# Exhibit 13

Moalem Weitemeyer
Advokatpartnerselskab
Amaliegade 3
DK-1256 Copenhagen

Tel. +45 7070 1505
moalemweitemeyer.com

CVR 3162 7885

**Moalem
Weitemeyer**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to all related dockets | Master Docket 18-md-02865 (LAK)<br><br>ECF Case |

## DECLARATION OF FOREIGN LAW OF HENNING AASMUL-OLSEN

**June 6, 2022**



| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

## Contents

I.      Introduction ........................................................................................................... 3

II.     Shares Of A Publicly Traded Company .............................................................. 4

     A.      Shares And Share Issuance .......................................................................... 4

     B.      Holding Dematerialised Shares ................................................................... 7

III.    Ownership Of Publicly Traded Shares ................................................................ 8

     A.      The *"nemo dat quod non habet"* doctrine ................................................. 8

     B.      The *"nemo dat quod non habet"* doctrine applies to dividends ................ 13

     C.      Other Conditions For Ownership Of Dematerialised Shares ..................... 14

     D.      ED&F Man – Recycling Of Shares ........................................................... 19

     E.      The Term "Beneficial Ownership" ............................................................ 21

IV.     Recent Danish Decisions ................................................................................... 22

     A.      The Bech-Bruun Decision .......................................................................... 22

     B.      Cases before the Danish Tax Tribunal ...................................................... 22

## Appendices

**Appendix 1**      Curriculum vitae of Mr. Henning Aasmul-Olsen

**Appendix 2**      Glossary

**Appendix 3**      Rules and regulations, literature and other materials considered

**Appendix 4**      Timeline for dividend distribution based on T+2 and T+3 settlement

**Appendix 5**      Cases referenced by Mr. Pilgaard

| Report of | : | Mr Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

## I.    Introduction

1.    My full name is Henning Aasmul-Olsen. I have written this declaration (the "**Declaration**") at the request of Hughes Hubbard & Reed LLP on behalf of the Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) (the "**Plaintiff**" or "**SKAT**"), to be submitted to the United States District Court for the Southern District of New York in the United States of America (the "**Court**") in the case no. 18-md-2865 (LAK) (the "**Dispute**").

2.    I am broadly trained and experienced in Danish law with specialist expertise in Danish securities laws, including corporate laws, and an LL.M. degree from University of Michigan. I am a partner with Moalem Weitemeyer Advokatpartnerselskab, a Danish law firm focused on transactional work and dispute resolution. I am head of the firm's Capital Markets and Corporate Finance practises. I have previously worked as an investment banker with Danske Bank, the largest Bank in Denmark, as executive director and co-head of the bank's corporate finance unit in Copenhagen. I have advised on multiple capital markets and public M&A transactions as legal counsel or financial adviser. I am admitted to the Danish Bar with the privilege of audience in the Danish Supreme Court. My Curriculum Vitae is attached as Appendix 1.

3.    The opinions rendered herein are opinions on legal matters and not on facts. I am entitled to render such opinions and qualified to do so on the basis of my knowledge of Danish law.

4.    My compensation for rendering this Declaration has been agreed on a per-hour fee basis. My compensation does not depend in any way on the opinions I have rendered.

5.    I have based my opinions exclusively on official rules and documents and certain facts noted in the "**Defendants**"[1] written submissions to the Court and certain facts, of which have been informed by the Plaintiff.

---

[1] The "**Defendants**" are Acer Investment Group, LLC, American Investment Group of New York, L.P. Pension Plan, Basalt Ventures LLC Roth 401(k) Plan, David Schulman, Doston Bradley, John van Merkensteijn, Michael Ben-Jacob, RAK Investment Trust, Richard Markowitz, Riverside Associates Defined Benefit Plan, RJM Capital Pension Plan, Roadcraft Technologies LLC Roth 401(k) Plan, Robert Crema, Robert Klugman, Roger Lehman, Ronald Altbach, Routt Capital Trust, Stacey Kaminer, The FWC Capital LLC Plan, The Proper Pacific LLC 401K Plan, and ED&F Man Capital Markets Ltd. (third-party defendant).

| Report of | : | Mr Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

6.   A "**Paragraph**" refers to a paragraph of this Declaration and an "**Exhibit**" refers to an exhibit to this Declaration, unless otherwise stated or the context requires otherwise. A glossary is set out in Appendix 2.

7.   The Danish regulations and rules, practice, literature, and material submitted in the Dispute, which I have reviewed for the purpose of this Declaration, are set out in Appendix 3.

## II.   Shares Of A Publicly Traded Company

### A.   Shares And Share Issuance

8.   Defendants' and Third-Party Defendant's Memorandum in Support of Motion for Summary Judgment in the Dispute dated April 29, 2022 ("**Defendants' Motion**") seems to suggest that a mere contract can either create or transfer ownership of shares in a Danish company, regardless of the existence of any shares underlying such contract. A book-entry by a custodian of a purchaser evidencing a purchase of shares would, according to the Defendants, in any event evidence ownership. The reasoning of the Defendants is: "*Because shares of Danish securities [sic.] are dematerialized, meaning that they exist only as electronic book entries and not as physical paper certificates, the book entries in the RJM Plan's account statements evidence the RJM Plan's ownership.*" Defendants' Motion pages 6-7 citing Declaration of Foreign Law of Kasper Bech Pilgaard in the Dispute ("**Pilgaard Decl.**") ¶¶ 151, 154, 157; see also Defendants' Motion pages 19-20.

9.   This assertion of the Defendants, if accurately understood, would be wrong. Danish law does not recognize that a share of a Danish company can be created by two parties trading in a vacuum[2]. Danish law requires as a condition to ownership of shares that such shares pre-existed independently of a trade.

10.   Fundamentally, a share in a Danish company is the ownership interest of a shareholder[3]. In Danish law, ownership provides a person the right to possess and use, and the right to contract over, any

---

[2] See Sorensen Dep. Vol II 14:3-25.
[3] Section 5, no. 16, of the Danish Companies Act, see Exhibit 11, and Appendix 1, Definitions, General, No 6, of the Danish Financial Statements Act, see Exhibit 12.

| | | |
|---|---|---|
| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

given asset, subject in all events to restrictions imposed by law[4]. For ownership to a share, this implies the right to exercise the shareholder rights, governance rights and financial rights, in the company available to shareholders under the articles of association and the Danish Companies Act and the right to sell, pledge and contract in every respect over such share[5]. The shareholder rights include governance rights such as, e.g., the right to attend, speak and vote at general meetings, and financial rights, such as, e.g., the right to receive dividends and proceeds upon liquidation. All of these shareholder rights are directly enforceable against the issuer under law and would affect not only the issuer but the rights of all other shareholders as well. Consequently, two persons trading "a share" must be trading a share that is recognized by the Issuer and the other shareholders as existing.

11.     All Danish businesses with shares admitted to public trading and official listing are limited liability companies. A company with limited liability must have a fixed share capital (denominated in DKK or Euro or any other permitted currency from time to time)[6]. The share capital cannot be floating or a minimum[7].

12.     Danish companies must stipulate the aggregate nominal share capital and either the number of shares or the nominal value of each share in the articles of association[8]. The information is registered by the Danish Business Authority and publicly available[9].

13.     As a matter of Danish law, it is not possible for a company to be held to have issued more shares than the number registered by the Danish Business Authority, as this would imply non-compliance with several fundamental corporate law requirements such as:

---

[4] Peter Mortensen: Indledning til tingsretten, page 61 onwards, see Exhibit 13, and Michael Elmer og Lise Skovby: Ejendomsretten, 1999, page 13, see Exhibit 14.

[5] Jakob Bundgaard: Skatteret & Civilret, 2006, pages 918-922, see Exhibit 15.

[6] Section 4 of the Danish Companies Act, see Exhibit 11. See also Sorensen Dep. Vol II 12:17-13:13 confirming that the amount of shares issued by a company will be a fixed amount in VP Securities' systems.

[7] See section 15, subsection 1, item 5 of the Danish Executive Order on Registrations, which provides the following when incorporating a limited liability company: *"Registration via the Danish Business Authority's self-registration solution on www.virk.dk for companies etc. or filing for registration of incorporation of a limited liability company shall at a minimum include the following [...] (5) the amount of the share capital and the method of payment, the amount of the paid in share capital if only part of the share capital or the premium has been paid in, cf. the Danish Companies Act section 40, subsection 2, and the size of any potential premium"*, Lars Bunch et al.: *Selskabsloven med kommentarer* (*En.* The Danish Companies Act with comments), 3rd edition, 2018, page 95, Exhibit 16, and Bernhard Gomard et al.: *Kapitalselskaber* (*En.* Limited liability companies), 8th edition, 2015, pages 130-131, Exhibit 17.

[8] The Danish Companies Act, section 28, item 3, see Exhibit 11.

[9] Now at https://datacvr.virk.dk/data/.

| Report of | : | Mr Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

- The requirement for the share capital and number of shares to be adopted by the general meeting (or the board of directors) of the company[10];

- The requirement for any share to be subscribed in writing[11]; and

- The requirement that all shares have been fully paid in or at least paid in by 25 per cent (plus the full premium) into the company[12].

14.     Moreover, if a company could be held to have issued more shares than the number registered by the Danish Business Authority, market uncertainty would be created in respect of the size of offer and demand available, total voting rights, total dividend rights, and the basis for per share derived financial metrics (e.g., earnings per share), all of which could lead to additional non-compliance with law, including violations of disclosure obligations.

15.     Upon adoption of the relevant corporate resolutions and registration with the Danish Business Authority, shares of publicly traded Danish companies will be issued in the systems of VP Securities[13]. In fact, publicly traded companies will provide in their respective articles of association that *all* shares of the same class are or shall be issued through VP Securities (or, generally, a central securities depository, a "**CSD**")[14]. As correctly stated in Pilgaard Decl. ¶ 149 the "book-entry" representing the issuance of shares by a Danish company refers to a book-entry in the systems of VP Securities, not a book-entry by a custodian of a purchaser as the Defendants seem to suggest in Defendants' Motion on pages 7 and 23.

16.     Accordingly, for shares issued in dematerialised form at VP Securities, at any given time, the total share capital and the total number of shares in any given share class will be registered by the Danish Business Authority and will match (a) the total share capital and the total number of shares created in the systems operated by VP Securities, and (b) if the shares are admitted to trading and official listing on Nasdaq Copenhagen, the total share capital and the total number of shares so admitted to trading and

---

[10] Sections 154 - 155 of the Danish Companies Act, see Exhibit 11.

[11] Section 163 of the Danish Companies Act, see Exhibit 11.

[12] Sections 33 and 158 of the Danish Companies Act, see Exhibit 11.

[13] VP Securities is currently the only CSD with a Danish license and was the only Danish licensed CSD in the Relevant Period. For the Relevant Period, and having investigated multiple Danish companies, I believe that all Danish companies with primary Nasdaq Copenhagen listings chose VP Securities as CSD in the Relevant Period.

[14] See, for example, Article 4.1, last sentence, of Novo Nordisk A/S' articles of association as amended latest on 27 April 2022, Exhibit 18.

| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

listing at Nasdaq Copenhagen[15]. No additional shares can be created anywhere without several corporate formalities at the initiative of the issuer (who will be compelled to grant shareholder rights enforceable by law by virtue of a shareholding), a registration by the Danish Business Authority and an issuance by VP Securities.

17.    The implication is that ownership of any share in a Danish company will refer to ownership of a share existing as book-entry in the systems of VP Securities, and it will moreover always refer to a share allocated to a specific account in the name of an "**Account Holding Institution**"[16] (sometimes being the end-investor and sometimes not) for an account in the systems of VP Securities[17]. A share issued in the systems of VP Securities will never leave such systems, not even if purchased by a non-Danish owner.

18.    Consequently, as a result of the facts set out in Paragraphs 11-17, two persons trading "a share" cannot create a share that has not been issued by a company and recorded in the systems of VP Securities.

### B.    Holding Dematerialised Shares

19.    The fact that all shares of a publicly traded company will be issued in the systems of VP, and all allocated to accounts in VP Securities, does not mean that dematerialised shares can only be held by persons registered in VP Securities. From a Danish law point of view, the person registered with VP Securities is not necessarily the ultimate owner of the shares. Shares can indeed be held by end-investors in a chain of custody down-stream from VP Securities.

20.    Since ownership to shares in any event requires the existence of such shares, and all shares are allocated to accounts in VP Securities, a share held in a chain of custodians downstream from VP Securities will, at any given time, originate from shares in an account in VP Securities allocated to an Account Holding Institution.  For a purported downstream shareholder to establish that it owns a share,

---

[15] See Sorensen Dep. Vol II 11:12-14:25 and 24:8-25:5.

