# Exhibit 15

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re

CUSTOMS AND TAX ADMINISTRATION OF
THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

Master Docket 18-md-02865 (LAK)
ECF Case

This document relates to all related dockets

---

## DECLARATION OF FOREIGN LAW OF KASPER BECH PILGAARD

# TABLE OF CONTENTS

I.   Beneficial Ownership .................................................................................................. 1

I.   Further Response To Andersen's April Declaration ............................................... 5

    A.   SKAT's Claims .......................................................................................... 5

    B.   SKAT Is Not The Kingdom Of Denmark ................................................. 10

II.  Further Response to Aasmul-Olsen's Declaration ................................................. 16

    A.   Shares Of A Publicly Traded Company .................................................... 16

    B.   The *"Nemo Dat"* Doctrine ........................................................................ 17

    C.   Settlement Is Not A Prerequisite For Ownership ...................................... 21

## **BACKGROUND**

I, the undersigned Kasper Bech Pilgaard, state the following:

1.     I have written this legal opinion at the request of certain Defendants in the above-captioned litigation, to be submitted to the United States District Court for the Southern District of New York, in the United States of America, as evidence of Danish law.

2.     On April 27, 2022, I signed a declaration of Danish law that I understand has been submitted to the Court.

3.     In response, I understand that SKAT provided the Court with declarations of Mads Bryde Andersen and Henning Aasmul-Olsen dated June 6, 2022.

4.     I have reviewed those declarations, and do not agree that they are entirely accurate presentations of Danish law.  Accordingly, I have prepared this response.

## **I.     Beneficial Ownership**

5.     Aasmul-Olsen's declaration includes a section entitled "The Term 'Beneficial Ownership,'" but he claims that this is "not a Danish law concept and does not denote a special form of ownership for shares issued by a Danish company."  Aasmul-Olsen does not appear to disagree with my account of Danish case law interpreting and applying the concept of beneficial ownership.  Similarly, Andersen's latest declaration includes a heading called "The Beneficial Ownership Concept," but he does not explain what he thinks that concept means, and also does not disagree with my account of Danish case law interpreting and applying the concept of beneficial ownership.

6.     Instead, Andersen seems to assume that in this case, the shares at issue were either "fictitious" (¶ 29), did not "exist" (¶ 27), or were not held or delivered by the seller (¶ 42).  I have no opinion on that factual question, and confine myself to setting forth Danish law.

1

7.     I note that in the "Beneficial Ownership" section of his declaration, Andersen does not cite to a single Danish case or administrative decision that was decided before the year 2020.  His assertions shed no light at all on the meaning of beneficial ownership as that term would have been understood between 2012 and 2015, which I understand to be the relevant period at issue in this case.

8.     Andersen claims to be surprised that I did not refer to a recent decision from the Danish Tax Tribunal involving certain U.S. pension plans.  I do not understand the basis for his "surprise" given my assertion that I was providing "an overview of the limited Danish case law that addressed the subject of 'beneficial ownership' before 2016."  Pilgaard (April) ¶ 173.

9.     Rather than invoking any Danish law regarding beneficial ownership from the time period relevant in this case, Andersen cites one decision from the Danish Tax Tribunal and one decision from the Eastern High Court.  I disagree with his analysis of both.

10.     With respect to the DNTT, the Tribunal did not find "that SKAT was defrauded into paying reclaims by applicants who submitted applications falsely claiming to own shares over which they had no ownership of any kind."  Andersen ¶ 30.  The decision of the DNTT appears (in English) at the pages numerated 226/229 through 228/229, and the Tribunal states plainly that the pension plan had not met its "burden of proof" to establish that it "owned stocks" and "received dividends on those stocks, where dividend tax has been withheld." Andersen Ex. 13.

11.     While I disagree with the reasoning of the DNTT, I also disagree with Andersen's assertion about the state of mind of the pension plans in these actions (Andersen ¶¶ 39-40).  A litigant's failure to appeal a decision or its decision to withdraw a pending appeal does not

2

necessarily signify anything about its assessment of the merits of its argument, and, for example, could reflect economic or strategic considerations.

12.    As for the 28 April 2022 decision of the Eastern High Court in the Bech-Bruun case, Andersen declined to note what that Court actually said about beneficial ownership.  In that case, SKAT asserted claims against the law firm Bech Bruun based on its advice to North Channel Bank relating to the bank's role in dividend arbitrage transactions involving US pension plans.  Specifically, Bech Bruun advised North Channel Bank that it should not face liability for issuing dividend credit advice forms to US pension plans that would submit those forms to SKAT in order to seek refunds of dividend withholding tax.  The High Court explained that "North Channel Bank's possible liability would be most obvious if the recipient of the dividend credit advice that North Channel Bank would issue would not be the right recipient of the dividend in terms of tax."  Andersen Ex. 34 at 1.

