Ib5dcusM

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------------x

3  In re:

4  CUSTOMS AND TAX ADMINISTRATION OF
   THE KINGDOM OF DENMARK (SKAT) TAX
5  REFUND LITIGATION                        18-MD-2865(LAK)

6  This paper applies to All Cases.

7  ------------------------------------x

8                                    November 5, 2018
                                     2:00 p.m.
9
   Before:
10
                       HON. LEWIS A. KAPLAN,
11
                                          District Judge
12
                            APPEARANCES
13
   HUGHES HUBBARD & REED LLP
14      Attorneys for Plaintiff SKAT
   BY:  SARAH L. CAVE
15      MARC A. WEINSTEIN
        WILLIAM R. MAGUIRE
16
   CAPLIN & DRYSDALE, CHARTERED
17      Attorneys for Defendants The Bradley London
        Pension Plan and Doston Bradley, et al.
18 BY:  MARK D. ALLISON
        ZHANNA A. ZIERING
19
   WILLIAMS & CONNOLLY LLP
20      Attorneys for Sander Gerber Pension Plan
   BY:  AMY B. McKINLAY
21      BRYAN C. SKARLATOS
        STEPHEN D. ANDREWS
22      ERIC SMITH

23

24

25

Ib5dcusM

```
 1                    APPEARANCES CONTINUED

 2   MORVILLO, ABRAMOWITZ, GRAND, IASON & ANNELLO P.C.
          Attorneys for Adam LaRosa
 3   BY:  EDWARD M. SPIRO

 4   GUSRAE, KAPLAN, NUSBAUM, PLLC
          Attorneys for Goldstein Law Group PC 401(k)
 5        Profit Sharing Plan and Sheldon Goldstein
     BY:  JOSEPH CHRISTOPHER ALBANESE
 6        MARTIN H. KAPLAN

 7   DEWEY PEGNO & KRAMARSKY
          Attorneys for Michael Ben-Jacob
 8   BY:  THOMAS E.L. DEWEY

 9   KATTEN MUCHIN ROSENMAN LLP
          Attorneys for Defendant Robert Klugman
10   BY:  MICHAEL ROSENSAFT

11

12                         oOo

13

14            THE CLERK:  In re:  Customs and Tax Administration of

15   the Kingdom of Denmark (SKAT) Tax Refund Litigation.

16            Counsel for plaintiff SKAT, are you ready?

17            MR. WEINSTEIN:  Yes, your Honor.  Good afternoon, your

18   Honor.  Mark Weinstein and Bill Maguire and Sarah Cave from

19   Hughes Hubbard for plaintiff.

20            THE COURT:  Good afternoon.

21            THE CLERK:  Counsel for defendants Bradley London

22   Pension Plan and Doston Bradley, are you ready?

23            MR. ALLISON:  Yes, your Honor.  Mark Allison for those

24   defendants and about three dozen others that are before this

25   Court.
```

Ib5dcusM

1          THE COURT:  I've just asked my secretary how many of

2     these cases we have now and she couldn't count that high.  Good

3     afternoon.

4          THE CLERK:  Defendant Sander Gerber Pension Plan, are

5     you ready?

6          MR. ANDREWS:  Yes, your Honor.  Good afternoon, your

7     Honor.  Stephen Andrews and Amy McKinlay, from Williams &

8     Connolly.

9          THE COURT:  Good afternoon.

10          THE CLERK:  Defendant Adam LaRosa, are you ready?

11          MR. SPIRO:  Yes, your Honor.  Edward Spiro, of

12     Morvillo, Abramowitz, Grand, Iason & Annello.

13          THE COURT:  Good afternoon.

14          MR. SPIRO:  Good afternoon, your Honor.

15          THE CLERK:  Defendant Goldstein Law Group Profit

16     Sharing Plan and Sheldon Goldstein, are you ready?

17          MR. KAPLAN:  Yes.  Good afternoon, your Honor.  Martin

18     H. Kaplan, Gusrae, Kaplan, Nusbaum, PLLC, and to my right is my

19     associate Christopher Albanese.

