# EXHIBIT 4

# The New York Times

# Where in the World Is Denmark's $2 Billion?

By David Segal

Oct. 5, 2018

As large as it is, the building would be easy to miss. Plain, gray and near a McDonald's, it's part of a generic office complex surrounded by a vast parking lot in a suburb of Copenhagen. "Danish Tax Agency" is stenciled in both English and Danish on a glass front door.

This outpost of SKAT, as the I.R.S. in Denmark is known, seems an improbable setting for what the authorities call one of the great financial crimes in the country's history. For three years, starting in 2012, so much money gushed from an office here that it was as though the state had sprung a gigantic leak.

Prosecutors in Copenhagen say it was an elaborate ruse, one that ultimately cost taxpayers more than $2 billion — a spectacular sum for Denmark, the equivalent of a $110 billion loss in the far larger American economy.

The country had fallen victim to a dubious financial maneuver at the intersection of the tax system and capital markets, a dizzyingly complex transaction known as a "cum-ex" trade.

The trade is focused on one of the dullest, most overlooked acts in any financial system — the request for refunds on taxes withheld on dividends. Under Danish law, the government automatically collects taxes on dividends paid out by companies to their shareholders. If the shareholders live in the United States, they are eligible for a refund on some or all of those taxes.

A tiny department in SKAT, run by one man, approved thousands of applications for refunds. Most of the applications were filed by self-directed pension plans in the United States, a type of retirement account for individuals.

But experts and lawyers familiar with the scheme say those people were fronts for cum-ex trades. Deploying a kind of financial sleight of hand, the trades made it appear as if the pension plans had purchased shares of Danish companies and paid taxes on the dividends. Neither was true.

To the Danes, it was a fraud, one executed and conceived by Sanjay Shah, a 48-year-old, London-born financier. With an assist from employees, he found the Americans, helped facilitate the applications and ended up with much of the money.

Mr. Shah denies any wrongdoing and through a publicist says he merely took advantage of a loophole. He now lives in Dubai, where he owns a $1.3 million yacht and a 10,000-square-foot villa with access to the beach. He has become Denmark's national villain.

"You have this guy, living off fraud, it's infuriating," said Joachim B. Olsen, a member of the Danish Parliament and chairman of its Finance Committee. "The expectation of the Danish people is that we will go after him, no matter the cost."



Sanjay Shah, a 48-year-old, London-born financier, who Danish authorities say conceived and executed the scheme in Denmark. He denies any wrongdoing and through a publicist says he merely took advantage of a loophole.  Stuart Williamson

Since May, the cost has included hiring an American law firm to sue 277 of the self-directed pension plans and their owners who applied for all those tax refunds. But the true toll of this scandal can't be measured in kroner. It has undermined trust in Danish politics and it has severely dented the country's self-image as a bastion of honest, efficient government. An unfolding $230 billion money-laundering fiasco at Danske Bank, the country's largest lender, has only deepened the gloom.

What has made the dividend debacle even more painful is that many here believe it was an inside job. The lone employee approving those tax refunds was a lifelong civil servant named Sven Nielsen. After a lengthy investigation, the police learned that Mr. Nielsen had spent a few boozy and convivial evenings with an employee of Mr. Shah's, although they found no evidence that he had colluded or profited in any way.

Instead, they discovered evidence that years ago, Mr. Nielsen had helped an old friend bilk SKAT in a relatively small scam. Through his lawyer, Mr. Nielsen declined to comment — from prison, where he is now serving a six-year sentence for criminal fraud in that case.

So, Danes are left with a mystery that belongs in a Nordic noir, one with elements of farce and filled with enraging twists. Is Mr. Nielsen a co-conspirator, or a dupe? Is he a criminal or a man so flattered by attention that his critical faculties abandoned him?

The other mystery concerns Mr. Shah, who is now rebranding himself as a philanthropist, raising money for autism research by promoting concerts in Dubai with performers like Flo Rida and Lenny Kravitz. He has been formally termed a suspect by Danish authorities, but to the collective amazement of the Danes no criminal charges have been filed against him.

A spokesman for the State Prosecutor for Serious Economic and International Crime would not say why. Instead, with impeccable Scandinavian restraint he said only that the case involves people "who seem to have used a very crafty setup."

## Finding His Calling

Mr. Shah declined to be interviewed for this article. To offer his version of events, he provided through his publicist a 14-page handwritten letter that outlined his career. And for added personal details, there is a series of autobiographical videos that he posted two years ago on YouTube, titled "I Am Sanjay Shah."

In each, he sits in a spacious living room in a house in Dubai and muses about his life and business philosophy, omitting any hint of controversy. He comes across as an upbeat, middle-aged expat with an abiding fondness for music. After a midlife crisis, he founded Autism Rocks and became a part-time concert promoter, at one point booking his personal favorite, Prince. Mr. Shah also has a taste for the extravagant. In one video, he said that sports cars parked outside the office at Merrill Lynch, where he worked early on, inspired him to consider a new career.

