**Exhibit 5**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re

SKAT TAX REFUND SCHEME LITIGATION

This document relates to: All Cases

Master Docket 18-cv-4047(LAK)
ECF Case

## CONSOLIDATED DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT MOTION TO DISMISS THE COMPLAINTS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1), 12(b)(6) AND 9(b)

**CAPLIN & DRYSDALE, CHARTERED**

Mark D. Allison
Zhanna A. Ziering
600 Lexington Avenue
21st Floor
New York, New York 10022
Tel: (212) 379-6000

James P. Wehner
One Thomas Circle, N.W.
Washington, D.C.  20005
Tel: (202) 862-5000

August 15, 2018

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

BACKGROUND ...............................................................................................2

ARGUMENT ....................................................................................................5

   I.      LEGAL STANDARDS FOR DISMISSAL .....................................................5

   II.     THE COURT LACKS SUBJECT MATTER JURISDICTION UNDER THE
          REVENUE RULE .................................................................................6

          a.      Under the Revenue Rule, the Court Lacks Subject Matter Jurisdiction
                 Over the Present Case Because this is an Action by a Foreign
                 Sovereign to Enforce Foreign Tax Assessments .................................6

                i.      Revenue Rule ...................................................................6

                ii.     The Revenue Rule Bars SKAT's Claims as Direct
                     Enforcement of Danish Tax Laws .....................................9

                iii.    SKAT's Claims Do Not Qualify for the Limited
                     Exception to the Revenue Rule ........................................12

          b.     SKAT's Actions are Barred by the U.S.-Denmark Income Tax Treaty ..........15

   III.    THE FRAUD, AIDING AND ABETTING, AND NEGLIGENT
          MISREPRESENTATION CLAIMS FAIL TO ALLEGE KEY ELEMENTS
          UNDER THE HEIGHTENED PLEADING STANDARDS OF RULE 9(b) .............19

          a.     The Fraud and Aiding and Abetting Claims Fail to Adequately Allege
                 Knowledge and Intent ....................................................................19

          b.     The Aiding and Abetting Fraud Claims Do Not Adequately Allege
                 Any Defendant Provided "Substantial Assistance" .........................23

          c.     The Fraud and Negligent Misrepresentation Claims Against the
                 Authorized Representatives and Incorporators Should Be Dismissed
                 Because They Do Not Adequately Allege a False Representation of
                 Material Fact by Such Defendants ...................................................24

   IV.    THE UNJUST ENRICHMENT, MONEY HAD AND RECEIVED AND
          PAYMENT BY MISTAKE CLAIMS SHOULD EACH BE DISMISSED AS
          DUPLICATIVE ..................................................................................25

CONCLUSION ................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anschutz Corp. v. Merrill Lynch & Co.*,
  690 F.3d 98 (2d Cir. 2012)........................................................................................24

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937 (2009)..........................................................5, 6, 20

*Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
  268 F.3d 103 (2d. Cir. 2001)................................................................... *passim*

*Aurecchione v. Schoolman Transp. Sys., Inc.*,
  426 F.3d 635 (2d Cir. 2005)........................................................................................5

*Banco Do Brasil, S.A. v. A .C. Israel Commodity Co.*,
  190 N.E.2d 235 (N.Y. 1963)....................................................................................8, 9

*Bell Atl. Corp.* v. *Twombly*,
  550 U.S. 544, 127 S. Ct. 1955 (2007)......................................................................6

*Carmona v. Spanish Broad. Sys., Inc.*,
  2009 WL 890054 (S.D.N.Y. Mar. 30, 2009) (LAK) ............................................20

*Corsello v. Verizon New York, Inc.*,
  18 N.Y.3d 777 (2012) ..............................................................................................25

*Deutsche Zentral-Genossenchaftsbank AG v. HSBC North America Holdings, Inc.*,
  2013 WL 6667601 (S.D.N.Y. Dec. 17, 2013) ..............................................19, 21

*Dileng v. Commissioner*,
  157 F. Supp. 3d 1336 (N.D. Ga. 2016) ................................................................15

*European Community v. RJR Nabisco, Inc.*,
  355 F.3d 123 (2d. Cir. 2004).....................................................................................7, 8

*Figueroa v. Ministry for Foreign Affairs of Sweden*,
  222 F. Supp. 3d 304 (S.D.N.Y. 2016)......................................................................5

*Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*,
  479 F. Supp. 2d 349 (S.D.N.Y. 2007)....................................................................23

*J.C. Penney Corp., Inc. v. Carousel Center Co., L.P.*,
  635 F. Supp. 2d 126 (N.D.N.Y. 2008)....................................................................25

*Kolbeck v. LIT Am., Inc.*,
    939 F. Supp. 240 (S.D.N.Y. 1996)..................................................................................23

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)..........................................................................................20

*Luce v. Edelstein*,
    802 F.2d 49 (2d Cir. 1986).............................................................................................6

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000)...........................................................................................5

*MMA Consultants 1, Inc. v. Republic of Peru*,
    245 F. Supp. 3d 486 (S.D.N.Y. 2017).............................................................................5

*Morin v. Trupin*,
    711 F. Supp. 97 (S.D.N.Y. 1989)..................................................................................23

*Natowitz* v. *Mehlman*,
    542 F. Supp. 674 (S.D.N.Y. 1982)..................................................................................6

*In re Parmalat Securities Litigation*,
    377 F. Supp. 2d 390 (S.D.N.Y. 2005) (LAK)................................................................25

*In re Parmalat Securities Litigation*,
    684 F. Supp. 2d 453 (S.D.N.Y. 2010) (LAK)................................................................24

*Pasternack v. Laboratory Corp. of America Holdings*,
    27 N.Y.3d 817 (2016) ..............................................................................................19, 24

*Pfizer, Inc. v. Stryker Corp.*,
    348 F. Supp. 2d 131 (S.D.N.Y. 2004) (LAK)................................................................21

*Republic of Columbia v. Diageo of N.A. Inc.*,
    531 F. Supp. 2d 365 (E.D.N.Y. 2007) ........................................................... *passim*

*Republic of Ecuador v. Philip Morris Companies, Inc.*,
    188 F. Supp. 2d 1359 (S.D. Fla. 2002) ...............................................................6, 8, 10, 12

*Republic of Honduras v. Phillip Morris Co.*,
    341 F.3d 1253 (11th Cir. 2003) ...............................................................................7, 9, 10

*Rhulen Agency, Inc. v. A.L. Ins. Guar. Ass'n*,
    896 F.2d 674 (2d Cir. 1990)...........................................................................................5

*Saudi Arabia v. Nelson*,
    507 U.S. 349, 113 S. Ct. 1471 (1993).............................................................................14

*Silvercreek Management, Inc. v. Citigroup, Inc.*,
   248 F. Supp. 3d 428 (S.D.N.Y. 2017)................................................................20

*SPV Osus Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018)............................................................................23

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015)..............................................................................23

*United States v. Albinson*,
   2010 WL 3258266 (D.N.J. Aug. 16, 2010) ....................................................26

*United States v. First Nat'l City Bank*,
   321 F.2d 14 (2d Cir. 1963), *rev'd on other grounds*, 379 U.S. 378 (1965)............18

*United States v. Pasquantino*,
   544 U.S. 349, 125 S. Ct. 1766 (2005).............................................................15

*Wight v. BankAmerica Corp.*,
   219 F.3d 79 (2d Cir. 2000).........................................................................19, 23


