# EXHIBIT B

OFFICE COPY
HIGH COURT
ROLLS BUILDING
OF JUSTICE

Amended Particulars of Claim pursuant to CPR r17.1(2)(b), CPR r17.4(2) and by Order of The Honourable Mr Justice Teare dated 6 March 2019

Claim No. CL-2018-000297

**In the High Court of Justice**
**Business and Property Courts of England & Wales**
**Commercial Court**

Between:

**SKAT**
**(the Danish Customs and Tax Administration)**

Claimant

and

**SOLO CAPITAL PARTNERS LLP (IN SPECIAL ADMINISTRATION) & OTHERS**
Defendants

**In the High Court of Justice**          Claim No's. CL-2018-000404; CL-2018-000590
**Business and Property Courts of England & Wales**
**Commercial Court**

Between:

**SKAT**
**(the Danish Customs and Tax Administration)**

Claimant

and

**INDIGO GLOBAL PARTNERS LTD & OTHERS**

Defendants

_____

**AMENDED PARTICULARS OF CLAIM**

_____

1.    These are the Amended Particulars of Claim of the Claimant ("SKAT"). SKAT is a function of the Danish Government and is charged with the assessment and collection of Danish taxes. It brings these claims in a private capacity as a result of the civil wrongs set out herein.

2.    In these Particulars of Claim:

(a)    References to the **"First Claim"** are to Claim Number CL-2018-000297; references to the **"Second Claim"** are to Claim Number CL-2018-000404; and references to the **"Third Claim"** are to Claim Number CL-2018-000590;

(b)  References to the "**Alleged Fraud Defendants**" are to the 1st to 15th, 17th to 32nd and 34th to 63rd Defendants in the First Claim and to the 4th, 18th to 22nd and 25th Defendants in the Second Claim and the 8 Defendants in the Third Claim, against whom allegations of dishonesty are made by SKAT.

(c)  References to the "**Non-Fraud Defendants**" are to the 33rd and 63rd to 69th Defendants in the First Claim and to the 1st to 3rd, 5th to 13th, 15th to 16th, 23rd and 24th Defendants in the Second Claim, against whom no allegations of dishonesty are made by SKAT;

(d)  SKAT's claim against particular Defendants is supplemented by the facts and matters set out in the Schedules hereto;

(e)  Where reference is made to any document, SKAT will rely at trial on the document in question for its full terms and effect.

**A    SUMMARY**

3.  In summary and as further particularised below and in the Schedules hereto:

(a)  Under Danish law, a Danish company is obliged to withhold and pay to SKAT as withholding tax ("**WHT**") 27% of any dividend which it pays to shareholders. Certain foreign shareholders are entitled, under Danish law, to a refund of the tax withheld if they beneficially owned the shares and beneficially received the dividend (net of WHT) in respect of those shares on the relevant dates;

(b)  Between August 2012 and July 2015, SKAT received numerous applications for the refund of withholding tax, as set out in Schedule 1 hereto (the "**WHT Applications**"). The WHT Applications were principally made by English based agents ostensibly on behalf of US pension funds and certain entities in Malaysia, UK or Luxembourg. SKAT accepted the WHT Applications and, as a result, paid out approximately DKK12.66573 billion (c. £1.512 billion),[1] alternatively DKK9.713 billion (c. £1.159 billion), to the agents which had made the WHT Applications;

---

[1] These Particulars use an exchange rate of DKK8.377:£1 for illustrative purposes.



(c)    By each such WHT Application, the Alleged Fraud Defendants made (or assisted in or procured the making of) a number of representations, including that the applicant in question beneficially owned the shares and had beneficially received the dividend (net of WHT deducted) in respect of those shares on the relevant dates, and that the applications were genuine (i.e. were made with an honest belief in the facts stated in them) (the "**WHT Representations**");

(d)    The Alleged Fraud Defendants knew that the WHT Representations were false (or they were reckless as to whether they were true or false). The persons on whose behalf the WHT Applications were purportedly made (the "**WHT Applicants**") did not beneficially own the shares in question and/or had not beneficially received the dividends on the relevant dates and/or the Danish company had not withheld tax in respect of such dividend. They were therefore never entitled to any refund of WHT;

(e)    The WHT Applications were made as part of a fraudulent scheme (or schemes) by which the Alleged Fraud Defendants: (i) identified or procured or assisted in the formation of seemingly eligible applicants for WHT refunds; (ii) manufactured fictitious and/or sham transactions and/or carried out illegitimate trading for the purpose of facilitating WHT Applications; (iii) made or procured or assisted in the making of the WHT Applications, including the WHT Representations; and (iv) dealt with the sums paid by SKAT in reliance on said representations in such a way as to conceal and/or launder and/or distribute the proceeds of the WHT Applications;

(f)    Pending disclosure, the best particulars that SKAT can give are that, of the money paid out by SKAT in reliance on the WHT Representations, at least c.DKK6.715 billion (or c.£802 million) was ultimately received by the Alleged Fraud Defendants (not the purported WHT Applicants), through a complex web of transactions, which included the extensive use of offshore vehicles. SKAT infers that the intention of such transactions was to launder the proceeds of the monies, which the Alleged Fraud Defendants had deceived SKAT into paying out, and share them amongst themselves;

(g)    The primary individual responsible for the fraudulent scheme (or the primary fraudulent scheme) was Mr Sanjay Shah (the 34th Defendant in the First Claim) and entities controlled by him, principally:

   (i)    Solo Capital Partners LLP (the 1st Defendant in the First Claim) and related companies including the 2nd to 4th, 15th, 24th and 30th Defendants in the First Claim (collectively, the "**Solo Group Companies**");

   (ii)    Elysium Global Limited ("**Elysium Global**", the 48th Defendant in the First Claim) and related companies including the 17th, 35th, 46th, 47th, 49th, 50th, 53rd Defendants in the First Claim and the 4th, 18th, 19th, and 21st Defendants in the Second Claim (collectively, the "**Elysium Group Companies**").

(h)    The other Alleged Fraud Defendants were joint tortfeasors and/or co-conspirators with Mr Shah and the Solo Group and Elysium Group Companies;

(i)    SKAT brings its claims in English, alternatively Danish law. In respect of the Alleged Fraud Defendants, the claims are based on their dishonest participation in the WHT Representations and/or the WHT Scheme and/or their receipt of proceeds of the fraud;

(j)    Further, SKAT claims against the Non-Fraud Defendants in respect of their negligent participation in the WHT Scheme and/or their receipt of the proceeds of the fraud.

**B      DEFENDANTS**

4.    SKAT brings the claims set out in these Particulars of Claim against the Defendants to the First to Third Claims. The details of the Defendants and their role in the alleged wrongdoing (including the basis on which the knowledge, acts or intention of individual Defendants are to be attributed to corporate Defendants) are recorded in Schedule 5 to these Particulars of Claim. SKAT reserves the right to update these particulars, in particular following receipt of disclosure and/or evidence. In particular, SKAT notes that (at the date of these Particulars) Mr Sanjay Shah and his companies

have failed properly to comply with the proprietary disclosure orders made by the Court.

5.    In summary, the Defendants fall into the following categories:

(a)    Those Defendants which acted as tax reclaim agents and which made WHT Applications to SKAT, purportedly on behalf of WHT Applicants: Goal TaxBack Limited ("Goal", the 66th Defendant in the First Claim), Koi Associates Limited (in liquidation) ("Koi", the 67th Defendant in the First Claim), Syntax GIS Limited (in liquidation) ("Syntax", the 68th Defendant in the First Claim and the 22nd Defendant in the Second Claim), Acupay System LLC ("Acupay", the 3rd Defendant in the Second Claim) (collectively, the "Agents") and Global Equities GmbH ("Global", the 24th Defendant in the Second Claim);

(b)    Those Defendants which provided "credit advice" notes (or similar) which were included in the WHT Applications as purported evidence that the WHT Applicants beneficially owned the relevant shares and had beneficially received the relevant dividends at the relevant dates (net of WHT deducted): Solo Capital Partners LLP ("SCP", the 1st Defendant in the First Claim), Telesto Markets LLP ("Telesto", the 2nd Defendant in the First Claim), Old Park Lane Capital Ltd ("Old Park Lane", the 3rd Defendant in the First Claim), West Point Derivatives Ltd ("West Point", the 4th Defendant in the First Claim), North Channel Bank Gmbh ("North Channel, the 33rd Defendant in the First Claim), Salgado Capital ("Salgado", the 62nd Defendant in the First Claim), ED&F Man Capital Markets Ltd ("ED&F Man", the 69th Defendant in the First Claim), Indigo Global Partners Ltd[2] ("Indigo", the First Defendant in the Second and Third Claims) and Lindisfarne Partners LLP ("Lindisfarne, the Second Defendant in the Second Claim) (collectively, the "Custodians");

(c)    Those Defendants which SKAT believes were party to the fraud and which either received the traceable proceeds of the sums which SKAT paid out or were the shareholders, officers and/or controllers of entities which received such proceeds i.e. the Alleged Fraud Defendants; and

---
[2] Then called Indigo Securities Ltd.



(d)    Those Defendants which were themselves WHT Applicants and on whose behalf the Agents purportedly made WHT Applications (the 64th and 65th Defendants in the First Claim and the 10th to 14th Defendants in the Second Claim) and the officers or trustees thereof (the 5th, 6th, 8th and 9th Defendants in the Second Claim).

## C    DIVIDEND WHT REGIME

6.    Withholding tax is a common fiscal device by which taxes are deducted at the source by a payer of income, and are then paid on to the relevant tax authority.

7.    Under section 65 of the Danish Withholding Tax Act (enacted by Consolidated Act no. 1403 of 7 December 2010) 1967, Danish companies are obliged to withhold 27% of any dividend declared as WHT and only pay to the shareholder the dividend net of WHT. The withheld amount is paid by the company to SKAT.

8.    Under section 69B(1) of the Danish Withholding Tax Act (enacted by Act no. 591 of 18 June 2012) 1967, a shareholder in respect of whose shares part of a dividend has been withheld as WHT may apply to SKAT for the repayment of WHT if any part of the tax was not due.

9.    If a shareholder is resident in the United States, Malaysia, Canada, the United Kingdom or Luxembourg, then the following double taxation treaties provide that Denmark may not tax dividends received by the shareholder at all or may only do so at a rate which is less than 27%. In such circumstances, the shareholder may have a right to a refund of WHT. In particular:

(a)    In respect of the United States, Articles 10(3)(c) and 22(2)(e) of the Convention between the Government of the United States of America and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income (as amended by the Protocol with effective date 1 January 2001) provides that if the beneficial owner of dividends is a pension fund resident in the United States, Denmark may not tax dividends paid by a Danish company to that pension fund at all.

(b)    In respect of Malaysia, Article 10 of the Agreement between the Government of Malaysia and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income provides that if dividends are paid by a Danish company to a Malaysian resident who is subject to Malaysian tax in respect thereof, Denmark may not tax dividends paid by that Danish company to that Malaysian resident at all;

(c)    In respect of Canada, Article 10(1) and 30(3) of the Agreement between the Government of Canada and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income (effective date 2 March 1998) provides that if the beneficial owner of the dividends is resident in Canada, Denmark may not tax dividends received by a resident of Canada at a rate above 15%;

(d)    In respect of the United Kingdom, Article 10(2)(b) and Section 4 of the Convention between the Government of the Kingdom of Denmark and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains (as amended by the Protocols signed on 1 July 1991 and 15 October 1996) provides that if the beneficial owner of the dividends is resident in the United Kingdom, Denmark may not tax dividends received by a resident of the United Kingdom at a rate above 15%; and

(e)    In respect of Luxembourg, Articles 10 and 23 the Convention between the Government of the Grand Duchy of Luxembourg and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Establishment of Rules for Reciprocal Administrative Assistance with Respect to Taxes on Income and Capital Gains (signed 17 November 1980) provides if the beneficial owner of the dividends is resident in Luxembourg, Denmark may not tax dividends received by a resident of Luxembourg at a rate above 15%.

10.    At all relevant times, a shareholder in a Danish company that sought a refund of WHT had to complete (or arrange to have completed on its behalf) a form produced by

SKAT entitled "Claim to Relief from Danish Dividend Tax", with reference number 06.003 ENG (the "**Tax Relief Form**"). The Tax Relief Form required the following:

(a)  A declaration by the person completing the form that they were doing so in their capacity "as beneficial owner" or "on behalf of the beneficial owner";

(b)  The sum in Danish Kroner in respect of which a refund was sought;

(c)  The name, address and email address of the "Beneficial Owner";

(d)  If the claim was made on behalf of the beneficial owner, a power of attorney giving authority to the person completing the Tax Relief Form;

(e)  Documentation regarding "dividend advice(s)"; and

(f)  Certification that "*the beneficial owner is covered by the Double Taxation Convention*" between Denmark and the relevant foreign jurisdiction.

11.  The Tax Relief Form would be signed by the person completing the form.

12.  If SKAT accepted an application for a refund of dividend WHT, it would make payment of the sums claimed to the account specified in the Tax Relief Form.

**D    THE WHT APPLICATIONS**

13.  SKAT's claim is made in respect of the WHT Applications made between August 2012 and July 2015 by the Agents and Global.

14.  The Agents and Global purportedly made the WHT Applications on behalf of 306 foreign WHT Applicants, being: (a) 277 US pension funds: (b) 24 Malaysian companies; (c) 3 Canadian pension funds; (d) a British pension fund (Europa LLP Executive Pension Scheme, the 64th Defendant in the First Claim); and (e) a Luxembourg company (Khajuraho Equity Trading Sarl, the 65th Defendant in the First Claim). A full list of the WHT Applicants is at Schedule 1 to these Particulars of Claim.

15.  The WHT Applications that were purportedly made on behalf of WHT Applicants resident in the US, Canada and Malaysia were in respect of all the tax withheld.

16.    The WHT Applications that were purportedly made on behalf of WHT Applicants resident in the United Kingdom and Luxembourg were in respect of the difference between the 27% tax withheld and the 15% maximum tax rate under the relevant double taxation treaty.

17.    Each WHT Application was made up of the following documents:

(a)    A Tax Relief Form completed by the Agents or Global on behalf of the WHT Applicants;

(b)    A covering letter from the relevant Agent or Global;

(c)    One or more "credit advice" notes (in the case of SCP, Telesto, West Point, Salgado, Indigo and Lindisfarne), "dividend credit" (in the case of North Channel Bank), "income advice" (in the case of Old Park Lane) or "tax voucher" (in the case of ED&F Man) that were produced by the Custodians (the **"Credit Advice Notes"**). The Credit Advice Notes purported to record that:

i)    a specific number of shares in a specific Danish company were held for the named WHT Applicant (in most cases, specifying the "ex-date", being the date before which the share must be owned in order to be entitled to a dividend on the "payment date");

ii)    a specific dividend had been received for the account of the named WHT Applicant (in most cases, specifying the "payment date", being the date on which dividends are paid); and

iii)    such dividend had been received by the WHT Applicant net of a specific amount of tax that had been withheld by the named Danish company;

(d)    A document from a foreign authority certifying that the WHT Applicant was resident in the relevant foreign jurisdiction.



18. The WHT Applications were made in respect of purported shareholdings in 21 listed Danish companies, which belonged to the OMX Copenhagen 20 Index in Denmark, as set out in Schedule 1 hereto.

## E    THE WHT REPRESENTATIONS

### E1.    The Agent Representations and the Custodian Representations

19. The WHT Applications contained the following express, alternatively implied, representations (collectively, the "**Agent Representations**"):

    (a) The WHT Applicant was the beneficial owner of the shares in the Danish company described in the Credit Advice Note (on the day before the ex-date recorded therein, where stated); and/or

    (b) The WHT Applicant had beneficially received the dividend, net of tax, described in the Credit Advice Note (on the payment date described therein, where stated); and/or

    (c) The dividend had been paid to the WHT Applicant, after the Danish company had withheld the tax described in the Credit Advice Note; and/or

    (d) The WHT Application was a genuine application (i.e. made with an honest belief as to the truth of the statements of fact in it) to reclaim tax deducted from a dividend paid to the WHT Applicant by the named Danish company.

20. A reasonable person in the position of SKAT would have understood (and SKAT in fact understood) the Agent Representations to have been made, given: (i) the terms of the Tax Reclaim Form completed by the Agents and Global on behalf of the WHT Applicants; (ii) the terms of the covering letter provided by the Agents and Global; and (iii) the terms of the Credit Advice Note(s) provided with the Tax Reclaim Form; and (iv) the fact that such documents were being submitted to SKAT as part of a WHT Application seeking to reclaim WHT deducted by a Danish company in respect of a dividend purportedly received by the WHT Applicant.

