# Exhibit D: Example Lawsuit

B391100E - KWI

# WRITTEN

## IN THE

## EASTERN APPELLATE COURT (*ØSTRE LANDSRET*) JOURNAL

_____

JUDGMENT

Delivered on February 11, 2014 by the Eastern Court, Seventh Division, (appellate judges Tuk Bagger, K. Wiingaard and Louise Saul).

7th Div. No. B-3911-12:
SKAT
(Kammeradvokaten with attorney Finn Mejnertsen)
against
1) Person A
(attorney Martin Holm Land)
2) Person B
3) Person C
4) Person D
5) Person E
6) Person F
7) Person G
8) Person H
( 2) - 8): attorney Jens Lund Mosbek)

And

7th Div. No. B-4110-12:
1) Person B
2) Person C
3) Person D

- 2 -

4) Person E
5) Person F
6) Person G
7) Person H
(all: attorney Jens Lund Mosbek) against
State Certified Auditor Person I
(attorney Thomas Dall Jensen)

The lower court (*Lyngby Ret*) judgment of October 29, 2012 (BS 151-3412 / 2010) has been appealed by SKAT with the request that the Appellate Court order that the respondents, Person A, Person B, Person C, Person D, Person E, Person F, Person G and Person H, pay 606,944 kroner, jointly and severally, with added interest from the time the case is decided until payment is made.

Person A has primarily requested that the decision will be upheld or, in the alternative, requested payment of a lesser amount, as determined by the Appellate Court.

Person B, Person C, Person D, Person E, Person F, Person G and Person H have requested that the decision will be upheld with the lower court's determination that SKAT pay 70,000 kroner for lower court costs, or in the alternative, be ordered to pay an amount greater than that determined by the lower court, to each of them.

Furthermore, they have appealed the judgment with the request that the State Certified Auditor Person I indemnify them wholly or in part for any claim, including interest and court costs, which they may be ordered to pay to SKAT.

State Certified Auditor Person I has requested that the decision will be upheld or, in the alternative, requested payment of a lesser amount, as determined by the Appellate Court.

**Explanations**

A supplementary explanation has been provided by Person A, Person C, Person D and Person I to the Appellate Court. Furthermore, a witness explanation has been provided by Person J.

Person A has explained, among other things, that he did not have in-depth knowledge of the financial situation of the Fund when he started took office as director. In 2007, only 1.4 million in funding was received. Because of this, he recommended that the quality of the Fund's applications be improved. The increased revenue from advertising created a hopeful situation. There were other initiatives, including the website under development. The control budget in 2008 showed that a negative result of 375,000 kroner would be realized by the end of May. The relationship with Company A was good. Company A was brought in for the advertising part, not as a consideration for payment, but because Company A was a good partner. Company A would be able to expand the advertising component of the website and publication A. He does not remember what was owed to Company A, but it was probably considerable amounts. He held meetings with Bank A. The bank received weekly liquidity reports, but he was not informed of details in this regard. On June 17, 2008, Fund B announced that Company B's application was a priority and that a decision concerning a commitment would be forwarded. This he perceived as a commitment. He has no insurance covering legal expenses.

Person C has explained, among other things, that he has been a senior doctor, later health manager, in municipality A. In 2007, he took up similar employment in municipality B. He obtained, among other things, subsidies for various health projects, and it was usually not so difficult to get subsidies. He has been Chairman of Committee A since 2000. In the period 2005-2008, Committee A received significant funding. His experience told him that it actually would be possible for the Fund to receive support for at least some of the projects applied for. Person K explained in the lower court about his inquiries to SKAT about postponement, but he himself had no knowledge that VAT and A-tax had not been paid. He did not know when it became apparent that Company A had not received payment on time. This payment was something that was handled administratively.

Person D has explained, among other things, that Person L had a large network in the administrative system. There was no or only relatively little fund support, which is easy to identify retrospectively. However, the year 2007 was a transitional year, and the strategy was undergoing change. Person L's strategy had been based upon the existing funding, but a new strategy was put in place, focusing on several, smaller projects / fund

applications. He noted with pleasure in June 2008 that it had succeeded in achieving 2 million kroner. He did not make an in-depth assessment of the figures presented to him. The negative yearly result of 375,000 kroner in the control budget for 2008 was modest compared to 2007. The advertising revenue was evaluated on the basis that the advertising agency's bills were steadily increasing, and it was expected to reach that which had been budgeted before the end of the year. Employees were laid off. He was under the impression that the operation was almost in balance.

