# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to 1:18-CV-05053-LAK. | MASTER DOCKET<br><br>Case No. 1:18-MD-02865-LAK<br><br>**Jury Trial Demanded** |

**DEFENDANTS THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN'S AND SHELDON GOLDSTEIN'S AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS AGAINST SKATTEFORVALTNINGEN AND AMENDED THIRD-PARTY COMPLAINT AGAINST ED&F MAN CAPITAL MARKETS, LTD. AND JOHN DOES 1–10**

Defendants the Goldstein Law Group PC 401(K) Profit Sharing Plan (the "Plan") and Sheldon Goldstein (collectively, the "Goldstein Parties"), by their attorneys Gusrae Kaplan Nusbaum PLLC, answer the complaint (the "Complaint") as follows:

## GENERAL DENIAL

The Complaint contains allegations that pertain to the conduct of other unnamed entities that applied for Danish tax refunds.[1] Unless otherwise expressly admitted or denied, the Goldstein Parties deny such allegations because they lack knowledge or information sufficient to form a belief regarding the truth of these allegations. No answer is required to these allegations or other allegations that pertain to Danish withholding tax

[1] The Complaint contains allegations referring to conduct of unnamed entities, referred to in the Complaint as "claimants," that purportedly submitted fraudulent applications for repayment of taxes withheld from dividends paid on shares of Danish companies. Compl. ¶¶ 4–7; 9; 11; 23–24; 26–28; 32–36; 39; 41–45.

or the Danish Withholding Tax Act Convention and Protocol between the United States and Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, U.S.–Den., art. ¶¶ 10(3)(c), 22(2)(e), May 6, 1948, S. Treaty Doc. No. 106-12 (effective date Jan. 1, 2001) (the "Double-Taxation Treaty"), which call for legal conclusions.

**SPECIFIC RESPONSES**

1. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 1.

2. Paragraph 2 asserts legal conclusions to which no response is required. To the extent that a response is required, Paragraph 2 is denied.

3. Paragraph 3 asserts legal conclusions to which no response is required. To the extent that a response is required, Paragraph 3 is denied.

4. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 4, except deny the allegations to the extent they purport to implicate the Goldstein Parties in wrongful conduct.

5. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 5, except deny the allegations that the Plan knowingly submitted fraudulent requests for tax refunds to Plaintiff Skatteforvaltningen ("SKAT").

6. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 6, except deny the allegations to the extent they purport to implicate the Goldstein Parties in wrongful conduct.

7. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 7, except deny the allegations to the extent they purport to implicate the Goldstein Parties in wrongful conduct.

8. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 8, except aver that Plaintiff has wrongfully withheld no less than DKK 1,080,000 to which the Goldstein Parties are rightfully entitled, as detailed infra in the Goldstein Parties' Counterclaims.

9. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 9, except deny the allegations to the extent they purport to implicate the Goldstein Parties in wrongful conduct.

10. The Goldstein Parties deny the allegations of Paragraph 10.

11. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 11, except deny the allegations to the extent they purport to implicate the Goldstein Parties in wrongful conduct.

12. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 12.

13. The Goldstein Parties deny the allegations of Paragraph 13.

14. The Goldstein Parties admit the allegations of Paragraph 14.

15. The Goldstein Parties admit the allegations of Paragraph 15.

16. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 16.

17. The Goldstein Parties admit the allegations of Paragraph 17, except deny the allegations to the extent that they suggest that the Plan was not a bona fide trust forming part of a pension plan qualified and exempt from taxation under the U.S. Internal Revenue Code and resident of the United States of America for purposes of U.S. taxation. The Plan is, indeed, a bona fide trust forming part of a pension plan qualified under Section 401(a) of the U.S. Internal Revenue Code, exempt from taxation under Section 501(a) of the U.S. Internal Revenue Code, and resident of the United States of America for purposes of U.S. taxation.

18. The Goldstein Parties admit the allegations of Paragraph 18.

19. Paragraph 19 asserts legal conclusions to which no response is required. To the extent that a response is required, the Goldstein Parties admit the allegations of Paragraph 19.

20. Paragraph 20 asserts legal conclusions to which no response is required. To the extent that a response is required, the Goldstein Parties admit the allegations of Paragraph 20.

21. Paragraph 21 asserts legal conclusions to which no response is required. To the extent that a response is required, the Goldstein Parties admit the allegations of Paragraph 21.

22. Paragraph 22 asserts legal conclusions to which no response is required. To the extent that a response is required, the Goldstein Parties admit the allegations of Paragraph 22.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 5 of 67

23. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 23, except deny the allegations to the extent that they suggest that the Goldstein Parties did not actually own the relevant shares giving rise to the claims filed with SKAT. The Goldstein Parties only knowingly submitted refund claims for taxes paid on shares that the Goldstein Parties owned at the time of the relevant dividends.

24. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 24, except aver that the Goldstein Parties purchased the relevant shares and applied for the concomitant tax refunds in reliance on SKAT's "normal practice [of] accept[ing] claims from designated payment agents and[] transmit[ting] refunds to claimants through their designated payment agents."

25. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 25, except deny the allegations to the extent they purport to implicate the Goldstein Parties in wrongful conduct.

26. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 26, except deny the allegations to the extent they purport to implicate the Goldstein Parties in wrongful conduct.

27. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 27, except deny the allegations to the extent they purport to implicate the Goldstein Parties in wrongful conduct.

28. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 28, except admit that the Goldstein Parties submitted to SKAT similar documentation of the Plan's ownership of shares and payment of tax on dividends when applying for tax refunds.

29. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 29.

30. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 30, except aver that the Plan purchased the relevant shares and applied for the concomitant tax refunds in reliance on SKAT's "practice to pay claims that included the required supporting documentation."

31. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 31, except admit that SKAT properly refunded the Plan for eight of the nine refund claims that the Plan made to SKAT.

32. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 32.

33. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 33 of the Complaint, except admit that the Plan made nine withholding tax refund claims to SKAT through its reclaim agent, Goal Taxback Ltd. ("Goal").

34. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 34 of the Complaint, except deny

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 7 of 67

that the Goldstein Parties knowingly made any "fraudulent claims" to SKAT; admit that the Plan "represented that Goldstein was its Authorized Representative and agent who had authority to act on its behalf with respect to Defendant Goldstein Law Plan's claims;" and deny any implication that such representation was false.

35. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 35 of the Complaint, except deny that the Goldstein Parties knowingly made any "fraudulent claims" to SKAT; admit that the Plan "represented that non-party Goal was its agent and had authority to act on its behalf with respect to its claims;" and deny any implication that such representation was false.

36. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of Paragraph 36, except admit that the Plan made nine separate withholding tax refund claims totaling approximately DKK 11,343,510 on or around March 26, 2014; April 4, 2014; May 2, 2014; May 6, 2014; December 10, 2014; March 3, 2015; March 4, 2015; March 26, 2015; and August 10, 2015; and deny any implication that any claim made by the Goldstein Parties was fraudulent or otherwise knowingly or intentionally wrongful.

37. The Goldstein Parties deny the allegations of Paragraph 37.

38. The Goldstein Parties deny the allegations of Paragraph 38. The Goldstein Parties admit that the Plan received refund payments from SKAT on or around April 30, 2014; May 2, 2014; January 20, 2015; and May 18, 2015.

39. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of Paragraph 39, except admit that the Plan granted Goal authority to submit refund claims to SKAT on the Plan's behalf.

40. Paragraph 40 purports to summarize a document that speaks for itself. To the extent that a response is required, the Goldstein Parties admit the allegations of Paragraph 40.

41. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 41, except deny that the Goldstein Parties ever knowingly directed anyone to submit fraudulent withholding tax refund claims.

42. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of Paragraph 42, except admit that the Plan authorized Goal to submit tax refund claims on its behalf, and deny any implication that they ever knowingly authorized anyone to submit fraudulent claims on their behalf.

43. Paragraph 43 purports to summarize documents that speak for themselves. To the extent that a response is required, the Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of Paragraph 43, except admit that Goal submitted cover letters attaching documentation similar to that summarized in Paragraph 28.

44. Paragraph 44 purports to summarize documents that speak for themselves. To the extent that a response is required, the Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 9 of 67

44, except admit that Goal submitted cover letters attaching documentation similar to that summarized in Paragraph 28.

45. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 45, except admit that the Plan received proceeds from eight of the refund claims submitted to SKAT, and deny that said claims were knowingly fraudulent or that the Goldstein Parties were "participants in the fraud."

46. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 46, except admit that tax vouchers reflecting the Plan's ownership of the relevant shares were prepared by ED&F Man Capital Markets, Ltd. and submitted with each refund claim to SKAT.

47. Paragraph 47 purports to summarize a document that speaks for itself. To the extent that a response is required, the Goldstein Parties admit the allegations of Paragraph 47.

48. The Goldstein Parties deny the allegations of Paragraph 48.

49. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 49, except deny that any refund claims submitted by the Plan were knowingly fraudulent, and admit that SKAT refused to refund the Plan for one of its claims and demanded repayment of the refunds SKAT had already paid to the Plan.

## CAUSES OF ACTION

### COUNT I
### (Fraud – Against both Defendants)

50. In response to Paragraph 50, the Goldstein Parties repeat and reallege their foregoing responses as if fully set forth herein.

51. The Goldstein Parties deny the allegations of Paragraph 51.

52. The Goldstein Parties deny the allegations of Paragraph 52.

53. The Goldstein Parties deny the allegations of Paragraph 53.

54. The Goldstein Parties deny the allegations of Paragraph 54.

### COUNT II
### (Aiding and Abetting Fraud – Against both Defendants)

55. In response to Paragraph 55, the Goldstein Parties repeat and reallege their foregoing responses as if fully set forth herein.

56. The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations in paragraph 56 of the Complaint, except deny any implication that the Goldstein Parties knowingly perpetrated, indirectly or directly, any fraud on SKAT.

57. The Goldstein Parties deny the allegations of Paragraph 57.

58. The Goldstein Parties deny the allegations of Paragraph 58.

59. The Goldstein Parties deny the allegations of Paragraph 59.

60. The Goldstein Parties deny the allegations of Paragraph 60.

61. The Goldstein Parties deny the allegations of Paragraph 61.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 11 of 67

**COUNT III**
**(Payment by Mistake – Against Both Defendants)**

62. In response to Paragraph 62, the Goldstein Parties repeat and reallege their foregoing responses as if fully set forth herein.

63. The Goldstein Parties deny the allegations of Paragraph 63.

64. The Goldstein Parties deny the allegations of Paragraph 64.

65. The Goldstein Parties deny the allegations of Paragraph 65.

66. The Goldstein Parties deny the allegations of Paragraph 66.

67. The Goldstein Parties deny the allegations of Paragraph 67.

**COUNT IV**
**(Unjust Enrichment – Against both Defendants)**

68. In response to Paragraph 68, the Goldstein Parties repeat and reallege their foregoing responses as if fully set forth herein.

69. The Goldstein Parties deny the allegations of Paragraph 69

70. The Goldstein Parties deny the allegations of Paragraph 70.

71. The Goldstein Parties deny the allegations of Paragraph 71.

72. The Goldstein Parties deny the allegations of Paragraph 72.

**COUNT V**
**(Money Had and Received – Against Both Defendants)**

73. In response to Paragraph 73, the Goldstein Parties repeat and reallege their foregoing responses as if fully set forth herein.

74. The Goldstein Parties deny the allegations of Paragraph 74.

75. The Goldstein Parties deny the allegations of Paragraph 75.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 12 of 67

**COUNT VI**
**(Negligent Misrepresentation – Against Both Defendants)**

76. In response to Paragraph 76, the Goldstein Parties repeat and reallege their foregoing responses as if fully set forth herein.

77. The Goldstein Parties deny the allegations of Paragraph 77.

78. The Goldstein Parties deny the allegations of Paragraph 78.

79. The Goldstein Parties deny the allegations of Paragraph 79.

80. The Goldstein Parties deny the allegations of Paragraph 80.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

81. The Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

82. Plaintiff's claims are barred, in whole or in part, under the doctrines of laches, waiver, and/or ratification.

### THIRD AFFIRMATIVE DEFENSE

83. Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to join necessary and indispensable parties.

### FOURTH AFFIRMATIVE DEFENSE

84. Plaintiff's claims are barred, in whole or in part, because any and all losses sustained were due to Plaintiff's own acts and/or omissions.

**FIFTH AFFIRMATIVE DEFENSE**

85. Plaintiff's claims are barred, in whole or in part, under the doctrines of accord and satisfaction.

**SIXTH AFFIRMATIVE DEFENSE**

86. Plaintiff's claims are barred, in whole or in part, under the doctrine of estoppel.

**SEVENTH AFFIRMATIVE DEFENSE**

87. Plaintiff's claims for equitable relief are barred, in whole or in part, by the doctrine of unclean hands and Plaintiff's bad faith in initiating its suit in this jurisdiction while, upon information and belief, Plaintiff is simultaneously pursuing remedies for the same allegations contained in the Complaint in foreign jurisdictions and referring the same and / or similar allegations contained in the Complaint to other agencies in other jurisdictions for identical and / or substantially similar relief.

**EIGHTH AFFIRMATIVE DEFENSE**

88. Plaintiff's claim for unjust enrichment seeks to recover damages that Plaintiff is not entitled to recover in this case and award of the judgment sought by Plaintiff would unjustly enrich Plaintiff.

**NINTH AFFIRMATIVE DEFENSE**

89. Defendant reserves the right to add additional Affirmative Defenses as may become apparent during the course of this litigation.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 14 of 67

## DEFENSES

### FIRST DEFENSE

90. Plaintiff's claims are barred as the Goldstein Parties did not knowingly participate in any fraudulent scheme or other wrongful conduct. Demonstrative of the lack of any wrongful conduct by the Goldstein Parties are, inter alia, the following:

**a.** All transactions in Danish securities were arranged and executed by ED&F Man Capital Markets Ltd. ("ED&F Man" or the "Brokerage"), a registered broker–dealer subject to the rule of law governing broker–dealers in the United Kingdom, which issued various confirmations and written verifications of the transactions for the Plan;

**b.** In the United States, the use of derivative securities and other arbitrage strategies is legal and routine in securities markets;

**c.** Neither of the Goldstein Parties had any control over ED&F Man's internal procedures nor was in any way, directly or indirectly, involved in the custody and control of the Danish securities that the Plan transacted in its brokerage account at ED&F Man. The Goldstein Parties relied on the excellent reputation of ED&F Man and the laws of the United Kingdom and United States and had no reason to believe that ED&F Man would inaccurately represent the Plan's ownership of the relevant Danish securities or payment of the relevant Danish taxes. The course of activity relating to the trading and arbitrage activity in the Plan's ED&F Man account was similar to various arbitrage strategies developed and used in the United States securities markets.

### SECOND DEFENSE

91. The claims are barred, in whole or in part, because at all times the Goldstein Parties acted with reasonable care with respect to the matters alleged in the Complaint, including, but not limited to, those matters represented in the Plan's applications claiming repayment of tax withheld on dividends earned on shares of Danish companies (the "Reclaim Applications"). Relying on ED&F Man's compliance with U.K. laws and

regulations, the Goldstein Parties had reasonable grounds to believe, and did believe, that the Reclaim Applications were true.

**THIRD DEFENSE**

92. Plaintiff's claims are barred, in whole or in part, because neither of the Goldstein Parties acted to induce any act or acts alleged in the Complaint to constitute any fraud.

**FOURTH DEFENSE**

93. The Goldstein Parties hereby reserve and assert all defenses and affirmative defenses available under any applicable federal or state law. The Goldstein Parties have insufficient knowledge or information upon which to form a belief regarding whether they may have available other defenses or affirmative defenses. The Goldstein Parties reserve their right to assert any additional defenses or affirmative defenses that discovery indicates may be appropriate.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 16 of 67

## COUNTERCLAIMS AGAINST SKATTEFORVALTNINGEN AND THIRD-PARTY CLAIMS AGAINST ED&F MAN CAPITAL MARKETS, LTD. AND JOHN DOES 1–10

As and for their counterclaims against SKAT and third-party claims against ED&F Man and John Does 1–10, the Goldstein Parties respectfully allege:

94. This action is one of hundreds filed by SKAT throughout the United States, consolidated for pre-trial purposes into this multi-district litigation in the Southern District of New York (the "MDL").

95. SKAT alleges that the MDL defendants engaged in a scheme to wrongfully obtain tax refunds from SKAT by falsely representing that (a) they owned shares in Danish companies and received dividends issued by them, (b) the issuer had withheld Danish taxes on the dividends received by the MDL defendants, and (c) as tax-exempt entities, the MDL defendants were entitled to refunds pursuant to the Double-Taxation Treaty. See Dkt. 37, Transfer Order, In re: Customs and Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Scheme Litigation, 18-md-2865 (Oct. 3, 2018); see also, e.g., Compl. ¶¶ 3–4, 22 n.2, 37.

96. SKAT's counsel has told the Court that SKAT believes that U.K. national Sanjay Shah is the "mastermind" of the alleged fraudulent scheme set forth in the Complaint (the "Shah Scheme").

97. SKAT has repeated the Shah-centric theory in other jurisdictions, including in the High Court of Justice, Business and Property Courts of England and Wales, Commercial Court, where it has sued Mr. Shah and ED&F Man, among other parties (the "English Action").

98. SKAT has not, however, alleged any connection between the Goldstein Parties and the Shah Scheme.

99. The Goldstein Parties have no commonality with or connection to the Shah Scheme's "mastermind," Mr. Shah's allegedly-numerous accomplices, the overwhelming majority of MDL defendants, or the SKAT employee sentenced to six years in Danish prison for stealing millions from SKAT.

100. Neither the Plan nor Mr. Goldstein has ever attempted to defraud SKAT.

101. Mr. Goldstein is 81 years old and worked in Manhattan as a securities lawyer for decades before retiring approximately ten years ago.

102. In 1998, Mr. Goldstein founded non-party the Goldstein Law Group PC, which was the successor to law firms formed and managed by Mr. Goldstein since 1980.

103. Each of Mr. Goldstein's law firms really existed: they had real offices, real employees, real payrolls, real benefit plans, and real clients.

104. The Goldstein Plan is a bona fide pension plan, established in 1999 to safeguard firm personnel's retirement savings and other investments.

105. All of the Plan's transactions at issue in this case were solicited, arranged, funded, and executed by third-party defendant ED&F Man, with which the Plan had a brokerage account from 2012 to 2019.

106. In 2012, ED&F Man's equity finance personnel (the "Equity Finance Desk") solicited the Plan to open a brokerage account for the purpose of engaging in dividend arbitrage transactions.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 18 of 67

107. Upon information and belief, the Plan's citizenship and status as a U.S. tax-exempt entity caused ED&F Man to solicit and pursue the Plan's business.

108. As detailed infra, the Equity Finance Desk's business model revolved around soliciting, structuring, funding, clearing, and executing European and cross-border transactions for American investors.

109. Indeed, each and every contract that the Plan executed with ED&F Man expressly left open the possibility that the Plan would hale ED&F Man into American courts.

110. Those forum non-selection clauses were commercially reasonable and logical: the Brokerage's entire business model demands its purposeful availment of New York.

111. ED&F Man's promotional materials, including its website, emphasizes its access to "all U.S. equity and options markets," which are centered in Manhattan.

112. ED&F Man also advertises that it has co-location facilities—essentially, on-site servers that facilitate faster securities trading—at the New York Mercantile Exchange in Brookfield Place, the Intercontinental Exchange on Wall Street, and BrokerTec, which is across the street from Bryant Park.

113. Furthermore, instead of requiring its U.S. clients to open English bank accounts, ED&F Man regularly deposits into and withdraws from its clients' U.S. accounts.

114. For example, ED&F Man transferred money to and from the Plan via a National Financial Services brokerage account located at J.P. Morgan Chase at One Chase Plaza, New York, New York 10005.

115. Because the New York-based Plan was a U.S. nonprofit entity exempt from taxation, ED&F Man promised that in exchange for the Plan's business (and significant fees for facilitating the dividend arbitrage proceeds), ED&F Man would (1) through the Plan's Authorized Agent,[2] bring dividend arbitrage opportunities to the Plan; (2) structure, facilitate, and fund the Plan's pre-dividend purchases of securities in a manner that would entitle the Plan to tax-free dividends; and (3) create the certifications of securities ownership and dividend receipts necessary for the Plan to apply for the tax refunds.

116. In soliciting the Plan to open an account and engage ED&F Man to arrange and execute dividend arbitrage trading, ED&F Man directly and indirectly reassured the Plan that such activity was wholly proper and, through simultaneous hedges, posed minimal market risk.

117. To enable tax-exempt clients like the Plan to engage in dividend arbitrage, ED&F Man provided securities lending and financing.

118. In doing so, the Equity Finance Desk earned millions of dollars for ED&F Man, ED&F Man's affiliates, and the Desk's personnel.

---

[2] All communications between ED&F Man and the Plan were conducted via the Plan's authorized agent, Acer Investment Group, LLC (the "Authorized Agent").

119. Beginning in 2013, ED&F Man introduced the Plan to the Danish securities transactions that gave rise to the Plan's nine tax refund applications to SKAT (the "Danish Transactions").

120. ED&F Man solicited the Plan because it needed the Plan and similarly-situated clients to effectuate the Danish Transactions: without U.S.-based tax-exempt pension plans, there was no party that could be entitled to Double-Taxation Treaty dividend refunds.

121. ED&F Man solicited the Plan to engage in the Danish Transactions, arranged and executed all of the Transactions, and provided trade confirmations reflecting the Plan's purchases of the securities and receipts of the ensuing dividends.

122. After the dividends issued, ED&F Man prepared "Tax Vouchers" identifying the Plan's New York residency and certifying that the Plan had "[held]" the securities over the dividend dates, received the dividends net withholding, and "suffered" the withheld Danish taxes.

123. ED&F Man then sent the Tax Vouchers directly to Goal, the tax reclaim agent that ED&F Man had recommended and introduced to the Plan.

124. Throughout their relationship with the Brokerage, the Goldstein Parties reasonably relied on ED&F Man's strong reputation and 230-year history to trust that all activity in the Plan's account was lawful.

125. The Goldstein Parties also trusted the veracity of the years of steady communications and hundreds of trade documents and account statements that ED&F Man created for and provided to the Plan.

126. Most relevant to this action, the Goldstein Parties trusted that ED&F Man actually arranged and executed all of the Danish Transactions that gave rise to the Tax Vouchers.

127. After all, dividend arbitrage was the fundamental purpose of the parties' relationship, and there could be no dividend arbitrage unless ED&F Man actually facilitated those Transactions and created truthful Tax Vouchers.

128. In September 2018, SKAT sued ED&F Man in the English Action for tortiously creating and issuing the Tax Vouchers.

129. After SKAT initiated this action in June 2018, and even after the Goldstein Parties filed their initial amended complaint and third-party claims against ED&F Man, the Brokerage continued to reassure the Goldstein Parties that the Plan's Danish Transactions and Tax Vouchers had been proper.

130. But in September 2019, ED&F Man filed an amended answer in the English Action (the "Amended English Answer") and admitted that at least four of the nine Tax Vouchers it created for the Plan's submission to SKAT were false (the "Disavowed Vouchers"). Amended Defence of ED&F Man Capital Markets Ltd., Annex E, SKAT v. ED&F Man Capital Markets Ltd. et al., Nos. CL-2018-000297, CL-2018000590 (Sept. 6, 2019) (the "Amended English Answer").

131. A true and correct copy of the Amended English Answer is annexed hereto as Exhibit A.

132. True and correct copies of the four Disavowed Vouchers are annexed hereto as Exhibits B (TDC), C (Danske Bank), D (Novo Nordisk), and E (D/S Norden).

133. ED&F Man has refused to explain why—five years after the trades occurred, and nearly two years after SKAT sued the Brokerage in England—it now says that the Disavowed Vouchers were improper.

134. ED&F Man also has refused to explain whether and how the Transactions underlying the Disavowed Vouchers differed from the Plan's remaining five Danish Transactions.

135. But considering that ED&F Man created an entirely separate list of Tax Vouchers that were wrongful because ED&F had incorrectly calculated the refunds due, it is safe to assume that the Disavowed Vouchers' flaws are not merely arithmetic. Compare Amended English Answer Annex A and Annex E.

136. Subsequent investigation has revealed that ED&F Man defrauded the Goldstein Parties.

137. As it admitted by disavowing the Vouchers, ED&F Man falsely certified that the Plan had received dividends net of withholding.

138. ED&F Man then compounded its wrongful conduct by issuing the Disavowed Vouchers to Goal with the intention and expectation that Goal would send them to SKAT.

139. Once SKAT processed the Reclaim Applications—whose linchpins were the false Tax Vouchers—it remitted the refunds to an ED&F Man account, and ED&F allocated the appropriate amounts to the Plan.

140. ED&F Man then charged the Plan fees that amounted to a significant amount of the tax refunds.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 23 of 67

141. In other words, ED&F created and issued fraudulent Tax Vouchers to SKAT, and then reaped the rewards.

142. Upon information and belief, ED&F Man fabricated trading records to give the false impression that the dividends' issuers had paid the Plan the net dividends underlying the Disavowed Vouchers.

143. Furthermore, despite legal and contractual obligations to the contrary, ED&F Man failed to disclose that after it solicited the Plan to engage in the Danish Transactions, it surreptitiously caused the Plan to trade with, from, and through ED&F Man affiliates.

144. In reality, ED&F Man's recent admissions suggest that it solicited and structured at least four of the nine Danish Transactions in order to create the mere appearance of legitimacy, instead of ensuring that the Plan actually had received the net dividends from the issuer.

145. Now, ED&F Man is attempting to cover its tracks: it closed the Equity Finance Desk, fired all of Equity Finance personnel, and forced its European CEO to "resign" just two weeks before it filed the Amended English Answer and admitted that dozens of the Tax Vouchers are baseless.

146. Consequently, the Goldstein Parties implead ED&F Man, which had sole responsibility for, unique knowledge of, and actively committed the misconduct SKAT has alleged against the Goldstein Parties.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 24 of 67

**The Parties**

147. Defendant–Counterclaim-Plaintiff–Third-Party Plaintiff the Goldstein Law Group PC 401(K) Profit Sharing Plan (the "Plan") is a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the United States Internal Revenue Code, exempt from taxation under section 501(a) of the United States Internal Revenue Code, and resident of the United States of America for purposes of U.S. taxation.

148. While the Plan's current address is 6179 Seascape Terrace, Boynton Beach, Florida 33437, at all times relevant to this Complaint, the Plan was located at 61 Broadway, New York, New York 10006.

149. All of the correspondence and contracts between ED&F Man and the Plan are addressed to the Plan's Manhattan address.

150. At all times relevant to the Complaint, Defendant–Counterclaim-Plaintiff – Third-Party Plaintiff Sheldon Goldstein was a participant in the Plan. Mr. Goldstein served as a trustee for the Plan at all relevant times.

151. Plaintiff–Counterclaim-Defendant SKAT purports to be the Danish national agency charged with assessing and collecting taxes.

152. Third-Party Defendant ED&F Man is headquartered at 3 London Bridge Street, London, SE1 9SG United Kingdom, and is authorized and regulated by the United Kingdom Financial Conduct Authority ("FCA") and registered in England.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 25 of 67

153. ED&F Man is a wholly-owned subsidiary of non-party ED&F Man Holdings Ltd. ("Holdings"), which advertises itself as an "agricultural commodities merchant with 7,000 people in 60 countries."

154. In the English Action, ED&F Man pleaded that it is a global financial brokerage business authorized by the FCA to provide, inter alia, (1) specialized securities lending and financing services, (2) clearing and settlement for equities and fixed-income securities, and (3) custodian services for exchange-traded and over-the-counter transactions.

155. SKAT has not sued ED&F Man or any of its affiliates in the United States.

**Jurisdiction**

156. These counter- and third-party claims arise from the facts and circumstances relating to the transactions set forth in the Complaint filed by SKAT.

157. As conceded in SKAT's Complaint, this Court has jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1332(a)(4) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because it is between U.S. citizens and a foreign State.

158. This Court also has jurisdiction over this matter as the Goldstein Parties assert a third-party claim for securities fraud arising under the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (the "Exchange Act"), specifically the action for fraud prohibited by 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder.

159. This Court has jurisdiction over the remaining third-party claims pursuant to 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000, exclusive of

interest and costs, and because it is between citizens of the United States and subjects of a foreign State.

160. This Court may exercise specific jurisdiction over U.K.-domiciled ED&F Man pursuant to N.Y. C.P.L.R. § 302(a)(3) because ED&F Man's fraud, securities fraud, breach of fiduciary duty, and negligence caused injury to New York people and property, including the Goldstein Parties.

