UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re

CUSTOMS AND TAX ADMINISTRATION OF
THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

This document relates to 1:18-CV-05053-LAK.

MASTER DOCKET

No. 1-18-MD-02865-LAK

**OPPOSITION OF THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING
PLAN AND SHELDON GOLDSTEIN TO ED&F MAN CAPITAL MARKETS, LTD.'S
MOTION TO DISMISS THE AMENDED THIRD-PARTY COMPLAINT PURSUANT
TO RULE 12(b)(2) OR FOR *FORUM NON CONVENIENS*
OR IN THE ALTERNATIVE TO STAY ALL PROCEEDINGS AGAINST IT**

## TABLE OF CONTENTS

**TABLE OF CONTENTS**                                                          **I**
**PRELIMINARY STATEMENT**                                                      **1**
**BACKGROUND**                                                                 **2**

**The Goldstein Parties are Innocent Investors**                              **2**
**ED&F Man Advertises its Deep Access to American Financial Markets**         **4**
**ED&F Man's Fundamental Business Model Required U.S. Markets and Investors**  **6**
**From Trade Ideas to Tax Refunds, ED&F Man Controlled the Danish Transactions**  **7**
**ED&F Man Admitted that it Falsely Certified U.S. Pension Plans' Receipt of Danish**
**Dividends At Least 80 Times**                                               **8**
**ED&F Man's Profits were Predicated on Trading for American Investors**      **10**

**LEGAL STANDARD**                                                            **11**
**ARGUMENT**                                                                  **12**

**I.    ED&F Man is Subject to this Court's Personal Jurisdiction**           **13**

  **A.   The Exchange Act Authorizes the Exercise of Specific Jurisdiction over ED&F Man**
  **to the Broadest Limits of Due Process**                                  **14**
  **B.   ED&F Man Has Extensive Contacts with the United States and New York**  **16**
  **C.   Haling ED&F Man into this Court is Reasonable**                      **20**

**II.   New York's Long-Arm Statute Provides Additional, Independent Bases to Exercise**
**Specific Jurisdiction over ED&F Man**                                       **22**

  **A.   C.P.L.R. § 302(a)(3) Authorizes Long-Arm Jurisdiction over ED&F Man**  **22**

    **1. ED&F Man's Tortious Acts Caused the Plan Injury in New York**        **23**
    **2.    The Foreign Defendants Both Engaged in Persistent Business Conduct and Knew**
    **that They Would Cause Harm in New York**                               **25**

  **B.   C.P.L.R. § 302(a)(1) Also Confers Jurisdiction Over ED&F Man**       **26**

    **1.    ED&F Man Transacts Business in New York**                        **28**
    **2.    The Goldstein Parties' Claims Arise out of ED&F Man's New York Business**  **30**

**III. This Case Does Not Present the "Rare Circumstances" of *Forum non Conveniens***  **30**
**IV. There is No Basis to Stay the Third-Party Claims**                      **32**
**V.   In the Alternative, the Court Should Grant Leave to Amend or Order Jurisdictional**
**Discovery**                                                                **34**

**CONCLUSION**                                                                **35**

# TABLE OF AUTHORITIES

## CASES

Alfandary v. Niko Asset Mgmt. Co., 337 F. Supp. 3d 343 (S.D.N.Y. 2018) (Sweet, J.) ----------15

Alibaba Grp. Holding Ltd. v. Alibabacoin Found., No. 18-cv-2897 (JPO), 2018 WL 5118638
    (S.D.N.Y. Oct. 22, 2018) (Oetken, J.)-------------------------------------------------------------------27

Asahi Metal Indus. Co. v. Superior Court of Cal., 480 U.S. 102 (1987)-----------------------------20

Atlantica Holdings, Inc. v. BTA Bank JSC, No. 13-CV-5790 (JMF), 2015 WL 144165 (S.D.N.Y.
    Jan. 12, 2015) (Furman, J.) --------------------------------------------------------------------------------16

Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120 (2d Cir. 2002) ---- 21, 23

Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985)------------------------------------------- passim

C. Mahendra (N.Y.), LLC v. Nat'l Gold & Diamond Ctr., Inc., 125 A.D. 3d 454 (App. Div.
    2015) ------------------------------------------------------------------------------------------------------------27

Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158 (2d Cir. 2010)--------------------- passim

D&R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro, 29 N.Y.3d 292 (2017) ---- 28, 30

Deutsche Bank Securities, Inc. v. Montana Bd. of Investments, 7 N.Y.3d 65 (2006) -------------14

DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81 (2d Cir. 2001)--------------------------------- 24, 25

Evergreen Marine Corp. v. Welgrow Int'l Inc., 954 F. Supp. 101 (S.D.N.Y. 1997) (Sweet, J.)- 11,
    32, 33

Fischbarg v. Doucet, 9 N.Y.3d 375 (2007) -----------------------------------------------------------------27

FRA S.p.A. v. Surg-O-Flex of Am., Inc., 415 F. Supp. 421 (S.D.N.Y. 1976) (Tenney, J.)-------13

Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225 (2d Cir. 1977) ----------------------12

Gucci America, Inc. v. Weixing Li, 135 F. Supp. 3d 87 (S.D.N.Y. 2015) (Sullivan, J.) ----------29

Guidi v. Inter-Continental Hotels Corp., 224 F.3d 142 (2d Cir. 2000)-------------------------------31

Gulf Oil Co. v. Gilbert, 330 U.S. 501 (1947) -----------------------------------------------------31

Hargrave v. Oki Nursery, 636 F.2d 897 (2d Cir. 1980)----------------------------------------------25

Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55 (2d Cir. 1985)------------------------------11

In re Banco Bradesco S.A. Sec. Litig., 277 F. Supp. 3d 600 (S.D.N.Y. 2017) (Woods, J.) - 11, 12, 13, 14

Int'l Shoe Co. v. Washington, 326 U.S. 310 (1945) --------------------------------------------- 15, 20

Keeton v. Hustler Magazine, Inc., 465 U.S. 770 (1984)----------------------------------------- 17, 19

Koster v. (Am.) Lumbermans Mut. Cas. Co., 330 U.S. 518 (1947) ----------------------------- 11, 31

LaMarca v. Pak-Mor Mfg. Co., 95 N.Y.2d 210 (2000)---------------------------------------------20

Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50 (2d Cir. 2012) --------14, 22, 30

Mago Int'l LLC v. LHB AG, No. 13 Civ. 3370(CM), 2014 WL 2800751 (S.D.N.Y. June 18, 2014) (McMahon, J.) --------------------------------------------------------------------28

Marine Midland Bank v. Keplinger & Assocs., Inc., 488 F. Supp. 699 (S.D.N.Y. 1980) (Duffy, J.) ------------------------------------------------------------------------------------------24

Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560 (2d Cir. 1996) ----------------11, 13, 22

Morrison v. Nat'l Australia Bank Ltd., 561 U.S 247 (2010)----------------------------------------13

Navaera Scis., LLC v. Acuity Forensic Inc., 667 F. Supp. 2d 369 (S.D.N.Y. 2009) (Kaplan, J.) 15

Newmont Mining Corp. v. AngloGoldAshanti Ltd., 344 F. Supp. 3d 724 (S.D.N.Y. 2018) (Abrams, J.) ------------------------------------------------------------------------------------22

Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13 (1970)------------------------------------28

Paterno v. Laser Spine Inst., 24 N.Y.3d 370 (2014) ------------------------------------------------28

Penguin Grp. (USA), Inc. v. American Buddha, 16 N.Y.3d 295 (2011)------------------------------23

Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981) --------------------------------------------------31

S.E.C. v. Straub, 921 F. Supp. 2d 244 (S.D.N.Y. 2013) (Sullivan, J.)----------------------15, 16, 17

Sole Resort, S.a. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100 (2d Cir. 2006) -----------30

State Farm Fire & Cas. Co . v. Swizz Style, Inc., 246 F. Supp. 3d 880 (S.D.N.Y. 2017) (Román,

    J.) ------------------------------------------------------------------------------- 20, 21

Thackurdeen v. Duke Univ., 660 F. App'x 43 (2d Cir. 2016) ------------------------------------24

Timothy Coffey Nursey Landscape Inc. v. Soave, 760 F. App'x 58 (2d Cir. 2019) --------------24

UTC Fire & Sec. Americas Corp. v. NCS Power, Inc., 844 F. Supp. 2d 366 (S.D.N.Y. 2012)

    (Swain, J.) -------------------------------------------------------------------------- 23, 25

Vasquez v. Hong Kong & Shanghai Banking Corp. Ltd., No. 18 Civ. 1876 (PAE), 2019 WL

    237810 (S.D.N.Y. May 30, 2019) (Engelmayer, J.)---------------------------------------29

Walden v. Fiore, 571 U.S. 277 (2014) ----------------------------------------------------- passim

Whitaker v. Am. Telecasting, Inc., 261 F.3d 196 (2d Cir. 2001)------------------------------------24

Yurman Designs, Inc. v. A.R. Morris Jewelers, 60 F. Supp. 2d 241 (S.D.N.Y. 1999)------------34

### STATUTES

15 U.S.C. § 78aa (2010) --------------------------------------------------------------------15

N.Y. C.P.L.R. § 302(a) (McKinney 2019)----------------------------------------------------15

