# EXHIBIT 11

192                          HOUSE OF LORDS                **[1952]**

H. L. (E.)

1951

———

MAGOR AND
ST. MELLONS
RURAL
DISTRICT
COUNCIL
*v.*
NEWPORT
CORPORATION.

———

his interpretation.   In so far as the intention of Parliament or of Ministers is revealed in Acts of Parliament or Orders, either by the language used or by necessary implication, the courts should, of course, carry these intentions out; but it is not the function of any judge to fill in what he conceives to be the gaps in an Act of Parliament.   If he does so, he is usurping the function of the legislature.

LORD RADCLIFFE delivered an opinion in favour of allowing the appeal.

LORD TUCKER delivered an opinion in favour of dismissing the appeal.

*Appeal dismissed.*

Solicitors: *Torr & Co.; Rees & Freres, for the Town Clerk; Newport, Mon.*

———

J. C.*

1952
*Jan.* 21.

———

CANADA STEAMSHIP LINES LD.    .    . APPELLANTS;

AND

THE KING    .    .    .    .    .    .    . RESPONDENT.

ON APPEAL FROM THE SUPREME COURT OF CANADA.

*Canada—Contract—Freight shed—Lease by Crown—Fire caused by negligence of Crown's servants—Loss of goods—Liability of Crown—Third party proceedings—Indemnity clause—Construction.*

By clause 7 of a lease by which the Crown leased a freight shed to the appellant company it was provided that " the lessee shall not " have any claim . . . against the lessor for . . . damage . . . to . . . " goods . . . being . . . in the said shed," and by clause 8 the Crown undertook to keep the shed in repair.   Clause 17 provided that " the lessee shall at all times indemnify . . . the lessor from and " against all claims . . . by whomsoever made . . . in any manner " based upon, occasioned by or attributable to the execution of these " presents, or any action taken or things done . . . by virtue hereof, " or the exercise in any manner of rights arising hereunder."
Owing to the negligence of the Crown's servants while using an oxy-acetylene torch to effect certain repairs to the shed, a fire broke

———

* *Present*: LORD PORTER, LORD NORMAND, LORD MORTON OF HENRYTON, LORD ASQUITH OF BISHOPSTONE and LORD COHEN.

**A.C.**          AND PRIVY COUNCIL.                    193

out which destroyed the shed and all its contents. The appellant company and others, whose goods were lost in the fire, having presented petitions of right against the Crown for damages, the Crown pleaded that the appellant company's claim was barred by clause 7 of the lease, and in third party proceedings relied on clause 17 as giving rise to a right of indemnity from the appellants against the claims of the other suppliants.

*Held*, first, that the Crown had failed in clause 7 to limit its liability in respect of negligence in clear terms, and that accordingly, on the principle stated in *Alderslade* v. *Hendon Laundry Ld.* [1945] K.B. 189, at 192, which appeared not to be in conflict with the law of Lower Canada, the clause was to be construed as relating to a liability not based on negligence, instances of which were to be found in certain of the obligations imposed on lessors by the Civil Code of Lower Canada. The Crown was not, therefore, protected against the claims for loss by clause 7.

*Held*, secondly, that clause 17 did not cover negligent acts of the Crown's servants, for (a) it was at least doubtful whether the words " any action taken or things done . . . by virtue hereof " could be applied to a negligent act done in the course of carrying out an obligation ; (b) even if they were wide enough to include such a negligent act, the principle in the *Alderslade* case, supra, must be applied on the ground that the head of damage might be based on some other ground than that of negligence ; and (c) the meaning and effect of clause 17 were far from clear, and such a liability must be imposed by clear words. The Crown's claim to indemnity under clause 17 was not therefore established.

There would have been no difficulty in inserting in clauses 7 and 17 an express reference to negligence of the Crown's servants if those clauses had been intended to protect the Crown against the consequences of such negligence.

Judgment of the Supreme Court of Canada [1950] S.C.R. 532 reversed.

APPEAL (No. 15 of 1951), by special leave, from six judgments of the Supreme Court of Canada (June 23, 1950) reversing in part six judgments of the Exchequer Court of Canada (November 3, 4, 6, 12, 13 and 20, 1948), which had maintained petitions of right against the Crown for damages arising out of a fire.

By a lease dated November 18, 1940, the Crown leased to the appellants, Canada Steamship Lines Ld., a freight shed on a wharf in the St. Gabriel Basin in the inner harbour of Montreal, and by clause 8 of the lease the Crown undertook to keep the shed in repair. On May 5, 1944, three employees of the Crown were effecting repairs to the shed at the request of the appellants, and in doing so had occasion to enlarge a hole in a steel beam. Instead of using for the purpose a hand drill, they used an oxy-acetylene cutting torch. Some sparks fell on to some bales of

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.

cotton waste in the shed, and started a fire which destroyed the shed and all its contents. The shed contained $533,584 worth of goods, of which $40,714 worth belonged to the appellants, and the remainder to others.

Petitions of right were presented against the Crown based on an allegation of the Crown's negligence, and apart from the present six cases some 250 other cases were pending the decision in these proceedings. In answer to the petition of the appellants the Crown denied negligence, and, in addition, said that if they were guilty of negligence clause 7 of the lease exempted them from liability to the appellants. That clause provided: "That "the lessee shall not have any claim or demand against the lessor "for . . . damage . . . to the said shed . . . or to any . . . "goods . . . at any time . . . being . . . in the said shed." The Crown also brought in the appellants as third parties on the other petitions, saying that if the Crown were guilty of negligence the appellants, under clause 17 of the lease, were liable to indemnify the Crown against the consequences of their (the Crown's) negligence. Clause 17 provided: "That the lessee shall at all times "indemnify . . . the lessor from and against all claims and "demands, loss, costs, damages, actions, suits, or other proceed-"ings . . . brought . . . in any manner based upon, occasioned by "or attributable to the execution of these presents, or any action "taken or things done . . . by virtue hereof. . . ."

The facts and the clauses of the lease are stated more fully in the judgment of the Judicial Committee.

