K35KCUSC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In Re:

4   CUSTOMS AND TAX ADMINISTRATION            18 MD 2865 (LAK)
    OF THE KINGDOM OF DENMARK (SKAT)
5   TAX REFUND LITIGATION

6   ------------------------------x

7                                            March 5, 2020
                                             2:30 a.m.
8
    Before:
9
                        HON. LEWIS A. KAPLAN,
10
                                             District Judge
11
                            APPEARANCES
12
    HUGHES HUBBARD & REED LLP
13        Attorneys for Plaintiff SKAT
    BY:  MARC A. WEINSTEIN
14         WILLIAM P. MAGUIRE
           NEIL J. OXFORD
15
    CAPLIN & DRYSDALE, CHARTERED
16        Attorneys for Bradley London Pension Plan Defendants
    BY:  MARK D. ALLISON
17         DAVID L. GOLDBERG

18  WILLIAMS & CONNOLLY LLP
          Attorneys for Defendant Sander Gerber Pension Plan
19  BY:  AMY McKINLAY

20  GUSRAE, KAPLAN, NUSBAUM, PLLC
          Attorneys for Goldstein Defendants
21  BY:  MARTIN H. KAPLAN
           KARI PARKS
22
    KOSTELANETZ & FINK, LLP
23        Attorneys for Defendants John Doscos, David Freelow,
           Sterling Alpha Plan and Delmar Plan
24  BY:  ERIC SMITH

25

K35KCUSC

1                              APPEARANCES (Continued)

2    JOHN M. HANAMIRIAN
          Attorney for Defendants Acorn Summers, Greggory Summer,
3            Acron Nowell and Shreepah Shah

4    SEWARD & KISSEL LLP
          Attorneys for Tew Defendants
5    BY:  THOMAS R. HOOPER

6    K&L GATES LLP
          Attorneys for Defendants DW Construction, Inc. Retirement
7    Plan
     BY:  JOHN C. BLESSINGTON
8         BRANDON DILLMAN

9    WILMER CUTLER PICKERING HALE AND DORR LLP
          Attorneys for Defendants Batavia Capital Pension Plan,
10   Richard Markowitz and Jocelyn Markowitz
     BY:  ALAN SCHOENFELD
11        ALLISON STODDART

12   KOSTELANETZ & FINK LLP
          Attorneys for Defendants Elizabeth and John van
13   Merkensteijn
     BY:  SHARON L. McCARTHY
14

15   DEWEY PEGNO & KRAMARSKY LLP
          Attorneys for Defendant Michael Ben-Jacob
     BY:  SEAN K. MULLEN
16

17   AKERMAN LLP
          Attorneys for Third-Party Defendant ED&F Man Capital
18   Markets Ltd.
     BY:  BRIAN S. FRASER
19        KRISTEN G. NIVEN

20

21

22

23

24

25

K35KCUSC

1           (Case called)

2           THE DEPUTY CLERK:  Counsel for Plaintiff SKAT, are you

3    ready?

4           MR. WEINSTEIN:  Yes.

5           Good afternoon, your Honor.  Marc Weinstein, Bill

6    Maguire, and Neil Oxford.

7           THE COURT:  Good afternoon.

8           THE DEPUTY CLERK:  Defendants Bradley London Pension

9    Plan and Doston Bradley, are you ready?

10          MR. ALLISON:  Yes.

11          Good afternoon, your Honor.  Mark Allison, Caplin &

12   Drysdale, on behalf of the Bradley London Plan and 110 others,

13   as you know.

14          THE COURT:  I'll say a collective good afternoon to

15   all of the defendants.

16          MR. ALLISON:  Thank you.

17          THE COURT:  Keep going.

18          THE DEPUTY CLERK:  Defendant Robert Klugman, are you

19   ready?

20          MR. ALLISON:  Mark Allison, on behalf of Mr. Klugman.

21          THE DEPUTY CLERK:  Defendant Sander Gerber Pension

22   Plan, are you ready?

23          MS. McKINLAY:  Yes.

24          Good afternoon, your Honor.  Amy McKinlay, from

25   Williams & Connolly.

K35KCUSC

1          THE DEPUTY CLERK:  Defendant Goldstein Law Group

2     401(k) Profit Sharing Plan and Sheldon Goldstein, are you

3     ready?

