# Exhibit 3



# United Kingdom House of Lords Decisions

---

**You are here:** BAILII >> Databases >> United Kingdom House of Lords Decisions >> Three Rivers District Council & Ors v. Bank of England [2004] UKHL 48 (11 November 2004)
URL: *http://www.bailii.org/uk/cases/UKHL/2004/48.html*
Cite as: [2004] 3 WLR 1274, [2005] 4 All ER 948, [2005] 1 AC 610, [2005] AC 610, [2004] UKHL 48

---

[New search] [Buy ICLR report: [2005] 1 AC 610] [Buy ICLR report: [2004] 3 WLR 1274] [Help]

---

# Judgments - Three Rivers District Council and others (Respondents) v. Governor and Company of the Bank of England (Appellants) (2004)

---

HOUSE OF LORDS

SESSION 2003-04
**[2004] UKHL 48**
*on appeal from:[2002] EWHC 2730*

### OPINIONS

### OF THE LORDS OF APPEAL

### FOR JUDGMENT IN THE CAUSE

**Three Rivers District Council and others (Respondents)**

**v.**

**Governor and Company of the Bank of England (Appellants) (2004)**

ON

THURSDAY 11 NOVEMBER 2004

The Appellate Committee comprised:

Lord Scott of Foscote

Lord Rodger of Earlsferry

Baroness Hale of Richmond

Lord Carswell

Lord Brown of Eaton-under-Heywood/p>

---

# HOUSE OF LORDS

## OPINIONS OF THE LORDS OF APPEAL FOR JUDGMENT

## IN THE CAUSE

## Three Rivers District Council and others (Respondents) v. Governor and Company of the Bank of England (Appellants) (2004)

## [2004] UKHL 48

### LORD SCOTT OF FOSCOTE

My Lords,

1. On 29 July 2004, the Appellate Committee announced that this appeal should be allowed. I now give my reasons for reaching that decision.

   *Introduction*

2. The actual issue for decision on this appeal is an apparently simple one that can be very shortly stated. Do the communications between the Bank of England, their solicitors, Freshfields, and counsel relating to the content and preparation of the so-called overarching statement submitted on behalf of the Bank to the Bingham Inquiry qualify for legal professional privilege? It is contended by the respondents, and was held by the Court of Appeal, that they do not. But the broader issues that have been debated on this appeal are not in the least simple. They have required your Lordships to consider the policy justifications for the existence of legal professional privilege in our law and, generally, the permissible scope of the privilege. In relation to what sort of communications can legal professional privilege be claimed? As to the scope of legal professional privilege, the focus has been, first, on the part, if any, that legal professional privilege should be allowed to play where the advice or assistance sought by the lawyers is not advice or assistance about the client's legal rights or obligations, and, second, on the criteria to be applied to determine whether communications between the lawyers and employees of the client can be treated for privilege purposes as communications between the lawyers and the client.

3. In order that the significance of the issues as I have broadly described them can be understood, it is necessary to provide a brief history of the events that have led up to this appeal.

   *The history*

4. The starting point is the collapse of BCCI in July 1991 with a huge excess of liabilities over assets. BCCI's depositors stood to lose a substantial part of their deposits. Shareholders in BCCI stood to lose their investments. Under the Banking Acts of 1979 and 1987 the Bank of England ("the Bank") has a supervisory role in relation to banks and financial institutions carrying on business in the United Kingdom. So the Bank had had statutory responsibilities and duties regarding the supervision of BCCI.

5. Very shortly after the collapse of BCCI the Chancellor of the Exchequer announced in Parliament that there would be an independent inquiry into the Bank's supervision of BCCI. Bingham LJ (as he then was) was appointed to conduct the Inquiry. Bingham LJ's terms of reference required him

> "To enquire into the supervision of BCCI under the Banking Acts; to consider whether the action taken by all the UK authorities was appropriate and timely; and to make recommendations."

In a letter to the Chancellor of the Exchequer written in July 1992, Bingham LJ described his terms of reference as calling for the consideration of five broad questions. These were -

> "(1) What did the United Kingdom authorities know about BCCI at all relevant times?
>
> (2) Should they have known more?
>
> (3) What action did the United Kingdom authorities take in relation to BCCI at all relevant times?
>
> (4) Should they have acted differently?
>
> (5) What should be done to prevent or minimise the risk of such an event recurring in the future?"

6. It was clear to all that the Bank was the principal party to be investigated and shortly after the Inquiry had been established the Governor of the Bank appointed three Bank officials to deal with all communications between the Bank and the Inquiry. These officials, and other Bank personnel appointed to assist them from time to time, became known as the Bank's Bingham Inquiry Unit ("the BIU"). Freshfields were retained by the Bank to advise generally on all dealings of the Bank, its officials and employees with the Inquiry. Freshfields retained counsel to assist in that process. One of the main functions of the BIU was the preparation and communication of information and instructions to Freshfields to enable them to carry out their duties under their retainer. They (Freshfields) and counsel gave advice as to the preparation and presentation of the Bank's evidence to the Inquiry and as to the submissions to be made to the Inquiry on the Bank's behalf. Indeed, except for some routine administrative arrangements, all the Bank's communications with the Inquiry were the subject of extensive advice from Freshfields and counsel.

7. The Bingham Inquiry Report was published on 22 October 1992. In 1993 some 6,231 persons, each of whom claimed to be a depositor with United Kingdom branches of BCCI, and BCCI itself (by its liquidators) commenced an action against the Bank for the loss they had respectively been caused by the BCCI collapse. Section 1(4) of the Banking Act 1987 relieves the Bank of any liability "for anything done or omitted in the discharge or purported discharge of the functions of the Bank under this Act unless it is shown that the act or omission was in bad faith". It was, therefore, not possible for the action to be based merely on an alleged negligent performance by the Bank of its supervisory duties vis-à-vis BCCI. The various acts or omissions on the part of the Bank to which the collapse of BCCI was alleged to be attributable had to be "in bad faith". This requirement plainly placed before the claimants in the action (the respondents before your Lordships) a very high hurdle and it is not in the least surprising that they have been, and still are, seeking the widest possible discovery from the Bank in order to assist their efforts to jump it.

8. By an application notice dated 25 October 2002 the claimants sought disclosure by the Bank of a large number of documents which the Bank claimed it had the right to withhold on the

ground of legal professional privilege. These were documents which had been brought into existence by employees of the Bank for the purpose of being passed to Freshfields. The parties were agreed that documents emanating from or prepared by independent third parties and then passed to Freshfields were not privileged. It was the status of documents prepared by Bank employees that was in question.

9. Tomlinson J in his judgment of 13 December 2002 (*Three Rivers District Council v Governor and Company of the Bank of England (No.5)* [2002] EWHC 2730) held that all these documents were privileged. In paragraph 10 of his judgment, he described the documents as "generated for the purpose of providing information to the Bank's legal advisers to enable them to prepare submissions and/or to advise on the nature, presentation, timing and/or content of the Bank's submissions to, evidence for and responses to requests from the Inquiry". And he proceeded to consider the privilege issue "upon the assumption that the material which the Bank seeks to protect from disclosure is both relevant to and probative as to the issues in the trial".

10. The modern case law on legal professional privilege has divided the privilege into two categories, legal advice privilege and litigation privilege. Litigation privilege covers all documents brought into being for the purposes of litigation. Legal advice privilege covers communications between lawyers and their clients whereby legal advice is sought or given. In *in re L* [1997] AC 16 Lord Jauncey of Tullichettle described litigation privilege as "essentially a creature of adversarial proceedings" and held that the privilege could not be claimed in order to protect from disclosure a report prepared for use in non-adversarial proceedings (see p.26). Lord Lloyd of Berwick and Lord Steyn expressed their agreement. The Bingham Inquiry could not have been described as adversarial. It was, as inquiries invariably are, an inquisitorial proceeding. It was no doubt with *in re L* in mind that the Bank did not claim that the documents of which disclosure was being sought were entitled to litigation privilege. The Bank took its stand on legal advice privilege. As to that, the Bank claimed privilege for all documents prepared for at least the dominant purpose of obtaining or recording legal advice from Freshfields or counsel. In paragraph 30 of his judgment Tomlinson J accepted this claim. He said -

> "In my judgment an internal confidential document, not being a communication with a third party, which was produced or brought into existence with the dominant purpose that it or its contents be used to obtain legal advice is privileged from production."

He therefore dismissed the 25 October 2002 discovery application.

11. In an addendum to his judgment given on 6 February 2003 after a further hearing Tomlinson J dealt with the question whether documents prepared by ex-employees or ex-officers of BCCI stood on the same footing for legal advice privilege purposes as documents prepared by current employees or current officers. He held that provided the dominant purpose test that he had formulated in his main judgment were satisfied, no distinction for privilege purposes was to be drawn. He said, in paragraph 6 -

> "In my judgment the former officers of the Bank who were concerned with the supervision of BCCI and who in that capacity acquired relevant knowledge which was confidential to the Bank are not for this purpose to be regarded as third parties".

12. The BCCI claimants appealed and on 3 April 2003 the Court of Appeal allowed the appeal. It is important to notice that Mr Gordon Pollock QC, counsel for the claimants, did not argue for disclosure of documents passing between the BIU and Freshfields nor for disclosure of any of Freshfields' internal memoranda or drafts. Mr Pollock accepted that the BIU was, for the

purpose of the Inquiry, Freshfields' client and that communications passing between them were covered by legal advice privilege (see para.4 of the judgment handed down by Longmore LJ: *Three Rivers District Council v Governor and Company of the Bank of England (No.5)* [2003] QB 1556).

13. The Court of Appeal judgment (*Three Rivers (No.5)*) succinctly summed up the rival submissions -

> "5 … Mr Pollock submitted that it was only communications between solicitor and client, and evidence of the content of such communications, that were privileged. Preparatory materials obtained before such communications, even if prepared for the dominant purpose of being shown to a client's solicitor, even if prepared at the solicitor's request and even if subsequently sent to the solicitor, did not come within the privilege."

> "6 Mr Stadlen, for the Bank, submitted that, as a matter of general principle, any document prepared with the dominant purpose of obtaining the solicitor's advice upon it came within the ambit of the privilege, whether or not it was actually communicated to the solicitor … This general principle was subject to the exception that documents sent to or by an independent third party (even if created with the dominant purpose of obtaining a solicitor's advice) would not be covered by legal advice privilege".

The Court of Appeal accepted Mr Pollock's submission and held that the only documents for which legal professional privilege could be claimed were communications between the BIU and Freshfields seeking or giving legal advice. The BIU, and no one else, was to be treated as Freshfields' client for privilege purposes. And in paragraph 37 of the judgment the Court of Appeal expressed the view that material prepared "for the dominant purpose of putting relevant factual material before the inquiry in an orderly and attractive fashion" was not prepared "for the dominant purpose of taking legal advice upon such material" and so could not attract legal professional privilege. The former purpose has, for convenience, been referred to as a "presentational" purpose.

14. As to the question of who, for privilege purposes, was to be regarded as Freshfields' client, the Court of Appeal said that information provided to solicitors by an employee stood in the same position as information provided by an independent third party (see [2003] QB at 1574 G/H) and, specifically, when considering whether information provided to Freshfields by the Governor of the Bank would have qualified for privilege, that "the BIU … is… the client rather than any single officer however eminent he or she may be" ([2003] QB at 1581 A/B). In allowing the appeal the Court of Appeal made a declaration that

> " … the only documents or parts of documents coming into the Bank's possession between the closure of BCCI on 5th July 1991 and the issue of the present proceedings in May 1993 which the Bank is entitled to withhold from inspection on the ground of legal advice privilege are:

> 1) communications passing between the Bank and its legal advisers (including any solicitor seconded to the Bank) for the purposes of seeking or obtaining 'legal advice';

> 2) any part of a document which evidences the substance of such a communication."

15. The Bank's petition to this House for leave to appeal against the Court of Appeal's order was dismissed.

16. After the dismissal of the Bank's petition for leave to appeal the Bank began the task of disclosing documents whose disclosure was required under the Court of Appeal order. But the Bank disclosed none of the communications between the BIU and Freshfields or drafts of or internal memoranda relating to the overarching statement that had been submitted on behalf of the Bank to the Inquiry. These were withheld by the Bank from disclosure for two reasons. First, Mr Pollock had told the Court of Appeal that his clients were not seeking disclosure of any communications between the BIU and Freshfields; secondly, the Bank contended that the expression "legal advice" in the Court of Appeal's declaration should be interpreted widely so as to cover all advice and assistance from Freshfields or counsel relating to the evidence to be submitted and the submissions to be made to the Inquiry on behalf of the Bank ie. so as to cover advice given for presentational purposes.

17. The impasse regarding these documents led to a further discovery application by the claimants. The application was made on 1 August 2003. It sought "further documents from or relating to the Bingham Inquiry Unit arising from the judgment of the Court of Appeal dated 3 April 2003". Tomlinson J gave judgment on the application on 4 November 2003. He held that the rationale of the Court of Appeal judgment overturning his own previous decision was that Freshfields' advice sought or given for presentational purposes should not in general be categorised as legal advice of the sort which attracted legal advice privilege (see para.13). If, however, the dominant purpose of some particular communication between the BIU and Freshfields was the provision of advice as to the Bank's legal rights and obligations, as opposed to the question of how the Bank's evidence might be presented to the Inquiry so as to be least likely to attract criticism, then that communication, or the relevant part of it, would be entitled to privilege.

18. So Tomlinson J made an order dated 10 November 2003 declaring that the only documents or parts of documents that the Bank was entitled to withhold from disclosure on the ground of legal advice privilege were communications passing between the BIU and its lawyers for the purpose of seeking or obtaining "advice concerning the Bank's rights and obligations".

19. The Bank appealed and on 1 March 2004 the Master of the Rolls, Lord Phillips of Worth Matravers, handed down the judgment of the Court of Appeal dismissing the appeal *(Three Rivers District Council v Governor and Company of the Bank of England (No. 6)* [2004] QB 916. The judgment (*Three Rivers (No. 6)*) made clear the view of the Court of Appeal that for legal advice privilege purposes the advice being sought from the lawyers must be advice as to legal rights or liabilities. Advice as to how the Bank should present its case to the Inquiry so as to lead to a conclusion as favourable to the Bank as possible did not qualify for privilege.

