# Exhibit 4

**If this Transcript is to be reported or published, there is a requirement to ensure that no reporting restriction will be breached. This is particularly important in relation to any case involving a sexual offence, where the victim is guaranteed lifetime anonymity (Sexual Offences (Amendment) Act 1992), or where an order has been made in relation to a young person.**

Neutral Citation Number: **[2017] EWHC 3535 (Ch)**

No. FL-2016-000017

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

FINANCIAL LIST

Rolls Building
Royal Courts of Justice

Wednesday, 20th December 2017

Before:

Sir Geoffrey Vos, Chancellor of the High Court

B E T W E E N :

BILTA (UK) LTD (in Liquidation) & Ors.     Claimants

- and -

(1) ROYAL BANK OF SCOTLAND PLC

(2) MERCURIA ENERGY EUROPE TRADING LIMITED

.     Defendants

_____

MR ORLANDO GLEDHILL QC and MR MATTHEW ABRAHAM (instructed by Messrs Rosenblatt Solicitors) appeared on behalf of the Applicants.

MR JOHN WARDELL QC and MR MICHAEL RYAN (instructed by Pinsent Masons LLP) appeared on behalf of the Respondents.

_____

**J U D G M E N T**

**SIR GEOFFREY VOS, CHANCELLOR OF THE HIGH COURT**:

<u>INTRODUCTION</u>:

1     The claimants, Bilta (UK Ltd) and various other associated companies in liquidation acting by their liquidators, issued an application notice on 25th September 2017 seeking disclosure and inspection of certain documents held by the first defendant, the Royal Bank of Scotland plc ('RBS'), pursuant to CPR Part 31. RBS's answer to this application is to claim that these documents are subject to litigation privilege.

2     The documents in question are described as:

> "The documents created after 29th March 2012 during the course of the investigation that led to the report by Pinsent Masons LLP on behalf of RBS to the Commissioners for Her Majesty's Revenue and Customs ['HMRC'] dated 28th January 2014 [the 'PM report'] and any documents created after 28th January 2014 that formed part of that investigation."

I shall call them the "documents." They include some 29 transcripts of interviews with key RBS employees and ex-employees which I shall call the "interviews."

3     Mr Orlando Gledhill QC, leading counsel for the claimants, accepted that it was these transcripts that the claimants were most interested in obtaining. Indeed, he was probably most interested in obtaining the interviews that relate to the statements of some nine witnesses that RBS has already served in preparation for the trial of this action that is, as I understand it, fixed to commence in June 2018.

4     The substantive claim brought by the claimants arises from an alleged missing trader intra-community fraud ('MTIC fraud') which is said to have affected the UK market for European Union Allowances ('EUAs') in mid-2009. EUAs, also known as "carbon credits", are tradeable units in greenhouse gases. The MTIC fraud in question involves companies trading in EUAs failing to account to HMRC for the value added tax ('VAT') which accrued and, instead, paying their VAT receipts to third parties before going into liquidation. The claimants say that the directors of the companies in liquidation breached their fiduciary duties and/or acted with fraudulent purposes by causing their respective companies to execute such a fraud.

5     The trades involved in the claimed fraud were carried out by representatives of RBS and the second defendant, Mercuria Energy Europe Trading Ltd ('Mercuria'), which was at the time an indirect subsidiary of RBS known as RBS Sempra Energy Europe Ltd ('RBS Sempra'). The claimants contend that in executing the trades, RBS and RBS Sempra wilfully shut their eyes to what was an obvious fraud. As a result, they claim equitable compensation for dishonest assistance of at least £73 million and compensation in the same amount in respect of alleged fraudulent trading under s.213 of the Insolvency Act 1986.

6     On this application, the parties agree that the test for whether litigation privilege can be claimed was accurately stated by Lord Carswell in *Three Rivers District Council v Governor & Company of the Bank of England (No 6)* [2005] 1 AC 610 ('*Three Rivers*') at para.102 as follows:

> "(a) litigation must be in progress or in contemplation;
>
> (b) the communications must have been made for the sole or dominant purpose of conducting that litigation;
>
> (c) the litigation must be adversarial, not investigative or inquisitorial."

7   Mr Gledhill conceded at the outset of the hearing that the evidence produced by RBS had established that in this case the documents were brought into being when litigation was in contemplation. The litigation in question was a claim likely to be represented by a threatened assessment by HMRC against RBS in respect of overclaimed VAT in the sum of £86,247,876. The third condition as provided for in the *Three Rivers'* case is also accepted by the claimants as having existed at the relevant time. The dispute before me, therefore, centres on whether RBS has established (it bearing the burden of proof) that the documents were made for the "sole or dominant purpose of conducting that litigation."

8   Mr Gledhill, in the broadest of outlines, submitted that the documents were prepared as an essential part of the preparation of the PM report promised to HMRC and pursuant to RBS's general duties and obligations as a tax payer and under its own Codes of Practice to provide HMRC with a full and detailed account of the relevant facts concerning deductions of VAT that it had made. He relied heavily on the response to the claimants from RBS's solicitors in January 2017 whereby they said in terms that the first purpose of the investigation was to provide a full and detailed account of the relevant facts. Even if the interviews and the production of the interviews had multiple purposes, the claimants submitted that RBS's evidence simply did not establish or even properly address the question of whether any litigation purpose was the dominant one. Mr Gledhill submitted that the enquiry was predominantly a factual one but placed considerable reliance on the approach adopted by Andrews J in the recent decision of *Serious Fraud Office v Eurasian National Resources Corporation Ltd* [2017] 1 WLR 4205 ('*ENRC*').

9   Mr John Wardell QC, leading counsel for RBS, argued in response that HMRC had spent two years investigating the situation prior to writing its 29th March 2012 letter to RBS (the 'HMRC letter'). The HMRC letter constituted a watershed moment at which HMRC had decided to make an assessment but were prepared to wait to consider RBS's considered comments before they did so. At that stage, RBS instructed outside litigation lawyers. This, said Mr Wardell, was not a dual purpose case. The dominant purpose of producing the documents was to defend HMRC's claim. Of course, RBS as a responsible publicly owned bank behaved openly but the intention behind the creation of the documents and the conduct of the interviews was to resist HMRC's almost inevitable assessment when the litigation ultimately began.

