# EXHIBIT 6

2005 WL 1625040
United States District Court,
E.D. Pennsylvania.

In re LINERBOARD ANTITRUST LITIGATION
FARMLAND NATIONAL BEEF
PACKING COMPANY, L.P., Plaintiff,
v.
STONE CONTAINER CORPORATION, Jefferson Smurfit Corporation, Smurfit-Stone Container Corporation, International Paper Company, Weyerhaeuser Paper Company, Temple-Inland Inc, Gaylord Container Corporation, Union Camp Corporation, Tenneco Inc, Tenneco Packaging Corporation of America, and Packaging Corporation of America, Defendants.

No. MDL NO. 1261, Civ.A.04-4001.
|
July 11, 2005.

**Attorneys and Law Firms**

Isaac L. Diel, Diel & Seelman P.C., Rex A. Sharp, Gunderson Sharp & Walke LLP, Prairie Village, KS, Kerry E. McQueen, Sharp Mcqueen Mckinley McQueen & Dodge, PA, Liberal, KS, for Plaintiff.

Daniel H. Diepenbrock, Miller & Diepenbrock, P.A., Liberal, KS, Barbara W. Mather, Pepper Hamilton LLP, Philadelphia, PA, James Alexander Walker, Triplett Woolf & Garretson LLC, Lee Thompson, Thompson Law Firm LLC, Wichita, KS, J. Nick Badgerow, Spencer Fane Britt & Browne, Overland Park, KS, for Defendants.

*MEMORANDUM*

DUBOIS, J.

**\*1** THIS DOCUMENT RELATES TO:

I. INTRODUCTION

Presently before the Court is the Motion to Remand of Farmland National Beef Packing Company, LP ("Farmland") for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1447(c). Defendants removed the case from state court in Kansas to the United States District Court for the District of Kansas, asserting federal jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332(a). For the reasons that follow, the Court concludes that defendants have failed to establish diversity jurisdiction, or any other basis of federal jurisdiction. Thus, the case is remanded to state court.

II. *FACTUAL AND PROCEDURAL HISTORY*

This multidistrict litigation case involves allegations that a number of United States manufacturers of linerboard [1] engaged in a combination and conspiracy in unreasonable restraint of trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1, and state antitrust statutes.

The Court sets forth only an abbreviated factual and procedural history as pertinent to address Farmland's pending Motion to Remand. The factual background of the case is described at length in this Court's Memorandum dated October 4, 2000 denying defendants' Motion to Dismiss, its Memorandum dated September 4, 2001 certifying classes of direct purchasers of corrugated boxes and corrugated sheets, the Opinion of the Court of Appeals for the Third Circuit affirming the September 4, 2001 Memorandum and Order, this Court's Memorandum dated August 26, 2003 approving the final settlement between plaintiffs' classes and two of the defendants, Temple-Inland, Inc. and Gaylord Container Corporation, this Court's Memorandum dated June 2, 2004 awarding class counsel attorneys fees, its Memorandum dated August 27, 2004 denying Defendants' Motion to Dismiss Plaintiffs' State Law Claims, and the Court's Memorandum dated August 27, 2004 denying defendants' Rule 60 Motion and Motion for Expedited Discovery. *See In re Linerboard Antitrust Litig.,* MDL No. 1261, 2000 WL 1475559, at \*1–3 (E.D.Pa. Oct.4, 2000) (*"Linerboard I"*); *In re Linerboard Antitrust Litig.,* 203 F.R.D. 197, 201–04 (E.D.Pa.2001) (*"Linerboard II"*); *In re Linerboard Antitrust Litig.,* 305 F.3d 145, 147–49 (3d Cir.2002) (*"Linerboard III"*); *In re Linerboard Antitrust Litig.,* 296 F.Supp.2d 568, 573–75 (E.D.Pa. Aug.26, 2003) (*"Linerboard IV"*); *In re Linerboard Antitrust Litig.,* 2004 WL 1221350, at \*1–3 (E.D.Pa. Jun.2, 2004) (*"Linerboard V"*); *In re Linerboard Antitrust Litig.,* 223 F.R.D. 357, 358–63 (E.D.Pa.2004) (*"Linerboard VI"*); *In re Linerboard Antitrust Litig.,* 223 F.R.D. 335, 337–40 (E.D.Pa.2004) (*"Linerboard VII"*).

A. The Class Case

Class plaintiffs named the following defendants in their Complaints and Amended Complaints-Stone Container Corporation, Jefferson Smurfit Corporation, Smurfit-Stone Container Corp., International Paper Company, Georgia-Pacific Corporation, Temple-Inland, Inc., Gaylord Container Corporation, Tenneco, Inc., Tenneco Packaging, Inc., Union Camp Corporation, Packing Corporation of American and Weyerhaeuser Paper Company-and alleged that they conspired to raise the price of corrugated containers and corrugated sheets throughout the United States by restricting production and/or curtailing inventory in violation of federal antitrust laws.

