# Exhibit 1

Amended Particulars of Claim pursuant to CPR r17.1(2)(b), CPR r17.4(2) and by Order of The Honourable Mr Justice Teare dated 6 March 2019

**In the High Court of Justice**
Claim No. CL-2018-000297

**Business and Property Courts of England & Wales**

**Commercial Court**

Between:

SKAT

**(the Danish Customs and Tax Administration)**

**Claimant**

and

**SOLO CAPITAL PARTNERS LLP (IN SPECIAL ADMINISTRATION) & OTHERS**

**Defendants**

**In the High Court of Justice**      Claim No's. CL-2018-000404; CL-2018-000590

**Business and Property Courts of England & Wales**

**Commercial Court**

Between:

SKAT

**(the Danish Customs and Tax Administration)**

**Claimant**

and

**INDIGO GLOBAL PARTNERS LTD & OTHERS**

**Defendants**

---

### AMENDED PARTICULARS OF CLAIM

---

1.    These are the Amended Particulars of Claim of the Claimant ("SKAT"). SKAT is a function of the Danish Government and is charged with the assessment and collection of Danish taxes. It brings these claims in a private capacity as a result of the civil wrongs set out herein.

2.    In these Particulars of Claim:

    (a)    References to the "**First Claim**" are to Claim Number CL-2018-000297; references to the "**Second Claim**" are to Claim Number CL-2018-000404; and references to the "**Third Claim**" are to Claim Number CL-2018-000590;

(b)     References to the "**Alleged Fraud Defendants**" are to the 1st to 15th, 17th to 32nd and 34th to 63rd Defendants in the First Claim and to the 4th, 18th to 22nd and 25th Defendants in the Second Claim and the 8 Defendants in the Third Claim, against whom allegations of dishonesty are made by SKAT.

(c)     References to the "**Non-Fraud Defendants**" are to the 33rd and 63rd to 69th Defendants in the First Claim and to the 1st to 3rd, 5th to 13th, 15th to 16th, 23rd and 24th Defendants in the Second Claim, against whom no allegations of dishonesty are made by SKAT;

(d)     SKAT's claim against particular Defendants is supplemented by the facts and matters set out in the Schedules hereto;

(e)     Where reference is made to any document, SKAT will rely at trial on the document in question for its full terms and effect.

## A     SUMMARY

3.     In summary and as further particularised below and in the Schedules hereto:

(a)     Under Danish law, a Danish company is obliged to withhold and pay to SKAT as withholding tax ("**WHT**") 27% of any dividend which it pays to shareholders. Certain foreign shareholders are entitled, under Danish law, to a refund of the tax withheld if they beneficially owned the shares and beneficially received the dividend (net of WHT) in respect of those shares on the relevant dates;

(b)     Between August 2012 and July 2015, SKAT received numerous applications for the refund of withholding tax, as set out in Schedule 1 hereto (the "**WHT Applications**"). The WHT Applications were principally made by English based agents ostensibly on behalf of US pension funds and certain entities in Malaysia, UK or Luxembourg. SKAT accepted the WHT Applications and, as a result, paid out approximately DKK12.65~~73~~ billion (c. £1.512 billion),[1] alternatively DKK9.713 billion (c. £1.159 billion), to the agents which had made the WHT Applications;

---

[1] These Particulars use an exchange rate of DKK8.377:£1 for illustrative purposes.

(c)   By each such WHT Application, the Alleged Fraud Defendants made (or assisted in or procured the making of) a number of representations, including that the applicant in question beneficially owned the shares and had beneficially received the dividend (net of WHT deducted) in respect of those shares on the relevant dates, and that the applications were genuine (i.e. were made with an honest belief in the facts stated in them) (the "**WHT Representations**");

(d)   The Alleged Fraud Defendants knew that the WHT Representations were false (or they were reckless as to whether they were true or false). The persons on whose behalf the WHT Applications were purportedly made (the "**WHT Applicants**") did not beneficially own the shares in question and/or had not beneficially received the dividends on the relevant dates and/or the Danish company had not withheld tax in respect of such dividend. They were therefore never entitled to any refund of WHT;

(e)   The WHT Applications were made as part of a fraudulent scheme (or schemes) by which the Alleged Fraud Defendants: (i) identified or procured or assisted in the formation of seemingly eligible applicants for WHT refunds; (ii) manufactured fictitious and/or sham transactions and/or carried out illegitimate trading for the purpose of facilitating WHT Applications; (iii) made or procured or assisted in the making of the WHT Applications, including the WHT Representations; and (iv) dealt with the sums paid by SKAT in reliance on said representations in such a way as to conceal and/or launder and/or distribute the proceeds of the WHT Applications;

(f)   Pending disclosure, the best particulars that SKAT can give are that, of the money paid out by SKAT in reliance on the WHT Representations, at least c.DKK6.715 billion (or c.£802 million) was ultimately received by the Alleged Fraud Defendants (not the purported WHT Applicants), through a complex web of transactions, which included the extensive use of offshore vehicles. SKAT infers that the intention of such transactions was to launder the proceeds of the monies, which the Alleged Fraud Defendants had deceived SKAT into paying out, and share them amongst themselves;

3

(g)    The primary individual responsible for the fraudulent scheme (or the primary fraudulent scheme) was Mr Sanjay Shah (the 34th Defendant in the First Claim) and entities controlled by him, principally:

    (i)    Solo Capital Partners LLP (the 1st Defendant in the First Claim) and related companies including the 2nd to 4th, 15th, 24th and 30th Defendants in the First Claim (collectively, the "**Solo Group Companies**");

    (ii)    Elysium Global Limited ("**Elysium Global**", the 48th Defendant in the First Claim) and related companies including the 17th, 35th, 46th, 47th, 49th, 50th, 53rd Defendants in the First Claim and the 4th, 18th, 19th, and 21st Defendants in the Second Claim (collectively, the "**Elysium Group Companies**").

