# Exhibit 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re

CUSTOMS AND TAX ADMINISTRATION
OF THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX
REFUND LITIGATION

This document relates to: 1:18-cv-05053-LAK

MASTER DOCKET

Case No.: 1:18-md-02865-LAK

---

THE GOLDSTEIN LAW GROUP PC 401(K)
PROFIT SHARING PLAN and SHELDON
GOLDSTEIN,

        Third-Party Plaintiffs,

    -against-

ED&F MAN CAPITAL
MARKETS, LTD.,

        Third-Party Defendant.

---

## AMENDED COUNTERCLAIMS OF THIRD-PARTY DEFENDANT
## ED&F MAN CAPITAL MARKETS, LTD.

Third-Party Defendant ED&F Man Capital Markets, Ltd. ("ED&F Man"), by and through

its attorneys, Binder & Schwartz LLP, and pursuant to Rule 15 of the Federal Rules of Civil

Procedure, submits its Amended Counterclaims against Third-Party Plaintiffs The Goldstein

Law Group PC 401(K) Profit Sharing Plan (the "Plan") and Sheldon Goldstein ("Goldstein"

and collectively with the Plan, the "Third-Party Plaintiffs" or the "Goldstein Parties"). ED&F

Man's Answer and Affirmative Defenses are not hereby amended.

## FIRST COUNTERCLAIM AGAINST THE GOLDSTEIN PARTIES
### (Indemnification)

1.      On June 21, 2012, the Plan and ED&F Man entered into a Custody Agreement (the "Custody Agreement") that established ED&F Man's contractual obligations as the Custodian for the Plan.  The Custody Agreement set forth the terms and conditions of business between ED&F Man as the Custodian and the Plan as the Client.

2.      The Plan's Custody Agreement with ED&F Man is attached to the Third-Party Complaint (MDL Dkt. No. 219) as Exhibit F.

3.      Pursuant to the binding terms of the Custody Agreement, the Plan maintained "responsibility for the selection, acquisition and disposal of the Client Property." (Third-Party Complaint Ex. F, at 11(m)).

4.      Client Property is defined as (i) "any securities (including evidence thereof, evidence of title thereto and all rights in respect thereof) deposited or transferred by the Client or on the Client's behalf to the Custodian or a Sub-Custodian or collected by the Custodian or a Sub-Custodian for the Client's account"; and (ii) all "cash in any currency arising out of or in connection with the Client Securities and any amounts standing to the credit of the Client Cash Account."  (Third-Party Complaint Ex. F, at 1.1).

5.      ED&F Man and the Plan explicitly agreed that ED&F Man "does not act as manager or investment adviser to" the Plan. (Third-Party Complaint Ex. F, at 11(m)).

6.      In accordance with the parties' respective obligations under the Custody Agreement, the Plan conceived, structured, and directed each of the Danish securities transactions (the "Danish Transactions") that ED&F Man executed on behalf of the Plan.

7.      The Plan designated its Authorized Agent (Acer Investment Group, LLC) as its attorney-in-fact with respect to its trading account[s] with ED&F Man pursuant to a Power of

Attorney dated March 23, 2012.  A true and correct copy of the Power of Attorney is annexed hereto as Exhibit 1.

8.      The Plan acknowledges in the Power of Attorney, among other things, that ED&F Man "shall be entitled to rely upon the instructions, orders and requests provided to it by [the Authorized Agent] as if given or made by [the Plan]."  Power of Attorney, Ex. 1 at section 1.3(b)

9.      Accordingly, all acts by the Authorized Agent as agent and attorney-in-fact on behalf of the Plan pursuant to the management of the Plan's ED&F Man brokerage account are imputed to the Plan as principal.

10.     In or about March 2012, Stacey Kaminer ("Kaminer"), the principal for the Authorized Agent and authorized signatory for the Plan, participated in a conference call with ED&F Man to discuss "onboarding" several clients to ED&F Man for brokerage services, including the Plan.  In that meeting, Kaminer represented that she was preparing the forms to open the accounts on behalf of the Plan.

11.     In the same phone conference,  ED&F Man and Kaminer discussed potential markets, and Kaminer agreed to send over indicative trade schedules and flow diagrams of various trade structures for the purpose of enacting trades with ED&F Man.

12.     Kaminer subsequently sent the trading structures that would be the basis for the Danish Transactions to ED&F Man.

13.     Pursuant to the trading structures sent by Kaminer, ED&F Man was to pay the Authorized Agent a significant fee in connection with the transactions.

14.     At all relevant times, the Plan, acting through its Authorized Agent, was aware that ED&F Man would conduct transactions through its inter-dealer broker, Volcafe, as this was explicitly acknowledged in the communications between ED&F Man and the Authorized Agent.

15.     Far from being "solicited" by ED&F Man for the purposes of engaging in trades, it was the Plan that approached ED&F Man, having been brought to ED&F Man by its Authorized Agent.

16.     Upon information and belief, the Plan's Authorized Agent and/or Kaminer originated the trading structures used by ED&F Man in the Danish Transactions on behalf of their client, the Plan.

17.     The Plan, through its Authorized Agent, originated, structured, and communicated the trading structures used in the Danish Transactions to ED&F Man.

18.     ED&F Man executed the Danish Transactions at the specific direction of the Plan through its Authorized Agent.

19.     The Plan, through its authorized agent, repeatedly notified ED&F Man of its interest in acquiring Danish securities, and for several transactions specifically requested specific numbers of shares, asking ED&F Man to provide liquidity for the equity purchase.

20.     Having been made aware of the Plan's consistent trading strategy and interest in Danish securities, at times ED&F Man would notify the Plan through its Authorized Agent if there was liquidity in a Danish stock.

21.     At all relevant times and for each Danish Transaction, ED&F Man only executed the trades at the specific request of the Plan, and in accordance with the trading structures it supplied.

22.     Once the trades were executed at the direction and with the knowledge of the Plan, the Plan, through its Authorized Agent, specifically requested that ED&F Man send the Tax Vouchers from the Danish Transactions to Goal for the reclaim applications.

23.     Pursuant to the Custody Agreement, the Plan agreed to indemnify ED&F Man "fully and effectively [] against each liability, loss and cost which may be suffered or incurred by" ED&F Man in connection with "the Client Property, this Agreement, or the performance of [ED&F Man's] obligations under this Agreement."  (Third-Party Complaint Ex. F, at 16(a)(i)).

24.     The Plan also agreed to indemnify ED&F Man "fully and effectively" against "any Tax for which [ED&F Man] is or may be liable or accountable in connection with the Client Property, this Agreement or the performance of [ED&F Man's] obligations under this Agreement (including without limitation the purchase and/or sale of Client Securities, the collection and/or realisation of coupons, dividends, interest or other payments, the receipt of or entitlement to receive any income, and the Custodian acting as or being deemed to be a trustee, branch, or agent of the Client) provided that this indemnity shall not extend to Tax on or attributable to any Fees." (Third-Party Complaint Ex. F, at 16(a)(ii)).

25.     ED&F Man has fully satisfied all of its obligations under the Custody Agreement.

26.     ED&F Man's Terms and Conditions of Business (the "Terms and Conditions") set out contractual terms governing the relationship between ED&F Man and the Goldstein Parties, subject, where relevant, to any transaction-specific documentation.  A true and correct copy of the Terms and Conditions is annexed hereto as Exhibit 2.

27.     On or about April 18, 2012, Goldstein executed an acknowledgement indicating that he had "read and understood the relevant sections" of the Terms and Conditions.  A true and correct copy of the acknowledgment is annexed hereto as Exhibit 3.

28.     Pursuant to the Terms and Conditions, the Goldstein Parties agreed, among other things, to indemnify ED&F Man against "any loss, liability, costs and expenses" incurred by ED&F Man "either directly or indirectly in the due performance of [ED&F Man's] obligations" under the Terms and Conditions.

29.     ED&F Man is entitled to complete indemnification by the Goldstein Parties pursuant to the Custody Agreement and/or the Terms and Conditions, including, without limitation, for all liabilities, losses and/or costs suffered or incurred in connection with (i) the Custody Agreement and/or the Terms and Conditions; (ii) the performance of ED&F Man's obligations under the Custody Agreement and/or the Terms and Conditions; (iii) any tax reclaim applications submitted by or on behalf of the Plan for the Danish Transactions; and/or (iv) any action or proceeding—whether in this jurisdiction, in the English Action,[1] or in any other proceedings—related to the Custody Agreement, the Terms and Conditions, the performance of ED&F Man's obligations under the Custody Agreement and/or the Terms and Conditions, and/or any tax reclaim applications submitted by or on behalf of the Plan for the Danish Transactions.

---

[1] The "English Action" is the case titled *Skatteforvaltningen v. Solo Capital Partners LLP*, Nos. CL-2018-000297, CL-2018-000404 & CL-2018-000590 (2018), in the High Court of Justice, Business and Property Courts of England and Wales.

## JURY DEMAND

ED&F Man demands a jury trial on all issues so triable.

## REQUEST FOR RELIEF

**WHEREFORE**, Third-Party Defendant ED&F Man Capital Markets, Ltd. respectfully requests that this Court enter judgment against Third-Party Plaintiffs The Goldstein Law Group PC 401(K) Profit Sharing Plan and Sheldon Goldstein, as follows:

    i.    Dismissing the Third-Party Complaint as against ED&F Man in its entirety;

    ii.    Judgment in favor of ED&F Man against the Third-Party Plaintiffs;

    iii.    Judgment ordering full and complete indemnification of ED&F Man;

    iv.    An award of reasonable attorneys' fees and costs; and

    v.    Such other and further relief as the Court deems just and appropriate.

Dated:    New York, New York
            April 20, 2020

                    Respectfully submitted,

                    **BINDER & SCHWARTZ LLP**

             By:   /s/ Neil S. Binder
                 Neil S. Binder
                 Binder & Schwartz LLP
                 366 Madison Avenue, 6th Floor
                 New York, NY 10017
                 Telephone:  212-510-7031
                 Facsimile:   212-510-7299
                 nbinder@binderschwartz.com

                 *Attorneys for Third-Party Defendant / Third-Party Counter Claimant ED&F Man Capital Markets, Ltd.*

# Exhibit 1



**ED&F MAN**

E D & F MAN CAPITAL MARKETS

# Power of Attorney

## Corporate

Dated 3/23/12

**1  Power of Attorney and Authority**

1.1  The undersigned investor(s) (the Customer) hereby appoints: Acer Investment Group, LLC
**Full name of Attorney**
of 5532 Lillehammer Ln Suite 103 Park City, UT 84098
**(Full address of Attorney) (the Attorney)**

My/our relationship with the Attorney is Broker Dealer
*[Please indicate whether the Attorney is a relative (and state you are how related) or a professional adviser (and state e.g. whether it is a lawyer, financial adviser, etc.)].*

Have you appointed the Attorney to manage your account on a discretionary basis?  Yes ☐  No ☒

1.2  The Attorney hereby accepts appointment, as attorney-in-fact with respect to the trading account of the Customer (the **Account**) with E D & F Man Capital Markets Limited, with full power and authority to invest and trade the cash, assets and investments in the Account in accordance with the Agreement (including the cover letter, account opening form and terms of business) as it may be amended or supplemented from time to time, entered into or to be entered into between the Customer and E D & F Man Capital Markets on or about the date of this power of attorney. The Attorney is authorised to invest and trade the said cash, assets and investments in its discretion, without prior notice to or consultation with the Customer, to the same extent and with the same force and effect as if such actions were taken by the Customer directly.

