# Exhibit 5

Ades v. Deloitte & Touche, Not Reported in F.Supp. (1993)

Fed. Sec. L. Rep. P 97,768

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Steed Finance LDC v. Laser Advisers, Inc., S.D.N.Y.,
April 15, 2003

1993 WL 362364
United States District Court,
S.D. New York.

Morris ADES, Apmont Group, Inc., the Equity
Group, Inc. Profit Sharing Trust, Jerome I.
Feldman, S. Marcus Finkle, Sandra Glicksman,
Goldstein, Golub & Kessler Profit Sharing Trust,
Philippe Grelsamer, Richard Kessler, James
J. Manning, Markin Trading Corp. Pension
Trust, Randolph K. Pace, Anna B. Rosen,
Dennis Silberman and Martin Stern, Plaintiffs,
v.
DELOITTE & TOUCHE, Winifred
Schuberth, John Hanny, David F. Randall
and Luis Santacaterina, Defendants.
DELOITTE & TOUCHE,
Defendant/Third–Party Plaintiff
v.
BOLAR PHARMACEUTICAL CO., INC.,
Robert Shulman, Eastlake Securities, Inc.,
William T. Hultquist, Lawson Mardon
Group Limited, Lawson Mardon, Inc., and
Garrett Cronin, Third–Party Defendants.

Nos. 90 Civ. 4959(RWS), 90 Civ. 5056(RWS).
|
Sept. 17, 1993.

**Attorneys and Law Firms**

Abbey & Ellis, New York City (Lee Squitieri, of counsel), for
plaintiffs.

Shea & Gould, New York City (Leon P. Gold, David S.
Tannenbaum, Bernard Garbutt, III, of counsel), for defendant
Deloitte & Touche.

Schulte Roth & Zabel, New York City (Irwin J. Sugarman,
Daniel J. Kramer, and Stephen H. Weiner, of counsel), for
Defendant Bolar Pharmaceutical Co., Inc.

Phelan & Costello, P.C., New York City (John J. Phelan, III,
of counsel), for third-party defendant Garrett J. Cronin.

Robinson Brog Leinwand Reich Genovese & Gluck, P.C.,
New York City, (David C. Burger and Richard W. Cohen, of
counsel), for third-party defendant East Lake Securities.

OPINION

SWEET, District Judge.

**\*1** Third-party defendants Bolar Pharmaceutical Co.,
Inc. ("Bolar"), Garrett J. Cronin ("Cronin"), and Eastlake
Securities Inc. ("Eastlake") have moved to dismiss the counts
against them in a third-party complaint (the "Third–Party
Complaint") filed by defendant Deloitte & Touche, Inc. ("D
& T"). Third-party defendant Robert Shulman ("Shulman")
has moved to join the arguments to dismiss filed by all
other defendants insofar as they may apply to his case.
Third-party defendants Bolar and Shulman have filed cross-
claims against each other, and, pursuant to those claims,
Bolar has also moved to dismiss Shulman's claims against
Bolar for contractual indemnity under Shulman's employment
agreement with Bolar.

For the following reasons, the motions are denied in part and
granted in part.

*The Parties*

Direct defendant and Third–Party Plaintiff D & T is a
partnership of certified public accountants with a place of
business in New York State. It is the successor in interest to
Touche Ross & Co. ("Touche"), a national accounting firm
which acted as Qmax Technology Group, Inc's ("Qmax")
independent auditor at all relevant times.

Qmax Technology Group, Inc. ("Qmax") was a Delaware
corporation with a place of business in Ohio which issued
and defaulted on certain promissory Notes (the "Notes") in
July, 1988. Qmax filed for protection from its creditors under
Chapter 11 of the United States Code on August 3, 1989, and
pursuant to 11 U.S.C. § 362(a) it is not a party to any of
these proceedings.

The plaintiffs in the underlying action are purchasers (the
"Investors" or "the Plaintiffs") of the Notes on which Qmax
defaulted. They have sued D & T and four former officers and
directors of Qmax, alleging among other things that D & T
recklessly failed to correct the misimpressions created by D &
T's approval of a stale, unqualified audited opinion for Qmax

Ades v. Deloitte & Touche, Not Reported in F.Supp. (1993)

Fed. Sec. L. Rep. P 97,768

for use in the private placement (the "Private Placement") of the Notes. The four remaining direct defendants in the underlying action are former officers and directors of Qmax: Winifred Schuberth ("Schuberth"), chairman, CEO and Treasurer of Qmax; John Hanny ("Hanny"), the President, Chief Operating Officer, and a director of Qmax; David F. Randall ("Randall"), Vice President of Finance and a director of Qmax; and Luis Santacaterina ("Santacaterina"), Executive Vice President of Operations and a director of Qmax.

Third-party defendant Bolar has moved pursuant to Rule 12(b)(6), F.R.Civ. P., to dismiss both the Third–Party Complaint of D & T and the cross-claim of Shulman, its former president and CEO and cross-claim of Qmax from April 6, 1988 until August 9, 1988, for indemnity against Bolar. Bolar is a manufacturer and distributor of prescription generic drugs with offices in Copiague, New York. Bolar had entered into a joint venture involving the development of a pharmaceutical plant with Qmax in 1986 (the "Transpharma Plant" or the "Joint Venture").

 *2  Third-party defendant Cronin has moved to dismiss the claims alleged against him in D & T's Third-party Complaint as time barred. Cronin was a Vice President of Lawson Mardon, Inc. ("Lawson Mardon"), a supplier to Qmax. Lawson Mardon is a wholly-owned Delaware subsidiary of Lawson Mardon Group, a Canadian corporation with offices in Ontario, Canada.

Third-party defendant Eastlake has moved both to dismiss the claims against it and, in the alternate, for summary judgment. Eastlake is a New York corporation and licensed underwriter which acted as the placement agent for the Private Placement of Qmax's notes offered in August, 1988.

*Prior Proceedings*

The Investors originally filed two complaints (*Ades v. Deloitte & Touche,* 90 Civ. 4959, filed July 26, 1990, and *Lane v. Deloitte & Touche,* No. 90 Civ. 5056, filed July 30, 1990) which were later consolidated and amended into one complaint filed on February 14, 1992 (the "Amended Complaint"). The Investors have alleged that D & T and the four former officers and directors of Qmax knowingly misrepresented Qmax's financial condition in public filings and materials made available to the Investors prior to their purchase of the Notes in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10(b)–

5, 17 C.F.R. § 144.10(b)–5, ("the 10(b) action"), and pendent state law claims of common law fraud, negligence, and breach of contract.

The portions of the Complaint relevant to D & T relate to alleged misrepresentations in an accountants' review report issued by D & T dated August 4, 1988 (the "Review" or the "Review Report") which stated, among other things, that D & T found no material change in Qmax's finances from Qmax's financial statements from the previous year. These financial statements included Qmax's annual audited balance sheet for Qmax's fiscal year ended June 30, 1987 (the "1987 Audit Report"), to which D & T gave an unqualified or "clean" auditors' opinion, and Qmax's consolidated interim financial statements subsequent to the audited balance sheet.

D & T's first motion to dismiss the Investors' complaints for failure to plead fraud with particularity was ultimately granted in full. D & T's second motion to dismiss the Investors' new Amended Complaint, however, was denied in an opinion dated August 11, 1992, familiarity with which is assumed.

*See* *Ades v. Deloitte & Touche,* 799 F.Supp. 1493 (S.D.N.Y.1992).

After its motion to dismiss the Investors' Amended Complaint was denied, D & T filed an answer and cross-claims on September 14, 1992, controverting the central allegations of the complaint. In December, 1992, pursuant to Fed.R.Civ.P. 14(a)[1], D & T filed the Third–Party Complaint against seven corporate and individual third-party defendants: Bolar, Shulman, Eastlake, Cronin, Lawson Mardon, Inc., Lawson Mardon Group Ltd. (collectively, the "Moving Defendants") and William T. Hultquist ("Hultquist"), a vice president and director of Qmax not named by the original Investors in their complaints. Hultquist has not joined any of the motions.

 *3  The Moving Defendants filed their motions to dismiss in December of 1992 and January of 1993. Oral argument was heard on March 17, 1993.

*The Facts*

On a motion to dismiss, all of the factual allegations in a complaint are accepted as true, *Weiss v. Wittcoff,* 966 F.2d 109, 112 (2d Cir.1992) and all allegations must be considered in the light most favorable to the party against whom the motion is made, *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). The facts below, therefore, are taken from D & T's

Fed. Sec. L. Rep. P 97,768

Third–Party Complaint, affidavits, exhibits, and the Investors' Amended Complaint (incorporated by reference in the Third–Party Complaint) and do not represent factual findings by the Court.

Qmax was originally incorporated as a Delaware corporation in August, 1975, under the name American Thermometer Company. In June of 1983, it changed its name to Qmax Technology Group, Inc., and reincorporated American Thermometer Company as a wholly owned subsidiary at that time. Qmax also decided to develop and manufacture various cosmetic products and to prepare printed samples of cosmetics and pharmaceuticals. These ventures relied, in part, upon two technologies owned by Qmax: microencapsulation and liquid crystal technology. Microencapsulation is the coding or micropackaging of materials in the form of extremely small capsules; in the case of the cosmetic sampler products, for instance, liquids or solids are condensed in a number of tiny microcapsules printed on paper or cardboard until the pressure of an applicator breaks the microcapsules and releases the powder or liquid. Liquid crystals are a class of chemical compounds which, within a certain temperature range, possess properties of a state of matter which can be poured like liquids but refracts light and exhibits other optical properties of crystals.

After certain initial successes in its cosmetics products, Qmax's business in this area faltered, and Qmax's cosmetic business as a whole declined substantially in 1988. However, D & T alleges that the Investors did not purchase their notes primarily in order to provide working capital for Qmax's cosmetics business, but to provide bridge financing for a public offering designed to raise money for a new joint venture, one which would use Qmax's proprietary technology in the area of prescription drugs.

On December 24, 1986, Qmax entered into a letter agreement for a Joint Venture with Bolar to build a pharmaceutical plant, the Transpharma Plant, adjacent to Qmax's existing plant in Vandalia, Ohio to manufacture pharmaceutical chemicals using Qmax's microencapsulated technology. The first product proposed for the Joint Venture was the production of a blood pressure medication containing microencapsulated Potassium Chloride ("KCL").

Bolar agreed to fully capitalize the Joint Venture with a contribution of $3.5 million. Any additional costs related to the construction would be split equally by Qmax and Bolar. Qmax would initially own 10% of the stock in the Joint Venture and would be given an additional 40% of the stock two years after the first drug to be produced at the plant was approved by the FDA.

*4 FDA requirements and the parties' desires to have a multipurpose capability made the Transpharma Plant much more expensive to build than had been originally planned. On April 23, 1988, Qmax filed a Form S–3 (the "Registration Statement") with the SEC which disclosed that plant construction costs of the Joint Venture had overrun by $4 million. In July 20, 1988, Qmax filed an amendment (the "July Amendment") to the SEC filings which disclosed that due to a dispute with Bolar over responsibility for the overruns there could be no assurance that Qmax would be able to recover Bolar's full share of the overruns. On August 5, 1988, Qmax filed another amendment (the "August Amendment") to its filings with the SEC which disclosed that it now believed the Joint Venture would require up to $8 million in additional funds and that it needed to raise additional capital to continue with the construction. The August Amendment also explicitly stated that the success of Qmax was materially dependent upon the success of the Joint Venture.

D & T alleges that Qmax approached Eastlake for aid in raising additional financing principally to continue with the Joint Venture, although the Investors allege Qmax needed money for its operational and working capital needs as well. Whatever the reason, Eastlake entered into a letter of intent dated July 21, 1988 with Qmax in to underwrite a public offering (the "Public Offering") of Qmax securities scheduled for 1989.

As part of its underwriter due diligence, Eastlake sought and received a letter dated July 29, 1988, from Bolar in which Bolar assured Eastlake that the Joint Venture Agreement remained in full force and Qmax was not in default on the Joint Venture (the "Bolar Letter"). Eastlake also arranged for interim bridge financing for Qmax in the form of the Private Placement of the Notes. The Notes, with a face value of $2.2 million and an interest rate of 10%, were due and payable within one year, on July 1, 1989, or as soon as the Public Offering were successful.

As a condition of the Investors' purchase of the Notes, Qmax was required to have D & T review, in accordance with standards established by the American Institute of Certified Public Accountants ("AICPA"), its consolidated interim financial statements as of March 31, 1988 and for

Fed. Sec. L. Rep. P 97,768

the three-month and nine-month periods ended March 31, 1987 and 1988. D & T represented in the Review Report dated August 4, 1988 that it performed a review in accordance with AICPA standards of the consolidated interim financial statements of Qmax as of March 31, 1988, and for the three and nine month periods ended March 31, 1988 and 1987, and that these statements fairly represented the financial condition of Qmax and were in conformity with GAAP and other accounting standards.

The Review carried no auditors' opinion as to whether Qmax would continue as a going concern or not. In the Review, D & T also represented that it had previously examined, in accordance with GAAP, prior financial data for Qmax and that the information set forth in the 1987 Audit Report was fairly stated in all material respects. Although D & T apparently had qualified its opinion of Qmax's audited 1986 balance sheets, Qmax's 1987 Audit Report had received a "clean" or unqualified opinion from D & T, and the 1987 Audit Report was included in the Private Placement along with the interim financial statements and the Review Report. By letter dated August 18, 1988, D & T consented to the use of the Review Report in the Securities Purchase Agreement between Qmax and the Investors (the "Consent Letter").

 **\*5**  The Amended Complaint alleges that this Consent Letter constitutes a "subsequent events" review by D & T and made an express and implied representation that there had been no material changes in Qmax's financial position from the date of the Review Report to the date of the Consent Letter.

An article dated July 18, 1988 in Barron's contained a statement from Representative John Dingell's oversight and investigation subcommittee which disclosed that on July 5, 1988, the subcommittee sent subpoenas to certain generic drug companies in various states, including Bolar. On August 4, 1988, the American Stock Exchange stopped trading of Bolar's stock amidst rumors that Bolar was in fact a subject of Dingell Committee's investigation, although it permitted trading to resume within a few days. Information about the rumors of investigation and about declines in the price of Bolar's shares appeared in a Reuter's release on August 2, 1988 and Wall Street Journal on August 5, 1988.

The offering materials for the Private Placement referred to these events in a separate short statement, which read in part: "Bolar's common stock resumed trading at 9:55 am on August 5, 1988 opening at 19. Murray Koppelman telephoned Robert Shulman, President and Chief Executive Officer of Bolar at

10:10 a.m. Mr. Shulman emphatically denied that Bolar had ever engaged in any of the rumored practices and denied, further, that Bolar is under investigation." D & T alleges that rumors that Bolar was being investigated were circulated at least as early as the Barron's article dated July 18, 1988.

The Notes were sold to the Investors through the Private Placement in August and September of 1988. After the closing of the sale of the Notes, D & T audited Qmax's financial statements for the year ending June 31, 1988, and on October 24, 1988 issued a qualified auditor's opinion expressing uncertainty as to Qmax's ability to continue as a going concern due to, among other problems with Qmax's inventory, an increase in the allowance for doubtful accounts for fiscal 1988 over that previously disclosed in the financial statements. The Investors' Amended Complaint alleges that the statements of accounts receivable, current assets and retained earnings in the condensed consolidated balance sheets were overstated by $315,000 attributable to the premature booking of a sale to Estee Lauder in fiscal year 1987 (the "Estee Lauder Sale") and by the booking of $426,000 attributable to a transaction with Montreal Litho as a sale (the "Montreal Litho Sale") when in fact it was a consignment.

Although over $2 million in additional financing was raised through the sale of the Notes, Qmax filed for bankruptcy on August 3, 1989, shortly after it defaulted on the Notes. Qmax's Disclosure Statement (the "Disclosure Statement") states that Qmax attempted two reorganizations after it entered bankruptcy, one based upon marketing KCL after receiving assurances received from Bolar concerning the "imminent" approval of KCL by the FDA, and the other based upon obtaining credit and producing drugs with the American Cyanamid Company using the Transpharma Plant. Both fell through, and the Qmax Disclosure Statement, filed June 26, 1990, provides for the liquidation of the company.

 **\*6**  D & T alleges that Shulman resigned as CEO and Chairman of Bolar on February 11, 1990. D & T also alleges that in a criminal information dated February 26, 1991, the United States alleged that Bolar had made false and fraudulent statements to the FDA in connection with certain ANDAs[2] submitted by Bolar in 1984, distributing adulterated and misbranded drugs, and obstructing investigations of this. D & T alleges that Bolar pled guilty to all of the charges on March 22, 1191, and was sentenced to a $10 million fine. A criminal information against Shulman was filed dated October 10, 1991, alleging, *inter alia,* that Shulman had made

Fed. Sec. L. Rep. P 97,768

false statements to the FDA. D & T alleges that Shulman signed a plea agreement with the United States Attorney for the District of Maryland and pled guilty to all of the charges against him in November of 1991.

The Investors' Amended Complaint alleges that the Investors purchased the Notes in reliance upon statements and representations as to Qmax's financial condition, express and implied, made by D & T in its Review of Qmax's financial statements. The Investors allege that D & T knew or was reckless not to have known that Qmax was not an unqualifiedly going concern at the time D & T issued the Review Report, but that it did not reveal this to the Investors until it issued the qualified opinion with respect to Qmax's 1988 audited financial statements. Essentially, the Investors allege that D & T's Review Report was issued so close in time to the qualified opinion (D & T consented to the use of the Review on August 18, 1988, and the audited 1988 financial statements were published on October 24, 1988) that in preparing the Review D & T must have known, or recklessly disregarded, those warning signs about Qmax's financial status as a going concern which caused it to issue a qualified opinion some two months later.

D & T's Third–Party Complaint alleges that Bolar failed to disclose its problems with the FDA to either D & T or the Investors, although it knew that Qmax depended upon the success of the Joint Venture and that, pursuant to the Bolar Letter, the Investors were relying upon the success of the Joint Venture. D & T alleges that Bolar knew, because of its problems with the FDA, that it would be impossible for Bolar to secure timely FDA approval for the Joint Venture's first product. D & T alleges that Eastlake represented Qmax to the Investors as a financially sound going concern, which would be able to repay the Notes from either the operating revenues derived from the Joint Venture or the proceeds of the Public Offering or both, although Eastlake had an obligation to conduct its own due diligence investigation into the business, operations and prospects of Qmax, and as agent of Qmax, Eastlake had access to material non-public proprietary information about Qmax's business. D & T also alleges that at some time prior to the 1987 Audit Report, Qmax gave Cronin warrants to purchase 110,000 shares of Qmax common stock. D & T also alleges that Cronin, a Vice President of Larson Mardon, signed two audit confirmation letters on July 22 and 29, 1987, and participated in two telephone calls with D & T personnel, on September 22, 1987 and August 9, 1988. In the August 9th call, D & T alleges that Cronin confirmed that the sales to Montreal Litho were sales,

not consignments, and that Cronin exercised his warrants immediately after this communications with D & T.

*Discussion*

I. *Scope of Review on a Motion to Dismiss*

**\*7** Bolar alleges that D & T raises new arguments in its Memorandum of Law in Opposition to Motions to Dismiss which are not reflected in the pleading of the actual Third–Party Complaint. Second, Bolar alleges that this Court may not consider many of the documents referred to by D & T in its memorandum of law upon the theory that these documents are extrinsic to the Third–Party Complaint and should not be considered under Rule 12(b)(6), F.R.Civ.P.

Despite Bolar's first allegation, all of D & T's legal theories of injury—which are properly set out in its memorandum of law and not presented as factual conclusions in its Third–Party Complaint—can be inferred from its factual allegations. The portions of D & T's memorandum of law which Bolar urges the Court to ignore are either allegations which are contained in the Third–Party Complaint, logical inferences that flow from these allegations, or legal theories based on those allegations.

In its Third–Party Complaint, D & T need only make a short and plain statement of its claim, enough to give a defendant fair notice of what the plaintiff's claim is and the grounds upon which its rests. *See* Rule 8, F.R.Civ.P. The complaint need only "contain direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory," *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984), *cert. denied, 470 U.S. 1054 (1985)* (citations omitted).

While a claim for relief "may not be amended by the briefs in opposition to a motion to dismiss," *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 687 F.Supp. 832, 836 (S.D.N.Y.1988) (citations omitted), D & T's legal theories do not amend its complaint. D & T's Third–Party Complaint alleged that the Investors purchased their notes in reliance upon the Joint Venture and that the Joint Venture failed because the Joint Venture would never able to secure FDA approval for its products due to Bolar's alleged fraud. D & T's legal theories, which include all the elements of securities fraud and loss causation, can be inferred from the factual

Fed. Sec. L. Rep. P 97,768

allegations set out in this Third–Party Complaint. The standard of review under Rule 12(b)(6) requires the court to accept as true all reasonable inferences which can be drawn from the Third–Party Complaint.

Bolar's other argument is that D & T cannot rely on documents and affidavits which it did not attach as exhibits to its complaint. However, the purpose of the Rule is simply to give a plaintiff notice that extraneous documents may be considered by the Court in dismissing his complaint. If the plaintiff and not the party moving for dismissal submits the extraneous documents, notice to the plaintiff cannot be an issue. Second, the appropriate response to the extraneous documents is not to disregard them, as Bolar suggests, but to convert the motion for dismissal into a motion for summary judgment and invite the plaintiff to submit documents as well. [3] There is no reason to convert a motion to dismiss into a motion for summary judgment when (as here) it is the plaintiff who has incorporated the documents into his pleading by reference or by exhibit:

> *8 it is for that reason—requiring notice so that the party against whom the motion to dismiss is made may respond—that Rule 12(b)(6) motions are ordinarily converted into summary judgment motions. Where plaintiff has actual notice.... the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.

*Cortec Indus. Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561 (1992). Accordingly, there is no reason to turn Bolar's motion for dismissal into one for summary judgment.

Although this remains a motion to dismiss, it is still proper for the Court to consider the affidavits and documents before it in deciding Bolar's motion to dismiss. Rule 10(c), F.R.Civ.P., provides: "Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion. A copy of any written instrument which is an exhibit to a pleading is a part hereof for all purposes." In the Second Circuit, a complaint is deemed to include any written instrument attached to it as an exhibit or any statements of documents incorporated in it by reference.

*Cortec,* 949 F.2d at 47; *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989); *Goldman v. Belden,* 754 F.2d 1059, 1065–66 (2d Cir.1985). A court may also take notice of public records, including SEC documents, for no serious question as to the authenticity of documents required by law to be filed with the SEC can exist, *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991).

Finally, a court may review documents integral to the complaint even where they have been neither attached nor incorporated by reference simply because a plaintiff should not be able to evade a properly argued motion to dismiss by not submitting the offering materials to the court. *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991). In *Cortec,* the Court of Appeals for the Second Circuit held that the district court, in dismissing the plaintiffs' complaint, could have considered documents which the plaintiffs either had in their possession or had knowledge of and relied upon in bringing their complaint:

> The stock purchase agreement, Bowles' offering memorandum, and the [stock purchase] warrant were documents plaintiffs ... had knowledge of.... [Plaintiffs] did not lack notice of those documents; these papers were integral to its complaint. Consequently, ... the district court ... could have viewed them on the motion to dismiss because there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim.

*Cortec,* 949 F.2d at 48.

The situation in this case is a perfect analogy to *Cortec:* all the documents which Bolar maintains should not be considered are documents which D & T had in its possession and upon which it relied in filing its complaint. Bolar alleges the Court should not consider the offering documents, although in the Amended Complaint, the Investors individually list all the offering materials they alleged they relied on, including the Qmax Private Placement Offering Memorandum, the "Statement of Principal Risk Factors" compiled by Eastlake

(the "Risk Factors Statement"), the 1987 Audit Report, and the Review Report.[4] Bolar also alleges that this Court should not consider the affidavit of Edward Bentley submitted by D & T, although that affidavit merely helps to illustrate the logical inferences regarding D & T's allegations that Bolar and D & T jointly participated in the fraud alleged in the Third–Party Complaint. Finally, Bolar alleges that this Court should not consider Qmax's Chapter 11 Disclosure Statement, attached as Exhibit 2 to the Affidavit of D & T's counsel, David Tannenbaum, Esq. This Court make take judicial notice of the Disclosure Statement, as a public document filed in another court proceeding, in the same way that it may take judicial notice of the documents filed with the SEC. Under *Cortec,* notice to the pleader is the critical factor, and there can be no dispute that D & T has been on notice of the contents of all these documents and relied upon information in them in drafting its Third–Party Complaint. *Cf. Wood v. Brosse U.S.A., Inc.,* 788 F.Supp. 772, 775 (S.D.N.Y.1992) ("[T]he Complaint does state that Wood did not have a copy of the agreement when the Complaint was drafted ... Wood's Complaint therefore will not be construed as incorporating the letter agreement at issue"). D & T either possessed or had access to all of these documents before it filed its Third–Party Complaint. D & T, therefore, is entitled to rely upon all the documents which it has submitted to the Court in connection with this motion.

## II. *Right to Contribution under 10(b)*

**\*9** The existence of an implied right to contribution from joint tortfeasors for violations of the federal securities laws, which has been available to defendants in the Second Circuit since *Globus, Inc. v. Law Research Service, Inc.,* 318 F.Supp. 955, 957–58 (S.D.N.Y.1970), *aff'd per curiam* 442 F.2d 1346 (2d Cir.), *cert. denied,* 404 U.S. 941 (1971), is now incontestible. In *Musick Peeler & Garrett v. Employers Ins. of Wausau,* 508 U.S. 286, 113 S.Ct. 2085 (1993), the Supreme Court resolved a split between the circuits (*see Chutich v. Touche Ross & Co.,* 960 F.2d 721, 723 (8th Cir.1992)) and held that a right to contribution among joint tortfeasors existed under 10(b) and Rule 10(b)–5.

*Musick Peeler* found that actions brought under two sections of the 1934 Act, §§ 9 and 18 (15 U.S.C. §§ 78i and 78r) to be sufficiently close in structure, purpose and intent to a 10b–5 action to serve as models for defining rights of contribution.

Both Sections 9 and 18 contain nearly identical express provisions for such a right, each permitting a defendant to "recover contribution as in cases of contract from any person who, if joined in the original suit, would have been liable to make the same payment," 15 U.S.C. §§ 78i(e) and 78r(b).

> We think that these explicit provisions for contribution are an important, not an inconsequential, feature of the federal securities laws and that consistency requires us to adopt a like contribution rule for the right of action existing under Rule 10b–5.... Those charged with liability in a 10b–5 action have a right to contribution against other parties who have joint responsibility for the violation.

*Musick Peeler,* —— U.S. at ——; 113 S.Ct. at 2091–92. However, *Musick Peeler* applies to 10(b)–5 actions only: there remains no general right to contribution under federal law. *See Northwest Airlines, Inc. v. Transport Workers,* 451 U.S. 77 (1981) (no right to contribution under labor law or civil rights statute); *Texas Indus. Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630 (1981) (no right to contribution under the Sherman Act); *Getty Petroleum Corp. v. Island Transp. Corp.,* 862 F.2d 10 (2d Cir.1988) (no right to contribution under the Lanham Act), *cert. denied,* 490 U.S. 1006 (1989).

Nothing in *Musick Peeler* requires a court in the Second Circuit to question the holdings of prior cases which previously found a right to contribution. These cases have already recognized that such a right to contribution under the federal law depends upon the particular policy at stake:

> The goal of the securities laws is not just to compensate persons who have been defrauded but also to deter violations of those laws. This goal is advanced by a recognition of liability for contribution among joint offenders and by a recognition that liability does not depend on the plaintiff's having

Fed. Sec. L. Rep. P 97,768

elected to proceed against all those who have offended.

*Tucker v. Arthur Andersen & Co.,* 646 F.2d 721, 727 n. 7 (2d Cir.1981) (citations omitted); *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566 (2d Cir.), *cert. denied,* 459 U.S. 838 (1982) (comparing Section 10(b) to Sections 9 and 18 of the 1934 Act); *In re Crazy Eddie Sec. Litig.,* 802 F.Supp. 804, 814–15 (E.D.N.Y.1992).

### A. Loss Causation in Contribution Actions

**\*10** A claim for contribution under the federal securities laws, like a claim for contribution under the common law, requires a third-party plaintiff to allege all the elements of the offense against a third-party defendant in order to prevail. In this action, D & T must allege all the elements of a 10(b) action against the Third–Party Defendants, namely that the Third–Party Defendants either knowingly or reckless made material misrepresentations to the Plaintiffs on which the Plaintiffs relied in the purchase of the Notes and which proximately caused loss to the Plaintiffs.

Third–Party Defendant Bolar challenges D & T's claims on the issue of loss causation: it alleges that any misrepresentations or omissions concerning its alleged fraud on the FDA were not a proximate cause of Qmax's default on the Notes, and therefore nothing done by Bolar caused a loss to the Plaintiffs. Loss causation "turns upon a question of proximate cause: were the damages complained of a foreseeable result of the plaintiff's reliance on the fraudulent misrepresentation?" *Weiss,* 966 F.2d at 111; *Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.,* 801 F.2d 13, 21 (2d Cir.1986), *cert. denied sub nom. Arthur Andersen & Co. v. Manufacturers Hanover Trust Co.,* 479 U.S. 1066 (1987). There must be a direct or proximate relationship between the loss and the misrepresentation, *Bennett v. United States Trust Co.,* 770 F.2d 308, 314 (2d Cir.1985), *cert. denied,* 474 U.S. 1058 (1986). Although it is not necessary to plead causation in any great detail, *Whitbread (U.S.) Holdings, Inc. v. Baron Philippe de Rothschild, S.A.,* 630 F.Supp. 972, 979 (S.D.N.Y.1986), D & T must show that Bolar's misrepresentations go to the investment quality of the stock, not the investment characteristics. *Manufacturers*

*Hanover,* 801 F.2d at 22. "[P]laintiffs must prove that but for the circumstances the fraud concealed, the investment would not have lost its value," *In re Gas Reclamation, Inc. Sec. Litig.,* 733 F.Supp. 713, 721 (S.D.N.Y.1990).

To establish that Bolar's concealment of its alleged fraud on the FDA contributed to the Plaintiffs' loss, D & T must allege facts from which it can be inferred that Bolar's misrepresentations induced the Plaintiffs' purchases, that such misrepresentations affected the "investment quality" of the Notes, and that the falsity of the information was a significant factor in Qmax's default on the Notes.

The Third–Party Complaint does allege facts from which a reasonable jury could infer that predictions of the success for the Joint Venture acted as a substantial inducement for the purchase of the Notes. In their Amended Complaint, the Plaintiffs describe the Notes in the following manner:

> Qmax sought immediate financing to complete the development of the pharmaceutical plant in connection with its first venture with Bolar.... Thus, in addition to undertaking to underwrite a public offering of Qmax securities, Eastlake arranged for interim bridge financing for Qmax which was intended as short term financing to be repaid from the proceeds of the public offering contemplated by the Letter of Intent [between Qmax and Eastlake]. The bridge financing took the form of the Notes which were evidenced by a promissory note issued by the Company [Qmax] pursuant to the Securities Purchase Agreement between the Company and each of the Plaintiffs.

**\*11** Amended Complaint, ¶ 26, quoted in the Third–Party Complaint, ¶ 10. The Business Plan (on which the Plaintiffs allege they relied) attached to the offering materials contemplated the additional investment of all the funds provided by the Plaintiffs, as well as the proceeds of the planned Public Offering, would be invested in the Joint

Ades v. Deloitte & Touche, Not Reported in F.Supp. (1993)

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 10 of 247

Fed. Sec. L. Rep. P 97,768

Venture. The Business Plan also projected that Qmax would begin to derive revenue from the Joint Venture in November 1988 and contemplated a total of $3.15 million from the sales of microencapsulated KCL in fiscal 1989. The Joint Venture was described as critical to Qmax in the Offering Memorandum, in Note C to Qmax's Consolidated Financial Statements attached to the Review Report, in the first of the Principal Risk Factors, in various places in the Business Plan, and in the August filing with the SEC.

A statement is misleading if a reasonable investor, in the exercise of due care, would have received a false impression from the statement. Because this determination requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts, it is generally a question of fact for the jury, *In re Par Pharmaceutical Inc. Sec. Litig.,* 733 F.Supp. 668, 677 (S.D.N.Y.1990) (citations omitted). D & T has established that there is at least a question of fact whether the Investors may have substantially relied upon promises associated with the Joint Venture, rather than just upon projections of Qmax's existing cosmetics business, in purchasing the Notes.

The Joint Venture was dependant upon several factors for its success, and one of these factors was FDA approval for its products. Although the Transpharma Plant was to use microencapsulation techniques which Qmax had previously used for its cosmetics business, the offering materials make it clear that Transpharma was designed to produce generic drugs. According to the August Amendment (also alleged to have been relied on by the Plaintiffs, and quoted by D & T in the Third–Party Complaint ¶ 18), part of Bolar's role in the Joint Venture was to secure the FDA approval for the particular drugs to be produced:

> Since the Transpharma facility is specially designed and equipped for the production of Microencapsulated Pharmaceuticals, in the event that the Company is unable to satisfy the FDA as to its compliance with good manufacturing practices or Bolar is unable to obtain an ANDA ... the Company may not be able to recover its investment in the Plant.

These concerns were also communicated to the Plaintiffs as one of the "risk factors" listed in the Risk Factors Statement.

Section 3.6 of Qmax's Disclosure Statement indicates that Qmax tried to reorganize in bankruptcy with funding from another source based in part upon assurances which it received from Bolar that approval of KCL by the FDA was "imminent," and Qmax actually produced an initial batch of KCL in late 1988. However, the FDA never approved the ANDA for KCL. These allegations raise a factual issue as to whether the Joint Venture failed because Bolar could not get FDA approval of its ANDA for KCL in light of the FDA's growing awareness of Bolar's fraud.

**\*12** Finally, Bolar alleges that even if the Investors relied upon the Joint Venture and Bolar's inability to secure an ANDA for KCL caused the failure of the Joint Venture, the Investors' allegations still focus on the overstated receivables on Qmax's balance sheets. That factors other than Bolar's alleged fraud on the FDA may have contributed to the Plaintiffs' loss is not fatal to D & T's allegations of loss causation against Bolar. A plaintiff is not required to prove that the defendant's act was the sole and exclusive cause of his injury; he need only show that it was "substantial," *i.e.,* a significant contributing cause, *Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 92 (2d Cir.1981); *Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 708 (2d Cir.), *cert. denied sub. nom. Wood Walker & Co. v. Marbury Management, Inc.,* 449 U.S. 1011 (1980); *Northwestern Nat'l Ins. Co. v. Alberts,* 741 F.Supp. 424, 433 (S.D.N.Y.1990), *modified,* 937 F.2d 77 (2d Cir.1991) (plaintiffs "need not prove in the pleadings that there is no other cause underlying the loss").

D & T alleges that Bolar had been served with a subpoena on July 5, 1988, that the American Stock Exchange closed trading in Bolar's stock on August 5, 1988, and that when the president of Eastlake telephoned Shulman at Bolar about the stock exchange's action Shulman stated that Bolar was not under investigation. Since the Private Placement occurred after these events, Bolar knew or should have known that its alleged fraud on the FDA would at the very least impair its ability to secure future approvals of drugs from the FDA. However, Bolar knew that the proceeds of the Private Placement were to fund completion of the Transpharma Plant, which was being built to produce a product for which Bolar had agreed to secure FDA approval. Since the success of

the Joint Venture was critical to Qmax's ability to repay the Notes, its bridge financing for the Joint Venture, Bolar should have foresee that its problems with the FDA would cause a loss to the purchasers of the Notes. Bolar should have known that its misrepresentations and omissions would touch upon the reasons for the Notes' decline in value, *In re Gas Reclamation,* 733 F.Supp. at 721. Because D & T has alleged as a factual matter that Bolar's misrepresentations and omission may have amounted to "significant contributing cause," *Wilson,* 648 F.2d at 92, of Qmax's inability of pay the Notes, D & T has adequately alleged loss causation against Bolar.

### B. *Bolar's Duty to Disclose*

Bolar argues that, even if D & T can establish that Bolar's inability to secure FDA approval for KCL was a proximate cause of the Investors' loss, Bolar had no duty to disclose its alleged fraud upon the FDA to the Plaintiffs. Bolar argues that knowledge alone of a material omission is not enough to violate the applicable laws, even where that omission will reduce the value of the securities in question, simply because silence, absent a duty to disclose, is not a violation of the securities laws. *See, e.g., Chiarella v. United States,* 445 U.S. 222, 232 (1980); *Dirks v. SEC,* 463 U.S. 646, 655–56 (1988); *Glazer v. Formica Corp.,* 964 F.2d 149, 156 (2d Cir.1992); *In re Par Pharmaceutical,* 733 F.Supp. at 674.

**\*13** Liability for nondisclosure of material non-public market information under Section 10(b) is premised upon some relationship triggering trust and confidence between parties to a transaction, *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 12 (2d Cir.1983), *cert. denied sub nom. Moss v. Newman,* 465 U.S. 1025 (1984). "[T]his duty does not come from § 10(b) or Rule 10(b)–5; if it did the inquiry would be circular. The duty must come from a fiduciary relationship outside securities law," *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 496 (7th Cir.1986).

D & T alleges that Bolar's extensive involvement in the Private Placement makes Bolar liable to the Plaintiffs even without a contractual relation between the two. "[P]rivity between plaintiffs and defendants is not a requisite element of a Rule 10b–5 cause of action for damages," for relief may be granted even though "there have been no direct transactions between plaintiffs and defendant," *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228, 229 (2d Cir.1974); *Baretge v. Barnett,* 553 F.2d 290, 291 (2d Cir.1977).

> When one party undertakes to communicate information to another who it knows will use that information in connection with a securities purchase, the former assumes a duty to communicate any additional or qualifying information then known, the absence of which would render misleading that which was communicated.

*Horwitz v. AGS Columbia Assocs.,* 700 F.Supp. 712, 721 (S.D.N.Y.1988) (substantial involvement in securities transaction made any misrepresentations actionable), quoting *Whitbread,* 630 F.Supp. at 972. *See also Schatz v. Rosenberg,* 943 F.2d 485, 491 (4th Cir.1991) (affirmative misrepresentations made in solicitation of sale of securities), *cert. denied,* 503 U.S. 936, 112 S.Ct. 1475 (1992).

Likewise, a duty to disclose arises under New York law in the context of a confidential or fiduciary relationship such as to create a duty to disclose, *County of Westchester v. Welton Becket Assocs.,* 102 A.D.2d 34, 50–51, 478 N.Y.S.2d 305, 316 (2d Dep't 1984), *aff'd,* 66 N.Y.2d 642, 485 N.E.2d 1029, 495 N.Y.S.2d 364 (1985). The duty is explained more fully in *Ossining Union Free School Dist. v. Anderson,* 73 N.Y.2d 417, 539 N.E.2d 91, 541 N.Y.S.2d 335 (1989), where the Court held that a plaintiff must allege:

> (1) awareness [on the part of the defendants] that the reports were to be used for a particular purpose or purposes; (2) reliance by a known party or parties in furtherance of that purpose, and (3) some conduct by the defendants linking them to the party

**Ades v. Deloitte & Touche, Not Reported in F.Supp. (1993)**
Fed. Sec. L. Rep. P 97,768

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 12 of 247

or parties and evincing defendant's understanding of their reliance.

*Id.,* 73 N.Y.2d at 424–25.

Although the Bolar Letter [5] is the most direct evidence of Bolar's awareness of the Plaintiffs' reliance upon its misrepresentations, D & T alleges that the June 23, 1988 Prospectus of Bolar, the Joint Venture Agreement, Shulman's tenure as a director of Qmax from April to August, 1988 (in order to oversee Bolar's interests in the Joint Venture), and a memorandum to Eastlake's Qmax file regarding a meeting between representatives of Eastlake, Shulman, and Bolar's corporate counsel, Jack Kornreich on July 21, 1988, all demonstrate Bolar's extensive involvement with the Private Placement. If the third-party plaintiffs' evidence is believed, a fact-finder may conclude that Bolar's involvement in the securities transactions was substantial. *Horwitz,* 700 F.Supp. at 721. Such involvement may also qualify as the link evidencing Bolar's understanding of the Plaintiffs' reliance upon Bolar's representations under *Ossining.* Only the documents which Bolar disseminated to the public or filed with the SEC cannot give rise to a duty to disclose possible consequences of its relationship with the FDA. *In re Par Pharmaceutical,* 733 F.Supp. at 678.

**\*14** Because Bolar's direct activities in connection with the Private Placement incurred a duty of disclosure, the Court does not reach D & T's allegations of Bolar's *respondeat superior* liability based on Shulman's status as a director of Qmax or whether Shulman signed the Bolar Letter in the scope of his employment as CEO of Bolar.

### C. *Definition of Joint Tortfeasor*

Bolar does not dispute that D & T has a right to contribution from joint tortfeasors, but it alleges that because it and D & T did not knowing commit the same fraud upon the Plaintiffs, Bolar and D & T do not qualify as "joint" tortfeasors and D & T is barred from asserting a right of contribution against Bolar.

The courts of the Second Circuit agree that since the right is a right of contribution under federal law, the state law of contribution does not govern the definition

of "joint tortfeasor" under federal law. *Altman v. Liberty Equities Corp.,* 54 F.R.D. 620, 625 (S.D.N.Y.1972); *Jordan v. Madison Leasing Co.,* 596 F.Supp. 707, 711 (S.D.N.Y.1984). [6] The misleading nature of Bolar's statements must make Bolar liable to the Plaintiffs under a count of securities fraud, *see* *Tucker,* 646 F.2d at 727 ("under the securities laws, a person who has defrauded the plaintiff in violation of those laws may be liable for contribution to another person who has similarly defrauded the plaintiff.") As long as this requirement is met, however, there is little guidance as to whether the term "joint tortfeasors" requires the defendants to participate knowingly in a joint scheme, or extends to independent or concurrent tortfeasors who may be unaware of how their actions jointly contribute to the plaintiff's harm. *See* *Kenneth Leventhal & Co. v. Joyner Wholesale Co.,* 736 F.2d 29, 31 n. 1 (2d Cir.1984) ("We do not reach this issue" of the definition of joint participants in fraud); *McCoy v. Goldberg,* 778 F.Supp. 201, 204 (S.D.N.Y.1991) ("The Second Circuit has provided little guidance on the question.").

The most recent persuasive authority on this issue put before the Court by either party is the decision of the Honorable William C. Conner in *McCoy.* In *McCoy,* the direct defendant, a securities brokerage firm, filed suit against eleven limited partnerships, alleging that if the plaintiff's complaint against it were true each of the partnerships had made material misrepresentations to the securities house, for it had merely repeated to the plaintiff information prepared by the partnerships. The court rejected the partnerships' arguments that the definition of "joint tortfeasors" required knowing participation or planned cooperation, and found that *Tucker's* requirement that the third-party defendants "similarly defraud" the plaintiff permitted concurrent tortfeasors who commit independent securities law violations to be liable for contribution.

Bolar, like the partnerships in *McCoy,* attempts to rely on the language in two older cases, *Stratton Group, Ltd. v. Sprayregen,* 466 F.Supp. 1180, 1187 (S.D.N.Y.1979) ("a necessary predicate for contribution ... is an allegation that [the third-party defendant] was a joint participant in the fraud alleged in the main action"), and *Greene v. Emersons, Ltd.,* 102 F.R.D. 33, 36 (S.D.N.Y.1983) (holding "that contribution lies only between knowing participants in the same fraud"), *aff'd on other grounds by Kenneth Leventhal & Co.,* 736 F.2d 29 (in which, as noted above, the Second Circuit

Fed. Sec. L. Rep. P 97,768

declined to reach this issue). However, these decisions are distinguishable: "in each, third-party plaintiffs failed to allege that the third-party defendants had violated the securities laws and had participated in the underlying fraud," *McCoy,* 778 F.Supp. at 204–05.

**\*15** Defining "joint tortfeasors" to include independent tortfeasors furthers the purposes of federal securities laws. The vast majority of circuit and district court decisions, including the Second Circuit, have found that recklessness is sufficient to allege scienter as part of a claim under 10(b).

*See, e.g.,* *Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142, 144 (2d Cir.1991); *IIT v. Cornfeld,* 619 F.2d 909, 923 (2d Cir.1980) (Friendly, J.); *Rolf v. Blyth, Eastman, Dillon & Co.,* 570 F.2d 38, 44 (2d Cir.), *cert. denied,* 439 U.S. 1039 (1978). The Amended Complaint's "red flag" warnings about certain Qmax accounts and D & T's failure to investigate these supported the Investors' allegations of recklessness on the part of D & T in a manner sufficient to survive a motion to dismiss, *Ades,* 799 F.Supp. at 1500. To bar contribution in a situation with two independent tortfeasors—one alleged to be reckless, the other alleged to have intentionally committed fraud—would not make sense as long as it is possible to allege a cause of action against both parties under the theory that one party recklessly but unknowingly furthered the deliberate misrepresentations of another.

The Supreme Court, in focusing upon the harm which the securities laws were designed to deter, did not imply a need to find a deliberate conspiracy among the tortfeasors. "The violation of the securities laws gives rise to the 10b–5 private cause of action, and the question before us is the ancillary one of how damages are to be shared among person or entities already subject to that liability," *Musick, Peeler,* 508 U.S. at ——, 113 S.Ct. at 2088. "The approach to the issue should not turn on how 'joint tortfeasor' is defined but rather on an assessment of the goals of both the securities laws and contribution," *Department of Economic Development v. Arthur Andersen & Co.,* 747 F.Supp. 922, 933 (S.D.N.Y.1990) (not finding "joint tortfeasors" where misrepresentations to accounting firm did not amount to a fraud on plaintiffs). Here D & T alleges that D & T and Bolar both participated in material fraudulent misrepresentations about Qmax made to the Plaintiffs upon which the Plaintiffs relied and which affected the investment quality of Qmax's Notes. Although the joint participation of D & T and Bolar in the misrepresentations about Qmax were

not "knowing" according to the allegations in D & T's Third–Party Complaint, they are "joint" in the sense that the actions of both made the Notes of Qmax a better investment than it actually was. The allegations against Bolar by D & T, if established, permit D & T to state a claim for contribution against Bolar as a "joint tortfeasor" for violation of the federal securities laws.

## D. *Contribution is a Derivative Claim*

Bolar's arguments that D & T's action for contribution should be dismissed for lack of standing are meritless. A claim for contribution is a derivative claim. Contribution is concerned only with the apportionment of liability among persons all liable for the plaintiffs' harm, not to liability for wrongs committed by such against each other. Second Circuit decisions which had held there is a right to contribution under § 10(b) had assumed without discussion that the party asserting the right need not be a purchaser or seller of securities. *Tucker,* 646 F.2d at 727 (accountants permitted to bring third-party complaint against officer of issuer corporation); *Sirota,* 673 F.2d at 578 (2d Cir.) (right of accountants to assert contribution claim against issuer upheld); *Alexander & Baldwin, Inc. v. Peat, Marwick, Mitchell & Co.,* 385 F.Supp. 230, 238–39 (S.D.N.Y.1974) (accountants permitted to bring claim for contribution against sellers). The decision cited by Bolar, *Connecticut Nat'l Bank v. Reliance Ins. Co.,* 704 F.Supp. 506, 511 (S.D.N.Y.1989) is distinguishable, for in that case the court found that the third-party defendant had not breached any duty to the plaintiff.

**\*16** The arguments of third-party defendant Cronin (which Eastlake and Lawson Mardon have joined) based upon statute of limitations are equally meritless, and for the same reason. Cronin alleges that the since the last act charged to him was the August 9, 1988 telephone call in which D & T alleges that he confirmed the "sale" to Montreal–Litho, D & T's Third–Party Complaint is time-barred by the one-year discovery rule laid down in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilberton,* 501 U.S. 350, 111 S.Ct. 2773 (1991).

The decision in *Lampf* does not address the question of the statute of limitations for a contribution claim or in any way change the existing rule, which is that an action for contribution accrues at the time a judgment is entered against

the direct defendant and is paid by him. In the case at bar, D & T's action has not yet accrued, and the statute of limitations against the third-party defendants has not yet begun to run. As the Restatement (Second) of Torts § 886A(2) provides:

> The right of contribution exists only in favor of a tortfeasor who has discharged the entire claim for the harm by paying more than his equitable share of the common liability, and is limited to the amount paid by him in excess of his share. No tortfeasor can be required to make contribution beyond his own equitable share of liability.

In order for a contribution claim to arise, the liability of the third-party plaintiff in the underlying action must be established.

> Although the claim for contribution may be brought under Rule 14 at the same time the original claim is being litigated, the statute of limitations applicable to the contribution claim does not begin to run until the third-party plaintiff is compelled to respond in damages for the injury as to which he is claiming contribution.

*Tri–Ex Enterprises, Inc. v. Morgan Guar. Trust Co.,* 586 F.Supp. 930, 933 (S.D.N.Y.1984) (citations omitted). Courts in other jurisdictions have reached the same result. *See, e.g., Nelson v. Quimby Island Reclamation Corp.,* Fed.Sec.L.Rep. (CCH) ¶ 97,388 at 97,537, 97,540 (N.D.Cal.1980) ("under both federal and state securities laws, a cause of action for contribution or indemnity does not arise at least until the party seeking relief has previously been found to be liable.").

Cronin cites no case holding there is a right to contribution under 10(b) which changes this fundamental rule. Nowhere in *Lampf* did the Supreme Court address the issue of contribution. *Lampf* concerns solely the appropriate statute of limitation for a direct cause of action under § 10(b). In the absence of any authority supporting the idea that *Lampf* alters

the long-standing rule governing the accrual of contribution claims, this Court declines to change that rule.

## II. *Eastlake*

Eastlake has three lines of defense against D & T Third–Party Complaint. First, it alleges that it has settled with the Investors, which it claims operates as a bar to D & T's claims; second, that D & T has failed to state a claim for contribution based on fraud against it with sufficient particularity to survive Rule 9(b) of the Federal Rules of Civil procedure; and third, that Eastlake is entitled to summary judgment on the issue of due diligence. For the reasons given below, all three arguments fail.

### A. *D & T's State Law Claims Against Eastlake Are Dismissed Pursuant to* N.Y.G.O.L. § 15–108

**\*17** Although Eastlake does not allege that it secured a bar order from this or any other court, Eastlake argues that the public policy of favoring settlements bars any claim for contribution for violations of the securities laws after a settlement.

There is no automatic bar of a non-settling party's contribution claims against settling third parties as a matter of federal law. *Singer v. Olympia Brewing Co.,* 878 F.2d 596, 599 (2d Cir.1989), *cert. denied,* 493 U.S. 1024 (1990). Under Second Circuit precedents for a claim arising under federal law, a settlement bar cannot be ordered until a non-settling party, upon request, is allowed to participate in an evidentiary hearing to determine the fairness of the settlement. *In re Masters Mates & Pilots Pension Plan,* 957 F.2d 1020 (2d Cir.1992). The fairness hearing takes into account the effect of the settlement upon nonsettling defendants and will determine whether the settlement has been entered into in good faith. *Id.* at 1031. In the absence of a bar order, Eastlake's motion to dismiss the 10(b) and 10(b)–5 count of the Third–Party Complaint must be denied. Accordingly, D & T's request for a fairness hearing after the close of discovery to determine the proper effect of Eastlake's settlement of the federal claims, and to determine the appropriate method of judgment reduction, must be granted under *Masters Mates.*

However, D & T's action for contribution based on New York State law claims will be dismissed based upon Eastlake's

Ades v. Deloitte & Touche, Not Reported in F.Supp. (1993)

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 15 of 247

Fed. Sec. L. Rep. P 97,768

settlements with the Investors, for New York law does provide for the automatic bar of all further contribution claims against a settling tortfeasor from other tortfeasors. New York General Obligations Law § 15–108 (McKinney 1989), provides in relevant part:

> (b) ... A release given in good faith by the injured person to one tortfeasor ... relieves him from liability to any person for contribution....

See also Franzek v. Calspan Corp., 78 A.D.2d 134, 139, 434 N.Y.S.2d 288, 292 (4th Dep't 1980). In Gonzalez v. Armac Indus. Ltd., 756 F.Supp. 165, 167–68 (S.D.N.Y.1991), the Court observed:

> The purpose of § 15–108 is to provide a defendant who is one of several tortfeasors with an incentive to settle by assuring that the settling defendant will have no further liability to the other tortfeasors ... The quid pro quo is that the defendant is barred from seeking contribution against any of the other tortfeasors.... The remaining tortfeasors suffer no harm, as they may offset the amount of which they are ultimately found liable by the amount of settlement between plaintiff and the first defendant.

However, precisely because a settlement under state law does operate as an automatic bar against the claims of other parties for contribution, the settlement is required to be in good faith. Cf. Torres v. State, 67 A.D.2d 814, 814, 413 N.Y.S.2d 262, 263 (4th Dep't 1979) ("The 'good faith' requirement was imposed to assure that an injured party would not collusively release one wrongdoer for a small amount in return for a promise to cooperate improperly in an attempt to extract from the other wrongdoers more than their equitable share of the damage.") If D & T can allege facts from which it may be inferred that Eastlake's settlement was collusive or in bad faith, the automatic bar of N.Y.G.O.L. § 15–108 will not operate.

**\*18** D & T alleges that Eastlake's settlement with the Plaintiffs is "collusive" for two reasons: first, that an April 19, 1990 memorandum from Eastlake to the Investors' counsel, in which Eastlake outlines potential claims against D & T and states that the settlement amount is to be earmarked for litigation against D & T, is evidence of "collusion," and, second, that the relative size of the settlement ($115,000 plus $250,000 raised from the Private Placement which was apparently never conveyed to Qmax) alone suggests collusion.

The good-faith requirement depends upon all the facts alleged, not just upon the amount of the settlement. A release even for nominal damages will not be evidence of collusion or bad faith if the record otherwise supports allegations of good faith. Friend v. Dibble, 124 Misc.2d 151, 475 N.Y.S.2d 765 (Sup.Ct. Sullivan Cty.1984) (settlement with product manufacturer for $1.00 not in bad faith given absence of product identification). D & T will suffer no harm by Eastlake's settlement, since D & T's potential liability under the state law claims will be reduced by the greater of the amount paid by Eastlake or Eastlake's equitable share of damages. N.Y.G.O.L. § 15–108; Gonzalez, 756 F.Supp. at 168. A "collusive" settlement is one where the injured party releases a:

> wrongdoer for a small amount in return for the promise of that wrongdoer to cooperate improperly with the injured person in an attempt to extract from the remaining wrongdoers more than the equitable share of the damages attributable to them.

Friend, 124 Misc.2d at 153, 475 N.Y.S.2d at 766. D & T has not alleged that Eastlake's settlement with the Plaintiffs prevents N.Y.G.O.L. § 15–108's limiting D & T's payment of equitable share of damages pursuant to the statute. D & T has merely alleged that communications and settlement before the lawsuit officially began together with settling for a relatively small amount indicate collusion. Given New York's official policy of encouraging settlement, these allegations do not rise to the level of bad faith. Accordingly, D & T has not alleged facts from which it can be inferred that the settlement

Fed. Sec. L. Rep. P 97,768

of the state-law claims should not be respected according to New York law. Eastlake's motion to dismiss D & T's state-law claims is therefore granted.

### B. *Eastlake Is Not Entitled to Summary Judgment*

Eastlake, alone of all the defendants, has moved for summary judgment in addition to its motion to dismiss. On a motion for summary judgment, the burden is upon the movant to establish that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), F.R.Civ.P.; *Oxley v. City of New York,* 923 F.2d 22, 24 (2d Cir.1991). Although the Supreme Court has made summary judgment an integral part of federal practice, (*see* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986) and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1985)) summary judgment remains appropriate only when there is no uncertainty as the true state of any material fact, *Gibson v. American Broadcasting Companies, Inc.,* 892 F.2d 1128, 1132 (2d Cir.1989); *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). The adequacy of a party's due diligence may be decided on summary judgment if the underlying historical facts are undisputed, *In re Software Toolworks, Inc. Sec. Litig.,* 789 F.Supp. 1489, 1496 (N.D.Cal.1992), citing *Laven v. Flanagan,* 695 F.Supp. 800, 811–12 (D.N.J.1988), in the same way that scienter may be decided on summary judgment by simply showing that there is a complete failure of proof on the part of the plaintiff, *id.* at 1489–99.

**\*19** Here the facts concerning the nature, scope, and adequacy of Eastlake's due diligence are certainly in dispute. D & T alleges that it has not had an opportunity to conduct adequate discovery of Eastlake's due diligence, and that summary judgment should not be granted where a factual dispute exists where one party has yet to exercise its opportunities for pretrial discovery or has had limited or no opportunity for discovery. *See* Rule 56(f), Fed.R.Civ.P.; [7] *National Life Ins. Co. v. Solomon,* 529 F.2d 59, 61 (2d Cir.1975); *Merritt Forbes & Co. v. Newman Invest. Sec. Inc.,* 604 F.Supp. 943, 957 (S.D.N.Y.1985); *Argus Inc. v. Eastman Kodak Co.,* 552 F.Supp. 589, 600 (S.D.N.Y.1982).

The rule is especially applicable when knowledge or control of the facts is largely in the control of the moving party. *Schoenbaum v. Firstbrook,* 405 F.2d 215, 218 (2d Cir.1968), *cert. denied sub. nom. Manley v. Schoenbaum,* 395 U.S. 906 (1969).

In the Second Circuit, when conducting a due diligence investigation in connection with the sale of a security, an underwriter must make adequate investigation of an issuer's financial soundness and prospects and must disclose materially adverse information to the potential investors. *Feit v. Leasco Data Processing Equip. Corp.,* 332 F.Supp. 544 (E.D.N.Y.1971); *Escott v. BarChris Constr. Corp.,* 283 F.Supp. 643 (S.D.N.Y.1968). Failure to carry out a reasonable investigations will render the underwriter liable for material misrepresentations which such an investigation would have uncovered. *Feit,* 332 F.Supp. at 582. What constitutes a reasonable investigation will vary depending upon circumstances:

> The question, however, is not whether Goldman, Sachs conducted a reasonable credit investigation ... but whether by.... the date of the foundation's purchase, there were sufficient storm warnings as to the Company's insecure condition to render Goldman, Sachs' normal procedures inadequate and to require more concrete verification of management representations and projections.

*University Hill Foundation v. Goldman, Sachs & Co.,* 422 F.Supp. 879, 902 (S.D.N.Y.1976). D & T has submitted authority to the effect that reasonably due diligence will normally involve a careful review of the issuer's financial statements and important contracts, *Feit,* 332 F.Supp. at 582.

The case on which Eastlake relies both for summary judgement and its particularity defense is *In re Software Toolworks,* where summary judgment was granted to the underwriters of a public offering of a software company which designed products for the computer game market created by Nintendo of America. The Court described the

Ades v. Deloitte & Touche, Not Reported in F.Supp. (1993)

Fed. Sec. L. Rep. P 97,768

underwriters' due diligence in *Software Toolworks* in the following terms:

> The Underwriters interviewed over a dozen Toolworks and Mindscape officials, exploring all aspects of Toolworks' business. They then verified management's representations by contacting three major Nintendo customers, the distributors of Toolworks' PC software, three major software developers or licensees, and customers of the Priority subsidiary. They also contacted Nintendo of America regarding the health of the Nintendo market, inspected the factory where Miracle Piano was being manufactured, subjected Toolworks' fiscal 1991 budget to line-by-line scrutiny and reviewed its financial statements with Deloitte. The Underwriters even obtained written representations from Toolworks *and* selling stockholders that the Prospectus was accurate, as well as a comfort letter from Deloitte.

**\*20** 🚩 *Software Toolworks,* 789 F.Supp. at 1497. The Court also described how the Underwriters' legal counsel reviewed Toolworks' contracts, Board minutes, and other documents, and how the Underwriters investigated particular problems, such as price cutting, returnable Nintendo cartridges, and certain aspects of the Nintendo market. Although the plaintiffs in *Software Toolworks* alleged that the underwriters were reckless not to investigate an internal Toolworks spreadsheet which allegedly showed negative preliminary financial data for the most recent quarter before the offering, the claim was dismissed by the Court when the plaintiffs could not show that the underwriters had ever seen the spreadsheet. *Id.* at 1500 & n. 19. The Plaintiffs also failed to show that the underwriters should not have relied upon negative analyst reports where there was no evidence of bad faith or omitted information by the analysts. *Id.* at 1501. The plaintiffs in *Software Toolworks* failed to establish recklessness on the part of Deloitte & Touche as well with regard to all claims save Section 11 OEM (Original Equipment Manufacture)

revenue recognition claims (*id.* at 1512), as to which "Deloitte concede[d] that there is a genuine issue of material fact as to whether OEM licensing revenue recognized in fiscal 1990 was properly stated," *id.* at 1504.

Eastlake has not alleged a due diligence search anywhere near as extensive as the one described in *Software Toolworks.* Eastlake has alleged by affidavit only that it contacted Revlon and Estee Lauder, and that Revlon did not return the call. Upon being told by an Estee Lauder accounts payable representative that there were no disputes between Qmax and Estee Lauder, and upon being told by Randall, vice-president of Qmax, that Revlon had paid $72,000 in reduction of its account receivable, Eastlake apparently ended its investigation of Qmax's relationship with those companies. *Cf. Software Toolworks:*

> The Underwriters specifically confirmed with Toolworks' customers that they could not return non-defective Nintendo cartridges and surveyed Nintendo retailers .. to confirm no price-cutting on Toolworks' Nintendo products.... The Underwriters, however, did not solely rely on Deloitte. They reviewed confirmations from each OEM, demanded a reconfirmation from Hyosung, and confirmed Toolworks' OEM revenue recognition policy with other accounting firms.

🚩 *In re Software Toolworks,* 789 F.Supp. at 1497–98.

D & T alleges that it was unreasonable for Eastlake not to further investigate Revlon's failure to respond to its inquiries, and that Eastlake has not alleged that it make any inquiries about the account receivable from Montreal Litho, although this $426,000 was the largest receivable at issue. D & T also alleges that it was neither reasonable nor customary for Eastlake to rely upon Qmax's most recent audited financial statements, which were almost a year old at the time the Notes were being offered.

**\*21** Eastlake alleges that it relied upon D & T's Review Report, but it does not describe procedures comparable to

Fed. Sec. L. Rep. P 97,768

the line-by-line scrutiny in *Software Toolworks.* Instead, Eastlake asserts that it required D & T to perform the Review of Qmax's interim financial statements and its 1987 Audit Report. Eastlake also alleges that any recklessness on the part of D & T was not mirrored in its own behavior, since it was entitled to rely upon D & T's interim financial statements and the Review. D & T avers that from the nature of the Review Report itself and from conversations with D & T personnel, Eastlake should have been aware that the Review was substantially less in scope than an audit and that Eastlake personnel should have been aware that the procedures undertaken by D & T in the Review consisted largely of inquiries of management and did not involve independent inquiries of the outside accounts in question.

While it is true that a private placement agent need not duplicate accounting procedures in evaluating a firm, D & T alleges that Eastlake failed to duplicate Qmax's major contracts with Estee Lauder and Montreal Litho, not that Eastlake failed to duplicate all accounting procedures. D & T further alleges that it was appropriate for Eastlake, in its capacity as underwriter, to have requested at least a "comfort" letter from D & T with respect to any additional "agreed upon procedures" pursuant to industry standards (such as the AICPA Codification of Statements on Auditory Standards, AU § 634.02.),[8] as the underwriters apparently did in 🚩 *Software Toolworks,* 789 F.Supp. at 1497. Given the lack of any specified additional "agreed upon procedures," D & T alleges that Eastlake's reliance upon the unaudited figures in the Review Report was unreasonable.

Whether or not such Eastlake's investigation of Qmax's contracts or D & T's procedures constituted adequate or reasonable underwriter's due diligence remains a factual issue. The evidence put before the Court is not so overwhelming that the issuer permits only one resolution, and therefore Eastlake's motion for summary judgment must be denied.

### C. *D & T's Claims Cannot be Dismissed for Failure to Plead Fraud with Particularity*

Eastlake contends that the Third–Party Complaint has failed to plead *scienter* on the part of Eastlake with the particularity required by Rule 9(b), F.R.Civ.P. Eastlake makes essentially the same due diligence argument in favor of its claim for dismissal that it made in favor of its motion for summary

judgment, and the motion is denied for much the same reason: D & T has alleged factual issues which preclude dismissal for lack of particularity about Eastlake's scienter or recklessness.

> To satisfy this Rule [Rule 9(b) ], a pleading must specify the time, place, speaker and content of the alleged misrepresentations or omissions, the nature of the defendant's alleged participation in the fraud, and factual circumstances giving rise to a "strong inference" that the defendant possessed the requisite scienter.... For § 10(b) purposes, conscious behavior can take the form of intent to defraud, knowledge of the falsity or a reckless disregard for the truth. An inference of "recklessness" satisfying the scienter requirement my be drawn from facts demonstrating conduct that the defendant disseminated material "knowing [it was] false or that the method of preparation was so egregious as to render [the] dissemination reckless.

**\*22** 🚩 *Ades,* 799 F.Supp. at 1498–99 (citations omitted). In the case at bar, the time, place, speaker and content requirements of Rule 9(b) are satisfied by the offering materials prepared by Eastlake, notably the Risk Factors Statement provided to the Plaintiffs as part of the Private Placement by Eastlake. *See* 🚩 *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986); 🚩 *Stevens v. Equidyne Extractive Indus. 1980,* 694 F.Supp. 1057, 1062 (S.D.N.Y.1988). However, Eastlake has alleged that D & T provides no evidence to support any contention that the underwriter knew of additional facts which they failed to reveal in the offering documents or had any motive to conceal such facts, and that its "due diligence" defense is sufficient to dismiss any allegations of recklessness.

D & T's Third–Party Complaint, which incorporates by reference the Investors' Amended Complaint, simply alleges that Eastlake was as reckless as D & T in not knowing about the same facts and circumstances concerning the general condition of Qmax, including its receivables. *See* 🚩 *Ades,* 799 F.Supp. at 1500. D & T has alleged that Eastlake as underwriter had a duty to investigate Qmax's major contracts and its relationships with its customers, and that if Eastlake had only conducted a thorough enough investigation, it too would have noticed the problems with the Montreal Litho and the Estee Lauder sales.

Eastlake alleges that its "Investor Information Packages," which were distributed to the Plaintiffs as part of the Private

Ades v. Deloitte & Touche, Not Reported in F.Supp. (1993)

Fed. Sec. L. Rep. P 97,768

Placement, demonstrate its research with such thoroughly that allegations of recklessness on its part must fail. However, these documents do not reflect any investigation of the Montreal Litho Sale, the Estee Lauder Sale, or Qmax's receivables generally, and thus paint at least as misleading a picture of Qmax's assets as D & T's financial statements. The Risk Factors Statement refers, instead, to "risk factors" such as the possibility of no future orders from Qmax's two principle customers, Estee Lauder and Revlon, not to problems with existing accounts, and makes no mention of Montreal Litho at all. The overwhelming emphasis of the Risk Factors Statement is on risks associated with the additional capital needed for the Joint Venture. For these reasons, Eastlake's motion to dismiss for failure to identify recklessness on the part of Eastlake is denied.

### III. *The Indemnification of Shulman*

Shulman has cross-claimed against Bolar for indemnification "for any and all of his actions as a director as they relate to Qmax," based on the relevant provisions of Bolar's by-laws. [9] Bolar has moved to dismiss this claim insofar as Shulman seeks indemnification for his criminal, reckless and intentional misconduct. Shulman has filed no papers in opposition to this motion save the request to join in Bolar's opposition to D & T's Third–Party Complaint.

Under the common law, indemnification was unavailable for intentional conduct. Because securities fraud requires either recklessness or intentional misconduct, indemnification has been held unavailable under federal securities law as well. *See Globus,* 418 F.2d at 1288 (holding indemnification is not available in action for securities fraud since "one cannot insure himself against his own reckless, willful or criminal misconduct"). *See also* *In re U.S. Oil & Gas Litig., 967 F.2d 489, 495 (11th Cir.1992)* ("Indemnification claims are not cognizable under the Securities Acts of 1933 and 1934"); *McCoy v. Goldberg,* Fed.Sec.L.Rep. (CCH) ¶ 97,009 (S.D.N.Y.1992) (indemnity not permitted); *Department of Economic Dev., 747 F.Supp. at 931* (dismissing indemnity claims as to violations of Section 10(b) because of evidence of scienter); *Stratton, 466 F.Supp. at 1185 n. 4* ("for

reasons of public policy an intentional tortfeasor may not escape liability for his conduct by totally shifting it to a joint tortfeasor"). Shulman's cross-claim for indemnification is dismissed insofar as he seeks indemnification for any criminal, reckless, or intentional misconduct.

**\*23** However, Shulman has the same rights as any other defendant for contribution, and for this reason alone, Shulman's cross-claims for contribution should not be dismissed. In the event that both Shulman and Bolar are found liable to the Third–Party Plaintiff, Shulman is entitled to assert his rights for contribution.

### IV. *State Law Claims*

Because both the Section 10(b) and the Rule 10(b)–5 actions and the state law claims in this case "derive from a common nucleus of operative fact," *United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966)*, it is appropriate for this Court to retain jurisdiction over such claims.

### *Conclusion*

All motions to dismiss the Third–Party complaint are denied. D & T's request for a fairness hearing upon the close of discovery regarding the effect of Eastlake's settlement with the Investors is granted. Eastlake's motions for summary judgment and for dismissal of the federal claims against it are both denied, although pursuant to N.Y.G.O.L. § 15–108, D & T's contribution claims against Eastlake based upon New York State law are dismissed as barred by Eastlake's settlement with the Plaintiffs. Bolar's motion to dismiss the cross-claims of Shulman for indemnification is granted.

A final pretrial conference will be held on October 27, 1993 at which time a pretrial order will be submitted.

It is so ordered.

### All Citations

Not Reported in F.Supp., 1993 WL 362364, Fed. Sec. L. Rep. P 97,768

Fed. Sec. L. Rep. P 97,768

# Footnotes

1    Rule 14(a) provides in part: "At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or maybe liable to him for all or part of the plaintiff's claim against him.... The plaintiff may assert any claim against the third-party defendant arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff."

2    ANDAs, or Abbreviated New Drug Applications, generally require considerably less expense and time than standard NDAs, or New Drug Applications. Manufacturers of new brand name drug products must submit NDAs, usually after years of extensive clinical trials. Generic drug manufacturers, such a Bolar, submit ANDAs to the FDA in order market generic equivalents of patented brand-name drugs after the patents expire. In order to obtain FDA approval of an ANDA, the drug manufacturer must demonstrate only that its drug is a "bioequivalant" to the brand name product, *i.e.,* the rate and extent to which the active ingredient contained in the brand name and generic drug is absorbed and becomes available for therapeutic effect is essentially the same.

3    When a motion is made under Rule 12(b)(6) and "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56," so that all parties may have a reasonable opportunity to present pertinent material under that Rule. *See Carter v. Stanton,* 405 U.S. 669, 671 (1972). A motion for summary judgement under Rule 56 allows a Court to consider matters extrinsic to the pleadings, *see* 56(c). Documents attached as exhibits and incorporated by reference, however, are not "outside the pleading."

4    The other documents which the Investors allege they relied on include the Registration Statement filed in April with the SEC, the July Amendment, the August Amendment, Qmax's business plan, Qmax's unqualified audited financial statements for 1987 prepared by D & T, Qmax's quarterly report dated September 14, 1987, and Qmax's interim unaudited financial statements dated March 31, 1987 and March 31, 1988. D & T's Third–Party Complaint explicitly incorporates the Amended Complaint in which the Investors allege they relied upon these documents.

5    The relevant portion in the Bolar Letter reads: "Bolar understands that Eastlake and the investors will be relying upon the [Joint Venture] Agreement and this letter in consummating the proposed private placement of securities and in filing a registration statement with respect to a public offering of QMAX securities."

6    There is no question but that Bolar is liable for contribution to D & T under D & T's pendent state law claims. Under New York state law, "a claim for contribution will lie whether or not the culpable parties are allegedly liable under the same or different theories and whether or not the party from whom contribution is sought is allegedly responsible for the injury as a concurrent, successive, independent, alternative, or even intentional tort-feasor," *Nassau Roofing & Sheet Metal Co. v. Facilities Dev. Corp.,* 71 N.Y.2d 599, 603, 523 N.E.2d 803, 528 N.Y.S.2d 516 (1988) (citations omitted); *see also Board of Educ. v. Sargent, Webster Crenshaw & Folley,* 71 N.Y.2d 21, 27, 523 N.Y.S.2d 475, 517 N.E.2d 1360, (1987) (same).

7    "Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment ..."

8    AU § 634.02 provides in part that "[u]nderwriters, in requesting comfort letters, are generally seeking assistance on matters of importance to them. They wish to perform a "reasonable investigation" of financial and accounting data not "expertised" (covered by a report of independent accountants, who consent to be names as experts, based on an audit performed in accordance with generally accepted auditing standards) as a defense to a claim under the [Securities Act of 1933]...."

9    Bolar's applicable by-law provides: "The corporation shall indemnify any person who is or was a director of officer of the Corporation.... against all expenses ... in connection with or as a result of any actual or threatened claim, action, suit or proceeding, whether civil, criminal, administrative ... provided, however, that

**Ades v. Deloitte & Touche, Not Reported in F.Supp. (1993)**

Fed. Sec. L. Rep. P 97,768

no indemnification or payment may be made ... if such indemnification or payment is prohibited under the Business Corporation Law of the State of New York or other applicable law as in effect form time to time."

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 22 of 247
Anderson v. Greyhound Lines, Inc., Not Reported in F.Supp.2d (2011)
75 UCC Rep.Serv.2d 308

2011 WL 3480945
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Kirsten ANDERSON and Societe De
L'Assurance Automobile Du Quebec, Plaintiffs,

v.

GREYHOUND LINES, INC., and the Goodyear
Rubber and Tire Company, Defendants.
Greyhound Lines, Inc., Plaintiff,

v.

Motor Coach Industries, Inc., Defendants.
Greyhound Lines, Inc., Plaintiff,

v.

UGL Unicco, Formerly known as
Unicco Service Company, Defendants.
and Related Actions.

No. 06 Civ. 13371(GBD).
|
Aug. 3, 2011.

*MEMORNADUM DECISION AND ORDER*

GEORGE B. DANIELS, District Judge.

 **\*1**  Greyhound Lines, Inc. ("Greyhound") brings third party claims against Goodyear Rubber and Tire Company ("Goodyear") for contribution, indemnification, and breach of contract arising out of a 2006 bus accident. Goodyear moves for summary judgment dismissing these claims pursuant to Fed.R.Civ.P. 56. Goodyear contends that Greyhound's indemnification claims are in fact contribution claims extinguished by N.Y. Gen. Oblig. Law § 15–108(c). Goodyear also argues that Greyhound's breach of contract claims fail because Greyhound seeks improper damages and did not provide adequate notice under the UCC, and the claims are precluded by the economic loss doctrine. Goodyear's motion is GRANTED.

**Facts**

Pursuant to an October 2000 written agreement, Goodyear leased radial medium truck tries to Greyhound. Kaplan Decl.

Ex. J at § 2. The agreement remained in effect until December 2005 with an automatic one year renewal. *Id.* Ex. J. at 8 § 16.

In paragraph 9 of the Agreement, titled "Contingencies and Indemnity" the agreement states in relevant part:

> *Greyhound agrees to defend, save, and hold Goodyear harmless from all claims or actions for damages to property or injury to persons arising out of the use or possession of tires furnished hereunder, except that this provision shall not apply to claims and actions for damages caused by the negligence of Goodyear. Goodyear agrees to defend, save, and hold Greyhound harmless from claims or actions resulting from the use or possession of the tires furnished hereunder caused by the sole negligence of Goodyear.* In the event of Goodyear's negligence, Goodyear agrees to cooperate with Greyhound and share the cost in the investigation of claims arising out of the use or possession of tires furnished hereunder.
>
> Goodyear will indemnify, save harmless, and defend Greyhound and its affiliates, their officers, agents, and employees from and against liability, losses, claims, demands, suits and Judgments, and from costs and expenses, including the reasonable fees of counsel therewith arising or as a result of the negligence of Goodyear or its agents or employees or Goodyear's use of the tire storage and work areas provided by Greyhound in this Agreement.
>
> ...
>
> (c) In no event, however, shall Goodyear be obligated to indemnify or hold Greyhound harmless with respect to any liability caused by the sole negligence of Greyhound. *In the event that loss, injury or damage to a third party results in[sic]* [1] *the negligence or tortious conduct of both Greyhound and Goodyear, each party will bear any resulting liability to the extent that its own conduct contributed thereto.*

*Id.* Ex. J 4–5 § 9 (emphasis added). Further, under the agreement, Goodyear warrants that "all tires provided to Greyhound [would] be of sufficient grade, quality, and standard to permit reasonable and safe use and operation on Greyhound's buses." *Id.* Ex. J § 11(a). "Upon written notice, Goodyear agrees to repair or replace any tires Greyhound and Goodyear jointly judge to be below this grade, quality and standard." *Id.*

75 UCC Rep.Serv.2d 308

**\*2** On August 28, 2006, a passenger bus operated by Greyhound crashed in upstate New York, killing and injuring numerous passengers. Greyhound leased the subject bus from the Bank of Oklahoma who held title to the bus pursuant to a Master Lease Agreement between Greyhound and the Bank dated February 16, 2000. *See id.* Ex. L.

In September 2006, the first passenger-plaintiff action was filed. *Id.* Ex. A. In January 2008, a consolidated Complaint was filed, consolidating multiple separate actions, which also asserted direct claims against Goodyear. *See id.* Ex. B. In its Answer to the Consolidated Complaint, Greyhound asserted cross-claims against Goodyear, Motor Coach Industries, the manufacturer of the bus, and UNICCO, Greyhound's service subcontractor. *Id.* Ex. C. After the close of discovery, the majority of Plaintiffs voluntarily dismissed their claims against Goodyear. Every plaintiff dismissed their claims against Goodyear by February 4, 2011. Hearing Tr. 143–144 (Feb. 4, 2011).

In opposition to various motions for summary judgment, Greyhound submitted the expert testimony of Dr. Williams Daws who opined that the accident was caused by a combination of two factors: (1) a design defect in Goodyear's G409 Tire, which made the tire easier to puncture, and (2) wear on the tire due to the subject bus having wheel rims that were too small to carry its weight. *See* Greyhound Opp't to Goodyear's Mot. for Summary Judgment Ex. B at 25. As to the second contributing factor, Dr. Daws opined that it was Motor Coach Industries' negligent choice of rim size that caused the wear. *Id.* In response to Goodyear's motion to preclude Dr. Daws, this Court held a hearing pursuant to *Daubert v. Merrill Dow Pharmaceuticals,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

By March 2011, prior to the scheduled trial, Greyhound settled with all the Plaintiffs. Kaplan Decl. Ex. H. Only the cross-claims between Goodyear and Greyhound remain pending.

### Standard

Summary judgment is appropriate where the evidence, viewed in the light most favorable to the non-moving party, shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Vacold, L.L.C. v.*

*Cerami,* 545 F.3d 114, 121 (2d Cir.2008). The burden rests upon the moving party to show that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is "material" only where it will affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For there to be a "genuine" issue about the fact, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether there is a genuine issue of material fact, the Court is required to resolve all ambiguities and draw all inferences in favor of the non-moving party. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2d Cir.2004). Where there is no evidence in the record "from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact," summary judgment is proper. *Catlin v. Sobol,* 93 F.3d 1112, 1116 (2d Cir.1996).

### Contribution and Indemnification Claims

**\*3** It is well settled that under New York Law, when a defendant settles, the right to assert contribution claims against any other party is extinguished. *See* N.Y. Gen. Oblig. Law § 15–108(c); *Rosado v. Procter & Schwartz,* 66 N.Y.2d 21, 22, 494 N.Y.S.2d 851, 484 N.E.2d 1354 (1985) ("In order to remove a disincentive to settlement, the Legislature amended General Obligations law § 15–108 to provide that a settling tort-feasor can neither obtain, nor be liable for, contribution claims."). It is equally well established that a settling defendant may still assert claims for indemnification. *See Gibbs–Alfano v. Burton,* 281 F.3d 12, 20 (2d Cir.2002) ( "Section 15–108(c)'s contribution bar does not apply to a settling defendant's claim for indemnity (as distinct from contribution) under an express contractual provision that shifts liability in its entirety to another party.") (citing *Weinstock v. Jenkin Contracting Co.,* 134 A.D.2d 254, 520 N.Y.S.2d 589, 590–91 (2d Dep't 1987), *appeal denied,* 70 N.Y.2d 616, 526 N.Y.S.2d 437, 521 N.E.2d 444 (1988)). Thus, to the extent that Greyhound asserts contribution claims against Goodyear, Greyhound's settlements with plaintiffs extinguished any claims for liability. *See* N.Y. Gen. Oblig. Law § 15–108(c).

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 24 of 247
Anderson v. Greyhound Lines, Inc., Not Reported in F.Supp.2d (2011)
75 UCC Rep.Serv.2d 308

Basically, "in contribution the loss is distributed among tort-feasors, by requiring joint tort-feasors to pay a proportionate share of the loss to who [sic] has discharged their joint liability." *Rosado,* 66 N.Y.2d at 23, 494 N.Y.S.2d 851, 484 N.E.2d 1354; *Chemung Canal Trust Co. v. Sovran Bank/ Maryland,* 939 F.2d 12, 15 (2d Cir.1991) ("contribution is no more than a procedural device for equitably distributing responsibility for plaintiff's losses *proportionally among those responsible for the losses,* and without regard to which particular persons plaintiff chose to sue in the first instance.") (emphasis added); *Barrett v. United States,* 853 F.2d 124, 128 n. 3 (2d Cir.1988) ("contribution involves an apportionment of responsibility where the wrongdoers are *in pari delicto."* ); *Mancini v. CSX Transp. Inc.,* 08 Civ. 933(TJM), 2010 WL 2985964, at *2–3 (N.D.N.Y. Jul. 27, 2010). Contribution does not require a contract and "arises from the rule of law that tortfeasors generally are jointly and severally liable for a judgment, meaning that each is responsible for the full amount regardless of culpability."

*Sommer v. Federal Signal Corp.,* 79 N.Y.2d 540, 556 593 N.E.2d 1365 (19921 *see also Transmodal Corp. v. Pianin,* 09 Civ. 10497(DLC), 2010 WL 2629405, at *1 (S.D.N.Y. Jun. 30, 2011).

Indemnification, on the other hand, "arises out of a contract which may be express or may be implied in law to prevent a result which is regarded as unjust or unsatisfactory." *Rosado,* 66 N.Y.2d at 24, 494 N.Y.S.2d 851, 484 N.E.2d 1354 (internal quotation marks omitted); *McDermott v. City of New York,* 50 N.Y.2d 211, 216, 428 N.Y.S.2d 643, 406 N.E.2d 460 (1980); *see also Rock v. Reed– Prentice Division of Package Machinery Co.,* 39 N.Y.2d 34, 382 N.Y.S.2d 720, 346 N.E.2d 520 (1976) ("Indemnity, on the other hand, is not dependent upon the legislative will. It springs from contract, express or implied, and full, not partial reimbursement is sought."). Unlike contribution claims, which distinguish among tortfeasors based upon their relative fault, indemnification claims shift liability, in the absence of a determination of fault, based upon a relationship between the parties. *See Rosado,* 66 N.Y.2d at 24, 494 N.Y.S.2d 851, 484 N.E.2d 1354 (noting that indemnification claims are not barred by settlement "inasmuch as an entire shifting of the loss to another would not act as a disincentive to settlement or *necessitate an examination of the relative degrees of fault."* ) (emphasis added); *Raquet v. Braun,* 90 N.Y.2d 177, 183, 659 N.Y.S.2d 237, 681 N.E.2d 404 (1997) ("the key element of a common-law cause of action for indemnification is not a duty running from the indemnitor to the injured party, but rather is a separate duty owed the indemnitee by the indemnitor") (internal quotation omitted); *Glaser v. M. Fortunoff of Westbury Corp.,* 71 N.Y.2d 643, 646 524 N.E.2d 413 (1988) ( "where one is held liable solely on account of the negligence of another, indemnification, not contribution, principles apply to shift the entire liability to the one who was negligent.") (internal quotation marks omitted); *KBL Corp. v. Amouts,* 646 F.Supp.2d 335, 344 (S.D.N.Y.2009) ("Indemnification is a claim by which the party held legally liable shifts the entire loss to another.");

*Tokio Marine and Fire Ins. Co., Ltd. v. Grodin,* 05 Civ. 9153(DLC), 2006 WL 3054321, at *3 (S.D.N.Y. Oct. 27, 2006) ("a party is entitled to indemnification when it is held liable for a tort committed by a third party despite the fact that it has done no wrong."); *Lewis v. Rosenfeld,* 00 Civ. 5368(SAS), 2002 WL 441185, at *5 (S.D.N.Y.2002) ("Where the only claims against a non-settling defendant *require a finding of fault,* indemnification against a settling tortfeasor is inappropriate") (emphasis added).

**\*4** The New York Court of Appeals has identified the "classic indemnification case" as one where the "party seeking indemnity had committed no wrong but by virtue of some relationship with the tort-feasor or obligation imposed by law, was nevertheless held liable by the injured party." *Glaser,* 71 N.Y.2d at 646, 529 N.Y.S.2d 59, 524 N.E.2d 413. When defining what an indemnification claim is, New York courts do not draw a distinction between contractual indemnification and common law indemnification claims. *See Rock,* 39 N.Y.2d 34, 382 N.Y.S.2d 720, 346 N.E.2d 520 (1976); *see also Gibbs–Alfano,* 281 F.3d at 20 (relying on the indemnification principles laid out in *Rosado* to determine whether an alleged contractual indemnification provision was barred by § 15–108); *Matter of Poling Transp. Corp.,* 784 F.Supp.2d 1045, 1048 n. 1 (S.D.N.Y.1992) ("Implied indemnification apparently is the same as contractual indemnification for purposes of G.O.L. § 15108.").

Absent express contractual indemnification, "implied indemnity is frequently employed in favor of who is vicariously liable for the tort of another ... and has been

invoked in other contexts as well." *Rosado,* 66 N.Y.2d at 24, 494 N.Y.S.2d 851, 484 N.E.2d 1354. Common examples of the relationships that trigger common law or implied indemnification are: master-servant, employer-employee, agent-principle, partner-partner, and owner-guest. *See* Prosser & Keeton on Torts 341 (3d ed.1984). However, an indemnity cause of action can be sustained only "if some duty to indemnify exists between them." *Rosado,* 66 N.Y.2d at 24, 494 N.Y.S.2d 851, 484 N.E.2d 1354; *Mathis v. United Homes, LLC,* 607 F.Supp.2d 411, 434 (E.D.N.Y.2009) ("Nevertheless, implied indemnification is only available if an agreement to indemnify can be implied between the parties ... due to some special relationship that exists between them or some obligation imposed by law."). This right to indemnification is extinguished if the party who seeks indemnification is partially at fault or "responsible in any degree." *Monaghan v. SZS 33 Assoc. LP,* 73 F.3d 1276, 1284–85 (2d Cir.1996).

Under the principles illustrated above, Greyhound is not entitled to either contractual or common law indemnification. Under the plain language of the contract, Greyhound is only entitled to "indemnification" when Goodyear was solely negligence for any third-party injuries. Similarly, Goodyear is only entitled to "indemnification" when Greyhound was solely negligence for any third-party injuries. When both parties are partially at fault, they must each bear their share of the liability and neither is entitled to "indemnification."[2] This is a classic case of contribution.

A so-called "indemnification" clause which agrees to "indemnify" or "hold harmless" a contracting party only when the other party is solely at fault is legally a contribution clause based upon the degree of fault, not a contractual indemnification clause under New York law. *See Lewis,* 2002 WL 441185, at *5. In order to constitute a true indemnification clause, the contractual obligation must be to assume the cost of liability irrespective of fault. *See Rosado,* 66 N.Y.2d at 64, 495 N.Y.S.2d 14, 485 N.E.2d 221. Under the contract at issue, neither party agreed to bear a loss it did not incur by its own acts. There was no shifting of liability, without regard to a degree of fault, by agreement or operation of law. As a matter of law, the parties' agreement to hold the other harmless from claims resulting from its sole negligence creates no greater obligation by contract than that which is already legally required by the law of contribution.[3] *See Glaser,* 71 N.Y.2d at 646, 529

N.Y.S.2d 59, 524 N.E.2d 413 ("where one is held liable solely on account of the negligence of another, indemnification, not contribution, principles *apply to shift the entire liability to the one who was negligent."* ) (internal quotation marks omitted) (emphasis added); *KBL Corp.,* 646 F.Supp.2d at 344 (S.D.N.Y.2009) ("indemnification is a claim by which the party held legally liable *shifts the entire loss to another."* ) (emphasis added). Because the contract between Greyhound and Goodyear legally provides for contribution and not indemnification, Greyhound's contractual claim for indemnification based on Goodyear's alleged negligence is extinguished by Greyhound's settlement with the plaintiffs.[4]

*See* N.Y. Gen. Oblig. Law § 15–108(c).

**\*5** Absent the contract, Greyhound is not entitled to common law indemnification. As the New York Court of Appeals made clear in *Rosado,* implied indemnification only arises when "some duty to indemnify exists between" the parties. *Rosado,* 66 N.Y.2d at 24, 494 N.Y.S.2d 851, 484 N.E.2d 1354. The duty to indemnify arises out of an implied-in-law contract theory based upon the nature of the relationship between the parties. *See Rock v. Reed–Prentice Division of Package Machinery Co.,* 39 N.Y.2d 34, 382 N.Y.S.2d 720, 346 N.E.2d 520 (1976). Consideration of equitable principles only comes into play once such a relationship is established. *See id.* Greyhound has not articulated a basis by which this Court could find that such a relationship exists between the parties. There is no implied contract between the parties. Further, the relationship, between Greyhound and Goodyear is not akin to the type where vicarious liability is normally imposed.

Greyhound contends that it is entitled to common law indemnification under *McDermott v. City of New York,* 50 N.Y.2d 211, 428 N.Y.S.2d 643, 406 N.E.2d 460 (1980). *McDermott,* however, does not stand for the proposition that under common law, indemnification is available for a blameless party in a products liability suit. Rather, *McDermott* stands for the proposition that implied indemnification is available when " '[a] person[ ], in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other ....'" *Id.* at 216–17, 428 N.Y.S.2d 643, 406 N.E.2d 460. Courts previously recognized that there were two categories of cases where a duty is one that "should have been discharged by" another: (1) when there is an implied

contract between the parties, and (2) when there was a "great disparity" between the fault of the two tortfeasors, referred to as "implied in law indemnity." *See* *Peoples' Democratic Republic of Yemen v. Goodpasture, Inc.,* 782 F.2d 346, 351 (2d Cir.1986). However, as recent cases in this district make clear, New York courts no longer imply indemnification when there is a "great disparity" in the fault of the tortfeasors. *See* *Amusement Industry, Inc. v. Stern,* 693 F.Supp.2d 319, 326 (S.D.N.Y.2010). Therefore, Greyhound would not be able to recover under this theory. Since there is no basis for Greyhound to assert a claim for either common law or contractual indemnification, summary judgment dismissing this claim is GRANTED. [5]

Even if 15–108(c) did not independently extinguish Greyhound's contractual rights to indemnification, summary judgment dismissing the claim would still be appropriate. For Greyhound to be entitled to collect under the contract, it must prove that the claims and actions for damages were "caused by the sole negligence of Goodyear ." This has never been Greyhound's theory nor can their evidence support such a conclusion. Rather, Greyhound has asserted throughout the pendency of this litigation that it was Motor Coach Industries' ("MCI") negligent choice of an 8.25–inch rim in combination with Goodyear's improperly designed tire that caused the accident. *See* Greyhound Opp' to Goodyear's Mot. for Summary Judgment Ex. B at 25; Daubert Hearing Tr. at 97:8–13.

**\*6** In support of its theory of liability, Greyhound relies exclusively upon the expert testimony of Dr. William Daws. Dr Daws opined that the 2006 bus accident was caused by two contributing factors: cracking on the tires due to overloading the bus and an improperly designed tire, which made it more vulnerable to punctures. *See* Dr. Daws Expert Report at 24–25. Specifically, Dr. Daws opines that "the left front tire in this matter was breaking down before the failure. This breakdown was caused by the overloading of the tire resulting from an overspecification of the tire's load capacity." Id at 24. "MCI, by retaining the 8.25–inch rim configuration of the lower-capacity 14,400 lb axle rather than installing the recommended 9.0–inch wide rims, chose a wheel/tire configuration, with Goodyear's assistance, which provided no load safety margin on the front axle of the incident bus." *Id.* at 25. Essentially, Dr. Daws opines that the rim on the bus was too small and thus it could not carry the appropriate amount of weight. *See id.* The choice of rim "obviously belonged to MCI and MCI alone." Daubert Hearing Tr. at 144:19–20. Greyhound also alleged that Goodyear's G409

tire, which was the tire that failed on the subject bus, was defectively designed. *Id.* At the *Daubert* hearing, Dr. Daws stated that it was these two causes together that "conspired to bring about a blowout and tread separation that occur[ed] simultaneously." [6] Daubert Hearing Tr. at 97:8–13.

The contractual language on which Greyhound relies does not require finding that Goodyear have some degree of fault and Greyhound have none. It requires that Goodyear be solely at fault. Based on Greyhound's evidence, it was the negligence of MCI and Goodyear in combination that caused the accident. [7] It would thus be impossible for Greyhound to demonstrate that the accident was caused by Goodyear's sole negligence, as a prerequisite for the "indemnification provision." Greyhound cannot simply ignore its own evidence that MCI's negligence was a critical contributing factor, without which the accident would not have occurred. Thus, Goodyear is entitled to summary judgment regardless of whether the claim was extinguished under 15–108(c).

### Property Damage Claim

Greyhound's final claim seeks to recover damage to property arising out of the 2006 accident. Specifically, Greyhound alleges that due to Goodyear's wrongful conduct it suffered "property damage, economic loss, business interruption, loss of revenue and loss of income," when it had to replace the subject bus with another Greyhound bus, whose title was transferred to the Bank of Oklahoma. *See* Greyhound Motion in Opp. at 6–7. Essentially, Greyhound argues that "Goodyear warrants and promises that all tires provided to Greyhound will be of sufficient grade, qualify and standard to permit reasonable and safe use and operation on Greyhound buses ... They contracted with us to give us a safe tire, and it failed." Oral Arg. Tr. dated March 1, 2011 at 31:17–32:3. The only damage that Greyhound has alleged is the costs it incurred in providing the Bank of Oklahoma, the owner of the bus, with a replacement bus. Greyhound alleges it is entitled to recover under breach of contract, breach of warranties and tort theories. Goodyear moves for summary judgment on all theories.

**\*7** In its opposition to Goodyear's motion, Greyhound first contends that it is entitled to damages under Section 9 of the Agreement, the same indemnification provisions discussed above. *See* Greyhound Br. at 30. Greyhound is not entitled to any damages under these provisions because, as already discussed, Greyhound is only entitled to recover

under Section 9 of the agreement for losses that are the result of the "sole negligence" of Goodyear. Since Greyhound has no evidence to demonstrate that the 2006 accident was caused by the "sole negligence" of Goodyear, Greyhound is not entitled to recover under that provision.

Also, Greyhound is not entitled to recover its replacement cost of the bus because the damages it seeks are improper consequential damages. Damages are an essential element of a claim for breach of contract. *See e.g.,* Leland Leland Eaves v. Designs for Fin., Inc., 2011 U.S. Dist. LEXIS 33654, 2011 WL 1236173. at * 56 n. 22 (S.D.N.Y. Mar. 30, 2011). "[I]t is well established that in actions for breach of contract, the nonbreaching party may recover general damages which are the natural and probable consequence of the breach." Kenford Co., Inc. v. County of Erie, 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989). For damages that are not the "natural and probable consequence" of the breach, damages can be recoverable if they were "brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." *Id.* This inquiry focuses on "the nature, purpose and particular circumstances of the contract known by the parties" at the time of contracting. *Id., see also* RCN Telecom Services, Inc. v. 202 Centre Street Realty LLC., 156 F. App'x 349, 351 (2d Cir.2005). Even if it were argued that it may be foreseeable that a bad tire might cause the bus to crash, incurring repair costs or replacement costs to its owner, it is not foreseeable that it would impact a contract Greyhound had with a third-party. Here, the only evidence of damages that Greyhound has identified is $345,000 in no-fault payments to the Bank of Oklahoma and a $190,000 "write-off" cost it incurred when it transferred title of one of its buses to the Bank of Oklahoma pursuant to its Master Lease Agreement. *See* Greyhound Aff. Ex. A at 13. Greyhound has offered no evidence that these reimbursement costs were somehow contemplated by the parties to the Greyhound–Goodyear contract. Thus, Greyhound would not be entitled to recover such consequential damages under a breach of contract theory.

Greyhound is also not entitled to recovery such damages under an implied warranty theory. Greyhound does not dispute that the contract between the parties is a lease agreement subject to Article 2–A of the Uniform Commercial Code. *See* Greyhound Br. at 21. Under UCC § 2–A–516, "within a reasonable time after the lessee discovers or should have discovered any default ... the lessee shall notify the lessor and the supplier, if any, or be barred from any remedy against

the party not notified." *Id.* The accident occurred on August 28, 2006. Greyhound did not file suit against Goodyear, or otherwise assert a claim, until mid–2008. Greyhound continued to use Goodyear tires on its buses well into 2010. No reasonable jury could conclude that such a delay satisfies the reasonable notice requirement of Section 2–A–516. Thus, any claim for implied warranties is precluded. [8]

**\*8** Lastly, Goodyear contends that Greyhound's claim for property damage fails because New York's economic loss doctrine precludes recovery under a negligence or products liability theory. Under New York law, "where the relationship between the parties is contractual in nature, damages which are purely economic are not recoverable under tort theories such as negligence." *Rochester–Genesee Reg'l Transp. Auth. v. Cummins,* 09 Civ. 6370(MAT), 2010 U.S. DIST. LEXIS 75805, at *21, 2010 WL 2998768 (W.D.N.Y. Jul. 28, 2010) (citing to East River S.S. Corp. v. Transamerica Delaval Inc., 476 U.S. 858, 868–70, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986)). Greyhound argues that it qualifies under the "damage to other property" exception, which allows tort claims when the damage occurs to property other than the property that is the subject of the contract. *See* Trump Int'l Hotel & Tower v. Carrier Corp., 524 F.Supp.2d 302 (S.D.N.Y.2007). However, courts routinely hold that automobiles are treated as a single unit for the purposes of the economic loss doctrine. *See* Rochester–Genesse, 2010 U.S. DIST. LEXIS at *25, 2010 WL 2998768 (citing to Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875, 879, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997)) (finding that for the purposes of the economic loss doctrine, a car engine and the body of the automobile constitutes a single unit). While a wheel is somewhat different than the engine of a car, the tires and the body of the automobile form a single unit and are not separate parts. Furthermore, Greyhound has not cited any cases where a court treated the wheels or any other components of a vehicle as separate property. Moreover, Greyhound's settlement of the bank's claim against it should also extinguish any further contribution claim by Greyhound against Goodyear for negligence. Therefore, Greyhound's negligence theory is precluded by New York law. [9]

Because Greyhound cannot recover the cost of replacing the bus under any indemnification, negligence, or contractual theory, Goodyear's motion for summary judgment on Greyhound's claim for property damage is GRANTED.

75 UCC Rep.Serv.2d 308

<div style="display:flex">

**Conclusion**

Goodyear's motion for summary judgment dismissing all of Greyhound's claims against Goodyear is GRANTED. [10]

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3480945, 75 UCC Rep.Serv.2d 308

</div>

## Footnotes

1   Both parties agree that this is a scrivener's error and the contract should read "from" instead of "in."

2   Greyhound also contends that the second paragraph of Section 9, which states that "Goodyear will indemnify ... Greyhound from and against any liability ... arising or as a result of the negligence of Goodyear, or its agents or employees or Goodyear's use of the tire storage and work areas provided by Greyhound under this Agreement," provides Greyhound with complete indemnification. However, such a reading would render the provisions, which require that each party be solely negligent before they can be "indemnified," and that each party will bear liability "to the extent that its own conduct contributed thereto," superfluous. This violates one of the basic tenets of contract interpretation. *See Suffolk Cnty. Water Auth. v. Vill. of Greenport,* 21 A.D.3d 947, 948, 800 N.Y.S.2d 767, 768 (2d Dep't 2005) ("an interpretation which renders language in the contract superfluous is unsupportable.").

3   Greyhound's argument that New York law has recognized the concept of partial indemnification is not compelling. The cases cited by Greyhound for the proposition that New York recognizes so-called partial indemnification arise under a specific statute, not applicable here, and in the narrow context of contracts between general and sub-contractors. *See Brooks v. Judlau Contracting Inc. .,* 11 N.Y.3d 204, 210, 869 N.Y.S.2d 366, 369, 898 N.E.2d 549 (2008). Greyhound has not cited any case where New York courts have expanded its holding beyond this limited field. During oral argument, Greyhound referenced *Quevedo v. City of New York,* 56 N.Y.2d 150, 436 N.E.2d 651 (1982) as being such a case. However, *Quevedo* involves the same statute, *N.Y. Gen. Oblig. Law § 5–322.1,* as the other partial indemnification cases, and arises out of a building maintenance contract. *See Quevedo,* 56 N.Y.2d at 157, 451 N.Y.S.2d 651, 436 N.E.2d 1253.

4   It is irrelevant that the contract uses the terms "indemnify" and "hold harmless." *Rosado,* 66 N.Y.2d at 25, 494 N.Y.S.2d 851, 484 N.E.2d 1354 ("The statutory bar to contribution may not be circumvented by the simple expedient of calling the claim indemnification.").

5   Finding that this claim is a disguised contribution claim advances the policy behind the settlement rule. As the New York Court of Appeals made clear in *Rosado,* the seminal case, indemnification claims are not barred "inasmuch as an entire shifting of the loss to another would not ... necessitate an examination of relative degrees of fault." *Rosado,* 66 N.Y.2d at 24, 494 N.Y.S.2d 851, 484 N.E.2d 1354. If Greyhound were allowed to continue to pursue this so-called indemnification claim, it would require exactly what the New York Court of Appeals sought to avoid-an examination of the relative degrees of fault of the parties. *Id.* To allow a disguised contribution claim to continue after settlement would void the protections of the contribution bar in *§ 15–108(c).*

6   This Court has yet to rule on Goodyear's motion to preclude the expert testimony of Dr. Daws, which is the only evidence of Goodyear's liability. Regardless of whether Greyhound may rely upon and offer in evidence Dr Daws' expert opinion, it certainly is not evidence that proves that Goodyear was solely responsible for the bus accident and its resultant injuries.

7    Both logic and equitable principles would support the appropriateness of such a provision since it would make little sense that the parties would be expected to pay each other for the negligence of third parties.

8    Similarly, any claim for breach of express warranties is extinguished. In the Lease Agreement, Goodyear warranted that "all tires provided to Greyhound [would] be of sufficient grade, quality, and standard to permit reasonable and safe use and operation on Greyhound's buses." Kaplan Decl. Ex. J § 11(a). "Upon written notice, Goodyear agrees to repair or replace any tires Greyhound and Goodyear jointly judge to be below this grade, quality and standard." *Id.* Greyhound has not offered any evidence that such written notice was ever provided. In any event, such a warranty would not require payment for the replacement cost of the bus owned by the bank.

9    Greyhound also asserts that this doctrine does not apply because "personal injury is/was alleged and is still at issue," which precludes application of the doctrine. *See* Greyhound Br. at 35. Greyhound has not asserted, nor can it, that it has a claim for personal injury as a result of Goodyear's alleged negligence. Thus, this does not preclude application of the economic loss doctrine.

10    As Goodyear's counsel conceded at oral argument, Greyhound's settlement with all the plaintiffs also extinguishes the claims for indemnification and contribution that Goodyear asserted against Greyhound. Thus, to the extent any such claims by Goodyear remain pending, they are also DISMISSED. Also, Goodyear's outstanding motion to preclude the expert testimony of Dr. Daws is moot.

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 30 of 247
Barbagallo v. Marcum LLP, Not Reported in F.Supp.2d (2012)
2012 WL 1664238

2012 WL 1664238
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Joseph S. BARBAGALLO, Plaintiff,
v.
MARCUM LLP and John Doe Nos. 1–9, Defendants.
Marcum LLP, Counterclaim
and Third–Party Plaintiff
v.
Joseph S. Barbagallo, Counterclaim Defendant,
and
Citrin Cooperman & Company,
LLP, Third–Party Defendant.

No. 11–CV–1358.
|
May 11, 2012.

**Attorneys and Law Firms**

Alan S. Fellheimer, Fellheimer & Eichen, LLP, New York, NY, Derek Eddy, Fellheimer & Eichen, LLP, Philadelphia, PA, for Joseph S. Barbagallo.

John Houston Pope, Epstein Becker & Green, P.C., New York, NY, Raymond T. Mak, Epstein Becker & Green, P.C., New York, NY, Kevin Richard Brady, Epstein Becker & Green, P.C., New York, NY, Alexis Downs, Epstein Becker & Green, P.C., New York, NY, For Marcum LLP.

John K Crossman, Zukerman Gore & Brandeis LLP, New York, NY, Frank Christian Welzer, Zukerman Gore & Brandeis LLP, New York, NY, For Citrin Cooperman & Co. LLP.

**MEMORANDUM & ORDER**

JACK B. WEINSTEIN, Senior District Judge.

I. Introduction................................................................................................ 3

II. Relevant Facts.......................................................................................... 5

III. Motion to Dismiss Standard................................................................... 7

IV. Only Eligible for Indemnification for Defense of Dismissed Claims............. 8

A. No Indemnification for Intentional Torts.................................................. 9

1. No Contractual Indemnification for Intentional Torts................................ 9

2. No Contractual Duty to Defend Intentional Torts.................................... 10

3. No Common Law Indemnification for Intentional Torts............................ 12

B. Barbagallo Must Only Indemnify Citrin Against Dismissed Unjust Enrichment Claim. 13

1. Tortious Interference and Aiding and Abetting a Breach of a Fiduciary Duty Claims are Intentional Torts................................................ 13

2. Unfair Competition is an Intentional Tort................................................ 14

3. Citrin May Be Entitled to Indemnification for Unjust Enrichment.................................. 15

V. Breach of Fiduciary Duty................................................................................................. 16

VI. Contribution................................................................................................................... 18

A. Generally........................................................................................................................ 18

B. No Contribution for Economic Loss Resulting from Breach of Contract...................... 20

C. Contribution Permitted for Marcum's Monetary Loss Not Resulting from Breach of Contract.............................................................................................................................. 22

VII. Conclusion.................................................................................................................... 23

## I. Introduction

**\*1** In this contract and tort action, plaintiff Joseph Barbagallo, an accountant, moved from one accounting firm, Marcum LLP ("Marcum"), to another, Citrin Cooperman & Company, LLP ("Citrin"), taking former firm clients with him. Raised are a series of legal and equitable claims and counterclaims ranging from entitlement to retirement benefits to breach of fiduciary duties to application of a non-compete clause. While much of the dead wood can be cleared before trial, central matters in contention will require both a bench and a jury trial.

Barbagallo moves to dismiss Citrin's cross-claims for: 1) contractual indemnification; 2) common-law indemnification; 3) contribution; and 4) breach of an alleged fiduciary duty owed by Barbagallo to Citrin. *See* Mem. of L. Supp. Plaintiff Barbagallo's Mot. to Dismiss Citrin Cooperman's Crossclaim Against Him for Contractual Indemnification, Doc. Entry 52, Mar. 26, 2012 ("Barbagallo First Mot. to Dismiss"); Reply Mem. of L. Supp. Pl. Barbagallo's Mot. to Dismiss Citrin's Cross–Claim for Contractual Indemnification 6–8, Doc. Entry 65, Apr. 19, 2012 ("Barbagallo First Mot. Reply"); Mem. of L. Supp. Pl. Barbagallo's Mot. to Dismiss Citrin's Am. Cross–Claim, Doc. Entry 63, Apr. 16, 2012 ("Barbagallo Second Mot. to Dismiss"). He argues that: 1) New York law does not permit contractual or common law indemnification for intentional torts, which are the only remaining claims in this case; 2) he has already reimbursed Citrin for expenses

paid to defend dismissed unintentional tort claims; 3) New York does not permit contribution for claims that seek recovery for economic loss; and 4) the breach of fiduciary duty claim is duplicative of his breach of contract claim. *See* Barbagallo First Mot. to Dismiss; Barbagallo First Mot. Reply; Barbagallo Second Mot. to Dismiss. Although Barbagallo had previously moved for leave to amend his counterclaim against Marcum, *see* Mem. of L. Supp. Pl. Barbagallo's Mot. for Leave to Amend His Ans. to Def. Marcum LLP's Amended Counterclaim to Insert a Cross–Claim, Doc. Entry 56, Apr. 5, 2012, he has since withdrawn his motion, *see* Tr. of Hr'g, May 1, 2012.

Barbagallo's motion is granted in part and denied in part. He is correct that the claim for breach of his fiduciary duty to Citrin must be dismissed as duplicative of Citrin's claim for contractual indemnification. Since New York law does not permit indemnification for intentional torts, Barbagallo is not required to indemnify Citrin against the remaining claims in the case nor pay for the costs of defending against those claims. He may, however, be obligated to reimburse Citrin for the costs and attorneys' fees associated with litigating the unjust enrichment claim which was previously dismissed by the court. Since Marcum seeks to recover compensatory damages, not damages for economic loss, on its aiding and abetting breach of fiduciary duty and unfair competition claims, Citrin's claim of contribution for those claims survives.

## II. Relevant Facts

**\*2** The facts underlying the substantive claims in this case are described at length in the October 25, 2011 memorandum and order. *See* Mem. & Order, Doc. Entry 39, Oct. 25, 2011. The details relevant to the instant motion are set forth below.

Marcum is an accounting firm with its principle place of business in Melville, New York. *See* Compl. ¶ 2, Doc. Entry 1, Mar. 18, 2011 ("Compl."). Citrin is a New York City-based accounting firm that competes directly with Marcum in the New York City and Philadelphia metropolitan areas. *See* Marcum's Am. Ans. ¶ 140, Doc. Entry 36, Sept. 22, 2011 ("Marcum Am. Ans."). Barbagallo, a Pennsylvania resident, is a certified public accountant. *See* Compl. ¶ 1.

Barbagallo was employed by Marcum from September 2009 to July 2010. *See* Marcum Am. Ans. ¶ 127; Citrin's Am. Cross–Claim ¶ 9, Doc. Entry 60, Apr. 12, 2012 ("Citrin Am. Cross–Claim"). Following his departure from Marcum, Barbagallo began working for Citrin on November 1, 2010.

As part of their employment negotiations, Citrin alleges that it "received assurances from Barbagallo that Barbagallo could join Citrin Cooperman, and that clients could follow him to Citrin Cooperman, without violating any obligations that he owed" to Marcum, including that: 1) "he had no obligation to make any payment to Marcum if referral sources for his litigation support work followed him;" 2) "no payment would be due to Marcum if clients of a former colleague of Barbagallo's at Marcum, Ed Glinski, followed him or Glinksi to Citrin;" and 3) "to the extent that Barbagallo owed any payments to Marcum for any clients that would follow Barbagallo, Barbagallo would make such payments to Marcum." Citrin Am. Cross–Claim ¶ 2. Barbagallo's employment contract contained the following provision:

5. Violation of Other Agreements

(a) Barbagallo represents and warrants to [Citrin] that he is legally able to enter into this Agreement and accept this engagement with [Citrin]; that Barbagallo is not prohibited by the terms of any agreements from entering into this Agreement; and the terms hereof will not and do not violate or contravene the terms of any agreement to which Barbagallo is or may be a party, or by which Barbagallo may be bound. Barbagallo agrees that, as it is a material inducement to [Citrin] that Barbagallo make the foregoing representations and warranties and that they be true in all respects. *Barbagallo shall forever indemnify and hold [Citrin] harmless from and against all liability, costs or expenses (including attorney's fees and disbursement) on*

*account of the foregoing representations being untrue or any claims made against [Citrin].*

*Id.* Ex. A (Admission Agreement) (emphasis added). The contract specifies that it is to be "governed by, construed and enforced in accordance with the internal laws of the State of New York." *Id.* § 14.

On March 18, 2011, Barbagallo sued Marcum for, *inter alia,* failure to pay retirement benefits. *See generally* Compl. Marcum has since raised counterclaims against both Barbagallo and Citrin. *See generally* Marcum Ans., Doc. Entry 7, May 13, 2011; Marcum Am. Ans. In its most recent complaint, Marcum asserted causes of action against Citrin for: 1) tortious interference; 2) aiding and abetting a breach of a fiduciary duty; 3) unfair competition; and 4) unjust enrichment. *See* Marcum Am. Ans.

**\*3** Barbagallo initially told Joel Cooperman, Citrin's managing partner, that he would honor his indemnification obligations, including paying Citrin's defense costs. Citrin Am. Cross–Claim ¶ 24. Throughout the summer of 2011, Barbagallo continued to confirm, in writing, that he would indemnify Citrin and pay its defense costs. *Id.* ¶ 25.

In June 2011, Citrin moved to dismiss all of the claims against it. Citrin's Mot. to Dismiss, Doc. Entry 18, June 29, 2011. Only the unjust enrichment claim was dismissed. Mem. & Order, Doc. Entry 39, Oct. 25, 2011. Remaining against Citrin are Marcum's claims for tortious interference with contract; unfair competition; and aiding and abetting breach of a fiduciary duty.

Barbagallo paid a portion of Citrin's defense costs, sending a check for $2,000 directly to Citrin's lawyers on October 10, 2011. Citrin Am. Cross–Claim ¶ 26.

On January 3, 2012, Barbagallo disclaimed his obligation to indemnify Citrin for its costs, expenses, and attorneys' fees associated with this action. *Id.* ¶ 28 (quoting a letter from Barbagallo's attorney as stating that "Mr. Barbagallo will not be indemnifying or otherwise making payment for any liability of or representation of Citrin for any liability, damages, costs, expenses, or attorney's fees to either your firm or the Zuckerman firm whatsoever related to the Marcum Litigation").

Barbagallo resigned from Citrin three days later. *Id.* ¶ 5.

Citrin alleges that it incurred significant expenses and devoted substantial resources to defending itself in the instant action. *Id.* ¶ 27. In its amended cross-claim, Citrin seeks: 1) damages resulting from the breach of indemnification provision of Barbagallo's contract and a declaratory judgment stating it is entitled to indemnification; 2) a declaratory judgment that it acted without fault or with simple negligence; 3) damages resulting from Barbagallo's breach of his fiduciary duty to indemnify Citrin; 4) contribution; and 5) common law indemnification. *See generally id .*

## III. Motion to Dismiss Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows dismissal of claims when the pleading party has failed "to state a claim upon which relief can be granted." In ruling on a 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor. *Hayden v. Paterson,* 594 F.3d 150, 160 (2d Cir.2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). The court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

## IV. Only Eligible for Indemnification for Defense of Dismissed Claims

**\*4** Barbagallo does not dispute that his employment contract with Citrin could, by its plain terms, require him to indemnify that firm against recovery on the claims at issue in this case and pay for its defense costs. *See* Citrin Am. Cross–Claim Ex. A ("Barbagallo will forever indemnify and hold [Citrin] harmless from and against all liability, costs or expenses (including attorney's fees and disbursement) on account of the foregoing representations being untrue or any claims made against [Citrin]."). Rather, he argues that the only claims currently alleged against Citrin are intentional torts, which cannot be indemnified against either by contract or under common law.

Citrin claims that, even if Barbagallo is not required by contract to indemnify it against damages resulting from its intentional torts, he is required to pay the costs of defending against such claims. Citrin Opp. to Barbagallo's Mot. to Dismiss Counterclaim for Contractual Indemnification 7–9, Doc. Entry 61, Apr. 12, 2012 ("Citrin Opp."). It also contends: 1) that Marcum "appears prepared to argue that even negligent receipt by Citrin ... of Marcum's allegedly confidential client information constitutes 'common law unfair competition,' " *id.* 10–11; and 2) that it can recover for the costs of defending itself against the dismissed unjust enrichment claim, which is not an intentional tort, *id.* 9.

### A. No Indemnification for Intentional Torts

### 1. No Contractual Indemnification for Intentional Torts

New York law does not permit a party to indemnify itself against its own intentional torts. *Austro v. Niagara Mohawk Power Corp.,* 487 N.E.2d 267, 267 (N.Y.1985) ("Indemnification agreements are unenforceable as violative of public policy ... to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury."); *see also, e.g., St. Paul Fire and Marine Ins. Co. v. Universal Builders Supply,* 409 F.3d 73, 86 (2d Cir.2005) (noting that, under New York law, indemnity contracts are contrary to public policy if "they purport to indemnify a party for damages flowing from an injury that was intentional"); *Bank of N.Y. v. Neumann,* 628 N.Y.S.2d 675, 676 (1st Dep't 1995) ("[P]ublic policy does not permit indemnification for damages flowing from the intentional causation of injury."). As the New York Court of Appeals has explained:

> One who intentionally injures another may not be indemnified for any civil liability thus incurred. However, one whose intentional act causes an unintended injury may be so indemnified.... This is so because to allow such indemnity would be to violate the "fundamental principle that no one shall be permitted to take advantage of his own wrong".

*Pub. Serv. Mut. Ins. v. Goldfarb,* 425 N.E.2d 810, 814 (N.Y.1981) (internal citations omitted). Thus, whether a contract explicitly or implicitly requires indemnification for intentional torts, that provision is unenforceable. "An agreement between two private parties, no matter how explicit, cannot change the public policy of this State." *Id.* (holding that insured could not be indemnified against

2012 WL 1664238

punitive damages because "[s]uch damages are, as the name implies, a punishment for intentional wrongdoing").

**\*5** Citrin cannot be contractually indemnified against damages for its intentional torts.

### 2. No Contractual Duty to Defend Intentional Torts

Citrin argues that, even if Barbagallo may not be required to indemnify it against *damages* resulting from intentional torts, he is nevertheless required to reimburse Citrin for its *defense* of those claims. *See* Citrin Opp. 7–9. This claim is without merit.

Under New York law, an insurer's duty to defend is broader than its duty to indemnify. *Ruder & Finn Inc. v. Seaboard Surety Co.,* 422 N.E.2d 518, 521 (N.Y.1981) ("It is a well-established legal principle that the duty of an insurer to defend is broader than its duty to pay."). If "any of the claims against an insured arguably arise from covered events, the insurer is required to defend the entire action"; it is "immaterial that the complaint against the insured asserts additional claims which fall outside the policy's general coverage." *Town of Massena v. Healthcare Underwriters Mut. Ins. Co.,* 779 N.E.2d 167, 170 (N.Y.2002) (internal citations and quotations omitted). Insurers may thus be required to defend against intentional torts that they cannot be required to indemnify. *See Pub. Serv. Mut. Ins. Co.,* 425 N.E.2d at 814–15.

Where, as here, the contractual indemnitor is not an insurer, the indemnitor's duty to defend is substantially narrower. In such cases, the indemnitor's "duty to defend its contractual indemnitee is no broader than its duty to indemnify." *Inner City Redevelopment Corp. v. Thyssenkrupp Elevator Corp.,* 913 N.Y.S.2d 29, 30 (1st Dep't 2010); *see also Bellefleur v. Newark Beth Israel Med. Ctr.,* 888 N.Y.S.2d 81, 84 (2d Dep't 2009).

Since Barbagallo is not an insurer, his duty to defend is coextensive with his duty to indemnify. *Inner City Redevelopment Corp.,* 913 N.Y.S.2d at 30. Because he did not enter into an enforceable contract to indemnify Citrin against damages from intentional torts, he cannot be obligated to defend that company against these claims. Permitting recovery for the defense of such claims would contradict the "fundamental principle that no one shall be permitted to take advantage of his own wrong" by allowing it to avoid one of the costs imposed by intentional tort liability-i .e., the costs of

defending itself against these claims. *Public Service Mut. Ins. Co.,* 425 N.E.2d at 814.

The language of the contract at issue in the instant case is not to the contrary. The agreement between Barbagallo and Citrin is broad, providing that:

> Barbagallo shall forever indemnify and hold [Citrin] harmless from and against *all* liability, costs or expenses (including attorney's fees and disbursement) on account of the foregoing representations being untrue or *any* claims made against [Citrin].

Citrin Am. Cross–Claim Ex. A (Admission Agreement) (emphasis added). Yet the clause does not state or imply that Barbagallo's duty to pay "costs or expenses (including attorney's fees and disbursement)" is broader than his duty to "hold [Citrin] harmless from and against ... liability."

**\*6** In support of its position, Citrin cites cases indicating that "[w]here there is a broad indemnity agreement providing for indemnification 'against all claims, actions, damages and costs,' the indemnitee is entitled to costs, including attorney's fees, incurred in defense of the primary action even where the action is dismissed." Citrin Opp. 7 (citing *Perchinsky v. State,* 660 N.Y.S.2d 177, 181 (3d Dep't 1997)); *see also* Citrin Opp. 8 (" '[T]he wording of the provision is broad enough to justify the conclusion that it covers expenses incurred in a successful defense, since the term "loss, damage or injury" is properly read as modifying, inter alia, claims and suits asserted [against the insured], and thus indicating that indemnification is triggered by suits in which the plaintiff claims "loss, damage or injury", whether or not the claim is upheld.' " (quoting *Luna v. American Airlines,* 769 F.Supp.2d 231, 241 (S.D.N.Y.2011)).

*Perchinsky* and *Luna* are inapposite. Citrin's claims for indemnification for intentional torts fail not because the company will lose the case on the merits, but because it may not contract out of the liability for these harms as a matter of public policy.

Barbagallo is not obligated to pay for the costs of defending Citrin against any of its intentional torts.

### 3. No Common Law Indemnification for Intentional Torts

Under New York law, "[i]n the absence of an express contractual agreement the courts recognized an implied contract of indemnity ... in favor of the wrongdoer who has been guilty of passive negligence ... against the one who has been actively negligent." *Rock v. Reed–Prentice Div. of Package Machinery Co.,* 346 N.E.2d 520, 522 (N.Y.1976) (internal citations and quotations omitted; omissions in original).

> "In the classic indemnification case, *'the one seeking indemnity had committed no wrong,* but by virtue of some relationship with the tort-feasor or obligation imposed by law, was nevertheless held liable to the injured party.' " *Glaser v. Fortunoff of Westbury Corp.,* 71 N.Y.2d 643, 646, 529 N.Y.S.2d 59, 524 N.E.2d 413 (1988), quoting *D'Ambrosio v. City of New York,* 55 N.Y.2d 454, 461, 450 N.Y.S.2d 149, 435 N.E.2d 366 (1982). Common-law indemnity thus permits one who "is held liable solely on account of the negligence of another ... to shift the entire liability to the one who was negligent." *D'Ambrosio,* 55 N.Y.2d at 462, 450 N.Y.S.2d 149, 435 N.E.2d 366....

*Mioscia v. B.R. Guest Holdings, LLC,* 928 N.Y.S.2d 905, 919 (N .Y. Sup.Ct.2011) (citations and internal quotations omitted) (emphasis added).

When "the party seeking indemnification was himself partially at fault, the courts of [New York] State, and throughout the Nation generally, [have] refused to imply a right to ... indemnification against another who played an effective role in causing the damage." *Rock,* 346 N.E.2d at 522 (internal citations and quotations omitted); *see also, e.g., Rosado v. Proctor & Schwartz, Inc.,* 484 N.E.2d 1354, 1356–57 (N.Y.1985) (stating that a party

seeking indemnification "must show that it may not be held responsible in any degree"); *Trustees of Columbia Univ. in City of N.Y. v. Mitchell/Giurgola Assocs.,* 492 N.Y.S.2d 371, 375 (1st Dep't 1985) ("[A] party who has itself actually participated to some degree in the wrongdoing cannot receive the benefit of the doctrine.").

**\*7** New York law thus does not permit common law indemnification against intentional torts. *Campers' World Intern., Inc. v. Perry Ellis Intern., Inc.,* No. 02 CIV 453, 2002 WL 1870243, at \*6 (S.D.N .Y. Aug. 13, 2002); *see also Mioscia,* 928 N.Y.S.2d at 919 (holding that there is no indemnification where "plaintiff alleges that [defendant] actually participated in the acts giving rise to his injuries, by [committing the intentional tort of discrimination]," as "[a]ny liability of [defendant] in this case would be based on its own wrongdoing").

Barbagallo is not obligated under common law to indemnify or defend against intentional torts of Citrin.

### B. Barbagallo Must Only Indemnify Citrin Against Dismissed Unjust Enrichment Claim

Marcum initially asserted four claims against Citrin: 1) tortious interference; 2) aiding and abetting breach of a fiduciary duty; 3) unfair competition; and 4) unjust enrichment. The unjust enrichment claim was dismissed by the court. Although Citrin claims that Marcum may seek to hold it vicariously liable for Barbagallo's acts, *see* Citrin Opp. to Barbagallo's Mot. to Dismiss Citrin's Am. Cross–Claim 9, Doc. Entry 69, Apr. 30, 2012, no such claim has been made by Marcum.

Citrin may be able to recover for any costs of defending itself against the dismissed unjust enrichment claim. Marcum's remaining claims against Citrin are intentional torts which cannot be indemnified against either by contract or common law.

### 1. Tortious Interference with Contract and Aiding and Abetting a Breach of a Fiduciary Duty Claims are Intentional Torts

Citrin does not dispute that the tortious interference and aiding and abetting a breach of a fiduciary duty claims are intentional torts. *See, e.g., Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983) (holding that aiding and abetting a breach of a fiduciary duty requires the aider and

abettor to know that the primary wrongdoer is breaching and to provide substantial assistance in the primary wrong);

*Lama Holding Co. v. Smith Barney Inc.,* 668 N.E.2d 1370, 1375 (N.Y.1996) (holding that tortious interference with contract requires a showing of the "defendant's *intentional* procurement of the third-party's breach of the contract without justification" (emphasis added)); *Modular Devices, Inc. v. Alcatel Alenia Space Espana,* No. 08–CV–1441, 2010 WL 3236779, at *5 (E.D.N.Y. Aug. 12, 2010) ("Under New York law, tortious interference is an intentional tort."), Barbagallo is not required to indemnify or defend Citrin against these claims.

Citrin's causes of action for contractual and common law indemnification against the tortious interference and aiding and abetting a breach of a fiduciary duty claims are dismissed.

## 2. Unfair Competition is an Intentional Tort

Citrin claims that Marcum may seek to recover for negligent unfair competition. Such a claim is without basis in New York law. Unfair competition is an intentional tort for which contractual and common law indemnification is forbidden.

**\*8** "[T]he essence of unfair competition under New York common law is the *bad faith* misappropriation of the labors and expenditures of another." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 34 (2d Cir.1995) (emphasis added) (internal citations and quotations omitted);

*see also Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980) ("The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another.... Central to this notion is some element of bad faith."); *Abe's Rooms, Inc. v. Space Hunters, Inc.,* 833 N.Y.S.2d 138, 140 (2d Dep't 2007) (requiring a showing of bad faith). Mere negligence or recklessness is insufficient. In order to establish bad faith, Marcum would have to show that Citrin acted "out of a dishonest purpose." *Kalisch–Jarcho Inc. v. City of New York,* 448 N.E.2d 413, 417 n. 5 (N.Y.1983) (defining bad faith in the context of a contract claim).

Because it must be shown that Citrin intentionally acted with a dishonest purpose to injure Marcum, the latter could not hold the former liable for negligent unfair competition. Such a cause of action is not recognized under New York law. Citrin cannot be indemnified by contract or common law against

this intentional tort claim. *See Public Serv. Mut. Ins. Co.,* 425 N.E.2d at 814 ("One who intentionally injures another may not be indemnified for any civil liability thus incurred. However, one whose intentional act causes an unintended injury may be so indemnified.").

The claim for indemnification of damages flowing from unfair competition must be dismissed.

### 3. Citrin May Be Entitled to Indemnification for Unjust Enrichment

Unlike the other claims pled by Marcum against Citrin, unjust enrichment is not an intentional tort. It requires only a showing "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution," *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000) (citation omitted). The remedy is available whether the defendant has obtained the money by wrongdoing, illegality, or mere mistake. *See, e.g., Parsa v. State of New York,* 474 N.E.2d 235, 237–38 (N.Y.1984). A cause of action may lie even if the defendant did not intend to injure the plaintiff. *See, e.g., Corsello v. Verizon N.Y., Inc.,* 2012 WL 1032741 (N.Y.2012) ( "Typical [unjust enrichment] cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled."). Contractual indemnification of such claims is not forbidden as a matter of public policy.

While Marcum's unjust enrichment claim has since been dismissed, expenditures were required to defend against this claim. Under the terms of Barbagallo's contract, he could be required to not only indemnify Citrin against this claim, but to pay for the costs of its defense.

**\*9** In his reply papers, Barbagallo claims that he has effectively already paid Citrin for the cost of defending itself against the unjust enrichment claim. Barbagallo First Mot. Reply 6–8. He states that his attorney's drafted the motion to dismiss Marcum's claims, and that Citrin's attorneys made minimal revisions on the draft. *Id.* He argues that the $2,000 he has already paid more than compensates for this effort. *Id.*

While Barbagallo's evaluation may prove accurate, it raises issues of fact that are inappropriate for resolution in this motion. Citrin's claim for indemnification against the costs of defending the unjust enrichment claim stands.

## V. Breach of Fiduciary Duty

Under New York law, "conduct amounting to breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract which is nonetheless independent of such contract." *Bullmore v. Ernst & Young Cayman Islands,* 846 N.Y.S.2d 145, 148 (1st Dept 2007). Defendants who owe fiduciary duties to a plaintiff "may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties," since in "these instances, it is policy, not the parties' contract, that gives rise to a duty of care." *Sommer v. Federal Signal Corp.,* 593 N.E.2d 1365, 1369 (N.Y.1992); *Meyers v. Waverly Fabrics, Div. of F. Schumacher & Co.,* 479 N.E.2d 236, 239 n. 2 (N.Y.1985) (internal citations and quotations omitted) ("[I]t is plain that a contracting party may be charged with a separate tort liability arising from a breach of duty distinct from, or in addition to, the breach of contract ... as when it springs from extraneous circumstances, not constituting elements of the contract as such although connected with and dependent upon it, and born of that wider range of legal duty which is due from every man to his fellow, to respect his rights of property and person, and refrain from invading them by force or fraud.").

Nevertheless, a "cause of action alleging breach of a fiduciary duty, which ... is merely duplicative of a breach of contract claim, cannot stand." *See, e.g., Hylan Elec. Contr., Inc. v. MasTec N. Amer., Inc.,* 903 N.Y.S.2d 528, 530 (2d Dep't 2010). Where a defendant owes no duty to the plaintiff outside of that created by the contract, a breach of fiduciary duty claim will not lie. *See, e.g., id.* (noting that defendant was not a fiduciary of the plaintiff); *Bullmore,* 846 N.Y.S.2d at 148 (holding that breach of fiduciary duty claim could go forward, notwithstanding the similarity with the conduct constituting breach of contract, as defendants had an independent duty toward plaintiffs). Even if a defendant were in a position of trust with respect to the plaintiff, there is no breach of fiduciary duty claim when the complaint alleges a breach of a contractual, rather than fiduciary, duty. *See William Kaufman Organization, Ltd. v. Graham & James LLP,* 703 N.Y.S.2d 439, 442 (1st Dep't 2000) (holding that breach of fiduciary duty claim by former client against attorney was not independent of the contract where "the cause of action for breach of contract refers, at paragraph 60 of the complaint, to the unethical conduct described in paragraphs 53 and 54, which constitute the allegations of breach of fiduciary duty");

*see also Celle v. Barclays Bank P.L.C.,* 851 N.Y.S.2d 500, 501 (1st Dep't 2008) (holding that, where a contract "cover[s] the precise subject matter of the alleged fiduciary duty," then a claim for breach of fiduciary duty must be dismissed as duplicative (internal citations and quotations omitted)); *LaSalle Hotel Lessee, Inc. v. Marriott Hotel Services, Inc.,* 816 N.Y.S.2d 347, 348 (1st Dep't 2006) (holding that "[t]he cause of action for breach of fiduciary duty ... was ... properly dismissed" because it was "based on the same allegations as for breach of contract"); *Pane v. Citibank, N.A.,* 797 N.Y.S.2d 76, 77 (1st Dep't 2005) (holding that defendant's actions cannot "be deemed a breach of fiduciary duty given a formal written agreement covering the precise subject matter of the alleged fiduciary duty").

**\*10** In the instant case, even if Barbagallo owed Citrin a fiduciary duty of good faith and loyalty, Citrin has failed to allege sufficient facts to show that he did more than violate the duties he owed under the contract.

The duties of good faith and loyalty require a fiduciary to avoid self-dealing. They obligate a fiduciary to place the best interest of the beneficiary above his own self-interest. They do not protect beneficiaries from all forms of fiduciary misconduct.

Citrin claims Barbagallo breached his fiduciary duties by: 1) breaching his contract with Marcum, thereby prompting Marcum's suit against Citrin, Citrin Am. Cross–Claim ¶¶ 50–51; and 2) "refusing his duty to indemnify Citrin Cooperman," *id.* ¶ 52. The duties of good faith and loyalty do not require that a fiduciary avoid breaching a contract with a third party, where the fiduciary and not beneficiary is liable on the contract. Barbagallo owes these duties to Citrin solely on the basis of his employment contract, not because of any fiduciary obligations.

Citrin's cross-claim for breach of Barbagallo's fiduciary duty is duplicative of its cross-claim for Barbagallo's breach of contract. It is dismissed.

### VI. Contribution

#### A. Generally

In its amended cross-claim, Citrin alleges that "[i]n the event that Barbagallo and Citrin Cooperman are both found liable to Marcum, Citrin Cooperman is entitled to contribution from Barbagallo, pursuant to CPLR 1401–1403, for all or part

of any amount, if any, for which Citrin Cooperman is held liable." *Id.* ¶ 57.

Unlike in indemnity, where the party held legally liable (but not actually culpable) shifts the entire loss to another who is blameworthy, "in contribution the loss is distributed among tort-feasors [who are all at fault], by requiring joint tort-feasors to pay a proportionate share of the loss." *Rosado v. Proctor & Schwartz, Inc.,* 484 N.E.2d 1354, 1356 (N.Y.1985). Contribution thus "enables a joint tortfeasor that has paid more than its equitable share of damages to recover the excess from the other tortfeasors." *Sommer v. Federal Signal Corp.,* 593 N.E.2d 1365, 1372 (N.Y.1992).

The New York contribution statute provides that:

> [T]wo or more persons who are subject to liability for damages for the same ... injury to property ... may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought.

N.Y. C.P.L.R. § 1401; *see also, e.g., Structure Tone, Inc. v. Univ. Servs. Grp., Ltd.,* 929 N.Y.S.2d 242, 245 (1st Dep't 2011). "The statute applies not only to joint tort-feasors, but also to concurrent, successive, independent, alternative, and even intentional tort-feasors." *Bd. of Educ. of Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley,* 517 N.E.2d 1360, 1364 (N.Y.1987) (emphasis added). "A contribution claim can be made even when the contributor has no duty to the injured plaintiff ... if there has been a breach of a duty that runs from the contributor to the defendant who has been held liable." *Raquet v. Braun,* 681 N.E.2d 404, 407 (N.Y.1997).

**\*11** The "critical requirement" for apportionment by contribution is that "the breach of duty by the contributing party must have had a part in causing or augmenting the injury for which contribution is sought." *Nassau Roofing & Sheet Metal Co. v. Facilities Dev. Corp.,* 523 N.E.2d 803, 805 (N.Y.1988). Contribution is available "whether or not the culpable parties are allegedly liable for the injury under the same or different theories." *Id.*

Marcum seeks to hold both Barbagallo and Citrin liable for fundamentally the same injury—i.e., damage to Marcum's business relationships and good will resulting from the poaching of clients by Barbagallo. Barbagallo nevertheless argues that, because Marcum seeks to recover against Citrin for economic loss, Citrin cannot seek contribution for the claims in this case. He is mistaken.

**B. No Contribution for Economic Loss Resulting from Breach of Contract**

"[S]ome form of tort liability is a prerequisite to application of the [New York contribution] statute." *Bd. of Educ. of Hudson City Sch. Dist.,* 517 N.E.2d at 1364. Parties may not seek contribution for purely economic loss resulting from a breach of contract, since this does not constitute "injury to property." *Id.* at 1364–65.

Where the plaintiff and the defendants are contractually related, a claim is properly considered a tort action only if the plaintiff alleges that the defendant violated a legal duty independent of that created by the contract. *See, e.g., Sommer,* 593 N.E.2d at 1371–75 (holding that alarm company could be held liable for contribution to building owner where complaint alleged gross negligence); *see also Hydro Investors, Inc. v. Trafalgar Power, Inc.,* 227 F.3d 8, 18 (2d Cir.2000) (holding that contribution may lie for breach of contract actions in the "limited class of cases involving liability for the violation of a professional duty"). "This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Clark–Fitzpatrick Inc. v. Long Is. R.R. Co.,* 516 N.E.2d 190, 194 (N.Y.1987).

In deciding whether an action lies in contract or in tort, "the determining factor as to the availability of contribution is not the theory behind the underlying claim but the measure of damages sought" by the plaintiff. *E.g., Rockefeller Univ. v Tishman Constr. Corp. of N.Y.,* 659 N.Y.S.2d 460, 463 (1st Dep't 1997), *lv. denied* 691 N.E.2d 630 (N.Y.1997). An injury is properly characterized as "economic loss" when it goes to the "expectancy of the parties (loss of bargain)," such as "defects related to the quality of the product, e.g., product performance." *Hemming v. Certainteed Corp.,* 468 N.Y.S.2d 789, 790 (4th Dep't 1983); *see also Bellevue*

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 39 of 247
Barbagallo v. Marcum LLP, Not Reported in F.Supp.2d (2012)
2012 WL 1664238

*S. Assocs. v. HRH Constr. Corp.,* 579 N.E.2d 195, 200 (N.Y.1991) (holding that damages constituted economic loss, and thus were not recoverable in tort, "where the bargained-for consideration has failed to meet the expectations of the purchaser"); *Grinnell v. G. Beames and Sons, Inc.,* 859 N.Y.S.2d 903 (table), 2008 WL 880299, at *2 (Cortland Cnty. Sup.Ct.2008) ("[E]conomic loss" refers to the "benefit of the bargain" struck between two parties, that is, the product, service or result that one party sought to obtain from the other, pursuant to their contract. This category of damages encompasses losses stemming from poor product quality or performance, which "go to the expectancy of the parties."). "[W]here plaintiff is essentially seeking enforcement of the bargain," the action is considered one for breach of contract rather than tort, and no contribution is available. *Sommer,* 593 N.E.2d at 552; *see also, e.g., Bd. of Educ. of Hudson City Sch. Dist.,* 517 N.E.2d at 1364 ("We find nothing in the legislative history or the common-law evolution of the statute on which to base a conclusion that CPLR 1401 was intended to apply in respect to a pure breach of contract action such as would permit contribution between two contracting parties *whose only potential liability to the plaintiff is for the contractual benefit of the bargain."* (emphasis added)); Rockefeller Univ., 659 N.Y.S.2d at 463 (holding that contribution is barred where claims "seek the identical contractual benefit of the bargain, their tort language notwithstanding").

**\*12** Barbagallo has cited no case holding that damages sought under tort theories should be considered "economic loss" and not "injury to property" for which contribution is available where, as here, no contractual relationship existed between the plaintiff (Marcum) and the defendant (Citrin). In one case, the Fourth Department indicated that the bar to recovery for economic loss might apply more broadly, stating that:

> Contribution may not be sought where the underlying action is for breach of contract *or where the damages sought are purely for economic loss* .... Here, the underlying action is based on breach of contract. However, *even if it was a tort action, contribution would not be available because the damages sought are limited to economic loss.*

*Livingston v. Klein,* 684 N.Y.S.2d 115, 116 (4th Dep't 1998) (emphasis added). At issue in *Livingston* was a claim for breach of contract. *Id.*

### C. Contribution Permitted for Marcum's Monetary Loss Not Resulting from Breach of Contract

To the extent that Marcum's tortious interference with contract claim against Citrin seeks to recover the benefit of Marcum's bargains with Barbagallo and Glinski, this damage is properly characterized as economic loss. Barbagallo cannot be required to contribute to Citrin for this claim.

Barbagallo can be held liable in contribution for Marcum's aiding and abetting breach of a fiduciary duty and unfair competition claims. Citrin has a duty under common law to refrain both from unfair business tactics (unfair competition) and from interference with common law duties (aiding and abetting breach of a fiduciary duty). Its duty to act with reasonable care is not a function of a private contract with Marcum—none existed—nor of Marcum's contract with Barbagallo. The damages Marcum seeks to recover against Citrin under these claims are not for economic loss, but compensation for harms intentionally caused to Marcum's business relationships and good will, including the diminished value of its confidential client lists. These damages can be considered "injury to property" for which N.Y. C.P.L.R. § 1401 would permit contribution.

Barbagallo's motion to dismiss Citrin's claim for contribution is denied.

### VII. Conclusion

Citrin's cross-claims for breach of fiduciary duty, and for contractual and common law indemnification of Marcum's causes of action for tortious interference, unfair competition, and aiding and abetting breach of a fiduciary duty, are dismissed. Barbagallo's motion to dismiss Citrin's claim for contribution of Marcum's tortious interference and aiding and abetting a breach of a fiduciary duty claims is denied. Barbagallo may also be required to reimburse Citrin for the costs of defending itself against Marcum's unjust enrichment claim.

SO ORDERED.

**Barbagallo v. Marcum LLP, Not Reported in F.Supp.2d (2012)**

2012 WL 1664238

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1664238

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 41 of 247
Board of Trustees of Southern California IBEW-NECA..., Not Reported in...

2011 WL 6130831

2011 WL 6130831
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

THE BOARD OF TRUSTEES OF the SOUTHERN
CALIFORNIA IBEW–NECA DEFINED
CONTRIBUTION PLAN, on behalf of itself
and all others similarly situated, Plaintiff,
v.
The BANK OF NEW YORK MELLON
CORPORATION, et al., Defendants.

No. 09 Civ. 6273(RMB).
|
Dec. 9, 2011.

### DECISION & ORDER

RICHARD M. BERMAN, District Judge.

**\*1** Having reviewed the record herein, including **(i)** the third amended complaint ("Complaint"), filed March 11, 2011 by the Board of Trustees ("Plaintiff" or "Board") of the Southern California IBEW–NECA Defined Contribution Plan (the "Plan"), alleging, among other things, that The Bank of New York Mellon Corp. ("BNYM"), The Bank of New York, and BNY Mellon, N.A. (collectively, "Defendants") "failed to invest [the Plan's c]ollateral in a prudent manner" in violation of Defendants' fiduciary and other obligations under §§ 404 and 406 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1104, 1106 ("ERISA"), when they held the collateral under BNYM's Securities Lending Program ("SLP") in Lehman Brothers Holdings, Inc. ("Lehman") floating rate note ("Lehman Note") through Lehman's bankruptcy filing on September 15, 2008, resulting in a loss to the Plan in the amount of "almost $3 million" (Compl., dated Mar. 11, 2011, ¶¶ 1–6, 223–45; Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J., dated July 25, 2011 ("Pl.Opp'n"), at 1); **(ii)** Defendants' answer and Defendant BNYM's counterclaims against Plaintiff, filed March 25, 2011 ("Counterclaims"), for breach of fiduciary duty, breach of co-fiduciary duty, equitable indemnification, and contribution, alleging, among other things, that the Lehman Note was purchased and maintained by Defendants in compliance with applicable guidelines that the Board agreed to and approved, and that, "[i]n the event [Defendants

a]re found liable to the ... Plan for losses as alleged in the ... Complaint, such losses were caused in whole or in part by the acts or omissions of the Board" (Counterclaims, dated Mar. 25, 2011, ¶¶ 5, 35, 39, 43, 47); **(iii)** Plaintiff's motion, filed April 21, 2011, to dismiss BNYM's Counterclaims as, among other things, "not ripe for adjudication at this juncture because no liability has been imposed on [Defendants]," and to strike all twenty-one of Defendants' affirmative defenses (Pl.'s Mem. of Law in Supp. of Mot. to Dismiss Counterclaims & to Strike Aff. Defenses, dated Apr. 21, 2011 ("Pl.Mem."), at 2, 16–17, 24–25); **(iv)** Defendants' cross-motion, filed May 25, 2011, for summary judgment as to Plaintiff's claims, arguing, among other things, that "Monday morning quarterbacking cannot overcome the fact that the [Lehman] bankruptcy was a surprise to BNYM as well as to Plaintiff, as shown by the fact that Plaintiff never asked BNYM or any of Plaintiff s other investment managers to divest the Plan's widely held investments in Lehman," and that "hindsight evaluations of an investment's performance cannot support a claim of imprudence under ERISA" (Defs.' Mem. of Law in Supp. of Mot. for Summ. J. as to Pl.'s Claims, dated May 25, 2011 ("Defs.Mem."), at 2, 18); **(v)** Plaintiff's opposition to Defendants' cross-motion, filed July 25, 2011, arguing, among other things, that Defendants "had knowledge of the serious risk of a Lehman default" but took "***no steps whatsoever*** to protect Plaintiff from a Lehman default" (Pl.' Opp'n at 1 (emphasis in original)); **(vi)** Defendants' reply, filed August 19, 2011 (*see* Defs.' Mem. of Law in Further Supp. of Mot. for Summ. J., dated Aug. 19, 2011 ("Defs.Reply")); **(vii)** Plaintiff's surreply, filed September 9, 2011 (*see* Pl.'s Surreply, dated Sept. 9, 2011); and applicable law, **the Court hereby grants Plaintiffs motion to dismiss BNYM's Counterclaims [# 150] without prejudice, respectfully denies Plaintiff's motion to strike Defendants' affirmative defenses [# 150], and respectfully denies Defendants' motion for summary judgment as to Plaintiff's claims [# 160],** as follows:

**\*2 (I)** ***Counterclaims***—BNYM's Counterclaims, all of which presuppose a (prior) finding of Defendants' liability, are premature and are hereby respectfully dismissed without prejudice. (*See* Counterclaims ¶¶ 5, 29–30, 35, 39, 43, 47, & pp. 40–41 ("If BNYM or any affiliate is found liable, the equities in this case require the Board ... to bear the full share of responsibility for any alleged losses as a result of their own breaches of fiduciary duties to the ... Plan."); Pl. Mem. at 16 ("BNYM's claims for contribution and indemnification are not ripe for adjudication as liability has not yet been imposed

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 42 of 247

Board of Trustees of Southern California IBEW-NECA..., Not Reported in...

2011 WL 6130831

upon BNYM.").)[1] The Court is in no way ruling upon the merits of those Counterclaims.

"A claim resting on contingent future events that may occur as anticipated or may not occur at all, is not ripe for adjudication." *FSP, Inc. v. Societe Generale,* No. 02 Civ. 4786, 2003 WL 124515, at *4 (S.D.N.Y. Jan. 14, 2003) ("Claims concerning indemnification obligations ... are not ripe for adjudication until liability has been imposed upon the party to be indemnified.") (collecting cases). "Where the facts on which the Court's decision depends have yet to unfold, ... 'dismissal of the [claims] without prejudice is the correct disposition of the action.' " *Travelers Prop. Cas. Corp. v. Winterthur Int'l,* No. 02 Civ. 2406, 2002 WL 1391920, at *6 (S.D.N.Y. June 25, 2002) (quoting *Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.,* 90 F.3d 671, 676 (2d Cir.1996)).

**(II)** *Affirmative Defenses*—Plaintiff's request that the Court strike all of Defendants' twenty-one affirmative defenses (*see* Answer, dated Mar. 25, 2011, at 26–29), is respectfully denied. "[M]otions to strike are disfavored and should not be granted 'unless there is a strong reason for so doing.' " *Bailey v. Pataki,* No. 08 Civ. 8563, 2010 WL 234995, at *3 (S.D.N.Y. Jan. 19, 2010) (quoting *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 893 (2d Cir.1976)). Plaintiff's generalized and unsupported contention that "not a single affirmative defense, as pled, has put Plaintiff on notice of the basis for the defense" (Pl. Mem. at 24) does not constitute a "clear showing that the challenged defense[s] ha[ve] no bearing on the subject matter [of the case or] ... that permitting the defense[s] to stand would prejudice ... [P]laintiff." *Emmpresa Cubana Del Tabaco v. Culbro Corp.,* 213 F.R.D. 151, 155 (S.D.N.Y.2003) (collecting cases) (internal quotation marks omitted).

**(III)** *Summary Judgment*—Preliminarily, Defendants' contention that Plaintiff's § 406 claim (*see* Compl. ¶¶ 240–45) is "expressly exempted" by a U.S. Department of Labor Prohibited Transaction Exemption is without merit. (Defs. Mem. at 23.)[2] By its (express) terms, the relevant exemption does not cover BNYM's investment of Plaintiff s collateral. *See* U.S. Dep't of Labor, Prohibited Transaction Exemption 2006–16, 71 F.R. 63786 (Oct. 31, 2006), at § I(c) (hereinafter, "PTE 2006–16"). The exemption provides only that § 406(b)(1) of ERISA "shall not apply to the **payment** to a fiduciary [*e.g.,* BNYM] ... and **compensation for services** rendered in

connection with loans of plan assets that are securities." U.S. Dep't of Labor, Prohibited Transaction Exemption 2006–16, 71 F.R. 63786 (Oct. 31, 2006), at § I(c) (emphases added). Plaintiff correctly points out that its § 406 claim "is not based on the fact that Defendant[s] loaned securities, received [c]ollateral [from the borrowers of those securities], or w[ere] paid a fee [by Plaintiff] for doing so. Instead, [Plaintiff's claim] ... is based on ... Defendant[s'] separate and subsequent act of imprudently investing the [c]ollateral" in the Lehman Note. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss, dated Dec. 8, 2009, at 23); *see Bd. of Trustees of N.J. Carpenters Annuity & Pension Funds v. Bank of N.Y. Mellon,* No. 11 Civ. 1555, 2011 WL 4916302, at *1 (S.D.N.Y. Oct.14, 2011) ("The agreements in a securities lending transaction typically mandate that the borrower provide the lender with a certain amount of collateral, usually in the form of cash and cash equivalents ..., equal to or greater than the value of the loaned securities."); *Stephenson v. Deutsche Bank AG,* 282 F.Supp.2d 1032, 1042 (D.Minn.2003).

**\*3** Resolving all ambiguities and drawing all reasonable factual inferences in favor of the non-moving party, the Court concludes that genuine issues of fact exist which preclude summary judgment in favor of Defendants as to Plaintiff's claims for breach of fiduciary duty under ERISA § 404(a) (*see* Compl. ¶¶ 223–39) and for prohibited transactions under ERISA § 406 (*see* Compl. ¶¶ 240–45); *see also SCF Ariz. v. Wells Fargo Bank, N.A.,* No. 09 Civ. 9513, 2011 WL 3874889, at *7 (S.D.N.Y. Sept. 1, 2011) (denying defendant summary judgment on plaintiff's breach of fiduciary duty claim where defendant, in securities lending arrangement, failed to sell its investment of plaintiff s collateral in a Lehman floating rate note prior to Lehman's bankruptcy); *Gray v. Briggs,* 45 F.Supp.2d 316, 327–28 (S.D.N.Y.1999) ("[P]laintiffs may be able to prove at trial that the[ ] investments, and their subsequent management by [defendants], demonstrate breaches of fiduciary duty to the Plans ...."); *Liss v. Smith,* 991 F.Supp. 278, 294–303 (S.D.N.Y.1998). The fiduciary standard imposed by ERISA requires the application of a reasonableness standard. Rarely will such a determination be appropriate on a motion for summary judgment. *See Hunt v. Magnell,* 758 F.Supp. 1292, 1297 n. 6 (D.Minn.1991) (citing *Pension Fund v. Omni Funding Grp.,* 731 F.Supp. 161, 169 (D.N.J.1990)). These genuine, disputed questions of fact include, among others, the following:

- **Whether Defendants discharged their duties with respect to the Plan with the care, skill, prudence, and**

2011 WL 6130831

**diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.**

*See* 29 U.S.C. § 1104(a)(1)(B).

Plaintiff contends that "[a] trier of fact could easily find that Defendant [s] acted imprudently" (Pl. Opp'n at 2) in light of evidence that Defendants held the Lehman Note through Lehman's September 2008 bankruptcy even though "BNYM classified Lehman as a purchase-restricted issuer" in November 2007, such that "[n]ew purchases of Lehman investments were disallowed" "until [Lehman's] eventual bankruptcy" (Pl.'s Rule 56.1 Stmt. of Material Facts, dated July 25, 2011 ("Pl.56.1"), ¶¶ 416, 421); BNYM's Risk, Fiduciary Risk Management, and Global Securities Lending Credit Committees held meetings in April, May, and June 2008, respectively, where various dangers in the SLP business were discussed, including an observation at one of the meetings that that "Lehman ... is trying to acquire more capital in case of bankruptcy" (Pl. 56.1 ¶¶ 382, 387, 394); and an email exchange that took place on June 6, 2008 between two SLP members in which one asked, "Are we doing anything different because of Lehman[?]," and the other responded in part, "Not so far" (Pl. 56.1 ¶ 389).

Defendants argue that, "[d]espite Plaintiff's attempt to muddy the record, Plaintiff's own admissions demonstrate that there is no dispute as to the dispositive facts," including testimony from one of Plaintiff's purported experts that the decision to purchase more Lehman investments is "very distinct" from the decision to sell existing Lehman investments "at a loss" (Defs.' Resp. to Pl. 56.1, dated Aug. 19, 2011 ("Defs. 56.1 Resp."), ¶ 421); and Plaintiff's admission that two Plan fiduciaries other than BNYM, which "placed Plan assets in Lehman bonds, held them there upon Lehman's bankruptcy, and lost Plan principal as a result," "were prudent" (Defs. Mem. at 10–11, 15–17); *see SCF Ariz.,* 2011 WL 3874889, at *7; *Gray,* 45 F.Supp.2d at 327–28.

**\*4 • Whether Defendants discharged their duties by diversifying the investments of the plan so as to minimize the risk of large losses.** *See* 29 U.S.C. § 1104(a)(1)(C).

Plaintiff contends that the Lehman Note "accounted for more than 9% of [the Plan's] collateral account" between June 30, 2008 and August 31, 2008 (Pl. 56.1 ¶ 118); "[b]y June 2008, 65% of Plaintiff s total collateral portfolio consisted of fixed income securities issued by financial institutions" (Pl. 56.1 ¶ 119); and BNYM's Chief Risk Officer penned a memo on April 1, 2008 to the Risk Committee warning that "Bear [Stearns] is an example of the many exposure points we have with major broker dealers and raises some policy issues," including "our concentration risk in the Securities Lending business" (Pl. 56.1 ¶¶ 139, 384).

Defendants argue that "Plaintiff's collateral account had on average 50.3% of its portfolio invested in non-financial securities between February 2008 and August 2008" (Defs.' 56.1 Resp. ¶ 119); and "financial institutions are the primary issuers of ... the primary type of investments that complied with Plaintiff's [securities lending g]uidelines" for the collateral invested by BNYM (Defs. Reply at 19); *see DiFelice v. U.S. Airways, Inc.,* 497 F.3d 410, 423 (4th Cir.2007) ("[T]he portfolio management theory teaches that an investment in a risky security as part of a diversified portfolio is, in fact, an appropriate means to increase return while minimizing risk."); *Liss,* 991 F.Supp. at 301 ("Congress ... imposed a requirement of diversification that depends upon the facts and circumstances surrounding each plan and investment.").

• **Whether Defendants discharged their duties with respect to the Plan solely in the interest of and for the exclusive purpose of providing benefits to the participants and beneficiaries.** *See* 29 U.S.C. § 1104(a)(1), (a)(1)(A)(i). **Relatedly, whether Defendants dealt with the assets of the Plan in Defendants' own interest or for their own account.** *See* 29 U.S.C. § 1106(b) (1).

Plaintiff contends that, because Plaintiff and Defendants "shared in the returns of collateral investments" but "the risk of investment loss [fell] on Plaintiff alone (Defs. 56.1 ¶¶ 80, 89), "continuing to hold the Lehman Note was a 'heads I win; tails you lose' investment for BNYM" (Pl. Opp'n at 25), as demonstrated by a June 11, 2008 email message written by SLP's Executive Director to other SLP personnel. In that email, which related to questions from the Federal Reserve Bank of New York (the "Fed") regarding BNYM's Lehman exposure in securities lending, the Executive Director wrote that "we remain concerned about [L]ehman name risk," "but it may be wise to

indicate explicitly in your response to the [F]ed that our process involves exclusively customer-money;[ ]neither indemnified or guaranteed by [BNYM]." (Pl. 56.1 ¶¶ 124, 391; Def. 56.1 Resp. ¶ 391.)

**\*5** Defendants argue that "Plaintiff never explains how ... a common industry fee arrangement is somehow evidence of a violation of [§ ] 406." (Defs. Reply at 21); *see Lowen v. Tower Asset Mgmt., Inc.,* 829 F.2d 1209, 1213 (2d Cir.1987) ("Section 406(b) [must] be broadly construed and ... liability [may] be imposed even where there is no taint of scandal, no hint of self-dealing, no trace of bad faith." (citation and internal quotation marks omitted)).

**Conclusion & Order**

For the foregoing reasons, Plaintiff's motion to dismiss BNYM's Counterclaims [# 150] is granted without prejudice;

Plaintiff's motion to strike Defendants' affirmative defenses [# 150] is denied; and Defendants' motion for summary judgment as to Plaintiff's claims [# 160] is denied.

A trial with respect to Plaintiff's claims is hereby scheduled to begin on Monday, April 2, 2012 at 9:00 a.m. The parties are also directed to appear before the Court with their principals for a status and settlement conference on Wednesday, January 4, 2012 at 10:30 a.m. in Courtroom 21B of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York. **The parties are directed to engage in good faith settlement negotiations prior to the conference.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 6130831

---

**Footnotes**

1    Defendants do not respond to Plaintiff's motion in their briefs. Instead, Defendants refer the Court to their arguments in an earlier brief, dated January 10, 2011, filed in response to Plaintiff's December 20, 2010 motion to dismiss BNYM's counterclaims, which arose out of Plaintiff's second amended complaint in this matter, filed September 21, 2010. (Defs. Mem. at 3 n. 7.) As noted, Plaintiff's third amended complaint was filed on March 11, 2011.

2    Defendants do not argue the substance of this point in their briefs, but instead refer the Court to an earlier filed brief, dated November 9, 2009, relating to Defendants' motion to dismiss Plaintiff's first amended complaint in this matter, filed October 29, 2009. (*See* Defs. Mem. at 23–24.) Plaintiff responds by referring the Court to its earlier response, dated December 8, 2009, to Defendants' prior brief. (Pl. Opp'n at 27.)

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

*Privy Council Appeal No.* 15 *of* 1951

**Canada Steamship Lines Limited** - - - - - - *Appellant*

*v.*

**The King** - - - - - - - - - *Respondent*

FROM

## THE SUPREME COURT OF CANADA

JUDGMENT OF THE LORDS OF THE JUDICIAL COMMITTEE
OF THE PRIVY COUNCIL, DELIVERED THE 21ST JANUARY, 1952

*Present at the Hearing:*

LORD PORTER
LORD NORMAND
LORD MORTON OF HENRYTON
LORD ASQUITH OF BISHOPSTONE
LORD COHEN

[*Delivered by* LORD MORTON OF HENRYTON]

It will be convenient to refer to the appellant company as " the company " and to the respondent as " the Crown ".

This is an appeal by special leave from six judgments of the Supreme Court of Canada dated the 23rd day of June, 1950, reversing in part a like number of judgments of the Exchequer Court of Canada (Angers, J.), which had maintained Petitions of Right against the Crown for damages arising out of a disastrous fire.

In the first of these six cases the company was suppliant, claiming from the Crown $40,713.72 as the value of the property of the company destroyed in the fire. In the remaining five cases the suppliants were owners of other property destroyed by the fire. The suppliants in these five cases and the amounts respectively claimed by them from the Crown were as follows :—

| | | | | |
|---|---|---|---|---|
| J. H. Heinz Company of Canada | ... | | | $38,430.88 |
| Canada & Dominion Sugar Co. Ltd. | ... | | | $108,310.83 |
| W. H. Taylor Limited | ... | ... | ... | $3,670.25 |
| Raymond Copping | ... | ... | ... | ... | $1,662.37 |
| Cunningham & Wells Limited | ... | ... | | $15,159.83 |

In addition to the present six cases, Petitions of Right were instituted against the Crown in some 250 other cases involving additional claims arising out of the fire to a total amount of $325,636.05, which Petitions of Right have remained in abeyance pending the outcome of these proceedings.

The events leading up to all these claims must now be set out. By an Indenture of Lease (hereafter called " the lease ") dated the 18th November, 1940, the Crown leased to the company a piece of land on the western side of St. Gabriel Basin No. 1 of the Lachine Canal in

**[1]**

2

the City of Montreal " together with the right and privilege to occupy,
use and enjoy, for the purpose of receiving and storing therein freight
and goods loaded onto and/or unloaded from vessels owned and operated
by the lessee," the whole of a shed known as St. Gabriel Shed No. 1
and hereafter referred to as " the shed ". The shed occupied the greater
part of the said piece of land. The company was also granted " the
right and privilege to construct, maintain and use, at its own cost and
expense and over and/or across the said land, along the whole length
of the southerly face of the said shed, a loading platform approximately
fourteen feet in width, and a canopy extending approximately twenty feet
beyond the southerly edge of the said platform." Between the land
demised to the company and the St. Gabriel Basin No. 2 there lay a
strip of land 30 feet in width. The term of the lease was 12 years from
1st May, 1940, and the rent was over $12,000 per annum. The lease
was expressed to be " made and executed upon and subject to the
covenants, provisoes, conditions and reservations hereinafter set forth
and contained, and that the same and every of them, representing and
expressing the exact intention of the parties, are to be strictly observed,
performed and complied with namely :—". Then follow a number of
clauses some of which must be set out, as the decision of this appeal
ultimately turns upon the construction of clauses 7 and 17, and these
two clauses must be considered in the light of the lease read as a
whole. The more important clauses are as follows :—

" 1. That the Lessee will pay all rental herein reserved at the time
and in the manner in these Presents set forth, without any abatement
or deduction whatever.

.    .    .    .    .    .    .    .    .    .    .

5. That the Lessor, His Servants or agents, shall at all times and
for all purposes, have full and free access to any and every part
of the said land, the said shed and the said platform.

6. That the said land shall be used for purposes in connection with
the Lessee's business, only, and for no other purpose or purposes
whatever.

7. That the Lessee shall not have any claim or demand against
the Lessor for detriment, damage or injury of any nature to the
said land, the said shed, the said platform and the said canopy,
or to any motor or other vehicles, materials, supplies, goods, articles,
effects or things at any time brought, placed, made or being upon
the said land, the said platform or in the said shed.

8. That the Lessor will, at all times during the currency of this
Lease, at His own cost and expense, maintain the said shed, exclusive
of the said platform and the said canopy.

9. That the Lessee shall, in addition to the payment of the yearly
rental hereunder, at i's own sole cost and expense, insure, con-
currently with the execution of this Lease or as soon thereafter as
possible, and thereafter keep insured during the currency of this
Lease with an insurance company or companies satisfactory to the
Minister of Transport the said shed against fire and other casualty
in the sum of FORTY-EIGHT THOUSAND DOLLARS ($48,000.00)
.    .    .    .    .

10. That the Lessee shall before constructing or erecting the said
platform, the said canopy or other structures, including alterations
to the said shed, on the said land, submit to the General Super-
intendent plans or drawings showing the location and design and
nature of construction of the said platform, the said canopy or
such structures, and obtain his approval of such plans or drawings,
and shall construct or erect the said platform, the said canopy or
such structures on the location and in accordance with the designs
as shown on the plans and drawings approved by the General
Superintendent, and thereafter maintain the said platform, the said

3

canopy or such structures in accordance with the designs respecting the same, and shall carry on the work of such construction and maintenance of the said platform, the said canopy and such structures at its own cost and expense and under the control and direction of the General Superintendent and to his entire satisfaction.

12. That it is distinctly understood and agreed that this Lease is granted subject to the condition that the said platform and the said canopy shall forthwith, upon termination of this Lease in any manner, except as provided for in Clause 18 hereof, be and become vested in title in the Lessor without any payment of compensation to the Lessee in respect of the said platform and the said canopy.

16. That the parcel or tract of land, thirty (30) feet in width, situated between St. Gabriel Basin No. 2 and the said land may be used by the Lessee in common with the public generally, it being understood and agreed, however, that the Lessee shall, in the discretion of the Superintending Engineer and in accordance with his direction, have preference in the use thereof.

17. That the Lessee shall at all times indemnify and save harmless the Lessor from and against all claims and demands, loss, costs, damages, actions, suits or other proceedings by whomsoever made, brought or prosecuted, in any manner based upon, occasioned by or attributable to the execution of these Presents, or any action taken or things done or maintained by virtue hereof, or the exercise in any manner of rights arising hereunder."

Pursuant to the lease the company took possession of the leased premises and continued to occupy them at all times material to the present litigation. A few days prior to 5th May, 1944, the Department of Transport in Montreal, representing the Crown, received a request from the company to effect certain minor repairs to the premises, including the doors of the shed. An inspection was made and the work undertaken by the employees of the Department of Transport almost immediately.

At this time the shed contained a large variety of merchandise awaiting shipment, other goods stored there by third parties and a quantity of equipment belonging to the company. A number of trucks and motor vehicles were on the wharf delivering or about to deliver further goods for transport.

The shed was constructed of corrugated iron on a steel frame and the shipping doors were hung on hinges bolted to the uprights of the frame. These uprights were in the form of steel " H-Beams ", the flanges of which were one-quarter to three-eighths of an inch thick.

The Crown's employees, having almost completed their work on the afternoon of the 5th May, had removed and straightened the upper hinge of one of the shipping doors which had to be replaced. These hinges had originally been affixed to the " H-Beam " with three-eighths inch bolts. When they came to replace the hinge in question the Crown's employees found that they had no three-eighths inch bolts with them, the smallest size being one-half inch in diameter. They elected to enlarge the three-eighths inch hole in the " H-Beam " so that it would take the half-inch bolt.

Inside the door, immediately opposite and a few feet distant from the " H-Beam " in question were piled a number of bales of cotton waste.

Having decided to enlarge the hole, the Crown's employees proceeded to make use of an oxy-acetylene cutting torch for this purpose. The operation of this torch involved the use of oxygen and acetylene gas which are combined in a cutting-head under pressure and, when ignited, produce extremely high temperatures of from 5,500° to 6,300° Fahrenheit. The flame of the torch, at such temperatures, will cut through steel.

14133

A 2

4

The use of such a torch in the vicinity of inflammable material is dangerous, since, apart from the heat of the torch itself, the operation of cutting the metal necessarily produces a shower of sparks or particles of molten metal which fly off at a tangent from the point of cutting. The Crown's employees directed the torch from the exterior into the interior of the shed. For the purpose of preventing sparks from entering the shed, they placed a board on the inside across the opening of the "H-Beam". This board was some three feet shorter than the beam and did not fit closely at the top because it was cut square whereas the roof of the shed sloped. There were accordingly openings at both the top and bottom of the beam through which sparks might escape. One of the workmen was stationed on the top of the bales of cotton waste and a pail of water was placed inside the shed.

The operation of enlarging the hole involved using the torch for about three or four minutes. Sparks escaped into the shed. The bales of cotton waste caught fire and the flames spread rapidly to the other contents of the shed and consumed the whole. Hence the claims, already mentioned, by the company and others against the Crown.

Angers, J., after hearing the evidence, found as a fact that the fire and resulting damage were caused by the gross negligence of the Crown's servants while acting within the scope of their duties or employment. The Crown had denied negligence, and had pleaded that the company's claim was in any event barred by the provisions of clause 7 of the lease. In Third Party proceedings the Crown relied upon clause 17 of the lease as giving rise to a right of indemnity from the company against the claims of the other five suppliants.

The learned trial judge did not express any view as to the meaning of clauses 7 and 17 of the lease. It was not necessary for him to do so because, basing himself on the law of Quebec which he reviewed exhaustively, he found that no clause would extend to relieve the Crown of liability for damages resulting from the gross negligence (*faute lourde*) of its servants. He accordingly refused to regard clause 7 as a bar to the company's action or to hold that clause 17 gave the Crown a right to indemnity in the other five cases. In the result he condemned the Crown to pay to the company and to the other five suppliants the damages respectively claimed by them, and he dismissed the Third Party proceedings brought by the Crown against the company. The amount of the damages was agreed and is not in issue.

The Supreme Court of Canada (Rinfret, C.J., and Rand, Kellock, Estey, Locke, Cartwright and Fauteux, JJ.) by a majority of six to one (Locke, J., dissenting) reversed the trial judge in the company's own case and unanimously reversed the trial judge in the cases of the other five suppliants in so far as the Third Party proceedings of the Crown against the company were concerned.

The Supreme Court concurred in the finding of the trial judge that the Crown's servants were negligent, but declined to hold that such negligence amounted to gross negligence (*faute lourde*). On the interpretation which they placed upon clauses 7 (Locke, J., dissenting) and 17 of the lease, they held that such clauses must be read as barring the company's action and as entitling the Crown to indemnity in the other actions. They accordingly dismissed the company's petition, confirmed the judgments maintaining the petitions in the five other cases, and condemned the company to indemnify the Crown in respect thereof.

In view of the findings of the Supreme Court, the Crown does not now seek to deny that its servants were negligent but contends that their negligence was not gross negligence. Thus the issues arising upon this appeal are whether the Supreme Court rightly construed clauses 7 and 17 of the lease, whether the Crown's servants were guilty of gross negligence and if so whether, by the law of Quebec, clauses stipulating immunity from or limitation of liability for the gross negligence of one of the contracting parties or his servants, or indemnity against such

liability, are illegal and void. Counsel for the company conceded that such clauses were legal and effective if they applied only to negligence which did not amount to *faute lourde*. He opened the appeal by submitting that even if the negligence of the Crown's servants did not amount to "*faute lourde*", on the true construction of clauses 7 and 17 of the lease clause 7 afforded no answer to the company's claim against the Crown, and clause 17 did not entitle the Crown to the indemnity claimed in the Third Party proceedings. As this submission, if successful, would dispose of the appeal, their Lordships thought it well to hear it argued fully before hearing argument upon the other issues in the case.

In considering this question of construction their Lordships have had in mind Articles 1013 to 1021 of the Civil Code of Lower Canada and also the special principles which are applicable to clauses which purport to exempt one party to a contract from liability. These principles were stated by Lord Greene, M.R., in *Alderslade* v. *Hendon Laundry Limited*, 1945, 1 K.B. 189 at page 192 as follows :—

"Where the head of damage in respect of which limitation of liability is sought to be imposed by such a clause is one which rests on negligence and nothing else, the clause must be construed as extending to that head of damage, because if it were not so construed it would lack subject matter. Where, on the other hand, the head of damage may be based on some ground other than that of negligence the general principle is that the clause must be confined in it application to loss occurring through that other cause to the exclusion of loss arising through negligence. The reason is that if a contracting party wishes in such a case to limit his liability in respect of negligence, he must do so in clear terms in the absence of which the clause is construed as relating to a liability not based on negligence."

It appears to their Lordships that none of the learned Judges of the Supreme Court regarded this passage as being in any way in conflict with the law of Lower Canada, and Kellock, J., observed :—

"It is well settled that a clause of this nature is not to be construed as extending to protect the person in whose favour it is made from the consequences of the negligence of his own servants unless there is express language to that effect or unless the clause can have no operation except as applied to such a case."

Their Lordships think that the duty of a court in approaching the consideration of such clauses may be summarised as follows :—

(1) If the clause contains language which expressly exempts the person in whose favour it is made (hereafter called "the *proferens*") from the consequence of the negligence of his own servants, effect must be given to that provision. Any doubts which existed as to whether this was the law in the Province of Quebec were removed by the decision of the Supreme Court of Canada in *The Glengoil Steamship Company* v. *Pilkington*, 28 S.C.R. 146.

(2) If there is no express reference to negligence, the Court must consider whether the words used are wide enough, in their ordinary meaning, to cover negligence on the part of the servants of the *proferens*. If a doubt arises at this point, it must be resolved against the *proferens* in accordance with Article 1019 of the Civil Code of Lower Canada : "In cases of doubt, the contract is interpreted against him who has stipulated and in favour of him who has contracted the obligation."

(3) If the words used are wide enough for the above purpose, the Court must then consider whether "the head of damage may be based on some ground other than that of negligence" to quote again Lord Greene in the *Alderslade* case. The "other ground" must not be so fanciful or remote that the *proferens* cannot be supposed to have desired protection against it ; but subject to this qualification, which is no doubt to be implied from Lord Greene's words, the

14133                                                                                          A 3

6

existence of a possible head of damage other than that of negligence is fatal to the *proferens* even if the words used are *prima facie* wide enough to cover negligence on the part of his servants.

With these principles in mind, their Lordships turn to a consideration of clause 7, and they will first consider its language apart from the contents of clause 8 which immediately follows it. The claim of the company in the present case is " a claim . . . against the lessor for damage to . . . goods . . . being . . . in the said shed ", and would therefore *prima facie* be barred by clause 7. It is, however, a claim for damage admittedly caused by the negligence of the Crown's servants. Their Lordships must therefore consider the third question stated above, and in considering this question it is necessary to bear in mind that the only liability of the Crown in the Province of Quebec in respect of claims arising *ex delicto* is based upon section 19 (c) of the Exchequer Court Act R.S.C. 1927 Chap. 34 as amended. That section is in the following terms : —

> " The Exchequer Court shall have the exclusive jurisdiction to hear and determine the following matters : —
>
>     (a) . . . . .
>
>     (b) . . . . .
>
>     (c) Every claim against the Crown arising out of any death or injury to the person or property resulting from negligence of any officer or servant of the Crown while acting within the scope of his duties or employment."

Thus the field for claims against the Crown, not based upon negligence and coming within clause 7, is not a very wide one, but Counsel for the company has given the following instances of such claims : —

1. Claims under Article 1614 of the Civil Code for " defects or faults in the thing leased which prevent or diminish its use, whether known to the lessor or not ".

There might be, says Counsel, a defect in the construction of the roof of the shed, not known to the Crown, and as a result of this defect the roof might fall down and injure chattels in the shed which belonged to the company. A claim for damage to these chattels resulting from this breach of the lessor's obligation under Article 1614 is not a claim based on negligence and it would be barred by clause 7.

2. Claims under Article 1612 (3) of the Civil Code.

Suppose, for example, says Counsel, that the Crown were to authorise a third party to carry out some operation on adjacent land which caused damage to the shed. In that event, again, the company would have a claim for damages, not based on negligence, which would be barred by clause 7.

3. Claims for a reduction of the rent, by the joint operation of Articles 1617 and 1660 of the Civil Code, if, for instance, a trespasser caused damage to the shed by setting part of it on fire, and the lessee's right of action for damages against the trespasser proved to be ineffectual.

Counsel for the Crown contended that a claim for a reduction of the rent would not fall within clause 7, but their Lordships think that such a claim, although it would not be a claim for " damages " might fairly be described as " a demand against the lessor for . . . damage . . . of any nature . . . to the said shed " within the meaning of clause 7.

It was contended on behalf of the Crown that these instances of possible claims for damages were fanciful and remote, and would not have been within the contemplation of the parties when the terms of the lease were agreed. No doubt there may be cases in which it may be difficult to draw the line. In the present case, however, their Lordships are not prepared to assume that the obligations imposed upon

7

lessors by the Civil Code were not in the minds of the parties. They think that the Crown may well have desired to protect itself from claims for damage arising out of any breach of these obligations, and yet may not have intended to go so far as to stipulate for protection from claims for damage resulting from the negligence of its servants.

So far, clause 7 has been considered apart from clause 8, but these two clauses must be read together, according to the ordinary principles of construction. So reading them, it appears to their Lordships most unlikely that clause 7 was intended to protect the Crown from claims for damage resulting from the negligence of its servants in carrying out the very obligations which were imposed upon the Crown by clause 8. It is difficult to imagine the Crown saying to the company, when the lease was being negotiated, " Notwithstanding that the Crown agrees to maintain the shed, at its own expense, throughout the term of the lease and notwithstanding that such an agreement implies an obligation to use due care in its performance, if the Crown's servants set about the work of repair in such a negligent manner that the shed and all the goods therein are destroyed, you are to have no claim for damages against the Crown " and if the Crown had made such a suggestion, it seems unlikely that the company would have accepted it.

Counsel for the Crown submitted that inconsistency between clauses 7 and 8 would be avoided if the former clause were read as barring claims for damages for non-feasance or misfeasance under clause 8, but leaving open to the company any claims for specific performance which it might make as a result of non-feasance, under Article 1641 (1) and (2) of the Civil Code. This is not an impossible construction of clause 7, but it appears to their Lordships to be a somewhat strained and artificial construction. Counsel for the Crown also relied on the fact that under clause 9 the company was bound to insure the shed, as an indication that the Crown did not intend to be liable for any damage to the shed, howsoever such damage might arise. This argument is not without force, as applied to the shed, but clause 9 makes no reference to goods within the shed.

Their Lordships will shortly consider how far the construction of clause 7 is affected by clause 17, for they entirely agree with the view expressed by the majority of the Supreme Court as to the close inter-relation of these two clauses. If, however, clause 7 were to be considered apart from clause 17, their Lordships would conclude that, even if the case is put at its highest in favour of the Crown, the Crown has failed to limit its liability in respect of negligence in clear terms. They would therefore decide against the Crown in accordance with the principles already stated.

Their Lordships now turn to clause 17, and observe at the outset that if the Crown's contention as to this clause is correct, it imposes a very remarkable and burdensome obligation on the company. However widespread may be the destruction caused by the negligence of the Crown's servants in carrying out the Crown's obligations under clause 8, the whole of the damage must be paid for by the company. In the present case the claims are heavy, and it is obvious that the damage caused by a fire such as this might be even greater. Such a liability for the negligence of others must surely be imposed by very clear words, if it is to be imposed at all.

The opening words of clause 17 are certainly very wide:

> " That the Lessee shall at all times indemnify and save harmless the Lessor from and against all claims and demands, loss, costs, damages, actions, suits or other proceedings by whomsoever made, brought or prosecuted."

They are, however, considerably narrowed in their scope by the words which follow. These words limit the application of the clause to claims, etc., " in any manner based upon, occasioned by or attributable to " any one of three specified matters, namely, (1) " The execution of these presents ", (2) " Any action taken or things done or maintained by virtue hereof ", (3) " The exercise in any manner of rights arising hereunder ".

8

Are these words, in their ordinary meaning, wide enough to cover the negligent act of the Crown's servants, which caused the damage now under consideration?

The learned Chief Justice appears to have placed some reliance on the words "occasioned by or attributable to the execution of these Presents", treating "execution" as synonymous with "performance", but their Lordships are unable to take that view. They think that the words "execution of these Presents" refer only to the signing and sealing of the lease. This is the usual meaning of these words, and the word "executed" is used in the same sense at the end of the document, where it is stated that "The Lessee has executed these Presents". Their Lordships think that by this phrase the Crown must have desired to protect itself against third parties claiming that they had contractual rights against the Crown which had been violated by the execution of the lease and the resulting grant of various rights to the company.

The remaining part of clause 17 gives rise to questions of great difficulty. Counsel for the Crown submitted that the negligent act of the Crown's servants was covered by the words "any action taken or things done . . . by virtue hereof". They contended that the words "by virtue of" may fairly be construed as meaning "in consequence of" and that the act of the Crown's servants in enlarging the hole was done in consequence of the lease, none the less so because it was negligently done. They pointed out, quite rightly, that the intent of the clause was to protect the Crown against claims by third parties and submitted (a) that the only acts which could involve claims against the Crown by third parties would be acts of the Crown's servants, and therefore the words in question must refer to, or at least include, acts of the Crown's servants; and (b) that the acts contemplated must be negligent acts, otherwise they would give rise to no liability to third parties.

Counsel for the company contended that this argument involved a strained and unnatural construction of the words in question and that the phrase "any action taken or things done by virtue hereof" would naturally refer to the doing of an act in pursuance of some right or privilege conferred by the lease rather than to the doing of an act in performance of some obligation imposed by the lease. They further contended that even if the words in question could cover an act properly done in performance of an obligation imposed by the lease, they could not extend to cover an act negligently done in the course of carrying out such an obligation. They submitted the following argument on the construction of clause 17. By the phrase "occasioned by or attributable to the execution of these Presents" the Crown was seeking to protect itself against the possible claims already mentioned, while by the rest of the clause the Crown was seeking to protect itself against possible liability to third parties occasioned by or attributable to acts of the company. The reference to the execution of the lease is closely linked up with the words which follow it. In executing the lease the Crown was conferring a large number of rights and privileges upon the company. The party who is likely to "take actions" or "do things" or "exercise rights" under the lease is the company. By clause 17 the Crown is saying, in effect to the company "Nothing that you do under the lease is to involve the Crown in any liability. Third Parties may consider that they have a claim against the Crown by reason of the Crown's act in granting to you the right of occupying the shed and by reason of acts done by you with the sanction of the Crown such as the erection of the loading platform and canopy in accordance with plans approved by the Crown under clause 10 of the lease, or the exercise of "preferential" rights under clause 16. If any such claim is made against the Crown, and succeeds, you must indemnify the Crown". In support of this argument counsel referred to the latter part of Article 1618 of the Civil Code as showing that the Crown might become a party to an action by a third party claiming some "right in or upon the thing leased".

9

The choice between these two contentions is not an easy one, but their Lordships have come to the conclusion that the company's contention is to be preferred, for the following reasons. First, it gives the more natural construction to the words " any action done by virtue hereof ". It is at least doubtful whether these words can be applied to a negligent act done in the course of carrying out an obligation. Secondly, even if the words are wide enough to include such a negligent act, the principle laid down in the *Alderslade* case must be applied and their Lordships are inclined to think that on the company's construction, " the head of damage may be based on some ground other than that of negligence ". although the possible grounds are somewhat limited in extent. Thirdly, their Lordships think it is manifest that the meaning and effect of clause 17 are far from clear, and if this is so the Crown has failed to impose in clear terms the burdensome obligation which has already been described. There would have been no difficulty in inserting an express reference to negligence of the Crown's servants, in clauses 7 and 17, if these clauses had been intended to protect the Crown against the consequences of such negligence.

If their Lordships had agreed with the Supreme Court that clause 17 extended so far as to cover negligent acts of the Crown's servants, they might well have had to reconsider the provisional view already expressed as to clause 7, but as they have arrived at the contrary opinion, their provisional view as to clause 7, so far from being disturbed, is strengthened. It would seem unlikely that if negligent acts by the Crown's servants are outside the scope of one clause, they are within the scope of the other.

The result is that, after hearing an able argument as to the construction of the lease from both sides, their Lordships find that the Crown has failed to establish either its defence under clause 7 or its claim for indemnity under clause 17. This being so, no other question arises for decision on this appeal.

Their Lordships will humbly advise His Majesty that this appeal should be allowed, the Orders of the Supreme Court in the petition of the company against the Crown and in the five Third Party proceedings should be set aside, and the Orders of Anger, J. restored. The Crown must pay the company's costs in each of these six petitions, here and in the Courts of Canada.

(14133)   Wt. 8137—69   125   2/52   D.L./P1/3

# In the Privy Council

CANADA STEAMSHIP LINES LIMITED

_v._

THE KING

Delivered by
LORD MORTON OF HENRYTON

Printed by Her Majesty's Stationery Office Press,
Drury Lane, W.C.2.
1952



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# England and Wales Court of Appeal (Civil Division) Decisions

---

**You are here:** BAILII >> Databases >> England and Wales Court of Appeal (Civil Division) Decisions >> Capita (Banstead 2011) Ltd & Anor v RFIB Group Ltd [2015] EWCA Civ 1310 (21 December 2015)
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2015/1310.html*
Cite as: [2016] PNLR 17, [2016] QB 835, [2016] WLR(D) 61, [2016] 2 BCLC 32, [2015] EWCA Civ 1310, [2016] 2 WLR 1429

---

[New search] [Printable RTF version] [View ICLR summary: [2016] WLR(D) 61] [Buy ICLR report: [2016] QB 835] [Buy ICLR report: [2016] 2 WLR 1429] [Help]

---

**Neutral Citation Number: [2015] EWCA Civ 1310**

Case No: A3/2014/3542

IN THE COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
THE HONOURABLE MR JUSTICE POPPLEWELL

Royal Courts of Justice
Strand, London, WC2A 2LL

21/12/2015

B e f o r e :

**THE RIGHT HONOURABLE LORD JUSTICE LONGMORE**
**THE RIGHT HONOURABLE LADY JUSTICE GLOSTER DBE**
**and**
**THE HONOURABLE MR JUSTICE HENDERSON**

_____

Between:

## CAPITA (BANSTEAD 2011) LIMITED (FORMERLY KNOWN AS FPS GROUP LTD & ANR

**Appellants**

## - and -

## RFIB GROUP LIMITED

**Respondent**

————————————

**Mr Adam Tolley QC (instructed by Plexus Law) for the Appellants**
**Mr Neil Kitchener QC & Mr Laurence Emmett (instructed by Nabarro LLP) for the Respondent**
**Hearing dates: 21st & 22nd October 2015**

————————————

### HTML VERSION OF JUDGMENT

————————————

Crown Copyright ©

**Lord Justice Longmore:**

**Introduction**

1. This appeal relates to a claim under an indemnity clause contained in a share purchase agreement. It raises the question whether, if the seller of shares in a company undertakes to indemnify the purchaser in respect of liabilities which the purchaser may incur as a result of negligently performed services provided by the company to a recipient before the transfer date of the shares ("the Transfer Date") and the company provides services to a customer both before and after the Transfer Date, it is appropriate, as between the seller and the purchaser of the shares, to apportion the liability incurred to that customer by reference to the time when that liability is incurred or by reference to some other criteria and, if so, what.

2. In the present case the company (by one of its employees Mr Le Cras) negligently provided pension services and advice to the Trustees ("the Trustees") of the Queen Elizabeth's Foundation for Disabled People Pension and Assurance Scheme ("the Scheme") and to the principal employer under the Scheme, the Queen Elizabeth's Foundation for Disabled People ("QEF"), by failing to inform the Trustees and QEF that amendments to the pension plan for the Scheme's members could only be made by the Trustees' execution of a formal document and that, save in a small respect, any amendment could not be retrospective. He later represented to the Trustees and QEF that the appropriate amendments were in place. Apart from the later representations, these failures first occurred before the Transfer Date but their effects continued after the Transfer Date. On Popplewell J's view of the matter, the failures were a continuing breach of contract since the company had a general retainer and duty to assist in ensuring that the Trustees' instructions were implemented. He concluded that some of the loss incurred by the Scheme and thus some of the liability arose after the Transfer Date and apportioned the claim to indemnity brought by the purchaser against the seller accordingly. The question in this appeal is whether he was right.

**Facts**

3. RFIB Group Ltd ("RFIB"), the original defendant and respondent to this appeal, were the sellers of the shares in Capita Hartshead Benefit Consultants ("CHBC") who, under their previous name of Robert Fleming Benefit Consultants Ltd ("RFBC"), provided pension management and advisory services to QEF. The contract pursuant to which these services were provided was made in September 1995 and called a Services and Fee Agreement. For an agreed sum of £7500 per annum, increasing annually by reference to the national Average Earnings Index for employees in the banking, finance and insurance

sector, RFBC were to supply the services contained in Section 2.1 of the agreement. Section 2.2 set out non-core services for which fees would be assessed and paid on a quarterly basis in accordance with RFBC's standard scales. Additional services could be requested and would then be undertaken at extra cost (Section 1.3). Section 2 of the agreement specified what it called the "consultancy service" as including

> "<u>Core Services</u>
>
> 2.1.1 <u>Advice & Guidance on Scheme Design & Legislative Trends</u>
>
> - Guidance and recommendations about the design of the Scheme, benefit structure, eligibility criteria, and the specific needs of the Scheme membership.
>
> - Providing information and recommendations about social and political trends affecting the provision of pensions and employee benefits.
>
> - Supplying information and tailored advice regarding the effect and specification of all relevant legislation, regulations and practice of the Pension Scheme Office of the Inland Revenue, the Occupational Pensions Board and the Department of Social Security.
>
> …
>
> 2.1.6 <u>Trusteeship Advice</u>
>
> - Offering advice, as necessary to the Trustees on their main duties and discretionary powers.
>
> - Assisting the Trustees in the conduct of their duties.
>
> 2.1.7 <u>The Pension Bill/Act</u>
>
> - Advice, guidance and recommendations on the effects of the Pensions Bill …."

4. The judge, towards the end of paragraph 11 of his judgment, described this retainer as including "a duty to assist in maintaining a state of affairs, namely that the Scheme in force from time to time should reflect the decisions of the Trustees" of the Scheme. This is not explicitly stated in the Services Agreement and I am not clear how the judge came to describe it in those terms. To the extent that he makes it sound as if there was an absolute duty to assist in maintaining a particular state of affairs, I do not think he can be correct but it may be that his shorthand should be read to mean that RFBC/CHBC were under a duty to comply with the instructions of the Trustees so far as they were lawful and were obliged to take care in and about the implementation of those instructions. That would, I think, be a fair summary of RFIB's duties so far as relevant for the purpose of determining the issues in this appeal and is, in any event, much the same as the duty stated earlier in paragraph 11 of the judgment namely to advise and assist the Trustees and QEF and in particular to consider the implementation of the proposed amendments in the context of dealing with the Trustees. It is difficult to spell even this duty

from the Core Services to be performed by RFIB but it could perhaps be said to derive from a combination of Sections 2.1.6 and 2.1.7. Otherwise it would have to be part of the additional services which QEF or the Trustees were entitled to request under Section 1.3.

5. By a share purchase agreement of 28th April 2004 RFIB sold the entire share capital of CHBC to Capita (Banstead 2011) Ltd ("Capita"). The Transfer Date under that agreement was 30th April 2004; the agreement also provided:-

> "5.8 The Seller undertakes to indemnify and keep indemnified the Buyer on behalf of itself and the Company … from any liabilities costs claims demands or expenses which any of them may suffer or incur arising directly or indirectly from …
>
> > 5.8.5 any services or products supplied by the Company … or any advice provided by the Company (or any of its employees or agents) prior to the Transfer Date."

6. The claim by QEF and the Trustees was set out in a Protocol letter from their solicitors of 16th April 2010. The gist of the QEF Claim was that it and its trustees were advised on all aspects of the day-to-day management of the Scheme by CHBC. CHBC's employee, Anthony Le Cras, was the consultant dealing with QEF between 2000 and 2006. The Trustees, in consultation with CHBC, acting through Mr Le Cras, decided to make various amendments to the Scheme with the objective of reducing liabilities to members and therefore the cost of funding those liabilities. Those amendments were announced to members and ought to have taken effect on various dates between 6th April 2000 and 1st April 2004. The amendments and the dates on which they ought to have taken effect were:

> i) The introduction of a cap of the retail price index (with a maximum of 5%) for increases in pension benefits, with effect from 6th April 2000 (announced March 2000);
>
> ii) The introduction of the same cap for revaluation of deferred pensions, with effect from 6th April 2000 (announced January 2001);
>
> iii) A reduction of the annual accrual rate from 1/60th to 1/80th, with effect from 1st July 2001;
>
> iv) A reduction of dependants' pensions on a member's death from ? to ½ with effect from 1st April 2004 (announced March 2004); and
>
> v) An increase in the active members' contribution rate from 5% to 7%, with effect from 1st April 2004 (announced March 2004).

7. Formal amendments to the rules of the Scheme, signed by the Trustees, were required in order to implement the proposed changes, so that the mere announcements issued to the members of the Scheme were legally ineffective to achieve their purpose. CHBC was negligent and in breach of contract in failing to ensure that the amendments were made. In addition, from April 2004 (if not earlier) CHBC, acting through Mr Le Cras, came to appreciate that formal amendments to the Scheme rules were required, so that, in making subsequent representations that the amendments were in place, he was said to be guilty of deceit or, at the very least, negligent misrepresentation. The failure to make the changes in the required manner was only appreciated by QEF in October 2007 and amendments to

the Scheme rules were effected on 30th July 2008. Because of the effect of s. 67 of the Pensions Act 1995, these changes could only be made prospectively, save for the increase in contributions from 5% to 7%. Save in the latter respect, as a result of CHBC's wrongdoing, the liabilities of the Scheme between 1st April 2000 and 30th July 2008 were substantially greater than would have been the case if the required amendments to the rules of the Scheme had been properly made in a timely fashion. This had in turn increased the cost of funding the Scheme. The amount was estimated at £4.2 million. In addition approximately £88,000 was claimed in respect of costs. QEF's and the Trustees' claim against CHBC was settled by mediation for £3,850,000, a sum which is now agreed to have been a reasonable settlement. It is that sum together with costs which Capita and CHBC claimed to recover from RFIB in the present proceedings.

8. The judge held that, by the Transfer Date, 30th April 2004, CHBC had been in breach of contract and duty in respect of all the amendments in failing to ensure that they were effectively made by a formal amendment to the Scheme rules prior to the date on which they were intended to have effect i.e. 6th April 2000, 1st July 2001 and 1st April 2004 respectively. He further held that CHBC was also in continuing breach of duty in this respect from day to day throughout the period from the Transfer Date to December 2007.

9. The misrepresentation claim was based on the information acquired by Mr Le Cras in the course of correspondence between Mr Le Cras and Burges Salmon, the solicitors acting for QEF and/or the Trustees and/or CHBC. By letter of 14th April 2004, Burges Salmon had advised that the 2004 amendments (which at that stage were the only ones they had been asked to include in a deed of amendment to the Scheme rules) could not become effective before the deed of amendment was signed because of the effect of section 67 of the Pensions Act 1995. On 22nd April 2004 Mr Le Cras wrote to Burges Salmon making it clear that he wanted the deed of amendment to include the March 2000 and January 2001 amendments and that there had been recent changes to the identity of the Trustees. In Burges Salmon's letter of 10th May 2004 enclosing a draft deed of amendment for approval, they recorded that they had drafted the deed in a form which purported to make the changes retrospective (now including the 2000 and 2001 changes) notwithstanding that they had expressed reservations about the efficacy of that approach in the light of s. 67 of the Pensions Act 1995; and that they had done so on the instructions of Mr Le Cras who had confirmed that the Scheme actuary was prepared to provide a certificate. There was no evidence that the Scheme actuary was prepared to or did provide any such certificate, and it is common ground that he could not properly have done so. The judge said it was strongly arguable that Mr Le Cras must, at least from 10th May 2004, have been aware that the proposed changes had not been effectively made and could only be made effective prospectively by a formal amendment to the Scheme rules (with the exception of the 5% to 7% increase in contributions amendment which Burges Salmon correctly advised could be made retrospectively). In fact he was clearly so aware by 19th April but I do not think it matters. The judge then held (paragraph 12) that Mr Le Cras's first misrepresentation (that the amendments had been made) was made by producing in late 2004 or 2005 an updated version of a guidance booklet issued to members of the Scheme purporting to state the position at September 2004. He described the allegation of deceit as "a strong one".

**The Judgment**

10. On the basis of these facts and in the light of RFIB's argument that misconduct of Mr Le Cras occurred after, as well as before, the Transfer Date the judge referred to the well-known judgment of the Privy Council in Canada Steamship Lines Ltd v R [1952] AC 192, that a clause is not to be construed as

exempting a party to a contract from negligence if there is any other potential basis of liability which falls within its wording. This had been applied to indemnity clauses in <u>Smith v South Wales Switchgear Co Ltd</u> [1978] 1 WLR 165 and later cases had also considered it, in particular, <u>Ailsa Craig Fishing Co Ltd v Malvern Fishing Co Ltd</u> [1983] 1 WLR 964, <u>HIH Casualty and General Insurance Ltd v Chase Manhattan Bank</u> [2003] 1 All ER (Comm) 349 and <u>Lictor Anstalt v Mir Steel UK Ltd</u> [2013] 2 All E.R. (Comm) 54. From these authorities he derived the following principles which I do not understand to be in dispute and have in any event now received the imprimatur of Sir Kim Lewison in The Interpretation of Contracts, (2nd supplement 12.06).

> "1. A clear intention must appear from the words used before the Court will reach the conclusion that one party has agreed to exempt the other from the consequences of his own negligence or indemnify him against losses so caused. The underlying rationale is that clear words are needed because it is inherently improbable that one party should agree to assume responsibility for the consequences of the other's negligence: <u>Smith</u> at p. 168D-E; <u>Ailsa Craig</u> at p.970; <u>HIH</u> at [11], [63]; <u>Lictor</u> at [36].

> 2. The <u>Canada Steamship</u> principles are not to be applied mechanistically and ought to be considered as no more than guidelines; the task is always to ascertain what the parties intended in their particular commercial context in accordance with the established principles of construction: <u>Smith</u> at p. 177; <u>Ailsa Craig</u> at p. 970; <u>HIH</u> at [11], [61]-[63], [116]; <u>Lictor</u> at [35]. They nevertheless form a useful guide to the approach where the commercial context makes it improbable that in the absence of clear words one party would have agreed to assume responsibility for the relevant negligence of the other.

> 3. These principles apply with even greater force to dishonest wrongdoing, because of the inherent improbability of one party assuming responsibility for the consequences of dishonest wrongdoing by the other. The law, on public policy grounds, does not permit a party to exclude liability for the consequences of his own fraud; and if the consequences of fraudulent or dishonest misrepresentation or deceit by his agent are to be excluded, such intention must be expressed in clear and unmistakeable terms on the face of the contract. General words will not serve. The language must be such as will alert a commercial party to the extraordinary bargain he is invited to make because in the absence of words which expressly refer to dishonesty the common assumption is that the parties will act honestly: <u>HIH</u> at [16], [68]-[75], [97]."

11. The judge then reached the following conclusions:-

> i) the clause drew a line between wrongful conduct before and after the Transfer Date; it confined the scope of the indemnity to liabilities or losses whose effective cause was wrongful conduct prior to the Transfer Date;

> ii) the consequences of employees' conduct after the Transfer Date were for the purchaser's account;

> iii) the use of the words "directly or indirectly" required the court to look for the widest link in establishing the causative link between the relevant conduct and the relevant liability or loss incurred by the purchaser such as, for example, loss covered by the second limb of <u>Hadley v Baxendale</u>;

iv) the clause did not however cover conduct by an employee which merely set the background to the loss or could be said to have been causative in the sense of "but for" causation. The conduct must be a real and effective cause of the liability or the loss consequent or the employee's conduct and the claim to which it gave rise;

v) the losses incurred after the Transfer Date had two effective causes in that CHBC was in breach of contract and duty when it failed to make effective amendments to the Scheme rules on or shortly after 6th April 2000, 1st July 2001 and 1st April 2004 and was also in continuing breach of contract and duty after the Transfer Date and liable for later representations founding QEF's claim in deceit. As the judge put it (paragraph 24):-

> "immediately after the Transfer Date, CHBC was in continuing breach of duty which gave rise to the continuing losses on a day to day basis."

vi) since the buyer had contractually assumed the risk of negligent or dishonest conduct by the seller's employees after the Transfer Date, it could not rely on conduct prior to the Transfer Date as a concurrent cause because the losses after the Transfer Date would not have occurred if there had not been negligence and dishonesty after the Transfer Date. By this the judge presumably meant that if, immediately after the Transfer Date, Mr Le Cras had complied with his duty of procuring the Trustees' signature to the proposed amendments there would have been no further loss from that time onwards and the previous losses would have been capped; and

vii) it was therefore appropriate to apportion the totality of the loss incurred by Capita/CHBC as a result of the settlement with QEF between losses incurred before the Transfer Date and losses incurred after the Transfer Date; with expert assistance the judge held that the appropriate apportionment was 50/50.

**The submissions**

12. Mr Adam Tolley QC for Capita and CHBC made three main complaints about the judgment. He submitted:-

i) the entirety of the post-Transfer Date losses was effectively caused by the pre-Transfer Date conduct of Mr Le Cras; the fact that he continued to be negligent and made negligent or deceitful representations was all part of the original breach of contract and duty which occurred before the Transfer Date;

ii) it was inappropriate to talk in terms of "continuing breach of contract or duty" as founding any new liability after the original breach. The concept of a continuing breach occurring "day by day" was artificial and wrong;

iii) if it was appropriate to fasten on any claim for misrepresentation, the relevant representation was made in late 2004 or April 2005 and any apportionment should be recalculated on that basis; and

iv) in any event, any apportionment was wrong because Mr Le Cras's post-Transfer Date was at most a concurrent cause which was not enough to preclude reliance on the

indemnity.

### (1) Irrelevance of post-Transfer Date conduct?

13. I cannot accept that post-Transfer Date conduct cannot be relevant. The judge was, with respect, right to say that the scheme of the indemnity was to allocate losses caused by pre-Transfer Date conduct to the seller and losses caused by post-Transfer Date conduct to the purchaser and that CHBC could not expect to receive an indemnity in respect of loss caused by the negligence or fraud of its own employees in such circumstances. Mr Le Cras continued to be an employee of CHBC after 30th April 2004 and, on any view, CHBC could not expect to recover in respect of losses caused by separate (or fresh) negligence or by deceit after the Transfer Date. (It is true that Capita, the first appellant to the appeal, was not technically Mr Le Cras's employer but Capita (as the holding company of CHBC) and CHBC have to be treated as having a common interest and, in any event, CHBC has been held to have title to pursue the claim, a matter which is no longer challenged). Mr Tolley's argument under this head amounts to saying that the post-Transfer Date losses exclusively arose because of Mr Le Cras's pre-Transfer Date conduct which is the "but for" causation argument; that is an argument which the judge rightly rejected. The true question is whether the post-Transfer Date conduct of Mr Le Cras was indeed a concurrent cause of the post-Transfer Date losses.

### (2) Continuing Breach of Contract or Duty as a concurrent cause?

14. Here the judge's conclusion depends on whether he was right to say that there was a breach of contract or duty every day after the Transfer Date. He held that there was, because Mr Le Cras's conduct fell on what he called the <u>Midland Bank</u> side of the line rather than the <u>Bell v Peter Browne Co</u> or <u>Nouri v Marvi</u> side of the line.

15. The trouble with this is that it is a very elusive line. In <u>Midland Bank Trust Co v Hett Stubbs & Kemp</u> [1979] Ch 384 Oliver J held that a family solicitor was under a continuing duty to take steps to register a son's 10 year option to purchase his father's farm every day after the deed granting the option had been executed until the 10 years had elapsed. This was because (438 D-F) the solicitors had retained the document, opened (but not closed) a file relating to the option and were consulted by the son on the question whether he should exercise the option from time to time between its grant and the time when the option became incapable of exercise because the father had transferred the farm elsewhere. The son's claim against the solicitors was not therefore statute-barred. In <u>Bell v Peter Browne & Co</u> [1990] 2 QB 495 a divorcing husband agreed that the matrimonial house could be transferred to his wife and that, when it was sold, he should have one-sixth of the proceeds to be protected by either a trust deed or a mortgage. He executed a transfer but his solicitors took no steps to prepare or have executed any declaration of trust or mortgage or otherwise register the husband's interest in the house. The wife sold the house and spent the proceeds. The Court of Appeal held that the husband had a single cause of action accruing at the time of the failure to protect his interests not a cause of action accruing day by day thereafter and that his claim against the solicitors was therefore statute-barred. Nicholls LJ distinguished <u>Midland Bank</u> on the basis that, once the divorce proceedings were concluded, the husband and the solicitors had no further contact and the solicitors were thus, as the learned lord justice put it, *functi officio*. It is, however, difficult, with respect, to see that the failure to protect the husband's interest was inherently different from the solicitor's failure to protect the son's interest in <u>Midland Bank</u>. Beldam LJ's judgment can only be understood as saying implicitly that <u>Midland Bank</u> was wrongly decided (see <u>Maharaj v Johnson</u> [2015] PNLR 553 at para 32 per Lord Wilson and para 55 per

Lord Clarke dissenting). Mustill LJ (page 512F) could contemplate the theoretical possibility that a solicitor could have a continuing retainer which could be construed as requiring the solicitor to be constantly on watch for new sources of potential danger and to take immediate steps to nip them in the bud. But he found it impossible to imply such "a strange obligation" from the mundane facts of <u>Bell</u>

> "and equally improbable to suppose that if it did exist the obligation would be broken at any time other than when the mistake should have been discovered and put right: namely straightaway."

This also seems to be saying implicitly that <u>Midland Bank</u> was wrongly decided, unless it could be distinguished from <u>Bell</u> on its facts (as to which Mustill LJ presumably agreed with Nicholls LJ, having expressed his entire agreement with Nicholls LJ's judgment "as regards the breach of contract" at page 511F).

16. <u>Nouri v Marvi</u> [2009] EWCA Civ 1107; [2011] PNLR 100 was a case similar to <u>Bell</u> in which this court held that there were no special facts to suggest that any duty survived completion of the sale of the flat which the solicitors were instructed to undertake.

17. Likewise in <u>Maharaj v Johnson [2015] UKPC 28</u>; [2015] PNLR 553 the Privy Council, on appeal from the Court of Appeal in Trinidad and Tobago, held that solicitors who had acted for the purchasers of a property and accepted a defective title on his behalf were not liable day by day after completion of the transaction to take steps to correct the defect of title, even though it would have been perfectly easy to do so. This was because (para 34) their fees had been paid and their file had been closed. There was no reference in the contract of retainer to any obligation to procure execution of a deed of rectification which in any event could not have been procured without the consent of a third party, unlike the unilateral ability of a solicitor to register an option (as in <u>Midland Bank</u>) or a caution (as in <u>Bell</u>). The judges who formed the majority of the Judicial Committee accepted that Beldam LJ may have been right to regard the facts in <u>Bell</u> as indistinguishable from <u>Midland</u> but declined to decide whether it was <u>Midland Bank</u> or <u>Bell</u> which was correct because they did not regard the case before them as a case of non-feasance; rather it was a case where the contract had been negligently and wrongly performed.

18. Mr Neil Kitchener QC for RFIB submitted that the present case was much more similar to <u>Midland Bank</u> than to <u>Bell</u>, <u>Nouri</u> and <u>Maharaj</u> because there was undoubtedly a continuing retainer with a yearly fee and Mr Le Cras was in correspondence with the solicitors for the Trustees of the Scheme after 30th April 2004 just as much as before. That is, of course, true but that makes it necessary to reach a conclusion on the question whether <u>Midland Bank</u> was correctly decided. If, as the Privy Council recognised in <u>Maharaj</u>, <u>Bell</u> and <u>Midland Bank</u> are inconsistent which is the authority which should be followed?

19. As to that the first question is whether the distinction from <u>Midland Bank</u> referred to in the subsequent cases, namely that there was a continuing retainer because the file had not been closed and further advice was sought and obtained, is a distinction of principle rather than of incidental fact. In my opinion it is a factually incidental distinction rather than a distinction of principle. The obtaining and receiving of advice after a mistake has been made (even if the mistake can be easily rectified) cannot to my mind mean that an obligation to correct one's mistake or negligence continues to accrue and give a fresh cause of action every day after the mistake has been made. As Mustill LJ pointed out in <u>Bell</u>, it would be unusual for there to be an express term in the average retainer contract (or the average pension adviser contract) requiring the adviser to exercise continuing vigilance to discover any

mistakes he may have made and then to busy himself to put them right. Moreover it cannot be right to imply what he called such "a strange obligation" into an apparently usual form of contract.

20. Once it is clear that there is no principled distinction between <u>Midland Bank</u> and <u>Bell</u>, it is clear that our obligation is to follow <u>Bell</u> as a decision of this court. If <u>Midland Bank</u> is to be preferred, that must be for a higher court to decide.

21. I would therefore conclude that despite the existence of a continuing retainer on the part of CHBC, it does not follow that fresh acts of negligence occurred, in respect of each of the amendments, of failing to secure the Trustees' formal adoption of the amendments in a signed document and failing to inform them that the amendments could not be retrospective. These were original acts of negligence which occurred before 30th April 2004 and are accordingly not acts of negligence for which Capita/CHBC are responsible under the indemnity, even though Mr Le Cras made no attempt to repair his omission thereafter.

22. It is, of course, true that all the above cases were decided in the context of arguments about limitation and that courts are not supportive of long and ill-defined periods elapsing before a cause of action has arisen. It is also true that the limitation problem has, since <u>Midland Bank</u> and <u>Bell</u> were decided, been largely avoided in England (though not in Trinidad and Tobago) by section 14A of the Limitation Act 1980 inserted by section 1 of the Latent Damage Act 1986. But the fact that the problem no longer arises so often in England and Wales is no reason for resolving it differently when it does arise in, for example the context of an indemnity clause in share purchase agreements. The judge thought the cases apposite to the problem in this case and, to that extent, I agree with him.

23. But I cannot agree that Mr Le Cras's continuing failure after 30th April 2004 to remedy his previous acts of negligence constituted a fresh cause of action accruing day by day entitling QEF and the Trustees to sue CHBC. Nor, therefore, can I agree that continuing negligence was a cause of the loss suffered by Capita or CHBC, which operated concurrently with the undoubted causative negligence which occurred before the Transfer Date. A failure to correct previous acts of negligence is not, to my mind, concurrently causative of losses caused by the original acts of negligence.

(3) **The representations**

24. The position in relation to Mr Le Cras's later representations is, however, different. These representations undoubtedly did give rise to new causes of action. The judge correctly held that the first operative misrepresentation was the production in late 2004 or 2005 of an updated version of the guidance booklet issued to members of the Scheme (and thus incidentally to the Trustees) purporting to state that the amendments had been effected as at September 2004. The judge was reluctant to make an actual finding of deceit against Mr Le Cras who did not give evidence before him but held, again correctly, that QEF's deceit claim was "strongly arguable"; on any view it was a negligent misrepresentation which would give rise to a fresh cause of action. That representation, whether correctly characterised as negligent or fraudulent, can legitimately be said to be a concurrent cause of the loss which followed after the issue of the guidance booklet. There was a subsequent representation that the amendments had not only been done but had retrospective effect, but the first concurrent cause is the operative concurrent cause for the present purposes.

(4) **Legal relevance of post-Transfer Date conduct as a concurrent cause**

25. The judge concluded that the indemnity could not be relied on, if a concurrent cause of loss was the misconduct of Mr Le Cras after the Transfer Date. He derived considerable support from <u>EE Caledonia Ltd v Orbit Value Co Europe</u> [1994] 1 W.L.R. 221 (Hobhouse J) and 1515 (CA). In that case the operator of the Piper Alpha Platform sought to recover in respect of its liability to the estate of a service engineer, Mr Quinn, who had died in the disastrous fire. Mr Quinn was an employee of the defendant company which had contracted to provide his services. The operator and the services provider had each agreed in a mutual exemption and indemnity clause to assume responsibility for losses consequent on the personal injury or death of its own employees. On the face of it therefore the defendant should have been the party liable for Mr Quinn's death but both Hobhouse J and this court held that, since the operator had itself been negligent, it could not recover from his employer in respect of the amounts which it had had to pay in respect of Mr Quinn's death. It was argued that the operator was not only negligent but also in breach of statutory duty (a strict liability). Even if, therefore, the clause precluded recovery in case of negligence, it should apply to liability for breach of statutory duty. Hobhouse J said (231H):-

> "I consider that the plaintiffs' arguments cannot be accepted. Where there are concurrent causes, each cause is a cause of the consequent event. If the event would have occurred in the absence of a particular fault, that fault is not a cause of the event. Accordingly, it is not correct to say in the present case that the plaintiffs were liable in respect of the death of Mr Quinn because of the breaches of statutory duty; they were liable because of the breaches of statutory duty and the negligence of their servant. It was the concurrent effect of both those causes that gave rise to the death of Mr Quinn and without either of those causes that death would not have occurred and the plaintiffs would not have been liable. Therefore the correct question remains whether the plaintiffs have a right to an indemnity from the defendants in respect of a liability of which a cause was the negligence of one of their servants. It is still necessary to ask whether, as a matter of the construction of the clause, it does cover such liability.

> For the purposes of considering the first question I have already quoted from judgments which state the principle to be applied. The principle is that in the absence of clear words the parties to a contract are not to be taken to have intended that an exemption or indemnity clause should apply to the consequences of a party's negligence. Applying that principle and adopting a correct understanding of causation, the parties to a contract such as that with which I am concerned should not be taken to have intended that a party whose servant has been negligent should be entitled to an exemption or an indemnity although there has also been, as a concurrent cause of the relevant loss, a breach of a strict statutory duty."

In this court Steyn LJ (with whom the other members of this court agreed) said that the relevant clause of the contract:-

> "…should be construed as providing that the indemnities are not applicable if the event in question has been caused not only by a party's breach of statutory duty but also by his negligence. The short point is that the plaintiffs have contractually assumed the risk of their own negligence and cannot seek to avoid the consequences of that assumption of risk by seeking to rely on a breach of statutory duty."

26. I agree with the judge that this authority supports the conclusion that, where there are concurrent

causes of the loss to which an indemnity apparently applies, one of which is negligence (or deliberate action) and the other of which is non-negligent, there can be no recovery because it is not intended that the clause should apply to losses caused by the claimant's negligence. That principle is well-established for indemnity cases; it is similar to the principle applicable in insurance cases that in cases of concurrent loss in which one cause is covered by the policy and one cause is excepted by the policy, the insurer is not liable because, even if the clause granting cover applies, the loss is still caused by the excepted cause, see Wayne Tank v Employers' Liability Assurance [1974] QB 57.
.

**Conclusion**

27. In this respect, therefore, I would uphold the judge but, differing as I do on the question whether failure to correct previous negligence can be a concurrent cause of loss, I would hold that it is only post 31st December 2004 losses that are irrecoverable under the indemnity. That will (or may) require a (no doubt) modest adjustment to the apportionment, there being no appeal against the judge's general reasoning as to how the apportionment is to be achieved. If the parties cannot resolve this question by agreement before hand down of the judgment, I would remit the matter to the judge for re-assessment.

**Lady Justice Gloster:**

28. I agree with Longmore LJ, for the reasons which he sets out in his judgment, that the judge was correct to conclude, on the basis of the construction of clause 5.8.5 of the SPA and by analogy with the decision in EE Caledonia Ltd v Orbit Value Co Europe [1994] 1 W.L.R. 221 and [1994] 1 W.L.R. 1515 (CA), that, where there are concurrent effective causes of the loss, one being wrongdoing before the Transfer Date and the other wrongdoing after that date, the indemnity in the clause under consideration in the present case does not cover losses caused by the latter: see paragraphs 25-28 of the judge's judgment.

29. However, I do not, with respect, agree with Longmore LJ's conclusions:

     i) that the judge was wrong to hold that:

> "CHBC was also in continuing breach of duty in this respect from day-to-day throughout the period from the Transfer Date to December 2007."

> see paragraph 11 of the judge's judgment;

     ii) that:

> "21. ...... despite the existence of a continuing retainer on the part of CHBC, it does not follow that fresh acts of negligence occurred, in respect of each of the amendments, of failing to secure the Trustees' formal adoption of the amendments in a signed document and failing to inform them that the amendments could not be retrospective. These were original acts of negligence which occurred before

30th April 2004 and are accordingly not acts of negligence for which Capita/CHBC are responsible under the indemnity, even though Mr Le Cras made no attempt to repair his omission thereafter.

22. ……

23. But I cannot agree that Mr Le Cras's continuing negligence after 30th April 2004 constituted a fresh cause of action accruing day by day entitling the Trustees and the Foundation to sue CHBC. Nor, therefore, can I agree that that continuing negligence was a cause of the loss suffered by Capita or CHBC, which operated concurrently with the undoubted causative negligence which occurred before the Transfer Date of 30th April 2004. A failure to correct previous acts of negligence is not, to my mind, concurrently causative of losses caused by the original acts of negligence." ;

iii) that there is no distinction of principle between the facts as found by Oliver J (as he then was) in Midland Bank and the facts as found in cases such Bell, Nouri v Marvi and Maharaj v Johnson;

iv) that it is this court's obligation to follow Bell as a decision of this court; and

v) that, accordingly, it is only post 31st December 2004 losses that are irrecoverable under the indemnity (because Mr Le Cras' later representations in late 2004 or 2005 undoubtedly did give rise to new causes of action).

30. The starting point in my view as to whether CHBC was under a continuing contractual obligation, and therefore was in continuing breach of contract or duty after the Transfer Date, must be the nature of CHBC's obligations under the terms of the Services Agreement; see e.g. per Dyson J in New Islington and Hackney Housing Association Ltd v Pollard Thomas & Edwards [2001] P.N.L.R. 20, at para 13[1]; and per Lord Clarke in Maharaj v Johnson [2015] UKPC 28; [2015] PNLR 553, at paragraph 54. The Services Agreement, under which CHBC was to provide wider-ranging consultancy services and advice for the Scheme on an ongoing basis, is a very different type of contract from the solicitors' contracts of retainer under consideration in cases such as Bell, Nouri and Maharaj.

31. In the latter three cases, the solicitors were retained to act effectively in relation to one transaction. By contrast, in the present case, the range of CHBC's duties as defined in the Services Agreement was extremely wide. The fact that it received fees paid quarterly in arrear supports the concept of an ongoing, day to day, retainer. Although Longmore LJ has already set out the more relevant duties, I reproduce Section 2 of the Services Agreement in full to emphasise the point that clearly CHBC was expected to be proactive in the provision of its advice and consultancy services on a rolling basis. Thus, for example, the evidence showed that not only was CHBC required to attend Trustees' meetings four times a year, but it was also required to draft the agendas for such meetings; in other words the

obligation was on CHBC to identify and raise the issues which required discussion, resolution and action.

> "SECTION 2 - CONSULTANCY SERVICE SPECIFICATION
>
> 2.1 **Core Services**
>
> 2.1.1. Advice & Guidance on Scheme Design & Legislative Trends
>
> - Guidance and recommendations about the design of the Scheme, benefit structure, eligibility criteria, and the specific needs of the Scheme membership.
>
> - Providing information and recommendation about social and political trends affecting the provision of pensions and employee benefits.
>
> - Supplying information and tailored advice regarding the effect and specification of all relevant legislation, regulations and practice of the Pension Schemes Office of the Inland Revenue, the Occupational Pensions Board and the Department of Social Security.
>
> 2.1.2. Investment Advice
>
> - Advising the Trustees about the attributes and suitability of the Scheme's investments.
>
> - Monitoring and reporting on the investment performance of the scheme's investment manager.
>
> - Providing advice and recommendations about suitable investment vehicles for members' additional voluntary contributions.
>
> 2.1.3. Scheme Communications
>
> - Issue of a periodical Newsletter to the Trustees providing information upon benefit trends and pensions practice.
>
> 2.1.4. Broking
>
> - Conducting periodic assessments of the competitiveness of the insurance companies with which the Death in Service benefits risks are placed.
>
> - If pensions are to be secured by purchasing annuities, ensuring that competitive rates consistent with security are obtained from the annuity market place.

### 2.1.5. Meetings

- Attendance at meetings with the Trustees or the Employer as necessary.

- Attending up to four formal Trustees meetings per year.

### 2.1.6 Trusteeship Advice

- Offering advice, as necessary, to the Trustees on their main duties and discretionary powers.

- Assisting the Trustees in the conduct of their duties.

### 2.1.7. The Pensions Bill/Act

- Advice, guidance and recommendations on the effects of the Pensions Bill.

## 2.2 **Non-Core Service**

### 2.2.1. Investment Advice

- Assisting the Trustees in the assessment and selection of investment managers.

### 2.2.2. Scheme Communications

- Drafting, designing and arranging the production of:

    a. The Trustees Report and Accounts (to audit stage)

    b. A simplified version of the Trustees Report and Accounts for distribution to members.

    c. Advising the Trustees about the requirements of the Disclosure of Information Regulations.

### 2.2.3. Member Communications and Advice

- At the Trustees request, giving presentations to members and prospective members regarding the benefits provided by the Scheme.

- Attending meetings with individual employees in connection with any matters arising from their membership or prospective membership of the scheme.

- Advising individual members on the exercise of any option

Capita (Banstead 2011) Ltd & Anor v RFIB Group Ltd [2015] EWCA Civ 1310 (21 December 2015)

under the Scheme.

### 2.2.4. Actuarial Advice

- Advice and recommendation for the development of the most appropriate funding strategy.

- Providing assessments of the cost of individual or bulk augmentations of benefits.

- Advice on scheme solvency.

### 2.2.5. Pension Bill/Act

- Preparation of a Scheme "audit" to renew the likely effect of forthcoming legislation.

### 2.2.6. Other Projects

- Non-specified projects that fall outside of the services offered under the core service."

32. In paragraph 5 of his judgment, the judge set out details from the QEF Particulars of Claim. For present purposes the relevant paragraphs are paragraphs 24 to 32 of the Particulars of Claim. They read as follows (all emphasis supplied):

"24. On 6 April 2004 Mr Le Cras instructed Burges Salmon to prepare a deed of amendment in relation to the Scheme to reflect the contribution and benefit changes announced to members in March 2004.

25. On 14 April 2004 Burges Salmon sent a letter to Mr Le Cras advising him, amongst other things, as follows:

"In relation to the effective date for the changes, I should mention at this stage that, in my view, the earliest date these changes can become effective is the date on which the deed of amendment is signed. To give the deed retrospective effect would require the consent of the members under section 67 of the Pensions Act 1995 due to the adverse effect the amendment would have on rights and entitlements accrued in respect of members prior to the date of the amendment..."

26. Thus by 14 April 2004 Mr Le Cras was aware (if he was not so aware before) that (a) intended changes to benefits could not be made by way of announcement to members and (b) the rules could not be amended with retrospective effect so as to adversely affect members' existing rights without raising section 67 issues. Mr Le Cras should have but failed to immediately (on receiving this advice) advise the Trustees of the same and further failed to advise them that the 2000/2001 amendments had not in fact been effected.

27. On 22 April 2004 Mr Le Cras provided Burges Salmon with, amongst other things, copies of the Announcements to Members dated March 2000 and January 2001 together with details of the further changes intended to have been effected in July 2001. He requested that Burges Salmon include such changes in the Deed of Amendment which they were preparing. He further requested that Burges Salmon delete or amend Clause 5 of the then existing draft Deed of Amendment which related to the effective date of the changes.

28. On 10 May 2004 Burges Salmon sent a revised draft deed of amendment to Mr Le Cras for his approval under cover of a letter which stated, amongst other things, as follows:

"...the effective dates for the amendments in the deed are those stipulated in the announcements in accordance with your instructions..,.

...As you know we have expressed reservations about making the amendments retrospective in view of section 67 of the Pensions Act 1995 but you have instructed us to make the amendments retrospective. You have also confirmed that the actuary has said he is prepared to give a certificate. We have drafted the amendments on that basis but express no view as to whether they are legally watertight"

29. **Mr Le Cras again failed to forward the above letter to the Foundation and the Trustees and omitted to inform them of the content of the above advice.**

30. During June and July 2004 Burges Salmon sent four further drafts of the proposed deed of amendment to Mr Le Cras. On the basis of the documentation provided to the Claimants to date, this correspondence culminated in an email dated 5th July 2004 from Burges Salmon to Mr Le Cras confirming that the changes requested by him had been made and requesting his instructions in relation to two outstanding issues (namely whether there were any Dorincourt members and the potential payment period for childrens' pensions).

31. **The Claimants have not to date been provided with any documentation to show that Mr Le Cras responded to the above request for instructions (as he ought to have done). Further the draft Deed was not provided to the Foundation and the Trustees so as to enable the changes to the Scheme to be effected nor were the Foundation and the Trustees provided with any advice in relation to the effect of the failure to execute the Deed. Instead, as set out in paragraphs 32 and 33 below, Mr Le Cras continued to make positive representations to the Foundation, the Trustees and Members that the intended changes had been validly made (when he was expressly aware that this was not the case).**

Material Events after 2004

32. At all material times after July 2004 until he left RFBC's employment, Mr Le Cras **continued to falsely, alternatively negligently, misrepresent that the changes to the Scheme referred to in paragraph 12 above had been validly made**."

33.  The judge analysed Mr Le Cras and CHBC's continuing breach of duty as follows:

"11. **CHBC was also in continuing breach of duty in this respect from day to day throughout the period from the Transfer Date to December 2007. The nature of CHBC's retainer, set out in a Services and Fees Agreement dated 1 July 1995, was that it had a continuing role in advising and assisting the trustees and QEF in relation to the Scheme, which included considering the changes previously made, or purportedly made, and considering the implementation of the amendments in the context of subsequent dealings with the trustees.** This is apparent from the activity which founded QEF's misrepresentation claim, which involved Mr Le Cras adverting to the previous changes for the purposes of subsequent dealings with the trustees and members of the Scheme. **It is also apparent from the activity in the period immediately before and shortly after the Transfer Date.** From the end of March 2004 Mr Le Cras had liaised with Burges Salmon who were instructed to include the April 2004 amendments in a draft deed of amendment to the Scheme rules to be executed by the trustees. By 19 April 2004 his instructions included the drafting of amendments to reflect the 2000 and 2001 changes. Discussions with Burges Salmon continued sporadically until July 2004. The last relevant communication appears to have been a letter of 20 September 2004 from Burges Salmon in which the latter notified Mr Le Cras that the partner previously handling the matter had left the firm and asking whether the draft deed of amendment he had sent by email on 5 July was ready to be finalised or whether any further changes were necessary. This is a case which falls on the Midland Bank side of the line (Midland Bank Trust Co Ltd v Hett Stubbs & Kemp [1979] Ch 384) as distinct from one concerned with a retainer to advise on, or carry out, a single transaction such as that in Bell v Peter Browne Co [1990] 2 QB 495 or Nouri v Marvi [2011] PNLR 7. CHBC's retainer included a duty to assist in maintaining a state of affairs, namely that the scheme in force from time to time should reflect the decisions of the Trustees. As such it involved a continuing duty in the sense explained by Dixon J in Larking v Great Western (Nepean) Gravel Ltd [1940] HCA 37; (1940) 64 CLR 221 at 236:

"If a covenantor undertakes that he will do a definite act and omits to do it within the time allowed for the purpose, he has broken his covenant finally and his continued failure to do the act is nothing but a failure to remedy his past breach and not the commission of any further breach of his covenant. His duty is not considered as persisting and, so to speak, being forever renewed until he actually does that which he promised. On the other hand, if his covenant is to maintain a state or condition of affairs, as, for instance, maintaining a building in repair, keeping the insurance of a life on foot, or

affording a particular kind of lateral or vertical support to a tenement, then a further breach arises in every successive moment of time during which the state or condition is not as promised, during which, to pursue the examples, the building is out of repair, the life uninsured, or the particular support unprovided. The distinction may be difficult of application in a given case but it must be regarded as one depending upon the meaning of the covenant." (Emphasis supplied.)

34. I agree with this analysis. The revised draft deed of amendment, enclosed with Burges Salmon's letter dated 10th May 2004, gave effect for the first time in the drafting process to Mr Le Cras' instructions in his fax dated 22nd April 2004 to state that the effective dates for the relevant amendments were those stipulated in the announcements, as opposed to the date on which the amendment deed was signed. In those circumstances, in my judgment, in May 2004 Mr Le Cras clearly had an ongoing contractual obligation under the Services Agreement to circulate the draft deed to the Trustees for their signature and to inform them of the doubts which Burges Salmon had expressed as to whether the purported retrospective implementation from the announcement dates would be effective. Mr Le Cras' failure to do either of those things, in particular when he was specifically dealing with the draft deeds of amendment in the period May to September 2004, in my view clearly amounted to continuing breaches of his ongoing contractual duties. Indeed at this stage there was an additional breach of duty in that, although he apparently had intended the Trustees to sign the draft deed of amendment, he appears, whether deliberately or negligently, to have decided at some time during the summer months of 2004 not to provide them with the draft at all.

35. This analysis is supported by the approach taken by Dyson J in New Islington and Hackney Housing Association Ltd v Pollard Thomas & Edwards supra in relation to the ongoing obligations (if any) of an architect who had designed the foundations of the building. Dyson J said this at paragraphs 15 to 21:

> "15 But it is necessary to consider the scope of that duty in a little more detail. What does the duty to review the design entail? In what circumstances will an architect be in breach of that duty? I find it convenient to consider an example. Let us suppose that an architect is engaged on the standard RIBA Conditions of Engagement to provide the full service (as PTE were in the present case), including administering a building contract in a standard JCT form of contract. Suppose that he designs the foundations of a building (a large office block), the foundations are constructed in accordance with his design, and several years later, practical completion is achieved. Let us further suppose that the design of the foundations is defective and one which no reasonably competent architect would have produced: in other words, the architect was negligent. There can be no doubt that the architect commits a breach of contract when he completes the design and gives instructions to the contractor to construct the foundations in accordance with it. But in what sense and to what extent is the architect under a duty to review his negligent design once the foundations have been designed and constructed?

> **16 In my view, in the absence of an express term or express instructions, he is not under a duty specifically to review the design of the foundations, unless something occurs to make it necessary, or at least prudent, for a reasonably competent architect to do so. For example, a specific duty**

might arise if, before completion, the inadequacy of the foundations causes the building to show signs of distress; or if the architect reads an article which shows that the materials that he has specified for the foundations are not fit for their purpose; or if he learns from some other source that the design is dangerous. In such circumstances, I am in no doubt that the architect would be under a duty to review the design, and, if necessary, issue variation instructions to the contractor to remedy the problem. But in the absence of some reason such as this, I do not think that an architect who has designed and supervised the construction of foundations is thereafter under an obligation to review his design.

17 I do not accept that in every case where an architect has negligently introduced a defective design into a building, he is also by the same token in breach of a continuing breach of a contractual obligation to review his design. In <u>Midland Bank Trust Co. Ltd v. Hett, Stubbs & Kemp</u> [1979] Ch 384, 503C, Oliver J. said:

"It is not seriously arguable that a solicitor who or whose firm has acted negligently comes under a continuing duty to take care to remind himself of the negligence of which, ex hypothesi, he is unaware."

18 In my view, that observation is as apt to apply to an architect as it is to a solicitor. **The position is quite different where the architect (or solicitor) knows, or ought to know, of his earlier negligence. When that occurs, then he may well be under a contractual obligation to review his earlier performance, and advise his client honestly and competently of his opinion. Whether he is in fact under such a duty when he has actual or constructive knowledge of his earlier breach of contract will depend on whether the contract is still being performed.** If the contract has been discharged (for whatever reason), then the professional person may be under a duty in tort to advise his client of his earlier breach of contract, but it is difficult to see how he can be under any contractual duty to do so.

19 The foundation for the statement in the cases that an architect is under a continuing duty to review his design is the dictum of Sachs L.J. in <u>Brickfield Properties Ltd v Newton</u> [1971] 1 W.L.R. 862, 973F: *522

"The architect is under a continuing duty to check that his design will work in practice and to correct any errors which may emerge. It savours of the ridiculous for the architect to be able to say, as it was here suggested that he could say: 'true, my design was faulty, but, of course, I saw to it that the contractors followed it faithfully' and be enabled on that ground to succeed in the action."

20 But Sachs L.J. was not concerned to explore the scope of an architect's continuing duty to review his design. In my judgment, the duty does not require the architect to review any particular aspect of the design that he has already completed unless he has good reason for so doing. What is a good

reason must be determined objectively, and the standard is set by reference to what a reasonably competent architect would do in the circumstances." (Emphasis supplied.)

36. In that case, applying the appropriate objective standard, Dyson J held that the architect concerned was under no continuing duty. However, in my judgment, on the facts of the present case both the terms of CHBC's continuing obligations under the Services Agreement and the circumstances which had specifically brought the problems of retrospective implementation to Mr Le Cras' attention, made it incumbent upon him, applying an objective standard as discussed by Dyson J, to bring the matter to the Trustees' attention throughout the period from the Transfer Date to the end of 2004. Indeed, his failure to do so, in the light of his knowledge that, on any basis a draft amendment deed was required, and his failure in the summer of 2004 after the Transfer Date even to circulate the draft deed of amendment to the Trustees, has all the hallmarks of dishonest concealment (i.e. deceit), in circumstances where CHBC was clearly under an obligation to inform the Trustees and QEF of the advice which it had received.

37. The judge decided that, when looked at holistically, CHBC's duties included the ongoing obligation to take reasonable steps to ensure that the Scheme in force adequately reflected the Trustees' decisions from time to time and that they were provided with any legal advice which CHBC had obtained and for which they and/or QEF were obliged to pay. I agree. These duties and their breach in relation to the relevant period from the Transfer Date to the end of 2004 were pleaded against CHBC in the QEF Claim. This was not simply the case of a continued failure to remedy a past remediable breach. This was a case where Mr Le Cras had continuing obligations after the Transfer Date and under the Services Agreement to keep the Trustees and QEF advised in relation to the status of the Scheme.

38. Nor do I consider that there is any need for this Court on this occasion to rationalise the difference in approach between <u>Midland Bank</u> on the one hand and <u>Bell</u>, <u>Nouri</u> and <u>Maharaj</u> on the other. That is for a number of reasons.

39. First of all, as I have already said, the terms of the contract in the present case, the nature of the continuing contractual relationship between the parties and the particular circumstances giving rise to the breach are wholly distinguishable on the facts from the "one off" conveyancing transactions, and their aftermath, which formed the subject matter of <u>Midland Bank</u>, <u>Bell</u>, <u>Nouri</u> and <u>Maharaj</u>.

40. Second, I do not accept, if that indeed be the implication of Longmore LJ's judgment, that whether or not a continuing obligation, or a continuing breach of duty, exists as a matter of law in the present case is somehow <i>predicated</i> by the analysis in <u>Bell</u>, <u>Nouri</u> and <u>Maharaj</u> as to whether a continuing obligation exists in the context of a failure to register a conveyancing transaction or as to when a breach occurred in the context of a fraudulent conveyancing transaction. That point was expressly recognised by Nicholls LJ in <u>Bell</u> at 500-501, where he said:

> "It is, of course, true that the solicitor's breach of contract in 1978 did not discharge his obligations. Had the plaintiff learned, a year or two later, of what had happened, he would still have been entitled to go back to his former solicitor and require him to carry out, belatedly, his contractual obligations so far as they could still be performed. For example, lodging a caution. Despite this, it was in 1978 that the breach occurred. Failure thereafter to make good the omission did not constitute a further breach. The position after 1978 was

Capita (Banstead 2011) Ltd & Anor v RFIB Group Ltd [2015] EWCA Civ 1310 (21 December 2015)                     3/30/20, 1:23 PM

simply that, in breach of contract, the solicitor had failed to do what he ought to have done in 1978 and, year after year, that breach remained unremedied. Nor would the position have been different if in, say, 1980 the plaintiff's solicitor had been asked to remedy his breach of contract and he had failed to do so. His failure to make good his existing breach of contract on request would not have constituted a further breach of contract: it would not have set a new six-year limitation period running. Once again, the position would have been simply that the solicitor remained in breach. Nor, finally, is the position any different because, in respect of lodging a caution, the breach remained remediable until 1986 when the house was sold. A remediable breach is just as much a breach of contract when it occurs as an irremediable breach, although the practical consequences are likely to be less serious if the breach comes to light in time to take remedial action. Were the law otherwise, in any of these instances, the effect would be to frustrate the purpose of the statutes of limitation, for it would mean that breaches of contract would never become statute-barred unless the innocent party chose to accept the defaulting party's conduct as a repudiation or, perhaps, performance ceased to be possible.

For completeness I add that the above observations are directed at the normal case where a contract provides for something to be done, and the defaulting party fails to fulfill his contractual obligation in that regard at the time when performance is due under the contract. In such a case there is a single breach of contract. **By way of contrast are the exceptional cases where, on the true construction of the contract, the defaulting party's obligation is a continuing contractual obligation. In such cases the obligation is not breached once and for all, but it is a contractual obligation which arises anew for performance day after day, so that on each successive day there is a fresh breach**. A familiar example of this is the usual form of repairing clause in a tenancy agreement. Non-repair for six years does not result in the repairing obligation becoming statute-barred while the tenancy still subsists. The obligation of the tenant or the landlord to keep the property in repair is broken afresh every day the property is out of repair, as Bramwell B. observed in Spoor v. Green (1874) L.R. 9 Ex. 99, 111." (Emphasis supplied.)

To similar effect was Mustill LJ at page 512 F- 513A where he recognised that a solicitor may indeed have a continuing retainer in appropriate circumstances.

41. Likewise in Carlton v Fulchers [1997] PNLR 337 at 342, Waller LJ said;

"As it seems to me, the passage in Oliver J.'s judgment in Midland Bank v. Hett, Stubbs & Kemp [1979] 1 Ch. 384 at 438 to which we were referred holds that, in a case where there is a continuous contractual obligation, the limitation period does not begin to run until the contract finally becomes impossible of performance. In the case of want of prosecution by a solicitor for example, it would be wholly unsatisfactory to contemplate defining the date of breach for limitation purposes by reference to a solicitor's first failure

> to take out the summons for directions for the reasons given by Oliver J. Nothing, as I see it, in Bell v. Peter Browne & Co. [1990] 2 Q.B. 495, criticises that aspect of the judgment in a continuing duty case. Indeed as I see it, Nichols L.J. at 501 and Mustill L.J. at 512, seem to recognise that the continuing retainer type of case both exists and will bring a different result from the situation being dealt with in Bell v. Browne. There was, as I see it, clearly a continuing duty on Mr Fulcher up to October 4. His retainer was to make all attempts to preserve the plaintiff's cause of action, including making a section 33 application. That was capable of performance up to the termination of his retainer by the October 4 letter; not before that date should any period of limitation in my view begin to run."

42. In other words I do not accept that the mere fact that, in the present case, the original pre-Transfer Date breach was to some extent remediable has the result that Bell, Nouri and Maharaj require an outcome, as a matter of law, that CHBC was not in continuing breach of its continuing obligations.

43. Third, it is thus irrelevant for present purposes whether Midland can be distinguished on its facts, or on any principled basis, from Bell, Nouri and Maharaj and this court does not need to decide between them. Certainly in Nouri the Court of Appeal regarded the Court of Appeal in Bell as having treated the decision of Oliver J in Midland as very much dependent on its own facts: see per Patten LJ at paragraph 36, with whom Rix LJ and Sir Mark Waller agreed. I also agree. Moreover the critical issue in Midland was Oliver J's definition of the relevant contractual duty as an obligation requiring the solicitors to register the option before a 3rd party acquired an interest in the land: see e.g. page 434A. That was what the judges in the subsequent decisions, perhaps not surprisingly, had difficulty in accepting. And that articulation of the duty of a solicitor in a conveyancing context may well not be correct in the light of Bell, Nouri and Maharaj. But the extent to which Oliver J's articulation of the duty survives, if at all, in my judgment has nothing to do with the correct outcome of this appeal.

44. Accordingly I would uphold the judgment of Popplewell J to its full extent. I would hold that losses incurred in the period from 1st May 2004 to 31st December 2004 are irrecoverable under the indemnity, because Mr Le Cras' conduct post the Transfer Date (i.e. from 1st May 2004) undoubtedly did give rise to new causes of action, both for breach of contractual duty and probably also for misrepresentation and/or deceit. I would not remit the matter to the judge for further assessment of the sums due under the indemnity.

**Mr Justice Henderson:**

45. I agree with the reasoning and conclusions of Longmore LJ in his judgment, which I have had the opportunity of reading in draft. Accordingly, I too would hold that it is only losses after 31st December 2004 that are irrecoverable under the indemnity. The losses incurred before that date were in my judgment caused wholly by CHBC's breaches of duty before the Transfer Date, which remained unremedied. Those losses therefore fell squarely within the wording of clause 5.8 of the Share Purchase Agreement, being referable to claims which arose "directly or indirectly from … services … supplied by the Company [*CHBC*] … prior to the Transfer Date".

46. In respect of losses incurred after 1 January 2005, the causative potency of CHBC's original breaches of duty continued with undiminished force until the date when the judge held that QEF and the

Trustees should have remedied the position for the future by procuring formal amendments to the Scheme rules, namely 1 December 2007. The difference is that, in respect of this later period of loss, there was also a concurrent cause in the form of Mr Le Cras's negligent or fraudulent representations that the necessary amendments of the Scheme had been put in place by September 2004. The existence of this concurrent cause engages (by close analogy, if not directly) the principles applied by Hobhouse J and this court in E E Caledonia, whereby recovery under an indemnity is normally taken to be precluded, as a matter of construction, where a concurrent cause of the relevant loss is negligence (or, a fortiori, fraud) on the part of the claimant.

47. My Lady Gloster LJ, in her judgment which I have also had the benefit of reading in draft, gives powerful reasons for disagreeing with Longmore LJ's conclusion that CHBC was not in continuing breach of contract on a day to day basis after the Transfer Date. I must therefore explain why, with the greatest respect, I am unpersuaded by her views and prefer the analysis of Longmore LJ.

48. The central point, to my mind, is that CHBC was instructed by the Trustees to ensure that the necessary amendments to the Scheme were made with effect from specified dates falling between 6 April 2000 and 1 April 2004. Owing to the negligence of CHBC, those instructions were never effectively implemented. CHBC was under a contractual duty to ensure that the amendments were made in due time, but it failed to fulfil that duty. CHBC was therefore in breach of contract, at the latest when each of the specified dates for performance arrived and nothing effective had been done.

49. Those breaches remained unremedied, but an unremedied breach of contract is just that: a breach of contract which has not been remedied. In the normal way, it is impossible to construct a continuing contractual obligation, in the sense of one which gives rise to a fresh breach on a daily basis, from the mere failure to perform the original obligation in due time. This remains the case, as Nicholls LJ explained in Bell, even if the party in breach is asked to make good his default but fails to do so. As Nicholls LJ said, at 501A:

> "His failure to make good his existing breach of contract on request would not have constituted a further breach of contract: it would not have set a new six-year limitation period running. Once again, the position would have been simply that the solicitor remained in breach."

50. Conceptually, there is of course a class of contractual duties which do give rise to a continuing obligation to perform them which arises afresh from day to day. Examples are given by Nicholls LJ in Bell at 501D-E (repairing clauses in a lease), and by Dixon J in Larking v Great Western (Nepean) Gravel Ltd [1940] HCA 37, (1940) 64 CLR 221 at 236, cited by the judge at the end of paragraph 11 of his judgment. To quote Dixon J, a duty of this nature is one "to maintain a state or condition of affairs".

51. The judge clearly had this passage in mind when, just before his citation from Larking, he described CHBC's retainer as including "a duty to assist in maintaining a state of affairs, namely that the scheme in force from time to time should reflect the decisions of the Trustees". With respect, however, I do not consider that to be an accurate description of any of the duties of CHBC under the Services Agreement, and it is certainly not an accurate description of the obligations which CHBC undertook to ensure that the necessary amendments to the Scheme were made by the specified dates. It seems to me that these were probably "additional services" falling within paragraph 1.3 of section 1 of the Services Agreement, as they do not sit comfortably within any of the core or non-core services specified in section 2 (unless, possibly, they fall within paragraph 2.2.6 as "other projects", which again would not

Case 1:18-md-02865-LAK   Document 350-6   Filed 05/20/20   Page 79 of 247   3/30/20, 1:23 PM

in my view import a continuing duty). I therefore think the judge was wrong to characterise these obligations to perform specific tasks by specific dates as importing a duty to maintain a state or condition of affairs, and he may have been over-influenced by a wish to bring the facts of the present case within the very different kind of continuing duty recognised by Dixon J and Nicholls LJ.

52. If my analysis is right thus far, I do not think the position was significantly altered by Mr Le Cras's failure around the time of the Transfer Date to ensure that the misgivings expressed by Burges Salmon in their letter of 14 April 2004 were passed on to the Trustees, or that the draft deed of amendment which he instructed Burges Salmon to prepare on 22 April 2004 was approved and signed by the Trustees. Reprehensible though these failures may have been, I see them as essentially failures by Mr Le Cras to make good the existing breaches of contract of which he must by then have been fully aware.

Note 1   This case was referred to in Jackson & Powell on *Professional Liability*, 7th edition paragraph 5-031, which was cited in the course of argument.   [Back]

---

**BAILII:** Copyright Policy **|** Disclaimers **|** Privacy Policy **|** Feedback **|** Donate to BAILII
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2015/1310.html*

2010 WL 1375169
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.

CBS CORPORATION, formerly known as Viacom, Inc., Plaintiff,
v.
EATON CORPORATION, Defendant.

No. 07 Civ. 11344(LBS).
|
March 30, 2010.

**MEMORANDUM & ORDER**

SAND, District Judge.

**\*1** Plaintiff CBS Corporation ("CBS") and Defendant Eaton Corporation ("Eaton") bring cross-motions for summary judgment on all claims. With the parties' consent, the Court addressed one of the three issues presented in the cross motions for summary judgment in a prior memorandum and order. That memorandum and order sets out the background of the dispute and the relevant summary judgment standard; familiarity with it is assumed. *See CBS Corp. v. Eaton Corp.,* No. 07 Civ. 11344(LBS), 2009 WL 4756436 (S.D.N.Y. Dec.7, 2009).

Presently before the Court are the remaining two issues for summary judgment: (1) whether Eaton must indemnify CBS for costs relating to the "Potter Fraud Case," and (2) whether Eaton must indemnify CBS for attorneys' fees incurred in bringing the instant action. The Court finds that Eaton is liable for costs relating to the Potter Fraud Case, but is not liable for attorneys' fees in this action.

**I. "Potter Fraud Case"** [1]
In 1995, the Potters filed the "Original Potter Case" against CBS in Tennessee State court, raising product liability claims based on an alleged design defect in Westinghouse electrical equipment that caused damage to the equipment itself. The Potters agreed to voluntarily dismiss that case when a loss

on statute of limitations grounds appeared likely. In 2004, the Potters refiled the "Potter Fraud Case" against CBS and Eaton in Tennessee State court seeking economic damages due to fraudulent concealment of the design defect over many years. Even when the case was ultimately dismissed on summary judgment, it remained unclear exactly what legal theory the Potters were relying on, and the judge referred to the legal theories put forth by all the parties as "moving targets." (CBS 56.1 Ex. U.) Whether the Potters brought product liability claims, fraud claims, breach of warranty claims, or some combination of the three was unclear.

Both Eaton and CBS were named as defendants in the Potter Fraud Case. CBS tendered its defense to Eaton because it believed that the Potter Fraud Case, like the Original Potter Case before it, [2] was covered by the Contract's indemnity provision. Eaton rejected CBS's tender because it disagreed with CBS's characterization of the Potter Fraud case, and CBS defended itself through dismissal on summary judgment. CBS now seeks indemnification for its legal defense fees from CBS in this breach of contract action.

CBS argues that the Potter Fraud Case brought the same tort claims as the Original Potter Case under the guise of fraud claims in order to get around the statute of limitations; Eaton insists that the fraud claims in the Potter Fraud Case were distinct from the Potters' original product liability claims. CBS claims Eaton was required to defend the case and indemnify it for its costs because the Potter Fraud Case was one "seeking compensation or recovery *for or relating to* personal injury or property damage caused or allegedly caused by any Products ... [based on] negligence, strict liability, theories of design defect or failure to warn and/or any other legal theory." (CBS 56.1 Ex. A ("DCBU") ¶ 1.121 (emphasis added).) Eaton claims that it is not liable because the suit only alleged fraud rather than damage to property.

**\*2** As we determined when we resolved the prior issue in this case, we agree with the parties that the Contract is not ambiguous. *See generally CBS Corp.,* 2009 WL 4756436. Because the parties' submissions do not establish a trade-specific or technical usage of the relevant terms, and the relevant terms are not defined further in the Contract, the Court construes the relevant terms according to their plain meaning. *Id.; see, e.g., In re Delta Air Lines, Inc.,* 381 B.R. 57, 64-65 (S.D.N.Y.2008). While the Potter Fraud Case was not one "for" personal injury or property damage according to the Potter's own statement of the case, (*see* Eaton 56.1 ¶ 65), it was certainly one "relating to" property damage-namely,

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 81 of 247

damage to the Westinghouse product itself, caused by the product itself. Eaton counters that this reading runs afoul of the "economic loss rule," which requires such claims to be brought under a warranty theory rather than a tort theory if the damage was to the defective equipment itself. However, Eaton points to no law, no contractual definition, and no evidence indicating that the "economic loss rule" should be read into the contractual definition of "product liability obligation." The Contract does not specify that the "property damage" must be to property other than the "Product." Moreover, the Contract states that product liability obligations include suits for damage to property based on several tort theories or "any other legal theory." (DCBU ¶ 1.121.)

While contracts that would indemnify a party for intentional or fraudulent conduct are void as against public policy in New York, CBS was never found liable for fraud. In the context of liability insurance, New York courts have held that so long as the indemnity contract's terms would apply to intentional conduct, an indemnified party is entitled to legal defense fees in cases alleging intentional or fraudulent wrongdoing until the indemnified party is found by the finder of fact to have acted intentionally or fraudulently. *See* 📖 *Public Service Mut. Ins. Co. v. Goldfarb*, 53 N.Y.2d 392, 442 N.Y.S.2d 422, 425 N.E.2d 810, 815 (N.Y.1981) ("[A]lthough the insurer need not indemnify [the insured] for any liability for punitive damages, it must, nonetheless, defend him in the pending lawsuit because a claim within the stated coverage has been made."). [3]

Eaton breached the Contract when it refused CBS's tender of the Potter Fraud Case because (1) the Contract's terms apply to the claims in the Potter Fraud Case because those claims "related" to property damage, and (2) CBS was never found liable of intentional misconduct and was never assessed punitive damages. CBS's motion for summary judgment as to the Potter Fraud Case issue is granted.

## II. Attorneys' Fees in this Action

CBS seeks attorneys' fees and costs in this action under the Contract, but under New York law, the contractual language is insufficiently explicit to impose fee-shifting between CBS and Eaton. CBS relies on the following contractual provisions in support of its argument: The Contract provides that Eaton must indemnify CBS for "Damages" arising out of Eaton's breach of the Contract. (DCBU ¶ 13.2.) "Damages" are defined to include "reasonable attorneys' fees" which arise "out of any Action." (DCBU ¶ 1.58 .) "Action" is defined

broadly to include any "proceeding" before any "court," *inter alia*. (DCBU ¶ 1.2.) Thus, because CBS had incurred attorneys' fees ("Damages") arising out of Eaton's breach, namely CBS' attorneys' fees in bringing the instant action, CBS argues it is entitled to fee-shifting.

**\*3** However, New York's *Hooper Associates* presumption against imposing fee-shifting in a suit between contracting parties absent explicit contractual language applies with full force here. *See* 📖 *Hooper Assocs. Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 549 N.Y.S.2d 365, 548 N.E.2d 903, 904-05 (N.Y.1989). The *Hooper Associates* standard provides that "[i]f the claims covered refer 'exclusively' or 'unequivocally' to claims between the parties, a [c]ourt may interpret an indemnification agreement to include such claims. If not, then a court must find the agreement to be lacking evidence of the required intent." 📖 *Sequa Corp. v. Gelmin,* 851 F.Supp. 106, 110-11 (S.D.N.Y.1994) (*discussing* 📖 *Hooper Assocs.,* 74 N.Y.2d 487, 549 N.Y.S.2d 365, 548 N.E.2d 903).

Determining whether the Contract provides unequivocally for fee-shifting in the instant dispute requires looking to the structure of the Contract and its indemnification provisions. *See* 📖 *Hooper Assocs.,* 549 N.Y.S.2d 365, 548 N.E.2d at 905 (Courts should look to "the language and purpose of the entire agreement and the surrounding facts and circumstances."). There are three main categories of attorneys' fees that could possibly arise under the indemnification provisions: (1) attorneys' fees in a *CBS v. Eaton* action for breach of contract, where the alleged breach did not involve any third-party claims, but arose only through the interaction of CBS and Eaton; (2) attorneys' fees incurred in defending a third-party claim, for which indemnification is then sought from the other contracting party; and (3) attorneys' fees in a *CBS v. Eaton* "collection" action, such as the instant case, to recover all expenses incurred as a result of a third-party claim, including the fees in category (2). In order to determine whether the fees in category (3) are available here, the provisions relating to the first two categories of fees must be considered.

Under the Contract, attorneys' fees in category (1) are plainly recoverable, but that does not support CBS's argument for fee-shifting here. Within Article Thirteen, which sets out the broad indemnification clause and related procedures, there is a specific clause entitled "non-third party claims." (DCBU ¶ 13.4.) This clause, Paragraph 13.4, provides that "with respect to any claim not involving a third-party claim or litigation,"

if a party is ultimately found liable for indemnification, it is liable for all "Damages" that result, including interest. (DCBU ¶ 13.4.) As noted, the Contract defines "Damages" to include reasonable attorneys' fees. (DCBU ¶ 1.58.) It is difficult to imagine what attorneys' fees could possibly arise as a result of one party's breach when third-party claims are not involved, other than attorneys fees in a *CBS v. Eaton* action for breach of contract. When this is the case, courts find that the *Hooper Associates* standard is met, and fee-shifting applies. *See e.g., Broadhurst Investments, LP v. Bank of New York Mellon,* No. 09 Civ. 1154(PKC), 2009 WL 4906096, at *3 (S.D.N.Y. Dec.14, 2009) (*quoting Breed, Abbott & Morgan v. Hulko,* 74 N.Y.2d 686, 543 N.Y.S.2d 373, 541 N.E.2d 402, 403 (N.Y.1989)) ("General language in an indemnification provision for 'reasonable attorneys' fees' is sufficient to encompass attorneys' fees incurred in litigation between the parties only in the context where 'it is difficult, if not impossible, to ascertain for what it was that the parties had agreed to indemnify [the plaintiff]' if the promise did not extend to legal fees in an action between the parties.") (alteration in original). However, CBS cannot rely on this provision here because it does not apply to the present situation, which involves third-party litigation costs. [4]

**\*4** As to category (2), attorneys fees incurred in underlying litigation with third parties, the Contract also plainly provides for indemnity because the *Hooper Associates* standard does not apply. The plain language of the indemnity provision and the definition of "Damages" provides that if Eaton breaches the Contract by improperly refusing CBS' tender of a third-party claim (or vice versa), Eaton is liable for the "Damages" incurred by CBS as a result of its refusal, (DCBU ¶ 13.2.), including the "reasonable attorneys' fees" incurred in defending the third-party claim. (DCBU ¶ 1.2.) Because that does not amount to fee shifting in a suit between the parties, *Hooper Associates* is inapplicable, and the plain language governs. *See, e.g., ⚑ In re Delta Air Lines, Inc.,* 381 B.R. at 64-65.

Courts have developed several ways of analyzing a contract's indemnification provisions to determine whether category (3) fees are provided for under *Hooper Associates,* but they all aim at adopting a construction that does not render any clause meaningless or superfluous. *See, e.g., Promuto v. Waste Management, Inc.,* 44 F.Supp.2d 628, 650 (S.D.N.Y.1999) ("The Court must read the indemnification provision in conjunction with all other provisions in the agreement to avoid inconsistencies or an interpretation which would render

another provision superfluous or without effect."). If the indemnity provision does not distinguish between third-party claims and inter-party claims, yet contains provisions that clearly only apply to third-party claims, courts read the provision to only apply to third-party claims to avoid rendering those provisions meaningless. [5] However, this argument does not help CBS here, as the broad indemnity provision does distinguish between the two types of claims, and imposes the relevant notice requirements and the like only for third-party claims. (DCBU ¶¶ 13.2, 13.3.)

If a broad indemnity clause is followed by a more specific clause directly addressing only third-party claims, courts read the broad indemnity clause to reach inter-party claims to avoid rendering the specific clause superfluous. [6] In the Contract before the Court, the converse situation is presented: a broad indemnity clause is followed by a specific clause addressing only inter-party claims, thus confirming the unexceptional proposition that the broad clause encompasses fees incurred defending third-party claims (i.e., category (2) fees as delineated above). (*See* DCBU ¶¶ 13.2, 13.4.)

CBS relies on *Pfizer, Inc. v. Stryker Corp.,* 348 F.Supp.2d 131 (S.D.N.Y.2004), which held that "where special notice-of-claim, assumption-of-defense and counsel-selection provisions only apply to third-party claims," as is the case in the Contract here, "[the] broad indemnification provision covers claims by contracting parties." *Goshawk Dedicated Ltd. v. Bank of New York,* No. 06 Civ. 13758(MHD), 2010 WL 1029547, at *6 (S.D.N.Y. Mar.15, 2010). However, *Pfizer's,* holding was based, as ours must be, on an examination of the entire contract in order to determine "whether there is an 'unmistakably clear' intent to indemnify, either from the language or the structure of the agreement." *Pfizer, Inc.,* 348 F.Supp.2d at 145. The *Phizer* court's holding was also based on the fact that a narrow provision referred to third-party claims, so the court endeavored to avoid rendering the broad provision superfluous by construing it to encompass inter-party claims. [7] As noted above, that consideration is not present in this case.

**\*5** Like the *Phizer* court and the other courts to apply the *Hooper Associates* standard to an indemnity agreement potentially addressing attorneys' fees from third-party and inter-party claims, we seek a construction that avoids rendering any clause superfluous. *See, e.g., Promuto,* 44 F.Supp.2d at 650. CBS's argument ultimately founders on two

clauses added to the Contract in the 1998 Product Liability Amendment, (Eaton 56.1 Ex. 4 ("PLA")), which would be made utterly superfluous if its proposed construction was adopted. Paragraph Seven of the PLA provides that if Eaton determines that it is not liable for a third-party claim tendered to it by CBS, it will provide timely notice to CBS of its rejection of the tender, and the case will be managed by CBS. (PLA ¶ 7.) Furthermore, Paragraph Seven subjects Eaton to liability for *"any Damages caused by delay or lack of notice,* to the extent resulting from actual prejudice to CBS's ability to defend the Action or claim, ... including all attorneys and experts fees and expenses and court costs of CBS *if litigation against Eaton is necessary for CBS to recover such Damages."* (PLA ¶ 7 (emphasis added).)

This is the type of sufficiently explicit language that *Hooper Associates* requires, and it only appears in one contractual provision addressing the very specific situation of damage through delay, which is not present here. Paragraph Seven shows that the parties (i) knew how to evince clearly an intent to impose fee-shifting when they desired to do so, and (ii) did not contemplate that the broad indemnity agreement in the original Contract would impose fee-shifting between the parties. Because Paragraph Seven would be completely superfluous if the broad indemnity agreement applied to suits between the parties,[8] CBS cannot overcome the *Hooper Associates* presumption against inter-party fee-shifting by pointing to the structure of the indemnity provisions, which strongly support the opposite construction.

This holding comports with the general wariness of courts to find a broad indemnity provision to impose inter-party fee-shifting when the contract clearly anticipates indemnity for fees incurred in litigation with third-parties.[9] And it must be remembered that even if a broadly worded indemnity clause *could* be read to cover inter-party suits, *Hooper Associates* still places a very heavy thumb on the scale against doing so

because fee-shifting runs "against the grain of the accepted policy that parties are responsible for their own attorneys' fees." *Oscar Gruss & Son, Inc. v. Hollander,* 337 F.3d 186, 199 (2d Cir.2003). Courts have repeatedly found broad language similar to the language here to be insufficiently specific or explicit to impose inter-party fee-shifting. *See, e.g., Coastal Power Int'l, Ltd. v. Transcontinental Capital Corp.,* 10 F.Supp.2d 345, 371 (S.D.N.Y.1998) ("The language of the agreement certainly is susceptible of the interpretation that Coastal would place upon it. The word 'Claim' is defined so broadly as to include attorneys' fees incurred by it. This case certainly arises or relates to breaches of covenant by Wartsila, so Coastal's attorneys' fees in pursuing it are a 'Claim' within the language of Section 14.3. But the clear message of *Hooper Associates* is that this is not enough. There is no language clearly evidencing an intention that the loser in a suit for breach of the Purchase Agreement was intended to pay the winner's attorneys' fees. In consequence, Coastal's claim must be rejected."). Accordingly, Eaton is not liable for attorneys' fees in this action.

### III. Conclusion

**\*6** The Court finds that Eaton is liable for costs relating to the Potter Fraud Case, but is not liable for attorneys' fees in this action. Both motions for summary judgment are granted in part, denied in part. CBS is to submit a proposed judgment to the Court within thirty (30) days of this order. Eaton is to submit any objections to the Court within (30) days after the proposed judgment is submitted.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1375169

---

### Footnotes

1  Background on the Potter Fraud Case is taken from the parties' Rule 56.1 statements. (*See* Eaton 56.1; CBS 56.1.)

2  The Parties apparently do not dispute that the Original Potter Case was covered by the Contract's indemnity provision, and that Eaton was responsible for CBS's defense.

3  The same reasoning is applicable to punitive damages-while it would contravene New York's public policy to indemnify for punitive damages actually awarded, that does not excuse an indemnifying party's obligation

to assume the indemnified party's defense before a punitive damage award has issued. *See, e.g.,* 🔖 *Pfizer, Inc. v. Stryker Corp.,* 348 F.Supp.2d 131 (S.D.N.Y.2004)* ("New York prohibits indemnification for punitive damages as against public policy.... Pfizer therefore is not entitled to indemnification for any losses from post-closing cases *resulting from a punitive damage award."* ) (emphasis added and citations omitted).

4   While CBS pointed to this clause in support of its request for attorneys' fees in this action at oral argument, that contractual language does not apply to the present situation because the claims before the Court are inextricably intertwined with third-party litigation (the underlying Silver and Potter cases). Rather, CBS acknowledged in its briefing that its claim for attorneys' fees is governed by the more general indemnification provision, Paragraph 13 .2. (Pl's. Mem. Opp. Def s. Mot. Summ. J. 21-23.)

5   "When an indemnification provision contains clauses that the court considers to be inapplicable to suits between parties-such as requiring that notice of a claim be given to the indemnitor or allowing the indemnitor to assume the indemnitee's defense-courts have concluded that the contract does not evidence an unmistakably clear intent to indemnify attorneys' fees incurred in a lawsuit between the contracting parties. *See, e.g.,*

🔖 *Oscar Gruss & Son, Inc. v. Hollander,* 337 F.3d 186, 200 (2d Cir.2003); *India.com, Inc. v. Dalai,* No. 02 Civ. 0111(DLC), 2009 WL 5171734, at *6 (S.D.N.Y. Dec.30, 2009); *Nathan v. Cooper,* No. 06 Civ. 5973(HB), 2007 WL 4352705, at *5 (S.D.N.Y. Dec.12, 2007); [ 🔖 *Gelmin,*] 851 F.Supp. at 111; [ 🔖 *Hooper Assocs.,*], 74 N.Y.2d 487, 549 N.Y.S.2d 365, 548 N.E.2d 903." 🔖 *Goshawk Dedicated Ltd. v. Bank of New York,* No. 06 Civ. 13758(MHD), 2010 WL 1029547, at *6 (S.D.N.Y.2010).

6   "[W]hen confronted with indemnification provisions that include broad indemnity clauses as well as narrower clauses that target third-party claims, courts have determined that the broad provisions cover claims by contracting parties, thereby ensuring that neither clause is superfluous. *See, e.g.,* 🔖 *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,* 418 F.3d 168, 178-79 (2d Cir.2005); 🔖 *Sagittarius Broad. Corp. v. Evergreen Media Corp.,* [663 N.Y.S.2d 160], 161 (N.Y.App.Div.1997)." 🔖 *Goshawk Dedicated Ltd. v. Bank of New York,* No. 06 Civ. 13758(MHD), 2010 WL 1029547, at *7 (S.D.N.Y. Mar.15, 2010).

7   This is the same argument relied on by the cases cited *supra,* note 5.

8   Moreover, unlike 🔖 *Breed, Abbott & Morgan v. Hulko,* 74 N.Y.2d 686, 543 N.Y.S.2d 373, 541 N.E.2d 402, 403 (N.Y.1989), we are not faced with an indemnity clause that has no other readily conceivable application besides inter-party suits. The relevant indemnification provisions indemnify for "Damages" resulting from or alleged to result from (in the case of third-party claims) Eaton's breach of contract or Eaton's failure to pay for an assumed liability. (DCBU ¶ 13.2.) These are the very provisions under which CBS presumably seeks indemnity for the attorneys' fees expended in the underlying Silver and Potter Fraud Cases. Therefore, another application of the indemnity clause exists besides one imposing fee-shifting in the instant action.

9   "In the absence of contractual language evidencing the parties' intent regarding the indemnification of attorneys' fees incurred in suits between them, courts have determined that such expenses are not indemnified in contexts where third-party claims are possible.... "At least in contexts in which contracting parties could have anticipated that they would be subject to third-party claims, courts apply a presumption against concluding that indemnification clauses cover litigation costs incurred in the course of resolving non-third-party claims." 🔖 *Goshawk Dedicated Ltd.,* 2010 WL 1029547, at *7 (*citing* 🔖 *Bridgestone/Firestone, Inc.,* 98 F.3d 13, 21 (2d Cir.1996) (where indemnification clause is not "unmistakably clear" that it covers counsel fees in breach-of-contract action and "may easily be read as limited to third party actions," fees not indemnified); 🔖 *Coastal Power Int'l, Ltd. v. Transcon. Capital Corp.,* 10 F.Supp.2d 345, 371 (S.D.N.Y.1998) (although indemnification clause could be interpreted to cover costs of litigation by contracting parties, absent "language clearly evidencing an intention that the loser in a suit for breach of the [contract] was intended to pay the winner's attorneys' fees," those fees are not indemnified); *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 955 F.Supp. 203, 218-19 (S.D.N.Y.1997) (indemnification clause does not cover costs of litigation

2010 WL 1375169

between parties because it is not "unmistakably clear" that they are covered, and provision "can easily be read to protect [party] from claims to its rights and interests by third parties"); *Bourne Co. v. MPL Commc'ns, Inc., 751 F.Supp. 55, 57 (S.D.N.Y.1990)* (indemnification clause not "unmistakably clear" that costs of litigation between parties covered despite reference to breach-of-contract actions, when clause typical of type that contemplates indemnity for third-party claims)).

**End of Document**© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 86 of 247

2009 WL 3246116
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

The CHARTER OAK FIRE
INSURANCE COMPANY, Plaintiff,
v.
Richard BOLDING, Cynthia Morris
Bolding, And Eddie and Tanya Karim,
Individually and as Executors for the
Estate of Jasmine Karim, Defendants.

No. 08–CV–02632 (KAM).
|
Oct. 1, 2009.

West KeySummary

1    **Declaratory Judgment** 🔑 Liability or
Indemnity Insurance in General

A liability insurer failed to establish the existence
of an actual controversy to give the court subject
matter jurisdiction to issue declaratory relief to
the insurer. The evidence showed that neither
the insured nor a decedent's estate had filed suit
against insurer in connection with an accident
that caused decedent's death. Insurer's claim
rested on its potential duty to defend or duty to
indemnify insured in the event that decedent's
estate filed a claim, a future event that was
uncertain to occur. U.S.C.A. Art. III § 2.

**Attorneys and Law Firms**

Joanne M. Engeldrum, Rivkin Radler, LLP, Uniondale, NY,
for Plaintiff.

***MEMORANDUM & ORDER***

KIYO A. MATSUMOTO, District Judge.

**\*1** Plaintiff, The Charter Oak Fire Insurance Company
("Charter Oak") filed this declaratory judgment action against
Defendants, Richard Bolding and Cynthia Morris Bolding
(collectively referred to as the "Boldings"), and Defendants,
Eddie and Tanya Karim, individually and as executors for
the Estate of Jasmine Karim (collectively referred to as the
"Karims"). Charter Oak seeks a declaration that the Boldings
and the Karims failed to give Charter Oak timely notice of the
accident that resulted in Jasmine Karim's death ("Accident"),
and, as such, there is no coverage under the Charter Oak
Policy in connection with the Accident and any potential
ensuing claim or action by the Karims against the Boldings.
The Boldings and the Karims were properly served with
summonses and a complaint, and have not answered or
otherwise appeared in this case. The Clerk of the Court noted
the default of the Boldings and the Karims on December
11, 2008. Charter Oak now moves for a default judgment
against the Boldings and the Karims. (*See* Plaintiff's Motion
for Default Judgment ("Pl.Mot."), Doc. Entry No. 18.) The
Boldings and the Karims have not filed any appearance or
submission in this action.

*BACKGROUND*

The following facts are undisputed. Charter Oak issued
Homeowners Policy 979389356 633 1 to the Boldings at
their residence premises for the policy period December 21,
2006 to December 21, 2007 ("Policy"). (Pl. Mot. Attach.
No. 8, Kirisits Aff. at ¶ 2 ("Kirisits Aff."), Ex. 1.) The
policy identifies the "Location of Residence Premises," 66
E. Hook Cross Road, Hopewell Junction, New York, as the
subject premises ("subject premises"). (*Id.* at ¶ 3, Ex. 1.)
The policy generally provides liability coverage of up to
$300,000 for damages from bodily injury or property damage
caused by an "occurrence." (*Id.* at ¶¶ 2–3, Ex. 1.) The policy
defines "occurrence" as "an accident, including exposure to
conditions which results, during the policy period, in ... bodily
injury ... or ... property damage." (*Id.* ¶ 4, Ex. 1.)

The Boldings' policy includes a condition precedent to
coverage as follows:

SECTION II—CONDITIONS

* * *

2009 WL 3246116

**3. Duties After Loss.** In case of an accident or occurrence, the insured shall perform the following duties that apply. You will help us in seeing that these duties are performed:

**a.** give written notice to us or our agent as soon as is practical, which sets forth:

(1) the identity of the policy and the insured;

(2) reasonably available information on the time, place and circumstances of the accident or occurrence; and (c) names and addresses of any claimants and witnesses;

\* \* \*

(*Id.* at ¶ 5; Pl.Ex. 1.)

On June 2, 2007, the Boldings hosted a party at their home, the subject premises. (*See* Kirisits Aff. at ¶ 9.) The Karims and their minor daughter, Jasmine Karim, were guests at the Boldings' party. (*Id.*) Jasmine Karim drowned in an in-ground swimming pool at the subject premises during the Boldings' party. (*Id.*) After being placed on life support at the hospital, Jasmine Karim died the following week as a result of the Accident. (*Id.* at ¶ 10.) The Boldings and the Karims were aware of the Accident on June 2, 2007 and the subsequent death of Jasmine Karim the week after. (*Id.* at ¶ 11.)

**\*2** The Boldings first notified Charter Oak of the accident on March 14, 2008, over nine months after the Accident and Jasmine Karim's death. (*Id.* at ¶ 12.) The Karims have not inquired about the Boldings' insurance coverage nor have they contacted Charter Oak regarding the Accident. (*Id.*) By letter dated April 21, 2008, Charter Oak disclaimed coverage to the Boldings based on untimely notice and to the Karims based on their failure to provide timely notice of the Accident. Charter Oak has not represented that the Boldings are seeking coverage for the Accident. (*See* Pl. Mot.)

On July 2, 2008, Charter Oak commenced this action, seeking a declaration that the Boldings and the Karims did not give Charter Oak timely notice of the Accident, the policy's condition precedent for coverage, and, as a result, there is no coverage under the Charter Oak policy in connection with the Accident and any ensuing claim or action by the Karims against the Boldings. (*See* Pl. Mot., Engeldrum Aff. at ¶ 3 ("Engeldrum Aff."), Ex. A.) On July 17, 2008, the Boldings were served with summonses and a complaint. (Engeldrum Aff. at ¶ 4.) On July 29, 2008, affidavits of service evidencing service upon the Boldings were filed with the

Court. (Engeldrum Aff. at ¶ 4, Ex. C.) On September 19, 2008, a letter notifying the Boldings that they are in default, along with copies of the summonses and complaint in this action and affidavits of service, were sent by certified mail to the Boldings. (Engeldrum Aff. at ¶ 5, Ex. C.) The letter requested that the Boldings answer Charter Oak's complaint by October 6, 2008. (Engeldrum Aff. at ¶ 5, Ex. C.) To date, the Boldings have not answered Charter Oak's complaint, or otherwise appeared in this action. (Engeldrum Aff. at ¶ 5.)

On September 27, 2008, the Karims were served with summonses and a complaint. (Engeldrum Aff. at ¶ 6.) On October 8, 2008, affidavits of service evidencing service upon the Karims were filed with the Court. (Englerum Aff. at ¶ 6; Pl.Ex. D.) On November 5, 2008, a letter notifying the Karims that they are in default along with copies of the summonses and complaint in this action and affidavits of service were sent to the Karims by certified and first class mail. (Engledrum Aff. at ¶ 7; Pl.Ex. E.) The letter requested that the Karims answer Charter Oak's complaint by November 21, 2008. (Engledrum Aff. at ¶ 7; Pl.Ex. E.) To date, the Karims have not answered Charter Oak's complaint, or otherwise appeared in this action.

On December 11, 2008, upon Charter Oak's request, the Clerk of the Court noted the default of the Boldings and the Karims pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. (Engledrum Aff. at ¶ 10; Pl.Ex. F.) Pending before this court is Charter Oak's motion for entry of a default judgment against the Boldings and the Karims.

### DISCUSSION

Before addressing the merits of Charter Oak's motion for default judgment, the court raises, *sua sponte,* the threshold question of whether the court has subject matter jurisdiction over this proceeding. *See* Fed. R. of Civ. P. 12(h)(3). The question of subject matter jurisdiction is "the first and fundamental question ... [that] the court is bound to ask and answer." *Steel C. v. Citizens for a Better Environment,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (citation and internal quotations omitted). "Without jurisdiction, the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Id.* (citation and internal quotations omitted). For the following reasons, the court finds

that it lacks subject matter jurisdiction because a "case or controversy," as understood by Article III, Section II of the United States Constitution and the Declaratory Judgment Act, 28 U.S.C. § 2201(a), does not exist.

**\*3** Under Article III, Section II of the United States Constitution, the subject matter jurisdiction of the federal courts extends only to cases or controversies. *See* U.S. Const. Art. III § 2. For a case to qualify for federal-court adjudication, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona,* 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (citation and internal quotations omitted). A court's judgment must resolve "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975) (citation and internal quotations omitted). The power of the federal judiciary has not been extended to advisory opinions nor " 'to decide questions that cannot affect the rights of litigants in the case before them.' " *Id.* (citation omitted). A justiciable controversy must be "distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937). A controversy must be "definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co.,* 300 U.S. at 240–241 (citation omitted). The possibility of a future controversy between parties in certain contingencies is insufficient to establish a controversy. *Indem. Ins. Co. of North America v. Kellas,* 173 F.2d 120, 124 (1949). A plaintiff asserting jurisdiction bears the burden of proof by a preponderance of evidence. *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000).

Here, Charter Oak seeks a declaratory judgment. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), a court has the power to issue declaratory relief "in a case of actual controversy within its jurisdiction." The Declaratory Judgment Act states, in relevant part, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." [1] The Declaratory Judgment Act is

"operative only in respect to controversies which are such in the constitutional sense." *Aetna Life Ins. Co.,* 300 U.S. at 240.

In light of the foregoing, the court finds that there is no "case or controversy" and, therefore, it lacks subject-matter jurisdiction. *See FSP, Inc. v. Societe Generale,* 02–CV–4786 (GBD), 2003 U.S. Dist. Lexis 493, at \*13, 2003 WL 124515 (S.D.N.Y. Jan. 14, 2003) (holding that an action seeking a "declaration regarding defendant's obligation to defend and indemnify plaintiff with regard to potential, unfiled claims, and seek[ing] reimbursement for losses arising from eight filed actions and future, anticipated claims" is not justiciable); *see also Selective Ins. Co. v. Oliveira Building Contractors, LLC,* 07–CV–918 (JCH), 2009 U.S. Dist. Lexis 41660, at \*10, 2009 WL 1396260 (D.Conn. May 18, 2009) (denying plaintiff's motion for summary judgment as moot because there was no longer a live controversy between the plaintiff and defendants where the claims were dismissed pursuant to the parties' stipulation). In its complaint, Charter Oak requests that the Court enter a judgment:

> **\*4** a) Declaring that notice to Charter Oak was late as a matter of law;
>
> b) Declaring that there is no coverage under the policy for the Accident and any resulting underlying action;
>
> c) Declaring that Charter Oak has no duty to defend or to indemnify the Boldings in connection therewith;
>
> b) Awarding such other and further relief the Court may deem just and proper.

(Compl. at 5.) However, based on the record before the Court, the Boldings and the Karims have not instituted an underlying suit, or taken any other action stemming from the Accident, aside from the Boldings giving Charter Oak notice thereof. Therefore, Charter Oak's claim rests on its potential duty to defend or indemnify the Boldings in the event that the Karims file a claim in connection with the Accident, a future event that may or may not occur. *See Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998). The duty to defend is legally distinct from the duty to indemnify, and the court addresses each in turn.

Although claims concerning a "duty to defend against *pending* actions are generally justiciable," there is "no duty to defend against any actions that do not currently exist."

*FSP, Inc.,* 2003 U.S. Dist. Lexis 493 at *13–14, 2003 WL 124515. (emphasis added). In the action before the court, there is no underlying suit regarding the Accident; therefore, there is no duty to defend on the part of Charter Oak. Charter Oak's "expectation of future actions is speculative, and does not give rise to an actual controversy." *FSP, Inc.,* 2003 U.S. Dist. Lexis 493 at *14, 2003 WL 124515. In the absence of an actual controversy, the Court lacks subject-matter jurisdiction.

Similarly, Charter Oak's expectation of a potential claim for indemnification does not give rise to an actual controversy. *Id.; see also The New York Guardian Mortgage Group v. Cleland,* 473 F.Supp. 409, 418 (S.D.N.Y.1979). Claims involving "indemnification obligations [ ] are not ripe for adjudication until liability has been imposed upon the party to be indemnified." *FSP, Inc.,* 2003 U.S. Dist. Lexis 493, at *13, 2003 WL 124515 (quotation omitted). Where an underlying suit is lacking, "federal courts generally decline to award declaratory relief in indemnification actions." *Solow Building Co., LLC v. ATC Assocs., Inc.,* 388 F.Supp.2d 136, 139 (E.D.N.Y.2005).

To date, there is no underlying action between the Boldings and the Karims to defend a claim of indemnification for any liability imposed upon Charter Oak. By Charter Oak's own admission, the Karims "never inquired about the Boldings' insurance coverage, and the Karims never contacted Charter Oak regarding the Accident. (Kirisits Aff. at ¶ 12.) Indeed, the Boldings and the Karims have not filed any proceedings nor have they appeared in this action at any time (Pl. Mot. Attach. No. 9 at 2–3.), indicating a lack of interest in pursuing an action related to the Accident. On this record, Charter Oak has not shown that this action involves parties with adverse legal interests.

 **\*5** Based on the foregoing, the court finds that even if the "makings of a potential controversy" exist, they are insufficient to meet the case or controversy requirement. *See Indem. Ins. Co. of North America,* 173 F.2d at 124. Whether Charter Oak will be held liable in the future is speculative and does not qualify as a "question of 'sufficient immediacy and reality' to warrant the issuance at this time of a declaratory judgment." *Olin Corp. v. Consol. Aluminum Corp.,* 5 F.3d 10, 17 (2d Cir.1993); *see also Millennium Capital Markets LLC et. al. v. U.S. Nat'l Corp.,* 97–CV–8397 (RPP), 1999 U.S. Dist. Lexis 7221, at *18 (S.D.N.Y.

May 13, 1999) (holding that "absent evidence or an allegation in the complaint that any [ ] party has demanded payment from plaintiff[ ], it cannot be said that there is a current live controversy between plaintiff[ ] and defendants concerning liability for the fees in question"). Because the court lacks subject matter jurisdiction over Charter Oak's claim seeking declaratory relief as to indemnification, it does not reach the merits of Charter Oak's claim.

Finally, in the context of declaratory actions, the Second Circuit requires the district courts to consider: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade Inc. v. St. Paul Fire and Marine Ins. Co.,* 411 F.3d 384, 389 (2d Cir.2005) (citation omitted). If either of the two objectives is achieved, a failure to entertain the action would be an error. *See Broadview Chemical Corp. v. Loctite Corp.,* 417 F.2d 998, 1001 (2d Cir.1969). In the absence of a live controversy, the court cannot conclude that either of the two objectives of a declaratory judgment articulated by the Second Circuit will be achieved. The declaration sought by Charter Oak will not clarify nor settle the legal issues, as it is not clear that there are issues to clarify or settle, nor will it terminate the non-existent controversy giving rise to the proceeding.

To grant declaratory relief in this action would run afoul of Article III. Accordingly, because the court lacks subject matter jurisdiction over Charter Oak's claim, the case is dismissed without prejudice and the court does not reach the merits of Charter Oak's motion for default judgment.

### *CONCLUSION*

As set forth above, this action is dismissed without prejudice for lack of subject matter jurisdiction. The court does not reach the merits of plaintiff's motion for default judgment. The Clerk of the Court is directed to enter judgment in accordance with this Order and to close the case.

### SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 3246116

## Footnotes

1    The Declaratory Judgment Act does not "supply an independent ground for subject matter jurisdiction." *AARP v. 200 Kelsey Associates, LLC,* 06–CV–81 (SCR), 2009 U.S. Dist. Lexis 969, at *9 (S.D.N.Y. Jan. 6, 2009). Therefore, "an action for declaratory relief under the Act may ordinarily be brought only if subject matter jurisdiction would exist in a coercive action between the parties." *Id.* at *9–10 (quotation omitted).

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

33 Employee Benefits Cas. 1751

2004 WL 829158
United States District Court,
S.D. New York.

Nathan J. COLODNEY, Plaintiff,

v.

CONTINUUM HEALTH PARTNERS, INC.,
Ms. Gail Donovan, Coo, Mr. Peter Kelley, CEO
& President, Mr. Morton Hyman, Chairman,
Mr. James Marden, Trustee, Beth Israel
Medical Center, St. Luke's-Roosevelt Hospital,
Long Island College Hospital, Defendants.

No. 03 Civ. 7276(DLC).
|
April 15, 2004.

**Attorneys and Law Firms**

Nathan J. Colodney, Alexandria, Virginia, for the Plaintiff,
pro se.

David O. Simon, Barbara A. Gross, Shaub, Ahmuty, Citrin,
& Spratt, LLP, New York, New York, for the Defendant.

*OPINION AND ORDER*

COTE, J.

 **\*1** *Pro se* plaintiff Nathan J. Colodney ("Colodney") worked
for approximately one year and two months as a Chief
Information Officer ("CIO") at Continuum Health Partners
("Continuum"). Colodney brought this diversity [1] action on
September 17, 2003, against Continuum and seven other
defendants alleging, *inter alia,* defamation, breach of good
faith, breach of implied contract, and constitutional and
statutory violations, arising from his loss of employment.
On November 5, Colodney amended his complaint to add
additional claims against the same defendants. [2] All eight
defendants have moved to dismiss the amended complaint.
For the reasons that follow, the motion is granted in part.

*Background*

All the facts in this Opinion are taken from the complaint and
documents upon which the complaint relies. [3] The events at
issue principally span the period between March 2001 and
August 2002.

*The Hiring Process*

On March 15, 2001, Colodney was interviewed by
Continuum [4] for a position as its CIO. At the
interview, Joseph Szmadzinski ("Szmadzinski"), a consultant
to Continuum's technology department, explained that
Continuum's technology operations had been outsourced
to Cap Gemini Ernst & Young ("CGEY") for a seven-
year period starting in December 2000. The CIO would be
responsible for managing Continuum's contract with CGEY,
and for overseeing the technology department's strategic
planning. Szmadzinski informed Colodney that the CIO
position would be "steady employment throughout the term
of the outsourcing agreement ."

On March 16, Colodney received a tentative job offer from
Continuum. On March 23, Colodney returned to Continuum
for a follow-up interview with Gail Donovan ("Donovan"),
the Interim Chief Operating Officer of St. Luke's-Roosevelt
Hospital Center and the Chief Operating Officer of Beth
Israel Medical Center (the "Medical Center"). At the meeting,
Colodney asked Donovan if Continuum engaged in strategic
planning, and whether it had a business plan. Donovan
answered yes to both questions. That day, Colodney also met
with Pamela Abner ("Abner"), a Human Resources executive
at Continuum. Abner explained that Colodney would be
required to complete a six-month probationary period, during
which his employment could be terminated at any time.

In a letter from Abner dated March 26 (the "Offer
Letter"), Continuum extended to Colodney a formal offer of
employment. The Offer Letter described Colodney's salary,
job title, and the company's retirement savings plan. Nothing
in the Offer Letter referred to a fixed term of employment or
to the six-month probationary period. Colodney accepted the
job offer, rented out his Virginia home, resigned from his job
at the United States Air Force, and relocated to the New York
City area.

*Employee Handbook*

Colodney began his employment at Continuum on June 4. On
that day, he received a copy of an employee handbook (the
"Handbook"). The front page of the Handbook bears the logos
of both the Medical Center and Continuum. The Handbook's
first page contains a disclaimer that is boxed off and shaded
a different color. It states:

**\*2**  Neither this handbook nor any other Medical Center document, give you right [sic], either express or implied, to remain employed by the Medical Center. Nor does it guarantee any fixed terms and conditions of your employment. *Your employment is not for any specific time and may be terminated at will* with or without cause and without prior notice, by Medical Center.

(Emphasis supplied.) The second page of the Handbook describes Continuum as the parent corporation of several hospitals, including the Medical Center. [5]

The Handbook provides that its list of "serious violations," which subject an employee to disciplinary actions "up to and including suspension and discharge," is not intended to be "comprehensive." The list includes, *inter alia,* the misuse of property belonging to the employer; the unauthorized possession, use, and copying of records or "disclosure of information contained in such records to unauthorized persons;" and the "failure or refusal to perform satisfactorily the duties and responsibilities of one's job or related duties as assigned."

According to Colodney, "the Handbook does not state a single basis for firing for cause." Moreover, Colodney asserts, none of the reasons for his firing are listed.

### 2001 Meeting with Internal Audit

Shortly after commencing his employment at Continuum, Colodney discovered that there was no supporting documentation for the pricing of the CGEY-Continuum outsourcing agreement. Colodney noted this discrepancy to Edward Shapoff ("Shapoff"), Continuum's Chief Financial Officer, who suggested that Colodney contact Continuum's Internal Audit Team from Ernst & Young Accounting ("Internal Audit"). Colodney met with two Ernst & Young auditors, and turned over to them documents associated with Continuum's prior technology budgets. Shapoff left Continuum within sixty days of Colodney's meeting with Internal Audit, and was replaced by Brendan Loughlin ("Loughlin").

Sometime after Shapoff's departure, Loughlin and Sharon Joy ("Joy"), Continuum's Vice President of Finance, spoke with Colodney regarding his meeting with Internal Audit. Loughlin, in Joy's presence, "scolded" Colodney for turning over Continuum's technology budgets to Internal Audit, and directed Colodney to seek Loughlin's permission before holding any future meetings with Internal Audit. Loughlin explained that reports from Internal Audit were sent directly to the Board of Directors.

### Summer 2002: Szmadzinski Makes Bid to Become CIO

In early June 2002, Szmadzinski informed Colodney that there was "no future" for Colodney at Continuum and that he should "consider looking elsewhere." On June 22, Szmadzinski, in his role as a consultant to Continuum, completed a study of the outsourcing agreement. He concluded that a new retained organization led by a new CIO was needed to monitor the agreement. Szmadzinski had himself in mind for the new CIO position.

On July 11, Donovan met with Colodney in the presence of Loughlin, Szmadzinski, and Mark McDougle ("McDougle"), the Chief Operating Officer of Long Island College Hospital. Donovan informed Colodney that, based on Szmadzinski's study of the outsourcing agreement, Szmadzinski would be joining Continuum as the Chief Information Resources Officer (CIRO), effective immediately. Colodney would now report to Szmadzinski. Donovan directed Colodney to turn over his CGEY files to Szmadzinski for copying.

**\*3**  The following day, Donovan and Colodney met with the Feld Group, a consulting company. Donovan asked the company to bid on the same work she had just awarded to Szmadzinski. At the meeting, Donovan indicated to the Feld Group that, although she was inclined to use Szmadzinski because of his familiarity with Continuum, no decision had been reached regarding who would receive the contract. She stated that she wanted to make a decision as soon as possible, and asked the Feld Group to submit a proposal within three days. Donovan noted that the price of the proposal would be "the key factor" in determining who was awarded the contract. The Feld Group gave their price and stated that there was no room for compromise. Donovan did not disclose to the Feld Group the conversation she had had with Szmadzinski the day before.

### July 2002: Colodney's Meeting with the Feld Group

33 Employee Benefits Cas. 1751

After the meeting and unbeknownst to Donovan, Colodney met privately with the Feld Group representatives. He described to them "what was happening" at Continuum so that the Feld Group could make a "competitive" proposal. Colodney discussed with the Feld Group the "mess" at the technology department caused by Donovan's lack of management skills, described "the roles that each executive played" in the outsourcing agreement, and gave specific examples of Donovan and Loughlin's managerial shortcomings. According to Colodney, since all of this information was already known to Szmadzinski, "nothing was a secret, but it put the two competitors on the same level."

The Feld Group told Colodney that they were aware that Donovan was being dishonest with them regarding the status of the contract award, and expressed doubt about submitting a bid in light of Donovan's preference for Szmadzinski. Colodney told them that it would be worth it to submit a proposal that "beat all aspects of Szmadzinski's proposal." To that end, Colodney supplied the Feld Group with copies of Szmadzinski's study of the outsourcing agreement in order to "give them a better idea of what they were bidding on." According to Colodney, none of the documents prepared by Szmadzinski was marked proprietary by either Continuum or Szmadzinski. Colodney also informed the Feld Group that their price was "a little high" and that they would "need to do something about it if they were going to beat Szmadzinski."

Shortly after the Feld Group submitted its proposal, Donovan sent an email to Colodney, Loughlin, and McDougle stating that the Feld Group no longer wanted the job. Colodney expressed his concerns to McDougle regarding Donovan's selection of Szmadzinski, noting that Szmadzinski was the person who had originally negotiated the price and terms of the outsourcing agreement.

*July 22, 2002: Colodney's Meeting with Donovan*

At a July 22 meeting, Donovan informed Colodney that Szmadzinski was his new supervisor. Colodney asked Donovan what would happen to him in the long term, and she assured him that he would have his job. Donovan mentioned that she had heard from the Feld Group that Colodney had indicated to them that Szmadzinski had already been hired for the position on which they were bidding. Colodney denied having told the Feld Group that Szmadzinski had already been hired, but admitted to having made "suggestions" in order to improve the Feld Group's proposal. Donovan also raised the issue of remarks made by Colodney to the Feld Group about

her, and asked Colodney to bring any future complaints he may have about her directly to her attention.

*August 13, 2002: Termination of Colodney's Employment*

 **\*4** On August 13, Colodney was called into Donovan's office. In the presence of Kathy Meyer, Vice President of Continuum, Donovan informed Colodney that he was being terminated "for cause." Donovan told Colodney that she had heard from a "very reliable source" that Colodney had lied to her on July 22 regarding what he had told the Feld Group. She stated that Colodney had made disparaging remarks about senior executives at Continuum, and had released proprietary information to the Feld Group. Donovan asked Colodney if he had anything to say in his own defense; Colodney remained silent. Colodney was escorted out of the building.

Colodney alleges that Donovan fired him for cause in order to avoid paying him the severance package that Continuum typically provides to "employees with whom it wished to sever an employment relationship" but who were not fired for cause. According to Colodney, Continuum's "corporate human resources policy" provides that employees not fired for cause are entitled to a severance package of "a base amount plus an additional amount for longevity." Colodney also alleges that Donovan fired him for cause in order to cover up her own "fraud" with respect to the Feld Group and her shortcomings as an executive.

*September 2002: Request for Reimbursement*

Colodney traveled to Wisconsin on behalf of Continuum in July 2002. During his employment, Colodney also accrued miscellaneous expenses for travel in and around Manhattan. At the time he was fired, Colodney had not yet submitted his travel vouchers to Continuum for reimbursement. In September 2002, Colodney sought reimbursement for approximately $1,500 in travel expenses he had incurred while employed at Continuum. Continuum denied Colodney's request for reimbursement.

*Claims*

In his amended complaint, Colodney charges the defendants with breach of good faith (Claims 1-3), defamation (Claims 4-18, 27-29, 31-33), breach of implied contract (Claim 19), negligent supervision (Claims 20-22), fraud (Claim 23), "failure to provide opportunity to transition to COBRA" (Claim 24), intentional infliction of emotional distress (Claim 25), fraudulent inducement (Claim 26),

conversion (Claim 30), negligence (Claims 34-36), negligent recruitment (Claim 37), a violation of 42 U.S.C. § Section 1983 ("Section 1983") (Claim 38), a violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., (Claim 39), and a breach of ERISA (Claims 40-41).

The defendants have moved to dismiss the amended complaint in its entirety. Many of Colodney's state law claims turn on whether he had an implied contract of employment with Continuum. For that reason, his breach of contract claim will be discussed first. Colodney's federal claims will be addressed last.

*Discussion*

The defendants move to dismiss the amended complaint pursuant to Rules 8(a), 9(b), 12(b)(1) and 12(b)(6), Fed.R.Civ.P. When considering a motion to dismiss, a court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Securities Investor Protection Corp. v. BDO Seidman, LLP,* 222 F.3d 63, 68 (2d Cir.2000); *Jaghory v. New York State Department of Education,* 131 F.3d 326, 329 (2d Cir.1997). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or him to relief." *Raila v. United States,* 355 F.3d 118, 119 (2d Cir.2004); *Securities Investor Protection Corp., LLP,* 222 F .3d at 68. Where, as here, a plaintiff is proceeding *pro se,* the court has an obligation to "construe [the] pleadings broadly, and interpret them to raise the strongest arguments they suggest." *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (citation omitted); *see also Cucco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000).

**\*5** Most of Colodney's claims are governed by the pleading standard set forth in Rule 8(a), Fed.R.Civ.P. Under Rule 8(a), a complaint adequately states a claim when it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512 (2002) (citing Rule 8(a)(2), Fed. R. Civ. P). Thus, under Rule 8(a)'s liberal pleading standard, a complaint is sufficient if it gives "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* (citation

omitted). *See also Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002).

*Breach of Implied Contract; Breach of Good Faith*

Colodney alleges that he had an implied contract of employment with Continuum and that Continuum breached the contract by terminating his employment. Colodney admits that he had no written employment contract, but alleges that Szmadzinski orally assured him at his initial job interview that Colodney's employment would be for the remainder of the seven-year outsourcing agreement with CGEY. Colodney points to his firing "for cause" as evidence that he had an implied contract of employment with Continuum. Colodney also alleges that the six-month probationary period described by Abner at his final job interview supports the finding of an implied contract.

Under New York law, [6] absent an express agreement of fixed duration, an employment relationship is presumed to be at will, "and may be freely terminated by either party at any time without cause or notice." *Horn v. New York Times,* 760 N.Y.S.2d 378, 380 (N.Y.2003) (discussing development of at-will employment jurisprudence). *See Baron v. Port Authority of New York and New Jersey,* 271 F.3d 81, 85 (2d Cir.2001). The presumption of at-will employment status may be rebutted, however, if a plaintiff can establish "that the employer made its employee aware of an express written policy limiting the right of discharge and the employee detrimentally relied on that policy in accepting employment ." *Lobosco v. New York Telephone Co.,* 96 N.Y.2d 312, 316 (2001). *See Baron,* 271 F.3d at 85. Oral assurances in conjunction with "general provisions in the employee manual" are insufficient to state a claim for an implied employment contract. *Skelly v. Visiting Nurse Assoc. of Capital Region Inc.,* 619 N.Y.S.2d 879, 881 (3d Dep't 1994).

Colodney's amended complaint does not plead sufficient facts to establish a claim for a breach of an implied contract of employment. It identifies no express agreement with a fixed term of employment. For instance, the Offer Letter, which is integral to the complaint, makes no mention that Colodney's position would be guaranteed until the expiration of the seven-year outsourcing agreement with CGEY. Colodney's employment at Continuum must therefore be presumed to be at will.

Colodney's pleading does not identify any written policy at Continuum which limited the company's right to fire him, or which could be a source of an implied contract. The complaint's description of Szmadzinski's oral representation at the initial job interview to the effect that the CIO position would last the term of the outsourcing agreement is not sufficient to plead the existence of an implied contract of employment. Similarly, neither the fact that Colodney was fired for cause, nor the existence of a probationary period is sufficient to plead the existence of an implied contract. *See Harrison v. Indosuez,* 6 F.Supp.2d 224, 232 (S.D.N.Y.1998) (existence of a probationary period "does not indicate an *express* intention ... to alter the at will status"); *Wolde-Meskel v. Vocational Instruction Project Community Servs., Inc.,* 950 F.Supp. 101, 104 (S.D.N.Y.1997) (90-day probationary period during which plaintiff could be fired for any reason did not create exception to at-will employment).

 **\*6** To the extent that Colodney may seek to rely on the Handbook as a written policy, his complaint would also fail to state a claim. [7] The Handbook contained a boxed-off, shaded disclaimer explicitly warning that all employees were employed at will. Where there is "a sufficiently unambiguous disclaimer, conspicuously placed in the employee handbook such that the employee reasonably could be expected to read it," an implied contract claim may be dismissed as a matter of law. *See Baron,* 271 F.3d at 88 (affirming summary judgment).

Colodney's complaint fails to plead sufficient facts to identify any implied contract of employment or to overcome the presumption that he was an at-will employee. Consequently, it does not state a claim for a breach of an implied contract of employment. A plaintiff in New York has no claim for breach of contract where the employment is at will, regardless of whether or not the termination was wrongful or violated public policy. *Lobosco,* 96 N.Y.2d at 316. Since Colodney's breach of good faith claims assume the existence of a contractual relationship between Colodney and the defendants, they must be construed as an improper attempt to circumvent the traditional at-will employment rule, and must be dismissed as well. *Murphy v. American Home Prods. Corp.,* 461 N.Y.S.2d 232, 237 (N.Y.1983) (no implied obligation of good faith and fair dealing exists with respect to at-will employment).

Leave to amend will be "freely given when justice so requires." Rule 15, Fed.R.Civ.P.; *see also Simmons v. Abruzzo,* 49 F.3d 83, 86-87 (2d. Cir.1995). This is especially true in the case of *pro se* plaintiffs. *See Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003). "Where it appears that granting leave to amend is unlikely to be productive," however, "it is not an abuse of discretion to deny leave to amend." *Lucente v. Int'l Bus. Mach. Corp.,* 310 F.3d 243, 258 (2d Cir.2002) (citation omitted). Thus, it is appropriate to deny leave to amend if the proposed amendment is futile. *Id.; see also Foman v. Davis,* 371 U.S. 178, 182 (1962).

In their moving papers, the defendants clearly identified the law that applies to the pleading of a claim for breach of a contract of employment. Since Colodney has not identified in his opposition to this motion any written policy that could be construed as a source of a contract of employment, and since Colodney has not requested leave to amend, leave to amend these claims will not be given because any proposed amendment would be futile.

*Negligence*

Colodney charges Donovan with negligently terminating his employment because she had an "obligation to conduct a good faith investigation" into the truth of the allegations against Colodney prior to firing him for cause. As stated *supra,* Colodney's employment with Continuum was at will. New York "neither recognizes a tort of wrongful discharge nor requires good faith in an at-will employment relationship." *De Petris v. Union Settlement Assn.,* 633 N.Y.S.2d 274, 276 (N.Y.1995). *See Rooney v. Tyson,* 127 F.3d 295, 296-97 (2d Cir.1997). Indeed, to allow a negligent discharge claim by an at-will employee would be inconsistent with the well-established principle that an at-will employee may be discharged for any reason or no reason at all. *See Horn,* 760 N.Y.S.2d at 384. Thus, Colodney's allegation that the defendants violated their duty to conduct a good faith investigation into the reasons underlying his firing fails to state a cognizable cause of action under New York law. The negligence claims are dismissed. Since any repleading of these claims would be futile, leave to amend these claims will not be given.

*Defamation*

 **\*7** Colodney alleges that Donovan defamed him by telling other Continuum executives that Colodney had: (1) lied to her

regarding statements he had made to the Feld Group in July 2002; (2) given away proprietary materials to the Feld Group in July 2002; and (3) made derogatory statements about "undisclosed" Continuum executives in July 2002. Colodney states that Donovan maliciously and falsely concocted each of the three statements in order to "circumvent" Continuum's severance payment policy, "ensure that a stigma attached" to Colodney, and "conceal Donovan's fraud against the Feld Group." In each of the defamation claims, Colodney charges Donovan "or another in Continuum" with repeating each allegedly false statement to different named executives. [8]

"Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name." *Albert v. Loksen,* 239 F.3d 256, 265 (2d Cir.2001) (citation omitted). Spoken defamatory words are slander; written defamatory words are libel. *Id.* Colodney's defamation claim is directed at words spoken by Donovan and "another," and therefore is a claim for slander.

To successfully state a claim for slander under New York law, a plaintiff must plead: "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander *per se,* [9] and (vii) not protected by privilege." *Loksen,* 239 F.3d at 265-66 (citation omitted).

Colodney fails to state a cause of action for slander because the facts contained in his own pleading contradict any naked assertion that Donovan's statements about him were false. Colodney's defamation claim concerns his statements to the Feld Group in July 2002, and his subsequent description to Donovan of what he had done. In his pleading, Colodney admits that he gave materials to the Feld Group, that he made disparaging comments to them about Continuum executives, and that he lied to Donovan about what he had said to them. Colodney admits that when Donovan confronted him at their July 22 meeting about the statements he had made to the Feld Group, Colodney did not disclose to her either that he had turned over Szmadzinski's study, or that he had discussed with them how to tailor their proposal to beat Szmadzinski's offer. Thus, Colodney has actually alleged that Donovan's allegedly libelous statements about Colodney were *true.* A bald assertion that libelous statements are false is insufficient when it is contradicted by more particularized

allegations in the pleading. *See Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995) (the court need not credit general conclusory allegations that "are belied by more specific allegations of the complaint").

Because Colodney's pleading demonstrates that Donovan's statements were not false, it is unnecessary to address the other arguments made by the defendants in support of their motion to dismiss these claims. [10] Leave to amend is properly denied since any amendment would be futile. Colodney having himself undermined any allegation that Donovan's alleged libelous statements were false, further litigation regarding Donovan's statements is not warranted.

*Intentional Infliction of Emotional Distress*

**\*8** Colodney charges defendants with the intentional infliction of emotional distress by "concocting numerous serious false statements" in order to fire Colodney, and for other circumstances surrounding his firing, including having him escorted out of Continuum's offices. Colodney states that the defendants' conduct was "outrageous, intentional, and with utter disregard for the truth," and resulted in Colodney's emotional distress, "physical ailments," and inability to sleep.

Under New York law, liability for the intentional infliction of emotional distress may be found only where the conduct has been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Conboy v. AT & T Corp.,* 241 F.3d 242, 258 (2d Cir.2001) (citation omitted). *See also DeFilippo v. Xerox Corp.,* 636 N.Y.S.2d 463, 465 (3d Dep't 1996). Colodney has not alleged sufficient facts in his amended complaint that, even if true, would constitute a claim for the intentional infliction of emotional distress. Leave to amend is denied since there is no reason to believe that an amendment would be anything other than futile.

*Negligent Supervision and Recruitment*

Colodney charges three Continuum executives with failing to exercise "due supervision" over Donovan. According to Colodney, they "knew or should have known that [Donovan] had a propensity to lie and/or conceal information to cover her own ignorance and incompetence." Colodney asserts that, as a result of the executives' failure to supervise, Donovan "felt free to, and did so freely, concoct lies about [Colodney] to

unlawfully terminate his employment for cause." Colodney also accuses one of the executives of "negligent recruitment" in hiring Donovan because it was "foreseeable" that Donovan, who lacked the "knowledge, skills, and abilities" to perform the job for which she was hired, would "engage in fraudulent and wrongful behavior," as she did with Colodney.

A claim for negligent hiring or supervision can only proceed against an employer for an employee acting outside the scope of her employment. *See Murns v. City of New York,* No. 00 Civ. 9590(DLC), 2001 WL 515201, at *5 (S.D.N.Y. May 15, 2001) (collecting cases). When an employee is acting within the scope of her employment, her employer may be held liable for the employee's negligence only under a theory of *respondeat superior,* and no claim may proceed against the employer for negligent hiring or retention. *Karoon v. New York City Transit Authority,* 659 N.Y.S.2d 27, 29 (1st Dep't 1997). Because the facts alleged by Continuum only support an inference that Donovan was acting within the scope of her employment when she fired Colodney, no claim may proceed against Donovan's employer for the negligent hiring or supervision of Donovan. Leave to amend is denied on the ground of futility.

*Fraudulent Inducement*

**\*9**  Colodney alleges that he was fraudulently induced into accepting the CIO position at Continuum based on the defendants' materially false representations regarding the scope and duration of his employment. Colodney alleges that Continuum executives [11] informed him that his employment "was to parallel the CGEY outsourcing agreement term of 7 years," and that he was being hired for a "long-term, stable position." In addition, Colodney alleges that Donovan told him that Continuum had both strategic and business plans. Colodney avers that he relied on those statements in making his decision to resign from his position at the United States Air Force, and to relocate to New York City in order to work for Continuum.

Under New York law, the elements of fraudulent inducement are: (1) a knowingly false representation of a material fact, and (2) detrimental reliance thereon. *Fax Telecommunicaciones Inc. v. AT & T,* 138 F.3d 479, 490 (2d Cir.1998); *National Union Fire Ins. Co. v. Worley,* 690 N.Y.S.2d 57, 61 (1st Dep't 1999). Reliance means "reasonable" reliance. *Remington Rand Corp. v.*

*Amsterdam-Rotterdam Bank, N.V.,* 68 F.3d 1478, 1484 (2d Cir.1995).

Where a fraud claim is brought alongside a breach of contract claim, the plaintiff must distinguish the two by (1) demonstrating a legal duty separate from the duty to perform under the contract, (2) demonstrating a fraudulent misrepresentation collateral or extraneous to the contract, or (3) seeking special damages caused by the misrepresentation and unrecoverable as contract damages. *Bridgestone/ Firestone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13, 20 (2d Cir.1996); *see Manning v. Utilities Mut. Ins. Co., Inc.,* 254 F.3d 387, 400 (2d Cir.2001). Although "a valid fraud claim may be premised on misrepresentations that were made before the formation of the contract and that induced the plaintiff to enter the contract," *Cohen v. Koenig,* 25 F.3d 1168, 1173 (2d Cir.1994), an assertion that defendants made intentionally false statements regarding their intent to fulfill the terms of the contract does not constitute a misrepresentation collateral or extraneous to a contract, *Bridgestone/Firestone,* 98 F.3d at 19. *See Wilmoth v. Sandor,* 686 N.Y.S.2d 388, 391 (1st Dep't 1999).

Colodney's fraudulent inducement claim fails insofar as it relies on his understanding that his employment would last as long as the CGEY outsourcing agreement. This claim is duplicative of his breach of implied contract claim. The crux of both claims is that the defendants promised to hire Colodney for the duration of the CGEY outsourcing agreement, but reneged on that promise by firing him. The fraudulent inducement claim only adds that the defendants intended not to perform the employment contract at the time they offered Colodney the CIO position. A "contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations." *Rocanova v. Equitable Life Assurance Society of the United States,* 612 N.Y.S.2d 339, 343 (N.Y.1994). Defendants' alleged false promise was not sufficiently collateral or extraneous to the terms of the alleged underlying agreement between the parties to support an independent fraud claim.

**\*10**  In addition, the pleadings do not allege "reasonable reliance" on the alleged promise that Colodney would be hired for the term of the CGEY outsourcing agreement. The Offer letter did not contain any definitive term of employment, nor any language tying his employment to

the duration of the outsourcing agreement. A written offer of employment lacking any reference to a definite term of employment or the CGEY outsourcing agreement makes Colodney's asserted reliance on the defendants' oral assurances regarding the term of his employment unreasonable as a matter of law.

Colodney does state a claim for fraudulent inducement, however, to the extent that he alleges that he relied on Donovan's representation that Continuum had strategic and business plans in making his decision to accept the CIO position. The existence of such plans was extraneous to the terms of any agreement between the parties regarding the scope and duration of Colodney's employment. Colodney alleges that, in reliance on Donovan's statement, he resigned from his previous job and relocated to the New York City area. Colodney also alleges that Donovan knew or should have known that her statement was false. As Continuum's Chief Operating Officer, Donovan was in a position to know whether Continuum engaged in strategic and business planning. Accordingly, at this early stage in this action, it cannot be said that Colodney does not state a claim for fraudulent inducement with respect to this prong of his claim.

*Fraud and Conversion*

Colodney alleges that the defendants committed fraud and conversion by refusing to reimburse him for $1,500 in travel expenses that he incurred while traveling on business in July 2002 to Wisconsin and on miscellaneous local travel in and around Manhattan. Colodney alleges that he was "led to believe" that he would be reimbursed for such expenses, but had not yet had a chance to submit travel vouchers prior to his firing. Colodney states that the defendants "maliciously" ignored his requests for reimbursement.

Colodney does not state a claim for fraud. To prove fraud under New York law, "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995). All claims for fraud are subject to a heightened pleading standard.

*See* Rule 9(b), Fed.R.Civ.P.; *Olsen v. Pratt & Whitney Aircraft, Div. of United Technologies Corp.,* 136 F.3d 273, 275 (2d Cir.1998).

Colodney fails to identify with particularity who made the allegedly false representations to him about reimbursement, when they were made, and the nature of the statements. Since there is a possibility that Colodney could cure this defect in his pleading, he will be permitted an opportunity to amend in order to provide this specificity.

**\*11** Colodney does state a claim for conversion. "Conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." *Schwartz v. Capital Liquidators, Inc.,* 984 F.2d 53, 53-54 (2d Cir.1993) (per curiam) (citation omitted). "Where the original possession is lawful, a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property." *Schwartz,* 984 F.3d at 54 (citation omitted). *See also King v. Fox,* No. 97 Civ. 4134(RWS), 2004 WL 68397, at *7 (S.D.N.Y. Jan. 14, 2004).

Continuum was the lawful possessor of any money due and owing to Colodney for his business travel expenses. Colodney adequately alleges that he made several requests for reimbursement after he was fired, but that Continuum denied his requests. Colodney's conversion claim does not duplicate his breach of contract claim, since he seeks damages wholly apart from contractual damages.

*Section 1983*

Colodney asserts that the defendants violated Section 1983 by terminating his employment based on the allegedly disparaging comments about Continuum executives that he made to the Feld Group. Colodney locates the Section 1983 violation in the First Amendment's right to free speech.

In order to state a claim under Section 1983, a plaintiff must allege that he was injured by "either a state actor or a private party acting under color of state law," *Ciambriello v. County of Nassau,* 292 F.3d 307, 323 (2d Cir.2002), and that such conduct deprived the plaintiffs of a right, privilege, or immunity secured by the Constitution or laws of the United States," *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993).

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 99 of 247
Colodney v. Continuum Health Partners, Inc., Not Reported in F.Supp.2d (2004)
33 Employee Benefits Cas. 1751

Continuum is not a state actor. Colodney does not allege that Continuum executives acted under color of state law. Even reading his pleading liberally, Colodney does not state a cause of action under  Section 1983. Because any amendment to this claim would be futile, leave to amend shall not be given.

### ERISA Claims

Colodney charges the defendants with violating ERISA. According to Colodney, Donovan made false statements about him for the purpose of firing him for cause so that the defendants could "evade" paying Colodney severance pay "as dictated by Continuum's corporate policies." Colodney claims that he is owed at least one year of severance "in accordance with [Continuum's] actual practices established for the payment of executives."

ERISA grants federal courts jurisdiction over all claims by an "employee welfare benefit plan" beneficiary who seeks to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B) & (e)(1). The term "employee welfare benefit plan" has been held to apply to "most, but not all," employer obligations to pay severance benefits.  *Schonholz v. Long Island Jewish Medical Center,* 87 F.3d 72, 75 (2d Cir.1996). As both the Supreme Court and the Second Circuit have emphasized, "ERISA applies only where such an undertaking or obligation requires the creation of an ongoing administrative program." *Id.* For instance, a single lump-sum severance payment program is not an employee benefit plan under ERISA because it "requires no administrative scheme whatsoever to meet the employer's obligation."  *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 12 (1987); *see*  *James v. Fleet/Norstar Fin. Group, Inc.,* 992 F.2d 463, 467-68 (2d Cir.1993) (employer's payment of sixty days' salary following employees' last day of work did not create an employee welfare benefit plan under ERISA).

**\*12**  In his amended complaint, Colodney does not allege the existence of a qualified ERISA plan at Continuum or a denial of benefits under such a plan. The amended complaint's reference to a "corporate human resources policy" does not allege the existence of a benefit plan covered by ERISA. Moreover, even if the complaint had alleged the existence of a qualified ERISA plan, ERISA generally requires a beneficiary to exhaust a plan's administrative remedies before

bringing a suit for benefits. *See, e.g.,*  *Burke v. Kodak Retirement Income Plan,* 336 F.3d 103, 107 (2d Cir.2003) (survivor income benefits). Colodney does not allege that he sought administrative review of his purported ERISA claim.

Accordingly, Colodney's ERISA claims are dismissed, and leave to amend will not be given. In their moving papers, the defendants provided Colodney with adequate notice of the deficiencies in his ERISA claim. In his opposition papers, Colodney did not address these deficiencies, or seek leave to amend his pleadings.

### COBRA Health Coverage

Colodney charges the defendants with failing to provide him with "the opportunity to transition to [the Congressional Omnibus Budget Reconciliation Act ("COBRA"),  29 U.S.C. § 1161-68] health insurance coverage." [12] According to Colodney, he was left without healthcare insurance, and thus could not visit a physician on "several occasions" when he was sick. Colodney alleges that he "unnecessarily endured the pain and suffering of severe allergies and numerous infections" due to his lack of health insurance. [13]

COBRA permits an employee to continue to receive health benefits at the group rate even after the termination of his employment. [14] *See*  29 U.S.C. §§ 1161(a), 1163;  *Local 217 v. MHM, Inc.,* 976 F.2d 805, 809 (2d Cir.1992). The statute sets out deadlines by which the employer must notify the health plan administrator of the employee's termination; by which the administrator must notify the employee of his rights to continued coverage under the plan; and by which the employee must elect his right to continue coverage under COBRA.  29 U.S.C. §§ 1166(a)(2), 1162(a)(4). A plan administrator's failure to comply with COBRA's notice provisions entitles a beneficiary to statutory damages of up to $100 per day.  29 U.S.C. § 1132(c)(1). Statutory damages for a failure to give notice are not available against an employer who is not the plan administrator.  29 U.S.C. § 1132(c)(3).

Colodney may be able to state a claim for relief under COBRA, but his pleading is deficient in several respects: Colodney fails to (1) allege the existence of a qualified healthcare plan governed by COBRA; (2) name the plan administrator as a defendant; and (3) allege that his employer is the plan administrator if no separate administrator has

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 100 of 247
Colodney v. Continuum Health Partners, Inc., Not Reported in F.Supp.2d (2004)
33 Employee Benefits Cas. 1751

been designated. Accordingly, Colodney's COBRA claim is dismissed without prejudice to his amendment of this claim.

*Conclusion*

For the reasons stated above, the defendants' motion to dismiss the amended complaint is granted in part. It is hereby

**\*13** ORDERED that the following claims are dismissed with prejudice: breach of good faith (Claims 1-3), defamation (Claims 4-18, 27-29, 31-33), breach of implied contract (Claim 19), negligent supervision (Claims 20-22), intentional infliction of emotional distress (Claim 25), negligence (Claims 34-36), negligent recruitment (Claim 37), 42 U.S.C. § 1983 (Claim 38), and violations of ERISA (Claims 39-41).

IT IS FURTHER ORDERED that the fraud claim in connection with reimbursement for $1,500 in business travel

expenses (Claim 23) and the COBRA claim (Claim 24) are dismissed without prejudice to being amended by May 7, 2004.

IT IS FURTHER ORDERED that the plaintiff has stated a cause of action under New York law for (1) fraudulent inducement with respect to the assertion that Colodney relied on Donovan's statements regarding the strategic and business plans in accepting employment (Claim 26), and (2) conversion with respect to the $1,500 in business travel expenses incurred by Colodney while employed by Continuum (Claim 30).

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 829158, 33 Employee Benefits Cas. 1751

---

## Footnotes

1    Colodney returned to Virginia following the termination of his employment with Continuum. His pleadings identify him as a resident of Virginia. None of the defendants are Virginia residents.

2    The amended complaint is 76 pages long, and consists of 353 numbered paragraphs alleging 41 separate claims.

3    Although the court's focus should be on the pleadings, it may also consider any written instrument attached to the complaint as an exhibit, "or any statements or documents incorporated in it by reference." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.1991).

4    Continuum Health Partners is the parent corporation of Beth Israel Medical Center, St. Luke's-Roosevelt Hospital Center, the Long Island College Hospital, and the New York Eye and Ear Infirmary.

5    Colodney alleges in his opposition to this motion that the Handbook applied only to employees of the Medical Center, and not to Continuum employees.

6    While the parties do not address choice of law in this diversity action, Colodney's employment with Continuum was in New York and the parties have relied on New York law in their motion papers. New York law will be applied to the plaintiff's state law claims.

7    Although Colodney does not rely on the Handbook to support his breach of implied contract claim, he extensively discusses the Handbook in his pleading.

8    For example, claim 3 alleges that Donovan falsely fabricated that Colodney had lied to her regarding statements he had made to the Feld Group in July 2002, and that Donovan "or another in Continuum" repeated this statement to Bart Metzger, the Vice President of Human Resources for Continuum. Claim 2 alleges that Donovan or another repeated the same statement to Loughlin. Claim 3 alleges that Donovan or another repeated the same statement-to Peter Kelley, Continuum's former Chief Executive Officer. This pattern is repeated in each of the defamation claims for each of the allegedly false statements. In addition

33 Employee Benefits Cas. 1751

to the above-mentioned executives, Colodney asserts that the defamatory statements were made as well to Meyer, McDougle, James Marden and other "members of the Continuum Board of Trustees."

9    Compensable injury is presumed if the defamatory statement falls within a category of slander *per se.* *Loksen,* 239 F.3d at 271. Statements that tend to injure the plaintiff in his "trade, business or profession" constitute slander *per se. Id.* Donovan's statements at issue here constitute slander *per se* since the statements "impute[ ] fraud, dishonesty, misconduct, or unfitness in the conduct of one's profession." *Gjonlekaj v. Sot,* 764 N.Y.S.2d 278, 281 (2d Dep't 2003).

10    For instance, the defendants contend that the complaint established the existence of a complete defense to defamation. New York affords qualified protection to defamatory "communication[s] made by one person to another upon a subject in which both have an interest." *Loksen,* 239 F.3d at 272 (citing *Stillman v. Ford,* 290 N.Y.S.2d 893, 897 (N.Y.1968)). "Communications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge, fall within the privilege." *Loksen,* 239 F .3d at 272.

11    In the body of his amended complaint, Colodney identifies these executives as Szmadzinski and Richard McGrail.

12    Reading this *pro se* complaint liberally, it is presumed that Colodney alleges that the defendants failed to comply with COBRA's notice provisions in violation of 29 U.S.C. §§ 1161 and 1162(5).

13    The defendants do not dispute that they failed to provide Colodney with notice as required by COBRA.

14    COBRA has been codified as part of ERISA. *See* 29 U.S.C. § 1001 *et seq.;* *Phillips v. Saratoga Harness Racing, Inc.,* 240 F.3d 174, 177 n. 1 (2d Cir.2001).

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Dresser-Rand Co. v. Ingersoll Rand Co., S.D.N.Y., July 14,
2015

2012 WL 2148221
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

CONVERGENT WEALTH ADVISORS LLC, Plaintiff,
v.

LYDIAN HOLDING COMPANY, Lydian Trust
Co., Lydian Wealth Management Company LLC,
CMS Strategies Company, LLC, Windermere
Investment Associates, LLC, and Windermere
Capital Management LLC, Defendants.

No. 12 Civ. 1199.
|
June 13, 2012.

**Attorneys and Law Firms**

Alyson M. Weiss, Esq., John M. Piskora, Esq., Loeb & Loeb
LLP, New York, NY, for Plaintiff.

Joel M. Miller, Esq., Charles R. Jacob III, Esq., Amanda
Frances Parsels, Esq., Miller & Wrubel P.C., New York, NY,
for Defendants.

*OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

*1 Convergent Wealth Advisors LLC, a private wealth
management company, brings this indemnification action
against fellow private wealth management companies:
Lydian Holding Company, Lydian Trust Co ., Lydian
Wealth Management Company LLC, CMS Strategies
Company, LLC, Windermere Investment Associates, LLC,
and Windermere Capital Management LLC. The defendants
now move to dismiss the plaintiff's claims for breach of
contract, common law indemnification and contribution, and
declaratory judgment. For the reasons stated below, the
defendants' motion is granted in part and denied in part.

## II. BACKGROUND

### A. The Purchase and Sale Agreement

Plaintiff and defendants are, or were, private wealth
management companies that manage the assets of high
net worth individuals. [1] On or about March 26, 2007,
City National Corporation ("City National") and Convergent
Capital Management LLC ("Convergent Capital"), the parent
and affiliate of the plaintiff, entered into a Purchase
and Sale agreement ("the purchase agreement") with
defendants. [2] Pursuant to the purchase agreement, City
National and Convergent Capital ("Buyer Parties") agreed to
acquire certain of defendants' assets—one hundred percent
membership interests in Newco LLC, which subsequently
became Convergent Wealth Management, the plaintiff—
and only certain liabilities, defined as the "Assumed
Liabilities." [3]

Pursuant to section 9.1 of the purchase agreement, the
defendants agreed to "indemnify, defend, and hold harmless,
the Buyer Parties ... from and against, and pay and reimburse
the Buyer Parties ... for, any and all Losses to the extent ...
arising out of ... any Excluded Liabilities." [4] Losses is defined
in the purchase agreement to include "all costs, damages,
liabilities, awards, judgments, losses, expenses (including but
not limited to reasonable attorneys' and consultants' fees and
expenses, interest and penalties [) ]...." [5] Excluded Liabilities
are those based on events occurring prior to closing on May
1, 2007. [6]

Section 9 of the purchase agreement is implemented by
Exhibit D, which sets forth the indemnification procedures. [7]
After the assertion of a third party claim against the
"Indemnified Party," the "Indemnifying Party" may "at
its option, assume and control the defense of such a
claim (including the employment of counsel, who shall be
reasonably satisfactory to such Indemnified Party, and the
payment of expenses of such counsel)." [8] Until the defense
may be assumed by the "Indemnifying Party," the parties
shall "cooperate in defense of such claim[,] ... and if such
Indemnified Party is entitled to indemnification under [ ]
Article IX, all reasonable legal and other expenses reasonably
incurred by the Indemnified Party shall be borne by the
Indemnifying Party." [9]

### B. The *Sherman* Arbitration

On or about May 27, 2011, Michael Sherman, Frances
Sherman, and Jeffrey Sherman ("the Shermans") commenced

2012 WL 2148221

an arbitration proceeding against the plaintiff ("the arbitration"), currently pending in New York, New York. [10] The plaintiff denies any liability to the Shermans and is defending itself in the arbitration . [11] The Shermans allege, inter alia, that they were fraudulently induced in "early 2007," prior to the purchase agreement closing date, to make certain investments via a "blind trust." [12] Prior to the closing date, the plaintiff did not exist in its current form, but as Newco LLC, an asset of the defendants.

### III. LEGAL STANDARD

#### A. Rule 12(b)(1)

**\*2** Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of a claim when a federal court lacks subject matter jurisdiction, "the statutory or constitutional power to adjudicate [a claim]." [13] Plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. [14] A federal court may only exercise jurisdiction over live cases and controversies. [15]

In considering a motion to dismiss for lack of subject matter jurisdiction, " 'the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff.' " [16] However, " 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.' " [17] In fact, "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." [18] "In deciding the motion, the court 'may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [it] may not rely on conclusory or hearsay statements contained in the affidavits.' " [19]

#### B. Ripeness

The "ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." [20] In its constitutional dimension, the ripeness doctrine " 'prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur.' " [21] In this respect, ripeness overlaps with standing, and a showing that a claim is

sufficiently "actual and imminent" to constitute an Article III injury in fact is normally sufficient to establish that the claim is constitutionally ripe for review. [22]

Under the prudential doctrine of ripeness, "when a court declares that a case is not prudentially ripe, it means that the case will be better decided later and that the parties will not have constitutional rights undermined by the delay." [23] "[T]he fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration must inform any analysis of ripeness." [24]

#### C. 12(b)(6) Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must assume "all well-pleaded, nonconclusory factual allegations in the complaint to be true" [25] and "draw all reasonable inferences in the plaintiff's favor ." [26] On the other hand, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." [27] To survive a motion to dismiss, therefore, the allegations in the complaint must meet a standard of "plausibility." [28] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [29] Plausibility "is not akin to a probability requirement," rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." [30]

**\*3** The plaintiff in support of her claim may allege "upon information and belief" facts that are "peculiarly within the possession and control of the defendant." [31] Conversely, the plaintiff should not allege upon information and belief matters that are presumptively within her personal knowledge, unless she rebuts the presumption. [32] Such matters include " 'matters of public record or matters generally known in the community ... inasmuch as everyone is held to be conversant with them.' " [33]

#### D. Leave to Amend

Federal Rule of Civil Procedure 15(a)(2) provides that, other than amendments as a matter of course, "a party may amend [its pleading] only by leave of court or by written consent of the adverse party." [34] Although "[t]he Court

2012 WL 2148221

should freely give leave when justice so requires," [35] it is "within the sound discretion of the district court to grant or deny leave to amend." [36] When a motion to dismiss is granted, "[i]t is the usual practice ... to allow leave to replead." [37] Where plaintiff inadequately pleads a claim and cannot offer additional substantive information to cure the deficient pleading, granting leave to replead is futile. [38]

## IV. APPLICABLE LAW

A federal court sitting in diversity applies the choice of law rules of the state in which it sits. [39] Under New York Law, "[a]bsent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." [40] Neither party disputes the applicability of the purchase agreement's choice of law provision, which designates Delaware law as controlling. [41] Accordingly, the plaintiff's claims are governed by Delaware law.

### A. Breach of Contract

Under Delaware Law, a plaintiff must properly plead three elements of a breach of contract claim: "(1) the existence of a contract, whether express or implied; (2) a breach of an obligation imposed by that contract; and (3) damage suffered by the plaintiff as a result." [42] If the contract imposes both a duty to defend and a duty to indemnify, these obligations should be examined separately. [43] In the indemnification context, a duty to defend claim is ripe during the pendency of the underlying action. [44] However, a claim for indemnification does not accrue until the underlying liability has been established. [45]

### B. Contract Interpretation Under Delaware Law

"[T]he proper interpretation of language in a contract is a question of law." [46] "Delaware adheres to the objective theory of contract interpretation" under which "the court looks to the most objective indicia of [the parties'] intent: the words found in the written instrument." [47] "When the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation, that interpretation controls the litigation." [48] If the language in the contract "is clear and unambiguous on its face" courts may not "consider parol evidence to interpret it or search for the parties' intentions." [49]

*4 Contract terms are not rendered ambiguous simply because the parties disagree as to their construction. [50] "A trial judge must review a contract for ambiguity through the lens of 'what a reasonable person in the position of the parties would have thought the contract meant.' " [51] Contract terms are only ambiguous "[w]hen the provisions in controversy are fairly susceptible [to] different interpretations or may have two or more different meanings ." [52]

When faced with an ambiguous contract provision, "the interpreting court must look beyond the language of the contract to ascertain the parties' intentions" at the time of drafting. [53] In making such a determination, "the court [ ] may consider objective [parol] evidence, 'including the overt statements and acts of the parties, the business context, the parties' prior dealings, and industry custom.' " [54] "[W]here a contract provision lends itself to two interpretations, a court will not adopt [an] interpretation that leads to unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes the affected contract provisions." [55] "An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract." [56]

### C. Common Law Contribution and Indemnification

A right of contribution "arises when one of several obligors liable on a common debt discharges all, or greater than its share, of the joint obligation for the benefit of all the obligors." [57] A contribution claimant "must show concurrent obligations existed to the same entities...." [58]

On the other hand, "indemnification differs from contribution because it places the entire burden of a loss upon the party ultimately liable or responsible for it, and by whom the loss should have been discharged initially." [59] The remedies for contribution and indemnification are mutually exclusive. [60] "A key difference between a 'common law indemnification,' which is defined as a general right of reimbursement for debts owed to third parties by the [indemnifying party] as a secondarily liable party, and 'contractual indemnification' is that common law indemnification involves the responsibility to pay for another's liability." [61] A common law indemnification cause of action does not "accrue until after the party seeking

Convergent Wealth Advisors LLC v. Lydian Holding Co., Not Reported in F.Supp.2d (2012)

2012 WL 2148221

indemnification has made payment to the third party and the dispute with that party is finally concluded ." [62]

### D. Declaratory Judgment

The party seeking a declaratory judgment bears the burden of "establishing the existence of an actual case or controversy." [63] An actual controversy has been defined as one that is " 'real and substantial ... admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " [64] That a party's liability may be contingent " 'does not necessarily defeat jurisdiction of a declaratory judgment action.' " [65] Instead, " 'courts should focus on the practical likelihood that the contingencies will occur[ ].' " [66]

**\*5** In a declaratory judgment case, the court will consider: " '(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved[,] and (2) whether a judgment would finalize the controversy and offer relief from uncertainty.' " [67] In deciding whether a plaintiff has stated a claim for declaratory relief, a federal court applies the substantive state law of the forum in which it sits. [68]

## V. DISCUSSION

### A. The Claims for Contractual and Common Law Indemnification Are Not Ripe for Adjudication and Are Dismissed

#### 1. Contractual Indemnification

The plaintiff cannot claim indemnification, as a matter of law. [69] The matter is not ripe because there has been no award in the arbitration. [70] Under Delaware law, a contractual indemnification claim has not accrued; therefore the claim is not prudentially ripe. [71] The plaintiff does not offer any significant arguments to counter this legal hurdle to its indemnification claim; [72] and the defendants are correct —the duty to defend and duty to indemnify obligations must be examined separately. [73] No constitutional rights are implicated here, and the hardship to the plaintiff is mitigated by its ability to proceed on its duty to defend claim. [74] As a claim for indemnification has not accrued, a breach of the duty to indemnify claim is not ripe for adjudication.

#### 2. Common Law Indemnification

There is no ripe case or controversy as to common law indemnification or contribution, because there has not yet been a payment to a third party, which is required for the claim to accrue. [75] The defendants correctly argue that one's attorney is not a third party. [76] As no common law indemnification claim has accrued, this claim is not ripe and must be dismissed.

### B. Declaratory Judgment Is Available on Both Duty to Defend and Duty to Indemnify Claims

The Second Circuit has held that declaratory relief is appropriate for a contingent indemnification claim. [77] The defendants signed a purchase agreement to "indemnify, defend, and hold harmless" the plaintiff from all "Losses," arising out of Excluded Liabilities. [78] This unambiguous obligation yields a live case or controversy for the purposes of declaratory relief. [79] The defendants do not dispute that they may have an obligation to indemnify. [80]

There is also a case or controversy here regarding the defendants' duty to defend or pay plaintiff's legal fees. The issue of the breach of the duty to defend is ripe and substantial. [81] The breach of contract admits of specific relief: reimbursement, which may be awarded before the underlying litigation is resolved. [82] Contingency does not defeat the court's jurisdiction over this action. [83] The plaintiff will continue to pay legal fees apparently owed by the defendants.

### C. The Plaintiff Presents a Case or Controversy Regarding the Contractual Duty to Defend that Is Ripe for Adjudication

#### 1. There Is an Actual Controversy Regarding the Duty to Defend or to Pay Legal Fees

**\*6** The defendants argue that they have no duty to defend the plaintiff in a third party suit, only an "option to defend." [84] This is a flawed reading of an unambiguous contract. The defendants have an option to either pay legal fees or take over the defense. [85] The defendants rely heavily on a portion of text in Exhibit D of the purchase agreement that states: "if such Indemnified Party is entitled to indemnification under [ ] Article IX." [86] However, an "Indemnified Party" is clearly entitled to indemnification under Article 9 of the purchase

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 106 of 247
**Convergent Wealth Advisors LLC v. Lydian Holding Co., Not Reported in F.Supp.2d (2012)**
2012 WL 2148221

agreement once it is established that the third party claim arises out of an Excluded Liability.[87] The defendants do not challenge the assertion that the third party claim alleges inducements occurring in "early 2007."[88] Accepting this well-pleaded fact as true, the arbitration arises, at least in part, out of an Excluded Liability. Therefore, the defendants have a contractual duty to defend plaintiff in the arbitration or to pay plaintiff's legal expenses. A breach of this duty yields a legally cognizable case or controversy.

### 2. The Duty to Defend or Pay Legal Fees Claim Is Ripe for Adjudication

Under Delaware law, the right to defend claim can be resolved before the underlying litigation—in this case, arbitration—is concluded, as defendant's own case law reveals.[89] The plaintiff's injury is not speculative; the plaintiff has expended significant sums in its defense.[90] The plaintiff's injury, in expending unanticipated legal fees, is apparent and imminent. The hardship in delay is great, the plaintiff's contractual right to legal fees is further infringed upon each day. As a result, the claim for contractual indemnification is ripe for adjudication.

### D. The Plaintiff Adequately Pleaded Claims for Breach of Contract and Declaratory Relief Regarding Legal Fees and the Duty to Defend

### 1. Breach of Contract—Legal Fees

The plaintiff has properly pled the existence of the purchase agreement,[91] defendants' breach of the obligation to defend or reimburse imposed by the purchase agreement, and resulting damage. The purchase agreement clearly requires that the defendants have an obligation to either defend or reimburse the plaintiff's expenses.[92] The plaintiff properly pled facts demonstrating this duty in the Complaint.[93] The plaintiff sufficiently alleges that it has suffered losses in the amount of its attorneys' fees.[94] "Losses" is defined under the contract to include attorney's fees.[95] As a result, the plaintiff

has properly pled a breach of contract claim with regard to attorneys' fees.[96]

### 2. Declaratory Judgment Is Available

The plaintiff has properly pled a justiciable case or controversy as to the duty to defend and the duty to indemnify, which is ripe for adjudication. A declaratory judgment can settle the issues related to these duties, given the lack of ambiguity in the purchase agreement.[97] A judgment as to defendants' obligation to reimburse and indemnify the plaintiff will finalize the controversy and offer the plaintiff some relief from the uncertainty as to the cost of the arbitration.

### E. Leave to Amend Is Denied

**\*7** The plaintiff has requested leave to amend should any aspect of the defendants' motion be granted.[98] However, it would be futile to grant leave to amend the indemnification claim, given that they are not ripe for adjudication as a matter of law.[99]

## VI. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the contractual indemnification claim and the common law indemnification and contribution claim is granted. The contractual claim for breach of the duty to defend or pay legal fees and the claim for declaratory relief survive. Leave to amend is denied. The Clerk of the Court is directed to close this motion (Docket No. 7). A conference is scheduled for June 28, at 4:30 p.m. in Courtroom 15C.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2148221

---

### Footnotes

1      *See* Defendants' Memorandum of Law in Support of Motion to Dismiss ("Def.Mem.") at 3.
2      *See* Complaint ¶ 10.
3      *See id.* at ¶ 11.

4       Purchase and Sale Agreement ("Agreement"), Ex. A to 03/23/12 Declaration of Joel M. Miller, Defendants' counsel, at 63.

5       *Id.* at 11.

6       *See* Def. Mem. at 3.

7       *See* Agreement at 64.

8       *Id.* at Exhibit D(2).

9       *Id.*

10      *See* Complaint ¶ 13.

11      *See id.* ¶ 14.

12      *Id.* ¶ 15.

13      *See Diagnostic Cardioline Monitoring of N.Y., Inc. v. Leavitt,* 171 Fed. App'x 374, 375 (2d Cir.2006).

14      *See Luckett v. Bure,* 290 F.3d 493, 497 (2d Cir.2002). *See also Goonewardena v. N.Y.,* No. 05 Civ. 8554, 2007 WL 510097, at * 6 (S.D.N.Y. Feb. 14, 2007) ("[T]he burden of demonstrating that the court has subject matter jurisdiction over the case falls on the plaintiff[,] as it is the plaintiff who seeks to invoke the court's jurisdiction.").

15      *See Van Wie v. Pataki,* 267 F.3d 109, 113 (2d Cir.2001) (citation omitted).

16      *Natural Res. Def. Council v. Johnson,* 461 F.3d 164, 171 (2d Cir.2006) (quoting *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000)).

17      *APWU v. Potter,* 343 F.3d 619, 623 (2d Cir.2003) (quoting *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998)). *Accord London v. Polishbook,* 189 F.3d 196, 199 (2d Cir.1999) (citations omitted) ("[I]t is the affirmative burden of the party invoking [federal subject matter] jurisdiction ... to proffer the necessary factual predicate [—] not just an allegation in a complaint [—] to support jurisdiction.").

18      *LeBlanc v. Cleveland,* 198 F.3d 353, 356 (2d Cir.1999).

19      *Mosdos Chofetz Claim, Inc. v. Village of Wesley Hills,* 701 F.Supp.2d 568, 580–81 (S.D.N.Y.2010) (alteration in original) (quoting *J.S. ex rel. N.S. v. Attica Cent. Sch.,* 386 F.3d 107, 110 (2d Cir.2004)).

20      *Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 57 n. 18 (1993).

21      *Ross v. Bank of Am., N.A.(USA),* 524 F.3d 217, 226 (2d Cir.2008) (quoting *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 90 (2d Cir.2002)).

22      *Id.*

23      *Simmonds v. INS,* 326 F.3d 351, 357 (2d Cir.2003).

24      *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 581 (1985).

25      *Kiobel v. Royal Dutch Petroleum* Co., 621 F.3d 111, 124 (2d Cir.2010), *cert. granted,* 132 S.Ct. 472 (2011) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678–679 (2009)).

26      *Ofori Tenkorang v. American Int'l Group, Inc.,* 460 F.3d 296, 298 (2d Cir.2006).

27      *Iqbal,* 556 U.S. at 678 (citation omitted).

28      *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 564 (2007). *Accord Iqbal,* 556 U.S. at 678.

29      *Iqbal,* 556 U.S. at 678 (citation omitted).

30      *Id.* (quotation marks omitted).

31      *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir.2010).

32      *See Sanders v. Grenadier Realty, Inc.,* 367 Fed. App'x 173, 177 n. 2 (2d Cir.2010).

33    *Id.* (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1224, at 300–01 (3d ed.2004)).

34    *Slayton v. American Express Co.,* 460 F.3d 215, 226 n. 10 (2d Cir.2006) (citation and quotation marks omitted).

35    Fed.R.Civ.P. 15(a)(2).

36    *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir.2007) (citation omitted).

37    *Schindler v. French,* 232 Fed. App'x 17, 18 (2d Cir.2007) (quoting *Cortec Indus., Inc. v. Sum Holding P.P.,* 949 F.2d 42, 48 (2d Cir.1991)) (quotation marks omitted).

38    *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000).

39    *See Schwartz v. Liberty Mut. Ins. Co.,* 539 F.3d 135, 147 (2d Cir.2008) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97 (1941)).

40    *Fieger v. Pitney Bowes Credit Corp.,* 251 F.3d 386, 393 (2d Cir.2001).

41    *See* Agreement at 69.

42    *Narrowstep, Inc. v. Onstream Media Corp.,* No. 5114–VCP, 2010 WL 5422405, at *7 (Del. Ch.2010) (citing *VLIW Tech., LLC v. Hewlett–Packard Co.,* 840 A.2d 606, 612 (Del.2003)).

43    *See LaPoint v. AmerisourceBergen Corp.,* 970 A.2d 185, 197 (Del.2009).

44    *See id.* (citation omitted)

45    *See id.* at 198. *See also Scharf v. Edgcomb Corp.,* 864 A.2d 909, 919 (Del.2004) (citation omitted) (finding that a cause of action for indemnification accrues when the party seeking indemnification can be confident that the underlying action has been resolved with certainty).

46    *Allied Capital Corp. v. GC–Sun Holdings, L.P.,* 910 A.2d 1020, 1030 (Del. Ch.2006).

47    *Sassano v. CIBC World Mkts. Corp.,* 948 A.2d 453, 461 (Del. Ch.2008). *Accord Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

48    *Sassano,* 948 A.2d at 461 (citing *Eagle,* 702 A.2d at 1232). *Accord AT & T Corp. v. Lillis,* 953 A.2d 241, 252 (Del.Super.2008) (quoting *Lorillard Tobacco Co. v. American Legacy Found.,* 903 A.2d 728, 739 (Del.2006)) (" 'Delaware courts will not destroy or twist [contract] language under the guise of construing it. When the language of a ... contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented....' "); *Rhone–Poulenc Basic Chem. Co. v. American Motorist Ins.* Co., 616 A.2d 1192, 1195–96 (Del.1992).

49    *Pellaton v. Bank of N.Y.,* 592 A.2d 473, 478 (Del.1991).

50    *See Rhone–Poulenc,* 616 A.2d at 1196.

51    *Kuhn Const., Inc. v. Diamond State Port Corp.,* 990 A.2d 393, 396 (Del.Super.2010) (quoting *Rhone–Poulenc,* 616 A.2d at 1197).

52    *Eagle,* 702 A.2d at 1232.

53    *Id.*

54    *Julian v. Julian,* No. 1892–VCP, 2010 WL 1068192, at *5 (Del. Ch. Mar. 22, 2010) (quoting *Concord Steel, Inc. v. Wilmington Steel Processing Co.,* No. 19035, 2009 WL 3161643, at *6 (Del. Ch. Sept. 30, 2009)).

55    *Axis Reinsurance Co. v. HLTH Corp.,* 993 A.2d 1057, 1063 (Del.Super.2010) (citing Restatement (Second) of Contracts § 203 (1981)); *Lorillard,* 903 A.2d 728; *O'Brien v. Progressive N. Ins. Co.,* 785 A.2d 281, 288 (Del.2001); *Holland v. National Auto. Fibres,* 194 A. 124, 127 (Del. Ch.1937)).

56    *Osborn ex rel. Osborn v. Kemp,* 991 A.2d 1153, 1160 (Del.Super.2010) (citations omitted).

57    *Levy v. Hli Operating Co.,* No. 1395–VCL, 2007 WL 2801383, at *7 (Del. Ch. May 16, 2007) (citation omitted).

58    *Id.*

59    *Id.*

60    *See id.*

61    *Quereguan v. New Castle County,* No. 20298–NC, 2006 WL 2522214, at *5 (Del. Ch. Aug. 18, 2006) (citing *Levy v. Hayes Lemmerz Int'l, Inc.,* No. 1395–N, 2006 WL 985361, at *11 (Del. Ch. Apr. 5, 2006)).

62    *Id.*

63    *Nike, Inc. v. Already, LLC,* 663 F.3d 89, 98 (2d Cir.2011) (quoting *Cardinal Chem. Co. v. Morton Int'l, Inc.,* 508 U.S. 83, 95 (1993)); 28 U.S.C. § 2201(a).

64    *E.R. Squibb & Sons, Inc. v. Lloyd's & Companies,* 241 F.3d 154, 177 (2d Cir.2001) (citation omitted) (quoting *Olin Corp. v. Consolidated Aluminum Corp.,* 5 F.3d 10, 17 (2d Cir.1993)).

65    *SR Int'l Bus. Ins. Co. v. Allianz Ins. Co.,* 343 Fed. App'x 629, 632 (2d Cir.2009) (citation omitted) (quoting *Associated Indem. Corp. v. Fairchild Indus., Inc.,* 961 F.2d 32, 35 (2d Cir.1992)).

66    *Employers Ins. of Wausau v. Fox Entm't Grp.,* 522 F.3d 271, 278 (2d Cir.2008) (citation omitted) (alteration in original) (quoting *E.R. Squibb & Sons, In c.,* 241 F.3d at 177).

67    *Niagara Mohawk Power Corp. v. Hudson River–Black River,* 673 F.3d 84, 105 (2d Cir.2012) (quoting *Dow Jones & Co. v. Harrods Ltd.,* 346 F.3d 357, 359 (2d Cir.2003)).

68    *See NAP, Inc. v. Shuttletex, Inc.,* 112 F.Supp.2d 369, 372 (S.D.N.Y.2000).

69    *See Lapoint,* 970 A.2d at 198. *See also Scharf,* 864 A.2d at 919 (citation omitted) (finding that a cause of action for indemnification accrues when the party seeking indemnification can be confident that the underlying action has been resolved with certainty).

70    *See* Complaint ¶ 13.

71    *See Lapoint,* 970 A.2d at 198. *See also Scharf,* 864 A.2d at 919 (citation omitted)

72    *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl.Mem.") at 12–15.

73    *See* Def. Mem. at 7 (quoting *Molex Inc. v. Wyler,* 334 F.Supp.2d 1083, 1086 (N.D.Ill.2004)). *See also LaPoint,* 970 A .2d at 197 (citation omitted) (adopting *Molex'* s reasoning in distinguishing between duty to defend claims, which can be resolved during the pendency of the underlying action, and duty to indemnify claims, which accrue only at the conclusion of the underlying action).

74    *See supra* Part V.B.I.

75    *Quereguan,* 2006 WL 2522214, at *5 (citing *Levy,* 2006 WL 985361, at *11).

76    *See* Def. Mem. at 14. *See also Levy,* 2006 WL 985361, at *11 (finding that common law indemnification actions become legally cognizable only when a payment is made to a third party on a particular action).

77    *See Associated Indem. Corp.,* 961 F.2d at 35 (finding that contingency does not defeat the jurisdiction of a declaratory judgment action and that insurance litigation has become the paradigm for asserting jurisdiction over future contingencies).

78    Agreement at 63.

Convergent Wealth Advisors LLC v. Lydian Holding Co., Not Reported in F.Supp.2d (2012)

2012 WL 2148221

79    *See Employers Ins. of Wausau,* 522 F.3d at 278 (finding that where a possibility exists of a party seeking coverage there is a case or controversy for the purposes of a declaratory judgment action).

80    *See* Def. Mem. at 5–9.

81    *See supra* Part V.B.I.

82    *See LaPoint,* 970 A.2d at 197 (citation omitted) (finding that duty to defend claims can be resolved during the pendency of the underlying action).

83    *See SR Int'l Bus. Ins. Co.,* 343 Fed. App'x at 632 (citing *Associated Indem. Corp,* 961 F.2d at 35) (citation and quotation marks omitted).

84    Def. Mem. at 10.

85    *See* Agreement at Exhibit D(2).

86    *Id.*

87    *See id.* at 63.

88    *See* Def. Mem. at 5.

89    *See LaPoint,* 970 A.2d at 197 (citation omitted) (finding that a duty to defend claim can be resolved during the pendency of the underlying action).

90    *See* Complaint ¶ 14.

91    *See id.* ¶¶ 10–11.

92    *See supra* Part V.B.I.

93    *See* Complaint ¶¶ 11–16.

94    *See id.* ¶ 14.

95    *See* Agreement at 11.

96    *See ConAgra Foods, Inc. v. Lexington Ins. Co.,* 21 A.3d 62, 72 (Del.2011) (finding that the duty to defend may be broader than the duty to indemnify and is triggered whenever any third party claim is covered by the terms of the contract). *See also LaPoint,* 970 A.2d at 197 (citation omitted).

97    *See supra* Part V.B.I.

98    *See* Pl. Mem. at 15.

99    *See Cuoco,* 222 F.3d at 112 (holding that repleading is futile when a complaint is substantively insufficient).

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC, S.D.N.Y., March 24, 2010

2009 WL 2242605

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Carlo DeBLASIO, et al., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

MERRILL LYNCH & CO., INC., et al., Defendants.

No. 07 Civ 318(RJS).

|

July 27, 2009.

West KeySummary

1    **Federal Civil Procedure**  ⬦  Fraud, mistake and condition of mind

Investors who alleged their financial advisors were able to use their uninvested cash for their own profit through a cash sweep program, did not adequately plead a claim for fraud. The investors complained the financial advisors held themselves out as fiduciaries, and took a number of well calculated steps in order induce the investors to give them their money. Because the complaint failed to identify the place and time of the alleged misrepresentations and their conclusory allegations were unsupported by factual assertions, the claim was dismissed pursuant to Rule 9(b). Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

52 Cases that cite this headnote

**Attorneys and Law Firms**

Joel Paul Laitman, Ashley H. Kim, Jay Paul Saltzman, Robert Chira, and Samuel P. Sporn, Schoengold Sporn Laitman & Lometti, P.C., New York, NY, for Plaintiffs.

Jay B. Kasner and Scott D. Musoff, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Defendants Merrill Lynch.

Allen W. Burton, Bradley Jay Butwin, and Daniel Lucas Cantor, O'Melveny & Myers LLP, New York, NY, for Defendants Merrill Lynch.

Andrew W. Stern and Alfred Robert Pietrzak, Sidley Austin LLP, New York, NY, for Defendants Citigroup.

Kenneth Ian Schacter and Theo J. Robins, Bingham McCutchen LLP, New York, NY, for Defendants Charles Schwab.

Michael Terrance Conway, Cameron S. Matheson, James A. Murphy, LeClair Ryan, P.C., New York, NY, for Defendants Wachovia.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge.

**\*1** In this putative class action, seven individual Plaintiffs bring claims under federal and state law, on behalf of themselves and all others similarly situated, alleging that five groups of banking entities engaged in "deceptive and misleading" practices relating to a series of "Cash Sweep Programs" that were offered as part of Plaintiffs' brokerage accounts. Plaintiffs bring claims for violations of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–1 *et seq.* ("IAA"), the Sherman Antitrust Act, 15 U.S.C. § 1, and 🚩 New York General Business Law § 349 (" 🚩 § 349"), as well as common-law claims for fraud, breach of fiduciary duty, aiding andabetting a breach of fiduciary duty, negligent misrepresentation, negligence, breach of contract, and unjust enrichment.

Before the Court are Defendants' five motions to dismiss Plaintiffs' claims pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendants' motions are granted.

I. BACKGROUND

The following information is derived from the Second Amended Complaint ("SAC"), the declarations and affidavits

submitted by the parties in connection with Defendants' motions, and the additional materials attached as exhibits thereto. [1] Plaintiffs' factual allegations are assumed to be true and all reasonable inferences are drawn in their favor. *See*

🔖 *In re Ades & Berg Group Investors,* 550 F.3d 240, 243 n. 4 (2d Cir.2008).

### A. Overview

This action relates to a brokerage account feature known as a "Cash Sweep Program." This feature is offered to retail investors by each of the five groups of Defendant banks, which the Court refers to as the Merrill Lynch Defendants, the Morgan Stanley Defendants, the Citigroup Defendants, the Charles Schwab Defendants, and the Wachovia Defendants. [2] Through these Programs, Plaintiffs were offered the option of having the balance of uninvested funds in their brokerage accounts, known as a "free credit balance," placed in—or, "swept" into—other types of investments. (*See* SAC ¶ 1.) [3] As a result of these "sweeps," Plaintiffs earned interest on the otherwise-uninvested funds in their brokerage accounts. (*Id.*)

Plaintiffs allege that, when Defendants initially implemented the Cash Sweep Programs, their free credit balances were swept into money market mutual funds that provided interest rates of approximately five percent. (*See id.* ¶ 6.) In these original Cash Sweep Programs, "the profits obtained by Defendants ... were limited in nature" and typically did not exceed an "expense ratio" of less than one percent of the principal. (*Id.* ¶ 65.) [4] Additionally, "since money market funds are maintained in a trust, those funds were unavailable for use by a brokerage firm to lend or invest in higher-yielding activities ...." (*Id.* ¶ 65 (emphasis omitted).)

According to Plaintiffs, Defendants subsequently modified their respective Cash Sweep Programs in a deceptive manner in an attempt to capitalize on "an immense opportunity for their own profit ...." (*Id.* ¶ 7.) In these modified Cash Sweep Programs, Defendants limited certain customers' ability to have their free credit balances swept into money market mutual funds, often according to the amount of assets deposited in the customers' brokerage accounts. (*Id.* ¶ 12.) Instead of mutual funds, many customers' free credit balances were swept into standard deposit accounts. (*See id.* ¶ 6.)

**\*2** Plaintiffs allege that these modified Cash Sweep Programs provided between one and two percent interest

on free credit balances, as opposed to the four to five percent interest that they had previously earned when their uninvested funds were swept into money market mutual funds. (*Id.*) Plaintiffs further allege that, by sweeping their free credit balances into depository accounts at affiliated banks, Defendants were able to "use their clients' uninvested cash for their own investment or commercial lending." (*Id.* ¶ 7.) Finally, Plaintiffs assert that, although Defendants significantly increased their profits through this modification to the Cash Sweep Programs, they "dramatically reduced the yields paid to their clients on the clients' uninvested cash ...." (*Id.* ¶ 9 (emphasis omitted).)

Plaintiffs contend that, in order to maintain the "massive profits" that resulted from these activities, Defendants concealed the modifications to their Cash Sweep Programs through a series of misleading statements and omissions. (*Id.* ¶ 18.) Plaintiffs argue that, as a result of this alleged fraudulent scheme, they were induced to remain enrolled in modified Cash Sweep Programs, despite the fact that there were more lucrative investments available for their uninvested free credit balances. Based on these allegations, Plaintiffs seek an unspecified amount of "damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial ...." (*Id.* ¶ 330(b).)

### 1. The Parties

Plaintiffs are seven retail investors who maintained brokerage accounts with one or more of Defendants at the time the SAC was filed; six hail from New York, and the seventh resides in North Carolina. (*Id.* ¶¶ 30–36.) [5] Plaintiffs bring claims on behalf of a putative class of "all those who maintained a brokerage account with one or more of the ... Defendants where the clients' uninvested cash was automatically swept into a Defendant controlled and affiliated bank account paying interest below prevailing money market yields." (*Id.* ¶ 54.)

Plaintiffs name as Defendants five groups of banks, each of which includes three types of entities: (1) a principal banking entity that functions as a parent firm (collectively, the "Parent Defendants"); (2) an affiliated broker-dealer subsidiary (collectively, the "Brokerage Defendants"); and (3) a series of affiliated subsidiaries that function as depository banks (collectively, the "affiliated Sweep Bank Defendants" or "affiliated Sweep Banks").

Parent Defendant Merrill Lynch & Co., Inc. is the parent of three wholly owned subsidiaries named in this action: Brokerage Defendant Merrill Lynch, Pierce, Fenner & Smith Inc., and affiliated Sweep Bank Defendants Merrill Lynch Bank, USA and Merrill Lynch Bank & Trust Co., FSB (collectively, the "Merrill Lynch Defendants"). (*Id.* ¶¶ 38–40.)

Parent Defendant Morgan Stanley is the parent of three wholly owned subsidiaries named in this action: Brokerage Defendant Morgan Stanley & Co., Inc., and affiliated Sweep Bank Defendants Morgan Stanley Bank and Discover Bank (collectively, the "Morgan Stanley Defendants"). (*Id.* ¶¶ 41–43.) [6]

**\*3** Parent Defendant Citigroup, Inc. is the parent to four wholly owned subsidiaries named in this action: Brokerage Defendant Citigroup Global Markets, Inc., and affiliated Sweep Bank Defendants Citibank N.A., Citicorp Trust Bank, FSB, and Citibank (South Dakota) N.A. (collectively, the "Citigroup Defendants"). (*Id.* ¶¶ 44–46.) [7]

Parent Defendant Charles Schwab Corp. is the parent to three wholly owned subsidiaries named in this action: Brokerage Defendant Charles Schwab & Co., Inc., and affiliated Sweep Bank Defendants Charles Schwab Bank, N.A., and U.S. Trust Company, N.A. (collectively, the "Charles Schwab Defendants"). (*Id.* ¶¶ 47–49.)

Parent Defendant Wachovia Corp. is the parent to three wholly owned subsidiaries named in this action: Brokerage Defendant Wachovia Securities, LLC, and affiliated Sweep Bank Defendants Wachovia Bank N.A. and Wachovia Bank of Delaware, N.A. (collectively, the "Wachovia Defendants"). (*Id.* ¶¶ 50–52.) [8]

### 2. The Evolution of the Cash Sweep Programs

Plaintiffs' allegations relate to the manner in which Defendants implemented three successive phases of their respective Cash Sweep Programs, which the Court refers to as the "Original Cash Sweep Programs," the "Modified Cash Sweep Programs," and the "Tiered Cash Sweep Programs."

#### a. The Original Cash Sweep Programs

Beginning in 1977, Defendants began to offer retail investment accounts that included both brokerage services and "bank-like features." (*Id.* ¶ 64.) The Original Cash Sweep Programs were one of the defining features of these types of accounts. (*See id.*) Through these Programs, Defendants used customers' free credit balances to purchase shares of money market mutual funds for those customers on a periodic basis, but still allowed the customers to write checks drawing on the swept funds. (*Id.; see also id.* ¶ 7.)

Plaintiffs allege that, "[u]ntil the late 1990s," the Original Cash Sweep Programs allowed customers to "receive the benefit of money market rates while also maintaining the [free credit balances] in safe and highly liquid investments." (*Id.* ¶ 65.) However, the profits earned by Defendants in connection with the Original Cash Sweep Programs were "generally small" and limited to an " 'expense ratio' that [was] ... less than 1% of the principal." (*Id.*) Plaintiffs further allege that, because the money under the control of a money market mutual fund is held in trust for the benefit of the fund's shareholders, Defendants were not permitted to use their customers' swept funds to raise profits through their other commercial activities. (*See id.*)

#### b. The Modified Cash Sweep Programs

Beginning in 1997, the Brokerage Defendants began to implement the Modified Cash Sweep Programs. (*Id.* ¶ 66.) In these Programs, the Brokerage Defendants offered customers an alternative to the Original Cash Sweep Programs in which they could have their free credit balances swept into FDIC-insured deposit accounts at affiliated Sweep Banks. (*Id.*) Plaintiffs allege that, although such deposit accounts traditionally pay lower interest rates than money market mutual funds, many of the Brokerage Defendants initially provided interest rates that were similar to the rates that customers had previously received in the Original Cash Sweep Programs. (*Id.*)

**\*4** However, Plaintiffs assert that, at some point after implementing the Modified Cash Sweep Programs, "it became irresistible to the Defendants to pay [their customers] *substantially lower* rates" on funds deposited at affiliated Sweep Banks and "to *restrict* access to alternative money market sweep accounts ...." (*Id.* (emphases in original).) In response to this incentive, Defendants allegedly "dramatically reduced the yields paid to their clients on the clients'

uninvested cash to well below money market yields—to even as low as less than 1%." (*Id.* ¶ 9 (emphasis omitted).)

Plaintiffs allege that, at the same time that Defendants began to pay their customers lower interest rates on their free credit balances, Defendants were seeking to enhance their own profits. (*See id.*) Specifically, as part of the Modified Cash Sweep Programs, when customers' funds were deposited at affiliated Sweep Banks, Defendants were able "to use their clients' uninvested cash for their own investment or commercial lending." (*Id.* ¶ 7.) These commercial endeavors allegedly resulted in substantially higher returns than Defendants received through the Original Cash Sweep Programs, and Plaintiffs assert that the net result of the transition to the Modified Cash Sweep Programs was that Defendants "reap[ed] massive profits at their clients' expense ...." (*Id.* ¶ 11.)

### c. The Tiered Cash Sweep Programs

In approximately June 2001, Defendants began to introduce the Tiered Cash Sweep Programs. (*Id.* ¶ 67.) In the Tiered Cash Sweep Programs, Defendants classified their customers according to "tiers" based on the amount of assets held in their brokerage accounts, and offered progressively lower interest rates on free credit balances to customers in the tiers with fewer assets. (*See id.*)

Plaintiffs allege that Defendants subsequently made further changes to the structure of the Tiered Cash Sweep Programs so that customers in the bottom asset tiers were *precluded* from having their free credit balances swept into money market mutual funds. (*See id.*) In these versions of the Tiered Cash Sweep Programs, some customers were forced to choose between either depositing their free credit balances at affiliated Sweep Banks, or not earning a profit on the uninvested funds in their accounts. (*See id.*)

The Tiered Cash Sweep Programs were allegedly designed to maximize Defendants' financial benefits by taking advantage of the retail brokerage customers who held the least amount of assets in their accounts. (*See id.* ¶ 12.) Plaintiffs allege that Defendants provided their "wealthiest and presumably their most sophisticated clients—who had assets of at least $1 million—... [with] higher money market yields in their bank sweep programs" so that they would "not balk" at the Tiered Cash Sweep Programs. (*Id.*)

Relying on certain Defendants' public filings, Plaintiffs allege that the Tiered Cash Sweep Programs resulted in approximately $186 billion of customers' free credit balances being deposited at the Defendant Sweep Banks and becoming available for use in Defendants' other commercial activities. (*Id.* ¶ 70.) Plaintiffs contend that "Defendants' ability to generate massive profits arose both from the ability to lend and invest client cash at eight percent or higher and from the fact that they were essentially able to create multibillion dollar banks—filled with captive brokerage client depositors —*without* any of the costs normally associated with commercial banking." (*Id.* ¶ 69 (emphasis in original).)

**\*5** Plaintiffs allege that, in an "attempt to camouflage" this "egregious ... 'client cash grab,' " Defendants implemented the Tiered Cash Sweep Programs through a deceptive scheme that was intended to defraud their customers. (*Id.* ¶ 10.) First, Plaintiffs allege that Defendants issued misleading statements in their advertisements and public websites that caused investors to believe that the Brokerage Defendants would "act not merely as 'stock brokers,' but rather as 'Financial Advisors' who [would] provide a special relationship of trust and confidence wherein the special interests of the client come first." (*Id.* ¶ 2.) Second, Plaintiffs argue that, by modifying the existing Cash Sweep Program features in their customers' brokerage accounts through "negative consent," Defendants "purposely put[ ] the burden on the client to parse through the[ir] 'Disclosures,' and affirmatively object in order for the sweep programs not to go into effect ...." (*Id.* ¶ 14 (emphasis in original).) Finally, Plaintiffs identify a series of alleged misrepresentations in the documents relating to their brokerage accounts, as well as the supplemental disclosures later issued by Defendants regarding the benefits of and alternatives to the Tiered Cash Sweep Programs. (*See id.* ¶¶ 13, 15–17.)

Based on these contentions, Plaintiffs argue that

> no reader of any of these purported "Disclosures" ... could ever glean from the words used ... that Defendants were obtaining billions of additional dollars in profit by sweeping client cash into Defendant banks as opposed to investing the cash in safe and liquid money market funds; yet were paying

their clients far below money market rates for Defendants' use of client cash.

(*Id.* ¶ 14.)

### 3. The February 2005 NYSE Information Memo

On February 15, 2005, the Member Firm Regulation Division of the New York Stock Exchange ("NYSE") issued Information Memo 05–11 to its member firms. (SAC ¶ 75; *see also* Terry Decl. Ex. B (the "NYSE Info. Mem." or the "Memo").).)[9] In the Memo, NYSE expressed concern that changes to its members' Cash Sweep Programs "may be so significant and beyond the ... reasonable expectations of the customer at the time of the prior [brokerage account opening] agreement that without effective subsequent disclosure the use of prior or negative consent is not sufficient." (N.Y.SE Info. Mem. at 2.) The Memo described a series of "best practices"—based on NYSE Rules—that were "designed to safeguard investor interests for [cash sweep] programs currently in place." (*Id.* at 1.)

NYSE suggested that its member firms make a series of disclosures accompanied by a "concise document, preferably on one or two pages, written in plain English and referring customers to places where additional and more detailed disclosure is available." (*Id.* at 3.) NYSE also recommended that its members disclose the terms, conditions, risks, and features of the Cash Sweep Programs, including "conflicts of interest, current interest rates, the manner by which future interest rates will be determined, as well as the nature and extent of ... insurance available." (*Id.*)

**\*6** However, the Memo stated that, "[w]ith regard to existing sweep programs, it is not intended that member organizations which secured prior consent and made effective subsequent disclosure secure affirmative consent for such programs." (*Id.* at 2 n. 2.) Rather, the Memo instructed that:

> Member organizations which have previously instituted or changed sweep arrangements without providing all of the appropriate disclosures discussed herein should effectively provide customers with those omitted

disclosures promptly, but no later than three months after the date of this Information Memo. The utilization of the one or two page, plain English disclosure document discussed herein is required, and if so deemed by the member organization may be sufficient to satisfy these disclosure requirements.

(*Id.* at 5.)

### B. Plaintiffs' Specific Allegations Regarding Defendants' Cash Sweep Programs

In this Part, the Court briefly describes Plaintiffs' allegations against each group of Defendants in order to provide a timeline of the events at issue. Defendants' alleged misrepresentations and omissions are discussed below in connection with the Court's analysis of Plaintiffs' common-law fraud claim. *See infra* Part II.B.3.b.

### 1. The Merrill Lynch Defendants

In approximately 1977, the Merrill Lynch Defendants became the first group of Defendants to make available an Original Cash Sweep Program, which was offered in connection with Merrill Lynch's "Cash Management Account," or "CMA." (SAC ¶ 64.) In March 2000, the Merrill Lynch Defendants began to provide their version of a Modified Cash Sweep Program, and, in June 2001, they introduced a Tiered Cash Sweep Program. (*Id.* ¶¶ 66, 67, 90.) The Merrill Lynch Defendants' Cash Sweep Program was described to customers in two undated documents cited and relied upon by Plaintiffs: the "Merrill Lynch Client Relationship Agreement," and the "Disclosures and Account Agreement" relating to, *inter alia,* the "CMA Financial Service Cash Management Account." (*See, e.g.,* SAC ¶¶ 107–09, 111–12; *see also* Pls.' Merrill Lynch Decl. Exs. 8, 9.)

Additionally, an "Information Statement" issued in 2001 regarding the Merrill Lynch Defendants' Tiered Cash Sweep Program stated that, "[e]ffective June 6, 2001, the interest rates paid to clients with deposits held at the Merrill Lynch Banks" would be determined by Merrill Lynch "based on economic and business conditions, and interest rates will be

tiered based upon your relationship with Merrill Lynch as determined by the value of assets in your account(s)." (SAC ¶ 101; *see also* Pls.' Merrill Lynch Decl. Ex. 7.)

Plaintiffs Ronald Kassover and Jerome Silverman allege that, at the time the SAC was filed, they maintained "brokerage account[s]" with the Merrill Lynch Defendants. (SAC ¶¶ 31–32.) Kassover opened a CMA account with the Merrill Lynch Defendants in July 1985, and alleges that, as of December 31, 2006, he was earning 3.20% on the "uninvested cash awaiting investment" in his account. (*Id.* ¶ 31; Musoff Decl. Ex. 3.) Silverman opened a CMA account with the Merrill Lynch Defendants in August 1999, and he alleges that, as of January 31, 2007, he was earning 1.45% interest on his free credit balances. (SAC ¶ 32; Musoff Decl. Ex. 4.)

### 2. The Morgan Stanley Defendants

**\*7** The Morgan Stanley Defendants' Original Cash Sweep Program was offered as part of its "Active Assets Account," which was a brokerage account that provided "[p]ractical investment features," "essential cash management services," and "[u]nparalleled reporting" so that customers were "always in control of [their] money." (SAC ¶ 165; *see also* Pls.' Morgan Stanley Decl. Ex. 7.) The "practical investment features" associated with this account included an "[a]utomatic cash sweep," in which "[a]vailable cash balances [we]re automatically swept into bank deposit accounts ... or a money market fund .... " (Pls.' Morgan Stanley Decl. Ex. 8.)

Plaintiffs allege that, in "early September 2005," the Morgan Stanley Defendants provided notice to their customers that they would be implementing a Tiered Cash Sweep Program in November 2005. (*See* SAC ¶¶ 66, 162.) According to a media report regarding the revisions, the Morgan Stanley Defendants' Tiered Cash Sweep Program swept customers' free credit balances into affiliated Sweep Banks, and paid interest to those customers based on the value of the assets they had invested. (*See id.* ¶ 162 (quoting *Investment News* ).)[10]

Plaintiffs further allege that, in March 2006, Morgan Stanley issued a "Bank Deposit Program Disclosure Statement." (*Id.* ¶ 168; *see also* Pls.' Morgan Stanley Decl. Ex. 9.) The Disclosure Statement stated that "[u]nder the Bank Deposit Program ..., free credit balances in your Morgan Stanley brokerage account ... will be automatically deposited into

deposit accounts" at affiliated Sweep Banks. (*Id.* ¶ 169.) The Disclosure Statement further stated that "[t]he interest rates on the Deposit Accounts will be tiered based upon the value of the eligible assets in your Account ... and deposits, if any, that you have established directly in your name with a Sweep Bank ...." (Pls.' Morgan Stanley Decl. Ex. 9 at 2.)

Plaintiffs Kassover and Arthur Kornblit allege that they maintained "brokerage account[s]" with the Morgan Stanley Defendants. (SAC ¶¶ 31, 35.) Kassover opened an Active Assets Account in October 1999, and alleges that, as of December 31, 2006, he was earning 3.20% on the free credit balance in his account. (*Id.* ¶ 31; Cantor Decl. Ex. B.) Kornblit opened an Active Assets Account in July 2006, and alleges that, as of March 31, 2007, he was earning 1.25% interest. (SAC ¶ 35; Cantor Decl. Ex. C.)

### 3. The Citigroup Defendants

Defendant Smith Barney, which is now an affiliate of Citigroup, offered a "Financial Management Account" ("FMA") that included a "Daily Sweep" Program that it described as follows: "In an FMA account, your excess funds are never sitting idle. Cash balances of $1 or more are automatically invested into your choice of one or more FDIC-insured, interest-bearing accounts or tax-exempt money funds." (*Id.* ¶ 190.) Smith Barney began offering a Modified Cash Sweep Program in late 1997, and, after Citigroup merged with Salomon Smith Barney, Inc. in September 1998, the free credit balances of the Citigroup Defendants' retail brokerage clients were deposited at affiliated Sweep Banks. (*Id.* ¶ 185.)

**\*8** The SAC references an undated document authored by the Citigroup Defendants and titled "Important New Account Information," which described "[a]ccount [o]pening [p]rocedures," indicated that a "Client Agreement" was enclosed, and provided information regarding "Sweep Features" associated with the account. (Pls.' Citigroup Decl. Ex. 10.) Additionally, by letter dated August 1, 2006, the Citigroup Defendants notified their customers that they would be implementing a Tiered Cash Sweep Program. (*See* SAC ¶ 192; Pls.' Citigroup Decl. Ex. 8.) The letter was accompanied by a sixteen-page brochure titled "Q & A: Important Information about changes to the [Bank Deposit Program] and to Sweep Options." (SAC ¶ 192; *see also* Pls.' Citigroup Decl. Ex. 8.)

Plaintiffs Carlo DeBlasio and Kassover allege that they maintained "brokerage account[s]" with the Citigroup Defendants. (SAC ¶¶ 30–31.) DeBlasio alleges that, as of March 31, 2007, he was earning 1.41% on his "uninvested cash awaiting investment," and Kassover alleges that, as of December 31, 2006, he was earning 3 .24%. (*Id.* ¶¶ 30–31.)

### 4. The Charles Schwab Defendants

The Charles Schwab Defendants' Original Cash Sweep Program was known as "Schwab One Interest." (*See* SAC ¶ 131.) These Defendants implemented a Modified Cash Sweep Program on October 27, 2003, and they issued a "Disclosure Statement for Schwab Cash Features" at some point in 2004 explaining the changes to the Program. (*Id.; see also* Pls.' Charles Schwab Decl. Ex. 14.) The Disclosure Statement indicated that uninvested funds would be deposited at a Charles Schwab-affiliated Sweep Bank. (SAC ¶ 145.) The Disclosure Statement also indicated that, "[g]enerally, clients with greater Household Balances will receive a higher interest rate ...." (*Id.*)

In "early 2005," the Charles Schwab Defendants implemented a Tiered Cash Sweep Program. (*Id.* ¶¶ 132–34.) During 2005, they notified their customers that " '[b]eginning [January 23, 2006], Schwab [would] stop putting uninvested cash in money market funds' even for its *current* customers whose 'household' balances were under $500,000." (*Id.* ¶ 134 (emphasis in original) (quoting the *San Francisco Chronicle* ).) Finally, a document titled "Cash Features Disclosure for Individual Investors," which is dated March 2007 and referenced in the SAC, described the available cash management features for the Charles Schwab Defendants' brokerage customers. (*See* Pls.' Charles Schwab Decl. Ex. 16.)

Plaintiffs Deborah Torres and Michael R. Schirripa allege that they maintained "brokerage account[s]" with the Charles Schwab Defendants. (SAC ¶¶ 33–34.) Torres opened a "Schwab Rollover IRA" Account in November 2005, and alleges that, as of March 31, 2007, she was earning 2.55% on the free credit balance in her account. (*Id.* ¶ 33; *see also* Schachter Decl. Ex. C.) Schirripa opened a "Schwab Custodial" Account in February 1998, and a "Schwab One" Account in April 2004. (Schachter Decl. Exs. A, B.) He alleges that, as of March 31, 2007, he was earning 0.965%, and that on or about May 1, 2007 the Charles Schwab Defendants "phased out [their] Schwab One Interest feature .... " (SAC ¶ 34.)

### 5. The Wachovia Defendants

**\*9** The Wachovia Defendants offered a "Command Asset Program," which they advertised as including a "[d]aily cash sweep with [a] competitive rate." (*Id.* ¶ 216.) During the fourth quarter of 2003, they instituted a Modified Cash Sweep Program, and on January 23, 2006, the Wachovia Defendants began to offer a Tiered Cash Sweep Program. (*Id.* ¶¶ 224, 227.) The Wachovia Defendants provided information regarding their Cash Sweep Program through an undated "Cash Sweep Program Disclosure Statement," which is referenced in the SAC. (*Id.* ¶¶ 230–31; *see also* Pls.' Wachovia Decl. Exs. 12–13.) [11]

Plaintiff Carol Washburn alleges that she maintained a "brokerage account" with the Wachovia Defendants. (SAC ¶ 36.) The account was opened in August 2002, and, as of February 28, 2006, Washburn was earning 3.29% on her "uninvested cash awaiting investment." (SAC ¶ 36; *see also* Terry Decl. Ex. C.)

### C. Procedural History

Plaintiffs commenced this putative class action by filing a complaint on January 12, 2007. (Doc. No. 1.) The case was originally assigned to the Honorable Victor M. Marrero, District Judge. (*Id.*) Plaintiffs filed an amended complaint on May 1, 2007 (Doc. No. 5), and the SAC was filed on June 11, 2007 (Doc. No. 8).

This matter was reassigned to the undersigned on October 1, 2007. (Doc. No. 30.) Defendants filed the instant motions on November 12, 2007, and briefing on the motions was completed on March 6, 2008. (Doc. Nos.78–85.)

## II. DISCUSSION

Plaintiffs bring claims for violations of the IAA and § 349, as well as common-law claims for fraud, negligent misrepresentation, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, negligence, breach of contract, and unjust enrichment. [12]

For the reasons set forth below, the Court concludes that: (1) with the exception of the § 349 claim, Plaintiffs have not pleaded their claims with the particularity required by Rule 9(b), and (2) all of Plaintiffs' claims are subject to dismissal pursuant to Rule 12(b)(6). Accordingly, Defendants' motions are granted, and the SAC is dismissed.

### A. Rule 9(b)

Reviewing the SAC in its entirety, the Court concludes that, with the exception of the § 349 claim, each of Plaintiffs' claims sounds in fraud and therefore is subject to a heightened pleading standard. *See* Fed.R.Civ.P. 9(b). However, Plaintiffs' allegations lack the particularity required by Rule 9(b). Therefore, the Court dismisses Plaintiffs' claims for violations of the IAA, common-law fraud, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, negligent misrepresentation, negligence, breach of contract, and unjust enrichment.

### 1. Applicable Law

"While the rules of pleading in federal court usually require only 'a short and plain statement' of the plaintiff's claim for relief, averments of fraud must be 'state[d] with particularity.' " *In re PXRE Group, Ltd., Sec. Litig.,* 600 F.Supp.2d 510, 524 (S.D.N.Y.2009) (quoting Fed.R.Civ.P. 8, 9(b)); *see also* *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98–99 (2d Cir.2007). The language of Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir.2004). "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." *ATSI Commc'ns,* 493 F.3d at 99 (citing *Rombach,* 355 F.3d at 171).

**\*10** In order to satisfy Rule 9(b), the plaintiff must: " '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Rombach,* 355 F.3d at 170 (quoting

*Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)); *see also* *ATSI Commc'ns,* 493 F.3d at 99. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns,* 493 F.3d at 99. Moreover, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987); *see also* *Mills,* 12 F.3d at 1175 ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.' ").

### 2. Analysis

This case involves "classic fraud allegations, that is, allegations of misrepresentations and omissions made with intent to defraud ...." *In re Ultrafem Inc. Sec. Litig.,* 91 F.Supp.2d 678, 691 (S.D.N.Y.2000). The gravamen of the SAC is that

> Defendants engaged in *deceptive and misleading* "cash sweep" programs ... whereby Defendants, acting in the role and guise of Plaintiffs' "Financial Advisors" caused billions of their clients' uninvested cash to be automatically swept ... into Defendants' owned and controlled bank accounts, so that [D]efendants were able to use their clients' uninvested cash for *their own profit* ....

(SAC ¶ 1 (first emphasis added).) Specifically, Plaintiffs allege that

> [s]o egregious was Defendants' "client cash grab" that Defendants *well understood* that they needed to take a number of *well calculated steps*—including a mixture of *blatant misrepresentations* and obtuse and

misleading disclosures—in order to attempt to camouflage or conceal the deceit and fraud from their own clients and the public.

(*Id.* ¶ 10 (emphasis added).) Elaborating on this theory, Plaintiffs further allege that "Defendants, by their *affirmative misrepresentations,* held themselves out as fiduciaries with their loyalties and trust to ... enhance their clients' assets and accounts, including their cash holdings." (*Id.* ¶ 6 (emphasis added).)

As these quotations from the SAC make clear, this action is based on averments of fraud. In light of this general theory of the case, there is little question that four of Plaintiffs' claims are subject to the requirements of Rule 9(b): common-law fraud; violations of the IAA (*see* Pls.' Mem. at 36 (referring to Defendants' alleged "scheme to defraud clients" under the IAA)); breach of fiduciary duty (*see* SAC ¶¶ 278, 285 (alleging that "Defendants participated in a false and deceptive scheme" and that their "conduct was willful, wanton, and reckless")); and aiding and abetting a breach of fiduciary duty (*See id.* ¶ 288 (alleging that the Parent and Sweep Bank Defendants "knowingly induced ... fiduciary breaches" by, *inter alia,* "approving or ratifying both the bank sweep programs ... and the disclosures" regarding the Programs)). *See, e. g., Frota v. Prudential–Bache Sec.,* 639 F.Supp. 1186, 1193 (S.D.N.Y.1986) ("Rule 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty—statutory, common law, tort, contractual, or fiduciary."). Plaintiffs offer no argument to the contrary with respect to these claims, which therefore must be pleaded with particularity pursuant to Rule 9(b).

**\*11** Superficially, Plaintiffs' claims for negligent misrepresentation, negligence, breach of contract, and unjust enrichment present closer questions. However, the Second Circuit has noted with approval the Ninth Circuit's rejection of a plaintiff's "effort to characterize claims by the label used in the pleading" because " '[t]hese nominal efforts are unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims ....' " *Rombach,* 355 F.3d at 172 (quoting *In re Stac Elecs. Sec. Litig .,* 89 F.3d 1399, 1405 n. 2 (9th Cir.1996)). Just so here. To the extent any of Plaintiffs' claims are "premised on fraudulent conduct, the facts alleging that conduct are subjected to the higher pleading standard of [Rule

9(b) ]." *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.,* 234 B.R. 293, 311 (Bankr.S.D.N.Y.1999); *see also Daly v. Castro Llanes,* 30 F.Supp.2d 407, 414 (S.D.N.Y.1998) (citing *O'Brien v. Nat'l Prop. Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991)). Consequently, "[t]he ultimate question is whether, at its core, the [SAC] is predicated on allegations of fraudulent conduct." *Ladmen Partners, Inc. v. Globalstar, Inc.,* No. 07 Civ. 976(LAP), 2008 WL 4449280, at \*11 (S.D.N.Y. Sept.30, 2008); *see also Rombach,* 355 F.3d at 171 ("[Rule 9(b) ] is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."); *Matsumura v. Benihana Nat. Corp.,* 542 F.Supp.2d 245, 252 (S.D.N.Y.2008) (holding that Rule 9(b) applied to all claims in a pleading that contained a "quintessential averment of fraud" and that, "to the extent the plaintiffs have alleged a fraud predicate for any of their claims, they have made no effort to meaningfully distinguish the fraud allegations in the amended complaint ..."); *In re Rezulin Prods. Liab. Litig.,* 133 F.Supp.2d 272, 285 (S.D.N.Y.2001) ("[A]lthough plaintiffs have characterized their claims as being for negligence, in substance they charge fraud.").

Plaintiffs have made, at most, a half-hearted effort to articulate a non-fraudulent basis for their claims for negligent misrepresentation, negligence, breach of contract, and unjust enrichment. Each of Plaintiffs' claims incorporates by reference all of the allegations in the SAC and is predicated on their allegations of affirmative representations by Defendants regarding the nature of the Cash Sweep Programs. (SAC ¶¶ 247, 255, 261, 270, 277, 286, 292, 298, 303.) "[W]here the complaint incorporates by reference prior allegations of fraud into other claims traditionally not perceived to be grounded in fraud, those claims must then be pleaded according to [Rule 9(b) ]." *Stratton Oakmont,* 234 B.R. at 311; *see also ICD Holdings S.A. v. Frankel,* 976 F.Supp. 234, 246 n. 53 (S.D.N.Y.1997); *cf. In re Alstom SA Sec. Litig.,* 406 F.Supp.2d 402, 410 (S.D.N.Y.2005) ("Plaintiffs cannot so facilely put the fraud genie back in the bottle."). Therefore, the Court looks to the gravamen of Plaintiffs' allegations, rather than the labels of their claims, to determine the applicability of Rule 9(b).

**\*12** With respect to Plaintiffs' claim for negligent misrepresentation, the Second Circuit has expressly left open

the question of whether such a claim is subject to Rule 9(b)'s pleading requirements. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 188 (2d Cir.2004). However, "[d]istrict court decisions in this Circuit have held that the Rule is applicable to such claims ...." *Id.* (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* No. 02 Civ. 1312(LMM), 2003 WL 21305355, at *4 (S.D.N.Y. June 5, 2003) (collecting cases)). Therefore, contrary to Plaintiffs' argument (Pls.' Mem. at 54), their negligent misrepresentation claim is not, as a matter of law, immune from Rule 9(b)'s particularity requirements. Moreover, this claim, as pleaded, is based on the "false and misleading" nature of Defendants' alleged "misrepresentations, concealment and omissions of material facts ...." (SAC ¶ 304.) In light of Plaintiffs' theory of this case and their contentions regarding the manner in which Defendants allegedly made misstatements and omissions, the Court concludes that the negligent misrepresentation claim must be pleaded with particularity.

This reasoning also applies to Plaintiffs' claims for negligence, breach of contract, and unjust enrichment. In their negligence claim, Plaintiffs allege that the Brokerage Defendants owed them a general duty of care as to the "deployment of 'sweep' monies," that the Brokerage Defendants violated these duties by, *inter alia,* "making the misrepresentations and omissions set forth" in the SAC, and that this conduct "was, *at minimum,* negligent." (*Id.* ¶¶ 293–95 (emphasis added).) Neither labeling the claim as one of negligence nor offering this "at minimum" caveat is sufficient to avoid the application of Rule 9(b).

In their breach of contract claim, Plaintiffs allege that, "by making the misrepresentations and omissions set forth" in the SAC, the Brokerage Defendants breached the implied covenant of good faith and fair dealing. (*See id.* ¶ 273; *see also* Pls.' Mem. at 57–58.) Finally, Plaintiff's unjust enrichment claim is based on the same predicate allegations relating to a fraudulent scheme, which purportedly "yielded enormous ill-gotten profits." (SAC ¶ 301.) Therefore, because these claims are based on the same allegations of intentional misrepresentations and omissions by Defendants that are described throughout the SAC, they are subject to Rule 9(b). [13]

The SAC alleges that Defendants' conduct exceeded mere negligence, and rose to the level of "calculated" and intentional misdeeds. (*Id.* ¶ 10.) Rule 9(b) requires that where,

as here, these types of allegations are levied, the defendants named in the plaintiff's claims be afforded notice of the bases for the plaintiff's contentions. Accordingly, with the exception of Plaintiffs' claim under § 349, Plaintiffs' claims must be pleaded with particularity under Rule 9(b).

**\*13** Turning to the application of Rule 9(b), the structure of the SAC is crucial to the analysis. In the SAC, Plaintiffs define five short forms that include pairings of Parent Defendants and Brokerage Defendants: "Merrill Lynch" (SAC ¶¶ 38–39); "Morgan Stanley" (*id.* ¶¶ 41–42); "Smith Barney" (*id.* ¶¶ 44–45 (collectively referring to Defendants Citigroup, Inc. and Citigroup Global Capital Markets Inc.)); "Schwab" (*id.* ¶¶ 47–48); and "Wachovia" (*id.* ¶¶ 50–51). Plaintiffs' definitions of these short forms do not include the Sweep Bank Defendants. Instead, Plaintiffs identify in separate paragraphs the Sweep Bank Defendants that are affiliated with each of the five pairings of Parent and Brokerage Defendants. (*See id.* ¶¶ 40, 43, 46, 49, 52.) However, when presenting allegations regarding misstatements and other conduct by Defendants (*see* Pls.' Mem. at 39–40), Plaintiffs attribute all such acts to the respective pairings of Parent and Brokerage Defendants. (*See, e.g., id.* ¶¶ 81, 120, 154, 176, 208.)

The SAC's presentation of allegations in this fashion is insufficient as a matter of law with respect to the claims to which Rule 9(b) is applicable. First, Plaintiffs have not adequately pleaded fraudulent misstatements or omissions by the Sweep Bank Defendants. Based on Plaintiffs' allegations, the Sweep Bank Defendants were little more than passive recipients of the free credit balances that were swept out of accounts maintained by the Brokerage Defendants. Indeed, not a single allegation in the 330–paragraph SAC directly identifies a statement or act by the Sweep Bank Defendants, and the vast majority of the references in the pleading to these Defendants appear in quotations that Plaintiffs attribute to other Defendants. (*See, e.g.,* SAC ¶¶ 99, 202.) Plaintiffs offer no explanation for this deficiency. Accordingly, with the exception of the § 349 claim, Plaintiffs' claims against the Sweep Bank Defendants are dismissed pursuant to Rule 9(b).

Second, to the extent the SAC does contain allegations regarding fraudulent misstatements, omissions, and other misconduct by Defendants, Plaintiffs attribute such events to Parent–Brokerage Defendant pairings rather than to specific parties. Such allegations do not satisfy Rule 9(b). Plaintiffs " 'may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant

named in the complaint is entitled to be [apprised] of the circumstances surrounding the fraudulent conduct with which he individually stands charged.' " *Am. Fin. Int'l Group–Asia, L.L.C. v. Bennett,* No. 05 Civ. 8988(GEL), 2007 WL 1732427, at *7 (S.D.N.Y. June 14, 2007) (quoting *Red Ball Interior Demolition Corp. v. Palmadessa,* 874 F.Supp. 576, 584 (S.D.N.Y.1995)); *see also Mills,* 12 F.3d at 1175; *DiVittorio,* 822 F.2d at 1247; *Filler v. Hanvit Bank,* Nos. 01 Civ. 9510, 02 Civ. 8251(MGC), 2003 WL 22110773, at *3 (S.D.N.Y. Sept. 12, 2003) (finding that the plaintiffs had failed to meet the requirements of Rule 9(b) because they failed to "make allegations with respect to each defendant, but instead refer [red] only generally to the defendants as 'the Banks' or 'the Korean Banks' "); *Ellison v. Am. Image Motor Co., Inc.,* 36 F.Supp.2d 628, 640–41 (S.D.N.Y.1999); *Silva Run Worldwide Ltd. v. Gaming Lottery Corp.,* No. 96 Civ. 3231(RPP), 1998 WL 167330, at *11 (S.D.N.Y. Apr.8, 1998); *Primavera Familienstiftung v. Askin,* 173 F.R.D. 115, 126 (S.D.N.Y.1997); *Pallickal v. Tech. Int'l Ltd.,* No. 94 Civ. 5738(DC), 1996 WL 153699, at *1 (S.D.N.Y. Apr.3, 1996); *Manela v. Gottlieb,* 784 F.Supp. 84, 87 (S.D.N.Y.1992).

**\*14** Lastly, Plaintiffs make almost no effort to identify the place and time that these alleged misrepresentations were made to them, and Plaintiffs' allegations regarding why the statements were materially misleading are deficient. *See, e.g., Ben Hur Moving & Storage, Inc. v. Better Bus. Bureau,* No. 08 Civ. 6572(JGK), 2008 WL 4702458, at *4 (S.D.N.Y. Oct.3, 2008) ("The plaintiff's complaint fails [the Rule 9(b) ] standard because the allegations in the complaint do not specify the time, place, [or] speaker ... of the misrepresentations that were allegedly made through the mails and over the Internet."). Specifically, the Court finds unavailing Plaintiffs' assertions that Defendants' statements were "materially false and misleading" because: (1) Defendants' retail brokerage customers were offered "no alternative vehicles for uninvested cash" (*see, e.g.,* SAC ¶ 104); (2) "no *bona fide* disinterested 'Financial Advisor' would ever recommend" enrolling in the Cash Sweep Programs (*see, e.g., id.* ¶ 118); and (3) Defendants failed to disclose the amount of their profits from these Programs (*see, e.g., id.* ¶ 115). Plaintiffs have not pleaded facts suggesting that Defendants were under an obligation to provide them with investment advice, *see infra* Part II.B.2.b (discussing Plaintiffs' IAA claim), and Defendants did not engage in a material omission by failing to disclose the precise amount of the profits they earned in connection with their respective Cash Sweep Programs, *see infra* Part II.B.3.c.(2) (concluding that this alleged omission was immaterial as a matter of law). Moreover, it is entirely unclear how these alleged omissions rendered fraudulent Defendants' disclosures regarding the mechanics of their respective Cash Sweep Programs, such as interest rates, the availability of FDIC insurance, and the manner in which Defendants earned money by providing these services. *See ATSI Commc'ns,* 493 F.3d at 99 (noting that "[a]llegations that are conclusory or unsupported by factual assertions are insufficient" to satisfy Rule 9(b)); *cf. Powe v. Cambium Learning Co.,* No. 08 Civ.1963(JGK), 2009 WL 2001440, at *7 (S.D.N.Y. June 9, 2009). Therefore, as to the Parent and Brokerage Defendants, Plaintiffs have failed to meet the requirements of Rule 9(b).

In sum, both the SAC and Plaintiffs' arguments in opposition to Defendants' motions make clear that their claims sound in fraud. As such, Plaintiffs must plead with particularity their claims for violations of the IAA, common-law fraud, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, negligent misrepresentation, negligence, breach of contract, and unjust enrichment. For the reasons stated above, Plaintiffs have not done so. Accordingly, these claims are dismissed pursuant to Rule 9(b).

### B. Rule 12(b)(6)

In addition to the SAC's lack of particularized allegations against each Defendant, Plaintiffs' allegations are also subject to three general deficiencies. First, Plaintiffs have failed to offer allegations capable of supporting a plausible inference that they had anything more than a nondiscretionary broker-client relationship with any Defendant. Second, although the Brokerage Defendants owed Plaintiffs a transaction-specific duty of care, Plaintiffs have not alleged that this duty was breached through Defendants' implementation of the Cash Sweep Programs. Third, Plaintiffs have not identified any materially misleading statements, or omissions by Defendants in contravention of an existing disclosure obligation. Therefore, as discussed in more detail below, these broad defects in the SAC prevent Plaintiffs from adequately pleading claims for the relief they seek. Accordingly, Defendants' motions to dismiss all of Plaintiffs' claims pursuant to Rule 12(b)(6) are granted.

DeBlasio v. Merrill Lynch & Co., Inc., Not Reported in F.Supp.2d (2009)

### 1. Legal Standard

**\*15** On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must draw all reasonable inferences in Plaintiffs' favor. *ATSI Commc'ns, 493 F.3d at 98; Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). Nonetheless, "[f]actual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true ...." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citation and emphasis omitted). "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009). Therefore, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id. at 1949.*

Ultimately, Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U .S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. On the other hand, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly,* 550 U.S. at 557) (internal citation omitted). Applying this standard, if Plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly,* 550 U.S. at 570.

### 2. Investment Advisers Act

In their first cause of action, Plaintiffs assert that the Brokerage Defendants' alleged misrepresentations and omissions regarding the Modified and Tiered Cash Sweep Programs breached "fiduciary dut[ies]" owed to their customers under the IAA. (*See* SAC ¶¶ 247–251.) Plaintiffs assert that they are entitled to have their "bank sweep account agreements" voided pursuant to 15 U.S.C. § 80b–15(b), and they seek an accounting, restitution, and disgorgement of "all monies and fees wrongfully obtained by Defendants and their affiliates pursuant to the bank sweep account program ...." (SAC ¶¶ 252, 254.)

For the reasons set forth below, the Court concludes that Plaintiffs' allegations do not support the existence of an investment advisory relationship under the IAA as to any Defendant, and that the relief Plaintiffs seek is unavailable in a private lawsuit under the statute. Therefore, Plaintiffs have failed to state a claim for alleged violations of the IAA, and this cause of action is dismissed pursuant to Rule 12(b)(6).

### a. Applicable Law

"[T]here exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract, but ... the Act confers no other private causes of action, legal or equitable." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 24, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). Section 206 of the IAA states that:

> **\*16** It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly ... to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

15 U.S.C. § 80b–6(2). This provision is given "teeth" by section 215 of the Act, which "provides that any investment adviser contracts whose formation or performance would violate the provisions of the IAA 'shall be void.' " *Norman v. Salomon Smith Barney, Inc.,* 350 F.Supp.2d 382, 388 (S.D.N.Y.2004) (quoting 15 U.S.C. § 80b–15).

In order to maintain a private action under section 215 of the IAA, a plaintiff must allege that he or she entered into a contract for investment advisory services with an

investment adviser. *See* Kassover v. UBS AG, No. 08 Civ. 2753(LMM), 2008 WL 5331812, at *3 (S.D.N.Y. Dec.19, 2008); Clark v. Nevis Capital Mgmt., LLC, No. 04 Civ. 2702(RWS), 2005 WL 488641, at *13 (S.D.N.Y. Mar.2, 2005) ("Only parties to an investment advisory contract may sue for rescission under section 215."). Moreover, the only relief available to a private litigant under the IAA is rescission and "restitution of the consideration given under the contract." Transamerica Mortgage Advisers, 444 U.S. at 25 n. 14. Therefore, a plaintiff may not seek "compensation for any diminution in the value of the rescinding party's investment alleged to have resulted from the adviser's action or inaction." *Id.; see also* Kassover, 2008 WL 5331812, at *5.

b. Analysis

Plaintiffs' IAA claim is deficient in at least two respects: (1) Plaintiffs do not allege that they received investment advisory services from Defendants, and they have not identified investment advisory contracts to which they were parties; and (2) in the absence of a voidable investment advisory contract, the relief sought by Plaintiffs is unavailable in a private right of action under the IAA.

Both the named Plaintiffs and the members of the putative class held nondiscretionary *brokerage* accounts with Defendants. (*See* SAC ¶¶ 30–36, 54.) That reality notwithstanding, Plaintiffs attempt to plead the existence of an investment advisory relationship with Defendants through the allegation that they entered into "express, implied or assumed cash sweep contracts" with the Brokerage Defendants. (*Id.* ¶ 248.) However, "[p]laintiffs must establish by more than conclusory allegations that the defendant was an investment adviser." Hall v. Paine, Webber, Jackson & Curtis, Inc., No. 82 Civ. 2840(DNE), 1984 WL 812, at *2 (S.D.N.Y. Aug.27, 1984). The opening of brokerage accounts does not automatically give rise to an investment advisory relationship under the IAA. *See* Kassover, 2008 WL 5331812, at *4 (dismissing IAA claim where "the contracts [p]laintiffs entered into and the only ones referred to in the Amended Complaint (and therefore properly considered in a motion to dismiss) are 'brokerage' agreements"). Thus, although there may have been agreements between Plaintiffs and the Brokerage Defendants regarding the Cash Sweep Programs, it does not necessarily follow that the agreements in question

provided for investment advisory services covered by the IAA.

**\*17** Indeed, the language of the documents provided to Plaintiffs in connection with their accounts indicates that no Defendant undertook to provide investment advisory services:

- The Merrill Lynch Defendants' "Disclosures and Account Agreement" regarding its CMA account disclaimed the existence of any right to unsolicited investment advisory services in relation to customers' free credit balances: "[N]either your Financial Advisor nor Merrill Lynch undertakes any obligation to ensure you receive any particular rate of interest or to advise you to invest your cash or bank deposit balances in higher yielding cash alternatives." (SAC ¶ 111.)

- The Morgan Stanley Defendants issued a March 2006 "Active Assets Account Client Agreement," which stated that "[t]his Account is a brokerage account and is not regulated by the Investment Advisors [sic] Act of 1940. The services and tools we offer in connection with this Account are brokerage tools." (Cantor Decl. Ex. D at 3.)

- The Citigroup Defendants' "Important New Account Information" document, which is relied on by Plaintiffs in the SAC (*see, e.g.,* SAC ¶ 202), stated that the "Smith Barney AssetOne account is a brokerage account and not an advisory account. Smith Barney's interests may not be the same as yours." (Pls.' Citigroup Decl. Ex. 10 at 71.) The document also warned customers that, "[i]f you decide to open an investment advisory account, we will provide you with more information regarding these services ...." (*Id.* at 3.)

- The Charles Schwab Defendants' "Schwab One Brokerage Account Application" listed its Tiered Cash Sweep Program as a "Brokerage Feature[ ]," and specifically stated that: "You agree that you ... are solely responsible for investment decisions in your Account.... Unless Schwab otherwise agrees with you in writing, Schwab does not have any discretionary authority or obligation to review or make recommendations for the investment of securities or cash in your Account." (Pls.' Charles Schwab Decl. Ex. 17 at 3, 7.)

- The Wachovia Defendants' "MarketLink Investor's Account Opening Form," which was completed by Plaintiff Carol Washburn—the only named Plaintiff who

alleges that she maintained an account at Wachovia—stated that "[a]ll transactions will be done only on my order or the order of my authorized delegate ...." (Terry Decl. Ex. D at 3.)

In their opposition to Defendants' motions, Plaintiffs argue that their Cash Sweep Program " 'contracts' consisted of disclosures approved—purportedly—by way of negative consent." (Pl.'s Mem. at 8 n. 7.) However, rather than providing investment advice regarding topics that would bring Defendants within the IAA's definition of "investment adviser"—such as, "the value of securities" or the "advisability of investing in ... securities," 15 U.S.C. § 80b–2(11)—the disclosure documents relating to Defendants' Modified and Tiered Cash Sweep Programs amended the terms of the features described in Plaintiffs' account agreements. These disclosure documents did not provide investment advice that brought the agreements within the purview of the IAA. See Kassover, 2008 WL 5331812, at *4 (finding that the plaintiffs' allegation that the defendant "recommended [that the] [p]laintiffs invest in [auction rate securities] is insufficient to infer an investment advisory agreement in the context of a non-discretionary brokerage account"). In fact, Defendants warned Plaintiffs that they should do their own research and seek additional advice if necessary:

> **\*18**  • Merrill Lynch Defendants: "You should review your account statement and speak to your Financial Advisor ... to determine current [interest] rates. You should also compare the interest rates, account charges and other features with other accounts, cash sweep programs, and alternative investments offered by Merrill Lynch or other institutions." (Pls.' Merrill Lynch Decl. Ex. 7 at 1.)

> • Morgan Stanley Defendants: "You should compare the terms, interest rates, required minimum amounts, and other features of the Deposit Accounts with other deposit accounts and alternative cash investments. You may obtain information with respect to the current interest rates and interest rate tiers by contacting your Financial Advisor or accessing Morgan Stanley's public Web site ...." (Pls.' Morgan Stanley Decl. Ex. 9 at 3.)

> • Citigroup Defendants: "You may obtain information about your Deposit Accounts, including balances, the current interest rate and the names and priority of the other Affiliated Program Banks at which Deposit Accounts are currently available by contacting your Financial Advisor." (Pls.' Citigroup Decl. Ex. 8 at 12.)

> • Charles Schwab Defendants: "You should compare the terms, interest rates, required minimum amounts, and other features of the Bank Deposit Feature with other accounts and alternative investments ." (Pls.' Charles Schwab Decl. Ex. 14 at 9.)

> • Wachovia Defendants: "You must monitor and determine the best sweep option for you under this program.... Wachovia Securities does not have any duty to monitor the Cash Sweep Option for your account or make recommendations about, or changes to, the Sweep Program that might be beneficial to you." (SAC ¶ 237.)

Apart from the allegations relating to these disclosure documents, no Plaintiff alleges that any specific interaction with a Brokerage Defendant took place that rose to the level of advice regarding investment in securities.

In light of Plaintiffs' failure to identify an investment advisory contract or other investment advisory services that they received from Defendants, it is of no moment that, generally speaking, the Brokerage Defendants registered some of their "Financial Advisors" as "Investment Advisers" under the IAA. See Norman, 350 F.Supp.2d at 388 (noting that the IAA provides "no remedy for plaintiffs who are not investor-clients" or for "conduct that is not pursuant to an investor-adviser contract"); Reserve Mgmt. Corp. v. Anchor Daily Income Fund, Inc., 459 F.Supp. 597, 608 (S.D.N.Y.1978) ("It is clear that an advisor/client relationship is essential to any action brought under Section 206."). Therefore, Plaintiffs cannot maintain a private cause of action under the IAA to void the agreements relating to the Cash Sweep Program features in their brokerage accounts because these contracts were not "investment advisory contracts" for purposes of the IAA.

In addition to the lack of allegations supporting an inference that an investment advisory relationship existed between Plaintiffs and Defendants, the relief Plaintiffs seek is unavailable in a private cause of action under the IAA. "The only remedy available under the Advisers Act is rescission of the investment advisory contract and restitution of consideration paid for investment advisory services." Kassover, 2008 WL 5331812, at *5. In their IAA claim, Plaintiffs seek: (1) "a declaratory judgment that the sweep account agreements with the Class are void"; (2) "an

accounting and restitution on behalf of the Class of all monies and fees wrongfully obtained by Defendants and their affiliates pursuant to the bank sweep account program[s]"; and (3) "disgorgement of all profits made by the Brokerage Defendants ....*" (SAC ¶ 254 .) Yet, because Plaintiffs have not identified an investment advisory contract in their allegations, there is no agreement to declare void or to rescind under the IAA. Moreover, as Plaintiffs have not alleged that they received investment advisory services, it is not surprising that the SAC lacks allegations regarding consideration paid *by Plaintifs* for such services. Indeed, the only fees alleged to have been paid by Plaintiffs are the general fees associated with their brokerage accounts. (*See, e.g., id.* ¶ 249.) Such fees are not recoverable in a private cause of action under the IAA. *See Transamerica Mortgage Advisers,* 444 U .S. at 24 n. 14. Similarly, Plaintiffs cannot use a private cause of action under the IAA to obtain a share of Defendants' *profits* from the Cash Sweep Programs. Even if Plaintiffs had alleged that they received investment advisory services, Defendants' profits did not constitute "consideration paid" by Plaintiffs for those services. *Kassover,* 2008 WL 5331812, at *5.

**\*19** Thus, Plaintiffs' allegations do not support a plausible inference that they were parties to investment advisory contracts, and the relief that they seek is unavailable under the IAA. Accordingly, Plaintiffs' claim for violations of the IAA is dismissed pursuant to Rule 12(b)(6).

### 3. Common-law Fraud [14]

Plaintiffs allege that Defendants committed common-law fraud by making a series of misrepresentations and omissions that "were false and misleading" because "customers' cash balances were being reinvested for [Defendants'] profits at the customers' expense." (SAC ¶ 263.) Specifically, Plaintiffs have identified five categories of alleged misrepresentations: two categories relate to Defendants' advertisements and public statements regarding the type of relationship Defendants aspired to develop with their clients, and the remaining three categories relate to the details of the Modified and Tiered Cash Sweep Programs. In addition to the alleged misrepresentations, Plaintiffs also contend that Defendants' failure to disclose the profits they earned from the Cash Sweep Programs was a material omission.

For the reasons stated below, the Court concludes that Plaintiffs have not adequately pleaded a plausible claim for common-law fraud based on the alleged misstatements and omissions identified in the SAC. First, Defendants' advertisements and other public statements regarding the nature and quality of their services constituted puffery. Second, reviewing as a whole the disclosure documents identified in the SAC, Plaintiffs have failed to identify any materially misleading statements by Defendants regarding the mechanics of the Cash Sweep Programs. Finally, with respect to Defendants' alleged failure to quantify their profits from the Cash Sweep Programs, the Court finds this omission to be immaterial as a matter of law. Accordingly, Plaintiffs' common-law fraud claim is dismissed.

### a. Applicable Law

The elements of a fraud claim under New York law are: "1) a material false representation made by defendant; 2) defendant intended to defraud plaintiff thereby; 3) plaintiff's reasonable reliance; and 4) plaintiff's damages as a result of the reliance."

*Randolph Equities, LLC v. Carbon Capital, Inc.,* No. 05 Civ. 10889(PAC), 2007 WL 914234, at *6 (S.D.N.Y. Mar.26, 2007) (citing *Keywell Corp. v. Weinstein,* 33 F.3d 159, 163–64 (2d Cir.1994)).

With respect to the requirement that the alleged misrepresentations and omissions be material, the Second Circuit has held that "certain information is 'so basic that any investor could be expected to know it.' " *Levitin v. Painewebber, Inc.,* 159 F.3d 698, 702 (2d Cir.1998) (quoting *Zerman v. Ball,* 735 F.2d 15, 21 (2d Cir.1984)). Specifically,

> the practice of a financial institution using money deposited with it to obtain earnings is neither unknown nor unexpected, much less nefarious. That is precisely how banks make money. Some bank accounts are not interest-bearing—*e.g.,* most checking accounts—even though the balances in such accounts are used by banks to earn money. Even interest-bearing bank accounts—and money market

accounts with brokers for that matter —do not return to the investor the amount earned but rather pay a contractual rate. *None of these routine practices is regarded as deceptive or even unusual.*

**\*20**  *Id.* at 703 (emphasis added).

### b. Alleged Misrepresentations

In their opposition to Defendants' motions, Plaintiffs identify five categories of statements that they contend were misleading: (1) promises of a "Special Relationship with Clients"; (2) statements regarding customers' rights as investors and Defendants' codes of ethics (the "Investor Rights Statements"); (3) statements about the financial benefits that Defendants received from the Modified and Tiered Cash Sweep Programs; (4) statements regarding potential benefits to customers from these Programs; and (5) statements describing customers' alternatives to depositing free credit balances at affiliated Sweep Banks in the Cash Sweep Programs. (Pls .' Mem. at 39–40.) Although there is some overlap between these categories, below the Court provides examples of each type of alleged misrepresentation identified by Plaintiffs.

### (1) Defendants' "Special Relationship with Clients"

Plaintiffs first allege that Defendants made a series of misrepresentations, which appeared for the most part on Defendants' websites and in their advertisements (*see, e.g.,* SAC ¶ 85), regarding the nature of the relationships that they sought to establish with clients and customers:

- "Merrill Lynch presented to its clients on its website a 'Client Commitment' statement which provide[d] in no uncertain terms that the client is Merrill Lynch's first priority ...." (*Id.* ¶ 8 1.)

- The Morgan Stanley Defendants' " 'Global Wealth Management' " website stated that " '[o]btaining your financial goals is number one ... on your Financial Advisor's list.' " (*Id.* ¶¶ 154–55 (quoting website).)

- The Citigroup Defendants maintained a "web page called 'Working with Your Financial Advisor,' " which

"emphasize[d] the importance in confiding and relying on the personal relationship with the Smith Barney Financial Advisor ...." (*Id.* ¶ 176.)

- The Charles Schwab Defendants' website contained an "open Letter to Investors" from "its namesake and founder, Charles Schwab," which stated that " '[f]rom day one, I've made it our business to put the needs of the individual investors first.' " (*Id.* ¶ 120 (quoting website).)

- The Wachovia Defendants' website stated that " '[a]t Wachovia Securities, our Financial Advisors are committed to your financial welfare.' " (*Id.* ¶ 212 (quoting website).)

Plaintiffs allege that these statements were misleading because, rather than seeking to maximize their customers' earnings on free credit balances, Defendants were allegedly using their customers' uninvested funds to increase their own profits. (*See, e.g., id.* ¶¶ 86, 89, 144.) According to Plaintiffs, "the cash sweep program[s] ensured ... clients were put *'second'* after [Defendants'] profit ...." (*Id.* ¶ 86 (emphasis in original).)

### (2) Defendants' Investor Rights Statements

Plaintiffs further allege that each group of Defendants issued a series of Investor Rights Statements regarding their commitments to customers. For example:

- **\*21**  The Merrill Lynch Defendants' "Commitment to Clarity" brochure stated that "[w]e believe that the needs of the investor should always come first." (*Id.* ¶ 88.)

- The Morgan Stanley Defendants' "Code of Ethics" stated that "the firm's clients, shareholders, competitors and the public have come to expect more from us than simple obedience to the letter of the law. They expect the highest degree of ethics, honesty and fairness in all our dealings." (*Id.* ¶ 160.)

- The Citigroup Defendants' Investor Rights Statement, which was titled "Our Mutual Commitment," stated that customers have a right "[t]o be treated in a fair, ethical and respectful manner in all interactions ...." (*Id.* ¶ 183.)

- The Charles Schwab Defendants' "Code of Business Conduct and Ethics" document "state[d] that [Charles Schwab's] 'Vision' is to 'Provide clients with the most

useful and ethical financial services in the world ....“ (*Id.* ¶ 129.)

• The Wachovia Defendants' website “include[d] a 'Client Commitment' web page which assure[d] clients that ... '[y]ou will be informed of any significant conflict of interest, and we will always act in your best interest.'“ (*Id.* ¶ 217 (quoting website).)

Similar to the first category, Plaintiffs allege that this category of misstatements was “deceptively false and misleading” because, although these statements suggested that Defendants would seek to maximize their customers' earnings on free credit balances, Defendants used the Cash Sweep Programs to maximize their own profits and paid customers lower amounts of interest. (*See, e.g., id.* ¶¶ 184, 219.)

### (3) Defendants' Benefits from the Cash Sweep Programs

In the third category of alleged misrepresentations, Plaintiffs allege that Defendants misstated the extent of the financial benefits that they derived from the Cash Sweep Programs. The alleged misstatements in this category are nearly identical as to each of the five groups of Defendants. (*See* SAC ¶ 114 (Merrill Lynch); *id.* ¶ 147 (Charles Schwab); *id.* ¶ 173 (Morgan Stanley); *id.* ¶ 197 (Citigroup); *id.* ¶ 242 (Wachovia).)

For example, Plaintiffs note that the Merrill Lynch Defendants disclosed to their customers that the modifications to the Cash Sweep Programs would “be financially beneficial” to them in an amount determined by the “difference between the interest paid and other costs incurred ... on bank deposits, and the interest or other income earned on [the Merrill Lynch Defendants'] loans, investments and other assets.” (*Id.* ¶ 114.) Plaintiffs allege that such statements were false and misleading because Defendants “failed to disclose the *amount* by which Merrill Lynch and its affiliates profited from bank account sweeps and that the sweep system was rigged to pay clients less interest than money market funds for the sole purpose of increasing Merrill Lynch profits at its clients['] expense.” (*Id.* ¶ 115 (emphasis in original); *see also id.* ¶ 148 (Charles Schwab); *id.* ¶ 174 (Morgan Stanley); *id.* ¶ 198 (Citigroup); *id.* ¶ 243 (Wachovia).)

### (4) Customers' Benefits from the Cash Sweep Programs

**\*22** Plaintiffs allege that, in order to entice customers to permit their free credit balances to be used in the Modified and Tiered Cash Sweep Programs, Defendants also made a series of misrepresentations regarding the benefits and advantages to customers of the Cash Sweep Programs. Like the alleged misstatements regarding the benefits Defendants derived from the Cash Sweep Programs, Plaintiffs' allegations regarding this category of misstatements are nearly identical as to each group of Defendants.

Examples of these alleged misstatements include promises that the Cash Sweep Programs would make customers' money “work harder” (*id.* ¶¶ 189–90), allow customers to “keep [their] money working” (*id.* ¶¶ 99, 165–66), and permit customers to “make the most of [their] cash” (*id.* ¶ 139). (*See id.* ¶ 97 (Merrill Lynch); *id.* ¶ 126 (Charles Schwab); *id.* ¶ 166 (Morgan Stanley); *id.* ¶ 189 (Citigroup).) Plaintiffs further allege that Defendants emphasized that participation in their respective Cash Sweep Programs was free, that deposits at affiliated Sweep Banks were insured by the FDIC, and that purchasing shares of money market mutual funds involved more risk because those investments were not FDIC-insured. (*See, e.g., id.* ¶¶ 15, 99, 126, 145, 191, 245.)

Plaintiffs allege that these statements were misleading because Defendants failed to disclose that customers' money would be “working *harder”* in money market mutual funds, as opposed to deposit accounts at affiliated Sweep Banks. (*See id.* ¶ 189 (emphasis added).) For example, Plaintiffs assert that the Merrill Lynch Defendants “did not maximize Plaintiffs' 'short term finances' or 'keep money working' effectively but rather ensured client cash was sweep [sic] into bank accounts where defendants could use the cash to truly 'maximize' Merrill Lynch's own profit.” (*Id.* ¶ 98.) Similarly, Plaintiffs allege that the Morgan Stanley Defendants' statements in this category were misleading because

> they failed to disclose that there was no reason to pay clients the bank rate [at affiliated Sweep Banks] other than to additionally enhance Morgan Stanley profits from the use of its clients' uninvested cash and that no *bona fide* disinterested 'Financial Advisor' would ever recommend ... a scheme

which would place uninvested cash in bank account[s] bearing interest of less than 1% over money market funds and that in all events such a scheme did not 'keep cash working' for Plaintiffs.

(*Id.* ¶ 167; *see also id.* ¶¶ 128, 144 (Charles Schwab); *id.* ¶ 196 (Citigroup); *id.* ¶ 246 (Wachovia).)

### (5) Customer Alternatives to Depositing Their Free Credit Balances at Affiliated Sweep Banks

Lastly, Plaintiffs allege that Defendants made misrepresentations regarding customers' alternatives to having their free credit balances deposited at affiliated Sweep Banks. Here, Plaintiffs identify a series of substantially similar statements made by each group of Defendants that directed customers to compare interest rates, evaluate other banks' Cash Sweep Programs, and speak with their "Financial Advisors" regarding alternatives for their free credit balances. (*See id.* ¶¶ 103, 109, 111–12 (Merrill Lynch); *id.* ¶ 152 (Charles Schwab); *id.* ¶ 171 (Morgan Stanley); *id.* ¶ 195 (Citigroup); *id.* ¶ 231 (Wachovia).)

**\*23**  For the most part, the SAC alleges that Defendants indicated to customers that money market mutual funds were the primary investment alternative to the Modified and Tiered Cash Sweep Programs. (*Id.* ¶ 99 (Merrill Lynch); *id.* ¶¶ 150–52 (Charles Schwab); *id.* ¶ 195 (Citigroup); *id.* ¶ 231 (Wachovia).) However, Plaintiffs contend that Defendants offered a misleading comparison between making deposits at Sweep Banks and owning shares of mutual funds. (*See, e.g., id.* ¶ 62.) Specifically, Plaintiffs allege that Defendants overemphasized the utility of the FDIC insurance accompanying deposits of free credit balances through the Modified and Tiered Cash Sweep Programs, and failed to disclose that shares of money market mutual funds are "universally accepted as highly safe investments ... because of the quality and duration of the investments made ... with little risk of default ." (*Id.* ¶ 6.)

Plaintiffs allege that these statements, including the comparisons, were deceptive, false, and misleading because: (1) in reality, Defendants "provided no alternative vehicles for uninvested cash ... other than allowing [customers'] cash to sit idle earning no interest at all" (*id.* ¶ 104); (2) the Cash Sweep Programs were "rigged to ensure that uninvested cash went

to [Defendants]" (*id.* ¶ 172); and (3) "no *bona fide* 'Financial Advisor' would recommend—much less implement—such an investment ... in place of money market funds" (*id.*).

### c. Analysis

In addition to the above-described allegations regarding misrepresentations, *see supra* Part II.B.3.b, Plaintiffs also allege that Defendants' failure to disclose the amount of their profits from the Cash Sweep Programs was materially misleading. The Court first addresses Plaintiffs' five categories of misrepresentations, and then analyzes the alleged omission regarding Defendants' profits. For the reasons stated below, these allegations are insufficient to adequately plead a claim for common-law fraud.

### (1) Defendants' Alleged Misrepresentations

Plaintiffs have failed to articulate a plausible theory under which the five categories of statements they have identified could be materially misleading to a reasonable investor. Plaintiffs' first two categories of alleged misrepresentations—those relating to Defendants' statements about their relationships with customers and Defendants' Investor Rights Statements—constituted nothing more than puffery. The remaining three categories, which relate to the benefits and alternatives for the Modified and Tiered Cash Sweep Programs, are not materially misleading.

As to the first category of alleged misrepresentations, Defendants' advertisements regarding their aspirations for customer relationships were immaterial puffery. *See, e.g.,*

*Hubbard v. Gen. Motors Corp.,* No. 95 Civ. 4362(AGS), 1996 WL 274018, at \*6 (S.D.N.Y. May 22, 1996) (" 'Puffing' has been described as making generalized or exaggerated statements such that a reasonable consumer would not interpret the statement as a factual claim upon which he or she could rely." (internal quotation omitted)). "The allegation that the customer was told that the broker's primary purpose was to make profits for the customer is nothing more than the common puff of a salesman and must be looked at from the point of view of a reasonable person.... The law does not give premiums for naivete." *Bowman v. Hartig,* 334 F.Supp. 1323, 1328 (S.D.N.Y.1971); *see also The Sample Inc. v. Pendleton Woolen Mills, Inc.,* 704 F.Supp. 498, 505–06 & n. 10 (S.D.N.Y.1989) (dismissing

fraud claim because manufacturer's advertisements about "relationships that last a lifetime" constituted "puffing"); *Frota,* 639 F.Supp. at 1190 (characterizing as puffery a series of alleged misrepresentations that the "plaintiffs' account would be 'properly and prudently managed,' ... [and] that [the defendant] was not only [the] plaintiffs' broker, but their 'friend, confidant and financial advisor' and a person whom [the] plaintiffs 'could trust to look after their interests' "); *cf.* ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Co., 553 F.3d 187, 206 (2d Cir.2009) (characterizing as puffery the defendants' statements regarding "high standards of integrity and credit-risk management" because "[n]o investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every investment bank makes these statements"). Therefore, this first category of alleged misrepresentations cannot serve as the basis for Plaintiffs' fraud claim.

**\*24** With respect to the second category of alleged misrepresentations, Plaintiffs appear to acknowledge in the SAC that Defendants' Investor Rights Statements either quote verbatim, or mimic, the 2004 "Best Practices" recommendations of the Securities Industryand Financial Markets Association regarding "Investor Rights." (*See* SAC ¶ 88 (alleging that the Merrill Lynch Defendants' statements regarding their "Commitment to Clarity" were "based on a Securities Industry Association 2004 statement"); *id.* ¶ 183 (alleging that Smith Barney's statement titled "Our Mutual Commitment" was "modeled from a 'Statement of Investor Rights and Responsibilities' adopted by the Board of the Securities Industry Association in 2004").) Therefore, Plaintiffs have not alleged that the Investor Rights Statements were anything more than an industry-wide set of maxims that were compiled by a trade group. *Cf.* ECA, 553 F.3d at 206. As with Defendants' advertisements, these statements did not contain facts or concrete promises of future performance that were specific to the relationship between the parties. *See* Nasik Breeding & Research Farm Ltd. v. Merck & Co. ., 165 F.Supp.2d 514, 530 (S.D.N.Y.2001) ("Terms [that] ... do not set forth a concrete representation as to the company's future performance ... are in the nature of commercial puffery and cannot form the basis for a fraud claim ...."). The "vigorous promotion" of a commercial venture "without more, is not a misrepresentation." *Id.* Therefore, the Court concludes that Plaintiffs' second category of alleged misstatements is immaterial as a matter of law. [15]

With respect to Plaintiffs' remaining three categories of alleged misrepresentations, the Court concludes that Defendants' disclosures regarding the nature and mechanics of their Cash Sweep Programs were not materially misleading. As to the third category—Defendants' benefits from the Sweep Programs—Plaintiffs contend that these statements "failed to meaningfully disclose the true benefits" that Defendants derived from the Cash Sweep Programs. (SAC ¶ 243.) However, that assertion is belied by the text of the disclosures Plaintiffs have included in the SAC, which reveal that Defendants disclosed the precise manner in which they would profit from the Cash Sweep Programs. For example, the Wachovia Defendants disclosed that:

> Wachovia Bank earns net income from the difference between the interest it pays on deposit accounts, such as the Bank Deposit Sweep Option, and the income it earns on loans, investments and other assets.... As a result of the fees and benefits described above, the Bank Deposit Sweep Option may be significantly more profitable to us than other available Cash Sweep Options.

(*Id.* ¶ 242.) The remaining four groups of Defendants made substantially similar disclosures, which are also detailed in the SAC. (*See id.* ¶ 105 (Merrill Lynch); *id.* ¶ 147 (Charles Schwab); *id.* ¶ 173 (Morgan Stanley); *id.* ¶ 197 (Citigroup); *id.* ¶ 242 (Wachovia).) Each group of Defendants explicitly explained the manner in which they would profit from the Cash Sweep Programs. Therefore, the Court concludes that Defendants' statements regarding the benefits they derived from the Cash Sweep Programs were not materially misleading.

**\*25** Similarly, Defendants' disclosures regarding customers' potential benefits from, and alternatives to, the Cash Sweep Programs were not materially misleading. Plaintiffs do not allege that Defendants' disclosures regarding the FDIC insurance on customer deposits at affiliated Sweep Banks contained actual misrepresentations. (*See, e.g., id.* ¶ 99.) Rather, they contend that Defendants overemphasized the advantages of FDIC insurance. However, that contention is not supported by the documents upon which Plaintiffs rely. For example, in the SAC, under the heading "Merrill

Lynch Deceptive Description Of Bank Deposit FDIC Insured Option," Plaintiffs identify as misleading the Merrill Lynch Defendants' disclosure that "money market funds are not insured or guaranteed by the Federal Deposit Insurance Corporation or any other governmental agency. Although the [money market] funds seek to preserve the value of your investment at $1 per share, it is possible to lose money by investing in the funds." (*Id.* ¶ 99 .) These disclosures were specifically called for by the NYSE (*See id.* ¶ 77; NYSE Info. Mem. at 3–4, 6), and Plaintiffs do not contest their veracity. Other than the bold typeface that Plaintiffs have used in the SAC, there is no basis for their conclusory allegation that Defendants "emphasiz[ed]" the availability of FDIC insurance to customers (*see, e.g.,* SAC ¶ 99), and there is nothing misleading about the statements themselves.

Morever, Plaintiffs' argument that "no *bona fide* disinterested 'Financial Advisor' would ever recommend" enrolling in the Modified or Tiered Cash Sweep Programs misstates the nature of the Brokerage Defendants' obligations to their customers. (*Id.* ¶ 144 (Charles Schwab; *see also id.* ¶ 100 (Merrill Lynch); *id.* ¶ 167 (Morgan Stanley); *id.* ¶ 196 (Citigroup); *id.* ¶ 246 (Wachovia).) Plaintiffs have not alleged that they sought, or that Defendants promised to provide, "*bona fide* investment advisory services." Although each set of Defendants recommended that their customers either contact a "Financial Advisor" regarding the Cash Sweep Programs or examine alternatives to the Programs on their own, no Plaintiff alleges that he or she did so. *See supra* Part II.B.2.b. Therefore, Plaintiffs' broad, categorical conjecture regarding the content of investment advice that they *might* have received from Defendants' Financial Advisors, *if they had sought such advice,* does not make these disclosures materially misleading.

There are also no factual allegations in the SAC that Defendants hindered Plaintiffs' investigation of suitable alternatives to the Cash Sweep Programs. Plaintiffs do allege that it would have been "pointless" to consult Defendants' "Financial Advisors" becausethey received commissions based on the amount of funds deposited at affiliated Sweep Banks. (SAC ¶ 104.) Although the fact that the Brokerage Defendants' employees received commissions in connection with the Cash Sweep Programs was likely material, *see, e.g., Press v. Quick & Reilly, Inc.,* 218 F.3d 121, 130 (2d Cir.2000), the SAC makes clear that Defendants disclosed the commissions structure. (*See* SAC ¶ 114 (Merrill Lynch); *id.* ¶ 149 (Charles Schwab); *id.* ¶ 173 (Morgan Stanley); *id.* ¶ 197 (Citigroup); *id.* ¶ 242 (Wachovia).) Accordingly, the Court

concludes that Defendants' disclosures about the alternatives and benefits available to customers from the Cash Sweep Programs were not materially misleading.

### (2) Defendants' Alleged Failure to Disclose Profits

**\*26** Plaintiffs also allege that, notwithstanding Defendants' disclosures regarding the manner in which they profited from the Cash Sweep Programs, Defendants' failure to disclose the actual amount of their profits was misleading. (*See, e.g., id.* ¶ 243 .) The Court disagrees, and concludes that these alleged omissions were also immaterial as a matter of law.

Plaintiffs repeatedly allege, in substance, that Defendants "failed to even attempt to disclose the billions of dollars in ... profit from the use of clients' uninvested cash at their clients' expense ...." (SAC ¶ 106 (emphasis omitted).) However, because this broad contention sits in significant tension with Plaintiffs' other allegations in the SAC, the Court is not obligated to accept it as true. *See, e.g., Koulkina v. City of New York,* No. 06 Civ. 11357(SHS), 2009 WL 210727, at \*6 (S.D.N.Y. Jan.29, 2009) ("[T]he 'Court [ ] is not obliged to reconcile plaintiffs' own pleadings that are contradicted by other matter asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint.'

" (quoting *Fisk v. Letterman,* 401 F.Supp.2d 362, 368 (S.D.N.Y.2005)) (first alteration in original)). Specifically, Plaintiffs also allege that, rather than concealing the profits from the Cash Sweep Programs, Defendants touted these earnings to the public. According to Plaintiffs, Defendants did so in media releases and press conferences (*see, e.g.,* SAC ¶¶ 92, 225), as well as in contemporaneous SEC filings (*see, e.g.,* SAC ¶¶ 8, 68, 70). Plaintiffs further allege that Defendants' profits from the Cash Sweep Programs were the subject of both press coverage and publicly available industry analysis. (*See, e.g., id* . ¶¶ 71, 94.) Thus, in light of these allegations, Plaintiffs' argument must be construed as a challenge to Defendants' failure to specifically identify the extent of their profits in disclosures transmitted directly to their retail brokerage clients.

The Court concludes that this more narrow alleged omission is immaterial as a matter of law. In *Levitin v. Painewebber, Inc.,* the Second Circuit affirmed the dismissal of a putative class action brought by the holder of a brokerage account against a broker-dealer that had effected short-sale transactions on the plaintiff's behalf. *See* 159 F.3d at 700–

01. The plaintiff alleged that the defendant had improperly used the collateral posted by customers in connection with short sales for its own financial benefit. *See id.* Specifically, the plaintiff alleged that " '[t]ypically,' " the defendant " 'will not inform its customers of ... the interest or profits ... [earned] from using the customer's property.' " *Id.* at 701 (quoting thecomplaint). Reviewing these allegations, the *Levitin* court held that "[a]n investor who is ignorant of the fact that free cash or securities may be used to earn interest or other kinds of financial returns is simply not reasonable by any measure." *Id.* at 702. The court further noted that the plaintiff "might as reasonably complain of [the defendant's] failure to disclose that the interest it pays to investors on money market accounts is less than that earned by [the defendant] on the amount in the account." *Id.*

**\*27** Plaintiffs seek greater disclosures than those sought by the plaintiffs in *Levitin.* There, the plaintiff argued that the defendant had failed to "disclose profits on the posted collateral." *Levitin,* 159 F.3d at 699. Here, as discussed above, *see supra* Part II.B.3.c, Defendants disclosed not only that they derived financial benefits from the Cash Sweep Programs, but also that the extent of their profits was governed by the difference between the interest rate paid to customers, and the rate of return Defendants earned by using their customers' free credit balances for other commercial purposes. (*See* SAC ¶¶ 105, 147, 173, 197, 242.) Plaintiffs argue that they were nevertheless entitled to additional disclosures regarding the precise amounts of profits that Defendants earned. Under *Levitin,* the failure to disclose such information in this context, absent a breach of some other duty to do so, is not actionable. Indeed, it would have been difficult, if not impossible, for Defendants to quantify in their disclosures to retail brokerage investors, *in advance,* the amount of profits they would earn through the Cash Sweep Programs. The law does not require such speculation. Therefore, in light of the disclosures made by Defendants, which Plaintiffs acknowledge, the Court concludes that the alleged omissions relating to the amount of Defendants' profits are immaterial as a matter of law.

In sum, the Court has carefully reviewed the disclosures by Defendants regarding the Cash Sweep Programs. This review has included both the specific statements identified by Plaintiffs, and, because the documents are integral to the pleading, the full-length disclosure documents referenced in the SAC. Having done so, the Court concludes that: (1) Plaintiffs have failed to identify a materially false or

misleading statement regarding Defendants' Modified and Tiered Cash Sweep Programs; (2) Defendants' disclosures regarding their respective Cash Sweep Programs would not have misled reasonable investors; and (3) the alleged omission of Defendants' exact amount of profits from these Programs was immaterial as a matter of law in light of the other disclosures. Accordingly, for these reasons, Plaintiffs' common-law fraud claim is dismissed pursuant to Rule 12(b)(6).

### 4. Breach of Fiduciary Duty and Aiding and Abetting a Breach of Fiduciary Duty

Plaintiffs bring a claim for breach of fiduciary duty against all Defendants (SAC ¶¶ 277–85), as well as a claim for aiding and abetting a breach of fiduciary duty against the Parent and Sweep Bank Defendants (*id.* ¶¶ 286–91). In support of these claims, Plaintiffs argue that the SAC "clearly pleads a breach of the duty of loyalty through the implementation of the" Modified and Tiered Cash Sweep Programs. (Pls.' Mem. at 26.)

However, Plaintiffs have offered no allegations that, if proven, would establish the existence of a fiduciary duty owed by the Parent and Sweep Bank Defendants to Plaintiffs. Moreover, as to the Brokerage Defendants, although the law recognizes a limited duty owed by brokers to the holders of brokerage accounts, that duty was not breached through the actions that these Defendants are alleged to have taken in connection with the Cash Sweep Programs. Thus, Plaintiffs have not stated a claim for breach of fiduciary duty, and in the absence of sufficient allegations of a primary breach, the claim for aiding and abetting a breach of fiduciary duty must also fail. Accordingly, for the reasons stated below, Plaintiffs' claims for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty are dismissed.

#### a. Applicable Law

**\*28** Under New York law, a claim for breach of fiduciary duty has three elements: " '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.' " *Alfaro v. Wal–Mart Stores, Inc. .,* 210 F.3d 111, 114 (2d Cir.2000) (quoting *Akins v. Glens Falls City Sch. Dist.,* 53 N.Y.2d 325, 333, 441 N.Y.S.2d 644, 424 N.E.2d 531 (N.Y.1981)).

"A fiduciary relationship exists ... 'when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.' " *Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 599 (2d Cir.1991) (quoting *Mandelblatt v. Devon Stores, Inc.,* 132 A.D.2d 162, 521 N.Y.S.2d 672, 676 (1st Dep't 1987)) (alteration in original). However, "when parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *Pan Am. Corp. v. Delta Air Lines, Inc.,* 175 B.R. 438, 511 (S.D.N.Y.1994) (internal quotation omitted). In this case, the relationship between a brokerage customer and a broker as to free credit balances is that of a debtor and creditor. *See Bissell v. Merrill Lynch & Co.,* 937 F.Supp. 237, 246 (S.D.N.Y.1996). Such a relationship "is not by itself a fiduciary relationship although the addition of 'a relationship of confidence, trust, or superior knowledge or control' may indicate that such a relationship exists." *In re Mid–Island Hosp., Inc.,* 276 F.3d 123, 130 (2d Cir.2002) (quoting *Delta Air Lines,* 175 B.R. at 511).

### b. Breach of Fiduciary Duty

With respect to the Parent and Sweep Bank Defendants, Plaintiffs have not sufficiently alleged the existence of a fiduciary duty. Instead, Plaintiffs offer only the conclusory assertion that the "Defendants," collectively, "through their agents and representatives, held themselves out as financial advisors to Plaintiffs and other Class members, and as such owed fiduciary duties to Plaintiffs and the other Class members." (SAC ¶ 278.) Similarly, in their opposition to Defendants' motions, Plaintiffs present no independent arguments in support of this claim against the Parent and Sweep Bank Defendants, and instead refer to "Defendants" *en masse.* (*See* Pls.' Mem. at 23–32.) However, Plaintiffs cannot maintain a claim for breach of fiduciary duty against these Defendants simply by levying a series of general allegations regarding their brokerage accounts.

"[A]bsent an allegation of a special relationship, mere assertions of 'trust and confidence' are insufficient to support a claim of a fiduciary relationship." *Abercrombie v. Andrew Coll.,* 438 F.Supp.2d 243, 274 (S.D.N.Y.2006). "Thus, for example, 'the fact that one party trusts the other is insufficient to create a fiduciary relationship.' " *Id.*

(quoting *Cumis Ins. Soc'y, Inc. v. Peters,* 983 F.Supp. 787, 797 (N.D.Ill.1997)). Other than the fact that Plaintiffs' free credit balances were deposited *by the Brokerage Defendants* at affiliated Sweep Banks, there are no allegations in the SAC regarding interactions—indirect or otherwise—between Plaintiffs and either the Parent or Sweep Bank Defendants. Therefore, Plaintiffs' breach of fiduciary claim as to these Defendants is dismissed.

**\*29** Nor are Plaintiffs' allegations sufficient to state a claim for breach of fiduciary duty against the Brokerage Defendants. As noted, under New York law, the " 'mere existence of a broker-customer relationship is not proof of its fiduciary character .' " *Bissell,* 937 F.Supp. at 246 (quoting *Rush v. Oppenheimer & Co.,* 681 F.Supp. 1045, 1055 (S.D.N.Y.1988)). As discussed in relation to Plaintiffs' IAA claims, *see supra* Part II.B.2.b, there are no allegations in the SAC, or in the documents that have been deemed integral to the pleading, tending to suggest that there was anything but a nondiscretionary brokerage relationship between Plaintiffs and the Brokerage Defendants. Indeed, each Plaintiff specifically alleges that he or she maintained one or more "brokerage" accounts (SAC ¶¶ 30–36), and Plaintiffs affirmatively argue in their opposition to Defendants' motions that "in fact, they had nothing more than an '[arms]-length' relationship—the same as with any commercial vendor ." (Pls.' Mem. at 40.)

The Second Circuit has offered cogent guidance on the legal obligations that arise out of such a relationship:

> [A] broker ordinarily has no duty to monitor a nondiscretionary account, or to give advice to such a customer on an ongoing basis. The broker's duties ordinarily end after each transaction is done, and thus do not include a duty to offer unsolicited information, advice, or warnings concerning the customer's investments.... The client may enjoy the broker's advice and recommendations with respect to a given trade, but has no legal claim on the broker's ongoing attention.

*de Kwiatkowski v. Bear, Stearns & Co., Inc.,* 306 F.3d 1293, 1302 (2d Cir.2002); *see also* *Press v. Chem. Inv. Servs. Corp.,* 166 F.3d 529, 536 (2d Cir.1999); *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,* 157 F.3d 933, 940–41 (2d Cir.1998); *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.,* 586 F.Supp.2d 172, 193 (S.D.N.Y.2008); *Crigger v. Fahnestock & Co., Inc.,* No. 01 Civ. 7819(JFK), 2003 WL 22170607, at *10 (S.D.N.Y. Sept.18, 2003) ("Where the broker is not recommending investments to the client, but rather acting primarily as a banker ..., a fiduciary duty is not created."); *Bissell,* 937 F.Supp. at 246 ("In the absence of discretionary trading authority delegated by the customer to the broker—and none is alleged in the case at bar—a broker does not owe a general fiduciary duty to his client.").

Thus, "absent an express advisory contract, there is no fiduciary duty on [the] part of [the] broker-dealer unless thecustomer is infirm or ignorant of business affairs." *Kwiatkowski,* 306 F.3d at 1308–09 (internal quotation omitted). A fiduciary duty owed by the Brokerage Defendants "could arise only if the law, under the circumstances of this case, imposes on [them] some special duty as a result of the relationship between the parties—that is, if [Plaintiffs'] account[s] deviated from the usual nondiscretionary account in a way that create[d] a special duty beyond that ordinary duty of reasonable care that applies to a broker's actions in nondiscretionary accounts." *Id.* at 1308. Such "transformative 'special circumstances' " include situations that "render the client dependent," such as "a client who has impaired faculties, or one who has a closer than arms-length relationship with the broker, or one who is so lacking in sophistication that *de facto* control of the account is deemed to rest in the broker." *Id.* The SAC lacks any such allegations.

**\*30** Notwithstanding this fact, Plaintiffs argue that the language of Defendants' advertisements was sufficient to create a fiduciary relationship as to *all* Defendants. (Pls.' Mem. at 28.) This argument is unavailing for a number of reasons. First, the advertisements quoted in the SAC promote the full range of services offered by Defendants, which included, but was not limited to, retail brokerage accounts. (*See* SAC ¶ 97 (Merrill Lynch); *id.* ¶¶ 123, 126–27 (Charles Schwab); *id.* ¶ 155 (Morgan Stanley); *id.* ¶ 178 (Citigroup); *id.* ¶ 214 (Wachovia).) The fact that Defendants made known to the public that they offered discretionary brokerage accounts

and other types of investment advice is only relevant here to the extent that Plaintiffs enrolled in or otherwise sought those services. *See* *Brinsights, LLC v. Charming Shoppes of Delaware, Inc.,* No. 06 Civ. 1745(CM), 2008 WL 216969, at *8 (S.D.N.Y. Jan.16, 2008) ("Where the parties do not create their own relationship of higher trust, courts should not fashion the stricter duty for them."). No Plaintiff alleges that he or she sought such services.

Second, fiduciary relationships—like investment advisory relationships under the IAA—are personal and context-specific. *See, e.g.,* *Abercrombie,* 438 F.Supp.2d at 274 ("[I]n order to survive a motion to dismiss a claim for breach of fiduciary duty, the plaintiff must set forth specific facts constituting the alleged relationship with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship." (internal quotation omitted)); *Europacific Asset Mgmt. Corp. v. Tradescape Corp.,* No. 03 Civ. 4556(PKL), 2005 WL 497787, at *9 (S.D.N.Y. Mar.2, 2005) ("[F]inding a breach of fiduciary duty requires finding that a fiduciary relationship existed *between the parties."* (emphasis added)). However, no Plaintiff alleges that he or she read the advertisements and promotional materials cited in the SAC, and there are almost no specific allegations regarding any of Plaintiffs' relationships with the Brokerage Defendants.

Finally, "the fact that the broker ... represents, as part of his sales pitch, that he is particularly well qualified to [offer investment advice] does not alter the limited scope of the broker's legally enforceable obligations." *Stewart v. J.P. Morgan Chase & Co.,* No. 02 Civ.1936(MHD), 2004 WL 1823907, at *12 (S.D.N.Y. Aug.16, 2004); *see also* *Renner v. Chase Manhattan Bank,* No. 98 Civ. 926(CSH), 2000 WL 781081, at *20 (S.D.N.Y. June 16, 2000) ("Thatplaintiffs may have regarded defendants as their fiduciaries is not enough to establish a fiduciary duty when that duty otherwise would not exist." (internal quotation omitted)). As discussed in more detail in relation to Plaintiffs' common-law fraud claim, *see supra* Part II.B.3.c.(1), no reasonable investor would expect that these vague and general advertisements created any sort of extra-contractual relationship extending beyond the terms specified in Plaintiffs' account agreements.

**\*31** Plaintiffs' claim fares no better if the analysis is narrowed to focus on the Brokerage Defendants' use of their customers' free credit balances. "Federal regulation of ... broker utilization of customer funds is extensive." *Levitin,*

159 F.3d at 705. However, "[t]he SEC has ... recognized that the relationship of brokers to customers with respect to credit and debit balances in their accounts is that of debtor and creditor." *Bissell,* 937 F.Supp. at 246 (citing Adoption of Rule 15c3–2 under the Securities Exchange Act of 1934, Exchange Act Release No. 34–7325 (May 27, 1964)); *cf.*

Newbro v. Freed, 409 F.Supp.2d 386, 396 (S.D.N.Y.2006) ("[A] claim against a broker for converting funds in a free credit balance fails for the same reason as a customer's claim against a bank—the funds at issue arise from a debtor-creditor relationship and are not segregated vis-à-vis other accounts at the brokerage firm."). [16] Plaintiffs have not alleged that this debtor-creditor relationship resulted from anything more than an arms-length transaction relating to the investments that they initiated.

By definition, free credit balances existed in Plaintiffs' brokerage accounts because Plaintiffs chose not to invest these funds and instead left them idle in their accounts. *See* 17 C.F.R. § 240.15c3–3(a)(8); *see also* Amendments to Financial Responsibility Rules for Broker–Dealers, 72 Fed.Reg. 12,862, 12,866 (proposed Mar. 19, 2007). Nevertheless, Plaintiffs acknowledge that they earned positive rates of interest on these funds. (*See* SAC ¶¶ 30–36.) However, Plaintiffs suggest that they were entitled to an additional service from the Brokerage Defendants—namely, ongoing advice regarding how to *maximize* returns on free credit balances. Plaintiffs present this argument notwithstanding the fact that the specific Cash Sweep Programs at issue were governed by the terms of their account agreements and the amendments thereto. No such service was included in Plaintiffs' brokerage accounts, and the Brokerage Defendants had no fiduciary obligation to provide it. *See, e.g.,*

Kwiatkowski, 306 F.3d at 1311 ("The general rule ... is that ... brokers do not owe nondiscretionary clients ongoing advisory or account-monitoring duties, such as the duty to warn of changes in market conditions or other information that can impact the client's investments."); Hoffman v. UBS–AG, 591 F.Supp.2d 522, 535 (S.D.N.Y.2008) ("[I]t is well-established Second Circuit law that the fiduciary duty in the broker/customer relationship is only to 'the narrow task of consummating the transaction requested.' " (quoting

Press, 166 F.3d at 536)). Thus, the Brokerage Defendants were not required to notify Plaintiffs of opportunities to improve their earnings on uninvested funds.

Nevertheless, Plaintiffs are correct that they were owed—to some extent—a duty of reasonable care. *See* Kwiatkowski, 306 F.3d at 1305 ("[A] duty of reasonable care applies to the broker's performance of its obligations to customers with nondiscretionary accounts."). "[T]he scope of affairs entrusted to a broker is generally limited to the completion of a transaction." *Bissell,* 937 F.Supp. at 246 (internal quotation omitted). Specifically, "[o]n a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders, and is obliged to give honest and complete information when recommending a purchase or sale." Kwiatkowski, 306 F.3d at 1302. The SAC does not identify a breach of this transaction-specific duty. Although it is possible that the "failure to give information material to a particular transaction" may support a claim against a broker by a client with a nondiscretionary account, id. at 1306, the Court has already concluded that Plaintiffs have not identified a false or materially misleading statement or omission by any Defendant relating to enrollment in the Cash Sweep Programs. *See supra* Part II.B.3.c. Moreover, Plaintiffs do not allege that any of the transactions that were conducted in connection with Defendants' Cash Sweep Programs were erroneously or negligently executed. Nor do Plaintiffs contend that they either received unsound investment recommendations from the Brokerage Defendants, or sought the investment advice that was one of the available services offered by them.

**\*32** Therefore, although the Court agrees with Plaintiffs that cases such as *Kwiatkowski* do not demonstrate as a matter of law that every brokerage relationship lacks fiduciary characteristics, Plaintiffs have not alleged facts or circumstances that, if proven, would establish that the Brokerage Defendants breached the limited duties that they owed to Plaintiffs in regard to their brokerage accounts. Accordingly, Plaintiffs' claim for breach of fiduciary duty is dismissed.

### c. Aiding and Abetting

"Under New York law, '[a] plaintiff seeking to establish a cause of action for aiding and abetting a breach of fiduciary duty must show ... the existence of a ... violation by the primary (as opposed to the aiding and abetting) party ....'

" Design Strategy, Inc. v. Davis, 469 F.3d 284, 303 (2d Cir.2006) (quoting Samuel M. Feinberg Testamentary

*Trust v. Carter,* 652 F.Supp. 1066, 1082 (S.D.N.Y.1987));
*see also* Lerner v. Fleet Bank, N.A., 459 F.3d 273, 294
(2d Cir.2006) (" '[A] person knowingly participates in a
breach of fiduciary duty only when he or she provides
substantial assistance to the primary violator.' " (quoting
Kaufman v. Cohen, 307 A.D.2d 113, 760 N.Y.S.2d 157,
165 (1st Dep't 2003)); Kottler v. Deutsche Bank AG, 607
F.Supp.2d 447, 466 (S.D.N.Y.2009). "Aiding and abetting
liability arises only when [the] plaintiffs'injury was 'a
direct or reasonably foreseeable result' of the complained-of
conduct." Kolbeck v. LIT Am., Inc., 939 F.Supp. 240, 249
(S.D.N.Y.1996) (quoting Morin v. Trupin, 711 F.Supp. 97,
112 (S.D.N.Y.1989)).

Plaintiffs have not identified a "primary violator" because
they have not adequately pleaded a claim for breach of
fiduciary duty. Such allegations are a predicate to their
claims against the Parent and Sweep Bank Defendants for
aiding and abetting a breach of fiduciary duty. *See* Kottler,
607 F.Supp.2d at 466. Accordingly, this claim is likewise
dismissed.

### 5. Negligent Misrepresentation

Plaintiffs' negligent misrepresentation claim is nearly
identical to their fraud claim. In addition to the Court's above-
stated conclusions regarding the alleged misrepresentations
and omissions identified in the SAC, Plaintiffs have not
sufficiently alleged the "reasonable reliance" element of this
claim. Accordingly, for the reasons set forth below, Plaintiffs'
negligent misrepresentation claim is dismissed.

### a. Applicable Law

"Negligent misrepresentation 'involves most of the same
elements as fraud, with a negligence standard substituted
for the scienter requirement.' " *Carroll v. Leboeuf, Lamb,
Greene & MaCrae, LLP,* —— F.Supp.2d ——, No. 05 Civ.
391(LAK), 2009 WL 1575213, at *3 (S.D.N.Y. June 5,
2009) (quoting *Mia Shoes, Inc. v. Republic Factors, Corp.,*
No. 96 Civ. 7974(TPG), 1997 WL 525401, at *3 (S.D.N.Y.
Aug.21, 1997)). Specifically, to state a claim for negligent
misrepresentation under New York law, a plaintiff must
adequately plead five elements:

*33 (1) the defendant had a duty, as a result of a special
relationship, to give correct information; (2) the defendant
made a false representation that he or she should have
known was incorrect; (3) the information supplied in the
representation was known by the defendant to be desired by
the plaintiff for a serious purpose; (4) the plaintiff intended
to rely and act upon it; and (5) the plaintiff reasonably relied
on it to his or her detriment.

Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8,
20 (2d Cir.2000); *see also* Eternity Global Master Fund,
375 F.3d at 188; Kimmell v. Schaeffer, 89 N.Y.2d 257, 263–
64, 652 N.Y.S.2d 715, 675 N.E.2d 450 (N.Y.1996)

### b. Analysis

Plaintiffs have not adequately pleaded a claim for negligent
misrepresentation. First, as discussed above in relation to
their fraud claim, *see supra* Part II.B.3.c, the statements
and omissions identified by Plaintiffs were neither false
nor materially misleading. Absent such allegations, Plaintiffs
cannot meet the elements of a negligent misrepresentation
claim. *See* Hampshire Equity Partners II, L.P. v. Teradyne,
Inc., No. 04 Civ. 3318(LAP), 2005 WL 736217, at *6
(S.D.N.Y. Mar.30, 2005) (dismissing a fraud claim because
the "[d]efendants' allegedly fraudulent statements [we]re
not actionable" and dismissing an accompanying negligent
misrepresentation claim because it "suffer[ed] from the
same weakness"). Therefore, this pleading deficiency alone
requires dismissal of Plaintiffs' negligent misrepresentation
claim.

Second, Plaintiffs' allegations are insufficient to support an
inference of reasonable reliance. The New York Court of
Appeals has held that three factors are relevant to this
element of a negligent misrepresentation claim: (1) whether
the defendant "held or appeared to hold unique or special
expertise"; (2) whether there was "a special relationship of
trust or confidence" between the parties; and (3) "whether
the speaker was aware of the use to which the information
would be put and supplied it for that purpose." Kimmell,
89 N.Y.2d at 264, 652 N.Y.S.2d 715, 675 N.E.2d 450.
"[W]here ... a 'special relationship' is nowhere pled, and the
allegations with respect to the other *Kimmell* factors are soft,
a claim for negligent misrepresentation is dismissible under

Rule 12(b)(6).' " 📑 *Eternity Global Master Fund,* 375 F.3d at 188.

While Plaintiffs have sufficiently alleged that the Brokerage Defendants possessed special expertise in the area of retail brokerage investment services, the latter two *Kimmell* factors are not adequately supported by the SAC. "Although a broker-client relationship can evolve into a special relationship, the mere fact that [the defendant] and the plaintiffs had a broker-client relationship does not in and of itself create a special or fiduciary relationship." *Crigger,* 2003 WL 22170607, at *10 (internal citation omitted). The Court has already discussed at length the SAC's allegations regarding the relationship between Plaintiffs and Defendants in regard to Plaintiffs' IAA and breach of fiduciary duty claims. *See supra* Parts II.B.2, II.B.4. As stated above, Plaintiffs' allegations do not support an inference that there existed anything more than a broker-client relationship. Thus, Plaintiffs have not alleged that they had a "special relationship" with the Brokerage Defendants that is sufficient to serve as the basis for a negligent misrepresentation claim.

**\*34** Moreover, Plaintiffs have not alleged that the Brokerage Defendants were aware of the uses to which their statements were allegedly being put. Plaintiffs' allegations do not support an inference that Defendants either intended—or could have reasonably anticipated—that their advertisements and Investor Rights Statements would be construed by reasonable investors as containing investment advice. *See* 📑 *Eternity Global Master Fund,* 375 F.3d at 187–88 ("As in the case of fraud, an alleged misrepresentation must be factual and not 'promissory or related to future events.' " (quoting 📑 *Hydro Investors,* 227 F.3d at 20)). Similarly flawed are Plaintiffs' allegations regarding the Brokerage Defendants' representations in their account agreements and the disclosure statements regarding the Cash Sweep Programs. As Plaintiffs acknowledge in the SAC, each Brokerage Defendant encouraged customers to investigate the Cash Sweep Programs and indicated that, if customers wished to seek advice regarding cash management strategies, their "Financial Advisors" were available to discuss additional options. (*See* Pls.' Merrill Lynch Decl. Ex. 7 at 1; Pls.' Morgan Stanley Decl. Ex. 9 at 3; Pls.' Citigroup Decl. Ex. 8 at 12; Pls.' Charles Schwab Decl. Ex. 14 at 9; SAC ¶ 237 (Wachovia).) Therefore, Plaintiffs have not alleged that the Brokerage Defendants were aware that these statements and disclosures would be relied on by brokerage customers as investment advice regarding the merits of the

respective Cash Sweep Programs. In light of this conclusion, and because the allegations in the SAC do not support an inference that a "special relationship" existed between the Brokerage Defendants and Plaintiffs, Plaintiffs have not adequately pleaded justifiable reliance on Defendants' alleged misrepresentations.

Accordingly, because Plaintiffs have not identified material misrepresentations or omissions by Defendants, and they have not alleged justifiable reliance, their negligent misrepresentation claim is dismissed.

## 6. Negligence Against the Brokerage Defendants

Plaintiffs' negligence claim against the Brokerage Defendants "repeat[s] and reiterate[s]" all of the allegations that have been previously discussed herein (SAC ¶ 292), and alleges that the Brokerage Defendants "breached their duty of care" by, *inter alia,* "placing Plaintiffs' ... uninvested monies into bank sweep accounts at substantially below money market rates ..." (*id.* at 294). In opposition to Defendants' motions, Plaintiffs argue that the Brokerage Defendants breached a "duty of care" by "fail[ing] to evaluate *suitability to invest"* and by "placing their clients in low-interest-bearing bank accounts instead of high-yielding safe investments ...." (Pls.' Mem. at 50–51 (emphasis in original).)

However, as Defendants point out, Plaintiffs overstate the scope of the duty they were owed by the Brokerage Defendants, and they have failed to allege that Defendants breached their actual legal obligations. Accordingly, for the reasons stated below, Plaintiffs' negligence claim is dismissed.

### a. Applicable Law

**\*35** "Under New York law, the elements of a negligence claim are: (i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Lombard v. Booz–Allen & Hamilton, Inc.,* 280 F.3d 209, 215 (2d Cir.2002).

### b. Analysis

Plaintiffs contend that the SAC contains allegations regarding "multiple layers of 'duties,' " including a fiduciary duty,

a duty arising out of the NASD's suitability rules, "a duty arising from each of the Defendants' 'Codes of Ethics,' " and "a duty to implement matters entrusted to them ... in good faith and with reasonable care and not in a manner whereby Defendant acted contrary to their express representations ...." (Pls.' Mem. at 49–50.) However titled, the scope of the purported duty that Plaintiffs seek to enforce through their negligence claim is overly broad.

With respect to the first "layer" identified by Plaintiffs— a general fiduciary duty—the Court has already concluded that the SAC does not allege facts sufficient to give rise to such a relationship between Plaintiffs and the Brokerage Defendants. *See supra* Parts II.B.2.b, II.B.4.b. Second, alleged violations of self-regulatory organizations' ("SROs") promulgations, such as the NASD's suitability rule (*see* SAC ¶ 294) or the "best practices" identified in the NYSE Information Memo (*See id.* ¶¶ 75–78), did not alter the scope of the duties owed by the Brokerage Defendants to Plaintiffs. Such rules may not be enforced by private litigants through civil actions. *See, e.g., Brady v. Calyon Sec. (USA),* 406 F.Supp.2d 307, 312 (S.D.N.Y.2005). At most, alleged violations of these rules are relevant to the *breach* element of Plaintiffs' negligence claim. *See Kwiatkowski,* 306 F.3d at 1311 ("It may be that noncompliance with internal standards could be evidence of a failure to exercise due care, assuming however a duty as to which due care must be exercised ."). The mere existence of the NASD suitability rule, however, did not expand the duty that the Brokerage Defendants owed their brokerage customers.

Nor did Defendants' Investor Rights Statements give rise to an ongoing duty to provide investment advice or maximize the income Plaintiffs earned from their uninvested free credit balances. *See Stewart,* 2004 WL 1823902, at *13 ("As for the argument that [a brokerage defendant] assumed extra-contractual duties by virtue of its promised relationship with plaintiff, again the theory is unsupported by ... the law."). Plaintiffs provide no authority for the assertion that promotional documents and advertisements should be deemed to give rise to a heightened duty of care, and, as has been discussed throughout this decision, the argument is unpersuasive. As in *Kwaitkowski,* the obligations that Plaintiffs would foist upon the Brokerage Defendants "presuppose[ ] an ongoing duty of reasonable care (*i.e.,* that the broker has obligations between transactions)." 306 F.3d at 1306. However, based on the allegations in the SAC, the Brokerage Defendants owed Plaintiffs no such duty.

**\*36** As stated in the analysis of Plaintiffs' breach of fiduciary duty claim, *see supra* Part II.B.4.b, the Brokerage Defendants did owe Plaintiffs a transaction-specific duty of care. *See Kwiatkowski,* 306 F.3d at 1305; *Bissell,* 937 F.Supp. at 246. Here as well, however, Plaintiffs have failed to attribute any conduct to the Brokerage Defendants that could plausibly be deemed a breach of that duty. "[I]n the ordinary nondiscretionary account"—and Plaintiffs have alleged no more—"the broker's failure to offer information and advice between transactions cannot constitute negligence." *Kwiatkowski,* 306 F.3d at 1306. Therefore, although the Brokerage Defendants owed Plaintiffs a duty of care with respect to both the transactions they executed on their behalf and any investment advice that they provided to them, Plaintiffs' allegations are insufficient as a matter of law to satisfy the "breach" element of their negligence claim. Accordingly, this claim is dismissed.

### 7. N.Y. General Business Law § 349

With respect to their claim under § 349, Plaintiffs argue that Defendants deceived consumers by issuing "false and misleading statements" that were "uniform and directed at all current and potential clients through the public media, including the Internet." (Pls.' Mem. at 64.) For the reasons set forth below, the Court finds these contentions unavailing.

Accordingly, Plaintiffs' § 349 claim is dismissed.

#### a. Applicable Law

Section 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349. There are three elements to a private claim alleging deceptive practices under the statute: "(1) that the act, practice, or advertisement was consumer-oriented; (2) that the act, practice, or advertisement was misleading in a material respect; and (3) that the plaintiff was injured as a result of the deceptive act, practice, or advertisement ." *Pelman ex rel. Pelman v. McDonald's Corp.,* 396 F.Supp.2d 439, 444 (S.D.N.Y.2005); *see also Stutman v. Chem. Bank,* 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (N.Y.2000).

"An act is deceptive within the meaning of the New York statute only if it is likely to mislead a reasonable consumer."

*Marcus v. AT & T,* 138 F.3d 46, 64 (2d Cir.1998).

### b. Analysis

Plaintiffs' § 349 claim relies exclusively on their allegations regarding misrepresentations and omissions. (*See* SAC ¶ 257; Pls.' Mem. at 64.) Although proof of scienter is unnecessary under § 349, "[a] *prima facie* case requires ... a showing that defendant is engaging in an act or practice that is deceptive or misleading in a material way ...."

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (N.Y.1995). Thus, regardless of whether a claim under § 349 is predicated on a "representation or an omission, the deceptive practice must be likely to mislead a reasonable consumer acting reasonably under the circumstances." *Stutman,* 95 N.Y.2d 29 (internal quotation omitted)).

**\*37** Plaintiffs assert that Defendants' statements were

> designed to mislead consumers into believing that they had much more than an "[arms]-length" relationship with the Defendant Firms; to convince clients that the [Cash Sweep Programs] were beneficial to them; and to conceal that, in fact, the [Cash Sweep Programs] were designed to create windfall profits for Defendants at their clients' expense.

(Pls.' Mem. at 64–65.) However, Plaintiffs have failed to identify any materially misleading misstatements or omissions by Defendants that support these contentions. *See supra* Part II.B.3.c. In the absence of such allegations, a cause of action under § 349 cannot be maintained. *See Shovak v. Long Island Commercial Bank,* 50 A.D.3d 1118, 858 N.Y.S.2d 660, 662–63 (2d Dep't 2008) (dismissing a § 349 claim because "there was no materially misleading statement, as the record indicated that the yield spread premium, which

is not *per se* illegal, was fully disclosed to the plaintiff"). Accordingly, Plaintiffs' § 349 claim is dismissed.

### 8. Breach of Contract Against the Brokerage Defendants

In their breach of contract claim, Plaintiffs allege that the Brokerage Defendants breached the implied covenant of good faith and fair dealing. (*See* SAC ¶¶ 271, 273; Pls.' Mem. at 57.) Although Plaintiffs fail to identify the specific contracts to which they are referring, much less the provisions of the agreements on which they rely, Plaintiffs' theory of this claim appears to be that these unidentified contracts did "not authorize Defendants to reap windfall profits at their clients' expense" because they were "silent as to both the magnitude of Defendants' windfall profits and to how those profits were to be obtained ...." (Pls.' Mem. at 59.)

However, as discussed above, *see, e.g., supra* Part II.B.3.c. (2), Plaintiffs cannot prevail on a legal theory that is based on their alleged surprise that Defendants used freecredit balances to earn a profit. Plaintiffs have also failed to point to any provision of an agreement that could plausibly give rise to an expectation on their part that Defendants were somehow subject to a limitation on the amount of profits that they were allowed to make in connection with the Cash Sweep Programs. Similarly, Plaintiffs have not identified any agreement that could support a reasonable expectation that Defendants were obligated to maximize Plaintiffs' earnings on *uninvested* funds in their brokerage accounts. Therefore, Plaintiffs have failed to state a claim based on a theory of a breach of the implied covenant of good faith and fair dealing. Accordingly, this claim is dismissed.

### a. Applicable Law

" '[U]nder New York law, a covenant of good faith and fair dealing is implicit in all contracts during the course of contract performance.' " *Janel World Trade, Ltd. v. World Logistics Servs ., Inc.,* No. 08 Civ. 1327(RJS), 2009 WL 735072, at \*13 (S.D.N.Y. Mar.20, 2009) (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 98 (2d Cir.2007)). "In particular, the covenant includes a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' " *Payday Advance Plus, Inc. v. Findwhat.com, Inc.,* 478 F.Supp.2d 496, 503 (S.D.N.Y.2007)

(quoting *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 639 N.Y.S.2d 977, 979, 663 N.E.2d 289 (N.Y.1995)). Thus, "[t]o state a cause of action for breach of the implied covenant of good faith and fair dealing, 'the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff.' " *Dweck Law Firm, L.L .P. v. Mann,* 340 F.Supp.2d 353, 358 (S.D.N.Y.2004) (quoting *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce,* 265 A.D.2d 513, 697 N.Y.S.2d 128, 130 (2d Dep't 1999)).

### b. Analysis

**\*38** Plaintiffs summarize the theory of their breach of contract claim as follows:

> Defendants' breach of the implied covenant of good faith is alleged as the basis for the breach of contract [claim] because no client would ever in good faith believe that it is justified for the Defendants to deploy the [Cash Sweep Programs] in such a manner that they would derive massive ill-gotten windfall profits at their clients' expense ....

(Pls.' Mem. at 58.) The "expense" to which Plaintiffs refer is apparently the difference between the interest that they actually earned, and the returns that they believe they would have been earned if they had chosen to invest their free credit balances in money market mutual funds or other investments. (*See id.*)

Plaintiffs' argument fails on its own terms. With respect to this claim, the issue is whether Defendants breached the obligation to act in good faith that is implied in every contract governed by New York law, not whether Plaintiffs "believe[d]" (Pls.' Mem. at 58)—in good faith or otherwise—that Defendants' profit-seeking behavior was inappropriate. *See Tractebel Energy Mktg.,* 487 F.3d at 98. Defendants did not violate the implied covenant of good faith and fair dealing "by acting in [their] own self-interest consistent with [their] rights under a contract." *Suthers v. Amgen*

*Inc.,* 441 F.Supp.2d 478, 485 (S.D.N.Y.2006). As stated above, "the practice of a financial institution using money deposited with it to obtain earnings is neither unknown nor unexpected, much less nefarious. That is precisely how banks make money." *Levitin,* 159 F.3d at 703. Therefore, the Brokerage Defendants did not breach the agreements governing Plaintiffs' accounts simply by seeking to maximize their profits.

Moreover, Plaintiffs have not identified a contractual provision that could be interpreted to give rise to a belief that the "fruits of the contract," *Dalton,* 639 N.Y.S.2d at 979, 663 N.E.2d 289, included a limitation on the profits that Defendants could earn through the use of Plaintiffs' free credit balances. *See Window Headquarters, Inc. v. MAI Basic Four, Inc.,* Nos. 91 Civ. 1816, 92 Civ. 5283(MBM), 1993 WL 312899, at \*3 (S.D.N.Y. Aug. 12, 1993) ("[A] complaint in a breach of contract action must set forth the terms of the agreement upon which liability is predicated.");

*see also Phoenix Four, Inc. v. Strategic Res. Corp.,* No. 05 Civ. 4837(HB), 2006 WL 399396, at \*10–11 (S.D.N.Y. Feb.11, 2006). Nor does the SAC suggest that the Brokerage Defendants undertook any contractual obligation to maximize Plaintiffs' earnings on their uninvested free credit balances.

*See, e.g., EBC I, Inc. v. Goldman Sachs & Co.,* 5 N.Y.3d 11, 22, 799 N.Y.S.2d 170, 832 N.E.2d 26 (N.Y.2005) (affirming the dismissal of a claim for breach of the implied covenant of good faith and fair dealing where "[t]he complaint does not adequately allege that [the defendant] injured [the plaintiff's] right to receive the benefits of their agreement"). Although Plaintiffs argue in their opposition papers that the Brokerage Defendants possessed discretion over the brokerage accounts that was to be exercised in Plaintiffs' best interest (*see, e.g.,* Pls.' Mem. at 58), the SAC contains nothing more than conclusory allegations to that effect. (*See* SAC ¶ 271 ("Among the Brokerage Defendants' obligations to their customers were to act in their interests in taking discretionary actions with their accounts ....").) Brokers, acting as such, owe no such duty to clients with nondiscretionary brokerage accounts. *See Kwiatkowski,* 306 F.3d at 1302 ("The broker's duties ordinarily end after each transaction is done, and thus do not include a duty to offer unsolicited information, advice, or warnings concerning the customer's investments."). [17] And, although Defendants may have made investment advisory services available to their customers, Plaintiffs have not alleged that they sought

or received such services. *See supra* Part II.B.2. Simply put, in the absence of a contractual duty, Plaintiffs' allegations are insufficient to state a claim that a breach occurred.

**\*39** Finally, Plaintiffs argue that the "contracts were defective from the outset since they were implemented largely through negative consent, which was not meaningful consent at all." (Pls.' Mem. at 60.) However, Defendants disclosed to their customers that the Cash Sweep Programs' features could be modified unilaterally through advance written notice of the modifications that would become effective on a later date. (*See* Pls.' Merrill Lynch Decl. Ex. 8 at 5; Cantor Decl. Ex. C at 10, Ex. D at 24 (Morgan Stanley); Pls.' Citigroup Decl. Ex. 9 at 5; Pls.' Charles Schwab Decl. Ex. 14 at 5; Pls.' Wachovia Decl. Ex. 12 at 1, 7.) Moreover, the NYSE Information Memo upon which Plaintiffs rely as an "indicia" of a contract breach by Defendants expressly stated that "[w]ith regard to existing sweep programs, it is not intended that member organizations which secured prior consent and made effective subsequent disclosure secure affirmative consent for such programs." (N.Y.SE Info. Memo at 2 n. 2.) [18] Therefore, the use of negative consent to modify the Cash Sweep Programs did not, in and of itself, breach the contracts underlying Plaintiffs' brokerage accounts.

The implied covenant of good faith and fair dealing "does not 'add [ ] to the contract a substantive provision not included by the parties.' " *Broder v. Cablevision Sys. Corp.,* 418 F.3d 187, 198–99 (S.D.N.Y.2005) (quoting *Geren v. Quantum Chem. Corp.,* 832 F.Supp. 728, 732 (S.D.N.Y.1993)). Since Plaintiffs have not identified any contract-based expectation—implied or otherwise—that was harmed by the implementation of Defendants' Cash Sweep Programs or the profits allegedly earned by Defendants, Plaintiffs' breach of contract claim must be dismissed.

## 9. Unjust Enrichment

In their unjust enrichment claim, Plaintiffs allege that Defendants paid their customers lower rates of interest on free credit balances deposited at Sweep Banks, and enriched themselves by using those funds to generate profits. (*See* SAC ¶ 301.) For the reasons stated below, the Court concludes that this theory is insufficient to adequately plead a claim for unjust enrichment.

### a. Applicable Law

An unjust enrichment claim "rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *IDT Corp. v. Morgan Stanley Dean Witter & Co.,* 12 N.Y.3d 132, 879 N.Y.S.2d 355, 907 N.E.2d 268, 2009 WL 774351, at \*4 (N.Y. Mar. 26, 2009). Therefore, "[u]nder New York law, for a plaintiff to prevail on a claim of unjust enrichment, he must establish (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Golden Pac. Bancorp v. FDIC,* 273 F.3d 509, 519 (2d Cir.2001).

"Courts have not allowed claims for unjust enrichment, however, where there is a valid and enforceable written contract governing the subject matter of the dispute." *Kottler,* 607 F.Supp.2d at 467. "On the other hand, where 'there is a *bona fide* dispute as to the existence of a contract or where the contract does not cover the dispute in issue, [a party] may proceed upon a theory of quantum meruit and will not be required to elect his or her remedies.' " *CBS Broadcasting Inc. v. Jones,* 460 F.Supp.2d 500, 506 (S.D.N.Y.2006) (quoting *Leroy Callender, P.C. v. Fieldman,* 252 A.D.2d 468, 676 N.Y.S.2d 152, 153 (1st Dep't 1998)).

### b. Analysis

**\*40** For the purpose of assessing Plaintiffs' unjust enrichment claim, the Court assumes, *arguendo,* that Plaintiffs have raised a sufficient challenge to the contractual agreements governing their retail brokerage accounts to permit them to plead an unjust enrichment claim in the alternative. *See, e.g., Fantozzi v. Axsys Techs., Inc.,* No. 07 Civ. 2667(LMM), 2008 WL 4866054, at \*11 (S.D.N.Y. Nov.6, 2008). However, Plaintiffs have not presented sufficient allegations to support a claim for unjust enrichment.

Specifically, Plaintiffs provide no factual basis for their conclusory allegation that "Defendants have been unjustly enriched at the expense of and to the detriment of Plaintiffs ... by collecting money to which [Defendants] are not entitled." (SAC ¶ 301.) Instead, their unjust enrichment

claim appears to be based on the *correlation* between (1) the reduced rates of interest they allegedly received in the Modified and Tiered Cash Sweep Programs, and (2) Defendants' increased profits as a result of the implementation of these Programs.

However, more of a nexus is required between a defendant's "enrichment" and a plaintiff's "expense" to plead a plausible claim to relief on a theory of unjust enrichment. *See Gurvey v. Cowan, Liebowitz & Latman, PC.,* No. 06 Civ. 1202(BSJ), 2009 WL 1117278, at *8 (S.D.N.Y. Apr.24, 2009) ("Plaintiff has provided only assertion and speculation as to the benefit that was taken from her by [the][d]efendants. Even under the low threshold that plaintiffs must meet under Rule 12(b)(6), the unjust enrichment claim must be dismissed ...."); *cf. Bridgeway Corp. v. Citibank, N.A.,* Nos. 97 Civ. 8884, 00 Civ. 3598(DC), 2003 WL 402790, at *4 (S.D.N.Y. Feb. 20, 2003) (finding implausible a theory of compensatory damages based on the argument that "a bank and a depositor would have contemplated ... that if there were a problem in the return of the funds, the depositor would be able to recover for profits it could have made if it had had the use of funds"). Plaintiffs do not allege that Defendants' actions caused losses, in real terms, to the value of the principal amount of their free credit balances. Nor do Plaintiffs contend that Defendants induced them to deposit their free credit balances at affiliated Sweep Banks but then delayed or refused to return those funds upon request. Lastly, Plaintiffs acknowledge that they *did* receive at least some compensation for these uninvested funds, in the form of a positive rate of interest. (*See* SAC ¶¶ 30–36.) Therefore, Plaintiffs' factual allegations fail to support a plausible inference that Defendants' were enriched at Plaintiffs' expense.

Plaintiffs have also failed to offer any factual allegations to support an inference that "equity and good conscience" require that Defendants pay them a share of the profits that they earned from the use of free credit balances. *Golden Pac. Bancorp,* 273 F.3d at 519. Plaintiffs essentially argue that they did not earn as much of a return on their *uninvested funds* as they believe they should have. Such an allegation is insufficient to demonstrate an equitable entitlement to a share of the profits earned by Defendants through disclosed uses of Plaintiffs' free credit balances. *See Smith v. Chase Manhattan Bank, USA, N.A.,* 293 A.D.2d 598, 741 N.Y.S.2d 100 (2d Dep't 2002) (dismissing unjust enrichment claim where "[t]here [was] no allegation that the benefits received were less than what [the plaintiffs] bargained for").

Plaintiffs have failed to sufficiently allege that Defendants' use of the Cash Sweep Programs was deceptive, and they have not identified any materially misleading statements or omissions by Defendants in connection with these Programs. Moreover, to repeat, "the practice of a financial institution using money deposited with it to obtain earnings is *neither unknown nor unexpected, much less nefarious." Levitin,* 159 F.3d at 703 (emphasis added). Therefore, the Court concludes that Plaintiffs have failed to plead a sufficient nexus between Defendants' profits and their alleged losses, and they have not identified circumstances suggesting that equitable considerations entitle them to a share of Defendants' profits. Accordingly, Plaintiffs' unjust enrichment claim is dismissed.

C. Leave to Amend

**\*41** The final footnote of Plaintiffs' 117–page brief in opposition to Defendants' motions states, in its entirety:

> In the event that the Court dismisses any of the claims in whole or in part, Plaintiffs respectfully request an opportunity to replead since this is the first pleading to be reviewed by the Court in this matter.

(Pls.' Mem. at 117 n. 112 (citing, *inter alia,* Fed.R.Civ.P. 15(a)).)

"While [Rule] 15(a) provides that leave to amend 'shall be freely given when justice so requires,' the Court has broad discretion in deciding whether or not to grant such a request." *Panther Partners, Inc. v. Ikanos commc'ns, Inc.,* No. 06 Civ. 12967(PAC), 2008 WL 2414047, at *2 (S.D.N.Y. June 12, 2008); *see also McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir.2007). Factors that are relevant to the exercise of the Court' discretion include: (1) the presence of bad faith, dilatory motives, or undue delay on the part of the movant; (2) the potential for prejudice to an opposing party; and (3) whether the sought-after amendment would be futile. *See, e.g., In re PXRE Group, Ltd., Sec. Litig.,* 600 F.Supp.2d at 523–24. "An amendment to a pleading is futile if the proposed claim could not withstand a motion to

dismiss pursuant to [Rule] 12(b)(6)." *Lucente v. Int'l Bus. Machines Corp.,* 310 F.3d 243, 258 (2d Cir.2002).

Some courts in this District have required that a plaintiff file a copy of the proposed amended pleading in order to demonstrate that Rule 15(a) relief is appropriate. *See, e.g., In re Crude Oil Commodity Litig.,* No. 06 Civ. 6677(NRB), 2007 WL 2589482, at *4 (S.D.N.Y. Sept.8, 2007) ("In the context of a motion to amend, Rule 7(b) ... requires the movant to supply a copy of the proposed amendment."); Bankr.*Trust of Gerald Sillam v. REFCO Group, LLC,* No. 05 Civ. 10072(GEL), 2006 WL 2129786, at *5 (S.D.N.Y. July 28, 2006); *Smith v. Planas,* 151 F.R.D. 547, 550 (S.D.N.Y.1993). At the very least, a party seeking leave to amend must provide some indication of the substance of the contemplated amendment in order to allow the Court to apply the standards governing Rule 15(a). *See, e.g., Horoshko v. Citibank, N.A.,* 373 F.3d 248, 249 (2d Cir.2004) ("Because an amendment is not warranted '[a]bsent some indication as to what [the plaintiffs] might add to their complaint in order to make it viable,' the District Court was under no obligation to provide the [plaintiffs] with leave to amend their complaint ...." (quoting *Nat'l Union of Hosp. & Health Care Emp., RWDSU, AFL–CIO v. Carey,* 557 F.2d 278, 282 (2d Cir.1977))); *Shields v. Citytrust Bancorp,* 25 F.3d 1124, 1132 (2d Cir.1994). In sum, "[i]n the absence of any identification of how a further amendment would improve

upon the Complaint, leave to amend must be denied as futile." *In re WorldCom, Inc. Sec. Litig.,* 303 F.Supp.2d 385, 391 (S.D.N.Y.2004).

Plaintiffs' five-line footnote falls far short of these standards. Rule 15(a) is not a shield against dismissal to be invoked as either a makeweight or a fallback position in response to a dispositive motion. Plaintiffs have filed two amended pleadings in this matter, and they have not made any attempt to demonstrate that they are entitled to file a third. Therefore, the Court concludes that amending the SAC, as proposed, would be futile. Accordingly, Plaintiffs' request for leave to amend the SAC is denied.

### III. CONCLUSION

**\*42** For the reasons stated above, Defendants' motions to dismiss are granted. The Clerk of the Court is respectfully directed to terminate the motions docketed as document numbers 48, 52, 56, 60 and 62, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2242605

---

### Footnotes

1    In support of their separate motions to dismiss, Defendants submitted one joint memorandum of law, which the Court cites as "Defs.' Mem.," as well as individual memoranda for each group of Defendants, which the Court cites by specific reference to the relevant group of Defendants that submitted the brief. Plaintiffs submitted a single memorandum of law in opposition to Defendants' motions, which the Court cites as "Pls.' Mem."

No party has objected to the exhibits and attachments that were submitted to the Court for consideration in connection with Defendants' motions. Plaintiffs appended a substantial volume of such materials— including excerpts from websites, account-opening agreements, brochures, and public filings—to the five declarations of Joel P. Laitman (the "Laitman Declarations"), and they relied in their opposition papers on the materials that were submitted by Defendants. The Court has reviewed all of these materials, and the documents cited in this decision have been deemed to be integral to the SAC. *See Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 157 (2d Cir.2006) ("In most instances ..., [an integral document] is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls ...."). These materials are therefore appropriately considered in connection with the resolution of Defendants' motions. *See, e.g., Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006).

2    The Court adopts this convention based on Plaintiffs' classification of Defendants into "five separate groups." (Pls.' Mem. at 1 n. 2.) Plaintiffs' five Laitman Declarations are also arranged according to these groups. Thus, for example, the Court cites to the Laitman Declaration regarding the Merrill Lynch Defendants as "Pls.' Merrill Lynch Decl."

3    The regulations of the Securities and Exchange Commission ("SEC") define "free credit balances" as "liabilities of a broker or dealer to customers which are subject to immediate cash payment to customers on demand, whether resulting from sales of securities, dividends, interest, deposits or otherwise ...." 17 C.F.R. § 240.15c3–3(a)(8). In the SAC, Plaintiffs provide an appropriately simple alternative definition: "uninvested cash." (See, e.g., SAC ¶ 1.)

4    An "expense ratio" is calculated by dividing the total value of the assets that a mutual fund holds under management by the fund's total annual operating costs and service charges. See Hoffman v. UBS–AG, 591 F.Supp.2d 522, 540–41 (S.D.N.Y.2008). The figure, expressed as a percentage, represents the proportional service fee that a mutual fund charges to an investor based on the amount of the investment in the fund.

5    Although the named Plaintiffs' accounts are discussed below, see infra Part I.B, no Plaintiff makes allegations regarding: (1) when his or her account was opened; (2) the value of the assets held in the account; (3) the history of the interest rates received through Defendants' various Cash Sweep Programs; or (4) whether he or she received or read the advertisements and disclosures described in the SAC.

6    In April 2007, an entity known as Morgan Stanley DW, Inc. merged into Morgan Stanley & Co., Inc. (See SAC ¶ 42.) Prior to the merger, Morgan Stanley DW, Inc. acted as the principal broker-dealer for Parent Defendant Morgan Stanley. (Id.) Following the merger, Morgan Stanley & Co., Inc. assumed that role. (Id.)

7    The Citigroup Defendants assert that, although Plaintiffs named "Citigroup Global Capital Markets, Inc." as a Defendant in the caption of the SAC, the name of Citigroup's principal broker-dealer is Citigroup Global Markets, Inc. (Citigroup Mem. at 1 n. 1.) The Citigroup Defendants further assert that "Smith Barney," which is referred to in the SAC as a separate entity (see, e.g., SAC ¶ 45), is merely "a division and service mark of [Citigroup Global Markets, Inc.]." (Citigroup Mem. at 1 n. 1.) These distinctions appear to be immaterial to the resolution of the instant motions. Accordingly, the Court refers to this group of Defendants collectively as the Citigroup Defendants, and adopts Plaintiff's identification of Smith Barney as a separate broker-dealer entity affiliated with the Citigroup Defendants.

8    Defendant Wachovia Corp. is the successor entity arising out of the September 1, 2001 merger of First Union Corporation and the former Wachovia Corporation. (See SAC ¶ 50.) Defendant Wachovia Securities has an intermediate parent entity known as Wachovia Financial Holding, LLC, which is a joint venture between Wachovia Corp. and Prudential Financial Inc. (See id. ¶ 51.)

9    NYSE's Member Firm Regulation Division no longer exists as such. On July 26, 2007, the SEC approved the consolidation of the regulatory functions of the NYSE and the National Association of Securities Dealers ("NASD") into a single entity known as the Financial Industry Regulatory Authority ("FINRA"). See Press Release No.2007–151Release No.2007–151, SEC Gives Regulatory Approval for NASD and NYSE Consolidation (July 26, 2007).

10    Plaintiffs do not appear to allege that the Morgan Stanley Defendants took the intermediate step of using a Modified Cash Sweep Program prior to the November 2005 implementation of their Tiered Cash Sweep Program. (See SAC ¶ 162.)

11    Plaintiffs also allege that a "slightly different" version of the Wachovia Defendants' Disclosure Statement, which was available on a different website, contained "substantially the same language, except that it add[ed] ... language making it clear that only individual investors with a Command Asset brokerage account [could] have a money market sweep option ...." (SAC ¶ 232.)

12    In their opposition to Defendants' motions, Plaintiffs voluntarily withdrew their "tying" claim under the Sherman Antitrust Act. (Pls.' Mem. at 4. n. 6.) Accordingly, pursuant to Rule 41(a)(2), that claim is hereby dismissed.

13    As Plaintiffs point out, the Second Circuit has held that, as a categorical matter, claims under § 349 are only required to meet the requirements of Rule 8(a). City of New York v. Sm okes-Spirits. Com, Inc., 541

F.3d 425, 455 (2d Cir.2008) (citing *Pelman ex rel. Pelman v. McDonald's Corp.,* 396 F.3d 508, 511 (2d Cir.2005)).

14    With the exception of the Wachovia Defendants, which argue that Virginia law applies, the parties agree that New York law governs Plaintiffs' state-law claims. (*See* Pls.' Mem. at 110.) Where "[t]he parties' briefs assume that New York law controls, ... such 'implied consent ... is sufficient to establish choice of law.' " *Nat'l Utility Serv., Inc. v. Tiffany & Co.,* No. 07 Civ. 3345(RJS), 2009 WL 755292, at *6 n. 6 (S.D.N.Y. Mar.20, 2009) (quoting *Krumme v. WestPoint Stevens, Inc.,* 238 F.3d 133, 138 (2d Cir.2000)).

> With respect to the Wachovia Defendants' arguments, the Court need not "embark on a choice-of-law analysis in the absence of an 'actual conflict' between the applicable rules of two relevant jurisdictions."

> *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.,* 414 F.3d 325, 331 (2d Cir.2005). In this regard, the Wachovia Defendants have identified only two material differences between the relevant law of

> New York and Virginia—the availability of claims for violations of § 349 and negligent misrepresentation. However, in light of the Court's conclusion that Plaintiffs have failed to state a claim under New York law with respect to these causes of action, the Court does not reach the Wachovia Defendants' choice of law arguments.

15    Plaintiffs have also failed to specifically allege that they actually read and relied on Defendants' advertisements and Investor Rights Statements. Rather, they offer the conclusory assertion that "Plaintiffs and other Class members justifiably relied upon such misrepresentations, concealment and omissions to their damage and detriment." (SAC ¶ 266.) This failure is fatal to Plaintiffs' common-law fraud claim based

on the first two categories of alleged misrepresentations by Defendants. *See* *Granite Partners, L.P. v. Bear, Stearns & Co.,* 58 F.Supp.2d 228, 258 (S.D.N.Y.1999) (finding that the plaintiffs had not adequately pleaded reliance because "[d]espite the [plaintiffs'] catch-all allegation that [they] relied upon [the defendant's] statements ..., the [plaintiffs] never venture[ ] to actually plead facts that underlie this reliance"); *see also* *Tuosto v. Philip Morris USA Inc.,* No. 05 Civ. 9384(PKL), 2007 WL 2398507, at *9 (S.D.N.Y. Aug.21, 2007) (finding that the plaintiff had not adequately pleaded reliance because the complaint did "not allege that [the plaintiff] saw ... any specific ... advertisement, [but] simply that [the defendant's] advertisements were widely

circulated and intended to mislead"); *Bennett,* 2007 WL 1732427, at *9 ("In this case ..., [the] plaintiffs have not alleged that they read any of the financial statements at issue, much less that they actually relied on them."). Therefore, as to the first two categories of alleged misrepresentations by Defendants, Plaintiffs' fraud claim is dismissed for this reason as well.

16    More recently, in proposed amendments to the SEC regulations governing free credit balances, *see* 17 C.F.R. §§ 240.15c3–2, 15c3–3, the SEC offered a similar view: "[f]ree credit balances constitute money that a broker-dealer owes its customers." SEC, Amendments to Financial Responsibility Rules for Broker–Dealers, Exchange Act Release No. 34–55431 at 80 (Mar. 9, 2007) (emphasis added), *available at* htt p://

www.sec.gov/rules/proposed/2007/34–55431.pdf. In light of this authority, Plaintiffs' reliance on *United States v. Chestman,* 947 F.2d 551 (2d Cir.1991), is misplaced. Plaintiffs quote *Chestman* at length in their opposition papers (*see* Pls.' Mem. at 24), including the court's remark that "[a] fiduciary relationship involves

*discretionary authority,"* *Chestman,* 947 F.2d at 569 (emphasis added). Here, by contrast, the free credit balances at issue were swept from *nondiscretionary* brokerage accounts. In that context, the Brokerage Defendants acted as *debtors,* not fiduciaries.

17    Contrary to Plaintiffs' assertion, the Rules and Regulations promulgated by the NYSE and the NASD do not broaden the scope of the Brokerage Defendants' contractual duties, implied or otherwise. First, as Plaintiffs

acknowledge, SROs' rules cannot serve as the basis for a private cause of action. *See, e.g.,* *SSH Co., Ltd. v. Shearson Lehman Bros. Inc.,* 678 F.Supp. 1055, 1058 (S.D.N.Y.1987). Second, even "when those regulatory rules are incorporated into a customer agreement, they do not bring with them a right to sue for an infraction." *Gurfein v. Ameritrade, Inc.,* No. 04 Civ. 9526(LLS), 2007 WL 2049771, at *3 (S.D.N.Y. July 17,

2007), *aff'd* 2009 WL 485062 (2d Cir. Feb.27, 2009). Therefore the SRO pronouncements cited by Plaintiffs do not bolster their breach of contract claim.

18    The SEC's proposed changes to its regulations regarding the use of customers' free credit balances adopt the NYSE's view: "To minimize the burden on the broker-dealer, [the proposed Rule 15c3–3] would not require the broker-dealer to obtain [an existing] customer's previous agreement to permit the broker-dealer to switch the sweep option between money market fund products and bank deposit account products." *See* Amendments to Financial Responsibility Rules for Broker–Dealers, 72 Fed.Reg. 12,862, 12,867 (proposed Mar. 19, 2007).

---

**End of Document**                                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    35

Case 1:18-md-02865-LAK   Document 350-6   Filed 05/20/20   Page 146 of 247

Handelsbanken v Dandridge & ors | [2002] 2 Lloyd's Rep 421 | England... Wales Court of Appeal (Civil Division)... Judgments-Law | Casemine   3/30/20, 3:47 PM



( (/) )

Have you created your unique lawyer profile yet?
Claim the judgments where you have appeared,
and create your exclusive legal network.

Login to find out more! (/lawyer/edit)

Upload brief
to use the new AI search
(/caseiq)
‹

 CITATION CODES

[2002] 2 Lloyd's Rep 421  •  [2002]
EWCA Civ 577  •  [2002] 2 LLR
421  •  [2002] 2 All ER (Comm) 39

CITES  0

This judgment does
not cite any other
record.

KeyCite Yellow Flag - Negative Treatment

Affirmed and Remanded by FSP, Inc. v. Societe Generale, 2nd Cir.(N.Y.), November 12, 2003

2003 WL 124515
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

FSP, INC. f/k/a Cowen Incorporated, Plaintiff,
v.
SOCIETE GENERALE, Defendant.

No. 02 CV 4786(GBD).
|
Jan. 14, 2003.

**Synopsis**

Seller of brokerage firm brought action against buyer seeking declaration that buyer was required to defend and indemnify seller in connection with pending and anticipated claims arising out of securities fraud suits against broker. On buyer's motion to compel arbitration or to dismiss, the District Court, Daniels, J., held that: (1) seller's claims were not subject to compulsory arbitration pursuant to stock exchange rules; (2) claims seeking indemnification were premature; and (3) buyer had no duty to defend actions that did not currently exist.

Motion granted in part.

West Headnotes (2)

[1]     **Alternative Dispute Resolution**  Performance, Breach, Enforcement, and Contest of Agreement

Action by seller, which was member of stock exchange, against buyer of brokerage firm, seeking declaration that buyer was required to defend and indemnify seller in connection with pending and anticipated claims arising out of securities fraud suits against broker, did not concern exchange-related business, and thus was not subject to compulsory arbitration pursuant to stock exchange's arbitration rules; action was merely contractual dispute wholly separate and apart from seller's exchange-related activities.

2 Cases that cite this headnote

[2]     **Declaratory Judgment**  Particular Estates and Interests

Seller's action against buyer of brokerage firm seeking declaration that buyer was required to defend and indemnify seller in connection with pending and anticipated claims arising out of securities fraud suits against broker was not justiciable to extent it sought declaration regarding seller's obligation to defend and indemnify it with regard to potential, unfiled claims, and sought reimbursement for losses arising from filed actions and future, anticipated claims, where no liability had yet been imposed upon buyer. U.S.C.A. Const. Art. 3, § 2, cl. 1; 28 U.S.C.A. § 2201.

13 Cases that cite this headnote

*MEMORANDUM DECISION & ORDER*

DANIELS, J.

**\*1** In an action for, *inter alia,* declaratory judgment, the defendant Societe General is moving to stay the action pending arbitration, or to dismiss the action, pursuant to Fed.R.Civ.P. 12(b)(1), for lack of subject matter jurisdiction.

Plaintiff FSP, Inc., formerly known as Cowen Incorporated, is the general partner of Financial Square Partners, L.P., formerly known as Cowen & Co. By Acquisition Agreement, dated February 22, 1998, the defendant purchased, among other things, "the business of brokerage, investment banking, asset management, sales and trading and other client services" from the "Sellers," Cowen Incorporated and Cowen Co. Pursuant to the Agreement, defendant assumed, with certain exceptions not applicable here, all of the plaintiff's liabilities whether fixed, absolute, matured, unmatured, accrued or contingent. Acquisition Agreement § 2.5. The Agreement also contained an indemnification clause which required, in pertinent part, that the defendant "indemnify, defend and hold harmless the Sellers and their respective successors ... from and against any and all Losses (as defined in the Agreement)." Acquisition Agreement § 10.2(a). Section 10.4

of the Agreement provided that if any dispute concerning the right of indemnification and defense thereunder, cannot be amicably resolved, "any party may institute suit against the other party in the United States District Court located in New York, New York, to resolve the matter."

The complaint states that in January, 2002, plaintiff learned that a broker, Frank Gruttadauria, had allegedly engaged in securities fraud and other misconduct over a number of years. Mr. Gruttadauria was employed by Cowen & Co., at the time the Acquisition Agreement was executed, and thereafter became an employee of Societe Generale Cowen Securities Corporation, defendant's retail brokerage subsidiary.

By letter dated February 4, 2002, plaintiff's counsel advised the defendant that an action entitled, *Fazio, et al. v. Gruttadauria, et al.* was filed asserting claims against plaintiff as a result of Gruttadauria's alleged misconduct, and that it anticipates additional claims from other parties. The letter further stated that "FSP, the General Partner and the appropriate other FSP Indemnified Parties hereby make claim against (defendant) for any and all Losses which any of them may suffer as a result of the Action or any other Gruttadauria Claims." Plaintiff also inquired whether defendant intended to defend plaintiff with regard to all the claims.

By letter dated March 6, 2002, defendant advised the plaintiff that the Acquisition Agreement did not require defendant to indemnify plaintiff for all claims arising in connection with Mr. Gruttadauria's activities. Nevertheless, defendant suggested that the parties enter into a Tolling and Forbearance Agreement to preserve all claims and defenses while the parties investigate the underlying facts and circumstances.

There are presently eight lawsuits that name Cowen & Co. as a defendant due to Mr. Gruttadauria's alleged misconduct. Plaintiff commenced this action seeking, on its first claim, a declaration that defendant is obligated to indemnify, defend and hold harmless the Sellers for all Losses (as defined in the Acquisition Agreement) they may suffer in connection with the filed actions and any other *Gruttadauria* claims. Plaintiff's second claim seeks reimbursement for all Losses (as defined in the Acquisition Agreement) that Sellers have suffered in connection with the filed actions and any other *Gruttadauria* claims, in an amount to be determined at trial.

**\*2**  Defendant now argues that since plaintiff was a member of the New York Stock Exchange ("NYSE" or "Exchange") when it sold its business to defendant, plaintiff is bound to

arbitrate this dispute. Defendant contends that the case at bar raises an exchange-related dispute, *i.e.,* the liability for fraud allegedly perpetrated by an employee of a stock exchange member firm. Defendant interprets § 10.4 of the Acquisition Agreement as "an agreement that filing suit in this District is an appropriate method of resolving disputes not subject to compulsory arbitration under the Exchange Constitution, such as disputes in which both parties are amenable to proceeding in court (which are not required to be arbitrated) or proceedings to enforce, vacate or modify an arbitration award (which by definition must be brought in a judicial forum)." Defendant's Brief at 9. Defendant further argues that even if the dispute is not exchange-related, arbitration is still mandated because the controversy raises a question about a member's business practices. Finally, defendant contends that even if arbitration is not required, the indemnification claims and the claim relating to defendant's obligation to defend unfiled *Gruttadauria* claims, are premature and should be dismissed.

There exist a strong federal policy favoring arbitration as an alternative means of dispute resolution. *Oldroyd v. Elmira Savings Bank, FSB,* 134 F.3d 72, 76 (2d Cir.1998). Despite this pro-arbitration policy, a party may only be compelled to arbitrate a dispute to the extent he or she has agreed to do so. *Bell v. Cedent Corp.,* 293 F.3d 563, 566–67 (2d Cir.2002); *John Hancock Life Ins. v. Wilson,* 254 F.3d 48, 58 (2d Cir.2001). Where the scope of the arbitration agreement is ambiguous, any doubt should be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Absent some ambiguity, however, it is the language of the contract that defines the scope of disputes subject to arbitration. *Equal Employment Opportunity Comm. v. Waffle House, Inc.,* 534 U.S. 279, 122 S.Ct. 754, 762, 151 L.Ed.2d 755 (2002).

An exchange member, by virtue of his or her admission, agrees to be governed by the Exchange's constitution and rules. *Axelrod & Co. v. Kordich, Victor & Neufeld,* 451 F.2d 838, 841 (2d Cir.1971). Article XI, § 1 of the NYSE Constitution states that "any controversy between a member ... and any other person arising out of the business of such member ... shall at the instance of any such party, be submitted for arbitration ..." Furthermore, Rule 600(a) of the NYSE Arbitration Rules provide that "[a]ny dispute, claim or controversy between a nonmember and a member ...

arising in connection with the business of such member ... shall be arbitrated under the Constitution and Rules of the (N.YSE) ... upon the demand of the .... nonmember." The phrase "arising in connection with the business" has been interpreted by the Second Circuit as prescribing that the controversy arise out of a member's "exchange-related" business. *Spear, Leeds & Kellogg v. Cental Life Assoc. Co.,* 85 F.3d 21, 28 (2d Cir.1996); *Paine, Webber, Jackson & Curtis v. Chase Manhattan Bank, N.A.,* 728 F.2d 577, 580 (2d Cir.1984). Since the Exchange has a substantial interest in the sound and proper management of its members, the compulsory arbitration provisions for exchange-related disputes is warranted. *Paine, Webber,* 728 F.2d at 581. The NYSE arbitration provisions are binding on signatories to a contract even though the contract itself does not incorporate these provisions by reference. *Merrill Lynch Pierce, Fenner & Smith, Inc. v. Georgiadis,* 903 F.2d 109, 113 (2d Cir.1990); *Paine, Webber,* 728 F.2d at 580. To extend arbitration to non-exchange matters, however, "would do significant injustice to the reasonable expectations of the exchange members." *Paine, Webber,* 728 F.2d at 580.

**\*3**  **[1]**  The dispute at issue herein does not concern exchange-related business. Rather it solely relates to the narrow issue of whether, pursuant to the Acquisition Agreement, defendant is required to defend and indemnify plaintiff in connection with the pending and anticipated *Gruttadauria* claims. This is simply a contractual dispute wholly separate and apart from plaintiff's exchange-related activities. *Gruttadauria* related claims by investors themselves may be subject to arbitration.[1] *see eg., Lehman Bros. Inc. v. Certified Reporting Co.,* 939 F.Supp. 1333 (N.D.Ill.1996)(claim regarding brokerage firm's improper supervision of employees who misrepresented the viability of a stock and participated in a scheme to inflate and manipulate its price constitutes an exchange-related dispute under Rule 600(a)); *see also, Royal Alliance Assoc., Inc. v. Davis,* 897 F.Supp. 783 (S.D.N.Y.1995)(investors' claim against brokerage firm for failure to properly supervise broker charged with misappropriation of funds was subject to arbitration as dispute "in connection with the business" of a member pursuant to § 12(a) of the Code of the National Association of Securities Dealers). Defendant cannot bootstrap the underlying factual allegations of securities fraud perpetrated by the broker to transform an otherwise garden variety contract dispute into an exchange-related dispute.

In a footnote, defendant cites *Nomura Securities Int'l Inc. v. Citibank N.A.,* 81 N.Y.2d 614, 620–21, 601 N.Y.S.2d 448, 619 N.E.2d 385 (N.Y.1993), contending that even where the dispute is unrelated to exchange business, it is arbitrable if it raises questions about the member's business practices. Defendant's Brief at 7, n. 1. In *Nomura,* the New York Court of Appeals held that although the subject dispute was not exchange-related, the charges against the member firm implicated the Exchange's interest in assuring accuracy in the financial transactions and in monitoring adherence to industry practices. 81 N .Y. at 621. Such interest were deemed central to the NYSE's self-regulatory goals thereby subjecting the dispute to arbitration under Rule 600(a). The instant contract dispute, however, does not involve a substantial interest of the Exchange relating to the business conducted by one of its members. All disputes concerning an Exchange member would in some way arise from the member's operation of its business. But a member is not required to submit to arbitration "every dispute it has with any entity in the world, no matter what the subject matter." *Paine, Webber,* 728 F.2d at 580.

Since the controversy is not subject to compulsory arbitration, the Court must turn its attention to the parties' Acquisition Agreement to determine whether they intended to arbitrate this matter. "When determining the intent of the parties the court must look to the plain language of the contract, and construe the contract as a whole." *Bell,* 293 F.3d at 568. Section 10.4 of the Acquisition Agreement clearly states that either party may commence an action in United States District Court for the Southern District of New York to resolved disputes concerning the right of indemnification. This provision manifests a clear intent by the parties to have such disputes resolved by the district court.

**\*4**  Additionally, § 11.12 of the Acquisition Agreement provides that any disputes arising out of the employee retention plan which cannot be resolved by mediation, shall be finally settled by arbitration. An agreement which provides for arbitration of specified disputes suggests that "the parties likely gave at least some thought to the scope of arbitration." *First Option of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 945, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). The Acquisition Agreement does not specifically require that indemnification disputes be settled through arbitration. It instead explicitly provides, by clear and concise language, that such disputes

be resolved by the district court. In light of the foregoing, the defendant's motion to stay the action pending arbitration is denied.

Defendant is also moving to dismiss the action for lack of subject matter jurisdiction. In entertaining such a motion, the Court accepts the material factual allegations in the complaint as true. *Atlantic Mutual Ins. Co. v. Balfour Maclain Int. Ltd.,* 968 F.2d 196, 198 (2d Cir.1992). In determining whether subject matter jurisdiction exists, the court may refer to evidence outside the pleadings and the party asserting jurisdiction bears the burden of proof by a preponderance of the evidence. *Moser v. Pollin,* 294 F.3d 335, 339 (2d Cir.2002); *Luckett v. Bure,* 290 F.3d 493, 496–97 (2d Cir.2002).

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). Article III, Section 2 of the Constitution limits judicial authority to actual cases and controversies. *Freedom Party of New York v. New York State Bd. of Elections,* 77 F.3d 660, 662 (2d Cir.1996), quoting *Jefferson v. Abrams,* 747 F.2d 94, 96 (2d Cir.1984); *S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exchange, Inc.,* 24 F.3d 427, 431 (2d Cir.1994). Similarly, the Declaratory Judgment Act limits declaratory judgments only to cases of actual controversy. 28 U.S.C. § 2201.

"A justiciable controversy" may not be "hypothetical or abstract" in nature, but rather must be "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 81 L.Ed. 617 (1937). A claim resting on contingent future events that may occur as anticipated or may not occur at all, is not ripe for adjudication. *Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (citations omitted).

**[2]** The subject action is not justiciable to the extent it seeks a declaration regarding defendant's obligation to defend and indemnify plaintiff with regard to potential, unfiled claims, and seeks reimbursement for losses arising from the eight filed actions and future, anticipated claims. The duties to defend and indemnify are legally distinct. *Travelers Property Casualty Corp. v. Winterthur Int'l.,* 2002 WL 1391920, *4 (S.D.N.Y. June 25, 2002). Claims regarding a duty to defend against pending actions are generally justiciable. *Winterthur Int'l, supra; Buckley v. County of Dupage,* 1998 WL 832641, *4 (N.D.Ill. Nov.23, 1998). Claims concerning indemnification obligations, however, are not ripe for adjudication until liability has been imposed upon the party to be indemnified. *Winterthur Int'l, supra; Cohen v. Loeb Partners Corp.,* 1992 WL 84535 (S.D.N.Y. April 13, 1992); *New York Guardian Mortgagee Corp. v. Cleland,* 473 F.Supp. 409, 418 (S.D.N.Y. Jan.8, 1979).

**\*5** Since, to date, no liability has been imposed upon the plaintiff, those claims seeking indemnification are premature. Moreover, defendant has no duty to defend against any actions that do not currently exist. Plaintiff's expectation of future actions is speculative, and does not give rise to an actual controversy. Accordingly, such claims for indemnification or defense of unfiled potential lawsuits are hereby dismissed without prejudice. [2]

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 124515

---

### Footnotes

1    The court in five of the eight pending actions has held that the controversies are not subject to arbitration. *Fazio v. Lehman Brothers, Inc.,* No. 02 Civ. 157; *Visconsi v. Lehman Brothers, Inc.,* No. 02 Civ. 382; *Lopardo v. Lehman Brothers, Inc.,* No. 02 Civ. 794; *Savoca v. Lehman Brothers, Inc.,* No. 02 Civ. 968; *Bonutti v. Lehman Brothers, Inc.,* No. 02 Civ. 1018 (N.D.Ohio July 19, 2002). The court concluded that:

[W]hen the Plaintiffs signed the alleged account agreements, they had no reasonable concern or contemplation that their assets would be stolen. There was, therefore, never any meetings of the minds with respect to any portion of the alleged account agreements, including the arbitration provisions. In addition, claims arising from allegations of outright theft are beyond the scope of such arbitration provisions.

2    Should additional actions be filed against plaintiff, and defendant, after receiving proper notification in accordance with the provisions of the Acquisition Agreement, refuses to defend, plaintiff may move to amend the complaint accordingly. Similarly, if there is an award or settlement in a pending action imposing liability on the plaintiff, plaintiff may move to amend to add an appropriate claim for indemnification.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# *Handelsbanken*

[ Home ] [ Up ]

| Custom Search |
|---|

DMC/INS/09/02

**Handelsbanken v. Dandridge and Others**

English Court of Appeal: Lord Phillips MR, Potter and Arden LJJ: 30 April 2002

Lionel Persey QC and Timothy Hill, instructed by Ince & Co, for Handelsbanken

Graham Charkham, instructed by Hill Taylor Dickinson, for respondent underwriters

Nigel Meeson, instructed by Beaumont & Son, for the respondent insurance brokers

**MARINE INSURANCE POLICIES: INSTITUTE WAR AND STRIKES HULLS-TIME CLAUSES 1983 EDITION: ILLEGAL FISHING: SEIZURE AND DETENTION OF VESSEL UNDER FISHERIES MANAGEMENT ACT 1991 OF AUSTRALIA: WARRANTY OF NO ILLEGAL FISHING: POTENTIAL FORFEITURE OF VESSEL: FORECLOSURE PROCEEDINGS: SALE OF VESSEL: INFRINGEMENT OF TRADING REGULATIONS: NATURE AND PURPOSE OF REGULATIONS: NATURE OF VESSEL: ORDINARY JUDICIAL PROCESS: CIVIL PROCEEDINGS: EXECUTIVE ACTS: EFFECTIVE DOMINANT CAUSE: FAILURE TO PROVIDE SECURITY: ANY FINANCIAL CAUSE: CONCURRENT CAUSES OF LOSS OF USE: INSURED VALUE: SECURITY EXCEEDING VALUE OF VESSEL: REASONABLENESS OF AMOUNT: LIKELIHOOD OF RECOVERY**

**Summary:**

**Underwriters of a Mortgagees' Interest Insurance policy could not rely on standard exclusion clauses in the Institute War and Strikes Hulls-Time Clauses in regard to losses arising from a) breach of trading regulations or b) ordinary judicial process, failure to provide security or any financial cause, following the seizure, detention and arrest by the Australian authorities of a fishing vessel on the grounds of illegal fishing.**

*DMC Category Rating: **Developed***



€€€

**Facts**

The Claimants, a Norwegian bank, claimed against underwriters under a Mortgagees' Interest Insurance ('MII') in respect of the mv. 'The Aliza Glacial'. The vessel had been seized and detained by the Australian authorities in October 1997 and threatened with forfeiture pursuant to the Fisheries Management Act of Australia, 1991, (the 'FMA') on grounds of illegal fishing. In order to avoid the forfeiture of the vessel and to minimise its losses, the bank had itself commenced foreclosure proceedings in Australia and had obtained summary judgment in its favour for the amounts due to it from the owners, with a direction that the vessel be valued and sold. The bank then bought the vessel for US$4.5 million at a judicial sale held in December 1998.

The owners had insured the vessel under a War Risk policy incorporating the Institute War and Strikes Hulls-Time Clauses 1983 Edition but containing an express warranty of 'No illegal fishing'. The owners' claim for the constructive total loss of the vessel was declined by underwriters on the grounds of breach of this warranty. That in turn led the bank to claim indemnity from its MII insurers for the balance outstanding under the loan agreement, plus the costs in incurred in connection with the Australian proceedings, in the amount of £1.6 million, approx.

Under clause 6 of the MII, the bank was insured against 'loss resulting from: loss of or damage to or liability of each vessel which is prima facie [at first impression] covered by owners' policies or [PandI] Club entries, but in respect of which there is subsequent non-payment……
6.1.1    by reason of any act or omission of any one or more of the owners… including breach or alleged breach of warranty.'

The issue before the court was whether the loss for which the bank sought recovery was 'prima facie covered' by owners' policies, subject to the breach of the 'no illegal fishing' warranty. The key clauses in the owners' policies covered the owners against loss of or damage to the vessel caused by 'capture, seizure, arrest, restraint or detainment and the consequences thereof or any attempt thereat'. The policy further provided – in the Detainment Clause - that, where the owners had been deprived of 'the free use and disposal of the vessel for a continuous period of twelve months' by one of those named perils, 'then, for the purpose of ascertaining whether the vessel is a constructive total loss, the Assured shall be deemed to have been deprived of the possession of the vessel without any likelihood of recovery'. The policy was, however, subject to a number of exclusions, which excluded liability for loss arising from:
"4.1.5 arrest, restraint, detainment…. under quarantine regulations or by reason of infringement of any customs or trading regulations;
4.1.6 the operation of ordinary judicial process, failure to provide security or to pay any fine or penalty or any financial cause."



**Judgment at First Instance**
At first instance, the judge (Toulson J.) had held that the vessel had indeed been detained for a breach of 'trading regulations'. He held that phrase was to be given a business-like interpretation and saw no reason to give the expression 'a particularly restricted interpretation'. He noted that the FMA had the twin objectives of economic advancement and environmental protection. An important part of the statutory scheme was the imposition of control over commercial fishing. He did not regard it as straining the interpretation of the word 'trading' to say that it included commercial fishing. "I would regard," he said, "regulations which govern such activities as naturally described by the words 'trading regulations'.

On the remaining issues, he rejected the argument of the defendant underwriters that the failure to pay the draft bonds put forward in January 1998 by the Australian government solicitor against the possible outcome of criminal proceedings against the Master and Fishing Master of the vessel, amounted to a failure to provide security under Exception 4.1.6 of the War Risks policy. He held that the security contemplated by the exclusion related to claims against the Master, rather than, as here, a form of recognisance for the attendance of the Master and the Fishing Master at their trial.

The background to this part of the judgment was that the Master and Fishing Master, having been charged with offences under the FMA, were later released on bail without conditions. They subsequently left Australia, and failed to return to stand trial. Without their conviction, the Australian authorities could not

implement the right to forfeit the vessel under the FMA. The bonds proposed by the Australian authorities were in the amounts of A\$9.768 million against 'possible forfeiture orders and fines that may be imposed' and A\$275,000 to cover the costs of a monitoring system on board the vessel until the completion of legal proceedings relating to the charges against the Master and Fishing Master. The authorities had indicated that the amounts of the bonds were negotiable.

In like manner, the judge rejected the argument that the bond requirement was to be construed as a 'financial cause' of the detainment of the vessel. In this regard, the court had to determine whether the dominant cause of the seizure and detention was a financial cause or something else. In the present case, the dominant reason for the detainment of the vessel was that it had been caught fishing illegally, "and the fact that its release might have been procured by the payment of money should not lead to the conclusion that the cause of the detainment was financial." Accordingly, the judge found in favour of the defendant underwriters.

The bank appealed against the findings of the judge on the 'trading regulations' issue and the underwriters cross-appealed against the findings of the judge on the issues of 'failure to provide security' and 'any financial cause'.



## Judgment of Court of Appeal

1. On the 'trading regulations' point, the court held that the phrase was to be construed in the context of a long-standing regime of interlocking clauses designed and applied as a package for inclusion in policies relating to vessels of all kinds, the majority of which will be trading vessels concerned with carriage of goods by sea in furtherance or fulfilment of international trading transactions, being classically, the actual process of buying, selling or otherwise dealing in goods and services, either in the domestic or in the international market. It would therefore be wrong to construe the word "trading" in the context of the nature of the vessel or the nature of the trade or business of the owner.
Instead the question of what was or was not a trading regulation depended on the nature and purpose of the regulation itself and not on the fact that it may incidentally affect a shipowner in the operation of his trade or business.

In the context of the FMA, the court held that a regulation, the purpose of which was primarily the conservation and management of fishing stocks, could not be regarded as a 'trading regulation' in the sense intended by the policy. It is not correct to say that, "because commercial fishing is a trade to which the regulation applies, the regulation is therefore a trading regulation.") In the present case the ship's seizure had been for illegal fishing rather than trading illegally.

2. As regards the exclusions under Exclusion 4.1.6. the court dealt with these under three headings.
a) 'ordinary judicial process'
This exception, the court held, was limited to civil proceedings for the enforcement of private rights, and did not extend to criminal proceedings and public rights. The vessel's initial seizure and its detention up to the point of its arrest by the Admiralty Marshal on February 20 1998 [pursuant to the bank's foreclosure proceedings] was an executive act under the 1991 Act. It was not correct to say that once the vessel had been arrested in the foreclosure proceedings, the vessel's further detention was by reason of ordinary judicial process. The original seizure and continuing detention of the vessel under the FMA remained in full operational effect until the moment of the judicial sale in December 1998.

The insurers had also advanced the argument that where a loss is caused by two causes effectively operating

at the same time, of which one is expressly excluded by the policy, the policy does not pay. Further, where two perils are operating concurrently, they do not have to be exactly co-extensive in time. Whilst accepting both these propositions, the court held that it had first to determine whether one of the causes was plainly the proximate cause of the loss. In this regard, it found that the detention of the vessel under the FMA and the authorities' continued assertion of their rights in that respect were the effective and dominant cause of the owners' loss of use of the vessel and consequent claim for a constructive total loss, rather than the judicial process initiated by the bank.

b) failure to provide security.. or any financial cause
The court considered these two exceptions together.

It agreed with the judge at first instance that the exception was directed at claims against the vessel, as opposed to a recognisance or security for an individual charged with a criminal offence. But, contrary to the judge at first instance, it held that the security here demanded was one relating to a claim, or potential claim against the vessel. This finding was based on the fact that the FMA had authorised the detention of the vessel against the possibility of its forfeiture, following the conviction [which never in fact took place] of the Master and Fishing Master under the Act.

The court further held that the exclusion in respect of failure to provide security is to be considered independently of the other defences available to the insurers. Its operation is not limited only to those cases where the failure to give security itself gives rise to the original seizure or detention. But this is subject to the limitation that the exception is inoperative in a case where the amounts and circumstances of providing such security would otherwise enable the vessel to be treated as a total loss.

Subject to that point, the court held that, on the facts of the case, owners' decision to refuse to pay security of A$10 million in order to secure the release of the vessel was an effective cause of the continuing detention, operating concurrently with the seizure and detention under the
1991 Act, so as to deprive owners of the use of the vessel. Under the principle of concurrent causes, referred to above, the claim would have been defeated by the exception.

The case therefore turned on whether, the vessel having been detained, it would have been reasonable for the owners to have provided the security as required by the Australian authorities, having regard to the size of the security demanded and the likelihood of its recovery, as against the value of the vessel. In this regard, the defendants had argued that the value to be taken into consideration was the insured value of the vessel. This argument was based on Clause 19 of the Institute Time Clauses Hulls 1/10/83, (incorporated by reference into the War Risks policy) which provided;

"No claim for constructive total loss based upon the cost of recovery and/or repair of the vessel shall be recoverable hereunder unless such costs will exceed the insured value".

The insured value was in the region of A$13.5 million.

The court rejected this argument, on the grounds that the terms of Clause 19.2 were not applicable to the claim for constructive total loss in this case; the claim here had been made under the 'deeming' provisions of the Detainment Clause in the War Risks policy. This required only proof of deprivation of possession for a continuous period of twelve months in order to establish a constructive total loss. On that basis, the value to be considered was the actual value of the vessel.

The court held that the Australian authorities were demanding, and in any subsequent negotiation, would have required, a sum by way of surety substantially greater than (or at least equal to) the value of the vessel, and given that there was no reasonable prospect of the Master and Fishing Master returning to Australia to stand trial, the owners were entitled to take the view that it would not be reasonable to provide a sum by way of security 'which would exceed the value of the vessel thereby recovered and would inevitably be lost'.

Accordingly, the bank had established that it had suffered a loss which was prima facie covered by the owners' War Risk policy and not excluded either of the relevant Exceptions clauses. The bank's claim against its MII underwriters therefore succeeded.

**Comment**
The defendant brokers have applied for permission to appeal to the House of Lords on the 'trading regulations' issue and the Clause 19.2 point.

These Case Notes have been prepared with care, but neither the Editor nor the International and other Contributors can guarantee that they are free from error, nor that they contain every pertinent point. Reliance should not therefore be placed upon them without independent verification. The Editor and the International and other Contributors disclaim all liability for any loss of whatsoever nature and howsoever arising as a result of others acting or refraining from acting in reliance on the contents of this website and the information to which it gives access. The Editor claims copyright in the content of the website.



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# England and Wales Court of Appeal (Civil Division) Decisions

---

**You are here:** BAILII >> Databases >> England and Wales Court of Appeal (Civil Division) Decisions >> IIG Capital LLC v Van Der Merwe & Anor [2008] EWCA Civ 542 (22 May 2008)
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2008/542.html*
Cite as: [2008] EWCA Civ 542, [2008] 1 FCR 633

---

[New search] [Printable RTF version] [Help]

---

**Neutral Citation Number: [2008] EWCA Civ 542**

Case No: A3/2007/2698

**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**Chancery Division**
**Mr Justice Lewison**
**[2007] EWHC 2631 (Ch)**

Royal Courts of Justice
Strand, London, WC2A 2LL

22/05/2008

B e f o r e :

**LORD JUSTICE WALLER**
**Vice-President of the Court of Appeal, Civil Division**
**LORD JUSTICE LAWRENCE COLLINS**
**and**
**LORD JUSTICE RIMER**

———————————

Between:

**IIG Capital Llc**                    **Respondents**

- and -

**Van Der Merwe & Anr**                    **Appellants**

————————————————

**Paul McGrath (instructed by Messrs Jones Day) for the Respondents**
**Matthew Collings QC and Adam Smith (instructed by Messrs H L Miller & Co) for the Appellants**
**Hearing date : 2nd April 2008**

————————————————

## HTML VERSION OF JUDGMENT

————————————————

Crown Copyright ©

**Lord Justice Waller :**

**Introduction**

1. This is an appeal from the judgment of Lewison J dated 13th November 2007 by which he dismissed an appeal from a judgment of Master Teverson dated 19th September 2007. Master Teverson had given summary judgment in the sum of $31,882,541.96 against the appellants (the Van Der Merwes) in favour of the respondents (IIG).

2. IIG had entered into a loan agreement with Hurst Parnell Imports and Exports Ltd (HPIE). The Van Der Merwes were directors of HPIE and executed "deeds of guarantee" in favour of IIG. Before the Master the Van Der Merwes, in reliance on such authorities as *Holme v Brunskill* (1878) 3 QBD 495 and *Marubeni Hong Kong and South China Limited v Mongolian Government* [2005] 1 WLR 2497, sought to rely on defences available to HPIE, in particular they sought to rely on expert evidence of New York law (the law by which the loan agreement was governed) to the effect that by that law there would be implied a covenant of good faith and fair dealing which would require IIG to have given reasonable notice of its demand and that such notice had not been given thereby providing HPIE a complete answer to the claim.

3. IIG's case was however that on the true construction of the "deeds of guarantee" they excluded the forms of defence available to a guarantor where his liability is secondary i.e. the defences available to the primary obligor and thus that the above authorities had no application. They submitted that on the true wording of the guarantees executed by the Van Der Merwes, the Van Der Merwes were obliged to pay as principal obligor moneys certified as due by duly authorised officers of IIG.

4. The Master concluded that IIG were right as did Lewison J. Chadwick LJ granted permission to appeal despite it being a second appeal because the "security instrument which [the judge] had construed contained common form provisions, such that his decision might give rise to "ramifications"."

**The loan and demand**

5. The judge describes the matter in this way:-

> "2. In 2004 Mrs Van Der Merwe came across IIG Capital LLC ("IIG"), a company registered in New York and carrying on business there. She understood that it was interested in financing business start ups by trade finance and invoice discounting. IIG

began affording finance to HPIE. However, the relationship had its ups and downs and Mr and Mrs Van Der Merwe transferred HPIE's business to Barclays. But in 2006 IIG recaptured HPIE's financing and a series of documents were entered into. All the documents were executed on the same day: 30 June 2006. One of those documents is at the heart of this dispute.

3. The first of the relevant documents is a loan agreement made between IIG and HPIE. The loan agreement contains a number of warranties given and obligations undertaken by HPIE. These include (for example) warranties about the accuracy of HPIE's accounts and financial statements (clause 8); obligations to provide regular accounts (clause 10.1); obligations to maintain insurance (clause 10.1.9); obligations not to enter into transactions otherwise than in the normal course of business (clause 11.4) and not to make loans to affiliates (clause 11.6). Clause 27.1 of that agreement said that the agreement was to be governed by New York Law. The second of the relevant documents was a debenture granted over the assets of HPIE. The third was a document described as a guarantee and signed by Mrs Van Der Merwe. I will refer to it as the guarantee, without prejudice to the contention of either party. Mr Van Der Merwe signed an identical document, although it was not in evidence.

4. On 12 January 2007 IIG demanded US$30,303,576 from HPIE said to be due under the loan agreement; and on the same day appointed administrators over HPIE. HPIE did not pay the amount demanded; and on 16 January 2007 IIG sent letters to Mr and Mrs Van Der Merwe reciting the failure of HPIE to pay and certifying that the amount due and payable by each of them under the guarantee was US$30,303,576. The letter demanded payment within 2 days. Mr and Mrs Van Der Merwe have not paid."

**The terms of the guarantee**

6. I can again take the description and relevant terms from the judge's judgment. He describes Mrs Van Der Merwe's guarantee but it is common ground that Mr Van Der Merwe's was in identical terms:-

"6. The guarantee begins by describing itself as "THIS GUARANTEE" and Mrs Van Der Merwe is described as "the Guarantor". Recital (A) records the grant of the facility to HPIE (described as "the Borrower") of US$23,000,000. Recital (B) says that it was a condition precedent to the grant of the facility that the "Guarantor enters into this Guarantee of the obligations of the Borrower to the Lender under the [Loan] Agreement". Recital (C) says that the guarantee is an "all monies" guarantee.

7. The document contains a single definition in clause 1.2. The defined term is "Guaranteed Monies" and the definition is:

"(i) all moneys and liabilities (whether actual or contingent) which are now or may at any time hereafter be due, owing, payable, or expressed to be due, owing or payable, to the Lender from or by the Borrower (ii) all interest…costs, commissions, fees and other charges and expenses which the Lender may charge against the Borrower; and (iii) all legal and other costs, charges and expenses which the Lender may incur in enforcing or

obtaining, or attempting to enforce or obtain, payment of any such moneys…"

8. Clause 2 contains the main payment obligation and reads:

"In consideration of the Lender agreeing to enter into the Agreement, the Guarantor as principal obligor and not merely as surety unconditionally and irrevocably:

2.1 guarantees to the Lender the due and punctual payment of the Guaranteed Moneys and agrees that, if at any time or from time to time any of the Guaranteed Moneys are not paid in full on their due date … it will immediately upon demand unconditionally pay to the Lender the Guaranteed Moneys which have not been so paid

2.2 As an original and independent obligation under this Deed, the Guarantor shall

2.2.1 indemnify the Lender and keep the Lender indemnified against any loss … incurred by the Lender as a result of a failure by the Borrower to make due and punctual payment of any of the Guaranteed Monies …"

9. Clause 3 is headed "Preservation of Guarantee" and provides:

"3.1 The Lender shall be at liberty without thereby affecting its rights hereunder at any time at its absolute discretion and with or without the consent or knowledge of or notice to the Guarantor:

3.1.1 to give time to any Obligor for the payment of all or any sums due or payable under the Agreement or any other Finance Document;

3.1.2 to neglect or forbear to enforce payment of all or any sums due or payable under the Agreement or any other Finance Document and (without prejudice to the foregoing) to grant any indulgence or forbearance to and fail to assert or pursue or delay in asserting or pursuing any right or remedy against any Obligor thereunder;

3.1.3 to accept, vary, exchange, renew, abstain from perfecting, or release any other security now held or to be held by it for or on account of the Financial Indebtedness;

3.1.4 to amend, add to or vary the terms of the Finance Documents;

IIG Capital LLC v Van Der Merwe & Anor [2008] EWCA Civ 542 (22 May 2008)        3/30/20, 4:05 PM

3.1.5 to compound with, accept compositions from and make any other arrangements with any other Obligor.

3.2 This Guarantee and the rights of the Lender hereunder shall not be affected by:

3.2.1 the appointment of a receiver, trustee or similar officer of any other Obligor, its undertaking or all or any of its or his asset.

3.2.2 Any alteration of the status of any other Obligor or any defective or irregular exercise of the powers of the Borrower to raise finance

3.2.3 The insolvency, bankruptcy, death, incapacity, winding up, liquidation or dissolution of any other Obligor;

3.2.3 Any failure by the Lender to take any other security for all or any part of the indebtedness agreed to be taken by the Lender pursuant to the Finance Documents or any total or partial invalidity, voidability or unenforceability of any such security;

3.2.4 The doing by the Lender of anything referred to in clause 3.1 above; or

3.2.5 Any other act or circumstance which (apart from this provision) would or might constitute a legal or equitable defence for or discharge of a surety or guarantor,

and this Guarantee may be called and/or enforced without steps or proceedings first being taken against any other Obligor."

10. Clause 4.2 provided that:

"A certificate in writing signed by a duly authorised officer or officers of the Lender stating the amount at any particular time due and payable by the Guarantor under this Guarantee shall, save for manifest error, be conclusive and binding on the Guarantor for the purposes hereof."

11. Clause 5 said that the guarantee was "a continuing guarantee" and would remain in force until all sums "due from the Borrower under the Finance Documents have been paid in full". Clause 7.3 prevented the Guarantor from asserting any set-off against the Borrower. Finally, clause 14 said that the guarantee was to be governed by English law."

7. It was common ground before us that it ultimately depends on the true construction of the agreement whether a particular label is the right one to apply to any instrument. It was further common ground that the instrument must be construed "by looking at it as a whole without preconceptions as to what it

is." [see Tuckey LJ in *Gold Coast Limited v Caja de Ahorros del Mediterraneo* [2003] 1 All ER (Comm) 142].

8.  We were referred as was the judge to certain other authorities of relevance to construing the provisions with which we are concerned. First we were referred to *Marubeni* (supra) as to the right approach to the question whether under these instruments the Van Der Merwes were assuming a secondary liability dependant on the primary liability of HPIE, or whether they were assuming a primary liability independent of the liability of HPIE. The judge cites extensively from that authority and I will not repeat those citations because there was as I understand it no issue ultimately between Mr Collings QC and Mr McGrath as to the guidance which that authority provides. It emphasises that the context in which any instrument comes into being is important. Thus performance bonds given by banks are almost invariably construed as imposing a liability on the bank to pay, whatever dispute there may be on liability under the underlying contract. "They have been accepted by the courts as the equivalent of irrevocable letters of credit" (see paragraph 23 of Carnwath LJ's judgment). Furthermore as he says in that paragraph "It cannot be assumed that cases relating to such banking instruments provide any useful guide when construing guarantees given outside the banking context". In considering the instrument in that case he said that it was not a banking instrument and that it was not described either on its face or in the supporting legal opinion in terms "appropriate to a demand bond or something having equivalent legal effect". The absence of such language in a transaction outside the banking context created in Carnwath LJ's view "a strong presumption against" interpretation as a demand bond. That was a judgment with which Sir Martin Nourse and I agreed.

9.  Lewison J took the view that "the strong presumption" against the deeds of guarantee being demand bonds applied and was thus concerned to see whether there are sufficient indications in the wording to displace that presumption [see paragraph 46]. No criticism is made of that approach by Mr McGrath [see paragraph 12.2 of his skeleton] and Mr Collings unsurprisingly emphasised the approach as the correct one.

10.  A second line of authority to which our attention was directed related to what are commonly termed "conclusive evidence clauses". The authority relied on by the judge was *Bache v Banque Vernes* [1973] 2 Lloyds Rep 437. In that case the plaintiffs had demanded a bank guarantee before entering into buying and selling transactions on behalf of their customer a French Trading company. The French Trading company's bank gave a guarantee which included a conclusive evidence clause in the following terms:-

> "Notice of default shall from time to time, be given by [plaintiffs] to [defendants] and on receipt of any such notice [defendants] will forthwith pay . . . the amount stated therein as due, such notice of default being as between [plaintiffs and defendants] conclusive evidence that [defendants'] liability hereunder has accrued in respect of the amount claimed."

11.  The Court of Appeal held unanimously that the conclusive evidence clause was valid and if notice of default was given it was binding according to its terms.

12.  There are various points to record in relation to *Bache*. Mr Collings submitted that since the authority was concerned with a performance bond being given by a bank, it was not an authority which assisted to any great degree in a case outside that context, relying on *Marubeni*. I, of course, understand that submission but it goes no further than requiring an anxious scrutiny of the language of the clause used

IIG Capital LLC v Van Der Merwe & Anor [2008] EWCA Civ 542 (22 May 2008)

in any particular case in order to ascertain whether the guarantee is secondary or primary.

13.   In this context Mr Collings was critical of the judge supporting the view he took by relying on a quotation from O'Donovan and Phillips without also referring to a passage in the book which appears shortly before the one he quoted. The passage relied on at the end of paragraph 5-105 reads as follows:-

> "The fact that conclusive evidence clauses are strictly construed also means that the guarantor may raise arguments as to whether the document served upon him can properly be described as a "certificate" or "statement" and as to whether the person who has signed the certificate comes within the class of persons authorised to do so."

14.   The passage relied on by the judge from paragraph 5-107 appears from his judgment at paragraph 35 in the following terms:-

> "Commenting on this kind of clause O'Donovan and Phillips say in The Modern Contract of Guarantee English Edition (2003) (¶ 5-107):
>
> "The extraordinary effect of … the more usual conclusive evidence clause, in the context of a guarantee, however, is that a guarantee which is not phrased in terms of a performance bond payable simply on demand without proof of default becomes analogous to such a guarantee as a result of the inclusion of this clause."

15.   In *Bache* some attention was paid by all judges to the question which might arise if it ultimately turned out that what had been demanded had been too large a sum once any dispute between the underlying contracting parties had been resolved. Lord Denning MR at 440 said this:-

> "Such being the commercial practice, it is only right that brokers should be able to turn to the French bank and say: "On our giving you notice of default, you must pay."
>
> The French bank can in turn recover the sum from their own customer, the French trading company. No doubt they have taken security for the purpose.
>
> This does not lead to any injustice because if the figure should be erroneous, it is always open to the French trading company to have it corrected by instituting proceedings against the brokers, in England or in France, to get it corrected as between them."

16.   Megaw LJ dealt with the same point and relied on the fact that the bank would have covered themselves by requiring an indemnity from its customer [see page 441 left column]. Scarman LJ put it this way at 441:-

> "On the question of policy I do not wish to add anything to what has already been said by my Lord, the Master of the Rolls, and Lord Justice Megaw. Had I the slightest doubt about the effect of the clause, I think it would have been right to have accepted the submission of Mr Libbert that there was a triable issue; but there is nothing in the clause which precludes a subsequent adjustment as between the English broker and the French customer of the bank. The result of that adjustment, if it takes place, will ultimately enure to the benefit of the bank, always assuming that the bank has used its opportunities to regulate its relationship with its customer in a businesslike way."

17. The judge in the instant case also thought of some relevance (as indeed did we) how, if the Van Der Merwes were forced to pay the demand as certified but it later transpired that HPIE did not owe the sum, they would recover any over- payment. Mr Collings submitted that since it had to be assumed at the summary judgment stage that the defences being put forward on behalf of HPIE were arguable, it was necessary to consider the position on the basis that at a trial HPIE might be shown to have a complete defence to the claim. How a company could borrow nearly $30 million and have a complete defence to repaying any part back, it is difficult to imagine, but on any view with personal liability being at stake if there is an answer to any part of the claim to $32 million, the point is a serious one.

18. Mr Collings (as he had before the judge) relied on *Trafalgar House Limited v General Surety Co* [1996] 1 AC 199. That case was concerned with a bond issued jointly by a subcontractor and General Surety, the bond obliging the "guarantors" to pay a sum of money, but it being a condition of the bond that if the subcontractor performed all the terms of the subcontract (described as the first part of the condition), or "if on default by the subcontractors the surety shall satisfy and discharge the damages sustained by the main contractors thereby up to the amount of the above written bond" (described as the second part of the condition) then the bond would be null and void. The speech of Lord Jauncey in the House of Lords was supported by all other members of the Committee. His conclusions, by reference to which the decision of the Court of Appeal was reversed, have some relevance to other matters in issue in this appeal as well as to the particular point now being addressed and for that reason I will quote the relevant passage in its context. First at page 204 he identified the issues in this way:-

> "Two principal issues arise in this appeal namely, first whether the bond is a guarantee with the consequent result that the appellants are entitled to rely on defences which would be available to Chambers and second whether the affidavits lodged by the appellants raise an issue which ought to be tried (the "triable issue"). For reasons which will become apparent it is appropriate to divide the first issue into two parts namely (1) whether the bond without the second part of the condition which I have italicised would be a guarantee (the "guarantee issue") and (2) if so, whether the addition of that second part alters the position (the "construction issue")."

19. He then said this at 207D to 208F:-

> "My Lords I have no doubt that the Court of Appeal were in error in concluding that the bond was not a guarantee but was akin to an on demand bond. No distinction can, in my view, properly be drawn between the effect of this bond minus the second part of the condition and the bond considered by Lord Atkin in the *Workington* case [1937] AC 1, 17 and other bonds using this or similar wording which have for many years been generally treated as guarantees: *Hudson's building and Engineering Contracts*, 11th ed. (1995), vol 2 pp 1499-1500, para 17-007. Thus in a second action arising out of the bond in the *Workington* case, *Workington Harbour & Dock Board v Trade Indemnity Co Ltd (No 2)* [1938] 2 All ER 101, 105, Lord Atkin said:
>
>> "My Lords, both actions were brought on the money bond." – That is the first and second actions. – "It is well established that in such an action the plaintiff has to establish damages occasioned by the breach or breaches of the conditions, and, if he succeeds, he recovers judgment on the whole amount of the bond, but can only issue execution for the amount of the damages proved."

*"The construction issue*

Mr Beloff argued that the words "damages sustained by the main contractor thereby" had the effect of defining the appellants' obligation solely by reference to the additional expenditure incurred by the respondents without reference to any sums which would normally be set against it in an action of damages against Chambers. Such a construction would involve treating these general words as an express exclusion of the normal legal incidents of suretyship. It would, as Mr Pollock for the appellants pointed out, also give rise to problems in the event of a final accounting between Chambers and the respondents producing an overall indebtedness by the latter to the former or a converse indebtedness less than the sum paid by the appellants under the bond. Mr Beloff's answer to this difficulty was that the court might in appropriate circumstances imply into the bond a condition of repayment by the respondents to the appellants. A solution which does not appear to be particularly attractive.

There is no doubt that in a contract of guarantee parties may, if so minded, exclude any one or more of the normal incidents or suretyship. However if they choose to do so clear and unambiguous language must be used to displace the normal legal consequence of the contract – language such as was used in *Hyundai Shipbuilding & Heavy Industries Co Ltd v Pournaras* [1978] 2 Lloyd's Rep 502, 503 where the letter of guarantee provided:

> "the [defendant] hereby irrevocably and unconditionally guarantees the payment in accordance with the terms of the contact of all sums due or to become due by the buyer to you under the contract and in case the buyer is in default of any such payment in default on behalf of the buyer . . ."

This was construed as enabling the shipowner to recover from the guarantors of the buyers and amount due irrespective of the position between yard and buyers: *per* Roskill LJ at p 5088. The words relied upon by the respondents however do not clearly displace those legal consequences. Indeed the use of the word "damages" is far more consistent with the compensation arrived at after taking into account all sums due to or by Chambers and the appellants. If the parties had intended to produce the result contended for by Mr Beloff it would have been a simple matter to use a form of words such as "the additional expenditure incurred." Instead they have used words which if anything point away from such a result."

20. I draw attention to the fact that once again it is clear that context is important. Furthermore even minor variations in language plus a different context can produce different results as the last paragraph of Lord Jauncey's speech indicates since he is not saying that *Hyundai* was wrongly decided.

21. As to the reliance that Mr Collings placed on what in that case was said to be not a particularly attractive solution, context once again seems to me important. In that case the context was subcontractors and a building contract with the prospect of a battle over the minutiae involved in such disputes. In this case as Mr McGrath emphasised the context is a company run by the two shareholders borrowing money for a business over which those shareholders have complete control.

**Discussion of the deeds of guarantee in this case**

22. It is convenient to deal with the last point first. Mr McGrath emphasises the context just explained. He submits that these guarantees require the Van Der Merwes to pay what is certified as due. He submits that the language is clear and that if the Van Der Merwes have not put in place a right of indemnity from the company HPIE or some agreement giving the right to force the company to sue to recover any over payment for their benefit, that is the fault of the Van Der Merwes which should not prejudice IIG.

23. He in fact however goes further and submits that even if some express agreement has not been made between the Van Der Merwes and the company, the law or equity will come to the rescue. The law he submits would require the company to indemnify the Van Der Merwes to the full extent of whatever they had paid, they having paid the company's debt on its behalf. He submits that HPIE would have no right when an indemnity was sought to argue that the Van Der Merwes have paid too much. He submits that the company's obligation would be to indemnify and the company would have a right to recover any over payment from IIG. In this latter regard he relies on a dictum of Potter LJ in the Court of Appeal approving the analysis of Morison J at first instance in *Cargill International SA v BSFIC* [1998] 2 All ER 406.

24. The point is discussed in O'Donovan and Phillips at paragraph 13-54 and following. The judge seemed to be of the view that that paragraph supported an argument for the person liable under the bond or guarantee (i.e. in this case the Van Der Merwes) having a remedy directly against the overpaid payee. I cannot spell that out from those paragraphs and Mr McGrath did not seek to support that view. Mr McGrath had of course some interest in not supporting that view since a direct claim over might give rise to a more arguable case for allowing a set off to be raised even at this stage as against IIG seeking to enforce the guarantee.

25. Mr Collings submitted that the law would not imply any indemnity. He submitted that for a director to enter into an open ended commitment to pay sums which might not even be due could not be said to be an action in the best interests of the company. The law would accordingly not imply a term requiring the company to indemnify the directors. He submitted that the Van Der Merwes would have no direct claim over or if they did they should be allowed to raise that claim now.

26. I am not persuaded that the company would not be bound to indemnify the Van Der Merwes. It seems to me that where a loan agreement requires the giving of guarantees whether on demand guarantees or only secondary liability guarantees of that loan, a call and payment of what is found to be due from the guarantors will lead almost certainly to a right of indemnity from the company if the guarantee has to be paid.

27. Furthermore I am inclined to the view that even if there is no express contract negotiated between the Van Der Merwes and the company it is strongly arguable that the Van Der Merwes will have a remedy against the company and in my view if the company refused to seek return of the overpayment, the guarantors would have a right of subrogation by which they could force IIG to pay back sums found to have been overpaid.

28. But it seems to me that strictly what precise mechanism there might be for repayment is not the most relevant question when considering what the guarantees themselves require. If of course they do not require payment of the certified sum, then no difficulty arises. Leave to defend must be given so that the defences that the company could raise could be considered at a trial. If the guarantees by their clear language do require payment, then it was for the Van Der Merwes to protect themselves against that eventuality.

29.   I should stress that even in a case where an on demand obligation is undertaken a question might arise when judgment was given, whether there should be a stay. That would depend on the strength or otherwise of the claim that some money would ultimately have to be reimbursed. The argument that if IIG are entitled to judgment, there should still be stay has never been run in this case. That would require some detailed consideration of the strength of claims made as a matter of New York law.

30.   The question at the end of the day is what on the true language of these deeds of guarantee did the Van Der Merwes agree. I accept there is a presumption against these being demand bonds or guarantees; I also accept that the documents must be looked at as a whole. I accept that clause 3 which would only be necessary if the deeds were or might be undertaking a secondary liability, points in favour of the presumption and that there are other terms which appear in what I would call normal guarantees given to banks in relation to a customer's indebtedness. It will thus only be if clear language has been used in the operative clauses that the presumption will be rebutted.

31.   I turn thus to the operative language of the deeds of guarantee. By condition 2.1 the guarantor (Mr or Mrs Van Der Merwe) agreed "as principal obligor" "not merely as surety" that "if …the guaranteed moneys are not paid in full on their due date …it (the guarantor) will immediately upon demand unconditionally pay to the Lender (IIG) the Guaranteed moneys which have not been so paid". The Guaranteed moneys are defined as "all moneys and liabilities ….which are now or may at any time hereafter be due, owing or payable *or expressed to be due owing or payable, to the Lender from or by the borrower*…". The obligation to pay moneys "expressed to be due" "upon demand" "unconditionally" as "principal obligor" "not merely as surety" would indicate that the Van Der Merwes were taking on something more than a secondary obligation.

32.   Clause 4.2 then provides that "A certificate in writing signed by a duly authorised officer …stating the amount at any particular time due and payable by the Guarantor…shall save for manifest error, be conclusive and binding on the Guarantor for the purposes hereof". I agree with the judge that that clause puts the matter beyond doubt. Any presumption has by the language used been clearly rebutted. Apart from manifest error, the Van Der Merwes have bound themselves to pay on demand as primary obligor the amount stated in a certificate pursuant to clause 4.2.

33.   Mr Collings before the judge attempted to run an argument based on manifest error. It was rejected by the judge in the following terms:-

> "52. Mr Collings fastened on the phrase in clause 4.2 "save in the case of manifest error". A "manifest error" is one that is obvious or easily demonstrable without extensive investigation. Mr Collings referred to the decision of Thomas J in *Invensys plc v Automotive Sealing Systems Ltd* (8 November 2001). That was a case in which a certificate made by an expert was to be conclusive save in the case of manifest error. Thomas J held that the expert's reasons could be examined in order to determine whether he had made a manifest error. But since the contract in that case provided for the expert to give reasons, Thomas J was undoubtedly right to say that the parties must have contemplated that those reasons could be examined to see whether any manifest error had been made. By contrast, in the present case the certificate was not required to contain any reasons. I did not derive any assistance from the *Invensys* case."

34.   The judge's conclusion was not challenged in the appellants' notice of appeal or in Mr Collings' skeleton argument. When during the hearing clarification was sought as to whether Mr Collings was

suggesting as an alternative to his other arguments manifest error, Mr Collings initially confirmed he was not seeking so to argue. On reflection however he made a submission to the same effect as he had made before the judge.

35. In my view the judge's conclusion on manifest error was clearly right, and it was rightly not challenged in the notice of appeal.

36. I would accordingly dismiss the appeal.

**Lord Justice Lawrence Collins :**

37. I agree.

**Lord Justice Rimer :**

38. I also agree.

---

**BAILII:** [Copyright Policy](#) | [Disclaimers](#) | [Privacy Policy](#) | [Feedback](#) | [Donate to BAILII](#)
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2008/542.html*

2010 WL 4502038
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States Bankruptcy Court,
S.D. New York.

In re RICHARTZ, FLISS,
CLARK & POPE, INC., Debtor.
Angela Tese–Milner, as Chapter 7 Trustee of
Richartz, Fliss, Clark & Pope, Inc., Plaintiff,
v.
Bridal Guide Magazine, Defendant.

Bankruptcy No. 08–13919 (MG).
|
Adversary No. 10–03317 (MG).
|
Nov. 1, 2010.

**Attorneys and Law Firms**

Tese & Milner, LLP, by Angela Tese–Milner, Esq., New York, NY, for Angela Tese–Milner, Chapter 7 Trustee.

Halperin Battaglia Raicht, LLP, by Walter Benzija, Esq., Alan D. Halperin, Esq., Debra J. Cohen, Esq., New York, NY, for Defendant Bridal Guide Magazine.

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS WITH PREJUDICE**

MARTIN GLENN, Bankruptcy Judge.

**\*1** Pending before the Court is Bridal Guide Magazine's ("RFP")[1] Motion to Dismiss an adversary proceeding for (1) Angela Tese–Milner's (the "Trustee") failure to sue a juridical person[2]; and (2) failure to state a claim upon which relief can be granted (the "Motion"). The Trustee is seeking to recover for the benefit of the estate as alleged property of Richartz, Fliss, Clark & Pope, Inc. (the "Debtor") under section 549 of the Bankruptcy Code, a transfer made to RFP by a non-debtor third party, the Grenada Board of Tourism ("GBT"). The Court heard oral argument on the motion on October 27, 2010 and took the matter under submission. For the reasons explained below, the Court concludes that the complaint must be dismissed for failure to state a claim. In light of this conclusion, an amendment of the Complaint to name RFP

as the proper party defendant would be futile. Therefore, the Motion to dismiss is granted with prejudice.

**BACKGROUND**

On October 6, 2008 (the "Petition Date"), the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code. (Case No. 08–13919, ECF Doc. # 1.) On April 27, 2009 (the "Conversion Date"), the Debtor's case was converted from a case under chapter 11 to a case under chapter 7 and the Trustee was appointed. (Case No. 08–13919, ECF Doc. # 58.) Prior to filing for bankruptcy, the Debtor was in the business of providing advertising and public relations services. Prior to the Petition Date, Debtor was retained by GBT to provide GBT advertising and public relations services.

On or about April 2, 2008, the Debtor, acting on behalf of GBT, submitted to RFP insertion order # 00466–00001–000 (the "First Order") for a full page advertisement for GBT in the July/August 2008 edition of Bridal Guide Magazine (the "First Ad") for a price of $10,418.00, plus a $1,838.47 commission to be earned by the Debtor. On or about July 14, 2008, the Debtor, acting on behalf of GBT, again submitted to RFP another insertion order # 004629–00001–000 (the "Second Order" and together with the First Order, the "Orders") for a full page advertisement (the "Second Ad") in the following edition of Bridal Guide Magazine. This advertisement was for the same price, $10,418.00, again plus a $1,838.47 commission to be earned by the Debtor.

On June 1, 2008, RFP forwarded the Debtor invoice number 119795 (the "First Invoice") for the First Ad in the aggregate amount of $12,256.47, representing the ad price plus the Debtor's commission ("First Commission"). The First Invoice, attached to RFP's Motion as Exhibit B, clearly distinguishes between the ad price and the Debtor's commission. On October 1, 2008, RFP forwarded the Debtor invoice number 120448 (the "Second Invoice" and together with the First Invoice, the "Invoices"), for the Second Ad, again broken down between the ad price and the Debtor's commission. Thereafter, on or about May 20, 2009, GBT paid the Invoices in full by remitting $24,512.94 to RFP, representing $20,836.00 for the actual ad space, and $3,676.94 for the Debtor's commissions.

**\*2** On June 18, 2010, the Trustee commenced this adversary proceeding against "Bridal Guide Magazine" to recover the entire $24,512.94 paid by GBT to RFP. The Trustee extended

GBT's time to answer or otherwise respond to the Complaint to August 30, 2010. On August 20, 2010, RFP turned over the commission payments ($3,676.94) to the Trustee, but retained the $20,836.00 fee for the advertisement space.

The Trustee contends that all of the funds that GBT paid to RFP are property of the estate pursuant to section 541 and that the Trustee is entitled to collect the remaining $20,836.00 retained by RFP. RFP argues that the Debtor was RFP's agent and that amounts paid to RFP for the ads were never property of the estate. As explained below, the documents attached to the Complaint establish that the Debtor was the disclosed agent for RFP, and that the property the Trustee seeks to recover was never property of the Debtor.

## DISCUSSION

### A. Standard on a Motion to Dismiss

FED.R.CIV.P. 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss pursuant to FED.R.CIV.P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949 (2009). Courts deciding motions to dismiss must draw all reasonable inferences in favor of the nonmoving party and must limit their review to facts and allegations contained in (1) the complaint, (2) documents either incorporated into the complaint by reference or attached as exhibits, and (3) matters of which the court may take judicial notice. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004); *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002). Courts also consider documents not attached to the complaint or incorporated by reference, but "upon which the complaint *solely* relies and which *[are] integral to the complaint.*" *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (internal quotation marks omitted) (emphasis in original) (quoting *Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)); *see also Kalin v. Xanboo, Inc.,* No. 04 Civ. 5931(RJS), 2009 WL 928280, at *8 (S.D.N.Y. Mar. 30, 2009); *Grubin v. Rattet (In re Food Mgmt. Grp.),* 380 B.R. 677, 690 (Bankr.S.D.N.Y.2008) ("*Food Mgmt.*") (holding that a court may consider documents that have "not been incorporated by reference where the complaint relies heavily upon its

terms and effect, which renders the document integral to the complaint") (internal quotation marks omitted).

Following the Supreme Court's decision in *Ashcroft v. Iqbal,* courts use a two-prong approach when considering a motion to dismiss. *See, e.g., Weston v. Optima Commc'ns Sys., Inc.,* No. 09 Civ. 3732(DC), 2009 WL 3200653, at *2 (S.D.N.Y. Oct. 7, 2009) (Chin, J.) (acknowledging a "two-pronged" approach to deciding motions to dismiss); *S. Ill. Laborers' and Employers Health and Welfare Fund v. Pfizer, Inc.,* No. 08 CV 5175(KMW), 2009 WL 3151807, at *3 (S.D.N.Y. Sept. 30, 2009) (same); *Inst. for Dev. of Earth Awareness v. People for the Ethical Treatment of Animals,* No. 08 Civ. 6195(PKC), 2009 WL 2850230, at *3 (S.D.N.Y. Aug. 28, 2009) (same). First, the court must accept all factual allegations in the complaint as true, discounting legal conclusions clothed in the factual garb. *Iqbal,* 129 S.Ct. at 1949–50; *Boykin v. Keycorp,* 521 F.3d 202, 204 (2d Cir.2008); *Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178, 183 (2d Cir.2008). Second, the court must determine if these well-pleaded factual allegations state a "plausible claim for relief." *Iqbal,* 129 S.Ct. at 1951.

*3 Courts do not make plausibility determinations in a vacuum; it is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. Meeting the plausibility standard requires a complaint to plead facts that show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 557 (2007)). A complaint that only pleads facts that are "merely consistent with a defendant's liability" does not meet the plausibility requirement. *Id.* (quoting *Twombly,* 550 U.S. at 557 (quotation marks omitted)).

In deciding a motion to dismiss, the court may consider documents that are integral to the complaint. *Roth,* 489 F.3d at 509. When documents contain statements that contradict allegations in a complaint, the documents control and the court need not accept as true the allegations in the complaint to the extent they are contradicted. *Id.*

at 510–11. Where an allegation in the complaint conflicts with other allegations, or where the plaintiff's own pleadings are contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint, the court is neither obligated to reconcile the pleadings with the other matter nor accept the allegation in the pleadings as true in deciding a motion to dismiss. *DeBlasio v. Merrill Lynch & Co., Inc.,* No. 07 Civ 318(RJS), 2009 WL 2242605, *26 (S.D.N.Y.2009) (citing *Koulkina v. City of New York,* No. 06 Civ. 11357(SHS), 2009 WL 210727, at *6 (S.D.N.Y. Jan. 29, 2009); *Fisk v. Letterman,* 401 F.Supp.2d 362, 368 (S.D.N.Y.2005).

**B. Application of the Standard to the Trustee's Complaint**

*1. The Trustee's Complaint Fails to State a Claim Upon Which Relief Can be Granted*

a. *The Trustee's Complaint Contains Legal Conclusions Masquerading as Factual Allegations*
The Trustee has failed to allege facts sufficient to state a claim upon which relief can be granted. There are several problems with the facial validity and substance of the Trustee's Complaint. First, the Trustee's Complaint contains conclusory legal assertions. The Court accepts as true all factual allegations in the Complaint but discounts legal conclusions clothed in factual accoutrement. *Iqbal,* 129 S.Ct. at 1949–50. The Trustee asserts that the transfer in question represents a "preferential payment" (ECF Doc. # 2, ¶ 13) and that the funds transferred are "property of the Bankruptcy Estate pursuant to § 541." *Id.* at ¶ 16. The Trustee does not support these legal conclusions with factual information. To the contrary, even if these claims qualified as factual assertions, the Invoices attached to the Trustee's Complaint in Exhibit D contradict them. Where plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss. *DeBlasio,* 2009 WL 2242605, at *26.

b. *The Documentation Annexed To and Referenced Within the Trustee's Complaint Establishes the Existence of a Principal–Agent Relationship*
**\*4** The documentation annexed to the Trustee's Complaint and referenced therein establishes that the Debtor's

relationship to GBT was that of agent and principal. The Restatement (First) of Agency provides in relevant part that,

> [t]he relationship of agency is created as the result of conduct by the parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act. The principal must in some manner indicate that the agent is to act for him, and the agent must agree to act on his behalf and subject to his control.

RESTATEMENT (FIRST) OF AGENCY § 1 cmt. a (1933). The Complaint, in conjunction with the attached materials, establishes that the conduct of the parties manifested an intention to create an agency relationship. It follows from a finding of an agency relationship that the transferred funds were not property of the estate and are therefore not recoverable by the Trustee.

The Invoices and the Orders establish the Debtor's role as agent acting on behalf of GBT as principal. The Debtor's own Orders specifically refer to GBT as the client and are signed by the Debtor on a signature line marked as "authorized agency signature." In support of their contention that the Debtor's signature in the context of the case suffices to establish an agency relationship, RFP cites *American Diabetes Association v. Abbey, Mecca & Co., Inc .,* No. 10–00388, 2010 WL 3817370 (N.Y.App.Div. 4th Dept. Oct. 1, 2010). The *American Diabetes* court rejected plaintiff's assertion that "defendant is liable because the insertion order [did] not explicitly state that defendant was acting on behalf of Incline." *Id.* at * 1. The court explained that the evidence clearly established that all parties involved knew that the defendant had been acting on behalf of another. While *American Diabetes* involved a breach of contract claim and a summary judgment motion rather than a motion to dismiss, the legal conclusion in *American Diabetes* applies here as well. The documents attached to the Complaint here fill the same role as the evidence offered on summary judgment in *American Diabetes.*

Both the Invoices and Orders distinguish between the cost of the advertisements and the agency's commissions. The Invoices distinguish between

"Agency Commission" ($1,838.47) and "Net after Commission" ($10,418.00). Only the former represents property of the estate, and both parties agree that these funds have already been paid to the Trustee. The Debtor never held a legal or equitable interest in the remaining $20,836.00 paid to RFP.

The Trustee claims that GBT's payment to RFP represented an offset against the Debtor's Account Receivable. However, under New York law, GBT was primarily liable for the cost of the advertisements; therefore, it was appropriate for GBT to pay RFP directly instead of paying the Debtor. *See News America Marketing, Inc. v. Lepage Bakeries, Inc.,* 791 N.Y.S.2d 80, 82 (App . Div.2005) (stating that "it is clear from these documents that McDonald acted as the agent for a disclosed principal, which is responsible to make payment for goods and services purchased by its agent within the exercise of the agent's express or implied authority") (citing *Tobron Off. Furniture Corp. v. King World Prods.,* 555 N.Y.S.2d 315, 316 (1990)).

**\*5** The Trustee has failed to establish a claim for which relief may be granted. The papers establish that the relationship between the Debtor and GBT was that of an agent and principal. The funds at issue were never property of the estate and were therefore properly received by RFP. In light of the documents attached to the Complaint, the Trustee's Complaint fails to satisfy the plausibility standard established by *Iqbal,* 129 S.Ct. at 1951.

### CONCLUSION

For the reasons discussed above, the Court dismisses with prejudice the Trustee's complaint seeking recovery of property of the estate.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in B.R., 2010 WL 4502038

### Footnotes

1    Bridal Guide Magazine is not a juridical person. It is not a corporation, partnership, unincorporated association or an individual. (ECF Doc. # 7.) Rather, it is a magazine that is published by RFP, LLC ("RFP"). Therefore, the defendant in this action will be referred to as RFP.

2    The Trustee filed a cross-motion for leave to amend the complaint to name RFP LLC as the defendant (the "Cross–Motion"). (ECF Doc. # 16.) Because the Trustee's complaint seeking recovery of property of the estate (the "Complaint") fails to state a claim upon which relief can be granted, it is futile to grant the Trustee's Cross–Motion. The Trustee's failure to name a juridical person as defendant will not be discussed, as RFP established an alternative ground for dismissal.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# United Kingdom Supreme Court

---

**You are here:** BAILII >> Databases >> United Kingdom Supreme Court >> Petroleo Brasileiro SA v ENE Kos 1 Ltd [2012] UKSC 17 (2 May 2012)
URL: *http://www.bailii.org/uk/cases/UKSC/2012/17.html*
Cite as: [2012] WLR(D) 132, [2013] 1 All ER (Comm) 32, [2012] 2 Lloyd's Rep 292, [2012] 2 WLR 976, [2013] 1 CLC 1, [2012] 4 All ER 1, 149 Con LR 76, [2012] 2 AC 164, [2012] UKSC 17

---

[New search] [Printable PDF version] [Buy ICLR report: [2012] 2 AC 164] [View ICLR summary: [2012] WLR(D) 132] [Help]

---

Summary

Easter Term
**[2012] UKSC 17**
On appeal from: *[2010] EWCA Civ 772*

# JUDGMENT

**Petroleo Brasileiro S.A. (Respondent) *v* E.N.E. Kos 1 Limited (Appellant)**

**before**

**Lord Phillips, President
Lord Walker
Lord Mance
Lord Clarke
Lord Sumption**

**JUDGMENT GIVEN ON**

**2 May 2012**

**Heard on 12 January 2012**

| *Appellant* | *Respondent* |
|---|---|
| Timothy Brenton QC | Andrew Baker QC |
| (Instructed by Ince & Co LLP) | Henry Byam-Cook |
| | (Instructed by Thomas Cooper Solicitors) |

## LORD SUMPTION (WITH WHOM LORD WALKER AGREES)

1. This appeal is about the rights of the owner of a time-chartered ship after the ship has been lawfully withdrawn for non-payment of hire. The question must often have arisen in practice but, oddly enough, there is no direct authority upon it.

2. The *MT Kos* is a 301,000 mt VLCC. She was time chartered by her owners to Petroleo Brasileiro SA on 2 June 2006 for 36 months plus or minus 15 days at charterers' option. The charterparty, which was on the Shelltime 3 Form, contained a standard form of withdrawal clause providing that if hire was not paid when due, the owners should have the right to withdraw the vessel "without prejudice to any claim owners may otherwise have on charterers under this charter." It is increasingly common for such contracts to include anti-technicality clauses requiring notice to be given before this right is exercised. But for whatever reason no anti-technicality clause was included in this case. So when, on 31 May 2008, charterers failed to make the advance payment required for the month of June, the owners were entitled to withdraw the *MT Kos*, and did so at 14.41 GMT on 2 June 2008. It is agreed between the parties to the appeal that the charterers' failure to pay hire was not a repudiatory breach of contract.

3. At the time of the withdrawal, the *MT Kos* was at Angra dos Reis in Brazil, where she had just completed the loading of a parcel of cargo for the charterers' account in accordance with their orders. She was awaiting a second parcel, which in the event was not loaded. There were no bills of lading in the hands of third parties. On 2 and 3 June there was a number of exchanges between the parties. The charterers tried to persuade the owners to cancel the withdrawal. The owners refused. Their position was set out in a message at 11.30 GMT on 3 June 2008. They said that they would be willing to reinstate the charterparty or continue on a voyage basis, but only at the current market rate, which was much higher than the charterparty rate. Otherwise, they required the charterers to make prompt arrangements to receive back their cargo. Ultimately, after further fruitless exchanges, the charterers told the owners at 21.36 GMT on 3 June 2008 that they would arrange for the terminal to receive back the cargo. The arrangements were duly made, and discharge of the cargo was completed at 06.00 GMT on 5 June 2008. It is agreed that if the charterers had begun to make arrangements for the discharge of their cargo as soon as they received the owners' notice of withdrawal, the vessel would have been detained at Angra dos Reis for one day. As it was, she was detained there for 2.64 days.

4. The issue before us is whether the owners are entitled to be paid for the service of the vessel during that 2.64 days, and for bunkers consumed in the same period. Leaving to one side points which have fallen by the wayside at earlier stages of these proceedings, their claim is put forward on four bases: (i) under clause 13 of the charterparty; (ii) under an express or implied new contract made after the vessel was withdrawn, to pay for the time and bunkers; (iii) on the ground of unjust enrichment; and (iv) under the law of bailment. The judge, Andrew Smith J, held that they were entitled to succeed on basis (iv), but rejected every other basis which they put forward. The Court of Appeal (Longmore and Smith LJJ and Sir Mark Waller) rejected the claim on all four bases, except that they allowed the owners to recover the value of bunkers consumed in actually discharging the cargo.

   *New contract after withdrawal*

5. The argument that there was a new contract turns entirely on the facts and can be shortly dealt with. Once the charterparty came to an end, the owners no longer had any obligation to carry the cargo to its destination or to discharge it. Their duty was to make it available to the charterers. It was then for the charterers to make any necessary arrangements for discharge. For a day and a half after the notice of

withdrawal, they did nothing because they declined to accept that the owners were entitled to withdraw the vessel. Each party was trying to persuade the other to resume the contractual service (or a variant of it) on its own terms. Each of them rejected the other's terms. On the footing that the owners were not willing to treat the old contract as subsisting and that no agreement could be reached upon a new one, both parties then submitted to the inevitable. Owners called on charterers to take delivery of their cargo, as charterers in any event were bound to do. The charterers then got on with it. Both courts below held that it was impossible to spell a new contract out of these facts. I agree.

*Implications of the owners' decision to withdraw*

6.  Under all the remaining heads of claim, the charterers' argument is substantially the same, namely that any delay or loss arising from the need to discharge the cargo results from the owners' decision to withdraw. That was a decision made at their own election and for their own commercial purposes. The owners, it is said, must bear the adverse as well as the beneficial consequences of an optional decision made in their own interest. It is clear that this consideration influenced both courts below, and that it was decisive in the minds of the Court of Appeal.

7.  The factual premise of the argument is of course correct. It is axiomatic that a withdrawal clause operates at the election of owners, and not automatically. Two main consequences follow from this. The first is that owners will not exercise their right of withdrawal unless it is in their commercial interest to do so. Usually, this will be because market rates of hire have risen. But it may be in owners' interest to withdraw the vessel even if they have not risen, for example, where the charterers are insolvent or owners depend on prompt payment to fund payments under a head charter or charterers' payment record occasions administrative or other difficulties. The second consequence is that any failure on the part of the charterers to pay hire when it falls due will not of itself entitle the owners to damages representing the loss of the bargain or the expenses of termination simply because the owners respond by withdrawing the vessel. This is because the non-payment does not itself destroy the bargain or occasion the expenses, unless in the circumstances it is a repudiation which owners have accepted as such. But the present claim is not a claim for damages, and the non-payment of the June 2008 hire payment in this case was not a repudiation. This, however, is as much as can usefully be said. The fact that rather than perform the contract the owners found it more advantageous to exercise an express right of termination is morally and legally neutral. There are no standards by which the owners' reasons may be judged, other than those to be found in the contract. There is no legal policy specific to termination rights restricting their availability or the consequences of their exercise more narrowly than does the language of the contract or the general law. More generally, the reasons for any particular withdrawal cannot affect the principle to be applied in resolving an issue like the present one.

*Clause 13*

8.  Clause 13 provides, so far as relevant:

> "The master (although appointed by owners) shall be under the orders and direction of charterers as regards employment of the vessel, agency or other arrangements. Bill[s] of lading are to be signed as charterers or their agents may direct, without prejudice to this charter... charterers hereby indemnify owners against all consequences or liabilities that may arise from the master, charterers or their agents signing bills of lading or other documents, or from the master otherwise complying with charterers' or their agents' orders..."

9. Clause 13 is the employment and indemnity clause which is found in most modern forms of time charter. The indemnity reflects the breadth of the powers conferred on the charterers as to the employment of the vessel. As Devlin J observed in *Royal Greek Government v Minister of Transport* (1949) 83 Ll L Rep 228, 234, "if [the owner] is to surrender his freedom of choice and put his master under the orders of the charterer, there is nothing unreasonable in his stipulating for a complete indemnity in return." Indeed, the courts have held that, subject to the express terms of any particular charterparty and to the limitations which I shall consider below, the indemnity is not just 'not unreasonable'. It is necessary. It will generally be implied even in forms of time charter (such as the New York Produce Exchange Form) where it is not expressed.

10. The scope of the indemnity in clause 13, like that of the corresponding implied term, is very wide ("all consequences or liabilities that may arise"). But it is not "complete", nor is it unlimited.

11. In the first place, it has to be read in the context of the owners' obligations under the charterparty as a whole. The owners are not entitled to an indemnity against things for which they are being remunerated by the payment of hire. There is therefore no indemnity in respect of the ordinary risks and costs associated with the performance of the chartered service. The purpose of the indemnity is to protect them against losses arising from risks or costs which they have not expressly or implicitly agreed in the charterparty to bear. What risks or costs the owners have agreed to bear may depend on the construction of other relevant provisions of the contract, or on an informed judgment of the broad range of physical and commercial hazards which are normally incidental to the chartered service, or on some combination of the two. The classic example of a loss within the indemnity, and probably the commonest in practice, is one which arises from the master complying with the charterers' direction to sign bills of lading on terms of carriage more onerous than those of the charterparty. But the indemnity has been held to be applicable in principle to a wide variety of other circumstances, including compliance with an order to load cargo which is dangerous even on the footing that appropriate care is taken of it, or an order to proceed to a legally unsafe port. On the other hand, the indemnity will not apply to risks which the owners have contractually assumed, which will usually be the case where they arise from, for example, their own negligence or breach of contract or consequences such as marine fouling which are incidental to the service for which the vessel was required to be available.

12. Secondly, clause 13 itself limits the indemnity to losses which were caused by complying with the charterers' orders. Like all questions of causation, this one is sensitive to the legal context in which it arises. It depends on the intended scope of the indemnity as a matter of construction, which is necessarily informed by its purpose. We are not therefore concerned with questions of remoteness and foreseeability of the kind which would arise in the law of damages, where the object is to limit the range of consequences for which a wrongdoer may be said to have assumed responsibility in the eyes of the law. Indeed, as Sir Donald Nicholls V-C pointed out in *Triad Shipping Co v Stellar Chartering & Brokerage Inc (The Island Archon)* [1994] 2 Lloyd's Rep 227, 238, the more foreseeable the owners' loss, the more likely it is to be an ordinary incident of the chartered service and therefore outside the scope of the indemnity. The real question is whether the charterers' order was an effective cause of the owner having to bear a risk or cost of a kind which he had not contractually agreed to bear. I use the expression "effective cause" in contrast to a mere "but for" cause which does no more than provide the occasion for some other factor unrelated to the charterers' order to operate. If the charterers' order was an effective cause in this sense, it does not matter whether it was the only one.

13. For present purposes, the relevant order of the charterers was the order to load the parcel of cargo which was on board the vessel when it was withdrawn. In my judgment the loss claimed by owners

was the consequence of that order. The need to discharge the cargo in the owners' time arose from the combination of two factors, namely (i) that the cargo had been loaded, and (ii) that the purpose for which it had been loaded (ie carriage under the charterparty to its destination) had come to an end with the termination of the charterparty. In other words, the cargo which charterers had ordered the vessel to load was still on board when the charterparty came to an end. On any realistic view, this was because the charterers had put it there. The analysis would have been exactly the same if the charterparty had come to an end for any other reason with cargo still on board, for example by frustration or expiry at the end of the contractual term.

14. Andrew Smith J and the Court of Appeal both rejected the claim under clause 13 on the ground that the true cause was the owners' withdrawal of the vessel. The judge said at para 35 of his judgment that the owners' claims were "too remote" from the order to load. Longmore LJ, giving the reasons of the Court of Appeal, observed at para 15 that it was

> "not a natural consequence of ordering [the cargo] to be loaded that it would have to be discharged at the self-same port. The true cause of the necessity for the discharge of the cargo was the fact that, in the light of the withdrawal, the owners required the charterers to discharge the cargo."

In effect, therefore, both courts below found that the withdrawal of the vessel was an independent cause of the loss, breaking the chain of causation between the order to load the cargo and the detention of the vessel after withdrawal.

15. The difficulty about this is that because the cargo had been loaded, it had to be discharged somewhere, if not at the port of loading then at its destination or possibly at an intermediate port. The owners' decision to withdraw the vessel or, to be precise, the adventitious timing of that decision, merely determined the place at which the discharge of the cargo occurred. If the owners were to withdraw the vessel, they had to do it promptly upon hire going into default, and it so happened this was when the vessel was still at the port of loading. But the precise timing of the withdrawal and location of the discharge are irrelevant to the owners' loss. If the vessel had been withdrawn immediately before discharge at the destination, the consequence would have been exactly the same. It is of course true that discharge at the destination would have been a great deal more beneficial to the charterers than discharge at the port of loading. This is a point that seems to have influenced the Court of Appeal. But a claim under clause 13 does not depend on the benefit conferred on the charterers. It depends on the detriment to the owners. They would have suffered a detriment of much the same kind wherever the vessel had discharged.

16. It is fair to say that it was only because of the withdrawal of the vessel that the subsequent discharge of the cargo at Angra dos Reis had to be done in the owners' time and without earning contractual hire. But that is the very reason why the detention of the vessel falls within the indemnity. The need to discharge the cargo in their own time and at their own expense was not an ordinary incident of the chartered service and was not a risk that the owners assumed under the contract. It arose after the chartered service had come to an end in accordance with the withdrawal clause in the contract. Mr Baker QC for the charterers asked rhetorically whether, in that case, the owners would be entitled to claim the cost of sending the vessel in ballast from Angra dos Reis to somewhere else where she could start employment under a new charterparty. But a claim like that, although ultimately dependent on its particular facts, would be likely to fall on the other side of the line. The need for a ballast voyage before a vessel can begin her next employment is an ordinary commercial risk associated with the

Petroleo Brasiliero SA-ENE-kol ... [2012] UKSC 17 (9 May 2012)     Document 350-6     Filed 05/20/20     Page 178 of 247   3/30/20, 3:48 PM

Case 1:18-md-02865-LAK

trading of the vessel under a time charter.

17. It remains to consider the measure of the indemnity on the facts of this case:

> (1) In my judgment the whole of the 2.64 days during which the vessel was detained resulted from the cargo being on board on the charterers' orders at the time of the withdrawal. The time required to remove it was unnecessarily prolonged by the charterers' refusal to recognise the owners' right to withdraw the vessel or to make immediate arrangements for the removal of their cargo from a ship that was no longer at their disposal contractually, but that does not alter the character or cause of the delay.

> (2) It is not suggested that there is any difference, in the circumstances of this case, between (i) the measure of the owners' loss in having to await discharge and then discharge in their own time, and (ii) reasonable remuneration for involuntarily making their ship available during that period. On the face of it, the opportunity cost to the owners of the detention of their ship is the market rate of hire at the time. In the absence of any subsisting contractual obligation to make her available at any other rate, the owners' loss is the market rate of hire for 2.64 days.

> (3) Although the Court of Appeal distinguished between the owners' right to the value of bunkers consumed (in actually discharging the cargo) and the rest of the owners' claim, it seems to me that the two heads of loss must stand or fall together. The owners are therefore entitled to the value of bunkers consumed during the whole period of detention.

> *Bailment*

18. Strictly speaking, this makes it unnecessary to address any of the other legal bases put forward by the owners in support of their claim. But I propose to deal with the question whether the owners were also entitled to succeed at common law as non-contractual bailees of the cargo after the withdrawal of the vessel. I do so partly out of respect for the trial judge who decided the case on that basis, and partly because I think that the commercial and legal logic of the claim in bailment is close to the logic which brings it within clause 13 and would bring it within any corresponding implied term. On the whole, one would expect a coherent system of law to produce a consistent answer under both heads, and in my judgment it does.

19. Unlike many civil law systems, English law does not allow a general right of recovery for benefits conferred on others or expenses incurred in the course of conferring them. In the pejorative phrase which has become habitual, there is no recovery for benefits "officiously" conferred. In *Falcke v Scottish Imperial Insurance Co* (1886) 34 Ch D 234, 248 Bowen LJ said:

> "The general principle is, beyond all question, that work and labour done or money expended by one man to preserve or benefit the property of another do not according to English law create any lien upon the property saved or benefited, nor, even if standing alone, create any obligation to repay the expenditure. Liabilities are not to be forced upon people behind their backs

any more than you can confer a benefit upon a man against his will."

20.  While this remains the general principle, the exceptions have over the years become more important than the rule. The particular feature of the present case which makes it difficult to apply the general rule is that the original bailment of the cargo had occurred under a previous contractual relationship. The bailment was therefore consensual, albeit that after the withdrawal of the *MT Kos* from the time charter, it was no longer contractual. It is common ground, and clear on the authorities that in these circumstances, the owners had a continuing duty to take reasonable care of the cargo, which they could not escape except by retaining it until arrangements were made to discharge it. But the owners had in no sense officiously put themselves in this position, nor had they (as the charterers put it in argument), "voluntarily assumed" possession of the goods. There is a thin, but consistent line of authority which deals with the legal consequences of this situation.

21.  In *Gaudet v Brown* (1873) LR 5 PC 134 ("*Cargo ex Argos*"), petroleum was shipped in London on the *Argos* under a bill of lading providing for delivery at Le Havre. The vessel arrived at Le Havre in the later stages of the Franco-Prussian war, when the port was full of munitions, and the landing of flammable cargoes was forbidden. The master therefore discharged the petroleum into lighters in the outer harbour, and it seems that the shippers (who had retained the bill of lading) could have taken delivery of it there and transported it elsewhere. But they failed to present the bill of lading or to make any arrangements to receive it. Having waited for as long as the port authorities would allow him to, the master reshipped the cargo and carried it back to London. The owners then successfully sued the shippers for freight for the return voyage. The case appears to have been decided on the footing that the contract of carriage was at an end when the *Argos* left Le Havre for London, either because the contractual service had been completed or because the contract was frustrated at Le Havre. The ground of the decision was expressed at pp 165-166 as follows:

> "...not merely is a power given, but a duty is cast on the master in many cases of accident and emergency to act for the safety of the cargo, in such manner as may be best under the circumstances in which it may be placed; and that, as a correlative right, he is entitled to charge its owner with the expenses properly incurred in so doing... In a case like the present, where the goods could neither be landed nor remain where they were, it seems to be a legitimate extension of the implied agency of the master to hold that, in the absence of all advices, he had authority to carry or send them on to such other place as in his judgment, prudently exercised, appeared to be most convenient for their owner; and if so, it will follow from established principles that the expenses properly incurred may be charged to him... The authority of the master being founded on necessity would not have arisen if he could have obtained instructions from the defendant or his assignees. But under the circumstances this was not possible."

22.  A year later, the Court of Exchequer reached a very similar conclusion in *Great Northern Railway Co v Swaffield* (1874) LR 9 Ex 132. Mr Swaffield sent his horse by railway to a station at Sandy. The horse arrived late at night, and the railway company lodged the horse overnight for their own account at a livery stable. Mr Swaffield failed to collect it on the following morning. The only basis on which he was prepared to give any instructions about the fate of his horse was that the railway company assumed all responsibility for storing and delivering it to him from the time of its arrival at Sandy. After four months of this, the railway company lost patience. They unilaterally delivered the horse to Mr

Swaffield's farm and then sued him for the livery charges to date. As in *Cargo ex Argos*, the case was decided on the footing that the contract of carriage had come to an end, in this case on the day after the arrival of the horse at Sandy, when the performance required of them as carriers was completed. Counsel did not refer to *Cargo ex Argos*. But Baron Pollock drew attention to it in the course of argument and based his judgment upon it. Having referred to previous authority to the effect that the railway company was bound to take reasonable care of the horse notwithstanding the termination of the contract of carriage, he observed (p 138) that "if there were that duty without the correlative right, it would be a manifest injustice." In his concurring judgment, at page 136, Kelly CB treated the principle as applying because it was necessary for the railway company to incur the expenditure. "They had no choice unless they would leave the horse at the station or in the high road to his own danger and the danger of other people."

23.  The principle applied in these cases has commonly been analysed as depending on the agency of necessity of the carrier, which indeed is how Longmore LJ analysed it in his judgment in this case. The existence of a coherent doctrine of agency of necessity has occasionally been doubted: see Goff & Jones, *The Law of Unjust Enrichment*, 8th ed (2011), para. 18-50, where it is suggested that "the cases in which it has been invoked are now best understood in other ways." But so far as the doctrine does have a coherent existence, the case law requires that a bailee of goods should have taken steps in an emergency for the sole benefit of the cargo in circumstances where it was impossible to communicate with the owners of the goods. On that ground, the Court of Appeal held that the doctrine had no application to the present case, and that that was the end of the matter.

24.  It is true that in *Cargo ex Argos* the Privy Council used the language of agency and necessity. But the master of the *Argos* was not in fact acting as the cargo-owner's agent, as he would have been if (for example) he had purported to bind him to a contract with a third party, such as a lighterman or a warehouseman. On the face of it, he was simply carrying the goods back to London on behalf of his owners, in circumstances where there was no contract to do so but no reasonable or practical alternative. His claim was for additional remuneration for his own services, in excess of the performance required of him under the contract. As for *Swaffield*, although Baron Pollock cited authority on agency of necessity, on its facts there was no emergency and no agency. The true basis of the judgments in *Swaffield* was that where the property was originally bailed under a contract of carriage and the carrier had no choice but to remain in possession after the contract had ended, the existence of a continuing duty to care for the cargo was a sufficient basis for imposing on its owner an obligation to pay. Pollock B, I think rightly, regarded this as the principle on which *Cargo ex Argos* was really founded.

25.  This view of the matter was accepted by the House of Lords in *China Pacific SA v Food Corpn of India (The Winson)* [1982] AC 939. The facts were that the *Winson*, bound for Bombay with a cargo of wheat, stranded on a reef in the South China Sea. Salvors retained on behalf of the ship and cargo interests off-loaded the wheat into barges and took it to Manila, where it was stored for their account in warehouses. It was common ground that storage under cover was necessary to prevent deterioration of the wheat, and that upon its arrival at the warehouse the salvage services came to an end. Some time after that, the owners gave notice that they were abandoning the voyage and the contract of carriage thereupon came to an end. The salvors wrote to the cargo-owners' solicitors asking them to take delivery of their property, but received no answer. On these facts the salvors were bailees under the salvage agreement from the time that the cargo was taken off the stranded vessel until it reached the warehouse, and were thereafter non-contractual bailees until the cargo-owners finally took possession

of the wheat from the warehouse. The issue was whether the cargo-owners were liable to the salvors for warehouse charges incurred up to the time when the owners gave notice that they abandoned the voyage. The cargo-owners accepted liability for the charges after that point, but contended that while the contract of carriage subsisted the warehouse charges were the responsibility of the carriers alone. It was held that the salvors were entitled to succeed. The leading speech was given by Lord Diplock, with whom the rest of the House agreed. Lord Diplock considered (p 957) that the case turned on the application of "well known and basic principles of the common law of salvage, of bailment and of lien." He expressed the principle (at p 960) as follows:

> "… the bailment which up to the conclusion of the salvage services had been a bailment for valuable consideration became a gratuitous bailment; and so long as that relationship of bailor and bailee continued to subsist the salvors, under the ordinary principles of the law of bailment too well known and too well-established to call for any citation of authority, owed a duty of care to the cargo owner to take such measures to preserve the salved wheat from deterioration by exposure to the elements as a man of ordinary prudence would take for the preservation of his own property. For any breach of such duty the bailee is liable to his bailor in damages for any diminution in value of the goods consequent upon his failure to take such measures; and if he fulfils that duty he has, in my view, a correlative right to charge the owner of the goods with the expenses reasonably incurred in doing so."

He regarded this as being the principle applied in *Cargo ex Argos* and *Swaffield* in which the decisive facts, on his analysis, had been (i) that the bailee was left in possession of the goods after the termination of the contract under which the bailment had originally been made, and (ii) that in the absence of any contrary instructions from the cargo-owner, the warehousing of the goods was necessary for their preservation: see p 960G-H. Lord Diplock added, at p 961:

> "It is, of course, true that in English law a mere stranger cannot compel an owner of goods to pay for a benefit bestowed upon him against his will; but this latter principle does not apply where there is a pre-existing legal relationship between the owner of the goods and the bestower of the benefit, such as that of bailor and bailee, which imposes upon the bestower of the benefit a legal duty of care in respect of the preservation of the goods that is owed by him to their owner."

26. Lord Diplock went on to consider the doctrine of agency of necessity, because it had been submitted on behalf of the cargo-owners that a bailee in possession of goods could have authority on that basis only if it was impossible to communicate with the owner of the goods. The argument was that although the cargo-owners were not very communicative, they were never actually out of contact. This submission was rejected because the restrictions placed by the case law on a bailee's authority as an agent of necessity applied only where the bailee was acting as a true agent, ie by purporting to bind the bailor to arrangements with third parties. They did not apply to a bailee's right to reimbursement of his own expenses. It was sufficient for that purpose that the bailor should have failed to give instructions: see pp 961G-962B. It is clear that the relevance of this last point was that if the owner of the goods had given instructions, the salvor could by complying with them have relieved himself of any further responsibility. The decisive point, and the sense in which the word "necessity" is used in these cases, is that if the bailee is in a position where he has no way of discharging his responsibility to care for the

goods without incurring loss or expense, then the loss or expense is for the account of the goods-owner.

27. Lord Simon of Glaisdale, who delivered a concurring judgment, took the same view. He thought (p 965E) that to confine agency of necessity to cases where the issue was the bailee's authority to bind the bailor to contracts with third parties was "justified by the fact that the law of bailment will often resolve any issue between alleged principal and agent of necessity, as it has done here." *The Winson* was a decision about the law of bailment. It was not a decision about agency of necessity.

28. The circumstances which entitle the owners to recover in the present case correspond to those which were decisive in *The Winson*. They are (i) that the cargo was originally bailed to the owners under a contract which came to an end while the cargo was still in their possession, (ii) that as a matter of law their obligation to look after the cargo continued notwithstanding the termination of the charterparty, and (iii) that the only reasonable or practical option open to them once the charterparty had come to an end was to retain the cargo until it could be discharged at the port where the vessel was then located.

29. *The Winson* was a claim for expenses incurred by the salvors, although Lord Diplock's adoption of the decision in *Cargo ex Argos* suggests that he would have applied the same principle to a claim for remuneration where the claimant stored and handled the goods with his own facilities. In principle, that seems right. The opportunity cost of retaining the vessel in Angra dos Reis while the charterers' cargo remained on board was a true cost even if it was not an out of pocket expense. However, it is unnecessary to go any further into that question because in this context as in that of clause 13, no point is taken about the difference between expenses and remuneration.

30. In the result, I agree with the conclusion reached on this point by Andrew Smith J.

   *Unjust enrichment*

31. It may well be that in the light of recent developments in this area of law, the owners might be entitled to succeed on this basis also, although the measure of recovery would not necessarily be the same. This, however, raises larger issues which would be better decided in a case where they arise, and possibly in a less specialised context than a dispute about carriage by sea.

   *Conclusion*

32. I would allow the appeal and restore the order of Andrew Smith J.

### LORD PHILLIPS

33. I agree, for the reasons given by Lord Sumption, that this appeal should be allowed. I wish only to add a brief explanation of why I agree with him and Lord Clarke that the express indemnity provided by Clause 13 applied to the facts of this case.

34. I do not view the issue as turning upon a choice between competing causes of the requirement to discharge the cargo. The obligation to discharge a cargo loaded under a time charter will normally be proximately caused by the order to load the cargo. The reason why the consequences of the obligation to discharge are not normally covered by an indemnity clause such as clause 13 of the charter in this case is that those consequences form part of the services that the owners has contracted to provide under the charter and for which hire is being paid. Where, however, the charter comes to an end before

the cargo has been discharged in circumstances where the consequences are not expressly covered by the charter, those consequences fall naturally within the scope of the indemnity clause. I accept that the application of the indemnity clause in such circumstances appears to be a novelty, but I can see no argument of principle that precludes this.

### LORD MANCE

35. I agree with the result reached by the majority, but I do so not under clause 13, but on the basis of the principle in *The Winson (China Pacific SA v Food Corpn of India* [1982] AC 939), with which Lord Sumption deals in paras 18-30. As he notes (para 29), the charterers in the present case have expressly disclaimed any reliance upon the distinction between reimbursement of expenses and remuneration (as to which, see eg *The Principles of the Law of Resitution* by Graham Virgo 2nd ed (2006), p 290). They have done this on the basis that the two would on the facts here equate (ie it "cost" the owners the market rate to wait in Angra dos Reis). It is unnecessary to consider the correctness of this concession, and I do not do so.

36. There is much case law on time charter indemnities. They may be express, as in the time charters which were the subject of *Larrinaga Steamship Co Ld v The King* [1945] AC 246, 253 and *Royal Greek Government v Minister of Transport (The Ann Stathatos)* (1949) 83 Ll L Rep 228 and in the Shelltime 3 form of charter in issue in the present case. They may also be implied, as in the case of the New York Produce Exchange form of charter, in which the only relevant express obligation is that the owners or master shall be under the orders and directions of the charterers as regards employment, agency and other arrangements. The existence of an implied time charter indemnity in respect of compliance with charterers' orders and direction has long been recognised: see *The Athanasia Comninos* [1990] 1 Lloyd's Rep 277, 290 per Mustill J, and *Triad Shipping Co v Stellar Chartering & Brokerage Inc (The Island Archon)* [1994] 2 Lloyd's Rep 227, 234 per Evans LJ.

37. The scope and application of an indemnity clause depends upon its precise terms read in the context of the contract as a whole. Other terms of the contract may mean that it is necessarily or impliedly limited in its scope. In addition to that, an indemnity clause in the form of clause 13 will not cover matters of navigation or in respect of which owners can by the contract be taken to have assumed the risk. Within its scope, the present clause also only applies to "consequences or liabilities that may arise from [here] the master complying with charterers' or their agents' orders". This raises a question of causation. The search is for "the 'proximate' or 'determining' cause". This was stated in relation to a materially identical clause in *Larrinaga Steamship Co Ltd v The King* [1945] AC 246, 253 by Viscount Simon LC, with whose speech Lord Thankerton and Wright agreed at pp 253-254.

38. The issue of causation was considered in depth by Devlin J in *The Ann Stathatos* 83 Ll L Rep 228. The decision is at the root of the modern jurisprudence on time charter indemnity clauses, and Lord Sumption cites it in para 9. One particular passage is worth citing in full, because it bears on an argument advanced by owners in the present appeal, which the majority might otherwise be thought to be accepting.

39. In *The Ann Stathatos* the vessel had been damaged by an explosion resulting from an explosive atmosphere created by the cargo of coal and some unidentified act during repair work causing a flame or spark leading to a series of explosions. The arbitrator selected as "the direct or immediate or effective cause" of the explosions the latter act. Owners argued that it was enough that the explosive atmosphere generated by the cargo was "a" cause. The argument mirrors a submission made by owners

on the present appeal, which was rejected in the following passage:

> "This conclusion clears the ground for consideration of a further submission on behalf of the owner. The loading, if not the proximate cause, was at any rate, it is argued, a cause of the explosion, and that is sufficient for the purpose of clause 9. Sir Robert Aske does not in this contention rely on the phrase 'all consequences'; in this I think he is right, having regard to the dictum of Willes J in *Ionides v Universal Marine Insurance Co* (1863) 14 CB (NS) 259, 289. He relies on the principle applicable in cases of tort, and he referred again to *Burrows v March Gas and Coke Co* LR 7 Ex 96, though Baron Pigott, in the court below (LR 5 Ex 67, 73) hardly supports the contention. He referred also to *Minister of Pensions v Chennell* [1947] KB 250, where Denning J discusses the whole matter. As against this, Sir William McNair argues that the term 'a cause' can properly be used only when there are two or more causes equal in proximity, as in *Reischer v Borwick* [1894] 2 QB 548. I need not consider this last contention, for I think it is clear that clause 9 is concerned with the proximate cause. It is a contract of indemnity, and I can see no reason for treating it differently from any other contract of insurance. The observations of Lord Shaw in *The Ikaria* [1918] AC 350, 368 and the dicta he there cites are also in point."

40. The search is therefore for the proximate cause. Devlin J cited *Reischer v Borwick* [1894] 2 QB 548 as indicating that there can be situations in which two causes are so closely matched that both are identified as proximate causes. That is a largely theoretical analysis which finds little practical application in the authorities, and has achieved any prominence only in discussion about exception clauses. *Reischer v Borwick* itself was a case on a marine insurance policy covering "only …. collision", and so not perils of the seas. The vessel was holed by collision, the hole was temporarily plugged, but the plug failed as she was being towed to safety and she sank due to the inflow of water. Not surprisingly, the claim succeeded. Only Lindley LJ addressed the possibility that this situation could and should be analysed as one of concurrent proximate causes (although even he in his concluding remarks identified the injury by collision as "really … the cause of the loss – the causa causans and not merely the causa sine que non"). Both Lopes and Davey LJJ analysed the position throughout in what one would have thought to be more conventional terms as involving a single proximate cause of the sinking (the collision holing the vessel).

41. Another of the few cases in which courts have discussed the possibility of concurrent causes is *Wayne Tank and Pump Co Ltd v Employers Liability Assurance Corpn Ltd* [1974] QB 57. The case involved an insurance claim following on from the decision in *Harbutt's "Plasticine" Ltd v Wayne Tank and Pump Co Ltd* [1970] 1 QB 447. Harbutt's factory was burnt down in a fire. The fire occurred because Wayne Tank had installed a pipeline made of unsuitable and dangerous plastic material and wrapped in heating tape attached to a useless thermostat, and had then switched on the heating and left it unattended overnight without testing. Wayne Tank's policy contained an exclusion of damage caused by the nature or condition of any goods which they sold or supplied. Again not surprisingly, both Lord Denning MR (pp 66G-67B and 68A) and Roskill LJ (p 74 B-C) preferred to analyse the situation as one of a single effective, dominant and proximate clause (the defective plastic material and thermostat supplied), while only Cairns LJ (p 69A) preferred an analysis of "approximately equal" causes. All three member of the Court also indicated that the claim anyway failed (because of the exclusion) even

if analysed as one of two concurrent proximate causes (pp 67B-68A, 69B-D and 74D-75E). In both *Reischer v Borwick* and *Wayne Tank*, the courts further noted that merely because one can identify concurrent causes does not mean that both are in law proximate causes.

42.  The same point had been made by Lord Shaw fifty years earlier in another leading authority on proximate cause, *Leyland Shipping Co Ltd v Norwich Union Fire Insurance Society* [1918] AC 350, 370, when he said: "Where various factors or causes are concurrent, and one has to be selected, the matter is determined as one of fact, and the choice falls upon the one to which may be variously ascribed the qualities of reality, predominance, efficiency". That reasoning was followed and applied in *Yorkshire Dale Steamship Co Ltd v Minister of War Transport* [1942] QC 691. The issue in that case was whether a vessel lost by stranding in the course of a warlike operation was lost by reason of the warlike operation. Viscount Simon LC said: "Most results are brought about by a combination of causes, and a search for "*the* cause" involves a selection of the governing explanation in each case" (p 698), Lord Macmillan said: "it is not enough that the casualty arose in the course of a warlike operation. It must also arise out of, and be proximately caused by the warlike operation" (p 702), and Lord Wright underlined the point in a well-known passage, including the statements that "This choice of the real or efficient cause from out of the whole complex of the facts must be made by applying commonsense standards. ….. The question always is what is *the* cause, not merely what is *a* cause" (p 706).

43.  Another case involving an exceptions clause where the possibility of rival causes was considered briefly and obiter was *Handelsbanken v Dandridge* [2002] EWCA Civ 577. [2002] CLC 1227, where in para 47 Potter LJ remarked that "the first task of the court is to look to see whether one of the causes is plainly the proximate cause of the loss" and that "It is only if the court is driven to the conclusion that there was 'not one dominant cause, but two causes which were equal or nearly equal in their efficiency in bringing about the damage' one being a period, the other an exception, that the exception prevails", citing in support *Wayne Tank*, p 67. That dictum may go further to blur lines than I would in referring to causes "nearly equal in their efficiency", but, once again, the Court's actual view was that this was not the situation on the facts. The position regarding exclusion clauses in situations where two causes might be said to be operating concurrently was most recently discussed in *Global Process Systems Inc and another (Respondents) v Syarikat Takaful Malaysia Berhad* [2011] UKSC 5, para 88. As Devlin J pointed out in *The Ann Stathatos* at p 237, bottom left, the existence of an exceptions clause is itself likely to affect what falls to be regarded as dominant, proximate or relevant; this is because "the whole of what one might call the area naturally appurtenant to the excepted area must be granted to it". Indemnity clauses are not subject to such considerations. They cover consequences proximately caused, no more and no less.

44.  This is underlined by another way in which the scope of time charter indemnities is delimited in the case law. Implied time charter indemnities and indemnities like clause 13 apply only where there is "a *direct* causal link" between the orders and the consequences. The phrase and the emphasis are Lord Hobhouse of Woodborough's in the leading speech, with which all other members of the House agreed, in *Whistler International Ltd v Kawasaki Kisen Kaisha Ltd (The Hill Harmony)* [2001] 1 AC 638, 656. Lord Hobhouse made the comment in the course of discussion of the decision in *Larrinaga Steamship Co Ltd v The King* [1945] AC 246, a case like the present of an express indemnity. He cited in support *The White Rose* [1969] 1 WLR 1098, another case of an express indemnity. As to implied indemnities: see *The Hill Harmony* itself and *Triad Shipping Co v Stellar Chartering & Brokerage Ltd*. (*The "Island Archon"*) [1994] 2 Lloyd's Rep 227, 238, where Sir Donald Nicholls V-C noted that "the underlying

principle" is that the implied indemnity "extends only to certain consequences flowing from a shipowner complying with charterer's orders", one limitation being that "to be within the implied indemnity the loss must arise directly from the charterer's instruction" (another being that it must also be one which, on a fair reading of the charter-party, the shipowner cannot be taken to have accepted: see para 37 above).

45. In *The White Rose*, Donaldson J had the benefit of the formidable advocacy of Mr Anthony Evans for owners and Mr Robert Goff QC and Mr Davenport for charterers. He recited Mr Goff's submission that one vital element had been omitted from Mr Evans's case:

> "namely, that the right to indemnity only arises if and in so far as the loss
> suffered by the shipowners can be proved to have been caused by compliance
> with the time charterers' instructions" (p 1107).

Donaldson J went on to note Mr Goff's further observation that causation is rarely a live issue in cases where an owner has on charterers' instructions signed bills of lading committing him to liabilities over and above his charterparty liabilities, but that causation is all important in other cases.

46. Donaldson J accepted Mr Goff's submission, holding that it was "necessary in every case to establish an unbroken chain of causation", and that:

> "A loss may well arise in the course of compliance with the time charterers'
> orders, but this fact does not, without more, establish that it was caused by and
> is in law a consequence of such compliance and, in the absence of proof of
> such causation, there is no right to indemnity". (p 1108)

47. The facts in *The White Rose* were that a Finnish vessel had been ordered to load in Duluth, Minnesota, where Mr de Chambeau, an employee of charterers' stevedores was injured while on board. He had left his proper place for purposes unconnected with his work, but owners were liable to him under Minnesota law on the ground that the part of the ship where he had gone lacked fencing. The owners were, it seems, in breach of Finnish law in this respect, but that was expressly disregarded as being irrelevant. Donaldson J nonetheless agreed with the umpire that owners' indemnity claim failed because "what connected the accident with, and gave rise to, a potential liability and an actual loss was the provisions of Minnesota law". There was lacking "the necessary causal connection between the order to load and the loss" (p 1108).

48. The selection of the proximate, determining or, in the more modern terminology, real or efficient cause for the purposes of an indemnity has traditionally been described as involving a "choice … to be made by applying common sense standards as the man in the street or a business or seafaring man would apply them": *The Ann Stathatos* 83 Ll L Rep 228, 236 per Devlin J, citing Lord Wright in *Yorkshire Dale Steamship Co Ltd v Minister of War Transport* [1942] AC 691, 706. Lord Wright's words were more recently cited under the implied indemnity which was in issue under a voyage charter in *Total Transport Corpn v Arcadia Petroleum Ltd (The Eurus)* [1998] 1 Lloyd's Rep 351, 361-362. Such an approach does not, or should not, "conceal, or perhaps reveal" – in Lord Hoffmann's extra-judicial words giving the Chancery Bar Association lecture in 1999 on "Common Sense and Causing Loss" – "a complete absence of any form of reasoning". Rather, it should involve a conclusion reached after identifying the relevant context and purpose of the question and the relevant considerations. I do not however regard it as wholly irrelevant that three experienced commercial judges have concluded,

without it seems real doubt, that the present indemnity clause does not cover the present case.

49. Perhaps more striking, since the present constitution is also heavy in commercial experience, is the fact that no previous claim like the present can be identified under any express or implied time charter indemnity; this, despite the fact that time charter clauses entitling owners to withdraw in default of payment of any hire instalment, without anti-technicality provisions, have been commonplace and have given rise to other contentious issues over many past decades. Robert Goff J made no mention of any such possibility in *Tropwood AG of Zug v Jade Enterprises Ltd (The Tropwind)* [1982] 1 Lloyd's Rep 45, when considering "the nature of a shipowner's right to recover from charterers remuneration for services rendered after a ship has been withdrawn from the charterers' service under a time charter, pursuant to an express contractual right of withdrawal" (p 53). Apart from any express request which might be found to have been made (to render such services), he thought that "their liability (if any) to pay remuneration for the services so rendered can only derive from the principles of the law of restitution".

50. Of course, if the owners were bound to third parties by bills of lading which charterers had required them to issue, the continuation of the voyage under those separate bill of lading contracts could engage the time charter indemnity, and could (despite Lord Denning MR's contrary dictum on appeal in *The Tropwind* [1982] 1 Lloyd's Rep 232, 237) lead to charterers having to pay owners the market, rather than the charter, rate. Further, if owners were left with no practical option but to carry the cargo to its destination, then they might still have an argument that their time and money were spent "in compliance with the time charterers' instructions". No assistance on this latter situation is derived from the New South Wales Supreme Court decision in *J Gadsden Pty Ltd v Strider 1 Ltd (The Aes Express)* (1990) 20 NSWLR 57, where the owners failed in a claim against bill of lading holders, who, before the vessel's withdrawal from charter, had pre-paid freight to charterers under what were charterers' bills.

51. The present case differs materially from both these situations. Here, if one asks whether the loss suffered by the shipowners was "caused by compliance with the time charterers' instructions" - Robert Goff QC's words accepted by Donaldson J in *The White Rose* [1969] 1 WLR 1098, 1107-1108 – the natural answer, it seems to me, is: certainly not. It was caused because the charter was at an end, the owners were *not* performing the charterers' instructions and they were not receiving hire for the time wasted prior to discharge. The "direct" or "unbroken" causal link required by the authorities is lacking. The loss did not even arise "in the course" of compliance with charterers' orders, to use Donaldson J's words quoted in paragraph 70 above. It is true, historically, that no cargo would have been on board but for charterers' instructions. But that is no test of the proximate or the effective cause, as the authorities make clear: see paragraphs 37 to 47 above. It is also unrealistic to scissor up the instructions between loading and carriage to destination, and to attribute the loss to the instructions to load ignoring the failure to carry. When one engages in such a division, one is in fact recognising that subsequent events superseded charterers' orders and rendered them a matter of history.

52. The general contractual context in my view also supports a conclusion that the express indemnity clause is inapt to apply to the present situation. Clause 8 of the charterparty gives owners a simple contractual option. It is accepted that the mere late payment of one instalment did not constitute a repudiatory breach (or a breach of a condition in a sense like that used in the Sale of Goods Act 1979) which could entitle the owners to damages for loss of the charter. That loss flowed from the owners' exercise of their option to withdraw. The phrase in clause 8 "without prejudice to any claim owners may otherwise have on charterers under this charter" does not create a right of action, and looks on its

face only to pre-existing claims. So there is no way in which the time spent discharging in Angra dos Reis can be claimed as damages. Yet it is submitted that, because the owners exercised an option to terminate the charter in mid-flow, the charter indemnity provides them as of right not merely with the charter rate (US45,000 per day), but with the market rate (US158,864 per day) in respect of any delay before the vessel is free to move elsewhere to take advantage of the increased market rate. That would be to give them a claim by way of indemnity for loss they cannot claim by way of damages.

53.  It is also unclear where this submission could or would end. In shipping law certainty is of recognised importance and disputes not to be encouraged. The charter required redelivery at the same port as the port of delivery in the Arabian Gulf (clause 3), with hire being paid up to that point. Logically, the consequences of the charterers' orders to proceed to and load cargo at Angra dos Reis could, on owners' case, embrace the whole period during which the vessel was returning to the Arabian Gulf, unless she found other paid employment to take her back. The risk of having to return in ballast to her Arabian Gulf delivery port (or anywhere else) could not be described as an "ordinary commercial risk" which the owners were prepared to accept under this time charter (cf the last sentence of paragraph 16 of Lord Sumption's judgment), since the owners expressly stipulated against it.

54.  The silence of clause 8 regarding the position post-withdrawal also contrasts with clause 18 which expressly provides that, should the vessel be on a ballast or laden voyage at the date the charter should otherwise terminate, "charterers shall continue to have the use of the vessel" at the charter rate or the market rate if higher. Under clause 18, the charterers are paying for completion of the services requested. Under clause 8, owners, having elected to determine the charter, are now seeking by way of "indemnity" to recover the market rate, without of course having to give any credit for the considerable benefit likely to have accrued to them from such termination.

55.  In conclusion, the majority's present decision stretches the application of the express charter indemnity beyond any previous decision, without justification, without regard to the potential consequences (including the uncertainty - or certainty - of ever more ambitious claims) and without need. The law is capable of dealing with this situation in a more conventional manner. It will impose on charterers an obligation as bailors to reimburse the owners as bailees for their time and expense spent in looking after the cargo prior to its discharge. It would, even apart from that, probably also impose on charterers an obligation in restitution in respect of any benefit they could be said to have had through the storage on board the vessel of the cargo. But those remedies flow either from the service rendered in that respect by the owners under the compulsion of their legal obligations as bailees, or from the benefit received thereby by the charterers, and not from the express indemnity.

56.  It follows that I too would allow the appeal and restore the order of Andrew Smith J, although I would do so for the reasons and on the basis that he gave, and not those adopted by the majority.

**LORD CLARKE**

57.  I agree with Lord Sumption that, for the reasons he gives, this appeal should be allowed on the *Winson* point (*China Pacific SA v Food Corpn of India* [1982] AC 939). I wish to add a few words of my own on the construction of clause 13 of the charterparty in the light of the sharp difference of opinion between Lord Mance and Lord Sumption.

58.  I have not found this an easy question. Lord Mance makes a powerful case for a narrower application of clause 13 than that preferred by Lord Sumption. His analysis owes much to the approach adopted in

Petroleo Brasileiro SA & ORE kol 6 TLM (2012 0K32-17) (9 May 2013) Document 350-6    Filed 05/20/20    Page 189 of 247   3/30/20, 3:48 PM

Case 1:18-md-02865-LAK

a number of decided cases. However, none of them is on facts such as these. As I see it, the question whether the owners are entitled to succeed under the indemnity provided for in clause 13 involves two sub-questions. The first is one of construction of the clause and the second is whether the owners have shown that they are entitled to succeed under the clause on the particular facts of this case, which is essentially a question of causation.

*Construction of clause 13*

59.    In order to succeed, the owners must show that the expenses (or loss) they sustained as a result of discharging the cargo at Angra dos Reis in Brazil, which was of course the loading port, in the circumstances described by Lord Sumption, were a consequence of their complying with the charterers' order to load the cargo. The relevant part of clause 13 is in these terms:

> "charterers hereby indemnify owners against all consequences … that may arise from the master … complying with charterers' … orders …".

60.    I agree with Lord Sumption in paras 10 to 12 that the clause is very wide but that it is neither complete nor unlimited. In particular, I agree with him that the indemnity is not intended to include consequences which are incidental to the service for which the vessel was required to be available under the charterparty. So, for example, it would not include any cost of or in relation to the discharge of the cargo in the ordinary course of events, which would be covered by clauses 5 and 6 of the charterparty, which provide for the services to be provided and paid for by the owners and charterers respectively, or by clause 7, which provides for hire to be paid by the charterers to the owners. Nor, as Lord Mance observes at para 37, would clause 13 cover matters of navigation or in respect of which owners can be taken to have assumed the risk by contract.

61.    I further agree with Lord Sumption that the real question under clause 13 is whether the charterers' order to load the cargo was an effective cause of the owners having had to bear a risk or cost of a kind which they had not contractually agreed to bear and that, if the charterers' order was an effective cause in the sense that it was not a mere "but for" cause which did no more than provide the occasion for some other factor unrelated to the charterers' order to operate, it does not matter whether it was the only effective cause.

62.    It is not I think helpful to use other adjectives to describe the cause. Different adjectives have been used over the years, including "proximate cause", "dominant cause" and "direct cause". To my mind they are somewhat misleading because they tend to suggest that the cause must be the most proximate in time or that the search is for the sole cause. Lord Mance says at para 37 that the search is for "the 'proximate' or 'determining' cause". However, I respectfully disagree because such a formulation suggests that there can be only one such cause, whereas there may, depending upon the circumstances, be more than one effective cause.

63.    It is true that the cases make some reference to "the determining" or "the proximate cause". For example, in *Larrinaga Steamship Co Ltd v The King* [1945] AC 246, 252 Viscount Simon LC said that the proximate cause of the stranding of a vessel was not "warlike operations". As he put it at p 253, the vessel was attempting to make a voyage without cargo and suffered from a marine peril when doing so. The fact that she was ordered to leave port sooner than her acting master thought was wise could not turn her disaster into the consequence of a warlike operation. He concluded that the "proximate" or "determining" cause was a misfortune in navigation, not attributable to any warlike operation at all.

The House of Lords was not considering the possibility of two effective causes.

64. Lord Mance refers (at paras 38 to 40) in some detail to the decision of Devlin J in *Royal Greek Government v Minister of Transport (The Ann Stathatos)* (1949) 83 Ll L Rep 228. On my reading of the arbitrator's findings in that case (as described at pp 231-232) he identified four causes of the first explosion (using the word "caused" in the wide sense of the word). Omitting two causes which are irrelevant for present purposes, the arbitrator found that the first explosion was caused by (a) the loading on board of gassy and dusty coal and the battening down of the hatches so as to trap the gasses and leave coal dust suspended in such air as existed in tween deck space and (d) some act on the part of the crew who were repairing the tanks, which act caused a flame or spark.

65. Devlin J said at p 237 that by "the wide sense of the word", the arbitrator meant to include all suggested or possible causes, however remote, and whether causes in the legal sense or not. He added:

> "From these five [the arbitrator] selects the act which caused the flame or spark and the explosive atmosphere as the direct or immediate or effective causes of the first explosion."

The first explosion is the only explosion which is relevant for present purposes. It would seem to follow from that conclusion that there were two effective causes and not one. It would also seem to follow that the arbitrator was choosing causes (a) and (d) as the two effective causes. However the arbitrator then held (as stated at p 232) that "the loading of the coal, while one of the causes of the damage to the ship (using the word 'causes' in its wide sense), was not the direct or immediate or effective cause of the loss or expenses claimed".

66. It is not clear to me how these findings can be reconciled. One possibility is that the arbitrator treated cause (a) as two causes and not one, by treating the loading of the coal as a different cause from the presence of the gas. If that is correct, the arbitrator held that there were two effective causes, namely the presence of the gas and the flame or spark. It is not easy to see how that is consistent with the view later expressed by the judge that the arbitrator seems to have taken "what is immediate in time", by which he must have meant the flame or spark (p 237). If the arbitrator treated (a) as one cause, namely the loading of cargo in a gaseous state, it is not easy to see how his conclusion that the flame or spark and the explosive atmosphere were the direct or immediate or effective causes of the explosion is consistent with his conclusion that "the loading of the coal, while one of the causes of the damage to the ship (using the word 'causes' in its wide sense) was not the direct or immediate or effective cause of the loss or expenses claimed".

67. As I read the judgment of Devlin J, he concluded (at pp 237-238) that the arbitrator favoured the cause that was immediate in time, namely the initial flame or spark which ignited the gas. He rejected the submission that the arbitrator misdirected himself by confusing immediate cause with direct or effective cause. He also rejected (at p 238) the submission that the flame or spark was too remote in law to be the cause of the first explosion. He then considered whether the loading, which the arbitrator rejected as the direct cause, was too remote in law to be a cause at all.

68. It was in the light of those conclusions that, in the passage quoted by Lord Mance at para 39, Devlin J considered, at p 238, whether, if it was not the proximate cause, loading was a cause of the explosion. This part of Devlin J's judgment must be set in the context of the facts. Perhaps naturally in the light of the arbitrator's award, he started with "the proximate cause", which the arbitrator had held was the

flame or spark which ignited the methane gas. He considered the possibility of there being more than one proximate cause, but said that it was not necessary to consider it because the indemnity clause was concerned with "the proximate cause". He then expressed his conclusion thus:

> "So the matter comes down to this, that the arbitrator has selected one cause in preference to another as the proximate or direct cause. I cannot see that any question of law is involved in this selection".

In short, Devlin J held that that conclusion was a conclusion of fact and that the arbitrator had not misdirected himself in law.

69. In these circumstances, I do not think that the decision or reasoning in *The Ann Stathatos* is of any real assistance. The arbitrator had expressly held that there was a sole proximate cause. It may be that, in the light of his earlier conclusion that the direct or immediate or effective causes of the collision were both (a) the act which caused the spark or flame and (b) the explosive atmosphere, the arbitrator made an error in concluding that the spark or flame was the proximate cause, in the sense of sole proximate cause. However, if he did, on Devlin J's approach it was an error of fact, not an error of law.

70. In all the circumstances the decision of Devlin J is an unconvincing basis for a conclusion that the search is for *the* proximate cause. As I see it, the question in each case, whether under a contract of insurance or under a contract of indemnity, is whether an effective cause of the alleged loss or expense was a peril insured against or an indemnifying event. By reference to Devlin J's citation of *Reischer v Borwick* [1894] 2 QB 548, Lord Mance accepts in para 64 that two causes may be so closely matched that both are identified as effective causes. However he says that that it is a largely theoretical analysis which finds little practical application in the authorities.

71. It is true that the authorities do not contain much discussion of the circumstances in which there may be two effective causes. However, in my opinion, they clearly show that two effective causes can, in principle, exist. To my mind this can be clearly seen from *Wayne Tank and Pump Co Ltd v Employers Liability Assurance Corpn Ltd* [1974] QB 57, *Lloyd (JJ) Instruments Ltd v Northern Star Insurance Co Ltd (The Miss Jay Jay)* [1987] 1 Lloyd's Rep 32 and *Midland Mainline Ltd v Eagle Star Insurance Co Ltd* [2004] EWCA Civ 1042, [2004] 2 Lloyd's Rep 604.

72. The present position can be most clearly seen from the *Midland Mainline* case, where Sir Martin Nourse, with whom Brooke and Jacob LJJ agreed, expressly held at para 48 that there can be more than one proximate cause of loss. He cited *Leyland Shipping Co Ltd v Norwich Union Fire Insurance Society Ltd* [1918] AC 350, *Wayne Tank* and *The Miss Jay Jay* as authority for that proposition.

73. It is true that in *Wayne Tank* [1974] QB 57, on the facts (which are described by Lord Mance at para 41) the majority of the Court of Appeal, Lord Denning MR and Roskill LJ, held that the proximate cause of the fire was the defective plastic material and thermostat supplied and not the act of switching on the heating and leaving it unattended without testing. However, in a passage quoted by Sir Martin Nourse at para 10 of the *Midland Mainline* case, Roskill LJ said that he found it impossible to say that the latter was the sole proximate cause of the fire and, that if he was wrong to say that the defective state of the material and thermostat was the sole proximate cause of the fire, there were two effective proximate causes. Cairns LJ, whose approach Sir Martin described as different but instructive, said at p 68:

"But for my part I do not consider that the court should strain to find a dominant cause if, as here, there are two causes both of which can be properly described as effective causes of the loss. Mr Le Quesne recognised that if there are two causes which are approximately equal in effectiveness, then it is impossible to call one rather than the other the dominant cause. I should prefer to say that unless one cause is clearly more decisive than the other, it should be accepted that there are two causes of the loss and no attempt should be made to give one of them the quality of dominance."

74. Those were cases in which it was held that, where the or a proximate, or effective, cause of the loss is excepted by the policy, the insurers are not liable. It is, however, clear from *The Miss Jay Jay* that, where there are two effective causes, neither of which is excluded but only one of which is insured, the insurers are liable. In the Court of Appeal Slade LJ underlined (at p 39) that the authorities show that the question of proximate cause has to be determined by "a broad commonsense view of the whole position" and that, by proximate, is meant proximate in efficiency. It was held that the faulty design and construction of the vessel, which was neither an insured peril nor an excepted cause, and perils of the seas, which was an insured peril, were both proximate causes of the loss since they were, as Slade LJ put it at p 40 "equal or at least nearly equal in their efficiency in bringing about the damage". These principles are as I see it correctly summarised in *McGillivray on Insurance Law*, 11th ed (2008) at para 19-005 under the heading "Two effective causes" and in *McGee on The Modern Law of Insurance* 3rd ed (2011) at pp 260-261. See also to the same effect *McCann's Executors v Great Lakes Reinsurance (UK) Plc* [2010] CSOH 59, para 112 to 117, where Lord Hodge also stressed the importance of context; *Orient-Express Hotels Ltd v Assicurazioni General SpA (UK branch) (trading as Generali Global Risk)* [2010] EWHC 1186 (Comm), [2011] Bus LR 7 per Hamblen J; and *Global Process Systems Inc v Syarikat Takaful Malaysia Bhd* [2011] UKSC 5, [2011] Bus LR 537, para 88 per Lord Mance and, in the Court of Appeal, [2009] EWCA Civ 1398, [2010] 2 All ER 248, para 32 per Waller LJ.

75. I entirely agree with Lord Mance that there must be a causal link between the order and the consequences relied upon. In short, there must be no break in the chain of causation between the order and the consequences. This is clear from *The White Rose* [1969] 1 WLR 1098. As Lord Mance says at para 45, Donaldson J there accepted that it was "necessary in every case to establish an unbroken chain of causation". That is the sense in which I read Lord Hobhouse of Woodborough's reference to the necessity for a "direct causal link" in *Whistler International Ltd v Kawasaki Kisen Kaisha Ltd (The Hill Harmony)* [2001] 1 AC 638, 656. Lord Hobhouse was not considering a case like the present. I do not read him as intending a direct causal link to be different from an effective cause. I remain of the view expressed above (and in agreement with Lord Sumption) that the question is whether the relevant order was an effective cause of the alleged consequence.

76. I agree with both Lord Sumption and Lord Mance that in deciding whether causation was established on the facts, it is important to have in mind the context in which the question is asked. I do not think that the answer can be found in the conclusions on the facts to which Lord Mance has referred. In particular, I do not think that Donaldson J's conclusion based on the vagaries of Minnesota law in *The White Rose* is of any assistance in deciding the relevant question of fact in this appeal.

*Causation on the facts*

77. Lord Sumption has identified the relevant commercial context. It is that the charterers gave an order to

load the cargo in the ordinary way. The consequence of that order was that the cargo was indeed loaded and therefore had sooner or later to be discharged. The failure of the charterers to pay hire timeously triggered the owners' right of withdrawal. When they exercised that right, the question was what should be done with the cargo which was still on board the vessel. It had to be discharged somewhere. As it happened, it was discharged at the port of loading but it might have been discharged at the port of discharge or at an intermediate port. I entirely agree with Lord Sumption's analysis at paras 9 to 16. In particular I agree with Lord Sumption that the owners' motive for exercising the right to terminate is irrelevant.

78.  It was adventitious where and when the termination occurred. The position would have been the same if the termination had occurred for some other reason than the exercise of an option by the owners, as for example as a result of frustration. The owners would have had to procure discharge of the cargo and would have incurred expenses and perhaps loss. They would not have been able to recover such expenses and loss under any of the other provisions of the charterparty. The reason they would have to incur the expenses is that the cargo was still on board the vessel. Just as here there are two effective causes of the expenses and loss, namely the withdrawal and the fact that cargo had been loaded, so in a frustration case, there would be two such causes, namely the frustration and the fact that cargo had been loaded and was on board.

79.  I agree with the view expressed by Lord Mance at para 50 that, if the owners were bound to third parties by bills of lading which charterers had required them to issue, the continuation of the voyage under those bill of lading contracts could engage the indemnity under clause 13. Lord Mance further recognises (to my mind correctly) that if owners were left with no practical option but to carry the cargo to its destination, then they might have an argument that their time and money were spent "in compliance with charterers' orders". Indeed, at present I see no reason why they should not succeed under the indemnity in such circumstances. As I see it, that would be on the basis that the charterers' orders would be the orders to load. In terms of causation, I see no distinction in principle between that case and the present.

80.  For these reasons and the reasons given by Lord Sumption I would allow this appeal on the indemnity point as well as the *Winson* point.

---

**BAILII:** [Copyright Policy](#) I [Disclaimers](#) I [Privacy Policy](#) I [Feedback](#) I [Donate to BAILII](#)
URL: *http://www.bailii.org/uk/cases/UKSC/2012/17.html*

> **All England Law Reports, All ER 1978 Volume 1, Smith and others v South Wales Switchgear Ltd**

[1978] 1 All ER 18

# Smith and others v South Wales Switchgear Ltd

CONTRACT

HOUSE OF LORDS
LORD WILBERFORCE, VISCOUNT DILHORNE, LORD SALMON, LORD FRASER OF TULLYBELTON AND LORD KEITH OF KINKEL
4, 5 OCTOBER, 9 NOVEMBER 1977

*Contract - Incorporation of terms - Reference to general conditions obtainable on request - Version of general conditions not specified - Contract between manufacturer and supplier of services - Contract subject to manufacturer's general conditions of contract - Contract stating that conditions were obtainable on request - Three versions of conditions - Particular version to be incorporated not specified - Whether general conditions incorporated into contract.*

*Indemnity - Construction of indemnity clause - Indemnity against consequence of own negligence - Express provision exempting proferens from liability for own or servants' negligence - Need to include word 'negligence' or some synonym expressly - Clause indemnifying proferens against 'any liability, loss, claim or proceedings whatsoever' - Whether words constituting an express provision exempting proferens from liability for own negligence.*

*Indemnity - Construction of indemnity clause - Indemnity against consequence of own negligence - Words wide enough in ordinary meaning to cover negligence of proferens - Construction of clause contra proferentem where any doubt - Supplier of services undertaking to indemnify purchaser against 'any liability, loss, claim or proceedings whatsoever' in respect of personal injury to any person - Indemnity applying only where order for services involving carrying out of work by supplier and only in respect of injuries 'arising out of or in the course of ... the execution of the order' - Supplier's employee engaged on work for purchaser injured in consequence of purchaser's negligence - Whether clause to be construed as applying only to liability of purchaser for acts and omissions of supplier in carrying out work - Whether purchaser entitled to be indemnified for liability for own negligence.*

For some years the respondents, motor manufacturers, had engaged the appellants to carry out an annual overhaul of electrical equipment at the respondents' factory in Scotland. By letter dated 18 March 1970 the respondents requested the appellants to carry out an overhaul of the equipment during July 1970. The appellants replied that they were able to do so and on 27 May the respondents sent the appellants a purchase note requesting them to supply the services specified in the note, ie the service of overhauling the equipment, 'subject to ... our General Conditions Contract 24001, obtainable on request'. By letter dated 16 July the appellants informed the respondents that they had given instructions for the work to be carried out. The appellants did not request a copy of the general conditions, although on 1 July a copy of the 1969 version was sent to them. There were two other versions of the general conditions, the original version and the version as revised in March 1970. All three versions bore the number 24001. Each version contained an indemnity clause which provided that 'In the event of [the] order involving the carrying out of work by the Supplier and its sub-contractors on land and/or premises of the [respondents], the Supplier will keep the [respondents] indemnified against ... Any liability, loss, claim or proceedings whatsoever under Statute or Common Law (i) in respect of personal injury to, or death of, any person whomsoever, (ii) in respect of any injury or damage whatsoever to any property, real or personal, arising out of or in the course of ... the execution of [the] order'. On 25 July 1970 an employee of the appellants who was engaged on the overhaul at the respondents' factory was seriously injured in an accident at the factory. The employee brought an action for damages against the respondents in the Court of Session alleging negligence and breach of statutory duty. The respondents served a third party notice on the appellants claiming indemnity in **18** respect of the claim under the indemnity clause in the respondents' general conditions of contract. The court held that the accident was wholly caused by the respondents' negligence and breach of statutory duty and awarded the employee damages against the respondents. The court also held that the respondents were entitled under the indemnity clause to be indemnified by the appellants against the liability which they had incurred, and that decision was affirmed by the Second Division of the Court of Session. The appellants appealed to the House of Lords, contending (i) that, since it was uncertain which of the three versions of the general conditions of contract would have been sent to the appellants if the latter had requested a copy, it had not been proved that any of the versions had been incorporated into the contract, and (ii) that on its proper construction the indemnity clause did not require the appellants to indemnify the respondents against liability for the respondents' own negligence or that of their employees.

**Held** - (i) The reference in the purchase order to the respondents' 'General Conditions of Contract 24001, obtainable on request' was sufficient to incorporate into the contract between the respondents and the appellants the general conditions of contract, as revised in March 1970, since the reference clearly indicated the manner in which the terms of the general conditions could be ascertained by the appellants, and the meaning reasonably to be attributed to the reference was that the conditions referred to were those current at the date of the contract, for it was common experience that the general conditions of contract of undertakers were revised from time to time, and if the appellants had requested a copy of the conditions they would reasonably have expected to receive the current, March 1970, edition which was the version which, on a request, the respondents ought to have sent to them (see p 21 *a* to *c*, p 23 *f*, p 24 *f* to p 25 *a* and p 29 *j* to p 30 *c*, post).

(ii) The principles applicable to a clause which purported to confer exemption from liability on one party to a contract applied to a clause of indemnity. Accordingly, the party in whose favour the indemnity clause was made (the proferens) was entitled to indemnity against the consequence of his own negligence or that of his servants only where the indemnity clause contained an express provision to that effect or where the words of the clause in their ordinary meaning were wide enough to cover negligence on the part of the proferens. A

clause did not contain an express provision indemnifying the proferens against his own or his servants' negligence unless it contained the word 'negligence' or some synonym for 'negligence'. Accordingly, since there was no express reference in the clause to negligence and the inclusion of the word 'whatsoever' could not be read as equivalent to an express reference to negligence since it was no more than a word of emphasis, the indemnity clause did not expressly provide that the respondents were to be indemnified against the results of their own or their servants' negligence. Nor were the words of the indemnity clause, read as a whole, wide enough in their ordinary meaning to cover negligence on the part of the respondents or their servants. The indemnity applied only where the order involved the carrying out of work by the appellants (the suppliers) or by their sub-contractors, and was in respect of injuries 'arising out of or in the course of ... the execution of [the] order'; it was therefore intended to apply only to liabilities incurred by the respondents for acts or omissions of the appellants or their servants in connection with carrying out the contractual work, and not to liability incurred by the respondents for their own or their servants' negligence towards the appellants' employees engaged on the contractual work since such liability was not, in a sufficiently proximate sense, connected with the carrying out of the contractual work by the appellants. It followed that the appeal would be allowed (see p 21 *a b*, p 22 *a g h*, p 23 *f*, p 25 *d* to *h*, p 26 *b* to *j*, p 27 *d e*, p 31 *b* and *e* to p 32 *a* and p 33 *b c*, post); dicta of Lord Greene MR in *Alderslade v Hendon Laundry Ltd* [1945] 1 All ER at 245, of Lord Morton of Henryton in *Canada Steamship Lines Ltd v Regem* [1952] 1 All ER at 310 and of Lord Maxwell in *Clark v Sir William Arrol & Co Ltd* 1974 SLT (Notes) at 92 applied; *North of Scotland* **190** *Hydro-Electric Board v D & R Taylor* 1956 SC 1 and *Walters v Whessoe Ltd and Shell Refining Co Ltd* (1960) [1968] 2 All ER 816n approved; dicta of Buckley and Orr LJJ in *Gillespie Brothers & Co Ltd v Roy Bowles Transport Ltd* [1973] 1 All ER at 204, 205 disapproved.

Per Lord Fraser of Tullybelton. Where there is an indemnity against a breach of statutory duty by the proferens but no express provision applying the indemnity to negligence, if the liability of the proferens is founded on breach of statutory duty without any finding against him of negligence at common law he will not lose his indemnity if the breach of statutory duty can be regarded as negligent. It cannot be relevant, for the purpose of ascertaining whether the indemnity applies or not, to enquire whether the breach of statutory duty involves negligence (see p 28 *a b*, post).

### Notes

For the construction of indemnity clauses, see 18 *Halsbury's Laws* (3rd Edn) 534, para 980. For construction of a contract against exclusion of liability for negligence, see 9 *Halsbury's Laws* (4th Edn) para 373.

### Cases referred to in opinions

*Alderslade v Hendon Laundry Ltd* [1945] 1 All ER 244, [1945] KB 189, 114 LJKB 196, 172 LT 153, CA, 3 *Digest* (Repl) 102, *286*.

*AMF International Ltd v Magnet Bowling Ltd* [1968] 2 All ER 789, [1968] 1 WLR 1028, 66 LGR 706, *Digest* (Cont Vol C) 63, *548Aa*.

*Canada Steamship Lines Ltd v Regem* [1952] 1 All ER 305, [1952] AC 192, PC, 11 *Digest* (Reissue) 697, *\*213*.

*Clark v Sir William Arrol & Co Ltd* 1974 SLT (Notes) 90.

*Gillespie Brothers & Co Ltd v Roy Bowles Transport Ltd* [1973] 1 All ER 193, [1973] QB 400, [1972] 3 WLR 1003, [1973] RTR 95, CA, 8(1) *Digest* (Reissue) 53, *300*.

*Hollier v Rambler Motors (AMC) Ltd* [1972] 1 All ER 399, [1972] 2 QB 71, [1972] 2 WLR 401, [1972]

RTR 190, CA, *Digest* (Cont Vol D) 50, *160b*.
*McGlynn v Robert Rome & Son Ltd* 1968 SLT (Notes) 16.
*Murfin v United Steel Companies Ltd* [1957] 1 All ER 23, [1957] 1 WLR 104, 55 LGR 43, CA, *Digest* (Cont Vol A) 608, *394b*.
*North of Scotland Hydro-Electric Board v D & R Taylor* 1956 SC 1 26 *Digest* (Repl) 255, *\*771*.
*Walters v Whessoe Ltd and Shell Refining Co Ltd* [1968] 2 All ER 816n, [1960] Bar Library transcript 343, CA.

### Appeal

South Wales Switchgear Co Ltd appealed against the interlocutor dated 21 December 1976 of the Second Division of the Court of Session (the Lord Justice Clerk (Lord Wheatley), Lord Kissen and Lord Leechman) affirming the interlocutor dated 25 February 1976 of the Lord Ordinary (Lord Brand) whereby he held that the respondents, UMB Chrysler (Scotland) Ltd, were entitled to be indemnified, by virtue of an indemnity clause in a contract between the respondents and the appellants, in respect of damages of £51,639 awarded against the respondents in favour of William Smith, an employee of the appellants, for personal injuries sustained by him in an accident at the respondents' factory in the course of overhauling equipment at the factory under the contract between the respondents and the appellants. The facts are set out in the opinion of Lord Fraser of Tullybelton.

*J P H McKay QC (Dean of Faculty)* and *W M Walker (also of the Scottish Bar)* for the appellants.
*W Douglas Cullen QC* and *A C M Johnston (both of the Scottish Bar)* for the respondents.

 **200**

*Their Lordships took time for consideration*

9 November 1977. The following opinions were delivered.

**LORD WILBERFORCE.** My Lords, I have had the benefit of reading in advance the opinions of my noble and learned friends, Lord Fraser of Tullybelton and Lord Keith of Kinkel. I agree with their conclusions. I would allow the appeal.

**VISCOUNT DILHORNE.** My Lords, I have had the advantage of reading the speeches of my noble and learned friends, Lord Fraser of Tullybelton and Lord Keith of Kinkel, and I agree with their conclusions.

  I agree with them in thinking that the 1970 edition of the general conditions was the edition to be treated as incorporated in the contract. If the respondents had been asked to send a copy of the conditions and had sent an earlier edition, it would no doubt have been difficult for them successfully to contend that another edition was that to which the purchase order referred.

The main question for determination in this appeal is as to the construction to be placed on cl 23(b) of the general conditions. The view of their Lordships as expressed by Lord Morton of Henryton in *Canada Steamship Lines Ltd v Regem* as to the approach to be made in construing 'such clauses' was summarised by the formulation of what has been referred to as three tests. In that case there was both an exemption clause and an indemnity clause. Although the tests themselves referred only to clauses exempting from liability, the reference by Lord Morton of Henryton in the preceding sentence to 'such clauses' shows that the tests were meant to apply both to exemption and to indemnity clauses.

It is, however, to be noted that after formulating these tests, Lord Morton of Henryton said ([1952] 1 All ER 305 at 311, 312, [1952] AC 192 at 211) in relation to the indemnity provision:

> '... if the Crown's contention as to this clause is correct, it imposes a very remarkable and burdensome obligation on the company. However widespread may be the destruction caused by the negligence of the Crown's servants in carrying out the Crown's obligations ... the whole of the damage must be paid for by the company. In the present case the claims are heavy, and it is obvious that the damage caused by a fire such as this might be even greater. Such a liability for the negligence of others must surely be imposed by very clear words, if it is to be imposed at all.'

It would seem in the light of these observations that it was the view of Lord Morton of Henryton that a heavier burden lay on the proferens seeking to establish that the other party to an agreement had agreed to indemnify him against liability for his negligence and that of his servants than when he is merely seeking to establish exemption from liability for his negligence.

In *Gillespie Brothers & Co Ltd v Roy Bowles Transport Ltd* ([1973] 1 All ER 193 at 203, [1973] QB 400 at 419) Buckley LJ said:

> 'It is, however, a fundamental consideration in the construction of contracts of this kind that it is inherently improbable that one party to the contract should intend to absolve the other party from the consequences of the latter's own negligence. The intention to do so must therefore be made perfectly clear, for otherwise the court will conclude that the exempted party was only to be free from liability in respect of damage occasioned by causes other than negligence for which he is answerable.'

↰**21**📖

While an indemnity clause may be regarded as the obverse of an exempting clause, when considering the meaning of such a clause one must, I think, regard it as even more inherently improbable that one party should agree to discharge the liability of the other party for acts for which he is responsible. In my opinion it is the case that the imposition by the proferens on the other party of liability to indemnify him against the consequences of his own negligence must be imposed by very clear words. It cannot be said, in my opinion, that it has been in the present case.

The tests formulated by Lord Morton of Henryton are applicable to the exempting or indemnity provision itself but in construing such a provision other parts of the contract which throw a light on the meaning to be given to it, are not to be ignored. It would be wrong in this case only to have regard to cl 23(b) to which the tests apply, and to ignore the other parts of the clause which in my opinion throw a revealing light on the meaning to be given to that provision.

In *Hollier v Rambler Motors (AMC) Ltd* ([1972] 1 All ER 399 at 405, 406, [1972] 2 QB 71 at 80) Salmon LJ, as he then was, made some observations on the passage in Lord Greene MR's judgment in *Alderslade v Hendon Laundry Ltd* ([1945] 1 All ER 244 at 245, [1945] KB 189 at 192), which was cited with approval by Lord Morton of Henryton in the *Canada Steamship* case ([1952] 1 All ER 305 at 309, 310, [1952] AC 192 at 207, 208). He pointed out that 'in the end you are driven back to construing the clause in question to see what it means'. My noble and learned friend Lord Salmon's observations met with the approval of Lord Denning MR in *Gillespie Brothers & Co Ltd v Roy Bowles Transport Ltd* ([1973] 1 All ER 193 at 199, [1973] QB 400

at 414) and while the tests formulated by Lord Morton of Henryton are a useful aid to construing such clauses, they must not be interpreted as if they were provisions in a statute. At the end of the day one must construe the clause in the light, inter alia, of other provisions of the contract. It might be, though I do not think it is the case, that applying the tests to cl 23(b) alone might lead to the conclusion that the respondents succeeded while regard to the other provisions of the clause led to a contrary conclusion.

   When one considers cl 23(b) by itself in relation to the three tests, I agree with my noble and learned friend, Lord Fraser of Tullybelton, that it did not expressly indemnify the respondents from the consequences of their or their servants' negligence, and so did not satisfy the first test. To satisfy that, there must be a clear and unmistakable reference to such negligence; that is shown by the words 'If there is no express reference to negligence' with which the second test begins. In *Gillespie Brothers & Co Ltd v Roy Bowles Transport Ltd* ([1973] 1 All ER 193 at 204, 205, [1973] QB 400 at 420, 421) Buckley and Orr LJJ thought that the first test was satisfied by a clause whereby one party undertook to 'save harmless and keep' the other party 'indemnified against all claims or demands whatsoever'. With that conclusion I must express my dissent.

   Clause 23(b) begins with very wide words, but their width is restricted to liability for personal injuries or death or injury or damage to property arising out of or in the course of or caused by the execution of the order, that is to say, by the doing of the work the subject of the order. The liability in respect of which the respondents are to be indemnified is thus linked with the doing of the work. This appears to me to point to liability incurred by the respondents for acts or omissions of the appellants and their servants, and not to liability of the respondents for their or their servants' negligence. Whether or not this be right, it cannot be said that the language of cl 23(b) makes it perfectly clear that the respondents were to be indemnified against that.

   On the assumption that I am wrong about this, and that the words of cl 23(b) are wide enough to cover negligence on the part of the respondents and so are covered by the second part, I now turn to the third test. In my opinion it cannot be said that the clause was not intended to cover something other than negligence on the part of the **22** respondents. The language is apt to cover negligence on the part of the appellants and their servants and to my mind the likely object of it was to make it clear that the respondents were to be indemnified against liability to the third parties in respect of acts or omissions of the appellants and their servants. I agree with my noble and learned friend, Lord Keith of Kinkel, in agreeing with the observations of the Lord Justice Clerk Lord Thomson and Lord Patrick in *North of Scotland Hydro-Electric Board v D & R Taylor* (1956 SC 1 at 8, 10) which he has cited. It does not suffice to show that this conclusion with regard to the third test is wrong, that at common law the respondents would have a remedy against the appellants if held liable for something which was the appellants' fault.

   I think the view that cl 23(b) considered by itself does not indemnify the respondents against liability for their own negligence is reinforced when one comes to consider the introductory words of that clause, para (a), and its concluding part.

   The words 'In the event of this order involving the carrying out of work by the Supplier ... on land and/or premises of the Purchaser' support the view that the indemnity was intended to protect the respondents against liability resulting from the carrying out of the work by the appellants. Clause 23(a) makes it clear that all losses and costs incurred by reason of the supplier's breach of the statute etc are to be covered. This again points to the clause being intended to protect the respondents from any liability arising from conduct of the supplier. It was sought to attach significance to the omission of any reference in cl 23(b) to the supplier, but I do not think that omission significant. If, after providing that the indemnity was to cover liability for the appellants' breaches of statute, it was intended that cl 23(b) should extend to indemnity against the consequences of the respondents' own negligence, that could easily have been made clear.

   The final words of the clause as to insurance are difficult indeed to construe, but I think they were intended to mean that the supplier and sub-contractors were required to insure against liabilities they might incur under the contract or sub-contracts. I cannot suppose that sub-contractors would be required to insure against a

liability to indemnify the respondents against the consequences of their own negligence.

I, too, would allow the appeal.

**LORD SALMON.** My Lords, I too have had the advantage of reading in advance the speeches of my noble and learned friends, Lord Fraser of Tullybelton and Lord Keith of Kinkel. For the reasons they give I would allow this appeal.

**LORD FRASER OF TULLYBELTON.** My Lords, this is an appeal from the Second Division of the Court of Session. The Lord Justice Clerk (Lord Wheatley), with whom Lord Kissen and Lord Leechman concurred, held that an indemnity clause had been incorporated in a contract between the appellants and the respondents and that its effect was to entitle the respondents to be indemnified against a liability solely caused by their own negligence. The appellants appeal against both parts of the decision.

The respondents are motor manufacturers with a factory at Linwood in Renfrewshire. For some years before 1970 they or their predecessors, Rootes Motors (Scotland) Ltd, had employed the appellants to carry out an annual overhaul of the electrical equipment in the factory. On 25 July 1970, while the appellants were carrying out the annual overhaul, an electrical fitter employed by them and engaged on the overhaul work was seriously injured. He raised this action for damages against the respondents as defenders and they later convened the appellants as third parties. After a proof, limited to the question of liability for the accident, the Lord Ordinary (Lord Brand), held that it had been wholly caused by negligence and breach of statutory duty on the part of the respondents, and his decision on that part of the case has been ← **231** → accepted. A separate proof was then held on the question of indemnity. The pursuer had no interest in this issue and took no part in the second proof. Lord Brand held that the respondents were entitled to be indemnified by the appellants and, on a reclaiming motion, the Second Division affirmed his decision.

The respondents found on an indemnity clause in their general conditions of contract and the first question is whether the general conditions were incorporated in the contract between the respondents and the appellants. If they were, there is a subsidiary question as to which of three versions of the conditions was incorporated, but this is of no practical importance because all three versions included an indemnity clause and there is no difference material to this issue between the clauses. If any of the versions was incorporated there arises a separate question as to the construction of the indemnity clause.

The first question arises in this way. The contract was formed by several documents, one of which was a purchase order dated 27 May 1970 issued by the respondents to the appellants which included the words:

'Please supply goods or services specified below subject to the instructions and conditions on the facts hereof and our General Conditions of Contract 24001, obtainable on request, and to the following special conditions, if any, shown on the attached form and numbered.'

(The word 'facts' is obviously a mistake for 'face'.) The appellants did not request a copy of the general conditions. Some time later, on 1 July 1970, a copy of the general conditions (January 1969 version) was sent to the appellants because it happened to be printed on the back of a purchase order amendment issued by the respondents after confusion had arisen between this contract and another contract to which the respondents and appellants were parties. In May 1970 there were three versions of the conditions. The original version was headed 'General Conditions of Contract (24001)' and the later versions bore the same heading with the addition of 'Revised January 1969' and 'Revised March 1970' respectively. The respondents' system of referring to general conditions which would be sent on request was only in operation for about a year, during

which period no supplier ever asked for a copy of them, but the evidence of the respondents' chief buyer at Linwood was that if anyone had asked, he would have sent whichever of the three versions happened to come first to hand. In that state of matters counsel for the appellants argued that none of the versions had been incorporated by the reference in the purchase order because such a reference could only be effective if it was to a unique set of conditions. I cannot agree. If the argument had any validity, its logical result would seem to be that there was no contract at all, but that was rightly not maintained. The reference in the purchase order clearly shows that the respondents intended to include the general conditions in the contract. The appellants never raised any objection to their incorporation, nor any question as to their terms and a few days after receiving the copy of the January 1969 version, they proceeded to carry out the work. In these circumstances I agree with the Lord Justice Clerk (Lord Wheatley), who delivered the only opinion in the Second Division, that one or other of the three versions of the conditions was certainly incorporated. The only question is which.

  The Lord Ordinary (Lord Brand) and the Second Division held that the original (unrevised) version had been incorporated because it was the only one that precisely fitted the description in the purchase order which made no mention of 'revised January 1969' or 'revised March 1970'. In my opinion that view depends on too strict a reading of the words in the purchase order. It seems to me that the reference to general conditions without any further description must be taken to refer to the edition current at the date of the contract, that is, the edition revised in March 1970. If the appellants had asked for a copy of the general conditions that is the version which ought to have been sent, and, as the appellants do not suggest that they were in any way misled by the sending of the January 1969 edition in July 1970, I consider ⌖ **24**⟨⟩ that the latest edition is to be taken as having been incorporated in the contract. I shall hereafter refer to the clause, cl 23, in the March 1970 edition, although as I have already mentioned, the argument on construction would be the same whichever edition had been incorporated.

  I come now to the question of construction. The indemnity clause is as follows:

  '23. In the event of this order involving the carrying out of work by the Supplier and its sub-contractors on land and/or premises of the Purchaser, the Supplier will keep the Purchaser indemnified against:-(a) All losses and costs incurred by reason of the Supplier's breach of any statute, bye-law or regulation. (b) Any liability, loss, claim or proceedings whatsoever under Statute or Common Law (i) in respect of personal injury to, or death of, any person whomsoever, (ii) in respect of any injury or damage whatsoever to any property, real or personal, arising out of or in the course of or caused by the execution of this order. The Supplier will insure against and cause all sub-contractors to insure against their liability hereunder, and will produce to the Purchaser on demand the policies of insurance with current renewal receipts therefor.'

  The principles which are applicable to clauses which purport to exempt one party to a contract from liability were stated by Lord Greene MR in *Alderslade v Hendon Laundry Ltd* [[1945] 1 All ER 244 at 245, [1945] KB 189 at 192] and were quoted with approval by Lord Morton of Henryton in the Privy Council in *Canada Steamship Lines Ltd v Regem* ([1952] 1 All ER 305 at 310, [1952] AC 192 at 208) where he summarised them as follows:

  '(i) If the clause contains language which expressly exempts the person in whose favour it is made (hereafter called "the *proferens*") from the consequence of the negligence of his own servants, effect must be given to that provision ... (ii) If there is no express reference to negligence, the court must consider whether the words used are wide enough, in their ordinary meaning, to cover negligence on the part of the servants of the *proferens*. If a doubt arises at this point, it must be resolved against the *proferens* ... (iii) If the words used are wide enough for the above purpose, the court must then consider whether "the head of damage may be based on some ground other than that of negligence", to quote

again LORD GREENE, MR, in the *Alderslade* case [[1945] 1 All ER 244 at 245, [1945] KB 189 at 192]. The "other ground" must not be so fanciful or remote that the *proferens* cannot be supposed to have desired protection against it, but subject to this qualification, which is, no doubt, to be implied from LORD GREENE'S words, the existence of a possible head of damage other than that of negligence is fatal to the *proferens* even if the words used are, *prima facie*, wide enough to cover negligence on the part of his servants.'

These rules were stated in relation to clauses of exemption, but they are in my opinion equally applicable to a clause of indemnity which in many cases, including *Canada Steamship Lines Ltd v Regem*, is merely the obverse of the exemption. The statement has been accepted as authoritative in the law of Scotland: see *North of Scotland Hydro-Electric Board v D & R Taylor*, which was concerned with a clause of indemnity and it was accepted by both parties, rightly in my opinion, as being applicable to the present appeal.

The argument based on the first of Lord Morton of Henryton's tests can be disposed of quickly. Counsel for the respondents argued that para (b) in the present indemnity clause contained language which 'expressly' entitled the respondents to indemnity against the consequence of their own negligence and that the first test was satisfied. The argument was that the words 'any liability, loss, claim or proceedings whatsoever' **25** amounted to an express reference to such negligence because they covered any liability however caused. The argument was supported by reference to the opinions of Buckley and Orr LJJ in *Gillespie Brothers & Co Ltd v Roy Bowles Transport Ltd* ([1973] 1 All ER 193 at 204, 205, [1973] QB 400 at 420, 421), where great emphasis was placed on the word 'whatsoever' occurring in an indemnity clause as showing that the indemnity was intended to apply to all claims and demands however caused including claims for negligence. I agree with the decision in that case and with the statement by Buckley LJ that the clause was one 'which cannot sensibly be construed as subject to an implied qualification' but I am unable to agree with the Buckley LJ's conclusion ([1973] 1 All ER 193 at 205, [1973] QB 400 at 421) that the clause contained 'an agreement in express terms' to indemnify the proferens. I do not see how a clause can 'expressly' exempt or indemnify the proferens against his negligence unless it contains the word 'negligence' or some synonym for it and I think that is what Lord Morton of Henryton must have intended as appears from the opening words of his second test ('If there is no express reference to negligence'). On this point I agree with the opinion of the Lord Justice Clerk (Lord Wheatley) in the present case and of Lord Maxwell in *Clark v Sir William Arrol & Co Ltd* (1974 SLT (Notes) 90 at 92). The word 'whatsoever' occurs in para (b) of cl 23 here, but in my opinion it is no more than a word of emphasis and it cannot be read as equivalent to an express reference to negligence. To hold that it could would be to invest it with the same sort of magic property as the word 'allenarly' used to have in relation to an alimentary liferent in Scotland and there is no justification for that. In the present case I am clearly of opinion that there is no express provision that the respondents are to be indemnified against the results of their own negligence and that the Second Division were right in so holding.

I pass then to consider the second test. The words 'Any liability ... whatsoever under ... Common Law ... in respect of personal injury' which occur near the beginning of cl 23(b), if read in isolation, are of course wide enough to cover liability arising from negligence of the respondents or their servants. But they cannot properly be read in isolation from their context in cl 23 and in the general conditions. I have reached the opinion that cl 23(b), read as a whole, does not apply to liability arising from negligence by the respondents or their servants. The general conditions are evidently intended to apply to many contracts where the respondents are 'the Purchaser' and some other party is the supplier of goods or services to them. But cl 23 applies only 'in the event of [the particular contract] involving the carrying out of work by the supplier *and* its sub-contractors on' the respondents' premises. (Counsel for the appellants accepted, rightly in my opinion, that the word 'and' which I have italicised must be read as if it were, or included, 'or'. Otherwise in a case such as the present, where no sub-contractors were involved, the clause would not apply at all. That seems absurd.) The clause is thus looking to cases where the employees of the supplier will be working on the respondents' premises and it very naturally provides for an indemnity against the consequences of negligence

by those employees while working there. But the employees of the respondents would not require to do any work in carrying out the contract and it seems unlikely that the parties intended that the respondents were to be indemnified by the appellants against liability as occupiers of the factory, especially as the indemnity is against claims in respect of injury to any person whomsoever and is not limited to servants of the suppliers or sub-contractors. Moreover, the indemnity is, in the final words of para (b), in respect of injuries etc 'arising out of or in the course of or caused by the execution of this order' and the only parties who will be concerned in 'execution' of the order are the appellants and any sub-contractors. 'In the course of' must convey some connection with execution of the order beyond the merely temporal; and thus they appropriately apply to activities of the party who is carrying out work under the order.

### 26

The scope of the indemnity is defined in paras (a) and (b) of cl 23. It was accepted by both parties in argument that para (a) is concerned only with breaches of criminal law. That appears rather less clearly in the March 1970 version ('all losses and costs incurred by reason of the Suppliers' breach of any statute, bye-law or regulation') than in the original version ('all fines, penalties and loss incurred ... ') but I think it is clear enough. Paragraph (b) is evidently concerned with civil liability. In contrast with para (a) it is not expressly limited to liabilities incurred by reason of the acts or omissions of the supplier. So far as it goes, that contrast is in favour of the respondents, but it is not, in my opinion, enough to overcome the other indications that I have mentioned which point in favour of the appellants.

Some further support for the appellants' argument is to be derived from the final part of cl 23 dealing with insurance. No doubt these provisions are obscure, and the reference to sub-contractors insuring against 'their liability hereunder' (which I read as meaning 'under this clause') is inept as no liability was imposed on sub-contractors under the clause nor could it have been as no sub-contractors were parties to the contract. But it evidently contemplates both suppliers and sub-contractors, if any, having liabilities under para (b) of the clause; these must, I think, be separate liabilities arising from their respective acts or omissions. Otherwise the effect of the insurance provisions would be to require double (or multiple) insurance by suppliers and (apparently all) sub-contractors against liability arising from acts or omissions of any party including the respondents; it seems to me most unlikely that that can have been intended.

For these reasons the construction of cl 23 goes, in my opinion, further than raising a doubt to be resolved against the respondents as the proferens under the second test, and leads to a positive conclusion adverse to them. That is enough for the decision of the appeal, but if it were necessary to go on to consider the third test I would hold that the head of damage under liability at common law for personal injury may be based on some ground other than the respondents' own negligence. The possibility of common law liability falling on the respondents, as occupiers of the premises, through the fault of the suppliers' servants is in my opinion not fanciful or remote. Nor is the possibility of claims for nuisance or for breach of contract caused by defective work by the suppliers. No doubt the respondents would have a right of relief against the supplier in most if not all of these cases, but that is not a sufficient answer as they might well prefer to rely on the protection of an express right of indemnity rather than on their right to raise an action of relief with all its inevitable hazards. See *North of Scotland Hydro-Electric Board v D & R Taylor* (1956 SC 1 at 8, 10), per the Lord Justice Clerk (Thomson) and Lord Patrick.

The conclusion that I have reached is in harmony with several recent decisions both in Scotland and in England to which we were referred, particularly *North of Scotland Hydro-Electric Board v D & R Taylor* and *Gillespie Brothers & Co Ltd v Roy Bowles Transport Ltd*, and *Walters v Whessoe Ltd* and *Shell Refining Co Ltd* (unreported) but cited and followed in *AMF International Ltd v Magnet Bowling Ltd*. We were supplied with a full transcript of the judgments in *Walters v Whessoe* and the decision seems to be unexceptionable, but there is a short passage in the opinion of Devlin LJ ([1968] 2 All ER 789 at 812, 813, [1968] 1 WLR 1028 at 1057) which might be read as meaning that an indemnity against a breach of statutory duty by the proferens would in the absence of express provision apply only if it occurred 'without negligence on his part'.

It is followed by this sentence: 'In none of these cases is there any negligence on his part and there is therefore no reason to presume an intention to ⌕ 27 🕮 exclude them from the indemnity.' I do not think that that can have been intended to mean that if the liability of the proferens is founded on breach of statutory duty without any finding of negligence at common law against him he will lose his indemnity if the breach of statutory duty can be regarded as negligent. If it is intended to mean that, I would respectfully disagree. I do not consider that it can be relevant, for the purpose of ascertaining whether an indemnity applies or not, to enquire whether the breach of statutory duty involves negligence. A decision of my own in the Outer House in *McGlynn v Robert Rome & Son Ltd* (1968 SLT (Notes) 16) was referred to by the Lord Justice Clerk (Lord Wheatley) in his opinion in the present case. The decision turned entirely on the words of the particular clause and the circumstances of the case, and raised no question of general principle, but I think the statement near the end of the opinion that 'there was no distinction for this purpose between claims for negligence at common law and claims arising out of breach of statutory duty' has to be read with reference to the clause then under consideration, and is not of general application. There are cases, of which *Murfin v United Steel Companies Ltd* is an example, where the terms of the indemnity clause clearly draw a distinction between statutory liability and negligence.

I would allow the appeal.


**LORD KEITH OF KINKEL.** My Lords, the action with which this appeal is concerned arose out of an accident which occurred within the respondents' factory at Linwood, Renfrewshire on 25 July 1970, and which resulted in serious personal injuries to the pursuer, an electrician employed by the appellants. On 29 August 1974 the Lord Ordinary (Lord Brand), after hearing proof, held that the accident was wholly caused by negligence and breach of statutory duty on the part of the respondents, and awarded the pursuer damages of £51,639. He found that no fault was to be attributed to the appellants.

The respondents by their pleadings in the action claimed against the appellants both a contribution under the Law Reform (Miscellaneous Provisions) (Scotland) Act 1940 and also a contractual indemnity in respect of any damages and expenses which they might be found liable to pay to the pursuer. That issue was separated from the pursuer's claim to damages and made the subject of a second proof, following which, on 25 February 1976, the Lord Ordinary (Lord Brand) held that the respondents were entitled to a contractual indemnity from the appellants in respect of all damages and expenses payable by the respondents to the pursuer. The Second Division affirmed that decision by interlocutor dated 21 December 1976, against which the present appeal is taken.

The facts material to the indemnity issue are as follows. For some years before 1970 the respondents had engaged the appellants to carry out an annual overhaul of electrical equipment at their factory. On 18 March 1970 they sent to the appellants a letter asking whether the latter could carry out certain specified work on their electrical sub-stations during the period 19 to 20 July. The appellants replied by letter dated 10 April 1970 stating that they were able to carry out the work and requesting early instructions. On 27 May 1970 the respondents sent to the appellants a purchase order containing an order no NQ492122. The purchase order stated inter alia: 'Please supply goods or services specified below subject to the instructions and conditions on the facts [sic] hereof and our General Conditions Contract 24001, obtainable on request.' A specification of the work followed, and a detachable slip was appended which was designed to be returned by the recipient acknowledging receipt of the order. The appellants did not sign and return this slip. There followed a period of confusion which resulted from the appellants mistakenly thinking that order ⌕ 28 🕮 no NQ492122 related to contractual work for the respondents which had been completed at the end of 1969, but which had apparently not yet been paid for. The respondents fell into the same error and sent the appellants a purchase order amendment dated 1 July 1970, the purpose of which was to fix the price for work done. It bore the

reference number NQ492122 and had printed on the reverse a copy of the respondents' 'General Conditions of Contract (24001) revised January 1969'. Later it was informally agreed between the appellants and the respondents that the work required would start on 25 July 1970, and on 17 July the appellants wrote to the respondents saying that they had issued instructions for the work to be put in hand, but that they were unable to trace the original order no NQ492122. On 22 July the respondents sent to the appellants a copy of the order which was identical to the original except that it did not have the detachable slip appended to it. On 25 July the appellants duly sent the pursuer to the respondents' factory to carry out the specified work and the accident occurred on that day.

In the course of the proof it emerged that in addition to the original version of the respondents' general conditions of contract 24001, and the version as revised in January 1969, there existed a third version as revised in March 1970. Each of these versions contained an indemnity clause, the terms of which, in the two revised versions, were as follows:

'23. In the event of this order involving the carrying out of work by the supplier and its sub-contractors on land and/or premises of the Purchaser, the supplier will keep the Purchaser indemnified against: -(a) All losses and costs incurred by reason of the Supplier's breach of any statute, bye-law or regulation. (b) Any liability, loss, claim or proceedings whatsoever under Statute or Common Law (i) in respect of personal injury to, or death of, any person whomsoever, (ii) in respect of any injury or damage whatsoever to any property real or personal, arising out of or in the course of or caused by the execution of this order. The Supplier will insure against and cause all sub-contractors to insure against their liability hereunder, and will produce to the Purchaser on demand, the policies of insurance with current renewal receipts therefor.'

The terms of the corresponding clause in the unrevised version (cl 25) were the same, save that in place of the words 'All losses and costs' at the beginning of para (a), there appeared the words 'All fines, penalties and loss'. The punctuation also differed in certain respects. There were differences of greater or less significance in other provisions of the three versions.

It was argued for the appellants before the Lord Ordinary (Lord Brand) and the Second Division that, since it was uncertain which of the three versions of the general conditions of contract would have been sent by the respondents to the appellants had the latter requested a copy, it had not been proved that any of the versions had in fact been incorporated into the contract. Reliance was placed on the evidence of an employee of the respondents responsible for sending out the conditions. This witness stated that no supplier had ever asked for a copy of the conditions, and that he was unsure which version he would have sent if he had been asked. The Lord Ordinary (Lord Brand) and the Second Division both held that the original unrevised version of the conditions had been incorporated in the contract.

Counsel for the appellants advanced the same argument to this House. In my opinion it is ill-founded. I consider that the contract was concluded by the appellants receiving the respondents' original purchase order dated 27 May 1970, coupled with their letter to the respondents dated 16 July 1970 saying that they had instructed the work to be carried out. It is true that at the same time they said they had been unable to trace the original order, but on a copy being sent to them they put the work in hand without demur. The purchase order referred to the respondents', 'General Conditions of Contract 24001, obtainable on request.' It thus clearly indicated the manner in which the terms of these conditions could be ascertained, and that was **29** sufficient in law, unconditional acceptance having followed, for their incorporation into the contract. A question however arises as to what in the circumstances is the meaning to be attributed to 'General Conditions of Contract 24001, obtainable on request', it having emerged that the original terms of these conditions were revised by the respondents in January 1969 and again in March 1970. In my opinion the meaning reasonably to be attributed is that the conditions referred to are the current conditions, that is to say, the conditions as

revised in March 1970. It is common experience that the general conditions of contract of various undertakers are revised from time to time, and anyone requesting a copy of such conditions would reasonably expect to receive the current up-to-date edition. Further, that is the edition which a responsible employee of the undertaker clearly ought to send to an enquirer. Viewing the matter objectively therefore, I am of opinion that the parties contracted on the basis of the respondents' general conditions of contract 24001 as revised in March 1970. I do not consider that the reference in the purchase order to 'General Conditions of Contract 24001', without any mention of revision, precludes the relevant conditions from being the latest revised version. All three versions in fact bore the number 24001. The situation does not differ from that which would exist had the reference simply been to 'General Conditions of Contract' without any number. It would be unreasonable to suggest that whenever such conditions are revised the fact of revision must necessarily be indicated on any contractual reference to them. Any reference to conditions can only be understood, in the mind of an ordinary reasonable man, as a reference to the conditions currently in force. The circumstance that on 1 July 1970 the respondents sent to the appellants a purchase amendment order having printed on the reverse a copy of the general conditions as revised in January 1969 does not, in my view, affect the matter. This occurred at a time when both parties were erroneously attributing the number NQ492122 to contractual work which had been completed at the end of 1969, and engaged in fixing the price to be paid for that work. In that situation the January 1969 version of the general conditions was quite rightly attributed to the particular work in question.

The second question in the appeal poses a much more difficult problem. It is whether cl 23 of the general conditions as revised in March 1970, on a proper construction, requires the appellants to indemnify the respondents against the liability which they incurred to the pursuer by reason of their own negligence and breach of statutory duty. The matter is essentially one of ascertaining the intention of the contracting parties from the language they have used, considered in the light of surrounding circumstances which must be taken to have been within their knowledge. Certain guidelines of assistance in approaching this task where an exemption clause or a clause of indemnity is under consideration were, however, laid down in the Privy Council case of *Canada Steamship Lines Ltd v Regem* ([1952] 1 All ER 305 at 310, [1952] AC 192 at 208). Lord Morton of Henryton, delivering the advice of the Board, expressed these as follows:

> '(i) If the clause contains language which expressly exempts the person in whose favour it is made (hereafter called "the *proferens*") from the consequence of the negligence of his own servants, effect must be given to that provision ... (ii) If there is no express reference to negligence, the court must consider whether the words are wide enough, in their ordinary meaning, to cover negligence on the part of the servants of the *proferens*. If a doubt arises at this point, it must be resolved against the proferens ... (iii) If the words are wide enough for the above purpose, the court must then consider whether "the head of damage may be based on some ground other than that of negligence" ... The "other ground" must not be so fanciful or remote that the *proferens* cannot be supposed to have desired protection against it, but, subject to this qualification ... the existence of a possible head of damage other than that of negligence is fatal to the *proferens* 30 even if the words used are, *prima facie*, wide enough to cover negligence on the part of his servants.'

In *North of Scotland Hydro-Electric Board v D & R Taylor* the Second Division accepted that these principles applied in the law of Scotland. It is to be stressed that they do not represent rules of law, but simply particular applications of wider general principles of construction, the rule that express language must receive due effect and the rule omnia praesumuntur contra proferentem. While they apply to the construction both of a clause relied on as exempting from certain liabilities a party who has undertaken to carry out contractual work and of a clause whereby such a party has agreed to indemnify the other party against liabilities which would ordinarily fall on him, they apply a fortiori in the latter case, since it represents a less usual and more extreme situation.

In the contract under consideration the clause in question is an indemnity clause. In terms of its preamble, it is to apply only where the order involves the carrying out of work by the supplier and its sub-contractors on land or premises of the purchasers. This suggests that it is to be concerned with matters connected with acts of the supplier or its sub-contractors in the course of carrying out the work. Under para (a) 'all losses and costs incurred by reason of the Suppliers' breach of any statute, bye-law or regulation' are made the subject of indemnity by the supplier. It is here contemplated that such a breach by the supplier might involve the purchaser in losses or costs on the basis, it is to be inferred, of strict legal responsibility. There is no question here of the supplier indemnifying the purchaser against anything for which the supplier is not personally responsible. As regards para (b), its language is of the widest possible import down to the point where there occur the words 'arising out of or in the course of or caused by the execution of this order'. In my view these words are naturally to be read as qualifying 'any liability, loss, claim or proceedings whatsoever', and thus they impose a limit on the width of what has gone before. The words 'out of or in the course of' go together with 'arising'. What then, is the extent of the limit so set? In my opinion the words 'execution of this order' means 'the doing by the suppliers of the contractual work'. Insofar as a liability on the purchaser may arise out of the doing by the suppliers of the contractual work, that must clearly, in my view, be a liability resulting from some act or omission on the part of the suppliers. It is not so clear what might constitute a liability 'arising in the course of' the doing by the suppliers of the contractual work. It was accepted by counsel for the respondents that the significance of 'in the course of' could not reasonably be purely temporal, otherwise the suppliers would have to indemnify the purchasers against some negligent act of the latter done in a part of the factory where no contractual work was going on, or even in some other factory. He submitted that 'in the course of' meant 'connected with'. Accepting that as sound, I am of opinion that a liability incurred by the purchasers by reason of a breach by them of their common law duty of care towards a servant of the suppliers who is in the factory for the purpose of the contractual work is not, in a sufficiently proximate sense, connected with the doing by the suppliers of the contractual work. Any connection between the liability and the doing of the contractual work is purely fortuitous, resting merely on the circumstance that the doing of the contractual work led to the presence in the factory of the suppliers' servant and thus exposed him to the possibility of injury through the purchasers' negligence.

I conclude that the limit set by the concluding words of para (b) is such that the negligence of the purchasers is not expressly made the subject of indemnity by the suppliers, and further that the words used are not wide enough, in their ordinary meaning, to cover such negligence. If I were wrong as regards the latter aspect, I should be of the opinion that the indemnity stipulated for is intended to apply, not to 31 liabilities arising from the purchasers' own negligence, but to liabilities incurred by them by reason of acts or omissions on the suppliers' part in the course of carrying out the contractual work. There is no difficulty in envisaging situations where something done or left undone by the suppliers might result in the purchasers incurring liabilities at common law either as occupiers of the factory or as employers, or for breaches of the Factories Acts or the Electricity Acts. In my opinion the possibility of such situations must be taken to have been in the contemplation of the parties and not only provides ample content for the clause but casts considerable light on the intention to be gathered from the language used.

It was argued for the respondents that the indemnity clause was unnecessary for the purpose of protecting the purchasers against claims arising through acts or omissions of the suppliers, since in relation to such claims the purchasers would have available to them an action of relief against the supplier. A similar argument was advanced in *North of Scotland Hydro-Electric Board v D & R Taylor*, but it was rejected. The Lord Justice Clerk (Lord Thomson) said (1956 SC 1 at 8):

> 'The second answer was that the protection was unnecessary, as the Board would have an action of relief. Again that is true enough, but there is no reason why the Board should not seek to cover themselves directly and avoid the pitfalls of such a form of action.'

Lord Patrick said (1956 SC 1 at 10):

'Moreover I do not think it is a good answer for the employers to say that they should not be assumed to have protected themselves *per expressum* in this contract against events in which the law would have afforded them relief without expression. Nothing is more common in protective clauses of all kinds than to find protection expressly provided for where the law would have afforded protection without expression.'

I respectfully agree, and am of opinion that the argument fails in the present case for the same reason.

I have to add that I have found the final part of cl 23, dealing with the suppliers' obligation to insure and cause all sub-contractors to insure 'against their liability hereunder' extremely difficult of construction. In particular it is very uncertain whether 'their liability hereunder' refers to liability under the indemnity clause or general liability that may be incurred by reason of the contract. Considering that the suppliers are not taken bound to require sub-contractors to grant an indemnity, there are difficulties in attributing the former meaning to the words. But in my opinion this part of the clause is not in any event significant for the purpose of ascertaining the extent of indemnity obligation, and it is therefore unnecessary to resolve the problems which it presents.

Your Lordships were referred to a decision in 1960 of the Court of Appeal in *Walters v Whessoe Ltd*. This is incompletely reported, but transcripts of the judgments were made available. A contractual indemnity clause in terms very similar to that under consideration in the present case was there held to afford no relief to the party founding on it. While every such clause is to be construed on its own terms in the light of the circumstances of the particular case, I consider that the decision is helpful as indicating the proper approach in principle to this question of construction. Sellers LJ said in the course of his judgment:

'It is well established that indemnity will not lie in respect of loss due to a person's own negligence or that of his servants unless adequate and clear words **32** are used or unless the indemnity could have no reasonable meaning or application unless so applied.'

Devlin LJ said:

'It is now well established that if a person obtains an indemnity against the consequences of certain acts, the indemnity is not to be construed so as to include the consequences of his own negligence unless those consequences are covered either expressly or by necessary implication.'

In the present case I have come to the conclusion, for the reasons which I have indicated, that the indemnity clause relied on by the respondents does not cover, either expressly or by necessary implication, the consequences of their own negligence or that of their servants.

My Lords, I would allow the appeal.

*Appeal allowed.*

Solicitors: *Martin & Co* agents for *Biggart Baillie & Gifford*, Glasgow and *Campbell Smith & Co, WS*, Edinburgh (for the appellants); *Berrymans* agents for *Jno Shaughnessy, Quigley & McColl*, Glasgow and *Simpson & Marwick, WS*, Edinburgh (for the respondents).

Mary Rose Plummer Barrister.

---

end of selection

---



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# United Kingdom House of Lords Decisions



---

**You are here:** BAILII >> Databases >> United Kingdom House of Lords Decisions >> Smith v UMB Chrysler [1977] UKHL 7 (09 November 1977)
URL: *http://www.bailii.org/uk/cases/UKHL/1977/1978_SC_HL_1.html*
Cite as: [1978] WLR 165, 8 BLR 1, 1978 SC (HL) 1, [1978] 1 All ER 18, 1978 SLT 21, [1978] 1 WLR 165, [1977] UKHL 7

---

[New search] [Buy ICLR report: [1978] 1 WLR 165] [Help]

---

JISCBAILII_CASE_SCOT_CONTRACT

09 November 1977

SMITH

v.

U.M.B. CHRYSLER (SCOTLAND) LTD

At delivering judgment on 9th November 1977,—

**LORD WILBERFORCE** .—MY LORDS, I have had the benefit of reading in advance the opinions of my noble and learned friends Lord Fraser of Tullybelton and Lord Keith of Kinkel. I agree with their conclusions. I would allow the appeal.

**VISCOUNT DILHORNE** .—MY LORDS, I have had the advantage of reading the speeches of my noble and learned friends Lord Fraser of Tullybelton and Lord Keith of Kinkel and I agree with their conclusions.

I agree with them in thinking that the 1970 edition of the General Conditions was the edition to be treated as incorporated in the contract. If the respondents had been asked to send a copy of the conditions and had sent an earlier edition, it would no doubt have been difficult for them successfully to contend that another edition was that to which the Purchase Order referred.

The main question for determination in this appeal is as to the construction to be placed on Clause 23(*b*) of the General Conditions. The view of their Lordships as expressed by Lord Morton of Henryton in *Canada Steamship Lines Ltd*. *v. The King* [1952] AC 192 as to the approach to be made in construing "such clauses" was summarised by the formulation of what has been referred to as three tests. In that case there was both an exemption clause and an indemnity clause. Although the tests themselves referred only to clauses exempting from liability, the reference by Lord Morton in the preceding sentence to "such clauses" shows that the tests were meant to apply both to exemption and to indemnity clauses.

It is, however, to be noted that after formulating these tests, Lord Morton at p. 211 said in relation to the indemnity provision "… if the Crown's contention as to this clause is correct, it imposes a very remarkable and burdensome obligation on the company. However widespread may be the destruction caused by the negligence of the Crown's servants in carrying out the Crown's obligations … the whole of the damage must be paid for by the company. In the present case the claims are heavy, and it is obvious that the damage caused by a fire such as this might be even greater. Such a liability for the negligence of others must surely be imposed by very clear words, if it is to be imposed at all."

It would seem in the light of these observations that it was the view of Lord Morton that a heavier burden lay on the proferens seeking to establish that the other party to an agreement had agreed to indemnify him against liability for his negligence and that of his servants than when he is merely seeking to establish exemption from liability for his negligence.

In *Gillespie Bros. & Co. Ltd. v. Roy Bowles Transport Ltd.* [1973] Q.B. 400 Buckley L.J. said at p. 419 "It is, however, a fundamental consideration in the construction of contracts of this kind that it is inherently improbable that one party to the contract should intend to absolve the other party from the consequences of the latter's own negligence. The intention to do so must therefore be made perfectly clear, for otherwise the court will conclude that the exempted party was only to be free from liability in respect of damage occasioned by causes other than negligence for which he is answerable."

While an indemnity clause may be regarded as the obverse of an exemption clause, when considering the meaning of such a clause one must, I think, regard it as even more inherently improbable that one party should agree to discharge the liability of the other party for acts for which he is responsible. In my opinion it is the case that the imposition by the proferens on the other party of liability to indemnify him against the consequences of his own negligence must be imposed by very clear words.

It cannot be said, in my opinion, that it has been in the present case.

The tests formulated by Lord Morton are applicable to the exempting or indemnity provision itself but in construing such a provision other parts of the contract which throw a light on the meaning to be given to it are not to be ignored. It would be wrong in this case only to have regard to Clause 23(*b*) to which the tests apply, and to ignore the other parts of the clause which in my opinion throw a revealing light on the meaning to be given to that provision.

In *Hollier v. Rambler Motors (A.M.C.) Ltd .* [1972] 2 QB 71, Salmon L.J., as he then was, at p. 80 made some observations on the passage in Lord Greene's judgment in *Alderslade v. Hendon Laundry Ltd .* [1945] 1 K.B. 189 which was cited with approval by Lord Morton in the *Canada Steamship* case. He pointed out that "in the end you are driven back to construing the clause in question to see what it means." My noble and learned friend Lord Salmon's observations met with the approval of Lord Denning M.R. in *Gillespie Bros. v. Roy Bowles Ltd .(supra)* and while the tests formulated by Lord Morton are a useful aid to construing such clauses, they must not be interpreted as if they were provisions in a statute. At the end of the day one must construe the clause in the light, *inter alia*, of other provisions of the contract. It might be, though I do not think it is the case, that applying the tests to Clause 23(*b*) alone might lead to the conclusion that the respondents succeeded while regard to the other provisions of the clause led to a contrary conclusion.

When one considers Clause 23(*b*) by itself in relation to the three tests, I agree with my noble and learned friend Lord Fraser that it did not expressly indemnify the respondents from the consequences of their or their servants' negligence, and so did not satisfy the first test. To satisfy that, there must be a clear and

unmistakable reference to such negligence; that is shown by the words "If there is no express reference to negligence" with which the second test begins. In *Gillespie Bros*. *v. Roy Bowles Ltd* .(*supra*) Buckley L.J. and Orr L.J. thought that the first test was satisfied by a clause whereby one party undertook "to saving harmless and keep" the other party "indemnified against all claims or demands whatsoever …" With that conclusion I must express my dissent.

Clause 23(*b*) begins with very wide words, but their width is restricted to liability for personal injuries or death or injury or damage to property arising out of or in the course of or caused by the execution of the order, that is to say, by the doing of the work the subject of the order. The liability in respect of which the respondents are to be indemnified is thus linked with the doing of the work. This appears to me to point to liability incurred by the respondents for acts or omissions of the appellants and their servants and not to liability of the respondents for their or their servants' negligence. Whether or not this be right, it cannot be said that the language of Clause 23(*b*) makes it perfectly clear that the respondents were to be indemnified against that.

On the assumption that I am wrong about this, and that the words of Clause 23(*b*) are wide enough to cover negligence on the part of the respondents and so are covered by the second part, I now turn to the third test. In my opinion it cannot be said that the clause was not intended to cover something other than negligence on the part of the respondents. The language is apt to cover negligence on the part of the appellants and their servants and to my mind the likely object of it was to make it clear that the respondents were to be indemnified against liability to the third parties in respect of acts or omissions of the appellants and their servants. I agree with my noble and learned friend Lord Keith of Kinkel in agreeing with the observations of Lord Justice-Clerk Thomson and Lord Patrick in *North of Scotland Hydro-Electric Board v. D. & R. Taylor* 1956 S.C.1 which he has cited. It does not suffice to show that this conclusion with regard to the third test is wrong, that at common law the respondents would have a remedy against the appellants if held liable for something which was the appellants' fault.

I think the view that Clause 23(*b*) considered by itself does not indemnify the respondents against liability for their own negligence is reinforced when one comes to consider the introductory words of that clause, sub-paragraph (*a*) and its concluding part.

The words "In the event of this order involving the carrying out of work by the Supplier … on land and/or premises of the Purchaser" support the view that the indemnity was intended to protect the respondents against liability resulting from the carrying out of the work by the appellants. Clause 23(*a*) makes it clear that all losses and costs incurred by reason of the supplier's breach of the statute, etc., are to be covered. This again points to the clause being intended to protect the respondents from any liability arising from conduct of the supplier. It was sought to attach significance to the omission of any reference in Clause 23 (*b*) to the supplier, but I do not think that omission significant. If, after providing that the indemnity was to cover liability for the appellants' breaches of statute, it was intended that Clause 23(*b*) should extend to indemnity against the consequences of the respondents' own negligence, that could easily have been made clear.

The final words of the clause as to insurance are difficult indeed to construe, I but I think they were intended to mean that the supplier and subcontractors were required to insure against liabilities they might incur under the contract or subcontracts. I cannot suppose that sub-contractors would be required to insure against a liability to indemnify the respondents against the consequences of their own negligence.

I, too, would allow the appeal.

**LORD SALMON** .—MY LORDS, I too have had the advantage of reading in advance the speeches of my noble and learned friends Lord Fraser of Tullybelton and Lord Keith of Kinkel. For the reasons they give I would allow this appeal.

**LORD FRASER OF TULLYBELTON** .—MY LORDS, This is an appeal from the Second Division of the Court of Session. The Lord Justice-Clerk, with whom Lord Kissen and Lord Leechman concurred, held that an indemnity clause had been incorporated in a contract between the appellants and the respondents and that its effect was to entitle the respondents to be indemnified against a liability solely caused by their own negligence. The appellants appeal against both parts of the decision.

The respondents are motor manufacturers with a factory at Linwood in Renfrewshire. For some years before 1970 they or their predecessors, Rootes Motors (Scotland) Ltd., had employed the appellants to carry out an annual overhaul of the electrical equipment in the factory. On 25th July 1970, while the appellants were carrying out the annual overhaul, an electrical fitter employed by them and engaged on the overhaul work was seriously injured. He raised this action for damages against the respondents as defenders and they later convened the appellants as third parties. After a proof, limited to the question of liability for the accident, the Lord Ordinary, Lord Brand, held that it had been wholly caused by negligence and breach of statutory duty on the part of the respondents, and his decision on that part of the case has been accepted. A separate proof was then held on the question of indemnity. The pursuer had no interest in this issue and took no part in the second proof. The Lord Ordinary held that the respondents were entitled to be indemnified by the appellants and, on a reclaiming motion, the Second Division affirmed his decision.

The respondents found on an indemnity clause in their General Conditions of Contract and the first question is whether the General Conditions were incorporated in the contract between the respondents and the appellants. If they were, there is a subsidiary question as to which of three versions of the conditions was incorporated, but this is of no practical importance because all three versions included an indemnity clause and there is no difference material to this issue between the clauses. If any of the versions was incorporated there arises a second question as to the construction of the indemnity clause.

The first question arises in this way. The contract was formed by several documents, one of which was a Purchase Order dated 27th May 1970 issued by the respondents to the appellants and included the words "Please supply goods or services specified below subject to the instructions and conditions on the facts hereof and our General Conditions of Contract 24001, obtainable on request, and to the following special conditions, if any, shown on the attached form and numbered." (The word "facts" is obviously a mistake for "face.") The appellants did not request a copy of the General Conditions. Some time later, on 1st July 1970, a copy of the General Conditions (January 1969 version) was sent to the appellants because it happened to be printed on the back of a Purchase Order Amendment issued by the respondents after confusion had arisen between this contract and another contract to which the respondents and appellants were parties. In May 1970 there were three versions of the conditions. The original version was headed "General Conditions of Contract (24001)" and the later versions bore the same heading with the addition of "Revised January 1969" and "Revised March 1970" respectively. The respondents' system of referring to General Conditions which would be sent on request was only in operation for about a year, during which period no supplier ever asked for a copy of them, but the evidence of the respondents' chief buyer at Linwood was that if anyone had asked, he would have sent whichever of the three versions happened to come first to hand. In that state of matters the Dean of Faculty argued that none of the versions had been incorporated by the reference in the Purchase Order because such a reference could only be effective if it was to a unique set of conditions. I cannot agree. If the argument had any validity, its logical result would seem to be that there was no contract at all, but that was rightly not maintained. The reference in the Purchase Order clearly shows that the respondents intended to

include the General Conditions in the contract. The appellants never raised any objection to their incorporation, nor any question as to their terms and a few days after receiving the copy of the January 1969 version, they proceeded to carry out the work. In these circumstances I agree with the Lord Justice-Clerk, who delivered the only opinion in the Second Division, that one or other of the three versions of the conditions was certainly incorporated. The only question is which.

The Lord Ordinary and the Second Division held that the original (unrevised) version had been incorporated because it was the only one that precisely fitted the description of the Purchase Order which made no mention of "revised January 1969" or "revised March 1970." In my opinion that view depends upon too strict a reading of the words in the Purchase Order. It seems to me that the reference to General Conditions without any further description must be taken to refer to the edition current at the date of the contract, that is, in the edition revised in March 1970. If the appellants had asked for a copy of the General Conditions that is the version which ought to have been sent, and, as the appellants do not suggest that they were in any way misled by the sending of the January 1969 edition in July 1970, I consider that the latest edition is to be taken as having been incorporated in the contract. I shall hereafter refer to the clause, clause 23, in the March 1970 edition, although as I have already mentioned, the argument on construction would be the same whichever edition had been incorporated.

I come now to the question of construction. The indemnity clause is as follows:

> "23. In the event of this order involving the carrying out of work by the Supplier and its subcontractors on land and/or premises of the Purchaser, the Supplier will keep the Purchaser indemnified against:—(a) All losses and costs incurred by reason of the Supplier's breach of any statute, bye-law or regulation. (b) Any liability, loss, claim or proceedings whatsoever under Statute or Common Law—(i) in respect of personal injury to, or death of, any person whomsoever; (ii) in respect of any injury or damage whatsoever to any property, real or personal, arising out of or in the course of or caused by the execution of this order. The Supplier will insure against and cause all sub-contractors to insure against their liability hereunder, and will produce to the Purchaser on demand the policies of insurance with current renewal receipts therefor."

The principles which are applicable to clauses which purport to exempt one party to a contract from liability were stated by Lord Greene in *Alderslade v. Hendon Laundry Ltd* . [1945] K.B. 189, 192 and were quoted with approval by Lord Morton of Henryton in the Privy Council in *Canada Steamship Lines Ltd. v. The King* [1952] AC 192, 208 where he summarised them as follows:—

> "(1) If the clause contains language which expressly exempts the person in whose favour it is made (hereafter called 'the proferens') from the consequence of the negligence of his own servants, effect must be given to that provision. (2) If there is no express reference to negligence, the court must consider whether the words used are wide enough, in their ordinary meaning, to cover negligence on the part of the servants of the proferens. If a doubt arises at this point, it must be resolved against the proferens. (3) If the words used are wide enough for the above purpose, the court must then consider whether 'the head of damage may be based on some ground other than that of negligence,' to quote again Lord Greene in the *Alderslade* case. The 'other ground' must not be so fanciful or remote that the proferens cannot be supposed to have desired protection against it; but subject to this qualification, which is no doubt to be implied from Lord Greene's words, the existence of a possible head of damage other than that of negligence is fatal to the proferens even if the words used are *prima facie* wide enough to cover

negligence on the part of his servants."

These rules were stated in relation to clauses of exemption, but they are in my opinion equally applicable to a clause of indemnity which in many cases, including the *Canada Steamship Lines Ltd*. is merely the obverse of the exemption. The statement has been accepted as authoritative in the law of Scotland, see *North of Scotland Hydro-Electric Board v. D. & R. Taylor* 1956 SC 1, which was concerned with a clause of indemnity and it was accepted by both parties, rightly in my opinion, as being applicable to the present appeal.

The argument based on the first of Lord Morton's tests can be disposed of quickly. Mr. Cullen argued that paragraph (*b*) in the present indemnity clause contained language which "expressly" entitled the respondents to indemnity against the consequence of their own negligence and that the first test was satisfied. The argument was that the words "any liability, loss, claim or proceedings whatsoever" amounted to an express reference to such negligence because they covered any liability however caused. The argument was supported by reference to the opinions of Buckley L.J. and Orr L.J. in *Gillespie Bros. v. Roy Bowles Ltd* . [1973] Q.B. 400, 420, 421, where great emphasis was placed on the word "whatsoever" occurring in an indemnity clause as showing that the indemnity was intended to apply to all claims and demands however caused including claims for negligence. I agree with the decision in that case and with the statement by Buckley L.J. at page 421, that the clause was one "which cannot sensibly be construed as subject to an implied qualification" but I am unable to agree with the learned Lord Justice's conclusion that the clause contained "an agreement in express terms" to indemnify the proferens. I do not see how a clause can "expressly" exempt or indemnify the proferens against his negligence unless it contains the word "negligence" or some synonym for it and I think that is what Lord Morton must have intended as appears from the opening words of his second test ("If there is no express reference to negligence …"). On this point I agree with the opinion of the Lord Justice-Clerk in the present case and of Lord Maxwell in *Clark v. Sir William Arrol & Co. Ltd. and Others* 1974 S.L.T. 90, 92. The word "whatsoever" occurs in paragraph (*b*)of Clause 23 here, but in my opinion it is no more than a word of emphasis and it cannot be read as equivalent to an express reference to negligence. To hold that it could would be to invest it with the same sort of magic property as the word "allenarly" used to have in relation to an alimentary liferent in Scotland and there is no justification for that. In the present case I am clearly of opinion that there is no express provision that the respondents are to be indemnified against the results of their own negligence and that the Second Division were right in so holding.

I pass then to consider the second test. The words "any liability … whatsoever … under common law in respect of personal injury" which occur near the beginning of Clause 23(*b*), if read in isolation, are of course wide enough to cover liability arising from negligence of the respondents or their servants. But they cannot properly be read in isolation from their context in Clause 23 and in the General Conditions. I have reached the opinion that Clause 23(*b*), read as a whole, does not apply to liability arising from negligence by the respondents or their servants. The General Conditions are evidently intended to apply to many contracts where the respondents are "the Purchaser" and some other party is the supplier of goods or services to them. But Clause 23 applies only "in the event of [the particular contract] involving the carrying out of work by the supplier *and* its sub-contractors on" the respondents' premises. (The Dean of Faculty accepted, rightly in my opinion, that the word "and" which I have italicised must be read as if it were, or included, "or." Otherwise in a case such as the present, where no sub-contractors were involved, the clause would not apply at all. That seems absurd.) The clause is thus looking to cases where the employees of the supplier will be working on the respondents' premises and it very naturally provides for an indemnity against the consequences of negligence by those employees while working there. But the employees of the respondents would not require to do any work in carrying out the contract and it seems unlikely that the parties intended that the respondents were to be indemnified by the appellants against liability as occupiers of the factory, especially as the

indemnity is against claims in respect of injury to any person whomsoever and is not limited to servants of the suppliers or sub-contractors. Moreover, the indemnity is, in the final words of paragraph (b), in respect of injuries etc. "arising out of or in the course of or caused by the execution of this order" and the only parties who will be concerned in "execution" of the order are the appellants and any sub-contractors. "In the course of" must convey some connection with execution of the order beyond the merely temporal; and thus they appropriately apply to activities of the party who is carrying out work under the order.

The scope of the indemnity is defined in paragraph (a) and (b) of Clause 23. It was accepted by both parties in argument that sub-paragraph (a) is concerned only with breaches of criminal law. That appears rather less clearly in the March 1970 version ("all losses and costs incurred by reason of the Suppliers' breach of any statute, bye-law or regulation") than in the original version ("all fines, penalties and loss incurred …") but I think it is clear enough. Sub-paragraph (b) is evidently concerned with civil liability. In contrast with sub-paragraph (a) it is not expressly limited to liabilities incurred by reason of the acts or omissions of the supplier. So far as it goes, that contrast is in favour of the respondents, but it is not, in my opinion, enough to overcome the other indications that I have mentioned which point in favour of the appellants.

Some further support for the appellants' argument is to be derived from the final part of Clause 23 dealing with insurance. No doubt these provisions are obscure, and the reference to sub-contractors insuring against "their liability hereunder" (which I read as meaning "under this clause") is inept as no liability was imposed on sub-contractors under the clause nor could it have been as no sub-contractors were parties to the contract. But it evidently contemplates both suppliers and sub-contractors, if any, having liabilities under paragraph (b) of the clause; these must, I think, be separate liabilities arising from their respective acts or omissions. Otherwise the effect of the insurance provisions would be to require double (or multiple) insurance by suppliers and (apparently all) sub-contractors against liability arising from acts or omissions of any party including the respondents; it seems to me most unlikely that that can have been intended.

For these reasons the construction of Clause 23 goes, in my opinion, further than raising a doubt to be resolved against the respondents as the proferens under the second test, and leads to a positive conclusion adverse to them. That is enough for the decision of the appeal, but if it were necessary to go on to consider the third test I would hold that the head of damage under liability at common law for personal injury may be based on some ground other than the respondents' own negligence. The possibility of common law liability falling upon the respondents, as occupiers of the premises, through the fault of the suppliers' servants is in my opinion not fanciful or remote. Nor is the possibility of claims for nuisance or for breach of contract caused by defective work by the suppliers. No doubt the respondents would have a right of relief against the supplier in most if not all of these cases, but that is not a sufficient answer as they might well prefer to rely on the protection of an express right of indemnity rather than upon their right to raise an action of relief with all its inevitable hazards. See *North of Scotland Hydro-Electric Board* (*supra*) per Lord Justice-Clerk, and Lord Patrick.

The conclusion that I have reached is in harmony with several recent decisions both in Scotland and in England to which we were referred, particularly the *North of Scotland Hydro-Electric Board*, and *Gillespie Bros.*, both *cit supra*, and *Walters v. Whessoe Ltd. and Shell Refining Co. Ltd* . (unreported) but cited and followed in *A.M.F. International Ltd. v. Magnet Bowling Ltd. & Another* [1968] 1 W.L.R. 1028. We were supplied with a full transcript of the judgments in *Walters* and the decision seems to be unexceptionable, but there is a short passage in the opinion of Devlin L.J., (cited at [1968] 1 W.L.R. at 1057 H) which might be read as meaning that an indemnity against a breach of statutory duty by the proferens would in the absence of express provision apply only if it occurred "without negligence on his part." It is followed by this sentence:

"In none of these cases is there any negligence on his part and there is therefore no reason to presume an intention to exclude them from the indemnity."

I do not think that that can have been intended to mean that if the liability of the proferens is founded upon breach of statutory duty without any finding of negligence at common law against him he will lose his indemnity if the breach of statutory duty can be regarded as negligent. If it is intended to mean that, I would respectfully disagree. I do not consider that it can be relevant, for the purpose of ascertaining whether an indemnity applies or not, to enquire whether the breach of statutory duty involves negligence. A decision of my own in the Outer House in *McGlynn v. Robert Rome & Son Ltd* . 1968 S.L.T. (Notes) 16 was referred to by the Lord Justice-Clerk in his opinion in the present case. The decision turned entirely on the words of the particular clause and the circumstances of the case, and raised no question of general principle, but I think the statement near the end of the opinion that "there was no distinction for this purpose between claims for negligence at common law and claims arising out of breach of statutory duty" has to be read with reference to the clause then under consideration, and is not of general application. There are cases, of which *Murfin v. United Steel Companies Ltd* . [1957] 1 W.L.R. 104 is an example, where the terms of the indemnity clause clearly draw a distinction between statutory liability and negligence.

I would allow the appeal.

**LORD KEITH OF KINKEL** .—[His Lordship read the narrative quoted above and continued.] It was argued for the appellants before the Lord Ordinary and the Second Division that, since it was uncertain which of the three versions of the General Conditions of Contract would have been sent to the appellants had the latter requested a copy, it had not been proved that any of the versions had in fact been incorporated into the contract. Reliance was placed upon the evidence of an employee of the respondents responsible for sending out the conditions. This witness stated that no supplier had ever asked for a copy of the conditions, and that he was unsure which version he could have sent if he had been asked. The Lord Ordinary and the Second Division both held that the original unrevised version of the conditions had been incorporated in the contract.

The Dean of Faculty, for the appellants, advanced the same argument to this House. In my opinion it is ill-founded. I consider that the contract was concluded by the appellants receiving the respondents' original Purchase Order dated 27th May 1970, coupled with their letter to the respondents dated 16th July 1970 saying that they had instructed the work to be carried out. It is true that at the same time they said they had been unable to trace the original order, but on a copy being sent to them they put the work in hand without demur. The Purchase Order referred to the respondents "General Conditions of Contract 24001 obtainable on request." It thus clearly indicated the manner in which the terms of these conditions could be ascertained, and that was sufficient in law, unconditional acceptance having followed, for their incorporation into the contract. A question however arises as to what in the circumstances is the meaning to be attributed to "General Conditions of Contract 24001, obtainable on request," it having emerged that the original terms of these conditions were revised by the respondents in January 1969 and again in March 1970. In my opinion the meaning reasonably to be attributed is that the conditions referred to are the current conditions, that is to say, the conditions as revised in March 1970. It is common experience that the general conditions of contract of various undertakers are revised from time to time, and anyone requesting a copy of such conditions would reasonably expect to receive the current up-to-date edition. Further, that is the edition which a responsible employee of the undertaker clearly ought to send to an inquirer. Viewing the matter objectively therefore, I am of opinion that the parties contracted on the basis of the respondents' General Conditions of Contract 24001 as revised in March 1970. I do not consider that the reference in the Purchase Order to "General Conditions of Contract 24001," without any mention of revision, precludes the relevant conditions from

being the latest revised version. All three versions in fact bore the number 24001. The situation does not differ from that which would exist had the reference simply been to "General Conditions of Contract" without any number. It would be unreasonable to suggest that wherever such conditions are revised the fact of revision must necessarily be indicated on any contractual reference to them. Any reference to conditions can only be understood, in the mind of an ordinary reasonable man, as a reference to the conditions currently in force. The circumstance that on 1st July 1970 the respondents sent to the appellants a Purchase Amendment Order having printed on the reverse a copy of the General Conditions as revised in January 1969 does not, in my view, affect the matter. This occurred at a time when both parties were erroneously attributing the number NQ492122 to contractual work which had been completed at the end of 1969, and engaged in fixing the price to be paid for that work. In that situation the January 1969 version of the General Conditions was quite rightly attributed to the particular work in question.

The second question in the appeal poses a much more difficult problem. It is whether Clause 23 of the General Conditions as revised in March 1970, upon a proper construction, requires the appellants to indemnify the respondents against the liability which they incurred to the pursuer by reason of their own negligence and breach of statutory duty. The matter is essentially one of ascertaining the intention of the contracting parties from the language they have used, considered in the light of surrounding circumstances which must be taken to have been within their knowledge. Certain guidelines of assistance in approaching this task where an exemption clause or a clause of indemnity is under consideration were, however, laid down in the Privy Council case of *Canada Steamship Lines Ltd. v. The King* [1952] AC 192. Lord Morton of Henryton, delivering the advice of the Board, expressed these as follows (at p. 208):—

> "(1) If the clause contains language which expressly exempts the person in whose favour it is made (hereafter called the 'proferens') from the consequence of the negligence of his own servants, effect must be given to that provision. … (2) If there is no express reference to negligence, the court must consider whether the words are wide enough, in their ordinary meaning, to cover negligence on the part of the servants of the proferens. If a doubt arises at this point, it must be resolved against the proferens. … (3) If the words are wide enough for the above purpose, the court must then consider whether 'the head of damage may be based on some ground other than that of negligence' … The 'other ground' must not be so fanciful or remote that the proferens cannot be supposed to have desired protection against it; but subject to this qualification … the existence of a possible head of damage other than that of negligence is fatal to the proferens even if the words used are *prima facie* wide enough to cover negligence on the part of his servants."

In *North of Scotland Hydro-Electric Board v. D. & R. Taylor* 1956 SC 1 the Second Division accepted that these principles applied in the law of Scotland. It is to be stressed that they do not represent rules of law, but simply particular applications of wider general principles of construction, the rule that express language must receive due effect and the rule *omnia praesumuntur contra proferentem*. While they apply to the construction both of a clause bearing to exempt from certain liabilities a party who has undertaken to carry out contractual work and of a clause whereby such a party has agreed to indemnify the other party against liabilities which would ordinarily fall upon him, they apply *a fortiori* in the latter case, since it represents a less usual and more extreme situation.

In the contract under consideration the clause in question is an indemnity clause. In terms of its preamble, it is to apply only where the order involves the carrying out of work by the supplier and its sub-contractors on land or premises of the purchasers. This suggests that it is to be concerned with matters connected with acts of the supplier or its sub-contractors in the course of carrying out the work. Under paragraph (*a*) "all losses

and costs incurred by reason of the suppliers' breach of any statute, bye-law or regulation" are made the subject of indemnity by the supplier. It is here contemplated that such a breach by the supplier might involve the purchaser in losses or costs on the basis, it is to be inferred, of strict legal responsibility. There is no question here of the supplier indemnifying the purchaser against anything for which the supplier is not personally responsible. As regards paragraph (b), its language is of the widest possible import down to the point where there occur the words "arising out of or in the course of or caused by the execution of this order." In my view these words are naturally to be read as qualifying "any liability, loss, or proceedings whatsoever," and thus they impose a limit on the width of what has gone before. The words "out of or in the course of" go together with "arising." What then, is the extent of the limit so set? In my opinion the words "execution of this order" means "the doing by the suppliers of the contractual work." In so far as a liability on the purchaser may arise out of the doing by the suppliers of the contractual work, that must clearly, in my view, be a liability resulting from some act or omission on the part of the suppliers. It is not so clear what might constitute a liability "arising in the course of" the doing by the suppliers of the contractual work. It was accepted by Mr Cullen, for the respondents, that the significance of "in the course of" could not reasonably be purely temporal, otherwise the suppliers would have to indemnify the purchasers against some negligent act of the latter done in a part of the factory where no contractual work was going on, or even in some other factory. He submitted that "in the course of" meant "connected with." Accepting that as sound, I am of opinion that a liability incurred by the purchasers by reason of a breach by them of their common law duty of care towards a servant of the suppliers who is in the factory for the purpose of the contractual work is not, in a sufficiently proximate sense, connected with the doing by the suppliers of the contractual work. Any connection between the liability and the doing of the contractual work is purely fortuitous, resting merely on the circumstance that the doing of the contractual work led to the presence in the factory of the suppliers' servant and thus exposed him to the possibility of injury through the purchasers' negligence.

I conclude that the limit set by the concluding words of paragraph (b) is such that the negligence of the purchasers is not expressly made the subject of indemnity by the suppliers, and further that the words used are not wide enough, in their ordinary meaning, to cover such negligence. If I were wrong as regards the latter aspect, I should be of the opinion that the indemnity stipulated for is intended to apply, not to liabilities arising from the purchasers' own negligence, but to liabilities incurred by them by reason of acts or omissions on the suppliers' part in the course of carrying out the contractual work. There is no difficulty in envisaging situations where something done or left undone by the suppliers might result in the purchasers incurring liabilities at common law either as occupiers of the factory or as employers, or for breaches of the Factories Acts or the Electricity Acts. In my opinion the possibility of such situations must be taken to have been in the contemplation of parties and not only provides ample content for the clause but casts considerable light on the intention to be gathered from the language used.

It was argued for the respondents that the indemnity clause was unnecessary for the purpose of protecting the purchasers against claims arising through acts or omissions of the suppliers, since in relation to such claims the purchasers would have available to them an action of relief against the supplier. A similar argument was advanced in *North of Scotland Hydro-Electric Board v. D. & R. Taylor* (supra), but it was rejected. Lord Justice-Clerk Thomson said at p. 8:

> "The second answer was that the protection was unnecessary, as the Board would have an action of relief. Again that is true enough, but there is no reason why the Board should not seek to cover themselves directly and avoid the pitfalls of such a form of action."

Lord Patrick said, at p. 10:

"Moreover I do not think it is a good answer for the employers to say that they should not be assumed to have protected themselves *per expressum* in the contract against events in which the law would have afforded them relief without expression. Nothing is more common in protective clauses of all kinds than to find protection expressly provided for where the law would have afforded protection without expression."

I respectfully agree, and am of opinion that the argument fails in the present case for the same reason.

I have to add that I have found the final part of Clause 23, dealing with the suppliers' obligation to insure and cause all sub-contractors to insure "against their liability hereunder" extremely difficult of construction. In particular it is very uncertain whether "their liability hereunder" refers to liability under the indemnity clause or general liability that may be incurred by reason of the contract. Considering that the suppliers are not taken bound to require sub-contractors to grant an indemnity, there are difficulties in attributing the former meaning to the words. But in my opinion this part of the clause is not in any event significant for the purpose of ascertaining the extent of indemnity obligation, and it is therefore unnecessary to resolve the problems which it presents.

Your Lordships were referred to a decision in 1960 of the Court of Appeal in *Walters v. Whessoe Ltd. and Others* . This is incompletely reported in [1968] 1 W.L.R. 1028, but transcripts of the judgments were made available. A contractual indemnity clause in terms very similar to that under consideration in the present case was there held to afford no relief to the party founding upon it. While every such clause is to be construed upon its own terms in the light of the circumstances of the particular case, I consider that the decision is helpful as indicating the proper approach in principle to this question of construction. Sellers L.J. said in the course of his judgment:

"It is well established that indemnity will not lie in respect of loss due to a person's own negligence or that of his servants unless adequate and clear words are used or unless the indemnity would have no reasonable meaning or application unless so applied."

Devlin L.J. said:

"It is now well established that if a person obtains an indemnity against the consequences of certain acts, the indemnity is not to be so construed as to include the consequences of his own negligence unless those consequences are covered either expressly or by necessary implication."

In the present case I have come to the conclusion, for the reasons which I have indicated, that the indemnity clause relied on by the respondents does not cover, either expressly or by necessary implication, the consequences of their own negligence or that of their servants.

My Lords, I would allow the appeal.

[1978] SC(HL) 1

The permission for BAILII to publish the text of this judgment was granted by Scottish Council of Law Reporting and the electronic version of the text was provided by Justis Publishing Ltd. Their assistance is gratefully acknowledged.

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII

URL: *http://www.bailii.org/uk/cases/UKHL/1977/1978_SC_HL_1.html*

KeyCite Yellow Flag - Negative Treatment

Distinguished by Sicoli v. Hartford Insurance Company of Illinois, W.D.N.Y.,
July 3, 2013

2006 WL 3054321

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

TOKIO MARINE AND FIRE
INSURANCE CO., LTD., as Subrogee,
and NILT, Inc., as Subrogor, Plaintiffs,

v.

Leonard GRODIN, Defendant.
Leonard Grodin, Third-Party Plaintiff,

v.

Geico General Insurance Company,
Government Employees Insurance Company,
and Kay & Gray, Third-Party Defendants.

No. 05 Civ. 9153(DLC).
|
Oct. 27, 2006.

**Attorneys and Law Firms**

Jeremy Cantor, London Fischer LLP, New York, NY, for
Plaintiffs.

Robert Boydstun, Harvey Gladsten & Partners LLP, New
York, NY, for Defendant/Third-Party Plaintiff.

Richard P. Byrne, GEICO General Insurance Company and
Government Employees Insurance Company, Garden City,
NY, for Third-Party Defendant Geico General Insurance
Company, Government Employees Insurance Company.

Frank T. Cara, McDonough Marcus Cohn Tretter Heller &
Kanca LLP, New Rochelle, NY, for Third-Party Defendant
Kay & Gray.

*OPINION & ORDER*

DENISE COTE, District Judge.

**\*1** Tokio Marine and Fire Insurance Company, Ltd.
("Tokio Marine") and Nissan-Infiniti LT ("NILT") have
brought suit against Leonard Grodin ("Grodin") for common-
law indemnification. Ann Blumenthal ("Blumenthal"), a

pedestrian who was struck by a Nissan Pathfinder which
was driven by Grodin and leased from NILT, [1] suffered
catastrophic injuries and filed a personal injury lawsuit in
state court against Grodin, NILT, Nissan Motor Acceptance
Corporation, and Autotech Nissan ("State Court Action").
In settling the State Court Action, Tokio Marine, NILT's
insurer, paid millions of dollars above the amount contributed
by Grodin's primary insurer, GEICO Insurance Company
("Geico").

Grodin has filed a third party complaint against Geico, and
Kay & Gray, a law firm to whom Geico referred Grodin's
defense in the State Court Action. Grodin alleges that Geico
breached its contract with Grodin by improperly failing to
offer a defense to NILT in the State Court Action. Grodin's
second cause of action alleges breach of contract, bad faith,
and legal malpractice against Geico and Kay & Gray for
their alleged failure to settle the State Court Action within
Grodin's Geico policy limits. His third cause of action seeks
a declaration that Geico is liable for the defense costs of
the present action. Tokio Marine and NILT have moved
for summary judgment on their claim for common law
indemnification and Geico and Kay & Gray have moved to
dismiss the claims brought against them by Grodin for failure
to state a claim. [2]

*Background*

The following facts are undisputed or taken in the light
most favorable to Grodin. On September 28, 2000, Grodin
entered into a Lease Agreement ("Lease") with Autotech
Nissan for the Pathfinder. The Lease was assigned to Nissan
Motor Acceptance Corporation which, in turn, granted full
power to collect and discharge obligations under the Lease to
NILT. The Lease did not contain an indemnity provision. As
part of the Lease, Grodin was required to secure automobile
insurance that provided coverage for bodily injury liability of
$100,000 per person and $300,000 per occurrence.

Grodin secured insurance from Geico, which issued him a
policy covering the Pathfinder on July 29, 2002 ("Geico
Policy"). The Geico Policy contains a section entitled "Losses
We Will Pay For You" which states:

[W]e will pay damages which an insured becomes legally
obligated to pay because of:

1. bodily injury, sustained by a person; and

2. property damage

arising out of the ownership, maintenance or use (including loading or unloading) of the owned auto or a non-owned auto. We will defend any suit for damages payable under the terms of this policy even if the claim or suit is groundless. We may investigate and settle any claim or suit.

On November 24, 2002, Grodin was involved in an accident while attempting to park the Pathfinder near the intersection of Third Avenue and East 26th Street in Manhattan. Blumenthal was knocked to the ground and struck her head, suffering serious injuries.

 **\*2**  On December 18, 2002, Geico wrote a letter to Grodin indicating that it was aware of the accident and that Grodin had no excess insurance. It asked Grodin for a copy of the Lease and advised him that NILT may have some additional rights against him in the event that it was forced to pay a monetary settlement over the limit of his underlying liability policy. Geico also informed Grodin that he might want to retain private counsel. Geico's letter stated in pertinent part:

> The "lessor" may have some additional rights against you as the "lessee" in the event that they are forced to pay a monetary settlement over the limit of your underlying liability limit of $100,000) as a result of this accident. You may be required to report this loss to them as well and, if so, you should do this now.

> You may wish to obtain your own attorney at your own expense, to cooperate with the defense attorney assigned to your case (if a lawsuit is commenced against you-but no such suit has been filed as far as we know). You need not do this, but is [sic] your right to do so under your policy contact [sic]. We assure you that if it is necessary to refer this claim to defense counsel the attorney assigned to your case will do his/her best to protect your interests.

(Emphasis supplied.) On December 26, 2002, Grodin advised Geico that he had no insurance other than its policy.

On January 10, 2003, Blumenthal filed the State Court Action against Nissan Motor Acceptance Corporation, NILT, Autotech Motors (collectively "Nissan") and Grodin in New York Supreme Court seeking $10,000,000 in damages based on theories of negligence. By correspondence dated February 28, 2003, NILT's contingent auto liability insurer, Tokio Marine, tendered the defense of NILT in the State Court Action to Geico.

On March 3, 2003, Geico notified Tokio Marine that it would be providing a defense to Nissan through Kay & Gray. Grodin did not retain his own counsel. Kay & Gray interposed an answer on his behalf. Three days later, London Fischer LLP indicated that Nissan had made an election to be defended by London Fischer rather than Kay & Gray. London Fischer interposed an answer on behalf of Nissan in the State Court Action. Nissan's answer did not contain any cross claim for indemnification.

On June 18, 2003, Geico wrote to Blumenthal's counsel offering to settle for the sum of $100,000, the full limit of Grodin's policy with Geico. On February 17, 2005, the State Court Action settled for $6 million ("Settlement"). Tokio Marine, as NILT's insurer, contributed $3 million to the settlement, Geico contributed $100,000 and Royal & Sunalliance, NILT's excess insurer, contributed $2.9 million.

DISCUSSION

I. Plaintiffs' Motion for Summary Judgment
Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the nonmoving party. *Celotex Corp. v. Cartrett,* 477 U.S. 317, 323 (1986); *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings. Rule 56(e), Fed.R.Civ.P.; *accord Sista,* 445 F.3d at 169. Only disputes over material facts, facts that might affect the outcome of the suit under the governing law, will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

 **\*3**  Tokio Marine bings a common law indemnification claim against Grodin for the $3 million it paid as insurer for NILT in the settlement of Blumenthal's State Court Action against NILT and Grodin for personal injury. A party is entitled to indemnification when it is held liable for a tort committed by a third party despite the fact that it has done no wrong. *Glaser v. M. Fortunoff of Westbury Corp.,* 71 N.Y.2d 643, 646

(1988). [3]  In contrast, contribution principles apply when one is held liable "at least partially" because of one's negligence. *Id.* The principles of common law indemnification allow the party held vicariously liable to shift the entire burden of the loss to the wrongdoer. *Frank v. Meadowlake Development Corp.,* 6 N.Y.3d 687, 691-92 (2006). "The duty that forms the basis for the liability arises from the principle that 'every one is responsible for the consequences of his own negligence, and if another person has been compelled to pay the damages which ought to have been paid by the wrongdoer, they may be recovered from him.' " *Raquet v. Braun* 90 N.Y.2d 177, 183 (1997) (citation omitted). "The rule in the State of New York, is that a person entitled to indemnity, where he is liable to be mulcted in damages, may settle the claims and recover over and against the indemnitor, subject to the proof (1) of liability and (2) as to the reasonableness of the amount of settlement." *McGurran v. DiCanio Planned Develop. Corp.,* 674 N.Y.S.2d 706, 707 (App.Div.1998) (citation omitted). "A defendant who voluntarily pays without waiting for judgment assumes the risk of being able to prove the actionable facts upon which his liability depends, as well as the reasonableness of the amount he pays when he seeks recovery by way of indemnity from the party ultimately determined to be liable." *Id.*

To obtain indemnification from Grodin, plaintiffs must prove that NILT was liable to Blumenthal and that the settlement amount of $6 million was reasonable. If Grodin has raised a triable issue of fact as to either NILT's liability to Blumenthal or the reasonableness of the settlement amount, the plaintiffs are not entitled to summary judgment.

Blumenthal's theory of liability against NILT was based on New York's vicarious liability statute. N.Y. Veh. & Traf. Law, § 388. For Grodin to be held liable for negligence to Blumenthal under New York law, Blumenthal had to demonstrate by a preponderance of the evidence that Grodin (1) owed her a duty of care; (2) he breached that duty; (3) she sustained injury; and (4) her injury was proximately caused by Grodin's breach of duty. *Japanese Airlines Co. Ltd., v. Port Authority of N.Y. and N.J.,* 178 F.3d 103, 109 (2d Cir.1999).

Every driver of a motor vehicle has a duty, under New York law, "to exercise due care to avoid colliding with any ... pedestrian ... upon any roadway." N.Y. Veh. & Traf. Law § 1146. Due care is the care "which is exercised by reasonably prudent drivers." *Kane v. United States of America,* 189

F.Supp.2d 40, 52 (S.D.N.Y.2002) (citation omitted); *see also Russell v. Adduci,* 528 N.Y.S.2d 232, 234 (App.Div.1988). Under New York law "decisions as to lack of reasonable care and its nexus to a plaintiff's injury are quintessential jury questions." *Lombard v. Booz-Allen & Hamilton, Inc.,* 280 F.3d 209, 215-16 (2d Cir.2002).

**\*4** A defendant can establish a prima facie entitlement to a judgment as a matter of law by providing evidence that the plaintiff darted out into traffic "outside of a crosswalk," leaving the driver unable to avoid contact with the pedestrian.

*Mancia v. Metropo. Transp. Auth. Long Island Bus,* 790 N.Y.S.2d 31 (App.Div.2005). A vehicle must, however, yield to a pedestrian lawfully within a crosswalk. *Canradi v. N.Y. Transit Auth. et al.,* 671 N.Y.S.2d 506 (App.Div.1998).

Grodin has submitted evidence that raises a question of fact as to whether he was operating his vehicle with reasonable care at the time of the accident that injured Blumenthal. Grodin testified in his deposition that he completely stopped the Pathfinder for three to five seconds approximately two-car lengths in front of an available parking spot, looked in both side view mirrors and the rear view mirror, and then turned to look over his right shoulder before putting the Pathfinder in reverse. Grodin asserts that he continuously watched out for pedestrians while backing up the Pathfinder to angle it into the parking spot next to the crosswalk on the south side of 26th Street just east of Third Avenue. He does not remember if the impact of the Pathfinder with Blumenthal occurred when any part of his vehicle was in the crosswalk. His car was moving at a speed of two miles an hour and he was looking over his right shoulder when he heard the Pathfinder tap against an object. Grodin did not see Blumenthal at any point in time prior to the tap. Grodin also testified that subsequent to the accident, "I suspected that there were spots that I didn't see because they were blind spots," and that he suspected the blind spots were located at both rear corners of the vehicle and behind the rear seat headrests. Finally, Grodin has contended, "Blumenthal must have darted out into the street and run into the back of my Nissan Pathfinder as I did not see her prior to the tap and I was looking behind me as I was backing up."

Grodin's statements raise a genuine issue of fact as to whether Blumenthal was in the crosswalk when she was hit and whether Grodin exercised due care to avoid colliding with any pedestrian while backing the Pathfinder into a parking spot. Because there is a question of fact as to whether Grodin was liable to Blumenthal, there is also a question of fact as to whether Tokio Marine was liable to Blumenthal.

The plaintiffs have presented evidence that establishes the reasonableness of the settlement figure. As a result of the accident, Blumenthal sustained a traumatic brain injury requiring surgery in the form of a right frontal craniotomy and removal of a subdural hematoma. Her memory, cognitive functioning, and ability to smell, taste and walk were impaired. Blumenthal also suffered anxiety, depression, and emotional distress as a consequence of the accident. Grodin has not submitted any evidence that raises a question of fact regarding the seriousness of her injuries or the reasonableness of the settlement amount in the context of the issues at stake in the State Court Action.

**\*5** The plaintiffs' motion for summary judgment is denied to the extent it is addressed to liability. It is granted on the issue of reasonableness.

## II. Motions to Dismiss

Pursuant to Rule 12(b)(6), Fed.R.Civ.P., a defendant may move to dismiss a cause of action where it "fails to state a claim upon which relief can be granted." In construing the complaint, the court must "accept all factual allegations in the complaint and draw inferences from those allegations in the light most favorable to the plaintiff." Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir1997). If it is clear that "no relief could be granted under any set of facts that could be proved consistent with the allegations," the claims should be dismissed. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002). A complaint need only "give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." Id. at 512. The Court must accept the allegations as pled in the complaint as true and may consider "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir.2000)). See also Global Network Communications, Inc. v. City of N.Y., 458 F.3d 150, 156-57 (2d Cir.2006).

### A. Geico's Motion to Dismiss

#### 1. Breach of Contract, Bad Faith and Legal Malpractice

Geico moves to dismiss Grodin's second claim, a combined claim for breach of contract, bad faith and legal malpractice, on the grounds that 1) it is not vicariously liable for the acts or omission of Kay & Gray in the defense of the State

Court Action, 2) and Grodin has failed to state a claim for bad faith against Geico.[4] Under New York law, insurers are not vicariously liable for the malpractice of attorneys they retain to defend their insureds when the lawyers are independent contractors. Feliberty v. Damon, 72 N.Y.2d 112, 120 (1988). This refusal to extend vicarious liability exists because "the duty to defend an insured is by its very nature delegable ... for in New York[,] ... an insurance company is in fact prohibited from the practice of law" and because the "paramount interest independent counsel represents is that of the insured, not the insurer." Id. Where an insurer is unable to provide or control the legal services at issue and there is a remedy for incompetence against counsel, the imposition of vicarious liability is unwarranted. Id. See also Elm Ins. Co v. Geico Direct, et al., 805 N.Y.S.2d 34 (App.Div.2005).

In response to this motion, Grodin asserts that the Kay & Gray attorneys defending him were not independent counsel, but employees of Geico. He will be permitted to amend his pleading to add such an assertion.

Under New York law, in order to establish a prima facie case of an insurer's bad faith in connection with its treatment of a settlement offer, "the plaintiff must establish that the insurer's conduct constituted a 'gross disregard' of the insured's interests-that is, a deliberate or reckless failure to place on equal footing the interests of its insured with its own interests when considering the settlement offer." Pavia v. State Farm Mutual Automobile Insurance, 82 N.Y.2d 445, 453 (1993). Ordinary negligence is an "insufficient predicate for a bad-faith action." Id. at 456. Where an insurer "deliberately or recklessly" misrepresents the status of the litigation, thereby effectively depriving the insured of a meaningful opportunity to protect its interests, it has acted in bad faith. Elm, 805 N.Y.S.2d at 35. See also Smith v. General Accident Insurance Company, 91 N.Y.2d 648, 653 (1998).

**\*6** Grodin has stated a claim for breach of contract and bad faith. In his Amended Third Party Complaint, he alleges that "third-party defendants failed to advise[ ]" him "of the terms of the settlement" of the State Court Action and the "portion of the settlement that exceeded the limits of coverage" of his Geico motor vehicle insurance policy. Grodin also alleges that Geico misrepresented the status of his liability in the

settlement of the State Court Action by communicating to him that the State Court Action was "successfully resolved."

2. Attorneys Fees for the Present Action

Geico moves to dismiss Grodin's claim that Geico is liable for his attorney's fees in the present action on the ground that it has no duty to defend Grodin in the present action under the terms of Grodin's insurance policy with Geico. "It is a well-established legal principle that the duty of an insurer to defend is broader than its duty to pay." *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 115 (2d Cir.2004) (citation omitted). The duty to defend "arises whenever the allegations within the four corners of the underlying complaint potentially give rise to a covered claim, or where the insurer 'has actual knowledge of facts establishing a reasonable possibility of coverage.' " *Id.* (citation omitted).

The Geico policy states,

[Geico] will pay damages which an insured becomes legally obligated to pay because of:

1) bodily injury, sustained by a person; ... arising out of the ... use ... of ... a non-owned auto. We will defend any suit for damages payable under the terms of this policy even if the claim or suit is groundless.

The question at issue is whether the plaintiffs' claim against Grodin is a "suit for damages payable under the terms" of the Geico policy.

Construing an insurance policy that provided that "Allstate will defend a person insured if sued as the result of a covered auto accident," the Second Circuit has held that Allstate had a duty to defend its insured driver on the indemnification claim brought on behalf of the leasing company because that claim arose "as a result" of the covered automobile accident. *Allianz,* 416 F.3d at 116. The terms of the Geico policy are not identical to the terms of the Allstate policy at issue in *Allianz.* Nonetheless, parroting the terms of the Geico policy, plaintiffs' claim seeks "damages which [Grodin may be] legally obligated to pay *because of* bodily injury sustained by a person arising out of the use of" the leased auto. Grodin has sufficiently pled that Geico has a duty to defend him in the instant action, and has stated a claim for attorney's fees. [5] The indemnification damages which the plaintiffs seek from Grodin exist "because of" the injuries sustained when Blumenthal was struck by Grodin's automobile. Contrary to

Geico's argument, its payment of its policy limit does not relieve it of its duty to defend. *Id.* at 117.

B. Kay & Gray's Motion to Dismiss

 *7  Kay & Gray move to dismiss Grodin's claim for legal malpractice on the grounds that (1) Grodin failed to state a cause of action, (2) Kay & Gray did not have a conflict of interest in representing Geico and Grodin, and (3) it did not have a duty to ensure that the settlement offer was fair and reasonable. A plaintiff seeking to recover damages for alleged legal malpractice must prove: (1) that the defendant failed to exercise that degree of care, skill, and diligence commonly possessed and exercised by an ordinary member of the legal community, (2) that such negligence was the proximate cause of the actual damages sustained by the plaintiff, and (3) that, but for the defendant's negligence, the plaintiff would have been successful in the underlying action. *Simmons v. Edelstein,* 32 820 N.Y.S.2d 614, 615 (App.Div.2006). *See also* *Allianz,* 416 F.3d at 118; *Wester v. Sussman,* 757 N.Y.S.2d 500 (App.Div.2003).

Grodin has alleged that it may have been possible for Kay & Gray attorneys to secure a release from Tokio Marine and NILT of common law indemnification claims against him. His Amended Third Party Complaint contends that prior to entering into the settlement of the State Court Action, Kay & Gray failed to advise him of the terms of the settlement, failed to advise him of the portion of the settlement that exceeded the limits of his Geico policy, permitted a settlement for a sum in excess of the fair and reasonable value of the claim, and that as a result he was improperly exposed to damages in excess of coverage limits. Grodin also asserts that Kay & Gray labored under a conflict of interest given its desire to keep defense costs low. These allegations are sufficient to state a claim for malpractice.

Kay & Gray relies on *Allianz,* 416 F.3d at 118-19, in making this motion. *Allianz* addressed a summary judgment motion and therefore reviewed the evidence submitted by the parties. At this stage, Grodin has met his burden of stating a claim.

Conclusion

The plaintiffs' motion for summary judgment is granted on the issue of the reasonableness of the settlement. It is otherwise denied. Geico's motion to dismiss and Kay & Gray's motion to dismiss are each denied. Grodin has until November 10,

2006 to file an amended complaint adding to his second claim the allegation that the Kay & Gray attorneys defending him were not independent counsel, but employees of Geico.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 3054321


# Footnotes


1    Grodin leased the Pathfinder from Autotech Nissan, the lessor, which assigned NILT all rights, title and interest in the lease and the leased vehicle, granting NILT the power to collect and discharge obligations related to the Lease.

2    Grodin has also moved to dismiss Tokio Marine and NILT's claims for attorneys' fees and costs incurred in defending the State Court Action. Tokio Marine and NILT have since withdrawn those claims, rendering Grodin's motion moot.

3    The parties agree that New York law applies to all claims in this action.

4    Geico also moved to dismiss on the ground that it had no responsibility to indemnify Grodin for Nissan's attorneys fees for the underlying State Court Action. This claim is moot since Tokio Marine and NILT have dropped their claim for attorneys fees against Grodin.

5    If Geico had framed its motion as a motion for summary judgment, it would be denied.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Stoncor Group, Inc. v. Peerless Insurance Company,
S.D.N.Y., August 15, 2018

2002 WL 1391920
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

TRAVELERS PROPERTY CASUALTY
CORPORATION a/s/o the Fisher Park–Lane
Company and Richard C. Fisher, Plaintiff,
v.
WINTERTHUR INTERNATIONAL and
Union Bank of Switzerland, Defendants.

No. 02 Civ. 2406(SAS).
|
June 25, 2002.

**Attorneys and Law Firms**

Nicholas R. Caiazzo, Wilson, Elser, Moskowitz, Edelman &
Dicker LLP, New York, New York, for Plaintiff.

Brian A. Birenbach, James M. Mucklewee, Damon & Morey
LLP, Buffalo, New York, for Defendants.

*OPINION AND ORDER*

SCHEINDLIN, J.

**\*1** Plaintiff Travelers Property Casualty Corporation
("Travelers"), as subrogee of The Fisher Park–Lane Company
("Park–Lane") and Richard C. Fisher (collectively "the
Fishers"), seeks a declaration that it has the right to defense
and indemnity from defendants Winterthur International
("Winterthur") and Union Bank of Switzerland ("UBS")
(collectively "defendants") in an underlying personal injury
action which names the Fishers and UBS as defendants.
Plaintiff further seeks damages for defendants' failure to
defend and indemnify the Fishers' litigation costs, as well as
contribution and common law indemnification from UBS for
any judgment rendered against the Fishers in the underlying
action.

Defendant Winterthur now moves for dismissal pursuant to
Federal Rule of Civil Procedure 12(b)(6), for failure to state
a claim upon which relief can be granted; both defendants
also move to dismiss on the ground that no actual controversy

yet exists. In the alternative, they argue that this Court should
abstain from exercising jurisdiction pending the resolution of
the underlying state court action. For the reasons set forth
below, Winterthur's motion is granted and UBS's motion is
granted in part and denied in part.

## I. LEGAL STANDARD

### A. Rule 12(b)(6)

A motion to dismiss should be granted only if "it appears
beyond doubt that the plaintiff can prove no set of facts
in support of his claim which would entitle him to relief."
*Tarshis v. Riese Org.,* 211 F.3d 30, 35 (2d Cir.2000)
(quotation marks and citation omitted). "At the Rule 12(b)
(6) stage, '[t]he issue is not whether a plaintiff is likely to
prevail ultimately, but whether the claimant is entitled to
offer evidence to support the claims. Indeed it may appear
on the face of the pleading that a recovery is very remote
and unlikely but that is not the test." ' *Sims v. Artuz,* 230
F.3d 14, 20 (2d Cir.2000) (quoting *Chance v. Armstrong,*
143 F.3d 698, 701 (2d Cir.1998) (internal quotation marks
omitted)). The task of the court in ruling on a Rule 12(b)
(6) motion is " 'merely to assess the legal feasibility of the
complaint, not to assay the weight of the evidence which
might be offered in support thereof." ' *Sims,* 230 F.3d at 20
(quoting *Ryder Energy Distribution Corp. v. Merrill Lynch
Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984) (internal
quotation marks omitted)).

When deciding a motion to dismiss pursuant to Rule 12(b)
(6), courts must "take as true all of the allegations contained
in plaintiff's complaint and draw all inferences in favor
of plaintiff." *Weinstein v. Albright,* 261 F.3d 127, 131 (2d
Cir.2001). Courts should "include in this analysis not only
the assertions made within the four corners of the complaint
itself, but also those contained in documents attached to
the pleadings or in documents incorporated by reference."
*Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001).

### B. Rule 12(b)(1) [1]

"The court properly dismisses a case for lack of subject
matter jurisdiction pursuant to Rule 12(b)(1) when the district
court lacks the statutory or constitutional power to adjudicate
it." *Tasini v. New York Times Co.,* 84 F.Supp.2d 350, 353
(S.D.N.Y.2002) (quotations, alterations omitted). Plaintiffs

bear the burden of proving, by a preponderance of the evidence, that this Court has subject matter jurisdiction over their case. *See* Makarova v. United States, 201 F.3d 110, 113 (2d Cir.2000).

**\*2** "It is well ingrained in the law that subject-matter jurisdiction can be called into question either by challenging the sufficiency of the allegation or by challenging the accuracy of the jurisdictional facts alleged." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 68 (1987). When faced with a Rule 12(b)(1) motion that contains a factual challenge, a court must draw jurisdictional facts from the complaint, affidavits and exhibits submitted by the parties. *See* Robinson v. Government of Malaysia, 269 F.3d 133, 140 (2d Cir.2001); Kline v. Kaneko, 685 F.Supp. 386, 389–90 (S.D.N.Y.1988).

If a defendant challenges only the legal sufficiency of a plaintiff's jurisdictional allegations, a court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff. *See* Robinson, 269 F.3d at 140; *Tasini,* 184 F.Supp.2d at 353 (referring to such a challenge as "facial" as distinguished from a "factual attack"); Virtual Countries, Inc. v. Republic of South Africa, 148 F.Supp.2d 256, 262 (S.D.N.Y.2001). Of course, "where evidence relevant to the jurisdictional question is before the court, the district court may refer to that evidence." Robinson, 269 F.3d at 140 (quotation marks, citation and alterations omitted).

## II. FACTUAL BACKGROUND

Beginning in 1981, UBS leased several floors of a building located at 299 Park Avenue in New York, New York from Park–Lane. Complaint ("Compl.") ¶ 14; 11/25/81 Agreement of Lease between the Fisher 299 Realty Company and Union Bank of Switzerland, New York Branch, Ex. B to Defendants' Notice of Removal ("the Lease"). The Lease contained the following clause:

> Tenant shall indemnify, defend, and save Landlord harmless from and against any liability or expense which is not the result of Landlord's negligence, willful act or willful

omission, and which arises from the use or occupation of the demised premises by Tenant or anyone in the demised premises with Tenant's permission, or any breach of this Lease by Tenant.

Lease § 35.01: Indemnity ("the Lease Provision").

On April 2, 1998, Donna Martin, an employee of Sodexho Marriott, a food service company under contract with UBS, was allegedly injured by a defective cash register while working on the 27th floor of the building, one of the floors under lease. Compl. ¶ 16; 6/19/00 Underlying Complaint ¶¶ 17, 20, Ex. A to Defendants' Notice of Removal ("Und.Compl."). On June 19, 2000, Martin brought a personal injury suit in the Supreme Court of the State of New York in Kings County against UBS, Park–Lane, and Richard C. Fisher, whom she identified as general partner in Park–Lane and manager of the building at 299 Park Avenue. Compl. ¶¶ 2, 16; Und. Comp. ¶¶ 5–7. Martin's complaint alleged negligence on the part of all three defendants. Und. Compl. ¶¶ 23–27. In their answer, Park–Lane and Fisher cross-claimed against UBS for indemnity based on the Lease Provision. Defendants' Memorandum of Law ("Def.Mem.") at 3; Plaintiff's Memorandum of Law ("Pl.Mem.") at 2. The case is still pending in state court. Def. Mem. at 4; Pl. Mem. at 4.

**\*3** On July 12, 2000, plaintiff sent a demand letter to UBS for defense and indemnification of all costs arising from the Martin suit. 7/12/00 Travelers Letter, Ex. A to Affidavit of Nicholas R. Caiazzo ("Caiazzo Aff."), Attorney for Plaintiff. This triggered a correspondence between the parties in negotiation of their respective rights under the Lease Provision. Caiazzo Aff., Exs. A–G. On August 2, 2001, Winterthur, UBS's insurance company, sent a letter to plaintiff agreeing to assume the defense of and to indemnify Park–Lane with certain exceptions. 8/2/01 Winterthur Letter, Ex. E to Caiazzo Aff ("the August 2nd Letter"). The Letter stated that Winterthur would not pay the investigative costs or attorneys' fees incurred prior to its assumption of the defense. *Id.* It also stipulated that if it were established at any time during the litigation that Park–Lane had been negligent and had caused Martin's injuries, Park–Lane would resume the defense and pay any resulting judgment. *Id.*

In a letter dated September 5, 2001, plaintiff rejected the conditions set forth by Winterthur. 9/5/01 Travelers Letter, Ex. F to Caiazzo Aff. Plaintiff presented alternate terms and stated that "[s]hould the above counter-offer be rejected, the Travelers hereby rejects the terms of the August 2, 2001 conditional acceptance of the defense tender of the Fisher Park–Lane Company. Additionally, please be advised that a declaratory judgment action will be commenced should this matter not be resolved in the near future." *Id.* Winterthur responded by renewing its original offer, and further proposing a compromise by which it would add Fisher —who, Winterthur noted, was not named in the Lease—to the proposed defense agreement if Travelers would drop its claim for existing legal and investigative fees. 10/29/01 Winterthur Letter, Ex. G to Caiazzo Aff. Instead, Travelers followed through on its threat by bringing this action in New York state court. Defendants removed the case to this Court based on diversity of citizenship. Defendants' Notice of Removal ¶ 7.

## III. DISCUSSION

### A. Defendant Winterthur

Winterthur argues that its status as UBS's insurer does not give rise to liability for unadjudicated claims against UBS by a third party. Because plaintiff is neither insured by Winterthur nor in possession of a judgment against UBS, Winterthur contends that plaintiff fails to state a viable claim against it. In response, plaintiff argues that Park–Lane is an additional insured under the Winterthur–UBS policy, and alternatively that even an uninsured party who stands to benefit from a policy may bring an action for a declaratory judgment.

### 1. The Lack of Privity between Park–Lane and Winterthur

Plaintiff's only allegation against Winterthur is that UBS was and is insured by Winterthur. Compl. ¶¶ 17, 21. In its Memorandum, however, plaintiff argues that by virtue of Winterthur's August 2nd Letter, in which it agreed to assume the defense and indemnity of Park–Lane under specified terms, Winterthur effectively admitted that plaintiff was an additional insured under UBS's policy. Pl. Mem. at 6–7.

**\*4** Plaintiff did not reference the August 2nd Letter in the complaint nor attach it thereto; nevertheless, under an exception to the general rule that material outside the Complaint will not be considered on a Rule 12(b)(6) motion, plaintiff asks the Court to consider the document because plaintiff had actual notice of it and relied on it in bringing this suit.[2] *See Chambers v. Time Warner, Inc.,* 282 F.3d

147, 153 (2d Cir.2002). In any case, however, the Letter is unavailing: "[C]overage cannot be created through equitable estoppel" unless an insurer "undertakes the defense of the case, in reliance on which the insured suffers the detriment of losing the right to control its own defense." *See Interstate Indem. Co. v. Cont'l Ins. Co.,* No. 94 Civ. 5201, 1998 WL 118165, at \*3. (S.D.N.Y. Mar. 16, 1998). No such reliance occurred, or is even alleged, in this case. The Letter was merely an offer made in the course of pre-litigation correspondence between the parties. Plaintiff rejected that offer and cannot revive it for other purposes here. By hypothesizing that Park–Lane is an additional insured under the Winterthur–UBS policy, plaintiff is attempting an end-run around the rule barring a stranger to a policy from suing the insurer in the absence of a judgment against the insured.

### 2. Third Party Suits Against Insurers

Plaintiff next contends that as a third party who stands to benefit from the Winterthur–UBS policy, it is permitted to bring a declaratory judgment action against Winterthur. If this were correct, the declaratory judgment action could proceed, but not the claim against Winterthur for damages.

Under New York law, a stranger to an insurance contract may not bring an action for damages against the insurer until and unless a judgment has issued against the insured. *See Jefferson v. Sinclair Refining Co.,* 10 N.Y.2d 422, 427 (1961). Section 3420 of the Insurance Law provides that a third party judgment creditor may sue an insurer. *See N.Y. Ins. Law § 3420 (McKinney);*[3] *Richards v. Select Ins. Co.,* 40 F.Supp.2d 163, 166 (S.D.N.Y.1999) (citing *Thrasher v. United States Liab. Ins. Co.,* 19 N.Y.2d 159, 166 (1967)).[4] Because plaintiff is a stranger to the Winterthur–UBS policy, and no judgment has yet been rendered against UBS, New York law precludes plaintiff's suit against Winterthur for damages. Whether the declaratory judgment action may proceed, however, presents a thornier question.

Only the Appellate Division Second Department holds that "[a] party who is not privy to an insurance contract but would nevertheless benefit from the insurance policy may bring a declaratory judgment action to determine whether the insurer owes a defense and/or coverage under the policy." *Watson v. Aetna Cas. and Sur. Co.,* 675 N.Y.S.2d 367, 368 (2d Dept.1998) (quoting *Tepedino v. Zurich–American Ins. Group,* 632 N.Y.S.2d 604, 605 (2d Dept.1995)). Not

surprisingly, all of the cases cited by plaintiff are from the Second Department. However, the other Departments that have spoken on the issue have adopted the opposite rule. *See, e.g., Abdalla v. Yehia,* 667 N.Y.S.2d 736, 737 (1st Dept.1998); *Hershberger v. Schwartz,* 604 N.Y.S.2d 428, 429 (4th Dept.1993). [5]

**\*5** Federal courts in this Circuit have adopted the latter view, both because the greater weight of state authority lies with the First and Fourth Departments, and because their reasoning better comports with the plain language of section 3420. *See Hartford Fire Ins. Co. v. Mitlof,* 123 F.Supp.2d 762, 768–69 (S.D.N.Y.2000); *NAP, Inc. v. Shuttletex, Inc.,* 112 F.Supp.2d 369, 377–78 (S.D.N.Y.2000); *Richards,* 40 F.Supp.2d at 169. "[A]bsent any legally cognizable interest in the insurance contracts at issue, there is no justiciable controversy between a third party and the insurer to give such party standing.... [A]ny declaratory relief under these circumstances would be premature if the third party's standing to maintain such action is contingent on the occurrence of a future event which may not happen." *NAP,* 112 F.Supp.2d at 378 (citing *Clarendon Place Corp. v. Landmark Ins. Co.,* 587 N.Y.S.2d 311, 313 (1st Dept.1992)) (internal quotation marks omitted).

Though the Declaratory Judgment Act gives federal courts broad discretion in entertaining suits seeking declaratory relief, a court sitting in diversity must tailor its decision to the substantive rights recognized by state law. *Id.* at 376–77; *Universal Acupuncture Pain Servs. v. State Farm Mut. Auto. Ins. Co.,* 196 F.Supp.2d 378, 384 (S.D.N.Y.2002). "A declaratory judgment is a remedy. Its availablity does not create an additional cause of action or expand the range of factual disputes that may be decided by a district court sitting in diversity." *Richards,* 40 F.Supp.2d at 169. As plaintiff's declaratory judgment action against Winterthur would most likely fail were it to reach New York's highest court, it cannot be heard in this diversity action governed by New York's substantive law. Plaintiff's claims against Winterthur must therefore be dismissed pursuant to Rule 12(b)(6).

B. Defendant UBS

UBS argues that as long as the underlying personal injury suit is still pending, plaintiff's claims against it are not yet ripe for adjudication. UBS is partially correct. Plaintiff seeks a declaratory judgment that UBS has a duty both to defend and indemnify it in the underlying suit. Because those two duties are legally distinct, I will discuss each in turn.

1. The Duty to Defend
"A duty to defend is broader than the duty to indemnify." *Town of Oyster Bay v. Employers Ins. of Wausau,* 702 N.Y.S.2d 630, 632 (2d Dept.2000). The test is in the complaint: "The duty to defend arises whenever the allegations ... fall within the scope of the risks undertaken ... regardless of how false or groundless those allegations might be. The duty is not contingent on the insurer's ultimate duty to indemnify should the insured be found liable, nor is it material that the complaint against the insured asserts additional claims which fall outside the policy's coverage or within its exclusory provisions." [6] *Stonewall Ins. Co. v. Nat'l Gypsum Co.,* No. 86 Civ. 9671, 1992 WL 123144, at \*6 (S.D.N.Y. May 27, 1992) (quoting *Seabord Sur. Co. v. Gillette Co.,* 64 N.Y .2d 304, 310 (1984) (citations omitted)).

**\*6** Thus, if the complaint contains at least one allegation covered by the promise to defend, the insurer or promisor must provide a defense to the entire action. *See Physicians' Reciprocal Insurers v. Loeb,* 738 N.Y.S.2d 68, 70 (2d Dept.2002). Further, the same allegations that trigger a duty to defend trigger an obligation to pay defense costs. *See Lowy v. Travelers Prop. and Cas. Co.,* No. 99 Civ. 2727, 2000 WL 526702, at \*2 n. 1 (S.D.N.Y. May 2, 2000). Only where the promisor can prove as a matter of law that the claimed injury is excluded by the contract will the duty to defend be abrogated. *Id.* at \*2.

In the Lease Provision, UBS agreed to defend Park–Lane provided the latter is not at fault in causing the alleged injury. Because the Underlying Complaint attributed Martin's injury alternatively to the negligence of UBS, Park–Lane, and Fisher, plaintiff has stated a claim for a declaratory judgment as to UBS's duty to defend. For the same reason, plaintiff has also stated a claim for damages for UBS's failure to defend from the commencement of the underlying suit. Contrary to UBS's contentions, its duty to defend does not hinge on the resolution of the negligence issue in the underlying suit. In fact, although Park–Lane and Fisher's cross-claims have brought the question of UBS's duty to indemnify before the state court, the question of its duty to defend will not be addressed in that proceeding. At least as to the latter issue, then, the grounds for UBS's abstention argument fall away.

2. The Duty to Indemnify

In contrast to the duty to defend, the duty to indemnify turns not on the allegations of the complaint but on the actual liabilities as borne out by the facts. *See* Stonewall, 1992 WL 123144, at *8 (citing Servidone Constr. Corp. v. Sec. Ins. Co., 64 N.Y.2d 419, 424 (1985)). Where the facts on which the Court's decision depends have yet to unfold, a declaratory judgment action is "not currently a justiciable and ripe controversy and ... dismissal of the complaint without prejudice is the correct disposition of the action. This leaves open the possibility that at some future time a more complete development of the facts might lead to a different result." Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp., 90 F.3d 671, 676 (2d Cir.1996).

The Supreme Court has defined a justiciable controversy as one that is "definite and concrete, touching the legal relations of parties having adverse legal interests.... It must be a real and substantial controversy admitting of specific relief through a decree of conclusive character...." Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240–41 (1937). There is no mechanical test for determining whether a suit presents such a controversy. *See* Lloyd's, 90 F.3d at 675 ("The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree...."). Nevertheless, in cases such as this—where the key facts can and will be established in an underlying proceeding—the lack of ripeness is palpable.

*See, e.g.,* Pavarini Constr. Co. v. Liberty Mut. Ins. Co., 704 N.Y.S.2d 72 (1st Dept.2000) ("Whether the underlying plaintiff's injuries come within the policy's exclusion for injuries caused by the additional insureds' negligence is a question that must await a determination of liability in the underlying action.... [A]ccordingly, defendant's arguments on appeal bearing upon whether it has an obligation to indemnify the additional insureds are not properly before this Court."); Statt v. Am. Home Assur. Co., 595 N.Y.S.2d 700, 701 (4th Dept.1993) ("This declaratory judgment action is premature. The extent of [defendant's] duty to indemnify must necessarily depend on the resolution of an issue that, if it arises, will be decided in the underlying action."). A decision by this Court as to UBS's duty to indemnify would be both

hypothetical and speculative, and might be rendered moot by the result of Martin's suit.

**\*7** Plaintiff argues that based on the facts of the underlying case—chiefly, that UBS rather than Park–Lane was responsible for maintaining the equipment involved in the injury—a judgment of liability against Park–Lane or Fisher is exceedingly unlikely. In essence, plaintiff asks this Court to exercise jurisdiction over the action based on the ostensibly high probability that the Fishers will prevail in the underlying suit. In support of its argument, plaintiff cites E.R. Squibb & Sons, Inc. v. Lloyd's & Co., 241 F .3d 154 (2d Cir.2001), in which the Second Circuit allowed a declaratory judgment action pertaining to insurers' future liabilities. "There are many issues still to be resolved in this lawsuit, and the ultimate resolution of those issues can very well affect the liability of each of the excess carriers.... [T]here is a substantial enough controversy that the matter should be fully resolved in this case and not left to future litigation when the claims are actually made against the excess policy." Id. at 176–77. In that case, the Court recognized that one or more of the issues to be decided in the suit rested on certain likely contingencies; the central difference, however, was that there was no underlying proceeding in which those contingencies would be resolved.

Here, the single decisive issue of negligence will be determined by the state court in the underlying action. Any decision on UBS's duty to indemnify plaintiff must therefore await that determination. [7] Accordingly, plaintiff's claim for a declaratory judgment regarding UBS's duty to indemnify, as well as plaintiff's related claims for damages, contribution, and common law indemnification, are dismissed pursuant to Rule 12(b)(1).

III. CONCLUSION

For the foregoing reasons, Winterthur's motion to dismiss is granted, and UBS's motion to dismiss is granted in part and denied in part. A conference is scheduled for July 16 at 4:30 p.m.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 1391920

## Footnotes

1    Defendants' assertion that plaintiff's suit is not ripe amounts to an attack on subject matter jurisdiction, pursuant to Rule 12(b)(1), rather than an argument for dismissal based upon Rule 12(b)(6). *See Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–41 (1937) (holding that the existence of an actual, justiciable controversy is a Constitutional prerequisite for the exercise of jurisdiction).

2    "We reiterate here that a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (emphasis in original). Whether plaintiff in this case *relied* on the Letter in drafting the Complaint is a question that need not be answered here for the reasons discussed below.

3    Both the Second Circuit and the New York Court of Appeals have held that although so-called "direct action statutes" have procedural consequences, they are substantive in character and therefore applicable in diversity cases under the *Erie* doctrine. *See Richards v. Select Ins. Co.,* 40 F.Supp.2d 163, 167 (S.D.N.Y.1999) ("the requirement of a judgment against the insured as a predicate to asserting a claim is best viewed as an element of the rights created in § 3420, and not merely a procedural, or timing, control") (citing *State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld,* 921 F.2d 409, 416 (2d Cir.1990); *Oltarsh v. Aetna Ins. Co.,* 15 N.Y.2d 111, 116 (1965).

4    Direct action statutes such as New York's mark a departure from the common law, which bars suits by third parties against insurers under all circumstances. *SeeRichards,* 40 F.Supp.2d at 167.

5    The Third Department has not ruled on this issue.

6    Although UBS is not Park–Lane's insurer, its promise in the Lease Provision to defend and indemnify Park–Lane contains language most often used in insurance contracts; therefore, the Court looks to insurance cases to aid in construing the clause.

7    Because these claims are not yet ripe, I need not reach the question of whether the abstention doctrine would require deference to the state court proceeding. *See Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800 (1976) (setting forth "exceptional circumstances" test for whether a federal court should abstain from exercising jurisdiction over a suit while a parallel action proceeds in state court). *But see Wilton v. Seven Falls Co.,* 515 U.S. 277 (1995) (prescribing discretionary standard for abstention in declaratory judgment suits). I note, however, that by virtue of Park–Lane and Fisher's cross-claims, the state court will directly address the issue of plaintiff's right to indemnification.

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 234 of 247

U.S. Bank, Nat. Ass'n v. Commonwealth Land Title Ins. Co., Not Reported in F.Supp.3d...

2015 WL 1291151

2015 WL 1291151
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

U.S. BANK, NATIONAL ASSOCIATION, Plaintiff,
v.
COMMONWEALTH LAND TITLE INSURANCE
COMPANY, Defendant, and Third–Party Plaintiff,
v.
Anm Funding LLC, Abe Klein, Noah Hershkovitz,
Leah Hershkovits, Tsviny Hershkovitz,
Lowenthal & Kofman, P.C., Martin Kofman,
Norman Tepfer, Samuel Gluckman, and
Roland Fields, Third Party Defendants.

No. 13 Civ. 7626(NRB).
|
Signed March 23, 2015.

MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

*1 Presently before the court is a motion on behalf of third-party defendants Lowenthal & Kofman, P.C., Martin Kofman, and Norman Tepfer (collectively, the "Lowenthal defendants") to dismiss the third-party complaint brought by defendant/third-party plaintiff Commonwealth Land Title Insurance Company ("Commonwealth"). For the reasons stated herein, this motion is granted.

BACKGROUND

I. Factual Background
On November 29, 2007, plaintiff U.S. Bank National Association ("U.S.Bank") made a loan to Laura Fields, the repayment of which was to be secured by a mortgage on Fields's property. TPC ¶ 13. At the closing of the loan and mortgage, Commonwealth issued U.S. Bank a loan policy insuring the mortgage as a first lien and indemnifying U.S. Bank against losses suffered as a result of title defects. *Id.* ¶ 22; Cmplt. ¶¶ 16–26. However, unbeknownst to both parties, Laura Fields had in fact died one month before the closing, and her November 2007 mortgage had been signed by an imposter—a fact U.S. Bank first discovered nearly

two years later, when it unsuccessfully attempted to foreclose on the mortgage after Fields appeared to default in March 2009. TPC ¶ 20; Cmplt. ¶¶ 27–29. U.S. Bank consequently submitted a title insurance claim to Commonwealth, which Commonwealth denied on March 1, 2012. Cmplt. ¶¶ 31, 33.

Commonwealth alleges that fraud on the part of several third-party defendants allowed Fields's death to go undetected and her mortgage to be signed by an imposter. Specifically, Commonwealth alleges that, before the closing, U.S. Bank's mortgage broker and several of its employees submitted false credit reports, false employment verifications, and a false property appraisal in order to induce U.S. Bank to make the loan. TPC ¶ 14. At the closing, Norman Tepfer, a notary and agent of Lowenthal & Kofman, which acted as U.S. Bank's settlement agent at the closing, allegedly fraudulently acknowledged the imposter's signature as Fields's. *Id.* ¶ 21. Finally, according to Commonwealth, the Lowenthal defendants submitted a false HUD–1 after the closing, knowingly omitting the payment of proceeds to third party who is believed to have laundered the funds. *Id.*

II. Procedural Background
U.S. Bank filed a complaint on October 28, 2013, alleging that Commonwealth breached its insurance contract with U.S. Bank by denying U.S. Bank's claim, and Commonwealth answered on December 13, 2013. On July 17, 2014, after a period of discovery, Commonwealth sought leave to implead parties from whom it sought indemnification, citing the recent disclosure of a document regarding loan disbursement as the basis for the delayed impleader. On August 6, 2014, we issued an order granting Commonwealth's motion, and on August 11, 2014, Commonwealth filed a third-party complaint (the "TPC") seeking contribution and/or indemnification from several third-party defendants, including the Lowenthal defendants. The Lowenthal defendants moved to dismiss the TPC on December 24, 2014, and the motion was fully briefed on February 5, 2014.

DISCUSSION

I. Legal Standard
*2 When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. *Harris v. Mills,* 572 F.3d 66, 71 (2d Cir.2009); *Kassner v. 2nd Ave. Delicatessen Inc.,*

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 235 of 247

U.S. Bank, Nat. Ass'n v. Commonwealth Land Title Ins. Co., Not Reported in F.Supp.3d...

2015 WL 1291151

496 F.3d 229, 237 (2d Cir.2007). A motion to dismiss may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Still v. DeBuono,* 101 F.3d 888, 891 (2d. Cir.1996). Nevertheless, a plaintiff's "[f]actual allegations must be enough to raise a right of relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Thus, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face," and if a plaintiff "ha [s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly,* 550 U.S. at 570. This pleading standard applies in "all civil actions." *Iqbal,* 556 U.S. at 684 (internal quotation marks omitted).

## II. Analysis

### A. Contribution

First, the Lowenthal defendants assert that the TPC fails to state a claim for contribution because, under N.Y. C.P.L.R. § 1401, parties may not seek contribution for purely economic loss and thus may not seek contribution where, as here, the underlying action is one for breach of contract. *See Conestoga Title Ins. Co. v. ABM Title Servs., Inc.,* 10 Civ. 3017(CM), 2012 WL 2376438, at *6 (S.D.N.Y. June 20, 2012) (holding that, under New York law, "a contribution claim is not available to one ... potentially liable only for breach of contract" and that "there is no contribution available if the measure of damages is purely economic"). [1] Commonwealth concedes that its claim for contribution is not available under New York law. *See* Def's Br. at 6. Commonwealth's claim for contribution is thereby dismissed.

### B. Indemnification

Second, the Lowenthal defendants argue that the TPC fails to state a claim for indemnification because Commonwealth cannot be found liable to U.S. Bank without having been found itself at fault, thereby barring it from receiving indemnification.

In the absence of contractual right to recovery—which neither party has here asserted—a "party who has itself actually participated to some degree in the wrongdoing cannot receive the benefit of the doctrine [of implied indemnification]."

*17 Vista Fee Assoc. v. Teachers Ins. And Annuity Ass'n of Am.,* 259 A.D.2d 75, 80, 693 N.Y.S.2d 554 (App. Div. 1st Dep't 1999). *See also Monaghan v. SZS 33 Associates, L.P.,* 73 F.3d 1276, 1285 (2d Cir.1996) ("New York case law supports a proposition ... that common-law indemnity is barred altogether where the party seeking indemnification was itself at fault ...."); *id.* (citing *Trustees of Columbia Univ. v. Mitchell/Giurgola Assocs.,* 109 A.D.2d 449, 492 N.Y.S.2d 371, 375 (App.Div. 1st Dep't.1985) ("Since the predicate of common law indemnity is vicarious liability without actual fault on the part of the proposed indemnitee, it follows that a party who has itself actually participated to some degree in the wrongdoing cannot receive the benefit of the doctrine.")).

**\*3** Consequently, where the underlying action is one for breach of contract, a defendant may not seek indemnification because the defendant, if found liable to the plaintiff in the underlying action, will have necessarily participated in the wrongdoing by breaching the contract. *See, e.g., Knight v. H.E. Yerkes & Associates, Inc.,* 675 F.Supp. 139, 143 (S.D.N.Y.1987) ("[Where] the underlying action sounds in contract, not in tort, there is no possible set of facts on which it can be true that [the defendant] was not at least partially responsible for harm, for it was [the defendant] that allegedly breached the contract, not [third-party defendant]. There can therefore be no cause of action in indemnity."); *Intesa Sanpaolo S.p.A. v. Piliero,* 08 Civ. 2223(LLS), 2008 WL 3465032, at *1 (S.D.N.Y. Aug. 12, 2008) ("New York law bars [defendant's] claims against the third-party defendants for contribution and non-contractual indemnification because the claim against him is for breach of contract, not a tort."); *Highland Capital Mgmt., L.P. v. Schneider,* 533 F.Supp.2d 345, 354–55 (S.D.N.Y.2008) (PKL) ("Fatal to the [defendants'] implied-in-law indemnification claim is that the underlying claim by [the plaintiff] sounds in contract, and not tort.... [I]f the jury ultimately finds that [defendants breached a contract], the [defendants] cannot be indemnified by [the third-party defendant]."); *Amusement Indus., Inc. v. Stern,* 693 F.Supp.2d 319, 326–27 (S.D.N.Y.2010) (LAK) ("Indemnity is not available here [because u]nder New York law, indemnification is not available where the party seeking indemnification was 'partially at fault' or 'responsible in any degree' .... [W]hile Stern asserts he was 'duped' by Egert and did nothing wrong, the third-party complaint does not provide a scenario under which Stern could be found both free from fault and at the same time liable for damages to Amusement because of Egert. In other words, Stern has not explained

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 236 of 247

U.S. Bank, Nat. Ass'n v. Commonwealth Land Title Ins. Co., Not Reported in F.Supp.3d...

2015 WL 1291151

how he could be found vicariously liable—or liable in any other way imputed by law—because of his relationship with Egert. Accordingly, Stern has not stated a claim for indemnity against Egert.").

The TPC, which seeks indemnification for an underlying breach of contract, thus necessarily fails to state a claim for indemnification. Because Commonwealth must have itself breached the contract to have been found liable to U.S. Bank, it cannot be said to have incurred damages purely as a result of vicarious liability or by operation of law. As a result, the TPC does not provide a scenario under which Commonwealth could be found both liable for damages to U.S. Bank and at the same time free from fault, thereby barring Commonwealth from receiving the benefit of implied indemnification.

Notably, Commonwealth does not rebut this principle, but rather reasserts that Commonwealth is entitled to indemnification as a result of Tepfer's wrongful notarization of the imposter's signature. Specifically, Commonwealth argues that Tepfer is liable—and the other Lowenthal defendants are vicariously liable—in indemnification to Commonwealth pursuant to N.Y. Exec. Law § 135, which states that a notary will be liable to a party for any damages caused by his misconduct if the party can show both notarial misconduct and that such misconduct was the proximate cause of the party's injury. It also asserts more generally that Commonwealth is entitled to indemnification from the Lowenthal defendants because they "participated in a conspiracy to defraud plaintiff and cause a forged signature of an imposter to be acknowledged on a mortgage." Def's Br. at 1.

**\*4** However, as the Lowenthal defendants counter, Commonwealth provides no basis on which to conclude that the law barring Commonwealth's indemnification claim—namely, that Commonwealth cannot be both liable to U.S. Bank and free from fault and therefore cannot seek indemnification—has been abrogated in the context of notarial misconduct or third-party fraud. None of the cases cited by Commonwealth in support of its position controvert the principle that participation in wrongdoing, and specifically liability for an underlying breach of contract claim, will bar indemnification. See, e.g., 📄 Plemmenou v. Arvanitakis, 39 A.D.3d 612, 833 N.Y.S.2d 596 (App.Div. 2nd Dep't.2007) abrogated on other grounds by Butler v. Catinella, 58 A.D.3d 145, 868 N.Y.S.2d 101 (App.Div.2008) (permitting indemnification based on a notary's misconduct where the plaintiff sought to declare a lien held by the

bank void, because the action—for rescission rather than breach of contract—could have resulted in the bank incurring damages in a judgment for the plaintiff without the bank having been found at fault); In re Lowbet Realty Corp., 43 Misc.3d 587, 981 N.Y.S.2d 285 (Sup.Ct.2014) (permitting indemnification based on allegations of third-party fraud where the statute governing the underlying action permitted rescission without a finding of fault). Indeed, several of the cases cited by Commonwealth expressly affirm the principle that a defendant's claim for indemnification will not lie if the defendant's liability is more than vicarious. See In re Lowbet Realty Corp., 981 N.Y.S.2d at 292–93 ("If [defendant] is found liable to petitioner for rescission based on fraud, it would not be able to obtain indemnification, since its loss would result from its own culpability in the transfer of title in violation of petitioner's rights. Under such circumstances, [its] liability would not be only vicarious, and [it] would not be entitled to indemnification. [However], the statutory claims for rescission and an accounting pursuant to Business Corporation Law § 1114 [brought here] may, in effect, impose vicarious liability on [defendant] ... because section 1114 does not require the court to find the recipient of the corporate property at fault before setting aside a sale.");

📄 Am. Home Assur. Co. v. Nausch, Hogan & Murray, Inc., 71 A.D.3d 550, 897 N.Y.S.2d 413 (2010) ("[T]he record is sufficient at this juncture to support a theory that plaintiffs' liability was vicarious only, and therefore an indemnity claim is appropriate."). Thus, the wrongdoing limitation on indemnification still applies and Commonwealth's claim for indemnification must be dismissed.

Although we are obligated under this precedent to dismiss the TPC, we recognize that dismissal of Commonwealth's recourse to third parties poses a harsh prospect, which could result in injustice to Commonwealth should Commonwealth be found liable to U.S. Bank purely as a result of third parties' fraud or misconduct and through no fault of its own. However, our dismissal of Commonwealth's claims for contribution and indemnification does not necessarily preclude Commonwealth from pursuing direct claims against the third-party defendants, either for violation of Exec. Law § 135 or more generally for fraud. [2] It should be clear that we intend to express no view on the ultimate merits of any such claim(s).

### CONCLUSION

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 237 of 247

U.S. Bank, Nat. Ass'n v. Commonwealth Land Title Ins. Co., Not Reported in F.Supp.3d...

2015 WL 1291151

**\*5** For the aforementioned reasons, the motion to dismiss is granted. This Memorandum and Order resolves Docket Nos. 103 and 104.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1291151

## Footnotes

1    *See also* Bd. of Educ. of Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley, 71 N.Y.2d 21, 523 N.Y.S.2d 475, 517 N.E.2d 1360, 1364 (N.Y.1987) ("We find nothing in the legislative history or the common-law evolution of the statute on which to base a conclusion that CPLR 1401 was intended to apply in respect to a pure breach of contract action such as would permit contribution between two contracting parties whose only potential liability to the plaintiff is for the contractual benefit of the bargain."); *Trump Vill. Section 3, Inc. v. New York State Hous. Fin. Agency,* 307 A.D.2d 891, 764 N.Y.S.2d 17, 23 (App.Div. 1st Dep't.2003) ("Where a plaintiff's direct claims against a codefendant seek only a contractual benefit of the bargain recovery, [even] tort language notwithstanding, contribution is unavailable.").

2    While the Lowenthal defendants suggest that such claims would be untimely, it is not yet apparent that either claim would in fact be time-barred. Actions for both fraud and violations of Section 135 are governed by a six-year statute of limitations, *see* N.Y. C.P.L.R. § 213; *Bank of New York Fin. Corp. v. Mitchell–B.J. Ltd.,* 222 A.D.2d 217, 634 N.Y.S.2d 486, 487 (App.Div. 1st Dep't.1995), such that claims here would be untimely if measured from the date of the loan and notarization, in November 2007. However, claims for fraud may run from discovery of the alleged fraud rather than from the date of notarization. *See* N.Y. C.P.L.R. § 213(8) ("[T]he time within which the action must be commenced shall be the greater of six years from the date the cause of action accrued or two years from the time the plaintiff ... discovered the fraud, or could with reasonable diligence have discovered it."). Likewise, case law suggests that a cause of action under § 135 will not accrue until injury, i.e. the party has parted with its money. *See, e.g., Marine Midland Bank, N.A. v. Stanton,* 147 Misc.2d 426, 556 N.Y.S.2d 815, 817 (Sup.Ct. Monroe Cnty.1990) ("Section 135 of the Executive Law creates a cause of action for persons injured by reason of notarial misconduct. By its very language there is no cause of action absent injury. Therefore, it follows that the misconduct is not the triggering factor for computation of the statute of limitations, but rather the injury."). As a result, Commonwealth may yet be able to bring such claims against third-party defendants.

---

End of Document                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# England and Wales Court of Appeal (Civil Division) Decisions

---

**You are here:** BAILII >> Databases >> England and Wales Court of Appeal (Civil Division) Decisions >> Waite v Paccar Financial Plc [2012] EWCA Civ 901 (10 July 2012)
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2012/901.html*
Cite as: [2012] EWCA Civ 901

---

[New search] [Printable RTF version] [Help]

---

**Neutral Citation Number: [2012] EWCA Civ 901**

Case No: B2/2011/2881; B2/2011/2881 (A)

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE BRIGHTON COUNTY COURT**
**Her Honour Judge Jakens**
**OHM00980**

Royal Courts of Justice
Strand, London, WC2A 2LL

10/07/2012

B e f o r e :

**THE CHANCELLOR OF THE HIGH COURT**
**LORD JUSTICE PATTEN**
and
**LORD JUSTICE MCFARLANE**

———————————

Between:

**Christopher Waite**

- and -

**Paccar Financial Plc**

———————————

**Appellant**

**Respondent**

**Miss January Scott (instructed by Rollits LLP) for the Appellant**

**Mr Thomas Bell (instructed by Stevensdrake) for the Respondent**
**Hearing date : 19 June 2012**
_____

**HTML VERSION OF JUDGMENT**
_____

Crown Copyright ©

**Lord Justice McFarlane :**

1.  This appeal relates to proceedings in the Brighton County Court arising out of the hire and eventual sale of a lorry. The lorry was originally the subject of a lease agreement between a finance house, Paccar Financial Plc ('Paccar'), on the one hand and the hirer, Mr Christopher Waite, on the other. The lease agreement was entered into on 21st October 2003 and related to the hire of a Foden A3-6M lorry. Exercising rights under the agreement, and after the conclusion of the initial period of hire, it was agreed between the parties that the lorry would be sold. Mr Waite identified a potential buyer, but the sale was in fact executed between Paccar and another finance house, Private and Commercial Finance Company Ltd ("Private") who were facilitating the purchase for the ultimate use of the buyer identified by Mr Waite.

2.  Soon after taking delivery of the lorry the new user, a Mr Jones, complained as to the fitness of the vehicle in that it seemed to lack acceptable pulling power in the course of his use of it as the tractor unit for a loaded milk tanker. Mr Jones issued proceedings against Private and, in turn, Private notified Paccar of the dispute, but did not go so far as to issue proceedings against Paccar. Paccar, Private and Mr Jones, through their lawyers, eventually negotiated a settlement in which Paccar contributed £7,000. The proceedings that have been progressing in the Brighton County Court, and now form the subject of this appeal, relate to Paccar's claim against Mr Waite for reimbursement of their £7,000 contribution to the "Jones" settlement together with ancillary costs, including legal fees, relating to it.

3.  The action was heard by Deputy District Judge Mills on 17th May 2011 and concluded with the dismissal of Paccar's claim against Mr Waite. Paccar appealed and, on 29th October 2011, that appeal was allowed by Her Honour Judge Jakens, liability was found to be established against Mr Waite and the question of quantum was remitted to the District Judge for determination. We have now heard Mr Waite's appeal against HHJ Jakens' decision which comes to us pursuant to permission to appeal granted by Lord Justice Gross on 1st February 2012.

**The lease agreement**

4.  The lease agreement between Paccar and Mr Waite, dated 21st October 2003, is on a pro forma produced by Paccar and contains some thirteen substantial clauses of which the following are particularly relevant to this appeal:

    "4. YOUR [i.e. Mr Waite's] OBLIGATIONS

    You will

i) as an obligation surviving termination of this Agreement, indemnify us against any loss, damage, or other expense we incur, (including legal costs on a full indemnity basis and as a result of any third party claim or otherwise), arising directly or indirectly out of the state, condition or use of the Vehicle or in any way arising out of our having entered in this Agreement, (except in the case of death or personal injury caused by our negligence);

….

iii) be responsible, at your own cost, for keeping the vehicle in good condition (allowing for fair wear and tear) and in full working order and for arranging all servicing, maintenance and repairs that may be required at any time, in accordance with the manufacturer's instructions and recommendations and that all replacement parts are of good industry standard. You must make good all damage to the Vehicle, other than fair wear and tear;…."

8. RENEWAL OPTION AND DISPOSAL

a) [Renewal option]

b) If you are not in default of any of your obligations then, on expiry of the hiring of the Vehicle, we may at our discretion appoint you as our sales agent for the Vehicle on the following terms:

i) the vehicle shall be sold at not less than the open market value to a person who is not a connected person for a price first approved by us in writing (a "connected person" being either you or a person who is in our opinion connected with you);

ii) title shall pass on full payment of the purchase price, inclusive of Value Added Tax, to us;

iii) the vehicle must be sold for business use without the benefit of any warranty, representation or condition on our part (save that we can pass good title);

iv) you must indemnify us against all losses, damage, costs, claims and expense arising out of the sale (including legal fees) on a full indemnity basis in connection with any proceedings against us brought by any purchaser; and

v) on receipt of the proceeds of sale, we shall pay to you a sum equal to the Sales Proceeds Percentage (net of VAT) as rebate of Rentals, subject to the amount of such sum not exceeding the total Rentals paid. If the vehicle is not sold within three months, we reserve the right to terminate this agency. "

**First instance hearing**

5. Before Deputy District Judge Mills most of the background factual material was agreed. In addition to

the terms of the leasing agreement to which I have already made reference, it was established that by June 2007 Mr Waite was looking to dispose of the vehicle which was by then some four years old with approximately 460,000 kilometres on the clock. The sale of the lorry, which eventually took place between Paccar and Private, was by written agreement date 15th June 2007. It was an express term of the agreement that the lorry was "sold as seen" for £15,000 plus VAT. Mr Jones subsequently claimed that the vehicle was defective, and in March 2009 issued proceedings against Private for breach of his contract with them, seeking £42,000 and/or damages for breach of Sale of Goods Act 1979 s 14. Paccar were drawn into discussions with Private and Mr Jones. Paccar claim that they sought to make contact with Mr Waite in order to engage him in negotiations, but the Deputy District Judge accepted that Mr Waite probably did not receive any of the relevant communications. The "Jones" proceedings were settled in May 2010 with a Tomlin Order reflecting an agreement by which Private was to pay Mr Jones £8,000 made up of £7,000 from Paccar and £1,000 from Private. It was also agreed that the vehicle would be restored to good working order and Mr Jones would pay Private's legal costs of £10,000 as well as entering into some altered form of hire agreement with them.

6.  In its action against Mr Waite, Paccar claimed £18,918.51 made up of the £7,000 contribution to Mr Jones' case, expert fees of £140.18 and £95.83 and legal costs in relation to the "Jones" dispute of £11,682.00.

7.  During the course of the Jones proceedings and wider negotiations, some expert opinion had been obtained as to the condition of the lorry. Various written reports from these experts were available before the Deputy District Judge, but Paccar's counsel made clear at the start of the hearing that these documents were not relied upon as expert opinion evidence in the present proceedings, but merely as part of the factual background.

8.  The Deputy District Judge heard evidence from Mr Prescott on behalf of Paccar and also, on the other side, from Mr Waite.

9.  In summary the case for Paccar before the Deputy District Judge, as indeed it has remained before the Circuit Judge and before us, is based upon clauses 4 and 8 of the leasing agreement. In particular Paccar claims that:

> a) the state of the vehicle that led Mr Jones to make his complaint must establish a breach of clause 4(iii), being Mr Waite's obligation to keep the vehicle in good condition and in good working order;
>
> b) Mr Waite had breached his obligation under clause 4(i) to indemnify Paccar on a full indemnity basis in relation to loss, damage or expense, including legal costs, as a result of any claim arising directly or indirectly out of the state, condition or use of the vehicle; and
>
> c) Mr Waite must indemnify Paccar under clause 8(b)(iv) against all losses, damage, costs, claims and expenses arising out of the sale of the vehicle on a full indemnity basis in connection with any proceedings brought against Paccar as a result of the "Jones" sale.

10. The Deputy District Judge heard evidence about the state of the vehicle during the final months of Mr Waite's use of it. Mr Waite described how a water leak was detected in January 2007. The relevant manufacturer for this vehicle is DAF and Mr Waite took the vehicle to the local manufacturer's agent. They identified a leak in the head gasket which they purported to repair. Thereafter Mr Waite thought

he detected some loss of pulling power in the vehicle's performance. He took it back to the DAF agency on two subsequent occasions but, despite analysing the vehicle's performance with technical equipment, they advised him that no loss of power could be identified. In his oral evidence Mr Waite sought to quantify the extent to which he noticed a lack of pulling power by describing it as "just slightly intermittent – from personally driving the vehicle before to afterwards, I could just tell there was just the slight drop of power from when it came back out from" the DAF agency. Later he said "it was minimum; the vehicle to me just didn't run as efficiently as it had done before the head gasket". Mr Waite described being told "there is nothing wrong with it" on the two occasions that he took the lorry back to the agency. The following exchange then took place between counsel and the witness:

> "Q: But they said there was nothing wrong with it?
>
> A: Yes
>
> Q: But presumably you knew that was wrong because you were experiencing the loss of performance?
>
> A: Yes but I take it back to people who strip engines down daily; if they say the vehicle is performing on their diagnostic correctly, I cannot take the case any further, can I?
>
> Q: It is not a very satisfactory situation, is it, Mr Waite?
> A: No
>
> Q: You take the vehicle to a garage knowing full well that it is not performing as it should do, the garage is saying there is nothing wrong with it; it is not normal just to take their word for it and just say "well, I must be imagining the loss of power", is it?
> A: Well, what else could I do after I had had it back; the vehicle was still serviceable, the vehicle was still there working. We had lost nothing on the fuel to say it was pulling fault; the fuel was still doing adequate MPG, so……
>
> Q: So in your mind it was not a sufficiently big problem to say the vehicle is not serviceable or performing to standard?
>
> A: No; no."

11. It was agreed evidence that soon after the sale Mr Jones telephoned Mr Waite to complain about a lack of pulling power in the tractor unit. Thereafter Mr Waite had no further communication from Mr Jones. The court had no direct evidence from Mr Jones, but did have an account of his complaints in the documents provided from the "Jones" proceedings.

12. In his shortly stated conclusions the Deputy District Judge dealt first with the claims under clause 8(b) (iv). The focus of his consideration, encouraged as he seems to have been by the advocates, was upon the phrase "any proceedings brought against us by the purchaser". The Deputy District Judge found that the only proceedings that had been issued were by Mr Jones against Private. Paccar were never a party to those proceedings. The proceedings were compromised by agreement. The Deputy District Judge was plain that as no proceedings had been issued against Paccar, it was not open to Paccar to rely

upon this clause to recover damages against Mr Waite.

13.  In relation to clause 4, the Deputy District Judge held that the burden was on Paccar to show that Mr Waite was in breach of this clause. He concluded:

> "from the documents produced to me, it seems that we cannot be clear as to why this vehicle failed. There are comments that there is some form of defect in the vehicle making it prone to head gasket failure. No report is actually clear as to what is wrong with the vehicle. In these specific proceedings there is no expert evidence; all we have are the documents which have been produced within the bundle. Applying the civil test of the balance of probabilities, I cannot find that the defendant is in breach of [clause 4(i)]."

14.  In relation to clause 4(iii) (responsibility to keep the vehicle in good condition and in good working order) the Deputy District Judge recited the history given by Mr Waite of his involvement with the DAF dealership and, in his judgment, asks rhetorically "what more could he do?". The judge rejected Paccar's submission that this was an obligation of strict liability and Mr Waite was obliged to carry on his investigation of the power loss. The judge rejected that submission and concluded:

> "We do not know what the ultimate problem was with the vehicle. It seems to have been prone to gasket problems. I find that [Mr Waite] did keep it in good condition and in accordance with the lease, and on the balance of probabilities the defect was due to factors which could be said to be fair wear and tear, age, mileage and prone to conditions associated with power loss. "

15.  In consequence of these specific decisions, the ultimate conclusion of the judgment was to dismiss Paccar's claim in its entirety.

**First appeal**

16.  Paccar appealed to the Circuit Judge, having been given permission to do so by the Deputy District Judge. The argument on appeal was based upon the same three sub clauses of the leasing agreement with the invitation for the judge to hold that the first instance decision was erroneous in each respect.

17.  In relation to the clause 8(b)(iv) "proceedings" point, HHJ Jakens reviewed the various authorities placed before her by the parties, but held that each of those decisions was applicable in a discrete and narrow way to the facts and substance of the relevant disputes. In my view she was right to do so and it is not necessary for me to make reference now to those authorities. Having fully considered the matter the judge rejected the "proceedings" argument on the basis that the wording of the clause did not incorporate any steps prior to or short of the issue of court proceedings. She held that the meaning of the phrase "any proceedings brought against us by the purchaser" was clear and, as that event did not occur in the context of this dispute, this sub-clause did not apply. She therefore upheld the Deputy District Judge in this regard.

18.  In relation to clause 4(i) (indemnity for loss etc. relating to state or condition of vehicle) the judge held as follows:

a) This was a far reaching clause which survived the termination of the agreement

b) Paccar had suffered loss as a result of a "third party claim or otherwise" being threatened against them by Private;

c) That claim arose as a result of the state or condition of the vehicle;

d) There is a direct connective line between the loss suffered by Paccar and the terms of the agreement and that line is not severed as a result of the fact that the vehicle was "sold as seen" to Private.

19. Consequently the judge held that the District Judge was in error to conclude that, in the absence of cogent evidence to demonstrate why the vehicle failed, this clause would not bite. She held that this was a strict liability clause with no need for Paccar to demonstrate the nature of the fault with the vehicle. In any event, the judge held that there was sufficient evidence on Mr Waite's testimony as to the lack of power in the vehicle, to substantiate Paccar's case which was that the loss incurred resulted from the state or condition of the lorry. The appeal before her therefore succeeded on that point.

20. In relation to clause 4(iii) (responsibility for good condition and full working order) the judge emphasised the high level of responsibility which flowed from the obligation to maintain the vehicle in "full working order". The judge considered that Mr Waite was under a duty to "make good all damage" but had failed to do so. She further held that the pulling power of a lorry was such a fundamental part of the vehicle's condition and performance that "it flies in the face of logic to say that it falls into the category of the kind of cosmetic disrepair or minor mechanical faults that one would normally associate as fair wear and tear. Fair wear and tear is not, in my judgment, full working order"

21. The judge finally held that the requirement under clause 4 (iii) was one of strict liability. For those various reasons she therefore found that Mr Waite had been in breach of clause 4 (iii). The appeal was therefore allowed.

**The arguments on appeal to the Court of Appeal**

22. We have heard argument from Miss Scott on behalf of the Appellant to the effect that the judge was in error in reversing the first instance decision relating to clause 4(i) and 4(iii). In addition she sought to establish that the contract between Mr Waite and Paccar contained an implied term requiring Paccar, if it sold the vehicle, to do so on the basis that no warranty as to fitness was given. Mr Bell on behalf of Paccar sought to uphold the circuit judge's decision and also to reverse the conclusion of both previous judges on the question of whether clause 8(b)(iv) applied, notwithstanding the absence of formal 'proceedings' against Paccar.

23. Counsels' helpful and clear submissions travelled over ground which had, by and large, been the focus of the two earlier judgments. As a result it is not necessary for me to reproduce much of the detail of their respective arguments here. In relation to clause 4(iii), Miss Scott submitted that there was no basis upon which the judge could substitute her view for that of the Deputy District Judge: the judge's finding that Mr Waite's own evidence established a breach was in error; there was no expert evidence in the proceedings and the judge was therefore wrong to rely upon the expert material from the "Jones" dispute; assessment of the condition of the vehicle must take account of its age and mileage; and the judge had misconstrued the clause by holding that it was one of strict liability.

24. In relation to clause 4(i), Miss Scott's case is that the clause can only apply to acts and/or omissions by

Mr Waite whilst the vehicle is in his care during the term of the agreement. Whilst the wording of the clause permitted Paccar to claim damages after the termination of the agreement, the causation of the loss must relate to time during which the vehicle was in Mr Waite's possession and control.

25. In relation to clause 8(b)(iv), despite the fact that no formal proceedings were issued against Paccar either by Private or Mr Jones, Mr Bell referred to case law (*Solomon v Cromwell Group plc* [2011] EWCA Civ 1584 and *Crosbie v Munroe* [2003] EWCA Civ 350) in support of his submission that the word 'proceedings' in this context includes pre-action proceedings.

26. At an early stage in the hearing, the court raised a matter which had not been in the contemplation of either side regarding the syntax within clause 8(b)(iv). It will be recalled that the printed clause reads as follows:

> " (iv) you must indemnify us against all losses, damage, costs, claims and expense arising out of the sale (including legal fees) on a full indemnity basis in connection with any proceedings against us brought by any purchaser;"

The court questioned whether the closing bracket should in fact be placed at the end of the clause, after "purchaser", rather than in its present location after "legal fees". Some support for that suggestion was gained from the reference to 'full indemnity basis' and the fact that a similar, wider bracket was deployed in clause 4(i). The effect of such a redrafting of the clause would be to diminish the impact of the word 'proceedings' so that it would only qualify a claim for legal fees, and not govern the entire clause. It was common ground that the court had jurisdiction, if the facts justified it, to modify a clause by moving a bracket in this manner. Predictably, Mr Bell agreed with the suggestion, but it was firmly contested by Miss Scott. In the event, we have not found it necessary to pursue this point to a conclusion.

**Discussion and conclusions**

27. It is, in my view, necessary to read the hire agreement as a whole in order to determine, not only the internal construction of each clause, but also the inter-relation of each clause with every other in so far as they may overlap.

28. Clause 8 as a whole deals with 'Renewal Option and Disposal'. Clause 8(b) presents as a complete code which covers the circumstances in which the hirer sells the vehicle acting as the agent of the finance company. If there is a sale by the hirer as agent, then each of the sub-sub-clauses within sub-clause 8(b) will apply. It cannot be permissible for the hirer to pick and choose amongst these provisions and seek to rely, for example, on clause 8(b)(iv), without having to accept that any sale to which that provision relates must also be governed by cl 8(b)(iii).

29. Whilst, on the facts of this case, the sale was not, in the event, concluded by Mr Waite acting as agent for Paccar Financial Plc, both parties conducted themselves as if it had been. In accordance with the 8(b) code Mr Waite provided the name of Mr Jones as a willing purchaser, the sale of the lorry was 'as seen', Mr Waite was paid 95% of the proceeds as provided by clause 8(b)(v) and, initially, the only claim made against him was under clause 8(b)(iv). Thus, although this was not a sale to which the provisions of clause 8(b) applied, both parties treated it as if it was and would now be estopped by convention from contending otherwise. It follows that Paccar are able to rely upon clause 8(b)(iv) as against Mr Waite, but he in turn is entitled to rely on clause 8(b)(iii) against Paccar.

30. In any event consideration of what requirement as to contract terms was placed upon the finance company by clause 8(b)(iii) in the event of a direct sale is academic as Paccar did in fact sell the lorry on a 'sold as seen' basis. Once it became apparent that there was a dispute as to the condition of the vehicle and proceedings had been issued between Mr Jones and Private, Paccar, for reasons of its own, opted to make a payment to Private in settlement of any potential claim. That payment was made without any finding or concession as to the condition of the vehicle. Any payment that Paccar have made, or any expense that they have incurred in relation to the dispute with Private and Mr Jones, has occurred outside the terms of the contract with Mr Waite as a result of a free-standing decision by Paccar.

31. In the alternative, any liability that is to fall on Mr Waite must be limited to that which is determined under clause 8(b) when read as a whole. As a result, any sale would be deemed to have been in accordance with clause 8(b)(iii) and no liability would impact on Mr Waite.

32. My central conclusion, therefore, is that the code in clause 8(b) governed this sale, it was a sale without warranty as to the lorry's condition, any payment made by Paccar to Private or Mr Jones did not, and could not as a matter of law, have arisen out of such a sale with the result that there is no liability under clause 8(b) upon Mr Waite in these proceedings.

33. In view of the approach that I consider should be taken to clause 8 as a whole, the question of the position of the bracket in clause 8(b)(iv) does not arise and neither does the need to interpret the definition of 'proceedings'. In like manner, the implied term argued for by Miss Scott is unnecessary as the protection that she seeks for her client is provided by the requirement that clause 8(b)(iii) applies to the sale and he is entitled to the protection that the express terms that are therein provided.

34. In the light of my conclusions in relation to clause 8 it is not strictly necessary to go on to consider the points raised in relation to clause 4 on the basis that it is clause 8 which provides the code in this agreement to govern the event of a sale of the vehicle, if no liability upon Mr Waite arises under clause 8 then it cannot be open to Paccar to establish liability in relation to a sale under clause 4.

35. If it were necessary to do so, I would agree with Miss Scott's submissions that:

> a) Clause 4 applies only to acts and omissions by Mr Waite during the period of his hire of the lorry and not thereafter;
>
> b) It was not open, on the evidence, for HHJ Jakens to rely upon the reports filed in the "Jones" dispute as expert evidence in the present proceedings;
>
> c) The district judge's findings were properly open to him on the evidence and HHJ Jakens was in error in overturning his decision and substituting her own findings.

36. Further, within the internal provisions of clause 4, if a hirer complies with the requirements of clause 4(iii), which the Deputy District Judge found that he had, there can be no separate liability arising from clause 4(i).

37. In the light of these conclusions, I hold that the circuit judge was in error in allowing the appeal from the deputy district judge and that his decision is to be upheld and restored, albeit for the expanded reasons that I have described. I would therefore allow the appeal and restore the original order.

Case 1:18-md-02865-LAK    Document 350-6    Filed 05/20/20    Page 247 of 247    3/30/20, 1:36 PM

**Lord Justice Patten**

38. I agree

**The Chancellor of the High Court**

39. I also agree.

---

**BAILII:** [Copyright Policy](#) | [Disclaimers](#) | [Privacy Policy](#) | [Feedback](#) | [Donate to BAILII](#)
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2012/901.html*