# Exhibit N

Case 1:18-md-02865-LAK   Document 358-14   Filed 06/09/20   Page 2 of 71



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# United Kingdom Supreme Court

---

**You are here:** BAILII >> Databases >> United Kingdom Supreme Court >> Petroleo Brasileiro SA v ENE Kos 1 Ltd [2012] UKSC 17 (2 May 2012)
URL: *http://www.bailii.org/uk/cases/UKSC/2012/17.html*
Cite as: [2012] WLR(D) 132, [2012] UKSC 17, 149 Con LR 76, [2012] 4 All ER 1, [2012] 2 AC 164, [2012] 2 Lloyd's Rep 292, [2013] 1 CLC 1, [2013] 1 All ER (Comm) 32, [2012] 2 WLR 976

---

[New search] [Printable PDF version] [Buy ICLR report: [2012] 2 AC 164] [View ICLR summary: [2012] WLR(D) 132] [Help]

---

*Summary*

Easter Term
**[2012] UKSC 17**
On appeal from: *[2010] EWCA Civ 772*

# JUDGMENT

**Petroleo Brasileiro S.A. (Respondent) *v* E.N.E. Kos 1 Limited (Appellant)**

**before**

**Lord Phillips, President**
**Lord Walker**
**Lord Mance**
**Lord Clarke**
**Lord Sumption**

**JUDGMENT GIVEN ON**

**2 May 2012**

**Heard on 12 January 2012**

| Appellant | Respondent |
|---|---|
| Timothy Brenton QC | Andrew Baker QC |
| (Instructed by Ince & Co LLP) | Henry Byam-Cook |
| | (Instructed by Thomas Cooper Solicitors) |

**LORD SUMPTION (WITH WHOM LORD WALKER AGREES)**

1. This appeal is about the rights of the owner of a time-chartered ship after the ship has been lawfully withdrawn for non-payment of hire. The question must often have arisen in practice but, oddly enough, there is no direct authority upon it.

2. The *MT Kos* is a 301,000 mt VLCC. She was time chartered by her owners to Petroleo Brasileiro SA on 2 June 2006 for 36 months plus or minus 15 days at charterers' option. The charterparty, which was on the Shelltime 3 Form, contained a standard form of withdrawal clause providing that if hire was not paid when due, the owners should have the right to withdraw the vessel "without prejudice to any claim owners may otherwise have on charterers under this charter." It is increasingly common for such contracts to include anti-technicality clauses requiring notice to be given before this right is exercised. But for whatever reason no anti-technicality clause was included in this case. So when, on 31 May 2008, charterers failed to make the advance payment required for the month of June, the owners were entitled to withdraw the *MT Kos*, and did so at 14.41 GMT on 2 June 2008. It is agreed between the parties to the appeal that the charterers' failure to pay hire was not a repudiatory breach of contract.

3. At the time of the withdrawal, the *MT Kos* was at Angra dos Reis in Brazil, where she had just completed the loading of a parcel of cargo for the charterers' account in accordance with their orders. She was awaiting a second parcel, which in the event was not loaded. There were no bills of lading in the hands of third parties. On 2 and 3 June there was a number of exchanges between the parties. The charterers tried to persuade the owners to cancel the withdrawal. The owners refused. Their position was set out in a message at 11.30 GMT on 3 June 2008. They said that they would be willing to reinstate the charterparty or continue on a voyage basis, but only at the current market rate, which was much higher than the charterparty rate. Otherwise, they required the charterers to make prompt arrangements to receive back their cargo. Ultimately, after further fruitless exchanges, the charterers told the owners at 21.36 GMT on 3 June 2008 that they would arrange for the terminal to receive back the cargo. The arrangements were duly made, and discharge of the cargo was completed at 06.00 GMT on 5 June 2008. It is agreed that if the charterers had begun to make arrangements for the discharge of their cargo as soon as they received the owners' notice of withdrawal, the vessel would have been detained at Angra dos Reis for one day. As it was, she was detained there for 2.64 days.

4. The issue before us is whether the owners are entitled to be paid for the service of the vessel during that 2.64 days, and for bunkers consumed in the same period. Leaving to one side points which have fallen by the wayside at earlier stages of these proceedings, their claim is put forward on four bases: (i) under clause 13 of the charterparty; (ii) under an express or implied new contract made after the vessel was withdrawn, to pay for the time and bunkers; (iii) on the ground of unjust enrichment; and (iv) under the law of bailment. The judge, Andrew Smith J, held that they were entitled to succeed on basis (iv), but rejected every other basis which they put forward. The Court of Appeal (Longmore and Smith LJJ and Sir Mark Waller) rejected the claim on all four bases, except that they allowed the owners to recover the value of bunkers consumed in actually discharging the cargo.

*New contract after withdrawal*

5. The argument that there was a new contract turns entirely on the facts and can be shortly dealt with. Once the charterparty came to an end, the owners no longer had any obligation to carry the cargo to its destination or to discharge it. Their duty was to make it available to the charterers. It was then for the charterers to make any necessary arrangements for discharge. For a day and a half after the notice of withdrawal, they did nothing because they declined to accept that the owners were entitled to withdraw the vessel. Each party was trying to persuade the other to resume the contractual service (or a variant of it) on its own terms. Each of them rejected the other's terms. On the footing that the owners were not willing to treat the old contract as subsisting and that no agreement could be reached upon a new one, both parties then submitted to the inevitable. Owners called on charterers to take delivery of their cargo, as charterers in any event were bound to do. The charterers then got on with it. Both courts below held that it was impossible to spell a new contract out of these facts. I agree.

*Implications of the owners' decision to withdraw*

6. Under all the remaining heads of claim, the charterers' argument is substantially the same, namely that any delay or loss arising from the need to discharge the cargo results from the owners' decision to withdraw. That was a decision made at their own election and for their own commercial purposes. The owners, it is

said, must bear the adverse as well as the beneficial consequences of an optional decision made in their own interest. It is clear that this consideration influenced both courts below, and that it was decisive in the minds of the Court of Appeal.

7. The factual premise of the argument is of course correct. It is axiomatic that a withdrawal clause operates at the election of owners, and not automatically. Two main consequences follow from this. The first is that owners will not exercise their right of withdrawal unless it is in their commercial interest to do so. Usually, this will be because market rates of hire have risen. But it may be in owners' interest to withdraw the vessel even if they have not risen, for example, where the charterers are insolvent or owners depend on prompt payment to fund payments under a head charter or charterers' payment record occasions administrative or other difficulties. The second consequence is that any failure on the part of the charterers to pay hire when it falls due will not of itself entitle the owners to damages representing the loss of the bargain or the expenses of termination simply because the owners respond by withdrawing the vessel. This is because the non-payment does not itself destroy the bargain or occasion the expenses, unless in the circumstances it is a repudiation which owners have accepted as such. But the present claim is not a claim for damages, and the non-payment of the June 2008 hire payment in this case was not a repudiation. This, however, is as much as can usefully be said. The fact that rather than perform the contract the owners found it more advantageous to exercise an express right of termination is morally and legally neutral. There are no standards by which the owners' reasons may be judged, other than those to be found in the contract. There is no legal policy specific to termination rights restricting their availability or the consequences of their exercise more narrowly than does the language of the contract or the general law. More generally, the reasons for any particular withdrawal cannot affect the principle to be applied in resolving an issue like the present one.

*Clause 13*

8. Clause 13 provides, so far as relevant:

> "The master (although appointed by owners) shall be under the orders and direction of charterers as regards employment of the vessel, agency or other arrangements. Bill[s] of lading are to be signed as charterers or their agents may direct, without prejudice to this charter... charterers hereby indemnify owners against all consequences or liabilities that may arise from the master, charterers or their agents signing bills of lading or other documents, or from the master otherwise complying with charterers' or their agents' orders..."

9. Clause 13 is the employment and indemnity clause which is found in most modern forms of time charter. The indemnity reflects the breadth of the powers conferred on the charterers as to the employment of the vessel. As Devlin J observed in *Royal Greek Government v Minister of Transport* (1949) 83 Ll L Rep 228, 234, "if [the owner] is to surrender his freedom of choice and put his master under the orders of the charterer, there is nothing unreasonable in his stipulating for a complete indemnity in return." Indeed, the courts have held that, subject to the express terms of any particular charterparty and to the limitations which I shall consider below, the indemnity is not just 'not unreasonable'. It is necessary. It will generally be implied even in forms of time charter (such as the New York Produce Exchange Form) where it is not expressed.

10. The scope of the indemnity in clause 13, like that of the corresponding implied term, is very wide ("all consequences or liabilities that may arise"). But it is not "complete", nor is it unlimited.

11. In the first place, it has to be read in the context of the owners' obligations under the charterparty as a whole. The owners are not entitled to an indemnity against things for which they are being remunerated by the payment of hire. There is therefore no indemnity in respect of the ordinary risks and costs associated with the performance of the chartered service. The purpose of the indemnity is to protect them against losses arising from risks or costs which they have not expressly or implicitly agreed in the charterparty to bear. What risks or costs the owners have agreed to bear may depend on the construction of other relevant

provisions of the contract, or on an informed judgment of the broad range of physical and commercial hazards which are normally incidental to the chartered service, or on some combination of the two. The classic example of a loss within the indemnity, and probably the commonest in practice, is one which arises from the master complying with the charterers' direction to sign bills of lading on terms of carriage more onerous than those of the charterparty. But the indemnity has been held to be applicable in principle to a wide variety of other circumstances, including compliance with an order to load cargo which is dangerous even on the footing that appropriate care is taken of it, or an order to proceed to a legally unsafe port. On the other hand, the indemnity will not apply to risks which the owners have contractually assumed, which will usually be the case where they arise from, for example, their own negligence or breach of contract or consequences such as marine fouling which are incidental to the service for which the vessel was required to be available.

12. Secondly, clause 13 itself limits the indemnity to losses which were caused by complying with the charterers' orders. Like all questions of causation, this one is sensitive to the legal context in which it arises. It depends on the intended scope of the indemnity as a matter of construction, which is necessarily informed by its purpose. We are not therefore concerned with questions of remoteness and foreseeability of the kind which would arise in the law of damages, where the object is to limit the range of consequences for which a wrongdoer may be said to have assumed responsibility in the eyes of the law. Indeed, as Sir Donald Nicholls V-C pointed out in *Triad Shipping Co v Stellar Chartering & Brokerage Inc (The Island Archon)* [1994] 2 Lloyd's Rep 227, 238, the more foreseeable the owners' loss, the more likely it is to be an ordinary incident of the chartered service and therefore outside the scope of the indemnity. The real question is whether the charterers' order was an effective cause of the owner having to bear a risk or cost of a kind which he had not contractually agreed to bear. I use the expression "effective cause" in contrast to a mere "but for" cause which does no more than provide the occasion for some other factor unrelated to the charterers' order to operate. If the charterers' order was an effective cause in this sense, it does not matter whether it was the only one.

13. For present purposes, the relevant order of the charterers was the order to load the parcel of cargo which was on board the vessel when it was withdrawn. In my judgment the loss claimed by owners was the consequence of that order. The need to discharge the cargo in the owners' time arose from the combination of two factors, namely (i) that the cargo had been loaded, and (ii) that the purpose for which it had been loaded (ie carriage under the charterparty to its destination) had come to an end with the termination of the charterparty. In other words, the cargo which charterers had ordered the vessel to load was still on board when the charterparty came to an end. On any realistic view, this was because the charterers had put it there. The analysis would have been exactly the same if the charterparty had come to an end for any other reason with cargo still on board, for example by frustration or expiry at the end of the contractual term.

14. Andrew Smith J and the Court of Appeal both rejected the claim under clause 13 on the ground that the true cause was the owners' withdrawal of the vessel. The judge said at para 35 of his judgment that the owners' claims were "too remote" from the order to load. Longmore LJ, giving the reasons of the Court of Appeal, observed at para 15 that it was

> "not a natural consequence of ordering [the cargo] to be loaded that it would have
> to be discharged at the self-same port. The true cause of the necessity for the
> discharge of the cargo was the fact that, in the light of the withdrawal, the owners
> required the charterers to discharge the cargo."

In effect, therefore, both courts below found that the withdrawal of the vessel was an independent cause of the loss, breaking the chain of causation between the order to load the cargo and the detention of the vessel after withdrawal.

15. The difficulty about this is that because the cargo had been loaded, it had to be discharged somewhere, if not at the port of loading then at its destination or possibly at an intermediate port. The owners' decision to withdraw the vessel or, to be precise, the adventitious timing of that decision, merely determined the place at which the discharge of the cargo occurred. If the owners were to withdraw the vessel, they had to do it

promptly upon hire going into default, and it so happened this was when the vessel was still at the port of loading. But the precise timing of the withdrawal and location of the discharge are irrelevant to the owners' loss. If the vessel had been withdrawn immediately before discharge at the destination, the consequence would have been exactly the same. It is of course true that discharge at the destination would have been a great deal more beneficial to the charterers than discharge at the port of loading. This is a point that seems to have influenced the Court of Appeal. But a claim under clause 13 does not depend on the benefit conferred on the charterers. It depends on the detriment to the owners. They would have suffered a detriment of much the same kind wherever the vessel had discharged.

16. It is fair to say that it was only because of the withdrawal of the vessel that the subsequent discharge of the cargo at Angra dos Reis had to be done in the owners' time and without earning contractual hire. But that is the very reason why the detention of the vessel falls within the indemnity. The need to discharge the cargo in their own time and at their own expense was not an ordinary incident of the chartered service and was not a risk that the owners assumed under the contract. It arose after the chartered service had come to an end in accordance with the withdrawal clause in the contract. Mr Baker QC for the charterers asked rhetorically whether, in that case, the owners would be entitled to claim the cost of sending the vessel in ballast from Angra dos Reis to somewhere else where she could start employment under a new charterparty. But a claim like that, although ultimately dependent on its particular facts, would be likely to fall on the other side of the line. The need for a ballast voyage before a vessel can begin her next employment is an ordinary commercial risk associated with the trading of the vessel under a time charter.

17. It remains to consider the measure of the indemnity on the facts of this case:

> (1) In my judgment the whole of the 2.64 days during which the vessel was detained resulted from the cargo being on board on the charterers' orders at the time of the withdrawal. The time required to remove it was unnecessarily prolonged by the charterers' refusal to recognise the owners' right to withdraw the vessel or to make immediate arrangements for the removal of their cargo from a ship that was no longer at their disposal contractually, but that does not alter the character or cause of the delay.

> (2) It is not suggested that there is any difference, in the circumstances of this case, between (i) the measure of the owners' loss in having to await discharge and then discharge in their own time, and (ii) reasonable remuneration for involuntarily making their ship available during that period. On the face of it, the opportunity cost to the owners of the detention of their ship is the market rate of hire at the time. In the absence of any subsisting contractual obligation to make her available at any other rate, the owners' loss is the market rate of hire for 2.64 days.

> (3) Although the Court of Appeal distinguished between the owners' right to the value of bunkers consumed (in actually discharging the cargo) and the rest of the owners' claim, it seems to me that the two heads of loss must stand or fall together. The owners are therefore entitled to the value of bunkers consumed during the whole period of detention.

*Bailment*

18. Strictly speaking, this makes it unnecessary to address any of the other legal bases put forward by the owners in support of their claim. But I propose to deal with the question whether the owners were also entitled to succeed at common law as non-contractual bailees of the cargo after the withdrawal of the vessel. I do so partly out of respect for the trial judge who decided the case on that basis, and partly because I think that the commercial and legal logic of the claim in bailment is close to the logic which brings it within clause 13 and would bring it within any corresponding implied term. On the whole, one

would expect a coherent system of law to produce a consistent answer under both heads, and in my judgment it does.

19. Unlike many civil law systems, English law does not allow a general right of recovery for benefits conferred on others or expenses incurred in the course of conferring them. In the pejorative phrase which has become habitual, there is no recovery for benefits "officiously" conferred. In *Falcke v Scottish Imperial Insurance Co* (1886) 34 Ch D 234, 248 Bowen LJ said:

> "The general principle is, beyond all question, that work and labour done or money expended by one man to preserve or benefit the property of another do not according to English law create any lien upon the property saved or benefited, nor, even if standing alone, create any obligation to repay the expenditure. Liabilities are not to be forced upon people behind their backs any more than you can confer a benefit upon a man against his will."

20. While this remains the general principle, the exceptions have over the years become more important than the rule. The particular feature of the present case which makes it difficult to apply the general rule is that the original bailment of the cargo had occurred under a previous contractual relationship. The bailment was therefore consensual, albeit that after the withdrawal of the *MT Kos* from the time charter, it was no longer contractual. It is common ground, and clear on the authorities that in these circumstances, the owners had a continuing duty to take reasonable care of the cargo, which they could not escape except by retaining it until arrangements were made to discharge it. But the owners had in no sense officiously put themselves in this position, nor had they (as the charterers put it in argument), "voluntarily assumed" possession of the goods. There is a thin, but consistent line of authority which deals with the legal consequences of this situation.

21. In *Gaudet v Brown* (1873) LR 5 PC 134 ("*Cargo ex Argos*"), petroleum was shipped in London on the *Argos* under a bill of lading providing for delivery at Le Havre. The vessel arrived at Le Havre in the later stages of the Franco-Prussian war, when the port was full of munitions, and the landing of flammable cargoes was forbidden. The master therefore discharged the petroleum into lighters in the outer harbour, and it seems that the shippers (who had retained the bill of lading) could have taken delivery of it there and transported it elsewhere. But they failed to present the bill of lading or to make any arrangements to receive it. Having waited for as long as the port authorities would allow him to, the master reshipped the cargo and carried it back to London. The owners then successfully sued the shippers for freight for the return voyage. The case appears to have been decided on the footing that the contract of carriage was at an end when the *Argos* left Le Havre for London, either because the contractual service had been completed or because the contract was frustrated at Le Havre. The ground of the decision was expressed at pp 165-166 as follows:

> "...not merely is a power given, but a duty is cast on the master in many cases of accident and emergency to act for the safety of the cargo, in such manner as may be best under the circumstances in which it may be placed; and that, as a correlative right, he is entitled to charge its owner with the expenses properly incurred in so doing... In a case like the present, where the goods could neither be landed nor remain where they were, it seems to be a legitimate extension of the implied agency of the master to hold that, in the absence of all advices, he had authority to carry or send them on to such other place as in his judgment, prudently exercised, appeared to be most convenient for their owner; and if so, it will follow from established principles that the expenses properly incurred may be charged to him... The authority of the master being founded on necessity would not have arisen if he could have obtained instructions from the defendant or his assignees. But under the circumstances this was not possible."

22. A year later, the Court of Exchequer reached a very similar conclusion in *Great Northern Railway Co v Swaffield* (1874) LR 9 Ex 132. Mr Swaffield sent his horse by railway to a station at Sandy. The horse

arrived late at night, and the railway company lodged the horse overnight for their own account at a livery stable. Mr Swaffield failed to collect it on the following morning. The only basis on which he was prepared to give any instructions about the fate of his horse was that the railway company assumed all responsibility for storing and delivering it to him from the time of its arrival at Sandy. After four months of this, the railway company lost patience. They unilaterally delivered the horse to Mr Swaffield's farm and then sued him for the livery charges to date. As in *Cargo ex Argos*, the case was decided on the footing that the contract of carriage had come to an end, in this case on the day after the arrival of the horse at Sandy, when the performance required of them as carriers was completed. Counsel did not refer to *Cargo ex Argos*. But Baron Pollock drew attention to it in the course of argument and based his judgment upon it. Having referred to previous authority to the effect that the railway company was bound to take reasonable care of the horse notwithstanding the termination of the contract of carriage, he observed (p 138) that "if there were that duty without the correlative right, it would be a manifest injustice." In his concurring judgment, at page 136, Kelly CB treated the principle as applying because it was necessary for the railway company to incur the expenditure. "They had no choice unless they would leave the horse at the station or in the high road to his own danger and the danger of other people."

23. The principle applied in these cases has commonly been analysed as depending on the agency of necessity of the carrier, which indeed is how Longmore LJ analysed it in his judgment in this case. The existence of a coherent doctrine of agency of necessity has occasionally been doubted: see Goff & Jones, *The Law of Unjust Enrichment*, 8th ed (2011), para. 18-50, where it is suggested that "the cases in which it has been invoked are now best understood in other ways." But so far as the doctrine does have a coherent existence, the case law requires that a bailee of goods should have taken steps in an emergency for the sole benefit of the cargo in circumstances where it was impossible to communicate with the owners of the goods. On that ground, the Court of Appeal held that the doctrine had no application to the present case, and that that was the end of the matter.

24. It is true that in *Cargo ex Argos* the Privy Council used the language of agency and necessity. But the master of the *Argos* was not in fact acting as the cargo-owner's agent, as he would have been if (for example) he had purported to bind him to a contract with a third party, such as a lighterman or a warehouseman. On the face of it, he was simply carrying the goods back to London on behalf of his owners, in circumstances where there was no contract to do so but no reasonable or practical alternative. His claim was for additional remuneration for his own services, in excess of the performance required of him under the contract. As for *Swaffield*, although Baron Pollock cited authority on agency of necessity, on its facts there was no emergency and no agency. The true basis of the judgments in *Swaffield* was that where the property was originally bailed under a contract of carriage and the carrier had no choice but to remain in possession after the contract ended, the existence of a continuing duty to care for the cargo was a sufficient basis for imposing on its owner an obligation to pay. Pollock B, I think rightly, regarded this as the principle on which *Cargo ex Argos* was really founded.

25. This view of the matter was accepted by the House of Lords in *China Pacific SA v Food Corpn of India (The Winson)* [1982] AC 939. The facts were that the *Winson*, bound for Bombay with a cargo of wheat, stranded on a reef in the South China Sea. Salvors retained on behalf of the ship and cargo interests off-loaded the wheat into barges and took it to Manila, where it was stored for their account in warehouses. It was common ground that storage under cover was necessary to prevent deterioration of the wheat, and that upon its arrival at the warehouse the salvage services came to an end. Some time after that, the owners gave notice that they were abandoning the voyage and the contract of carriage thereupon came to an end. The salvors wrote to the cargo-owners' solicitors asking them to take delivery of their property, but received no answer. On these facts the salvors were bailees under the salvage agreement from the time that the cargo was taken off the stranded vessel until it reached the warehouse, and were thereafter non-contractual bailees until the cargo-owners finally took possession of the wheat from the warehouse. The issue was whether the cargo-owners were liable to the salvors for warehouse charges incurred up to the time when the owners gave notice that they abandoned the voyage. The cargo-owners accepted liability for the charges after that point, but contended that while the contract of carriage subsisted the warehouse charges were the responsibility of the carriers alone. It was held that the salvors were entitled to succeed.

The leading speech was given by Lord Diplock, with whom the rest of the House agreed. Lord Diplock considered (p 957) that the case turned on the application of "well known and basic principles of the common law of salvage, of bailment and of lien." He expressed the principle (at p 960) as follows:

> "… the bailment which up to the conclusion of the salvage services had been a bailment for valuable consideration became a gratuitous bailment; and so long as that relationship of bailor and bailee continued to subsist the salvors, under the ordinary principles of the law of bailment too well known and too well-established to call for any citation of authority, owed a duty of care to the cargo owner to take such measures to preserve the salved wheat from deterioration by exposure to the elements as a man of ordinary prudence would take for the preservation of his own property. For any breach of such duty the bailee is liable to his bailor in damages for any diminution in value of the goods consequent upon his failure to take such measures; and if he fulfils that duty he has, in my view, a correlative right to charge the owner of the goods with the expenses reasonably incurred in doing so."

He regarded this as being the principle applied in *Cargo ex Argos* and *Swaffield* in which the decisive facts, on his analysis, had been (i) that the bailee was left in possession of the goods after the termination of the contract under which the bailment had originally been made, and (ii) that in the absence of any contrary instructions from the cargo-owner, the warehousing of the goods was necessary for their preservation: see p 960G-H. Lord Diplock added, at p 961:

> "It is, of course, true that in English law a mere stranger cannot compel an owner of goods to pay for a benefit bestowed upon him against his will; but this latter principle does not apply where there is a pre-existing legal relationship between the owner of the goods and the bestower of the benefit, such as that of bailor and bailee, which imposes upon the bestower of the benefit a legal duty of care in respect of the preservation of the goods that is owed by him to their owner."

26. Lord Diplock went on to consider the doctrine of agency of necessity, because it had been submitted on behalf of the cargo-owners that a bailee in possession of goods could have authority on that basis only if it was impossible to communicate with the owner of the goods. The argument was that although the cargo-owners were not very communicative, they were never actually out of contact. This submission was rejected because the restrictions placed by the case law on a bailee's authority as an agent of necessity applied only where the bailee was acting as a true agent, ie by purporting to bind the bailor to arrangements with third parties. They did not apply to a bailee's right to reimbursement of his own expenses. It was sufficient for that purpose that the bailor should have failed to give instructions: see pp 961G-962B. It is clear that the relevance of this last point was that if the owner of the goods had given instructions, the salvor could by complying with them have relieved himself of any further responsibility. The decisive point, and the sense in which the word "necessity" is used in these cases, is that if the bailee is in a position where he has no way of discharging his responsibility to care for the goods without incurring loss or expense, then the loss or expense is for the account of the goods-owner.

27. Lord Simon of Glaisdale, who delivered a concurring judgment, took the same view. He thought (p 965E) that to confine agency of necessity to cases where the issue was the bailee's authority to bind the bailor to contracts with third parties was "justified by the fact that the law of bailment will often resolve any issue between alleged principal and agent of necessity, as it has done here." *The Winson* was a decision about the law of bailment. It was not a decision about agency of necessity.

28. The circumstances which entitle the owners to recover in the present case correspond to those which were decisive in *The Winson*. They are (i) that the cargo was originally bailed to the owners under a contract which came to an end while the cargo was still in their possession, (ii) that as a matter of law their obligation to look after the cargo continued notwithstanding the termination of the charterparty, and (iii)

that the only reasonable or practical option open to them once the charterparty had come to an end was to retain the cargo until it could be discharged at the port where the vessel was then located.

29. *The Winson* was a claim for expenses incurred by the salvors, although Lord Diplock's adoption of the decision in *Cargo ex Argos* suggests that he would have applied the same principle to a claim for remuneration where the claimant stored and handled the goods with his own facilities. In principle, that seems right. The opportunity cost of retaining the vessel in Angra dos Reis while the charterers' cargo remained on board was a true cost even if it was not an out of pocket expense. However, it is unnecessary to go any further into that question because in this context as in that of clause 13, no point is taken about the difference between expenses and remuneration.

30. In the result, I agree with the conclusion reached on this point by Andrew Smith J.

   *Unjust enrichment*

31. It may well be that in the light of recent developments in this area of law, the owners might be entitled to succeed on this basis also, although the measure of recovery would not necessarily be the same. This, however, raises larger issues which would be better decided in a case where they arise, and possibly in a less specialised context than a dispute about carriage by sea.

   *Conclusion*

32. I would allow the appeal and restore the order of Andrew Smith J.

   **LORD PHILLIPS**

33. I agree, for the reasons given by Lord Sumption, that this appeal should be allowed. I wish only to add a brief explanation of why I agree with him and Lord Clarke that the express indemnity provided by Clause 13 applied to the facts of this case.

34. I do not view the issue as turning upon a choice between competing causes of the requirement to discharge the cargo. The obligation to discharge a cargo loaded under a time charter will normally be proximately caused by the order to load the cargo. The reason why the consequences of the obligation to discharge are not normally covered by an indemnity clause such as clause 13 of the charter in this case is that those consequences form part of the services that the owners has contracted to provide under the charter and for which hire is being paid. Where, however, the charter comes to an end before the cargo has been discharged in circumstances where the consequences are not expressly covered by the charter, those consequences fall naturally within the scope of the indemnity clause. I accept that the application of the indemnity clause in such circumstances appears to be a novelty, but I can see no argument of principle that precludes this.

   **LORD MANCE**

35. I agree with the result reached by the majority, but I do so not under clause 13, but on the basis of the principle in *The Winson (China Pacific SA v Food Corpn of India* [1982] AC 939)*, with which Lord Sumption deals in paras 18-30. As he notes (para 29), the charterers in the present case have expressly disclaimed any reliance upon the distinction between reimbursement of expenses and remuneration (as to which, see eg *The Principles of the Law of Resitution* by Graham Virgo 2nd ed (2006), p 290). They have done this on the basis that the two would on the facts here equate (ie it "cost" the owners the market rate to wait in Angra dos Reis). It is unnecessary to consider the correctness of this concession, and I do not do so.

