# EXHIBIT 5

Case 1:18-md-02865-LAK    Document 360-5    Filed 06/23/20    Page 2 of 17

Bensen v. American Ultramar Ltd., Not Reported in F.Supp. (1997)
1997 WL 317343

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by In re Rivastigmine Patent Litigation (MDL No. 1661), S.D.N.Y., April 19, 2007

1997 WL 317343
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lloyd BENSEN, Plaintiff,
v.
AMERICAN ULTRAMAR LIMITED,
ULTRAMAR INTERNATIONAL HOLDINGS
LIMITED, and ULTRAMAR PLC, Defendants.

No. 92 CIV. 4420 KMW NRB.
|
June 12, 1997.

**Attorneys and Law Firms**

Bressler, Amery & Ross, New York, N.Y., Brian F. Amery, Michael J. Riordan, Lawrence D. Ross, David J. Libowsky, *Of Counsel,* for Plaintiff.

Solomon, Zauderer, Ellenhorn, Frischer & Sharp, New York, N.Y. David N. Ellenhorn, James R. Pigott, Jr., *Of Counsel,* for Defendants.

**Opinion**

NAOMI RICE BUCHWALD, United States Magistrate Judge.

 *1  This Opinion addresses the issues of damages and attorney's fees that were left open by stipulation of the parties until after the conclusion of the liability phase of the case. Bensen v. American Ultramar Ltd., No. 92 Civ. 4420, 1997 WL 66780, at *11 (S.D.N.Y. Feb.14, 1997). Familiarity with the procedural history and factual background of this action are presumed and are reiterated only in the context of the particular issues raised.

I. *Plaintiff's Claim for Breach of Contract*

A. Measure of Damages

Having found that plaintiff was involuntarily terminated by Ultramar on October 30, 1991, and that he is entitled to damages for the remaining four years and eleven months of his 1985 Service Agreement ("the contract" or "the 1985 Agreement"), we now address the issue of the annual salary to be used for the calculation of damages. Bensen maintains that he agreed to reduce his salary from $800,000 to $600,000 and to forego future pension benefits [1] only in consideration for an agreement to use a base salary of $1.2 million for the calculation of final benefits. [2] Defendants maintain that the damages should be based on Bensen's actual final salary of $600,000 because there is no evidentiary support for a link between the salary reduction and a $1.2 million provision, and no new agreement was ever finalized that included such a provision.

To place this issue in context, it will be recalled that in November of 1990, Bensen requested early disbursement of the pension and severance payments he would become entitled to receive on May 10, 1991, his 65th birthday. [3] On November 26, 1990, Bensen sent a memorandum to Ultramar Chief Executive Officer Jean Gaulin, proposing, in accordance with a "Gentlemen's Agreement" that was reached when he took over the chairmanship of Ultramar PLC in 1985, [4] that his final entitlements be calculated using an adjusted $1.2 or $1.3 million "notional" salary rather than his then-current salary of $800,000. (Ex. J29.) Gaulin conducted his own investigation and prepared a memorandum that was never circulated, reiterating many of Bensen's arguments and recommending the use of a $1.2 million notional salary to compute Bensen's final pension payment. (Ex. J30.) Gaulin then submitted to the Compensation Committee a compilation of documents and memoranda (the "Gaulin Package") supporting the use of a $1.2 million notional salary. (Ex. J31.) The Compensation Committee, consisting of disinterested directors Chairman John Darby, CEO Gaulin, Deputy Chairman Lord Remnant, Bernard Ness, and Ronald Utiger, approved the use of a $1.2 million notional salary to compute Bensen's pension. (Ex. J32.) On December 19, 1990, Ultramar International Holdings Limited disbursed over $10 million to Bensen, consisting of both pension and severance benefits (the "1990 payment"). (Ex. J34.) Bensen acknowledged receipt of the 1990 payment in a letter dated December 19, 1990. (Ex. J37.) [5] This payment brought the total amount of "pension" payments that Bensen received from the Ultramar Group to approximately $20 million. [6]

 *2  In 1991, Arnold Lorbeer, former chairman of Ultramar and Bensen's close friend, and Eugene O'Shea, general counsel for Ultramar, were involved in drafting a new contract for Bensen. (Tr. at 897.) There were many issues with these draft contracts, including objections to a lucrative "golden parachute" designed to take effect in the event of a takeover of

Case 1:18-md-02865-LAK   Document 360-5   Filed 06/23/20   Page 3 of 17

**Bensen v. American Ultramar Ltd., Not Reported in F.Supp. (1997)**
1997 WL 317343

Ultramar. While several drafts were created, none was signed by Darby, whose signature as guarantor on behalf of Ultramar PLC was required to make the contract binding. (Tr. at 128, 156, 436.)

In early October of 1991, Ultramar held a management meeting in Arizona during which the topic of Bensen's proposed new contract was raised, but not resolved. (Tr. at 901; Ex. D148.) Shortly after the Arizona meeting, on October 17, 1991, LASMO announced its takeover bid for Ultramar.

1. $1.2 Million

The first issue is whether Bensen's 1985 Agreement was in fact amended to provide for the use of a $1.2 million salary for purposes of determining the payment due him in the event of an involuntary termination or takeover. Since the 1985 Agreement is subject to the Statute of Frauds as the contract was not to be performed within one year, N.Y. Gen. Oblig. L. § 5–701(a)(1) (McKinney 1989), [7] any modification of the contract is also subject to the Statute of Frauds, *Beacon Terminal Corp. v. Chemprene, Inc.,* 75 A.D.2d 350, 354, 429 N.Y.S.2d 715, 718 (2d Dep't), *appeal denied,* 51 N.Y.2d 706, 433 N.Y.S.2d 1026, 413 N.E.2d 369 (1980).[8] The Statute of Frauds may be satisfied by a writing subscribed to by the party to be charged, N.Y. Gen. Oblig. L. § 5–701(a), or the modification may fall outside the Statute of Frauds if it is made orally and has been partially performed,[9] *Rose v. Spa Realty Associates,* 42 N.Y.2d 338, 343–44, 397 N.Y.S.2d 922, 926, 366 N.E.2d 1279 (1977). The Statute of Frauds is satisfied only if the partial performance is "unequivocally referable" to the oral modification, that is, it is not compatible with any provision of the original written agreement. *See Rose,* 42 N.Y.2d at 343–44, 397 N.Y.S.2d at 926, 366 N.E.2d 1279.

First, there is no dispute that there is no writing modifying the 1985 Agreement. (Transcript of Apr. 9, 1997 Oral Argument ("Oral Arg.") at 4.) While the drafts of the proposed contract include a $600,000 salary and the $1.2 million provision, (*see* Exs. P86, P87, P92, P120), these drafts were never signed by Chairman Darby, (Oral Arg. at 8; Tr. at 128, 156, 436). Though Bensen claims that the completion of the new contract was delayed due to the LASMO takeover bid on October 17, 1991, we are not persuaded by this argument. Despite the fact that Bensen had agreed to a "final-type version" of the contract in March, May, and July 1991, (Tr. at 549), as late as the October 1991 Ultramar management meeting, which was held prior to any awareness of the LASMO bid, Darby still had not signed the new contract. (Darby Dep. at 47–48; Tr. at 149–50.)

Moreover, there is abundant evidence that Ultramar officials disapproved of the terms of the draft contracts. (*See, e.g.,* Darby Dep. at 47–48, 50–51, 114.) Darby was displeased that the proposed contract was a Service Agreement rather than a Consulting Agreement; that it ran to age 72 rather than age 70; and that in the event of Bensen's death, his widow would receive payments based on $1.2 million rather than his actual salary. (Darby Dep. at 50–51.)[10] In addition, O'Shea testified that he and Gaulin were "concerned" about the use of $1.2 million in the event of a takeover. (Tr. at 903.) Finally, O'Shea's handwritten notes from one of the meetings in Arizona in October 1991 indicate that contrary to Bensen's assertion that the parties were in full agreement about $1.2 million provision, others at Ultramar intended that "in the event of a change of control," the draft contract would "not ... change or set any other compensation rate than that which [Bensen] is being paid...." (Ex. D148.) We find that it was the disagreement over the terms of the new contract, not the LASMO takeover bid, that prevented the signing of a new contract.

**\*3** Thus, in the absence of a written modification, we must explore whether there was an oral modification of the contract. Neither party claims that there was full performance of any modification. Therefore, we will examine whether there was partial performance of an agreement linking the salary reduction with a promise of a $1.2 million salary upon takeover provision, and whether that partial performance is unequivocally referable to the oral modification.

