# EXHIBIT 6

2016 WL 5719783
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

DEUTSCHE BANK TRUST COMPANY,
Americas, solely as Trustee, Plaintiff,
v.
AMERICAN GENERAL LIFE INSURANCE
COMPANY; Serengeti Opportunities Mm LP;
Serengeti Lycaon MM LP; Depository Trust
Company, as legal owner or holder of Notes
under the Trust Deed dated as of February
26, 2003 among Northlake CDO I Limited, as
Issuer, Northlake Company Americas, CDO 1
Corp. as Co-Issuer; and Deutsche Bank Trust
Company Americas, as Trustee; Does 1 through
100, owners of beneficial interests in Notes
under the Trust Deed; and Does 101 through
200, owners of beneficial interests in Preferred
Shares under the Trust Deed, Defendants.

1:15-cv-3869-GHW
|
Signed 09/30/2016

**Attorneys and Law Firms**

Christopher May Mason, Abigail T. Reardon, Nixon Peabody LLP, New York, NY, for Plaintiff.

Howard Robert Hawkins, Jr., Ellen Margaret Halstead, Joshua Paul Arnold, Cadwalader, Wickersham & Taft LLP, Michael Andrew Hanin, Jeffrey Thibault, Kasowitz, Benson, Torres & Friedman, LLP, Eric P. Heichel, Eiseman, Levine, Lehrhaupt & Kakoyiannis, P.C., New York, NY, Henry Bowen Brownstein, Kasowitz, Benson, Torres & Friedman LLP, Washington, DC, for Defendants.

MEMORANDUM OPINION AND ORDER

GREGORY H. WOODS, District Judge

**I. INTRODUCTION**

\*1 The collateralized debt obligations at issue in this litigation were issued in February of 2003, years before the financial crisis, in simpler days for the collateralized debt obligation (or "CDO") market. And like many others, this intricately crafted CDO came under pressure in 2007, ultimately leaving classes of security holders to battle over the residual value of the CDO's assets. This interpleader action was commenced to resolve a dispute regarding the relative priority of two series of notes—the "Class I-MM Notes" and the "Class I-A Notes."

American General Life Insurance Company ("AGL"), which holds all of the Class I-MM Notes, asserts that the Class I-MM Notes must be paid before the Class I-A Notes because certain financial covenants have not been satisfied. AGL bases its position on the text of the detailed waterfall provision —the "Priority of Payments" —that governs payments with respect to the notes generally. Two funds, Serengeti Opportunities MM LP and Serengeti Lycaon MM LP (collectively, "Serengeti"), own most of the Class I-A Notes, and contend that, following acceleration of the Notes, the Class I-A Notes must be paid pro rata with the Class I-M Notes. Because the transaction documents unambiguously, and expressly, prioritize principal payments to the Class I-MM Notes so long as certain financial covenants have not been met, the Court grants AGL's motion for judgment on the pleadings, denies Serengeti's motion for judgment on the pleadings, and dismisses Serengeti's counterclaims against the Trustee.

**II. BACKGROUND**

*a. The Structure of the Northlake
CDO and its Governing Documents*

The basic financial structure of this transaction will be familiar to connoisseurs of CDO transactions. Two co-issuers, Northlake CDO I, Ltd. and Northlake CDO I Corp. (together, "Northlake") issued over $1 billion of notes (the "Notes") pursuant to a trust deed, dated as of February 26, 2003 (the "Trust Deed"), among Northlake and Deutsche Bank Trust Company Americas (the "Trustee"). Joint Exhibit ("JE") 8. The Trust Deed is governed by English law. Trust Deed § 15.1. Northlake issued three classes of notes: Class I Notes, Class II Notes, and Class III Notes, which rank in that order of priority. The Class I Notes were issued in two series: Class IMM Notes and Class I-A Notes.

The proceeds from the issuance of Notes were used to finance the purchase of a portfolio of financial assets. Northlake pledged those financial assets, and their proceeds, as collateral for the benefit of the holders of the Notes pursuant to a

Security Agreement, also dated as of February 26, 2003 (the "Security Agreement"), among Northlake CDO I, Ltd., the Trustee, and Deutsche Bank Trust Company Americas, as collateral agent and securities intermediary (the "Collateral Agent"). JE 7. The governing law provision of the Security Agreement provides that the agreement is to be governed by New York law, but Articles V and VII of the agreement—the critical provisions that govern the priority of payments in respect of the Notes—are governed by English law. Security Agreement § 11.08.

**\*2** The Security Agreement requires that all of the collateral, and proceeds of the collateral, be deposited into, and maintained in, a series of interlocking securities and deposit accounts. Security Agreement Art. IV. The Security Agreement creates a ring fence around the collateral accounts and the assets maintained in them—transfers and withdrawals from the accounts are permitted only in accordance with the specific rules established in the Security Agreement. The account structure is organized so that, ultimately, all payments of cash from the CDO structure to holders of Notes must flow from the aptly named "Payment Account." Security Agreement §§ 4.02 and 4.03.

The priority of payments to the each of the various classes of noteholders, and other participants in the transaction, is described in a detailed waterfall provision contained in Section 5.01 of the Security Agreement, called the "Priority of Payments." Security Agreement § 5.01; JE 8 at 72. The Court describes the Priority of Payments provision as a "waterfall" because it is structured so that funds must be expended in a specified order of priority. *See* Security Agreement § 5.01(a)(ii) ("Principal Proceeds will be distributed on each Payment Date *in the following order of priority* ....") (emphasis added). Cash flows from the top of the waterfall, through a series of steps; only funds that exceed the amounts payable under prior steps flow down to be allocated as described in subsequent steps.

The Security Agreement and the Trust Deed consistently refer to the Priority of Payments to constrain payments from the CDO to holders of Notes.[1] In particular, all payments from the Payment Account are required to be made in accordance with the Priority of Payments. *See, e.g.,* Security Agreement § 4.03(a) ("Except as provided in Section 5.01, the only permitted withdrawal from or application of funds on deposit in ... the Payment Account shall be to pay amounts due and payable on the Notes ... in accordance with the Priority of Payments.").

**\*3** As a general matter, the Priority of Payments requires that taxes and administrative expenses of the Trustee and other service providers be paid before any distributions to holders of Notes. Security Agreement § 5.01(a)(i)(A)-(E); § 5.01(a)(ii)(A). The Priority of Payments then directs cash flow from the collateral securing the CDO to fund payments to the several series of Notes issued under the Trust Deed. JE 8 at 1. Pursuant to the Priority of Payments, holders of Class I-MM and I-A Notes are generally paid before Class II and III Notes, and long before any equity distributions. Security Agreement § 5.01. There is no question that Class II and III Notes can only be paid after all amounts owing to holders Class I Notes are satisfied. Indeed, as described below, all payments to Class II and III Notes are expressly subordinated to both series of Class I Notes. Security Agreement § 7.01.

