# Exhibit 1

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 2 of 62

Arkwright Mut. Ins. Co. v. Bojoirve, Inc., Not Reported in F.Supp. (1996)

🟡 KeyCite Yellow Flag - Negative Treatment

Disagreed With by Trump Intern. Hotel & Tower v. Carrier Corp., S.D.N.Y.,
October 23, 2007

1996 WL 361535
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

ARKWRIGHT MUTUAL
INSURANCE COMPANY, Plaintiff,
v.
BOJOIRVE, INC., Cummins Metropower,
Inc., and Consolidated Controls, Inc.,
Defendant/Third–Party Plaintiff,
v.
WOODWARD GOVERNOR
COMPANY, Third–Party Defendant.

No. 93 CIV 3068 (WK).
|
June 27, 1996.

**Attorneys and Law Firms**

Theodore E. Tsekerides, Mound Cotton and Wollan, New
York City, for Plaintiff.

Charles A. Horowitz, Speyer & Perlberg, New York City,
Donald G. Derrico, Smetana, Villani and Gash, New York
City, for Defendant.

Mark S. Zemcik, Ralph V. Pasano, Mendes & Mount, New
York City, for Third–Party Defendant.

**Opinion**

WHITMAN KNAPP, Senior District Judge.

*1 This is a subrogation action brought by plaintiff insurance
company against two service companies that maintained and
operated a generator that failed. One of the service companies,
Consolidated Controls ("Consolidated") brought a third-
party action against Woodward ("Woodward") seeking
contribution and indemnification. The other service company,
Bojoirve ("Bojoirve")[1] brought a cross claim against
Woodward, also seeking contribution and indemnification.
Woodward, the manufacturer of an allegedly defective
component of the generator ("the governor"), brought
motions to dismiss the third-party complaint and cross-claim.

On May 6, 1996, without ruling on the merits, we granted
Woodward's motions, and dismissed the third-party complaint
and cross-claim without prejudice to repleading them both.
Third-party plaintiff Consolidated has now repleaded the
complaint, and Bojoirve has repleaded its cross-claim.
Woodward has once again moved to dismiss both. For the
reasons that follow, we deny Woodward's motions.

*BACKGROUND*

Plaintiff brought this action as subrogee of Citibank
("Citibank"). Plaintiff insured Citibank for loss or damage
to its emergency diesel generators which were allegedly
maintained, repaired and operated by defendants Bojoirve[2]
and Consolidated, who were employed by Citibank. One of
those generators ("the generator") was destroyed on or about
August 14, 1990. As a result, Citibank made a claim under its
policy and was paid by plaintiff $446,237.20 in full settlement
of the claim.

Plaintiff brought this action alleging three things: first, that
prior to August 14, 1990, defendant Bojoirve failed to use
reasonable care while inspecting, servicing, maintaining and
repairing the generator by failing to notice broken and worn
parts; second, that both defendants operated, monitored and
maintained the generator on August 13 and August 14 and in
so doing

> failed to exercise reasonable care in
> that they repeatedly placed generator
> number 3 on line even though it
> was acting improperly and without
> properly inspecting it.

Amended Complaint ¶ 16; and third, that both defendants
failed to inspect, monitor, maintain, repair and operate
the generator in a workmanlike manner, thereby breaching
contractual obligations.

Defendant Consolidated filed a third-party complaint against
Woodward Governor Company alleging that if plaintiff's
allegations (described above) are found to be true, and
Consolidated is found to be liable, then the proximate cause
of the loss was the negligence and other wrong doing
on the part of Woodward in designing, manufacturing and

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 3 of 62

Arkwright Mut. Ins. Co. v. Bojoirve, Inc., Not Reported in F.Supp. (1996)

supplying a faulty and defective component of the generator. The third-party complaint seeks indemnity and contribution from Woodward. Subsequently, defendant Bojoirve brought a cross-claim against Woodward, alleging essentially the same thing as the third-party complaint and seeking indemnity and contribution from Woodward.

These motions followed.

## DISCUSSION

**\*2** Woodward claims that the third-party complaint and the cross claim should be dismissed for two reasons: first, that they are not sufficiently plead; and second, that even if they were sufficiently plead, the claims would fail under New York law. We will address each argument in turn. [3]

### Insufficient Pleading

Woodward argues that the basis for the third-party complaint is the allegation that plaintiff in the underlying subrogation action contends that the generator failed due to the installation of a faulty Woodward governor. Because the underlying complaint contains no such contention and does not mention Woodward's name, Woodward argues that the third-party complaint fails to state a claim.

Whether or not the plaintiff mentioned Woodward by name is irrelevant. Rule 14(a) of the Federal Rules of Civil Procedure allows impleader actions against a third party who "is or may be liable" in the underlying action. Moreover, the underlying complaint does refer generically to the Woodward governor. In its second cause of action, the complaint states that Consolidated "installed replacement parts without first verifying that the parts would function as intended." Complaint at ¶ 16.

Woodward argues further that the third-party complaint's demand for relief is deficient. The third-party complaint demands judgment against Woodward "to the extent of its liability, if any, to the plaintiff [Arkwright]." Because Rule 14 of the Federal Rules of Civil Procedure allows a defendant as a third-party plaintiff to serve a summons and complaint only "upon a person not a party to the action who is or may be liable to the third-party plaintiff," Woodward argues that this third-party complaint—seeking as it does judgment to the extent of Woodward's liability to the *plaintiff*, not the *third-party plaintiff*—is legally deficient.

We are unpersuaded. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires simply a short and plain statement of claim showing that the pleader is entitled to relief. Indeed, the pleading standards may be lessened somewhat for third-party claims, which may be read in conjunction with the original pleadings. This is particularly true in a claim for contribution or indemnity where the allegations are "necessarily intertwined with those of the complaint." *Bozsi Ltd. Partnership v. Lynott* (S.D.N.Y.1987) 676 F.Supp. 505, 515.

In this case, the third-party complaint provides ample notice of facts giving rise to Woodward's potential liability: it alleges that the generator failed due to the "installation of a faulty Woodward Governor and/or component therein;" it alleges that "said allegedly faulty or defective Woodward governor was designed, manufactured and sold by third-party defendant Woodward." These allegations that Woodward manufactured and sold a defective instrumentality that caused harm to another adequately state causes of action in negligence and strict products liability.

**\*3** Accordingly, we find that the third-party complaint and the cross claim are sufficiently plead.

### New York Law

(a) What is "other property"?

Woodward argues in the alternative that New York law does not allow this type of tort-based claim for purely economic losses, allegedly caused by a component failure.

In support of this argument, Woodward cites *Bocre Leasing Corp. v. General Motors* (1995) 84 N.Y.2d 685, 645 N.E.2d 1195, 621 N.Y.S.2d 497, wherein the court precluded a tort cause of action for only economic losses, characterizing them as contractually based; and *East River S.S. Corp. v. Transamerica Delaval* (1986) 476 U.S. 858, 871, wherein the Supreme Court held that a "manufacturer in a commercial relationship has no duty under either a negligence or strict products liability theory to prevent a product from injuring itself." Woodward's argument, simply stated, is that the traditional "property damage" case—where presumably recovery would be possible—involves damage to *other* property, and that "since all but the very simplest of machines have component parts," *East River* 476 U.S. at 867, damage to the actual machine caused by failure of one of its components is not damage to "other" property.

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 4 of 62

Arkwright Mut. Ins. Co. v. Bojoirve, Inc., Not Reported in F.Supp. (1996)

We find that the holdings of *East River* and *Bocre* do not apply here. In *East River,* Justice Blackmun specifically limited the Court's ruling to situations where the defective instrumentality damages itself only. *See* 476 U.S. at 872. (The *Bocre* court explicitly adopted the holding in *East River, see* 621 N.Y.S.2d at 502). These cases do not, therefore, apply in situations where the defective product causes damage to "persons or property other than the product itself." *Bancorp Leasing & Finance Corp. v. Agusta Aviation Corp.* (9th Cir.1987) 813 F.2d 272, 277.

In the case at bar, although the underlying complaint fails to particularize its damages, the amended third party complaint alleges that the defective governor damaged not only the generator in which it was housed, but also "adjacent generators, floors, ceilings, furniture and other items of real and personal property on the floor in which the generators were situated." Amended Third–Party Complaint, ¶ 12. Because these items are clearly property other than the governor and the generator, New York law does not preclude this action.

On the question—in what appears to be a case of first impression in this circuit—of whether or not the governor constitutes "other property" in relation to the generator, we reserve decision until we have a full record. However, we are inclined at this point to believe, without deciding, that New York law does not preclude this tort-based action. [4]

Consolidated contends—and we must accept these contentions as true at this stage of the proceedings—that the facts developed at trial will show that the defective item purchased by the plaintiff in the case at bar—a governor manufactured by third-party defendant Woodward, and not a finished or entire generator—constitutes "other property" in relation to the generator. First, a governor is wired into the control panel of a generator; it is an electronic monitoring device that is physically distinct and separate from the generator. Second, the defective governor in question was either a spare part or a part cannibalized from another generator, rather than one furnished with the original generator. It appears based on this evidence that the governor was indeed property separate from the generator, and thus, in destroying the generator, it destroyed "other property."

(b) Contribution

**\*4** Woodward argues that the claims for contribution should be dismissed because purely economic loss resulting from a breach of contract does not constitute "injury to property" under New York's contribution statute. Hence, New York law does not permit contribution for economic loss when the underlying action is one for breach of contract. In the case at bar, Woodward argues that the entire complaint sounds in contract—Citibank allegedly "employed" the defendants to take care of the generator, and they breached "their respective contracts with Citibank." As such, Woodward argues, the contribution claims must be dismissed.

We are not persuaded by this argument. The underlying action sounds in tort as well as breach of contract. Plaintiff states causes of action in negligence by alleging that defendants failed to use reasonable care in performing their duties. The remedy plaintiff seeks is damages for loss of property allegedly caused by the negligence of the defendants, a traditional tort remedy.

(c) Indemnification

Finally, Woodward argues that the indemnification claims must be dismissed because defendant Consolidated had no implied right of indemnification. First, the underlying complaint alleges active misconduct by the defendants. Woodward contends that if plaintiff prevails on any of its claims, it will be because the fact-finder determined that one or both of the defendants acted negligently, and was not merely passive in failing to discover another's negligence. Woodward concludes that because Consolidated and Bojoirve themselves are partially at fault, indemnity will not be implied. *See Knight v. H.E. Yerkes and Assocs* (S.D.N.Y.1987) 675 F.Supp. 139, 143.

However, the plaintiff in the underlying action alleges that Consolidated failed to test the defective Woodward governor prior to installation. Defendant Consolidated asserts that evidence at trial will show the following things: that the latent defect in the governor would not have been discovered even if Consolidated had tested the governor before installing it; that Consolidated was hired simply to monitor the control panel, and had no duty to test the governor; and finally, that defendant Consolidated had no part in the decision to turn on the generator. On this motion we must accept as true defendant Consolidated's version of the facts. That version of the facts appears to create a situation where implied indemnity might apply. At this stage, then, it would be premature to dismiss the indemnity claim.

Arkwright Mut. Ins. Co. v. Bojoirve, Inc., Not Reported in F.Supp. (1996)

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 5 of 62

Second, Woodward argues that the underlying complaint sounds in contract; and that New York law provides that where the underlying action sounds primarily in contract, indemnity cannot be implied. *See Knight* 675 F.Supp. at 143. Because we have determined that the underlying action sounds in tort as well as contract, *see* discussion, *supra,* Woodward's argument in this regard is unpersuasive.

Finally, Woodward argues that indemnity is warranted only when the proposed indemnitor—in this case, Woodward—has breached a duty to a third-party, but the proposed indemnitees—in this case, the two defendants—have paid the third-party for the loss attributable to that breach. Because neither the third-party complaint nor the underlying complaint allege that Woodward owed or breached a duty to plaintiff's subrogor, Woodward argues, the indemnification claims should be dismissed.

 **\*5** Again, this argument is based on the contention that the only breach that occurred here was a breach of contract. If, however, it were found that plaintiff had suffered injury to "other property," *see* discussion *supra,* proximately caused by a defective governor, potential causes of action in tort exist against the manufacturer of the defective part, *ie* Woodward. Thus, indemnification of Consolidated by Woodward might be appropriate.

*CONCLUSION*

Having suffered damage to "other property"—as distinct from the allegedly defective part manufactured by Woodward—plaintiff could have sued Woodward in tort as an initial matter. [5] Moreover, in the underlying complaint, plaintiff properly stated a cause of action against both defendants in negligence. Given that, both defendants may be entitled to contribution from Woodward, a third party whose own wrongdoing is alleged to have contributed to the loss. Further, both defendants, as the allegedly innocent installers and maintainers of a part whose defect could not be discovered may be entitled to indemnity from Woodward, the manufacturer of the defective part.

Accordingly, Woodward's motions to dismiss the third-party complaint and Bojoirve's cross claim are denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1996 WL 361535

# Footnotes

1    At some point after this action was brought, for reasons that are immaterial to this Memorandum and Order, the original defendant Cummins became defendant Bojoirve. For the sake of clarity and simplicity, we will refer to this entity only as "Bojoirve."

2    *see supra* note 1.

3    The amended third-party complaint and cross claim incorporate the original third-party complaint and cross claim. The cross claim contains essentially the same allegations as the third-party complaint, and Bojoirve has adopted the arguments made by Consolidated in opposition to Woodward's motion to dismiss. Accordingly, though we will address ourselves primarily to the motion to dismiss the third-party complaint, the same reasoning and conclusions apply to the motion to dismiss the cross claim.

4    New York law offers scant guidance in this area. Defendant Consolidated points to a Third Department case, *Village of Groton v. Tokheim Corporation* (1994) 202 A.D. 728, 608 N.Y.S.2d 565, where the court permitted tort actions against the manufacturer of a regulator which was part of a fuel dispensing system, where the defect led to an oil spill. In ruling that soil and ground water contamination does not constitute economic loss, the court in effect classified soil and ground water "other property," distinct from the fuel dispensing system. The court, however, did not articulate a standard for identifying "other property."

5    Consolidated contends that the reason plaintiff did not sue Woodward in tort as an initial matter is that such action was time barred.

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 6 of 62

Arkwright Mut. Ins. Co. v. Bojoirve, Inc., Not Reported in F.Supp. (1996)

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.



# England and Wales Court of Appeal (Civil Division) Decisions

---

---

[New search] [Printable RTF version] [View ICLR summary: [2016] WLR(D) 61] [Buy ICLR report: [2016] QB 835] [Buy ICLR report: [2016] 2 WLR 1429] [Help]

---

**Neutral Citation Number: [2015] EWCA Civ 1310**

Case No: A3/2014/3542

IN THE COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
THE HONOURABLE MR JUSTICE POPPLEWELL

Royal Courts of Justice
Strand, London, WC2A 2LL

21/12/2015

B e f o r e :

**THE RIGHT HONOURABLE LORD JUSTICE LONGMORE**
**THE RIGHT HONOURABLE LADY JUSTICE GLOSTER DBE**
**and**
**THE HONOURABLE MR JUSTICE HENDERSON**

_____

Between:

**CAPITA (BANSTEAD 2011) LIMITED (FORMERLY KNOWN AS FPS GROUP LTD & ANR**

**Appellants**

**- and -**

**RFIB GROUP LIMITED**

**Respondent**

———————————————

**Mr Adam Tolley QC (instructed by Plexus Law) for the Appellants**
**Mr Neil Kitchener QC & Mr Laurence Emmett (instructed by Nabarro LLP) for the Respondent**
**Hearing dates: 21st & 22nd October 2015**

———————————————

## HTML VERSION OF JUDGMENT

———————————————

Crown Copyright ©

**Lord Justice Longmore:**

**Introduction**

1. This appeal relates to a claim under an indemnity clause contained in a share purchase agreement. It raises the question whether, if the seller of shares in a company undertakes to indemnify the purchaser in respect of liabilities which the purchaser may incur as a result of negligently performed services provided by the company to a recipient before the transfer date of the shares ("the Transfer Date") and the company provides services to a customer both before and after the Transfer Date, it is appropriate, as between the seller and the purchaser of the shares, to apportion the liability incurred to that customer by reference to the time when that liability is incurred or by reference to some other criteria and, if so, what.

2. In the present case the company (by one of its employees Mr Le Cras) negligently provided pension services and advice to the Trustees ("the Trustees") of the Queen Elizabeth's Foundation for Disabled People Pension and Assurance Scheme ("the Scheme") and to the principal employer under the Scheme, the Queen Elizabeth's Foundation for Disabled People ("QEF"), by failing to inform the Trustees and QEF that amendments to the pension plan for the Scheme's members could only be made by the Trustees' execution of a formal document and that, save in a small respect, any amendment could not be retrospective. He later represented to the Trustees and QEF that the appropriate amendments were in place. Apart from the later representations, these failures first occurred before the Transfer Date but their effects continued after the Transfer Date. On Popplewell J's view of the matter, the failures were a continuing breach of contract since the company had a general retainer and duty to assist in ensuring that the Trustees' instructions were implemented. He concluded that some of the loss incurred by the Scheme and thus some of the liability arose after the Transfer Date and apportioned the claim to indemnity brought by the purchaser against the seller accordingly. The question in this appeal is whether he was right.

**Facts**

3. RFIB Group Ltd ("RFIB"), the original defendant and respondent to this appeal, were the sellers of the shares in Capita Hartshead Benefit Consultants ("CHBC") who, under their previous name of Robert Fleming Benefit Consultants Ltd ("RFBC"), provided pension management and advisory services to QEF. The contract pursuant to which these services were provided was made in September 1995 and called a Services and Fee Agreement. For an agreed sum of £7500 per annum, increasing annually by reference to the national Average Earnings Index for employees in the banking, finance and insurance

sector, RFBC were to supply the services contained in Section 2.1 of the agreement. Section 2.2 set out non-core services for which fees would be assessed and paid on a quarterly basis in accordance with RFBC's standard scales. Additional services could be requested and would then be undertaken at extra cost (Section 1.3). Section 2 of the agreement specified what it called the "consultancy service" as including

"Core Services

2.1.1 Advice & Guidance on Scheme Design & Legislative Trends

- Guidance and recommendations about the design of the Scheme, benefit structure, eligibility criteria, and the specific needs of the Scheme membership.

- Providing information and recommendations about social and political trends affecting the provision of pensions and employee benefits.

- Supplying information and tailored advice regarding the effect and specification of all relevant legislation, regulations and practice of the Pension Scheme Office of the Inland Revenue, the Occupational Pensions Board and the Department of Social Security.

…

2.1.6 Trusteeship Advice

- Offering advice, as necessary to the Trustees on their main duties and discretionary powers.

- Assisting the Trustees in the conduct of their duties.

2.1.7 The Pension Bill/Act

- Advice, guidance and recommendations on the effects of the Pensions Bill …."

4. The judge, towards the end of paragraph 11 of his judgment, described this retainer as including "a duty to assist in maintaining a state of affairs, namely that the Scheme in force from time to time should reflect the decisions of the Trustees" of the Scheme. This is not explicitly stated in the Services Agreement and I am not clear how the judge came to describe it in those terms. To the extent that he makes it sound as if there was an absolute duty to assist in maintaining a particular state of affairs, I do not think he can be correct but it may be that his shorthand should be read to mean that RFBC/CHBC were under a duty to comply with the instructions of the Trustees so far as they were lawful and were obliged to take care in and about the implementation of those instructions. That would, I think, be a fair summary of RFIB's duties so far as relevant for the purpose of determining the issues in this appeal and is, in any event, much the same as the duty stated earlier in paragraph 11 of the judgment namely to advise and assist the Trustees and QEF and in particular to consider the implementation of the proposed amendments in the context of dealing with the Trustees. It is difficult to spell even this duty

from the Core Services to be performed by RFIB but it could perhaps be said to derive from a combination of Sections 2.1.6 and 2.1.7. Otherwise it would have to be part of the additional services which QEF or the Trustees were entitled to request under Section 1.3.

5. By a share purchase agreement of 28th April 2004 RFIB sold the entire share capital of CHBC to Capita (Banstead 2011) Ltd ("Capita"). The Transfer Date under that agreement was 30th April 2004; the agreement also provided:-

> "5.8 The Seller undertakes to indemnify and keep indemnified the Buyer on behalf of itself and the Company … from any liabilities costs claims demands or expenses which any of them may suffer or incur arising directly or indirectly from …
>
> > 5.8.5 any services or products supplied by the Company … or any advice provided by the Company (or any of its employees or agents) prior to the Transfer Date."

6. The claim by QEF and the Trustees was set out in a Protocol letter from their solicitors of 16th April 2010. The gist of the QEF Claim was that it and its trustees were advised on all aspects of the day-to-day management of the Scheme by CHBC. CHBC's employee, Anthony Le Cras, was the consultant dealing with QEF between 2000 and 2006. The Trustees, in consultation with CHBC, acting through Mr Le Cras, decided to make various amendments to the Scheme with the objective of reducing liabilities to members and therefore the cost of funding those liabilities. Those amendments were announced to members and ought to have taken effect on various dates between 6th April 2000 and 1st April 2004. The amendments and the dates on which they ought to have taken effect were:

> i) The introduction of a cap of the retail price index (with a maximum of 5%) for increases in pension benefits, with effect from 6th April 2000 (announced March 2000);
>
> ii) The introduction of the same cap for revaluation of deferred pensions, with effect from 6th April 2000 (announced January 2001);
>
> iii) A reduction of the annual accrual rate from 1/60th to 1/80th, with effect from 1st July 2001;
>
> iv) A reduction of dependants' pensions on a member's death from ? to ½ with effect from 1st April 2004 (announced March 2004); and
>
> v) An increase in the active members' contribution rate from 5% to 7%, with effect from 1st April 2004 (announced March 2004).

7. Formal amendments to the rules of the Scheme, signed by the Trustees, were required in order to implement the proposed changes, so that the mere announcements issued to the members of the Scheme were legally ineffective to achieve their purpose. CHBC was negligent and in breach of contract in failing to ensure that the amendments were made. In addition, from April 2004 (if not earlier) CHBC, acting through Mr Le Cras, came to appreciate that formal amendments to the Scheme rules were required, so that, in making subsequent representations that the amendments were in place, he was said to be guilty of deceit or, at the very least, negligent misrepresentation. The failure to make the changes in the required manner was only appreciated by QEF in October 2007 and amendments to

the Scheme rules were effected on 30th July 2008. Because of the effect of s. 67 of the Pensions Act 1995, these changes could only be made prospectively, save for the increase in contributions from 5% to 7%. Save in the latter respect, as a result of CHBC's wrongdoing, the liabilities of the Scheme between 1st April 2000 and 30th July 2008 were substantially greater than would have been the case if the required amendments to the rules of the Scheme had been properly made in a timely fashion. This had in turn increased the cost of funding the Scheme. The amount was estimated at £4.2 million. In addition approximately £88,000 was claimed in respect of costs. QEF's and the Trustees' claim against CHBC was settled by mediation for £3,850,000, a sum which is now agreed to have been a reasonable settlement. It is that sum together with costs which Capita and CHBC claimed to recover from RFIB in the present proceedings.

8.  The judge held that, by the Transfer Date, 30th April 2004, CHBC had been in breach of contract and duty in respect of all the amendments in failing to ensure that they were effectively made by a formal amendment to the Scheme rules prior to the date on which they were intended to have effect i.e. 6th April 2000, 1st July 2001 and 1st April 2004 respectively. He further held that CHBC was also in continuing breach of duty in this respect from day to day throughout the period from the Transfer Date to December 2007.

9.  The misrepresentation claim was based on the information acquired by Mr Le Cras in the course of correspondence between Mr Le Cras and Burges Salmon, the solicitors acting for QEF and/or the Trustees and/or CHBC. By letter of 14th April 2004, Burges Salmon had advised that the 2004 amendments (which at that stage were the only ones they had been asked to include in a deed of amendment to the Scheme rules) could not become effective before the deed of amendment was signed because of the effect of section 67 of the Pensions Act 1995. On 22nd April 2004 Mr Le Cras wrote to Burges Salmon making it clear that he wanted the deed of amendment to include the March 2000 and January 2001 amendments and that there had been recent changes to the identity of the Trustees. In Burges Salmon's letter of 10th May 2004 enclosing a draft deed of amendment for approval, they recorded that they had drafted the deed in a form which purported to make the changes retrospective (now including the 2000 and 2001 changes) notwithstanding that they had expressed reservations about the efficacy of that approach in the light of s. 67 of the Pensions Act 1995; and that they had done so on the instructions of Mr Le Cras who had confirmed that the Scheme actuary was prepared to provide a certificate. There was no evidence that the Scheme actuary was prepared to or did provide any such certificate, and it is common ground that he could not properly have done so. The judge said it was strongly arguable that Mr Le Cras must, at least from 10th May 2004, have been aware that the proposed changes had not been effectively made and could only be made effective prospectively by a formal amendment to the Scheme rules (with the exception of the 5% to 7% increase in contributions amendment which Burges Salmon correctly advised could be made retrospectively). In fact he was clearly so aware by 19th April but I do not think it matters. The judge then held (paragraph 12) that Mr Le Cras's first misrepresentation (that the amendments had been made) was made by producing in late 2004 or 2005 an updated version of a guidance booklet issued to members of the Scheme purporting to state the position at September 2004. He described the allegation of deceit as "a strong one".

