# EXHIBIT 1

**Amended by Order of The Honourable Mr Justice Teare dated 6 March 2019 (as varied by Order of The Honourable Mrs Justice Cockerill dated 20 May 2019)**
**Re-Amended by Order of The Honourable Mr Justice Andrew Baker dated 18 January 2020**

Claim Nos.: CL-2018-000297; CL-2018-000404; CL-2018-000590; CL-2019-000487

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
B E T W E E N :

SKAT SKATTEFORVALTNINGEN
**(The Danish Customs and Tax Administration)**

**Claimant**

- and -

**ED&F MAN CAPITAL MARKETS LIMITED & OTHERS**

**Defendants**

---

**RE-AMENDED DEFENCE**

---

**[References to paragraph numbers and defined terms in this Re-Amended Defence ("Re-ADef") are (save where otherwise indicated) to paragraph numbers and defined terms in the Re- Re-Amended Particulars of Claim ("the RRAPOC") and Re-Amended Schedule 5T ("5T")]**

OVERVIEW

1.      This is the Re-Amended Defence of the 69th Defendant, ED&F Man Capital Markets Limited ("**ED&F Man**"), to the First Claim (issued on 4 May 2018), as now consolidated with the Second and Third Claims (together, the "**Consolidated Claims**"), by which the Claimant ("**SKAT**") alleges that:

1.1.      it was the victim of a sophisticated and extensive financial fraud which resulted in SKAT mistakenly paying out approximately £1.512 £1,455,611,510[1] billion between August 2012 and July 2015 in respect of 4,590 WHT A 4,170 applications identified in RRAPOC Schedule 1A and defined in RRAPOC/3(b) as "the WHT Applications" for the refund of withholding tax ("**WHT**") payable in relation to shares held in Danish companies (the "**WHT Applications**"); and in particular that

---

[1] At the exchange rate of 1DKK: £0.120390 on 11 June 2020 (XE Currency Converter).

1.2.   the WHT Applications were made pursuant to a fraudulent scheme (the so-called WHT Scheme described at RRAPOC/49-51) perpetrated by Mr Sanjay Shah and a network of 75 further individual and corporate defendants related to him (the Alleged Fraud Defendants); and

1.3.   SKAT mistakenly paid out approximately a further £70,166,833[2] between 24 September 2012 and 29 April 2015 in respect of 420 applications identified in RRAPOC Schedule 1B for the refund of WHT allegedly containing a document described as a "Tax Voucher" (the "**Tax Voucher**") prepared by ED&F Man (defined in RRAPOC/3(b) as the "ED&F Man Applications") (the "**ED&F Man Applications**")[3].

2.   However and for the avoidance of doubt:

2.1.   ED&F Man is not an Alleged Fraud Defendant and has no knowledge of: (1) the WHT Scheme to which it was not (and is not alleged to have been) a party; or (2) the Alleged Fraud Defendants who it is said were behind it;

2.1A.   SKAT's claims against ED&F Man (now substantially recast in 5T) are predicated on a separate group of WHT applications, namely the non-fraudulent ED&F Man Applications, as distinct from the fraudulent WHT Applications (RRAPOC/3(b));

2.2.   on the contrary, and as set out further below, ED&F Man's role in connection with the WHT ED&F Man Applications was limited to preparing for its clients which were US and Canadian pension plans (the "**PPs**") a single document described as a "Tax Voucher" ("**the Tax Vouchers**") the Tax Voucher, which SKAT alleges was included in each of the 420 of the WHT ED&F Man Applications (the "**Relevant WHT Applications**") on behalf of the applicants (the PPs) identified therein (the "**Relevant WHT ED&F Man Applicants**"); and

---

[2] At the exchange rate of 1DKK: £0.120390 on 11 June 2020 (XE Currency Converter).
[3] In this Re-Amended Defence ED&F Man adopts the defined terms "ED&F Man Applications" (RRAPOC/3(b)) and "ED&F Man Applicants" (RRAPOC/14A) to describe, respectively (1) the applications for withholding tax containing (among other documents) a Tax Voucher prepared by ED&F Man and (2) the PPs on whose behalf such applications were made. However, SKAT's use of these defined terms (1) is misleading (in circumstances where ED&F Man played no part in the preparation, assessment and submission of the relevant WHT applications); and (2) is only used to avoid a proliferation of different defined terms (and strictly and only in order to denote WHT applications in respect of which ED&F Man Tax Vouchers were submitted).

2.3.    as set out in RRAPOC Schedule 1B, SKAT's claims against ED&F Man in respect of 20 of the 420 ED&F Man Applications made on behalf of 2 PPs are no longer pursued because SKAT has settled claims it brought in the United States against those PPs for the entire amounts originally claimed by SKAT in relation to those 20 Applications (reducing the value of SKAT's claim against ED&F Man to DKK 572,607,396)[4].

3.    Instead SKAT's primary case is that ED&F Man is liable to SKAT in negligence (under English law) on the grounds, in short summary, that ~~(POC/21-24, 91-94)~~:

3.1.    ED&F Man owed a duty of care to SKAT to take reasonable care to avoid causing SKAT loss due to inaccuracies and false statements in the Tax Vouchers (5T/16);

3.2.    in respect of each of the ~~Relevant WHT~~ ED&F Man Applications, the Tax Vouchers contained express and implied representations (the so-called ~~"**Custodian Representations**"~~ "ED&F Man Representations") ~~that (inter alia) a specific number of shares in the Danish company identified therein "…were held for the named WHT Applicant…" (POC/21(a)) on the day before the dividend ex-date (being the date on or after which a security is traded without a previously declared dividend ("**the Ex-Date**"))~~ as follows:

   3.2.1.    express representations that (1) the specified number of shares in the named Danish company identified in the Tax Voucher were held by the PP on "*the Reference Date*" (5T/10(a)); (2) a specific dividend had been received (a) for the account of the named PP (5T/10(b)) (b) net of a specific amount of tax that had been withheld by the named Danish company (5T/10(c)); and (3) ED&F Man did not have a beneficial interest in the shares and was not reclaiming withholding tax (5T/10(d)); and

   3.2.2.    implied representations that (1) the PP was the beneficial owner of the shares and dividend (5T/11(a)-(b)); and (2) the Tax Voucher was an honest and accurate statement of the facts set out in it (5T/11(c));

---

[4] See entries struck out in RRAPOC Schedule 1B in relation to (1) ST Advisory Services Retirement Plan Trust (rows 10, 168-170, 201, 226-227, 267, 309 and 338); and (2) Uplands Consulting Retirement Plan Trust (rows 12, 175-177, 203, 265-266, 269, 311 and 340)

3.3.　in reliance on the ~~Custodian~~ <u>ED&F Man</u> Representations SKAT paid DKK582 million in respect of the ~~Relevant WHT~~ <u>ED&F Man</u> Applications <u>(5T/15)</u>; however

3.4.　the ~~Custodian~~ <u>ED&F Man</u> Representations were false principally because the ~~Relevant WHT~~ <u>ED&F Man</u> Applicants ~~*"…did not own the relevant shares in the Danish companies beneficially or at all…"* prior to the Ex-Date (POC/23(a))~~ "<u>*did not hold and [were] not the beneficial owner of the specified shares and had not received any dividend as beneficial owner net of WHT*</u>" <u>(5T/18(e))</u>.

4.　These allegations are unsustainable. In particular <u>and as further set out below and in ED&F Man's defence to 5T (the "**5T.Def**")</u>:

4.1A.　<u>no representations to SKAT: the Tax Vouchers did not contain any representations by ED&F Man to SKAT where each Tax Voucher (1) was addressed by ED&F Man to its client (the PP) only; (2) was not submitted by ED&F Man to SKAT; and (3) was one of a number of documents submitted to SKAT (a) by a different entity (either the PP itself or on the PP's behalf by a specialist tax reclaim agent) and (b) under cover of a Tax Relief Form in the completion of which ED&F Man had no involvement  (5T.Def/11, 12 and 15);</u>

4.1B.　<u>no implied representation as to beneficial ownership: the Tax Vouchers did not contain an implied representation that the PP beneficially owned the shares and dividends described therein and no reasonable representee in the position of SKAT could in fact have understood the Tax Vouchers to contain such representation (5T.Def/12-15);</u>

4.1.　<u>no duty of care</u>: ED&F Man owed no duty of care to SKAT in circumstances where (1) there was not a sufficiently proximate relationship between ED&F Man and SKAT; (2) ED&F Man had no involvement in the ~~Relevant WHT~~ <u>ED&F Man</u> Applications; and (3) ED&F Man did not assume responsibility to SKAT for the contents of the Tax Vouchers which were prepared for ED&F Man's client only (and were not submitted by ED&F Man to SKAT) <u>(5T.Def/17-18)</u>;

4.2.　<u>no misstatements</u>: with respect to the Tax Vouchers (with the exception of <u>(1)</u> the 9 identified at Annex A hereto ("**the Annex A Tax Vouchers**") <u>and (2) the 80 identified at</u>

4

Annex E hereto ("**the Annex E Tax Vouchers**")), ~~the Custodian Representations were~~ any representations made thereby were accurate (as evidenced by the contemporaneous documentary records retained by ED&F Man in respect of the ~~Relevant WHT~~ ED&F Man Applications) (5T.Def/18.7, 19);

4.3.    no breach: absent a duty of care (1) there was no breach of duty; and in any event (2) by reference to the same records (with the exception of (1) the Annex A Tax Vouchers; and (2) the Annex E Tax Vouchers) ED&F Man did exercise reasonable skill and care in the preparation of the Tax Vouchers (5T.Def/20);

4.4.    no reasonable reliance: in any event it was not reasonable for SKAT to rely on the alleged ~~Custodian~~ ED&F Man Representations in circumstances where it was SKAT, as the tax authority in Denmark with overall responsibility for processing WHT applications (5T.Def/18.6, 22); yet further

4.5.    contributory negligence: if (which is denied) SKAT has suffered loss and damages as a result of any ~~representations made~~ breach of duty by ED&F Man, such loss was caused or contributed to by its own negligence in circumstances where its systems and procedures for managing the review and assessment of WHT reclaim applications were manifestly deficient (see paragraphs 40-41 below and 5T.Def/27).

**PREAMBLE TO PARTICULARS OF CLAIM**

5.    As to paragraph 1 (description and legal status of SKAT):

5.1.    it is admitted that until 1 July 2018 (and therefore at the time the First Claim was issued on 4 May 2018) SKAT was a function of the Danish Government and was charged with the assessment and collection of Danish taxes; however

5.2.    it is not admitted pending expert evidence in relation to SKAT's legal personality and standing (and SKAT is required to prove by reference to (inter alia) the matters set out in SKAT's Further Particulars Regarding the Identity of the Claimant dated 13 March 2020) that ~~it~~ SKAT has a legal entitlement to bring this claim against ED&F Man (SKAT having been replaced by 7 new agencies on 1 July 2018); in any event

5.3.    it is denied (for the reasons set out below) that ED&F Man has committed any "*civil wrongs*" as alleged or at all.

6.    As to paragraph 2 (references in the <u>Re-Re-</u>Amended Particulars of Claim): (1) ED&F Man (the 69th Defendant to the First Claim) is (see RRAPOC/2(c)) a "Non-Fraud Defendant"; and (2) SKAT's claim against ED&F Man is supplemented by the facts and matters set out in <u>5T</u> Amended Schedule 5T to the Amended Particulars of Claim, to which ED&F Man pleads in <u>5T/Def.</u> the Schedule to this Re-Amended Defence. For the avoidance of doubt ED&F Man:

6.1.    is a global financial brokerage business, authorised and regulated by the Financial Conduct Authority ("**FCA**") to provide (among other services): (1) specialised securities lending and financing services; (2) clearing and settlement for equities and fixed-income securities; and (3) custodian services for on-exchange and over-the-counter transactions;

6.2.    from 2012 and 2015, in relation to the trading of shares in companies listed on the Danish stock exchange ("**Danish Listed Companies**"), acted for 36 <u>PPs</u> pension plans (the "PPs")[5] <u>which were introduced to ED&F Man in the circumstances described in 5T.Def/4.2.</u>

## A. SUMMARY

7.    As to paragraph 3 (SKAT's summary of its case):

7.1.    subparagraph 3 (a) (the potential refund of WHT) is admitted;

7.2.    subparagraph 3 (b) (the WHT Applications) is not admitted (being outside ED&F Man's knowledge);

7.3.    subparagraphs 3 (c) to (i) (the WHT Representations, WHT Applications and fraudulent scheme on the part of the Alleged Fraud Defendants and the claims against them) are noted but not pleaded to (as they do not concern ED&F Man);

7.4.    subparagraph 3(j) <u>(negligent participation of Non-Fraud Defendants in WHT Scheme) does not apply to ED&F Man and is not therefore pleaded to (see paragraph 2.1A above);</u> and the allegation against ED&F Man (as a Non-Fraud Defendant) of "…*negligent participation in*

---

[5] Comprising 33 United States pension plans and 3 Canadian pension plans identified in <u>RRA</u>POC/Schedule 1 of which (1) 32 were direct clients of ED&F Man (see Annex B hereto); and (2) 4 were members of Gibraltarian partnerships, which were themselves clients of ED&F Man (the "**Gibraltarian Partnerships**") (see Annex C hereto).

*the WHT Scheme and/or [its] receipt of the proceeds of the fraud...*" is denied for the reasons summarised above and amplified below

7.5.     subparagraph 3(k) (SKAT's claim against ED&F Man) is noted: SKAT's claim is denied for the reasons summarised above and amplified below and in 5T.

**B. DEFENDANTS**

8.     Paragraph 4 (details of Defendants and alleged wrongdoing set out in Schedule 5) is noted.

9.     As to paragraph 5 (categorisation of Defendants) subparagraphs 5 (a) (c) and (d) – (e) are noted; and as to subparagraph 5 (b) (f):

9.1.     ED&F Man is (1) (despite providing the custodian services set out at paragraph 6.1 above) no longer grouped with one of the 9 8 Defendants collectively described (at RRAPOC/5(b)) as "Custodians"; and (2) one of just two Non-Fraud Defendants which provided custodian services (the other being Lindisfarne) amongst the "Custodians"; and (3) the only Non-Fraud Defendant in a group of its own;

9.2.     as to SKAT's allegation that the Custodians provided "…*"credit advice" notes (or similar)...*" (1) ED&F Man provided Tax Vouchers as set out below; and (2) pending disclosure of the "credit advice" notes allegedly provided by the other Custodians, it is not admitted that Tax Vouchers are "*similar*" to the same

9.3.     the case against ED&F Man in 5T is denied in 5T.Def.

10.     The circumstances in which ED&F Man produced the Tax Vouchers were, in summary, as follows:

10.1.     the PP's Investment Manager: by means of a power of attorney ("**the Power of Attorney**") the PP would: (1) appoint an investment manager  ("**the Investment Manager**"); and (2) authorise the Investment Manager (inter alia) to take all actions required to conduct trading in equities and/or other financial instruments and to reclaim any deducted taxes in the name of and on behalf of the PP;

10.2.     the Declaration Date: from time to time each of the Danish Listed Companies would make a "Declaration" ("**the Declaration Date**") as to the gross dividend rate and payable currency

in relation to specified shares, which Declaration Date would be published by Bloomberg approximately one month prior to the reference date on which the holder of a dividend-bearing share has the right to receive a dividend ("**the Reference Date**");

10.3.  the Dividend Window: the period between the Declaration Date and the Reference Date would give rise to a window ("**the Dividend Window**") in which the PP could acquire the shares in respect of which the dividend was payable ("**the Security**");

10.4.  the PP's acquisition and sale of the Security:

10.4.1.  on a date ~~on or~~ prior to the Reference Date ("**the Trade Date**"), ED&F Man would (1) (upon instruction from the PP's Investment Manager) purchase the Security by means of an over-the-counter transaction; ~~or (2) acquire the Security pursuant to an industry standard stock lending arrangement known as the Global Master Securities Lending Arrangement ("the GMSLA");~~ (~~3~~2) on a principal to principal basis, on sell the Security to the PP; and (~~4~~3) enable the PP to enter into a transaction to hedge the risk of adverse market movements in the value of the Security ("**the Hedge**"); alternatively

10.4.2.  on the Trade Date, the PP would recall the Security from ED&F Man by way of redelivery of equivalent securities pursuant to ED&F Man's obligation to replace securities provided by the PP to ED&F Man as financial collateral ~~the terms of a GMSLA~~;

10.4.3.  from the Trade Date (and pursuant to (1) a Custody Agreement ("**the Custody Agreement**") (utilising the client securities and cash accounts defined therein (together "**the Custody Account**")); and (2) a Security and Set Off Deed ("**the Security and Set Off Deed**"), entered into between each of PP and ED&F Man at the inception of their relationship), ED&F Man would (1) hold the Security as a bare trustee on behalf of the PP in the Custody Account; and (2) hold a charge over the Security and the Custody Account; accordingly

10.4.4.  on the Reference Date, which would fall at least one day after the Trade Date, ED&F Man would hold the Security as a bare trustee on behalf of the PP in the Custody Account;

10.4.5.   on an agreed date after the Trade Date ("**the Settlement Date**"), ED&F Man would (1) pay for the Security on behalf of the PP (and debit the PP's Custody Account in that sum); and on or shortly after the Settlement Date (21) on-sell or loan the Security on behalf of the PP or (2) exercise its right to use and dispose of the Security in discharge of the PP's obligation to make payment (and credit the PP's Custody Account accordingly);

10.5.   the dividend Pay Date: shortly after the Settlement Date (1) the Danish company would pay the dividend net of WHT in respect of the Security ("**the Pay Date**"); (2) ED&F Man would receive payment of the dividend into a general account held in the name of  ED&F Man (and administered by its sub-custodian BNP Paribas) which recorded transactions relating to multiple clients ("**the Omnibus Account**"); and (3) ED&F Man would credit the relevant amount of the dividend net of WHT to the PP's Custody Account;

10.6.   the WHT reclaim: (1) shortly after the Settlement Date ED&F Man would produce a Tax Voucher and send the same to (a) the Investment Manager; or (b) the tax reclaim agent (on the instructions of the Investment Manager as set out in paragraph 17.1A below); (2) a tax reclaim agent would submit the Tax Relief Form to SKAT; and (3) upon acceptance of the application (typically a few weeks after the Settlement Date) (a) SKAT would credit the amount of the WHT to the reclaim agent; (b) the reclaim agent (after deducting its fees) would credit the Omnibus Account; and (c) ED&F Man would credit the PP's Custody Account.

