EXHIBIT 5

KeyCite Yellow Flag - Negative Treatment
Distinguished by Izquierdo v. Panera Bread Co., S.D.N.Y., March 30, 2020

2015 WL 7018369
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

In re FORD FUSION AND C–MAX
FUEL ECONOMY LITIGATION.
This Document Relates to All Actions.

No. 13–MD–2450 (KMK).
|
Signed Nov. 12, 2015.

**Attorneys and Law Firms**

Paul Geller, Esq., Stuart Davidson, Esq., Mark Dearman, Esq., & Sheri Coverman, Esq., Robbins Geller Rudman & Dowd LLP, Boca Raton, FL, for Plaintiffs and the Class.

Samuel Rudman, Esq., Robbins Geller Rudman & Dowd LLP, Melville, NY, for Plaintiffs and the Class.

Rachel Jensen, Esq., Robbins Geller Rudman & Dowd LLP, San Diego, CA, for Plaintiffs and the Class.

Eric Gibbs, Esq., Geoffrey Munroe, Esq., & David Stein, Esq., Girard Gibbs LLP, San Francisco, CA, for Plaintiffs and the Class.

John Yanchunis, Esq. & Rachel Soffin, Esq., Morgan & Morgan, Tampa, FL, for Plaintiffs' Executive Committee.

Peter Safirstein, Esq., Morgan & Morgan, New York, NY, for Plaintiffs' Executive Committee.

Richard McCune, Esq. & Elaine Kusel, Esq., McCune Wright LLP, Redlands, CA, for Plaintiffs' Executive Committee.

Jonathan Shub, Esq. & Scott George, Esq., Seeger Weiss LLP, New York, NY, for Plaintiffs' Executive Committee.

Stephen Jaffe, Esq., Mark Fistos, Esq., & Seth Lehrman, Esq., Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L., Fort Lauderdale, FL, for Plaintiffs' Executive Committee.

Bruce Steckler, Esq. & Mazin Sbaiti, Esq., Steckler Law LLP, Dallas, TX, for Plaintiffs' Executive Committee.

Cory Fein, Esq., Caddell & Chapman, Houston, TX, for Plaintiffs' Executive Committee.

Joel Dewey, Esq., Jeffrey Yeatman, Esq., Matthew Goldberg, Esq., & Timothy Birnbaum, Esq., DLA Piper LLP New York, NY, for Defendant.

*OPINION AND ORDER*

KENNETH M. KARAS, District Judge.

**\*1** Plaintiffs are "consumers who purchased or leased a 2013 Ford Fusion Hybrid ("Fusion") or 2013 Ford C–MAX ("C–MAX") (collectively, the "Vehicles") from dealerships licensed by Ford Motor Company ("Ford," or "Defendant"), an automobile manufacturer based in Dearborn, Michigan, allegedly in reliance on Ford's "misrepresentations and material omissions" about the Vehicles' fuel economy. (Consolidated Am. Class Action Compl. ("CAC") ¶¶ 7–9, 41 (Dkt. No. 51).) Plaintiffs bring this Consolidated Amended Class Action Complaint ("CAC"), on their own behalf and on behalf of members of a putative class ("Class"), alleging that they would not have otherwise purchased or leased the Vehicles, or would not have paid as much for them, had it not been for Ford's misrepresentations, and that they have otherwise been damaged because of higher fuel costs and the diminution in the Vehicles' value. (*Id.* ¶ 8.) Before the Court is Defendant's Motion To Dismiss the CAC. For the reasons stated herein, the Motion is denied in part and granted in part.

*I. Background*

*A. Factual Background*

*1. Advertising Campaign*
The following facts are drawn from the CAC, and they are assumed to be true for purposes of deciding Defendant's Motion.

Until 2012, following Ford's release of its first hybrid sedan- the Fusion–Ford's "efforts to break into the ... market for hybrid vehicles had been largely unsuccessful." (*Id.* ¶¶ 2, 47.) As of mid–2012, Ford had only a 3% share of that market. (*Id.* ¶ 3.) Plaintiffs allege that this was due to an inability of Ford's "primary hybrid offering," the Fusion, with offered an estimated combined 39 miles per gallon ("MPG")–36 MPG city, 41 MPG highway-fuel economy, to compete with the

Case 1:18-md-02865-LAK   Document 394-5   Filed 07/02/20   Page 3 of 33
In re Ford Fusion and C-Max Fuel Economy Litigation, Not Reported in F.Supp.3d (2015)
2015 WL 7018369

Toyota Prius and its estimated combined 51 MPG city, 48 MPG highway. (*Id.* ¶¶ 2, 48.)

In 2013, Ford "launched a massive," and allegedly misleading, "advertising campaign" focusing on two of its new hybrid models-the Fusion and the C–MAX, highlighting their estimated 47 MPG. (*Id.* ¶ 3.) The campaign included a "Times Square '47' kick-off," which featured Ryan Seacrest and "the number '47' featured prominently and in a variety of ways," including a sign held by Ford's CEO, the number "47" on "giant LED screens," and "crowds of people" wearing "47" t-shirts and holding "up signs to make a '47' montage visible from the sky." (*Id.* ¶¶ 3, 56.)

Ford also launched a " '47 Challenges, 47 Days' multi-media campaign" designed to "target all hybrid [buyers] on the fence" about purchasing a hybrid vehicle. (*Id.* ¶¶ 3, 57 (brackets and internal quotation marks omitted).) The campaign included commercials aired "thousands of times, in all major media markets, on major networks, and at all times of day touting the fuel economy of the Vehicles," magazine advertisements in "numerous and varied magazines ... with collective national circulations in the tens of millions," newspaper advertisements, a social media campaign on "Facebook, Twitter, and other social media" which included the "47 Day Photo Challenge," in which "consumers were asked to submit photos that 'captured the spirit of the Hybrid Fusion's 47 [MPG]'," promotional brochures "touting ... 47 MPG," on-line profiles on Ford's website, and "a number of national press releases boasting about the Vehicles' improved fuel economy and the success of [Ford's] 47 MPG advertising." (*Id.* ¶¶ 3, 58.) Ultimately, the campaign was a "tremendous success" and contributed to "record hybrid sales," allegedly attributable to the increase in fuel economy. (*Id.* ¶ 4.) By the end of 2012, Ford had increased its share of the hybrid market to 16% and by April 2013 was the "second-leading auto company in the hybrid market," with record hybrid sales continuing through August 2013. (*Id.* ¶¶ 4, 52–53.)

**\*2** The problem, Plaintiffs contend, is that Ford's advertising was "highly misleading." (*Id.* ¶ 5.) Plaintiffs allege that while the campaign "emphasized that the '47 MPG' was something the Vehicles would actually deliver," (*id.* ¶ 59), designed to convey "real vehicle[ ] performance" and "truly reflect the vehicle," (*id.* ¶ 60 (internal quotation marks omitted), "under real-world driving conditions, consumers ... [were] consistently unable to get anywhere near the advertised 47 MPG," (*id.* ¶ 5). Plaintiffs further aver that only "[s]ome of

Ford's advertisements include[d] small type at the bottom that read [ ] 'EPA-estimated 47 city/47 hwy [sic]/47 combined [MPG]. Actual mileage may vary,' " and that, even so, this "standard boilerplate language ... did not alter the campaign's overall impression on consumers," (*id.* ¶ 62), in part because "nowhere in the [advertising] campaign did [Ford] make a distinction between real-world performance and the EPA-estimated rating," (*id.* ¶ 63.) [1]

Plaintiffs maintain that the offending representations included:

- "The ... Fusion delivers a remarkable 47 mpg city and highway[.]"

- "The ... Fusion delivers a U.S. EPA-certified 47 mpg city, 47 mpg highway [,] and 47 mpg combined in its hybrid model!"

- "47 mpg in the city and on the highway? Yes, it's true. The all new Fusion ... achieves 47 combined mpg-doubling the fuel economy of the average vehicle."

- "Fusion ... gets 47 MPG in the city, on the highway[,] and combined."

- "C–MAX ... is Ford's first hybrid vehicle to offer 47 mpg across the board."

- "C–MAX Hybrid delivers EPA-certified 47 mpg city, 47 mpg highway ratings–7 mpg better than the Toyota Prius [V] on the highway-for a 47 mpg combined rating."

- "47 mpg hybrid for me."

(*Id.* (emphasis and internal quotation marks omitted).) Plaintiffs further allege that Ford made two misleading posts on the C–MAX official Facebook page: (1) On August 7, 2012, a post noting that "[i]f someone asks what MPG the C–MAX Hybrid gets, you can tell them 47[,][and][t]hat's because the all-new ... C–MAX ... delivers EPA-certified 47 mpg city and 47 mpg highway ratings for a 47–mph combined rating"; (2) On August 21, 2012, a post indicating that "the C–MAX ... can more than keep up [with the 2013 Ford Escape] and achieve an estimated 570 miles on a single tank of gas." (*Id.* ¶ 67.) Additionally, Plaintiffs allege that on February 6, 2013, during a "Ford Fusion Lunch Date," Gil Portalatin, the Chief Programming Engineer for Electrified Programs and Integration at Ford, "told a consumer asking about the ability to get the advertised fuel economy of the ... Fusion ... that, 'You can get it. It is there.' " (*Id.* ¶ 64.)

Finally, Plaintiffs allege that, in a press release, Ford stated that the "C–MAX ... returns the same fuel economy whether driving cross-county or across the city-stemming mostly from a growing list of Ford innovations that have helped the vehicle to deliver an impressive list of metrics, such as its 570–mile overall range, taking customers from Los Angeles to Las Vegas and back on one tank of gas," a range Ford referred to as "real car range" which "beat[s] Toyota Prius [V] by 120 miles." [2] (*Id.* ¶¶ 65–66 (internal quotation marks omitted).)

**\*3** Plaintiffs also allege that several other advertisements compared the Fusion and C–MAX to other hybrid cars available for sale. These advertisements include the following:

- An advertisement indicating that the Fusion "tops the Toyota Camry Hybrid by 8 mpg highway and 4 mpg city, and delivers the highest-ever fuel economy numbers in city and highway driving for a midsize sedan." (*Id.* ¶ 70 (internal quotation marks omitted).)

- An advertisement entitled "Wrong Direction" in which the narrator indicated that the Fusion was "the most fuel efficient midsize sedan in America." (*Id.* ¶ 71 (internal quotation marks omitted).)

- An advertisement entitled "New Idea" which claimed that the "Fusion doubles the fuel economy of the average vehicle." (*Id.* ¶ 72.)

- An advertisement indicating that the C–MAX "beats Prius V with better mpg" and is "Miles Per Gallon Ahead of the Competition ." (*Id.* ¶ 73 (internal quotation marks omitted).) As indicated above, the advertising campaign targeted the Toyota Prius V in particular, which "provided space comparable to Ford's 2012 Fusion Hybrid, but was advertised as achieving 44 MPG city, 40 MPG highway, for a combined 42 MPG." (*Id.* ¶¶ 51, 74.) Plaintiffs allege that, in its advertisements, Ford "regularly compared the mileage of the C–MAX to that of the Toyota Prius. (*Id.* ¶ 74.) For example, in July and August 2012, Ford "boasted that the C–MAX raises the bar for hybrid fuel economy and takes customers further than the Toyota Prius." (*Id.* ¶ 76.) Ford reinforced this message in two cartoon advertisements. The first, "Ford C–MAX vs. Toyota Prius [V], How Far on a Tankful," shows a Prius stopping for gas before a C–MAX, and says "C–MAX 571 miles, Prius only 450 miles," "C–MAX ... Maximizes a Tank of Gas," and "Stop Less, Go More." (*Id.* ¶ 77 (internal quotation marks omitted).)

The second, "C–MAX Hybrid MPG," shows how the "C–MAX beat the Prius V in combined MPG," pairing the Prius V with "44 MPG combined" and the C–MAX with "47 MPG combined," and says "C–MAX Hybrid Maximizes MPG, Stop Less, Go More." (*Id.* ¶ 78 (internal quotation marks omitted).)

A series of advertisements reinforced Ford's comparative message. In an internet advertisement entitled "The Hybrid Games, MPG Showdown," "two actors portray reporters trying to determine whether the C–MAX or Prius V had better MPG," wherein the announcers state, and it is graphically depicted, that "the total range of the C–MAX is 571 miles while the Prius' driving range is 560 miles," and that the "C–MAX should go further on a tank of fuel." (*Id.* ¶ 79.) Also in this advertisement, a Prius and C–MAX owner are shown "going about daily errands," and the Prius owner stops for gas first. (*Id.* ¶ 79 (internal quotation marks omitted).) Likewise, an advertisement called "Say Whee," indicates that the "C–MAX 'bests' the Toyota Prius V in MPG," and concludes by pairing the tagline "Say Hi to the all[-]new 47 combined mpg C–MAX Hybrid," with an image of the C–MAX and a 47 MPG graphic. (*Id.* ¶¶ 80–81 (some internal quotation marks omitted).) In an advertisement entitled "Be Great," the narrator indicates that the C–MAX "beats Prius V with better MPG ... Say hi to the all new 47 combined mpg C–MAX." (*Id.* ¶ 79 (second alteration in original) (internal quotation marks omitted).) [3] Plaintiffs allege that, unlike the claims in the comparisons described above, "the Prius actually achieves better MPG than the C–MAX in real-world driving conditions." (*Id.* ¶ 85.) Thus, the gist of Plaintiffs' claim is that Ford's representations about the Fusion and the C–MAX were "false and misleading" because "they left reasonable consumers with the overall impression that [the Vehicles] did, in fact, deliver 47 MPG ... under real world driving conditions." (*Id.* ¶ 68.)

*2. Consumer Complaints and Subsequent Action*

**\*4** Even before the 47–MPG advertising campaign was in full swing, and shortly after the Fusion and C–MAX were made available for sale, Plaintiffs allege that "buyers began complaining in droves about the low gas mileage they were able to achieve," with many "report[ing] an inability to even reach MPG in the high 30s," never mind fuel economy that "beats Toyota's Prius." (*Id.* ¶ 89.) Plaintiffs also allege that subsequent independent testing has confirmed that the Vehicles do not achieve the advertised 47 MPG. (*Id.* ¶ 90.) They claim that in October 2012, Larry

Vellequette of Automotive News found that the C–MAX "only achieved slightly above 37 MPG," that Consumer Reports, in December 2012, found that the Fusion achieved only about 39 MPG, and that the C–MAX achieved only about 37 MPG, "concluding that Ford overstated the fuel economy [of the Vehicles] by ... about 20 percent," the largest discrepancy among the vehicles it tested. (*Id.* ¶¶ 90–92.) In April 2013, Plaintiffs further allege that Autoblog found that the Fusion only achieves 37 MPG under normal use; the best they could achieve was just over 40 MPG. (*Id.* ¶ 93.)

Importantly, Plaintiffs contend that Ford knew that the Vehicles did not achieve 47 MPG in real-world conditions, and acknowledged as much near the end of the 2013 model year. (*Id.* ¶ 5.) Specifically, Plaintiffs allege that Ford "would have known" because "Ford and other automakers do field testing where a number of vehicles are subject to extensive real-world driving and the resulting data-which includes actual gas mileage-is recorded and analyzed." (*Id.* ¶ 94.) Plaintiffs further allege that Ford implicitly recognized that its advertising campaign was misleading, by "offering ... Fusion ... and C–MAX ... owners a software upgrade to improve their fuel economy," even as "consumers continue[d] to report average mileage well below 47 MPG," and without disclosing any possible "performance trade-offs associated with the upgrade," (*id.* ¶ 97), and that Ford also "lowered the estimated MPG for the C–MAX, from 47/47/47 to 45 city, 40 hwy, for a combined 43 MPG," (*id.* ¶ 98.) Plaintiffs also aver that Ford announced that it derived the MPG figures for the C–MAX based "solely on the testing of the 2013 Fusion Hybrid, although the [Fusion] is smaller and has a more aerodynamic shape." (*Id.* ¶ 6; *see also id.* ¶ 100.) As a result, Plaintiffs allege that "Ford is [ ] now offering 'good will' payments to C–MAX owners and lessees," namely "partial compensation ... as reimbursement for ... increased fuel costs." (*Id.* ¶ 102.)

### 3. Regulatory Context

As Defendant notes in its Motion, "[t]he testing and disclosure of estimated fuel economy for new vehicles sold in the United States is governed by a comprehensive federal regulatory scheme" created by the Environmental Policy and Conservation Act ("EPCA"), and enforced by the Federal Trade Commission ("FTC") and Environmental Protection Agency ("EPA"). (Def.'s Mem. of Law in Support of Mot. To Dismiss ("Def.'s Mem.") 14 (Dkt. No. 64).) In 1975, Congress passed the EPCA with the intent of improving motor vehicle energy efficiency. *See Green Mtn. Chrysler Plymouth Dodge Jeep v. Crombie,* 508 F.Supp.2d 295, 305–07 (D.Vt.2007).

It provides that every new vehicle sold in the United States be labeled with a sticker (a "Monroney Sticker") indicating estimated fuel economy, and that a booklet comparing fuel economies of similar vehicles, prepared by the EPA, be made available by vehicle dealerships. *See* 49 U.S.C. § 32908(b); *see also* Gilles v. Ford Motor Co., 24 F.Supp.3d 1039, 1045 (D.Colo.2014) (identifying the sticker as a "Monroney Sticker"). The Monroney Sticker must also include a disclaimer indicating that "[a]ctual results will vary for many reasons, including driving conditions and how you drive and maintain your vehicle." 40 C.F.R. 600.302–12(b) (4) (internal quotation marks omitted); *see also* Gilles, 24 F.Supp.3d at 1045.

**\*5** The EPA regulates the calculation of estimated fuel economy. The current regime allows automobile manufacturers to choose between two methods of calculating fuel economy. A manufacturer can either directly test fuel economy using a "5–cycle" method, or can it can derive fuel economy estimates using a series of equations and data from directly-tested, similar vehicles. *See* 40 C.F.R. § 600.210–12; Press Release, "EPA Announces Revised Fuel Economy Label Estimates for 2013 Ford C–MAX; Initiates Effort to Update Labeling Procedures to Keep Pace with Industry Trends," ("Press Release") Aug. 15, 2013, available at http://yosemite.epa.gov/opa/admpress.nsf/6424ac1caa800aab85257359003f5337/8a00bfd7633d548f85257bc800637d37!OpenDocument (last visited November 2, 2015) ("EPA label regulations allow, but do not require, vehicles with the same engine, transmission[,] and weight class to use the same fuel economy label value data ...."); *see also* 40 C.F.R. § 600.115–11 (providing criteria for using this method). [4] Ford used the former approach with the Fusion and the latter with the C–MAX. *See* Press Release ("Ford based the 2013 Ford C–MAX label on testing of the related Ford Fusion hybrid, which has the same engine, transmission[,] and test weight as allowed under EPA regulations.")

