**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

CUSTOMS AND TAX ADMINISTRATION OF
THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

This document relates to 1:18-CV-05053-LAK.

MASTER DOCKET

Case No. 1:18-MD-02865-LAK

**THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN'S, SHELDON GOLDSTEIN'S, AND SCOTT GOLDSTEIN'S MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION TO DISMISS AMENDED COMPLAINT**

GUSRAE KAPLAN NUSBAUM PLLC
Martin H. Kaplan
Kari Parks
120 Wall Street
New York, New York 10005
(212) 269-1400
mkaplan@gusraekaplan.com
kparks@gusraekaplan.com

*Counsel for Defendants The Goldstein Law Group PC 401(K) Profit Sharing Plan, Sheldon Goldstein, and Scott Goldstein*

**TABLE OF CONTENTS**

**TABLE OF CONTENTS**                                                                         ii

**TABLE OF AUTHORITIES**                                                                      iii

**PRELIMINARY STATEMENT**                                                                     1

**BACKGROUND**                                                                               2

   I.   Governments Have Long Been Aware of Dividend Arbitrage's Risks          2

   II.  SKAT Has Never Pleaded Facts Suggesting that the Goldstein Parties were
Involved in the Shah Scheme                                                                   7

   III. Despite Claiming that the Shah Scheme and ED&F Strategy are Completely
Separate Events, SKAT Pleads Both Theories Against the Goldstein Parties                      10

   IV. For Decades, SKAT has Failed to Fix its Flaws                             12

**LEGAL STANDARD**                                                                           15

**ARGUMENT**                                                                                 16

   I.   SKAT Cannot Invoke the Shah Scheme to State Its Claims                16

   II.  SKAT Cannot State Any of Its Claims By Alleging that the Goldstein Plan
Committed Tax Fraud                                                                           17
      A.  The Internal Revenue Code Does Not Grant SKAT a Private Right of Action    18
      B.  SKAT Cannot Dress Up Section 401 Claims as Common-Law Torts          19

   III. SKAT's Copy–Paste Pleadings Fail to Allege Fraud                         20
      A.  The Amended Complaint Does Not Allege Scienter                       21
         1.  The Amended Complaint Does Not Plead Motive or Opportunity       22
         2.  SKAT Does Not Show Strong Circumstantial Evidence of Scienter    22
      B.  SKAT Failed to Take "Reasonable Steps to Protect Itself from Deception"    25
      C.  SKAT Fails to Plead that the Goldstein Parties Knew of Any Fraud, Let Alone
"Substantially Assisted" It                                                                   28

   IV. SKAT Cannot Claim Negligent Misrepresentation Because the Goldstein Parties
Never Owed SKAT a "Special Duty"                                                              29
      A.  SKAT Did Not Have a "Special Relationship" with Any Goldstein Party    30
      B.  SKAT Did Not Rely on Any Special Expertise of the Goldstein Parties    31

   V.  SKAT's Equitable Claims are Unjust                                     32

   VI. SKAT Does Not Plead Sheldon's or Scott's Wrongful Intent or Conduct        34

**CONCLUSION**                                                                               35

# TABLE OF AUTHORITIES

## CASES

ACA Fin. Guar. Corp. v. Goldman, Sachs & Co., 25 N.Y.3d 1043 (2015) ............ 30

Acito v. IMCERA Grp, Inc., 47 F.3d 47 (2d Cir. 1995) ...................................... 19

Am. Buying Ins. Svcs., Inc. v. S. Kornreich & Sons, Inc., 944 F. Supp. 240 (S.D.N.Y. 1996)
(Kaplan, J.) ...................................................................................................... 19

Amusement Indus. v. Stern, 786 F. Supp. 2d 758 (S.D.N.Y. 2011) (Kaplan, J.) ....... 34

Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146
(2d Cir. 1995) .............................................................................................. 34, 35

Banque Franco-Hellenique de Commerce Int'l et Maritime, S.A. v. Christophedes, 106
F.3d 22 (2d Cir. 1997) ........................................................................ 29, 30, 31

Burns v. Delaware Charter Guarantee & Trust Co., 805 F. Supp. 2d 12 (S.D.N.Y. 2011)
(Sweet, J.) ........................................................................................................ 23

Campo v. Sears Holdings Corp., 635 F. Supp. 2d 323 (S.D.N.Y. 2009) (Kaplan, J.) ... 19, 20,
26

Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V., 17 N.Y.3d 269
(2011) .............................................................................................................. 30

Corsello v. Verizon New York, Inc., 18 N.Y.3d 777 (2012) .................................... 37

Cosmas v. Hassett, 886 F.2d 8 (2d Cir. 1989) .................................................... 24

Cowan v. Keystone Employee Profit Sharing Fund, 586 F.2d 888 (1st Cir. 1978) ...... 22

Crawford v. Roane, 53 F.3d 750 (6th Cir. 1995) ................................................ 23

Credit All. Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536 (1985) .................... 25, 26

Crigger v. Fahnestock and Co., Inc., 443 F.3d 230 (2d Cir. 2006) ........................ 31

DDJ Mgmt., LLC v. Rhone Group LLC, 15 N.Y.3d 147 (2010) ......................... 29, 32

Dembeck v. 220 Central Park S., LLC, 33 A.D.3d 491 (1st Dep't 2006) ................. 24

DIMON Inc. v. Folium, Inc., 48 F. Supp. 2d 359 (S.D.N.Y. 1999) ........................ 25

Dobroshi v. Bank of Am., N.A., 65 A.D.3d 882 (1st Dep't 2009) ...................... 34, 35

Dubai Islamic Bank v. Citibank, N.A., 256 F. Supp. 2d 158 (S.D.N.Y. 2003) (Berman, J.) 32

EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11 (2005) ................................... 34

Ebin v. Kangadis Food Inc., No. 13 Civ. 2311(JSR), 2013 WL 6504547 (S.D.N.Y. Dec. 11,
2013) (Rakoff, J.) ............................................................................................ 37

Fed. Hous. Fin. Agency v. UBS Americas, Inc., 858 F. Supp. 2d 306 (S.D.N.Y. 2012)
(Cote, J.), aff'd, 712 F.3d 16 (2d Cir. 2013) ...................................................... 35

Global Mins. & Metals Corp. v. Holme, 35 A.D.3d 93 (1st Dep't 2006) ................. 30

Goldman v. Belden, 754 F.2d 1059 (2d Cir. 1985) .............................................. 24

Greentech Research LLC v. Wissman, 104 A.D.3d 540 (1st Dep't 2013) ............. 35, 36

Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729 (2d Cir. 1984) ........ 31

Houbigant, Inc. v. Deloitte & Touche, 303 A.D.2d 92 (1st Dep't 2003) ................. 25

In re Bisys Sec. Litig., 397 F. Supp. 2d 430 (S.D.N.Y. 2005) (Kaplan, J.) ............... 27

In re Caldor, Inc.-NY, 217 B.R. 121 (Bankr. S.D.N.Y. 1998) (Garrity, J.) .............. 36

In re DRDGOLD Ltd. Sec. Litig., 472 F. Supp. 2d 562 (S.D.N.Y. 2007) (Marrero, J.) 26, 27

In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595 (S.D.N.Y. 2005) (Stein, J.) ... 26

In re Livent, Inc. Sec. Litig., 148 F. Supp. 2d 331 (S.D.N.Y. 2001) (Marrero, J.) ....... 26

Katz v. Cellco P'ship, 794 F.3d 341 (2d Cir. 2015) ................................................ 22

L.L. Capital Partners, L.P. v. Rockefeller Center Properties, Inc., 921 F. Supp. 1174
(S.D.N.Y. 1996) (Kaplan, J.) ................................................................................ 29

Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531 (2d Cir. 1997) ........ 30

Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10 (2d Cir. 2001) ............................. 19

Lewis v. Delaware Charter Guarantee & Trust Co., No. 14-CV-1779 (KAM), 2015 WL
1476403 (E.D.N.Y. Mar. 31, 2015) (Matsumoto, J.) ........................................... 23

Mallis v. Bankers Trust, 615 F.2d 68 (2d Cir. 1980) ................................................ 31

Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173 (2011) ................................. 33

Marketxt Holdings Corp. v. Engel & Reiman, P.C., 693 F. Supp. 387 (S.D.N.Y. 2010)
(Kaplan, J.) ........................................................................................................... 19

Moslem v. Parietti & McGuire Ins. Agency, No. 07 Civ. 7962, 2011 WL 721653 (S.D.N.Y.
Feb. 24, 2011) (Schiendlin, J.) .............................................................................. 36

MP Cool Investments Ltd. v. Forkosh, 142 A.D.3d 286 (1st Dep't 2016)      24, 25, 30, 31

