Exhibit 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to 1:18-CV-05053-LAK. | MASTER DOCKET<br><br>Case No. 1:18-MD-02865-LAK<br><br>**Jury Trial Demanded** |

**DEFENDANTS THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN'S AND SHELDON GOLDSTEIN'S AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS AGAINST SKATTEFORVALTNINGEN AND AMENDED THIRD-PARTY COMPLAINT AGAINST ED&F MAN CAPITAL MARKETS, LTD. AND JOHN DOES 1–10**

Defendants the Goldstein Law Group PC 401(K) Profit Sharing Plan (the "Plan") and Sheldon Goldstein (collectively, the "Goldstein Parties"), by their attorneys Gusrae Kaplan Nusbaum PLLC, answer the complaint (the "Complaint") as follows:

<u>**GENERAL DENIAL**</u>

The Complaint contains allegations that pertain to the conduct of other unnamed entities that applied for Danish tax refunds.[1] Unless otherwise expressly admitted or denied, the Goldstein Parties deny such allegations because they lack knowledge or information sufficient to form a belief regarding the truth of these allegations. No answer is required to these allegations or other allegations that pertain to Danish withholding tax

---

[1] The Complaint contains allegations referring to conduct of unnamed entities, referred to in the Complaint as "claimants," that purportedly submitted fraudulent applications for repayment of taxes withheld from dividends paid on shares of Danish companies. Compl. ¶¶ 4–7; 9; 11; 23–24; 26–28; 32–36; 39; 41–45.

or the Danish Withholding Tax Act Convention and Protocol between the United States and Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, U.S.–Den., art. ¶¶ 10(3)(c), 22(2)(e), May 6, 1948, S. Treaty Doc. No. 106-12 (effective date Jan. 1, 2001) (the "Double-Taxation Treaty"), which call for legal conclusions.

### SPECIFIC RESPONSES

1.       The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 1.

2.       Paragraph 2 asserts legal conclusions to which no response is required. To the extent that a response is required, Paragraph 2 is denied.

3.       Paragraph 3 asserts legal conclusions to which no response is required. To the extent that a response is required, Paragraph 3 is denied.

4.       The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 4, except deny the allegations to the extent they purport to implicate the Goldstein Parties in wrongful conduct.

5.       The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 5, except deny the allegations that the Plan knowingly submitted fraudulent requests for tax refunds to Plaintiff Skatteforvaltningen ("SKAT").

6.       The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 6, except deny the allegations to the extent they purport to implicate the Goldstein Parties in wrongful conduct.

7.      The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 7, except deny the allegations to the extent they purport to implicate the Goldstein Parties in wrongful conduct.

8.      The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 8, except aver that Plaintiff has wrongfully withheld no less than DKK 1,080,000 to which the Goldstein Parties are rightfully entitled, as detailed _infra_ in the Goldstein Parties' Counterclaims.

9.      The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 9, except deny the allegations to the extent they purport to implicate the Goldstein Parties in wrongful conduct.

10.      The Goldstein Parties deny the allegations of Paragraph 10.

11.      The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 11, except deny the allegations to the extent they purport to implicate the Goldstein Parties in wrongful conduct.

12.      The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 12.

13.      The Goldstein Parties deny the allegations of Paragraph 13.

14.      The Goldstein Parties admit the allegations of Paragraph 14.

15.      The Goldstein Parties admit the allegations of Paragraph 15.

16.      The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 16.

17.     The Goldstein Parties admit the allegations of Paragraph 17, except deny the allegations to the extent that they suggest that the Plan was not a bona fide trust forming part of a pension plan qualified and exempt from taxation under the U.S. Internal Revenue Code and resident of the United States of America for purposes of U.S. taxation. The Plan is, indeed, a bona fide trust forming part of a pension plan qualified under Section 401(a) of the U.S. Internal Revenue Code, exempt from taxation under Section 501(a) of the U.S. Internal Revenue Code, and resident of the United States of America for purposes of U.S. taxation.

18.     The Goldstein Parties admit the allegations of Paragraph 18.

19.     Paragraph 19 asserts legal conclusions to which no response is required. To the extent that a response is required, the Goldstein Parties admit the allegations of Paragraph 19.

20.     Paragraph 20 asserts legal conclusions to which no response is required. To the extent that a response is required, the Goldstein Parties admit the allegations of Paragraph 20.

21.     Paragraph 21 asserts legal conclusions to which no response is required. To the extent that a response is required, the Goldstein Parties admit the allegations of Paragraph 21.

22.     Paragraph 22 asserts legal conclusions to which no response is required. To the extent that a response is required, the Goldstein Parties admit the allegations of Paragraph 22.

23.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 23, except deny the allegations to the extent that they suggest that the Goldstein Parties did not actually own the relevant shares giving rise to the claims filed with SKAT. The Goldstein Parties only knowingly submitted refund claims for taxes paid on shares that the Goldstein Parties owned at the time of the relevant dividends.

24.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 24, except aver that the Goldstein Parties purchased the relevant shares and applied for the concomitant tax refunds in reliance on SKAT's "normal practice [of] accept[ing] claims from designated payment agents and[] transmit[ting] refunds to claimants through their designated payment agents."

25.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 25, except deny the allegations to the extent they purport to implicate the Goldstein Parties in wrongful conduct.

26.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 26, except deny the allegations to the extent they purport to implicate the Goldstein Parties in wrongful conduct.

27.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 27, except deny the allegations to the extent they purport to implicate the Goldstein Parties in wrongful conduct.

28.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 28, except admit that the Goldstein Parties submitted to SKAT similar documentation of the Plan's ownership of shares and payment of tax on dividends when applying for tax refunds.

29.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 29.

30.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 30, except aver that the Plan purchased the relevant shares and applied for the concomitant tax refunds in reliance on SKAT's "practice to pay claims that included the required supporting documentation."

31.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 31, except admit that SKAT properly refunded the Plan for eight of the nine refund claims that the Plan made to SKAT.

32.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 32.

33.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 33 of the Complaint, except admit that the Plan made nine withholding tax refund claims to SKAT through its reclaim agent, Goal Taxback Ltd. ("Goal").

34.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 34 of the Complaint, except deny

that the Goldstein Parties knowingly made any "fraudulent claims" to SKAT; admit that the Plan "represented that Goldstein was its Authorized Representative and agent who had authority to act on its behalf with respect to Defendant Goldstein Law Plan's claims;" and deny any implication that such representation was false.

35.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations in Paragraph 35 of the Complaint, except deny that the Goldstein Parties knowingly made any "fraudulent claims" to SKAT; admit that the Plan "represented that non-party Goal was its agent and had authority to act on its behalf with respect to its claims;" and deny any implication that such representation was false.

36.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of Paragraph 36, except admit that the Plan made nine separate withholding tax refund claims totaling approximately DKK 11,343,510 on or around March 26, 2014; April 4, 2014; May 2, 2014; May 6, 2014; December 10, 2014; March 3, 2015; March 4, 2015; March 26, 2015; and August 10, 2015; and deny any implication that any claim made by the Goldstein Parties was fraudulent or otherwise knowingly or intentionally wrongful.

37.     The Goldstein Parties deny the allegations of Paragraph 37.

38.     The Goldstein Parties deny the allegations of Paragraph 38. The Goldstein Parties admit that the Plan received refund payments from SKAT on or around April 30, 2014; May 2, 2014; January 20, 2015; and May 18, 2015.

39.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of Paragraph 39, except admit that the Plan granted Goal authority to submit refund claims to SKAT on the Plan's behalf.

40.     Paragraph 40 purports to summarize a document that speaks for itself. To the extent that a response is required, the Goldstein Parties admit the allegations of Paragraph 40.

41.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 41, except deny that the Goldstein Parties ever knowingly directed anyone to submit fraudulent withholding tax refund claims.

42.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of Paragraph 42, except admit that the Plan authorized Goal to submit tax refund claims on its behalf, and deny any implication that they ever knowingly authorized anyone to submit fraudulent claims on their behalf.

43.     Paragraph 43 purports to summarize documents that speak for themselves. To the extent that a response is required, the Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of Paragraph 43, except admit that Goal submitted cover letters attaching documentation similar to that summarized in Paragraph 28.

44.     Paragraph 44 purports to summarize documents that speak for themselves. To the extent that a response is required, the Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph

44, except admit that Goal submitted cover letters attaching documentation similar to that summarized in Paragraph 28.

45.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 45, except admit that the Plan received proceeds from eight of the refund claims submitted to SKAT, and deny that said claims were knowingly fraudulent or that the Goldstein Parties were "participants in the fraud."

46.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 46, except admit that tax vouchers reflecting the Plan's ownership of the relevant shares were prepared by ED&F Man Capital Markets, Ltd. and submitted with each refund claim to SKAT.

47.     Paragraph 47 purports to summarize a document that speaks for itself. To the extent that a response is required, the Goldstein Parties admit the allegations of Paragraph 47.

48.     The Goldstein Parties deny the allegations of Paragraph 48.

49.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations of Paragraph 49, except deny that any refund claims submitted by the Plan were knowingly fraudulent, and admit that SKAT refused to refund the Plan for one of its claims and demanded repayment of the refunds SKAT had already paid to the Plan.

## CAUSES OF ACTION

### COUNT I
### (Fraud – Against both Defendants)

50.     In response to Paragraph 50, the Goldstein Parties repeat and reallege their foregoing responses as if fully set forth herein.

51.     The Goldstein Parties deny the allegations of Paragraph 51.

52.     The Goldstein Parties deny the allegations of Paragraph 52.

53.     The Goldstein Parties deny the allegations of Paragraph 53.

54.     The Goldstein Parties deny the allegations of Paragraph 54.

### COUNT II
### (Aiding and Abetting Fraud – Against both Defendants)

55.     In response to Paragraph 55, the Goldstein Parties repeat and reallege their foregoing responses as if fully set forth herein.

