# Exhibit 7

# (Part 2 of 2)

(a)     Between 21 May 2014 and 26 August 2015, SCP made further payments to Elysium Global or Elysium Global Dubai totalling circa €10 million, £229 million and US$96 million89,000,000;

(b)     Between 7 January 2014 and 29 April 2015, SCP made further payments to Gaymede Cayman totalling €9 million and £18 million;

(c)     Between 10 January 2014 and 11 August 2015, SCP made further payments to Sanjay Shah totalling €9.818 million and £2.493 million and US$151,000;

(d)     Between 10 and 13 June 2014, SCP made payments of €1,554,375 and £60,000 to Mr Barac (the 23rd Defendant in the First Claim);

(e)     Between 10 January 2014 and 7 August 2014, SCP made further payments to Mr Jas Bains (the 40th Defendant in the First Claim) totalling £3.245 million;

(f)     Between 10 September 2014 and 5 August 2015, Treefrog Capital Limited (the 19th Defendant in the Second Claim, formerly known as Arche Cayman Limited) received payments directly from SCP totalling €13,545,774 and US$2,000,500;

(g)     Between 15 May 2014 and 9 January 2015, Mr Darren Lui (the 13th Defendant in the First Claim) received sums directly from SCP totalling £274,191;

(h)     Between 7 January 2014 and 6 June 2014, Rajan Shah received sums totalling £6.596 million from SCP;

(i)     Between 8 January 2014 and 9 May 2014, Hooloomooloo (the 47th Defendant in the First Claim) received sums totalling JPY 24,180,000 and £950,000 from SCP;

(j)     Between 31 March 2014 and 31 March 2015, Solo Capital Limited (the 24th Defendant in the First Claim) received sums totalling £1,152,700 from SCP;

(k)     Between 15 May 2014 and 3 December 2014, Agrius Capital Limited (the 12th Defendant in the First Claim) received sums totaling £531,000 and €17,000 from SCP;

(l)     Between 9 January 2014 and 13 January 2015, Aesa Sarl (the 39th Defendant in the First Claim) received sums totalling €2,150,333 from SCP;

(m)     Between 29 May 2014 and 6 June 2014, Anupe Dhorajiwala (the 20th Defendant in the First Claim) received sums totalling €1,500,000 from SCP;

(n)     Between 21 August 2014 and 26 June 2015, Old Park Lane Capital Limited (the 3rd Defendant in the First Claim) received sums totalling £206,099 from SCP; and

(o)     Between 14 January 2014 and 19 August 2015, Telesto Markets LLP (the 2nd Defendant in the First Claim) received sums totalling €320,000 and USD 672,522 from SCP.

33.     Further, substantial payments were made to the Alleged Fraud Defendants by other Alleged Fraud Defendants using monies received from SCP and traceable to sums paid by SKAT. In particular, as set out in Schedule 5 hereto:

(a)     Between 13 January and 25 June 2015, Ganymede Cayman received further sums totalling €11,302,870 and US$6,399,975;

(b)     Between 24 June 2014 and 15 September 2015, Mr Sanjay Shah received further sums totalling €51,100,000, AED 21,500,050, US$195,929.20 and £47,325,519.60;

(c)     Between 1 July 2014 and 15 September 2015, Mr Anthony Mark Patterson (the 5th Defendant in the First Claim) received net sums totalling €24,500,000 and £2,182,000;

(d)     Between 28 November 2014 and 18 May 2015, Elysium Dubai received further sums totalling €44,395,000, US$13,555,000 and £1,500,000;

(e)     On 13 May 2015, Ampersand received further sums totalling €3,561,698.63

(f)     Between 28 October 2013 and 4 July 2014, Graham Horn (the 15th Defendant in the Second Claim and the 2nd Defendant in the Third Claim) received a total of £23,520,421 from SCP via or in connection with Ganymede Cayman;

(g)     Between 18 June 2015 and 6 August 2015, Elysium Global Limited received further sums totalling €4,391,081 and £1,082,125;

(h)     Between 8 May 2015 and 13 May 2015, T&S Capital received further sums totalling €5,171,698.63;

(i)     On Between 16 September 2014 and 28 May 2015, Colbrook received a total of €3,095,000 and £1,997,439;

(j)     Between 1 August 2014 and 18 June 2015, Mr Priyan Shah (the 21st Defendant in the First Claim) received a total of £21,500,000 and €2,600,000;

(k)     Between 1 August 2014 and 18 June 2015, Mr Gerard O'Callaghan (the 22nd Defendant in the First Claim) received a total of £21,000,000 and €2,600,000;

(l)     On 9 October 2014, Mr Edo Barac received a further sum of £3,000,000;

(m)     Between 25 June 2014 and 5 November 2015, Mrs Usha Shah (the 36th Defendant in the First Claim) received a total of £250,000 and AED10,100,025;

(n)     Between 7 April 2015 and 7 December 2015, Ms Daksha Bhudia (the 39th Defendant in the First Claim) received a total of €1,533,896.19;

(o)     Between 9 January 2014 and 11 May 2015, AESA (the 30th Defendant in the First Claim) received sums totalling of €5,150,332 and £267,976;

(p)     Between 8 July 2014 and 4 June 2015, Ms Stratford (the 41st Defendant in the First Claim) received a total of €7,014,500 and £500,000;

(q)     On 15 September 2015, Elysium Global Trading Limited (the 49th Defendant in the First Claim) received a total of €50,100,000;

(r)     Between 16 December 2014 and 5 October 2015, Mr Martin Smith (the 63rd Defendant in the First Claim) received a total of £2,553,650 and €630,000;

(s)     Between 4 December 2014 and 13 May 2015 Treefrog Capital Ltd received further sums totalling €7,240,100 and £5,800,000;

(t) Between 17 February and 5 June 2015, Mr Darren Lui (the 13th Defendant in the First Claim) received further sums totalling £194,452.00;

(u) On 27 May 2015, Mr Llewelyn (the 29th Defendant in the First Claim) received a payment of US$92,044.24;

(v) On 22 June 2015, Agrius Capital Limited (or Agrius Capital Partners LLP) received a sum of £180,324.24;

(w) Between 13 May and 26 November 2015, Michael Murphy (the 3rd Defendant in the Third Claim) received sums totalling €4 million, together with a further "loan" of AED15,341,059 via his company (Lanesra Consultancy DWC LLC) on a date unknown;

(x) On 5 June 2015, Mr Knott and Mr Hoogewerf (the 6th and 7th Defendants in the Third Claim) each received €2.76 million;

(y) Between 5 February 2015 and 3 June 2015, Mr Anupe Dhorajiwala (the 20th Defendant in the Second Claim) received a total of €10,500,000,249,748.12, US$2,249,748.12, AED 3,800,000 and £500,000; and

(z) On 13 August 2015, FGC Elysium Holdings Ltd (the 21st Defendant in the Second Claim) received a total of US$11,000,000.

**F4. Purchase of controlling shareholding in Varengold Bank AG**

34. Between May 2014 and June 2015, a total of approximately DKK216 million (€29 million) of the funds received by SCP was used for the purchase of 40.89% of the shares in Varengold Bank. The purchase was made by means of the following transactions:

(a) On 13 May 2014, SCP paid €3.191 million to Varengold Bank as consideration for the issue of 159,571 shares in Varengold Bank. The shares were issued to Agrius Capital Limited (the 12th Defendant in the First Claim). On 28 April 2015, Agrius Capital Limited transferred the shares to its subsidiary, Rivera One Limited (the 7th Defendant in the First Claim). As set out in Schedule 5E, at the time of the said transactions, Agrius Capital Limited and Rivera One

Limited were ultimately beneficially owned by Priyan Shah and Gerard O'Callaghan (the 21st and 22nd Defendants in the First Claim).

(b)     Between 12 June 2014 and 4 July 2014, SCP transferred a total sum of €10.263 million to the account of Ampersand Capital Limited (the 51st Defendant in the First Claim) at Varengold Bank. On 17 June 2014, Ampersand Capital Limited acquired 160,000 shares in Varengold Bank from former directors of Varengold Bank for a sum of €4.96 million. On 30 April 2015, Ampersand Capital Limited transferred the shares to its subsidiary PCM Capital Limited (the 9th Defendant in the First Claim). As set out in Schedule 5D, at the time of the said transactions, Ampersand Capital Limited and PCM Capital Limited were ultimately beneficially owned by Anthony Mark Patterson (the 5th Defendant in the First Claim).

(c)     On 20 June 2014, SCP transferred €4,680,999.81 to the account of Ace City Holding Limited (the 43rd Defendant in the First Claim) at Varengold Bank. On 24 June 2014, Ace City Holding Limited acquired 151,000 shares in Varengold Bank from former directors of Varengold Bank for a sum of €4,680,999. On 30 April 2015, Ace City Holding Limited transferred the shares to its subsidiary, Astella Capital Limited (the 8th Defendant in the First Claim). As set out in Schedule 5H, at the time of the said transactions, Ace City Holding Limited and Astella Capital were ultimately beneficially owned by Darren Lui (the 13th Defendant in the First Claim).

(d)     On 20 June 2014, SCP transferred €3.1 million to the account of Oberix International Corporation (the 52nd Defendant in the First Claim) at Varengold Bank. On 27 June 2014, Oberix International Corporation acquired 160,000 shares in Varengold Bank from former directors of Varengold Bank for a sum of €3.1 million. On 30 April 2015, Oberix International Corporation transferred the shares to its subsidiary, Eris Investments Limited (the 10th Defendant in the First Claim). As set out in Schedule 5G, at the time of the said transactions, Oberix International Corporation and Eris Investments Limited were ultimately beneficially owned by Mankash Jain (the 32nd Defendant in the First Claim).

(e)      On 20 June 2014, SCP transferred €5,239,000.27 to the account of Silverfox Holding Limited (the 42nd Defendant in the First Claim) at Varengold Bank. On 27 June 2014, Silverfox Holding Limited acquired 169,000 shares in Varengold Bank from former directors of Varengold Bank for a sum of €5,239,000. On 28 July 2015, Silverfox Holding Limited transferred the shares to its subsidiary, Silvercouk Limited (the 11th Defendant in the First Claim). As set out in Schedule 5F, at the time of the said transactions, Silverfox Holding Limited and Silvercouk Limited were ultimately beneficially owned by Edo Barac and Jas Bains (the 23rd and 40th Defendants in the First Claim).

(f)      On 18 February 2015, SCP paid €3.54 million to Varengold Bank as consideration for the issue of 176,963 in Varengold Bank. The shares were issued to Skyfall Financial Limited (the 56th Defendant in the First Claim). On 13 May 2015, Skyfall Financial Limited transferred the shares to its subsidiary, Bellview Financial Limited (the 6th Defendant in the First Claim). As set out in Schedule 5K, at the time of the said transactions, Skyfall Financial Limited and Bellview Financial Limited were ultimately beneficially owned by Paul Preston (the 38th Defendant in the First Claim).