[16] An "**Account Holding Institution**" is a Danish or foreign financial institution entitled and obliged to report for book-entry in the systems of VP Securities, see Sections 62 and 66 of the Danish Securities Trading Act, Exhibit 1.

[17] Except for certain shares temporarily unclaimed pursuant to Section 63 of the Danish Companies Act, Exhibit 11, and placed credited to a special VP account (bonus shares and residual shares from a replacement of certificated shares with dematerialised shares), Danish law does not permit shares of a publicly traded company to be unallocated in the systems of VP.

| | | |
|---|---|---|
| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

it must demonstrate upstream ownership at VP Securities, and then identify the recorded holding in every downstream custody level in such chain until it reaches its sub-custodian. For the conditions for ownership of shares, see Paragraphs 24-54.

21.     This is explicitly recognised in Section 72, subsection 2, of the Danish Securities Trading Act, see Exhibit 1 (applicable in the Relevant Period), noting that "*If the account holder keeps an account [in VP Securities] on behalf of one or more owners, this shall be registered by book-entry on the account*" (my insertion).

22.     The view is shared by VP Securities. In a note pursuant to CSDR Article 38(6), Exhibit 2, VP Securities has expressed that "*legal ownership to securities held by and in the name of a participant on behalf of an end-investor [...] also vests in the end-investor*"[18]. As a matter of financial regulations, the Danish Financial Business Act Section 72, Exhibit 3, when referring to omnibus accounts (*Da.* samledepoter), permits commingling of "instruments of customers" and provide that each customer may in the event of insolvency proceedings of a financial institution retrieve "its instruments" from such omnibus account subject to certain conditions[19].

23.     VP Securities operates three kinds of securities accounts: (1) an omnibus account, (2) an individual account, and (3) an end-investor account. Shares held in an individual account and an end-investor account are effectively segregated from shares belonging to other investors and participants in VP Securities[20] and are owned by the persons registered with VP Securities. For shares in an omnibus account, the owners would not be registered by VP Securities. Instead, the shares would be held by the owners in custody on an intermediated basis by a custodian or through a chain of custodians[21].

## III.     Ownership Of Publicly Traded Shares

### A.     The "*nemo dat quod non habet*" doctrine

---

[18] Note by VP Securities: "*Levels of segregation offered by VP SECURITIES A/S*", dated as of 17 August 2017, page 3, Exhibit 20.

[19] End-investor ownership is also recognized in case precedents, see Supreme Court ruling of March 20, 1997 (Ugeskrift for Retsvæsen. 1997.762H), Exhibit 19.

[20] See Note by VP Securities: "*Levels of segregation offered by VP SECURITIES A/S*", dated as of 17 August 2017, page 3, Exhibit 20. VP Securities operated similar account forms in the Relevant Period.

[21] See Sorensen Dep. 49:11-21.

| Report of | : | Mr Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

24.    Defendants' Motion appears to assert that a mere contract can transfer ownership of shares in a Danish company, regardless of whether or not the seller holds any shares or acquires any for delivery by the settlement date. The Defendants' view is that "*a purchaser owns shares and their associated dividends when he enters into a binding contract…*" and the fact that "[*t*]*here are no shares that are identified or held at accounts at that time, … is no matter because it is the contractual right that gives rise to beneficial ownership under Danish tax law.*" Defendants' Motion pages 23-24. Moreover, according to the Defendants, "*Danish law allows a custodian with equal and offsetting positions … to engage in "netting*" and internalized settlement (Pilgaard Decl. ¶¶ 204-208) such that the custodian does not need to obtain external shares in order to settle its customers' transactions", *Id.*

25.    Defendants' view is incorrect and conflicts with principles of Danish law expressing as a rule of law that a seller, who does not own an asset, is incapable of transferring ownership to a purchaser. These principles are fundamental property law and will be applied across asset classes, including dematerialised shares, and will be applied for purposes of tax laws requiring ownership to shares, see Paragraph 42.

26.    Danish law recognises as a non-statutory legal principle the "*nemo dat quod non habet*" ("no one gives what they do not have") doctrine. Being a principle of law, the Danish courts would apply the doctrine in rulings and, if the asset has been sold by persons with flawed ownership, order repossession in favour of the original owner of an asset[22].

27.    As described in Paragraph 10, ownership generally provides a person with the right to possess and use, and the right to contract over, any given asset, subject in all events to restrictions by law.

28.    Naturally, a person can only legally contract for any given property in accordance with the terms and conditions agreed *inter partes* with the person conveying such property to him. This is true, regardless of whether such property right is absolute or partial. That is to say, a person A can only transfer a

---

[22] This principle is manifest in *Danske Lov* passed by King Christian V on April 15, 1683, Section 6-17-5 (my translation): "*If anybody purchases stolen goods and the owner reclaims the goods, then he who purchased (lawfully and witnessed) shall prove that he in fact purchased the goods and under oath swear that he is neither a thief nor a thief's accomplice and do not know where his seller was and still shall have lost the property. If he who purchased can find his seller, then he can claim damages.*" The principle dictates that an owner of stolen goods will have a claim for repossession of the stolen goods from subsequent resellers. In effect, this rule of law underpins the *nemo dat quod non habet* principle since a right for the owner to repossess an asset means that a person purporting to convey ownership in a downstream chain to something he does not lawfully own by definition cannot do so.

| Report of | : | Mr Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

right to another person B, if A actually holds the right. Accordingly, if person A had no ownership rights, it would not be able to transfer or convey any ownership rights to a buyer, B. Generally, this entails that A can only dispose of its *own* property rights[23]. If the right in question is a pledge, A can only transfer the pledge – not the absolute ownership to the pledged asset, just as a lessee of a car would only be capable of transferring the use right to the car, not the ownership right to the car.[24]

29.     The above views have been articulated in the general Danish law principle that *"a purchaser does not acquire better rights than its seller"*. This principle is manifest in Section 27 of the Danish Debentures Act which has the following wording:

> "If an ordinary debenture is transferred or pledged, the acquirer does not obtain better
> rights than the transferor, unless explicitly provided for by law."

30.     An example of use of Section 27 is in the Western High Court ruling of 19 December 1963[25], Exhibit 4, where R arranged for D to borrow DKK 4,000 from M. D issued a debenture to M with a guarantee from K. However, as M did not want to provide the loan, R instead used his daughter B's funds – which he managed – to provide the loan. R subsequently arranged for M to transfer the debenture to B. Later, B redeemed the loan and required immediate and full payment from D and K. However, as the loan was never provided and thus did not exist, the court held that M was not capable of transferring the debenture to B. The court held that M was incapable of conveying a right that did not exist to B and as K had not accepted that the guarantee covered a debt to B, K was released from repaying the loan to B. Consequently, the court applied the *"nemo dat quod non habet"* doctrine to the transfer of the debenture with the result that it could not be transferred as it did not exist in the first place.

---

[23] See Henry Ussing: *Aftaler,* 1978, pages 264-265, Exhibit 21. In addition, a contractual entitlement may imply that a person can dispose of another person's asset(s). This would be the case, e.g., at a sale by a pledgee of pledged asset(s) in enforcement proceedings after default by pledgor.

[24] See W.E. von Eyben: *Formueretligheder,* 1972, page 25, Exhibit 22, and Henry Ussing: *Aftaler,* 1978, page 264, Exhibit 21.

[25] Reference: Ugeskrift for Retsvæsen.1964.307V, Exhibit 4.

| Report of | : | Mr Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

**Moalem Weitemeyer**

31.     There is consensus in Danish legal theory that the "*nemo dat quod non habet*" doctrine applies not only to ordinary debentures and claims, but universally to transactions involving property rights[26]. By definition it is irrelevant whether or not a transfer of an asset, which a seller does not own, is valid[27]. Invalidity of a contract is based on a set of specific grounds in Danish law, but lacking ownership is an even more fundamental flaw causing any agreement for transfer to be ineffective in transferring title in the first place without the need to invoke a specific validity ground[28]. As the seller does not have any legal control over the asset, it cannot dispose of it and the question on whether or not the transfer is valid does not arise.

32.     If a seller contracts to transfer shares that it does not own, the seller is liable to the purchaser on an objective basis[29], *i.e.* seller would be contractually liable without any negligence or "*scienter*" required on seller's part.  But that would not create ownership rights for the purchaser to any shares.

33.     As noted, the "*nemo dat quod non habet*" principle has a broad reach to any property right in any asset class. For example, the Supreme Court ruling of 20 March 1974[30], Exhibit 5, confirms that the principle applies to a slot machine. In this case, a seller A had sold a slot machine to a purchaser B with title reservation (*Da.* ejendomsforbehold). B resold the slot machine to C and received the purchase price without paying A. The Supreme Court held that the title reservation was valid, and that C did not become the owner – despite the purchase agreement and payment of purchase price – as B, from which he derived his right, was not the owner of the slot machine. Consequently, A retained its title to the slot machine.

34.     The legal principle applies to dematerialised shares registered with VP Securities. In a ruling from the Maritime and Commercial High Court of 9 May 1994[31], Exhibit 6, a stockbroker firm had

---

[26] See Lennart Lynge-Andersen, Peter Møgelvang-Hansen og Anders Ørgaard: *Gældsbrevsloven med kommentarer (En.* The Danish Debentures Act with commentaries), 2007, page 184, Exhibit 23, Henry Ussing: *Obligationsretten – Almindelig del (En.* The Law of Obligations – Ordinary Part), 1967, page 211, Exhibit 24, and Peter Mortensen, *Indledning til Tingsretten (En.* Introduction to the law of property), 2nd edition, 2009, page 148, Exhibit 13.

[27] See Lennart Lynge-Andersen, Peter Møgelvang-Hansen og Anders Ørgaard: *Gældsbrevsloven med kommentarer,* 2007, page 184, Exhibit 23.

[28] Which is consistent with the statement by the Maritime and Commercial High Court in the case referred to in Paragraph 34.

[29] Section 59 of the Danish Sales of Goods Act, Exhibit 25, on defective title. This rule of law *a priori* confirms that defective title of the seller will prevent ownership of the purchaser of an asset. The purchaser is instead entitled to claim damages.

[30] Reference: Ugeskrift for Retsvæsen.1974.363H, Exhibit 5.

[31] Reference: Ugeskrift for Retsvæsen.1994.719Ø, Exhibit 6.

| | | |
|---|---|---|
| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

unlawfully registered a client's shares in its own name. Shortly after, the broker firm went bankrupt. The bankruptcy estate claimed that the estate had ownership to the shares, as it was registered with VP Securities and, thus, had perfected its ownership rights in accordance with the then applicable perfection requirements[32]. The court held that the registration of the shares in the broker firm's own name was unlawful as the broker firm did not own the shares and awarded ownership to the client. The ruling did not address a contractual transfer of ownership from a transferor with no rights, but a conflict between the owner and the bankruptcy estate of the person registered being one step further down the chain of transfers from the transferor. In my view, the ruling would have been the same, had the broker firm sold the shares to a third party.

35.     It is true that in certain circumstances Danish law permits netting and internalized settlement among several customers of the same custodian without compromising a purchaser's ownership rights[33]. For regulatory requirements, see Paragraph 51 and 53. However, netting and internalized settlement are premised on the custodian holding actual shares. If none of the sellers having accounts with the custodian own (or has contracted to own) any share of the relevant class, none of the sellers are capable of conveying ownership to any purchaser under the "*nemo dat quod non habet*" principle, and any "net" or "internalized" settlement would not cause a transfer of ownership of any shares to the custodian's purchasing customers. Similarly, if the total number of shares owned and ultimately sold by net-sellers is insufficient to cover orders of net-purchasers, netting and internalised settlement will not be possible at all, or at least not be possible for the unsatisfied portion of the net-purchase orders, as a result of failure to deliver the full amount of the shares or segregate the shares, see Paragraph 16[34].

---

[32] The perfection requirement was provided for in Sections 8 and 11 of the Danish Act on Central Securities Depositories, which was repealed and replaced by identical provisions in Sections 66 and 69 of the Danish Securities Trading Act, Exhibit 1.

[33] Netting or internalised settlement does not change the requirement for segregation and delivery of shares (see also Sorensen Dep. 16:1-9). While Article 3 of the Settlement Finality Directive, Exhibit 26, does allow for netting, Article 3 sets out as a condition for enforceability and binding effect on third parties that transfer orders have been entered into a system. Pilgaard Decl. ¶ 205 is incomplete and fails to state that condition. Pursuant to Article 3, the transfer orders must be entered into a system before the moment of opening of the insolvency proceedings, see also Danish Securities Trading Act Section 57, Exhibit 1, which transposed article 3 in the Relevant Period. Prior to settlement, VP Securities performs clearance based on preadvice from the parties to a trade. VP Securities believes that some protection of ownership is available from clearance and clearance in the systems of VP Securities likely meets the standard for segregation under Danish law. In clearance, the preadvices are matched if the purchase price and the settlement date correspond. Then the transfer order is deemed final, cleared and "entered into" the systems of VP Securities. At this point, the transfer order cannot be cancelled or revoked unilaterally by either of the parties, a VP participant or a third party.