13.    The High Court ruled against SKAT.[1]  It concluded that the Bech Bruun lawyers did not act with negligence, and it also made significant statements regarding beneficial ownership.  In particular, the Court stated:

> The High Court finds that at any rate there is no such certainty that by lending the shares or by entering into the forward contracts as described in the set-up the pension plan is no longer to be deemed to be the owner of the shares in terms of tax that it may be deemed to be culpable to deem that the pension plan remains the owner under tax law.

*Id.* at 4.  In other words, the fact that a US pension plan might loan out shares or enter into forward contracts to hedge its position would not necessarily deprive the pension plan of its status as beneficial owner of the shares or any dividends flowing from those shares.

---

[1]    Aasmul-Olsen agrees that "The High Court rejected liability for the law firm on the ground that the lawyer advising had not acted negligently."  Aasmul-Olsen Decl. ¶ 64.

14. I also note that SKAT seems to have agreed with this analysis. Quoting once more from the decision:

> During the hearing of the case by the High Court *the parties agreed that* the seller's sale of the borrowed shares entailed a fiscal disposal of the shares which entails that in terms of tax *the pension plan is deemed to be the beneficial owner of the shares* …

Andersen Ex. 34 at 3 (emphasis added). In other words, in proceedings in Denmark, SKAT apparently agreed that US pension plans trading through North Channel Bank were the beneficial owners of the shares.

15. Although Andersen ultimately presents his "firm conclusion" that a party cannot be a beneficial owner (of what he does not say) by entering into a contract to purchase shares from a seller who does not deliver them, he never refers to a single case from any Danish court establishing that the failure to deliver shares deprives the purchaser of beneficial ownership.

16. Instead, Andersen spends much time attempting to distinguish the case law I referred to by asserting that those cases did not involve instances in which the sellers had "no shares" or "never deliver" "actual shares." This is not true. For example, I referred to the decision in SKM2010.259.BR, where the question was how to value certain shares. The company that was the "buyer" of shares had the choice to either pay in kind or in cash within a year following the sales agreement. The payment in kind would be shares in the company of the buyer. One year after the conclusion of the sales agreement, the buyer chose to pay in kind. The buyer chose to pay with shares that it created through a capital increase shortly before the payment was made. Thus, the shares that the buyer chose to make the payment with *did not, in fact, exist* at the time of the conclusion of the sales agreement a year prior. Nevertheless, the City Court ruled that "…*the shares* [from the buyer] must be considered acquired at the time of the agreement…" Even though the Court had to answer the question of value of the received

4

shares for tax purposes, the fact is that the Court considered the seller (who received shares as payment) to have acquired and owned for tax purposes shares that did not exist at the time of the agreement. Nor was the ownership interest delayed until the delivery of the actual shares as payment. According to the City Court, ownership transferred at the time of the agreement, not at the time of delivery of shares. This was true even though the seller of the shares did not possess the shares at the time of the agreement to sell them, and indeed the shares did not exist at that time.

17. I also discussed cases involving option rights, including the Danish Supreme Court's decision in SKM2005.490.HR, where ownership was deemed to have been transferred at the time when an option agreement was signed based on the likelihood that the option rights would be exercised. In that case, the option agreement was entered into in May 1999, and the option right existed between August 2001 and April 2002. There is no requirement under Danish law (of any kind) that a company issuing options must have shares at the time of the agreement. In short, regardless of the presence or absence of shares, the Court's analysis turned on the likelihood that the final and binding agreement would lead to an ownership position in the future.

18. At any rate, Andersen himself does not refer to cases involving "fictitious" shares or cases involving the failure to deliver shares, so his critique about the cases I have cited is not persuasive.

## I.     Further Response To Andersen's April Declaration

### A.     SKAT's Claims

19. In *Andersen (July)*, section IV, Andersen expresses how certain tortious actions and omissions can lead to liability for the losses that such actions and omissions have caused.

5

20. In this discussion, Andersen describes the *culpa rule* as the metric that such actions and omissions are measured against for imposing non-contractual liability on a tortfeasor when the matter is not specifically regulated by statute.

21. In paragraph 54, Andersen describes the *culpa rule* as: "a tortfeasor is liable for his (1) willful or negligent acts and (under certain circumstances), omissions to the extent these acts and omissions (2) actually caused losses to the victim, to the extent these losses were (3) foreseeable, and provided that (4) no particular exceptions or modifications apply."

22. As Andersen acknowledges in Paragraph 55, he focusses exclusively on what is referred to as "*the subjective test*" in his condition (1).