20          THE COURT:  Good afternoon.

21          MR. KAPLAN:  Good afternoon, your Honor.

22          THE CLERK:  Defendant Michael Ben-Jacob, are you

23     ready?

24          MR. DEWEY:  Yes, we are.  Good afternoon, your Honor.

25     Tom Dewy, from Dewey Pegno & Kramarsky.

Ib5dcusM

1          THE COURT:  Good afternoon.

2          THE CLERK:  And defendant Robert Klugman, are you

3     ready?

4          MR. ROSENSAFT:  Yes, your Honor.  Good afternoon.

5     Michael Rosensaft for defendant Robert Klugman.

6          THE COURT:  Good afternoon.

7          OK.  Counsel.

8          MR. ALLISON:  Your Honor --

9          THE COURT:  Yes.  I would appreciate that.

10          MR. ALLISON:  Thank you.

11          THE COURT:  Let's figure about a half hour for the

12     defense and a half hour for the plaintiff.

13          MR. ALLISON:  Sure.  No problem, your Honor.

14          Your Honor, may it please the Court?  Defendants have

15     brought a motion to dismiss on two principal grounds which

16     we're happy to cover both today for your Honor.  One is a

17     12(b)(1) motion to dismiss on grounds under the revenue rule,

18     which your Honor obviously is familiar with.  And, your Honor,

19     the revenue rule obviously is a well-developed common law

20     doctrine that bars U.S. courts in this case from enforcing the

21     tax revenue laws of foreign jurisdictions, and that can apply

22     either with respect to final tax judgments or unadjudicated tax

23     claims.

24          This case, your Honor, from defendants' perspective,

25     falls squarely into the revenue rule jurisprudence that has

Ib5dcusM

1  been developed by this jurisdiction and other courts in the

2  U.S.  This is, in our view, very much your classic revenue rule

3  fact pattern.  The genesis of this litigation is the filing of

4  tax refund claims by the defendants that were filed with SKAT,

5  which is the plaintiff here, on standard tax refund claim forms

6  that were issued by SKAT, that included all the supporting

7  documentation required by SKAT for those tax refund claims, and

8  which resulted in the payment of tax refund amounts to the

9  defendants, at least to the defendant pension plans in this

10  case.  SKAT later determined that it erred in issuing those tax

11  refunds and through their own internal tax administrative

12  proceedings that are currently ongoing in Denmark have demanded

13  the return of those tax refunds.

14       The amounts in dispute in this case, your Honor,

15  exactly equal the amount of the tax refunds that are in dispute

16  in Denmark.  They are the exact same dollar or kroner amounts.

17       The tax refund claims themselves that are in dispute

18  in Denmark are identified and listed in each of the complaints

19  in these cases, and they match exactly those that are in

20  dispute in Denmark.

21       THE COURT:  Let me pose a hypothetical to you.

22  Suppose two guys break into the Danish Central Bank and steal

23  20 million Euro and flee to the United States and Denmark sues

24  to recover the money.  Does the revenue rule bar that claim?

25       MR. ALLISON:  In my view, my personal view, your

Ib5dcusM

1    Honor, no, the revenue rule would not apply in that case.

2              THE COURT:  And that's true even though the money they

3    stole were tax revenues collected by the Kingdom of Denmark,

4    right?

5              MR. ALLISON:  Well, in that case it is not tax

6    revenue.  The character that makes --

7              THE COURT:  What do you think got?  Charitable

8    contributions?

9              MR. ALLISON:  Well, your Honor, if I walked into --

10   maybe to use a little bit more stark example.  If I walked into

11   SKAT's office in Copenhagen -- I assume that they have the

12   equivalent of IRS offices around Denmark.  If I walk into the

13   office with a gun -- if I may use that term here -- and I say

14   "Give me all your money," I'm not implicating the Danish tax

15   system by doing that.