"I said to my boss, 'Who drives these cars?'" he recalled in the video. "And he said the traders do on the fifth floor. So then I decided that I wanted to be one of those people."

Mr. Shah was raised in London by parents of Indian ancestry who had immigrated from Kenya. He dropped out of college in 1992, citing a lack of motivation, and worked at a number of large financial firms. In 2007, he landed a job at the London office of Rabobank, a Dutch company, on the dividend arbitrage desk.



This outpost of SKAT, as the I.R.S. in Denmark is known, seems an improbable setting for what the authorities call one of the great financial crimes in the country's history.
Carsten Snejbjerg for The New York Times

There he learned about cum-ex trades. The term is Latin for "with-without" and refers to the status of shares before and after a dividend is issued. Cum-ex trades would quickly become the focus of Mr. Shah's professional life.

Around the time of the global financial crisis, Rabobank closed its dividend arbitrage desk. While former colleagues scrambled to look for careers in other fields, Mr. Shah boldly opened his own firm, Solo Capital, with an office of eight employees. At the same time, he did something unusual for a man starting a business in London. He and his family moved to Dubai, "mainly for the weather and the lifestyle," he explained in a video.

As economies around the globe reeled, Mr. Shah found himself in one of the few growth segments in banking. Cum-ex trades are made possible by tax treaties between countries, agreements that are intended to prevent double taxation. Denmark has such a treaty with the United States.

What government regulators throughout Europe failed to foresee was that foreign dividend tax refunds could yield immense and dubious profits. After the financial meltdown, dozens of German banks desperate for a new source of profits eagerly facilitated cum-ex trades, fueled by capital from all over the world.

Traders made off with more than $11 billion, according to officials there. Cum-ex would reap fortunes from the governments in Austria, Belgium and Switzerland, too.

It took years for the German authorities, who banned the practice in 2012, to figure out what had hit them. The first cum-ex indictments in the country were filed in May.

"It turned out to be one of the biggest financial scandals that Europe has ever seen," said Bastian Finkel, a tax lawyer at BLD, a law firm in Cologne, "and all the more painful because it's public money."

In the wake of their losses, the authorities in Germany didn't bother to alert other countries, and speculators moved elsewhere. The biggest target, it turned out, was Denmark.

Under the terms of an American-Danish tax agreement, Americans who own shares in, for instance, Carlsberg can get a full or partial refund on the 27 percent withheld for tax on dividends. Retirement accounts get the best deal of all. They get all 27 percent of the tax back.

To scale up his cum-ex trade, Mr. Shah needed individuals in the United States with self-directed pension plans, a type of retirement account that allows owners to invest in a wide range of financial instruments. By 2012, he had found more than a dozen of them — which turned out to be plenty.



Sven Nielsen, a lifelong civil servant. Defenders of Mr. Nielsen maintain that he is a fundamentally decent guy who made a serious mistake under the suasion of a pal. True or not, Mr. Nielsen had a new pal in 2014, just as the SKAT payouts soared.
DR Nyheder

## A Man With 44 Pension Plans

The names of these Americans who owned the self-directed pension plans became public this summer, when Danish authorities sued them, hoping to recover lost funds. Exactly how these people linked up with Solo Capital is unknown. Mr. Shah's publicist would say only that they came via wealth management advisory firms.

There are demographic patterns. Most live on the East Coast, with clusters in New York, New Jersey and Florida. At least five different plans used the same mailing address, 425 West 23rd Street, Apartment 7B, New York, N.Y. The current tenant there had never heard of the Danish lawsuits, but said he had received mail for one of the defendants, Gavin Crescenzo, a previous occupant.

Nearly all the defendants have jobs in finance, though one, Michael Ben-Jacob, is a partner at a prestigious law firm, Arnold & Porter. He declined to discuss the case and a spokeswoman at the firm said it did not comment on litigation in progress.

Many people have their names attached to dozens of pension plans, which is why there are 277 suits and roughly 17 defendants. A 30-year-old named Roger Lehman, for instance, opened 44 plans in a handful of states, with names such as the Ludlow Holdings 401K Plan and the Hotel Fromance Pension Plan.

Mr. Shah said through his spokesman that Solo Capital worked with 200 of these pension plans. He declined to identify which ones.

None of the defendants responded to requests for comment. In July, though, an email response came instead, unbidden, from a law firm in Luxembourg called Schaffelhuber Müller & Kollegen. A partner there named Helene Schwiering stated that her clients, whom she did not name, would appreciate it "if you henceforth refrain from attempting to contact them."