## STATUTES

28 U.S.C. § 1603(d) .................................................................................................14

26 U.S.C. § 401(a) .....................................................................................................3

26 U.S.C. § 892 .......................................................................................................14

Foreign Sovereign Immunities Act ..........................................................................14


## OTHER ATHOURITIES

Capital Gains Tax Act of Denmark, section 23.1 .....................................................10

Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion
with respect to Taxes on Income, U.S.-Den., Aug. 19, 1999, T.I.A.S. No. 13056............... *passim*

Danish Corporation Act, sections 2.1(c) and (3) ..................................................4, 11

Danish Corporation Tax Act, sections 65.1 and 69B.1.........................................4, 11

Danish Withholding Tax Act section 65.....................................................................2

Danish Tax Assessment Act, section 16A.1 .........................................................4, 11

*Dept. of the Treas. Technical Explanation of the Convention Between the Government of the United States of America and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income Singed at Washington, August 19, 1999,* effective date Jan. 1, 2001. ...............17

Federal Rule of Civil Procedure 9(b) ...........................................................................6, 19, 20, 23

Federal Rules of Civil Procedure Rule 12(b)(1) ..............................................................................5

Federal Rules of Civil Procedure Rule 12(b)(6) ..............................................................................5

Internal Revenue Manual 5.21.7.4 (Nov. 13, 2015) ......................................................................16

Jt. Comm. Tax., *Explanation of Proposed Income Tax Treaty Between the United States and Denmark* (Oct. 8, 1999)..............................................................................................16

Mutual Legal Assistance Instrument ("MLAT"), U.S.-Den., June 23, 2005, T.I.A.S. No. 10-201.29 ......................................................................................................19

The Legal Guide, section C.B.2.1.6.1, SKAT Publication ......................................................10, 11

Treas. Reg. § 1.892-4T(c)(4) ...........................................................................................................14

## PRELIMINARY STATEMENT

The Plaintiff in these consolidated cases is SKAT, the Danish tax authority responsible for the assessment and collection of Danish taxes. While Plaintiff's Complaints contain claims nominally styled as tort actions, their explicit goal is the recovery of tax refunds paid by SKAT several years ago to the U.S. Pension Plan Defendants with respect to dividend withholding taxes on investments in Danish securities. SKAT's superficial allegation that the Defendants did not own the securities at issue, and therefore were not entitled to tax refunds, requires an interpretation and application of complex Danish tax law, which claim is being vigorously challenged by the U.S. Pension Plan Defendants in ongoing Danish administrative tax appeals proceedings.

Accordingly, these Complaints patently violate the longstanding principle of the United States and international law that prohibits one sovereign from using the courts of another sovereign to enforce its revenue laws, either directly or indirectly. This doctrine, known as the Revenue Rule, is well recognized by both the U.S. Supreme Court and the Court of Appeals for the Second Circuit and expressly bars actions brought by a foreign government to collect its tax revenue, including through the guise of purported violations of U.S. tort laws. SKAT's claims lie in direct contravention of both the Revenue Rule and SKAT's contractual obligations under the bilateral tax treaty between the United States and Denmark, which specifically limits the provision of tax collection assistance by each government. As such, these cases should be dismissed for lack of subject matter jurisdiction.

In addition, the tort claims in which the Danish tax authority has clothed its tax recovery efforts are themselves inadequately pleaded and should be dismissed for failure to state a claim.

## BACKGROUND

Under section 65 of the Danish Withholding Tax Act (or "Kildeskatteloven"), Danish companies that issue dividends to shareholders are required to withhold and remit to SKAT a 27% tax on the dividend. TBLPP Compl. ¶ 20.[1] "Withholding tax is a common fiscal device by which taxes are deducted at the source by a payer of income, and are reported to the relevant tax authority." TBLPP Compl. ¶ 19. If the withheld tax exceeds the amount of tax negotiated under the Treaty between the United States and Denmark, U.S. shareholders may be eligible to receive a refund of such excess. TBLPP Compl. ¶¶ 21, 22; Treaty, Art. 10.[2] SKAT "is the agency of the government of Denmark charged with the assessment and collection of Danish taxes." TBLPP Compl. ¶ 1. SKAT is therefore the Danish government agency responsible for accepting, approving, and paying withholding tax refund claims. *See* TBLPP Compl. ¶¶ 2, 23, 24.

In May and June 2018, SKAT filed over 140 nearly identical complaints in eleven federal district courts and three state courts, including 49 Complaints with this Court, seeking to recover dividend withholding tax refunds from the Defendants, specifically the pension plan investors (e.g., The Bradley London Pension Plan) (the "Plan"), the Plan's Authorized Representatives (e.g., Doston Bradley) (the "Authorized Representative"), and, in certain cases, from the incorporator of the Plan's sponsor, who is alleged to have played some role in creating entities involved in the matter (the "Incorporator").[3]

All of the Complaints, identical in their allegations and nearly identical in their purported facts, contend that the Plans delegated to the Authorized Representatives the authority to act as

---

[1] For the purpose of this Joint Motion to Dismiss, the citations to the Complaint are to the Complaint filed by SKAT against The Bradley London Pension Plan & Doston Bradley, Dkt. No. 1:18-cv-04047 (hereafter, "TBLPP Complaint"). Ex. 1. By Pretrial Order 1 dated June 26, 2018, this Court designated this case as a master docket. Thus, the documents related to this case are cited herein to support this Motion.
[2] Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income, U.S.-Den., Aug. 19, 1999, T.I.A.S. No. 13056 (the "Denmark Treaty" or the "Treaty").
[3] *See, e.g.,* Complaint ¶¶ 19, 41, *SKAT v. The Aria Pension Plan, Roger Lehman, and Gavin Crescenzo*, Dkt. No. 1:18-cv-05147 ("The Aria Complaint"). Ex. 2.

2

their agent and authorized representative with respect to the submission of their tax withholding refund claims.  TBLPP Compl. ¶ 34.  The Authorized Representatives, in turn, are alleged to have delegated the authority to submit tax withholding refund claims to a Payment Agent (e.g., Syntax GIS).[4]  TBLPP Compl. ¶ 35, 40.  The Payment Agent subsequently submitted refund claims to SKAT.  TBLPP Compl. ¶ 26.  Each of the submitted claims included a cover letter, a standard tax refund form entitled "Claim to Relief from Danish Dividend Tax;" a signed Power of Attorney from the Authorized Representative that authorized the Payment Agent to receive the payment on behalf of the Plan; a statement from the U.S. Internal Revenue Service confirming that the Plan was a qualified pension plan under section 401(a) of the Internal Revenue Code; and a "credit advice" (or a similar document such as a "tax voucher," or "income advice") note from the Broker Custodian (e.g., Solo Capital Partners LLP), which was, at the time, authorized and regulated by the Financial Services Authority (the "FSA") of the United Kingdom.[5]  TBLPP Compl. ¶¶ 26, 28, 43, 46, 47; *see, e.g.*, Ex. 3.

The Complaints contend that SKAT had been investigating these tax refund claims for at least the last three years.  The Complaints allege that in June 2015 SKAT received information indicating certain dividend withholding tax refund claims it had paid out may be fraudulent, and it began an investigation.  TBLPP Compl. ¶ 6.  SKAT further alleges that it had concluded by August 2015 that many of these claims were indeed fraudulent, including the claims by the The Bradley London Pension Plan (the "TBLPP"), because the Plan allegedly "never owned the

---

[4]  Other Payment Agents referenced in the Complaints are GOAL TaxBack Limited and Acupay System LLC.  *See, e.g.*, Complaint ¶ 26, *SKAT v. Ackview Solo 401K Plan & Sean Driscoll*, Dkt. No. 1:18-cv-04900; Complaint ¶ 26, *SKAT v. The Dosmon Bly Pension Plan & Doston Bradley*, Dkt. No. 1:18-cv-05045.  Ex. 37 and 38.