21. Further, the Credit Advice Notes themselves contained the following representations (together, the "**Custodian Representations**"):

(a)   The specific number of shares in the named Danish company were held for the named WHT Applicant (before the "ex-date", where stated);

(b)   A specific dividend had been received for the account of the named WHT Applicant (on the "payment date", where stated);

(c)   Such dividend had been received by the named WHT Applicant net of a specific amount of tax that had been withheld by the named Danish company; and

(d)   The Credit Advice Note was an honest and accurate statement of the facts set out therein by the relevant Custodian.

22.   The Agent Representations and the Custodian Representations are referred to collectively in these Particulars of Claim as the "**WHT Representations**".

**E2.   Falsity of the WHT Representations**

23.   The WHT Representations were false because, in particular:

(a)   The WHT Applicants did not own the relevant shares in the Danish companies beneficially or at all prior to the ex-date (where stated); and/or

(b)   The WHT Applicants had not received the relevant dividends from the Danish companies beneficially or at all on the payment date (where stated); and/or

(c)   The Danish company in question had not withheld the stated tax in respect of the dividend purportedly received by the WHT Applicant; and/or

(d)   The Credit Advice Notes issued by SCP, Telesto, West Point, Old Park Lane, Salgado and Indigo were not honest statements of the facts set out therein by the relevant Custodian, for one or more of the above reasons.



24. The falsity of the WHT Representations is to be inferred from the following facts and matters:

    (a)    In the relevant period (August 2012 to July 2015):

        (i)    There was a substantial increase in the number of applications for the refund of WHT. In particular, the number of such applications increased from 24,292 in 2011 to 41,764 in 2014 and then to 34,850 in the first 7 months of 2015 alone;

        (ii)    There was a substantial increase in the amounts paid out by SKAT in response to such WHT applications. In particular, the total sums paid by SKAT increased from DKK1.12 billion in 2011 to DKK6.06 billion in 2014 and then to DKK8.73 billion in the first half of 2015 alone. This included the following sums paid by SKAT as a result of the WHT Applications:

            (A)    DKK40.44.7 million in 2012;

            (B)    DKK7974.6 million in 2013;

            (C)    DKK3.8391 billion in 2014;

            (D)    DKK7.996 billion in the first 7 8 months of 2015;

        (iii)    There was a substantial increase in the proportion of WHT received by SKAT which was ultimately refunded (the **"Refund Percentage"**). In particular, the Refund Percentage rose from 11.6% in 2011 to 47.2% in the first half of 2015;

        (iv)    Further, the percentage of shares in companies in the OMX Copenhagen 20 Index allegedly owned by the WHT Applicants on the day prior to ex-date was implausibly high as illustrated by the examples set out in Schedule 2 hereto. By way of example, the WHT Applicants would have had to have owned approximately 80% of the shares in TDC on 7 August 2014 and 5 March 2015, in order to support the relevant WHT Applications relating to that company;

(b)     The WHT Applicants did not have the assets necessary to make the very substantial investments in the Danish companies which would have been required for the WHT Applicants to have become entitled to receive the dividends in respect of which the WHT Applications were based. In particular:

(i)     Schedule 1 contains a master list of all WHT Applications, including details of the implied value of the shareholdings that would have been required to obtain the dividends in respect of which tax was allegedly withheld so as to justify the WHT Applicants reclaiming such tax from SKAT;

(ii)    It is inherently unlikely that the WHT Applicants would have been able to afford share purchases of that magnitude, particularly in so far as they were:

(A)    recently incorporated pension plans or companies and/or one or two-person pension plans and/or had limited to no assets (which SKAT infers to have been the case for the large majority of WHT Applicants based on the Norwich Pharmacal disclosure received from ED&F Man and/or Indigo and/or the report on North Channel Bank produced by KPMG for BaFin (the "**BaFin Report**"); and

(B)    set up by and/or represented by a small number of individuals (as set out in paragraph 50(b) below);

(c)     Since July 2016, SKAT has issued preliminary decisions in respect of all the WHT Applications. In these preliminary decisions, SKAT annulled its previous decisions to accept the WHT Applications and pay the requested amounts. Those preliminary decisions invited a response from the relevant WHT Applicant prior to SKAT making a final decision and evidence relied on by the WHT Applicants. In the responses received, none of the WHT Applicants: (i) were able to explain how they in fact managed to acquire the relevant shareholdings in the Danish companies, relying instead on speculative suggestions as to possible legitimate bases for their involvement; or (ii) provided any documentary evidence purporting to support their alleged



beneficial ownership or receipt of the shares or the dividends (other than the Credit Advice Notes);

(d)    As set out further in Section H below, the majority of the sums paid by SKAT in reliance on the WHT Representations was paid by the Agents to SCP. SCP's receipt and subsequent use of that money, as particularised below, is not consistent with the WHT Applicants having been the beneficial owners of the shares and/or having beneficially received the dividends (and thereby becoming entitled to a WHT refund). In particular:

(i)    There is no apparent legitimate reason for SCP to have received such a large proportion of the sums paid by SKAT to the Agents (DKK8.438 billion or c.£1.007 billion), when those Agents were purportedly receiving the funds on behalf of the WHT Applicants;

(ii)    There is no apparent legitimate reason for SCP to have paid on such substantial sums (directly or indirectly) to Alleged Fraud Defendants (c.DKK6.715 billion or c.£802 million), as specified at Section F3 below and in the Schedule 5 hereto, instead of the WHT Applicants; and

(iii)    SCP's use of the funds which it received shows an apparent intention: (A) to conceal and/or launder the proceeds of the WHT Applications such that the origin of the funds was obscured (including through the use of offshore intermediaries and the acquisition of majority interests in Varengold Bank and Dero Bank); and (B) to distribute such proceeds to the Alleged Fraud Defendants who (it is to be inferred as set out in Section G below) were the primary actors in the alleged fraud on SKAT.

(e)    In the BaFin Report, KPMG recorded that:

(i)    North Channel Bank acted as custodian for a number of purported transactions in 2014 involving the following entities with custody accounts at North Channel Bank:

(A)    25 US pension funds as "buyer" (of whom 24 pension plans were WHT Applicants);



(B)    7 companies as "seller" (of whom 6 were based in the BVI and one in Belize);

(C)    A single third party as "share lender" (Sherwood Enterprises Limited, a Cayman entity);

(D)    A single broker (Bastion Capital London Limited, which SKAT notes received a number of payments from SCP and Ganymede Cayman as set out in <u>paragraph</u> 50(e) below);

(ii)    In each case, the parties above purported to enter into a series of connected, contemporaneous share transactions that were circular and cancelled each other out. In particular:

(A)    The "buyer" agreed to buy shares from the broker, who agreed to buy them from the "seller", who agreed to borrow them from the "share lender", who agreed to borrow them from the "buyer" (SKAT reserves its position as to whether the brokers were acting as principals or agents);

(B)    Each of these connected transactions was purportedly entered into prior to the ex-date for the relevant company, with settlement due shortly after the ex-date;

(C)    The net result was that the transactions offset each other and there were never any shares held in the North Channel Bank custody accounts;

(iii)    Further, a number of weeks or months later, the parties entered into a series of further connected, contemporaneous share transactions that reversed the effect of the first set of transactions. In particular, the "buyer" agreed to sell the same shares back to the broker, who agreed to sell them to the "seller" and the share lending agreements were terminated prematurely;

(iv)    Yet further, it does not appear that any net dividend payments were received by any of the US pension plans that were buyers. Rather, the

"seller" was debited the amount of the dividend (net of WHT), the "buyer" was credited the amount of the net dividend, the cash collateral between the "buyer" and the "share lender" was correspondingly reduced and the cash collateral between the "share lender" and the "seller" was correspondingly increased, resulting in a loop with no actual transfer of any net dividends;

(v)    The only purpose of these purported transactions was to generate a claim for WHT payment, in reliance on a dividend credit advice from North Channel Bank. There was no other commercial rationale for the purported transactions, which did not result in any or any other material profits for any of the parties. Further, none of the parties to the purported transactions took any price risk in relation to the shares. In the circumstances, SKAT infers that the fruits of WHT refunds were shared between the parties to the purported transactions;

(vi)   In each case, the authorised representatives of the US pension funds were was Donald Donaldson and Adam LaRosa (although Donald Donaldson alone signed all the powers of attorney given to the tax reclaim agents). Further, the model for the North Channel Bank "trades" was introduced by Adam LaRosa. These individuals were the signatories on Powers of Attorney given by US pension plans to tax reclaim agents authorised representatives for pension plans in respect of whose WHT Applications the 1st and 3rd largest payments were made by SKAT (being DKK2.744 billion and DKK1.185 billion respectively). In the case of Mr Donaldson, all WHT Applications were based on Credit Advice Notes from Indigo, North Channel Bank and Lindisfarne. In the case of Mr LaRosa, all WHT Applications were based on Credit Advice Notes from SCP. In the circumstances set out in these Particulars of Claim, SKAT infers that the same or a substantially similar model of trades was utilised in a significant proportion of WHT Applications made using Credit Advice Notes from other custodians;

(e1)   The model presented by Mr LaRosa as described in the BaFin Report was a simplified version of the model of circular "trades" between connected parties



that was employed in the WHT Scheme by the Solo Group Custodians and Salgado, a diagram of which is at Schedule 6A hereto (the "**Solo Model**"):

(i)     The Solo Model was a closed loop of circular transactions that did not require any actual shares or payments for shares to be transferred:

    (A)     Under the first leg of the transactions:

        (1)     The "seller" (an offshore company) agreed to "sell" a certain quantity of shares in a Danish company to an intermediate broker ("**Broker A**") shortly before the ex-date, with settlement to take place shortly after the ex-date;

        (2)     Broker A entered into a back to back "sale" of those same shares for the same price and on the same terms to a further intermediate broker ("**Broker B**"); and

        (3)     Broker B entered into a back to back "sale" of those same shares for the same price and on the same terms to the "buyer" (a WHT Applicant, who was notionally eligible to reclaim WHT);

    (B)     Under the second leg of the transactions:

        (1)     The "buyer" agreed to "loan" the same shares to a "stock lender ("**Stock Lender A**") in return for cash "collateral" in the amount of the notional sale price under the first leg, with settlement to take place on the same day as under the first leg;

        (2)     Stock Lender A entered into a back to back "stock loan agreement" on the same terms to "loan" the same shares to a further "stock lender" ("**Stock Lender B**");

        (3)     Stock Lender B entered into a back to back "stock loan agreement" on the same terms to loan the same shares

back to the original "seller";

(C)    The net effect of the first two legs of the circular transactions was that the "buyer" was purportedly buying shares from a "seller" (via intermediate brokers), who was obtaining the same shares from the "buyer" itself (via intermediate "stock lenders"). In other words, the same entity was both buying and lending (or borrowing and selling) the same shares at the same time. Further, the money to be used to pay for those shares was notionally to come from the "seller", which was simultaneously supposed to receive the same money from the "buyer". The transactions were therefore offsetting, requiring no transfer of shares or payment for those shares;

(D)    Under the third leg of the transactions:

(1)    The "buyer" entered into a "forward contract" to "sell" the same shares to a "forward counterparty" ("**Forward Counterparty A**"), for settlement a number of weeks after the "ex-date";

(2)    Forward Counterparty A entered into a back to back "forward contract" to "sell" the same shares to a further "forward counterparty" ("**Forward Counterparty B**");

(3)    Forward Counterparty B entered into a back to back forward contract to "sell" the same shares back to the original "seller";

(4)    Contemporaneously with settlement of these trades, the "stock loans" in the second leg of the transactions would be unwound or terminated;

(5)    As such, the shares would be notionally returned by the "seller" to the "buyer" (via the "stock lenders") at the same time as being notionally returned by the "buyer"



to the "seller" (via the "forward counterparties"). The transactions were therefore offsetting again, requiring no transfer of actual shares;

(ii)     Further, the Solo Model did not involve any dividend payments (net of tax withheld by a Danish company) entering the loop. As depicted in the diagram at Schedule 6A, the only external payment to the loop of circular transactions was the WHT reclaimed from SKAT by Acupay, Goal or Syntax (which was to be shared between the participants to the circular transactions, with substantially all going to the Alleged Fraud Defendants);

(iii)    As further depicted in the diagram at Schedule 6A, SCP was at the heart of the circular transactions with all "trade instructions" being "provided" to and "executed" by SCP in respect of custody accounts at SCP, the other Solo Group Custodians or Salgado. On the basis of the circular transactions, which gave an appearance of legitimacy (particularly when any leg of the transaction was viewed in isolation), SCP, the other Solo Group Custodians and Salgado produced Credit Advice Notes to support the WHT Application, notwithstanding that there were no shares, no payment for those shares and no dividends;

(iv)     Yet further, whilst the circular transactions ostensibly involved a number of independent parties, each of the "buyers", "sellers", "stock lenders" and "forward counterparties" were in reality owned, controlled or in league with Mr Shah and the Solo and Elysium Group Companies. The brokers were interposed to give the transactions the false appearance of being at arms' length between unrelated parties. In fact, all the "trades" were arranged by SCP as part of a closed loop without the brokers performing a normal broking function of buying and selling in the market;

(v)      This can be illustrated by reference to the ledger at Schedule 6B (the "Oaks Ledger"):



(A) This records a series of circular transactions relating to 588,158 shares in GN Store Nord A/S in respect of which DKK142,922.39 was reclaimed from SKAT through Acupay based on a Credit Advice Note from SCP dated 24 March 2015, purportedly on behalf of The Oaks Group Pension Plan;

(B) With respect to the first and second legs of the circular transactions (no's 1-3 and 7-9):

(1) On 19 March 2015 (the day before the ex-date), "OAK01" (the "buyer") purportedly purchased the shares from "SUN01" (Broker A), which purportedly purchased them from "ARF01" (Broker B), which purportedly purchased them from "DDC01" (the "seller"). In each case, the notional price was DKK90,693,963.60 and settlement was to occur on 24 March 2015 (the dividend payment date);

(2) On 23 March 2015, "DDC01" (the "seller") purportedly agreed to borrow the same shares from "CEK01" (Stock Lender A), which purportedly agreed to borrow them from "PML01" (Stock Lender B), which purportedly agreed to borrow them from "OAK01" (the "buyer"). In each case, the notional collateral amount was DKK90,693,963.60 and the settlement was to occur on 24 March 2015;

(3) Upon settlement on 24 March 2015, the above "trades" resulted in "DDC01" purportedly selling shares (indirectly) to "OAK01" with "OAK01" simultaneously purportedly lending the very same shares (indirectly) to "DDC01". Further, in order to purchase those shares, "OAK01" required money that it was receiving (indirectly) from "DDC01" itself (as the collateral for the stock loan) at the very same time that "OAK01" was



supposed to pay that money to "DDC01". These transactions therefore offset each other with no transfer of shares or payment for those shares taking place;

(E)    With respect to the third leg of the circular transactions (no's 4-6):

     (1)    On 19 March 2015, "OAK01" purportedly entered into a forward transaction to sell the same shares to "ALL01", which purportedly agreed to sell them by way of forward to "REH01", which purportedly agreed to sell them by way of forward back to "DDC01", with settlement to occur between June and September 2015;

     (2)    The effect of the forward transactions was that, on settlement, the stock loan then existing (ultimately) between "OAK01" and "DDC01" could be unwound, with the shares notionally being returned to "OAK01" at the same time as "OAK01" was notionally returning those shares to "DDC01". Once more, these transactions offset with no actual shares being transferred;

(F)    The "buyer" ("OAK01") is The Oaks Group Pension Plan, a US pension plan represented by Mathew Tucci, who was the authorised representative for 27 US pension plans in respect of whose WHT Applications SKAT paid out DKK1.160 billion. As set out at paragraphs 50(c) below, companies owned and controlled by Mr Tucci received payments from Ganymede Cayman and SCP (via the intermediaries, "Acai", "Philo", "Fire" and "Parla") totalling at least US$3,932,044 between June and August 2015. A further company of Mr Tucci, White Sand Advisors, received an alleged "loan" of US$3.5m from Elysium Dubai in around June 2016;



(G)  The "seller" ("DDC01") is DDC Cayman Ltd ("DDC"), a Cayman company (incorporated on 11 September 2012, struck off the register on 30 June 2017), owned and/or controlled by Paul Oakley. DDC received payments totalling at least €10,252,277.71 from Ganymede Cayman between November 2012 and May 2015. Further, Mr Oakley was a shareholder and director (along with Owen Mitchell) of Orca Investments Ltd, an English company that received payments totalling at least €999,213.04 from SCP (via "Acai", "Philo", "Fire" and Parla" referred to at paragraph 50(c) below) in the latter half of 2015;

(H)  Forward Counterparty A ("ALL01") is Allitsen Asset Ltd, a BVI company (incorporated on 12 December 2014, dissolved on 9 March 2016), which acted by its "trader", Rebecca Robson. Ms Robson is a former employee of Solo Capital Ltd, SCP, West Point and Callisto Asset Management LLP (another entity associated with Mr Sanjay Shah). She was remunerated for her role in the circular transactions pursuant to the Solo Model initially through Luxembourg companies[3] owned and controlled by Sanjay Shah and (from 2014) through Polar Advisors FZE, which received payments totalling at least £75,000 from Ganymede Cayman and at least €574,000 from SCP (via the intermediaries, "Acai", "Philo", "Fire" and Parla") between mid-2014 and mid-2015;

(I)  Forward Counterparty B ("RHE01") is Rheidol Trading Limited, a BVI company (incorporated on 9 December 2014, dissolved on 2 May 2017), which was owned and/or controlled by David (Dai) Griffiths. Mr Griffiths also owned and/or controlled LDW Consultants Limited (incorporated on 25 June 2009, dissolved on 1 November 2017), which received sums totalling €9.05m from Ganymede Cayman between August 2014 and June 2015;

---

[3] These included AESA, Pallas Equity Trading Sarl and Athena Equity Trading Sarl.