Person I has explained among other things that the Fund's strategy for a long period of time was to exist solely as a publication company which was predominately ad-financed and dependent on only a few public subsidies. In connection with the change of director in 2006, a new strategy was needed. The company was to be expanded with communication and advisory services. Publication B was to get more exposure. The deficit in 2007 was largely determined to be caused by the free publication, after Company C had received promises of free delivery. The idea was to increase the circulation and thus the advertising revenue. There was uncertainty about how quickly readership and revenue could be increased. The advertising industry was under pressure due to the emergence of the free newspapers. In the summer or fall of 2007, the decisions were still based upon the allocation of existing funding. This was not successful due to several reasons, and new changes had to be made. It was decided to pursue smaller but more profitable projects. Furthermore, publication B had to be relaunched as a subscription publication and the number of employees had to be reduced. In 2008, more control over projects and applications for funding had been obtained. The witness could not assess which concrete project funds were realistic to expect, but the expectation that funding could be achieved was realistic, because the preparatory work was thorough and long-term for the projects, which the funding was allocated to support. There were at least 15 different projects with well-established partners. In 2008, the budget was 4.7 million kroner in total fund income, but at the same time the cost of receiving this funding was 2,820,000 kroner. The bottom line for 2008 was therefore that the budget would provide a contribution of approximately 1.8 million kroner. This, he found, was a realistic assessment by the management. He heard about the commitment of the 2 million kroner from Fund B in June 2008. He did not reach a decision on how this amount should be accounted for. Presumably, a surplus of 1.5 million kroner was expected because of these funds over the course of three years. Person A's minutes for the meetings with the bank are correct. If the company got additional funding, the bank would look favorably on increasing the available credit.

<u>Person J</u> has explained among other things that in 2007-2008 he was employed by Bank A as Area Director. They were in close dialogue with the Fund as early as the end of 2007. The reason was that liquidity was tight and equity was threatened. The former director "had burned a lot of money in a very short time," and that made the bank skeptical. He certainly does not believe that the bank raised available credit in 2008. He does not remember whether temporary overdrafts based upon credit were granted, but it is possible. The bank generally allows such overdrafts, but the situation is followed day-by-day. The bank was in regular contact with Person K, the accounting manager, and received regular liquidity forecasts, i.e, overviews of the expected need for liquidity in the upcoming week. The contact with her became very strained. She faced enormous pressure at work. Her cases were organized and he did not doubt that she was being honest.  On the other hand, it was surprising that liquidity forecasts did not hold up.  He perceived this as an expression of the pressure that the fund was under.  The liquidity situation became very critical. On March 5, 2008, there was a meeting with, among others, Person A. The bank accepted a proposed budget, but would not increase the credit ceiling. He does not remember the meeting in detail, but the bank welcomed the change of strategy. It was in the bank's best interest that the conditions improve before a potential sale of the company. The bank continued its commitment to protect its security interest. He does not remember that there were discussions on increasing the line of the credit, but he cannot rule it out.  It would only be natural to allow an increase if some of the equity was restored. He is certain that the bank did not promise anything about credit increases. The bank did not note the credit limit when the debt ceiling was not reached.  This was because the Bank risked closure of the company if such a step were taken.  Publication B was worth the money, which was also made evident by a later sale. The downward spiral had been turned around in 2008 compared to 2007, but he would not call it "good", but it is an advantage to sell a company that has shown a "turn around". The bank believed that an additional value could be generated. The bank also acknowledged that in 2007 it had received a grant of 1.4 million kroner, but in 2008 was budgeted with 4.7 million kroner. Finally, the bank said stop. This was in July 2008. It was not the bank's own problems that supported this decision.  The bank wrote off 100 million kroner in losses and received poor press coverage. This affected the bank's liquidity, but this crisis did not occur until September 2008. In response to the information that Person A stated on June 19, 2008, to Person B, the Chairman of the Board, that publication B was on the right road, the witness explained that he does not remember so stating.

**Procedure**

The parties have reiterated the arguments made to the lower court to the Appellate Court and have proceeded accordingly.