161. This Court also may exercise specific jurisdiction over ED&F Man pursuant to N.Y. C.P.L.R. § 302(a)(1) because the Goldstein Parties' third-party claims arise from New York business transacted by ED&F Man.

162. As detailed infra, this Court has jurisdiction over ED&F Man because it solicited and executed contracts with the New York-based Plan; solicited the Plan to engage in the Danish Transactions; arranged and executed the Danish Transactions; created fraudulent Tax Vouchers; and, knowing that the Plan was domiciled in New York, defrauded the Plan and breached its contractual and fiduciary duties in connection with the Danish Transactions.

163. Exercising personal jurisdiction over ED&F Man also is appropriate because it arranged and executed the Danish transactions for at least 31 U.S. pension plans sued by SKAT in this MDL: three domiciled in New Jersey, three in the Southern District of New York, two in Connecticut, 15 in the Eastern District of Kentucky, one in the Eastern District of Pennsylvania, one in the Northern District of Illinois, and six in the Central District of Utah.

164. SKAT alleges that ED&F Man created dozens of fraudulent Tax Vouchers that caused it to pay out hundreds of millions of dollars in unjustified tax refunds.

165. In the Amended English Answer, ED&F Man, itself, admitted that it created and issued approximately 80 wrongful Tax Vouchers for U.S. pension plans that caused SKAT to pay out tens of millions of dollars.

166. These Counterclaims and Third-Party Claims are properly venued in this Court because their facts and circumstances arise out of the same transactions that are the subject of the Complaint initiated by SKAT in this District.

167. These Counterclaims and Third-Party Claims also are properly venued in this Court because the facts and circumstances relating to the claims occurred in part in this District.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 28 of 67

## COUNTER-STATEMENT OF FACTS

### ED&F Man's Core Dividend Arbitrage Business Depended Upon Targeting U.S. Tax-Exempt Entities

168. For the purposes of this litigation, "dividend arbitrage" is the practice of tax-exempt entities purchasing securities in order to receive the full benefit of the dividends.

169. Dividend arbitrage is designed to generate profit where the security's purchaser will be entitled to net more of the dividend than the security's seller would have been able to.

170. As early as 2008, the U.S. Senate recognized that as a condition of business, New York-based institutional investors demand that brokerages offer dividend arbitrage.

171. To do so, brokerages must match their for-profit clients with tax-exempt purchasers.

172. Here, the Plan was an ideal Danish dividend arbitrageur for ED&F Man.

173. By prohibiting Denmark from taxing Danish dividends paid to U.S. pension plans, the Double-Taxation Treaty creates an opportunity for dividend arbitrage.

174. Unlike with American securities, where the dividend recipient is responsible for reporting and remitting taxes, Danish issuers must withhold tax when they pay out dividends and pay these withheld sums to the Danish government.

175. To receive Danish dividend tax refunds, tax-exempt entities like the Plan must submit Reclaim Applications to SKAT.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 29 of 67

176. If not for SKAT's promise to refund dividend taxes to U.S. pensions, the Plan would never have invested in the Danish companies, let alone paid taxes on the resulting dividends.

177. Indeed, as a general matter, it would have made no sense for the non-profit, U.S.-tax-exempt Plan to purchase stock that would incur a 27% Danish dividend tax, particularly when the United States has taxation treaties with over 60 other countries.

178. Until August 2015, so long as the Reclaim Applications included the necessary documents and properly calculated the amounts due, SKAT promptly remitted the refunds.

**The Goldstein Parties Had No Reason to Doubt the Reclaim Applications' Validity**

179. Relying on ED&F Man's compliance with all applicable laws and regulations, the Plan agreed to open a Brokerage account and participate in the nine Danish Transactions.

180. ED&F Man solicited, structured, and executed the Danish Transactions so the Plan could apply for tax refunds on dividends issued by (1) TDC Group on March 7, 2014; (2) Danske Bank on March 24, 2014; (3) Novo Nordisk on March 26, 2014; (4) D/S Norden on April 29, 2014; (5) Coloplast on December 9, 2014; (6) Novozymes on March 2, 2015; (7) Danske Bank on March 23, 2015; (8) Novo Nordisk on March 24, 2015; and (9) TDC Group on August 12, 2015.

181. ED&F Man purports to explain the mechanics of these transactions in the Amended English Answer. See generally Amended English Answer ¶¶ 10.2–10.5.

182. ED&F Man claims that when it became aware of a Danish issuer's intent to issue dividends, ED&F Man would solicit a U.S. pension plan client and, after ascertaining the plan's interest, acquire the security.

183. Then, ED&F Man would sell the security to the U.S. tax-exempt pension plan while simultaneously hedging the transaction.

184. ED&F Man says that at the time the dividend issued, the Brokerage would hold the securities as a bare trustee on behalf of the plan in the plan's ED&F Man custody account in accordance with a custody agreement and a security and set-off deed.

185. Once the Danish company paid the dividend net of withholding into a general ED&F Man account, the Brokerage would credit the relevant amount to a U.S. plan's brokerage account.

186. ED&F Man then would prepare a Tax Voucher and, in the case of the Plan's Reclaim Applications, submit it to the Plan's reclaim agent Goal, which ED&F Man had introduced to the Plan.

187. After receiving ED&F Man's Tax Voucher, Goal would compile the Reclaim Application and submit it to SKAT.

188. SKAT generally would process the Reclaim Application within a few weeks of receipt and refund the withheld tax to Goal, which, after deducting its own fees, transferred the balance to ED&F Man.

189. ED&F Man would then credit the remaining refund to the pension plan's brokerage account.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 31 of 67

190. ED&F Man also would charge the plan additional fees for providing the dividend arbitrage opportunity and facilitating the transaction.

191. ED&F Man purports to have followed this process for each of the Danish Transactions.

192. Indeed, an ED&F Man-created general ledger purporting to reflect all nine Danish Transactions suggests that for each and every Reclaim Application submitted to SKAT, the Plan (a) owned the relevant shares on their respective record dates and (b) was paid the dividends, minus Danish taxes (the "General Ledger").

193. At all relevant times herein, the Goldstein Parties had no reason to doubt the communications that ED&F Man made or transaction confirmations, Tax Vouchers, General Ledger or the other documents that ED&F Man prepared in connection with the Danish Transactions.

**SKAT Had No Particularized Basis to Reject the Plan's Ninth Reclaim Application**

194. SKAT issued refunds to the Plan for the first eight dividends.

195. But after SKAT paid those eight refunds, it began publicly claiming that Mr. Shah "masterminded" a scheme whereby foreign pension plans would fraudulently submit refund claims.

196. Soon thereafter, SKAT denied the Plan's Reclaim Application for the August 2015 TDC Group dividend.

197. On August 26, 2015, SKAT revealed that a "foreign authority" had notified SKAT of the allegations underlying this MDL and that SKAT had reported those

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 32 of 67

allegations to the Danish Public Prosecutor for Serious Economic and International Crime ("SØIK").

198. Since then, SKAT has argued that one individual, Dubai-based and U.K.-born Sanjay Shah, is the "mastermind" of the allegedly-fraudulent Shah Scheme.[3]

199. In England, SKAT alleged that Mr. Shah perpetrated the scheme through entities he controlled, including several that SKAT has discussed in its MDL complaints: Old Park Lane Capital Ltd., Salgado Capital, Solo Capital Partners LLP, Syntax GIS Ltd., Telesto Markets LLP, and West Point Derivatives Ltd. (the "Shah Entities").

200. SKAT alleges connections to the Shah Entities in 154 of its 183 MDL complaints.

201. But SKAT has never alleged that the Goldstein Parties are connected to Mr. Shah or his Entities.

202. Upon information and belief, SKAT has never identified any connection between the Goldstein Parties and Mr. Shah or the Shah Entities.

203. Indeed, the Goldstein Parties are fundamentally different from the Shah Entities and the vast majority of this MDL's defendants.

204. SKAT's own allegations reveal that the Goldstein Parties simply are not part of the Shah Scheme.

---

[3] See generally Transcript of Record, In re SKAT Tax Refund Scheme Litig., 18-cv-4047 (June 26, 2018); see also, e.g., Compl. ¶¶ 2, 3, 5, 25.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 33 of 67

205. For example, while a total of seven people served as the authorized representatives for 157 of the 183 MDL plan defendants, Mr. Goldstein only represented the Plan.

206. While the average MDL plan defendant submitted approximately 14 Reclaim Applications, the Plan submitted only nine.

207. While SKAT alleges an average of more than $5.8 million in damages per complaint, it only alleges $1.49 million against the Plan.

208. And while SKAT alleges that the majority of the MDL plan defendants were formed shortly before they began submitting Danish reclaim applications, the Goldstein Plan existed for 15 years before it filed its first Reclaim Application.

209. The Goldstein Parties simply bear none of the many indicia of fraud that SKAT alleges.

**SKAT'S Deficient Refund Processes Cannot Justify Its Breaches of the Double-Taxation Treaty**

210. Upon information and belief, SKAT failed to review the specific facts and circumstances relating to the Danish Transactions before it denied the Plan's ninth refund and haled the Goldstein Parties into this Court.

211. In August 2016, Denmark's tax minister announced that the country would budget billions of kroner to implement a new information technology infrastructure and hire 2000 new employees by 2020.

212. He did so because of public outrage over SKAT's many flagrant missteps.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 34 of 67

213. Throughout the relevant time period, SKAT entrusted just one man, Sven Nielsen, with processing all tax refund applications.

214. But SKAT failed to provide Mr. Nielsen with the necessary tools to examine whether a pension plan had actually owned the shares it claimed to own or had actually received the net dividends.

215. Instead, Mr. Nielsen merely checked whether applications included the necessary documents and had properly calculated refunds.

216. Mr. Nielsen's former supervisor, who had raised concerns about application processing for years before her 2013 retirement, told The New York Times that "[Mr. Nielsen's] job was reduced to bookkeeping, essentially, checking if a form was filled out properly. A monkey could do it."

217. Furthermore, as early as 2011, SKAT suspected Mr. Nielsen of stealing $5.7 million from SKAT.

218. However, SKAT did not fire Mr. Nielsen until 2015, after Danish police raided his home in connection with the Shah Scheme.

219. Moreover, Mr. Nielsen had at least one personal contact with Mr. Shah.

220. The founder of Syntax, whom SKAT alleges to be an accomplice of Mr. Shah, requested to meet and struck up a friendship with Mr. Nielsen immediately after he founded Syntax.

221. At those meetings, Mr. Nielsen freely explained exactly how to submit reclaim applications.

222. Shortly thereafter, the founder sold Syntax to Mr. Shah.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 35 of 67

223. SKAT has alleged that Syntax facilitated fraudulent refunds in approximately 40% of the cases consolidated in this MDL.

224. A Danish court has convicted Mr. Nielsen of defrauding SKAT and sentenced him to six years in prison.

225. In 2017, Denmark revealed that it would close SKAT entirely and divide its responsibilities among seven new authorities.

226. The tax minister justified the reforms to Denmark's oldest continuously-operating newspaper, Berlingske: "[I[nstead of using money on patching up a SKAT that doesn't deliver, or if we are being completely honest has never really functioned, we should just completely stop SKAT from existing."

227. The tax minister also proclaimed that Denmark "will fight for every single nickel that was taken from the treasury."

228. Consequently, SKAT not only reported the allegedly-criminal conduct to SØIK, but also filed the dozens of lawsuits in this MDL.

229. Yet several years and hundreds of lawsuits later, SKAT still lacks the tools to determine whether any given applicant did own particular Danish securities on record dates or did receive dividends, net of withheld tax.

**ED&F Man Solicited, Structured, Funded, Executed, and Cleared the Plan's Nine Danish Transactions**

230. Neither the Plan nor Mr. Goldstein has ever attempted to defraud or otherwise harm SKAT.

231. ED&F Man is solely responsible for any irregularities with the Plan's Danish Transactions and Tax Vouchers.

232. ED&F Man's Equity Finance Desk created and managed the Plan's Danish Transactions.

233. While "equity finance" is a broad term, financial institutions' equity finance departments generally specialize in securities lending and financing.

234. Historically, ED&F Man did not offer equity finance services.

235. Instead, the Holdings subsidiary was well-regarded for providing futures and options that complemented its parent company's core business: soft commodities like coffee, molasses, and sugar.

236. In late 2011 and early 2012, ED&F Man expanded into equity finance by hiring dozens of executives, traders, and other brokerage personnel from MF Global, whose Manhattan-based parent company had just filed for bankruptcy.

237. ED&F Man and its New York-based affiliate hired over 150 former MF Global traders from MF Global's general brokerage unit.

238. MF Global existed to structure, clear, and settle European transactions on behalf of its parent company's American clients.

239. MF Global's business had been particularly dependent on dividend arbitrage and had frequently clashed with its New York-based risk managers.

240. Many of the Plan's direct ED&F Man contacts were former MF Global employees.

241. They continued to specialize in dividend arbitrage for American clients when they joined ED&F Man.

242. For example, ED&F Man European CEO Stephen Hawksworth, who personally signed all four custody fee letters relating to the Disavowed Vouchers, had been MF Global's London Head of Equities and Fixed Income.

243. In early 2012, ED&F Man induced the Plan to open an account by promising that the Brokerage would find, structure, arrange, finance, and execute dividend arbitrage opportunities for the Plan.

244. The parties memorialized their understanding in several agreements, including a (1) Custody Agreement, (2) Security and Set-Off Deed, and (3) Letter Agreement dated June 21, 2012. Each agreement is annexed hereto as Exhibits F, G, and H, respectively.

245. In or around late 2013, ED&F Man solicited the Plan to engage in Danish dividend arbitrage transactions.

246. ED&F Man explained that because clients like the Plan were exempt from the 27% Danish dividend tax, ED&F Man could arrange transactions whereby the clients would purchase Danish securities before the issuance of a dividend and be entitled to 100% of the dividend, instead of 73%.

247. ED&F Man further explained that it would structure the transactions so they would be risk-free for its tax-exempt clients.

248. In exchange for facilitating these transactions, ED&F Man charged fees that amount to a significant amount of the dividend arbitrage "profits" it purported to generate for the Plan.

249. As discussed supra, when it did purportedly conduct the Danish Transactions, ED&F Man told the Plan that it (1) paid for a given security on behalf of the Plan, (2) debited the Plan's brokerage account for that sum, (3) sold or loaned the security on behalf of the Plan, and (4) credited the Plan's brokerage account accordingly.

250. In doing so, ED&F Man created situations whereby the dividend's recipient would be a U.S. pension plan that would be entitled to 100% of the dividend, instead of a non-tax-exempt client, such as a U.S. hedge fund, that would receive only 73% of the dividend.

251. To actually receive the 27% refund, tax-exempt dividend recipients needed to submit the Reclaim Applications.

252. To facilitate the submission of these Applications, ED&F Man prepared and issued the Tax Vouchers, which certified to SKAT that the pension plans (1) "[held]" the security "over the dividend date," (2) had received the specified amount of money in dividends from the issuer, and (3) had "suffered' the specified Danish withholding tax.

253. In exchange for recommending, creating, financing, and structuring the transactions and preparing the Tax Vouchers, ED&F Man charged large fees.

254. ED&F Man documented the fees underlying each Disavowed Voucher in custody fee letters signed by European CEO Steve Hawksworth and addressed to the Plan at its Manhattan address. True and correct copies of these custody fee letters are annexed hereto as Exhibits I (TDC), J (Danske Bank), K (Novo Nordisk), and L (D/S Norden).

255. From 2012 to 2015, ED&F Man solicited, recommended, structured, created, and executed similar Danish dividend transactions for at least 36 U.S. pension plan clients.

256. In connection with those transactions, ED&F Man created for submission to SKAT at least 420 Tax Vouchers certifying its clients' receipt of dividends net withholding.

257. SKAT has sued at least 31 ED&F Man pension plan clients in this MDL.

258. SKAT alleges that at least 397 of the fraudulent Tax Vouchers involved in this MDL were created by ED&F Man.

259. ED&F Man needed U.S. pension plans like the Plan to execute the dividend tax arbitrage strategies: without tax-exempt dividend recipients, there could be no "extra" 27% profit to be paid out pursuant to the Double-Taxation Treaty.

**ED&F Man Recently Admitted that it Created and Issued Baseless Tax Vouchers**

260. From 2012 to 2019, the Goldstein Parties trusted ED&F Man's repeated and explicit assurances that the Danish Transactions were legal and appropriate and that all documents that ED&F Man had prepared for the Plan were accurate and trustworthy.

261. Even after SKAT sued the Goldstein Parties and ED&F Man, ED&F Man reiterated that the Plan's Danish Transactions were legitimate and documented properly.

262. Indeed, both at the time of the Danish Transactions and after SKAT initiated this lawsuit, ED&F Man provided the Plan with dozens of documents, including trade confirmations and account statements, that facially support ED&F Man's assurances that the trades were proper.

263. However, ED&F Man's 2019 behavior and statements increasingly have suggested that the Brokerage defrauded the Plan and its agents.

264. In early 2019, the Equity Finance personnel who had serviced the Plan began resigning from ED&F Man.

265. On April 3, 2019, ED&F Man announced that it was closing the Equity Finance Desk.

266. On April 23, 2019, out of an abundance of caution, the Goldstein Parties filed the third-party complaint against ED&F Man, alleging breach-of-contract essentially as indemnification: if SKAT was right, and something was wrong, that wrongdoing was ED&F Man's fault.

267. On May 22, 2019, ED&F Man sent the Plan a termination notice that it would close the Plan's account effective June 21, 2019.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 41 of 67

268. Thereafter, ED&F Man continued to reassure the Goldstein Parties that the Plan's Danish securities trading and documentation were legal and accurate.

269. The remaining Equity Finance traders' FCA registrations terminated on July 31, 2019.

270. On or around August 20, 2019, ED&F Man's European CEO, Mr. Hawksworth, quietly resigned—effective immediately.

271. Just two weeks later, ED&F Man filed the Amended English Answer and admitted—for the very first time—that 80 of the Tax Vouchers it had prepared for submission to SKAT had falsely certified its clients' receipt of the Danish dividends and "suffering" of the Danish taxes.

272. Four of those false Tax Vouchers were the Disavowed Vouchers that ED&F Man created for the Plan: those relating to the (1) March 2014 TDC Group, (2) March 2014 Danske Bank, (3) March 2014 Novo Nordisk, and (4) April 2014 D/S Norden dividends (the "Spring 2014 Transactions"). See Amended English Answer Annex E.

273. ED&F Man did not warn the Plan that it had determined that the Disavowed Vouchers were wrongful.

274. In fact, ED&F Man never directly notified the Plan, at all.

275. Instead, on September 27, 2019, ED&F Man filed a letter with this Court to "apprise[]" the court of its "most recent pleadings." See Dkt. 202 (Sept. 27, 2019).

276. Despite multiple inquiries from the Goldstein Parties, ED&F Man has refused to explain why it now admits that the Disavowed Vouchers are false.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 42 of 67

277. Among other failures of explanation, ED&F Man has not explained how the Plan owned the securities, yet did not actually receive the dividends, net of withholding.

278. Furthermore, ED&F Man has refused to explain how the Spring 2014 Transactions differ from the other five that it arranged for the Plan.

279. ED&F Man also has refused to explain why the Plan should trust that the remaining five transactions are legitimate.

280. On its face, the Amended English Answer suggests that ED&F Man disavowed the Spring 2014 Transactions because, contrary to the confirmations and other documents that ED&F Man prepared for and communications made to the Plan and SKAT, the Plan did not actually receive the dividends from the issuers and thus had not been entitled to tax refunds. See Amended English Answer Annex E.

281. Instead, ED&F Man created the mere illusion of the Plan's receipt of the dividends, manipulating the Spring 2014 Transactions' underlying records in order to create legal fictions whereby multiple entities simultaneously "owned" the shares.

**ED&F Man Failed to Disclose Affiliate Trading**

282. One way that ED&F Man was able to manipulate those records was by trading with its Switzerland- and Dubai-based affiliates—without ever disclosing its self-dealing to the Goldstein Parties.

283. ED&F Man failed to disclose to the Goldstein Parties that the Plan bought all of the Spring 2014 Transactions' securities from its affiliate Volcafe Ltd. ("Volcafe"), Holdings's Switzerland-based coffee-trading unit.

284. Upon information and belief, ED&F Man did not purchase the remaining five Danish Transactions' securities directly from Volcafe.

285. In connection with the Spring 2014 Transactions, ED&F Man typically would contact the Authorized Agent by phone or text message to present the trading opportunity.

286. If the Plan was interested in that particular security, ED&F Man instructed the Plan to email an explicit order to buy the Danish securities.

287. In each of the Spring 2014 Transactions, ED&F Man also instructed the Plan to explicitly request settlement on a T+4 basis.

288. For example, in April 2014, ED&F Man approached the Plan with the opportunity to invest in D/S Norden.

289. ED&F Man had told the Plan to express interest by emailing an order for the desired number of shares and request T+4 settlement.

290. When ED&F Man received the Plan's written D/S Norden order, ED&F Man purchased the D/S Norden shares from Volcafe and then sold the shares to the Plan.

291. ED&F Man also arranged for Volcafe to purchase those same shares from affiliate ED&F Man Professional Trading Dubai ("ED&F Dubai").

292. Despite numerous legal, regulatory, and contractual obligations to the contrary, ED&F Man never disclosed the affiliate transactions to the Plan.

293. Upon information and belief, ED&F Man solicited the Plan to engage in the 2014 trades for its own and its affiliates'—including Volcafe's, ED&F Dubai's, and Holdings's—profit.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 44 of 67

294. Volcafe, founded in 1851, became one of the world's largest coffee traders before being acquired by ED&F Man in 2004.

295. Volcafe trades raw coffee beans and purports to provide coffee beans for up to 50 billion cups of coffee per year.

296. Upon information and belief, Volcafe supplied the financing of the Plan's purchases and was the source of the securities for all of the Spring 2014 Transactions.

297. Upon information and belief, due to the seasonal nature of its business, Volcafe periodically has large amounts of unused cash.

298. Upon information and belief, ED&F Man and its affiliates hatched a plan to maximize Volcafe's returns on its cash reserves by involving Volcafe in the dividend arbitrage business.

299. In 2014 and 2015, the London Interbank Offering Rate ("LIBOR") was a benchmark interest rate that purported to represent the rates of interest at which banks would lend cash to each other.

300. LIBOR was at historically low rates in 2014 and 2015:

| **Year** | **U.S.D. Three-Month LIBOR** |
|---|---|
| 2006 | 5.198% |
| 2014 | .234% |
| 2015 | .316% |
| 2018 | 2.307% |

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 45 of 67

301. Lending cash and securities to ED&F Man clients allowed Volcafe to amass profits and revenue significantly higher than prevailing market interest rates.

302. Upon information and belief, ED&F Man and its affiliates compensated each other via internal debits and credits for soliciting, structuring, and executing the Danish dividend arbitrage transactions.

303. In doing so, Volcafe and its affiliates, including ED&F Man and ED&F Dubai, were able to extract profits from the Plan significantly higher than the prevailing market interest rates that ED&F Man and its affiliates would have earned on their cash balances.

304. ED&F Man's failures to disclose its material transactions with affiliates violate the federal securities laws and ED&F Man's own contracts with the Plan.

305. Upon information and belief, ED&F Man's trading with its affiliates also caused the Disavowed Vouchers to be wrongful: ED&F Man has only rejected the Transactions it conducted with Volcafe.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 46 of 67

**ED&F Man Structured the Spring 2014 Transactions to Fake the Disavowed Vouchers' Legitimacy**

306. ED&F Man's fundamental "business strategy" appears to have required the Brokerage to create artificial tax certifications to paper up fraudulent Reclaim Applications.

307. In each of the Spring 2014 Tax Vouchers, ED&F Man purported to certify the Plan's (1) "ownership of the[] security over the dividend date," (2) dividend payments that the Plan had received from the issuer, and (3) Danish tax that had been withheld on the dividend, which the Plan would seek to recover via the Reclaim Application.

308. As the entire point of the parties' relationship was to engage in dividend arbitrage trading, and certification from ED&F Man was necessary for the Plan to apply for Danish tax refunds, ED&F Man's creation and submission of accurate Tax Vouchers was fundamental not only to the parties' relationship, but also to each of the four Spring 2014 Transactions.

309. In the Amended English Answer, ED&F Man admitted, for the very first time, that the Disavowed Vouchers were "inaccurate" insofar that the Plan had not actually (1) received the dividend net of withholding or (2) "suffered" the withholding tax.

310. These admissions contradict all of the relevant statements and documents that ED&F Man has issued to the Plan.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 47 of 67

311. For example, ED&F Man memorialized each of the Spring 2014 Transactions with custody fee letters sent from ED&F Man European CEO Steve Hawksworth to the Plan at its Manhattan address.

312. Each of those letters referred to the Custody Agreement between the parties and stated that ED&F Man had provided "custodian and related services" "in connection with [ED&F Man] entering into with, or arranging for [the Plan] [ . . . ] the specific transaction in respect of[] shares in the capital of" each of the Spring 2014 Transaction securities: TDC, Danske Bank, Novo Nordisk, and D/S Norden.

313. As discussed supra, each of those "custodian and related services" necessarily included ED&F Man's creation of accurate Tax Vouchers for submission to SKAT.

314. But ED&F Man has now admitted that it made at least two material misstatements in each Disavowed Voucher: (1) the dividend amount that the Plan had "received," and (2) the withheld tax that the Plan had "suffered."

315. ED&F Man's refusal to explain how it came to issue the 80 incorrect vouchers—at least 160 materially false statements—suggests that its misstatements were intentional and systemic, not accidental or casual.

316. The fact that the European CEO personally signed the Spring 2014 Transactions' custody letters further suggests that something is amiss.

317. ED&F Man's signatory on each of the Spring 2014 Transaction custody letters was its European CEO, Steve Hawksworth.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 48 of 67

318. Mr. Hawksworth did not personally sign any of the Plan's other, numerous agreements with ED&F Man. See generally, e.g., Custody Agreement; Security and Set-Off Deed.

319. Throughout the relevant time period, ED&F Man continued MF Global's business strategy of focusing on dividend arbitrage and clearing and settling European transaction for primarily U.S. based clients.

320. Upon information and belief, Mr. Hawksworth and his team devised and implemented similar trading strategies at MF Global before its liquidation.

321. In late 2011 and early 2012, ED&F Man recruited the MF Global traders with the goal of moving beyond soft commodities trading to offer a wider variety of securities services demanded by sophistical institutional investors.

322. The Brokerage simply could not compete with top-tier financial services firms unless it offered complex cross-border tax solutions under one roof.

323. To fulfill its end of the bargain, the MF Global personnel needed to bring not only those institutional investors, but also the tax-exempt clients necessary to profit from dividend arbitrage.

324. Upon information and belief, the Plan was one of hundreds of U.S. clients that MF Global personnel brought to ED&F Man.

325. In 2014, ED&F Man posted profits of $17 million.

326. In 2015, however, ED&F Man made just $2.8 million.

327. ED&F Man issued 77 of the 80 Disavowed Vouchers in 2014.

328. While ED&F Man secured all of the Spring 2014 Transactions' securities from Volcafe, the Goldstein Parties have seen no indication that Volcafe participated in the Plan's other five Danish Transactions.

329. And while Mr. Hawksworth personally signed all four Spring 2014 Transactions' custody letters, upon information and belief, he is not a signatory on any other document with the Plan.

330. The Spring 2014 Transactions were not careless mistakes; they were intrinsic to ED&F Man's fundamental business model.

331. There is no reason why the Spring 2014 Transactions could not have been conducted in a legal manner: ED&F Man simply could have ensured that the Plan owned the securities on record date and actually received the net dividends, instead of creating illusory transactions.

332. But instead of explaining the Danish Transactions to the Plan—which ED&F Man has had the legal, contractual, and fiduciary duty to do—ED&F Man shut down the Equity Finance Desk entirely and, over the course of approximately six months, terminated the employment of each and every one of the Plan's contacts on the Danish Transactions.

333. Given ED&F Man's continual evasions to its clients and the English court, it is, for the moment, impossible to tell whether the Plan's remaining five transactions and concomitant Tax Vouchers were legitimate and qualified for Danish refunds.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 50 of 67

## COUNTERCLAIMS

### COUNTERCLAIM COUNT I
**(Declaratory Judgment that Decisions of this Court are Binding on SKAT and Estop SKAT from any other Efforts Outside this Jurisdiction to Obtain Remedies Arising out of or Relating to the Transactions in this Complaint)**

334. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

335. This is a counterclaim for judgment declaring that this Court's decisions in this action arising out of the transactions set forth in the Complaint are binding on SKAT in all jurisdictions and venues, including other U.S. courts and arbitrations, Danish administrative proceedings and/or investigations, Danish court actions, and any and all others.