N.Y. C.P.L.R. § 302(a)(1) (McKinney 2019) -------------------------------------------- 24, 29

N.Y. C.P.L.R. § 302(a)(3) (McKinney 2019) -----------------------------------------24, 28, 29

N.Y. C.P.L.R. 302(a)(4) (McKinney 2019) --------------------------------------------------19

### OTHER AUTHORITIES

Gavin Foggo and Caroline Benham, Commercial Litigation in the United Kingdom, American

    Bar Association (Dec. 22, 2011) --------------------------------------------------------23

RULES

Fed. R. Civ. P. 12(b)(2)-------------------------------------------------------------------11

Fed. R. Civ. P. 12(g) --------------------------------------------------------------------13

Fed. R. Civ. P. 15(a) --------------------------------------------------------------------38

Fed. R. Civ. P. 4(k)(1)(A)--------------------------------------------------------------14

TREATISES

Wright and Miller, Fed. Prac. & Proc. § 1384 (1st ed. 1969)-----------------------------------14

Defendants–Counterclaim Plaintiffs–Third-Party Plaintiffs The Goldstein Law Group PC 401(K) Profit-Sharing Plan and Sheldon Goldstein (collectively, the "**Goldstein Parties**") respectfully oppose Third-Party Defendant ED&F Man Capital Markets, Ltd.'s ("**ED&F Man**" or the "**Brokerage**") Motion to Dismiss the Amended Third-Party Complaint Pursuant to Rule 12(b)(2) or for *Forum Non Conveniens* or in the Alternative to Stay All Proceedings Against It (the "**Motion**").

## PRELIMINARY STATEMENT

From 2012 to 2019, ED&F Man's business revolved around providing American clients with European securities services like dividend arbitrage investments. Between just 2012 and 2015, ED&F Man arranged over $314 million in Danish securities transactions that give rise to at least 30 separate cases filed by Plaintiff Skatteforvaltningen ("**SKAT**") in this multi-district litigation ("**MDL**").

The Goldstein Law Group PC 401(K) Profit-Sharing Plan (the "**Plan**") was just one of those clients. In 2012, former MF Global UK Ltd. ("**MF Global**") personnel asked the Plan to come with them to their new employer, ED&F Man, where the traders would arrange dividend arbitrage investments for the Plan. ED&F Man did, in fact, arrange dozens of such transactions in various jurisdictions for the Plan, always assuring the Plan that it would structure the investments to allow the Plan to capture any related withholding tax reclaims.

In 2014 and 2015, ED&F Man created, structured, funded, and facilitated the securities trading and paperwork necessary for the Plan to apply for nine Danish dividend tax refunds (the "**Danish Transactions**").[1] One of ED&F Man's crucial services was the preparation and issuance

---

[1] The nine Danish Transactions relate to dividends issued by (1) TDC Group on March 7, 2014; (2) Danske Bank on March 24, 2014; (3) Novo Nordisk on March 26, 2014; (4) D/S Norden on April 29, 2014; (5) Coloplast on December 9, 2014; (6) Novozymes on March 2, 2015; (7) Danske

1

of "**Tax Vouchers**" certifying the Plan's (a) ownership of the securities on the dividend's record date, (b) receipt of the dividends net of withholding, and (c) "suffering" of withheld taxes.

But in September 2019, ED&F Man admitted that it had created and issued at least 80 false Tax Vouchers that wrongfully certified its clients' receipt of Danish dividends and "suffering" of Danish dividend taxes (the "**Disavowed Vouchers**"). ED&F Man had created four of those wrongful Vouchers for the Goldstein Plan's submission to SKAT.

While ED&F Man deliberately targeted New York customers and markets, it now claims that it is not subject to this Court's personal jurisdiction and that it would be just too inconvenient to defend itself in this Court at this time. The Brokerage's indignation cannot obscure the fact that it purposefully availed itself of this forum to harm New Yorkers and other Americans. This Court should dismiss the Motion in its entirety.

## BACKGROUND

### The Goldstein Parties are Innocent Investors

The Goldstein Parties have never intended to defraud or otherwise harm SKAT. Defendants the Goldstein Law Group PC 401(K) Profit Sharing Plan's and Sheldon Goldstein's Amended Answer, Affirmative Defenses, and Counterclaims Against Skatteforvaltningen and Amended Third-Party Complaint Against ED&F Man Capital Markets, Ltd. and John Does 1–10, Dkt. 219 (Nov. 5, 2019) ("**ATPC**") ¶¶ 230 (citing Transfer Order, Dkt. 37 (Oct. 3, 2018); 100. SKAT, itself, has never alleged that the Goldstein Parties are connected to the "mastermind" of this MDL's fraud or any other MDL defendant. Id. ¶¶ 200–09.

---

Bank on March 23, 2015; (8) Novo Nordisk on March 24, 2015; and (9) TDC Group on August 12, 2015. Id. ¶ 180. ED&F Man has disavowed the Tax Vouchers relating to the first four.

Mr. Goldstein is an 81-year-old former Manhattan-based securities lawyer who retired approximately ten years ago. Id. ¶ 101. In 1998, Mr. Goldstein founded non-party the Goldstein Law Group PC, which was the successor to law firms formed and managed by Mr. Goldstein since 1980. Id. ¶ 102. All of Mr. Goldstein's firms were real law firms with real offices, real clients, real employees, real payrolls, and real retirement and benefit plans. Id. ¶ 103. The Goldstein Plan was founded 15 years before the first Danish Transaction. Id. ¶ 104.

By prohibiting Denmark from taxing dividends paid to U.S. non-profit pension plans, the Double-Taxation Treaty created a dividend arbitrage investment opportunity. Id. ¶ 173. While most investors will receive only 73% of a Danish dividend after taxes, non-profit American pension plans like the Goldstein Plan are entitled to receive 100%. Id. ¶ 174. Historically, tax-exempt American entities that received Danish dividends could apply for refunds of the withheld tax by submitting a refund application and supporting documents to SKAT (a "**Reclaim Application**"). Id. ¶ 175. Until August 2015, so long as a Reclaim Application included the necessary documents and properly calculated the amounts due, SKAT promptly remitted the refunds. Id. ¶ 178.

In spring 2012, for the express purpose of engaging in dividend arbitrage investments, the Plan agreed to follow former MF Global UK Ltd. ("**MF Global**") personnel to and open an account with ED&F Man. Id. ¶¶ 179, 106, 127. Because the Plan was a U.S. nonprofit entity exempt from taxation, ED&F Man promised that in exchange for the Plan's business (and significant fees), ED&F Man would (1) bring dividend arbitrage opportunities to the Plan; (2) structure, facilitate, and fund the Plan's pre-dividend purchases of securities in a manner that would entitle the Plan to collect dividends from foreign issuers; and (3) create and issue the Tax Vouchers. Id. ¶ 115. Through its conduct, ED&F Man reassured the Plan that this trading would appropriately result in

the Plan's entitlement to dividend withholding taxes. Id. ¶ 116. As SKAT has identified at least 36 U.S. pension plan clients of ED&F Man, it is reasonable to believe that the Plan was just one of hundreds of U.S. clients, tax-exempt or otherwise, that MF Global personnel brought to the Brokerage. Id. ¶ 324.

ED&F Man and the Plan memorialized their understanding in several agreements. Id. ¶ 244; see also id. Exhibits F, G, H. The Custody Agreement between the parties provides that ED&F Man shall indemnify the Plan for losses caused by ED&F Man's "own breach of duty" or "willful default, fraud, or negligence [ . . . ] in providing services" pursuant to the Agreement. Id. Exhibit F § 13(a). It also states that English courts have "non-exclusive jurisdiction" to hear disputes arising out of the contract, notes that the parties "shall not be prevented from taking proceedings related to a Dispute in any other courts with jurisdiction," and that the parties "may take concurrent proceedings in any number of jurisdictions." Id. §§ 22(d), (f), (g).

All Plan documents denote its address as "61 Broadway, Suite 1915, New York, New York 10006." ATPC ¶ 149. In its account opening documents, the Plan also provided a National Financial Services brokerage account held at J.P. Morgan Chase at One Chase Plaza, New York, NY 10005, which ED&F Man withdrew from and deposited into over the next seven years (the "**NFS Account**"). See id. ¶ 114.

 ED&F Man solicited, arranged, funded, executed, and prepared and issued Tax Vouchers for each of the nine Danish Transactions. Id. ¶ 162.

**ED&F Man Advertises its Deep Access to American Financial Markets**

ED&F Man is the U.K.-incorporated and primary branch of the global brand "ED&F Man Capital Markets" ("**EDFMCM**"), which advertises itself as a global financial brokerage that provides specialized securities lending and financing from offices in Campinas, Brazil; Chicago;

Dubai; Hamburg; Hong Kong; London; Miami; New York; Rosario, Argentina; and Winterthur, Switzerland. ED&F Man Capital Markets, Global Presence, edfmancapital.com/global-presence ("Global Presence"). Although multiple entities comprise the group, EDFMCM holds itself out as a unified brand with a combined $8.1 billion in annual revenue and $14.2 billion in assets. ED&F Man Capital Markets, About Us, edfmancapital.com/about-us/.