The Exchequer Court (Angers J.) found as a fact that the fire and the resulting damage were caused by the gross negligence (faute lourde) of the Crown's servants, and he condemned the Crown to pay to the appellants and to the other five suppliants the damages claimed by them, and he dismissed the third party proceedings brought by the Crown against the appellants.

The Supreme Court of Canada (Rinfret C.J., Rand, Kellock, Estey, Locke, Cartwright and Fauteux JJ.), by a majority of six to one (Locke J. dissenting), reversed the trial judge in the appellant's own case, and unanimously reversed the trial judge in the cases of the other five suppliants in so far as the third party proceedings of the Crown against the appellants were concerned. The Supreme Court concurred in the finding of the trial judge that the Crown's servants were negligent, but declined to hold that such negligence amounted to gross negligence (faute lourde). On the interpretation which they placed on clauses 7 (Locke J. dissenting) and 17 of the lease, they held that those clauses must

**A.C.**        AND PRIVY COUNCIL.        195

be read as barring the company's action and as entitling the Crown to indemnity in the other actions. They accordingly dismissed the company's petition, confirmed the judgments maintaining the petitions in the five other cases, and condemned the company to indemnify the Crown in respect thereof.

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.

1951. November 12, 13, 14, 15, 19 and 20. *Geoffrey Cross K.C., Hazen Hansard K.C.* (of the Canadian Bar) and *R. O. Wilberforce* for the appellant company. The result of the decision of the Supreme Court is that the appellants not only receive no compensation for the loss of their own goods, but that they have also to pay for the loss suffered by the other suppliants. It is conceded that the loss was caused by the negligence of the Crown's servants. The questions therefore are, first, whether as a matter of construction clauses 7 and 17, or either of them, exempted or purported to exempt the Crown from liability for negligence in carrying out its obligations under the lease. It is finally a question of construction. If the Board are of opinion that as a matter of construction those clauses did not exempt the Crown, that is an end of the matter. If, however, the Board think that the Supreme Court were right in their construction of either or both of the clauses, and that they did have the effect of barring the appellants' claim and also of making them liable to indemnify the Crown against the loss sustained by the others, then the second problem arises, namely, whether the negligence was gross (faute lourde). Thirdly, assuming that it was faute lourde, were the Exchequer Court right in holding that a stipulation against the consequences of faute lourde is not valid under the law of Quebec? That, also, is a question of construction.

All that the parties really had in mind in so framing clause 17 of the lease was that something might be done by the lessee under the lease which might involve the Crown in claims by third parties. The claim for negligently carrying out the repairing work ought to be treated as falling under clause 8, and nothing can be excluded under clause 7 which falls under clause 8. Clause 7 is only intended to exclude the implied contractual obligations of the Crown under the Quebec Civil Code.

Citations from the English law do not appear to have any direct bearing on the problem. In English law, provided that it is expressed with sufficient clarity, the consequences of negligence can be excluded; even of gross negligence, falling short of fraud. That would not be the case in Lower Canada if the text-book writers and the authorities are right. The problem appears

HOUSE OF LORDS                    **[1952]**

J. C.

1952

———

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.

———

to be whether the old French law has endured in the Quebec law today in respect of faute lourde, which differs in that respect from English law. [Reference was made to articles 1012 to 1021 of the Quebec Civil Code, which cover the obligations and rights of a lessor.]

Clause 7 of the lease does not exclude any claim which can be brought under clause 8. This claim for negligently carrying out the repairing obligation, which is a breach of that obligation, can be brought under clause 8 and sued for under article 1641 (3) of the Civil Code, just as much as a claim for damages for failure to repair altogether, or a claim for consequential damage to the goods through failure properly to repair. They come under clause 8, and no distinction can be drawn between them. Assuming that that is wrong, and assuming that a claim for negligently repairing cannot be brought under clause 8, and can only arise as a pure delictual claim under article 1053 of the Civil Code, then it is submitted that clause 7, interpreted in the light of the English authorities, which, it appears, are accepted in Canada, can be given a perfectly sensible meaning if it is read as confined to the exclusion of claims arising under the implied contractual obligations of the Code: articles 1912 (3), 1614 and 1617 coupled with 1616.

With regard to clause 17, what the Crown has to show under this clause is, first, that a claim for negligently carrying out the repairing covenant could be said to be attributable to the execution of these presents, etc., and secondly, that if it can, there is no other sensible meaning that can be given to it. If there is a reasonable ambiguity, the appellants should have the benefit of it: it is for the Crown to establish its case. [Reference was made to *James Durnford & Sons Ld.* v. *Great Western Ry. Co.*[1] and to *Alderslade* v. *Hendon Laundry Ld.*[2]] Prima facie, the courts would approach such a clause as clause 17, if it does not expressly refer to negligence, by thinking that it would not cover it. The particular problem which arose in the *Alderslade* case[2] does not really arise here. There are a number of sources other than negligence from which claims might have arisen which would have been covered by clause 17, as appears when that clause is read in conjunction with the whole of the other provisions of the lease. Examples of such claims by third parties against the Crown, and not arising from negligence of its servants, and which

---

[1] (1927) 43 T.L.R. 527, 679; 44    [2] [1945] K.B. 189.
T.L.R. 415.

**A.C.**    AND PRIVY COUNCIL.    197

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.
___

would be covered by clause 17, are, inter alia, (a) claims regarding the right to possession or occupation of the shed; (b) claims arising out of alleged improper construction of the loading platform and canopy, or failure to maintain them; (c) claims arising out of the use in common of a portion of the premises by the appellants and the public generally; (d) claims arising out of the liability imposed by law on the owners of property, e.g., under article 1055 of the Civil Code.

The broad language in the opening of clause 17 is in any event restricted by the concluding language of the clause, and the claims by the third parties do not fall within the latter words. On a proper construction, clause 17 refers to the acts or defaults of the appellants as lessee in respect of which it is reasonable that the Crown should seek indemnity, and do not extend so as to make the appellants chargeable for the negligence of the Crown towards third parties.