4          MR. KAPLAN:  Ready.

5          Good afternoon, your Honor.  Martin Kaplan, Gusrae

6     Kaplan & Nusbaum.

7          THE COURT:  Good afternoon.

8          THE DEPUTY CLERK:  Defendant John Doscas, and David

9     Freelow, and Sterling Alpha Plan, and Delmar Plan, are you

10    ready?

11         MR. SMITH:  Yes.

12         Eric Smith, from Kostelanetz & Fink.

13         THE DEPUTY CLERK:  Defendants Acorn, Greggory Summers,

14    and Christopher Nowell, and Shreepah Shah, are you ready?

15         MR. HANAMIRIAN:  Yes, ready.

16         John Hanamirian, Hanamirian Law Firm.

17         THE DEPUTY CLERK:  Defendants DW Construction, Inc.

18    Retirement Plan, are you ready?

19         MR. BLESSINGTON:  We are.

20         Good afternoon, your Honor.  John Blessington, for the

21    Utah plans and the one Pennsylvania plan.

22         THE DEPUTY CLERK:  Tew Defendants, are you ready?

23         MR. HOOPER:  Yes.

24         Good afternoon, your Honor.  Ross Hooper, from

25    Seward & Kissel.

K35KCUSC

1          THE DEPUTY CLERK:  For Defendants Batavia Capital

2    Pension Plan, Richard Markowitz, and Jocelyn Markowitz, are you

3    ready?

4          MR. SCHOENFELD:  Yes, your Honor.

5          Alan Schoenfeld and Allison Stoddart, from Wilmer

6    Cutler.

7          THE DEPUTY CLERK:  For Defendants Elizabeth

8    van Merkenstein and John van Merkenstein, are you ready?

9          MS. McCARTHY:  Yes.

10         Good afternoon, your Honor, Sharon McCarthy from

11   Kostelanetz & Fink.

12         THE DEPUTY CLERK:  For Defendant Michael Ben-Jacob,

13   are you ready?

14         MR. MULLEN:  Yes.

15         Sean Mullen, from Dewey Pegno & Kramarsky.

16         THE DEPUTY CLERK:  Third-party Defendant ED&F Man

17   Capital Markets, are you ready?

18         MR. FRASER:  We are ready.

19         Brian Fraser, from Akerman LLP.

20         THE DEPUTY CLERK:  Thank you.  Please be seated.

21         THE COURT:  Well, I thank everybody for the report,

22   which was quite informative.  Everybody who knows me knows I'm

23   not happy with this stretching out so long, but let's see what

24   we can do.  I have some questions about specific parts.

25         On the second page of the letter, there's reference to

K35KCUSC

1    a letter rogatory concerning information from SEB.  The letter

2    says that it has been provided to the Danish Ministry of

3    Justice and so forth.  What's the timeline on that?

4                 MR. WEINSTEIN:  I do have an update on that, your

5    Honor.  It actually has now gone from the Ministry of Justice

6    to the court in Denmark, and we understand the timeline should

7    be pretty quick.

8                 THE COURT:  What's "pretty quick"?

9                 MR. WEINSTEIN:  I think it will be up to the court to

10   ultimately decide a date to have the parties in for testimony,

11   if the testimony is necessary, but I would expect by the end of

12   April, we can wrap that whole issue up.  It should not be a

13   delay in the case.

14                THE COURT:  Okay.  Thank you.

15                And a similar question about what's going on in

16   respect of the British Virgin Islands.

17                MR. WEINSTEIN:  Yes.  So, we are very close to

18   submitting to your Honor a request, and the reason why that is

19   taking some time is that we'd like it to be one request to each

20   of those countries, but we learned, through various sources in

21   discovery, additional entities for which we need information,

22   and so it's not a short list of entities that we are seeking

23   information on from those countries.  And just to give your

24   Honor some context, we're talking about these offshore entities

25   that we understand were purported counterparties to trading

K35KCUSC

1    under very many different names, and, as we believe, it turns

2    out that they are sort of counterparties in name only, they're

3    all within the same circle of family of friends participating

4    in this, but we keep learning of new names, and we don't want

5    to do repeated letters rogatory.