20. The Bank has now appealed to your Lordships. It is important to emphasise the narrowness of the actual issue. It is whether the communications between the BIU and Freshfields or counsel relating to the Inquiry are protected by legal advice privilege. The Bank plainly believe that the Court of Appeal order in *Three Rivers (No. 5)* went too far. But the Bank's petition for leave to appeal was refused and this is not an appeal against that order. Moreover the Bank has discharged the disclosure obligation required by that order. However, the narrow scope allowed by the Court of Appeal in the judgment now under appeal to "legal advice" has heightened the concerns of many about the approach to legal advice privilege inherent in the first Court of Appeal judgment. This explains in part the applications for leave to intervene in this appeal made by the Attorney-General, by the Law Society and by the Bar Council. Each has been given leave to intervene by written submissions, including leave, if so advised, to submit a written reply at the conclusion of the oral hearing. Their Lordships are grateful for the written submissions they have received from the interveners.

21. The written submissions from the interveners, and particularly that from the Law Society, make clear their concern that the *Three Rivers (No. 5)* Court of Appeal judgment may have gone too far in treating communications between Freshfields and employees of the Bank, other than the BIU, as being for privilege purposes communications between Freshfields and third parties. Your Lordships have been invited to clarify the approach that should be adopted to determine whether a communication between an employee and his or her employer's lawyers should be treated for legal advice privilege purposes as a communication between the lawyers and their client. This is of particular importance for corporate clients, who can only communicate through employees or officers.

22. The employee/client point does not, however, arise as an issue on this appeal. It did arise on the *Three Rivers (No. 5)* discovery application, and the Court of Appeal's view that only communications between the lawyers and the BIU could be regarded as communications qualifying for legal advice privilege was the basis on which disclosure by the Bank pursuant to the Court of Appeal order of 3 April 2003 has taken place. The disclosed documents have included communications between the Bank's lawyers and those Bank employees and officers who were not members of the BIU. Since then, and well before the hearing of this appeal, the hearing of the action before Tomlinson J commenced. Mr Pollock opened his case on the basis, *inter alia*, of the documents disclosed pursuant to the 3 April 2003 order. He expressed before your Lordships on this appeal a natural concern that if your Lordships gave any ruling indicating that some of the disclosed documents ought to have been held to be privileged, serious complications affecting the trial might arise. However Mr Sumption QC, on behalf of the Bank, gave the Bank's undertaking that reliance by the claimants on the documents already disclosed would not, whatever view your Lordships might express on the employer/client point, be resisted on privilege grounds, and that it would not be suggested that Tomlinson J's knowledge and sight of the contents of those documents constituted any reason why he should recuse himself. The point is, therefore, so far as the current litigation between the claimants and the Bank is concerned, strictly moot. Nothing turns on it. Nonetheless your Lordships have been asked to express on a view on the point. I will return to it.

   *Policy*

23. It is impossible to express a coherent view about the issues which have been debated on this appeal without taking into account the policy reasons which led to legal advice privilege becoming established in our law in the first place and to the policy reasons for its retention in our law today. Before examining those reasons, however, it seems to me helpful to review some of the features of legal advice privilege in order to provide a context for the policy reasons underlying the privilege.

24. First, legal advice privilege arises out of a relationship of confidence between lawyer and client. Unless the communication or document for which privilege is sought is a confidential one, there can be no question of legal advice privilege arising. The confidential character of the communication or document is not by itself enough to enable privilege to be claimed but is an essential requirement.

25. Second, if a communication or document qualifies for legal professional privilege, the privilege is absolute. It cannot be overridden by some supposedly greater public interest. It can be waived by the person, the client, entitled to it and it can be overridden by statute (c/f *R (Morgan Grenfell Ltd) v Special Commissioner of Income Tax* [2003] 1 AC 563), but it is otherwise absolute. There is no balancing exercise that has to be carried out (see *B v Auckland District Law Society* [2003] 2 AC 736 paras.46 to 54). The Supreme Court of Canada has held that legal professional privilege although of great importance is not absolute and can be set aside if a sufficiently compelling public interest for doing so, such as public safety, can be shown (see *Jones v Smith* [1999] 1 SCR 455). But no other common law jurisdiction has, so far as I am aware, developed the law of privilege in this way. Certainly in this country legal

professional privilege, if it is attracted by a particular communication between lawyer and client or attaches to a particular document, cannot be set aside on the ground that some other higher public interest requires that to be done.

26. Third, legal advice privilege gives the person entitled to it the right to decline to disclose or to allow to be disclosed the confidential communication or document in question. There has been some debate as to whether this right is a procedural right or a substantive right. In my respectful opinion the debate is sterile. Legal advice privilege is both. It may be used in legal proceedings to justify the refusal to answer certain questions or to produce for inspection certain documents. Its characterisation as procedural or substantive neither adds to nor detracts from its features.

27. Fourth, legal advice privilege has an undoubted relationship with litigation privilege. Legal advice is frequently sought or given in connection with current or contemplated litigation. But it may equally well be sought or given in circumstances and for purposes that have nothing to do with litigation. If it is sought or given in connection with litigation, then the advice would fall into both of the two categories. But it is long settled that a connection with litigation is not a necessary condition for privilege to be attracted (see eg. *Greenough v Gaskell* (1833) 1 My & K 98 per Lord Brougham at 102/3 and *Minet v Morgan* (1873) 8 Ch. App. 361). On the other hand it has been held that litigation privilege can extend to communications between a lawyer or the lawyer's client and a third party or to any document brought into existence for the dominant purpose of being used in litigation. The connection between legal advice sought or given and the affording of privilege to the communication has thereby been cut.

28. So I must now come to policy. Why is it that the law has afforded this special privilege to communications between lawyers and their clients that it has denied to all other confidential communications? In relation to all other confidential communications, whether between doctor and patient, accountant and client, husband and wife, parent and child, priest and penitent, the common law recognises the confidentiality of the communication, will protect the confidentiality up to a point, but declines to allow the communication the absolute protection allowed to communications between lawyer and client giving or seeking legal advice. In relation to all these other confidential communications the law requires the public interest in the preservation of confidences and the private interest of the parties in maintaining the confidentiality of their communications to be balanced against the administration of justice reasons for requiring disclosure of the confidential material. There is a strong public interest that in criminal cases the innocent should be acquitted and the guilty convicted, that in civil cases the claimant should succeed if he is entitled to do so and should fail if he is not, that every trial should be a fair trial and that to provide the best chance of these desiderata being achieved all relevant material should be available to be taken into account. These are the administration of justice reasons to be placed in the balance. They will usually prevail.

29. In paragraph 39 of their judgment in *Three Rivers (No. 6)* the Court of Appeal commented that

> "The justification for litigation privilege is readily understood.
> Where, however, litigation is not anticipated it is not easy to see why
> communications with a solicitor should be privileged".

As to the justification for litigation privilege, I would respectfully agree that the need to afford privilege to the seeking or giving of legal advice for the purposes of actual or contemplated litigation is easy to understand. I do not, however, agree that that is so in relation to those documents or communications which although having the requisite connection with litigation neither constitute nor disclose the seeking or giving of legal advice. Communications between litigant and third parties are the obvious example. This House in *in re L* [1997] AC 16 restricted litigation privilege to communications or documents with the requisite connection to *adversarial* proceedings. Civil litigation conducted pursuant to the current Civil Procedure

Rules is in many respects no longer adversarial. The decision in *in re L* warrants, in my opinion, a new look at the justification for litigation privilege. But that is for another day. It does not arise on this appeal.

30. The second sentence of the cited passage does, however, pose a question of great relevance to this appeal. It questions the justification for legal advice privilege where the legal advice has no connection with adversarial litigation. A number of cases in our own jurisdiction and in other common law jurisdictions have sought to answer the question. In *R v Derby Magistrates' Court Ex parte B* [1996] 1 AC 487 Lord Taylor of Gosforth CJ said this -

> "In *Balabel v Air India* [1988] Ch. 317 the basic principle justifying legal professional privilege was again said to be that a client should be able to obtain legal advice in confidence. The principle which runs through all these cases … is that a man must be able to consult his lawyer in confidence, since otherwise he might hold back half the truth. The client must be sure that what he tells his lawyer in confidence will never be revealed without his consent (p.507)"

and at p.508, that

> " … once any exception to the general rule is allowed, the client's confidence is necessarily lost".

In *R (Morgan Grenfell Ltd) v Special Commissioner of Income Tax* [2003] 1 AC 563 Lord Hoffmann referred to legal professional privilege as "a necessary corollary of the right of any person to obtain skilled advice about the law" and continued (p.607) -

> "Such advice cannot be effectively obtained unless the client is able to put all the facts before the adviser without fear that they may afterwards be disclosed and used to his prejudice."

And in *B v Auckland District Law Society* [2003] 2 AC 736 at 757 Lord Millett justified legal professional privilege on the ground that

> " … a lawyer must be able to give his client an absolute and unqualified assurance that whatever the client tells him in confidence will never be disclosed without his consent."

31. In the courts of foreign common law jurisdictions similar views have been expressed. In *Upjohn Co. v United States* (1981) 449 US 383, a decision of the US Supreme Court, Justice Rehnquist said, at p.389, that the purpose of legal professional privilege was

> " … to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."

He went on -

> "The privilege recognises that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client."

In *Jones v Smith* [1999] 1 SCR 455, a decision of the Supreme Court of Canada, the privilege was justified on the ground that -

"Clients seeking advice must be able to speak freely to their lawyers secure in the knowledge that what they say will not be divulged without their consent.

….. The privilege is essential if sound legal advice is to be given …. Family secrets, company secrets, personal foibles and indiscretions all must on occasion be revealed to the lawyer by the client. Without this privilege clients could never be candid and furnish all the relevant information that must be provided to lawyers if they are to properly advise their clients" (para.46)

32. In leading cases in Australia and New Zealand the justification for a rule affording particular protection to confidential communications between lawyers and clients has been expressed on a broader policy basis than merely the need to ensure candour. In *Baker v Campbell* (1983) 153 CLR 52, a decision of the High Court of Australia, Murphy J commented that

"The client's legal privilege is essential for the orderly and dignified conduct of individual affairs in a social atmosphere which is being poisoned by official and unofficial eavesdropping and other invasions of privacy" (p.89)

and Wilson J, at p.95, said

"In fostering the confidential relationship in which legal advice is given and received the common law is serving the ends of justice because it is facilitating the orderly arrangement of the client's affairs as a member of the community."

See also *Commissioner of Inland Revenue v West-Walker* [1954] NZLR 191, a decision of the Court of Appeal of New Zealand.

33. I would refer finally to the justification for legal professional privilege given by Advocate-General Slynn (as he then was) in *A M & S Europe Ltd v European Commission* [1983] QB 878 at 913, a passage cited by Kirby J in *Daniels Corp v ACCC* [2002] 192 ALR 561. The Advocate-General said this -

"[The privilege] springs essentially from the basic need of a man in a civilised society to be able to turn to his lawyer for advice and help, and if proceedings begin, for representation; it springs no less from the advantages to a society which evolves complex law reaching into all the business affairs of persons, real and legal, that they should be able to know what they can do under the law, what is forbidden, where they must tread circumspectly, where they run risks."

34. None of these judicial dicta tie the justification for legal advice privilege to the conduct of litigation. They recognise that in the complex world in which we live there are a multitude of reasons why individuals, whether humble or powerful, or corporations, whether large or small, may need to seek the advice or assistance of lawyers in connection with their affairs; they recognise that the seeking and giving of this advice so that the clients may achieve an orderly arrangement of their affairs is strongly in the public interest; they recognise that in order for the advice to bring about that desirable result it is essential that the full and complete facts are placed before the lawyers who are to give it; and they recognise that unless the clients can be assured that what they tell their lawyers will not be disclosed by the lawyers without their (the clients') consent, there will be cases in which the requisite candour will be absent. It is obviously true that in very many cases clients would have no inhibitions in providing their

lawyers with all the facts and information the lawyers might need whether or not there were the absolute assurance of non-disclosure that the present law of privilege provides. But the dicta to which I have referred all have in common the idea that it is necessary in our society, a society in which the restraining and controlling framework is built upon a belief in the rule of law, that communications between clients and lawyers, whereby the clients are hoping for the assistance of the lawyers' legal skills in the management of their (the clients') affairs, should be secure against the possibility of any scrutiny from others, whether the police, the executive, business competitors, inquisitive busy-bodies or anyone else (see also paras. 15.8 to 15.10 of Adrian Zuckerman's Civil Procedure where the author refers to the rationale underlying legal advice privilege as "the rule of law rationale"). I, for my part, subscribe to this idea. It justifies, in my opinion, the retention of legal advice privilege in our law, notwithstanding that as a result cases may sometimes have to be decided in ignorance of relevant probative material.

*The scope of legal advice privilege*

35. Legal advice privilege should, in my opinion, be given a scope that reflects the policy reasons that justify its presence in our law. In my respectful opinion, the approach of the Court of Appeal in the *Three Rivers (No. 6)* judgment has failed to do so. The Court of Appeal has restricted the scope of legal advice privilege to material constituting or recording communications between clients and lawyers seeking or giving advice about the clients' legal rights and obligations. It has excluded legal advice sought or given for presentational purposes (see para. 13 above). The particular issue to be decided under the disclosure application of 1 August 2003 was whether advice that related to the presentation of material to the Inquiry qualified for legal advice privilege. In holding that it did not, the Court of Appeal distinguished between a lawyer-client relationship "formed for the purpose of obtaining advice or assistance in relation to rights and liabilities" and a lawyer-client relationship where "the dominant purpose is not the obtaining of advice and assistance in relation to legal rights and obligations". In relation to the former, "broad protection will be given to communications passing between solicitor and client in the course of that relationship"; in relation to the latter, a similar broad protection could not be claimed (see paragraph 26 of the judgment).

36. The authorities on which the Court of Appeal founded their approach were all concerned with private law rights and obligations (ie. *Greenough v Gaskell* (1833) 1 My & K 98, *Wheeler v Le Marchant* (1881) 17 ChD 675, *Minter v Priest* [1930] AC 558 and *Great Atlantic Insurance Co v Home Insurance Co* [1981] 1 WLR 529). It is clear, however, that whatever view may be taken of the presentational advice point, legal advice privilege must cover also advice and assistance in relation to public law rights, liabilities and obligations. I understood Mr Pollock in his submissions to your Lordships to accept that that was so.