10  Before dealing with these competing submissions, it is necessary to consider both the background factual situation, the Codes of Practice and the authorities on which the parties relied in a little more detail.

FACTUAL BACKGROUND

11  In mid-2009 RBS, through its indirect subsidiary, RBS Sempra, was party to several transactions whereby it purchased EUAs for a price plus VAT. Its EUA spot trading volumes increased dramatically and by the end of June 2009 it enjoyed a market share on the main EUA exchange of close to 40 per cent. In accordance with ordinary principles, it

reclaimed the VAT element from HMRC as input tax. HMRC duly paid this amount which totalled nearly £90 million. In the second half of 2009, having become aware of the scale of MTIC fraud in the UK EUA market, HMRC began to investigate it. The investigation was a broad one and not by any means limited to RBS's activities alone.

12   Following a meeting with Mr David Stevanovic ('Mr Stevanovic'), RBS's UK head of indirect tax, HMRC wrote to RBS on 15th February 2010. Its letter began as follows:

> "Further to our meeting ... where we discussed the extended verification of your transactions in relation to the spot trade of EUAs ... in 2009 ... [we] are writing to you to confirm the following; the amount of input tax that we currently estimate to be at risk is £89,531,539.56. This is not a criminal investigation and we are not presently alleging dishonesty, rather, we are seeking to establish any culpability in respect of all the parties in the supply chain. There is no predetermined outcome to these enquiries and any measures subsequently applied by HMRC to RBS will be dependent on the result. Please be aware that if appropriate, penalties could apply ..."

13   The letter continued by requesting various documents and information from RBS in order to assist with the investigation.

14   RBS then wrote to HMRC on 27th April 2010 stating that it was very happy to assist and cooperate with HMRC in the investigation. It also provided the requested documents which in summary included the structure of its emissions trading desk, details of its anti-money laundering ('AML') and "know your customer" ('KYC') requirements, internal compliance memoranda relating to potential VAT fraud and suspicious activity and transaction reports. In July 2010 RBS divested itself of RBS Sempra, its subsidiary, to JP Morgan. This later gave rise to certain difficulties when RBS was challenged by HMRC because the staff, and indeed some documentation, had gone with RBS Sempra to JP Morgan.

15   HMRC's investigation continued throughout the remainder of 2010 and 2011. During this period RBS provided evidence of the commercial checks that it had carried out on various counterparties as requested by HMRC and other information which it had procured from JP Morgan. I cannot deal with every document that arose in that period but I shall pick out the most important ones from the submissions that have been made to me by the parties.

16   On 10th June 2011 Mr Stevanovic wrote to Mr Graham Halstead ('Mr Halstead') copied to Ms Emma Keen, both of RBS Group Tax, saying:

> "Something to note for the open issues document – HMRC now estimate that we can expect a decision on disallowance of the Sempra emissions trading input tax around the start of September. Although HMRC don't rule out further questions or requests for documents, it would appear they think they have enough information to proceed ..."

17   On 5th October 2011 Mr Stevanovic sent to HMRC in response to HMRC's questions and information requests, a copy of a report that RBS had received from JP Morgan addressing those points. That was later determined by Tribunal Judge Mosedale at a preliminary hearing to have been the last information that was received by HMRC before the assessment for limitation purposes. Her decision in this respect was released on 20th January 2017 and is reported at 2017 UK FTT 0223 (TC) (see paras. 45 and 152 in particular.)

18    On 23rd November 2011 HMRC wrote to Mr Stevanovic saying:

> "[We] have now completed the submission of the facts on Sempra Energy Europe's trade in carbon credit allowances. The submission will, first, be considered via HMRC's governance process. If that process confirms that there are grounds to deny any of the input tax claimed, then I will contact you again to confirm what those grounds are and to invite your comments before any decision is made ..."

19    On 21st February 2012 Mr Jason Collins, a partner in McGrigors LLP (which later became Pinsent Masons) wrote to Mr Stevanovic about some "developments in MTIC fraud in case they are of any interest to you." He said:

> "As you may remember, we represent a number of companies in connection with HMRC's MTIC investigations into EUA trading during 2009. We are now starting to see HMRC conclude their investigations and take formal steps to deny input tax. By 'formal' I mean that HMRC have issued an appealable decision and we are into the 'internal review'/tribunal appeal process ... would you find it useful to have a chat about your own case and where it is at the moment."

20    Mr Stevanovic replied saying that HMRC had stated that he could expect to hear about the conclusion of investigations in the week commencing 27th February 2012 and that if HMRC decided to adopt "denial of input tax" then he was sure that he would want to look very closely at the facts which underpin "should have known".

21    Thereafter, on 27th March 2012 Mr Stevanovic wrote to Ms Emma Keen and Ms Jane Young in RBS's Group Tax Department telling them that at his morning's update with HMRC he had been informed that, between that afternoon and close of business Friday, Mr Brian Goode ('Mr Goode') would be faxing HMRC's next letter. He continued by saying:

> "Without telling me what the letter will say, Brian [Mr Goode] suggested it would be a good idea if a meeting could be arranged very quickly to discuss the letter and what is to happen next. He also spoke about HMRC running up against a deadline of October [2012] which I assume must be a reference to assessment time limits ..."

22    On 29th March 2012 HMRC wrote the HMRC letter which first communicated that there might be grounds to deny RBS's VAT reclaim in relation to the 2009 EUA trading. After a brief introduction the letter set out "relevant legal cases." These included the well-known case of *Axel Kittel v The Belgian State (CE-439/04)* ('*Kittel*') in which (in HMRC's words):

> "The European Court of Justice stated that where a taxable person knew or should have known that it was participating in a transaction connected with fraudulent evasion of VAT, that taxable person's right to deduct income tax should be refused ..."

and various authorities applying the *Kittel* principle. The letter then analysed (over some eight pages) the information that RBS had gathered and provided to HMRC in the context of the *Kittel* principle, before concluding as follows:

> "41. HMRC view: Following consideration of all the above points, HMRC's view is that we have sufficient grounds to deny RBS £86,247,876 of input tax on the basis that they knew or should have known that their transactions were connected with fraud. This represents the input tax claimed on purchases from 08.06.09 onwards.