**\*2** By Memorandum and Order dated September 4, 2001, this Court certified the following two plaintiff classes: a "sheet class" consisting of buyers of corrugated sheets and a "box class" consisting of purchasers of corrugated containers. *Linerboard II,* 203 F.R.D. at 224. The Court's certification rulings were affirmed by the Third Circuit and the Supreme Court denied certiorari. *See Gaylord Container Corp. v. Garrett Paper, Inc.,* 538 U.S. 977, 123 S.Ct. 1786, 155 L.Ed.2d 666 (2003). As a result of four settlements between the classes and various groups of defendants, all claims in the class case were resolved for a total of $202,572,489. By Order dated February 10, 2005, the Court approved initial distribution of over 90% the settlement fund, and it approved a second distribution by Order dated June 28, 2005.

### B. The Direct Actions

One-hundred and forty entities opted out of the classes certified by the Court by filing Requests for Exclusion on or before June 9, 2003, including Farmland.[2] These 140 entities opted-out themselves and approximately 3400 subsidiary and affiliate companies.[3] Of the 140 Requests for Exclusion, 13 groups of opt-outs subsequently filed direct actions against defendants alleging both federal and state claims. As of the date of this Memorandum, 11 of those groups have outstanding claims against one or more of the defendants.[4]

### C. Direct Action by Farmland

#### 1. *Procedural History*

On June 10, 2003, plaintiff filed a Petition in the District Court of Seward County, Kansas against defendants, alleging a violation of Kansas antitrust law, K.S.A. §§ 50-101 et seq.[5] Defendants filed a joint Notice of Removal to the U.S. District Court for the District of Kansas on August 29, 2003 based on diversity of citizenship jurisdiction pursuant to 28 U.S.C. §§ 1332(a) and 1441. On September 30, 2003, plaintiff filed a Motion for Remand in the U.S. District Court for the District of Kansas, asserting that removal was procedurally and substantively improper. On December 19, 2003, the federal district court granted plaintiff's Motion based upon procedural defects in the Notice of Removal, but it did not address plaintiff's substantive claims based upon a lack of diversity jurisdiction. The U.S. Court of Appeals for the Tenth Circuit reversed the district court's remand order on April 16, 2004, but declined to address plaintiff's claims that complete diversity was lacking. *Farmland National Beef Packing Co., L.P. v. Stone Container Corp.,* 98 Fed.Appx. 752, 755-56 (10th Cir.2004).

On April 20, 2004, Farmland filed a Notice of Remand and Request for Decision on Diversity of Citizenship in the U.S. District Court for the District of Kansas, requesting that the court adjudicate that issue. However, on May 12, 2004, before that district court could do so, the Judicial Panel on Multidistrict Litigation issued a Conditional Transfer Order transferring the matter to this Court pursuant to 28 U.S.C. § 1407. By Order dated December 23, 2004, this Court granted the parties leave to engage in discovery on the issues presented by Farmland's Motion to Remand. At the conclusion of this discovery period, the parties submitted supplementary memoranda of law. Thereafter, on April 21, 2005, the Court conducted oral argument by telephone.

#### 2. *Background Facts*

**\*3** At the time Farmland filed its Petition in state court, on June 10, 2003, it was a limited partnership organized under the law of Delaware. According to Farmland, its general partners included the following entities:

- NBP Co., LLC, a Kansas limited liability company owned by Farmland Industries, Inc., a Kansas cooperative marketing corporation with its principal place of business in Missouri, and Farmland Foods, Inc., also a Kansas cooperative marketing corporation with its principal place of business in Missouri.

- U.S. Premium Beef Co., LLC, a Minnesota limited liability company owned by U.S. Premium Beef, Ltd., a Kansas cooperative marketing corporation with its principal place of business in Missouri.

Farmland's limited partners included:

- U.S. Premium Beef, Ltd., a Kansas cooperative marketing corporation, which has it principal place of business in Missouri and members in 30 states, including Missouri, Illinois, and Texas.

- Farmland Industries, Inc., a Kansas cooperative marketing corporation with its principal place of business in Missouri and members in 37 states, including Illinois, Missouri and Texas.

- NBPCo. Holding LLC, a limited liability company wholly owned by Beef Products, Inc., a Nebraska corporation with its principal place of business in South Dakota.