(h)    The other Alleged Fraud Defendants were joint tortfeasors and/or co-conspirators with Mr Shah and the Solo Group and Elysium Group Companies;

(i)    SKAT brings its claims in English, alternatively Danish law. In respect of the Alleged Fraud Defendants, the claims are based on their dishonest participation in the WHT Representations and/or the WHT Scheme and/or their receipt of proceeds of the fraud;

(j)    Further, SKAT claims against the Non-Fraud Defendants in respect of their negligent participation in the WHT Scheme and/or their receipt of the proceeds of the fraud.

## B    DEFENDANTS

4.    SKAT brings the claims set out in these Particulars of Claim against the Defendants to the First to Third Claims. The details of the Defendants and their role in the alleged wrongdoing (including the basis on which the knowledge, acts or intention of individual Defendants are to be attributed to corporate Defendants) are recorded in Schedule 5 to these Particulars of Claim. SKAT reserves the right to update these particulars, in particular following receipt of disclosure and/or evidence. In particular, SKAT notes that (at the date of these Particulars) Mr Sanjay Shah and his companies

have failed properly to comply with the proprietary disclosure orders made by the Court.

5.    In summary, the Defendants fall into the following categories:

(a)    Those Defendants which acted as tax reclaim agents and which made WHT Applications to SKAT, purportedly on behalf of WHT Applicants: Goal TaxBack Limited ("**Goal**", the 66th Defendant in the First Claim), Koi Associates Limited (in liquidation) ("**Koi**", the 67th Defendant in the First Claim), Syntax GIS Limited (in liquidation) ("**Syntax**", the 68th Defendant in the First Claim and the 22nd Defendant in the Second Claim), Acupay System LLC ("**Acupay**", the 3rd Defendant in the Second Claim) (collectively, the "**Agents**") and Global Equities GmbH ("**Global**", the 24th Defendant in the Second Claim);

(b)    Those Defendants which provided "credit advice" notes (or similar) which were included in the WHT Applications as purported evidence that the WHT Applicants beneficially owned the relevant shares and had beneficially received the relevant dividends at the relevant dates (net of WHT deducted): Solo Capital Partners LLP ("**SCP**", the 1st Defendant in the First Claim), Telesto Markets LLP ("**Telesto**", the 2nd Defendant in the First Claim), Old Park Lane Capital Ltd ("**Old Park Lane**", the 3rd Defendant in the First Claim), West Point Derivatives Ltd ("**West Point**", the 4th Defendant in the First Claim), North Channel Bank Gmbh ("**North Channel**", the 33rd Defendant in the First Claim), Salgado Capital ("**Salgado**", the 62nd Defendant in the First Claim), ED&F Man Capital Markets Ltd ("**ED&F Man**", the 69th Defendant in the First Claim), Indigo Global Partners Ltd[2] ("**Indigo**", the First Defendant in the Second and Third Claims) and Lindisfarne Partners LLP ("**Lindisfarne**, the Second Defendant in the Second Claim) (collectively, the "**Custodians**");

(c)    Those Defendants which SKAT believes were party to the fraud and which either received the traceable proceeds of the sums which SKAT paid out or were the shareholders, officers and/or controllers of entities which received such proceeds i.e. the Alleged Fraud Defendants; and

---

[2] Then called Indigo Securities Ltd.

(d)     Those Defendants which were themselves WHT Applicants and on whose behalf the Agents purportedly made WHT Applications (the 64th and 65th Defendants in the First Claim and the 10th to 14th Defendants in the Second Claim) and the officers or trustees thereof (the 5th, 6th, 8th and 9th Defendants in the Second Claim).

## C    DIVIDEND WHT REGIME

6.      Withholding tax is a common fiscal device by which taxes are deducted at the source by a payer of income, and are then paid on to the relevant tax authority.

7.      Under section 65 of the Danish Withholding Tax Act (enacted by Consolidated Act no. 1403 of 7 December 2010) 1967, Danish companies are obliged to withhold 27% of any dividend declared as WHT and only pay to the shareholder the dividend net of WHT. The withheld amount is paid by the company to SKAT.

8.      Under section 69B(1) of the Danish Withholding Tax Act (enacted by Act no. 591 of 18 June 2012) 1967, a shareholder in respect of whose shares part of a dividend has been withheld as WHT may apply to SKAT for the repayment of WHT if any part of the tax was not due.

9.      If a shareholder is resident in the United States, Malaysia, Canada, the United Kingdom or Luxembourg, then the following double taxation treaties provide that Denmark may not tax dividends received by the shareholder at all or may only do so at a rate which is less than 27%. In such circumstances, the shareholder may have a right to a refund of WHT. In particular:

(a)     In respect of the United States, Articles 10(3)(c) and 22(2)(e) of the Convention between the Government of the United States of America and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income (as amended by the Protocol with effective date 1 January 2001) provides that if the beneficial owner of dividends is a pension fund resident in the United States, Denmark may not tax dividends paid by a Danish company to that pension fund at all.

(b)     In respect of Malaysia, Article 10 of the Agreement between the Government of Malaysia and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income provides that if dividends are paid by a Danish company to a Malaysian resident who is subject to Malaysian tax in respect thereof, Denmark may not tax dividends paid by that Danish company to that Malaysian resident at all;

(c)     In respect of Canada, Article 10(1) and 30(3) of the Agreement between the Government of Canada and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income (effective date 2 March 1998) provides that if the beneficial owner of the dividends is resident in Canada, Denmark may not tax dividends received by a resident of Canada at a rate above 15%;

(d)     In respect of the United Kingdom, Article 10(2)(b) and Section 4 of the Convention between the Government of the Kingdom of Denmark and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains (as amended by the Protocols signed on 1 July 1991 and 15 October 1996) provides that if the beneficial owner of the dividends is resident in the United Kingdom, Denmark may not tax dividends received by a resident of the United Kingdom at a rate above 15%; and

(e)     In respect of Luxembourg, Articles 10 and 23 the Convention between the Government of the Grand Duchy of Luxembourg and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Establishment of Rules for Reciprocal Administrative Assistance with Respect to Taxes on Income and Capital Gains (signed 17 November 1980) provides if the beneficial owner of the dividends is resident in Luxembourg, Denmark may not tax dividends received by a resident of Luxembourg at a rate above 15%.