Without limitation of the foregoing, the Attorney is hereby authorised to:

(a)  purchase, sell (including short sales) and otherwise deal in the investment selected by the Customer in the account opening form or in writing to E D & F Man Capital Markets from time to time on margin or otherwise at such times and in such amounts as the Attorney in its discretion deems appropriate and to give to E D & F Man Capital Markets all instructions, orders or requests as the Attorney thinks fit for such purpose; and

(b)  *(delete if not applicable)* lend securities in the Account to third parties upon such terms as the Attorney in its discretion deems appropriate and to give to E D & F Man Capital Markets all instructions, orders or requests as the Attorney thinks fit for such purpose.

1.3  The Customer acknowledges and accepts that:

(a)  all transactions for the Account are for his/her account and risk;

(b)  E D & F Man Capital Markets shall be entitled to rely upon the instructions, orders and requests provided to it by the Attorney as if given or made by the Customer; and

(c)  E D & F Man Capital Markets may issue statements of account to the Attorney so that adequate records are maintained to demonstrate the nature of the orders submitted with respect to the Account and the time at which such orders are submitted.

1.4  The Attorney is not authorised to withdraw cash, assets or other investments from the Account.

1.5  This Power of Attorney shall remain in full force and effect until revoked by the Customer by notice in writing to the Attorney with a copy to E D & F Man Capital Markets. The Customer acknowledges and agrees that this Power of Attorney shall continue in full force and effect until notice of revocation is actually received by the Attorney and E D & F Man Capital Markets and that revocation of this Power of Attorney shall not affect the liability of the Customer with respect to any orders or transactions for the Account initiated prior to the receipt by E D & F Man Capital Markets of such notice of revocation.

Cottons Centre
Hays Lane
London SE1 2QE
Telephone: +44 (0)20 7089 8000

ED&FMAN/MCM/Corp/POA/006/30.01.12

1.6 The Customer acknowledges and agrees that [he/she/it] will be relying on the Attorney and not on E D & F Man Capital Markets to exercise judgement on his/her behalf on the merits or suitability of transactions for the Account.

1.7 The Customer hereby ratifies and confirms all transactions entered into for the Account prior to the date hereof.

2 **Governing Law**
This Power of Attorney shall be governed by and construed in accordance with the laws of England.

3 **Acknowledgement**
The Customer hereby confirms that he/she has read and understands this Power of Attorney and in that knowledge accepts and agrees to the terms hereof.


**(Please complete the appropriate part of this signature block if you are a company)**

**(Company incorporated in Great Britain (England, Wales or Scotland))**

Executed as a deed by:
_____
(Name of company)

acting by (a director and its secretary) (two directors) (delete as applicable)

Signed: _____
(Director)

Print name: _____

Signed: _____
(Director) (Secretary)

Print name: _____

**(Non Great Britain company executing a deed under the Foreign Companies (Execution of Documents) Regulations 1994)**

Executed as a deed by: The Goldstein Law Group PC 401(k)
Profit Sharing Plan FBO Sheldon and Scott Goldstein
(Name of company)

and signed by: Sheldon Goldstein
(Print Names of authorised signatory(ies)) being (a) person(s)

who in accordance with the law of: USA
(Country of incorporation)

are acting under the authority of the company

Signed: _____

Print name: Sheldon Goldstein

Date: 3/23/~~~

Signed: _____

Print name: _____

Date: _____

Case 1:18-md-02865-LAK Document 350-2 Filed 05/20/20 Page 1 of 49

# Exhibit 2

## TERMS AND CONDITIONS OF BUSINESS

**INTRODUCTION**

E D & F Man Capital Markets Limited ("MCM") is authorised and regulated by the Financial Services Authority, FSA Register No. 194296. Our registered office is Cotton's Centre, Hay's Lane, London SE1 2QE. The main business of MCM is the provision of investment and custody services.

Further information may be obtained from the FSA Register by visiting the FSA website www.fsa.gov.uk/register, by telephoning 0845 606 1234 or by writing to the FSA at 25, The North Colonnade, Canary Wharf, London E14 5HS.

Please read these Terms and Conditions carefully. It is important that you retain these Terms and Conditions as your rights are governed by them.

We have internal procedures for handling complaints fairly and promptly. You may send a complaint to us by letter, telephone, email or in person to the Compliance Department. Complaints made in writing should be made for the attention of the "Complaints Officer". Please contact us if you would like further details about our complaints procedure. As a Professional Client or Eligible Counterparty, you will have no right of complaint to the Financial Ombudsman Service. We participate in the Financial Services Compensation Scheme which, for those clients that are covered ("Eligible Claimants"), pays compensation in the event of the inability of an FSA-regulated firm to pay monies due, or satisfy obligations owed, for designated business (including obligations to return client money) up to a maximum compensation limit of £50,000 for investments per Eligible Claimant.

**DEFINITIONS AND INTERPRETATION**

In these Terms and Conditions, the following words and expressions have the meanings set out below (unless the context otherwise requires):

"**Affiliate**" means any affiliated company that is an undertaking in the same group as us, a representative whom we or an undertaking in the same group as us appoint, or any other person with whom we have a relationship that might reasonably be expected to give rise to a community of interest between us and them;

"**Applicable Law**" means all applicable laws and regulations of the UK;

"**Authorised Person**" means, where the account is in the name of:

- an individual: that individual;

- joint account holders: in respect of payment instructions, any of the joint account holders; and, in respect of other instructions, any of the joint account holders nominated in the account opening form;

- a trust: any of the trustees;

- a company: any of those officers, employees or agents whose names have been notified to us by you in writing; and

- in relation to any of the above: an agent acting on that person's behalf whose name has been notified to us by you in writing.

1

"**Base Currency**" means the lawful currency of the United Kingdom;

"**Business Day**" means any day on which banks are open for general commercial business in London;

"**Disclosure Booklet**" means the booklet of regulatory and other disclosures that we may send to you from time to time;

"**Exchange Contract**" means in respect of a Transaction made between us, a matching Transaction identical in its terms to your Transaction with us, except as to the parties, which we shall have made (or arranged to have made through an intermediate broker who may be an Affiliate) on a principal-to-principal basis on an Exchange or shall have accepted the allocation of any such Transaction;

"**FSA**" means the Financial Services Authority, currently of 25 The North Colonnade, Canary Wharf, London E14 5HS, including any replacement regulatory authority;

"**FSA Rules**" means the rules and guidance of the FSA (as amended from time to time);

"**FSMA**" means the Financial Services and Markets Act 2000 (as amended from time to time);

"**LME**" means the London Metals Exchange, currently of 56 Leadenhall Street, London EC3A 2 DX;

"**LME Select**" has the meaning in the rules of the LME;

"**Market**" means any regulated market, or multilateral trading facility (as such terms are defined in the FSA Rules);

"**MCM", "we"** or **"us"** means E D & F Man Capital Markets Limited;

"**Relevant Rules**" means any applicable exchange or clearing house rules (as amended from time to time);

"**Ring**" each has the meaning in the rules of the LME; and

"**Transaction**" means any Transaction subject to these Terms and Conditions, and includes:

(a) a contract made on a Market or Exchange or pursuant to the Relevant Rules of a Market or an Exchange;

(b) a contract that is subject to the Relevant Rules of a Market or an Exchange;

(c) a contract which would (but for its term to maturity only) be a contract made on, or subject to the Relevant Rules of a Market or Exchange and which, at the appropriate time, is to be submitted for clearing as a contract made on, or subject to the Relevant Rules of a Market;

(d) a contract made with any other party which contract is not subject to the Relevant Rules of any Market or Exchange (an 'over the counter' contract) and in any of cases (a) to (d) being a future, option, contract for differences, spot or forward contract of any kind in

2

relation to any commodity, financial instrument (including any security), currency, interest rate, index or any combination thereof;

(e)  an Exchange Contract;

(f)  a contract to buy or sell a commodity;

(g)  a contract to buy or sell a security; or

(h)  any other Transaction as agreed by us and you.

"**you**" and "**your**" means a person who engages with us as a client and is thereby subject to these Terms and Conditions.

References to a 'clause' mean a clause of these Terms and Conditions.  References to legislation, regulations, orders or rules shall mean such legislation, regulations, orders or rules, as amended from time to time or any re-enactment or replacement legislation, regulations, orders or rules, from time to time.  Clause headings are for convenience only and do not affect the interpretation of these Terms and Conditions.

**OUR SERVICES**

**1 Scope**

The services to be provided are set out in these Terms and Conditions.  We may provide such additional services as may be agreed between us and you in writing.

**2 Communications with Us**

(a)  **Placing of instructions**

You must give us instructions:

- for Transactions: by telephone or any other means we agree with you; and

- for any other purpose: in writing (including fax, email or any other electronic means).

(b)  **Authority**

We will accept instructions from any Authorised Person.  If we receive conflicting instructions, we reserve the right to act on one instruction or none at all, and we will use reasonable endeavours to inform all relevant persons of this.

We shall rely on the continuing authority of an Authorised Person to act on your behalf, whether alone or with others, until we receive from you a written notice to the contrary.

We may act upon instructions given or purported to be given by an Authorised Person without enquiry as to the genuineness, authority or identity of such person.

(c)  **Amendment of instructions**

3

Once given, instructions may be withdrawn or amended only with our consent and provided that we have not acted upon them.