36. There is much case law on time charter indemnities. They may be express, as in the time charters which were the subject of *Larrinaga Steamship Co Ld v The King* [1945] AC 246, 253 and *Royal Greek Government v Minister of Transport (The Ann Stathatos)* (1949) 83 Ll L Rep 228 and in the Shelltime 3

form of charter in issue in the present case. They may also be implied, as in the case of the New York Produce Exchange form of charter, in which the only relevant express obligation is that the owners or master shall be under the orders and directions of the charterers as regards employment, agency and other arrangements. The existence of an implied time charter indemnity in respect of compliance with charterers' orders and direction has long been recognised: see *The Athanasia Comninos* [1990] 1 Lloyd's Rep 277, 290 per Mustill J, and *Triad Shipping Co v Stellar Chartering & Brokerage Inc (The Island Archon)* [1994] 2 Lloyd's Rep 227, 234 per Evans LJ.

37.  The scope and application of an indemnity clause depends upon its precise terms read in the context of the contract as a whole. Other terms of the contract may mean that it is necessarily or impliedly limited in its scope. In addition to that, an indemnity clause in the form of clause 13 will not cover matters of navigation or in respect of which owners can by the contract be taken to have assumed the risk. Within its scope, the present clause also only applies to "consequences or liabilities that may arise from [here] the master complying with charterers' or their agents' orders". This raises a question of causation. The search is for "the 'proximate' or 'determining' cause". This was stated in relation to a materially identical clause in *Larrinaga Steamship Co Ltd v The King* [1945] AC 246, 253 by Viscount Simon LC, with whose speech Lord Thankerton and Wright agreed at pp 253-254.

38.  The issue of causation was considered in depth by Devlin J in *The Ann Stathatos* 83 Ll L Rep 228. The decision is at the root of the modern jurisprudence on time charter indemnity clauses, and Lord Sumption cites it in para 9. One particular passage is worth citing in full, because it bears on an argument advanced by owners in the present appeal, which the majority might otherwise be thought to be accepting.

39.  In *The Ann Stathatos* the vessel had been damaged by an explosion resulting from an explosive atmosphere created by the cargo of coal and some unidentified act during repair work causing a flame or spark leading to a series of explosions. The arbitrator selected as "the direct or immediate or effective cause" of the explosions the latter act. Owners argued that it was enough that the explosive atmosphere generated by the cargo was "a" cause. The argument mirrors a submission made by owners on the present appeal, which was rejected in the following passage:

> "This conclusion clears the ground for consideration of a further submission on behalf of the owner. The loading, if not the proximate cause, was at any rate, it is argued, a cause of the explosion, and that is sufficient for the purpose of clause 9. Sir Robert Aske does not in this contention rely on the phrase 'all consequences'; in this I think he is right, having regard to the dictum of Willes J in *Ionides v Universal Marine Insurance Co* (1863) 14 CB (NS) 259, 289. He relies on the principle applicable in cases of tort, and he referred again to *Burrows v March Gas and Coke Co* LR 7 Ex 96, though Baron Pigott, in the court below (LR 5 Ex 67, 73) hardly supports the contention. He referred also to *Minister of Pensions v Chennell* [1947] KB 250, where Denning J discusses the whole matter. As against this, Sir William McNair argues that the term 'a cause' can properly be used only when there are two or more causes equal in proximity, as in *Reischer v Borwick* [1894] 2 QB 548. I need not consider this last contention, for I think it is clear that clause 9 is concerned with the proximate cause. It is a contract of indemnity, and I can see no reason for treating it differently from any other contract of insurance. The observations of Lord Shaw in *The Ikaria* [1918] AC 350, 368 and the dicta he there cites are also in point."

40.  The search is therefore for the proximate cause. Devlin J cited *Reischer v Borwick* [1894] 2 QB 548 as indicating that there can be situations in which two causes are so closely matched that both are identified as proximate causes. That is a largely theoretical analysis which finds little practical application in the authorities, and has achieved any prominence only in discussion about exception clauses. *Reischer v Borwick* itself was a case on a marine insurance policy covering "only …. collision", and so not perils of the seas. The vessel was holed by collision, the hole was temporarily plugged, but the plug failed as she was being towed to safety and she sank due to the inflow of water. Not surprisingly, the claim succeeded.

Only Lindley LJ addressed the possibility that this situation could and should be analysed as one of concurrent proximate causes (although even he in his concluding remarks identified the injury by collision as "really … the cause of the loss – the causa causans and not merely the causa sine que non"). Both Lopes and Davey LJJ analysed the position throughout in what one would have thought to be more conventional terms as involving a single proximate cause of the sinking (the collision holing the vessel).

41. Another of the few cases in which courts have discussed the possibility of concurrent causes is *Wayne Tank and Pump Co Ltd v Employers Liability Assurance Corpn Ltd* [1974] QB 57. The case involved an insurance claim following on from the decision in *Harbutt's "Plasticine" Ltd v Wayne Tank and Pump Co Ltd* [1970] 1 QB 447. Harbutt's factory was burnt down in a fire. The fire occurred because Wayne Tank had installed a pipeline made of unsuitable and dangerous plastic material and wrapped in heating tape attached to a useless thermostat, and had then switched on the heating and left it unattended overnight without testing. Wayne Tank's policy contained an exclusion of damage caused by the nature or condition of any goods which they sold or supplied. Again not surprisingly, both Lord Denning MR (pp 66G-67B and 68A) and Roskill LJ (p 74 B-C) preferred to analyse the situation as one of a single effective, dominant and proximate clause (the defective plastic material and thermostat supplied), while only Cairns LJ (p 69A) preferred an analysis of "approximately equal" causes. All three member of the Court also indicated that the claim anyway failed (because of the exclusion) even if analysed as one of two concurrent proximate causes (pp 67B-68A, 69B-D and 74D-75E). In both *Reischer v Borwick* and *Wayne Tank*, the courts further noted that merely because one can identify concurrent causes does not mean that both are in law proximate causes.

42. The same point had been made by Lord Shaw fifty years earlier in another leading authority on proximate cause, *Leyland Shipping Co Ltd v Norwich Union Fire Insurance Society* [1918] AC 350, 370, when he said: "Where various factors or causes are concurrent, and one has to be selected, the matter is determined as one of fact, and the choice falls upon the one to which may be variously ascribed the qualities of reality, predominance, efficiency". That reasoning was followed and applied in *Yorkshire Dale Steamship Co Ltd v Minister of War Transport* [1942] QC 691. The issue in that case was whether a vessel lost by stranding in the course of a warlike operation was lost by reason of the warlike operation. Viscount Simon LC said: "Most results are brought about by a combination of causes, and a search for "*the* cause" involves a selection of the governing explanation in each case" (p 698), Lord Macmillan said: "it is not enough that the casualty arose in the course of a warlike operation. It must also arise out of, and be proximately caused by the warlike operation" (p 702), and Lord Wright underlined the point in a well-known passage, including the statements that "This choice of the real or efficient cause from out of the whole complex of the facts must be made by applying commonsense standards. ….. The question always is what is *the* cause, not merely what is *a* cause" (p 706).

43. Another case involving an exceptions clause where the possibility of rival causes was considered briefly and obiter was *Handelsbanken v Dandridge* [2002] EWCA Civ 577. [2002] CLC 1227, where in para 47 Potter LJ remarked that "the first task of the court is to look to see whether one of the causes is plainly the proximate cause of the loss" and that "It is only if the court is driven to the conclusion that there was 'not one dominant cause, but two causes which were equal or nearly equal in their efficiency in bringing about the damage' one being a period, the other an exception, that the exception prevails", citing in support *Wayne Tank*, p 67. That dictum may go further to blur lines than I would in referring to causes "nearly equal in their efficiency", but, once again, the Court's actual view was that this was not the situation on the facts. The position regarding exclusion clauses in situations where two causes might be said to be operating concurrently was most recently discussed in *Global Process Systems Inc and another (Respondents) v Syarikat Takaful Malaysia Berhad* [2011] UKSC 5, para 88. As Devlin J pointed out in *The Ann Stathatos* at p 237, bottom left, the existence of an exceptions clause is itself likely to affect what falls to be regarded as dominant, proximate or relevant; this is because "the whole of what one might call the area naturally appurtenant to the excepted area must be granted to it". Indemnity clauses are not subject to such considerations. They cover consequences proximately caused, no more and no less.

44. This is underlined by another way in which the scope of time charter indemnities is delimited in the case law. Implied time charter indemnities and indemnities like clause 13 apply only where there is "a *direct* causal link" between the orders and the consequences. The phrase and the emphasis are Lord Hobhouse of Woodborough's in the leading speech, with which all other members of the House agreed, in *Whistler International Ltd v Kawasaki Kisen Kaisha Ltd (The Hill Harmony)* [2001] 1 AC 638, 656. Lord Hobhouse made the comment in the course of discussion of the decision in *Larrinaga Steamship Co Ltd v The King* [1945] AC 246, a case like the present of an express indemnity. He cited in support *The White Rose* [1969] 1 WLR 1098, another case of an express indemnity. As to implied indemnities: see *The Hill Harmony* itself and *Triad Shipping Co v Stellar Chartering & Brokerage Ltd. (The "Island Archon")* [1994] 2 Lloyd's Rep 227, 238, where Sir Donald Nicholls V-C noted that "the underlying principle" is that the implied indemnity "extends only to certain consequences flowing from a shipowner complying with charterer's orders", one limitation being that "to be within the implied indemnity the loss must arise directly from the charterer's instruction" (another being that it must also be one which, on a fair reading of the charter-party, the shipowner cannot be taken to have accepted: see para 37 above).

45. In *The White Rose*, Donaldson J had the benefit of the formidable advocacy of Mr Anthony Evans for owners and Mr Robert Goff QC and Mr Davenport for charterers. He recited Mr Goff's submission that one vital element had been omitted from Mr Evans's case:

> "namely, that the right to indemnity only arises if and in so far as the loss suffered by the shipowners can be proved to have been caused by compliance with the time charterers' instructions" (p 1107).

Donaldson J went on to note Mr Goff's further observation that causation is rarely a live issue in cases where an owner has on charterers' instructions signed bills of lading committing him to liabilities over and above his charterparty liabilities, but that causation is all important in other cases.

46. Donaldson J accepted Mr Goff's submission, holding that it was "necessary in every case to establish an unbroken chain of causation", and that:

> "A loss may well arise in the course of compliance with the time charterers' orders, but this fact does not, without more, establish that it was caused by and is in law a consequence of such compliance and, in the absence of proof of such causation, there is no right to indemnity". (p 1108)

47. The facts in *The White Rose* were that a Finnish vessel had been ordered to load in Duluth, Minnesota, where Mr de Chambeau, an employee of charterers' stevedores was injured while on board. He had left his proper place for purposes unconnected with his work, and owners were liable to him under Minnesota law on the ground that the part of the ship where he had gone lacked fencing. The owners were, it seems, in breach of Finnish law in this respect, but that was expressly disregarded as being irrelevant. Donaldson J nonetheless agreed with the umpire that owners' indemnity claim failed because "what connected the accident with, and gave rise to, a potential liability and an actual loss was the provisions of Minnesota law". There was lacking "the necessary causal connection between the order to load and the loss" (p 1108).

48. The selection of the proximate, determining or, in the more modern terminology, real or efficient cause for the purposes of an indemnity has traditionally been described as involving a "choice … to be made by applying common sense standards as the man in the street or a business or seafaring man would apply them": *The Ann Stathatos* 83 Ll L Rep 228, 236 per Devlin J, citing Lord Wright in *Yorkshire Dale Steamship Co Ltd v Minister of War Transport* [1942] AC 691, 706. Lord Wright's words were more recently cited under the implied indemnity which was in issue under a voyage charter in *Total Transport Corpn v Arcadia Petroleum Ltd (The Eurus)* [1998] 1 Lloyd's Rep 351, 361-362. Such an approach does not, or should not, "conceal, or perhaps reveal" – in Lord Hoffmann's extra-judicial words giving the Chancery Bar Association lecture in 1999 on "Common Sense and Causing Loss" – "a complete absence of any form of reasoning". Rather, it should involve a conclusion reached after identifying the relevant

context and purpose of the question and the relevant considerations. I do not however regard it as wholly irrelevant that three experienced commercial judges have concluded, without it seems real doubt, that the present indemnity clause does not cover the present case.

49. Perhaps more striking, since the present constitution is also heavy in commercial experience, is the fact that no previous claim like the present can be identified under any express or implied time charter indemnity; this, despite the fact that time charter clauses entitling owners to withdraw in default of payment of any hire instalment, without anti-technicality provisions, have been commonplace and have given rise to other contentious issues over many past decades. Robert Goff J made no mention of any such possibility in *Tropwood AG of Zug v Jade Enterprises Ltd (The Tropwind)* [1982] 1 Lloyd's Rep 45, when considering "the nature of a shipowner's right to recover from charterers remuneration for services rendered after a ship has been withdrawn from the charterers' service under a time charter, pursuant to an express contractual right of withdrawal" (p 53). Apart from any express request which might be found to have been made (to render such services), he thought that "their liability (if any) to pay remuneration for the services so rendered can only derive from the principles of the law of restitution".

50. Of course, if the owners were bound to third parties by bills of lading which charterers had required them to issue, the continuation of the voyage under those separate bill of lading contracts could engage the time charter indemnity, and could (despite Lord Denning MR's contrary dictum on appeal in *The Tropwind* [1982] 1 Lloyd's Rep 232, 237) lead to charterers having to pay owners the market, rather than the charter, rate. Further, if owners were left with no practical option but to carry the cargo to its destination, then they might still have an argument that their time and money were spent "in compliance with the time charterers' instructions". No assistance on this latter situation is derived from the New South Wales Supreme Court decision in *J Gadsden Pty Ltd v Strider 1 Ltd (The Aes Express)* (1990) 20 NSWLR 57, where the owners failed in a claim against bill of lading holders, who, before the vessel's withdrawal from charter, had pre-paid freight to charterers under what were charterers' bills.

51. The present case differs materially from both these situations. Here, if one asks whether the loss suffered by the shipowners was "caused by compliance with the time charterers' instructions" - Robert Goff QC's words accepted by Donaldson J in *The White Rose* [1969] 1 WLR 1098, 1107-1108 – the natural answer, it seems to me, is: certainly not. It was caused because the charter was at an end, the owners were *not* performing the charterers' instructions and they were not receiving hire for the time wasted prior to discharge. The "direct" or "unbroken" causal link required by the authorities is lacking. The loss did not even arise "in the course" of compliance with charterers' orders, to use Donaldson J's words quoted in paragraph 70 above. It is true, historically, that no cargo would have been on board but for charterers' instructions. But that is no test of the proximate or the effective cause, as the authorities make clear: see paragraphs 37 to 47 above. It is also unrealistic to scissor up the instructions between loading and carriage to destination, and to attribute the loss to the instructions to load ignoring the failure to carry. When one engages in such a division, one is in fact recognising that subsequent events superseded charterers' orders and rendered them a matter of history.

52. The general contractual context in my view also supports a conclusion that the express indemnity clause is inapt to apply to the present situation. Clause 8 of the charterparty gives owners a simple contractual option. It is accepted that the mere late payment of one instalment did not constitute a repudiatory breach (or a breach of a condition in a sense like that used in the Sale of Goods Act 1979) which could entitle the owners to damages for loss of the charter. That loss flowed from the owners' exercise of their option to withdraw. The phrase in clause 8 "without prejudice to any claim owners may otherwise have on charterers under this charter" does not create a right of action, and looks on its face only to pre-existing claims. So there is no way in which the time spent discharging in Angra dos Reis can be claimed as damages. Yet it is submitted that, because the owners exercised an option to terminate the charter in mid-flow, the charter indemnity provides them as of right not merely with the charter rate (US45,000 per day), but with the market rate (US158,864 per day) in respect of any delay before the vessel is free to move elsewhere to take advantage of the increased market rate. That would be to give them a claim by way of indemnity for loss they cannot claim by way of damages.

53. It is also unclear where this submission could or would end. In shipping law certainty is of recognised importance and disputes not to be encouraged. The charter required redelivery at the same port as the port of delivery in the Arabian Gulf (clause 3), with hire being paid up to that point. Logically, the consequences of the charterers' orders to proceed to and load cargo at Angra dos Reis could, on owners' case, embrace the whole period during which the vessel was returning to the Arabian Gulf, unless she found other paid employment to take her back. The risk of having to return in ballast to her Arabian Gulf delivery port (or anywhere else) could not be described as an "ordinary commercial risk" which the owners were prepared to accept under this time charter (cf the last sentence of paragraph 16 of Lord Sumption's judgment), since the owners expressly stipulated against it.

54. The silence of clause 8 regarding the position post-withdrawal also contrasts with clause 18 which expressly provides that, should the vessel be on a ballast or laden voyage at the date the charter should otherwise terminate, "charterers shall continue to have the use of the vessel" at the charter rate or the market rate if higher. Under clause 18, the charterers are paying for completion of the services requested. Under clause 8, owners, having elected to determine the charter, are now seeking by way of "indemnity" to recover the market rate, without of course having to give any credit for the considerable benefit likely to have accrued to them from such termination.

55. In conclusion, the majority's present decision stretches the application of the express charter indemnity beyond any previous decision, without justification, without regard to the potential consequences (including the uncertainty - or certainty - of ever more ambitious claims) and without need. The law is capable of dealing with this situation in a more conventional manner. It will impose on charterers an obligation as bailors to reimburse the owners as bailees for their time and expense spent in looking after the cargo prior to its discharge. It would, even apart from that, probably also impose on charterers an obligation in restitution in respect of any benefit they could be said to have had through the storage on board the vessel of the cargo. But those remedies flow either from the service rendered in that respect by the owners under the compulsion of their legal obligations as bailees, or from the benefit received thereby by the charterers, and not from the express indemnity.

56. It follows that I too would allow the appeal and restore the order of Andrew Smith J, although I would do so for the reasons and on the basis that he gave, and not those adopted by the majority.

**LORD CLARKE**

57. I agree with Lord Sumption that, for the reasons he gives, this appeal should be allowed on the *Winson* point (*China Pacific SA v Food Corpn of India* [1982] AC 939). I wish to add a few words of my own on the construction of clause 13 of the charterparty in the light of the sharp difference of opinion between Lord Mance and Lord Sumption.

58. I have not found this an easy question. Lord Mance makes a powerful case for a narrower application of clause 13 than that preferred by Lord Sumption. His analysis owes much to the approach adopted in a number of decided cases. However, none of them is on facts such as these. As I see it, the question whether the owners are entitled to succeed under the indemnity provided for in clause 13 involves two sub-questions. The first is one of construction of the clause and the second is whether the owners have shown that they are entitled to succeed under the clause on the particular facts of this case, which is essentially a question of causation.

*Construction of clause 13*

59. In order to succeed, the owners must show that the expenses (or loss) they sustained as a result of discharging the cargo at Angra dos Reis in Brazil, which was of course the loading port, in the circumstances described by Lord Sumption, were a consequence of their complying with the charterers' order to load the cargo. The relevant part of clause 13 is in these terms:

> "charterers hereby indemnify owners against all consequences … that may arise
> from the master … complying with charterers' … orders …".

60. I agree with Lord Sumption in paras 10 to 12 that the clause is very wide but that it is neither complete nor unlimited. In particular, I agree with him that the indemnity is not intended to include consequences which are incidental to the service for which the vessel was required to be available under the charterparty. So, for example, it would not include any cost of or in relation to the discharge of the cargo in the ordinary course of events, which would be covered by clauses 5 and 6 of the charterparty, which provide for the services to be provided and paid for by the owners and charterers respectively, or by clause 7, which provides for hire to be paid by the charterers to the owners. Nor, as Lord Mance observes at para 37, would clause 13 cover matters of navigation or in respect of which owners can be taken to have assumed the risk by contract.

61. I further agree with Lord Sumption that the real question under clause 13 is whether the charterers' order to load the cargo was an effective cause of the owners having had to bear a risk or cost of a kind which they had not contractually agreed to bear and that, if the charterers' order was an effective cause in the sense that it was not a mere "but for" cause which did no more than provide the occasion for some other factor unrelated to the charterers' order to operate, it does not matter whether it was the only effective cause.

62. It is not I think helpful to use other adjectives to describe the cause. Different adjectives have been used over the years, including "proximate cause", "dominant cause" and "direct cause". To my mind they are somewhat misleading because they tend to suggest that the cause must be the most proximate in time or that the search is for the sole cause. Lord Mance says at para 37 that the search is for "the 'proximate' or 'determining' cause". However, I respectfully disagree because such a formulation suggests that there can be only one such cause, whereas there may, depending upon the circumstances, be more than one effective cause.

63. It is true that the cases make some reference to "the determining" or "the proximate cause". For example, in *Larrinaga Steamship Co Ltd v The King* [1945] AC 246, 252 Viscount Simon LC said that the proximate cause of the stranding of a vessel was not "warlike operations". As he put it at p 253, the vessel was attempting to make a voyage without cargo and suffered from a marine peril when doing so. The fact that she was ordered to leave port sooner than her acting master thought was wise could not turn her disaster into the consequence of a warlike operation. He concluded that the "proximate" or "determining" cause was a misfortune in navigation, not attributable to any warlike operation at all. The House of Lords was not considering the possibility of two effective causes.

64. Lord Mance refers (at paras 38 to 40) in some detail to the decision of Devlin J in *Royal Greek Government v Minister of Transport (The Ann Stathatos)* (1949) 83 Ll L Rep 228. On my reading of the arbitrator's findings in that case (as described at pp 231-232) he identified four causes of the first explosion (using the word "caused" in the wide sense of the word). Omitting two causes which are irrelevant for present purposes, the arbitrator found that the first explosion was caused by (a) the loading on board of gassy and dusty coal and the battening down of the hatches so as to trap the gasses and leave coal dust suspended in such air as existed in tween deck space and (d) some act on the part of the crew who were repairing the tanks, which act caused a flame or spark.

65. Devlin J said at p 237 that by "the wide sense of the word", the arbitrator meant to include all suggested or possible causes, however remote, and whether causes in the legal sense or not. He added:

> "From these five [the arbitrator] selects the act which caused the flame or spark
> and the explosive atmosphere as the direct or immediate or effective causes of the
> first explosion."

The first explosion is the only explosion which is relevant for present purposes. It would seem to follow from that conclusion that there were two effective causes and not one. It would also seem to follow that

the arbitrator was choosing causes (a) and (d) as the two effective causes. However the arbitrator then held (as stated at p 232) that "the loading of the coal, while one of the causes of the damage to the ship (using the word 'causes' in its wide sense), was not the direct or immediate or effective cause of the loss or expenses claimed".

66. It is not clear to me how these findings can be reconciled. One possibility is that the arbitrator treated cause (a) as two causes and not one, by treating the loading of the coal as a different cause from the presence of the gas. If that is correct, the arbitrator held that there were two effective causes, namely the presence of the gas and the flame or spark. It is not easy to see how that is consistent with the view later expressed by the judge that the arbitrator seems to have taken "what is immediate in time", by which he must have meant the flame or spark (p 237). If the arbitrator treated (a) as one cause, namely the loading of cargo in a gaseous state, it is not easy to see how his conclusion that the flame or spark and the explosive atmosphere were the direct or immediate or effective causes of the explosion is consistent with his conclusion that "the loading of the coal, while one of the causes of the damage to the ship (using the word 'causes' in its wide sense) was not the direct or immediate or effective cause of the loss or expenses claimed".

67. As I read the judgment of Devlin J, he concluded (at pp 237-238) that the arbitrator favoured the cause that was immediate in time, namely the initial flame or spark which ignited the gas. He rejected the submission that the arbitrator misdirected himself by confusing immediate cause with direct or effective cause. He also rejected (at p 238) the submission that the flame or spark was too remote in law to be the cause of the first explosion. He then considered whether the loading, which the arbitrator rejected as the direct cause, was too remote in law to be a cause at all.

68. It was in the light of those conclusions that, in the passage quoted by Lord Mance at para 39, Devlin J considered, at p 238, whether, if it was not the proximate cause, loading was a cause of the explosion. This part of Devlin J's judgment must be set in the context of the facts. Perhaps naturally in the light of the arbitrator's award, he started with "the proximate cause", which the arbitrator had held was the flame or spark which ignited the methane gas. He considered the possibility of there being more than one proximate cause, but said that it was not necessary to consider it because the indemnity clause was concerned with "the proximate cause". He then expressed his conclusion thus:

> "So the matter comes down to this, that the arbitrator has selected one cause in preference to another as the proximate or direct cause. I cannot see that any question of law is involved in this selection".

In short, Devlin J held that that conclusion was a conclusion of fact and that the arbitrator had not misdirected himself in law.

69. In these circumstances, I do not think that the decision or reasoning in *The Ann Stathatos* is of any real assistance. The arbitrator had expressly held that there was a sole proximate cause. It may be that, in the light of his earlier conclusion that the direct or immediate or effective causes of the collision were both (a) the act which caused the spark or flame and (b) the explosive atmosphere, the arbitrator made an error in concluding that the spark or flame was the proximate cause, in the sense of sole proximate cause. However, if he did, on Devlin J's approach it was an error of fact, not an error of law.

70. In all the circumstances the decision of Devlin J is an unconvincing basis for a conclusion that the search is for *the* proximate cause. As I see it, the question in each case, whether under a contract of insurance or under a contract of indemnity, is whether an effective cause of the alleged loss or expense was a peril insured against or an indemnifying event. By reference to Devlin J's citation of *Reischer v Borwick* [1894] 2 QB 548, Lord Mance accepts in para 64 that two causes may be so closely matched that both are identified as effective causes. However he says that that it is a largely theoretical analysis which finds little practical application in the authorities.

71. It is true that the authorities do not contain much discussion of the circumstances in which there may be two effective causes. However, in my opinion, they clearly show that two effective causes can, in principle, exist. To my mind this can be clearly seen from *Wayne Tank and Pump Co Ltd v Employers Liability Assurance Corpn Ltd* [1974] QB 57, *Lloyd (JJ) Instruments Ltd v Northern Star Insurance Co Ltd (The Miss Jay Jay)* [1987] 1 Lloyd's Rep 32 and *Midland Mainline Ltd v Eagle Star Insurance Co Ltd* [2004] EWCA Civ 1042, [2004] 2 Lloyd's Rep 604.

72. The present position can be most clearly seen from the *Midland Mainline* case, where Sir Martin Nourse, with whom Brooke and Jacob LJJ agreed, expressly held at para 48 that there can be more than one proximate cause of loss. He cited *Leyland Shipping Co Ltd v Norwich Union Fire Insurance Society Ltd* [1918] AC 350, *Wayne Tank* and *The Miss Jay Jay* as authority for that proposition.

73. It is true that in *Wayne Tank* [1974] QB 57, on the facts (which are described by Lord Mance at para 41) the majority of the Court of Appeal, Lord Denning MR and Roskill LJ, held that the proximate cause of the fire was the defective plastic material and thermostat supplied and not the act of switching on the heating and leaving it unattended without testing. However, in a passage quoted by Sir Martin Nourse at para 10 of the *Midland Mainline* case, Roskill LJ said that he found it impossible to say that the latter was the sole proximate cause of the fire and, that if he was wrong to say that the defective state of the material and thermostat was the sole proximate cause of the fire, there were two effective proximate causes. Cairns LJ, whose approach Sir Martin described as different but instructive, said at p 68:

> "But for my part I do not consider that the court should strain to find a dominant cause if, as here, there are two causes both of which can be properly described as effective causes of the loss. Mr Le Quesne recognised that if there are two causes which are approximately equal in effectiveness, then it is impossible to call one rather than the other the dominant cause. I should prefer to say that unless one cause is clearly more decisive than the other, it should be accepted that there are two causes of the loss and no attempt should be made to give one of them the quality of dominance."

74. Those were cases in which it was held that, where the or a proximate, or effective, cause of the loss is excepted by the policy, the insurers are not liable. It is, however, clear from *The Miss Jay Jay* that, where there are two effective causes, neither of which is excluded but only one of which is insured, the insurers are liable. In the Court of Appeal Slade LJ underlined (at p 39) that the authorities show that the question of proximate cause has to be determined by "a broad commonsense view of the whole position" and that, by proximate, is meant proximate in efficiency. It was held that the faulty design and construction of the vessel, which was neither an insured peril nor an excepted cause, and perils of the seas, which was an insured peril, were both proximate causes of the loss since they were, as Slade LJ put it at p 40 "equal or at least nearly equal in their efficiency in bringing about the damage". These principles are as I see it correctly summarised in *McGillivray on Insurance Law*, 11th ed (2008) at para 19-005 under the heading "Two effective causes" and in *McGee on The Modern Law of Insurance* 3rd ed (2011) at pp 260-261. See also to the same effect *McCann's Executors v Great Lakes Reinsurance (UK) Plc* [2010] CSOH 59, para 112 to 117, where Lord Hodge also stressed the importance of context; *Orient-Express Hotels Ltd v Assicurazioni Generali SpA (UK branch) (trading as Generali Global Risk)* [2010] EWHC 1186 (Comm), [2011] Bus LR 7 per Hamblen J; and *Global Process Systems Inc v Syarikat Takaful Malaysia Bhd* [2011] UKSC 5, [2011] Bus LR 537, para 88 per Lord Mance and, in the Court of Appeal, [2009] EWCA Civ 1398, [2010] 2 All ER 248, para 32 per Waller LJ.