Bensen claims that Gaulin's handwritten and formal memoranda regarding his 1990 pension payment show the link between the salary reduction and $1.2 million provision. (Exs.J30, J31.)[11] Though Gaulin's handwritten, uncirculated [12] memorandum does use a $1.2 million base salary for "disability and death plan, merger, etc." and sets Bensen's annual compensation at 50% of this base salary, the formal memorandum that was actually sent to the Compensation Committee uses the $1.2 million salary only to calculate pension payments already owed to Bensen. (Exs.J30, J31.) Furthermore, while Gaulin suggests in his formal memorandum "[t]hat Lloyd's 1985 Service Agreement be voluntarily revised to reduce the annual salary

Case 1:18-md-02865-LAK   Document 360-5   Filed 06/23/20   Page 4 of 17

**Bensen v. American Ultramar Ltd., Not Reported in F.Supp. (1997)**
1997 WL 317343

to $600,000," there is nothing stating that the reduction was in any way related to a $1.2 million provision. (Ex. J31.)

Bensen also argues that we can find a link between the salary reduction and $1.2 million provision because every draft of the proposed contract included the salary reduction and $1.2 million provision. [13] We are not persuaded by this evidence because, even assuming that it may have been the intent of the parties to include these provisions in the new contract, intent may be modified, revoked or abandoned any time before it is effectuated. *Triboro Coach Corp. v. New York State Labor Relations Bd.,* 261 A.D. 636, 27 N.Y.S.2d 83, 85 (2d Dep't), *aff'd,* 286 N.Y. 314, 36 N.E.2d 315 (1941). [14] Furthermore, the mere fact that the various drafts included both the salary reduction and a $1.2 million provision does not necessarily show that the two items were linked. In fact, there is positive evidence showing that Bensen accepted the reduction in salary without any link to the $1.2 million provision. (*See* Exs. J31 at 4 (Gaulin's recommendation "[t]hat Lloyd's 1985 Service Agreement be voluntarily revised to reduce the annual salary to $600,000," with no mention of a $1.2 million provision); J39; P84. [15] )

In sum, the drafts of the new contract were not effectuated, there is evidence that Ultramar officials disapproved of the $1.2 million provision and other terms, (*see* Ex. D148; Darby Dep. at 50–51; Tr. at 903), and there is evidence that the salary reduction and $1.2 million provision were not linked. Therefore, we decline

to use a $1.2 million salary as the measure of Bensen's damages. [16]

2. $800,000

Bensen's alternative argument is that we should use the $800,000 salary in effect prior to the reduction because he only agreed to the salary reduction in combination with the $1.2 million provision, and therefore there is a failure of consideration for the reduction. Failure of consideration may form the basis for rescission of a contract only "[w]here a plaintiff has received little or nothing of value." *Independent Energy Corp. v. Trigen Energy Corp.,* 944 F.Supp. 1184, 1199 (S.D.N.Y.1996). We find that the consideration for Bensen's salary reduction was his reduced workload resulting from his attaining age 65 and being phased out of the day-to-day management of Ultramar. (*See* Exs. P82; P86; P87; P92; P120; Tr. at 125 (Lorbeer's testimony that he redrafted Bensen's contract "with the $600,000 salary and on the basis of the reduced amount of work for the future ...").) [17] Receiving $600,000, only a 25% reduction in salary, in return for a reduced workload can hardly be called "little or nothing of value." Therefore, we decline to utilize an $800,000 salary as the measure of Bensen's damages.

**\*4** 3. $600,000

Bensen argues that we cannot use the $600,000 salary in effect at the time of his termination as the measure of damages because we must read section 3(a) of his 1985 Agreement literally when it says that "the Employer may from time to time increase the Employee's Base Annual Salary and such *increase* shall be the new Base Annual Salary for the remainder of the Term hereof." (Ex. J10 (emphasis added).) Under Bensen's interpretation, any reduction in his salary would last only for the current year, and in order to reduce his salary for the remainder of the term, his contract would have had to have been modified and that no such modification ever occurred.

We find this argument disingenuous. The New York Court of Appeals has held that "in searching for the probable intent of the parties, lest form swallow substance, our goal must be to accord the words of the contract their 'fair and reasonable meaning.' " *Sutton v. East River Sav. Bank,* 55 N.Y.2d 550, 555, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075 (1982) (quoting *Heller v. Pope,* 250 N.Y. 132, 135, 164 N.E. 881 (1928)). Furthermore, when the literal interpretation of a contract would lead to an absurd result, it should be rejected in favor of an interpretation that would meet the reasonable expectations of the parties. *Reape v. New York News, Inc.,* 122 A.D.2d 29, 30, 504 N.Y.S.2d 469, 470 (2d Dep't), *appeal denied,* 68 N.Y.2d 610, 508 N.Y.S.2d 1027, 501 N.E.2d 600 (1986). Where an absurdity is identified, "courts may as a matter of interpretation carry out the intentions of the parties by transposing, rejecting, or supplying words to make the meaning of the contract more clear." *Hickman v. Saunders,* 228 A.D.2d 559, 645 N.Y.S.2d 49, 50 (2d Dep't 1996).

In the present case, a literal interpretation of section 3(a) would create an absurd result because it would mean that the reduced salary would not have changed the Base Annual Salary no matter how long the lower salary was received. Rather, a fair and reasonable interpretation of this section is that the parties expected *any* change in Bensen's salary would alter his Base Annual Salary, and the contract only made provision for an increased salary in the expectation that Bensen's salary would rise over time, especially in light of the

Case 1:18-md-02865-LAK   Document 360-5   Filed 06/23/20   Page 5 of 17

**Bensen v. American Ultramar Ltd., Not Reported in F.Supp. (1997)**
1997 WL 317343

fact that the 1985 Agreement was negotiated in the context of a significant salary cut for Bensen.

In addition, while Bensen claims that the $600,000 salary was to be effective only for the final six months of 1991, there is no evidence to support that claim. Bensen argues that Exhibits J39 (a December 1990 confidential memorandum, signed by Bensen and the other members of the Compensation Committee, listing 1991 annual salaries) and P84 (a December 1990 memorandum signed by Bensen and the other members of the Compensation Committee, listing 1991 annual salaries and changes in remuneration) show that his $600,000 salary was meant to apply only in 1991, but this is contradicted by the use of the term "annual" in connection with his salary. "Annual" is defined as "of or pertaining to year; returning every year; coming or happening yearly; occurring or recurring once in each year...." Black's Law Dictionary 89 (6th ed.1990). Bensen's argument is also belied by his own testimony about Exhibit P84 wherein he stated that the document referred to salaries and remunerations "as of January 1, 1991," designating what directors were going to be paid "effective January 1, 1991." (Tr. at 368.) Thus we find that the $600,000 salary was not limited to 1991 and was expected to continue yearly unless and until a new salary was set. (*See* Exs. J39, P84, P85, P100.) Therefore, we apply the $600,000 salary to the remainder of the term of the contract to calculate Bensen's damages.

### B. Interest Payment on a Quarterly Basis

**\*5** Defendants maintain that the interest due Bensen on the salary owed him should be calculated on the same quarterly basis on which he was paid. Bensen was paid his salary quarterly; that is, he was paid on February 15 for January, February, and March; May 15 for April, May and June; August 15 for July, August and September; and November 15 for October, November and December. (Oral Arg. at 13.) Plaintiff does "not dispute, as it's set forth by defendants, ... [this] method." (Oral Arg. at 15.) Therefore, Bensen's damages should be calculated with interest compounded quarterly.

### C. Continuing Pension Benefits

Bensen claims that he waived further accrual of pension benefits after his 65th birthday (May 10, 1991) only as part of the contract modification that included the $1.2 million provision in the event of an involuntary termination or takeover. (*See* Ex. P120.) Because we find that there was no such modification, we must examine Bensen's claim that he is entitled to additional pension benefits accruing after his 65th birthday under sections 5(a) and 6 of his 1985 Agreement.