The parties dispute whether, and under what circumstances, Class I-MM Notes rank senior in right of payment to the Class I-A Notes. Because this dispute focuses on the Priority of Payments as it applies to the Class I-MM and Class I-A Notes, the relevant provisions are set forth in full below. As shown, the Priority of Payments provisions contain separate rules for distributions of funds resulting from interest yielded from the securities in the collateral portfolio, and principal amounts resulting from principal repayments or sales of the underlying collateral. These sources of funds are defined more precisely as "Interest Proceeds" and "Principal Proceeds." Trust Deed at 45, 70-71:

> Notwithstanding any other provision in this Agreement, *but subject to the other subsections of this Section 5.01 and Section 7.01*, on each Payment Date, the Collateral Agent shall disburse amounts, if any, on deposit in the Payment Account as follows and for application in accordance with the following priorities (the "Priority of Payments") ....
>
> (i) Interest Proceeds will be distributed on each Payment Date in the following order of priority:
>
> \* \* \* \*
>
> (F) to the payment pro rata based on the amount due, of (i) interest due and unpaid on the Class I-MM Notes (including Defaulted Interest and interest thereon), (ii) interest due and unpaid on the Class I-A Notes (including Defaulted Interest and interest thereon), (iii) Class I-MM Funding Account Makeup Interest (if any), (iv) the Put Premium, if any, payable to the Put Counterparty, and (v) the Remarketing Fee, if any,

payable to the Remarketing Agents and/or the Put Counterparty, as applicable;

(G) to the payment of due and unpaid interest on the Class II Notes (including Defaulted Interest and interest thereon);

(H) if the Senior Par Value Test or the Senior Interest Coverage Test is not satisfied on the related Determination Date and to the extent that application of Principal Proceeds for such purpose in accordance with Section 5.01(a)(ii)(B) is insufficient to redeem (in whole or in part) the principal amount of Class I-MM Notes, and then the principal amount of the Class I-A Notes, and then the principal amount of the Class II Notes, to the extent necessary and to the extent funds are available to cause each of the Senior Par Value Test and the Senior Interest Coverage Test to be satisfied or until each such Class is paid in full; ....

(ii) Principal Proceeds will be distributed on each Payment Date in the following order of priority:

(A) to the payment of the amounts referred to in clauses (A) through (G) of Section 5.01(a)(i), in that order (subject to the limits set forth in clauses (B) through (C) of Section 5.01(a)(i)), but only to the extent not paid in full from Interest Proceeds thereunder;

(B) (i) *if the Senior Par Value Test or the Senior Interest Coverage Test is not satisfied on the related Determination Date*, to redeem (in whole or in part) the principal amount of Class I-MM notes, *and then* the principal amount of the Class I-A Notes, and then the principal amount of the Class II Notes, to the extent necessary and to the extent funds are available to cause each of the Senior Par Value Test and the Senior Interest Coverage Test to be satisfied or until each such Class is paid in full, *and thereafter* (ii) following the Reinvestment Period only, if the Restrictive Senior Par Value Test is not satisfied on the related Determination Date (after giving effect to payments to be made in order to satisfy the Senior Par Value Test and the Senior Interest Coverage Test), to redeem (in whole or in part) the principal amount of Class I-MM Notes and the Class I-A Notes pro rata based on the Aggregate Outstanding Amount of each such Class, and then the principal amount of the Class II Notes, to the extent necessary and to the extent funds are available to cause the Restrictive Senior Par Value Test to be satisfied or until each such Class is paid in full ....

**\*4** Security Agreement § 5.01(b) (emphasis added).

The Security Agreement also contains an express subordination provision, pursuant to which each of the various classes of notes, and the equity holders of Northlake, have agreed to subordinate themselves to more senior securities. Security Agreement § 7.01. Section 7.01(a) reads in full as follows:

> Anything in this Agreement, the Trust Deed, the Notes or any other Transaction Document to the contrary notwithstanding, the Issuer and the Holders of the Class II Notes and the Class III Notes agree for the benefit of the Holders of the Class I Notes that the Class II Notes, the Class III Notes, the Preferred Shares, the Ordinary Shares and the Issuers rights in and to the Collateral (with respect to the Class I Notes, the "Subordinate Interests") shall be subordinate and junior to the Class I Notes to the extent and in the manner set forth in this Agreement *including as set forth in Section 5.01(a)* and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with the Conditions and the Trust Deed, *the Class I Notes shall be paid in full in Cash ... before any further payment or distribution is made on account of the Subordinate Interests.*

Security Agreement § 7.01(a) (emphasis added).

Sections 7.01(b) and (c) of the Security Agreement parallel the quoted Section 7.01(a), using nearly identical language to subordinate junior notes and/or equity to the Class II and Class III Notes, respectively. Notably, Sections 7.01(b) and (c) contain language similar to that in Section 7.01(a) to describe the protocol for payments following an Event of Default. For example, Section 7.01(b) states that "[i]f

any Event of Default has not been cured or waived and acceleration occurs in accordance with the Conditions and the Trust Deed, the Class II Notes shall be paid in full in Cash ... before any further payment is made on account of the Subordinate Interests." Security Agreement § 7.01(b). Section 7.01(c) contains nearly identical language, referring to the Class III Notes. In addition, Section 7.01(d) of the Security Agreement contains a "turn-over" provision—an essential feature of many subordination agreements. In it, the subordinated creditors agree to hold any distributions that they receive improperly in trust for the benefit of the more senior creditors, and to turn over any such distributions to the Collateral Agent.

The Notes themselves also contain specific references to the Priority of Payments and the hierarchy of payments to holders of Notes. Schedule 4 to the Trust Deed, which outlines the terms and conditions of all of the Notes, including the Class I-A Notes, describes the relative priority of the Class I-MM and Class I-A Notes as follows:

> *Except as otherwise specified in the Priority of Payments*, the Class I-MM Notes will rank *pari passu* with the Class I-A notes, the Class I Notes will be senior in right of payment on each Payment Date to the Class II Notes, the Class III Notes and the Preferred Shares, the Class II Notes will be senior in right of payment on each Payment Date to the Class III Notes and the Preferred Shares and the Class II Notes will be senior in right of payment on each Payment Date to the Preferred Shares.

***5** Schedule 4 to Trust Deed § 1(b), JE 13 ("Terms and Conditions of the Notes") (emphasis added). The italicized language makes clear that, while the Class I-MM Notes and Class I-A notes rank *pari passu*, in that they are equally senior to the Class II and Class III Notes, their right to payments under the structure is expressly subject to the Priority of Payments.