**The Judgment**

10.  On the basis of these facts and in the light of RFIB's argument that misconduct of Mr Le Cras occurred after, as well as before, the Transfer Date the judge referred to the well-known judgment of the Privy Council in Canada Steamship Lines Ltd v R [1952] AC 192, that a clause is not to be construed as

exempting a party to a contract from negligence if there is any other potential basis of liability which falls within its wording. This had been applied to indemnity clauses in <u>Smith v South Wales Switchgear Co Ltd</u> [1978] 1 WLR 165 and later cases had also considered it, in particular, <u>Ailsa Craig Fishing Co Ltd v Malvern Fishing Co Ltd</u> [1983] 1 WLR 964, <u>HIH Casualty and General Insurance Ltd v Chase Manhattan Bank</u> [2003] 1 All ER (Comm) 349 and <u>Lictor Anstalt v Mir Steel UK Ltd</u> [2013] 2 All E.R. (Comm) 54. From these authorities he derived the following principles which I do not understand to be in dispute and have in any event now received the imprimatur of Sir Kim Lewison in The Interpretation of Contracts, (2nd supplement 12.06).

> "1. A clear intention must appear from the words used before the Court will reach the conclusion that one party has agreed to exempt the other from the consequences of his own negligence or indemnify him against losses so caused. The underlying rationale is that clear words are needed because it is inherently improbable that one party should agree to assume responsibility for the consequences of the other's negligence: <u>Smith</u> at p. 168D-E; <u>Ailsa Craig</u> at p.970; <u>HIH</u> at [11], [63]; <u>Lictor</u> at [36].

> 2. The <u>Canada Steamship</u> principles are not to be applied mechanistically and ought to be considered as no more than guidelines; the task is always to ascertain what the parties intended in their particular commercial context in accordance with the established principles of construction: <u>Smith</u> at p. 177; <u>Ailsa Craig</u> at p. 970; <u>HIH</u> at [11], [61]-[63], [116]; <u>Lictor</u> at [35]. They nevertheless form a useful guide to the approach where the commercial context makes it improbable that in the absence of clear words one party would have agreed to assume responsibility for the relevant negligence of the other.

> 3. These principles apply with even greater force to dishonest wrongdoing, because of the inherent improbability of one party assuming responsibility for the consequences of dishonest wrongdoing by the other. The law, on public policy grounds, does not permit a party to exclude liability for the consequences of his own fraud; and if the consequences of fraudulent or dishonest misrepresentation or deceit by his agent are to be excluded, such intention must be expressed in clear and unmistakeable terms on the face of the contract. General words will not serve. The language must be such as will alert a commercial party to the extraordinary bargain he is invited to make because in the absence of words which expressly refer to dishonesty the common assumption is that the parties will act honestly: <u>HIH</u> at [16], [68]-[75], [97]."

11. The judge then reached the following conclusions:-

> i) the clause drew a line between wrongful conduct before and after the Transfer Date; it confined the scope of the indemnity to liabilities or losses whose effective cause was wrongful conduct prior to the Transfer Date;

> ii) the consequences of employees' conduct after the Transfer Date were for the purchaser's account;

> iii) the use of the words "directly or indirectly" required the court to look for the widest link in establishing the causative link between the relevant conduct and the relevant liability or loss incurred by the purchaser such as, for example, loss covered by the second limb of <u>Hadley v Baxendale</u>;

iv) the clause did not however cover conduct by an employee which merely set the background to the loss or could be said to have been causative in the sense of "but for" causation. The conduct must be a real and effective cause of the liability or the loss consequent or the employee's conduct and the claim to which it gave rise;

v) the losses incurred after the Transfer Date had two effective causes in that CHBC was in breach of contract and duty when it failed to make effective amendments to the Scheme rules on or shortly after 6th April 2000, 1st July 2001 and 1st April 2004 and was also in continuing breach of contract and duty after the Transfer Date and liable for later representations founding QEF's claim in deceit. As the judge put it (paragraph 24):-

> "immediately after the Transfer Date, CHBC was in continuing breach of duty which gave rise to the continuing losses on a day to day basis."

vi) since the buyer had contractually assumed the risk of negligent or dishonest conduct by the seller's employees after the Transfer Date, it could not rely on conduct prior to the Transfer Date as a concurrent cause because the losses after the Transfer Date would not have occurred if there had not been negligence and dishonesty after the Transfer Date. By this the judge presumably meant that if, immediately after the Transfer Date, Mr Le Cras had complied with his duty of procuring the Trustees' signature to the proposed amendments there would have been no further loss from that time onwards and the previous losses would have been capped; and

vii) it was therefore appropriate to apportion the totality of the loss incurred by Capita/CHBC as a result of the settlement with QEF between losses incurred before the Transfer Date and losses incurred after the Transfer Date; with expert assistance the judge held that the appropriate apportionment was 50/50.

**The submissions**

12. Mr Adam Tolley QC for Capita and CHBC made three main complaints about the judgment. He submitted:-

i) the entirety of the post-Transfer Date losses was effectively caused by the pre-Transfer Date conduct of Mr Le Cras; the fact that he continued to be negligent and made negligent or deceitful representations was all part of the original breach of contract and duty which occurred before the Transfer Date;

ii) it was inappropriate to talk in terms of "continuing breach of contract or duty" as founding any new liability after the original breach. The concept of a continuing breach occurring "day by day" was artificial and wrong;

iii) if it was appropriate to fasten on any claim for misrepresentation, the relevant representation was made in late 2004 or April 2005 and any apportionment should be recalculated on that basis; and

iv) in any event, any apportionment was wrong because Mr Le Cras's post-Transfer Date was at most a concurrent cause which was not enough to preclude reliance on the

Case 1:18-md-02865-LAK   Document 362-1   Filed 06/23/20   Page 14 of 62          3/30/20, 1:23 PM

indemnity.

### (1) Irrelevance of post-Transfer Date conduct?

13.   I cannot accept that post-Transfer Date conduct cannot be relevant. The judge was, with respect, right to say that the scheme of the indemnity was to allocate losses caused by pre-Transfer Date conduct to the seller and losses caused by post-Transfer Date conduct to the purchaser and that CHBC could not expect to receive an indemnity in respect of loss caused by the negligence or fraud of its own employees in such circumstances. Mr Le Cras continued to be an employee of CHBC after 30th April 2004 and, on any view, CHBC could not expect to recover in respect of losses caused by separate (or fresh) negligence or by deceit after the Transfer Date. (It is true that Capita, the first appellant to the appeal, was not technically Mr Le Cras's employer but Capita (as the holding company of CHBC) and CHBC have to be treated as having a common interest and, in any event, CHBC has been held to have title to pursue the claim, a matter which is no longer challenged). Mr Tolley's argument under this head amounts to saying that the post-Transfer Date losses exclusively arose because of Mr Le Cras's pre-Transfer Date conduct which is the "but for" causation argument; that is an argument which the judge rightly rejected. The true question is whether the post-Transfer Date conduct of Mr Le Cras was indeed a concurrent cause of the post-Transfer Date losses.

### (2) Continuing Breach of Contract or Duty as a concurrent cause?

14.   Here the judge's conclusion depends on whether he was right to say that there was a breach of contract or duty every day after the Transfer Date. He held that there was, because Mr Le Cras's conduct fell on what he called the <u>Midland Bank</u> side of the line rather than the <u>Bell v Peter Browne Co</u> or <u>Nouri v Marvi</u> side of the line.

15.   The trouble with this is that it is a very elusive line. In <u>Midland Bank Trust Co v Hett Stubbs & Kemp</u> [1979] Ch 384 Oliver J held that a family solicitor was under a continuing duty to take steps to register a son's 10 year option to purchase his father's farm every day after the deed granting the option had been executed until the 10 years had elapsed. This was because (438 D-F) the solicitors had retained the document, opened (but not closed) a file relating to the option and were consulted by the son on the question whether he should exercise the option from time to time between its grant and the time when the option became incapable of exercise because the father had transferred the farm elsewhere. The son's claim against the solicitors was not therefore statute-barred. In <u>Bell v Peter Browne & Co</u> [1990] 2 QB 495 a divorcing husband agreed that the matrimonial house could be transferred to his wife and that, when it was sold, he should have one-sixth of the proceeds to be protected by either a trust deed or a mortgage. He executed a transfer but his solicitors took no steps to prepare or have executed any declaration of trust or mortgage or otherwise register the husband's interest in the house. The wife sold the house and spent the proceeds. The Court of Appeal held that the husband had a single cause of action accruing at the time of the failure to protect his interests not a cause of action accruing day by day thereafter and that his claim against the solicitors was therefore statute-barred. Nicholls LJ distinguished <u>Midland Bank</u> on the basis that, once the divorce proceedings were concluded, the husband and the solicitors had no further contact and the solicitors were thus, as the learned lord justice put it, *functi officio*. It is, however, difficult, with respect, to see that the failure to protect the husband's interest was inherently different from the solicitor's failure to protect the son's interest in <u>Midland Bank</u>. Beldam LJ's judgment can only be understood as saying implicitly that <u>Midland Bank</u> was wrongly decided (see <u>Maharaj v Johnson</u> [2015] PNLR 553 at para 32 per Lord Wilson and para 55 per

Capita (Banstead 2011) Ltd & Anor v RFIB Group Ltd [2015] EWCA Civ 1310 (17 December 2015)

Lord Clarke dissenting). Mustill LJ (page 512F) could contemplate the theoretical possibility that a solicitor could have a continuing retainer which could be construed as requiring the solicitor to be constantly on watch for new sources of potential danger and to take immediate steps to nip them in the bud. But he found it impossible to imply such "a strange obligation" from the mundane facts of <u>Bell</u>

> "and equally improbable to suppose that if it did exist the obligation would be broken at any time other than when the mistake should have been discovered and put right: namely straightaway."

This also seems to be saying implicitly that <u>Midland Bank</u> was wrongly decided, unless it could be distinguished from <u>Bell</u> on its facts (as to which Mustill LJ presumably agreed with Nicholls LJ, having expressed his entire agreement with Nicholls LJ's judgment "as regards the breach of contract" at page 511F).

16. <u>Nouri v Marvi</u> [2009] EWCA Civ 1107; [2011] PNLR 100 was a case similar to <u>Bell</u> in which this court held that there were no special facts to suggest that any duty survived completion of the sale of the flat which the solicitors were instructed to undertake.

17. Likewise in <u>Maharaj v Johnson</u> [2015] UKPC 28; [2015] PNLR 553 the Privy Council, on appeal from the Court of Appeal in Trinidad and Tobago, held that solicitors who had acted for the purchasers of a property and accepted a defective title on his behalf were not liable day by day after completion of the transaction to take steps to correct the defect of title, even though it would have been perfectly easy to do so. This was because (para 34) their fees had been paid and their file had been closed. There was no reference in the contract of retainer to any obligation to procure execution of a deed of rectification which in any event could not have been procured without the consent of a third party, unlike the unilateral ability of a solicitor to register an option (as in <u>Midland Bank</u>) or a caution (as in <u>Bell</u>). The judges who formed the majority of the Judicial Committee accepted that Beldam LJ may have been right to regard the facts in <u>Bell</u> as indistinguishable from <u>Midland</u> but declined to decide whether it was <u>Midland Bank</u> or <u>Bell</u> which was correct because they did not regard the case before them as a case of non-feasance; rather it was a case where the contract had been negligently and wrongly performed.

18. Mr Neil Kitchener QC for RFIB submitted that the present case was much more similar to <u>Midland Bank</u> than to <u>Bell</u>, <u>Nouri</u> and <u>Maharaj</u> because there was undoubtedly a continuing retainer with a yearly fee and Mr Le Cras was in correspondence with the solicitors for the Trustees of the Scheme after 30th April 2004 just as much as before. That is, of course, true but that makes it necessary to reach a conclusion on the question whether <u>Midland Bank</u> was correctly decided. If, as the Privy Council recognised in <u>Maharaj</u>, <u>Bell</u> and <u>Midland Bank</u> are inconsistent which is the authority which should be followed?

19. As to that the first question is whether the distinction from <u>Midland Bank</u> referred to in the subsequent cases, namely that there was a continuing retainer because the file had not been closed and further advice was sought and obtained, is a distinction of principle rather than of incidental fact. In my opinion it is a factually incidental distinction rather than a distinction of principle. The obtaining and receiving of advice after a mistake has been made (even if the mistake can be easily rectified) cannot to my mind mean that an obligation to correct one's mistake or negligence continues to accrue and give a fresh cause of action every day after the mistake has been made. As Mustill LJ pointed out in <u>Bell</u>, it would be unusual for there to be an express term in the average retainer contract (or the average pension adviser contract) requiring the adviser to exercise continuing vigilance to discover any

mistakes he may have made and then to busy himself to put them right. Moreover it cannot be right to imply what he called such "a strange obligation" into an apparently usual form of contract.

20. Once it is clear that there is no principled distinction between <u>Midland Bank</u> and <u>Bell</u>, it is clear that our obligation is to follow <u>Bell</u> as a decision of this court. If <u>Midland Bank</u> is to be preferred, that must be for a higher court to decide.

21. I would therefore conclude that despite the existence of a continuing retainer on the part of CHBC, it does not follow that fresh acts of negligence occurred, in respect of each of the amendments, of failing to secure the Trustees' formal adoption of the amendments in a signed document and failing to inform them that the amendments could not be retrospective. These were original acts of negligence which occurred before 30th April 2004 and are accordingly not acts of negligence for which Capita/CHBC are responsible under the indemnity, even though Mr Le Cras made no attempt to repair his omission thereafter.

22. It is, of course, true that all the above cases were decided in the context of arguments about limitation and that courts are not supportive of long and ill-defined periods elapsing before a cause of action has arisen. It is also true that the limitation problem has, since <u>Midland Bank</u> and <u>Bell</u> were decided, been largely avoided in England (though not in Trinidad and Tobago) by section 14A of the Limitation Act 1980 inserted by section 1 of the Latent Damage Act 1986. But the fact that the problem no longer arises so often in England and Wales is no reason for resolving it differently when it does arise in, for example the context of an indemnity clause in share purchase agreements. The judge thought the cases apposite to the problem in this case and, to that extent, I agree with him.

23. But I cannot agree that Mr Le Cras's continuing failure after 30th April 2004 to remedy his previous acts of negligence constituted a fresh cause of action accruing day by day entitling QEF and the Trustees to sue CHBC. Nor, therefore, can I agree that continuing negligence was a cause of the loss suffered by Capita or CHBC, which operated concurrently with the undoubted causative negligence which occurred before the Transfer Date. A failure to correct previous acts of negligence is not, to my mind, concurrently causative of losses caused by the original acts of negligence.

(3) **The representations**

24. The position in relation to Mr Le Cras's later representations is, however, different. These representations undoubtedly did give rise to new causes of action. The judge correctly held that the first operative misrepresentation was the production in late 2004 or 2005 of an updated version of the guidance booklet issued to members of the Scheme (and thus incidentally to the Trustees) purporting to state that the amendments had been effected as at September 2004. The judge was reluctant to make an actual finding of deceit against Mr Le Cras who did not give evidence before him but held, again correctly, that QEF's deceit claim was "strongly arguable"; on any view it was a negligent misrepresentation which would give rise to a fresh cause of action. That representation, whether correctly characterised as negligent or fraudulent, can legitimately be said to be a concurrent cause of the loss which followed after the issue of the guidance booklet. There was a subsequent representation that the amendments had not only been done but had retrospective effect, but the first concurrent cause is the operative concurrent cause for the present purposes.

(4) **Legal relevance of post-Transfer Date conduct as a concurrent cause**

25.  The judge concluded that the indemnity could not be relied on, if a concurrent cause of loss was the misconduct of Mr Le Cras after the Transfer Date. He derived considerable support from <u>EE Caledonia Ltd v Orbit Value Co Europe</u> [1994] 1 W.L.R. 221 (Hobhouse J) and 1515 (CA). In that case the operator of the Piper Alpha Platform sought to recover in respect of its liability to the estate of a service engineer, Mr Quinn, who had died in the disastrous fire. Mr Quinn was an employee of the defendant company which had contracted to provide his services. The operator and the services provider had each agreed in a mutual exemption and indemnity clause to assume responsibility for losses consequent on the personal injury or death of its own employees. On the face of it therefore the defendant should have been the party liable for Mr Quinn's death but both Hobhouse J and this court held that, since the operator had itself been negligent, it could not recover from his employer in respect of the amounts which it had had to pay in respect of Mr Quinn's death. It was argued that the operator was not only negligent but also in breach of statutory duty (a strict liability). Even if, therefore, the clause precluded recovery in case of negligence, it should apply to liability for breach of statutory duty. Hobhouse J said (231H):-

> "I consider that the plaintiffs' arguments cannot be accepted. Where there are concurrent causes, each cause is a cause of the consequent event. If the event would have occurred in the absence of a particular fault, that fault is not a cause of the event. Accordingly, it is not correct to say in the present case that the plaintiffs were liable in respect of the death of Mr Quinn because of the breaches of statutory duty; they were liable because of the breaches of statutory duty and the negligence of their servant. It was the concurrent effect of both those causes that gave rise to the death of Mr Quinn and without either of those causes that death would not have occurred and the plaintiffs would not have been liable. Therefore the correct question remains whether the plaintiffs have a right to an indemnity from the defendants in respect of a liability of which a cause was the negligence of one of their servants. It is still necessary to ask whether, as a matter of the construction of the clause, it does cover such liability.
>
> For the purposes of considering the first question I have already quoted from judgments which state the principle to be applied. The principle is that in the absence of clear words the parties to a contract are not to be taken to have intended that an exemption or indemnity clause should apply to the consequences of a party's negligence. Applying that principle and adopting a correct understanding of causation, the parties to a contract such as that with which I am concerned should not be taken to have intended that a party whose servant has been negligent should be entitled to an exemption or an indemnity although there has also been, as a concurrent cause of the relevant loss, a breach of a strict statutory duty."

In this court Steyn LJ (with whom the other members of this court agreed) said that the relevant clause of the contract:-

> "…should be construed as providing that the indemnities are not applicable if the event in question has been caused not only by a party's breach of statutory duty but also by his negligence. The short point is that the plaintiffs have contractually assumed the risk of their own negligence and cannot seek to avoid the consequences of that assumption of risk by seeking to rely on a breach of statutory duty."

26.  I agree with the judge that this authority supports the conclusion that, where there are concurrent

causes of the loss to which an indemnity apparently applies, one of which is negligence (or deliberate action) and the other of which is non-negligent, there can be no recovery because it is not intended that the clause should apply to losses caused by the claimant's negligence. That principle is well-established for indemnity cases; it is similar to the principle applicable in insurance cases that in cases of concurrent loss in which one cause is covered by the policy and one cause is excepted by the policy, the insurer is not liable because, even if the clause granting cover applies, the loss is still caused by the excepted cause, see Wayne Tank v Employers' Liability Assurance [1974] QB 57.

.

**Conclusion**

27. In this respect, therefore, I would uphold the judge but, differing as I do on the question whether failure to correct previous negligence can be a concurrent cause of loss, I would hold that it is only post 31st December 2004 losses that are irrecoverable under the indemnity. That will (or may) require a (no doubt) modest adjustment to the apportionment, there being no appeal against the judge's general reasoning as to how the apportionment is to be achieved. If the parties cannot resolve this question by agreement before hand down of the judgment, I would remit the matter to the judge for re-assessment.

**Lady Justice Gloster:**

28. I agree with Longmore LJ, for the reasons which he sets out in his judgment, that the judge was correct to conclude, on the basis of the construction of clause 5.8.5 of the SPA and by analogy with the decision in EE Caledonia Ltd v Orbit Value Co Europe [1994] 1 W.L.R. 221 and [1994] 1 W.L.R. 1515 (CA), that, where there are concurrent effective causes of the loss, one being wrongdoing before the Transfer Date and the other wrongdoing after that date, the indemnity in the clause under consideration in the present case does not cover losses caused by the latter: see paragraphs 25-28 of the judge's judgment.

29. However, I do not, with respect, agree with Longmore LJ's conclusions:

    i) that the judge was wrong to hold that:

        "CHBC was also in continuing breach of duty in this respect from day-to-day throughout the period from the Transfer Date to December 2007."

        see paragraph 11 of the judge's judgment;

    ii) that:

        "21. …… despite the existence of a continuing retainer on the part of CHBC, it does not follow that fresh acts of negligence occurred, in respect of each of the amendments, of failing to secure the Trustees' formal adoption of the amendments in a signed document and failing to inform them that the amendments could not be retrospective. These were original acts of negligence which occurred before

30th April 2004 and are accordingly not acts of negligence for which Capita/CHBC are responsible under the indemnity, even though Mr Le Cras made no attempt to repair his omission thereafter.

22. ......

23. But I cannot agree that Mr Le Cras's continuing negligence after 30th April 2004 constituted a fresh cause of action accruing day by day entitling the Trustees and the Foundation to sue CHBC. Nor, therefore, can I agree that that continuing negligence was a cause of the loss suffered by Capita or CHBC, which operated concurrently with the undoubted causative negligence which occurred before the Transfer Date of 30th April 2004. A failure to correct previous acts of negligence is not, to my mind, concurrently causative of losses caused by the original acts of negligence." ;

iii) that there is no distinction of principle between the facts as found by Oliver J (as he then was) in <u>Midland Bank</u> and the facts as found in cases such <u>Bell</u>, <u>Nouri</u> *v* <u>Marvi</u> and <u>Maharaj v Johnson</u>;

iv) that it is this court's obligation to follow <u>Bell</u> as a decision of this court; and

v) that, accordingly, it is only post 31st December 2004 losses that are irrecoverable under the indemnity (because Mr Le Cras' later representations in late 2004 or 2005 undoubtedly did give rise to new causes of action).

30. The starting point in my view as to whether CHBC was under a continuing contractual obligation, and therefore was in continuing breach of contract or duty after the Transfer Date, must be the nature of CHBC's obligations under the terms of the Services Agreement; see e.g. per Dyson J in <u>New Islington and Hackney Housing Association Ltd v Pollard Thomas & Edwards</u> [2001] P.N.L.R. 20, at para 13[1]; and per Lord Clarke in <u>Maharaj v Johnson</u> [2015] UKPC 28; [2015] PNLR 553, at paragraph 54. The Services Agreement, under which CHBC was to provide wider-ranging consultancy services and advice for the Scheme on an ongoing basis, is a very different type of contract from the solicitors' contracts of retainer under consideration in cases such as <u>Bell</u>, <u>Nouri</u> and <u>Maharaj</u>.

31. In the latter three cases, the solicitors were retained to act effectively in relation to one transaction. By contrast, in the present case, the range of CHBC's duties as defined in the Services Agreement was extremely wide. The fact that it received fees paid quarterly in arrear supports the concept of an ongoing, day to day, retainer. Although Longmore LJ has already set out the more relevant duties, I reproduce Section 2 of the Services Agreement in full to emphasise the point that clearly CHBC was expected to be proactive in the provision of its advice and consultancy services on a rolling basis. Thus, for example, the evidence showed that not only was CHBC required to attend Trustees' meetings four times a year, but it was also required to draft the agendas for such meetings; in other words the

obligation was on CHBC to identify and raise the issues which required discussion, resolution and action.

"SECTION 2 - CONSULTANCY SERVICE SPECIFICATION

## 2.1 **Core Services**

2.1.1. Advice & Guidance on Scheme Design & Legislative Trends

- Guidance and recommendations about the design of the Scheme, benefit structure, eligibility criteria, and the specific needs of the Scheme membership.

- Providing information and recommendation about social and political trends affecting the provision of pensions and employee benefits.

- Supplying information and tailored advice regarding the effect and specification of all relevant legislation, regulations and practice of the Pension Schemes Office of the Inland Revenue, the Occupational Pensions Board and the Department of Social Security.