11.   As to the nature and content of the Tax Voucher produced by ED&F Man:

11.1.   it contained information in 11 information categories as set out in the following format:

| | Information category | Information supplied |
|---|---|---|
| 1 | Security Description | Name of Danish Listed Company |
| 2 | ISIN | Identification of International Securities Identification Number |
| 3 | SEDOL | Identification of Stock Exchange Daily Official List number |
| 4 | Ex Date | Date supplied |
| 5 | Record Date | Date supplied |
| 6 | Pay Date | Date supplied |
| 7 | Quantity | Specification of number of Danish shares |
| 8 | Gross Div Rate | Dividend rate applicable per share |
| 9 | Amount Received | Amount received by way of dividend |
| 10 | WHT Suffered | Amount withheld by way of withholding tax |
| 11 | WHT % | Percentage rate (27%) of withholding tax applied |

11.2.    it confirmed (in the circumstances summarised at paragraph 10 above):

     11.2.1.    (in 380 of the 420 Tax Vouchers) that the PP "…*was holding…*" the security (identified in entries 1, 2, 3 and 7) "…*over the dividend date…*";

     11.2.2.    (in the 40 Tax Vouchers where ED&F Man's direct client was a Gibraltarian Partnership), that (1) the Gibraltarian Partnership "*held*" the security (identified in entries 1, 2, 3 and 7) "*over dividend date*" for the PP; and (2) the PP was the "*beneficial owner*" of the security (the "**GP Tax Vouchers**");

11.3.    it (1) stated that ED&F Man (a) had "*no beneficial interest*" in the security; and (b) "…*will not be reclaiming…*" the WHT; (2) stated that the dividend (identified in entry 9) was paid to (or received by) the PP (or Gibraltarian Partnership) net of the WHT (identified in entry 10); and (3) was signed on behalf of ED&F Man by one or two authorised signatories.

### C. DIVIDEND WHT REGIME

12.    Paragraph 6 (description of withholding tax) is admitted.

13.    Paragraphs 7 and 8 (Danish tax law provisions) are not admitted: ED&F Man does not hold itself out as a tax adviser and <u>(save for understanding that 27% of any dividend from Danish companies was payable to the Danish tax authority as withholding tax)</u> had no knowledge at any material time of the provisions of Danish law relating to withholding tax.

14.    As to paragraph 9 (double taxation treaty provisions), at the time of preparing the Tax Vouchers (all of which related to shares held by PPs in Danish companies) ED&F Man was aware that:

14.1.    there existed double taxation treaties between (1) Denmark and the United States; and (2) Denmark and Canada, the effect of each of which was that the PPs were not subject to any tax by the Danish tax authority on dividends received in respect of shareholdings held in Danish companies;

14.2.    as a result, PPs could submit a claim to the Danish tax authority for a refund of the totality of all such withholding tax paid in respect of such dividends; however

14.3.    save as set out above, ED&F Man does not plead to the existence and effect of the alleged double tax treaties between Denmark and (1) Malaysia, (2) the United Kingdom <u>(except</u>

insofar as relevant to SKAT's pleaded loss (5T Def/22.4)) or (43) Luxembourg as set out at RRAPOC/9(b), (d) and (e).

15.    Paragraph 10 (the requirements of Tax Relief Form) is admitted. For the avoidance of doubt the Tax Relief Form makes clear that the key declaration as to beneficial ownership is made (1) in the Tax Relief Form itself (in the first prominent entry "*Beneficial Owner*"); and (2) by (or on behalf of) the person claiming the WHT refund (5T Def/12.3.3).

16.    Paragraphs 11 (signature of the Tax Relief Form) and 12 (payment of the WHT) are admitted. However and for the avoidance of doubt ED&F Man (1) did not sign any of; and (2) had no involvement in the completion of, the 420 ~~Relevant WHT~~ ED&F Man Applications.

### D. WHT APPLICATIONS

17.    Save that between approximately August 2012 and April 2015 ED&F Man prepared 420 Tax Vouchers (1) on behalf of 36 PPs; (2) which were generally submitted to the PPs' Investment Managers, paragraphs 13 (time period of SKAT's claim), ~~and~~ 14 (identity of WHT Applicants) and 14A (identity of ED&F Man Applicants) are not admitted. However (and for the avoidance of doubt):

17.1A.   on the instructions of the Investment Manager, Acer Investment Group, LLC ("**Acer**"), ED&F Man (copying Acer) submitted directly to the tax reclaim agent, Goal, the 72 Tax Vouchers relating to the 8 PPs which were clients of Acer (the "**Acer PPs**");

17.1.    save for the Acer PPs, ED&F Man infers from Schedule 1B but does not know that the Investment Managers submitted the remaining 348 Tax Vouchers to tax reclaim agents as follows:

| No | Tax reclaim agent | No of Tax Vouchers |
|----|-------------------|--------------------|
| 1 | Acupay | 16 |
| 2 | Global Equities | 266 |
| 3 | Globe Tax Securities Incorporated Limited ("**GTS**") | 4 |
| 4 | Goal | ~~134~~ 62 |
| Total | | ~~420~~ 348 |

17.2.    ED&F Man notes that (1) the definition of Agents in RRAPOC/5(a) does not include GTS; (2) SKAT makes no claim at all against (a) GTS; or (b) (under English or Danish law) against Global Equities (save in relation to 35 of the 266 ~~Relevant WHT~~ ED&F Man Applications submitted by Global Equities as set out in Amended Schedule 5P (paragraph

5) and  Schedule 5P1) (SKAT and Global Equities having agreed to settle that claim in January 2020); accordingly (3) SKAT advances no claims in English or Danish law against the reclaim agents which (it is alleged) submitted ~~270~~ 235 of the 420 (~~64~~56%) ~~Relevant WHT~~ ED&F Man Applications.

18.    As to paragraph 15 (extent of withholding tax claim relating to US, Canada and Malaysia), <u>ED&F Man does not plead to the first sentence which does not relate to the ED&F Man Applications. As to the second sentence,</u> it is admitted that the Tax Vouchers prepared by ED&F Man on behalf of the PPs which were its clients were in respect of all the tax withheld.

19.    Paragraph 16 (extent of withholding tax claim relating to United Kingdom and Luxembourg) <u>does not relate to the ED&F Man Applications and</u> is not admitted.

20.    As to paragraph<u>s</u> 17 and <u>17A</u> (documentary content of each WHT Application <u>and ED&F Man Application</u>), the actual documents comprising each ~~Relevant WHT~~ <u>ED&F Man</u> Application are not admitted. Paragraph 15 above is repeated.

21.    As to paragraph 18 (identity of Danish companies), the ~~Relevant WHT~~ ED&F Man Applications were made in relation to shareholdings in 16 of the Danish Listed Companies.

**E. THE WHT REPRESENTATIONS**

22.    In Section<u>s</u> E.<u>1 and E.</u>2 SKAT purports to set out: (1) the representations allegedly made by the Agents (the so-called "Agent Representations") <u>(RRAPOC/19-20)</u> and the Custodians (the so-called "Custodian Representations") <u>(RRAPOC/21)</u> by the WHT Applications (collectively, the  so-called "WHT Representations") (RRAPOC/22); and (2) the falsity of such representations <u>(RRAPOC/23-24).</u> ~~However SKAT's case against ED&F Man in this regard is obscurely pleaded and difficult to comprehend given that:~~

22.1.    ~~the Agent Representations (POC/19) and the Custodian Representations (POC/21) are materially different (the Agent Representations alleging that the WHT Applicant was "…*the beneficial owner*…" of the Danish shares and "…*had beneficially received the dividend*…"; whilst the Custodian Representations contain no allegation in relation to beneficial ownership and dividend receipt); yet~~

22.2.    for the purposes of the allegation of falsity, the representations are treated collectively and without differentiation as the "WHT Representations" (POC/22 and 23) relying on the same particulars of falsity (POC/23(a) - (d)); further

22.3.    in the case of ED&F Man and the fourth Custodian Representation (to the effect that "…*the Credit Advice Note was an honest and accurate statement of the facts set out therein…*") (POC/21(d)) SKAT's case against ED&F Man (as clarified in its Response to Request for Further Information dated 31 May 2019 ("**SKAT RFI Response**")) is that "…*the Tax Vouchers were inaccurate (but not dishonest)…*" (Response 2)); yet

22.4.    the alleged grounds for inferring falsity (POC/ 24) are pleaded generically and without distinction between (1) the Agent Representations and the Custodian Representations; and (2) the (very different) positions of (a) ED&F Man and (b) the Alleged Fraud Defendants.

**E1. The Agent Representations and the Custodian Representations**

23.    ED&F Man does not plead to paragraphs 19 and 20 (the Agent Representations), paragraph 21 (the Custodian Representations), paragraph 22 (definition of WHT Applications) or paragraphs 23-24 (the falsity of the WHT Representations), in circumstances where 5T paragraph 92(f) now alleges a new case (1) that ED&F Man (as one of the Non-Fraud Custodians) only made the Custodian ED&F Man Representations (5T/12) and (2) as to the falsity of the ED&F Man Representations (5T/18). ED&F Man responds to SKAT's new case in 5T.Def.

24.    As to paragraph 21 (the Custodian Representations (POC/21)):

24.1.    the representations (if any) made by the Tax Vouchers fall to be construed in context and objectively according to their effect on a reasonable representee in the position and with the characteristics of the actual representee. Yet SKAT would (or should) have known the following matters:

24.1.1.    ED&F Man: (1) provided custody services to its clients in relation to shares held in companies domiciled across multiple jurisdictions and subject to numerous different tax regimes; but (2) did not hold itself out as a tax adviser; and (3) was not qualified to advise on (a) the legal or beneficial ownership of security held in a Danish company under Danish law; or (b) the relevant double taxation treaty;

13

24.1.2.   the Tax Voucher (1) was addressed by ED&F Man to its client only, and not to SKAT; and (2) (save for the GP Tax Vouchers) did not address the question of the PP's beneficial ownership of the security; by contrast

24.1.3.   the Tax Relief Form, which was submitted by or on behalf of the PP (1) was addressed to SKAT; and (2) did contain the PP's declaration as to beneficial ownership of the security; further

24.1.4.   the concept of beneficial ownership was at the material time (and remains) legally uncertain in Danish law because: (1) historically Danish law did not distinguish between legal and beneficial ownership (a common law concept unfamiliar to Danish law); and (2) the Danish Supreme Court had not (and still has not) determined the meaning of the concept; and

24.1.5.   as the tax authority in Denmark with overall responsibility for processing WHT applications, SKAT was responsible for determining the beneficial ownership of shares held in Danish companies (which included publishing non-binding opinions in Danish on its website in relation to this issue);

24.2.   in the premises, it is denied that the Tax Vouchers contained the Custodian Representations:

24.2.1.   the Relevant WHT Applications did not contain *any* representations by ED&F Man to SKAT;

24.2.2.   such representations as the Relevant WHT Applications contained were made by (1) the tax reclaim agents which submitted the Relevant WHT Applications; and/or (2) the entity described as the "*beneficial owner*" on the Tax Relief Form, on whose behalf the Relevant WHT Applications were submitted;

24.2.3.   the Tax Vouchers (1) did not contain any separate or freestanding representations to SKAT; and (2) (save for the GP Tax Vouchers) did not contain any statement as to the beneficial ownership of the securities described in the Tax Vouchers.

25.   Paragraph 22 (definition of WHT Representations) is noted: paragraph 22.2 above is repeated.

14

### E2. Falsity of the WHT Representations

26. Paragraph 23 (falsity of WHT Representations) is denied in circumstances where:

26.1. (as noted above) the allegations of falsity applicable to ED&F Man (POC/23(a)-(c)) do not correspond to the Custodian Representations allegedly made by ED&F Man (POC/21(a)-(c));

26.2. it is not alleged that ED&F Man made any representation as to the beneficial ownership of shares and beneficial receipt of dividends described in the Tax Vouchers; and for the avoidance of doubt (and save in relation to the GP Tax Vouchers) (1) ED&F Man did not; and (2) SKAT could not reasonably have believed that it did, make any such representations; in any event

26.3. the Custodian Representations (if made, which is denied) were true in circumstances where (with the exception of the Annex A and Annex E Tax Vouchers) the ED&F Man Records (as defined at subparagraph 27.5 below) confirmed that:

26.3.1. the PP (or the Gibraltarian Partnership on its behalf) *was* holding the security (identified at entries 1, 2, 3 and 7) on the Reference Date;

26.3.2. the PP (or the Gibraltarian Partnership on its behalf) *had* received the dividend (identified at entry 9) on the security; and

26.3.3. the dividend *had* been received by the PP (or by the Gibraltarian Partnership on its behalf) net of WHT (identified at entry 10).

27. As to paragraph 24 (grounds for inferring falsity of WHT Representations):

27.1. in circumstances where (1) ED&F Man is not an Alleged Fraud Defendant; (2) ED&F Man was not a party to and had no knowledge of the WHT Scheme; and (3) (so far as ED&F Man understands the same) these subparagraphs do not contain allegations against ED&F Man, ED&F Man does not plead to: subparagraphs 24(b)(ii)(B) (the 6 individuals involved in WHT Scheme); 24(d) (Agents' payments to SCP); 24(e) and (f) (the BaFin Report); 24(e1) (the Solo Model); 24(g) (same day Credit Advice Notes for same company); 24(h) (facts relating to WHT Scheme); 24 (i) (ii) (B) and (C) ("*circular transactions*" created by the Alleged Fraud Defendants); 24 (i) (iii) (A) to (F) ("*sham transactions*" manufactured by

15

the Alleged Fraud Defendants); 24(i)(iv)(A) (trading of same shares multiple times around Ex-Date); and 24(i)(iv)(B)(i) and (ii) (WHT Applicant not the "*beneficial owner of the shares*");

27.2.  subparagraph 24(a) (substantial increase in WHT refund applications from August 2012 to July 2015) is not admitted. In any event it is not admitted that there is any correlation between (1) the matters pleaded in subparagraphs 24 (a) (i) to (iv) (if true); and (2) the accuracy of the Tax Vouchers used in the Relevant WHT Applications;

27.3.  subparagraph 24(b) (i) and (ii) (B) (PPs' lack of assets) is denied. The allegation that the Relevant WHT Applicants "…*did not have the assets necessary to make the very substantial investments…"* misunderstands the nature of the financial brokerage services provided by ED&F Man (identified at subparagraph 6.1 above). In particular where a PP did lack assets ED&F Man extended short term credit to the PP in order to facilitated the acquisition of the Security as follows:

27.3.1.  secured and hedged from the Trade Date: from the moment of ED&F Man's acquisition of the Security on the Trade Date on behalf of the PP (subparagraph 11.4.1 10.4.1 above), ED&F Man (1) held a fixed charge over the Security and the PP's Custody Account with ED&F Man; and (2) was protected against market movements in the value of the Security by the Hedge;

27.3.2.  reimbursed on or shortly after Settlement Date: following (1) ED&F Man's payment (on the Settlement Date) for the Security and the debit of that amount to the PP's Custody Account (2) the Security was (a) on sold in the market or (b) acquired by ED&F Man pursuant to its rights of use and disposal for a sum of money which was then credited to the PP's Custody Account (and which substantially reversed the debit) (subparagraph 10.4.5 above);

27.3.3.  receipt of dividend: shortly thereafter ED&F Man (1) received funds into the Omnibus Account in respect of the relevant dividend net of WHT; and (2) credited that amount to the Custody Account (subparagraph 10.5 above);

27.3.4.  receipt of tax reclaim: within a further few weeks, and without fail, SKAT paid the WHT to the tax reclaim agent which sum was then also credited to the Custody

Account (subparagraph 10.6 above), resulting (with the addition of any payment pursuant to the Hedge) in an overall net credit to the Custody Account arising out of the acquisition of the Security;

27.3.5.   no requirement for substantial assets: it was in these circumstances that the PPs did not need to have (1) the assets necessary to make "*very substantial investments*"; and/or (2) the means to "*afford*" the purchase of the relevant security. Instead ED&F Man, fully secured and protected against market movements, was prepared to (and did) enable the PPs to acquire the Security (and, for the avoidance of doubt, no third party provided any funding or collateral);

27.4.   subparagraph 24(e) (the PPs' response to preliminary decisions) is not admitted. Without prejudice to that non-admission and with respect to the PPs who were ED&F Man's clients, ED&F Man understands from documents filed in United States legal proceedings that (1) in April and May 2018 SKAT issued final determination letters to the PPs; and (2) each of those PPs has filed an administrative appeal of SKAT's determination to the Tax Appeals Agency (*Skatteankestyrelsen*) or is in the process of doing so (and each of the Tax Appeals Agency expects the review process to take approximately 30 months);

27.5.   subparagraphs 24(i)(i) and (ii) (A) (alleged "*fictitious records of transactions*" and "*circular transactions*")) are, with respect to the Relevant WHT Applications, denied. On the contrary ED&F Man has genuine records in respect of each of the Relevant WHT Applications ("**the ED&F Man Records**") including:

27.5.1.   the Declaration as published by Bloomberg in respect of the security;

27.5.2.   (1) the PP's order (ordinarily by email instruction) for both (a) the security and (b) the Hedge; and (2) ED&F Man's confirmation (again by email) of the same;

27.5.3.   a booking in ED&F Man's trading software recording ED&F Man's "Buy" of the Security and "Sell" or "Return" to the PP;

27.5.4.   a journal entry in ED&F Man's trading software identifying the nature, date and amount of a dividend payment credited to the PP in respect of the Security;

17

27.5.5.    entries in the PP's Custody Account recording ED&F Man's acquisition of the Security on the Trade Date;

27.5.6.    entries in the PP's Custody Account recording: (1) the credit of the net dividend payment in respect of the Security; (2) the credit of the tax reclaim to the PP a few weeks later; in the premises

27.5.7.    the Relevant WHT Applications were (1) based on "*genuine business records*" (in the words of counsel for SKAT when making this concession in relation to the PP Tveter LLC Pension Plan Trust at the hearing on 26 June 2018) (2) in relation to "*genuine transactions*" (in the words of Jacobs J. as accepted by counsel for SKAT in the course of the same hearing); and (3) (with the exception of the Annex E Tax Vouchers) resulted in an "*actual*" transfer of shares and dividends;

27.6.    subparagraph 24(i)(iv)(B)(iii) (WHT Applicant as "*mere nominee*") is denied. In particular:

27.6.1.    the reference to the WHT Applicant not being "*the beneficial owner*" of the shares is (as an allegation of falsity against ED&F Man) misconceived: the Custodian Representations do not contain any statement in relation to the WHT Applicant's beneficial ownership; in the premises

27.6.2.    the allegation that the Relevant WHT Applicant was a "*mere nominee*" of the shares is not understood: the relevant representation (if any) contained in the Tax Voucher in relation to the shares was that the PP "…*was holding [the Security] over the dividend date*…";

27.6.3.    that representation was true: subparagraph 26.2 above is repeated.; further

27.6.4.    the matters set out in SKAT RFI Response/3 do not support SKAT's case that the WHT Applicant was a "*mere nominee*" as regards the Security with no control as to its disposition: subparagraph 27.3 is repeated; and (for the avoidance of doubt)

27.6.5.    the WHT Applicant acquired (1) ownership of the Security; and (2) a right to receive any dividends thereon from the Trade Date, not the Settlement Date (as alleged in SKAT RFI Response/4.4 – 4.7).