The FTC, by contrast, regulates the advertisement of fuel economy estimates to consumers. Its regulations provide, in relevant part, that "[n]o manufacturer or dealer shall make any express or implied representation in advertising concerning the fuel economy of any new automobile unless ... the [EPA] is the source of the 'estimated city mpg' and estimated highway mpg' and that the numbers are estimates" and marked as such. 16 C.F.R. § 259.2(a); *see also* Gilles, 24 F.Supp.2d at 1046–47 (describing these regulations and

noting that, "[s]imply put, when a manufacturer includes miles per gallon numbers in an advertisement, it must, in a clear and conspicuous manner, include the EPA mileage estimates, state that they are estimates, and indicate that the EPA is the source of the estimates"). The FTC regulations further provide that "[f]uel economy estimates derived from a non-EPA test may be disclosed provided that," inter alia, the EPA estimates have "substantially more prominence than any other estimate." 16 C.F.R. § 259.2(c). [5] Unlike the EPA regulations, the FTC regulations do not require an "actual results will vary" disclaimer. 📖 Gilles, 24 F.Supp.3d at 1047. If a manufacturer fails to comply, the FTC may take "corrective action ... under appropriate statutory provisions." 16 C.F.R. § 1.5.

### 4. Experience of Each Plaintiff

In the CAC, Plaintiffs provide background on each of the Plaintiffs. While Defendant's Motion focuses on the allegations in the CAC as a whole, the Court briefly summarizes the experiences of each Plaintiff here, grouped by state and by vehicle. Plaintiffs allege that fuel economy is a central consideration when consumers shop for a new car, (CAC ¶¶ 42–46), and that the represented fuel economy of the Vehicles played a pivotal role in Plaintiffs' purchasing decisions, (id. ¶¶ 13–40).

### a. Fusion

**\*6** Johanna Fontenot, of Altadena, California, purchased a Fusion in November 2012 in Duarte, California, in reliance on representations on Ford's website and in Ford brochures that the Fusion "got 47 MPG in highway and in city driving," and, in fact, waited until the 2013 model year to purchase the Fusion for this reason. (Id. ¶ 16.)

Dan Wilkins, of Holyoak, Colorado, purchased a Fusion in November 2012 in Lakewood, Colorado, in reliance on representations on Ford's website that the Fusion "would get 47 MPG," as well as statements in a brochure at the dealership where he purchased his Fusion that it "got 47 MPG in the city and on the highway." (Id. ¶ 17.)

Jeremy Dobbs, of Orlando, Florida, purchased a Fusion in December 2012 in reliance on representations on Ford's website that the Fusion "would get 47 MPG city, 47 MPG hwy [sic][,] and 47 MPG combined," as well as a brochure "he was given" at the dealership where he bought his Fusion that "reinforced the 47/47/47 fuel economy message." (Id. ¶ 20.)

Richard Weglarz, of Antioch, Illinois, purchased a Fusion in November 2012 in reliance on representations on Ford's website that the Fusion "would achieve 47 MPG whether in the city or on the highway." (Id. ¶ 22.)

Matthew Romak, of Gibraltar, Michigan, purchased a Fusion in January 2014 in reliance on representations on Ford's website that the Fusion "achieved 47 MPG in the city, on the highway[,] and combined," as well as a brochure at a dealership which stated that the Fusion "achieved 47 MPG on the highway as well as in city driving." (Id. ¶ 26.)

Dean Majkrzak, of Elk River, Minnesota, purchased a Fusion in January 2013 in reliance on representations on Ford's website and Facebook page that the Fusion "would achieve 47 MPG on the highway, as well as in the city." (Id. ¶ 27.)

Michael Hendrickson, of Rogersville, Missouri, purchased a Fusion in January 2013 in reliance on representations on Ford's website and from "Ford Salespersons" that the Fusion "would achieve 47[MPG] in both highway and city driving," as well as a brochure which stated that the Fusion "would achieve 47 [MPG] in any type of driving." (Id. ¶ 28.)

Sal Lazuka, of Painesville, Ohio, purchased a Fusion in November 2012 in reliance on Ford's presentation at the Detroit Auto show, which indicated that the Fusion was "supposed to achieve 47 MPG in city, highway, and combined," as well as representations on Ford's website that the Fusion "would get 47 MPG in all types of driving." (Id. ¶ 34.)

Mark Goodale, of Beaverton, Oregon, purchased a Fusion in January 2013 in reliance on representations on Ford's website that the Fusion "achieved 47 MPG in the city and on the highway ... in any type of driving." (Id. ¶ 35.)

Gary Duckenmiller, of Lewistown, Pennsylvania, purchased a Fusion in December 2012 in reliance on representations on Ford's website that the Fusion "achieved 47 MPG city, highway[,] and combined," as well as assurances from a dealer's salesperson that the Fusion "really got 47 MPG." (Id. ¶ 36.) William Huff, of Boalsburg, Pennsylvania, purchased a Fusion in November 2012 in State College, Pennsylvania, in reliance on representations on Ford's website that the Fusion "would achieve 47 MPG city, highway[,] and combined." (Id. ¶ 37.)

In re Ford Fusion and C-Max Fuel Economy Litigation, Not Reported in F.Supp.3d (2015)
2015 WL 7018369
Case 1:18-md-02865-LAK Document 394-5 Filed 07/02/20 Page 7 of 33

*7 Richard and Carol Fox, of Ridgefield, Washington, purchased a Fusion in November 2012 in reliance on representations in "My Ford" magazine indicating that the Fusion "would get 47 MPG city, highway[,] and combined," as well representations on Ford's website that the Fusion "achieved 47 MPG in all types of driving." (*Id.* ¶ 39.)

*b. C–MAX*

Gregory Holman, of Phoenix, Arizona, purchased a C–MAX in December 2012 in reliance on a television commercial which indicated that "the C–MAX got better gas mileage than the Prius V and achieved 47[MPG] highway, city[,] and combined," and the C–MAX Facebook page, which echoed this message and "included a video ad series called the Hybrid Games" which compared the C–MAX favorably to the Prius. (*Id.* ¶ 13.)

Bruce Keller, of San Mateo California, purchased a C–MAX in November 2012 in reliance on representations on Ford's website that the C–MAX "achieved 47 MPG highway, city, and combined," and a television commercial indicating the C–MAX "had better horsepower than Prius V, beat Prius V in MPG[,] and got 47 combined MPG." (*Id.* ¶ 14.) Richard Pitkin, of Roseville, California, purchased a C–MAX in October 2012 in Folsom, California, in reliance on representations on Ford's website that the C–MAX "achieved 47 MPG highway, city, and combined," and that its fuel economy was "better ... than the Prius." (*Id.* ¶ 15.)

April Tibbets, of Terryville, Connecticut, purchased a C–MAX in November 2012 in reliance on a television commercial indicating that the C–MAX "got 47 MPG in highway and city driving which was better than the Prius V," as well as statements in a brochure at the dealership where she purchased her C–MAX that "reiterated the 47 combined MPG message." (*Id.* ¶ 18.)

James Oldcorn, of Naples, Florida, purchased a C–MAX in December 2012 in reliance on representations on Ford's website that the C–MAX "achieved 47 miles per gallon highway, city[,] and combined." (*Id.* ¶ 19.)

Gary Cole, of Wakarusa, Indiana, purchased a C–MAX in January 2013 in reliance on representations on Ford's website that "C–MAX achieved 47 MPG hwy [sic], 47 MPG city[,] and 47 MPG combined," as well as statements in a brochure at a dealership that "reinforced the message that the C–MAX would get 47 MPG in all types of driving." (*Id.* ¶ 21.)

Raymond Belden, of Odenton, Maryland, purchased a C–MAX in January 2013 in reliance on a television commercial which indicated that the C–MAX "got better gas mileage than the Prius V and achieved 47 miles per gallon highway, city [,] and combined," as well as internet ads that stated that the C–MAX "got 47 MPG in both city and highway driving and combined." (*Id.* ¶ 23.)

James Griffiths, of Bay City, Michigan, purchased a C–MAX in September 2012 in reliance on representations on Ford's website that the C–MAX "would achieve 47 miles per gallon highway, city, and combined," as well as statements in a brochure at a dealership that "reinforced the message that the C–MAX got 47 MPG whether it was driven in the city or on the highway." (*Id.* ¶ 24.) Charles Kroner, of Brownstown, Michigan, purchased a C–MAX in January 2013 in Taylor, Michigan, in reliance on statements in a brochure that indicated that the C–MAX "would achieve 47 MPG city, 47 MPG hwy [sic][,] and 47 MPG combined." (*Id.* ¶ 25.)

*8 Leah Broome, of Rolla, Missouri, purchased a C–MAX in December 2012 in reliance on the "Ford Hybrid Games commercial which claimed that the C–MAX had better fuel economy than the Prius and got 47 MPG in all types of driving," as well as another television commercial which "compared the Prius V's gas mileage unfavorably to the C–MAX." (*Id.* ¶ 29.) Michael McComas, of Kansas City, Missouri, purchased a C–MAX in September 2012 in reliance on representations on Ford's website that the C–MAX "got 47 MPG whether driven in the city or on the highway." (*Id.* ¶ 30.)

James DeVito, of Brewster, New York, purchased a C–MAX in December 2012 in reliance on a television commercial which indicated that "the C–MAX got better fuel economy than the Prius V and got 47 MPG in highway or city driving," as well as representations on Ford's website that "the C–MAX got 47 MPG in all types of driving." (*Id.* ¶ 31.) Robert Fellow, of Valley Cottage, New York, leased a C–MAX in October 2012 in reliance on representations on Ford's website that "the C–MAX would achieve 47 MPG, in the city, on the highway[,] and combined," as well as a television commercial which indicated that "the C–MAX got better MPG than the Prius V." (*Id.* ¶ 32.) Octavio Hoyos, of Howard Beach, New York, purchased a C–MAX in December 2012 in reliance on a television commercial which indicated that "the C–MAX got 47 MPG in city and on the highway and better MPG than the Prius V," as well as representations on Ford's website that "the C–MAX got 47 MPG in all types of driving." (*Id.* ¶ 33.)

Martin Babb, of Burien, Washington, purchased a C–MAX in December 2012 in reliance on representations on Ford's website that "the C–MAX delivered 47 MPG in the city, on the highway[,] and combined," a message which he later "saw everywhere." (*Id.* ¶ 38.)

Dennis Harkins, of Fitchburg, Wisconsin, purchased a C–MAX in November 2012 in reliance on Ford's "Hybrid Games" advertisement which indicated that the C–MAX "got better fuel economy than the Prius V, achieving 47 MPG city, highway [,] and combined," as well as representations on Ford's website which "reinforced the message that the C–MAX got 47 MPG in any type of driving." (*Id.* ¶ 40.)

### 5. Class Allegations

Plaintiffs define the class as "[a]ll persons in the United States who purchased and/or leased one of the Vehicles," excluding individuals affiliated with Ford. (*Id.* ¶ 104.) Plaintiffs allege that the class is as large as the number of Vehicles sold in the United States: 30,000 C–MAX and 20,000 Fusion purchasers/lessees. (*Id.* ¶ 105.) Plaintiffs also allege common legal and factual issues, namely:

a. whether the Vehicles achieve gas mileage materially lower than the advertised mileage;

b. whether the Vehicles achieve [a] mileage range on a single tank of gas materially less than the advertised range;

c. whether Ford's overstatement of its Vehicles' fuel economy was materially misleading;

 **\*9** d. whether Ford's statements were false and deceptive in conveying that the Vehicles would achieve the advertised gas mileage in normal, real-world highway usage;

e. whether Ford's advertisements failed to provide material disclosures that the gas mileage cannot be achieved in normal, real-world highway usage;

f. whether Ford willfully concealed the misrepresentations regarding MPG or recklessly disregarded their falsity;

g. whether Ford breached any warranties in selling the Vehicles which misrepresented MPG;

h. whether Ford's conduct violates the laws as set forth in the causes of action;

i. whether Plaintiffs and Class members are entitled to equitable or injunctive relief;

j. whether Plaintiffs and the Class are entitled to restitution or damages, and what is the proper measure of damages;

k. whether Ford's software upgrade to improve fuel economy was in response to this litigation;

l. whether Ford's goodwill payments to C–MAX customers was in response to this litigation; and

m. whether there are undisclosed performance trade-offs associated with Ford's software upgrade.

(*Id.* ¶ 106.) Plaintiffs also allege that their claims are typical of the Class, and will fairly and adequately represent the interests of the class because they "have retained counsel who are experienced and competent trial lawyers in complex litigation and class action litigation," and there are no material conflicts "that would make class certification inappropriate." (*Id.* ¶¶ 107–08.) Plaintiffs further make general allegations about the predominance of class claims and superiority of a class action in this circumstance, and note that they "contemplate the eventual issuance of notice to the proposed Class members" based on Ford's business records. (*Id.* ¶¶ 109–10.)

### B. Procedural History

#### 1. Multi–District Litigation

The instant Action, consolidated from seventeen lawsuits concerning Ford's advertisement of the fuel economy of the Vehicles, was centralized and consolidated in this Court by recommendation of the United States Judicial Panel on Multidistrict Litigation (the "Panel"). (*See* Dkt. No. 1.) The Court was initially assigned *Fellows v. Ford Motor Co.,* No. 13–CV–906, on February 7, 2013, and *Teppich v. Ford Motor Co.,* No. 13–CV–1144, three weeks later as related. (*See* Order ("Order No. 1") (Dkt. No. 18).) On June 7, 2013, the Panel assigned five other cases from other districts to this Court: three actions in the Central District of California, one in the District of New Hampshire, one in the District of New Mexico. On June 18, 2013, by recommendation of the Panel, several other pending actions were added: one from the District in Arizona, two from the Southern District of Florida, two from the Northern District of Illinois, one from the District of Massachusetts, and one from the Eastern District of Pennsylvania. (*See* Dkt. No. 7.) On June 21, 2013, by recommendation of the Panel, one pending action from the

District of Nevada was added. (*See* Dkt. No. 13.) On July 1, 2013, by recommendation of the Panel, one pending action from the Western District of Missouri was added. (*See* Dkt. Nos. 7, 16.) Finally, on August 8, 2013, by recommendation of the Panel, one pending action from the Western District of Washington was added. (*See* Dkt. No. 44.) [6]

**\*10** On July 10, 2013, the Court issued an Order addressing various administrative issues and setting an initial schedule. (*See* Order No. 1.) On July 18, 2013, the Parties filed their "Initial Report," detailing their positions on pretrial issues. (*See* Dkt. No. 22.) The Court held an initial conference on July 25, 2013, and thereafter, on July 30, 2013, adopted an Order designating Lead Counsel, Liaison Counsel, and members of Plaintiffs' Executive Committee, and set a schedule for the filing of the CAC and Motion To Dismiss. (*See* Order (Dkt. No. 30).) Plaintiffs filed the CAC on October 15, 2013, (Dkt. No. 51), deemed timely filed *nunc pro tunc,* (*see* Dkt. No. 50). Defendant filed its Motion to Dismiss and associated documents on November 22, 2013, (Dkt.Nos.63–65), Plaintiffs filed their Opposition on January 21, 2014, (Dkt. No. 67), and Defendant filed its Reply on March 7, 2014, (Dkt. No. 68). The Court also so-ordered a Stipulated Protective Order on December 12, 2013. (Dkt. No. 66.) The Court held oral argument on April 22, 2015. (*See* Dkt. (minute entry for Apr. 22, 2015).)

### 2. Plaintiffs' Claims [7]

Plaintiffs allege several state statutory causes of action, including one each for violations of the California Business & Professions Code § 17200, et seq. (Unfair Competition Law), California Business & Professions Code § 17500, et seq. (False Advertising Laws), and California Civil Code § 1750, et seq. (Consumer Legal Remedies Act) "on [b]ehalf of [a]ll Plaintiffs or, [a]lternatively, the California Plaintiffs"; one cause of action for violations of the Arizona Consumer Fraud Act §§ 44–1521–34 on behalf of the Arizona Plaintiff; one cause of action for violations of the Colorado Revised Statutes §§ 6–1–101, et seq. (Colorado Consumer Protection Act), on behalf of the Colorado Plaintiff; one cause of action for violations of the Connecticut General Statutes §§ 42110a, et seq. (Connecticut Unfair Trade Practices Act ("CUTPA")), on behalf of the Connecticut Plaintiff; one cause of action for violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, et seq., on behalf of the Florida Plaintiffs; one cause of action for violations of the

Illinois Consumer Fraud and Deceptive Business Practices Act, § 815 Illinois Compiled Statutes Annotated 505/1, et seq., on behalf of the Illinois Plaintiffs; one cause of action for violations of the Maryland Consumer Protection Act, Md.Code Com. Law § 13–101, et seq., on behalf of the Maryland Plaintiff; one cause of action for violations of the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901, et seq., on behalf of the Michigan Plaintiffs; one cause of action for violations of the Minnesota Consumer Fraud Act, Minnesota Statutes §§ 325f.68–69, on behalf of the Minnesota Plaintiff; one cause of action for violations of the Missouri Merchandising Practices Act, Missouri Revised Statutes §§ 407.010, et seq., on behalf of the Missouri Plaintiffs; one cause of action each for deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349, and false advertising in violation of N.Y. Gen. Bus. Law § 350, et seq., on behalf of the New York Plaintiffs; one cause of action each for violations of the Consumer Sales Practices Act, Ohio Revised Code §§ 1345, et seq., and Deceptive Trade Practices Act, Ohio Revised Code §§ 4165, et seq., on behalf of the Ohio Plaintiffs; one cause of action for violations of the Oregon Unlawful Trade Practices Act ("UTPA"), §§ 646.607–08, et seq., on behalf of the Oregon Plaintiff; one cause of action for violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201–1, et seq., on behalf of the Pennsylvania Plaintiffs; one cause of action for violations of Washington Revised Code §§ 19.86.010, et seq., (Washington Consumer Protection Act), on behalf of the Washington Plaintiffs; and one cause of action for violations of the Wisconsin Deceptive Trade Practices Act, Wisc. Stat. § 110.18, on behalf of the Wisconsin Plaintiff. (*Id.* ¶¶ 112–317.)