Nolan v. Meyer, 520 F.2d 1276 (2d Cir. 1975) ........................................................ 22

Perlman v. Fidelity Brokerage Servs. LLC, 932 F. Supp. 2d 397 (E.D.N.Y. 2013) (Bianco,
J.) ......................................................................................................................... 22

Pope v. Saget, 29 A.D.3d 437 (1st Dep't 2006) ....................................................... 27

Prime Mover Capital Partners L.P. v. Elixir Gaming Technologies, 898 F. Supp. 2d 673
(S.D.N.Y. 2012) (Kaplan, J.) ................................................................................ 34

Rabin v. Nasdaq OMX PHLX, 15-cv-00551, Fed. Sec. L. Rep. P 99073 (E.D. Pa. Apr. 21,
2016) .................................................................................................................... 28

Ravenna v. Christie's Inc., 289 A.D.2d 15 (1st Dep't 2001) ..................................... 35

Reklau v. Merchants Nat'l Corp., 808 F.2d 628 (7th Cir. 1986) ............................... 22

Reynolds v. de Silva, No. 09 Civ. 9218(CM), 2010 WL 743510 (S.D.N.Y. Feb. 24, 2010)
(McMahon, J.) ................................................................................................ 22, 23

RKA Film Fin., LLC v. Kavanaugh, 171 A.D.3d 678 (1st Dep't 2019) ............. 30, 35, 36

Robach v. Chang, 355 F.3d 164 (2d Cir. 2004) ....................................................... 25

Schumaker v. Mather, 133 N.Y. 590 (1892) ........................................................... 30

Silvercreek Mgmt., Inc. v. Citigroup, Inc., 346 F Supp. 3d 473 (S.D.N.Y. 2018) (Oetken, J.)
............................................................................................................................. 32

Silvers v. State, 68 A.D.3d 668 (1st Dep't 2009) ..................................................... 33

Sirna v. Prudential Sec. Inc., 95 Civ. 8422, 95 Civ. 9061, 96 Civ. 4534, 1997 WL 53194
(S.D.N.Y. Feb. 10, 1997) (Kaplan, J.) ............................................................ 22, 23, 24

Stamper v. Total Petroleum, Inc. Retirement Plan, 188 F.3d 1233 (10th Cir. 1999) ..... 23

Stoltz v. Fage Dairy Processing Indus., S.A., No. 14-cv-3826 (MKB), 2015 WL 5579872
(E.D.N.Y. Sept. 22, 2015) (Brodie, J.) .................................................................. 37

Suozzo v. Bergreen, No. 00 Civ. 9649 (JGK), 2003 WL 256788 (S.D.N.Y. Feb. 5, 2003)
(Koetl, J.) ............................................................................................................. 23

T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A., No. 10-CV-2843 JG ARL, 2010 WL
4038826 (E.D.N.Y. Oct. 14, 2010) (Gleeson, J.) ................................................. 36

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190 (2d
Cir. 2008) ............................................................................................................. 27

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 304 (2007) ........................... 26

iv

Waterscape Resort LLC v. McGovern, 107 A.D.3d 571 (1st Dep't 2013) ............... 27
Weisblum v. Prophase Labs, Inc., No. 14-CV-3587, 2015 WL 732112 (S.D.N.Y. Feb. 20, 2015) (Furman, J.) ............... 37
Wiesner v. Romo Paper Products Corp., 514 F. Supp. 289 (E.D.N.Y. 1981) (Neaher, J.) 22

### STATUTES

26 U.S.C. § 514 ............... 21
26 U.S.C. § 7476 ............... 23

### OTHER AUTHORITIES

Dividend Trade Strategies in the U.S. Options Industry, International Securities Exchange Whitepaper (March 2010) ............... 28
Jia Hao, Ex-dividend Arbitrage in Option Markets, 23 The Review of Fin. Studies 1 (2010) ............... 28
Robert J. Peroni, Tax Reform Interrupted: The Chaotic State of Tax Policy in 2003, 35 Mc.George L. Rev. 277 (2004) ............... 8
Securities and Exchange Commission, Self-Regulatory Organizations; The Options Clearing Corporation; Notice of Filing of Proposed Rule Change to Process All Sell Transactions Prior to the Exercise of Long Options in Market-Maker Accounts to Ensure that Only Net Long Positions May Be Exerrcised, Exchange Act Release No. 34-72677, 79 FR 44480, 44481 (July 31, 2014) ............... 28

### RULES

Fed. R. Civ. P. 12(b)(6) ............... 19
Fed. R. Evid. 201 ............... 20

Defendants–Third-Party Plaintiffs The Goldstein Law Group PC 401(K) Profit-Sharing Plan and Sheldon Goldstein ("**Goldstein Plaintiffs**") and Defendant Scott Goldstein (collectively, the "**Goldstein Parties**") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiff Skatteforvaltningen's ("**SKAT**") Amended Complaint[1] pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

SKAT's cookie-cutter Amended Complaint proves the Goldstein Parties' point: SKAT's got the wrong guy.

Two years after filing its initial Complaint[2] against the Goldstein Plaintiffs, SKAT still fails to plead facts specific to any Goldstein Party's allegedly-wrongful acts. Instead, SKAT again lumps in the Goldstein Parties with a fraudulent scheme that SKAT, itself, has said is completely separate from their own Danish trading. And despite pleading in the English Action[3] that third-party defendant ED&F Man Capital Markets, Ltd ("**ED&F Man**") victimized the Goldstein Parties, here in the United States, SKAT still claims that the Goldstein Parties controlled ED&F Man's conduct.

Conflicting theories aside, SKAT does not plead the elements of its claims against the Goldstein Parties. SKAT does not plead that any Goldstein Party acted with scienter.

---

[1] See generally Dkt. 155 (Apr. 22, 2020) ("**Am. Compl.**" or the "**Amended Complaint**"), annexed as Exhibit 1 to the Declaration of Kari Parks (July 3, 2020) ("**Parks Declaration**" or "**Parks Decl.**").

[2] A document comparison of SKAT's original Complaint and the Amended Complaint is annexed as Exhibit 2 to the Parks Declaration (the "**Complaint Comparison**").

[3] The "**English Action**" is the litigation filed by SKAT against ED&F Man and other parties captioned Skatteforvaltningen v. Solo Capital Partners LLP et al., CL-2018-000297, CL-2018-00404, CL-2018-000590.

SKAT does not plead any steps that it took to mitigate its own systemic refusal to properly process dividend tax refund claims. And SKAT has not pleaded and cannot plead that the Goldstein Parties owed SKAT any special duties, fiduciary or otherwise.

While the Goldstein Parties understand SKAT's initial impulse to cast a wide net, enough is enough. Two years of litigation and extensive discovery have failed to give SKAT the ammunition to plead particularized factual allegations against any Goldstein Party. The Court should dismiss the Amended Complaint with prejudice.

## BACKGROUND

### I.    Governments Have Long Been Aware of Dividend Arbitrage's Risks

In 2017, the United Kingdom Financial Conduct Authority ("**FCA**")—which supervises ED&F Man—explained dividend arbitrage:

> The intention of dividend arbitrage is to place shares in alternative tax jurisdictions around dividend dates, with the aim of minimizing withholding taxes ("**WHT**"), or generating WHT reclaims. This may involve several different trading activities including trading and lending securities and trading derivatives, including futures and total return swaps, designed to hedge movements in the price of the securities over the dividend dates.[4]

Therefore, when executed properly, dividend arbitrage is a "[legal] investment strategy [that] attempts to take advantage of relative pricing discrepancies."[5] Indeed, as

---

[4] Financial Conduct Authority, Market Watch 52 at 1 (June 2017), https://www.fca.org.uk/publication/newsletters/marketwatch-52.pdf ("**FCA Market Watch**").

[5] Leslie C. Giordani, Foreign Life Insurance Strategies, Int'l Trust and Estate Planning, SH032 ALI-ABA 531, 556–57 (2002); accord Giordani et al., Private Placement Life Insurance Planning, Int'l Trust and Estate Planning, the Am. Law Institute, SL032 ALI-ABA 603, 632 (2008).

recently as June 2017, the FCA acknowledged that "[m]ost firms executing transactions with[] or on behalf of clients engaged in dividend arbitrage[] appear to comply with [its] requirements."[6]

The United States Tax Convention with Denmark (the "**Treaty**") creates a dividend arbitrage opportunity: while most owners of Danish securities must pay a 27% tax on dividends, tax-exempt entities like the Goldstein Plan are entitled to tax-free dividend income, which they can obtain by submitting applications to SKAT.[7]

In a 2016 report of its investigation into the events underlying this litigation (the "**2016 Audit**"), Denmark's National Audit Office illustrated how parties  apply for withholding refunds:[8]

---

[6] FCA Market Watch at 1.
[7] Parks Decl. Exhibit 3, Defendants The Goldstein Law Group PC 401(K) Profit Sharing Plan's and Sheldon Goldstein's Amended Answer, Affirmative Defenses, and Counterclaims Against Skatteforvaltningen and Amended Third-Party Complaint Against ED&F Man Capital Markets, Ltd. and John Does 1–10 ¶¶ 246, 251 Dkt. 219 (Nov. 5, 2019) ("**ATPC**").
[8] Parks Decl. Exhibit 4, Report to the members of the Danish Public Accounts Committee (*Statsrevisorerne*) on the administration by the Danish Customs and Tax Administration (SKAT) and the supervision by the Danish Ministry of Taxation of refunds of dividend tax at 1 (Feb. 2016) (the "**2016 Audit**").