56.     The Goldstein Parties lack knowledge or information sufficient to form a belief regarding the truth of the allegations in paragraph 56 of the Complaint, except deny any implication that the Goldstein Parties knowingly perpetrated, indirectly or directly, any fraud on SKAT.

57.     The Goldstein Parties deny the allegations of Paragraph 57.

58.     The Goldstein Parties deny the allegations of Paragraph 58.

59.     The Goldstein Parties deny the allegations of Paragraph 59.

60.     The Goldstein Parties deny the allegations of Paragraph 60.

61.     The Goldstein Parties deny the allegations of Paragraph 61.

## COUNT III
### (Payment by Mistake – Against Both Defendants)

62.     In response to Paragraph 62, the Goldstein Parties repeat and reallege their foregoing responses as if fully set forth herein.

63.     The Goldstein Parties deny the allegations of Paragraph 63.

64.     The Goldstein Parties deny the allegations of Paragraph 64.

65.     The Goldstein Parties deny the allegations of Paragraph 65.

66.     The Goldstein Parties deny the allegations of Paragraph 66.

67.     The Goldstein Parties deny the allegations of Paragraph 67.

## COUNT IV
### (Unjust Enrichment – Against both Defendants)

68.     In response to Paragraph 68, the Goldstein Parties repeat and reallege their foregoing responses as if fully set forth herein.

69.     The Goldstein Parties deny the allegations of Paragraph 69

70.     The Goldstein Parties deny the allegations of Paragraph 70.

71.     The Goldstein Parties deny the allegations of Paragraph 71.

72.     The Goldstein Parties deny the allegations of Paragraph 72.

## COUNT V
### (Money Had and Received – Against Both Defendants)

73.     In response to Paragraph 73, the Goldstein Parties repeat and reallege their foregoing responses as if fully set forth herein.

74.     The Goldstein Parties deny the allegations of Paragraph 74.

75.     The Goldstein Parties deny the allegations of Paragraph 75.

## COUNT VI
### (Negligent Misrepresentation – Against Both Defendants)

76.     In response to Paragraph 76, the Goldstein Parties repeat and reallege their foregoing responses as if fully set forth herein.

77.     The Goldstein Parties deny the allegations of Paragraph 77.

78.     The Goldstein Parties deny the allegations of Paragraph 78.

79.     The Goldstein Parties deny the allegations of Paragraph 79.

80.     The Goldstein Parties deny the allegations of Paragraph 80.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

81.     The Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

82.     Plaintiff's claims are barred, in whole or in part, under the doctrines of laches, waiver, and/or ratification.

### THIRD AFFIRMATIVE DEFENSE

83.     Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to join necessary and indispensable parties.

### FOURTH AFFIRMATIVE DEFENSE

84.     Plaintiff's claims are barred, in whole or in part, because any and all losses sustained were due to Plaintiff's own acts and/or omissions.

## FIFTH AFFIRMATIVE DEFENSE

85.     Plaintiff's claims are barred, in whole or in part, under the doctrines of accord and satisfaction.

## SIXTH AFFIRMATIVE DEFENSE

86.     Plaintiff's claims are barred, in whole or in part, under the doctrine of estoppel.

## SEVENTH AFFIRMATIVE DEFENSE

87.     Plaintiff's claims for equitable relief are barred, in whole or in part, by the doctrine of unclean hands and Plaintiff's bad faith in initiating its suit in this jurisdiction while, upon information and belief, Plaintiff is simultaneously pursuing remedies for the same allegations contained in the Complaint in foreign jurisdictions and referring the same and / or similar allegations contained in the Complaint to other agencies in other jurisdictions for identical and / or substantially similar relief.

## EIGHTH AFFIRMATIVE DEFENSE

88.     Plaintiff's claim for unjust enrichment seeks to recover damages that Plaintiff is not entitled to recover in this case and award of the judgment sought by Plaintiff would unjustly enrich Plaintiff.

## NINTH AFFIRMATIVE DEFENSE

89.     Defendant reserves the right to add additional Affirmative Defenses as may become apparent during the course of this litigation.

## DEFENSES

### FIRST DEFENSE

90.     Plaintiff's claims are barred as the Goldstein Parties did not knowingly
participate in any fraudulent scheme or other wrongful conduct. Demonstrative of the
lack of any wrongful conduct by the Goldstein Parties are, <u>inter alia</u>, the following:

    **a.**  All transactions in Danish securities were arranged and executed by ED&F Man Capital Markets Ltd. ("ED&F Man" or the "Brokerage"), a registered broker–dealer subject to the rule of law governing broker–dealers in the United Kingdom, which issued various confirmations and written verifications of the transactions for the Plan;

    **b.**  In the United States, the use of derivative securities and other arbitrage strategies is legal and routine in securities markets;

    **c.**  Neither of the Goldstein Parties had any control over ED&F Man's internal procedures nor was in any way, directly or indirectly, involved in the custody and control of the Danish securities that the Plan transacted in its brokerage account at ED&F Man. The Goldstein Parties relied on the excellent reputation of ED&F Man and the laws of the United Kingdom and United States and had no reason to believe that ED&F Man would inaccurately represent the Plan's ownership of the relevant Danish securities or payment of the relevant Danish taxes. The course of activity relating to the trading and arbitrage activity in the Plan's ED&F Man account was similar to various arbitrage strategies developed and used in the United States securities markets.

### SECOND DEFENSE

91.     The claims are barred, in whole or in part, because at all times the Goldstein
Parties acted with reasonable care with respect to the matters alleged in the Complaint,
including, but not limited to, those matters represented in the Plan's applications
claiming repayment of tax withheld on dividends earned on shares of Danish companies
(the "Reclaim Applications"). Relying on ED&F Man's compliance with U.K. laws and

regulations, the Goldstein Parties had reasonable grounds to believe, and did believe, that the Reclaim Applications were true.

### THIRD DEFENSE

92.     Plaintiff's claims are barred, in whole or in part, because neither of the Goldstein Parties acted to induce any act or acts alleged in the Complaint to constitute any fraud.

### FOURTH DEFENSE

93.     The Goldstein Parties hereby reserve and assert all defenses and affirmative defenses available under any applicable federal or state law. The Goldstein Parties have insufficient knowledge or information upon which to form a belief regarding whether they may have available other defenses or affirmative defenses. The Goldstein Parties reserve their right to assert any additional defenses or affirmative defenses that discovery indicates may be appropriate.

**COUNTERCLAIMS AGAINST SKATTEFORVALTNINGEN AND
THIRD-PARTY CLAIMS AGAINST
ED&F MAN CAPITAL MARKETS, LTD. AND JOHN DOES 1–10**

As and for their counterclaims against SKAT and third-party claims against ED&F Man and John Does 1–10, the Goldstein Parties respectfully allege:

94.     This action is one of hundreds filed by SKAT throughout the United States, consolidated for pre-trial purposes into this multi-district litigation in the Southern District of New York (the "MDL").

95.     SKAT alleges that the MDL defendants engaged in a scheme to wrongfully obtain tax refunds from SKAT by falsely representing that (a) they owned shares in Danish companies and received dividends issued by them, (b) the issuer had withheld Danish taxes on the dividends received by the MDL defendants, and (c) as tax-exempt entities, the MDL defendants were entitled to refunds pursuant to the Double-Taxation Treaty. See Dkt. 37, Transfer Order, In re: Customs and Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Scheme Litigation, 18-md-2865 (Oct. 3, 2018); see also, e.g., Compl. ¶¶ 3–4, 22 n.2, 37.

96.     SKAT's counsel has told the Court that SKAT believes that U.K. national Sanjay Shah is the "mastermind" of the alleged fraudulent scheme set forth in the Complaint (the "Shah Scheme").

97.     SKAT has repeated the Shah-centric theory in other jurisdictions, including in the High Court of Justice, Business and Property Courts of England and Wales, Commercial Court, where it has sued Mr. Shah and ED&F Man, among other parties (the "English Action").

98.     SKAT has not, however, alleged any connection between the Goldstein Parties and the Shah Scheme.

99.     The Goldstein Parties have no commonality with or connection to the Shah Scheme's "mastermind," Mr. Shah's allegedly-numerous accomplices, the overwhelming majority of MDL defendants, or the SKAT employee sentenced to six years in Danish prison for stealing millions from SKAT.

100.     Neither the Plan nor Mr. Goldstein has ever attempted to defraud SKAT.

101.     Mr. Goldstein is 81 years old and worked in Manhattan as a securities lawyer for decades before retiring approximately ten years ago.

102.     In 1998, Mr. Goldstein founded non-party the Goldstein Law Group PC, which was the successor to law firms formed and managed by Mr. Goldstein since 1980.

103.     Each of Mr. Goldstein's law firms really existed: they had real offices, real employees, real payrolls, real benefit plans, and real clients.

104.     The Goldstein Plan is a bona fide pension plan, established in 1999 to safeguard firm personnel's retirement savings and other investments.

105.     All of the Plan's transactions at issue in this case were solicited, arranged, funded, and executed by third-party defendant ED&F Man, with which the Plan had a brokerage account from 2012 to 2019.

106.     In 2012, ED&F Man's equity finance personnel (the "Equity Finance Desk") solicited the Plan to open a brokerage account for the purpose of engaging in dividend arbitrage transactions.

107.     Upon information and belief, the Plan's citizenship and status as a U.S. tax-exempt entity caused ED&F Man to solicit and pursue the Plan's business.

108.     As detailed <u>infra</u>, the Equity Finance Desk's business model revolved around soliciting, structuring, funding, clearing, and executing European and cross-border transactions for American investors.

109.     Indeed, each and every contract that the Plan executed with ED&F Man expressly left open the possibility that the Plan would hale ED&F Man into American courts.

110.     Those forum non-selection clauses were commercially reasonable and logical: the Brokerage's entire business model demands its purposeful availment of New York.