(g)      Between 7 January 2015 and 2 April 2015, T&S Capital (the 44th Defendant in the First Claim) purchased a total of 48,049 shares in Varengold Bank for a total sum of €702,089.80, paid from its account at Varengold Bank. The said sum was derived from funds provided to T&S Capital directly or indirectly by SCP. On 5 January 2016, T&S Capital Limited received a further 146,397 shares in Varengold Bank. It did not pay for these shares and, SKAT infers, they were ultimately paid for by funds originating from SCP. As set out in Schedule 5M, at the time of the said transactions, T&S Capital was ultimately beneficially owned by Daksha Bhudia (the 39th Defendant in the First Claim).

(h)      Between 7 January 2015 and 2 April 2015, Colbrook Limited (the 45th Defendant in the First Claim) purchased a total of 48,174 shares in Varengold Bank for a total sum of €703,840.26, paid from its account at Varengold Bank. The said sum was derived from funds provided to Colbrook Limited directly or indirectly by SCP. On 28 January 2015, Colbrook Limited purchased a further 36,000 shares in Varengold Bank for €792,000, paid from its account at

Varengold Bank. As set out in Schedule 5L, at the time of the said transactions, Colbrook Limited was ultimately beneficially owned by Martin Smith (the 63rd Defendant in the First Claim).

35.   In early 2015, AESA Sarl (the 30th Defendant in the First Claim) acquired a further 5.47% shareholding in Varengold Bank (with funds paid to it from Ganymede Cayman as a purported "bonus") and Elysium Global (Dubai) Ltd ("**Elysium Dubai**", the 35th Defendant in the First Claim) acquired a further 33.32% shareholding in Varengold Bank. Both AESA Sarl and Elysium Dubai are ultimately beneficially owned by Mr Sanjay Shah.

36.   Each of the acquisitions referred to in paragraph 34 and 35 above was financed by SCP, using funds which were the traceable proceeds of sums paid by SKAT and were subject to the constructive trust referred to at paragraph 30 above. SKAT infers this to be the case with respect to the transactions in paragraph 35 because the other share acquisitions in Varengold Bank acquired indirectly by Mr Shah were financed entirely from funds obtained from SKAT, and some DKK4 billion of the sums paid by SKAT that were paid on to SCP remain unaccounted for.

37.   The purchase of and dealing with the shares in Varengold Bank was centrally co-ordinated by or on the instructions of Mr Sanjay Shah for the benefit of him and his associates (namely Mr Patterson, Mr Lui, Mr Jain, Mr Barac, Mr Bains, Mr Preston, Mr Priyan Shah, Mr O'Callaghan, Ms Bhudia and Mr Smith), many of whom also received substantial payments of the traceable proceeds of SKAT's money (directly or indirectly via SCP) as set out in Section F3 above. In particular:

  (a)   The accounts at Varengold Bank used for the acquisition or holding of the shares were set up around the same time in 2014, shortly before the purchases of the Varengold shares;

  (b)   The accounts at Varengold Bank were used solely as conduits to effect the purchases of Varengold shares and to pay out sums to the relevant principals and evidence no legitimate trading activity;

(c) The shares in Varengold Bank were acquired at around the same times (the first tranche in May-June 2014 and the second tranche in January to April 2015) in the same manners;

(d) The shares in Varengold Bank were all acquired using funds provided by SCP that were traceable to SKAT;

(e) The subsequent transfer of the shares in Varengold Bank to PCM Capital, Astella Capital, Eris Investments, Silvercouk and Rivera One occurred in the same manner at around the same time to SPVs established at around the same time for such purpose.

38. Further, on the dates set out in Schedule 5 (or on a presently unknown date, which SKAT believes to be after March 2017), Elysium Dubai acquired the shares in PCM Capital Limited, T&S Capital Limited, Colbrook Limited, Ampersand Capital Limited, Skyfall Holdings Limited and Skyfall Financial Limited. Elysium Dubai thereby acquired indirect control of a further 21.06% of the shares in Varengold Bank.

39. Yet further, as set out in Schedules 5E, ~~and~~ 5F and 5M hereto:

(a) Elysium Dubai entered into purported loan and security agreements with Skyfall Holdings Ltd, Agrius Capital Partners LLP, T&S Capital and Luna Capital Partners LLP:

(i) which were sham transactions and agreements entered into by the parties thereto with a common intention to mislead:

(A) knowing that (or being reckless as to whether) such transactions did not create the legal rights and obligations that they had the appearance of creating;

(B) for the true purpose of concealing the fact that the acquisition of the shares in Varengold Bank by those parties ~~Agrius Capital Ltd and Silver Fox Holdings Ltd~~ had been paid for by SCP;

(ii)   alternatively, which were designed to give Mr Sanjay Shah effective control over or in relation to the indirect owners of the shares in Varengold Bank;

(b)   Based on the facts and matters in paragraphs 37(a) and 39(a) above, it is inferred that Elysium Dubai (or another entity ultimately owned and controlled by Mr Sanjay Shah) entered into the same or similar arrangements with respect to the other acquisition of shares in Varengold Bank referred to in paragraph 34 above, for the same or similar purposes;

(c)   Further or alternatively, on or around 12 August 2014, Ace City Holding Limited granted a call option to Elysium Dubai in respect of its 151,000 shares in Varengold Bank, giving Elysium Dubai the right to purchase the said shares (purchased for €4.68 million) for €100.

40.   In the circumstances, it is inferred that the above holders of the shares in Varengold Bank were acting as nominees for Mr Shah/his companies, such that Mr Shah's ultimate beneficial interest in Varengold Bank was 79.69%. Alternatively, Mr Sanjay Shah's ultimate beneficial interest in Varengold Bank increased from at least 38.79% to at least 59.85% upon Elysium Dubai's acquisition of the shares in the companies referred to in paragraph 38 above and he exercised effective control over or in relation to the other holders of the shares in Varengold Bank as aforesaid.

41.   It is inferred that the purpose(s) of the aforementioned transactions was to enable Sanjay Shah (and/or persons affiliated with him referred to in paragraph 37 above) to obtain effective control over Varengold Bank, which was being used and/or would be used:

(a)   as a vehicle through which to launder and/or conceal and/or distribute proceeds of the WHT Applications as set out in paragraphs 31 and 33 above; and/or

(b)   as a counterparty for stock lending and/or custodian or clearing house to facilitate the making of WHT Applications.

**F5.**   **Purchase of 100% of the shares in Dero Bank AG**

42.   In 2015, a total of DKK213.18 million (€28.57 million) of the funds received by SCP was used for the purchase of 100% of the shares in Dero Bank AG ("**Dero Bank**"). The purchase was made by means of the following transactions:

    (a)   Between 21 November 2014 and 11 June 2015, SCP made a net transfer of €59.48 million to the account of Trillium Capital Sarl (the 32nd Defendant in the First Claim, formerly known as VEM Holdings Sarl) at Varengold Bank;

    (b)   On 23 June 2015, Trillium Capital Sarl transferred €29,500,222.81 to its account at ING Luxembourg SA;

    (c)   In the second half of 2015, Trillium Capital Sarl purchased 100% of the shares in Dero Bank for €28.573 million. The funds transferred as part of the purchase were the traceable proceeds of sums paid by SKAT, and which were subject to the constructive trust referred to at paragraph 30 above.

43.   At the time of the said transactions, Trillium Capital Sarl was (ostensibly) ultimately beneficially owned by the following parties:

    (a)   Sanjay Shah as to 45.05%, through Trillium Holdings (BVI) Limited (formerly known as Cielo Global Limited) (the 53rd Defendant in the First Claim);

    (b)   Priyan Shah as to 8.85%, through Serafine Capital Limited and Serafine Investments Limited (the 25th and 26th Defendants in the First Claim);

    (c)   Gerard O'Callaghan as to 8.85%, through Kenna Capital Limited and Kenna Investments Limited (the 27th and 28th Defendants in the First Claim);

    (d)   Edo Barac as to 7.85%, through Luna Capital Partners LLP, Copella Capital Limited and Zuben Capital Limited (the 18th to 20th Defendants in the First Claim);

    (e)   Darren Lui as to 7.85%, through Wang International Holdings Limited and Wong International Holdings Limited (the 58th and 59th Defendants in the First Claim);

(f)    Mankash Jain as to 7.85%, through DoubleTwo Holdings Limited and DoubleTwo Investments Limited (the 60th and 61st Defendants in the First Claim)

(g)    Anthony Mark Patterson as to 6.85%, through Woodfields Holdings Capital Limited and Woodfields Financial Limited (the 54th and 55th Defendants in the First Claim).

(h)    Michael Murphy (the 3rd Defendant in the Third Claim) as to 6.85%, through Polaris Capital Limited and Polaris Capital (One) Limited (the 4th and 5th Defendants in the Third Claim).

44.    At a presently unknown date (but which SKAT believes to be after March 2017), Elysium Dubai acquired shareholdings in Woodfields Holdings Capital Limited, Woodfields Financial Limited, Polaris Capital Limited and Polaris Capital (One) Limited.

45.    Yet further, as set out in Schedules 5E-F hereto:

(a)    Elysium Global or Elysium Dubai entered into purported loan and security agreements with Kenna Capital Ltd, Serafine Capital Limited and Luna Capital Partners LLP:

(i)    which were sham transactions and agreements entered into by the parties thereto with a common intention to mislead:

(A)    knowing (or being reckless as to whether) that such transactions did not create the legal rights and obligations that they had the appearance of creating;

(B)    for the true purpose of concealing the fact that the intended acquisition of the shares in Dero Bank (via Trillium Capital Sarl) by Kenna Investments Ltd, Serafine Investments Limited and Zuben Capital Limited would be paid for using funds provided by SCP;

(ii) alternatively, which were designed to give Mr Sanjay Shah effective control over or in relation to the intended indirect owners of the shares in Dero Bank;

(b) Based on the facts and matters in paragraphs 3739(a), 39(a) and 45(a) above, it is inferred that Elysium Global or Elysium Dubai (or another entity ultimately owned and controlled by Mr Sanjay Shah) entered into similar arrangements with respect to the other acquisition of shares in Dero Bank (through Trillium Capital Sarl) referred to in paragraph 43 above.

46. In the circumstances, it is inferred that the above holders of the shares in Dero Bank were acting as nominees for Mr Shah/his companies, such that Mr Shah's ultimate beneficial interest in Dero Bank was 100%. Alternatively, Mr Sanjay Shah's ultimate beneficial interest in Dero Bank increased from at least 45% to at least 58.7% upon Elysium Dubai's acquisition of the shares in the aforesaid companies and he exercised effective control over or in relation to the other holders of the shares in Dero Bank as aforesaid.

47. In the premises, it is inferred that the purpose(s) of the aforementioned transactions was to enable Sanjay Shah (and/or persons affiliated with him, namely Mr Lui, Mr Jain, Mr Murphy, Mr O'Callaghan, Mr Priyan Shah, and Mr Barac) to obtain effective control over Dero Bank which was being used and/or would be used:

(a) as a vehicle through which to launder and/or conceal and/or distribute proceeds of the WHT Applications; and/or

(b) as a counterparty for stock lending and/or custodian or clearing house to facilitate the making of WHT Applications.