[34] See Sorensen Dep. Vol II 28:21-28:25.

| | | |
|---|---|---|
| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

36.     Pages 15-18 of Plaintiff's Motion describes a series of circular transactions, in which a seller that does not hold shares contracts to sell shares to a pension plan that also does not hold shares. The seller purports to borrow the same shares to cover the sale to the pension plan by borrowing (through intermediaries) from the pension plan itself. By application of "*nemo dat quod non habet*" principle, where neither the seller nor the pension plan had any shares to begin with, the seller could not transfer any ownership interest.

**B.     The "*nemo dat quod non habet*" doctrine applies to dividends**

37.     Dividends are a distribution of equity made by a company to the owners of its shares, its share-holders[35]. Dividends are declared by way of a corporate resolution of the general meeting (or by the Board of Directors with special authority granted by the general meeting) at no consideration and, as of the time of declaration, (a) generates an enforceable right to the dividends for the shareholders against the company, (b) depletes the reserves distributed, and (c) creates a liability for the company in the amount declared. Publicly traded companies can only pay *dividends* through VP Securities[36]. The dividend distribution will be made as set out in Appendix 4.

38.     For persons not registered with VP Securities, the holding of shares and remittance of dividends at any level of custody in a downstream chain of custodians will be governed by a custody services agreement made between such persons and the custodians. In my view, however, any entitlement to dividends will require ownership of shares as a prerequisite for receipt. This is a consequence of the dividend construct under Danish law, being a corporate distribution of equity to shareholders, and this

---

[35] Sections 179 through 184 of the Danish Companies Act, Exhibit 11.

[36] A prerequisite for registration with VP Securities is that dividends are paid through VP Securities in accordance with its rules, see page 293 of VP Securities' System Guidelines, 19 December 2011, Exhibit 27, and page 5 of VP Rules A-D, applicable as of 17 June 2013, Exhibit 28, where VP Securities refers to Section 71, subsection 2, of the Danish Securities Trading Act, Exhibit 1, and adds that: *"[…] An issuer's provisions [in its articles of association] that prescribe payments [of interest, dividends and capital] in a different way, i.e. by registration in the share-holders' register, are not in accordance with the procedure for dematerialised assets."* (my insertions and emphasis) VP Securities further states that: *"Consequently, it is a condition for registration of dematerialised securities with VP Securities that the terms of the securities allow VP Securities to act as a payment intermediary [of interest, dividends and capital]"* (my insertions and emphasis).

Moalem
Weitemeyer

| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

construct must be determined under Danish law notwithstanding any choice of law in a custody services agreement[37].

39.    If, by reason of the "*nemo dat quod non habet*" principle or any other legal impediment, a person does not become an owner of shares, they will not obtain the right to receive a dividend as detailed in Paragraph 38. Accordingly, any payment received by such person from its custodian (either directly or on behalf of a seller) will not, in my view, be *dividends*.

### C.    Other Conditions For Ownership Of Dematerialised Shares

40.    Defendants' Motion asserts that ownership to a share passes on conclusion of a final and binding agreement. In particular, in the view of the Defendants, delivery of shares or settlement of the trade, is not a precondition of ownership under Danish tax law, Defendants' Motion pages 7 and 19 citing Pilgaard Decl. ¶¶ 155-170. That is incorrect[38].

41.    Under Danish law, a contract to purchase a dematerialised share will not be effective *inter partes* to transfer ownership until the delivery of such share or the completion of other means of segregation of such share from other similar shares for the benefit of the purchaser[39]. Until delivery, the purchaser will not be able to exercise any shareholder rights.

42.    The Defendants have specifically referred to Danish tax laws when alleging that a final and binding contract suffices to transfer ownership. The ownership construct for shares is the same in Danish tax laws and in Danish civil law. If a seller does not own anything in civil law, there is no construct in tax laws that allows the seller to create an asset or transfer ownership[40].

---

[37] See ISSA's "*Report on Inherent Risks within the Global Custody Chain*", February 2017, page 23, section 3 3, Exhibit 29: "*[…] the ability for an investor to gain access to their assets will depend on their rights in respect of i) the law of the country where the assets are issued (the law of incorporation of the securities (governing law) ii) the country where they are held in custody and iii) the law of the local CSD.*" See also the European Post Trade Forum Report of 15 May 2017, page 85, Exhibit 30: "*… there are no harmonised EU rules on the legal position of the end investor in book entry securities. Across the EU, Member States have developed legal mechanisms which are intended to ensure that an end investor enjoys in rem "ownership" of securities, notwithstanding that a chain of intermediaries may separate the end investor from the issuer. These mechanisms work reasonably well within each Member State. But the mechanisms differ from each other, and can come into conflict if the chain of intermediaries crosses borders. The lack of harmonised rules on the end investors' legal position in cross-border settings constitutes a barrier to the CMU.*"

[38] See also Sorensen Dep. 64:24-65:7.

[39] See Note by VP Securities: "*Levels of segregation offered by VP SECURITIES A/S*", dated as of 17 August 2017, Exhibit 20: "*Danish law provides that legal ownership of securities vests in the end-investor having acquired title to and received the relevant securities*" (my emphasis).

[40] See Jakob Bundgaard: *Deltagelse i kapitalselskaber – aktionærbegrebet i selskabsretlig og skatteretlig belysning*, 2006, SPO 2006.17, page 7, Exhibit 31. See also Anders Nørgaard Laursen *Kommentarer til udvalgte afgørelser – SKM2016.281.HR*, 2016, RR.SM.2016.0101, page 3,

| | | |
|---|---|---|
| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

43.     Dematerialised shares in book-entry form are globally recognized as fungible (just as cash). The shares are data in computing systems with no distinction between them. In the context of a sale and purchase, dematerialised shares represent a generic asset class (as opposed to a specific asset) as used in the Danish Sale of Goods Act meaning that a seller of a dematerialised share can perform the sale and purchase contract by delivery of any share in the same class issued by the company in question[41].

44.     In Danish law, a contract to sell and purchase a dematerialised share will, in and of itself, not be effective to transfer ownership. At inception, the contract will, if valid and binding, be deemed an obligation for the seller to deliver any similar share issued by the relevant company at the agreed time. This will be tantamount to a claim against the seller, not ownership, and the purchaser will be unable to require specific performance for an identified, specific asset[42]. In those circumstances, ownership will not pass, and the purchaser will not from contract inception be able to exercise any shareholder rights afforded by law and the articles of association in a company. Since the contract is binding and valid, the purchaser will have remedies for seller's failure to deliver. Such remedies will include damages and could potentially include specific performance for delivery of any similar share to the one purchased.

45.     To recognise ownership vested in a purchaser, Danish law, like other jurisdictions[43], requires segregation (*Da.* individualisering*)* from other assets of similar type belonging to the seller or

---

[41] See Søren Theilgaard et al: *Købeloven – med kommentarer*, 2017 (4. udgave), page 81, Exhibit 34.

[42] See Peter Mortensen: *Indledning til tingsretten – tredjemandskonflikter vedrørende løsøre*, 2. edition, 2008, pages 83, 86 and 226, Exhibit 13. On page 83, Peter Mortensen states: *"On the other hand, if the promise relates to a non-specified service – e.g., delivery of a batch of a specific product (genus) or payment of a sum of money – this is not a transfer. The promise creates a claim on a benefit (the shipment or the sum of money), but it does not relate to any specific property (real estate, chattel, promissory notes, etc.) after which the promise cannot be said to transfer the right to a property to the promisee. If the promisor does not fulfil his promise, the promisee may not demand that certain goods be handed over, but can only in general (e.g., by outlay) seek fulfilment in the promisor's assets. Only when a binding segregation of the benefit is made – e.g., separation and labelling of specific goods to fulfil the promise – the right to the separated goods is transferred to the transferee".* Similarly, VP Securities has noted that *"Danish law provides that legal ownership of securities vests in the end-investor having acquired title to and received the relevant securities"* (my emphasis), Note by VP Securities: *"Levels of segregation offered by VP SECURITIES A/S"*, dated as of 17 August 2017, Exhibit 20. In the same note, VP Securities has for omnibus accounts noted: *"However legal ownership to securities kept in an omnibus account requires the investor to be able to prove ownership when the assets have been commingled with similar assets belonging to other investors and/or the participant's own assets. The participant is obliged by Danish law to maintain a register (account) for each client showing such legal ownership to the securities. Provided that the participant has acted prudently the end-investor should be able to provide such proof of ownership. A transfer of an account to another participant cannot be completed before the client has proved ownership to the securities towards the estate."*

[43] For an international perspective with emphasis on trading in omnibus accounts, see Chapter 9 in Matthias Haentjens et al.: European Banking and Financial law, 2015, Exhibit 35.

| | | |
|---|---|---|
| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

commingled in the custody of a custodian. This applies *inter partes*, not only as a mean of perfection to protect from third parties as inaccurately stated in Pilgaard Decl. ¶ 153.

46.     Segregation is the standard for recognising ownership to assets that are *commingled* in the hands of a seller or a custodian[44]. Segregation is irrelevant if the seller or the custodian has no assets of the relevant type. The Defendants have stated that a "custodian *does not need shares* for an investor to be the owner of them", Defendants' Motion page 55. I disagree. A custodian downstream from VP Securities must hold shares that can be traced upstream through every level of custody until the VP Securities level *and* in every such level the shares must be segregated, see also Paragraphs 51-53. If either of the two fails, the investor will have no ownership.

47.     I understand that Defendants claim ownership to Danish securities through certain custodians associated with Sanjay Shah (the "**Solo Custodians**").  If the Solo Custodians held Danish shares for the Defendants, those would need to be held both at VP Securities and all intermediate sub-custodians between the Solo Custodians and VP Securities. I understand that Sanjay Shah, the principal behind the Solo Custodians, and the Solo Custodians' counsel, identified several such sub-custodians.  If those sub-custodians did not hold any shares for the Solo Custodians, then it is impossible as a matter of Danish law for the Defendants to own the Danish shares they claimed to own.

48.     Delivery of a share at settlement of a trade is obviously adequate segregation[45]. Such delivery at settlement concludes the trade *inter partes* and to the rest of the world. The appropriate method of delivery will depend upon the way the share is issued and held. Possibly, there could be other segregation measures that do not qualify as delivery of a share, but which would be sufficient segregation to transfer ownership. The successful completion of clearance for shareholdings registered to the name of the owner in VP Securities is likely one.

---

[44] The rightsholder must prove that the standard for segregation is satisfied. Crucial are; whether (i) there has been a separation of objects that (ii) corresponds to the agreed, if (iii) the separation has authority (in the parties' agreement or special legal provisions), if (iv) the purchaser has been notified of the separation, and (v) if the separation appears to be "ordinary" or "binding". See Michael Elmer et al, *Ejendomsretten 1*, 4th ed. 1999, page 51-60, Exhibit 36, with reference to Supreme Court ruling of 28 May 1954 (Reference: Ugeskrift for Retsvæsen 1954.673H) and see also Ulrik Rammeskov Bang Pedersen: "*Rettigheder over værdipapirer. Individualisering og sikringsakt*" in Juristen no. 4 – 2004, page 178, Exhibit 37.

[45] See Note by VP Securities: "Levels of segregation offered by VP SECURITIES A/S", dated as of 17 August 2017, Exhibit 20: "*Danish law provides that legal ownership of securities vests in the end-investor having acquired title to and received the relevant securities*" (my emphasis).

| | | |
|---|---|---|
| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

49.    For shares held in individual accounts and end-investor accounts made at VP Securities, shares will be registered to the name of each investor as from delivery, i.e. the concurrent time of settlement of the trade and registration for perfection purposes[46]. As from that time, the ownership of such named investor will be deemed effectively segregated[47].

50.    For shares held in omnibus accounts at VP Securities, there will be no registration in VP Securities to the name of each investor, and investors would have to rely on other means of segregation. This comes in the form of registers maintained by financial institutions acting as Account Holding Institutions in VP Securities. Under Section 72(3) of the Danish Financial Business Act, Exhibit 3, each such financial institution must maintain a register for each client showing the client's legal ownership to the shares, and under Section 72(7) of the Danish Financial Business Act, Exhibit 3, such register, if kept properly in accordance with law, will permit each client to retrieve its shares in case of insolvency proceedings[48]. In addition to maintenance of a register, financial institutions must (1) advise clients on the legal effects of the omnibus account, and (2) procure an express consent to the omnibus account from the client.