23. Andersen goes on to explain the *bonus pater rule* as the way in which negligent conduct is measured in Danish tort law.

24. It should be noted that the *bonus pater rule* in newer legal theory is criticized for being flawed as it is based on the prerequisite of a fictitious person—the *bonus pater* (a reasonable man)—who cannot make mistakes. The *bonus pater rule* is therefore not based on an actual reasonable person, who inevitably makes mistakes.

25. Thus, the *bonus pater rule* is today of lesser significance, and Danish courts instead rely on more objective measures such as statutory legislation and case law to determine whether an action is negligent and consequently covered by the *culpa rule*.

26. Furthermore, by purely focusing on *the subjective test* in his condition (1), Andersen fails to follow up on the remaining conditions and consequently, he fails to describe the full scope of the *culpa rule*.

27. Importantly, his condition (4)—whether exceptions or modifications apply—is critical to the conclusion of whether certain actions and omissions can in fact lead to liability for

6

the losses that these actions and omissions have caused, or if such liability is excluded due to the presence of particular exceptions or modifications.

28.     Thus, it should be noted that there are certain *general justification defenses* that exclude tortious liability in Danish law.

29.     These justification defenses provide that a tortfeasor is not liable for his (potentially) tortious actions (or omissions) if such actions are performed under (1) self-defense (2) acts of necessity (3) *negotiorum gestio* (management of another's affairs) and (4) consent from the injured party.

30.     There are several important aspects of condition (4) that are worth describing. The first is the matter of *risk acceptance*.

31.     Under Danish tort law, both express and implied consent from the injured party may result in the tortfeasor not incurring liability.  Hence, it does not matter whether consent is express or implied as consent can indeed be present in both cases because the risks (or damages) are accepted by the injured party and indicated (expressly or impliedly) to the tortfeasor.

32.     Express consent may be found when the injured party has voluntarily given his oral or written acceptance of the undertaking of a certain action or omission.  In such cases the tortfeasor's otherwise liable actions or omission will be exempt from liability.

33.     Implied consent may be found when the injured party has not expressly indicated acceptance of a given action or omission but when the *conduct* of the injured party implies such an acceptance.

34.     As an example, implied consent may be found when the injured party repeatedly follows a certain course of action over a certain period of time, creating a practice that has been established between the parties, and a certain mutual understanding that the parties rely on.

35.     In cases concerning implied consent, the tortfeasor's otherwise liable actions or omission will also be exempt from liability.

36.     In other situations, Danish courts will recognize the defense of *risk acceptance* where the injured party has not expressly or impliedly accepted the risk (or damages) of a given action or omission, but he realized or should have realized the risk of such actions or omissions, without taking measures to counter these risks, and the injured party will be found to have accepted such risk (or damages).

37.     It should be noted that the issue of *risk acceptance* arises when it is difficult to delineate how far an implied consent can be stretched in order to include certain actions and omissions.  Thus, cases regarding risk acceptance are in close connection with cases containing matters of implied consent.  Consequently, in cases regarding *risk acceptance*, the conclusion is not straightforward as theory and practice are divided in three categories.

38.     The first category provides that the injured party's *risk acceptance* exerts influence on the assessment of whether the tortfeasor has in fact acted culpably.  In this category, the court applies a test in which the negligence of the injured party is compared to the actions (or omissions) of the tortfeasor when determining if the tortfeasor is liable at all for such actions (or omissions) by means of the *culpa rule.*

39.     Such a test was applied in the High Court's decision in U 2013.84 V concerning a collision between cyclists riding together for exercise purposes.  It was decided that the tortfeasor's actions did not constitute culpable actions, and the tortfeasor was exempt from liability because the injured party had accepted the risk arising from the sport of cycling.

40.     The second category provides that if the tortfeasor is liable on an objective basis (instead of based on the *culpa rule*), the matter of *risk acceptance* will have an effect on the

assessment of whether the injured party's conduct is his own fault (egen skyld), which may result in a reduction, but not necessarily a preclusion, of his claim.

41.     In practice, this category is mostly relevant in cases concerning injuries occurring to passengers driving with a motorist, who is under the influence of substances that impair his driving abilities, in which they have accepted the risk of the danger of such a situation.

42.     The third category provides that the injured party's conduct can be considered as a *general justification defense,* which means that the tortfeasor's otherwise liable actions or omission will be exempt from liability.

43.     In the Supreme Court's decision in U 1980.367 H, the court arrived at such a conclusion.  The decision dealt with a case where four young people together fired air rifles at some moped helmets to test their durability.  One of them sustained an eye injury in connection with the episode.  He then demanded compensation from the other participants, who, however, were exempt from liability, considering that the injured party should have realized the danger.