16             THE COURT:  Even though the money is tax revenue.

17             MR. ALLISON:  Well, all money is fungible, and all of

18   it starts someplace as tax revenue presumably.  But in that

19   context, I am not invoking the tax administrative process in

20   order to get that money.  I have not filed a tax return.  I'm

21   not doing anything through the administrative proceedings --

22   the tax administrative proceedings --

23             THE COURT:  Suppose, for the sake of discussion, that

24   every single piece of supporting documentation that went along

25   with the forms was forged.

1          MR. ALLISON:  It makes no difference, your Honor.  The

2     revenue rule applies because we've implicated the tax system in

3     order to generate those funds.

4          And the revenue rule, as far as I could tell --

5          THE COURT:  You've implicated the tax system to

6     generate the funds.  So you've implicated the tax system by

7     submitting forged documents, humph?

8          MR. ALLISON:  Correct, your Honor.  No differently

9     than in the United States if I file -- to use an example, if I

10    file a refund claim pursuant to the earned income tax credit, I

11    file that claim and I make up the amount of income that I've

12    earned that results in this refundable tax credit.  I've made

13    it up.  I falsely claimed that I earned that income.  The

14    Internal Revenue Service's process for getting that money back

15    is through the tax system.  It should be no different because

16    we're talking about a foreign jurisdiction in which allegedly

17    the same thing occurred, even though that allegation --

18         THE COURT:  Your position is that no matter what the

19    crime, if it's committed against a taxing agency of a foreign

20    government, the foreign government cannot resort to the U.S.

21    courts to recover the proceeds of the crime?

22         MR. ALLISON:  To be more precise, it has to be done

23    through the tax procedures against that tax agency.  It can't

24    be just random like using a gun.  There has got to be something

25    that ignites the process, and that is usually done through a

Ib5dcusM

1    tax return.  It could be a tax return.  It could be a tax

2    refund claim.  But one of those things has to --

3              THE COURT:  How is that a defensible principle?

4              MR. ALLISON:  Well, your Honor, if you look at the

5    revenue rule jurisprudence -- of course, your Honor is aware of

6    it -- or if you look at the treaty between Denmark and the

7    United States, there is no subrogation, no depredation there

8    between filing a refund claim by mistake or through an

9    inadvertent error or negligence or through tax fraud or through

10   really bad fraud.  The key is that you've done something that

11   results in the payment -- or the nonpayment of tax revenue.

12   And that ultimately leads to the foreign tax jurisdiction --

13             THE COURT:  Your position would be the same if they

14   filed forged documents along with the refund claim and bribed

15   an official of the Danish government to overlook the forgery?

16             MR. ALLISON:  I think there are several cases in the

17   revenue rule jurisprudence that involve the claim of forged

18   documents, but that doesn't seem to be the differentiation in

19   any of those --

20             THE COURT:  How about the question I just asked?

21             MR. ALLISON:  I'm sorry, your Honor.  If you could

22   repeat it?

23             THE COURT:  Suppose they bribed a senior official of

24   the Danish tax authorities to overlook the forgeries.  Denmark

25   would have no recourse in the United States, right?

1          MR. ALLISON:  Against the recipients of those

2    benefits, yes, that's right.  They could go after the person

3    that they bribed in Denmark, if that be the case.  But the

4    connection between the taxpayer and the tax authority is the

5    receipt of something that was denominated as tax revenue as a

6    result of filing, whether forged or not, a take return or a tax

7    refund claim that resulted in that payment.  That has to be the

8    differentiation.  Otherwise, we are going to be stuck in this

9    quagmire as to what's the difference between something that

10   invokes or implicates the tax system and your example of

11   somebody just, you know, walking in with a gun or somehow

12   otherwise engineering a payment.