On paper, the owners of the plans pocketed most of SKAT's $2 billion. In reality, these people probably wound up with little or none of the money.

That, at least, is the impression of John Hanamirian, a plaintiffs attorney in New Jersey. Until mid-July, he represented defendants in more than 50 cases, then he suddenly filed legal papers withdrawing from all but a few of them.

The withdrawal filings were revealing. They stated that Mr. Hanamirian was not paid by defendants named in the lawsuits. Rather, his bills were paid by what he described only as a "Luxembourg law firm." And that law firm would not provide needed files about his defendants, "despite repeated requests," he wrote.

In an interview, Mr. Hanamirian elaborated. The firm was the one in Luxembourg that sent that out-of-the-blue email asking that defendants in the cases be left alone.



John Hanamirian, a plaintiffs attorney in New Jersey. Until mid-July, he represented defendants in more than 50 cases — then suddenly filed legal papers withdrawing from all but a few of them. Michelle Gustafson for The New York Times

"I needed documents surrounding their involvement, whatever that is — bank statements, investment statements, communications," Mr. Hanamirian said. "The firm wouldn't do it. They said, 'We'll meet you in advance, the day of the proceedings.' I said that's unacceptable."

Before exiting the cases, Mr. Hanamirian spoke to a handful of clients who told him that money went in and then was immediately moved out of their accounts. Whether the defendants earned a fee of some kind is unknown to Mr. Hanamirian, as is the ultimate destination of the funds.

"I don't want any of this to reflect on my former clients," he said. "But the whole thing was definitely odd."

## $3 Million, Every Hour

In 2013, all that stood between Solo Capital and Denmark's treasury was the bespectacled, gray-haired veteran of SKAT, Sven Nielsen. After two colleagues retired, he was the last person in the Dividend Department. Complicating matters, he lacked the tools to perform the most basic due diligence when reviewing refund applications.

The agency was in the midst of a yearslong and often disastrous overhaul, meant to digitize the system and reduce head count. The priority was helping Danish taxpayers, not foreign shareholders. Mr. Nielsen didn't even have a database to check whether an individual pension plan actually owned the shares it claimed, said Lisbeth Romer, who was Mr. Nielsen's boss until she retired in 2013.

"Sven's job was reduced to bookkeeping, essentially, checking if a form was filled out properly," she said. "A monkey could do it."

There was another problem that nobody knew about then: Mr. Nielsen could be persuaded to break the law. When the Danish police searched his home after the Solo Capital revelations, they found a letter showing that in 2007, he helped an old friend illegally secure $5.7 million from SKAT. (The two men knew each other from the days when Mr. Nielsen moonlighted with a job delivering newspapers.) Last December, prosecutors convicted Mr. Nielsen of fraud for taking a kickback, the equivalent of $315,000, for his efforts.

Defenders of Mr. Nielsen maintain that he is a fundamentally decent guy who made a serious mistake under the suasion of a pal. True or not, Mr. Nielsen had a new pal in 2014, just as the SKAT payouts soared.

His name was Camilo Vargas. He worked in London at one of a small number of "payment agents," niche companies that handle the array of paperwork submitted to foreign tax authorities for refunds. Mr. Vargas had just founded his own payment agent firm, which he called Syntax GIS. Soon after Syntax began operations, it started working with Sanjay Shah, who eventually bought the company.

During the first of several trips to Copenhagen, Mr. Vargas sought out Mr. Nielsen, asking for guidance on how to fill out Danish tax refund applications. What is known about those meetings comes from the one interview Mr. Nielsen has ever given, in a 2016 documentary that ran on DR, Denmark's version of the BBC. Mr. Nielsen appeared to be flattered by the attention and happy to provide advice.



A restaurant in downtown Copenhagen where Mr. Nielsen was said to have been taken.
Carsten Snejbjerg for The New York Times

He just as gladly accepted invitations to dinner. Mr. Nielsen described in the interview a lively evening drinking beer with Mr. Vargas in a popular downtown area in Copenhagen.

"We walked down Stroget," he said, referring to a famous pedestrian street, "and made several pit stops."

The friendship was fantastically lucrative. In 2014, more than $590 million was paid on 1,500 refund applications. Danish authorities believe most of them came from Solo Capital clients. In the first seven months of 2015, the figures soared to roughly $1.2 billion, paid to more than 2,500 applications — about 16 applications every working day.

It apparently never occurred to Mr. Nielsen that Camilo Vargas was playing him.

"At no point did I get the impression that he wanted to trick me or cheat in any way," Mr. Nielsen said in the documentary, sounding bereft. "But that's what it could appear like today."

Mr. Vargas could not be located for comment. The producers at DR hired a researcher to find him, to no avail.

In the summer of 2015, the pace of applications made one final surge. In July alone, $500 million in refunds was disbursed — about $25 million per working day, $3 million every hour.