[5]  *See* https://register.fca.org.uk/.  The other Broker Custodians identified in the Complaints, namely Old Park Lane Capital PLC, West Point Derivatives Ltd., and Telesto Markets LLP, were all authorized and regulated by the FSA.  *See id.  See, e.g.*, Complaint ¶ 49, *SKAT v. The Atlantic DHR 401K Plan & Doston Bradley*, Dkt. No. 1:18-cv-04430; Complaint ¶ 49, *SKAT v. The Busby Black 401K Plan & Doston Bradley*, Dkt. No. 1:18-cv-04522; The Aria Complaint ¶ 53.  Ex. 2, 19, and 21.  In 2013, the FSA dissolved and the Financial Conduct Authority assumed some of its regulatory responsibilities.

shares described above, never received any dividend from Danish companies in which it was a purported shareholder and was not entitled to claim a refund of dividend withholding tax." TBLPP Compl. ¶¶ 48, 49. Despite conceding that SKAT reached these (alleged) conclusions at least three years prior to filing these actions, the Complaints offer no further explanation for the basis of this determination and instead rely on conclusory statements and allegations for their claims for fraud, aiding and abetting fraud, negligent misrepresentation, unjust enrichment, money had and received, and payment by mistake. TBLPP Compl. ¶¶ 50-80. Indeed, the Complaints are carefully vague about SKAT's basis for the assertion that the Plans never owned the shares—notably, the Complaints do not allege that the credit advice, income advice, or tax vouchers submitted by the Payment Agents with the refund claims were incorrect or fraudulent, nor do the Complaints admit that the question of whether the Plans owned the shares is a matter of the definition of "beneficial owner" under Danish tax law (likely, because SKAT knows that such admission would be fatal to its claims under the Revenue Rule, discussed *supra*). *See generally* TBLPP Compl.

In April and May 2018, SKAT issued final determination letters to the Plans seeking repayment of these withholding tax refunds. *See, e.g.*, Ex. 4. In support of its determinations, SKAT relied on the Danish Corporation Act, sections 2.1(c) and (3), the Tax Assessment Act, section 16A.1, and the Danish Corporation Tax Act, sections 65.1 and 69B.1. *Id.*, p. 8. The final determination letters granted each of the Plans a right to appeal administratively SKAT's determination to Skatteankestyrelsen, or the Tax Appeals Agency, within three months from the date of the letter. *Id.*, p. 17. By now, most, if not all of the Plans have either filed an administrative appeal of SKAT's determination or are in the in the process of doing so. *See, e.g.*, Ex. 5. Skatteankestyrelsen expects its review process to take approximately 30 months. Ex. 6,

p. 1.   Yet, while the appeals were only recently filed and are still pending, and SKAT's determination is under Danish administrative appellate review (and subject to judicial review thereafter), SKAT asks this Court (and other U.S. federal and state courts) to short-circuit the Danish administrative and judicial process in clear derogation of the Revenue Rule (and the Treaty) to force the Defendants to return the withholding tax refunds.

## ARGUMENT

### I.  LEGAL STANDARDS FOR DISMISSAL

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for dismissal of a claim when the federal court lacks subject matter jurisdiction.  A Revenue Rule challenge to the claim falls under Rule 12(b)(1).  *See Republic of Columbia v. Diageo of N.A. Inc.*, 531 F. Supp. 2d 365, 381 (E.D.N.Y. 2007).  Where the defendant moves for dismissal under Rule 12(b)(1) as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first.  *MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 497-498 (S.D.N.Y. 2017); *Rhulen Agency, Inc. v. A.L. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990).  A plaintiff has the burden of proving subject matter jurisdiction by a preponderance of the evidence.  *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).  A court must generally "accept the material factual allegations in the complaint as true, but does not draw all reasonable inferences in the plaintiff's favor."  *Figueroa v. Ministry for Foreign Affairs of Sweden*, 222 F. Supp. 3d 304, 307 (S.D.N.Y. 2016).  When resolving issues of subject matter jurisdiction, the court is not confined to the complaint and may refer to evidence outside the pleadings, such as affidavits and exhibits.  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (*quoting Bell Atl. Corp.* v. *Twombly,*

550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).  A "plaintiff's obligation to provide the
grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic
recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S. Ct.
at 1965-6.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's
liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"
*Iqbal,* 556 U.S. at 678, 129 S. Ct. at 1949 (quoting *Twombly,* 550 U.S. at 557, 127 S. Ct. at 1966
(internal quotation omitted)).

Fraud and similar claims are subject to a higher pleading standard under Rule 9(b).  Rule
9(b) requires a plaintiff alleging fraud to state the circumstances constituting fraud or mistake
with particularity.  A claim must specify the time, place, speaker, and content of the alleged
misrepresentations.  *See Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir. 1986).  Where multiple
defendants are subject to a fraud claim, the complaint must inform each defendant of the nature
of his alleged participation in the fraud.  *See Natowitz* v. *Mehlman,* 542 F. Supp. 674, 676
(S.D.N.Y. 1982).

## II.  THE COURT LACKS SUBJECT MATTER JURISDICTION UNDER THE REVENUE RULE

### a.  Under the Revenue Rule, the Court Lacks Subject Matter Jurisdiction over the Present Case Because this is an Action by a Foreign Sovereign to Enforce Foreign Tax Assessments.

#### i.  Revenue Rule

The Revenue Rule is a well-established common law principle that prohibits courts from
enforcing the internal revenue laws of a foreign sovereign, including final tax judgments or
unadjudicated tax claims.  *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
268 F.3d 103, 109 (2d. Cir. 2001)*; see also Republic of Ecuador v. Philip Morris Companies,
Inc.*, 188 F. Supp. 2d 1359, 1362 (S.D. Fla. 2002) (referring to the Revenue Rule as an "age-old

common law doctrine provid[ing] that courts of one sovereign will not enforce unadjudicated tax claims of other sovereigns"). The continued vitality of the Revenue Rule is grounded on its perpetuation of fundamental objectives, namely "respect for sovereignty, concerns for judicial role and competence and separation of powers." *R.J. Reynolds*, at 109. The Revenue Rule safeguards and promotes respect for sovereignty because the internal revenue laws of each embody its political will, including its moral and social judgments and its ideological leanings and political goals. *See id.* at 111. "When a foreign nation appears as a plaintiff in our courts seeking enforcement of its revenue laws, the judiciary risks being drawn into issues and disputes of foreign policy that are assigned to – and better handled by – the political branches of government," as the court may interpret, apply or enforce foreign revenue laws in a manner inconsistent with or unintended by the foreign sovereign, potentially causing embarrassment or political friction between the two countries. *Id.* at 114. When it applies, the Revenue Rule "requires [the] court to abstain from considering the [plaintiff's] claims." *Republic of Honduras v. Phillip Morris Co.*, 341 F.3d 1253, 1261 (11th Cir. 2003).