(J)     Stock Lender A ("CEK01") is CEKA Invest Gmbh (now called Körner Unternehmensgruppe Gmbh), a German company ultimately owned and/or controlled by Alex Körner. Between 2013 and 2015, Mr Körner owned and/or controlled 4 other "stock lenders" that participated in the circular transactions under the Solo Model: Relative Value Trading Gmbh, Rock Capital Private Fund Ltd, RVT Consult Gmbh and EQ Invest Gmbh. During this period, Mr Körner's companies were paid at least €2,316,720.04 by Ganymede Cayman and SCP (via "Fire", "Philo", and "Acai"). Further, Mr Körner is or has been a director of Treefrog Capital Limited (the 19th Defendant in the Second Claim, formerly known as Arche Cayman Limited), Trillium Capital Sarl (the 32nd Defendant in the First Claim, formerly known as VEM Holdings Sarl) and IP Universal Limited (a company that acts as director to numerous companies owned or controlled by Mr Sanjay Shah);

(K)     Stock Lender B ("PML01") is Principle Markets Limited, a BVI company (incorporated on 21 October 2014, dissolved on 10 February 2016), which was owned and/or controlled by Martin Smith, the 63rd Defendant in the First Claim. As set out in Schedule 5L: (a) Mr Smith owned and/or controlled 7 other "stock lenders" that participated in the circular transactions under the Solo Model (including Colbrook, the 45th Defendant in the First Claim); and (b) during the period 24 June 2014 to 1 October 2015, Mr Smith's companies received sums totalling €15,111,242.90 from SCP (directly or via "Fire", "Acai", "Parla, and "Philo), Ganymede Cayman and Elysium Dubai.

(f)     Further, the BaFin Report recorded that North Channel Bank sent its Credit Advice Notes to Indigo. As set out in Schedule 3A hereto, many of the North Channel Bank and Indigo Credit Advice Notes in 2014 related to the same number of shares in the same Danish companies at the same time but for different US pension plans. Similarly, as set out in Schedule 3B hereto, Mr

Bains signed a number of Credit Advice Notes in 2013 on behalf of SCP on the same date for the same number of shares in the same Danish company for different US pension plans;

(g)     Yet further, in many other cases as illustrated by the examples in Schedule 4 hereto, Credit Advice Notes were produced by Custodians for different US pension plans on the same day in respect of the same Danish company for similar volumes of shares (often increasing by regular intervals);

(h)     SKAT also relies on the further facts and matters set out at paragraphs 50 and 50A below;

(i)     In the circumstances, it is inferred that:

    (i)     The WHT Applications were based on fictitious records of transactions that never occurred, such that the WHT Applicants did not acquire any interest in the relevant shares in the Danish companies prior to the ex-date and/or never received the relevant dividends from the Danish companies by the payment date (net of WHT deducted); and/or

    (ii)    The WHT Applications were based on circular transactions that cancelled each other out, which:

        (A)    did not involve any actual transfer of shares in or dividends from the relevant Danish company to any of the WHT Applicants;

        (B)    were created by the Alleged Fraud Defendants (or persons associated with them) for the sole purpose of manufacturing a claim to a WHT refund by the WHT Applicants;

        (C)    resulted in the large part of WHT refunds being paid to parties other than the WHT Applicants, in particular SCP and ultimately the Alleged Fraud Defendants; and/or

    (iii)   The WHT Applications were based on sham transactions, which the parties thereto entered into with a common intention to mislead, knowing that (or being reckless as to whether) such transactions (or documents

purporting to record such transactions) did not create the legal rights and obligations that they had the appearance of creating. In particular, the Alleged Fraud Defendants manufactured the relevant transactions for the purpose of making WHT Applications, by:

(A)   identifying, procuring or assisting in the formation of seemingly eligible applicants for WHT refunds (through associated intermediaries or otherwise);

(B)   purportedly "selling" shares (through associated brokers or otherwise) into the names of such WHT Applicants as "buyer", shortly before the ex-date purportedly to trigger the right to receive the dividend and reclaim the WHT from SKAT;

(C)   purportedly "lending" those shares to a "stock borrower/lender" so as to notionally provide the capital required for the WHT Applicant to pay for the shares "purchased";

(D)   notwithstanding that the same (or a connected) "stock borrower/lender" was lending the same shares to the "seller" to be "sold" to the "buyer" (namely, the WHT Applicant), resulting in a circular and stockless transaction;

(E)   subsequently unwinding the purported "stock loans" and purportedly "re-selling" the shares (through associated brokers or otherwise) to the "sellers" (directly or indirectly through owned and/or controlled companies) a few weeks or months later once the purpose of the purported trading had been fulfilled;

(F)   in circumstances where:

(1)   the "sellers" or "stock borrowers/lenders" were the Alleged Fraud Defendants or their corporate vehicles or other associated (presently unknown) persons who were party to the WHT Scheme, none of whom were eligible to reclaim WHT from SKAT;

25



 (2) each of the participants in the manufactured transactions had accounts with the Custodian in which the shares were purportedly held and to which payment for those shares were purportedly made;

 (3) the net dividend was never in fact received by the WHT Applicant; and

 (4) the profits of the WHT refunds were shared between the nominal "buyer" and "seller" or "stock borrower/lender" in such manufactured transactions (with the majority going ultimately to the Alleged Fraud Defendants); and/or

(iv) To the extent that WHT Applications were based on actual acquisitions of shares in the relevant Danish companies by WHT Applicants:

 (A) such shares were traded by the Alleged Fraud Defendants multiple times around the ex-date so as to enable multiple WHT Applicants to purportedly receive the same dividend in order to purportedly support multiple WHT Applications (despite the Danish company having only withheld tax once in respect of such dividend); and/or

 (B) the WHT Applicant was not the beneficial owner of the shares or the dividends because (i) they had been acquired using funding or collateral provided by the Alleged Fraud Defendants; and/or (ii) the WHT Applicants had an obligation to pass on the dividend and/or the majority of the WHT refund to the Alleged Fraud Defendants; and/or (iii) the WHT Applicant was a mere nominee as regards the shares with no control as regards their disposition.

## F PROCEEDS OF THE WHT APPLICATIONS

### F1. Payments by SKAT

25. In reliance on the WHT Representations (and acting under a mistake of fact ~~or law~~ induced thereby), SKAT paid DKK12.665~~73~~ billion ~~to the Agents~~, which it would not otherwise have done. In summary:

(a)    Between September 2012 and July 2015, SKAT made payments totalling DKK4.51949 billion to Goal's account at National Westminster Bank in London;

(b)    Between May 2014 and July 2015, SKAT made payments totalling DKK3.043 billion to Syntax's account at Barclays Bank in London;

(c)    Between April 2015 and August 2015, SKAT made payments totalling DKK1.22 billion to Koi's account at Barclays Bank in London;

(d)    Between September 2012 and August 2015, SKAT made payments totalling DKK3.61 billion to Acupay's account at Dexia Banque Internationale in Luxembourg;

(e)    Between 24 September 2012 and 29 April 2015, SKAT made payments totalling DKK259 million to Global Equities GmbH; and

(f)    On 5 July 2013, SKAT made payments totalling DKK11.5 million to Globe Tax Services Inc.

26.    For the reasons given below, Syntax (from 19 September 2014, alternatively 3 December 2014, alternatively 25 March 2015) made the Agent Representations fraudulently, which induced SKAT to make the payments set out in paragraph 25(b) above. It therefore received the sums after such dates (being DKK2.765 billion, alternatively DKK2.736 billion, alternatively DKK2.721 billion) as constructive trustee for SKAT, alternatively is to be so treated following SKAT's election to rescind the transactions by which the payments were made as set out in paragraphs 52-54 below.

**F2.    Transfers to Solo Capital Partners LLP**

27.    After receipt of the sums referred to in paragraph 25 above, Syntax, Goal and Acupay made the following aggregate payments to SCP totalling DKK8.012 billion (or c.£1.007 billion):

(a)    Between November 2014 and August 2015, Syntax paid a total sum of DKK2.746 billion to the accounts of Solo Capital Partners LLP ("**SCP**") at Barclays Bank;

(b)    Between July 2013 and July 2015, Goal paid a total sum of DKK2.79 billion to SCP's accounts at Barclays Bank; and

(c)    Between October 2014 and August 2015, Acupay paid a total sum of DKK2.961 billion to SCP's accounts at Barclays Bank.

28.    The above sums represented the traceable proceeds of sums paid by SKAT to the Agents and Global in reliance on the WHT Representations.

29.    At the time of these Particulars of Claim, SKAT does not know the ultimate destination of the payments to Koi but reserves the right to amend to plead such destination(s) following disclosure.

30.    For the reasons given below and in Schedules 5A and 5I , SCP and Indigo were was a fraudulent participants in the misrepresentations which induced SKAT to make the payments to the aAgents set out in paragraph 25 above. They It therefore received the sums referred to in paragraph 27 above as constructive trustees for SKAT, alternatively are is to be so treated following SKAT's election to rescind the transactions by which the payments were made (as set out in paragraphs 52-54 below).

**F3.    Transfers to the Alleged Fraud Defendants**

31.    Of the DKK8.012 billion received by SCP from the Agents, SCP paid a total of DKK4.263 billion (or c. £509 million) directly to accounts at Varengold Bank AG ("**Varengold Bank**"). This included substantial payments to accounts at Varengold Bank of Alleged Fraud Defendants. In particular, as set out in Schedule 5 hereto:

(a)    Between 23 July 2015 and 13 August 2015, Mr Sanjay Shah (the 34th Defendant in the First Claim) received payments to his accounts at Varengold Bank directly from SCP totalling US$11,100,000 and €4,500,000;

(b)    Between 11 August 2014 and 18 December 2014, Ganymede Cayman Limited ("**Ganymede Cayman**", the 46th Defendant in the First Claim and an entity

ultimately beneficially owned by Mr Sanjay Shah) received payments to its accounts at Varengold Bank directly from SCP totalling €200,624,137, £57,319,077 and US$5,308,011;

(c)    On 8 September 2015 and 10 September 2015, Elysium Global Limited (the 48th Defendant in the First Claim and an entity beneficially owned by Mr Sanjay Shah) received payments to its accounts at Varengold Bank directly from SCP of €222,100,000 and £14,999,983 respectively;

(d)    Between 25 November 2014 and 12 June 2015, Trillium Capital Sarl (the 32nd Defendant in the First Claim, formerly known as VEM Holdings Sarl) received payments to its account at Varengold Bank directly from SCP totalling €60,500,000;

(e)    Between 13 June 2014 and 24 March 2015, Ampersand Capital Limited (the 51st Defendant in the First Claim) received payments to its account at Varengold Bank directly from SCP totalling €13,763,641.37;

(f)    Between 24 June 2014 and 14 August 2015, Colbrook Limited (the 45th Defendant in the First Claim) received payments to its account at Varengold Bank directly from SCP totalling €8,666,662.93;

(g)    Between 27 May 2014 and 21 August 2015, Elysium Global (Dubai) Limited ("**Elysium Dubai**", the 35th Defendant in the First Claim and an entity beneficially owned by Mr Sanjay Shah) received payments to its accounts at Varengold Bank directly from SCP totalling €2,211,193, US$1,574,970 and £800,000; and

(h)    On 6 June 2014, T&S Capital (the 44th Defendant in the First Claim) received a payment to its account at Varengold Bank directly from SCP of €2,000,000.

32.    In addition, SCP paid a total of approximately DKK2.452 billion (or c. £293 million) directly to accounts of Alleged Fraud Defendants other than at Varengold Bank. In particular, as set out in Schedule 5 hereto:

(a)     Between 21 May 2014 and 26 August 2015, SCP made further payments to Elysium Global or Elysium Global Dubai totalling circa €110 million, £229 million and US$96 million 89,000,000;

(b)     Between 7 January 2014 and 29 April 2015, SCP made further payments to Gaymede Cayman totalling €9 million and £18 million;

(c)     Between 10 January 2014 and 11 August 2015, SCP made further payments to Sanjay Shah totalling €9.818 million and £2.493 million and US$151,000;

(d)     Between 10 and 13 June 2014, SCP made payments of €1,554,375 and £60,000 to Mr Barac (the 23rd Defendant in the First Claim);

(e)     Between 10 January 2014 and 7 August 2014, SCP made further payments to Mr Jas Bains (the 40th Defendant in the First Claim) totalling £3.245 million;

(f)     Between 10 September 2014 and 5 August 2015, Treefrog Capital Limited (the 19th Defendant in the Second Claim, formerly known as Arche Cayman Limited) received payments directly from SCP totalling €13,545,774 and US$2,000,500;

(g)     Between 15 May 2014 and 9 January 2015, Mr Darren Lui (the 13th Defendant in the First Claim) received sums directly from SCP totalling £274,191;

(h)     Between 7 January 2014 and 6 June 2014, Rajan Shah received sums totalling £6.596 million from SCP;

(i)     Between 8 January 2014 and 9 May 2014, Hooloomooloo (the 47th Defendant in the First Claim) received sums totalling JPY 24,180,000 and £950,000 from SCP;

(j)     Between 31 March 2014 and 31 March 2015, Solo Capital Limited (the 24th Defendant in the First Claim) received sums totalling £1,152,700 from SCP;

(k)     Between 15 May 2014 and 3 December 2014, Agrius Capital Limited (the 12th Defendant in the First Claim) received sums totaling £531,000 and €17,000 from SCP;



(l)    Between 9 January 2014 and 13 January 2015, Aesa Sarl (the 30th Defendant in the First Claim) received sums totalling €2,150,333 from SCP;

(m)    Between 29 May 2014 and 6 June 2014, Anupe Dhorajiwala (the 20th Defendant in the First Claim) received sums totalling €1,500,000 from SCP;

(n)    Between 21 August 2014 and 26 June 2015, Old Park Lane Capital Limited (the 3rd Defendant in the First Claim) received sums totalling £206,099 from SCP; and

(o)    Between 14 January 2014 and 19 August 2015, Telesto Markets LLP (the 2nd Defendant in the First Claim) received sums totalling €320,000 and USD 672,522 from SCP.