**The Appellate Court's reasoning and result**

*Two of the voting judges (Tuk Bagger and Louise Saul) conclude:*

The adopted strategy for 2008-2010 entailed a reduction in the level of costs, and the advertising revenue seemed to be increasing in the spring of 2008. Among other things, these conditions contributed to the control budget as of May 2008 showing a deficit of 375,000 kroner, which was significantly lower than what was budgeted in February 2008. Furthermore, Fund B's announcement of June 17, 2008, could be read the same as per Person A, Director, and communicated to the Board of Directors as a commitment regarding fund support. We do not find it of decisive significance if it can be assumed that the 2 million kroner from Fund B would be included in the full amount.

Next, and for the reasons set out in the judgment, we accept that it has not been established that the respondents should have realized at least by the end of March 2008 that a continuation was hopeless and would not result in loss to the creditors, including SKAT.

We therefore accept that both Person A, Director, and the Board of Directors and the auditor are acquitted.

*One of the voting judges (K. Wiingaard) concludes:*

After the change of strategy in 2006, the Fund generated significant losses, which, as of December 31, 2007, amounted to 7,903,293 kroner. Equity was lost in August 2007 and by the end of the year was negative by 2,844,000 kroner. During the board meeting of September 20, 2007, the chairman gave an assessment that the Fund had three options available: Merger with Fund C, receive reserved funds, and a possible sale to other funds or commercial players. The request for merger was not accepted, there were no negotiations regarding sale prior to the suspension of payments, and in February 2008, the Fund received a denial of its request to receive reserved funds.

According to a new strategy at the end of February 2008, the Fund was to focus on development projects and improving the efficiency of warehousing and distribution, etc.

As an efficiency improvement, the free edition was discontinued, and the subscription financed edition was drastically reduced. With such a complete reorganization, however, a significant negative economic impact had to have been expected, especially for the advertising sales. The effects did follow soon thereafter.

The fund's prospects depended on a positive assessment of the development projects. In 2007, the fund had received 1.4 million kroner in backing (against a budgeted 6.4 million), but for a very long period no means of funding were obtained. In February 2008, the Fund received a rejection for major backing of the project "Project A". It was explained that work was carried out thoroughly and over a long period with the smaller but more profitable projects that the Fund was to seek backing for under the new strategy. Based on this, there were general expectations of upcoming fund appropriations. However, in view of the circumstances, there was no specific prospect for this, which, in consideration of the seriousness of the situation, was necessary and would possibly allow the Fund to correct the deficit and negative equity in time. It is irrelevant whether the Fund was later granted 2 million kroner from Fund B on June 17, 2008.

On March 5, 2008, the Fund's bankers refused to extend the terms of credit.

Funds were still, as previously, insufficient, and liquidity was still very much under significant pressure. It was clear according to any realistic assessment that the budget could not be maintained. There were no real, concrete indications that the company had a likelihood of survival, and that continuation was possible without loss.

It is clear from § 25 of the Corporate Funds Act (*lov om erhvervsdrivende fond*) that the Board of Directors and the executive management were responsible for the management of a corporate fund business. According to § 46(1), § 44(1), board members and directors are liable for damages that they deliberately or negligently cause creditors in the performance of their duties.

In accordance with § 25(2) of the Act, Person A, Director, was responsible for the day-to-day management of the fund. I believe that he should have realized that the Fund would not be able to pay overdue A taxes, AM contributions, and VAT. He has acted irresponsibly by continuing the operation despite the accounting deficiencies. He has therefore incurred liability for damages to SKAT.

The board members, the respondents 2) - 8), in accordance with § 25(3) of the Act, were required to ensure that the asset management was controlled / audited in a satisfactory manner relative to the fund's condition.

It is clear from the board minutes that the Board of Directors was aware of the situation, including that the equity was negative from August 2007. It should have ensured that the information on the Fund's liquidity and the formation of new debt was being kept up to date on an ongoing basis. The board members acted irresponsibly by letting operations continue without the statutory / legally required control, which led to their not being informed of the lack of non-payment of taxes and fees. Due to such failure of oversight, they have incurred liability for damages to SKAT.