336. This Court "may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

337. "The intent [of the Declaratory Judgment Act] is to allow a party to be free from the whim of its opponent in deciding when to resolve the legal dispute between them." Great Am. Ins. Co. v. Houston Gen. Ins. Co., 735 F. Supp. 581, 585 (S.D.N.Y. 1990).

338. SKAT voluntarily availed itself of this Court's jurisdiction.

339. SKAT alleges that the Goldstein Parties engaged in fraud in connection with applications for tax dividend reimbursement in connection with the Danish Transactions.

340. Concurrently with this litigation, SKAT is pursuing multiple actions and investigations against the Goldstein Parties arising out of the same transactions in Denmark and, upon information and belief, other jurisdictions.

341. The Goldstein Parties will suffer substantial harm if SKAT pursues multiple actions against them, prosecuting the exact same conduct across multiple jurisdictions and venues.

342. Moreover, SKAT's pursuit of the same causes of action against the Goldstein Parties across multiple jurisdictions and venues gives rise to the likelihood of conflicting outcomes, which will only exacerbate the disputes between the parties.

**COUNTERCLAIM COUNT II**
**(Preliminary and Permanent Injunctive Relief)**

343. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

344. By pursuing its claims in multiple jurisdictions, SKAT has forced the Goldstein Parties to expend significant resources in defending the exact same conduct under different substantive and procedural laws in multiple jurisdictions.

345. SKAT's actions also threaten conflicting outcomes that will only exacerbate and prolong the parties' disputes.

346. The Goldstein Parties will continue to suffer substantial harm if SKAT pursues these foreign actions while prosecuting its claims before this Court.

347. Therefore, the Goldstein Parties respectfully request that this Court issue preliminary and permanent injunctions prohibiting SKAT from taking any action that

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 52 of 67

would impair or otherwise impact matters that SKAT has submitted for determination to this Court.

**COUNTERCLAIM COUNT III**
**(Recovery of Denied Claim)**

348. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

349. Although the Plan had nothing to do with Mr. Shah, SKAT refused to pay a refund due to the Plan in the amount of DKK 1,080,000 for a TDC Group dividend issued on August 10, 2015.

350. On or about June 10, 2015, the Plan purchased four million shares of TDC Group.

351. TDC Group's record date for determining payment to shareholders of its August 11, 2015 dividend was August 10, 2015.

352. The Plan owned four million shares of TDC Group on August 10, 2015.

353. On or around August 12, 2015, Plan received the TDC Group dividend payment, minus the Danish tax withheld.

354. Thereafter, the Plan submitted an application for tax dividend reimbursement of DKK 1,080,000, along with the necessary documentation to establish ownership of shares of TDC Group.

355. Despite rejecting the Disavowed Vouchers, ED&F Man continues to stand by the Tax Voucher it issued for this Transaction. See, e.g., Amended English Answer ¶ 4.2.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 53 of 67

356. The amount SKAT owes to the Plan as a result of the improper denial of this Reclaim Application is no less than DKK 1,080,000 (which as of April 8, 2019 is approximately USD 162,951.48), excluding interest and costs.

**COUNTERCLAIM COUNT IV**
**(Promissory Estoppel)**

357. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

358. Upon information and belief, for years, SKAT refunded Danish tax paid to all U.S. pension plans that submit the documentation requested by SKAT.

359. In reliance on SKAT's practice of paying all properly-documented claims, the Plan purchased shares of the Danish companies delineated supra in order to receive dividends from those companies.

360. In reliance on SKAT's practice of paying all properly-documented claims, the Plan submitted the nine Reclaim Applications to SKAT.

361. But for SKAT's practice of paying all properly-documented claims, the Plan never would have invested in those Danish companies, let alone paid Danish tax on their dividends.

362. Indeed, as a non-profit pension plan, the Plan was exempt from all income tax levied by the United States and various countries with which the United States has tax treaties, including Denmark.

363. Thus, SKAT is estopped from demanding that the Plan pay Danish income tax on the dividends.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 54 of 67

364. The amount owed to the Plan as a result of the improper denial of its application is no less than DKK 1,080,000 (which as of April 8, 2019 is approximately USD 162,951.48), excluding interest and costs.

## THIRD-PARTY CLAIMS

### THIRD-PARTY CLAIM COUNT I
### (Section 10(b) / Rule 10b-5 Securities Fraud – Against ED&F Man and John Does 1–10

365. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

366. Throughout the Plan's brokerage relationship with ED&F Man, ED&F Man purchased and sold securities on behalf of the Plan.

367. The Plan reasonably relied on ED&F Man's assurances of propriety and its status as a FCA-licensed broker-dealer and as a fiduciary to the Plan.

368. In connection with the Plan's purchase and sale of securities, ED&F Man knowingly, intentionally, and / or recklessly failed to disclose material facts necessary to make ED&F Man's statements not misleading, including, among others, failing to disclose the affiliate relationship between ED&F Man and Volcafe; that pricing for the transactions was pre-arranged among ED&F Man and its affiliates; and that on at least four occasions, the Plan did not hold the Danish Transactions' securities on record date in the manner required for ED&F Man to properly create and issue the Tax Vouchers for Goal to submit to SKAT on behalf of the Plan.

369. ED&F Man repeatedly failed to disclose facts material to the Plan's investment decisions, including the conflicts of interest detailed above.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 55 of 67

370. ED&F Man charged the Plan numerous undisclosed and / or unexplained fees in connection with its transactions that ED&F Man caused the Plan to engage in, purportedly for the Plan's own benefit.

371. In admitting the falsity of the Disavowed Vouchers, ED&F Man necessarily also has admitted that numerous other documents for and communications with the Plan were false, including the trading records and account statements that suggested that the Plan had actually received net dividends on the Spring 2014 Transactions and "suffered" the Danish taxes.

372. Simply put, despite its duties to the contrary, ED&F Man made the Plan subservient to its own activities and control thereof.

373. John Does 1–10 aided, abetted, facilitated, and / conspired with ED&F Man to perpetrate this wrongful activity.

374. ED&F Man's and / or John Does 1–10's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder have damaged the Goldstein Parties in an amount to be revealed during discovery and proven at trial.

**THIRD-PARTY CLAIM COUNT II**
**(Common-Law Fraud – Against ED&F Man)**

375. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

376. The Goldstein Parties reject SKAT's allegations that they knowingly defrauded or otherwise unlawfully obtained tax refunds from SKAT.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 56 of 67

377. However, if any of the Plan's Reclaim Applications were improper, ED&F Man is responsible.

378. ED&F Man directly and indirectly solicited the Goldstein Parties to engage in and then executed the Danish Transactions.

379. ED&F Man caused the Goldstein Parties to believe that Reclaim Applications were only submitted for taxes (a) the Plan actually paid to Denmark (b) on dividends the Plan actually received (c) on stock the Plan actually owned (d) on the dates necessary to be paid those dividends.

380. The Goldstein Parties' reliance on those representations set forth in the Reclaim Applications and submitted to SKAT via the Tax Vouchers was reasonable.

381. If these representations were false, ED&F Man has demonstrated a high degree of moral turpitude and wanton dishonesty, entitling the Goldstein Parties to (a) full compensation for any remedies the Goldstein Parties are found to owe SKAT, (b) reimbursement of all costs and fees without limitation, including legal fees, and (c) punitive damages.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 57 of 67

**THIRD-PARTY CLAIM COUNT III**
**(Negligence – Against ED&F Man)**

382. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

383. ED&F Man had a duty to provide only truthful information regarding the transactions it performed on behalf of the Plan.

384. ED&F Man has admitted that at least four of the Tax Vouchers it created for submission to SKAT were false.

385. By admitting that these Tax Vouchers were false, ED&F Man has also admitted that the trading confirmations, account documents, and communications it created and made to the Goldstein Parties regarding the Disavowed Vouchers' transactions also are false.

386. In issuing these false statements and documents, ED&F Man breached its duties of care.

387. Upon information and belief, the circumstances that caused ED&F Man to issue these false documents show that ED&F Man was negligent in structuring, funding, arranging, clearing, and executing the Danish Transactions, as well.

388. ED&F Man's negligence entitles the Goldstein Parties to (a) full compensation for any remedies the Goldstein Parties are found to owe SKAT and (b) compensation for additional damages to the Goldstein Parties.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 58 of 67

**THIRD-PARTY CLAIM COUNT IV**
**(Breach of Contract – Against ED&F Man)**

389. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

390. In connection with opening the Plan's brokerage account, ED&F Man and the Plan entered into various agreements.

391. Pursuant to those agreements, ED&F Man agreed to create only truthful and accurate documents for the Goldstein Plan.

392. When ED&F Man created false, misleading, and/or inaccurate Tax Vouchers, it breached its agreements with the Plan.

393. The Goldstein Parties are entitled to (a) full compensation for any remedies the Goldstein Parties are found to owe SKAT, (b) reimbursement of all expenses and costs without limitation, including legal fees, and (c) punitive damages to the Goldstein Parties for subjecting them to and prolonging SKAT's prosecution in Denmark, the United States, and any other jurisdictions.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 59 of 67

**THIRD-PARTY CLAIM COUNT V**
**(Breach of the Covenant of Good Faith and Fair Dealing – Against ED&F Man)**

394. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

395. Any agreements between ED&F Man and the Goldstein Parties, including the brokerage agreements, carry covenants of good faith and fair dealing.

396. Regardless of the relevance of any explicit term of an agreement between ED&F Man and the Goldstein Parties, ED&F Man had a duty to create only truthful, accurate documents on behalf of the Goldstein Plan.

397. By creating and issuing the Disavowed Vouchers, ED&F Man breached its implied covenant(s) with the Goldstein Parties.

398. The Goldstein Parties are entitled to (a) full compensation for any remedies the Goldstein Parties are found to owe SKAT and all related costs thereto, (b) reimbursement of all expenses and costs, including legal fees, and (c) punitive damages.

**THIRD-PARTY CLAIM COUNT VI**
**(Breach of Contract – Against ED&F Man)**

399. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

400. Pursuant to the brokerage and other agreements between ED&F Man and the Goldstein Parties, ED&F Man agreed, inter alia, that it would only charge the Plan custodian fees for transactions that it actually facilitated on behalf of the Plan.

401. ED&F Man did, in fact, charge the Plan custodian fees in connection with arranging and executing the Danish Transactions.

402. If, as SKAT has alleged, the Plan did not actually own the shares and / or receive the net dividends giving rise to the nine Reclaim Applications, ED&F Man breached the agreements with the Plan by falsely reporting transactions to the Plan and charging custodian and other fees for transactions that ED&F Man never actually effected on behalf of the Plan.

403. In fact, ED&F Man already has admitted that the Plan did not receive the net dividends associated with the Spring 2014 Transactions.

404. Moreover, the General Ledger reflects dozens of other unexplained and undisclosed charges to the Plan, which include undisclosed charges paid to affiliates of ED&F Man.

405. If ED&F Man breached the contracts in this manner, the Goldstein Parties are entitled to (a) full compensation for any remedies the Goldstein Parties are found to owe SKAT and all related costs thereto, (b) reimbursement of all expenses and costs, including legal fees, and (c) punitive damages.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 61 of 67

**THIRD-PARTY CLAIM COUNT VII**
**(Breach of the Covenant of Good Faith and Fair Dealing – Against ED&F Man)**

406. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

407. ED&F Man induced the Goldstein Plan to execute brokerage agreements by, inter alia, promising to properly execute securities transactions on the Plan's behalf and bring sound investment opportunities to the Plan.

408. However, ED&F Man frustrated the purpose of the brokerage agreements by soliciting and facilitating the transactions underlying the Reclaim Applications, which ED&F Man knew or should have known were wrongful and subjected the Goldstein Parties to legal, financial, reputational, and other exposure that the Goldstein Parties could not have anticipated when the Plan entered into the brokerage agreements.

409. ED&F Man frustrated the purpose of the brokerage agreements between ED&F Man and the Plan by effectuating transactions in order to enrich itself and its affiliates at the Plan's expense.

410. Moreover, ED&F Man's creation of the false Tax Vouchers has exposed the Goldstein Parties to unjustifiable liabilities.

411. ED&F Man's breach of the covenant has harmed the Goldstein Parties in an amount no less than all money they have ever paid to ED&F Man, plus all damages, fees, and other expenditures the Goldstein Parties incur in connection with this litigation.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 62 of 67

**THIRD-PARTY CLAIM COUNT VIII**
**(Tortious Interference with Contract – Against John Does 1–10)**

412. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

413. Upon information and belief, John Does 1–10 caused ED&F Man to effect transactions for ED&F Man's and its affiliates' own benefit, at the Plan's expense.

414. Upon information and belief, John Does 1–10 also caused ED&F Man to hide the affiliate relationships and its payments thereto from the Goldstein Parties.

415. Upon information and belief, John Does 1–10 also caused ED&F Man to issue the Disavowed Vouchers.

416. Upon information and belief, this wrongful conduct has harmed the Goldstein Parties in an amount no less than all money they have ever paid to ED&F Man, plus all damages, fees, legal fees, and other expenditures the Goldstein Parties incur in connection with this litigation and related disputes.

**THIRD-PARTY CLAIM COUNT IX**
**(Breach of Fiduciary Duty by Charging Undisclosed Fees – Against ED&F Man)**

417. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

418. ED&F Man owed fiduciary duties to the Plan.

419. ED&F Man's fiduciary duties included the duty to only charge fees for transactions that it actually arranged, executed, and certified on the Plan's behalf.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 63 of 67

420. ED&F Man charged the Plan significant fees in connection with each of the nine Danish Transactions.

421. However, ED&F Man has now admitted that it behaved deficiently with regard to at least four of the nine Danish Transactions.

422. ED&F Man's charging and collection of fees in relation to the Disavowed Vouchers is wrongful and breaches numerous fiduciary and brokerage standards of conduct and duties owed to the Goldstein Parties.

423. ED&F Man's breaches of fiduciary and brokerage duties has damaged the Plan in an amount to be revealed during discovery and proven at trial.

**THIRD-PARTY CLAIM COUNT X**
**(Aiding and Abetting Breach of Fiduciary Duty – Against John Does 1–10)**

424. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

425. Upon information and belief, John Does 1–10 caused ED&F Man to charge and collect unauthorized fees relating to the Disavowed Vouchers.

426. In doing so, John Does 1–10 have damaged the Plan in an amount to be revealed during discovery and proven at trial.

**THIRD-PARTY CLAIM COUNT XI**
**(Breach of Fiduciary Duty by Self-Dealing – Against ED&F Man)**

427. The Goldstein Parties repeat the previous allegations as if fully set forth herein.

428. By its conduct, ED&F Man became a fiduciary to the Plan with all of the duties of a fiduciary.

429. ED&F Man's fiduciary duties included the duty not to engage in self-dealing with respect to the Goldstein Plan's assets.

430. However, ED&F Man did exactly that.

431. Upon information and belief, ED&F Man created, structured, and sold the Danish Dividend Transactions to the Plan with the primary motive of enriching ED&F Man entities, including, among others, ED&F Man and Volcafe.

432. In brokerage terms, ED&F Man's acts comprised the quintessential "solicited trade."

433. Upon information and belief, ED&F Man failed to explain material terms regarding these transactions, including that ED&F Man and its affiliates were benefiting directly and indirectly in fees ED&F Man charged to the Plan.

434. Upon information and belief, with regard to those transactions, ED&F Man was acting not only as the Plan's broker, but also in other, undisclosed capacities that conflicted with the Plan's interests.

435. ED&F Man never adequately disclosed that it was acting in various conflicting and undisclosed capacities in connection with the transactions.

436. ED&F Man's multiple roles in participating directly and / or indirectly in fees and charges presented multiple conflicts of interest.

437. In the English Action, ED&F Man has pleaded that it may be impossible for SKAT to recover because ED&F Man already compensated its personnel for the activity underlying SKAT's claims against it.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 65 of 67

438. Upon information and belief, ED&F Man and its affiliates paid bonuses to personnel for structuring and executing the Danish Transactions.

439. ED&F Man failed to adequately disclose its self-dealing.

440. The Plan never consented to ED&F Man's self-dealing.

441. ED&F Man's conflicts of interest in these transactions encouraged and caused it to overcharge the Goldstein Parties for transactions it performed with regard to the Goldstein Plan.

442. Upon information and belief, ED&F Man did overcharge the Plan throughout their relationship.

443. ED&F Man's self-dealing has damaged the Goldstein Parties in an amount to be revealed during discovery and proven at trial.

**THIRD-PARTY CLAIM COUNT XII**
**(Aiding and Abetting Breach of Fiduciary Duty – Against John Does 1–10)**

444. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

445. John Does 1–10 knew or should have known that ED&F Man owed fiduciary duties to the Plan.

446. Upon information and belief, John Does 1–10 incentivized ED&F Man to cause the Plan to trade with its affiliates without proper disclosure.

447. John Does 1–10's aiding and abetting of ED&F Man's breach of fiduciary duty has damaged Counterclaim–Plaintiffs in an amount to be revealed during discovery and proven at trial.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 66 of 67

WHEREFORE, for the reasons outlined above, Counterclaim–Plaintiffs request that this Court enter judgment in their favor as follows:

A. Deny SKAT all relief sought in its Complaint against the Goldstein Parties;

B. For Counterclaim Count I, SKAT is bound by the decisions of this Court relating to or arising out of the transactions and facts set forth in the Complaint against the Goldstein Parties in all other jurisdictions and venues;

C. For Counterclaim Count II, SKAT is preliminarily and permanently enjoined from pursuing actions in other jurisdictions arising out of the same transactions at issue in the Complaint;

D. For Counterclaim Counts III and IV, SKAT is liable to the Goldstein Parties for damages sustained by SKAT's wrongful conduct in refusing to reimburse the Plan in connection with the Plan's Reclaim on dividends received in the amount of DKK 1,822,230, plus pre- and post-judgment interests, fees, costs and expenses;

E. For Third-Party Claims I through IX and XI, ED&F Man is liable to the Goldstein Parties for all damages caused by ED&F Man's wrongful conduct;

F. For Third-Party Claims I, X, and XII, John Does 1–10 are liable to the Goldstein Parties for all damages caused by their inducement and facilitation of ED&F Man's wrongful conduct;

G. For all Counts, SKAT, ED&F Man and John Does 1–10 are jointly and severally liable for the costs of this action; and

H. For all Counts, SKAT, ED&F Man and John Does 1–10 are jointly and severally liable for all other and further relief that is just and proper.

Case 1:18-md-02865-LAK Document 219 Filed 11/05/19 Page 67 of 67

**JURY DEMAND**

The Goldstein Parties demand a jury trial on all issues so triable.

Respectfully submitted,

GUSRAE KAPLAN NUSBAUM PLLC

/s/ Martin H. Kaplan
Martin H. Kaplan
Kari Parks
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
mkaplan@gusraekaplan.com
kparks@gusraekaplan.com

*Counsel for Defendants–Counterclaim-Plaintiffs–Third-Party Plaintiffs The Goldstein Law Group PC 401(K) Profit Sharing Plan & Sheldon Goldstein*

Dated: November 5, 2019
New York, New York

# EXHIBIT A

HIGH COURT ROLLS BUILDING OF JUSTICE

**Amended by Order of The Honourable Mr Justice Teare dated 6 March 2019 (as varied by Order of The Honourable Mrs Justice Cockerill dated 20 May 2019)**

**Claim Nos.: CL-2018-000297; CL-2018-000404; CL-2018-000590**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT**
**B E T W E E N:**

**SKAT**
**(The Danish Customs and Tax Administration)**

**Claimant**

**- and -**

**ED&F MAN CAPITAL MARKETS LIMITED & OTHERS**

**Defendants**

---

# AMENDED DEFENCE

---

**[References to paragraph numbers and defined terms in this Amended Defence are (save where otherwise indicated) to paragraph numbers and defined terms in the Amended Particulars of Claim ("POC")]**

## OVERVIEW

1. This is the Amended Defence of the 69th Defendant, ED&F Man Capital Markets Limited ("**ED&F Man**"), to the First Claim (issued on 4 May 2018), as now consolidated with the Second and Third Claims (together, the "**Consolidated Claims**"), by which SKAT alleges that:

   1.1. it was the victim of a sophisticated and extensive financial fraud which resulted in SKAT mistakenly paying out approximately £1.512 billion between August 2012 and July 2015 in respect of 4,590 WHT Applications for the refund of withholding tax ("**WHT**") payable in relation to shares held in Danish companies; and in particular that

   1.2. the WHT Applications were made pursuant to a fraudulent scheme (the so-called WHT Scheme described at POC/49-51) perpetrated by Mr Sanjay Shah and a network of 75 further individual and corporate defendants related to him (the Alleged Fraud Defendants).

2. However and for the avoidance of doubt:

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 3 of 43

HIGH COURT ROLLS BUILDING OF JUSTICE

2.1. ED&F Man is not an Alleged Fraud Defendant and has no knowledge of: (1) the WHT Scheme to which it was not (and is not alleged to have been) a party; or (2) the Alleged Fraud Defendants who it is said were behind it;

2.2. on the contrary, and as set out further below, ED&F Man's role in connection with the WHT Applications was limited to preparing a single document described as a "Tax Voucher" ("**the Tax Vouchers**"), which SKAT alleges was included in 420 of the WHT Applications (the "**Relevant WHT Applications**") on behalf of the applicants identified therein (the "**Relevant WHT Applicants**").

3. Instead SKAT's primary case is that ED&F Man is liable to SKAT in negligence (under English law) on the grounds, in short summary, that (POC/21-24, 91-94):

3.1. ED&F Man owed a duty of care to SKAT to take reasonable care to avoid causing SKAT loss due to inaccuracies in the Tax Vouchers;

3.2. in respect of each of the Relevant WHT Applications, the Tax Vouchers contained representations (the so-called "**Custodian Representations**") that (inter alia) a specific number of shares in the Danish company identified therein "*…were held for the named WHT Applicant…*" (POC/21(a)) on the day before the dividend ex-date (being the date on or after which a security is traded without a previously declared dividend ("**the Ex-Date**"));

3.3. in reliance on the Custodian Representations SKAT paid DKK582 million in respect of the Relevant WHT Applications; however

3.4. the Custodian Representations were false principally because the Relevant WHT Applicants "*…did not own the relevant shares in the Danish companies beneficially or at all…*" prior to the Ex-Date (POC/23(a)).

4. These allegations are unsustainable. In particular:

4.1. <u>no duty of care</u>: ED&F Man owed no duty of care to SKAT in circumstances where (1) there was not a sufficiently proximate relationship between ED&F Man and SKAT; (2) ED&F Man had no involvement in the Relevant WHT Applications; and (3) ED&F Man did not assume

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 4 of 43

HIGH COURT OF JUSTICE ROLLS BUILDING

responsibility to SKAT for the contents of the Tax Vouchers which were prepared for ED&F Man's client only (and were not submitted by ED&F Man to SKAT);

4.2. no misstatements: with respect to the Tax Vouchers (with the exception of (1) the 9 identified at Annex A hereto (**"the Annex A Tax Vouchers"**) and (2) the 80 identified at Annex E hereto (**"the Annex E Tax Vouchers"**)) the Custodian Representations were accurate (as evidenced by the contemporaneous documentary records retained by ED&F Man in respect of the Relevant WHT Applications);

4.3. no breach: by reference to the same records (with the exception of the Annex A Tax Vouchers) ED&F Man did exercise reasonable skill and care in the preparation of the Tax Vouchers;

4.4. no reasonable reliance: in any event it was not reasonable for SKAT to rely on the alleged Custodian Representations in circumstances where it was SKAT, as the tax authority in Denmark with overall responsibility for processing WHT applications; yet further

4.5. contributory negligence: if (which is denied) SKAT has suffered loss and damages as a result of any representations made by ED&F Man, such loss was caused or contributed to by its own negligence in circumstances where its systems and procedures for managing the review and assessment of WHT reclaim applications were manifestly deficient.

**PREAMBLE TO PARTICULARS OF CLAIM**

5. As to paragraph 1 (description and legal status of SKAT):

5.1. it is admitted that until 1 July 2018 (and therefore at the time the First Claim was issued on 4 May 2018) SKAT was a function of the Danish Government and was charged with the assessment and collection of Danish taxes; however

5.2. it is not admitted (and SKAT is required to prove) that it has a legal entitlement to bring this claim against ED&F Man (SKAT having been replaced by 7 new agencies on 1 July 2018); in any event

5.3. it is denied (for the reasons set out below) that ED&F Man has committed any "*civil wrongs*" as alleged or at all.

HIGH COURT ROLLS BUILDING OF JUSTICE

6. As to paragraph 2 (references in the Amended Particulars of Claim): (1) ED&F Man (the 69th Defendant to the First Claim) is (see POC/2(c)) a "Non-Fraud Defendant"; and (2) SKAT's claim against ED&F Man is supplemented by the facts and matters set out in Amended Schedule 5T to the Amended Particulars of Claim, to which ED&F Man pleads in the Schedule to this Amended Defence. For the avoidance of doubt ED&F Man:

6.1. is a global financial brokerage business, authorised and regulated by the Financial Conduct Authority ("**FCA**") to provide (among other services): (1) specialised securities lending and financing services; (2) clearing and settlement for equities and fixed-income securities; and (3) custodian services for on-exchange and over-the-counter transactions;

6.2. from 2012 and 2015, in relation to the trading of shares in companies listed on the Danish stock exchange ("**Danish Listed Companies**"), acted for 36 pension plans (the "**PPs**")[1].

**A. SUMMARY**

7. As to paragraph 3 (SKAT's summary of its case):

7.1. subparagraph 3 (a) (the potential refund of WHT) is admitted;

7.2. subparagraph 3 (b) (the WHT Applications) is not admitted (being outside ED&F Man's knowledge);

7.3. subparagraphs 3 (c) to (i) (the WHT Representations, WHT Applications and fraudulent scheme on the part of the Alleged Fraud Defendants and the claims against them) are noted but not pleaded to (as they do not concern ED&F Man);

7.4. subparagraph 3(j) and the allegation against ED&F Man (as a Non-Fraud Defendant) of "*…negligent participation in the WHT Scheme and/or [its] receipt of the proceeds of the fraud…*" is denied for the reasons summarised above and amplified below.

**B. DEFENDANTS**

8. Paragraph 4 (details of Defendants and alleged wrongdoing set out in Schedule 5) is noted.

---

[1] Comprising 33 United States pension plans and 3 Canadian pension plans identified in POC/Schedule 1 of which (1) 32 were direct clients of ED&F Man (see Annex B hereto); and (2) 4 were members of Gibraltarian partnerships, which were themselves clients of ED&F Man (the "**Gibraltarian Partnerships**") (see Annex C hereto).

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 6 of 43

HIGH COURT ROLLS BUILDING OF JUSTICE

9. As to paragraph 5 (categorisation of Defendants) subparagraphs 5 (a) (c) and (d) are noted; and as to subparagraph 5 (b):

9.1. ED&F Man is (1) one of the 9 Defendants collectively described (at POC/5(b)) as "Custodians"; and (2) one of just two Non-Fraud Defendants amongst the "Custodians";

9.2. as to SKAT's allegation that the Custodians provided "…*"credit advice" notes (or similar)*…" (1) ED&F Man provided Tax Vouchers as set out below; and (2) pending disclosure of the "credit advice" notes allegedly provided by the other Custodians, it is not admitted that Tax Vouchers are "*similar*" to the same.