EDFMCM advertises that it has co-location facilities with financial exchanges and "Tier 1 data center facilities in proximity to key financial exchanges," including the New York Mercantile Exchange ("**NYMEX**"), the Intercontinental Exchange ("**ICE**"), and BrokerTec, all located in Manhattan. ED&F Man Capital Markets, Infrastructure & Technology, edfmancapital.com/infrastructure-technology ("Infrastructure & Technology"). ED&F Man also shares services, infrastructure, and personnel with two New York City-based affiliates, including self-hosted trading platforms and physical data centers in Illinois, New Jersey, and the United Kingdom. CME Group, ED&F Man Capital Markets, www.cmegroup.com/partner-services/ed-and-f-man-capital-markets.html.

EDFMCM's website also touts its ability to "route orders across all US equity and options markets." Products & Services. The website does not single out or otherwise advertise EDFMCM's capabilities in any other specific jurisdictions. See generally ED&F Man Capital Markets, edfmancapital.com.

All EDFMCM entities are wholly-owned by ED&F Man Holdings Ltd. ("**Holdings**"), a 236-year-old agricultural commodity trading group that boasts "7,000 people in 60 countries," ATPC ¶ 8. ED&F Man, Holdings, and EDFMCM all represent that their primary offices are at 3 London Bridge Street, London, SE1 9SG, Great Britain. See Global Presence; ED&F Man Capital

Markets, <u>Company Information</u>, edfman.com/company-information ("<u>Company Information</u>");
ATPC ¶ 152.

### ED&F Man's Fundamental Business Model Required U.S. Markets and Investors

As early as 2008, the U.S. Senate acknowledged that financial institutions cannot compete
for the largest clients—New York-based institutional investors—unless they offer dividend
arbitrage by matching for-profit clients, such as hedge funds or private equity asset managers, with
tax-exempt purchasers like pension plans. <u>Id.</u> ¶¶ 170–71. In 2011 and 2012, hoping to offer a wider
variety of securities services demanded by sophisticated institutional investors, ED&F Man hired
dozens of executives, traders, and other brokerage personnel from MF Global, whose Manhattan-
headquartered parent company had just filed for bankruptcy. <u>Id.</u> ¶¶ 236, 321, 234–35.

London-based MF Global had existed to structure, clear, and settle European transactions
on behalf of its parent company's American clients. <u>Id.</u> ¶ 238. MF Global's business had been
particularly dependent on dividend arbitrage and had frequently clashed with its New York
parent's risk managers. <u>Id.</u> ¶ 239.

Among the new leadership was Steve Hawksworth, who had been MF Global's Head of
Equities and Fixed Income and who would become ED&F Man's CEO in 2013. <u>Id.</u> ¶ 242; <u>see also</u>
Tom Osborn, ED&F score further MF Global hires: London commodity trading firm beefs up its
board with senior hires from its former parent, Financial News (Jan. 25, 2012 14:01),
<u>https://perma.cc/FNL8-U24G</u>; Luke Jeffs, ED&F holds talks over brokerage unit – sources,
Futures & Options World (Oct. 23, 2019 13:38), <u>https://perma.cc/84X9-2ND3</u> ("**ED&F Holds
Talks Over Brokerage Unit**").

ED&F Man's equity finance personnel (the "**Equity Finance Desk**") included multiple
MF Global veterans who created and managed the Plan's Danish Transactions. <u>Id.</u> ¶ 232. From

2012 to 2015—when SKAT disclosed the Shah Scheme's existence and stopped issuing tax refunds—the Equity Finance Desk solicited, recommended, structured, created, and executed Danish dividend arbitrage transactions for at least 36 U.S. pension plan clients and created at least 420 Tax Vouchers for those clients' submission to SKAT. Id. ¶ 255–56. SKAT has sued at least 30 ED&F Man U.S. pension plan clients in this MDL and alleges that ED&F Man created at least 397 fraudulent Tax Vouchers submitted to SKAT. Id. ¶¶ 257–58.

**From Trade Ideas to Tax Refunds, ED&F Man Controlled the Danish Transactions**

In or around late 2013, ED&F Man asked the Plan, which was exempt from Denmark's 27% dividend tax, if it was interested in Danish dividend arbitrage investing. Id. ¶¶ 245–46; 119. ED&F Man purports to have executed many moving parts to facilitate each Danish Transaction. See generally id. ¶¶ 181–192; id. Exhibit A, Amended Defence of ED&F Man Capital Markets Ltd., SKAT v. ED&F Man Capital Markets Ltd. et al., Nos. CL-2018-000297, CL-2018000590 ¶¶10.2–10.5 (Sept. 6, 2019) ("**Amended English Answer**").

When the Brokerage became aware of a Danish issuer's intent to issue dividends, ED&F Man would reach out to U.S. pension plan clients, including the Plan, and after securing the client's consent, acquire the security. ATPC ¶ 182. ED&F Man then would sell the security to the client while hedging that client's purchase with another transaction. Id. ¶183. The Brokerage purported to hold the securities as trustee in the client's ED&F Man custody account when the dividends issued. Id. ¶ 184. Once the Danish issuer paid out the dividend net of withholding tax into a general ED&F Man account, the Brokerage would credit the relevant amount back to the U.S. client's own brokerage account. Id. ¶ 185.

Finally, ED&F Man would prepare a Tax Voucher and, in the case of the Plan's Reclaim Applications, submit it to the Plan's reclaim agent, Goal, which ED&F Man had introduced to the

Plan. Id.¶186. Goal, in turn, would compile the Reclaim Application and submit it to SKAT; SKAT would process the Application and refund the withheld tax to Goal, which, after deducting its own fees, transferred the balance to ED&F Man; and ED&F Man credited the remaining refund to the Plan's Brokerage account and eventually charged the Plan additional fees. Id. ¶¶187–89.

In connection with each Danish Transaction, ED&F Man prepared numerous documents and communications for the Plan, including the Tax Vouchers. Id. ¶¶ 121, 193, 252, 262. Because the essential function of the Plan's relationship with ED&F Man was to engage in dividend arbitrage trading, ED&F Man's creation and submission of accurate Tax Vouchers were fundamental not only to the parties' broader relationship, but also to each of the Danish Transactions. Id. ¶ 308.

### ED&F Man Admitted that it Falsely Certified U.S. Pension Plans' Receipt of Danish Dividends At Least 80 Times

Until September 2019, the Goldstein Parties trusted ED&F Man's repeated and explicit assurances that the Danish Transactions and dozens of documents that ED&F Man had prepared for the Plan, including the Tax Vouchers, were accurate and trustworthy. Id. ¶¶ 260, 262. Even after SKAT had sued the Goldstein Parties in this MDL and ED&F Man in England, ED&F Man reiterated, and the Goldstein Parties reasonably believed, that the Plan's Danish Transactions and Tax Vouchers were legitimate. Id. ¶ 262.

But in early 2019, the Equity Finance Desk personnel who had serviced the Plan— including many who had worked with the Plan since MF Global—began resigning from ED&F Man. Id. ¶ 265. In Spring 2019, ED&F Man announced that it was closing the Equity Finance Desk entirely and notified the Plan that it would close the Plan's account in June. Id. ¶¶ 266–68. ED&F Man fired the remaining Equity Finance traders no later than July 31, 2019. Id. ¶ 269. On

or around August 20, 2019, ED&F Man's CEO, Mr. Hawksworth, quietly resigned—effective immediately. Id. ¶ 270; see also ED&F Holds Talks Over Brokerage Unit.

And just two weeks later, ED&F Man admitted, for the very first time, that 80 of the Tax Vouchers it had prepared for submission to SKAT had falsely certified its clients' "recei[pt]" of the Danish dividends and "suffering" of the Danish taxes. Id. ¶ 271. In doing so, ED&F Man necessarily has admitted that other documents it created and provided to the Plan that purported to represent the Spring 2014 Transactions also are false. Id. ¶ 371.

ED&F Man created all 80 of those Tax Vouchers for U.S. pension plan clients that are defendants in this MDL. Id. Four of them are the "**Disavowed Vouchers**" that ED&F Man created for the Plan, which relate to the (1) March 2014 TDC Group, (2) March 2014 Danske Bank, (3) March 2014 Novo Nordisk, and (4) April 2014 D/S Norden dividends (the "**Spring 2014 Transactions**"). Id. ¶ 272.

Despite multiple inquiries from the Goldstein Parties and the Plan's longstanding relationship with the Brokerage—and despite filing its Motion—ED&F Man has refused to explain why it now admits that the Disavowed Vouchers are false. Id. ¶ 276; Dkt. 110. ED&F Man has not explained why the Plan did not actually receive the dividends from the relevant Danish issuers; why the Plan's general ledger and Brokerage statements showed that it received dividends, net of withholding tax, from the Danish issuers; how the Spring 2014 Transactions differ from the Plan's other five Danish Transactions; or why the Plan should trust the remaining five Transactions' Tax Vouchers. Id. ¶¶ 277–79. And none of the Plan's ED&F Man contacts has registered new employment information with the U.K. Financial Conduct Authority.