*A. J. Campbell K.C., D. W. Mundell K.C.* (both of the Canadian Bar) and *Gahan* for the Crown. It should be borne in mind that the lessor is the Crown, that at common law the Crown is not liable in tort, and that in Canada that rule still exists save to the very limited extent to which it has been superseded by section 19 (c) of the Exchequer Court Act, which provides that the only liability of the Crown is for the negligence of any officer or servant. That is the whole law of the Crown's liability for torts in Canada, and that is of some significance when approaching the interpretation of clauses 7 and 17 of the lease. The construction of the lease may also be assisted by considering the intention of the parties. It is clear that by clause 7 the Crown desired to relieve itself of some liability for damage or injury to physical property which would have existed if clause 7 had not been so framed; and clause 17 also provided that the lessee should assume some liability which the Crown would otherwise have had. It is common ground that this contract has to be interpreted in accordance with the Civil Code of Quebec. That may have a two-fold bearing; it has the significance that when the parties contracted they are presumed to have known what the law of Quebec was, and, secondly, the canons of construction of the civil law rather than those of the common law must be taken into consideration. In France under the Code Napoléon, and in Quebec under the Civil Code, all civil law is dependent on two factors, faute and prejudice: we are only concerned with faute.

In this case the Crown could have been liable in two ways: (i) either under section 19 (c) of the Exchequer Court Act, or

198            HOUSE OF LORDS         **[1952]**

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.

(ii) on breach of contract. For breach of contract liability of the Crown depends on faute of the same kind and of the same degree as it would in the case of delict. That faute may be presumed to exist, as in the case of a simple failure to perform an obligation, or it may exist, as in the present case, by reason of the improper performance of the contractual obligations.

In broad, clear and unequivocal language clause 7 bars the appellants' claim, which falls squarely within its terms: *any* claim for damages of *any* nature. The burden is on the appellants to show that it does not apply. The clause extends to faute (negligence). The parties would have in contemplation the liability of the Crown for damage to physical property which might be expected to arise in the carrying out of the provisions of the contract. They would wish to cover the probable and not the remote sources of liability. Unless clause 7 extends to negligence it would be rendered otiose, void of substantial content and would be completely out of harmony with clause 17. Clause 8 was inserted simply for the purpose of adding to the obligation of the lessor to make the larger repairs (articles 1612 (2) and 1613 of the Civil Code) the obligation of making the minor repairs (article 1635). If, therefore, as is suggested by the appellants, clause 7 applies to what they term the implied covenants, including the implied covenant to maintain (article 1612 (2) ) and the implied covenant to repair (article 1613), the extension of these obligations by clause 8 simply to include the minor repairs would not in any way affect the application of clause 7. Moreover, there is no logical or juridical reason to make a distinction between the provisions of the lease and the so-called implied covenants. They must be taken as a whole to determine the position of the parties and not one divorced from the other.

The instances of possible application of clause 7 suggested by the appellants are of such a minor or exceptional nature, or are so strained an application of the language of clause 7, as to make it necessary to conclude that it was another and more probable source of liability, namely, negligence, which was meant to be covered by the wide and all-embracing language of clause 7. Clause 8 can be interpreted so as to conserve to the lessee all its recourses for violation of the obligations of the lessor other than claims for damage to physical property. Thus the lessee could sue to force repairs to be made, could obtain all authorization to make them an expense of the lessor, and could obtain rescission of the lease, and reduction of rent, and, by appropriate action be relieved from the obligation to pay rent. In any event, the

**A.C.**    AND PRIVY COUNCIL.    199

J. C.
1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.
—

question is not how far one can extend or restrict the phrase " the " lessee shall not have any claim or demand against the lessor " for detriment, damage or injury to the shed," but whether the present claim is a claim for detriment, damage or injury, which it clearly is.

The proper interpretation of clause 17 makes it necessary to conclude that clause 7 has the meaning which the Crown attributes to it. It would be entirely illogical for the appellants to be liable to indemnify the Crown against its liability to third parties because of the fault and negligence of its servants and yet permit the appellants to claim from the Crown their own damages attributable to the same cause, namely, the negligence of the Crown's servants. Clauses 7, 9 and 17 must be read together. The purpose was to put the appellants as regards liability in the same position as if the Crown's servants were its servants, and as regards the subject-matter of clause 7 they agreed that the risk of loss should be borne by them, the appellants.

It is submitted that the appellants state the rule with reference to ambiguity much too broadly. The relevant articles are 1013 to 1021, inclusive. Before article 1019 can be applied there must exist two reasonable interpretations. Here the only reasonable interpretation is that given by the Crown. The interpretation of the appellants is strained and would only apply to exceptional cases which could not, in the light of the broad and all-embracing language used and of the probabilities, have been the prime consideration for inserting the clause in the contract. Care should be taken in applying the language of English decisions to a case to be determined under the Civil Law principles and under the limited liability of the Crown under section 19 (c) of the Exchequer Court Act. The real question is what liability did the parties intend to exclude.

It is common ground that a party may oblige himself to do something and yet stipulate that he will not be liable for his fault not amounting to dol. It is also common ground that it makes no difference whether the faute is contractual or delictual. It would of course be implied that the Crown would carry out all its obligations with due care, including maintenance stipulated by clause 8. The point of clause 7 is that as regards damage to physical property the Crown is not to be liable if inadvertently its servants fail to exercise due care.

Turning to clause 17, that clause in broad, clear and unequivocal language requires the appellants to indemnify the Crown against its liability to third parties. Liability on the part of the

HOUSE OF LORDS    **[1952]**

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.
———

Crown is clearly a subject within the contemplation of clause 17. The petitions of right taken by the other suppliants are obviously within the category of " all claims . . . by whomsoever made." The loss and damages sustained by the other suppliants were occasioned by and attributable to an action taken and a thing done by virtue (as a consequence of) the lease, e.g., the making of repairs. Clause 17 contemplates wrongful, i.e., negligent, acts, as there would be no need to be indemnified against the consequences of lawful acts. The words " attributable to the " execution of these presents " being referable to the grant of the lease by the Crown, the remaining words " or any action " taken . . ." refer to other actions or omissions of the Crown, namely, negligence. Inasmuch as the only liability of the Crown towards third parties would be for the negligence of its servants under section 19 (*c*) of the Exchequer Court Act, clause 17 applies to such negligence. The words " by virtue hereof," as defined by the dictionary, are apt to describe actions taken and things done by the Crown's servants as a consequence of the lease. The number of words used indicates that clause 17 was to be as all-embracing as possible.