6             I don't think -- once we get that submitted -- we're

7    seeking pretty limited amount of information about each

8    entity -- I don't foresee it taking a very long time.

9             THE COURT:  When do you expect to submit them to me?

10            MR. WEINSTEIN:  Probably by the end of next week.

11            THE COURT:  Okay.  Thanks.

12            Now let's talk about the EDF issue.

13            Mr. Weinstein, I take it EDF asserts, more or less,

14   that if this went on in conjunction, or in parallel, with the

15   English discovery, it wouldn't affect the overall schedule

16   you've proposed.  Do you agree with that?

17            MR. WEINSTEIN:  I don't agree with that.  The reason

18   being -- I understand their end date to be in October to

19   produce documents.  There's no, as far as I know, and certainly

20   it hasn't been conveyed to us, that there's any commitment --

21   even though they have interim dates, commitment by which to get

22   any certain types or quantity of documents before that.  If we

23   waited till October --

24            THE COURT:  You're going to get backloaded.

25            MR. WEINSTEIN:  Very backloaded.  It affects about 35

K35KCUSC

cases here.  So, we need to take depositions, and we plan to

schedule those depositions, and many of them well before

October.

        What we have done -- I don't think we are close to a

resolution on this -- is we understand if they've got a lot of

volume, some things will take some time, but we've asked to

prioritize certain things we think are critical to the case,

some of which we don't really understand why they can't be

produced today.  My example of that, your Honor, is, as the

pleadings have now informed the Court, in the U.K., in their

particulars of defense, originally, ED&F Man's position was all

the trading that happened through their entity was legitimate

trading, it all happened.  That changed a little bit in the

beginning of their defense.  They identified, in an Annex A, a

few examples where, actually, the information was false, they

admit, in which case, the particular plan at issue was not

entitled to the refund, and SKAT should get it back.  And then

this past September, they amended again to add Annex C, which

added many, many more of those claims, which they now

acknowledge were false.  And just from a dollar perspective or

kroner perspective, as it may be, we're talking about a third

of the kroner amount of money that SKAT paid out to plans that

used ED&F.  Since they, apparently, went through all of their

materials to identify those which they now say are false and to

commit that, in their view, the other two-thirds are accurate,

K35KCUSC

1    that information should be ready, available to us.  That was

2    done in September.  We're now at the end -- well, the beginning

3    of March, and they're saying they still can't produce that for

4    many, many months.

5              THE COURT:  Can't or won't?

6              MR. WEINSTEIN:  Well, I don't know, but certainly

7    haven't yet and aren't committing to do it any time soon.

8              And at the very beginning, we'd just like an

9    explanation of what happened, how do they now know that a third

10   of the submissions, from a dollar perspective, are false?  And

11   why do they believe the other ones aren't?

12             THE COURT:  Mr. Fraser?

13             MR. FRASER:  Thank you, your Honor.  May I approach

14   the podium?

15             THE COURT:  Yes, please.

16             MR. FRASER:  If I can, let's put this in some

17   perspective.  If you give me a couple of minutes, I'd

18   appreciate it.

19             The case in England between SKAT and ED&F has been

20   going on for quite some time.  ED&F's presence in this case is

21   much more recent.  The parties in England, SKAT and ED&F,

22   negotiated for months over the discovery schedule to take place

23   in that case.  That schedule was agreed among 20 law firms

24   involving all the other parties to the case and was so ordered

25   by Judge Baker, the Commercial Court of London, England, and

K35KCUSC

1    Wales.  That is now proceeding apace, and pursuant to SKAT's

2    request, my client is reviewing 4 million documents, using 149

3    keywords.  And they have devoted substantial resources to doing

4    that and are on their way to do that.

5         What we have told Mr. Weinstein and Hughes Hubbard is

6    that we would produce to them every document that we produced

7    to SKAT in the United Kingdom at the same time that we produce

8    it in the United Kingdom, but that we cannot do a special

9    production just for them.  And we suggested to them -- we met

10   at my office --

11        THE COURT:  You cannot because it would be a criminal

12   offense under U.K. law or you can't do it because you fired all

13   your people?  What's the reason you can't do it?