37. In my opinion, the impossibility of a principled exclusion from legal advice privilege of communications between lawyer and client relating to the client's public law rights, liabilities and obligations is conclusive of the narrow issue in this appeal. One of the main purposes of the Inquiry was to examine whether in relation to BCCI the Bank had properly discharged its public law duties of supervision imposed by the Banking Acts. The Bank was naturally anxious that the Inquiry's conclusions should be as favourable as possible or, to put the point in reverse, that the Inquiry's criticisms of the Bank should be as limited as possible. Every public inquiry conducts its proceedings and expresses its conclusions under the shadow of potential judicial review. The inquiry's procedures may be judicially reviewed if they are perceived to be unfair. The inquiry's conclusions may be judicially reviewed if they are thought to be unsustainable in the light of the evidence the inquiry has received. Presentational advice or assistance given by lawyers to parties whose conduct may be the subject of criticism by the inquiry is advice or assistance that may serve to avoid the need to invoke public law remedies. It would be - or should be - readily accepted that, once an inquiry's conclusions have been reached and communicated to the sponsors of the inquiry, advice from lawyers to someone

criticised as to whether a public law remedy might be available to quash the critical conclusions would be advice that qualified for legal advice privilege. It makes no sense at all, in my opinion, to withhold the protection of that privilege from presentational advice given by the lawyers for the purpose of preventing that criticism from being made in the first place.

38. In *Balabel v Air India* [1988] 1 Ch 317 Taylor LJ (as he then was) said that for the purposes of attracting legal advice privilege -

> ". . . legal advice is not confined to telling the client the law; it must include advice as to what should prudently and sensibly be done in the relevant legal context" (p 330).

I would venture to draw attention to Taylor LJ's reference to "the relevant legal context". That there must be a "relevant legal context" in order for the advice to attract legal professional privilege should not be in doubt. Taylor LJ said at p 331 that -

> " … to extend privilege without limit to all solicitor and client communication upon matters within the ordinary business of a solicitor and referable to that relationship [would be] too wide."

This remark is, in my respectful opinion, plainly correct. If a solicitor becomes the client's "man of business", and some solicitors do, responsible for advising the client on all matters of business, including investment policy, finance policy and other business matters, the advice may lack a relevant legal context. There is, in my opinion, no way of avoiding difficulty in deciding in marginal cases whether the seeking of advice from or the giving of advice by lawyers does or does not take place in a relevant legal context so as to attract legal advice privilege. In cases of doubt the judge called upon to make the decision should ask whether the advice relates to the rights, liabilities, obligations or remedies of the client either under private law or under public law. If it does not, then, in my opinion, legal advice privilege would not apply. If it does so relate then, in my opinion, the judge should ask himself whether the communication falls within the policy underlying the justification for legal advice privilege in our law. Is the occasion on which the communication takes place and is the purpose for which it takes place such as to make it reasonable to expect the privilege to apply? The criterion must, in my opinion, be an objective one.

39. In the discussion of the issue before your Lordships, and in the very helpful written submissions that the parties and the interveners have placed before your Lordships, a number of examples have been given of advice from lawyers in areas where it was suggested to be questionable whether legal advice privilege would be attracted. Planning inquiries were mentioned. Mr Pollock, as I understand it, contended that advice given by lawyers to an objector at a planning inquiry would not qualify for the privilege. The objector's rights, liabilities and obligations would not be in issue - so, no privilege. That plainly could not be said of advice given to the developer seeking the planning permission. Advice to the developer would relate directly to the rights under planning law that the developer hoped to acquire and to any conditions accompanying the permission to develop with which the developer would be under an obligation to comply. But how could it be right to allow privilege to protect advice given to the developer but to deny it to comparable advice given to the objector? Every objector has the right under public law to present his case to the inquiry. So, in my opinion, advice given by lawyers to objectors for the purpose of enhancing the prospects of a successful outcome, from their point of view, to the inquiry would be advice given in a relevant legal context and would qualify for legal advice privilege. So to hold would not be to extend litigation privilege to inquiries. It would be to give legal advice privilege its due scope.

40. Advice given by lawyers to the promoters of private bills was mentioned. I would myself be in no doubt at all but that advice and assistance given by lawyers to promoters of private bills,

although often, perhaps usually, presentational in character, would qualify for legal advice privilege. The relevant legal context seems to me clear. The same would apply to advice by lawyers given to opponents of the proposed bill.

41. Mr Jonathan Crow, in a written reply submission on behalf of the Attorney-General, has referred to advice given by Parliamentary counsel to the Government in relation to the drafting and preparation of public bills. This advice, too, Mr Crow submitted, should qualify for legal advice privilege. I agree that, here too, the relevant legal context is unmistakable and that legal advice privilege should apply.

42. Mr Pollock referred to advice sought from and given by a lawyer as to how to set about joining a private club. He put this forward as an obvious example of a case where legal advice privilege would not be attracted. The reason, Mr Pollock suggested, was that the advice being sought would not relate to the client's legal rights or obligations. I agree that legal advice privilege would not be attracted, not because the advice would necessarily not relate to the client's legal rights or obligations but because the bare bones of Mr Pollock's example had no legal context whatever. If his example were embellished with detail the answer might be different. Suppose the applicant for membership of the club had previously made an unsuccessful application to join the club, believed that his rejection had been inconsistent with the club's admission rules and wanted to make a fresh application with a view to testing the legality of his rejection if he were again to be blackballed. I think Mr Pollock would accept that in those circumstances the communications between the lawyer and the applicant would be protected by legal advice privilege. It would be protected because the communication would have a relevant legal context. It would relate to the legal remedies that might be available if the applicant's application were again unsuccessful.

43. There may, as I have said, be marginal cases where the answer is not easy. But, in my opinion, the present case is not in the least marginal. The preparation of the evidence to be submitted and the submissions to be made to the Inquiry on behalf of the Bank were for the purpose of enhancing the Bank's prospects of persuading the Inquiry that its discharge of its public law obligations under the Banking Acts in relation to BCCI was not deserving of criticism and had been reasonable in the circumstances. The presentational advice given by Freshfields and counsel for that purpose was advice "as to what should prudently and sensibly be done in the relevant legal context" (*Balabel v Air India* supra at p.330). The "relevant legal context" was the Bingham Inquiry and the question whether the Bank had properly discharged its public law duties under the Banking Acts. The presentational advice falls, in my opinion, squarely within the policy reasons underlying legal advice privilege.

44. I would be of the same opinion in relation to presentational advice sought from lawyers by any individual or company who believed himself, herself or itself to be at risk of criticism by an inquiry, whether a coroner's inquest, a statutory inquiry under the 1921 Act or an ad hoc inquiry such as the Bingham Inquiry. The defence of personal reputation and integrity is at least as important to many individuals and companies as the pursuit or defence of legal rights whether under private law or public law. The skills of professional lawyers when advising a client what evidence to place before an inquiry and how to present the client and his story to the inquiry in the most favourable light are, in my opinion, unquestionably legal skills being applied in a relevant legal context.

45. Accordingly, I would allow this appeal and set aside the order of 10 November 2003 made by Tomlinson J. In my opinion, all the communications between the BIU and Freshfields or counsel regarding the content and manner of presentation of the overarching statement made on the Bank's behalf to the Inquiry, and all internal notes and memoranda relating thereto, qualified for legal advice privilege. I have had the advantage of reading the opinions of my noble and learned friends Lord Carswell and Lord Rodger of Earlsferry and am in full

agreement with the reasons they give for allowing the appeal. I agree also with the comments made by my noble and learned friend Lord Brown of Eaton-under-Heywood.

*Communications between lawyers and their clients' employees*

46. One of the matters debated at the Court of Appeal hearing that led to the *Three Rivers (No.5)* judgment was whether, or which, communications between Freshfields and the Bank employees or ex-employees, or officers or ex-officers, could qualify for legal advice privilege. It was accepted that communications between the lawyers and third parties could not qualify. The Court of Appeal held that only communications between Freshfields and the BIU could qualify. All other communications had to be disclosed. This is not an issue which arises for decision on this appeal but, for reasons which I have explained (see paras. 20 and 21), submissions have been made to your Lordships on the issue and your Lordships have been invited to express views on them. I think your Lordships should decline the invitation for a number of reasons.

47. First, the issue is a difficult one with different views, leading to diametrically opposed conclusions, being eminently arguable. Second, there is a dearth of domestic authority. *Upjohn Co v United States* (1981) 449 US 383 in the United States Supreme Court constitutes a valuable authority in a common law jurisdiction but whether (or to what extent) the principles there expressed should be accepted and applied in this jurisdiction is debatable. Third, whatever views your Lordships may express, and with whatever unanimity, the views will not constitute precedent binding on the lower courts. The guiding precedent on the issue will continue to be the Court of Appeal judgment in *Three Rivers (No.5)*. Fourth, if and when the issue does come before the House (or a new Supreme Court) the panel of five who sit on the case may or may not share the views of your Lordships, or a majority of your Lordships, sitting on this appeal. Fifth, and finally, this House, represented by an Appeal Committee of three, refused leave to appeal against the *Three Rivers (No.5)* judgment.

48. For all these reasons I think your Lordships should refrain from expressing views on the issue. Nothing that I have said should be construed either as approval or disapproval of the Court of Appeal's ruling on the issue in *Three Rivers (No.5)*. The issue simply does not arise on this appeal.

### LORD RODGER OF EARLSFERRY

My Lords,

49. I have had the privilege of considering in draft the speeches of my noble and learned friends, Lord Scott of Foscote, Lord Carswell and Lord Brown of Eaton-under-Heywood. I agree with them that the appeal should be allowed for the reasons that they give. I also agree that the House should not deal with the second of the two points identified by Lord Scott. In adding some observations of my own I gratefully adopt the accounts of the facts and issues given by Lord Scott and Lord Carswell.

50. The Bank of England ("the Bank") resist a claim for disclosure of communications between the BIU and Freshfields on the ground that the communications are covered by legal advice privilege. In the formulation of Millett J in *Price Waterhouse v BCCI Holdings* [1992] BCLC 583, 588d-e legal advice privilege attaches to all communications made in confidence between solicitors and their clients for the purpose of giving or obtaining legal advice even at a stage when litigation is not in contemplation. It does not matter whether the communication is directly between the client and his legal adviser or is made through an intermediate agent of either.

51. It is common ground between the parties that legal advice privilege has to be distinguished from litigation privilege. As Lord Edmund-Davies noted in *Waugh v British Railways Board* [1980] AC 521, 541-542, in the past the need to make that distinction was sometimes overlooked:

> "It is for the party refusing disclosure to establish his right to refuse. It may well be that in some cases where that right has in the past been upheld the courts have failed to keep clear the distinction between (a) communications between client and legal adviser, and (b) communications between the client and third parties, made (as the Law Reform Committee put it) 'for the purpose of obtaining information to be submitted to the client's professional legal advisers for the purpose of obtaining advice upon pending or contemplated litigation.'"

52. Litigation privilege relates to communications at the stage when litigation is pending or in contemplation. It is based on the idea that legal proceedings take the form of a contest in which each of the opposing parties assembles his own body of evidence and uses it to try to defeat the other, with the judge or jury determining the winner. In such a system each party should be free to prepare his case as fully as possible without the risk that his opponent will be able to recover the material generated by his preparations. In the words of Justice Jackson in *Hickman v Taylor* (1947) 329 US 495, 516, "Discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary."

53. In *In re L (A Minor)(Police Investigation: Privilege)* [1997] AC 16 your Lordships' House held, Lord Mustill and Lord Nicholls of Birkenhead dissenting, that proceedings under Part IV of the Children Act 1989 were "investigative" rather than "adversarial" in nature and that litigation privilege was therefore excluded by necessary implication. In the present case the Bank accept that Bingham LJ's inquiry was not to be regarded as adversarial in nature and that, for this reason, they cannot claim litigation privilege for the communications between the BIU and Freshfields. In these circumstances it is unnecessary to analyse more fully the characteristics of those kinds of proceedings which do attract litigation privilege. In his dissenting speech in *In re L* Lord Nicholls of Birkenhead sounded a note of caution against basing any such analysis simply on the distinction between "adversarial" and "inquisitorial" proceedings: [1997] AC 16, 31G-32D. In the meantime those cautionary words have gained force since, for the purposes of the Human Rights Act 1998, one of the characteristics of a fair trial under article 6 is that the proceedings should be "adversarial": e g *Lobo Machado v Portugal* (1996) 23 EHRR 79, para 31. The ethos of the new system of civil procedure in England and Wales, and of the more limited changes in civil procedure in Scotland, may also have a bearing on the question. Consideration of the issue must, however, await a case where the matter arises for decision.

54. The rationale of legal advice privilege has been identified in numerous cases, many of which are cited in the speeches of Lord Scott and Lord Carswell. I need not repeat them but venture to add a passage from Sir George Mackenzie's *Observations upon the 18th Act of the 23rd Parliament of King James the Sixth against Dispositions made in Defraud of Creditors etc* (1675), in *Sir George Mackenzie's Works* Vol 2 (1755), p 1. He said at p 44:

> "An Advocate is by the Nature of his Imployment tied to the same Faithfulness that any Depositor is: For his Client has deposite in his Breast his greatest Secrets; and it is the Interest of the Common-wealth, to have that Freedom allowed and secured without which Men cannot manage their Affairs and private Business: And who would use that Freedom if they might be ensnared by it? This were to

beget a Diffidence betwixt such who should, of all others, have the
greatest mutual Confidence with one another; and this will make Men
so jealous of their Advocates that they will lose their private
Business, or succumb in their just Defence, rather than Hazard the
opening of their Secrets to those who can give them no Advice when
the case is Half concealed, or may be forced to discover them when
revealed."

As this passage shows, the public interest justification for the privilege is the same today as it
was 350 years ago: it does not change, or need to change, because it is rooted in an aspect of
human nature which does not change either. If the advice given by lawyers is to be sound, their
clients must make them aware of all the relevant circumstances of the problem. Clients will be
reluctant to do so, however, unless they can be sure that what they say about any potentially
damaging or embarrassing circumstances will not be revealed later. So it is settled that, in the
absence of a waiver by the client, communications between clients and their lawyers for the
purpose of obtaining legal advice must be kept confidential and cannot be made the subject of
evidence. Of course, this means that, from time to time, a tribunal will be deprived of
potentially useful evidence but the public interest in people being properly advised on matters
of law is held to outweigh the competing public interest in making that evidence available. As
Lord Reid succinctly remarked in *Duke of Argyll v Duchess of Argyll* 1962 SC (HL) 88, 93,
"the effect, and indeed the purpose, of the law of confidentiality is to prevent the court from
ascertaining the truth so far as regards those matters which the law holds to be confidential."