> This is from when RBS SEE knew specifically of VAT fraud in the carbon credit market ...
>
> "43. If a decision to deny is made at a later date, HMRC will, due to the periods concerned, have to consider the matter of penalties for inaccuracies as set out in Schedule 24 of the Finance Act 2007. However, we wish to receive your views on whether input tax should be denied before the issue of penalties is considered (if appropriate).
>
> "44. [We] would welcome your reply to this letter. Please include any further information that you wish [us] to consider ... If you wish to meet and discuss the issues raised above, please contact [us] to arrange a mutually convenient date.
>
> "45. If HMRC remain of the view that any input tax should be denied following any reply and/or meeting with RBS, you will receive a further letter giving an appealable decision and you would have 30 days to request a review or appeal this."

23  The following day RBS's Head of Group Tax, Mr Halstead, emailed its Group Legal Counsel, Mr Christopher Campbell ('Mr Campbell') saying:

> "It never rains but it pours! HMRC are accusing Sempra of knowingly or otherwise assisting third parties with VAT fraud back in 2009 in connection with trading in carbon credits. Given that this goes outside my usual tax dispute, I would appreciate some assistance from Group Litigation."

24  On the next working day, Monday 2nd April 2012, Mr Ketan Kumar Shah ('Mr Shah'), managing legal counsel in RBS's litigation and investigations team, took over conduct of the matter within RBS. On or about 19th April 2012 RBS instructed McGrigors LLP as its external solicitors in respect of the matter. McGrigors' retainer letter described their scope of work as "to provide legal advice in respect of a dispute with HMRC regarding the recoverability of income tax relating to the purchases of carbon credits by RBS SEE." Shortly afterwards, McGrigors merged with Pinsent Masons LLP, the merged entity retaining the name of the latter firm. From now on for convenience I will make no distinction between McGrigors and Pinsent Masons and will refer only to Pinsent Masons.

25  On 16th May 2012 RBS met HMRC in Edinburgh to discuss the HMRC letter. RBS was represented at the meeting by, amongst others, Mr Halstead, Mr Stevanovic and Pinsent Masons. RBS said that its key purpose in attending was "to understand HMRC's position, ascertain how close HMRC were to making an assessment and ascertain what RBS could do to provide more information that might lead HMRC to conclude that an assessment was not required." HMRC said that it had not yet had advice from external counsel on the matter and that it wanted a full written response from RBS on the facts before taking a decision on whether to assess. RBS agreed to do so but stated that its investigations might take some months due to the practical difficulties of obtaining information about RBS Sempra. In the meantime, it stated that it would write to HMRC setting out its view on the attribution of knowledge to corporates in the context of the *Kittel* test. The parties agreed to reconvene at the end of July 2012.

26  On 28th June 2012 HMRC wrote to RBS answering various questions that had been raised at the meeting. In response to whether it would raise any penalty payment on the basis that RBS's error was deliberate it said:

> "Any penalty is based on the taxable person's conduct so we cannot determine this until (a) we have made a decision to assess and (b) decided whether the behaviour giving rise to the assessment falls into the category of deliberate or careless ..."

27    RBS met with HMRC again on 25th July 2012. RBS provided an update on the progress of its investigation into the disputed trades including that it was currently obtaining information to present to the employees and former employees involved in them. HMRC agreed to provide RBS with a spreadsheet detailing all the relevant purchases and sales by RBS Sempra. Finally, HMRC told RBS that it would have to issue a protective assessment by 5th October 2012 to avoid being time barred. This, they said, was not intended to be a final decision and discussions would continue after its issue.

28    In a letter to RBS dated 16th August 2012 HMRC reiterated:

> "HMRC will need to raise an assessment to protect its position in late September 2012 ... the assessment will be made solely to protect HMRC's position. This will in no way close the door on further discussions and we wish to give full consideration to your written response to our letter of 29th March 2012 (the HMRC letter)."

29    On 20th September 2012 HMRC issued its assessment for an amount totalling £86,434,398 (the 'assessment'). The letter stated that the assessment had been raised "on a protective basis as discussion upon the issues was continuing," and said, "We hope this will remain the case." It also requested that RBS should explain in writing the issues which were delaying its formal response to the HMRC letter so that HMRC could consider an extension to the 30 day time period for requesting a review or appeal of its decision to assess. It stated, "should the issue still be in dispute" after RBS's formal response was considered, then RBS's right of review or appeal would not be affected.

30    On 27th September 2012 HMRC wrote to RBS responding to various questions raised by Pinsent Masons regarding the application of the *Kittel* principle. Its letter stated again that it had "yet to make a decision" on its position and would await RBS's response on the facts before doing so.

31    On 3rd October 2012 there was another meeting between RBS and HMRC but it is not known what was discussed as the minutes were not put in evidence by RBS. That is the subject of some significant complaint by Mr Gledhill. By letter dated 9th October 2012 HMRC extended the usual time limits for requesting a review or an appeal of its decision to assess to the end of January 2013. It is clear also, as appears below, that the deadlines were subsequently extended into 2014.

32    On 25th January 2013 RBS met again with HMRC and again it is not known what was discussed as the minutes were not put in evidence by RBS. The claimants assert that further update meetings took place on 13th August 2013, an unknown date in October 2013 and on 16th December 2013 but again no details have been provided by RBS.

33    On 16th December 2013 RBS supplied to HMRC a document called the "Project Coal Update." The first slide entitled "background" stated as follows:

> "The purpose of this document is to set out the progress made in the investigation of matters surrounding certain carbon credit transactions entered into by RBS Sempra

> in the period 8 June 2009 to 31 July 2009. This document is a status update on the progress of the investigation ... the investigation started in April 2012 and the Bank's final report will be issued in January 2014. The purpose of the investigation is to gather and review the available evidence in order to analyse whether, based on the information available to the business at the time, the business should have concluded that the only reasonable explanation for the circumstances of individual trades was their connection with actual fraud (not a risk of fraud) and to prepare a report in response to HMRC's letter dated 29 March 2012 [the HMRC letter] ... the work product of investigation is privileged ..."

34    The following eleven slides summarise the progress made by RBS in relation to each of the principal work streams of its investigation. In relation to one of those, namely, interviewing the employees and former employees involved in disputed trades, HMRC was informed that RBS had interviewed 29 individuals so far across a variety of functions including front office (i.e., traders) legal, compliance, tax, credit, operations and AML.