In framing the issues, the parties agreed that the citizenship of defendant Jefferson Smurfit Corporation ("Jefferson Smurfit") is dispositive of plaintiff's Motion. (4/21/05 Hearing Tr. at 9-10). Jefferson Smurfit is incorporated in Delaware and wholly owned by a holding company, JSCE, Inc. ("JSCE"). JSCE, in turn, is owned by defendant Smurfit-Stone Container Corporation ("Smurfit-Stone"), an integrated manufacturer of paperboard and paper-based packaging, incorporated in Delaware. (C. Hunt Aff. ¶ 3-4). Smurfit Stone was formed in November 1998 as a result of a merger between Jefferson Smurfit and Stone Container Corporation ("Stone"). (*Id.*). At the time of the filing of Farmland's state court Petition, Smurfit-Stone conducted all of its business operations through Stone and JSCE-owner of Jefferson Smurfit. (*Id.*). In discovery, counsel for defendants agreed that "[n]either Stone nor [Jefferson Smurfit] have separate organizational or management departments apart from [Smurfit Stone]"; "[Jefferson Smurfit] does not hold separate board meetings apart from Smurfit-Stone"; and that "organizational charts [produced] apply equally to [Smurfit-Stone] and [Jefferson Smurfit]." (Pls.Supp.Br., Ex. S) (email dated January 31, 2005).

In its Motion to Remand, Farmland challenges this Court's diversity jurisdiction on two grounds. First, it argues that defendant Jefferson Smurfit has its principal place of business in Missouri, and that this fact destroys complete diversity given plaintiff's citizenship in that state, which the parties do not dispute. Second, plaintiff argues that two of the cooperative marketing entities which are partners in Farmland destroy complete diversity because these entities share the citizenship of each of their members, which are located in nearly all states. Defendants respond that Jefferson Smurfit has its principal place of business in Illinois and that the cooperative marketing entities at issue do not destroy diversity because they should be treated as corporations for diversity of citizenship purposes.

**\*4** The Court concludes that defendants have failed to meet their burden of demonstrating that Jefferson Smurfit is a citizen of Illinois, as opposed to Missouri, and grants plaintiff's Motion on this ground. This ruling makes it unnecessary to decide the citizenship of the cooperative marketing entities which are partners in Farmland.

III. *GOVERNING LAW*

Before determining whether subject matter jurisdiction exists, the Court must decide a threshold issue: whether in an action transferred pursuant to 28 U.S.C. § 1407 this Court (the transferee court) should apply its own subject matter jurisdiction law or that of the transferor court.

Courts in the Third Circuit and other Courts of Appeals have held that, although the law of the transferor court merits consideration, only the law of the transferee court is binding on issues of federal law in an action transferred pursuant to 28 U.S.C. § 1407. See *In re Ikon Office Solutions, Inc. Securities Litigation,* 86 F.Supp.2d 481, 484 (E.D.Pa.2000); *In re Nazi Era Cases Against German Defendants Litigation,* 198 F.R.D. 429, 439 n. 16 (D.N.J.2000). See also e.g., *In re General American Life Ins. Co. Sales Practices Litigation,* 391 F.3d 907, 911 (8th Cir.2004); *Menowitz v. Brown,* 991 F.2d 36, 40 (2nd Cir.1993); *In re Korean Air Lines,* 829 F.2d 1171 (D.C.Cir.1987).

Further, several courts have specifically held that a transferee court must follow the law of its Circuit in deciding questions of federal jurisdiction in cases transferred pursuant to § 1407. See *In re Diet Drugs Products Liability Litigation,* 352 F.Supp.2d 533, 537 (E.D.Pa.2004) (applying fraudulent joinder standard of transferee court in MDL action); *See also, e.g., In re MTBE Products Liability Litigation,* 2005 WL 106936, at *5 (S.D.N.Y. Jan.18, 2005) (applying law of the transferee district to questions of personal jurisdiction in action transferred pursuant to § 1407); *In re Mastercard Int'l, Inc. Internet Gambling Litigation,* 2004 WL 287344, at *2 (E.D.La.2004) ( "[I]n [MDL] cases involving federal questions, the transferee court follows the law of its own circuit. Subject matter jurisdiction ... is just such a

federal question.") (citations omitted). *In re Starlink Corn Products Liability Litigation,* 211 F.Supp.2d 1060, 1063-64 (N.D.Ill.2002) ( "Applying the law of the transferor circuit [where case transferred pursuant to § 1407] could yield a situation where we would find federal jurisdiction exists over claims from some parts of the country but not from others."). *See also In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation,* 256 F.Supp.2d 884, 888 (S.D.Ind.2003); *In re Tobacco/Governmental Health Care Costs Litigation,* 100 F.Supp.2d 31, 35 n. 1 (D.D.C.2000).