10.     At all relevant times, a shareholder in a Danish company that sought a refund of WHT had to complete (or arrange to have completed on its behalf) a form produced by

SKAT entitled "Claim to Relief from Danish Dividend Tax", with reference number 06.003 ENG (the "**Tax Relief Form**"). The Tax Relief Form required the following:

(a)     A declaration by the person completing the form that they were doing so in their capacity "as beneficial owner" or "on behalf of the beneficial owner";

(b)     The sum in Danish Kroner in respect of which a refund was sought;

(c)     The name, address and email address of the "Beneficial Owner";

(d)     If the claim was made on behalf of the beneficial owner, a power of attorney giving authority to the person completing the Tax Relief Form;

(e)     Documentation regarding "dividend advice(s)"; and

(f)     Certification that "*the beneficial owner is covered by the Double Taxation Convention*" between Denmark and the relevant foreign jurisdiction.

11.     The Tax Relief Form would be signed by the person completing the form.

12.     If SKAT accepted an application for a refund of dividend WHT, it would make payment of the sums claimed to the account specified in the Tax Relief Form.

## D    THE WHT APPLICATIONS

13.     SKAT's claim is made in respect of the WHT Applications made between August 2012 and July 2015 by the Agents and Global.

14.     The Agents and Global purportedly made the WHT Applications on behalf of 306 foreign WHT Applicants, being: (a) 277 US pension funds: (b) 24 Malaysian companies; (c) 3 Canadian pension funds; (d) a British pension fund (Europa LLP Executive Pension Scheme, the 64th Defendant in the First Claim); and (e) a Luxembourg company (Khajuraho Equity Trading Sarl, the 65th Defendant in the First Claim). A full list of the WHT Applicants is at Schedule 1 to these Particulars of Claim.

15.     The WHT Applications that were purportedly made on behalf of WHT Applicants resident in the US, Canada and Malaysia were in respect of all the tax withheld.

16.    The WHT Applications that were purportedly made on behalf of WHT Applicants resident in the United Kingdom and Luxembourg were in respect of the difference between the 27% tax withheld and the 15% maximum tax rate under the relevant double taxation treaty.

17.    Each WHT Application was made up of the following documents:

(a)    A Tax Relief Form completed by the Agents or Global on behalf of the WHT Applicants;

(b)    A covering letter from the relevant Agent or Global;

(c)    One or more "credit advice" notes (in the case of SCP, Telesto, West Point, Salgado, Indigo and Lindisfarne), "dividend credit" (in the case of North Channel Bank), "income advice" (in the case of Old Park Lane) or "tax voucher" (in the case of ED&F Man) that were produced by the Custodians (the "**Credit Advice Notes**"). The Credit Advice Notes purported to record that:

i)    a specific number of shares in a specific Danish company were held for the named WHT Applicant (in most cases, specifying the "ex-date", being the date before which the share must be owned in order to be entitled to a dividend on the "payment date");

ii)    a specific dividend had been received for the account of the named WHT Applicant (in most cases, specifying the "payment date", being the date on which dividends are paid); and

iii)    such dividend had been received by the WHT Applicant net of a specific amount of tax that had been withheld by the named Danish company;

(d)    A document from a foreign authority certifying that the WHT Applicant was resident in the relevant foreign jurisdiction.

18.     The WHT Applications were made in respect of purported shareholdings in 21 listed Danish companies, which belonged to the OMX Copenhagen 20 Index in Denmark, as set out in Schedule 1 hereto.

**E      THE WHT REPRESENTATIONS**

**E1.     The Agent Representations and the Custodian Representations**

19.     The WHT Applications contained the following express, alternatively implied, representations (collectively, the "**Agent Representations**"):

(a)     The WHT Applicant was the beneficial owner of the shares in the Danish company described in the Credit Advice Note (on the day before the ex-date recorded therein, where stated); and/or

(b)     The WHT Applicant had beneficially received the dividend, net of tax, described in the Credit Advice Note (on the payment date described therein, where stated); and/or

(c)     The dividend had been paid to the WHT Applicant, after the Danish company had withheld the tax described in the Credit Advice Note; and/or

(d)     The WHT Application was a genuine application (i.e. made with an honest belief as to the truth of the statements of fact in it) to reclaim tax deducted from a dividend paid to the WHT Applicant by the named Danish company.

20.     A reasonable person in the position of SKAT would have understood (and SKAT in fact understood) the Agent Representations to have been made, given: (i) the terms of the Tax Reclaim Form completed by the Agents and Global on behalf of the WHT Applicants; (ii) the terms of the covering letter provided by the Agents and Global; and (iii) the terms of the Credit Advice Note(s) provided with the Tax Reclaim Form; and (iv) the fact that such documents were being submitted to SKAT as part of a WHT Application seeking to reclaim WHT deducted by a Danish company in respect of a dividend purportedly received by the WHT Applicant.

21.     Further, the Credit Advice Notes themselves contained the following representations (together, the "**Custodian Representations**"):

(a)     The specific number of shares in the named Danish company were held for the named WHT Applicant (before the "ex-date", where stated);

(b)     A specific dividend had been received for the account of the named WHT Applicant (on the "payment date", where stated);

(c)     Such dividend had been received by the named WHT Applicant net of a specific amount of tax that had been withheld by the named Danish company; and

(d)     The Credit Advice Note was an honest and accurate statement of the facts set out therein by the relevant Custodian.

22.     The Agent Representations and the Custodian Representations are referred to collectively in these Particulars of Claim as the "**WHT Representations**".