(d) **Execution of instructions**

We will execute Transactions in accordance with our Execution Policy, which is available on request. The Execution Policy is subject to this clause 2 and, in addition, we reserve the right to:

- refuse to accept instructions;

- not be able to enter into transactions as a result of Exchange action;

- impose conditions on carrying out an instruction;

- require you to limit the number of open positions which you may have with us;

- in our sole discretion close out any one or more Transactions in order to ensure that such position limits are maintained; and/or

- subject to the FSA Rules, aggregate transactions in respect of your portfolio with those of our own or of other clients, without asking you first. Such transactions will be allocated on a fair and reasonable basis in accordance with the FSA Rules. This process, described as "aggregation", may on occasion operate to your disadvantage, in which case we will disclose to you such disadvantage.

In the event that we refuse to accept instructions, we will use reasonable endeavours to notify and explain the reasons for this to you. We will not be liable for any expense, loss or damage incurred by you if we fail to notify you of such refusal of instructions unless this is a result of our gross negligence, bad faith, wilful default or fraud. We will further not be liable for any consequential or special damage.

Your placing of a limit order in respect of shares traded on a regulated market will be taken to be an express instruction that if the order is not immediately executed we are not required to make the order public so as to be accessible to other market participants.

(e) **Performance and settlement**

Pursuant to any Relevant Rules, you must promptly deliver all instructions, money, documents or assets as required for any Transaction, thus enabling us to perform our obligations in a timely manner (and as modified by any instruction given by us).

I.  You must promptly pay such sums of money as we may require at any time in or towards the clearance of any debit balance on any of your accounts held with us.

II. If you instruct us to purchase an investment for you, and you fail to ensure that we are holding sufficient cleared funds on your behalf on the appropriate settlement date to pay in full for the investment on that date for any reason other than as a result of our negligence, wilful default or fraud, we may (in our discretion but subject to any Relevant Rules) take one or more of the following actions:

- if practicable, not execute the Transaction;

- settle the Transaction on your behalf at our expense;

4

- sell, at the prevailing market price, sufficient of the investments for which settlement is outstanding to recover the amount of any shortfall; or

- sell, at the prevailing market price, sufficient of your other assets to recover the amount of any shortfall.

Where reasonably practicable, we will attempt to notify you before we take such action.

III.   If you instruct us to sell an investment for you and we are unable to complete settlement of the Transaction on the appropriate settlement date for any reason other than our negligence, wilful default or fraud, we may, at our discretion and without prior reference to you, buy sufficient investments, at your expense, at the prevailing market price, to enable us to complete settlement of the Transaction. Where reasonably practicable, we will attempt to notify you before we take such action.

IV.   In the event that we take any steps under paragraphs II or III of this clause, we will notify you of the action we have taken, together with the details of any amounts that you are required to pay as a result.

V.   We will, subject to your compliance with your obligations, pay or deliver any sums or assets to you by crediting your account with us.

VI.   If in any Transaction we deliver securities to you when your obligations to us have not been fully satisfied, then you will hold them on trust for us until your obligations to us are satisfied.

VII.   With FX Transactions:

(i)   each party will pay to the other all outstanding amounts owing by it on the date specified in the confirmation, although we will not pay if you fail, within two Business Days of our reasonable request, to give us assurance that you will be able to perform your obligations in respect of FX Transactions on that date; and

(ii)   payments will be made in the same day (or be immediately available) and be freely transferable funds to a bank account notified by the relevant party to the other at least five Business Days before payment is due.

VIII.   You must pay, on a full indemnity basis, any costs, claims, liabilities, expenses, fines, penalties or losses from time to time suffered or incurred by us by reason of any steps we take pursuant to this clause; any breach of these Terms and Conditions; any failure by you to duly perform your obligations in relation to any Transaction or Exchange Contract; or of us taking steps following an Event of Default.

(f)   **Derivatives**

- When we enter into a Transaction on an Exchange as an intermediate broker, we will automatically be deemed to have entered into with you a matching transaction on a principal-to-principal basis on identical terms except as to the parties and price.

5

- Unless we agree otherwise by way of confirmation and in the absence of earlier instructions from you to close out, each Transaction will be closed out before its expiry and settled in cash.  If we do so agree:

  (i)     you undertake to deliver all underlying property with full title guarantee and free of all third party rights;

  (ii)    title will pass at the time the warrant/commodity is delivered except that, where we are the seller, title will remain with us until we have received full payment;

  (iii)   risk will pass to you on delivery (where a commodity is in your possession before title has passed to you, you will preserve its condition and make good or fully compensate us for any damage or deterioration);

  (iv)    any commodity delivered will be of satisfactory quality pursuant to any Relevant Rules;

  (v)     where you intend to take physical delivery, you will notify us of this decision two Business Days in advance of the delivery date;

  (vi)    costs incurred by us in effecting physical delivery will be borne by you;

  (vii)   any commodity required to be delivered physically will be delivered to such location as is reasonably specified by the receiving party and in accordance with its reasonable instructions; and

  (vii)   with bullion:
  - it will be held on an unallocated basis;
  - delivery will occur upon confirmation of receipt;
  - delivery to an unallocated account excludes all warranties as to title; and
  - if we become liable for any VAT on delivery, you will pay an equivalent amount to us.

- Any instruction to exercise options must be received by us before the expiration time notified to you by us (which may be on or before the expiration time established by the relevant Exchange).  If you fail to so instruct us, the option may expire worthless.

- We will notify you of any profit or loss that results from closing out any transaction amounts due to us or any broker, exchange or clearing house will be due and payable upon such notification.

- Where there has been an error in the execution of your instruction, the relevant exchange may allow us to enter into an Exchange Contract in order to satisfy your instruction.  In such circumstances, we will try where possible to secure and offer a price that is better than that at which the error transaction was executed.

- Where we have bought or sold in accordance with your instruction, except that we have traded the wrong delivery/expiry month or wrong exercise price of the relevant contract, then we may in accordance with any Relevant Rules offset any loss arising from that trade against any improvement achieved for you in the course of correctly satisfying your instruction, thus offering you only a net improvement, if any.

- You acknowledge and accept that:

6

(i) the relevant intermediate broker, exchange or clearing house may alter a contract's terms or liquidate it; and

(ii) the exchange or clearing house may instruct us to take an action with regard to a Transaction,

and, in either case, the Transaction between us will be automatically amended to match the relevant Exchange Contract.

- If we execute (but do not clear) Transactions, then:

(i) the give-up will be subject to a give-up agreement entered into by you, us and your clearing broker, and this paragraph (f) will be read accordingly; and

(ii) if your clearing broker does not accept the Transaction for clearing then the provisions of these Terms and Conditions with regard to clearing and settlement will apply.

(g) **Securities**

- We may enter into Transactions which:

(i) will result in your having a short position, that is, a further Transaction will be necessary to fulfil your outstanding obligations to the market; or

(ii) may be for a settlement date beyond the normal market settlement date and, accordingly, you may find yourself committed to buying or selling securities at a price which is higher or lower than the market price for other transactions entered into on the same date but for the normal market settlement date.

In either case we may ask you to provide us with a deposit or security to cover your future obligations and may call margin or collateral of any amount at anytime under clause 10 below.

- Transactions on a delivery-versus-payment basis will be settled accordingly.

## 3  Advisory Services

MCM does not give investment advice or recommendations or provide an advisory service.

(a) **General**

All Transactions undertaken by us on your behalf are on an execution-only basis. Where you are categorised as a Professional Client and where required by the FSA Rules, we will, solely on the basis of information supplied by you (which we shall assume is accurate) assess, before it is provided, whether a proposed service is appropriate for you and, having assessed that it is, continue to make that service available to you, subject to these Terms and Conditions, unless and until you draw to our attention in writing information which reasonably indicates that such assessment ought to be changed.

We do not under any circumstances provide:

7

- advice on the merits of a Transaction;

- a recommendation that a Transaction is suitable for you; or

- tax advice.

Views expressed to you orally or in writing concerning investments, investment strategies, markets, opportunities, situations or other matters are to be construed in all cases to constitute generic information and/or personal views and should not be construed as regulated financial services advice or recommendations.

(b)     **Updating information**

On an annual basis you should update us, in writing, with any changes to the information which you have previously supplied to us, particularly if such information is likely to affect your regulatory status or client categorisation pursuant to the FSA Rules.

(c)     **Research**

We or our Affiliates may from time to time provide research reports to you (but are under no obligation to do so or to send any such reports to all our customers). Where they do so, they need not see that any information they give is given either before or at the same time as it is made available to other Affiliates or to our or their employees, officers or directors.  Further, you may not receive them at the same time as our other customers.

We or our Affiliates and our and their employees, officers and directors may receive, have knowledge of, act upon or use such research reports (or any conclusions expressed thereon or research or analysis upon which they are based) prior to publication or after they have been published but before they are received by our customers (e.g. because of postal delays).

***No obligation to take account of research.***  We are under no obligation to take account of any reports published to our customers when we deal with you or on your behalf.  Further, we are not required to ensure that our dealings with you or on your behalf take account of any such research which has been carried out for us, our Affiliates, market makers or otherwise with a view to assisting our or their own activities.

**4      Electronic Services**

(a)     "**Electronic Service**" means a service provided by us for your use upon which you may view information and enter into Transactions via our and/or a third party's electronic order routing/trading system.

(b)     **Our services**

At our absolute discretion we may provide you with direct access to an exchange or a closed user electronic communication network ("**ECN**") using our own computer equipment (the "**Equipment**") or otherwise.  Where appropriate we may supply to you the software (the "**Software**") necessary to enable your system to interconnect with our server, the Equipment, a designated link (a "**Designated Link**") and access to our online settlement data service ("**Online Settlement Data Service**").

8

We will issue a username and password to you and each person nominated by you in writing (the "**Authorised User**").

We may make such modifications, improvements or additions to the Equipment, electronic service or any part of it as we deem fit.

(c)     **Your Obligations**

• As applicable to you and the type of service we provide to you, you will:

i.      comply with all of our relevant policies concerning use of the facilities outlined in clause 4(a) and (b);

ii.     take reasonable care of the Equipment and Software and not (i) interfere or tamper with, alter, amend or modify the Equipment; (ii) copy any Software; (iii) reverse compile or disassemble any Software; (iv) move the Equipment; and

▪ not create or allow to be created any encumbrance over the Equipment; do or permit to be done any act which might prejudice our rights, or those of our suppliers, in the Equipment or result in it being taken from your possession;

▪ maintain the accommodation, environment and facilities for the Equipment as reasonably specified by us, and use the Equipment only in accordance with the manufacturer's recommendations;

▪ maintain all necessary support services;

▪ run such tests and provide such information to us as we shall reasonably consider necessary;

▪ only implement Transactions in accordance with Applicable Law;

▪ accept any updates or modifications to Software and install and use a state-of-the-art virus detection/scanning program (in the event that you become aware of a material defect, malfunction or virus you will immediately notify us and cease to use all such electronic services until you have received permission from us);

▪ use the services solely for the purpose supplied and not on behalf of any third parties without our prior written consent;

▪ not sell, lease, store, re-transmit, redistribute or provide, directly or indirectly, the electronic services and Software or any component thereof to any third party;

▪ provide all equipment and network services necessary;

▪ ensure that your system is compatible with our Software;

▪ since between us all information provided via the electronic service or incorporated Software is our exclusive and proprietary property, you agree to protect our proprietary rights in it.