75. I entirely agree with Lord Mance that there must be a causal link between the order and the consequences relied upon. In short, there must be no break in the chain of causation between the order and the consequences. This is clear from *The White Rose* [1969] 1 WLR 1098. As Lord Mance says at para 45, Donaldson J there accepted that it was "necessary in every case to establish an unbroken chain of causation". That is the sense in which I read Lord Hobhouse of Woodborough's reference to the necessity for a "direct causal link" in *Whistler International Ltd v Kawasaki Kisen Kaisha Ltd (The Hill Harmony)*

[2001] 1 AC 638, 656. Lord Hobhouse was not considering a case like the present. I do not read him as intending a direct causal link to be different from an effective cause. I remain of the view expressed above (and in agreement with Lord Sumption) that the question is whether the relevant order was an effective cause of the alleged consequence.

76. I agree with both Lord Sumption and Lord Mance that in deciding whether causation was established on the facts, it is important to have in mind the context in which the question is asked. I do not think that the answer can be found in the conclusions on the facts to which Lord Mance has referred. In particular, I do not think that Donaldson J's conclusion based on the vagaries of Minnesota law in *The White Rose* is of any assistance in deciding the relevant question of fact in this appeal.

> *Causation on the facts*

77. Lord Sumption has identified the relevant commercial context. It is that the charterers gave an order to load the cargo in the ordinary way. The consequence of that order was that the cargo was indeed loaded and therefore had sooner or later to be discharged. The failure of the charterers to pay hire timeously triggered the owners' right of withdrawal. When they exercised that right, the question was what should be done with the cargo which was still on board the vessel. It had to be discharged somewhere. As it happened, it was discharged at the port of loading but it might have been discharged at the port of discharge or at an intermediate port. I entirely agree with Lord Sumption's analysis at paras 9 to 16. In particular I agree with Lord Sumption that the owners' motive for exercising the right to terminate is irrelevant.

78. It was adventitious where and when the termination occurred. The position would have been the same if the termination had occurred for some other reason than the exercise of an option by the owners, as for example as a result of frustration. The owners would have had to procure discharge of the cargo and would have incurred expenses and perhaps loss. They would not have been able to recover such expenses and loss under any of the other provisions of the charterparty. The reason they would have to incur the expenses is that the cargo was still on board the vessel. Just as here there are two effective causes of the expenses and loss, namely the withdrawal and the fact that cargo had been loaded, so in a frustration case, there would be two such causes, namely the frustration and the fact that cargo had been loaded and was on board.

79. I agree with the view expressed by Lord Mance at para 50 that, if the owners were bound to third parties by bills of lading which charterers had required them to issue, the continuation of the voyage under those bill of lading contracts could engage the indemnity under clause 13. Lord Mance further recognises (to my mind correctly) that if owners were left with no practical option but to carry the cargo to its destination, then they might have an argument that their time and money were spent "in compliance with charterers' orders". Indeed, at present I see no reason why they should not succeed under the indemnity in such circumstances. As I see it, that would be on the basis that the charterers' orders would be the orders to load. In terms of causation, I see no distinction in principle between that case and the present.

80. For these reasons and the reasons given by Lord Sumption I would allow this appeal on the indemnity point as well as the *Winson* point.

---

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/uk/cases/UKSC/2012/17.html*



# England and Wales Court of Appeal (Civil Division) Decisions

---

**You are here:** BAILII >> Databases >> England and Wales Court of Appeal (Civil Division) Decisions >> Handelsbanken v Dandridge &amp; Ors [2002] EWCA Civ 577 (30th April, 2002)
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2002/577.html*
Cite as: [2002] 2 Lloyd's Rep 421, [2002] 2 All ER (Comm) 39, [2002] 2 LLR 421, [2002] EWCA Civ 577

---

[New search] [Printable RTF version] [Help]

---

# Handelsbanken v Dandridge & Ors [2002] EWCA Civ 577 (30th April, 2002)

**Neutral Citation Number: [2002] EWCA Civ 577**

Case No: A3/2001/1176

IN THE SUPREME COURT OF JUDICATURE
COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION (Mr Justice Toulson)

Royal Courts of Justice
Strand,
London, WC2A 2LL

30th April 2002

B e f o r e :

**MASTER OF THE ROLLS**
**LORD JUSTICE POTTER**
**LADY JUSTICE ARDEN**

---

Between:

**HANDELSBANKEN, NORWEGIAN BRANCH OF**
**SVENSKA HANDELSBANKEN AB (Publ)**          Appellant
**- and -**
**CHRISTINE ELAINE DANDRIDGE AND OTHERS**    Respondent

---

**(Transcript of the Handed Down Judgment of**
**Smith Bernal Reporting Limited, 190 Fleet Street**
**London EC4A 2AG**

Tel No: 020 7421 4040, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)

———————————

**Lionel Persey QC and Timothy Hill Esquire (instructed by Ince & Co, London) for the appellant**
**Graham Charkham Esquire (instructed by Hill Taylor Dickinson, London) for the 1st-11th**
**defendants/respondents.**
**Nigel Meeson Esquire (instructed by Beaumont & Son, London) for the 12th defendant/respondent**

———————————

**HTML VERSION OF JUDGMENT**
**AS APPROVED BY THE COURT**

———————————

Crown Copyright ©

**Lord Justice Potter:**

**This is the Judgment of the Court**

1. This appeal is concerned with the construction of two standard clauses in the Institute War and Strikes Clauses Hulls-Time, 1983 edition ("the Institute War Clauses").

2. The claimants/appellants are a Norwegian Bank who claim as mortgagees of the mv "The Aliza Glacial" ("the vessel") under a Mortgagees' Interest Insurance ("MII") Marine Policy Number 1328/1996, dated 18 December 1996 and amended on 6 December 1997. The first to eleventh defendants are sued as underwriters of that policy. They aver, and for the purposes of the preliminary issues under appeal it is argued, that the cover granted was in accordance with the terms of slip policy reference MD966752/PJM and incorporated the Institute Mortgagees Interest Clauses Hulls edition 30.5.86. The twelfth and thirteenth defendants are the brokers who were involved in the placement of the cover. The claimants claim from the underwriters the sum of NOK 20,996,489.00 which they contend is due under the MII policy following the seizure and detention of the vessel by the Australian Navy and the threatened forfeiture of the vessel, her equipment and the fish on board pursuant to the Fisheries Management Act 1991 of Australia ("the FMA") on grounds of illegal fishing. In order to avoid the forfeiture of the vessel and thereby to minimise their loss, the claimants themselves commenced foreclosure proceedings in Australia, obtaining summary judgment in their favour for the sums due and owing from the owners to the claimants with a direction that the vessel be valued and sold. The claimants thereafter purchased the vessel for US$ 4,500,000 from the Australian Admiralty Marshal by a judicial sale in December 1998 so as to extinguish the rights of detention and forfeiture under the FMA.

3. The owners had insured the vessel under a War Risks Policy incorporating the Institute War Clauses, with Clause 4.1.4 and 4.1.7 deleted. However, the policy contained an express term 'Warranted no illegal fishing ...'. The owners having tendered notice of abandonment and a claim for constructive total loss to the underwriters of the War Risks Policy prior to the sale of the vessel to the claimants in Australia, that claim was rejected by the leading underwriter for breach of the 'no illegal fishing' warranty and the claimants therefore claimed indemnity under the MII policy in respect of the outstanding indebtedness of the owners under their loan agreement and the costs incurred by the claimants in connection with the sale of the vessel and otherwise in Australia. The amount claimed is some £1.6 million plus interest.

4. On 23 June 2000, preliminary issues were ordered to be tried inter alia relating to the meaning and effect of exclusions 4.1.5 (Issue 1) and 4.1.6 (Issue 2) contained in the War Risks Policy (see further at paragraph 11 below). Having decided Issue 1 in favour of the underwriters, Toulson J dismissed the

action against all defendants, at the same time granting the claimants permission to appeal. In the light of his decision it was strictly unnecessary for him to consider Issue 2. However, he did so, indicating that, upon that issue, he found in favour of the claimants' argument. There is a cross-appeal by the underwriters in respect of that finding, should this court hold that the judge was wrong in respect of Issue 1.

## <u>THE RELEVANT POLICY TERMS</u>

### The MMI Policy

5. The Institute Mortgagees' Interest Clauses (Hulls), 1986 edition (the "IMI" Clauses) included the following:

> "4. WARRANTIES
>
> It is warranted in respect of each vessel that-
>
> 4.1 ... War Risks Policies equivalent to Institute War and Strikes Clauses (Hulls–Time) and full Protection and Indemnity Risks (hereafter referred to as 'the Owners' Policies and Club Entries) have been taken out and shall be maintained throughout the currency of this contract ...
>
> 6. INDEMNITY
>
> 6.1 This contract is to indemnify the assured for loss resulting from: loss of or damage to or liability of each vessel which is prima facie covered by owners' policies or club entries, but in respect of which there is subsequent non-payment .... :
>
> 6.1.1 by reason of any act or omission of any one or more of the Owners, Operators, Charterers or Managers of the vessel, or their servants or agents, including breach or alleged breach of warranty ..."

6. The issues before the judge were directed to the question whether the loss for which the claimants sought indemnity was prima facie covered by the owners' policies, subject to the breach of warranty ('no illegal fishing') as a result of which there was non-payment by the underwriters of the owners' policy.

### The Owners' War Risks Policy

7. As already indicated the War Risks Policy contained a term:

> "Warranted, no illegal fishing ..."

8. The Institute War Clauses which, subject to deletions, were incorporated into the owners' policy provided inter alia:

> "1. **Perils**. Subject always to the exclusions hereinafter referred to, this insurance covers loss of or damage to the vessel caused by:
>
> 1.1. war, civil war, revolution, rebellion, insurrection or civil strife arising therefrom, or any hostile act by or against a belligerent power
>
> 1.2 capture, seizure, arrest, restraint or detainment and the consequences thereof or attempt threat
>
> 1.3 derelict mines, torpedoes, bombs or other derelict weapons of war

1.4 strikers, locked out work men or persons taking part in labour disturbances, riots or civil commotions

1.5 any terrorist or any person acting maliciously, or from a political motive

1.6 Confiscation or expropriation ......

3. **Detainment**. In the event that the Vessel shall have been the subject of capture seizure arrest restraint detainment confiscation or expropriation and the Assured shall thereby have lost the free use and disposal of the Vessel for a continuous period of twelve months then for the purpose of ascertaining whether the vessel is a constructive total loss the Assured shall be deemed to have been deprived of the possession of the Vessel without any likelihood of recovery.

4. **Exclusions**. This insurance excludes:

4.1 loss, damage, liability or expense arising from ....

4.1.5 arrest restraint detainment confiscation or expropriation under quarantine regulations or by reason of infringement of any customs or trading regulations;

4.1.6 the operation of ordinary judicial process failure to provide security or to pay any fine or penalty or any financial cause."

9. Clause 2 of the Institute War Clauses had the effect of importing into the owners' policy various of the Institute Time Clauses Hulls including the sue and labour provision:

"13.1 In case of any loss or misfortune it is the duty of the Assured and their servants or agents to take such measures as may be reasonable for the purpose of averting or minimising a loss which would be recoverable under this Insurance."

**THE PRELIMINARY ISSUES**

10. The preliminary issues ordered to be tried were as follows:

(1) Have the Claimants suffered a loss or damage which is "*prima facie covered by the Owners' Policies or Club Entries"* within the meaning of Clause 6 of the Institute Mortgagees' Interests Clauses Hulls 30.5.86

(a) Did a failure of the assured under the War Risks Cover comply with the warranty alternatively condition: *"Warranted no illegal fishing"* prevent prima facie coverage thereunder?

(b) Alternatively, on a true construction of the War Risks Policy, was the warranty not a relevant peril and had no relevance to the scope of the coverage thereunder?

(c) Was the loss or damage prima facie excluded by exclusions 4.1.5 and 4.1.6 of the War Risks Cover?

- Was the vessel detained under the Fisheries Management Act?

- Was the seizure and detention of the Australian Authorities by reason of infringement of trading regulations?

- Was the seizure and detention by the Australian Authorities by operation of ordinary judicial process or failure to provide security?

11. Before Toulson J, the only live issues arose under (c). It was not in dispute that the vessel was detained under the FMA. However, there was an issue under Clause 4.1.5 as to whether the arrest and detention was for infringement of trading regulations as properly construed for the purposes of the policy (Issue 1). The issue under Clause 4.1.6 was whether the arrest and detention of the vessel arose from the operation of ordinary judicial process, or failure to provide security, or failure to pay a fine or penalty, or any financial cause (Issue 2).

## THE RELEVANT FACTS

12. A list of assumed facts was agreed for the purposes of the Issues which can be summarised as follows.

13. On 17 October 1997, during the currency of both policies, the vessel was boarded in the Australian Fishing Zone by naval personnel of the Western Australian Fisheries Management Department pursuant to powers granted by s.84(1)(a) of the FMA. The vessel was boarded and seized and ordered to sail to Freemantle pursuant to powers under s.84(1)(a) and (k) of the FMA, arriving there on 28 October. The vessel was detained on grounds of illegal fishing pursuant to s.84(1)(g) and/or s.84(1)(k) and/or s.88(1)(m). On 19 November 1997 the Master and Fishing Master of the vessel were personally charged, (i) with using a foreign fishing boat for commercial fishing without a foreign fishing licence, contrary to s.101 of the FMA and (ii) with having in their charge a foreign fishing boat, equipped with equipment for fishing contrary to s.100(1) of the FMA. Each charge provided that, upon conviction, an application would be made for forfeiture of the vessel, her equipment and fish on board, pursuant to s.106 of the FMA.

14. On 24 November 1997, the Master and Fishing Master were permitted to leave the vessel (being later permitted to leave Australia having been granted bail without conditions). On the same date, the Australian Fisheries Management Authority ("AFMA") confirmed the original seizure of the vessel, its equipment bait and catch and thereafter detained the vessel pursuant to s.84(1)(g) of the FMA. From its arrival in Freemantle until 14 January 1998 the vessel was berthed and under the control of AFMA. On that date AFMA entered into an agreement with a third party to underwrite the maintenance and security of the vessel on behalf of the AFMA. By 15 January 1998 the Australian Government solicitor had provided owners' solicitors with draft bond documentation; however no bond was put up by owners. In order to protect their position, the claimants then demanded immediate repayment of their loan and commenced foreclosure proceedings on 20 February 1998, the vessel being arrested by the Admiralty Marshal the same day. On 20 March 1998, the claimants obtained summary judgment against the owners, and the court (Ryan J) directed that the vessel should be appraised and sold. However, AFMA was not prepared to release the vessel pursuant to s.88(1) of the FMA and asserted that it remained in their possession and control. Ryan J subsequently ordered the hearing of an issue as to whether the AFMA's statutory rights constituted a defect of title to the ship if and when later sold to a purchaser pursuant to the court's order.

15. The Master and Fishing Master failed to appear on the date set for their trial in July 1998. Since any application for forfeiture of the vessel depended on their return to Australia for their trial, which prospect appeared remote, the court subsequently permitted sale of the vessel in the claimant's enforcement proceedings, which sale occurred on 21 December 1998, some fourteen months after the original seizure and detention of the vessel. A substantial part of the claimants' loan was thereby repaid. Meanwhile, the owners having tendered notice of abandonment and having had their claim rejected by the War Risks underwriters on the grounds that the vessel had been seized for illegal fishing in breach of the 'no illegal fishing' warranty, the claimants claimed under Clause 6 of the MII policy.

## THE HEARING BELOW

16. Before Toulson J, for the purposes of Issue 1, it was not in issue that *if* the vessel was detained for an infringement of 'trading regulations', then any claim under the War Risks Policy would be excluded and thus there would be no prima facie coverage in relation to the seizure of the vessel by AFMA.

However, it was denied by the claimants that there was any infringement of 'trading regulations', on the grounds that the provisions of the FMA were not trading regulations in the sense contemplated by the policy. Put shortly, the claimants' case was that an examination of the objectives of the FMA and its individual provisions demonstrated that it was a measure concerned with conservation and management of fishery resources of the Australian fishing zone in a manner which ensured ecologically sustainable development and maximised economic efficiency in the exploitation of those resources; it was not a measure concerned with the regulation of trade or trading in the usual sense of the process of buying and selling, import and export, or carriage of goods for that purpose. The FMA did not regulate the purchase and sale of fish or their importation into Australia but dealt with broad concerns of environmental protection and economic management. The claimants accepted that in ordinary usage the word 'trade' can be used to refer to activities wider than simply purchase and sale i.e. as a synonym for carrying on a commercial activity. However, it was submitted that it should not be so construed in this instance (a) because in a commercial context the word 'trade' is usually used in its transitive sense rather than its intransitive sense of simply carrying on a trade; (b) in case of doubt or ambiguity the exclusion should be construed in favour of the assured applying the 'contra proferentem' doctrine.

17. The judge stated that, like many questions of construction, the matter was a short point of impression, and he stated his conclusion shortly as follows:

> "Mr Charkham, for the underwriters, put his submission on this point in his skeleton argument with telling brevity as follows:
>
>> "The vessel was detained under the Australian Fisheries Management Act 1991. The act regulates commercial fishing. Commercial fishing is a trade. Ergo the vessel was detained by reason of infringement of a trading regulation."
>
> I accept Mr Charkham's submission. Like Customs' regulations which Lord Denning MR said in "THE ANITA" [1971] 1 Lloyd's Reports 487 at page 492 "must be given a business-like interpretation", trading regulations must equally be given a business-like interpretation. Most vessels insured under the Institute War Clauses are going to be used for trading purposes. Owners or managers may themselves be directly involved in the sale or purchase of goods, but more often they will not be. They will be involved in trading ventures which may well be subject to regulations, breach of which may lead to a vessel's seizure. It is natural that underwriters offering war and strikes cover should draw the line at covering vessels whose owners or managers choose to run the risk of engaging in such ventures in breach of regulations governing them. That being the broad and commercially sensible purpose behind the relevant words of clause 4.1.5, I see no reason to give the expression "trading regulations" a particularly restricted interpretation.
>
> As I have mentioned, the Act had the twin objectives, in summary, of economic advancement and environmental protection. An important part of the statutory scheme was the imposition of control over commercial fishing. Sections 100 and 101 were specifically directed towards unlicensed commercial fishing by foreign vessels. I do not regard it as a strained interpretation of the word "trading" to say it includes commercial fishing. On the contrary, bearing in mind that the expression is to be understood in a business-like way, if a businessman were asked whether he would describe commercial fishing as a form of trade or trading, I would expect his answer to be, "of course". In deference to Mr Hill's argument about the parsing of the phrase, I would read the word "trading" as derived from the verb "trade" in its intransitive sense; i.e. 'to take part in a trading or commercial venture". I would regard regulations which govern such activities as naturally described by the words "trading regulations".

18. Toulson J added later in his judgment that he did not think it right to have resort to the 'contra proferentem' rule because in his view the meaning of the words 'trading regulations' was not ambiguous. However, he observed that the argument that a 'contra proferentem' approach should be adopted presented a difficulty rather than a support to the claimants, in the light of the observations of Hobhouse J in *"The Wondrous"*, [1991] 1 Lloyd's Rep 416 when, in relation to the incorporation of the Institute War Clauses in a policy, he stated:

> "I bear in mind that the wording of these policies represents the proposal of the assured through his professional agent (the broker) for subscription by the underwriter and, therefore, in the event of ambiguity, it must be construed against the assured (e.g. *AS Ocean and Black Sea and Baltic General Insurance Co Limited* (1935) 51 Lloyd's Law Reports 305 at page 307)."

19. The judge then turned to Issue 2 and rejected the argument of the defendants that the failure to pay the draft bonds put forward by the Australian Government solicitor against the possible outcome of the criminal proceedings amounted to a failure to provide security within the sense contemplated by Exclusion 4.1.6. He held that the security contemplated was one relating to claims against the vessel, whereas here the bond required in the Australian procedures was principally a form of recognisance for the attendance of the master and fishing master at their trial. Finally, he rejected the defendants' argument that the bond requirement was to be construed as a 'financial cause' of the detainment of the vessel. In this respect he stated:

> "It seems to me that, in any given case, the court has to ask itself as a matter of fact whether the real or effective or dominant cause of the seizure and detention is a financial cause or something else. In the case of the *"The Wondrous"* the reason for the deemed detainment was financial. In the present case, it seems to me that the dominant reason for the detainment of the vessel by the AFMA was that it had been caught fishing in the Australian Fishing Zone, and the fact that its release might have been procured by the payment of money should not lead to the conclusion that the cause of the detainment was financial. The conclusion which I have therefore reached is that the claim by the mortgagees on the assumed facts fails by virtue of exclusion 4.1.5 and not 4.1.6."

## THE FMA

20. Before proceeding to the grounds of appeal it is convenient to set out the scheme of the FMA.

21. By s.3(1) its principal objectives are stated to be:

> "(a) Implementing efficient and cost-effective fisheries management on behalf of the Commonwealth; and
>
> (b) ensuring that the exploitation of fisheries resources and the carrying on of any related activities are conducted in a manner consistent with the principles of ecologically sustainable development and the exercise of the precautionary principle, in particular the need to have regard for the impact of fishing activities on non-target species and the long term sustainability of the marine environment; and
>
> (c) maximising economic efficiency in the exploitation of fishery resources; and
>
> (d) ensuring accountability to the fishing industry and the Australian community in AFMA's management of fisheries resources; and
>
> (e) achieving government targets in relation to the recovery of the costs of AFMA."

22. The FMA lays down a comprehensive scheme for the management and regulation of fishing within the Australian Fishing Zone which it establishes. Part 1 deals with various preliminary matters including the extent of and exceptions to, the fishing areas regulated. Part 2, Divisions 1-4, deal with plans of management and the grant of various fishing rights and options and Divisions 5 and 6 with the grant of permits to Australian boats and scientific permits.

23. Division 7 relates to the grant of foreign fishing licences and Division 9 to the grant of foreign master fishing licences. Under the former, by s.34(1), AFMA may, on application made in approved form, grant a licence authorising the use of a specified foreign boat for commercial fishing in a specified area of the Australian Fishing Zone. Under the latter it may grant to a 'foreign master' a fishing licence, authorising the grantee to be in charge of a foreign boat which is being used for commercial fishing in such an area. Such licences are granted subject to various specified conditions with which the holder must comply. Under s.100(1) a person must not, at any place in the Australian Fishing Zone use a foreign boat for commercial fishing unless there is in force a foreign fishing licence authorising the use of the boat at that place and, if he does so, he is guilty of an offence punishable on conviction by a fine. Under s.101 it is similarly an offence for a person to have in his or her possession or charge a foreign boat equipped with nets traps or other equipment for fishing unless authorised by a foreign fishing licence. So far as enforcement is concerned, it is clear that, under the provisions of the FMA to which I have earlier referred at paragraphs 13 and 14 above, the relevant officers were empowered to board, search and subsequently detain and seize the vessel by way of enforcement measures.

## ISSUE 1

### Trading Regulations

24. Upon this appeal, Mr Persey QC for the claimants prefaced his submissions with three preliminary propositions which are not in dispute. First, the court should give Clauses 4.1.5 and 4.1.6 a businesslike interpretation in the context in which they appear: see the observations of Lord Denning MR in *"The Anita"* [1971] 1 Lloyds 487 at 492. Second, that it is for the underwriters to bring themselves within the exceptions set out in those clauses: see again *"The Anita"* at 492 (per Lord Denning MR) and 495 (per Sir Gordon Wilmer). Third, in defining the insured risks under the War Risks Policy it is necessary to have regard both to the perils insured and the exclusions, since together they delimit the risk. As stated by Hobhouse J in *"The Wondrous"* [1991] 1 Lloyd's Rep 400 at 416-417:

> "The Institute Clauses include a coherent scheme of the formulation of the risks covered and to take only one part is not only contrary to that scheme, it is also contrary to the express wording of the clauses themselves and to the terms of the incorporation. The risks are the perils with the exclusions; together they delimit the risks covered. Accordingly the defendants are entitled to rely on the relevant parts of the cl.4."

See also, on appeal, [1992] 2 Lloyd's Rep 566 at 572 lhc per Lloyd LJ.

25. Mr Persey submits that the judge fell into error at p.11A of his judgment when he stated:

> "When one reads together Clause 1 (the insured perils) and Clause 4 (the exceptions), the broad picture which emerges is that the policy is intended to provide cover against a vessel being seized or damaged as a result of war or political or industrial action. It is not intended to provide cover against arrest by reason of civil claims *or by reason of a vessel engaged in illegal trading.*" (emphasis added)

26. Mr Persey rightly accepts that cover was not provided against arrest by reason of civil claims. However, he submits that the judge put the matter too widely, or at least begged the question by his reference to "illegal trading". He submits that, in the passage quoted, the judge overlooked that the War Risk cover provided was intended (subject to exceptions), to provide cover against seizure and

detention as a result of any political or executive act in anything other than civil proceedings, and thus included seizure arising out of criminal conduct or activity unless occurring with the privity of the assured. In this respect, he also rightly observed that the privity of owners had not been pleaded and there was no evidence before the court or by way of any agreed statement of fact to that effect. Accordingly, submits Mr Persey, the seizure and criminal proceedings arising out of the conduct of the master were prima facie within the risk insured, subject only to the proper interpretation of the term 'trading regulations'.

27. In this connection, Mr Persey no longer places reliance upon the so-called 'contra proferentem' rule, conceding that, if the task of the court is to ascertain the extent of the risk in the light of the defined perils read together with the relevant exclusion, there is no room for the operation of that rule. However, he otherwise repeats the submissions made below.

28. He accepts that the judge rightly held that the FMA regulates, inter alia, commercial fishing, but submits that he was wrong to hold that, simply because commercial fishing may be a trade and (indeed was the trade of the owners), the vessel was detained by reason of infringement of a trading regulation. He submits that the principal meaning of 'trade' when used as a verb or participle involves a commercial transaction between two parties, being classically the actual process of buying, selling or otherwise dealing in goods and services, either in the domestic market or the international market. He submits that, in the context of the Institute War Clauses, drafted as a 'package' applicable to all types of vessel, the word 'trading' should be read in that sense. Thus, he submits, regulations forbidding, controlling or otherwise regulating the sale or importation of goods into a country and the supplying, delivery or, carriage of goods for that purpose would rank as trading regulations, but regulations prohibiting fishing for purposes of conservation do not.

29. Mr Charkham for the underwriters supports the reasoning of the judge.

30. In our view Mr Persey is right. The exception in respect of 'trading regulations' was introduced into Exception 4.1.5 of the Institute War Clauses in the aftermath of the Iran-Iraq war and the effect upon trading vessels of the regime of sanctions widely operated at that time. As part of a long-standing regime of interlocking clauses designed and applied (on occasions subject to deletions) as a package for inclusion in policies relating to vessel of all kinds, the majority of which will be trading vessels concerned with carriage of goods by sea in furtherance and/or fulfilment of international trading transactions, it seems to us that the phrase 'trading regulations' falls to be construed with that in mind. While it is always necessary to construe the effect of 'standard' clauses in the context of the overall provisions of the contract in which they appear, it would in our view be wrong to accord to the label 'trading regulations' a varied purpose or meaning according to the nature or function of the particular vessel insured (in this case a fishing vessel) or the particular trade or business of the owner. Neither in themselves can affect the nature and character of the regulation which has been infringed. The question whether or not a regulation is a trading regulation depends upon its own nature and purpose and not upon the fact that it may, incidentally, affect a shipowner in the course of the operation of his trade or business.

31. The aims of the FMA are ecological and environmental. So far as the 'regulations' contained within it were passed to further those aims they were plainly not trading regulations. It is true that the FMA's aims also include the preservation and proper management of an important commercial resource, namely Australian fish stocks; in that context it regulates fishing within Australian waters whether for pleasure or gain. However, such regulation is not aimed at (or indeed concerned with) the processes by which any fish caught are thereafter sold, supplied or traded. The question to be asked is whether, in the ordinary language and understanding of commercial men, a regulation whose purpose is the conservation and management of fishing stocks is a 'trading regulation' in the sense contemplated by the policy. We do not think the answer is provided by simply asserting that, because commercial fishing is a trade to which the regulation applies, the regulation is therefore a trading regulation.