Section 6 of Bensen's 1985 Agreement provides that in the event Bensen is involuntarily terminated, Ultramar agrees to pay, for the remainder of the term of the contract, those benefits to which Bensen is entitled under section 5(a) of the 1985 Agreement, including "continuing accrual of pension benefits." (Ex. J10 §§ 5(a), 6.) Section 3(b) of the 1985 Agreement states that Bensen was entitled to fully vested pension benefits "equivalent to those as would normally accrue under the American Ultramar Limited ["AUL"] Employees Retirement Plan, as same may be amended from time to time." (Ex. J10 § 3(b).) Under section 5.4(b) of the Ultramar U.S. Employees Retirement Plan,[18], a member of the pension plan who elects to postpone his retirement beyond his normal retirement date may elect, as Bensen did, a retirement benefit commencing on his actual normal retirement date[19] and under the same conditions. However, the retirement plan also states that "[i]n the event benefits become payable in accordance with the preceding sentence, no additional benefits shall be payable hereunder upon the actual retirement of the Member or in the event of his death prior to retirement." (Ex. J13 § 5(b).) Therefore, since Bensen elected to receive his pension before retirement, in accordance with this provision, he was only entitled to pension benefits until his normal date of retirement, May 10, 1991.

Bensen contends that section 3(b)[20] of his 1985 Agreement, which was designed to permit him to receive a double pension, *see* *Bensen v. American Ultramar Ltd.,* 1997 WL 66780, at \*15, did not incorporate the entirety of the Ultramar U.S. Employees Retirement Plan and specifically did not incorporate the limitation in section 5.4(b). We reject this reading of section 3(b) of the 1985 Agreement, which would permit Bensen, who has already received three pension payments totalling approximately $20 million, to continue to accrue pension benefits.[21]

**\*6** Significantly, evidence of the parties' contemporaneous conduct supports the conclusion that Bensen's receipt of his third pension payment in December of 1990 was understood by all parties to be his final payment. Bensen testified that when he advocated using the $1.2 million notional salary for pension purposes in his November 26, 1990 memorandum to Gaulin, he was referring to his "*final* pension." (Tr. at 349, 353, 470 (emphasis added); Ex. J29.) Furthermore, Bensen acknowledged at trial that if his pension was calculated on the

Case 1:18-md-02865-LAK   Document 360-5   Filed 06/23/20   Page 6 of 17

**Bensen v. American Ultramar Ltd., Not Reported in F.Supp. (1997)**
1997 WL 317343

$1.2 million notional salary, as it was, that he "had no rights to any more money, cash payments," and that the December 1990 pension payment "discharged all pensions owed me up to May 10th." (Tr. at 358, 366.)[22] Finally, as he noted in his December 19, 1990 letter acknowledging receipt of the 1990 pension payment, "[t]his bonus payment extinguishes all claims or rights for pension payments for the period from July 1, 1950 to May 10, 1991," the only period for which pension payments were owed under the pension plan. (Ex. J37; *see* Ex. P82 (Darby's letter to Gaulin dated December 17, 1990 stating that "there will be a new agreement acknowledging [Bensen's] pension rights as settled ...").) In sum, not only does the more reasonable reading of the 1985 Agreement run counter to Bensen's argument that his pension rights continued to accrue past his 65th birthday on May 10, 1991, but the contemporaneous documentary record and the trial testimony reinforce this interpretation. Therefore, no additional pension benefits are due to Bensen.

### D. Life Insurance

Bensen also demands repayment of the premiums he was forced to pay for life insurance after Ultramar ended his entitlement following his termination. Defendants do not dispute that they must pay his life insurance premiums. As there is no current dispute regarding this issue, we do not address it.

### II. *Defendants' Request for Attorney's Fees*

We next address defendants' request to recover their attorney's fees for work done in connection with their counterclaim under Section 312 of the English Companies Act. Specifically, defendants maintain that the English rule for fee or cost shifting applies because English law provided the substantive rule of decision in this diversity case. For the reasons that follow, we deny this request.

To begin, we note that this action was commenced with the filing of plaintiff's Complaint in 1992. Since that time, numerous motions have been briefed, argued and decided. In addition, a three-week bench trial on liability was held in the fall of 1996. However, it was not until their March 10, 1997 post-liability brief addressing damages that defendants sought to apply the English rule. Defendants advance their choice of law contention at this late date despite the fact that the issue of whether defendants could pursue their counterclaims under the English Companies Act[23] in this forum was seriously litigated, *see Bensen v. American Ultramar Ltd.,* No. 92 Civ. 4420, 1996 WL 48601, at ——10–11 (S.D.N.Y. Feb.6, 1996), as was the issue of whether Bensen's contractual right to recover attorney's fees covered his defense of Ultramar's counterclaims, *see Bensen v. American Ultramar Ltd.,* No. 92 Civ. 4420, 1996 WL 435039 (S.D.N.Y. Aug.2, 1996).

**\*7** Plaintiff argues that the English rule should not apply for several reasons. First, Bensen asserts that defendants waived the opportunity to request legal fees when they did not include the request in their Amended Answer and Counterclaims, and that plaintiff would be prejudiced if defendants were allowed to amend their ad damnum clause at this late date. Second, Bensen maintains that New York considers the issue of attorney's fees to be procedural rather than substantive, and thus under conflicts of law principles attorney's fees must be considered in accordance with the law of the forum. Moreover, even if attorney's fees might be considered substantive law, a New York court would not apply the English rule as it would be in contravention of New York policy. Lastly, plaintiff contends that in a complex case such as this application of the rule to only one claim, for the benefit of only one of the parties, would be unfair and would distort the policy behind the rule.

### A. The English Rule

This fee request should not be considered in isolation. Rather, "[o]ne must understand how the issue is affected by the foreign system's entire culture." John F. Vargo, "The American Rule on Attorney Fee Allocation: The Injured Person's Access to Justice," 42 *Am. U.L.Rev.* 1567, 1598 (1993). Thus, we will examine the English rule in some detail. As will be clear from this discussion, the rule is not just a simple fee-shifting provision. Rather, it is only a part of an integrated legal and social system and cannot readily be isolated.

While the English rule is typically described as a "loser pays" system, "[t]he application of the cost-shifting principle is much more complicated than the simple phrase 'loser pays' implies." Herbert M. Kritzer, "The English Rule," 78 *A.B.A.J.* 54, 55 (1992). *See also* Theodore R. Tetzlaff, "The English Rule from the English Perspective," 18 *Litig.* 1, 2 (Summer 1992) (remarks of Lord Donaldson of Lymington, the master of the rolls or senior civil judge). First, the rule "rarely provides the winner with an indemnity as to costs." *Id.* There are several reasons for this. Primarily, most plaintiffs (at least in personal injury cases) do not fund their own litigation and thus are not subject to the risks of the English rule. Over

Case 1:18-md-02865-LAK    Document 360-5    Filed 06/23/20    Page 7 of 17

**Bensen v. American Ultramar Ltd., Not Reported in F.Supp. (1997)**
1997 WL 317343

fifty percent of the English population is eligible for a tax-subsidized legal aid program; for others their unions both provide legal representation and pay litigation costs. Kritzer at 55–56; Vargo at 1607–09. Moreover, even if the losing party has the wherewithal to pay, there is a significant difference between the costs incurred and the recovery assessed by the "taxing master." "[T]he loser should not be expected to pay more than the minimum expenses necessarily incurred by the winner ...," Tetzlaff at 2, whereas the prevailing counsel can charge his client the maximum fee. It is also important to note that:

> judges have a discretionary power to deprive the winner of all or part of the costs if they think that he is to be criticized in the way in which he has conducted the case or if he has won on one issue and failed on another separate issue, a consideration of which has increased the overall costs.

*Id.*

**\*8** Wholly apart from the fact that the English rule is not a simple fee shifting system, the rule operates in a different legal and societal environment. In England, pretrial depositions of witnesses are not conducted; written interrogatories are discouraged by cost penalties; parties are duty bound to list all relevant documents in their possession or control; and jury trials have been eliminated in all but malicious prosecution or defamation cases. *Id.* at 1, 58–59. *See also* Vargo at 1602. In addition, in the personal injury context, it should be remembered that England has a "comprehensive social insurance system that provides English victims of injuries with extensive compensation outside the tort system." Kritzer at 56.

Finally, it is widely recognized that the English rule has significant consequences both with respect to whether litigations are commenced and with respect to settlement. The English rule is likely "to discourage complex suits with a low probability of success." Clinton F. Beckner III and Avery Katz, "The Incentive Effects of Litigation Fee Shifting When Legal Standards are Uncertain," 15 *Int'l Rev. L. & Econ.* 205, 216 (June 1995). "It is generally accepted that the English rule discourages privately funded parties from bringing meritorious claims." Kritzer at 55. More specifically, "[t]his type of cost-shifting arrangement probably would discourage speculative litigation that advances unique legal theories or new causes of action, thus dampening the entrepreneurial tendencies of the plaintiff bar." *Id.* at 57. Similarly the English rule creates severe pressures, particularly on privately funded parties, to settle. Vargo at 1609–1613.