The Terms and Conditions of the Notes then go on to describe the rules for mandatory redemption of the Notes. Those rules establish that in the event that certain financial covenants are not met, payments of principal on the Notes is to be made pursuant to the Priority of Payments:

> On any Payment Date on which any Coverage Test was not satisfied on the immediately preceding Determination Date, principal payments on the Notes shall be made as follows: If the Senior Par Value Test or the Senior Interest Coverage Test is not satisfied (1) Principal Proceeds ... will be applied in accordance with the Priority of Payments ....

Terms and Conditions of the Notes § 6.

The form of Class I-A Note also incorporates the Priority of Payments as a constraint on payments to the holders of those Notes, and recognizes that payments to Class I-A holders are subordinated under certain circumstances. JE 11 ("Form of Class I-A Note"). For example, the form of Class I-A Note provides that "[a]fter the end of the Reinvestment Period [2], the principal amount of this Note shall be payable on each Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments." Form of Class I-A Note at 5. The Form of Class I-A Note then goes on to acknowledge that "the payment of the principal amount of this Note is subordinated to the payment on each Payment Date of certain fees and expenses *and other amounts* in accordance with the Priority of Payments." *Id.* (emphasis added). The restrictive legends for each of the Class I-A, and Class II Notes also contain express references to the fact that those Notes are subordinated to other classes of Notes. *See* JE 11 at 2; JE 12 at 2. Most significantly, the Class I-A Notes bear the following legend:

> THE PAYMENT OF THE PRINCIPAL OF AND INTEREST ON THE CLASS I-MM AND THE CLASSS I-A NOTES WILL BE *PARI PASSU* EXCEPT IN THE CASE OF PRIMARY COVERAGE TESTS, IN WHICH CASE PRINCIPAL PAYMENTS ON THE CLASS I-A NOTES WILL BE SUBORDINATE

   TO PRINCIPAL PAYMENTS ON THE CLASS I-MM NOTES.

Form of Class I-A Note at 2.

### b. *The Dispute Between AGL and Serengeti*

As of December 8, 2014, AGL held all of the Class I-MM Notes—an aggregate outstanding amount in excess of $26 million. Interpleader Complaint ("Compl.") JE 1 ¶¶ 9, 18. As of September 22, 2014, the two Serengeti funds owned nearly $41 million of the Class I-A Notes—representing more than 82% of the outstanding Class I-A Notes. Compl. ¶¶ 10, 20, 22.

On July 14, 2014, Northlake notified the Trustee that an Event of Default had occurred on June 30, 2014. Compl. ¶ 4. On July 18, 2018, the Trustee notified the noteholders and others, in turn, that Northlake had issued a notice of default. Two months later, on September 22, 2014, Serengeti wrote the Trustee to accelerate the Notes pursuant to Section 12 of the Terms and Conditions of the Notes. Compl. ¶ 12; *see also* Declaration of Howard Hawkins, Dkt. No. 66 ("Hawkins Declaration") ¶ 33. As a result, the principal of and accrued and unpaid interest on all the Notes became immediately due and payable.

**\*6** In its letter accelerating the Notes, Serengeti first raised the issue that triggered this litigation—Serengeti's belief that following acceleration, payments with respect to the Class I-MM and I-A Notes should be made on a pro rata basis, without regard to the waterfall contained in the Priority of Payments. Serengeti's September 22, 2014 letter did not point to language in the definitive transaction documents themselves as the basis for its position, relying instead on language in the offering documents for the Notes. Serengeti noted in its letter that "the Principal Repayments section of the Summary of Terms in the Final Offering Memorandum, which states that if an Event of Default occurs and the principal of the Notes is accelerated, payments of principal will be made on the Class I-MM and the Class I-A pro rata." September 22, 2014 Letter at 1, Hawkins Decl. Ex. B.

In the following months, counsel to Serengeti sent several additional letters to the Trustee, challenging the Trustee's distributions of payments to the Class I-MM Notes prior to payments for the Class I-A Notes. Hawkins Decl. Ex. C-E. Serengeti asserted that the Class I-MM Notes and the Class I-A Notes ranked *pari passu* and should be paid ratably. In its later letters, Serengeti found support for its position in the definitive transaction documents, as well as the transaction's offering documents.

Serengeti presents two basic arguments in support of its position that the Class I-MM Notes and the Class I-A Notes should now be paid pro rata. First, Serengeti claims that a special rule for payment applies following acceleration of the Notes. After acceleration, Serengeti claims, the Class I-MM and Class I-A Notes must be paid pro rata. Serengeti bases this argument on the text of Section 7.01(a) of the Security Agreement, as described in Serengeti's answer to the interpleader complaint:

> Specifically, Section 7.01(a) provides that '[i]f any Event of Default has not been cured or waived *and acceleration occurs* in accordance with the Conditions of the Trust Deed, the Class I Notes shall be paid in full in Cash ....' Section 7.01(a) does not differentiate between subclasses of Class I Note in any way and requires the *pro rata* treatment of all Class I Noteholders post-Acceleration.

Serengeti Answer and Counterclaim ¶ 69, JE 3 (emphasis in original). Serengeti argues that this provision of the Security Agreement trumps the Priority of Payments in the event of acceleration, pointing to the text of Section 5.01(a), which, as noted above, states that payments from the Payment Account are to be made pursuant to the Priority of Payments "subject to ... Section 7.01(a)." Serengeti contends that "Article VII is the only section of the Security Agreement that addresses how principal proceeds are distributed in the event of an Acceleration." Serengeti Answer and Counterclaim ¶ 68, JE 3. Therefore, while Serengeti acknowledges that generally, the Priority of Payments prescribes the order of payments to the two series of Class I Notes, it asserts that a special rule applies following acceleration, and that Section 7.01(a) of the Security Agreement alone provides that rule.

Second, Serengeti argues in the alternative that the Priority of Payments does not permit Class I-MM Notes to be paid before the Class I-A Notes unless, as a result of those payments, the "Senior Par Value Test" and the "Senior Interest Coverage Test" are both satisfied as a result of the payments. This argument relies on an interpretation of Section 5.01(a)(ii)(B)(i) of the Security Agreement, which, again, reads as follows:

> (B) (i) if the Senior Par Value Test or the Senior Interest Coverage Test is not

Case 1:18-md-02865-LAK   Document 360-6   Filed 06/23/20   Page 7 of 15
**Deutsche Bank Trust Company v. American General Life..., Not Reported in Fed....**
2016 WL 5719783

satisfied on the related Determination Date, to redeem (in whole or in part) the principal amount of Class I-MM notes, and then the principal amount of the Class I-A Notes, and then the principal amount of the Class II Notes, to the extent necessary and *to the extent funds are available to cause each of the Senior Par Value Test and the Senior Interest Coverage Test to be satisfied* or until each such Class is paid in full, and thereafter (ii) following the Reinvestment Period only, if the Restrictive Senior Par Value Test is not satisfied on the related Determination Date (after giving effect to payments to be made in order to satisfy the Senior Par Value Test and the Senior Interest Coverage Test), to redeem (in whole or in part) the principal amount of Class I-MM Notes and the Class I-A Notes pro rata based on the Aggregate Outstanding Amount of each such Class ....