2.1.2. Investment Advice

- Advising the Trustees about the attributes and suitability of the Scheme's investments.

- Monitoring and reporting on the investment performance of the scheme's investment manager.

- Providing advice and recommendations about suitable investment vehicles for members' additional voluntary contributions.

2.1.3. Scheme Communications

- Issue of a periodical Newsletter to the Trustees providing information upon benefit trends and pensions practice.

2.1.4. Broking

- Conducting periodic assessments of the competitiveness of the insurance companies with which the Death in Service benefits risks are placed.

- If pensions are to be secured by purchasing annuities, ensuring that competitive rates consistent with security are obtained from the annuity market place.

### 2.1.5. <u>Meetings</u>

- Attendance at meetings with the Trustees or the Employer as necessary.

- Attending up to four formal Trustees meetings per year.

### 2.1.6 <u>Trusteeship Advice</u>

- Offering advice, as necessary, to the Trustees on their main duties and discretionary powers.

- Assisting the Trustees in the conduct of their duties.

### 2.1.7. <u>The Pensions Bill/Act</u>

- Advice, guidance and recommendations on the effects of the Pensions Bill.

## 2.2 **<u>Non-Core Service</u>**

### 2.2.1. <u>Investment Advice</u>

- Assisting the Trustees in the assessment and selection of investment managers.

### 2.2.2. <u>Scheme Communications</u>

- Drafting, designing and arranging the production of:

   a. The Trustees Report and Accounts (to audit stage)

   b. A simplified version of the Trustees Report and Accounts for distribution to members.

   c. Advising the Trustees about the requirements of the Disclosure of Information Regulations.

### 2.2.3. <u>Member Communications and Advice</u>

- At the Trustees request, giving presentations to members and prospective members regarding the benefits provided by the Scheme.

- Attending meetings with individual employees in connection with any matters arising from their membership or prospective membership of the scheme.

- Advising individual members on the exercise of any option

under the Scheme.

### 2.2.4. Actuarial Advice

- Advice and recommendation for the development of the most appropriate funding strategy.

- Providing assessments of the cost of individual or bulk augmentations of benefits.

- Advice on scheme solvency.

### 2.2.5. Pension Bill/Act

- Preparation of a Scheme "audit" to renew the likely effect of forthcoming legislation.

### 2.2.6. Other Projects

- Non-specified projects that fall outside of the services offered under the core service."

32.  In paragraph 5 of his judgment, the judge set out details from the QEF Particulars of Claim. For present purposes the relevant paragraphs are paragraphs 24 to 32 of the Particulars of Claim. They read as follows (all emphasis supplied):

"24. On 6 April 2004 Mr Le Cras instructed Burges Salmon to prepare a deed of amendment in relation to the Scheme to reflect the contribution and benefit changes announced to members in March 2004.

25. On 14 April 2004 Burges Salmon sent a letter to Mr Le Cras advising him, amongst other things, as follows:

"In relation to the effective date for the changes, I should mention at this stage that, in my view, the earliest date these changes can become effective is the date on which the deed of amendment is signed. To give the deed retrospective effect would require the consent of the members under section 67 of the Pensions Act 1995 due to the adverse effect the amendment would have on rights and entitlements accrued in respect of members prior to the date of the amendment..."

26. Thus by 14 April 2004 Mr Le Cras was aware (if he was not so aware before) that (a) intended changes to benefits could not be made by way of announcement to members and (b) the rules could not be amended with retrospective effect so as to adversely affect members' existing rights without raising section 67 issues. Mr Le Cras should have but failed to immediately (on receiving this advice) advise the Trustees of the same and further failed to advise them that the 2000/2001 amendments had not in fact been effected.

27. On 22 April 2004 Mr Le Cras provided Burges Salmon with, amongst other things, copies of the Announcements to Members dated March 2000 and January 2001 together with details of the further changes intended to have been effected in July 2001. He requested that Burges Salmon include such changes in the Deed of Amendment which they were preparing. He further requested that Burges Salmon delete or amend Clause 5 of the then existing draft Deed of Amendment which related to the effective date of the changes.

28. On 10 May 2004 Burges Salmon sent a revised draft deed of amendment to Mr Le Cras for his approval under cover of a letter which stated, amongst other things, as follows:

"...the effective dates for the amendments in the deed are those stipulated in the announcements in accordance with your instructions..,.

...As you know we have expressed reservations about making the amendments retrospective in view of section 67 of the Pensions Act 1995 but you have instructed us to make the amendments retrospective. You have also confirmed that the actuary has said he is prepared to give a certificate. We have drafted the amendments on that basis but express no view as to whether they are legally watertight"

29. **Mr Le Cras again failed to forward the above letter to the Foundation and the Trustees and omitted to inform them of the content of the above advice.**

30. During June and July 2004 Burges Salmon sent four further drafts of the proposed deed of amendment to Mr Le Cras. On the basis of the documentation provided to the Claimants to date, this correspondence culminated in an email dated 5th July 2004 from Burges Salmon to Mr Le Cras confirming that the changes requested by him had been made and requesting his instructions in relation to two outstanding issues (namely whether there were any Dorincourt members and the potential payment period for childrens' pensions).

31. **The Claimants have not to date been provided with any documentation to show that Mr Le Cras responded to the above request for instructions (as he ought to have done). Further the draft Deed was not provided to the Foundation and the Trustees so as to enable the changes to the Scheme to be effected nor were the Foundation and the Trustees provided with any advice in relation to the effect of the failure to execute the Deed. Instead, as set out in paragraphs 32 and 33 below, Mr Le Cras continued to make positive representations to the Foundation, the Trustees and Members that the intended changes had been validly made (when he was expressly aware that this was not the case).**

Material Events after 2004

32. At all material times after July 2004 until he left RFBC's employment, Mr Le Cras **continued to falsely, alternatively negligently, misrepresent that the changes to the Scheme referred to in paragraph 12 above had been validly made.**"

33.  The judge analysed Mr Le Cras and CHBC's continuing breach of duty as follows:

"11.  **CHBC was also in continuing breach of duty in this respect from day to day throughout the period from the Transfer Date to December 2007. The nature of CHBC's retainer, set out in a Services and Fees Agreement dated 1 July 1995, was that it had a continuing role in advising and assisting the trustees and QEF in relation to the Scheme, which included considering the changes previously made, or purportedly made, and considering the implementation of the amendments in the context of subsequent dealings with the trustees.** This is apparent from the activity which founded QEF's misrepresentation claim, which involved Mr Le Cras adverting to the previous changes for the purposes of subsequent dealings with the trustees and members of the Scheme. **It is also apparent from the activity in the period immediately before and shortly after the Transfer Date.** From the end of March 2004 Mr Le Cras had liaised with Burges Salmon who were instructed to include the April 2004 amendments in a draft deed of amendment to the Scheme rules to be executed by the trustees. By 19 April 2004 his instructions included the drafting of amendments to reflect the 2000 and 2001 changes. Discussions with Burges Salmon continued sporadically until July 2004. The last relevant communication appears to have been a letter of 20 September 2004 from Burges Salmon in which the latter notified Mr Le Cras that the partner previously handling the matter had left the firm and asking whether the draft deed of amendment he had sent by email on 5 July was ready to be finalised or whether any further changes were necessary. This is a case which falls on the Midland Bank side of the line (Midland Bank Trust Co Ltd v Hett Stubbs & Kemp [1979] Ch 384) as distinct from one concerned with a retainer to advise on, or carry out, a single transaction such as that in Bell v Peter Browne Co [1990] 2 QB 495 or Nouri v Marvi [2011] PNLR 7. CHBC's retainer included a duty to assist in maintaining a state of affairs, namely that the scheme in force from time to time should reflect the decisions of the Trustees. As such it involved a continuing duty in the sense explained by Dixon J in Larking v Great Western (Nepean) Gravel Ltd [1940] HCA 37; (1940) 64 CLR 221 at 236:

"If a covenantor undertakes that he will do a definite act and omits to do it within the time allowed for the purpose, he has broken his covenant finally and his continued failure to do the act is nothing but a failure to remedy his past breach and not the commission of any further breach of his covenant. His duty is not considered as persisting and, so to speak, being forever renewed until he actually does that which he promised. On the other hand, if his covenant is to maintain a state or condition of affairs, as, for instance, maintaining a building in repair, keeping the insurance of a life on foot, or

affording a particular kind of lateral or vertical support to a tenement, then a further breach arises in every successive moment of time during which the state or condition is not as promised, during which, to pursue the examples, the building is out of repair, the life uninsured, or the particular support unprovided. The distinction may be difficult of application in a given case but it must be regarded as one depending upon the meaning of the covenant." (Emphasis supplied.)

34.  I agree with this analysis. The revised draft deed of amendment, enclosed with Burges Salmon's letter dated 10th May 2004, gave effect for the first time in the drafting process to Mr Le Cras' instructions in his fax dated 22nd April 2004 to state that the effective dates for the relevant amendments were those stipulated in the announcements, as opposed to the date on which the amendment deed was signed. In those circumstances, in my judgment, in May 2004 Mr Le Cras clearly had an ongoing contractual obligation under the Services Agreement to circulate the draft deed to the Trustees for their signature and to inform them of the doubts which Burges Salmon had expressed as to whether the purported retrospective implementation from the announcement dates would be effective. Mr Le Cras' failure to do either of those things, in particular when he was specifically dealing with the draft deeds of amendment in the period May to September 2004, in my view clearly amounted to continuing breaches of his ongoing contractual duties. Indeed at this stage there was an additional breach of duty in that, although he apparently had intended the Trustees to sign the draft deed of amendment, he appears, whether deliberately or negligently, to have decided at some time during the summer months of 2004 not to provide them with the draft at all.

35.  This analysis is supported by the approach taken by Dyson J in <u>New Islington and Hackney Housing Association Ltd v Pollard Thomas & Edwards supra</u> in relation to the ongoing obligations (if any) of an architect who had designed the foundations of the building. Dyson J said this at paragraphs 15 to 21:

> "15 But it is necessary to consider the scope of that duty in a little more detail. What does the duty to review the design entail? In what circumstances will an architect be in breach of that duty? I find it convenient to consider an example. Let us suppose that an architect is engaged on the standard RIBA Conditions of Engagement to provide the full service (as PTE were in the present case), including administering a building contract in a standard JCT form of contract. Suppose that he designs the foundations of a building (a large office block), the foundations are constructed in accordance with his design, and several years later, practical completion is achieved. Let us further suppose that the design of the foundations is defective and one which no reasonably competent architect would have produced: in other words, the architect was negligent. There can be no doubt that the architect commits a breach of contract when he completes the design and gives instructions to the contractor to construct the foundations in accordance with it. But in what sense and to what extent is the architect under a duty to review his negligent design once the foundations have been designed and constructed?
>
> **16 In my view, in the absence of an express term or express instructions, he is not under a duty specifically to review the design of the foundations, unless something occurs to make it necessary, or at least prudent, for a reasonably competent architect to do so. For example, a specific duty**

might arise if, before completion, the inadequacy of the foundations causes the building to show signs of distress; or if the architect reads an article which shows that the materials that he has specified for the foundations are not fit for their purpose; or if he learns from some other source that the design is dangerous. In such circumstances, I am in no doubt that the architect would be under a duty to review the design, and, if necessary, issue variation instructions to the contractor to remedy the problem. But in the absence of some reason such as this, I do not think that an architect who has designed and supervised the construction of foundations is thereafter under an obligation to review his design.

17 I do not accept that in every case where an architect has negligently introduced a defective design into a building, he is also by the same token in breach of a continuing breach of a contractual obligation to review his design. In <u>Midland Bank Trust Co. Ltd v. Hett, Stubbs & Kemp</u> [1979] Ch 384, 503C, Oliver J. said:

"It is not seriously arguable that a solicitor who or whose firm has acted negligently comes under a continuing duty to take care to remind himself of the negligence of which, ex hypothesi, he is unaware."

18 In my view, that observation is as apt to apply to an architect as it is to a solicitor. **The position is quite different where the architect (or solicitor) knows, or ought to know, of his earlier negligence. When that occurs, then he may well be under a contractual obligation to review his earlier performance, and advise his client honestly and competently of his opinion. Whether he is in fact under such a duty when he has actual or constructive knowledge of his earlier breach of contract will depend on whether the contract is still being performed.** If the contract has been discharged (for whatever reason), then the professional person may be under a duty in tort to advise his client of his earlier breach of contract, but it is difficult to see how he can be under any contractual duty to do so.

19 The foundation for the statement in the cases that an architect is under a continuing duty to review his design is the dictum of Sachs L.J. in <u>Brickfield Properties Ltd v Newton</u> [1971] 1 W.L.R. 862, 973F: *522

"The architect is under a continuing duty to check that his design will work in practice and to correct any errors which may emerge. It savours of the ridiculous for the architect to be able to say, as it was here suggested that he could say: 'true, my design was faulty, but, of course, I saw to it that the contractors followed it faithfully' and be enabled on that ground to succeed in the action."

20 But Sachs L.J. was not concerned to explore the scope of an architect's continuing duty to review his design. In my judgment, the duty does not require the architect to review any particular aspect of the design that he has already completed unless he has good reason for so doing. What is a good

reason must be determined objectively, and the standard is set by reference to
what a reasonably competent architect would do in the circumstances."
(Emphasis supplied.)

36. In that case, applying the appropriate objective standard, Dyson J held that the architect concerned was
under no continuing duty. However, in my judgment, on the facts of the present case both the terms of
CHBC's continuing obligations under the Services Agreement and the circumstances which had
specifically brought the problems of retrospective implementation to Mr Le Cras' attention, made it
incumbent upon him, applying an objective standard as discussed by Dyson J, to bring the matter to the
Trustees' attention throughout the period from the Transfer Date to the end of 2004. Indeed, his failure
to do so, in the light of his knowledge that, on any basis a draft amendment deed was required, and his
failure in the summer of 2004 after the Transfer Date even to circulate the draft deed of amendment to
the Trustees, has all the hallmarks of dishonest concealment (i.e. deceit), in circumstances where
CHBC was clearly under an obligation to inform the Trustees and QEF of the advice which it had
received.

37. The judge decided that, when looked at holistically, CHBC's duties included the ongoing obligation to
take reasonable steps to ensure that the Scheme in force adequately reflected the Trustees' decisions
from time to time and that they were provided with any legal advice which CHBC had obtained and for
which they and/or QEF were obliged to pay. I agree. These duties and their breach in relation to the
relevant period from the Transfer Date to the end of 2004 were pleaded against CHBC in the QEF
Claim. This was not simply the case of a continued failure to remedy a past remediable breach. This
was a case where Mr Le Cras had continuing obligations after the Transfer Date and under the Services
Agreement to keep the Trustees and QEF advised in relation to the status of the Scheme.

38. Nor do I consider that there is any need for this Court on this occasion to rationalise the difference in
approach between Midland Bank on the one hand and Bell, Nouri and Maharaj on the other. That is for
a number of reasons.

39. First of all, as I have already said, the terms of the contract in the present case, the nature of the
continuing contractual relationship between the parties and the particular circumstances giving rise to
the breach are wholly distinguishable on the facts from the "one off" conveyancing transactions, and
their aftermath, which formed the subject matter of Midland Bank, Bell, Nouri and Maharaj.

40. Second, I do not accept, if that indeed be the implication of Longmore LJ's judgment, that whether or
not a continuing obligation, or a continuing breach of duty, exists as a matter of law in the present case
is somehow predicated by the analysis in Bell, Nouri and Maharaj as to whether a continuing
obligation exists in the context of a failure to register a conveyancing transaction or as to when a
breach occurred in the context of a fraudulent conveyancing transaction. That point was expressly
recognised by Nicholls LJ in Bell at 500-501, where he said:

> "It is, of course, true that the solicitor's breach of contract in 1978 did not
> discharge his obligations. Had the plaintiff learned, a year or two later, of what
> had happened, he would still have been entitled to go back to his former
> solicitor and require him to carry out, belatedly, his contractual obligations so
> far as they could still be performed. For example, lodging a caution. Despite
> this, it was in 1978 that the breach occurred. Failure thereafter to make good
> the omission did not constitute a further breach. The position after 1978 was

simply that, in breach of contract, the solicitor had failed to do what he ought to have done in 1978 and, year after year, that breach remained unremedied. Nor would the position have been different if in, say, 1980 the plaintiff's solicitor had been asked to remedy his breach of contract and he had failed to do so. His failure to make good his existing breach of contract on request would not have constituted a further breach of contract: it would not have set a new six-year limitation period running. Once again, the position would have been simply that the solicitor remained in breach. Nor, finally, is the position any different because, in respect of lodging a caution, the breach remained remediable until 1986 when the house was sold. A remediable breach is just as much a breach of contract when it occurs as an irremediable breach, although the practical consequences are likely to be less serious if the breach comes to light in time to take remedial action. Were the law otherwise, in any of these instances, the effect would be to frustrate the purpose of the statutes of limitation, for it would mean that breaches of contract would never become statute-barred unless the innocent party chose to accept the defaulting party's conduct as a repudiation or, perhaps, performance ceased to be possible.

For completeness I add that the above observations are directed at the normal case where a contract provides for something to be done, and the defaulting party fails to fulfill his contractual obligation in that regard at the time when performance is due under the contract. In such a case there is a single breach of contract. **By way of contrast are the exceptional cases where, on the true construction of the contract, the defaulting party's obligation is a continuing contractual obligation. In such cases the obligation is not breached once and for all, but it is a contractual obligation which arises anew for performance day after day, so that on each successive day there is a fresh breach**. A familiar example of this is the usual form of repairing clause in a tenancy agreement. Non-repair for six years does not result in the repairing obligation becoming statute-barred while the tenancy still subsists. The obligation of the tenant or the landlord to keep the property in repair is broken afresh every day the property is out of repair, as Bramwell B. observed in <u>Spoor v. Green</u> (1874) L.R. 9 Ex. 99, 111." (Emphasis supplied.)

To similar effect was Mustill LJ at page 512 F- 513A where he recognised that a solicitor may indeed have a continuing retainer in appropriate circumstances.

41.  Likewise in <u>Carlton v Fulchers</u> [1997] PNLR 337 at 342, Waller LJ said;

"As it seems to me, the passage in Oliver J.'s judgment in <u>Midland Bank v. Hett, Stubbs & Kemp [1979] 1 Ch. 384</u> at 438 to which we were referred holds that, in a case where there is a continuous contractual obligation, the limitation period does not begin to run until the contract finally becomes impossible of performance. In the case of want of prosecution by a solicitor for example, it would be wholly unsatisfactory to contemplate defining the date of breach for limitation purposes by reference to a solicitor's first failure

to take out the summons for directions for the reasons given by Oliver J. Nothing, as I see it, in Bell v. Peter Browne & Co. [1990] 2 Q.B. 495, criticises that aspect of the judgment in a continuing duty case. Indeed as I see it, Nichols L.J. at 501 and Mustill L.J. at 512, seem to recognise that the continuing retainer type of case both exists and will bring a different result from the situation being dealt with in Bell v. Browne. There was, as I see it, clearly a continuing duty on Mr Fulcher up to October 4. His retainer was to make all attempts to preserve the plaintiff's cause of action, including making a section 33 application. That was capable of performance up to the termination of his retainer by the October 4 letter; not before that date should any period of limitation in my view begin to run."

42. In other words I do not accept that the mere fact that, in the present case, the original pre-Transfer Date breach was to some extent remediable has the result that Bell, Nouri and Maharaj require an outcome, as a matter of law, that CHBC was not in continuing breach of its continuing obligations.

43. Third, it is thus irrelevant for present purposes whether Midland can be distinguished on its facts, or on any principled basis, from Bell, Nouri and Maharaj and this court does not need to decide between them. Certainly in Nouri the Court of Appeal regarded the Court of Appeal in Bell as having treated the decision of Oliver J in Midland as very much dependent on its own facts: see per Patten LJ at paragraph 36, with whom Rix LJ and Sir Mark Waller agreed. I also agree. Moreover the critical issue in Midland was Oliver J's definition of the relevant contractual duty as an obligation requiring the solicitors to register the option before a 3rd party acquired an interest in the land: see e.g. page 434A. That was what the judges in the subsequent decisions, perhaps not surprisingly, had difficulty in accepting. And that articulation of the duty of a solicitor in a conveyancing context may well not be correct in the light of Bell, Nouri and Maharaj. But the extent to which Oliver J's articulation of the duty survives, if at all, in my judgment has nothing to do with the correct outcome of this appeal.

44. Accordingly I would uphold the judgment of Popplewell J to its full extent. I would hold that losses incurred in the period from 1st May 2004 to 31st December 2004 are irrecoverable under the indemnity, because Mr Le Cras' conduct post the Transfer Date (i.e. from 1st May 2004) undoubtedly did give rise to new causes of action, both for breach of contractual duty and probably also for misrepresentation and/or deceit. I would not remit the matter to the judge for further assessment of the sums due under the indemnity.

**Mr Justice Henderson:**

45. I agree with the reasoning and conclusions of Longmore LJ in his judgment, which I have had the opportunity of reading in draft. Accordingly, I too would hold that it is only losses after 31st December 2004 that are irrecoverable under the indemnity. The losses incurred before that date were in my judgment caused wholly by CHBC's breaches of duty before the Transfer Date, which remained unremedied. Those losses therefore fell squarely within the wording of clause 5.8 of the Share Purchase Agreement, being referable to claims which arose "directly or indirectly from … services … supplied by the Company [*CHBC*] … prior to the Transfer Date".

46. In respect of losses incurred after 1 January 2005, the causative potency of CHBC's original breaches of duty continued with undiminished force until the date when the judge held that QEF and the

Trustees should have remedied the position for the future by procuring formal amendments to the Scheme rules, namely 1 December 2007. The difference is that, in respect of this later period of loss, there was also a concurrent cause in the form of Mr Le Cras's negligent or fraudulent representations that the necessary amendments of the Scheme had been put in place by September 2004. The existence of this concurrent cause engages (by close analogy, if not directly) the principles applied by Hobhouse J and this court in E E Caledonia, whereby recovery under an indemnity is normally taken to be precluded, as a matter of construction, where a concurrent cause of the relevant loss is negligence (or, a fortiori, fraud) on the part of the claimant.

47. My Lady Gloster LJ, in her judgment which I have also had the benefit of reading in draft, gives powerful reasons for disagreeing with Longmore LJ's conclusion that CHBC was not in continuing breach of contract on a day to day basis after the Transfer Date. I must therefore explain why, with the greatest respect, I am unpersuaded by her views and prefer the analysis of Longmore LJ.

48. The central point, to my mind, is that CHBC was instructed by the Trustees to ensure that the necessary amendments to the Scheme were made with effect from specified dates falling between 6 April 2000 and 1 April 2004. Owing to the negligence of CHBC, those instructions were never effectively implemented. CHBC was under a contractual duty to ensure that the amendments were made in due time, but it failed to fulfil that duty. CHBC was therefore in breach of contract, at the latest when each of the specified dates for performance arrived and nothing effective had been done.

49. Those breaches remained unremedied, but an unremedied breach of contract is just that: a breach of contract which has not been remedied. In the normal way, it is impossible to construct a continuing contractual obligation, in the sense of one which gives rise to a fresh breach on a daily basis, from the mere failure to perform the original obligation in due time. This remains the case, as Nicholls LJ explained in Bell, even if the party in breach is asked to make good his default but fails to do so. As Nicholls LJ said, at 501A:

> "His failure to make good his existing breach of contract on request would not have constituted a further breach of contract: it would not have set a new six-year limitation period running. Once again, the position would have been simply that the solicitor remained in breach."

50. Conceptually, there is of course a class of contractual duties which do give rise to a continuing obligation to perform them which arises afresh from day to day. Examples are given by Nicholls LJ in Bell at 501D-E (repairing clauses in a lease), and by Dixon J in Larking v Great Western (Nepean) Gravel Ltd [1940] HCA 37, (1940) 64 CLR 221 at 236, cited by the judge at the end of paragraph 11 of his judgment. To quote Dixon J, a duty of this nature is one "to maintain a state or condition of affairs".

51. The judge clearly had this passage in mind when, just before his citation from Larking, he described CHBC's retainer as including "a duty to assist in maintaining a state of affairs, namely that the scheme in force from time to time should reflect the decisions of the Trustees". With respect, however, I do not consider that to be an accurate description of any of the duties of CHBC under the Services Agreement, and it is certainly not an accurate description of the obligations which CHBC undertook to ensure that the necessary amendments to the Scheme were made by the specified dates. It seems to me that these were probably "additional services" falling within paragraph 1.3 of section 1 of the Services Agreement, as they do not sit comfortably within any of the core or non-core services specified in section 2 (unless, possibly, they fall within paragraph 2.2.6 as "other projects", which again would not

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 31 of 62    3/30/20, 1:23 PM

in my view import a continuing duty). I therefore think the judge was wrong to characterise these obligations to perform specific tasks by specific dates as importing a duty to maintain a state or condition of affairs, and he may have been over-influenced by a wish to bring the facts of the present case within the very different kind of continuing duty recognised by Dixon J and Nicholls LJ.