### E3. THE ED&F MAN REPRESENTATIONS

27A.   As to paragraph 24A (alleged falsity of ED&F Man Representations), it is denied (1) that ED&F Man made the alleged ED&F Man Representations (5T.Def/11-15); and (2) (with the exception of the erroneous information in the Annex A and Annex E Tax Vouchers) that any representations made by the Tax Vouchers were inaccurate (5T.Def/19).

### F. PROCEEDS OF THE WHT APPLICATIONS

28.   As to paragraph 25 (SKAT's payments in reliance on ED&F Man Representations to the Agents), ED&F Man does not plead to SKAT's alleged payment of sums in reliance on the WHT Representations which it is no longer alleged were made by ED&F Man. It is not admitted that SKAT made any payments in reliance on the alleged ED&F Man Representations (if made, which is denied). it is not admitted that SKAT (1) made the payments "*in reliance on the WHT Representations*"; and (2) made the payments alleged to the Agents, and SKAT is put to strict proof of the same.

29.   ED&F Man does not plead to paragraphs 26 to 48 (payments by SKAT; transfers to SCP and the Alleged Fraud Defendants; and purchase of shares in Varengold and Dero) in circumstances where they do not contain any allegations against ED&F Man. For the avoidance of doubt (1) (with the exception of the ED&F Man Applications made by Global Equities (5T Def/9.2.2)) ED&F Man did not receive any payments directly from SKAT; and (2) subject only to the deduction of its fees, the amounts received into the accounts from the agents were credited in full to the relevant PP.

### G. THE WHT SCHEME

30.   As to paragraph 49 (the WHT Scheme), it is not admitted that the WHT Applications were made as part of the WHT Scheme in circumstances where ED&F Man (1) was not an Alleged Fraud Defendant; and (2) has no knowledge of the matters relied upon at subparagraphs 49 (a) to (d).

31.   ED&F Man does not plead to paragraphs 50 and 51 (the WHT Scheme and the role of the Alleged Fraud Defendants) which do not contain allegations against ED&F Man.

32.   As to paragraphs 52 to 54 (SKAT's decisions and purported rescissions), ED&F Man does not plead to alleged mistakes on the part of SKAT induced by the WHT Applications. In respect of the ED&F Man Representations, it is denied that SKAT is entitled to rescind the transactions by which payments were made in respect of the Relevant WHT ED&F Man Applications in circumstances

where (as further addressed in paragraphs 42 and 43 below) (1) the alleged ED&F Man Representations (and in particular the alleged Beneficial Ownership Representation) were not made (5T.Def/11-15); (2) (with the exception of the erroneous information in the Annex A and Annex E Tax Vouchers) any representations made by the Tax Vouchers were accurate (5T.Def/19) ~~paragraphs 24, 0 and 27 above are repeated~~; and (3) to the extent that such payments were ultimately received by ED&F Man (an innocent third party which (a) provided services to its clients (the PPs) in respect of the payments; and/or (b) changed its position in good faith and to its detriment in reliance on the payments without notice of SKAT's (alleged) interest in the payments), rescission is not available.

### H. APPLICABLE LAW

33.  Paragraphs 55 and 56 (applicable law) are noted but not admitted. ED&F Man's defence is pleaded on the basis that English law, alternatively Danish law, is the law applicable to SKAT's claims.

### I. ENGLISH LAW CLAIMS AGAINST THE ALLEGED FRAUD DEFENDANTS

34.  ED&F Man does not plead to paragraphs 57 to 85 (claims against Alleged Fraud Defendants) which do not contain allegations against ED&F Man.

### J. ENGLISH LAW CLAIMS AGAINST THE NON-FRAUD DEFENDANTS
### J1. Tort/delict

35.  ED&F Man does not plead to paragraphs 86 to 90 (Agents' alleged liability for negligent misrepresentation) which do not contain allegations against ED&F Man.

36.  Paragraph 91 (ED&F Man's alleged liability for negligent representation) is denied, as further set out in 5T.Def below. ED&F Man does not plead to paragraphs 92 to 94 which relate to the Non-Fraud Custodians only, a group which no longer includes ED&F Man (see paragraph 9.1 above).

37.  ~~As to paragraph 92 (ED&F Man's alleged duty of care to SKAT):~~

   37.1.  ~~it is denied that ED&F Man owed SKAT a duty to take reasonable care as alleged. In particular:~~

      37.1.1.  ~~there was no contractual relationship between ED&F Man and SKAT, which was not ED&F Man's client;~~

37.1.2.    the Tax Vouchers were prepared for ED&F Man's client only and were not submitted by ED&F Man to SKAT;

37.1.3.    there were no written or oral communications at any material time between ED&F Man and SKAT in relation to the Tax Vouchers or otherwise;

37.1.4.    by the Tax Vouchers, ED&F Man did not make any representations to SKAT: paragraph 24 5.2 above is repeated; moreover

37.1.5.    at the time of receipt of the Tax Vouchers, SKAT knew or ought to have known from the matters set out at subparagraph 24.1 above that (1) ED&F Man was not assuming responsibility to SKAT for any (alleged) representations relating to the beneficial ownership of shares or dividends described in the Tax Vouchers; and (2) SKAT could not rely on such representations without independent inquiry.

37.2.    it is denied that the facts and matters set out in sub-paragraphs 92 (a) to (i) support the imposition of the alleged duty of care. In particular:

37.3.    subparagraph 92(a) (the AML obligations) is admitted. However at all material times ED&F Man maintained suitable policies and procedures in accordance with these obligations;

37.4.    as to subparagraph 92(b) (ED&F Man's regulatory obligations), it is admitted that (1) ED&F Man is subject to Principles 2 and 3 and SYSC 6 of the Financial Conduct Authority Handbook; and (2) subparagraphs 92 (b) (i) and (ii) contain a broadly accurate summary of Principles 2 and 3 and (parts of) SYSC 6;

37.5.    subparagraph 92(c) (ED&F Man's access to trading activity records) is admitted;

37.6.    as to subparagraph 92(d) (ED&F Man's knowledge of Tax Vouchers' purpose):

37.6.1.    it is admitted (as alleged at subparagraph 92 (d)(i)) that ED&F Man knew that PPs engaged in the trading of shares in Danish companies for the purpose of making tax reclaim applications to SKAT; and

37.6.2.    it is admitted (as alleged at subparagraphs 92 (d)(ii) and (iii)) that ED&F Man knew that the Tax Vouchers which it produced for the PPs were likely to be (1)

21

used for the purpose of the Relevant WHT Applications; and (2) communicated to SKAT for such purpose; however

37.6.3.   ED&F Man (1) had no role in the preparation of the Relevant WHT Applications; and (2) was not qualified to advise as to (and did not advise as to) the Relevant WHT Applicant's declaration as to beneficial ownership as contained in the Tax Relief Form;

37.7.   as to sub-paragraph 92(e) (alleged reliance on Tax Vouchers to seek large WHT refunds):

37.7.1.   as to subparagraph 92 (e)(i), it is denied that ED&F Man knew that the Tax Vouchers "…*would be relied upon to seek very large sums by way of WHT refunds*…" as alleged. In particular whilst (1) ED&F Man knew that  the Tax Voucher was one of a number of documents which SKAT required to be submitted by ED&F Man's clients (the PPs) in support of WHT reclaim applications; (2) ED&F Man did not know what other documentation was required by SKAT and/or the criteria which SKAT applied in the assessment of a tax reclaim;

37.7.2.   as to subparagraph 92(e)(ii), it is admitted that ED&F Man knew that 8 different Investment Managers represented the 36 PPs but it is denied (insofar as it is apparently alleged) that the number of Investment Managers is relevant to the imposition of a duty of care upon ED&F Man;

37.7.3.   as to subparagraph 92(e)(iii) (payment of proceeds of WHT Applications), it is denied that ED&F Man knew that "…*they were paying the large majority of the proceeds of the [Relevant] WHT Applications to persons other than*…" the PPs: the tax reclaims received by ED&F Man via the relevant tax reclaim agent were credited directly to the PP's Custody Account;

37.8.   as to subparagraph 92(f) (alleged Custodian Representations), paragraph 24 above is repeated;

37.9.   as to subparagraph 92(g) (SKAT's reasonable reliance), it is denied that it was reasonable for SKAT to rely on any representations contained in the Tax Vouchers without further enquiry and subparagraph 24.1 above is repeated. Further:

37.9.1.   it was a matter for SKAT as the tax authority in Denmark with overall responsibility for processing WHT applications to devise and implement appropriate systems and procedures which ensured that such applications were fairly and accurately reviewed and assessed;

37.9.2.   insofar as the matters set out at subparagraphs 92 (g) (ii) to (v) are true, such that SKAT was unable fairly and accurately to review and assess the Relevant WHT Applications, that was as a result of SKAT's own negligence as set out at paragraphs 40 and 41 below; and

37.9.3.   it is denied that ED&F Man knew or ought to have known the matters set out at subparagraphs 92 (g) (i) to (v): the extent of ED&F Man's knowledge at the material time was as set out at subparagraphs 37.6 and 37.7 above; in the premises

37.10.  subparagraph 92(h) (ED&F Man's alleged knowledge of SKAT's reliance) and subparagraph 93(i) (alleged reasonable foreseeability of SKAT's losses) are denied; and

37.11.  ED&F Man did not assume responsibility to SKAT in respect of the accuracy of the representations (if any) contained in the Tax Vouchers; and/or there was not a sufficiently proximate relationship between ED&F Man and SKAT; and/or it would not be fair, just and reasonable to impose a duty of care on ED&F Man, whether as alleged or at all.

38.    Paragraph 93 (ED&F Man's alleged breach of duty) is inadequately pleaded: SKAT has not set out any particulars in support of its assertion that ED&F Man failed to take reasonable care to ensure that the Tax Vouchers were accurate statements of the matters set out therein. Without prejudice to the foregoing and the matters set out in SKAT RFI Response/5, it is denied that ED&F Man acted in breach of duty as alleged or at all:

38.1.   ED&F Man did not owe SKAT a duty of care: paragraph 0 above is repeated;

38.2.   insofar as such duty was owed and representations were made, it related only to the Custodian Representations which were true: paragraphs 0 and 27 above are repeated; and in any event

38.2A. the WHT Applicants did not hold the Security identified in the Tax Vouchers as a "*mere nominee*": paragraph 27.6 above is repeated;

38.3. with the exception of (1) the Annex A Tax Vouchers; and (2) the Annex E Tax Vouchers (in respect of which breach of duty is not admitted), ED&F Man exercised all due care and skill in making the Custodian Representations by reference to the ED&F Man Records (as to which subparagraph 27.5 above is repeated).

39. As to paragraph 94 (payments made by SKAT in relation to the Relevant WHT Applications):

39.1. it is denied that SKAT (1) reasonably relied on the Custodian Representations (if made); or (2) was thereby induced by ED&F Man to make payments in respect of the Relevant WHT Applications; or (3) would not otherwise have made such payments: paragraphs 24 and 0 above are repeated; in any event

39.2. it is not admitted that SKAT made payments of DKK582 million in respect of the Relevant WHT Applications as alleged in subparagraph 94 (d) and SKAT is put to strict proof of the allegation;

39.3. save as aforesaid, ED&F Man does not plead to paragraph 94 (payments relating to Credit Advice Notes from Indigo, North Channel Bank and Lindisfarne) which does not contain allegations against ED&F Man.

39A. As to paragraph 94A (ED&F Man's alleged duty of care and breach of duty; SKAT's reliance and loss), it is denied that ED&F Man owed SKAT a duty of care or therefore breached that duty or that SKAT has suffered loss and damage as a result (5T.Def/16-22).

40. Further or alternatively, between 2012 and 2015 the systems and procedures in place at SKAT for managing the review and assessment of WHT reclaim applications were manifestly deficient in numerous respects. In particular and pending full disclosure:

40.1. ED&F Man relies on (1) the Rigsrevisionen Report dated February 2016; (2) the (undated) Intern Revision report relating to SKAT's administration of WHT tax; (3) judgments dated 7 December 2017 and 23 May 2018 in relation to criminal proceedings against Sven Jørgen

Nielsen (the "**Nielsen Criminal Proceedings**"); and (4) the additional documentation requirements introduced by SKAT since its discovery of the WHT Scheme;

40.2.  SKAT had no written procedures in place to govern its processing of tax reclaim applications between 2012 and 2015 and:

40.2.1.  approximately 90% of the WHT reclaim applications to SKAT were handled by Sven Jørgen Nielsen ("**Sven Nielsen**"), who (despite the rapidly increasing number of WHT reclaim applications from 2012) was the sole individual in the department dealing with such applications ("**the WHT Department**") responsible for their approval;

40.2.2.  in practice Sven Nielsen did no more than check that: (1) the documents required by SKAT had been submitted; and (2) the amount claimed had been accurately calculated, in which event he authorised SKAT to pay the WHT reclaim application;

40.2.3.  further, during the same period SKAT had no means of independently verifying (1) the identity of the beneficial owners of shares held by foreign shareholders in Danish companies in custody accounts maintained outside Denmark (such shares being registered as held by the custodian only); or (2) whether WHT had been withheld in respect of the dividends paid on such shares (5T.Def/18.6.3);

40.2.4.  notwithstanding the foregoing, SKAT only sought the information set out in the Tax Relief Form (RRAPOC/10) and did not seek supporting documentation from the Relevant WHT ED&F Man Applicant or from ED&F Man or make other inquiries to verify whether the PP identified in the Tax Voucher (1) was the owner of the shares on the Reference Date and (2) had received the dividend described therein (less WHT);

40.2.5.  instead, SKAT unlawfully delegated the evaluation and approval of the information and documentation submitted to SKAT in support of WHT applications to separate schemes operated by (1) the Danish banks; and (2) VP Securities A/S (the Danish Central Securities Depository), which (in the absence of the necessary statutory authority) resulted in the termination of the schemes in September and November 2015;

40.2.6.  further, in breach of SKAT's guidance obligation (article 7 of *forvaltingslov*) and/or investigation obligation (*Officialmaksimen*) under Danish law, SKAT did

25

not take any or any sufficient steps to (1) publish guidance in relation to (a) the information and documentation required from WHT applicants; or (b) the criteria governing beneficial ownership; and (2) obtain and verify such information and documentation;

40.2.7.   moreover (1) by 2011 SKAT had grounds to suspect that Sven Nielsen had dishonestly received illicit payments of up to DKK2m from Torben Dilung between 2006 and 2011 (the "**Dilung Payments**"); however (2) in June 2011 SKAT indefinitely suspended its investigation into Sven Nielsen in relation to the Dilung Payments for no or no good reason and (3) SKAT permitted Sven Nielsen to remain as an employee of SKAT until he was charged with fraud in Denmark in relation to the Dilung Payments in May 2015; and

40.2.8.   in 2013 SKAT did not implement the control functions set out in a statutory order (the "**2013 Statutory Order**") which would have enabled SKAT upon receipt of a WHT application to compare (1) the information received by SKAT from a Danish Listed Company immediately after the Declaration as to (a) the identity of dividend recipients; and (b) the amount of WHT; with (2) the information set out in the WHT application in relation to (a) and (b);

40.3.   SKAT's senior management were aware of and/or complicit in the deficiencies set out above from 2012 at the latest (such deficiencies having been repeatedly raised with senior management by at least Lisbeth Rømer (Head of WHT Department between 2002 and 2013)) but took no or insufficient action to remedy the deficiencies until after the discovery of the WHT Scheme described in the Re-Amended Particulars of Claim; in the premises

40.4.   SKAT failed adequately or at all:

40.4.1.   to develop or implement any or any sufficient processes and/or controls to verify whether applicants for WHT refunds were entitled to reclaim WHT;

40.4.2.   to ensure that the WHT Department was appropriately staffed to deal with the volume of WHT applications received between 2012 and 2015;

40.4.3.   to respond appropriately in 2011 to its discovery of the Dilung Payments which cast serious doubt on the honesty and integrity of Sven Nielsen;

40.4.4.    to act on fundamental process issues raised by (at least) Lisbeth Romer prior to 2012 (including SKAT's inability to verify the underlying ownership of shares held in Danish companies); and

40.4.5.    to implement the 2013 Statutory Order.

41.    In the premises, and in circumstances where SKAT assumed responsibility for deciding whether (1) the shares and dividends described in the Tax Vouchers were beneficially owned by the PPs on whose behalf the ~~Relevant WHT~~ ED&F Man Applications were made; and (2) WHT had been withheld in respect of such dividends:

41.1.    insofar as SKAT paid the ~~Relevant WHT~~ ED&F Man Applications (1) mistakenly, believing that (a) the shares and dividends described in the Tax Vouchers were beneficially owned by the PPs; and (b) WHT had been withheld; or (2) recklessly, not caring whether this was the case or not ~~such shares were beneficially so owned~~, such payments were made as a result of SKAT's negligence;

41.2.    SKAT's own negligence was the only real and substantial cause of the losses claimed against ED&F Man and/or eclipsed any causative effect of ED&F Man's alleged negligence (if proven); further or alternatively

41.3.    any damages payable to SKAT on account of ED&F Man's alleged negligence ought to be reduced because SKAT's contributory negligence caused or aggravated the alleged damage.