**\*11** Plaintiffs also allege several common law claims on behalf of all plaintiffs, though they do not specify upon which jurisdiction's common law they are based. These claims include one for fraud, one for negligent misrepresentation, one for breach of contract, one for breach of the covenant of good faith and fair dealing, one for breach of express warranties, and one for unjust enrichment. (*Id.* ¶¶ 318–51, 361–65.) [8] Plaintiffs also allege one federal statutory claim for violations of the Magnuson–Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301, et seq. (*Id.* ¶¶ 352–60.)

In connection with their state law claims, Plaintiffs make several additional allegations against Ford not included in other parts of the Complaint, namely (1) a failure to "comply with FTC regulations governing [the] advertising of fuel

economy, as set forth in 16 C.F.R. § 259.2(a)," (2) a failure to provide a "disclaimer that the advertised [fuel economy] rates will vary with actual MPG ratings achieved in the real world, consistent with the requirements of 40 C.F.R. § [§ ] 600.302–08(b)(4)," (3) a failure "to disclose that the MPG figures that [Ford] repeatedly touted and advertised for the C–MAX [were] not based on actual tests of the C–MAX," (5) "violations of California Civil Code §§ 1572–1573, 1709, 1711, and 1770, and the common law," (6) violat[ions] of the declared legislative policies as set forth by the federal government in" 40 C.F.R. § 600.307(a)(ii)(A) and 16 C.F.R. § 259.2(a), and (7) that Ford "failed to respond to Plaintiff's [Consumer Legal Remedy Act] letters within 30 days," as required by California Civil Code § 1782(b). (Id. ¶¶ 114–15, 130.) While the Court does not consider these allegations as separate causes of action, because they are not listed as such in the CAC, the Court considers them in the context of the enumerated causes of action.

As relief from Ford's alleged misconduct, Plaintiffs ask that the sales and leases of the Vehicles be rescinded or reimbursed, that all profits and compensation improperly obtained be disgorged, that Ford cease its false advertising and other unlawful business practices, and that Plaintiff be awarded damages, including punitive damages, attorneys' fees, interest, and costs of suit. (Id. at 77–78.)

## II. Discussion

### A. Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts which, taken as true, state a plausible claim for relief." Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 68 (2d Cir.2014). In reviewing a complaint, the Court "accept[s] all factual allegations as true and draw[s] every reasonable inference from those facts in the plaintiff's favor ." In re Adderall XR Antitrust Litig., 754 F.3d 128, 133 (2d Cir.2014) (internal quotation marks omitted). Moreover, along with the CAC itself, the Court "may consider ... any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." ASARCO, LLC v. Goodwin, 756 F.3d 191, 198 (2d Cir.2014) (internal quotation marks omitted), cert. denied, 135 S.Ct. 715 (2014).

*12 The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his [or her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (third alteration in original) (citations omitted). Instead, the Supreme Court has emphasized that the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id., and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," id. at 563. A plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." Id. at 570. But if a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." Id .; see also Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " (alteration in original) (citation omitted) (quoting Fed.R.Civ.P. 8(a)(2))).

### B. Applicability of Rule 9(b)

#### 1. Claims Subject to Rule 9(b)

Under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," though "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." To comply with this rule, a complaint must: "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir.2006); Rombach v. Chang, 355 F.3d 164, 170 (2d Cir.2004) (same); see also Jovel v.. i-Health, Inc., No. 12–CV–5614, 2013 WL 5437065, at *11 (E.D.N.Y. Sept. 27, 2013) ("Rule 9(b) generally requires that a plaintiff specify the who, what, where, when[,] and why of the alleged fraud; specifying which statements were fraudulent and why, who made the statements to whom, and when and where the statements were made." (citing Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.1993)). These

Case 1:18-md-02865-LAK Document 394-5 Filed 07/02/29 Page 11 of 33
In re Ford Fusion and C-Max Fuel Economy Litigation, Not Reported in F.Supp.3d (2015)
2015 WL 7018369

details principally serve to provide a defendant with fair notice of a plaintiff's claim. *See* O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674, 676 (2d Cir.1991).

Rule 9(b) applies broadly to claims "premised on allegations of fraud," *In re* Morgan Stanley Info. Fund. Sec., 592 F.3d 347, 358 (2d Cir.2010); *see also* Police & Fire Ret. Sys. of City of Detroit v. Goldman, Sachs & Co., No. 10–CV–4429, 2014 WL 1257782, at *5 (S.D.N.Y. Mar. 27, 2014), i.e., "to all averments of fraud," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (internal quotation marks omitted), and "is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action," Rombach, 355 F.3d at 171; *see also* Meserole v. Sony Corp. of Am., Inc., No. 08–CV–8987, 2009 WL 1403933, at *3 (S.D.N.Y. May 18, 2009) (explaining that Rule 9(b) applies "not only to formal averments of fraud, but also to allegations that sound in fraud, or where the wording and imputations of the complaint are classically associated with fraud" (internal quotation marks omitted)); Matsumura v. Benihana Nat'l Corp., 542 F.Supp.2d 245, 251 (S.D.N.Y.2008) (noting that Rule 9(b) applies to "any cause of action that bears a close legal relationship to fraud" and "any non-fraud claim that the plaintiffs have made little, if any, effort to differentiate from the fraud allegations upon which the action is predicated" (internal quotation marks omitted)); *cf.* Delgado v. Ocwen Loan Servicing, LLC, No. 13–CV–4427, 2014 WL 4773991, at *14 (E.D.N.Y. Sept. 24, 2014) (noting, in context of California state law claim, that "[e]ven if fraud is not a necessary element of a particular claim, Rule 9(b) will apply if the plaintiff has alleged a unified course of fraudulent conduct and relied entirely on that course of conduct as the basis of the claim." (brackets and internal quotation marks omitted)).

*13 A threshold question is the extent to which Rule 9(b) applies to Plaintiffs' claims. Defendant contends that the CAC, as a whole, must comply with Rule 9(b) because all of Plaintiffs' causes of action sound in fraud and/or are based on fraudulent conduct. (*See* Reply Br. in Support of Def. Ford Motor Company's Mot. to Dismiss ("Def.'s Reply.) 4 (Dkt. No. 68) (arguing that "nearly all of the consumer fraud claims found in the CAC" are subject to Rule 9(b), and therefore Rule 9(b) should apply to "all of [Plaintiff's] consumer protection claims"); Def.'s Mem. 22 ("Because the

CAC, as a whole, is both implausible and not pleaded with the specificity required by Rule 9(b), it should be dismissed in its entirety and with prejudice."). In support of its argument, Defendant quotes several lines from the CAC, which it argues are "quintessential averments of fraud," for example, the allegation that "Ford disseminated advertisements in print, online, and on television formats containing materially misleading and deceptive information and omitted material information ... for purposes of inducing customers to purchase and/or lease" the Vehicles. (Def.'s Reply 4 (quoting CAC ¶ 120).) Defendant also argues that several portions of the CAC are "averments classically associated with fraud," namely:

- "Ford has been engaged in a 'scheme' to 'wrongfully misrepresent[ ] the quality' of the subject vehicles, and ... Plaintiffs suffered a loss based on Ford's 'reckless or knowing' acts."

- "Ford has engaged in deceptive practices and false advertising 'knowingly, willfully, and deliberately.' "

- "The 'conduct complained of' constitutes, among other things, 'deception' or 'fraud' by Ford undertaken with the 'intent that the Maryland Plaintiff and the other Class members would rely upon such concealment, suppression, or omission.' "

- " 'Ford knew that the [Vehicles] did not achieve the represented fuel economy[,]' and concealed that fact from ... [P]laintiffs."

- "... Ford engaged in, among other things 'unlawful schemes' that were 'intended to induce the Missouri Plaintiffs and members of the Class' to purchase or lease the subject vehicles."

- "... Ford 'engaged in fraudulent conduct in their false marketing of the [V]ehicles,' and that the Class relied on Ford's 'fraudulent misrepresentations.' "

(Def.'s Reply 4–5 (quoting CAC ¶¶ 141, 147, 153–54, 198, 209–10, 238, 300, 302). Defendant further contends that because "Plaintiffs make absolutely no effort in the CAC or their opposition brief to distinguish those consumer protection claims allegedly founded on 'unfairness' from those allegedly founded on 'fraud,' " Rule 9(b) should apply to all of Plaintiffs' claims. (*Id.* at 5.)

Plaintiffs counter by arguing that only their common law fraud claim (claim 22) is subject to Rule 9(b), and that their other 27 claims, including their false advertising claims and

claims "founded on unfair conduct" are not subject to Rule 9(b). (Pls.' Mem. of Law in Opp'n to Def.'s Mot. To Dismiss ("Pls.' Opp'n") 28–30 (Dkt. No. 67) (collecting cases).) [9]

**\*14** The Court is persuaded that Plaintiffs' action is founded on, and based in, fraud. While Plaintiffs assert that only their explicit fraud claim sounds in fraud, the first paragraph of the CAC refers to the action as a whole as "consumer fraud class action," (CAC ¶ 1), and Plaintiffs have, for the most part, and especially through the first half of the CAC (in which most of the substantive allegations appear), made no effort to distinguish their non-fraud claims from their fraud claim beyond categorizing their claims into false advertising, consumer protection, and unfair conduct buckets. (*See, e.g., id.* ¶ 95 ("Even though Ford knew that its 2013 Fusion ... and C–MAX did not actually get anywhere near 47 MPG, it still chose to implement a massive '47 MPG' advertising campaign overstating the real world fuel economy of the Vehicles.").) In fact, Plaintiffs admit the predominance of their allegations of fraud in their Opposition to Defendant's Motion. For example, Plaintiffs contend that "the gravamen of [their] case is simple: Ford knew that the fuel efficiency numbers and gas savings it promoted could not realistically be achieved by consumers, but promoted them anyway as a primary selling point for the Vehicles." (Pls.' Opp'n 23; *see also id.* at 36 ("Ford's advertisements were ... deceptive and misleading because they included additional, voluntary statements that were designed to leave consumers with the impression that 47 MPG was also an EPA estimate."); *id.* at 42 ("[T]hroughout the CAC, Plaintiffs allege that Ford engaged in a uniform, widespread marketing campaign in which it perpetuated misrepresentations regarding the Vehicles' fuel economy, with the intent to defraud Plaintiffs, who reasonably relied on those statements to their detriment.").) In fact, as Defendant points out, the CAC, both before Plaintiffs lay out their individual claims, as well as within many of the allegations specific to those claims, is replete with allegations that sound in fraud. (*See, e.g.* CAC ¶¶ 114 (referring to "Ford's unlawful, unfair, and fraudulent business acts and practices"), 198 (finding "Ford's conduct complained of herein constitutes ... fraud"), 300 ("Ford engaged in fraudulent conduct in their false marketing of the Vehicles."), 321 ("Plaintiffs and the Class allege that Ford misrepresented material facts with the intent to defraud Plaintiffs and the Class.").)

The Court is not "required to sift through allegations of fraud" in order to find claims not subject to Rule 9(b). *See* Rombach, 355 F.3d at 176. Indeed, as one court has observed, "[i]n some cases, the plaintiff may allege a

unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be grounded in fraud or to sound in fraud, and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1103–04 (9th Cir.2003). Accordingly, with the exception of the few claims discussed below, the Court finds that because Plaintiffs have failed to "meaningfully distinguish [their] fraud allegations in the [CAC] or their [O]pposition" from their non-fraud claims, they are subject to Rule 9(b). *See Matsumura* 542 F.Supp.2d at 251; *see also L.S. v. Webloyalty.com, Inc.,* No. 10–CV–1372, 2014 WL 3547640, at *6 (D.Conn. July 17, 2014)* ("[The] overarching claim of fraud permeates several of the claims for relief asserted in the pleading. The heightened pleading requirements of Fed.R.Civ.P. 9(b) apply to such claims."); *In re Rezulin Prods. Liab. Litig.,* 133 F.Supp.2d 272, 285 (S.D.N.Y.2001) (dismissing claims for failure to comply with Rule 9(b) because "although [the] plaintiffs ... characterized their claims as being for negligence, in substance they charge[d] fraud"); *cf. In re Suprema Specialties, Inc. Secs. Litig.,* 438 F.3d 256, 273 (2d Cir.2006)* ("[W]here [a] plaintiff has exercised care in differentiating asserted negligence claims from fraud claims and in delineating the allegations that support the negligence cause of action as distinct from the fraud, the determination [of whether to apply Rule 9(b) ] is straightforward."); *In re FBR Inc. Secs. Litig.,* 544 F.Supp.2d 346, 353 (S.D.N.Y.2008)* (same).

**\*15** Plaintiffs do specifically attempt to distinguish a few causes of action from their other claims as not subject to Rule 9(b). (*See* Pls.' Opp'n 29–30.) These claims are those under Connecticut law (claim 6), Florida law (claim 7), Illinois law (claims 8 and 9), Minnesota law (claim 12) New York law (claims 14 and 15), Oregon law (claim 18), Pennsylvania law (claim 19), and Washington law (claim 20). The Court will address each of these claims in turn.

Starting with Plaintiffs' Connecticut law claim, the case that Plaintiffs cite suggests that "CUTPA claims need not meet the heightened pleading requirements of Rule 9(b)." *Quinn v. Walgreen Co.,* 958 F.Supp.2d 533, 543 (S.D.N.Y.2013). While CUTPA is undoubtedly "broader in scope than traditional common law remedies for fraud," *Fed. Paper Bd. Co., Inc. v. Amata,* 693 F.Supp. 1376, 1390

(D.Conn.1988), other cases have concluded that "CUTPA claims brought in federal court ... must satisfy Rule 9(b) if such claims are based on fraud allegations," *Tatum v. Oberg,* 650 F.Supp.2d 185, 195 (D.Conn.2009); *see also In re Trilegiant Corp., Inc.,* 11 F.Supp.3d 82, 120 (D.Conn.2014) ( "The Court holds that to the extent the Plaintiffs have alleged a CUTPA action based on fraud, they have failed to sufficiently plead with the particularity required in Rule 9(b)...."); *U.S. Bank Nat. Ass'n v. PHL Variabl e Ins. Co.,* No. 12–CV–6811, 2013 WL 791462, at *8 (S.D.N.Y. Mar. 5, 2013) ("When CUTPA claims rely on claims of fraud, ... Rule 9(b) applies."); *Lentini v. Fidelity Nat. Title Ins. Co. of N.Y.,* 479 F.Supp.2d 292, 298 n. 2 (D.Conn.2007) ("[T]o the extent that fraud claims in Count I rely on affirmative statements or omissions involving fraud or mistake, Rule 9(b) applies."). *But cf. Milo v. Galante,* No. 09–CV–1389, 2011 WL 1214769, at *8 (D.Conn. Mar. 28, 2011) ("[T]he mere fact that transactions alleged in the ... complaint give rise to some claims grounded in fraud does not mean that all the claims rising out of the same transactions are subject to 9(b)."). The allegations pertaining to this claim sound in fraud, because (a) they incorporate the other allegations in the CAC by reference and, as explained above, the thrust of the CAC is fraudulent conduct by Defendant, and (b) Plaintiffs allege in the section pertaining to this specific cause of action that Defendant "uniformly and falsely advertised the Vehicles' fuel efficiency," (CAC ¶ 159), and that such actions were "done with a reckless indifference to the rights of the Connecticut Plaintiff and Class members or were an intentional and wanton violation of those rights," (*id.* ¶ 161). *See Connect, Inc. v. Turbotect, Ltd.,* No. 97–CV–784, 1998 WL 91067, at *6 n. 4 (D.Conn. Feb. 23, 1998) ("[W]here common law fraud is being alleged under the guise of a CUTPA claim, ... such a claim [must] be alleged in accordance with the particularity requirements of [Rule 9(b) ]."); *NCC Sunday Inserts, Inc. v. World Color Press, Inc.,* 692 F.Supp. 327, 330 (S.D.N.Y.1988) (explaining that "if fraudulent intent is being alleged under CUTPA in federal court, then the complaint must meet the particularity requirements of Rule 9(b)," and finding CUTPA claim subject to Rule 9(b) because it "incorporate[d] the same allegations as that for fraudulent overcharges" from a previous count); *cf. Telemedia Partners Worldwide, Ltd. v. Hamelin, Ltd.,* No. 95–CV–2452, 1996 WL 41818, at *9 (S.D.N.Y. Feb. 2, 1996) ("To adequately plead a defendants' involvement in a scheme to defraud, in turn, a plaintiff must allege that the defendant engaged in intentional fraud or acted with reckless indifference to the truth" under Rule 9(b).). Accordingly, Rule 9(b) applies.

*16 Regarding Plaintiffs' Florida law claim, while Plaintiffs are correct that FDUTPA claims are generally not subject to Rule 9(b), "where FDUTPA claims do happen to sound in fraud, federal courts will apply the heightened pleading standard of Rule 9(b)." *Morano v. BMW of N. Am., LLC,* 928 F.Supp.2d 826, 833 (D.N.J.2013) (collecting cases); *see also Blair v. Wachovia Mortg. Corp.,* No. 11–CV–566, 2012 WL 868878, at *3 (M.D.Fla. Mar. 14, 2012) (noting that "federal district courts have split as to whether FDUTPA claims are subject to Rule 9(b)," but holding that "where the gravamen of the claim sounds in fraud, as here, the heightened pleading standard of Rule 9(b) would apply"); *D.H.G Props., L.L.C. v. Ginn Cos.,* No. 09–CV–735, 2010 WL 5584464, at *5 n. 9 (M.D.Fla. Sept. 28, 2010) ("The Court need not determine the extent to which FDUTPA claims in other contexts may or may not be subject to the heightened pleading requirements of Rule 9(b); it suffices to recognize that the allegations of misrepresentation comprising Plaintiff's FDUTPA claim in this action are grounded in fraud, and thus, required to be pled with particularity."). Given that, as discussed, Plaintiffs' claims, at core, not only contain allegations of false advertising and deceptive practices, but also allegations that those practices were knowingly intended to induce reliance, they therefore sound in fraud, and accordingly Rule 9(b) applies to Plaintiffs' FDUTPA claim. (*See* CAC ¶ 169 (alleging that Defendant "engag[ed] in the unfair and deceptive practices described herein" and "uniformly and falsely advertised the Vehicles' fuel efficiency and fail[ed] to disclose that the fuel economy figures repeatedly touted and advertised for the C–MAX were not based on actual tests performed on the C–MAX" in order to induce consumers to purchase cars).)