*Double taxation treaty*
*In general, the refund of dividend tax is made to <u>shareholders</u> in countries with which Denmark has a double taxation treaty.*

*The various double taxation treaties determine the dividend tax that the shareholder is to pay in Denmark and in its home country. For shareholders resident in countries that have a double taxation treaty with Denmark it means that the foreign recipient of Danish dividend tax is to ask SKAT for a refund of the withheld dividend tax in whole or in part, depending on what is stipulated in the double taxation treaty.*



**Figure 1. Procedure for a refund of dividend tax**

Source: The National Audit Office of Denmark based on SIR's analysis from 2015.

As early as the 1990s, governments, markets, and academics recognized that dividend arbitrage trading was a large market expressly predicated on maximizing cross-jurisdictional tax benefits—in other words, an investment strategy designed to pay governments as little money as possible.[9] For example, in 2008, the U.S. Senate acknowledged that financial institutions like ED&F Man cannot compete for the largest

---

[9] See, e.g., Gavin Jackson, <u>Companies Turn Arbitrage Traders</u>, Fin. T. (Oct. 6, 2016), <u>https://www.ft.com/content/6f5c59ca-8b06-11e6-8aa5-f79f5696c731</u>; Robert J. Peroni, <u>Tax Reform Interrupted: The Chaotic State of Tax Policy in 2003</u>, 35 McGeorge L. Rev. 277, 295 (2004).

clients unless they offer dividend arbitrage services by matching tax-exempt purchasers like pension plans with for-profit clients, such as hedge funds, private equity asset managers, and other institutional investors.[10] Those taxable clients demand that brokerages essentially "net up" their proceeds as much as possible, leaving the tax-exempt entity with relatively little of the dividend—but, of course, more than the $0 the tax-exempt entity would have received had it not participated in the transaction.[11]

Governments and markets also have long been aware of the risks posed by "manufactured" or "substitute" dividends, where lending and re-lending of the exact same security over a dividend date leads to multiple "dividend equivalent" payments, but only the one security-holder receives the actual dividend, net of withholding tax.[12] If the involved financial institutions and jurisdictions have failed to keep track of who actually owned the security and received the dividend, it can be very difficult to ensure that only a lawfully-entitled party applies for and receives a refund of the withholding tax. To mitigate these well-known issues, in 1997, the IRS issued a notice clarifying its taxation of substitute dividend payments.[13]

While governments have never outlawed dividend arbitrage, they have taken steps to make it less lucrative. For example, after the 2008 Senate Report, the United States

---

[10] ATPC ¶¶ 170–71; see also, e.g., Kevin McCoy, IRS Investigating Broker "Gimmicks" that Cheated U.S. of Billions in Tax, USA Today (Sept. 11, 2008), https://abcnews.go.com/Business/story?id=5783191&page=1.

[11] See, e.g., Parks Decl. Exhibit 5, Staff of S. Permanent Comm. on Investigations, 110th Cong., Dividend Tax Abuse: How Offshore Entities Dodge Taxes on U.S. Stock Dividends at 25–27 (Sept. 11, 2008) ("**2008 Senate Report**").

[12] See, e.g., Senate Report at 19–20.

[13] Senate Report at 19 (citing IRS Notice 97-66 (Nov. 1997)).

changed its laws to require entities to hold securities for significantly longer in order to be able to receive a dividend—no more could someone receive a dividend by buying the security immediately before the dividend issues and selling it immediately after.[14]

Despite this change, dividend arbitrage remained legal for American investors and remained a massive London-based industry: in May 2013, The Economist reported that $1.5 trillion of securities were on loan just for dividend arbitrage.[15]

---

[14] See, e.g., Aimee Picchi, Another tax-avoidance scheme is getting scrutiny, CBS News Moneywatch (Sept. 29, 2014), https://www.cbsnews.com/news/why-dividend-arbitrage-is-raising-regulators-eyebrows/ ("**Moneywatch**") (citing Jenny Strasburg, Fed Questions Bank Maneuver to Reduce Hedge Funds' Dividend Taxes, Wall St. J. (Sept. 28, 2014), https://www.wsj.com/articles/fed-questions-bank-maneuver-to-reduce-hedge-funds-dividend-taxes-1411952821?mod=djem10point)); see also Jenny Strasburg, Bank of America's U.S. Deposit-Taking Unit Financed Tax Trades, Wall St. J. (Feb. 11, 2015), https://www.wsj.com/articles/bank-of-americas-u-s-deposit-taking-unit-financed-tax-trades-1423666493.

[15] Moneywatch (citing Spring Break: A Practice Which Underpins Swathes of the Financial System Faces Turmoil, The Economist (May 11, 2013), https://www.economist.com/finance-and-economics/2013/05/11/spring-break).

## II.     SKAT Has Never Pleaded Facts Suggesting that the Goldstein Parties were Involved in the Shah Scheme

The Goldstein Parties have never intended to trick or steal from SKAT.[16]

Defendant Sheldon Goldstein is 82 years old and retired from his Manhattan securities law practice approximately ten years ago.[17] Defendant Scott Goldstein, also a securities lawyer, is his son, and a Partner of non-party the Goldstein Law Group ("**GLG**") since 1998.[18] In 1998, Sheldon founded non-party GLG, which was the successor to law firms formed and managed by Sheldon since 1980.[19] All of Mr. Goldstein's firms were real law firms with real offices, real clients, real employees, real payrolls, and real retirement and benefit plans.[20] In 1999—15 years before the first Goldstein Transaction—GLG formed the Defendant Goldstein Plan to provide retirement benefits to GLG's partners and employees.[21]

While SKAT alleged connections to Shah Entities in 154 of its initial 183 MDL complaints, it has never pleaded that the Goldstein Parties were connected to Shah, nor identified any similarities between the Goldstein Parties and the Shah Scheme, beyond both groups.[22] Instead, London-based broker–dealer ED&F Man solicited, recommended, structured, created, and executed at least 420 separate Danish dividend arbitrage

---

[16] ATPC ¶ 230 (citing Transfer Order, Dkt. 37 (Oct. 3, 2018); id. ¶ 100.
[17] Id. ¶ 101.
[18] Am. Compl. ¶ 19;  Parks Decl. ¶ 3.
[19] Id. ¶ 102.
[20] Id. ¶ 103.
[21] Id. ¶ 104.
[22] ATPC ¶ 197–209.

transactions for at least 36 U.S. pension plan clients, including the eight Goldstein Applications.[23]

In September 2019, ED&F Man filed an amended answer in the English Action and admitted—for the very first time—that dozens of "**Tax Vouchers**" it had created certifying its clients' ownership of Danish securities and receipt of concomitant dividends, net of withholding—including those underlying the first four Goldstein Applications—were false (the "**Disavowed Vouchers**").[24] Until then, the Goldstein Parties had believed that all of the Goldstein Applications had been accurate and lawful; indeed, ED&F Man had memorialized each Goldstein Transaction with numerous records, including custody fee letters, account statements, and trade confirmations.[25]

Despite repeated inquiries, ED&F Man refused to explain what, exactly, its Amended English Answer meant or how the Disavowed Vouchers could be false.[26] But in spring and summer 2019, ED&F Man shut down the department that facilitated the Goldstein Transactions and terminated the employment of each and every one of the Plan's ED&F Man contacts.[27] Moreover, in 2014—the year that ED&F Man issued 77 of the 80 Disavowed Vouchers—the Brokerage posted profits of $17 million.[28] The very next year, ED&F Man made just $2.8 million.[29]

---

[23] See Parks Decl. Exhibit 6, Re-Amended Schedule 5T filed by SKAT on or around February 28, 2020 in the English Action ¶ 5(c) ("**Schedule 5T**").

[24] Id. ¶ 130; see also Schedule 5T ¶ 5(b).

[25] ATPC ¶ 310–12.

[26] ATPC ¶¶ 276–80.