111.     ED&F Man's promotional materials, including its website, emphasizes its access to "all U.S. equity and options markets," which are centered in Manhattan.

112.     ED&F Man also advertises that it has co-location facilities—essentially, on-site servers that facilitate faster securities trading—at the New York Mercantile Exchange in Brookfield Place, the Intercontinental Exchange on Wall Street, and BrokerTec, which is across the street from Bryant Park.

113.     Furthermore, instead of requiring its U.S. clients to open English bank accounts, ED&F Man regularly deposits into and withdraws from its clients' U.S. accounts.

114.    For example, ED&F Man transferred money to and from the Plan via a National Financial Services brokerage account located at J.P. Morgan Chase at One Chase Plaza, New York, New York 10005.

115.    Because the New York-based Plan was a U.S. nonprofit entity exempt from taxation, ED&F Man promised that in exchange for the Plan's business (and significant fees for facilitating the dividend arbitrage proceeds), ED&F Man would (1) through the Plan's Authorized Agent,[2] bring dividend arbitrage opportunities to the Plan; (2) structure, facilitate, and fund the Plan's pre-dividend purchases of securities in a manner that would entitle the Plan to tax-free dividends; and (3) create the certifications of securities ownership and dividend receipts necessary for the Plan to apply for the tax refunds.

116.    In soliciting the Plan to open an account and engage ED&F Man to arrange and execute dividend arbitrage trading, ED&F Man directly and indirectly reassured the Plan that such activity was wholly proper and, through simultaneous hedges, posed minimal market risk.

117.    To enable tax-exempt clients like the Plan to engage in dividend arbitrage, ED&F Man provided securities lending and financing.

118.    In doing so, the Equity Finance Desk earned millions of dollars for ED&F Man, ED&F Man's affiliates, and the Desk's personnel.

---

[2] All communications between ED&F Man and the Plan were conducted via the Plan's authorized agent, Acer Investment Group, LLC (the "Authorized Agent").

119.   Beginning in 2013, ED&F Man introduced the Plan to the Danish securities transactions that gave rise to the Plan's nine tax refund applications to SKAT (the "Danish Transactions").

120.   ED&F Man solicited the Plan because it needed the Plan and similarly-situated clients to effectuate the Danish Transactions: without U.S.-based tax-exempt pension plans, there was no party that could be entitled to Double-Taxation Treaty dividend refunds.

121.   ED&F Man solicited the Plan to engage in the Danish Transactions, arranged and executed all of the Transactions, and provided trade confirmations reflecting the Plan's purchases of the securities and receipts of the ensuing dividends.

122.   After the dividends issued, ED&F Man prepared "Tax Vouchers" identifying the Plan's New York residency and certifying that the Plan had "[held]" the securities over the dividend dates, received the dividends net withholding, and "suffered" the withheld Danish taxes.

123.   ED&F Man then sent the Tax Vouchers directly to Goal, the tax reclaim agent that ED&F Man had recommended and introduced to the Plan.

124.   Throughout their relationship with the Brokerage, the Goldstein Parties reasonably relied on ED&F Man's strong reputation and 230-year history to trust that all activity in the Plan's account was lawful.

125.   The Goldstein Parties also trusted the veracity of the years of steady communications and hundreds of trade documents and account statements that ED&F Man created for and provided to the Plan.

126.     Most relevant to this action, the Goldstein Parties trusted that ED&F Man actually arranged and executed all of the Danish Transactions that gave rise to the Tax Vouchers.

127.     After all, dividend arbitrage was the fundamental purpose of the parties' relationship, and there could be no dividend arbitrage unless ED&F Man actually facilitated those Transactions and created truthful Tax Vouchers.

128.     In September 2018, SKAT sued ED&F Man in the English Action for tortiously creating and issuing the Tax Vouchers.

129.     After SKAT initiated this action in June 2018, and even after the Goldstein Parties filed their initial amended complaint and third-party claims against ED&F Man, the Brokerage continued to reassure the Goldstein Parties that the Plan's Danish Transactions and Tax Vouchers had been proper.

130.     But in September 2019, ED&F Man filed an amended answer in the English Action (the "Amended English Answer") and admitted that at least four of the nine Tax Vouchers it created for the Plan's submission to SKAT were false (the "Disavowed Vouchers"). Amended Defence of ED&F Man Capital Markets Ltd., Annex E, SKAT v. ED&F Man Capital Markets Ltd. et al., Nos. CL-2018-000297, CL-2018000590 (Sept. 6, 2019) (the "Amended English Answer").

131.     A true and correct copy of the Amended English Answer is annexed hereto as Exhibit A.

132.     True and correct copies of the four Disavowed Vouchers are annexed hereto as Exhibits B (TDC), C (Danske Bank), D (Novo Nordisk), and E (D/S Norden).

133.     ED&F Man has refused to explain why—five years after the trades occurred, and nearly two years after SKAT sued the Brokerage in England—it now says that the Disavowed Vouchers were improper.

134.     ED&F Man also has refused to explain whether and how the Transactions underlying the Disavowed Vouchers differed from the Plan's remaining five Danish Transactions.

135.     But considering that ED&F Man created an entirely separate list of Tax Vouchers that were wrongful because ED&F had incorrectly calculated the refunds due, it is safe to assume that the Disavowed Vouchers' flaws are not merely arithmetic. Compare Amended English Answer Annex A and Annex E.

136.     Subsequent investigation has revealed that ED&F Man defrauded the Goldstein Parties.

137.     As it admitted by disavowing the Vouchers, ED&F Man falsely certified that the Plan had received dividends net of withholding.

138.     ED&F Man then compounded its wrongful conduct by issuing the Disavowed Vouchers to Goal with the intention and expectation that Goal would send them to SKAT.

139.     Once SKAT processed the Reclaim Applications—whose linchpins were the false Tax Vouchers—it remitted the refunds to an ED&F Man account, and ED&F allocated the appropriate amounts to the Plan.

140.     ED&F Man then charged the Plan fees that amounted to a significant amount of the tax refunds.

141. In other words, ED&F created and issued fraudulent Tax Vouchers to SKAT, and then reaped the rewards.

142. Upon information and belief, ED&F Man fabricated trading records to give the false impression that the dividends' issuers had paid the Plan the net dividends underlying the Disavowed Vouchers.

143. Furthermore, despite legal and contractual obligations to the contrary, ED&F Man failed to disclose that after it solicited the Plan to engage in the Danish Transactions, it surreptitiously caused the Plan to trade with, from, and through ED&F Man affiliates.

144. In reality, ED&F Man's recent admissions suggest that it solicited and structured at least four of the nine Danish Transactions in order to create the mere appearance of legitimacy, instead of ensuring that the Plan actually had received the net dividends from the issuer.

145. Now, ED&F Man is attempting to cover its tracks: it closed the Equity Finance Desk, fired all of Equity Finance personnel, and forced its European CEO to "resign" just two weeks before it filed the Amended English Answer and admitted that dozens of the Tax Vouchers are baseless.

146. Consequently, the Goldstein Parties implead ED&F Man, which had sole responsibility for, unique knowledge of, and actively committed the misconduct SKAT has alleged against the Goldstein Parties.

**The Parties**

147.    Defendant–Counterclaim-Plaintiff–Third-Party Plaintiff the Goldstein Law Group PC 401(K) Profit Sharing Plan (the "Plan") is a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the United States Internal Revenue Code, exempt from taxation under section 501(a) of the United States Internal Revenue Code, and resident of the United States of America for purposes of U.S. taxation.

148.    While the Plan's current address is 6179 Seascape Terrace, Boynton Beach, Florida 33437, at all times relevant to this Complaint, the Plan was located at 61 Broadway, New York, New York 10006.

149.    All of the correspondence and contracts between ED&F Man and the Plan are addressed to the Plan's Manhattan address.

150.    At all times relevant to the Complaint, Defendant–Counterclaim-Plaintiff – Third-Party Plaintiff Sheldon Goldstein was a participant in the Plan. Mr. Goldstein served as a trustee for the Plan at all relevant times.

151.    Plaintiff–Counterclaim-Defendant SKAT purports to be the Danish national agency charged with assessing and collecting taxes.

152.    Third-Party Defendant ED&F Man is headquartered at 3 London Bridge Street, London, SE1 9SG United Kingdom, and is authorized and regulated by the United Kingdom Financial Conduct Authority ("FCA") and registered in England.

153.    ED&F Man is a wholly-owned subsidiary of non-party ED&F Man Holdings Ltd. ("Holdings"), which advertises itself as an "agricultural commodities merchant with 7,000 people in 60 countries."

154.    In the English Action, ED&F Man pleaded that it is a global financial brokerage business authorized by the FCA to provide, inter alia, (1) specialized securities lending and financing services, (2) clearing and settlement for equities and fixed-income securities, and (3) custodian services for exchange-traded and over-the-counter transactions.

155.    SKAT has not sued ED&F Man or any of its affiliates in the United States.

**Jurisdiction**

156.    These counter- and third-party claims arise from the facts and circumstances relating to the transactions set forth in the Complaint filed by SKAT.

157.    As conceded in SKAT's Complaint, this Court has jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1332(a)(4) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because it is between U.S. citizens and a foreign State.

158.    This Court also has jurisdiction over this matter as the Goldstein Parties assert a third-party claim for securities fraud arising under the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (the "Exchange Act"), specifically the action for fraud prohibited by 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder.

159.    This Court has jurisdiction over the remaining third-party claims pursuant to 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000, exclusive of

interest and costs, and because it is between citizens of the United States and subjects of a foreign State.

160.     This Court may exercise specific jurisdiction over U.K.-domiciled ED&F Man pursuant to N.Y. C.P.L.R. § 302(a)(3) because ED&F Man's fraud, securities fraud, breach of fiduciary duty, and negligence caused injury to New York people and property, including the Goldstein Parties.