## F6. Other transfers

48. SKAT is continuing to investigate the ultimate destination of the remainder of the money paid to the Agents and Global in respect of the WHT Applications. It reserves the right to update or supplement these particulars following disclosure and/or evidence, including to plead the ultimate destination of the monies paid to Koi.

**G    THE WHT SCHEME**

49.    The WHT Applications were made as part of a fraudulent scheme (or schemes) (the **"WHT Scheme"**) by which the Alleged Fraud Defendants:

(a)    identified or procured or assisted in the formation of seemingly eligible applicants for WHT refunds;

(b)    manufactured fictitious and/or sham transactions and/or carried out illegitimate trading for the purpose of facilitating WHT Applications;

(c)    made or procured or assisted in the making of the WHT Applications, including the WHT Representations; and

(d)    dealt with the sums paid by SKAT in reliance on said representations in such a way as to conceal and/or launder and/or distribute the proceeds of the WHT Applications.

50.    The WHT Scheme was co-ordinated by a small group of individuals and their corporate entities (namely, the Alleged Fraud Defendants), who (it is to be inferred) knew they were acting as part of a common scheme and with a common design to defraud SKAT for their personal benefit. SKAT will rely on the following facts and matters (as further particularised in the Schedule 5 hereto):

(a)    the large majority of WHT Applicants were (SKAT infers) formed shortly before and for the purpose of making the WHT Applications, as set out in paragraph 24(b)(ii)(A) above;

(b)    DKK8.055 billion (out of a total of DKK12.665~~73~~ billion) was refunded in respect of WHT Applicants that were US pension plans with one of the same 6 individuals as authorised representatives <u>who signed the powers of attorney to the tax reclaim agents</u> (Roger Lehman; Michael Ben-Jacob; Matthew Tucci; Doston Bradley; Donald Donaldson; and Adam LaRosa). In particular:

(i)    Mr Donaldson was the authorised representative for 58 US pension plans in respect of whose WHT Applications SKAT paid out DKK2.708 billion;

(ii) Mr Lehman was the authorised representative for 48 US pension plans in in respect of whose WHT Applications SKAT paid out DKK1.586 billion;

(iii) Mr La Rosa was the authorised representative for 24 US pension plans in in respect of whose WHT Applications SKAT paid out DKK1.185 billion;

(iv) Mr Tucci was the authorised representative for 27 US pension plans in in respect of whose WHT Applications SKAT paid out DKK1.160 billion;

(v) Mr Bradley was the authorised representative for 20 US pension plans in in respect of whose WHT Applications SKAT paid out DKK811 million; and

(vi) Mr Ben-Jacob was the authorised representative for 10 US pension plans in in respect of whose WHT Applications SKAT paid out DKK566 million;

(c) many of these individuals (or companies owned and controlled by them) received substantial payments from Solo Group or Elysium Group Companies. The best particulars SKAT can give are as follows:

(i) Mr Bradley (via Blackrain Advisors) and Mr Tucci (via White Sands Advisors) received alleged "loans" of US$2.5 million and US$3.5 million respectively from Elysium Dubai;

(ii) Mr Lehman received a payment of €83,000 from SCP on 14 May 2014;

(iii) Ganymede Cayman made payments to First Alton Inc (a company formed in February 2015 of which Roger Lehman is the director and, SKAT infers, the beneficial owner) **("First Alton")** in the following sums to an account (or accounts) at Bank of China: US$1,015,130.19 .015 million on 27 February 2015; US$1,060,000 .06 million on 12 May 2015; and US$2,012,559 .01 million on 2 June 2015 pursuant to an invoice dated 27 May 2015 and issued by First Alton to Ganymede Cayman for purported "advisory fees";

(iiiA) Ganymede Cayman made payments to SSM United LLC ("**SSM**") (a company formed on 29 May 2015 of which Kevin Lehman is the director and, SKAT infers, Roger Lehman is the beneficial owner) on 30 June 2015 in the sum of US$1,986,225, pursuant to an invoice dated 25 May 2015 issued by SSM to Ganymede Cayman for purported "advisory services";

(iv) Ganymede Cayman made payments to India Atlantic Inc (a company formed in May 2015 of which Doston Bradley is the director and, SKAT infers, the beneficial owner) ("**India Atlantic**") in at least the following sums to an account (or accounts) at Bank of China pursuant to an invoice dated 28 May 2015 and issued by India Atlantic to Ganymede Cayman for a purported "advisory fee" under a "service agreement" in the sum of US$2,008,732: US$238,732~~000~~ on 8 May 2015; US$246,957 ~~000~~ on 10 June 2015; US$239,268~~96,000~~ on 15 June 2015; US$241,957 ~~000~~ on 16 June 2015; and US$243,589~~000~~ on 18 June 2015;

(v) Ganymede Cayman made payments to Icon Beach Inc (a company formed in May 2015 of which Matthew Tucci is the director and, SKAT infers, the beneficial owner) ("**Icon Beach**") in at least the following sums to an account (or accounts) at Bank of China pursuant to an invoice dated 15 May 2015 and issued by Icon Beach to Ganymede Cayman for a purported "advisory fee" in the sum of US$2,009,503: US$249,503~~000~~ on 8 June 2015; US$243,674~~000~~ on 10 June 2015; US$246,947 on 16 June 2015; and US$245,612~~000~~ on 18 June 2015;

(c1) further, many of the same individuals (or companies owned and controlled by them) received substantial payments indirectly from Solo Group or Elysium Group Companies. As set out below, the indirect payments were made purportedly for "advisory fees" or "consultancy fees" in respect of services alleged rendered by newly formed companies of Mr Tucci, Mr Lehman and Mr Bradley to other newly formed companies forming part of the Solo Group or Elysium Group Companies, namely:

(i)     Parla Global Investments Limited (a BVI company incorporated on 8 July 2015 which was initially owned and controlled by Mrs Usha Shah and later by Elysium Global and/or Mr Sanjay Shah) ("**Parla**");

(ii)    Acai Investments Limited (a BVI company incorporated on 7 July 2015 which was initially owned and controlled by Mrs Usha Shah and later by Elysium Global and/or Mr Sanjay Shah) ("**Acai**");

(iii)   Philo Holdings Limited (a BVI company incorporated on 6 July 2015 which was initially owned and controlled by Mrs Usha Shah and later by Elysium Global and/or Mr Sanjay Shah) ("**Philo**"); and/or

(iv)    Fire Capital Limited (a BVI company incorporated on 29 May 2015 which was initially owned and controlled by Mrs Usha Shah and later by Elysium Global and/or Mr Sanjay Shah) ("**Fire**").

(c2)   as to the payments made by Parla:

(i)     Mr Lehman and/or Mr Kevin Lehman (who SKAT infers is a relative of Mr Lehman) caused the following invoices to be issued to (and which SKAT infers were paid by) Parla by recently formed companies owned and/or controlled by them: (A) an invoice from First Alton dated 23 July 2015 in the sum of US$4,020,800.85, purportedly for "consultancy fees"; (B) an invoice from SSM dated 19 July 2015 in the sum of US$1,711,357.19, purportedly for "advisory fees";

(ii)    Mr Bradley caused the following invoices to be issued to (and which SKAT infers were paid by) Parla by recently formed companies established in July 2015 that were owned and/or controlled by him: (A) an invoice from Pacific India Inc ("**Pacific India**") dated 29 July 2015 in the sum of US$298,453, purportedly for an "advisory fee due under service agreement"; (B) invoices from India North Atlantic Inc ("**India North**") dated 29 July 2015 in the sums of US$186,974 and US$194,817, purportedly for an "advisory fee due under service agreement"; (C) an invoice from Atlantic India Inc ("**Atlantic India**") dated 29 July 2015 in the sum of US$287,521, purportedly for an

"advisory fee due under service agreement"; and (D) an invoice from India Atlantic dated 29 July 2015 in the sum of US$194,817, purportedly for an "advisory fee due under service agreement";

(iii)   Mr Tucci caused the following invoices to be issued to Parla by recently formed companies established in July 2015 that were owned and/or controlled by him (and which SKAT infers were paid by Parla): (A) an invoice from Starfish Dunes Inc ("**Starfish Dunes**") dated 1 July 2015 in the sum of US$309,131, purportedly for an "advisory fee"; (B) Sand Dollar Beach Inc ("**Sand Dollar**") dated 1 July 2015 in the sum of US$251,710, purportedly for an "advisory fee"; (C) an invoice from Lava Beach Inc ("**Lava Beach**") dated 1 July 2015 in the sum of US$246,843, purportedly for an "advisory fee"; and (D) an invoice from Icon Beach dated 1 July 2015 in the sum of US$200,929, purportedly for an "advisory fee";

(c3)   as to the payments made by Acai:

(i)   companies owned and/or controlled by Mr Lehman and/or Mr Kevin Lehman received the following payments from Acai: (A) SSM received US$1,760,018.09 on or around 29 July 2015 (pursuant to an invoice dated 19 July 2015, purportedly for "advisory services"); (B) First Alton received US$3,977,88.05 on or around 29 July 2015 (pursuant to an invoice dated 23 July 2015, purportedly for "consultancy fees");

(ii)   companies owned and/or controlled by Mr Bradley received the following payments from Acai: (A) India North received US$237,751 on or around 12 August 2015 (pursuant to an invoice dated 29 July 2015 purportedly for an "advisory fee due under service agreement"); (B) India Atlantic received US$264,389 on or around 12 August 2015 (pursuant to an invoice dated 29 July 2015 purportedly for an "advisory fee due under service agreement"); (C) Pacific India received US$287,989 on or around 12 August 2015 (pursuant to an invoice dated 29 July 2015 purportedly for an "advisory fee due under

service agreement"); (D) Atlantic India received US$257,832 on or around 12 August 2015 (pursuant to an invoice dated 29 July 2015 purportedly for an "advisory fee due under service agreement");

(iii)    companies owned and/or controlled by Mr Tucci received the following payments from Acai: (A) Sand Dollar received US$279,320 on or around 17 August 2015 (pursuant to an invoice dated 1 July 2015 purportedly for an "advisory fee"); (B) Lava Beach received US$204,030 on or around 17 August 2015 (pursuant to an invoice dated 1 July 2015 purportedly for an "advisory fee"); (C) Starfish Dunes received US$217,509 on or around 17 August 2015 (pursuant to an invoice dated 1 July 2015 purportedly for an "advisory fee"); (D) Icon Beach received US$302,800 on or around 17 August 2015 (pursuant to an invoice dated 1 July 2015 purportedly for an "advisory fee");

(c4)    as to the payments made by Philo:

(i)    companies owned and/or controlled by Mr Lehman and/or Mr Kevin Lehman received the following payments from Philo: (A) SSM received US$1,675,420.21 on or around 4 August 2015 (pursuant to an invoice dated 19 July 2015 purportedly for an "advisory services"); (B) First Alton received US$2,177,469.29 on or around 24 September 2015 (pursuant to an invoice dated 31 August 2015 purportedly for "consultancy fees");