51.    The obligation to maintain a register (and the other regulatory requirements set out in this Section III.C) also applies to financial institutions acting as sub-custodians downstream from VP Securities and being subject to Danish law[49]. In case of a chain of custodians, each custodian must satisfy the obligation to maintain a properly kept register or, if not, the ownership of the end-investor is at risk.

---

[46] Prior to settlement, VP Securities performs clearance based on preadvice from the parties to a trade. VP Securities believes that some protection of ownership is available from clearance. The preadvices are matched to ascertain whether the purchase price and the settlement date correspond. Then, if the validity period specified in the instruct coincide, the transfer order is deemed final and entered into the systems of VP Securities (VP Securities' Clearing rules, 24 June 2013, page 8, Exhibit 38, and the Danish Securities Trading Act Section 57 c, subsection 1, item 1), Exhibit 1. At this point, the transfer order cannot be cancelled or revoked unilaterally by either of the parties, a VP participant or a third party (VP Securities' Clearing rules, 24 June 2013, page 8, Exhibit 38 and the Danish Securities Trading Act Section 57 c, subsection 1, item 2), Exhibit 1. Consequently, the transfer order is now "ready for settlement". Should a participant in VP Securities' system file for bankruptcy or become subject to a similar insolvency event, if a transfer order which involves the participant is deemed "ready for settlement", VP Securities will complete settlement of the transfer order; provided that the transfer order is deemed "ready for settlement" prior to VP Securities' receipt of the notice of bankruptcy or similar insolvency event (VP Securities' Clearing rules, 24 June 2013, page 8, Exhibit 38).

[47] See Note by VP Securities: "*Levels of segregation offered by VP SECURITIES A/S*", dated as of 17 August 2017, Exhibit 20. See also Ulrik Rammeskov Bang Pedersen: "*Rettigheder over værdipapirer. Individualisering og sikringsakt.*" in *Juristen no. 4 – 2004*, pages 176-189, Exhibit 37.

[48] *Id.* and Thomas Brenøe et al.: *Lov om finansiel virksomhed (En.* Danish Financial Business Act with commentaries), 2019, pages 418-419, Exhibit 39.

[49] The rules will also apply in the other EU Member States as Section 72 of the Danish Financial Business Act, Exhibit 3, implements MIFID II, Articles 16 and 23, Exhibit 40. International market practise is represented in ISSA: *Financial Crime Compliance Principles for Securities Custody and Settlement,* dated August 2015, Exhibit 41.

| Moalem Weitemeyer | Report of | : | Mr Henning Aasmul-Olsen |
| | Specialist field | : | Danish Law |
| | Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| | Prepared for | : | United States District Court, Southern District of New York |

52.     As a matter of Danish law, ownership of the end-investor to shares must be supported by agency relations in the entire chain of custody. If all custodians were subject to Danish law, there would be an additional requirement of *segregation* in each link of the chain for the end-investor's ownership to be recognized. It is evident from industry best practices, recommendations, and studies[50] that a similar requirement of *segregation* in each link applies in many other jurisdictions for an end-investor to be able to claim ownership to securities held by a custodian, be it a global or a sub-custodian[51].

53.     If, as the Plaintiff claims[52], the Solo Custodians had no Danish shares, and no seller ever delivered any actual shares to any purchaser for the benefit of the Solo Custodians, then under Danish law a contract to sell shares that such seller does not have and never delivers cannot convey any ownership of any kind over shares in any Danish company.  If the Solo Custodians' sub-custodians held no shares for the Solo Custodians, then no shares were delivered to the Solo Custodians' customers.

54.     Pilgaard's contrary view alleging that ownership is transferred at the time of a final and binding agreement without delivery of shares, see Pilgaard Decl. ¶¶ 156-157 is based upon Skatteforvaltningen's Legal Guide and a series of judicial decisions set out therein and outlined in Pilgaard Decl. ¶¶ 158-170. Neither the Legal Guide nor the decisions support Pilgaard's view. The issue addressed in the Legal Guide and the decisions was *not* the conditions for transfer of ownership but rather the *effective time* for tax purposes in circumstances where the conditions for transfer of ownership *unquestionably* are and

---

[50] European Post Trade Forum Report, 15 May 2017, IOSCO Recommendations Regarding the Protection of Client Assets – Final Report, January 2014, Exhibit 30, ISSA Report on Inherent Risks within the Global Custody Chain, February 2017, Exhibit 29, and Association for Financial Markets in Europe, Post Trade Division: Client Asset Protection Task Force – AFME Principles on Asset Segregation, Due Diligence and Collateral Management, September 2016 ("**AFME Principles on Asset Segregation**"), Exhibit 42.

[51] *Segregation* was the EU wide standard for ownership in the Relevant period absent a legislative harmonisation of ownership requirements in the Member States, see *European Post Trade Forum Report*, 15 May 2017, page 85, Exhibit 30, where the following is further provided for: *"There are no harmonised EU rules on the legal position of the end investor in book entry securities. Across the EU, Member States have developed legal mechanisms which are intended to ensure that an end investor enjoys in rem "ownership" of securities, notwithstanding that a chain of intermediaries may separate the end investor from the issuer. These mechanisms work reasonably well within each Member State. But the mechanisms differ from each other and can come into conflict if the chain of intermediaries crosses borders."* The International Organization of Securities Commissions (IOSCO) recommended action by custodians to safeguard clients' securities by measures to control *segregation*. For example, the IOSCO Recommendations Regarding the Protection of Client Assets, Exhibit 43, not only provide for the custodian itself to maintain arrangements to safeguard client assets (Principle 3 of the IOSCO Recommendations Regarding the Protection of Client Assets) – they also require continuous review of the arrangements for safeguarding client assets implemented by any third-party custodian, which the custodian has engaged to hold its clients' assets (*Id.,* explanatory note 3 to Principle 3). See also ISSA's report on the Inherent Risks in the Global Custody Chain, which provides for ongoing validation and reconciliation procedures to be implemented by each custodian in the chain (ISSA's report on the Inherent Risks in the Global Custody Chain, pages 9-10 and 34, Exhibit 29). The AFME Principles on Asset Segregation requires full segregation for internal accounts (accounts opened on the books of the custodian to reflect the holdings its clients have with it) and segregation between proprietary assets and securities held on behalf of customers for external accounts (accounts, which are accounts opened by the custodian with a third party custodian) (page 13 of the AFME Principles on Asset Segregation, Exhibit 42).

[52] See page 40, section VI A, subsections 132-138, Expert Report of Bruce G. Dubinsky, where the Plaintiff's forensic expert Bruce G. Dubinsky describes how the Solo Custodians and their sub-custodians never held any shares.

| Report of | : | Mr Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

were satisfied[53]. This is evident in the Legal Guide Section C.B.2.1.6.1, Exhibit 7, explicitly defining timing as the scope for the commentary: "*The section describes when a share is acquired or disposed of*" (my emphasis). The legal decisions all rule on facts where the trades were completed and no issue of lack of segregation was relevant as they all were private companies with materialized shares. The timing aspects of taxation was also the only issue before and ruled on by the Supreme Court in SKM2001.126[54], Exhibit 8. The Supreme Court ruled that ownership passed at the time of issue of a broker trade confirmation[55] but that cannot be construed to imply that the conditions for ownership were met by virtue of the trade confirmation[56].

55.     Consequently, both the guidance and the case law referred to by Pilgaard deal with instances where (i) the seller of the share owned the share(s) transferred, and (ii) the share sale and purchase was ultimately completed by delivery of the shares, possibly after exercise of a put or call option, and are thus irrelevant in the context of determining *what* is required to transfer ownership to dematerialised shares.

### D.     ED&F Man – Recycling Of Shares

56.     According to the Rosenblatt Investigation Report, dated 16 September 2019, Exhibit 10, submitted to the FCA on behalf of ED&F Man, ED&F settled the trades of all shares in the so-called Annex E trades[57] by recycling a much smaller number of shares that ED&F held in custody with BNP Paribas multiple times over the course of the settlement day, see pages 8-10, sections 5-7, of the Rosenblatt Investigation Report. While delivering and redelivering the same shares over and over again may have

---

[53] See Appendix 5 for a brief description of the cases referenced by Mr. Pilgaard.

[54] Ugeskrift for Retsvæsen 2001.893H, Exhibit 8. The case before the Western High Court contains the argumentation of the High Court, which the Supreme Court wholly agrees with and refers to (Western High Court Ruling of 25 November 1999, section 6, B-2838-97, Exhibit 9).

[55] A broker trade confirmation would normally refer to a trade confirmation for listed shares. However, this was not the case in this Supreme Court Ruling, as the ruling concerned shares in a private limited liability company, the shares of which cannot be listed in Denmark.

[56] In the Defendant's pleading for the Danish Tax Tribunal, see Sections 65-71, Pilgaard refers to the preparatory works to the Danish Taxation of Capital Gains on Shares Act (see page 117 of Decision of the Danish Tax Tribunal, *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312) Exhibit 45). However, the preparatory works merely confirm that it is solely the *effective time* for tax purposes that is determined by the entry into of a final and binding sales agreement. See also Sorensen Dep. 61:22-24 where Sorensen states that no book entry is made in VP Securities on the trade date.

[57] As I understand based on information provided by the Plaintiff, the "Annex E trades" are the trades which formed the basis for the tax vouchers produced by ED&F Man, as particularised in Annex E to ED&F's Amended Defence in the English litigation, in order to receive dividend tax refunds from the Plaintiff.

M Moalem
Weitemeyer

| Report of | : | Mr Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

been effective to settle outstanding trades, this recycling of the same shares in the course of intraday settlement cannot - as a matter of Danish law - create shares or dividends.

57.     As I noted above in Paragraph 16, for dematerialised shares, at any given time, the total number of shares in any given share class will be registered by the Danish Business Authority and will match the total share capital and the total number of shares created in the systems operated by VP Securities. No additional shares can be created anywhere without several corporate formalities at the initiative of the issuer, and under Danish law a custodian cannot create additional shares by recycling them for settlement purposes.

58.     Similarly, no additional dividends can be created anywhere without several corporate formalities at the initiative of the issuer, and under Danish law a custodian cannot create additional dividends by recycling shares for settlement purposes. Under Danish law, a proposal by the Board of Directors, and a resolution adopted by the general meeting by which dividends are declared, will express a specific amount for the total amount of dividends declared, and, in most cases of publicly traded companies, the dividend per share in Danish Kroner. The numeric expression is a fixed figure, not an interval or range, and it will be easily identifiable both in the proposal and the resolution. For listed companies, the amount of dividends proposed and declared will be announced to the market in a formal company announcement both at the time of proposal and adoption. In sum, a dividend issued by a company is a fixed amount that cannot be changed by the actions of market participants.

59.     Companies can only pay *dividends* through VP Securities[58]. The payment by VP Securities (net of WHT) discharges the company and VP Securities (if made in good faith and save for forgery or duress)[59]. Once payment has been completed by VP Securities, the company has no additional obligations in respect of the dividend distribution and any legal right against the company that the shareholders had in respect of dividends will have terminated. The amount set forth in the corporate resolution as the

---

[58] A prerequisite for registration with VP Securities is that dividends are paid through VP Securities in accordance with its rules, see page 293 of VP Securities' System Guidelines, 19 December 2011, Exhibit 27, and page 5 of VP Rules A-D, applicable as of 17 June 2013, Exhibit 28, where VP Securities refers to Section 71, subsection 2, of the Danish Securities Trading Act, Exhibit 1, and adds that: *"[…] An issuer's provisions [in its articles of association] that prescribe payments [of interest, dividends and capital] in a different way, i.e. by registration in the shareholders' register, are not in accordance with the procedure for dematerialised assets."* (my insertions and emphasis) VP Securities further states that: *"Consequently, it is a condition for registration of dematerialised securities with VP Securities that the terms of the securities allow VP Securities to act as a payment intermediary [of interest, dividends and capital]"* (my insertions and emphasis).
[59] Section 71, subsection 2, of the Danish Securities Trading Act, Exhibit 1.

| | | |
|---|---|---|
| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

*dividends* declared will (absent a default by the Company, a default by VP Securities or non-discharging payments by VP Securities) be the same amount as the aggregate amount paid by VP Securities as discharging and no other payment by a company of *dividends* would be lawful. So, while the *dividends* in the corporate law meaning express the equity distribution of distributable reserves to the shareholders, the cash flow associated with the *dividends* (in the exact same amount) will necessarily come by way of VP Securities' payment.

60.     Any trading in the underlying shares on or about the declaration date or contractual arrangements in respect of dividends is legally of no consequence to the company distributing the dividends. No additional dividends will be created since, from the point of view of the company, the carrier of the dividend is the underlying share, not any particular shareholder or holder of dividend rights, and the number of shares is constant irrespective of trading or assignments[60]. Accordingly, a custodian cannot create additional dividends by recycling the same shares multiple times to settle multiple purchases on the same day.