44.     Finally, even though the cases concerning risk acceptance are mainly focused on personal injuries, the principles outlined in the decisions apply outside of that context, and remain relevant in the present litigation.

45.     This is because of the clear fact in Danish tort law that the injured party who realized or should have realized the risk of certain actions or omissions, without taking measures to counter such risks, has accepted the risk (or damages) regardless of the type of injury that is in question.

46.     Thus, the subject of consent, implied consent, and the matter of risk acceptance are to be kept in mind as they constitute relevant exceptions or modifications to determining who is liable for tortious actions covered by the *culpa rule*.

9

## B.  SKAT Is Not The Kingdom Of Denmark

47.  In Andersen's latest declaration, he concludes that the various ministries within the Kingdom of Denmark are not separate legal persons but indeed just branches of the Kingdom of Denmark.

48.  In order to reach this conclusion Mr. Andersen among other points refers to section 14 of the Danish constitution, which he defines as being an absolute prerogative.  Furthermore, his underlying premise is that since section 14 of the Danish constitution awards the Prime Minister the right to determine the number of ministries and distribution of duties, they are always part of a total legal entity.

49.  In paragraph 109, Andersen states that the historic background of section 14 is of no relevance to the interpretation of the provision.  He then states in paragraph 113 that he reaches this conclusion purely by means of a literal interpretation of the provision.

50.  However, it is necessary to consider the historic developments and changes over time when interpreting the constitution.

51.  As an example, section 14 1st and 2nd paragraph can be considered.  The provision prescribes that: "The King shall appoint and dismiss the Prime Minister and the other Ministers. He shall decide upon the number of Ministers and upon the distribution of the duties of government among them."[2]

52.  This is no longer a reality to the same degree as when the provision was first drafted; today, it is the Prime Minister that in practice has this competence.

---

[2]  I am quoting from Andersen's translation, which appears in Paragraph 23 of his declaration of July 12th 2019.

53.     As mentioned in *Pilgaard (April)*, paragraph 70, even Andersen concedes this fact, as he agrees that today it is the Prime Minister who wields the powers that originally were the responsibility of "the King," despite the fact that the provision continues to refer to "the King."

54.     Thus, although Andersen says that he rejects a dynamic interpretation of the constitution, his own interpretation *is* in fact dynamic.

55.     In addition, the historic background of the provision is indeed important to consider. As mentioned in *Pilgaard (April)*, paragraph 69, the Danish government has changed dramatically since section 14 was drafted.  Originally, section 14 of the Danish constitution formed the basis for when changes of government were to take place.  This question was determined by the sovereign until constitutional changes in 1901 introduced the parliamentary system that was later formalized in the Danish constitution of 1953 with the introduction of section 15.

56.     Even though it is the Prime Minister who wields the power to determine the number of ministries and consequently appoint and dismiss the other ministers, the matter is fundamentally determined by parliamentarism.

57.     This follows from section 15 of the Danish constitution which states that: "No minister can remain in office after the parliament has expressed its distrust of him."

58.     In other words, it is effectively the Danish Parliament that has the final say in the matter of appointing and dismissing Danish Ministers, as it requires the consent of Parliament to appoint a minister, and the Parliament has the power to dismiss a minister by forwarding a motion of no confidence.  *See* section 15.

59.     This also bolsters the conclusion that section 14 is not absolute, as the Prime Minister must ultimately adhere to the Danish Parliament, even though section 14 grants the Prime Minister the comprehensive capabilities originally residing with "the King."

60.     Thus, I maintain my conclusion in *Pilgaard (April)*, paragraph 72, that section 14 of the Danish constitution is indeed not absolute.  Andersen's interpretation of the provision does not support the conclusion that since section 14 awards the Prime Minister the right to determine the number of ministries and distribution of duties, they are always part of a total legal entity.

61.     This follows from the fact mentioned above that the Danish Parliament has the final say in the matter of appointing and dismissing Danish Ministers and moreover as stated in *Pilgaard (April)*, para. 73, that the Parliament has the power to bind the government and may transfer specific tasks to either one remit or one ministry with specific subject-matter powers as opposed to another.

62.     Andersen also concludes in paragraph 116, that "each ministry and each administrative branch or agency acts under the responsibility and supervision of a minister who is in turn appointed by the prime minister to exercise the legal, factual and political functions of the Kingdom of Denmark."  I agree, but Andersen's statement does not mean that SKAT is the same legal entity as the Kingdom of Denmark.

63.     In *Pilgaard (April)*, paragraph 79, I explained that the Danish administration is divided into *separate* authorities with distinct powers in relation to their subject-matter, and it is not one total legal entity.