13          There are any number of other examples, your Honor.

14   If I am a vendor of computers and I sell computers to SKAT,

15   like I would to any other potential party, and I rip them off,

16   I say I'm selling Apple computers and it turns out that they

17   are fraudulent, they are not really Apple computers and I've

18   ripped them off, that has nothing to do with the fact that the

19   recipient of those services or those products is SKAT as a

20   Danish tax authority.  It is just another recipient of a

21   fraudulent transaction but does not involve the tax system

22   itself.

23          But, your Honor, in this case, just to continue, this

24   is not the examples you've given.  This is a much more

25   conventional situation.  The dispute here is not about whether

Ib5dcusM

somebody held a gun and walked in to steal money.  Despite the

characterization as something as theft or not, that is not the

issue.

       But to put a fine point on why the revenue rule needs

to apply in a context like this is that we have the added

issue, which your Honor is familiar with from the R.J. Reynolds

Canada case, which is we have a treaty that backstops this, and

the treaty between the United States and Denmark defines the

negotiations between the two governments as to when and how tax

collection should be -- tax collection assistance should be

granted by one government to the other.  That treaty defines

the limits of that service by the Internal Revenue Service.

And the fact is that those provisions in this context would bar

SKAT from being able to obtain that assistance from the

Internal Revenue Service.  But even if there was --

       THE COURT:  They are not attempting to do that.

       MR. ALLISON:  They are not, your Honor, and that's an

important point.  They are not because they know they cannot.

So it seemed ironic for SKAT to be able to go around a

negotiated treaty -- just as in Canada, to be able to go around

the treaty and suddenly say, well, we need the U.S. courts to

intervene because the treaty that we negotiated between our

executive branches doesn't permit it.  That would be a very

problematic circumstance, and that's why, at least as far as we

know, SKAT has not attempted to do that.

Ib5dcusM

1          But you raise an interesting point.  Even though SKAT

2     has, as far as we know, not attempted to go through the treaty

3     to get the benefit of some kind of assistance, they have in

4     fact used the treaty to obtain information relevant to these

5     cases.  So they know that this is a tax case and, hence, the

6     need to use the tax treaty to get information from the Internal

7     Revenue Service.  So, yeah, if you want to use --

8          THE COURT:  And where in the complaint will I find

9     that?

10         MR. ALLISON:  You will not find it in the complaint.

11    That was an exhibit that we included in our last submission as

12    one of the examples of where SKAT has interacted with the

13    Internal Revenue Service.

14         THE COURT:  So this is an argument on a motion to

15    dismiss the complaint that you introduced by (a) material

16    outside the complaint, (b) for the first time in the reply

17    papers, and what makes you think I'm even going to read it on

18    this motion?

19         MR. ALLISON:  Whether you read it or not, your Honor,

20    the fact is that we were faced with this in response to SKAT's

21    opposition, and the reality is that that is occurring.  And,

22    actually, you can see it, your Honor, just as another

23    example --

24         THE COURT:  We don't usually try the facts on motions

25    to dismiss.

Ib5dcusM

```
 1              MR. ALLISON:  Understood, your Honor.  We are only
 2    responding to the facts as alleged in the original complaints.
 3    There is jurisprudence that does allow the submission of
 4    additional information in the context of a 12(b)(1) motion --
 5              THE COURT:  Why is this 12(b)(1) in addition to
 6    12(b)(6)?
 7              MR. ALLISON:  It is 12(b)(1) because it is a subject
 8    matter jurisdiction issue in the first instance.
 9              THE COURT:  How is that true, as opposed to a failure
10    to state a claim upon which relief may be granted?
11              MR. ALLISON:  I think they certainly overlap your
12    Honor, there is no doubt about that.
13              THE COURT:  And the general rule is that unless the
14    claim is essentially preposterous, it's treated under 12(b)(6).
15              MR. ALLISON:  Understood, your Honor, but I believe
16    that --
17              THE COURT:  That is Bell v. Hood in 1946.
18              MR. ALLISON:  Understood, your Honor.  But I believe
19    that the revenue rule jurisprudence to date has well respected
20    the use of 12(b)(1) for these purposes.
21              THE COURT:  Has the Supreme Court?
22              MR. ALLISON:  I don't believe the Supreme Court has
23    addressed that issue.
24              THE COURT:  Has the Second Circuit?
25              MR. ALLISON:  I can't remember if it came up in Canada
```

Ib5dcusM

1    or not.