Mr. Shah may have had a hunch that the Danish tax refund machine was about to stop working. In May 2015, he met in London with his then-new compliance officer at Solo Capital, Navin Khokhrai. As Mr. Shah put it in the handwritten letter provided by his publicist, Mr. Khokhrai expressed profound reservations about Solo Capital's business, telling his boss that he was unsure "whether the company was processing the trades correctly." Mr. Shah assured him that he'd obtained all necessary legal clearances.

Mr. Khokhrai was apparently not convinced. He resigned soon after and Mr. Shah stated in the same handwritten letter that his former employee "submitted a whistle-blower letter to HMRC" — Her Majesty's Revenue and Customs — "alleging that Solo had created fictitious client accounts and trading records in order to defraud the tax authorities in Denmark and Belgium."

In August 2015, the dividends stopped flowing out of SKAT, though not because of sirens set off by anyone inside the agency. Rather, it took a tip from the British government to end the scheme, several Danish politicians said. The London offices of Solo Capital were later raided by Britain's National Crime Agency and by July 2016 Solo Capital closed.

At the time, Mr. Shah said he had done nothing improper. "Had they accused a large bank like Goldman Sachs the bank would have kicked back with a large team of lawyers," he told Borsen, a Danish newspaper. "It's easier to target a single individual."



Lisbeth Romer, who was Mr. Nielsen's boss until she retired in 2013. "Sven's job was reduced to bookkeeping, essentially, checking if a form was filled out properly," she said. "A monkey could do it."  Carsten Snejbjerg for The New York Times

## 'This Was Fraud'

Danish authorities have been trying to unravel Mr. Shah's handiwork for over three years. Much of his modus operandi was revealed, experts believe, in 2017 when police in Germany, who were acting at the behest of the Danes, used a search warrant to sift through the records of North Channel Bank, a small bank in Mainz, a city outside Frankfurt. A team of 60 investigators found that the bank was used by 27 of the American pension plans, which were ultimately paid a total of about $168 million by SKAT.

What investigators found is that the accounts didn't actually own any shares of Danish companies, said Prof. Christoph Spengel, who served as an adviser to Germany's Parliament during an inquiry into the questionable trades. He studied the results of the North Channel investigation, issued in a report by a German district attorney. He said that the 27 plans primarily traded with one another. One would place an order to short a chunk of shares of Danish stock — essentially, a promise to buy the shares once they dipped below a certain price.

Soon after, an order was placed by another of the 27 plans to buy the order for the shorted shares. That open buy order — essentially, a promise to purchase shares that the other plan still didn't own — was proof enough for SKAT to approve a refund. Once the refund was issued, the buy order was canceled.

"This wasn't a transaction, this wasn't tax planning," Professor Spengel said. "This was fraud."

A spokeswoman for North Channel said the bank was cooperating with the authorities and had no comment.

After funds were wired to North Bank, Professor Spengel said, they were shunted to two banks, first in London, then another in Germany. Finally, he said, they were sent to accounts controlled by Mr. Shah and his wife, Usha.

Jack Irvine, Mr. Shah's spokesman, said none of this was true.

"Neither Solo nor Sanjay have had anything to do with North Channel Bank," he wrote in an email, "so there appears to be confusion, which is not unusual in this case."

There has been outrage in Denmark over the SKAT scandal but so far the repercussions have been surprisingly limited. No ministers have been fired. The director of SKAT was laid off in August 2016, though Mr. Shah's machinations were among several causes. A new investigation into the cum-ex disaster was ordered by the justice minister in February, which could last years. For now, politicians here seem to emphasize pragmatism over finger-pointing.

"In the past, governments have fallen because of investigations like this," said Jesper Petersen, a member of the opposition Social Democratic Party. "But we have yet to find any minister who saw evidence of this problem and ignored it."

Sanjay Shah is preoccupied with his own troubles. In mid-September, a High Court of Justice judge in London entered a $1.3 billion default judgment against Solo Capital and a company it owned, Elysium Global, in a case filed by SKAT alleging fraud. Mr. Shah's spokesman said his client didn't respond to the lawsuit because both companies are now controlled by liquidators.

He also said that at the prodding of Danish officials, Britain, Germany and the United Arab Emirates have all frozen, though not confiscated, $660 million in assets belonging to Mr. Shah. The financial pinch is enough that Mr. Shah has been forced to put his house up for sale, the publicist added. Out of caution, the publicist said, Mr. Shah does not travel.

Fears of arrest and extradition are justified, said Henning Sorensen, an associate law professor at the University of Southern Denmark.

"Shah is free as long as he stays in Dubai," he said. "He is like a bird living in a golden cage."

Alain Delaquérière and Martin Selsoe Sorensen contributed reporting.