The Revenue Rule clearly bars any foreign sovereign's claims for *direct* enforcement of foreign tax laws. A foreign sovereign seeks direct enforcement of its internal revenue laws "when a judgment in [its favor] would require the defendants to reimburse them for lost tax revenues." *European Community v. RJR Nabisco, Inc.*, 355 F.3d 123, 131 (2d. Cir. 2004) (affirming the district court's decision to dismiss the European Community's claims for lost tax revenue due to alleged scheme by tobacco manufacturers to evade European custom duties, value-added taxes, and excise taxes).

The Revenue Rule also bars claims that in substance, albeit not in form, seek to *indirectly* enforce foreign tax laws if such a claim "seeks a remedy that would give extraterritorial effect to

its tax laws." *See id.* at 131.  For example, in *R.J. Reynolds*, the Second Circuit relied on the Revenue Rule to reject Canada's claim to recover law enforcement costs from defendants who were allegedly engaged in illegal tax avoidance schemes.  *R.J. Reynolds*, at 131-32*; accord*, *European Community*, at 132.  In addition, a federal district court held that a foreign sovereign's claim to recover lost *profits* from the sale of liquor products that it allegedly suffered due to the defendants' tax evasion scheme also constituted indirect enforcement prohibited under the Revenue Rule, as the claim was derivative of, and substantively related to, such foreign sovereign's internal tax laws.  *See Republic of Colombia v. Diageo North America Inc.*, 531 F. Supp. 2d 365 (E.D.N.Y. 2007).[6]

In determining whether the Revenue Rule applies to a particular claim brought by a foreign sovereign, "[w]hat matters is not the form of the action, but the substance of the claim."  *R.J. Reynolds*, at 130.  Thus, a claim that in form alleges violations of U.S. laws but in substance "seeks to recoup actual damages in the amount of lost revenue" is equally barred by the Revenue Rule as a direct claim for foreign tax revenue.  *Ecuador*, at 1366-67.  Consistent with that approach, the New York Court of Appeals affirmed the dismissal of a civil fraud action brought by an agent of a foreign government on the basis of the Revenue Rule.  In *Banco Do Brasil, S.A. v. A. C. Israel Commodity Co.*, a Brazilian government bank brought a conspiracy to defraud claim against a coffee importer for illegally circumventing Brazilian currency regulations with forged documents.  190 N.E.2d 235, 237 (N.Y. 1963).  The court affirmed dismissal of the suit in part on the basis that "it is well established … that one State does not enforce the revenue laws of

---

[6]  A claim would not be a prohibited indirect enforcement claim under the Revenue Rule where the foreign sovereign seeks, for example, lost commercial-actor profits arising from alleged illegal activities of the defendant, if such underlying illegal conduct does not implicate the enforcement of a foreign sovereign's tax law and thus does not raise sufficient policy concerns to warrant application of the Revenue Rule.  In *Colombia*, the court found that the Colombian government's claim for lost commercial-actor profits based on the defendants' narcotics laundering activities (which only required recognition of the Colombian tax law rather than its enforcement) was not barred by the Revenue Rule.  *See Colombia*, at 395-99.

another," and "[p]laintiff is an instrumentality of the Government of Brazil and is seeking, by use of an action for conspiracy to defraud, to enforce what is clearly a revenue law." *Id*. The substance-over-form approach in applying the Revenue Rule is important because, "[i]f it were otherwise, litigants could freely avoid the impact of the revenue rule by bringing tax claims under the guise of non-tax-related causes of action." *Honduras*, at 1256. This is precisely what SKAT is attempting to do here.

> ii. The Revenue Rule Bars SKAT's Claims as Direct Enforcement of Danish Tax Laws

The Revenue Rule bars SKAT's claims in these cases because, in substance, they are nothing more than a thinly-veiled attempt by SKAT to directly enforce Danish tax laws and use U.S. courts to seek reimbursement for allegedly lost tax revenue. SKAT admits as much on the face of its Complaints in these cases. *See* TBLPP Compl., p. 15.

In the first paragraph of each Complaint, SKAT identifies itself as "the agency of the government of Denmark charged with the assessment and collection of Danish taxes." TBLPP Compl. ¶ 1. Further, SKAT expressly alleges that it suffered damages that constitute the basis for these claims as a result of having paid "baseless *withholding tax refund claims* . . . of at least $11,135,000 (U.S.)." TBLPP Compl. ¶ 13 (emphasis added). Moreover, despite styling them as damages from tort claims, SKAT clearly seeks to recover amounts identical to the amounts of allegedly fraudulent tax refunds it paid to the Plans. *See* TBLPP Compl. ¶¶ 53, 67, 72, 75, 80. Thus, the sole object of SKAT's suits is to recover tax refunds; and, if SKAT was permitted to move forward with its claims, a judgment in its favor would result in the Defendants being compelled to reimburse SKAT for its lost tax revenues. As such, regardless of how it styles its claims, SKAT is explicitly requesting the U.S. courts to directly enforce Danish tax laws, which is unambiguously prohibited by the Revenue Rule. *See, e.g.*, *Honduras*, at 1257 (holding that

although the plaintiff foreign sovereigns framed their claims as violations of the RICO Act, the claims fundamentally dealt with the "adjudication of foreign taxes," which is barred under the Revenue Rule); *Ecuador*, at 1367 (holding that the substance of Ecuador's claims is to directly and indirectly enforce its tax laws and adjudicate a foreign tax claim, even though they were "fashioned under civil RICO and common law causes of action"). Otherwise, a foreign government would be permitted to make bare, non-tax allegations in order to gain access to U.S. courts and circumvent the policy behind the Revenue Rule. *See Honduras*, at 1256 (noting that absent a substance-over-form rule, "litigants could freely avoid the impact of the Revenue Rule by bringing tax claims under the guise of non-tax-related causes of action").

Thus, notwithstanding its efforts to shroud the tax revenue-seeking nature of its claims by pursuing redress under U.S. tort claims, it is clear from the Complaints that SKAT's fundamental goal in bringing these suits is to recover tax refunds. This is "nothing more than an attempt to use a United States tort claim to seek compensation for harms suffered as a result of the evasion of a foreign sovereign's tax laws." *Columbia*, at 394.

Moreover, adjudication of SKAT's claims would ultimately require the Court to examine and interpret, and potentially enforce, Danish tax laws in direct contravention of the Revenue Rule. The core of SKAT's Complaints allege that the Defendants fraudulently represented that the Plans owned shares of large Danish listed companies to claim a refund of Danish dividend withholding taxes. *See* TBLPP Compl. ¶ 48. Although SKAT is alleging fraud, in reality, the resolution of this case would require the Court to determine whether under *Danish* tax law the Plans "owned" or were deemed to own shares of Danish companies at the time the dividends were paid. Specifically, the Court would be required to interpret, apply, and enforce section 23.1 of the Capital Gains Tax Act of Denmark and section C.B.2.1.6.1 of The Legal Guide, which is

guidance published by SKAT setting forth its views on current practice and has the status of a circular.  Ex. 12 and 13.  SKAT based its determination that the Plans did not own the shares at issue and did not receive the dividends on the conclusory assertions:  (1) that the Plans did not have the "necessary capital" to own the shares, based on their reported year-end assets and capital; and (2) that VP Securities, the central securities depository in Denmark, did not find a security depository in a Danish bank that registered the Plan or its custodian, Solo Capital, as owners of the shares.  *See, e.g.,* Ex. 4-A, p. 1, 2, 7, 8, 10, 11, 16.  In support of this determination, SKAT cited to the Danish Corporation Tax Act, section 2.1(c) and (3), the Tax Assessment Act, section 16A.1, and the Act on Taxation at the Source, sections 65.1 and 69B.1.  *Id*. at 8.[7]  SKAT now asks this Court to uphold its determination and to declare as a matter of law for *Danish tax refund purposes* that the Plans did not own the shares.  All the while, the Plans that have filed the appeals to Skatteankestyrelsen are vigorously challenging SKAT's arguments on various grounds, including on the basis that (1) the Plan's ownership of the shares is confirmed by *bona fide* documentation issued by the Broker Custodian, an FSA-regulated UK financial institution, certifying that the Plans owned the shares at issue, (2) there are many means to obtain liquidity to purchase shares (such as through financing transactions), and (3) the lack of registration with VP Securities is of no significance in determining either legal or fiscal ownership of the shares (for example, because such shares may have been held in omnibus or custodian accounts).  *See, e.g.*, Ex. 5-A, p. 2-7.  As the court in *R.J. Reynolds* noted, "[e]nforcing foreign revenue laws is precisely the type of meddling in foreign affairs the Revenue Rule forbids."  *R.J. Reynolds*, at 108.