33.    Further, substantial payments were made to the Alleged Fraud Defendants by other Alleged Fraud Defendants using monies received from SCP and traceable to sums paid by SKAT. In particular, as set out in Schedule 5 hereto:

(a)    Between 13 January and 25 June 2015, Ganymede Cayman received further sums totalling €11,302,870 and US$6,399,975;

(b)    Between 24 June 2014 and 15 September 2015, Mr Sanjay Shah received further sums totalling €51,100,000, AED 21,500,050, US$195,929.20 and £47,325,519.60;

(c)    Between 1 July 2014 and 15 September 2015, Mr Anthony Mark Patterson (the 5th Defendant in the First Claim) received net sums totalling €24,500,000 and £2,182,000;

(d)    Between 28 November 2014 and 18 May 2015, Elysium Dubai received further sums totalling €44,395,000, US$13,555,000 and £1,500,000;

(e)    On 13 May 2015, Ampersand received further sums totalling €3,561,698.63

(f)    Between 28 October 2013 and 4 July 2014, Graham Horn (the 15th Defendant in the Second Claim and the 2nd Defendant in the Third Claim) received a total of £23,520,421 from SCP via or in connection with Ganymede Cayman;



(g)     Between 18 June 2015 and 6 August 2015, Elysium Global Limited received further sums totalling €4,391,081 and £1,082,128;

(h)     Between 8 May 2015 and 13 May 2015, T&S Capital received further sums totalling €5,171,698.63;

(i)     On Between 16 September 2014 and 28 May 2015, Colbrook received a total of €3,095,000 and £1,997,439;

(j)     Between 1 August 2014 and 18 June 2015, Mr Priyan Shah (the 21st Defendant in the First Claim) received a total of £21,500,000 and €2,600,000;

(k)     Between 1 August 2014 and 18 June 2015, Mr Gerard O'Callaghan (the 22nd Defendant in the First Claim) received a total of £21,000,000 and €2,600,000;

(l)     On 9 October 2014, Mr Edo Barac received a further sum of £3,000,000;

(m)     Between 25 June 2014 and 5 November 2015, Mrs Usha Shah (the 36th Defendant in the First Claim) received a total of £250,000 and AED10,100,025;

(n)     Between 7 April 2015 and 7 December 2015, Ms Daksha Bhudia (the 39th Defendant in the First Claim) received a total of €1,533,896.19;

(o)     Between 9 January 2014 and 11 May 2015, AESA (the 30th Defendant in the First Claim) received sums totalling of €5,150,332 and £267,976;

(p)     Between 8 July 2014 and 4 June 2015, Ms Stratford (the 41st Defendant in the First Claim) received a total of €7,014,500 and £500,000;

(q)     On 15 September 2015, Elysium Global Trading Limited (the 49th Defendant in the First Claim) received a total of €50,100,000;

(r)     Between 16 December 2014 and 5 October 2015, Mr Martin Smith (the 63rd Defendant in the First Claim) received a total of £2,553,650 and €630,000;

(s)     Between 4 December 2014 and 13 May 2015 Treefrog Capital Ltd received further sums totalling €7,240,100 and £5,800,000;



(t)    Between 17 February and 5 June 2015, Mr Darren Lui (the 18th Defendant in the First Claim) received further sums totalling £194,452.06;

(u)    On 27 May 2015, Mr Llewelyn (the 29th Defendant in the First Claim) received a payment of US$92,044.24;

(v)    On 22 June 2015, Agrius Capital Limited (or Agrius Capital Partners LLP) received a sum of £180,324.24;

(w)    Between 13 May and 26 November 2015, Michael Murphy (the 3rd Defendant in the Third Claim) received sums totalling €4 million, together with a further "loan" of AED15,341,059 via his company (Lanesra Consultancy DWC LLC) on a date unknown;

(x)    On 5 June 2015, Mr Knott and Mr Hoogewerf (the 6th and 7th Defendants in the Third Claim) each received €2.76 million;

(y)    Between 5 February 2015 and 3 June 2015, Mr Anupe Dhorajiwala (the 20th Defendant in the Second Claim) received a total of €10,500,000,249,748,12, US$2,249,748.12, AED 3,800,000 and £500,000; and

(z)    On 13 August 2015, FGC Elysium Holdings Ltd (the 21st Defendant in the Second Claim) received a total of US$11,000,000.

**F4.    Purchase of controlling shareholding in Varengold Bank AG**

34.    Between May 2014 and June 2015, a total of approximately DKK216 million (€29 million) of the funds received by SCP was used for the purchase of 40.89% of the shares in Varengold Bank. The purchase was made by means of the following transactions:

(a)    On 13 May 2014, SCP paid €3.191 million to Varengold Bank as consideration for the issue of 159,571 shares in Varengold Bank. The shares were issued to Agrius Capital Limited (the 12th Defendant in the First Claim). On 28 April 2015, Agrius Capital Limited transferred the shares to its subsidiary, Rivera One Limited (the 7th Defendant in the First Claim). As set out in Schedule 5E, at the time of the said transactions, Agrius Capital Limited and Rivera One



Limited were ultimately beneficially owned by Priyan Shah and Gerard O'Callaghan (the 21st and 22nd Defendants in the First Claim).

(b)    Between 12 June 2014 and 4 July 2014, SCP transferred a total sum of €10.263 million to the account of Ampersand Capital Limited (the 51st Defendant in the First Claim) at Varengold Bank. On 17 June 2014, Ampersand Capital Limited acquired 160,000 shares in Varengold Bank from former directors of Varengold Bank for a sum of €4.96 million. On 30 April 2015, Ampersand Capital Limited transferred the shares to its subsidiary PCM Capital Limited (the 9th Defendant in the First Claim). As set out in Schedule 5D, at the time of the said transactions, Ampersand Capital Limited and PCM Capital Limited were ultimately beneficially owned by Anthony Mark Patterson (the 5th Defendant in the First Claim).

(c)    On 20 June 2014, SCP transferred €4,680,999.81 to the account of Ace City Holding Limited (the 43rd Defendant in the First Claim) at Varengold Bank. On 24 June 2014, Ace City Holding Limited acquired 151,000 shares in Varengold Bank from former directors of Varengold Bank for a sum of €4,680,999. On 30 April 2015, Ace City Holding Limited transferred the shares to its subsidiary, Astella Capital Limited (the 8th Defendant in the First Claim). As set out in Schedule 5H, at the time of the said transactions, Ace City Holding Limited and Astella Capital were ultimately beneficially owned by Darren Lui (the 13th Defendant in the First Claim).

(d)    On 20 June 2014, SCP transferred €3.1 million to the account of Oberix International Corporation (the 52nd Defendant in the First Claim) at Varengold Bank. On 27 June 2014, Oberix International Corporation acquired 160,000 shares in Varengold Bank from former directors of Varengold Bank for a sum of €3.1 million. On 30 April 2015, Oberix International Corporation transferred the shares to its subsidiary, Eris Investments Limited (the 10th Defendant in the First Claim). As set out in Schedule 5G, at the time of the said transactions, Oberix International Corporation and Eris Investments Limited were ultimately beneficially owned by Mankash Jain (the 32nd Defendant in the First Claim).

(e)    On 20 June 2014, SCP transferred €5,239,000.27 to the account of Silverfox Holding Limited (the 42nd Defendant in the First Claim) at Varengold Bank. On 27 June 2014, Silverfox Holding Limited acquired 169,000 shares in Varengold Bank from former directors of Varengold Bank for a sum of €5,239,000. On 28 July 2015, Silverfox Holding Limited transferred the shares to its subsidiary, Silvercouk Limited (the 11th Defendant in the First Claim). As set out in Schedule 5F, at the time of the said transactions, Silverfox Holding Limited and Silvercouk Limited were ultimately beneficially owned by Edo Barac and Jas Bains (the 23rd and 40th Defendants in the First Claim).

(f)    On 18 February 2015, SCP paid €3.54 million to Varengold Bank as consideration for the issue of 176,963 in Varengold Bank. The shares were issued to Skyfall Financial Limited (the 56th Defendant in the First Claim). On 13 May 2015, Skyfall Financial Limited transferred the shares to its subsidiary, Bellview Financial Limited (the 6th Defendant in the First Claim). As set out in Schedule 5K, at the time of the said transactions, Skyfall Financial Limited and Bellview Financial Limited were ultimately beneficially owned by Paul Preston (the 38th Defendant in the First Claim).

(g)    Between 7 January 2015 and 2 April 2015, T&S Capital (the 44th Defendant in the First Claim) purchased a total of 48,049 shares in Varengold Bank for a total sum of €702,089.80, paid from its account at Varengold Bank. The said sum was derived from funds provided to T&S Capital directly or indirectly by SCP. On 5 January 2016, T&S Capital Limited received a further 146,397 shares in Varengold Bank. It did not pay for these shares and, SKAT infers, they were ultimately paid for by funds originating from SCP. As set out in Schedule 5M, at the time of the said transactions, T&S Capital was ultimately beneficially owned by Daksha Bhudia (the 39th Defendant in the First Claim).

(h)    Between 7 January 2015 and 2 April 2015, Colbrook Limited (the 45th Defendant in the First Claim) purchased a total of 48,174 shares in Varengold Bank for a total sum of €703,840.26, paid from its account at Varengold Bank. The said sum was derived from funds provided to Colbrook Limited directly or indirectly by SCP. On 28 January 2015, Colbrook Limited purchased a further 36,000 shares in Varengold Bank for €792,000, paid from its account at



Varengold Bank. As set out in Schedule 5L, at the time of the said transactions, Colbrook Limited was ultimately beneficially owned by Martin Smith (the 63rd Defendant in the First Claim).

35.  In early 2015, AESA Sarl (the 30th Defendant in the First Claim) acquired a further 5.47% shareholding in Varengold Bank (with funds paid to it from Ganymede Cayman as a purported "bonus") and Elysium Global (Dubai) Ltd ("**Elysium Dubai**", the 35th Defendant in the First Claim) acquired a further 33.32% shareholding in Varengold Bank. Both AESA Sarl and Elysium Dubai are ultimately beneficially owned by Mr Sanjay Shah.

36.  Each of the acquisitions referred to in paragraph 34 and 35 above was financed by SCP, using funds which were the traceable proceeds of sums paid by SKAT and were subject to the constructive trust referred to at paragraph 30 above. SKAT infers this to be the case with respect to the transactions in paragraph 35 because the other share acquisitions in Varengold Bank acquired indirectly by Mr Shah were financed entirely from funds obtained from SKAT, and some DKK4 billion of the sums paid by SKAT that were paid on to SCP remain unaccounted for.

37.  The purchase of and dealing with the shares in Varengold Bank was centrally co-ordinated by or on the instructions of Mr Sanjay Shah for the benefit of him and his associates (namely Mr Patterson, Mr Lui, Mr Jain, Mr Barac, Mr Bains, Mr Preston, Mr Priyan Shah, Mr O'Callaghan, Ms Bhudia and Mr Smith), many of whom also received substantial payments of the traceable proceeds of SKAT's money (directly or indirectly via SCP) as set out in Section F3 above. In particular:

(a)  The accounts at Varengold Bank used for the acquisition or holding of the shares were set up around the same time in 2014, shortly before the purchases of the Varengold shares;

(b)  The accounts at Varengold Bank were used solely as conduits to effect the purchases of Varengold shares and to pay out sums to the relevant principals and evidence no legitimate trading activity;

(c)     The shares in Varengold Bank were acquired at around the same times (the first tranche in May-June 2014 and the second tranche in January to April 2015) in the same manners;

(d)     The shares in Varengold Bank were all acquired using funds provided by SCP that were traceable to SKAT;

(e)     The subsequent transfer of the shares in Varengold Bank to PCM Capital, Astella Capital, Eris Investments, Silvercouk and Rivera One occurred in the same manner at around the same time to SPVs established at around the same time for such purpose.

38.     Further, on the dates set out in Schedule 5 (or on a presently unknown date, which SKAT believes to be after March 2017), Elysium Dubai acquired the shares in PCM Capital Limited, T&S Capital Limited, Colbrook Limited, Ampersand Capital Limited, Skyfall Holdings Limited and Skyfall Financial Limited. Elysium Dubai thereby acquired indirect control of a further 21.06% of the shares in Varengold Bank.

39.     Yet further, as set out in Schedules 5E, and 5F and 5M hereto:

(a)     Elysium Dubai entered into purported loan and security agreements with Skyfall Holdings Ltd, Agrius Capital Partners LLP, T&S Capital and Luna Capital Partners LLP:

        (i)     which were sham transactions and agreements entered into by the parties thereto with a common intention to mislead:

                (A)     knowing that (or being reckless as to whether) such transactions did not create the legal rights and obligations that they had the appearance of creating;

                (B)     for the true purpose of concealing the fact that the acquisition of the shares in Varengold Bank by those parties Agrius Capital Ltd and Silver Fox Holdings Ltd had been paid for by SCP;

37



      (ii)    alternatively, which were designed to give Mr Sanjay Shah effective control over or in relation to the indirect owners of the shares in Varengold Bank;

(b)    Based on the facts and matters in paragraphs 37(a) and 39(a) above, it is inferred that Elysium Dubai (or another entity ultimately owned and controlled by Mr Sanjay Shah) entered into the same or similar arrangements with respect to the other acquisition of shares in Varengold Bank referred to in paragraph 34 above, for the same or similar purposes;

(c)    Further or alternatively, on or around 12 August 2014, Ace City Holding Limited granted a call option to Elysium Dubai in respect of its 151,000 shares in Varengold Bank, giving Elysium Dubai the right to purchase the said shares (purchased for €4.68 million) for €100.

40.    In the circumstances, it is inferred that the above holders of the shares in Varengold Bank were acting as nominees for Mr Shah/his companies, such that Mr Shah's ultimate beneficial interest in Varengold Bank was 79.69%. Alternatively, Mr Sanjay Shah's ultimate beneficial interest in Varengold Bank increased from at least 38.79% to at least 59.85% upon Elysium Dubai's acquisition of the shares in the companies referred to in paragraph 38 above and he exercised effective control over or in relation to the other holders of the shares in Varengold Bank as aforesaid.

41.    It is inferred that the purpose(s) of the aforementioned transactions was to enable Sanjay Shah (and/or persons affiliated with him referred to in paragraph 37 above) to obtain effective control over Varengold Bank, which was being used and/or would be used:

(a)    as a vehicle through which to launder and/or conceal and/or distribute proceeds of the WHT Applications as set out in paragraphs 31 and 33 above; and/or

(b)    as a counterparty for stock lending and/or custodian or clearing house to facilitate the making of WHT Applications.

**F5.    Purchase of 100% of the shares in Dero Bank AG**

42.    In 2015, a total of DKK213.18 million (€28.57 million) of the funds received by SCP
was used for the purchase of 100% of the shares in Dero Bank AG ("**Dero Bank**").
The purchase was made by means of the following transactions:

    (a)    Between 21 November 2014 and 11 June 2015, SCP made a net transfer of
€59.48 million to the account of Trillium Capital Sarl (the 32nd Defendant in
the First Claim, formerly known as VEM Holdings Sarl) at Varengold Bank;

    (b)    On 23 June 2015, Trillium Capital Sarl transferred €29,500,222.81 to its
account at ING Luxembourg SA;

    (c)    In the second half of 2015, Trillium Capital Sarl purchased 100% of the shares
in Dero Bank for €28.573 million. The funds transferred as part of the purchase
were the traceable proceeds of sums paid by SKAT, and which were subject to
the constructive trust referred to at paragraph 30 above.

43.    At the time of the said transactions, Trillium Capital Sarl was (ostensibly) ultimately
beneficially owned by the following parties:

    (a)    Sanjay Shah as to 45.05%, through Trillium Holdings (BVI) Limited (formerly
known as Cielo Global Limited) (the 53rd Defendant in the First Claim);

    (b)    Priyan Shah as to 8.85%, through Serafine Capital Limited and Serafine
Investments Limited (the 25th and 26th Defendants in the First Claim);

    (c)    Gerard O'Callaghan as to 8.85%, through Kenna Capital Limited and Kenna
Investments Limited (the 27th and 28th Defendants in the First Claim);

    (d)    Edo Barac as to 7.85%, through Luna Capital Partners LLP, Copella Capital
Limited and Zuben Capital Limited (the 18th to 20th Defendants in the First
Claim);

    (e)    Darren Lui as to 7.85%, through Wang International Holdings Limited and
Wong International Holdings Limited (the 58th and 59th Defendants in the First
Claim);



(f)   Mankash Jain as to 7.85%, through DoubleTwo Holdings Limited and DoubleTwo Investments Limited (the 60th and 61st Defendants in the First Claim)

(g)   Anthony Mark Patterson as to 6.85%, through Woodfields Holdings Capital Limited and Woodfields Financial Limited (the 54th and 55th Defendants in the First Claim).

(h)   Michael Murphy (the 3rd Defendant in the Third Claim) as to 6.85%, through Polaris Capital Limited and Polaris Capital (One) Limited (the 4th and 5th Defendants in the Third Claim).

44.   At a presently unknown date (but which SKAT believes to be after March 2017), Elysium Dubai acquired shareholdings in Woodfields Holdings Capital Limited, Woodfields Financial Limited, Polaris Capital Limited and Polaris Capital (One) Limited.

45.   Yet further, as set out in Schedules 5E-F hereto:

(a)   Elysium Global or Elysium Dubai entered into purported loan and security agreements with Kenna Capital Ltd, Serafine Capital Limited and Luna Capital Partners LLP:

   (i)   which were sham transactions and agreements entered into by the parties thereto with a common intention to mislead:

      (A)   knowing (or being reckless as to whether) that such transactions did not create the legal rights and obligations that they had the appearance of creating;

      (B)   for the true purpose of concealing the fact that the intended acquisition of the shares in Dero Bank (via Trillium Capital Sarl) by Kenna Investments Ltd, Serafine Investments Limited and Zuben Capital Limited would be paid for using funds provided by SCP;



(ii) alternatively, which were designed to give Mr Sanjay Shah effective control over or in relation to the intended indirect owners of the shares in Dero Bank;

(b) Based on the facts and matters in paragraphs 3739(a), 39(a) and 45(a) above, it is inferred that Elysium Global or Elysium Dubai (or another entity ultimately owned and controlled by Mr Sanjay Shah) entered into similar arrangements with respect to the other acquisition of shares in Dero Bank (through Trillium Capital Sarl) referred to in paragraph 43 above.