I vote to find Person A and the respondents 2) - 8) as liable for damages from the losses they have inflicted on SKAT. In accordance with the deliberation results, I take no position on questions regarding the size of losses and on the right of recourse against the State Certified Auditor Person I.

In accordance with the deliberation results, the dismissal is confirmed.

*All voting judges comment on the issue of court costs:*

SKAT originally filed the case with a claim for payment of approximately 1 million kroner, and the claim was only reduced to the approximately 600,000 kroner immediately before the main hearing. Furthermore, considering that the work on the case has been extensive, the Appellate Court finds that the costs payable to the board members shall be increased so that SKAT shall pay to each of them 50,000 kroner including VAT for court costs in the lower court.

SKAT shall also pay 70,000 kroner to Person A and 50,000 kroner to Person B, Person C, Person D, Person E, Person F, Person G and Person H, respectively, for court costs in the Appellate Court. The amounts include attorney fees and VAT.

Person B, Person C, Person D, Person E, Person F, Person G and Person H must jointly

and severally pay 55,000 kroner to the State Certified Auditor Person I for court costs in the Appellate Court. The amount includes attorney fees.

In determining the costs of the case, the Appellate Court has emphasized the value and scope of the case, including the duration of the main proceedings.

### The Court hereby orders:

The Lower Court's judgment is upheld with the modification that SKAT must pay court costs of 50.000 kroner each to Person B, Person C, Person D, Person E, Person F, Person G and Person H.

In court costs for the Appellate Court, SKAT must pay 70,000 kroner to Person A and 50,000 kroner to Person B, Person C, Person D, Person E, Person F, Person G and Person H each.

In court costs for the Appellate Court, SKAT must pay 70,000 kroner to Person A and 50,000 kroner to Person B, Person C, Person D, Person E, Person F, Person G and Person H each.

In court costs for the Appellate Court, Person B, Person C, Person D, Person E, Person F, Person G and Person H must jointly and severally pay 55,000 kroner to the State Certified Auditor Person I.

The court costs must be paid within 14 days of the date of this judgment.
Court costs will accrue interest in accordance with § 8 of the Danish Interest Act (*renteloven*).

**(Sign.)**

___  ___  ___
**Accuracy of the writing is confirmed.**
**Eastern Appellate Court, the**

B391100E - KWI

UDSKRIFT

AF

ØSTRE LANDSRETS DOMBOG

_____

D O M

Afsagt den 11. februar 2014 af Østre Landsrets 7. afdeling

(landsdommerne Tuk Bagger, K. Wiingaard og Louise Saul).

7. afd. nr. B-3911-12:

SKAT

(Kammeradvokaten v/advokat Finn Mejnertsen)

mod

1) Person A

(advokat Martin Holm Land)

2) Person B

3) Person C

4) Person D

5) Person E

6) Person F

7) Person G

8) Person H

( 2) - 8): advokat Jens Lund Mosbek)

og

7. afd. nr. B-4110-12:

1) Person B

2) Person C

3) Person D

4) Person E
5) Person F
6) Person G
7) Person H
(alle: advokat Jens Lund Mosbek)
mod
Statsautoriseret revisor Person I
(advokat Thomas Dall Jensen)

Lyngby Rets dom af 29. oktober 2012 (BS 151-3412/2010) er anket af SKAT med påstand som for byretten om, at de indstævnte, Person A, Person B, Person C, Person D, Person E, Person F, Person G og Person H, in solidum tilpligtes at betale 606.944 kr. med tillæg af procesrente fra sagens anlæg, til betaling sker.

Person A har principalt påstået stadfæstelse, subsidiært betaling af et af landsretten skønsmæssigt fastsat mindre beløb.

Person B, Person C, Person D, Person E, Person F, Person G og Person H har påstået stadfæstelse, dog således at SKAT i sagsomkostninger for byretten tilpligtes at betale principalt 70.000 kr., subsidiært et højere beløb end tilkendt af byretten, til dem hver især.

Desuden har de anket dommen med påstand om, at adciterede, statsautoriseret revisor Person I, tilpligtes at friholde dem helt eller delvist for ethvert krav, inklusive renter og sagsomkostninger, som de måtte blive dømt til at betale SKAT.

Statsautoriseret revisor Person I har påstået stadfæstelse, subsidiært betaling af et af landsretten skønsmæssigt fastsat mindre beløb.