10. The circumstances in which ED&F Man produced the Tax Vouchers were, in summary, as follows:

10.1. the PP's Investment Manager: by means of a power of attorney ("**the Power of Attorney**") the PP would: (1) appoint an investment manager ("**the Investment Manager**"); and (2) authorise the Investment Manager (inter alia) to take all actions required to conduct trading in equities and/or other financial instruments and to reclaim any deducted taxes in the name of and on behalf of the PP;

10.2. the Declaration Date: from time to time each of the Danish Listed Companies would make a "Declaration" ("**the Declaration Date**") as to the gross dividend rate and payable currency in relation to specified shares, which Declaration Date would be published by Bloomberg approximately one month prior to the reference date on which the holder of a dividend-bearing share has the right to receive a dividend ("**the Reference Date**");

10.3. the Dividend Window: the period between the Declaration Date and the Reference Date would give rise to a window ("**the Dividend Window**") in which the PP could acquire the shares in respect of which the dividend was payable ("**the Security**");

10.4. the PP's acquisition and sale of the Security:

10.4.1. on a date on or prior to the Reference Date ("**the Trade Date**"), ED&F Man would (1) (upon instruction from the PP's Investment Manager) purchase the Security by means of an over-the-counter transaction; ~~or (2) acquire the Security pursuant to an industry standard stock lending arrangement known as the Global Master Securities Lending Arrangement ("the GMSLA")~~; (3) on a principal to principal basis, on sell

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 7 of 43

HIGH COURT OF JUSTICE
ROLLS BUILDING

the Security to the PP; and (4) enable the PP to enter into a transaction to hedge the risk of adverse market movements in the value of the Security ("**the Hedge**"); alternatively

10.4.2. on the Trade Date, the PP would recall the Security from ED&F Man by way of redelivery of equivalent securities pursuant to ED&F Man's obligation to replace securities provided by the PP to ED&F Man as financial collateral ~~the terms of a GMSLA~~;

10.4.3. from the Trade Date (and pursuant to (1) a Custody Agreement ("**the Custody Agreement**") (utilising the client securities and cash accounts defined therein (together "**the Custody Account**")); and (2) a Security and Set Off Deed ("**the Security and Set Off Deed**"), entered into between each of PP and ED&F Man at the inception of their relationship), ED&F Man would (1) hold the Security as a bare trustee on behalf of the PP in the Custody Account; and (2) hold a charge over the Security and the Custody Account; accordingly

10.4.4. on the Reference Date, which would fall at least one day after the Trade Date, ED&F Man would hold the Security as a bare trustee on behalf of the PP in the Custody Account;

10.4.5. on an agreed date after the Trade Date ("**the Settlement Date**"), ED&F Man would ~~(1)~~ pay for the Security on behalf of the PP (and debit the PP's Custody Account in that sum)~~;~~ and (~~2~~1) on-sell ~~or loan~~ the Security on behalf of the PP or (2) exercise its right to use and dispose of the Security in discharge of the PP's obligation to make payment (and credit the PP's Custody Account accordingly);

10.5. the dividend Pay Date: shortly after the Settlement Date (1) the Danish company would pay the dividend net of WHT in respect of the Security ("**the Pay Date**"); (2) ED&F Man would receive payment of the dividend into a general account held in the name of ED&F Man (and administered by its sub-custodian BNP Paribas) which recorded transactions relating to multiple clients ("**the Omnibus Account**"); and (3) ED&F Man would credit the relevant amount of the dividend net of WHT to the PP's Custody Account;

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 8 of 43

HIGH COURT ROLLS BUILDING OF JUSTICE

10.6. the WHT reclaim: (1) shortly after the Settlement Date ED&F Man would produce a Tax Voucher and send the same to the Investment Manager; (2) a tax reclaim agent would submit the Tax Relief Form to SKAT; and (3) upon acceptance of the application (typically a few weeks after the Settlement Date) (a) SKAT would credit the amount of the WHT to the reclaim agent; (b) the reclaim agent (after deducting its fees) would credit the Omnibus Account; and (c) ED&F Man would credit the PP's Custody Account.

11. As to the nature and content of the Tax Voucher produced by ED&F Man:

11.1. it contained information in 11 information categories as set out in the following format:

| | Information category | Information supplied |
|---|---|---|
| 1 | Security Description | Name of Danish Listed Company |
| 2 | ISIN | Identification of International Securities Identification Number |
| 3 | SEDOL | Identification of Stock Exchange Daily Official List number |
| 4 | Ex Date | Date supplied |
| 5 | Record Date | Date supplied |
| 6 | Pay Date | Date supplied |
| 7 | Quantity | Specification of number of Danish shares |
| 8 | Gross Div Rate | Dividend rate applicable per share |
| 9 | Amount Received | Amount received by way of dividend |
| 10 | WHT Suffered | Amount withheld by way of withholding tax |
| 11 | WHT % | Percentage rate (27%) of withholding tax applied |

11.2. it confirmed (in the circumstances summarised at paragraph 10 above):

11.2.1. (in 380 of the 420 Tax Vouchers) that the PP "*…was holding…*" the security (identified in entries 1, 2, 3 and 7) "*…over the dividend date…*";

11.2.2. (in the 40 Tax Vouchers where ED&F Man's direct client was a Gibraltarian Partnership), that (1) the Gibraltarian Partnership "*held*" the security (identified in entries 1, 2, 3 and 7) "*over dividend date*" for the PP; and (2) the PP was the "*beneficial owner*" of the security (the "**GP Tax Vouchers**");

11.3. it (1) stated that ED&F Man (a) had "*no beneficial interest*" in the security; and (b) "*…will not be reclaiming…*" the WHT; (2) stated that the dividend (identified in entry 9) was paid to (or received by) the PP (or Gibraltarian Partnership) net of the WHT (identified in entry 10); and (3) was signed on behalf of ED&F Man by one or two authorised signatories.

HIGH COURT ROLLS BUILDING OF JUSTICE

**C. DIVIDEND WHT REGIME**

12. Paragraph 6 (description of withholding tax) is admitted.

13. Paragraphs 7 and 8 (Danish tax law provisions) are not admitted: ED&F Man does not hold itself out as a tax adviser and had no knowledge at any material time of the provisions of Danish law relating to withholding tax.

14. As to paragraph 9 (double taxation treaty provisions), at the time of preparing the Tax Vouchers (all of which related to shares held by PPs in Danish companies) ED&F Man was aware that:

14.1. there existed double taxation treaties between (1) Denmark and the United States; and (2) Denmark and Canada, the effect of each of which was that the PPs were not subject to any tax by the Danish tax authority on dividends received in respect of shareholdings held in Danish companies;

14.2. as a result, PPs could submit a claim to the Danish tax authority for a refund of the totality of all such withholding tax paid in respect of such dividends; however

14.3. save as set out above, ED& Man does not plead to the existence and effect of the alleged double tax treaties between Denmark and (1) Malaysia, (2) the United Kingdom or (4) Luxembourg as set out at POC/9(b), (d) and (e).

15. Paragraph 10 (the requirements of Tax Relief Form) is admitted. For the avoidance of doubt the Tax Relief Form makes clear that the key declaration as to beneficial ownership is made (1) in the Tax Relief Form itself (in the first prominent entry "*Beneficial Owner*"); and (2) by (or on behalf of) the person claiming the WHT refund.

16. Paragraphs 11 (signature of the Tax Relief Form) and 12 (payment of the WHT) are admitted. However and for the avoidance of doubt ED&F Man (1) did not sign any of; and (2) had no involvement in the completion of, the 420 Relevant WHT Applications.

**D. WHT APPLICATIONS**

17. Save that between approximately August 2012 and April 2015 ED&F Man prepared 420 Tax Vouchers (1) on behalf of 36 PPs; (2) which were submitted to the PPs' Investment Managers,

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 10 of 43

HIGH COURT ROLLS BUILDING OF JUSTICE

paragraphs 13 (time period of SKAT's claim) and 14 (identity of WHT Applicants) are not admitted. However (and for the avoidance of doubt):

17.1. ED&F Man infers from Schedule 1 but does not know that the Investment Managers submitted Tax Vouchers to tax reclaim agents as follows:

| No | Tax reclaim agent | No of Tax Vouchers |
|---|---|---|
| 1 | Acupay | 16 |
| 2 | Global | 266 |
| 3 | Globe Tax Securities Incorporated Limited ("GTS") | 4 |
| 4 | Goal | 134 |
| Total | | 420 |

17.2. ED&F Man notes that (1) the definition of Agents in POC/5(a) does not include GTS; (2) SKAT makes no claim at all against (a) GTS; or (b) (under English or Danish law) no claim against Global (save in relation to 35 of the 266 Relevant WHT Applications submitted by Global as set out in Amended Schedule 5P (paragraph 5) and Schedule 5P1); accordingly (3) SKAT advances no claims in English or Danish law against the reclaim agents which (it is alleged) submitted ~~270~~ 235 of the 420 (~~64~~56%) Relevant WHT Applications.

18. As to paragraph 15 (extent of withholding tax claim relating to US, Canada and Malaysia), it is admitted that the Tax Vouchers prepared by ED&F Man on behalf of the PPs which were its clients were in respect of all the tax withheld.

19. Paragraph 16 (extent of withholding tax claim relating to United Kingdom and Luxembourg) is not admitted.

20. As to paragraph 17 (documentary content of each WHT Application), the actual documents comprising each Relevant WHT Application are not admitted. Paragraph 15 above is repeated.

21. As to paragraph 18 (identity of Danish companies), the Relevant WHT Applications were made in relation to shareholdings in 16 of the Danish Listed Companies.

**E. THE WHT REPRESENTATIONS**

22. In Section E SKAT purports to set out: (1) the representations allegedly made by the Agents (the so-called "Agent Representations") and the Custodians (the so-called "Custodian Representations"); and (2) the falsity of such representations. However SKAT's case against ED&F Man in this regard is obscurely pleaded and difficult to comprehend given that:

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 11 of 43

HIGH COURT OF JUSTICE ROLLS BUILDING

22.1. the Agent Representations (POC/19) and the Custodian Representations (POC/21) are materially different (the Agent Representations alleging that the WHT Applicant was "…*the beneficial owner*…" of the Danish shares and "…*had beneficially received the dividend*…"; whilst the Custodian Representations contain no allegation in relation to beneficial ownership and dividend receipt); yet

22.2. for the purposes of the allegation of falsity, the representations are treated collectively and without differentiation as the "WHT Representations" (POC/22 and 23) relying on the same particulars of falsity (POC/23(a) - (d)); further

22.3. in the case of ED&F Man and the fourth Custodian Representation (to the effect that "…*the Credit Advice Note was an honest and accurate statement of the facts set out therein*…") (POC/21(d)) SKAT's case against ED&F Man (as clarified in its Response to Request for Further Information dated 31 May 2019 (**"SKAT RFI Response"**)) is that "…*the Tax Vouchers were inaccurate (but not dishonest)*…" (Response 2)); yet

22.4. the alleged grounds for inferring falsity (POC/ 24) are pleaded generically and without distinction between (1) the Agent Representations and the Custodian Representations; and (2) the (very different) positions of (a) ED&F Man and (b) the Alleged Fraud Defendants.

**E1. The Agent Representations and the Custodian Representations**

23. ED&F Man does not plead to paragraphs 19 and 20 (the Agent Representations) in circumstances where paragraph 92(f) alleges that ED&F Man (as one of the Non-Fraud Custodians) only made the Custodian Representations.

24. As to paragraph 21 (the Custodian Representations (POC/21)):

24.1. the representations (if any) made by the Tax Vouchers fall to be construed in context and objectively according to their effect on a reasonable representee in the position and with the characteristics of the actual representee. Yet SKAT would (or should) have known the following matters:

24.1.1. ED&F Man: (1) provided custody services to its clients in relation to shares held in companies domiciled across multiple jurisdictions and subject to numerous different

HIGH COURT OF JUSTICE ROLLS BUILDING

tax regimes; but (2) did not hold itself out as a tax adviser; and (3) was not qualified to advise on (a) the legal or beneficial ownership of security held in a Danish company under Danish law; or (b) the relevant double taxation treaty;

24.1.2. the Tax Voucher (1) was addressed by ED&F Man to its client only, and not to SKAT; and (2) (save for the GP Tax Vouchers) did not address the question of the PP's beneficial ownership of the security; by contrast

24.1.3. the Tax Relief Form, which was submitted by or on behalf of the PP (1) was addressed to SKAT; and (2) did contain the PP's declaration as to beneficial ownership of the security; further

24.1.4. the concept of beneficial ownership was at the material time (and remains) legally uncertain in Danish law because: (1) historically Danish law did not distinguish between legal and beneficial ownership (a common law concept unfamiliar to Danish law); and (2) the Danish Supreme Court had not (and still has not) determined the meaning of the concept; and

24.1.5. as the tax authority in Denmark with overall responsibility for processing WHT applications, SKAT was responsible for determining the beneficial ownership of shares held in Danish companies (which included publishing non-binding opinions in Danish on its website in relation to this issue);

24.2. in the premises, it is denied that the Tax Vouchers contained the Custodian Representations:

24.2.1. the Relevant WHT Applications did not contain *any* representations by ED&F Man to SKAT;

24.2.2. such representations as the Relevant WHT Applications contained were made by (1) the tax reclaim agents which submitted the Relevant WHT Applications; and/or (2) the entity described as the "*beneficial owner*" on the Tax Relief Form, on whose behalf the Relevant WHT Applications were submitted;

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 13 of 43

HIGH COURT ROLLS BUILDING OF JUSTICE

24.2.3. the Tax Vouchers (1) did not contain any separate or freestanding representations to SKAT; and (2) (save for the GP Tax Vouchers) did not contain any statement as to the beneficial ownership of the securities described in the Tax Vouchers.

25. Paragraph 22 (definition of WHT Representations) is noted: paragraph 22.2 above is repeated.

**E2. Falsity of the WHT Representations**

26. Paragraph 23 (falsity of WHT Representations) is denied in circumstances where:

26.1. (as noted above) the allegations of falsity applicable to ED&F Man (POC/23(a)-(c)) do not correspond to the Custodian Representations allegedly made by ED&F Man (POC/21(a)-(c));

26.2. it is not alleged that ED&F Man made any representation as to the beneficial ownership of shares and beneficial receipt of dividends described in the Tax Vouchers; and for the avoidance of doubt (and save in relation to the GP Tax Vouchers) (1) ED&F Man did not; and (2) SKAT could not reasonably have believed that it did, make any such representations; in any event

26.3. the Custodian Representations (if made, which is denied) were true in circumstances where (with the exception of the Annex A and Annex E Tax Vouchers) the ED&F Man Records (as defined at subparagraph 27.5 below) confirmed that:

26.3.1. the PP (or the Gibraltarian Partnership on its behalf) *was* holding the security (identified at entries 1, 2, 3 and 7) on the Reference Date;

26.3.2. the PP (or the Gibraltarian Partnership on its behalf) *had* received the dividend (identified at entry 9) on the security; and

26.3.3. the dividend *had* been received by the PP (or by the Gibraltarian Partnership on its behalf) net of WHT (identified at entry 10).

27. As to paragraph 24 (grounds for inferring falsity of WHT Representations):

27.1. in circumstances where (1) ED&F Man is not an Alleged Fraud Defendant; (2) ED&F Man was not a party to and had no knowledge of the WHT Scheme; and (3) (so far as ED&F Man understands the same) these subparagraphs do not contain allegations against ED&F Man, ED&F Man does not plead to: subparagraphs 24(b)(ii)(B) (the 6 individuals involved in WHT Scheme); 24(d) (Agents' payments to SCP); 24(e) and (f) (the BaFin Report); 24(e1) (the

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 14 of 43

HIGH COURT OF JUSTICE ROLLS BUILDING

Solo Model); 24(g) (same day Credit Advice Notes for same company); 24(h) (facts relating to WHT Scheme); 24 (i) (ii) (B) and (C) ("*circular transactions*" created by the Alleged Fraud Defendants); 24 (i) (iii) (A) to (F) ("*sham transactions*" manufactured by the Alleged Fraud Defendants); 24(i)(iv)(A) (trading of same shares multiple times around Ex-Date); and 24(i)(iv)(B)(i) and (ii) (WHT Applicant not the "*beneficial owner of the shares*");

27.2. subparagraph 24(a) (substantial increase in WHT refund applications from August 2012 to July 2015) is not admitted. In any event it is not admitted that there is any correlation between (1) the matters pleaded in subparagraphs 24 (a) (i) to (iv) (if true); and (2) the accuracy of the Tax Vouchers used in the Relevant WHT Applications;

27.3. subparagraph 24(b) (i) and (ii) (B) (PPs' lack of assets) is denied. The allegation that the Relevant WHT Applicants "*...did not have the assets necessary to make the very substantial investments...*" misunderstands the nature of the financial brokerage services provided by ED&F Man (identified at subparagraph 6.1 above). In particular where a PP did lack assets ED&F Man ~~extended short term credit to the PP in order to~~ facilitated the acquisition of the Security as follows:

27.3.1. secured and hedged from the Trade Date: from the moment of ED&F Man's acquisition of the Security on the Trade Date on behalf of the PP (subparagraph ~~11.4.1~~ 10.4.1 above), ED&F Man (1) held a fixed charge over the Security and the PP's Custody Account with ED&F Man; and (2) was protected against market movements in the value of the Security by the Hedge;

27.3.2. reimbursed on or shortly after Settlement Date: following (1) ED&F Man's payment (on the Settlement Date) for the Security and the debit of that amount to the PP's Custody Account (2) the Security was (a) on sold in the market or (b) acquired by ED&F Man pursuant to its rights of use and disposal for a sum of money which was then credited to the PP's Custody Account (and which substantially reversed the debit) (subparagraph 10.4.5 above);

27.3.3. receipt of dividend: shortly thereafter ED&F Man (1) received funds into the Omnibus Account in respect of the relevant dividend net of WHT; and (2) credited that amount to the Custody Account (subparagraph 10.5 above);

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 15 of 43

HIGH COURT
ROLLS BUILDING
OF JUSTICE

27.3.4. receipt of tax reclaim: within a further few weeks, and without fail, SKAT paid the WHT to the tax reclaim agent which sum was then also credited to the Custody Account (subparagraph 10.6 above), resulting (with the addition of any payment pursuant to the Hedge) in an overall net credit to the Custody Account arising out of the acquisition of the Security;

27.3.5. no requirement for substantial assets: it was in these circumstances that the PPs did not need to have (1) the assets necessary to make "*very substantial investments*"; and/or (2) the means to "*afford*" the purchase of the relevant security. Instead ED&F Man, fully secured and protected against market movements, was prepared to (and did) enable the PPs to acquire the Security (and, for the avoidance of doubt, no third party provided any funding or collateral);

27.4. subparagraph 24(c) (the PPs' response to preliminary decisions) is not admitted. Without prejudice to that non-admission and with respect to the PPs who were ED&F Man's clients, ED&F Man understands from documents filed in United States legal proceedings that (1) in April and May 2018 SKAT issued final determination letters to the PPs; and (2) each of those PPs has filed an administrative appeal of SKAT's determination to the Tax Appeals Agency (*Skatteankestyrelsen*) or is in the process of doing so (and each of the Tax Appeals Agency expects the review process to take approximately 30 months);

27.5. subparagraphs 24(i)(i) and (ii) (A) (alleged "*fictitious records of transactions*" and "*circular transactions*")) are, with respect to the Relevant WHT Applications, denied. On the contrary ED&F Man has genuine records in respect of each of the Relevant WHT Applications ("**the ED&F Man Records**") including:

27.5.1. the Declaration as published by Bloomberg in respect of the security;

27.5.2. (1) the PP's order (ordinarily by email instruction) for both (a) the security and (b) the Hedge; and (2) ED&F Man's confirmation (again by email) of the same;

27.5.3. a booking in ED&F Man's trading software recording ED&F Man's "Buy" of the Security and "Sell" or "Return" to the PP;

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 16 of 43

HIGH COURT OF JUSTICE ROLLS BUILDING

27.5.4. a journal entry in ED&F Man's trading software identifying the nature, date and amount of a dividend payment credited to the PP in respect of the Security;

27.5.5. entries in the PP's Custody Account recording ED&F Man's acquisition of the Security on the Trade Date;

27.5.6. entries in the PP's Custody Account recording: (1) the credit of the net dividend payment in respect of the Security; (2) the credit of the tax reclaim to the PP a few weeks later; in the premises

27.5.7. the Relevant WHT Applications were (1) based on "*genuine business records*" (in the words of counsel for SKAT when making this concession in relation to the PP Tveter LLC Pension Plan Trust at the hearing on 26 June 2018) (2) in relation to "*genuine transactions*" (in the words of Jacobs J. as accepted by counsel for SKAT in the course of the same hearing); and (3) (with the exception of the Annex E Tax Vouchers) resulted in an "*actual*" transfer of shares and dividends;

27.6. subparagraph 24(i)(iv)(B)(iii) (WHT Applicant as "*mere nominee*") is denied. In particular:

27.6.1. the reference to the WHT Applicant not being "*the beneficial owner*" of the shares is (as an allegation of falsity against ED&F Man) misconceived: the Custodian Representations do not contain any statement in relation to the WHT Applicant's beneficial ownership; in the premises

27.6.2. the allegation that the Relevant WHT Applicant was a "*mere nominee*" of the shares is not understood: the relevant representation (if any) contained in the Tax Voucher in relation to the shares was that the PP "*...was holding [the Security] over the dividend date...*";

27.6.3. that representation was true: subparagraph 26.3 above is repeated.; further

27.6.4. the matters set out in SKAT RFI Response/3 do not support SKAT's case that the WHT Applicant was a "*mere nominee*" as regards the Security with no control as to its disposition: subparagraph 27.3 is repeated; and (for the avoidance of doubt)

HIGH COURT OF JUSTICE ROLLS BUILDING

27.6.5. the WHT Applicant acquired (1) ownership of the Security; and (2) a right to receive any dividends thereon from the Trade Date, not the Settlement Date (as alleged in SKAT RFI Response/4.4 – 4.7).

**F. PROCEEDS OF THE WHT APPLICATIONS**

28. As to paragraph 25 (SKAT's payments to the Agents) it is not admitted that SKAT (1) made the payments "*in reliance on the WHT Representations*"; and (2) made the payments alleged to the Agents, and SKAT is put to strict proof of the same.

29. ED&F Man does not plead to paragraphs 26 to 48 (payments by SKAT; transfers to SCP and the Alleged Fraud Defendants; and purchase of shares in Varengold and Dero) in circumstances where they do not contain any allegations against ED&F Man. For the avoidance of doubt (1) ED&F Man did not receive any payments directly from SKAT; and (2) subject only to the deduction of its fees, the amounts received into the accounts from the agents were credited in full to the relevant PP.

**G. THE WHT SCHEME**

30. As to paragraph 49 (the WHT Scheme), it is not admitted that the WHT Applications were made as part of the WHT Scheme in circumstances where ED&F Man (1) was not an Alleged Fraud Defendant; and (2) has no knowledge of the matters relied upon at subparagraphs 49 (a) to (d).

31. ED&F Man does not plead to paragraphs 50 and 51 (the WHT Scheme and the role of the Alleged Fraud Defendants) which do not contain allegations against ED&F Man.

32. As to paragraphs 52 to 54 (SKAT's decisions and purported rescissions), it is denied that SKAT is entitled to rescind the transactions by which payments were made in respect of the Relevant WHT Applications in circumstances where (1) paragraphs 24, 26 and 27 above are repeated; and (2) to the extent that such payments were ultimately received by ED&F Man (an innocent third party), rescission is not available.

**H. APPLICABLE LAW**

33. Paragraphs 55 and 56 (applicable law) are noted but not admitted. ED&F Man's defence is pleaded on the basis that English law, alternatively Danish law, is the law applicable to SKAT's claims.

**I. ENGLISH LAW CLAIMS AGAINST THE ALLEGED FRAUD DEFENDANTS**

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 18 of 43

HIGH COURT
ROLLS BUILDING
OF JUSTICE

34. ED&F Man does not plead to paragraphs 57 to 85 (claims against Alleged Fraud Defendants) which do not contain allegations against ED&F Man.

**J. ENGLISH LAW CLAIMS AGAINST THE NON-FRAUD DEFENDANTS**

**J1. Tort/delict**

35. ED&F Man does not plead to paragraphs 86 to 90 (Agents' alleged liability for negligent misrepresentation) which do not contain allegations against ED&F Man.

36. Paragraph 91 (ED&F Man's alleged liability for negligent representation) is denied, as further set out below.

37. As to paragraph 92 (ED&F Man's alleged duty of care to SKAT):

37.1. it is denied that ED&F Man owed SKAT a duty to take reasonable care as alleged. In particular:

37.1.1. there was no contractual relationship between ED&F Man and SKAT, which was not ED&F Man's client;

37.1.2. the Tax Vouchers were prepared for ED&F Man's client only and were not submitted by ED&F Man to SKAT;

37.1.3. there were no written or oral communications at any material time between ED&F Man and SKAT in relation to the Tax Vouchers or otherwise;

37.1.4. by the Tax Vouchers, ED&F Man did not make any representations to SKAT: paragraph 24~~5~~.2 above is repeated; moreover

37.1.5. at the time of receipt of the Tax Vouchers, SKAT knew or ought to have known from the matters set out at subparagraph 24.1 above that (1) ED&F Man was not assuming responsibility to SKAT for any (alleged) representations relating to the beneficial ownership of shares or dividends described in the Tax Vouchers; and (2) SKAT could not rely on such representations without independent inquiry.

37.2. it is denied that the facts and matters set out in sub-paragraphs 92 (a) to (i) support the imposition of the alleged duty of care. In particular:

Case 1:18-cv-05053-LAK Document 160-1 Filed 11/05/19 Page 19 of 43

HIGH COURT
ROLLS BUILDING
OF JUSTICE

37.3. subparagraph 92(a) (the AML obligations) is admitted. However at all material times ED&F Man maintained suitable policies and procedures in accordance with these obligations;

37.4. as to subparagraph 92(b) (ED&F Man's regulatory obligations), it is admitted that (1) ED&F Man is subject to Principles 2 and 3 and SYSC 6 of the Financial Conduct Authority Handbook; and (2) subparagraphs 92 (b) (i) and (ii) contain a broadly accurate summary of Principles 2 and 3 and (parts of) SYSC 6;

37.5. subparagraph 92(c) (ED&F Man's access to trading activity records) is admitted;

37.6. as to subparagraph 92(d) (ED&F Man's knowledge of Tax Vouchers' purpose):

37.6.1. it is admitted (as alleged at subparagraph 92 (d)(i)) that ED&F Man knew that PPs engaged in the trading of shares in Danish companies for the purpose of making tax reclaim applications to SKAT; and

37.6.2. it is admitted (as alleged at subparagraphs 92 (d)(ii) and (iii)) that ED&F Man knew that the Tax Vouchers which it produced for the PPs were likely to be (1) used for the purpose of the Relevant WHT Applications; and (2) communicated to SKAT for such purpose; however

37.6.3. ED&F Man (1) had no role in the preparation of the Relevant WHT Applications; and (2) was not qualified to advise as to (and did not advise as to) the Relevant WHT Applicant's declaration as to beneficial ownership as contained in the Tax Relief Form;

37.7. as to sub-paragraph 92(e) (alleged reliance on Tax Vouchers to seek large WHT refunds):

37.7.1. as to subparagraph 92 (e)(i), it is denied that ED&F Man knew that the Tax Vouchers "*...would be relied upon to seek very large sums by way of WHT refunds...*" as alleged. In particular whilst (1) ED&F Man knew that the Tax Voucher was one of a number of documents which SKAT required to be submitted by ED&F Man's clients (the PPs) in support of WHT reclaim applications; (2) ED&F Man did not know what other documentation was required by SKAT and/or the criteria which SKAT applied in the assessment of a tax reclaim;

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 20 of 43

HIGH COURT
ROLLS BUILDING
OF JUSTICE

37.7.2. as to subparagraph 92(e)(ii), it is admitted that ED&F Man knew that 8 different Investment Managers represented the 36 PPs but it is denied (insofar as it is apparently alleged) that the number of Investment Managers is relevant to the imposition of a duty of care upon ED&F Man;

37.7.3. as to subparagraph 92(e)(iii) (payment of proceeds of WHT Applications), it is denied that ED&F Man knew that "*…they were paying the large majority of the proceeds of the [Relevant] WHT Applications to persons other than…*" the PPs: the tax reclaims received by ED&F Man via the relevant tax reclaim agent were credited directly to the PP's Custody Account;

37.8. as to subparagraph 92(f) (alleged Custodian Representations), paragraph 24 above is repeated;

37.9. as to subparagraph 92(g) (SKAT's reasonable reliance), it is denied that it was reasonable for SKAT to rely on any representations contained in the Tax Vouchers without further enquiry and subparagraph 24.1 above is repeated. Further:

37.9.1. it was a matter for SKAT as the tax authority in Denmark with overall responsibility for processing WHT applications to devise and implement appropriate systems and procedures which ensured that such applications were fairly and accurately reviewed and assessed;

37.9.2. insofar as the matters set out at subparagraphs 92 (g) (ii) to (v) are true, such that SKAT was unable fairly and accurately to review and assess the Relevant WHT Applications, that was as a result of SKAT's own negligence as set out at paragraphs 40 and 41 below; and

37.9.3. it is denied that ED&F Man knew or ought to have known the matters set out at subparagraphs 92 (g) (i) to (v): the extent of ED&F Man's knowledge at the material time was as set out at subparagraphs 37.6 and 37.7 above; in the premises

37.10. subparagraph 92(h) (ED&F Man's alleged knowledge of SKAT's reliance) and subparagraph 93(i) (alleged reasonable foreseeability of SKAT's losses) are denied; and

HIGH COURT
ROLLS BUILDING
JUSTICE

37.11. ED&F Man did not assume responsibility to SKAT in respect of the accuracy of the representations (if any) contained in the Tax Vouchers; and/or there was not a sufficiently proximate relationship between ED&F Man and SKAT; and/or it would not be fair, just and reasonable to impose a duty of care on ED&F Man, whether as alleged or at all.