**ED&F Man's Profits were Predicated on Trading for American Investors**

To execute the Spring 2014 Transactions, ED&F Man traded with its own Switzerland- and Dubai-based affiliates and—despite numerous legal, regulatory, and contractual obligations to the contrary—concealed its self-dealing from the Goldstein Parties. Id. ¶¶ 282–84. ED&F Man also instructed the Plan to place each of the Spring 2014 Transaction orders on a T+4 settlement basis. Id. ¶¶ 287–89. ED&F Man reached out to clients and gave the T+4 instruction over the telephone or via text message and told the clients to email ED&F Man that same instruction in writing. Id. ¶ 285–86. This pattern allowed ED&F Man to conceal the fact that ED&F Man had orchestrated and solicited the trades and avoid concomitant regulatory risks and responsibilities. Id. ¶ 304–06.

Furthermore, ED&F Man memorialized each of the Spring Transactions—again, the only ones that it now disclaims—with personally-signed custody fee letters sent from its CEO, Steve Hawksworth, to the Plan at its Manhattan address. Id. ¶ 311. Each of those letters referred to the Custody Agreement between the parties and stated that ED&F Man had provided "custodian and related services" "in connection with [ED&F Man] entering into with, or arranging for [the Plan . . . ] the specific transaction in respect of[] shares in the capital of" each of the Spring 2014 Transaction securities. Mr. Hawksworth, who helped lead dividend arbitrage trading at MF Global before joining ED&F Man, did not personally sign any of the Plan's other, numerous agreements or communications with ED&F Man. Id. ¶ 318. By disavowing the Spring 2014 Transactions' Tax Vouchers, ED&F Man has admitted that it never should have charged or collected fees from the Plan that are outlined in the Hawksworth custody letters. See Amended English Answer ¶ 43.

ED&F Man's continual evasions of its clients and the English court make it impossible to tell whether the Plan's remaining five Danish Transactions and concomitant Tax Vouchers were

legitimate and qualified for refunds from SKAT. Id. ¶ 333. ED&F Man's refusal to explain the difference between the Spring 2014 Transactions and the Plan's remaining transactions, plus its post-litigation closure of the Equity Finance Desk and firing of every single one of the Plan's ED&F Man contacts, gives the Goldstein Parties no comfort. Id. ¶ 332.

## LEGAL STANDARD

A plaintiff need only make a prima facie showing of jurisdiction to defeat a Rule 12(b)(2) motion. See, e.g., Metro. Life Ins. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996), cert. denied, 498 U.S. 854 (1990) (citation omitted); see also Fed. R. Civ. P. 12(b)(2). The plaintiff's allegations "must be taken as true to the extent they are uncontroverted by the defendant's affidavits." In re Banco Bradesco S.A. Securities Litig., 277 F. Supp. 3d 600, 630 (S.D.N.Y. 2017) (Woods, J.) (citation and quotation marks omitted). But even if affidavits conflict, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." Id. (citation and quotation marks omitted). A defendant's "controverting presentation" does not heighten the plaintiff's burden. Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir. 1985).

The "ultimate inquiry" of the *forum non conveniens* analysis, meanwhile, is "where trial will best serve the convenience of the parties and the ends of justice." Koster v. (Am.) Lumbermans Mut. Cas. Co., 330 U.S. 518, 527 (1947). And to determine whether to grant a stay, the Court should analyze "the similarity of parties and issues involved in the foreign litigation; the promotion of judicial efficiency; adequacy of relief available in the alternative forum; issues of fairness to and convenience of the parties, counsel, and witnesses; the possibility of prejudice to any of the parties; and the temporal sequence of the filing of the actions." Evergreen Marine Corp. v. Welgrow Int'l Inc., 954 F. Supp. 101, 103 (S.D.N.Y. 1997) (Sweet, J.).

For all three analyses, this Court must consider ED&F Man's wrongful conduct and forum contacts in the aggregate, not in isolation. See, e.g., Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985); accord Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 172–73 (2d Cir. 2010). In fact-specific tests like these, "the whole truly is greater than the sum of its parts." Cf. Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225, 236 (2d Cir. 1977) (in relevant part, reversing denial of motion to disqualify attorney; "[W]e find most troublesome Judge Stewart's decision to consider only four of the contacts between the Morgan and the Milgrim firms, and to ignore the extensive and intimate contacts between the firms dating back, at the least, to the summer of 1973.").

## ARGUMENT

As a preliminary matter, ED&F Man's continual assertions that the Goldstein Parties "imagine a vaguely[-]articulated improper motive," present an "imagined scheme," and invent "patently false allegations" are irrelevant, particularly because ED&F Man has offered no evidence, via affidavit or otherwise, that contradicts the Goldstein Parties' allegations. Compare Mot. at 8, 20, 2 and In re Banco Bradesco, 277 F. Supp. 3d at 630 (plaintiff's 12(b)(2) allegations must be taken as true even if controverted by defendants' affidavits).

If ED&F Man had a basis to suggest that the Goldstein Parties are merely trying to "save their baseless claims from dismissal," the Brokerage should have filed a Rule 12(b)(6) motion to dismiss. Compare Mot. at 8 n.9, 9 n.10, 25 n. 21 (Attempting to "reserve" "the right to file a "motion to dismiss" pursuant to Rule 12(c), which governs motions for judgment on the pleadings; "As another issue potentially for another motion, the Goldstein [Parties'] allegations of fraud could never pass muster under Fed. R. Civ. P. 9;" "We leave for another day the fact that under Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 130, S.Ct. 2869 (2010) which barred federal securities

claims against foreign defendants trading securities on foreign exchanges [sic][2]") and Fed. R. Civ. P. 12(g) ("If a party makes a motion under this rule but omits therefrom any defense or objection then available to him which this rule permits to be raised by motion, he shall not thereafter make a motion based on the defense or objection so omitted"); cf. FRA S.p.A. v. Surg-O-Flex of Am., Inc., 415 F. Supp. 421, 426–27 (S.D.N.Y. 1976) (Tenney, J.) (Rule 12 exists to "prevent dilatory motion practice;" "[T]he only persons to whom Rule 12(g) presents a hazard are motion-minded lawyers who, from force of habit or lack of good faith, cannot close their pleadings or come to issue without attempting to make numerous motions.") (quoting Wright and Miller, Fed. Prac. & Proc. § 1384 (1st ed. 1969)) (quotation marks omitted).

As ED&F Man failed to move pursuant to Rule 12(b)(6), the rest of this brief will ignore ED&F Man's hyperbole unless it is both  relevant to the motions that ED&F Man does make and paired with fact or law.

## I.     ED&F Man is Subject to this Court's Personal Jurisdiction

Federal courts apply a two-part test to determine whether defendants are subject to their jurisdiction. See, e.g., Metro. Life Ins., 84 F.3d at 567 (reversing and remanding dismissal for lack of personal jurisdiction where defendants visited New York numerous times to conduct franchise-related activities and suit alleged breach of franchise agreement). First, the court analyzes whether there is a statutory basis to exercise personal jurisdiction; if so, it considers whether doing so comports with Fifth Amendment due process. In re Banco Bradesco, 277 F. Supp. 3d at 641 (citation omitted) (in relevant part, denying Brazilian bank's motion to dismiss allegations of

---

[2] Morrison did not "bar[] federal securities claims against foreign defendant trading securities on foreign exchanges." See Mot. at 25 n.21. In fact, the Supreme Court expressly noted that Section 10(b) applies to domestic transactions in foreign securities, such as if American plaintiffs trading in the United States had alleged similar conduct against Morrison's defendants. See Morrison v. Nat'l Australia Bank Ltd., 561 U.S 247, 266–67 (2010).

securities fraud); cf. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 59 (2d Cir. 2012) (citing Fed. R. Civ. P. 4(k)(1)(A)) (apply forum's jurisdictional statute unless a federal statute explicitly provides otherwise).

However, the nine separate claims that the Goldstein Parties have asserted against ED&F Man, see generally Counts I–VII, IX, XI —and that the Brokerage has not moved to dismiss— trigger two bases for specific jurisdiction: the Securities Exchange Act of 1934 (the "**Exchange Act**") and New York's long-arm statute, N.Y. C.L.P.R. § 302 ("**Section 302**"). See 15 U.S.C. § 78aa (2010); N.Y. C.P.L.R. § 302 (McKinney 2019).

The New York Court of Appeals has unequivocally held that long-arm jurisdiction exists over "a sophisticated institutional trader knowingly entering our state—whether electronically or otherwise—to negotiate and conclude a substantial transaction." Deutsche Bank Securities, Inc. v. Montana Bd. of Investments, 7 N.Y.3d 65, 72 (2006) (affirming, inter alia, denial of Montana state investment agency's motion to dismiss for lack of personal jurisdiction where it engaged in nine bond trades with New York bank branch).

## A. The Exchange Act Authorizes the Exercise of Specific Jurisdiction over ED&F Man to the Broadest Limits of Due Process

Because the Goldstein Parties allege that ED&F Man violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, Section 27 of the Exchange Act allows the Brokerage to be sued in any "district wherein the defendant is found or is an inhabitant or transacts business." 15 U.S.C. § 78aa. Where, as here, a plaintiff alleges Exchange Act claims, the court's only analytical step is to determine whether due process permits the exercise of jurisdiction over the defendant. In re Banco Bradesco, 277 F. Supp. 3d at 642; see also, e.g., Morrison, 561 U.S. at 253–54 (district courts may exercise Section 27 jurisdiction even where foreign plaintiffs allege securities fraud against foreign defendants for foreign conduct involving foreign issuers and fail

on the merits due to the presumption against extraterritoriality); Alfandary v. Niko Asset Mgmt. Co., 337 F. Supp. 3d 343, 359 (S.D.N.Y. 2018) (Sweet, J.), reconsideration denied, No. 17-CV-5137 (LAP), 2019 WL 2525414 (S.D.N.Y. June 19, 2019) (Preska, J.) (Section 27 "permit[s] the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment.") (citations omitted).