If the Crown and the lessee were jointly and severally liable for damage caused by their joint negligence the Crown, if called on to pay by a third party would by force of the law alone have a right to be reimbursed to the extent of the lessee's negligence: article 1117 of the Civil Code. Therefore the insertion of clause 17 would only be necessary to make the lessee bear the consequences of the negligence of the Crown's servants. The instances of liability to which the appellants say that clause 17 applies either do not exist or are such remote possibilities as to make it necessary to conclude that they could not have been the prime consideration for inserting a clause of general application in the contract. Clause 7 frees the Crown from some liability, and therefore clause 17 must force the appellants to shoulder some liability of the Crown, i.e., in both instances a liability arising from negligence.

While authorities may not be of much assistance on the question of construction, reference may be made to *James Durnford & Sons Ld.* v. *Great Western Ry. Co.*[3]; *Canadian National Ry. Co.* v. *La Cité de Montreal*[4]; *Rosin and Turpentine Import Company* v. *B. Jacob & Sons*[5]; *Commissaires du Havre de*

[3] 43 T.L.R. 527, 679; 44 T.L.R. 415.

[4] (1927) Q.R. 43 K.B. 409.

[5] (1910) 102 L.T. 81.

Quebec v. *Swift Canadian Company* [6]; *McCawley* v. *Furness Ry.
Co.* [7]; *Forbes, Abbott & Lennard Ld.* v. *Great Western Ry. Co.* [8];
*Calico Printers' Association* v. *Barclays Bank* [9]; and *Turner* v.
*Civil Service Supply Association.* [10]

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.

*Mundell K.C.*, following, dealt with the interpretation of
section 19 (c) of the Exchequer Court Act, and in that connexion
referred to *The King* v. *Anthony.* [11]

*Geoffrey Cross K.C.*, in reply. There is no ground for sug-
gesting that, from the point of view of the person putting forward
the clause, the Canadian courts have adopted a more lenient
view of the construction of such clauses as 7 and 17 than have
the English courts. It was held in *The Glengoil Steamship
Company* v. *Pilkington* [12] that the exemption must be express
and clear, and beyond peradventure cover the negligence to
which it was said to apply. Reliance is placed on what Lord
Greene M.R. said in the *Alderslade* case. [13] Reading clauses 7
and 8 together, it is not reasonable to say that negligence in
carrying out the repairing covenant is excluded by clause 7.
With regard to clause 17, it should be stressed how very wide
and unascertainable the liability of the appellants may be if the
Crown's construction is right, for they might be liable for almost
unlimited damages if the fire had extended. In clause 17 there
are no general words such as often appear in clauses of this kind,
e.g., " from whatsoever cause "; it is carefully limited to claims
based on or occasioned by or attributable to, etc. Those words
can be given a perfectly intelligible meaning if they are limited
to acts which as between lessor and lessee are lawful, but may
give rise to claims by third parties. It is for the Crown to con-
vince the Board beyond peradventure that the appellants are
barred from recovering any damages in respect of the loss of
their goods, and that they are bound to pay to the Crown what
it has had to pay to other people by reason of its servants'
negligence. There is that measure of ambiguity in the clauses
which should constrain the Board to say that the Crown has not
proved its case.

1952. January 21. The judgment of their Lordships was
delivered by LORD MORTON OF HENRYTON.

This is an appeal, by special leave, from six judgments of the

6 (1929) Q.R. 47 K.B. 118.
7 (1872) L.R. 8 Q.B. 57.
8 (1927) 138 L.T. 286.
9 (1931) 145 L.T. 51.

10 [1926] 1 K.B. 50, 58.
11 [1946] S.C.R. (Can.) 569, 571.
12 (1897) 28 S.C.R. (Can.) 146, 152.
13 [1945] K.B. 189, 192.

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.

Supreme Court of Canada dated June 23, 1950, reversing in part
a like number of judgments of the Exchequer Court of Canada
(Angers J.), which had maintained petitions of right against the
Crown for damages arising out of a disastrous fire. It will be
convenient to refer to the appellant company as " the company "
and to the respondent as " the Crown."

In the first of these six cases the company was suppliant,
claiming from the Crown $40,713.72 as the value of the property
of the company destroyed in the fire. In the remaining five cases
the suppliants were owners of other property destroyed by the
fire. The suppliants in these five cases, and the amounts
respectively claimed by them from the Crown, were as follows:—

| | |
|---|---|
| J. H. Heinz Company of Canada ... | $38,430.88 |
| Canada & Dominion Sugar Co. Ld. ... | $108,310.83 |
| W. H. Taylor Ld. ...    ...    ...    ... | $3,670.25 |
| Raymond Copping ...    ...    ...    ... | $1,662.37 |
| Cunningham & Wells Ld.    ...    ... | $15,159.83 |

In addition to the present six cases, petitions of right were
instituted against the Crown in some 250 other cases, involving
additional claims arising out of the fire to a total amount of
$325,636.05, which petitions of right have remained in abeyance
pending the outcome of these proceedings.