14        MR. FRASER:  The reason we can't do it was that we

15   would interfere with the process in the U.K. and, therefore, be

16   at risk of violating the order in the U.K.

17        THE COURT:  How would it interfere with that process?

18        MR. FRASER:  I'm sorry, your Honor?

19        THE COURT:  How would it interfere with that process?

20        MR. FRASER:  Because there is a limited number of

21   resources who are devoted towards moving as quickly as possible

22   going through the process laid out in the U.K., and if we

23   divert those resources to doing something else, then the U.K.

24   litigation is not going to be --

25        THE COURT:  So this is a matter of a resource decision

K35KCUSC

1    by your client, right?

2            MR. FRASER:  It's a matter of resources -- yes,

3    whether it's money, or employees, or lawyers, yes, it's a

4    matter of resource.

5            THE COURT:  Okay.

6            MR. FRASER:  But we're not saying we're not going to

7    give him anything.  In fact, we've produced documents to Hughes

8    Hubbard a couple of weeks ago and we produced more documents to

9    them just the day before yesterday.

10           THE COURT:  What you haven't done is answered

11   Mr. Weinstein's question, which is:  Here you've been going

12   along amending your position in the British litigation and

13   acknowledging that certain transactions involve false

14   statements, or whatever precisely they involve, and you,

15   therefore, must have gone through your records and whatever

16   information is available to you, looked at them, made decisions

17   about them, and made representations to the U.K. court.

18           Why can't you give SKAT the exact same materials upon

19   which you base those decisions here now?

20           MR. FRASER:  Mr. Weinstein makes an assumption that's

21   incorrect.  He assumes that we were looking at documents, hard

22   copy documents or electronic documents, to do that analysis.

23   We retained FTI Consulting, who did the analysis by reviewing a

24   database called Shadow, which has electronic data in it, but

25   does not have documents in it.  So it does not contain

K35KCUSC

1    documents the way Relativity or one of our discovery databases

2    would have.  So those documents need to be identified and found

3    throughout the entire system at ED&F.

4            THE COURT:  Had you, prior to now, explained to them

5    that it was done by a review of this Shadow Database?

6            MR. FRASER:  The conversation never got that far.  We

7    had a conversation with them in January.  I thought it went

8    pretty well, and, apparently, it didn't from their perspective,

9    and then I got a letter from them demanding all these things,

10   which we haven't had a chance to address with them.

11           THE COURT:  When did you get the letter?

12           MR. FRASER:  The day before -- we got a letter from

13   them two weeks ago, with which we responded by producing

14   documents, and then we had another letter Wednesday, I believe.

15           THE COURT:  I think you need to have another

16   conversation with your client about resources.

17           MR. FRASER:  Your Honor, if I could suggest:  A lot of

18   this could be resolved if Hughes Hubbard & Reed would

19   coordinate with SKAT's counsel, Pinsent Masons, in the U.K. and

20   the four law firms, two U.K. law firms and two U.S. law firms,

21   could coordinate on what order this is going to be done in.

22   We'd be more than happy to work --

23           THE COURT:  Your presupposition in making that

24   suggestion, which may be a good idea, for other reasons, is

25   that the schedule is going to be the same in both countries.

K35KCUSC

1   And I don't accept that.  So you better get used to it.

2            MR. FRASER:  Your Honor, the documents that they're

3   asking for are going to take time to find.  They have to be

4   identified, they have to be found, they've got to be reviewed,

5   and they've got to be produced.  It is not going to happen

6   overnight.  We're moving as fast as we possibly can, but I

7   can't put certain documents in front of the line of others

8   because they're doing keyword searches, and they've got to

9   search through each keyword, review those documents, and go on

10  to the next keyword.

11           Mr. Weinstein?

12           MR. WEINSTEIN:  Your Honor, I'm not going -- I don't

13  think it's worth the Court's time quibbling about the dates

14  that we've asked for things.  I think we've dealt with a lot of

15  defense counsel here.  You're not hearing any other disputes on

16  discovery.  There's compromises that have been made,

17  meet-and-confers, and we've all agreed to get to places where

18  we need to be.