55. Despite its long pedigree the Court of Appeal in this case appear to have been less than
enthusiastic about the very notion of legal advice privilege. In particular, they thought that it
was not clear why it should attach to matters such as the conveyance of real property or the
drawing up of a will: [2004] QB 916, 935, para 39 per Lord Phillips of Worth Matravers MR. I
do not share these doubts. A client's financial or tax position, or the financial or tax position of
members of his family, may well be relevant to the way in which he asks his solicitor to
structure a property transaction. Or else, for example, the client may have private worries
about his son's ability to fend for himself which explain why he conveys a more valuable
property to his son than to his more able daughter. People have a legitimate interest in keeping
such matters private. The case for confidentiality is, if anything, even more obvious when it
comes to the preparation of a will. Rightly or wrongly, the provisions are often shaped by past
relationships, indiscretions, experiences, impressions and mistakes, as well as by jealousies,
slights, animosities and affections, which the testator would not wish to have revealed but
which he must nevertheless explain if the solicitor is to carry out his wishes. Divulging the
provisions during the testator's lifetime or disclosing the reasons for them after the testator's
death could often cause incalculable harm and misery. The public interest lies in minimising
the risk of that happening. In these circumstances it is, in the words of Sir George Mackenzie,
*Works* vol 2, p 45, the interest of the commonwealth "not to unseal the Secrets of private
Persons and thereby to render all Trust and Commerce suspect."

56. More often than not the lawyer will be advising his client on legal matters that relate to his
own position - whether his public law or private law rights and obligations. Legal advice
privilege also applies to advice on criminal matters, which it may not always be easy to
characterise as relating, strictly speaking, to rights and obligations of the client. Mr Pollock
QC accepted that legal advice privilege would apply in all these cases. In other cases, such as
that of an objector at a public inquiry, the advice sought may relate partly to the client's own
legal position and partly to the position of someone else, such as the developer. But clients
may also legitimately consult their lawyers simply about someone else's legal position. Most
obviously, a concerned parent may consult a lawyer about the potential repercussions for their
adult child of some step which that child is contemplating. In all these cases the client would

be inhibited in obtaining proper advice from his lawyer if there were any risk that either of them might require to reveal what had passed between them. So legal advice privilege applies.

57. In the present case the Court of Appeal proceeded, [2004] QB 916, 932, on the basis that "the dominant role of Freshfields was to advise on preparation and presentation of evidence for the Bingham Inquiry but that it is possible that they may have given some advice as to the Bank's legal rights and obligations" and that "the advice and assistance sought was primarily in relation to the presentation of evidence to the inquiry rather than in relation to the Bank's rights and obligations." Mr Sumption QC criticised that conclusion but, simply for present purposes, I am content to accept it without addressing those criticisms. The implication of the Court of Appeal's judgment that in these circumstances legal advice privilege is not engaged must be that, when the Bank were communicating with Freshfields in relation to the presentation of their evidence to the inquiry, they were not seeking legal advice from them.

58. In his important judgment in *Balabel v Air India* [1988] Ch 317, 331H - 332B, Taylor LJ seems to have thought that in the past the business of solicitors was more restricted than it is today and that there is therefore now more of a need to keep legal advice privilege within justifiable bounds. In the present case the Court of Appeal adopted that observation, [2004] QB 916, 933, para 30. As counsel for both parties accepted, however, what Taylor LJ says in that passage is, at best, an over-simplification. Especially in the nineteenth century, many solicitors or attorneys acted as "men of business". They not only gave legal advice and assistance but carried on business, for instance, as patent agents, as agents for insurance companies, as deposit agents for colonial banks, and as stewards or factors running estates. They would also lend money to their clients, sometimes in relation to the purchase of property. Until fairly recently indeed, Scottish solicitors had succeeded in keeping for themselves all the work of selling houses that estate agents were doing in England. Given the varied functions performed by lawyers, it is scarcely surprising that questions frequently arose as to the capacity in which the lawyer or firm was acting in a particular transaction. For example, in both *Hagart and Burn-Murdoch v Inland Revenue Commissioners* [1929] AC 386 and *Minter v Priest* [1930] AC 558 the House had to decide in what capacity solicitors had lent money to clients. And one of the issues in *Minter* was, precisely, the application of legal advice privilege in that kind of case. Lawyers today may be instructed in situations in which they would not have been instructed in the past or which did not even exist in the past; equally, however, lawyers in the past were employed in situations in which they would not be employed today and which do not even exist today. In relation to legal advice privilege what matters today remains the same as what mattered in the past: whether the lawyers are being asked qua lawyers to provide legal advice.

59. In *Balabel v Air India* [1988] Ch 317, 330 Taylor LJ reviewed the authorities and held that, for the purposes of legal advice privilege, "legal advice is not confined to telling the client the law; it must include advice as to what should prudently and sensibly be done in the relevant legal context." According to his terms of reference, Bingham LJ was to enquire into the supervision of BCCI under the Banking Acts and to consider whether the action taken by all the United Kingdom authorities was appropriate and timely. Therefore the Banking Acts formed the relevant legal context in which Freshfields were asked to act for the Bank. So far as the Bank were concerned, what Bingham LJ had to decide was whether or not the steps that they took to supervise BCCI had been appropriate, having regard to their powers and duties under the Banking Acts as they stood at the relevant time. The Bank's evidence to the inquiry was directed to that issue. It may be - the House was not told - that the BIU consulted other professionals, such as bankers, accountants or actuaries, about the presentation of the Bank's evidence. If so, the BIU would have expected them to bring their particular expertise to bear on the evidence and to comment accordingly - alerting the Bank, for instance, to any possible grounds of criticism, or to particularly favourable points which they noticed. Similarly, if - and there is no reason to suppose this happened - the BIU had sought advice from the modern

equivalent of a rhetorician on how to make sure that the Bank's evidence would be presented to the inquiry in a way that made it easily understood and assimilated, it would have expected him to use his rhetorical expertise when making his comments on the drafts.

60. When, however, the BIU consulted the lawyers in Freshfields, and through them counsel, about the presentation of their evidence to the inquiry, it was not seeking their comments and assistance as bankers, accountants, rhetoricians or anything else: it was seeking their comments and assistance as lawyers professing expertise in the field. Either expressly or impliedly, the BIU was asking them to put on legal spectacles when reading, considering and commenting on the drafts. In other words it was asking them to consider, as lawyers, how the Bank's evidence could be most effectively presented to Bingham LJ, given that he was inquiring into the Bank's discharge of their legal responsibilities under the Banking Acts. Such advice could come in many forms. For instance, the BIU could have expected Freshfields to draw attention to any implications, favourable or otherwise, which a particular line of evidence on one aspect of the Bank's supervisory obligations might have for a different aspect of their responsibilities. Similarly, Freshfields would be in a position to point out matters which should not be laboured in evidence as they would be obvious to a senior judge like Bingham LJ with his ready grasp of the relevant law. Alternatively, they might highlight points that would be worth exploring more fully. Of course, your Lordships do not know which issues actually arose and were considered by the lawyers when reading the Bank's draft evidence - far less what comments Freshfields communicated to the BIU which eventually helped to shape the Bank's "overarching" statement to the inquiry. That does not matter. What matters is that the BIU was instructing the lawyers in Freshfields to carry out a function which necessarily involved the use of their legal skills if it was to be performed properly. The communications between the BIU and Freshfields were therefore concerned with obtaining "legal advice" in the broader sense in which, as Taylor LJ rightly said in *Balabel v Air India*, that term should be understood for this purpose. It follows that legal advice privilege applies to those communications. The appeal must be allowed.

BARONESS HALE OF RICHMOND

My Lords,

61. I agree, for the reasons given by each of you, that this appeal should be allowed. I do sympathise with the Court of Appeal's anxiety to set boundaries to the scope of legal advice privilege. Legal advice privilege restricts the power of a court to compel the production of what would otherwise be relevant evidence. It may thus impede the proper administration of justice in the individual case. This makes the communications covered different from most other types of confidential communication, where the need to encourage candour may be just as great. But the privilege is too well established in the common law for its existence to be doubted now. And there is a clear policy justification for singling out communications between lawyers and their clients from other professional communications. The privilege belongs to the client, but it attaches both to what the client tells his lawyer and to what the lawyer advises his client to do. It is in the interests of the whole community that lawyers give their clients sound advice, accurate as to the law and sensible as to their conduct. The client may not always act upon that advice (which will sometimes place the lawyer in professional difficulty, but that is a separate matter) but there is always a chance that he will. And there is little or no chance of the client taking the right or sensible course if the lawyer's advice is inaccurate or unsound because the lawyer has been given an incomplete or inaccurate picture of the client's position.

62. This rationale extends much more broadly than to advice about legal rights and obligations strictly so-called. I understand that we all endorse the approach of the Court of Appeal in *Balabel v Air India* [1988] Ch 317, and in particular the observation of Taylor LJ at 330, that "legal advice is not confined to telling the client the law; it must include advice as to what should prudently and sensibly be done in the relevant legal context". There will always be

borderline cases in which it is difficult to decide whether there is or is not a 'legal' context. But much will depend upon whether it is one in which it is reasonable for the client to consult the special professional knowledge and skills of a lawyer, so that the lawyer will be able to give the client sound advice as to what he should do, and just as importantly what he should not do, and how to do it. We want people to obey the law, enter into valid and effective transactions, settle their affairs responsibly when they separate or divorce, make wills which will withstand the challenge of the disappointed, and present their best case before all kinds of court, tribunal and inquiry in an honest and responsible manner.

63. Given this rationale, there are particular difficulties in identifying 'the client' to whose communications privilege should attach in the case of a large organisation such as the Bank or a Government Department. As the point does not arise for decision in this case, I agree, for the reasons given by Lord Scott of Foscote, that we should not express any views upon the matter.

### LORD CARSWELL

My Lords,

64. The relatively brief but active trading history of the Bank of Credit and Commerce International SA ("BCCI"), which commenced business in 1972, came to an end on 5 July 1991, when it presented a petition for the appointment of a provisional liquidator. The history of the rise and fall of BCCI has been fully set out in the report of the inquiry held by Bingham LJ and well documented in several judgments, and it is unnecessary to repeat it here. It is sufficient merely to refer for convenience to the summary contained in paragraphs 16 to 26 of the speech of Lord Hope of Craighead in the appeal entitled *Three Rivers District Council and others v Bank of England (No 3)* [2003] 2 AC 1, 240-243.

65. The respondents, who are creditors of BCCI and the liquidators of the company, have brought the present claim against the Bank of England ("the Bank") for misfeasance in public office. The essence of the claim is that the Bank through its officials acted in bad faith in the exercise its statutory responsibilities as a supervisor of BCCI as an institution licensed to accept deposits in the United Kingdom, in that it failed to take decisions that would protect the interests of depositors and potential depositors when it was aware that there was a serious and immediate threat that unless BCCI was rescued by the Abu Dhabi government it would collapse. The action, the hearing of which has now commenced before Tomlinson J, has spawned a mass of satellite litigation which has brought the parties on a number of occasions to the Court of Appeal and to your Lordships' House. The present appeal concerns documents in the control of the Bank, in circumstances to which I shall refer in more detail, and raises fundamental questions concerning the nature and ambit of legal professional privilege. That privilege is commonly classified in modern usage under the two sub-headings of legal advice privilege and litigation privilege (terminology which appears to owe its origin to the submission of counsel in *Re Highgrade Traders Ltd* [1984] BCLC 151, adopted by Oliver LJ at page 161h). The former covers communications passing between lawyer and client for the purpose of seeking and furnishing legal advice, whether or not in the context of litigation. The latter, which is available when legal proceedings are in existence or contemplated, embraces a wider class of communication, such as those passing between the legal adviser and potential witnesses. The relationship between these two classes of privilege formed the subject of much of the argument before the House.

66. The Government reacted quickly to the failure of BCCI, largely due to expressions of concern which had emanated from the financial community about the quality of the Bank's supervision of BCCI under the Banking Acts. On 19 July 1991 it was announced that an independent inquiry would be held into the exercise by the Bank of its statutory duty of supervision of BCCI as a licensed deposit-taker, and on 22 July 1991 Bingham LJ was formally appointed to

conduct the inquiry. His comprehensive report on the affair was submitted in July 1992 to the Chancellor of the Exchequer and the Governor of the Bank.

67. The Bank considered it of great importance to make the most effective response to the Bingham Inquiry. For that purpose the Governor appointed a group of officials who became known as the Bingham Inquiry Unit ("BIU"), with the task of dealing with all communications between the Bank and the Inquiry. Messrs Freshfields and counsel were instructed and over a period of time gave extensive advice and assistance, the nature of which is described in detail in paragraphs 8 and 9 of the judgment of Tomlinson J given on 13 December 2002 in *Three Rivers District Council v Bank of England (No 5)* [2003] QB 1556 and the documents quoted therein. In the process the BIU and Freshfields generated a substantial volume of documents. It may be summarised very baldly as the gathering of the necessary information to enable the solicitors and counsel to advise on the way in which the Bank's case could be presented to the Inquiry, the furnishing of such advice and the preparation and amendment of draft witness statements and submissions to and responses to requests from the Inquiry. It is, however, worth adding to the material quoted by Tomlinson J the contents of paragraph 17 of the second witness statement made by Mr Philip Mark Croall, a partner in Freshfields Bruckhaus Deringer, which gives a useful synopsis of the type of work carried out by the BIU and Freshfields:

> "So as to ensure that the Bank's legal advisers were properly instructed and fully informed to advise and assist the Bank in preparing its evidence and more generally in relation to all its dealings with the Bingham Inquiry, there was a constant flow of factual information from the Bank to its legal advisers, usually channelled through the BIU. The BIU and the Bank's legal advisers effectively operated as a single team, with members of the BIU undertaking, or delegating to others within the Bank, tasks of research or fact-gathering for the purpose of review and/or advice by the Bank's legal advisers. Specific requests for factual matters to be investigated and reported (typically in the form of notes) to the legal team were sometimes made by the legal team itself to the BIU which then initiated work within the Bank. Sometimes such work was carried out by the BIU itself and sometimes by others elsewhere within the Bank commissioned to do so by the BIU. Fact finding and research based exercises were sometimes commissioned by the BIU itself of its own initiative in order to furnish information to the legal advisers. The purpose of carrying out all of this work was to provide information to the Bank's legal advisers to enable them to prepare submissions and/or advise on the nature, presentation and/or content of the Bank's submissions to, evidence for and responses to requests from, the Inquiry."