35    On or about 28th January 2014 RBS's final report in response to the HMRC letter, which had been prepared by Pinsent Masons and bore its letterhead (the PM report), was supplied to HMRC. It ran to some 66 pages. Its introduction stated:

> "Pinsent Masons ... have been instructed by [RBS] to assist with an investigation into the factual circumstances surrounding the onboarding of and trading relationship with ..." five emissions trading counterparties.

That section concluded by saying:

> "[RBS] does not waive any legal professional privilege in providing this report to [HMRC]."

36    The report went on to argue that HMRC's assessment was time barred. It then stated that in any event RBS did not know and ought not to have known that the EUA transactions were connected to VAT fraud. As part of the analysis supporting this conclusion it drew upon the results of the interviews and in particular what Mr Andrew Gygax (Mr Gygax) and Mr Jonathan Shain (Mr Shain), the main traders responsible for the disputed trades, had thought about them in the light of the significant increase in volumes. The interview transcripts themselves were not, however, supplied to HMRC. Part 4 of the PM report responded specifically point by point to the HMRC letter in some detail and the PM report concluded by inviting HMRC to withdraw the assessment.

37    On 17th October 2014 RBS appealed HMRC's decision to issue the assessment to the First Tier Tribunal (Tax Chamber) (the 'FTT').

38    On 8th June 2015 the claimants issued their claim form against RBS, RBS Sempra, under its new name Mercuria, and RBS Sempra Commodities LLP in the substantive dispute I have described. The claim form was amended on 15th June 2015 to add further claimants and on 7th October 2015 to add still more claimants and to remove the third defendant RBS Sempra Commodities LLP.

39    On 2nd December 2016 during the subsequent disclosure and inspection exercise the claimants' solicitors asked RBS's solicitors:

> "In respect of the investigations undertaken by your client in relation to the [HMRC] investigation, please confirm the basis on which it was undertaken. In particular, was the process voluntary or was it subject to any duties or rules?"

40  The response received in January 2017 said:

> "The investigation was undertaken in order to be able to provide HMRC with a full detailed account of the relevant facts. VAT is a self-assessed tax and tax payers are under a general obligation to provide accurate information to the HMRC in respect of it. Further, the investigation was undertaken with litigation (by way of an appeal to the tax chamber of the First Tier Tribunal) in contemplation and, as such, was undertaken in such a manner so as to ensure that our client would be in a position to meet the disclosure obligations ..."

41  Mr Gledhill points out that in five sections of that lengthy letter of January 2017 Pinsent Masons also referred to matters of privilege specifically. He relies upon those mentions to indicate that privilege was in the mind of the author of the letter. The dispute that is the subject of this application arose when RBS provided a copy of the PM report to the claimants but claimed litigation privilege in respect of, first, documents created on or after 30th March 2012, i.e., following receipt of the HMRC letter, as part of the investigation that led to the report and, two, documents created as part of the investigation that continued after the PM report. Those documents included the interviews. The claimants did not accept that RBS's claim to litigation privilege was made out and on 22nd September 2017 applied, as I have said, for an order as follows:

> "(1) Within 14 days of the order, RBS file and serve a supplemental disclosure statement listing individually the documents within CPR 31.6 created after 29th March 2012 during the course of the investigation that led to the PM report and any documents created after the PM report that formed part of the same investigation.
>
> "(2) Within 14 days of the order, RBS provide to the claimants copies of the documents listed in its supplemental disclosure statement.
>
> "(3) RBS pay the claimants' costs of the application summarily assessed."

THE EVIDENCE ON THIS APPLICATION

42  Witness statements have been filed by Ms Laura Clatworthy, the claimants' solicitor, and by Mr Stevanovic, Mr Shah, and Mr Jason Collins ('Mr Collins'), the solicitor at Pinsent Masons having conduct of the matter on behalf of RBS. Reliance is placed by the claimants on the detail of these statements and I have considered them in detail. It would, however, lengthen this judgment unnecessarily to set out the statements at length and I do not intend to do so. In addition, Mr Wardell informed me, on instructions, that RBS's solicitors had indeed reviewed, as Mr Gledhill alleged, some 17,000 documents for the purpose of defending this application. These mainly comprise documents from two custodians, namely, Mr Stevanovic and Mr Halstead, created between January 2009 and mid-May 2012. Less than 30 of these documents were ultimately placed before the court on this application by RBS excluding those that were exhibited by the claimants themselves. This paucity of documentation has been the subject also of complaint by Mr Gledhill who submits that many more documents, including the minutes of meetings with HMRC, ought to have been produced to the court.

43  Mr Stevanovic, who was himself an officer of HMRC in a previous employment for a period of some five years, says in para.14 of his statement:

> "I had no doubt, having read the HMRC letter, that HMRC would not be dissuaded from their view that [RBS] should be denied its entitlement to input tax recovery on the transactions at issue."

44  Mr Stevanovic described the corporate structures and the relationship as it developed on these issues between RBS and HMRC. He concluded his statement by saying that he regarded the HMRC letter as the end of HMRC's investigative phase and as marking the start of a tax dispute. He said he thought it a "racing certainty" that it would end in litigation.

45  Mr Shah said in his statements that he thought there was a real prospect of litigation when he saw the HMRC letter. He wrote an email on 5th April 2012 to Mr Campbell which he said in his statement represented his view at the time and he said this:

> "...by way of update, HMRC are seeking to recover approximately £86 million of input tax (VAT) plus interest claimed by RBS in respect of carbon credits' trading carried out by RBS Sempra in 2009. It is alleged that RBS Sempra knew of widespread VAT (missing trader) fraud in the carbon credit market and specifically had knowledge that various counterparties it traded with were involved in VAT fraud. HMRC also wish to impose penalties upon RBS which could amount to 100 per cent of the amount recovered. We are in the process of appointing external legal counsel to advise the Bank on its position with regard to the claim by HMRC. We shall update you further once we have their initial views."

Mr Shah has exhibited a schedule of the types of what he claims to be privileged documents that are concerned.

46  Mr Collins said in his statement that upon reading the HMRC letter:

> "It was my opinion that HMRC had already reached its decision to deny input tax recovery."