Based on this authority, the Court will apply Third Circuit law on the issue of subject matter jurisdiction presented in this case.

IV. *STANDARD OF REVIEW*

**\*5** Under 28 U.S.C. § 1332(a), there must be complete diversity between the parties for subject matter jurisdiction to exist. Moreover, under 28 U.S.C. § 1332(c)(1), "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." In determining the status of a party's citizenship, a court must consider the relevant facts at the time the suit was filed. See *Quaker State Dyeing & Finishing Co. Inc. V. ITT Terryphone Corp.,* 461 F.2d 1140, 1143 (3d Cir.1972); *Connors, III v. UUU Productions, Inc.,* 2004 WL 834726, at \*3 (E.D.Pa. March 15, 2004).

28 U.S.C. § 1447(c), the removal statute at issue, states that, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." "[I]t remains the defendant's burden to show the existence and continuance of federal jurisdiction" in removed cases. *Steel Valley Authority v. Union Switch and Signal Div.,* 809 F.2d 1006, 1010 (3d Cir.1987). The Court notes that while some courts in this district require the parties asserting jurisdiction, in this case, the defendants, to meet their burden by a preponderance of the evidence, others have applied stricter standards. [6] *Dunson v. McNeil-PPC, Inc.,* 346 F.Supp.2d 735, 737 n. 3 (E.D.Pa.2004) (Robreno, J.). However, because the Court concludes that defendants in this case have failed to meet their burden by a preponderance of the evidence, it need not determine whether a stricter standard is required. *Id.*

V. *DISCUSSION*

A. Applicable Law

Courts apply one of three tests when determining a corporation's principal place of business. Some Courts of Appeals apply the "nerve center" test, holding the principal place of business to be the location of executive and administrative functions. *See, e .g., Buethe v. Britt Airlines, Inc.,* 787 F.2d 1194, 1196 (7th Cir.1986). Others have adopted the "total activity test," which "considers a variety of factors, such as the location of the corporation's nerve center, administrative offices, production facilities, employees, etc., and it balances these factors in light of the facts of each case." *See Amoco Rocmount Co. v. Anschutz Corp.,* 7 F.3d 909, 915 (10th Cir.1993) (internal quotations omitted).

Courts in the Third Circuit apply a third test-the "center of corporate activities" test set forth in *Kelly v. United States Steel Corp.,* 284 F.2d 850 (3d Cir.1960). In *Kelly,* the Third Circuit considered the principal place of business of U.S. Steel Corporation, which consisted of fourteen divisions and eleven subsidiaries and had its manufacturing plants distributed among many states. *Id.* at 853. Rejecting the "nerve center" approach, the court held that the corporation's board and the board's Executive and Finance Committees-which sat in New York-were not determinative of its principal place of business despite the fact that they exercised final authority over corporate policy. *Id.* at 853-54. The court emphasized that the place of "the occasional meeting of policy-making Directors" did not qualify as the principal place of business, and also declined to rule that "the place where physical activity is carried on" was the principal place of business. *Id.* at 852-53.

**\*6** Instead the court in *Kelly* held that it would look to "center of corporate activity," or "headquarters of day-to day corporate activity and management." *Id.* at 854. It concluded that U.S. Steel's principal place of business was Pennsylvania because the Board of Directors had delegated day-to-day decision-making authority to an "Operation Policy Committee" which sat there, and because the vast majority of the corporation's executive vice presidents, administrative vice presidents and vice presidents were located in Pennsylvania with their staffs, as was the general solicitor. *Id.* at 854.

The court in *Kelly* also weighed several secondary factors, which although of "lesser importance," were of "some significance," when "added to the items already enumerated pointing to the center of corporate activity." *Id.* These factors included the location of employees, productive capacity and tangible property. *Id.* The court noted that while "Pennsylvania does not have the majority of the productive capacity of this corporation nor the majority of the employees of this corporation[,] it does have, however, more than any other state." *Id.*

Applying the decision in *Kelly,* courts in this Circuit have weighed the distribution of executives and corporate officers as the primary consideration in determining a corporation's principal place of business. *See* [Mennen Co. v. Atlantic Mut. Ins. Co., 147 F.3d 287, 291 (3d Cir.1998)](holding New Jersey to be the principal place of business where a majority of senior executives were located there); [Quaker State, 461 F.2d at 1144](holding Pennsylvania to be principal place of business where almost all officers were located there); [Eyal Lior v. SIT, 913 F.Supp. 868, 875 (D.N.J.1996)](holding principal place of business to be Connecticut, where majority of executives were located).