**E2.    Falsity of the WHT Representations**

23.     The WHT Representations were false because, in particular:

(a)     The WHT Applicants did not own the relevant shares in the Danish companies beneficially or at all prior to the ex-date (where stated); and/or

(b)     The WHT Applicants had not received the relevant dividends from the Danish companies beneficially or at all on the payment date (where stated); and/or

(c)     The Danish company in question had not withheld the stated tax in respect of the dividend purportedly received by the WHT Applicant; and/or

(d)     The Credit Advice Notes issued by SCP, Telesto, West Point, Old Park Lane, Salgado and Indigo were not honest statements of the facts set out therein by the relevant Custodian, for one or more of the above reasons.

24.   The falsity of the WHT Representations is to be inferred from the following facts and matters:

(a)   In the relevant period (August 2012 to July 2015):

(i)   There was a substantial increase in the number of applications for the refund of WHT. In particular, the number of such applications increased from 24,292 in 2011 to 41,764 in 2014 and then to 34,850 in the first 7 months of 2015 alone;

(ii)   There was a substantial increase in the amounts paid out by SKAT in response to such WHT applications. In particular, the total sums paid by SKAT increased from DKK1.12 billion in 2011 to DKK6.06 billion in 2014 and then to DKK8.73 billion in the first half of 2015 alone. This included the following sums paid by SKAT as a result of the WHT Applications:

(A)   DKK40.44.7 million in 2012;

(B)   DKK7974.6 million in 2013;

(C)   DKK3.8391 billion in 2014;

(D)   DKK7.996 billion in the first 78 months of 2015;

(iii)   There was a substantial increase in the proportion of WHT received by SKAT which was ultimately refunded (the "**Refund Percentage**"). In particular, the Refund Percentage rose from 11.6% in 2011 to 47.2% in the first half of 2015;

(iv)   Further, the percentage of shares in companies in the OMX Copenhagen 20 Index allegedly owned by the WHT Applicants on the day prior to ex-date was implausibly high as illustrated by the examples set out in Schedule 2 hereto. By way of example, the WHT Applicants would have had to have owned approximately 80% of the shares in TDC on 7 August 2014 and 5 March 2015, in order to support the relevant WHT Applications relating to that company;

(b)     The WHT Applicants did not have the assets necessary to make the very substantial investments in the Danish companies, which would have been required for the WHT Applicants to have become entitled to receive the dividends in respect of which the WHT Applications were based. In particular:

    (i)     Schedule 1 contains a master list of all WHT Applications, including details of the implied value of the shareholdings that would have been required to obtain the dividends in respect of which tax was allegedly withheld so as to justify the WHT Applicants reclaiming such tax from SKAT;

    (ii)     It is inherently unlikely that the WHT Applicants would have been able to afford share purchases of that magnitude, particularly in so far as they were:

        (A)     recently incorporated pension plans or companies and/or one or two-person pension plans and/or had limited to no assets (which SKAT infers to have been the case for the large majority of WHT Applicants based on the Norwich Pharmacal disclosure received from ED&F Man and/or Indigo and/or the report on North Channel Bank produced by KPMG for BaFin (the "**BaFin Report**"); and

        (B)     set up by and/or represented by a small number of individuals (as set out in paragraph 50(b) below);

(c)     Since July 2016, SKAT has issued preliminary decisions in respect of all the WHT Applications. In these preliminary decisions, SKAT annulled its previous decisions to accept the WHT Applications and pay the requested amounts. Those preliminary decisions invited a response from the relevant WHT Applicant prior to SKAT making a final decision and evidence relied on by the WHT Applicants. In the responses received, none of the WHT Applicants: (i) were able to explain how they in fact managed to acquire the relevant shareholdings in the Danish companies, relying instead on speculative suggestions as to possible legitimate bases for their involvement; or (ii) provided any documentary evidence purporting to support their alleged

beneficial ownership or receipt of the shares or the dividends (other than the Credit Advice Notes);

(d)    As set out further in Section H below, the majority of the sums paid by SKAT in reliance on the WHT Representations was paid by the Agents to SCP. SCP's receipt and subsequent use of that money, as particularised below, is not consistent with the WHT Applicants having been the beneficial owners of the shares and/or having beneficially received the dividends (and thereby becoming entitled to a WHT refund). In particular:

(i)    There is no apparent legitimate reason for SCP to have received such a large proportion of the sums paid by SKAT to the Agents (DKK8.438 billion or c.£1.007 billion), when those Agents were purportedly receiving the funds on behalf of the WHT Applicants;

(ii)    There is no apparent legitimate reason for SCP to have paid on such substantial sums (directly or indirectly) to Alleged Fraud Defendants (c.DKK6.715 billion or c.£802 million), as specified at Section F3 below and in the Schedule 5 hereto, instead of the WHT Applicants; and

(iii)    SCP's use of the funds which it received shows an apparent intention: (A) to conceal and/or launder the proceeds of the WHT Applications such that the origin of the funds was obscured (including through the use of offshore intermediaries and the acquisition of majority interests in Varengold Bank and Dero Bank); and (B) to distribute such proceeds to the Alleged Fraud Defendants who (it is to be inferred as set out in Section G below) were the primary actors in the alleged fraud on SKAT.