- We will assume that all Transactions entered into and communications made with your password were entered into or made by you.

- You must ensure that your password is not disclosed to any other person, and is sufficiently complex to prevent it being guessed by another person.

(d)  **Withdrawal of an Electronic Service**

We may suspend or withdraw temporarily or permanently any Electronic Service.

(e)  **Right Of Access**

We may, on reasonable notice, enter your premises and inspect your system and trading practices to ensure that you are carrying out electronic trading in accordance with these Terms and Conditions.

(f)  **Setting Limits and Controls**

We may set limits or other controls on your ability to use electronic trading access including but not limited to: (i) the maximum order/trade amount; (ii) our total exposure to you; (iii) our overall exposure to third parties; (iv) the price of orders; and (v) as necessary or desirable to comply with Applicable Law.

(g)  **Offer and Acceptance**

i.  The price displayed is merely an invitation to you to make an offer.

ii.  An offer is made by you clicking on the designated box within any permitted time displayed.

iii.  Acceptance with a CFD (as defined in clause 7(a) below) is when we have established a hedge in the market.

(h)  **Orders**

i.  We shall only be responsible for the execution of orders in the circumstances where you have received a notification of receipt generated by the relevant systems and you will bear the risk of inaccuracy, loss or delay in transmission.

ii.  Our electronic records and paper copies of such electronic records will be conclusive, although taped conversations will prevail.

iii.  In respect of orders submitted incorrectly or erroneously, we will only accept instructions to amend or delete orders submitted by an Authorised User and only to the extent that such order has not already been executed.

iv.  If such order has already been executed, you will be bound by it.  In our discretion and for our protection, or for reasons of market integrity/counterparty risk, we may reverse the executed trade and you agree to co-operate in that regard and to indemnify us fully for any and all costs and losses arising therefrom.

(i)  **Security**

i.  We may from time to time notify you of the security procedures for accessing an Electronic Service and you agree to follow the procedures, not disclose them to any third party and maintain appropriate security arrangements for this purpose.  From

10

time to time we may require you to describe and, if appropriate, adapt your arrangements in this regard.

ii.    If for any reason you suspect that such security information has been discovered by any third party, you must notify us immediately and cease to use it.

iii.   You will ensure that only Authorised Users access and use Electronic Services and you will notify us of the identity of all Authorised Users and will ensure that all Authorised Users have been given suitable training.  We are under no obligation to provide training or assistance and if we do, it is at your sole risk.

(j)    **Record Keeping**

Both parties will keep records in accordance with Applicable Law to demonstrate the nature of orders submitted and the time at which such orders are submitted.

(k)    **Information Available through our Trading System or our Web Site**

• The display of any price quotation, volume or other information does not constitute:

i.    an offer to buy or sell; or

ii.   any guarantee that your orders will be executed at the price or market level displayed or at the level specified in your order.

• We accept no responsibility for the accuracy or completeness of any information displayed.

• We make no representations or warranties concerning the content of sites which can be accessed through our website.

• Our marketing material may be sent to you through our trading system or our web site.

(l)    **Open Networks**

Although we take reasonable steps to avoid information being intercepted and read by third parties, we draw your attention to the fact that the provision of an Electronic Service over an open network, the internet, which is accessible to anybody, may result in someone other than us gaining access to information about you and your dealings with us.

**5      Our capacity**

(a)    Derivatives and margined transactions: we act as your principal.

(b)    Securities: other than in respect of Transactions on the London Stock Exchange, where we act as matched principal, and unless otherwise indicated in these Terms and Conditions, or agreed in writing, we act as your agent.

**6      Your capacity**

(a)    **General**

You will deal with us as a principal unless you have indicated otherwise in your application form.

(b) **Joint Accounts**

All investments will be registered jointly in the name of all account holders.

We may send communication to the primary account holder in the account opening form.

Each joint account holder will be jointly and severally liable under these Terms and Conditions.

If you selected in the account opening form to hold the account as tenants in common:

• your joint account holders' interests will be equal, unless you stated otherwise; and

• if one of you dies, the deceased's interest will vest in their estate.

Otherwise, you will hold as joint tenants and, if one of you dies, the entire interest will vest in the surviving joint tenant(s).

If one of you becomes bankrupt, we:

• will act on the instructions of the trustee in bankruptcy and other joint account holders; and

• may establish a new account in the name of the remaining non-bankrupt joint accountholder(s) and transfer their interest into the new account.

(c) **Trust accounts**

If you act as trustee of more than one trust, these Terms and Conditions will apply to you in each such capacity.

You warrant to us on the date of these Terms and Conditions and as of the date of each Transaction that:

• your account is for the benefit of the relevant trust;

• you have the right to be fully indemnified out of trust assets for obligations incurred under these Terms and Conditions; and

• you comply with clause 20(a) of these Terms and Conditions.

You will notify us in writing as soon as there are any changes in the trustee(s).

After each change of trustee(s), you will procure by way of a deed of novation that the continuing and/or incoming trustee(s) expressly adopt these Terms and Conditions and all Transactions entered into before the change.

(d) **Agents**

You may, in a form acceptable to us, appoint another person to act on your behalf.

12

Case 1:18-md-02865-LAK   Document 323-2   Filed 04/20/20   Page 25 of 49

We may follow the agent's instructions and you will be liable for anything that the agent does or does not do.

You must notify us in writing as soon as you cancel or revoke an agent's authority.

(e)   **FSA Classification**

We shall classify you as defined in our cover letter to you for the purposes of the FSA Rules.  However and notwithstanding the absence of applicable FSA Rules, we will endeavour to provide a service that is overall effective and commercially reasonable.

**7      Equity Contracts for Differences**

(a)   **Our Services**

    i.      We may make available an indicative price quotation for an Equity Contract for Differences ("**CFD**") and enter into such CFD with you at our absolute discretion.

    ii.     Where we choose to do so, the CFD will be deemed to be executed at the contract security price (where such price is the current price of the underlying reference security as determined by us from time to time) at the time a hedge/contract is matched in whole or in part by any counterparty (which may include us).  The day of execution will be the first day of the term of the CFD.

    iii.    We will calculate the contract value of each CFD on each business day.  The contract value is the contract security price multiplied by the number of underlying securities to which the CFD relates and for the purposes of this clause 7, "Business Day" means each day on which the exchange on which the CFD underlying security is principally traded is open for trading.

(b)   **Payment of Differences**

    i.      If, on any Business Day during the term of the CFD, the current contract value is:

- higher than the previous Business Day's contract value, then the short party will pay the long party the difference; or
- lower than the previous Business Day's contract value, then the long party will pay the short party the difference, where the long party is the party who has notionally bought a CFD and the short party is the party who has notionally sold a CFD.

    ii.     We will debit and credit amounts owing between us to your account.

    iii.    All Contracts will be cash settled.

(c)   **Interest**

Interest will be payable as follows:

    i.      The long party will pay a funding charge payable on a percentage of the contract value of each CFD; the applicable interest rates will be notified to you in the rate schedule or by a separate letter; and

13

Case 1:18-md-02865-LAK Document 323-2 Filed 04/20/20 Page 15 of 34

ii.   The charge will be calculated and accrued daily and be credited or debited from your account. The interest will be calculated on the day count basis that we deem to be appropriate in the relevant market.

(d)   **Dividends/Interest**

We will make appropriate debits and/or credits to your account in respect of dividends/interest on the relevant contract security.

(e)   **Closing a Contract**

i.   If on any Business Day you wish to close any CFD (whether in whole or in part), then before the close of business on that day you must give notice of that fact to us specifying the CFD underlying security and (if only part of the CFD is to be closed) the proportion that you wish to close.

ii.   We will use reasonable endeavours to calculate and notify to you an indicative closing price and you will immediately notify us whether or not you are willing to accept such indicative closing price. Acceptance will constitute a binding closing of the CFD on that day. If you do not immediately accept our closing price the CFD will remain in full force and effect.

(f)   **Adjustments**

i.   If we determine that any CFD underlying security has become subject to possible adjustment as a result of any event to be reasonably determined by us and which would include (but not be limited to) a merger, takeover, nationalisation, insolvency, an exchange suspension or delisting, we will determine the appropriate adjustment, if any, to be made to the contract value of that underlying equity and/or the related quantity of such equities to preserve the economic equivalent of the rights and obligations of the parties under the relevant CFD immediately prior to that event, to be effective as of the date determined by us. In the event of an exchange suspension we may at our absolute discretion close out the CFD with you at a price to be determined by us.

ii.   We will give notice of any adjustment to you as soon as reasonably practicable after the determination thereof and such notice will be conclusive and binding in the absence of manifest error.

(g)   **Rate Schedule**

We may amend the rate schedule at any time.

**8   LME Contracts**

(a)   We act as broker and market maker on the London Metal Exchange ("LME"). Accordingly, when we enter into an LME contract with you, we may choose a basis of trading, including:

• entering into a back-to-back transaction on a principal-to-principal basis across the Ring or via LME Select, in which case the client contract and the back-to-back Exchange Contract will be identical or substantially similar in its terms except as to parties and price;

14

- entering into a back-to-back transaction on a principal-to-principal basis with a counterparty OTC, in which case our Transaction with you and the back-to-back OTC transaction will be identical or substantially similar in its terms except as to the parties and the price;

- not entering into any back-to-back or matching transaction;

- matching your Transaction with that of one or more of our other clients; and/or

- combining any or all of the above bases of trading.

(b)   Notwithstanding paragraph (a) above, we may agree with you that we will use a particular basis of trading for a particular Transaction.

(c)   Any order taken from you in respect of an LME contract will be on the basis that:

- the order will not be executed in whole or in part unless and until we bid for the LME contract concerned at the same or a higher price than that specified in your order (in the case of a sell order) or offer it at the same or a lower price than that specified in your order (in the case of a buy order) with a view to purchasing or selling (as the case maybe) the LME contract concerned in the amount of the order; and

- until execution, we may buy the LME contract (where the order you gave was to sell) at a price equal to or lower than that stated in your order, or sell it (where the order was to buy) at a price equal to or higher than that stated in the order.  Any such purchase or sale by us may be from or to any third party and for our own account or for the account of any company within our group or any other client of ours.