32. In this connection, Mr Charkham has drawn attention to the following observation in *Arnould's Law of Marine Insurance and Average (16th ed)* para 357, by way of comment on wording identical to Exception 4.1.5, contained in Clause 5.1.4 of the 1995 Hull Clauses cover:

> "The exception relating to "customs regulations" has been broadly construed, as referring to laws in force in the country concerned, whatever their form, which deal with smuggling or other offences in the realm of customs .... The other expressions in this clause (quarantine, trading regulations), should no doubt also be construed broadly."

33. However, the authority referred to for the proposition in the first sentence is *"The Anita"* [1970] 2 Lloyd's Rep 365, reference to which shows that the relevant provision of the Vietnam decree under consideration in that case was stated to cover inter alia "contraband" and referred specifically to "those who import or attempt to import products or goods whose import is prohibited by the legislation in force". Thus, while no formal customs code was apparently involved, the nature and purpose of the provision was quite clearly one relating to contraband, the traditional area of concern of customs regulations. As observed by Sir Gordon Willmer in *"The Anita"* in the Court of Appeal at [1971] 1 Lloyd's Rep 495:

> "The ordinary man, if asked what was the reason for the ship's confiscation, would surely reply that it was by reason of the members of the crew having been caught smuggling."

34. By way of contrast in this case, it seems to us that, faced with the same question, the ordinary man would reply that the ship's seizure was by reason of the crew having been caught illegally fishing, rather than for trading illegally. Furthermore, we regard the requirement or imposition by the insurers of a warranty as to 'no illegal fishing' as some indication of the parties' contemplation that fishing in breach of local laws or regulations would not otherwise be excluded from the scope of the policy by reason of the exception in respect of 'trading regulations'.

35. We are conscious that our conclusion as to the businesslike interpretation of the term 'trading regulations' is contrary to that which the judge thought so plain. However, it seems to us that, taken to its logical conclusion, the judge's unqualified acceptance of Mr Charkham's submission that, if a national law operates to place restrictions on a trade, it is a trading regulation, would mean that Exception 4.1.5 has the potential to apply to every local statute or regulation the effect of which is to prescribe or place limitations upon a shipowner's activities and breach of which may give rise to seizure or detention. If that is so, its scope would extend to the full range of regulatory measures which may affect a shipowner whether in relation to carriage of goods, pollution, health and safety, or conditions of employment. Just as commercial fishing is a trade, so is the operation of a ship for reward, whether for carriage of goods, dredging or operating as a cruise liner. Upon that basis, to interpret the expression 'trading regulations' without the imposition of any generic limitation would be unreasonably to emasculate the breadth of Clause 1.2.

36. We therefore accept the thrust of Mr Persey's submissions and would allow the appeal under Issue 1.

## ISSUE 2

37. We now turn to consider the cross-appeal under Issue 2.

38. We have so far only shortly indicated the area of dispute under Issue 2. The relevant facts were these. The vessel was formally seized on 17 October on the day that she was boarded and was from 24 November detained by AFMA pursuant to the relevant provisions of the FMA. Once the Master and Fishing Master had been charged, it was open to AFMA under s.88(1) of the FMA to release the boat to the owners on such conditions as AFMA thought fit "including conditions as to the giving of security for payment of the value of the property if it is forfeited and for the payment of any fines that may be imposed under this act in respect of offences that AFMA has reason to believe have been committed ...."

39. Following their being charged on 19 November 1997, the Master and Fishing Master were given bail without conditions on 11 December 1997 until 5 February 1998 when bail was extended, again without conditions, to 6-8 July 1998, their anticipated trial date.

40. By 15 January 1998 the Australian Government solicitor had provided owners' solicitors with draft bond documentation. He also informed them that AFMA 'is prepared to negotiate on the provision of reasonable bonds by your client for the release of the "Aliza Glacial"' and invited owners' comments on the documents provided. The drafts which were each headed "Security" recited that the vessel was under the control of the AFMA and its powers under s.88 to direct release to the owners on such conditions as it thought fit. Two separate forms of security were provided, one for A$ 9,768,705 against "possible forfeiture orders and fines that may be imposed by a court in relation to the charges" and the further security for a A$ 275,000 "to ensure the operation of a Vessel Monitoring System on board the vessel until completion of all legal proceedings relating to the charges". The body of the security provided that, in the event of conviction of the Master and Fishing Master and any consequent forfeiture order being made, the Australian government could retain the amount of the security which also covered any fine imposed and not paid by the owner. The security was also to be forfeit if the Master and Fishing Master failed to appear for the hearing of the charges or on any occasion to which they had been bailed to appear, unless excused from attendance. It does not appear that the solicitor's offer of negotiation was taken up. From that time on, until it was eventually sold in December 1998, the vessel remained subject to the detention of AFMA pursuant to its powers under the FMA.

41. Following commencement by the claimants of their foreclosure proceedings on 20 February 1998, Ryan J gave summary judgment in their favour in those proceedings on 20 March 1998 and directed that the vessel be valued and sold. However, AFMA, having given no directions for release of the vessel pursuant to s.88(1) of the FMA, Ryan J ordered the trial of a preliminary issue to decide whether the rights of the AFMA and the government of Australia under the FMA constituted a defect of title to the vessel which a purchaser would acquire upon the sale ordered by the court. By order dated 18 September 1998, Ryan J answered that issue in the negative.

42. By that time the Master and Fishing Master had failed to appear on the date to which they had been bailed (6 July 1998) and bench warrants had been issued for their arrest. In his judgment dated 19 October 1998 Ryan J stated that the only prospect of the trial being brought to a conclusion and an application for forfeiture of the ship under the FMA being made depended on their return to Australia and, since that prospect was so remote and there were many difficulties which stood in the way of the ship being confiscated under the Australian Proceeds of Crime Act 1987, he would give directions for the sale of the vessel. He directed the Admiralty Marshal to accept the claimants' tender to purchase the vessel and to conclude the sale. The sale was concluded on 21 December 1998. In the event the Master and Fishing Master were never tried or convicted for illegal fishing.

43. Exclusion 4.1.6 excludes (a) the operation of ordinary judicial process: (b) failure to provide security and (c) any financial cause. We omit reference to failure to pay any fine or penalty because such failure cannot be demonstrated in this case. Nor does it appear that any exclusion on that particular ground was argued before the judge. We shall deal with the other exclusions in order.

### The operation of ordinary judicial process

44. It is plain that the scope of the words "ordinary judicial process" is confined to civil proceedings for the enforcement of private rights and it does not extend to judicial process for the purpose of enforcing public or criminal laws, even if taking place within the ordinary judicial system of the country concerned: see *Arnould* para 361. It was recognised for the underwriters before the judge and in this court that, at any rate as from its initial seizure until the arrest by the Admiralty Marshal following issue of the claimant's forfeiture proceedings, the seizure and detention was the result of executive action under the FMA. However, it is argued for the underwriters that, once the claimants brought their mortgagees' action and the vessel had been arrested by the Admiralty Marshal pursuant to those

proceedings, following which the vessel was in the joint custody of the Marshal and the AFMA, the further detention of the vessel was by reason of ordinary judicial process.

45. Mr Meeson, for the twelfth defendants, who has principally argued this point, has relied upon the fact that in their claim, the claimants assert that, by reason of the length of its detention from 17 October 1997 to 21 December 1998 the vessel was a constructive total loss pursuant to Clause 3. He submits that, for the bulk of that time, i.e. from the time of its arrest, effective control of the vessel passed to the Admiralty Marshal and thereafter the authorities were powerless to sell the vessel other than through the court; on that basis the effective cause of the loss was 'ordinary judicial process'. Like the judge below, we reject that analysis. In the proceedings before Ryan J, he was trying an issue as to whether the statutory rights of detention and control over the vessel enjoyed by AFMA would constitute a defect of title to the vessel which a purchaser would acquire upon the sale of the vessel ordered to be sold by the court in an action *in rem*. In answering that question in the negative, the relevant part of his judgment reads as follows:

> "... the legislature has not provided that the general power of sale exercisable by a Court of Admiralty, including conveyance to a purchaser from the Marshal of a clean title of the vessel should, in all cases, override the right of detention under the Act and the inchoate right of the Crown to the forfeiture of the vessel.
>
> In these circumstances, I consider that the legislature intended to leave to the Court of Admiralty, in the exercise of its discretion, the adjustment of the competing rights of the authorised officer under the Act on the one hand, and of the plaintiff in an action *in rem* and other persons concerned in the resolution of that action on the other. This interpretation allows the Court of Admiralty to make an order, for example securing the salvor's reward for salvage of the vessel while she is under detention ... it also permits the Court in an appropriate case, to defer the sale to preserve the utility of the detention of the vessel under the Act if those who would be entitled to claim on the fund in the event of a sale refused to allow an order for forfeiture, if made, to attach to that fund in lieu of the vessel."

46. We find nothing in the judgment of Ryan J to suggest that, as between AFMA and the owners, no security having been provided, AFMA's rights of seizure and detention were other than effective until the moment of sale pursuant to the order of the court. The original seizure and continuing detention remained operative to deprive the owners of the free use and disposal of the vessel until sale occurred. Arrest by the Admiralty Marshal superimposed a fetter upon the owners' ability to use the vessel but had no significant causative effect upon it. It certainly did not prolong such deprivation. Ryan J referred to the vessel, following commencement of the claimants' proceedings, as being in the joint custody of AFMA and the Admiralty Marshal. The reason the judicial process became extended was because of the stance of the FMA in asserting and seeking to protect its statutory rights of detention which only ended upon its sale. Had the claimants not invoked the court process, there is no reason to suppose that the detention of the vessel would not have continued indefinitely, and at least until the date of deemed constructive total loss provided for in Clause 3.

47. In this context (as below in relation to the non-provision of security) reliance has been placed by the defendants upon the principle that:

> "If the loss is caused by two causes effectively operating at the same time and one is wholly expressly excluded from the policy, the policy does not pay"

per Roskill LJ in *Wayne Tank and Pump Co Limited –v- Employers Liability Assurance Corporation Limited* [1974] QB 57 at 75; see also *P. Samuel & Co Ltd –v- Dumas* [1924] AC 431 at 467 per Lord Sumner:

> "Where a loss is caused by two perils operating simultaneously at the time of loss and one is wholly excluded because the policy is warranted free of it, the question is whether it can be denied that the loss was so caused, or if not the warranty operates."

It is also submitted that, where two or more causes are operating concurrently, they do not have to be exactly co-extensive in time; thus a later cause may join with a previous and continuing cause so as to become concurrent.

48. Both propositions are correct. Nonetheless, whenever an argument as to causation arises in respect of rival causes contended for under a policy of insurance, the first task of the court is to look to see whether one of the causes is plainly the proximate cause of the loss. This of course means proximate in efficiency and not in time; what is frequently described as "the effective or dominant cause" (see per Lord Denning MR in the *Wayne Tank* case at p.66F-G and per Roskill LJ at 72A). If in a case where one of two rival causes is an insured peril and the other is the subject of an exception, it can be shown that the effective and dominant cause was the peril rather than the exception, that is decisive in favour of the insured. It is only if the court is driven to the conclusion that there was "not one dominant cause, but two causes which were equal or nearly equal in their efficiency in bringing about the damage", one being a peril and the other an exception, that the exception prevails. (*ibid* at p.67). For the reasons which we have set out in paragraph 46 above, we would regard the detention by AFMA and its continuing assertion of its rights in that respect as the effective and dominant cause of the owner's loss of use of the vessel and their consequent claim for constructive total loss, rather than the judicial process initiated by the claimants, the extended period of which was caused by AFMA's continuing intervention to vindicate its rights of detention.

### Failure to provide security ... or any financial cause

49. These two exceptions may be considered together in this case. The essence of the underwriters' and brokers' case is that the failure of the owners to provide security in the form of the bonds proffered by the AFMA in the amount of some A$10 million falls within both exceptions. The steps in their argument can be shortly stated. (1) The bonds were described as, and were plainly in the nature of, a security; they were proffered with a view to the release of a vessel and its equipment which would otherwise be detained against the possibility of forfeiture orders following the trial of the Master and Fishing Master. (2) They were accompanied by a letter making clear that AFMA was prepared to 'negotiate on the provision of reasonable bonds' to be provided by the owners. (3) Had bonds been provided in the sum originally requested, or some negotiated lesser amount, the vessel would have been released. (4) Had that been done, no question of a constructive total loss (on which basis the owners claimed upon their underwriters) would have arisen. (5) Thus, to the extent that any loss suffered by reason of the original detention was extended and augmented by owners' failure to provide security, that failure was causative of the owners' loss. (6) The case could equally well be put as damage arising from 'any financial cause', namely the failure of the owners to put up the money for the security necessary to secure the ship's release.

50. The judge rejected the defendants' submissions below essentially for two reasons. First, in respect of the failure to provide security, he accepted that such a provision might apply in the context of criminal proceedings (as the reference also to 'any fine or penalty' also suggested). However, he said:

> "I am inclined to accept Mr Hill's argument that the businessman would have had in mind when considering a clause of this kind security as something relating to claims against the vessel. Here, the bond required was, among other things, a form of surety for the attendance of defendants. I think that it is an over-wide interpretation of security in such a clause to treat it as extending to a requirement to put up recognisances for an individual charged with a criminal offence. On that ground, I would accept Mr Hill's argument that this part of the clause is not applicable in the present circumstances."

51. Second, in respect of 'any financial cause', he referred to the decision of this court in *"The Wondrous"* [1992] 2 Lloyd's Rep 566, in which Lloyd LJ stated at 573:

> "The financial cause must, of course, affect the ship. Otherwise there would be no detainment. But assuming the ship is detained by a failure to pay money on the part of the cargo interest, it comes within the ordinary meaning of the words 'financial cause'. I accept that the ordinary meaning of the words is 'very wide. But they are the words which the parties have chosen. In the context of a War Risks policy the words can and should be given their ordinary meaning."

52. The judge observed that in that case it was easy to see that the primary reason for the vessel's inability to leave Banda Abbas was a financial cause given that port dues had not been paid, nor a tax on freight. However, he continued:

> "Wide as the words 'any financial cause' are, it seems to me they must have some limitation. Suppose that a vessel was seized by a terrorist organisation wanting to raise money, a ransom demand was made for a million pounds and the owner declined to pay the money: could it be said that the detention of the vessel thereafter was through a financial cause? In a literal sense, it could, but no one would suggest that such a conclusion would accord with the spirit of the policy. The perils insured against include seizure of vessels by terrorist organisations and a common major procedure would be to make a monetary demand. It is easy to say as a matter of instinct that the exclusion under 4.1.6 would not apply in those circumstances, but as a matter of construction, I ask the question why it would not? It seems to me that, in any given case, the court has to ask itself as a matter of fact whether the real or effective or dominant cause of the seizure and detention is a financial cause or something else. In the case of "THE WONDROUS", the reason for the deemed detainment was financial. In the present case, it seems to me that the dominant reason for the detainment of the vessel by the AFMA was that it had been caught fishing in the Australian Fishing Zone, and the fact that its release might have been procured by the payment of money should not lead to the conclusion that the cause of the detainment was financial."

53. Deciding the point on those grounds, the judge observed that it was unnecessary for him to decide whether or not the editors of *Arnould* were correct in their view expressed as follows in relation to the exceptions contained in Clause 5 of the Institute War and Strikes Clauses, which is in identical terms to Exception 4.1.6 in this case:

> "The structure of Clause 5 pre-supposes that the loss (which would otherwise be insured) is one "arising from" the various exceptions. Failure to provide security, or to pay a fine or penalty may in some circumstances prevent restoration of the vessel, after there has already been an operation of insured perils and after there is therefore either already a loss, or a situation has already arisen which (if not remedied) will develop into one of total loss. It is open to question whether these exceptions in 5.1.5 should apply in such circumstances; the wording of the clause can more aptly be applied where the failure to provide security or effect payment is what brings about the operation of an insured peril."

54. The suggested limitation upon the application of the exceptions as advocated in that passage was urged upon the judge below and has been repeated by Mr Persey in this court.

55. Dealing first with the failure to provide security, like the judge we accept that, when considering a clause of this kind, one is contemplating a clause relating to claims against the vessel, and not a form of recognisance or surety for an individual charged with a criminal offence. However, unlike the judge, we consider that, despite the circumstances in which it was demanded, the security was one which, on a businesslike interpretation, was in respect of a claim or (more accurately) a potential claim against the vessel, in the sense that the FMA authorised its detention against the event of its forfeiture

following conviction of the Master and Fishing Master (i.e. in assertion of what Ryan J described as the "inchoate right" of the Crown to forfeiture of the vessel).

56. We therefore proceed to consider the question raised in *Arnould* in the passage quoted at paragraph 48 above.

57. We agree with the broad point made that the structure of Clause 4 pre-supposes that the loss which would otherwise be insured is one 'arising from' the various exceptions and thus that the wording of the clause is most obviously apt for application where the failure to provide a security or effect payment is what brings about the operation of the insured peril and not vice versa. That was certainly the position in *"The Wondrous",* in which a wide meaning was accorded to 'financial cause', the exception there under consideration.

58. We also consider that it is plainly reasonable for insurers to seek to exclude from cover a seizure or detention precipitated (i.e. originally caused) by financial weakness or default of the insured, whereas it is less obviously so where the assured is placed in a financial difficulty or dilemma as result of a seizure made or detainment initiated in circumstances which fall within the perils insured. That is because, if the insured unreasonably fails in such circumstances to provide the security or otherwise expend money to secure the release of his detained vessel, the insurer may plead that the insured is in breach of his obligation to sue and labour, whether under s.78(4) of the *Marine Insurance Act 1906* or (as in this case) by reason of Clause 13.1 of the *InstituteTime Clauses Hull*s (see paragraph 9 above). In deciding whether or not such a breach amounts to a defence to the claim of the insured, the test of proximate cause as between the occurrence of the peril and the breach of the assured will in practice be applied as the touchstone of liability: see generally *Arnould* at para 770 p.617-20 and *State of Netherlands –v- Youell* [1998] 1 Lloyd's Rep 236 at 244-5 per Phillips LJ. That is, of course, a point which, had the war risks underwriters not repudiated liability for breach of warranty, they might have sought to take by way of defence against the owners; it is not, however, a point which the MII underwriters could take against the claimants since, upon that basis, there would be prima facie coverage in respect of the peril under the owners' policy even if, by reason of the insured's breach of Clause 2 of the Institute War Clauses, their claim for constructive loss might be defeated.

59. The broad question raised is whether or not the exceptions are intended to co-exist with, or be read subject to, other defences available under the terms of the policy. The editors of Arnould do not answer that question beyond suggesting that, if and insofar as the exceptions extend to circumstances other than those where a prior failure to provide security is what causes the operation of the insured peril in the first place, a 'reasonableness limitation' should be imposed on its operation. In particular, they suggest that the exception should not:

> "be construed so as to afford a defence in circumstances where it would have been unreasonable to provide the security etc demanded in order to recover the vessel, or where the amounts involved would otherwise enable her to be treated as a total loss."

See also *Stringer –v- English & Scottish Marine Insurance Co* (1869) LR 4 QB 676 at 691-2, affirmed on appeal at LR 5 QB 599 at 603, a case in which the court held it to be no answer to a claim for total loss that the vessel could have been recovered by provision of bail to its full value. We agree that such a limitation is indeed appropriate, and would hold that the exception in respect of a failure to provide security should be read as inoperative in a case where the amount and circumstances of such provision would otherwise enable the vessel to be treated as a total loss.

60. In our opinion (subject to such limitation) the exclusion in respect of failure to provide security does not fall to be read as applying only to the situation where the failure to give security itself gives rise to the operation of the original seizure or detention. We consider that it is the contractual intention that the exceptions in 4.1.6 fall to be considered independently of other defences available to the insurers. In this case it appears to us that Exception 4.1.6 is different in nature from the preceding Exceptions 4.1.1 to 4.1.5 and the Exception which follows (4.1.7). Those other exceptions are defined by

reference to the particular circumstances in which physical damage, seizure or detainment occur, whereas the terms of Exception 4.1.6 are not so constrained and appear to us to me to make clear that, losses arising from the causes listed are intended to be excluded in any event. In this context, use of the phrase "Loss ... or expense *arising from*" the various exceptions does no more than import the usual test of causation as between peril and exception, namely that of proximate cause, primacy being attached to the exception over the peril in any case where competing causes are equal or nearly equal in bringing about the damage.

61. Further, we consider that Exception 4.1.6 falls to be construed against the background that the owners' policy is one in which the relevant peril is defined as "loss of or damage to the vessel" (Clause 1). In that context, the burden rests upon the insured to establish its actual or constructive total loss. The policy plainly contemplates, as indeed is the position in this case, that following seizure and/or detainment, the deeming provision contained in the detainment clause (Clause 3) is likely to be relied on by the insured as the mode of proof of loss. Clause 3 requires that, in the event of seizure, detainment etc "the assured shall *thereby* have lost the free use and disposal of the vessel for a *continuous period of twelve months*". If a claim is made under Clause 3, this seems to us to import a test of causation which must be applied not simply to the cause of the original seizure (not enough in itself to amount to loss of the vessel) but to the full 12 month period of the detainment relied on as constituting the loss of the vessel.

62. That being so, in this case, where the loss of the vessel relied on is a constructive total loss accruing as a result of a detainment of at least twelve months, it is the task of the court to consider whether the insured peril is indeed the proximate cause of that loss or whether that loss equally falls within the exclusion. In this connection, however, if it be shown that it was not reasonable for the owners to provide the surety demanded in respect of the vessel because the sum required exceeded the full value of the ship and would otherwise enable her to be treated as a constructive total loss, the exclusion should be treated as inapplicable.

63. Mr Meeson's submissions have run as follows. He rightly points out that, in considering whether the claimants are able to show that the loss was prima facie covered by the owners' policy, the agreed statement of facts records, and the parties have accepted, that the claim of the owners was for constructive total loss of the vessel pursuant to Clause 3 (Detainment). No argument has been advanced or addressed to the effect that the owners might have claimed on the basis of a partial loss, so as to justify any assertion by the claimants that such partial loss at least was prima facie covered by the owners' policy. He submits therefore that the claimants must prove detention *for twelve months* as a result of an insured peril. That, he submits, cannot be demonstrated because, for the bulk of the twelve month period under Clause 3 (i.e. February 1998-October 1998) the proximate cause of the detention, effective and concurrently operative, was the failure of the owners to provide security for the release of the vessel, either in the sum originally required or in some lesser amount following the offer of negotiations which was never taken up.

64. Subject to the question of the value of the vessel as against the amount of the security demanded we consider that Mr Meeson is right. Upon the agreed facts, as supplemented by the documents before us, as from mid-January the owners had the clear opportunity to secure the release of the vessel from detainment by AFMA by putting up the security requested or by agreeing some lesser sum in response to the invitation in the government solicitor's letter. However, the owners did not do so and thus the detention continued.

65. In those circumstances, subject only to argument upon the value of the vessel in relation to the security demanded, we consider that, as from January 1998, the failure of the owners to provide security to AFMA for the release of the vessel was an effective cause operating concurrently with AFMA's original seizure and detention so as to deprive the owners of their use of the vessel.

66. The point upon value which Mr Persey has raised is simply this. He submits that, in the light of the claimant's eventual purchase of the vessel for US$ 4.5 million from the Australian Admiralty Marshal,

it is plain that the amount demanded as security by AFMA (in total some A$ 10 million) was far in excess of the value of the vessel and he therefore asserts that the exception in 4.1.6 is not applicable. Mr Meeson, on the other hand, submits that it is not open to the court to draw any such inference. First, he points out that there is no agreement between the parties as to the value of the vessel or her machinery and equipment; nor as to the basis or circumstances of the sale to the claimants by the Admiralty Marshal. Second, he relies upon the fact that the owners' policy was a valued policy under which the vessel was insured for an insured value of NOK 65 million, approximately equivalent to A$ 13.5 million at the relevant time. He says that this is of significance because in his submission it is the insured value rather than the actual or market value of the vessel which is relevant in relation to the owners' claim.

67. In this connection Mr Meeson submits as follows. He acknowledges that s.27(4) of the *Marine Insurance Act 1906* provides:

"*Unless the policy otherwise provides,* the value fixed by the policy is not conclusive for the purposes of determining whether there has been a constructive total loss."

68. However he submits that in this case the policy does otherwise provide. Clause 2 of the Institute War Clauses incorporates Institute Time Clauses Hulls 1/10/83 (with certain exceptions which are not relevant). Clause 19 of the Institute Time Clauses Hulls ("Constructive Total Loss") provides:

"19.1 In ascertaining whether the Vessel is a constructive total loss, *the insured value shall be taken as the repaired value* and nothing in respect of the damaged or break-up value of the vessel or wreck shall be taken into account.

19.2 *No claim for constructive total loss based upon the cost of recovery* and/or repair of the vessel *shall be recoverable hereunder unless such costs will exceed the insured value*. In making this determination, only the cost relating to a single accident or sequence of damages arising from the same accident shall be taken into account."

69. Mr Meeson relies upon the words which we have italicised in Clause 19 and submits that the use of the word 'recovery' in the first line of Clause 19.2 is plainly intended to refer back to s.60(2)(i)(b) of the 1906 Act which provides:

"There is a constructive total loss where the assured is deprived of possession of his ship ... by a peril insured against and ... (b) the cost of *recovering the ship* ... would exceed their value when recovered."

70. We do not consider that Clause 19 is of assistance to Mr Meeson in the context of this case. Clause 19.1 appears to be concerned with a claim for constructive total loss based on an accident to the vessel involving the need for salvage and/or repair. So far as Clause 19.2 is concerned, while its provisions appear apt to a claim for constructive total loss under s.60(2)(i)(b) of the 1906 Act, its terms are not applicable to the claim for constructive total loss in this case, which was made under the deeming provisions of Institute War Clause 3 (Detainment), which simply requires proof of deprivation of possession for a continuous period of twelve months in order to establish a constructive total loss. The claim of the owners was not one 'based upon the cost of recovery' within the meaning of ITC Hulls Clause 19.2. It follows that insofar as it is necessary to consider the value of the vessel for the purpose of deciding whether there has been a constructive total loss, the insured value of the vessel is not conclusive.

71. Accordingly, we consider that the matter turns upon whether or not, the vessel having been detained, it would have been reasonable or unreasonable for the owners to have provided security as required by AFMA, having regard to the size of the security demanded and the likelihood of its recovery as against the actual value of the vessel. That is an issue which, if it arose as between the owners and their underwriters, would require considerable investigation not only as to the actual (as opposed to the

insured) value of the vessel, the prospects of negotiating a reduction in the security, the likelihood of the Master and Fishing Master attending their trial and (if they were to attend) the likely outcome of the proceedings against them. Those are not however matters on which agreement has been reached or evidence adduced on the hearing of this preliminary issue which arises between the claimants and their underwriters under the MII Policy and is concerned with the question whether or not the loss was *prima facie* covered by the owners' policy. For that purpose, we are obliged to resolve the matter on the basis of the Assumed Facts and the sparse contents of the documents in evidence before us.

72. So far as the value of the vessel is concerned, it seems clear that AFMA were demanding surety in the sum of some A$ 10 million which they regarded as at least sufficient to cover the full value of the vessel. It is also apparent from the judgment of Ryan J that in April 1998 the Admiralty Marshal procured a valuation on the basis of the price obtainable from a willing buyer at that time of US$ 6 million. Finally, it is clear that the claimants subsequently purchased the vessel in November 1998 in a sale by sealed bid tenders for US$ 4.5 million. On the face it, therefore, it would appear clear that AFMA were on any view demanding, and in any subsequent negotiations would have required, a sum by way of surety substantially greater than (or at least equal to) the value of the vessel and, given the view of Ryan J that there was no reasonable prospect of the Master and Fishing Master attending their trial in Australia, the owners were entitled to take the view that it would not be reasonable to provide a sum by way of security which would exceed the value of the vessel thereby recovered and would inevitably be lost.

## CONCLUSION

73. In those circumstances, we hold, on the Assumed Facts, that the claimants have established that they have suffered a loss which was prima facie covered by the owner's policy within the meaning of Clause 6 of the MII Clauses and that the loss was not prima facie excluded by the exclusions contained in Clauses 4.1.5 and 4.1.6 of the Owners' War Risks Cover. We therefore allow the appeal and dismiss the cross-appeal of the defendants under their respondents' notices.