Without entering into the debate about the relative merits of the American rule versus the English rule,[24] suffice it to say that they operate differently and represent different policy choices and legislative and judicial philosophies. Under the American rule the prevailing party is generally not entitled to attorney's fees in the absence of specific statutory authority[25] or a contractual provision to the contrary. The Supreme Court described the rationale behind the American rule thus:

> In support of the American rule, it has been argued that since litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and that the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel.

*Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). *See also* Keith Evans, "Beware the English Rule," *West's Legal News* 10237, 1996 WL 545554 (Sept. 27, 1996)1996 WL 545554 (Sept. 27, 1996) (describing the American rule as encouraging the vindication of individual rights as compared with the English rule's limitation of access to litigation to wealthy individuals and corporations).

### B. Defendants' Request is Unprecedented

**\*9** As the prior discussion hopefully has clarified, defendants' request to import the British rule with respect to fees as an adjunct to its Companies Act claim is far more complex than it might appear at first blush. Moreover, as the following discussion will illustrate, this request is also unprecedented. There is no case authority applying a foreign fee-shifting statute to a single, non-compulsory counterclaim five years into the litigation.[26]

In fact, the English rule has been applied in very few American cases,[27] none of which provide definitive principles to guide us. For instance, defendants cite *DeRoburt v. Gannett Co., Inc.,* 558 F.Supp. 1223 (D.Hawai'i 1983), a defamation action by the president of Nauru (an

Case 1:18-md-02865-LAK   Document 360-5   Filed 06/23/20   Page 8 of 17

Bensen v. American Ultramar Ltd., Not Reported in F.Supp. (1997)
1997 WL 317343

independent republic located in the Pacific) against an American newspaper. After the complaint was dismissed, defendants moved to recover their attorney's fees and costs. Having earlier decided to apply Nauru substantive law to the defamation claim, the court then applied Nauru's law regarding attorney's fees, "which is substantially similar to English law." *Id.* at 1225. The court found plaintiff liable for defendants' fees as the prevailing party, and defendants liable for plaintiff's fees with respect to some motions. While the court reasoned that in a choice of law analysis, attorney's fees are an issue of substantive law, *id.* at 1226, it noted that other reasons also supported application of Nauru law to the issue:

> First, applying Nauru law is wholly consistent with the parties' justified expectations and a concern for predictability. After insisting for four years that Nauru law is the applicable law, plaintiff certainly cannot claim that application of Nauru law to the question of attorneys' fees is unexpected. Second, Nauru's practice of awarding attorneys' fees to the prevailing party is integrally connected with Nauru's overall scheme for tort compensation and therefore reflects an important foreign governmental interest. Hawaii's countervailing interest in applying the American rule regarding attorneys' fees does not appear substantial under the circumstances of this case. (*Id.* at 1227.)

The factors that led the District of Hawaii to take the unusual step of applying Nauru's law on attorney's fees lead to a contrary result here. First, applying the English rule would be wholly inconsistent with the parties' justified expectations and would produce an unpredictable result. In this case, the issue was not even raised until five years into the litigation, and after a trial on liability. Moreover, unlike the plaintiff in *DeRoburt,* Bensen insisted that English law did not apply to this case at all until the issue was decided against him on summary judgment in February 1996. Finally, governmental interests in this case weigh in favor of using the New York, or American rule. The plaintiff is a resident of New York, the main claim in this action was brought under New York law, and this case has proceeded through the trial phase under the assumption that the American rule applied. England's interests in its rule being applied are comparatively small: defendants chose an American forum to assert their Companies Act counterclaims, and England has little interest in regulating this court's conduct.

 **\*10** Another case upon which defendants rely, and which is cited in *DeRoburt,* is *Cutler v. Bank of America Nat. Trust and Sav. Ass'n,* 441 F.Supp. 863 (N.D.Cal.1977). *Cutler* involved a Spanish plaintiff who sued an American bank after his safety-deposit box in the bank's London branch was looted. Plaintiff moved for a determination that attorney's fees would be awarded to the prevailing party. Despite plaintiff's failure to provide any authority to support his request, the court found that the English rule would apply to any award of attorney's fees, since English law provided the substantive "source of the right" to sue in contract and tort. Again, this case is readily distinguishable. The court noted that California's only connection with the case other than serving as the forum state was that it housed defendant's headquarters; and that England had a strong interest in compensating plaintiff as a foreign visitor who was injured there. In addition, unlike the instant case, this decision was made in a pre-trial motion designed to establish from the outset the rules under which the case would proceed.

Our research has uncovered only two other American cases where the English rule with respect to attorney's fees was applied. Both involved contract disputes in which the parties' contract was governed by English law, or in which the parties had designated English law in a choice of law clause. *See Csaky v. Meyer,* No. 94 Civ. 8117, 1995 WL 494574 (S.D.N.Y. Aug.18, 1995) (construing a contract drafted and distributed in England that provided for "costs" to include attorney's fees pursuant to the English rule, and granting such fees to plaintiff for its post-judgment efforts to collect monies due); *J. Barbour & Sons, Ltd. v. Tafico, Inc.,* No. Civ. A. 87–2609, 1989 WL 49518 (E.D.Pa. May 8, 1989) (finding parties' contractual English choice of law clause enforceable with respect to attorney's fees because the English rule does not offend Pennsylvania public policy, and therefore requiring both parties to post a security bond for the other's fees). These cases, decided pursuant to contracts involving English law, are entirely different from the case at bar and are not controlling.

Having reviewed all the relevant precedents and finding them readily distinguishable and not otherwise binding, we begin our analysis afresh.

### C. Federal Rule of Civil Procedure 9(g)

As we mentioned above, defendants failed to include a request for attorney's fees in their amended answer, and did not invoke the English rule until after trial. Federal Rule of Civil Procedure 9(g) provides that "[w]hen items of special damage are claimed, they shall be specifically stated." Failure to request items of special damage in the pleadings results in a waiver of the right to those damages. "Special damages"

Case 1:18-md-02865-LAK   Document 360-5   Filed 06/23/20   Page 9 of 17

**Bensen v. American Ultramar Ltd., Not Reported in F.Supp. (1997)**
1997 WL 317343

have been described as "those that, although resulting from the commission of the wrong, are unusual for the claim in question and not normally associated with the claim." 2 Jeffrey A. Parness et al., *Moore's Federal Practice* ¶ 9.08 (3d ed.1997).

**\*11** Attorney's fees have been deemed special damages by numerous Circuits, including the Third, Fourth, Fifth, Sixth, and Eighth. *Maidmore Realty Co., Inc. v. Maidmore Realty Co., Inc.,* 474 F.2d 840, 843 (3d Cir.1973); *Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.,* 705 F.2d 712, 716 n. 4 (4th Cir.), *cert. denied,* 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983); *United Industries, Inc. v. Simon–Hartley, Ltd.,* 91 F.3d 762, 765 (5th Cir.1996); *In re American Cas. Co.,* 851 F.2d 794, 802 (6th Cir.1988); *Western Cas. & Sur. Co. v. Southwestern Bell Tel. Co.,* 396 F.2d 351, 356 (8th Cir.1968). Within the Second Circuit, at least two district courts have classified attorney's fees as special damages. *Marshall v. New Kids on the Block Partnership,* No. 91 Civ. 3905, 1993 WL 350063, at \*1 (S.D.N.Y. Sept.8, 1993) ("Attorney's fees are special damages for the purposes of Rule 9(g)"); *U.S. for Harbor Clean Corp. v. M. Zanis Contracting Corp.,* No. 95 Civ. 2318, 1996 WL 560300, at \*2 (E.D.N.Y. Aug. 28, 1996) ("Rule 9(g) of the Federal Rules of Civil Procedure requires that special damages, including attorney's fees, be pleaded specifically").

We find that in this case, attorney's fees constitute special damages. The English law counterclaims were completely novel in this Court and indeed had never before been brought in any American jurisdiction. Plaintiff could not have expected that a request for fees would have accompanied the unusual Section 312 counterclaim, and there is no way he could have associated a request for defendants' fees with this claim.[28] This is especially true considering defendants' earlier successful motion to exclude evidence of *plaintiff's* attorney's fees in connection with this same counterclaim, during which no mention whatsoever was made of an anticipated request for defendants' attorney's fees on the same claim. See *Bensen v. American Ultramar Ltd.,* No. 92 Civ. 4420, 1996 WL 435039 (S.D.N.Y. Aug.2, 1996). Thus we find that defendants, having failed to forewarn plaintiff of this extremely unusual request in their responsive pleadings,[29] have waived any right to such fees.