**\*7** Security Agreement § 5.01(a)(ii)(B) (emphasis added). The Senior Par Value Test and the Senior Interest Coverage Test have not been satisfied since 2007, Hawkins Decl. ¶¶ 25-30, and the parties anticipate that the tests are unlikely to be satisfied in the near future.

Read naturally, Section 5.01(a)(ii)(B)(i) provides that payments are to be applied to repay Class I-MM Notes before the Class I-A Notes if those financial tests are not satisfied. But Serengeti's alternative argument construes the phrase that is italicized above to permit priority payments to the Class I-MM Noteholders *only* in circumstances where the result of that payment will result in satisfaction of the tests. Serengeti posits that whenever the financial coverage tests will not be satisfied as a result of the payment, Section 5.01(a)(ii)(B)(i) does not apply; rather, one should proceed to Section 5.01(a)(ii)(B)(ii), which provides for pro rata payments of the Class I-MM and Class I-A Notes.

### III. PROCEDURAL HISTORY

As a result of the dispute between the holders of Class I-MM and Class I-A Notes, the Trustee began this interpleader action on May 19, 2015. Dkt. No. 1. In order to satisfy the jurisdictional requirements of 28 U.S.C. § 1335(a), on July 21, 2015, the Court authorized the Trustee to post bond in an amount sufficient to cover the amount of the challenged distributions made to Class I-MM Notes. Dkt. No. 42. Thereafter, AGL and Serengeti filed the cross-motions for judgments on the pleadings that are the subject of this decision. Dkt. Nos. 61 and 64. The Trustee also filed a motion for judgment on the pleadings, seeking dismissal of counterclaims asserted against it by Serengeti which allege that Serengeti has suffered damages as a result of the Trustee's incorrect interpretation of its obligations under the transactional documents at issue. Dkt. No. 68.

### IV. STANDARD OF REVIEW

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." In deciding a motion for judgment on the pleadings under Rule 12(c), a court employs "the same standard applicable to dismissal pursuant to Fed. R. Civ. P. 12(b)(6)." *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009). Thus, a court is to "accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor." *In re Thelen LLP*, 736 F.3d 213, 218 (2d Cir. 2013). "In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *Id.* at 219. "Judgment pursuant to Rule 12(c) can be particularly appropriate in breach of contract cases involving legal interpretations of the obligations of the parties." *VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 529 (S.D.N.Y. 2013) (citations omitted).

### V. ANALYSIS

#### a. Choice of Law

"In federal interpleader actions where jurisdiction is based on a diversity of citizenship, like the instant action, courts apply the choice-of-law rules of the forum state." *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (citation and alterations omitted); *accord Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d

Cir. 1984) ("Because this is a diversity case, we must apply the choice-of-law rules of the forum State ...."); *Digital Camera Intern. Ltd. v. Antebi*, 2014 WL 940723, No. 11-cv-1823 (MKB) (E.D.N.Y. Mar. 11, 2014) ("To determine the substantive law that governs a diversity action, courts generally apply the choice of law rules of the forum state, which in this case is New York."). "In the absence of a violation of a fundamental state policy, New York courts generally defer to the choice of law made by the parties to a contract." *Cargill, Inc. v. Charles Kowsky Resources, Inc.*, 949 F.2d 51, 55 (2d Cir. 1991). "Moreover, in the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied." *Heller*, 730 F.2d at 52. Where "[t]he parties' briefs assume" that a certain body of law controls, "such implied consent is sufficient to establish choice of law." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000); *accord Antebi*, 2014 WL 940723, at *3 ("Such 'conduct' indicating the parties' consent to a given state's substantive law can consist of the cases cited and relied upon by the parties in their briefs, and their apparent decision not to raise the choice-of-law issue.") (citation and internal quotation marks omitted); *Fed. Ins. Co. v. Marlyn Nutraceutircals, Inc.*, No. 13-cv-0137 (JS) (ARL) 2013 WL 6796162, at *3 n.7 ("The Court will assume that New York law applies given the parties' briefs.").

*8 Here, the Court easily infers consent to the application of New York law to the Security Agreement, except with respect to Articles V and VII, for which the Court infers the parties' consent to the application of English law. Serengeti asserts that the Security Agreement is "governed by and construed and accordance with New York law" except that Articles V and VII of the Security Agreement are "governed by and construed in accordance with English law." Dkt. No. 62 at 9. Neither AGL nor the Trustee dispute Serengeti's assertions regarding choice of law. Rather, their briefs are in accord on this question. *See* Dkt. No. 65 at 3 ("[T]he Priority of Payments under Section 5.01(a)(ii) of the Security Agreement is governed by English law."); Dkt. No. 70 at 13, n.9 ("[T]he Security Agreement states that it is governed by New York law, except as to its Articles V and VII, which are governed by English law, Security Agreement § 11.08.").

Under New York law, the "fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent" and the question of "whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177-78 (2d Cir. 2004). Courts "ascertain intent from the plain meaning of the language employed in the agreements, rather than from extrinsic evidence." *Katel Ltd. Liability Co. v. AT&T Corp.*, 607 F.3d 60, 64 (2d Cir. 2010) (citation and internal quotation marks omitted). "Where the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law ...." *Id.* (quoting *Am. Exp. Bank Ltd. v. Uniroyal, Inc.*, 164 N.Y.S.2d 613, 614 (1st Dep't 1990)). "Under New York law, the presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence." *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 236 (2d Cir. 2008).

Under Fed. R. Civ. P. 44.1, "[i]n determining foreign law, the court may consider any relevant material or source ... whether or not submitted by a party." "Rule 44.1 is intended to assist the court with its work and the court is, of course, free to enlist the parties in this effort. Ultimately, the responsibility for correctly identifying and applying foreign law rests with the court." *Rationis Enterprises Inc. of Panama v. Hyundai Mipo Dockyard Co., Ltd.*, 426 F.3d 580, 586 (2d Cir. 2005). Here, Serengeti has submitted a declaration which attaches several English judicial decisions on contract interpretation, as well as excerpts from the leading treatise of *Chitty on Contracts*. *See generally* Declaration of Michael A. Hanin, Dkt. No. 63. The Court also has at its disposal a number of American judicial decisions interpreting and citing to English cases on contract interpretation.