52. If my analysis is right thus far, I do not think the position was significantly altered by Mr Le Cras's failure around the time of the Transfer Date to ensure that the misgivings expressed by Burges Salmon in their letter of 14 April 2004 were passed on to the Trustees, or that the draft deed of amendment which he instructed Burges Salmon to prepare on 22 April 2004 was approved and signed by the Trustees. Reprehensible though these failures may have been, I see them as essentially failures by Mr Le Cras to make good the existing breaches of contract of which he must by then have been fully aware.

Note 1   This case was referred to in Jackson & Powell on *Professional Liability*, 7th edition paragraph 5-031, which was cited in the course of argument.   [Back]

---

**BAILII:** Copyright Policy I Disclaimers I Privacy Policy I Feedback I Donate to BAILII
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2015/1310.html*

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Allergan Finance, LLC v. Pfizer Inc., N.Y.Sup., April 13, 2020

2015 WL 4254033
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

DRESSER–RAND COMPANY, et al., Plaintiffs,

v.

INGERSOLL RAND COMPANY, et al., Defendants.

No. 14 Civ. 7222(KPF).
|
Signed July 14, 2015.

*OPINION AND ORDER*

KATHERINE POLK FAILLA, District Judge.

**\*1** On August 21, 2012, a fire broke out at a nitrogen fertilizer plant located near the town of Belle Plaine, in the province of Saskatchewan, Canada. The owner of the facility—Yara Belle Plaine Inc. ("Yara Belle")—brought suit in the Court of Queen's Bench for Saskatchewan against Dresser–Rand Company, Dresser–Rand Canada, Inc., and Dresser–Rand Group, Inc. (collectively, "Dresser–Rand"), as well as Ingersoll Rand Company and Ingersoll Rand Company Limited (collectively, "Ingersoll Rand"), to recover damages for property losses and business interruption losses. Yara Belle grounds its action against Dresser–Rand and Ingersoll Rand (the "Canadian Action") in allegations that these companies either manufactured or serviced the piece of equipment that caused the fire.

On September 8, 2014, with the Canadian Action pending, Dresser–Rand commenced the instant suit against Ingersoll Rand, seeking, *inter alia,* a declaration under the Declaratory Judgment Act, 🚩 28 U.S.C. § 2201, that Ingersoll Rand was required to defend and indemnify Dresser–Rand in the Canadian Action. Ingersoll Rand has moved to dismiss the instant complaint (the "Complaint") as premature and not ripe for adjudication while issues of liability remain undecided in the Canadian Action. For the reasons discussed herein, Ingersoll Rand's motion is granted, and Dresser–Rand's Complaint is dismissed without prejudice.

BACKGROUND [1]

**A. Factual Background**

**1. The Equity Purchase Agreement**

In 1987, Dresser–Rand Company was formed by Ingersoll Rand

Corporation and Dresser Industries, Inc., as a New York general partnership. (Compl.¶ 2). In 2004, FRC Acquisitions LLC ("FRC" or the "Buyers") purchased Ingersoll Rand's ownership interest in Dresser–Rand Company by entering into an Equity Purchase Agreement (the "EPA"). (See *id.*). The transaction closed on October 29, 2004 (the "Closing Date"). (*See* Leibowitz Decl., Ex. 2 at 7). The EPA memorializes the defense and indemnification obligations at issue in this action. (*See* Compl. ¶¶ 32–34 (citing EPA §§ 8.1(a), 9.10(g))). It also contains a forum selection clause in which the parties to the EPA consented to the exclusive jurisdiction of the state and federal courts located within the Southern District of New York "for all actions or proceedings arising out of or relating to" the EPA. (EPA § 9.14).

Section 8 of the EPA contains reciprocal indemnification provisions between "the Sellers" (i.e., Ingersoll Rand) and "the Buyers" (i.e., FRC). (*See* EPA § 8.1(a), (b)). Section 8.1(a) requires Ingersoll Rand to defend and indemnify Dresser–Rand under certain circumstances:

> *Indemnification by the Sellers.* Subject to the limits set forth in this Section 8.1, the Sellers agree, jointly and severally, to indemnify, defend and hold the Buyers and their Affiliates (including, after the Closing Date, ... Dresser–Rand ... ) ... harmless from and in respect of any and all losses, claims, liabilities, damages, fines, penalties, costs (in each case including reasonable out-of-pocket expenses (including, without limitation, reasonable fees and expenses of counsel [ ) ] ) (collectively, "Losses"), that they may incur arising out of, relating to, or due to any ... (iv) Products Liabilities Losses.

**\*2** (EPA § 8.1(a)).

"Products Liabilities" is defined elsewhere in the EPA, and specifically excludes liability based on acts or omissions following the Closing Date:

> *"Products Liability"* (and collectively *"Products Liabilities"* ) means, to the extent related to Products

shipped prior to the Closing Date and except to the extent based on acts or omissions (excluding omissions in respect of an alleged failure to warn based solely on events, activities or occurrences prior to the Closing) following the Closing, any claim or Proceeding of a third party against Dresser–Rand ... to the extent such claim or Proceeding alleges personal injury or property damage[.]

(EPA § 9.10(g)).

As noted, indemnification duties flow both ways under the EPA, depending on the circumstances and the claims at issue. Section 8.1(b) obligates the "Buyers" (initially, FRC) to indemnify the "Sellers" (i.e., Ingersoll Rand) for losses due to Dresser–Rand's post-Closing "conduct of business":

> *Indemnification by the Buyers.* Subject to the limits set forth in this Section 8.1, the Buyers jointly and severally agree to indemnify, defend and hold the Sellers harmless from and in respect of any and all Losses that they may incur arising ... as a result of the conduct of business of ... Dresser–Rand ... after the Closing Date.

(EPA § 8.1(b)).

Sections 8.1(e) and 8.1(f) deal specifically with defense obligations. To that end, Section 8.1(e) gives Ingersoll Rand the "opportunity" to assume the defense when notified that an indemnifiable event has potentially occurred:

> *Notice and Opportunity to Defend.* If there occurs an event which a party asserts is an indemnifiable event pursuant to Sections 8.1(a) ... the party or parties seeking indemnification (the *"Indemnified Party"* ) shall notify the other party or parties obligated to provide indemnification (the *"Indemnifying Party"* ) promptly.... In case any such action shall be brought against any party seeking indemnification and it shall notify the Indemnifying Party of the commencement thereof, the Indemnifying Party shall be entitled to participate therein and to assume the defense thereof with counsel selected by the Indemnifying Party and, after notice from the Indemnifying Party to such party or parties seeking indemnification of such election so to assume the defense thereof, the Indemnifying Party shall not be liable to the party or parties seeking indemnification hereunder for any legal expenses of other counsel or any other expenses subsequently incurred by such party or parties in connection with the defense thereof; provided, however, that Sellers [Ingersoll Rand] shall assume the defense of all Asbestos Liabilities.... If the Indemnifying

Party fails to assume the defense of a third party claim, the Indemnified Party may assume the defense of any such claim with counsel selected by the Indemnified Party.

(EPA § 8.1(e)). Significantly for purposes of the present motion, Section 8.1(f) provides that only a party "entitled to indemnification" must be reimbursed defense costs in real time, as they accrue:

> **\*3** *Payment.* ... If any Indemnified Party shall be entitled to indemnification under [Section 8] ... the Indemnifying party shall pay the Indemnified Party's costs and expenses arising as a result of a proceeding directly relating to an indemnifiable Loss (including, without limitation, any reasonable fees paid to witnesses), periodically as incurred.

(*Id.* § 8.1(f)).

On August 4, 2005, Dresser–Rand Group Inc. went public through an initial public offering. (*See* Leibowitz Decl., Ex. 3). As of the filing of the instant motion, Ingersoll Rand had not been able to ascertain which entity or entities currently hold the indemnification obligations of the "Buyers" (i.e., the obligations originally undertaken by FRC), which are owed to Ingersoll Rand under the EPA. (Def. Br. 7 n. 5).[2]

### 2. The Canadian Action

In August 2013, Yara Belle filed a "Statement of Claim" in the Canadian Action. (Compl., Ex. A (the "Statement of Claim")). That lawsuit, styled *Yara Belle Plaine Inc. v. Ingersoll–Rand Company, Dresser–Rand Company, Dresser Rand Group, Inc. and Dresser–Rand Canada, Inc.,* asserts claims against both Dresser–Rand and Ingersoll Rand. (*Id.* at ¶¶ 18–35). The Statement of Claim alleges that a nitric acid expander (the "Expander"), manufactured by either Ingersoll Rand or Dresser–Rand in approximately 1971, purchased by Yara Belle in 2002, and maintained and serviced by Dresser–Rand between at least February or March 2004 and the end of July 2012, "experienced a catastrophic failure" that resulted in a fire and damage to Yara Belle's facility on August 21, 2012 (the "Expander Incident"). (*Id.* at ¶¶ 8, 14, 16).

After purchasing the Expander, Yara Belle retained Dresser–Rand to "disassemble, overhaul and reassemble the Expander as well as its rotor and spare rotor assembly." (Statement of Claim ¶ 9). Yara Belle alleges that in 2009, a particular rotor (referred to as "Rotor A" in the Statement of Claim) was removed and "inspected and repaired" by Dresser–Rand. (*Id.* at ¶ 10). The spare rotor ("Rotor B") was put into service

from 2009 until July 2012, while Rotor A was stored as a spare after Dresser–Rand inspected it and reported that the first- and second-stage disc assemblies in Rotor A were "okay to reuse." (*Id.* at ¶¶ 10–13). Rotor A was reinstalled in the Expander in July 2012 and the Expander went back into service "at the end of July 2012." (*Id.* at ¶ 13). Yara Belle alleges that on August 21, 2012, the Expander experienced a "catastrophic failure" leading to a fire at the plant. (*Id.* at ¶¶ 14–17).

The Statement of Claim alleges $32 million (CAD) in damages—$13 million for alleged "property damage" and $19 million for alleged "business interruption damages"— related to the Expander Incident. (Statement of Claim ¶¶ 27–28). Yara Belle asserts three claims. Two are asserted solely against Dresser–Rand—specifically, for negligence and breach of contract related to Dresser–Rand Canada's servicing of the Expander. (*Id.* at ¶¶ 29–33). The other claim is asserted against both Ingersoll Rand and Dresser–Rand for breach of the duty to warn with respect to stress relaxation cracking in the rotor disc's steel alloy. (*Id.* ¶¶ 18–28).

**\*4** While the instant motion has been pending, Dresser–Rand and Ingersoll Rand have filed cross-claims against each other in the Canadian Action. (*See* Dkt. # 24, 25). In those cross-claims, Dresser–Rand alleges that Ingersoll Rand must indemnify it for any liability in the Canadian Action (*see* Dkt. # 24 at 3–6); Ingersoll Rand alleges that Dresser–Rand must indemnify it for any such liability (*id.* at 24–25).

**B. Procedural Background**
Plaintiffs initiated the instant action on September 8, 2014. (Dkt.# 1).

On October 3, 2014, Defendants informed the Court that they intended to move to dismiss the Complaint. (Dkt.# 9). The Court held a pre-motion conference on October 28, 2014. (*See* October 28, 2014 Conference Transcript ("Oct. 28 Tr.") (Dkt.# 15)). At the October 28 conference, the parties discussed the two obligations Ingersoll Rand could potentially owe Dresser–Rand under the EPA: (i) the duty to defend Dresser–Rand (or pay its legal fees) in the Canadian Action; and (ii) the duty to indemnify Dresser–Rand for a judgment imposed in the Canadian Action. (*See id.* at 3). In light of the arguments raised in Defendants' pre-motion letter, Plaintiffs conceded at the conference that their claim for indemnification was not ripe for adjudication. (*See id.* at 8 ("The indemnity issue clearly is premature.... We spent a lot of time with [Defendants']

arguments.... We are in agreement that it is premature to decide the duty to indemnify now.")). With respect to the defense obligation, however, Plaintiffs came to the contrary conclusion. Analogizing Ingersoll Rand's duty defend in the instant action to that of an insurer, Plaintiffs summarized their position as follows: "If the allegations give rise to *the possibility* of an indemnity obligation, then Ingersoll–Rand has to pick up the defense." (*Id.* at 5 (emphasis added)). Defendants rejoined that "the barest point of dispute between the parties, is that our contractual indemnification obligation is the same whether the loss that is being sought is defense invoices or resulting judgment. There is no separate duty to defend that is broader than the duty to indemnify." (*Id.* at 18).

Pursuant to the briefing schedule set by the Court (Dkt.# 13), Defendants moved to dismiss on December 1, 2014 (Dkt.# 17–19). Plaintiffs filed their opposition on January 7, 2015 (Dkt.# 20), and the motion was fully briefed as of the filing of Defendants' reply on January 21, 2015 (Dkt.# 21).

**DISCUSSION**

**A. Applicable Law**

**1. Motions Under Federal Rule of Civil Procedure 12(b)(1)**
"It is a fundamental precept that federal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress."

*Durant, Nichols, Houston, Hodgson & Cortese–Costa, P.C. v. Dupont,* 565 F.3d 56, 62 (2d Cir.2009) (internal quotation marks omitted). In that regard, "a district court may properly dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) if it lacks the statutory or constitutional power to adjudicate it." *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir.2005) (internal quotation marks omitted); *accord Solowski v. Metro. Transp. Auth.,* 723 F.3d 187, 190 (2d Cir.2013). A "plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000).

**\*5** In resolving a Rule 12(b)(1) motion to dismiss, "[t]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff, but jurisdiction must be shown affirmatively, and that showing [may] not [be] made by drawing from the pleadings

inferences favorable to the party asserting it." *Morrison v. Nat'l Bank Ltd., 547 F.3d 167, 170 (2d Cir.2008)* (internal citation and quotation marks omitted). Moreover, where subject matter jurisdiction is contested, a district court is permitted to consider evidence outside the pleadings, such as affidavits and exhibits. *See Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir.2000)* ("On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing."); *accord Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir.2014)* ("[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside of the pleadings, such as affidavits.").

### 2. Ripeness of a Declaratory Judgment Action

"The federal judicial power extends only to actual cases and controversies; federal courts are without jurisdiction to decide abstract or hypothetical questions of law." *E.I. Dupont de Nemours & Co. v. Invista B.V., 473 F.3d 44, 46 (2d Cir.2006).* In accordance with this principle, the Declaratory Judgment Act provides,

> [i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). Courts retain "unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995).* "But that discretion does not extend to the declaration of rights that do not exist under law.... The [Declaratory Judgment Act] is procedural only, and does not create an independent cause of action." *Chevron Corp. v. Naranjo, 667 F.3d 232, 244 (2d Cir.2012)* (internal quotation marks and citations omitted).

The words "case of actual controversy" incorporate the ripeness requirements of Article III. *See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126–27 (2007).* To be ripe for adjudication, a declaratory judgment action

> must present a real, substantial controversy, not a mere hypothetical question. Ripeness is peculiarly a question of timing. A claim is not ripe if it depends upon contingent future events that may not occur as anticipated, or indeed may not occur at all. The doctrine's major purpose is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.

**\*6** *Nat'l Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 687 (2d Cir.2013)* (internal quotation marks and citations omitted).

That a case presents an active controversy, however, does not require a court to exercise its jurisdiction under the Declaratory Judgment Act. Rather, as the Second Circuit has instructed, when assessing the appropriateness of declaratory relief, courts should consider "[i] whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and [ii] whether a judgment would finalize the controversy and offer relief from uncertainty." *Dow Jones & Co. v. Harrods, Ltd., 346 F.3d 357, 359 (2d Cir.2003).* The Second Circuit has also identified several other relevant factors, such as "[iii] whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata,' [iv] whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court, and [v] whether there is a better or more effective remedy." *Id. at 359–60; accord Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist., 673 F.3d 84, 105 (2d Cir.2012).*

### B. Analysis

*Dresser-Rand Co. v. Ingersoll Rand Co., Not Reported in F.Supp.3d (2015)*

### 1. The Matter Is Not Ripe for Adjudication

The parties agree that the issue of indemnification will only be ripe after issues of liability are resolved in the Canadian Action. (*See* Def. Br. 1–2; Pl. Opp. 1; Def. Reply 1). If, as Defendants argue, their defense obligations are coextensive with indemnification obligations under the EPA, then this entire action is premature. [3] Thus, the issue the Court must decide is whether Ingersoll Rand's defense obligations (arising under New York law or the EPA) are broader than their indemnification obligations under the EPA.

### a. The "Duty to Defend" Under New York Law

As an initial matter, the Court notes that the EPA is not an insurance policy, and Ingersoll Rand is not an insurance company. This point is not merely self-evident, but significant: Under New York law, which the parties agree governs the EPA, "[i]t is well settled that an insurance company's duty to defend is broader than its duty to indemnify. Indeed, the duty to defend is 'exceedingly broad' and an insurer will be called upon to provide a defense whenever the allegations of the complaint 'suggest ... a reasonable possibility of coverage.' " *Auto. Ins. Co. of Hartford v. Cook,* 7 N.Y.3d 131, 137 (2006) (quoting *Cont'l Cas. Co. v. Rapid–American Corp.,* 80 N.Y.2d 640, 648 (1993)); accord *Euchner–USA, Inc. v. Hartford Cas. Ins. Co.,* 754 F.3d 136, 140 (2d Cir.2014) ("In New York, an insurer's duty to defend is 'exceedingly broad' and distinct from the duty to indemnify." (quoting *Auto. Ins. Co. of Hartford* )).

The question the Court must address is whether this "exceedingly broad" duty exists outside the insurance context. This question is hardly novel; indeed, contractually indemnified parties frequently invite courts in New York to import a similarly expansive duty to defend into agreements outside the insurance context. Courts have, with few exceptions, declined this invitation. *See, e.g., Barbagallo v. Marcum LLP,* No. 11 Civ. 1358(JBW), 2012 WL 1664238, at *5 (E.D.N.Y. May 11, 2012) ("Where, as here, the contractual indemnitor is not an insurer, the indemnitor's duty to defend is substantially narrower. In such cases, the indemnitor's duty to defend its contractual indemnitee is no broader than its duty to indemnify. Since [defendant] is not an insurer, his duty to defend is coextensive with his duty to indemnify." (internal citations and quotation marks omitted)); *Inner City Redevelopment Corp. v. Thyssenkrupp Elevator Corp.,* 8 N.Y.3d 314, 315 (1st Dep't 2015) ("No finding

has yet been made as to [defendant's] negligence, and thus no determination can yet be made as to its obligation to indemnify. As an indemnitor, [defendant] is not an insurer, and in that context its duty to defend is no broader than its duty to indemnify."); *Sawicki v. GameStop Corp.,* 966 N.Y.S.2d 447, 450 (2d Dep't 2013) ("[S]ince the ... defendants are not insurers, their duty to defend was no broader than their duty to indemnify."); *DiBuono v. Abbey, LLC,* 944 N.Y.S.2d 280, 285 (2d Dep't 2012) (same); *Steuhl v. Home Therapy Equip., Inc.,* 857 N.Y.S.2d 335, 339–40 (3d Dep't 2008) (finding that the lower court "properly denied [defendant's] motion for summary judgment on its cross claim seeking indemnification and defense" where, because plaintiff was "not an insurer, its duty to defend [wa]s no broader than its duty to indemnify"). [4]

**\*7** Outside the context of insurance policies, contractual defense obligations are generally treated like any other contractual provision. That is to say, such provisions "must be strictly construed to avoid inferring duties that the parties did not intend to create." *Bank of N.Y. Tr. Co. v. Franklin Advisers, Inc.,* 726 F.3d 269, 283–84 (2d Cir.2013); *see also Viacom Inc. v. Philips Elecs. N. Am. Corp.,* 791 N.Y.S.2d 104, 104 (1st Dep't 2005) (noting that a "contract of indemnity ... [is] strictly construed"); *cf. Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co.,* 16 N.Y.3d 257, 264 (2011) ("An insurer's duty to defend is *liberally construed* and is broader than the duty to indemnify, in order to ensure an adequate defense of the insured without regard to the insured's ultimate likelihood of prevailing on the merits of a claim." (emphasis added, internal quotation marks and citations omitted)). Thus the breadth of a non-insurer's contractual defense obligations is defined solely by the terms of the contract, strictly construed.

That is not to say a contractual defense obligation cannot be broad. If a contractual defense obligation is, by its own terms, exceedingly broad, a court will not artificially circumscribe it simply because the indemnitor is not an insurer. *See, e.g., McCleary v. City of Glens Falls,* 819 N.Y.S.2d 607, 611 (3d Dep't 2006) (finding that, where "[n]othing in the broad language of the [indemnification provision] conditions the [indemnitor's] duty to defend ... on a predicate finding of fault," the indemnitee was "due the full benefit of the bargain it reached with the [indemnitor] under the clear and unambiguous terms of the [contract]"). Additionally, where an indemnitor has expressly assumed the obligation to insure, it has also assumed the concomitant duty to defend. *See*

*Thyssenkrupp,* 8 N.Y.S.3d at 315 ("[W]here ... a party gives a promise to procure insurance to protect from a certain amount of liability, ... the promising party must pay any costs, including defense costs.... In that context, [the indemnitor] is acting like an insurer, and has a broad duty to defend, as an insurer would."); *see also Travelers Prop. Cas. Corp. v. Winterthur Int'l* (" *Winterthur I* "), No. 02 Civ. 2406(SAS), 2002 WL 1391920, at *5 n. 6 (S.D.N.Y. June 25, 2002) (finding a defense obligation where indemnitor's "promise ... to defend and indemnify ... contain[ed] language most often used in insurance contracts"), *reconsideration denied, Travelers Prop. Cas. Corp. v. Winterthur Int'l* (*"Winterthur II"* ), No. 02 Civ. 2406(GWG), 2002 WL 31889569, at *4 (S.D.N.Y. Dec. 27, 2002) (noting as an alternative grounds for imposing a duty to defend that the indemnitor "was required under the [contract] to obtain insurance"). [5]

The foregoing compels the following conclusion: Under New York law, the "duty to defend" is presumed only in insurance policies; the common law imposes no such duty on contractual indemnitors more generally. Accordingly, an indemnitor's obligation to defend must emanate (if at all) from the language of the contract.

### b. A Declaratory Judgment on the Defense Obligation Is Premature

**\*8** Having reviewed the EPA and the parties' submissions, the Court concludes that the issue of whether Ingersoll–Rand is required to defend Dresser–Rand in the Canadian Action "depends upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Nat'l Org. for Marriage,* 714 F.3d at 687. The declaratory judgment action is not ripe for adjudication.

Particularly relevant to the instant action, Ingersoll Rand has agreed to "indemnify [and] defend ... Dresser–Rand ... from ... any and all ... claims ... relating to ... Products Liabilities Losses." (EPA § 8.1(a)). Standing alone, this promise could be broad enough to trigger a defense obligation in the Canadian Action. *See McCleary,* 819 N.Y.S.2d at 611. However, as Defendants point out, this provision does not stand alone. (Def.Br.14–18). It is "subject to" other limiting provisions within the EPA.

To that end, Ingersoll Rand has no obligation to defend or indemnify Dresser–Rand if the underlying claims are based on "acts or omissions ... [of Dresser–Rand] following the

Closing" (EPA § 9.10(g)); rather, the EPA provides that "the Buyers" will "indemnify [and] defend ... [Ingersoll Rand] from ... any and all Losses that they may incur arising ... as a result of the conduct of business of any member of ... Dresser–Rand ... after the Closing Date" (*id.* § 8.1(b)). These provisions of the EPA place the indemnification and defense obligations of the parties on equal footing, and there is no suggestion that the obligation to defend is any broader than the obligation to indemnify. Because the determination of the scope of both obligations is contingent upon the determination of whether Dresser–Rand's post-Closing acts or omissions are responsible for Yara Belle's losses, Ingersoll Rand's indemnification and defense obligations are equally unripe. [6]

Additionally, bearing in mind that "[r]ipeness is peculiarly a question of timing," *Nat'l Org. for Marriage,* 714 F.3d at 687, the EPA's specific provisions governing the circumstances under which defense payments may be recovered "periodically as incurred" are also worth noting. (*See* EPA § 8.1(f)). Plaintiffs allege that Defendants have breached the EPA by, *inter alia,* "refusing to reimburse Dresser–Rand for costs and attorneys' fees that it has [incurred] ... in defending the Canadian [Action.]" (Compl.¶ 45). But even if, at some later date, Ingersoll Rand is required to reimburse Dresser–Rand's defense costs associated with the Canadian Action, the EPA does not necessarily provide for reimbursement *now,* in real time as the Canadian Action proceeds. Instead, reimbursement for defense costs are provided "periodically as incurred" under the EPA only where a party "shall be entitled to indemnification." (*Id.*). Dresser–Rand's entitlement to indemnification is not evident, and the issue of whether Ingersoll Rand must provide real-time defense reimbursements, as Plaintiffs contend they must, is equally entangled in the unripe issue of indemnification.