**J2. Unjust enrichment/restitution**

42.    As to paragraph 95 (SKAT's alleged mistaken payments to Agents and Global Equities):

42.1.    SKAT was not mistaken as to the information set out in the Tax Vouchers in circumstances where (1) factually (with the exception of the Annex A and Annex E Tax Vouchers), ~~the Custodian Representations were true~~ any representations made by the Tax Vouchers were accurate (5T.Def/18.7.3); (2) legally, ~~the Custodian Representations~~ the Tax Vouchers did not contain the alleged Beneficial Ownership Representation (5T.Def/12.2-12.5) ~~any representation as to the PP's beneficial ownership of the shares described in the Tax Vouchers~~; further

42.2.    SKAT was itself in a state of doubt as to the PP's beneficial ownership of such shares as a result of the matters set out in ~~subparagraphs 24.1.3 and~~ subparagraph 40.2.3 above and 5T.Def/12.3.4 yet paid the tax reclaim agents anyway without taking reasonable or any steps

to resolve such doubt, and therefore SKAT was not relevantly mistaken in relation to the PP's beneficial ownership of the shares described in the Tax Vouchers; in any event

42.3.    the ~~Custodian~~ <u>ED&F Man</u> Representations did not cause SKAT to make payments to tax reclaim agents in relation to the ~~Relevant WHT~~ <u>ED&F Man</u> Applications, which would have been made anyway;

42.4.    further, such payments as were made to ~~Global and~~ GTS in relation to ~~270~~ <u>4</u> of the 420 ~~Relevant WHT~~ <u>ED&F Man</u> Applications were not made to the Agents (as defined) <u>or Global Equities</u>; and

42.5.    in any event, it is not admitted that SKAT paid out the sums alleged to the Agents <u>or Global Equities</u>.

43.    As to paragraph 96 (ED&F Man's receipt of fees), it is admitted that ED&F Man received fees for <u>standard financial brokerage, settlement and custody</u> services provided to its client (the PP) <u>(as set out in 5T.Def/4.2.4 and 6.1)</u> ~~in connection with the PP's acquisition of Danish shares~~ ~~out of the proceeds of any successful WHT applications which included a Tax Voucher prepared by ED&F Man~~ (the "**ED&F Man Fees**"). Save as aforesaid, paragraph 96 is denied:

43.1.    the ED&F Man Fees were not received as a result of SKAT's mistaken payment of WHT refunds (see paragraph 42 above); further,

43.2.    the receipt of the ED&F Man Fees was not unjust: the ED&F Man Fees were received by ED&F Man in good faith for payment of services provided to its clients; and in any event

43.3.    as a result of receiving the ED&F Man Fees, ED&F Man changed its position in good faith <u>and to its detriment in reliance on SKAT's payment of WHT refunds without notice of SKAT's (alleged) interest in such WHT refunds</u> by making payment of bonuses to employees which ED&F Man would not ordinarily have made: accordingly, SKAT is not entitled to restitution in respect of such payments.

44.    Paragraph 97 (ED&F Man's unjust enrichment at SKAT's expense) is denied. Paragraphs 42 and 43 above are repeated. <u>Further, ED&F Man has not (or will not have) been enriched at SKAT's</u>

expense to the extent that SKAT has recovered (or does recover) amounts from the PPs in settlement of the payments made by SKAT in respect of ED&F Man Applications made on their behalf  (see paragraph 2.3 above).

45.     In the premises, it is denied that ED&F Man is liable to make restitution to SKAT of the ED&F Man Fees as alleged in paragraph 98 (ED&F Man's liability in restitution).


**K. ALTERNATIVE DANISH LAW CLAIMS**

**K1. Danish law**

46.     Paragraph 99 (Danish law) is admitted as a broadly accurate summary of Danish law, save that:

46.1.   the liability of (1) a tortfeasor (subparagraphs 99(a)(ii) and (b)) and (2) the accomplice of a tortfeasor (subparagraphs 99(c) and (d)) each fall to be assessed against the *culpa* standard by reference to the factors set out at subparagraph 99(b));

46.2.   a claimant's entitlement to restitution on the grounds of unjust enrichment (subparagraph 99(e)) is a discretionary remedy based on a residual legal principle which is rarely applied.


**K2.  Damages claims against the Alleged Fraud Defendants**

47.     ED&F Man does not plead to paragraph 100 (misconduct of Alleged Fraud Defendants) which does not contain allegations against ED&F Man.


**K3. Damages claims against other Defendants**

48.     As to paragraph 101 (Danish law negligence claim against ED&F Man), ED&F Man does not plead to sub-paragraph (c) (conduct of Agents and Global) which does not relate to ED&F Man. Otherwise it is denied (1) that (with the exception of (a) the Annex A Tax Vouchers; and (b) the Annex E Tax Vouchers (in respect of which violation and/or breach is not admitted)) ED&F Man's conduct violated the *culpa* standard or any other requisite standard of care as alleged in sub-paragraphs (a) and (b) or (2) that SKAT suffered the losses set out in paragraph 90(d) as a result as alleged in sub-paragraph (d): see 5T.Def/11-15, 19-21, 24-25 and paragraphs 40-41 above. Paragraphs 0 to 41 above are repeated.

49.     ED&F Man does not plead to paragraph 102 (other Non-Fraud Defendants) which does not contain allegations against ED&F Man.

### K4. Unjust enrichment/restitution claims

50.    As to paragraph 103 (Danish law unjust enrichment claim against ED&F Man), (1) ED&F Man received payment (including the ED&F Man Fees) for the services it supplied and was not unjustly enriched thereby; (2) in the premises it is denied that ED&F Man is liable under Danish law in unjust enrichment and/or restitution. Paragraphs 42 to 44 and 0 above are repeated.

### K5. Proprietary claim

51.    ED&F Man does not plead to paragraph 104 (proprietary claims against selected Alleged Fraud Defendants) which does not contain allegations against ED&F Man.

### K6.  Additional defences to Danish law claims

52.    Further or alternatively, under principles developed in Danish case law SKAT (as a public authority) is not entitled to rescind decisions to grant WHT refunds which were made properly and on the basis of Tax Vouchers prepared in good faith and where the information set out therein (save for the Annex A Tax Vouchers) was accurate.

53.    Further or alternatively, SKAT's claims against ED&F Man in respect of WHT refund payments made prior to 19 November 2012 are barred by the three year limitation period applicable in Danish law to public debt claims already obsolete on 19 November 2015.

### L. INTEREST

54.    As to paragraph 105 (English law interest claim) and paragraph 106 (Danish law interest claim), (1) it is noted that SKAT claims interest against ED&F Man only if Danish law applies; (2) in the premises it is denied that SKAT is entitled to the interest claimed or at all.

### M. CURRENCY OF CLAIMS

55.    Paragraphs 107 and 108 (currency of claims) are noted.

### N. REVENUE RULE

56.    Further or alternatively, in circumstances where SKAT seeks to enforce in the English courts the revenue laws of Denmark (including (1) the right of Danish companies to withhold tax under the Danish Withholding Tax Act 1967 in respect of shares beneficially owned by foreign shareholders; and (2) double taxation treaties between Denmark and the United States and Canada), SKAT's

claims against ED&F Man are liable to be struck out on the grounds that the English courts lack jurisdiction to determine such claims.

## O. SCHEDULE 5T

57.    ED&F Man pleads to ~~Amended Schedule~~ 5T in 5T.Def. ~~Annex D to this Amended Defence~~.

## P. PRAYER FOR RELIEF

58.    In the premises, it is denied that SKAT is entitled to the relief sought against ED&F Man in paragraph (4) (damages), paragraph (5) (restitution), paragraph (7) (interest) and paragraph (8) (costs) or to any relief.

ALI MALEK QC
MATTHEW HARDWICK QC
GEORGE McPHERSON

ALI MALEK QC
MATTHEW HARDWICK QC
GEORGE McPHERSON

ALI MALEK QC
MATTHEW HARDWICK QC
GEORGE McPHERSON

### Statement of Truth

ED&F Man believes that the facts stated in this Re-Amended Defence are true and I am duly authorised by it to sign this statement of truth on its behalf. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: ……………………………………………………………………..

Full Name: Christopher John Robert Smith

Title/Position: Managing Director of ED&F Man Capital Markets Limited

Date:   11 June 2020

Re-served this 12th day of June 2020 by Rosenblatt, of 9-13 St Andrew Street, London EC4A 3AF solicitors to the 69th Defendant to Claim No CL-2018-000297.

## DEFENCE TO RE-AMENDED SCHEDULE 5T[1]

1.    This Defence:

    1.1.    responds to SKAT's new Re-Amended Schedule 5T ("**5T**") as clarified by (1) SKAT's 28 February 2020 response to ED&F Man's 6 December 2019 Part 18 Request ("**the February 2020 RFI Response**"); and (2) SKAT's 28 February 2020 Further Particulars Regarding the Validity of the WHT Refund Application ("**the Validity Particulars**");

    1.2.    is in addition to ED&F Man's Re-Amended Defence ("**Re-ADef**") which defence (1) amends ED&F Man's existing Amended Defence (dated 5 September 2019) ("**ADef**")[2] in order to respond to the new allegations contained in SKAT's Re-Re-Amended Particulars of Claim (dated 18 February 2020) ("**the RRAPOC**"); but (2) no longer responds to specific allegations of negligence against ED&F Man in circumstances where (a) the allegations in RRAPOC/21-24 as to representations and falsity no longer apply to ED&F Man; and instead (b) SKAT's negligence case against ED&F Man is (as clarified in RRAPOC/24A) exclusively contained in 5T; and

    1.3.    should be read in conjunction with ED&F Man's Defence to the Validity Particulars dated 12 June 2020 (the "**Validity Defence**"); and

    1.4.    save where otherwise stated, deploys the defined terms used in the RRAPOC and the Re-ADef.

2.    Paragraph 1 (ED&F Man as 69th Defendant) is admitted. ED&F Man and its business are described in Re-ADef/6.1.

### A. ALLEGED UNJUST ENRICHMENT

3.    As to paragraph 2 (fees and other payments):

    3.1.    it is admitted that as a result of the Schedule 1B ED&F Man Applications, ED&F Man received fees;

---

[1] In circumstances where (as stated in footnote 1 to the Re-Amended Schedule 5T itself) Re-Amended Schedule 5T replaced the entirety of Amended Schedule 5T, ED&F Man takes the same position as SKAT in <u>not</u> showing in green and underlined the entirety of this new Defence.

[2] ED&F Man's original Defence was dated 14 December 2018.

3.2.    no admissions are made as to the receipt of unidentified "*other payments*" (and SKAT's intention to provide proper particulars of the same "…*after disclosure and/or witness statements*…" is noted);

3.3.    it is denied (as apparently intended by the use of the subheading "Unjust Enrichment") that ED&F Man was unjustly enriched by the receipt of fees and other payments: it was not (and Re-ADef/42-44 is repeated).

## B. ALLEGED NEGLIGENT MISREPRESENTATION
### B1. The Alleged ED&F Man Scheme

4.    Paragraph 3 (the alleged "ED&F Man Scheme") is denied. In particular:

4.1.    the allegation is inadequately pleaded and embarrassingly vague in the absence of any particulars as to when (beyond the vague "…*in or about 2012*…"), how and by whom the alleged "*scheme*" was "*devised and structured*".  In any event (and strictly without prejudice to the burden of proof):

4.2.    it is denied that there was any "*scheme*" (as considered further below) and/or that ED&F Man "…*devised and structured a scheme*…" in the manner alleged or at all. On the contrary:

4.2.1.    from approximately February 2012, ED&F Man was approached by Investment Managers acting on behalf of 3 Canadian and 33 US PPs to set up  brokerage and custody accounts for PPs with a view to such PPs: (1) acquiring the rights to shares in the Dividend Window (Re-ADef/10.3); (2) in companies domiciled in jurisdictions benefiting from a "double taxation" treaty with the United States or Canada; and (3) for the purpose of receiving payment of the dividend (the "**Dividend Arbitrage Strategy**");

4.2.2.    as a result 36 PPs managed by 8 different Investment Managers (as identified in Re-ADef Amended Annex B ("**Annex B**") and Annex C ("**Annex C**")) (1) (between 22 February 2012 and 24 February 2014) became clients of ED&F Man; (2) instructed ED&F Man to acquire shares on their behalf in a variety of jurisdictions utilising a variety of different trades to implement their Dividend

Arbitrage Strategy; and (3) (from 7 September 2012) submitted WHT applications to SKAT (in respect of shares acquired by the PPs in Danish companies);

4.2.3.    ED&F Man played no role in (1) the formulation of the Dividend Arbitrage Strategy or (2) the design of the trades (designed by the Investment Managers); or (3) the recruitment of PPs as clients of ED&F Man (introduced to ED&F Man by the PPs' Investment Managers); instead

4.2.4.    ED&F Man's role was limited to providing standard financial brokerage, settlement and custody services ("**the ED&F Man Services**") which involved in summary (as further set out in Re-ADef/10.4 and 27.3):

4.2.4.1.    upon ED&F Man's retention by the PP: setting up client designated securities and cash accounts for the PP (the Custody Account) to receive and hold shares (the Security) and dividends in respect of the same;

4.2.4.2.    on the Trade Date (i.e. prior to the Reference Date) and on instruction from the PP as communicated by its Investment Managers: (1) purchasing for or redelivering to the PP the rights to the Security (such rights held in its Omnibus Account); and (2) enabling the Hedge;

4.2.4.3.    from the Trade Date and on the Reference Date: holding the Security as bare trustee on behalf of the PP and recording the PP's ownership of the Security in the PP's Custody Account;

4.2.4.4.    on the Settlement Date paying for the Security on behalf of the PP and debiting the PP's Custody Account; and

4.2.4.5.    after the Settlement Date: (1) holding as custodian and trustee on behalf of the PP the dividend in respect of the security rights (net of WHT) in its Omnibus  Account and recording the PP's receipt of the dividend by crediting the PP's Custody Account; (2) producing at the PP's request a Tax Voucher for the PP; and (3) holding as custodian and trustee in its Omnibus Account, the amount of WHT in respect of the dividend  and

3

recording the PP's receipt of this WHT by crediting the PP's Custody Account.

5.    Paragraph 4 (the alleged ingredients of the ED&F Man Scheme) is denied. In particular:

5.1.    again the allegations are inadequately pleaded and embarrassingly vague in the absence of any attempt to particularise when and how ED&F Man is alleged to have recruited the PPs. In any event (and strictly without prejudice to the burden of proof):

5.2.    as to the first sentence, there was no "…*recruitment*…" by ED&F Man of the PPs. On the contrary ED&F Man's commercial relationship with each of the 36 PPs (referred to above and identified in Annexes B and C) commenced (1) not by reason of the alleged recruitment of the PPs by ED&F Man; but (2) by reason of the fact that:

5.2.1.    the PPs required specialist financial brokerage, clearing, settlement and custodian services in order to pursue the Dividend Arbitrage Strategy;

5.2.2.    ED&F Man was (and remains) a well-known global financial brokerage business authorised to provide (among other services) (1) specialised securities lending and financing services; (2) clearing and settlement for equities and fixed-income securities; and (3) custodian services for on-exchange and over-the-counter transactions; and

5.2.3.    the PPs were introduced to ED&F Man by their Investment Managers (acting on the PPs' behalf and as their agents);

5.3.    as to the second and third sentences, whilst ED&F Man did (as alleged in the second sentence) act as custodian on behalf of the PPs, (1) there was no "*scheme*"; and (2) there was no "*purported*" purchase of shares: paragraph 4.2 above is repeated;

5.4.    as to the fourth sentence, it is denied that the transactions were "*entirely financed by the ED&F Man*". Whilst it is admitted that ED&F Man provided funding (as part of a standard suite of services provided in the brokerage market in which it operated), the PPs (1) financed the transaction costs (the dealing and advisory fees and the costs of the Hedge)

4

from the dividends received; and (2) settled the acquisition of the Security with a debit to the Custody Account;

5.5.     as to the fifth sentence, again there was no "*scheme*", and the only "*purpose*" on ED&F Man's part was to provide broking, finance, execution, settlement and custody services to its PP customers in the ordinary course of its business. In particular: (1) the PPs (via their Investment Managers)  required the services of ED&F Man in order to (a)  acquire rights to securities  in Danish listed companies over the Reference Date; (b) enter into the Hedges; (c) receive dividends in respect of such security rights; (d) hold and record the PPs' rights to the securities and receipt of dividends in a client designated account and in the PPs' name; and (e) to provide evidence of such acquisition and receipt in the form of its Tax Vouchers; and (2) the PPs then used specialist tax reclaim agents to make withholding tax applications on their behalf by submitting the completed Tax Relief Form (as defined at RRAPOC/10) with supporting documents.

6.     As to paragraph 5 (alleged facts and matters in support of the existence of the alleged scheme):

6.1.     subparagraph (a) (ED&F Man as alleged "principal beneficiary" of the WHT) is denied:

6.1.1.     ED&F Man was not a "beneficiary" of the WHT: ED&F Man received fees (1) for the ED&F Man Services provided to its clients (the PPs); (2) which varied from client to client; and (3) were calculated by reference to the size of the client's trade and/or the client's profit generated on the totality of its trades, and not by reference to the success of a client's WHT application; and

6.1.2.     the PPs paid these fees from the funds in their Custody Accounts;

6.2.     subparagraph (b) (the "Paragraph 10 Transactions") is denied. In particular:

6.2.1.     paragraph 10 of the Amended Defence (retained at R-ADef/10 and summarised above) was only intended (as stated in the first line thereof) as a summary of "…*the circumstances in which ED&F man produced the Tax Vouchers*…": it was not intended to (and did not) describe either "*a chain of transactions*" or a "*single identical scheme*" – but had the more modest aim (for pleading purposes) of identifying, in a relatively simple and high level way, the standard brokerage and

5

custodian services provided by ED&F Man which culminated in the production of the Tax Vouchers; in the premises

6.2.2.   whilst the format of, and the nature of the information contained in, the ED&F Man produced Tax Vouchers did not vary (see Re-ADef/11) (since ED&F Man's standard form Tax Voucher adequately captured the information categories and information supplied across all of the PPs);

6.2.3.   there was no "*single identical scheme which applied to different PPs*": each Investment Manager devised its own trades on behalf of its PP clients: paragraph 4.2 above is repeated; and

6.2.4.   ED&F Man did not "*devise*" any "*single identical scheme*" as alleged;

6.3.   subparagraph (c) (the "Goldstein PP") is denied. In particular:

6.3.1.   whilst it is admitted (1) that the Goldstein PP was one of ED&F Man's PP clients and on behalf of whom ED&F Man issued 8 Tax Vouchers (as alleged); and (2) that in the 30 August 2019 filing the Goldstein PP has alleged that ED&F Man "…*solicited and sold*…" to the Goldstein PP "…*customised equity finance solutions*…";

6.3.2.   Goldstein PP's allegation of solicitation is emphatically denied: it was Goldstein PP (via its Investment Manager) which approached ED&F Man (and paragraphs 4 and 5 above are repeated).