Regarding the Illinois law claims, the case that Plaintiffs cite applies to the Illinois Consumer Fraud Act, not the Illinois Uniform Deceptive Trade Practices Act, the law under which those claims are brought. *See Windy City Metal Fabricators & Supply, Inc.,* 536 F .3d 663, 670 (7th Cir.2008). Indeed, several decisions from the Northern District of Illinois have applied Rule 9(b) to a fraud claim under the latter statute. *See, e.g., Medscript Pharmacy, LLC v. My Script, LLC,* —— F.Supp.3d ——, 2015 WL 149062, at *2 (N.D.Ill. Jan. 12, 2015) (applying Rule 9(b) to "allegations of fraud" in violation of the Illinois Uniform Deceptive Trade Practices Act); *Platinumtel Comms., LLC v. Zefcom, LLC,* No. 08–CV–1062, 2008 WL 5423606, at *1 (N.D.Ill.Dec. 30, 2008) (applying Rule 9(b)

to "allegations of consumer fraud" in violation of, *inter alia*, IUDPTA); 📑 *Cardionet, Inc. v. Lifewatch Corp.*, No. 07–CV–6625, 2008 WL 567031, at *2 (N.D.Ill. Feb. 27, 2008) ("IUDPTA ... claims sounding in fraud must meet the pleading requirements of Rule 9(b)."). Accordingly, because Plaintiffs rely on fraud allegations in support of their Illinois law claims, Rule 9(b) applies. (*See, e.g.,* CAC ¶ 184 ("Ford's illegal and wrongful conduct ... including Ford['s] self-dealing, misrepresentations, and material omissions, intended to benefit Ford at the expense of the Illinois Plaintiffs and the Class ... [and] was perpetrated by evil motive....").)

**\*17** With respect to Plaintiffs' Minnesota law claim, the case that Plaintiffs cite in their Opposition recognizes that "Rule 9(b) can apply where fraud is an essential element of a claim or where [the] [p]laintiffs allege some fraudulent and some non-fraudulent conduct." 📑 *Vernon*, 643 F.Supp.2d at 1256. Beyond the general allegations of the CAC, which are sufficient on their own to justify applying Rule 9(b) in this instance, *see* 📑 *Tuttle v. Lorillard Tobacco Co.*, 118 F.Supp.2d 954, 963 (D.Minn.2000) (applying Rule 9(b) because "the gravamen of the complaint [was] fraud"), Plaintiffs also make fraud allegations specific to their claim under Minnesota law, for example, that Defendant "affirmatively misrepresent[ed]" the Vehicles' fuel efficiency and "fail[ed] to alert the public and purchasers" of the Vehicles' "true fuel efficiency," (CAC ¶¶ 225(c)-(d)), which constituted a "conscious" and "deliberate disregard for the rights of others," (*id.* ¶ 22). Therefore, Rule 9(b) applies. *See Masterson Pers., Inc. v. McClatchy Co.,* No.05–CV–1274, 2005 WL 3132349, at *4–5 (D.Minn. Nov. 22, 2005) (applying Rule 9(b) to claims under the Minnesota Consumer Fraud Act); *Apogee Enters., Inc. v. State St. Bank & Trust Co.,* No. 09–CV–1899, 2010 WL 3632697, at *4 (S.D.N.Y. Sept. 17, 2010) (applying Rule 9(b) because the claims at issue "sound[ed] in allegations that [the defendant] fraudulently misrepresented information").

Regarding Plaintiffs' New York law claims, courts in the Second Circuit have consistently found that claims under 📑 New York General Business Law § 349 are not subject to the heightened pleading standards of Rule 9(b), because 📑 § 349 "extends well beyond common-law fraud" and a claim under that statute "does not require proof of the same essential elements ... as common-law fraud." 📑 *Pelman ex rel. Pelman v. McDonald ′ s Corp.,* 396 F.3d 508, 511 (2d Cir.2005); *see also Angermeir v. Cohen,* 14 F.Supp.3d 134,

145 (S.D.N.Y.2014) (same). Accordingly, even given the fact that the thrust of the CAC is fraud, the Court must follow the law of the Second Circuit and, therefore, Rule 9(b) does not apply to Plaintiffs' New York law claims. *See* 📑 *Leonard v. Abbott Labs., Inc.,* No. 10–CV–4676, 2012 WL 764199, at *19 (E.D.N.Y. Mar. 5, 2012) ("*Pelman* ... establish[es] a categorical rule that [ § 349] claims, regardless of whether they 'sound in fraud,' or are premised on specific misrepresentations rather than an 'advertising scheme,' are not subject to the heightened pleading requirement of Rule 9(b).").

With respect to Plaintiffs' Oregon law claim, the case that Plaintiffs' cite, *McKie v. Sears Protection Co.,* No. 10–CV–1531, 2011 WL 1587103 (D.Or. Apr. 27, 2011), is one of the only cases to address the applicability of Rule 9(b) to claims under the Oregon UTPA. The Court in *McKie* adopted a Report and Recommendation ("R & R"), finding that Rule 9(b) did not apply because UTPA claims are distinguishable from common law fraud claims. The district court found this conclusion "correct [and] sound" and adopted it, noting that UTPA claims "do not require proof of reliance" and that require "only negligence misrepresentation." *McKie,* 2011 WL 1587103, at *3 (internal quotation marks omitted). Therefore, in the absence of contrary authority, the Court concludes that Plaintiffs' Oregon law claim is not governed by Rule 9(b).

**\*18** Regarding Plaintiffs' Pennsylvania law claim, the case that Plaintiffs cite in their Opposition makes clear that their Pennsylvania UTPCPL claim is subject to Rule 9(b), because Plaintiffs explicitly allege in the paragraph dedicated to that claim that "Ford engaged in fraudulent conduct." (*Id.* ¶ 300). *See* 📑 *Seldon,* 647 F.Supp.2d at 469 ("[T]his court concludes that for a claim under the catchall provision of the UTPCPL, if a plaintiff alleges deceptive conduct, a plaintiff need not allege the elements of common law fraud, but, conversely, must do so if a plaintiff alleges fraudulent conduct.").

In support of the Washington law claim, Plaintiffs cite the same case as they cited for their Minnesota claim which, as noted above, recognizes that Rule 9(b) applies when even some fraudulent conduct is alleged. While the portion of the CAC pertaining to the Washington cause of action contains more sparse allegations, because it "incorporate[s] by reference the previous allegations" of the CAC, (CAC ¶ 304), Plaintiffs still allege that Defendant "falsely advertised the Vehicles' fuel efficiency" and thereby "deceiv[ed] a

substantial portion of the public" by "induc[ing] [them] into purchasing and/or leasing [the] Vehicles and paying a higher price for the Vehicles," (*id.* ¶ 308). Accordingly, because the allegations here contain the key elements of fraud, namely knowing misrepresentation with an intent to induce reliance, the Court finds that Rule 9(b) applies to Plaintiffs' Washington law claim, as well.

Additionally, while the Court has already found that Plaintiffs' failure to distinguish their other state law claims from their overarching claim of fraud renders them subject to Rule 9(b), the case law and allegations specific to each of those claims also indicate that Rule 9(b) should apply. These include Plaintiffs' claims under the California Business & Professions Code and California Legal Remedies Act (claims 1–3), *see* Kearns v. Ford Motor Co., 567 F.3d 1120, 1125–27 (9th Cir.2009) (applying Rule 9(b) to claim for false advertising, noting that if a plaintiff "allege[s] a unified course of fraudulent course of conduct ... the claim is said to be 'grounded in fraud' "); Vess, 317 F.3d at 1102–04 (applying Rule 9(b) to claim for false advertising); Janney v. Mills, 944 F.Supp.2d 806, 818 (N.D.Cal.2013) (noting that "in a deceptive advertising case, Rule 9(b) requires that the plaintiff(s) identify specific advertisements and promotional materials; alleged when the plaintiff[s] were exposed to the materials; and explain how such materials were false or misleading"); Hughes v. Ester C Co., 930 F.Supp.2d 439, 465 (E.D.N.Y.2013) (applying Rule 9(b) to California law claims of "false advertising and unfair, unlawful, or deceptive business practices" because they "sound[ed] in fraud"); the Arizona Consumer Fraud Act (claim 4), *see* Williamson v. Allstate Ins. Co., 204 F.R.D. 641, 644 (D.Ariz.2001) (noting that Rule 9(b)'s particularity requirement applies to fraud claims brought under the ACFA); the Colorado Consumer Protection Act (claim 5), *see* HealthONE of Denver, Inc. v. UnitedHealth Grp., Inc., 805 F.Supp.2d 1115, 1120–21 (D.Colo.2011) (applying Rule 9(b) to Colorado Consumer Protection Act claim relating to "a deceptive or unfair trade practice"); Hansen v. Auto–Owners Ins. Co., No. 09–CV–2736, 2010 WL 749820, at *2 (D.Colo. Mar. 4, 2010) (applying Rule 9(b) to Colorado Consumer Protection Act claim), the Maryland Consumer Protection Act (claim 10), *see* Currie v. Wells Fargo Bank, N.A., 950 F.Supp.2d 788, 799 (D.Md.2013) (noting that claims under this law that sound in fraud must be pleaded with particularity); Green v. Wells Fargo Bank, N.A., 927 F.Supp.2d 244, 248 (D.Md.2013) ("[The][p]laintiffs' claims alleging fraud and

violation of the Maryland Consumer Protection Act are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b)."), the Michigan Consumer Protection Act (claim 11), *see* Williams v. Scottrade, Inc., No. 06–CV–10677, 2006 WL 2077588, at *7 (E.D.Mich. July 24, 2006) (dismissing Michigan Consumer Protection Act claim which involved allegations of false advertising under Rule 9(b), and characterizing that claim as alleging "fraudulent conduct"), the Missouri Merchandising Practices Act (claim 13), *see* Hughes, 930 F.Supp.2d at 470 ("Rule 9(b) governs the applicable standard of pleading for plaintiff's claims under the MMPA."); Blake v. Career Educ. Corp., No. 08–CV–821, 2009 WL 140742, at *2 (E.D.Mo. Jan. 20, 2009) (dismissing claim under this law based on Rule 9(b), and noting that "the United States District Courts in Missouri have consistently applied Rule 9(b) to cases arising under [this statute]"), Ohio's Consumer Sales Practices Act (claim 16), *see* Morrison v. Skestos, No. 04–CV–244, 2004 WL 2944159, at *1, *4 (Ohio Ct.App. Dec. 21, 2004) (affirming dismissal of claim under this statute because, inter alia, the plaintiffs failed to comply with Ohio Civil Rule 9(b), the state equivalent of Federal Rule of Civil Procedure 9(b)), Ohio's Deceptive Trade Practices Act (claim 17), *see* Crown Battery Mfg. Co. v. Club Car, Inc., No. 13–CV–2158, 2015 WL 845732, at *2–3 (N.D.Ohio Feb. 25, 2015) (applying Rule 9(b) to Ohio Deceptive Trade Practice Act claim); Koorndyk v. Midway Motor Sales, Inc., No. 04–CV–333, 2005 WL 1802343, at *1, *5 (W.D.Mich. July 28, 2005) (same), and the Wisconsin Deceptive Trade Practices Act (claim 21), *see* Am. Orthodontics Corp. v. Epicor Software Corp., 746 F.Supp.2d 996, 999 (E.D.Wisc.2010) (applying Rule 9(b) to Wisconsin Deceptive Trade Practice Act claim); Moscinski v. Bristol–Myers Squibb Co., No. 06–CV–6055, 2009 WL 5216962, at *6–8 (D.N.J. Dec. 30, 2009) (dismissing Wisconsin Deceptive Trade Practice Act claim for failure to comply with Rule 9(b)).

**\*19** Unlike the state consumer protection claims discussed above, two of Plaintiffs' other common law claims—breach of express warranty (claim 26) and violations of the Magnuson–Moss Warranty Act (claim 27)—refer to conduct sufficiently separate from the fraud allegations contained throughout the rest of the Complaint that the Court finds that Rule 9(b) does not apply to them. *See* LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate Inc., No. 01–CV–4389, 2002 WL 31729632, at *3 (S.D.N.Y. Dec. 5, 2002) (declining to apply Rule 9(b) to a breach of warranty claim); Columbia Sav. and Loan Ass'n v. Am. Int'l Grp., Inc., No. 91–CV–589, 1994 WL 114828,

at *5 (S.D.N.Y. Mar. 31, 1994) (same). However, Plaintiffs' claim for unjust enrichment (claim 28) *is* subject to Rule 9(b) because, as discussed above, that claim involves averments of fraud. *See Sgaliordich v. Lloyd's Asset Mgmt.,* No. 10–CV–03669, 2012 WL 4327283, at *5 (E.D.N.Y. Sept. 20, 2012) (noting that a claim of unjust enrichment "must be pled with specificity when the underlying acts are allegedly fraudulent"); *Welch v. TD Ameritrade Holding Corp.,* No. 07–CV–6904, 2009 WL 2356131, at *21 (S.D.N.Y. July 27, 2009) (holding that Rule 9(b) applied to unjust enrichment claim premised on alleged fraudulent acts).

In sum, because the gravamen of the CAC is fraud, the Court concludes that Rule 9(b) applies to all of Plaintiffs' claims except for Plaintiffs' New York law claim, Plaintiffs' Oregon law claim, and two claims for breach of warranty.

### *2. Relaxed Rule 9(b) Standards*

Plaintiffs also argue that, even if Rule 9(b) applies to Plaintiffs' claims, the "[s]tandards [a]re [r]elaxed." (Pls.' Opp'n 30.) Beyond the fact that Rule 9(b) generally "must be read in light of the liberal pleading requirement of Rule 8" such that "[p]laintiffs are not required to plead with detailed evidence," *Gildepath Holding B.V. v. Spherion Corp.,* 590 F.Supp.2d 435, 451 (S.D.N.Y.2007), Plaintiffs argue that "Rule 9(b) must be considered in light of its purposes and the [CAC's] factual context and circumstances." (Pls.' Opp'n 31 (citing, inter alia, *United States v. Wells Fargo Bank, N.A.,* 972 F.Supp.2d 593, 616 (S.D.N.Y.2013); *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.,* No. 12–CV–6811, 2013 WL 791462, at *9 (S.D.N.Y. Mar. 5, 2013)). Accordingly, Plaintiffs argue that because the " 'misstatements [at issue] are alleged to have occurred over a period of time ... the pleadings are not required to provide the date and time of every communication,' " (*id.* at 31 (some internal quotation marks omitted) (quoting *Lehman Bros. Comm. Corp. v. Minmetals Int'l Non–Ferrous Metals Trading Co.,* No. 94–CV–4301, 1995 WL 608323, at *2 (S.D.N.Y. Oct. 16, 1995))), nor do they need to be pled with " 'absolute particularity or a recital of the evidence' " because " 'some matters ... beyond the knowledge of the pleader ... can only be developed through discovery,' " (*id.* at 32 (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1298 (3rd ed.2010))).) Plaintiffs also point out that their "knowledge and state of mind," namely their reliance on the representations at issue, need only be averred generally, placing particular emphasis on *True v. American Honda Motor Co., Inc.,* 520

F.Supp.2d 1175 (C.D.Cal.2007). (*See* Pls.' Opp'n 33 (citing *True,* 520 F.Supp.2d at 1183).) *See also* Fed.R.Civ.P. 9(b) ("Malice, intent, knowledge, and other conditions of mind of a person may be averred generally.").

**\*20** Defendant argues in response that the opposite is true, namely that because Plaintiffs' allegations are "wholly generic," "it is of the utmost importance that Plaintiffs identify the specific advertisement or advertisements that allegedly induced them to purchase their vehicles, in order to determine whether they have a plausible claim and to place Ford on notice of its allegedly unlawful conduct." (Def.'s Reply 6 (emphasis omitted).) Accordingly, Defendant asserts that Plaintiffs fail to respond to Defendant's introduction of "copies of the actual advertisements at issue," and "why those advertisements are not actionable as a matter of law and/or why [the] claims ... are preempted," "at their peril." (*Id.* at 6–7 (citing *Rombach,* 355 F.3d at 170; *The Chicago Faucet Shoppe, Inc. v. Nestle Waters N. Am. Inc.,* 24 F.Supp.2d 762–63 (N.D.Ill.2014)).)

While the Court finds that, in general, there is no reason to relax the requirements of Rule 9(b) in this case, *see Nugent v. Searle Pharms., Inc.,* No. 86–CV–675, 1987 WL 15328, at *1 (W.D.N.Y. Aug. 5, 1987) (refusing to relax requirements of Rule 9(b) where "the plaintiffs [were] required to reveal [only] the specifics of the false advertising allegedly relied on by [one plaintiff]"), the Court agrees with Plaintiffs that they do not need to provide the date and time of every allegedly fraudulent statement. For example, in *Gilles,* which concerned the gas mileage of 2013 Ford Escape SE, Ford argued that the plaintiff had not pled fraud with the requisite specificity because, among other things, he did "not say exactly when, how many times, which portions he viewed, or whether his viewing was connected to the purchase." 24 F.Supp.3d at 1049. The court found that this argument went to the reasonability of reliance "that [could] be more fruitfully addressed after discovery," and that the plaintiff's mere identification of "videos on YouTube and Ford's 2014 Product Sheet" that did not disclose the source of fuel economy estimates and similar statements made by Ford's salespeople met the requirements of Rule 9(b), noting that "[i]f [the plaintiff] were able to give more specific dates or tell us exactly where he was when he saw these materials, it does not seem more likely to put Ford on notice of the claims against it." *Id.* at 1048–49. The Court applies the same standard here. The Court also agrees that general allegations

Case 1:18-md-02865-LAK  Document 394-5  Filed 07/02/29  Page 17 of 33
In re Ford Fusion and C-Max Fuel Economy Litigation, Not Reported in F.Supp.3d (2015)
2015 WL 7018369

about malice and state of mind are sufficient, as explicitly provided by Rule 9(b).

Certainly, the mere allegation that fraudulent statements were made is insufficient to state a claim. Plaintiffs must under Rule 9(b) to state a claim. The Second Circuit, as discussed above, requires under Rule 9(b) that the alleged fraudulent statements be *specifically identified. See Rombach,* 355 F.3d at 170. In other words, Plaintiffs must "identify specific advertisements and promotional materials; allege when the [Plaintiffs] were exposed to the materials; and explain how such materials were false or misleading." *In re Frito–Lay N. Am., Inc. All Natural Litig.,* No. 12–MD–2413, 2013 WL 4647512, at *24 (E.D.N.Y. Aug. 29, 2013) (citations omitted). In *In re Frito–Lay,* the court found that allegations about the a campaign concerning "All Natural" ingredients in certain snack foods "in advertising and online" was insufficiently specific because it did not identify "the marketing and advertising to which [the] plaintiffs were exposed, and whether that material [was] identical to, or ... different from ... the 'All Natural' stamp that appeared on the products' packaging." *Id.* at *25. *Likewise, inL.S. v.* Webloyalty.com, another court found Plaintiffs' fraud claims did not pass muster under Rule 9(b) because the plaintiff did "not identify with factual specificity the misrepresentations or specific advertisement that he relied on" beyond "vague allegations of [a] coupon coffer." 2014 WL 3547640, at *6–7.