[27] ATPC ¶¶ 332; Schedule 5T ¶ 19(d).

[28] Id. ¶¶ 325, 327.

[29] Id. ¶ 326.

After the Goldstein Plaintiffs filed their Amended Third-Party Complaint highlighting these discrepancies and ED&F Man's malfeasance, SKAT filed new pleadings in England, hammering ED&F Man for using American pension plan clients as fronts for ED&F Man's own undisclosed self-dealing.[30] SKAT's February 2020 pleadings conclude that "ED&F Man's apparent inability to explain the causes of the admitted [Tax Voucher] errors without some six months' work by external consultants implies a systemic failure of basic systems and controls" and a "failure [ . . . ] to perform its most basic duties as a custodian."[31]

In January 2020, this Court denied ED&F Man's Rule 12(b)(2) motion to dismiss the Goldstein Plaintiffs' Amended Third-Party Complaint.[32] ED&F Man's most recent English pleadings continue to affirm that all of the Goldstein Transactions did happen and that their non-Disavowed Vouchers are valid.[33]

---

[30] See generally Schedule 5T; Parks Decl. Exhibit 9, Further Particulars Regarding the Validity of WHT Refund Applications filed by SKAT in the English Action on or around February 28, 2020 ("**Further Particulars**").

[31] Schedule 5T ¶ 19.

[32] See Memorandum Opinion, Dkt. 255 (Jan. 7, 2020).

[33] Parks Decl. Exhibit 8, ED&F Man's Response to Claimant's Request Dated 19 May 2020 for Further Information Under Part 18, English Action ¶ 1.4 (May 19, 2020).

### III.   Despite Claiming that the Shah Scheme and ED&F Strategy are Completely Separate Events, SKAT Pleads Both Theories Against the Goldstein Parties

SKAT's initial complaints in this MDL and the English Action alleged that all plan defendants participated in the Shah Scheme by submitting tax refund applications that were fraudulent because they "did not own the shares that they claimed to own, did not earn the dividends they claimed to have earned, and were not entitled to the tax refunds they claimed."[34] SKAT's English complaint claims unjust enrichment and negligent misrepresentation against ED&F Man—not fraud or any other intentional torts (though its recent filings do allege many acts of intentional misconduct).[35]

SKAT's Amended Complaint now advances two separate theories against the Goldstein Parties: (1) the original Shah Scheme, plus (2) a wholly separate theory: that the applications were fraudulent because the Goldstein Plan and its Applications did not qualify for "tax-qualified status under section 401(a) of the Internal Revenue Code" ("**Section 401**").[36]

The Amended Complaint's new allegations identify two sources of supposedly-fraudulent statements: the Goldstein Applications' (1) Tax Vouchers and (2) IRS certifications.[37] The Tax Vouchers "certified that the beneficial owner is covered by the Double Taxation Convention concluded between Denmark and U.S.A,"[38] while the IRS certifications stated "to the best of our knowledge, the above-named entity is a trust

---

[34] See, e.g., Complaint Comparison ¶ 4.
[35] See Schedule 5T ¶¶ 2–8.
[36] Am. Compl. ¶ 24; accord id. ¶¶ 4, 41–45.
[37] See id. ¶¶ 30(b) (Tax Vouchers), 30(e) (IRS certifications).
[38] See, e.g., Parks Decl. Ex. 10, Goldstein Applications at 2.

forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the U.S. Internal Revenue Code, which is exempt from U.S. taxation under section 501(a), and is a resident of the United States of America for purposes of U.S. taxation."[39] SKAT also now claims that new defendant Acer Investment Group, LLC ("**Acer**") was the Goldstein Parties' contact with ED&F Man.[40]

But in England, SKAT alleges that each theory is a completely separate scheme with completely separate defendants.[41] In the English Action, SKAT has broken up refund applicants into two separate buckets: (1) the "**WHT [Shah Scheme] Applicants**," which "never owned shares in the relevant Danish companies [ . . . ] and did not receive any dividends in respect of such shares," and (2) the "**ED&F Man Applicants,**" which "did not receive dividends [ . . . ] at least in respect of some transactions," and "were not entitled to relief under the applicable double tax treaties" for those dividends the ED&F Man Applicants actually did receive.[42] SKAT pleads that there is no overlap between the Shah Scheme Applicants and the ED&F Man Applicants.[43]

Furthermore, in the English Action, SKAT specifically identified the Goldstein Plan as an "ED&F Man Application," not a "WHT Applicant."[44] But here, SKAT claims that the Goldstein Parties participated in both the Shah Scheme and the ED&F Strategy.

---

[39] See, e.g., id. at 4.
[40] Am. Compl. ¶ 61.
[41] See, e.g., Further Particulars ¶ 3.
[42] Further Particulars ¶¶ 3, 13–47.
[43] Further Particulars ¶ 46.5.
[44] See Schedule 5T ¶ 5. By SKAT's reasoning, at least eight other defendants in this multi-district litigation should be considered "ED&F Man Applicants:" DW Construction, Inc., Retirement Plan; Kamco Investments, Inc. Pension Plan; Kamco LP

## IV.    For Decades, SKAT has Failed to Fix its Flaws

SKAT's many pleadings in this MDL and the English Action neglect to mention

that SKAT's supervisors had long warned SKAT that it was improperly tracking,

calculating, and issuing dividend tax refunds.[45]

For example, in May 2010, the Danish Ministry of Taxation[46] issued an internal

Audit Report finding several issues with how SKAT processed and refunded dividend

withholding tax (the "**2010 Audit**"), including that:

- SKAT lacked the reporting and information necessary to correctly calculate net proceeds from dividend tax withholding;
- It was possible for dividend tax to be "refunded" before the tax was ever paid or reported to SKAT;
- SKAT was unable to determine "whether dividend tax is requested more than once per share;"
- "[T]here are no checks [ . . . ] as to whether the investor is actually a shareholder" or liable for tax; and
- "[I]t does not appear that the previous investigations initiated by SKAT have been followed up on."[47]

In the wake of the Shah scandal, Denmark's National Audit Office investigated

and issued the 2016 Audit, which further damned SKAT's malfeasance:

It is the National Audit Office of Denmark's overall assessment that SKAT's administration and the Ministry of Taxation's supervision of the refunds of

---

Profit Sharing Pension Plan; Moira Associates 401(k) LLC Plan; Riverside Associates Defined Benefit Plan; Linden Associates Defined Benefit Plan; American Investment Group of New York, L.P. Penson Plan; and Newsong Fellowship Church 401(k). Those eight defendants also (i) transacted via Acer, (ii) traded through ED&F Man, (iii) filed third-party claims against ED&F Man, and (iv) have moved to dismiss SKAT's amended complaints.

[45] See generally Parks Decl. Exhibit 11, Danish Ministry of Taxation, Audit of SKAT (2010).

[46] This 2010 Audit was prepared by the Internal Audit department of Skatteministeriet, one of SKAT's predecessor agencies within the Ministry of Taxation.

[47] 2010 Audit at 11–12.

dividend tax have been very unacceptable. SKAT's control of the payments of the refunds of dividend tax and the Ministry of Taxation's supervision of the area have been extremely inadequate. [ . . . ]

In the period when the assumed fraud was committed[,] SKAT refunded dividend tax in the amount of DKK 14.2 billion [USD 2.142 billion[48]] [ . . . ] on a completely insufficient basis and SKAT did not check completely basic information in the requests, for example the ownership of the shares and whether the application's dividend tax had been withheld. [ . . . ]

SKAT refunded dividend tax of DKK 3.2 billion [USD 482,836,800[49]] after the date when SKAT received information from the public of the assumed fraud and until the refunds were suspended. [ . . . ] The Ministry [of Taxation] did not react to the fluctuations in the refunds of dividend tax that were brought to the Ministry's attention several times in connection with the monthly approvals of accounts from SKAT, for example that the refunds of dividend tax were increasing and that the payments in a month in 2015 had increased by 200% compared to the same month the year before. [ . . . ] Moreover, the Ministry of Taxation did not react to several indications of problems with the refunds of dividend tax that the Ministry has received.

[ . . . ] The National Audit Office of Denmark's analysis shows that very simple analyses of the development in the refunds of dividend tax would have called attention to problems in the area that should have resulted in a closer look at the area.[50]

The 2016 Audit also included several graphs illustrating the exponential, rapid increase in both (a) the number of applications SKAT received and (b) the sums those applications requested:[51]

---

[48] This conversion was calculated on July 3, 2020, applying the rate of 1 Danish Kroner to 15 U.S. cents.

[49] This conversion was calculated on July 3, 2020, applying the rate of 1 Danish Kroner to 15 U.S. cents.

[50] 2016 Audit at 2–4.

[51] 2016 Audit at 8.