161.     This Court also may exercise specific jurisdiction over ED&F Man pursuant to N.Y. C.P.L.R. § 302(a)(1) because the Goldstein Parties' third-party claims arise from New York business transacted by ED&F Man.

162.     As detailed _infra_, this Court has jurisdiction over ED&F Man because it solicited and executed contracts with the New York-based Plan; solicited the Plan to engage in the Danish Transactions; arranged and executed the Danish Transactions; created fraudulent Tax Vouchers; and, knowing that the Plan was domiciled in New York, defrauded the Plan and breached its contractual and fiduciary duties in connection with the Danish Transactions.

163.     Exercising personal jurisdiction over ED&F Man also is appropriate because it arranged and executed the Danish transactions for at least 31 U.S. pension plans sued by SKAT in this MDL: three domiciled in New Jersey, three in the Southern District of New York, two in Connecticut, 15 in the Eastern District of Kentucky, one in the Eastern District of Pennsylvania, one in the Northern District of Illinois, and six in the Central District of Utah.

164.    SKAT alleges that ED&F Man created dozens of fraudulent Tax Vouchers that caused it to pay out hundreds of millions of dollars in unjustified tax refunds.

165.    In the Amended English Answer, ED&F Man, itself, admitted that it created and issued approximately 80 wrongful Tax Vouchers for U.S. pension plans that caused SKAT to pay out tens of millions of dollars.

166.    These Counterclaims and Third-Party Claims are properly venued in this Court because their facts and circumstances arise out of the same transactions that are the subject of the Complaint initiated by SKAT in this District.

167.    These Counterclaims and Third-Party Claims also are properly venued in this Court because the facts and circumstances relating to the claims occurred in part in this District.

Case 1:18-md-02865-LAK Document 321-3 Filed 05/15/20 Page 28 of 67

## COUNTER-STATEMENT OF FACTS

### ED&F Man's Core Dividend Arbitrage Business Depended Upon
### Targeting U.S. Tax-Exempt Entities

168. For the purposes of this litigation, "dividend arbitrage" is the practice of tax-exempt entities purchasing securities in order to receive the full benefit of the dividends.

169. Dividend arbitrage is designed to generate profit where the security's purchaser will be entitled to net more of the dividend than the security's seller would have been able to.

170. As early as 2008, the U.S. Senate recognized that as a condition of business, New York-based institutional investors demand that brokerages offer dividend arbitrage.

171. To do so, brokerages must match their for-profit clients with tax-exempt purchasers.

172. Here, the Plan was an ideal Danish dividend arbitrageur for ED&F Man.

173. By prohibiting Denmark from taxing Danish dividends paid to U.S. pension plans, the Double-Taxation Treaty creates an opportunity for dividend arbitrage.

174. Unlike with American securities, where the dividend recipient is responsible for reporting and remitting taxes, Danish issuers must withhold tax when they pay out dividends and pay these withheld sums to the Danish government.

175. To receive Danish dividend tax refunds, tax-exempt entities like the Plan must submit Reclaim Applications to SKAT.

176.     If not for SKAT's promise to refund dividend taxes to U.S. pensions, the Plan would never have invested in the Danish companies, let alone paid taxes on the resulting dividends.

177.     Indeed, as a general matter, it would have made no sense for the non-profit, U.S.-tax-exempt Plan to purchase stock that would incur a 27% Danish dividend tax, particularly when the United States has taxation treaties with over 60 other countries.

178.     Until August 2015, so long as the Reclaim Applications included the necessary documents and properly calculated the amounts due, SKAT promptly remitted the refunds.

**The Goldstein Parties Had No Reason to Doubt the Reclaim Applications' Validity**

179.     Relying on ED&F Man's compliance with all applicable laws and regulations, the Plan agreed to open a Brokerage account and participate in the nine Danish Transactions.

180.     ED&F Man solicited, structured, and executed the Danish Transactions so the Plan could apply for tax refunds on dividends issued by  (1) TDC Group on March 7, 2014; (2) Danske Bank on March 24, 2014; (3) Novo Nordisk on March 26, 2014; (4) D/S Norden on April 29, 2014; (5) Coloplast on December 9, 2014; (6) Novozymes on March 2, 2015; (7) Danske Bank on March 23, 2015; (8) Novo Nordisk on March 24, 2015; and (9) TDC Group on August 12, 2015.

181.     ED&F Man purports to explain the mechanics of these transactions in the Amended English Answer. See generally Amended English Answer ¶¶ 10.2–10.5.

182.     ED&F Man claims that when it became aware of a Danish issuer's intent to issue dividends, ED&F Man would solicit a U.S. pension plan client and, after ascertaining the plan's interest, acquire the security.

183.     Then, ED&F Man would sell the security to the U.S. tax-exempt pension plan while simultaneously hedging the transaction.

184.     ED&F Man says that at the time the dividend issued,  the Brokerage would hold the securities as a bare trustee on behalf of the plan in the plan's ED&F Man custody account in accordance with a custody agreement and a security and set-off deed.

185.     Once the Danish company paid the dividend net of withholding into a general ED&F Man account, the Brokerage would credit the relevant amount to a U.S. plan's brokerage account.

186.     ED&F Man then would prepare a Tax Voucher and, in the case of the Plan's Reclaim Applications, submit it to the Plan's reclaim agent Goal, which ED&F Man had introduced to the Plan.

187.     After receiving ED&F Man's Tax Voucher, Goal would compile the Reclaim Application and submit it to SKAT.

188.     SKAT generally would process the Reclaim Application within a few weeks of receipt and refund the withheld tax to Goal, which, after deducting its own fees, transferred the balance to ED&F Man.

189.     ED&F Man would then credit the remaining refund to the pension plan's brokerage account.

190.     ED&F Man also would charge the plan additional fees for providing the dividend arbitrage opportunity and facilitating the transaction.

191.     ED&F Man purports to have followed this process for each of the Danish Transactions.

192.     Indeed, an ED&F Man-created general ledger purporting to reflect all nine Danish Transactions suggests that for each and every Reclaim Application submitted to SKAT, the Plan (a) owned the relevant shares on their respective record dates and (b) was paid the dividends, minus Danish taxes (the "General Ledger").

193.     At all relevant times herein, the Goldstein Parties had no reason to doubt the communications that ED&F Man made or transaction confirmations, Tax Vouchers, General Ledger or the other documents that ED&F Man prepared in connection with the Danish Transactions.

**SKAT Had No Particularized Basis to Reject the Plan's Ninth Reclaim Application**

194.     SKAT issued refunds to the Plan for the first eight dividends.

195.     But after SKAT paid those eight refunds, it began publicly claiming that Mr. Shah "masterminded" a scheme whereby foreign pension plans would fraudulently submit refund claims.

196.     Soon thereafter, SKAT denied the Plan's Reclaim Application for the August 2015 TDC Group dividend.

197.     On August 26, 2015, SKAT revealed that a "foreign authority" had notified SKAT of the allegations underlying this MDL and that SKAT had reported those

allegations to the Danish Public Prosecutor for Serious Economic and International Crime ("SØIK").

198.    Since then, SKAT has argued that one individual, Dubai-based and U.K.-born Sanjay Shah, is the "mastermind" of the allegedly-fraudulent Shah Scheme.[3]

199.    In England, SKAT alleged that Mr. Shah perpetrated the scheme through entities he controlled, including several that SKAT has discussed in its MDL complaints: Old Park Lane Capital Ltd., Salgado Capital, Solo Capital Partners LLP, Syntax GIS Ltd., Telesto Markets LLP, and West Point Derivatives Ltd. (the "Shah Entities").

200.    SKAT alleges connections to the Shah Entities in 154 of its 183 MDL complaints.

201.    But SKAT has never alleged that the Goldstein Parties are connected to Mr. Shah or his Entities.

202.    Upon information and belief, SKAT has never identified any connection between the Goldstein Parties and Mr. Shah or the Shah Entities.

203.    Indeed, the Goldstein Parties are fundamentally different from the Shah Entities and the vast majority of this MDL's defendants.

204.    SKAT's own allegations reveal that the Goldstein Parties simply are not part of the Shah Scheme.

---

[3] See generally Transcript of Record, In re SKAT Tax Refund Scheme Litig., 18-cv-4047 (June 26, 2018); see also, e.g., Compl. ¶¶ 2, 3, 5, 25.

Case 1:18-md-02865-LAK Document 321-3 Filed 1/05/19 Page 33 of 67

205.    For example, while a total of seven people served as the authorized representatives for 157 of the 183 MDL plan defendants, Mr. Goldstein only represented the Plan.

206.    While the average MDL plan defendant submitted approximately 14 Reclaim Applications, the Plan submitted only nine.

207.    While SKAT alleges an average of more than $5.8 million in damages per complaint, it only alleges $1.49 million against the Plan.

208.    And while SKAT alleges that the majority of the MDL plan defendants were formed shortly before they began submitting Danish reclaim applications, the Goldstein Plan existed for 15 years before it filed its first Reclaim Application.

209.    The Goldstein Parties simply bear none of the many indicia of fraud that SKAT alleges.

### SKAT'S Deficient Refund Processes Cannot Justify Its Breaches of the Double-Taxation Treaty

210.    Upon information and belief, SKAT failed to review the specific facts and circumstances relating to the Danish Transactions before it denied the Plan's ninth refund and haled the Goldstein Parties into this Court.

211.    In August 2016, Denmark's tax minister announced that the country would budget billions of kroner to implement a new information technology infrastructure and hire 2000 new employees by 2020.

212.    He did so because of public outrage over SKAT's many flagrant missteps.

213.    Throughout the relevant time period, SKAT entrusted just one man, Sven Nielsen, with processing all tax refund applications.

214.    But SKAT failed to provide Mr. Nielsen with the necessary tools to examine whether a pension plan had actually owned the shares it claimed to own or had actually received the net dividends.