(ii)    companies owned and/or controlled by Mr Bradley received the following payments from Philo: (A) India North received US$293,456 on or around 12 August 2015 (pursuant to an invoice dated 29 July 2015 purportedly for an "advisory fee due under service agreement"); (B) India Atlantic received US$234,567 on or around 12 August 2015 (pursuant to an invoice dated 29 July 2015 purportedly for an "advisory fee due under service agreement"); (C) Pacific India received US$256,098 on or around 12 August 2015 (pursuant to an invoice dated 29 July 2015 purportedly for an "advisory fee due under

service agreement"); (D) Atlantic India received US$245,397 on or around 12 August 2015 (pursuant to an invoice dated 29 July 2015 purportedly for an "advisory fee due under service agreement");

(iii) companies owned and/or controlled by Mr Tucci received the following payments from Philo: (A) Sand Dollar received US$300,214 on or around 17 August 2015 (pursuant to an invoice dated 1 July 2015 purportedly for an "advisory fee"); (B) Lava Beach received US$311,025 on or around 17 August 2015 (pursuant to an invoice dated 1 July 2015 purportedly for an "advisory fee"); (C) Starfish Dunes received US$249,727 on or around 17 August 2015 (pursuant to an invoice dated 1 July 2015 purportedly for an "advisory fee"); (D) Icon Beach received US$207,150 on or around 17 August 2015 (pursuant to an invoice dated 1 July 2015 purportedly for an "advisory fee");

(c5) as to the payments made by Fire:

(i) Mr Lehman and/or Mr Kevin Lehman (who SKAT infers is a relative of Mr Roger Lehman) caused the following invoices to be issued to Fire by companies owned and/or controlled by them (and which SKAT infers were paid by Fire): (A) an invoice from First Alton dated 23 July 2015 in the sum of US$3,975,089.59, purportedly for "consultancy fees"; (B) an invoice from SSM dated 19 July 2015 in the sum of US$1,853,212.73, purportedly for an "advisory services";

(ii) Mr Bradley caused the following invoices to be issued to Fire by companies owned and/or controlled by him (and which SKAT infers were paid by Fire): (A) invoices from Pacific India and India North dated 29 July 2015 in the sums of US$287,591 and US$261,531, purportedly for an "advisory fee due under service agreement"; (B) an invoice from Atlantic India dated 29 July 2015 in the sum of US$271,361, purportedly for an "advisory fee due under service agreement"; and (C) an invoice from India Atlantic dated 29 July 2015

in the sum of US$163,198, purportedly for an "advisory fee due under service agreement";

(iii)  Mr Tucci caused the following invoices to be issued to Fire by companies owned and/or controlled by him (and which SKAT infers were paid by Fire): (A) an invoice from Starfish Dunes dated 1 July 2015 in the sum of US$201,646, purportedly for an "advisory fee"; (B) Sand Dollar dated 1 July 2015 in the sum of US$263,218, purportedly for an "advisory fee"; (C) an invoice from Lava Beach dated 1 July 2015 in the sum of US$242,722, purportedly for an "advisory fee"; and (D) an invoice from Icon Beach dated 1 July 2015 in the sum of US$226,900, purportedly for an "advisory fee";

(c6)  The payments referred in subparagraphs c2-c5 above were all ultimately funded by SCP (with what SKAT infers were the traceable proceeds of the fraud on SKAT). Such payments were either made by SCP directly to the relevant recipients or were routed through other accounts held at (or with SCP but in the name of) Solo Group Custodians: Acai: Telesto; Philo: West Point Derivatives; and Fire: Old Park Lane. At around the same time, payments were booked as purported "loans" to Parla, Acai, Philo and Fire from Elysium Global in the financial statements of Elysium Global. By 31 March 2016, a total of €46.824 million had been booked as alleged "loans" from Elysium Global: €12.368m to Parla, €14.029m to Acai, €12.173m to Fire and €8.254m to Philo.

(c7)  Each of the paying companies (Parla, Acai, Philo and Fire) and each of the recipient companies owned and/or controlled by Mr Lehman, Mr Tucci and Mr Bradley were incorporated shortly before the invoices and payments referred to above. It is extremely implausible that, between the date of their incorporation (as set out above) and the dates of the invoices that "advisory" or "consultancy" services to the value of the above invoices were provided to Parla, Acai, Philo and Fire.

(c8)  There is no apparent innocent explanation for: (a) the use by Messrs Lehman, Bradley and Tucci of multiple newly formed companies to issue invoices; (b)

the issuing of multiple invoices by such corporate vehicles on the same or similar dates; (c) to four apparently independent companies all of which had the same control, ownership and source of funds).

(c9)  SKAT infers from the facts and matters identified in sub-paragraphs (c) to (c8) above that:

    (i)  the substantial aforementioned payments were made as a reward for the involvement of Messrs Lehman, Bradley and Tucci in the WHT Scheme; and

    (ii)  the following aspects of the transactions were employed to try to conceal this: (A) the issuing of invoices for "advisory fees" (or similar); (B) the use by each of Messrs Lehman, Bradley and Tucci of multiple companies to issue those invoices; (C) the interposition of Parla, Fire, Philo and Acai, for no commercial purpose, as conduits for payments from SCP.

(d)  further, Mr Donaldson (who was the authorised representative for the largest number of WHT Applications by value) was himself the trustee and beneficiary of DWM Pension Plan, on behalf of whom WHT Applications totalling DKK75.372 million were made between May 2014 and May 2015. Similarly:

    (i)  Mr La Rosa (who was the authorised representative for the third largest number of WHT Applications by value) was himself the trustee and beneficiary of Raubritter LLC Pension Plan, on behalf of whom WHT Applications totalling DKK59.825 million were made between May 2014 and May 2015;

    (ii)  Mr Lehman (who was the authorised representative for the second largest number of WHT Application by value) was himself the trustee and/or beneficiary of The Valerius LLC Solo 401K Plan, on behalf of whom WHT Applications totalling DKK35,970,976.27 were made between March 2014 and December 2014;

(iii)  Mr Bradley (who was the authorised representative for the fifth largest number of WHT Application by value) was himself the trustee and/or beneficiary of:

(A)  Blackrain Pegasus LLC Solo 401K Plan, on behalf of whom WHT Applications totalling DKK35,495,780.99 were made between January 2014 and September 2014; and

(B)  The Bradley London Pension Plan on behalf of whom WHT Applications totalling DKK69,217,447.21 were made in April 2015 and May 2015;

(d1)  further, payments in the manner set out in subparagraphs (c2)-(c9) above were made at around the same times to companies owned and/or controlled by Mr Daniel Fletcher, the 6th Defendant in the Second Claim. Mr Fletcher was the trustee of Roxy Ventures LLC Solo 401K Plan ("**Roxy**"), on behalf of whom WHT Applications totalling DKK34,906,040.46 were made between March 2014 and August 2008. As particularised in Schedule 5AB, companies owned and/or controlled by Mr Fletcher issued invoices in respect of "fees" to and/or received payments from Ganymede Cayman, Parla, Acai, Philo and Fire totalling US$34.5m;

(d2)  yet further, payments in the manner set out in subparagraphs 50(c1)-(c8) and (d1) above were made at around the same time to other corporate vehicles of persons who were (SKAT infers) participants in the WHT Scheme. Details of these payments are set out in Schedule 7. SKAT infers that they related to the relevant person's participation in circular transactions forming part of the Solo Model because the invoices referred to in Schedule 7 were issued around the same time as, and were stored by Elysium Dubai in the same Black Boxes (Boxes 10-B, 95-B and 98-B), as other invoices from known parties to the circular transactions pursuant to the Solo Model (including companies of Mr Lehman, Mr Tucci, Mr Bradley, Mr Fletcher, Mr Smith, Mr Oakley and Mr Mitchell, Ms Robson, Mr Griffiths, Mr Körner, Mr Mistry, Mr Grant-Klar, Mr Rajeev Dave and Mr Wilson);

(e)    certain brokers involved in the trading or purported trading facilitated WHT Applications received payments from SCP, Elysium Dubai or Ganymede Cayman. In particular:

(i)    Bastion Capital received the following payments:

(A)    payments totalling €764,393 and US$690,926 from SCP between 30 May 2014 and 17 August 2015; and

(B)    a payment of €36,949 from Ganymede Cayman on 6 August 2014;

(ii)    Novus Capital Markets Limited received the following payments:

(A)    payments totalling €780,980, £785,030 and US$34,877 from SCP between 22 April 2014 and 5 June 2015; ~~and~~

(B)    a payment of £65,000 from Elysium Dubai on 10 April 2015; and

(C)    a payment of £205,939.28 from SCP in November 2012 "on behalf of custody clients";

(iii)    TJM Partners received the following payments:

(A)    payments totalling €634,203 and US$118,477 from SCP between 30 May 2014 and 17 August 2015; ~~and~~

(B)    a payment of €5,510 from Ganymede Cayman on 3 September 2014~~.~~; and

(C)    a payment of US$117.971 from Elysium Dubai's USD account at Abu Dhabi Islamic Bank with payment reference "TJM Debt factoring";

(f)    yet further, the Solo Group or Elysium Group Companies subsequently acquired other brokers used in the trades purportedly supporting WHT Applications such as Novus Capital Markets Limited (acquired by Solo Group Holdings Limited, the 15th Defendant in the First Claim, in around June 2015) and FGC Securities LLC (acquired by FGC Elysium LLC, the 21st Defendant in the Second Claim, in August 2015). SKAT infers that, even prior to its

formal acquisition by Solo Group Holdings Limited, Novus Capital Markets Limited was associated with and/or controlled by the Solo Group or the Elysium Group Companies from at least 5 December 2014, by reason of it being identified as an "Affiliate Firm" in Schedule 5 to the Exclusivity Agreement between Acupay and AESA of that date;

(g) a number of the owners of the Malaysian WHT Applicants (such as Mr Jain, Mr Smyth, and Mr Turner) were associates of Mr Shah who received money or assets (directly or indirectly) derived from the fraud on SKAT via SCP ;

(h) other WHT Applicants (the 64th and 65th Defendants to the First Claim) were owned or controlled by associates of Mr Sanjay Shah, including Mr Grant-Klar (the 9th Defendant to the Second Claim), who formerly held management positions at the Solo Group Companies and/or the Elysium Group Companies as set out in Schedule 5U;

(i) the limited number of Custodians that produced Credit Advice Notes for the WHT Applications, including:

(i) the 1st to 4th Defendants in the First Claim (the "**Solo Group Custodians**"), which provided Credit Advice Notes in respect of WHT Applications in reliance on which SKAT paid out a total of DKK9.025 billion. Of this sum, DKK8.012 billion was received by SCP. All of the Solo Group Custodians were ultimately owned and/or controlled by Mr Sanjay Shah. Further, it inferred that each of the Solo Group Custodians used the same software/IT system for purported trading given that their Credit Advice Notes have consecutive numbers;

(ii) Indigo, which provided Credit Advices Notes in support of WHT Applications in reliance on which SKAT paid out DKK688 million. All such WHT Applications were made whilst Mr Horn was a director of Indigo and the recipient of payments totalling £21.5 million from SCP via or in connection with Ganymede Cayman;

(j)     the limited number of ~~a~~Agents used to make the WHT Applications, including
        Syntax:

        (i)     which was ultimately wholly or partly owned and/or controlled by Mr
                Sanjay Shah from 19 September 2014 (alternatively 3 December 2014,
                alternatively 25 March 2015), as set out in Schedule 5B;