### E.     The Term "Beneficial Ownership"

61.     The Defendants' Motion sometimes refers to the term "beneficial ownership" in the context of ownership to shares, see, e.g. pages 21 and 23. The term "beneficial ownership" as used in the "**Double Taxation Convention between Denmark and the United States of America**"[61] is a construct defining recipients of payments, primarily dividends, for the purpose of allocating taxation between the two nations.

62.     As already noted in Paragraph 42, the ownership construct in Danish tax laws and Danish civil laws is the same and has the meaning set out in the opinions herein. The concept of "beneficial ownership" is not a Danish law concept and does not denote a special form of ownership for shares issued by

---

[60] As a general rule, the Danish Companies Act attaches the right to receive dividends to shares rather than shareholders, see for example Sections 158, item 4, 159, subsection 3, item 3, 162, subsection 3, 237, subsection 3, item 4, and section 326, subsection 3, item 4, Exhibit 11. The articles of association of companies do the same either explicitly or implicitly.

[61] The Convention between the Government of the United States of America and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Estates, Inheritances, Gifts and certain other Transfers of 27 April 1983 with subsequent amendments the latest being the Protocol Amending the Convention between the Government of the Kingdom of Denmark and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income of 2 May 2006.

| Report of | : | Mr Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

a Danish company. In particular, "beneficial ownership" does not imply that two trading parties can create a share of a Danish company or a dividend that does not exist. If shares or dividends do not exist, they cannot be owned, beneficially or otherwise. Danish law does not recognize ownership of shares or dividends that do not exist.

## IV.  Recent Danish Decisions

### A.  The Bech-Bruun Decision

63.  The issue in the case *Skatteforvaltningen v. Bech-Bruun Advokatpartnerselskab P/S*[62] was whether a lawyer of the law firm of Bech-Bruun had acted negligently in advising North Channel Bank regarding a dividend tax refund scheme[63] and whether, as a result, the law firm was liable to pay damages to Skatteforvaltningen.

64.  The High Court rejected liability for the law firm on the ground that the lawyer advising had not acted negligently[64]. In deciding that issue, the High Court noted:

> "The High Court notes that implementing the tax set-up as proforma or without any shares and actual cashflows must be deemed to be ordinary fraud under criminal law that is merely disguised by complicated transactions."

### B.  Cases before the Danish Tax Tribunal

65.  The issues addressed by me in this Declaration have been decided by Danish case precedents[65]. In 2018-19, the pension plans in each of the seven Bellwether cases[66] brought claims against Skatteforvaltningen before the Danish Tax Tribunal, the supreme administrative appeal body for tax cases.

---

[62] Eastern High Court Ruling of 28 April 2022. Reference: BS-26436/2020-OLR, Exhibit 44. Only the Court's ruling and holdings have been made available to me.

[63] The North Channel Bank accepted that the scheme, in which the bank issued dividend credit vouchers reflecting the plans purported ownership of shares and dividends but in fact never held any shares or received any dividends for the plans, was tantamount to fraud and pleaded guilty in a criminal case, see Gunnar Volkers Dep , e.g. 24:2-25:8, and 71:4-13.

[64] The judgement has been appealed to the Supreme Court by Skatteforvaltningen on the negligence point for the law firm but not on merits or legal qualification of the tax refund schemes operated by North Channel Bank.

[65] For the purpose of Paragraph 65, I have relied on case information made available by SKAT for the purpose of this Declaration.

[66] RJM Capital Pension Plan, Basalt Ventures LLC Roth 401(K) Plan, Roadcraft Technologies LLC Roth 401(K) Plan, The FWC Capital LLC Pension Plan, The Proper Pacific LLC 401(K) Plan, American Investment Group of New York, L P. Pension Plan, and Riverside Associated Defined Benefit Plan.

| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

Decisions of the Danish Tax Tribunal are appealable to the Danish courts. Mr. Pilgaard and the law firm in which he is a partner, TVC Advokatfirma København P/S, represented three of the Bellwether plaintiffs[67]. The Bellwether plan plaintiffs in the Danish Tax Tribunal cases asserted that Skatteforvaltningen's decisions to cancel its previous decisions about dividend refund payments were unlawful. In the summer of 2020, three of the complaints made by the Bellwether plan plaintiffs were withdrawn by the plaintiffs in the cases[68]. In the remaining four Bellwether plan cases, the Danish Tax Tribunal upheld Skatteforvaltningen's decision to cancel the previous decision about dividend refund payments[69]. One case out of the seven cases related to the Bellwether plan plaintiffs was appealed but the appeal was withdrawn by the plaintiff[70]. Thus, all Danish proceedings brought by the Bellwether plan plaintiffs have been concluded, with Skatteforvaltningen successful in each case for which the Tribunal rendered a decision.

66.     In the cases brought by the FWC Capital LLC Pension Plan and the Proper Pacific LLC 401(K) Plan before the Tribunal, the defendants argued in relation to ownership of shares that:

(i)     ownership to a share is transferred when a final and binding and unconditional agreement between the parties has been validly concluded[71];

(ii)    settlement of a share trade is no precondition for the transfer of ownership[72];

(iii)   documentation of cash flow from purchaser to seller is not required to evidence a transfer of ownership to a share in a Danish company[73];

(iv)    documentation of transfer of a share from seller's securities depository to purchaser's securities depository is not required to evidence a transfer of ownership to a share in a Danish company[74];

---

[67] Roadcraft Technologies LLC Roth 401(K) Plan, The FWC Capital LLC Pension Plan, and The Proper Pacific LLC 401(K) Plan.

[68] RJM Capital Pension Plan, Basalt Ventures LLC Roth 401(K) Plan, and Roadcraft Technologies LLC Roth 401(K) Plan

[69] The FWC Capital LLC Pension Plan, The Proper Pacific LLC 401(K) Plan, American Investment Group of New York, L.P. Pension Plan, and Riverside Associated Defined Benefit Plan

[70] American Investment Group of New York, L.P. Pension Plan.

[71] Decision of the Danish Tax Tribunal, *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312), page 116, Exhibit 45, and Decision of the Danish Tax Tribunal: *Skatteforvaltningen v. Proper Pacific LLC 401(k) Plan* (case no. 18-0004312), dated July 26, 2020), page 119, Exhibit 46. See also Defendants Motion pages 7 and 19 citing Pilgaard Decl. ¶¶ 155-156.

[72] *Id.* page 116, Exhibit 45, and *Id.* Page 119, Exhibit 46. See also Defendants Motion pages 7 and 24 citing Pilgaard Decl. ¶ 162. See to the contrary Sorensen Dep. 64:24-65:7.

[73] *Id.* page 116, Exhibit 45, and *Id.* Page 119, Exhibit 46.

[74] *Id.* page 116, Exhibit 45, and *Id.* Page 119, Exhibit 46.

| | | |
|---|---|---|
| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

(v)     a purchaser of a share is the owner of the share prior to the share being registered in such person's securities depository[75];

(vi)    the trade date appearing on the trade confirmation is the time of transfer of ownership;[76] and

(vii)   that they had provided sufficient documentation for the stock trades in question, including trade confirms, broker confirms, custody statements from the Solo custodians, and dividend credit advices from the Solo Custodians.[77]

67.     Similarly, in the cases brought by American Investment Group of New York, L.P. Pension Plan and Riverside Associated Defined Benefit Plan by AIG and Riverside, the defendants argued that they were the civil law owner of the shares in question and that the plans were the taxable rightful owner of the shares in question. They supported this argument by submitting trade confirmations, account statements, and other supporting documentation.[78]

68.     The Danish Tax Tribunal dismissed all of the defendants' claims[79]. Most notably, the Danish Tax Tribunal stated that: "... *refund of dividend withholding tax is conditional upon the [defendant] having owned shares and that the [defendant] has received dividends from these shares from which dividend tax was withheld in connection with payment of dividends. It is the [defendant's] burden to prove that these conditions were fulfilled [...]. The Danish Tax Tribunal determines that the [defendant] failed to prove that this was the case*" (my translation and insertion)[80].

---

[75] *Id.* page 116, Exhibit 45, and *Id.* Page 119, Exhibit 46.

[76] *Id.* page 117, Exhibit 45, and *Id.* page 120, Exhibit 46. See also Defendants Motion pages 7 and 9 and Pilgaard Decl. ¶¶ 151, 157, 168, 170.

[77] Decision of the Danish Tax Tribunal: *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312), page 226, Exhibit 45, and Danish Tax Tribunal: *Skatteforvaltningen v. Proper Pacific LLC 401(k) Plan* (case no. 18-0004312), dated July 26, 2020), page 228, Exhibit 46.

[78] Decision of the Danish Tax Tribunal: *Skatteforvaltningen v. The American Investment Group of New York L.P. Pension Plan* (case no. 18-0005426), page 48-50, Exhibit 47. Decision of the Danish Tax Tribunal: *Skatteforvaltningen v. Riverside Associates Defined Benefit Plan* (case no. 18-0005368), page 29-31, Exhibit 48.

[79] *See* Decision of the Danish Tax Tribunal: *Skatteforvaltningen v. The American Investment Group of New York L.P. Pension Plan* (case no. 18-0005426), dated July 7, 2021, Exhibit 47; Decision of the Danish Tax Tribunal: *Skatteforvaltningen v. Riverside Associates Defined Benefit Plan* (case no. 18-0005368), dated October 2, 2020, Exhibit 48; Decision of the Danish Tax Tribunal: *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312), dated July 16, 2020, Exhibit 45; Decision of the Danish Tax Tribunal: *Skatteforvaltningen v. Proper Pacific LLC 401(k) Plan* (case no. 18-0004312) dated July 26, 2020), Exhibit 46.

[80] Decision of the Danish Tax Tribunal, *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312), page 227, Exhibit 45.

| | | |
|---|---|---|
| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

69.     In its decision, the Danish Tax Tribunal held that[81]:

(i)     the defendant was a newly established pension plan with no financial means to perform the alleged share purchases;

(ii)    the defendant had not proved that it had purchased the shares and was the owner of such shares or that it had received any dividends;

(iii)   the documentation provided by the defendant regarding the share transactions (purchase and sale, share lending, and forward contracts) did not evidence the defendant's ownership of shares

On these grounds, the Danish Tax Tribunal held that the necessary connection which would evidence share transactions having flowed through the defendant's financials had not been evidenced. Moreover, the Danish Tax Tribunal held, in pertinent part, that[82]:

(iv)    the defendant had not provided documentation to evidence that the defendant had paid any capital to the custodian or other parties involved in the share transactions; and

(v)     the defendant had solely provided fictious contracts, custodial statements, broker confirmations etc. with the custodian or other players acting in the alleged share transactions, which did not evidence that the custodian had traded shares on behalf of the defendant.

70.     The Danish Tax Tribunal concluded that the defendant could not be considered as the owner of the shares and could not be deemed to have received dividends. As a result, the Danish Tax Tribunal decided that Skatteforvaltningen had paid out dividend refunds on an inaccurate basis and that it was legitimate to cancel the dividend refund payments[83].

71.     Consequently, the Defendants have unsuccessfully submitted the same argumentation for the allegations as they now do in the Dispute.

---

[81] Decision of the Danish Tax Tribunal, *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312), page 227, Exhibit 45.

[82] Decision of the Danish Tax Tribunal, *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312), page 227, Exhibit 45.

[83] Decision of the Danish Tax Tribunal, *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312), page 227, Exhibit 45.



| Report of | : | Mr. Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

Pursuant to 28 U.S.C. § 1746 the undersigned Henning Aasmul-Olsen declares under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 6, 2022.

Name: Henning Aasmul-Olsen
Title: Partner



| Report of | : | Mr Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

## Appendix 1 – Curriculum vitae of Mr. Henning Aasmul-Olsen

### Experience

<u>Present and past positions</u>

| Year | Activity |
|---|---|
| 2018- | Partner at Moalem Weitemeyer Advokatpartnerselskab; heading the firm's Capital Markets and Corporate Finance practises |
| 2016-2018 | Partner at Horten Law Firm |
| 2010-2016 | Partner at Bruun & Hjejle Law Firm |
| 2007-2010 | Executive director and co-head of Corporate Finance at Danske Bank (the largest bank in Denmark); Strategic and Financial advisory |
| 2006-2007 | Senior Advisor at Carnegie Investment Bank; Strategic and Financial Advisory |
| 1996-2006 | Partner and Managing Partner at Jonas Bruun Law Firm |
| 1991-1996 | Associate at Jonas Bruun Law Firm |
| 1985-1990 | Associate at Hjejle Gersted & Mogensen Law Firm |

<u>Selected Work</u>

For years, Henning Aasmul-Olsen have advised clients on corporate transactions, mostly M&A and capital markets transactions such as public-to-private M&A and defense work, IPOs, accelerated bookbuild offerings and rights issues.