64.     To substantiate this, Henrik Zahle, who as stated in *Pilgaard (April)*, paragraph 72, was an expert in Danish constitutional law and served as a Professor of Law at the University of Copenhagen and a judge on the Supreme Court, writes in his treatise "Dansk Forfatningsret" that:

12

Finally, the minister acts as an independent authority. The Minister oversees a ministry and is thus the highest in the state hierarchy, insofar as this fall under the central administration. In this context, the Minister exercises functions in several directions: The Minister has the final say in the matters to be decided by the Ministry, the Minister is responsible for the Ministry's external position in relation to the public, in relation to organizations and individuals to which the Ministry's decisions are addressed and in relation to the Parliament, where the Minister in relation to the plenary and the committees handles the tasks that fall within the Ministry's area.[3]

65.     Even though Zahle's statement regards the role of the minister in question, it underlines the fact that the Minister and therefore the Ministry, is completely and utterly independent from other branches of Danish agencies and authorities.

66.     As stated in *Pilgaard (April)*, paragraphs 40-54, SKAT is a part of the Ministry of Taxation, which is a government agency with distinct powers in relation to its subject-matter, being essentially to collect taxes on behalf of the Danish government.

67.     In this context, the Ministry of Taxation and therefore SKAT is completely independent from other government agencies, regarding the ministry's functions, decisions, and responsibilities.

68.     However, even though SKAT is authorized to collect taxes on behalf of the Danish government, the tax revenues do not belong to SKAT. Moreover, SKAT is neither injured nor benefitted in the event of a shortfall or surplus in the collection of tax recipients for any reason. This potential benefit or injury ultimately lies with the Kingdom of Denmark.

69.     Thus, I must maintain my conclusion that SKAT is indeed its own legal entity, separate from the Kingdom of Denmark, which in turn is its own legal entity.

70.     In disputing this fact, Andersen states that SKAT is not a legal entity, separate from the Kingdom of Denmark, since a citizen who is sued by one ministry may counterclaim against

---

[3]     Zahle, H. (2017). *Dansk Forfatningsret*, page 126.

that ministry for any amount owed by any other ministry. Andersen also makes the reverse point in *Andersen (July)*, paragraphs 39-40, which states that a ministry may assert a counterclaim arising from any other ministry to compensate or counterbalance its debt towards a citizen.

71. In relation to the first situation in which it is the citizen who asserts its counterclaim, Andersen does not provide any case law or any other sources to substantiate the fact that a citizen can assert counterclaims against a ministry with a claim that is owed by any other ministry. I am unaware of any case in which this happened or any authority that supports the proposition.

72. In relation to the second situation in which it is the ministry who asserts its counterclaim it should be noted that Andersen interprets case law as being that Danish ministries have an unconditional opportunity of asserting counterclaims regardless of what and where the claim originally arises out of.

73. However, Andersen's conclusions collide with Circular letter no. 186 of 1983-11-22 on the limitation of the State's right to assert counterclaims – To all ministries and agencies (Cirkulærskrivelse nr. 186 af 22. November 1983 om begrænsning af statens modregningsret – til samtlige ministerier og styrelser) where it is ascertained that government ministries and agencies are excluded from asserting public law counterclaims in private law matters, and vice versa.

74. In other words, it is only possible for a government ministry or agency to assert its counterclaim arising from another ministry or agency to the extent the claims are both public law claims (e.g., tax claims) or both private law claims (e.g., contractual claims). The ability to assert counterclaims is thus limited in such a degree that it cannot form the basis for a conclusion that all Danish ministries and agencies are part of a total legal entity. If anything, it

might suggest that all Danish ministries and agencies are authorized to collect funds on behalf of the Kingdom of Denmark, but that hardly means that they *are* the Kingdom of Denmark.

75.     Indeed, even though government ministries and agencies can sometimes counterclaim with each other's claims, that does not change the foundation of the legal framework.  Each governmental ministry still is an independent entity with its own legal identity, and this does not interfere with who is the correct party in a civil litigation.

76.     Furthermore, a ministry or agency's right to assert a counterclaim has no relevance in terms of the ministry or agency's ability to assert claims in the first instance.

77.     Therefore, just because SKAT has the ability to counterclaim with other ministries or agencies claims does not mean that SKAT is not a legal entity in its own right, separate from the Kingdom of Denmark.  SKAT still needs its own standing to bring its own claims before the courts.

78.     Andersen also refers to one court decision in U 1981.473 H in which SKAT was the plaintiff.  He states in paragraph 118 that "There are no substantial differences between the private law claim that SKAT raised in the 1981 decision, and the claims that SKAT has raised in the present litigation."

79.     It should be noted that even though the claim, as a matter of private law, is similar to the claim in the present litigation, the decision has little bearing since SKAT's authority to bring the case before the courts was not disputed in U 1981.473 H.