2              But that said, your Honor, I don't think the point

3    needs --

4              THE COURT:  It certainly was not the linchpin of it.

5              MR. ALLISON:  It was not.  The linchpin or at least

6    not the linchpin but one of the critical issues in Canada and

7    R.J. Reynolds was the purpose of the treaty.  And the fact is

8    that treaty does play an important role here in defining the

9    relationship between the U.S. and the Danish government on this

10   exact issue.  And certainly would be appropriate, we believe,

11   for SKAT --

12             THE COURT:  On what exact issue?

13             MR. ALLISON:  I'm sorry?

14             THE COURT:  On what exact issue?

15             MR. ALLISON:  On the appropriateness of applying the

16   revenue rule in a circumstance where the executive branch of

17   the political governments have addressed this issue.

18             THE COURT:  Doesn't the treaty address the revenue

19   rule?

20             MR. ALLISON:  It does.

21             THE COURT:  Where?

22             MR. ALLISON:  In Article 27.  Article 27, the treaty,

23   defines when and how SKAT may seek assistance from the Internal

24   Revenue Service --

25             THE COURT:  That's not the revenue rule.  That's when

Ib5dcusM

1    they can seek the assistance of the IRS --

2             MR. ALLISON:  Correct.

3             THE COURT:  Which we agreed is not this case.

4             MR. ALLISON:  Well, what I believe, your Honor, is

5    that paragraph 8 of Article 27 absolutely prohibits -- it

6    eliminates the discretion of the Internal Revenue Service to

7    provide assistance of any kind to SKAT in a circumstance where

8    there is a U.S. taxpayer involved.  And how that could suddenly

9    be avoided by going through the U.S. court system, particularly

10   when there can't be any dispute that this is a tax issue, first

11   and foremost, this is about the filing of a tax refund claim --

12            THE COURT:  That's one of the great -- well, I won't

13   characterize it -- there is a very big dispute about that, as

14   you well know.

15            MR. ALLISON:  Well, your Honor, put it this way, but

16   for the filing of that tax refund claim, we would not be here.

17   It is only because of that tax refund claim that SKAT is

18   pursuing this.  And it is only because of that tax refund claim

19   that tax revenue was paid out to the taxpayers.  There is no

20   other circumstance in which this litigation would exist --

21            THE COURT:  Tax revenue is paid out when somebody

22   holds up a bank with government funds in it.

23            MR. ALLISON:  That may be the case, your Honor, but it

24   is not the result of filing -- of invoking, implicating the tax

25   system.  That has to be the distinction, otherwise everything

Ib5dcusM

1    gets swept under the rug and the revenue rule never applies.

2          Your Honor, just to take it a step further.  In our

3    view, there is no doubt, this is an attempt at a direct

4    enforcement of a foreign tax revenue law.  I mean, that is what

5    this is about.  It is not even a remote coincidence that

6    everything going on in Denmark exactly matches what is being

7    requested here -- the same tax refund claims, the same tax

8    revenue dollars or kroner.  Those are the exact same issues.

9    But even if we somehow get past that, we still have the issue

10   of an indirect enforcement effort here, and this certainly

11   would fall under that circumstance, your Honor.

12         The way SKAT presents this is, as your Honor is sort

13   of addressing, is that this is just your plain vanilla theft,

14   that this is just an outright theft, it is no different than

15   you walking into an office with a gun and demanding money.  But

16   the reality is -- and as a result of that, SKAT says, you know,

17   these are not taxpayers, there's no legitimate connection to

18   the Danish tax system.  But the revenue rule jurisprudence,

19   including in Canada, R.J. Reynolds, tells us, informs us, and

20   instructs us that we have to look at the underlying substance

21   of what is happening here, not the mere forum, not the mere

22   claim that this is theft and somehow a simple state law fraud

23   claim.  This is in substance a tax issue.  But in arguing --

24         THE COURT:  This in substance is alleged to be a

25   gigantic fraud perpetrated in the context of procuring tax

Ib5dcusM

1    returns by people who weren't even taxpayers.