Further, permitting SKAT to proceed with its claims in this litigation is especially inappropriate in the present cases given that there has been no determination by any

---

[7]  The relevant sections of Danish law and certified translations thereof are attached as Exhibits 7-11.

administrative appellate or judicial body in Denmark that the alleged fraudulent conduct by the Defendants in fact occurred or that the tax refunds should be returned and, indeed, Danish administrative tax proceedings with respect to these exact issues are still ongoing. In effect, the U.S. courts are being asked to assess in the first instance whether tax fraud occurred under Danish tax law (i.e., whether the Defendants ever held or owned shares of Danish companies entitling them to a refund of Danish withholding taxes and, if not, whether they fraudulently claimed otherwise). The interpretation and application of a foreign sovereign's tax laws is precisely the kind of situation that the Revenue Rule is intended to prevent. This is exactly why SKAT's proper recourse "is not in the courts but rather in negotiating a tax treaty with [the political branches of the United States] or adjudicating and enforcing these claims within its own territory." *Ecuador*, at 1367.

   iii. <u>SKAT's Claims Do Not Qualify for the Limited Exception to the Revenue Rule</u>

   Although the Revenue Rule is broad, its reach is not unlimited and it will not be applied where the policy concerns that underlie the Revenue Rule are not present. For example, a foreign sovereign was permitted to proceed with its claims where the claims were brought by the sovereign as a commercial actor, rather than in its capacity as a sovereign, and the remedy did not give "extraterritorial effect" to foreign tax law, which is a prohibited indirect enforcement of foreign tax laws. *See Colombia*, at 386-90.

   The *Colombia* court laid out a general rule regarding whether a foreign sovereign's claim for damages constitutes impermissible indirect enforcement or instead a permissible damages claim brought by a foreign sovereign in its capacity as a commercial actor. *See Colombia*, at 386-90. In *Colombia*, the defendants allegedly engaged in not only a tax evasion scheme but also in a narcotics laundering scheme. The Republic of Colombia sued the defendants in federal

district court alleging violations of the RICO Act and sought, *inter alia*, two different types of damages—(i) lost tax revenues, and (ii) the commercial profit that the government of Colombia lost as the sole seller and distributor of liquor within Colombia, as a result of the defendants' tax evasion and money laundering activities. *See id*. at 380.

The court found that Colombia's claim for lost tax revenues was clearly barred as direct enforcement under the Revenue Rule, noting that such damages, which were sought in its sovereign capacity, are generally impermissible. The court also determined that Colombia's claims for lost revenues and profits, which Colombia alleged to have incurred in its capacity as a commercial actor, were not automatically barred under the Revenue Rule, but should rather be bifurcated into two portions—the portion attributable to the defendants' tax evasion scheme, and the portion attributable to the defendants' money laundering scheme. *See id*. at 393-94. The court first determined that the lost profits claim arising from the defendants' tax evasion scheme would "permit [Colombia] to bring an indirect claim for lost tax revenues;" would "clearly constitute an indirect enforcement of Colombian tax laws," barred by the Revenue Rule; and were "nothing more than an attempt to use a United States tort claim to seek compensation for harms suffered as a result of the evasion of a foreign sovereign's tax laws." *Id*. at 394. By contrast, the court found that the lost revenues and profits attributable to the defendant's money laundering scheme was not barred by the Revenue Rule because it only tangentially related to Columbian tax law, required a mere recognition of such laws (rather than its interpretation, application or enforcement), and did not raise sufficient policy concerns to warrant application of the Revenue Rule. *See id.* at 395.

Here, SKAT endeavors to avoid the prohibitions of the Revenue Rule by bringing its claims for damages under United States tort law and appears to be attempting to portray itself as

13

a defrauded commercial actor.  However, such posturing is a fallacy.  SKAT did not act and does not allege to have acted as an investor, trader, broker, or any other commercial party to the securities investments at issue.  Rather, these claims arose directly and solely in the context of SKAT's role as a government body performing a core government function—namely, the assessment and collection of Danish taxes, including making a determination as to whether withholding tax was due or refundable.[8]  And the sole interaction between SKAT and the Defendants in these cases is the submission of the allegedly fraudulent tax refund claims prepared on standard tax refund forms created by SKAT, submitted by the Payment Agents pursuant to SKAT's standard tax refund procedures, and which, on their face, do not reference any other purpose.  *See* Ex. 3, p. 2.

Indeed, this action was brought only after SKAT began its tax audits in Denmark (which are still ongoing and currently only in the administrative appeals phase).  Ex. 4 and 5.  Further, each of SKAT's claims for damages under its various causes of action all relate to a purported tax scheme that the Defendants allegedly facilitated, and which requires not only recognition of Danish tax laws, but its interpretation, application, and potential enforcement.  Unlike the sovereign in *Colombia* which revealed a commercial role in the sovereign's role in the

---

[8]  The question of when a foreign sovereign is acting in its capacity as a commercial actor has been addressed in the context of the Foreign Sovereign Immunities Act ("FSIA") and under section 892 of the Internal Revenue Code of 1986, as amended (the "Code").  Under the FSIA, a "commercial activity" of a foreign sovereign is defined as "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  If the foreign state's activity is "peculiar to sovereigns" and is a type of conduct in which private citizens cannot engage, the foreign state's activity will not constitute "commercial" activity.  *See Saudi Arabia v. Nelson*, 507 U.S. 349, 360, 113 S. Ct. 1471, 1479 (1993).  Under this definition, SKAT's conduct in the present cases—collecting taxes—is clearly a purely "sovereign" activity that private citizens cannot engage in.  Thus, here, SKAT is acting not in a commercial but in a sovereign capacity.  Code section 892 exempts certain types of income earned by foreign sovereigns from U.S. income tax, with a proviso that a foreign sovereign's U.S. source income arising from commercial activities cannot benefit from such an exemption.  The relevant Treasury Regulations provide a list of five specific categories of activities that do *not* constitute commercial activities, one of which is "governmental functions"—i.e., "activities performed for the general public with respect to the social welfare or which relate to the administration of some phase of government."  Treas. Reg. § 1.892-4T(c)(4).  The collection of taxes is undeniably a government function that is performed as part of government administration, which SKAT admittedly is performing in a sovereign capacity in pursuing its claim for lost tax revenue. TBLPP Compl. ¶ 1.