46. In the circumstances, it is inferred that the above holders of the shares in Dero Bank were acting as nominees for Mr Shah/his companies, such that Mr Shah's ultimate beneficial interest in Dero Bank was 100%. Alternatively, Mr Sanjay Shah's ultimate beneficial interest in Dero Bank increased from at least 45% to at least 58.7% upon Elysium Dubai's acquisition of the shares in the aforesaid companies and he exercised effective control over or in relation to the other holders of the shares in Dero Bank as aforesaid.

47. In the premises, it is inferred that the purpose(s) of the aforementioned transactions was to enable Sanjay Shah (and/or persons affiliated with him, namely Mr Lui, Mr Jain, Mr Murphy, Mr O'Callaghan, Mr Priyan Shah, and Mr Barac) to obtain effective control over Dero Bank which was being used and/or would be used:

(a) as a vehicle through which to launder and/or conceal and/or distribute proceeds of the WHT Applications; and/or

(b) as a counterparty for stock lending and/or custodian or clearing house to facilitate the making of WHT Applications.

**F6. Other transfers**

48. SKAT is continuing to investigate the ultimate destination of the remainder of the money paid to the Agents and Global in respect of the WHT Applications. It reserves the right to update or supplement these particulars following disclosure and/or evidence, including to plead the ultimate destination of the monies paid to Koi.

**G    THE WHT SCHEME**

49.    The WHT Applications were made as part of a fraudulent scheme (or schemes) (the **"WHT Scheme"**) by which the Alleged Fraud Defendants:

(a)    identified or procured or assisted in the formation of seemingly eligible applicants for WHT refunds;

(b)    manufactured fictitious and/or sham transactions and/or carried out illegitimate trading for the purpose of facilitating WHT Applications;

(c)    made or procured or assisted in the making of the WHT Applications, including the WHT Representations; and

(d)    dealt with the sums paid by SKAT in reliance on said representations in such a way as to conceal and/or launder and/or distribute the proceeds of the WHT Applications.

50.    The WHT Scheme was co-ordinated by a small group of individuals and their corporate entities (namely, the Alleged Fraud Defendants), who (it is to be inferred) knew they were acting as part of a common scheme and with a common design to defraud SKAT for their personal benefit. SKAT will rely on the following facts and matters (as further particularised in the Schedule 5 hereto):

(a)    the large majority of WHT Applicants were (SKAT infers) formed shortly before and for the purpose of making the WHT Applications, as set out in paragraph 24(b)(ii)(A) above;

(b)    DKK8.055 billion (out of a total of DKK12.66573 billion) was refunded in respect of WHT Applicants that were US pension plans with one of the same 6 individuals as authorised representatives who signed the powers of attorney to the tax reclaim agents (Roger Lehman; Michael Ben-Jacob; Matthew Tucci; Doston Bradley; Donald Donaldson; and Adam LaRosa). In particular:

(i)    Mr Donaldson was the authorised representative for 58 US pension plans in respect of whose WHT Applications SKAT paid out DKK2.708 billion;



(ii)  Mr Lehman was the authorised representative for 48 US pension plans in in respect of whose WHT Applications SKAT paid out DKK1.586 billion;

(iii)  Mr La Rosa was the authorised representative for 24 US pension plans in in respect of whose WHT Applications SKAT paid out DKK1.185 billion;

(iv)  Mr Tucci was the authorised representative for 27 US pension plans in respect of whose WHT Applications SKAT paid out DKK1.160 billion;

(v)  Mr Bradley was the authorised representative for 20 US pension plans in in respect of whose WHT Applications SKAT paid out DKK811 million; and

(vi)  Mr Ben-Jacob was the authorised representative for 10 US pension plans in in respect of whose WHT Applications SKAT paid out DKK566 million;

(c)  many of these individuals (or companies owned and controlled by them) received substantial payments from Solo Group or Elysium Group Companies. The best particulars SKAT can give are as follows:

(i)  Mr Bradley (via Blackrain Advisors) and Mr Tucci (via White Sands Advisors) received alleged "loans" of  US$2.5 million and US$3.5 million respectively from Elysium Dubai;

(ii)  Mr Lehman received a payment of €83,000 from SCP on 14 May 2014;

(iii)  Ganymede Cayman made payments to First Alton Inc (a company formed in February 2015 of which Roger Lehman is the director and, SKAT infers, the beneficial owner) ("First Alton") in the following sums to an account (or accounts) at Bank of China: US$1,015,130.19 .015 million on 27 February 2015; US$1,060,000 .06 million on 12 May 2015; and US$2,012,559 .01 million on 2 June 2015 pursuant to an invoice dated 27 May 2015 and issued by First Alton to Ganymede Cayman for purported "advisory fees";

(iiiA) Ganymede Cayman made payments to SSM United LLC ("SSM") (a company formed on 29 May 2015 of which Kevin Lehman is the director and, SKAT infers, Roger Lehman is the beneficial owner) on 30 June 2015 in the sum of US$1,986,225, pursuant to an invoice dated 25 May 2015 issued by SSM to Ganymede Cayman for purported "advisory services";

(iv)  Ganymede Cayman made payments to India Atlantic Inc (a company formed in May 2015 of which Doston Bradley is the director and, SKAT infers, the beneficial owner) ("**India Atlantic**") in at least the following sums to an account (or accounts) at Bank of China pursuant to an invoice dated 28 May 2015 and issued by India Atlantic to Ganymede Cayman for a purported "advisory fee" under a "service agreement" in the sum of US$2,008,732: US$238,732000 on 8 May 2015; US$246,957 000 on 10 June 2015; US$239,26896,000 on 15 June 2015; US$241,957 000 on 16 June 2015; and US$243,589000 on 18 June 2015;

(v)  Ganymede Cayman made payments to Icon Beach Inc (a company formed in May 2015 of which Matthew Tucci is the director and, SKAT infers, the beneficial owner) ("**Icon Beach**") in at least the following sums to an account (or accounts) at Bank of China pursuant to an invoice dated 15 May 2015 and issued by Icon Beach to Ganymede Cayman for a purported "advisory fee" in the sum of US$2,009,503: US$249,503000 on 8 June 2015; US$243,674000 on 10 June 2015; US$246,947 on 16 June 2015; and US$245,612000 on 18 June 2015;

(c1)  further, many of the same individuals (or companies owned and controlled by them) received substantial payments indirectly from Solo Group or Elysium Group Companies. As set out below, the indirect payments were made purportedly for "advisory fees" or "consultancy fees" in respect of services alleged rendered by newly formed companies of Mr Tucci, Mr Lehman and Mr Bradley to other newly formed companies forming part of the Solo Group or Elysium Group Companies, namely;

44

(i)    Parla Global Investments Limited (a BVI company incorporated on 8 July 2015 which was initially owned and controlled by Mrs Usha Shah and later by Elysium Global and/or Mr Sanjay Shah) ("**Parla**");

(ii)    Acai Investments Limited (a BVI company incorporated on 7 July 2015 which was initially owned and controlled by Mrs Usha Shah and later by Elysium Global and/or Mr Sanjay Shah) ("**Acai**");

(iii)    Philo Holdings Limited (a BVI company incorporated on 6 July 2015 which was initially owned and controlled by Mrs Usha Shah and later by Elysium Global and/or Mr Sanjay Shah) ("**Philo**"); and/or

(iv)    Fire Capital Limited (a BVI company incorporated on 29 May 2015 which was initially owned and controlled by Mrs Usha Shah and later by Elysium Global and/or Mr Sanjay Shah) ("**Fire**").

(c2)    as to the payments made by Parla:

(i)    Mr Lehman and/or Mr Kevin Lehman (who SKAT infers is a relative of Mr Lehman) caused the following invoices to be issued to (and which SKAT infers were paid by) Parla by recently formed companies owned and/or controlled by them: (A) an invoice from First Alton dated 23 July 2015 in the sum of US$4,020,800.85, purportedly for "consultancy fees"; (B) an invoice from SSM dated 19 July 2015 in the sum of US$1,711,357.19, purportedly for "advisory fees";

(ii)    Mr Bradley caused the following invoices to be issued to (and which SKAT infers were paid by) Parla by recently formed companies established in July 2015 that were owned and/or controlled by him: (A) an invoice from Pacific India Inc ("**Pacific India**") dated 29 July 2015 in the sum of US$298,453, purportedly for an "advisory fee due under service agreement"; (B) invoices from India North Atlantic Inc ("**India North**") dated 29 July 2015 in the sums of US$186,974 and US$194,817, purportedly for an "advisory fee due under service agreement"; (C) an invoice from Atlantic India Inc ("**Atlantic India**") dated 29 July 2015 in the sum of US$287,521, purportedly for an

"advisory fee due under service agreement"; and (D) an invoice from India Atlantic dated 29 July 2015 in the sum of US$194,817, purportedly for an "advisory fee due under service agreement";

(iii)    Mr Tucci caused the following invoices to be issued to Parla by recently formed companies established in July 2015 that were owned and/or controlled by him (and which SKAT infers were paid by Parla): (A) an invoice from Starfish Dunes Inc ("**Starfish Dunes**") dated 1 July 2015 in the sum of US$309,131, purportedly for an "advisory fee"; (B) Sand Dollar Beach Inc ("**Sand Dollar**") dated 1 July 2015 in the sum of US$251,710, purportedly for an "advisory fee"; (C) an invoice from Lava Beach Inc ("**Lava Beach**") dated 1 July 2015 in the sum of US$246,843, purportedly for an "advisory fee"; and (D) an invoice from Icon Beach dated 1 July 2015 in the sum of US$200,929, purportedly for an "advisory fee";

(c3)    as to the payments made by Acai:

(i)    companies owned and/or controlled by Mr Lehman and/or Mr Kevin Lehman received the following payments from Acai: (A) SSM received US$1,760,018.09 on or around 29 July 2015 (pursuant to an invoice dated 19 July 2015, purportedly for "advisory services"); (B) First Alton received US$3,977,88.05 on or around 29 July 2015 (pursuant to an invoice dated 23 July 2015, purportedly for "consultancy fees");

(ii)    companies owned and/or controlled by Mr Bradley received the following payments from Acai: (A) India North received US$237,751 on or around 12 August 2015 (pursuant to an invoice dated 29 July 2015 purportedly for an "advisory fee due under service agreement"); (B) India Atlantic received US$264,389 on or around 12 August 2015 (pursuant to an invoice dated 29 July 2015 purportedly for an "advisory fee due under service agreement"); (C) Pacific India received US$287,989 on or around 12 August 2015 (pursuant to an invoice dated 29 July 2015 purportedly for an "advisory fee due under



service agreement"); (D) Atlantic India received US$257,832 on or around 12 August 2015 (pursuant to an invoice dated 29 July 2015 purportedly for an "advisory fee due under service agreement");

(iii)     companies owned and/or controlled by Mr Tucci received the following payments from Acai: (A) Sand Dollar received US$279,320 on or around 17 August 2015 (pursuant to an invoice dated 1 July 2015 purportedly for an "advisory fee"); (B) Lava Beach received US$204,030 on or around 17 August 2015 (pursuant to an invoice dated 1 July 2015 purportedly for an "advisory fee"); (C) Starfish Dunes received US$217,509 on or around 17 August 2015 (pursuant to an invoice dated 1 July 2015 purportedly for an "advisory fee"); (D) Icon Beach received US$302,800 on or around 17 August 2015 (pursuant to an invoice dated 1 July 2015 purportedly for an "advisory fee");

(c4)    as to the payments made by Philo:

(i)      companies owned and/or controlled by Mr Lehman and/or Mr Kevin Lehman received the following payments from Philo: (A) SSM received US$1,675,420.21 on or around 4 August 2015 (pursuant to an invoice dated 19 July 2015 purportedly for an "advisory services"); (B) First Alton received US$2,177,469.29 on or around 24 September 2015 (pursuant to an invoice dated 31 August 2015 purportedly for "consultancy fees");

(ii)     companies owned and/or controlled by Mr Bradley received the following payments from Philo: (A) India North received US$293,456 on or around 12 August 2015 (pursuant to an invoice dated 29 July 2015 purportedly for an "advisory fee due under service agreement"); (B) India Atlantic received US$234,567 on or around 12 August 2015 (pursuant to an invoice dated 29 July 2015 purportedly for an "advisory fee due under service agreement"); (C) Pacific India received US$256,098 on or around 12 August 2015 (pursuant to an invoice dated 29 July 2015 purportedly for an "advisory fee due under

service agreement"); (D) Atlantic India received US$275,397 on or around 12 August 2015 (pursuant to an invoice dated 29 July 2015 purportedly for an "advisory fee due under service agreement");

(iii)   companies owned and/or controlled by Mr Tucci received the following payments from Philo: (A) Sand Dollar received US$300,214 on or around 17 August 2015 (pursuant to an invoice dated 1 July 2015 purportedly for an "advisory fee"); (B) Lava Beach received US$311,025 on or around 17 August 2015 (pursuant to an invoice dated 1 July 2015 purportedly for an "advisory fee"); (C) Starfish Dunes received US$249,727 on or around 17 August 2015 (pursuant to an invoice dated 1 July 2015 purportedly for an "advisory fee"); (D) Icon Beach received US$207,150 on or around 17 August 2015 (pursuant to an invoice dated 1 July 2015 purportedly for an "advisory fee");

(c5)   as to the payments made by Fire:

(i)   Mr Lehman and/or Mr Kevin Lehman (who SKAT infers is a relative of Mr Roger Lehman) caused the following invoices to be issued to Fire by companies owned and/or controlled by them (and which SKAT infers were paid by Fire): (A) an invoice from First Alton dated 23 July 2015 in the sum of US$3,975,089.59, purportedly for "consultancy fees"; (B) an invoice from SSM dated 19 July 2015 in the sum of US$1,853,212.73, purportedly for an "advisory services";

(ii)   Mr Bradley caused the following invoices to be issued to Fire by companies owned and/or controlled by him (and which SKAT infers were paid by Fire): (A) invoices from Pacific India and India North dated 29 July 2015 in the sums of US$287,591 and US$261,531, purportedly for an "advisory fee due under service agreement"; (B) an invoice from Atlantic India dated 29 July 2015 in the sum of US$271,361, purportedly for an "advisory fee due under service agreement"; and (C) an invoice from India Atlantic dated 29 July 2015



in the sum of US$163,198, purportedly for an "advisory fee due under service agreement";

(iii) Mr Tucci caused the following invoices to be issued to Fire by companies owned and/or controlled by him (and which SKAT infers were paid by Fire): (A) an invoice from Starfish Dunes dated 1 July 2015 in the sum of US$201,646, purportedly for an "advisory fee"; (B) Sand Dollar dated 1 July 2015 in the sum of US$263,218, purportedly for an "advisory fee"; (C) an invoice from Lava Beach dated 1 July 2015 in the sum of US$242,722, purportedly for an "advisory fee"; and (D) an invoice from Icon Beach dated 1 July 2015 in the sum of US$226,900, purportedly for an "advisory fee";

(c6) The payments referred in subparagraphs c2-c5 above were all ultimately funded by SCP (with what SKAT infers were the traceable proceeds of the fraud on SKAT). Such payments were either made by SCP directly to the relevant recipients or were routed through other accounts held at (or with SCP but in the name of) Solo Group Custodians: Acai: Telesto; Philo: West Point Derivatives; and Fire: Old Park Lane. At around the same time, payments were booked as purported "loans" to Parla, Acai, Philo and Fire from Elysium Global in the financial statements of Elysium Global. By 31 March 2016, a total of €46.824 million had been booked as alleged "loans" from Elysium Global: €12.368m to Parla, €14.029m to Acai, €12.173m to Fire and €8.254m to Philo.

(c7) Each of the paying companies (Parla, Acai, Philo and Fire) and each of the recipient companies owned and/or controlled by Mr Lehman, Mr Tucci and Mr Bradley were incorporated shortly before the invoices and payments referred to above. It is extremely implausible that, between the date of their incorporation (as set out above) and the dates of the invoices that "advisory" or "consultancy" services to the value of the above invoices were provided to Parla, Acai, Philo and Fire.

(c8) There is no apparent innocent explanation for: (a) the use by Messrs Lehman, Bradley and Tucci of multiple newly formed companies to issue invoices; (b)

the issuing of multiple invoices by such corporate vehicles on the same or similar dates; (c) to four apparently independent companies (all of which had the same control, ownership and source of funds).

(c9)     SKAT infers from the facts and matters identified in sub-paragraphs (c) to (c8) above that:

(i)     the substantial aforementioned payments were made as a reward for the involvement of Messrs Lehman, Bradley and Tucci in the WHT Scheme; and

(ii)     the following aspects of the transactions were employed to try to conceal this: (A) the issuing of invoices for "advisory fees" (or similar); (B) the use by each of Messrs Lehman, Bradley and Tucci of multiple companies to issue those invoices; (C) the interposition of Parla, Fire, Philo and Acai, for no commercial purpose, as conduits for payments from SCP.