**Forklaringer**

Der er i landsretten afgivet supplerende forklaring af Person A, Person C, Person D og Person I. Der er endvidere afgivet vidneforklaring af Person J.

Person A har forklaret blandt andet, at han ikke havde dybtgående kendskab til den økonomiske situation i Fonden, da han tiltrådte som direktør. Man modtog kun 1,4 mio. kr. i fondsstøtte i 2007. Han anbefalede på den baggrund, at Fondens ansøgninger blev kvalitetsudviklet. Man var fortrøstningsfuld med hensyn til øgede annonceindtægter. Der var andre tiltag, blandt andet var hjemmesiden under udvikling. Kontrolbudget 2008 viste, at der ultimo maj ville blive realiseret et negativt årsresultat på 375.000 kr. Forholdet til Virksomhed A var godt. Virksomhed A blev taget ind på annoncedelen, ikke som modydelse for kredit, men fordi Virksomhed A var en god samarbejdspartner. Virksomhed A ville kunne udbygge annoncesiden på hjemmesiden og Blad A. Han husker ikke, hvad man skyldte Virksomhed A, men det har nok drejet sig om betydelige beløb. Han holdt møder med Bank A. Banken modtog ugentlige likviditetsoversigter, men han var ikke orienteret om detaljer i denne forbindelse. Den 17. juni 2008 meddelte Fond B, at Virksomhed Bs ansøgning var prioriteret, og at der ville blive fremsendt en afgørelse indeholdende et tilsagn. Dette opfattede han som et tilsagn. Han har ingen retshjælpsforsikring.

Person C har forklaret blandt andet, at han har været overtandlæge, senere sundhedschef, i kommune A. I 2007 tiltrådte han en lignende beskæftigelse i kommune B. Han skaffede blandt andet tilskud til forskellige sundhedsprojekter, og det var normalt ikke så vanskeligt at få støtte. Han har været formand for Komite A siden 2000. I perioden 2005 – 2008 modtog Komite A betydelige støttemidler. Hans erfaring siger ham, at det virkelig ville være muligt for Fonden at få støtte til i hvert fald en del af de projekter, der blev søgt om. Person K har i byretten forklaret om sine henvendelser til SKAT om henstand, men han havde selv intet kendskab til, at der ikke var indbetalt moms og A-skat. Han ved ikke, hvornår det kom frem, at Virksomhed A ikke fik betaling til tiden. Dette betalingsanliggende var noget, der blev håndteret administrativt

Person D har forklaret blandt andet, at Person L havde et stort netværk i det administrative system. Der kom ingen eller kun relativt ringe fondsstøtte, hvilket er let at erkende i en bakspejlsbetragtning. Året 2007 var imidlertid et overgangsår, og strategien var under omlægning. Person Ls strategi havde kørt på satspuljemidlerne, men der blev lagt ny strategi med fokus på flere, mindre projekter/fondsansøgninger. Han konstaterede

med glæde i juni 2008, at det var lykkedes at opnå 2 mio. kr. Han var ikke dybere nede i de tal, som han fik forelagt. Det negative årsresultat på 375.000 kr. i kontrolbudget 2008 var beskedent i forhold til 2007. Annonceindtægterne bedømt på grundlag af annoncebureauets afregninger var pænt stigende, og man regnede med at nå det budgetterede inden årets udgang. Der var afviklet medarbejdere. Han sad med et billede af, at driften tilnærmelsesvis var i balance.