38. Paragraph 93 (ED&F Man's alleged breach of duty) is inadequately pleaded: SKAT has not set out any particulars in support of its assertion that ED&F Man failed to take reasonable care to ensure that the Tax Vouchers were accurate statements of the matters set out therein. Without prejudice to the foregoing and the matters set out in SKAT RFI Response/5, it is denied that ED&F Man acted in breach of duty as alleged or at all:

38.1. ED&F Man did not owe SKAT a duty of care: paragraph 37 above is repeated;

38.2. insofar as such duty was owed and representations were made, it related only to the Custodian Representations which were true: paragraphs 26 and 27 above are repeated; and in any event

38.2A. the WHT Applicants did not hold the Security identified in the Tax Vouchers as a "*mere nominee*": paragraph 27.6 above is repeated;

38.3. with the exception of (1) the Annex A Tax Vouchers; and (2) the Annex E Tax Vouchers (in respect of which breach of duty is not admitted), ED&F Man exercised all due care and skill in making the Custodian Representations by reference to the ED&F Man Records (as to which subparagraph 27.5 above is repeated).

39. As to paragraph 94 (payments made by SKAT in relation to the Relevant WHT Applications):

39.1. it is denied that SKAT (1) reasonably relied on the Custodian Representations (if made); or (2) was thereby induced by ED&F Man to make payments in respect of the Relevant WHT Applications; or (3) would not otherwise have made such payments: paragraphs 24 and 37 above are repeated; in any event

39.2. it is not admitted that SKAT made payments of DKK582 million in respect of the Relevant WHT Applications as alleged in subparagraph 94 (d) and SKAT is put to strict proof of the allegation;

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 22 of 43

HIGH COURT OF JUSTICE ROLLS BUILDING

39.3. save as aforesaid, ED&F Man does not plead to paragraph 94 (payments relating to Credit Advice Notes from Indigo, North Channel Bank and Lindisfarne) which does not contain allegations against ED&F Man.

40. Further or alternatively, between 2012 and 2015 the systems and procedures in place at SKAT for managing the review and assessment of WHT reclaim applications were manifestly deficient in numerous respects. In particular and pending full disclosure:

40.1. ED&F Man relies on (1) the Rigsrevisionen Report dated February 2016; (2) the (undated) Intern Revision report relating to SKAT's administration of WHT tax; (3) judgments dated 7 December 2017 and 23 May 2018 in relation to criminal proceedings against Sven Jørgen Nielsen (the "**Nielsen Criminal Proceedings**"); and (4) the additional documentation requirements introduced by SKAT since its discovery of the WHT Scheme;

40.2. SKAT had no written procedures in place to govern its processing of tax reclaim applications between 2012 and 2015 and:

40.2.1. approximately 90% of the WHT reclaim applications to SKAT were handled by Sven Jørgen Nielsen ("**Sven Nielsen**"), who (despite the rapidly increasing number of WHT reclaim applications from 2012) was the sole individual in the department dealing with such applications ("**the WHT Department**") responsible for their approval;

40.2.2. in practice Sven Nielsen did no more than check that: (1) the documents required by SKAT had been submitted; and (2) the amount claimed had been accurately calculated, in which event he authorised SKAT to pay the WHT reclaim application;

40.2.3. further, during the same period SKAT had no means of independently verifying the identity of the beneficial owners of shares held by foreign shareholders in Danish companies in custody accounts maintained outside Denmark (such shares being registered as held by the custodian only);

40.2.4. notwithstanding the foregoing, SKAT did not seek supporting documentation from the Relevant WHT Applicant or make other inquiries to verify whether the PP identified in the Tax Voucher (1) was the owner of the shares on the Reference Date and (2) had received the dividend described therein;

40.2.5. instead, SKAT unlawfully delegated the evaluation and approval of the information and documentation submitted to SKAT in support of WHT applications to separate

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 23 of 43

HIGH COURT OF JUSTICE ROLLS BUILDING

schemes operated by (1) the Danish banks; and (2) VP Securities A/S (the Danish Central Securities Depository), which (in the absence of the necessary statutory authority) resulted in the termination of the schemes in September and November 2015;

40.2.6. further, in breach of SKAT's guidance obligation (article 7 of *forvaltingslov*) and/or investigation obligation (*Officialmaksimen*) under Danish law, SKAT did not take any or any sufficient steps to (1) publish guidance in relation to (a) the information and documentation required from WHT applicants; or (b) the criteria governing beneficial ownership; and (2) obtain and verify such information and documentation;

40.2.7. moreover (1) by 2011 SKAT had grounds to suspect that Sven Nielsen had dishonestly received illicit payments of up to DKK2m from Torben Dilung between 2006 and 2011 (the "**Dilung Payments**"); however (2) in June 2011 SKAT indefinitely suspended its investigation into Sven Nielsen in relation to the Dilung Payments for no or no good reason and (3) SKAT permitted Sven Nielsen to remain as an employee of SKAT until he was charged with fraud in Denmark in relation to the Dilung Payments in May 2015; and

40.2.8. in 2013 SKAT did not implement the control functions set out in a statutory order (the "**2013 Statutory Order**") which would have enabled SKAT upon receipt of a WHT application to compare (1) the information received by SKAT from a Danish Listed Company immediately after the Declaration as to (a) the identity of dividend recipients; and (b) the amount of WHT; with (2) the information set out in the WHT application in relation to (a) and (b);

40.3. SKAT's senior management were aware of and/or complicit in the deficiencies set out above from 2012 at the latest (such deficiencies having been repeatedly raised with senior management by at least Lisbeth Rømer (Head of WHT Department between 2002 and 2013)) but took no or insufficient action to remedy the deficiencies until after the discovery of the WHT Scheme described in the Amended Particulars of Claim; in the premises

40.4. SKAT failed adequately or at all:

40.4.1. to develop or implement any or any sufficient processes and/or controls to verify whether applicants for WHT refunds were entitled to reclaim WHT;

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 24 of 43

HIGH COURT OF JUSTICE ROLLS BUILDING

40.4.2. to ensure that the WHT Department was appropriately staffed to deal with the volume of WHT applications received between 2012 and 2015;

40.4.3. to respond appropriately in 2011 to its discovery of the Dilung Payments which cast serious doubt on the honesty and integrity of Sven Nielsen;

40.4.4. to act on fundamental process issues raised by (at least) Lisbeth Romer prior to 2012 (including SKAT's inability to verify the underlying ownership of shares held in Danish companies); and

40.4.5. to implement the 2013 Statutory Order.

41. In the premises, and in circumstances where SKAT assumed responsibility for deciding whether the shares described in the Tax Vouchers were beneficially owned by the PPs on whose behalf the Relevant WHT Applications were made:

41.1. insofar as SKAT paid the Relevant WHT Applications (1) mistakenly, believing that the shares described in the Tax Vouchers were beneficially owned by the PPs; or (2) recklessly, not caring whether such shares were beneficially so owned, such payments were made as a result of SKAT's negligence;

41.2. SKAT's own negligence was the only real and substantial cause of the losses claimed against ED&F Man and/or eclipsed any causative effect of ED&F Man's alleged negligence (if proven); further or alternatively

41.3. any damages payable to SKAT on account of ED&F Man's alleged negligence ought to be reduced because SKAT's contributory negligence caused or aggravated the alleged damage.

**J2. Unjust enrichment/restitution**

42. As to paragraph 95 (SKAT's alleged mistaken payments to Agents):

42.1. SKAT was not mistaken as to the information set out in the Tax Vouchers in circumstances where (1) factually (with the exception of the Annex A and Annex E Tax Vouchers), the Custodian Representations were true; and (2) legally, the Custodian Representations did not contain any representation as to the PP's beneficial ownership of the shares described in the Tax Vouchers; further

HIGH COURT OF JUSTICE ROLLS BUILDING

42.2. SKAT was itself in a state of doubt as to the PP's beneficial ownership of such shares as a result of the matters set out at subparagraphs 24.1.4 and 40.2.3 above yet paid the tax reclaim agents anyway without taking reasonable or any steps to resolve such doubt, and therefore SKAT was not relevantly mistaken in relation to the PP's beneficial ownership of the shares described in the Tax Vouchers; in any event

42.3. the Custodian Representations did not cause SKAT to make payments to tax reclaim agents in relation to the Relevant WHT Applications, which would have been made anyway;

42.4. further, such payments as were made to Global and GTS in relation to 270 of the 420 Relevant WHT Applications were not made to the Agents (as defined); and

42.5. in any event, it is not admitted that SKAT paid out the sums alleged to the Agents.

43. As to paragraph 96 (ED&F Man's receipt of fees), it is admitted that ED&F Man received fees out of the proceeds of any successful WHT applications which included a Tax Voucher prepared by ED&F Man (the "**ED&F Man Fees**"). Save as aforesaid, paragraph 96 is denied:

43.1. the ED&F Man Fees were not received as a result of SKAT's mistaken payment of WHT refunds (see paragraph 42 above); further,

43.2. the receipt of the ED&F Man Fees was not unjust: the ED&F Man Fees were received by ED&F Man in good faith for payment of services provided to its clients; and in any event

43.3. as a result of receiving the ED&F Man Fees, ED&F Man changed its position in good faith by making payment of bonuses to employees which ED&F Man would not ordinarily have made: accordingly, SKAT is not entitled to restitution in respect of such payments.

44. Paragraph 97 (ED&F Man's unjust enrichment at SKAT's expense) is denied. Paragraphs 42 and 43 above are repeated.

45. In the premises, it is denied that ED&F Man is liable to make restitution to SKAT of the ED&F Man Fees as alleged in paragraph 98 (ED&F Man's liability in restitution).

## K. ALTERNATIVE DANISH LAW CLAIMS

### K1. Danish law

46. Paragraph 99 (Danish law) is admitted as a broadly accurate summary of Danish law, save that:

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 26 of 43

HIGH COURT OF JUSTICE ROLLS BUILDING

46.1. the liability of (1) a tortfeasor (subparagraphs 99(a)(ii) and (b)) and (2) the accomplice of a tortfeasor (subparagraphs 99(c) and (d)) each fall to be assessed against the *culpa* standard by reference to the factors set out at subparagraph 99(b));

46.2. a claimant's entitlement to restitution on the grounds of unjust enrichment (subparagraph 99(e)) is a discretionary remedy based on a residual legal principle which is rarely applied.

**K2. Damages claims against the Alleged Fraud Defendants**

47. ED&F Man does not plead to paragraph 100 (misconduct of Alleged Fraud Defendants) which does not contain allegations against ED&F Man.

**K3. Damages claims against other Defendants**

48. As to paragraph 101 (Danish law negligence claim against ED&F Man), ED&F Man does not plead to sub-paragraph (c) (conduct of Agents and Global) which does not relate to ED&F Man. Otherwise it is denied (1) that (with the exception of (a) the Annex A Tax Vouchers; and (b) the Annex E Tax Vouchers (in respect of which violation and/or breach is not admitted)) ED&F Man's conduct violated the *culpa* standard or any other requisite standard of care as alleged in sub-paragraphs (a) and (b) or (2) that SKAT suffered the losses set out in paragraph 90(d) as a result as alleged in sub-paragraph (d). Paragraphs 37 to 41 above are repeated.

49. ED&F Man does not plead to paragraph 102 (other Non-Fraud Defendants) which does not contain allegations against ED&F Man.

**K4. Unjust enrichment/restitution claims**

50. As to paragraph 103 (Danish law unjust enrichment claim against ED&F Man), (1) ED&F Man received payment (including the ED&F Man Fees) for the services it supplied and was not unjustly enriched thereby; (2) in the premises it is denied that ED&F Man is liable under Danish law in unjust enrichment and/or restitution. Paragraphs 42 to 44 and 0 above are repeated.

**K5. Proprietary claim**

51. ED&F Man does not plead to paragraph 104 (proprietary claims against selected Alleged Fraud Defendants) which does not contain allegations against ED&F Man.

**K6. Additional defences to Danish law claims**

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 27 of 43

HIGH COURT OF JUSTICE ROLLS BUILDING

52. Further or alternatively, under principles developed in Danish case law SKAT (as a public authority) is not entitled to rescind decisions to grant WHT refunds which were made properly and on the basis of Tax Vouchers prepared in good faith and where the information set out therein (save for the Annex A Tax Vouchers) was accurate.

53. Further or alternatively, SKAT's claims against ED&F Man in respect of WHT refund payments made prior to 19 November 2012 are barred by the three year limitation period applicable in Danish law to public debt claims already obsolete on 19 November 2015.

**L. INTEREST**

54. As to paragraph 105 (English law interest claim) and paragraph 106 (Danish law interest claim), (1) it is noted that SKAT claims interest against ED&F Man only if Danish law applies; (2) in the premises it is denied that SKAT is entitled to the interest claimed or at all.

**M. CURRENCY OF CLAIMS**

55. Paragraphs 107 and 108 (currency of claims) are noted.

**N. REVENUE RULE**

56. Further or alternatively, in circumstances where SKAT seeks to enforce in the English courts the revenue laws of Denmark (including (1) the right of Danish companies to withhold tax under the Danish Withholding Tax Act 1967 in respect of shares beneficially owned by foreign shareholders; and (2) double taxation treaties between Denmark and the United States and Canada), SKAT's claims against ED&F Man are liable to be struck out on the grounds that the English courts lack jurisdiction to determine such claims.

**O. SCHEDULE 5T**

57. ED&F Man pleads to Amended Schedule 5T in Annex D to this Amended Defence.

**P. PRAYER FOR RELIEF**

58. In the premises, it is denied that SKAT is entitled to the relief sought against ED&F Man in paragraph (4) (damages), paragraph (5) (restitution), paragraph (7) (interest) and paragraph (8) (costs) or to any relief.

ALI MALEK QC
MATTHEW HARDWICK QC
GEORGE McPHERSON

ALI MALEK QC
MATTHEW HARDWICK QC
GEORGE McPHERSON

Statement of Truth

The Defendant believes that the facts stated in this Amended Defence are true and I am duly authorised by it to sign this statement of truth on its behalf.

Signed: ..........................................................................................................
Full Name: Christopher John Robert Smith
Title/Position: Managing Director of ED&F Man Capital Markets Limited
Date: 5th September 2019

Re-served this 6th day of September 2019 by Rosenblatt, of 9-13 St Andrew Street, London EC4A 3AF solicitors to the 69th Defendant.

## Annex A – incorrect Tax Vouchers

| | Schedule 1 reference | Pension Plan | Share and ISIN | Ex Date | Claimed shareholding | Claimed withheld dividend tax (DKK) |
|---|---|---|---|---|---|---|
| 1. | 174 | JSH FARMS LLC 401 (K) PLAN | Lundbeck A/S DKK0010287234 | 22/03/2013 | 95,900 | 51,786.00 |
| 2. | 177 | KRH FARMS LLC 401 (K) PLAN | Lundbeck A/S DKK0010287234 | 22/03/2013 | 94,100 | 50,814.00 |
| 3. | 180 | MGH FARMS LLC 401 (K) PLAN | Lundbeck A/S DKK0010287234 | 22/03/2013 | 82,200 | 44,388.00 |
| 4. | 183 | MSJJ RETIREMENT GROUP TRUST | Lundbeck A/S DKK0010287234 | 22/03/2013 | 89,400 | 48,276.00 |
| 5. | 186 | SRH FARMS LLC 401 (K) PLAN | Lundbeck A/S DKK0010287234 | 22/03/2013 | 97,150 | 52,461.00 |
| 6. | 188 | SV HOLDINGS, LLC RETIREMENT PLAN | Lundbeck A/S DKK0010287234 | 22/03/2013 | 417,800 | 225,612.00 |
| 7. | 191 | TEW ENTERPRISES, LLC RETIREMENT PLAN | Lundbeck A/S DKK0010287234 | 22/03/2013 | 416,400 | 224,856.00 |
| 8. | 194 | TEW, LP RETIREMENT PLAN | Lundbeck A/S DKK0010287234 | 22/03/2013 | 420,300 | 226,962.00 |
| 9. | 198 | TRITON FARMS LLC 401 (K) PLAN | Lundbeck A/S [illegible] | 22/03/2013 | 101,250 | 54,675.00 |

**Annex B – further details in relation to ED&F Man clients**

| | Client name | Agent |
|---|---|---|
| 1. | Acorn Capital Strategies LLC Employee Pension Profit Sharing Plan & Trust | Acupay System LLC |
| 2. | American Investment Group of New York, L.P. Pension Plan | Goal Taxback Limited |
| 3. | Autoparts Pension Group Trust | Global Equities GmbH |
| 4. | Bluegrass Investment Management, LLC Retirement Plan | Global Equities GmbH |
| 5. | Bluegrass Retirement Group Trust | Global Equities GmbH |
| 6. | Cambridge Way LLC 401K Profit Sharing Plan | Acupay System LLC Co |
| 7. | Casting Pensions Group Trust | Global Equities GmbH |
| 8. | Central Technologies Pensions Group Trust | Global Equities GmbH |
| 9. | DW Construction, Inc. Retirement Place | Goal Taxback Limited |
| 10. | Federated Logistics LLC 401 (K) Plan | Goal Taxback Limited |
| 11. | GSA Trading (Canada) Corporation Pension Plan | Globe Tax Services Incorporated & Goal Taxback Limited |
| 12. | Industrial Pensions Group Trust | Global Equities GmbH |
| 13. | JSH Farms LLC 401 (K) Plan | Global Equities GmbH |
| 14. | Kamco Investments. Inc Pension Plan | Goal Taxback Limited |
| 15. | Kamco LP Profit Sharing Pension Plan | Goal Taxback Limited |
| 16. | Koutroulakis & Co Corporation Pension Plan | Goal Taxback Limited |

| | Client name | Agent |
|---|---|---|
| 23. | Oranje Canada Corporation Pension Plan | Goal Taxback Limited |
| 24. | Riverside Associates Defined Benefit Plan | Goal Taxback Limited |
| 25. | SRH Farms LLC 401 (k) Plan | Global Equities GmbH |
| 26. | Sterling Alpha LLC 401 (k) Profit Sharing Plan | Acupay System LLC |
| 27. | SV Holdings, LLC Retirement Plan | Global Equities GmbH |
| 28. | Tew Enterprises, LLC Retirement Plan | Global Equities GmbH |
| 29. | Tew, LP Retirement Plan | Global Equities GmbH |
| 30. | The Goldstein Law Group PC 401 (k) Profit Sharing Plan | Goal Taxback Limited |
| 31. | Triton Farms LLC 401 (k) Plan | Global Equities GmbH |
| 32. | Tveter LLC Pension Plan | Goal Taxback Limited |

## Annex C – members of Gibraltarian Partnerships

| | | |
|---|---|---|
| **Partner of Hamlyn LP** | | |
| 1. | Del Mar Asset Management Saving & Retirement Plan | Goal Taxback Limited |
| **Partners of Cubix Managers Limited LLP** | | |
| 2. | 5T Advisory Services Retirement Plan Trust | Goal Taxback Limited |
| 3. | KK Law Firm Retirement Plan Trust | Goal Taxback Limited |

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 32 of 43

HIGH COURT OF JUSTICE ROLLS BUILDING

## ANNEX D: RESPONSE TO AMENDED SCHEDULE 5T

1. References to paragraph numbers in this Annex D are to paragraph numbers in Amended Schedule 5T to the Amended Particulars of Claim.

### A. ED&F MAN CAPITAL MARKETS LIMITED

### A1. Description of Defendant

2. Paragraph 1 (description of ED&F Man) is admitted. A description of ED&F Man and its business is set out at paragraph 6.1 of the Amended Defence.

3. As to paragraph 2 (Custodian Representations), it is denied that ED&F Man made or SKAT relied on the Custodian Representations with respect to the Tax Vouchers. Section E of the Amended Defence is repeated.

4. Paragraph 3 (attribution of individuals' knowledge to ED&F Man) is noted.

### A2. Unjust enrichment

5. As to paragraph 4 (ED&F Man's receipt of fees), it is admitted that ED&F Man received fees in the circumstances described in paragraph 43 of the Amended Defence. It is denied that ED&F Man was unjustly enriched thereby, as further set out at paragraphs 42 to 45 of the Amended Defence.

### A3. Negligent misrepresentation

6. As to paragraph 5 (Tax Voucher description), it is assumed that the reference to paragraph 92(s) of the Particulars of Claim (which does not exist) is an error and that SKAT intended to refer to paragraph 92, and ED&F Man pleads accordingly. The description of the documents produced by ED&F Man as "Tax Vouchers" does not support the inference of knowledge alleged. Paragraph 37 of the Amended Defence is repeated.

### A4. Danish law claims

7. As to paragraph 6 (ED&F Man's alleged negligence), it is denied (with the exception of (1) the Annex A Tax Vouchers; and (2) the Annex E Tax Vouchers (in respect of which violation and/or breach is not admitted)) that ED&F Man's conduct violated the *culpa* standard or any other requisite standard of care under Danish law, whether as alleged or at all. Paragraphs 46.1 and 48 of the Amended Defence are repeated.

Case 1:18-cv-05053-LAK Document 100-1 Filed 11/05/19 Page 33 of 43

HIGH COURT OF JUSTICE ROLLS BUILDING

8. Paragraph 7 (ED&F Man's alleged unjust enrichment) is noted. It is denied that ED&F Man is liable in unjust enrichment and/or restitution under Danish law. Paragraph 50 of the Amended Defence is repeated.

9. Further, ED&F Man relies on the additional defences set out at paragraphs 52 and 53 of the Amended Defence.

HIGH COURT ROLLS BUILDING OF JUSTICE

## Annex E – incorrect Tax Vouchers (2)

1. ED&F Man produced 80 Tax Vouchers as particularised in Schedule 1 (64 Tax Vouchers) and Schedule 2 (16 Tax Vouchers) to this Annex E (**the Annex E Tax Vouchers**).

2. The information in the Annex E Tax Vouchers was inaccurate in that the PP identified therein:

   2.1. had not "*received*" the amount set out therein by way of dividend from the Danish Listed Company; and

   2.2. had not "*suffered*" WHT in the amount set out therein in relation to such dividend at the stated (27%) or any rate.

3. Insofar as SKAT accepted or paid WHT reclaims in the sum of DKK183,902,400 or any sum in relation to the Relevant WHT Applications which included the Annex E Tax Vouchers, SKAT's own negligence was the real and substantial cause of such payments and/or eclipsed any causative effect of ED&F Man's negligence in relation to the Annex E Tax Vouchers (if proven). Paragraphs 40 and 41 of the Amended Defence are repeated.

## Annex E: Schedule 1 – incorrect Tax Vouchers

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| | **Schedule 1 reference** | **Pension Plan** | **Shareholding** | **Ex Date** | **Withheld dividend tax (DKK)** |
| 1. | 505 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 500,000 Coloplast A/S – B | 06/12/2013 | 945,000.00 |
| 2. | 535 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 7,850,000 Novozymes A/S - B | 27/02/2014 | 5,298,750.00 |
| 3. | 606 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 24,000,000 TDC A/S | 07/03/2014 | 14,256,000.00 |
| 4. | 629 | DW CONSTRUCTION, INC. RETIREMENT PLAN | 3,300,000 TDC A/S | 07/03/2014 | 1,960,200.00 |
| 5. | 632 | KAMCO INVESTMENTS, INC. PENSION PLAN | 2,000,000 TDC A/S | 07/03/2014 | 1,188,000.00 |
| 6. | 634 | LINDEN ASSOCIATES DEFINED BENEFIT PLAN | 2,150,000 TDC A/S | 07/03/2014 | 1,277,100.00 |
| 7. | 637 | NEWSONG FELLOWSHIP CHURCH 401 (K) PLAN | 2,500,000 TDC A/S | 07/03/2014 | 1,485,000.00 |
| 8. | 640 | RIVERSIDE ASSOCIATES DEFINED BENEFIT PLAN | 2,150,000 TDC A/S | 07/03/2014 | 1,277,100.00 |
| 9. | 646 | THE GOLDSTEIN LAW GROUP PC | 2,200,000 | | |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) |
| 13. | 700 | DW CONSTRUCTION, INC. RETIREMENT PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 |
| 14. | 701 | DW CONSTRUCTION, INC. RETIREMENT PLAN | 3,850,000 Novo Nordisk A/S - B | 21/03/2014 | 4,677,750.00 |
| 15. | 702 | FEDERATED LOGISTICS LLC 401(K) PLAN | 16,500,000 Danske Bank A/S | 19/03/2014 | 8,910,000.00 |
| 16. | 703 | FEDERATED LOGISTICS LLC 401(K) PLAN | 10,000,000 Novo Nordisk A/S - B | 21/03/2014 | 12,150,000.00 |
| 17. | 704 | KAMCO INVESTMENTS, INC. PENSION PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 |
| 18. | 705 | KAMCO INVESTMENTS, INC. PENSION PLAN | 2,000,000 Novo Nordisk A/S - B | 21/03/2014 | 2,430,000.00 |
| 19. | 706 | KAMCO LP PROFIT SHARING PENSION PLAN | 7,375,000 Danske Bank A/S | 19/03/2014 | 3,982,500.00 |
| 20. | 708 | LINDEN ASSOCIATES DEFINED BENEFIT PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 |
| 21. | 709 | LINDEN ASSOCIATES DEFINED BENEFIT PLAN | 2,000,000 Novo Nordisk A/S - B | 21/03/2014 | 2,430,000.00 |
| 22. | 710 | MOIRA ASSOCIATES LLC 401 (K) PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) |
| 26. | 714 | RIVERSIDE ASSOCIATES DEFINED BENEFIT PLAN | 2,000,000 Novo Nordisk A/S - B | 21/03/2014 | 2,430,000.00 |
| 27. | 715 | THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 |
| 28. | 716 | THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN | 2,000,000 Novo Nordisk A/S - B | 21/03/2014 | 2,430,000.00 |
| 29. | 829 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 350,000 Tryg A/S | 04/04/2014 | 2,551,500.00 |
| 30. | 830 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 12,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 4,536,000.00 |
| 31. | 831 | FEDERATED LOGISTICS LLC 401(K) PLAN | 300,000 Tryg A/S | 04/04/2014 | 2,187,000.00 |
| 32. | 832 | FEDERATED LOGISTICS LLC 401(K) PLAN | 18,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 6,804,000.00 |
| 33. | 843 | DW CONSTRUCTION, INC. RETIREMENT PLAN | 5,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 1,890,000.00 |
| 34. | 844 | KAMCO LP PROFIT SHARING PENSION PLAN | 5,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 1,890,000.00 |
| 35. | 845 | LINDEN ASSOCIATES DEFINED BENEFIT PLAN | 175,000 Tryg A/S | 04/04/2014 | 1,275,750.00 |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) |
| 39. | 849 | RIVERSIDE ASSOCIATES DEFINED BENEFIT PLAN | 175,000 Tryg A/S | 04/04/2014 | 1,275,750.00 |
| 40. | 850 | TVETER LLC PENSION PLAN | 1,000,000 TDC A/S | 07/03/2014 | 594,000.00 |
| 41. | 851 | TVETER LLC PENSION PLAN | 390,000 Danske Bank A/S | 19/03/2014 | 210,600.00 |
| 42. | 852 | TVETER LLC PENSION PLAN | 225,000 Novo Nordisk A/S - B | 21/03/2014 | 273,375.00 |
| 43. | 853 | TVETER LLC PENSION PLAN | 800 A.P. Møller Mærsk A/S - B | 01/04/2014 | 302,400.00 |
| 44. | 854 | TVETER LLC PENSION PLAN | 100,000 Tryg A/S | 04/04/2014 | 729,000.00 |
| 45. | 1092 | ACORN CAPITAL STRATEGIES LLC EMPLOYEE PENSION PROFIT SHARING PLAN & TRUST | 20,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 7,560,000.00 |
| 46. | 1093 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 5,000,000 Danske Bank A/S | 19/03/2014 | 2,700,000.00 |
| 47. | 1094 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 612,500 Tryg A/S | 04/04/2014 | 4,465,125.00 |
| 48. | 1095 | CAMBRIDGE WAY LLC 401K | 20,000 | | |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) |
| 51. | 1164 | RIVERSIDE ASSOCIATES DEFINED BENEFIT PLAN | 322,500 Dampskibsselskabet Norden A/S | 24/04/2014 | 435,375.00 |
| 52. | 1165 | THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN | 215,000 Dampskibsselskabet Norden A/S | 24/04/2014 | 290,250.00 |
| 53. | 1166 | TVETER LLC PENSION PLAN | 240,000 Dampskibsselskabet Norden A/S | 24/04/2014 | 324,000.00 |
| 54. | 1391 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 425,000 Dampskibsselskabet Norden A/S | 24/04/2014 | 573,750.00 |
| 55. | 1508 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 3,000,000 Coloplast A/S - B | 09/05/2014 | 3,240,000.00 |
| 56. | 1510 | DW CONSTRUCTION, INC. RETIREMENT PLAN | 1,300,000 Coloplast A/S - B | 09/05/2014 | 1,404,000.00 |
| 57. | 1511 | FEDERATED LOGISTICS LLC 401(K) PLAN | 1,300,000 Coloplast A/S - B | 09/05/2014 | 1,404,000.00 |
| 58. | 1513 | KAMCO INVESTMENTS, INC. PENSION PLAN | 1,300,000 Coloplast A/S - B | 09/05/2014 | 1,404,000.00 |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) |
| 62. | 1583 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 2,850,000 Coloplast A/S - B | 09/05/2014 | 3,078,000.00 |
| 63. | 1945 | NEWSONG FELLOWSHIP CHURCH 401 (K) PLAN | 50,000 IC Group A/S | 25/09/2014 | 40,500.00 |
| 64. | 2064 | AMERICAN INVESTMENT GROUP OF NEW YORK, L.P. PENSION PLAN | 750,000 Novozymes A/S - B | 26/02/2015 | 607,500.00 |