To exercise specific jurisdiction over ED&F Man, the Constitution merely requires that (1) ED&F Man have "minimum contacts" with the forum such that it should "reasonably anticipate being haled into court there" and that (2) exercising jurisdiction is "reasonable" and would comport with "traditional notions of fair play and substantial justice." Walden v. Fiore, 571 U.S. 277, 283 (2014) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). Conduct "designed to violate United States securities regulations," standing alone, militates in favor of finding minimum contacts. S.E.C. v. Straub, 921 F. Supp. 2d 244, 248 (S.D.N.Y. 2013) (Sullivan, J.) (denying motion to dismiss filed by executives of publicly-traded Hungarian company accused of violating the Foreign Corrupt Practices Act in Macedonia).

ED&F Man's contacts with the New York and United States are not "random, fortuitous, or attenuated." See Walden, 571 U.S. at 286. The Plan's New York address is not "the only New York connection to [the Goldstein Parties'] claims." Mot. at 1. And the Goldstein Parties certainly have not alleged or argued that "[t]he existence of a contract," standing alone, or "contracting with" the Goldstein Parties, standing alone, or "communications[] with New York residents," standing alone, subjects ED&F Man to this Court's jurisdiction. See Mot. at 17, 19; but see Mot. at 17 (quoting Navaera Scis., LLC v. Acuity Forensic Inc., 667 F. Supp. 2d 369, 375 (S.D.N.Y. 2009) (Kaplan, J.) ("The mere fact that an out-of-state defendant enters into a contract with" a

New York plaintiff "does not establish the requisite minimum contacts **unless the contract projects [the defendant] into the New York market**.")) (emphasis added).

Instead, the Goldstein Parties allege that ED&F Man—through its own regular, sustained business activities—purposefully projected itself into New York and established countless connections with the forum. See Walden, 571 U.S. at 286. Accordingly, this Court should exercise personal jurisdiction over the Brokerage.

## B. ED&F Man Has Extensive Contacts with the United States and New York

Because the Exchange Act authorizes nationwide service of process, the "minimum contacts" test considers ED&F Man's contacts with the entire United States, rather than just with the forum state.[3] Atlantica Holdings, Inc. v. BTA Bank JSC, No. 13-CV-5790 (JMF), 2015 WL 144165, at *4 (S.D.N.Y. Jan. 12, 2015) (Furman, J.) (citing Straub, 921 F. Supp. 2d at 253) (inter alia, denying Rule 12(b)(2) motion to dismiss where Panamanian and U.S. plaintiffs alleged Section 10(b) claims against Kazakh Bank arising out of that bank's restructuring in Kazakhstan).

Courts generally analyze minimum contacts by evaluating the "quality and nature" of the defendant's contacts with the forum, examining them in their totality. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985); accord Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 172–73 (2d Cir. 2010). While a defendant "may not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, jurisdiction is proper where the contacts proximately result from actions by the defendant **himself** that create a 'substantial

---

[3] While the Exchange Act's constitutional inquiry focuses on ED&F Man's contacts with the United States as a whole, Section 302(a)'s must concentrate on the Brokerage's contacts with New York. To avoid re-arguing nearly exactly the same issue later in this brief, in this Due Process analysis, the Goldstein Parties specify which of ED&F Man's contacts are with New York and which are with the United States more generally.

connection' with the forum." Straub, 921 F. Supp. 2d at 253–54 (emphasis added) (citation and quotation marks omitted); accord Walden, 571 U.S. at 283 (citation and quotation omitted).

However, a plaintiff's residence "may, because of the defendant's relationship with the plaintiff, enhance defendant's contacts with the forum." Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 780 (1984). The "crucial question" is "whether the defendant has purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws such that [it] should reasonably anticipate being haled into court there." Burger King, 471 U.S. at 474–75.

Therefore, the Supreme Court has affirmed specific jurisdiction over defendants who have purposefully "reach[ed] out" into the forum by entering into a contractual relationship that "envisioned continuing and wide-reaching contacts" in the forum, id. at 479–80, as well as those who have "deliberately exploited" a market in the forum, Keeton, 465 U.S. at 781. The location of a plaintiff's injury also is jurisdictionally relevant "insofar as it shows that the defendant has formed a contact with the forum State." Walden, 571 U.S. at 290; infra § II(A)(2).

ED&F Man has "continuously and deliberately exploited" the American market. See Keeton, 465 U.S. at 781 (holding that publisher's regular circulation of its monthly magazine in the forum was sufficient to assert specific jurisdiction over libel claims based on the contents of the magazines). ED&F Man continues to boast of its unfettered access to New York markets and on-site physical presence at NYMEX on Brookfield Place, ICE on Wall Street, and BrokerTec on 42nd Street. Cf. N.Y. C.P.L.R. 302(a)(4) (McKinney 2019) (long-arm jurisdiction proper over defendant that "owns, uses, or possess any real property situated within the state."). ED&F Man specialized in structuring, clearing, and settling dividend arbitrage transactions for American clients, including the over $85 million in Danish tax refunds at issue in this MDL. See, e.g., ATPC

¶¶ 108, 234–35, 238, 239, 241, 321. ED&F Man sought out not only wealthy American institutional investors, but also the non-profit American pension plans that were necessary to implement dividend arbitrage investments. See id. ¶ 107.

ED&F Man's Danish dividend arbitrage trading for non-profit American clients reveals just some of its "continuing and wide-reaching contacts" with the United States and New York. See Burger King, 471 U.S. at 479–80. From 2012 to 2015, ED&F Man solicited, recommended, structured, created, and executed Danish dividend arbitrage transactions for at least 36 U.S. pension plan clients and created at least 420 Tax Vouchers for those clients' submission to SKAT. ATPC ¶¶ 255–56. SKAT has sued at least 30 of those U.S. pension plan clients and alleges that ED&F Man created and caused to be issued at least 397 of the fraudulent Tax Vouchers involved in in this MDL. Id. ¶¶ 257–58. By disavowing 80 separate Tax Vouchers prepared for submission to SKAT, ED&F Man has admitted that it made at least 160 materially incorrect statements to SKAT so that SKAT would pay millions of dollars to dozens of American pension plans. Id. ¶ 315.

The Brokerage's relationship with the Plan also demonstrates sufficient minimum contacts. See Walden, 571 U.S. at 284–85 (a defendant's relationship with a plaintiff "may be intertwined with" his contacts with the forum and is relevant to show contact with the forum). In 2012, the Plan's MF Global traders asked the Plan to come with them to ED&F Man. ATPC ¶ 243. Over the next seven years, ED&F Man presented, structured, funded, and executed dozens of dividend arbitrage transactions purportedly for the Plan's benefit, addressed all correspondence to the Plan's Manhattan address, transferred all funds via the Fund's Manhattan NFS Account, and charged the Plan large fees through their relationship. See, e.g., ATPC ¶¶ 149, 180, 253.

Furthermore, that ED&F Man generally communicated with the Plan's agent instead of Mr. Goldstein directly is immaterial, as the Brokerage knew that the Plan was domiciled in and therefore was affected in New York. Compare Mot. at 11, 18, 20 (discussing Utah agent) and, e.g., Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc., 207 F.3d 1351, 1358 (11th Cir. 2000) (Alabama long-arm jurisdiction proper over defendant insurer where it communicated with plaintiff's Florida-based agent but knew plaintiff was in and insurance policy would be used in Alabama); Levin v. Harned, 304 F. Supp. 2d 136 (D. Mass 2003) (Massachusetts long-arm jurisdiction appropriate over antiques dealers who knew that they were contracting with and delivering goods to Boston).

Moreover, ED&F Man purposefully availed itself of the Plan and other American pension plan clients **because** they are U.S. non-profits exempt from taxation; they were crucial to ED&F Man's principal business. Keeton, 465 U.S. at 780 (citing Calder v. Jones, 465 U.S. 783, 788 (1984)) (residence relevant precisely because it was "the focus of the activities of the defendant out of which [this] suit arises."); ATPC ¶ 120.

Like in Deutsche Bank, ED&F Man knowingly initiated and pursued contracts, transactions, and a long-time relationship with the Plan. Even more, ED&F Man also pursued and contracted with hundreds of other American institutional and non-profit investors, including at least 30 that have been sued in this MDL, and another five that also submitted Reclaim Applications. Compare Deutsche Bank Securities, 7 N.Y.3d at 72 and ATPC ¶ 163. Nothing about the Brokerage's jurisdictional contacts is merely "random, fortuitous, or attenuated." See Walden, 571 U.S. at 286.