The events leading up to all these claims must now be set out.
By an indenture of lease (hereafter called " the lease ") dated
November 18, 1940, the Crown leased to the company a piece
of land on the western side of St. Gabriel Basin No. 1 of the
Lachine Canal in the City of Montreal " together with the right
" and privilege to occupy, use and enjoy, for the purpose of
" receiving and storing therein freight and goods loaded onto
" and/or unloaded from vessels owned and operated by the
" lessee," the whole of a shed known as St. Gabriel Shed No. 1,
and hereafter referred to as " the shed." The shed occupied the
greater part of the said piece of land. The company was also
granted " the right and privilege to construct, maintain and use,
" at its own cost and expense and over and/or across the said
" land, along the whole length of the southerly face of the said
" shed, a loading platform approximately 14 feet in width,
" and a canopy extending approximately 20 feet beyond the
" southerly edge of the said platform." Between the land
demised to the company and the St. Gabriel Basin No. 2 there
lay a strip of land 30 feet in width. The term of the lease was
12 years from May 1, 1940, and the rent was over $12,000 per
annum. The lease was expressed to be " made and executed

J. C.
1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.
—

" upon and subject to the covenants, provisos, conditions and
" reservations hereinafter set forth and contained, and that the
" same and every of them, representing and expressing the exact
" intention of the parties, are to be strictly observed, performed
" and complied with, namely :—". Then follow a number of
clauses, some of which must be set out, as the decision of this
appeal ultimately turns on the construction of clauses 7 and 17,
and these two clauses must be considered in the light of the lease
read as a whole. The more important clauses are as follows :—

" 1. That the lessee will pay all rental herein reserved at the
" time and in the manner in these presents set forth, without
" any abatement or deduction whatever.

" 5. That the lessor, his servants or agents, shall at all times
" and for all purposes, have full and free access to any and every
" part of the said land, the said shed and the said platform.

" 6. That the said land shall be used for purposes in connexion
" with the lessee's business, only, and for no other purpose or
" purposes whatever.

" 7. That the lessee shall not have any claim or demand
" against the lessor for detriment, damage or injury of any nature
" to the said land, the said shed, the said platform and the said
" canopy, or to any motor or other vehicles, materials, supplies,
" goods, articles, effects or things at any time brought, placed,
" made or being upon the said land, the said platform or in the
" said shed.

" 8. That the lessor will, at all times during the currency of
" this lease, at his own cost and expense, maintain the said shed,
" exclusive of the said platform and the said canopy.

" 9. That the lessee shall, in addition to the payment of the
" yearly rental hereunder, at its own sole cost and expense,
" insure, concurrently with the execution of this lease or as soon
" thereafter as possible, and thereafter keep insured during the
" currency of this lease with an insurance company or companies
" satisfactory to the Minister of Transport the said shed against
" fire and other casualty in the sum of FORTY-EIGHT
" THOUSAND DOLLARS ($48,000.00). . . .

" 10. That the lessee shall before constructing or erecting the
" said platform, the said canopy or other structures, including
" alterations to the said shed, on the said land, submit to the
" General Superintendent plans or drawings showing the location
" and design and nature of construction of the said platform, the
" said canopy or such structures, and obtain his approval of such

J. C.
1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.

———

" plans or drawings, and shall construct or erect the said plat-
" form, the said canopy or such structures on the location and in
" accordance with the designs as shown on the plans and drawings
" approved by the General Superintendent, and thereafter main-
" tain the said platform, the said canopy or such structures in
" accordance with the designs respecting the same, and shall
" carry on the work of such construction and maintenance of the
" said platform, the said canopy and such structures at its own
" cost and expense and under the control and direction of the
" General Superintendent and to his entire satisfaction.

" 12. That it is distinctly understood and agreed that this
" lease is granted subject to the condition that the said platform
" and the said canopy shall forthwith, upon termination of this
" lease in any manner, except as provided for in clause 18 hereof,
" be and become vested in title in the lessor without any pay-
" ment of compensation to the lessee in respect of the said
" platform and the said canopy.

" 16. That the parcel or tract of land, thirty (30) feet in
" width, situated between St. Gabriel Basin No. 2 and the said
" land may be used by the lessee in common with the public
" generally, it being understood and agreed, however, that the
" lessee shall, in the discretion of the Superintending Engineer
" and in accordance with his direction, have preference in the
" use thereof.
" 17. That the lessee shall at all times indemnify and save
" harmless the lessor from and against all claims and demands,
" loss, costs, damages, actions, suits or other proceedings by
" whomsoever made, brought or prosecuted, in any manner based
" upon, occasioned by or attributable to the execution of these
" presents, or any action taken or things done or maintained by
" virtue hereof, or the exercise in any manner of rights arising
" hereunder."
Pursuant to the lease the company took possession of the
leased premises and continued to occupy them at all times
material to the present litigation. A few days before May 5,
1944, the Department of Transport in Montreal, representing the
Crown, received a request from the company to effect certain
minor repairs to the premises, including the doors of the shed.
An inspection was made and the work undertaken by the
employees of the Department of Transport almost immediately.

**A.C.**        AND PRIVY COUNCIL.                    205

At this time the shed contained a large variety of merchandise awaiting shipment, other goods stored there by third parties and a quantity of equipment belonging to the company. A number of trucks and motor vehicles were on the wharf delivering, or about to deliver, further goods for transport.

The shed was constructed of corrugated iron on a steel frame, and the shipping doors were hung on hinges bolted to the uprights of the frame. These uprights were in the form of steel " H- " Beams," the flanges of which were one-quarter to three-eighths of an inch thick. The Crown's employees, having almost completed their work on the afternoon of May 5, had removed and straightened the upper hinge of one of the shipping doors which had to be replaced. These hinges had originally been affixed to the " H-Beam " with three-eighths inch bolts. When they came to replace the hinge in question the Crown's employees found that they had no three-eighths inch bolts with them, the smallest size being one-half inch in diameter. They elected to enlarge the three-eighths inch hole in the " H-Beam " so that it would take the half-inch bolt.

Inside the door, immediately opposite and a few feet distant from the " H-Beam " in question, were piled a number of bales of cotton waste. Having decided to enlarge the hole, the Crown's employees proceeded to make use of an oxy-acetylene cutting torch for this purpose. The operation of this torch involved the use of oxygen and acetylene gas, which are combined in a cutting-head under pressure and, when ignited, produce extremely high temperatures of from 5,500° to 6,300° Fahrenheit. The flame of the torch, at such temperatures, will cut through steel.