19           Unlike here, in the U.K., there's not going to be

20  depositions.  We need to take depositions.  We tried to put

21  forward to your Honor a realistic time frame.  I understand the

22  Court would probably like things to go quicker, but they

23  certainly can't go quicker if we don't get the production.

24           For starters, there has to be -- this is a U.K.

25  regulated entity, an FCA regulated entity, that many, many

K35KCUSC

months ago came to a conclusion, based on -- they had FTI, a

big vendor, do a big investigation for every claim in this case

and, presumably, reach conclusions sufficient enough for them

to state under oath in court that a third of the submissions

were false.  It cannot be that the only information about how

they got there is in a database, that there's been nothing

extracted, no reports given to the regulator about what

happened, any kind of narrative description that explains --

THE COURT:  Where is this database?  I realize that's

a funny question in the electronic era, but indulge me.

MR. FRASER:  It's in the U.K.

THE COURT:  Who does it belong to?

MR. FRASER:  I assume it belongs to ED&F, but I don't

know that.

Your Honor, we're asking for one thing.  We're asking

that SKAT, with both its counsel, the U.K. counsel and U.S.

counsel, engage with us in this discussion rather than

involving all these good people.

THE COURT:  Look, I don't hear any unwillingness to

engage.  To the extent I see any unwillingness, I suspect it

may be on the other side.  What I gathered from this letter was

that your position was we are not doing any document production

in the U.S. except on the U.K. schedule, take it or leave it.

That's what I got from it.  And I gave you a chance to address

Mr. Weinstein's point, and you've, more or less, confirmed that

K35KCUSC

1    impression.

2              MR. FRASER:  Your Honor, we are willing to engage with

3    them, but it's got to be in coordination with what's happening

4    in the U.K.  We can't be doing one thing in the U.K. and

5    something else here.

6              THE COURT:  I'm sorry, you can, and you may have to.

7              MR. FRASER:  May we brief it, your Honor?

8              THE COURT:  What are you going to brief?

9              MR. FRASER:  I would like to explain in more detail

10   what is involved with the document review in the U.K., the

11   schedule in the U.K., other parties in the U.K.

12             THE COURT:  Nobody is questioning the schedule in the

13   U.K.

14             Is anyone questioning what the schedule in the U.K.

15   is?

16             Are you disputing what Mr. Weinstein's letter said

17   that schedule was?

18             MR. FRASER:  No, your Honor.

19             THE COURT:  Do I need a brief to know what that

20   schedule is?

21             MR. FRASER:  I may not be explaining exactly why this

22   is so difficult.  It may include more technical issues than I

23   have access to.  All I'm saying is that we have great

24   difficulty in doing this at this time, and I would like to be

25   able to discuss it with them and their U.K. counsel.  It's hard

K35KCUSC

1   to see why that's so problematic for them.

2               THE COURT:  I don't know that it's problematic for

3   them.  Is that problematic for you?

4               MR. WEINSTEIN:  No.  And we proposed certain things.

5   The problem with the U.K. schedule, it has zero milestones, it

6   just has dates, by which two scraps of paper may be produced in

7   May, and two more in July, and then in October, there's going

8   to be a big dump -- I expect that's what's going to happen --

9   and we're going to be way behind schedule here.

10              MR. FRASER:  If we have a conference with U.K. counsel

11  and Hughes Hubbard, and they agree what process we should

12  follow, so we're not at risk of falling behind on our

13  obligations in the U.K. while we're meeting his obligations

14  here, if they agree what they want us to do, we'll do that.

15              THE COURT:  Look, I really don't care who meets with

16  whom.  And I take it, from what Mr. Weinstein just said, he

17  doesn't care either.  You want to get the U.K. lawyers

18  involved?  Nobody's standing in your way.  Nobody.

19              But the assumption that whatever is going to happen in

20  the U.K. is what's going to happen in my court is not an

21  assumption I start with and may not be the one I end with.

22              MR. FRASER:  Yes, your Honor.

23              THE COURT:  So I will give you ten days to have

24  whatever meetings you want, and then you can make whatever

25  submissions you want about this issue by March 16th.