It was originally intended that witness statements from employees of the Bank and other persons would be furnished to Bingham LJ on behalf of the Bank, but in the event this was not done and the witnesses were called to give evidence to the inquiry without written statements having been supplied in advance. It appears, however, that a substantial volume of communications came into existence in the course of gathering the evidence of witnesses. Moreover, an "overarching" statement of some 258 pages was prepared on behalf of the Bank and furnished to the inquiry, which set out its case and the material evidence in some detail.

68. The inquiry itself amassed a large volume of documentation, which has been given the title of the "Bingham archive". Much of the satellite litigation to which I have referred has been concerned with attempts by the respondents to obtain access to various categories of

documents in order to ascertain if there was material which they could use in support of their case. The phrase "fishing expedition" has been used more than once during the course of the series of proceedings, but it is no less than fair to recall the comment of Tomlinson J at paragraph 72 of his judgment given on 31 May 2002 in relation to the Bingham archive:

> "If the Claimants are to be regarded as fishing, I am bound to say that
> they are fishing in waters which can be regarded as likely to be
> stocked, albeit not exclusively with fish likely to be to their taste."

69. The respondents brought two successive applications for disclosure of documents relating to the BIU. The first, the Court of Appeal decision in which is reported as *Three Rivers District Council v Bank of England (No 5)* [2003] QB 1556, is not directly the subject of this appeal, but an understanding of the issues dealt with in it is essential to consideration of the present proceedings. The second decision of the Court of Appeal, against which this appeal has been brought, is reported under the title of *Three Rivers District Council v Bank of England (No 6)* [2004] QB 916. I shall refer to these proceedings respectively as *Three Rivers (No 5)* and *Three Rivers (No 6)*.

70. In *Three Rivers (No 5)* the claimants, the present respondents, applied pursuant to CPR r 31.19 for disclosure by the Bank of a large number of documents for which the Bank had claimed legal privilege. In his judgment given on 13 December 2002, to which I have referred, Tomlinson J upheld the Bank's claim and refused the declaratory relief sought by the claimants. His reasons for so holding, which appear to me to have considerable force, are set out in paragraph 30 of his judgment, in which he expressed his conclusion:

> "In my judgment an internal confidential document, not being a
> communication with a third party, which was produced or brought
> into existence with the dominant purpose that it or its contents be
> used to obtain legal advice is privileged from production."

The judge stated that the necessary control is supplied by the dominant purpose test, which is applied at the time of creation of the documents. He summarised his conclusion on the dominant purpose test at para 32 of his judgment, where he held that

> " … the Bank has properly identified as the dominant purpose for
> which much of the material was brought into existence by the BIU
> the obtaining or recording of legal advice. More broadly, the Bank
> has established that the material was prepared or commissioned
> pursuant to the retainer between the Bank and the legal advisers as
> part of the necessary exchange of information of which the object
> was the giving of legal advice."

71. The Court of Appeal (Lord Phillips of Worth Matravers MR, Sedley and Longmore LJJ) reversed the judge's decision, accepting the contention advanced by counsel for the claimants that documents prepared by the Bank's employees or ex-employees, whether prepared for submission to or at the direction of Freshfields or not, should be disclosed as being no more than raw material on which the BIU, as the client of Freshfields, would thereafter seek advice. It accordingly held that the Bank was not entitled to privilege in respect of any of the following four categories of documents in issue:

> a. documents prepared by Bank employees, the dominant purpose of
> preparing which was that they should be sent to Freshfields and
> which were in fact so sent;

b. documents of the same class which were not in fact so sent to Freshfields;

c. documents prepared by Bank employees, without the dominant purpose of obtaining legal advice, which were in fact sent to Freshfields;

d. documents in categories a to c which had been prepared by Bank employees who were no longer employed by the Bank.

72. The court accepted that Freshfields' client was the BIU, not the Bank itself or any individual officer, but its conclusions did not turn so much on the identity of the authors of the documents in question as on the more general point that in the court's view legal advice privilege, as distinct from litigation privilege, was restricted to communications between a client and his legal advisers, to documents evidencing such communications, and to documents that were intended to be such communications even if they were not in fact communicated. None of the four categories of documents concerned in the appeal came within that description and accordingly they were not covered by privilege. It rejected the Bank's argument that communications from an employee were so covered, even though it recognised that a corporation can only act through its employees.

73. The court reached a subsidiary but distinct conclusion on a second issue, the dominant purpose of the preparation of the documents, which was set out in paragraph 35 of the judgment of the court, given by Longmore LJ:

> "In the former case of original documentary material supplied to assist in the compilation of the November 1991 statement or April 1992 paper, we think it impossible to say that the dominant purpose of its preparation was the obtaining of legal advice. It is raw material for presentation to the inquiry and the dominant purpose for which it was prepared was so that the Bank could comply with its primary duty of putting all relevant factual material before Bingham LJ."

74. The Bank presented a petition for leave to appeal to your Lordships' House, but on 14 May 2003 the Appeal Committee dismissed the petition. The Bank has disclosed documents to the respondents in accordance with the ruling of the Court of Appeal. The respondents, as they state in their printed case, found that those documents proved to be a "veritable gold-mine of factual information as to what had happened during the years of BCCI's supervision and as to what various Bank officials had really thought."

75. In *Three Rivers (No 5)* Mr Pollock QC, leading counsel for the respondents, made it clear that he did not seek disclosure of any documents passing between Freshfields and the BIU, regarding them on thitherto accepted principle as being covered by legal advice privilege. In the light of the content of the judgment of the Court of Appeal on the second issue in *Three Rivers (No 5)* the respondents mounted a further application - *Three Rivers (No 6)* - seeking disclosure of communications between the BIU and Freshfields in so far as those were seeking or obtaining assistance or advice as to the manner in which the Bank should most appropriately present evidence and material to the inquiry. The essence of the case made by the respondents was that although the Court of Appeal had declared that the Bank was entitled to claim privilege for communications passing between the Bank and its legal advisers for the purpose of obtaining legal advice, the term "legal advice" was limited to advice on the legal rights and obligations of the Bank and, specifically, did not extend to advice and assistance directed towards the better presentation of the Bank's case to the inquiry. Tomlinson J permitted Mr Pollock to withdraw the concession which he had made in *Three Rivers (No 5)* and to present this new argument. He expressed the view that it was implicit in the decision of

the Court of Appeal in *Three Rivers (No 5)* that it did not regard Freshfields' assistance and advice on presentational matters as attracting legal advice privilege. He held accordingly and made a declaration that

> "the only documents or parts of documents in the Bank's control and coming into existence between the closure of BCCI SA on 5 July 1991 and the issue of the present proceedings in May 1993 which the Bank is entitled to withhold from inspection on the ground of legal advice privilege are:
>
> (1) communications passing between the Bank and its legal advisers (including any solicitor seconded to the Bank) for the purpose of seeking or obtaining legal advice (which means, for the avoidance of doubt, advice concerning the Bank's rights and obligations); and
>
> (2) any part of a document which evidences the substance of such a communication."

He ordered that the Bank should serve a further and better list of documents and make them available for inspection.

76. The Court of Appeal (Lord Phillips of Worth Matravers MR, Longmore and Thomas LJJ) dismissed the Bank's appeal. In giving the judgment of the court, the Master of the Rolls commenced by defining legal advice, not as advice given by a lawyer but as "advice in relation to law". He examined in some detail a series of authorities, which I shall consider in due course, and concluded (para 16) that the statements in them lent support to the argument that legal advice is restricted to advice about legal rights and liabilities. He referred (para 25) to the opinion expressed by the Law Reform Committee in its 16th Report on Privilege in Civil Proceedings (1967) (Cmnd 3472), to the effect that the true rationale of legal advice privilege was that it was "a privilege in aid of litigation" and was concerned exclusively with rights and liabilities enforceable in law. He regarded the authorities as supporting that statement, since he considered that in all of them the relationship of solicitor and client arose in relation to transactions involving legal rights and obligations capable of becoming the subject matter of litigation. The court set out in paragraph 26 the conclusion which it drew from this examination:

> "In summary, the authorities to which we have referred show that, where a solicitor-client relationship is formed for the purpose of obtaining advice or assistance in relation to rights and liabilities, broad protection will be given to communications passing between solicitor and client in the course of that relationship. In all the cases, however, the primary object of the relationship was to obtain assistance that required knowledge of the law. We do not consider that the same principle applies to communications between solicitor and client when the dominant purpose is not the obtaining of advice and assistance in relation to legal rights and obligations."

77. The Court of Appeal rejected (para 28) the Bank's argument that since the subject matter of the inquiry was very sensitive and the Bank could be subject to criticism or blame as a result of its findings, the giving of advice and assistance by the solicitors, being designed to protect the Bank against such a possibility, was in the context of a professional relationship that involved advising on legal rights and obligations. It held that the advice and assistance sought was primarily in relation to the presentation of evidence to the inquiry rather than in relation to the Bank's rights and obligations. Nor did the possibility of damage to the Bank's reputation suffice to attract legal advice privilege for the communications in question. Although the role

of the solicitor might have widened in recent times, the extent of legal advice privilege should not be widened to encompass that extension. The court expressed this conclusion in paragraph 37 of its judgment:

> "We do not consider that the facts of this case justify this extension to the law of privilege. The inquiry in this case was a private, non-statutory inquiry. One of the sponsors of that inquiry, albeit a reluctant sponsor, was the Bank itself. The Bank's primary concern was, or should have been, to ascertain whether the collapse of BCCI was attributable to any regulatory shortcomings in this country. We cannot see that in these circumstances communications between the Bank and the solicitors who were assisting in the obtaining, preparation and presentation of evidence and submissions to the inquiry should attract privilege, even if the Bank was anxious that this assistance should enable the Bank's role to be presented in the best possible light."

78. The Master of the Rolls concluded his judgment with remarks in paragraph 39 which caused a degree of concern to the interveners in the appeal before the House, HM Government, the Bar Council and the Law Society:

> "We have found this area of the law not merely difficult but unsatisfactory. The justification for litigation privilege is readily understood. Where, however, litigation is not anticipated it is not easy to see why communications with a solicitor should be privileged. Legal advice privilege attaches to matters such as the conveyance of real property or the drawing up of a will. It is not clear why it should. There would seem little reason to fear that, if privilege were not available in such circumstances, communications between solicitor and client would be inhibited. Nearly fifty years have passed since the Law Reform Committee looked at this area. It is perhaps time for it to receive a further review."

79. Mr Sumption QC presented the case on behalf of the Bank on two main grounds, one broader and one narrower. The essence of the former was that legal advice privilege attaches to the documents in question, as being communications between lawyer and client constituting advice and assistance of a kind which it is part of the proper function of a lawyer to give by virtue of his legal skills. Mr Pollock, upholding the decision of the Court of Appeal, contended that legal advice privilege is an "outgrowth and extension" of litigation privilege, the true root of legal professional privilege, which should be closely confined in extent to advice on legal rights and obligations. It did not cover advice and assistance in the presentation of a client's case before a tribunal such as the Bingham Inquiry, the outcome of which did not have legal consequences for that client. Mr Sumption challenged this last point in advancing his narrower submission, to the effect that the Bingham Inquiry did have considerable potential legal consequences for the Bank, and that even on the definition of legal advice propounded by the Court of Appeal Freshfields' advice to it was covered by legal advice privilege.

80. It is convenient first to consider the narrower submission, which involves looking at the nature of the inquiry and the implications which it held for the Bank. The terms of reference were:

> "To enquire into the supervision of BCCI under the Banking Acts; to consider whether the action taken by all the UK authorities was appropriate and timely; and to make recommendations."

The focus of the inquiry was always going to be a critical examination of the Bank's performance of its supervisory duties under the Banking Acts. It was apparent that some would seek to attach blame to the Bank for failing to take earlier action - the then Prime Minister stated in the House of Commons that the inquiry would "determine where the blame lies" - and that public criticism in the inquiry report of the conduct of some officials was a distinct possibility. Nor could one rule out the possibility that some amendment, which might be unwelcome to the Bank, of its regulatory powers and duties might be recommended. There appears accordingly to be some substance in the suggestion made by Mr Croall in paragraph 8 of his second witness statement that

> "any criticism and consequential damage to its reputation (or to that of any of its senior officials in the Banking Supervision Division) might impair its ability to supervise effectively."

81. Under section 1(4) of the Banking Act 1987 the Bank was immune against ordinary civil liability for failure to perform its duty to supervise deposit takers, but if bad faith were established it would be liable to remedies in private law. Public law remedies could also be obtained against the Bank in respect of its performance of its functions.

82. In these circumstances I consider that the observations made by Tomlinson J were justified, when he stated at paragraph 7 of his judgment in *Three Rivers (No 5)*:

> "Anything that the Bank did and said in relation to the Inquiry was potentially of great legal sensitivity. It was an inquiry one outcome of which could be criticism of the conduct of the Bank from an informed and highly authoritative source, an outcome which would not only be of some importance in relation to the Bank's ongoing regulatory and supervisory role but would itself be likely either to lead to or to encourage the institution or attempted institution of proceeding against the Bank by depositors and others who had lost money in consequence of the collapse of BCCI."

Again, in paragraph 15 of that judgment the judge referred to the "obvious possibility" that litigation might in due course be instituted against the Bank. Bingham LJ also appears to have envisaged the same possibility when he referred in his covering letter of July 1992 to the Chancellor of the Exchequer and the Governor of the Bank to "any forthcoming litigation".

83. Counsel for the Bank did not seek to argue that this possibility was sufficient to make the case one of litigation privilege. For that head of privilege to apply litigation must be reasonably in prospect: see Matthews & Malek, *Disclosure*, 2nd ed (2001) para 9.034 and authorities cited there. He did contend, however, that the prospect of litigation, added to that of criticism and blame and the possibility of amendment of the regulatory regime, meant that the advice and assistance given by Freshfields concerned the Bank's legal rights and obligations. If, contrary to his submission, the Court of Appeal was correct in its definition of legal advice for which privilege can be claimed, the advice and assistance given fell within that definition on a correct view of the facts of the case. The Court of Appeal was not correct in stating at paragraph 28 of the judgment of the court that the matter was concluded by the judge's finding in paragraph 8 of his judgment, for that was to disregard what he stated in paragraphs 7 and 15 which I have quoted.