This opinion was based on his knowledge of HMRC's investigations into other participants in the EUA market, upon his experience that HMRC would not make such a serious accusation against a publicly owned bank unless it thought there was sufficient evidence to support it and upon his experience that formal representations by the tax payer only rarely dissuade HMRC from issuing a decision based on its original view.

47  The claimants, as I say, rely on the precise terms of these statements. I do not intend to set them out in detail in this judgment. The main complaints that are made about the statements are that they are "overstated" and "contain notable omissions." I shall have to evaluate these submissions in due course.

RBS'S CODES OF PRACTICE

48  The standard "RBS group policy standard managing our capital resources corporate income tax and UK value added tax" dated 31st August 2012 provided as follows.

   (1) At p.1 under the heading "Risks addressed by the standard" as follows:

   "Reputational risk: the group's reputation with authorities, customers or the wider public is damaged by activities that lead to incorrect payment or receipt of taxation."

   (2) At p.4 the standard said it applied to:

   "All tax teams in every part of the business and every part of the group, all people with any role in transactions for the group or for customers in every part of the group, all people involved in recording or maintaining the group's financial data in every part of our business in every part of the group."

   (3) At p.3 the standard said this under the heading "Controls":

   "Tax risk management ... all communications with tax authorities must be conducted on the basis of openness, transparency and full disclosure. Contact with tax authorities must only be via the relevant tax team in the group except where external consultants are used rather than in-house tax staff."

   (4) At p.3 the standard stated:

   "UK business areas must refer to the UK tax procedures mandatory requirements paper for further guidance."

49  RBS's "UK tax procedures mandatory requirements paper" was dated 11th February 2010 and provided as follows:

   "Principles: the group will comply with the spirit as well as the letter of tax law discerning and following the intentions of Parliament. This will be achieved by ... maintaining a transparent relationship with the tax authorities ... relationships with tax authorities should be transparent and constructive based on mutual trust wherever possible and should include the following:

   • Engaging in a cooperative, supportive and professional manner in all interactions.

   • Working collaboratively to achieve early resolution and hence certainty."

THE LAW AS TO WHETHER DOCUMENTS ARE CREATED FOR THE SOLE OR DOMINANT PURPOSE OF CONDUCTING LITIGATION

50  Mr Gledhill relied particularly on Thanki's book, The Law on Privilege, Second Edition (2011) at para.3.76 where the editors said this:

> "Dual Purpose Documents: Where a communication has been made for two or more purposes it is necessary to identify the dominant purpose. It is not sufficient if the relevant litigation purposes are merely secondary or even an equal purpose. When faced with the difficulty of deciding between two apparent purposes courts have sometimes concluded that two apparent purposes are merely inseparable parts of a single purpose and then just examined that overarching purpose ... at base the question of dominant purpose is one of fact, hence previous decisions are not particularly helpful except as exemplifying various techniques of analysis ..."

51   In *Re Highgrade Traders* [1984] BCLC 151 ('*Highgrade*') the liquidator of an insurance company sought disclosure of reports prepared by insurers in contemplation of a claim under a fire policy where arson by an officer of the insured was suspected. Oliver and Reginald Gough LJJ allowed the appeal from Mervyn Davies J holding that the reports were covered by legal professional privilege. Oliver LJ said this at p.173 to 174:

> "What, then, was the purpose of the reports? The learned judge found a duality of purpose because, he said, the insurers wanted not only to obtain the advice of their solicitors, but also wanted to ascertain the cause of the fire. Now, for my part, I find these two quite inseparable. The insurers were not seeking the cause of the fire as a matter of academic interest in spontaneous combustion. Their purpose in instigating the enquiries can only be determined by asking why they needed to find out the cause of the fire. And the only reason that can be ascribed to them is that of ascertaining whether, as they suspected, it had been fraudulently started by the insured. It was entirely clear that, if the claim was persisted in and if it was resisted, litigation would inevitably follow. The claim had been made and there was no indication that it was not going to be pressed, particularly after Mr MR's acquittal. It is, as it seems to me, entirely unrealistic to attribute to the insurers an intention to make up their minds independently of the advice, which they received from their solicitors, that the claim should or should not be resisted. Whether they paid or not depended on the legal advice which they received, and the reports were prepared in order to enable that advice to be given. The advice given would necessarily determine their decision and would also necessarily determine whether the anticipated litigation would or would not take place.
>
> ... [The judge] seems ... to have been of the opinion that [*Waugh v British Railways Board* [1980] AC 520] established that it was only if the documents were brought into existence for the dominant purpose.
>
> The learned judge (I have already quoted this passage from his judgment) said ([1983] BCLC 137 at 148):
>
> 'In my view, the reports were commissioned for two purposes: (a) to enable Phoenix to make up its mind about whether to resist the insurance claim on the ground that the fire was or was probably caused by the insured and (b) to place evidence of the cause of the fire in the hands of the solicitors if the reports should suggest with some probability that the fire was caused by the insured.'
>
> He seems here, as I read his judgment, at this point to have been of the opinion that *Waugh's* case established that it was only if the documents were brought into existence for the dominant purpose of actually being used as evidence in the anticipated proceedings that privilege could attach and that the purpose of taking

advice on whether or not to litigate (which is, in substance, what the decision to resist the claim amounted to) was some separate purpose which did not qualify for privilege.  That, in my judgment, is to confine litigation privilege within too narrow bounds and it reproduces what I believe to be the fallacy inherent in the note in the Supreme Court Practice to which I have referred.  No doubt the purpose was 'dual' in the sense that the documents might well serve both to inform the solicitors and as proofs of evidence if proceedings materialised.  But, in my judgment, the learned judge failed to appreciate that the former purpose was itself one which would cause the privilege to attach."

52    In *West London Pipeline and Storage Ltd v Total UK Ltd* [2008] EWHC 1728 (Com) [2008] 2 CLC 258, Beatson J said this at para.86:

"It is possible to distil the following propositions from the authorities on challenges to claims to privilege:-

(1) The burden of proof is on the party claiming privilege to establish it: see *Matthews & Malek on Disclosure* (2007) 11-46, and paragraph [50] above. A claim for privilege is an unusual claim in the sense that the party claiming privilege and that party's legal advisers are, subject to the power of the court to inspect the documents, the judges in their or their own client's cause. Because of this, the court must be particularly careful to consider how the claim for privilege is made out and affidavits should be as specific as possible without making disclosure of the very matters that the claim for privilege is designed to protect: *Bank Austria Akt v Price Waterhouse*; *Sumitomo Corp v Credit Lyonnais Rouse Ltd* (*per* Andrew Smith J).