Moreover, consistent with the *Kelly* court's ruling that the location of operations is a secondary factor, courts in this Circuit have held that the location of the largest number and/or majority of executives/corporate officers qualified as the principal place of business even where a company's operations were predominantly located in another state. [Wheelabrator Frackville Energy Co., 741 F.Supp. 536, 539-40 (E.D.Pa.1990)](holding that "while factors of lesser importance, e.g. location of physical plants, employees and assets, would support a finding that Pennsylvania is the principal place of business of plaintiff [given that all operations were located there], plaintiff has clearly established that New Hampshire is the 'headquarters of day-to-day corporate activity and management' " where executives all worked in New Hampshire); [Lakawanna Refuse Removal, Inc. v. Proctor and Gable Paper Prod., 86 F.R.D. 330, 333-34 (M.D.Pa.1979)](holding that Ohio was the principal place of business because company executives worked there, despite the fact that more operations occurred in Pennsylvania); [Alpha Portland Cement Co., 224 F.Supp. 714, 716-17 (E.D.Pa.1963)](holding Pennsylvania to be the principal place of business where six of eight executive officers worked there, despite the fact that New York was the site of board meetings, had greater productive capacity, and had more company offices).

**\*7** Although some courts in this Circuit have found a company's principal place of business to be in a state which did not contain the largest number of executives, the parties in those cases proffered evidence that other personnel were charged with the daily management of the company. *See, e.g.,* [Swanson v. McNeil, PPL, Inc., 1996 WL 182806, at \*4 (E.D.Pa.1996)](holding that Pennsylvania was the principal place of business although the executives worked in New Jersey because the vast majority of "full-time managerial employees" worked in Pennsylvania and the majority of production occurred there, and "in light of evidence that neither the directors nor the officers play[ed] an actual role in corporate affairs"). [7]

B. Jefferson Smurfit's Principal Place of Business

In its Motion for Remand, Farmland argues that complete diversity of citizenship does not exist because it is a citizen of Missouri [8] and Jefferson Smurfit has its principal place of business in Missouri. Defendants respond that Jefferson Smurfit's principal place of business is Illinois. [9]

The Court notes that Jefferson Smurfit's operations, like those of U.S. Steel in *Kelly,* are spread out among many states, as evidenced by the fact that it has "107 manufacturing facilities in 26 states." (C. Hunt Aff. ¶ 8). However, in determining the "headquarters of day-to-day corporate activity and management," the Court weighs heavily the fact that, at the time plaintiff filed its Petition in state court, fourteen of twenty-six of Jefferson Smurfit's executives had their offices in Clayton, Missouri, including the CEO, CFO, and General Counsel, whereas only eight were located in Illinois. [10] (Pl.Supp., Ex. P). As detailed above, courts in the Third Circuit have held the distribution of executives to be the primary factor in determining principal place of business, unless the opposing party proffers evidence that other personnel manage the corporate activity of the company on a daily basis. [Kelly, 284 F.2d at 852-54](). *See also* [Mennen, 147 F.3d at 291](); [Quaker State, 461 F.2d at 1144](); [Wheelabrator, 741 F.Supp. at 539-40](); [Swanson, 1996 WL 182806, at \*4](). The Court concludes that, based on the evidence presented, it is these executives located in Missouri who run Jefferson Smurfit's corporate activities on a day-to-day basis.

During oral argument defendants argued that Jefferson Smurfit has an Executive Committee located in Illinois which, like the "Operation Policy Committee" in *Kelly,* conducts the daily management of the company. (4/21/05 Tr. at 53). Further, Craig A. Hunt, general counsel for Jefferson Smurfit, stated in a supplementary affidavit submitted after the close of discovery [11] that Jefferson Smurfit's Executive Committee was "delegated the day-to-day management" of the corporation and that it "served as the decision-making body for the day-to-day operations and management of [Jefferson Smurfit] from at least 2000 to November 2004." (Supp. C. Hunt Aff. ¶ 15).

**\*8** The Court finds this statement unpersuasive. First, defendants admit that the Executive Committee "conducted its meetings on a *monthly* basis" and that these meetings, although occurring more frequently in Illinois than Missouri, have been held in both locations. (*Id.*) (emphasis added); (4/21/05 Tr. at 55). Second, at the time the Petition was filed in state court, four of the six members of the Executive Committee worked out of the Jefferson Smurfit office in Clayton, Missouri, and only one in Illinois. (Supp. C. Hunt Aff. ¶ 11); (Pl.Supp.Br., Ex. P). [12] Finally, defendants offered no evidence of the activities of the Executive Committee beyond Mr. Hunt's affidavit. Mr. Hunt's bare assertion that the Executive Committee managed the day-to-day corporate activity of Jefferson Smurfit is insufficient to establish this fact in the context of the other evidence presented. See *Mash Enterprises, Inc. v. Prolease Atlantic Corp.,* 199 F.Supp.2d 254, 261 (E.D.Pa.2002) (ruling that general counsel's averment in affidavit that company's day-to-day management occurred in Pennsylvania "holds no weight since it was directly contradicted by [other evidence]"). Thus, the Court concludes that defendants have failed to demonstrate that the Executive Committee engaged in the day-to-day management of Jefferson Smurfit in Illinois.