(e)    In the BaFin Report, KPMG recorded that:

(i)    North Channel Bank acted as custodian for a number of purported transactions in 2014 involving the following entities with custody accounts at North Channel Bank:

(A)    25 US pension funds as "buyer" (of whom 24 pension plans were WHT Applicants);

(B)   7 companies as "seller" (of whom 6 were based in the BVI and one in Belize);

(C)   A single third party as "share lender" (Sherwood Enterprises Limited, a Cayman entity);

(D)   A single broker (Bastion Capital London Limited, which SKAT notes received a number of payments from SCP and Ganymede Cayman as set out in paragraph 50(e) below);

(ii)   In each case, the parties above purported to enter into a series of connected, contemporaneous share transactions that were circular and cancelled each other out. In particular:

(A)   The "buyer" agreed to buy shares from the broker, who agreed to buy them from the "seller", who agreed to borrow them from the "share lender", who agreed to borrow them from the "buyer" (SKAT reserves its position as to whether the brokers were acting as principals or agents);

(B)   Each of these connected transactions was purportedly entered into prior to the ex-date for the relevant company, with settlement due shortly after the ex-date;

(C)   The net result was that the transactions offset each other and there were never any shares held in the North Channel Bank custody accounts;

(iii)   Further, a number of weeks or months later, the parties entered into a series of further connected, contemporaneous share transactions that reversed the effect of the first set of transactions. In particular, the "buyer" agreed to sell the same shares back to the broker, who agreed to sell them to the "seller" and the share lending agreements were terminated prematurely;

(iv)   Yet further, it does not appear that any net dividend payments were received by any of the US pension plans that were buyers. Rather, the

"seller" was debited the amount of the dividend (net of WHT), the "buyer" was credited the amount of the net dividend, the cash collateral between the "buyer" and the "share lender" was correspondingly reduced and the cash collateral between the "share lender" and the "seller" was correspondingly increased, resulting in a loop with no actual transfer of any net dividends;

(v)    The only purpose of these purported transactions was to generate a claim for WHT payment, in reliance on a dividend credit advice from North Channel Bank. There was no other commercial rationale for the purported transactions, which did not result in any or any other material profits for any of the parties. Further, none of the parties to the purported transactions took any price risk in relation to the shares. In the circumstances, SKAT infers that the fruits of WHT refunds were shared between the parties to the purported transactions;

(vi)   In each case, the authorised representatives of the US pension funds were was Donald Donaldson and Adam LaRosa (although Donald Donaldson alone signed all the powers of attorney given to the tax reclaim agents). Further, the model for the North Channel Bank "trades" was introduced by Adam LaRosa. These individuals were the signatories on Powers of Attorney given by US pension plans to tax reclaim agents authorised representatives for pension plans in respect of whose WHT Applications the 1st and 3rd largest payments were made by SKAT (being DKK2.744 billion and DKK1.185 billion respectively). In the case of Mr Donaldson, all WHT Applications were based on Credit Advice Notes from Indigo, North Channel Bank and Lindisfarne. In the case of Mr LaRosa, all WHT Applications were based on Credit Advice Notes from SCP. In the circumstances set out in these Particulars of Claim, SKAT infers that the same or a substantially similar model of trades was utilised in a significant proportion of WHT Applications made using Credit Advice Notes from other custodians;

(e1)   The model presented by Mr LaRosa as described in the BaFin Report was a simplified version of the model of circular "trades" between connected parties

that was employed in the WHT Scheme by the Solo Group Custodians and Salgado, a diagram of which is at Schedule 6A hereto (the "**Solo Model**"):

(i)    The Solo Model was a closed loop of circular transactions that did not require any actual shares or payments for shares to be transferred:

   (A)    Under the first leg of the transactions:

      (1)    The "seller" (an offshore company) agreed to "sell" a certain quantity of shares in a Danish company to an intermediate broker ("**Broker A**") shortly before the ex-date, with settlement to take place shortly after the ex-date;

      (2)    Broker A entered into a back to back "sale" of those same shares for the same price and on the same terms to a further intermediate broker ("**Broker B**"); and

      (3)    Broker B entered into a back to back "sale" of those same shares for the same price and on the same terms to the "buyer" (a WHT Applicant, who was notionally eligible to reclaim WHT);

   (B)    Under the second leg of the transactions:

      (1)    The "buyer" agreed to "loan" the same shares to a "stock lender ("**Stock Lender A**") in return for cash "collateral" in the amount of the notional sale price under the first leg, with settlement to take place on the same day as under the first leg;

      (2)    Stock Lender A entered into a back to back "stock loan agreement" on the same terms to "loan" the same shares to a further "stock lender" ("**Stock Lender B**");

      (3)    Stock Lender B entered into a back to back "stock loan agreement" on the same terms to loan the same shares



back to the original "seller";

(C)    The net effect of the first two legs of the circular transactions was that the "buyer" was purportedly buying shares from a "seller" (via intermediate brokers), who was obtaining the same shares from the "buyer" itself (via intermediate "stock lenders"). In other words, the same entity was both buying and lending (or borrowing and selling) the same shares at the same time. Further, the money to be used to pay for those shares was notionally to come from the "seller", which was simultaneously supposed to receive the same money from the "buyer". The transactions were therefore offsetting, requiring no transfer of shares or payment for those shares;

(D)    Under the third leg of the transactions:

(1)    The "buyer" entered into a "forward contract" to "sell" the same shares to a "forward counterparty" ("**Forward Counterparty A**"), for settlement a number of weeks after the "ex-date";

(2)    Forward Counterparty A entered into a back to back "forward contract" to "sell" the same shares to a further "forward counterparty" ("**Forward Counterparty B**");

(3)    Forward Counterparty B entered into a back to back forward contract to "sell" the same shares back to the original "seller";

(4)    Contemporaneously with settlement of these trades, the "stock loans" in the second leg of the transactions would be unwound or terminated;

(5)    As such, the shares would be notionally returned by the "seller" to the "buyer" (via the "stock lenders") at the same time as being notionally returned by the "buyer"

to the "seller" (via the "forward counterparties"). The transactions were therefore offsetting again, requiring no transfer of actual shares;

(ii)    Further, the Solo Model did not involve any dividend payments (net of tax withheld by a Danish company) entering the loop. As depicted in the diagram at Schedule 6A, the only external payment to the loop of circular transactions was the WHT reclaimed from SKAT by Acupay, Goal or Syntax (which was to be shared between the participants to the circular transactions, with substantially all going to the Alleged Fraud Defendants);