(d)   When we enter into a Transaction with you in relation to an LME-deliverable contract, which would (but for its term to maturity) be an LME registered client contract, we will register it on the LME at the time agreed in the relevant confirmation.

(e)   We may record a loss or a gain on the difference between the price quoted to you and the price applying to any matching transaction.  Such a loss or gain will be in addition to agreed commission and clearing fees and will not be separately identified in the confirmation relating to the Transaction.

(f)   We will only enter into Transactions which are undertaken at the prevailing market price unless we have taken reasonable steps to ensure that a Transaction undertaken at a price other than the prevailing market price is not being entered into for an improper purpose, which would include but is not limited to the perpetration of fraud, market abuse or the improper concealment of a profit or loss.

(g)   Neither the rules of the LME nor trade practices in relation to LME contracts provide any mechanism for us to determine the best price in the market at any given time.  Accordingly, we cannot offer best execution in relation to these Transactions.  The price we will offer to you will be fair and reasonable, taking into account factors such as the trader's assessment of market liquidity and risk, the size and the nature of the Transaction, the time of day, the nature of the service, the cost of funding and clearing the business and margin and commission terms applicable to your Account.

(h)   The FOA Explanatory Memorandum on Base Metals Transactions (the "FOA Explanatory Memorandum") has been provided to you separately and is incorporated

15

by reference into these Terms and Conditions.  It applies to dealings between us as if specifically set out in this clause 8, as if references to "a Firm" or "the Firm" were references to MCM and references therein to "Metals Transactions" were (except for the purposes of sub-clause (j) below) references to an LME contract.  Your attention is also drawn to the Guide to the Structure and Market Terminology of the LME which is appended to the FOA Explanatory Memorandum and which explains, among other things, certain order types and certain features of trading LME Contracts.

(i)     You represent and warrant that you have read and fully understood our Terms and Conditions including this clause 8 and the FOA Explanatory Memorandum and understand fully the manner in which we deal with the different types of orders that you may submit to us.

(j)     Except to the extent they constitute LME Contracts, nothing in these Terms and Conditions or in the FOA Explanatory Memorandum shall be construed as imposing any restrictions on our ability to enter into OTC metals transactions (or any other metals transactions that are not LME contracts) with third parties.

(k)     Unless otherwise agreed with you at the time that we accept your order, our obligations and duties to you when we effect LME contracts with you or where we receive and execute your orders in relation to LME contracts, will be confined to those expressly set out in this clause 8 (and for the avoidance of doubt the FOA Explanatory Memorandum) and (to the extent they are consistent) these Terms and Conditions.  To the extent permitted by Applicable Law we agree that no other duties or obligations on our part will apply to, or be implied into, the relationship between us.  However nothing in this clause 8 shall be construed as excluding or restricting any duty that we may owe to you under Applicable Law or any Relevant Rules (including the LME rules).

(l)     Except as required under FSMA or any other Applicable Law:

• we shall not be under any obligation to disclose to you any information we hold (including information about ourselves, any of our Affiliates or any of our other customers).  Where one of our employees has knowledge of a particular fact or circumstance, this shall not be deemed to constitute knowledge of that fact or circumstance on our part or on the part of any of our other employees or officers; and

• where our Terms provide that we have the right, ability or discretion to act, or refrain from acting, in a particular way, we shall, except where these Terms and Conditions provide to the contrary, be entitled to exercise such right, ability or discretion without making any prior disclosure to you of our intention to do so or of any fact or circumstance which is or may be material or relevant to you or your interests.

**9      Charges and Payments**

(a)     **Our charges**

You will pay all our charges as notified to you plus any applicable taxes, duties and imposts and fiscal and regulatory charges of any nature, brokerage fees, transfer fees, registration fees, exchange/clearing house fines, penalties, or buy in costs relating to late or non-settlement of Transactions and all other liabilities, charges, costs and expenses payable in connection with Transactions effected on your behalf.

We will give you notice of any changes in our charges.

(b)     **Introductions**

16

Where you have been introduced to us by a third party, we may pay to such introducer a share of the income earned by us from your account.  We can provide you with full details of such amounts subject to your written request.

(c)   **Payments**

   i.   **Funds**

   All obligations under these Terms and Conditions will become immediately due and payable when incurred by you or on your behalf. You must make payments to us in same day (or immediately available) and freely transferable funds without set-off, counterclaim, deduction or withholding for any taxes, duties, imposts or fiscal and regulatory charges of any nature.

   ii.   **Default interest**

   If you fail to pay any amount when due, we will charge you interest (both before and after any judgment) on any such unpaid amount calculated at 5 per cent over the overnight MCM borrow/lend rate from time to time.  This rate will be available upon request.  Interest will accrue on a daily basis.

   iii.   **Currency indemnity**

   If we receive or recover any amount in a currency other than that in which such amount was payable, you will indemnify us against any cost (including costs of conversion) and loss suffered by us as a result.

   iv.   **Withholding Taxes**

   We may deduct or withhold all taxes, duties, imposts and fiscal and regulatory and other charges of any nature, from any payment if obliged to do so under Applicable Law and we may estimate the amounts concerned.  Any excess of such estimated amount over the final confirmed liability will be credited to your account.

   v.   **Payments net**
   Unless we expressly agree with you in writing (or give you written notice) to the contrary, all payments and deliveries between us shall be made on a net basis. You acknowledge that it shall be a discharge of any payment or delivery obligation of ours for such payment or delivery to be made on a net basis.

**10   Margin, Collateral, Default and Termination**

(a)   Margin

   i.   Margin calls

   You will pay or transfer to us on demand such sums by way of initial and variation margin and/or collateral as we may in our absolute discretion require from time to time pursuant any Relevant Rules and/or to protect ourselves against loss or risk of loss on present, future or contemplated Transactions.

   ii.   Form of margin and/or collateral

17

Margin must be paid in freely transferable funds in such currency as we may in our discretion reasonably accept.  We may in our absolute discretion agree to accept a guarantee or other form of credit support.

**(b)     Assets transferred**

i.      Requests for segregation

You may instruct us to hold some or all of your assets in accordance with the FSA Rules on client money (in the case of cash) or in custody accounts segregated from our own assets (in the case of financial instruments).  If you give us such an instruction then we will send you a written notification identifying (by account number) which of your accounts are accounts that benefit from client money protection/segregation to enable you to identify those assets in relation to which client money protection/safe custody segregation will apply and, with effect from your receipt of that notification, the relevant provisions of clauses 14 and 15 shall apply in substitution for the applicable provisions of this clause 10 in relation to those assets, but subject in each such case to the charge described in clause 11.

ii.     Absolute title transfer

Except in relation to assets in respect of which you have received a notification of the type described in paragraph (a) above, all assets, whether cash or financial instruments, received by us either from you or in respect of your account will be actually or potentially in respect of margin or collateral for the purpose of securing or otherwise covering present or future, actual, contingent or prospective obligations and full ownership in such assets will be absolutely transferred to us, and all right, title and interest in and to such assets will pass to us outright and absolutely for the purposes of covering your obligations to us.  Upon such transfer we will become obliged, subject to the following provisions, to re-transfer to you assets equivalent, but not necessarily identical, to the assets so transferred to us.  Our obligation will be reduced to the extent that such assets are applied, in accordance with the margin and collateral arrangements in place between us, in discharge of your obligations to us.  We will re-transfer assets to you either: (i) at our absolute discretion; or (ii) at your request, but only if and when we determine in our absolute discretion that you have no present or future, actual, contingent or prospective obligations to us or to the extent that we determine in our absolute discretion that such liability is adequately covered by collateral or margin remaining held by us.

**(c)     Effect of absolute title transfer**

The effects of absolute title transfer under paragraph (b)(ii) above are as follows:

i.      the relevant assets cease to be your assets and you will no longer have a proprietary claim over them. They will not be held subject to the rules of the FSA in safe custody (where they are financial instruments) or subject to client money protection (where they are cash). The assets become our assets and we can deal with them in our own right;

ii.     you will have (subject to the limitations described in paragraph (b)(ii) above) an unsecured contractual claim against us for re-transfer of equivalent assets; and

18

      iii.    as a result, the assets will not be subject to a trust or otherwise isolated in our insolvency and in such event, you may not receive back everything so transferred to us and you will only rank as a general creditor.

(d) **Interest**

Any interest charge rates which will apply to your account will be separately agreed with you.

(e) **Segregated and Non-segregated Cash Accounts**

Where the assets are cash and we hold that cash for you in an account subject to absolute title transfer (a "non-segregated" account) and in an account subject to the FSA Rules on client money (a "segregated" account):

      i.    the segregated and non-segregated accounts will be separately margined;

      ii.    we will not transfer funds between the accounts unless prior written consent is obtained from you and only where the effect of such a transfer would be to leave a balance on the segregated account which was sufficient to satisfy our obligations under the FSA Rules on client money; and

      iii.    you will meet any interest charges which might arise.

## 11 Charge

As a continuing security for the payment and discharge of all obligations owing to us by you (whether present or future, actual or contingent) you hereby charge to us with full title guarantee by way of fixed and floating charge:

(a) all your beneficial interests in and to all derivatives contracts carried on your account;

(b) all your assets transferred to us under clause 10 and all your rights against us with respect to the cash accounts referred to in clause 10(e) above.

## 12 Negative Pledge

You will not without our prior written consent create or have outstanding any security interest whatsoever over any of your rights under these Terms and Conditions.

## 13 Closing Out

(a) We may close out a Transaction in such a manner as we consider appropriate, whether on the relevant market or exchange or by private sale or any other method and we reserve the right to act as purchaser or seller in relation to such Transaction.

(b) Unless otherwise agreed in writing between us, or subject to any Relevant Rules, if we enter into any Transaction with you in order to close out any existing Transaction between us, our respective obligations under both such Transactions shall automatically and immediately be terminated upon entering into the second Transaction, except for any settlement payment due from one of us to the other in respect of such close-out.