### Order:

1. **Appeal allowed, cross appeal dismissed**

2. **1st – 11th Defendants to pay the costs of the appeal**

3. **No Order for costs of hearing 30.04.02**

**(Council to provide minute of Order)**
**(Order does not form part of the approved judgment)**

© 2002 Crown Copyright

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2002/577.html*



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# United Kingdom House of Lords Decisions

---

**You are here:** BAILII >> Databases >> United Kingdom House of Lords Decisions >> Banque Financiere De La Cite v. Parc (Battersea) Ltd and Others [1998] UKHL 7; [1999] AC 221; [1998] 1 All ER 737; [1998] 2 WLR 475 (26th February, 1998)
URL: *http://www.bailii.org/uk/cases/UKHL/1998/7.html*
Cite as: [1999] AC 221, [1998] UKHL 7, [1998] EG 36, [1998] 2 WLR 475, [1998] CLC 520, [1998] 1 All ER 737, [1999] 1 AC 221

---

[New search] [Buy ICLR report: [1998] 2 WLR 475] [Buy ICLR report: [1999] AC 221] [Help]

---

# Banque Financière De La Cité v. Parc (Battersea) Ltd and Others [1998] UKHL 7; [1999] AC 221; [1998] 1 All ER 737; [1998] 2 WLR 475 (26th February, 1998)

### HOUSE OF LORDS

Lord Steyn   Lord Griffiths   Lord Hoffmann   Lord Clyde   Lord Hutton

### OPINIONS OF THE LORDS OF APPEAL FOR JUDGMENT IN THE CAUSE

*BANQUE FINANCIÈRE DE LA CITÉ*
*(APPELLANTS)*

*v.*

*PARC (BATTERSEA) LIMITED AND OTHERS*
*(RESPONDENTS)*

### ON 26 FEBRUARY 1998

**LORD STEYN**

My Lords,

The present dispute arose out of the short term refinancing by the appellant ("BFC"), a Swiss bank, of part of an existing bank loan made available by Royal Trust Bank (Switzerland) ("RTB") to Parc (Battersea) Limited ("Parc") for the purpose of buying development land at Battersea Wharf, London, S.W.11. Parc was part of the Omni Group of companies which was controlled by Mr. Werner Rey, a Swiss national. The ultimate holding company was Omni Holding AG ("Holding"). Mr. Markus Herzig was the General Manager of Holding. The refinancing transaction was concluded and completed at the end of September and the beginning of October 1990. The relevant events and circumstances were as follows. (1) The transaction was negotiated by Mr. Rey and Mr. Herzig with officers of BFC. Originally, the

parties intended a loan directly from BFC to Parc. That would have brought into operation a disclosure obligation on BFC under Swiss Federal Banking Regulations. In order to avoid this requirement the transaction was restructured by interposing Mr. Herzig as the immediate borrower. (2) BFC lent DM30m. to Mr. Herzig and Mr. Herzig took steps to ensure that the sterling equivalent of this sum was paid directly by BFC to Parc in reduction of the existing loan granted to Parc by RTB. (3) At the request of BFC Mr. Herzig handed a signed letter on the letterhead of Holding to BFC. This letter read as follows:

> "This is to confirm that we and all companies of our group will not demand any repayment of loans granted to Parc (Battersea) Ltd., London, until the full repayment of your loan of DM 30,000,000. granted to Mr. M. Herzig, which is secured by a deep discount promissory note amounting to GBP 10,000,000. issued by Parc (Battersea) Ltd."

I will call this letter the postponement letter. (4) On 1 October Parc issued to Mr. Herzig a promissory note for the relevant sum and soon afterwards Mr. Herzig assigned the note to BFC.

In April 1991 the Omni Group collapsed. Parc is insolvent. BFC obtained a judgment for £12m. against Parc representing the sum due on the note, with interest. RTB and Omnicorp Overseas Limited ("OOL"), a company incorporated in the British Virgin Islands, respectively had first and second charges over the Battersea Wharf Property. OOL was a company in the Omni Group and the second charge related to an intra-group debt as it has been described. OOL obtained a judgment for £30m. against Parc. Parc and OOL contended that the debt owed to OOL took priority over the debt owed by BFC by reason of OOL's second charge. BFC asserted that by reason of the letter of postponement and its utilization to obtain the refinancing the rights of BFC took priority over the rights of OOL Parc and OOL had been unaware of the letter of postponement. The judge upheld BFC's contention. The Court of Appeal disagreed and allowed the appeal.

The starting point is the letter of postponement, Robert Walker J. (now Robert Walker L.J.) found that it was not binding on Parc or OOL Although they were "companies of our group" within the meaning of the letter Parc and OOL were not bound by its terms either by agency or estoppel. But Robert Walker J. concluded that properly construed the letter of postponement was intended to be directly binding on all companies in the Omni Group. The Court of Appeal came to the opposite conclusion. Morritt L.J. held that the agreement expressed in the postponement letter was intended to be that of Holding alone. This interpretation does not involve an undertaking on the part of Holding to procure the consent of companies in the group: it takes effect as a warranty by Holding. Morritt L.J. relied strongly on the fact that companies in the group were neither consulted nor informed of the letter. Given Mr. Rey's dominance and control of the Omni Group I do not attach much weight to this factor. The letter was badly drafted, and it is certainly capable of more than one interpretation. But ultimately I take the same view as the judge. The context is important. The letter was requested by BFC, and tendered by Mr. Herzig, as a form of security albeit not security involving rights in rem. Moreover, the letter shows that BFC wanted security not from Parc but in respect of intra-group indebtedness. The letter was the result of a negotiation between commercial men. In my view the commercial construction is one that treats the letter as intended to give effective protection in respect of all companies in the group, i.e. it was intended to be directly binding on all companies in the group. And I am reinforced in this view by the fact that Robert Walker J., who was steeped in the realities of the context of the letter, ultimately favoured it. From this conclusion it follows that the expectation of BFC was that the letter of postponement effectively protected BFC against loans granted by group companies to Parc. In the result that expectation has not been fulfilled. In any event, the important point is that BFC would not have lent had it not mistakenly believed that its priority in respect of intra-group indebtedness was secured effectively against subsidiaries of the group.

My Lords, both the judge and Morritt L.J. invoked the vocabulary of unjust enrichment or restitution. Nevertheless both courts ultimately treated the question at stake as being whether BFC is entitled to be subrogated to the rights of RTB. On the present appeal counsel adopted a similar approach. That position

may have seemed natural at a stage when BFC apparently claimed to be entitled to step in the shoes of RTB as chargee with the usual proprietary remedies. On appeal to your Lordships' House counsel for BFC attenuated his submission by making clear that BFC only seeks a restitutionary remedy against OOL. In these circumstances it seems sensible to consider directly whether the grant of the remedy would be consistent with established principles of unjust enrichment. OOL committed no wrong: it cannot therefore be a case of unjust enrichment by wrongdoing. If it is a case of unjust enrichment, it must in the vivid terminology of Prof. Peter Birks be unjust enrichment by subtraction. If the case is approached in this way it follows that BFC is either entitled to a restitutionary remedy or it is not so entitled. After all, unjust enrichment ranks next to contract and tort as part of the law of obligations. It is an independent source of rights and obligations.

Four questions arise: (1) Has OOL benefited or been enriched? (2) Was the enrichment at the expense of BFC? (3) Was the enrichment unjust? (4) Are there any defences? The first requirement is satisfied: the repayment of £10m. of the loan pro tanto improved OOL's position as chargee. That is conceded. The second requirement was in dispute. Stripped to its essentials the argument of counsel for OOL was that the interposition of the loan to Mr. Herzig meant that the enrichment of OOL was at the expense of Mr. Herzig. The loan to Mr. Herzig was a genuine one spurred on by the motive of avoiding Swiss regulatory requirements. But it was nevertheless no more than a formal act designed to allow the transaction to proceed. It does not alter the reality that OOL was enriched by the money advanced by BFC via Mr. Herzig to Parc. To allow the interposition of Mr. Herzig to alter the substance of the transaction would be pure formalism.

That brings me to the third requirement, which was the ground upon which the Court of Appeal decided against BFC. Since no special defences were relied on, this was also the major terrain of debate on the present appeal. It is not seriously disputed that by asking for a letter of postponement BFC expected that they would obtain a form of security sufficient to postpone repayment of loans by all companies in the Omni groups until repayment of the BFC loan. In any event, that fact is clearly established. But for BFC's mistaken belief that it was protected in respect of intra-group indebtedness BFC would not have proceeded with the refinancing. In these circumstances there is in my judgment a principled ground for granting a restitutionary remedy.

Counsel for OOL challenged the view that restitutionary liability is prima facie established by submitting that there was no mutual intention that BFC should have priority as against OOL. Restitutionary liability is triggered by a range of unjust factors or grounds of restitution. Defeated bilateral expectations are a prime source of such liability. But sometimes unilateral defeated expectations may be sufficient, e.g. payments made under a unilateral mistake of fact where the ground of liability is the mistake of one party. I would reject the idea that in a case such as the present a test of mutuality must be satisfied.

It is now necessary to mention the other factors which the Court of Appeal relied on in concluding that BFC was not entitled to succeed. Perhaps in passing Morritt L.J. commented that neither Parc nor OOL was guilty of any misrepresentation. It is sufficient to say that restitution is not a fault-based remedy. Morritt L.J. then pointed out that BFC failed to take elementary precautions to safeguard their interests. Counsel for OOL conceded that this feature is not a self-sufficient answer to the claim. At one stage he argued that this feature is relevant to the exercise of a discretion but I understood him ultimately to concede that the relief sought is not discretionary. In any event, the neglect of BFC is akin to the carelessness of a mistaken payor: it does not by itself undermine the ground of restitution.

On the arguments as presented in the Court of Appeal Morritt L.J. concluded that BFC, if subrogated, would be in competition with RTB Factually this is incorrect. BFC knew that RTB had a first charge over the property. The letter of postponement, and the circumstances of the case, show that BFC merely expected to receive priority over loans by other companies in the Omni group. This particular obstacle is

not a real one.

The Court of Appeal considered that subrogation if allowed would place BFC in a better position than if the postponement letter had been binding on Parc and OOL. The Court of Appeal considered the matter from the point of view of BFC seeking to step into the shoes of RTB as chargee. But it has now been made clear that BFC merely seeks reversal of OOL's unjust enrichment at the expense of BFC. BFC merely asserts restitutionary rights against OOL. In the circumstances conceptual difficulties about the remedy sought by BFC disappear.

In my view, on an application of established principles of unjust enrichment BFC are entitled to succeed against OOL. But, if it were necessary to do so, I would reach the same conclusion in terms of the principles of subrogation. It would admittedly not be the usual case of subrogation to security rights in rem and in personam. The purpose of the relief would be dictated by the particular form of security, involving rights in personam against companies in the group, which BFC mistakenly thought it was obtaining. It is true that no decided case directly in point has been found. But distinguished writers have shown that the place of subrogation on the map of the law of obligations is by and large within the now sizeable corner marked out for restitution: see *Goff and Jones, The Law of Restitution*, 4th ed. (1993), pp. 526, 531; *Birks, An Introduction to the Law of Restitution*, (1985), p. 93 et seq; *Burrows, The Law of Restitution*, (1993), p. 92; *Mitchell, The Law of Subrogation*, (1994), p. 4. And there can be no conceptual impediment to the remedy of subrogation being allowed not in respect of both rights in rem and rights in personam but only in respect of rights in personam.

For these reasons, as well as the reasons contained in the speech of my noble and learned friend, Lord Hoffmann, I would allow the appeal.

## LORD GRIFFITHS

My Lords,

I have had the advantage of reading in draft the speech prepared by my noble and learned friend Lord Hoffmann. For the reasons which he gives I, too, would allow the appeal.

## LORD HOFFMANN

My Lords,

This appeal raises, in unusual circumstances, a question on the scope of the equitable remedy of subrogation. The appellant, the Banque Financiere de la Cité ("BFC") made an advance of DM30m. for the purpose of enabling Parc (Battersea) Ltd. ("Parc") to repay part of a loan from another bank secured by a first charge upon its property. The transaction did not contemplate that Parc would provide any security. It was however an express condition of the advance that other companies in the group to which Parc belonged would not demand repayment of their loans until BFC had been repaid. One such company was Omnicorp Overseas Ltd ("OOL") which was owed £26.25m. secured by a second charge over the property. Unfortunately the persons who negotiated the transaction had no authority to commit OOL to such an undertaking and it was not binding upon it. Parc is insolvent and if BFC has no priority over OOL's second charge, it is unlikely to be repaid. The question is whether, as against OOL, BFC is entitled to be subrogated to the first charge to the extent that its money was used to repay the debt which it secured. The judge, Robert Walker J., decided that the remedy was available. The Court of Appeal, in a judgment delivered by Morritt L.J. decided that it was not. Against that decision BFC appeals to your Lordships' House.

The striking feature of this case, which distinguishes it from familiar cases on subrogation to which it

bears a partial resemblance such as *Butler v. Rice* [1910] 2 Ch. 278 and *Ghana Commercial Bank v. Chandiram* [1960] AC 732 is that BFC did not contemplate that Parc would provide it with any security at all. As against Parc, it was content to be an unsecured creditor. What was contemplated was a negative form of protection from certain of Parc's other creditors, namely the other companies in the group, in the form of an undertaking that they would not enforce any claims they might have against Parc in priority to BFC. It is this distinction which is principally relied upon by the respondents for their submission, which found favour in the Court of Appeal, that subrogation is not available. To allow BFC to be subrogated to the first charge would mean, it is said, giving it far greater security than it ever bargained for. But there are also other distinctions and for this purpose it is necessary to set out the facts in rather more detail.

Parc is an English company owning development land in Battersea and OOL is registered in the British Virgin Islands. They belonged to the Omni Group, based in Switzerland, where the ultimate holding company, Omni Holdings AG ("Holdings"), was incorporated. The principal officers of Holdings were its founder and principal shareholder Mr. Werner Rey and its chief financial officer Mr. Markus Herzig. Parc acquired the Battersea land in 1988 with the aid of a £30m. bridging loan from Royal Trust Bank (Switzerland) ("RTB"), secured by a first charge, and additional finance from OOL, in respect of which it subsequently obtained a second charge. The RTB loan was partially repaid in 1989 but £20m. was extended until 28 September 1990. Parc was unable to refinance its borrowing on the London market and turned to Mr. Herzig for help. He approached BFC, which had previously lent to the Omni Group. On 14 September 1990 it agreed in principle to advance DM30m. for two months and the necessary arrangements were concluded in haste. A difficulty was that a further loan to a member of the Omni Group would have had to be reported to the Swiss banking authorities. To avoid this, BFC agreed to make the loan to Mr. Herzig personally on the basis that he would pass it on to Parc, which would issue him with a promissory note which he would assign to BFC as security. The principal security was to be the pledge of 35,000 bearer shares in Holdings, which BFC valued at DM40m and, in addition, BFC required the "postponement letter" in respect of the claims of other group companies. This read as follows:

"This is to confirm that we and all companies of our group will not demand any repayment of loans granted to Parc (Battersea) Ltd, London, until the full repayment of your loan of DM 30,000,000.- granted to Mr. M. Herzig, which is secured by a deep discount promissory note amounting to GBP 10,000,000.- issued by Parc (Battersea) Ltd."

Completion took place on 28 September 1990, when Mr. Herzig handed over the pledged shares and postponement letter, signed by himself and another officer of Holdings, and BFC, at the direction of Mr. Herzig, paid DM30m. to RTB for the account of Parc, which was credited with £10.097m. The promissory note was issued by Parc to Mr. Herzig on 8 November 1990 and duly assigned by him to BFC. Its terms were quite different from those of BFC's loan to Mr. Herzig: it was for £11.775m. payable on 28 September 1991, representing an advance of £10m and interest at a fixed rate of 17.75 per cent, and unsecured. BFC's loan was DM30m for two months, secured as I have described and bearing interest at 1.25 per cent over 2 months LIBOR from time to time.

Mr. Herzig defaulted on repayment of the loan and in April 1991 the Omni Group collapsed. BFC had realised some of the pledged shares before they became worthless and repaid itself about DM5m. but the rest of the advance remains unpaid. Parc still owns the land in Battersea but is in receivership and has no other assets. Mr. Herzig is unable personally to repay.

The first issue at the trial before Robert Walker J. concerned the purported effect of the postponement letter. He rejected a submission that it was not intended to have legal effect and this point has not been pursued. He also dealt with a point of construction: were Holdings purporting to contract on behalf of the other group companies or were they merely warranting on their own behalf that they would take whatever steps were necessary to ensure that the other group companies did not make claims in priority to BFC? He declared himself "narrowly persuaded" that the former construction was correct. The main question at the

trial then became whether OOL was bound by the postponement letter, either because Holdings (or Mr. Herzig) had authority to contract on its behalf or because it was estopped from denying this. The judge held that OOL (which, like Parc, was administered from London) had not given the necessary authority and had no knowledge of the postponement letter at any time which could have raised an estoppel. There was no appeal against these findings of fact.

On the question of subrogation, the judge held that although Parc, like OOL, knew nothing of the postponement letter, it knew enough to permit the presumption of whatever mutual intention was needed to activate the remedy of subrogation. Your Lordships may think this summary of his reasoning somewhat cryptic but I shall in due course expand upon the issues which it raises. He went on to say that BFC did not get all it expected to get in the way of a binding postponement letter and the effect of its failure to bind OOL would, in the absence of subrogation, result in OOL being enriched at BFC's expense. This, he held, would "in the technical sense" be unjust and therefore brought subrogation into play.

In the Court of Appeal, Morritt L.J. (with whom Mummery and Beldam L.JJ. agreed) disagreed. He accepted that OOL would be enriched at the expense of BFC but said that such enrichment would not be unjust or unconscionable. His reasons were as follows:

(1)    The loan was structured to avoid disclosure under Swiss banking regulations. As a result, the loan by BFC was to Mr. Herzig on different terms from the loan by Mr. Herzig to Parc and the idea of a second charge in favour of the Bank over the Battersea property had been considered and for similar reasons rejected.

(2)    The reason why BFC did not get a binding postponement letter was its own failure to take the elementary precaution of checking that Holdings had the necessary authority.

(3)    There had been no misrepresentation or sharp practice on the part of the recipient of the enrichment, OOL.

(4)    There was a conceptual problem about the subrogation of BFC to part of the debt secured by the charge in favour of RTB, which would have prejudiced the security of RTB in respect of the rest of its debt. It was also said to be contrary to a Priority Agreement executed on 13 February 1990 which had confirmed RTB's priority over OOL's second charge.

(5)    Subrogation would give BFC the rights of a first mortgagee over the Battersea land. This would give it rights for which it had never bargained--indeed, the possibility of even a second charge had been considered and rejected--and would place it in a more favourable position than if the postponement letter had been binding.

My Lords, the subject of subrogation is bedeviled by problems of terminology and classification which are calculated to cause confusion. For example, it is often said that subrogation may arise either from the express or implied agreement of the parties or by operation of law in a number of different situations: see, for example, Lord Keith of Kinkel in *Orakpo v. Manson Investments Ltd.* [1978] A.C. 95, 119. As a matter of current terminology, this is true. Lord Diplock, for example, was of the view that the doctrine of subrogation in contracts of insurance operated entirely by virtue of an implied term of the contract of insurance (*Hobbs v. Marlowe* [1978] A.C. 16, 39) and although in *Lord Napier and Ettrick v. Hunter* [1993] A.C. 713 your Lordships rejected the exclusivity of this claim for the common law and assigned a larger role to equitable principles, there was no dispute that the doctrine of subrogation in insurance rests upon the common intention of the parties and gives effect to the principle of indemnity embodied in the contract. Furthermore, your Lordships drew attention to the fact that it is customary for

the assured, on payment of the loss, to provide the insurer with a letter of subrogation, being no more nor less than an express assignment of his rights of recovery against any third party. Subrogation in this sense is a contractual arrangement for the transfer of rights against third parties and is founded upon the common intention of the parties. But the term is also used to describe an equitable remedy to reverse or prevent unjust enrichment which is not based upon any agreement or common intention of the party enriched and the party deprived. The fact that contractual subrogation and subrogation to prevent unjust enrichment both involve transfers of rights or something resembling transfers of rights should not be allowed to obscure the fact that one is dealing with radically different institutions. One is part of the law of contract and the other part of the law of restitution. Unless this distinction is borne clearly in mind, there is a danger that the contractual requirement of mutual consent will be imported into the conditions for the grant of the restitutionary remedy or that the absence of such a requirement will be disguised by references to a presumed intention which is wholly fictitious. There is an obvious parallel with the confusion caused by classifying certain restitutionary remedies as quasi-contractual and importing into them features of the law of contract.

In this case there was plainly no common intention as between OOL, the party enriched, and BFC, the party deprived. OOL had no knowledge of the postponement letter or reason to believe that the advance to Parc of the money provided by BFC was otherwise than unsecured. But why should this necessarily exclude subrogation as a restitutionary remedy? I shall refer to five authorities which in my view demonstrate the contrary.

In *Chetwynd v. Allen* [1899] 1 Ch. 353 one Terrell had in 1891 lent Mr. Chetwynd £2,000 secured upon mortgages over two properties: a house called Cedars, which belonged to his wife, and a riding school, which was his own. Mrs. Chetwynd had consented to the mortgage over her property. In 1892 Mr. Chetwynd borrowed £1,200 from one Mynors, saying that it was to pay off Terrell's mortgage on Cedars and promising him a transfer of that mortgage. He did not disclose that Cedars belonged to his wife or that Terrell's mortgage was for a larger sum and was over the riding school as well. Mr. Chetwynd applied £1,000 of Mynor's money in part repayment to Terrell. Mrs. Chetwynd, who had known nothing of the transaction with Mynors, claimed that she was entitled to Cedars with the benefit of the part repayment to Terrell but free of any claim by Mynors. Romer J. held, at p. 357 that the charge over Cedars and the riding school was, to the extent of £1,000, "kept alive in equity in favour of Mynors." I shall have to return to the question of what that expression means, but the case shows that the remedy of subrogation does not depend upon any common intention between the plaintiff and the party enriched.

In *Butler v. Rice* [1910] 2 Ch. 277, Mrs. Rice owned properties in Bristol and Cardiff which were equitably mortgaged to a bank (by deposit of title deeds) to secure a loan of £450. Mr. Rice asked Mr. Butler to lend him £450 to pay off the mortgage on the Bristol property, not mentioning the Cardiff property or the fact that both belonged to his wife. Mr. Butler agreed to lend on a mortgage for £300 over the Bristol property and a guarantee for the rest from Mr. Rice's solicitor. The money was used to pay off the bank but Mrs. Rice refused to execute a mortgage over the Bristol property. She too had known nothing about the transaction before the bank's mortgage was paid off. Warrington J. said, at p. 282 that the question was whether the bank's charge had been "paid off or kept alive" and on that question "the concurrence of the mortgagor is immaterial." He followed *Chetwynd v. Allen* [1899] 1 Ch. 353 in holding that Mr. Butler was entitled to the benefit of the mortgage over the Bristol property to secure the £450 he had advanced.

In *Ghana Commercial Bank v. Chandiram* [1960] AC 732 the bank made an advance to the owner of property in Accra which was used to pay off his indebtedness to Barclays (D.C. & O.) Ltd, secured by an equitable mortgage. The owner executed a legal mortgage in favour of the Ghana Bank, but this was invalidated by a previous attachment of the property by a creditor. The Privy Council, following *Butler v. Rice* and *Chetwynd v. Allen* held that the Ghana Bank was entitled to be subrogated to the equitable mortgage which had been paid off. Lord Jenkins said, at p. 745:

"It is not open to doubt that where a third party pays off a mortgage he is presumed, unless the contrary appears, to intend that the mortgage shall be kept alive for his own benefit. . ."

In *Paul v. Speirway Ltd.* [1976] Ch. 220 the plaintiff made a loan to a company in which he had a joint interest in order to enable it to pay the price due under a contract for the purchase of development land. When the company failed, he claimed to be a secured creditor by subrogation to the vendor's lien. Oliver J. found on the facts that the advance to the company was intended to be an unsecured loan and held that this excluded any remedy by way of subrogation, which would give the plaintiff more than he had bargained for. The learned judge rejected the proposition, advanced by counsel for the company, that the remedy of subrogation was available only when the common intention of the parties was (as in the three earlier cases to which I have referred) that the plaintiff should have some security which, for one reason or another, he did not get. He confined himself to the much narrower proposition, at p. 232 that:

". . . where on all the facts the court is satisfied that the true nature of the transaction between the payer of the money and the person at whose instigation it is paid is simply the creation of an unsecured loan, this in itself will be sufficient to dispose of any question of subrogation."

In formulating this proposition, the learned judge was clearly confining himself to cases in which the claim was to subrogation to security and not referring to subrogation to a mere debt, as in cases of ultra vires borrowings.

The wisdom of the caution shown by Oliver J. was demonstrated by the facts in *Boscawen v. Bajwa* [1996] 1 WLR 328, which contains a valuable and illuminating analysis of the remedy of subrogation by Millett L.J. The Abbey National Building Society agreed to make an advance on mortgage to a purchaser of property and paid the money to the solicitors acting for them and the purchaser to hold on behalf of the Abbey National until paid over against a first legal charge on the property. The solicitors paid it over to the vendor's solicitors to hold to their order pending completion but the latter used the money in advance of completion to pay off the vendor's mortgage to the Halifax Building Society. In fact completion never took place: the vendor failed to convey to the purchaser and the Abbey National accordingly obtained no legal charge or other security. It claimed to be subrogated to the Halifax mortgage. It will be seen at once that there was no common intention that the vendor, whose mortgage had been paid off, should grant any security to the Abbey National. As Millett L.J. pointed out, at p. 339, the Abbey National expected to obtain a charge from the purchaser as legal owner after completion of the sale, and, in the event which happened of there being no such completion, did not intend its money to be used at all. This meant that:

"[t]he factual context in which the claim to subrogation arises is a novel one which does not appear to have arisen before but the justice of its claim cannot be denied."

These cases seem to me to show that it is a mistake to regard the availability of subrogation as a remedy to prevent unjust enrichment as turning entirely upon the question of intention, whether common or unilateral. Such an analysis has inevitably to be propped up by presumptions which can verge upon outright fictions, more appropriate to a less developed legal system than we now have. I would venture to suggest that the reason why intention has played so prominent a part in the earlier cases is because of the influence of cases on contractual subrogation. But I think it should be recognised that one is here concerned with a restitutionary remedy and that the appropriate questions are therefore, first, whether the defendant would be enriched at the plaintiff's expense; secondly, whether such enrichment would be unjust and thirdly, whether there are nevertheless reasons of policy for denying a remedy. An example of a case which failed on the third ground is *Orakpo v. Manson Investments Ltd.* [1978] A.C. 95, in which it was considered that restitution would be contrary to the terms and policy of the Moneylenders Acts.

This does not of course mean that questions of intention may not be highly relevant to the question of whether or not enrichment has been unjust. I would certainly not wish to question the proposition of

Oliver J. in *Paul v. Speirway Ltd.* [1976] Ch. 220 that, as against a borrower, subrogation to security will not be available where the transaction was intended merely to create an unsecured loan. I do not express a view on the question of where the burden of proof lies in these matters. Oliver J., following the dictum of Lord Jenkins in *Ghana Commercial Bank v. Chandiram* [1960] AC 732, 745 which I have quoted, held that if the plaintiff's money was used to discharge a secured liability, he was presumed to "intend that the mortgage shall be kept alive for his own benefit" and this presumption was applied by Nicholls J. in *Boodle Hatfield & Co. v. British Films Ltd.* [1986] P.C.C. 176. However, if it is recognised that the use of the plaintiff's money to pay off a secured debt and the intentions of the parties about whether or not the plaintiff should have security are only materials upon which a court may decide that the defendant's enrichment would be unjust, it could be argued that on general principles it is for the plaintiff to make out a case of unjust enrichment. In this case, I think that in the absence of subrogation, OOL would be enriched at BFC's expense and that prima facie such enrichment would be unjust. The bank advanced the DM30m. upon the mistaken assumption that it was obtaining a postponement letter which would be effective to give it priority over any intra-group indebtedness. It would not otherwise have done so. On the construction of the letter adopted by Robert Walker J., namely that Holdings was purporting to contract on behalf of all companies in the Omni group, the payment was made under a mistake as to Holdings's authority. On the construction adopted by the Court of Appeal the mistake was as to the power of Holdings to ensure that other group companies would postpone their claims. For my part, I prefer the construction adopted by judge. But I do not think that for present purposes it matters which view one takes. In either case, BFC failed to obtain that priority over intra-group indebtedness which was an essential part of the transaction under which it paid the money. It may have attached more importance to the pledge of the shares but the provision of the postponement letter was a condition of completion. The result of the transaction is that BFC's DM30m. has been used to reduce the debt secured by RTB's first charge and that this reduction will, by reason of OOL's second charge, enure wholly to the latter's advantage. I turn, therefore, to the grounds upon which the Court of Appeal decided that the enrichment of OOL would not be unjust. The first four seem to me to carry little weight. It is true that the transaction was structured to pass the money through the hands of Mr. Herzig in order to avoid disclosure under Swiss banking law. But there is no difficulty in tracing BFC's money into the discharge of the debt due to RTB: the payment to RTB was direct. In this respect, the case is stronger than in *Boscawen v. Bajwa* [1996] 1 WLR 328. Since the money can be traced, the differences in the terms of the loans by BFC to Mr. Herzig and by Mr. Herzig to Parc do not seem to me to matter, although of course on the principle of *Paul v. Speirway Ltd.* [1976] Ch. 220, BFC could not, on the basis of any terms agreed between Mr. Herzig and Parc, assert by way of subrogation greater rights than they bargained for. As for the avoidance of Swiss banking law, it seems to me that there was no evidence that this amounted to an illegality which would disqualify BFC from obtaining equitable relief and I do not think that Morritt L.J. suggested this to be the case.