D. Federal Rules of Civil Procedure 15(a) and 54(c)

We also analyze defendants' belated request for attorney's fees as an application to amend their pleadings to incorporate the request. Federal Rule of Civil Procedure 15 governs the amendment and supplementation of pleadings, and the policy of the rule is clear: the court is instructed that "leave [to amend] shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). A decision to allow a party to amend its pleadings lies within the discretion of the district court, and even if a motion to do so is made after trial, the motion "may be granted if the party against whom the amendment is offered will not be prejudiced by the amendment...." *Hillburn by Hillburn v. Maher,* 795 F.2d 252, 264 (2d Cir.1986), *cert. denied,* 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 859 (1987).

**\*12** However, "[w]hen the moving party has had an opportunity to assert the amendment earlier, but has waited until after judgment before requesting leave, a court may exercise its discretion more exactingly." *State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld,* 921 F.2d 409, 418 (2d Cir.1990). Although final judgment has not yet been entered in this case, five years have elapsed since its inception and a lengthy decision on the merits after trial has already been rendered. With these facts in mind, we examine whether allowing an amendment at this stage would prejudice the plaintiff.[30]

Prejudice may be found where an amendment, if granted, would "greatly alter [ ] the nature of the litigation...." *Morongo Band of Mission Indians v. Rose,* 893 F.2d 1074, 1079 (9th Cir.1990); *see also Hillburn by Hillburn,* 795 F.2d at 264. Given the unprecedented nature of the counterclaim and the complexity of the issues raised, we find it reasonable to conclude that a request for, and an early determination that, attorney's fees were available in accordance with the English rule[31] would have had a significant effect on the course of the litigation. Obviously, a ruling in favor of the application of the English rule would necessarily alter the risk/benefit analysis by these sophisticated parties. Of prime importance is that defendants' Section 312 claim was entirely novel. Thus, defendants could have had no assurance that they would prevail. In addition, after their Section 317 Companies Act claim was dismissed on summary judgment, the consequence of owing attorney's fees on that claim might have caused defendants to reevaluate their approach to the Section 312 claim. Moreover, we have been informed by the parties that they each incurred fees in the range of $1 million. Regardless

Case 1:18-md-02865-LAK   Document 360-5   Filed 06/23/20   Page 10 of 17

**Bensen v. American Ultramar Ltd., Not Reported in F.Supp. (1997)**
1997 WL 317343

of their wealth, it defies common sense that the "double or quits" system would not have influenced their litigation tactics (such as the employment of experts at very substantial sums) or their views on the beneficial value of settlement.

In short, we conclude that allowing this amendment would "greatly alter[ ] the nature of the litigation." As we have illustrated, had both sides known that the English rule (in some form) would be applied from the outset, it is likely that the whole case would have proceeded very differently, and quite possibly have settled before trial. Allowing the amendment would unduly prejudice the plaintiff, who has conducted this litigation with certain justified expectations. Had defendants wanted to proceed under the English rule, they should have made it clear from the beginning and litigated the issue up-front. *See* *United Industries, Inc., 91 F.3d at 765* (denying plaintiff's request for attorney's fees under the English rule pursuant to a contractual choice-of-law clause when such fees were not requested until a year after final judgment, stating "[h]aving voluntarily sued in this forum, United has an obligation to put the parties and the court on notice that attorneys' fees are at issue.... [Such a] claim ... cannot be buried in a general request for costs and then later resurrected ..."). Therefore, because plaintiff would be unduly prejudiced by an amendment to the pleadings post-trial, we deny leave to amend.

E. Choice of Law Analysis

**\*13** Even if attorney's fees were not considered special damages, and if we were to allow defendants to amend their pleadings at this late date, defendants' request for application of the English rule would nevertheless not withstand a choice of law analysis. To begin, we note that in a diversity case, pursuant to the principles of *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), we apply our own procedural rules and the substantive rules of the forum state. "Under *Erie* principles, attorney's fees are considered substantive and [are] controlled by state law in diversity cases." *Whiteside v. New Castle Mut. Ins. Co.,* 595 F.Supp. 1096, 1100 (D.Del.1984), *citing* *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *see also* *Montgomery Ward & Co., Inc. v. Pacific Indem. Co.,* 557 F.2d 51, 56 (3rd Cir.1977). [32]

Thus our next step is to decide which state's [33] law to apply to the question of attorney's fees. *See* *Whiteside,* 595 F.Supp. at 1100. Pursuant to *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), we employ New York's choice of law rules to make this determination. In cases involving foreign causes of action, New York will apply its own procedural law and the substantive law of the foreign jurisdiction. The question then becomes whether a New York court would consider attorney's fees an issue of substance or procedure. Since there is no New York case law directly on point, we consider the policy behind the traditional substance/procedure distinction.

"Except at the extremes, the terms 'substance' and 'procedure' precisely describe very little except a dichotomy, and what they mean in a particular context is largely determined by the purposes for which the dichotomy is drawn." *Sun Oil Co. v. Wortman,* 486 U.S. 717, 726, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988). In the context of conflicts of law between two states, the term "procedural" describes those laws which govern the forum state's judicial administration, including rules concerning "service of process, pleading, rules of discovery, mode of trial and execution and costs." *Restatement (Second) of Conflict of Laws* § 122 cmt. a (1971). The forum state is recognized as having the greatest interest in how the mechanics of a case are handled, and it is considered extremely burdensome and unwise for the forum to attempt to import and apply the procedures of a foreign jurisdiction. *Id.*

In this context, we think it is clear that New York law concerning the availability of attorney's fees should be considered procedural. In New York, the American rule is applied to every case, regardless of subject matter, unless an exception is specified by statute or contract. It is a fundamental part of the framework of litigation in the state, relied on by litigants and counsel as a matter of course.

In reaching this conclusion, we rely on Judge Friendly's decision in *Conte v. Flota Mercante Del Estado,* 277 F.2d 664, 672 (2d Cir.1960). [34] *Conte* involved an Argentine sailor who sued an Argentine shipowner in the Southern District of New York for personal injuries based on negligence, breach of warranty, and other theories under Argentine law. The libelant demanded attorney's fees pursuant to the Argentine Code of Civil and Commercial Procedure, which provided that the defeated party had to pay the expenses of the prevailing one.

Case 1:18-md-02865-LAK   Document 360-5   Filed 06/23/20   Page 11 of 17

**Bensen v. American Ultramar Ltd., Not Reported in F.Supp. (1997)**

1997 WL 317343

Thus, the issue was similar to the one in this case, in which defendants succeeded on an English substantive claim and request fees pursuant to the procedural law of England. We agree with Judge Friendly's analysis:

> **\*14** If provision for recovery of counsel fees had been made in an Argentine statute outlining the elements compensable in seamen's or perhaps in all personal injury actions, we should doubtless give effect to this as an integral part of the claim, but here the provision is a general one and is not even in the Civil Code which creates the right of action for tort but in the Code of Civil and Commercial Procedure.... [N]o authority is needed for the proposition that a court will tax ordinary court costs in accordance with its own practice rather than that of the state where the claim arose. A similar rule has been applied as to the fees of a guardian ad litem.... We think the same rule should govern with respect to the fees of counsel, also officers of the court.... [T]he American practice of generally not including counsel fees in costs was a deliberate departure from the English practice, stemming initially from the colonies' distrust of lawyers and continued because of a belief that the English system favored the wealthy and unduly penalized the losing party. *On a matter so intimately related to judicial administration the forum will follow its own policy.*
>
> *Conte,* 277 F.2d at 672 (emphasis supplied; citations omitted). Although Judge Friendly did not invoke the mantras of "substance" and "procedure," this case illustrates why counsel fees, especially in the context of an attempted application of the English rule, must be deemed a matter of judicial administration.[35]