Under English law, "[i]nterpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract" and the "meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean." *Sigma Finance Corp. (In Administration)*, *Re*, [2009] UKSC 2, [2010] B.C.C. 40 (S.C.) ¶ 10. "The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent." *Id.*; *accord Excell Consumer Prods. Ltd. v. Smart Candle LLC*, No. 11-cv-7220 (MEA), 2013 WL 4828581, at *14 (S.D.N.Y. Sept. 10, 2013) ("[T]he correct interpretation of a contract [under English law] is the 'meaning which the document would

Case 1:18-md-02865-LAK   Document 360-6   Filed 06/23/20   Page 9 of 15
**Deutsche Bank Trust Company v. American General Life..., Not Reported in Fed....**
2016 WL 5719783

convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.' ") (quoting *Investor's Compensation Scheme, Limited. v. West Bromich Building Society* [1998] 1 WLR 896); *In re* McMahon, 236 B.R. 295, 305 (1999) ("Under English law, the words of a contract are interpreted according to their plain and ordinary meaning.") (citing *Investors Compensation Scheme Ltd.*). English law also recognizes the parol evidence rule: "Extrinsic evidence ... does not usurp the authority of the written documents or contract, vary, add to or subtract from its terms. It is the writing which operates." *Chitty on Contracts*, ¶ 12-117 (31st ed. 2012). The Second Circuit has recognized, in passing, that "English law comports with New York law on contract interpretation." *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825, n.3 (2d Cir. 1990).

### b. The Priority of Payments Applies At All Times, Including Following Acceleration

**\*9** CDOs are complex, structured transactions. The prioritization of payments in structured financial products, such as CDOs, is essential to achieve one of their primary purposes—the creation of one or more classes of securities with higher credit ratings than the underlying pool of assets. Investors in structured financial vehicles reasonably expect the distribution of assets to be made in accordance with a clearly articulated structure; after all, the priority of payments within the structure enhances the credit of senior tranches of securities. Consistent with this commercial frame, the transaction documents in this case clearly require that payments be made in accordance with the Priority of Payments at all times, even following acceleration of the Notes. Serengeti's strained arguments to the contrary do not muddy the clear meaning of the contracts.

In this case, all of the assets of the issuer are maintained in a series of accounts maintained by the Collateral Agent. Inflows and outflows from those accounts are carefully controlled by the transaction documents, guided pervasively by the Priority of Payments waterfall. As noted above, all payments to holders of Notes flow through the "Payment Account." And all payments from the Payment Account are expressly subject to the Priority of Payments. *See* Security Agreement § 4.03(a) ("Except as provided in Section 5.01, the only permitted withdrawal from or application of funds on deposit in ... the Payment Account shall be to pay amounts due and payable on the Notes ... in accordance with the Priority of Payments."). As described above, the transaction documents are replete with references to the Priority of Payments to constrain transfers of assets within the structure and to holders of Notes and equity holders.

Within this carefully constructed framework, Serengeti's argument that a single clause in Section 7.01(a) establishes a special rule for distribution of funds following acceleration is wholly unpersuasive. Serengeti asserts that "Section 7.01(a) is the only section of the Security Agreement that addresses how principal proceeds are distributed in the event of an acceleration." Serengeti Answer and Counterclaim ¶ 68, JE 3. But Section 7.01(a) provides no rule for distribution of principal proceeds at all. It does not provide a mechanism for the Collateral Agent to release funds from the relevant collateral accounts. The fact that the one clause of the Security Agreement on which Serengeti relies has no corresponding provision to permit distributions from the collateral accounts, including the Payment Account, shows that Serengeti's interpretation of the provision is incorrect.

The clause in Section 7.01(a) upon which Serengeti relies is more plausibly understood as a statement of the relative priority of the Class I Notes with respect to the Class II and III Notes and the equity holders. Serengeti selectively quotes one clause of Section 7.01(a) in isolation, avoiding its surrounding text. Read in the context of Article VII as a whole, Serengeti's proposed interpretation is clearly erroneous. Section 7.01(a) reads in full as follows:

> Anything in this Agreement, the Trust Deed, the Notes or any other Transaction Document to the contrary notwithstanding, the Issuer and the Holders of the Class II Notes and the Class III Notes agree for the benefit of the Holders of the Class I Notes that the Class II Notes, the Class III Notes, the Preferred Shares, the Ordinary Shares and the Issuers rights in and to the Collateral (with respect to the Class I Notes, the "Subordinate Interests") shall be subordinate and junior to the Class I Notes to the extent and in the manner set forth in this Agreement including as set forth in Section 5.01(a) and hereinafter

provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with the Conditions and the Trust Deed, the Class I Notes shall be paid in full in Cash ... before any further payment or distribution is made on account of the Subordinate Interests.

**\*10**  Security Agreement § 7.01(a).

Serengeti selectively quotes only the last sentence of this provision as the basis for its position. But the first sentence of Section 7.01(a) makes it clear that the purpose of the paragraph is to establish the agreement of the junior creditors to subordinate their interests to those of the Class I noteholders, and to prioritize the interests of the Class I Notes to the so-called "Subordinate Interests." The last sentence of Section 7.01(a), then, is properly construed as an agreement between the holders of the Subordinate Interests and the issuer that the Class I Notes are to be paid in full in cash before the subordinated interest holders receive anything. In this context, it cannot reasonably be read to establish a special rule regarding the allocation of funds between the two series of Class I Notes following acceleration.

This interpretation of the language contained in Section 7.01(a) that is the basis for Serengeti's argument is strengthened by a review of Sections 7.01(b) and 7.01(c) of the Security Agreement. Those sections contain parallel language to the language in 7.01(a). *See* Security Agreement § 7.01(b) ("If any Event of Default has not been cured or waived and acceleration occurs in accordance with the Conditions and the Trust Deed, the Class II Notes shall be paid in full in Cash ... before any further payment or distribution is made on account of the Subordinate Interests."); Security Agreement § 7.01(c) ("If any Event of Default has not been cured or waived and acceleration occurs in accordance with the Conditions and the Trust Deed, the Class III Notes shall be paid in full in Cash ... before any further payment or distribution is made on account of the Subordinate Interests."). In those provisions of the Security Agreement, the language that is the basis for Serengeti's position cannot possibly be read to establish a priority of payment between series of the Class II and Class III Notes—there is only one series of each. Instead, the language clearly signals that the relevant senior class of notes is to be paid in full in cash before the junior interests. There is no reasonable basis to conclude, as Serengeti does, that the same language in Section 7.01(a) should have a different meaning.

The subordination provisions in the Security Agreement establish the CDO security holders' agreement between themselves as to the relative ranking of the securities in the CDO. In Section 7.01(a) of the Security Agreement, the Class II and III Notes, the other subordinated security holders, and Northlake agree that the Class I Notes rank equally senior to them—the Class I Notes are *pari passu* because they are equal in seniority to the subordinated interests. But the subordination provisions do not articulate the rules for the allocation of payments from the collateral accounts.