**\*9** In sum, adjudication of Ingersoll Rand's defense obligation, which under New York law and the terms of the EPA is co-extensive with its indemnification obligation, would be premature. *Inner City Redevelopment Corp. v. Thyssenkrupp Elevator Corp.,* 913 N.Y.S .2d 29, 30 (1st Dep't 2010) ("Because there has been no showing that defendant was negligent, any order requiring defendant to defend or indemnify is premature."); *Bellefleur v. Newark Beth Israel Med. Ctr.,* 888 N.Y.S.2d 81, 84 (2d Dep't 2009) (summary judgment on defense obligation "was premature" where "triable issues of fact as to whose negligence, if any, caused the plaintiff's accident"); *Bryde v. CVS Pharmacy,* 878 N.Y.S.2d 152, 154 (2d Dep't 2009) ("It would also have been

premature for the court to have granted ... summary judgment on so much of the contractual indemnification claim as sought the provision of a defense."); *Steuhl,* 857 N.Y.S.2d at 339–40 ("[S]ummary judgment on [the] cross claim seeking indemnification and defense" was "premature ... because there ha[d] not been any finding of negligence."). [7] This action is not ripe, and it must be dismissed without prejudice. *See Novie v. Vill. of Montebello,* No. 10 Civ. 9436(CS), 2012 WL 3542222, at *16 n. 32 (S.D.N.Y. Aug. 16, 2012) ("If the case is not ripe, there is no subject matter jurisdiction, and thus no basis to issue a stay. Dismissal without prejudice is therefore the proper disposition in the ripeness context."); *Country View Estates @ Ridge LLC v. Town of Brookhaven,* 452 F.Supp.2d 142, 144 (E.D.N.Y.2006) ("[B]ecause Plaintiffs' ... claims are not ripe, I lack subject matter jurisdiction over these claims and therefore also lack grounds on which to enter a stay [.]"). [8]

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED, and Plaintiff's Complaint is dismissed without prejudice. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4254033

## Footnotes

1    The facts contained in this Opinion are drawn from Plaintiff's Complaint ("Compl." (Dkt.# 1)), and from the Declaration of Noah M. Leibowitz ("Leibowitz Decl.") and the exhibits attached thereto. Citations to the Equity Purchase Agreement (Compl., Ex. B), are referred to as "EPA § ___." For convenience, Defendants' memorandum in support of their motion to dismiss is referred to as "Def. Br."; Plaintiffs' memorandum in opposition is referred to as "Pl. Opp."; and Defendants' reply memorandum is referred to as "Def. Reply."

2    Since filing the motion, however, Ingersoll Rand has asserted a cross-claim for indemnification against Dresser–Rand in the Canadian action. *See* Background Sec. A(2), *infra.*

3    Although Plaintiffs' Complaint also includes claims for breach of contract and anticipatory breach of contract, both claims presuppose the existence of an extant defense obligation under the EPA. (*See* Compl. ¶¶ 43–49). Accordingly, the issue of whether Ingersoll Rand breached the EPA by refusing or failing to defend Dresser–Rand can only be ripe for adjudication if the Court can exercise subject matter jurisdiction over the declaratory judgment claim and decide whether such a defense obligation exists under the EPA. If the extent of the defense duty is not presently justiciable, neither is the breach of this duty.

4    Plaintiffs cite only two New York cases arising outside the insurance context to support the application of a broad duty to defend here. (Pl.Opp.6–7). *Convergent Wealth Advisors, LLC v. Lydian Holding Co.,* is inapposite, as the district court applied Delaware law. No. 12 Civ. 1199(SAS), 2012 WL 2148221, at *6 (S.D.N.Y. June 23, 2012). In *Travelers Prop. Cas. Corp. v. Winterthur Int'l,* which is discussed *infra* n. 5, the district court found a broad duty to defend where the indemnitor's "promise ... to defend and indemnify ... contain[ed] language most often used in insurance contracts." No. 02 Civ. 2406(SAS), 2002 WL 1391920, at *5 n. 6 (S.D.N.Y. June 25, 2002). Thus the district court did not find that New York law imposed a broad duty to defend; rather, it found that cases discussing insurance policies were analogous because of similarities in the breadth of the defense obligation. *See id.* ("[T]he Court looks to insurance cases to aid in construing the clause."). This Court believes that the more recent non-insurance cases decided by the Appellate Division (cited herein) provide a more useful reference point, and that the EPA's language is not so broad as to necessitate reference to the body of case law dealing with insurance policies.

5    Plaintiffs rely heavily on *Winterthur I* in their opposition. (*See* Pl. Opp. 6–7.) Further discussion of *Winterthur I* is therefore warranted. *Winterthur I* can be read as collapsing the distinction in defense obligations of insurers and indemnitors under New York law. However, a fairer reading of *Winterthur I* reveals that the district court was well aware of the traditional distinction, but decided that the particular language of the indemnity provision at issue was effectively broad enough to replicate an insurer's promise to defend. *Winterthur I,* 2002 WL 1391920, at *5 n. 6 ("Although UBS is not Park–Lane's insurer, its promise in the Lease Provision to defend and indemnify Park–Lane contains language most often used in insurance contracts; therefore, the Court looks to insurance cases to aid in construing the clause."). As the holdings of the more recent cases from the Appellate Division suggest, the difference between insurance policies and other contracts is significant under New York law. And using insurance coverage cases to interpret defense obligations outside the insurance context has not gained traction over the years. Regardless, the EPA, which, unlike an insurance policy, creates contingent indemnification and defense obligations running in both directions, does not fit the *Winterthur I* mold or resemble an insurance policy.

    *Winterthur II,* which Defendants cite (Def. Reply 5 n. 2), is also worth addressing. The procedural posture of *Winterthur II* is somewhat unusual. After the decision in Winterthur I, the indemnitor filed a motion for reconsideration—but only after the parties had consented to proceed before a magistrate judge for all purposes. Accordingly, the magistrate judge considered the motion for reconsideration of the district court's opinion. *Winterthur II,* in that it denies reconsideration, could also be read as endorsing a collapse of the distinction between defense obligations of insurers and indemnitors under New York law. The Court notes that the magistrate judge in *Winterthur II* relied on a then-recent Second Department decision in *Brasch v. Yonkers Construction Co.,* for the proposition that "a third-party defendant, which [i]s not an insurance company but a construction contractor, owe[s] a duty to defend a third-party plaintiff based on a contractual indemnification clause." *Winterthur II,* 2002 WL 31889569, at *3 (S.D.N.Y. Dec. 27, 2002) (citing *Brasch v. Yonkers Const. Co.* ("*Brasch I*"), 751 N.Y.S.2d 200, 202 (2d Dep't 2002)). As it happened, the Second Department's decision in *Brasch I* was subsequently recalled, vacated, and superseded on reargument by the Second Department. *Brasch v. Yonkers Const. Co.* ("*Brasch II*"), 762 N.Y.S.2d 626, 629 (2d Dep't 2003) ("[I]t was inappropriate to require the third-party defendant to provide a defense to the defendant third-party plaintiff in the main action since the obligation of the third-party defendant to indemnify the defendant third-party plaintiff has yet to be determined.").

6    The Court is skeptical of Defendants' contention that a similar significance inheres in Section 8.1(g), which they argue excludes indemnification of damages in the form of business interruption losses. (*See* Def. Br. 18). Defendants argue that "more than half of the damages Yara Belle seeks [i.e., the business interruption losses] ... are indisputably *not* indemnifiable under the EPA under *any* circumstances." (*Id.* (emphases in original)). While such a limitation would certainly reduce Ingersoll Rand's exposure to a judgment in the Canadian Action, it is difficult to image a scenario in which this limitation would prove dispositive of Ingersoll Rand's defense obligation. It would be a bizarre occurrence if "Yara Belle [were] awarded only business interruption damages in Canada" and awarded none of the $19 million in alleged property damages, yet that is the only scenario under which Section 8.1(g) could impact Ingersoll Rand's defense obligation. One would expect that the type of fire that could interrupt business would damage some property along its way.

    Along the same lines, Defendants make much of the EPA's provision of a putative indemnitor's *"Opportunity* to Defend," and the procedures by which the putative indemnitor may *"elect*[ ] ... to assume the defense." (EPA § 8.1(e) (emphases added)). The Court is not convinced that Section 8.1(e) modifies the indemnitor's obligation (if any) to pay defense costs that may exist under Sections 8.1(a) and 8.1(b); instead Section 8.1(e) appears to implicate the indemnitor's option under the EPA to take control of litigation strategy and select counsel. Put simply, even if an indemnitor declines this "opportunity" to defend under Section 8.1(e), Sections 8.1(a) and Section 8.1(b) may still require the indemnitor to foot the bill for a defense.

7    Plaintiffs cite *Convergent Wealth* for the proposition that defense obligations—unlike indemnification obligations—remain ripe for adjudication while a third-party action is still pending. (Pl. Opp. 7–8 (citing

*Convergent Wealth,* 2012 WL 2148221, at *6)). Significantly, the district court in *Convergent Wealth* applied Delaware law to reach the conclusion that the "duty to defend and duty to indemnify obligations must be examined separately." 2012 WL 2148221, at *6 (citing *LaPoint v. AmerisourceBergen Corp.,* 970 A.2d 185, 197 (Del.2009)). This is not so under New York law. *See* Analysis Sec. B(1)(a), *supra.* Accordingly, the reasoning that led the district court in *Convergent Wealth* to dismiss the indemnification claims applies here to foreclose as unripe the defense obligation claims.

8   Even were the Court permitted to exercise subject matter jurisdiction over this matter, it would be reluctant to do so. The Second Circuit has previously recognized the concept of "prudential ripeness," pursuant to which a court should consider "[i] whether an issue is fit for judicial decision and [ii] whether and to what extent the parties will endure hardship if decision is withheld." *Simmons v. I.N.S.,* 326 F.3d 351, 359 (2d Cir.2003) (citing *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49 (1967)). The doctrine functions "to enhance the accuracy of the [ ] decision[ ] and to avoid becoming embroiled in [an] adjudication [ ] that may later turn out to be unnecessary or may require premature examination of ... issues that time may make easier or less controversial." *Id.* at 357; *see generally* *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,* 725 F.3d 65, 110 (2d Cir.2013). The Supreme Court recently noted that prudential justiciability doctrines of this type, however, are "in some tension with ... the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List v. Driehaus,* 134 S.Ct. 2334, 2346–47 (2014) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 134 S.Ct. 1377, 1386 (2014)). The Supreme Court declined to "resolve the continuing vitality of the prudential ripeness doctrine in this case because the 'fitness' and 'hardship' factors are easily satisfied here," *id.,* and the Second Circuit has not spoken further on the issue. Given this uncertainty, the Court has focused on the constitutional ripeness analysis.

In any event, declining declaratory relief at this stage is appropriate in light of the factors set forth in *Dow Jones.* With respect to the first two factors, the Court is not convinced at this stage that a declaration regarding defense obligations in the Canadian Action would serve a useful purpose in settling the legal issues between the parties, finalize the controversy between the parties, or offer relief from uncertainty. *Dow Jones,* 346 F.3d at 359. Because the indemnification and defense obligations are co-extensive, the Court would simply be making a best guess as to whether Ingersoll Rand will eventually need to reimburse Dresser–Rand for defense costs. A later finding as to liability in the Canadian Action could be in tension with the declaration by this Court, and engender further disputes. Consideration of the third and fifth *Dow Jones* factors (whether the proposed remedy is being used merely for "procedural fencing," or whether there is a better or more effective remedy), fails to tilt the scales in either direction. The parties agree that, under the forum selection clause, a court located within the Southern District of New York will eventually decide issues relating to defense and indemnification obligations under the EPA. (*See* Pl. Opp. 10; Def. Reply 9; *see generally* EPA § 9.14). In other words, the request for declaratory relief—although ill-timed—is not improper. Finally, the Court notes that the fourth *Dow Jones* factor weighs against the entertainment of a declaratory judgment suit at this juncture. To the extent the instant action were to proceed to discovery, the very issues the Court would need to decide to determine Ingersoll Rand's defense obligation would be the same issues regarding fault that are under consideration in the Canadian Action and are (as far as the Court can tell) governed by Saskatchewan law. There is, therefore, a risk that this Court's resolution of the defense obligation issue would create friction between sovereign legal systems and improperly encroach on the domain of a foreign court.

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by NuMSP, LLC v. St. Etienne, S.D.N.Y., May 22, 2020

2000 WL 959721
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Shimon Y. KATZ, et al., Plaintiffs,

v.

BERISFORD INTERNATIONAL PLC, Defendant.

No. 96 Civ. 8695(JGK).
|
July 10, 2000.

*OPINION AND ORDER*

KOELTL, J.

**\*1** In this diversity action, the plaintiffs, Shimon Y. Katz ("Katz"), Bomar Resources Holdings, Inc. ("BRHI"), and Bomar Resources Inc. ("Bomar Resources"), alleged that the defendant, Berisford International PLC ("Berisford"), breached the terms of a contract that provided for indemnity. The underlying facts and the contentions of the parties are set forth in the Court's prior decision, *Katz v. Berisford,* No. 96 Civ. 8695, 1998 WL 684481 (S .D.N.Y. Sept. 30, 1998), familiarity with which is assumed.

The action was tried to a jury. At the end of the plaintiffs' case, the defendant moved for judgment as a matter of law pursuant to Rule 50(a)(1) of the Federal Rules of Civil Procedure. The Court reserved decision pending completion of the evidence. The Court continued to reserve after the evidence was complete, and the case was sent to the jury. The jury rejected the claims of Mr. Katz and Bomar Resources, but returned a verdict in favor of BRHI, finding the defendant liable to BRHI in the amount of $1,800,024.80 plus 50% of certain future costs, expenses and damages. With respect to the verdict in favor of BRHI, the defendant timely renewed its motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. The defendant has explicitly not moved for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure.

I.

The standards for granting a Rule 50 motion are well established. In ruling on a motion for judgment as a matter of law, the district court must deny the motion "unless, viewed in the light most favorable to the nonmoving party, 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." ' *Cruz v. Local Union Number 3 of the International Brotherhood of Electrical Workers,* 34 F.3d 1148, 1154–55 (2d Cir.1994) (quoting *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970)). "In other words, there must be either an utter lack of evidence supporting the verdict, so that the jury's findings could only have resulted from pure guess-work, or the evidence must be 'so overwhelming that reasonable and fair-minded persons could only have reached the opposite result." ' *Doctor's Associates, Inc. v. Weible,* 92 F.3d 108, 112 (2d Cir.1996) (quoting 🚩 *Baskin v. Hawley,* 807 F.2d 1120, 1129 (2d Cir.1986)).

II.

A.

The defendant moves for judgment as a matter of law on several grounds. First, the defendant asserts that it was impossible for the jury rationally to conclude that the indemnity rights under which BRHI recovered, contained in Clause 10 of the so-called U.S. Agreement, had been validly assigned to BRHI. The defendant argues that the indemnity rights contained in Clause 10 were not validly assigned because they were not assignable. The defendant relies on the fact that Clause 10, unlike certain other provisions of the U.S. Agreement, did not expressly permit assignment, and on the testimony of Patrick O'Connor that the parties did not intend for the rights under Clause 10 to be assignable. *See* Def. Mem., at 5–7; *Katz v. Berisford Int'l PLC,* No. 96 Civ. 8695, Trial Transcript ("Tr."), at 531.

**\*2** Under English law, which the parties agree governs the U.S. Agreement, the issue of whether the right to indemnification was assignable is resolved by determining whether the parties to the agreement intended that the right to indemnification be assignable. The parties' intent is an objective fact that is generally to be found by looking at the words of the written contract taken as a whole. *See* 1 *Chitty*

Katz v. Berisford Intern. PLC, Not Reported in F.Supp.2d (2000)
2000 WL 959721

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 42 of 62

*on Contracts* §§ 12–039, 12–040, 12–053, 12–060 (27th ed.1994) (hereinafter *"Chitty"* ). The jury was instructed on the law to be applied to determine whether the indemnity was assignable and whether it had actually been assigned. The defendant does not contend that the instructions were in any way improper, and there was ample evidence to support the jury's verdict.

Here, the U.S. Agreement was received into evidence, *see* PX 3, and the jury had the opportunity to review its contents. There is nothing in the agreement that expressly prevented the assignment of the indemnity rights contained in Clause 10. Moreover, Clause 4 explicitly permitted the assignment of the representations and warranties listed in the Fourth Schedule to the U.S. Agreement, including the representation and warranty that "[t]here are no actions, suits, claims or legal, administrative or arbitration proceedings or investigations ... pending or threatened against or involving the Company which, in the aggregate, could have a material adverse effect upon the condition, business prospects or financial affairs of the Company and the Subsidiaries (considered as a whole)." PX 3, at 62. It would be reasonable for this representation and warranty to be guaranteed by an indemnification provision in the event it proved false. On this basis alone, inasmuch as the indemnity rights contained in Clause 10 specifically concerned "litigation and/or arbitration proceedings brought against the Company," the jury could rationally have concluded, in light of the expressly assignable representation and warranty contained in Clause 4, that the parties intended the indemnity rights under Clause 10 to be assignable.

The rationality of such a conclusion is also supported by evidence extrinsic to the U.S. Agreement. Evidence introduced at trial supported a conclusion that Berisford continued to pay under the indemnity contained in Clause 10 even after it learned that BRHI had acquired Bomar Resources from its original purchaser, Bomar Holdings, Inc. ("Bomar Holdings"). *See, e.g.,* PX 27; PX 38; Tr. 59–60, 62–63, 91–92, 112–15, 235, 477–85. Moreover, evidence was introduced at trial from which it could reasonably be inferred that Patrice Klein ("Klein"), a signatory to the U.S. Agreement, believed the indemnity rights to be assignable. *See* PX 26, at 1–2; PX 30, ¶ 1(a); PX 31, ¶ 2(e). Finally, the jury was entitled to disbelieve the arguably self-interested testimony of Mr. O'Connor, a Berisford executive. Therefore, the jury's conclusion that the parties intended the rights contained in Clause 10 to be assignable is neither unreasonable nor devoid of evidentiary support.

B.

**\*3** Berisford next contends that as a matter of law BRHI may not enforce the indemnity rights under Clause 10, even if those rights were assignable, because Bomar Holdings, BRHI's predecessor-in-interest, materially breached the U.S. Agreement, thereby terminating Berisford's obligations under the agreement. In particular, Berisford asserts that Bomar Holdings contravened Clause 20 of the U.S. Agreement by paying a $3 million dividend and by winding up its affairs without, as required by the Eleventh Schedule, first obtaining Berisford's written consent while Berisford was owed money due under the U.K. Agreement, one of three agreements to which the Eleventh Schedule expressly refers. *See* Def. Mem., at 7–11; PX 3, at 105.

BRHI does not dispute the fact that Bomar Holdings failed to obtain Berisford's written consent to the payment of the dividend by Bomar Holdings and to the subsequent liquidation of Bomar Holdings despite being required to do so under Clause 20 and the Eleventh Schedule of the U.S. Agreement. BRHI contends, however, that the jury could reasonably conclude that the failure to obtain such consent was not a material breach of the agreement. Materiality is a question of fact to be determined by the jury, and the defendant does not dispute that the jury was properly instructed on the meaning of materiality.

A rational jury could determine that no material breach had occurred. The amount still owed to Berisford at the time that the dividend was paid and at the time that Bomar Holdings was liquidated was £150,000, or 3% of the £ 5,000,000 Total Consideration that was to be paid Berisford. *See* PX 3, at 82; PX 4, at 22; PX 5, at 115; DX E, at 3; Tr. 537–40. The apparent purpose of Clause 20 and the Eleventh Schedule was to preserve the assets of Bomar Holdings to ensure that Berisford would receive the money that it was due. The evidence showed that Berisford did in fact receive the money owed it. *See* DX E, at 3. There was no evidence that Berisford suffered any harm as a result of Bomar Holdings' failure to obtain its written consent or that it was ever at risk that any material portion of the purchase price would not be paid. Under these circumstances, it cannot be said that the only reasonable conclusion allowed by the evidence is that a material breach had occurred. [1]

Katz v. Berisford Intern. PLC, Not Reported in F.Supp.2d (2000)

2000 WL 959721

Moreover, the jury was entitled to credit Mr. Katz's testimony that in December 1989 he informed Berisford, although perhaps only orally, of his intent to restructure Bomar Holdings. *See* PX 26; PX 51; Tr. 59, 69–70, 235. There is no dispute that Berisford continued to pay under the indemnity after December 1989. *See, e.g .,* PX 37–39, PX 42, PX 44; Tr. 59–60, 63, 91–92, 118–21, 131, 136–40, 477–78. Thus, even if the failure to comply with Clause 20 were a material breach, the jury could rationally conclude that such a breach had been waived by Berisford. *See Chitty* §§ 24–002, 24–003, 24–005. Berisford does not dispute that the jury was correctly instructed on the principle of waiver.

### C.

**\*4** Berisford argues that BRHI may not recover with respect to the so-called Sierra Rutile Limited ("SRL") matters because the expenses and liabilities for which BRHI would be indemnified are the result of fraud that was committed by Mr. Katz. Under English law, an indemnity against the expenses and liabilities that result from the deliberate commission of a crime or fraud generally may not be enforced by the wrongdoer, either directly or indirectly. *See Askey v. Golden Wine Co. Ltd.,* [1948] 2 All E.R. 35, 38H; *Chitty* § 16–146; 20 *Halsbury's Laws of England* § 359 (4th ed. reissued 1993). Because Mr. Katz is the sole shareholder of BRHI, *see* Tr. 174, recovery by BRHI ultimately redounds to Mr. Katz's benefit. Thus, BRHI may not recover for the SRL matters if Mr. Katz were guilty of the wrongdoing that gave rise to the expenses and liabilities associated with the SRL matters.

To support its contention that Mr. Katz had committed the wrongdoing that gave rise to the expenses and liabilities associated with the SRL matters, Berisford relies primarily upon an arbitration award, subsequently confirmed by Judge Keenan, that found Bomar Resources had committed fraud and racketeering. *See Sierra Rutile Ltd. v. Bomar Resources, Inc.,* No. 90 Civ. 0835 (S.D.N.Y. Aug. 25, 1992); *Sierra Rutile Ltd. v. BRINC Ltd.,* No. 13–199–0098–90 (A.A.A. March 27, 1992); Def. Mem., at 12–15. However, Mr. Katz was not a party to the arbitration and the arbitration award was not binding upon him. Moreover, there is evidence in the record from which the jury could rationally conclude that the wrongdoing that gave rise to the SRL expenses and liabilities was committed by Michael Lobel, a former associate of Mr. Katz, rather than by Mr. Katz.[2] *See* DX C, at 13–15; Tr. 49, 51–53, 197–99, 222, 325–26, 655–56, 671. In any event, the jury was entitled to credit Mr. Katz's sworn denials

of wrongdoing and conclude that the defendants had failed to prove that he was guilty of fraudulent conduct. Thus, it cannot be said that the evidence was so overwhelming that reasonable and fair-minded persons could only have concluded that Mr. Katz committed the wrongdoing that gave rise to the SRL expense and liability.

### D.

The jury awarded BRHI fifty percent of any future costs, expenses and damages arising from the so-called Brazilian Friendship litigation. Berisford argues that BRHI may not recover with respect to the Brazilian Friendship litigation because the costs, expenses and liabilities for which BRHI would be indemnified are the result of an intentional tort committed by Mr. Katz. Under English law, an indemnity against the expenses and liabilities that result from the commission of an intentional tort may not be enforced, either directly or indirectly, by the person who committed the tort. *See Chitty* § 16–148; G.H. Treitel, *The Law of Contract* 383–84 (8th ed.1991). Because Mr. Katz is the sole shareholder of BRHI, *see* Tr. 174, recovery by BRHI ultimately benefits Mr. Katz. Thus, BRHI may not recover for the Brazilian Friendship litigation if it were proven that Mr. Katz had committed the tortious interference with contract that gave rise to the Brazilian Friendship litigation.