**B2. The Tax Vouchers**

7.   As to paragraph 6 (alleged implementation of the ED&F Man Scheme):

7.1.   it is admitted that ED&F Man produced 420 documents entitled "Tax Vouchers" on behalf of 36 PPs: Re-ADef/10 and 11 are repeated;

7.2.   it is denied that from September 2012 to May 2015 (or at all), ED&F Man either implemented or purported to implement the alleged ED&F Man Scheme: there was no such scheme (and paragraphs 4 and 5 above are repeated).

8.  As to paragraph 7 (purpose of the Tax Vouchers):

8.1.  as to the first sentence (ED&F Man's financial benefit):

8.1.1.  SKAT's use of the defined term "*ED&F Man Applications*" (1) is misleading (in circumstances where such applications were made (a) on behalf of the PPs and (b) by means of Tax Relief Forms prepared and submitted by the PPs' specialist tax reclaim agents, the preparation and submission of which ED&F Man played no part in); and (2) is only used in this Defence to avoid a proliferation of different defined terms (and strictly and only in order to denote WHT applications in respect of which ED&F Man Tax Vouchers were submitted);

8.1.2.  it is denied that there was a "*scheme*" (paragraphs 4 and 5 above are repeated);

8.1.3.  it is denied that ED&F Man's "*financial benefit*" depended on "…*the successful making of ED&F Man Applications to SKAT*…" (and paragraph 6.1 above is repeated);

8.2.  as to the second sentence (the Tax Voucher):

8.2.1.  it is admitted that ED&F Man knew that the Tax Vouchers which it produced for the PPs were to be used for the purpose of the ED&F Man Applications; however (and for the avoidance of doubt)

8.2.2.  the  principal document which ED&F Man understood to be required by SKAT (for the purpose of the ED&F Man Applications) was SKAT's Tax Relief Form (defined at RRAPOC/10) which required: (1) a signature from the PP as WHT applicant (or from the PP's specialised tax reclaim agent) declaring the PP as "*beneficial owner*"; and (2) a signature and stamp from a "*competent authority*" in the PP's country of origin certifying that "*the beneficial owner is covered by the Double Taxation Convention*" ;

8.3.  it is denied (as alleged in the third sentence) that ED&F Man produced the Tax Vouchers "…*for the purpose of, and with the intention that, the Tax Vouchers would be presented to*

7

*SKAT as part of an ED&F Man Application in accordance with the ED&F Man Scheme…*":

    8.3.1.    ED&F Man produced the Tax Vouchers at the request of and for the purpose of its clients (the PPs); and

    8.3.2.    the subsequent tax reclaim applications (the so-called "*ED&F Man Applications*") were <u>not</u> made in accordance with the alleged "*ED&F Man Scheme*" (and were <u>not</u> made by ED&F Man): these 420 applications were made utilising the Tax Relief Form which were submitted by the 4 tax reclaim agents (identified at Re-ADef/17.1) on behalf of the PPs.

9.    As to paragraph 8 (the WHT payments):

    9.1.    as to the first sentence (the WHT payments):

        9.1.1.    it is admitted that the Tax Vouchers were "*presented to SKAT*": they were included as one of the documents supporting the Tax Relief Forms; however

        9.1.2.    ED&F Man had no involvement in the presentation of these Tax Relief Forms, which were (1) prepared and signed by the 4 tax reclaim agents (<u>not</u> by ED&F Man) on behalf of the PPs; (2) required (in the language of the pro forma forms) to be certified by the "*competent authority*"; and (3) presented to SKAT by the 4 tax reclaim agents; and

        9.1.3.    whilst the aggregate sum of the WHT payments is admitted, it is denied (insofar as it is intended to be alleged) that SKAT made the WHT payments "*in response*" to the presentation of the Tax Vouchers: on the contrary, and strictly without prejudice to the burden of proof: (1) (as set out at Re-ADef/15) SKAT's Tax Relief Form made clear that the declaration as to beneficial ownership was made (a) in the Tax Relief Form itself (in the first prominent entry "*Beneficial Owner*"); (b) by (or on behalf of) the person claiming the WHT refund; (c) with a stamped and signed certification from the "*competent authority*" in the PP's home country that the "*beneficial owner is covered by the Double Taxation Convention*" and (2)

8

SKAT made payments "*in response*" to the Tax Relief Form (and in particular that declaration);

9.2.    as to the second, third, fourth and fifth sentences (remission of WHT payments by Goal, Acupay and Global Equities):

9.2.1.    it is admitted that in respect of the ED&F Man Applications made by Goal and Acupay, they remitted the WHT payments to ED&F Man following deduction of their own fees (the PP's receipt of such payment being recorded in the PP's Custody Account);

9.2.2.    it is admitted that in respect of the ED&F Man Applications made by Global Equities,  ED&F Man received the WHT payments (1) directly from SKAT until June 2014; and (2) indirectly from Global Equities' UK associate/agent thereafter (the PP's receipt of such payment  again being recorded in the PP's Custody Account);

9.2.3.    it is admitted that ED&F Man (1) knew that successful ED&F Man Applications were being made to SKAT; and (2) understood that the Tax Vouchers were one of a number of documents which were  submitted by the PPs' specialist tax reclaim agents  in support of the Tax Relief Forms; however (and again)

9.2.4.    ED&F Man had no involvement in the completion and submission of the 420 Tax Relief Forms by which the ED&F Man Applications were made.

**B3. The Alleged ED&F Man Representations**

10.    As to paragraph 9 (the content of the Tax Vouchers):

10.1.    it is admitted that each of the Tax Vouchers contained the text cited; further

10.2.    Re-ADef/11.1 identifies the 11 information categories (and the information supplied pursuant to each) also set out in the Tax Vouchers; and

10.3.    Re-ADef/11.2.2 notes that the 40 GP Tax Vouchers additionally stated that: (1) the Gibraltarian Partnership "*held*" the security identified therein "*over the dividend date*" for the

9

PP; and (2) the PP was the "*beneficial owner*" of the security. For the avoidance of doubt these references:

    10.3.1.   were intended only to communicate the fact that (in the tripartite relationship between (1) ED&F Man; (2) the Gibraltarian Partnership; and (3) the PP) (a) it was the Gibraltarian Partnership (ED&F Man's client) who held the Security; whilst (b) the PP was the beneficial (not legal) owner of the Security;

    10.3.2.   were not intended to and did not make any representation as to beneficial ownership as a matter of Danish law or the relevant double tax treaty.

11.    As to paragraph 10 (alleged express representations):

    11.1.   it is admitted that each Tax Voucher contained the information set out at subparagraphs 10 (a) (b) (c) and (d); however

    11.2.   it is denied that the Tax Vouchers contained any "*express representations*" by ED&F Man to SKAT: on the contrary each Tax Voucher (1) was addressed by ED&F Man to its client only and not to SKAT; and (2) was submitted to SKAT by or on behalf of the PP.

12.    As to paragraph 11 (alleged implied representations):

    12.1.   it is denied that the Tax Vouchers contained any "*implied representations*" by ED&F Man to SKAT: again the Tax Vouchers were addressed by ED&F Man to its client only and not to SKAT and were submitted to SKAT by or on behalf the PP; in any event

    12.2.   it is denied that the Tax Vouchers impliedly represented that the relevant PP "…*was the beneficial owner of the specified number of shares in the named Danish company and the beneficial owner of the amount received by way of a dividend net of withholding tax…*" ("**the Beneficial Ownership Representation**") for the reasons alleged at subparagraphs 11 (a) and (b) or at all. In particular:

    12.3.   the representations (if any) made by the Tax Vouchers fall to be construed in context and objectively according to their effect on a reasonable representee in the position and with the characteristics of the actual representee. Yet SKAT would (or should) have known that:

12.3.1.  ED&F Man: (1) provided custody services to its clients in relation to securities held in companies domiciled across multiple jurisdictions and subject to numerous different tax regimes; but (2) did not hold itself out as a tax adviser; and (3) was not qualified to advise on (a) the legal or beneficial ownership under Danish Law of securities (or dividends paid thereon) held in a Danish company; or (b) the relevant double taxation treaty; and

12.3.2.  the Tax Voucher (1) was addressed by ED&F Man to its client only, and not to SKAT; and (2) (save for the GP Tax Vouchers considered above) did not address the question of the PP's beneficial ownership of the security; by contrast

12.3.3.  the Tax Relief Form, which was submitted by or on behalf of the PP: (1) was addressed to SKAT; (2) did contain the PP's express declaration as to beneficial ownership (containing 6 references to "*beneficial owner*"); and (3) was to be stamped and signed by a "*competent authority*" certifying the PP as the beneficial owner covered by the double tax treaty; further

12.3.4.  the concept of beneficial ownership was at the material time (and remains) legally uncertain in Danish law because: (1) historically Danish law did not distinguish between legal and beneficial ownership (a common law concept unfamiliar to Danish law); and (2) the Danish Supreme Court had not (and still has not) determined the meaning of the concept;

12.3.5.  as the tax authority in Denmark with overall responsibility for processing WHT applications, SKAT was responsible for determining (1) the beneficial ownership of shares and dividends held in Danish companies for the purposes of Danish law and/or the double tax treaties; (2) the information and documentation necessary to establish beneficial ownership in accordance with the *officialmaksime* principle; and (in that context) (3) an applicant's eligibility for a WHT claim (by reference to the four conditions of eligibility for a refund of WHT set out in section 69B(1) of the Danish Withholding Tax Act (the "**WHT Act**") as further set out in Validity Defence/4); however

12.3.6.    at the material time (1) SKAT had not reached and/or published a clear and consistent view as to the meaning of beneficial ownership for these purposes; with the necessary result that (2) it was not possible for ED&F Man to make the Beneficial Ownership Representation; in the premises:

12.4.    any representations as to beneficial ownership were made by (1) the entity described as the "*beneficial owner*" on the Tax Relief Form, on whose behalf the ED&F Man Applications were submitted; and/or (2) the tax reclaim agents which submitted the ED&F Man Applications;

12.5.    as this latest iteration of SKAT's case as to the alleged express and implied representations made by the Tax Vouchers necessarily acknowledges, save for the GP Tax Vouchers the Tax Vouchers did <u>not</u> contain <u>any</u> text addressing the question of the PPs' "*beneficial ownership*" of securities but consistent with the description and limited purpose of the document as a "Tax Voucher":

12.5.1.    stated only that the relevant PP was "…*holding*…" the identified security over the dividend date, in respect of which an identified dividend had been received and WHT "*suffered*";

12.5.2.    confirmed that ED&F Man was not itself the "*beneficial owner*" of the security; but

12.5.3.    did not and did not purport to engage with the question as to whether or not the PP was the "*beneficial owner*" of the security (or dividend) for the purposes of Danish law and/or the double tax treaty;

12.6.    as to the alleged implied representation that the Tax Voucher was "*an honest and accurate statement of the facts set out in it*" (subparagraph 11(c)):

12.6.1.    it is admitted that by the Tax Voucher ED&F Man impliedly represented to its client (the PP) (1) that the information set out in the Tax Voucher directly within ED&F Man's knowledge (as to the PP "holding" the Security) was accurate; and (2) that ED&F Man reasonably and honestly believed that the information set out in the Tax

12

Voucher not directly within ED&F Man's knowledge (as to the payment of the specified dividend net of WHT to the PP) was accurate; but (for the avoidance of doubt)

12.6.2.   ED&F Man did not make this or the alleged implied representation to SKAT (and paragraph 12.1 above is repeated).

13.   In the premises the alleged "ED&F Man Representations" as defined at paragraph 12 (and in particular the alleged Beneficial Ownership Representation) are denied.

14.   As to paragraph 13, it is denied that "…*a reasonable person in the position of SKAT would have understood…the ED&F Man Representations in the sense pleaded*…": paragraphs 11 and 12 above are repeated.

15.   As to paragraph 14 (alleged Beneficial Ownership Representation):

15.1.   it is denied that there was any representation of "…*beneficial ownership*…": paragraphs 11 and 12 above are repeated; further

15.2.   SKAT has now recently clarified (by Responses 1 and 2 of its February 2020 RFI Response) that it <u>is</u> its case that (1) the alleged Beneficial Ownership Representation was a representation as to beneficial ownership *as a matter of Danish law*; (2) essentially on the basis that (underlining supplied) "…*the purpose for which the Tax Vouchers were produced by ED&F Man….was…to provide information to SKAT that <u>the relevant PP was the beneficial owner of a dividend paid</u> on Danish shares*…". This too is denied. Again (and as SKAT would or should have known):

15.2.1.   the limited purpose of the Tax Vouchers (apparent on the face of the same) was to state ED&F Man's belief that (1) the relevant PP was "…*holding*…" the identified security over the dividend date; and that in respect of that security (2) an identified dividend had been received and WHT "*suffered*";

15.2.2.   the Tax Vouchers did not (and did not purport to) "…*provide information to SKAT that the relevant PP was the beneficial owner*…" as a matter of Danish law or  the

13

relevant double tax treaty: save for the GP Tax Vouchers (considered above) the Tax Vouchers were silent as to the question of the PPs' beneficial ownership;

15.2.3.   by contrast it was the purpose of the Tax Relief Form, completed by the tax reclaim agent, and signed by or on behalf of the PP, to claim that the relevant PP was the "*beneficial owner*": the pro forma Tax Relief Form contained 6 references to "*beneficial owner*" and concluded with a formal certification by the PP's "*competent authority*" in terms "…*It is hereby certified that the beneficial owner is covered by the Double Taxation Convention concluded between Denmark and [relevant state]…*"; however

15.2.4.   ED&F Man played no part in the completion of the Tax Relief Form (and prior to these proceedings had not seen a completed Tax Relief Form);

15.3.   it is not admitted that a reasonable person would have understood (and that SKAT in fact understood) the alleged Beneficial Ownership Representation "…*in its ordinary and natural sense*…" that "…*the beneficial owner is the entity that benefits from the interest economically and has the power freely to determine the use to which it is put…*". In particular (albeit strictly without prejudice to the burden of proof):

15.3.1.   SKAT now contends (by Responses 2.2, 4.1 and 4.2 of its February 2020 RFI Response) that (1) the concept of beneficial ownership in Danish law at the material time was not "*legally uncertain*"; but (2) had the "*ordinary and natural*" meaning contended for at 5T/14 and as "*set out*" at paragraphs 44 and 45 of the Validity Particulars; however

15.3.2.   paragraphs 44, 45, 47 and 50 of the Validity Particulars (1) invoke (paragraph 44) "…*the concept of "beneficial owner" in the Double Tax Treaties…*" as "…*derived from…*" the OECD Model Convention ("**the OECD Convention**") and as explained in the commentary thereto ("**the OECD Commentary**"); (2) identify (paragraph 45) 7 "…*non-exhaustive factors relevant to decide whether a WHT refund applicant was the beneficial owner of a dividend*…" ("**the 7 OECD Factors**"); and (3) cite (paragraph 47 and 50) 7 "…*facts and matters*…" in support

14

of the claim that on a proper analysis the ED&F Man Applicants were "…*not the beneficial owners*…" of the relevant dividends;

15.3.3.   SKAT's contention that, notwithstanding the Tax Vouchers' silence as to the PPs' "beneficial ownership", the Tax Vouchers in fact contained the implied Beneficial Ownership Representation (1) by reference to a complex evaluation of the circumstances of the acquisition, disposition and economic benefit derived from the PPs' various trades; and (2) in the context of the Double Tax Treaties and 7 OECD Factors, is obviously unrealistic and unsustainable; and

15.4.   no admissions are made as to the nature of SKAT's alleged "understanding": SKAT (1) is put to strict proof  as to its understanding of "beneficial ownership" at the material time between January 2012 and May 2015; and (2) is required to identify and disclose the "…*guidelines published on its website*…" to which reference is made.

### B4. Alleged Negligent Misrepresentation

16.   Paragraph 15 (alleged liability for negligent misrepresentation) is denied. In particular:

16.1.   it is denied that ED&F Man made the alleged express and/or implied representations: paragraphs 11, 12 and 15 above are repeated; in any event

16.2.   it is denied (1) that ED&F Man owed a duty of care to SKAT; (2) that (with the exception of the Annex A and E Tax Vouchers) any representations made by the Tax Vouchers were inaccurate; (3) that ED&F Man was in breach of duty of care; and (4) that SKAT relied upon the alleged representations (a) in determining the PPs' beneficial interest in the security as a matter of Danish law; and/or (b) in making the WHT payments, for the reasons set out below.

17.   Paragraph 16 (ED&F Man's alleged duty of care to SKAT) is denied. In particular:

17.1.   there was no contractual relationship between ED&F Man and SKAT (which was not ED&F Man's client);

17.2.   the Tax Vouchers were prepared for ED&F Man's clients only and were not submitted by ED&F Man to SKAT;

17.3.    there were no written or oral communications at any material time between ED&F Man and SKAT in relation to the Tax Vouchers or otherwise;

17.4.    by the Tax Vouchers, ED&F Man did not make any representations to SKAT; moreover

17.5.    at the time of receipt of the Tax Vouchers, SKAT knew or ought to have known (in particular from the matters set out at subparagraph 12.3 above) that (1) ED&F Man was not assuming responsibility to SKAT for any (alleged) representations relating to the beneficial ownership of the securities or dividends described in the Tax Vouchers; (2) SKAT could not rely on such representations without independent inquiry.