**\*21** There is support in the Second Circuit for the proposition that when there are a number of advertisements at issue spanning a long period of time, it is too burdensome for a plaintiff to produce each and every advertisement, and therefore Rule 9(b) should not be strictly applied. *See, e.g., Gillette Co. v. Philips Oral Healthcare, Inc.,* No. 99–CV–807, 2001 WL 1442637, at *6 (S.D.N.Y. Nov. 15, 2001) ("[I]t would not make sense to apply Rule 9(b) strictly in this case, given the potential burdensomeness of [producing every allegedly offending advertisement]."); *Philip Morris Inc. v. Heinrich,* No. 95–CV–328, 1997 WL 781907, at *10 (S.D.N.Y. Dec. 18, 1997) ("When the issues are complicated or the transactions cover a long period of time, courts tend to require less of a pleader. Furthermore, when a large number of documents are [sic] involved, it is sufficient that a plaintiff has identified the categories of documents which allegedly contain misstatements ...." (citations omitted)). That is not the case here, however. Given the limited time span of the marketing campaign, and Plaintiffs' demonstrated ability to produce advertisements from the marketing campaign at

issue, the Court finds that, under Rule 9(b), Plaintiffs must identify each and every advertisement Plaintiffs relied upon in order to establish the "who ... where, when[,] and why" of the fraud. *Jovel,* 2013 WL 5437065, at *11.

*C. Analysis*

Defendant contends that Plaintiffs' Complaint should be dismissed on several grounds, namely that: (a) Plaintiffs' lack standing; (b) Plaintiffs' claims are preempted under federal law; (c) the Court should abstain under the "primary jurisdiction doctrine," and (d) Plaintiffs have otherwise failed to state a claim under Rules 8(a) and 9(b). Defendant's other contentions relating to Plaintiffs' negligent misrepresentation, breach of contract, and breach of the good faith and fair dealing are not addressed below because, as noted above, Plaintiffs have voluntarily dismissed those claims.

At the outset, the Court notes that Plaintiffs' claims have evolved from the CAC. In the CAC, as noted above, a portion of Plaintiffs' claims consist of criticism of Ford's failure to disclose so-called "actual" fuel economy estimates. (*See* CAC ¶ 114–15, 130, 169.) Now, Plaintiffs claim that they do not allege that Ford "should have provided more accurate fuel economy numbers." (Pls.' Opp'n 36–37.) Further, in the CAC, Plaintiffs contended that at least some of the advertisements at issue did not include the EPA estimate disclaimer. (CAC ¶ 62.) Now, however, Plaintiffs contend that they "do not allege that Ford failed to include disclosures stating that 47 MPG was an 'EPA estimate.' " (Pls.' Opp'n 36.) Plaintiffs also initially took issue with the Vehicles' Monroney Stickers and the fact that Ford derived the C–MAX fuel estimate from testing performed on the Fusion, (CAC ¶ 97, 100–01, 331, 343), but they did not press those claims in its Opposition to Defendant's Motion. Therefore, at this point, it appears that the thrust of Plaintiffs' claims is that "Ford's advertisements were ... deceptive and misleading because they included additional, voluntary statements that were designed to leave consumers with the impression that 47 MPG was the fuel economy the Vehicles could achieve irrespective of whether 47 MPG was also an EPA estimate." (*Id.*) In particular, Plaintiffs allege that "Ford's promotion of the [Vehicles] revolved around its 47 MPG promise and that its marketing campaign was designed to convey its real-world 47 MPG to all would-be purchasers." (*Id.*)

*1. Standing*

**\*22** Defendant alleges that Plaintiffs' claims are, at heart, "a direct attack upon Ford's disclosure and advertisement

of the EPA estimated fuel economy," which Defendant contends is "impermissible by a private litigant." (Def.'s Mem. 22.) In support of this contention, Defendant cites the EPCA, which vests enforcement authority in the Secretary of Transportation, and which Defendant contends contains no "private enforcement mechanism." (*Id.* at 12, 22 (citing 49 U.S.C. §§ 32911–12).)

Defendant is correct that the EPCA does not provide for a private right of action. *See* Metro. Taxicab Bd. of Trade v. City of N.Y., No. 08–CV–7837, 2008 WL 4866021, at *6 (S.D.N.Y. Oct. 31, 2008) ("Nothing in the EPCA expressly grants rights to individual drivers or owners");

*see also* Grochowski v. Phoenix Constr., 318 F.3d 80, 86 (2d Cir.2002) ("Since in this case, no private right of action exists under the relevant statute, the plaintiffs' efforts to bring their claims as state common-law claims are clearly an impermissible 'end run' around [the statute]."). Plaintiffs distinguish their claims, however, by arguing that they are not seeking to enforce provisions of the EPCA. (*See* Pls.' Opp'n 23–25.) Rather, Plaintiffs allege that "Ford's advertisements about the Vehicles' fuel economy, which went beyond the disclosures required by the EPCA, were false and misleading." (*Id.* at 25.) It is on this basis that Plaintiffs assert that the instant case is distinct from *Grochowski,* where the plaintiffs brought claims under state law seeking compensation guaranteed by the Davis–Bacon Act, which did not provide for a private right of action, Grochowski, 318 F.3d at 83–86, and from *Metropolitan Taxicab,* where the EPCA was found to preempt a city rule imposing different fees on hybrid taxis, because they addressed the same issue, Metropolitan Taxicab, 2008 WL 4866021, at *6, *9, *11.

The Court agrees with Plaintiffs. Defendant cites no cases applying *Grochowski* outside the breach of contract context, *see* Grochowski, 318 F.3d at 86 (noting that allowing "a third-party private contract action aimed at enforcing ... wage schedules would be inconsistent with the underlying purpose of the legislative scheme"); *cf.* Gunther v. Capital One, N.A., 703 F.Supp.2d 264, 271 (E.D.N.Y.2010) (discussing *Grochowski* in breach of contract context), nor does Defendant explain in any detail why each of Plaintiffs' claims would constitute an "end run" around the EPCA. In fact, the chapter of the EPCA at issue only governs the calculation of fuel economy and the production of Monroney Stickers/fuel-economy booklets, not advertisement of EPA-

estimated fuel economy. *See* 49 U.S.C. §§ 32901–32919; *see also* Gilles, 24 F.Supp.3d at 1046 (finding that the EPCA "and the regulations issued pursuant to it do not purport to regulate advertising of fuel economy beyond the requirements of the Monroney Sticker and the dealer booklet"); True, 520 F.Supp.2d at 1181 (finding that "[n]othing in the EPCA or its accompanying regulations purports to regulate advertising of fuel economy beyond the requirements regarding these stickers and booklets" (italics omitted)). Here, Plaintiffs are not challenging Defendant's compliance with the EPCA, including the accuracy of the Monroney Stickers or other information Defendant provided about the EPA-estimated MPG for the Vehicles. In particular, while reserving judgment on preemption, which is addressed in the next section, the Court finds that far from constituting an "end run" around the EPCA, Plaintiffs here rely on causes of action provided by state and common law that exist separate and apart from the provisions of the EPCA. They contend that Defendant went beyond a discussion of the EPA-estimated MPG itself by representing what MPG would actually be achieved. For the Vehicles (*See* Pls.' Opp'n 13 ("[T]he gravamen of the CAC is Ford's advertising campaign was deceptive because it portrayed a false impression about the 'superior' fuel economy of the Fusion and C–MAX, beyond the mere disclosure of EPA estimates.") *See* Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 585 (7th Cir.2012) (rejecting applicability of *Grochowski* where applicable federal law provided no private right of action because the plaintiff had a common law breach of contract claim "under the plain language" of the applicable contract). Accordingly, Plaintiffs claims survive Defendant's standing challenge.

### 2. Preemption

**\*23** The Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to,' federal law." Hillsborough Cty. v. Automated Med. Labs., Inc., 471 U.S. 707, 712 (1985). "State action may be foreclosed by express language in a congressional enactment, by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or by implication because of a conflict with a congressional enactment." Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 531 (2001) (citations omitted); *accord* Wachovia Bank, N.A. v. Burke, 414 F.3d 305, 313 (2d Cir.2005). Defendant alleges that Plaintiffs' claims are preempted on the first and third of these grounds,

namely "as a matter of express preemption and conflict preemption." (Def.'s Mem. 24.) The Court addresses each of these claims in turn.

### a. Express Preemption

State law is expressly preempted under the Supremacy Clause when "Congress ... define[s] explicitly the extent to which its enactments pre-empt state law." *English v. Gen. Elec. Co.,* 496 U.S. 72, 78–79 (1990). In evaluating express preemption provisions, the "task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent," *Sprietsma v. Mercury Marine,* 537 U.S. 51, 62–63 (2002), but also must include an analysis of the purpose and structure of the statute and associated regulatory scheme, which the Supreme Court has called "the ultimate touchstone" in every preemption case, *Wyeth v. Levine,* 555 U.S. 555, 565 (2009) (internal quotation marks omitted); *see also Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485–86 (1996) (same). There is also a general "presumption that the historic police powers of the States [are] not to be superseded ... unless that is the clear and manifest purpose of Congress." *See Wyeth,* 555 U.S. at 565; *see also Madeira v. Affordable Hous. Found., Inc.,* 469 F.3d 219, 237 (2d Cir.2006) ( "Our Federalism prescribes that the national government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the states." (internal quotation marks omitted)). "Thus, when the text of a pre-emption clause is susceptible [to] more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." *Altria Grp., Inc. v. Good,* 555 U.S. 70, 77 (2008) (citation and internal quotation marks omitted). However, "when Congress has unmistakably ordained that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525 (1977) (citation and internal quotation marks omitted). The party arguing that federal law preempts a state law bears the burden of establishing preemption. *See In re Methyl Tertiary Butyl Ethanol (MTBE) Prods. Liability Litig.,* 725 F.3d 65, 96 (2d Cir.2013).

**\*24** Defendant argues that Plaintiffs' claims are expressly preempted in two ways. First, Defendant contends that Plaintiffs' claims are contrary to § 32919(b) of the EPCA, a "broad" provision, *Green Mtn.,* 508 F.Supp.2d at 353, which provides that "a State or a political subdivision of a State may adopt or enforce a law or regulation on disclosure of fuel economy or fuel operating costs for an automobile covered by [49 U.S.C. § 32908] only if the law or regulation is identical to that requirement," because Plaintiffs' claim is based on an alleged additional obligation to test and disclose the so-called "actual" fuel economy of the vehicles. (Def.'s Mem. 25–26 (citing 49 U.S.C. § 32919(b)); Def.'s Reply 11–13.) Indeed, Defendant asserts that any false advertisement claims based on advertisements that contain federally-mandated disclosure language "should be deemed pre-empted" based on the *Espinosa* and *Kim* cases. (*See id.* at 13–14 (citing *Espinosa,* Ex. A, at 3; *Yung–Kim,* 2015 WL 1668366, at \*10).) Second, Defendant argues that pursuant § 32919(a) of the EPCA, which bars "a law or regulation related to fuel economy standards for automobiles covered by an average fuel economy standard," (Def.'s Mem. at 27 (citing 49 U.S.C. § 32919(a)), Plaintiffs "fundamentally challenge" the fuel economy testing regime "by treating EPA fuel economy numbers as deceptive per se," (*id.* at 28 (italics omitted).)

In response, Plaintiffs allege that consumer protection laws are "quintessentially within the states' historic police powers," and that, accordingly, "the presumption against preemption applies with particular force." (Pls.' Opp'n 10.) Regarding the first provision at issue, § 32919(b), Plaintiffs argue that it does not preempt state laws of general applicability "because they are not 'based on' conflicting fuel economy obligations." (*Id.* at 11.) Plaintiffs specifically argue that the state laws at issue are not based on the disclosure of fuel economy or fuel operating costs, but rather are based on the more general duty not to deceive, which Defendant allegedly violated by "portray[ing] a false impression about the 'superior' fuel economy of the [Vehicles], beyond the mere disclosure of EPA estimates." (*Id.* at 12–13 (citing *Altria Grp.* 555 U.S. at 79–81).) In support, Plaintiffs rely principally on three cases from the Central District of California in which each court found that § 32919(b) does not preempt false advertisement claims. (*See id.* at 14 (citing Ex. A (*Yung–Kim v. Gen. Motors, LLC,* —— F.Supp.3d ——, 2015 WL 1668366, at \*5 (C.D.Cal. Mar. 9, 2015); *Espinosa v. Hyundai Motor Am.,* No. 12–CV–800 (C.D.Cal. Apr. 23, 2012) ("*Espinosa* "), at 3; *True,* 520 F.Supp.2d at 1181 (concluding that "no clear and manifest Congressional intent to regulate advertising

exists," and that therefore "Congress intended to leave the regulation of false advertising, and unfair business practices of auto manufacturers, to the state")).) [10] Regarding the second provision at issue, § 32919(a), Plaintiffs contend that "a state law is 'related to' the preempted subject matter when 'the challenged law contains a reference to the preempted subject matter or makes the existence of the preempted subject matter essential to the law's operation,' " and that the statutes at issue "do not refer to fuel economy disclosures or testing, nor are fuel economy disclosures or testing essential to their operation." (*Id.* at 15–16 (citing *Paduano, 88 Cal.Rptr.3d at 108–110*) (quoting *Metro. Taxicab, 615 F.3d at 156*).) Plaintiffs, distinguishing contrary authority, contend that their claims "do not seek to impose contrary fuel economy standards," and are rooted not in the idea that Defendant said "too little," but that, through its advertisement campaign, "said too much." (*Id.* at 16–18.)

**\*25** The Court concludes that Plaintiffs' claims are partially preempted. At the outset, the Court recognizes that a presumption against preemption applies in consumer protection cases. *See Langan v. Johnson & Johnson Consumer Cos., Inc.,* —— F.Supp.3d ——, 2015 WL 1476400, at *4 (D.Conn. Mar. 31, 2015) (noting that the presumption against preemption applies to claims related to "[t]he advertising and labeling of consumer products" because it is "a field traditionally subject to state regulation" (citing *Altria Grp.,* 550 U.S. at 77)). Additionally, as discussed above, and contrary to the characterization of Plaintiffs' claims made by both Plaintiffs and Defendant, Plaintiffs' claims appear to rest on two separate strands of alleged wrongdoing. Some of Plaintiffs' allegations challenge Defendant's guarantees of a real-world fuel economy that go beyond including EPA estimates in advertisements, (*see, e.g.,* CAC ¶ 59 ("Ford's campaign emphasized that '47 MPG' was something that the Vehicles would actually deliver."); *id.* ¶ 63 (noting that "Ford stressed that the 47 MPG figure was one that its 2013 hybrids actually 'deliver,' that 'it's true' the hybrids get 47 MPG, that they actually 'achieve' 47 MPG, and that consumers can expect '47 [MPG] for me' ")), whereas others appear to challenge the mere use of EPA fuel estimates, in ways that the EPA contemplated using them, as opposed to "actual" fuel economy, (*see, e.g.,* CAC ¶ 95 ("Even though Ford knew that its 2013 Fusion ... and C–MAX did not actually get anywhere near 47 MPG, it still chose to implement a massive '47 MPG' advertising campaign overstating the real world fuel economy of the Vehicles."); *id.* ¶ 100 ("[W]ithout ever actually testing

the fuel economy of the C–MAX under EPA standards, Ford repeatedly touted its '47 MPG' message creating the impression that consumers would be able to achieve these results under real world conditions"); *id.* ¶ 101 ("[A]t the time Ford made the statements touting C–MAX's class-leading fuel economy, Ford knew that the '47 MPG' estimates were not achieved by the C–MAX. However, Ford continued to defend its advertised figures."); *id.* ¶¶ 331, 343 (identifying "window stickers" as a source of misleading representations). The Court considers both aspects of Plaintiffs' claims in determining whether or not they are preempted.

First, it is clear § 32919(a) has no relevance here. That provision governs fuel economy standards for "entire fleets and/or fleets of subclasses of vehicles," rather than individual model vehicles. *Paduano, 88 Cal.Rptr.3d at 109; see also Yung–Kim, 2015 WL 1668366, at *5* (finding this statute inapplicable for the same reason, and noting that the plaintiff's claims were different because they "pertain[ed] largely to representations made by [the defendant] in characterizing what sort of fuel economy their vehicle achieves" (italics omitted); *Metro. Taxicab, 2008 WL 4866021, at *6* ("The focus of the EPCA is on regulating fuel economy standards across an entire fleet of manufacturer vehicle models." (citing 49 U.S.C. § 32919(a))). It accordingly "simply has no application in this case," *Paduano, 88 Cal.Rptr.3d at 110,* which only involves advertisements allegedly used to discuss the mpg estimates of the Vehicles.

**\*26** Second, applying § 32919(b), false advertisement claims based on fuel economy are not, in all forms, expressly preempted by the provisions cited by Defendant. As argued by Plaintiffs, analogizing to the Supreme Court's decision in *Altria Group,* Plaintiffs' state law false advertising claims are rooted in an extrinsic duty not to deceive, one that is not equivalent to disclosure obligations under the EPCA. The *Paduano* and *True* cases are particularly persuasive on this point. The Court in *True,* in an extensive discussion of the EPCA, made clear that "[n]othing in the EPCA or its accompanying regulations purports to regulate advertising of fuel economy beyond the requirements regarding these stickers and booklets," and that it is an "unreasonable assumption" to conclude that "Congress intended to preempt states from regulating false or misleading advertising of a vehicle's fuel efficiency and cost savings." *520 F.Supp.2d at 1175.* Similarly, adopting a more textual approach, the *Paduano* court made clear that "the phrase 'on disclosure of

fuel economy or fuel operating costs' ... cannot be construed to encompass the general duty not to make fraudulent or misleading statements" 98 Cal.Rptr.3d at 111 (quoting 49 U.S.C. § 32919(b)). The *Gilles* court likewise found these two cases persuasive, explaining that the EPCA "and the regulations issued pursuant to it do not purport to regulate advertising of fuel economy beyond the requirements of the Monroney Sticker and the dealer booklet," and therefore holding that state false advertising claims "are not preempted by this body of federal law." 24 F.Supp.3d at 1046.