Figure 3. Development in revenue and refunds of dividend tax percentage (DKK bn)



Figure 4. Refund



Figure 5. Development in the number of applications through the form programme



Figure 6. Development in the average claimed-back amount through the form programme (DKK)

In 2017, Denmark's tax minister announced that Denmark would close SKAT entirely and divide its responsibilities among seven new authorities, explaining that "instead of using money on patching up a SKAT that doesn't deliver, or if we are being completely honest has never really functioned, we should just completely stop SKAT from existing."[52] Denmark did just that on July 1, 2018, when Plaintiff assumed the responsibilities of its predecessor.[53]

---

[52] Id. ¶¶ 225–16.
[53] See Am. Compl. at 1 n.1 (citing Danish Legal Order 804 (June 6, 2018)).

14

## LEGAL STANDARD

To analyze a Rule 12(b)(6) motion to dismiss, the Court must accept all well-pleaded facts as true and draw all reasonable inferences in the plaintiff's favor. Marketxt Holdings Corp. v. Engel & Reiman, P.C., 693 F. Supp. 2d 387, 392 (S.D.N.Y. 2010) (Kaplan, J.) (citing Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001)); see also Fed. R. Civ. P. 12(b)(6).

But "conclusory allegations or legal conclusions masquerading as factual conclusions" cannot survive a motion to dismiss. Marketxt, 693 F. Supp. 2d at 392 (citation omitted). Factual allegations must "raise a right to relief above the speculative level." Campo v. Sears Holdings Corp., 635 F. Supp. 2d 323, 328 (S.D.N.Y. 2009) (Kaplan, J.).

Because the Amended Complaint pleads fraud and aiding-and-abetting fraud against each of the Goldstein Parties, it also must "state with particularity the circumstances constituting fraud." Id. (quoting Fed. R. Civ. P. 9(b)). While "[m]alice, intent, knowledge, and other conditions of a person's mind may be averred generally," SKAT "must allege facts that give rise to a strong inference of fraudulent intent." Id. (citing Fed. R. Civ. P. 9(b)). Fraud allegations made on information and belief do not satisfy Rule 9(b) "unless the facts are peculiarly within the knowledge of the defendants, in which case the complaint must allege facts demonstrating the basis for the information and belief." Am. Buying Ins. Svcs., Inc. v. S. Kornreich & Sons, Inc., 944 F. Supp. 240, 248–49 (S.D.N.Y. 1996) (Kaplan, J.) (citations and quotation marks omitted).

In deciding this motion, the Court should consider SKAT's Amended Complaint, as well as (1) documents attached to or incorporated by reference in the Amended Complaint, (2) documents "integral to and relied upon in the complaint, even if not attached or incorporated by reference," and (3) facts of which judicial notice properly may be taken pursuant to Federal Rule of Evidence 201, i.e. facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Campo, 635 F. Supp. 2d at 328–29 (citations omitted); see also Fed. R. Evid. 201.

## ARGUMENT

### I.      SKAT Cannot Invoke the Shah Scheme to State Its Claims

Although the Amended Complaint pleads both the Shah Scheme and ED&F Strategy against the Goldstein Parties, in the English Action, SKAT has pleaded that (a) the Shah Scheme and ED&F Strategy are mutually exclusive and (b) the Goldstein Plan is an "ED&F Man Applicant." See Further Particulars ¶ 46.5; Schedule 5T ¶ 5. To the extent that the Amended Complaint pleads any specific factual allegations of the Goldstein Parties' intentions and conduct, they fall within the ED&F Strategy, not the Shah Scheme. See, e.g., Am. Compl. ¶¶ 40–48, 52, 60–62.

Therefore, SKAT's own pleadings show that the Shah Scheme allegations cannot sustain any claim against the Goldstein Parties. The Court should dismiss the Amended Complaint to the extent it relies on allegations underpinning the Shah Scheme.

16

## II.   SKAT Cannot State Any of Its Claims By Alleging that the Goldstein Plan Committed Tax Fraud

Tacitly acknowledging that even after two years and voluminous discovery, it has identified no evidence of the Goldstein Parties' scienter, SKAT now pleads that the Goldstein Parties "falsely represented to SKAT that they were qualified U.S. pension plan entitled to the maximum refunds provided by the Treaty" when they filed the Goldstein Applications and enclosed their IRS Certificates. Am. Compl. ¶ 31.

SKAT does not claim that any documents were forged; instead, SKAT's new theory alleges that the Goldstein Plan does not actually satisfy the requirements for tax-exempt status as set forth in IRC Section 401 because the Plan "did not operate for the exclusive benefit of [GLG's] employees and their beneficiaries" and neither the Plan nor the Goldstein Transactions were properly-funded. See Am. Compl. ¶¶ 41–45.

As a threshold matter, even assuming that the Goldstein Plan earned taxable unrelated business income via the Danish dividends, that income would not strip the Plan of its Section 401 status. See 26 U.S.C. § 514. Furthermore, SKAT cannot plead its ability to enforce U.S. tax laws, let alone that the Goldstein Parties violated them. The Court should reject all claims premised on this theory.

17

### A.  The Internal Revenue Code Does Not Grant SKAT a Private Right of Action

"Because there is no private right of action for violations of the Internal Revenue Code" (the "**IRC**"), this Court should reject SKAT's claims. See Reynolds v. de Silva, No. 09 Civ. 9218(CM), 2010 WL 743510, at *7 (S.D.N.Y. Feb. 24, 2010) (McMahon, J.), abrogated on other grounds, Katz v. Cellco P'ship, 794 F.3d 341, 346 (2d Cir. 2015)  (collecting cases).

Over twenty years ago, this very Court rejected claims rooted in alleged violations of IRC Sections 401 and 408, noting that "there is no basis whatsoever for concluding that there is a private cause of action under the [Internal Revenue Code]." Sirna v. Prudential Sec. Inc., 95 Civ. 8422, 95 Civ. 9061, 96 Civ. 4534, 1997 WL 53194, at *3 (S.D.N.Y. Feb. 10, 1997) (Kaplan, J.); cf. Nolan v. Meyer, 520 F.2d 1276, 1280 (2d Cir. 1975) (holding that the IRC does not "define[] a substantive right for the enforcement of which a remedy for the collection of profit-sharing benefits may be implied" and affirming dismissal of a "federal common law cause of action [ . . . ] implied from the" IRC and the Welfare Pension and Disclosure Act of 1958).

In doing so, this Court noted that "numerous courts ha[d] rejected similar claims of an implied right of action under Section 401." Sirna, 1997 WL 53194, at *3 (citing Reklau v. Merchants Nat'l Corp., 808 F.2d 628, 631 (7th Cir. 1986); Cowan v. Keystone Employee Profit Sharing Fund, 586 F.2d 888, 890 n.3 (1st Cir. 1978); Wiesner v. Romo Paper Products Corp., 514 F. Supp. 289, 291 n.2 (E.D.N.Y. 1981) (Neaher, J.) ).

Federal courts continue to hold that Section 401 "relate[s] solely to tax qualification" and does not create a private right of action. See, e.g., Perlman v. Fidelity Brokerage Servs. LLC, 932 F. Supp. 2d 397, 413–14 (E.D.N.Y. 2013) (Bianco, J.)  (granting

motion for summary judgment in favor of defendants). In fact, the IRC explicitly provides that (a) only the United States Tax Court may adjudicate whether a retirement plan is tax-exempt, and (b) only an employer, plan administrator, certain employees, and the Pension Benefit Guaranty Corporation may file such actions in that court. See Crawford v. Roane, 53 F.3d 750, 756 (6th Cir. 1995) (citing 26 U.S.C. § 7476).

### B.  SKAT Cannot Dress Up Section 401 Claims as Common-Law Torts

That SKAT's claims are not styled as "breach of Section 401" is irrelevant: Section 401 does not give rise to any "actionable duties, and any [argument] that it does is 'frivolous.'" See Burns v. Delaware Charter Guarantee & Trust Co., 805 F. Supp. 2d 12, 20 (S.D.N.Y. 2011) (Sweet, J.) (holding, inter alia, that Section 408 does not give rise to actionable duties) (citing Sirna, 1997 WL 53194, at *2); see also Lewis v. Delaware Charter Guarantee & Trust Co., No. 14-CV-1779 (KAM), 2015 WL 1476403, at *10–11 & n.10 (E.D.N.Y. Mar. 31, 2015) (Matsumoto, J.) (dismissing, inter alia, breach-of-contract claims where only non-conclusory allegation was that defendant breached IRC Section 408); Reynolds, 2010 WL 743510, at *7 (dismissing Federal Insurance Contributions Act claims where plaintiff alleged that defendants violated the IRC by failing to withhold and remit payroll taxes).