215.    Instead, Mr. Nielsen merely checked whether applications included the necessary documents and had properly calculated refunds.

216.    Mr. Nielsen's former supervisor, who had raised concerns about application processing for years before her 2013 retirement, told The New York Times that "[Mr. Nielsen's] job was reduced to bookkeeping, essentially, checking if a form was filled out properly. A monkey could do it."

217.    Furthermore, as early as 2011, SKAT suspected Mr. Nielsen of stealing $5.7 million from SKAT.

218.    However, SKAT did not fire Mr. Nielsen until 2015, after Danish police raided his home in connection with the Shah Scheme.

219.    Moreover, Mr. Nielsen had at least one personal contact with Mr. Shah.

220.    The founder of Syntax, whom SKAT alleges to be an accomplice of Mr. Shah, requested to meet and struck up a friendship with Mr. Nielsen immediately after he founded Syntax.

221.    At those meetings, Mr. Nielsen freely explained exactly how to submit reclaim applications.

222.    Shortly thereafter, the founder sold Syntax to Mr. Shah.

223. SKAT has alleged that Syntax facilitated fraudulent refunds in approximately 40% of the cases consolidated in this MDL.

224. A Danish court has convicted Mr. Nielsen of defrauding SKAT and sentenced him to six years in prison.

225. In 2017, Denmark revealed that it would close SKAT entirely and divide its responsibilities among seven new authorities.

226. The tax minister justified the reforms to Denmark's oldest continuously-operating newspaper, Berlingske: "[I[nstead of using money on patching up a SKAT that doesn't deliver, or if we are being completely honest has never really functioned, we should just completely stop SKAT from existing."

227. The tax minister also proclaimed that Denmark "will fight for every single nickel that was taken from the treasury."

228. Consequently, SKAT not only reported the allegedly-criminal conduct to SØIK, but also filed the dozens of lawsuits in this MDL.

229. Yet several years and hundreds of lawsuits later, SKAT still lacks the tools to determine whether any given applicant did own particular Danish securities on record dates or did receive dividends, net of withheld tax.

### ED&F Man Solicited, Structured, Funded, Executed, and Cleared the Plan's Nine Danish Transactions

230.     Neither the Plan nor Mr. Goldstein has ever attempted to defraud or otherwise harm SKAT.

231.     ED&F Man is solely responsible for any irregularities with the Plan's Danish Transactions and Tax Vouchers.

232.     ED&F Man's Equity Finance Desk created and managed the Plan's Danish Transactions.

233.     While "equity finance" is a broad term, financial institutions' equity finance departments generally specialize in securities lending and financing.

234.     Historically, ED&F Man did not offer equity finance services.

235.     Instead, the Holdings subsidiary was well-regarded for providing futures and options that complemented its parent company's core business: soft commodities like coffee, molasses, and sugar.

236.     In late 2011 and early 2012, ED&F Man expanded into equity finance by hiring dozens of executives, traders, and other brokerage personnel from MF Global, whose Manhattan-based parent company had just filed for bankruptcy.

237.     ED&F Man and its New York-based affiliate hired over 150 former MF Global traders from MF Global's general brokerage unit.

238.     MF Global existed to structure, clear, and settle European transactions on behalf of its parent company's American clients.

239. MF Global's business had been particularly dependent on dividend arbitrage and had frequently clashed with its New York-based risk managers.

240. Many of the Plan's direct ED&F Man contacts were former MF Global employees.

241. They continued to specialize in dividend arbitrage for American clients when they joined ED&F Man.

242. For example, ED&F Man European CEO Stephen Hawksworth, who personally signed all four custody fee letters relating to the Disavowed Vouchers, had been MF Global's London Head of Equities and Fixed Income.

243. In early 2012, ED&F Man induced the Plan to open an account by promising that the Brokerage would find, structure, arrange, finance, and execute dividend arbitrage opportunities for the Plan.

244. The parties memorialized their understanding in several agreements, including a (1) Custody Agreement, (2) Security and Set-Off Deed, and (3) Letter Agreement dated June 21, 2012. Each agreement is annexed hereto as Exhibits F, G, and H, respectively.

245. In or around late 2013, ED&F Man solicited the Plan to engage in Danish dividend arbitrage transactions.

246. ED&F Man explained that because clients like the Plan were exempt from the 27% Danish dividend tax, ED&F Man could arrange transactions whereby the clients would purchase Danish securities before the issuance of a dividend and be entitled to 100% of the dividend, instead of 73%.

247.    ED&F Man further explained that it would structure the transactions so they would be risk-free for its tax-exempt clients.

248.    In exchange for facilitating these transactions, ED&F Man charged fees that amount to a significant amount of the dividend arbitrage "profits" it purported to generate for the Plan.

249.    As discussed <u>supra</u>, when it did purportedly conduct the Danish Transactions, ED&F Man told the Plan that it (1) paid for a given security on behalf of the Plan, (2) debited the Plan's brokerage account for that sum, (3) sold or loaned the security on behalf of the Plan, and (4) credited the Plan's brokerage account accordingly.

250.    In doing so, ED&F Man created situations whereby the dividend's recipient would be a U.S. pension plan that would be entitled to 100% of the dividend, instead of a non-tax-exempt client, such as a U.S. hedge fund, that would receive only 73% of the dividend.

251.    To actually receive the 27% refund, tax-exempt dividend recipients needed to submit the Reclaim Applications.

252.    To facilitate the submission of these Applications, ED&F Man prepared and issued the Tax Vouchers, which certified to SKAT that the pension plans (1) "[held]" the security "over the dividend date," (2) had received the specified amount of money in dividends from the issuer, and (3) had "suffered' the specified Danish withholding tax.

253.    In exchange for recommending, creating, financing, and structuring the transactions and preparing the Tax Vouchers, ED&F Man charged large fees.

254.     ED&F Man documented the fees underlying each Disavowed Voucher in custody fee letters signed by European CEO Steve Hawksworth and addressed to the Plan at its Manhattan address. True and correct copies of these custody fee letters are annexed hereto as Exhibits I (TDC), J (Danske Bank), K (Novo Nordisk), and L (D/S Norden).

255.     From 2012 to 2015, ED&F Man solicited, recommended, structured, created, and executed similar Danish dividend transactions for at least 36 U.S. pension plan clients.

256.     In connection with those transactions, ED&F Man created for submission to SKAT at least 420 Tax Vouchers certifying its clients' receipt of dividends net withholding.

257.     SKAT has sued at least 31 ED&F Man pension plan clients in this MDL.

258.     SKAT alleges that at least 397 of the fraudulent Tax Vouchers involved in this MDL were created by ED&F Man.

259.     ED&F Man needed U.S. pension plans like the Plan to execute the dividend tax arbitrage strategies: without tax-exempt dividend recipients, there could be no "extra" 27% profit to be paid out pursuant to the Double-Taxation Treaty.

**ED&F Man Recently Admitted that it Created and Issued Baseless Tax Vouchers**

260.     From 2012 to 2019, the Goldstein Parties trusted ED&F Man's repeated and explicit assurances that the Danish Transactions were legal and appropriate and that all documents that ED&F Man had prepared for the Plan were accurate and trustworthy.

261.     Even after SKAT sued the Goldstein Parties and ED&F Man, ED&F Man reiterated that the Plan's Danish Transactions were legitimate and documented properly.

262.     Indeed, both at the time of the Danish Transactions and after SKAT initiated this lawsuit, ED&F Man provided the Plan with dozens of documents, including trade confirmations and account statements, that facially support ED&F Man's assurances that the trades were proper.

263.     However, ED&F Man's 2019 behavior and statements increasingly have suggested that the Brokerage defrauded the Plan and its agents.

264.     In early 2019, the Equity Finance personnel who had serviced the Plan began resigning from ED&F Man.

265.     On April 3, 2019, ED&F Man announced that it was closing the Equity Finance Desk.

266.     On April 23, 2019, out of an abundance of caution, the Goldstein Parties filed the third-party complaint against ED&F Man, alleging breach-of-contract essentially as indemnification: if SKAT was right, and something was wrong, that wrongdoing was ED&F Man's fault.

267.     On May 22, 2019, ED&F Man sent the Plan a termination notice that it would close the Plan's account effective June 21, 2019.

268.     Thereafter, ED&F Man continued to reassure the Goldstein Parties that the Plan's Danish securities trading and documentation were legal and accurate.

269.     The remaining Equity Finance traders' FCA registrations terminated on July 31, 2019.

270.     On or around August 20, 2019, ED&F Man's European CEO, Mr. Hawksworth, quietly resigned—effective immediately.

271.     Just two weeks later, ED&F Man filed the Amended English Answer and admitted—for the very first time—that 80 of the Tax Vouchers it had prepared for submission to SKAT had falsely certified its clients' receipt of the Danish dividends and "suffering" of the Danish taxes.

272.     Four of those false Tax Vouchers were the Disavowed Vouchers that ED&F Man created for the Plan: those relating to the (1) March 2014 TDC Group, (2) March 2014 Danske Bank, (3) March 2014 Novo Nordisk, and (4) April 2014 D/S Norden dividends (the "Spring 2014 Transactions"). See Amended English Answer Annex E.

273.     ED&F Man did not warn the Plan that it had determined that the Disavowed Vouchers were wrongful.

274.     In fact, ED&F Man never directly notified the Plan, at all.

275.     Instead, on September 27, 2019, ED&F Man filed a letter with this Court to "apprise[]" the court of its "most recent pleadings." See Dkt. 202 (Sept. 27, 2019).

276.     Despite multiple inquiries from the Goldstein Parties, ED&F Man has refused to explain why it now admits that the Disavowed Vouchers are false.

277. Among other failures of explanation, ED&F Man has not explained how the Plan owned the securities, yet did not actually receive the dividends, net of withholding.