        (ii)    to whom the knowledge, acts and intentions of Mr Shah fall to be
                attributed (as its directing mind and will from such date(s) for the
                purpose of the events described in the Particulars of Claim);

(k)     the majority of the funds received as a result of the WHT Applications were
        paid to the Alleged Fraud Defendants (for which there is no apparent innocent
        explanation), as set out in paragraphs 31-33 above and Schedule 5 hereto, with
        only limited sums being ultimately received by the WHT Applicants
        themselves;

(l)     save as set out at paragraph 32 above, the payments to the Alleged Fraud
        Defendants were routed through bank accounts at Varengold Bank that had
        been set up for the purpose of laundering and/or concealing the source of the
        money. Further, many such payments were routed through Varengold accounts
        in the name of offshore entities in jurisdictions as set out in the Schedule 5
        hereto. Yet further, these offshore entities had no apparent connection to the
        WHT Applicants and no apparent claim to the funds;

(m)     almost all of the individual Alleged Fraud Defendants who received the
        proceeds of the WHT Applications were current or former directors, managers
        or employees of the Solo Group Companies and/or the Elysium Group
        Companies, namely Mr Sanjay Shah, Mr Priyan Shah, Mr O'Callaghan, Mr
        Barac, Mr Llewellyn, Ms Stratford, Mr Patterson, Mrs Usha Shah, Mr Jain, Mr
        Bains, Mr Horn, Mr Dhorajiwala, Mr Knott, Mr Hoogewerf and Mr Rajen
        Shah;

(n)     almost all the corporate Alleged Fraud Defendants which received the proceeds
        of the WHT Applications (via SCP) were the corporate entities of the
        individuals listed above, including but not limited to the Solo Group

Companies and Elysium Group Companies (all of which were ultimately beneficially owned by Mr Sanjay Shah);

(o)   the acquisition of and dealing with the shares in Varengold Bank and Dero Bank was centrally co-ordinated by or on the instructions of Mr Sanjay Shah for the benefit of him and his associates (namely Mr Patterson, Mr Lui, Mr Jain, Mr Barac, Mr Bains, Mr Preston, Mr Priyan Shah, Mr O'Callaghan, Ms Bhudia and Mr Smith), many of whom also received substantial payments directly or indirectly from SCP as set out in Section F above;

(p)   the purpose behind the acquisition of shares in Varengold Bank and Dero Bank was to obtain effective control over those banks, which were being or would be used for stock lending and/or as a custodian or clearing house to facilitate the making of WHT Applications and/or to conceal, launder or distribute proceeds of the fraud on SKAT.

50A.   SKAT's primary case is that the WHT Scheme was a single conspiracy involving all of the Alleged Fraud Defendants. In the alternative, SKAT alleges that the WHT Applications made in reliance on Credit Advice Notes from Indigo, North Channel Bank and Lindisfarne was a further conspiracy that grew out of the wider conspiracy involving Sanjay Shah, the Solo Group and Elysium Group Companies and the other Alleged Fraud Defendants:

(a)   Each of those Custodians produced Credit Advice Notes for WHT Applications in relation to US pension plans whose powers of attorney were signed by Donald Donaldson (the **"Donaldson Plans"**) in respect of which SKAT paid out a total of DKK2,744,880,244.23, being:

(i)   DKK688,383,354.02, in respect of WHT Applications supported by a Credit Advice Note produced by Indigo;

(ii)   DKK1,135,775,446.19, in respect of WHT Applications supported by a Credit Advice Note produced by North Channel Bank;

(iii)   DKK920,721,444.02, in respect of WHT Applications supported by a Credit Advice Note produced by Lindisfarne;

(b)    All of the WHT Applications for Donaldson Plans were based on Credit Advice Notes from Indigo, North Channel Bank and Lindisfarne. Donald Donaldson did not sign powers of attorney in respect of WHT Applications supported by Credit Advice Notes from any other Custodian;

(c)    The BaFin Report records that (in addition to the facts and matters set out in paragraph 24(e) of the Particulars of Claim):

    (i)    Adam LaRosa gave an instruction to North Channel Bank to send all of its Credit Advice Notes to Indigo (pages 26, 38);

    (ii)    A number of the "sellers" had referred to discussions with Mr Rajen Shah or Indigo when commencing the "business relationship" with North Channel Bank (page 15);

    (iii)    The stock lender in the case of every transaction was Sherwood Enterprises Limited (pages 14, 42);

(d)    The Norwich Pharmacal disclosure from Indigo records that the US pension plans that were its purported clients were all represented by Adam LaRosa and Donald Donaldson (like those for North Channel Bank);

(e)    Sherwood Enterprises Ltd is a Cayman company that was liquidated on the same day as Potala Trading Limited, the or a stock lender in the Indigo and Lindisfarne transactions;

(f)    Mr Horn was well acquainted with Mr LaRosa and Mr Rajen Shah from his time working with Mr Shah at Solo Capital Limited (until March 2012), at SCP (until February 2013) and at Ganymede Cayman and Elysium Dubai (until at least July 2013);

(g)    Mr Sanjay Shah has alleged in a witness statement dated 17 January 2017 that Mr Horn, Mr Rajen Shah, Mr Dhorajiwala and Mr Craig Price later acted as his competitors in connection with Indigo from 2014. SKAT reserves its position as to whether this is accurate (or wholly accurate) in circumstances where:

(i)    Mr Horn continued to receive very large payments from SCP and/or Ganymede in 2014 as set out in Schedule 5;

(ii)    Mr Rajen Shah and Mr Dhorajiwala continued to receive very large payments from SCP and/or Ganymede as set out in Schedules 5AF and 5AG; and

(iii)    pension plans represented by Adam LaRosa continued to make WHT Applications based on Credit Advice Notes from SCP until September 2014;

(h)    Without prejudice to this, SKAT notes that:

(i)    An exclusivity agreement dated 5 December 2014 between Acupay and AESA recorded Mr Horn, Mr Rajen Shah, Mr Dhorajiwala and Mr Price (along with Mr Bains) as competing individuals and Indigo, North Channel Bank and Agre Management (Mr La Rosa's company) as competing companies;

(ii)    Mr Rajen Shah is a former director of Solo Capital Limited, Elysium Dubai, and Ganymede Cayman and employee of SCP (during periods overlapping with Mr Horn);

(iii)    Mr Dhorajiwala and Mr Price are former employees of SCP and directors of Elysium Dubai (during periods overlapping with Mr Horn); and

(iv)    Mr Price is a former member of Lindisfarne;

(i)    As set out in Schedule 3A to the Particulars of Claim, many of the North Channel Bank and Indigo Credit Advice Notes in 2014 related to the same number of shares in the same Danish companies at the same time but for different and allegedly separate US pension plans;

(j)    Yet further, as illustrated by the examples in Schedule 4 to the Particulars of Claim, each of Indigo, North Channel Bank and Lindisfarne produced Credit Advice Notes for different and allegedly separate US pension plans on the

same day in respect of the same Danish company for similar volumes of shares (often increasing by regular intervals);

(k) In the circumstances, SKAT infers that the WHT Applications based on Credit Advice Notes from Indigo, North Channel Bank and Lindisfarne were part of the same conspiracy involving (at least) Mr Horn, Mr Rajen Shah, Mr Dhorajiwala, Mr LaRosa, Mr Price and Mr Donaldson.

51. The role that each of the Alleged Fraud Defendants played in the WHT Scheme is set out to the best of SKAT's knowledge, pending disclosure and/or evidence, in the Schedule 5 hereto.

52. As set out in paragraph 25 above, SKAT decided to accept the WHT Applications and make the payments there set out by reason of a mistake (or mistakes) induced by fraudulent misrepresentations as part of the WHT Scheme. In the circumstances, SKAT was, alternatively is, entitled to rescind the transactions by which those payments were made (if and to the extent that it is necessary to do so, which is denied).

53. Since July 2016, SKAT has issued preliminary and final decisions in respect of the WHT Applications proposing to and in fact annulling its previous decisions to accept the WHT Applications and pay the requested amounts to the Agents and Global. By so doing, SKAT elected to rescind the said transactions (if and to the extent that it is necessary to do so, which is denied).

54. Alternatively, SKAT by these Particulars of Claim elects to rescind the aforesaid transactions (if and to the extent that it is necessary to do so, which is denied).

## H    APPLICABLE LAW

55. As particularised below, SKAT brings claims against the Fraud and Non-Fraud Defendants which are to be characterised as being non-contractual claims arising out of tort/delict and unjust enrichment. The applicable law to such claims is, pursuant to the Rome II Regulation No 864/2007 (EC):

(a) in respect of the tort claims, the law of the country in which the damage occurred or the law of another country if the tort is manifestly more closely connected with that country; and

(b) in respect of the unjust enrichment claims (including whether mistaken payments procured by fraud give rise to a constructive trust), the law of the country in which the enrichment occurred or the law of another country if the claim is manifestly more closely connected with that country.

56. The matters set out in these Particulars of Claim and the Schedules thereto mean that the law applicable to SKAT's claim is English law, alternatively Danish law.

# I  ENGLISH LAW CLAIMS AGAINST THE ALLEGED FRAUD DEFENDANTS

## I1.  Tort claims

## (a)  Deceit

57. The Agent Representations were made by:

(a) Syntax, by its submission of Tax Reclaim Forms and the covering letters appending (in particular) the Credit Advice Notes;[4] and

(b) The true principals on whose ultimate instructions the Agents and Global were acting, including namely the 1st to 4th, 15th, 24th, 30th, 34th, and 62nd Defendants in the First Claim and the 1st Defendant in the Third Claim, as further particularised in Schedule 5 hereto; and/or

(c) Jointly, by all of the Alleged Fraud Defendants (except the 49th Defendant in the First Claim, 4th, 18th and 21st Defendants in the Second Claim and the 8th Defendant in the Third Claim), by their actions taken in furtherance of the deceits in pursuance of a common design, as particularised above in Section G and in Schedule 5 hereto.

---

[4] The representations made by the Agents who are Non-Fraud Defendants are set out in paragraph 87(d)(iv) below.

58. The Custodian Representations were made by:

   (a) SCP, Telesto, Old Park Lane, West Point, Salgado and Indigo, which produced the Credit Advice Note submitted with the WHT Application in question;[5] and

   (b) Jointly, by all of the Alleged Fraud Defendants (except the 4th, 18th and 21st Defendants in the Second Claim and the 8th Defendant in the Third Claim), by the actions taken in furtherance of the deceits in pursuance of a common design, as particularised above in Section G and in Schedule 5 hereto.

59. Further or alternatively, as set out in Schedule 5 hereto:

   (a) The 1st to 4th, 15th, 24th, 30th, 34th, and 62nd Defendants in the First Claim and the 1st Defendant in the Third Claim induced or procured the making of the Agent Representations; and

   (b) The 1st, 34th and 41st Defendants in the First Claim and the 2nd Defendant in the Third Claim induced or procured the making of the Custodian Representations.