According to Mergermarket, Henning Aasmul-Olsen is among the most active M&A lawyers in Denmark, measured by deal value in the period from 1 January 2011 when he returned to legal practise after four years as an investment banker. Henning is credited with a deal value of EUR 30.5 bn in aggregate for that period.



| Report of | : | Mr Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

Clients for capital markets work include several companies in the C 25 index served both as a legal and a financial advisor.

Henning Aasmul-Olsen has served as a chairman of AGMs and EGMs to several publicly traded companies.

Past litigation experience includes files before the Danish Supreme Court and the CJEU.

<u>Publications</u>

| Year | Activity |
|---|---|
| 2020 | Sustainable Finance 2020: Green Bonds and Beyond, article in Accounting and Auditing |
| 2015 | Chapter on Capital Markets in "Corporate Crimes", Iversen, Karnov Group |

**Academic qualifications**

| Year | Activity |
|---|---|
| 2006-2007 | Corporate Finance Modular Programme, London Business School, London, United Kingdom |
| 1991 | Master of Laws (LL.M), University of Michigan, Ann Arbor, Michigan, United States, with courses in Securities Regulations and Advanced Topics in Securities Regulation |
| 1980-1985 | Master of Laws (LL.M), University of Copenhagen, Copenhagen, Denmark. Graduated with the highest-grade point average of 161 students receiving the Master degree. |

**Professional qualifications**

| Year | Activity |
|---|---|
| 1994 | Privilege of audience before the Danish Supreme Court |
| 1989 | Privilege of audience before the Danish High Courts |

| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

**Moalem Weitemeyer**

1988        Admission to the Danish bar

N/A        Member of the International Bar Association

**Specialist Fields**

My specialist fields are Danish securities laws (including corporate law) and market practises for trading, clearance, and settlement in securities traded in the public markets.

| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

## Appendix 2 – Glossary

| Term | Meaning |
| --- | --- |
| **Account Holding Institution** | Danish and foreign financial institutions entitled and obliged to make book entry reporting in the systems of VP Securities. |
| **AFME Principles on Asset Segregation** | Association for Financial Markets in Europe, Post Trade Division: Client Asset Protection Task Force – AFME Principles on Asset Segregation, Due Diligence and Collateral Management, September 2016. |
| **Clearance** | Clearing occurs after a trade is executed. It is the process of checking whether the terms of a securities sales and purchase contract can be fulfilled by settlement, including checking that parties have sufficient securities and money to complete the transaction as contemplated. |
| **CSD** | Central Securities Depository. |
| **CSDR** | Regulation (EU) no. 909/2014 of the European Parliament and of the Council of 23 July 2014 on improving securities settlement in the European Union and on central securities depositories and amending Directives 98/26/EC and 2014/65/EU and Regulation (EU) no. 236/2012. |
| **Court** | United States District Court for the Southern District of New York in the United States of America. |
| **Danish Companies Act** | The Danish Companies Act applicable in the Relevant Period. |
| **Danish Business Authority** | The Danish Business Authority (*Da.* Erhvervsstyrelsen). |
| **Defendants** | Acer Investment Group, LLC, American Investment Group of New York, L.P. Pension Plan, Basalt Ventures LLC Roth 401(k) Plan, David Schulman, Doston Bradley, John van Merkensteijn, Michael Ben-Jacob, RAK Investment Trust, Richard Markowitz, Riverside Associates Defined Benefit Plan, RJM Capital Pension Plan, Roadcraft Technologies LLC Roth 401(k) Plan, Robert Crema, Robert Klugman, |

| | | |
|---|---|---|
| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| | |
|---|---|
| | Roger Lehman, Ronald Altbach, Routt Capital Trust, Stacey Kaminer, The FWC Capital LLC Plan, The Proper Pacific LLC 401K Plan, and ED&F Man Capital Markets Ltd. (third-party defendant). |
| **Defendants' Motion** | Defendants' and Third-Party Defendant's Memorandum in Support of Motion for Summary Judgment in the Dispute, dated April 29, 2022. |
| **Dispute** | Case no. 18-md-2865 (LAK) at the United States District Court for the Southern District of New York in the United States of America. |
| **Double Taxation Convention between Denmark and the United States of America** | The Convention between the Government of the United States of America and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Estates, Inheritances, Gifts and certain other Transfers of 27 April 1983 with subsequent amendments the latest being the Protocol Amending the Convention between the Government of the Kingdom of Denmark and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income of 2 May 2006. |
| **Exhibit** | An exhibit to this Declaration. |
| **Gunnar Volkers Dep.** | Remote VTC videotaped deposition under oral examination of Gunnar Volkers in the Dispute dated June 8, 2021. |
| **ISSA** | The International Securities Services Association. |
| **MiFID II** | Directive 2014/65/EU of the European Parliament and of the Council of 15 May 2014 on markets in financial instruments and amending directive 2002/92/EC and directive 2011/61/EU. |
| **Nasdaq Copenhagen** | Nasdaq Copenhagen A/S. |
| **Declaration** | This declaration. |

| | | |
|---|---|---|
| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| | |
|---|---|
| **Pilgaard Decl.** | Declaration of Foreign Law of Kasper Bech Pilgaard in the Dispute. |
| **Plaintiff** | The Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen). |
| **Plaintiff's Motion** | Plaintiff Memorandum in Support of Motion for Summary Judgment dated, April 29, 2022. |
| **Relevant Period** | The period between August 2012 and July 2015. |
| **Paragraph** | A paragraph of this Declaration, unless otherwise stated. |
| **Settlement** | The process where a transaction involving dematerialised securities is completed and the purchaser receives the purchased securities and the seller receives the corresponding payment. |
| **Settlement Finality Directive** | Directive 98/26/EC of the European Parliament and of the Council (the Settlement Finality Directive as amended). |
| **Solo Custodians** | Certain custodians associated with Sanjay Shah. |
| **Sorensen Dep.** | Remote VTC videotaped deposition under oral examination of Helen Sorensen in the Dispute dated 21 September 2021. |
| **Sorensen Dep. Vol II** | Remote VTC videotaped deposition under oral examination of Helen Sorensen in the Dispute dated 7 December 2021. |
| **VP Securities** | VP Securities A/S acting in its capacity as CSD, unless otherwise set forth. |



| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

### Appendix 3 – Rules and regulations, literature and other materials considered

In preparing this Report I have considered the below material:

**Regulation**

| Date | Material |
|---|---|
| 27 November 2020 | The Danish Capital Markets Act as amended from time to time (Consolidated Act no. 1767 of 27 November 2020). |
| 26 June 2020 | The Danish Corporations Taxes Act as amended from time to time. |
| 8 August 2019 | The Danish Tax Assessment Act: |
| | • 2011: Consolidated act no. 1017 of 28 October 2011 |
| | • 2013: Consolidated act no. 405 of 22 April 2013 |
| | • 2014: Consolidated act no. 1041 of 15 September 2014 |
| 8 August 2019 | The Danish Financial Statements Act as amended from time to time (Consolidated Act no. 838 of 8 August 2019). |
| Amended from time to time | The Danish Contracts Act (currently Consolidated Act no. 193 of 2 March 2016). |
| Amended from time to time | Danish Act on Taxation of Income and Property. |
| 29 December 2015 | The Danish State Tax Act (Consolidated Act no. 1883 of 29 December 2015). |
| Applicable in the Relevant Period | The Danish Financial Business Act: |
| | • 2011: Consolidated act. no. 885 of 8 August 2011 |
| | • 2012: Consolidated act no. 705 of 25 June 2012 |
| | • 2013: Consolidated act no. 948 of 2 July 2013 |
| | • 2014: Consolidated act no. 928 of 4 August 2014 |
| | 2015: Consolidated act no. 182 of 18 February 2015 |
| Applicable in the Relevant Period | The Danish Securities Trading Act: |
| | • 2012: Consolidated act no. 855 of 17 August 2012 |
| | • 2013: Consolidated act no. 219 of 20 February 2013 |
| | • 2013: Consolidated act no. 982 of 6 August 2013 |
| | • 2014: Consolidated act no. 227 of 11 March 2014 |
| | • 2014: Consolidated act no. 831 of 12 June 2014 |

| Report of | : | Mr Henning Aasmul-Olsen |
|-----------|---|--------------------------|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| Applicable in the Relevant Period | The Danish Companies Act (consolidated act no. 610 of 28 April 2015 (until 30 June 2015) and consolidated act no. 1089 of 14 September 2015 (from 1 July 2015). |
|---|---|
| 1 June 2015 | Act no. 739 of 1 June 2015 on amendment of among other the Danish Companies Act. |
| 15 May 2014 | Regulation (EU) no. 600/2014 of the European Parliament and of the Council (MiFIR) . |
| 15 May 2014 | Directive 2014/65/EU of the European Parliament and of the Council (MiFID II). |
| 11 December 2013 | Executive Order no. 1476 on filing for registration, registrations, fees and announcements etc. with the Danish Business Authority. |
| 22 October 2013 | Directive 2013/50/EU of the European Parliament and of the Council (the Transparency Directive Amending Directive). |
| 26 June 2013 | Executive Order no. 819 on registration of dematerialised securities with a central securities depository. |
| 5 July 2012 | Commission Delegated Regulation (EU) no. 918/2012 of 5 July 2012 supplementing the Short Selling Regulation with regard to definitions, the calculation of net short positions, covered sovereign credit default swaps, notification thresholds, liquidity thresholds for suspending restrictions, significant falls in the value of financial instruments and adverse events. |
| 4 July 2012 | Regulation (EU) no. 648/2012 of the European Parliament and of the Council (EMIR). |
| 25 June 2012 | Executive Order no. 668 on major shareholders. |
| 14 March 2012 | Regulation (EU) no. 236/2012 of the European Parliament and of the Council (the Short Selling Regulation). |
| 7 December 2010 | The Danish Withholding Taxes Act (Consolidated Act no. 1403 of 7 December 2010). |
| 4 September 2007 | Executive Order no. 1069 on the conditions for official listing of securities. |
| 10 August 2006 | Commission Directive 2006/73/EC (Implementing Directive MiFID). |
| 2 May 2006 | Convention between the Government of the Kingdom of Denmark and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income. |
| 21 April 2004 | Directive 2004/39/EC of the European Parliament and of the Council (MiFID). |
| 19 May 1998 | Directive 98/26/EC of the European Parliament and of the Council (the Settlement Finality Directive as amended). |

| | | |
|---|---|---|
| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| | |
|---|---|
| 17 August 1993 | Executive Order no. 1993 of 17 August 1993 on the Copenhagen Stock Exchange. |
| 27 April 1983 | The Convention between the Government of the United States of Ameri-ca and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Estates, Inheritances, Gifts and certain other Transfers. |
| Repealed | Danish Act on Central Securities Depositories. |

**Case Law**

| Date | Material |
|---|---|
| 28 April 2022 | Eastern High Court Ruling of 28 April 2022. Reference: BS-26436/2020-OLR. |
| 12 March 2020 | Ugeskrift for Retsvæsen.2020.1923H. |
| 16 July 2020 | Decision of the Danish Tax Tribunal, Skatteforvaltningen v. The FWC Capital LLC Pension Plan (case no. 18-0004312). |
| 22 August 2006 | Ugeskrift for Retsvæsen.2006.3050H. |
| 7 October 2005 | Ugeskrift for Retsvæsen.2006.145H. |
| 3 December 2001 | SKM2001.88.HR. |
| 31 January 2001 | Ugeskrift for Retsvæsen.2001.893H. |
| 3 March 2000 | Ugeskrift for Retsvæsen.2000.1413V. |
| 3 March 2000 | TfS.1998.408 LR. |
| 20 March 1997 | Ugeskrift for Retsvæsen.1997.762H. |
| 30 January 1997 | Ugeskrift for Retsvæsen.1997.444H. |
| 9 May 1994 | Ugeskrift for Retsvæsen.1994.719Ø. |
| 11 January 1982 | Ugeskrift for Retsvæsen.1982.152H. |
| 12 March 1980 | Ugeskrift for Retsvæsen.1980.383H. |
| 4 October 1978 | Ugeskrift for Retsvæsen.1978.880H. |
| 28 June 1977 | Ugeskrift for Retsvæsen.1977.686H. |
| 1964 | Ugeskrift for Retsvæsen.1964.307V. |
| 8 December 1960 | Ugeskrift for Retsvæsen.1961.101H. |
| 28 May 1954 | Ugeskrift for Retsvæsen.1954.673H. |