80.     Thus, the court's decision in U 1981.473 H just substantiates the fact that SKAT is indeed its own legal entity.  Moreover, SKAT's ability to assert claims in a Danish court in that case says nothing about SKAT's ability to assert or recover on claims in a US court.

81.     Andersen also states in paragraph 119 that there are numerous cases in which the Ministry of Finance appears as *a party* in civil law claims.  In paragraph 121, Andersen then refers to the Supreme Court's decision in U 1939.296 H in which the Ministry of Finance was sued by the Association for Securities Trade in Amsterdam.

82.     In this context, the decision only shows that the Ministry of Finance may be sued and subsequently act as a defendant in a civil law case.  Consequently, the Supreme Court's decision in U 1939.296 H has nothing to do with SKAT's ability to assert claims in a US court, or the fact that SKAT is not a legal entity, separate from the Kingdom of Denmark.

83.     Finally in this regard, Andersen asserts that "the United States would be allowed to appear as plaintiff in a Danish court with claims identical to SKAT's claims in the present litigation," and he describes this as "the reverse situation" as SKAT's current lawsuits in the United States.  I disagree that the hypothetical lawsuit by the United States would be the "reverse" of SKAT's lawsuits in the United States because SKAT is not the same as the Kingdom of Denmark.  In other words, the "reverse situation" might involve a lawsuit brought by the US tax authority.  However, the ability of the IRS to pursue litigation in Denmark would be governed by the US-Denmark Treaty, and might further be subject to the "revenue rule," which Danish courts have recognized.  *See, e.g.*, U.1924.176.Ø (finding case unsuitable for adjudication by Danish court because a nation may not have its tax claims enforced before the courts of a foreign country).

## II.     Further Response to Aasmul-Olsen's Declaration

### A.     Shares Of A Publicly Traded Company

84.     In his declaration, Aasmul-Olsen suggests that I have claimed that a "mere contract" can "create" "shares in a Danish company."  I did not make that assertion.

85. To be clear, I agree with Aasmul-Olsen that Danish companies issue a specific number of shares. However, it is a well understood market phenomenon both within Denmark and around the world that ordinary trading activity can result in claims to ownership of shares in excess of the number of shares issued by the company. Within Denmark, this has been recognized by the Ministry of Taxation itself: in a Reply to Early Warning, the Ministry acknowledged that "the share loan structure carries the risk" that both a securities lender (deemed the beneficial owner of shares for tax purposes) and the securities borrower (reported to SKAT as owner of the shares) could "seek reimbursement for the dividend tax." Schoenfeld Ex. 16. In other words, SKAT acknowledges that two different investors could claim to be the owner of the same share.

86. Another well-known example involved shares of the public company GameStop. As a result of securities lending and short selling—both of which are legal in Denmark—investors shorted shares representing more than 100% of the company's "float." I am aware of no regulation or rule of law in Denmark that would prevent shareholders in a Danish company from holding long or short positions that exceed more than 100% of the issued shares of that company as a result of securities lending. In other words, what happened to GameStop could just as easily have happened to Maersk.

### B. The *"Nemo Dat"* Doctrine

87. Aasmul-Olsen devotes large portions of his declaration to characterizations of Danish securities laws and Danish civil law. He does not, for the most part, discuss Danish tax law, and, as I noted above, he does not meaningfully discuss beneficial ownership. For that reason, most of his discussion sheds little light on what I understand to be the relevant question in this case, which is whether the US pension plans were the beneficial owners of dividends.

17

88.     To be sure, it is commonly agreed upon that the civil law in Denmark provides the basis for Danish tax law.  However, in certain areas of Danish tax law, the courts do not feel obliged to follow the civil law basis and therefore deviate "for tax purposes."  There are many examples.  For instance, in the Ministry of Taxation's Reply to Early Warning, the Ministry observed that "the tax and civil treatment of share loans is different."  Schoenfeld Ex. 16.  In particular, "the lender is the beneficial owner of the shares for tax purposes," but the borrower "is reported to SKAT" as the civil "owner of the shares."  *Id.*

89.     It is clearly not correct to suggest, as Aasmul-Olsen does (n.40) that "tax laws are controlled by civil laws … on the issue of ownership to shares," and in the very submission to the DNTT that Aasmul-Olsen cites, I explained that there are "exceptions" in which "the civil law owner of the stock" is "not the tax law owner of the stock."  Aasmul-Olsen Ex. 45 at 117-18.  Another example that is discussed in SKAT's Legal Guide concerns sales of shares followed by repurchases of shares.  According to the Legal Guide C.B.2.1.4.10, "A disposal of a share followed by a repurchase is recognized *for tax purposes* as a sale and repurchase if there has been a real opportunity for price fluctuations in the intervening period."  If, however, there has been no opportunity for price fluctuation between the sale and the repurchase, then the share will not count as having been sold *for tax purposes*, and the seller will not have tax liability for gains or losses even though as a matter of civil law, he disposed of the share.