2              MR. ALLISON:  That is the highlighted spin from SKAT,

3    yes.  I'll grant you that is the way they love to characterize

4    this.  But it doesn't change how this started, which is through

5    a tax refund claim.

6              But even taking that aside, your Honor, the underlying

7    substantive issue that we have to look at, and that is really

8    the issue in the cases in Denmark, the way SKAT presents it is,

9    who is the owner.  They are saying that these are not the real

10   owners of the Danish stock for which dividends were paid and

11   for which withholding tax was credited.  That is actually not

12   the issue.  The issue is who is the beneficial owner of the

13   stock.  That's a different question.  What it means to be a

14   beneficial owner of stock is potentially very different than

15   what it means to be the owner.

16             THE COURT:  The complaint alleges that they are not

17   owners.

18             MR. ALLISON:  Correct.

19             THE COURT:  Period.

20             MR. ALLISON:  Correct, your Honor.  But the tax

21   refund --

22             THE COURT:  I am obliged to assume that that is true

23   for purposes of deciding this motion, right?

24             MR. ALLISON:  For purposes of this motion, it is

25   certainly something to be taken into account.

Ib5dcusM

1      THE COURT:  No, not "taken into account," obliged to

2    assume the truth.

3      MR. ALLISON:  Your Honor, it doesn't make a

4    difference.  It doesn't make a difference whether it is

5    described as owner or beneficial owner; you still have the same

6    problem.  The tax refund claims themselves only required the

7    people seeking a refund to identify themselves as the

8    beneficial owner.  That is what they claimed on those forms.

9      THE COURT:  And if they come in and prove at trial

10   that they weren't the owner, the beneficial owner, the

11   equitable owner, the rabbit who had the ownership interest,

12   they win, right?

13     MR. ALLISON:  I certainly would hope that they would

14   win.  But, your Honor, that takes us into a very big leap,

15   because the analysis of whether they are the owner, the

16   beneficial owner, the equitable owner, tax owner, whatever

17   characterization you want to give to it --

18     THE COURT:  The imaginary owner.

19     MR. ALLISON:  The imaginary, whatever characterization

20   you want to give to it, your Honor, is still a legal question

21   and requires an analysis of Danish tax law.  That is why the

22   indirect enforcement issue is still important.

23     THE COURT:  Suppose one of the defendants comes in and

24   testifies at deposition that "I never owned it.  I was not a

25   beneficial owner.  I never had any interest in it.  I never saw

Ib5dcusM

1     these papers.  I don't know who these people are.  It's all a

2     hoax.  I got nothing to do with this."  How about that?

3             MR. ALLISON:  Well, except, your Honor, we're not at

4     that point, and the only allegation in the complaint is that

5     they were not the owner.  It doesn't say that these were made

6     up, manufactured, hoaxes.  It doesn't say any of that.  It just

7     says we believe that they were not the owner.

8             And in determining ownership, we have to ask ourselves

9     any number of questions that could only be addressed by Danish

10    tax law.  For example, what does it mean --

11            THE COURT:  You think the facts have no bearing

12    whatsoever on any conceivable state of circumstances?

13            MR. ALLISON:  The relevant question at this juncture

14    is whether what has been pled establishes this as something

15    that implicates the revenue rule or not; you know, the court

16    has subject matter jurisdiction or it doesn't; or it's been

17    properly pled or it hasn't.  And that determination, even to

18    what your Honor said before, is based on what they say in the

19    complaint, what SKAT says in the complaint.  It is just that

20    they have not established -- or we don't believe that whatever

21    spin they want to give, that they were the owner.