distribution of liquor in the marketplace which it controlled, SKAT alleges no other non-tax basis on which it seeks damages and it fails to allege that it has engaged in any activity outside of its role as the tax authority for Denmark.  Because SKAT's claim for damages, while presented as purported tort causes of action, clearly relate to an alleged underlying withholding tax refund scheme that deeply implicates Danish tax laws, this Court would be required to determine whether the Defendants indeed violated Danish tax law and potentially enforce such law in the recovery of Danish tax revenues.  As such, SKAT's claims are barred as a direct enforcement under the Revenue Rule.[9]

### b.  SKAT's Actions are Barred by the U.S.-Denmark Income Tax Treaty.

The United States and Denmark have entered into an income tax treaty that governs the parameters for assistance between the two governments with respect to the collection of taxes (the "Denmark Treaty" or the "Treaty").[10]  Treaty, Art. 27.  *See Dileng v. Commissioner*, 157 F. Supp. 3d 1336, 1339 (N.D. Ga. 2016).  Specifically, Article 27, paragraph 2, of the Denmark Treaty, titled Administrative Assistance, provides that Denmark may submit to the "competent authority" of the U.S. "[a]n application for assistance in the collection of a revenue claim[,]" which application "may be accepted" by the U.S. Treaty, Art. 27, ¶¶ 2, 3.  Therefore, the Denmark Treaty contemplates a tax collection assistance request from the Danish taxing authority (SKAT) to the U.S. competent authority (the IRS), which the IRS then has the

---

[9]  The Revenue Rule does not prohibit the *U.S. government* itself from instituting a prosecution under *United States law* against those who have taken actions that also defrauded foreign governments of tax revenues.  *See United States v. Pasquantino*, 544 U.S. 349, 358-62, 125 S. Ct. 1766, 1774-5 (2005). In *Pasquantino,* the Supreme Court rejected defendants' claims that Revenue Rule barred U.S. government's prosecution finding that the primary object of the prosecution was not to award Canada its lost tax revenues, but to deter and punish domestic criminal conduct and that the link between the prosecution and foreign tax collection was merely "incidental and attenuated at best." *Id.* at 364, 125 S. Ct. at 1777. Here, SKAT is bringing a suit to enforce its own laws as an agency of a foreign sovereign, and any recovery by SKAT of its lost tax revenue could not be characterized as merely "incidental to" the suit.  Indeed, a recovery by SKAT is the *raison d'etre* of the entire proceeding.  Nor is this an action being brought by or on behalf of the United States government itself.  Thus, the limited exception to the Revenue Rule provided by *Pasquantino* is of no avail to SKAT.

[10]  Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income, U.S.-Den., Aug. 19, 1999, T.I.A.S. No. 13056.

discretion to accept or not.  *Id.* at ¶ 3; *see also* Jt. Comm. Tax., *Explanation of Proposed Income Tax Treaty Between the United States and Denmark*, p. 11 (Oct. 8, 1999) (noting delegation of competent authority to the Assistant Commissioner of the IRS).[11]  If the IRS accepts a request for assistance by Denmark, the revenue claim is treated by the IRS as an assessment under U.S. laws against the taxpayer.  Treaty, Art. 27, ¶ 4.  Nowhere in the Denmark Treaty is Denmark granted a right of action to collect its taxes through the U.S. court system.  Rather, its sole avenue of redress, if any, is through a request to the IRS.  However, rather than make a request for collection under the Denmark Treaty, SKAT attempts to bypass the mandated procedure for collection assistance negotiated by both countries.

Moreover, Article 27, paragraph 8, of the Denmark Treaty, carves out a broad limitation upon the IRS's discretionary authority to provide collection assistance, stating that "[n]o assistance shall be provided under this Article for a revenue claim in respect of a taxpayer to the extent the taxpayer can demonstrate that: a) where the taxpayer is an individual, the revenue claim relates to a taxable period in which the taxpayer was a citizen of the requested State, and b) where the taxpayer is an entity that is a company, estate or trust, the revenue claim relates to a taxable period in which the taxpayer derived its status as such an entity from the laws in force in the requested State."  *Id.* at ¶ 8.

The congressional Joint Committee on Taxation's explanation of the (then) proposed Denmark Treaty (the "Joint Committee Explanation") further explains that "[t]he *only* collection assistance required in [cases where paragraph 8 applies] would be assistance authorized under the proposed treaty's mutual agreement procedure article."  Jt. Comm. Tax., *Explanation of Proposed Income Tax Treaty Between the United States and Denmark*, p. 50 (emphasis added).

---

[11]  Internal Revenue Manual 5.21.7.4 (Nov. 13, 2015) provides specificity with respect to the content and procedures for such a request, available at https://www.irs.gov/irm/part5/irm_05-021-007r#idm140569389882384.

Thus, the plain language of the Denmark Treaty, in conjunction with the Joint Committee Explanation, makes clear that, where a revenue claim falls under the exception set forth in Article 27, paragraph 8, the *sole* avenue of collection assistance available to a Contracting State is through the competent authority procedures provided by Article 25, Mutual Agreement Procedure.[12]

SKAT's claim for lost tax revenue falls squarely within the provisions of Article 27, paragraph 8.  Here, all the named individual Defendants were United States citizens during the period to which SKAT's claim relates—i.e., 2012 through 2015.  *See, e.g.,* TBLPP Compl. ¶ 18. Further, each of the Plans named as a Defendant was an entity—either a limited liability company or a trust—that derived its status as such an entity from the laws of the United States during the period to which SKAT's claim relates.  *See, e.g.,* TBLPP Compl. ¶ 17. Thus, under the unambiguous language of paragraph 8, SKAT is precluded from requesting collection assistance from the United States under Article 27.  Rather, any collection assistance must be obtained only through the mutual agreement procedures set forth in Article 25.[13]  Neither the Treaty nor the Technical Explanation,[14] nor the Joint Committee Explanation or other pertinent authority, identify any other collection channels for SKAT to pursue its revenue claim, and particularly not the U.S. courts.

---

[12]  Article 25 of the Treaty allows the competent authorities of Denmark and the United States to resolve "difficulties or doubts" relating to the interpretation and application of the Treaty by mutual agreement.  Treaty, Art. 25, ¶ 4.

[13]  SKAT may also seek an exchange of information regarding the revenue claim at issue (rather than its collection) under Article 26 (Exchange of Information).

[14]  *Dept. of the Treas. Technical Explanation of the Convention Between the Government of the United States of America and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income Singed at Washington, August 19, 1999,* effective date Jan. 1, 2001, available at https://www.irs.gov/pub/irs-trty/dentech.pdf.

SKAT seeks to use the U.S. court system to achieve what it is prohibited to do under the Treaty.[15]  As the court in *R.J. Reynolds* noted, the presence of a provision specifically addressing the parameters of the collection of tax revenue within the treaty is strong proof that any action outside the scope of the treaty that specifically seeks revenue collection is barred.  *R.J. Reynolds*, at 125 (noting that the Revenue Rule should be respected particularly "where the two sovereigns … have a well-established treaty process that has strictly limited the extent to which each government can pursue its tax claims using the other's domestic administrative and judicial processes").