(d)     further, Mr Donaldson (who was the authorised representative for the largest number of WHT Applications by value) was himself the trustee and beneficiary of DWM Pension Plan, on behalf of whom WHT Applications totalling DKK75.372 million were made between May 2014 and May 2015. Similarly:

(i)     Mr La Rosa (who was the authorised representative for the third largest number of WHT Applications by value) was himself the trustee and beneficiary of Raubritter LLC Pension Plan, on behalf of whom WHT Applications totalling DKK59.825 million were made between May 2014 and May 2015;

(ii)     Mr Lehman (who was the authorised representative for the second largest number of WHT Application by value) was himself the trustee and/or beneficiary of The Valerius LLC Solo 401K Plan, on behalf of whom WHT Applications totalling DKK35.970.976.27 were made between March 2014 and December 2014;

OFFICE COPY
HIGH COURT
ROLLS BUILDING
OF JUSTICE

(iii)   Mr Bradley (who was the authorised representative for the fifth largest number of WHT Application by value) was himself the trustee and/or beneficiary of:

    (A)   Blackrain Pegasus LLC Solo 401K Plan, on behalf of whom WHT Applications totalling DKK35,495,780.99 were made between January 2014 and September 2014; and

    (B)   The Bradley London Pension Plan on behalf of whom WHT Applications totalling DKK69,217,447.21 were made in April 2015 and May 2015;

(d1)   further, payments in the manner set out in subparagraphs (c2)-(c9) above were made at around the same times to companies owned and/or controlled by Mr Daniel Fletcher, the 6th Defendant in the Second Claim. Mr Fletcher was the trustee of Roxy Ventures LLC Solo 401K Plan ("**Roxy**"), on behalf of whom WHT Applications totalling DKK34,906,040.46 were made between March 2014 and August 2008. As particularised in Schedule 5AB, companies owned and/or controlled by Mr Fletcher issued invoices in respect of "fees" to and/or received payments from Ganymede Cayman, Parla, Acai, Philo and Fire totalling US$34.5m;

(d2)   yet further, payments in the manner set out in subparagraphs 50(c1)-(c8) and (d1) above were made at around the same time to other corporate vehicles of persons who were (SKAT infers) participants in the WHT Scheme. Details of these payments are set out in Schedule 7. SKAT infers that they related to the relevant person's participation in circular transactions forming part of the Solo Model because the invoices referred to in Schedule 7 were issued around the same time as, and were stored by Elysium Dubai in the same Black Boxes (Boxes 10-B, 95-B and 98-B), as other invoices from known parties to the circular transactions pursuant to the Solo Model (including companies of Mr Lehman, Mr Tucci, Mr Bradley, Mr Fletcher, Mr Smith, Mr Oakley and Mr Mitchell, Ms Robson, Mr Griffiths, Mr Körner, Mr Mistry, Mr Grant-Klar, Mr Rajeev Dave and Mr Wilson);



(e)    certain brokers involved in the trading or purported trading facilitated WHT Applications received payments from SCP, Elysium Dubai or Ganymede Cayman. In particular:

    (i)    Bastion Capital received the following payments:

        (A)    payments totalling €764,393 and US$690,926 from SCP between 30 May 2014 and 17 August 2015; and

        (B)    a payment of €36,949 from Ganymede Cayman on 6 August 2014;

    (ii)    Novus Capital Markets Limited received the following payments:

        (A)    payments totalling €780,980, £785,030 and US$34,877 from SCP between 22 April 2014 and 5 June 2015; and

        (B)    a payment of £65,000 from Elysium Dubai on 10 April 2015; and

        (C)    a payment of £205,939.28 from SCP in November 2012 "on behalf of custody clients";

    (iii)    TJM Partners received the following payments:

        (A)    payments totalling €634,203 and US$118,477 from SCP between 30 May 2014 and 17 August 2015; and

        (B)    a payment of €5,510 from Ganymede Cayman on 3 September 2014; and

        (C)    a payment of US$117,971 from Elysium Dubai's USD account at Abu Dhabi Islamic Bank with payment reference "TJM Debt factoring";

(f)    yet further, the Solo Group or Elysium Group Companies subsequently acquired other brokers used in the trades purportedly supporting WHT Applications such as Novus Capital Markets Limited (acquired by Solo Group Holdings Limited, the 15th Defendant in the First Claim, in around June 2015) and FGC Securities LLC (acquired by FGC Elysium LLC, the 21st Defendant in the Second Claim, in August 2015). SKAT infers that, even prior to its

formal acquisition by Solo Group Holdings Limited. Novus Capital Markets Limited was associated with and/or controlled by the Solo Group or the Elysium Group Companies from at least 5 December 2014, by reason of it being identified as an "Affiliate Firm" in Schedule 5 to the Exclusivity Agreement between Acupay and AESA of that date;

(g)    a number of the owners of the Malaysian WHT Applicants (such as Mr Jain, Mr Smyth, and Mr Turner) were associates of Mr Shah who received money or assets (directly or indirectly) derived from the fraud on SKAT via SCP ;

(h)    other WHT Applicants (the 64th and 65th Defendants to the First Claim) were owned or controlled by associates of Mr Sanjay Shah, including Mr Grant-Klar (the 9th Defendant to the Second Claim), who formerly held management positions at the Solo Group Companies and/or the Elysium Group Companies as set out in Schedule 5U;

(i)    the limited number of Custodians that produced Credit Advice Notes for the WHT Applications, including:

(i)    the 1st to 4th Defendants in the First Claim (the "**Solo Group Custodians**"), which provided Credit Advice Notes in respect of WHT Applications in reliance on which SKAT paid out a total of DKK9.025 billion. Of this sum, DKK8.012 billion was received by SCP. All of the Solo Group Custodians were ultimately owned and/or controlled by Mr Sanjay Shah. Further, it inferred that each of the Solo Group Custodians used the same software/IT system for purported trading given that their Credit Advice Notes have consecutive numbers;

(ii)    Indigo, which provided Credit Advices Notes in support of WHT Applications in reliance on which SKAT paid out DKK688 million. All such WHT Applications were made whilst Mr Horn was a director of Indigo and the recipient of payments totalling £21.5 million from SCP via or in connection with Ganymede Cayman;

(j)  the limited number of ~~a~~Agents used to make the WHT Applications, including Syntax:

(i)  which was ultimately wholly or partly owned and/or controlled by Mr Sanjay Shah from 19 September 2014 (alternatively 3 December 2014, alternatively 25 March 2015), as set out in Schedule 5B;

(ii)  to whom the knowledge, acts and intentions of Mr Shah fall to be attributed (as its directing mind and will from such date(s) for the purpose of the events described in the Particulars of Claim);

(k)  the majority of the funds received as a result of the WHT Applications were paid to the Alleged Fraud Defendants (for which there is no apparent innocent explanation), as set out in paragraphs 31-33 above and Schedule 5 hereto, with only limited sums being ultimately received by the WHT Applicants themselves;

(l)  save as set out at paragraph 32 above, the payments to the Alleged Fraud Defendants were routed through bank accounts at Varengold Bank that had been set up for the purpose of laundering and/or concealing the source of the money. Further, many such payments were routed through Varengold accounts in the name of offshore entities in jurisdictions as set out in the Schedule 5 hereto. Yet further, these offshore entities had no apparent connection to the WHT Applicants and no apparent claim to the funds;

(m)  almost all of the individual Alleged Fraud Defendants who received the proceeds of the WHT Applications were current or former directors, managers or employees of the Solo Group Companies and/or the Elysium Group Companies, namely Mr Sanjay Shah, Mr Priyan Shah, Mr O'Callaghan, Mr Barac, Mr Llewellyn, Ms Stratford, Mr Patterson, Mrs Usha Shah, Mr Jain, Mr Bains, Mr Horn, Mr Dhorajiwala, Mr Knott, Mr Hoogewerf and Mr Rajen Shah;

(n)  almost all the corporate Alleged Fraud Defendants which received the proceeds of the WHT Applications (via SCP) were the corporate entities of the individuals listed above, including but not limited to the Solo Group



Companies and Elysium Group Companies (all of which were ultimately beneficially owned by Mr Sanjay Shah);

(o)    the acquisition of and dealing with the shares in Varengold Bank and Dero Bank was centrally co-ordinated by or on the instructions of Mr Sanjay Shah for the benefit of him and his associates (namely Mr Patterson, Mr Lui, Mr Jain, Mr Barac, Mr Bains, Mr Preston, Mr Priyan Shah, Mr O'Callaghan, Ms Bhudia and Mr Smith), many of whom also received substantial payments directly or indirectly from SCP as set out in Section F above;

(p)    the purpose behind the acquisition of shares in Varengold Bank and Dero Bank was to obtain effective control over those banks, which were being or would be used for stock lending and/or as a custodian or clearing house to facilitate the making of WHT Applications and/or to conceal, launder or distribute proceeds of the fraud on SKAT.

50A.    SKAT's primary case is that the WHT Scheme was a single conspiracy involving all of the Alleged Fraud Defendants. In the alternative, SKAT alleges that the WHT Applications made in reliance on Credit Advice Notes from Indigo, North Channel Bank and Lindisfarne was a further conspiracy that grew out of the wider conspiracy involving Sanjay Shah, the Solo Group and Elysium Group Companies and the other Alleged Fraud Defendants:

(a)    Each of those Custodians produced Credit Advice Notes for WHT Applications in relation to US pension plans whose powers of attorney were signed by Donald Donaldson (the "**Donaldson Plans**") in respect of which SKAT paid out a total of DKK2,744,880,244.23, being:

(i)    DKK688,383,354.02, in respect of WHT Applications supported by a Credit Advice Note produced by Indigo;

(ii)    DKK1,135,775,446.19, in respect of WHT Applications supported by a Credit Advice Note produced by North Channel Bank;

(iii)    DKK920,721,444.02, in respect of WHT Applications supported by a Credit Advice Note produced by Lindisfarne;

(b) All of the WHT Applications for Donaldson Plans were based on Credit Advice Notes from Indigo, North Channel Bank and Lindisfarne. Donald Donaldson did not sign powers of attorney in respect of WHT Applications supported by Credit Advice Notes from any other Custodian;

(c) The BaFin Report records that (in addition to the facts and matters set out in paragraph 24(e) of the Particulars of Claim):

  (i) Adam LaRosa gave an instruction to North Channel Bank to send all of its Credit Advice Notes to Indigo (pages 26, 38);

  (ii) A number of the "sellers" had referred to discussions with Mr Rajen Shah or Indigo when commencing the "business relationship" with North Channel Bank (page 15);

  (iii) The stock lender in the case of every transaction was Sherwood Enterprises Limited (pages 14, 42);

(d) The Norwich Pharmacal disclosure from Indigo records that the US pension plans that were its purported clients were all represented by Adam LaRosa and Donald Donaldson (like those for North Channel Bank);

(e) Sherwood Enterprises Ltd is a Cayman company that was liquidated on the same day as Potala Trading Limited, the or a stock lender in the Indigo and Lindisfarne transactions;

(f) Mr Horn was well acquainted with Mr LaRosa and Mr Rajen Shah from his time working with Mr Shah at Solo Capital Limited (until March 2012), at SCP (until February 2013) and at Ganymede Cayman and Elysium Dubai (until at least July 2013);

(g) Mr Sanjay Shah has alleged in a witness statement dated 17 January 2017 that Mr Horn, Mr Rajen Shah, Mr Dhorajiwala and Mr Craig Price later acted as his competitors in connection with Indigo from 2014. SKAT reserves its position as to whether this is accurate (or wholly accurate) in circumstances where:



(i)     Mr Horn continued to receive very large payments from SCP and/or Ganymede in 2014 as set out in Schedule 9;

(ii)    Mr Rajen Shah and Mr Dhorajiwala continued to receive very large payments from SCP and/or Ganymede as set out in Schedules 5AF and 5AG; and

(iii)   pension plans represented by Adam LaRosa continued to make WHT Applications based on Credit Advice Notes from SCP until September 2014;

(h)     Without prejudice to this, SKAT notes that:

(i)     An exclusivity agreement dated 5 December 2014 between Acupay and AESA recorded Mr Horn, Mr Rajen Shah, Mr Dhorajiwala and Mr Price (along with Mr Bains) as competing individuals and Indigo, North Channel Bank and Agre Management (Mr La Rosa's company) as competing companies;

(ii)    Mr Rajen Shah is a former director of Solo Capital Limited, Elysium Dubai, and Ganymede Cayman and employee of SCP (during periods overlapping with Mr Horn);

(iii)   Mr Dhorajiwala and Mr Price are former employees of SCP and directors of Elysium Dubai (during periods overlapping with Mr Horn); and

(iv)    Mr Price is a former member of Lindisfarne;

(i)     As set out in Schedule 3A to the Particulars of Claim, many of the North Channel Bank and Indigo Credit Advice Notes in 2014 related to the same number of shares in the same Danish companies at the same time but for different and allegedly separate US pension plans;

(j)     Yet further, as illustrated by the examples in Schedule 4 to the Particulars of Claim, each of Indigo, North Channel Bank and Lindisfarne produced Credit Advice Notes for different and allegedly separate US pension plans on the



same day in respect of the same Danish company for similar volumes of shares (often increasing by regular intervals);

(k) In the circumstances, SKAT infers that the WHT Applications based on Credit Advice Notes from Indigo, North Channel Bank and Lindisfarne were part of the same conspiracy involving (at least) Mr Horn, Mr Rajen Shah, Mr Dhorajiwala, Mr LaRosa, Mr Price and Mr Donaldson.

51. The role that each of the Alleged Fraud Defendants played in the WHT Scheme is set out to the best of SKAT's knowledge, pending disclosure and/or evidence, in the Schedule 5 hereto.

52. As set out in paragraph 25 above, SKAT decided to accept the WHT Applications and make the payments there set out by reason of a mistake (or mistakes) induced by fraudulent misrepresentations as part of the WHT Scheme. In the circumstances, SKAT was, alternatively is, entitled to rescind the transactions by which those payments were made (if and to the extent that it is necessary to do so, which is denied).

53. Since July 2016, SKAT has issued preliminary and final decisions in respect of the WHT Applications proposing to and in fact annulling its previous decisions to accept the WHT Applications and pay the requested amounts to the Agents and Global. By so doing, SKAT elected to rescind the said transactions (if and to the extent that it is necessary to do so, which is denied).

54. Alternatively, SKAT by these Particulars of Claim elects to rescind the aforesaid transactions (if and to the extent that it is necessary to do so, which is denied).

**H    APPLICABLE LAW**

55. As particularised below, SKAT brings claims against the Fraud and Non-Fraud Defendants which are to be characterised as being non-contractual claims arising out of tort/delict and unjust enrichment. The applicable law to such claims is, pursuant to the Rome II Regulation No 864/2007 (EC):

(a)     in respect of the tort claims, the law of the country in which the damage occurred or the law of another country if the tort is manifestly more closely connected with that country; and

(b)     in respect of the unjust enrichment claims (including whether mistaken payments procured by fraud give rise to a constructive trust), the law of the country in which the enrichment occurred or the law of another country if the claim is manifestly more closely connected with that country.

56.     The matters set out in these Particulars of Claim and the Schedules thereto mean that the law applicable to SKAT's claim is English law, alternatively Danish law.

# I    ENGLISH LAW CLAIMS AGAINST THE ALLEGED FRAUD DEFENDANTS

## I1.    Tort claims

### (a)    Deceit

57.     The Agent Representations were made by:

(a)     Syntax, by its submission of Tax Reclaim Forms and the covering letters appending (in particular) the Credit Advice Notes;[4] and

(b)     The true principals on whose ultimate instructions the Agents and Global were acting, including namely the 1st to 4th, 15th, 24th, 30th, 34th, and 62nd Defendants in the First Claim and the 1st Defendant in the Third Claim, as further particularised in Schedule 5 hereto; and/or

(c)     Jointly, by all of the Alleged Fraud Defendants (except the 49th Defendant in the First Claim, 4th, 18th and 21st Defendants in the Second Claim and the 8th Defendant in the Third Claim), by their actions taken in furtherance of the deceits in pursuance of a common design, as particularised above in Section G and in Schedule 5 hereto.

---

[4] The representations made by the Agents who are Non-Fraud Defendants are set out in paragraph 87(d)(iv) below.



58.    The Custodian Representations were made by:

    (a)    SCP, Telesto, Old Park Lane, West Point, Salgado and Bottled, which produced the Credit Advice Note submitted with the WHT Application in question;[5] and

    (b)    Jointly, by all of the Alleged Fraud Defendants (except the 4th, 18th and 21st Defendants in the Second Claim and the 8th Defendant in the Third Claim), by the actions taken in furtherance of the deceits in pursuance of a common design, as particularised above in Section G and in Schedule 5 hereto.