Person I har forklaret blandt andet, at Fondens strategi i en lang periode var at eksistere som en ren bladvirksomhed, der hovedsagelig var annoncefinansieret og afhængig af kun få offentlige støttemidler. I forbindelse med direktørskiftet i 2006 ønskede man en ny strategi. Virksomheden skulle udvides med kommunikations- og rådgivningsvirksomhed. Blad B skulle eksponeres mere. Underskuddet i 2007 blev stort set udelukkende oparbejdet, fordi bladet blev gratis, efter at Virksomhed C havde fået løfte om gratis levering. Tanken var at øge oplaget og dermed annonceindtægterne. Det usikre var, hvor hurtigt man kunne øge læsertallet og indtægterne. Annoncemarkedet var presset blandt andet på grund af gratisavisernes fremkomst. I sommeren eller efteråret 2007 valgte man endvidere at satse på tildeling af satspuljemidler. Det lykkedes af flere grunde ikke, og man måtte lave en ny tilpasning. Det besluttedes at forfølge mindre, men mere lønsomme projekter. Desuden skulle Blad B på ny gøres til et betalingsblad, og antallet af medarbejdere skulle ned. I 2008 havde man fået mere styr på projekter og ansøgninger om fondsmidler. Vidnet kan ikke vurdere, hvilke konkrete projektmidler det var realistisk at forvente, men forventningerne til, at støtte ville blive opnået, var realistiske, fordi der var arbejdet grundigt og gennem en lang periode med de projekter, som der blev søgt støtte til. Der var tale om mindst 15 forskellige projekter med veletablerede samarbejdspartnere. Der var i 2008 budgetteret med 4,7 mio. kr. i samlede fondsindtægter, men samtidig var omkostningerne til opnåelsen heraf medtaget med 2.820.000 kr. På bundlinjen ville fondsindtægterne for 2008 derfor ifølge budgettet give et dækningsbidrag på ca. 1,8 mio. kr. Dette, fandt han, var en realistisk vurdering fra ledelsen. Han hørte om tilsagnet på de 2 mio. kr. fra Fond B i juni 2008. Han nåede ikke at tage stilling til, hvordan dette beløb skulle behandles regnskabsmæssigt. Formentlig var der tale om et forventet overskud vedrørende disse midler på 1,5 mio. kr. til fordeling over 3 år. Person As referater af møderne med banken er korrekte. Skaffede virksomheden fondsmidler, ville banken se positivt på at øge kreditten.

Person J har forklaret blandt andet, at han i 2007-08 var ansat i Bank A som områdedirektør. Man var i tæt dialog med Fonden allerede fra slutningen af 2007. Baggrunden var, at likviditeten var stram, og egenkapitalen var truet. Den tidligere direktør "havde brændt rigtig mange penge af på rigtig kort tid", og det gjorde banken skeptisk. Han mener bestemt ikke, at banken hævede kreditten i 2008. Han kan ikke huske, om der blev bevilget midlertidige overtræk af kreditten, men det er muligt. Sådanne overtræk giver banken lov til, men situationen bliver fulgt dag for dag. Banken var jævnligt i kontakt med regnskabschef Person K og modtog løbende likviditets-forecasts, dvs. oversigter over forventet likviditetsbehov i den kommende uge. Kontakten til hende blev meget intens. Hun var enormt presset arbejdsmæssigt. Der var ikke rod i hendes sager, og han tvivlede ikke på hendes ord. Derimod kunne det undre, at likviditet-forecasts ikke holdt. Han opfattede det som et udtryk for det pres, fonden lå under. Likviditetssituationen var meget kritisk. Den 5. marts 2008 var der møde med blandt andre Person A. Banken godtog et forelagt budget, men ville ikke hæve kreditloftet. Han husker ikke mødet i detaljer, men banken hilste strategiskiftet velkommen. Bankens interesse var, at forholdene blev forbedret inden et eventuelt salg af virksomheden. Banken videreførte engagementet for at beskytte sit virksomhedspant. Han husker ikke, at der skulle have været drøftelser om forhøjelse af kreditrammen, men han kan ikke afvise det. Det ville kun være naturligt at tillade en forhøjelse, hvis der blev genskabt noget egenkapital. Han er sikker på, at banken intet lovede angående kreditforhøjelser. Banken nedskrev ikke kreditmaksimum, når gælden ikke nåede loftet. Dette skyldtes, at banken risikerede at lukke virksomheden, hvis man tog et sådant skridt. Blad B var jo penge værd, hvilket også viste sig ved det senere salg. Udviklingen var vendt i 2008 i forhold til 2007, uden at han dog vil kalde det "flot", og det er en fordel at sælge en virksomhed, som har vist en "turn around". Banken troede på, at der kunne skabes en yderligere værdi. Banken hæftede sig også ved, at man i 2007 havde modtaget en støtte på 1,4 mio. kr., men i 2008 budgetterede med 4,7 mio. kr. Til slut sagde banken dog stop. Det var i juli 2008. Det var ikke bankens egne problemer, der begrundede denne afgørelse. Banken nedskrev 100 mio. kr. i tab og fik dårlig presseomtale. Det gik ud over bankens likviditet, men denne krise indtraf først i september 2008. Til oplysningen om, at Person A den 19. juni 2008 over for bestyrelsesformand Person B har refereret vidnet for direkte at have givet udtryk for, at Blad B var på rette vej, forklarede vidnet, at han ikke husker at have udtalt sig således.