## Annex E: Schedule 2 – incorrect Tax Vouchers

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) |
| 1. | 527 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 2,000,000 Coloplast A/S - B | 06/12/2013 | 3,780,000.00 |
| 2. | 615 | AMERICAN INVESTMENT GROUP OF NEW YORK, L.P. PENSION PLAN | 5,000,000 TDC A/S | 07/03/2014 | 2,970,000.00 |
| 3. | 617 | AUTOPARTS PENSIONS GROUP TRUST | 3,705,000 TDC A/S | 07/03/2014 | 2,200,771.00 |
| 4. | 620 | BLUEGRASS INVESTMENT MANAGEMENT, LLC RETIREMENT PLAN | 4,248,000 TDC A/S | 07/03/2014 | 2,523,312.00 |
| 5. | 621 | BLUEGRASS RETIREMENT GROUP TRUST | 1,610,000 TDC A/S | 07/03/2014 | 956,340.00 |
| 6. | 623 | CASTING PENSIONS GROUP TRUST | 3,402,400 TDC A/S | 07/03/2014 | 2,021,025.60 |
| 7. | 624 | CENTRAL TECHNOLOGIES PENSIONS GROUP TRUST | 1,570,000 TDC A/S | 07/03/2014 | 932,580.00 |
| 8. | 631 | INDUSTRIAL PENSIONS GROUP TRUST | 3,713,200 TDC A/S | 07/03/2014 | 2,205,640.80 |
| 9. | 633 | KAMCO LP PROFIT SHARING | 5,000,000 | 07/03/2014 | 2,970,000.00 |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) |
| 13. | 645 | TEW, LP RETIREMENT PLAN | 4,959,200 TDC A/S | 07/03/2014 | 2,945,764.80 |
| 14. | 658 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 7,900,000 Novozymes A/S - B | 27/02/2014 | 5,332,500.00 |
| 15. | 697 | AMERICAN INVESTMENT GROUP OF NEW YORK, L.P. PENSION PLAN | 7,750,000 Danske Bank A/S | 19/03/2014 | 4,185,000.00 |
| 16. | 707 | KAMCO LP PROFIT SHARING PENSION PLAN | 4,400,000 Novo Nordisk A/S - B | 21/03/2014 | 5,346,000.00 |

HIGH COURT
ROLLS BUILDING
OF JUSTICE

Amended by Order of The Honourable Mr Justice Teare dated 6 March 2019 (as varied by Order of The Honourable Mrs Justice Cockerill dated 20 May 2019)

**Claim Nos.: CL-2018-000297; CL-2018-000404; CL-2018-000590**

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT**

**B E T W E E N:**

**SKAT**
**(THE DANISH CUSTOMS AND TAX ADMINISTRATION)**
**Claimant**

**- and -**

**ED&F MAN CAPITAL MARKETS LIMITED AND OTHERS**
**Defendants**

---

# AMENDED DEFENCE

---

**Rosenblatt**
**9-13 St Andrew Street**
**London EC4A 3AF**
**Tel: (020) 7955 0880**
**Fax: (020) 7955 0888**
**DX: LDE 493**

**Solicitor's Ref: TS/ASF/EDF/1/57**

# EXHIBIT B

Case 1:18-cv-05053-LAK Document 100-2 Filed 11/05/19 Page 2 of 2

ED&F MAN

E D & F MAN CAPITAL MARKETS LIMITED

# Tax Voucher

We ED&F Man Capital Markets Ltd, based at Cotton's Centre, Hays Lane, London SE1 2QE and registered in the United Kingdom – confirm, The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein – Suite 1915, 61 Broadway, New York City, New York, 10006, United States of America, was holding the below security over the dividend date.

| | |
|---|---|
| Security Description: | TDC A/S |
| ISIN: | DK0060228559 |
| SEDOL: | 5698790 |
| Ex Date: | 07th March 2014 |
| Record Date: | 11th March 2014 |
| Pay Date: | 12th March 2014 |
| Quantity: | 2,200,000 Shares |
| Gross Div Rate: | DKK 2.20 |
| Amount Received: | DKK 3,533,200.00 |
| WHT Suffered: | DKK 1,306,800.00 |
| WHT %: | 27% |

ED&F Man Capital Markets Limited has no beneficial interest in the holding and will not be reclaiming the tax. The dividends specified on this credit advice were paid net of withholding tax to The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein. If you have any further concerns or issues please do not hesitate to contact us.

AUTHORISED SIGNATORY

Christina MacKinnon

Head of Securities Operations

# EXHIBIT C

ED&F MAN

E D & F MAN CAPITAL MARKETS LIMITED

# Tax Voucher

We ED&F Man Capital Markets Ltd, based at Cotton's Centre, Hays Lane, London SE1 2QE and registered in the United Kingdom – confirm, The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein - 61 Broadway, Suite 1915, New York, NY 10006, , USA, was holding the below security over the dividend date.

| | |
|---|---|
| Security Description: | Danske Bank A/S |
| ISIN: | DK0010274414 |
| SEDOL: | 4588825 |
| Ex Date: | 19/03/2014 |
| Record Date: | 21/03/2014 |
| Pay Date: | 24/03/2014 |
| Quantity: | 2,000,000.00 |
| Gross Div Rate: | 2 |
| Amount Received: | 2,920,000.00 |
| WHT Suffered: | 1,080,000.00 |
| Currency | DKK |
| WHT %: | 27% |

ED&F Man Capital Markets Limited has no beneficial interest in the holding and will not be reclaiming the tax. The dividends specified on this credit advice were paid net of withholding tax to The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein. If you have any further concerns or issues please do not hesitate to contact us.

AUTHORISED SIGNATORY

Christina MacKinnon

Head of Securities Operations

# EXHIBIT D

ED&F MAN

E D & F MAN CAPITAL MARKETS LIMITED

# Tax Voucher

We ED&F Man Capital Markets Ltd, based at Cotton's Centre, Hays Lane, London SE1 2QE and registered in the United Kingdom – confirm, The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein - 61 Broadway, Suite 1915, New York, NY 10006, USA, was holding the below security over the dividend date.

| | |
|---|---|
| Security Description: | Novo Nordisk A/S |
| ISIN: | DK0060534915 |
| SEDOL: | BHC8X90 |
| Ex Date: | 21/03/2014 |
| Record Date: | 25/03/2014 |
| Pay Date: | 26/03/2014 |
| Quantity: | 2,000,000.00 |
| Gross Div Rate: | 4.5 |
| Amount Received: | 6,570,000.00 |
| WHT Suffered: | 2,430,000.00 |
| Currency | DKK |
| WHT %: | 27% |

ED&F Man Capital Markets Limited has no beneficial interest in the holding and will not be reclaiming the tax. The dividends specified on this credit advice were paid net of withholding tax to The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein. If you have any further concerns or issues please do not hesitate to contact us.

AUTHORISED SIGNATORY

Christina MacKinnon

Head of Securities Operations

# EXHIBIT E

ED&F MAN

E D & F MAN CAPITAL MARKETS LIMITED

# Tax Voucher

We ED&F Man Capital Markets Ltd, based at Cotton's Centre, Hays Lane, London SE1 2QE and registered in the United Kingdom – confirm, The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein - 61 Broadway, Suite 1915, New York, 10006, USA, was holding the below security over the dividend date.

| | |
|---|---|
| Security Description: | D/S Norden A/S |
| ISIN: | DK0060083210 |
| SEDOL: | B1WP656 |
| Ex Date: | 24/04/2014 |
| Record Date: | 28/04/2014 |
| Pay Date: | 29/04/2014 |
| Quantity: | 215,000.00 |
| Gross Div Rate: | 5 |
| Amount Received: | 784,750.00 |
| WHT Suffered: | 290,250.00 |
| Currency | DKK |
| WHT %: | 27% |

ED&F Man Capital Markets Limited has no beneficial interest in the holding and will not be reclaiming the tax. The dividends specified on this credit advice were paid net of withholding tax to The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein. If you have any further concerns or issues please do not hesitate to contact us.

AUTHORISED SIGNATORY

Christina MacKinnon

Head of Securities Operations

Cottons Centre
Hay's Lane
London SE1 2QE

Telephone: +44 (0)20 7089 8000

Regulated by the Financial Services Authority
Registered in England No.1292851

# EXHIBIT F

# CUSTODY AGREEMENT

**THIS CUSTODY AGREEMENT** is made on 21 June 2012

**BETWEEN:**

(1) **E D & F MAN CAPITAL MARKETS LIMITED**, registered in England and Wales with company number 1292851, whose registered office is at Cottons Centre, Hay's Lane, London, SE1 2QE (the "**Custodian**"); and

(2) **THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN FBO SHELDON AND SCOTT GOLDSTEIN** the "**Client**").

**IT IS AGREED** as follows:

## 1. DEFINITIONS AND INTERPRETATION

### 1.1 Definitions

Capitalised terms in this Agreement have the meaning given to them below:

"**Authorised Signatory**" means any person who is designated in writing by the Client from time to time to act on behalf of the Client in respect of this Agreement;

"**Business Day**" means a day on which the Trans-European Automated Real-time Gross settlement Express Transfer (TARGET) system is open;

"**Client Cash**" means cash in any currency arising out of or in connection with the Client Securities and any amounts standing to the credit of the Client Cash Account;

"**Client Property**" means the Client Cash and/or the Client Securities;

"**Client Securities**" means any securities (including evidence thereof, evidence of title thereto and all rights in respect thereof) deposited or transferred by the Client or on the Client's behalf to the Custodian or a Sub-Custodian or collected by the Custodian or a Sub-Custodian for the Client's account;

"**Client Securities Voting Rights**" means each and any right to vote exercisable in respect of the Client Securities;

"**Costs and Expenses**" means costs, charges, losses, liabilities, expenses and other sums (including legal, accountants' and other professional fees) and any Tax thereon;

"**Custody Accounts**" means the Client Cash Accounts and the Client Securities Accounts, and "Custody Account" shall mean any or a particular one of them as the context requires;

"**FSA**" means the Financial Services Authority of the United Kingdom (including any successor or replacement regulatory authority);

"**FSA Rules**" means the rules promulgated by the FSA pursuant to FSMA and set out in the FSA's handbook of rules and guidance, as updated, amended or repealed from time to time;

Case 1:18-cv-05053-LAK Document 100-6 Filed 11/05/19 Page 3 of 19

"**FSMA**" means the Financial Services and Markets Act 2000;

"**Secured Liabilities**" has the meaning given to such term in the Security and Set-Off Deed;

"**Security and Set-Off Deed**" means the security and set-off deed dated on or about the date hereof between the Custodian and the Client;

"**Sub-Custodian**" means "Deutsche Bank Custody Services" or any other sub-custodian appointed by the Custodian from time to time;

"**Tax**" or "**taxation**" or "**tax**" includes any tax, levy, impost, duty, charge, fee, contribution, deduction or withholding of any nature, and any interest or penalties in respect thereof.

**1.2 Construction of particular terms**

Unless otherwise specified, any reference to:

(a) an "**affiliate**" means in relation to any person, a subsidiary of that person or a holding company of that person or any other subsidiary of that holding company;

(b) "**assets**" includes properties, revenues and rights of every kind, present, future and contingent, and whether tangible or intangible;

(c) a "**company**" includes any company, corporation or other body corporate, wherever and however incorporated or established;

(d) "**holding company**" means a holding company within the meaning of section 1159 of the Companies Act 2006;

(e) "**law**" includes common or customary law, principles of equity and any constitution, code of practice, decree, judgement, decision, legislation, order, ordinance, regulation, bye-law, statute, treaty or other legislative measure in any jurisdiction or any present or future directive, regulation, guideline, request, rule or requirement (in each case, whether or not having the force of law but, if not having the force of law, the compliance with which is in accordance with the general practice of persons to whom the directive, regulation, guideline, request, rule or requirement is intended to apply) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(f) "**liability**" includes, and "**liabilities**" include, any loss, damage, cost, charge, claim, demand, expense, judgement, action, proceeding or other liability whatsoever (including, without limitation, in respect of taxes, duties, levies, imposts and other charges);

(g) a "**person**" includes any natural person, firm, company, corporation, undertaking, government, state or agency of a state, any local or municipal authority, trust, any association or partnership (whether or not having separate legal personality) of two or more of the foregoing or other legal entity;

(h) a "**regulation**" includes any regulation, rule, official directive, request or guideline (in each case, whether or not having the force of law but, if not having the force of law, the compliance with which is in accordance with the general practice of

Case 1:18-cv-05053-LAK Document 100-6 Filed 11/05/19 Page 4 of 19

persons to whom the regulation, rule, official directive, request or guideline is intended to apply) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(i) "**rights**" includes all rights, title, benefits, powers, privileges, interests, claims, authorities, discretions, remedies, liberties, easements, quasi easements and appurtenances (in each case, of every kind, present, future and contingent);

(j) "**security**" or "**security interest**" includes any mortgage, charge, pledge, lien, security assignment, hypothecation or trust arrangement for the purpose of providing security and any other encumbrance or security interest of any kind having the effect of securing any obligation of any person (including, without limitation, the deposit of moneys or property with a person with the intention of affording such person a right of set-off or lien) and any other agreement or any other type of arrangement having a similar effect; and

(k) "**subsidiary**" means a subsidiary within the meaning of section 1159 of the Companies Act 2006 and a subsidiary undertaking within the meaning of section 1161 of the Companies Act 2006.

**1.3 Interpretation**

(a) Words importing the singular shall include the plural and vice versa.

(b) Unless a contrary indication appears, a reference to any party or person shall be construed as including its and any subsequent successors in title, permitted transferees and permitted assigns, in each case in accordance with their respective interests.

(c) Unless a contrary indication appears, a reference to a time of day shall be construed as referring to London time.

(d) Section, clause and Schedule headings are for ease of reference only and shall be ignored in construction.

(e) Unless a contrary indication appears, references to any provision of any law or regulation are to be construed as referring to that provision as it may have been, or may from time to time be, amended or re enacted, and as referring to all bye laws, instruments, orders and regulations for the time being made under or deriving validity from that provision.

(f) A reference to any document is a reference to that document as amended, restated, supplemented, novated or replaced from time to time (except where the context otherwise requires).

**2. APPOINTMENT**

(a) The Client hereby appoints the Custodian to act as bare trustee for the purposes of safekeeping the Client Property upon the terms of this Agreement and the Custodian agrees to act as such upon the terms and conditions set out in this Agreement.

(b) The Custodian shall open the following accounts:

Case 1:18-cv-05053-LAK Document 100-6 Filed 11/05/19 Page 5 of 19

(i) one or more custody accounts in the Custodian's books recording any Client Securities (the "**Client Securities Accounts**"); and

(ii) one or more accounts in the Custodian's books recording any Client Cash held by or on behalf of the Custodian on account of the Client (the "**Client Cash Account**").

(c) Each Custody Account shall be maintained in London, England.

(d) Subject to Clause 2(c), the Client Property may be held by the Custodian at any of the Custodian's places of business or (in accordance with Clause 4 (*Use of Sub-Custodians*)) by a Sub-Custodian in the United Kingdom or elsewhere, at the Custodian's absolute discretion.

(e) The Client Securities shall be held, recorded, registered and segregated in accordance with the FSA Rules or, where held outside the United Kingdom, the equivalent of the FSA Rules relating solely to these matters, provided that the Custodian shall not be required to comply with any equivalent of the FSA Rules which require any consent to be obtained or notification to be given by the Custodian.

(f) The Custodian shall only accept custody under this Agreement of Client Property.

**3. CATEGORISATION**

(a) The Client hereby acknowledges that the Custodian shall classify the Client as a "Elective Professional Client" for the purpose of the FSA Rules; that the Client has not objected to this classification; and the Client hereby confirms that it consents to such classification.

(b) The Client may be entitled to request a different categorisation under the FSA Rules. However, a different categorisation could result in the loss of certain client protections.

**4. USE OF SUB-CUSTODIANS**

(a) The Custodian may from time to time delegate to a Sub-Custodian any of the Custodian's duties under this Agreement, including (without limitation) the safekeeping of the Client Property, and each such Sub-Custodian shall hold the Client Property at the Client's risk and, subject to Clauses 2(e) and 4(b), on such terms and conditions as such Sub-Custodian may require.

(b) The Client acknowledges that any Sub-Custodian may delegate or appoint an agent or sub-custodian to perform any of its duties as Sub-Custodian.

(c) Holdings of the Client Property by Sub-Custodians will be subject to applicable laws and regulations including, without limitation, any applicable rules of the relevant Sub-Custodian and the Custodian is under no obligation to take or refrain from taking any action in relation to such Client Property, whether pursuant to a Client Instruction or otherwise, except to the extent the Custodian has a right to require the Sub-Custodian to take or refrain from taking such action.

(d) Notwithstanding any other provision of this Agreement, where the Client Property is held by a Sub-Custodian the Custodian has no liability or responsibility of any nature whatsoever to the Client in relation to the Client Property except to the

Case 1:18-cv-05053-LAK Document 100-6 Filed 11/05/19 Page 6 of 19

extent that the Sub-Custodian has an equivalent liability to the Custodian in relation to the Client Property under the Sub-Custody Agreement.

## 5. CUSTODY OF THE CLIENT SECURITIES

(a) The Client shall deliver assets intended for custody under this Agreement to the Custodian or as the Custodian may direct at the Client's expense and risk, in the manner, and accompanied by such documents, as the Custodian may require.

(b) The Custodian will identify in the Custodian's books that the Client Securities are beneficially owned by the Client. The Custodian will require Sub-Custodians to identify in their books that the Client Securities are held to the order of the Custodian.

(c) The Custodian may pool the Client Securities with securities held by the Custodian for other clients. The Client Securities may be held by the Custodian or by any Sub-Custodian in a fungible account in which case the Custodian will identify in its books that such Client Securities belong to the Client. The Custodian may use the Client Securities for the account of another customer and vice versa.

(d) The Custodian may hold any document of title or document evidencing title to the Client Securities:

(i) in the Custodian's physical possession;
(ii) with a Sub-Custodian; or
(iii) otherwise, with the prior written consent of the Client.

(e) Notwithstanding any other provision of this Agreement, but without prejudice to the Client's proprietary rights, the Client Securities will be deemed to be fungible for the purposes of this Agreement. Accordingly, the Customer's redelivery rights in respect of the Client Securities are not in respect of the Securities actually deposited with the Custodian from time to time but rather in respect of Securities of the same number, class, denomination and issue as those Securities originally deposited with the Custodian from time to time. A reference in this Agreement to "Client Securities" (and similar expressions) shall be construed accordingly.

## 6. REGISTRATION OF SECURITIES

(a) All Client Securities delivered to the Custodian shall be registered in the name of the Client, Custodian, nominee or agent of the Custodian, or Sub-Custodian in compliance with FSA Rules.

(b) The Client acknowledges that where Client Securities are registered in the name of the Custodian, the Client Securities may not be segregated from other securities held by the Custodian and the Client Securities and may not be identifiable by separate certificates or other physical documents of title. Consequently, should the Custodian become insolvent, the Client securities may not be protected from claims made on behalf of the general creditors of the Custodian.

(c) The Client acknowledges that where the Client Securities are held by a Sub-Custodian outside the United Kingdom, different settlement, legal and regulatory

Case 1:18-cv-05053-LAK Document 100-6 Filed 11/05/19 Page 7 of 19

requirements, and different practices relating to the segregation of those securities, may apply.

(d) Where the Client Securities are registered in the same name as the securities of other clients of the Custodian, the Client is warned that its entitlements to particular Client Securities may not be identifiable by separate certificates or other physical documents of title, and that, should the Custodian default, any shortfall in the Client Securities registered in that name may be shared pro rata among all Clients whose securities are registered.

(e) Where the Client has instructed the Custodian on the holding, registration or recording of Client Securities, the Client is hereby notified that the consequences of doing so are at the Client's own risk unless the Custodian has agreed otherwise.

(f) Where any Client Securities are in uncertificated form or are otherwise transferable by book entry transfer, the Client agrees that the Custodian may (where this is market practice) use the services of any securities depository, clearing or settlement system, account controller or other participant in the relevant system, on such terms as the Custodian may think fit, for the purposes of the holding and transfer of such Client Securities (or entitlements thereto). Such Client Securities or entitlements will, so far as is practicable, be separately identifiable from any Client Securities or entitlements held within the same system for the account of the Custodian.

## 7. AUTHORISED SIGNATORIES

The Client shall provide the Custodian with a list of Authorised Signatories together with specimens of their signatures and the Custodian shall be entitled to rely upon the continued authority of the Authorised Signatories until the Custodian receives written notice from the Client to the contrary.

## 8. CLIENT INSTRUCTIONS

(a) The Custodian may act on instructions ("**Client Instructions**") from an Authorised Signatory or Client Instructions purporting to be given by an Authorised Signatory received by the Custodian in writing, or by electronic or other medium agreed in writing between the parties. Client Instructions given by an agreed electronic medium shall be deemed to have been given by an Authorised Signatory.

(b) Client Instructions shall continue in full force and effect until cancelled or suspended.

(c) The Custodian may, in the Custodian's absolute discretion (but shall be under no duty to), refuse to act on Client Instructions which are not given in accordance with this Agreement.

(d) If any Client Instructions are incomplete, unclear, ambiguous, and/or in conflict with other Client Instructions, the Custodian may at the Custodian's absolute discretion and without any liability on the Custodian's part, act upon what the Custodian believes in good faith such Client Instructions to be or refuse to act on such Client Instructions until any incompleteness, lack of clarity, ambiguity and/or conflict has been resolved to the Custodian's satisfaction.

Case 1:18-cv-05053-LAK Document 100-6 Filed 11/05/19 Page 8 of 19

(e) The Custodian will promptly inform an Authorised Signatory if it is not going to act on a particular Client Instruction received from such individual.

(f) Client Instructions shall be carried out subject to the rules, operating procedures and market practice of any relevant stock exchange, Sub-Custodian or market (the "**Custody Rules**"). The Custodian may refuse to carry out Client Instructions if in the Custodian's reasonable opinion they are contrary to the Custody Rules or any applicable law, or other regulatory or fiscal requirement and shall be entitled at the Custodian's absolute discretion to amend Client Instructions so that they comply with the Custody Rules, in which case the Custodian shall promptly notify the Client of such amendment.

(g) The Custodian shall be under no duty to challenge or make any enquires concerning any Client Instruction and, subject to Clause 8(d), all Client Instructions shall be deemed to be conclusive of the Client's order or instruction.

**9. SETTLEMENT AND REDELIVERY**

(a) In accordance with Client Instructions and subject to Clause 8 (*Client Instructions*), the Custodian will arrange for the settlement of transactions which have been executed by the Client or on the Client's behalf.

(b) The Custodian shall credit the Client Cash Account with the proceeds of any sale or exchange of Client Securities and debit the Client Cash Account for the cost of any Client Securities purchased or acquired only on the date on which such proceeds or Client Securities are received by the Custodian.

(c) If Client Instructions are given to transfer to Client or at its direction, Client Property other than as contemplated by the foregoing provisions of this Clause 9 then, subject to Clauses 8 (*Client Instructions*) and 9(d) and subject to the Custodian being able to give effect to such Client Instructions in accordance with their terms, the Custodian shall give effect to the relevant transfer.

(d) The Custodian shall be under no obligation to act on Client Instructions:

(i) to settle any purchase of Client Securities unless and until there is sufficient Client Cash in the Client Cash Account (or other arrangements for payment satisfactory to the Custodian have been made);

(ii) to settle or give effect to any sale or other transfer of Client Securities unless the Client Securities are in deliverable form in the relevant Client Securities Accounts; or

(iii) to give effect to any transfer to the Client or at its direction, of Client Cash unless there is sufficient Client Cash in the Client Cash Account.

**10. ACTIONS NOT REQUIRING CLIENT INSTRUCTIONS**

In the absence of contrary Client Instructions, the Custodian is authorised by the Client to carry out the following actions relating to Client Property without reference to the Client, namely:

(a) to take such actions as are necessary to settle: (i) the transactions contemplated by the Transaction Documents (as defined in the Security and Set-Off Deed); and (ii)

Case 1:18-cv-05053-LAK Document 100-6 Filed 11/05/19 Page 9 of 19

transactions contemplated by any instruction in respect of the Client Securities given by the Client to its broker;

(b) to collect and receive, for the Client's account, all payments (whether income or capital), income and dividends in respect of Client Property and to credit such to the Client Cash Account, and to take any action necessary and proper in connection with the same and the endorsement for collection of cheques, drafts and other negotiable instruments and the deduction or withholding of any sum on account of any Tax which may be due from either the Custodian or the Client in respect of Client Property;

(c) to execute on the Client's behalf such ownership and other certificates as may be required to obtain payment in respect of the Client Securities;

(d) to exchange interim or temporary documents of title to the Client Securities for definitive ones; and

(e) to perform and carry out on the Client's behalf or otherwise all acts which, in the Custodian's reasonable opinion or the reasonable opinion of any Sub-Custodian, are requisite or desirable to enable the Custodian or a Sub-Custodian, to implement any Client Instructions or otherwise to perform the Custodian's duties and exercise the Custodian's rights under this Agreement.

## 11. OTHER SERVICES AND SCOPE OF RESPONSIBILITY

(a) The Custodian shall use all reasonable care in performing its obligations under this Agreement and shall look after the Client Securities with all reasonable care.

(b) Income, dividends and redemption proceeds on the Client Securities will only be credited (net of Taxes) after actual receipt and reconciliation.

(c) Provided the Custodian receives the requisite information acting in its capacity as custodian under this Agreement, the Custodian shall use reasonable endeavours to notify the Client of all calls for redemption, grants or expiration of conversion rights or subscription rights, mergers, takeover or other offers, consolidations, reorganisations and capitalisations affecting the Client Securities.

(d) For the avoidance of doubt, and subject to Clause 10 (*Actions not requiring Client Instructions*), the Custodian shall not, except in accordance with Client Instructions, take any action in relation to the matters referred to in Clause 11(c) and the Custodian is not responsible for the exercise of any conversion or subscription rights or for dealing with takeover or other offers or capital restructuring.

(e) The Custodian shall notify the Client when the Client Securities Voting Rights become exercisable by the Custodian in respect of any Client Securities promptly upon becoming aware of the same and shall, subject to Clause 11(f), exercise such Client Securities Voting Rights in accordance with the Client's written instructions provided such instructions are received so as to allow the Custodian acting on its best efforts to do so. If no such instructions are received from the Client then the Custodian shall not exercise such Client Securities Voting Rights.

(f) The Custodian shall not be obliged to act in accordance with the written instructions given under Clause 11(e) unless:

(i) such instructions are clear, unambiguous and lawful; and

Case 1:18-cv-05053-LAK Document 100-6 Filed 11/05/19 Page 10 of 19

(ii) the exercise by the Custodian of the Client Securities Voting Rights in accordance with such instructions is lawful; and

(iii) the proposed resolution or matter in respect of which the Client Securities Voting Rights are to be exercised in accordance with such instructions is lawful.

(g) Unless otherwise agreed in writing and subject to Clause 10 (*Actions not requiring Client Instructions*), the Client shall be responsible for all filings, Tax returns and reports on any transactions undertaken or settled pursuant to this Agreement which must be made to any relevant authority whether governmental or otherwise for the payment of all unpaid calls, Taxes (including, without limitation, any value added tax) or any other liability or payment arising out of or in connection with the Client Property.