19

### C.  Haling ED&F Man into this Court is Reasonable

Federal courts favor exercising jurisdiction where a plaintiff has made a threshold showing of minimum contacts. Queen Bee, 616 F.3d at 165 (quoting Burger King, 471 U.S. at 477). If minimum contacts exist, the burden shifts to the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." LaMarca v. Pak-Mor Mfg. Co., 95 N.Y.2d 210, 217–18 (2000); accord State Farm Fire & Cas. Co . v. Swizz Style, Inc., 246 F. Supp. 3d 880, 893 (S.D.N.Y. 2017), mot. to certify denied, No. 15 Civ. 9432 (NSR), 2017 WL 3835694 (S.D.N.Y. Aug. 31, 2017) (Román, J.). "The reasonableness of jurisdiction is inversely proportional to the minimum contacts present." State Farm, 246 F. Supp. 3d at 893 (citing Burger King, 471 U.S. at 477).

Exercising jurisdiction is reasonable if it "comports with traditional notions of fair play and substantial justice," i.e., is reasonable "under the circumstances of the particular case." Queen Bee, 616 F.3d at 164 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). To analyze reasonableness, courts consider the five factors enumerated by the Supreme Court: (1) the burden that the exercise of jurisdiction will impose on the defendant, (2) the interests of the forum in adjudicating the case, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy, and (5) the states' shared interest in furthering substantive social policies. Asahi Metal Indus. Co. v. Superior Court of Cal., 480 U.S. 102, 113–14 (1987).

"In this modern era, the first factor is largely disregarded with respect to solvent corporate defendants." State Farm, 246 F. Supp. 3d at 893 ("[I]t is hard to imagine that a corporation with distributors in every country across the globe would be heavily burdened by travel or translation costs"); cf., e.g., Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 129–30

(2d Cir. 2002) ("Even if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support"). While requiring an ED&F Man representative to travel to New York for trial may present some burden, it would be far more difficult for 81-old Mr. Goldstein to travel to London and navigate its legal system than it would be for ED&F Man to litigate in the Southern District, where it already has counsel on retainer.

Because New York has a "manifest interest in providing effective means of redress for its residents," the second factor also favors the Goldstein Parties. See Burger King, 471 U.S. at 483 (quotation marks omitted). For example, in State Farm, Judge Román refused to grant a motion to dismiss filed by a Swiss corporate third-party defendant, noting that New York "surely would not welcome" the possibility that the third-party plaintiff, a New York resident, would be held liable "without effective recourse against the [foreign] manufacturer of the item." 246 F. Supp. 3d at 880, 893. Allowing the foreign third-party defendant to become "effectively judgment-proof" would undermine New York's interests, particularly in safeguarding its citizens. Id.

The third factor also favors the Goldstein Parties, who not only have significantly fewer resources to litigate than ED&F Man does, but also would be severely prejudiced by the English legal system's paucity of discovery practices, particularly because SKAT would continue to have access to full American discovery while the Plan could only seek limited information from ED&F Man. See, e.g., Gavin Foggo and Caroline Benham, Commercial Litigation in the United Kingdom, American Bar Association (Dec. 22, 2011), https://bit.ly/2NHbZmt.

Finally, because this case does not involve parties based in different United States jurisdictions, the fourth and fifth factors are not relevant here.

ED&F Man's "generalized complaints of inconvenience arising from having to defend [itself] from suit in New York do not add up to a 'compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" Queen Bee, 616 F.3d at 173 (quoting Metro. Life Ins. Co., 84 F.3d at 568). Asserting specific jurisdiction is proper.

## II.    New York's Long-Arm Statute Provides Additional, Independent Bases to Exercise Specific Jurisdiction over ED&F Man

New York's long-arm statute provides two additional bases for exercising long-arm jurisdiction over ED&F Man. See generally N.Y. C.P.L.R. §§ 302(a)(1), (3). If either statutory predicate exists, exercising jurisdiction also will comport with the Fifth Amendment: while Section 302(a) jurisdiction "may theoretically be prohibited under due process analysis," undersigned counsel is unaware of a single case in which Section 302(a) jurisdiction existed but its exercise was unconstitutional. Accord Licci, 732 F.3d at 170; Newmont Mining Corp. v. AngloGoldAshanti Ltd., 344 F. Supp. 3d 724, 742–54 (S.D.N.Y. 2018) (Abrams, J.). See also supra §§ I(B), (C) (arguing that exercising specific jurisdiction over ED&F Man satisfies due process).

### A.  C.P.L.R. § 302(a)(3) Authorizes Long-Arm Jurisdiction over ED&F Man

A non-domiciliary is subject to New York's long-arm jurisdiction if it:

commits a tortious act without the state causing injury to person or property within the state [and] (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in [New York], [or] (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

N.Y. C.P.L.R. § 302(a)(3).

The Goldstein Parties' claims for securities fraud, common-law fraud, negligence, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty claims each allege Section 302(a)(3)'s threshold element: a "tortious act." See ATPC Counts I–VII, IX, XI.

### 1. ED&F Man's Tortious Acts Caused the Plan Injury in New York

To determine whether an economic injury occurred in New York, courts must identify "where the first effect of the tort was located that ultimately produced the final economic injury." UTC Fire & Sec. Americas Corp. v. NCS Power, Inc., 844 F. Supp. 2d 366, 374 (S.D.N.Y. 2012) (Swain, J.) (quoting Bank Brussels Lambert, 171 F.3d at 792). In "traditional commercial tort cases," "the place where [the plaintiff's] business is lost or threatened exerts a significant gravitational influence on the jurisdictional analysis." Penguin Grp. (USA), Inc. v. American Buddha, 16 N.Y.3d 295, 305 (2011); see also Bank Brussels Lambert, 171 F.3d at 792 (injury in New York may even occur when a defendant's loss of customers occurs **outside** the state, so long as "the discernible local impact of the commercial injury to plaintiff" in New York is great enough.") (emphasis in original) (citation omitted).

In UTC Fire, for example, the court held that Section 302(a)(3) jurisdiction existed where the plaintiff asserted that upon being apprised of defects in Chinese-made batteries, it was "forced to undertake costly corrective action to mitigate damages" in New York, among other locations; would be forced to replace the remaining batteries in New York; and was likely to lose customers in New York. 844 F. Supp. 2d at 374 (denying foreign manufacturer's motion for summary judgment asserting lack of personal jurisdiction). In DiStefano v. Carozzi N. Am., Inc.—cited, but not analyzed, by ED&F Man—the Second Circuit held that despite the fact that plaintiff was wrongfully terminated in New Jersey, Section 302(a)(3) jurisdiction was proper, since the first

"effect" was felt in New York, where plaintiff actually worked. 286 F.3d 81, 85 (2d Cir. 2001) (vacating and remanding Section 302(a)(3)-based dismissal).

The Plan was domiciled in New York throughout the ED&F Man relationship; ED&F Man targeted and solicited the Plan because it was a U.S. pension plan, i.e., the Plan's residence was not merely "fortuitous;" the economic injury was most immediately felt in the Plan's Manhattan NFS Account, into which ED&F Man deposited and from which it withdrew U.S. Dollars for seven years; and ED&F Man's wrongful conduct caused SKAT to sue the Goldstein Parties in New York. See Marine Midland Bank v. Keplinger & Assocs., Inc., 488 F. Supp. 699, 703 (S.D.N.Y. 1980) (Duffy, J.) ("[S]ince all disbursements to ADDM or its creditors were made by MMB in New York, the situs of the injury was in New York").

All three Section 302(a)(3) cases relied upon by ED&F Man are factually inapposite. See generally Mot. at 16 (citing Thackurdeen v. Duke Univ., 660 F. App'x 43, 46–47 (2d Cir. 2016) (citing DiStefano, 286 F.3d at 84–85) ("RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT.") (emphasis in original); Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 209 (2d Cir. 2001); Timothy Coffey Nursey Landscape Inc. v. Soave, 760 F. App'x 58, 61 (2d Cir. 2019) ("RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT.") (emphasis in original)).

The Thackurdeen court held that Section 302(a)(3) did not confer jurisdiction where bereaved parents asserted tort claims arising out of the drowning death of their son in Costa Rica. 660 F. App'x at 47. In both Whitaker and Timothy Coffey, the plaintiffs' New York injuries were merely "fortuitous:" in Whitaker, because the defendants had contracted for the plaintiff's services to be performed in California, and in Timothy Coffey, because the plaintiffs allegedly were defrauded after traveling to and making in a business deal in Cuba, where the plaintiffs also agreed

24

to payment via wire transfers out of plaintiffs' New York bank account. Whitaker, 261 F.3d at 209; Timothy Coffey, 760 F. App'x at 60.

But here, ED&F Man's wrongful conduct first "[a]ffected" the Plan in its NFS brokerage account. See DiStefano, 286 F.3d at 85; see also, e.g., Hargrave v. Oki Nursery, 636 F.2d 897, 900 (2d Cir. 1980) ("One immediate and direct 'injury' Oki's alleged tortious misrepresentations caused to plaintiffs was the loss of money paid by them for the diseased vines"). ED&F Man's tortious acts also have "forced [the Plan] to undertake costly corrective action to mitigate damages" in New York—defending itself against wrongful conduct that ED&F Man perpetrated. See UTC Fire, 844 F. Supp. 2d at 374. The Plan's harm occurred in New York.

### 2. The Foreign Defendants Both Engaged in Persistent Business Conduct and Knew that They Would Cause Harm in New York

Section 302(a)(3)'s second element is disjunctive: ED&F Man is subject to this Court's jurisdiction if it **either** "(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state" **or** "(ii) expects or reasonably should expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." N.Y. C.P.L.R. §§ 302(a)(3)(i), (ii). This Court could exercise jurisdiction over ED&F Man on either basis.