The use of such a torch in the vicinity of inflammable material is dangerous, since, apart from the heat of the torch itself, the operation of cutting the metal necessarily produces a shower of sparks or particles of molten metal which fly off at a tangent from the point of cutting. The Crown's employees directed the torch from the exterior into the interior of the shed. For the purpose of preventing sparks from entering the shed, they placed a board on the inside across the opening of the " H-Beam." This board was some three feet shorter than the beam and did not fit closely at the top because it was cut square whereas the roof of the shed sloped. There were accordingly openings at both the top and bottom of the beam through which sparks might escape. One of the workmen was stationed on the top of the bales of cotton waste and a pail of water was placed inside

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.

the shed. The operation of enlarging the hole involved using the torch for about three or four minutes. Sparks escaped into the shed. The bales of cotton waste caught fire and the flames spread rapidly to the other contents of the shed and consumed the whole. Hence the claims, already mentioned, by the company and others against the Crown.

Angers J., after hearing the evidence, found as a fact that the fire and resulting damage were caused by the gross negligence of the Crown's servants while acting within the scope of their duties or employment. The Crown had denied negligence, and had pleaded that the company's claim was in any event barred by the provisions of clause 7 of the lease. In third party proceedings the Crown relied on clause 17 of the lease as giving rise to a right of indemnity from the company against the claims of the other five suppliants.

The trial judge did not express any view as to the meaning of clauses 7 and 17 of the lease. It was not necessary for him to do so because, basing himself on the law of Quebec, which he reviewed exhaustively, he found that no clause would extend to relieve the Crown of liability for damages resulting from the gross negligence (faute lourde) of its servants. He accordingly refused to regard clause 7 as a bar to the company's action or to hold that clause 17 gave the Crown a right to indemnity in the other five cases. In the result he condemned the Crown to pay to the company and to the other five suppliants the damages respectively claimed by them, and he dismissed the third party proceedings brought by the Crown against the company. The amount of the damages was agreed and is not in issue.

The Supreme Court of Canada (Rinfret C.J., Rand, Kellock, Estey, Locke, Cartwright and Fauteux JJ.) by a majority of six to one (Locke J. dissenting) reversed the trial judge in the company's own case, and unanimously reversed the trial judge in the cases of the other five suppliants in so far as the third party proceedings of the Crown against the company were concerned. The Supreme Court concurred in the finding of the trial judge that the Crown's servants were negligent, but declined to hold that such negligence amounted to gross negligence (faute lourde). On the interpretation which they placed on clauses 7 (Locke J. dissenting) and 17 of the lease, they held that such clauses must be read as barring the company's action and as entitling the Crown to indemnity in the other actions. They accordingly

**A.C.**            AND PRIVY COUNCIL.                              207

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.

dismissed the company's petition, confirmed the judgments main-
taining the petitions in the five other cases, and condemned the
company to indemnify the Crown in respect thereof.

In view of the findings of the Supreme Court, the Crown does
not now seek to deny that its servants were negligent, but
contends that their negligence was not gross negligence. Thus
the issues arising on this appeal are whether the Supreme Court
rightly construed clauses 7 and 17 of the lease, whether the
Crown's servants were guilty of gross negligence and, if so,
whether, by the law of Quebec, clauses stipulating immunity
from or limitation of liability for the gross negligence of one of
the contracting parties or his servants, or indemnity against such
liability, are illegal and void. Counsel for the company conceded
that such clauses were legal and effective if they applied only to
negligence which did not amount to faute lourde. He opened the
appeal by submitting that even if the negligence of the Crown's
servants did not amount to "faute lourde," on the true con-
struction of clauses 7 and 17 of the lease clause 7 afforded no
answer to the company's claim against the Crown, and clause 17
did not entitle the Crown to the indemnity claimed in the third
party proceedings. As this submission, if successful, would
dispose of the appeal, their Lordships thought it well to hear it
argued fully before hearing argument on the other issues in the
case.

In considering this question of construction their Lordships
have had in mind articles 1013 to 1021 of the Civil Code of Lower
Canada and also the special principles which are applicable to
clauses which purport to exempt one party to a contract from
liability. These principles were stated by Lord Greene M.R. in
*Alderslade* v. *Hendon Laundry Ld.*[14] as follows: "Where the
"head of damage in respect of which limitation of liability is
"sought to be imposed by such a clause is one which rests on
"negligence and nothing else, the clause must be construed as
"extending to that head of damage, because it would otherwise
"lack subject-matter. Where, on the other hand, the head of
"damage may be based on some other ground than that of
"negligence, the general principle is that the clause must be
"confined in its application to loss occurring through that other
"cause to the exclusion of loss arising through negligence. The
"reason is that if a contracting party wishes in such a case to
"limit his liability in respect of negligence, he must do so in

[14] [1945] K.B. 189, 192.

HOUSE OF LORDS            **[1952]**

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.
———

" clear terms in the absence of which the clause is construed as
" relating to a liability not based on negligence."

It appears to their Lordships that none of the judges of
the Supreme Court regarded this passage as being in any way
in conflict with the law of Lower Canada, and Kellock J.
observed [15]: " It is well settled that a clause of this nature is
" not to be construed as extending to protect the person in whose
" favour it is made from the consequences of the negligence of
" his own servants unless there is express language to that effect
" or unless the clause can have no operation except as applied to
" such a case."

Their Lordships think that the duty of a court in approaching
the consideration of such clauses may be summarized as
follows:—

(1) If the clause contains language which expressly exempts
the person in whose favour it is made (hereafter called " the
" proferens ") from the consequence of the negligence of his own
servants, effect must be given to that provision. Any doubts
which existed whether this was the law in the Province of
Quebec were removed by the decision of the Supreme Court of
Canada in *The Glengoil Steamship Company* v. *Pilkington*.[16]

(2) If there is no express reference to negligence, the court
must consider whether the words used are wide enough, in their
ordinary meaning, to cover negligence on the part of the servants
of the proferens. If a doubt arises at this point, it must be
resolved against the proferens in accordance with article 1019 of
the Civil Code of Lower Canada: " In cases of doubt, the con-
" tract is interpreted against him who has stipulated and in
" favour of him who has contracted the obligation."