K35KCUSC

1          MR. FRASER:  Thank you, your Honor.

2          THE COURT:  Except that you aren't going to -- either

3    side -- dump on me.  The submissions are going to be ten

4    double-spaced pages or less, both of them.

5          MR. FRASER:  Understood.

6          THE COURT:  Okay.

7          I'm reasonably familiar with English practice, and

8    it's a different kettle of fish in important respects from

9    ours, and their needs are different than ours.  It's that

10   simple.

11         Thank you, Mr. Fraser.

12         MR. FRASER:  Thank you.

13         THE COURT:  Now, then, in the trial section here,

14   Mr. Weinstein, you propose three groups.  Give me an idea,

15   would you please, as to what you estimated the length of each

16   of the trials in each of those three groups, if I were to

17   accept that proposal, would be.

18         MR. WEINSTEIN:  Sure, your Honor.

19         The first group is the largest in terms of cases.

20         THE COURT:  How many cases?

21         MR. WEINSTEIN:  I believe it's exactly a hundred, but

22   in or around a hundred.  Once I get past ten, my counting is

23   usually not so great.  So it's, I believe, a hundred cases, but

24   it's not a hundred individuals.  It's a much narrower group of

25   individuals; it's just people who are involved in many, many,

K35KCUSC

1    many plans.  If the case were to start today as it stands now,

2    with those involved in it, it may take up to five weeks, but my

3    expectation is that by the time we get to trial, things will

4    shake out, and it will be a smaller group that are left.  We'd

5    hope to winnow that case down to closer to three weeks.

6              THE COURT:  How about group two?

7              MR. WEINSTEIN:  Group two is -- give me one second.

8    It is, I think, exactly 50 cases.

9              THE COURT:  And the trial estimate?

10             MR. WEINSTEIN:  And the trial estimate?  I'd say three

11   to four weeks.

12             THE COURT:  And group three?

13             MR. WEINSTEIN:  So group three in a slightly different

14   position.  It's a smaller number of cases.  It's, I believe, 34

15   cases.  The issue there is, in that group, many of the cases

16   are not Southern District-filed cases, and so once we get to

17   trial, we're talking about 5 of those cases are ones originally

18   filed in this court, 29 of them were filed elsewhere.  So,

19   unless there's an agreement to have those --

20             THE COURT:  Transferred.

21             MR. WEINSTEIN:  -- tried here, we're only talking

22   about five cases, and that group involves the ED&F Man group of

23   cases.  With that small of a group, two to three weeks.

24             I should say, just for your Honor's sake, in group

25   one, where I said it was a hundred cases, it's 44 cases filed

K35KCUSC

1   in this court, 56 filed in other courts.  There are a lot of

2   defendants who are the same, so if they're going to be doing a

3   case here, they may want to just have them all joined here,

4   but, obviously, I can't speak for that.

5          In group two, all of the cases were filed in this

6   court, all 50.  And I think I gave you the split on group

7   three.

8          THE COURT:  If we were to try the EDF cases, the five

9   Southern District of New York cases, how long a trial is that?

10  You say two to three weeks?

11         MR. WEINSTEIN:  The reason I say that -- that's

12  probably the one I have the least ability to give an estimate

13  on because we don't really have a lot of what we need, which is

14  part of the discussion we just had, with ED&F.  So it's a

15  little difficult to estimate, but it's not that many plans,

16  it's only five, and so I think two to three weeks is a fair

17  estimate.

18         THE COURT:  Are these cookie cutter cases, basically,

19  within each group?

20         MR. WEINSTEIN:  I think for the first two groups, yes,

21  they're all -- and the reason we grouped them is they are

22  essentially the same fact pattern, with the same players, just

23  repeated over and over, which is why we think, rather than

24  picking a test case and actually doing them all together, you

25  get the economies of scale, and a lot of it will be explaining

K35KCUSC

1    a few of them, and then doing things in chart form to just show

2    how many times it happened and giving the details.

3             So, I think with the third group, there are some

4    disparate sort of subgroups within it.  We just put them all

5    together because they each used ED&F, so it will be a somewhat

6    familiar fact pattern, but there may be a little more nuance as

7    between sort of subgroups within that group three.