84. In my opinion there is substantial force in the appellant's argument. Even if the definition of legal advice adopted by the Court of Appeal is to be regarded as correct, the circumstances in which the Bank sought advice and assistance from Freshfields were such that much of the focus was on the legal rights and obligations of the Bank. There may be room for argument, however, on the question whether that was the dominant purpose of the Bank in seeking that

advice and assistance, but I do not propose to attempt to resolve that issue or to determine the appeal on this ground alone. I think that it is of some importance for the House to take the opportunity to examine more generally the basis of legal advice privilege and the correctness of the major thesis of the Court of Appeal in its judgment in this case.

85. The object of litigation privilege was described in the classic statement of Jessel MR in *Anderson v Bank of British Columbia* (1876) 2 Ch D 644 at 649:

> "The object and meaning of the rule is this: that as, by reason of the complexity and difficulty of our law, litigation can only be properly conducted by professional men, it is absolutely necessary that a man, in order to prosecute his rights or to defend himself from an improper claim, should have recourse to the assistance of professional lawyers, and it being so absolutely necessary, it is equally necessary, to use a vulgar phrase, that he should be able to make a clean breast of it to the gentleman whom he consults with a view to the prosecution of his claim, or the substantiating his defence against the claim of others; that he should be able to place unrestricted and unbounded confidence in the professional agent, and that the communications he so makes to him should be kept secret, unless with his consent (for it is his privilege, and not the privilege of the confidential agent), that he should be enabled properly to conduct his litigation. That is the meaning of the rule."

86. Determining the bounds of privilege involves finding the proper point of balance between two opposing imperatives, making the maximum relevant material available to the court of trial and avoiding unfairness to individuals by revealing confidential communications between their lawyers and themselves. The practice which has developed is a reconciliation between these principles: *Seabrook v British Transport Commission* [1959] 1 WLR 509 at 513, per Havers J. There is a considerable public interest in each of these. The importance of keeping to a minimum the withholding of relevant material from the court, upon which Mr Pollock laid emphasis, is self-evident. It was stressed by Wigmore (*Evidence*, vol 8, para 2291 McNaughton rev. 1961), who expressed the opinion that the privilege should be strictly confined within the narrowest possible limits consistent with the logic of its principle, an approach echoed in the speech of Lord Edmund-Davies in *Waugh v British Railways Board* [1980] AC 521 at 543. The competing principle of legal professional privilege is also rooted in public policy: cf *B v Auckland District Law Society* [2003] 2 AC 736, paras 46-7. It is not based upon the maintenance of confidentiality, although in earlier case-law that was given as its foundation. If that were the only reason behind the principle the same privilege would be extended to such confidants as priests and doctors, whereas it has been settled in a line of authority stemming from the *Duchess of Kingston's Case* (1776) 1 East PC 469 that it is confined to legal advisers: see, eg, Cross & Tapper on Evidence, 9th ed, pp 461-5.

87. It is stated in Cross & Tapper, *op cit*, p 439 that in England the rule was traditionally regarded as a rule of evidence, but the learned editor points out that in some Commonwealth jurisdictions

> "The privilege was elevated into something more nearly resembling a basic constitutional principle, expressed in the rhetoric of rights."

That development has been mirrored in this jurisdiction. In *R v Derby Magistrates' Court, ex parte B* [1996] AC 487 Lord Taylor of Gosforth CJ, with whose reasons the other members of the House agreed, stated at page 509, after reviewing the authorities:

> "The principle which runs through all these cases, and the many other
> cases which were cited, is that a man must be able to consult his
> lawyer in confidence, since otherwise he might hold back half the
> truth. The client must be sure that what he tells his lawyer will never
> be revealed without his consent. Legal professional privilege is thus
> much more than an ordinary rule of evidence, limited in its
> application to the facts of a particular case. It is a fundamental
> condition on which the administration of justice as a whole rests."

Lord Hoffmann expressed himself similarly, again with the concurrence of the other members
of the House, in *R (Morgan Grenfell & Co Ltd) v Special Commissioner of Income Tax* [2003]
1 AC 563, when he described legal professional privilege in paragraph 7 as "a fundamental
human right long established in the common law." In paragraph 31 he referred with approval
to the judgments of the New Zealand Court of Appeal in *IRC v West-Walker* [1954] NZLR
191, where the privilege was described as not merely a rule of evidence but a substantive right
founded on an important public policy.

88.  The approach of the Court of Appeal to ascertaining the ambit of legal advice which will
     attract privilege was conditioned by its acceptance of Mr Pollock's proposition to which I have
     referred, that legal professional privilege is an outgrowth and extension of litigation privilege.
     The Master of the Rolls stated at paragraph 25 of the judgment of the court:

> "All of the cases to which we have thus far referred were ones in
> which the relationship of client and solicitor arose in relation to
> transactions involving legal rights and obligations capable of
> becoming the subject matter of litigation."

One must therefore commence consideration of this part of the case by examining the validity
of the proposition. One has to ask the question, does legal professional privilege stem from
litigation, as the Court of Appeal held, in which event any extension of it outside that sphere
requires to be carefully limited? Or is it, as the appellant contended, a more general privilege
based on the relationship of lawyer and client and so extending to a wider area of advice and
assistance given by legal advisers to their clients? Subsidiary arguments were developed about
the need for certainty and the inconvenience which would ensue if the ruling given by the
Court of Appeal were generally applied. But if answers are found to these questions which
embody proper principles and are consistent with established lines of authority, that will, I
think, take one a good distance towards conclusions which will settle the issues debated in this
part of the case under appeal.

89.  I propose to commence that search by examining the authorities. The arguments on the issue
     of principle depend to a large extent on one's starting point, which is determined by the
     answers to the questions which I have posed. There is no *a priori* reason why legal
     professional privilege should be regarded as stemming from litigation rather than more
     generally from the giving of legal advice, or vice versa, and therefore it is of assistance to
     attempt to ascertain the direction which the law has taken on this topic.

90.  Both the appellant and the respondents claimed that the decided cases supported their
     respective interpretations of the law, so it is necessary to consider them in some detail. The
     early history of legal privilege is set out in the speech of Lord Taylor of Gosforth CJ in *R v
     Derby Magistrates, ex parte B* [1996] AC 487 at 507 *et seq*, where he traces it back to the
     earliest instances, to be found in 16th century reports, and follows it through a number of cases
     in the 18th and 19th centuries. For present purposes it is sufficient to commence with the case
     of *Greenough v Gaskell* 1 My & K 98, decided by Lord Brougham LC in 1833. The defendant
     in the suit, a solicitor, objected to being required to produce book entries, memoranda, letters
     and other papers generated over a period in the course of furnishing professional legal advice

to his client, to whom money was advanced out of a fund in court in an administration suit. In his judgment Lord Brougham LC set out his conclusions on the claim to privilege in a passage at pages 101-3 which is worth quoting at length, since it is the *fons et origo* of the modern law:

> "Here the question relates to the solicitor, who is called upon to produce the entries he had made in accounts, and letters received by him, and those written (chiefly to his town agent) by him, or by his direction, in his character or situation of confidential solicitor to the party; and I am of opinion that he cannot be compelled to disclose papers delivered, or communications made to him, or letters, or entries made by him in that capacity. To compel a party himself to answer upon oath, even as to his belief or his thoughts, is one thing; nay, to compel him to disclose what he has written or spoken to others, not being his professional advisers, is competent to the party seeking the discovery; for such communications are not necessary to the conduct of judicial business, and the defence or prosecution of men's rights by the aid of skilful persons. To force from the party himself the production of communications made by him to professional men seems inconsistent with the possibility of an ignorant man safely resorting to professional advice, and can only be justified if the authority of decided cases warrants it. But no authority sanctions the much wider violation of professional confidence, and in circumstances wholly different, which would be involved in compelling counsel or attorneys or solicitors to disclose matters committed to them in their professional capacity, and which, but for their employment as professional men, they would not have become possessed of.
>
> As regards them, it does not appear that the protection is qualified by any reference to proceedings pending or in contemplation. If touching matters that come within the ordinary scope of professional employment, they receive a communication in their professional capacity, either from a client, or on his account, and for his benefit in the transaction of his business, or, which amounts to the same thing, if they commit to paper, in the course of their employment on his behalf, matters which they know only through their professional relation to the client, they are not only justified in withholding such matters, but bound to withhold them, and will not be compelled to disclose the information or produce the papers in any Court of law or equity, either as party or as witness. If this protection were confined to cases where proceedings had commenced, the rule would exclude the most confidential, and it may be the most important of all communications - those made with a view of being prepared either for instituting or defending a suit, up to the instant that the process of the Court issued.
>
> If it were confined to proceedings begun or in contemplation, then every communication would be unprotected which a party makes with a view to his general defence against attacks which he apprehends, although at the time no one may have resolved to assail him. But were it allowed to extend over such communications, the protection would be insufficient, if it only included communications more or less connected with judicial proceedings; for a person oftentimes requires the aid of professional advice upon the subject of

his rights and his liabilities, with no references to any particular litigation, and without any other reference to litigation generally than all human affairs have, in so far as every transaction may, by possibility, become the subject of judicial inquiry. 'It would be most mischievous,' said the learned Judges in the Common Pleas, 'if it could be doubted whether or not an attorney, consulted upon a man's title to an estate, was at liberty to divulge a flaw' (2 Brod. & Bingh. 6).

The foundation of this rule is not difficult to discover. It is not (as has sometimes been said) on account of any particular importance which the law attributes to the business of legal professors, or any particular disposition to afford them protection, though certainly it may not be very easy to discover why a like privilege has been refused to others, and especially to medical advisers.

But it is out of regard to the interests of justice, which cannot be upholden, and to the administration of justice, which cannot go on, without the aid of men skilled in jurisprudence, in the practice of the Courts, and in those matters affecting rights and obligations which form the subject of all judicial proceedings. If the privilege did not exist at all, every one would be thrown upon his own legal resources; deprived of all professional assistance, a man would not venture to consult any skilful person, or would only dare to tell his counsellor half his case. If the privilege were confined to communications connected with suits begun, or intended, or expected, or apprehended, no one could safely adopt such precautions as might eventually render any proceedings successful, or all proceedings superfluous."

91. Statements to the same effect concerning advice given in relation to legal proceedings may be found in such cases as *Bolton v Liverpool Corporation* (1833) 1 My & K 88 at 94-5, per Lord Brougham LC and *Holmes v Baddeley* (1844) 1 Ph 476 at 480-1, per Lord Lyndhurst LC. In *Herring v Clobery* (1842) 1 Ph 91 Lord Lyndhurst L C followed the rule laid down in *Greenough v Gaskell* in preference to a narrower rule confined to litigation, in progress or anticipated, which had been propounded by Lord Tenterden CJ at nisi prius. He stated at pages 94-5:

"But further, I think that restriction of the rule is not consistent with, and not founded on, any sound principle; for it may, and in a great variety of cases would, be of as much importance to parties that the communications made between a client and a solicitor with respect to the state of the client's property, with respect to his liabilities, with respect to his title, should be protected, as that protection should be afforded to communications made in the progress of a cause; and it appears to me that, as individuals must from time to time resort to their legal advisers for guidance in their ordinary transactions, public policy requires that communications of that kind should be privileged and protected, in order that they may be free and unfettered."

Lord Lyndhurst gave a similar ruling in *Carpmael v Powis* (1846) 1 Ph 687, where he held the privilege to exist in respect of communications relating to the fixing of a reserved bidding on a sale of land. He said at page 692:

"I am of opinion that the privilege extends to all communications between a solicitor, as such, and his client, relating to matters within

the ordinary scope of a solicitor's duty."

Lord Lyndhurst declined to confine it to the lawyer's work *stricto sensu* of drawing the agreements, investigating the title and preparing the conveyance. The work done was all part of one transaction of the nature in which solicitors are ordinarily employed. Knight Bruce V-C gave a decision to the same effect in *Pearse v Pearse* (1846) 1 De G & Sm 12, where the communications related to transactions concerning the client's lands and were unconnected with any existing or anticipated litigation.

92. Notwithstanding the clarity of the expressions of opinion which I have cited, there remained for some time some differences of view and some contrary statements in the case-law. The differences were authoritatively resolved by a judgment given by Lord Selborne LC in the Court of Appeal in Chancery in *Minet v Morgan* (1873) 8 Ch App 361, in which he said that the law had not at once reached a broad and reasonable footing, but reached it by successive steps. He affirmed in very positive terms the propositions set out in the judgments to which I have referred, quoting with approval the statement of Kindersley V-C in *Lawrence v Campbell* (1859) 4 Drew 485 at 490, in which he said that it was now sufficient for privilege if communications passed as professional communications in a professional capacity, even though they were not made either during or relating to an actual or even to an expected litigation. Similarly, the operation of the rule was described in unqualified terms in the Privy Council by the Earl of Halsbury LC, when he said in *Bullivant v Attorney-General for Victoria* [1901] AC 196 at 200 that

> "for the perfect administration of justice, and for the protection of the confidence which exists between a solicitor and his client, it has been established as a principle of public policy that those confidential communications shall not be subject to production."

93. In modern law authoritative statements support this view of the law. In *R v Derby Magistrates, ex parte B* [1996] AC 487 at 510 Lord Nicholls of Birkenhead said:

> "The law has been established for at least 150 years, since the time of Lord Brougham LC in 1833 in *Greenough v Gaskell* 1 M & K 98: subject to recognised exceptions, communications seeking professional legal advice, whether or not in connection with pending court proceedings, are absolutely and permanently privileged from disclosure even though, in consequence, the communications will not be available in court proceedings in which they might be important evidence."

Lord Jauncey of Tullichettle expressed himself similarly in *Re L (a minor)* [1997] AC 16, when he said at page 25 that in the case of communications between solicitor and client "the privilege attaches to all communications whether related to litigation or not."

94. It is relevant also to inquire, since this doctrine is a judge-made development, what view other common law jurisdictions have taken of the nature of legal professional privilege. One finds a similar approach in Australia and Canada. In *Baker v Campbell* (1983) 153 CLR 52 in the High Court of Australia Wilson J stated at page 94 that the privilege is not limited to a rule of evidence confined to judicial and quasi-judicial proceedings. This statement was followed in *Esso Australia Resources Ltd v Commissioner of Taxation* (1999) 201 CLR 49, para 35, per Gleeson CJ and in *Daniels International Corporation Pty Ltd v Australian Competition and Consumer Commission*, (2002) 192 ALR 561, para 44, per McHugh J, and para 85, per Kirby J. In *Descoteaux v Mierzwinski* (1982) 141 DLR (3d) 590 in the Supreme Court of Canada Lamer J, giving the judgment of the court, defined at pages 604-5 the substantive rule of privilege, as distinct from the evidentiary rule applying in court proceedings, in terms which

were clearly meant to encompass any circumstances in which a client consults a solicitor, irrespective of any existing or anticipated litigation.