(2) An assertion of privilege and a statement of the purpose of the communication over which privilege is claimed in an affidavit are not determinative and are evidence of a fact which may require to be independently proved: *Re Highgrade Traders Ltd; National Westminster Bank plc v Rabobank Nederland.*

(3) It is, however, difficult to go behind an affidavit of documents at an interlocutory stage of proceedings. The affidavit is conclusive unless it is reasonably certain from:

(a) the statements of the party making it that he has erroneously represented or has misconceived the character of the documents in respect of which privilege is claimed: *Frankenstein v Gavin's House to House Cycle Cleaning and Insurance Co*, per Lord Esher MR and Chitty LJ; *Lask v Gloucester Health Authority.*

(b) the evidence of the person who or entity which directed the creation of the communications or documents over which privilege is claimed that the affidavit is incorrect: *Neilson v Laugharane* (the Chief Constable's letter)*, Lask v Gloucester HA* (the NHS Circular), and see *Frankenstein v Gavin's House to House Cycle Cleaning and Insurance Co,* per A L Smith LJ.

(c) the other evidence before the court that the affidavit is incorrect or incomplete on the material points: *Jones v Montivedeo Gas Co; Birmingham and Midland Motor Omnibus Co v London and North West Railway Co; National Westminster Bank plc v Rabobank Nederland.*

>   (4) Where the court is not satisfied on the basis of the affidavit and the other evidence before it that the right to withhold inspection is established, there are four options open to it [including the documents or ordering further affidavits or cross-examination]."

53   In *Rawlinson & Hunter Trustees SA v Akers* [2014] 4 All ER 627 Tomlinson LJ said at para.22 that a claim for litigation privilege was not made out where the witness statement asserting privilege "made no effort to grapple with the obvious need to establish which of dual or even multiple purposes was dominant."

54   Finally, in *ENRC* Andrews J denied a claim for documents generated by solicitors during a company's internal investigations in the context of a criminal investigation by the Serious Fraud Office. Mr Gledhill relied on multiple passages from Andrews J's judgment, (which I understand to be under appeal) but I can confine myself to citing relatively short sections of her judgment as follows:

>   "59. In this context, I was ... to a helpful decision of the Federal Court of Australia, *Bailey v Beagle Management Pty* [2001] FCA 185, in which the court distinguished between communications that were made 'without prejudice' and communications subject to litigation privilege. The judge, Goldberg J ... made these observations at [11]:
>
>   '... Properly characterised, it is not correct to say that a document is brought into existence for the purpose of conduct of litigation, and so is privileged from production, if it is brought into existence, albeit to try and settle the litigation, but for the purpose of being shown to the other side,'
>
>   60. I respectfully agree with and adopt that analysis, which must apply with equal force in a situation such as this, where litigation has not commenced. …
>
>   61. However, I reject ENRC's submission that by parity of reasoning, litigation privilege extends to third party documents created in order to obtain legal advice as to how best to *avoid* contemplated litigation (even if that entails seeking to settle the dispute before proceedings are issued). There is no authority cited in support of that proposition, and it self-evidently contradicts the underlying rationale for the privilege. Equipping yourself with evidence to enable you to conduct your defence free from the risk that your opponent will discover how you are preparing yourself, and to decide what evidence you are planning to call if the case goes to court, and what tactics to employ, is something entirely different from equipping yourself with evidence that you hope may enable you (or your legal advisers) to persuade him not to commence proceedings against you in the first place. …
>
>   170. Moreover, documents created with the specific purpose or intention of showing them to the potential adversary in litigation are not subject to litigation privilege. It does not matter whether the reason why they are going to be shown to the adversary is to persuade him to settle, or not to bring proceedings in the first place. The justification for the privilege does not exist in such circumstances and the Court must take care not to widen its boundaries beyond what is permissible. There is a distinction between that scenario, and creating privileged documents for the dominant purpose of defending oneself and obtaining advice pertaining to the defence to anticipated legal proceedings, whilst also having it in mind that you might

waive privilege over those documents in future either generically or for a limited purpose. That was not this case, despite the attempt by ENRC to characterise it as such at a late stage of its dialogue with the SFO.

171. The information generated in respect of the African investigation, and all but a fraction of the information generated in respect of the pre-existing Kazakh investigation, was something that ENRC intended to be shared with the SFO before and at the time when the relevant documents were created, and the dominant purpose for which those documents were created was to enable reports to be prepared to show to the SFO and presentations to be made to the SFO, at a time when the relationship was collaborative rather than adversarial. The contemporaneous documentary evidence in this regard is overwhelming. The commitment to transparency and sharing of information was made in the knowledge and expectation that the SFO would want to satisfy itself that the reports were accurate and thorough, and carry out its own audit. If the SFO called for the underlying material as part of the audit, ENRC and its advisers knew that ENRC could not refuse. Therefore, no legitimate distinction can be drawn between the reports and the underlying materials in terms of the purpose for which they were created."

THE ARGUMENTS ADVANCED BY THE PARTIES:

55  Mr Gledhill submitted on behalf of the claimants that the dominant purpose of RBS's investigation was not litigation but, rather (1) to inform itself of its position being in the unusual situation of no longer having access to the relevant documents or employees; (2) to supply a full and detailed account of the relevant facts to HMRC pursuant to its duties as a taxpayer, and (3) to persuade HMRC not to issue an assessment.  In support of these submissions, as I have said, he particularly relied on the approach and decision of Andrews J in *ENRC*.  He further contended that *ENRC* and not *Highgrade* was the relevant authority because relationships between large corporates and government authorities are fundamentally different in nature from those between parties to ordinary civil litigation.  It follows, Mr Gledhill argued, that the HMRC letter and the PM report are not analogous to a letter before claim and a response.  Finally, he submitted based on the Court of Appeal's decision in *Rawlinson & Hunter Trustees v Akers* (to which I have already referred) that for a claim of privilege to be made out where there are multiple purposes, the witness statements asserting privilege must attempt to grapple with these purposes.  He argued that, since RBS's witnesses had made no attempt to do so, their claim to privilege must fail.