Defendants also respond that Illinois has a larger number of corporate *offices* than Missouri (four out of twelve, compared to only one). (C. Hunt Aff. ¶ 9). However, absent evidence that this greater number of offices actually housed the company's day-to-day management, this fact does not outweigh the fact that the majority of executives/managers worked in Missouri. See *Alpha Portland Cement Co.,* 224 F.Supp. at 716-17.

Finally, defendants assert that Jefferson Smurfit has its principal place of business in Illinois based on additional facts of "lesser importance," including the site of occasional meetings and the location of operations. *Kelly,* 284 F.2d at 853. For example, defendants argue that Illinois is the principal place of business because the majority of Jefferson Smurfit's board meetings since November 1998, all shareholder meetings since 1999, and the largest number of Executive Committee meetings since 2000 were held there. (Def. Supp. at 9-12); (C. Hunt Aff.¶ 7). However, the *Kelly* court expressly rejected the assertion that the location of occasional meetings at which decisions on overall corporate policy are made is determinative of a company's principal place of business. *Kelly,* 284 F.2d at 853-54. Instead, as noted above, the Third Circuit looks to the site of day-to-day management and corporate activity.

Defendants also argue that Jefferson Smurfit had a greater operational presence in Illinois than Missouri between 2002 and 2003, as measured, *inter alia,* by the number of manufacturing facilities, employees, assets, and sales revenue. (Def. Supp. at 9-12); (C. Hunt Aff. ¶¶ 8-12). These averments are equally unpersuasive. In addition to being of "lesser importance," discovery reveals that, with regard to several such secondary considerations, neither Missouri nor Illinois contain even a plurality presence. [13] Instead, the Court concludes that Jefferson Smurfit's operations are spread out among many states, none of which predominates.

**\*9** Defendants have the burden to establish federal jurisdiction in the context of this case. The Court concludes that they have not met this burden by a preponderance of the evidence-they have failed to establish that Jefferson Smurfit has its principal place of business in Illinois rather than Missouri. As a result, because the parties do not dispute that Farmland is a citizen of Missouri, diversity jurisdiction is lacking, and there is no other basis of federal jurisdiction.

VI. *CONCLUSION*
For all of the foregoing reasons, plaintiff's Motion for Remand is granted and this matter is remanded to state court for further proceedings. An appropriate Order follows.

*ORDER*

AND NOW, this 11th day of July, 2005, upon consideration of the Motion to Remand by Plaintiff Farmland National Beef Packing Company, L.P. (D. Kansas, Doc. No. 10, filed September 30, 2003); Memorandum in Opposition by

Defendants to Motion to Remand (D. Kansas, Doc. No. 15, filed October 14, 2003); Reply in Support of Motion to Remand (D. Kansas, Doc. No. 19, filed October 27, 2003); Notice of Remand and Request for Decision on Diversity of Citizenship by Farmland National Beef Packing Company, L.P. (D. Kansas, Doc. No. 42, filed April 20, 2004); Defendants' Response to Plaintiff's Notice of Remand and Request for Decision on Diversity of Citizenship (D. Kansas, Doc. No. 43, filed April 22, 2004); Plaintiff's Reply in Support of Notice of Remand and Request for Decision on Diversity of Citizenship (D. Kansas, Doc. No. 45, filed April 23, 2004); Defendants' Supplementary Memorandum in Opposition to Farmland National Beef Packing Company, L.P.'s Motion for Remand (E.D. Pa., Doc. No. 622, filed February 16, 2005); FNBP's Brief in Support of Remand (E.D. Pa., Doc. No. 623, filed under seal February 16, 2005); Farmland National Beef Packing Company LP's Supplementary Brief in Support of Remand (Doc. No. 658, filed May 16, 2005); Defendants' Motion for Leave to File the Affidavit of Craig A. Hunt in Opposition to Farmland National Beef Packing Company, L.P.'s Motion to Remand (E.D. Pa., Doc. No. 659, filed May 16, 2005); and the related submissions of the parties, following oral argument held on April 21, 2005 by telephone, for the reasons set forth in the attached Memorandum, IT IS ORDERED as follows:

1. Defendants' Motion for Leave to File the Affidavit of Craig A. Hunt in Opposition to Farmland National Beef Packing Company, L.P.'s Motion to Remand is GRANTED;