(iii)   As further depicted in the diagram at Schedule 6A, SCP was at the heart of the circular transactions with all "trade instructions" being "provided" to and "executed" by SCP in respect of custody accounts at SCP, the other Solo Group Custodians or Salgado. On the basis of the circular transactions, which gave an appearance of legitimacy (particularly when any leg of the transaction was viewed in isolation), SCP, the other Solo Group Custodians and Salgado produced Credit Advice Notes to support the WHT Application, notwithstanding that there were no shares, no payment for those shares and no dividends;

(iv)    Yet further, whilst the circular transactions ostensibly involved a number of independent parties, each of the "buyers", "sellers", "stock lenders" and "forward counterparties" were in reality owned, controlled or in league with Mr Shah and the Solo and Elysium Group Companies. The brokers were interposed to give the transactions the false appearance of being at arms' length between unrelated parties. In fact, all the "trades" were arranged by SCP as part of a closed loop without the brokers performing a normal broking function of buying and selling in the market;

(v)     This can be illustrated by reference to the ledger at Schedule 6B (the "**Oaks Ledger**"):

(A)    This records a series of circular transactions relating to 588,158 shares in GN Store Nord O/S in respect of which DKK142,922.39 was reclaimed from SKAT through Acupay based on a Credit Advice Note from SCP dated 24 March 2015, purportedly on behalf of The Oaks Group Pension Plan;

(B)    With respect to the first and second legs of the circular transactions (no's 1-3 and 7-9):

(1)    On 19 March 2015 (the day before the ex-date), "OAK01" (the "buyer") purportedly purchased the shares from "SUN01" (Broker A), which purportedly purchased them from "ARF01" (Broker B), which purportedly purchased them from "DDC01" (the "seller"). In each case, the notional price was DKK90,693,963.60 and settlement was to occur on 24 March 2015 (the dividend payment date);

(2)    On 23 March 2015, "DDC01" (the "seller") purportedly agreed to borrow the same shares from "CEK01" (Stock Lender A), which purportedly agreed to borrow them from "PML01" (Stock Lender B), which purportedly agreed to borrow them from "OAK01" (the "buyer"). In each case, the notional collateral amount was DKK90,693,963.60 and the settlement was to occur on 24 March 2015;

(3)    Upon settlement on 24 March 2015, the above "trades" resulted in "DDC01" purportedly selling shares (indirectly) to "OAK01" with "OAK01" simultaneously purportedly lending the very same shares (indirectly) to "DDC01". Further, in order to purchase those shares, "OAK01" required money that it was receiving (indirectly) from "DDC01" itself (as the collateral for the stock loan) at the very same time that "OAK01" was

supposed to pay that money to "DDC01". These transactions therefore offset each other with no transfer of shares or payment for those shares taking place;

(E)    With respect to the third leg of the circular transactions (no's 4-6):

   (1)    On 19 March 2015, "OAK01" purportedly entered into a forward transaction to sell the same shares to "ALL01", which purportedly agreed to sell them by way of forward to "REH01", which purportedly agreed to sell them by way of forward back to "DDC01", with settlement to occur between June and September 2015;

   (2)    The effect of the forward transactions was that, on settlement, the stock loan then existing (ultimately) between "OAK01" and "DDC01" could be unwound, with the shares notionally being returned to "OAK01" at the same time as "OAK01" was notionally returning those shares to "DDC01". Once more, these transactions offset with no actual shares being transferred;

(F)    The "buyer" ("OAK01") is The Oaks Group Pension Plan, a US pension plan represented by Mathew Tucci, who was the authorised representative for 27 US pension plans in respect of whose WHT Applications SKAT paid out DKK1.160 billion. As set out at paragraphs 50(c) below, companies owned and controlled by Mr Tucci received payments from Ganymede Cayman and SCP (via the intermediaries, "Acai", "Philo", "Fire" and "Parla") totalling at least US$3,932,044 between June and August 2015. A further company of Mr Tucci, White Sand Advisors, received an alleged "loan" of US$3.5m from Elysium Dubai in around June 2016;

(G)     The "seller" ("DDC01") is DDC Cayman Ltd ("**DDC**"), a Cayman company (incorporated on 17 September 2012, struck off the register on 30 June 2017), owned and/or controlled by Paul Oakley. DDC received payments totalling at least €10,252,277.71 from Ganymede Cayman between November 2012 and May 2015. Further, Mr Oakley was a shareholder and director (along with Owen Mitchell) of Orca Investments Ltd, an English company that received payments totalling at least €999,213.04 from SCP (via "Acai", "Philo", "Fire" and Parla" referred to at paragraph 50(c) below) in the latter half of 2015;

(H)     Forward Counterparty A ("ALL01") is Allitsen Asset Ltd, a BVI company (incorporated on 12 December 2014, dissolved on 9 March 2016), which acted by its "trader", Rebecca Robson. Ms Robson is a former employee of Solo Capital Ltd, SCP, West Point and Callisto Asset Management LLP (another entity associated with Mr Sanjay Shah). She was remunerated for her role in the circular transactions pursuant to the Solo Model initially through Luxembourg companies[3] owned and controlled by Sanjay Shah and (from 2014) through Polar Advisors FZE, which received payments totalling at least £75,000 from Ganymede Cayman and at least €574,000 from SCP (via the intermediaries, "Acai", "Philo", "Fire" and Parla") between mid-2014 and mid-2015;

(I)      Forward Counterparty B ("RHE01") is Rheidol Trading Limited, a BVI company (incorporated on 9 December 2014, dissolved on 2 May 2017), which was owned and/or controlled by David (Dai) Griffiths. Mr Griffiths also owned and/or controlled LDW Consultants Limited (incorporated on 25 June 2009, dissolved on 1 November 2017), which received sums totalling €9.05m from Ganymede Cayman between August 2014 and June 2015;

---

[3] These included AESA, Pallas Equity Trading Sarl and Athena Equity Trading Sarl.