## 14 Default, Netting and Termination

## Part I: EVENTS OF DEFAULT

The following shall constitute Events of Default:

(a)   you fail to make any payment when due under these Terms and Conditions or to make or take delivery of any property when due under, or to observe or perform any other provision of these Terms and Conditions;

(b)   you commence a procedure seeking or proposing liquidation, reorganisation, an arrangement or composition, a freeze or moratorium, or other similar relief with respect to you or your debts under any bankruptcy, insolvency, regulatory, supervisory or similar law (including any corporate or other law with potential application to you, if insolvent), or seeking the appointment of a trustee, receiver, liquidator, conservator, administrator, custodian or other similar official (each a "**Custodian**") of you or any substantial part of your assets, or if you take any corporate action to authorise any of the foregoing, and in the case of a reorganisation, arrangement or composition, we do not consent to the proposals;

(c)   a procedure is commenced against you seeking or proposing liquidation, reorganisation, an arrangement or composition, a freeze or moratorium, or other similar relief with respect to you or your debts under any bankruptcy, insolvency, regulatory, supervisory or similar law (including any corporate or other law with potential application to you, if insolvent) or seeking the appointment of a Custodian of you or any substantial part of your assets and such involuntary case or other procedure;

d)   to the extent you are a natural person, you die, become of unsound mind, are unable to pay your debts as they fall due or are bankrupt or insolvent, as defined under any bankruptcy or insolvency law applicable to you; or any indebtedness of yours is not paid on the due date therefore, or becomes capable at any time of being declared, due and payable under agreements or instruments evidencing such indebtedness before it would otherwise have been due and payable, or any suit, action or other proceedings relating to these Terms and Conditions are commenced for any execution, any attachment or garnishment, or distress against, or an encumbrancer takes possession of, the whole or any part of your property, undertaking or assets (tangible and intangible);

(e)   you or any credit support provider (or any Custodian acting on behalf of either of you or a credit support provider) disaffirms, disclaims or repudiates any obligation under these Terms and Conditions or any guarantee, hypothecation agreement, margin or security agreement or document, or any other document containing an obligation of a third party, or of you, in favour of us supporting any of your obligations under these Terms and Conditions (each a "**Credit Support Document**");

(f)   any representation or warranty made or given or deemed made or given by you under these Terms and Conditions or any Credit Support Document proves to have been false or misleading in any material respect as at the time it was made or given or deemed made or given;

(g)   (i) any Credit Support Provider fails, or you yourself fail to comply with or perform any agreement or obligation to be complied with or performed by you or it in accordance with the applicable Credit Support Document; (ii) any Credit Support Document expires or ceases to be in full force and effect prior to the satisfaction of all your obligations under these Terms and Conditions, unless we have agreed in writing that this shall not

20

be an Event of Default; (iii) any representation or warranty made or given or deemed made or given by any credit support provider pursuant to any Credit Support Document proves to have been false or misleading in any material respect as at the time it was made or given or deemed made or given; or (iv) any event referred to in paragraphs (b) to (d) or (h) of this clause 14, Part 1 occurs in respect of any credit support provider;

(h)    to the extent you are not a natural person, you are dissolved, or, if your capacity or existence is dependent upon a record in a formal register, the registration is removed or ends, or any procedure is commenced seeking or proposing your dissolution, removal from such a register, or the ending of such a registration;

(i)    where you or your credit support provider is a partnership, any of the events referred to in paragraphs (b) to (d) or (h) of this clause 14, Part 1 occurs in respect of one or more of your or its partners;

(j)    we consider it necessary or desirable to prevent what we consider is or might be a violation of Applicable Law or Relevant Rules or is not in-keeping with accepted market practice;

(k)    we consider it necessary or desirable for our own protection or any action is taken or event occurs which we consider might have a material adverse effect upon your ability to perform any of your obligations under these Terms and Conditions;

(l)    any event of default (however described) occurs in relation to you under any other agreement between us.

## Part II: NETTING

(a)    *Rights on Default*:  On the occurrence of an Event of Default, we may exercise our rights under this clause, except that in the case of the occurrence of any Event of Default specified in paragraphs (b) or (c) under Part I of this clause 14 (each a "**Bankruptcy Default**"), the automatic termination provision in of Part II paragraph (c) of this clause shall apply.

(b)    *Liquidation Date:* Subject to the following sub-clause, at any time following the occurrence of an Event of Default, we may, by notice to you, specify a date (the "**Liquidation Date**") for the termination and liquidation of any ongoing Transactions in accordance with this clause.

(c)    *Automatic termination:* The date of the occurrence of any Bankruptcy Default shall automatically constitute a Liquidation Date, without the need for any notice by us and the provisions of the following sub-clause shall then apply.

(d)    *Calculation of Liquidation Amount:* Upon the occurrence of a Liquidation Date:

   i.    neither of us shall be obliged to make any further payments or deliveries under any ongoing Transactions which would, but for this clause, have fallen due for performance on or after the Liquidation Date and such obligations shall be satisfied by settlement (whether by payment, set-off or otherwise) of the Liquidation Amount;

   ii.    we shall (on, or as soon as reasonably practicable after, the Liquidation Date) determine (discounting if appropriate), in respect of each ongoing Transaction referred to in paragraph (a) the total cost, loss or, as the case may be, gain, in

21

each case expressed in the Base Currency (and, if appropriate, including any loss of bargain, cost of funding or, without duplication, cost, loss or, as the case may be, gain as a result of the termination, liquidation, obtaining, performing or re-establishing of any hedge or related trading position) as a result of the termination, pursuant to these Terms and Conditions, of each payment or delivery which would otherwise have been required to be made under such Transaction (assuming satisfaction of each applicable condition precedent and having due regard, if appropriate, to such market quotations published on, or official settlement prices set by the relevant Market as may be available on, or immediately preceding, the date of calculation); and

iii.   we shall treat each cost or loss to us, determined as above, as a positive amount and each gain by us, so determined, as a negative amount and aggregate all of such amounts to produce a single, net positive or negative amount, denominated in the Base Currency (the "**Liquidation Amount**").

(e)   ***Payer:*** If the Liquidation Amount determined pursuant to this clause is a positive amount, you shall pay it to us and if it is a negative amount, we shall pay it to you.  We shall notify you of the Liquidation Amount, and by whom it is payable, immediately after the calculation of such amount.

(f)   ***Other transactions:***  Where termination and liquidation occurs in accordance with this clause, we shall also be entitled, at our discretion, to terminate and liquidate, in accordance with the provisions of this clause, any other Transactions entered into between us which are then outstanding.

(g).   ***Payment:*** The Liquidation Amount shall be paid in the Base Currency by the close of business on the Business Day following the completion of the termination and liquidation under this clause (converted as required by Applicable Law into any other currency, any costs of such conversion to be borne by you, and (if applicable) deducted from any payment to you).  Any Liquidation Amount not paid on the due date shall be treated as an unpaid amount and bear interest, at the average rate at which overnight deposits in the currency of such payment are offered by major banks in the London interbank market as of 11.00 am (London time) (or, if no such rate is available, at such reasonable rate as we may select) one 1% per annum for each day for which such amount remains unpaid.

(h)   ***Base Currency:***  For the purposes of any calculation hereunder, we may convert amounts denominated in any other currency into the Base Currency at such rate prevailing at the time of the calculation as we shall reasonably select.

(i)   ***Payments:***  Unless a Liquidation Date has occurred or has been effectively set, we shall not be obliged to make any payment or delivery scheduled to be made by us under a Transaction for as long as an Event of Default or any event which may become (with the passage of time, the giving of notice, the making of any determination hereunder, or any combination thereof) an Event of Default with respect to you has occurred and is continuing.

(j)   ***Additional rights:*** Our rights under this Part II of clause 14 shall be in addition to, and not in limitation or exclusion of, any other rights which we may have (whether by agreement, operation of law or otherwise).

(k)   ***Application of netting to Transactions:*** This Part II applies to each Transaction entered into or outstanding between us on or after the date these Terms and Conditions take effect.

(l)   **Single agreement:** These Terms and Conditions, the particular terms applicable to each Transaction, and all amendments to any such agreements shall together constitute a single agreement between us.  We both acknowledge that all Transactions entered into on or after the date that these Terms and Conditions take effect are entered into in reliance upon the fact that each agreement and all such terms constitute a single agreement between us.

(m)  **Other agreements:** Subject to clause 8, the provisions of this clause shall not apply to any Transaction which is subject to liquidation and termination under another agreement.  However, any sum resulting from a liquidation and termination under another agreement, may be set-off against the Liquidation Amount.

(n)   **Default:** On an Event of Default or at any time after we have determined, in our absolute discretion, that you have not performed (or we reasonably believe that you will not be able or willing in the future to perform) any of your obligations to us, in addition to any rights under this Part II we shall be entitled without prior notice to you:

- instead of returning to you investments equivalent to those credited to your account, to pay to you the fair market value of such investments at the time we exercise such right;

- to sell such of your investments as are in our possession or in the possession of any nominee or third party appointed under or pursuant to these Terms and Conditions, in each case as we may in our absolute discretion select or and upon such terms as we may in our absolute discretion think fit (without being responsible for any loss or diminution in price) in order to realise funds sufficient to cover any amount due by you hereunder;

- to close out, replace or reverse any Transaction, buy, sell, borrow or lend or enter into any other Transaction or take, or refrain from taking, such other action at such time or times and in such manner as, at our sole discretion, we consider necessary or appropriate to cover, reduce or eliminate our loss or liability under or in respect of any of your contracts, positions or commitments.

**Part III: Termination without Default**

(a)   **Termination:** Unless required by Applicable Law, either party may terminate these Terms and Conditions (and the relationship between us) by giving ten days written notice of termination to the other.  We may terminate these Terms and Conditions immediately if you fail to observe or perform any provision of them other than in the case of force majeure.  Upon termination of these Terms and Conditions, all amounts payable by you to us will become immediately due and payable including (but without limitation):

(a)   all outstanding fees, charges and commissions;

(b)   any dealing expenses incurred by terminating these Terms and Conditions; and

(c)   any losses and expenses realised in closing out any Transactions or settling or concluding outstanding obligations incurred by us on your behalf.

(b)   **Existing rights:** Termination shall not affect then outstanding rights and obligations under these Terms and Conditions and in relation to outstanding Transactions which

shall continue to be governed by these Terms and Conditions and the particular clauses agreed between us in relation to such Transactions until all obligations have been fully performed.

**CLIENT MONEY AND CUSTODY**

**15    Application**

Clauses 16 and 17 below will apply to assets received by us from you or in respect of your account where you have requested us to hold those assets in safe custody/subject to client money protection and we have notified you that we will hold such assets in safe custody/subject to client money protection in accordance with clause 10(b)i.

**16    Client money**

The following applies where we hold cash in accordance with the FSA's Rules on client money:

(a)    **Client Money Rules**

We shall treat money received from you or held by us on your behalf in accordance with the FSA's client money rules. Accordingly, subject to these Terms and Conditions, we will segregate your money from ours and place it in a client bank account pursuant to FSA Rules. Subject to paragraph (b) below, this account is held by us as trustee and the relevant bank is not entitled to combine it with any other account or to exercise any right of set-off or counter claim against money in that account in respect of any sum we owe the bank. We will exercise due skill, care and diligence in the selection, appointment and periodic review of any such bank where your money is deposited but we shall not be liable for the solvency, acts or omissions of any such bank. A depositary with whom we may deposit your money may have a security interest or lien over, or right of set-off in relation to that money.