The second ground was that BFC did not take proper precautions to ensure that Mr. Herzig had authority to execute the postponement letter. But there is, so far as I know, no case in which it has been held that carelessness is a ground for holding that a consequent enrichment is not unjust. No doubt Mr. Mynors (in *Chetwynd v. Allen* [1899] 1 Ch. 353) and Mr. Butler (in *Butler v. Rice* [1910] 2 Ch. 277) were careless in parting with their money without bothering to inspect the borrower's title deeds. They relied upon Mr. Chetwynd and Mr. Rice as BFC relied upon Mr. Herzig. But that did not entitle Mrs. Chetwynd or Mrs. Rice to be enriched as a result of their mistakes. As a third ground, Morritt L.J. said that there had been no misrepresentation or sharp practice on the part of the recipient of the enrichment. But neither had there been on the part of Mrs. Chetwynd or Mrs. Rice. Both were found to have known nothing about the transactions which resulted in their indebtedness being paid off. All that could be said against them was that they, in common with OOL, wanted to retain the benefit of their enrichment.

Fourthly, there is the "conceptual problem" about BFC and RTB appearing to share the same security. In my view this is not a real problem. BFC does not claim any priority over RTB. It accepts that RTB was

entitled to rely upon its first charge, in priority to BFC, in respect of the whole of its outstanding indebtedness. BFC claims only to be able to rely upon that security against OOL after RTB has been paid. In this respect the case is in my view no different from *Chetwynd v. Allen* [1899] 1 Ch. 353, 357 in which Romer J. said that the unpaid balance of Terrell's debt would take priority over Mynors's claim by way of subrogation to his security. Morritt L.J. regarded this authority as of no assistance because "Romer J. made it plain that his decision was not based on any principle of subrogation." It is true that Romer J., following the submissions of counsel, appeared to distinguish between "keeping the charge alive," or what would now be called subrogation to the security, and "subrogation," by which he seems to have meant subrogation to the debt (and, presumably, the security). But subrogation to the security is precisely the remedy sought in this case and *Chetwynd v. Allen* therefore seems to me very much in point. In any case, the priority of RTB over BFC can be explained on a wider ground which I shall in due course discuss.

This brings me to the fifth reason relied upon by the Court of Appeal and what I regard as the main question in the case, namely the fact that "keeping the charge alive" for the benefit of BFC would give it more than it was entitled to expect. The transaction contemplated that BFC would be an unsecured creditor of Parc; "keeping the charge alive" would give it the benefit of a first charge. This makes it necessary, as I earlier foreshadowed, to examine more closely what is involved in subrogation to a security.

In my view, the phrase "keeping the charge alive" needs to be handled with some care. It is not a literal truth but rather a metaphor or analogy: see Professor Birks's *An Introduction to the Law of Restitution*, (1985) pp. 93-97. In a case in which the whole of the secured debt is repaid, the charge is not kept alive at all. It is discharged and ceases to exist. In a case like the present, in which part of the secured debt is repaid, the charge remains alive only to secure the remainder of the debt for the benefit of the original chargee. Nothing can affect his rights and there is no question of competition between him and the party claiming subrogation. It is important to remember that, as Millett L.J. pointed out in *Boscawen v. Bajwa* [1996] 1 WLR 328, 335, subrogation is not a right or a cause of action but an equitable remedy against a party who would otherwise be unjustly enriched. It is a means by which the court regulates the legal relationships between a plaintiff and a defendant or defendants in order to prevent unjust enrichment. When judges say that the charge is "kept alive" for the benefit of the plaintiff, what they mean is that his legal relations with a defendant who would otherwise be unjustly enriched are regulated *as if* the benefit of the charge had been assigned to him. It does not by any means follow that the plaintiff must for all purposes be treated as an actual assignee of the benefit of the charge and, in particular, that he would be so treated in relation to someone who would not be unjustly enriched.

This, I interpose, is the real reason why there is no "conceptual problem" about treating BFC as subrogated to part of the RTB secured debt. The equitable remedy is available only against OOL, which is the only party which would be unjustly enriched. As between RTB and BFC, subrogation has no part to play. RTB is entitled to its security and BFC is no more than an unsecured creditor. The same is true as between BFC and any secured or unsecured creditor of Parc other than the members of the Omni group. The transaction contemplated that as against non-group creditors, BFC would incur no more than an unsecured liability, evidenced by the promissory note issued to Mr. Herzig and assigned by him to BFC. As against such creditors, therefore, the remedy of subrogation is not available. Nor is it available against Parc itself, so as to give BFC the rights of sale, foreclosure etc. which would normally follow from BFC being treated as if it were an assignee of the RTB charge.

It follows that subrogation *as against OOL*, which is all that BFC claims in the action, would not give it greater rights than it bargained for. All that would happen is that OOL would be prevented from being able to enrich itself to the extent that BFC's money paid off the RTB charge. This is fully within the scope of the equitable remedy. I would therefore allow the appeal. Robert Walker J. made a declaration that BFC "is and has since the 28th day of September 1990 been entitled to the benefit of" the RTB charge and

the Priority Agreement of 13 February 1990. I think that this declaration goes further than is justified. As against Parc, BFC is not entitled to such a declaration. I would therefore insert after the words "entitled to" the words "be treated as against OOL as if it had." Subject to that amendment, I would restore the declaration made by the judge.

**LORD CLYDE**

My Lords,

The basis for the appellants' claim is to be found in the principle of unjust enrichment, a principle more fully expressed in the Latin formulation, nemo debet locupletari aliena jactura. The principle is equitable in the sense that it seeks to secure a fair and just determination of the rights of the parties concerned in the case. But it is not a principle which is entirely discretionary in its application so as to enable a court in any case to withhold a remedy where all the necessary elements for its satisfaction have been established, although there may be circumstances where on grounds which may be described as grounds of public policy a remedy may be refused. Without attempting any comprehensive analysis, it seems to me that the principle requires at least that the plaintiff should have sustained a loss through the provision of something for the benefit of some other person with no intention of making a gift, that the defendant should have received some form of enrichment, and that the enrichment has come about because of the loss. The loss may be an expenditure which has not met with the expected return. The remedy may vary with the circumstances of the case, the object being to effect a fair and just balance between the rights and interests of the parties concerned. The obligation to provide the remedy does not rest on any contractual basis but on the general principle of the common law and it may find its expression in a variety of circumstances.

The claim which the appellants have eventually come to make is not for a share in the charge which had been effected over the Battersea Wharf in favour of RTB, so as to give them a preference over all creditors of Parc, but only a personal right to rank in priority to OOL, effective only as between RTB and OOL and open to be defeated by any further transactions by Parc, which in the event have not occurred. I would have had difficulty in accepting that the appellants would be entitled to have even a pro tanto right to the charge in circumstances where they did not intend to obtain any such security, indeed such a provision had been deliberately considered and deleted from the documentation. The more modest claim which they now make, however, seems to me to have been made out. The difference between these two positions, which to my mind is critical in the case, can be readily obscured by the use of the term "subrogation."

It is agreed that OOL was enriched by the repayment of some £10m. of the RTB loan. The structural arrangements made with Mr. Herzig in order to avoid a breach of the Swiss banking regulations do not seem to me to prevent recognition of the reality of the granting of the funds by the appellants to RTB for Parc's account. Indeed the money was transmitted by them through the Deutsche- Schweizische Bank AG to RTB for the account of Parc. The appellants were well aware that the money was required for a partial reduction of an existing bank loan. The enrichment which is agreed to have occurred seems to me to have come about through the expenditure which the appellants made. Parc then incurred a direct liability to the appellants through the promissory note which Parc supplied and, ill-drafted as it was, the appellants certainly must have come to expect through the letter of postponement that they would in any question with OOL enjoy a priority to OOL in the enforcing of their own claim against Parc. It does not in my view matter that neither Parc nor OOL knew anything about the letter nor that the letter was ineffective to achieve what the appellants expected. In the circumstances it seems to me to in accordance with principle that they should be accorded the priority which they now claim.

For these reasons and for the reasons more fully set out by my noble and learned friend Lord Hoffmann I would allow the appeal.

My Lords, the subject of subrogation is bedeviled by problems of terminology and classification which are calculated to cause confusion. For example, it is often said that subrogation may arise either from the express or implied agreement of the parties or by operation of law in a number of different situations: see, for example, Lord Keith of Kinkel in *Orakpo v. Manson Investments Ltd.* [1978] A.C. 95, 119. As a matter of current terminology, this is true. Lord Diplock, for example, was of the view that the doctrine of subrogation in contracts of insurance operated entirely by virtue of an implied term of the contract of insurance (*Hobbs v. Marlowe* [1978] A.C. 16, 39) and although in *Lord Napier and Ettrick v. Hunter* [1993] A.C. 713 your Lordships rejected the exclusivity of this claim for the common law and assigned a larger role to equitable principles, there was no dispute that the doctrine of subrogation in insurance rests upon the common intention of the parties and gives effect to the principle of indemnity embodied in the contract. Furthermore, your Lordships drew attention to the fact that it is customary for the assured, on payment of the loss, to provide the insurer with a letter of subrogation, being no more nor less than an express assignment of his rights of recovery against any third party. Subrogation in this sense is a contractual arrangement for the transfer of rights against third parties and is founded upon the common intention of the parties. But the term is also used to describe an equitable remedy to reverse or prevent unjust enrichment which is not based upon any agreement or common intention of the party enriched and the party deprived. The fact that contractual subrogation and subrogation to prevent unjust enrichment both involve transfers of rights or something resembling transfers of rights should not be allowed to obscure the fact that one is dealing with radically different institutions. One is part of the law of contract and the other part of the law of restitution. Unless this distinction is borne clearly in mind, there is a danger that the contractual requirement of mutual consent will be imported into the conditions for the grant of the restitutionary remedy or that the absence of such a requirement will be disguised by references to a presumed intention which is wholly fictitious. There is an obvious parallel with the confusion caused by classifying certain restitutionary remedies as quasi-contractual and importing into them features of the law of contract.

In this case there was plainly no common intention as between OOL, the party enriched, and BFC, the party deprived. OOL had no knowledge of the postponement letter or reason to believe that the advance to Parc of the money provided by BFC was otherwise than unsecured. But why should this necessarily exclude subrogation as a restitutionary remedy? I shall refer to five authorities which in my view demonstrate the contrary.

In *Chetwynd v. Allen* [1899] 1 Ch. 353 one Terrell had in 1891 lent Mr. Chetwynd £2,000 secured upon mortgages over two properties: a house called Cedars, which belonged to his wife, and a riding school, which was his own. Mrs. Chetwynd had consented to the mortgage over her property. In 1892 Mr. Chetwynd borrowed £1,200 from one Mynors, saying that it was to pay off Terrell's mortgage on Cedars and promising him a transfer of that mortgage. He did not disclose that Cedars belonged to his wife or that Terrell's mortgage was for a larger sum and was over the riding school as well. Mr. Chewynd applied £1,000 of Mynor's money in part repayment to Terrell. Mrs. Chetwynd, who had known nothing of the transaction with Mynors, claimed that she was entitled to Cedars with the benefit of the part repayment to Terrell but free of any claim by Mynors. Romer J. held, at p. 357 that the charge over Cedars and the riding school was, to the extent of £1,000, "kept alive in equity in favour of Mynors." I shall have to return to the question of what that expression means, but the case shows that the remedy of subrogation does not depend upon any common intention between the plaintiff and the party enriched.

In *Butler v. Rice* [1910] 2 Ch. 277, Mrs. Rice owned properties in Bristol and Cardiff which were equitably mortgaged to a bank (by deposit of title deeds) to secure a loan of £450. Mr. Rice asked Mr. Butler to lend him £450 to pay off the mortgage on the Bristol property, not mentioning the Cardiff property or the fact that both belonged to his wife. Mr. Butler agreed to lend on a mortgage for £300 over the Bristol property and a guarantee for the rest from Mr. Rice's solicitor. The money was used to pay off

the bank but Mrs. Rice refused to execute a mortgage over the Bristol property. She too had known nothing about the transaction before the bank's mortgage was paid off. Warrington J. said, at p. 282 that the question was whether the bank's charge had been "paid off or kept alive" and on that question "the concurrence of the mortgagor is immaterial." He followed *Chetwynd v. Allen* [1899] 1 Ch. 353 in holding that Mr. Butler was entitled to the benefit of the mortgage over the Bristol property to secure the £450 he had advanced.

In *Ghana Commercial Bank v. Chandiram* [1960] AC 732 the bank made an advance to the owner of property in Accra which was used to pay off his indebtedness to Barclays (D.C. & O.) Ltd, secured by an equitable mortgage. The owner executed a legal mortgage in favour of the Ghana Bank, but this was invalidated by a previous attachment of the property by a creditor. The Privy Council, following *Butler v. Rice* and *Chetwynd v. Allen* held that the Ghana Bank was entitled to be subrogated to the equitable mortgage which had been paid off. Lord Jenkins said, at p. 745:

> "It is not open to doubt that where a third party pays off a mortgage he is presumed, unless the contrary appears, to intend that the mortgage shall be kept alive for his own benefit. . ."

In *Paul v. Speirway Ltd.* [1976] Ch. 220 the plaintiff made a loan to a company in which he had a joint interest in order to enable it to pay the price due under a contract for the purchase of development land. When the company failed, he claimed to be a secured creditor by subrogation to the vendor's lien. Oliver J. found on the facts that the advance to the company was intended to be an unsecured loan and held that this excluded any remedy by way of subrogation, which would give the plaintiff more than he had bargained for. The learned judge rejected the proposition, advanced by counsel for the company, that the remedy of subrogation was available only when the common intention of the parties was (as in the three earlier cases to which I have referred) that the plaintiff should have some security which, for one reason or another, he did not get. He confined himself to the much narrower proposition, at p. 232 that:

> ". . . where on all the facts the court is satisfied that the true nature of the transaction between the payer of the money and the person at whose instigation it is paid is simply the creation of an unsecured loan, this in itself will be sufficient to dispose of any question of subrogation."

In formulating this proposition, the learned judge was clearly confining himself to cases in which the claim was to subrogation to security and not referring to subrogation to a mere debt, as in cases of ultra vires borrowings.

The wisdom of the caution shown by Oliver J. was demonstrated by the facts in *Boscawen v. Bajwa* [1996] 1 WLR 328, which contains a valuable and illuminating analysis of the remedy of subrogation by Millett L.J. The Abbey National Building Society agreed to make an advance on mortgage to a purchaser of property and paid the money to the solicitors acting for them and the purchaser to hold on behalf of the Abbey National until paid over against a first legal charge on the property. The solicitors paid it over to the vendor's solicitors to hold to their order pending completion but the latter used the money in advance of completion to pay off the vendor's mortgage to the Halifax Building Society. In fact completion never took place: the vendor failed to convey to the purchaser and the Abbey National accordingly obtained no legal charge or other security. It claimed to be subrogated to the Halifax mortgage. It will be seen at once that there was no common intention that the vendor, whose mortgage had been paid off, should grant any security to the Abbey National. As Millett L.J. pointed out, at p. 339, the Abbey National expected to obtain a charge from the purchaser as legal owner after completion of the sale, and, in the event which happened of there being no such completion, did not intend its money to be used at all. This meant that:

> "[t]he factual context in which the claim to subrogation arises is a novel one which does not appear to have arisen before but the justice of its claim cannot be denied."

These cases seem to me to show is that it is a mistake to regard the availability of subrogation as a remedy to prevent unjust enrichment as turning entirely upon the question of intention, whether common or unilateral. Such an analysis has inevitably to be propped up by presumptions which can verge upon outright fictions, more appropriate to a less developed legal system than we now have. I would venture to suggest that the reason why intention has played so prominent a part in the earlier cases is because of the influence of cases on contractual subrogation. But I think it should be recognised that one is here concerned with a restitutionary remedy and that the appropriate questions are therefore, first, whether the defendant would be enriched at the plaintiff's expense; secondly, whether such enrichment would be unjust and thirdly, whether there are nevertheless reasons of policy for denying a remedy. An example of a case which failed on the third ground is *Orakpo v. Manson Investments Ltd.* [1978] A.C. 95, in which it was considered that restitution would be contrary to the terms and policy of the Moneylenders Acts.

This does not of course mean that questions of intention may not be highly relevant to the question of whether or not enrichment has been unjust. I would certainly not wish to question the proposition of Oliver J. in *Paul v. Speirway Ltd.* [1976] Ch. 220 that, as against a borrower, subrogation to security will not be available where the transaction was intended merely to create an unsecured loan. I do not express a view on the question of where the burden of proof lies in these matters. Oliver J., following the dictum of Lord Jenkins in *Ghana Commercial Bank v. Chandiram* [1960] AC 732, 745 which I have quoted, held that if the plaintiff's money was used to discharge a secured liability, he was presumed to "intend that the mortgage shall be kept alive for his own benefit" and this presumption was applied by Nicholls J. in *Boodle Hatfield & Co. v. British Films Ltd.* [1986] P.C.C. 176. However, if it is recognised that the use of the plaintiff's money to pay off a secured debt and the intentions of the parties about whether or not the plaintiff should have security are only materials upon which a court may decide that the defendant's enrichment would be unjust, it could be argued that on general principles it is for the plaintiff to make out a case of unjust enrichment. In this case, I think that in the absence of subrogation, OOL would be enriched at BFC's expense and that prima facie such enrichment would be unjust. The bank advanced the DM30m. upon the mistaken assumption that it was obtaining a postponement letter which would be effective to give it priority over any intra-group indebtedness. It would not otherwise have done so. On the construction of the letter adopted by Robert Walker J., namely that Holdings was purporting to contract on behalf of all companies in the Omni group, the payment was made under a mistake as to Holdings's authority. On the construction adopted by the Court of Appeal the mistake was as to the power of Holdings to ensure that other group companies would postpone their claims. For my part, I prefer the construction adopted by judge. But I do not think that for present purposes it matters which view one takes. In either case, BFC failed to obtain that priority over intra-group indebtedness which was an essential part of the transaction under which it paid the money. It may have attached more importance to the pledge of the shares but the provision of the postponement letter was a condition of completion. The result of the transaction is that BFC's DM30m. has been used to reduce the debt secured by RTB's first charge and that this reduction will, by reason of OOL's second charge, enure wholly to the latter's advantage. I turn, therefore, to the grounds upon which the Court of Appeal decided that the enrichment of OOL would not be unjust. The first four seem to me to carry little weight. It is true that the transaction was structured to pass the money through the hands of Mr. Herzig in order to avoid disclosure under Swiss banking law. But there is no difficulty in tracing BFC's money into the discharge of the debt due to RTB: the payment to RTB was direct. In this respect, the case is stronger than in *Boscawen v. Bajwa* [1996] 1 WLR 328. Since the money can be traced, the differences in the terms of the loans by BFC to Mr. Herzig and by Mr. Herzig to Parc do not seem to me to matter, although of course on the principle of *Paul v. Speirway Ltd.* [1976] Ch. 220, BFC could not, on the basis of any terms agreed between Mr. Herzig and Parc, assert by way of subrogation greater rights than they bargained for. As for the avoidance of Swiss banking law, it seems to me that there was no evidence that this amounted to an illegality which would disqualify BFC from obtaining equitable relief and I do not think that Morritt L.J. suggested this to be the case.

The second ground was that BFC did not take proper precautions to ensure that Mr. Herzig had authority to execute the postponement letter. But there is, so far as I know, no case in which it has been held that carelessness is a ground for holding that a consequent enrichment is not unjust. No doubt Mr. Mynors (in *Chetwynd v. Allen* [1899] 1 Ch. 353) and Mr. Butler (in *Butler v. Rice* [1910] 2 Ch. 277) were careless in parting with their money without bothering to inspect the borrower's title deeds. They relied upon Mr. Chetwynd and Mr. Rice as BFC relied upon Mr. Herzig. But that did not entitle Mrs. Chetwynd or Mrs. Rice to be enriched as a result of their mistakes. As a third ground, Morritt L.J. said that there had been no misrepresentation or sharp practice on the part of the recipient of the enrichment. But neither had there been on the part of Mrs. Chetwynd or Mrs. Rice. Both were found to have known nothing about the transactions which resulted in their indebtedness being paid off. All that could be said against them was that they, in common with OOL, wanted to retain the benefit of their enrichment.

Fourthly, there is the "conceptual problem" about BFC and RTB appearing to share the same security. In my view this is not a real problem. BFC does not claim any priority over RTB. It accepts that RTB was entitled to rely upon its first charge, in priority to BFC, in respect of the whole of its outstanding indebtedness. BFC claims only to be able to rely upon that security against OOL after RTB has been paid. In this respect the case is in my view no different from *Chetwynd v. Allen* [1899] 1 Ch. 353, 357 in which Romer J. said that the unpaid balance of Terrell's debt would take priority over Mynors's claim by way of subrogation to his security. Morritt L.J. regarded this authority as of no assistance because "Romer J. made it plain that his decision was not based on any principle of subrogation." It is true that Romer J., following the submissions of counsel, appeared to distinguish between "keeping the charge alive," or what would now be called subrogation to the security, and "subrogation," by which he seems to have meant subrogation to the debt (and, presumably, the security). But subrogation to the security is precisely the remedy sought in this case and *Chetwynd v. Allen* therefore seems to me very much in point. In any case, the priority of RTB over BFC can be explained on a wider ground which I shall in due course discuss.

This brings me to the fifth reason relied upon by the Court of Appeal and what I regard as the main question in the case, namely the fact that "keeping the charge alive" for the benefit of BFC would give it more than it was entitled to expect. The transaction contemplated that BFC would be an unsecured creditor of Parc; "keeping the charge alive" would give it the benefit of a first charge. This makes it necessary, as I earlier foreshadowed, to examine more closely what is involved in subrogation to a security.

In my view, the phrase "keeping the charge alive" needs to be handled with some care. It is not a literal truth but rather a metaphor or analogy: see Professor Birks's *An Introduction to the Law of Restitution*, (1985) pp. 93-97. In a case in which the whole of the secured debt is repaid, the charge is not kept alive at all. It is discharged and ceases to exist. In a case like the present, in which part of the secured debt is repaid, the charge remains alive only to secure the remainder of the debt for the benefit of the original chargee. Nothing can affect his rights and there is no question of competition between him and the party claiming subrogation. It is important to remember that, as Millett L.J. pointed out in *Boscawen v. Bajwa* [1996] 1 WLR 328, 335, subrogation is not a right or a cause of action but an equitable remedy against a party who would otherwise be unjustly enriched. It is a means by which the court regulates the legal relationships between a plaintiff and a defendant or defendants in order to prevent unjust enrichment. When judges say that the charge is "kept alive" for the benefit of the plaintiff, what they mean is that his legal relations with a defendant who would otherwise be unjustly enriched are regulated *as if* the benefit of the charge had been assigned to him. It does not by any means follow that the plaintiff must for all purposes be treated as an actual assignee of the benefit of the charge and, in particular, that he would be so treated in relation to someone who would not be unjustly enriched.

This, I interpose, is the real reason why there is no "conceptual problem" about treating BFC as subrogated to part of the RTB secured debt. The equitable remedy is available only against OOL, which is

the only party which would be unjustly enriched. As between RTB and BFC, subrogation has no part to play. RTB is entitled to its security and BFC is no more than an unsecured creditor. The same is true as between BFC and any secured or unsecured creditor of Parc other than the members of the Omni group. The transaction contemplated that as against non-group creditors, BFC would incur no more than an unsecured liability, evidenced by the promissory note issued to Mr. Herzig and assigned by him to BFC. As against such creditors, therefore, the remedy of subrogation is not available. Nor is it available against Parc itself, so as to give BFC the rights of sale, foreclosure etc. which would normally follow from BFC being treated as if it were an assignee of the RTB charge.

It follows that subrogation *as against OOL*, which is all that BFC claims in the action, would not give it greater rights than it bargained for. All that would happen is that OOL would be prevented from being able to enrich itself to the extent that BFC's money paid off the RTB charge. This is fully within the scope of the equitable remedy. I would therefore allow the appeal. Robert Walker J. made a declaration that BFC "is and has since the 28th day of September 1990 been entitled to the benefit of" the RTB charge and the Priority Agreement of 13 February 1990. I think that this declaration goes further than is justified. As against Parc, BFC is not entitled to such a declaration. I would therefore insert after the words "entitled to" the words "be treated as against OOL as if it had." Subject to that amendment, I would restore the declaration made by the judge.

## LORD CLYDE

My Lords,

The basis for the appellants' claim is to be found in the principle of unjust enrichment, a principle more fully expressed in the Latin formulation, nemo debet locupletari aliena jactura. The principle is equitable in the sense that it seeks to secure a fair and just determination of the rights of the parties concerned in the case. But it is not a principle which is entirely discretionary in its application so as to enable a court in any case to withhold a remedy where all the necessary elements for its satisfaction have been established, although there may be circumstances where on grounds which may be described as grounds of public policy a remedy may be refused. Without attempting any comprehensive analysis, it seems to me that the principle requires at least that the plaintiff should have sustained a loss through the provision of something for the benefit of some other person with no intention of making a gift, that the defendant should have received some form of enrichment, and that the enrichment has come about because of the loss. The loss may be an expenditure which has not met with the expected return. The remedy may vary with the circumstances of the case, the object being to effect a fair and just balance between the rights and interests of the parties concerned. The obligation to provide the remedy does not rest on any contractual basis but on the general principle of the common law and it may find its expression in a variety of circumstances.

The claim which the appellants have eventually come to make is not for a share in the charge which had been effected over the Battersea Wharf in favour of RTB, so as to give them a preference over all creditors of Parc, but only a personal right to rank in priority to OOL, effective only as between RTB and OOL and open to be defeated by any further transactions by Parc, which in the event have not occurred. I would have had difficulty in accepting that the appellants would be entitled to have even a pro tanto right to the charge in circumstances where they did not intend to obtain any such security, indeed such a provision had been deliberately considered and deleted from the documentation. The more modest claim which they now make, however, seems to me to have been made out. The difference between these two positions, which to my mind is critical in the case, can be readily obscured by the use of the term "subrogation."

It is agreed that OOL was enriched by the repayment of some £10m. of the RTB loan. The structural arrangements made with Mr. Herzig in order to avoid a breach of the Swiss banking regulations do not

seem to me to prevent recognition of the reality of the granting of the funds by the appellants to RTB for Parc's account. Indeed the money was transmitted by them through the Deutsche-Schweizische Bank AG to RTB for the account of Parc. The appellants were well aware that the money was required for a partial reduction of an existing bank loan. The enrichment which is agreed to have occurred seems to me to have come about through the expenditure which the appellants made. Parc then incurred a direct liability to the appellants through the promissory note which Parc supplied and, ill-drafted as it was, the appellants certainly must have come to expect through the letter of postponement that they would in any question with OOL enjoy a priority to OOL in the enforcing of their own claim against Parc. It does not in my view matter that neither Parc nor OOL knew anything about the letter nor that the letter was ineffective to achieve what the appellants expected. In the circumstances it seems to me to in accordance with principle that they should be accorded the priority which they now claim.

For these reasons and for the reasons more fully set out by my noble and learned friend Lord Hoffmann I would allow the appeal.

## LORD HUTTON

My Lords,

The case made on this appeal by the appellant, the Banque Financiere de la Cité ("BFC"), is that there is an equitable principle that where a lender advances a sum of money to another person intended to be a secured loan, and the money is used by that person to discharge a debt owed by him to a secured creditor, the lender is entitled to be subrogated to the charge of that creditor if his security proves to be defective. The appellant further contends that its claim comes within the ambit of this principle.

In some circumstances such a principle is applied by equity. It was applied in *Ghana Commercial Bank v. Chandiram* [1960] AC 732 where, in the context of that case, the lender's security having proved to be defective, Lord Jenkins said, at p. 745:

"It is not open to doubt that where a third party pays off a mortgage he is presumed, unless the contrary appears, to intend that the mortgage shall be kept alive on his own benefit: see *Butler v. Rice.*"

The issue on this appeal is whether, in the unusual circumstances of this case, the appellant can rely on this principle. The facts giving rise to the appellant's claim have been set out by my noble and learned friend Lord Hoffmann and I need not repeat them.