We also rely on the decisions of other jurisdictions, which have explicitly classified their attorney's fees provisions as procedural. See *Du–Wel Products, Inc. v. U.S. Fire Ins. Co.,* 236 N.J.Super. 349, 565 A.2d 1113 (N.J.Super.Ct.App.Div.1989) ("This jurisdiction views its counsel-fee rules as inextricably bound to the question of access to our courts. They are thus procedural rules in the fundamental sense ..."), *certification denied,* 121 N.J. 617, 583 A.2d 316 (N.J.1990); *Bell v. City of Kellogg,* 922 F.2d 1418, 1425 (9th Cir.1991) (finding that Idaho's rule of civil procedure regarding attorney's fees is procedural and thus does not bind a federal court in a federal question case); *Ehredt v. DeHavilland Aircraft Co. of Canada, Ltd.,* 705 P.2d 446, 452 n. 8 (Alaska 1985) (finding Alaska's attorney fee rule (which is quite similar to the English rule) applicable in an Alaskan court in a case governed by Florida substantive law); *Whiteside,* 595 F.Supp. at 1100 (finding that Delaware considers attorney's fees procedural for conflicts of law purposes); *see also City of Carter Lake v. Aetna Cas. and Sur. Co.,* 604 F.2d 1052, 1062 (8th Cir.1979) (finding Nebraska's law concerning attorney's fees in insurance cases to be procedural); *American Physicians Ins. Co. v. Hruska,* 244 Ark. 1176, 428 S.W.2d 622, 629 (Ark.1968) (same, with respect to Arkansas law). *But see Bill's Coal Co., Inc. v. Bd. of Pub. Utils. of Springfield, Mo.,* 887 F.2d 242, 245 (10th Cir.1989) (finding that attorney's fees are considered substantive law for diversity purposes within the Tenth Circuit).[36]

**\*15** Based on the above authorities, we are convinced that a New York court would not import the English rule to award attorney's fees when they would not otherwise be available. A New York court would consider the application of the American rule to be a fundamental component of the state's procedural law, and would apply it in the interests of predictability, fairness, and efficient judicial administration.

As a final point, we note that even if the English rule did apply to defendants' counterclaim, the award of attorney's "costs" (legal fees and expenses) is a matter within the court's discretion. (Carr Aff. of 4/2/97 ("Carr Aff.") ¶¶ 30, 31.) However, "[t]here has to be good reason shown if a successful party is to be denied his costs." (Brindle Aff. of 3/17/97 ("Brindle Aff.") ¶ 7.) The leading British case on this issue states that "[w]here the successful party raises issues or makes allegations improperly or unreasonably, the Court may not only deprive him of his costs but may order him to pay the whole or a part of the unsuccessful party's costs." (Carr Aff. ¶ 31, *quoting In re Elgindata Limited (No. 2)* [1992] 1 W.L.R. 1207.) We believe that this would be an appropriate case in which to deny an award of costs to defendants. As was discussed above, it would be unjust to compel plaintiff to absorb defendants' sizable legal bill when he was not aware of the possibility and did not have the opportunity to conduct the litigation accordingly. Clearly, the defendants had the opportunity to raise this issue earlier in the litigation.

III. *The Amount of the Non–Contractual Portion of the 1990 Payment*

Following the bench trial in this matter, we found that "plaintiff must return that portion of the 1990 payment that

Case 1:18-md-02865-LAK   Document 360-5   Filed 06/23/20   Page 12 of 17

**Bensen v. American Ultramar Ltd., Not Reported in F.Supp. (1997)**
1997 WL 317343

exceeds his contractual entitlement, with interest." *Bensen v. American Ultramar Ltd.,* No. 92 Civ. 4420, 1997 WL 66780, at *19 (S.D.N.Y. Feb.14, 1997). We referred to this amount as the "non-contractual portion" of the 1990 payment, and defined it as "all of the pension and severance bonus payments that were calculated using th[e] $1.2 million adjusted salary, over and above the amounts that may be calculated using his actual $800,000 salary." *Id.* at *14. The required calculation has led to two areas of dispute, which we now address. [37]

### A. Use of the Interest Guarantee Factor

When Bensen's pension entitlements were calculated in 1988 and 1990, an adjustment was made to provide him with 8% interest on his vested benefit for 1987, and 7% for the first half of 1988. This "interest guarantee factor" was granted to AUL employees who transferred their interest from the AUL Employees Retirement Plan to the Ultramar U.S. Employees Retirement Plan after the former was terminated at the end of 1986. As discussed earlier, Bensen's 1985 Agreement provided in paragraph 3(b) that although he would no longer be a member of the AUL Pension Plan, he would be entitled to pension benefits

> ***16** equivalent to those as would normally accrue under the American Ultramar Limited Employees Retirement Plan, as same may be from time to time amended; provided, however ... [such benefits] shall not be limited by the maximum permissible benefit thereunder; nor shall the benefits so payable be reduced by any pension or severance bonus heretofore paid....

In accord with this provision, when his pension benefits were calculated in 1988 and 1990, Bensen was treated by the Compensation Committee as if he had remained a member of the company's qualified plan. Accordingly, Bensen's payment included an amount for the interest guarantee. (Ex. J31 at 6, 22.)

Defendants, who originally approved of the use of the interest guarantee as Bensen's employer in 1988 and 1990, now seek to recoup the monies paid on account of the interest guarantee, claiming that he was not contractually entitled to receive it. We find, however, that Bensen was contractually entitled to the interest guarantee. [38] As we found in our earlier opinion, "[a] court's objective in interpreting a contract is to determine the intentions of the parties based upon an examination of the contractual language." *Bensen,* 1997 WL 66780 at *11, citing *Reefer and General Shipping Co., Inc. v. Great White Fleet, Ltd.,* 922 F.Supp. 935, 940 (S.D.N.Y.1996), *aff'd,* 107 F.3d 4 (2d Cir.1997). We interpret the language in plaintiff's 1985 Service Agreement to mean that he was indeed to be treated as if he had remained in Ultramar's qualified company retirement plan, with the only exception being that his 1985 $6.1 million pension payout be disregarded. Thus, the vested benefits that Bensen kept in Ultramar's coffers until 1988 and 1990 were entitled to "equivalent" treatment as the funds other employees kept in the company's qualified retirement plan. [39]

### B. Discounting the 1988 Payment

When CEO Gaulin calculated Bensen's 1990 payment based upon a notional salary of $1.2 million, he arrived at a total pension figure of approximately $13.9 million. (Ex. J31 at 6.) He then subtracted the amount of the previous 1988 payout, approximately $5.7 million, to arrive at the figure of $8.2 million. (*Id.*) As we observed in our earlier opinion, the 1988 payment was an early payout of plaintiff's final pension entitlements, to which he was technically not entitled until he reached age 65 in 1991. *Bensen,* 1997 WL 66780, at *3. Defendants claim that in order to calculate plaintiff's proper pension payment, the amount of the 1988 payment must be discounted to account for its early receipt. If plaintiff is not charged interest for the early use of this money, they argue, he will have received more than the amount to which he is contractually entitled.

On this issue we agree with defendants. We do not find that section 3(b)'s reference to plaintiff's benefits not being "limited by the maximum permissible benefit" under the qualified plan to include within its scope early pension payouts without any penalties. We adhere to our conclusion that this sentence was drafted to permit plaintiff to receive the 1985 $6.1 million payment without penalty, rather than to allow plaintiff to receive unlimited additional payments. [40] We are supported in this view by the deposition of plaintiff's pension benefits expert, who testified on cross-examination as follows:

Case 1:18-md-02865-LAK   Document 360-5   Filed 06/23/20   Page 13 of 17

**Bensen v. American Ultramar Ltd., Not Reported in F.Supp. (1997)**
1997 WL 317343

*17 Q. With regard to whether or not interest should be applied to reflect the time value of a prior lump-sum distribution that someone received prior to the calculation of their final pension benefits, am I correct that it was your testimony earlier that unless it was the employer's intention to enhance the employee's pension benefit it would be appropriate to make an adjustment for the time value of money?

A. That was my testimony.

(Howard Phillips Dep. at 128.) In addition, Chairman Darby testified at his deposition about notes he wrote during a phone call with Deputy Chairman Lord Remnant in December 1990 when the Compensation Committee was deliberating about the 1990 payment. The note read, in part, "American rates to be used; agreed that 1988 should be adjusted to 1990 for this purpose." (Darby Dep. at 24.) Although 1988 was not adjusted to 1990 in the final calculation, this note suggests that Darby and Remnant were of the belief that it should have been.

Thus, we find that if the 1988 payment is not discounted for the time value of Bensen's early use of the money, he will have received more than the contractual entitlement to which he is due. Therefore, we adopt defendants' suggestion that the 1988 payment be discounted at a rate of 5% compounded annually, a figure they obtained from section 7.5 of the Ultramar U.S. Employees Retirement Plan, which provides for repayment to the Plan of certain lump-sum distributions at this rate.