Unlike the subordination provisions, which provide an agreement between junior security holders and the issuer for the benefit of more senior creditors, the Priority of Payments structure is a set of instructions to the Collateral Agent and Trustee regarding the allocation of payments. Here, both series of Class I Notes rank *pari passu* in the subordination hierarchy. At the same time, the allocation of payments from the Collateral Agent and Trustee remain subject to the Priority of Payments. The transaction documents read as a whole, in context, make that point very clear. Consider, for example, Schedule 4 to the Trust Deed, which states:

> **\*11**  *Except as otherwise specified in the Priority of Payments*, the Class I-MM Notes will rank *pari passu* with the Class I-A notes, the Class I Notes will be senior in right of payment on each Payment Date to the Class II Notes, the Class III Notes and the Preferred Shares, the Class II Notes will be senior in right of payment on each Payment Date to the Class III Notes and the Preferred Shares and the Class II Notes will be senior in right of payment on each Payment Date to the Preferred Shares.

Terms and Conditions of the Notes § 1(b) (emphasis added). This provision expressly provides that, while the series of Class I Note rank *pari passu* to each other, payments to them are still subject to the Priority of Payments. The Court observes that Serengeti's selective quotations from this

Case 1:18-md-02865-LAK    Document 360-6    Filed 06/23/20    Page 11 of 15
Deutsche Bank Trust Company v. American General Life..., Not Reported in Fed....
2016 WL 5719783

section of the Terms and Conditions of the Notes consistently omit its qualifying reference to the Priority of Payments.

Section 5.01(a) of the Security Agreement qualifies the obligation that payments be made pursuant to the Priority of Payments by stating that the provision is "subject to Section 7.01." Serengeti strains this qualification to argue that Section 7.01(a) trumps the Priority of Payments provision, and creates room for a special allocation of funds between the Class I-MM and Class I-A Notes following acceleration. This is not a reasonable interpretation of the provision. First, as explained above, Serengeti's interpretation of the relevant provision of Section 7.01(a) is clearly erroneous. Second, there is a much more natural, and reasonable interpretation of the qualifying reference to Section 7.01 in the introduction to Section 5.01(a)—namely, that it is a recognition of the relative seniority of the classes of Notes to their respective subordinate interests, as described in Section 7.01(a), (b) *and* (c), and made operational through the turn-over obligation contained in Section 7.01(d). Serengeti's position that it refers to a unique rule for distributions between the Class I-MM and Class I-A Notes following acceleration is based on a misreading of a single phrase in subsection (a) of Section 7.01—one that ignores the full text of the provision. The qualifying reference to Section 7.01 in Section 5.01(a) cannot reasonably be understood to establish a special payment rule for the Class I-MM and Class I-A Notes following acceleration, extrinsic from the Priority of Payments. Instead, it represents a recognition that all junior securities in the CDO structure are subordinate to senior securities, and that junior security holders have an obligation to turn over excess payments pursuant to Section 7.01(d).

The transaction documents provide that following an event of default, payments are to be distributed in accordance with the Priority of Payments. The fact that the Priority of Payments expressly guide the allocation payments following the significant adverse credit events that permit acceleration contradicts Serengeti's argument that the Priority of Payments does not apply following acceleration. Section 16 of the Terms and Conditions of the Notes states that "[a]ll amounts due and payable with respect to the Notes shall be paid in accordance with the Priority of Payments set forth in Article V of the Security Agreement." This provision references no special rule of allocation pursuant to Article Section 7.01(a) following acceleration, instead, it requires that "all" payments be made pursuant to the Priority of Payments. In addition, the Terms and Conditions of the Notes establish that following an event of default, the Trustee is required to "continue making payments in the manner described under the Priority of Payments ...." Terms and Conditions of the Notes § 12. The Trust Deed too requires that payments made following an event of default be made in accordance with the Priority of Payments. Trust Deed § 2.3(b), (c). Reviewing these provisions, reasonable investors would not expect that special payment allocation rules would apply following acceleration, as Serengeti advocates; instead, they would expect the result that the transaction documents expressly dictate—that "all" payments are subject to the Priority of Payments, even following an event of default.

**\*12** The Priority of Payments provision clearly provides that in the event that the Senior Par Value Test and the Senior Interest Coverage Test are not satisfied, Class I-MM Notes are to be paid before the Class I-A Notes. Section 5.01(a)(ii)(B)(i) of the Priority of Payments says plainly that "if the Senior Par Value Test or the Senior Interest Coverage Test is not satisfied on the related Determination Date, to redeem (in whole or in part) the principal amount of Class I-MM notes, *and then* the principal amount of the Class I-A Notes ...." Security Agreement § 5.01(a)(ii)(B)(i) (emphasis added). In the event that the coverage tests are not satisfied, the Priority of Payments requires that the Class I-MM Notes be paid first, *and then* the Class I-A Notes. The legend that appears on the Class I-A Notes makes this rule utterly plain:

> THE PAYMENT OF THE PRINCIPAL OF AND INTEREST ON THE CLASS I-MM AND THE CLASSS I-A NOTES WILL BE *PARI PASSU* EXCEPT IN THE CASE OF PRIMARY COVERAGE TESTS, IN WHICH CASE PRINCIPAL PAYMENTS ON THE CLASS I-A NOTES WILL BE SUBORDINATE TO PRINCIPAL PAYMENTS ON THE CLASS I-MM NOTES.

Form of Class I-A Note at 2.

Serengeti's proposed alternative construction of Section 5.01(a)(ii)(B) is also implausible. Serengeti proposes that Section 5.01(a)(ii)(B) be construed to prioritize payments to the Class I-MM Notes *only if* as a result the financial coverage tests will be satisfied. This argument is not supported by the text. Serengeti points to the language in Section 5.01(a)(ii)(B)

which states that priority payments are to be made to the Class I-MM Notes "*to the extent necessary and to the extent funds are available to cause each of the Senior Par Value Test and the Senior Interest Coverage Test to be satisfied* or until each such Class is paid in full ...." Security Agreement § 5.01(a)(ii)(B) (emphasis added). However, this language does not say that such payments will be made *only if* sufficient funds are available, as Serengeti suggests. Instead, it permits those priority payments "to the extent necessary and to the extent funds are available ...." Again, Serengeti's interpretation of the transaction documents is based on a selective quotation, focusing on the words "to the extent funds are available" without regard to the words surrounding that phrase. The natural reading of the entire text is that priority payments to Class I-MM Notes are required up to the point that the tests are satisfied ("to the extent necessary *and* to the extent funds are available"); after the tests are satisfied, remaining funds are distributed pro rata between Class I-MM Notes and Class I-A Notes pursuant to Section 5.01(a)(ii)(B)(ii).