**\*5** During the course of the Brazilian Friendship litigation, Bomar Resources was found liable at trial for tortious interference with contract. *See* 📙 *International Minerals & Resources v. Pappas,* 96 F.3d 586 (2d Cir.1996).[3] Without citation to the record, Berisford asserts that the evidence adduced in this trial "establishes that Katz and no one else at Bomar Resources committed the intentional wrongful acts that led to the *Brazilian Friendship* action." Def. Mem., at 17. There is, however, no merit to this assertion. First, the Court of Appeals decision makes clear that the liability of Bomar Resources for tortious interference with contract rested on a theory of vicarious liability for the actions of Richard Jaross, not those of Mr. Katz. *See* 📙 *International Minerals & Resources,* 96 F.3d at 594 (quoting trial court's jury instruction that "[p]laintiffs' claim that Bomar's interference with the contract was through its agent Jaross"). Second, Mr. Katz, who testified that he was not intimately involved with the Brazilian Friendship matter, categorically denied any wrongdoing in connection therewith. *See* Tr. 57, 61–62. Thus, there is ample evidence in the record from which the

Katz v. Berisford Intern. PLC, Not Reported in F.Supp.2d (2000)

2000 WL 959721

jury could rationally conclude that the costs, expenses and damages arising from the Brazilian Friendship litigation were not the result of an intentional tort committed by Mr. Katz.

Berisford contends that BRHI cannot recover any damages for the Brazilian Friendship litigation because the public policy of New York would prevent such recovery. It is undisputed that English law is the substantive law that governs the U.S. Agreement. Berisford contends, however, that New York public policy bars indemnification for liability arising from an intentional tort, and that therefore, because New York provides the forum for this action, BRHI may not be indemnified for any liability relating to the Brazilian Friendship litigation inasmuch as that liability arises from tortious interference with contract, an intentional tort. BRHI has agreed that it will not seek indemnification for any punitive damages arising from the Brazilian Friendship litigation. *See Katz v. Berisford,* No. 96 Civ. 8695, Hearing, at 26 (S.D.N.Y. May 26, 2000). To the extent that this argument is directed against indemnification for punitive damages, the argument is moot. Berisford, however, argues that under New York public policy BRHI may not be indemnified for any liability arising from an intentional tort, regardless of whether that liability is for punitive or compensatory damages. Berisford misconstrues New York law. New York public policy does not under all circumstances preclude indemnification for compensatory damages awarded in connection with an intentional tort. In 📄 *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,* 642 N.E.2d 1065 (N.Y.1994), the plaintiff, who had issued an insurance policy to the defendant, sought a declaration that it was under no duty to indemnify the defendant, who had been found liable for slander, an intentional tort, in two out-of-state actions. The New York Court of Appeals held that the plaintiff was obligated to indemnify the defendant to the extent that the defendant's liabilities, although denominated "punitive damages" under the applicable foreign law, might have been considered compensatory damages under New York law. Thus, New York public policy does not automatically preclude indemnification for compensatory damages arising from an intentional tort. *See id.,* at 1068 ("[O]nly when the damage award is of a 'punitive nature' is indemnification precluded by New York policy. On the record before us, it appears that the damages awarded ... also had a compensatory purpose and plaintiff must indemnify its insured for them."). BRHI may therefore be indemnified for liabilities arising from the Brazilian Friendship litigation to the extent that those liabilities represent compensatory damages.

E.

**\*6** Berisford next argues that BRHI may not enforce the indemnity, which would benefit Mr. Katz as BRHI's sole shareholder, because it was obtained, if at all, through Mr. Katz's theft and fraud. *See* Def. Mem., at 18. It is a principle of English law that no person can obtain or enforce, directly or indirectly, any rights resulting to him from his own crime or fraud. *See Chitty* § 16–142. Thus, if the right to indemnity was obtained by Mr. Katz's theft or fraud, BRHI would indeed be barred from recovering under the indemnity. According to Berisford, "[t]he record at trial establishes that plaintiff Katz acquired Bomar Resources and Bomar Holdings," the original holder of the indemnity, "through the theft of Bomar Resources assets that he and his partner Michael Lobel wrongfully siphoned out of Bomar and kept entirely off the books of Bomar Resources." Def. Mem., at 18.

There is, however, evidence in the record that would allow the jury rationally to conclude that Mr. Katz had not used theft and fraud to acquire Bomar Resources and Bomar Holdings. Mr. Katz testified that various Berisford executives as well as Mr. Klein, the previous owner of Bomar Resources and Bomar Holdings, were aware of the rebate scheme that accounted for more than half of the allegedly siphoned funds. Mr. Katz, who generally denied siphoning funds from Bomar Resources and specifically denied that he had forged an invoice as part of the alleged siphoning effort, further testified that others besides himself directed the transfer of Bomar Resources funds to various foreign accounts. Finally, Mr. Katz testified that the financing of his acquisition of Bomar Resources and Bomar Holdings was handled by his lawyers and that he was not involved in the details. *See* Tr. 43–44, 46, 52–54, 66–69, 180–81, 194, 196, 199–200, 204–15, 219–20, 27273, 325–27. This testimony, which the jury was entitled to credit, is evidence from which the jury could rationally conclude that the indemnity had not been acquired through theft or fraud by Mr. Katz.

F.

Berisford argues that even if the indemnity were properly assigned and not acquired by theft or fraud BRHI is not entitled to indemnification for costs associated with the Dale action and the Hyosung arbitration because BRHI breached Clause 10(b) of the U.S. Agreement, which required that Berisford be kept fully informed of all material developments

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 45 of 62

Katz v. Berisford Intern. PLC, Not Reported in F.Supp.2d (2000)

2000 WL 959721

in any legal proceedings involving Bomar Resources. BRHI does not dispute that it breached Clause 10(b) with respect to the Dale action and Hyosung arbitration. BRHI argues, however, that the jury was entitled to conclude that the breach was not material. Given that Berisford offered no evidence that it was in any way harmed by the breach, that the litigation was conducted in a less than optimal way, or that Berisford would have done anything differently had it been advised of any developments, it cannot be said that the only conclusion a reasonable person would have reached is that a material breach had in fact occurred.

**\*7** Berisford also contends that prior to trial it had already paid $109,000 of the approximately $142,000 for which BRHI seeks indemnification in connection with the Hyosung arbitration. *See* PX 75; Tr. 522. The plaintiff concedes that the jury award should be reduced by $109,000 and agrees to accept an award of $33,000 in damages for the Hyosung matter. *See Katz v. Berisford,* No. 96 Civ. 8695, Hearing, at 23–24 (S.D.N.Y. May 26, 2000).

### G.

The U.S. Agreement provides that it "shall be governed by and construed in accordance with English law." PX 3, ¶ 18(A), at 22. In contrast to the "American Rule," under which each party to a litigation bears its own costs, *see generally* Aleyska Pipeline Service Co. v. The Wilderness Society, 421 U.S. 240, 247–62 (1975), under the "English Rule," the prevailing party may recover at least some of its costs, including attorneys' fees, from the losing party. *See generally* Bensen v. American Ultramar Ltd., No. 92 Civ. 4420, 1997 WL 317343, at \*7–9 (S.D.N.Y. June 12, 1997). Here, the jury awarded BRHI the very modest amount of $36,626.10 in damages arising from the current action.

Berisford does not dispute the reasonableness of the costs awarded but maintains that BRHI is not entitled to recover the costs of this action. The U.S. Agreement is silent as to the issue of attorney's fees arising from the enforcement of the agreement. Berisford argues that, in the absence of a contractual provision expressly allowing the recovery of attorneys' fees, the American Rule should be applied as the procedural law of the forum in which this action was brought.

In a diversity action such as this, a federal court follows federal procedure but applies the substantive law of the state

in which it sits. *See* Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). For purposes of *Erie* analysis, attorneys' fees are considered substantive and are therefore controlled by state law in diversity cases. *See* Bensen, 1997 WL 317343, at \*13; Whiteside v. New Castle Mut. Ins. Co., 595 F.Supp. 1096, 1100 (D.Del.1984); *see also* Alyeska, 421 U.S. at 259 n. 31. Thus, the dispositive question is whether BRHI is entitled to recover attorneys' fees under New York law.

New York follows the American rule and does not allow the prevailing party to recover its attorneys' fees unless there is a specific statutory or contractual right to such fees. *See* A.G. Ship Maintenance Corp. v. Lezak, 503 N.E.2d 681, 683 (N.Y.1986) (per curiam) ("Under the general rule, attorneys' fees and disbursements are incidents of litigation and the prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties or by statute or court rule."). The contract at issue in this case, however, is governed by English law and English law allows the recovery of attorneys' fees. There is, therefore, a conflict between New York law and English law. When resolving a conflict of laws in a diversity action such as this, a federal court must apply the choice-of-law principles of the forum state, in this case New York. Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496–97 (1941).

**\*8** The U.S. Agreement contains a choice-of-law clause which provides that the agreement shall be governed by the laws of England. *See* PX 3, ¶ 18(A), at 22. Where the parties to a contract have expressly agreed that the laws of a particular jurisdiction will govern that contract, New York courts will generally honor the parties' choice of law so long as the selected jurisdiction has significant contacts to the transaction. *See* International Minerals & Resources, 96 F.3d at 592 ("New York law is unambiguous in the area of express choice of law provisions in a contract. Absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction.") (internal quotations and alterations omitted); *see also* Bank Itec N.V. v. J. Henry Schroder Bank & Trust Co., 612 F.Supp. 134, 140–41 (S.D.N.Y.1985); Freedman v. Chemical Const. Corp., 372 N .E.2d 12, 15 n. \* (N.Y.1977); 19A N.Y.Jur.2d Conflict of Laws § 33 (1999). Here, there is no allegation that the U.S. Agreement is either contrary to New York public policy or a

2000 WL 959721

result of fraud. Moreover, there can be no question that there are sufficient contacts between England and the transaction governed by the U.S. Agreement: the transaction involved a sale of assets by an English company; the contract was drafted by English solicitors; and, the deal was closed in London. Under these circumstances, a New York court would honor the U.S. Agreement's choice-of-law provision.

While it is true that the U.S. Agreement does not specifically address the issue of attorney's fees, by agreeing that English law would govern the U.S. Agreement, "[i]t is as though the law of [England] were incorporated into the agreement by reference." *Freedman,* 372 N.E.2d at 15 n.. [*] English law allows the recovery of attorneys' fees by the prevailing party. Inasmuch as the parties to the U.S. Agreement incorporated English law into their agreement, the parties' agreement provides for the recovery of attorneys' fees. Although the American rule is the default rule under New York law, New York law does allow contracting parties to provide for the recovery of attorneys' fees if they so choose. *See A.G. Ship Maintenance Corp. v. Lezak,* 503 N.E.2d at 683. Given that the parties to the U.S. Agreement could have expressly provided for the recovery of attorneys' fees under New York law, the parties' choice of English law should be interpreted as encompassing the English rule that the prevailing party may recover its attorneys' fees. *See Restatement (Second) of Conflict of Laws § 187(1) (1971)* ("The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue."); *see also Boyd Rosene & Assocs., Inc. v. Kansas Municipal Gas Agency,* 174 F.3d 1115, 1126–28 (10th Cir.1999) (applying law of jurisdiction designated in contract's choice-of-law clause to attorneys' fees issue despite fact that contract did not expressly address attorneys' fees issue); *El Paso Natural Gas Co. v. Amoco Production Co.,* Civ. A. No. 12083, 1994 WL 728816, at [*]4– 5 (Del. Ch. Dec. 16, 1994) (same).

**\*9** This conclusion, that BRHI is entitled to recover attorneys' fees under New York choice-of-law analysis, is consistent with the few reported cases that have reached the issue. *See Csaky v. Meyer,* No. 94 Civ. 8117, 1995 WL 494574 (S.D.N.Y. Aug. 18, 1995) (applying English rule in contract action where contract governed by English law under New York choice-of-law principles); *cf. J. Barbour & Sons, Ltd. v. Tafico, Inc.,* Civ. A. No. 87–2609, 1989 WL 49518

(E.D.Pa. May 8, 1989) (applying English rule in contract action where contract, although silent as to attorneys' fees, contained choice-of-law clause designating English law as governing law and forum state honors parties' choice of law).

*Bensen,* 1997 WL 317343, which is in any event not controlling, does not dictate a contrary result. In *Bensen,* the party seeking attorneys' fees had prevailed on a statutory counterclaim under the English Companies Act. *See id.,* at [*]6. Here, by contrast, BRHI prevailed on a contract claim. The *Bensen* court distinguished both *Csaky* and *J. Barbour,* noting that they were "decided pursuant to contracts involving English law" and were therefore "entirely different" from *Bensen. Bensen,* 1997 WL 317343, at [*]10. Insofar as the verdict in this case was returned on a contract claim brought under English law, this case is more like *Csaky* and *J. Barbour* than *Bensen.* Moreover, here, in contrast to *Bensen,* the application of the English rule "would be wholly [ ] consistent with the parties' justified expectations." *Id.,* at [*]9. Not only did the U.S. Agreement contain a choice-of-law clause that designated English law as the law to govern the agreement, but both the Complaint and the Joint Pretrial Order put Berisford on notice that the plaintiffs were seeking attorneys' fees. *See* Amended Complaint ¶ 35; Amended Joint Pretrial Order, at 17. [4]

Because New York law would honor the choice-of-law provision contained in the U. S. Agreement, *see International Minerals & Resources,* 96 F.3d at 592, and because that provision has the effect of incorporating English law by reference, *see Freedman,* 372 N.E.2d at 15 n., [*] BRHI is, in accordance with the English rule and New York choice-of-law principles, entitled to recover attorneys' fees.

### H.

Finally, Berisford argues that there was insufficient evidence from which the jury could reasonably conclude that the SRL matters were included within the Clause 10 indemnity as amended by Addendum No. 1 in April 1989. This assertion is without merit. Clause 3(C) of Addendum No. 1 limited the scope of the indemnity to matters listed in an attached Schedule. The Schedule contains, among other things, a reference to "an ongoing dispute between Bomar Resources and Nord Resources." Memorandum for William P. Karon, dated September 6, 1988, attached as part of Schedule to

Katz v. Berisford Intern. PLC, Not Reported in F.Supp.2d (2000)

2000 WL 959721

Addendum No. 1 (PX 6). It was this dispute that matured into the SRL arbitration and litigation. While it is true that the dispute had not yet ripened into formal arbitration and litigation as of the signing of Addendum No. 1, the jury could reasonably conclude that the reference to the dispute contained in the Schedule attached to Addendum No. 1 brought the SRL matters within the scope of the indemnity.

 **\*10** Moreover, Clause 4 of Addendum No. 1 provided that "[n]othing in this Agreement shall affect the liability under the agreement of ... [Berisford] ... in respect of any costs, claims, expenses, liabilities whatsoever that may arise due to any action, omission or activity in each case of an illegal or fraudulent nature in relation to or affecting [Bomar Resources] ... prior to 31st July 1988." Addendum No. 1, PX 6, at 3. Mr. O'Connor testified that he knew of no allegations of fraud against Bomar Resources other than those alleged in the SRL arbitration and litigation. *See* Tr. 411–12. Given the unambiguous language of Clause 4, the testimony of Mr. O'Connor, and the reference to the dispute with Nord contained in the Schedule, the jury could reasonably conclude on the basis of the evidence before it that the parties intended for the indemnity to cover the SRL matters.

While BRHI could not recover under the indemnity if it had been proven that Mr. Katz, BRHI's sole shareholder, had committed the fraud alleged in the SRL matters, there is, as discussed above, an evidentiary basis upon which the jury could reasonably find that the fraud was not committed by Mr. Katz. Under these circumstances BRHI is not barred from indemnification for Bomar Resources' liabilities in the SRL matters. While a person who commits fraud may not be indemnified against liabilities arising from such fraud, nothing prevents an innocent party from being indemnified against the liabilities arising from the fraud of another.

CONCLUSION

For all of the foregoing reasons,[5] the defendant's motion is denied except insofar as BRHI agrees to accept an award of $33,000 in damages for the Hyosung arbitration and agrees not to seek indemnification for punitive damages arising from the Brazilian Friendship litigation.

BRHI is directed to submit a proposed Judgment by July 14, 2000 together with any supporting memorandum of law and detailed calculations for any requested pre-judgment interest. The defendant may submit any counter proposal and supporting materials by July 21, 2000.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 959721

---

**Footnotes**

1    Berisford argues that the U.S. Agreement established a $75,000 materiality threshold, and that therefore it was necessarily a material breach when the plaintiffs failed to obtain Berisford's written consent to the payment of the dividend and to the liquidation of Bomar Resources when £150,000 (or roughly $227,000 at the current exchange rate) of the total consideration remained outstanding. *See* Def. Mem., at 9; PX 3, at 84. This argument is, however, unavailing. Materiality is a question of fact for the jury to decide, and the defendant does not dispute the correctness of the jury instructions. Thus, the $75,000 threshold was not binding on the jury, which was, as the finder of fact, free to determine whether a given breach was material in light of all the circumstances. Moreover, the $75,000 threshold was the threshold set for the *seller's* representations and warranties. It did not apply to the alleged breaches of the purchaser's obligations under the Eleventh Schedule and was thus not directly relevant to the issue of the materiality of an alleged breach of that Schedule.

2    Although Mr. Lobel did not appear as a witness, portions of testimony that he gave at a deposition were read into the record at trial. *See* Tr. 667–96. The jury was entitled to question Mr. Lobel's credibility given his repeated failure to recall relevant details.

3    The Court of Appeals affirmed Bomar Resources' liability, but remanded for retrial as to the liability of certain other defendants and as to the amount of damages. In a separate trial held after the conclusion of this trial,

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 48 of 62

Katz v. Berisford Intern. PLC, Not Reported in F.Supp.2d (2000)

2000 WL 959721

Bomar Resources was held liable in the amount of $19.5 million in compensatory damages and $5 million in punitive damages. *See International Minerals & Resources v. Pappas,* No. 87 Civ. 3988, Verdict Form, at 4 (S.D.N.Y. Sept. 15, 1999), attached as Ex. 2 to Affidavit of Howard R. Hawkins, dated October 1, 1999. The parties advised this Court at argument on the current motion that those amounts were substantially reduced by the trial court and that the judgment is now on appeal.

4      *Bensen* expressly relied upon Judge Friendly's choice-of-law analysis in *Conte v. Flota Mercante Del Estado,* 277 F.2d 664, 672 (2d Cir.1960). *See Bensen,* 1997 WL 317343, at [*]13–14. That analysis, however, was in the context of an admiralty torts case, not a contracts case, and Judge Friendly therefore did not have occasion to consider the appropriate choice-of-law analysis to be applied under New York law to the issue of attorneys' fees in the face of a contractual choice-of-law clause. New York applies different choice-of-law principles in contract cases than in tort cases, particularly where the contract at issue contains a choice-of-law provision. *See Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1539 n. 5 (2d Cir.1997); *Robins v. Max Mara, U.S.A., Inc.,* 923 F.Supp. 460, 465 (S.D.N.Y.1996); *see also* 19A N.Y.Jur.2d Conflict of Laws § 2 (1999) ("In a conflict of laws situation, a court must determine at the outset whether the problem brought before it for a solution relates to torts, contracts, property, or some other field, or to a matter of substance or procedure, in order to refer to the appropriate law."). Here, the relevant choice-of-law analysis is the New York choice-of-law analysis which is appropriate to contracts cases.

5      The Court has considered all of the arguments raised by the parties and any argument not expressly addressed above is either moot or without merit.

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Lafarge Canada Inc. v. American Home Assurance Company, Not Reported in Fed....

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 49 of 62

KeyCite Yellow Flag - Negative Treatment
Distinguished by Stoncor Group, Inc. v. Peerless Insurance Company,
S.D.N.Y., August 15, 2018

2018 WL 1634135
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

LAFARGE CANADA INC. and Lafarge
North America, Inc., Plaintiffs,

v.

AMERICAN HOME ASSURANCE COMPANY,
AIG Insurance Company of Canada, and
Lexington Insurance Company, Defendants.

No. 15-CV-8957 (RA)
|
Signed 03/31/2018

**Attorneys and Law Firms**

Abdirashid Aidid, Jonathan David Cohen, Neil Kenneth
Roman, Albert Lewis Wells, Russell Matthew Squire,
Covington & Burling LLP, New York, NY, for Plaintiffs.

Mark D. Sheridan, Jason Francis King, Patton Boggs, LLP,
Newark, NJ, Sarah K. Rathke, Squire Patton Boggs (US) LLP,
Cleveland, OH, for Defendants.

OPINION & ORDER

Ronnie Abrams, United States District Judge

**\*1** Plaintiffs Lafarge Canada Inc. ("LCI") and Lafarge
North America, Inc. ("LNA") (collectively, "Lafarge")
bring this declaratory-judgment action against their insurers
(collectively, the "Insurers"). Lafarge is Canada's largest
provider of construction materials, and it filed this action
seeking declaratory relief with respect to the Insurers'
duty to defend and indemnify it against potential liability
from a mass tort litigation currently pending in Quebec,
Canada. Lafarge and the Insurers have now both moved for
summary judgment, each asking for declarations regarding
the Insurers' duties towards Lafarge. After reviewing the
parties' submissions and the other filings in the case, the Court
finds certain disputes to be unripe, declines to exercise its
discretionary Declaratory Judgment Act ("DJA") jurisdiction
as to the others at this time, and stays this case pending, further
developments in the underlying litigation.

**BACKGROUND** [1]

The facts underlying this action are complex and ongoing,
and they began, and will eventually end, in the Canadian
province of Quebec. A large group of Canadian plaintiffs
brought suit against parties they allege were responsible for
significant property damage to their homes. This damage
eventually prompted approximately 240 lawsuits that became
the ongoing Canadian mass tort litigation ("the Canadian
litigation" or "the underlying litigation"). Specifically, the
Canadian plaintiffs allege that concentrations of a mineral
called pyrrhotite caused defects in the concrete used to build
their homes, which in turn led to cracking and other serious
damage. The parties in the underlying litigation later came
to the consensus that oxidation of the pyrrhotite spurred the
concrete's deterioration.

The defendants in the Canadian litigation included
entities such as B&B Quarry (the alleged source of the
pyrrhotite), SNC-Lavalin (a construction company), and
other participants in the construction of the damaged homes.
In 2012, a Quebec court consolidated roughly 70 of the
lawsuits into a so-called "First Wave." None of those suits
named Lafarge—a company that primarily manufactures
and distributes cement and other construction materials—
as a defendant, and an attempt to insert Lafarge's Canadian
business, LCI, into the First Wave was unsuccessful. In other
words, Lafarge is not a party to the First Wave of the Canadian
litigation. In 2014, the Quebec court issued an approximately
$130 million judgment against the First-Wave defendants,
holding them jointly and severally liable. The Quebec court
found SNC-Lavalin liable for about 70% of the damages. All
the First-Wave defendants have appealed the judgment.

In 2012, well before the Quebec trial court rendered that
First-Wave judgment, SNC-Lavalin and one of its geologists
separately sued LCI for contribution for some of its First-
Wave liability. Shortly after the First-Wave judgment, SNC-
Lavalin expanded its claims in that suit, seeking to hold LCI
liable for contribution for the First-Wave claims not raised
in its earlier contribution action. All the contribution claims
are still pending in the Quebec court, and the First-Wave
judgment remains on appeal.

**\*2** Unfinished as those proceedings may be, they constitute
only (as their name suggests) the first wave of lawsuits
with claims relating to defective concrete in the Canadian

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 50 of 62

Lafarge Canada Inc. v. American Home Assurance Company, Not Reported in Fed....

litigation. A Quebec court is currently in the preliminary stages of consolidating the remaining lawsuits relating to the damages allegedly caused by pyrrhotite, as well as other related lawsuits that continue to be filed, into a "Second Wave." A number of the Second-Wave suits have named Lafarge as a defendant or third-party defendant. The plaintiffs in those suits contend that LCI wrongly informed one of the concrete-supplier defendants that the material containing pyrrhotite was suitable for use in concrete, that LCI failed to warn about the dangers posed by the materials, and that LCI failed to prevent the use of the materials. LCI denies all liability relating to any claims in the Canadian litigation and has not been found liable or entered into any settlement. The Quebec court has yet to set a trial date for the Second Wave.