18.    As to paragraph 17 (facts and matters in support of duty of care allegation) it is denied that the facts and matters set out in subparagraphs 17 (a) to (h) support the imposition of a duty of care. In particular:

18.1.    as to subparagraph 17 (a) (production of the Tax Vouchers), ED&F Man produced the Tax Vouchers for its clients (the PPs), and the Tax Vouchers were only provided to SKAT by the four reclaim agents as part of the ED&F Man Applications;

18.2.    as to subparagraph 17 (b) (reliance without further enquiry):

18.2.1.    it is denied that ED&F Man "…*intended and foresaw that SKAT would rely upon the information set out in the Tax Vouchers, without further enquiry, in making payments in response to the ED&F Man Applications*…"; and it is denied that it was "…*reasonably foreseeable*…" that SKAT would so rely. In particular (albeit strictly without prejudice to the burden of proof):

18.2.2.    it is denied that ED&F Man "…*intended and foresaw*…" that SKAT would make payments in reliance upon the information contained in the Tax Vouchers: again it was the Tax Relief Form which contained the repeated description "*beneficial owner*" by or on behalf of the WHT applicant; further

18.2.3.    as noted above, SKAT has now clarified, at Response 1 of SKAT's February 2020 RFI Response, that it <u>does</u> allege that the alleged Beneficial Ownership

16

Representation was a representation as to beneficial ownership *as a matter of Danish law*; yet

18.2.4.    whilst the alleged Beneficial Ownership Representation is denied (for the reasons set out at paragraph 12 above), it is denied in any event that ED&F Man intended and/or foresaw that such an implied representation as to beneficial ownership as a matter of Danish Law would be relied upon by SKAT "…*without further enquiry*…". On the contrary (1) ED&F Man did not (and did not purport to) undertake the complex evaluation of the circumstances of the acquisition, disposition and economic benefit derived from the PPs' various trades (in the context of the Double Tax Treaties and 7 OECD Factors) which SKAT now claims to be essential to an analysis of beneficial ownership as a matter of Danish law ("**the Danish Law Beneficial Ownership Analysis**");  (2) ED&F Man had no intention and no knowledge that SKAT should not or would not undertake its own "*enquiry*" in respect of the Danish Law Beneficial Ownership Analysis; and (3) ED&F Man (a) never saw SKAT's internal guidance note for the processing of WHT applications (referred to at paragraph 45 of the fifteenth  witness statement of Andrew Herring ("**Herring 15**")[3]) which according to Herring 15 was not produced until "*in around August 2015*" (in respect of which date SKAT is put to strict proof but which in any event was after the last of the 420 ED&F Man Applications was allegedly made on 9 April 2015); and (b) did not know (and could not have known) that SKAT's "…*general approach was to trust and pay out on any WHT applications*…" without any independent verification process of its own;  and

18.2.5.    it is denied that it was "*reasonably foreseeable*" that SKAT would rely upon the information in the Tax Vouchers "*without further enquiry*": on the contrary, in accordance with the *officialmaksime* principle, SKAT was obliged (and entitled pursuant to section 69B(2) of the WHT Act) to request such further documentation and information as it required in order to determine the eligibility of an applicant for a refund of WHT (as further set out in Validity Defence/4);

---

[3] Dated 28 February 2020.

18.3.   as to subparagraph 17 (c) (benefit), it is denied that the ED&F Man Applications made using the Tax Vouchers were "…*principally for the benefit of ED&F Man*…": subparagraphs 6.1 and 8.1.3 above are repeated;

18.4.   as to subparagraph 17 (d) (alleged reliance):

18.4.1.   it is not admitted that SKAT did rely upon the information set out in the Tax Vouchers in making the payments sought and SKAT is put to strict proof as to (1) the nature of SKAT's evaluation of the ED&F Man Applications at the material time; and (2) the weight (if any) placed by SKAT upon the information contained in the Tax Vouchers in that evaluation;

18.4.2.   it is not admitted that SKAT did not have "…*the information necessary to enable it to verify the information confirmed by ED&F Man in the Tax Vouchers…*" and SKAT is put to strict proof of the same. In any event, if SKAT did not have such information it should, as the relevant tax authority with overall responsibility for processing WHT applications, have taken proper steps to acquire such information, in particular in circumstances where (1) each of the covering letters sent by the reclaim agents when submitting the Tax Relief Forms offered to provide "*any further assistance*"; (2) each of the Tax Vouchers concluded with the offer "…*If you have any further concerns or issues please do not hesitate to contact us…*"; (3) Section 1(2) of the Danish Tax Control Act gave SKAT the power to request information from third parties for the purposes of assessing and determining tax liability; (4) pursuant to section 69(B) of the WHT Act, SKAT had the legal powers to require further information from a WHT applicant or its agent when assessing an application; and (5) the *officialmaksime* principle obliged SKAT to obtain the information and documentation required to determine the eligibility of a WHT applicant (as set out in paragraph 18.2.5 above);

18.4.3.   it is not admitted that "…*it was SKAT's practice not to subject the application to any detailed due diligence*…" and again SKAT is put to strict proof as to the precise nature of "*SKAT's practice*" and "*due diligence*" (such as it was) in relation to the evaluation and determination of the ED&F Man Applications, including in particular the importance attached to the Tax Relief Form itself;

18

18.4.4.    if (which is not admitted) SKAT did so rely, it is denied that SKAT's reliance, apparently "…*without further enquiry*…" and without "…*any detailed due diligence*…" was reasonable. In particular:

18.4.4.1.    it was for SKAT, as the tax authority in Denmark with overall responsibility for processing the ED&F Man Applications, to devise and implement appropriate systems and procedures which ensured that such applications were fairly and accurately reviewed and assessed;

18.4.4.2.    SKAT has now explained (at paragraphs 44, 45, 47 and 50 of the Validity Particulars) the necessary Danish Law Beneficial Ownership Analysis by reference to the 7 OECD Factors and Alleged Facts and Matters;

18.4.4.3.    self-evidently, the Tax Vouchers contained no information in relation to this Danish Law Beneficial Ownership Analysis and/or the 7 OECD Factors including in particular: (1) whether the ED&F Man Applicant had the power freely to decide how to dispose of the income said to constitute a dividend; (2) whether the ED&F Man Applicant's power to use and enjoy the dividend was constrained by an obligation to pass on the economic benefit of the amount received to another person; (3) whether the ED&F Man Applicant was an agent or nominee or conduit for the passing of the dividend; (4) whether the ED&F Man Applicant received the dividend as part of a transaction between related parties that was not arm's length; (5) whether the ED&F Man Applicant was an entity of commercial substance; (6) whether a holding company (or other affiliated entity or individual) exercised a level of control over the ED&F Man Applicant that was beyond the control and management that one would normally expect; and (7) whether the ED&F Man Applicant was set up for the sole or main purpose of obtaining the benefit(s) of a double tax treaty; and

18.4.4.4.    in the premises, SKAT's alleged reliance, "*without further enquiry*" or "*any detailed due diligence*", on the alleged Beneficial Ownership Representation in a document which contained (1) no express statement

19

as to the PPs' beneficial ownership; (2) no information in relation to the 7 OECD Factors; (3) no Danish Law Beneficial Ownership Analysis; and (4) none of the evidence of ownership required by SKAT in its current 2020 website guidance entitled "*Claiming refund of Danish dividend tax*" (such as a custody account statement, proof of trade, receipt or SWIFT confirmation), was not reasonable; finally

18.4.4.5.  ED&F Man relies upon the opinion of Rigsrevisionen (cited below) to the effect that SKAT should have taken, but failed to take, elementary steps to check the validity of the tax reclaim information which it received;

18.5.  as to subparagraph 17 (e) (ED&F Man's alleged knowledge re no detailed due diligence), it is denied that ED&F Man knew that SKAT's practice "…*was not to subject a withholding tax application to detailed due diligence*…" for the reasons alleged or at all. On the contrary:

18.5.1.  ED&F Man had no knowledge of the level of enquiry or due diligence to which SKAT subjected the ED&F Man Applications and (as set out at subparagraph 18.4 above) SKAT is now required to give full and proper particulars of the same;

18.5.2.  in any event (albeit strictly without prejudice to the burden of proof) ED&F Man notes the claim (at paragraph 44.2 of the 15th witness statement of Andrew Herring (dated 28 February 2020)) that the average time between request to SKAT and payment between 2012 and 2015 for WHT Applications and ED&F Man Applications made through Goal was 33 days: an average processing time of nearly 5 weeks would have permitted checks to be performed by, or on behalf of, SKAT;

18.6.  as to subparagraphs 17 (f) and (g) (alleged reasonable reliance), it is denied that SKAT's reliance was reasonable for the reasons alleged or at all. In particular:

18.6.1.  it is admitted (as alleged at subparagraph 17 (f)) that the purchase of shares by the PPs was "…*settled internally to ED&F Man in its books and records*…" such that

ED&F Man was able to provide information as to "…*the purchase of shares and receipt of dividends by an individual PP*…"; and

18.6.2.    it is admitted and averred (as alleged at subparagraph 17 (g)) that the Tax Vouchers summarised the cash and securities accounts held by ED&F Man on behalf of the relevant PP: however

18.6.3.    no admissions are made as to the alleged inability of SKAT (subparagraphs 17 (f) and (g)) to verify this information in each Tax Voucher and ED&F Man notes (1) the opinion of Rigsrevisionen (the Danish national audit agency) at paragraphs 31, 36 and 38 of its report) that:

> **"….Rigsrevisionen is of the opinion that SKAT has refunded the dividend tax without checking the validity of the information received by SKAT. SKAT has not established and written down the procedures for checking the refund of dividend tax. Rigsrevisionen notes that the absence of such business practices increases the risk of inadequate handling and management…";**

and:

> **"…The investigation carried out by SIR shows that SKAT's IT support for the dividend area is insufficient for implementing an effective basic control based on the data recorded. A basic check includes checking whether shareholder covered by the request of refund of dividend tax is true and whether the dividend tax is included…SKAT's IT support for the refund of the dividend tax has been completely insufficient. This means that the input data has not been controlled…"**

and (2) the conclusion of the National Audit Office of Denmark in its February 2016 report that:

> **"…SKAT's administration and the Ministry of Taxation's supervision of the refunds of dividend tax have been very unacceptable. SKAT's control of the payments of the refunds of dividend tax and the Ministry of Taxation's supervision of the are have been extremely inadequate…"**

and in particular that:

> **"…The refunds were made on a completely insufficient basis and SKAT did not check completely basic information in the requests, for example the ownership of the shares and whether the application's dividend tax had been withheld…"**

in any event

18.6.4.   in respect of the Danish Beneficial Ownership Analysis and the 7 OECD Factors: (1) ED&F Man had no monopoly on information; and (2) on the contrary it was for SKAT, as the tax authority in Denmark with overall responsibility for processing all WHT reclaims, to identify and call for such information as it required to undertake the necessary evaluation and analysis;

18.7.   as to subparagraph 17 (h), it is denied that the conduct alleged (ED&F Man's alleged failure to verify the correctness of the information set out in the Tax Vouchers) is relevant to whether ED&F Man owed SKAT a duty of care (as distinct from whether any such alleged duty was breached). In any event, it is denied that ED&F Man "…*failed to verify the correctness of the information set out in the Tax Vouchers*…" in the general manner alleged. In fact:

18.7.1.   as disclosed in Annex A of ED&F Man's original 14 December 2018 Defence, 9 of the 420 Tax Vouchers (the Annex A Vouchers) contained errors in a total value of DKK312,120 (the sum of £37,579 as at that date[4]); and

18.7.2.   as disclosed in Annex E of ED&F Man's 6 September 2019 Amended Defence (following a detailed review of the 420 Tax Vouchers and the underlying documents) a further 80 of the 420 Vouchers (the Annex E Tax Vouchers) contained errors in the total value of DKK183,902,399 (the sum of £22,123,459 as at that date[5]);  however

18.7.3.   the balance of 331 Tax Vouchers ("**the Disputed Tax Vouchers**") (1) were accurate in that (a) ED&F Man *was* holding the Security (identified at entries 1, 2, 3 and 7 of the Tax Vouchers) on the Reference Date for the identified PP; (b) ED&F Man reasonably and honestly believed that the PP *had* received the dividend in respect of the Security (identified at entry 9) net of WHT (identified at entry 10); and (2) were (a) based on "*genuine business records*" in relation to "*genuine transactions*" (as conceded by SKAT: ADef/27.5.7); and (b) supported by contemporaneous ED&F Man's records ("**the ED&F Man Records**") including in particular:

---

[4] At the exchange rate of 1DKK: £0.1204 on 14 December 2018 (XE Currency historical data).
[5] At the exchange rate of 1DKK: £0.1203 on 6 September 2019 (XE Currency historical data).

18.7.3.1.  the Declaration as published by Bloomberg in respect of the security;

18.7.3.2.  (1) the PP's order (ordinarily by email instruction) for both (a) the security and (b) the Hedge; and (2) ED&F Man's confirmation of the same (again by email);

18.7.3.3.  a booking in ED&F Man's trading software recording ED&F Man's "Buy" of the Security and "Sell" or "Return" to the PP;

18.7.3.4.  a SWIFT message confirming delivery of the Security to the Omnibus Account (and a daily SWIFT message confirming the retention of the Security therein);

18.7.3.5.  entries in the PP's Custody Account recording ED&F Man's acquisition of the Security on the Trade Date; and

18.7.3.6.  a journal entry in ED&F Man's trading software identifying the nature, date and amount of a dividend payment credited to the PP in respect of the Security;

18.7.3.7.  entries in the PP's Custody Account recording: (1) the credit of the net dividend payment in respect of the Security; and (2) the credit of the tax reclaim to the PP a few weeks later;

18.8.  in the premises it is denied, as alleged at subparagraph 17 (i), that ED&F Man assumed responsibility to SKAT for alleged representations made in the Tax Vouchers.

19.  As to paragraph 18 (alleged falsity of the ED&F Man Representations):

19.1.  as to subparagraphs 18 (a) (b) (c) and (d)  (the Annex E Tax Vouchers), it is admitted that ED&F Man admits that the Annex E Tax Vouchers were inaccurate: this information was volunteered by ED&F Man in the 6 September 2019 Amended Defence (and in particular in Annex E thereof) following a review which revealed that the relevant PPs had received a payment which was *equivalent in value* to a dividend net of 27% WHT (but not the identified net dividend itself); however

23

19.2.    as to subparagraph 18(d) (and save in relation to the 7 GP Tax Vouchers submitted by or on behalf of Del Mar Asset Management Saving & Retirement Plan ("**Del Mar**")) it is denied that even in respect of the inaccurate Annex E Tax Vouchers ED&F Man had "…*falsely stated that the relevant PP was the beneficial owner of the specified shares*…" and "…*had received as beneficial owner a dividend net of withholding tax…*": they stated only that the PP "…*was holding…*" the security "…*over the dividend date*…" and made no statement (express or implied) about the PP as "*beneficial owner*"; and

19.3.    as to subparagraph 18 (e) (the Disputed Tax Vouchers):

19.3.1.    it is denied (1) that the relevant PP "…*did not hold…the specified shares*…" and/or (2) that ED&F Man did not reasonably and honestly believe that the PP "…*had not received any dividend net of WHT*…": on the contrary, the Disputed Tax Vouchers were accurate: subparagraph 18.7.3 is repeated;

19.3.2.    as to the different allegations that the relevant PP "…*was not the beneficial owner of the specified shares*…" and had not received "…*any dividend as beneficial owner*…" (1) the Disputed Tax Vouchers did not contain the alleged Beneficial Ownership Representation: paragraph 12 above is repeated; in any event (2) the allegation of falsity is not admitted and SKAT is put to strict proof thereof;

19.3.3.    it is denied (1) (subparagraph 18 (e)(i)) that the PP held any interest in the security or received any payment by way of dividend "…*for the benefit of ED&F Man*…"; and/or (2) (subparagraph 18 (e)(ii) and (iii)) that ED&F Man was "…*the beneficial owner of any specified shares or dividend*…" and/or "…*the true principal of the ED&F Man Applications*…" for the reasons alleged or at all, in particular:

19.3.3.1.    (as to subparagraph 18 (e) (ii) (A)) none of the PPs were a "*mere nominee recipient of the dividend*": they were  independent pension plans which (1) contracted with ED&F Man for its services on an arms-length basis; (2) originated all trade instructions; (3) held the relevant Security on the Reference Date (as recorded in their respective Custody Account); (4) received and held the dividend in their respective Custody

24

Account; (5) used the dividend for their own benefit (by paying transaction costs); and (6) retained the balance of the dividend;

19.3.3.2. (as to subparagraph 18 (e) (ii) (B)) it is denied that PPs provided no funding for their transactions: subparagraph 5.4 is repeated;

19.3.3.3. (as to subparagraph 18 (e) (ii) (C)) it is denied that PPs did not bear any economic risk: moreover, whilst the PPs' trades were designed, in particular through the Hedge (Re-ADef/10.4.1), to minimise economic risk hedging was a rationale commercial strategy in the context of the Dividend Arbitrage Strategy (which did not cause ED&F Man to become the beneficial owner as apparently alleged);

19.3.3.4. (as to subparagraph 18 (e) (ii) (D)) it is denied that the PPs had "…*no control over the disposition of any shares purchased*…": at all material times (1) the PPs had ownership and retained control over the Security; and ED&F Man (2) held the Security on trust for the PPs in the Omnibus Account; and (3) recorded the PPs' ownership of the Security in the Custody Accounts.