Third, and more specifically, any allegations that go beyond the mere disclosure—with appropriate caveats—of the estimated fuel economy of the Vehicles, go beyond the scope of the EPCA. *See Green Mtn.,* 508 F.Supp.2d at 353 (encouraging a narrower reading of this provision of the EPCA). It stands to reason that Congress did not intend to protect car manufacturers that may have falsely advertised facts about their vehicles-including facts that might go beyond merely reporting the EPA-estimated MPG. As the Supreme Court noted, "If 'relate to' were taken to extent to the furthest reach of its indeterminacy, then for all practical purposes preemption would never run its course," effectively "read[ing] the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality." *N.Y. Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655 (1995). Indeed, as Defendant admits, Congress' intent in regulating EPA fuel economy disclosures was not to prevent false advertising but rather was to "provid[e] consumers with uniform and comparable fuel economy information." (Def.'s Mem. 29.) Here, Plaintiffs' allegation that Ford did not only rely on the EPA estimate, but also guaranteed real-world fuel economy based upon it, is an allegation that goes "beyond" that estimate. The Court therefore concurs with holdings of other courts that considered similar allegations, namely that advertisements functioned to guarantee specific, real-world performance, and concludes that such claims are not preempted. *See Yung–Kim,* 2015 WL 1668466, at *6 (finding allegations that "statements[ ] made in advertisements ... that ... could lead a reasonable consumer to believe that the vehicle [at issue] [was] capable of achieving ... EPA estimates under real world conditions" not to be preempted); *Sanchez v. Ford Motor Co.,* No. 13–CV–1924, 2014 WL 218278, at *3 (D.Colo. May 29, 2014) (finding claims highlighting "advertisements about the Lincoln MKZ Hybrid beyond the EPA estimate itself," including an alleged suggestion that an MKZ Hybrid "could travel 717 miles on tank," to "not

[be] preempted by federal law"); *Espinosa,* Ex. A at 3 (same); *True,* 520 F.Supp.2d at 1181 (finding the plaintiff's claim not preempted because it "challenge[d] the manner in which [the] [d]efendant advertised the Honda Civic Hybrid in mediums other than the Monroney Sticker and information booklet").

*\*27 On the other hand, as noted in *Espinosa,* "[t]o the extent that Plaintiff['s'] claims rest on Defendant's mere use of EPA estimates ... such claims are preempted." *Espinosa,* Ex. A, at 3. The use of EPA estimates themselves clearly falls within the scope of the relevant FTC regulations, and any state law indicating otherwise would constitute "a law or regulation on disclosure of fuel economy or fuel operating costs" that is not identical to those contained in, or contemplated by, the EPCA. 49 U.S.C. § 32919(b); *see also Gilles,* 24 F.Supp.3d at 1046 ("Although the EPA did not undertake regulation of automobile manufacturers' advertising beyond the Monroney Sticker and the booklet, the Federal Trade Commission (FTC) did."); *Green Mtn.,* 508 F.Supp.2d at 353 ("A state law that controlled or superseded a core EPCA function-to set fuel economy standards for automobiles-would appear to be preempted." (citing *Gerosa v. Savasta & Co.,* 329 F.3d 317, 324 (2d Cir.2003)); *cf. Yung–Kim,* 2015 WL 1668366, at *8 (distinguishing claims based on the "manner in which" car companies "represent[ ] ... EPA figures in various advertisements, which is not covered by, nor ... [in] conflict with [,] FTC regulations"). Likewise, as Defendant contends, any obligation to include "actual" fuel economy based on independent testing of each Vehicle goes beyond what automobile manufacturers are required to do under the EPCA. Accordingly, to the extent that Plaintiffs' claims are premised on the idea that the advertisements (or Monroney Stickers) included EPA estimates, rather than some other "actual" fuel economy calculation, or to the extent that Plaintiffs' claims are based on the contention that Defendant failed to independently test and disclose the fuel economy of the C–MAX in order to determine its "actual" performance, (CAC ¶¶ 97, 100–01), the Court finds that those claims are preempted by the EPCA and FTC, because they seek to impose a regime above and beyond that required by those regulations.

### b. Conflict Preemption

Defendant also contends that Plaintiffs' claims are barred by conflict preemption. Conflict preemption occurs when "compliance with both state and federal law is impossible,

or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objective[s] of Congress." *United States v. Locke,* 529 U.S. 89, 109 (2000). [11] A finding of conflict preemption "turns on the identification of 'actual conflict,' " and "a court should not find pre-emption too readily in the absence of clear evidence of a conflict." *Geier v. Am. Honda Motor Co., Inc.,* 529 U.S. 861, 884–85 (2000). Indeed, "[t]he mere fact of tension ... is generally not enough to establish an obstacle supporting preemption." *Madeira,* 469 F.3d at 241.

Defendant asserts that there is a "comprehensive set of statutes and regulations to further the federal objective of providing consumers with uniform and comparable fuel economy information." (Def.'s Mem. 29.) The statutes include 49 U.S.C. § 32904 (vesting the EPA with responsibility for establishing test methods and calculation procedures for fuel economy estimates); § 32908(b)(1) (requiring automobile manufacturers to display fuel economy estimates on new automobiles offered for sale); and § 32908(c)(3) (requiring that the EPA prepare an annual fuel economy guide), and the regulations include 40 C.F.R. § 600.405–08 (requiring automobile dealers to make a printed copy of the annual fuel economy guide available to customers). Accordingly, together with the FTC's advertising requirements, Defendant argues that this scheme is "comprehensive," that Plaintiffs are attempting to require that Defendant follow a standard "different than what is dictated by EPA requirements," and that the proper venue for addressing Plaintiffs' concerns about the Vehicles' fuel economy is the EPA. (Def.'s Mem. 28–29.)

**\*28** In response, Plaintiffs argue that they do not seek a change in labeling, but rather only target "specific affirmative statements about the fuel efficiency of the ... Fusion ... and C–MAX vehicles that were false or misleading ... [and] went beyond mere reiteration of EPA estimates," as in *True* and *Paduano.* (Pls.' Opp'n 20 (citing *True,* 520 F.Supp.2d at 1181).) Plaintiffs likewise cite those cases for the proposition that "[f]alse advertising claims regarding fuel economy do not stand as an obstacle to accomplishing the purpose of the EPCA." (*See id.* at 20 (citing *True,* 520 F.Supp.2d at 1181).)

The Court finds that the core of Plaintiffs' claims, as narrowed in the motion papers (and as described above),

is not in conflict with labeling and fuel economy guide requirements of the federal scheme. As the *Yung–Kim* court noted, "the existence of the federal regulatory scheme does not preclude states from barring the misuse of EPA fuel efficiency data in advertising or other promotional materials," and "allowing states to regulate false advertising and unfair business practices may further the goals of the EPCA." 2015 WL 1668366, at \*7. Moreover, as noted in the previous section, regulation of false advertising is a traditional state police power, and so the presumption against preemption applies with equal force here, counseling against a finding of conflict preemption. *See, e.g., Gilles,* 24 F.Supp.3d at 1046. Accordingly, Plaintiffs' claims regarding additional guarantees about the Vehicles' fuel economy that go beyond the mere use of EPA estimates are not conflict-preempted.

Additionally, while the Court has already found these claims to be expressly preempted, to the extent that Plaintiffs suggest that Defendant had an obligation to release so-called "actual" fuel economy estimates, while in tension with the FTC's requirement that EPA fuel estimates be the most prominent in automobile advertisements, *see* 16 C.F.R. § 259.2(a) (requiring that automobile manufacturers use EPA estimates as the most prominent mileage figure in any advertisement that makes "any express or implied representation in advertising concerning the fuel economy of any new automobile"), those claims are not preempted because it is not impossible to comply with both the regulation and the obligations that Plaintiffs identify. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Abrams,* 899 F.2d 1315, 1322 (2d Cir.1990) (explaining that "for preemption to occur ..., there must be more than mere differences between the state and federal regulatory systems; rather compliance with the two must be a physical impossibility," and finding that state law was not conflict preempted for this reason (internal quotation marks omitted)). Indeed, a manufacturer could disclose an alternative fuel economy estimate yet still ensure that EPA estimates are the most prominent. For the same reason, Defendant has not indicated any reason why Ford could not have included other fuel economy estimates in addition to an EPA estimate. Therefore, Plaintiffs' claims are not conflict preempted, though, as discussed above, some are expressly preempted. *Cf. Cangemi v. U.S.,* 939 F.Supp.2d 188, 198 (E.D.N.Y.2013) ("Where a defendant could comply with state and federal law by following the stricter state law requirements, there is no conflict preemption."); *Ins. Corp. of N.Y. v. Monroe Bus Corp.,* 491 F.Supp.2d 430, 440 (S.D.N.Y.2007) (finding no conflict preemption because,

inter alia, "it would not be impossible for a party to comply with both state and federal law, and state law is not an obstacle to the achievement of federal objectives").

### 3. Primary Jurisdiction Doctrine

**\*29**  Defendant also argues that, even if "Plaintiffs' claims are not preempted or otherwise insufficient, the Court should nonetheless decline to exercise jurisdiction ... under the doctrine of primary jurisdiction." (Def.'s Mem. 30.) The primary jurisdiction doctrine applies "to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *Reiter v. Cooper,* 507 U.S. 258, 268 (1993); *see also S. New Eng. Tel. Co. v. Global NAPs,* 624 F.3d 123, 135–36 (2d Cir.2010). This doctrine is "designed to protect agencies possessing quasi-legislative powers ... that are actively involved in the administration of regulatory statutes," particularly when a case "implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant agency rather than by the judicial branch." *Clark v. Time Warner Cable,* 523 F.3d 1110, 1114–15 (9th Cir.2008) (internal quotation marks omitted); *see also Far E. Conference v. United States,* 342 U.S. 570, 575 (1952) (noting that primary jurisdiction doctrine applies when a case raises "issues of fact not within the conventional experience of judges"). "No fixed formula exists for applying the doctrine of primary jurisdiction." *United States v. W. Pac. R.R. Co.,* 352 U.S. 59, 64 (1956). However, while application of the doctrine is done on a case-by-case basis, the Second Circuit has suggested that courts apply four factors:

(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

(2) whether the question at issue is particularly within the agency's discretion;

(3) whether there exists a substantial danger of inconsistent rulings; and

(4) whether a prior application to the agency has been made.

*Ellis v. Tribune Television Co.,* 443 F.3d 71, 82–83 (2d Cir.2006); *see also RCA Global Commc'ns, Inc. v. W. Union Tel. Co.,* 521 F.Supp. 998, 1006 (S.D.N.Y.1981).

Defendant asserts that the EPA has primary jurisdiction over Plaintiffs' claims because it "audits ... data from testing performed by manufacturers and performs its own testing on some of these vehicles to confirm the manufacturers' results." (Def.'s Mem. 31 (brackets omitted) (quoting Emission and Fuel Economy Test Data, available at http://epa.gov/oms/testdata.htm (last visited Apr. 15, 2015).) Defendant further contends that the EPA's responsibility extends to all use of these figures, and that "any question about the accuracy of EPA mileage estimates implicates ongoing EPA regulatory activity," particularly because "[t]he EPA has full administrative and regulatory authority to enforce its obligations," including "the power to subpoena witnesses, ... to bring civil enforcement actions [,] ... to conduct proceedings to determine a manufacturer's compliance[,] and to impose significant financial penalties for noncompliance." (*Id.* (quoting 49 U.S.C. §§ 32901, 32910–12).) In fact, Defendant argues that it is these enforcement powers that led Ford to relabel the C–MAX with lower estimated fuel economy figures, and that the EPA should therefore "reach an appropriate determination" of how to proceed in this case "based on its technical expertise and knowledge of the industry." (*Id.* at 32.)

**\*30**  In response, Plaintiffs argue that "primary jurisdiction doctrine does not automatically apply whenever the factual subject matter of a lawsuit touches and concerns issues within the purview of an agency." (Pls.' Opp'n 21.) Plaintiffs further contend that because the CAC concerns "conduct [that] violates garden variety consumer protection laws," the primary jurisdiction doctrine has no application here. (*Id.* at 23.) Defendant offers no response in its Reply.

The Court finds that Plaintiffs have the better of the argument. While Defendant is correct that Plaintiffs' claims relate to the accuracy of EPA-estimated fuel economy (and perhaps suggest deficiencies in the current estimation formula), the question of whether the advertisements related to such information were misleading is a question conventionally left to the courts to answer. *See Jovel,* 2013 WL 5437065, at \*7 (declining to apply primary jurisdiction doctrine in false advertising case concerning healthcare products because "every day courts decide whether conduct is misleading")

(internal quotation marks omitted); *In re Frito–Lay,* 2013 WL 4647512, at *8 (noting that "the primary jurisdiction doctrine does not apply when 'the issue at stake is legal in nature and lies within the traditional realm of judicial competence,' " and finding that this case fell within that competence because the "case is far less about science than about whether a label is misleading") (some internal quotation marks omitted) (quoting *Goya Foods, Inc. v. Tropicana Prods., Inc.,* 846 F.2d 848, 851 (2d Cir.1988)). Therefore, the Court properly may determine whether Defendant's alleged guarantees of real-world fuel economy were misleading to consumers without treading on the calculation methods devised by the EPA, or their disclosure as mandated by the FTC. On the other hand, passing judgment on whether there is a way to calculate fuel economy for the C–Max, and whether that should be disclosed, directly implicates the methods devised by the EPA, and the disclosure requirements devised by the FTC. Accordingly, those claims are barred here by the primary jurisdiction doctrine, as they fall within the competence, and mandate, of the EPA and FTC.

*4. Failure to State a Claim*

Defendant also seeks to dismiss Plaintiffs' claims based on Rule 12(b)(6) for failure to state a claim. The crux of Defendant's position is that "no individual Plaintiff pleads facts demonstrating that he or she relied upon and/ or was injured by an actionable representation from Ford, i.e., a representation lacking federally mandated disclosure language or one that 'goes beyond' the EPA estimate." (Def.'s Mem. 32 (italics omitted).) In particular, Defendant contends that "[w]hile the CAC lists a series of advertisements ..., only 4 of the 29 Plaintiffs plead that they were exposed to one of those specified advertisements," and that that advertisement, titled "Hybrid Games," "contains federally mandated disclosure language" such that claims based on it are "either preempted and/or not actionable as a matter of law." (*Id* . at 33.) [12] Defendant then proceeds to discuss individual categories of Plaintiffs' claims, each of which the Court addresses (to the extent Defendant's arguments remain applicable).

*a. Consumer Protection Claims*

**\*31** Defendant addresses all of Plaintiffs' state law claims together (albeit with reference to precedent from some state-specific cases), arguing that each "require[s] either a showing of reliance on an actionable misrepresentation, or a showing that an actionable misrepresentation caused injury to the complaining party," and that "none of the Plaintiffs have pleaded facts sufficient to make this showing." (Def.'s Mem. 34–35.) [13] Defendant relies principally on a case from the Middle District of Florida, *Brett v. Toyota Motor Sales, U.S.A., Inc.,* No. 08–CV–1168, 2008 WL 4329876, at *7 (M.D. Fla. Sept 15, 2008), wherein the court found that allegations of a failure to disclose "actual" fuel economy of the Toyota Prius did not state a claim under the FDUTPA because the " 'practice of advertising the EPA's estimates and identifying the EPA as the source of those estimates is not unfair or deceptive' " as it is consistent with the " 'legislative and regulatory scheme for fuel economy labeling and advertising.' " (Def.'s Mem. 36 (citing *Brett,* 2008 WL 4329876, at *7).) The *Brett* court also found that, because disclosure of the EPA estimates is "specifically permitted or required by federal law," it fell within a safe harbor provision of the FDUTPA. (*Id.* (citing *Brett,* 2008 WL 4329876, at *7).) Defendant accordingly contends that its actions are "not unfair or deceptive as a matter of law" and that "a majority of the state consumer protection laws under which Plaintiffs bring their claims contain a [safe harbor] clause similar to that found in the FDUTPA[,]" which likewise apply. (Def .'s Mem. 36–37.) *See also* *Paduano,* 88 Cal.Rptr.3d at 105 ("As a matter of law, there is nothing false or misleading about ... advertising with regard to its statements that identify the EPA fuel economy estimates...."). [14] Defendant also independently maintains that claims based on "advertisements that contain federally mandated disclosure language" are not actionable as a matter of law. (*See* Def.'s Reply 13–14 (citing *Espinosa,* Ex. A, at 3; *Yung–Kim,* 2015 WL 1668366, at *10)).

In response, Plaintiffs argue that their consumer protection claims are sufficiently pled under Rule 9(b) because they allege the "where" (TV commercials, magazine ads, social media, etc.), "what" (specifically-identified advertisements touting the real world fuel economy of the Fusion and C–MAX), "when" (2013 Model year advertisements, beginning in September 2012), and "why" (the advertisements were misleading insofar as they guaranteed a certain real world fuel economy that Ford allegedly knew the Vehicles would not achieve), and that those allegations are sufficient to put Defendant on notice of Plaintiffs' claims. (Pls.' Opp'n 34–36.) (*See id.* at 34–36 (citing *Rosales v. FitFlop USA, LLC,* 882 F.Supp.2d 1168, 1175–77 (S.D.Cal.2012); *Von Koenig v. Snapple Beverage Corp.,* 713 F.Supp.2d 1066, 1077 (E.D.Cal.2010).) Plaintiffs also, importantly, distinguish

*Brett*, arguing that in that case, the "plaintiffs alleged that the advertisement of the EPA estimates, alone, misrepresented the fuel economy of the Prius in violation of the FDUTPA," and that "Toyota should have provided more accurate fuel economy numbers," as compared to Plaintiffs' claim here that Defendant went beyond EPA-estimated fuel economy representations. (*Id.* at 36.) Finally, Plaintiffs contend that "[a]dvertisers cannot use fine print to contradict other statements in an ad," such that the mere use of the EPA-mandated "actual mileage may vary" does not inoculate a misleading advertisement. (*See id.* at 25–26, 37–38 (citing, inter alia, 🔖 *In re Frito–Lay,* 2013 WL 4647512, at \*20–23; 🔖 *In re Horizon Organic Milk Plus DHA Omega–3 Marketing and Sales Practice Litig.,* 955 F.Supp.2d 1311, 1344–47 (S.D.Fla.2013)); 🔖 *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,* 133 F.Supp.2d 162, 175–76 (E.D.N.Y.2001).)