SKAT cannot plead around this prohibition by dressing up its Section 401 claims as common-law torts. See, e.g., Stamper v. Total Petroleum, Inc. Retirement Plan, 188 F.3d 1233, 1239 (10th Cir. 1999) (Section 401 and its implementing regulations "cannot form the basis of an ERISA action"); Suozzo v. Bergreen, No. 00 Civ. 9649 (JGK), 2003 WL 256788, at *2 (S.D.N.Y. Feb. 5, 2003) (Koetl, J.) (rejecting "plaintiff's attempt to recast his

[Section 401] claim as a breach of fiduciary duty" and ERISA); Sirna, 1997 WL 53194, at *1 (granting motion to dismiss various legal theories where sole alleged bases of federal jurisdiction arose under ERISA and IRC Sections 401 and 408).

SKAT's new allegations against the Goldstein Parties begin and end with its legal (and speculative) conclusion that the Goldstein Parties knew the Plan's activities violated Section 401, but submitted the Applications anyway. This Court should reject all claims premised on the Goldstein Parties' alleged violations of the Internal Revenue Code.

### III.    SKAT's Copy–Paste Pleadings Fail to Allege Fraud

To state fraud, a plaintiff must allege (1) misrepresentation of material fact, (2) falsity, (3) defendants' scienter, (4) justifiable reliance, and (5) resulting injury. MP Cool Investments Ltd. v. Forkosh, 142 A.D.3d 286, 290 (1st Dep't 2016) (citing Dembeck v. 220 Central Park S., LLC, 33 A.D.3d 491, 492 (1st Dep't 2006)). To satisfy Rule 9(b)'s heightened pleading requirement, SKAT also must allege "particulars [explaining why it] contends the statements were fraudulent." Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989) (citing Goldman v. Belden, 754 F.2d 1059, 1069–70 (2d Cir. 1985)).

Because ED&F Man has taken full responsibility for issuing the Disavowed Vouchers, the Court should dismiss any fraud claims against the Goldstein Parties arising out of those first four Goldstein Applications.

And even assuming that the Amended Complaint does properly allege misrepresentation of material fact, falsity, and resulting injury, SKAT fails to allege that any Goldstein Party made such a representation with the intent to deceive SKAT or "substantially assisted" any fraud against SKAT. SKAT also fails to allege that it

justifiably relied on any supposed misrepresentation. The Court should dismiss the fraud and aiding-and-abetting fraud claims that SKAT brings against all three Goldstein Parties. See Am. Compl. ¶¶ 63–74.

### A. The Amended Complaint Does Not Allege Scienter

SKAT cannot satisfy its burden to plead "a strong inference of fraudulent intent" by just "coupl[ing] a factual statement," such as Sheldon's, Scott's, and the Plan's relationships to each other, "with a conclusory allegation of fraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 304, 324 (2007) (quoting Robach v. Chang, 355 F.3d 164, 176 (2d Cir. 2004)) (alterations omitted) (dismissing fraud claims).

Instead, SKAT must plead non-conclusory facts that (1) show that each Goldstein Party had both motive and opportunity to commit fraud, or (2) comprise "strong circumstantial evidence of conscious misbehavior or recklessness." Credit All. Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 554 (1985) (citing DIMON Inc. v. Folium, Inc., 48 F. Supp. 2d 359, 372 (S.D.N.Y. 1999)); cf. Novak, 216 F.3d at 310 (Second Circuit courts analyze scienter identically in securities and common-law fraud claims).

While scienter is "the element most likely to be within the sole knowledge of the defendant and least amenable to direct proof," SKAT still must plead "facts from which it is possible to infer [each of the Goldstein Parties'] knowledge of the falsity of their statements" when they made them. MP Cool, 142 A.D.3d at 292 (quoting Houbigant, Inc. v. Deloitte & Touche, 303 A.D.2d 92, 98, 99 (1st Dep't 2003)) (alterations omitted). A complaint only "gives rise to a strong inference of scienter [ . . . ] if a reasonable person would deem the inference cogent and at least as compelling as any opposing inference

21

one could draw from the facts alleged.'" <u>Campo</u>, 635 F. Supp. 2d at 333 (citing <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 304, 324 (2007)).

### 1.  The Amended Complaint Does Not Plead Motive or Opportunity

"General allegations that a defendant entered into a contract with the intent not to perform are insufficient to support a fraud claim." <u>MBIA Ins. Corp. v. Countrywide Home Loans, Inc.</u>, 87 A.D.3d 287, 293 (1st Dep't 2011) (citations omitted). And the profit motive, without more, does not plead scienter. <u>See, e.g.</u>, <u>Novak</u>, 216 F.3d at 307 ("Plaintiffs could not proceed based on motive possessed by virtually all corporate insiders, including the desire to sustain the appearance of corporate profitability, or the success of the investment."). The Amended Complaint does not plead that any of the Goldstein Parties had motive or opportunity to defraud SKAT.

### 2.  SKAT Does Not Show Strong Circumstantial Evidence of Scienter

The Amended Complaint also fails to plead "strong circumstantial evidence of conscious misbehavior or recklessness." <u>See</u> <u>Arthur Andersen</u>, 65 N.Y.2d at 554. It is not enough to plead "enhanced negligence:" SKAT must allege "knowing, intentional, or extreme behavior." <u>In re JP Morgan Chase Sec. Litig.</u>, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005) (Stein, J.); <u>In re Livent, Inc. Sec. Litig.</u>, 148 F. Supp. 2d 331, 351 (S.D.N.Y. 2001) (Marrero, J.).

To show "conscious misbehavior" or "recklessness," SKAT must allege "clear" facts that the Goldstein Applications "could not possibly succeed" or be lawful. <u>See</u> <u>In re DRDGOLD Ltd. Sec. Litig.</u>, 472 F. Supp. 2d 562, 570, 573 (S.D.N.Y. 2007) (Marrero, J.) (citations omitted); <u>cf.</u> <u>Waterscape Resort LLC v. McGovern</u>, 107 A.D.3d 571, 571–72 (1st

Dep't 2013) ("plaintiff's affidavit stating that 'it is inconceivable that [defendants] were unaware that PMG had not obtained Subguard Insurance for [the subcontractor's] work' was insufficient to establish scienter in this case."); Pope v. Saget, 29 A.D.3d 437, 447 (1st Dep't 2006) (dismissing fraud claim where "plaintiffs fail[ed] to allege in other than conclusory terms" that at worst, defendant carelessly executed a routine business transaction).

At bare minimum, SKAT must allege how or why the Goldstein Parties should have known that the Goldstein Applications were untrue. See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196–97 (2d Cir. 2008); Credit All. Corp., 65 N.Y.2d at 554 (dismissing fraud claim against Arthur Andersen where complaint alleged that the accountancy had "recklessly disregarded facts" but failed to plead that accountancy had actual knowledge of contravening facts).

The Amended Complaint does not plead any facts available to the Goldstein Parties that should have changed their behavior, let alone that the Goldstein Parties actually knew of those facts. See In re DRDGOLD, 472 F. Supp. 2d at 572 (complaint must allege facts showing "the defendants knew or should have known better"). Without such allegations, it is at least as likely that the Goldstein Parties acted in good faith in agreeing to routine dividend arbitrage investments. See id., 472 F. Supp. at 573 (citations omitted) (dismissing securities fraud claims where, inter alia, allegedly-fraudulent activity "may have been caused by intentional fraud or recklessness," but "could well [have] be[en] the products of negligence or mismanagement.") (quoting In re Bisys Sec. Litig., 397 F. Supp. 2d 430, 448 (S.D.N.Y. 2005) (Kaplan, J.)).

Nor does—or could—the Amended Complaint allege that dividend arbitrage trading and refund applications are *per se* unlawful, let alone that the Goldstein Parties knew or should have known they were. See, e.g., Rabin v. Nasdaq OMX PHLX, 15-cv-00551, Fed. Sec. L. Rep. P 99073 (E.D. Pa. Apr. 21, 2016). For example, the Rabin plaintiff alleged that defendants, including Nasdaq and various market-makers, committed fraud by engaging in "dividend play" transactions significantly more complicated than those involved in this case. While the Court found it was "certainly **possible** to infer the [defendants] acted with an intent to deceived by engaging in the dividend plays," the Court granted the motion to dismiss because it was "**equally** plausible that [the d]efendants believed they were engaging in a completely legal trading strategy." Id. (emphasis in original).

Most relevant here, Judge McHugh noted:

It weighs heavily in [the d]efendants' favor that the dividend trading strategy [p]laintiff challenges here has been widely publicized. There is little doubt that financial industry regulators knew about the strategy and did not forbid it in the [relevant] Exchange.