278. Furthermore, ED&F Man has refused to explain how the Spring 2014 Transactions differ from the other five that it arranged for the Plan.

279. ED&F Man also has refused to explain why the Plan should trust that the remaining five transactions are legitimate.

280. On its face, the Amended English Answer suggests that ED&F Man disavowed the Spring 2014 Transactions because, contrary to the confirmations and other documents that ED&F Man prepared for and communications made to the Plan and SKAT, the Plan did not actually receive the dividends from the issuers and thus had not been entitled to tax refunds. See Amended English Answer Annex E.

281. Instead, ED&F Man created the mere illusion of the Plan's receipt of the dividends, manipulating the Spring 2014 Transactions' underlying records in order to create legal fictions whereby multiple entities simultaneously "owned" the shares.

**ED&F Man Failed to Disclose Affiliate Trading**

282. One way that ED&F Man was able to manipulate those records was by trading with its Switzerland- and Dubai-based affiliates—without ever disclosing its self-dealing to the Goldstein Parties.

283. ED&F Man failed to disclose to the Goldstein Parties that the Plan bought all of the Spring 2014 Transactions' securities from its affiliate Volcafe Ltd. ("Volcafe"), Holdings's Switzerland-based coffee-trading unit.

284.    Upon information and belief, ED&F Man did not purchase the remaining five Danish Transactions' securities directly from Volcafe.

285.    In connection with the Spring 2014 Transactions, ED&F Man typically would contact the Authorized Agent by phone or text message to present the trading opportunity.

286.    If the Plan was interested in that particular security, ED&F Man instructed the Plan to email an explicit order to buy the Danish securities.

287.    In each of the Spring 2014 Transactions, ED&F Man also instructed the Plan to explicitly request settlement on a T+4 basis.

288.    For example, in April 2014, ED&F Man approached the Plan with the opportunity to invest in D/S Norden.

289.    ED&F Man had told the Plan to express interest by emailing an order for the desired number of shares and request T+4 settlement.

290.    When ED&F Man received the Plan's written D/S Norden order, ED&F Man purchased the D/S Norden shares from Volcafe and then sold the shares to the Plan.

291.    ED&F Man also arranged for Volcafe to purchase those same shares from affiliate ED&F Man Professional Trading Dubai ("ED&F Dubai").

292.    Despite numerous legal, regulatory, and contractual obligations to the contrary, ED&F Man never disclosed the affiliate transactions to the Plan.

293.    Upon information and belief, ED&F Man solicited the Plan to engage in the 2014 trades for its own and its affiliates'—including Volcafe's, ED&F Dubai's, and Holdings's—profit.

Case 1:18-md-02865-LAK Document 213 Filed 1/05/19 Page 44 of 67

294. Volcafe, founded in 1851, became one of the world's largest coffee traders before being acquired by ED&F Man in 2004.

295. Volcafe trades raw coffee beans and purports to provide coffee beans for up to 50 billion cups of coffee per year.

296. Upon information and belief, Volcafe supplied the financing of the Plan's purchases and was the source of the securities for all of the Spring 2014 Transactions.

297. Upon information and belief, due to the seasonal nature of its business, Volcafe periodically has large amounts of unused cash.

298. Upon information and belief, ED&F Man and its affiliates hatched a plan to maximize Volcafe's returns on its cash reserves by involving Volcafe in the dividend arbitrage business.

299. In 2014 and 2015, the London Interbank Offering Rate ("LIBOR") was a benchmark interest rate that purported to represent the rates of interest at which banks would lend cash to each other.

300. LIBOR was at historically low rates in 2014 and 2015:

| Year | U.S.D. Three-Month LIBOR |
|------|--------------------------|
| 2006 | 5.198% |
| 2014 | .234% |
| 2015 | .316% |
| 2018 | 2.307% |

301.     Lending cash and securities to ED&F Man clients allowed Volcafe to amass profits and revenue significantly higher than prevailing market interest rates.

302.     Upon information and belief, ED&F Man and its affiliates compensated each other via internal debits and credits for soliciting, structuring, and executing the Danish dividend arbitrage transactions.

303.     In doing so, Volcafe and its affiliates, including ED&F Man and ED&F Dubai, were able to extract profits from the Plan significantly higher than the prevailing market interest rates that ED&F Man and its affiliates would have earned on their cash balances.

304.     ED&F Man's failures to disclose its material transactions with affiliates violate the federal securities laws and ED&F Man's own contracts with the Plan.

305.     Upon information and belief, ED&F Man's trading with its affiliates also caused the Disavowed Vouchers to be wrongful: ED&F Man has only rejected the Transactions it conducted with Volcafe.

**ED&F Man Structured the Spring 2014 Transactions to
Fake the Disavowed Vouchers' Legitimacy**

306.    ED&F Man's fundamental "business strategy" appears to have required the Brokerage to create artificial tax certifications to paper up fraudulent Reclaim Applications.

307.    In each of the Spring 2014 Tax Vouchers, ED&F Man purported to certify the Plan's (1) "ownership of the[] security over the dividend date," (2) dividend payments that the Plan had received from the issuer, and (3) Danish tax that had been withheld on the dividend, which the Plan would seek to recover via the Reclaim Application.

308.    As the entire point of the parties' relationship was to engage in dividend arbitrage trading, and certification from ED&F Man was necessary for the Plan to apply for Danish tax refunds, ED&F Man's creation and submission of accurate Tax Vouchers was fundamental not only to the parties' relationship, but also to each of the four Spring 2014 Transactions.

309.    In the Amended English Answer, ED&F Man admitted, for the very first time, that the Disavowed Vouchers were "inaccurate" insofar that the Plan had not actually (1) received the dividend net of withholding or (2) "suffered" the withholding tax.

310.    These admissions contradict all of the relevant statements and documents that ED&F Man has issued to the Plan.

311. For example, ED&F Man memorialized each of the Spring 2014 Transactions with custody fee letters sent from ED&F Man European CEO Steve Hawksworth to the Plan at its Manhattan address.

312. Each of those letters referred to the Custody Agreement between the parties and stated that ED&F Man had provided "custodian and related services" "in connection with [ED&F Man] entering into with, or arranging for [the Plan] [ . . . ] the specific transaction in respect of[] shares in the capital of" each of the Spring 2014 Transaction securities: TDC, Danske Bank, Novo Nordisk, and D/S Norden.

313. As discussed <u>supra</u>, each of those "custodian and related services" necessarily included ED&F Man's creation of accurate Tax Vouchers for submission to SKAT.

314. But ED&F Man has now admitted that it made at least two material misstatements in each Disavowed Voucher: (1) the dividend amount that the Plan had "received," and (2) the withheld tax that the Plan had "suffered."

315. ED&F Man's refusal to explain how it came to issue the 80 incorrect vouchers—at least 160 materially false statements—suggests that its misstatements were intentional and systemic, not accidental or casual.

316. The fact that the European CEO personally signed the Spring 2014 Transactions' custody letters further suggests that something is amiss.

317. ED&F Man's signatory on each of the Spring 2014 Transaction custody letters was its European CEO, Steve Hawksworth.

318. Mr. Hawksworth did not personally sign any of the Plan's other, numerous agreements with ED&F Man. <u>See generally</u>, <u>e.g.</u>, Custody Agreement; Security and Set-Off Deed.

319. Throughout the relevant time period, ED&F Man continued MF Global's business strategy of focusing on dividend arbitrage and clearing and settling European transaction for primarily U.S. based clients.

320. Upon information and belief, Mr. Hawksworth and his team devised and implemented similar trading strategies at MF Global before its liquidation.

321. In late 2011 and early 2012, ED&F Man recruited the MF Global traders with the goal of moving beyond soft commodities trading to offer a wider variety of securities services demanded by sophistical institutional investors.

322. The Brokerage simply could not compete with top-tier financial services firms unless it offered complex cross-border tax solutions under one roof.

323. To fulfill its end of the bargain, the MF Global personnel needed to bring not only those institutional investors, but also the tax-exempt clients necessary to profit from dividend arbitrage.

324. Upon information and belief, the Plan was one of hundreds of U.S. clients that MF Global personnel brought to ED&F Man.

325. In 2014, ED&F Man posted profits of $17 million.

326. In 2015, however, ED&F Man made just $2.8 million.

327. ED&F Man issued 77 of the 80 Disavowed Vouchers in 2014.

328.     While ED&F Man secured all of the Spring 2014 Transactions' securities from Volcafe, the Goldstein Parties have seen no indication that Volcafe participated in the Plan's other five Danish Transactions.

329.     And while Mr. Hawksworth personally signed all four Spring 2014 Transactions' custody letters, upon information and belief, he is not a signatory on any other document with the Plan.

330.     The Spring 2014 Transactions were not careless mistakes; they were intrinsic to ED&F Man's fundamental business model.

331.     There is no reason why the Spring 2014 Transactions could not have been conducted in a legal manner: ED&F Man simply could have ensured that the Plan owned the securities on record date and actually received the net dividends, instead of creating illusory transactions.

332.     But instead of explaining the Danish Transactions to the Plan—which ED&F Man has had the legal, contractual, and fiduciary duty to do—ED&F Man shut down the Equity Finance Desk entirely and, over the course of approximately six months, terminated the employment of each and every one of the Plan's contacts on the Danish Transactions.

333.     Given ED&F Man's continual evasions to its clients and the English court, it is, for the moment, impossible to tell whether the Plan's remaining five transactions and concomitant Tax Vouchers were legitimate and qualified for Danish refunds.

## COUNTERCLAIMS

### COUNTERCLAIM COUNT I
### (Declaratory Judgment that Decisions of this Court are Binding on SKAT and Estop SKAT from any other Efforts Outside this Jurisdiction to Obtain Remedies Arising out of or Relating to the Transactions in this Complaint)

334.     The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

335.     This is a counterclaim for judgment declaring that this Court's decisions in this action arising out of the transactions set forth in the Complaint are binding on SKAT in all jurisdictions and venues, including other U.S. courts and arbitrations, Danish administrative proceedings and/or investigations, Danish court actions, and any and all others.