60. Yet further, by signing Credit Advice Notes issued by SCP, Sanjay Shah, Jas Bains and Graham Horn impliedly represented that they honestly believed the Custodian Representations made by SCP were true (the **"Individuals' Custodian Representations"**).

61. The WHT Representations were false for the reasons set out in Section E2 above.

62. Each of the Alleged Fraud Defendants knew that the WHT Representations were false (alternatively were reckless as to whether they were true or false) and intended to induce SKAT to rely on them by paying out under the WHT Applications. This is to be inferred from the participation of the Alleged Fraud Defendants in the WHT Scheme as set out in Sections F-G above and Schedule 5 hereto.

63. The aforementioned fraudulent misrepresentations were material and were likely to induce, and in fact induced, SKAT to pay DKK12.66573 billion (alternatively

---

[5] The representations made by the Custodians who are Non-Fraud Defendants are set out in paragraph 92(f) (e) below.

DKK9.713 billion) to the Agents, which it would not otherwise have done. Paragraph 25 above is repeated.

64. Further, by reason of the same facts and matters, Mr Shah, Mr Bains and Mr Horn:

    (a)    knew that the Custodians Representations in the Credit Advice Notes of SCP, which they signed, were false (alternatively were reckless as to whether they were true or false);

    (b)    intended to induce SKAT to rely on the Individuals' Custodian Representations in such Credit Advice Notes by paying out under the WHT Applications;

    (c)    caused SKAT to pay out the amounts stated as being withheld as tax on the Credit Advice Notes signed by the relevant individuals.

**(b)**    **Unlawful means conspiracy**

65. As set out in Section G above and Schedule 5 hereto, the Alleged Fraud Defendants (alternatively, groups of them) combined and conspired together for the purpose of carrying out the WHT Scheme pursuant to a common design. The dates on which each such Alleged Fraud Defendant joined the conspiracy (or conspiracies) and the concerted action taken pursuant to the conspiracy (or conspiracies) is set out, to the best of SKAT's knowledge pending disclosure and/or evidence, in Schedule 5 hereto.

66. The said combination and conspiracy (or combinations and conspiracies) was entered into and put into effect by the Alleged Fraud Defendants with the intention of injuring or causing financial loss to SKAT by unlawful means (as a means to the end of obtaining personal benefits for themselves as set out in Section F above and Schedule 5 hereto).

67. The intended unlawful means, which were the instrumentality by which SKAT was harmed pursuant to the WHT Scheme, were:

    (a)    the making of the fraudulent WHT Representations, which constituted the torts of deceit (or joint deceit or procuring deceit) as set out in section I1(a) above;

(b)     the breach of constructive trust by Syntax and/or SCP in paying away money
held on constructive trust for SKAT as set out in paragraphs 26 and 30 and
Section F above;

(c)     the dishonest assistance of such breach of constructive trust by the Alleged
Fraud Defendants (other than the 4th, 18th and 21st Defendants in the Second
Claim and the 8th Defendant in the Third Claim), as set out in Section I2(a)
below;

(d)     the knowing receipt as a result of such breach of constructive trust by the
Alleged Fraud Defendants set out in Section I2(b) below.

**(c)     Loss**

68.     SKAT has suffered loss and damage as a result of the Alleged Fraud Defendants' joint
deceit and/or unlawful means conspiracy.

69.     The total loss suffered is the amount that SKAT was fraudulently induced to pay out
as part of the WHT Scheme, namely DKK12.665~~73~~ billion (alternatively, the total
amount which SKAT was fraudulently induced to pay out pursuant to WHT
Applications supported by the Solo Group Companies and Indigo, namely DKK9.713
billion). SKAT is entitled to and claims such total loss jointly and severally from each
of the Alleged Fraud Defendants, who were party to the WHT Scheme.

70.     Alternatively, SKAT claims from each of the Alleged Fraud Defendants such sums as
it was fraudulently induced to pay out by reason of the WHT Applications after the
dates on which the relevant Alleged Fraud Defendant became party to the WHT
Scheme as set out in Schedule 5 hereto.

71.     In the yet further alternative:

(a)     SKAT claims from each of the Alleged Fraud Defendants such sums as it was
fraudulently induced to pay out by reason of the WHT Applications in respect
of which the relevant Alleged Fraud Defendant made, procured or assisted in
the making of the deceitful WHT Representations; and/or

(b)   SKAT claims from Mr Sanjay Shah, Mr Horn and Mr Bains such sums as it was fraudulently induced to pay out by reason of the deceitful Individuals' Custodian Representations.

**I2.   Equitable claims**

72.   As set out in paragraphs 26 and 30 above, Syntax and SCP held the money paid to them as a result of the WHT Applications on constructive trust for SKAT. Both Defendants breached such constructive trusts by paying away the money as described in Section F above. The other Alleged Fraud Defendants were accessories to such breaches of constructive trust.

**(a)   Dishonest assistance**

73.   Each of the Alleged Fraud Defendants (except the 47th Defendant in the First Claim, 4th, 15th, 18th and 21st Defendants in the Second Claim and the 2nd and 8th Defendants in the Third Claim) induced, procured or assisted in the breach of such constructive trusts in the manner set out in Schedule 5 hereto.

74.   In doing so, each such Alleged Fraud Defendant had actual (alternatively, blind eye) knowledge that they were participating in a scheme to defraud SKAT and to conceal and/or launder and/or distribute the proceeds of the WHT Applications, as set in Section G above and Schedule 5 hereto.

75.   Further or in the alternative, each such Alleged Fraud Defendant failed to act as an honest person would act in the circumstances because they had actual (alternatively, blind eye) knowledge that they were each assisting SCP to launder the proceeds of a dishonest scheme.

76.   In the circumstances, each such Alleged Fraud Defendant acted dishonestly according to the objective standards of reasonable and honest people in the position and with the knowledge of each such Defendant.

**(b)   Knowing receipt**

77.   Further or alternatively, the Alleged Fraud Defendants (other than the 4th, 15th and 38th in the First Claim) beneficially received funds or assets, which are the traceable

proceeds of SKAT's money paid away by Syntax and/or SCP in breach of constructive trust. Particulars of such beneficial receipt are set out in Section F above and Schedule 5 hereto.

78.  In doing so, each such Alleged Fraud Defendant had such knowledge as to make it unconscionable for such Defendant to retain the benefit of the receipts. In particular:

(a)  Each such Alleged Fraud Defendant had actual (alternatively, blind eye) knowledge that they were participating in a scheme to defraud SKAT and to conceal and/or launder and/or distribute the proceeds of the WHT Applications, as set in Section G above and Schedule 5 hereto; and/or

(b)  On the facts actually known to such Alleged Fraud Defendant, a reasonable professional in their position would have appreciated that the transfers to them were probably wrongful or would have made inquiries and sought advice that would have revealed the probability of such wrongdoing.

**(c)  Equitable compensation or an account of profits**

79.  In the circumstances, SKAT is entitled to and claims from the aforementioned Alleged Fraud Defendants:

(a)  An account of any and all profits made by reason of their dishonest assistance and/or knowing receipt; or

(b)  Equitable compensation in respect of SKAT's losses suffered as a result of their dishonest assistance and/or knowing receipt:

(i)  With respect to dishonest assistance, SKAT suffered the following losses:

(A)  By reason of the breach of constructive trust by Syntax:

(1)  the sum of DKK 2,765,398,045 paid out by Syntax from 19 September 2014 (alternatively, the sum of DKK2,736,247,396 paid out by Syntax from 3 December 2014, alternatively the sum of DKK 2,721,661,782 paid out by Syntax from 25 March 2015);

64

(2)   alternatively, such sums as were paid out by Syntax after the relevant Alleged Fraud Defendant became party to the WHT Scheme;

(3)   alternatively, such sums as were paid out by Syntax in respect of WHT Applications in respect of which the Alleged Fraud Defendant provided dishonest assistance;

(B)   By reason of the breach of constructive trust by SCP:

(1)   the sum of DKK8.012 billion paid out by SCP;

(2)   alternatively, such sums as were paid out by SCP after the relevant Alleged Fraud Defendant became party to the WHT Scheme;

(3)   alternatively, such sums as were paid out by SCP in respect of WHT Applications in respect of which the Alleged Fraud Defendant provided dishonest assistance;

(ii)   With respect to knowing receipt, SKAT has suffered loss in the amounts received by the Alleged Fraud Defendants (other than the 4th, 15th and 38th in the First Claim), as set out in Schedule 5 hereto.

## I3.   Unjust enrichment/restitution

80.   As set out at paragraph 25 above, SKAT paid out DKK12.6~~573~~657 billion (alternatively DKK9.713 billion) to the Agents, which it would not otherwise have done, acting under a mistake of fact ~~or law~~ that was induced by fraudulent misrepresentations as part of the WHT Scheme.

81.   The Alleged Fraud Defendants (other than the 4th, 15th and 38th in the First Claim) received money or assets as a result of the WHT Applications, are set out in Section F above and Schedule 5 hereto. Each such Alleged Fraud Defendant was thereby enriched as a result of SKAT's mistaken payment of the WHT refunds. SKAT reserves the right to apply to amend these Particulars of Claim if further enrichment is discovered.

82. The enrichment of the aforementioned Alleged Fraud Defendants was at the expense of SKAT and was unjust by reason of the fraudulently induced mistake.

83. Each such Alleged Fraud Defendant is therefore liable to make restitution to SKAT of the enrichments unjustly received.

**I4.  Proprietary claims**

84. To the extent that the Alleged Fraud Defendants (other than the 4th, 15th and 38th in the First Claim) retain the traceable proceeds or product of the payments made by SKAT, they hold the said proceeds or product on constructive trust for SKAT.

85. SKAT is entitled to and claims a declaration in such terms and an order that the relevant Alleged Fraud Defendants pay or convey such traceable proceeds or product to SKAT.

85A. Alternatively, SKAT is entitled to and claims an equitable charge and/or lien over the traceable proceeds or product of the payments made by SKAT, as security for its claims set out in paragraph 79 above.

**J    ENGLISH LAW CLAIMS AGAINST THE NON-FRAUD DEFENDANTS**

**J1.  Tort/delict**

The Agents

86. Further or in the alternative (in the case of Syntax), each of the Agents are liable to SKAT for negligent misrepresentations.