**Preparatory Works and Reports**

| Date | Material |
|---|---|

| Report of | : | Mr Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| 25 February 2015 | Proposal no. 154 of 25 February 2015 on amongst other amendment of the Danish Securities Trading Act. |
|---|---|
| 2010 | *"Legislation on legal certainty of securities holding and disposition"* cited in footnote 9 of the DWF Defendants Defence. |
| 2008 | Preparatory works no. 1498/2008 for the Danish Companies Act (*Da.* Betænkning over modernisering af selskabsretten). |
| 21 December 2005 | Preparatory works to amendment of the Danish Tax Assessment Act Section 16A (act no. 1414 of 21 December 2005). |
| 3 February 2012 | Report from the Commission – Commission Staff Working Paper – Impact Assessment (SEC(2011) 1279 final/2) (TDAD Impact Assessment) |
| 1999 | Regnskabsrådets rapport om Revision af Årsregnskabsloven |
| 29 January 1986 | Proposal for the Danish Stock Exchange Act with remarks. |
| 1985-1986 | Proposal to amend the Danish Companies Act. |
| 29 February 1980 | Proposal for the Danish Securities Trading Act with remarks. |
| 24 February 1905 | Proposal to the Danish Sales of Goods Act with remarks. |

## Guidance

| Date | Material |
|---|---|
| Applicable in the Relevant Period | SKAT's Legal Guide. |
| 2014 | Statement by the Danish Business Authority. |

## Private Rules and Standards

| Date | Material |
|---|---|
| 3 September 2020 | VP Securities Rule Book parts 1-5. |
| June 2012 and July 2015 | Nasdaq Nordic Market Model. |
| 2 March 2020 | Nasdaq Nordic Member Rules, version 3.9. |
| Applicable in the Relevant Period | Nasdaq Nordic Member Rules, versions 1.6 – 2.7. |
| Applicable in the Relevant Period | All articles of association of companies listed in Schedule 1A to the Particulars of Claim. |
| May 2019 | The ISSA Financial Crime Compliance Principles for Securities Custody and Settlement, second revision. |

| Report of | : | Mr Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| | |
|---|---|
| May 2019 | Background & Overview to ISSA Financial Crime Compliance Principles for Securities Custody and Settlement, first revision. |
| 14 December 2015 | Nasdaq Reporting Guideline, version 1.9, Members' On Exchange trade and Members' and Non-Members' OTC trade Reporting. |
| 27 August 2015 | The ISSA Financial Crime Compliance Principles for Securities Custody and Settlement, first revision. |
| 27 August 2015 | Background & Overview to ISSA Financial Crime Compliance Principles for Securities Custody and Settlement, first revision. |
| 2015 | Chartered Financial Analyst Society Denmark, Recommendations and Ratios. |
| 23 June 2013 | VP Securities' Clearing Rules, applicable as of 23 June 2013. |
| 17 June 2013 | VP Securities' Rules A- D, applicable as of 17 June 2013. |
| 2012 | Market Standards for Corporate Actions Processing, by Corporate Actions Joint Working Group. |
| 19 December 2011 to 10 August 2015 | VP Securities' System Guidelines. |
| 2002 | Custody Services, Controller's Handbook, by Controller of the Currency Administrator of National Banks. |
| 5 February 2002 | Standard terms and conditions for stock lending agreements prepared by the Danish Bankers' Association and the Danish Securities Dealers' Association, 5 February 2002, journal no. 613/03, doc no. 29094. |

## Literature

| Date | Material |
|---|---|
| 2021 | The Complex Commercial Litigation Law Review: Denmark, published in The Law Reviews on 14 January 2021, by Dan Terkildsen and Emil Hald Winström. |
| 2020 | Almindelig kontraktsret, by Bernhard Gomard, Hans Viggo Godsk Pedersen & Anders Ørgaard. |
| 2020 | Årsregnskabsloven med kommentarer, by Henrik Steffensen. |
| 2019 | Securities and Capital Markets Law (*Da.* Børs- og Kapitalmarkedsret), 6th edition, by Peer Schaumburg-Müller and Erik Werlauff. |
| 2019 | Selskabsret, 11th edition, by Erik Werlauff. |
| 2019 | Danish Financial Business Act - with commentaries (Da. Lov om finansiel virksomhed – med kommentarer), 4th edition, by Thomas Brenøe, Marianne Simonsen, Merete Hjetting and Malene Stadil. |

| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| | |
|---|---|
| 2018 | Konkursloven med kommentarer, by Lars Lindencrone Petersen & Anders Ørgaard. |
| 2018 | The Danish Capital Markets Act with commentaries (*Da.* Kapitalmarkedsloven), 1st edition, by Dan Moalem, David Moalem, Peer Schaumburg-Müller, and Erik Werlauff. |
| 2018 | Finansieringsret, 2nd edition, by Henrik Kure. |
| 2018 | The Danish Companies Act with commentaries (Da. *Selskabsloven*) med kommentarer), 3rd edition, by Lars Bunch and Søren Corfixsen Whitt. |
| 17 August 2017 | Note by VP Securities:" Levels *of segregation offered by VP SECURITIES A/S*". |
| 15 May 2017 | European Post Trade Forum Report. |
| 15 May 2017 | Annex 3 to the European Post Trade Forum Report: Detailed analysis of the European Post Trade Landscape. |
| February 2017 | ISSA Report on the Inherent Risks within the Global Custody Chain. |
| 2017 | Limited liability companies (*Da.* Kapitalselskaber), 5th edition, by Jan Schans Christensen. |
| 2017 | The Danish Sales of Goods Act with comments (*Da.* Købeloven), 4th edition, Søren Theilgaard, Aqbal Amiri and Theis Jacobsen. |
| 2017 | Aftaler og Mellemmænd, 7th edition, by Lennart Lynge Andersen and Palle Bo Madsen. |
| 2016-2017 | Report on administration of dividend tax, by Skatteministeriet. |
| September 2016 | AFME Post Trade Division: Client Asset Protection Task Force. AFME Principles on Asset Segregation, Due Diligence and Collateral Management. |
| July 2016 | The Custody Services of Banks, by The Clearing House. |
| 2016 | Comments on selected decisions (Da. *Kommentarer til udvalgte afgørelser*), SKM2016.281.HR, RR.SM.2016.0101, by Anders Nørgaard Laursen. |
| February 2015 | Post Trade explained: The role of post-trade services in the financial sector, by Association for Financial Markets in Europe. |
| 2015 | European Banking and Financial Law, by Matthias Haentjens and Pierre de Gioia-Carabellese. |
| 2015 | Limited liability companies (Da. *Kapitalselskaber*), 8th edition, by Bern-hard Gomard and Peer Schaumburg-Müller. |
| 2015 | SKAT's early warning response in connection with stock lending (*Da.* Svar på early warning i forbindelse med aktielån), J nr. 15-2051530. |

| Report of | : | Mr Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| 2014 | IOSCO Final report – Recommendations Regarding the Protection of Client Assets |
|---|---|
| 2013 | Værdipapirhandelsloven med kommentarer 2013, 12th edition, by Jesper Lau Hansen. |
| 2013 | The Danish Securities Trading Act with commentaries, part II, 9th edition, by Jesper Lau Hansen. |
| 2013 | Limited liability companies (*Da.* Aktie- og anpartsselskabsret – Kapitalselskaber), 12th edition, by Paul Krüger Andersen. |
| 2013 | Grundlæggende aftaleret, by Mads Bryde Andersen. |
| 2012 | Almindelig kontraktret, Bernhard Gomard, Hans Viggo Godsk Pedersen & Anders Ørgaard. |
| 2012 | The Danish Companies Act with commentaries (*Da.* Selskabsloven med kommentarer), 1st edition, by Jan Schans Christensen. |
| 19 March 2012 | Post Trade Settlement Committee Task Force on CSD Account Structure: CSD Account Structure: Issues and Proposals, Final Report, by Association for Financial Markets in Europe. |
| 2012 | Aftaler og Mellemmænd, 6th edition, by Lennart Lynge Andersen and Palle Bo Madsen. |
| 2011 | Panterettens deklaratoriske omfang ved pant i kapitalandele, by Henrik Kure. |
| 2011 | Årsregnskabsloven med kommentarer, by Henrik Steffensen. |
| 2011 | Contract Law in Denmark, by Ruth Nielsen. |
| 2011 | Handbook of corporate equity derivatives and equity capital markets, by Juan Ramirez. |
| 2010 | The extent of the prohibition against short selling (*Da.* Rækkevidden af short selling-forbuddet), by Henrik Kure. |
| 2010 | On the rationale behind the prohibition against short selling (*Da.* Om rationalet bag forbud mod short selling), by Henrik Kure. |
| 2009 | Obligationsret 3. del, 2. edition, by Bernhard Gomard and edited by Torsten Iversen. |
| 2009 | Forvaltningsret – Almindelige emner, 5th edition, by Jens Garde et al. |
| 2009 | TfS.2009.480 by Jakob Bundgaard. |
| 2009 | Introduction to the law of property (Da. *Indledning til tingsretten – tredjemandskonflikter vedrørende løsøre*), 2nd edition, by Peter Mortensen. |
| 2008 | The Danish Sales of Goods Act with commentaries, by Jacob Nørager-Nielsen, Søren Theilgaard, Michael Bjerg Hansen and Martin Hørmann Pallesen. |

| | | |
|---|---|---|
| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| | |
|---|---|
| 2007 | The Securities Custody, Occasional Paper Series, by the European Central Bank (Diana Chan, Florence Fontan, Simonetta Rosati, and Daniela Russo). |
| 2007 | Gældsbrevsloven med kommentarer, 2nd edition, by Lennart Lynge-Andersen, Peter Møgelvang-Hansen og Anders Ørgaard. |
| 2006 | The Danish Securities Trading Act with commentaries (*Da.* Værdipapirhandelsloven med kommentarer), 1ˢᵗ edition, by Dan Moalem, David Moalem and Erik Werlauff. |
| 2006 | Tax law and civil law (*Da.* Skatteret og civilret), 1ˢᵗ edition, by Jakob Bundgaard. |
| 2006 | Participation in limited liability companies – The shareholder concept in the light of company and tax law (Da. *Deltagelse i kapitalselskaber – ak-tionærbegrebet i selskabsretlig og skatteretlig belysning*), SPO.2006.17, by Jakob Bundgaard. |
| 2006 | Law of obligations (*Da.* Obligationsret), 4ᵗʰ edition, 1ˢᵗ part, by Bernhard Gomard. |
| 2004 | Legal methodology (*Da.* Juridisk Metodelære), 3ʳᵈ edition, by Peter Blume. |
| 2004 | Securites' rights (*Da.* Rettigheder over værdipapirer. Individualisering og sikringsakt) in Juristen no. 4, by Ulrik Rammeskov Bang Pedersen. |
| 2003 | Sikkerhed i fordringer, 4th edition, by Nis Jul Clausen. |
| 2002 | Law & Methodology (*Da.* Ret & Metode), 1ˢᵗ edition, by Mads Bryde Andersen. |
| 1999 | The sources of law (*Da.* Rettens kilder), 1ˢᵗ edition, by Henrik Zahle. |
| 1999 | The law of Property 1 (*Da.* Ejendomsretten 1), 4th edition, by Michael Elmer and Lise Skovby. |
| 1997 | Actio Pauliana og pro forma (1997, published in Ugeskrift for Retsvæsen.1997B.369), by Torben Jensen. |
| 1992 | Juridisk grundbog 1 – Retskilderne, W.E. von Eyben. |
| 1978 | Aftaler, by Henry Ussing. |
| 1972 | Formuerettigheder: Indhold, beskyttelse, overdragelse, by W.E. von Eyben. |
| 1971 | Kontraktsret I, by Stig Jørgensen. |
| 1967 | Obligationsretten – Almindelig del, by Henry Ussing. |
| 1908 | Haandbog i Obligationsretten, almindelig del, by Julius Lassen. |

**Other materials**

| Date | Materials |
|---|---|

| | | |
|---|---|---|
| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| | |
|---|---|
| 2022 | CVR – Central Business Register – Database by The Danish Business Authority (Da. CVR – Det Centrale Virksomhedsregister - Erhvervsstyrelsen) https://datacvr.virk.dk/data/. |
| 27 April 2022 | Novo Nordisk A/S' articles of association. |
| February 2021 | Novo Nordisk' notice for annual general meeting 2021 |
| 4 December 2020 | Data extract from VP Securities. |
| 20 October 2020 | Indicator summary from VP Securities. |
| 3 September 2020 | Ringkjøbing Landbobank Custody Account Terms. |
| September 2020 | Jyske Bank Custody Account Terms. |
| 2020 | Annual Report – Novo Nordisk. |
| 2020 | Annual Report – Carlsberg. |
| 2020 | Annual Report – Danske Bank. |
| 1 June 2019 | Spar Nord Custody Account Terms. |
| 25 May 2018 | Nordea Custody Account Terms. |
| 1 March 2018 | Danske Bank Custody Account Terms. |
| 3 January 2018 | Saxo Bank Custody Account Terms. |
| 3 January 2018 | Arbejdernes Landsbank Custody Account Terms. |
| 3 January 2018 | Den Jyske Sparekasse Custody Account Terms |
| 3 January 2017 | Skandinaviska Enskilda Banken (SEB) Custody Account Terms. |
| 13 December 2017 | Nykredit Custody Account Terms. |
| 12 December 2017 | Vestjysk Bank Custody Account Terms. |
| 30 September 2013 | Danske Bank Custody Account Terms. |
| 24 September 2007 | Sydbank Custody Account Terms. |