90.     Yet another example from the case law is SKM2011.533.HR (and SKM2005.490.HR) in which the Supreme Court ruled that the shares were disposed of at the time of the option agreement and not at the time of the exercise of the option agreement "for tax purposes," indicating that the result might differ from that of a civil law point of view.  An

assessment under tax law will not always be the same as under civil law, which is, in fact, the position I communicated to the DNTT.

91.    To the extent Aasmul-Olsen asserts that a seller must own shares at the moment of sale in order to transfer ownership, or that ownership is only transferred at the time of delivery of shares, I disagree.  In none of the cases I cited did any court ever consider whether the seller owned the shares on the trade date, and Aasmul-Olsen does not suggest otherwise.  It is standard market practice in Denmark (as indeed around the world) for trades to settle several days after the agreement to purchase and sell has been entered into.  There is no obligation under Danish civil or tax law that the seller possess shares on the trade date.  Nevertheless, the series of cases I cited in my previous declaration all stand for the proposition that the buyer acquires the ownership interest on the trade date, and not on the settlement date.

92.    Again, the Ministry of Taxation's Reply to Early Warning confirms that a borrower of shares may sell them.  SKAT's own website has stated that a purchaser of borrowed shares *is the beneficial owner of the shares*.  Accordingly, whatever the "non-statutory legal principle" of "nemo dat" means, it cannot mean that a purchaser of borrowed shares does not own them (or if it does, SKAT's guidance on its own website is incorrect).  Quite obviously a seller of borrowed shares does not own them for tax purposes, at least as of the trade date.

93.    As another example, for many years, the practice of "naked short selling" was, in fact, legal in Denmark.  A naked short seller is a seller of shares who does not own them and has no right to acquire them.  Of course, it would not be possible for naked short selling to exist at all—and give rise to gains and losses—if those trades were nullities because of the concept of *nemo dat*.  When naked short sales were permitted in Denmark (before 2012), Danish tax

19

law did not treat naked short sales any differently from other sales, including from the perspective of the buyer of shares (sold by a short seller) who was the tax owner even though no shares existed.

94. I also note that although Aasmul-Olsen and Andersen both cite approvingly the decisions of the DNTT in certain appeals involving US pension plans and the decision of the Eastern High Court in the Bech Bruun case, none of those decisions includes any discussion at all of the *nemo dat* principle. In none of those cases did SKAT argue that the concept of *nemo dat* deprived the pension plans of ownership of shares or dividends. In the Bech Bruun case, SKAT even *agreed* that the US pension plans were beneficial owners and said nothing of *nemo dat*. Neither did the DNTT nor the Eastern High Court indicate in their findings that tax or beneficial ownership takes into consideration the civil law principle of *nemo dat*.

95. Aasmul-Olsen states that "Danish law permits netting and internalized settlement among several customers of the same custodian without compromising a purchaser's ownership rights." I agree. Aasmul-Olsen goes on to state that these concepts are "premised on the custodian holding actual shares." He cites nothing in support, and I am aware of no Danish authority that requires a custodian engaging in equal and offsetting trades to "hold" any particular quantity of shares. The entire point of netting and internalized settlement is to enhance liquidity and reduce the need to go to the market to buy or sell shares; as a Product Manager from VP Securities explained, if a custodian begins the day with zero shares, and has one customer who buys 100 shares and another customer who sells 100 shares of the same security, the custodian will end the day with zero shares. Sorensen Vol 2 Tr. 60-63. That does not mean that the buyer owns nothing.

20

96.     With respect to dividends, Aasmul-Olsen says, "In my view, however, any entitlement to dividends will require ownership of shares as a prerequisite for receipt." While ownership of shares certainly suffices to establish entitlement to dividends, it is not the exclusive way to obtain entitlement to dividends. For example, the Official Commentary to the OECD Model Convention of 2014 explains that "Article 10 refers to the beneficial owner of a dividend as opposed to the owner of the shares, which may be different in some cases." Pilgaard (April) Ex. 74 at 123.