22            THE COURT:  It is not spin.  It doesn't say any of the

23    things you just imagined.

24            MR. ALLISON:  But, your Honor --

25            THE COURT:  It doesn't -- shall I read it to you?

Ib5dcusM

1          MR. ALLISON:  Please, your Honor.

2          THE COURT:  "These applications were fraudulent

3    because the claimants did not own the shares that they claim to

4    own."  That's what it says.  Not that "we believe," not that

5    "we suspect," or whatever else you hypothesized.

6          MR. ALLISON:  Your Honor, in order to answer the

7    question as to what it means to have owned, what it means to

8    have owned the shares:  If I buy the shares -- if I buy shares

9    in Danish stock by -- through a margin account, through

10   leverage, does that mean I bought the shares?  Does that mean I

11   own them?  What if I buy the shares and then immediately lend

12   them out --

13         THE COURT:  I would like to know what the fact are.

14         MR. ALLISON:  You would need to know the facts.  You

15   would need to know what Danish law says about what it means to

16   own, how title is passed --

17         THE COURT:  You don't need to know Danish law unless

18   there are some facts.

19         MR. ALLISON:  Your Honor, all SKAT has asserted and

20   alleged is that they were not the owner.

21         THE COURT:  Yeah, right.

22         MR. ALLISON:  Right.  And ownership does require

23   facts, but those facts also require the background of what the

24   law is in determining what an owner is.  Ownership doesn't --

25         THE COURT:  So you think that it is conceivable that

Ib5dcusM

under Danish law somebody who has a hundred shares of stock in

General Motors actually is an owner of some Danish shares?

Yeah?  You think that's possible?

    MR. ALLISON:  All I was saying, your Honor --

    THE COURT:  Do you think if we have a plaintiff here

who owns one, and only one, security, common stock of General

Motors -- I shouldn't have said "plaintiff," I should have said

defendant.

    MR. ALLISON:  Understood, your Honor.

    THE COURT:  -- that there is some interpretation of

Danish law under which that individual owns stock in a Danish

company?

    MR. ALLISON:  No.  I think the question is whether if

I buy shares of Danish stock, when do I obtain title to that

stock to be an owner?

    THE COURT:  So the premise is that somebody, these

defendants, each and every one of them, in fact bought shares

of a Danish stock, a Danish company, in one manner or another,

leveraged, not leveraged, who knows, right?

    MR. ALLISON:  That very well could be the fact, you

are right.

    THE COURT:  It is conceivable but it is inconsistent

with it.

    MR. ALLISON:  I'm sorry?

    THE COURT:  The complaint is inconsistent with it.

Ib5dcusM

1          MR. ALLISON:  All the complaint says is that in SKAT's

2     view of the world these defendants did not own their shares.

3          THE COURT:  It doesn't say that.  It doesn't say that

4     at all.

5          MR. ALLISON:  It alleges that they did not own the

6     shares.

7          THE COURT:  Right.  It doesn't say anything about

8     SKAT's view.

9          MR. ALLISON:  Well, it is an allegation so it has to

10     be their view.  But that doesn't change the fact that we need

11     to know what it means to own shares.

12          THE COURT:  Never mind.  Go ahead.

13          MR. ALLISON:  Your Honor, this is an important point.

14     This is an important part of the issue.  Indirect enforcement

15     of a foreign tax revenue law requires us to understand the

16     context in which the allegation is made.  SKAT is alleging that

17     they didn't own the shares, that the defendants didn't own the

18     shares.  But that doesn't answer any question, because if I buy

19     shares -- if I called my broker -- your Honor, if I called my

20     broker and I say I would like to buy a hundred shares of pick

21     your favorite, you know, Danish company, OK, then what happens?