Here, SKAT, recognizing that it is unable to utilize the Denmark Treaty collection assistance provision because of the limitation in Article 27, paragraph 8, attempts to circumvent the clear terms of the Treaty that it voluntarily negotiated by filing more than 140 lawsuits in multiple federal district and state courts of the United States.  Such conduct reflects the appearance of a disturbing abuse of the U.S. court system, employed solely for the seeming purpose of intimidation and as a means to conduct expedited discovery for use in Danish proceedings that are ongoing and remain unresolved in Denmark.  *See generally* Ex. 14.  If this Court permitted SKAT's claims to go forward, it "would be ignoring and undermining the treaty negotiation process and the clearly expressed views of the political branches of the United States government."  *R.J. Reynolds,* at 122, 135 (noting Canada's "[r]ecourse, to the degree it is warranted and available, lies with the executive and legislature," not the courts); *see also United States v. First Nat'l City Bank*, 321 F.2d 14, 24 (2d Cir. 1963) ("Absent an explicit indication to the contrary, there should not be attributed to Congress an intent to give the courts of this nation,

---

[15]  In fact, Article 27, paragraph 5, of the Denmark Treaty specifically stated that Article 27 does not create or provide "any rights of administrative or judicial review" of Denmark's revenue claim.  Treaty, Art. 27, ¶ 5. However, this is precisely what SKAT is asking the Court to engage in here – a judicial review of Denmark's revenue claim.

in this highly sensitive area of intergovernmental relations, the power to affect rights to property wherever located in the world. The apparent necessity of tax treaties underscores the conclusion that Congress has seen fit to handle this problem in another manner."), *rev'd on other grounds*, 379 U.S. 378 (1965).[16]

### III. THE FRAUD, AIDING AND ABETTING, AND NEGLIGENT MISREPRESENTATION CLAIMS FAIL TO ALLEGE KEY ELEMENTS UNDER THE HEIGHTENED PLEADING STANDARDS OF RULE 9(b).

#### a. The Fraud and Aiding and Abetting Claims Fail to Adequately Allege Knowledge and Intent

While the Complaints allege in conclusory terms that the Plans did not own the shares it claimed to own or receive any dividends subject to withholding tax, they fail to allege adequately that the Plans or their purported agents, the Authorized Representatives and the Payment Agents, *knew* the Plans did not own the shares or receive the dividends subject to withholding tax, or that any of such Defendants intended to defraud SKAT. Similarly, SKAT fails to plead what statements of material fact were false or even why they were false. As such, the fraud and aiding and abetting claims both fail.

Knowledge of the fraud is an element of both a fraud and an aiding and abetting claims. *Pasternack v. Laboratory Corp. of America Holdings*, 27 N.Y.3d 817, 827 (2016); *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000). Likewise, fraud and aiding and abetting claims both require intent to defraud, or scienter. *Deutsche Zentral-Genossenchaftsbank AG v. HSBC North America Holdings, Inc.*, 2013 WL 6667601 (S.D.N.Y. Dec. 17, 2013).

---

[16] Moreover, by initiating the present suits, SKAT gains access to the robust discovery rules provided by the U.S. court system in connection to what is clearly a claim for collection of its purported lost tax revenue. SKAT's exploitation of the U.S. judicial system to obtain information is improper, especially in light of various other avenues of information gathering that the United States and Denmark have expressly agreed upon. Article 26 of the Denmark Treaty explicitly provides a channel for information gathering that is necessary for, among others, the carrying out of the provisions of Danish tax law. In addition, the United States and Denmark have implemented a Mutual Legal Assistance Treaty ("MLAT"), the purpose of which is to facilitate the gathering and exchanging of information to enforce public or criminal laws.

Federal Rule of Civil Procedure 9(b) gives plaintiffs some leeway in alleging knowledge and intent, but that leeway is not a license for speculation. "While knowledge and intent 'may be alleged generally,' under the pleading standard of Federal Rule of Civil Procedure 9(b), a court 'must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations.'" *Silvercreek Management, Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 438 (S.D.N.Y. 2017) (citing *Lerner v. Fleet Bank*, N.A., 459 F.3d 273, 291 (2d Cir. 2006)). A plaintiff must allege facts "that give rise to a strong inference of fraudulent intent." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015) (internal quotations omitted). Such an inference is "strong" if it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 177–78.

Here, to allege knowledge and intent, the Complaints rely on a single, conclusory statement in paragraph 10[17]—"The Defendants did know or should have known that these arrangements would cause SKAT to make payments to which the Defendants were not entitled." TBLPP Compl. ¶ 10. This is insufficient to meet even an *Iqbal* pleading standard, much less satisfy the requirements of Rule 9(b). Although the Complaints repeatedly allege that the Plans did not own the shares it claimed to own, or receive any dividends subject to withholding tax, they fail to support their conclusory assertions and allege facts showing that the Plans or their purported agents *knew* they did not own the shares or receive the dividends subject to withholding tax, or that any of them intended to defraud SKAT. Nor do the Complaints allege that the Authorized Representatives and the Incorporators made any false statements, knowingly or otherwise. *See Carmona v. Spanish Broad. Sys., Inc.,* 2009 WL 890054, at *5 (S.D.N.Y. Mar.

---

[17]  A similarly conclusory statement that provides no additional detail is repeated under Counts I and II in the Complaint's "Causes of Action" section. *See* ¶¶ 51, 52, 57, 58.

30, 2009) (LAK) (knowledge insufficiently alleged for on-air promoters of an allegedly fraudulent contest because there were no allegations the promoters knew the contest was bogus). The Complaints also do not contain any credible allegation of intent to defraud on part of the Authorized Representatives or the Incorporators. *See, e.g.*, *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 155 (S.D.N.Y. 2004) (LAK) (allegations suggesting "financial motives . . . typical of the general profit motivations of business person" are not sufficient to establish scienter).

The Complaints allege that the tax refund claims submitted on behalf of the Plans each included a "credit advice" (or "tax voucher") from the Broker Custodian, an FSA-regulated UK financial institution, certifying that the Plans owned the shares at issue, complete with an International Securities Identification Number ("ISIN") for the shares. *See* TBLPP Compl. ¶¶ 28, 47; Ex. 3, p. 3. While the Complaints allege these credit advices were incorrect, *see, e.g.,* TBLPP Compl. ¶¶ 9, 48, they nowhere allege facts suggesting that the Plans or their agents conspired with the Broker Custodians to acquire false documentation, or that the credit advices were forged by the Plans or their agents, or even that the Broker Custodians intentionally provided a statement with false information.

Moreover, the Complaints do not allege any facts suggesting *how* the Plans or any of their agents could have known that the information in the credit advices from the Broker Custodians (from which the other allegedly false statements were derived) were incorrect (assuming *arguendo* that they were incorrect). There is not, for example, any allegation that any of the Defendants had access to information that contradicted the credit advice documents provided by the Broker Custodians, much less any description of that information. *See, e.g., Deutsche Zentral-Genossenchaftsbank AG,* 2013 WL 6667601 at *19 (an allegation that

defendants had access to information that was inconsistent with their alleged misstatements must specifically identify the reports or statements containing this information).

Beyond the conclusory statements noted above, there are only a few, highly speculative references to a "scheme" to defraud SKAT of billions of dollars of tax revenue involving hundreds of pension plans in the United States.  *See, e.g.,* TBLPP Compl. ¶¶ 2, 3, 9.  But after what is alleged to be a three-year investigation by SKAT, *id*. ¶¶ 6, 8, no actual facts whatsoever are alleged to support the existence of such a scheme.  The Complaints do not allege that the Plans had any contact *at all* with each other, directly or indirectly, much less that they conspired together to submit false refund claims.