59.    Further or alternatively, as set out in Schedule 5 hereto:

    (a)    The 1st to 4th, 15th, 24th, 30th, 34th, and 62nd Defendants in the First Claim and the 1st Defendant in the Third Claim induced or procured the making of the Agent Representations; and

    (b)    The 1st, 34th and 41st Defendants in the First Claim and the 2nd Defendant in the Third Claim induced or procured the making of the Custodian Representations.

60.    Yet further, by signing Credit Advice Notes issued by SCP, Sanjay Shah, Jas Bains and Graham Horn impliedly represented that they honestly believed the Custodian Representations made by SCP were true (the **"Individuals' Custodian Representations"**).

61.    The WHT Representations were false for the reasons set out in Section E2 above.

62.    Each of the Alleged Fraud Defendants knew that the WHT Representations were false (alternatively were reckless as to whether they were true or false) and intended to induce SKAT to rely on them by paying out under the WHT Applications. This is to be inferred from the participation of the Alleged Fraud Defendants in the WHT Scheme as set out in Sections F-G above and Schedule 5 hereto.

63.    The aforementioned fraudulent misrepresentations were material and were likely to induce, and in fact induced, SKAT to pay DKK12.66573 billion (alternatively

---

[5] The representations made by the Custodians who are Non-Fraud Defendants are set out in paragraph 92(f) (e) below.

DKK9.713 billion) to the Agents, which it would not otherwise have done. Paragraph 25 above is repeated.

64.    Further, by reason of the same facts and matters, Mr Shah, Mr Bains and Mr Horn:

   (a)    knew that the Custodians Representations in the Credit Advice Notes of SCP, which they signed, were false (alternatively were reckless as to whether they were true or false);

   (b)    intended to induce SKAT to rely on the Individuals' Custodian Representations in such Credit Advice Notes by paying out under the WHT Applications;

   (c)    caused SKAT to pay out the amounts stated as being withheld as tax on the Credit Advice Notes signed by the relevant individuals.

**(b)    Unlawful means conspiracy**

65.    As set out in Section G above and Schedule 5 hereto, the Alleged Fraud Defendants (alternatively, groups of them) combined and conspired together for the purpose of carrying out the WHT Scheme pursuant to a common design. The dates on which each such Alleged Fraud Defendant joined the conspiracy (or conspiracies) and the concerted action taken pursuant to the conspiracy (or conspiracies) is set out, to the best of SKAT's knowledge pending disclosure and/or evidence, in Schedule 5 hereto.

66.    The said combination and conspiracy (or combinations and conspiracies) was entered into and put into effect by the Alleged Fraud Defendants with the intention of injuring or causing financial loss to SKAT by unlawful means (as a means to the end of obtaining personal benefits for themselves as set out in Section F above and Schedule 5 hereto).

67.    The intended unlawful means, which were the instrumentality by which SKAT was harmed pursuant to the WHT Scheme, were:

   (a)    the making of the fraudulent WHT Representations, which constituted the torts of deceit (or joint deceit or procuring deceit) as set out in section 11(a) above;

(b) the breach of constructive trust by Syntax and/or SCP in paying away money held on constructive trust for SKAT as set out in paragraphs 26 and 30 and Section F above;

(c) the dishonest assistance of such breach of constructive trust by the Alleged Fraud Defendants (other than the 4th, 18th and 21st Defendants in the Second Claim and the 8th Defendant in the Third Claim), as set out in Section I2(a) below;

(d) the knowing receipt as a result of such breach of constructive trust by the Alleged Fraud Defendants set out in Section I2(b) below.

**(c)    Loss**

68.    SKAT has suffered loss and damage as a result of the Alleged Fraud Defendants' joint deceit and/or unlawful means conspiracy.

69.    The total loss suffered is the amount that SKAT was fraudulently induced to pay out as part of the WHT Scheme, namely DKK12.66573 billion (alternatively, the total amount which SKAT was fraudulently induced to pay out pursuant to WHT Applications supported by the Solo Group Companies and Indigo, namely DKK9.713 billion). SKAT is entitled to and claims such total loss jointly and severally from each of the Alleged Fraud Defendants, who were party to the WHT Scheme.

70.    Alternatively, SKAT claims from each of the Alleged Fraud Defendants such sums as it was fraudulently induced to pay out by reason of the WHT Applications after the dates on which the relevant Alleged Fraud Defendant became party to the WHT Scheme as set out in Schedule 5 hereto.

71.    In the yet further alternative:

(a) SKAT claims from each of the Alleged Fraud Defendants such sums as it was fraudulently induced to pay out by reason of the WHT Applications in respect of which the relevant Alleged Fraud Defendant made, procured or assisted in the making of the deceitful WHT Representations; and/or



(b)     SKAT claims from Mr Sanjay Shah, Mr Horn and Mr Bains such sums as it was fraudulently induced to pay out by reason of the deceitful Individuals' Custodian Representations.

**I2.     Equitable claims**

72.     As set out in paragraphs 26 and 30 above, Syntax and SCP held the money paid to them as a result of the WHT Applications on constructive trust for SKAT. Both Defendants breached such constructive trusts by paying away the money as described in Section F above. The other Alleged Fraud Defendants were accessories to such breaches of constructive trust.

**(a)     Dishonest assistance**

73.     Each of the Alleged Fraud Defendants (except the 47th Defendant in the First Claim, 4th, 15th, 18th and 21st Defendants in the Second Claim and the 2nd and 8th Defendants in the Third Claim) induced, procured or assisted in the breach of such constructive trusts in the manner set out in Schedule 5 hereto.

74.     In doing so, each such Alleged Fraud Defendant had actual (alternatively, blind eye) knowledge that they were participating in a scheme to defraud SKAT and to conceal and/or launder and/or distribute the proceeds of the WHT Applications, as set in Section G above and Schedule 5 hereto.

75.     Further or in the alternative, each such Alleged Fraud Defendant failed to act as an honest person would act in the circumstances because they had actual (alternatively, blind eye) knowledge that they were each assisting SCP to launder the proceeds of a dishonest scheme.

76.     In the circumstances, each such Alleged Fraud Defendant acted dishonestly according to the objective standards of reasonable and honest people in the position and with the knowledge of each such Defendant.

**(b)     Knowing receipt**

77.     Further or alternatively, the Alleged Fraud Defendants (other than the 4th, 15th and 38th in the First Claim) beneficially received funds or assets, which are the traceable

proceeds of SKAT's money paid away by Syntax and/or SCB in breach of constructive trust. Particulars of such beneficial receipt are set out in Section F above and Schedule 5 hereto.

78.    In doing so, each such Alleged Fraud Defendant had such knowledge as to make it unconscionable for such Defendant to retain the benefit of the receipts. In particular:

(a)    Each such Alleged Fraud Defendant had actual (alternatively, blind eye) knowledge that they were participating in a scheme to defraud SKAT and to conceal and/or launder and/or distribute the proceeds of the WHT Applications, as set in Section G above and Schedule 5 hereto; and/or

(b)    On the facts actually known to such Alleged Fraud Defendant, a reasonable professional in their position would have appreciated that the transfers to them were probably wrongful or would have made inquiries and sought advice that would have revealed the probability of such wrongdoing.

(c)    **Equitable compensation or an account of profits**

79.    In the circumstances, SKAT is entitled to and claims from the aforementioned Alleged Fraud Defendants:

(a)    An account of any and all profits made by reason of their dishonest assistance and/or knowing receipt; or

(b)    Equitable compensation in respect of SKAT's losses suffered as a result of their dishonest assistance and/or knowing receipt:

(i)    With respect to dishonest assistance, SKAT suffered the following losses:

(A)    By reason of the breach of constructive trust by Syntax:

(1)    the sum of DKK 2,765,398,045 paid out by Syntax from 19 September 2014 (alternatively, the sum of DKK2,736,247,396 paid out by Syntax from 3 December 2014, alternatively the sum of DKK 2,721,661,782 paid out by Syntax from 25 March 2015);



    (2)    alternatively, such sums as were paid out by Syntax after the relevant Alleged Fraud Defendant became party to the WHT Scheme;

    (3)    alternatively, such sums as were paid out by Syntax in respect of WHT Applications in respect of which the Alleged Fraud Defendant provided dishonest assistance;

  (B)    By reason of the breach of constructive trust by SCP:

    (1)    the sum of DKK8.012 billion paid out by SCP;

    (2)    alternatively, such sums as were paid out by SCP after the relevant Alleged Fraud Defendant became party to the WHT Scheme;

    (3)    alternatively, such sums as were paid out by SCP in respect of WHT Applications in respect of which the Alleged Fraud Defendant provided dishonest assistance;

  (ii)    With respect to knowing receipt, SKAT has suffered loss in the amounts received by the Alleged Fraud Defendants (other than the 4th, 15th and 38th in the First Claim), as set out in Schedule 5 hereto.

## 13.   Unjust enrichment/restitution

80.    As set out at paragraph 25 above, SKAT paid out DKK12.66~~573~~ billion (alternatively DKK9.713 billion) to the Agents, which it would not otherwise have done, acting under a mistake of fact ~~or law~~ that was induced by fraudulent misrepresentations as part of the WHT Scheme.

81.    The Alleged Fraud Defendants (other than the 4th, 15th and 38th in the First Claim) received money or assets as a result of the WHT Applications, are set out in Section F above and Schedule 5 hereto. Each such Alleged Fraud Defendant was thereby enriched as a result of SKAT's mistaken payment of the WHT refunds. SKAT reserves the right to apply to amend these Particulars of Claim if further enrichment is discovered.



82.    The enrichment of the aforementioned Alleged Fraud Defendants was at the expense of SKAT and was unjust by reason of the fraudulently induced mistake.

83.    Each such Alleged Fraud Defendant is therefore liable to make restitution to SKAT of the enrichments unjustly received.

**I4.    Proprietary claims**

84.    To the extent that the Alleged Fraud Defendants (other than the 4th, 15th and 38th in the First Claim) retain the traceable proceeds or product of the payments made by SKAT, they hold the said proceeds or product on constructive trust for SKAT.

85.    SKAT is entitled to and claims a declaration in such terms and an order that the relevant Alleged Fraud Defendants pay or convey such traceable proceeds or product to SKAT.

85A.    Alternatively, SKAT is entitled to and claims an equitable charge and/or lien over the traceable proceeds or product of the payments made by SKAT, as security for its claims set out in paragraph 79 above.

**J    ENGLISH LAW CLAIMS AGAINST THE NON-FRAUD DEFENDANTS**

**J1.    Tort/delict**

The Agents

86.    Further or in the alternative (in the case of Syntax), each of the Agents are liable to SKAT for negligent misrepresentations.

87.    Each of the Agents owed SKAT owed a duty to exercise reasonable care to communicate only genuine WHT Applications to SKAT and in particular to avoid causing loss to SKAT through the communication of fraudulent WHT Applications. That duty arose from the following facts and matters:

(a)    The Agents were obliged by the relevant anti-money laundering ("**AML**") regulations to verify the identity of the WHT Applicants, the source of their funds, and the identity of the relevant authorised representatives;



(b)    In particular, pursuant to the Money Laundering Regulations 2007 (SI 2007/2157):

(i)    the Agents were obliged by Regulations 5 and 7 to implement "customer due diligence measures": (i1) on establishment of a business relationship, or (i2) on carrying out an occasional transaction, or (i3) if money laundering was suspected or (i4) if there were doubts as to the veracity or adequacy of information previously provided by the relevant clients;

(ii)    such "customer due diligence measures" included identifying and verifying the identity of the customer, the control and ownership structure of legal persons, and the ultimate beneficial owner and obtaining information on the purpose and intended nature of the business relationship. The Agents were required to determine the extent of "customer due diligence measures" on a risk sensitive basis depending on the type of customer, business relationship, product or transaction;

(iii)    further, the Agents were obliged by Regulations 8 and 11 to conduct ongoing monitoring of business relations and to cease transactions if the Agents were unable to apply "customer due diligence measures"

(c)    Further, Goal requested that new clients complete a "beneficial ownership questionnaire";

(d)    The Agents knew or ought to have known that:

(i)    they were seeking very large sums by way of WHT refunds from SKAT as set out in Schedule 1 hereto;

(ii)    over an extended period of time;

(iii)    nominally on behalf of pension plans or entities represented by a small number of authorised representatives (many of whom represented multiple WHT Applicants as set out in Schedule 1 hereto);

(iv)  in circumstances where they were paying (in the case of Goal, Acupay and Syntax) the large majority of the proceeds of the WHT Applications to SCP as set out in paragraph 27 above;

(e)  As set out at paragraph 19(d) above, the Agents represented that each WHT Application was a genuine application to reclaim dividend tax, alternatively that the Agents had reasonable grounds to believe that to be the case;

(e1)  The Agent Representations concerned facts not entirely within SKAT's knowledge, and SKAT did not have access to all relevant information and documentation;

(e2)  The Agent Representations were made in documents (the covering letter was printed on the Agents' letterhead) which the relevant Agent sent directly to SKAT, so there was a direct relationship between the parties. Further, the Tax Relief Form completed by the Agents was addressed to SKAT;

(e3)  Acupay's fees were paid indirectly by SKAT out of WHT refunds issued by SKAT and SKAT infers that the same is true for Goal, Koi and Syntax;

(e4)  The documents sent by the Agents to SKAT in which the Agent Representations were made were intended by the Agents to influence SKAT's decision making process and they in fact influenced SKAT to accede to the WHT Applications;

(f)  It was reasonable for SKAT to rely on the is representation in paragraph 19(d) above without further enquiry when deciding whether to accede to the WHT Applications and the Agents knew or ought to have known that SKAT was highly likely to do so. In addition to the matters set out in Schedule 5, SKAT will rely on the following facts and matters:

(i)  the Agents knew or ought to have known from their general experience of tax reclaim applications (alternatively their experience of making WHT Applications to SKAT) that:

(A)    SKAT would rely on the fact that the WHT Applications were made through the Agents as a factor in support of the WHT Applications;

(B)    the large majority of WHT Applications would not have been subjected to detailed due diligence by SKAT, absent irregularities on the face of the applications. This is to be inferred from the fact that, until August 2015, SKAT paid out under the WHT Applications within a short time of receiving a request from the Agents and without raising any queries with the Agents;

(C)    it was not possible for SKAT to verify whether individual pension funds owned shares or had received dividends (net of WHT) in specific Danish companies, given that the relevant shareholdings would have been dematerialised shares held through custodians;

(ii)    the Agents knew or ought to have known that SKAT did not have ready access to the type of AML information that the Agents had in their possession (but had not communicated to SKAT), which would have showed that the WHT Applicants could not realistically have been the beneficial owners of the shares necessary to have received dividends (net of WHT) given, in particular, the facts and matters set out at paragraph 24(b)(ii) above;

(iii)    the Agents knew or ought to have known that SKAT did not know the identity of the persons to whom the proceeds of the WHT Applications were paid by the Agents, most notably SCP.

(g)    The Agents therefore knew or ought to have known that their representations would be relied on by a specific person (SKAT), for a specific purpose in connection with a specific transaction (deciding whether to accept the particular WHT Application and make payment to the relevant Agent);

(h)    The Agents knew or ought to have known that it was reasonably foreseeable that, if the Credit Advice Notes were fraudulent, SKAT would suffer losses in

the form of the payments made to the relevant Agent that would not otherwise
have been made; and

    (i)    SKAT was the only party which could have suffered losses as a result of the
Agents' failure to take reasonable care not to communicate fraudulent WHT
Applications to SKAT.

88.    Each of the Agents breached the said duty by failing to exercise due skill and care in
making the representations in paragraph 87(d)(iv) above. In particular, such
representations were made negligently by reason of the Agent's failure to make any or
reasonable enquiries into whether the WHT Applications they were putting forward
were genuine, alternatively because the Agents had no reasonable grounds for
believing that the WHT Applications were genuine.

89.    SKAT reasonably relied on the aforementioned representations and was thereby
induced to pay DKK12.66573 billion (alternatively DKK9.713 billion) to the Agents,
which it would not otherwise have done.

90.    As a result of the said negligent misrepresentations, SKAT suffered the foreseeable
loss and damage set out, in respect of each Agent, in paragraph 25 above (alternatively
such loss as was suffered after the date on which the Court finds that the Agent ought
to have known that the Credit Advice Notes were fraudulent). SKAT claims such
sums as damages against the Agents.

Custodians

91.    Further or alternatively (in the case of Indigo), Indigo, North Channel Bank,
Lindisfarne and ED&F Man (the "**Non-Fraud Custodians**") are liable to SKAT for
negligent misrepresentation.

92.    Each such Defendant owed SKAT a duty to take reasonable care when producing
Credit Advice Notes for WHT Applications to avoid causing SKAT loss due to
inaccuracies in the Credit Advice Notes. That duty of care arose from the following
facts and matters:

    (a)    The UK-based Non-Fraud Custodians were obliged by the AML regulations to
verify the identity of the WHT Applicants, the source of their funds and the

identity of the relevant authorised representatives. Paragraph 87(b) above is repeated with respect to the UK-based Non-Fraud Custodians.