**Procedure**

Parterne har for landsretten gentaget deres anbringender for byretten og har procederet i overensstemmelse hermed.

**Landsrettens begrundelse og resultat**

*To af de voterende (Tuk Bagger og Louise Saul) udtaler:*

Den vedtagne strategi for 2008-10 indebar en reduktion i omkostningsniveauet, og annonceindtægterne syntes at være stigende i foråret 2008. Blandt andet disse forhold medvirkede til, at kontrolbudgettet pr. maj 2008 udviste et underskud på 375.000 kr., hvilket var væsentligt lavere end budgetteret i februar 2008. Endvidere kunne Fond Bs meddelelse af 17. juni 2008 læses, som den blev læst af direktør Person A og videregivet til bestyrelsen, som et tilsagn om fondsstøttemidler. Vi finder det ikke af afgørende betydning, om det kan lægges til grund, at de 2 mio. kr. fra Fond B ville indgå med det fulde beløb.

Herefter og af de grunde, der i øvrigt er anført i dommen, tiltræder vi, at det ikke er godtgjort, at de indstævnte senest ved udgangen af marts 2008 burde have indset, at en videreførelse var håbløs og ikke ville medføre tab for kreditorerne, herunder SKAT.

Vi tiltræder derfor, at såvel direktør Person A som bestyrelsen og revisor er frifundet.

*En af de voterende (K. Wiingaard) udtaler:*

Efter strategiskiftet i 2006 oparbejdede Fonden betydelige underskud, der pr. 31. december 2007 udgjorde 7.903.293 kr. Egenkapitalen var tabt i august 2007 og ved årsskiftet negativ med 2.844.000 kr. Under bestyrelsesmødet den 20. september 2007 opsummerede formanden, at Fonden havde tre handlemuligheder: Fusion med Fond C, satspuljemidler og eventuelt salg til andre fonde eller kommercielle aktører. Anmodningen om fusion blev ikke imødekommet, der blev ikke ført forhandlinger om salg før betalingsstandsningen, og i februar 2008 fik Fonden afslag på at modtage satspuljemidler.

Ifølge en ny strategi ultimo februar 2008 skulle Fonden koncentrere sig om udviklingsprojekter og effektivisering af oplag og distribution mv. Som effektivisering blev

gratisoplaget skåret væk, og det abonnementsfinansierede oplag blev nedsat drastisk. En så fuldstændig omlægning måtte imidlertid realistisk forventes at ville få en væsentlig negativ økonomisk betydning, især for annoncesalget. Virkningen indtraf da også snart efter.

Fondens muligheder afhang af en positiv vurdering af udviklingsprojekterne. Fonden havde i 2007 modtaget 1,4 mio. kr. i støtte – mod budgetteret 6,4 mio. – men i en meget lang periode var der ikke opnået fondsmidler. I februar 2008 fik Fonden afslag på at modtage en større støtte til projektet "Projekt A". Det er forklaret, at der var arbejdet grundigt og gennem en lang periode med de mindre, men mere lønsomme projekter, som Fonden ifølge den nye strategi skulle søge om støtte til. Der var på dette grundlag almindelige forventninger om kommende fondsbevillinger. Efter det foreliggende var der dog ikke den konkrete udsigt hertil, som i betragtning af situationens alvor var nødvendig, og som i givet fald ville give Fonden mulighed for i tide at rette op på underskuddet og den negative egenkapital. Der kan ikke lægges vægt på, hvorvidt Fonden senere, den 17. juni 2008, fik tildelt 2 mio. kr. fra Fond B.

Den 5. marts 2008 nægtede Fondens bankforbindelse at udvide kreditten.

Fonden var som hidtil insufficient, og likviditeten var fortsat meget presset. Budgettet ville efter en realistisk vurdering klart ikke kunne overholdes. Der forelå ingen reelle, konkrete holdepunkter for, at virksomheden havde mulighed for at overleve, og at videreførelse var mulig uden tab.