(h) The Client shall, if required in connection with any Taxes required to be withheld or otherwise paid in respect of interest, dividends, redemption proceeds or other income arising from the Client Property, provide any relevant information to the Custodian and co-operate with the Custodian in furnishing information, executing documents or otherwise. The Custodian shall rely on such information as has been provided by the Client, and the Client shall be responsible for notifying the Custodian of any changes affecting its Tax position or status. Other than as may be expressly provided in this Agreement, the Custodian shall have no responsibility with regard to the Client's Tax position or status in any jurisdiction.

(i) Neither the Custodian nor any Sub-Custodian shall be obliged to:

(i) institute legal or administrative proceedings on behalf of the Client or in respect of any Client Property or any Tax; or

(ii) file a claim or proof of claim in any insolvency proceedings.

(j) The Custodian shall be under no duty or obligation to insure the Client Property or any part of the Client Property, for the Client against any risk.

(k) The Custodian shall be under no duty to take or omit to take any action with respect to the Client Property or otherwise except in accordance with this Agreement.

(l) Without prejudice to Clause 11(g) above, the Client will be responsible for all filings, returns, reports and statements with any regulatory authority which it is required to make either by that authority or under applicable laws, rules or regulations.

(m) The Custodian does not act as manager or investment adviser to the Client under this Agreement, and responsibility for the selection, acquisition and disposal of the Client Property remains with the Client at all times.

(n) The Custodian may appoint agents to conduct any of the services referred to in this Clause 11 (or in any other agreement expressed to form part of this Agreement) including, without limitation, any of its affiliates or persons connected with any Sub-Custodian.

Case 1:18-cv-05053-LAK Document 100-6 Filed 11/05/19 Page 11 of 19

**12. RECORDS AND STATEMENTS**

(a) The Custodian shall keep all records and statements as may be necessary to give the Client a complete record of all Client Property held by it on behalf of the Client from time to time and of all material actions taken by it pursuant to this Agreement.

(b) The Custodian shall provide the Client with a statement of Client Property held by the Custodian on behalf of the Client at intervals to be agreed with the Client.

(c) The basis on which Client Property is valued as shown in such statements shall be notified to the Client.

**13. LIMITATIONS OF LIABILITY**

(a) The Custodian shall only be liable to the Client for any liability, loss or cost suffered by or incurred by the Client to the extent that such liability, loss or cost is a direct result of its own breach of duty, the wilful default, fraud or negligence of the Custodian in providing services under this Agreement.

(b) Subject to Clause 13(a) above, the Custodian shall not be liable to the Client for any liability, loss or cost suffered by the Client arising from:

(i) the acts, omissions or the insolvency of any Sub-Custodian or its agent in the absence of breach of duty, negligence or wilful default by the Custodian in the initial selection of any Sub-Custodian;

(ii) the collection or deposit or crediting to the relevant Client Securities Account of invalid, fraudulent or forged Client Securities or any entry in the Client Securities Accounts or the Client Cash Account which may be made in connection with that collection, deposit, crediting or entry;

(iii) any delay arising while the Custodian obtains clarification of Client Instructions in accordance with Clause 8(d);

(iv) acting on what the Custodian in good faith believes to be valid Client Instructions or in relation to notices, requests, waivers, consents, receipts, corporate resolutions or their equivalent or other documents which the Custodian in good faith believes to be genuine; or

(v) effecting delivery or payment against an expectation of receipt, except where such delivery or payment is contrary to the Client Instruction or relevant local market practice.

(c) Investing in foreign markets and holding assets overseas may involve special risks. The Client should be aware that there may be different settlement, legal and regulatory requirements in overseas jurisdiction from those applying in the United Kingdom, together with different practices for the separate identification of Client Securities where the Custodian arranges for such Client Securities to be held overseas.

(d) For the avoidance of doubt and subject to Clause 13(a) above, the Custodian accepts no liability whatsoever for any liability, loss or cost suffered or incurred by the Client resulting from the general risks of investment or the holding of assets including, but not limited to, losses arising from nationalisation, expropriation or

Case 1:18-cv-05053-LAK Document 100-6 Filed 11/05/19 Page 12 of 19

other governmental actions, regulations of the banking or securities industries, including changes in market rules, currency restrictions, devaluations or fluctuations, and market conditions affecting the execution or settlement of transactions or the value of assets.

(e) The Custodian shall not be responsible for any loss resulting from acts of war, terrorism, insurrection, revolution, acts of God, strikes or work stoppages, failures of settlement systems to settle transactions, or other events beyond the reasonable control of the Custodian.

(f) Any liability of any nature which arises from the provision by the Custodian of its services under this Agreement shall be limited to the amount of the Client's actual loss at the time the loss is discovered (which loss shall, in respect of any asset which has been mislaid or lost, be determined solely by reference to the market value of that asset) but without reference to any special conditions or circumstances known to the Custodian at the time of entering into this Agreement, or at the time of accepting any Client Instructions, which increases the amount of the loss. In no event shall the Custodian be liable for any consequential or special damages, including, without limitation, any loss of reputation, goodwill or business suffered by the Client.

(g) The Custodian and each of its affiliates may have an interest in or in relation to, as the case may be, any Client Property or transaction held, executed or settled, as the case may be under this Agreement as investment manager, investment adviser, broker, underwriter, counterparty or creditor or in any other capacity. The Custodian and each of its affiliates may receive and retain any fee or brokerage due or paid, as the case may be, to it or any of them, as the case may be, and shall not be liable to account to the Client for any such fee or brokerage or any information obtained by it or any of them as the case may be, by reason of the interest referred to above.

**14. FEES AND EXPENSES**

(a) The Client shall pay such fees ("**Fees**") to the Custodian in respect of the services provided under this Agreement as the Custodian may, from time to time, determine and notify to the Client.

(b) The Client shall on demand reimburse the Custodian's reasonable Costs and Expenses properly incurred in connection with this Agreement.

**15. INTEREST**

To the extent permitted by applicable law, if any sum of money payable to the Custodian is not paid when due, interest shall accrue upon such unpaid sum as a separate debt, at such reasonable market rate as the Custodian may determine, for the actual number of days during the period from and including the date on which payment was due but excluding the date of payment.

Case 1:18-cv-05053-LAK Document 100-6 Filed 11/05/19 Page 13 of 19

**16. INDEMNITY**

(a) The Client hereby agrees on demand to indemnify the Custodian, and keep the Custodian fully and effectively indemnified against:

(i) each liability, loss and cost which may be suffered or incurred by the Custodian in connection with the Client Property, this Agreement or the performance of the Custodian's obligations under this Agreement (other than Tax); and

(ii) any Tax for which the Custodian is or may be liable or accountable in connection with the Client Property, this Agreement or the performance of the Custodian's obligations under this Agreement (including without limitation the purchase and/or sale of Client Securities, the collection and/or realisation of coupons, dividends, interest or other payments, the receipt of or entitlement to receive any income, and the Custodian acting as or being deemed to be a trustee, branch or agent of the Client) provided that this indemnity shall not extend to Tax on or attributable to any Fees.

(b) The indemnity in Clause 16(a) shall not extend to any liability, loss or cost arising out of the wilful default, fraud or negligence of the Custodian or any Sub-Custodian appointed by the Custodian under this Agreement.

**17. REPRESENTATIONS AND WARRANTIES**

(a) The Client hereby represents and warrants to the Custodian that:

(i) the Client is 401K Plan

(ii) the Client was, on or immediately prior to the deposit or transfer of any Client Securities by the Client or on the Client's behalf with or to the Custodian or a Sub-Custodian, the beneficial owner of such Client Securities free of mortgage, charge, pledge, lien, right of set-off or any security interest, encumbrance and claim whatsoever in favour of a third party,

(iii) the Client is acting as principal and not as agent with respect to each transaction or asset that is the subject of this Agreement; and

(iv) the Client has not relied on or been induced to enter into this Agreement by any representations other than those expressly set out in this Agreement and the Custodian is not liable to the Client for any representation that is not set out in this Agreement.

(b) The representations and warranties set out in Clause 17(a) shall be continuing and shall be deemed repeated by the Client on the date of this Agreement and each time the Client deposits Client Property with, or withdraws Client Property from, the Custodian.

**18. CONFIDENTIALITY**

(a) The Custodian will not (subject to the other provisions of this Agreement, including Clauses 18(b) and 18(c)) disclose to any other person any confidential information

Case 1:18-cv-05053-LAK Document 100-6 Filed 11/05/19 Page 14 of 19

acquired as a result of or pursuant to this Agreement ("**Client Confidential Information**") except: (a) to an affiliate of the Custodian; (b) as appropriate to perform its services under this Agreement; or (c) as authorised by the Client.

(b) Client Confidential Information may be disclosed by the Custodian if the Custodian is required to do so by any applicable law, statute or other regulation or by any court order or similar process enforceable in any relevant jurisdiction and if required to do so by any fiscal body or regulatory body or self-regulatory organisation (whether of a governmental nature or otherwise) in any relevant jurisdiction.

(c) Client Confidential Information may be disclosed to any Sub-Custodian.

(d) The Custodian may collect, use and disclose personal data about individuals associated with the Client, in connection with the services to be provided under this Agreement and in compliance with all applicable laws. The Custodian may also transfer this personal data to any country, including countries outside the European Economic Area, for any of the purposes set out above.

## 19. NOTICES

(a) Any communication to be made under or in connection with this Agreement shall be made in writing and, unless otherwise stated, may be made by fax, e-mail or letter to the following:

(i) in the case of the Client to:

Address: 61 Broadway
Suite 1915
New York
NY 10006
USA
Attention: Sheldon Goldstein, Scott Goldstein
Email:
Tel:

(ii) in the case of the Custodian to:

Address: E D& F Man Capital Markets Limited
Attention: Legal & Compliance
Address: Cottons Centre
Hays Lane
London,
SE1 2QE
England.
Email: BackOffice@edfmcs.com & compliance@edfmca.com
Tel: +44 20 7089 8000

Case 1:18-cv-05053-LAK Document 100-6 Filed 11/05/19 Page 15 of 19

or any substitute address or fax number or e-mail address as a party to this Agreement may notify to the other parties hereto by not less than five Business Days' notice.

(b) Any notice or other communication required in this Agreement to be given in writing by the Client to the Custodian shall be signed by one or more Authorised Signatories and sent by post or delivered personally to the address for the Custodian specified in Clause 19(a) and marked with any contact name for the Custodian identified in Clause 19(a).

(c) Any communication made by one party to this Agreement to another under or in connection with this Agreement will only be effective:

(i) if by way of fax, at the time when the fax transmission has been sent in its entirety and the sender's fax machine shall have generated a successful transmission report; or

(ii) if by way of e-mail electronic messaging, at the time that the e-mail electronic message is sent for the attention of the legal department and trading desk detailed in Clause 19 and the sender's e-mail electronic messaging system shall not immediately thereafter have generated an unsuccessful transmission report, and, in either case, if made to the Custodian, only if addressed in such manner as the Custodian may from time to time specify for this purpose; or

(iii) if by way of letter, when such letter has been delivered at the relevant address noted in Clause 19 or, in the case of posting, upon one Business Day after the date of registered or recorded delivery posting addressed to it at that address,

(iv) and, if a particular department, officer or person is specified as part of its address details provided under Clause 19(a), if addressed to that department, officer or person.

## 20. MISCELLANEOUS

(a) The Client undertakes upon request to notify the Custodian its place of incorporation, principal place of business, residence, control or management, home office, tax file number or other information which may affect the Client's status or accessibility for taxation purposes in any country by reason of this Agreement.

(b) The Client acknowledges that the provision of services outlined in this Agreement by the Custodian to the Client arose solely as a consequence of the initiative of the Client and did not result from any form of solicitation on the part of the Custodian.

(c) Unless otherwise agreed in writing, this Agreement may only be amended by written agreement of the parties except that the Custodian may amend this Agreement on written notice to the Client if the Custodian believes the amendments are requisite or desirable in order for the Custodian to comply with, or reflect in the Agreement, any applicable law or regulation or any rule of any governmental agency to which the Custodian or any Sub-Custodian may become

Case 1:18-cv-05053-LAK Document 100-6 Filed 11/05/19 Page 16 of 19

subject in any jurisdiction, including without limitation, in USA or the United Kingdom or its obligations under Clause 2(c).

(d) If any of the provisions of this Agreement become invalid, or illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

(e) The rights and obligations of the parties under this Agreement shall not, other than pursuant to the Security and Set-Off Deed, be assigned, charged or otherwise dealt with by either of them. The Custodian may however assign, charge or otherwise deal with its rights and obligations under this Agreement with or to any of its affiliates, including without limitation by delegating any of its rights and obligations to an affiliate. Subject to this Clause 20(e), this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

(f) The parties to this Agreement do not intend that any term of this Agreement should be enforceable, by virtue of the Contracts (Rights of Third Parties) Act 1999, by any person who is not a party to this Agreement.

(g) A waiver (whether express or implied) by one party of any provision of this Agreement or of any breach of or default of the other party under this Agreement shall not constitute a continuing waiver and that waiver shall not prevent the waiving party from subsequently enforcing any of the provisions of this Agreement not waived or from acting on any subsequent breach of or default by the other party under any of the provisions of this Agreement.

(h) Telephone conversations between the Client and the Custodian may be recorded and monitored by the Custodian and any recording may be used as evidence in the case of any dispute.

(i) The Custodian may be required by law or the rules and regulations of the FSA and/or other relevant regulatory agencies, authorities and exchanges to perform or refrain from certain acts or report or disclose details of Client Instructions or transactions effected with or for the Client or any other matters. In particular, disclosure and reporting obligations may arise under the rules referred to in Clause 8(f) and the Money Laundering Regulations 2003 (and related legislation). The Client hereby authorises the Custodian to do or refrain from such acts, and consents to such reporting or disclosure.

(j) The Client and the Custodian agree that any services provided by the Custodian to the Client under this Agreement shall be deemed to be a "Netting Transaction" for the purposes of any Terms of Business (as defined in the Security and Set-Off Deed).

(k) The Client and the Custodian agree that this Agreement is in all respects subject to the terms of the Security and Set-off Deed and that, in the event of any inconsistency between this Agreement and the Security and Set-off Deed, the terms of the Security and Set-off Deed shall prevail to the extent of any inconsistency.

Case 1:18-cv-05053-LAK Document 100-6 Filed 11/05/19 Page 17 of 19

## 21. TERMINATION

(a) The Custodian may terminate this Agreement on giving not less than 30 calendar days' written notice to the Client.

(b) The Client may terminate this Agreement on giving not less than 45 calendar days' written notice to the Custodian, provided that the Client shall not be entitled to terminate this Agreement until all the Secured Liabilities have been irrevocably paid or discharged in full.

(c) All remedies under this Agreement shall survive the termination of this Agreement.

(d) Subject to the completion of transactions already initiated under this Agreement and the exercise by the Custodian of the Custodian's rights under this Agreement, the Custodian shall as soon as reasonably practicable after termination of this Agreement deliver to the Client the Client Property held by the Custodian.

(e) Clauses 13 (*Limitations of Liability*), 14 (*Fees and Expenses*), 15 (*Interest*) and 16 (*Indemnity*) will continue to be effective despite the termination of this Agreement.

## 22. GOVERNING LAW, LANGUAGE AND JURISDICTION

(a) This Agreement shall be governed by, and shall be construed in accordance with, the laws of England.

(b) Any notice given under or in connection with this Agreement shall be in English.

(c) All other documents provided under or in connection with this Agreement shall be:

(i) in English; or

(ii) if not in English, accompanied by a certified English translation if requested by the relevant recipient and, in this case, the English translation shall prevail unless the document is a statutory or other official document.

(d) The courts of England have non-exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute regarding the existence, validity or termination of this Agreement) (a "Dispute").

(e) The parties to this Agreement agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no party will argue to the contrary.

(f) The parties to this Agreement shall not be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the parties may take concurrent proceedings in any number of jurisdictions.

(g) The parties irrevocably consent to service of process or any other documents in connection with proceedings in any court by personal service at any address specified in Clause 19, by mail, by facsimile or in any other manner permitted by English law, or by the law of the place of service and the law of the jurisdiction where proceedings are instituted.

**IN WITNESS WHEREOF** the parties to this Agreement have executed this Agreement as of the date first above written.

Case 1:18-cv-05053-LAK Document 100-6 Filed 11/05/19 Page 19 of 19

**SIGNATURES**

**The Client**

**SIGNED BY** SHELDON E. GOLDSTEIN )
for and on behalf of )
**The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein** )

**The Custodian**

**SIGNED BY** ________________ )
for and on behalf of )
**E D & F MAN CAPITAL MARKETS LIMITED** )
)

Verrona Browne
COO Operations

Sharon Heath
Compliance / Documentation

# EXHIBIT G

Case 1:18-cv-05053-LAK Document 100-7 Filed 11/05/19 Page 2 of 18

**SECURITY AND SET-OFF DEED**

**THIS SECURITY AND SET-OFF DEED** is made on 21 June 2012.

**BETWEEN:**

(1) **E D & F MAN CAPITAL MARKETS LIMITED** , registered in England and Wales with company number 1292851, whose registered office is at Cottons Centre, Hay's Lane, London, SE1 2QE in its capacity as chargee (the "**Chargee**"); and

(2) **E D & F MAN CAPITAL MARKETS LIMITED** , registered in England and Wales with company number 1292851, whose registered office is at Cottons Centre, Hay's Lane, London, SE1 2QE in its capacity as Custodian under the Custody Agreement (the "**Custodian**"); and

(3) **THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN FBO SHELDON AND SCOTT GOLDSTEIN** (the "**Chargor**").

**1. DEFINITIONS**

**1.1 Definitions**

Capitalised terms in this Deed have the meaning given to them below:

"**Business Day**" means a day on which TARGET is open.

"**Charged Property**" means the property, assets, undertaking and rights for the time being comprised in or subject to the security interests created by this Deed;

"**Custody Accounts**" has the meaning given to such term in the Custody Agreement, including all credit balances now or at any time in future on such accounts, all debts from time to time represented by such credit balances and all other rights accruing or arising in relation to each of such accounts;

"**Custody Agreement**" means the custody agreement dated on or about the date hereof between the Chargor and the Custodian;

"**Derived Investments**" means all present and future rights, moneys and property whatsoever which may from time to time or at any time be derived from, accrue on or be offered in respect of the Investments whether by way of redemption, conversion, exchange, substitution, bonus or otherwise;

"**Enforcement**" (and all grammatical variations or derivations thereof) means the taking of steps (or attempting to do so) by the Chargee to:

(a) sell, repossess or take possession of any rights or assets the subject of the security conferred by this Deed; or

(b) appoint an administrator in respect of the Chargor; or

(c) enforce any security interest created by or pursuant to this Deed or to exercise any rights or powers in relation to enforcement conferred by this Deed after the security conferred by this Deed has become enforceable,

unless such action is taken to preserve or protect (rather than to enforce) such security interest.

Case 1:18-cv-05053-LAK Document 100-7 Filed 11/05/19 Page 3 of 18

"**Event of Default**" means the occurrence of any of the following events:

(a) the Chargor fails to perform any of its obligations under the Transaction Documents; or

(b) a Bridging Event (as defined in the ISDA Master Agreement) and a default, event of default or other similar condition or event (however described) in respect of the Chargor under any Transaction Document; or

(c) an event of default (howsoever described) or termination event (howsoever described) occurs under any of the Transaction Documents; or

(d) any representation made by the Chargor under the Custody Agreement is untrue when made; or

(e) a material adverse change occurs, in the opinion of the Chargee, in the financial condition, results of operations or business of the Chargor; or

(f) the Chargor becomes or is deemed for the purposes of any law to be insolvent or unable to pay its debts as they fall due, or the value of its assets is less than the amount of its liabilities (taking into account contingent and prospective liabilities); or

(g) any step is taken with a view to a composition or similar arrangement with any of its creditors by the Chargor, or with a view to rescheduling or avoiding default, or a moratorium or suspension of payments in relation to any of its debts or any analogous procedure or step is taken in any jurisdiction; or

(h) any step is taken with a view to the winding-up or reorganisation of, or the appointment of an administrator, receiver or administrative receiver in relation to, the Chargor or any of its assets, or the holder of any Security over any asset of the Chargor takes any step to enforce that Security or any analogous procedure or step is taken in any jurisdiction; or

(i) any asset of the Chargor is subject to attachment or execution or similar process; or

(j) it becomes unlawful or impossible for the Chargee to perform any of its obligations or to fund amounts outstanding under any Transaction Document; or

(k) it becomes unlawful for the Chargor to perform any of its obligations under any Transaction Document or the Chargor repudiates, or threatens to repudiate, any Transaction Document.

"**Investment**" means the Securities, all Derived Investments, all dividends, interest and other distributions and income paid or payable in respect of the Securities, or any Derived Investments, all rights from time to time attached to any of the foregoing, all rights to acquire the foregoing and all proceeds of sale of any of the foregoing;

"**ISDA Master Agreement**" means the ISDA Master Agreement dated on or about the date hereof between the Chargor and Deutsche Bank Custody Services or BNP Paribas Security Services , including all confirmations or transactions entered into under or in accordance with that agreement;

"**LPA 1925**" means the Law of Property Act 1925;

"**Relevant Business Day**" means a day on which TARGET is open and securities markets are open for trading in the place in which the exchange is situated on which relevant Securities are traded and in such other place(s) as the Bank may notify to the Borrower from time to time.

Case 1:18-cv-05053-LAK Document 100-7 Filed 11/05/19 Page 4 of 18

"**Secured Liabilities**" means all moneys and liabilities whatsoever which now are or at any time hereafter may (whether before or after demand) become due, owing or payable to the Chargee by the Chargor, whether actually or contingently and whether owed jointly or severally or in any other capacity whatever, under or in respect of any of the Transaction Documents, together with all costs (including legal costs), charges, expenses and damages sustained or incurred by the Chargee in connection with the Transaction Documents or in connection with the enforcement, defence or protection of the security constituted by this Deed or the appointment of any receiver or other insolvency practitioner, delegate or sub-delegate hereunder or the pursuit of any rights herein contained or under or in connection with the other Transaction Documents;

"**Securities**" means all securities and cash from time to time credited to or recorded in the Custody Accounts;

"**TARGET**" means the Trans-European Automated Real-time Gross settlement Express Transfer (TARGET) system;

"**Terms of Business**" means any applicable terms of business under which the Chargee, in any capacity, provides services to the Chargor; and

"**Transaction Documents**" means:

(a) the Custody Agreement;

(b) this Deed;

(c) any Terms of Business;

(d) the ISDA Master Agreement; and

(e) any other document designated as such by the Chargor and the Chargee.

**1.2 Construction of particular terms**

In this Deed, unless otherwise specified, any reference to:

(a) "**assets**" includes properties, revenues and rights of every kind, present, future and contingent, and whether tangible or intangible;

(b) "**authorisation**" or "**consent**" shall be construed as including, without limitation, any authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration;

(c) a "**company**" includes any company, corporation or other body corporate, wherever and however incorporated or established;

(d) "**this Deed**" or any other agreement or instrument is a reference to this Deed or other agreement or instrument as it may have been amended, supplemented, replaced or novated from time to time and includes a reference to any document which amends, supplements, replaces, novates or is entered into, made or given pursuant to or in accordance with any of the terms of this Deed or, as the case may be, the relevant deed, agreement or instrument;

Case 1:18-cv-05053-LAK Document 100-7 Filed 11/05/19 Page 5 of 18

(e) "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(f) "**law**" includes common or customary law, principles of equity and any constitution, code of practice, decree, judgement, decision, legislation, order, ordinance, regulation, bye-law, statute, treaty or other legislative measure in any jurisdiction or any present or future directive, regulation, guideline, request, rule or requirement (in each case, whether or not having the force of law but, if not having the force of law, the compliance with which is in accordance with the general practice of persons to whom the directive, regulation, guideline, request, rule or requirement is intended to apply) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(g) a "**person**" includes any natural person, firm, company, corporation, undertaking, government, state or agency of a state, any local or municipal authority, trust, any association or partnership (whether or not having separate legal personality) of two or more of the foregoing or other legal entity;

(h) a "**regulation**" includes any regulation, rule, official directive, request or guideline (in each case, whether or not having the force of law but, if not having the force of law, the compliance with which is in accordance with the general practice of persons to whom the regulation, rule, official directive, request or guideline is intended to apply) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(i) "**rights**" includes all rights, title, benefits, powers, privileges, interests, claims, authorities, discretions, remedies, liberties, easements, quasi easements and appurtenances (in each case, of every kind, present, future and contingent);

(j) "**security**" or "**security interest**" includes any mortgage, charge, pledge, lien, security assignment, hypothecation or trust arrangement for the purpose of providing security and any other encumbrance or security interest of any kind having the effect of securing any obligation of any person (including, without limitation, the deposit of moneys or property with a person with the intention of affording such person a right of set-off or lien) and any other agreement or any other type of arrangement having a similar effect; and

(k) "**subsidiary**" means a subsidiary within the meaning of section 1159 of the Companies Act 2006 and a subsidiary undertaking within the meaning of section 1161 of the Companies Act 2006.

## 2. INTERPRETATION

(a) Words importing the singular shall include the plural and vice versa.

(b) Unless a contrary indication appears, a reference to any party or person shall be construed as including its and any subsequent successors in title, permitted transferees and permitted assigns, in each case in accordance with their respective interests.

(c) Unless a contrary indication appears, a reference to a time of day shall be construed as referring to London time.

(d) Section, clause and Schedule headings are for ease of reference only and shall be ignored in construction.

Case 1:18-cv-05053-LAK Document 100-7 Filed 11/05/19 Page 6 of 18

(e) Unless a contrary indication appears, references to any provision of any law or regulation are to be construed as referring to that provision as it may have been, or may from time to time be, amended or re enacted, and as referring to all bye laws, instruments, orders and regulations for the time being made under or deriving validity from that provision.

(f) A reference to any document is a reference to that document as amended, restated, supplemented, novated or replaced from time to time (except where the context otherwise requires).

**3. DELIVERY OF SECURITIES**

The Chargor covenants with the Chargee that it will, upon acquiring the Securities, deliver those Securities to the relevant Custody Account or to such other account as the Chargee, in its capacity as custodian under the Custody Agreement, shall notify to the Chargor.

**4. COVENANT TO DISCHARGE SECURED LIABILITIES**

The Chargor covenants with the Chargee that it will pay and discharge to the Chargee the Secured Liabilities at the time or times when, in the manner in which and in the currencies in which, they are expressed to be due and payable under the Transaction Documents.

**5. SECURITY**

**5.1 Fixed Charge and assignment**

(a) The Chargor with full title guarantee, hereby charges by way of first fixed legal mortgage to the Chargee, as a continuing security for the full and punctual payment or discharge of the Secured Liabilities, all of its rights, title, interest and benefit, present and future, in, to and under the Investments;

(b) The Chargor with full title guarantee, hereby charges by way of first fixed legal mortgage to the Chargee, as a continuing security for the full and punctual payment or discharge of the Secured Liabilities, all of its rights, title, interest and benefit, present and future, in, to and under the Custody Accounts; and

(c) The Chargor with full title guarantee, as a continuing security for the full and punctual payment or discharge of the Secured Liabilities, hereby assigns absolutely and charges by way of first fixed charge to the Chargee all of its rights under the Custody Agreement, the assignment of which is hereby notified to, and acknowledged by the Custodian.

**5.2 Floating Charge**

(a) **Creation of Floating Charge**

The Chargor with full title guarantee, hereby charges by way of floating charge, all its present and future rights and interests in the Charged Property expressed to be assigned or charged by clause 5.1 (*Fixed Charge and assignment*).

(b) **Ranking**

The floating charge created by the Chargor in clause 5.2(a) (*Creation of Floating Charge*) shall rank behind all the fixed charges and mortgages created by clause 5.1 (*Fixed Charge*

Case 1:18-cv-05053-LAK Document 100-7 Filed 11/05/19 Page 7 of 18

*and assignment*) but shall rank in priority to any other security created by it after the date of this Deed.

(c) **Crystallisation by notice from Chargee**

The Chargee may, at any time after an Event of Default has occurred or if the Chargee considers any of the Charged Property to be in danger of being seized or sold under any form of distress, attachment, execution or other legal process or to be otherwise in jeopardy, convert the floating charge created by clause 5.2(a) (*Creation of Floating Charge*) into a fixed charge on all or such of the Charged Property of the Chargor as shall be specified (whether generally or specifically) by notice to the Chargor.