ED&F Man regularly solicited business from New Yorkers, including the Plan, and "reasonably should have expected its conduct to have consequences in the state." See supra §§ I(B), (C) ; N.Y.C.P.L.R. § 302(a)(3)(ii). For example, at least two other defendants in this MDL are New York residents who were ED&F Man dividend arbitrage clients. See generally 18-cv-5374, Dkt. 1 (S.D.N.Y. June 14, 2018). SKAT has also filed complaints against ED&F Man clients located in Bernardsville, Green Brook, and Weehawken, New Jersey, and New Canaan and Darien,

25

Connecticut, further suggesting that ED&F Man solicited and conducted business in the New York City metropolitan area. See generally 18-cv-9841, Dkt. 1 (D.N.J. May 4, 2018); 18-cv-8655, Dkt. 1 (D.N.J. May 4, 2018); 18-cv-10088, Dkt. 1 (D.N.J. June 12, 2018); 18-cv-10130, Dkt. 1(D. Conn. June 12, 2018); 18-cv-8655, Dkt. 1 (D. Conn. June 12, 2018).

ED&F Man also "derive[d] substantial revenue from [ . . . ] services rendered in the state" by charging the Plan fees once SKAT processed its Reclaim Applications, which totaled nearly $1.5 million. See N.Y. C.P.L.R. § 302(a)(3)(i); ATPC ¶ 248. ED&F Man-enabled Reclaim Applications are the basis for over $85 million of damages alleged by SKAT in this MDL. Multiplied by the number of dividend arbitrage transactions that ED&F Man conducted purportedly for the benefit of its hundreds of New York clients, there is even less question that jurisdiction would be appropriate.

Finally, in 2014—the same year that ED&F Man issued 77 of the 80 Disavowed Vouchers—ED&F Man posted profits of $17 million. Id. ¶ 325. The next year—when SKAT stopped issuing refunds—it made just $2.8 million. Id. ¶ 326. The multiple entities that comprise EDFMCM advertise a combined annual revenue of $8.1 billion and assets of $14.2 billion. See supra at 5. There can be no question that ED&F Man also "derive[d] substantial revenue from interstate or international commerce." N.Y. C.P.L.R. § 302(a)(3)(ii).

### B.  C.P.L.R. § 302(a)(1) Also Confers Jurisdiction Over ED&F Man

Section 302(a)(1) allows this Court to exercise jurisdiction over ED&F Man because it (1) "transact[ed] any business" in New York and (2) the Goldstein Plan's claims "aris[e] from" that business. N.Y. C.P.L.R. § 302(a)(1). One single New York transaction can be sufficient to confer personal jurisdiction. Compare C. Mahendra (N.Y.), LLC v. Nat'l Gold & Diamond Ctr., Inc., 125

A.D. 3d 454, 457 (App. Div. 2015) and Mot. at 17 ("For a specific jurisdiction analysis, the number of contacts that a defendant has with the forum is irrelevant.") (citing no authority).

To determine whether Section 302(a)(1) jurisdiction is appropriate, Second Circuit courts consider the totality of the defendant's contacts with the forum. Queen Bee, 616 F.3d at 163–64 (citations and quotations omitted). A defendant need never enter New York state to be subject to "transacting business" jurisdiction. Deutsche Bank, 7 N.Y.3d at 71 (citations omitted). Whether purchases or sales of securities occurred in the United States also is irrelevant to Section 302(a)(1) jurisdiction. Alibaba Grp. Holding Ltd. v. Alibabacoin Found., No. 18-cv-2897 (JPO), 2018 WL 5118638, at *3–4 (S.D.N.Y. Oct. 22, 2018) (Oetken, J.).

The Court of Appeals has repeatedly held that Section 302(a)(1) jurisdiction is proper where the defendant has an ongoing commercial relationship with a New York-based plaintiff. In Deutsche Bank, the Court held that it was proper to exercise jurisdiction over a "sophisticated institutional trader" that conducted nine bond trades with a New York branch of Deutsche Bank via phone and email over approximately 13 months. 7 N.Y.3d 65. In Fischbarg v. Doucet, the Court held that California defendants "transacted business" where they formed an attorney–client relationship with the plaintiff New York attorney through numerous telephone calls, faxes, letters, and emails over approximately nine months. 9 N.Y.3d 375, 380 (2007).

Similarly, in Mahendra, the First Department reversed a dismissal for lack of personal jurisdiction where the California-based defendant had "placed numerous orders, totaling millions of dollars, by telephoning plaintiff [diamond wholesaler] in New York and negotiating terms of size, price range, and description of the diamonds," even though the parties' litigation concerned only two of those transactions. 125 A.D.3d at 454.

Even a one-day business relationship has been sufficient where the defendant called the plaintiff New York auction house, asked the auction house to establish an open line so he could bid telephonically, and then failed to pay for two paintings he had won in the auction. Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 15–16 (1970).

### 1.  ED&F Man Transacts Business in New York

By "project[ing] [itself] into this state to engage in a sustained and substantial transaction of business," ED&F Man transacted business in New York. See D&R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro, 29 N.Y.3d 292, 298 (2017) (quotation and citation omitted) (Section 302(1)(a) jurisdiction appropriate where defendant "seeks out and initiates contact with New York, solicits business in New York, and establishes a continuing relationship.").

Since ED&F Man "entered into a[] contract for the benefit of [the Plan], a New York corporation, [ED&F Man] should have known that a perceived failure to fulfill its obligations would give rise to a suit by that same New York corporation in its home forum." Mago Int'l LLC v. LHB AG, No. 13 Civ. 3370(CM), 2014 WL 2800751, at *5 (S.D.N.Y. June 18, 2014) (McMahon, J.) (denying motion to dismiss for lack of personal jurisdiction and for *forum non conveniens*; "The rule that a guaranty to make payments to a New York **entity** constitutes a contract to provide services in New York pursuant to C.P.L.R. § 302(a)(1) is so firmly entrenched in case law that it is hardly worth elucidation.") (emphasis in original) (citing Key Bank of N.Y., N.A. v. Patel, 796 f. Supp. 674, 676 (N.D.N.Y. 1992)). ED&F Man reached out into New York to solicit the dividend arbitrage business of New Yorkers and other Americans, including the Plan. APTC ¶ 255. ED&F Man knew that the Plan was a New York resident from the very beginning: the Plan's account application, opening documents, and Custody Agreements attached to opposing counsel's declaration all state that the Plan's address is in Manhattan, at 61 Broadway. See id. ¶

149. ED&F Man promised to pay the dividend arbitrage profits into the Manhattan NFS Account. See id. ¶ 114.

For the next seven years—a far longer period than those in Deutsche Bank, Fischbarg, and Mahendra, let alone Parke-Bernet—ED&F Man and the Plan had an active brokerage relationship in which ED&F Man conducted hundreds, if not thousands, of individual securities transactions in order to implement dividend arbitrage investment strategies for the Plan in multiple jurisdictions. See supra at 18–19. In doing so, ED&F Man provided millions of dollars of "customized equity finance solutions" to the Plan. See, e.g., id. ¶¶ 119–27. As discussed above, the Goldstein relationship was just one of hundreds that ED&F Man had with New York investors. See, e.g., id. ¶¶ 255–59.

Furthermore, ED&F Man not only solicited the Plan to engage in Danish dividend arbitrage trading as a general matter, but also solicited each of the specific Spring 2014 Transactions whose Tax Vouchers it now disclaims. ATPC ¶ 162. ED&F Man also directly—and orally—instructed the Plan to place each of those orders on T+4 settlement bases and in writing. ATPC ¶¶ 285–87.

"It is of no moment" that the Goldstein Parties told ED&F Man which bank account to use, "because what matters is [ED&F Man's] banking activity" with the NFS Account. Vasquez v. Hong Kong & Shanghai Banking Corp. Ltd., No. 18 Civ. 1876 (PAE), 2019 WL 237810, at *11 (S.D.N.Y. May 30, 2019), reconsideration denied, No. 18 Civ. 1876 (PAE), 2019 WL 3252907 (S.D.N.Y. July 19, 2019) (Engelmayer, J.) ("Our cases do not require that the foreign bank itself direct the deposits, only that the bank affirmatively act on them."); see also, e.g., Gucci America, Inc. v. Weixing Li, 135 F. Supp. 3d 87, 95 (S.D.N.Y. 2015) (Sullivan, J.) (denying motion to dismiss for lack of personal jurisdiction where judgment debtors "[could not] credibly compare [themselves] to a passive recipient of a few one-off wire transfers that by pure happenstance were

routed through a domestic correspondent bank account."); cf. Licci, 732 F.3d at 171 ("In light of the widespread acceptance and availability of U.S. currency, LCB could have, as it acknowledges, processed U.S.-dollar-denominated wire transfers for the Shahid account through correspondent accounts anywhere in the world)[,] but LCB deliberately chose to process the many Shahid wire transfers through AmEx in New York.").

There can be no question that ED&F Man transacted business in New York, "thus invoking the benefits and protections of its laws." D&R Global, 29 N.Y.3d at 298.