(3) If the words used are wide enough for the above purpose,
the court must then consider whether " the head of damage may
" be based on some ground other than that of negligence," to
quote again Lord Greene in the *Alderslade* case.[14] The " other
" ground " must not be so fanciful or remote that the proferens
cannot be supposed to have desired protection against it; but
subject to this qualification, which is no doubt to be implied from
Lord Greene's words, the existence of a possible head of damage
other than that of negligence is fatal to the proferens even if the
words used are prima facie wide enough to cover negligence on
the part of his servants.

With these principles in mind, their Lordships turn to a

consideration of clause 7, and they will first consider its language
apart from the contents of clause 8, which immediately follows
it.  The claim of the company in the present case is "a claim
". . . against the lessor for . . . damage . . . to . . . goods . . .
"being . . . in the said shed," and would therefore prima facie
be barred by clause 7.  It is, however, a claim for damage
admittedly caused by the negligence of the Crown's servants.
Their Lordships must therefore consider the third question stated
above, and in considering this question it is necessary to bear in
mind that the only liability of the Crown in the Province of
Quebec in respect of claims arising ex delicto is based on section
19 (c) of the Exchequer Court Act, R.S.C. 1927, c. 34, as
amended.  That section is in the following terms :—

"The Exchequer Court shall have the exclusive jurisdiction
"to hear and determine the following matters :—

"(a) . . .
"(b) . . .
"(c) Every claim against the Crown arising out of any death
"or injury to the person or property resulting from negligence of
"any officer or servant of the Crown while acting within the
"scope of his duties or employment."

Thus the field for claims against the Crown, not based on
negligence and coming within clause 7, is not a very wide one,
but counsel for the company has given the following instances of
such claims :—

1. Claims under article 1614 of the Civil Code for "defects or
"faults in the thing leased which prevent or diminish its use,
"whether known to the lessor or not."  There might be, says
counsel, a defect in the construction of the roof of the shed, not
known to the Crown, and as a result of this defect the roof might
fall down and injure chattels in the shed which belonged to the
company.  A claim for damage to these chattels resulting from
this breach of the lessor's obligation under article 1614 is not a
claim based on negligence and it would be barred by clause 7.

2. Claims under article 1612 (3) of the Civil Code.  Suppose,
for example, says counsel, that the Crown were to authorize a
third party to carry out some operation on adjacent land which
caused damage to the shed.  In that event, again, the company
would have a claim for damages, not based on negligence, which
would be barred by clause 7.

3. Claims for a reduction of the rent, by the joint operation
of articles 1617 and 1660 of the Civil Code, if, for instance, a
trespasser caused damage to the shed by setting part of it on

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
v.
THE KING.

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.
——

fire, and the lessee's right of action for damages against the
trespasser proved to be ineffectual. . Counsel for the Crown con-
tended that a claim for a reduction of the rent would not fall
within clause 7, but their Lordships think that such a claim,
although it would not be a claim for " damages " might fairly
be described as " a demand against the lessor for . . . damage
" . . . of any nature . . . to the said shed " within the meaning
of clause 7.

It was contended on behalf of the Crown that these instances
of possible claims for damages were fanciful and remote, and
would not have been within the contemplation of the parties
when the terms of the lease were agreed. No doubt there may
be cases in which it may be difficult to draw the line. In the
present case, however, their Lordships are not prepared to
assume that the obligations imposed on lessors by the Civil Code
were not in the minds of the parties. They think that the Crown
may well have desired to protect itself from claims for damage
arising out of any breach of these obligations, and yet may not
have intended to go so far as to stipulate for protection from
claims for damage resulting from the negligence of its servants.

So far, clause 7 has been considered apart from clause 8, but
these two clauses must be read together, according to the ordinary
principles of construction. So reading them, it appears to their
Lordships most unlikely that clause 7 was intended to protect
the Crown from claims for damage resulting from the negligence
of its servants in carrying out the very obligations which were
imposed on the Crown by clause 8. · It is difficult to imagine
the Crown saying to the company, when the lease was being
negotiated : " Notwithstanding that the Crown agrees to main-
" tain the shed, at its own expense, throughout the term of the
" lease, and notwithstanding that such an agreement implies an
" obligation to use due care in its performance, if the Crown's
" servants set about the work of repair in such a negligent
" manner that the shed and all the goods therein are destroyed,
" you are to have no claim for damages against the Crown," and
if the Crown had made such a suggestion, it seems unlikely that
the company would have accepted it.

Counsel for the Crown submitted that inconsistency between
clauses 7 and 8 would be avoided if the former clause were read
as barring claims for damages for non-feasance or misfeasance
under clause 8, but leaving open to the company any claims for
specific performance which it might make as a result of non-
feasance, under article 1641 (1) and (2) of the Civil Code. This

is not an impossible construction of clause 7, but it appears to
their Lordships to be a somewhat strained and artificial construc-
tion.  Counsel for the Crown also relied on the fact that under
clause 9 the company was bound to insure the shed, as an indica-
tion that the Crown did not intend to be liable for any damage
to the shed, howsoever such damage might arise.  This argument
is not without force, as applied to the shed, but clause 9 makes
no reference to goods within the shed.

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
v.
THE KING.

Their Lordships will shortly consider how far the construction
of clause 7 is affected by clause 17, for they entirely agree with
the view expressed by the majority of the Supreme Court as to
the close inter-relation of these two clauses.  If, however,
clause 7 were to be considered apart from clause 17, their Lord-
ships would conclude that, even if the case is put at its highest
in favour of the Crown, the Crown has failed to limit its liability
in respect of negligence in clear terms.  They would therefore
decide against the Crown in accordance with the principles
already stated.

Their Lordships now turn to clause 17, and observe at the
outset that if the Crown's contention as to this clause is correct,
it imposes a very remarkable and burdensome obligation on the
company.  However widespread may be the destruction caused
by the negligence of the Crown's servants in carrying out the
Crown's obligations under clause 8, the whole of the damage must
be paid for by the company.  In the present case the claims are
heavy, and it is obvious that the damage caused by a fire such
as this might be even greater.  Such a liability for the negligence
of others must surely be imposed by very clear words, if it is to
be imposed at all.