8             THE COURT:  So what's the nub of those cases?  What's

9    the nub issue?

10            MR. WEINSTEIN:  So I'd say group one is --

11            THE COURT:  I'm talking about group three.

12            MR. WEINSTEIN:  Okay.  We're kind of early, still, in

13   getting some information about those groups, but there's a

14   group from Utah -- the Utah plans, as you've heard them --

15   there's a group from Kentucky.  These groups may not overlap,

16   but they all had ED&F Man as their custodian.  We've heard now,

17   as it was our expectation, that many of the submissions were

18   false.  We'd like to hear what the explanation is from ED&F Man

19   as to how that happened.  We haven't gotten that yet.  But our

20   expectation still is that these plans did not each own the

21   hundreds of millions and more much kroner worth of stock and

22   actually received the dividends, but I think it's just a

23   different group than the first two because it's a different

24   custodian.  The first two are mostly related to the Sanjay Shah

25   individual, who some parties have raised.  ED&F group is

K35KCUSC

1    different than that.

2              THE COURT:  There's not a Sanjay Shah --

3              MR. WEINSTEIN:  There's not.  I think there's a few

4    plans within that group that originally started with Shah and

5    then switched over to ED&F Man, but, for the most part, it's

6    not Sanjay Shah related.  So there will be some different

7    patterns there.

8              THE COURT:  Any other enlightenment you have for me?

9              MR. WEINSTEIN:  The only other thing I want to raise,

10   it's in the proposed schedule about amended pleadings, and we

11   do expect to amend.  And the one thing I just wanted to raise

12   with your Honor is whether we need to file a motion with the

13   Court to do that.  This would be the first time we'd be

14   amending.  If we could --

15             THE COURT:  Well, I think Rule 15 says you don't

16   unless an answer has been filed, right?

17             MR. WEINSTEIN:  Well, I think at this point --

18             THE COURT:  It's a long time since I looked at that.

19             MR. WEINSTEIN:  I think you're right, but answers have

20   been filed, and we're beyond the 21 days of that.

21             THE COURT:  Well, it all depends whether they're

22   prepared to stipulate to it, to the filing, right?  If you have

23   to file a motion, you have to file a motion.

24             MR. WEINSTEIN:  Okay.  We'll work with defense counsel

25   on that.

K35KCUSC

1        THE COURT:  I mean, you might be in a position where

2   you could file one motion that would cover the whole

3   waterfront.

4        MR. WEINSTEIN:  We would definitely do that, yes.

5        THE COURT:  Okay.  All right.

6        Defendants.

7        MR. ALLISON:  Your Honor, should I --

8        THE COURT:  Please.

9        MR. ALLISON:  Your Honor, a few particular items to

10  address.

11       You were discussing previously the database that ED&F

12  Man was using.  I did want to alert the Court to an issue

13  regarding a database that we are using here in the U.S.  Caplin

14  & Drysdale, on behalf of our defense group, established a

15  database through Epic, which hosts the Relativity database

16  system, in order to gather and produce documents to SKAT and

17  Hughes Hubbard.  Likewise, we used that database system to host

18  documents that are received by SKAT in response to our

19  discovery requests, and we give access to that portion of the

20  database to all defendants in order to share and streamline the

21  process.  The company that hosts Relativity, Epic, announced on

22  Monday, I believe it was, your Honor, that they were the victim

23  of a cybersecurity ransomware attack, and, as a result, they

24  have shut down their entire system worldwide to all customers,

25  which obviously includes all of the users through Caplin &

K35KCUSC

1    Drysdale.

2            We are getting daily updates about this from Epic,

3    they're issuing public press releases about it, but have

4    indicated no particular timetable --

5            THE COURT:  Is this the same one who has all the

6    hospital systems?

7            MR. ALLISON:  I don't know, your Honor, but my

8    understanding is that it's basically frozen everybody worldwide

9    that's ever used the system.  That obviously precludes our

10   ability to access the system for purposes of discovery and

11   preparation of depositions and whatnot.  It's a day-to-day

12   thing, but, at the moment, there's no timetable for it being

13   lifted or unfrozen.  At the moment, I don't think it's an issue

14   as in this week, but we do have depositions that are coming up

15   later this month, and we are obviously going to be a little

16   worried if we're not able to prepare because we don't have

17   access to our own system.