95. A statement of the rationale of legal privilege which is consistent with the approach in the cases which I have cited may be found in the European case-law in the opinion of Mr Advocate-General Sir Gordon Slynn in *Case 155/79 A M & S Europe Ltd v Commission* [1983] QB 878, 913:

> "Whether it is described as the right of the client or the duty of the lawyer, this principle has nothing to do with the protection or privilege of the lawyer. It springs essentially from the basic need of a man in a civilised society to be able to turn to his lawyer for advice and help, and if proceedings begin, for representation; it springs no less from the advantages to a society which evolves complex law reaching into all the business affairs of persons, real and legal, that they should be able to know what they can do under the law, what is forbidden, where they must tread circumspectly, where they run risks."

96. The branch of legal professional privilege which is classified under the name of litigation privilege had a later origin in three cases decided in the later part of the 19th century, which were discussed in detail by the Court of Appeal in *Three Rivers (No 5).* The first was *Anderson v Bank of British Columbia* (1876) 2 Ch D 644, to which I have already referred briefly. The management of the defendant bank, whose headquarters were in London, apprehended litigation concerning the conduct of an account in a branch in Portland, Oregon. The London manager accordingly cabled the branch manager in Portland, requesting "fullest particulars" of the transactions in question. The latter duly sent details by letter, which was discussed with the Bank's solicitor at a meeting of the board of directors in London. In the ensuing litigation privilege was claimed for the letter, but refused by Jessel MR and the Court of Appeal. As Bingham LJ observed in *Ventouris v Mountain* [1991] 1 WLR 607 at 612, on modern principles the Oregon manager's letter would be regarded as privileged as a letter written for the purpose of laying before a solicitor in order to obtain legal advice. The importance of the case, however, lies not in the conclusion reached but in the statements of the law propounded by the judges who heard the case.

97. Jessel MR defined the extent of the rule at pages 649-50:

> "Now, as to the extent of the rule. It goes not merely to a communication made to the professional agent himself by the client directly, it goes to all communications made by the client to the solicitor through intermediate agents, and he is not bound to write letters through the post, or to go himself personally to see the solicitor; he may employ a third person to write the letter, or he may send the letters through a messenger, or he may give a verbal message to a messenger, and ask him to deliver it to the solicitor, with a view to his prosecuting his claim, or of substantiating his defence.
>
> Again, the solicitor's acts must be protected for the use of the client. The solicitor requires further information, and says, I will obtain it from a third person. That is confidential. It is obtained by him as solicitor for the purpose of the litigation, and it must be protected upon the same ground, otherwise it would be dangerous, if not impossible, to employ a solicitor. You cannot ask him what the information he obtained was. It may be information simply for the purpose of knowing whether he ought to defend or prosecute the

action, but it may be also obtained in the shape of collecting evidence for the purpose of such prosecution or defence. All that, therefore, is privileged."

In the Court of Appeal James LJ described the principle shortly at page 656 as being

"that as you have no right to see your adversary's brief, you have no right to see that which comes into existence merely as the materials for the brief."

Mellish LJ at page 658 said:

"To be privileged it must come within one of two classes of privilege, namely, that a man is not bound to disclose confidential communications made between him and his solicitor, directly, or through an agent who is to communicate them to the solicitor; or, secondly, that he is not bound to communicate evidence which he has obtained for the purpose of litigation."

98. In the second case of this trilogy, *Southwark and Vauxhall Water Co v Quick* (1878) 3 QBD 315, documents prepared with the intention of laying them before the plaintiff company's solicitor in order to obtain his advice were held to be privileged. I need not to go into the facts of the case, which I cite only for the statement of law by Brett LJ at page 320, which he deduced from the judgments in *Anderson v Bank of British Columbia*:

" … it is clear that if a party seeks to inspect a document which comes into existence merely as the materials for the brief, or that which is equivalent to the brief, then the document cannot be seen, for it is privileged. It has been urged that the materials, or the information obtained for the brief, should have been obtained 'at the instance' or 'at the request' of the solicitor; but I think it is enough if they come into existence merely as the materials for the brief, and I think that phrase may be enlarged into 'merely for the purpose of being laid before the solicitor for his advice or for his consideration'".

99. In the third case, *Wheeler v Le Marchant* (1881) 17 Ch D 675 the defendants sought privilege for reports obtained by their solicitors from estate agents/surveyors in the course of previous administration proceedings unconnected with the instant action brought by the plaintiff for specific performance of an agreement. The Court of Appeal, reversing the order of Bacon V-C, held that the documents were not privileged. Jessel MR at pages 680-1 discussed the limits of the privilege granted to documents obtained by a solicitor from third parties for the purposes of existing or anticipated litigation:

"What they contended for was that documents communicated to the solicitors of the Defendants by third parties, though not communicated by such third parties as agents of the clients seeking advice, should be protected, because those documents contained information required or asked for by the solicitors, for the purpose of enabling them the better to advise the clients. The cases, no doubt, establish that such documents are protected where they have come into existence after litigation commenced or in contemplation, and when they have been made with a view to such litigation, either for the purpose of obtaining advice as to such litigation, or of obtaining evidence to be used in such litigation, or of obtaining information which might lead to the obtaining of such evidence, but it has never

hitherto been decided that documents are protected merely because
they are produced by a third person in answer to an inquiry made by
the solicitor."

At page 682 he described the rule as being "established and maintained solely for the purpose
of enabling a man to obtain legal advice with safety." Brett and Cotton LJJ expressed the rule
in similar terms, Cotton LJ stating at pages 684-5:

> "Hitherto such communications have only been protected when they
> have been in contemplation of some litigation, or for the purpose of
> giving advice or obtaining evidence with reference to it. And that is
> reasonable, because then the solicitor is preparing for the defence or
> for bringing the action, and all communications he makes for that
> purpose, and the communications made to him for the purpose of
> giving him the information, are, in fact, the brief in the action, and
> ought to be protected. But here we are asked to extend the principle to
> a very different class of cases, and it is not necessary, in order to
> enable persons freely to communicate with their solicitors and obtain
> their legal advice, that any privilege should be extended to
> communications such as these."

100. The limits of this litigation privilege were defined by your Lordships' House in relatively
recent times in *Waugh v British Railways Board* [1980] AC 521. The appeal concerned a
report made very shortly after a railway accident, based on a joint internal enquiry conducted
by the board's personnel. The report was prepared, in Lord Wilberforce's words,

> "for a dual purpose: for what may be called railway operation and
> safety purposes and for the purpose of obtaining legal advice in
> anticipation of litigation."

The House rejected the claim for privilege, holding that it extended to such documents only if
the latter purpose was the dominant one. It was made clear in the speeches given by their
Lordships that the context was purely that of what is now termed litigation privilege, not legal
advice privilege. So Lord Edmund-Davies said at page 542 that litigation, apprehended or
actual, was the hallmark of this privilege, and that preparation with a view to litigation was the
essential purpose which protects a communication from disclosure in such cases.

101. An exception to the availability of litigation privilege appears in the decision of your
Lordships' House in *Re L (a minor)* [1997] AC 16. The majority held that a party could not
rely upon it in proceedings which were not adversarial. The jurisdiction concerned in that case
was care proceedings under Part IV of the Children Act 1989. Such proceedings, as Lord
Jauncey of Tullichettle stated at page 27,

> "are so far removed from normal actions that litigation privilege has
> no place in relation to reports obtained by a party thereto which could
> not have been prepared without the leave of the court to disclose
> documents already filed or to examine the child."

102. The conclusion to be drawn from the trilogy of 19th century cases to which I have referred and
the qualifications expressed in the modern case-law is that communications between parties or
their solicitors and third parties for the purpose of obtaining information or advice in
connection with existing or contemplated litigation are privileged, but only when the following
conditions are satisfied:

> (a) litigation must be in progress or in contemplation;

> (b) the communications must have been made for the sole or dominant purpose of conducting that litigation;

> (c) the litigation must be adversarial, not investigative or inquisitorial.

103. Mr Sumption relied on the cases which I have cited as a foundation for his submission that no fundamental distinction should be drawn between communications in connection with litigation and others. He submitted that Lord Nicholls of Birkenhead was correct in his statement in *Re L (a minor)* [1997] AC 16 at 33 when he described the two sub-headings of legal advice privilege and litigation privilege as integral parts of a single privilege. The only area in which the distinction became relevant was that of third party communications. Mr Pollock quoted, however, a passage to the opposite effect from the 16th Report of the Law Reform Committee, produced in 1967. In discussing what in present terminology is legal advice privilege, the Committee stated at paragraph 18:

> "This privilege, which is generally referred to as legal professional privilege, extends to all communications between the client or his agents and the client's legal advisers made for the purpose of obtaining legal advice other than communications made for the purpose of obtaining advice to enable the client to commit a crime or a fraud. It differs from the other two kinds of privilege in aid of litigation in that it is not necessary to show that, at the time the advice was sought, any litigation was contemplated by the client in respect of the subject-matter of the advice. For this reason, the privilege might also be classified as a privilege in protection of a confidential relationship. Nevertheless, we think that its true rationale is as a privilege in aid of litigation."

It went on to say in paragraph 19, in a passage relied upon by the Court of Appeal in paragraph 25 of its judgment in the present appeal:

> "What distinguishes legal advice from other kinds of professional advice is that it is concerned exclusively with rights and liabilities enforceable in law, i.e. in the ultimate resort by litigation in the courts or in some administrative tribunal. It is, of course, true that on many matters on which a client consults his solicitor he does not expect litigation and certainly hopes that it will not occur; but there would be no need for him to consult his solicitor to obtain *legal* advice unless there were *some* risk of litigation in the future in connection with the matter upon which advice is sought. As Lord Brougham pointed out, it is to minimise that risk by ensuring that he so conducts his affairs as to make it reasonably certain that he would succeed in any litigation which might be brought in connection with them, that the client consults his solicitor at all."

104. In so stating the Committee does not appear to have meant merely that the operation of legal professional privilege is restricted to occasions when a party wishes to resist production of documents in litigation in a court of law, for it is apparent from cases such as *Parry-Jones v The Law Society* [1969] 1 Ch 1 and *R (on the application of Morgan Grenfell & Co Ltd) v Special Commissioner of Income Tax* [2003] 1 AC 563 that it may operate in other situations. The approach of the Committee may owe something to the reasoning of the Court of Appeal in *Parry-Jones v The Law Society,* to which it bears some similarity. In their judgments in that case Lord Denning MR and Diplock LJ (who was a member of the Law Reform Committee) confined the definition of legal professional privilege to the principle whereby a party can resist production of documents in a court of law. They classified what is now termed legal

advice privilege as a confidence which is created by an implied term in the contract between solicitor and client. This restriction of the ambit of legal professional privilege was, however, rejected by Lord Hoffmann, with whom the other members of the House agreed, in the *Morgan Grenfell* case, when he said at paragraph 30:

> "It is not the case that LPP does no more than entitle the client to require his lawyer to withhold privileged documents in judicial or quasi-judicial proceedings, leaving the question of whether he may disclose them on other occasions to the implied duty of confidence. The policy of LPP requires that the client should be secure in the knowledge that protected documents and information will not be disclosed at all."

With all respect to the eminence of the jurists who comprised the membership of the Law Reform Committee, accordingly, I think that paragraph 18 of its Report would require to be rephrased in the light of modern case-law and the correctness of the statements in paragraph 19 requires consideration.

105. Mr Sumption submitted, in my opinion correctly, that the cases establish that, so far from legal advice privilege being an outgrowth and extension of litigation privilege, legal professional privilege is a single integral privilege, whose sub-heads are legal advice privilege and litigation privilege, and that it is litigation privilege which is restricted to proceedings in a court of law in the manner which the authorities show. The conclusions which the Court of Appeal sought in paragraph 25 of its judgment to draw from the authorities cited by it do not appear to me to be well founded.

106. The Court of Appeal also expressed some doubts in paragraph 39 of its judgment about the justification for legal advice privilege. The Law Society at paragraph 18 of its helpful written case stated:

> "In the course of giving instructions to draw a will, confidential information may be given about matrimonial or financial difficulties; about anticipated inheritance; about the parentage or adoption of children; about the perceived unsuitability of a former spouse to act as guardian; about the physical or mental health of the testator or spouse or other family member; about pensions, or businesses, or other assets. If a testator is to be free to supply the frank and full information necessary for the drafting of a will, he must be sure that what he says will remain confidential even though litigation is not 'anticipated'".

In relation to family matters it stated at note 36:

> "Family lawyers similarly receive a great deal of sensitive information, not only about businesses and assets, but also about family behaviour. Particularly while taking initial instructions, when litigation may well not be 'anticipated', this information can be very wide. To learn that some or all of this information might not be privileged would not only worry clients but also might lead to a failure to disclose."

One can add to these observations the experience of lawyers who have advised on taxation matters. This applies in particular to inheritance tax planning, where the focus is on the disposition of assets and litigation is not in prospect. It is essential that the legal adviser has a complete picture of financial matters, some of which may be highly confidential, especially

when dealing with family businesses. Many clients seeking such advice would be very dismayed to think that the information they have made available to their lawyers might not remain confidential. In my view there is substantial force in the Law Society's submissions, and a well founded case has been made out for the retention of legal advice privilege in its present form

107. Mr Sumption then relied on the proposition which I have accepted concerning the basis of legal professional privilege as a foundation for his argument on the main issue to be decided, which is the ambit of the term "legal advice" in legal advice privilege. His contention was that the content of legal advice qualifying for the protection of privilege was the same in respect of both legal advice privilege and litigation privilege and that the creation of a special head for litigation privilege would conflict both with principle and with the authorities.

108. Some statements about the ambit of the privilege may be garnered from the earlier authorities. In the passage which I have quoted from *Greenough v Gaskell* (1833) 1 My & K 98 Lord Brougham LC referred at page 102 to "matters that come within the ordinary scope of professional employment" and in *Carpmael v Powis* (1846) 1 Ph 687 at 692 Lord Lyndhurst LC used the same phrase and defined it further as "a transaction in which solicitors are ordinarily employed by their client". In *Herring v Clobery* (1842) 1 Ph 91 Lord Lyndhurst referred at page 96 to "professional business", while in *Pearse v Pearse* (1846) 1 De G & Sm 12 at 26 Knight Bruce V-C uses the phrase "communications made in confidence professionally".