56  Mr Wardell submitted in response that litigation was clearly the dominant purpose of RBS's investigation.  The HMRC letter marked a watershed or step change from an investigation to a tax dispute.  It was, therefore, analogous to a letter before claim, and the PM report to a response.  It followed, said Mr Wardell, that the investigations underlying the PM report which were carried out by specialist tax litigators at the direction of RBS's litigation department were for the dominant purpose of conducting litigation.  None of the claimants' alleged alternative purposes negated this conclusion.  It was clear, said Mr Wardell, from *Highgrade*, that assembling evidence to ascertain the strength of one's position is an ordinary part of any litigation and not separate from the litigation purpose.  Similarly, an intention to dissuade a counterparty from pursuing a claim or, in this case, issuing an assessment, is inseparable from the wider purpose of conducting litigation.  Finally, Mr Wardell submitted that RBS was no longer merely complying with its duties as a tax payer since HMRC's letters from the HMRC letter on 29th March 2012 onwards did not compel it

57    In a supplemental note filed between the first day of the hearing and today, Mr Wardell submitted that for there to be a dual purpose the second purpose had to be unconnected with the potential proceedings. He pointed to *Alfred Compton Amusement Machines Ltd v Customs & Excise Commissioners No 2* [1974] AC 405 where he said that the sole and immediate purpose for which the documents came into existence was to help the Commissioners ascertain the wholesale value of the machines made and sold by the appellants. He said that in *Waugh* the report obtained by the British Railways Board was prepared for "railway operation and safety purposes" as well as for obtaining legal advice and he said that in *Rawlinson & Hunter* the liquidators were under a duty to establish what, if any, assets or liabilities existed and what, if any, steps were open to them to collect in the assets or to reduce or discharge the liabilities. The situation, said Mr Wardell, was quite different in this case.

## WERE THE DOCUMENTS AND/OR INTERVIEWS CREATED FOR THE SOLE OR DOMINANT PURPOSE OF CONDUCTING LITIGATION?

58    Although Mr Gledhill placed much reliance on *ENRC* I do not consider it to be determinative in the present case for reasons that will appear. First, I think, there is something of a tension between Andrews J's decision and the decision of the Court of Appeal in *Highgrade*, a case which does not appear to have been directly cited to her. I fully accept, however, that she may well have had the case or *dicta* to similar effect in mind when she reached her decision.

59    Secondly, all are agreed as stated in the extract I have mentioned from *Thanki* that the exercise of determining the sole or dominant purpose in each case is a determination of fact. Although both cases, that is *ENRC* and this case, involve internal investigations by corporates in the face of scrutiny by government authorities, one cannot simply apply conclusions that were reached on one company's interactions with the Serious Fraud Office in the very different context of another company's interactions with HMRC. I have to focus then on the facts of the present case.

60    It seems to me that the HMRC letter did indeed amount to a watershed moment. Following an investigation into the facts, which had lasted more than two years, HMRC stated for the first time in the HMRC letter that it considered that it had sufficient grounds to deny RBS nearly £90 million by way of input VAT. The HMRC letter analysed the relevant law and applied the law to the facts as they understood them before asking for RBS's comments on those facts. It was, therefore, similar in nature as Mr Wardell has submitted to a letter before claim. Moreover, since HMRC had to prove no more under the *Kittel* test than that RBS knew or ought to have known that the relevant transactions were connected with fraud, it was highly likely at this point that an assessment would follow. That the assessment was highly likely is the evidence of Mr Collins and is also the business and revenue reality. It was hardly very likely that RBS would persuade HMRC to drop altogether a claim for many millions of pounds on the basis of a solicitor's report, however persuasive that report might turn out to be when HMRC had already determined expressly that it had evidence supporting the case that RBS "knew or ought to have known" of the VAT fraud.

61    This, as it seems to me, is even clearer when one considers the wider context of HMRC's attempts to recover input tax from other high-profile participants in the EUA market. The

|   |   |
|---|---|
|   | witness statements of Mr Stevanovic and Mr Shah, together with their contemporaneous email communications, to which I have referred above, demonstrate that the key RBS personnel shared this view.  Moreover, the fact that RBS appointed external solicitors specialising in tax litigation within weeks of receipt of the HMRC letter strongly suggest that RBS anticipated a claim and was gearing up to defend it.  Mr Gledhill says, on the one hand, that the question is a factual one but, on the other hand, that I must grapple with Andrews J's decision, which I should follow.  I pay due and proper regard to Andrews J's decision but I am not sure, as I say, that it can be determinative.  Moreover, I do not think that the facts that arise in this case arose in the case with which Andrews J was dealing. |
| 62 | In addition, I do not think that the ostensibly collaborative and cooperative nature of RBS's interactions with HMRC after the HMRC letter actually changes the position.  It is common place for HMRC to canvass the views of large corporate taxpayers prior to formally issuing an assessment and the burden was plainly on RBS to convince HMRC not to do so.  In these circumstances, and given that RBS was seeking extensions to the deadline for filing its formal written response to the HMRC letter, it is unsurprising that RBS met several times with HMRC and provided updates on the progress of its investigation.  Such cooperation does not, as it seems to me, preclude the investigation being conducted for the dominant purpose of litigation.  The terms of the PM report are, in my judgment, instructive in this respect.  The PM report represented the fruits of the solicitors' investigation.  It sets out the reasons why RBS thought that HMRC was not entitled to deny it input tax.  It was supported by a detailed, legal and factual analysis.  Indeed, as the claimants point out, the PM report drew on various aspects of the interviews that had been obtained but did so expressly without waiving privilege in the underlying material. |
| 63 | Mr Gledhill says that RBS's purpose in creating the PM report and conducting the interviews was to maintain a good relationship with HMRC and to do as RBS had said it would do, namely, to respond to the HMRC letter.  Mr Gledhill says that RBS was providing information to HMRC in accordance with its duties as a taxpayer, its Codes of Practice (to which I have referred) and in order to persuade HMRC to change its mind.  But all those purposes are, in my judgment, in this case effectively subsumed under the purpose of defeating the expected assessment. It is, once again, a matter of fact but it is clear to me from a detailed review of the correspondence, some of which I have summarised above, that there was a significant change in circumstances when HMRC wrote the HMRC letter in March 2012 indicating, as I have said, that it took the view that it had sufficient evidence to issue an assessment. |
| 64 | In the context of a relationship between a corporate taxpayer and HMRC, which both parties accept is very different from that between ordinary parties to civil litigation, it seems to me that the PM report was a close comparable to a response to a letter before claim in ordinary commercial litigation.  Such a response might easily draw on witness evidence already obtained so as to enable the claim to be defended, just as RBS did here. |
| 65 | Andrews J's dicta concerning the situation where a party is mounting an investigation in order to settle a dispute or to persuade the opposing party not to initiate a claim has given me pause for thought but, ultimately, I do not think that that was the commercial reality of the present position.  The commercial reality here was that RBS had to comply with its own protocols and its statutory duties to cooperate with HMRC.  The discussions were conducted in an entirely appropriate collaborative and cooperative manner but that did not change the fact that the overwhelming probability was that an assessment would follow the HMRC letter and that RBS knew as much.  RBS took steps to protect its position which were only |