2. Motion to Remand by Plaintiff Farmland National Beef Packing Company, L.P. is GRANTED; and

3. This matter is REMANDED to the District Court of Seward County, Kansas for further proceedings.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1625040, 2005-2 Trade Cases P 74,881

**Footnotes**

1   Linerboard includes any grade of paperboard suitable for use in the production of corrugated sheets, which are in turn used in the manufacture of corrugated boxes and for a variety of industrial and commercial applications. Corrugated sheets are made by gluing a fluted sheet which is not made of linerboard, known as the corrugating medium, between facing sheets of linerboard; corrugated sheets are also referred to as containerboard. The defendants named in the instant lawsuits are major integrated manufacturers and sellers of linerboard, corrugated sheets and corrugated boxes.

2   A copy of the Record of Potential Class Members Who Excluded Themselves from the Classes is appended to this Court's Memorandum and Order dated December 8, 2003 approving the Settlement Agreement between Temple-Inland, Inc. and Gaylord Container Corporation; this Court's Memorandum and Order dated December 8, 2003 granting Class Plaintiffs' Motion for Final Approval of Settlement Agreement Between the Class and International Paper Company and Union Camp Corporation, Georgia-Pacific Corporation, and Weyerhauser Company; and this Court's Memorandum and Order dated April 21, 2004 granting Class Plaintiffs' Motion for Final Approval of the Settlements with Defendants Packaging Corporation of America, Inc., Tenneco, Inc. And Tenneco Packaging Inc. and with Defendants Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation.

3   In its Memorandum dated August 27, 2004, the Court directed each entity on whose behalf a Request for Exclusion was filed to affirm its intent to opt out by submitting a ratification form. By Order dated January 7, 2005, the Court dismissed with prejudice 803 entities which failed to submit ratification forms. The Court also dismissed without prejudice 635 entities and/or names of alleged predecessors-in-interest, trade names, and other entities/names which plaintiffs claim were not required to opt out.

4   The following are the direct actions that are proceeding:

   1. *Perdue Farms Incorporated v. Stone Container Corporation, et al.,* No. 03-1702 (D. Md. filed June 9, 2003);

2. *Conopco, Inc., et al. v. Smurfit Stone Container Corporation, as successor to Stone Container Corporation, et al.,* No. 03-3549 (E.D. Pa. filed June 9, 2003);

3. *Sara Lee Corporation, et al. v. Smurfit Stone Container Corporation, et al.,* No. 03-3939 (N.D. Ill. filed June 10, 2003);

4. *Procter & Gamble Company, et al. v. Stone Container Corporation, et al.,* No. 03-3944 (N.D. Ill. filed June 10, 2003);

5. *United States Gypsum Company, et al. v. Stone Container Corporation, et al.,* No. 03-4251 (N.D. Ill. filed June 10, 2003);

6. *Smithfield Foods, Inc., et al. v. Smurfit Stone Container Corporation, et al.,* No. 03-3968 (N.D. Ill. filed June 11, 2003);

7. *Hormel Foods Corporation, et al. v. Stone Container Corporation, et al.,* No. 03-3421 (D. Minn. filed June 13, 2003);

8. *Milne Fruit Products, Inc., et al. v. Stone Container Corporation, et al.,* No. 03-4049 (N.D. Ill. filed June 13, 2003);

9. *Kellogg Company, et al. v. Smurfit Stone Container Corporation, et al.,* No. 03-4213 (N.D. Ill. filed June 19, 2003)

10. *Farmland National Beef Packing Co. v. Stone Container Corporation, et al.,* No. 03-1312 (D. of Kansas filed August 29, 2003); and

11. *Mars Inc., et al. v. Stone Container Corporation, et al.,* No. 03-6977 (N.D. of Ill. filed October 1, 2003).

5   The Court notes that Farmland is also listed as a named plaintiff in the *Procter & Gamble* action, and that the Second Amended Complaint in that action asserts claims under Kansas antitrust law. During a status conference on December 23, 2004, Liaison Counsel for direct action plaintiffs reported that he was not asserting these state claims on behalf of Farmland and that it had communicated this fact to defendants by letter. (Dec. 23, 2004 Tr. at 4).

6   For example, many courts apply a "presumption" in favor remand, that "[i]f there is any doubt as to the propriety of removal, that case should not be removed to federal court." *Brown v. Francis,* 75 F.3d 860, 865 (3d Cir.1996). The Third Circuit, in dicta, recently questioned the validity of this presumption. *Cook v. Wikler,* 320 F.3d 431, 436 n. 6 (3d. Cir.2003).