(J)     Stock Lender A ("CEK01") is CEKA Invest GmbH (now called Körner Unternehmensgruppe GmbH), a German company ultimately owned and/or controlled by Alex Körner. Between 2013 and 2015, Mr Körner owned and/or controlled 4 other "stock lenders" that participated in the circular transactions under the Solo Model: Relative Value Trading Gmbh, Rock Capital Private Fund Ltd, RVT Consult Gmbh and EQ Invest Gmbh. During this period, Mr Körner's companies were paid at least €2,316,720.04 by Ganymede Cayman and SCP (via "Fire", "Philo", and "Acai"). Further, Mr Körner is or has been a director of Treefrog Capital Limited (the 19th Defendant in the Second Claim, formerly known as Arche Cayman Limited), Trillium Capital Sarl (the 32nd Defendant in the First Claim, formerly known as VEM Holdings Sarl) and IP Universal Limited (a company that acts as director to numerous companies owned or controlled by Mr Sanjay Shah);

(K)     Stock Lender B ("PML01") is Principle Markets Limited, a BVI company (incorporated on 21 October 2014, dissolved on 10 February 2016), which was owned and/or controlled by Martin Smith, the 63rd Defendant in the First Claim. As set out in Schedule 5L: (a) Mr Smith owned and/or controlled 7 other "stock lenders" that participated in the circular transactions under the Solo Model (including Colbrook, the 45th Defendant in the First Claim); and (b) during the period 24 June 2014 to 1 October 2015, Mr Smith's companies received sums totalling €15,111,242.90 from SCP (directly or via "Fire", "Acai", "Parla, and "Philo), Ganymede Cayman and Elysium Dubai.

(f)     Further, the BaFin Report recorded that North Channel Bank sent its Credit Advice Notes to Indigo. As set out in Schedule 3A hereto, many of the North Channel Bank and Indigo Credit Advice Notes in 2014 related to the same number of shares in the same Danish companies at the same time but for different US pension plans. Similarly, as set out in Schedule 3B hereto, Mr

Bains signed a number of Credit Advice Notes in 2013 on behalf of SCP on the same date for the same number of shares in the same Danish company for different US pension plans;

(g)     Yet further, in many other cases as illustrated by the examples in Schedule 4 hereto, Credit Advice Notes were produced by Custodians for different US pension plans on the same day in respect of the same Danish company for similar volumes of shares (often increasing by regular intervals);

(h)     SKAT also relies on the further facts and matters set out at paragraphs 50 and 50A below;

(i)     In the circumstances, it is inferred that:

   (i)     The WHT Applications were based on fictitious records of transactions that never occurred, such that the WHT Applicants did not acquire any interest in the relevant shares in the Danish companies prior to the ex-date and/or never received the relevant dividends from the Danish companies by the payment date (net of WHT deducted); and/or

   (ii)    The WHT Applications were based on circular transactions that cancelled each other out, which:

      (A)    did not involve any actual transfer of shares in or dividends from the relevant Danish company to any of the WHT Applicants;

      (B)    were created by the Alleged Fraud Defendants (or persons associated with them) for the sole purpose of manufacturing a claim to a WHT refund by the WHT Applicants;

      (C)    resulted in the large part of WHT refunds being paid to parties other than the WHT Applicants, in particular SCP and ultimately the Alleged Fraud Defendants; and/or

   (iii)   The WHT Applications were based on sham transactions, which the parties thereto entered into with a common intention to mislead, knowing that (or being reckless as to whether) such transactions (or documents

purporting to record such transactions) did not create the legal rights and obligations that they had the appearance of creating. In particular, the Alleged Fraud Defendants manufactured the relevant transactions for the purpose of making WHT Applications, by:

(A)    identifying, procuring or assisting in the formation of seemingly eligible applicants for WHT refunds (through associated intermediaries or otherwise);

(B)    purportedly "selling" shares (through associated brokers or otherwise) into the names of such WHT Applicants as "buyer", shortly before the ex-date purportedly to trigger the right to receive the dividend and reclaim the WHT from SKAT;

(C)    purportedly "lending" those shares to a "stock borrower/lender" so as to notionally provide the capital required for the WHT Applicant to pay for the shares "purchased";

(D)    notwithstanding that the same (or a connected) "stock borrower/lender" was lending the same shares to the "seller" to be "sold" to the "buyer" (namely, the WHT Applicant), resulting in a circular and stockless transaction;

(E)    subsequently unwinding the purported "stock loans" and purportedly "re-selling" the shares (through associated brokers or otherwise) to the "sellers" (directly or indirectly through owned and/or controlled companies) a few weeks or months later once the purpose of the purported trading had been fulfilled;

(F)    in circumstances where:

(1)    the "sellers" or "stock borrowers/lenders" were the Alleged Fraud Defendants or their corporate vehicles or other associated (presently unknown) persons who were party to the WHT Scheme, none of whom were eligible to reclaim WHT from SKAT;

(2) each of the participants in the manufactured transactions had accounts with the Custodian in which the shares were purportedly held and to which payment for those shares were purportedly made;

(3) the net dividend was never in fact received by the WHT Applicant; and

(4) the profits of the WHT refunds were shared between the nominal "buyer" and "seller" or "stock borrower/lender" in such manufactured transactions (with the majority going ultimately to the Alleged Fraud Defendants); and/or

(iv) To the extent that WHT Applications were based on actual acquisitions of shares in the relevant Danish companies by WHT Applicants:

(A) such shares were traded by the Alleged Fraud Defendants multiple times around the ex-date so as to enable multiple WHT Applicants to purportedly receive the same dividend in order to purportedly support multiple WHT Applications (despite the Danish company having only withheld tax once in respect of such dividend); and/or

(B) the WHT Applicant was not the beneficial owner of the shares or the dividends because (i) they had been acquired using funding or collateral provided by the Alleged Fraud Defendants; and/or (ii) the WHT Applicants had an obligation to pass on the dividend and/or the majority of the WHT refund to the Alleged Fraud Defendants; and/or (iii) the WHT Applicant was a mere nominee as regards the shares with no control as regards their disposition.