(b)    **Passing money to Exchanges, etc.**

We may pass money received from you to an exchange, intermediate broker or clearing house to effect a Transaction with or through that person or to satisfy your obligation to provide margin or collateral for a Transaction.

(c)    **Interest**

Unless otherwise agreed in writing, we shall not pay you interest, nor account to you for profits earned, on client money.

(d)    **General Client Bank Accounts**

Unless otherwise agreed in writing, where we deposit client money in a client bank account, such account shall be a "general client bank account". We do not offer to hold client money in "designated client bank accounts". This means that you will not have a claim against a specific sum in a specific account with a particular bank but will instead have a claim in respect of the general pool of client money held by us. As such, in the event of any shortfall in the amount of client money that we are holding for our clients which arises as the result of the failure or default of any bank with which we maintain our client bank accounts, your client money will be

24

Case 1:18-md-02865-LAK   Document 323-2   Filed 04/20/20   Page 26 of 34

pooled with all other client money held by us (whether held at the failed bank or otherwise) and you will participate in the relevant shortfall on a *pro rata* basis along with our other clients who benefit from protection under the FSA's Client Money Rules.

(e) **Money market funds**

We may place client money into a qualifying money market fund and units in any such fund will be custodied under clause 17 below and held in accordance with the FSA's custody rules.  You should notify us if you do not wish your money to be placed in a qualifying money market fund.

(f) **Overseas banks, intermediate brokers or settlement agents**

If we conclude Transactions on exchanges outside the UK, the FSA Client Money Rules permit us to hold client money with a bank located outside the UK or pass money to an intermediate broker, settlement agent, exchange or clearing house located outside the UK (which may, in each case, also be outside the European Economic Area ("EEA")). The legal and regulatory regime applying will be different from that of the UK or, where applicable, elsewhere in the EEA and in the event of the insolvency or any other equivalent failure of that bank or person, your money may be treated differently from the treatment which would apply if the money was held with a bank in the UK or, where applicable, elsewhere in the EEA.  We will not be liable for the solvency, acts or omissions of any third party referred to in this paragraph.

(g) **Right of application of client money**

If you owe us any money under these Terms and Conditions, we will on the day it becomes due and payable cease to treat as client money an equivalent amount and may apply that money in or towards satisfaction of the money due and payable to us.

(h) **Surplus**

Any surplus on a sale or closing out after exercising our rights under these Terms and Conditions belongs to you and we will treat it as client money.  Accordingly, if we default while still holding it, it will be pooled with our other client money for the benefit of all our customers and you will share rateably with them in that pool.

**17    Custody**

Where we, our nominee, or our Affiliate receive assets from you which we agree to custody or to arrange to custody:

(a) **Custodian**

We may act as custodian or may appoint a third party (which may be a member of our group) to act as custodian.  "Custodian" refers to us or such third party, as the case may be.

The custodian will:

• hold your assets in custody accounts segregated from its own assets; and

- register title to the assets in your name or the name of the custodian or a nominee. Where the assets are held with a nominee or custodian outside of the UK, the assets may be subject to the law or market practice of that jurisdiction.

**(b)   Segregation**

The custodian may:

- hold the assets at your risk and on such terms and conditions as the custodian may require (where the custodian is a third party, we may grant security interests over assets to the custodian);

- in certain jurisdictions the custodian may not be able under local law to separately identify your assets from its own proprietary assets, in which case in the event of a default or insolvency of the custodian, if there is a shortfall in the total assets held, you may not recover all of your assets.

**(c)   Instructions**

You may:

- give us instructions to: (i) deal with any rights and meeting calls; (ii) exercise any voting, conversion, subscription, redemption or other rights; and (iii) deal with take-over or other offers; and

- choose: (i) to mandate your dividends, interest payments and other entitlements to your bankers; or (ii) that we account to you for the same.

We will not exercise any rights unless we have sufficient instructions from you and/or (as necessary) sufficient funds immediately made available to us.

**(d)   Place of custody**

Assets may be held in the UK or elsewhere, in our absolute discretion.  Where assets are held outside the UK, the legal and regulatory regime will be different from that of the UK.  If the custodian becomes insolvent, assets held outside the UK may be treated differently from the treatment which would apply if they were held in the UK.  In a non-EEA country which does not regulate the holding and safekeeping of financial instruments, this may be because the nature of the assets or the services that we are providing in connection with those assets requires them to be deposited with a person in that country (see also clause 22(c)).

**(e)   Exclusion of liability**

We accept no responsibility for the acts, default or insolvency of:

- any custodian other than ourselves or our nominee or a member of our group, in the absence of fraud, negligence or wilful default by us in the initial selection of the custodian;

- any issuer, depository or registrar of securities.

**(f)   Right to use assets**

We may not use assets for any purpose other than as permitted by these Terms and Conditions without your prior written consent.  In particular, we may not enter into securities financing transactions in respect of your assets held either by us in a client account or in an omnibus account held by a third party without first obtaining your written consent.

**UNDERTAKINGS**

**18    Exclusion of liability**

Neither we nor any member of our group nor our respective directors, officers, employees or agents will be liable (whether in contract or in tort or otherwise) for:

• any direct or indirect losses, damages, costs or expenses incurred or suffered by you unless arising directly from our or their respective negligence, wilful default or fraud; or

• special, indirect, incidental, punitive or consequential damage.

**19    Indemnity**

You agree to indemnify us and our directors, officers, employees or agents against any loss, liability, costs and expenses, which we (or they) incur either directly or indirectly in the due performance of our obligations under these Terms and Conditions.

**20    Warranties**

(a)    General

You represent and warrant to us at the date you enter into these Terms and Conditions and each Transaction that:

(i)    you possess all the necessary consents, powers, licences and authorisations and have taken all necessary action to authorise the entry into and performance of these Terms and Conditions and any Transactions;

(ii)    these Terms and Conditions and each Transaction are binding upon you and do not and will not violate any law, regulation, order, charge or agreement by which you are bound;

(iii)    no litigation, arbitration or administrative proceedings are current or, to your knowledge, pending or threatened, which might, if adversely determined, have a material adverse effect on your business or financial condition or on your ability to perform your obligations under these Terms and Conditions;

(iv)    no Event of Default as defined in Part 1 of clause 14 or any event which may become (with the passage of time and/or the giving of notice and/or the making of any determination) an Event of Default has occurred and is continuing with respect to you or any guarantor; and

(v)    unless you have expressly notified us otherwise, you act in the capacity set out in the account opening form; and

(vi)    any information provided to us is complete, accurate and not misleading in any material respect; and

27

(vii)    you are willing and financially able to sustain a total loss of funds or assets resulting from any Transactions; and

(viii)   subject to paragraph (v) above, you are the sole beneficial owner of:

- all margin and collateral provided; and

- your account;

  in either case, free and clear of any third party right whatsoever other than a lien routinely imposed on all securities in a clearing system in which the relevant assets may be held.

(b)    **Individuals**

If you are an individual, you also represent and warrant to us at the date of these Terms and Conditions and each Transaction that you have full capacity to enter into such Terms and Conditions and such Transaction(s).

(c)    **Companies**

If you are a company, you also represent and warrant at the date of these Terms and Conditions and each Transaction that:

•       you are duly incorporated and validly existing under the laws of the jurisdiction of your incorporation; and

•       you have the power to own assets and carry on business as it is being conducted; and

•       all authorisations required in connection with the entry into, performance, validity and enforceability of Transactions and these Terms and Conditions have been obtained or effected and are in full force and effect.

(d)    **Our warranties**

We represent and warrant to you at the date of these Terms and Conditions and each Transaction in the terms as set out in clause 20 paragraphs (a)(i) and (iii) and (c).

**21    Covenants**

You will:

• use all reasonable endeavours to comply with Applicable Law;

• promptly notify us in writing if any information previously provided to us changes;

• notify us of the occurrence of an Event of Default as defined in Part I of clause 14;

• upon demand, provide us with such information as we may reasonably require; and

- if any action or proceeding is brought by or against us in relation to these Terms and Conditions, cooperate with us to the fullest extent possible in the defence or prosecution of such action or proceedings.

## 22   REGULATORY DISCLOSURES

### (a)  Important information

Where you are a Professional Client, information on the firm and its services, investments and strategies designed to assist you in understanding their nature and risks is contained in our Disclosure Booklet, which accompanies these Terms and Conditions and will be updated and sent to you from time to time.

The appropriate paragraph(s) of the then current Booklet should always be read before entering into a Transaction described in the relevant paragraph(s).

### (b)  Your Capacity for FSA Rule purposes

- As notified to you in the cover letter to these Terms and Conditions, we will treat you for all purposes and all services and Transactions as either an Eligible Counterparty or as a Professional Client.

- Where you act as agent:

(i)     we will treat you, and not your principal, as our sole "client" under the FSA Rules; and

(ii)    you warrant to us as at the date of these Terms and Conditions and in relation to each Transaction that:

   o   you have your principal's full authority to enter into and perform these Terms and Conditions and your principal is aware of and agrees to these Terms and Conditions; and

   o   any information which you transmit to us about your principal is true, accurate and complete; and

   o   you have, where necessary, either advised your principal to enter into that Transaction or concluded that such Transaction is appropriate for your principal.

### (c)    Additional Information

Please note:

- you may communicate with us, and will receive documents from us, in English;

- where we hold your assets in safe custody with a third party pursuant to clause 17, the third party may hold your assets in an omnibus account for all of our clients and, in the event of our or that third party's default or insolvency, if there is a shortfall in that omnibus account, you may not recover all of your assets;

- where your assets are held by a third party outside of the UK, it may not be possible for those assets to be separately identifiable.  In the event of the third party's default, you may not recover all of your assets;

- in the event that your money and/or assets are held in an account that is subject to the law of a jurisdiction other than an EEA member state, your rights in relation to that money or those assets may differ accordingly; and

- all charges will, to the extent possible, be deducted from sums held in your account.

**(d)     Cold Calls**

By entering into these Term and Conditions you expressly request that we call you in relation to any service, investment and/or opportunity that we reasonably consider may be of interest to you.

**(e)     Distance Marketing**

If you are an individual client (not a legal entity) and we enter into a Transaction as a result of our distance marketing, then in every such case you should note the following disclosures:

- the information in paragraph (a) above;

- the services referred to in these Terms and Conditions and the Disclosure Booklet; and

- you do not have a right to cancel any Transaction.

If you are not a client of ours in your capacity as an individual, these disclosures do not apply to you.

**MISCELLANEOUS PROVISIONS**

**23     Conflicts of Interest**

We have in place arrangements to manage conflicts of interest between ourselves and our clients and between our different clients, which are set out in our Conflicts of Interest Policy.  Where we do not consider that the arrangements under our Conflicts of Interest Policy are sufficient to manage a particular conflict that would apply to you, we will inform you of the nature of the conflict so that you can decide how to proceed.

**24     Confirmations**

We will make available to you a confirmation of each Transaction, promptly after entering into that Transaction with or for you.

**25     Periodic statements**

Within 10 Business Days after the end of each month, we will make available on our website a statement of your account as well as (where appropriate) a statement of the valuation and composition of your portfolio and/or any assets and client money held.

Periodic statements and confirmations will, in the absence of manifest error, be conclusive and binding on you unless we receive from you an objection in writing within, respectively, 2 or 5 Business Days of receipt.

## 26 Notices

All communications will be to the address or fax number and to the individual/department specified in the account opening form or by proper notice in writing accompanied by any necessary evidence of the change. Email notifications of changes in contact details will not be accepted.

Communications are taken to be received:

- if sent by post: 3 Business Days after the date of posting (or 5 if sent to or from a place outside the UK);

- if sent by fax: at the time shown in a transmission report that indicates that the whole fax was sent;

- if sent by electronic mail: on the day following dispatch; and

- if posted on our website: on the day following such posting.

## 27 Recording calls

We may tape record telephone calls and use such recording as evidence in any dispute.

## 28 Your personal information

(a) We will treat all of your information as confidential, even when you are no longer a client, but may disclose it:

- as required by Applicable Law;

- as necessary in the provision of services pursuant to these Terms and Conditions; and

- as necessary to protect our interests.

(b) Any such information may be:

- held and/or processed by our Affiliates or agents;

- transferred to any country, including outside the European Union, which may or may not have data protection laws; and/or

- used to enable us to give you information about products and services offered by us or our Affiliates or selected third parties which we believe may be of interest to you. If you do not wish to receive marketing information, please contact us in writing.

(c) Under Applicable Law you may have the right to access information that we hold about you, or have inaccurate information corrected, and if you wish to exercise such right, please contact us in writing.

(d) Where you are a company, the information we hold about you may include information regarding your officers and employees and you will inform them that we may hold such information in the manner described above.

(e) We may at our discretion provide your details to credit reference agencies or other organisations that help us make credit decisions and reduce the incidence of fraud or in the course of carrying out such identity checks, fraud prevention or credit control checks.  If you are resident in the United Kingdom and we undertake such checks the Credit Reference Agency will check your information against its database and will retain a record of the check which has been undertaken.  This information may be available to other organisations for checking purposes.

## 29   Applicable Law

If there is any inconsistency between Applicable Law and these Terms and Conditions, the Applicable Law will prevail.  Nothing in these Terms and Conditions exclude or restrict any obligation that we owe pursuant to the FSA Rules or Applicable Law.  We may take or omit to take any action we consider necessary to ensure compliance with Applicable Law and the FSA Rules which will be binding on you.

## 30   Amendments

Without prejudice to your existing rights and obligations, we may amend these Terms and Conditions by way of prior written notice to you.  Such amendment will become effective from the date of such notice.

## 31   Force majeure

Subject to any other clause of these Terms and Conditions, we shall not be liable to you for any partial or non-performance of our obligations by reason of any cause beyond our reasonable control, including any breakdown, malfunction or failure of transmission, communication or computer facilities, industrial action, acts and regulations of any governmental or supra national bodies or authorities or the failure of any relevant intermediate broker, agent or principal of ourselves, custodian, sub-custodian, dealer, exchange, clearing house or regulatory or self-regulatory organisation, for any reason, to perform its obligations.

## 32   Assignment

These Terms and Conditions are for the benefit of, and are binding upon, both of us and our respective successors and assigns.  We may, but you may not without our prior written consent, assign, charge or otherwise create a third party right over these Terms and Conditions or any right, benefit or interest under them or transfer any obligation under them.

## 33   Termination

Subject to all existing rights which may then have accrued, or prior events which may lead to such rights accruing, you or we may terminate the agreement constituted by these Terms and Conditions upon written notice to the other.

34     **Time of the essence**

Time will be of the essence in respect of all obligations owed by you pursuant to these Terms and Conditions.

35     **Rights of Third Parties**

Any person who is not a party to these Terms and Conditions, but is referred to in them, may enforce its terms under the Contracts (Rights of Third Parties) Act 1999.

36     **Governing law and Jurisdiction**

These Terms and Conditions, and any non-contractual obligations arising from or connected with them, are governed by construed in accordance with, English law.

Subject to the next paragraph, we both irrevocably:

- agree that the courts of England shall have jurisdiction to determine any proceedings arising out of or in connection with these Terms and Conditions (whether arising out of or in connection with contractual or non-contractual obligations) and irrevocably submit to their jurisdiction, but this will not prevent us from bringing an action in the courts of any other jurisdiction; and

- waive any objection to the venue of any such proceedings.

Where any Relevant Rules require us to we will, and where they so permit us to we may, refer any dispute relating to a Transaction to arbitration under such Relevant Rules prior to resorting to the jurisdiction of the courts.

# Exhibit 3



## ED&F MAN

E D & F MAN CAPITAL MARKETS LIMITED

The Goldstein Law Group PC 401K Profit Sharing Plan FBO Sheldon and
Scott Goldstein
61 Broadway
Suite 1915
New York
NY 10006
USA

**Your New Account and Status: *<ELECTIVE PROFESSIONAL>***

Thank you for contacting us with regard to opening an account with E D & F Man
Capital Markets Limited ("MCM"). In order for us to proceed there is certain
information that we need to provide you with to explain and document the terms of
MCM's relationship with you.

MCM is authorised and regulated in the UK by the Financial Services Authority (the
"FSA"). The FSA requires us to provide you with certain information in accordance
with the rules of the FSA (the "FSA Rules"). As such, please ensure you read this
letter and the enclosed materials carefully.

We are required by the FSA Rules to categorise you for the purpose of the services
that we provide to you. We have determined, based on those rules, that you will be
categorised as an "**Elective Professional Client**". As a Professional Client, the FSA
Rules state that it is your responsibility to keep us informed of any change that could
affect your categorisation and we require you to do so.

In addition, the FSA Rules state that you have the right to request re-categorisation
as a Retail Client, whereby you would be entitled to additional protections under the
FSA Rules. Please be aware, however, that MCM does not accept Retail Clients and
if you ask to be re-categorised as a Retail Client, we would not be able to proceed
any further with your application.

It is your responsibility to inform MCM of any changes that could affect your
categorisation.

The following documents are attached:

(i) **MCM's Terms and Conditions of Business**
These Terms and Conditions set out the contractual terms that govern our
relationship but are subject to, where relevant, any transaction-specific
documentation (e.g. ISDA, GMRA) as entered into between you and us from
time to time and as the case may be.

(ii) **Rate Card**
This sets out our fees and charges (this may be sent under separate cover).

(iii) **Application Form**

Cottons Centre
Hay's Lane
London SE1 2QE

Authorised and Regulated by the Financial Services Authority
Registered in England No 1292851

Telephone: +44 (0)20 7089 8000



ED&F
MAN                                    E D & F MAN CAPITAL MARKETS LIMITED

Please
complete this Form and provide the documentation requested in order to verify
your identity.    A signed and completed Form, including supporting
documentation and a signed copy of this cover letter, should be returned to us.

(iv)  **MCM's Professional Client Disclosure Document and Order Execution
      Policy**
      These documents outline the main risks that you should be aware of which
      arise through the different services and investments that we may offer to you
      and explains the difference in the protections afforded to different client types
      under the FSA Rules. This risk disclosure is in no way intended to replace the
      need to seek your own independent advice. The Order Execution Policy sets
      out the procedures that MCM follows in the execution of your orders,
      particularly in relation to client order handling and the applicability of best
      execution. This Policy includes the Risk Disclosure Document.

Any assets, including cash, held or received by us from you or in respect of your
account will be dealt with in accordance with clause 10(b) ("Assets Transferred") of
our Terms and Conditions. In respect of certain products we may be able to offer
you a segregated account and treat money received from you in respect of these
products as "client money" subject to the FSA Rules. Please contact us if you require
any further information.

You are advised to read the referenced documentation carefully and retain it for your
records. If you have any questions about any of the documentation or about your
client categorisation, please contact your MCM representative or the Compliance
Department.

We look forward to our new business relationship with you.

Yours sincerely

Documentation Department

Cottons Centre
Hay's Lane
London SE1 2QE

Authorised and Regulated by the Financial Services Authority
Registered in England No.1292851

Telephone: +44 (0)20 7089 8000



**ED&F MAN**

E D & F MAN CAPITAL MARKETS LIMITED

**Confirmation of**
**ElectionStatement/FSA Client Categorisation**

*I/We hereby request and consent to be categorised by MCM as an Elective Professional client. I/We confirm that I/we have read and understood the* **Professional Client Disclosure Document and Order Execution Policy.**

*I/we further confirm to you that I am/we are an experienced and knowledgeable investor, am/are capable of making investment decisions, and understand the risks involved with investing in complex products.*

*I/we understand that, under the FSA Rules, it is my/our obligation to inform you of any change that could affect my/our categorisation as a Professional client I/We also understand that it is my/our responsibility to ask MCM for a higher level of protection if I am/we are unable to properly assess or manage the risks involved.*

*I/we understand that, under the FSA Rules, it is my/our obligation to inform you of any change that could affect my/our categorisation as a Professional client.*

*I/We confirm that I/We have had sufficient time to consider the implications of being categorised as a Professional Clients including the implications described in your letter.*

Signature(s): _____

Name(s): SHELDON GOLDSTEIN

Date: 4 18 12


**Acknowledgement of ATT Status**

I/We acknowledge that my account/s with MCM will be treated as ATT and that I have read and understood the relevant sections of the MCM Terms and Conditions. In addition I acknowledge that MCM does not provide segregation where I/we trade OTC products or have been granted a credit facility.

Signature(s): _____

Name(s): SHELDON GOLDSTEIN

Date: 4 18 12


Cottons Centre
Hay's Lane
London SE1 2QE

Authorised and Regulated by the Financial Services Authority
Registered in England No.1292851

Telephone: +44 (0)20 7089 8000