It is clear that one of the elements which gives rise to the right to subrogation is the unjust enrichment of the defendant at the expense of the plaintiff. In *Orakpo v. Manson Investments Ltd.* [1978] A.C. 95, 104C Lord Diplock stated:

"My Lords, there is no general doctrine of unjust enrichment recognised in English law. What it does is to provide specific remedies in particular cases of what might be classified as unjust enrichment in a legal system that is based upon the civil law. There are some circumstances in which the remedy takes the form of 'subrogation', but this expression embraces more than a single concept in English law."

It is not disputed by the respondent, Omnicorp Overseas Limited ("OOL"), that it had been enriched by the reduction of the debt owing to Royal Trust Bank (Switzerland) ("RTB") secured by a first charge held by RTB on the freehold property of Parc (Battersea) Limited ("Parc") in Battersea, London ("the Battersea property") so that OOL's second charge over the Battersea property was made more valuable. But the argument advanced on behalf of OOL, which was rejected by Robert Walker J. but was largely

accepted by the Court of Appeal, was that there were a number of features of the transaction involving BFC, Mr. Herzig, Omni Holdings AG and Parc which resulted in the payment of about £10m. to RTB on 28 September 1990, which took the case outside the ambit of the doctrine of subrogation and which defeated BFC's claim against OOL.

One of the submissions advanced to the House by Mr. Kosmin on behalf of OOL was that OOL had not been enriched at BFC's expense. A claim based on unjust enrichment cannot succeed unless the plaintiff can establish that the defendant was unjustly enriched at its expense: see per Lord Goff of Chieveley in *Lipkin Gorman v. Karpnale Ltd.* [1991] 2 AC 548, 578C. Mr. Kosmin submitted that OOL had not been enriched at the expense of BFC but at the expense of Mr. Herzig. BFC did not lend to Parc but deliberately lent to Mr. Herzig who then lent an equivalent sum to Parc. Moreover Mr. Herzig lent to Parc on different terms in that, whereas BFC's loan to Mr. Herzig was for a short period of two months and was secured by a pledge of shares, Mr. Herzig's loan to Parc was for a period of 12 months and was unsecured. Accordingly it was argued that having chosen to lend to Mr. Herzig, BFC could not subsequently claim that OOL had been enriched at its expense. Both Robert Walker J. and the Court of Appeal rejected this submission. The findings of Robert Walker J. at pp. 23 and 24 of his judgment made it clear that the understanding and intention of BFC was that the loan to be made by it was a loan to enable Parc to make partial repayment of a debt owing by it to a bank. Therefore I consider that Robert Walker J. and the Court of Appeal were right to hold that the reality was that OOL was enriched at the expense of BFC.

Before considering Mr. Kosmin's further submissions it is necessary to refer to the terms of the letter of 28 September 1990 sent to BFC by Omni Holding AG ("the postponement letter"):

> "This is to confirm that we and all companies of our group will not demand any repayment of loans granted to Parc (Battersea) Ltd., London, until the full repayment of your loan of DM 30,000,000--granted to Mr. M. Herzig, which is secured by a deep discount promissory note amounting to GBP 10,000,000 -, issued by Parc (Battersea) Ltd."

I agree with Robert Walker J. and the Court of Appeal that the postponement letter was intended to have legal effect, and I did not understand Mr. Kosmin to dispute this conclusion. Robert Walker J. held that the intended effect of the postponement letter was an agreement by Omni Holding AG ("Holding") on its own behalf and as agent for all the other companies in the Omni group that all of those companies would not demand any repayment of loans granted to Parc until the full repayment of BFC's loan to Mr. Herzig, but the judge further held that Holding did not have authority to contract as agent on behalf of OOL and the other companies in the group. The Court of Appeal held that the only undertaking contained in the letter was an undertaking by Holding on its own behalf which did not bind OOL.

The letter was drafted in terms which are imprecise and lacking in clarity, but for the reasons stated by Robert Walker J. I incline, on balance, to the view that the letter was intended to constitute an undertaking by Holding both on its own behalf and as agent for the other companies. But even if the letter constituted only an undertaking by Holding on its own behalf, I consider that its terms were such and the relationship, as known to BFC, between Holding and the other companies in its group (all of which were controlled by Mr. Rey) was such that the letter gave rise to the expectation by BFC that all the members of the Omni group would postpone their claims against Parc until the loan made by BFC had been repaid to it.

The claim made by BFC that it is entitled to subrogation to RTB's charge on Parc's Battersea property is advanced on the basis that it expected the letter of postponement to give it security for its loan, but this expectation was disappointed because it transpired that OOL was not bound by the letter. Therefore the question arises whether, if the letter had been enforceable against OOL, the letter would have given the bank a "security", so that the letter can now be regarded as a "defective security". In my opinion it can,

because BFC expected that by reason of the letter its loan would be repaid in priority to the debts owing by Parc to the companies in the Omni group, and I consider that if the letter had operated in that way, it would have given BFC protection which can be regarded as a form of security.

Another principal argument advanced on behalf of OOL was that any enrichment of OOL at the expense of BFC was not unjust. A number of reasons were advanced in support of this contention. One reason related to the security which BFC did receive in respect of its loan and to a security which it decided not to require. In the discussions prior to the making of the loan to Mr. Herzig BFC stipulated for, and obtained, security in the form of a pledge of 35,000 bearer shares in Holding (with an initial margin of cover of about 160 per cent), and this pledge of shares would have constituted ample security for the loan if the Omni group had not become insolvent. Moreover, whereas the bank had originally required a second charge to be granted to it over Parc's Battersea property, it subsequently agreed not to require such a charge. Therefore it was submitted that the remedy of subrogation should not be granted to a lender who had got all that it bargained for in lending to the borrower. In particular, a new lender who lends on an unsecured basis will not be entitled to be subrogated to the security of an earlier lender. In support of this submission Mr. Kosmin relied on the judgment of Oliver J. in *Paul v. Speirway Ltd.* [1976] 1 Ch. 220, 233B where he said:

> "As it seems to me, where a court, upon a review of the facts, comes to the conclusion that what was intended between the parties was really an unsecured borrowing, there is no room for the doctrine of subrogation. That really is analogous to the situation envisaged in the judgment which I have just read, because to apply the doctrine of subrogation in such a case would in fact be putting the lender in a better position than he is bargaining to be put in when he advances money."

It was submitted that, equally, a new lender who bargains for and gets his own security should not be subrogated to the security of an earlier lender merely because its security turned out to be inadequate.

Linked to this submission was the further submission that there was no mutual intention on the part of BFC and Parc that BFC should be subrogated to the rights of RTB. My Lords, I agree with the view of my noble and learned friend Lord Hoffmann that the concept of mutual intention, whether actual or presumed, can be artificial in a case such as the present one, where the claim to subrogation arises because the security intended by the lender has proved to be defective. In my opinion in such circumstances the doctrine of subrogation is to be applied unless its application will produce an unjust result. This view finds strong support in the judgment of Nicholls J. in *Boodle Hatfield & Co. v. British Films Ltd.* [1986] P.C.C. 176, where, after referring to the judgments in the *Orakpo* case, he stated at p. 182:

> "First, one of the ways (because I do not think that Lord Diplock meant that this was the only way) in which the implication of subrogation to the existing security rights of the vendor may be displaced is by the express terms in the contract made between the lender and the borrower being inconsistent with the acquisition by the lender of the security rights. Secondly, the failure of the lender and the borrower to address themselves to the question whether the lender will acquire the security rights of the vendor will not of itself negative the application of the doctrine of subrogation. A lender who advances money to enable a borrower to complete and who stipulates for a legal charge to be given when his loan is made is unlikely to consider what his security position will be if the legal charge produced is invalid; that is, whether in that event he will acquire a lien by subrogation. But the view of both Lord Diplock and Lord Keith was that such a lender may acquire the pre-existing security rights by subrogation. Thirdly, and of overriding importance, the equitable doctrine of subrogation will not be applied when its application would produce an unjust result. One of the circumstances in which subrogation may lead to an unjust result is if, without the implication of subrogation, the lender obtained all that he bargained for."

And at p. 183:

> "Moreover, I do not think that the absence of any agreement or even discussion regarding security leads to the conclusion that there was by implication a common intention that the lender should have no security. The explanation for the absence of any discussion on this subject is the simple one, that neither party considered what the plaintiffs' position would be if the cheque was not met. Mr. Smith did not consider this, because he was relying on the assurance of a person who was well known to his firm. Obviously he was taking a risk that the cheque might not be met after all. But I do not think that from this I should infer that he was agreeing to waive or release any rights which the plaintiffs otherwise would have had in respect of the financial assistance they were providing to their client." . . .

> "As to the argument that the plaintiffs obtained all they bargained for, it is important to remember that subrogation applied in this case unless excluded. Accordingly, the question is not: did the plaintiffs bargain for the transfer to them of the vendor's security rights? Rather it is: did the bargain made by the plaintiffs with the defendant exclude that transfer, either expressly or impliedly? Unless this is kept in mind, consideration of whether the plaintiffs obtained what they bargain for is likely to mislead rather than assist in a case where, at the time, in the course of one short conversation neither party directed his mind to the crucial question."

This view is also supported by the judgment of Oliver J. in *Paul v. Speirway Ltd.* [1976] Ch. 220, 232B where he said:

> "I think respectfully that the wide general formulation in *Coote on Mortgages*, 9th ed. (1927), vol. 2, p. 1377 and in *Ghana Commercial Bank v. Chandiram* [1960] AC 732 is the right one, and that where the given circumstances exist subrogation applies unless the contrary appears. The real divergence here, as it seems to me, is on the strength of the evidence which is required to demonstrate a contrary intention."

A further submission was that as BFC had not maintained its original requirement to have a charge on Parcs' Battersea property, and had obtained the security it required, which was the pledge of shares in Holding, BFC would receive more than it had bargained for if it were granted subrogation. I do not accept this submission because, in the events which have happened, there are competing claims by BFC and OOL to priority in receiving payment from Parc's remaining asset, the Battersea property. Therefore, as Robert Walker J. observed at p. 65 of his judgment, to permit BFC to be subrogated to the RTB security, to the extent of its loan to Mr. Herzig, would give rise to a result not dissimilar to that which would have occurred if the postponement letter had operated as BFC had expected.

It was also submitted on behalf of OOL that BFC should not be subrogated to RTB's security because it had neglected to take simple steps to ensure that the letter of postponement would operate effectively to bind the other companies of the Omni group. In my opinion this submission is invalid because there is no requirement that before a lender can claim the benefit of subrogation he must show that he took reasonable precautions to ensure that the security for which he stipulated would be effective. It is because the intended security proved to be defective that the need for subrogation arises.

It was further submitted that there was no misrepresentation or sharp practice on the part of OOL or Parc, and that this was a consideration which pointed to the conclusion that there was no unjust enrichment of OOL. But in my opinion a remedy for unjust enrichment is granted where the defendant has been enriched at the expense of the plaintiff, and it would be unjust to allow the defendant to retain the enrichment. I consider that for a plaintiff to establish that it would be unjust for the defendant to keep the benefit which he had gained at the expense of the plaintiff, the plaintiff does not need to prove that the defendant was guilty of misconduct. In order for a claim for unjust enrichment to succeed at common law

the plaintiff does not have to prove a wrong committed by the defendant against him. In *Lipkin Gorman v. Kaspuale Ltd.* [1991] 2 AC 548, 572E Lord Goff of Chieveley stated:

> "Furthermore, it appears that in these cases the action for money had and received is not usually founded upon any wrong by the third party, such as conversion; nor is it said to be a case of waiver of tort. It is founded simply on the fact that, as Lord Mansfield said, the third party cannot in conscience retain the money--or, as we say nowadays, for the third party to retain the money would result in his unjust enrichment at the expense of the owner of the money."

A separate submission advanced by Mr. Kosmin was that where the creditor who held a charge over the property of the debtor received payment by reason of a subsequent loan made to the debtor by a new lender, the essence of the subrogation granted to the new lender was the acquisition by him of the benefit of the charge held by the creditor who had been paid off: that, as stated by Lord Diplock in the *Orakpo* case [1977] A.C. 95, 104D, there is "a transfer of rights from one person to another, without assignment or assent of the person from whom the rights are transferred and which takes place by operation of law". But in the present case there were two closely linked and inter-related reasons why subrogation should not be granted to BFC. One reason was that the payment of about £10m. which RTB received from Mr. Herzig did not discharge the entire debt owing to it by Parc. A balance of more than £10m. remained owing, and the charge held by RTB remained in being as security for that balance (although it was subsequently repaid to RTB at the end of October 1990 with money advanced by OOL). Therefore it was not conceptually possible for BFC to be subrogated to RTB's charge. Before the Court of Appeal BFC relied upon the decision of Romer J. in *Chetwynd v. Allen* [1899] 1 Ch. 353 in answer to this submission. In his judgment at p. 24 Morritt L.J. referred to the passage at p. 359 in the judgment of Romer J. where he made it clear that his decision in that case was not based on the principle of subrogation, and accordingly Morritt L.J. stated that he did not regard the decision as being of any assistance to BFC.

My Lords, I consider that the decision does materially assist BFC, as it establishes that a lender, whose loan is used to discharge part of a sum owing on a mortgage, will be treated by equity as having a charge on the mortgaged property to secure his loan without prejudice to the security given by the mortgage to the first lender. In *Chetwynd v. Allen* [1899] 1 Ch. 353 there was a mortgage to Terrell of two properties, the "Cedars", of which Chetwynd's wife, the plaintiff, was the beneficial owner, and the "Riding School" owned by Chetwynd, to secure £2,000 lent to him by Terrell. Mynors subsequently lent £1,200 to Chetwynd on a promise by Chetwynd that he should have a transfer of the earlier mortgage to Terrell, and Chetwynd applied £1,000 of the sum of £1,200 advanced by Mynors in partial repayment of the loan of £2,000 made by Terrell. Romer J. stated, at p. 357:

> "On these facts I have to consider what Mynors' rights are. Now, in my opinion, when Mynors advanced the £1200 on the representations and promise above mentioned, and the £1000 was applied in part payment to Terrell, the charge on the Cedars and school to the extent of the £1000 was kept alive in equity in favour of Mynors, so far as that could be done without prejudicing Terrell or the plaintiff. So far as Chetwynd was concerned, he could not complain that the charge was kept alive also on the school, seeing that it was by his fraud that the true facts as to Terrell's charge were kept hidden from Mynors. As regards Terrell, he clearly was not prejudiced, for the balance of his mortgage debt had priority over Mynors' charge; and as regards the plaintiff she was not prejudiced, so long as no extra costs were thrown on the Cedars by reason of the original mortgage debt of £2000 being divided as between Terrell and Mynors (and this I can provide for), and provided that as between the school and the Cedars the former remained primarily liable for the debt as between her and her husband."

It is somewhat puzzling to read, at the present day, the statement relating to subrogation at the end of Romer J's. judgment, to which Morritt L.J. referred, and which clearly influenced him to hold, erroneously in my respectful opinion, that the decision was not of assistance to BFC. The report of

*Chetwynd v. Allen* [1899] 1 Ch. 353, 355 states that after having ruled in favour of the plaintiff, Chetwynd's wife, on a number of points which had been raised, Romer J. reserved for further consideration "the question which had been raised as to the right of the defendant Mynors to be subrogated to the rights of Terrell under the mortgage of June 4, 1891, so far as concerned the £1000 paid off to Terrell out of the £1200 advanced by Mynors to Chetwynd." And at p. 356 it is reported that in the subsequent argument on the reserved question counsel for Mynors submitted that "Mynors is entitled on the principle of subrogation to stand in the shoes of Terrell to the extent of the £1000 paid off to him out of the £1200." I consider that the decision of Romer J. in favour of Mynors was a decision which today would be described as one that Mynors was entitled to the extent of £1000 to a charge upon the "Cedars" under the doctrine of subrogation, and it appears that the decision was treated as an application of that doctrine by Lord Jenkins in the *Ghana Commercial Bank* case [1960] AC 732, 745. It may be that Romer J. considered at the time of his decision, 100 years ago, that a case should not be regarded as one to which the principle of subrogation applied unless the debt of the first lender was completely discharged and the new lender succeeded to the entirety of the charge held by the first lender. Whilst that is the usual situation where the new lender is entitled to subrogation, it is not the only situation, because as *Goff and Jones on the Law of Restitution*, 4th ed. (1993) state at p. 593:

> ". . . subrogation is essentially a remedy, which is fashioned to the facts of the particular case and which is granted in order to prevent the defendant's unjust enrichment."

And in *Burston Finance Ltd. v. Speirway Ltd.* [1974] 1 W.L.R. 1648, 1652 Walton J., referring to subrogation, stated:

> "It finds one of its chief uses in the situation where one person advances money on the understanding that he is to have certain security for the money he has advanced, and, for one reason or another, he does not receive the promised security. In such a case he is nevertheless to be subrogated to the rights of any other person who at the relevant time had any security over the same property and whose debts have been discharged, in whole *or in part*, by the money so provided by him, but of course only to the extent to which his money has, in fact, discharged their claims." (emphasis added)

The second related reason relied on by Mr. Kosmin as to why BFC could not be subrogated in part to RTB's charge, ranking behind the balance of the charge held by RTB, was because this would not, in reality, have constituted subrogation to RTB's rights but a grant to BFC by the court of new rights created specially for the purpose. Mr. Kosmin's submission was that the court had no jurisdiction to confer such new rights.

In my opinion this submission is invalid because it fails to take account of the consideration that the doctrine of subrogation applies in a variety of different circumstances where the defendant has been unjustly enriched at the expense of the plaintiff, and where equity considers that it would be unconscionable for the defendant to retain that enrichment. In such a case, as Goff and Jones say, the remedy is fashioned to the facts of the particular case. In the *Orakpo* case at 104E Lord Diplock stated that some rights by subrogation "appear to defeat classification except as an empirical remedy to prevent a particular kind of unjust enrichment."

And in *Boscawen v. Bajwa* [1996] 1 WLR 328, 335 Millett L.J. referring to subrogation, said:

> "This is available in a wide variety of different factual situations in which it is required in order to reverse the defendants' unjust enrichment."

Therefore, in the present case, where OOL was enriched at the expense of BFC, where it would be unconscionable to permit OOL to retain that enrichment, and where BFC had expected to receive the

form of security constituted by the postponement of the demands of OOL and the other companies in the group, I consider that BFC is entitled in the circumstances to the order made by Robert Walker J. (subject to the amendment proposed by my noble and learned friend Lord Hoffmann), the effect of which is that its loan will be repaid in priority to the payment claimed by OOL.

As I have observed, the submissions advanced by Mr. Kosmin to this House were largely accepted by the Court of Appeal, and the grounds upon which Morritt L.J. held in favour of OOL can be summarised as follows (in a different order to that stated by the learned Lord Justice). First, the failure of the BFC to obtain the security for which it stipulated, which was an agreement binding on all the companies of the Omni group that they would postpone their demands against Parc, was due entirely to the failure of BFC to take the normal and elementary precautions. Secondly, there had been no misrepresentation or sharp practice on the part of OOL. Thirdly, there was the conceptual difficulty that BFC could not be subrogated to the rights given by RTB's charge when that charge remained vested in RTB to secure the balance of the debt owing to it, and the decision of Romer J. in *Chetwynd v. Allen* [1899] 1 Ch. 353 did not assist BFC. For the reasons which I have stated in considering the submissions advanced by Mr. Kosmin I am unable to agree with these grounds given by Morritt L.J. for dismissing BFC's claim.

In addition there was a further reason for dismissing the bank's action given by Morritt L.J., which was a reason advanced to Robert Walker J. and the Court of Appeal by Mr. Kosmin, but which he did not rely upon as a separate ground before the House. This was that the loan was made by the bank to Mr. Herzig, and not to Parc, in order to avoid the impact of the Swiss Federal Banking regulations. The decision of Robert Walker J. at p. 63 of his judgment on this aspect of the case was as follows:

"It is clear that the Swiss regulatory authorities took the view that the loan to Mr. Herzig was a breach of the reporting requirement. That breach carried criminal sanctions, though in fact the plaintiff received only a reprimand. The breach did not invalidate the loan. I do not consider that those circumstances are a reason for refusing subrogation, either by themselves or in conjunction with the plaintiff's failure, in its apparent eagerness to oblige Mr. Rey, to make enquiries about intra-group indebtedness."

I consider that the conclusion of Robert Walker J. on this point was correct and I agree with his view that the breach of the reporting requirement should not prevent the court from remedying the unjust enrichment of OOL at the expense of BFC.

Accordingly I would allow this appeal and restore the order of Robert Walker J. with the proposed amendment.

---

© 1998 Crown Copyright

---

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/uk/cases/UKHL/1998/7.html*

# *1098* A.B. Helsingfors Steamship Co. Ltd. Rederiaktiebolaget Rex v The White Rose

 Positive/Neutral Judicial Consideration

**Court**
Queen's Bench Division (Commercial Court)

**Judgment Date**
21 March 1969

**Report Citation**
[1969] 1 W.L.R. 1098



Queen's Bench Division

Donaldson J.

1969 March 12, 13; 21

*Arbitration—Special case—Findings of fact—Duty of parties to state to arbitrator all points on which facts to be found—Duty equally applicable whether lay or legally-qualified arbitrator—Circumstances in which court will remit case for further findings.*

*Shipping—Charterparty—Owners' Indemnity—Baltime form—Obligation on charterers to arrange loading—Master to be under orders of charterers as regards employment, agency or other arrangements—Charterers to indemnify owners against all consequences or liabilities arising from compliance with charterers' orders—Charterers responsible for loss or damage caused to owners by improper or careless loading or other improper or negligent act by them or their servants—Independent contractors engaged by charterers to load vessel at U.S. port—Injury to stevedore—Not caused by improper or careless loading or by other negligent act by charterers—Whether owners entitled to indemnity for sum paid to stevedore in settlement of potential liability under local law.*

*Ships' Names—White Rose.*

In May, 1959, shipowners chartered their vessel, the s.s. *White Rose,* to charterers under a charterparty in the Baltime form for "one time charter trip via Great Lakes … to UK/Continent/Scandinavia." By clause 4 of the charterparty it was the charterers' duty to arrange and pay for loading, trimming and stowing of cargo. By clause 9:

> "… The master to be under the orders of the charterers as regards employment, agency or other arrangements. The charterers to indemnify the owners against all consequences or liabilities arising from the master, officers or agents signing bills of lading or other documents or otherwise complying with such orders …"

By clause 13

Case 1:18-md-02865-LAK    Document 358-14    Filed 06/09/20    Page 62 of 71

A/B Helsingfors Steamship Co Ltd v Rederiaktiebolaget..., [1969] 1 W.L.R. 1098...

"… The charterers to be responsible for loss or damage caused to … the owners … by improper or careless loading, stowing or discharging of goods or any other improper or negligent act on their part or that of their servants."

Pursuant to the charter the charterers ordered the vessel to proceed to Duluth, Minnesota, and there load a cargo of grain. During loading operations carried out by an American firm of stevedores engaged by the charterers, one of the stevedores was injured when he fell through an unfenced tween deck hatch. He began proceedings in the local courts against the shipowners claiming $100,000 damages. The court ordered his employers, the stevedoring company, to be joined as third party but the claim was eventually settled by a payment of 25,000 dollars, of which the shipowners contributed 3,000 dollars to dispose of their "potential liability" to the stevedore under the local law and the stevedoring company 22,000 dollars.

*1099*

In an arbitration the owners sought to recover the 3,000 dollars from the charterers by way of indemnity under the express or implied terms of the charterparty, together with the costs and expenses which they had incurred. The arbitrators failed to agree and the matter was referred to a legally-qualified umpire who found that the accident occurred when the stevedore left his position at No. 2 tween deck hatch and for his own private purposes unconnected with his employment went after to No. 3 tween deck, and that the accident was caused partly by the stevedore's failure to have regard for his own safety and partly by the absence of fencing round No. 3 tween deck hatch (in breach of the shipowners' obligations under Finnish law). He found further that the injured stevedore was not an employee of the charterers but of the stevedore company, who were independent contractors, that the charterers were themselves at no time guilty of any improper or negligent act and held that the accident was not caused by the shipowners' complying with the orders of the charterers. He accordingly awarded in favour of the charterers and dismissed the shipowners' claim.

On the hearing of a special case, in which the shipowners contended, inter alia, that insufficient facts were found and the case should be remitted to the umpire:—

*Held,* upholding the award, (1), that the power to remit a special case for the finding of further facts would only be exercised if the facts found were inadequate to enable the court to reach any decision (post, p. 1103C, D) and that the facts upon which the court would proceed in the present case were only those found in the award together with such inferences of fact as must inevitably flow therefrom (post, p. 1104B, C).

Dictum of Lord Hanworth M.R. in *Strathlorne Steamship Co. Ltd. v. Andrew Weir & Co. (1934) 50 Ll.L.R. 185, 189 applied .*

*Per curiam .* It is the duty of the parties who frame questions of law for the decision of the court to make quite plain to the arbitrator the points upon which they want facts found in order to argue that point of law. That principle applies equally to a case stated by legal arbitrators, subject only to the modification that the parties may reasonably expect that a legal umpire will, without much assistance, fully appreciate the extent of the relevant areas of fact and make all such findings as the evidence justifies (post, pp. 1103H — 1104A).

© 2020 Thomson Reuters.

Case 1:18-md-02865-LAK    Document 358-14    Filed 06/09/20    Page 63 of 71

A/B Helsingfors Steamship Co Ltd v Rederiaktiebolaget..., [1969] 1 W.L.R. 1098...

Observations of Devlin J. in *Sinason-Teicher Inter-American Grain Corpn. v. Oilcakes and Oilseeds Trading Co. Ltd. [1954] 1 W.L.R. 935, 942; [1954] 2 All E.R. 497 applied* .

(2) Upon the assumption that the matter was not concluded by the holding of the umpire (post, p. 1108F, G), that although the owners' "potential liability" to the stevedore and their costs were incidents of and occurred in the course of complying with the charterers' orders to load at Duluth, their right to indemnity under clause 9 only arose if they established an unbroken chain of causation between compliance with the order and the loss suffered, and since it had not been established that their losses were caused by and were in law a consequence of such compliance, in the absence of proof of such causation, their claim under clause 9 failed (post, p. 1108B, C).

*Milburn & Co. v. Jamaica Fruit Importing & Trading Co. of London [1900] 2 Q.B. 540, C.A.* ; *Krüger & Co. Ltd. v. Moel Tryvan Ship Co. [1907] A.C. 272* and *Royal Greek Government v. Minister of Transport (1949) 83 Ll.L.R. 228 applied* .

Dictum of Roche J. in *Portsmouth Steamship Co. Ltd. v. Liverpool & Glasgow Salvage Association (1929) 34 Ll.L.R. 459* , 462 doubted.

(3) That although the indemnity afforded by clause 13  *1100*  was wide enough to cover loss incurred by a reasonable settlement of a potential liability it only operated if the loss was caused either (a) by improper or careless loading or stowing, by whoever was performing those functions, or (b) by some other improper or negligent act, of whatever nature, on the part of the charterers or their servants (post, pp. 1108H — 1109A) and that since there was no finding in the award that the loading or stowing was improper or careless while there was a finding that the charterers were themselves at no time guilty of any other improper or negligent act, the claim under clause 13 also failed (post, p. 1109B, C).

*Semble* . The term "servants" in clause 13 extends no further than that class of persons for whom the time charterers are vicariously responsible.

**The following cases are referred to in the judgment:**

*Bosma v. Larsen [1966] 1 Lloyd's Rep. 22* .
*Brabant, The [1967] 1 Q.B. 588; [1966] 2 W.L.R. 909; [1966] 1 All E.R. 961* .
*Elder, Dempster & Co. v. Dunn & Co. (1909) 15 Com.Cas. 49, H.L.(E.)* .
*Krüger & Co. Ltd. v. Moel Tryvan Ship Co. Ltd. [1907] A.C. 272* .
*Larrinaga Steamship Co. Ltd. v. The King [1944] 1 K.B. 124* ; *[1945] A.C. 246, H.L.(E.)* .
*Lensen Shipping Co. Ltd. v. Anglo-Soviet Shipping Co. (1935) 40 Com. Cas. 320, C.A.*
*Milburn & Co. v. Jamaica Fruit Importing & Trading Co. of London [1900] 2 Q.B. 540, C.A.*
*Portsmouth Steamship Co. Ltd. v. Liverpool & Glasgow Salvage Association (1929) 34 Ll.L.R. 459* .
*Royal Greek Government v. Minister of Transport (1950) 83 Ll.L.R. 228* .
*Sinason-Teicher Inter-American Grain Corp. v. Oilcakes and Oilseeds Trading Co. Ltd. [1954] 1 W.L.R. 935; [1954] 2 All E.R. 497* .
*Strathlorne Steamship Co. Ltd. v. Andrew Weir & Co. (1934) 50 Ll.L.R. 185, C.A.*

**The following additional cases were cited in argument:**

*Chesworth v. Farrar [1967] 1 Q.B. 407; [1966] 2 W.L.R. 1073; [1966] 2 All E.R. 107* .

© 2020 Thomson Reuters.

Case 1:18-md-02865-LAK    Document 358-14    Filed 06/09/20    Page 64 of 71

A/B Helsingfors Steamship Co Ltd v Rederiaktiebolaget..., [1969] 1 W.L.R. 1098...

Doolan v. Midland Rly. Co. (1877) 2 App.Cas. 792, H.L.(I.) .

Margarine Union G.m.b.H. v. Cambay Prince Steamship Co. Ltd. [1969] 1 Q.B. 219; [1967] 3 W.L.R. 1569; [1967] 3 All E.R. 775 .

SPECIAL CASE.

Under a Baltine charterparty dated April 23, 1959, the Finnish vessel *White Rose* was chartered by the owners, A.B. Helsingfors Steamship Company Ltd., to Rederiaktiebolaget Rex for "one time-charter trip via Great Lakes and St. Lawrence River to U.K./Continent/Scandinavia." Disputes arose between the parties which were referred to arbitration. The owners appointed Mr. R. A. Clyde and the charterers appointed Mr. C. A. L. Clark. By an instrument in writing dated June 19, 1968, the arbitrators nominated Mr. R. A. MacCrindle, Q.C., as umpire and by an instrument in writing dated July 12, 1968, gave notice that they were unable to agree.

The following statement of facts is taken from the umpire's award, dated July 29, 1968. Pursuant to the charterparty, the vessel was ordered by the charterers to Duluth, Minnesota, U.S.A., to load a cargo of grain. The vessel accordingly proceeded to Duluth and arrived there in May, 1959. The charterers made arrangements through local agents for grain to be *1101 loaded into the vessel by a firm of stevedores called American Grain Trimmers Inc. On or about May 27, 1959, one Ramon de Chambeau, being on that day employed as a longshoreman by American Grain Trimmers Inc., was on board the vessel to carry out stevedoring operations on behalf of American Grain Trimmers Inc. At or about 1435 hours on that day he fell from the tween deck into No. 3 lower hold, severely injuring his back. Ramon de Chambeau commenced proceedings against the shipowners in the District Court Minnesota (Fifth Division) by a libel filed on May 29, 1959. Pursuant to an order of that court dated October 21, 1959, American Grain Trimmers Inc. was made a third party respondent in the proceedings. The claim, which was for a total amount of the order of U.S. $100,000, was on or about November 30, 1960, settled by agreement between the parties to the proceedings upon terms whereby Ramon de Chambeau was paid $25,000, to which sum the shipowners contributed $3,000. In the present dispute the shipowners claimed to recover the sterling equivalent of U.S. $3,000 together with their costs and expenses incurred in connection with those proceedings, amounting to £2,935 5s. 5d. They claimed to recover this amount from the charterers by way of an indemnity under the express or implied terms of the charterparty; alternatively, by way of damages for alleged breaches of the charterparty.

At the arbitration the shipowners contended, inter alia, (a) that by virtue of clause 4 of the charterparty the charterers were to arrange and pay for stevedores, and that the stevedores should to this extent be regarded as the servants of the charterers; (b) that the charterers had ordered the vessel to Duluth, and had ordered her to receive on board the stevedores in question; (c) that Ramon de Chambeau, if not all stevedore labour employed by American Grain Trimmers Inc., was inexperienced and insufficiently trained to pay due regard to his own safety on board an oceangoing vessel; (d) that if the accident occurred in any way due to inadequate fencing or lighting on board the vessel the shipowners were in no way at fault in this respect under the charterparty, and were entitled to rely on the provisions of clause 13 thereof in that regard; (e) that the accident constituted a consequence or liability arising from compliance with the orders of the charterers and that the shipowners were accordingly entitled to recover an indemnity in respect thereof under clause 9 of the charterparty; (f) that in any event the accident occurred by reason of improper or careless loading, or by reason of some improper or negligent act on the part of Ramon de Chambeau or alternatively of American Grain Trimmers Inc., and that accordingly the shipowners were entitled to recover in respect thereof under the terms of the second paragraph of clause 13 of the charterparty.

The charterers contended, inter alia, (a) that the operative cause of the accident was inadequate fencing or lighting on board the vessel; (b) that if there was any carelessness on the part of Ramon de Chambeau or American Grain Trimmers Inc. which contributed to the accident the payment of U.S. $3,000 was not related to any such negligence, but represented a reasonable measure of the shipowners' personal liability after making all proper allowances for contributory negligence on the part of de Chambeau or American Grain Trimmers Inc.; that while de Chambeau was inexperienced as a stevedore, there was no evidence that American Grain Trimmers Inc. were an incompetent firm or that the management of that firm had in any way fallen below the standards appropriate to master stevedores at Great Lakes ports or anywhere else; (c) that the accident was merely an accident in the course of loading, and was not in any way a consequence of, *1102 or liability in law arising from, compliance with the charterer's orders to load at Duluth by means of American Grain Trimmers Inc.: (d) that in any event neither Ramon de Chambeau nor American Grain Trimmers Inc. should be regarded as servants of the charterers for the purposes of clause 13 of the charterparty; (e) that the accident occurred while Ramon de Chambeau was acting outside the course of his employment.

The umpire found the following facts. That (i) Ramon de Chambeau had little or no experience as a stevedore on board ocean-going vessels; (ii) stevedores in general at Duluth were at all material times no more, and no less, careful than stevedores

© 2020 Thomson Reuters.

Case 1:18-md-02865-LAK    Document 358-14    Filed 06/09/20    Page 65 of 71

A/B Helsingfors Steamship Co Ltd v Rederiaktiebolaget..., [1969] 1 W.L.R. 1098...

at most other Great Lakes grain ports; and American Grain Trimmers Inc. was no more, and no less, competent in carrying out its business than other master stevedores at most other Great Lakes grain ports: (iii) on the day of the accident Ramon de Chambeau, who had received little or no special instructions from anyone as to precautions he should take for his own safety, was employed with others in No. 2 tween deck at No. 2 tween deck hatch, in connection with the loading of grain into No. 2 lower hold; (iv) at all material times the hatch covers on the weather deck of No. 2 cargo compartment had been removed: and the hatch covers of No. 3 cargo compartment on the weather deck were in place. Most of the hatchway in No. 3 tween deck was occupied by a feeder, which had been built in the tween deck prior to the vessel's arrival at Duluth, and which was as wide as the hatchway itself; but over the forward and after end of that hatchway where the feeder did not extend, there were no hatch boards or covers in place. There was no thwartships bulkhead in the tween deck between No. 2 and No. 3 cargo compartments. No. 3 cargo compartment was not being loaded at the material time, it was not lit, and accordingly the tween deck in the region of No. 3 tween deck hatch was in relative darkness; (v) at or about 1435 hours on May 27, 1959, Ramon de Chambeau left his position at No. 2 tween deck hatch, and for his own private purposes unconnected with his employment made his way aft into No. 3 tween deck. Shortly thereafter he fell through No. 3 tween deck hatch; (vi) at all material times No. 3 tween deck hatch was not fenced in any way; this was a breach of the Finnish law imposing legal obligations upon the owners of vessels sailing under the Finnish flag (such as this vessel) in relation to the safety of cargo spaces; (vii) the acident was caused partly by the failure of Ramon de Chambeau to have due regard for his own safety, and partly by the absence of fencing round No. 3 tween deck hatch; (viii) the claim of Ramon de Chambeau in the American proceedings was subject to Minnesota law. Certain propositions of Minnesota law were agreed between counsel for the parties. The umpire found that those propositions correctly represented Minnesota law; (ix) the shipowners reasonably and properly paid and disbursed a total of £2,935 5s. 5d. in the American proceedings and the amount of $3,000 paid by them to Ramon de Chambeau represented a payment reasonably made to dispose of the shipowners' potential liability in damages under Minnesota law to Ramon de Chambeau.

Insofar as it was a question of fact the umpire found, and insofar as it was a question of law he held, (i) that Ramon de Chambeau was not an employee of the charterers but of American Grain Trimmers Inc; (ii) that American Grain Trimmers Inc. were independent contractors engaged by or on behalf of the charterers; (iii) that the charterers were themselves at no time guilty of any improper or negligent act; (iv) that the accident was not caused by the shipowners complying with orders of the charterers and the shipowners' claim accordingly failed and was dismissed.

*1103

The question of law for the decision of the court was whether on the facts found and on the true construction of the charterparty the charterers were liable to pay £2,935 5s. 5d. to the shipowners as damages for breach of the charterparty and/or by way of an indemnity under the terms thereof.

**Representation**

Anthony Evans for the shipowners.
Robert Goff Q.C. and Brian Davenport for the charterers.

*Cur. adv. vult.*

DONALDSON J.

March 21. read the following judgment. On the afternoon of May 27, 1959, Mr. Ramon de Chambeau, a longshoreman, was groping his way along the 'tween deck of the *m.s. White Rose,* which was loading a cargo of grain at Duluth, Minnesota, when he fell through No. 3 tween deck hatch, severely injuring his back. That was nearly ten years ago, but the echoes of his fall still reverberate through the corridors of shipping offices in Helsingfors, Stockholm, and indeed the City of London, for the claimants, the owners of the *White Rose,* have sought to make the time-charterers indemnify them in respect of the 3,000 dollars which they contributed to the settlement of Mr. de Chambeau's claim and in respect of costs incurred by them. This is, so far as my experience goes, an entirely novel claim, albeit brought under the well known and, in more than one sense, well tried clauses of the Baltime charterparty. Novelty is, I need hardly say, no guarantee of unsoundness, although in the field of shipping law, where disputes are commonplace and are handled on both sides by expert lawyers, it may provide some reason for adopting a somewhat cautious approach.

© 2020 Thomson Reuters.

Case 1:18-md-02865-LAK    Document 358-14    Filed 06/09/20    Page 66 of 71

A/B Helsingfors Steamship Co Ltd v Rederiaktiebolaget..., [1969] 1 W.L.R. 1098...

The matter comes before this court by way of an award in the form of a special case stated by Mr. R. A. MacCrindle, Q.C., who found in favour of the time charterers. The question, and the only question, before me is

> "whether on the facts found and the true construction of the said charterparty, the [charterers] are liable to pay £2,935 5s. 5d. to the [shipowners] as damages for breach of the said charterparty and/ or by way of indemnity under the terms of the said charterparty."

Mr. Evans, for the shipowners, submits that on the facts found by the umpire the shipowners are entitled to the indemnity which they seek. However, he says that if I am left in the position that in order to reach a correct decision I need to know further facts, I should remit the case to the umpire. I quite agree that I have power to remit any special case, but it is a power which, for my part, I should only exercise if the facts found were inadequate to enable me to reach any decision. The fact, if it be the fact, that it might be possible to persuade the tribunal on remission to make additional findings of fact leading to a different result in law points the weakness of the hybrid procedure whereby the facts are found in arbitration and the law is ascertained and applied to those facts in litigation. Devlin J. drew attention to this weakness in *Sinason-Teicher Inter American Grain Corpn. v. Oilcakes and Oilseeds Trading Co., Ltd. [1954] 1 W.L.R. 935* , 942–943, and said that it was for the parties who frame questions of law to make quite plain to the arbitrator the points upon which they want facts found in order to argue that point of law. It is true that he made his remarks in the context of a case stated by lay arbitrators, but the principle applies equally to legal arbitrators, subject only to the modification that the parties may reasonably expect, and I have no doubt that their expectations were justified in the present case, that a very distinguished legal  *\*1104*  umpire will, without much assistance, fully appreciate the extent of the relevant areas of fact and will make all such findings as the evidence justifies.

If, as I am told is the case, claims of this nature often arise, although I do not think that they have ever been reported as having reached the courts, and if the parties, or perhaps more accurately the shipowners' and time charterers' clubs with which the parties are respectively associated, are more interested in views on the scope and purpose of the indemnity clauses in the Baltime charter than in the incidence of liability to compensate Mr. de Chambeau, they might have been better advised to have left the matter to arbitration, asking Mr. MacCrindle to give reasons for his award on the usual terms, or to have litigated both the facts and the law. The situation being as it is, I propose to express my views on the basis solely of the facts found in the award and such inferences of fact as must inevitably flow from those facts. If and in so far as inferences of fact may, but need not, be drawn from facts found, those inferences are for the arbitral tribunal and not for the court: see *Strathlorne Steamship Co. Ltd. v. Andrew Weir & Co. (1934) 50 Ll.L.R. 185* , 189, *per* Lord Hanworth M.R., and the umpire, no doubt for good reason, has not drawn them.

Let me therefore turn to the facts which are found. The vessel was chartered by the claimants to the respondents on the Baltime form for "one time charter trip via Great Lakes and St. Lawrence River to U.K./Continent/Scandinavia." Pursuant to this charterparty the vessel was ordered by the respondents to proceed to Duluth and there load a cargo of grain. By clause 4 of the charterparty it was the respondent's duty to arrange and pay for loading, trimming and stowing of the cargo and they engaged independent contractors, American Grain Trimmers Inc., to perform this task. American Grain Trimmers were found by the umpire to have been no more and no less competent in carrying out their business than other master stevedores at most other Great Lakes grain ports and stevedores in general at Duluth were found at all material times to have been no more and no less careful than stevedores at most other Great Lakes grain ports. The unfortunate Mr. de Chambeau was found to have had little or no experience as a stevedore on board ocean-going vessels and to have received little or no special instructions as to precautions which he should take for his own safety.

Turning now to the circumstances of the accident, it is found that Mr. de Chambeau was employed with others in No. 2 tween deck at No. 2 tween deck hatch in connection with the loading of grain into No. 2 lower hold. At all material times the hatch

Case 1:18-md-02865-LAK    Document 358-14    Filed 06/09/20    Page 67 of 71

A/B Helsingfors Steamship Co Ltd v Rederiaktiebolaget..., [1969] 1 W.L.R. 1098...

covers on the weather deck of No. 2 cargo compartment had been moved and the hatch covers of No. 3 cargo compartment on the weather deck were in place. So far as the tween deck was concerned, No. 2 hatchway was open to enable cargo to be loaded and there was no thwartship bulkhead between it and No. 3 hatchway. Most of No. 3 hatchway was occupied by a grain feeder which had been built prior to the vessel's arrival at Duluth. This feeder was as wide as the hatchway, but did not fill it in a fore and aft direction. The unfilled parts of the hatchway were not covered with hatch boards or covers and were unfenced in any way. This lack of fencing constituted a breach of the obligations in relation to the safety of cargo spaces which were imposed by Finnish law on the owners of vessels which, like the *White Rose,* wore the flag of Finland. The umpire made no findings as to whether such fencing should or would have been permanent or temporary or fixed or moveable in its nature and, apart from the position under Finnish law,  *\*1105*  who, if anyone, was responsible for the lack of fencing. I am not sure what, if any, inferences Mr. Evans would have had me draw in this regard, save perhaps that the omission did not constitute unseaworthiness in the vessel and, if it did constitute such unseaworthiness, was not caused by any want of due diligence upon the part of the owners or their manager. In any event, I decline to draw any inference.

At about 14.35 hours on May 27, 1959, Mr. de Chambeau left his position at No. 2 tween deck hatch, and for his private purposes unconnected with his employment made his way aft into No. 3 tween deck. The nature of these purposes must remain private, for they are not found and I will not speculate, although several possibilities spring immediately to mind, some of which would have been of interest to the local police, some to the local health authority and some to his employers, who are expressly found to have been American Grain Trimmers Inc. and not the time charterers. Shortly thereafter he fell through No. 3 tween deck hatch, sustaining serious injury to his back.

In so far as they were questions of fact, the umpire found that the accident was caused partly by Mr. de Chambeau's failure to have due regard for his own safety and partly by the absence of fencing round No. 3 tween deck hatch, that the time charterers were themselves at no time guilty of any improper or negligent act and that the accident was not caused by the shipowners complying with the orders of the time charterers. He has not found whether the accident would have happened to a competent and/or experienced and/or properly instructed stevedore and I cannot draw any inferences in these respects.

Mr. de Chambeau began proceedings against the claimant shipowners in the District Court of the United States for the District of Minnesota, claiming 100,000 dollars as damages. He did not, I infer, make any claim against his employers American Grain Trimmers Inc., who were shortly joined in the proceedings as a third party respondent. This failure to make a direct claim against his employers is not altogether surprising in the light of the provisions of Minnesota law as found by the umpire. It appears that under that law Mr. de Chambeau had no direct claim against his employers other than under the Harbour Workers and Longshoremen Act and that the employers' liability in respect of such a claim was limited at 17,280 United States dollars. On the other hand, no such limitation applied to a claim against the shipowners who were liable if the accident was caused by unseaworthiness of the vessel. "Unseaworthiness" is a term of art in this context and includes any failure to take proper steps, for example by warning, instructions or otherwise, to make the ship a safe place of work for Mr. de Chambeau. "Unchambeauworthiness" might in fact be a better term. However, the shipowners were entitled to an indemnity from the employers in respect of their liability to Mr. de Chambeau and in respect of their costs of defending his claim if and to the extent that the liability arose from a breach by the employers of an implied warranty between them and the shipowners that they would perform the loading in a workmanlike manner.

Mr. de Chambeau's claim was settled for 25,000 dollars of which 22,000 dollars was provided by American Grain Trimmers Inc., and 3,000 dollars by the shipowners. This 3,000 dollars, together with their costs of defending the claim, is equivalent to £2,935 5s. 5d. The umpire has found as a fact that

"the claimants reasonably and properly paid and disbursed a total of £2,935 5s. 5d. in the American proceedings and the amount of  *\*1106*  3,000 dollars paid by them to … Ramon de Chambeau represented a payment reasonably made to dispose of the claimants' potential liability in damages under Minnesota law to … Ramon de Chambeau."

© 2020 Thomson Reuters.

Case 1:18-md-02865-LAK    Document 358-14    Filed 06/09/20    Page 68 of 71

A/B Helsingfors Steamship Co Ltd v Rederiaktiebolaget..., [1969] 1 W.L.R. 1098...

The umpire made no finding as to the nature of the potential liability to which he referred and Mr. Evans submits that I may infer from the relatively small contribution being made by the shipowners that there was no liability, although the claim had nuisance value or that if there was any liability on the part of the shipowners, it may have arisen by breach of statutory duty or by reason of vicarious responsibility for the acts and omissions of the crew. In my view all that is found is that there was a potential liability to Mr. de Chambeau under the law of Minnesota and that that potential liability was settled for 25,000 dollars on the reasonable terms that the shipowners would contribute 3,000 dollars and nothing further should or can be inferred.

The claim for an indemnity is made in the alternative under clauses 9 and 13 of the Baltime charterparty. Somewhat different considerations apply to each clause and I will therefore consider them separately.

## Clause 9

This clause, so far as is material, provides that:

> "9 … The master to be under the orders of the charterers as regards employment, agency or other arrangements. The charterers to indemnify the owners against all consequences or liabilities arising from the master, officers or agents signing bills of lading or other documents or otherwise complying with such orders …"

In *Larrinaga Steamship Co. Ltd. v. The King [1944] K.B. 124* , 131, Mackinnon L.J. held that

> "… the word 'employment' in the part of clause 9 which speaks of 'employment, agency or other arrangement' cannot refer to 'the employment of the ship' … Manifestly, it refers to the 'employment' of stevedores, agents, pilots, tug-owners or other persons with whom, by direction of the charterer, the master is to make contracts or 'arrangements.'"

Neither party to that litigation had suggested this construction and it did not survive an appeal to the House of Lords, which held that "employment" in the clause meant "employment of the ship": see *[1945] A.C. 246* .

Mr. Evans now seeks to restore the effect of the Court of Appeal's judgment by a different route. He submits that the authorities establish that if the shipowner, having complied with an instruction from the charterer, thereby incurs a liability to a third party from which he would be protected had the time charterer alone been concerned, he is entitled to an indemnity. He says that the basis of the bargain between the parties was summarised by Devlin J. in *Royal Greek Government v. Minister of Transport (1950) 83 Ll.L.R. 228* when he said, at p. 234:

> "If he [the shipowner] is to surrender his freedom of choice and put his master under the orders of the charterer, there is nothing unreasonable in his stipulating for a complete indemnity in return."

© 2020 Thomson Reuters.

Case 1:18-md-02865-LAK    Document 358-14    Filed 06/09/20    Page 69 of 71

A/B Helsingfors Steamship Co Ltd v Rederiaktiebolaget..., [1969] 1 W.L.R. 1098...

As applied to a claim by a stevedore for personal injuries, the shipowner makes good his claim to an indemnity by the following stages. (1) The *1107 shipowner establishes an order to go to a particular port to load a particular cargo. (2) The terms of the charterparty expressly place the duty of arranging and paying for loading upon the time charterer, who, in fulfilment of that obligation, engages independent stevedores whom the shipowner is impliedly obliged to accept. (3) Under the terms of the relevant law, that is, the local law, a potential liability on the part of the shipowner towards the stevedore is thereby established. (4) The time charterer fails to clothe the shipowners with the protection against the stevedore's claims which, under clause 13, he would have against similar claims by the time charterers. That clause, after dealing with delay in delivery of the vessel, delay during the currency of the charter and loss or damage to goods on board, provides that "The owners not to be responsible in any other case nor for damage or delay whatsoever and howsoever caused even if caused by the neglect or default of their servants." (5) As the shipowner has, as a result of complying with the charterers' orders, been placed in a less attractive position than he would have been if the time charterers had personally loaded the vessel, he is entitled to an indemnity.

Mr. Evans further submits that this is consistent with the cases in which shipowners have been indemnified against their liability to holders of bills of lading, whose terms were less favourable to the shipowners than were the terms of the time charterparty: see, for example, *Milburn & Co. v. Jamaica Fruit Importing & Trading Company of London [1900] 2 Q.B. 540* , where the loss arose from an inability to claim general average contribution from cargo; *Kruger & Co. Ltd. v. Moel Tryvan Ship Co. Ltd. [1907] A.C. 272* , where the shipowners became liable for loss of cargo; *Elder, Dempster & Co. v. Dunn & Co. (1909) 15 Com.Cas. 49* , where the cargo was wrongly marked and by the terms of the bills of lading and/or the provisions of the law of the place of discharge the shipowners could not require the receivers to take delivery of the mismarked goods and were liable as if they had lost them; *The Brabant [1967] 1 Q.B. 588* and *Bosma v. Larsen [1966] 1 Lloyd's Rep. 22* , further damage to cargo cases.

He also submits that is is consistent with the decisions in *Lensen Shipping Co. Ltd. v. Anglo-Soviet Shipping Co. Ltd. (1935) 40 Com.Cas. 320* , in which a vessel sustained damage as a result of being ordered to load at an unsafe berth; in *Strathlorne Steamship Co. Ltd. v. Andrew Weir & Co., 50 Ll.L.R. 185* , in which the shipowners incurred a liability to the bill of lading holders as a result of their having delivered the cargo on the instructions of the time charterers to persons who could not produce the bills of lading and were not in fact entitled to receive the goods; and in *Portsmouth Steamship Co. Ltd v Liverpool & Glasgow Salvage Association (1929) 34 Ll.L.R. 459* , in which the shipowners recovered an indemnity in respect of damage to the vessel caused by the cargo which they loaded on the time charterers' instructions.

Mr. Goff, for the time charterers, accepts much of Mr. Evans' submission, but he says that one vital element has been omitted, namely, that the right to indemnity only arises if and in so far as the loss suffered by the shipowners can be proved to have been caused by the shipowners' compliance with the time charterers' instructions. He says that in the bill of lading cases causation is relevant, but it is rarely, if ever, a live issue, because commonly the shipowner is for practical purposes under no liability whatsoever in respect of cargo under the terms of the charterparty and if he is liable under the bills of lading which he has signed under instructions from the time charterers, his liability must be caused *1108 by his compliance with those instructions. When, however, one looks at the unsafe port cases or cases of damage to the ship resulting from the nature or condition of the cargo ( *Portsmouth Steamship Co Ltd. v. Liverpool & Glasgow Salvage Association (1929) 34 Ll.L.R. 459* and *Royal Greek Government v. Minister of Transport (1949) 83 Ll.L.R. 228* ) the element of causation is all important as it is in the present case.

In my judgment Mr. Goff's submission is correct and it is necessary in every case to establish an unbroken chain of causation, although I would not accept as a generalisation that "if some act of negligence intervenes or some marine casualty intervenes then I think the chain of causation is broken and the indemnity does not operate": *per* Roche J. in *Portsmouth Steamship Co. Ltd. v. Liverpool & Glasgow Salvage Association, 34 Ll.L.R. 459* , 462. A loss may well arise in the course of compliance with

© 2020 Thomson Reuters.

Case 1:18-md-02865-LAK    Document 358-14    Filed 06/09/20    Page 70 of 71

A/B Helsingfors Steamship Co Ltd v Rederiaktiebolaget..., [1969] 1 W.L.R. 1098...

the time charterers' orders, but this fact does not, without more, establish that it was caused by and is in law a consequence of such compliance and, in the absence of proof of such causation, there is no right to indemnity.

The shipowners in the present case have undoubtedly established that their "potential liability" to Mr. de Chambeau and their actual loss of £2,935 5s. 5d. were incidents of and occurred in the course of complying with the charterers' orders to load grain at Duluth. But were they caused by such compliance? The judge of fact, the umpire, has found that the accident itself was caused partly by the absence of fencing, but it is clear from his conclusion that the time charterers themselves were at no time guilty of any improper or negligent act and that they were not responsible for the lack of fencing. He has found that the shipowners were in breach of Finnish law, but I do not think that that is material. What connected the accident with, and gave rise to, a potential liability and an actual loss was the provisions of Minnesota law. Unless it can be said that this law was so unusual as to constitute Duluth a legally unsafe port to which the vessel should not have been ordered — and no such contention was advanced — or that the time charterers engaged stevedores who were incompetent by local standards, which is negatived by the findings of fact, I do not consider that it can be said that there is the necessary causal connection between the order to load and the loss. This view is strengthened by, although not dependent upon, the finding that at the time of the accident Mr. de Chambeau had "left his position at No. 2 tween deck hatch, and for his own private purposes unconnected with his employment made his way aft into No. 3 tween deck." It is also strengthened, and it may be that I am really precluded from reaching any other conclusion, although I have assumed that this is not the case, by the umpire's conclusion that "the accident was not caused by the [shipowners'] complying with orders of the [charterers']," it not being suggested that in reaching this conclusion he misdirected himself in fact or in law.

Accordingly in my judgment the claim under clause 9 fails.

## Clause 13

There remains the alternative claim under this clause which, so far as is material, provides that:

> "13  … The charterers to be responsible for loss or damages caused to the … owners … by improper or careless loading, stowing or discharging of goods or any other improper or negligent act on their part or that of their servants."

The indemnity afforded by this clause is clearly wide enough to cover  *1109  loss incurred by a reasonable settlement of a potential liability, as contrasted with physical loss of or damage to the vessel or financial loss by, for example, the detention of the vessel. However, it only operates if the loss is caused by either (a) improper or careless loading or stowing by whoever is performing those functions, whether or not they are independent contractors appointed by the time charterers or servants or agents of such contractors, or (b) some other improper or negligent act of whatsoever nature on the part of the time charterers or their servants. There is no finding that the loading or stowing was improper or careless or that, if it was, it in any way caused the accident. There is a finding that the absence of fencing at No. 3 hatchway contributed to the accident, but no finding that the provision of such fencing was part of the process of loading, which was not taking place at that hatchway, or that this absence resulted from the improper or negligent act of the time charterers or their servants, or of the American Grain Trimmers Inc. or their servants.

In the circumstances it is unnecessary to decide whether Mr. Goff is right in his submission that the term "servants" extends no further than that class of person for whom the time charterers are vicariously responsible, although I incline to think that it

Case 1:18-md-02865-LAK    Document 358-14    Filed 06/09/20    Page 71 of 71

A/B Helsingfors Steamship Co Ltd v Rederiaktiebolaget..., [1969] 1 W.L.R. 1098...

is so limited. There is, furthermore, a finding that the time charterers were themselves at no time guilty of any other improper or negligent act.

Accordingly in my judgment the claim under clause 13 also fails.

I therefore answer the questions of law for the decision of this court in the negative and the award will stand in accordance with clause 12.

[Reported by R. D. FAYERS ESQ., Barrister-at-Law.]

**Representation**

Solicitors: William A. Crump & Son; Richards, Butler & Co.

*Order accordingly.*

(c) Incorporated Council of Law Reporting for England & Wales