As a final matter, we address the issue of pre-judgment interest on the non-contractual portion of the payment, i.e., the amount received in violation of the Companies Act. Both parties agree that interest should be calculated under the English measure of simple interest at 1% over LIBOR (a commercial rate that reflects the cost of borrowing by the aggrieved claimant). (Carr Aff. ¶¶ 37–39; Brindle Aff. ¶¶ 3–5.) [41] Interest should be calculated from the date of Bensen's receipt of the non-contractual portion of the 1990 payment to the date of final judgment. (Brindle Aff. ¶ 3.) The parties are directed to confer with respect to the required calculation and embody it in their proposed judgment.

CONCLUSION

For the foregoing reasons, we find that plaintiff's breach of contract damages shall be measured based on a $600,000 annual salary; that pre-judgment interest on the contract claim shall be calculated on a quarterly basis; that plaintiff is not entitled to the accrual of additional pension benefits after May 10, 1991; that defendants are liable to plaintiff for the cost of his life insurance premiums; that the English rule does not apply to defendants' attorney's fees incurred in connection with their successful counterclaim; that plaintiff is entitled to the use of the interest guarantee factor on the contractual portion of the 1990 payment; that plaintiff must discount the value of the 1988 early disbursement of pension; and that pre-judgment interest on the defendants' counterclaim shall be calculated at the rate of 1% over LIBOR. The parties are directed to confer and endeavor to reach an agreement on a form of judgment to be submitted to the Court.

**All Citations**

Not Reported in F.Supp., 1997 WL 317343

---

**Footnotes**

1   The issue of continued pension accruals is discussed in section I.C. of this Opinion.
2   In the alternative, Bensen argues that the $800,000 salary that was in effect prior to the reduction should be the measure of damages because there was a failure of consideration for the salary reduction.
3   The normal retirement age for a member of the Ultramar U.S. Employees Retirement Plan was 65. (Ex. J13 § 1.1.) Bensen's 1985 Agreement provided that upon retirement, he was entitled to receive, *inter alia,* a severance bonus and his fully vested, accrued pension benefits. (Ex. J10 §§ 3(b), 7(a)(i).)
4   For a complete discussion of the "Gentlemen's Agreement," see *Bensen v. American Ultramar Ltd.,* 1997 WL 66780 at ——2–3.

Case 1:18-md-02865-LAK Document 360-5 Filed 06/23/20 Page 14 of 17
Bensen v. American Ultramar Ltd., Not Reported in F.Supp. (1997)
1997 WL 317343

| | |
|---|---|
| 5 | Bensen's acknowledgement stated that the bonus payment "extinguishes all claims or rights for pension payments for the period from July 1, 1950 to May 10, 1991." That same month, the Compensation Committee approved Bensen's annual salary for 1991 as $800,000 until July 1, 1991, when it would be reduced to $600,000. (Ex. J39.) July 1, 1991 was the beginning of the first quarter after Bensen's 65th birthday, May 10, 1991, and Bensen was paid on a quarterly basis. |
| 6 | These payments were comprised of a $6.1 million payment in 1985, a $5.7 million payment in 1988, and the $10 million payment in 1990, $8.2 million of which was designated as a pension payment. |
| 7 | The parties previously agreed that New York law governs the breach of contract claim. |
| 8 | In addition, there must be mutual assent to the terms of the contract or modification and consideration. *Paper Corp. of U.S. v. Schoeller Technical Papers, Inc.,* 807 F.Supp. 337, 345–46 (S.D.N.Y.1992). |
| 9 | An oral modification may also be enforced if it has been fully performed. See *T & N West Galla Pizzeria, Inc. v. CF White Plains Associates,* 185 A.D.2d 270, 272, 586 N.Y.S.2d 266, 268 (2d Dep't 1992). The fact that Bensen did not receive the $1.2 million when he was terminated prevents us from finding a modification based on the parties' conduct. |
| 10 | This also shows that mutual assent was lacking, which would also serve to defeat the modification. *Beacon Terminal Corp.,* 75 A.D.2d at 354, 429 N.Y.S.2d at 718. |
| 11 | These memoranda were drafted to address the issue of Bensen's pension entitlement in December 1990. Gaulin testified that Darby had asked him to resolve the issue of Bensen's pension, not his new contract, and that it was Darby who had the "mandate" from the Compensation Committee to deal with Bensen's new contract. (Tr. at 1164.) |
| 12 | Not only had this memorandum "not gone anywhere," Gaulin testified that he had not made Bensen aware of it. (Tr. at 1092.) |
| 13 | We note that the proposed contracts were drafted by O'Shea, general counsel for the Ultramar Group, and Lorbeer, former chairman of Ultramar. Neither O'Shea nor Lorbeer were "decision-maker [s]" regarding Bensen's new contract, nor were they members of the Compensation Committee. (Oral Arg. at 7.) In addition, Lorbeer and Bensen were close friends who owned condominiums in the same building in Belair, Florida, spent much of their free time playing tennis together, and often had dinner together. (Tr. at 68, 81, 85.) In addition, Lorbeer is the godfather of Bensen's daughter and served as the best man at Bensen's wedding. (Tr. at 84. |
| 14 | In addition, in light of the fact that no one else at Ultramar had a "golden parachute," we cannot infer any intent to include one in Bensen's new contract. (Oral Arg. at 7.) |
| 15 | Both Exhibits J39 and P84 are documents signed by Bensen that list his 1991 annual salary as $800,000 with a "$200,000/yr. reduction" as of July 1, 1991, without any mention of a $1.2 million provision. |
| 16 | Bensen claims that the Compensation Committee's approval of the $1.2 million notional salary for pension purposes in December 1990 was the rationale for its continued use in the event of his involuntary termination. We find this argument meritless because the purpose of using the $1.2 million salary in December 1990 for pension purposes was to compensate Bensen for any pension and salary he may have lost when he took a reduction in salary upon becoming chairman of Ultramar. (Tr. at 665–67, 940.) However, there is no reason to link the receiving of a golden parachute with compensation for past lost pension. |
| 17 | Bensen claims that there is no evidence that he agreed to the salary reduction because of an "allegedly reduced workload" and relies on our February 14, 1997 Opinion in which we found that Bensen did not retire as a matter of fact or law. Plaintiff misreads our previous finding. There is a difference between retiring and winding down one's career and while Bensen did not *per se* retire, the evidence is clear that he was reducing his workload as he approached age 65. (Tr. at 894–95.) |
| 18 | The American Ultramar Limited Employees Retirement Plan was paid out and cancelled in December 1986 and replaced by the Ultramar U.S. Employees Retirement Plan. (Ex. D131 ¶ 2.) |
| 19 | The Ultramar U.S. Employees Retirement Plan defines "normal retirement age" as 65 and "normal retirement date" as the first day of the month following the date on which a member reaches "normal retirement age." (Ex. J13 § 1.1.) |

Case 1:18-md-02865-LAK   Document 360-5   Filed 06/23/20   Page 15 of 17

**Bensen v. American Ultramar Ltd., Not Reported in F.Supp. (1997)**
1997 WL 317343

20  Section 3(b) states, in relevant part, that Bensen's pension benefits "shall not be limited by the maximum permissible benefit payable thereunder...." (Ex. J10 § 3(b).)

21  In addition, in rejecting this argument we note that plaintiff argued, in the context of the use of an interest guarantee factor (*see infra*), that "[w]hen the 1985 Agreement became effective on January 1, 1985, Bensen was no longer in the AUL Plan but had immediately vested pension rights under the 1985 Agreement dating back to 1950, *pursuant to which he was to be treated equivalent to employees under the Plan* (ignoring the 1985 payment)." (Pl.'s Mem. on Damages at 17–18 (emphasis added)). Bensen cannot simultaneously argue that he was to be treated equivalent to others in the AUL Plan, and that he is not so limited in his entitlements under the Plan.

22  Bensen also testified at trial that "judgment day," the day for compensating him for any pension losses he may have suffered due to the decreased salary he received during the years he served as chairman of Ultramar, would happen "May 10, 1991 as far as the company having an obligation that day to pay me XXX...." (Tr. at 516).

23  The English Companies Act counterclaims included the 312 claim as well as a claim under Section 317, which was dismissed on summary judgment.

24  The relative merits of the English and American rules have recently been the subject of considerable debate because of the suggestions of the President's Council on Competitiveness, chaired by then-Vice President Dan Quayle, that the English principle of fee-shifting become part of American jurisprudence. Kritzer at 55.

25  "There are over 200 federal statutes and almost 2000 state statutes that provide for shifting of attorney's fees." Vargo at 1588.

26  Defendants' counterclaim under English law was not compulsory, since it arose from a different nucleus of facts (the 1990 payment) than did the plaintiff's claim (the 1991 contract termination). *See* Fed.R.Civ.P. 13(a).

27  We exclude from this generalization cases decided under Alaska's state procedural law. Alaska has adopted, by statute, its own version of the English rule.

28  We note that defendants have not suggested that the English rule should apply to their counterclaim brought under Section 317 of the Companies Act, which was dismissed by Judge Wood. Consistent application of the English Rule would require defendants to pay plaintiff his costs in defending against that now-dismissed claim.

29  We reject defendants' contention that their original request for "costs and disbursements" and "such other and further relief as the Court may deem just and proper" was adequate to plead a request for attorney's fees. *See* United Industries, Inc., 91 F.3d at 765 (rejecting argument that a "request for 'costs' should be deemed sufficient because, under English law, attorneys' fees are awarded to the prevailing party as costs," as a "semantic word game").

30  As part of the same inquiry regarding prejudice, we address defendants' reliance on Fed.R.Civ.P. 54(c), which states that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." "Courts have interpreted this rule to permit requests for attorney's fees raised for the first time post-trial where such late requests did not prejudice opposing parties." *New Kids on the Block Partnership,* 1993 WL 350063, at * 1, *citing* Engel v. Teleprompter Corp., 732 F.2d 1238, 1241–42 (5th Cir.1984); *Paliaga v. Luckenbach S.S. Co.,* 301 F.2d 403, 410 (2d Cir.1962).

31  In addition to ruling on the general proposition, the Court would have had to decide what other aspects of the English rule would be imported. Would fees be allowed for only those pretrial proceedings permitted in English courts? What expenses would be covered if there was a cost shift? Would fees be awarded on a two-way shift basis or a one-way shift basis as defendants seem to suggest?

32  Defendants argue that the inquiry ends here, contending that the "state law" to be applied is automatically the substantive law being applied to the claim, and thus that all of English law may be imported into an American courtroom when a counterclaim borrows an English cause of action. In support of this contention, defendants cite cases such as *Grand Union Co. v. Cord Meyer Development Co.,* 761 F.2d 141, 147–148 (2d Cir.1985) and *Lewis v. S.L. & E., Inc.,* 629 F.2d 764, 773 n. 21 (2d Cir.1980), wherein the Second Circuit stated

Case 1:18-md-02865-LAK   Document 360-5   Filed 06/23/20   Page 16 of 17
**Bensen v. American Ultramar Ltd., Not Reported in F.Supp. (1997)**
1997 WL 317343

that pursuant to *Alyeska,* state law governed attorney's fees, and proceeded to apply New York law without further analysis. However, both of these cases arose solely under New York law and there was no choice of law question. The present case, involving the conflicting laws of two jurisdictions, is not so simple.

33   Choice of law analysis between two states is generally the same as the analysis between the law of a state and a foreign country. *See* Restatement (Second) of Conflict of Laws § 10 (1971). For ease of reference, we refer to both New York and English local law as "state" law.

34   Defendants' attempt to distinguish this case based on the fact that the choice of law analysis is different because it was brought in admiralty rather than diversity, cannot succeed. Laws that are deemed procedural, such as attorney's fees were in *Conte,* are not subject to any choice of law rules. That is, once a law is deemed procedural, no further analysis under federal admiralty principles or diversity jurisprudence is needed because the law of the forum will be used. State Trading Corp. of India, Ltd., 921 F.2d at 416.

35   Analysis under *Alyeska* also supports this result. *Alyeska* instructs federal courts that in a diversity case, "state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed." Alyeska, 421 U.S. at 259 n. 31; *see also* Riordan v. Nationwide Mutual Fire Insurance Co., 977 F.2d 47, 53 (2d Cir.1992) ("State law creates the substantive right to attorney's fees ..."). In 1991, the Supreme Court clarified its holding in *Alyeska,* stating that federal courts' "inherent" power to grant or deny attorney's fees was limited by *Alyeska* only in the context of state-created "exceptions to the American Rule"; that is, "only [with respect] to fee-shifting rules that embody a substantive policy, such as a [state] statute which permits a prevailing party in certain classes of litigation to recover fees." Chambers v. NASCO, Inc., 501 U.S. 32, 51–52, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (finding that a federal court sitting in diversity can use its inherent power to assess attorney's fees for bad-faith conduct even if applicable state law does not allow such a penalty). The Court discussed People of Sioux County, Neb. v. Nat'l Sur. Co., 276 U.S. 238, 48 S.Ct. 239, 72 L.Ed. 547 (1928), noting with approval the Court's enforcement of a state-created right to attorney's fees that was included in a substantive statute regarding the enforcement of insurance policies. Chambers, 501 U.S. at 52 ("In enforcing the statute, the Court treated the provision as part of a statutory liability which created a substantive right").

> Since the English rule regarding attorney's fees is a general rule, not specifically part of the public policy embodied in the Companies Act, under the principles of *Alyeska* and *Chambers,* a federal court need not apply such an unusual provision in the case of a conflict between federal and state (or foreign) law. A federal court is bound only to respect a state's (or country's) "public policy choices involved in deciding whether vindication of the rights afforded by a particular statute is important enough to warrant the award of fees."

Chambers, 501 U.S. at 52. Unlike New York's General Business Law § 349(h) (consumer protection from deceptive practices) or other statutes wherein fee-shifting is an integral part of the legislature's plan for law enforcement, the Companies Act lacks a specific provision for fee-shifting that would compel us to respect it.

36   The following cases, although not directly on point, are also useful in our determination that attorney's fees are considered a procedural matter in New York: Mighty Midgets, Inc. v. Centennial Ins. Co., 47 N.Y.2d 12, 21–22, 416 N.Y.S.2d 559, 564, 389 N.E.2d 1080 (1979) (affirming reversal of an award of expenses incurred by victorious party in a litigation, describing such award as "damages" not generally afforded pursuant to "fundamental legislative policy"); City of Buffalo v. J.W. Clement Co., Inc., 28 N.Y.2d 241, 262–63, 321 N.Y.S.2d 345, 364, 269 N.E.2d 895 (1971) (describing counsel fees as "merely incidents of litigation" not compensable in the absence of statutory authority); Entertainment Partners Group, Inc. v. Davis, 155 Misc.2d 894, 898, 590 N.Y.S.2d 979, 982 (Sup.Ct.N.Y.Cty.1992) (describing attorney's fees as a "remedy" to deter frivolous litigation), *aff'd,* 198 A.D.2d 63, 603 N.Y.S.2d 439 (1st Dep't 1993).

37   The parties agree to the proper amount of a severance bonus calculated on the $800,000 salary. Both employ the formula specified by section 7(b) of plaintiff's 1985 Agreement to arrive at the following calculation:

**Bensen v. American Ultramar Ltd., Not Reported in F.Supp. (1997)** Case 1:18-md-02865-LAK   Document 360-5   Filed 06/23/20   Page 17 of 17

1997 WL 317343

| | |
|---|---|
| | 150% of $800,000 plus $450,000 = $1,650,000. (Pl.'s Mem. on Damages at 15; Defs.' Mem. on the Issue of Damages at 24.) |
| | Since plaintiff actually received $1,800,000 in severance bonus payments, he must return $150,000 of this amount to defendants, with interest as specified below. |
| 38 | Since we base our decisions on both of these contested issues on our reading of Bensen's 1985 Agreement, we need not address plaintiff's argument that defendants are claiming a unilateral mistake. |
| 39 | Although we are not permitted to consider the parties' actual conduct to determine their intentions in the absence of ambiguity in the contractual language, Bensen, 1997 WL 66780 at *11, the parties' actions clearly demonstrate that both sides intended Bensen to receive the benefit of the interest guarantee. It was defendant Ultramar PLC's Compensation Committee that approved the use of the guarantee not once but twice, in 1988 and 1990. Defendants' claim that Bensen must now give back money they intended him to have before this litigation began should be rejected. |
| 40 | It will be recalled that plaintiff received a $6.1 million pension payment in 1985 upon his ascension to the position of chairman of Ultramar PLC. He also signed a new Service Agreement which provided that this payout be disregarded when his final pension was calculated. This arrangement was meant to partially compensate plaintiff for the reduction in salary he suffered during the time he served as chairman. |
| 41 | We see no reason to grant the extra "equitable" interest sometimes awarded for the "disgorgement of sums wrongfully received," since defendants' expert instructs us that such an award would be "controversial" and requires "somewhat special circumstances." (Brindle Aff. ¶ 4.) |

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.