This construction of Section 5.01(a)(ii)(B) is consistent with the text of that section as a whole. It is also supported, again, by the text of the legend that appears on Class I-A Notes, which states that the Class I-A Notes will be subordinate to the Class I-MM Notes when there is a failure of the coverage tests without the substantive qualification suggested by Serengeti.[3]

In sum, the express language of the transaction documents clearly supports the interpretation of the agreements proposed by AGL and the Trustee. Because the language of the contracts themselves is clear, the Court need not turn to the offering documents and other extrinsic evidence to support its judgment.

### c. Serengeti's Counterclaims

**\*13** As noted above, Serengeti has also asserted counterclaims against the Trustee. *See* Dkt. No. 29. The gist of Serengeti's counterclaims is that the Trustee's "erroneous construction of its contractual obligations has caused [the Trustee]" to pay funds to AGL "that rightfully should have been paid to Serengeti ...." *Id.* ¶ 50. Inasmuch as it is clear that Serengeti's counterclaims depend on its interpretation of the Priority of Payments being correct, and the Court has rejected that interpretation, these counterclaims must be dismissed and the Trustee's motion for judgment on the pleadings seeking dismissal of these counterclaims (Dkt. No. 68) must be granted.

### d. Attorneys' Fees

AGL has also brought a cross-claim against Serengeti which seeks, "[u]pon resolution of the claims at issue in this interpleader action in AGL's favor" an award of attorneys' fees and costs "incurred with respect to this interpleader action and in responding to Serengeti's claims." Dkt. No. 33, ¶ 40. AGL asserts that English law "provides that a prevailing party may recover its reasonable attorneys' fees," and because "English law governs the priority of payments," it is entitled to such an award if it is the prevailing party in this matter. Dkt. No. 65 at 23.

"Under the general rule in New York, attorneys' fees are the ordinary incidents of litigation and may not be awarded to the prevailing party unless authorized by agreement between the parties, statute, or court rule." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003) (collecting cases). Because the Priority of Payments provisions in the Security Agreement, Trust Deed, and the Notes are governed by English law, and English law allows the recovery of attorneys' fees, there is a conflict between New York and English law.

To determine whether English or New York law governs AGL's request for fees, the Court must consider two "conceptually distinct" issues. *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 151 (2d Cir. 2013). "First, a federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which that court sits to determine the rules of decision that would apply if the suit were brought in state court." *Id*; *accord Atomi, Inc. v. RCA Trademark Mgmt., S.A.S.*, No. 14-cv-7456 (VEC), 2015 WL 1433229, at \*4 (S.D.N.Y. Mar. 30, 2015) ("First, the Court must apply New York choice-of-law rules to determine which rule of decision ... a New York Court would apply."). "Second, after using state conflict-of-laws principles to ascertain the rules of decision that would apply in the state courts of the federal forum, federal courts apply those state rules of decision that are 'substantive' under [*Erie R. Co. v. Tompkins*, 304 U.S. 54 (1938)] and are consistent with federal law." *Id.* Accordingly, in order to adjudicate AGL's fee request, the Court must first apply New York's choice-of-law rules to determine which rule of decision—New York attorneys'

Case 1:18-md-02865-LAK   Document 360-6   Filed 06/23/20   Page 13 of 15
Deutsche Bank Trust Company v. American General Life..., Not Reported in Fed....
2016 WL 5719783

fee law or England's attorneys' fee law—would apply to the suit if it were brought in state court. The Court must then determine whether this rule of decision would be considered "substantive" by New York courts. Only if this rule of decision is substantive must the Court must apply it in this case.

"Decisions in this circuit are in conflict regarding whether attorney fee shifting should generally be classified as substantive or procedural under New York law. There are no New York state cases directly on point." *Ancile Inv. Co. Ltd. v. Archer Daniels Midland Co.*, 992 F. Supp. 2d 316, 319 (S.D.N.Y. 2014) (citing cases). In New York, procedural matters "pertain[ ] to the remedy rather than the right" while substantive matters are "ingredient[s] of the cause" or "qualif[y] the right." *Tanges v. Hedidelberg North Am., Inc.*, 93 N.Y.2d 48, 54-55 (1999); accord *Mack Fin. Servs. v. Poczatek*, No. 10-cv-3799 (JS) (AKT) 2011 WL 4628695, at *6 (E.D.N.Y. Aug. 30, 2011), *adopted in relevant party by*, 2011 WL 4628692 (E.D.N.Y. Sept. 30, 2011) ("New York courts classify legal rules as 'substantive' when they relate closely to an underlying right and 'procedural' when they deal with the remedy by which that right is enforced.") (citation and internal quotation marks omitted). "New York courts also take into account policy considerations that underlie the substance-procedure distinction. These policy concerns relate to: (1) judicial efficiency, (2) forum-shopping, (3) fairness to the parties, and (4) New York public policy." *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 464 F. Supp. 2d 206, 219 (S.D.N.Y. 2006).

**\*14** The Court finds that a New York court would consider the issue of attorneys' fees to be procedural rather than substantive, and begins by observing that in New York, the rule under which each litigant bears its own costs "is applied to every case, regardless of subject matter, unless an exception is specified by statute or contract" such that "[i]t is a fundamental part of the framework of litigation in the state, relied on by litigants and counsel as a matter of course." *Bensen v. American Ultramar Ltd.*, No. 92-cv-4420 (KMW) (NRB) 1997 WL 317343, at *13 (S.D.N.Y. June 12, 1997). Indeed, the New York Court of Appeals has remarked that "[i]nasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise." *Hooper Assoc. v. AGS Computers*, 74 N.Y.2d 487, 492 (1989). These principles weigh heavily in favor of finding that New York courts would deem the law on attorneys' fees procedural, because it generally applies by default, regardless of the subject matter of the underlying litigation.

With respect to judicial efficiency, as the district court in *RLS Associates* recognized, "[a]pplying the English rule to this case could impair judicial efficiency[,] as the Court would have to determine the amount of fees to be awarded under English law." 464 F. Supp. 2d at 219. Similarly, the Court would need to determine the precise content of the English rule on attorneys' fees—because "[w]hile the English rule is typically described as a 'loser pays' system, the application of the cost-shifting principle is much more complicated that the simple phrase 'loser pays' implies." *Bensen*, 1997 WL 317343, at *7 (citations omitted); *see also* *RLS Assocs., LLC v. United Bank of Kuwait PLC*, No. 01-cv-1290 (CSH), 2005 WL 578917, at *5 (S.D.N.Y. Mar. 11, 2005) (in addressing application for a cost bond, ordering the submission of affidavits from English solicitors or barristers to "support its suggested bond amount" because "[n]either [the] Court nor American counsel for the parties are competent to express a view on that subject"). AGL would also have to prove to the Court that its requested fees constitute the "minimum expenses necessarily incurred" such that the requested amount is what would be assessed by the "taxing master." *Id.*, at *7. Furthermore, AGL has not provided the Court with evidence as to the content of the English attorney fee shifting rule that it wishes to apply in this case, beyond its assertion that "English law provides that a prevailing party may recover its reasonable attorneys' fees," Dkt. No. 65 at 23, and some "[c]ourts will dismiss claims resting on the application of foreign law where the party advancing the claim fails to provide the authority for their interpretation of the law," *Ancile*, 992 F. Supp. 2d at 321 (collecting cases).

As for the expectations of the parties, AGL is correct that the Security Agreement provides that English law governs the Priority of Payments, but there is no provision in the Security Agreement or in the other transaction documents expressly providing for an award of attorneys' fees to the prevailing party in litigation between noteholders concerning the proper interpretation of the Priority of Payments. "[I]t is unsettled whether a choice-of-law clause providing that an agreement is governed by the law of a foreign legal system,

where attorneys' fees are incidents of litigation borne only by the losing party, would alter the general rule in this country not to award a prevailing litigant attorneys' fees." *Atomi*, 2015 WL 1433229, at *5. Moreover, in several of the cases awarding attorneys' fees pursuant to the English rule, the award was found to be consistent with the expectations of the parties. *See, e.g.*, *RLS Assocs.*, 464 F. Supp. 2d at 219 ("[F]ailure to apply the English rule would be unfair because it would be inconsistent with the parties' expectations. [The parties] entered into a contract governed by English law and both assumed, well into the litigation, that the English rule on attorneys' fees would apply."); *Katz v. Berisford Intern. PLC*, 2000 WL 959721, at *9 (S.D.N.Y. July 10, 2000) ("[T]he application of the English rule would be wholly consistent with the parties' justified expectations.") (citations, internal quotation marks, and brackets omitted); *Cf. Ancile*, 992 F. Supp. 2d at 320 ("Given this uncertainty over the applicable substantive law, and given that New York is the forum state, the parties could not reasonably have anticipated that [foreign] law would apply to attorney fee shifting."). Here, no parties' expectations would be upset by applying the New York rule on attorneys' fees. To the contrary, it would be unfair to apply the English rule where the underlying contract is not clear that the losing party in litigation would be responsible for another litigant's fees.

**\*15** With respect to New York public policy, the New York Court of Appeals has stated that the New York rule on attorneys' fees "reflects a fundamental legislative policy decision that, save for particular exceptions ... or when parties have entered into a special agreement ... it is undesirable to discourage submission of grievances to judicial determination and that, in providing freer and more equal access to the courts, the present system promotes democratic and libertarian principles." *Mighty Midgets, Inc. v. Centennial Ins. Co.*, 47 N.Y.2d 12, 22 (1979); *see also Atomi*, 2015 WL 1433229, at *5 ("Given New York's policy in this regard, applying the [foreign] rule would be contrary to a 'fundamental policy' of the forum."). The Court finds that New York's public policy weighs strongly against finding the English rule on fees to be substantive.

AGL cites the case of *Tyco Intern. Ltd. v. Walsh*, 751 F. Supp. 2d 606 (S.D.N.Y. 2010) in support of the argument that the English rule on attorneys' fees should be considered substantive rather than procedural. *See* Dkt. No. 78 at 25. The *Tyco* court noted that "[f]ollowing English practice, Bermuda law customarily awards attorneys' fees to the prevailing party" and that "New York choice-of-law analysis would treat the Bermuda attorneys' fees rule as substantive, rather than procedural." *Id.* at 627. The *Tyco* court cited to a prior decision in the litigation reaching the same conclusion, which itself cited a district court opinion finding the English rule to be substantive. However, inasmuch as the *Tyco* court did not analyze the factors addressed here, the Court respectfully declines to find the English rule on attorneys' fees to be substantive merely on the basis of a single statement in that decision that New York courts would reach that conclusion.

For these reasons, AGL's request for attorneys' fees is DENIED.

### VI. CONCLUSION

AGL's motion for judgment on the pleadings is GRANTED. Serengeti's motion for judgment on the pleadings is DENIED. Serengeti's counterclaims are DISMISSED and AGL's application for attorney's fees is DENIED. The Trustee is directed to make a separate application to the Court to release the surety posted with the Clerk of Court. The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 61, 64, and 68.

SO ORDERED.

Dated: September 30, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5719783

---

### Footnotes

1     References to the Priority of Payments to limit payments from or within the CDO structure are so pervasive that the Court will not attempt to identify them all here. Some illustrative examples follow: Trust Deed § 3.6 ("All

amounts due and payable with respect to the Notes pursuant to this Trust Deed shall be paid in accordance with the Priority of Payments set forth in Article V of the Security Agreement."); § 9.1 ("All Monies received by the Note Paying Agent or the Trustee in respect of the Notes or amounts payable under this Trust Deed shall be applied in accordance with the Priority of Payments under the Security Agreement ...."); Schedule 4 to Trust Deed § 4, JE 13 ("Terms and Conditions of the Notes") ("Subject to the Priority of Payments and so long as all interest on the Notes has been paid and each of the Coverage Tests is satisfied as of the applicable Determination Date principal payments on the Notes will be made from Principal Payments on each Payment Date as follows ... (2) with respect to all other Principal Proceeds, to redeem Notes, in each case in accordance with the Priority of Payments."); Terms and Conditions of the Notes § 6 ("On any Payment Date on which any Coverage Test was not satisfied on the immediately preceding Determination Date, principal payments on the Notes shall be made as follows: If the Senior Par Value Test or the Senior Interest Coverage Test is not satisfied (1) Principal Proceeds ... will be applied in accordance with the Priority of Payments ...."); Terms and Conditions of the Notes § 11 ("All amounts due and payable with respect to the Notes pursuant to these Conditions and the Trust Deed shall be paid in accordance with the Priority of Payments set forth in Article V of the Security Agreement.")

| | |
|---|---|
| 2 | The "Reinvestment Period" ended in March 2007. |
| 3 | The Court must also observe that Serengeti's argument is not only implausible based on the text of the agreements as a whole, but it is inconsistent with the commercial structure of the transaction: Class I-MM Notes have a lower yield than the Class I-A Notes, which generally signals a lower risk profile. The Court believes that Serengeti's interpretation of the transaction documents, which would have their higher-yielding Notes spring to a higher status, while still yielding a greater return following a deterioration of credit quality resulting in acceleration, is likely inconsistent with the commercial expectations of the parties. |

**End of Document**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.