Lafarge's North American entity, LNA, is headquartered in Virginia and is the parent company of LCI, which is headquartered in Quebec. LCI took out a number of different types of insurance policies from 2001 to 2012 from the Insurers, which include Defendants Lexington Insurance Company ("Lexington"), American Home Assurance Company ("American Home"), and AIG Insurance Company of Canada ("AIG Canada"). From April 1, 2001, to July 1, 2012, twelve consecutive "primary policies" issued by American Home and AIG Canada to LCI covered property-damage liability, applied to the first dollar of loss, and provided that the insurer would defend any suit against the insured that alleged covered damage. Notably, however, these policies were not true insurance policies, because they provided for no real transfer of risk from insured to insurer. Lafarge affiliates will reimburse American Home or AIG Canada for whatever costs those insurers are prompted to pay. The parties represent that this practice, known as "fronting," is common in commercial insurance and was used here to satisfy Canadian statutory obligations.

LCI also had genuine insurance coverage. From 2004 to 2012, LCI was provided umbrella general liability coverage by Lexington, which issued nine policies to LNA (in Virginia), and by AIG Canada, which issued two policies to LCI (in Quebec) (collectively the "umbrella policies"). Because LCI is a wholly-owned subsidiary of LNA, it is a named insured party in all 11 of the umbrella policies. The two policies issued directly to LCI were for the periods from April 1, 2004, to April 1, 2005, and from July 1, 2011, to July 1, 2012. For those periods, LCI was insured both under the policies issued to it directly and under the policies issued to LNA. The umbrella policies cover property damage, but only kick in when LCI pays more than C$2 million per occurrence for the type of

loss—not counting defense costs—covered by the policies.[2] That sum, C$2 million, is what is known as the "retained limit" of the policies. This retained limit functions, as Lafarge puts it, essentially as an insurance deductible.

American Home and AIG Canada are currently providing a defense to LCI in the Canadian litigation under the primary policies, even while they have been reserving their rights to argue that they are not obligated to do so. When Lafarge asked the Insurers to confirm that the umbrella policies covered LCI's potential liability in the Canadian litigation, the Insurers declined to provide such confirmation.

On November 16, 2015, Lafarge filed this action seeking declaratory relief. Specifically, Lafarge's complaint seeks declarations (1) that the umbrella policies cover LCI's potential liabilities relating to the Canadian litigation; and (2) that, if LCI is liable at all in the Canadian litigation, its liability constitutes a single occurrence. The Insurers answered, alleging a variety of defenses. See Dkt. 23.

**\*3** After discovery, both Lafarge and the Insurers moved for summary judgment as to declaratory relief and, at the Court's request, filed supplemental briefing in support of their motions. Lafarge argues that Quebec law applies to interpreting all the insurance policies at issue, and that the Insurers owe it a duty to defend and to indemnify it in the Canadian litigation. Relating specifically to indemnification, Lafarge further contends that the claims against it in the Canadian litigation constitute only one occurrence, that it is entitled to coverage for each claim under each triggered policy, and that it is entitled to allocate defense costs between the primary and umbrella policies. The Insurers oppose Lafarge's requested declarations and seek a number of their own. They argue that Virginia law applies to the umbrella policies issued there and that they have no duty to defend or indemnify Lafarge because a "professional services exclusion" in the policies bars all coverage. Alternatively, they argue that the exclusion for "expected or intended damage" bars most coverage, that only one umbrella policy can apply to each underlying claim, and that the umbrella policies do not cover any defense costs that Lafarge incurs before Lafarge's liability reaches the retained limit and thereby triggers the umbrella policies. The Insurers also argue that the bulk of the relief requested by Lafarge would constitute an advisory opinion ruling on matters not yet ripe for declaratory judgment because of the ongoing and unsettled state of the Canadian litigation.

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 51 of 62

Lafarge Canada Inc. v. American Home Assurance Company, Not Reported in Fed....

At the heart of this dispute is the interpretation and interaction of the primary and umbrella policies: Lafarge seeks confirmation that it will be protected by more than just the primary policies' fronting arrangement—it wants the benefit of the genuine economic-risk transfer of the umbrella policies. The Insurers want just the opposite. [3] Given the state of the underlying Canadian litigation, this Court must confront whether this case presents any ripe disputes and, if so, whether the Court should exercise its discretionary DJA jurisdiction over those disputes. Only then can the Court turn to the substance underlying the parties' summary-judgment motions.

## LEGAL STANDARDS

### I. Summary Judgment

To prevail on a motion for summary judgment, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a).* When deciding a motion for summary judgment, "a court must resolve all ambiguities and draw all reasonable inferences against the moving party." *Abrams v. RSUI Indemnity Co.,* 272 F. Supp. 3d 636, 639 (S.D.N.Y. 2017). The relevant substantive law will identify which facts are material. *Id.* "When both sides have moved for summary judgment, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.,* 595 F.3d 458, 468 (2d Cir. 2010) (internal quotation and citation omitted).

### II. Declaratory-Judgment Actions

#### A. Ripeness

Jurisdiction for declaratory-judgment actions "exists only if there is an 'actual controversy.' " *E.R. Squibb & Sons, Inc. v. Lloyd's & Companies,* 241 F.3d 154, 177 (2d Cir. 2001) (quoting *28 U.S.C. § 2201(a)*). This requirement is coextensive with the Constitution's Article III case or controversy standard. *See id.; U.S. Dep't of Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co.,* 475 B.R. 347, 357 (S.D.N.Y. 2012), "A party seeking a declaratory judgment bears the burden of proving that the district court has jurisdiction." *E.R. Squibb & Sons, Inc.,* 241 F.3d at 177. "It is well-settled that the party bearing this burden must prove that 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *Fed. Ins. Co. v. SafeNet, Inc.,* 758 F. Supp. 2d 251, 261 (S.D.N.Y. 2010) (quoting *SR Int'l Bus. Ins. Co., Ltd. v. Allianz Ins. Co.,* 343 Fed.Appx. 629, 631-32 (2d Cir. 2009)).

"In the context of an insurance dispute, a declaratory judgment action may be ripe even if the insured has not yet incurred any liability," *Id.* at 262. "That the liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action.... Indeed, litigation over insurance coverage has become the paradigm for asserting jurisdiction despite future contingencies that will determine whether a controversy ever actually becomes real." *Assoc. Indem. Corp. v. Fairchild Indus., Inc.,* 961 F.2d 32, 35 (2d Cir. 1992) (internal quotation and citations omitted). "[W]here liability is contingent, courts in this circuit traditionally examine the 'practical likelihood' that there will be some type of settlement or judgment against the insurer." *Fed. Ins. Co.,* 758 F. Supp. 2d at 262.

#### B. Discretion

**\*4** Finding that a ripe, justiciable action exists does not end the inquiry. "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.,* 515 U.S. 277, 286 (1995). "On its face, the statute provides that a court '*may* declare the rights and other legal relations of any interested party seeking such declaration.' " *Id.* (quoting *28 U.S.C. § 2201(a)*). "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.* at 288. Thus, "[e]ven where the case or controversy requirement is met—that is, even when subject matter jurisdiction exists—a court may nevertheless decline to hear a declaratory judgment action in an exercise of discretion." *Motors Liquidation Co.,* 475 B.R. at 358. District courts specifically are vested "with discretion in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp." *Wilton,* 515 U.S. at 289.

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 52 of 62

Lafarge Canada Inc. v. American Home Assurance Company, Not Reported in Fed....

In evaluating whether to exercise this "broad discretion," district courts consider a range of non-exclusive, fact-intensive factors:

> (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; ... (2) whether a judgment would finalize the controversy and offer relief from uncertainty[;] ... [ (3) ] whether the proposed remedy is being used merely for "procedural fencing" or a "race to res judicata"; [ (4) ] whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and [ (5) ] whether there is a better or more effective remedy.

*Dow Jones & Co., Inc., v. Harrods Ltd.,* 346 F.3d 357, 359-60 (2d Cir. 2003) (citations omitted). Other relevant considerations for deciding whether to exercise jurisdiction when a related proceeding is pending in another court include:

> (1) the scope of the pending state [or foreign] proceeding and the nature of the defenses available there; (2) whether the claims of all parties in interest can satisfactorily be adjudicated in that proceeding; (3) whether the necessary parties have been joined; (4) whether such parties are amenable to process in that proceeding[;] (5) avoiding duplicative proceedings; (6) avoiding forum shopping; (7) the relative convenience of the fora; (8) the order of filing; and (9) choice of law.

*TIG Ins. Co. v. Fairchild Corp.,* No. 07-CV-8250 (JGK), 2008 WL 2198087, at *2-3 (S.D.N.Y. May 27, 2008) (citations omitted). Ultimately,

> [w]hen all the lines are drawn and the terms of limitation are spelled out, and when rules of caution are put to the test, however finely the distinctions cut, what remains of the courts' demarcation of their discretionary role is a case-by-case approach circumscribed by recognition that what the statute bestows upon them is discretion, not ambitions; that a free hand does not mean free rein, and that in practice, in giving expression to the confidence Congress reposed upon them, the courts' response should be measured and orderly.

*Dow Jones & Co., Inc. v. Harrods, Ltd.,* 237 F. Supp. 2d 394, 436 (S.D.N.Y. 2002), *aff'd,* 346 F.3d 357 (2d Cir. 2003).

## DISCUSSION

The Court begins by examining whether the issues in this case constitute ripe controversies and then turns to whether the relevant factors urge the exercise of DJA jurisdiction. [4]

### I. Ripeness

The parties dispute whether Lafarge's claims for indemnification and defense under its insurance policies are ripe. "Courts often distinguish between the duty to defend and the duty to indemnify in determining whether each issue posed in a declaratory judgment action is ripe for adjudication," because the duties are usually triggered by different conditions. *See Atl. Cas. Ins. Co. v. Value Waterproofing, Inc.,* 918 F. Supp. 2d 243, 261 (S.D.N.Y. 2013). The duty to defend generally "is triggered by the filing of a lawsuit," whereas the duty to indemnify generally "is triggered by a determination of liability." *Id.* Thus, the Court addresses the issues with respect to the duty to indemnify and the duty to defend separately.

#### A. Duty to Indemnify

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 53 of 62

Lafarge Canada Inc. v. American Home Assurance Company, Not Reported in Fed....

**\*5** As explained above, ripeness requires "a substantial controversy, between parties with adverse legal interests, of sufficient immediacy and reality." *See Fed. Ins. Co., 758 F. Supp. 2d at 261*. The existence of an actual controversy "is necessarily relative and demands corresponding flexibility"; the inquiry "is one of degree, to be determined on a case by case basis." *Dow Jones & Co., Inc., 237 F. Supp. 2d at 406* (citing *Muller v. Olin Mathieson Chem. Corp., 404 F.2d 501, 504 (2d Cir. 1968)*).

In insurance cases where liability is merely contingent, there must be a "practical likelihood" that some form of judgment or settlement will be forthcoming. *Fed. Ins. Co., 758 F. Supp. 2d at 262*. More specifically, the duty to indemnify "turns not on the allegations of the complaint but on the actual liabilities as borne out by the facts." *Travelers Prop. Cas. Corp. v. Winterthur Int'l, No. 02-CV-2406 (SAS), 2002 WL 1391920, at \*6 (S.D.N.Y. June 25, 2002)*. "Where the facts on which the Court's decision depends have yet to unfold, a declaratory judgment action is 'not currently a justiciable and ripe controversy[.]' " *Id.* (quoting *Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp., 90 F.3d 671, 676 (2d Cir. 1960)*). In such situations, however, there is still a "possibility that at some future time a more complete development of the facts might lead to a different result." *Id.* (citation omitted).

"There is no *per se* rule" that underlying liability must be established before a court may rule on a declaratory action to establish the duty to indemnify. *Atl. Cas. Ins. Co., 918 F. Supp. 2d at 261*. But courts regularly require the existence of liability before exercising DJA discretion over indemnity issues. *See, e.g., FSP, Inc. v. Societe Generale, No. 02-CV-4786 (GBD), 2003 WL 124515, at \*4 (S.D.N.Y. Jan. 14, 2003)* ("Claims concerning indemnification obligations ... are not ripe for adjudication until liability has been imposed upon the party to be indemnified."). A central concern is often the level of factual investigation that a premature indemnification ruling would require. *See, e.g., All. Cas. Ins. Co., 918 F. Supp. 2d at 261* ("Courts are concerned about becoming entrenched in a factual quagmire that has yet to be resolved in the underlying litigation."). Because the duty to indemnify is contingent on the insured's liability, resolving it "often requires consideration of the factual disputes that are also at issue in the underlying action." *Id.* "[W]here the key facts can and will be established in an underlying proceeding—the lack

of ripeness is palpable." *Travelers Prop. Cas. Corp., 2002 WL 1391920, at \*6*.

Given the contentious and evolving nature of the Canadian litigation, Lafarge's indemnification controversy is not ripe at this time. Many critical threshold issues are presently unresolved. Lafarge continues to deny all liability, and the Quebec courts have yet to make factual findings on Lafarge's potential liability. No trial date has been set for the Second-Wave litigation. Meanwhile, Lafarge is not a party to the more advanced suits of the First Wave, which remain pending on appeal. Lafarge hopes that a declaration of its indemnity rights might assist in settlement negotiations. But that uncertain prospect is not enough to create a ripe controversy here. Furthermore, Lafarge asks the Court to find a duty to indemnify not only based on its as-yet-undetermined liability, but also based on other fact-intensive questions such as the number of occurrences, *i.e.,* how the underlying events will be tabulated for purposes of applying the terms of the insurance policies. The Quebec courts have not yet had an opportunity to evaluate the record and weigh in on these questions or on Lafarge's potential liability. It is thus premature to rule on the legal and factual contours of Lafarge's liability in the indemnity context. [5]

**\*6** Lafarge cites cases in which courts have decided indemnification issues before liability was determined. *See, e.g., Assoc. Indent. Corp. v. Dow Chem. Co., 814 F. Supp. 613, 617 (E.D. Mich. 1993)*. As noted, however, numerous courts in this district have ruled otherwise employing a case-by-case approach, and the specific, premature circumstances here simply do not support the existence of a ripe controversy related to the duty to indemnify. [6] Admittedly, the size of the Canadian litigation lends some support to the practical likelihood that Lafarge may be found liable for some conduct at some point. *See Empire Fire & Marine Ins. Co. v. Elrac, Inc., No. 04-CV-10315 (GEL), 2006 WL 3734308, at \*3 (S.D.N.Y. Dec. 18, 2006)*. But that speculative prospect pales in comparison to the complexity and uncertainties remaining here.

The underlying litigation may yet give rise to a ripe indemnification controversy if and when the Quebec courts determine issues establishing a "practical likelihood" of some form of liability against Lafarge. *See Fed. Ins. Co., 758 F. Supp. 2d at 262*. For example, the Quebec courts may eventually determine how Lafarge is liable, if at all, for what acts or omissions, and whether, under Quebec law, such

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 54 of 62

Lafarge Canada Inc. v. American Home Assurance Company, Not Reported in Fed....

conduct was a single event or many. Until the Quebec courts make at least some of those determinations, however, "the lack of ripeness is palpable." *Travelers Prop. Cas. Corp.,* 2002 WL 1391920, at *6.

### B. Duty to Defend

The disputes surrounding the Insurers' duties to defend Lafarge in the Canadian litigation are ripe, at least to the extent they revolve around the primary insurance policies. Those disputes are of sufficient immediacy and reality because the Insurers are currently providing a defense to Lafarge under those policies. *See Atl Cas. Ins. Co.,* 918 F. Supp. 2d at 261 (finding "no doubt" that a dispute concerning the duty to defend was an active controversy because the insurer was providing the insured with a defense in the underlying action). The ripeness of the duty-to-defend disputes involving the umbrella insurance policies is significantly less clear, mainly because that duty may not be triggered until after Lafarge's liability exceeds the retained limit in those policies. As explained above, such liability is speculative at this point. The Court need not resolve this question, however, because it is declining to exercise its discretionary jurisdiction under the DJA for the reasons explained below. For the purposes of this Opinion, the Court assumes that all the duty-to-defend disputes presented here are ripe.

### II. Declaratory Judgment Act Discretion

As noted above, courts in this Circuit consider a wide range of "not exclusive" factors to guide their DJA discretion. *See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Warrantech Corp.,* No. 00-CV-5007 (NRB), 2001 WL 194903, at *3 (S.D.N.Y. Feb. 27, 2001). These factors include the usefulness and potential certainty provided by a declaratory judgment, as well as the interest in avoiding friction with sovereign legal systems, the scope of the different proceedings, the order of filing, and the choice of law. *See, e.g., Dow Jones & Co., Inc.,* 346 F.3d at 359-60; *TIG Ins. Co.,* 2008 WL 2198087, at *2-3. The goal of this approach is a "measured and orderly," case-by-case analysis to best exercise the Court's "unique and substantial" discretion in this arena. *See Dow Jones & Co., Inc.,* 237 F. Supp. 2d at 434, 436 (citation omitted).

*7  In the context of declaratory actions related to foreign law and foreign proceedings, a court in this Circuit has observed that two factors create a general governing principle: "in each

case the forum that the court determined, in the exercise of its declaratory judgment discretion, to be the appropriate forum, was the forum where [1] the underlying dispute had its principal origins and [2] the primary controlling legal issues were to be governed by the substantive law of that forum." *In re Air Crash Near Nantucket Island, Massachusetts, on Oct. 31, 1999,* 392 F. Supp. 2d 461, 473 (E.D.N.Y. 2005). For the reasons explained below, and even if all the claims in this action were ripe, the Court presently declines to exercise its discretionary DJA jurisdiction over this case.

### A. Duty to Indemnify

The Court turns first to the indemnification issues. Assuming for the sake of argument that they were in fact ripe, the procedural posture of the Canadian litigation limits this Court's ability to issue a ruling that would serve a useful purpose or finalize the controversy. Lafarge's liability might never arise and, even if it does, the Court will be in a far better position to rule on how that liability affects insurance coverage when the court closest to the full factual record —the Quebec court—has had the opportunity to weigh in. *See, e.g., Fed. Ins. Co. v. Garner,* No. 15-CV-184 (DAB), 2016 WL 3554929, at *7 (S.D.N.Y. June 20, 2016) (finding a declaratory-judgment action regarding the duty to indemnify "premature" because it had "many unresolved issues in common with the Underlying Actions, such as [the insured's] liability"); *Bellefonte Reinsurance Co. v. Aetna Cas. & Sur. Co.,* 590 F. Supp. 187, 192 (S.D.N.Y. 1984) (similar). The Canadian courts are already familiar with the underlying facts from the First Wave and are now progressing to the specific facts related to Lafarge's conduct. *Cf., e.g., A & E Television Networks v. Genuine Entm't, Inc.,* No. 09-CV-7422 (RJH), 2010 WL 2308092, at *3 (S.D.N.Y. June 10, 2010) (declining to exercise jurisdiction where the underlying state case had "progressed deep into discovery"). This Court, rather than duplicate those ongoing efforts, need only wait to reap their benefits and consider the record established there. This approach will help prevent a situation in which, as the Insurers note, "alternate conclusions [are reached] on a different record." Ds' Supp. Mem. at 8 (Dkt. 106); *cf. Travelers Indem. Co. v. Philips Elecs. N. Am. Corp.,* No. 02-CV-9800 (WHP), 2004 WL 193564, at *3 (S.D.N. Y. Feb. 3,2004) ("Continuing this action in the face of the procedurally advanced [state] action would cause ... vexatious waste of judicial resources and gratuitous interference[.]" (internal quotations omitted)).

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 55 of 62

Lafarge Canada Inc. v. American Home Assurance Company, Not Reported in Fed....

Plaintiffs argue that the Quebec courts would be willing to accept and enforce any judgment that this Court issues. In fact, Plaintiffs appear to contend that the Quebec courts will respect this Court's factual findings even if they are inconsistent with their own. *See* Ps' Supp. Mem. at 1-2, 4 (Dkt. 103). And it is true that the two records are being developed for different purposes at present—insurance coverage here, and liability in Quebec. Nonetheless, the potential creation of overlapping, and possibly inconsistent, factual records may well create friction with the Canadian courts—a possibility that gives this Court serious pause.

The risk of friction here also extends to this case's legal questions. The courts involved in the Canadian litigation are grappling not only with the facts and law surrounding the pyrrhotite damage, but also the implications for Canadian insurance law. For example, Lafarge cites to a portion of the First-Wave judgment in support of its arguments here as to how many policies might be triggered by the claims in the Canadian litigation under Quebec law. *See* Ps' Mem. at 15 & n.9 (Dkt. 65) (citing *DeGuise v. Montminy*, 2014 QCCS 2672, at ¶¶ 1917-34 (Can. Que. Super. Ct. Jun 12, 2014)). As Lafarge acknowledges, that judgment remains on appeal. *Id.* Lafarge also asserts that the "Quebec courts have not addressed the allocation of multi-year losses under multiple policies" in relation to the insurance language at issue here. Ps' Mem. Opp. at 15-16 (Dkt. 75). Lafarge is thus asking this Court to rule on issues of Quebec law that appear unsettled in the Quebec courts. [7] The Court deems it inappropriate to wade into these unfolding Canadian legal issues at this time.

**\*8** Lafarge, in arguing that this case will not create such factual or legal friction, cites a number of abstention cases that weigh international comity according to the test developed by the Supreme Court in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976). But *Colorado River's* test is not the operative standard for deciding DJA jurisdiction. *See generally Youell v. Exxon Corp.,* 74 F.3d 373, 375 (2d Cir. 1996). In the DJA context, international comity and potential friction with sovereign legal systems are merely additional factors to weigh in a far more flexible balancing. *See id.; see also Dow Jones & Co.,* 346 F.3d at 359-60 (noting that one factor among many in the DJA discretion analysis is "whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court"). In a case Lafarge cites from Texas that did wrestle with DJA jurisdiction, the court found it highly

relevant—in line with the "principal origins" analysis of *In re Air Crash,* 392 F. Supp. 2d at 473—that parties, witnesses, and key pieces of evidence had close ties to Texas, rather than Germany, where the other, subsequent, action was pending. *BBC Chartering & Logistic GMBH & Co., KG v. Suzlon Wind Energy Corp.,* No. CIV.A. H-05-04128, 2006 WL 1007524, at \*5 (S.D. Tex. Apr. 18, 2006); *cf. Aruba Enters. N.V. v. Belfonti,* No. 3:07-CV-1297 (JCH), 2008 WL 185526, at \*4 (D. Conn. Jan. 17, 2008) (exercising jurisdiction in part because the underlying dispute "had the most significant relationship with Connecticut"). Here, the underlying events all occurred in Quebec.

The choice of law question is also a factor in its own right that weighs against DJA jurisdiction here. *See, e.g., Travelers Indem. Co.,* 2004 WL 193564, at \*3 (noting that the application of state law and the absence of federal issues weighs "heavily in favor of abstention"); *Nat'l Union Fire Ins. Co.,* 2001 WL 194903, at \*3 ("Significantly, this case does not present a question of federal law."); *Reliance Ins. Co. of Illinois v. Multi-Fin. Sec. Corp.,* No. 94-CV-6971 (SS), 1996 WL 61763, at \*3 (S.D.N.Y. Feb. 13, 1996) ("Tipping heavily in favor of abstention in this case ... is the fact that state law will govern the outcome of this action."); *cf. Aruba Enters. N.V.,* 2008 WL 185526, at \*4 (D. Conn. Jan. 17, 2008) (exercising jurisdiction in part because "Connecticut law would likely govern the dispute"). It is undisputed that Quebec law will apply to disputes concerning at least some of the policies here, and, though the Court takes no position on the question, it might apply to all of them. New York and federal law, in any event, do not apply to any of the policies.

There is no doubt that insurance cases, in the abstract, can present appropriate circumstances for declaratory relief, because parties often find it useful to know their rights, duties, or vulnerabilities in advance of an underlying judgment. *See Cont'l Cas. Co. v. Coastal Sav. Bank,* 977 F.2d 734, 738 (2d Cir. 1992); *Assoc. Indent. Corp.,* 961 F.2d at 35. But the courts' discretion in exercising jurisdiction in these cases is clear. The specific circumstances are what govern the exercise of discretion, and the ones here do not support it.

Lafarge correctly notes that the Canadian litigation does not presently involve the Insurers or the insurance policies at issue here, and that the lack of a directly parallel action pending in another court may weaken the force of the

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 56 of 62

Lafarge Canada Inc. v. American Home Assurance Company, Not Reported in Fed....

discretionary factors. Lafarge is thinking too categorically, however, because, even if this case is not directly parallel to the underlying litigation, the factual and legal issues in both cases overlap significantly. First, the facts underlying this action are the same as many of those being adjudicated in Canada. Second, insurance law is deeply enmeshed in the Canadian litigation. The First-Wave suits dealt with insurance-law questions similar to those here—as Plaintiffs know, since they cite the First Wave judgment as precedent in support of their arguments in this case. Third, the procedural posture of the Canadian litigation makes it too early to know whether any Second-Wave claims will be brought directly against the Insurers here. The fact that claims were brought against insurers in the First Wave makes it at the very least a distinct possibility. Lafarge contends that, even if some insurers were brought into the Second-Wave litigation, personal jurisdiction would extend over only Defendants American Home and AIG Canada and two of the eleven umbrella policies (specifically, the two policies that AIG Canada issued to LCI). In other words, Lafarge contends that the Quebec court would lack personal jurisdiction over LNA and Lexington. *See* Ps' Supp. Mem. at 2 (Dkt. 103). As Lafarge admits, however, all the umbrella policies are "materially the same" with "substantially identical Q" wording as they relate to this case. Ps' Mem. at 2, 7-8 (Dkt. 65), Thus, a Quebec court's ruling on how Quebec law applies to even a subset of the policies and issues present here would of course be highly relevant. Lafarge next suggests that a Quebec court might stay the underlying action in anticipation of a ruling from this Court under Quebec Civil Code § 3137. *See* Ps' Supp. Mem. at 4-5 (Dkt. 103). Were that to occur, this Court would readily consider such a development in further analyzing its discretionary jurisdiction. At present, however, the overlapping issues of law and fact weigh in favor of declining jurisdiction.

**\*9**  Lastly, Lafarge relies on the Second Circuit's case 📄 *Continental Casualty Co., 977 F.2d 734*, to argue that DJA jurisdiction is appropriate here. But that 1992 case was decided before the Supreme Court gave the district courts "unique and substantial" DJA discretion in 📄 *Wilton, 515 U.S. at 289-90*, and the Second Circuit thus applied a standard more stringent than courts do today, *see* 📄 *Continental Casualty Co., 977 F.2d at 737* (applying the categorical rule that "a court must entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity,

and controversy giving rise to the proceeding," rather than applying a multi-factor discretionary analysis). For all those reasons, even if the indemnification issues presented ripe controversies, the Court would not presently exercise its DJA jurisdiction to rule on them.

**B. Duty to Defend**

The Court next weighs whether to exercise jurisdiction over the remaining disputes regarding the duty to defend. "Because the duty to defend is often decided on the basis of the four corners of the underlying complaint and the terms of the insurance policy, it can frequently be resolved without factual investigation." 📄 *Atl. Cas. Ins. Co., 918 F. Supp. 2d at 261*. Such is not the case here, at least for now.

The Insurers argue that a professional services exclusion in the umbrella policies applies to all, and an expected-or-intended-damages exclusion applies to most, of Lafarge's relevant conduct. The professional services exclusion states that the policies do not apply to liability arising from the performance of "professional services." Dkt. 86-1 at 6-7. [8] The expected-or-intended-damages exclusion provides that the umbrella policies do not apply to property damage "expected or intended from the standpoint of the Insured." *Id.* at 8. [9]  The Insurers contend that all conduct for which Lafarge might be held liable was professional in nature, and that, beginning in March 2006, Lafarge "reasonably anticipated and/or expected" future damage. Ds' Mem. at 2-3 (Dkt. 69). The Insurers thus assert that these exclusions bar Lafarge from benefiting from the defense (or any other) portions of their policies. *See* Ds' Supp. Mem. at 3 (Dkt. 106).

To rule on the duty to defend, the Court is thus called upon to characterize the underlying facts so that it may evaluate the nature of the conduct alleged and whether it fits wholly or in part within one or both exclusions. But the parties vigorously dispute the nature of the record, including what conduct might give rise to Lafarge's liability and the consistency (or lack thereof) between certain factual assertions made here and related facts already found in the First-Wave litigation. *Compare, e.g.,* Ps' Mem. Opp. at 25-32, 39 (Dkt. 75), *with* Ds' Reply Mem. at 1, 8 (Dkt. 85) *and* Ds' Supp. Mem. at 8 (Dkt. 106).

Because the Quebec courts have yet to engage in such characterizations, the Court is wary of doing so. For example, this Court could rule that one of the two exclusions applied and barred insurance coverage after characterizing what the

facts in our record allege to have occurred. But a Quebec court, in determining Lafarge's liability based on a different, evolving record, might view the allegations in a different light. Indeed, the Insurers acknowledge that future factual findings in Quebec may "solidify the application" of the professional services exclusion. Ds' Supp. Mem. at 8 (Dkt. 106). Implicitly, such findings might also undermine its application. Ruling prematurely here would add confusion, not clarity. Additionally, because this Court is not exercising jurisdiction over the indemnification issues both because of ripeness and DJA suitability, a ruling on the duty to defend would only finalize the controversy if the Court sided fully with the Insurers. To do so now would risk duplicative or contradictory fact finding—a risk that cautions strongly against the exercise of discretionary jurisdiction for both duties at present. *See* *Nationwide Ins. v. Zavalis*, 52 F.3d 689, 694 (7th Cir. 1995) (noting that, when underlying facts and the nature of the insured's conduct are disputed, "the court presiding over the declaratory action typically cannot decide" the duty to defend without resolving disputes better left to the court in the underlying action); *Dresser-Rand Co. v. Ingersoll Rand Co.*, No. 14-CV-7222, 2015 WL 4254033, at *9 (S.D.N.Y. July 14, 2015) (finding adjudication of a duty to defend premature when coextensive with an unripe duty to indemnify), As discussed, the Quebec courts have a fuller record and a greater ability to develop it and, through their adjudication of the Second Wave of the Canadian litigation, are in the process of doing so. The Quebec courts should be given a chance to construe the allegations and conduct at issue, whether at a trial or in pretrial rulings. Once they do, this Court may be in a substantially better position to proceed with determining at least the duty to defend.

**\*10** Finally, for both duties, the parties have not shown why, in the face of the obstacles and potential pitfalls discussed, the exercise of declaratory jurisdiction is warranted. Until the Quebec courts find Lafarge liable—if ever—in such a manner that triggers the umbrella policies, the Insurers will be providing a defense that costs them nothing because of the fronting arrangement. Meanwhile, the risk of duplicative and possibly conflicting fact-finding will grow smaller as the Canadian litigation progresses. Accordingly, the Court concludes that the measured and orderly response called for on the facts of this case, at present, is a stay while the Canadian litigation develops.

### CONCLUSION

For the reasons stated above, the Court finds that neither the duty-to-defend dispute nor the duty-to-indemnify dispute is presently suitable for discretionary DJA jurisdiction. This case is hereby stayed. The parties are directed to meet and confer about the appropriate length of the stay and what progress in the Canadian litigation might alleviate the Court's concerns outlined in this Opinion. The parties are further ordered to appear at a conference on the matter on April 25, 2018 at 11:00 a.m., and to notify the Court on the results of their discussions one week prior.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkt. 52 and Dkt. 53.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1634135

### Footnotes

1    Although many facts are in dispute, those contained herein are undisputed unless otherwise noted. *See* Dkts. 66, 73, 76, 86.

2    Canadian dollar amounts are represented by "C$" preceding the number.

3    The parties also dispute the admissibility of certain witnesses' testimony. Because the Court does not exercise jurisdiction at this time, it need not reach the issues related to those witnesses.

4    The Insurers' asserted exclusions are relevant to both duties, as a ruling that they apply would nullify them both. For the sake of efficiency, the Court addresses these arguments in the context of the duty to defend. *See* Ds' Supp. Mem. at 6 n.3 (Dkt. 106).

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    9

5    The only indemnification disputes that the Insurers appear to think are ripe are how many umbrella policies might be triggered by the Canadian litigation and whether the umbrella policies cover defense costs incurred before the policies are triggered—though they also ask that the Court reach these issues only if it holds that the professional services exclusion does not apply. *See* Ds' Supp. Mem. at 3 n.2 (Dkt. 106). As discussed below, the Court is declining to exercise jurisdiction over the application of the exclusion at this time, and so will also defer ruling on these issues for now.

6    In the Michigan case, which involved more than declaratory relief, the district court ruled on the number of occurrences pursuant to an "unusual" stipulation between the parties in part because of the availability of discovery in the underlying Canadian litigation and the court's previous extensive handling of the occurrence at issue. *See Assoc. Indent. Corp.,* 814 F. Supp. at 617. Prior to that stipulation, the case "was put on the back-burner pending resolution in Canada of the underlying claims." *Id.* at 616. The Court notes these differences primarily to highlight the fact-intensive nature of the inquiry as to whether a ripe controversy exists.

7    That Lafarge asks this Court to consider the on-appeal First-Wave judgment as a precedent of Canadian insurance law but to ignore its factual findings because Lafarge was not a party to it is another indication that a ruling from this Court at present will confuse the factual and legal proceedings at issue. *See* Ps' Mem. at 15 n.9 (Dkt. 65).

8    Two "substantially similar" exclusions govern the 2004 policy from Lexington and the rest of the umbrella policies. Dkt. 86-1 at 6-7.

9    The prerequisites needed to trigger these exclusions are disputed and the Court's brief recitation here of when the exclusions apply is in no way intended to reflect the Court's ultimate position on these issues.

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 59 of 62

U.S. Bank, Nat. Ass'n v. Commonwealth Land Title Ins. Co., Not Reported in F.Supp.3d...

2015 WL 1291151
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

U.S. BANK, NATIONAL ASSOCIATION, Plaintiff,
v.
COMMONWEALTH LAND TITLE INSURANCE
COMPANY, Defendant, and Third–Party Plaintiff,
v.
Anm Funding LLC, Abe Klein, Noah Hershkovitz,
Leah Hershkovits, Tsviny Hershkovitz,
Lowenthal & Kofman, P.C., Martin Kofman,
Norman Tepfer, Samuel Gluckman, and
Roland Fields, Third Party Defendants.

No. 13 Civ. 7626(NRB).
|
Signed March 23, 2015.

**MEMORANDUM AND ORDER**

NAOMI REICE BUCHWALD, District Judge.

**\*1** Presently before the court is a motion on behalf of third-party defendants Lowenthal & Kofman, P.C., Martin Kofman, and Norman Tepfer (collectively, the "Lowenthal defendants") to dismiss the third-party complaint brought by defendant/third-party plaintiff Commonwealth Land Title Insurance Company ("Commonwealth"). For the reasons stated herein, this motion is granted.

**BACKGROUND**

**I. Factual Background**

On November 29, 2007, plaintiff U.S. Bank National Association ("U.S.Bank") made a loan to Laura Fields, the repayment of which was to be secured by a mortgage on Fields's property. TPC ¶ 13. At the closing of the loan and mortgage, Commonwealth issued U.S. Bank a loan policy insuring the mortgage as a first lien and indemnifying U.S. Bank against losses suffered as a result of title defects. *Id.* ¶ 22; Cmplt. ¶¶ 16–26. However, unbeknownst to both parties, Laura Fields had in fact died one month before the closing, and her November 2007 mortgage had been signed by an imposter—a fact U.S. Bank first discovered nearly

two years later, when it unsuccessfully attempted to foreclose on the mortgage after Fields appeared to default in March 2009. TPC ¶ 20; Cmplt. ¶¶ 27–29. U.S. Bank consequently submitted a title insurance claim to Commonwealth, which Commonwealth denied on March 1, 2012. Cmplt. ¶¶ 31, 33.

Commonwealth alleges that fraud on the part of several third-party defendants allowed Fields's death to go undetected and her mortgage to be signed by an imposter. Specifically, Commonwealth alleges that, before the closing, U.S. Bank's mortgage broker and several of its employees submitted false credit reports, false employment verifications, and a false property appraisal in order to induce U.S. Bank to make the loan. TPC ¶ 14. At the closing, Norman Tepfer, a notary and agent of Lowenthal & Kofman, which acted as U.S. Bank's settlement agent at the closing, allegedly fraudulently acknowledged the imposter's signature as Fields's. *Id.* ¶ 21. Finally, according to Commonwealth, the Lowenthal defendants submitted a false HUD–1 after the closing, knowingly omitting the payment of proceeds to third party who is believed to have laundered the funds. *Id.*

**II. Procedural Background**

U.S. Bank filed a complaint on October 28, 2013, alleging that Commonwealth breached its insurance contract with U.S. Bank by denying U.S. Bank's claim, and Commonwealth answered on December 13, 2013. On July 17, 2014, after a period of discovery, Commonwealth sought leave to implead parties from whom it sought indemnification, citing the recent disclosure of a document regarding loan disbursement as the basis for the delayed impleader. On August 6, 2014, we issued an order granting Commonwealth's motion, and on August 11, 2014, Commonwealth filed a third-party complaint (the "TPC") seeking contribution and/or indemnification from several third-party defendants, including the Lowenthal defendants. The Lowenthal defendants moved to dismiss the TPC on December 24, 2014, and the motion was fully briefed on February 5, 2014.

**DISCUSSION**

**I. Legal Standard**

**\*2** When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. *Harris v. Mills,* 572 F.3d 66, 71 (2d Cir.2009); *Kassner v. 2nd Ave. Delicatessen Inc.,*

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 60 of 62

U.S. Bank, Nat. Ass'n v. Commonwealth Land Title Ins. Co., Not Reported in F.Supp.3d...

496 F.3d 229, 237 (2d Cir.2007). A motion to dismiss may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Still v. DeBuono,* 101 F.3d 888, 891 (2d. Cir.1996). Nevertheless, a plaintiff's "[f]actual allegations must be enough to raise a right of relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Thus, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face," and if a plaintiff "ha [s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly,* 550 U.S. at 570. This pleading standard applies in "all civil actions." *Iqbal,* 556 U.S. at 684 (internal quotation marks omitted).

## II. Analysis

### A. Contribution

First, the Lowenthal defendants assert that the TPC fails to state a claim for contribution because, under N.Y. C.P.L.R. § 1401, parties may not seek contribution for purely economic loss and thus may not seek contribution where, as here, the underlying action is one for breach of contract. *See Conestoga Title Ins. Co. v. ABM Title Servs., Inc.,* 10 Civ. 3017(CM), 2012 WL 2376438, at *6 (S.D.N.Y. June 20, 2012) (holding that, under New York law, "a contribution claim is not available to one ... potentially liable only for breach of contract" and that "there is no contribution available if the measure of damages is purely economic"). [1] Commonwealth concedes that its claim for contribution is not available under New York law. *See* Def's Br. at 6. Commonwealth's claim for contribution is thereby dismissed.

### B. Indemnification

Second, the Lowenthal defendants argue that the TPC fails to state a claim for indemnification because Commonwealth cannot be found liable to U.S. Bank without having been found itself at fault, thereby barring it from receiving indemnification.

In the absence of contractual right to recovery—which neither party has here asserted—a "party who has itself actually participated to some degree in the wrongdoing cannot receive the benefit of the doctrine [of implied indemnification]."

*17 Vista Fee Assoc. v. Teachers Ins. And Annuity Ass'n of Am.,* 259 A.D.2d 75, 80, 693 N.Y.S.2d 554 (App. Div. 1st Dep't 1999). *See also Monaghan v. SZS 33 Associates, L.P.,* 73 F.3d 1276, 1285 (2d Cir.1996) ("New York case law supports a proposition ... that common-law indemnity is barred altogether where the party seeking indemnification was itself at fault ...."); *id.* (citing *Trustees of Columbia Univ. v. Mitchell/Giurgola Assocs.,* 109 A.D.2d 449, 492 N.Y.S.2d 371, 375 (App.Div. 1st Dep't 1985) ("Since the predicate of common law indemnity is vicarious liability without actual fault on the part of the proposed indemnitee, it follows that a party who has itself actually participated to some degree in the wrongdoing cannot receive the benefit of the doctrine.")).

**\*3** Consequently, where the underlying action is one for breach of contract, a defendant may not seek indemnification because the defendant, if found liable to the plaintiff in the underlying action, will have necessarily participated in the wrongdoing by breaching the contract. *See, e.g., Knight v. H.E. Yerkes & Associates, Inc.,* 675 F.Supp. 139, 143 (S.D.N.Y.1987) ("[Where] the underlying action sounds in contract, not in tort, there is no possible set of facts on which it can be true that [the defendant] was not at least partially responsible for harm, for it was [the defendant] that allegedly breached the contract, not [the third-party defendant]. There can therefore be no cause of action in indemnity."); *Intesa Sanpaolo S.p.A. v. Piliero,* 08 Civ. 2223(LLS), 2008 WL 3465032, at *1 (S.D.N.Y. Aug. 12, 2008) ("New York law bars [defendant's] claims against the third-party defendants for contribution and non-contractual indemnification because the claim against him is for breach of contract, not a tort."); *Highland Capital Mgmt., L.P. v. Schneider,* 533 F.Supp.2d 345, 354–55 (S.D.N.Y.2008) (PKL) ("Fatal to the [defendants'] implied-in-law indemnification claim is that the underlying claim by [the plaintiff] sounds in contract, and not tort.... [I]f the jury ultimately finds that [defendants breached a contract], the [defendants] cannot be indemnified by [the third-party defendant]."); *Amusement Indus., Inc. v. Stern,* 693 F.Supp.2d 319, 326–27 (S.D.N.Y.2010) (LAK) ("Indemnity is not available here [because u]nder New York law, indemnification is not available where the party seeking indemnification was 'partially at fault' or 'responsible in any degree' .... [W]hile Stern asserts he was 'duped' by Egert and did nothing wrong, the third-party complaint does not provide a scenario under which Stern could be found both free from fault and at the same time liable for damages to Amusement because of Egert. In other words, Stern has not explained

Case 1:18-md-02865-LAK    Document 362-1    Filed 06/23/20    Page 61 of 62

U.S. Bank, Nat. Ass'n v. Commonwealth Land Title Ins. Co., Not Reported in F.Supp.3d...

how he could be found vicariously liable—or liable in any other way imputed by law—because of his relationship with Egert. Accordingly, Stern has not stated a claim for indemnity against Egert.").

The TPC, which seeks indemnification for an underlying breach of contract, thus necessarily fails to state a claim for indemnification. Because Commonwealth must have itself breached the contract to have been found liable to U.S. Bank, it cannot be said to have incurred damages purely as a result of vicarious liability or by operation of law. As a result, the TPC does not provide a scenario under which Commonwealth could be found both liable for damages to U.S. Bank and at the same time free from fault, thereby barring Commonwealth from receiving the benefit of implied indemnification.

Notably, Commonwealth does not rebut this principle, but rather reasserts that Commonwealth is entitled to indemnification as a result of Tepfer's wrongful notarization of the imposter's signature. Specifically, Commonwealth argues that Tepfer is liable—and the other Lowenthal defendants are vicariously liable—in indemnification to Commonwealth pursuant to N.Y. Exec. Law § 135, which states that a notary will be liable to a party for any damages caused by his misconduct if the party can show both notarial misconduct and that such misconduct was the proximate cause of the party's injury. It also asserts more generally that Commonwealth is entitled to indemnification from the Lowenthal defendants because they "participated in a conspiracy to defraud plaintiff and cause a forged signature of an imposter to be acknowledged on a mortgage." Def's Br. at 1.

**\*4** However, as the Lowenthal defendants counter, Commonwealth provides no basis on which to conclude that the law barring Commonwealth's indemnification claim—namely, that Commonwealth cannot be both liable to U.S. Bank and free from fault and therefore cannot seek indemnification—has been abrogated in the context of notarial misconduct or third-party fraud. None of the cases cited by Commonwealth in support of its position controvert the principle that participation in wrongdoing, and specifically liability for an underlying breach of contract claim, will bar indemnification. *See, e.g.,* 📕 *Plemmenou v. Arvanitakis,* 39 A.D.3d 612, 833 N.Y.S.2d 596 (App.Div. 2nd Dep't.2007) *abrogated on other grounds by Butler v. Catinella,* 58 A.D.3d 145, 868 N.Y.S.2d 101 (App.Div.2008) (permitting indemnification based on a notary's misconduct where the plaintiff sought to declare a lien held by the

bank void, because the action—for rescission rather than breach of contract—could have resulted in the bank incurring damages in a judgment for the plaintiff without the bank having been found at fault); *In re Lowbet Realty Corp.,* 43 Misc.3d 587, 981 N.Y.S.2d 285 (Sup.Ct.2014) (permitting indemnification based on allegations of third-party fraud where the statute governing the underlying action permitted rescission without a finding of fault). Indeed, several of the cases cited by Commonwealth expressly affirm the principle that a defendant's claim for indemnification will not lie if the defendant's liability is more than vicarious. *See In re Lowbet Realty Corp.,* 981 N.Y.S.2d at 292–93 ("If [defendant] is found liable to petitioner for rescission based on fraud, it would not be able to obtain indemnification, since its loss would result from its own culpability in the transfer of title in violation of petitioner's rights. Under such circumstances, [its] liability would not be only vicarious, and [it] would not be entitled to indemnification. [However], the statutory claims for rescission and an accounting pursuant to Business Corporation Law § 1114 [brought here] may, in effect, impose vicarious liability on [defendant] ... because section 1114 does not require the court to find the recipient of the corporate property at fault before setting aside a sale."); 📕 *Am. Home Assur. Co. v. Nausch, Hogan & Murray, Inc.,* 71 A.D.3d 550, 897 N.Y.S.2d 413 (2010) ("[T]he record is sufficient at this juncture to support a theory that plaintiffs' liability was vicarious only, and therefore an indemnity claim is appropriate."). Thus, the wrongdoing limitation on indemnification still applies and Commonwealth's claim for indemnification must be dismissed.

Although we are obligated under this precedent to dismiss the TPC, we recognize that dismissal of Commonwealth's recourse to third parties poses a harsh prospect, which could result in injustice to Commonwealth should Commonwealth be found liable to U.S. Bank purely as a result of third parties' fraud or misconduct and through no fault of its own. However, our dismissal of Commonwealth's claims for contribution and indemnification does not necessarily preclude Commonwealth from pursuing direct claims against the third-party defendants, either for violation of Exec. Law § 135 or more generally for fraud. [2] It should be clear that we intend to express no view on the ultimate merits of any such claim(s).

## CONCLUSION

*5  For the aforementioned reasons, the motion to dismiss is granted. This Memorandum and Order resolves Docket Nos. 103 and 104.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1291151

## Footnotes

1    *See also* Bd. of Educ. of Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley, 71 N.Y.2d 21, 523 N.Y.S.2d 475, 517 N.E.2d 1360, 1364 (N.Y.1987) ("We find nothing in the legislative history or the common-law evolution of the statute on which to base a conclusion that CPLR 1401 was intended to apply in respect to a pure breach of contract action such as would permit contribution between two contracting parties whose only potential liability to the plaintiff is for the contractual benefit of the bargain."); *Trump Vill. Section 3, Inc. v. New York State Hous. Fin. Agency,* 307 A.D.2d 891, 764 N.Y.S.2d 17, 23 (App.Div. 1st Dep't.2003) ("Where a plaintiff's direct claims against a codefendant seek only a contractual benefit of the bargain recovery, [even] tort language notwithstanding, contribution is unavailable.").

2    While the Lowenthal defendants suggest that such claims would be untimely, it is not yet apparent that either claim would in fact be time-barred. Actions for both fraud and violations of Section 135 are governed by a six-year statute of limitations, *see* N.Y. C.P.L.R. § 213; *Bank of New York Fin. Corp. v. Mitchell–B.J. Ltd.,* 222 A.D.2d 217, 634 N.Y.S.2d 486, 487 (App.Div. 1st Dep't.1995), such that claims here would be untimely if measured from the date of the loan and notarization, in November 2007. However, claims for fraud may run from discovery of the alleged fraud rather than from the date of notarization. *See* N.Y. C.P.L.R. § 213(8) ("[T]he time within which the action must be commenced shall be the greater of six years from the date the cause of action accrued or two years from the time the plaintiff ... discovered the fraud, or could with reasonable diligence have discovered it."). Likewise, case law suggests that a cause of action under § 135 will not accrue until injury, i.e. the party has parted with its money. *See, e.g., Marine Midland Bank, N.A. v. Stanton,* 147 Misc.2d 426, 556 N.Y.S.2d 815, 817 (Sup.Ct. Monroe Cnty.1990) ("Section 135 of the Executive Law creates a cause of action for persons injured by reason of notarial misconduct. By its very language there is no cause of action absent injury. Therefore, it follows that the misconduct is not the triggering factor for computation of the statute of limitations, but rather the injury."). As a result, Commonwealth may yet be able to bring such claims against third-party defendants.

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.