20. Paragraph 19 (alleged breach) is denied. In particular:

20.1. as to subparagraph 19 (a) (the Annex E Tax Vouchers) (1) it is denied that ED&F Man owed a duty of care: paragraphs 17 and 18 above are repeated; (2) in the premises the alleged failure is denied; in any event (3) in the absence of any attempt to identify the "*basic systems and control*" relied upon, no admissions are made as to whether ED&F Man would not have made the misstatements but for the alleged failure to maintain the same;

20.2. as to subparagraph 19 (b) (ED&F Man's knowledge of beneficial ownership):

20.2.1. it is denied that ED&F Man ought to have known that the "*chain of transactions*" comprised in the alleged "*ED&F Man Scheme*" "…*did not vest beneficial ownership in the PPs*…": there was no "*ED&F Man Scheme*", no "*chain of transactions*" and no Beneficial Ownership Representation;

20.2.2.   it is denied (if alleged) (1) that ED&F Man was required to obtain legal advice in relation to a PP's beneficial ownership of the Security (Re-A.Def/10.3) before preparing a Tax Voucher for the PP in respect of the Security; and (2) that it was negligent of ED&F Man not to do so: no Beneficial Ownership Representation was made in the Tax Vouchers such as to necessitate the taking of such advice (as to which subparagraphs 12.3 and 12.4 above are repeated);

20.2.3.   further it is denied that "*competent legal counsel*", given "*full and proper instructions*" with reference to the OECD Convention and Commentary would, "*on the most cursory examination*" have advised ED&F Man in the terms alleged. In particular (albeit strictly without prejudice to the burden of proof):

20.2.3.1.   the meaning of "beneficial ownership" in Danish law at the material time was uncertain (subparagraph 12.3.4 above is repeated);

20.2.3.2.   SKAT had not provided any guidance as to the meaning of "beneficial ownership" in Danish law (subparagraph 18.2.4 above is repeated);

20.2.3.3.   there is nothing "cursory" about the complex evaluation of the circumstances of the acquisition, disposition and economic benefit derived from the PPs' various trades (in the context of the Double Tax Treaties and 7 OECD Factors) which SKAT now claims to be essential to the Danish Law Beneficial Ownership Analysis (subparagraphs 15.3 and 18.2 above are repeated); on the contrary

20.2.3.4.   the OECD Convention and Commentary (15 July 2014 Condensed Version): (1) is a 496 page document; (2) complete with 31 Articles and 301 pages of commentary (including 20 pages on Article 10 entitled "Dividends"); (3) which (obviously) did not address the Dividend Arbitrage Strategy; but (4) (in the commentary on Article 10) provided generic commentary on the "beneficial ownership" requirement thereunder; and (5) communicated a view that "a conduit company" "…*cannot normally be regarded as beneficial owner*…" if acting as

26

"…*a mere fiduciary or administrator on account of the interested parties*…";

20.2.3.5. in the premises no "*competent legal counsel*" could or would have concluded, whether on "*the most cursory examination of the commentary*" or otherwise, that the PPs were not beneficial owners;

20.3.    as to subparagraph 19 (c) (alleged carelessness):

20.3.1.    it is denied that any "*ED&F Man Scheme*" was "*implemented*" and/or that there was the alleged Beneficial Ownership Representation;

20.3.2.    whilst the letters to which reference is made are admitted, it is denied that there was any "*systemic carelessness*" for the reasons alleged at subparagraphs 19 (c) (i) to (iii) or at all; and

20.3.3.    as to subparagraph 19 (c) (iv) it is denied that ED&F Man "…*has refused to provide an explanation as to why the Annex E Tax Vouchers were false*…". On the contrary ED&F Man explained (1) in the Annex E narrative attached to the 6 September 2019 Amended Defence, that the information contained therein was inaccurate because the PPs identified therein (a) had not "*received*" the amount set out therein by way of dividend from the Danish Listed Company; and (b) had not "*suffered*" WHT in the amount set out therein; and (2) in the Rosenblatt letter dated 26 September 2019 in response to SKAT's 12 September 2019 Part 18 request, that the PP only received a payment which was "…*equivalent in value to a dividend net of 27%, but which was not a dividend net of WHT which had been paid by the Danish Listed Company*…";

20.4.    as to subparagraph 19 (d) (business division closure):

20.4.1.    it is admitted that ED&F Man closed its Equity Finance Desk: ED&F Man took these steps for commercial reasons and not in order "*to rectify*" any business practices;

27

20.4.2.   it is denied that ED&F Man ended the employment of Mr Hawksworth in order "*to rectify*" any business practices: Mr Hawksworth resigned after the closure of ED&F Man's Equity Finance Desk.

21.    In the premises, paragraph 20 (alleged loss and damage suffered) is denied.

22.    As to paragraph 21 (alleged reliance):

22.1.   the ED&F Man Scheme and the alleged ED&F Man Representations are denied: paragraphs 4 to 6 and 11 to 15 above are repeated;

22.2.   it is not admitted that SKAT did rely upon the ED&F Man Representations: subparagraph 18.4 above is repeated; and in any event

22.3.   if (which is not admitted) SKAT did rely upon the ED&F Man Representations (and in particular the Beneficial Ownership Representation) it is denied that such reliance was reasonable: subparagraphs 18.4.4 and 18.6 are repeated; further

22.4.   if (as SKAT alleges at subparagraph 18(e)(ii)) ED&F Man was the beneficial owner of the dividends, pursuant to Article 10(2)(b) of the Denmark-UK Double Tax Treaty the tax charged by SKAT was not to exceed 15% of the gross amount of those dividends: in the premises, SKAT's loss is limited to 12% of that gross amount.

23.    Paragraph 22 (the confidential settlements) is not admitted and SKAT is required to provide a properly particularised schedule of loss which explains the basis upon which it alleges that (1) the compensation which it now seeks in respect of the ED&F Man Applications (in the sum of DKK 574,607,39.643); (2) is DKK 8,223,323.48 less than the aggregate payments made by SKAT (in the total sum of DKK 582,830,719.91).

**B5. Danish Law claims**

24.    Paragraph 23 (ED&F Man's alleged false statements and alleged negligence) is denied: paragraphs 11 to 15 and 19 and 20 above are repeated.

25.    Paragraph 24 (ED&F Man's alleged failure to exercise required standard of care) is denied: paragraph 20 above is repeated.

26.     As to paragraph 25 (ED&F Man's receipt of fees and payments):

26.1.   it is admitted (as set out in Re-A.Def/43) that ED&F Man received fees in respect of the ED&F Man Applications (the ED&F Man Fees); however

26.2.   the ED&F Man Fees were not received as a result of SKAT's mistaken payment of WHT refunds: Re-ADef/42 is repeated;

26.3.   the receipt of the ED&F Man Fees was not unjust: Re-ADef/43.2 is repeated; and in any event

26.4.   as a result of receiving the ED&F Man Fees, ED&F Man changed its position in good faith: Re-ADef/43.3 is repeated.

**Contributory negligence**

27.     Further or alternatively, and as set out at Re-ADef/40-41, between 2012 and 2015 the systems and procedures in place at SKAT for managing the review and assessment of WHT reclaim applications were manifestly deficient in numerous respects such that:

27.1.   SKAT's own negligence was the only real and substantial cause of the losses claimed against ED&F Man and/or eclipsed any causative effect of ED&F Man's alleged negligence (if proven); and/or

27.2.   any damages payable to SKAT on account of ED&F Man's alleged negligence ought to be reduced because SKAT's contributory negligence caused or aggravated the alleged damage.

**Annex A – incorrect Tax Vouchers**

| | Schedule 1 reference | Pension Plan | Share and ISIN | Ex Date | Claimed shareholding | Claimed withheld dividend tax (DKK) | Actual shareholding | Actual withheld dividend tax entitlement (DKK) | Amount of overpayment by SKAT (DKK) |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 174 | JSH FARMS LLC 401 (K) PLAN | Lundbeck A/S DKK0010287234 | 22/03/2013 | 95,900 | 51,786.00 | 60,900 | 32,886.00 | 18,900.00 |
| 2. | 177 | KRH FARMS LLC 401 (K) PLAN | Lundbeck A/S DKK0010287234 | 22/03/2013 | 94,100 | 50,814.00 | 60,100 | 32,454.00 | 18,360.00 |
| 3. | 180 | MGH FARMS LLC 401 (K) PLAN | Lundbeck A/S DKK0010287234 | 22/03/2013 | 82,200 | 44,388.00 | 54,200 | 29,268.00 | 15,120.00 |
| 4. | 183 | MSJJ RETIREMENT GROUP TRUST | Lundbeck A/S DKK0010287234 | 22/03/2013 | 89,400 | 48,276.00 | 58,400 | 31,536.00 | 18,900.00 |
| 5. | 186 | SRH FARMS LLC 401 (K) PLAN | Lundbeck A/S DKK0010287234 | 22/03/2013 | 97,150 | 52,461.00 | 62,150 | 33,561.00 | 16,740.00 |
| 6. | 188 | SV HOLDINGS, LLC RETIREMENT PLAN | Lundbeck A/S DKK0010287234 | 22/03/2013 | 417,800 | 225,612.00 | 326,800 | 176,472.00 | 49,140.00 |
| 7. | 191 | TEW ENTERPRISES, LLC RETIREMENT PLAN | Lundbeck A/S DKK0010287234 | 22/03/2013 | 416,400 | 224,856.00 | 326,400 | 176,256.00 | 48,600.00 |
| 8. | 194 | TEW, LP RETIREMENT PLAN | Lundbeck A/S DKK0010287234 | 22/03/2013 | 420,300 | 226,962.00 | 223,300 | 120,582.00 | 106,380.00 |
| 9. | 198 | TRITON FARMS LLC 401 (K) PLAN | Lundbeck A/S DKK0010287234 | 22/03/2013 | 101,250 | 54,675.00 | 64,250 | 34,695.00 | 19,980.00 |
| | | | | | | | | **Total** | **312,120** |

**Annex B - further details in relation to ED&F Man clients**

| | Client name | Agent | Jurisdiction | Date of on-boarding as a client w/ ED&F Man | Identity of Investment Manager | No. of WHT apps | Period of WHT applications | Total Value of WHT applications DKK |
|---|---|---|---|---|---|---|---|---|
| 1. | Acorn Capital Strategies LLC Employee Pension Profit Sharing Plan & Trust | Acupay System LLC | USA | 10/08/2012 | Zeta Financial Partners Limited | 5 | 22/04/2013 – 28/04/2014 | 23,341,707.90 |
| 2. | American Investment Group of New York, L.P. Pension Plan | Goal Taxback Limited | USA | 13/03/2012 | Acer Investment Group LLC | 11 | 05/03/2014 – 08/04/2015 | 21,060,000.00 |
| 3. | Autoparts Pension Group Trust | Global Equities GmbH | USA | 22/02/2012 | Arunvill Capital UK Limited | 29 | 20/03/2013 – 09/04/2015 | 43,883,745.57 |
| 4. | Bluegrass Investment Management, LLC Retirement Plan | Global Equities GmbH | USA | 22/02/2012 | Arunvill Capital UK Limited | 23 | 07/09/2012 – 22/05/2014 | 16,060,388.10 |
| 5. | Bluegrass Retirement Group Trust | Global Equities GmbH | USA | 22/02/2012 | Arunvill Capital UK Limited | 23 | 20/03/2013 – 22/05/2014 | 15,500,160.35 |
| 6. | Cambridge Way LLC 401K Profit Sharing Plan | Acupay System LLC Correct | USA | 30/09/2013 | Zeta Financial Partners Limited | 10 | 06/01/2014 – 09/06/2014 | 36,912,580.20 |
| 7. | Casting Pensions Group Trust | Global Equities GmbH | USA | 22/02/2012 | Arunvill Capital UK Limited | 30 | 20/03/2013 – 09/04/2015 | 43,065,573.38 |
| 8. | Central Technologies Pensions Group Trust | Global Equities GmbH | USA | 22/02/2012 | Arunvill Capital UK Limited | 30 | 20/03/2013 – 09/04/2015 | 39,596,415.51 |
| 9. | DW Construction, Inc. Retirement Place | Goal Taxback Limited | USA | 20/03/2012 | Acer Investment Group LLC | 7 | 26/03/2014 – 110/12/2014 | 13,603,950.00 |
| 10. | Federated Logistics LLC 401 (K) Plan | Goal Taxback Limited | USA | 24/02/2014 | Duet Asset Management Limited | 6 | 04/04/2014 – 14/08/2014 | 32,265,000.00 |
| 11. | GSA Trading (Canada) Corporation Pension Plan | Globe Tax Services Incorporated & Goal Taxback Limited | Canada | 04/10/2014 | GSFS Asset Management B.V. | 8 | 18/06/2013 – 08/04/2015 | 23,708,916.00 |

| | Client name | Agent | Jurisdiction | Date of on-boarding as a client w/ ED&F Man | Identity of Investment Manager | No. of WHT apps | Period of WHT applications | Total Value of WHT applications DKK |
|---|---|---|---|---|---|---|---|---|
| 12. | Industrial Pensions Group Trust | Global Equities GmbH | USA | 22/02/2012 | Arunvill Capital UK Limited | 29 | 20/03/2013 – 09/04/2015 | 42,467,267.69 |
| 13. | JSH Farms LLC 401 (K) Plan | Global Equities GmbH | USA | 22/03/2012 | Arunvill Capital UK Limited | 6 | 20/03/2013 – 15/04/2013 | 2,342,582.32 |
| 14. | Kamco Investments. Inc Pension Plan | Goal Taxback Limited | USA | 20/03/2012 | Acer Investment Group LLC | 6 | 26/03/2014 – 08/04/2015 | 10,496,991.15 |
| 15. | Kamco LP Profit Sharing Pension Plan | Goal Taxback Limited | USA | 20/03/2012 | Acer Investment Group LLC | 5 | 26/03/2014 – 14/08/2014 | 15,313,356.72 |
| 16. | Koutroulakis & Co Corporation Pension Plan | Goal Taxback Limited | Canada | 24/05/2013 | MOA Trading (Dubai) Limited | 2 | 26/03/2015 | 7,425,000.00 |
| 17. | KRH Farms LLC 401 (k) Plan | Global Equities GmbH | USA | 22/03/2012 | Arunvill Capital UK Limited | 6 | 20/03/2013 – 15/04/2013 | 2,261,343.10 |
| 18. | Linden Associates Defined Benefit Plan | Goal Taxback Limited | USA | 20/03/2012 | Acer Investment Group LLC | 12 | 26/03/2014 – 26/03/2015 | 13,168,507.50 |
| 19. | MGH Farms LLC 401 (k) Plan | Global Equities GmbH | USA | 22/03/2012 | Arunvill Capital UK Limited | 6 | 20/03/2013 – 15/04/2013 | 2,325,282.15 |
| 20. | Moira Associates LLC 401 (k) Plan | Goal Taxback Limited | USA | 20/03/2012 | Acer Investment Group LLC | 8 | 14/03/2014 – 10/12/2014 | 16,989,750.00 |
| 21. | MSJJ Retirement Group Trust | Global Equities GmbH | USA | 20/03/2012 | Arunvill Capital UK Limited | 6 | 20/03/2013 – 15/04/2013 | 2,240,185.36 |
| 22. | New Song Fellowship Church 401 (k) Plan | Goal Taxback Limited | USA | 27/03/2012 | Acer Investment Group LLC | 4 | 26/03/2014 – 01/10/2014 | 4,245,750.00 |
| 23. | Oranje Canada Corporation Pension Plan | Goal Taxback Limited | Canada | 18/10/2012 | GSFS Asset Management B.V. | 2 | 17/03/2015 – 08/04/2015 | 5,865,975.99 |
| 24. | Riverside Associates Defined Benefit Plan | Goal Taxback Limited | USA | 20/03/2012 | Acer Investment Group LLC | 11 | 26/03/2014 – 26/03/2015 | 12,724,425.00 |
| 25. | SRH Farms LLC 401 (k) Plan | Global Equities GmbH | USA | 22/03/2012 | Arunvill Capital UK Limited | 6 | 20/03/2013 – 15/04/2013 | 2,376,732.41 |
| 26. | Sterling Alpha LLC 401 (k) Profit Sharing Plan | Acupay System LLC | USA | 12/07/2012 | Zeta Financial Partners Limited | 1 | 22/04/2013 | 6,415,200.00 |

| | Client name | Agent | Jurisdiction | Date of on-boarding as a client w/ ED&F Man | Identity of Investment Manager | No. of WHT apps | Period of WHT applications | Total Value of WHT applications DKK |
|---|---|---|---|---|---|---|---|---|
| 27. | SV Holdings, LLC Retirement Plan | Global Equities GmbH | USA | 22/02/2012 | Arunvill Capital UK Limited | 24 | 07/09/2012 – 30/05/2014 | 14,328,908.40 |
| 28. | Tew Enterprises, LLC Retirement Plan | Global Equities GmbH | USA | 22/02/2012 | Arunvill Capital UK Limited | 21 | 07/09/2012 – 25/04/2014 | 15,258,872.83 |
| 29. | Tew, LP Retirement Plan | Global Equities GmbH | USA | 22/02/2012 | Arunvill Capital UK Limited | 21 | 07/09/2012 – 25/04/2014 | 15,488,992.99 |
| 30. | The Goldstein Law Group PC 401 (k) Profit Sharing Plan | Goal Taxback Limited | USA | 23/03/2012 | Acer Investment Group LLC | 8 | 26/03/2014 – 26/03/2015 | 9,521,280.00 |
| 31. | Triton Farms LLC 401 (k) Plan | Global Equities GmbH | USA | 22/03/2012 | Arunvill Capital UK Limited | 6 | 20/03/2013 – 15/04/2013 | 2,338,133.28 |
| 32. | Tveter LLC Pension Plan | Goal Taxback Limited | USA | 10/02/2014 | AlphaSource | 8 | 16/04/2014 – 14/08/2014 | 3,003,075.00 |

**Annex C – members of Gibraltarian Partnerships**

| | Client name | Agent | Jurisdiction | Date | Identity of Investment Manager | No. | Period | Total Value |
|---|---|---|---|---|---|---|---|---|
| **Partner of Hamlyn LP** | | | | | | | | |
| 1. | Del Mar Asset Management Saving & Retirement Plan | Goal Taxback Limited | USA | 19/03/2013 | Duet Asset Management Limited | 10 | 08/05/2013 – 28/05/2014 | 55,486,998.00 |
| **Partners of Cubix  Managers Limited LLP** | | | | | | | | |
| 2. | 5T Advisory Services Retirement Plan Trust | Goal Taxback Limited | USA | 08/02/2012 | Ballance Advisors UK Limited | 10 | 08/02/2013 – 08/05/2014 | 3,930,948.85 |
| 3. | KK Law Firm Retirement Plan Trust | Goal Taxback Limited | USA | 08/02/2012 | Ballance Advisors UK Limited | 10 | 08/02/2013 – 08/05/2014 | 3,524,349.53 |
| 4. | Uplands Consulting Retirement Plan Trust | Goal Taxback Limited | USA | 08/02/2012 | Ballance Advisors UK Limited | 10 | 08/02/2013 – 08/05/2014 | 4,292,374.63 |

## Annex E – incorrect Tax Vouchers (2)

1.  ED&F Man produced 80 Tax Vouchers as particularised in Schedule 1 (64 Tax Vouchers) and Schedule 2 (16 Tax Vouchers) to this Annex E (**the Annex E Tax Vouchers**).

2.  The information in the Annex E Tax Vouchers was inaccurate in that the PP identified therein:

    2.1.   had not "*received*" the amount set out therein by way of dividend from the Danish Listed Company; and

    2.2.   had not "*suffered*" WHT in the amount set out therein in relation to such dividend at the stated (27%) or any rate.

3.  Insofar as SKAT accepted or paid WHT reclaims in the sum of DKK183,902,400 or any sum in relation to the Relevant WHT Applications which included the Annex E Tax Vouchers, SKAT's own negligence was the real and substantial cause of such payments and/or eclipsed any causative effect of ED&F Man's negligence in relation to the Annex E Tax Vouchers (if proven). Paragraphs 40 and 41 of the Amended Defence are repeated.

**Annex E: Schedule 1 – incorrect Tax Vouchers**

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) | Withheld dividend tax entitlement (DKK) | Amount of overpayment by SKAT (DKK) |
| 1. | 505 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 500,000 Coloplast A/S – B | 06/12/2013 | 945,000.00 | - | 945,000 |
| 2. | 535 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 7,850,000 Novozymes A/S - B | 27/02/2014 | 5,298,750.00 | - | 5,298,750 |
| 3. | 606 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 24,000,000 TDC A/S | 07/03/2014 | 14,256,000.00 | - | 14,256,000 |
| 4. | 629 | DW CONSTRUCTION, INC. RETIREMENT PLAN | 3,300,000 TDC A/S | 07/03/2014 | 1,960,200.00 | - | 1,960,200 |
| 5. | 632 | KAMCO INVESTMENTS, INC. PENSION PLAN | 2,000,000 TDC A/S | 07/03/2014 | 1,188,000.00 | - | 1,188,000 |
| 6. | 634 | LINDEN ASSOCIATES DEFINED BENEFIT PLAN | 2,150,000 TDC A/S | 07/03/2014 | 1,277,100.00 | - | 1,277,100 |
| 7. | 637 | NEWSONG FELLOWSHIP CHURCH 401 (K) PLAN | 2,500,000 TDC A/S | 07/03/2014 | 1,485,000.00 | - | 1,485,000 |
| 8. | 640 | RIVERSIDE ASSOCIATES DEFINED BENEFIT PLAN | 2,150,000 TDC A/S | 07/03/2014 | 1,277,100.00 | - | 1,277,100 |
| 9. | 646 | THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN | 2,200,000 TDC A/S | 07/03/2014 | 1,306,800.00 | - | 1,306,800 |
| 10. | 659 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 8,000,000 TDC A/S | 07/03/2014 | 4,752,000.00 | - | 4,752,000 |
| 11. | 698 | AMERICAN INVESTMENT GROUP OF NEW YORK, L.P. PENSION PLAN | 3,500,000 Novo Nordisk A/S - B | 21/03/2014 | 4,252,500.00 | - | 4,252,500 |
| 12. | 699 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 2,600,000 Novo Nordisk A/S - B | 21/03/2014 | 3,159,000.00 | - | 3,159,000 |

1

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | **Schedule 1 reference** | **Pension Plan** | **Shareholding** | **Ex Date** | **Withheld dividend tax (DKK)** | **Withheld dividend tax entitlement (DKK)** | **Amount of overpayment by SKAT (DKK)** |
| 13. | 700 | DW CONSTRUCTION, INC. RETIREMENT PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 | - | 1,080,000 |
| 14. | 701 | DW CONSTRUCTION, INC. RETIREMENT PLAN | 3,850,000 Novo Nordisk A/S - B | 21/03/2014 | 4,677,750.00 | - | 4,677,750 |
| 15. | 702 | FEDERATED LOGISTICS LLC 401(K) PLAN | 16,500,000 Danske Bank A/S | 19/03/2014 | 8,910,000.00 | - | 8,910,000 |
| 16. | 703 | FEDERATED LOGISTICS LLC 401(K) PLAN | 10,000,000 Novo Nordisk A/S - B | 21/03/2014 | 12,150,000.00 | - | 12,150,000 |
| 17. | 704 | KAMCO INVESTMENTS, INC. PENSION PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 | - | 1,080,000 |
| 18. | 705 | KAMCO INVESTMENTS, INC. PENSION PLAN | 2,000,000 Novo Nordisk A/S - B | 21/03/2014 | 2,430,000.00 | - | 2,430,000 |
| 19. | 706 | KAMCO LP PROFIT SHARING PENSION PLAN | 7,375,000 Danske Bank A/S | 19/03/2014 | 3,982,500.00 | - | 3,982,500 |
| 20. | 708 | LINDEN ASSOCIATES DEFINED BENEFIT PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 | - | 1,080,000 |
| 21. | 709 | LINDEN ASSOCIATES DEFINED BENEFIT PLAN | 2,000,000 Novo Nordisk A/S - B | 21/03/2014 | 2,430,000.00 | - | 2,430,000 |
| 22. | 710 | MOIRA ASSOCIATES LLC 401 (K) PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 | - | 1,080,000 |
| 23. | 711 | MOIRA ASSOCIATES LLC 401 (K) PLAN | 3,150,000 Novo Nordisk A/S - B | 21/03/2014 | 3,827,250.00 | - | 3,827,250 |
| 24. | 712 | NEWSONG FELLOWSHIP CHURCH 401 (K) PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 | - | 1,080,000 |
| 25. | 713 | RIVERSIDE ASSOCIATES DEFINED BENEFIT PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 | - | 1,080,000 |

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) | Withheld dividend tax entitlement (DKK) | Amount of overpayment by SKAT (DKK) |
| 26. | 714 | RIVERSIDE ASSOCIATES DEFINED BENEFIT PLAN | 2,000,000 Novo Nordisk A/S - B | 21/03/2014 | 2,430,000.00 | - | 2,430,000 |
| 27. | 715 | THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN | 2,000,000 Danske Bank A/S | 19/03/2014 | 1,080,000.00 | - | 1,080,000 |
| 28. | 716 | THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN | 2,000,000 Novo Nordisk A/S - B | 21/03/2014 | 2,430,000.00 | - | 2,430,000 |
| 29. | 829 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 350,000 Tryg A/S | 04/04/2014 | 2,551,500.00 | - | 2,551,500 |
| 30. | 830 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 12,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 4,536,000.00 | - | 4,536,000 |
| 31. | 831 | FEDERATED LOGISTICS LLC 401(K) PLAN | 300,000 Tryg A/S | 04/04/2014 | 2,187,000.00 | - | 2,187,000 |
| 32. | 832 | FEDERATED LOGISTICS LLC 401(K) PLAN | 18,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 6,804,000.00 | - | 6,804,000 |
| 33. | 843 | DW CONSTRUCTION, INC. RETIREMENT PLAN | 5,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 1,890,000.00 | - | 1,890,000 |
| 34. | 844 | KAMCO LP PROFIT SHARING PENSION PLAN | 5,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 1,890,000.00 | - | 1,890,000 |
| 35. | 845 | LINDEN ASSOCIATES DEFINED BENEFIT PLAN | 175,000 Tryg A/S | 04/04/2014 | 1,275,750.00 | - | 1,275,750 |
| 36. | 846 | MOIRA ASSOCIATES LLC 401 (K) PLAN | 225,000 Tryg A/S | 04/04/2014 | 1,640,250.00 | - | 1,640,250 |
| 37. | 847 | MOIRA ASSOCIATES LLC 401 (K) PLAN | 5,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 1,890,000.00 | - | 1,890,000 |
| 38. | 848 | NEWSONG FELLOWSHIP CHURCH 401 (K) PLAN | 225,000 Tryg A/S | 04/04/2014 | 1,640,250.00 | - | 1,640,250 |

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | **Schedule 1 reference** | **Pension Plan** | **Shareholding** | **Ex Date** | **Withheld dividend tax (DKK)** | **Withheld dividend tax entitlement (DKK)** | **Amount of overpayment by SKAT (DKK)** |
| 39. | 849 | RIVERSIDE ASSOCIATES DEFINED BENEFIT PLAN | 175,000 Tryg A/S | 04/04/2014 | 1,275,750.00 | - | 1,275,750 |
| 40. | 850 | TVETER LLC PENSION PLAN | 1,000,000 TDC A/S | 07/03/2014 | 594,000.00 | - | 594,000 |
| 41. | 851 | TVETER LLC PENSION PLAN | 390,000 Danske Bank A/S | 19/03/2014 | 210,600.00 | - | 210,600 |
| 42. | 852 | TVETER LLC PENSION PLAN | 225,000 Novo Nordisk A/S - B | 21/03/2014 | 273,375.00 | - | 273,375 |
| 43. | 853 | TVETER LLC PENSION PLAN | 800 A.P. Møller Mærsk A/S - B | 01/04/2014 | 302,400.00 | - | 302,400 |
| 44. | 854 | TVETER LLC PENSION PLAN | 100,000 Tryg A/S | 04/04/2014 | 729,000.00 | - | 729,000 |
| 45. | 1092 | ACORN CAPITAL STRATEGIES LLC EMPLOYEE PENSION PROFIT SHARING PLAN & TRUST | 20,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 7,560,000.00 | - | 7,560,000 |
| 46. | 1093 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 5,000,000 Danske Bank A/S | 19/03/2014 | 2,700,000.00 | - | 2,700,000 |
| 47. | 1094 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 612,500 Tryg A/S | 04/04/2014 | 4,465,125.00 | - | 4,465,125 |
| 48. | 1095 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 20,000 A.P. Møller Mærsk A/S - B | 01/04/2014 | 7,560,000.00 | - | 7,560,000 |
| 49. | 1096 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 2,000,000 Novo Nordisk A/S - B | 21/03/2014 | 2,430,000.00 | - | 2,430,000 |
| 50. | 1163 | LINDEN ASSOCIATES DEFINED BENEFIT PLAN | 322,500 Dampskibsselskabet Norden A/S | 24/04/2014 | 435,375.00 | - | 435,375 |

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) | Withheld dividend tax entitlement (DKK) | Amount of overpayment by SKAT (DKK) |
| 51. | 1164 | RIVERSIDE ASSOCIATES DEFINED BENEFIT PLAN | 322,500 Dampskibsselskabet Norden A/S | 24/04/2014 | 435,375.00 | - | 435,375 |
| 52. | 1165 | THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN | 215,000 Dampskibsselskabet Norden A/S | 24/04/2014 | 290,250.00 | - | 290,250 |
| 53. | 1166 | TVETER LLC PENSION PLAN | 240,000 Dampskibsselskabet Norden A/S | 24/04/2014 | 324,000.00 | - | 324,000 |
| 54. | 1391 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 425,000 Dampskibsselskabet Norden A/S | 24/04/2014 | 573,750.00 | - | 573,750 |
| 55. | 1508 | DEL MAR ASSET MANAGEMENT SAVING & RETIREMENT PLAN | 3,000,000 Coloplast A/S - B | 09/05/2014 | 3,240,000.00 | - | 3,240,000 |
| 56. | 1510 | DW CONSTRUCTION, INC. RETIREMENT PLAN | 1,300,000 Coloplast A/S - B | 09/05/2014 | 1,404,000.00 | - | 1,404,000 |
| 57. | 1511 | FEDERATED LOGISTICS LLC 401(K) PLAN | 1,300,000 Coloplast A/S - B | 09/05/2014 | 1,404,000.00 | - | 1,404,000 |
| 58. | 1513 | KAMCO INVESTMENTS, INC. PENSION PLAN | 1,300,000 Coloplast A/S - B | 09/05/2014 | 1,404,000.00 | - | 1,404,000 |
| 59. | 1520 | LINDEN ASSOCIATES DEFINED BENEFIT PLAN | 850,000 Coloplast A/S - B | 09/05/2014 | 918,000.00 | - | 918,000 |
| 60. | 1525 | RIVERSIDE ASSOCIATES DEFINED BENEFIT PLAN | 850,000 Coloplast A/S - B | 09/05/2014 | 918,000.00 | - | 918,000 |
| 61. | 1537 | TVETER LLC PENSION PLAN | 115,000 Coloplast A/S - B | 09/05/2014 | 124,200.00 | - | 124,200 |

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | **Schedule 1 reference** | **Pension Plan** | **Shareholding** | **Ex Date** | **Withheld dividend tax (DKK)** | **Withheld dividend tax entitlement (DKK)** | **Amount of overpayment by SKAT (DKK)** |
| 62. | 1583 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 2,850,000 Coloplast A/S - B | 09/05/2014 | 3,078,000.00 | - | 3,078,000 |
| 63. | 1945 | NEWSONG FELLOWSHIP CHURCH 401 (K) PLAN | 50,000 IC Group A/S | 25/09/2014 | 40,500.00 | - | 40,500 |
| 64. | 2064 | AMERICAN INVESTMENT GROUP OF NEW YORK, L.P. PENSION PLAN | 750,000 Novozymes A/S - B | 26/02/2015 | 607,500.00 | - | 607,500 |
| | | | | | | **Total** | **161,586,900** |

**Annex E: Schedule 2 – incorrect Tax Vouchers**

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) | Withheld dividend tax entitlement (DKK) | Amount of overpayment by SKAT (DKK) |
| 1. | 527 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 2,000,000 Coloplast A/S - B | 06/12/2013 | 3,780,000.00 | 2,835,000 | 945,000 |
| 2. | 615 | AMERICAN INVESTMENT GROUP OF NEW YORK, L.P. PENSION PLAN | 5,000,000 TDC A/S | 07/03/2014 | 2,970,000.00 | 1,782,000 | 1,188,000 |
| 3. | 617 | AUTOPARTS PENSIONS GROUP TRUST | 3,705,000 TDC A/S | 07/03/2014 | 2,200,771.00 | 1,525,037 | 675,734 |
| 4. | 620 | BLUEGRASS INVESTMENT MANAGEMENT, LLC RETIREMENT PLAN | 4,248,000 TDC A/S | 07/03/2014 | 2,523,312.00 | 1,815,264 | 708,048 |
| 5. | 621 | BLUEGRASS RETIREMENT GROUP TRUST | 1,610,000 TDC A/S | 07/03/2014 | 956,340.00 | 716,958 | 239,382 |
| 6. | 623 | CASTING PENSIONS GROUP TRUST | 3,402,400 TDC A/S | 07/03/2014 | 2,021,025.60 | 1,543,628 | 477,398 |
| 7. | 624 | CENTRAL TECHNOLOGIES PENSIONS GROUP TRUST | 1,570,000 TDC A/S | 07/03/2014 | 932,580.00 | 700,920 | 231,660 |
| 8. | 631 | INDUSTRIAL PENSIONS GROUP TRUST | 3,713,200 TDC A/S | 07/03/2014 | 2,205,640.80 | 1,515,947 | 689,693 |
| 9. | 633 | KAMCO LP PROFIT SHARING PENSION PLAN | 5,000,000 TDC A/S | 07/03/2014 | 2,970,000.00 | 1,782,000 | 1,188,000 |
| 10. | 636 | MOIRA ASSOCIATES LLC 401 (K) PLAN | 6,000,000 TDC A/S | 07/03/2014 | 3,564,000.00 | 1,188,000 | 2,376,000 |
| 11. | 642 | SV HOLDINGS, LLC RETIREMENT PLAN | 3,073,200 TDC A/S | 07/03/2014 | 1,825,480.80 | 1,131,332 | 694,148 |
| 12. | 644 | TEW ENTERPRISES, LLC RETIREMENT PLAN | 4,569,000 TDC A/S | 07/03/2014 | 2,713,986.00 | 2,040,390 | 673,596 |

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | Schedule 1 reference | Pension Plan | Shareholding | Ex Date | Withheld dividend tax (DKK) | Withheld dividend tax entitlement (DKK) | Amount of overpayment by SKAT (DKK) |
| 13. | 645 | TEW, LP RETIREMENT PLAN | 4,959,200 TDC A/S | 07/03/2014 | 2,945,764.80 | 1,989,425 | 956,340 |
| 14. | 658 | CAMBRIDGE WAY LLC 401K PROFIT SHARING PLAN | 7,900,000 Novozymes A/S - B | 27/02/2014 | 5,332,500.00 | 877,500 | 4,455,000 |
| 15. | 697 | AMERICAN INVESTMENT GROUP OF NEW YORK, L.P. PENSION PLAN | 7,750,000 Danske Bank A/S | 19/03/2014 | 4,185,000.00 | 1,620,000 | 2,565,000 |
| 16. | 707 | KAMCO LP PROFIT SHARING PENSION PLAN | 4,400,000 Novo Nordisk A/S - B | 21/03/2014 | 5,346,000.00 | 1,093,500 | 4,252,500 |
| | | | | | | Total | 22,315,499 |

**Amended by Order of The Honourable Mr Justice Teare dated 6 March 2019 (as varied by Order of The Honourable Mrs Justice Cockerill dated 20 May 2019)**

**Re-Amended by Order of The Honourable Mr Justice Andrew Baker dated 18 January 2020**

Claim Nos.: CL-2018-000297; CL-2018-000404;
CL-2018-000590; CL-2019-000487

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**B E T W E E N :**

**SKATSKATTEFORVALTNINGEN**
**(THE DANISH CUSTOMS AND TAX ADMINISTRATION)**
**Claimant**

- and -

**ED&F MAN CAPITAL MARKETS LIMITED AND OTHERS**
**Defendants**

---

**RE-AMENDED DEFENCE**

---

**Rosenblatt**
**9-13 St Andrew Street**
**London EC4A 3AF**
**Tel: (020) 7955 0880**
**Fax: (020) 7955 0888**
**DX: LDE 493**

**Solicitor's Ref: JN/TS/CHW/EDF/1/57**