\*32 In evaluating Plaintiffs' consumer protection claims, the Court notes that, as Plaintiffs indicate, consumer protection statutes are remedial in nature, and should be liberally construed in favor of protecting consumers. (*See* Pls.' Opp'n 40 (citing 🔖 *N.Y. v. Feldman,* 210 F.Supp.2d 294, 301 (S.D.N.Y.2002); 🔖 *Quinn,* 958 F.Supp.2d at 543; 🔖 *Khoday v. Symantec Co.,* 858 F.Supp.2d 1004, 1011, 116 (D.Minn.2012); 🔶 *Trunzo v. Citi Mortg.,* 876 F.Supp.2d 521, 541 (W.D.Pa.2012); *Wright v. Kia Motors Am., Inc.,* No. 06–CV–6212, 2007 WL 316531, at \*2 (D.Or. Jan. 29, 2007)*Wright v. Kia Motors Am., Inc.,* No. 06–CV–6212, 2007 WL 316531, at \*2 (D.Or. Jan. 29, 2007); *Tandy v. Marti,* 213 F.Supp.2d 935, 937 (S.D.Ill.2002)).) Further, as noted above, because Defendant addresses Plaintiffs' consumer protection claims as a whole, and Plaintiffs respond in kind, the Court notes that there is no need to treat each of Plaintiffs' consumer protection claims individually. The Court, accordingly, addresses those claims as a whole. Keeping this context in mind, and recognizing that the Court has already found these claims to be preempted, the Court is persuaded that any claims based on the mere inclusion of EPA estimated fuel economy and associated disclaimers do not state a claim upon which relief can be granted. The case law makes clear, and Plaintiffs cite no cases indicating otherwise, that the mere use of EPA estimates, as opposed to any other supposed estimates of "actual" fuel-economy, are not actionable. *See, e.g.,* 🔖 *Gray v. Toyota Motor Sales, USA,* No. 08–CV–1690, 2012 WL 313703, at \*6 (D.Cal. Jan. 23, 2012)

("[T]he claims must fail as they rely solely on advertisements that merely repeat the approved EPA mileage estimates, without any additional representations as to, for example, a consumer's ability to achieve those figures under normal driving conditions."), *aff'd sub nom. Gray v. Toyota Motor Sales, USA, Inc.,* 554 F. App'x 608, 609 (9th Cir.2014) ("Thus, no misrepresentation occurs when a manufacturer merely advertises EPA estimates."); 🔖 *Paduano,* 88 Cal.Rptr.3d at 105 ("As a matter of law, there is nothing false or misleading about ... advertising with regard to its statements that identify the EPA fuel economy estimates....").

By contrast, however, the Court finds that Plaintiffs' other claims, namely those targeting specific "additional" representations that go beyond those EPA estimates, state a claim under state consumer protection law, even under the strict requirements of Rule 9(b). First, Plaintiffs have sufficiently distinguished these additional representations from the mere use of EPA estimates in their papers. The best example is the "Hybrid Games" advertisement, given the purpose of the advertisement is to visually illustrate the impact of the difference in real-world fuel economy between the C–Max and Prius V in the course of regular driving. (Decl. of Jeffrey M. Yeatmen in Supp. of Motion To Dismiss Ex. 24 ("Hybrid Games") (Dkt. No. 65).) In fact, after familiarizing the viewer with the "specs," namely EPA-estimated fuel economy, the narrator indicates that the purpose of the competition between the C–Max and Prius V is to see if the difference in the specs proves true in actual use. (*Id.*). Additionally, while the FTC-mandated disclosure is present in most of the Hybrid games advertisement (and the other advertisements at issue), Defendant offers no response to Plaintiffs' argument that the use of this disclaimer (i.e., "actual mileage may vary") does not inoculate those representations, as they do not contradict the representation. The disclaimer is not meant to address any representations regarding how far a C–Max or Fusion (or Prius) driver will go on a tank of gas, thus its presence does not defeat Plaintiffs' claims. *See* 🔖 *Yung–Kim,* 2015 WL 1668366, at \*11 (denying motion to dismiss regarding additional representations beyond EPA-estimated fuel economy, specifically the implication "that a consumer will be able to actually achieve the EPA fuel economy figures when driving in the real world"); *cf.* 🔖 *Hughes,* 930 F.Supp.2d at 473 (declining to consider reasonableness of reliance because the court could not "conclude as a matter of law that the cited statements ... could not have been reasonably relied on by consumers"); *State Coll. Area Sch.*

*Dist. v. Royal Bank of Can.,* 825 F.Supp.2d 573, 590 n. 5 (M.D.Pa.2011) ("If we were to find that the [letter] contained a false or incorrect representation, the question of reasonable reliance, given the disclaimer, would become one of fact requiring the opportunity for discovery.").

**\*33** In this context, Defendant's characterization of *Espinosa* and *Kim* is unhelpful. Those cases do not stand for the proposition that the inclusion of an EPA-estimate-related disclosure in an advertisement renders the entire advertisement, no matter its content, non-actionable. Rather, as previously discussed, those cases both indicate that specific promises that constitute representations *beyond* EPA estimates and related disclosures *are* actionable. *See Espinosa,* Exhibit A, at 3 (denying motion to dismiss claims involving "additional assertions, beyond the mere disclosure of the mileage estimates, that are untrue or misleading[,]" which "federal law does not require, or even address" (internal quotation marks omitted)); *Yung–Kim,* 2015 WL 1668366, at \*11 (denying motion to dismiss claims involving additional representations beyond EPA-estimated fuel economy, specifically the implication "that a consumer will be able to actually achieve the EPA fuel economy figures when driving in the real world"); *see also Blue Cross & Blue Shield,* 133 F.Supp.2d at 175–76 (finding that "[c]ompliance with regulations does not immunize misconduct outside the regulatory scope," and noting "no case holds that when intentional deception is alleged, unregulated regulatory supervision immunizes[ ]" the alleged misconduct).

Second, Plaintiffs allege, with sufficient specificity, the "circumstances constituting the alleged fraudulent acts," namely the nature and timing of the advertisements specifically described in the CAC, to satisfy rule 9(b). *Dornberger v. Metro. Life Ins. Co.,* 961 F.Supp. 506, 528 (S.D.N.Y.1997). Those specific advertisements are paired with sufficient allegations describing the nature, timing, and location of the statements therein in the context of the 2013 marketing campaign, and Plaintiffs ascribe a reasonable motive to Defendant in making those misstatements, namely selling more of the Vehicles. As discussed above, this is all that is required under Rule 9(b). *Compare Weisblum v. Prophase Labs, Inc.,* —— F.Supp.3d ——, 2015 WL 738112, at \*13 (S.D.N.Y.2015) (finding allegations that the defendant "made personal guarantees in national media advertisements," that the plaintiff "heard [the] media advertisements," and that the plaintiff "relied

on these representations" were sufficient under Rule 9(b) (internal quotation marks omitted)); *Gilles,* 24 F.Supp.3d at 1048–49 (finding allegations that the plaintiff viewed "videos on YouTube and Ford's 2014 Product Sheet" that did not disclose the source of fuel economy estimates, and that "Ford's salespeople made similar statements about the Escape's fuel economy," to be sufficient to state a claim under California's consumer protection statute and Rule 9(b)); *id.* at 1049 (finding fact that the plaintiff did "not say exactly when, how many times, and which portions [of Ford's website] he viewed, or whether his viewing was connected to the purchase" not to render his allegations insufficient under Rule 9(b)); *id.* ("If [the plaintiff] were able to give more specific dates or tell us exactly where he was when he saw these materials, it does not seem more likely to put Ford on notice of the claims against it.") *with Amos v. Biogen Idec Inc.,* 28 F.Supp.3d 164, 172–73 (W.D.N.Y.2014) ( "Plaintiff further claims that [the] defendants made misrepresentations in advertisements, website statements, written and oral information provided to patients and doctors and other marketing materials, but fails to identify any such misrepresentation, and fails to explain why such misrepresentations were fraudulent. These general averments of fraud lack the particularity required by Rule 9(b)...."); *Nat'l Sur. Corp. v. Minchin Buick Ponitac,* No. 10–CV–1330, 2011 WL 2417103, at \*2 (D. Conn. June 13, 2011) (finding that claim was insufficiently specific under Rule 9(b) because it only alleged that "false advertisements, statements, representations, assurances, and promises [were made] at an unspecified date, at an unspecified location, through an unspecified agent." (internal quotation marks omitted)); *Rodriguez v. It's Just Lunch, Int'l,* No. 07–CV–9227, 2010 WL 685009, at \*5 (S.D.N.Y. Feb. 23, 2010) ("Simply averring that certain misrepresentations have been made, through a Web site and a 'nationwide marketing campaign,' since 1993, does not provide the requisite specificity to satisfy Rule 9(b)"); *Tuosto v. Philip Morris USA Inc.,* 672 F.Supp.2d 350, 361–62 (S.D.N.Y.2009) (finding that "vague [ ] refer[ences] to statements made in local [n]ewspapers ... and ... magazines" were insufficient under Rule 9(b) (internal quotation marks omitted)); *see also Dornberger,* 961 F.Supp. at 528 (finding that the plaintiff sufficiently alleged fraudulent acts under Rule 9(b) when the plaintiff alleged the existence of a marketing campaign of "false and misleading statements as to the legality of ... insurance policies" through "telephone marketing, mailings, face-to-face sales representations, advertisements

In re Ford Fusion and C-Max Fuel Economy Litigation, Not Reported in F.Supp.3d (2015)

2015 WL 7018369

in specific publications, premium notices, pamphlets, letters, and the like"). Accordingly, to the extent that Plaintiffs have referenced *specific ads* that made *specific promises* as to the real-world performance of the Vehicles, they have sufficiently alleged the who, what, when, where, and why of the fraud at issue under Rule 9(b), and have stated a claim upon which relief may be granted.

**\*34** However, without reviewing the allegations pertaining to each individual Plaintiff, it is not clear that Plaintiffs have alleged the specific advertisements that each and every Plaintiff relied upon, and the mere reference to advertisements generally contained in the 2013 advertising campaign is insufficient. Therefore, as discussed above, to the extent that individual Plaintiffs did not rely on any of the advertisements specifically alleged in the CAC, the claims of those Plaintiffs are dismissed, without prejudice. Plaintiffs have thirty days to amend the CAC to specifically allege the advertisements that each individual Plaintiff relied upon, in compliance with Rule 9(b).

*b. Common Law Fraud*

While, as noted above, it is not clear from the CAC what "common law" Plaintiffs' fraud claim is based upon, Defendant argues that Plaintiffs fail to state a claim for common law fraud under New York law. "In New York, a claim for common law fraud requires a plaintiff to plead (1) material misrepresentation of fact, (2) knowledge of its falsity, (3) intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec. LLC,* No. 12–CV–3723, 2013 WL 1294668, at \*9 (S.D.N.Y. Mar. 28, 2013). In pleading scienter, "a plaintiff needs to allege facts that give rise to a strong inference of fraudulent intent either by (1) showing that [the][d]efendants had the motive and opportunity to commit fraud, or (2) providing strong circumstantial evidence of their conscious misbehavior or recklessness," and "in pleading damages, a plaintiff must allege loss causation." (*Id.*) The particularity requirements of Rule 9(b) also apply. (*Id.*)

Defendant contends that Plaintiffs' common law fraud claim does not meet these standards because the relevant section of the CAC is "nothing more than a generic recitation of the elements [of] a fraud claim under the law of some unknown jurisdiction" and "alleges no facts" beyond referencing previous paragraphs of the CAC. (Def.'s Mem. 39.) Defendant further argues that Plaintiffs have failed to "demonstrat[e] that they were exposed to an actionable misstatement," identify a

particular advertisement or communication, "explain which representations they found material," or how they could have been misled by the use of EPA estimates. (*Id.* at 39–40; Defs.' Reply 14–15.) Finally, Defendant argues that Plaintiffs' scienter pleading consists of only "labels and conclusions," particularly in the scienter section itself, which is insufficient. (*Id.* at 40–41; Defs.' Reply 16–17.)

In response, Plaintiffs contend that their allegation that "Ford engaged in a uniform, widespread marketing campaign in which it perpetuated misrepresentations regarding the Vehicles' fuel economy, with the intent to defraud Plaintiffs, who reasonably relied on those statements to their detriment" is sufficient because (a) Rule 9(b) is relaxed when applied to allegations describing the nature and operation of the fraudulent scheme at issue, and (b) allegations of scienter "[do] not require 'great specificity,' and [are] 'sufficient if supported by facts giving rise to a strong inference of fraudulent intent.' " (*Id.* at 42 (quoting *Tribune Co. v. Purcigliotti,* 869 F.Supp. 1076, 1090 (S.D.N.Y.1994)).)

**\*35** Defendant's recitation of the elements of common law fraud under New York law is certainly accurate, *see Terra Secs. Asa Konkursbo v. Citigroup, Inc.,* 740 F.Supp.2d 441, 448 (S.D.N.Y.2010), and the Court also agrees with Defendant that Plaintiffs' only attempt to meet these standards via "shotgun pleading" renders it difficult to identify the precise nature of Plaintiff's claims; the allegations contained in the fraud cause of action are, as Defendant alleges, seemingly just a recitation of the elements of fraud, together with a note that "Plaintiffs incorporate the above allegations by reference as if fully set forth therein," (CAC ¶ 318). While such pleading evidences "utter disrespect for Rule 8 of the Federal Rules of Civil Procedure," *Manbeck v. Micka,* 640 F.Supp.2d 351, 366 (S.D.N.Y.2009), the Court nonetheless finds that, based on allegations through the CAC, Plaintiffs here have narrowly alleged enough facts to survive Defendant's Motion.

First, as discussed in the previous section, the Court finds that Plaintiffs have included adequate allegations as to some advertisements with the requisite specificity under Rule 9(b). The Complaint dedicates several paragraphs to identifying the statements Plaintiffs may have relied upon, as well as their source and the approximate time of exposure. (*See* CAC ¶¶ 13–40.) Second, the Court finds that Plaintiffs have adequately pleaded scienter by alleging "facts showing a motive for committing fraud and a clear opportunity for doing

so," namely allegations that Ford was lagging in the hybrid market and sought to improve its positioning by advertising improved fuel economy in its hybrid vehicles. *Beck v. Mfrs. Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987) (identifying this as a "common method for establishing a strong inference of scienter"), *overruled on other grounds by United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989); *see also 236 Cannon Realty, LLC v. Ziss,* No. 02–CV–6683, 2005 WL 289752, at *5 (S.D.N.Y. Feb. 8, 20050 (same). Accordingly, Defendant's Motion To Dismiss is denied as to Plaintiffs' common law fraud claim.

### c. Breach of Express Warranty

Defendant also contends that Plaintiffs' breach of express warranty claim is "[b]arred [b]y [f]ederal [l]aw." (Def.'s Mem. 44.) Specifically, aside from pointing out a "striking absence of facts" suggesting that Plaintiffs obtained a warranty, Defendant contends that the federal statute governing EPA estimates, which indicates that the use of EPA fuel economy estimates cannot constitute a warranty (which, as Defendant points out, Plaintiffs do not dispute), bars Plaintiffs' claim, (*id.* at 45 (citing 49 U.S.C. 32908(d) ( "A disclosure about fuel economy or estimated annual fuel costs under this section does not establish a warranty under the law of the United States or a State."); *Paduano,* 88 Cal.Rptr.3d at 102 ("Thus, to the extent that Honda identified the EPA fuel economy estimates in the Monroney sticker and reiterated those EPA mileage estimates in its own advertising, Honda's provision of those estimates does not constitute an independent warranty ...."); Defs.' Reply 18) and that Plaintiffs' claims are "preempted to the extent that they rely on representations found on the window stickers of the [V]ehicles or are otherwise directed to advertising that contains federally mandated EPA disclosure language." (Defs.' Mem. 44; Defs.' Reply 18–19.)

**\*36** In response, Plaintiffs rely on *Paduano* and *True,* which, as discussed above, hold that federal law regulating fuel economy does not preempt all lawsuits challenging statements made by automobile manufacturers regarding fuel economy. (Pls.' Opp'n 43–44 (citing *True,* 520 F.Supp.2d at 1181; *Paduano,* 88 Cal.Rptr.3d at 98–99).) Plaintiffs contend that because its breach of express warranty claims do not rely on the use of EPA-estimated fuel economy, but rather on statements that go beyond those estimates, their express warranty claims should not be dismissed. (*Id.* at 44.)

As discussed above, § 32908 refers only to Monroney Stickers and fuel economy booklets; the FTC regulations that govern advertising do not include a similar warranty provision. *See generally* 49 U.SC. § 32908. *Cf.* *Yung–Kim,* 2015 WL 1668366, at *7 (rejecting preemption argument based, in part, on the warranty provision of § 32908 because that section "plainly relates solely to Monroney Stickers and booklets that federal law requires be given to consumers"). However, even if *Paduano* is correct and the warranty provision also applies to advertisements containing EPA estimates, *see* *Paduano,* 88 Cal.Rptr.3d at 103 ("[I]t is clear that the EPA mileage estimate does not constitute a warranty," the statute only provides that a "disclosure" does not constitute a warranty. Guarantees *beyond* a mere disclosure, namely the alleged statements that Plaintiffs specifically challenge here, may still create such a warranty. *Cf. Sanchez,* 2014 WL 218278, at *3 (suggesting representation "that ... an MKZ Hybrid could travel 717 miles on one tank" went beyond the EPA estimate). Accordingly, Defendant's Motion To Dismiss is denied as to Plaintiffs' breach of express warranty claim.

### d. Violation of the MMWA

The MMWA provides a federal cause of action for breaches of written or implied warranties under state law. *See* 15 U.S.C. § 2310(d)(1). However, this statute "does not provide an independent cause of action for state law claims," but rather "only [provides] additional damages for breaches of warranty under state law." *Janke v. Brooks,* No. 11–CV–837, 2012 WL 1229891, at *2 n. 3 (D.Colo. Apr. 11, 2012) (internal quotation marks omitted); *see also Fanok v. Carver Boat Corp.,* 576 F.Supp.2d 404, 417 (E.D.N.Y.2008) ("[The] plaintiff has not pointed to any provision of MMWA that would operate independent of his state law warranty claims. Since the state law warranty claims fail, his MMWA claims fail as well."). On this basis, Defendant contends that Plaintiffs' MMWA claim fails because Plaintiffs do not allege a separate breach of implied warranty claim and otherwise fail to adequately allege that a written warranty existed, and that their MMWA claim therefore fails for the same reason their state-law warranty claim fails. (Def .'s Mem. 46–47; Def.'s Reply 19.) Defendant also contends that no written warranty in the guide provided at the time the Plaintiffs' purchased or leased the Vehicles was breached, that Defendant's advertising and marketing materials cannot constitute a written warranty because they do not make the necessary guarantees required by law, namely that they promise "a specified level of performance over a ... specified

period of time," (Def.'s Mem. 47), i.e., that the Vehicles would only consume a gallon of gas over a specified distance, (Def.'s Reply 20), and advertising EPA-estimated fuel economy does not create an actionable warranty, (see Def.'s Mem. 48 (citing 49 U.S.C. § 32908(d))).

**\*37** In response, Plaintiffs allege that written portions of Defendant's advertising campaign constituted a written warranty, in that these portions guaranteed a specified fuel economy performance over the time required to drive a given distance (i.e., the distance required to use a gallon or tank of gasoline). (*See id.* at 45–46 (citing *Amrav. Samsung Elecs. Am., Inc.,* Nos. 11–CV–6973, 12–CV–976, 2013 WL 3654090, at \*8–9, \*14 (D.N.J. July 11, 2013).)

The Court finds that Defendant's challenge to Plaintiffs' MMWA claim is meritorious. While a fuel economy estimate, even with the additional representations alleged here, plausibly constitutes a guarantee of a specific level of performance, it strains reason to believe that the representation is for performance over a specified time period, which, unlike when alleging a common law breach of warranty claim, is required by the MMWA. *See In re Scotts EZ Seed Litig.,* 2013 WL 2303727, at \*4–5 (rejecting claim that advertisement was a written warranty because it did not "include[ ] the requisite temporal element to be actionable under the MMWA" and collecting cases, including one in which an advertisement for a car transmission was found not to be a written warranty because the performance of the transmission was not guaranteed "for the life of the transmission") (citing *Skelton v. Gen. Motors Corp.,* 660 F.2d 311 (7th Cir.1981)). Plaintiffs have not otherwise alleged an implied warranty claim from any other source. Accordingly, Plaintiffs' MMWA claim is dismissed.

### *e. Unjust Enrichment*

Defendant also challenges Plaintiffs' unjust enrichment claim under California, Florida, and New York law. First, Defendant argues that "California courts have recognized repeatedly that 'unjust enrichment is not an independent cause of action, or even a remedy, but rather a general principle, underlying various legal doctrines and remedies.'

" (Def.'s Mem. 48 (citing *McBride v. Boughton,* 20 Cal.Rptr.3d 115, 121 (Cal.Ct.App.2004) (brackets, citation, and some internal quotation marks omitted)); Def.'s Reply 22.) Second, Defendant contends that Florida Plaintiff James Oldcorn cannot maintain an unjust enrichment claim against

Defendant "[b]ecause he does not allege to have purchased his C–MAX directly from Defendant," but instead from a dealer. (*See id.* (citing *Szymczak v. Nissan N. Am. Inc.,* No. 10–CV–7493, 2011 WL 7095432, at \*20 (S.D.N.Y. Dec. 16, 2011)).) Third, Defendant claims that "all of the unjust enrichment claims stated in the CAC should be dismissed because ... [they are] nothing more than ... generic and factually barren recitation[s] of the elements ... from no particular state." (*Id.* at 49.) Specifically, Defendant also argues that the allegations only support the contention that Ford's entire advertising campaign was deceptive, and that Plaintiffs purchased the Vehicles on that basis, which, according to Defendant, is, again, improper "shotgun pleading." (Def.'s Reply 20–22 (emphasis omitted).)

**\*38** Because Plaintiffs do not specify a state's common law on which the claim is based, Defendant bases this portion of its Motion on the elements of New York unjust enrichment: (1) defendant was enriched, (2) at the expense of the plaintiff, (3) under circumstance that, according to equity and good conscience, the defendant should make restitution (wherein services must have been performed for the defendant at the defendant's behest, or wherein defendant assumed an obligation to pay for services rendered). (*See* Def.'s Mem 49 (citing *Nat'l Cas. Co. v. Vigilant Ins. Co .,* 466 F.Supp.2d 533, 543–44 (S.D.N.Y.2006)).) Defendant argues that Plaintiffs do not "set forth any allegations" that establish these elements. (*Id.* at 49–50.)

In response, with regard to California law, Plaintiffs argue that unjust enrichment is not uniformly rejected as a separate cause of action by California courts. (Pls.' Opp'n 49 (citing *Ellis v. J.P. Morgan Chase & Co.,* 950 F.Supp.2d 1062, 1090–91 (N.D. Cal. June 13, 2013); *In re Processed Egg Prods.,* 851 F.Supp.2d 867, 913 (E.D.N.Y.2012); *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practs. Litig.,* 601 F.Supp.2d 1201, 1220–21 (S.D.Cal.2009)).) With regard to Florida law, Plaintiffs argue that "a direct benefit is not required ... [but] exists when a downstream consumer purchases products." (*Id.* at 49 (citing *Williams v. Wells Fargo Bank N.A.,* No. 11–CV–21233, 2011 WL 4368980, at \*9 (S.D.Fla. Sept. 19, 2011); *Romano v. Motorola, Inc.,* No. 07–CV–60517, 2007 WL 4199781, at \*2 (S.D.Fla. Nov. 26, 2007)).) With regard to New York law, Plaintiffs contend that they made the "exact allegations" required for an unjust enrichment claim under New York law, namely that Defendant benefitted from its 47 MPG advertising

campaign at Plaintiffs' expense because Plaintiffs purchased the Vehicles or paid more for them than they would have otherwise in reliance on the advertisements at issue. (Pls.' Opp'n 47.) Plaintiffs further contend that a benefit "conferred on the [D]efendant indirectly" is sufficient to state an unjust enrichment claim under Second Circuit law. (*Id.* at 47–48 (citing, inter alia, *Hughes,* 930 F.Supp.2d at 471; *Waldman v. New Chapter, Inc.,* 714 F.Supp.2d 398, 403–04 (E.D.N.Y.2010)).)

Addressing Plaintiffs' state-specific claims in order, the Court first finds that Plaintiffs cannot maintain a cause of action under California law for unjust enrichment. Certainly, it is true that some California courts have entertained unjust enrichment claims in various circumstances. *See, e.g., Hirsch v. Bank of America, N.A.,* 132 Cal.Rptr.2d 220, 229–30 (Cal.Ct.App.2003); *see also Lectrodryer v. SeoulBank,* 91 Cal.Rptr.2d 881, 883–84 (Cal.Ct.App.2000). However, as one court in the Northern District of California recently pointed out, "[d]espite some inconsistency in the law, several recent decisions by the California Court of Appeals have held that unjust enrichment is not a cause of action, just a restitution claim." *Herskowitz v. Apple Inc.,* 940 F.Supp.2d 1131, 1148 (N.D.Cal.2013) (brackets and internal quotation marks omitted) (citing *Hill v. Roll Int'l Corp,* 128 Cal.Rptr.3d 109 (Cal.Ct.App.2011); *Levine v. Blue Shield of Cal.,* 117 Cal.Rptr.3d 262 (Cal.Ct.App.2010); *Durell v. Sharp Healthcare,* 108 Cal.Rptr.3d 682 (Cal.Ct.App.2010); *Melchior v. New Line Prods., Inc.,* 131 Cal.Rptr.2d 347 (Cal.Ct.App.2003)). The Court accordingly will follow the weight of recent authority and determines that there is no independent cause of action for unjust enrichment under California law. *See Segedie v. Hain Celestial Grp.,* No. 14–CV–5029, 2015 WL 2168374, at \*14 (S.D.N.Y. May 7, 2015) ("Unjust enrichment is not available as an independent cause of action under California law."); *Delgado,* 2014 WL 4773991, at \*23 (dismissing unjust enrichment claim under California law because "California law does not recognize an independent cause of action for unjust enrichment" and collecting cases).

**\*39** Second, the Court finds that Plaintiffs' Florida law claim survives because this case is analogous to *Romano v. Motorola, Inc .,* No. 07–CV–60517, 2007 WL 4199781 (S.D.Fla. Nov. 26, 2007), as cited by Plaintiffs, wherein a

cell phone manufacturer was found to benefit from the sale of a phone by a retailer and therefore was subject to an unjust enrichment claim. *Id.* at \*2. Third, the Court finds that Plaintiffs' New York unjust enrichment claim fails, although for a different reason than that identified by Defendant. Under New York law, "an unjust enrichment claim 'is available only in unusual situations when, though the defendant has not breached a contract or committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff.' " *Weisblum,* 2015 WL 738112, at \*10–11 (quoting *Corsello v. Verizon N.Y., Inc.,* 967 N.E.2d 1177, 1185 (N.Y.2012)). Plaintiffs have failed to show how their unjust enrichment claim "differs from [their] ... tort claims[,]" which seek relief from the same conduct, and therefore "it must be dismissed" under New York law. *Id.* at \*11; *see also Ebin v. Kangadis Food Inc.,* No. 13–CV–2311, 2013 WL 6504547, at \*7 (S.D.N.Y. Dec. 11, 2013) (dismissing unjust enrichment claim as duplicative of fraud and breach of warranty claims); *Corsiello,* 967 N.E.2d at 740 ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."); *cf. State Farm Mut. Auto Ins. Co. v. Grafman,* No. 04–CV–2609, 2013 WL 1911301, at \*4 n. 3 (E.D.N.Y. Jan. 3, 2013) (refusing to consider unjust enrichment claims because "the damages sought on the unjust enrichment claims are duplicative of those sought on the common law fraud claims"); *Norez Petroleum Ltd. v. Blavatnik,* No. 650591/11, 2015 WL 5057693, at \*19 (N.Y.Sup.Ct. Aug. 25, 2015) (denying "conspiracy jurisdiction based on unjust enrichment" because "[t]o be a coconspirator, some level of participation in a wrongful act is required," which "conflicts" with "[t]he definition of unjust enrichment, as outlined in *Corsello,*" since "[a] party cannot simultaneously 'be guilty of no wrongdoing[ ]' while participating in a wrongful act").

As Plaintiffs point out, while Defendant nominally argues that the entirety of Plaintiffs' unjust enrichment claim should be dismissed, Defendant does not challenge Plaintiffs' claims under any state's common law other than the three states discussed above. (*See* Pls.' Opp'n 46 ("Ford attempts to fault Plaintiffs for not providing a state-by-state pleading in the CAC, yet only addresses the elements of New York law [in addition to specific claims regarding California and Florida law] in its motion.").) Accordingly, the Court finds that Plaintiffs' remaining state common law unjust enrichment claims survive for now. *Cf. Clayton's Auto Glass, Inc. v. First Data Corp.,* No. 12–CV–5018, 2013 WL 5460872, at \*5 (E.D.N.Y. Sept. 30, 2013) (noting that while the plaintiffs

Case 1:18-md-02865-LAK   Document 394-5   Filed 07/02/20   Page 31 of 33
In re Ford Fusion and C-Max Fuel Economy Litigation, Not Reported in F.Supp.3d (2015)
2015 WL 7018369

failed to "specify under which state's common law [they] [were] asserting their claims," the court applied the law the parties applied in their papers); *In re LIBOR–Based Fin. Instrum.* 🔖🔶 *Antitrust Litig.,* 935 F.Supp.2d 666, 737 (S.D.N.Y.2013)* ("Although the amended complaint does not specify which state's law the plaintiffs are seeking to apply, the parties have assumed for purposes of briefing that the claim is asserted pursuant to New York common law. Accordingly, we analyze this claim under New York law."); *Funtional Pathways of Tenn., LLC v. Wilson Sr. Care, Inc.,* No. 12–CV–922, 2013 WL 80373, at *2 (D.S.C. Jan. 7, 2013) ("Plaintiff's failure to specify which state's common law it was pleading is not fatal to its claim.").

### D. Leave to Amend

**\*40** In their Opposition, Plaintiffs argue that to the extent there are deficiencies in the CAC, they should be granted leave to amend. Plaintiffs contend that this is particularly true to the extent that their claims are evaluated under Rule 9(b), "in which case leave to amend is 'almost always' granted." (Pls.' Opp'n 50 (quoting 🔖 *Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986)).) Plaintiffs also say they have reserved the right to renew their negligent misrepresentation, breach of contract, and breach of good faith and fair dealing claims in an amended complaint. (*See id.*). In response, Defendant contends that Plaintiff should not be granted

leave to amend because (a) the CAC is already an amended complaint, having been consolidated from other complaints, (b) Plaintiffs knew of the portions of the CAC Defendant would challenge because of a previous by those Plaintiffs, under Rule 9(b), for whom the CAC does not specifically identify the advertisements relied upon. Plaintiffs according have 30 days to amend the CAC *only to specifically allege the advertisements that each of these Plaintiffs relied upon.*

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion To Dismiss is granted in part and denied in part. To the extent that Plaintiffs make claims based on the mere use of EPA fuel economy estimates in advertisements or on Monroney Stickers, those claims are dismissed because they are preempted by federal law and, in any event, fail to state a claim. Additionally, Plaintiffs' MMWA claim and unjust enrichment claim under California and New York law are dismissed. The Clerk is respectfully requested to terminate the Motion. (Dkt. No. 63.)

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 7018369

---

## Footnotes

1    Plaintiffs fail, however, to identify any advertisement that did not include the disclaimer.

2    Plaintiffs provide no date or title for the press release.

3    Further, Plaintiffs allege that in two unidentified advertisements "Ford stated that the C–MAX 'delivers EPA-certified 47 mpg city, 47 mpg highway ratings–7 mpg better than the Prius V' and claimed that customers would pay less at the dealership and the pump for a C–MAX versus a Prius V," that Ford "refers to the C–MAX as '[t]he country's most fuel-efficient and affordable hybrid[,]' and [that Ford] tout[s] the 'C–MAX ... at 47 mpg combined [which] beats Prius V by 7 mpg in the compact hybrid utility segment ." (CAC ¶¶ 83–84.)

4    Of note, manufacturers may also "voluntarily lower fuel economy values ... if they determine that the label values from any method are not representative of the fuel economy ... for that model type." 🔖 40 C.F.R. § 600.210–12(a).

5    The EPA estimate may have equal prominence to the non-EPA estimate in "radio and television advertisements in which any other estimate is used only in the audio." 16 C.F.R. § 259.2(c).

6    The Court notes that, on July 29, 2015, after oral argument was held, one pending action from the Central District of California was added. (*See* Dkt. No. 81.) No allegations pertaining to Plaintiff in that case, Dave Deluca, were included in the CAC, and therefore his claims are not specifically considered in this Opinion and Order.

7       Each set of state Plaintiffs referred to herein, e.g., "California Plaintiffs," refers to the Plaintiffs whose causes of action accrued in that state.

8       In alleging their breach of express warranty claim, Plaintiffs also allege that 48 states and the District of Columbia "have codified and adopted the provisions of the Uniform Commercial Code governing express warranty of merchantability." (CAC ¶ 349.) Of note, Plaintiffs have chosen to voluntarily dismiss their claims for negligent misrepresentation, breach of contract, and breach of the covenant of good faith and fair dealing. (*See* Pls.' Mem. of Law in Opp'n to Defendant Ford Motor Company's Mot. To Dismiss ("Pls.' Opp'n") 50 (Dkt. No. 67).)

        Plaintiffs also allege that Ford has indicated it has "no desire to participate" in any informal dispute resolution because it has failed to "remedy the problems associated with the Vehicles." (CAC ¶ 359.)

9       In evaluating the applicability of Rule 9(b), the Court also notes that, as is always the case, it is bound by Second Circuit law pertaining to the applicability of Rule 9(b). *See* Nw. Mut. Life Ins. Co. v. Banc of Am. Sec., LLC, 254 F.Supp.2d 390, 396–97 (S.D.N.Y.2003) ( "[T]his Court is required to follow the precedent of the Court of Appeals for the Second Circuit with respect to the interpretation and application of Rule 9(b)."); *see also* Schwartzco Enters., LLC v. TMH Mgmt., LLC, No. 14–CV–1082, 2014 WL 6390299, at *26 (E.D.N.Y. Nov. 17, 2014) (same). Accordingly, while Plaintiffs cite a number of cases outside our Circuit in support of their contention that many of their claims are not governed by Rule 9(b), the authorities are only persuasive under the aforementioned Second Circuit standard.

10      The *Espinosa* opinion is marked as "tentative" and is unavailable on Westlaw. Plaintiffs attached the opinion to their Opposition as Exhibit A.

11      "Federal regulations have no less pre-emptive effect than federal statutes." Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982).

12      As discussed above, the Hybrid Games advertisement portrays two actors commenting while two individuals drive a C–MAX and Prius V around Los Angeles, and concludes that the C–MAX delivers better fuel economy. (*See* Decl. of Jeffrey M. Yeatmen in Supp. of Motion To Dismiss Ex. 24 ("Hybrid Games") (Dkt. No. 65).) Defendant points to the fact that when the C–MAX's EPA estimated fuel economy appears 25 seconds into the advertisement, a footnote includes the "federally mandated disclosure language, i.e., 'EPA–Estimated. Actual [m]ileage [m]ay [v]ary.' " (Def.'s Mem. 33; Hybrid Games.) Defendant also contends that the next fuel economy representation, at 1 minute and 4 seconds into the advertisement, indicates "C–MAX total range 571 miles. Prius [V] total range 450 miles. Based on fueleconomy.gov," is also not actionable because it is drawn directly from a website hosted by the U.S. Department of Energy and the EPA. (Def.'s Mem. 33; Hybrid Games.) There is one further fuel economy representation in the advertisement, beginning 2 minutes and 33 seconds into the advertisement, wherein a graphic appears indicated that the C–MAX gets "47 MPG combined" and has a "total range" of "571 miles," without any disclaimer or source citation. (Hybrid Games.) While the Court can consider the content of this advertisement because it is incorporated by reference into the CAC, *see* Chambers v. Time Warner, Inc., 282 F.3d 147, 152–53 (2d Cir.2002) (noting that, in resolving a motion to dismiss, a court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference," and any "document ... not incorporated by reference ... where the complaint relies heavily upon its terms and effect, ... render[ing] the document integral to the complaint" (internal quotation marks omitted)), the Court finds more generally, as noted below, that Plaintiffs have stated a claim on the basis of the advertisements cited in the Complaint, including Hybrid Games, and that whether Plaintiffs' reliance was reasonable given the disclaimers is a question of fact not to be addressed at the motion-to-dismiss stage.

13      Even though Plaintiffs' New York consumer protection claim is only subject to Rule 8(a), as discussed above, the Court does not discuss it separately because it finds that Plaintiffs' claims survive under Rule 9(b).

14      Defendant also asserts-inaccurately, as the Court has already described-that Plaintiffs' claims are not actionable because they assert only that "they were injured by Ford's failure to advertise more accurate fuel economy estimates," meaning "Plaintiffs have [not] set forth facts establishing they were exposed to

advertising from Ford that departs from" federal regulations which require disclosure, and attribution, of EPA fuel economy estimates. (Def.'s Mem. 38.)

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.