Id. (citing Jia Hao, Ex-dividend Arbitrage in Option Markets, 23 The Review of Fin. Studies 1 at 272 (2010); Dividend Trade Strategies in the U.S. Options Industry, International Securities Exchange Whitepaper (March 2010); Securities and Exchange Commission, Self-Regulatory Organizations; The Options Clearing Corporation; Notice of Filing of Proposed Rule Change to Process All Sell Transactions Prior to the Exercise of Long Options in Market-Maker Accounts to Ensure that Only Net Long Positions May Be Exercised, Exchange Act Release No. 34-72677, 79 FR 44480, 44481 (July 31, 2014)

("dividend plays are an options trading strategy that has been executed for many years.").

As in <u>Rabin</u>, here, it should "weigh[] heavily in [the d]efendants' favor that the dividend trading strategy [p]laintiff challenges here has been widely publicized." <u>Id.</u> "There is little doubt that [SKAT] knew about the strategy and did not forbid it." <u>Id.</u> SKAT fails to plead any facts suggesting why the Goldstein Parties should have believed that their investments were unlawful.

**B.  SKAT Failed to Take "Reasonable Steps to Protect Itself from Deception"**

Because dividend arbitrage's risks and SKAT's own systemic failings were notorious, SKAT cannot allege that it reasonably relied on the Goldstein Plan's alleged misrepresentations. <u>See, e.g.</u>, <u>L.L. Capital Partners, L.P. v. Rockefeller Center Properties, Inc.</u>, 921 F. Supp. 1174, 1184 (S.D.N.Y. 1996) (Kaplan, J.) (dismissing securities fraud claims where, <u>inter alia</u>, plaintiffs "could [not] argue with straight faces" that they did not know of warning signs").

New York law analyzes justifiable reliance by considering "the degree to which the truth was accessible to the defrauded person." <u>Banque Franco-Hellenique de Commerce Int'l et Maritime, S.A. v. Christophedes</u>, 106 F.3d 22, 26 (2d Cir. 1997). A sophisticated party like SKAT must allege the "reasonable steps [that it took] to protect itself against deception." <u>DDJ Mgmt., LLC v. Rhone Group LLC</u>, 15 N.Y.3d 147, 154 (2010).

While "reasonable reliance is not generally a question to be resolved as a matter of law on a motion to dismiss," ACA Fin. Guar. Corp. v. Goldman, Sachs & Co., 25 N.Y.3d 1043, 1045 (2015),

> It is well established that if the facts represented are not matters peculiarly within the defendant's knowledge, and the plaintiff has the means available to it of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, the plaintiff must make use of those means, or it will not be heard to complain that it was induced to enter into the transaction by misrepresentations.

Id. at 1044–45 (quoting Schumaker v. Mather, 133 N.Y. 590, 596 (1892) (alterations omitted)).

Furthermore, since SKAT "ha[d] hints of [the allegedly-fraudulent statements'] falsity, a heightened degree of diligence [wa]s required." Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V., 17 N.Y.3d 269, 279 (2011) (citing Global Mins. & Metals Corp. v. Holme, 35 A.D.3d 93, 100 (1st Dep't 2006)); accord Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1543 (2d Cir. 1997) ("It is well-established that where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance") (citation and alterations omitted); Banque Franco-Hellenique, 106 F.3d at 27 ("While the law does not require that a defrauded party go to the ends of the earth to discover the falsity of a statement, patent foolishness is not excused.").

SKAT does not plead facts showing that it fulfilled its own duties to verify the Goldstein Applications' "true nature and real quality." MP Cool, 142 A.D. at 291; see also, e.g., RKA Film Fin., LLC v. Kavanaugh, 171 A.D.3d 678, 679 (1st Dep't 2019) ("Plaintiff

could not have justifiably relied on the misrepresentations regarding Relativity's financial health in agreeing to engage in the investment, as plaintiff, a sophisticated investor, did not demonstrate that it fulfilled its affirmative obligation to verify the nature and quality of its investment).

SKAT's own supervisors, among others, "placed [it] on guard or practically faced [it] with the facts" that its tax refund process and procedures were woefully inadequate. Banque Franco-Hellenique, 106 F.3d at 27 (quoting Mallis v. Bankers Trust, 615 F.2d 68, 81 (2d Cir. 1980), abrogation on other grounds recognized, Crigger v. Fahnestock and Co., Inc., 443 F.3d 230, 234 (2d Cir. 2006)); see also, e.g., MP Cool, 142 A.D.3d at 287 (no justifiable reliance "because plaintiff is a sophisticated investor that had the means available to it to learn the true nature and real quality of the investment it made").

SKAT is not a "simple or untutored" plaintiff that warrants the Court's indulgence; it is the sophisticated, if flawed, Danish governmental body entrusted with the power to levy and enforce Danish taxes. See, e.g., Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 737 (2d Cir. 1984) ("New York courts are particularly disinclined to entertain claims of justifiable reliance" brought by sophisticated entities that fail to take advantage of access to critical information).

Had SKAT heeded any of the market's—or even its own—warnings, we would not be here today. See Fahnestock, 443 F.3d at 235 ("A plaintiff cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable reliance without making inquiry and investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or truth about an investment."). SKAT's refusal to take "obvious reasonable

steps to protect [itself] against deception" is fatal to its fraud claims. See DDJ Mgmt, 15 N.Y.3d at 154.

### C. SKAT Fails to Plead that the Goldstein Parties Knew of Any Fraud, Let Alone "Substantially Assisted" It

To plead aiding-and-abetting fraud, SKAT must sufficiently allege fraud, plus the aider-and-abettor's (1) "actual knowledge" of the fraud and (2) "substantial assistance" thereof. Silvercreek Mgmt., Inc. v. Citigroup, Inc., 346 F Supp. 3d 473, 478 (S.D.N.Y. 2018) (Oetken, J.).

As discussed supra, SKAT has failed to plead that any Goldstein Party was even remotely involved in or aware of the Shah Scheme. The ED&F Strategy also cannot support aiding-and-abetting liability: SKAT has accused ED&F Man of negligence and unjust enrichment, not fraud. Thus, the only alleged "fraud" that the Goldstein Parties could have aided-and-abetted was their own—but SKAT cannot allege both claims.

SKAT also has failed to plead "substantial assistance:" that any Goldstein Party made "a substantial contribution to the perpetration of the fraud" by "affirmatively assist[ing], help[ing] conceal," or, when under a duty to do otherwise, "failing to act." Silvercreek, 346 F Supp. 3d at 478. Although substantial assistance "can take many forms, such as executing transactions or helping a firm to present an enhanced financial picture to others," id., in the banking context, "[t]he affirmative acts of opening accounts, approving various transfers, and then closing accounts on the basis of suspected fraud, without more, do not constitute substantial assistance." See, e.g., Dubai Islamic Bank v. Citibank, N.A., 256 F. Supp. 2d 158, 167 (S.D.N.Y. 2003) (Berman, J.).

Here, SKAT does not even claim that the Goldstein Parties directed ED&F Man's execution of the Goldstein Transactions: they merely granted Acer the authority to interact with ED&F Man. See Am. Compl. ¶¶ 61–62. Nor do Sheldon's and Scott's legal status as the authorized representative and beneficiaries of the Plan elevate their conduct into "substantial assistance:" legal titles and positions are, at best, legal conclusions, not facts that allege wrongful conduct.

## IV. SKAT Cannot Claim Negligent Misrepresentation Because the Goldstein Parties Never Owed SKAT a "Special Duty"

This Court should dismiss the Amended Complaint's negligent misrepresentation claim because SKAT has not pleaded and cannot plead a "confidential," "fiduciary," or other "special relationship of trust and confidence" between it and any of the Goldstein Parties. Compare Silvers v. State, 68 A.D.3d 668, 669 (1st Dep't 2009) (affirming dismissal of negligent misrepresentation claim brought by insurance broker against New York State Insurance Fund); and, e.g., Am. Compl. ¶¶ 89–93.

"It is well-settled that a claim for negligent misrepresentation requires a plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 180 (2011) (citations omitted).

SKAT's own malfeasance and inaction render it unable to plead reasonable reliance. See supra Argument § III(B).

SKAT also has failed to plead that the Goldstein Parties had "unique or specialized expertise" or were in "special position[s] of confidence and trust with [SKAT]" that could

justify SKAT's supposed reliance. See Dobroshi v. Bank of Am., N.A., 65 A.D.3d 882, 884 (1st Dep't 2009); accord, e.g., Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 158 (2d Cir. 1995) (citations omitted) ("Under New York law, a plaintiff may not recover for negligent misrepresentation in the absence of a special relationship of trust or confidence between the parties.").

### A.  SKAT Did Not Have a "Special Relationship" with Any Goldstein Party

Courts generally refuse to find a negligent misrepresentation claim unless the parties have "create[d] their own relationship of higher trust" with each other. EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 19–20 (2005) (citation and alterations omitted). Because SKAT alleges "nothing more than an arm's-length business arrangement between sophisticated and experienced parties," it fails to plead the "special relationship" necessary to state a negligent misrepresentation claim. See Amusement Indus. v. Stern, 786 F. Supp. 2d 758, 778–79 (S.D.N.Y. 2011) (Kaplan, J.); see also, e.g., Prime Mover Capital Partners L.P. v. Elixir Gaming Technologies, 898 F. Supp. 2d 673, 676 (S.D.N.Y. 2012) (Kaplan, J.) (dismissing negligent misrepresentation claim where plaintiff failed to allege "a closer degree of trust between the parties than that of the ordinary" arm's-length transaction).

Here, SKAT alleges no special relationship at all, pleading that its only contacts with the Goldstein Parties were the eight Goldstein Applications. See generally Am. Compl. But "courts regularly hold as a matter of law that an arm's-length business arrangement between sophisticated and experienced parties cannot give rise to a 'special relationship.'" Fed. Hous. Fin. Agency v. UBS Americas, Inc., 858 F. Supp. 2d 306, 334–35

(S.D.N.Y. 2012) (Cote, J.), <u>aff'd</u>, 712 F.3d 16 (2d Cir. 2013); <u>Greentech Research LLC v. Wissman</u>, 104 A.D.3d 540, 540–41 (1st Dep't 2013) (dismissing negligent misrepresentation claim for failure to plead special relationship).

Even arm's-length transactions significantly more continuous and intimate do not create the "privity" necessary to state a negligent misrepresentation claim. <u>RKA Film</u>, 171 A.D.3d at 680 (citations omitted). For example, New York courts have found privity lacking where the relationship is between borrowers and lenders, <u>id.</u>, 171 A.D.3d at 680; plaintiffs allegedly had met with and obtained advice on a painting from an auction house representative, <u>Ravenna v. Christie's Inc.</u>, 289 A.D.2d 15, 16 (1st Dep't 2001); and in general banking relationships, <u>Banque Arabe</u>, 57 F.3d at 158.

SKAT's Amended Complaint presents just another case of an arm's-length transaction gone awry—not one in which any of the Goldstein Parties abused a "special position of confidence and trust with the injured party" that could justify SKAT's alleged reliance. <u>See</u> <u>Dobroshi</u>, 65 A.D.3d at 884.

### B. SKAT Did Not Rely on Any Special Expertise of the Goldstein Parties

Nor does SKAT allege that the Goldstein Parties communicated "special expertise [ . . . ] to induce [SKAT] to trust them." <u>See</u> <u>Stern</u>, 786 F. Supp. 2d at 779 (citing <u>MBIA Ins. Co.</u>, 914 N.Y.S.2d at 611). The only possibly-relevant knowledge that SKAT does plead are its allegations that the Goldstein Parties knew they were submitting false documents and knew that they were not IRC-qualified pension plans. <u>See</u> Am. Compl. ¶¶ 39–48.

But neither "superior knowledge of alleged wrongdoing," nor even "admitted wrongdoing," "is the type of unique or specialized expertise" necessary to claim

negligent misrepresentation. <u>RKA Film</u>, 171 A.D.3d at 680 (quoting <u>Greentech</u>, 104 A.D.3d at 540–41). Superior knowledge of one's own corporate structure or transactions also does not state the requisite "superior knowledge." <u>MBIA Ins. Co.</u>, 914 N.Y.S.2d at 611.

SKAT simply pleads no facts "creating an 'exceptional situation' that would justify departure from the usual judicial 'disfavor' for finding a special relationship between two parties." <u>See</u> <u>Moslem v. Parietti & McGuire Ins. Agency</u>, No. 07 Civ. 7962, 2011 WL 721653, at *4 (S.D.N.Y. Feb. 24, 2011) (Schiendlin, J.).

## V.   SKAT's Equitable Claims are Unjust

SKAT also alleges money had and received, unjust enrichment, and payment by mistake against all three Goldstein Parties (the "**Equitable Claims**"). <u>See</u> Am. Compl. ¶¶ 75–88. Though New York courts do not agree on whether these causes of action are exactly coterminous, they all have the same "essential inquiry:" "whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." <u>T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.</u>, No. 10-CV-2843 JG ARL, 2010 WL 4038826, at *4 (E.D.N.Y. Oct. 14, 2010) (Gleeson, J.) (citations omitted).

Because SKAT's own negligence caused it to pay refunds, and because—especially after initiating this sweeping, multi-jurisdictional litigation—in doing so, SKAT caused the Goldstein Parties to change their positions to their detriment, SKAT can state no Equitable Claim. <u>See</u> <u>In re Caldor, Inc.-NY</u>, 217 B.R. 121, 136 (Bankr. S.D.N.Y. 1998) (Garrity, J.) (granting summary judgment dismissing complaint).

Furthermore, the Equitable Claims cannot be "catchall cause[s] of action to be used when others fail"—they are "available only in unusual situations when, though the defendant has not breached a contract nor committed a recognize tort, circumstances create an equitable obligation running from the defendant to the plaintiff." Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 790 (2012) (analyzing unjust enrichment). For example, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Id.

But here, SKAT has failed to allege any non-tortious reason why the Goldstein Parties should return the tax refunds. Therefore, the Court should dismiss all three Equitable Claims. See, e.g., Weisblum v. Prophase Labs, Inc., No. 14-CV-3587, 2015 WL 732112, at *11 (S.D.N.Y. Feb. 20, 2015) (Furman, J.) (dismissing unjust enrichment as duplicative of negligent misrepresentation and fraud claims); Stoltz v. Fage Dairy Processing Indus., S.A., No. 14-cv-3826 (MKB), 2015 WL 5579872, at *27 (E.D.N.Y. Sept. 22, 2015) (Brodie, J.) (dismissing unjust enrichment as duplicative of negligent misrepresentation claim); Ebin v. Kangadis Food Inc., No. 13 Civ. 2311(JSR), 2013 WL 6504547, at *6 (S.D.N.Y. Dec. 11, 2013) (Rakoff, J.) (dismissing unjust enrichment as duplicative of negligent misrepresentation and fraud claims).

## VI.    SKAT Does Not Plead Sheldon's or Scott's Wrongful Intent or Conduct

Finally, SKAT has failed to allege any element of any of its claims against Scott or Sheldon Goldstein.

SKAT pleads that Scott "was one of two participants in the [Goldstein] Plan," shares a residential address with the Plan and is Sheldon's son. Am. Compl. ¶¶ 19, 48. SKAT alleges that "Sheldon Goldstein was one of two participants in and served as the Authorized Representative" of the Plan, is Scott's father, and executed power of attorneys giving its vendors authority to conduct the Goldstein Transactions. Id. ¶¶ 18, 50–51. SKAT also claims that Scott and Sheldon executed documents despite knowing "that the plan was not properly funded, was not established for the exclusive benefit of its sponsor's employees, and was not entitled to a refund under the Treaty." Id. ¶¶ 48, 52.

The only wrongdoing that SKAT alleges against either man is conclusory and speculative. Am. Compl. ¶ 47 ("On information and belief, Defendants Sheldon and Scott Goldstein caused Defendant Goldstein Law Group's fraudulent refund claims to be submitted to SKAT. Defendants Sheldon and Scott Goldstein exerted control over Defendant Goldstein [Plan] as the plan's sole participants, and used this control to commit the fraud on SKAT.").

These conclusory allegations of Sheldon's and Scott's biographical information and legal relationships are insufficient to plead any element of SKAT's claim against them, let alone every element of all six claims. The Court should dismiss all claims against Sheldon and Scott.

## CONCLUSION

Five years after it began investigating the Shah Scheme, and two years into this case—after extensive discovery here and abroad—SKAT still does not plead facts showing that any Goldstein Party broke the law, let alone did so intentionally. It would be unjust to allow SKAT's scorched-earth investigation to sweep up the Goldstein Parties any longer.

Therefore, the Goldstein Parties respectfully request that this Court dismiss the Amended Complaint pursuant to Rule 12(b)(6), with prejudice.

Dated: New York, New York
       July 3, 2020

GUSRAE KAPLAN NUSBAUM PLLC

By: /s/ Martin H. Kaplan
Martin H. Kaplan
Kari Parks
120 Wall Street
New York, New York 10005
Telephone: (212) 269-1400
Fax: (212) 809-5449
mkaplan@gusraekaplan.com
kparks@gusraekaplan.com

*Counsel for Defendants The Goldstein Law Group PC 401(K) Profit Sharing Plan, Sheldon Goldstein, and Scott Goldstein*