336.     This Court "may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

337.     "The intent [of the Declaratory Judgment Act] is to allow a party to be free from the whim of its opponent in deciding when to resolve the legal dispute between them." Great Am. Ins. Co. v. Houston Gen. Ins. Co., 735 F. Supp. 581, 585 (S.D.N.Y. 1990).

338.     SKAT voluntarily availed itself of this Court's jurisdiction.

339.     SKAT alleges that the Goldstein Parties engaged in fraud in connection with applications for tax dividend reimbursement in connection with the Danish Transactions.

340.     Concurrently with this litigation, SKAT is pursuing multiple actions and investigations against the Goldstein Parties arising out of the same transactions in Denmark and, upon information and belief, other jurisdictions.

341.     The Goldstein Parties will suffer substantial harm if SKAT pursues multiple actions against them, prosecuting the exact same conduct across multiple jurisdictions and venues.

342.     Moreover, SKAT's pursuit of the same causes of action against the Goldstein Parties across multiple jurisdictions and venues gives rise to the likelihood of conflicting outcomes, which will only exacerbate the disputes between the parties.

**COUNTERCLAIM COUNT II**
**(Preliminary and Permanent Injunctive Relief)**

343.     The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

344.     By pursuing its claims in multiple jurisdictions, SKAT has forced the Goldstein Parties to expend significant resources in defending the exact same conduct under different substantive and procedural laws in multiple jurisdictions.

345.     SKAT's actions also threaten conflicting outcomes that will only exacerbate and prolong the parties' disputes.

346.     The Goldstein Parties will continue to suffer substantial harm if SKAT pursues these foreign actions while prosecuting its claims before this Court.

347.     Therefore, the Goldstein Parties respectfully request that this Court issue preliminary and permanent injunctions prohibiting SKAT from taking any action that

would impair or otherwise impact matters that SKAT has submitted for determination to this Court.

## COUNTERCLAIM COUNT III
### (Recovery of Denied Claim)

348.    The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

349.    Although the Plan had nothing to do with Mr. Shah, SKAT refused to pay a refund due to the Plan in the amount of DKK 1,080,000 for a TDC Group dividend issued on August 10, 2015.

350.    On or about June 10, 2015, the Plan purchased four million shares of TDC Group.

351.    TDC Group's record date for determining payment to shareholders of its August 11, 2015 dividend was August 10, 2015.

352.    The Plan owned four million shares of TDC Group on August 10, 2015.

353.    On or around August 12, 2015, Plan received the TDC Group dividend payment, minus the Danish tax withheld.

354.    Thereafter, the Plan submitted an application for tax dividend reimbursement of DKK 1,080,000, along with the necessary documentation to establish ownership of shares of TDC Group.

355.    Despite rejecting the Disavowed Vouchers, ED&F Man continues to stand by the Tax Voucher it issued for this Transaction. See, e.g., Amended English Answer ¶ 4.2.

356.     The amount SKAT owes to the Plan as a result of the improper denial of this Reclaim Application is no less than DKK 1,080,000 (which as of April 8, 2019 is approximately USD 162,951.48), excluding interest and costs.

## COUNTERCLAIM COUNT IV
### (Promissory Estoppel)

357.     The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

358.     Upon information and belief, for years, SKAT refunded Danish tax paid to all U.S. pension plans that submit the documentation requested by SKAT.

359.     In reliance on SKAT's practice of paying all properly-documented claims, the Plan purchased shares of the Danish companies delineated supra in order to receive dividends from those companies.

360.     In reliance on SKAT's practice of paying all properly-documented claims, the Plan submitted the nine Reclaim Applications to SKAT.

361.     But for SKAT's practice of paying all properly-documented claims, the Plan never would have invested in those Danish companies, let alone paid Danish tax on their dividends.

362.     Indeed, as a non-profit pension plan, the Plan was exempt from all income tax levied by the United States and various countries with which the United States has tax treaties, including Denmark.

363.     Thus, SKAT is estopped from demanding that the Plan pay Danish income tax on the dividends.

364.    The amount owed to the Plan as a result of the improper denial of its application is no less than DKK 1,080,000 (which as of April 8, 2019 is approximately USD 162,951.48), excluding interest and costs.

## THIRD-PARTY CLAIMS

### THIRD-PARTY CLAIM COUNT I
### (Section 10(b) / Rule 10b-5 Securities Fraud – Against ED&F Man and John Does 1–10)

365.    The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

366.    Throughout the Plan's brokerage relationship with ED&F Man, ED&F Man purchased and sold securities on behalf of the Plan.

367.    The Plan reasonably relied on ED&F Man's assurances of propriety and its status as a FCA-licensed broker-dealer and as a fiduciary to the Plan.

368.    In connection with the Plan's purchase and sale of securities, ED&F Man knowingly, intentionally, and / or recklessly failed to disclose material facts necessary to make ED&F Man's statements not misleading, including, among others, failing to disclose the affiliate relationship between ED&F Man and Volcafe; that pricing for the transactions was pre-arranged among ED&F Man and its affiliates; and that on at least four occasions, the Plan did not hold the Danish Transactions' securities on record date in the manner required for ED&F Man to properly create and issue the Tax Vouchers for Goal to submit to SKAT on behalf of the Plan.

369.    ED&F Man repeatedly failed to disclose facts material to the Plan's investment decisions, including the conflicts of interest detailed above.

370.     ED&F Man charged the Plan numerous undisclosed and / or unexplained fees in connection with its transactions that ED&F Man caused the Plan to engage in, purportedly for the Plan's own benefit.

371.     In admitting the falsity of the Disavowed Vouchers, ED&F Man necessarily also has admitted that numerous other documents for and communications with the Plan were false, including the trading records and account statements that suggested that the Plan had actually received net dividends on the Spring 2014 Transactions and "suffered" the Danish taxes.

372.     Simply put, despite its duties to the contrary, ED&F Man made the Plan subservient to its own activities and control thereof.

373.     John Does 1–10 aided, abetted, facilitated, and / conspired with ED&F Man to perpetrate this wrongful activity.

374.     ED&F Man's and / or John Does 1–10's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder have damaged the Goldstein Parties in an amount to be revealed during discovery and proven at trial.

## THIRD-PARTY CLAIM COUNT II
### (Common-Law Fraud – Against ED&F Man)

375.     The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

376.     The Goldstein Parties reject SKAT's allegations that they knowingly defrauded or otherwise unlawfully obtained tax refunds from SKAT.

377.     However, if any of the Plan's Reclaim Applications were improper, ED&F Man is responsible.

378.     ED&F Man directly and indirectly solicited the Goldstein Parties to engage in and then executed the Danish Transactions.

379.     ED&F Man caused the Goldstein Parties to believe that Reclaim Applications were only submitted for taxes (a) the Plan actually paid to Denmark (b) on dividends the Plan actually received (c) on stock the Plan actually owned (d) on the dates necessary to be paid those dividends.

380.     The Goldstein Parties' reliance on those representations set forth in the Reclaim Applications and submitted to SKAT via the Tax Vouchers was reasonable.

381.     If these representations were false, ED&F Man has demonstrated a high degree of moral turpitude and wanton dishonesty, entitling the Goldstein Parties to (a) full compensation for any remedies the Goldstein Parties are found to owe SKAT, (b) reimbursement of all costs and fees without limitation, including legal fees, and (c) punitive damages.

## THIRD-PARTY CLAIM COUNT III
### (Negligence – Against ED&F Man)

382.     The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

383.     ED&F Man had a duty to provide only truthful information regarding the transactions it performed on behalf of the Plan.

384.     ED&F Man has admitted that at least four of the Tax Vouchers it created for submission to SKAT were false.

385.     By admitting that these Tax Vouchers were false, ED&F Man has also admitted that the trading confirmations, account documents, and communications it created and made to the Goldstein Parties regarding the Disavowed Vouchers' transactions also are false.

386.     In issuing these false statements and documents, ED&F Man breached its duties of care.

387.     Upon information and belief, the circumstances that caused ED&F Man to issue these false documents show that ED&F Man was negligent in structuring, funding, arranging, clearing, and executing the Danish Transactions, as well.

388.     ED&F Man's negligence entitles the Goldstein Parties to (a) full compensation for any remedies the Goldstein Parties are found to owe SKAT and (b) compensation for additional damages to the Goldstein Parties.

## THIRD-PARTY CLAIM COUNT IV
### (Breach of Contract – Against ED&F Man)

389.    The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

390.    In connection with opening the Plan's brokerage account, ED&F Man and the Plan entered into various agreements.

391.    Pursuant to those agreements, ED&F Man agreed to create only truthful and accurate documents for the Goldstein Plan.

392.    When ED&F Man created false, misleading, and/or inaccurate Tax Vouchers, it breached its agreements with the Plan.

393.    The Goldstein Parties are entitled to (a) full compensation for any remedies the Goldstein Parties are found to owe SKAT, (b) reimbursement of all expenses and costs without limitation, including legal fees, and (c) punitive damages to the Goldstein Parties for subjecting them to and prolonging SKAT's prosecution in Denmark, the United States, and any other jurisdictions.

## THIRD-PARTY CLAIM COUNT V
### (Breach of the Covenant of Good Faith and Fair Dealing – Against ED&F Man)

394.     The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

395.     Any agreements between ED&F Man and the Goldstein Parties, including the brokerage agreements, carry covenants of good faith and fair dealing.

396.     Regardless of the relevance of any explicit term of an agreement between ED&F Man and the Goldstein Parties, ED&F Man had a duty to create only truthful, accurate documents on behalf of the Goldstein Plan.

397.     By creating and issuing the Disavowed Vouchers, ED&F Man breached its implied covenant(s) with the Goldstein Parties.

398.     The Goldstein Parties are entitled to (a) full compensation for any remedies the Goldstein Parties are found to owe SKAT and all related costs thereto, (b) reimbursement of all expenses and costs, including legal fees, and (c) punitive damages.

## THIRD-PARTY CLAIM COUNT VI
### (Breach of Contract – Against ED&F Man)

399.     The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

400.     Pursuant to the brokerage and other agreements between ED&F Man and the Goldstein Parties, ED&F Man agreed, <u>inter alia</u>, that it would only charge the Plan custodian fees for transactions that it actually facilitated on behalf of the Plan.

401.     ED&F Man did, in fact, charge the Plan custodian fees in connection with arranging and executing the Danish Transactions.

402. If, as SKAT has alleged, the Plan did not actually own the shares and / or receive the net dividends giving rise to the nine Reclaim Applications, ED&F Man breached the agreements with the Plan by falsely reporting transactions to the Plan and charging custodian and other fees for transactions that ED&F Man never actually effected on behalf of the Plan.

403. In fact, ED&F Man already has admitted that the Plan did not receive the net dividends associated with the Spring 2014 Transactions.

404. Moreover, the General Ledger reflects dozens of other unexplained and undisclosed charges to the Plan, which include undisclosed charges paid to affiliates of ED&F Man.

405. If ED&F Man breached the contracts in this manner, the Goldstein Parties are entitled to (a) full compensation for any remedies the Goldstein Parties are found to owe SKAT and all related costs thereto, (b) reimbursement of all expenses and costs, including legal fees, and (c) punitive damages.

## THIRD-PARTY CLAIM COUNT VII
**(Breach of the Covenant of Good Faith and Fair Dealing – Against ED&F Man)**

406. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

407. ED&F Man induced the Goldstein Plan to execute brokerage agreements by, inter alia, promising to properly execute securities transactions on the Plan's behalf and bring sound investment opportunities to the Plan.

408. However, ED&F Man frustrated the purpose of the brokerage agreements by soliciting and facilitating the transactions underlying the Reclaim Applications, which ED&F Man knew or should have known were wrongful and subjected the Goldstein Parties to legal, financial, reputational, and other exposure that the Goldstein Parties could not have anticipated when the Plan entered into the brokerage agreements.

409. ED&F Man frustrated the purpose of the brokerage agreements between ED&F Man and the Plan by effectuating transactions in order to enrich itself and its affiliates at the Plan's expense.

410. Moreover, ED&F Man's creation of the false Tax Vouchers has exposed the Goldstein Parties to unjustifiable liabilities.

411. ED&F Man's breach of the covenant has harmed the Goldstein Parties in an amount no less than all money they have ever paid to ED&F Man, plus all damages, fees, and other expenditures the Goldstein Parties incur in connection with this litigation.

### THIRD-PARTY CLAIM COUNT VIII
### (Tortious Interference with Contract – Against John Does 1–10)

412.     The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

413.     Upon information and belief, John Does 1–10 caused ED&F Man to effect transactions for ED&F Man's and its affiliates' own benefit, at the Plan's expense.

414.     Upon information and belief, John Does 1–10 also caused ED&F Man to hide the affiliate relationships and its payments thereto from the Goldstein Parties.

415.     Upon information and belief, John Does 1–10 also caused ED&F Man to issue the Disavowed Vouchers.

416.     Upon information and belief, this wrongful conduct has harmed the Goldstein Parties in an amount no less than all money they have ever paid to ED&F Man, plus all damages, fees, legal fees, and other expenditures the Goldstein Parties incur in connection with this litigation and related disputes.

### THIRD-PARTY CLAIM COUNT IX
### (Breach of Fiduciary Duty by Charging Undisclosed Fees –
### Against ED&F Man)

417.     The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

418.     ED&F Man owed fiduciary duties to the Plan.

419.     ED&F Man's fiduciary duties included the duty to only charge fees for transactions that it actually arranged, executed, and certified on the Plan's behalf.

420.     ED&F Man charged the Plan significant fees in connection with each of the nine Danish Transactions.

421.     However, ED&F Man has now admitted that it behaved deficiently with regard to at least four of the nine Danish Transactions.

422.     ED&F Man's charging and collection of fees in relation to the Disavowed Vouchers is wrongful and breaches numerous fiduciary and brokerage standards of conduct and duties owed to the Goldstein Parties.

423.     ED&F Man's breaches of fiduciary and brokerage duties has damaged the Plan in an amount to be revealed during discovery and proven at trial.

### THIRD-PARTY CLAIM COUNT X
### (Aiding and Abetting Breach of Fiduciary Duty – Against John Does 1–10)

424.     The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

425.     Upon information and belief, John Does 1–10 caused ED&F Man to charge and collect unauthorized fees relating to the Disavowed Vouchers.

426.     In doing so, John Does 1–10 have damaged the Plan in an amount to be revealed during discovery and proven at trial.

### THIRD-PARTY CLAIM COUNT XI
### (Breach of Fiduciary Duty by Self-Dealing – Against ED&F Man)

427.     The Goldstein Parties repeat the previous allegations as if fully set forth herein.

428.     By its conduct, ED&F Man became a fiduciary to the Plan with all of the duties of a fiduciary.

Case 1:18-md-02865-LAK Document 821-3 Filed 11/05/19 Page 64 of 67

429. ED&F Man's fiduciary duties included the duty not to engage in self-dealing with respect to the Goldstein Plan's assets.

430. However, ED&F Man did exactly that.

431. Upon information and belief, ED&F Man created, structured, and sold the Danish Dividend Transactions to the Plan with the primary motive of enriching ED&F Man entities, including, among others, ED&F Man and Volcafe.

432. In brokerage terms, ED&F Man's acts comprised the quintessential "solicited trade."

433. Upon information and belief, ED&F Man failed to explain material terms regarding these transactions, including that ED&F Man and its affiliates were benefiting directly and indirectly in fees ED&F Man charged to the Plan.

434. Upon information and belief, with regard to those transactions, ED&F Man was acting not only as the Plan's broker, but also in other, undisclosed capacities that conflicted with the Plan's interests.

435. ED&F Man never adequately disclosed that it was acting in various conflicting and undisclosed capacities in connection with the transactions.

436. ED&F Man's multiple roles in participating directly and / or indirectly in fees and charges presented multiple conflicts of interest.

437. In the English Action, ED&F Man has pleaded that it may be impossible for SKAT to recover because ED&F Man already compensated its personnel for the activity underlying SKAT's claims against it.

438. Upon information and belief, ED&F Man and its affiliates paid bonuses to personnel for structuring and executing the Danish Transactions.

439. ED&F Man failed to adequately disclose its self-dealing.

440. The Plan never consented to ED&F Man's self-dealing.

441. ED&F Man's conflicts of interest in these transactions encouraged and caused it to overcharge the Goldstein Parties for transactions it performed with regard to the Goldstein Plan.

442. Upon information and belief, ED&F Man did overcharge the Plan throughout their relationship.

443. ED&F Man's self-dealing has damaged the Goldstein Parties in an amount to be revealed during discovery and proven at trial.

### THIRD-PARTY CLAIM COUNT XII
### (Aiding and Abetting Breach of Fiduciary Duty – Against John Does 1–10)

444. The Goldstein Parties repeat the foregoing allegations as if fully set forth herein.

445. John Does 1–10 knew or should have known that ED&F Man owed fiduciary duties to the Plan.

446. Upon information and belief, John Does 1–10 incentivized ED&F Man to cause the Plan to trade with its affiliates without proper disclosure.

447. John Does 1–10's aiding and abetting of ED&F Man's breach of fiduciary duty has damaged Counterclaim–Plaintiffs in an amount to be revealed during discovery and proven at trial.

WHEREFORE, for the reasons outlined above, Counterclaim–Plaintiffs request that this Court enter judgment in their favor as follows:

A.      Deny SKAT all relief sought in its Complaint against the Goldstein Parties;

B.      For Counterclaim Count I, SKAT is bound by the decisions of this Court relating to or arising out of the transactions and facts set forth in the Complaint against the Goldstein Parties in all other jurisdictions and venues;

C.      For Counterclaim Count II, SKAT is preliminarily and permanently enjoined from pursuing actions in other jurisdictions arising out of the same transactions at issue in the Complaint;

D.      For Counterclaim Counts III and IV, SKAT is liable to the Goldstein Parties for damages sustained by SKAT's wrongful conduct in refusing to reimburse the Plan in connection with the Plan's Reclaim on dividends received in the amount of DKK 1,822,230, plus pre- and post-judgment interests, fees, costs and expenses;

E.      For Third-Party Claims I through IX and XI, ED&F Man is liable to the Goldstein Parties for all damages caused by ED&F Man's wrongful conduct;

F.      For Third-Party Claims I, X, and XII, John Does 1–10 are liable to the Goldstein Parties for all damages caused by their inducement and facilitation of ED&F Man's wrongful conduct;

G.      For all Counts, SKAT, ED&F Man and John Does 1–10 are jointly and severally liable for the costs of this action; and

H.      For all Counts, SKAT, ED&F Man and John Does 1–10 are jointly and severally liable for all other and further relief that is just and proper.

## <u>JURY DEMAND</u>

The Goldstein Parties demand a jury trial on all issues so triable.

Respectfully submitted,

GUSRAE KAPLAN NUSBAUM PLLC

/s/ Martin H. Kaplan
Martin H. Kaplan
Kari Parks
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
mkaplan@gusraekaplan.com
kparks@gusraekaplan.com

*Counsel for Defendants–Counterclaim-Plaintiffs–Third-Party Plaintiffs The Goldstein Law Group PC 401(K) Profit Sharing Plan & Sheldon Goldstein*

Dated: November 5, 2019
   New York, New York