87. Each of the Agents owed SKAT owed a duty to exercise reasonable care to communicate only genuine WHT Applications to SKAT and in particular to avoid causing loss to SKAT through the communication of fraudulent WHT Applications. That duty arose from the following facts and matters:

(a) The Agents were obliged by the relevant anti-money laundering ("**AML**") regulations to verify the identity of the WHT Applicants, the source of their funds, and the identity of the relevant authorised representatives;

(b)     In particular, pursuant to the Money Laundering Regulations 2007 (SI 2007/2157):

(i)     the Agents were obliged by Regulations 5 and 7 to implement "customer due diligence measures": (i1) on establishment of a business relationship, or (i2) on carrying out an occasional transaction, or (i3) if money laundering was suspected or (i4) if there were doubts as to the veracity or adequacy of information previously provided by the relevant clients;

(ii)    such "customer due diligence measures" included identifying and verifying the identity of the customer, the control and ownership structure of legal persons, and the ultimate beneficial owner and obtaining information on the purpose and intended nature of the business relationship. The Agents were required to determine the extent of "customer due diligence measures" on a risk sensitive basis depending on the type of customer, business relationship, product or transaction;

(iii)   further, the Agents were obliged by Regulations 8 and 11 to conduct ongoing monitoring of business relations and to cease transactions if the Agents were unable to apply "customer due diligence measures"

(c)     Further, Goal requested that new clients complete a "beneficial ownership questionnaire";

(d)     The Agents knew or ought to have known that:

(i)     they were seeking very large sums by way of WHT refunds from SKAT as set out in Schedule 1 hereto;

(ii)    over an extended period of time;

(iii)   nominally on behalf of pension plans or entities represented by a small number of authorised representatives (many of whom represented multiple WHT Applicants as set out in Schedule 1 hereto);

(iv)   in circumstances where they were paying (in the case of Goal, Acupay and Syntax) the large majority of the proceeds of the WHT Applications to SCP as set out in paragraph 27 above;

(e)   As set out at paragraph 19(d) above, the Agents represented that each WHT Application was a genuine application to reclaim dividend tax, alternatively that the Agents had reasonable grounds to believe that to be the case;

(e1)   The Agent Representations concerned facts not entirely within SKAT's knowledge, and SKAT did not have access to all relevant information and documentation;

(e2)   The Agent Representations were made in documents (the covering letter was printed on the Agents' letterhead) which the relevant Agent sent directly to SKAT, so there was a direct relationship between the parties. Further, the Tax Relief Form completed by the Agents was addressed to SKAT;

(e3)   Acupay's fees were paid indirectly by SKAT out of WHT refunds issued by SKAT and SKAT infers that the same is true for Goal, Koi and Syntax;

(e4)   The documents sent by the Agents to SKAT in which the Agent Representations were made were intended by the Agents to influence SKAT's decision making process and they in fact influenced SKAT to accede to the WHT Applications;

(f)   It was reasonable for SKAT to rely on the is representation in paragraph 19(d) above without further enquiry when deciding whether to accede to the WHT Applications and the Agents knew or ought to have known that SKAT was highly likely to do so. In addition to the matters set out in Schedule 5, SKAT will rely on the following facts and matters:

(i)   the Agents knew or ought to have known from their general experience of tax reclaim applications (alternatively their experience of making WHT Applications to SKAT) that:

(A) SKAT would rely on the fact that the WHT Applications were made through the Agents as a factor in support of the WHT Applications;

(B) the large majority of WHT Applications would not have been subjected to detailed due diligence by SKAT, absent irregularities on the face of the applications. This is to be inferred from the fact that, until August 2015, SKAT paid out under the WHT Applications within a short time of receiving a request from the Agents and without raising any queries with the Agents;

(C) it was not possible for SKAT to verify whether individual pension funds owned shares or had received dividends (net of WHT) in specific Danish companies, given that the relevant shareholdings would have been dematerialised shares held through custodians;

(ii) the Agents knew or ought to have known that SKAT did not have ready access to the type of AML information that the Agents had in their possession (but had not communicated to SKAT), which would have showed that the WHT Applicants could not realistically have been the beneficial owners of the shares necessary to have received dividends (net of WHT) given, in particular, the facts and matters set out at paragraph 24(b)(ii) above;

(iii) the Agents knew or ought to have known that SKAT did not know the identity of the persons to whom the proceeds of the WHT Applications were paid by the Agents, most notably SCP.

(g) The Agents therefore knew or ought to have known that their representations would be relied on by a specific person (SKAT), for a specific purpose in connection with a specific transaction (deciding whether to accept the particular WHT Application and make payment to the relevant Agent);

(h) The Agents knew or ought to have known that it was reasonably foreseeable that, if the Credit Advice Notes were fraudulent, SKAT would suffer losses in

the form of the payments made to the relevant Agent that would not otherwise have been made; and

(i) SKAT was the only party which could have suffered losses as a result of the Agents' failure to take reasonable care not to communicate fraudulent WHT Applications to SKAT.

88. Each of the Agents breached the said duty by failing to exercise due skill and care in making the representations in paragraph 87(d)(iv) above. In particular, such representations were made negligently by reason of the Agent's failure to make any or reasonable enquiries into whether the WHT Applications they were putting forward were genuine, alternatively because the Agents had no reasonable grounds for believing that the WHT Applications were genuine.

89. SKAT reasonably relied on the aforementioned representations and was thereby induced to pay DKK12.665~~73~~ billion (alternatively DKK9.713 billion) to the Agents, which it would not otherwise have done.

90. As a result of the said negligent misrepresentations, SKAT suffered the foreseeable loss and damage set out, in respect of each Agent, in paragraph 25 above (alternatively such loss as was suffered after the date on which the Court finds that the Agent ought to have known that the Credit Advice Notes were fraudulent). SKAT claims such sums as damages against the Agents.

Custodians

91. Further or alternatively (in the case of Indigo), Indigo, North Channel Bank, Lindisfarne and ED&F Man (the "**Non-Fraud Custodians**") are liable to SKAT for negligent misrepresentation.

92. Each such Defendant owed SKAT a duty to take reasonable care when producing Credit Advice Notes for WHT Applications to avoid causing SKAT loss due to inaccuracies in the Credit Advice Notes. That duty of care arose from the following facts and matters:

(a) The UK-based Non-Fraud Custodians were obliged by the AML regulations to verify the identity of the WHT Applicants, the source of their funds and the

identity of the relevant authorised representatives. Paragraph 87(b) above is repeated with respect to the UK-based Non-Fraud Custodians.

(b)     Further, as professional firms carrying out regulated activities, the UK-based Non-Fraud Custodians were obliged under Principles 2 and 3 and SYSC 6 of the Financial Conduct Authority Handbook to:

    (i)     conduct their business with due care, skill and diligence;

    (ii)    organise and control their affairs responsibly and effectively, with adequate risk management systems;

    (iii)   take reasonable care to establish and maintain effective systems and controls to counter the risk that the firm might be used to further financial crime;

    (iv)    ensure that these systems and controls enabled the firm to identify, assess, monitor and manage money laundering risk and were comprehensive and proportionate to the nature, scale and complexity of its activities, including the minimum matters in SYSC 6.3.7G such as appropriate measures to ensure that money laundering risk is taken into account in relation to the taking on of new customers;

(c)     The Non-Fraud Custodians had access to the relevant records regarding the trading activity (if any) of the WHT Applicants with respect to shares in Danish companies, including their nationality, information regarding the identity of the party or parties who gave the trading instructions and who provided the funding, collateral or other security (if any);

(d)     The Non-Fraud Custodians would therefore have known that:

    (i)     the WHT Applicants (or persons on their behalf) were engaged in purported or actual trading of shares in Danish companies, the only (or most likely) purpose of which was to support tax reclaim applications from SKAT;

     (ii)   the Credit Advice Notes produced by the Non-Fraud Custodians were highly likely to be used for the purpose of WHT Applications being made to SKAT; and

     (iii)  such Credit Advice Notes were therefore highly likely to be communicated to SKAT for such purpose;

(e)    Further, the Non-Fraud Custodians knew or ought to have known from their experience of producing Credit Advice Notes for the WHT Applications that:

     (i)    their Credit Advice Notes would be relied on to seek very large sums by way of WHT refunds from SKAT over an extended period of time;

     (ii)   the WHT Applicants were represented by a small number of authorised representatives (many of whom represented multiple WHT Applicants as set out in Schedule 1 hereto);

     (iii)  they were paying the large majority of the proceeds of the WHT Applications to persons other than the WHT Applicants;

(f)    As set out at paragraph 21 above, the Non-Fraud Custodians made the Custodian Representations through the Credit Advice Notes provided to SKAT, including that:

     (i)    the specific number of shares in the named Danish company were held for the named WHT Applicant before the "ex-date";

     (ii)   a specific dividend had been received for the account of the named WHT Applicant on the "payment date";

     (iii)  such dividend had been received by the named WHT Applicant net of a specific amount of tax that had been withheld by the named Danish company;

     (iv)  the Credit Advice Notes were accurate statements of the facts set out therein;

(g)    It was reasonable for SKAT to rely on these representations without further enquiry when deciding whether to accede to the WHT Applications and the Non-Fraud Custodians knew or ought to have known that it was highly likely that SKAT would do so. In addition to the matters set out in Schedule 5, SKAT will rely on the fact that the Non-Fraud Custodians knew or ought to have known from their general market experience (alternatively their experience of producing Credit Advice Notes for WHT Applications made to SKAT) that:

(i)    the Credit Advice Notes would be regarded by SKAT as important documents that accurately set out the facts stated therein;

(ii)    the large majority of WHT Applications would not have been subjected to detailed due diligence by SKAT, absent irregularities on the face of the applications;

(iii)    it was not possible for SKAT to verify whether individual pension funds owned shares or had received dividends (net of WHT) in specific Danish companies, given that the relevant shareholdings would have been dematerialised shares held through custodians;

(iv)    SKAT did not have ready access to the type of AML information and trading information that the Custodians had in their possession, which would have showed that the WHT Applicants could not realistically have been the beneficial owners of the shares necessary to have received dividends (net of WHT) given, in particular, the facts and matters set out at paragraph 24(b)(ii) above;

(v)    SKAT did not know the identity of the persons to whom the proceeds of the WHT Applications were paid by the Non-Fraud Custodians.

(h)    The Non-Fraud Custodians therefore knew or ought to have known that their representations would be relied on by a specific person (SKAT), for a specific purpose in connection with a specific transaction (deciding whether to accept the particular WHT Application and make payment to the relevant Agent);

(i)     The Non-Fraud Custodians knew or ought to have known that it was reasonably foreseeable that, if the Custodian Representations were false, SKAT would suffer losses in the form of the payments made to the relevant Agent that would not otherwise have been made.

93.     Each of the Non-Fraud Custodians breached the said duty by failing to exercise due skill and care in making the Custodian Representations. In particular, such representations were made negligently by reason of such Defendants' failure to take reasonable care to ensure that the Credit Advice Notes were accurate statements of the matters set out therein.

94.     SKAT reasonably relied on the aforementioned representations and was thereby induced to pay out the following sums (which it would not otherwise have done) and suffered foreseeable loss and damage as a result (in respect of which it claims damages from the Non-Fraud Custodians):

(a)     In respect of WHT Applications supported by Credit Advice Notes from Indigo: DKK688 million;

(b)     In respect of WHT Applications supported by Credit Advice Notes from North Channel Bank: DKK1.135 billion;

(c)     In respect of WHT Applications supported by Credit Advice Notes from Lindisfarne: DKK920 million;

(d)     In respect of WHT Applications supported by Credit Advice Notes from ED&F Man: DKK5~~71.98~~2 million.

**J2.    Unjust enrichment/restitution**

95.     As set out at paragraph 25 above, SKAT paid out DKK12.6~~65~~73 billion (alternatively DKK9.713 billion) to the Agents <u>and Global</u>, which it would not otherwise have done, acting under a mistake of fact ~~or law~~ that was induced by the Non-Fraud Defendants' negligent misrepresentations <u>or the fraudulent misrepresentations made by the true principals of the Agents and Global through them</u>.

96.     Each of the Non-Fraud Defendants received fees as a result of the WHT Applications. The Non-Fraud Defendants were thereby enriched as a result of SKAT's mistaken payment of the WHT refunds. SKAT reserves the right to apply to amend these Particulars of Claim if further enrichment is discovered.

97.     The enrichment of the Non-Fraud Defendants was at the expense of SKAT and was unjust by reason of the mistake induced by misrepresentation.

98.     The Non-Fraud Defendants are therefore liable to make restitution to SKAT of the enrichments unjustly received.

## K      ALTERNATIVE DANISH LAW CLAIMS

### K1.    Danish law

99.     To the extent that SKAT's claims are governed by Danish law, SKAT relies on the following rules of Danish law (which arise from judge made law):

    (a)     A claimant will have a claim for damages if:

        (i)     The claimant has suffered a financial loss;

        (ii)    The tortfeasor's conduct violated the bonus pater standard, i.e. conduct that violates well-established standards of behaviour in the area of the conduct in question;

        (iii)   There is a necessary and sufficient causal connection between the actionable conduct or the failure to act and the claimant's loss;

        (iv)    The loss suffered was foreseeable considering the actionable conduct or the failure to act (even if the extent of loss was not foreseeable); and

        (v)     There are no relevant defences.

    (b)     In respect of the *bonus pater* standard:

        (i)     Actions which are intentional (including fraudulent conduct) or negligent (including gross or ordinary negligence), will be actionable, subject to satisfaction of the other requirements set out above;

(ii)   Conduct is negligent if the defendant fails to exercise the standard of care, which a reasonable and prudent man would show in similar circumstances;

(iii)  Gross negligence involves negligent conduct that is particularly blameworthy compared to how a reasonable and prudent person in the position of the defendant would act;

(iv)   The standard of care for a professional is higher than for an ordinary person.

(c)   A claimant can bring a claim in damages against an accomplice of a tortfeasor who did not play any direct part in the damaging act, if:

(i)    The accomplice has contributed to the tortious act by acts or omissions; and

(ii)   The accomplice was or should have been aware of the possibility that the primary tortfeasor was committing a wrong;

(d)   If the above conditions are satisfied:

(i)    Joint tortfeasors are jointly and severally liable to compensate the Claimant for the entire loss caused by their torts through the payment of damages;

(ii)   Accomplices of the tortfeasors are severally liable for the loss caused by the tortious acts to which they contributed;

(e)   A claimant will have a claim for restitution if the defendant has been unjustly enriched by receipt of the traceable proceeds of payments made by the claimant;

(f)    A claimant will have a proprietary claim if the defendant received property that may be identified as belonging to the claimant;

(g)   Payments can be traced even if the funds have passed through a number of accounts, were converted into various currencies or were used to buy assets,

provided that the interests of innocent third-party creditors are not engaged in an insolvency or that the defendant received the property in bad faith (including where the defendant should have known that the payments were received as a result of a fraud).

**K2.    Damages claims against the Alleged Fraud Defendants**

100.    SKAT has suffered foreseeable loss as a result of the misconduct of the Alleged Fraud Defendants. In particular:

(a)    The fraudulent (and therefore intentional) conduct of the Alleged Fraud Defendants is described in Sections G and I above and Schedule 5 hereto. Such conduct violated the bonus pater standard;

(b)    Alternatively, in so far as any of the Alleged Fraud Defendants are not found to have acted fraudulently, their participation in the WHT Scheme was grossly negligent because each such Defendant failed to exercise the standard of care required of a person in their position and ought to have known that they were participating in a fraud on SKAT and/or receiving the proceeds of a fraud on SKAT;

(c)    In so far as any Alleged Fraud Defendant did not directly play a part in the damaging act, such Defendant contributed to the tortious act and was or ought to have been aware (at least) that it was possible that the primary tortfeasor(s) had committed a fraud on SKAT, for the reasons set out in Sections G and I above and Schedule 5 hereto;

(d)    As a result of such misconduct, SKAT has suffered loss and damage in the amount of DKK12.66~~573~~ billion (or DKK9.713 billion), for which the Alleged Fraud Defendants are jointly and severally liable. Alternatively, the Alleged Fraud Defendants are each liable for such losses as were suffered as a result of the wrongful acts to which they contributed;

(e)    The losses suffered by SKAT are the foreseeable consequence of the Alleged Fraud Defendants' misconduct, which was designed to extract, conceal and/or launder and/or distribute the proceeds of the WHT Applications.



### K3. Damages claims against other Defendants

The Agents and the Non-Fraud Custodians

101. Further or in the alternative, SKAT has suffered foreseeable loss as a consequence of the negligence of (i) the Agents and Global; and (ii) the Non-Fraud Custodians. In particular:

    (a) The negligent conduct of the Agents, Global and the Non-Fraud Custodians is described in Section J above (save that there is no need to establish a duty of care under Danish law) and Schedule 5 hereto. Such conduct violated the bonus pater standard;

    (b) As professional persons, the standard of care on the Agents, Global and Custodians was higher than for ordinary persons. The conduct of the Agents, Global and the Custodians described above and/or in Schedule 5 failed to comply with the requisite standard;

    (c) Further, in the case of the Agents and Global:

        (i) they were operating under a broad power of attorney in favour of the relevant WHT Applicant and therefore had a particular responsibility to ensure the truth and accuracy of the facts stated on behalf of the WHT Applicants;

        (ii) they made their banks accounts available to receive and pay-on money from SKAT and thereby gained particular visibility as to the cash flows from the WHT Applications and had a correlative responsibility to ensure that they received any monies paid by SKAT on a true and accurate factual basis;

        (iii) they ought to have taken reasonable care to ensure that the WHT Applications were materially accurate. The Agents and Global failed to take any or any reasonable steps to do so;

    (d) As a result of the said negligent misrepresentations, SKAT suffered the foreseeable loss and damage:

(i) set out in respect of each Agent, in paragraph 90 above;

(ii) in the amount of DKK259 million in the case of Global, and

(iii) set out in respect of each Non-Fraud Custodian, in paragraph 94 above.

Other Non-Fraud Defendants

102. Further, the 64th and 65th Defendants in the First Claim and the 5th to 16th and 23rd Defendants in the Second Claim are liable in tort under Danish law, if it applies, by reason of their having negligently caused foreseeable loss, as set out in Schedule 5 hereto.

**K4. Unjust enrichment/restitution claims**

103. Further or alternatively, by reason of the facts and matters set out at Sections I3 and J2 above, SKAT is entitled to and does bring claims under Danish law, if it applies, against all Defendants that have been unjustly enriched by receipt of the traceable proceeds of payments made by SKAT as set out in Schedule 5 hereto.

**K5. Proprietary claim**

104. Further or alternatively, SKAT brings proprietary claims against the Alleged Fraud Defendants (other than the 4th, 15th and 38th in the First Claim) under Danish law, if it applies, by reason of the facts and matters set out in Section I4 above. In particular, the Alleged Fraud Defendants:

(a) received funds that are identifiable as the proceeds of the money originally paid out by SKAT to the Agents; and

(b) did so in bad faith because they knew or ought to have known that the funds were received as a result of a wrong committed on SKAT.

**L    INTEREST**

105. SKAT claims compound, alternatively simple, interest against the Alleged Fraud Defendants pursuant to the Court's equitable jurisdiction and/or section 35A of the Senior Courts Act 1981 on the sums found to be due to SKAT at such rate and for such period as the Court considers appropriate.

106. In the alternative (if Danish law applies), SKAT is entitled to and claims interest against the Defendants under sections 1, 3 and 5 of the Danish Interest Act 2014 at 8% over the official lending rate of the Danish Central Bank for the following periods:

   (a) from the date of the payments by SKAT, given the special circumstances set out herein (in particular, the fraud on SKAT by which it was induced to pay out sums on a mistaken basis), pursuant to section 3(5) of the Danish Interest Act 2014;

   (b) Alternatively, from date of the relevant Claim Form (or this Particulars of Claim) by which a demand for payment was (or is) made against the relevant Defendants, pursuant to section 3(4) of the Danish Interest Act 2014.

**M    CURRENCY OF CLAIMS**

107. SKAT claims for damages and/or equitable compensation are in Danish Kroner, that being the currency in which it suffered its loss. As at 12 September 2018, the exchange rate as published by Bloomberg.com was £1 to DKK8.377. The sterling equivalent of SKAT's claim against the Alleged Fraud Defendants of DKK12.66~~573~~ billion (alternatively DKK9.713 billion) is therefore £1.512 billion (alternatively £1.159 billion).

108. SKAT claims an account of profits and restitution in the currencies in which the relevant Defendants received the relevant assets or profits.

**AND THE CLAIMANT CLAIMS:**

(1) Damages against the Alleged Fraud Defendants in the amount of DKK12.66~~573~~ billion, alternatively:

   (a) such sum as SKAT paid out after the relevant Defendant joined the WHT Scheme; or

   (b) such sum as SKAT paid out by reason of the WHT Applications in respect of which the relevant Alleged Fraud Defendant made, procured or assisted in the making of the deceitful WHT Representations;

(c)     such sum as SKAT paid out as a result of the wrongful act to which the relevant Defendant contributed;

(2)     Damages against Mr Sanjay Shah, Mr Horn and Mr Bains in such sums as SKAT was induced to pay out by reason of Credit Advice Notes signed by those individuals;

(3)     An account of profits or equitable compensation against the Alleged Fraud Defendants for their liability as constructive trustees or for dishonest assistance and knowing receipt;

(4)     Damages in the sums set out in paragraphs 90 and 94 above and in Schedule 5 against the Non-Fraud Defendants;

(5)     Restitution of unjust enrichment in the sums set out in Schedule 5 against the Alleged Fraud Defendants and the Non-Fraud Defendants;

(6)     A declaration that the Alleged Fraud Defendants hold the traceable proceeds or products of the payments that SKAT made to the Agents on constructive trust for SKAT (alternatively that SKAT is the owner of such proceeds or products), and an order that the same be paid or handed over to SKAT;

(7)     Interest;

(8)     Costs; and/or

(9)     Further or other relief.

Michael Fealy QC

Jamie Goldsmith

Sam O'Leary

Sophie Weber

James Ruddell

One Essex Court



**Statement of Truth**

The Claimant believes that the facts stated in these Particulars of Claim are true.

Signed.........................................................

Name: Jonathan Robert Fortnam

Position: Partner in the firm of Pinsent Masons LLP, solicitors to the Claimant

Date: 12 September 2018

Served this 12 day of September 2018 by Pinsent Masons LLP, of 55 Colmore Row, Birmingham B3 2FG solicitors for the Claimant

**Statement of Truth**

The Claimant believes that the facts stated in these Amended Particulars of Claim are true.

Signed.........................................................

Name: Jonathan Robert Fortnam

Position: Partner in the firm of Pinsent Masons LLP, solicitors to the Claimant

Date: 13 March 2019

Re-Served this 13 day of March 2019 by Pinsent Masons LLP, of 55 Colmore Row, Birmingham B3 2FG solicitors for the Claimant