**Submissions in the Dispute provided by Plaintiff**

| Date | Material |
|---|---|
| 29 April 2022 | Plaintiff Skatteforvaltningen's Memorandum of Law in Support of its Motion for Partial Summary Judgment. |
| 29 April 2022 | Defendants' and Third-Party Defendants' Memorandum in Support of Motion for Summary Judgment. |
| 28 April 2022 | Eastern High Court Ruling: Skatteforvaltningen v. Bech Bruun Advokatpartnerselskab P/S (case no. BS-26436/2020-OLR), including a certified English translation. Only the High Court's ruling and holdings have been made available to me. |
| 27 April 2022 | Declaration of Foreign Law of Kasper Bech Pilgaard in the Dispute. |



| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| | |
|---|---|
| 31 December 2021 | Expert Report of Bruce G. Dubinsky. |
| 7 December 2021 | Remote VTC videotaped deposition under oral examination of Helen Sorensen, Volume II. |
| 21 September 2021 | Remote VTC videotaped deposition under oral examination of Helen Sorensen. |
| 8 June 2021 | Remote VTC videotaped deposition under oral examination of Gunnar Volkers in the Dispute dated June 8, 2021. |
| 16 September 2019 | Rosenblatt Investigation into Danish trading activity of ED&F Man Professional Trading (Dubai) Ltd ("MPT Dubai") with no annexes or ancillary documents except for Annex E. |
| 2 October 2020 | Decision by Danish Tax Tribunal which involved the Riverside Associates Defined Benefit Plan. |
| 16 July 2020 | Decision by Danish Tax Tribunal which involved the FWC Capital LLC Pension Plan. |
| 16 July 2020 | Decision by Danish Tax Tribunal which involved the Roadcraft Technologies LLC Roth 401(K) Plan. |
| 7 July 2020 | Decision by Danish Tax Tribunal which involved the American Investment Group of New York, L.P. Pension Plan. |
| 26 June 2020 | Decision by Danish Tax Tribunal which involved the Proper Pacific LLC 401(K) Plan. |
| 19 December 2019 | Pleading of Defendants (The Proper Pacific LLC 401(K) Plan) in Danish tax cases before the Danish Tax Tribunal (Bellwether) prepared by TVC Advokatfirma, lawyers Kasper Bech Pilgaard and Torben Bagge. |
| 18 December 2019 | Pleading of Defendants (The FWC Capital LLC Plan) in Danish tax cases before the Danish Tax Tribunal (Bellwether) prepared by TVC Advokatfirma, lawyers Kasper Bech Pilgaard and Torben Bagge. |
| 9 December 2019 | Pleading of Defendants (Roadcraft Technologies LLC Roth 401(K) Plan) in Danish tax cases before the Danish Tax Tribunal (Bellwether) prepared by TVC Advokatfirma, lawyer Kasper Bech Pilgaard. |
| 27 August 2019 | Pleading of Defendants (Roadcraft Technologies LLC Roth 401(K) Plan) in Danish tax cases before the Danish Tax Tribunal (Bellwether) prepared by TVC Advokatfirma, lawyer Kasper Bech Pilgaard. |
| 12 August 2019 | Pleading of Plaintiff (Skatteforvaltningen) in Danish tax cases before the Danish Tax Tribunal (the FWC Capital LLC Plan case). |

| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| | |
|---|---|
| 14 May 2019 | Pleading of Defendants (The FWC Capital LLC Plan) in Danish tax cases before the Danish Tax Tribunal (Bellwether) prepared by TVC Advokatfirma, lawyers Kasper Bech Pilgaard and Torben Bagge. |
| 7 May 2019 | Pleading of Defendants (Roadcraft Technologies LLC Roth 401(K) Plan) in Danish tax cases before the Danish Tax Tribunal (Bellwether) prepared by TVC Advokatfirma, lawyer Kasper Bech Pilgaard. |
| 20 November 2018 | Pleading of Defendants (The FWC Capital LLC Plan) in Danish tax cases before the Danish Tax Tribunal (Bellwether) prepared by TVC Advokatfirma, lawyers Kasper Bech Pilgaard and Torben Bagge. |

| Report of | : | Mr Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

**Appendix 4 - Timeline for dividend distribution based on T+2 and T+3 settlement**

Case 1:18-cv-05326-AKD Document 84-38 Filed 06/27/24 Page 46 of 50
Case 1:18-cv-05326-AKD Document 84-38 Filed 06/27/24 Page 46 of 50

Moalem
Weitemeyer

## Appendix 4 – Timeline for the mechanics in a distribution of dividends by a Danish Nasdaq Copenhagen listed company (T+2)



Sources: Danske Bank Corporate Actions Wholesale Banking Services, VP Rules A-D 2013, VP Rule Book 1 October 2019, Nasdaq Nordic Member Rules V 4, and Henning Aasmul-Olsen.

[1] Provided that account holding institution has not put the dividend payment on hold due to insufficient cash funds on the Issuer's bank account.

[2] All trades past T (17:00) are ex-dividend, assuming customary T+2 settlement.

# Moalem Weitemeyer

## Appendix 4 – Timeline for the mechanics in a distribution of dividends by a Danish Nasdaq Copenhagen listed company (T+3)



Sources: Danske Bank Corporate Actions Wholesale Banking Services, VP Rules A-D 2013, VP Rule Book 1 October 2019, Nasdaq Nordic Member Rules V 4, and Henning Aasmul-Olsen

[1] Provided that account holding institution has not put the dividend payment on hold due to insufficient cash funds on the Issuer's bank account.

[2] All trades past T (17:00) are ex-dividend, assuming customary T+3 settlement.



| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

## Appendix 5 – Cases referenced by Mr. Pilgaard

| Reference | Description |
|---|---|
| SKM2001.126.HR | K1, K2, K3 and F1 incorporated on 1 July 1990 F2. On 1 September 1994, K3 sold nominally DKK 10,000 shares in F2 to K1 and DKK 12,000 shares in F2 to K2. Simultaneously, F1 sold all of its shares, nominally DKK 24,000 in F2 to K1. All shares were sold at a price of DKK 0. All trades were completed and there was no issue or dispute regarding whether (i) the shares existed, (ii) a final and binding agreement had been concluded, and (iii) the shares had been delivered and at what time delivery occurred. The Supreme Court held that the Danish Capital Gains Tax Act's rules on timing for passing of title for tax purposes is the time of transfer. As K1, K2, and K3 had executed trade confirmations on 1 September 1994, the Supreme Court held that the point in time from which taxation should occur was 1 September 1994. |
| | |
| SKM2005.490.HR | In May 1999, A and C entered into an agreement with B. The agreement provided B with a right to acquire A and C's shares in company D in the period between 1 August 2001 and 30 April 2002. B exercised the call option in January 2002. The trade was completed and there was no issue or dispute regarding whether (i) the shares existed, (ii) a final and binding agreement had been concluded, and (iii) the shares had been delivered and at what time delivery occurred. The Supreme Court held that the shares from a tax law perspective were sold at the time of conclusion of the option agreement in May 1999 and not at the time of exercise, as the Supreme Court found it highly unlikely that the option would not have been exercised as contemplated. Consequently, the Supreme Court held that the point in time from which taxation should occur was 1 September 1994. |
| | |
| SKM2011.533HR | On 30 June 2000, A entered into an agreement with B. The agreement provided B with a right to acquire A's shares in company C. B exercised the option in December 2001. The trade was completed and there was no issue or dispute regarding whether (i) the shares existed, (ii) a final and binding agreement had been concluded, and (iii) the shares had been delivered and at what time delivery occurred. The Supreme Court held that the shares from a tax law perspective were sold at the time of conclusion of the option agreement in June 2000 and not at the time of exercise, as the Supreme Court found it highly unlikely that the option would not have been exercised as contemplated. Consequently, the Supreme Court held that the point in time from which taxation should occur was 30 June 2000. |
| | |



| | | |
|---|---|---|
| Report of | : | Mr Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| | |
|---|---|
| SKM2008.825BR | On 16 December 2000, VN faxed to A an offer to purchase A's shares in company C. The shares were identified by physical share certificates and held in custody by Credit Suisse. There was no issue or dispute regarding whether (i) the shares existed, (ii) a final and binding agreement had been concluded, and (iii) the shares had been delivered. The time of delivery of the shares was unclear, but the City Court held that the shares were delivered at the time Credit Suisse's issuance of a "Transfer Instruction for Securities" on 27 February 2001 which stated that the share certificates should be sent to VN by registered letter. The Supreme Court held that the shares from a tax law perspective were sold at the time of conclusion of the agreement in December 2000. Consequently, the Supreme Court held that the point in time from which taxation should occur was 16 December 2000. |
| | |
| SKM2010.259.BR | On 28 February 2003, A entered into an agreement to sell shares in H2 to B. The shares were to be delivered and the consideration was to be paid within one year from 28 February 2003. The consideration could be paid by B in either cash or shares in B. B had the right to determine the time and form of payment of consideration and delivery within this period. B chose to pay in shares. The trade was completed at the expiry of the one year period. Shortly after, A sold the shares in B. The question concerned the timing of taxation with respect to the shares in B acquired by A. There was no issue or dispute regarding whether (i) the shares existed, (ii) a final and binding agreement had been concluded, and (iii) the shares had been delivered and at what time delivery occurred. Primarily because A had the downside risk on the shares in B from the time of entering into the agreement on 28 February 2003, the City Court held that the shares for taxation timing purposes had been sold at the time of the conclusion of the agreement on 28 February 2003 and that taxation should occur from this time. |
| | |
| SKM2002.399.VLR | A had a put option on the shares, which he exercised in 1995. However, the exercise was not immediately executed due to certain issues, including terms of placing the purchase price into escrow. The High Court held that the shares were not sold until 1996, where the transfer was executed. There was no issue or dispute regarding whether (i) the shares existed, (ii) a final and binding agreement had been concluded, and (iii) the shares had been delivered and at what time delivery occurred. |
| | |
| SKM2008.759.SR<br><br>(advance tax ruling (*Da.* bindende forhåndssvar) | An option agreement contained a call and put option for the shares in company A. The Danish Tax Assessment Council (*Da.* Skatterådet) was asked to confirm that the entry into of the option agreement would not trigger taxation at such time, i.e. the Danish Tax Assessment Council was not |



| Report of | : | Mr Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

|  | asked to opine on whether (i) the shares existed, (ii) a final and binding agreement would have been concluded, and (iii) the shares could be delivered and at what time delivery would have occurred. The Danish Tax Assessment Council stated that in the specific case it could not be considered a certainty that the option would be exercised, and that there was nothing in the information provided which indicated that the option agreement should in fact be a sale and purchase agreement. The Danish Tax Assessment Council held that there was a real possibility that the option would not be exercised. The transfer of the shares from a tax law perspective would therefore be deemed to have taken place at the time of exercise of the option from which time the transfer would be subject to taxation. |
|---|---|
| SKM2008.803.SR<br><br>(advance tax ruling (*Da.* bindende forhåndssvar) | The Danish Tax Assessment Council was asked to confirm that a final and binding agreement on the acquisition of shares for tax law purposes would at the earliest be deemed entered into when certain specific conditions had been met, i.e. the Danish Tax Assessment Council was not asked to opine on whether (i) the shares existed, and (ii) the shares could be delivered and at what time delivery would have occurred. As the conditions to the agreement had suspensory effect, meaning that the condition entailed that actual uncertainty existed as to whether the agreement will be concluded, the Danish Tax Assessment Council confirmed the request. |
| SKM2008.831.SR<br><br>(advance tax ruling (*Da.* bindende forhåndssvar) | The Danish Tax Assessment Council was asked to confirm whether shares for which an order was placed for prior to 30 December 2005 was subject to the Danish Capital Gains Taxation Act, i.e. the Danish Tax Assessment Council was not asked to opine on whether (i) the shares existed, and (ii) the shares could be delivered and at what time delivery would have occurred. As part of its analysis, the Danish Tax Assessment Council stated that according to customary tax law rules, a share purchase is considered for tax law purposes to have taken place at the time of entry into of a final and binding agreement. The Danish Tax Assessment Council held that the placing of an order for shares cannot be considered a final purchase agreement and consequently that the shares in question was not subject to the Danish Capital Gains Taxation Act. |