### C.     Settlement Is Not A Prerequisite For Ownership

97.     Aasmul-Olsen suggests that delivery of shares (i.e., settlement) is a precondition to ownership of shares under Danish tax law. He does not opine as to whether delivery of shares is a precondition to *beneficial ownership*, and I am not aware of any decision from any Danish court that presupposes delivery of shares as a prerequisite for beneficial ownership. The recent decision from the Eastern High Court in the Bech Bruun matter, and the endorsement by both Bech Bruun and SKAT of the Hannes Snellman opinion, suggest that under Danish tax law, a trade that is entered into cum-dividend but not settled until after the ex-dividend date nonetheless entitles the purchaser to the dividend. This would not be true if ownership did not transfer on the trade date. From para 50-51 in the Aasmul-Olsen declaration I understand that Aasmul-Olsen agrees that if a custodian or sub-custodian records shares in its books (by book entry) by the time of an agreement to buy or sell shares, those shares would be sufficiently segregated to transfer civil ownership upon their purchase or sale.

98.     I also note that the Hannes Snellman decision recognizes the availability of netting and internal settlement under Danish law. In particular, Assumption 4(6) states that a pension plan's "ownership to the Equities will be recorded with the custodian and, depending upon the custodian's and sub-custodian's other long and short positions, the Danish Securities

Centre." Thus, Hannes Snellman recognized that recording of ownership with VP Securities (the "Danish Securities Centre") would depend upon the custodian's "other long and short positions." According to the tax opinion, which was also endorsed by Bech Bruun, the pension plan would be the owner and entitled to any reclaim of dividend withholding tax even if the shares were not recorded with VP Securities as a result of netting and internal settlement.

99.     In my April declaration, I explained that ownership of shares is transferred upon a final and binding agreement to buy and sell shares. Aasmul-Olsen does not seriously challenge that assertion, but suggests that it relates only to the question of when ownership transfers.

100.    It is true that the main issue in the section C.B.2.1.6.1 of the Legal Guide which is referenced in Pilgaard paragraph 156 is the question of when a share is either acquired or disposed of for the purpose of the capital gains tax on shares. If one at a certain point in time is liable for capital gains tax on the disposal of shares, one must also have sold or disposed of that share which is the basis of the capital gains tax. Therefore, transfer of ownership to the share in question must have taken place at the time of disposal of the share which – according to section C.B.2.1.6.1 of the Legal Guide – is the time of a final and binding agreement between the parties.

101.    This is clearly supported by SKM2001.126.HR. In this case the Supreme Court stated with reference to the High Court's decision the following: "The rules of the Danish Capital Gains Tax Act on the time of acquisition of shares must - in accordance with the rules of the law of obligations - be understood as meaning that the time of acquisition is the transfer of ownership by transfer or otherwise. The plaintiffs' acquisition of shares in F2 ApS on 1 September 1994 took place in accordance with issued fund notes, *which were signed by both*

22

*the plaintiffs and the sellers, and the plaintiffs acquired ownership of the shares in question at that time*."

102.   In SKM2011.533.HR, in which the question was whether the time of the option agreement or the time of the exercise of the agreed option was the actual of disposal of the shares for tax purposes, the Ministry of Taxation stated the following:  "H1 ApS has the burden of proof for the presence of such a degree of uncertainty *that can push forward the time of the transfer of ownership* [from the time of agreement to the time of exercise], which burden of proof has not been lifted."  This argument was a repetition of a similar argument made in SKM2005.490.HR. Clearly the Ministry of Taxation is of the opinion that the actual transfer of ownership to the shares in this case occurred at the time of the option agreement, i.e. the time of the final and binding agreement.

103.   Above, I discussed the case of SKM2010.259.BR, in which the City Court ruled that shares were "considered acquired *at the time of the agreement*" even though they literally did not even exist at that point in time.  This case squarely rebuts any suggestion that a seller must have shares at the moment of sale in order to transfer ownership to the buyer at that time.

104.   The case law cited in section C.B.2.1.6.1 of the Legal Guide does not address the issue of the importance of segregation compared to the time of the conclusion of the sales agreement.  Whether or not segregation is of any importance when considering the transfer of ownership for tax purposes cannot be determined on the basis of the case law in question.

105.   According to the cited case law it can be concluded that when a final and binding agreement to buy or sell shares has been concluded and the shares are delivered at settlement, then the time of segregation or the time of settlement are not relevant for tax purposes.

23

106. The fundamental starting point in Danish case law is such that the time of the conclusion of the agreement is also the time when the ownership of the shares is transferred from seller to buyer. The courts have maintained this position whenever the taxpayer has tried to deviate from this starting point.

\* \* \*

107. In connection with my declaration of April 27, I have in paragraph 143 of my declaration made mention of "the recommendations of the Commission in "Recommendation on withholding tax relief procedures C(2009)7924 of October 19, 2009." The recommendation from the Commission is presented as Exhibit 1.

Pursuant to 28 U.S.C. § 1746(1) the undersigned Kasper Bech Pilgaard, state under penalty

of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 27, 2022

Kasper Bech Pilgaard
Copenhagen, Denmark