22     Do I acquire title at that point?  Do I own the shares?  No.

23     Because it's probably, as you know, your Honor, we don't

24     receive stock certificates anymore.  I don't have any stock

25     certificates that say that I own shares.  I get a statement

ultimately from my broker, or a confirmation from my broker

that says I've been allocated 100 shares of X company.  But who

knows, the title may be in the name of the broker, the

custodian or some state depository.  We don't know.

        That's a question of Danish tax law.  What does Danish

tax law look to to determine when ownership is obtained?  The

bare allegation that defendants don't own shares doesn't tell

you anything without understanding, interpreting, and applying

Danish tax law, otherwise this is just some exercise in

futility.  We'll constantly be here listening to facts without

any context.  And that's what the revenue rule is intending --

specifically is designed to prohibit, from us having to get

into the background of the context of the legal issues going on

in Denmark.

        And on top of that, your Honor, we've got obviously

Danish tax administrative proceedings that are ongoing

analyzing these same issues.  Obviously, it seems very

premature and very intrusive for us to be asking ourselves to

address an issue that is going its way through a system in

Denmark that will eventually go probably into judicial

proceedings in Denmark.  And so it would seem inappropriate, at

best, for U.S. courts to be applying and interpreting Danish

law, particularly in a manner that could end up being

inconsistent with the ultimate outcome of those proceedings in

Denmark.

Ib5dcusM

1          (Pause)

2          Your Honor, so the overall context, the overall layer

3   of all of this is that there is not an allegation that this is

4   a hoax, that this is some massive, you know, series of

5   transactions that never occurred.  The only claim here is a

6   lack of ownership.  A lack of ownership, as I said, is not --

7   first of all, is not even a question under Danish law, Danish

8   tax law.  It is only a question of beneficial ownership.  But

9   it doesn't matter.  Whether it is beneficial ownership, legal

10  ownership, equitable ownership, whatever kind of adjective that

11  you want to use to describe the ownership, it still requires

12  the application of Danish law to understand that and to be able

13  to determine what any facts could possibly mean in that

14  context.

15          And there is no purpose, in our view, of getting into

16  a factual analysis without understanding and applying and

17  interpreting Danish tax law.  And when you look at the

18  termination letters that were issued by SKAT, you look at the

19  appeals that are being filed in response to SKAT's

20  terminations, you are seeing a debate over what it means under

21  Danish tax law to get into these issues of ownership and

22  beneficial ownership.

23          And in addition, your Honor, when you look at the

24  treaty itself between the United States and Denmark, which

25  ultimately is what is going to be relevant at the end of the

Ib5dcusM

1   day, the treaty itself requires a determination of beneficial

2   ownership.  Article 10 of the treaty says that the issue of

3   whether the pension plans here are entitled to an exemption

4   from withholding tax under Danish law must be decided by the

5   internal law of Denmark.  That is what is provided for in the

6   treaty and the technical explanation.  There is no wavering on

7   that.

8          And so if we go down this road, your Honor, we are

9   stuck now analyzing internal Danish law both for purposes of

10  the ultimate outcome in terms of the substantive determination

11  as well as the effect on the treaty, and that is exactly why

12  the revenue rule does not permit U.S. courts to be addressing

13  these kinds of questions, your Honor.

14          THE COURT:  OK.  Thank you.

15          MR. ALLISON:  Your Honor, would you like me to address

16  the other side, the 12(b)(6) issues, or would you like to defer

17  that?

18          THE COURT:  Well, you've used your half hour so --

19          MR. ALLISON:  OK.  Thank you, your Honor.

20          THE COURT:  I don't need to hear from the other side.

21          I intend to deny this motion unless something radical

22  changes in my mind between now and the issuance of an opinion.

23  The longer and harder I have reflected about it, the clearer

24  that result seems to me.

25          This motion is extremely premature.  It is conceivable

Ib5dcusM

that at some point, depending on how things develop, there may

be a case for application of the revenue rule, but it is not

now.  At least that's my present view.  And in light of the

fact that it will take some time to write on this, I thought it

only fair to let you know.

OK.  Thank you.

(Adjourned)