Regardless, SKAT fails to point to any fraudulent statement made by the Defendants in the Claim for Relief from Danish Dividend Tax (a one-page standard form containing boilerplate language), the credit advices or tax vouchers (one-page confirmations from the Broker Custodians), or any of the other documents supporting the tax refund claims.  *See* Ex. 3.  Likewise, SKAT's Complaints do not provide any factual basis for *why* the Plans' requests for tax refunds were false.  SKAT simply concludes that the Plans "never owned the shares . . . , never received any dividend from Danish companies in which [they] [were] a purported shareholder and [were] not entitled to claim a refund of dividend withholding tax."  TBLPP Compl. ¶ 48.  SKAT's fraud and aiding and abetting claims simply assume fraud and ask the Court to recognize the same without providing particular facts to support its claims.

Rather, the few concrete facts alleged lead more compellingly to a different inference: that the various Plans engaged various investment advisors, who invested those Plans' funds in a common European dividend arbitrage investment strategy and those Plans made the relevant tax filings without knowledge that, or any reason to question whether, the credit advices were

incorrect. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (holding that court must "take into account plausible opposing inferences" when determining whether the strength-of-inference requirement has been satisfied). In short, SKAT does not adequately allege knowledge or intent with respect to its allegations of fraud. Both the fraud and aiding and abetting claims should therefore be dismissed for failure to state a claim.

### b. The Aiding and Abetting Fraud Claims Do Not Adequately Allege Any Defendant Provided "Substantial Assistance."

To survive a motion to dismiss, an aiding and abetting fraud claim must adequately allege, among other elements, an act by the defendant that constitutes "substantial assistance." *Wight v. BankAmerica Corp.*, at 91. To the extent that the underlying primary violations are based on fraud, allegations of aider-abettor liability must meet the heightened pleading requirements of Rule 9(b). *Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989).

It is not enough to allege defendants did some act that had the effect of permitting the fraud to occur. Plaintiffs must allege more than "but-for" causation. They must allege also that their injury was "a direct or reasonably foreseeable result of the conduct." *Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*, 479 F. Supp. 2d 349, 370-371 (S.D.N.Y. 2007) (citations omitted). Nor is it enough to imply that the Authorized Representatives or Incorporators should have revealed any knowledge about the fraud to SKAT. Inaction is actionable participation only when the defendant owes a fiduciary duty directly to the plaintiff. *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 346 (2d Cir. 2018); *Kolbeck v. LIT Am., Inc.,* 939 F. Supp. 240, 247 (S.D.N.Y. 1996).

The Complaints do not allege any specific act that could constitute "substantial assistance" on the part of the Plan itself. The only acts of the Authorized Representative (and the Incorporator) that the Complaints allege with specificity are ministerial acts that are not

23

themselves alleged to be fraudulent, mistaken or otherwise improper. The Complaints' only specific allegation about the Authorized Representative is that the Authorized Representative signed a power of attorney that is not alleged to be false. *See, e.g.*, TBLLP Compl. ¶¶ 39-40. The only specific allegation regarding the Incorporator is that he incorporated and dissolved certain companies. *See, e.g.*, The Aria Compl. ¶¶ 41-42. The Complaints do not allege the Authorized Representative or Incorporator had any contact whatsoever with SKAT. The Complaints do not allege that any Defendant had any fiduciary duty to reveal any purported fraud to SKAT.

Because the Complaints do not allege "substantial assistance" on the part of any Defendant, the aiding and abetting claims should be dismissed.

### c. The Fraud and Negligent Misrepresentation Claims Against the Authorized Representatives and Incorporators Should Be Dismissed Because They Do Not Adequately Allege a False Representation of Material Fact by Such Defendants

Both the fraud and negligent misrepresentation causes of action require pleading of a misrepresentation or a material omission of fact. *See, e.g.*, *Pasternack*, at 827 (fraud elements); *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012) (negligent misrepresentation elements).

The Complaints' only specific allegation about any representation at all by the Authorized Representative is that the Authorized Representative signed a power of attorney, a document which is *not* alleged to be false. *See, e.g.*, TBLPP Compl. ¶¶ 39-40. Nor do the Complaints allege that the representations made by the Authorized Representative by virtue of signing the power of attorney are material or that such statements affected SKAT's decisions to honor the withholding tax refund claims. *In re Parmalat Securities Litigation*, 684 F. Supp. 2d 453, 471 (S.D.N.Y. 2010) (LAK) (fraud requires a "material misrepresentation"). The only

specific allegation regarding the Incorporator is that he incorporated and dissolved certain companies, activities which are *not* alleged to be misrepresentations. *See, e.g.*, The Aria Compl. ¶¶ 41-42.

Nor are the allegations sufficient for the Authorized Representative or Incorporator to have vicarious liability for the actions of the Payment Agent or Broker Custodian. There is no allegation the Authorized Representatives or Incorporators were anything more than co-agents of the Payment Agents or Broker Custodians. "[A]n agent generally is not liable for the acts of co-agents or, for that matter, any other person or entity that the agent does not control." *In re Parmalat Securities Litigation*, 377 F. Supp. 2d 390, 406 (S.D.N.Y. 2005) (LAK).

The Authorized Representative is only alleged to have executed a Power of Attorney that stated he was authorized to appoint the Payment Agent. *See, e.g.*, TBLPP Compl. ¶¶ 39-40. Plaintiff does not allege that the Authorized Representative controlled the Payment Agent or Broker Custodian. The Incorporator is not alleged to have appointed or controlled the Payment Agent or Broker Custodian. Accordingly, the fraud and negligent misrepresentation claims should be dismissed as against the Authorized Representatives and Incorporators.

## IV. THE UNJUST ENRICHMENT, MONEY HAD AND RECEIVED AND PAYMENT BY MISTAKE CLAIMS SHOULD EACH BE DISMISSED AS DUPLICATIVE

An unjust enrichment claim will not lie "where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790-91 (2012). Here, the unjust enrichment claim contains no distinct factual basis beyond the "fraudulent scheme" alleged, for example, in paragraphs 1 through 54 of the TBLPP Complaint, so it must be dismissed.

The money had and received claim is legally and factually the same as the unjust enrichment claims and thus should be dismissed for the same reasons. *See J.C. Penney Corp.,*

*Inc. v. Carousel Center Co., L.P.*, 635 F. Supp. 2d 126, 129 n.1 (N.D.N.Y. 2008) ("claims for unjust enrichment and money had and received are identical," citing *In re Estate of Witbeck*, 245 A.D.2d 848, 850, 666 N.Y.S.2d 315 (3d Dep't 1997)).

Likewise, when alleged unjust behavior on the part of a defendant is the cause of a payment by mistake claim, "[p]ayment under mistake of fact and unjust enrichment are essentially duplicative and seek the same relief." *United States v. Albinson,* 2010 WL 3258266, *18 (D.N.J. Aug. 16, 2010). Here, the same alleged fraudulent scheme that is the basis of the unjust enrichment claims is also the cited basis of the payment by mistake claim. As a result, the payment by mistake claim is also duplicative of the unjust enrichment claim and should be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Complaints should be dismissed against all Defendants.


Dated: New York, New York           CAPLIN & DRYSDALE, CHARTERED
August 15, 2018

                                 By:    s/ Mark D. Allison
                                         Mark D. Allison
                                         Zhanna A. Ziering
                                         600 Lexington Avenue
                                         21th Floor
                                         New York, New York 10022
                                         Tel: (212) 379-6000
                                         mallison@capdale.com
                                         zziering@capdale.com

                                         James P. Wehner
                                         One Thomas Circle, N.W.
                                         Washington, D.C. 20005
                                         Tel: (202) 862-5000
                                         jwehner@capdale.com