(b)  Further, as professional firms carrying out regulated activities, the UK-based Non-Fraud Custodians were obliged under Principles 2 and 3 and SYSC 6 of the Financial Conduct Authority Handbook to:

    (i)  conduct their business with due care, skill and diligence;

    (ii)  organise and control their affairs responsibly and effectively, with adequate risk management systems;

    (iii)  take reasonable care to establish and maintain effective systems and controls to counter the risk that the firm might be used to further financial crime;

    (iv)  ensure that these systems and controls enabled the firm to identify, assess, monitor and manage money laundering risk and were comprehensive and proportionate to the nature, scale and complexity of its activities, including the minimum matters in SYSC 6.3.7G such as appropriate measures to ensure that money laundering risk is taken into account in relation to the taking on of new customers;

(c)  The Non-Fraud Custodians had access to the relevant records regarding the trading activity (if any) of the WHT Applicants with respect to shares in Danish companies, including their nationality, information regarding the identity of the party or parties who gave the trading instructions and who provided the funding, collateral or other security (if any);

(d)  The Non-Fraud Custodians would therefore have known that:

    (i)  the WHT Applicants (or persons on their behalf) were engaged in purported or actual trading of shares in Danish companies, the only (or most likely) purpose of which was to support tax reclaim applications from SKAT;

71

(ii)   the Credit Advice Notes produced by the Non-Fraud Custodians were highly likely to be used for the purpose of WHT Applications being made to SKAT; and

(iii)   such Credit Advice Notes were therefore highly likely to be communicated to SKAT for such purpose;

(e)   Further, the Non-Fraud Custodians knew or ought to have known from their experience of producing Credit Advice Notes for the WHT Applications that:

(i)   their Credit Advice Notes would be relied on to seek very large sums by way of WHT refunds from SKAT over an extended period of time;

(ii)   the WHT Applicants were represented by a small number of authorised representatives (many of whom represented multiple WHT Applicants as set out in Schedule 1 hereto);

(iii)   they were paying the large majority of the proceeds of the WHT Applications to persons other than the WHT Applicants;

(f)   As set out at paragraph 21 above, the Non-Fraud Custodians made the Custodian Representations through the Credit Advice Notes provided to SKAT, including that:

(i)   the specific number of shares in the named Danish company were held for the named WHT Applicant before the "ex-date";

(ii)   a specific dividend had been received for the account of the named WHT Applicant on the "payment date";

(iii)   such dividend had been received by the named WHT Applicant net of a specific amount of tax that had been withheld by the named Danish company;

(iv)   the Credit Advice Notes were accurate statements of the facts set out therein;

(g)    It was reasonable for SKAT to rely on these representations without further enquiry when deciding whether to accede to the WHT Applications and the Non-Fraud Custodians knew or ought to have known that it was highly likely that SKAT would do so. In addition to the matters set out in Schedule 5, SKAT will rely on the fact that the Non-Fraud Custodians knew or ought to have known from their general market experience (alternatively their experience of producing Credit Advice Notes for WHT Applications made to SKAT) that:

(i)    the Credit Advice Notes would be regarded by SKAT as important documents that accurately set out the facts stated therein;

(ii)    the large majority of WHT Applications would not have been subjected to detailed due diligence by SKAT, absent irregularities on the face of the applications;

(iii)    it was not possible for SKAT to verify whether individual pension funds owned shares or had received dividends (net of WHT) in specific Danish companies, given that the relevant shareholdings would have been dematerialised shares held through custodians;

(iv)    SKAT did not have ready access to the type of AML information and trading information that the Custodians had in their possession, which would have showed that the WHT Applicants could not realistically have been the beneficial owners of the shares necessary to have received dividends (net of WHT) given, in particular, the facts and matters set out at paragraph 24(b)(ii) above;

(v)    SKAT did not know the identity of the persons to whom the proceeds of the WHT Applications were paid by the Non-Fraud Custodians.

(h)    The Non-Fraud Custodians therefore knew or ought to have known that their representations would be relied on by a specific person (SKAT), for a specific purpose in connection with a specific transaction (deciding whether to accept the particular WHT Application and make payment to the relevant Agent);

(i)    The Non-Fraud Custodians knew or ought to have known that it was reasonably foreseeable that, if the Custodian Representations were false, SKAT would suffer losses in the form of the payments made to the relevant Agent that would not otherwise have been made.

93.    Each of the Non-Fraud Custodians breached the said duty by failing to exercise due skill and care in making the Custodian Representations. In particular, such representations were made negligently by reason of such Defendants' failure to take reasonable care to ensure that the Credit Advice Notes were accurate statements of the matters set out therein.

94.    SKAT reasonably relied on the aforementioned representations and was thereby induced to pay out the following sums (which it would not otherwise have done) and suffered foreseeable loss and damage as a result (in respect of which it claims damages from the Non-Fraud Custodians):

(a)    In respect of WHT Applications supported by Credit Advice Notes from Indigo: DKK688 million;

(b)    In respect of WHT Applications supported by Credit Advice Notes from North Channel Bank: DKK1.135 billion;

(c)    In respect of WHT Applications supported by Credit Advice Notes from Lindisfarne: DKK920 million;

(d)    In respect of WHT Applications supported by Credit Advice Notes from ED&F Man: DKK571.982 million.

**J2.    Unjust enrichment/restitution**

95.    As set out at paragraph 25 above, SKAT paid out DKK12.66573 billion (alternatively DKK9.713 billion) to the Agents and Global, which it would not otherwise have done, acting under a mistake of fact or law that was induced by the Non-Fraud Defendants' negligent misrepresentations or the fraudulent misrepresentations made by the true principals of the Agents and Global through them.

74



96. Each of the Non-Fraud Defendants received fees as a result of the WHT Applications. The Non-Fraud Defendants were thereby enriched as a result of SKAT's mistaken payment of the WHT refunds. SKAT reserves the right to apply to amend these Particulars of Claim if further enrichment is discovered.

97. The enrichment of the Non-Fraud Defendants was at the expense of SKAT and was unjust by reason of the mistake induced by misrepresentation.

98. The Non-Fraud Defendants are therefore liable to make restitution to SKAT of the enrichments unjustly received.

**K    ALTERNATIVE DANISH LAW CLAIMS**

**K1.    Danish law**

99. To the extent that SKAT's claims are governed by Danish law, SKAT relies on the following rules of Danish law (which arise from judge made law):

    (a)    A claimant will have a claim for damages if:

        (i)    The claimant has suffered a financial loss;

        (ii)    The tortfeasor's conduct violated the bonus pater standard, i.e. conduct that violates well-established standards of behaviour in the area of the conduct in question;

        (iii)    There is a necessary and sufficient causal connection between the actionable conduct or the failure to act and the claimant's loss;

        (iv)    The loss suffered was foreseeable considering the actionable conduct or the failure to act (even if the extent of loss was not foreseeable); and

        (v)    There are no relevant defences.

    (b)    In respect of the *bonus pater* standard:

        (i)    Actions which are intentional (including fraudulent conduct) or negligent (including gross or ordinary negligence), will be actionable, subject to satisfaction of the other requirements set out above;



(ii)    Conduct is negligent if the defendant fails to exercise the standard of care, which a reasonable and prudent man would show in similar circumstances;

(iii)   Gross negligence involves negligent conduct that is particularly blameworthy compared to how a reasonable and prudent person in the position of the defendant would act;

(iv)    The standard of care for a professional is higher than for an ordinary person.

(c)    A claimant can bring a claim in damages against an accomplice of a tortfeasor who did not play any direct part in the damaging act, if:

(i)    The accomplice has contributed to the tortious act by acts or omissions; and

(ii)   The accomplice was or should have been aware of the possibility that the primary tortfeasor was committing a wrong;

(d)    If the above conditions are satisfied:

(i)    Joint tortfeasors are jointly and severally liable to compensate the Claimant for the entire loss caused by their torts through the payment of damages;

(ii)   Accomplices of the tortfeasors are severally liable for the loss caused by the tortious acts to which they contributed;

(e)    A claimant will have a claim for restitution if the defendant has been unjustly enriched by receipt of the traceable proceeds of payments made by the claimant;

(f)    A claimant will have a proprietary claim if the defendant received property that may be identified as belonging to the claimant;

(g)    Payments can be traced even if the funds have passed through a number of accounts, were converted into various currencies or were used to buy assets,



provided that the interests of innocent third-party creditors are not engaged in an insolvency or that the defendant received the property in bad faith (including where the defendant should have known that the payments were received as a result of a fraud).

**K2.    Damages claims against the Alleged Fraud Defendants**

100.    SKAT has suffered foreseeable loss as a result of the misconduct of the Alleged Fraud Defendants. In particular:

(a)    The fraudulent (and therefore intentional) conduct of the Alleged Fraud Defendants is described in Sections G and I above and Schedule 5 hereto. Such conduct violated the bonus pater standard;

(b)    Alternatively, in so far as any of the Alleged Fraud Defendants are not found to have acted fraudulently, their participation in the WHT Scheme was grossly negligent because each such Defendant failed to exercise the standard of care required of a person in their position and ought to have known that they were participating in a fraud on SKAT and/or receiving the proceeds of a fraud on SKAT;

(c)    In so far as any Alleged Fraud Defendant did not directly play a part in the damaging act, such Defendant contributed to the tortious act and was or ought to have been aware (at least) that it was possible that the primary tortfeasor(s) had committed a fraud on SKAT, for the reasons set out in Sections G and I above and Schedule 5 hereto;

(d)    As a result of such misconduct, SKAT has suffered loss and damage in the amount of DKK12.66573 billion (or DKK9.713 billion), for which the Alleged Fraud Defendants are jointly and severally liable. Alternatively, the Alleged Fraud Defendants are each liable for such losses as were suffered as a result of the wrongful acts to which they contributed;

(e)    The losses suffered by SKAT are the foreseeable consequence of the Alleged Fraud Defendants' misconduct, which was designed to extract, conceal and/or launder and/or distribute the proceeds of the WHT Applications.



**K3.    Damages claims against other Defendants**

<u>The Agents and the Non-Fraud Custodians</u>

101.    Further or in the alternative, SKAT has suffered foreseeable loss as a consequence of the negligence of (i) the Agents and Global; and (ii) the Non-Fraud Custodians. In particular:

(a)    The negligent conduct of the Agents, Global and the Non-Fraud Custodians is described in Section J above (save that there is no need to establish a duty of care under Danish law) and Schedule 5 hereto. Such conduct violated the bonus pater standard;

(b)    As professional persons, the standard of care on the Agents, Global and Custodians was higher than for ordinary persons. The conduct of the Agents, <u>Global</u> and the Custodians described above <u>and/or in Schedule 5</u> failed to comply with the requisite <u>standard:</u>

(c)    Further, in the case of the Agents and Global:

(i)    they were operating under a broad power of attorney in favour of the relevant WHT Applicant and therefore had a particular responsibility to ensure the truth and accuracy of the facts stated on behalf of the WHT Applicants;

(ii)    they made their banks accounts available to receive and pay-on money from SKAT and thereby gained particular visibility as to the cash flows from the WHT Applications and had a correlative responsibility to ensure that they received any monies paid by SKAT on a true and accurate factual basis;

(iii)    they ought to have taken reasonable care to ensure that the WHT Applications were materially accurate. The Agents and Global failed to take any or any reasonable steps to do so;

(d)    As a result of the said negligent misrepresentations, SKAT suffered the foreseeable loss and damage:

(i)    set out in respect of each Agent, in paragraph 90 above;

(ii)   in the amount of DKK259 million in the case of Global; and

(iii)  set out in respect of each Non-Fraud Custodian, in paragraph 94 above.

Other Non-Fraud Defendants

102.   Further, the 64th and 65th Defendants in the First Claim and the 5th to 16th and 23rd Defendants in the Second Claim are liable in tort under Danish law, if it applies, by reason of their having negligently caused foreseeable loss, as set out in Schedule 5 hereto.

**K4.    Unjust enrichment/restitution claims**

103.   Further or alternatively, by reason of the facts and matters set out at Sections I3 and J2 above, SKAT is entitled to and does bring claims under Danish law, if it applies, against all Defendants that have been unjustly enriched by receipt of the traceable proceeds of payments made by SKAT as set out in Schedule 5 hereto.

**K5.    Proprietary claim**

104.   Further or alternatively, SKAT brings proprietary claims against the Alleged Fraud Defendants (other than the 4th, 15th and 38th in the First Claim) under Danish law, if it applies, by reason of the facts and matters set out in Section I4 above. In particular, the Alleged Fraud Defendants:

(a)    received funds that are identifiable as the proceeds of the money originally paid out by SKAT to the Agents; and

(b)    did so in bad faith because they knew or ought to have known that the funds were received as a result of a wrong committed on SKAT.

**L    INTEREST**

105.   SKAT claims compound, alternatively simple, interest against the Alleged Fraud Defendants pursuant to the Court's equitable jurisdiction and/or section 35A of the Senior Courts Act 1981 on the sums found to be due to SKAT at such rate and for such period as the Court considers appropriate.

106. In the alternative (if Danish law applies), SKAT is entitled to any claims interest against the Defendants under sections 1, 3 and 5 of the Danish Interest Act 2014 at 8% over the official lending rate of the Danish Central Bank for the following periods:

(a) from the date of the payments by SKAT, given the special circumstances set out herein (in particular, the fraud on SKAT by which it was induced to pay out sums on a mistaken basis), pursuant to section 3(5) of the Danish Interest Act 2014;

(b) Alternatively, from date of the relevant Claim Form (or this Particulars of Claim) by which a demand for payment was (or is) made against the relevant Defendants, pursuant to section 3(4) of the Danish Interest Act 2014.

**M    CURRENCY OF CLAIMS**

107. SKAT claims for damages and/or equitable compensation are in Danish Kroner, that being the currency in which it suffered its loss. As at 12 September 2018, the exchange rate as published by Bloomberg.com was £1 to DKK8.377. The sterling equivalent of SKAT's claim against the Alleged Fraud Defendants of DKK12.66573 billion (alternatively DKK9.713 billion) is therefore £1.512 billion (alternatively £1.159 billion).

108. SKAT claims an account of profits and restitution in the currencies in which the relevant Defendants received the relevant assets or profits.

**AND THE CLAIMANT CLAIMS:**

(1) Damages against the Alleged Fraud Defendants in the amount of DKK12.66573 billion, alternatively:

(a) such sum as SKAT paid out after the relevant Defendant joined the WHT Scheme; or

(b) such sum as SKAT paid out by reason of the WHT Applications in respect of which the relevant Alleged Fraud Defendant made, procured or assisted in the making of the deceitful WHT Representations;



 (c) such sum as SKAT paid out as a result of the wrongful act to which the relevant Defendant contributed;

(2) Damages against Mr Sanjay Shah, Mr Horn and Mr Bains in such sums as SKAT was induced to pay out by reason of Credit Advice Notes signed by those individuals;

(3) An account of profits or equitable compensation against the Alleged Fraud Defendants for their liability as constructive trustees or for dishonest assistance and knowing receipt;

(4) Damages in the sums set out in paragraphs 90 and 94 above and in Schedule 5 against the Non-Fraud Defendants;

(5) Restitution of unjust enrichment in the sums set out in Schedule 5 against the Alleged Fraud Defendants and the Non-Fraud Defendants;

(6) A declaration that the Alleged Fraud Defendants hold the traceable proceeds or products of the payments that SKAT made to the Agents on constructive trust for SKAT (alternatively that SKAT is the owner of such proceeds or products), and an order that the same be paid or handed over to SKAT;

(7) Interest;

(8) Costs; and/or

(9) Further or other relief.


Michael Fealy QC

Jamie Goldsmith

Sam O'Leary

Sophie Weber

James Ruddell

One Essex Court

OFFICE COPY
HIGH COURT
ROLLS BUILDING
OF JUSTICE

~~12 September 2018~~

13 March 2019

~~Statement of Truth~~

~~The Claimant believes that the facts stated in these Particulars of Claim are true.~~

~~Signed.......................................................~~

~~Name: Jonathan Robert Fortnam~~

~~Position: Partner in the firm of Pinsent Masons LLP, solicitors to the Claimant~~

~~Date: 12 September 2018~~

~~Served this 12 day of September 2018 by Pinsent Masons LLP, of 55 Colmore Row, Birmingham B3 2FG solicitors for the Claimant~~

**Statement of Truth**

The Claimant believes that the facts stated in these Amended Particulars of Claim are true.

Signed.......................................................

Name: Jonathan Robert Fortnam

Position: Partner in the firm of Pinsent Masons LLP, solicitors to the Claimant

Date: 13 March 2019

Re-Served this 13 day of March 2019 by Pinsent Masons LLP, of 55 Colmore Row, Birmingham B3 2FG solicitors for the Claimant