Det fremgår af lov om erhvervsdrivende fonde § 25, at bestyrelsen og direktionen forestår ledelse af en erhvervsdrivende fonds virksomhed. Efter § 46, stk. 1, jf. § 44, stk. 1, er bestyrelsesmedlemmer og direktører erstatningsansvarlige for skade, de under udførelsen af deres hverv forsætligt eller uagtsomt har tilføjet kreditorer.

Direktør Person A skulle i henhold til lovens § 25, stk. 2, varetage den daglige ledelse af fonden. Jeg finder, at han burde have indset, at Fonden ikke ville være i stand til at betale forfaldne A-skatter, AM- bidrag samt moms. Han har handlet uforsvarligt ved at fortsætte driften trods den manglende afregning. Han har derfor pådraget sig erstatningsansvar over for SKAT.

Bestyrelsesmedlemmerne, de indstævnte 2) – 8), skulle i henhold til lovens § 25, stk. 3, påse, at formueforvaltningen blev kontrolleret på en efter fondens forhold tilfredsstillende måde. Det fremgår klart af bestyrelsesmødereferaterne, at bestyrelsen var bekendt med situationen, herunder at egenkapitalen var negativ fra august 2007. Den burde have sikret sig, at der løbende tilgik den oplysninger om Fondens likviditet og stiftelse af ny gæld. Bestyrelsesmedlemmerne handlede uforsvarligt ved at lade driften fortsætte uden den lovbestemte kontrol, hvilket førte til, at de ikke blev informeret om den manglende afregning af skatter og afgifter. Det svigtende tilsyn har pådraget dem erstatningsansvar over for SKAT.

Jeg stemmer for at anse Person A og de indstævnte 2) – 8) som erstatningsansvar- lige for det tab, de har påført SKAT. Efter resultatet af stemmeafgivningen tager jeg ikke stilling til spørgsmålene om tabets størrelse og om regres over for statsautoriseret revisor Person I.

Efter resultatet af stemmeafgivningen stadfæstes frifindelserne.

*Samtlige voterede udtaler angående spørgsmålet om sagsomkostninger:*

Sagen blev af SKAT oprindelig anlagt med krav om betaling af cirka 1 mio. kr., og kravet blev først umiddelbart før hovedforhandlingen reduceret til de cirka 600.000 kr. Når endvidere henses til, at arbejdet med sagen har været omfattende, finder landsretten, at omkostningsbeløbene for så vidt angår bestyrelsesmedlemmerne bør forhøjes, således, at SKAT til hver af dem skal betale sagsomkostninger for byretten med 50.000 kr. inkl. moms.

SKAT skal endvidere betale sagsomkostninger for landsretten til Person A med 70.000 kr. og til Person B, Person C, Person D, Person E, Person F, Person G og Person H med 50.000 kr. til hver især. Beløbene omfatter udgifter til advokatbistand inkl. moms.

Person B, Person C, Person D, Person E, Person F, Person G og Person H skal in solidum betale sagsomkostnin-

ger for landsretten til statsautoriseret revisor Person I med 55.000 kr. Beløbet omfatter udgifter til advokatbistand.

Landsretten har ved fastsættelsen af sagsomkostningerne lagt vægt på sagens værdi og omfang, herunder hovedforhandlingens varighed.

T h i   k e n d e s   f o r   r e t :

Byrettens dom stadfæstes med den ændring, at SKAT til Person B, Person C, Person D, Person E, Person F, Person G og Person H hver især skal betale sagsomkostninger med 50.000 kr.

I sagsomkostninger for landsretten skal SKAT betale 70.000 kr. til Person A og 50.000 kr. til Person B, Person C, Person D, Person E, Person F, Person G og Person H hver især.

I sagsomkostninger for landsretten skal Person B, Person C, Person D, Person E, Person F, Person G og Person H in solidum betale 55.000 kr. til statsautoriseret revisor Person I.

Det idømte skal betales inden 14 dage efter denne doms afsigelse.

Sagsomkostningerne forrentes efter rentelovens § 8 a.

**(Sign.)**

___ ___ ___

**Udskriftens rigtighed bekræftes. Østre Landsret, den**