(d) **Automatic crystallisation**

In the event that, without the prior written consent of the Chargee:

(i) the Chargor creates or permits to subsist any security interest on, over or with respect to any of the Charged Property, or attempts to do so; or

(ii) any person levies or attempts to levy any distress, attachment, execution or other legal process against any of the Charged Property; or

(iii) an administrator is appointed in respect of the Chargor,

the floating charge created by this Deed shall, with effect from the instant before such event occurs, automatically convert into a fixed charge over the Charged Property which is the subject of such security interest or process or, in the case of the appointment of an administrator, over all of the Charged Property.

**6. PERFECTION OF SECURITY**

The Chargor shall, if requested by the Chargee, promptly deliver to the Chargee:

(a) all certificates, documents of title and other documentary evidence of ownership in relation to the Investments; and

(b) transfers of the Investments duly executed by it or its nominee with the name of the transferee left blank or, if the Chargee so requires, in favour of the Chargee or its nominee and duly stamped.

**7. CONTINUING SECURITY**

(a) The security created by this Deed shall be a continuing security and will extend to the ultimate balance of all the Secured Liabilities regardless of any intermediate discharge or payment in whole or in part and notwithstanding any settlement of account or the existence at any time of a credit balance on any current or other account or any other act.

(b) The covenants and provisions of this Deed shall remain in force from the date of this Deed for so long as any of the Secured Liabilities are outstanding or any security interest created under this Deed has not been released or discharged.

(c) The security created by this Deed is intended to secure further advances.

Case 1:18-cv-05053-LAK Document 100-7 Filed 11/05/19 Page 8 of 18

**8. ADDITIONAL SECURITY**

The security created by this Deed and the rights of the Chargee under this Deed shall be in addition to, and not prejudiced by, any other security or guarantee or any other right which the Chargee has in respect of or in connection with any or all of the Secured Liabilities. All such rights may be exercised from time to time as often as the Chargee may deem expedient.

**9. IMMEDIATE RECOURSE**

The Chargee need not, before exercising any of the rights, title, benefit and interest conferred upon it by this Deed or by law (i) take action or obtain judgement against the Chargor or any other person in any court, (ii) make or file any claim or proof in the liquidation of the Chargor or any other person or (iii) enforce or seek to enforce the recovery of the moneys and liabilities hereby secured or enforce or seek to enforce any other security interest or guarantee.

**10. WAIVER OF DEFENCES**

(a) Without prejudice to the provisions of this Deed, neither this Deed nor the security created under this Deed nor the liability of the Chargor for the Secured Liabilities shall be prejudiced or affected by:

(i) any variation or amendment of, or waiver or release granted under or in connection with, any other security or any guarantee or indemnity or other document; or

(ii) any time or waiver granted, or any other indulgence or concession granted, by the Chargee to the Chargor or any other person; or

(iii) the taking, holding, failure to take or hold, varying, realisation, non-enforcement, non-perfection or release by the Chargee or any other person of any other security or any guarantee or indemnity or other document; or

(iv) the insolvency, administration, reorganisation, liquidation or dissolution of, or any analogous proceeding in respect of, the Chargor or any other person; or

(v) any change in the constitution of the Chargor; or

(vi) any amalgamation, merger or reconstruction that may be effected by the Chargee with any other person, including any reconstruction by the Chargee involving the formation of a new company and the transfer of all or any of its assets to that company, or any sale or transfer of the whole or any part of the undertaking and assets of the Chargee to any other person; or

(vii) the existence of any claim, set-off or other right which the Chargor may have at any time against the Chargee or any other person; or

(viii) the making or absence of any demand for payment or discharge of any Secured Liabilities on the Chargor or any other person, whether by the Chargee or any other person; or

(ix) any arrangement or compromise entered into by the Chargee with the Chargor or any other person; or

(x) any other thing done or omitted or neglected to be done by the Chargee or any other person or any other dealing, fact, matter or thing which, but for this

Case 1:18-cv-05053-LAK Document 100-7 Filed 11/05/19 Page 9 of 18

provision, might operate to prejudice or affect any of the security interests created under this Deed or the liability of the Chargor for the Secured Liabilities.

(b) No delay or omission by the Chargee in exercising any right provided by law or under this Deed shall impair, affect, or operate as a waiver of, that or any other right. The single or partial exercise by the Chargee of any right shall not preclude or prejudice any other or further exercise of that, or the exercise of any other, right. The rights of the Chargee under this Deed are in addition to and do not affect any other rights available to it by law.

**11. FURTHER ASSURANCE**

In addition and without prejudice to any other provision of this Deed, the Chargor shall, at the request of the Chargee but at its own cost, promptly take whatever action the Chargee may from time to time require:

(a) to ensure that the security intended to be created by this Deed is and remains valid, legally binding and enforceable;

(b) to perfect, preserve or protect the security interests created or intended to be created under this Deed; and

(c) to facilitate the exercise of any and all of the rights vested or intended to be vested in the Chargee by or pursuant to this Deed and to facilitate the realisation of the Charged Property;

and for such purposes it shall in particular, but without limitation, execute all such documents, transfers, conveyances, assignments and assurances in respect of the Investments and give all such notices, orders, instructions and directions as the Chargee may require.

**12. EXERCISE OF RIGHTS**

(a) Each of the assignments, mortgages and charges on the terms set out in clause 5 constitutes and effects an immediate and full mortgage, charge and assignment of the Charged Property and shall be effective, and the security intended to be created by this Deed shall be constituted, immediately upon its execution.

(b) Notwithstanding but without prejudice to clause 12(a) above, the Chargee agrees that, subject to clause 12(c) below, the Chargor shall continue to be entitled to receive payments and to exercise all of the rights, powers, discretions, claims and remedies which would (but for this Deed) be vested in the Chargor under and in respect of the Charged Property unless and except to the extent that either the Chargee requires otherwise.

(c) Nothing in this clause 12 limits or affects the rights of the Chargee under clause 17.

**13. COVENANTS**

**13.1 General**

The Chargor covenants with the Chargee that from the date of this Deed for so long as any of the Secured Liabilities are outstanding or any security interest created under this Deed has not been released or discharged:

Case 1:18-cv-05053-LAK Document 100-7 Filed 11/05/19 Page 10 of 18

(a) it shall not without the prior written consent of the Chargee at any time be entitled to, or agree or seek to, withdraw or require the repayment of, and the Chargee shall be under no obligation to repay or redeliver, all or any part of any credit balance on the Custody Accounts until all Secured Liabilities have been unconditionally and irrevocably paid or discharged in full and the Chargor does not have any further liability or obligation under any Transaction Document;

(b) it shall not create or permit to subsist any security interest over any of the Charged Property without the prior written consent of the Chargee save for the security interests created by or pursuant to this Deed;

(c) it shall promptly obtain, comply with and do all that is necessary to maintain in full force and effect any authorisation required under any law or regulation of its jurisdiction of incorporation to enable it to create security and perform its obligations under this Deed and to ensure the legality, validity, enforceability or admissibility in evidence in its jurisdiction of incorporation of this Deed and the security created under this Deed;

(d) it shall comply in all respects with all laws and regulations to which it may be subject, if failure so to comply would materially impair the security created under or evidenced by this Deed or its ability to perform its obligations under this Deed;

(e) it shall remain liable to observe and perform all of the obligations and liabilities assumed by it under or in respect of the Charged Property to the same extent as if the security interests under this Deed had not been created;

(f) it shall duly and promptly pay, and indemnify the Chargee against all calls and other moneys which may lawfully be required to be paid and other liabilities that may be sustained, incurred or made against the Chargee in respect of the Investments;

(g) it shall notify the Chargee immediately on the occurrence of any Event of Default.

**13.2 Custodian direction**

The Chargor hereby irrevocably directs the Custodian, and the Custodian agrees with each of the Chargor and the Chargee that, until such time as the Custodian receives written notice from the Chargee that all Secured Liabilities have been unconditionally and irrevocably paid or discharged in full and the Chargor does not have any further liability or obligation under any Transaction Document, the Custodian shall not act on any Client Instructions (as that term is defined in the Custody Agreement) without the prior consent of the Chargee.

**14. SET-OFF**

(a) The Chargee may, at any time, apply the Charged Property, or any of it, to satisfy any obligations of the Chargor to the Chargee under any Transaction Document.

(b) The Chargee reserves the right as against the Chargor to effect a set off between any obligation of the Chargee (actual or contingent) to make a payment to the Chargor under any Transaction Document and any obligation of the Chargor (actual or contingent) to make a payment to the Chargee under any Transaction Document. This right is in addition to the Chargee's rights under any Terms of Business, the ISDA Master Agreement and the Chargee's legal and equitable rights of set off and combination of account, whether arising by agreement (express or implied), operation of law or custom or otherwise.

Case 1:18-cv-05053-LAK Document 100-7 Filed 11/05/19 Page 11 of 18

(c) The Chargee may but shall be obliged to notify the Chargor upon its exercise of any of its rights under this Clause 14.

## 15. LIABILITY OF THE CHARGEE

### 15.1 Possession

If the Chargee shall take possession of the Charged Property, it or he may at any time relinquish such possession.

### 15.2 Chargee's liability

The Chargee will not in any circumstances (whether by reason of taking possession of the Charged Property or for any other reason whatsoever and whether as mortgagee in possession or on any other basis whatsoever):

(a) be liable to account to the Chargor or any other person for anything except the Chargee's own actual receipts; or

(b) be liable to the Chargor or any other person for any costs, charges, losses, damages, liabilities or expenses arising from or connected with any realisation of the Charged Property or from any act, neglect, default, omission or misconduct of any nature of the Chargee, or any of its officers, employees or agents in relation to the Charged Property, except to the extent that they shall be caused by the fraud or wilful default or gross negligence of the Chargee or any of their respective officers, employees or agents.

### 15.3 Indemnity

The Chargee shall be entitled to be indemnified out of the Charged Property in respect of all liabilities and expenses incurred by any of them in the execution or purported execution of any of its rights and against all actions, proceedings, costs, claims and demands in respect of any matter or thing done or omitted in anyway relating to this Deed or the Charged Property, and the Chargee may retain and pay all sums in respect of them out of any moneys received.

The obligations contained in this clause 15.3 shall survive the expiration of this Deed.

## 16. RELEASE

### 16.1 Discharge of Secured Liabilities

(a) If the Chargee is satisfied that all Secured Liabilities have been unconditionally and irrevocably paid or discharged in full then the Chargee shall at the request and cost of the Chargor release and discharge the security constituted by this Deed or such part thereof as may still be subsisting and vested in the Chargee from the security created under this Deed.

(b) Any re-assignment, release, settlement or discharge (whether in respect of any of the Secured Liabilities or any security for those liabilities or otherwise) shall be conditional upon no payment to, or security provided to, the Chargee in respect of the relevant Secured Liabilities being avoided, invalidated or reduced or required to be restored or paid away by virtue of any requirement having the force of law.

**16.2 Request for Release**

Notwithstanding the provisions of Clause 16.1, the Chargor shall be entitled to request the release of an Investment from the security constituted by this Deed at any time but not fewer than 4 Relevant Business Days prior to the date of requested release, such release to be at the Chargee's absolute discretion. In connection with any request, the Chargee shall be entitled to require evidence in a form satisfactory to the Chargee that the Chargor is able to discharge the Secured Liabilities.

**17. ENFORCEMENT**

**17.1 Security enforceable**

(a) Immediately upon and at any time after the occurrence of an Event of Default, the security created by this Deed shall become enforceable and the Chargee shall be entitled (whether or not it shall have taken possession or appointed a receiver) without notice or further demand to exercise all the rights, powers and remedies possessed by it according to law as a secured party in respect of the Charged Property in any manner it sees fit and to:

(i) demand and receive all and any monies due under or arising out of the Charged Property and apply them in or towards the payment or discharge of the Secured Liabilities;

(ii) exercise in relation to the Charged Property all such rights as the Chargor was then entitled to exercise in relation to the Charged Property or might, but for the terms of this Deed;

(iii) apply, set off or transfer any or all of the Charged Property in or towards the payment or other satisfaction of the Secured Liabilities or any part of them; and

(iv) the Chargee shall be entitled and authorised to arrange for any of the Investments which are in registered form to be registered in the name of the Chargee or its nominee or any purchaser.

(b) If an Event of Default has occurred, the Chargee shall be entitled, without prior notice to the Chargor or prior authorisation from any court, to sell or dispose of all or any part of the Charged Property at the times and in the manner and on the terms it sees fit. The Chargee shall be entitled to apply the proceeds of that sale or disposal in paying the costs of that sale or disposal and in or towards the discharge of the Secured Liabilities.

**17.2 Power of sale**

(a) Notwithstanding any other provisions of this Deed, the Secured Liabilities shall be deemed for the purposes of section 101 of the LPA 1925 to have become due and payable within the meaning of section 101 of the LPA 1925, and the power of sale and other powers conferred on mortgagees by the LPA 1925 as varied or extended by this Deed including the power to appoint a receiver or an administrative receiver shall arise, immediately on execution of this Deed.

(b) Section 103 of the LPA 1925 shall not restrict the exercise by the Chargee of the statutory power of sale conferred on it by section 101 of the LPA 1925 which power may be

Case 1:18-cv-05053-LAK Document 100-7 Filed 11/05/19 Page 13 of 18

exercised by the Chargee without notice to the Chargor on or at any time after the occurrence of an Event of Default and the provisions of the LPA 1925 relating to and regulating the exercise of the said power of sale shall, so far as they relate to the Charged Property, be varied and extended accordingly.

(c) Sub-section 109(1) of the LPA 1925 shall not apply to this Deed.

**17.3 Consolidation**

The Chargee shall, so far as it is lawful, be entitled to consolidate all or any of the security created under this Deed with any other securities whether now in existence or hereafter created. The restriction on the right of consolidating mortgage securities which is contained in sub-section 93(1) of the LPA 1925 shall not apply to this Deed.

**17.4 Other rights**

At any time after an Event of Default has occurred, the Chargee shall do all such acts and things it may consider necessary or expedient for the realisation of any of the Charged Property or incidental to the exercise of any of the rights conferred on it under or in connection with this Deed or under applicable law.

**17.5 Appropriation**

To the extent that any of the Charged Property constitutes "financial collateral" and this Deed and the obligations of the Chargor hereunder constitute a "security financial collateral arrangement" (in each case for the purposes of the Financial Collateral Arrangements (No. 2) Regulations (SI 2003/3226)) the Chargee shall have the right to appropriate all or any part of such financial collateral in or towards discharge of the Secured Liabilities.

**18. ATTORNEY**

(a) The Chargor irrevocably and by way of security for the performance of its obligations under this Deed appoints the Chargee, every receiver and every delegate of the Chargee severally to be the attorney of the Chargor on its behalf and in its name or otherwise and as its act and deed, at such time and in such manner as the attorney may think fit:

(i) to take any action which it is obliged to take under this Deed or the other Transaction Documents but has not taken promptly following a request to do so from the Chargee; and

(ii) to take whatever action may be required for enabling the Chargee to exercise all or any of the rights, powers, authorities and discretions conferred on them by or pursuant to this Deed, the other Transaction Documents or by law,

and the taking of action by the attorney or attorneys shall (as between it and any third party) be conclusive evidence of its right to take such action.

(b) The Chargor undertakes to ratify and confirm everything that any attorney does or purports to do in the exercise or purported exercise of the power of attorney under this Clause 18.

Case 1:18-cv-05053-LAK Document 100-7 Filed 11/05/19 Page 14 of 18

## 19. GOVERNING LAW AND JURISDICTION

(a) This Deed is governed by, and shall be construed in accordance with, the laws of England.

(b) The courts of England have non-exclusive jurisdiction to settle any dispute arising out of or in connection with this Deed (including a dispute regarding the existence, validity or termination of this Deed) (a "**Dispute**").

(c) The parties to this Deed agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no party will argue to the contrary.

(d) The parties to this Deed shall not be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the parties may take concurrent proceedings in any number of jurisdictions.

## 20. SERVICE OF PROCESS

The parties irrevocably consent to service of process or any other documents in connection with proceedings in any court by personal service at any address specified below, by mail, by facsimile or in any other manner permitted by English law, or by the law of the place of service and the law of the jurisdiction where proceedings are instituted.

## 21. PARTIAL INVALIDITY

If, at any time, any provision of this Deed is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions hereof nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby.

## 22. NOTICES

### 22.1 Communications in writing

Any communication to be made under or in connection with this Deed shall be made in writing and, unless otherwise stated, may be made by fax, e-mail or letter.

### 22.2 Addresses

The address, e-mail address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with this Deed is that identified with its name below or any substitute address, e-mail address, fax number or department or officer as the Party may notify to the other Parties by not less than five Business Days' notice.

### 22.3 Delivery

(a) Any communication or document made or delivered by one person to another under or in connection with this Deed will only be effective:

(i) if by way of fax, when received in legible form; or

(ii) if by way of e-mail, at the time that the e-mail is sent for the attention of the legal department and trading contact and the sender's e-mail system shall not

Case 1:18-cv-05053-LAK Document 100-7 Filed 11/05/19 Page 15 of 18

immediately thereafter have generated an unsuccessful transmission report, and, in either case, if made to the Chargee, only if addressed in such manner as the Chargee may from time to time specify for this purpose; or

(iii) if by way of letter, when it has been delivered at the relevant address noted on page one or, in the case of posting, upon one Business Day after the date of registered or recorded delivery posting addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under clause 22.2 (Addresses), if addressed to that department or officer.

(b) Any communication or document to be made or delivered to the Chargee will be effective only when actually received by the Chargee and then only if it is expressly marked for the attention of the department or officer identified with the Chargee's signature below (or any substitute department or officer as the Chargee shall specify for this purpose).

**22.4 English language**

Any notice given under or in connection with this Deed must be in English.

**23. THIRD PARTY RIGHTS**

The Parties do not intend that any term of this Deed should be enforceable by virtue of the Contracts (Rights of Third Parties) Act 1999, by any person who is not a party to this Deed.

**24. ASSIGNMENT**

(a) The rights, interests and obligations of the Chargor under this Deed are personal to it. Accordingly, they are not capable of being assigned, transferred or delegated in any manner. The Chargor undertakes that it shall not at any time assign or transfer any of its rights, interests or obligations under or in respect of this Deed to any person.

(b) The Chargee may, at any time, without the consent of the Chargor, assign or transfer any of its rights and obligations under this Deed.

**25. EXECUTION AS A DEED**

Each of the parties to this Deed intends it to be a deed and confirms that it is executed and delivered as a deed, in each case notwithstanding the fact that any one or both of the parties may only execute this Deed under hand.

**26. COUNTERPARTS**

This Deed may be executed in any number of counterparts, and by the parties on separate counterparts, but will not be effective until each party has executed at least one counterpart. Each counterpart shall constitute an original of this Deed, but all the counterparts will together constitute one and the same instrument.

Case 1:18-cv-05053-LAK Document 100-7 Filed 11/05/19 Page 16 of 18

**27. MISCELLANEOUS**

Telephone conversations between the Chargee and Chargor may be recorded and monitored by the Chargee and any recording may be used as evidence in the case of a dispute.

**IN WITNESS** of which this document has been executed as a deed and delivered on the date stated at the beginning of this Deed.

**SIGNATURES**

**EXECUTED** as a deed for and on behalf of **THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN FBO SHELDON AND SCOTT GOLDSTEIN** by SHELDON E. GOLDSTEIN being [a person/persons who], in accordance with the laws of its jurisdiction of incorporation, are duly authorised to executed this deed on its behalf ) ) ) ) ........................................

**Address for notices or other communications**

| | |
|---|---|
| Address: | 61 Broadway<br>Suite 1915<br>New York<br>NY 10006<br>USA |
| Attention: | |
| Facsimile No: | |
| Telephone No: | |

**EXECUTED** as a deed by **E D & F MAN CAPITAL MARKETS LIMITED** as Chargee acting by its attorney ) ) ) ) )

........................................ Verrona Browne COO Operations

Sharon Heath Compliance / Documentation

in the presence of:
Signature of witness: ........................................
........................................
Name (in BLOCK CAPITALS)
Address: ........................................
........................................
........................................

**Address for notices or other communications**

| | |
|---|---|
| Address: | Cottons Centre,<br>Hay's Lane,<br>London,<br>SE1 2QE |
| Attention: | |
| Facsimile No: | |
| Telephone No: | |

**EXECUTED** as a deed by )
**E D & F MAN CAPITAL MARKETS** )
**LIMITED** as Custodian )
acting by its attorney )
____________________ )

...................................
Verrona Browne
COO Operations

Sharon Heath
Compliance / Documentation

in the presence of:
Signature of witness: ....................................
..........................................
Name (in BLOCK CAPITALS)
Address: ..........................................
..........................................
..........................................

**Address for notices or other communications**

| | |
|---|---|
| Address: | Cottons Centre, |
| Attention: | Hay's Lane, |
| Facsimile No: | London, |
| Telephone No: | SE1 2QE |

# EXHIBIT H

ED&F MAN

E D & F MAN CAPITAL MARKETS LIMITED

21 June 2012

**The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein**
**61 Broadway**
**Suite 1915**
**New York**
**NY 10006**
**USA**

Dear Sirs:

We refer to:

(a) the Security and Set-Off Deed dated 21 June 2012 between E D & F Man Capital Markets Limited (hereinafter "**us**") and The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein (hereinafter "**you**") ("**Security and Set-Off Deed**");

(b) the ISDA Master Agreement entered into between us and you on 21 June 2012 ("**ISDA Master Agreement**");

(c) the Custody Agreement entered into between us and you on 21 June 2012 ("**Custody Agreement**"); and

(d) any applicable terms of business under which you receive services from us in any capacity ("**Terms of Business**").

The purpose of this letter is to confirm our agreement that in consideration of the custodian and related services provided by us in connection with our entering into with, or arranging for you the above agreements and transactions (including any related or supporting transactions), together with our effecting with or for you any subsequent, similar transactions (each, a "**Transaction**"), you shall pay to us a fee (each, a "**Custodian Fee**"). Prior to entering into a Transaction, we will agree the specific amount of the Custodian Fee to be payable and confirm this with you in writing. Each Custodian Fee shall become payable upon settlement of all amounts for each Transaction, and we will subsequently either invoice you or alternatively at our discretion deduct such amounts from any funds you hold on account with us.

For the purposes of:

(a) the Security and Set-off Deed, this letter agreement is a "Transaction Document";

(b) the ISDA Master Agreement, this letter agreement, the Custody Agreement, the Security and Set-Off Deed and any Terms of Business will constitute Bridged Agreements and be subject to the Cross-Agreement Bridge; and

(c) any Terms of Business, the services and consideration provided under this letter agreement is deemed to be a "Netting Transaction".

# EXHIBIT I

ED&F MAN

E D & F MAN CAPITAL MARKETS LIMITED

13 March 2014

**The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein**
**61 Broadway**
**Suite 1915**
**New York**
**NY 10006**
**USA**

Dear Sirs:

We refer to the letter agreement dated 21 June 2012 between ED & F Man Capital Markets Ltd (hereinafter "us") and The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein (hereinafter "you").

In consideration of the custodian and related services provided by us in connection with our entering into with, or arranging for you the agreements and transactions referred to in the letter agreement (including any related or supporting transactions), together with our effecting with or for you the specific transaction in respect of 2,200,000 shares in the capital of TDC A/S (TDC DC) (the **"Transaction"**), you shall pay to us a fee of DKK 48,400 (the "**Custodian Fee**").

The Custodian Fee shall become payable upon settlement of all amounts for the Transaction and we will subsequently either invoice you or alternatively at our discretion deduct such amounts from any funds you hold on account with us.

Please confirm your agreement to be bound by the terms of this letter agreement by executing a copy of the letter agreement and returning it to us.

We are very pleased to have concluded this Transaction with you.

Yours sincerely,
**ED & F Man Capital Markets Ltd**



By:
Name: Steve Hawksworth
Title: European CEO

Accepted and agreed for and on behalf of
**The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein**

By: ___________________________
Name:
Title:

Case 1:18-cv-05053-LAK Document 100-10 Filed 11/05/19 Page 1 of 2

# EXHIBIT J

Case 1:18-cv-05053-LAK Document 100-10 Filed 11/05/19 Page 2 of 2

ED&F MAN

E D & F MAN CAPITAL MARKETS LIMITED

18 March 2014

**The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein**
**61 Broadway**
**Suite 1915**
**New York**
**NY 10006**
**USA**

Dear Sirs:

We refer to the letter agreement dated 21 June 2012 between ED & F Man Capital Markets Ltd (hereinafter "us") and The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein (hereinafter "you").

In consideration of the custodian and related services provided by us in connection with our entering into with, or arranging for you the agreements and transactions referred to in the letter agreement (including any related or supporting transactions), together with our effecting with or for you the specific transaction in respect of 2,000,000 shares in the capital of DANSKE BANK A/S (DANSKE DC) (the "**Transaction**"), you shall pay to us a fee of DKK 40,000 (the "**Custodian Fee**").

The Custodian Fee shall become payable upon settlement of all amounts for the Transaction and we will subsequently either invoice you or alternatively at our discretion deduct such amounts from any funds you hold on account with us.

Please confirm your agreement to be bound by the terms of this letter agreement by executing a copy of the letter agreement and returning it to us.

We are very pleased to have concluded this Transaction with you.

Yours sincerely,
**ED & F Man Capital Markets Ltd**

[signature]

By:
Name: Steve Hawksworth
Title: European CEO

Accepted and agreed for and on behalf of
**The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein**

By: [signature]
Name: Sheldon Goldstein
Title: Trustee

# EXHIBIT K

Case 1:18-cv-05053-LAK Document 100-11 Filed 11/05/19 Page 2 of 2

ED&F MAN

E D & F MAN CAPITAL MARKETS LIMITED

25 March 2014

**The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein**
**61 Broadway**
**Suite 1915**
**New York**
**NY 10006**
**0**
**USA**

Dear Sirs:

We refer to the letter agreement dated 21 June 2012 between ED & F Man Capital Markets Ltd (hereinafter "us") and The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein (hereinafter "you").

In consideration of the custodian and related services provided by us in connection with our entering into with, or arranging for you the agreements and transactions referred to in the letter agreement (including any related or supporting transactions), together with our effecting with or for you the specific transaction in respect of 2,000,000 shares in the capital of NOVO NORDISK A/S-B (NOVOB DC) (the "**Transaction**"), you shall pay to us a fee of DKK 90,000 (the "**Custodian Fee**").

The Custodian Fee shall become payable upon settlement of all amounts for the Transaction and we will subsequently either invoice you or alternatively at our discretion deduct such amounts from any funds you hold on account with us.

Please confirm your agreement to be bound by the terms of this letter agreement by executing a copy of the letter agreement and returning it to us.

We are very pleased to have concluded this Transaction with you.

Yours sincerely,
**ED & F Man Capital Markets Ltd**

S Hawksworth

By:
Name: Steve Hawksworth
Title: European CEO

Accepted and agreed for and on behalf of
**The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein**

By:
Name: Sheldon Goldstein
Trustee

Cottons Centre
Hay's Lane
London SE1 2QE

Telephone: +44 (0)20 7089 8000

Authorised and Regulated by the Financial Services Authority
Registered in England No.1292851

# EXHIBIT L

Case 1:18-cv-05053-LAK Document 100-12 Filed 11/05/19 Page 2 of 2

ED&F MAN

E D & F MAN CAPITAL MARKETS LIMITED

01 May 2014

**The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein**
**61 Broadway**
**Suite 1915**
**New York**
**NY 10006**
**USA**

Dear Sirs:

We refer to the letter agreement dated 21 June 2012 between ED & F Man Capital Markets Ltd (hereinafter "us") and The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein (hereinafter "you").

In consideration of the custodian and related services provided by us in connection with our entering into with, or arranging for you the agreements and transactions referred to in the letter agreement (including any related or supporting transactions), together with our effecting with or for you the specific transaction in respect of 215000 shares in the capital of D/S NORDEN (DNORD DC) (the "**Transaction**"), you shall pay to us a fee of DKK 10750 (the "**Custodian Fee**").

The Custodian Fee shall become payable upon settlement of all amounts for the Transaction and we will subsequently either invoice you or alternatively at our discretion deduct such amounts from any funds you hold on account with us.

Please confirm your agreement to be bound by the terms of this letter agreement by executing a copy of the letter agreement and returning it to us.

We are very pleased to have concluded this Transaction with you.

Yours sincerely,
**ED & F Man Capital Markets Ltd**

S Hawksworth

By:
Name: Steve Hawksworth
Title: European CEO

Accepted and agreed for and on behalf of
**The Goldstein Law Group PC 401(K) Profit Sharing Plan FBO Sheldon and Scott Goldstein**

By: ____________
Name: Sheldon Goldstein
Title: Trustee