**2.  The Goldstein Parties' Claims Arise out of ED&F Man's New York Business**

To prove Section 302(a)(1)'s second element, the Goldstein Parties need only show a "relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former." Licci, 732 F.3d at 168–69  (citation and quotation omitted); see also Sole Resort, S.a. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 104 (2d Cir. 2006) (long-arm requirement is satisfied as long as nexus is more than "tangential").

ED&F Man's business model was predicated on access to American clients seeking to invest in European securities and dividend arbitrage, and specifically Danish dividend arbitrage transactions. ED&F Man did perform—or, at least, charged the Plan for performing—all of these services. ED&F Man's provision of these services caused the Disavowed Vouchers to SKAT and SKAT's lawsuit against the Goldstein Parties. The Goldstein Parties' claims against ED&F Man— for securities and common-law fraud, negligence, breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty—were all caused by ED&F Man's New York business activity.

**III. This Case Does Not Present the "Rare Circumstances" of *Forum non Conveniens***

Because ED&F Man cannot establish that proceeding in this Court "[would] establish oppressiveness and vexation to [itself] out of all proportion to [the Goldstein Parties'] convenience" or that this Court "is inappropriate because of considerations affecting the [C]ourt's own administrative and legal problems," this Court must reject ED&F Man's Motion. See Guidi v. Inter-Continental Hotels Corp., 224 F.3d 142, 146 (2d Cir. 2000) (quoting Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 & n.3 (1981)); see also Gulf Oil Co. v. Gilbert, 330 U.S. 501, 508 (1947), superseded by Louisiana statute as stated in Am. Dredging Co. v. Miller, 510 U.S. 443 (1994) ("the plaintiff's choice of forum should rarely be disturbed," "unless the balance [of factors] is strongly in favor of the defendant."); Koster, 330 U.S. 518, 524 (1947) (a plaintiff "should not be deprived of the presumed advantages of its home jurisdiction").

Unlike analyses regarding transfer of cases among federal courts, the existence of related foreign litigation neither is a relevant factor in the Supreme Court's *forum non conveniens* analysis nor has been considered significant enough to outweigh plaintiffs' forum choices. Guidi, 224 F.3d at 148 (citations omitted). The Goldstein Parties, of course, have no power over SKAT's decisions to file lawsuits; the fact that SKAT initiated litigation against ED&F Man in England is irrelevant to whether New York courts can require ED&F Man to answer for the fraud and other wrongful conduct it perpetrated upon the Plan. Contra Mot. at 19–21.

ED&F Man musters no authority to support its argument that the Goldstein Parties' decision to name ED&F Man a third-party defendant is entitled to less deference simply because SKAT initiated the litigation. See Mot. at 30. The implication is particularly improper because in a *forum non conveniens* case involving a foreign court, the "'home forum' for a plaintiff is any federal district in the United States, not the particular district where the plaintiff lives." Guidi, 224 F.3d at 146 n.4.

Furthermore, the language that ED&F Man misrepresents as a "forum selection clause," see Mot. at 29, merely states that English courts "have non-exclusive jurisdiction" to settle contractual disputes and further provides that the parties may "tak[e] proceedings related to a Dispute in any other courts with jurisdiction," including "concurrent proceedings in any number of jurisdictions." Custody Agreement § 22(d). In other words, the Custody Agreement, itself, acknowledges that litigating in this Court is an entirely fair burden for the multi-billion-dollar brokerage firm. Accord Custody Agreement § 22.

Like in Guidi, here, the Goldstein Parties are "ordinary American citizens for whom litigating in [England] presents an obvious and significant inconvenience." 224 F.3d at 147. ED&F Man, meanwhile, is a sophisticated, wealthy corporation "doing business abroad [that] can expect to litigate in foreign courts" and is being sued for a "relatively simple" claim. See id.

The parties may not have anticipated a multi-jurisdictional lawsuit in which a foreign tax authority would attempt to sue both ED&F Man and the Plan wherever it could find them, but the Agreement certainly allows for the Plan to implead the Brokerage where it should be held liable for the conduct alleged against the Plan. See Custody Agreement § 22(d) (allowing concurrent proceedings in multiple jurisdictions).

**IV. There is No Basis to Stay the Third-Party Claims**

While this court has the "inherent power to dismiss or stay an action based on the pendency of a related proceeding in a foreign jurisdiction," "[f]ederal courts are reluctant to decline jurisdiction solely on the basis of concurrent proceedings." Evergreen Marine, 954 F. Supp. 101, 104 (S.D.N.Y. 1997) (citations omitted). The Court should not stay the Goldstein Parties' claims against ED&F Man pending resolution of the English action.

SKAT's claims against the Goldstein Parties necessarily involve different facts and defenses than SKAT's English lawsuit against ED&F Man. By arguing that ED&F Man is a "non-fraud" defendant, SKAT asserts an argument that is the exact opposite of the Goldstein Parties' theory: that if there is any fraud here, ED&F Man must have defrauded both SKAT and the Goldstein Parties by wrongfully representing that the Plan had engaged in the transactions at issue and paid the dividends that gave rise to the nine Reclaim Applications. There is no reason to assume that the English Action would resolve the Goldstein Parties' issues with ED&F Man.

Furthermore, there is no indication that issuing a stay would promote judicial efficiency. Unlike in Evergreen Marine, staying this case would not allow the consolidation of all issues and parties in the English court; the Goldstein Parties are not involved in any English litigation and do not have the resources to file claims in England. Cf. Mot. at 33 (citing Evergreen Marine, 954 F. Supp. 101, 104 (S.D.N.Y. 1997)). Moreover, arguing that ED&F Man's liability cannot be determined before the Goldstein Parties' puts the cart before the horse: the Goldstein Parties' theory is that if something improper has transpired, ED&F Man is the **only** liable party, not that they and ED&F Man would be joint-and-severally liable. See id.

Finally, it is absurd to claim that English discovery would be "more convenient" for the Goldstein Parties. See Mot. at 34 (proceeding in England would be "more convenient" for the Goldstein Parties "as they may reference public filings and determinations in that action once it has concluded, and may seek to take discovery from ED&F Man only if it becomes necessary based on the determinations in the MDL."). SKAT will continue to prosecute its claims against the Goldstein Parties even if ED&F Man is dismissed from this action, and then, the Goldstein Parties will have little practical recourse against the only party that knows what really happened here. And unlike American dockets, the English Action's filings are not public or readily-available

to the Goldstein Parties, who must rely on the kindness of strangers for any crumbs that might break off of the English Action. See, e.g., Oliver Cain and Nicholas Dawson, Litigation and Enforcement in the UK (England and Wales), Practical Law (Oct. 1, 2018).

Mr. Goldstein is 81 years old and is being sued for fraud by a foreign sovereign because of actions that ED&F Man took, including the substantial fees that it charged to Mr. Goldstein's retirement savings. See, e.g., ATPC ¶¶ 101, 115. The Goldstein Parties impleaded ED&F Man because it "had sole responsibility for, unique knowledge of, and actively committed the misconduct SKAT has alleged against the Goldstein Parties." ATPC ¶ 146. A stay would severely prejudice the Goldstein Parties.

### V.  In the Alternative, the Court Should Grant Leave to Amend or Order Jurisdictional Discovery

Finally, if this Court is not sufficiently persuaded of its ability to exercise specific jurisdiction over the Foreign Defendants, it should grant leave to amend or order jurisdictional discovery.

"[L]eave to amend shall be freely given when just so requires; this mandate is to be heeded." Forman v. Davis, 371 U.S. 178, 182 (1962) (quoting Fed. R. Civ. P. 15(a); "if the underlying facts or circumstances relied upon by plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."). Id.

Plaintiffs seeking jurisdictional discovery, meanwhile, bear the burden of showing necessity. Yurman Designs, Inc. v. A.R. Morris Jewelers, 60 F. Supp. 2d 241, 244 (S.D.N.Y. 1999). The Court has "broad discretion in determining whether or not to permit discovery aimed at establishing personal jurisdiction." Id.

If the Court finds that the Goldstein Parties have not met their prima facie burden, it should order jurisdictional discovery to determine the extent of ED&F Man's New York and

American dividend arbitrage business; all marketing and sales communications with New Yorkers and Americans; any business plans, strategies, or practices employed with regard to the Goldstein Parties; and the amount of money that ED&F Man earned through dealing with New York- and United States-based counterparties and markets. In the alternative, the Court should grant leave to amend to ensure that ED&F Man cannot enjoy impunity for defrauding the Plan, its other American clients, and SKAT by creating the Disavowed and other Tax Vouchers at the heart of this MDL.

## CONCLUSION

For the foregoing reasons, the Goldstein Parties respectfully request that the Court deny ED&F Man's motion in its entirety. In the alternative, the Court should allow the Goldstein Parties grant leave to amend the third-party complaint or to take jurisdictional discovery.


Dated: New York, New York
         December 20, 2019


                                 **GUSRAE KAPLAN NUSBAUM PLLC**

                                 /s/ Martin H. Kaplan
                                 Martin H. Kaplan
                                 Kari Parks
                                 120 Wall Street, 25th Floor
                                 New York, New York 10005
                                 (212) 269-1400
                                 mkaplan@gusraekaplan.com
                                 kparks@gusraekaplan.com

                                 *Counsel for Defendants–Counterclaim-Plaintiffs–Third-Party Plaintiffs The Goldstein Law Group PC 401(K) Profit Sharing Plan & Sheldon Goldstein*