The opening words of clause 17 are certainly very wide:
" That the lessee shall at all times indemnify and save harmless
" the lessor from and against all claims and demands, loss, costs,
" damages, actions, suits or other proceedings by whomsoever
" made, brought or prosecuted."  They are, however, consider-
ably narrowed in their scope by the words which follow.  These
words limit the application of the clause to claims, etc., " in any
" manner based upon, occasioned by or attributable to " any one
of three specified matters, namely: (1) " the execution of these
" presents "; (2) " any action taken or things done or maintained
" by virtue hereof "; (3) " the exercise in any manner of rights
" arising hereunder."

Are these words, in their ordinary meaning, wide enough to

HOUSE OF LORDS    **[1952]**

J. C.
1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.
———

cover the negligent act of the Crown's servants, which caused the damage now under consideration?

The Chief Justice appears to have placed some reliance on the words " occasioned by or attributable to the execution of " these presents," treating " execution " as synonymous with " performance," but their Lordships are unable to take that view. They think that the words " execution of these presents " refer only to the signing and sealing of the lease. This is the usual meaning of these words, and the word " executed " is used in the same sense at the end of the document, where it is stated that " the lessee has executed these presents." Their Lordships think that by this phrase the Crown must have desired to protect itself against third parties claiming that they had contractual rights against the Crown which had been violated by the execution of the lease and the resulting grant of various rights to the company.

The remaining part of clause 17 gives rise to questions of great difficulty. Counsel for the Crown submitted that the negligent act of the Crown's servants was covered by the words " any " action taken or things done . . . by virtue hereof." They contended that the words " by virtue of " may fairly be construed as meaning " in consequence of," and that the act of the Crown's servants in enlarging the hole was done in consequence of the lease, none the less so because it was negligently done. They pointed out, quite rightly, that the intent of the clause was to protect the Crown against claims by third parties, and submitted (a) that the only acts which could involve claims against the Crown by third parties would be acts of the Crown's servants, and therefore the words in question must refer to, or at least include, acts of the Crown's servants; and (b) that the acts contemplated must be negligent acts, otherwise they would give rise to no liability to third parties.

Counsel for the company contended that this argument involved a strained and unnatural construction of the words in question and that the phrase " any action taken or things done " . . . by virtue hereof " would naturally refer to the doing of an act in pursuance of some right or privilege conferred by the lease rather than to the doing of an act in performance of some obligation imposed by the lease. They further contended that even if the words in question could cover an act properly done in performance of an obligation imposed by the lease, they could not extend to cover an act negligently done in the course of carrying out such an obligation. They submitted the following

argument on the construction of clause 17. By the phrase " occasioned by or attributable to the execution of these " presents " the Crown was seeking to protect itself against the possible claims already mentioned, while by the rest of the clause the Crown was seeking to protect itself against possible liability to third parties occasioned by or attributable to acts of the company. The reference to the execution of the lease is closely linked up with the words which follow it. In executing the lease the Crown was conferring a large number of rights and privileges on the company. The party who is likely to " take " actions " or " do things " or " exercise rights " under the lease is the company. By clause 17 the Crown is saying, in effect, to the company: " Nothing that you do under the lease " is to involve the Crown in any liability. Third parties may " consider that they have a claim against the Crown by reason " of the Crown's act in granting to you the right of occupying the " shed, or by reason of acts done by you with the sanction of " the Crown, such as the erection of the loading platform and " canopy in accordance with plans approved by the Crown under " clause 10 of the lease, or the exercise of ' preferential ' rights " under clause 16. If any such claim is made against the Crown, " and succeeds, you must indemnify the Crown." In support of this argument counsel referred to the latter part of article 1618 of the Civil Code as showing that the Crown might become a party to an action by a third party claiming some " right in or " upon the thing leased."

The choice between these two contentions is not an easy one, but their Lordships have come to the conclusion that the company's contention is to be preferred, for the following reasons. First, it gives the more natural construction to the words " any " action done by virtue hereof." It is at least doubtful whether these words can be applied to a negligent act done in the course of carrying out an obligation. Secondly, even if the words are wide enough to include such a negligent act, the principle laid down in the *Alderslade* case [17] must be applied and their Lordships are inclined to think that on the company's construction, " the head of damage may be based on some ground other than " that of negligence," although the possible grounds are somewhat limited in extent. Thirdly, their Lordships think it is manifest that the meaning and effect of clause 17 are far from

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.

[17] [1945] K.B. 189, 192.

HOUSE OF LORDS            **[1952]**

J. C.

1952

CANADA
STEAMSHIP
LINES LD.
*v.*
THE KING.

clear, and if this is so the Crown has failed to impose in clear terms the burdensome obligation which has already been described. There would have been no difficulty in inserting an express reference to negligence of the Crown's servants, in clauses 7 and 17, if these clauses had been intended to protect the Crown against the consequences of such negligence.

If their Lordships had agreed with the Supreme Court that clause 17 extended so far as to cover negligent acts of the Crown's servants, they might well have had to reconsider the provisional view already expressed as to clause 7, but as they have arrived at the contrary opinion, their provisional view as to clause 7, so far from being disturbed, is strengthened. It would seem unlikely that if negligent acts by the Crown's servants are outside the scope of one clause, they are within the scope of the other.

The result is that, after hearing an able argument as to the construction of the lease from both sides, their Lordships find that the Crown has failed to establish either its defence under clause 7 or its claim for indemnity under clause 17. This being so, no other question arises for decision on this appeal.

Their Lordships will humbly advise His Majesty that this appeal should be allowed, the orders of the Supreme Court in the petition of the company against the Crown and in the five third party proceedings should be set aside, and the orders of Angers J. restored. The Crown must pay the company's costs in each of these six petitions, here and in the courts of Canada.

Solicitors: *Lawrence Jones & Co.; Charles Russell & Co.*