18           THE COURT:  Real trial lawyers.

19           MR. ALLISON:  The good old days of hard copy documents

20   are maybe slightly behind us, your Honor.  We only want to make

21   the Court aware of it in the event that it becomes a problem.

22   Hopefully, this all gets resolved in due course, but I've

23   alerted Mr. Weinstein to this today, and we'll continue to work

24   with Hughes Hubbard to find a remedy if we get to that point.

25           THE COURT:  Okay.

K35KCUSC

1          MR. ALLISON:  Secondly, the status report talks about

2     the discovery productions by all the parties, of course, and I

3     think, in general, the parties, the defendants and plaintiff,

4     have been cooperative and have been working together through

5     various meet-and-confers to make sure that we are addressing

6     each other's discovery issues and disputes.  Nothing major, no

7     crisis yet, but I do want to just alert the Court that

8     plaintiff, at the moment, has taken the position that there are

9     certain documents that defendants have requested that are

10    off-limits to defendants.  Very broadly speaking, your Honor,

11    these include documents that involve eternal SKAT

12    communications, communications between SKAT and other

13    government agencies both in Denmark and outside of Denmark, as

14    well as, again, broadly speaking, pleadings and other filings

15    in other courts outside the United States that may refer to

16    statements being made by SKAT in that litigation or other

17    parties in those litigations.

18         The defendants are concerned about not having access

19    to that information because we believe it may establish

20    potential defenses, both in terms of, of course, when SKAT

21    became aware of certain potential allegations that may

22    establish potential statute of limitations defenses, as well as

23    information that may indicate who SKAT believes are the actual

24    true owners of the stock that is in dispute, that produced the

25    dividends that are in dispute.  We're obviously still in the

K35KCUSC

1    middle of meet-and-confers.  We're not asking the Court for

2    anything at this point.  I'm just noting that while we've been

3    cooperative in both directions, we have issues in both

4    directions.  This is going to become an issue if it's not

5    resolved.  I just want to make the Court certainly aware of it.

6               THE COURT:  Okay.

7               MR. ALLISON:  Third, although I think the Court has

8    probably sort of realized this from the discussion today and

9    from the status report, we have sort of three different

10   tranches of activities occurring here because there's sort of

11   three tranches of defendants, if you will.  There's the

12   original defendants, those brought in last year, and then the

13   cross-claims with ED&F Man.  As a result, we're doing our best

14   to coordinate.  I don't think it's been an issue, but one of

15   the things that will come up is that the new defendants, or the

16   newer defendants coming in, will want likely to increase the

17   number of discovery requests that they have not had an

18   opportunity to take advantage of from the original requests

19   that were agreed to with the Court.  That has not yet been

20   addressed, but will need to be addressed at some point.

21              Lastly, I note this, only because the Court asked

22   about it in the order requesting the status report regarding

23   settlement discussions, and as Mr. Weinstein indicated in the

24   report that we signed off on, Hughes Hubbard has made clear

25   that the door is open for those conversations.  I've been asked

K35KCUSC

1    to note to the Court that there are some potential very, very,

2    very high-level constructs for discussions in Denmark between

3    SKAT and some Danish counsel in Denmark.  We don't know where

4    that's going or whether and how that would apply to the

5    proceedings here, but we wanted to make the Court aware of that

6    in the event that it becomes more grounded and it leads to

7    further developments.

8              THE COURT:  Okay.  Thank you.

9              MR. ALLISON:  That's all, your Honor.

10             THE COURT:  Okay.

11             Anyone else?

12             All right.  Well, I appreciate the thorough updating.

13   I hope that Mr. Allison and Mr. Weinstein can resolve their

14   issues.  I'd rather not have to resolve the issues.  And, in my

15   experience, you're probably both well advised not to want me to

16   resolve them.

17             Okay.  Thank you.  If this Epic problem isn't resolved

18   in the next two weeks, please let me know that.

19             MR. ALLISON:  Yes, your Honor, will do.

20             THE COURT:  Okay.  Thank you.

21                              * * *

22

23

24

25