109. The ambit of the privilege was examined in more depth in the Court of Appeal and your Lordships' House in *Minter v Priest* [1929] 1 KB 655; [1930] AC 558. One of the issues was whether conversations between a solicitor and his client relating to the business of obtaining a loan for the deposit on the purchase of real estate were privileged from disclosure. The Court of Appeal held that they were privileged. In the course of his judgment Lawrence LJ referred at pages 675 and 678 to "the ordinary scope" of a solicitor's business or duties, while Greer LJ at page 684 used the phrase "ordinary scope of a solicitor's employment". This House allowed the plaintiff's appeal, on the ground that the defendant was not acting as a solicitor at the relevant time because he was not undertaking the duty of a solicitor on the proposal made to him but had made a proposal involving "a malicious scheme" (per Lord Buckmaster at p 569) to keep the plaintiff out of the transaction, with a view to making a profit from it himself. The House defined the ambit of the privilege, however, in essentially the same terms as the Court of Appeal. Lord Buckmaster referred at page 568 to "the ordinary scope of a solicitor's business". Lord Atkin at page 580 spoke of professional communications for the purpose of getting legal advice, but his explanation at page 581 of what is covered by legal advice appears wider than that adopted by the Court of Appeal in the present case:

> "If therefore the phrase is expanded to professional communications passing for the purpose of getting or giving professional advice, and it is understood that the profession is the legal profession, the nature of the protection is I think correctly defined."

At pages 584-5 he was more specific, expressing the opinion that:

> "If a person goes to a professional legal adviser for the purpose of seeing whether the professional person will give him professional advice, communications made for the purpose of indicating the advice required will be protected. And included in such communications will be those made on occasions such as the present where the parties go to a solicitor for the purpose of seeing whether he will either himself advance or procure some third person to advance a sum of money to carry out the purchase of real property.

Such business is professional business, and communications made for its purpose appear to me to be covered by the protection, whether the solicitor eventually accedes to the request or not."

110. Other decided cases are reviewed by Taylor LJ in *Balabel v Air India* [1988] Ch 317, but it is always necessary to take account of the context in which such statements were made, for the ambit of legal advice may not have been in issue.

111. The issue in *Balabel v Air India* was whether the plaintiffs, who had sued the defendant airline for specific performance of an agreement for an underlease, could obtain discovery of various documents generated by the airline and its solicitors relating to the proposed underlease. After examining the authorities in detail, Taylor LJ said at page 330:

> "Although originally confined to advice regarding litigation, the privilege was extended to non-litigious business. Nevertheless, despite that extension, the purpose and scope of the privilege is still to enable legal advice to be sought and given in confidence. In my judgment, therefore, the test is whether the communication or other document was made confidentially for the purposes of legal advice. Those purposes have to be construed broadly. Privilege obviously attaches to a document conveying legal advice from solicitor to client and to a specific request from the client for such advice. But it does not follow that all other communications between them lack privilege. In most solicitor and client relationships, especially where a transaction involves protracted dealings, advice may be required or appropriate on matters great or small at various stages. There will be a continuum of communication and meetings between the solicitor and client. … Where information is passed by the solicitor or client to the other as part of the continuum aimed at keeping both informed so that advice may be sought and given as required, privilege will attach. A letter from the client containing information may end with such words as 'please advise me what I should do'. But, even if it does not, there will usually be implied in the relationship an overall expectation that the solicitor will at each stage, whether asked specifically or not, tender appropriate advice. Moreover, legal advice is not confined to telling the client the law; it must include advice as to what should prudently and sensibly be done in the relevant legal context."

In a later passage at pages 331-2 relied upon by the Court of Appeal as support for its conclusions Taylor LJ stated:

> "It follows from this analysis that those dicta in the decided cases which appear to extend privilege without limit to all solicitor and client communications upon matters within the ordinary business of a solicitor and referable to that relationship are too wide. It may be that the broad terms used in the earlier cases reflect the restricted range of solicitors' activities at the time. Their role then would have been confined for the most part to that of lawyer and would not have extended to business adviser or man of affairs. To speak therefore of matters 'within the ordinary business of a solicitor' would in practice usually have meant the giving of advice and assistance of a specifically legal nature. But the range of assistance given by solicitors to their clients and of activities carried out on their behalf has greatly broadened in recent times and is still developing. Hence

the need to re-examine the scope of legal professional privilege and keep it within justifiable bounds."

I agree with the view expressed by Colman J in *Nederlandse Reassurantie Groep Holding NV v Bacon & Woodrow Holding* [1995] 1 All ER 976 at 982 that the statement of the law in *Balabel v Air India* does not disturb or modify the principle affirmed in *Minter v Priest*, that all communications between a solicitor and his client relating to a transaction in which the solicitor has been instructed for the purpose of obtaining legal advice will be privileged, notwithstanding that they do not contain advice on matters of law or construction, provided that they are directly related to the performance by the solicitor of his professional duty as legal adviser of his client.

112. There must, as Taylor LJ said, be limits to the scope of privilege, but in my opinion the Court of Appeal has set them too tightly in concluding that it is confined to advice relating to the legal rights and obligations of the client. It has, I think, been too restrictive in its view, perhaps because of the doubts expressed by the Master of the Rolls about the justification for legal advice privilege. It is of course important not to permit a party to withhold production of information which may be of significant importance when the court is reaching its decision. As Bingham LJ put it in *Ventouris v Mountain* [1991] 1 WLR 607 at 612:

> " … disclosure being generally regarded as beneficial, any exception has to be justified as serving the public interest which gives rise to the exception."

In this connection it is worth quoting the remarks of Knight Bruce V-C in *Pearse v Pearse* (1846) 1 De G & Sm 12 at 28-9, which, expressed in the style of the times, seem to me to retain considerable validity:

> "The discovery and vindication and establishment of truth are main purposes certainly of the existence of Courts of Justice; still, for the obtaining of these objects, which, however valuable and important, cannot be usefully pursued without moderation, cannot be either usefully or creditably pursued unfairly or gained by unfair means, not every channel is or ought to be open to them … Truth, like all other good things, may be loved unwisely - may be pursued too keenly - may cost too much. And surely the meanness and the mischief of prying into a man's confidential communications with his legal adviser, the general evil of infusing reserve and dissimulation, uneasiness, and suspicion and fear, into those communications which must take place, and which, unless in a condition of perfect security, must take place uselessly or worse, are too great a price to pay for truth itself."

Lord Nicholls of Birkenhead summarised the same principle in more sober modern legal parlance in *Re L (a minor)* [1997] AC 16 when he said at page 32:

> "The public interest in a party being able to obtain informed legal advice in confidence prevails over the public interest in all relevant material being available to courts when deciding cases."

113. The question for decision is where the line is to be drawn and the bounds of privilege are to be set. It is unquestionable that the breadth of work commonly carried out by lawyers has increased since the early 19th century. The increase in the number and variety of tribunals other than courts of law has been marked in recent years. Statutory and non-statutory inquiries and investigations have proliferated, as HM Government set out in its written case. The

consequences of findings in inquiries such as the Bingham Inquiry may, as I have earlier outlined, be serious for some of the persons or bodies to whom they relate, and investigations such as those held under the Companies Act 1985 can have a substantial effect. It may be of considerable importance for those who may be affected to ensure that their case is put before the inquiry in as effective a manner as possible. The Court of Appeal stated in paragraph 33 of its judgment that a desire to protect reputation to avoid more intrusive regulation does not put the Bank on the same footing as an individual whose reputation is at risk in a public inquiry. That may be so, but I cannot agree that the Bank should for that reason be deprived of any protection of legal professional privilege. Its interests may differ from those of individuals whose conduct is called in question, but it does not follow that they are to be disregarded.

114. The work of advising a client on the most suitable approach to adopt, assembling material for presentation of his case and taking statements which set out the relevant material in an orderly fashion and omit the irrelevant is to my mind the classic exercise of one of the lawyer's skills. I can see no valid reason why that should cease to be so because the forum is an inquiry or other tribunal which is not a court of law, provided that the advice is given in a legal context: see Lord Scott's opinion at para 42. The skills of a lawyer in assembling the facts and handling the evidence are of importance in that forum as well as a court of law. The availability of competent legal advice will materially assist an inquiry by reducing irrelevance and encouraging the making of proper admissions. As Lord Phillips of Worth Matravers himself expressed it in his Chairman's Note on Lawyers in connection with the BSE tribunal:

> "Lawyers are experienced in gathering documentary evidence and have the skills essential to ensure that witness statements cover the relevant ground, without becoming unnecessarily prolix."

Dr Johnson described the function of lawyers, as Lord Simon of Glaisdale felicitously recalled in *Waugh v British Railways Board* [1980] AC 521 at 535, in the following terms:

> "As it rarely happens that a man is fit to plead his own cause, lawyers are a class of the community who, by study and experience, have acquired the art and power of arranging evidence, and of applying to the points at issue what the law has settled. A lawyer is to do for his client all that his client might fairly do for himself, if he could."

The Court of Appeal acknowledged at paragraph 34 of its judgment that the role of Freshfields in assisting with the preparation of evidence and submissions for the Bingham Inquiry was very similar to that which a solicitor plays in relation to litigation. It is an exercise in advocacy and good advocacy will be adapted to the tribunal concerned.

115. An inquest is a case in point. The findings may not now have the legal consequences which they formerly could have, but, as Lord Bingham of Cornhill stated in *R (on the application of Amin) v Secretary of State for the Home Department* [2004] 1 AC 653 at paragraph 31, the inquest may have a vital function in exposing culpable and discreditable conduct: cf the decision of the European Court of Human Rights in *Jordan v United Kingdom* (2001) 11 BHRC 1 and the discussion in the speech of Lord Bingham of Cornhill in *R (on the application of Middleton) v West Somerset Coroner* [2004] 2 AC 182. It is difficult to suppose that those whose conduct is investigated under such a searching light should be deprived of the protection of legal professional privilege when they obtain advice and assistance from their lawyers about how to proceed.

116. I therefore conclude that there is a clear case for upholding the appellant Bank's submission that privilege attached to communications between the BIU and Freshfields by which the advice and assistance of Freshfields was sought and obtained as to the manner in which the Bank should appropriately present evidence and material to the Bingham Inquiry. To repeat the

phrase of Lord Nicholls of Birkenhead, the public interest in the Bank's being able to obtain legal advice in confidence prevails over the public interest in all relevant material being available to the inquiry when reaching its conclusions.

117. It follows that the declaration and order made by Tomlinson J in *Three Rivers (No 6)* were incorrectly made. I would allow the appeal and set aside the judge's declaration and order for disclosure and inspection.

118. One other matter remains for mention. Mr Sumption urged that we should express an opinion on the correctness of the decision of the Court of Appeal in *Three Rivers (No 5)*, which he submitted raised important issues about privilege which should be resolved. The Court of Appeal in that case found against the Bank and your Lordships refused the Bank's petition for leave to appeal. Disclosure of large numbers of documents has been made in accordance with the order of the Court of Appeal and Mr Sumption gave an undertaking on behalf of the Bank that, if the House were to rule that the decision of the Court of Appeal was incorrect, the documents already disclosed will continue to be admissible in the present action and no point will be taken about the judge having seen them. I should be reluctant, in the absence of a very pressing need, to express an opinion on issues which are not before the House - even though we permitted some argument on them to be put before us - the more so when leave to appeal was refused. For that reason, and for those given by my noble and learned friend Lord Scott of Foscote in discussing this issue, I do not propose to express any opinion on it. Having said that, I am not to be taken to have approved of the decision in *Three Rivers (No 5),* and I would reserve my position on its correctness.

### LORD BROWN OF EATON-UNDER-HEYWOOD

My Lords,

119. Having had the advantage of reading in draft the speeches of my noble and learned friends, Lord Scott of Foscote, Lord Rodger of Earlsferry and Lord Carswell, I gratefully adopt Lord Scott's and Lord Carswell's accounts of the facts and issues and proceed at once to add just a very few observations of my own.

120. I think it clear that legal advice privilege attaches to the communications between the Bank and its lawyers concerning the preparation of the Bank's overarching statement (the statement of its case to the Bingham inquiry). I would go so far as to state as a general principle that the process by which a client seeks and obtains his lawyer's assistance in the presentation of his case for the purposes of any formal inquiry—whether concerned with public law or private law issues, whether adversarial or inquisitorial in form, whether held in public or in private, whether or not directly affecting his rights or liabilities—attracts legal advice privilege. Such assistance to my mind clearly has the character of legal business. It is precisely the sort of professional service for which lawyers are ordinarily employed by virtue of their expertise and experience. Indeed, it falls squarely within Dr Johnson's description of a lawyer's function— see Lord Carswell's speech at paragraph 114. It is, moreover, a service which can only effectively be rendered if the client is candid and forthcoming as to the true facts of his case— the very consideration which justifies the absolute character of legal advice privilege in the first place.

121. The Court of Appeal in *Three Rivers District Council v Governor and Company of the Bank of England (No. 6)* [2004] QB 916 (*Three Rivers (No. 6)*) to my mind adopted too narrow an approach to the scope of legal advice privilege, holding as it did that the privilege applies only where the client's legal rights and liabilities are at stake, seldom therefore in relation to an inquiry, perhaps not even where the inquiry puts the client's reputation at risk—a question expressly left undecided. But consider an inquiry where the client receives and must respond to a Salmon letter. Can the tribunal then insist on seeing the communications between the

client and his lawyer by which the terms of his response come to be settled? Surely not. Rather this would seem to me a classic case for the application of the privilege. And by the same token that legal advice privilege must in my judgment apply to someone whose reputation is at stake, so too should it apply to anyone who instructs lawyers with a view to making the best presentation of his case at an inquiry. It is simply not practicable to seek to distinguish between the different interests of those appearing. This is, after all, an area of the law where clarity and certainty are at a premium. Furthermore, as Lord Scott points out at paragraph 39 of his speech, it could hardly be right to allow legal advice privilege, for example, to a developer at a planning inquiry but deny it to an objector.

122. For these reasons, together with the reasons given in the speeches of my noble and learned friends, Lord Scott, Lord Rodger and Lord Carswell, I too would allow this appeal.

---

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/uk/cases/UKHL/2004/48.html*