consistent with its overarching purpose being preparation for the litigation in the FTT that it fully expected to be necessary to contest the assessment it expected. It instructed its litigation solicitors effectively to resist HMRC's position and to promote its own in the expected litigation.

66  The difficult question in the circumstances I have described is to determine whether litigation was the sole or the dominant purpose of the activities that RBS set in train following the HMRC letter. Mr Wardell argued persuasively that litigation was the sole purpose of the investigation after the sea change represented by the HMRC letter. I can see the force of his submission but I am not sure that it much matters whether the litigation purpose was the sole or merely the dominant purpose. The *Highgrade* approach would suggest that a subsidiary purpose is subsumed into the dominant litigation purpose. That, as I have already indicated, seems to me rather likely to be the position here. Andrews J thought that attempts to settle prevented the litigation purpose being dominant on the facts of her case. I cannot accept, as I have said, however, that one can properly draw a general legal principle from her approach to those facts. Whilst I accept that the situation in *Highgrade* was a quite different one, it is clear from that case and from the other Court of Appeal authorities cited that one has to take a realistic, indeed commercial, view of the facts. Just as the insurers were not determining the cause of the fire as a matter of academic interest, RBS was not spending large sums on legal fees here in the hope that HMRC would be dissuaded from issuing an assessment. If that is properly to be regarded as a purpose of the investigation at all, it was obviously a very subsidiary purpose. In the cases to which Mr Wardell pointed, the other purpose in dual purpose cases went beyond the litigation context. Here, fending off the assessment was just part of the continuum that formed the road to the litigation that was considered, rightly, as it turned out, to be almost inevitable.

67  I take full account of Mr Gledhill's submissions that the statements of RBS's witnesses are overstated and contain omissions. Having examined the statements in detail, however, I do not believe these criticisms even if partially justified lead to the conclusion that he seeks to reach. In particular I do not see it as problematic that they failed to address events which occurred more than a few weeks after receipt of the HMRC letter, since it was that letter that was the watershed that prompted RBS's investigation. The purposes of such an investigation will normally be clear as it was in this case at its inception. Indeed, Mr Gledhill acknowledged as much. It may be possible to look at events after the inception to cast light on the original purpose or purposes but it is not imperative to do so, nor is it fatal, I think, that RBS did not deal in its evidence with the meetings between RBS and HMRC that took place in the course of the investigation leading up to the PM report. The fact that RBS behaved openly and collaboratively in the period between the HMRC letter and the PM report does not mean that RBS was not gearing up for the litigation, nor does it mean that the interviews it conducted were not fully and primarily intended to provide the material to resist the expected assessment by a challenge in the FTT.

68  In addition, the 20th January 2017 letter from Pinsent Masons, which is relied so heavily upon by the claimants, does not seem to me to be conclusive. It was a statement made in a rather different context. It does not tell the whole story and whilst it is a good forensic point, I cannot place conclusive reliance on the drafting of a lengthy solicitor's letter written in response to a query in a rather different context. As it seems to me, a letter written years after the event cannot be conclusive to determine what the true dominant purpose of an investigation starting in 2012 actually was.

69  As for Mr Gledhill's argument that the statements failed to make the required attempt to grapple with the multiple purposes of RBS's investigations, this seems to result not from deliberate omission but, rather, from a genuine belief that the investigation was conducted solely in preparation for anticipated litigation, including for the inseparable purpose of avoiding that litigation if possible.  Therefore, although the evidence might be said to be not as comprehensive as it might have been, it is, in my judgment, quite sufficient to discharge RBS's burden of proof in this case.

70  I have, therefore, concluded that the documents and interviews were brought into being by RBS and its litigation solicitors for the sole or at least the dominant purpose of the expected litigation in the FTT following the expected assessment in respect of overclaimed input VAT.  The documents and interviews were, therefore, covered by litigation privilege.

71  All that said, I must confess that I have wondered in the course of the argument in this case why RBS sought to assert privilege over at least the interviews of the witnesses who will themselves be called to give evidence at the trial.  They will obviously cast light on what they said when initially asked about the events that underlie this litigation.  They are as likely, I would have thought, to help as to hinder RBS and disclosing them would dispel a great deal of suspicion that seems to have affected the claimants' application.  It is not for me to say what should be done on a voluntary basis.  I have only to decide the application as it was argued before me and that is what I have done.  My suggestion does not alter the fact that it is RBS's right to assert privilege where the required conditions are met and for the reasons set out above, I consider that they are met in this case.

72  I will accordingly dismiss the claimants' application.

(After a short time)

73  There is now a further application for permission to appeal to the Court of Appeal.  Mr Gledhill in his characteristically candid way accepts that he said all along that my decision was a factual one but he submits that paras. 59 to 61 concerning settlement and the persuasion purpose contained in Andrews J's judgment in *ENRC* raises a legal point which is inconsistent with my decision.

74  In my judgment, that argument, when I have reached a clear factual conclusion, has no real prospect of success and in those circumstances, I shall refuse permission to appeal.

---

*Transcribed by* **Opus 2 International Ltd.**
***(Incorporating Beverley F. Nunnery & Co.)***
*Official Court Reporters and Audio Transcribers*
*5 New Street Square, London EC4A 3BF*
*Tel:  020 7831 5627    Fax:  020 7831 7737*
*civil@opus2.digital*

---

This transcript has been approved by the Judge