7   To the extent the law of the transferor court merits consideration, this Court notes that the "center of corporate activities" test applied by the Third Circuit is consistent with the "total activity" test adopted by the Tenth Circuit, in which the transferor court in this case is located. The Tenth Circuit has held that "the nerve center and corporate activities tests are two sides of the same coin, and that they can be viewed as particular applications of the general rule that the bulk of corporate activity, as evidenced by the location of daily operating and management activities, governs the choice of a principal place of business." *Amoco Rocmount Co. v. Anschutz Corp.* 7 F.3d 909, 915 (10th Cir.1993) (quoting 13B Charles A. Wright et al., Federal Practice and Procedure § 3625, at 625 (2d ed.1984)). However, to the extent the "total activity" test deviates from this Court's analysis, the Court is only bound by the "center of corporate activities" test applied by the Third Circuit. *See, e.g., In re Diet Drugs,* 352 F.Supp.2d at 537; *In re MTBE,* 2005 WL 106936, at *5.

8   The Court notes that Farmland, as a limited partnership, shares the citizenship of each of its partners. *See Carden v. Arcoma Association,* 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). Farmland states, and defendants do not dispute, that its partners include cooperative marketing entities having both their principal places of business and members located in Missouri. The Ninth Circuit recently held in *Kuntz v. Lamar Corporation,* 385 F.3d 1177 (9th Cir.2004), that a cooperative marketing corporation is covered by 28 U.S.C. § 1332(c) and is therefore a citizen of the state in which its principal place of business is located and the state of incorporation. However, because Farmland's partners have their principal places of business *and* members in Missouri, the Court concludes that they qualify as citizens of that state regardless of whether it adopts the rule recently announced *Kuntz* or instead treats them as unincorporated entities sharing the

citizenship of all members. Thus, Farmland is a citizen of Missouri because its partners are citizens of that state.

9   In their supplementary memorandum, defendants argue that plaintiff is bound by averments in its state court petition stating that Jefferson Smurfit maintained its principal place of business in Illinois. (Def. Supp. at 7-8). This argument ignores Third Circuit precedent that, "a party may not confer or defeat jurisdiction by mere pleading ... Rather, subject matter jurisdiction depends upon facts of record, and when any question arises as to the existence of jurisdiction a federal court is obligated to make an independent determination of those facts." *Mennen Co. v. Atlantic Mut. Ins. Co.,* 147 F.3d 287, 293 -294 (3d Cir.1998). *See also* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

10  The Court notes that defendants produced two documents which differ slightly on this fact. Defendants submitted an organizational chart dated July 24, 2002, which lists a total of 27 executives. By letter dated January 18, 2005, defendants produced a table purporting to list the location of "each of Jefferson-Smurfit's corporate officers during the period 2002-03 time period, as identified in the organizational charts," which listed only 26 executives.

11  Following the close of discovery, defendants filed a Motion for leave to submit a supplementary affidavit of Mr. Hunt. The Court notes that "subject matter jurisdiction can be challenged at any point before final judgment, even if challenged for the first time on appeal." *In re Kaiser Group Intern. Inc.,* 399 F.3d 558, 565 (3d Cir.2005). Accordingly, courts in this district have ruled that additional evidence may be considered regarding subject matter jurisdiction following the close of discovery, and even after adjudicating this issue. *See Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc.,* 227 F.3d 62, 71 (3d Cir.2000) (holding that district court erred in barring additional untimely evidence relevant to subject matter jurisdiction and stating "that in the context of a challenge to subject matter jurisdiction which can be raised at any time during the course of the litigation, the District Court should have considered the additional evidence"); *Hygienics Direct Co. v. Medline Industries, Inc.,* 2000 WL 1468511 at *8 (E.D.Pa.2000) (dismissing case for lack of diversity jurisdiction on the state of the record, but allowing parties additional time to submit new evidence and nullify the order). Thus, this Court concludes that, in this context, it may consider this additional evidence submitted after the close of discovery.

12  In the supplementary Hunt Affidavit, defendant states that, currently, two of the four Committee members located in Missouri "also maintain a permanent office in Chicago, Illinois." (Supp. C. Hunt Aff. ¶ 10); (Tr. at 59). However, defendants fail to provide any evidence as to whether these committee members had these additional offices in Illinois at the time the state Petition was filed, and how frequently, and for what purposes, they used such secondary offices.

13  For example, defendants state that "In 2002, [Jefferson Smurfit] generated $250,255,839 in revenue from sales in Illinois, compared with $116,065,049 in revenue from sales in Missouri." (C. Hunt Aff. ¶ 8). However, that same year, the company generated roughly $358-million in California and $305-million in Florida. Likewise, California also led Illinois and Missouri in revenue by plant origin.

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.