## F    PROCEEDS OF THE WHT APPLICATIONS

### F1.    Payments by SKAT

25. In reliance on the WHT Representations (and acting under a mistake of fact or law induced thereby), SKAT paid DKK12.66573 billion to the Agents, which it would not otherwise have done. In summary:

(a)    Between September 2012 and July 2015, SKAT made payments totalling DKK4.5~~1~~949 billion to Goal's account at National Westminster Bank in London;

(b)    Between May 2014 and July 2015, SKAT made payments totalling DKK3.043 billion to Syntax's account at Barclays Bank in London;

(c)    Between April 2015 and August 2015, SKAT made payments totalling DKK1.22 billion to Koi's account at Barclays Bank in London;

(d)    Between September 2012 and August 2015, SKAT made payments totalling DKK3.61 billion to Acupay's account at Dexia Banque Internationale in Luxembourg;

(e)    Between 24 September 2012 and 29 April 2015, SKAT made payments totalling DKK259 million to Global ~~Equities GmbH~~; and

(f)    On 5 July 2013, SKAT made payments totalling DKK11.5 million to Globe Tax Services Inc.

26.    For the reasons given below, Syntax (from 19 September 2014, alternatively 3 December 2014, alternatively 25 March 2015) made the Agent Representations fraudulently, which induced SKAT to make the payments set out in paragraph 25(b) above. It therefore received the sums after such dates (being DKK2.765 billion, alternatively DKK2.736 billion, alternatively DKK2.721 billion) as constructive trustee for SKAT, alternatively is to be so treated following SKAT's election to rescind the transactions by which the payments were made as set out in paragraphs 52-54 below.

## F2.    Transfers to Solo Capital Partners LLP

27.    After receipt of the sums referred to in paragraph 25 above, Syntax, Goal and Acupay made the following aggregate payments to SCP totalling DKK8.012 billion (or c.£1.007 billion):

(a)     Between November 2014 and August 2015, Syntax paid a total sum of DKK2.746 billion to the accounts of Solo Capital Partners LLP ("**SCP**") at Barclays Bank;

(b)     Between July 2013 and July 2015, Goal paid a total sum of DKK2.79 billion to SCP's accounts at Barclays Bank; and

(c)     Between October 2014 and August 2015, Acupay paid a total sum of DKK2.961 billion to SCP's accounts at Barclays Bank.

28.     The above sums represented the traceable proceeds of sums paid by SKAT to the Agents and Global in reliance on the WHT Representations.

29.     At the time of these Particulars of Claim, SKAT does not know the ultimate destination of the payments to Koi but reserves the right to amend to plead such destination(s) following disclosure.

30.     For the reasons given below and in Schedules 5A and 5I , SCP and Indigo were was a fraudulent participants in the misrepresentations which induced SKAT to make the payments to the aAgents set out in paragraph 25 above. They It therefore received the sums referred to in paragraph 27 above as constructive trustees for SKAT, alternatively are is to be so treated following SKAT's election to rescind the transactions by which the payments were made (as set out in paragraphs 52-54 below).

**F3.    Transfers to the Alleged Fraud Defendants**

31.     Of the DKK8.012 billion received by SCP from the Agents, SCP paid a total of DKK4.263 billion (or c. £509 million) directly to accounts at Varengold Bank AG ("**Varengold Bank**"). This included substantial payments to accounts at Varengold Bank of Alleged Fraud Defendants. In particular, as set out in Schedule 5 hereto:

(a)     Between 23 July 2015 and 13 August 2015, Mr Sanjay Shah (the 34th Defendant in the First Claim) received payments to his accounts at Varengold Bank directly from SCP totalling US$11,100,000 and €4,500,000;

(b)     Between 11 August 2014 and 18 December 2014, Ganymede Cayman Limited ("**Ganymede Cayman**", the 46th Defendant in the First Claim and an entity

ultimately beneficially owned by Mr Sanjay Shah) received payments to its accounts at Varengold Bank directly from SCP totalling €200,624,137, £57,319,077 and US$5,308,011;

(c) On 8 September 2015 and 10 September 2015, Elysium Global Limited (the 48th Defendant in the First Claim and an entity beneficially owned by Mr Sanjay Shah) received payments to its accounts at Varengold Bank directly from SCP of €222,100,000 and £14,999,983 respectively;

(d) Between 25 November 2014 and 12 June 2015, Trillium Capital Sarl (the 32nd Defendant in the First Claim, formerly known as VEM Holdings Sarl) received payments to its account at Varengold Bank directly from SCP totalling €60,500,000;

(e) Between 13 June 2014 and 24 March 2015, Ampersand Capital Limited (the 51st Defendant in the First Claim) received payments to its account at Varengold Bank directly from SCP totalling €13,763,641.37;

(f) Between 24 June 2014 and 14 August 2015, Colbrook Limited (the 45th Defendant in the First Claim) received payments to its account at Varengold Bank directly from SCP totalling €8,666,662.93;

(g) Between 27 May 2014 and 21 August 2015, Elysium Global (Dubai) Limited ("**Elysium Dubai**", the 35th Defendant in the First Claim and an entity beneficially owned by Mr Sanjay Shah) received payments to its accounts at Varengold Bank directly from SCP totalling €2,211,193, US$1,574,970 and £800,000; and

(h) On 6 June 2014, T&S Capital (the 44th Defendant in the First Claim) received a payment to its account at Varengold Bank directly from SCP of €2,000,000.

32. In addition, SCP paid a total of approximately DKK2.452 billion (or c. £293 million) directly to accounts of Alleged Fraud Defendants other than at Varengold Bank. In particular, as set out in Schedule 5 hereto: