**Exhibit 2**

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE:                                          )
                                                )
CUSTOMS AND TAX ADMINISTRATION OF               )
THE KINGDOM OF DENMARK                          )    CASE NO.
(SKATTEFORVALTNINGEN) TAX REFUND                )    18-MD-2865 (LAK)
SCHEME LITIGATION                               )
                                                )
This document relates to case nos.              )
18-CV-05308; 18-CV-05309; 18-CV-05305;          )
18-CV-05299; and 18-CV-05300                    )

---

REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL
EXAMINATION OF
ALEXANDER JAMIE MITCHELL, III
DATE: May 14, 2020
REPORTED BY:  MICHAEL FRIEDMAN, CCR

Page 2

TRANSCRIPT of the videotaped deposition of the witness, taken remotely via VTC, called for Oral Examination in the above-captioned matter, said deposition being taken by and before MICHAEL FRIEDMAN, a Notary Public and Certified Court Reporter of the State of New Jersey, at VTC, ALL PARTIES REMOTE, on May 14, 2020, commencing at approximately 9:31 in the morning.

Page 4

APPEARANCES:

KOSTELANETZ & FINK
250 Greenwich Street
New York, NY 10007
BY:   BRYAN C. SKARLATOS, ESQ.
      CAROLINE D. CIRAOLO, ESQ.
      ERIC SMITH, ESQ.
      JULIET L. FINK, ESQ.
      NICHOLAS S. BAHNSEN, ESQ.
      SHARON L. MCCARTHY, ESQ.
      Via VTC
Attorneys for Azalea, et al

K&L GATES
One Lincoln Street
Boston, MA 02111
BY:   JOHN BLESSINGTON, ESQ.
      BRANDON R. DILLMAN, ESQ.
      DAVID FINE, ESQ.
      Via VTC
Attorneys for Alexander Jamie Mitchell, et al

GUSRAE, KAPLAN & NUSBAUM
120 Wall Street
New York, NY 10005
BY:   KARI PARKS, ESQ.
      MARTIN H. KAPLAN, ESQ.
Attorneys for Goldstein

Page 3

APPEARANCES:

HUGHES, HUBBARD & REED
One Battery Park Plaza
New York, NY 10004
BY:   NEIL OXFORD, ESQ.
      MARC A. WEINSTEIN, ESQ.
      JOHN MCGOEY, ESQ.
      DUSTIN SMITH, ESQ.
      VALERIE CAHAN, ESQ.
      ERIN PAMUKCU, ESQ.
      All via VTC
Attorneys for SKAT

HANAMIRIAN LAW FIRM
40 E. Main Street
Moorestown, NJ 08057
BY:   JOHN M. HANAMIRIAN, ESQ.
      Via VTC
Attorneys for Acorn Capital

CAPLIN & DRYSDALE
600 Lexington Avenue
New York, NY 10022
BY:   MARK ALLISON, ESQ.
      ZHANNA ZIERING, ESQ.
      Via VTC
Attorneys for Klugman

KAPLAN RICE
142 West 57th Street
New York, NY 10019
BY:   Y. KATIE WANG, ESQ.
      MICHELLE A. RICE, ESQ.
      Via VTC
Attorneys for Albedo, et al

Page 5

APPEARANCES:

WILMER HALE
7 World Trade Center - 250 Greenwich Street
New York, NY 10007
BY:   ALLISON STODDART, ESQ.
      ALAN SCHOENFELD, ESQ.
      MICHAEL BONGIORNO, ESQ.
      MICHAEL POSADA, ESQ.
      Via VTC
Attorneys for Avanix, et al

BINDER & SCHWARTZ
366 Madison Avenue
New York, NY 10017
BY:   NEIL BINDER, ESQ.
      GREG PRUDEN, ESQ.
      M. TOMAS MURPHY, ESQ.
      WENDY H. SCHWARTZ, ESQ.
      Via VTC
ATTORNEYS for ED&F Man

DEWEY, PEGNO & KRAMARSKY
777 Third Avenue
New York, NY 10017
BY:   SEAN K. MULLEN, ESQ.
      THOMAS E. L. DEWEY, ESQ.
      DAVID PEGNO, ESQ.
      Via VTC
Attorneys for Michael Ben-Jacob

WILLIAMS & CONNOLLY
725 12th STREET, NW
Washington, DC 20005
BY:   STEPHEN D. ANDREWS, ESQ.
      Via VTC
Attorneys for Sander Gerber Pension Plan

Page 6

```
 1   A P P E A R A N C E S :
 2
 3   KATTEN
     575 Madison Avenue
 4   New York, NY  10022
     BY:    DAVID GOLDBERG, ESQ.
 5          MICHAEL ROSENAFT, ESQ.
            Via VTC
 6   Attorneys for Klugman
 7
     SEWARD & KISSEL
 8   One Battery Park Plaza
     New York, NY  10004
 9   BY:    MARK J. HYLAND, ESQ.
            SHREY SHARMA, ESQ.
10          THOMAS R. HOOPER, ESQ.
            Via VTC
11   Attorneys for Bernard Tew
12
     LAW OFFICES OF SHELDON S. TOLL
13   2000 Town Center
     Southfield, MI  48075
14   BY:    SHELDON S. TOLL, ESQ.
     Attorneys for Hoffmeister
15
16
17   ALSO PRESENT:    DARRAK LIGHTY, Videographer
18
19
20
21
22
23
24
25
```

Page 7

```
 1              I N D E X
 2
 3   WITNESS NAME                           PAGE
 4   ALEXANDER JAMIE MITCHELL, III
 5        By Mr. Oxford                      13
 6        By Mr. Blessington                220
 7
 8              ********
 9
10            E X H I B I T S
11
12   EXHIBIT NO.                            PAGE
13   Exhibit 119   NewSong 401(k) plan       50
14   Exhibit 120   NewSong summary 401(k)    65
                   plan
15
     Exhibit 121   NewSong 401(k) plan       68
16                 amendment
17   Exhibit 122   NewSong 401(k) plan       70
18   Exhibit 123   NewSong balance sheet     74
19   Exhibit 124   Acer IMA                  82
20   Exhibit 125   Acer investors           121
                   agreement
21
     Exhibit 126   Sixth amendment Acer     130
22                 agreement
23   Exhibit 127   Compliance document      137
24
25
```

Page 8

```
 1         E X H I B I T S ( CONTINUED )
 2
 3   EXHIBIT NO.                            PAGE
 4   Exhibit 128   ED&F Man power of        144
                   attorney
 5
     Exhibit 129   ED&F Man letter          150
 6
     Exhibit 130   ED&F Man terms and       153
 7                 conditions
 8   Exhibit 131   E-mail dated March 19,   161
                   2015
 9
     Exhibit 132   Custody agreement dated  163
10                 June 21, 2012
11   Exhibit 133   Letter dated February    169
                   6, 2013
12
     Exhibit 134   E-mail dated February    170
13                 7, 2013
14   Exhibit 135   E-mail dated May 21,     174
                   2013
15
     Exhibit 136   ISDA 2002 Master         178
16                 Agreement
17   Exhibit 137   ISDA 2002 Master         179
                   Schedule
18
     Exhibit 138   Morgan Stanley account   187
19                 statement dated January
                   2014
20
21
22
23
24
25
```

Page 9

```
 1         E X H I B I T S ( CONTINUED )
 2
 3   EXHIBIT NO.                            PAGE
 4   Exhibit 139   Letter dated March 26,   188
                   2014
 5
     Exhibit 140   Letter dated April 16,   208
 6                 2014
 7   Exhibit 141   Letter dated April 16,   213
                   2014
 8
     Exhibit 142   Letter dated October 1,  214
 9                 2014
10
11              ********
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 10

---
DEPOSITION SUPPORT INDEX
---

Direction to Witness Not to Answer:
Page / Line
( None )

\*\*\*\*\*\*\*\*

Request for Production of Documents:
Page / Line
( None )

\*\*\*\*\*\*\*\*

Stipulations:
Page / Line
( None )

\*\*\*\*\*\*\*\*

Questions Marked:
Page / Line
( None )

\*\*\*\*\*\*\*\*

Page 11

1    THE COURT REPORTER:  My name is
2  Michael Friedman, a Certified Shorthand
3  Reporter.  This deposition is being held
4  via videoconferencing equipment.
5       The witness and reporter are not in
6  the same room.  The witness will be sworn
7  in remotely, pursuant to agreement of
8  all parties.  The parties stipulate that
9  the testimony is being given as if the
10 witness was sworn in person.
11 ///
12 ///
13 ///
14 ///
15 ///
16 ///
17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///

Page 12

1    THE VIDEOGRAPHER:  Here begins
2  Media Unit Number 1, Volume 1, in the
3  video deposition of Alexander James
4  Mitchell The Third, conducted virtually,
5  in the matter of Customs and Tax
6  Administration of the Kingdom of
7  Denmark, SKAT, Tax Refund Litigation.
8       Today's date is May 14, 2020, and
9  the time is 9:31 a.m. New York time.
10      My name is Darrak Lighty, and the
11 court reporter today is Mike Friedman,
12 both associated with Gregory Edwards,
13 LLC.
14      All participants will be noted on
15 the stenographic record.
16      Will the court reporter please
17 swear in the witness.
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///

Page 13

1  A L E X A N D E R   M I T C H E L L,   I I I,
2       called as a witness, having been first
3  duly sworn according to law, testifies as follows:
4
5  EXAMINATION BY MR. OXFORD:
6    Q   Thank you and good morning,
7  Mr. Mitchell.
8       We met informally a few minutes
9  ago.  My name is I'm Neil Oxford.  I'm with
10 the law firm of Hughes, Hubbard & Reed in New
11 York.  We represent the plaintiff in this
12 case, Skatteforvaltningen, which, for your
13 benefit, and frankly, my benefit too, I will
14 refer to it as SKAT.
15      Do you prefer to be addressed as
16 Mr. Mitchell or some other form of address
17 during the deposition?
18   A   That -- that would be fine.  That
19 would be fine.
20   Q   Okay.  Thank you.
21      Mr. Mitchell, have you ever been
22 deposed before?
23   A   Never.
24   Q   Okay.  I will give you a few rules
25 for the road that will probably help this go

Page 22

1  around 2016, you stopped working at NewSong
2  Fellowship Church, correct?
3      A    That's correct.
4      Q    And can you tell us why you stopped
5  working there?
6      A    I had a conflict with the board and
7  ended the relationship.
8      Q    Okay.  Do you have any background
9  in stock trading or in finance?
10     A    None whatsoever.
11     Q    Okay.  And do you have any
12 familiarity with dividend arbitrage
13 strategies?
14     A    I do.  Yes, I do.
15     Q    Can you tell us what your -- what
16 you know about those strategies?
17     A    I missed that -- your question.  It
18 ended --
19     Q    Sorry.
20          Can you tell us what you know about
21 dividend arbitrage strategies?
22     A    Well, it was explained to me back
23 in 1999 from Bob Crema and Dan Kaminer.  It
24 was a way to earn money by owning or having
25 control of a stock over the dividend term,

Page 23

1  and then depending upon who controlled the
2  stock on that day, they would -- they would
3  be afforded a favorable tax refund if it
4  was -- if it was allowed by that country.
5      Q    Okay.  And you said owning or
6  controlling.
7           Was there a difference, in your
8  mind, between owning and controlling a stock
9  for the purpose of a dividend arbitrage
10 strategies?
11     A    I guess, owning as in -- no, I
12 guess -- I guess owning is probably the
13 better word.  I don't know what that -- I
14 don't know what the difference is there.
15     Q    Okay.  And you said there was -- it
16 was explained to you by two people, the first
17 one was Robert Crema.
18          Do I have that right?
19     A    That's correct.
20     Q    And the second one was -- did you
21 say Dan Kaminer?
22     A    Dan Kaminer, yes.
23     Q    And let's take those individually.
24          Who's Mr. Crema?
25     A    Mr. Crema is my friend.

Page 24

1      Q    Okay.  How did you come to know
2  Mr. Crema?
3      A    He and his family attended a church
4  I was the pastor in Staten Island.
5      Q    So over time, Mr. Crema explained
6  dividend arbitrage trading strategies to you?
7      A    Yeah.  I mean, because we became
8  friends and because he was in the financial
9  business and those kinds of things, he was
10 always interested in me as a person and would
11 ask me if I had anything like a retirement
12 fund or anything like that, and I -- I really
13 didn't.
14          I had opted out of Social Security,
15 and so I had a little bit of savings for
16 retirement, but not really much and I hadn't
17 really planned anything, and he was always
18 encouraging me that I should make sure I have
19 something for the future.
20          So in those conversations, you
21 know, he would talk a little bit about what
22 he did, but not in -- not in great length
23 until around 1999.
24     Q    And what happened in 1999?
25     A    Well, in 1999, our church -- you

Page 25

1  know, NewSong Fellowship Church had started,
2  and one of the things that we discussed was
3  starting a retirement fund for me, and Bob
4  was very encouraging of that.
5           And then he approached me and said,
6  you know, if he gets something set up, I
7  would love to talk with you and talk with the
8  board about how I could be a blessing to you
9  and a blessing to the church, potentially.
10     Q    And in 1999 was that relationship
11 with Mr. Crema formalized?  Did you or the
12 church retain him as an investment advisor?
13          MR. BLESSINGTON:  Object as to
14     form.
15          You may answer.
16     A    Say that again.
17     Q    In 1999, did you or the church
18 retain Mr. Crema or a company related to
19 Mr. Crema as an investment advisor?
20          MR. BLESSINGTON:  Objection as to
21     form.
22     A    Yeah, I don't -- I don't think as
23 an investment advisor, but we definitely
24 talked with Mr. Crema, Mr. Kaminer, about how
25 their business could be a help to us and

Page 26

1  potentially to represent us and -- and bring
2  us to the table for some possible trades that
3  could be helpful to both of church and to my
4  retirement fund.
5       Q    Okay.  Mr. Crema, I understand, is
6  associated with a company called Acer.
7            Is that correct?
8       A    That's correct.
9       Q    Okay.  And Mr. Kaminer also is
10 related to Acer?
11      A    He died.
12      Q    Okay.  Sorry to hear that.
13           When did -- when did Mr. Kaminer
14 pass away?
15      A    Oh, in the mid 2000s sometime.
16      Q    All right.  And prior to his
17 passing, was Mr. Kaminer associated with Acer
18 as well?
19      A    I'm not sure.  The original company
20 was called AIG.  Then they changed their name
21 somewhere along the line to Acer.
22      Q    Okay.  And we talked a little bit
23 about your conversations and relationships
24 with Mr. Crema.
25           Moving to Mr. Kaminer, Dan Kaminer,

Page 27

1  what was your relationship with -- with him?
2       A    I -- I really didn't know Dan other
3  than through Bob, and the first time I met
4  him was when Bob and Dan came out to
5  Lancaster and met with myself and the board
6  of the church to discuss the foreign dividend
7  arbitrage and how it could be a blessing to
8  us.
9       Q    And approximately when was that
10 meeting that you just described?  When did
11 that take place?
12      A    I think it was May of 1999.
13      Q    Okay.  And who else was in
14 attendance other than you, Mr. Crema and
15 Mr. Kaminer?
16      A    Our -- our elders, the elder board.
17      Q    The elder board are responsible for
18 the governance of the church?
19      A    They are, yes.
20      Q    Would any notes or minutes be taken
21 of that meeting?
22      A    No, not at that meeting.
23      Q    Okay.  So appreciating, obviously,
24 this was some 20 years ago, can you give us
25 your best recollection of what was discussed

Page 28

1  at that meeting in 1999?
2       A    Yeah, they -- some of the men knew
3  Bob because he came out on a weekend or so to
4  visit me and visit our family.  They would
5  come to church and they kind of knew Bob
6  relationally.
7            And then he and Dan generally
8  explained how -- what they did and the kinds
9  of trades that they made, depending upon the
10 country and the tax treaty that the United
11 States had with certain countries would
12 afford organizations like a charitable
13 organization or an education or medical
14 research company and pension plans the
15 ability to do trades.
16           And -- and when the dividend was --
17 was applied, a tax refund could be made to
18 that and -- and earnings could be gained that
19 way.
20      Q    Did they just give you an oral
21 presentation or did they provide some
22 documents or materials for you and the elders
23 to arrive?
24      A    No, it was all oral.
25      Q    At any time subsequent to the

Page 29

1  meeting in 1999, did you get any documents or
2  other written explanations from Mr. Crema or
3  Mr. Kaminer about dividend arbitrage
4  strategies?
5       A    No, nothing explaining it, no.
6       Q    So you had this meeting in -- in
7  May of 1999.  What happened --
8       A    Correct.
9       Q    -- after that with respect to the
10 trading strategies that were discussed at
11 that meeting?
12      A    Well --
13           MR. BLESSINGTON:  Object as to
14      form.
15           You may answer.
16      A    Okay.  Well, what happened after
17 that was the men and I, we had some
18 subsequent conversations about it, and we --
19 number one, I needed to get a retirement fund
20 going anyway.  So that was kind of let's do
21 that.  Let's get Jamie a retirement fund up
22 and running.
23           And then we had subsequent
24 conversations and said, hey, if we can do
25 these trades and it can help the church and

Page 30

1  help you, why not.
2        And so then established the 401(k),
3  that summer, I believe it was, and then I
4  just don't even remember when the first trade
5  was executed.  I -- it was sometime obviously
6  after that, but yeah, that's what basically
7  happened.
8     Q    Okay.  So you referenced a
9  retirement plan being established.
10       Do I understand correctly that the
11 NewSong Church established -- as your
12 employer established a 401(k) retirement plan
13 for you?
14    A    Yeah, they were the sponsor of it.
15    Q    Okay.  Was anybody else the
16 beneficiary of this plan or was it simply a
17 plan for you and you alone?
18    A    No, I was it.  I was the only
19 employee.
20    Q    And then at some point after the
21 establishment of your retirement plan, did
22 you conduct some dividend arbitrage trades?
23    A    I didn't.  I know that, you know,
24 Mr. Crema and Acer did on behalf of the plan.
25    Q    Okay.  And can you give us a

Page 31

1  ballpark estimate of when that would have
2  been?  Would that have been shortly a year or
3  two after the plan was established or some
4  time later?
5     A    Yeah, it was sometime after that,
6  maybe a year.  I don't think it was -- it
7  wasn't right away because there was probably
8  a lot of paperwork and that kind of thing to
9  get ready for that.  I -- I just don't recall
10 exactly.  Plus, we had the -- we had the
11 church setting up a church town as well.
12       So we -- we had two things going at
13 once there, but I don't remember any trades
14 happening soon.
15    Q    At some point, was there a formal
16 agreement between the Acer company and your
17 401(k) plan?
18       MR. BLESSINGTON:  Object as to
19    form.
20       You may answer.
21    A    No, there was no formal -- no,
22 there was no formal agreement.
23    Q    Was Acer providing investment
24 advice for your 401(k) plan?
25    A    No.

Page 32

1        MR. BLESSINGTON:  Object as to
2     form.
3     A    No.
4     Q    Who was directing the trading that
5  was happening for the investments on behalf
6  of your 401(k) plan from 1999 on?
7     A    Well, nobody for -- in regards to
8  having an actual investment advisor, nobody
9  for a couple of years.  It was in a -- set up
10 a bank account for the funds, whatever funds
11 I was saving, and then we -- later on, when
12 we did get other employees, we established a
13 new 401(k) for all the employees, and I no
14 longer contributed to the first one.  That
15 just kind of sat there and -- in that regard.
16    Q    So let me try and make sure I
17 understand the different 401(k)s.
18       Some time after the meeting in May
19 of 1999, the church sponsored for you and you
20 alone a 401(k) plan, correct?
21    A    Correct.
22    Q    And then at some time later, the
23 church sponsored an additional 401(k) plan
24 for a -- for different employees?
25    A    Correct.  We started having

Page 33

1  employees around 2002, 2003, and then started
2  the -- the employees' 401(k) plan.
3        I no longer contributed to the
4  first one.  I stopped contributing to that
5  because you can only contribute to one at a
6  time and I began contributing to the other,
7  and the money that was in that account just
8  stayed in that account.
9     Q    So you had two 401(k) plans
10 established by or sponsored by the NewSong
11 Church; the original one in 1999, which you
12 were the only participant, and the second one
13 where you were not the only participant, that
14 you were a participant along with other
15 employees.
16       Is that correct?
17    A    That is correct.
18    Q    Okay, great.  Thank you.
19       To your knowledge, did Acer
20 Investment Management --
21    A    I'm sorry, Mr. Oxford.  That was
22 a -- I couldn't understand any of that.  It
23 was all chopped up.
24    Q    Sorry, let me -- let me clean that
25 up.

Page 42

1  retirement strategy?
2     A   With the second 401(k), yes.
3     Q   They were not involved with
4  investment strategy for your first 401(k)?
5     A   No, not at all.
6     Q   For the second 401(k), did you
7  pursue dividend arbitrage strategies for
8  those investments?
9     A   No, we did not.
10    Q   Did you pursue a dividend arbitrage
11 strategy for the investments in your first
12 401(k), the one in which you were a sole
13 participant?
14    A   Did I pursue it?
15    Q   Yes.
16    A   What do you mean by "pursue it"?
17    Q   Well, let me put it this way.
18 For the 401(k) in which you were
19 the only participant, was -- was any of the
20 money of the fund invested in dividend
21 arbitrage strategies?
22    A   I believe so, yeah.
23    Q   Okay. And did you get any
24 assistance from any financial advisors with
25 respect to those strategies?

Page 43

1     A   No.
2     Q   You didn't get any advice or
3  assistance from Mr. Crema or Mr. Kaminer?
4     A   Not advice. Well, I mean, they
5  were the ones who would bring -- bring me to
6  or bring our plan -- to bring my plan to --
7  to execute those trades. They weren't
8  advising me on my retirement plan.
9     Q   What do you mean when you say they
10 would -- when they would bring your plan to
11 execute those trades? Can you explain what
12 you mean by that?
13    A   Well, Mr. Crema, I will --
14 Mr. Crema more so because I really didn't
15 deal with Dan after the initial meeting.
16 But Mr. Crema, when there were
17 opportunities in different countries to do
18 the trades that we've been talking about, he
19 would then be an agent in some respects and
20 contact -- you know, he would have the
21 contacts with the banks and with the stock
22 owners and the -- and be able to, you know,
23 guide the trade.
24    Q   So you considered Mr. Crema to be
25 an agent for your 401(k) plan in pursuing

Page 44

1  dividend arbitrage strategies?
2     A   Yeah. I mean, he was -- he was the
3  one who -- you know, had all the pieces and
4  brought those things together.
5     Q   And this relationship that you
6  characterize as an agency relationship, this
7  wasn't governed by any agreement or piece of
8  paper, to your recollection?
9     A   No.
10    Q   And how did it work in practice?
11 Did Mr. Crema call you and say, "I want to do
12 these trades. Do I have your approval"?
13    A   No, no. Once -- once we were
14 involved, obviously -- obviously, if there
15 was certain banks involved or other entities,
16 there would be times where I would have to
17 sign some documents because we were now
18 working with a bank, you know, much like, you
19 know, really happened all through these
20 years.
21 There were different banks that
22 were involved, different countries that we
23 were doing trades with. So I would receive
24 paperwork to understand what was happening in
25 a general way, and then as those

Page 45

1  opportunities came, Mr. Crema would, I guess,
2  execute those trades and I would receive
3  notice of them.
4  Back in the day, we had a fax
5  machine, and I know that they're probably in
6  a museum somewhere, but on the day -- the day
7  that we would then be assigned the stock and
8  earn the dividend, you would receive a fax
9  that would say that my pension plan or the
10 church was now in ownership or would be
11 assigned 15 million shares of Deutsche Tele
12 stock, and my secretary would look at that.
13 She would say wow, and then a day later, I'd
14 say it was gone.
15 So that's the -- that's the only
16 notice I would ever get in regard to that,
17 but I understand that's how it worked,
18 you know.
19    Q   Sure. And why was your secretary
20 saying wow, that's a lot of stock?
21    A   You know, for people of Lancaster,
22 Pennsylvania, that's not a -- that's not a
23 normal fax that you would receive.
24    Q   Sounds like you might have received
25 quite a few of those faxes?

Page 90

1  with Denmark.  Pretty much the church was
2  done, like I said, Mr. Oxford, 2012/2013.  It
3  really pretty much dried up and we didn't do
4  any other trades for the church after that.
5         I want to -- I want to say Ireland
6  was the last thing we did for the church, and
7  that was it.
8     Q   And when was the Irish trading you
9  did for the church?
10    A   Late 2000s.  I'm not exactly sure
11 on the date.
12    Q   You mentioned earlier that
13 Mr. Crema would advise you from time to time
14 on where the opportunities were and which
15 particular countries presented particular
16 opportunities.
17        Do you remember that?
18    A   Yes, sir.
19    Q   Can you tell us what else you
20 remember about that?
21        Did Mr. Crema explain to you why
22 particular opportunities were appearing in
23 particular countries?
24    A   Well, normally, it was because a
25 new treaty -- a new -- new tax treaty would

Page 91

1  go into effect, would open up a certain
2  country, and certain banks would come in and
3  out.
4         Over the years, there were numerous
5  banks that were involved at different times
6  with -- with these trades.
7     Q   Generally speaking, which other
8  country stocks did you trade in with the
9  assistance of Acer?
10        MR. BLESSINGTON:  Object to form.
11    Q   Let me clean that up.
12        Which -- focusing on the NewSong
13 plan, which European or other stocks did you
14 trade in with the assistance of Acer?
15    A   The countries that I remember, and
16 this may not be exhaustive, but countries;
17 Germany, Ireland, Switzerland, and obviously
18 Denmark.
19    Q   Okay.  And then asking the same
20 question with respect to the church's
21 dividend arbitrage trading, you told us there
22 was no trading in Danish stocks.
23        What other country's stocks did the
24 church pursue a dividend arbitrage strategy
25 with?

Page 92

1         MR. BLESSINGTON:  Object as to
2  form.
3         You can answer.
4     A   Again, I think Ireland, Germany,
5  Switzerland.
6         A lot of times we would -- if
7  trades were happening, it would happen for
8  both of our -- you know, both the accounts
9  that we had with Acer, and -- and then
10 sometimes it would only be one of the
11 accounts because the country or the -- or the
12 treaty would allow for a pension, but not a
13 charitable or a charitable amount of pension.
14        So to be perfectly honest with you,
15 it blended a lot together because Bob would
16 say, hey, we just did a trade, and -- you
17 know, I -- I wouldn't know exactly if it was
18 the church or pension plan because I wouldn't
19 ask until -- you know, later on we would see
20 the money in the accounts.
21    Q   You also told us earlier that you
22 would, back in the day, get confirmation by
23 fax after a particular trade had been entered
24 into.
25        Do you remember telling us that?

Page 93

1     A   Yeah.  That was very early on.
2     Q   Would those -- would those fax
3  confirmations come from Acer or would they
4  come from another financial institution
5  involved in the trading?
6     A   I don't remember.
7     Q   When Mr. Crema was describing the
8  dividend arbitrage strategy to you, did he
9  ever discuss any risks to the NewSong plan in
10 engaging in this trading?
11    A   I mean, there -- not only did he
12 discuss it, we obviously -- obviously we --
13 sorry, Michael.
14        Yeah, I mean, in the conversation,
15 especially in that initial conversation back
16 in 1999 with him and Mr. Kaminer, that was a
17 lot of the questions that we had back then,
18 you know, what were the risks, what exposure
19 would the church have and all of that.
20        And obviously, we -- we were not
21 going to be putting up ourselves with the
22 capital for these trades and, you know, we
23 needed to understand how that worked, and as
24 a church, you ask those questions.
25        You know, as a 501(c)(3), we are

Page 102

1  hour so the lunch would be around 1:00.
2       MR. OXFORD:  Okay.  That's fine.
3       THE VIDEOGRAPHER:  Going off the
4  record.
5       The time 11:57 a.m., New York time.
6       (Brief recess taken.)
7       THE VIDEOGRAPHER:  The time is
8  12:11 p.m., New York time.
9       We're back on the record.
10   Q   Mr. Mitchell, before the short
11 break, we were talking about the risks to the
12 NewSong plan of the dividend arbitrage
13 strategy.  I just have a couple of follow-up
14 questions on that.
15      You identified as one risk that
16 Mr. Crema advised you of the possibility that
17 the country wouldn't pay the tax refund.
18      Is that fair?
19   A   Yeah, I think that was one of
20 the -- one of the issues that could come up.
21   Q   Yeah.  And how -- how would that
22 risk potentially manifest itself with the
23 NewSong plan?  How would that risk, if
24 realized, impact the plan negatively?
25      MR. BLESSINGTON:  Object as to

Page 103

1  form.
2       You can answer.
3    A   I don't know.  I mean, I don't
4  think we ever discussed the impact of it.  I
5  think we just talked about potentially things
6  that could happen, and you got to realize
7  then over how many years, nothing ever
8  happened.
9    Q   After nothing ever happening for
10 all of these years, did you consider dividend
11 arbitrage to be essentially a risk-free
12 strategy?
13      MR. BLESSINGTON:  Object as to
14 form.
15      You may answer.
16   A   I'm a pastor.  There's nothing risk
17 free.  I've worked with people too many
18 years, Mr. Oxford.  There is no risk free
19 when dealing with people.
20   Q   If, sticking with risk number 1,
21 that the country wouldn't pay the tax refund,
22 were you concerned that there would be a
23 liability or a loss to your pension plan?
24   A   I don't think I ever addressed that
25 or even was concerned about it.

Page 104

1    Q   Is the reason you weren't concerned
2  about a loss to your pension plan in the
3  event that the refund wasn't paid?
4       MR. BLESSINGTON:  Object as to
5  form.
6       You may answer.
7    A   Partially, because I didn't
8  understand all the technical aspects of
9  refunding and all -- you know how that all
10 worked.  I -- again, I was at a pretty high
11 level of understanding, but enough to
12 understand how these things worked.
13      The other side of it is I had great
14 faith in Mr. Crema and my relationship with
15 him, and I knew that he would never ever put
16 me in a position that would hurt me or the --
17 or the church that I was serving in.  That
18 was true for 20 some-odd years until SKAT.
19   Q   When did you first learn that -- to
20 use your terminology -- there was a problem
21 with SKAT?
22   A   Oh, boy.  I don't know if I got a
23 heads up from Mr. Crema or received some
24 document via service.  I don't -- I don't
25 recall.  I was in transition, I think, at the

Page 105

1  time from Florida to North Carolina, and the
2  timetable of exactly when I heard there was
3  something wrong, you know, kind of escapes me
4  exactly.
5    Q   Just to orient us in the timeline,
6  you were -- when were you transitioning from
7  Florida to North Carolina?
8    A   Well, we made the decision to leave
9  Florida in March of 2018.  We actually made
10 the move in June, of that time.
11   Q   Okay.  Sometime in the first half
12 of 2018?
13   A   Right.
14   Q   Okay.  And to the best of your
15 recollection, can you tell us everything that
16 you remember about your discussions with
17 Mr. Crema in that period?
18   A   Well, I -- I just remember him
19 saying that there was a -- there was a
20 potential problem with Denmark, but Mr. Crema
21 was also in the middle of his own personal
22 health concerns, and we were living right --
23 you know, 15 minutes away from each other in
24 Naples, Florida.
25      So we were more concerned about his

Page 106

1 health, at that point, than anything.
2     Q    Okay.  So you recall having just
3 one conversation with Mr. Crema in this -- in
4 this period, the first half of 2018, or do
5 you think you had a number of conversations?
6     A    Probably a number.  I don't think I
7 had one.
8     Q    Okay.  So just setting to one side
9 your very understandable concerns about
10 Mr. Crema's health problems --
11     A    And us moving, moving at the time
12 and all that, too.
13     Q    Sure.
14          But to the best of your
15 recollection, could you tell us everything
16 that Mr. Crema told you in, say, the first
17 half of 2018 about what you described as
18 potential problems with Denmark?
19          MR. BLESSINGTON:  You know, I'm
20     just going to interject here and just
21     caution Jamie not to obviously disclose
22     any conversations that you had with
23     counsel.
24          MR. OXFORD:  Yeah, that's fine.  I
25     appreciate that objection.

Page 107

1     Q    To be clear, I'm not seeking to
2 have any conversations -- not explore the
3 conversations that Mr. Mitchell had with you
4 or other counsel.
5          My question is:  What did you
6 discuss with Mr. Crema -- let's start with
7 the time period of the first half of 2018 --
8 about what you described as a potential
9 problem with Denmark?
10     A    Yeah.  Again, I -- I don't -- I
11 don't recall specifically or exactly, you
12 know, that some of our conversations talked
13 about the whole issue of Denmark and their
14 tax problems and what was happening in their
15 government.
16          And that there were some bad --
17 there were some bad people who were doing bad
18 trades in Denmark, and I'm trying to think if
19 even some of this was already publicized in
20 some journals or newspapers and directed me
21 or encouraged me to look at this and to
22 become familiar with what was happening,
23 because, you know, we potentially were going
24 to be involved with some of this because of
25 the trades that we were doing that Denmark

Page 108

1 was going after a whole bunch of companies.
2     Q    Anything else that you can recall,
3 discussions, from your discussions with
4 Mr. Crema about the potential problem with
5 your Danish trades, either in the first half
6 of 2018 or subsequently?
7     A    No, not at all.  Basically, he made
8 it clear that it was with the 401(k) plan,
9 never had done anything with the church, and
10 that was -- that was clear, and that was it.
11     Q    Have you discussed this lawsuit
12 with Mr. Crema?
13     A    Yeah, different times we talked
14 about the lawsuit.  Not in great detail once
15 counsel was involved, and -- you know.
16     Q    Okay.  And excepting as I said
17 before, any conversations where counsel were
18 party to them, can you tell me what
19 conversations you had with Mr. Crema about
20 this lawsuit?
21     A    Like if there's any progress, what
22 is happening with it, mostly how he was
23 doing.
24          Again, Mr. Oxford, I've had a
25 pastoral role with Mr. Crema, not just in a

Page 109

1 business sense.  I've married his daughters.
2 I've been at his bedside for most of his
3 surgeries and most of his health issues, and
4 this has taken obviously a toll on Mr. Crema.
5          He's very, very upset about it, and
6 probably most of our conversations, when we
7 talked about, it is just trying to encourage
8 him and pray with him.
9     Q    He's upset because the trading that
10 he recommended for the NewSong plan ended up
11 in this lawsuit?
12     A    Mr. Crema has been upset and
13 disappointed at this because he knows that
14 we've done nothing wrong in these trades, and
15 we've gotten lumped in with a whole bunch of
16 bad people and my name has been maligned.
17          I've been named in some fraud thing
18 that's on the Internet now and people have
19 found it, and I've had to answer to Christian
20 organizations why my name was in a fraud
21 situation, and he feels bad for that.  That's
22 why.
23          He loves us, he loves me, and he
24 feels bad that all this happened, and he
25 feels bad for all his clients.  And it's not

Page 146

1  So back to 1.2, it says, "The
2  attorney," which is Acer, "hereby accepts
3  appointment as attorney-in-fact with respect
4  to the trading account of the customer,
5  ED & F Man Capital Markets, Limited."
6       Do you see that?
7  A    Yes, sir.
8  Q    It goes on to say, "With full power
9  and authority to invest and trade the cash
10 assets and investments in the account in
11 accordance with the agreement, which is
12 defined in the parenthetical, as it may be
13 amended or supplemented from time to time."
14      Do you see that?
15 A    Yes, sir.
16 Q    Okay.  Is that consistent with your
17 understanding of the broad scope of the
18 authority of Acer Investment Group to act on
19 behalf of the NewSong plan?
20 A    Yes.
21      MR. BINDER:  Objection.
22 Q    Paragraph 1.2 goes on to say, "The
23 attorney is authorized to invest and trade
24 the said cash assets and investments in its
25 discretion without prior notice to or

Page 147

1  consultation with the customer to this same
2  extent and with the same force and effect as
3  if such actions were taken by the customer
4  directly."
5       Do you see that?
6  A    I do.
7  Q    Okay.  And again, is that language
8  consistent with your understanding of the
9  scope of the authority that the NewSong plan
10 gave to Acer Investment Group to conduct
11 trading on behalf of the plan with ED & F?
12      MR. BLESSINGTON:  Objection.
13      You can answer.  You can answer,
14   Jamie.
15      THE WITNESS:  Oh, I can answer?
16   Okay.  I have to be told if I can or I
17   can't, when I hear "object."
18 A    Yes, that's -- that would be
19 standard fair.
20 Q    And it -- was the power of attorney
21 ever revoked, Mr. Mitchell?
22 A    I don't remember.  I don't remember
23 if I ended that or not.
24 Q    Was this power of attorney executed
25 to allow Acer Investment Group to pursue a

Page 148

1  specific trading strategy on behalf of the
2  NewSong plan?
3       MR. BLESSINGTON:  Objection as to
4    form.
5       You can answer.
6  A    I don't think it was.
7  Q    Can you tell me, to the best of
8  your recollection, what trading strategies or
9  investments the NewSong plan made through
10 ED & F Man?
11 A    They essentially were going to be
12 the same strategies that we've been doing
13 since 1999, the -- the foreign dividend
14 arbitrage.
15 Q    Which is purchase stock with money
16 borrowed from the bank, hold it for a day,
17 and reclaim the tax from the foreign
18 sovereign, correct?
19      MR. BLESSINGTON:  Objection.
20   Object as to form.
21      You may answer.
22 A    In -- in general, that was the --
23 that was the structure.  I mean, I don't know
24 all the details that may have occurred in any
25 one bank or any one trade, but that,

Page 149

1  essentially, was what was happening.
2  Q    We'll get to the specific
3  applications in a moment.
4       We obviously know that through
5  ED & F and Acer the NewSong plan made some
6  refund, tax refund re-claims related to
7  Danish stocks.
8       Is that correct?
9       MR. BINDER:  Objection to form.
10   Neil Binder.
11 A    Correct.
12 Q    Do you know whether through ED & F
13 the NewSong plan executed similar strategies
14 as you just described, relating to European
15 stocks, other than Danish stocks?
16      MR. BLESSINGTON:  Objection as to
17   form.
18 A    With -- with ED & F Man?
19 Q    Yes.
20 A    I wouldn't know that, specifically.
21 Q    Okay.
22      MR. OXFORD:  Valerie, could I ask
23   you to upload these -- what is
24   internally Tab 12.  I will mark that as
25   Mitchell Exhibit 129.

Page 154

1  for the purposes of answering my first
2  question, I don't think a detailed review is
3  necessary.
4      A    Yeah, I don't -- I don't -- this
5  document -- I don't recall this document.
6  Again, if I -- if I had gotten it, it might
7  have been in a packet of materials.  33
8  pages, all these materials, I didn't read all
9  33 pages, but I was familiar with some of the
10 things in there.
11     Q    Okay.
12          MR. OXFORD:  In discretion for
13     Mr. Blessington, actually, John, we had
14     specifically asked you to produce the
15     terms and conditions of business that
16     were referenced in what we've marked as
17     Mitchell 129, and you're going to
18     produce these to us.
19          In response of that, can you
20     confirm that these are, in fact, the
21     terms and conditions of business
22     referenced in Mitchell 19?
23          MR. BLESSINGTON:  Yes.
24          MR. OXFORD:  Thank you.  I
25     appreciate that.

Page 155

1      Q    Back to you, Mr. Mitchell.
2           Could I ask you to turn to page 17
3  of the document?
4      A    Okay.
5      Q    At the top of the page, under the
6  section, "Charges and Payments," it says,
7  "Where you have been introduced to us by a
8  third party, we may pay to such introducer a
9  share of the income earned by us from your
10 account.  We can provide you with full
11 details of such amounts, subject to your
12 written request."
13          Do you see that?
14     A    Yes, I do.
15     Q    Were you aware that one of the
16 terms and conditions from ED & F is that they
17 paid an introducer a share of the income that
18 ED & F earned from your account with them?
19     A    Are you talking about like fees to
20 Acer, that kind of thing?
21     Q    Yeah.
22          My -- my question is:  Were you
23 aware that ED & F had the entitlement under
24 its terms and conditions of business with
25 your plan that it could pay to an introducer,

Page 156

1  such as Acer, a share of the income that it,
2  ED & F, earned from your account?
3           MR. BLESSINGTON:  Objection as to
4      form.
5           You may answer.
6      A    Yeah, I -- I -- I probably didn't
7  understand it as being in that structure, but
8  I knew that -- that Acer and anybody else
9  involved with the trading would be receiving
10 through the -- through the tax refund their
11 fees out of the plan.
12          But I didn't know if -- you know, I
13 understood it in a general sense, but not in
14 a formal way on this document.
15     Q    All right, I understood.
16          You understood that -- that Acer,
17 as part of the structure that you've
18 described to us, would be making a fee that
19 they would take out of the refund from, for
20 example, the Danish government, correct?
21          MR. BLESSINGTON:  Objection as to
22     form.  Object as to form.
23          You may answer.
24     A    Absolutely.
25     Q    Okay.  And just to -- just a

Page 157

1  ballpark percentage-wise, did you have a
2  sense of what percentage of a dividend
3  arbitrage refund that was applied for on
4  behalf of the NewSong plan would go to
5  respectively the plan Acer and ED & F?
6           MR. BLESSINGTON:  Objection to
7      form.
8           Excuse me, we're not doing this
9      live.  You have to allow people to
10     interpose their objections.  You know
11     what, Mr. Oxford, read back the question
12     and allow us to object.
13          Objection as to form.  You may
14     answer.
15     A    No, I didn't understand, but if
16 I -- again, from my -- from the years of
17 doing this, my understanding was the plan
18 would be getting a very small percentage, but
19 still a significant one.
20     Q    Can you be more specific about the
21 very small percentage that the plan would get
22 in its dividend arbitrage trading?
23          MR. BLESSINGTON:  Objection to
24     form.
25          MR. BINDER:  Objection to form.

Page 218

1  A   I -- used to work for Acer, and --
2  yeah, used to work for Acer.  I met him at a
3  wedding.
4  Q   I'm sorry, did you -- I see.
5      Did you say Mr. Messina used to
6  work for Acer or you used to work for Acer?
7  A   Mr. Messina used to work for Acer.
8  Q   Okay.  Did you have any substantive
9  conversations with Mr. Messina about the
10 dividend arbitrage strategy that Acer was
11 effecting for the NewSong plan?
12 A   No.
13 Q   Are you familiar with Kingham
14 Capital, K-I-N-G-H-A-M?
15 A   No, doesn't sound familiar.
16 Q   Are you familiar -- thank you.
17     Are you familiar with James Rhodes,
18 R-H-O-D-E-S?
19 A   It doesn't sound familiar, no.
20 Q   Are you familiar with a company
21 called Cubix, C-U-B-I-X?
22 A   No, sir.
23 Q   Are you familiar with KK Law
24 Retirement Plan Trust?
25 A   No, sir.

Page 219

1  Q   Are you familiar with 5T Advisory
2  Services Retirement Plan Trust?
3  A   No, sir.
4  Q   And lastly, are you familiar with
5  Uplands Consulting Retirement Plan and Trust?
6  A   I -- I am not.
7  Q   You're represented by
8  Mr. Blessington here today, correct?
9  A   That is correct.
10 Q   And very ably, may I say so.
11     Are you paying him for his services
12 or is someone else paying for
13 Mr. Blessington's legals bills?
14 A   Acer is.
15 Q   Great.
16     MR. OXFORD:  I don't have any more
17 questions for you at this time.
18 Thank you, Mr. Mitchell.
19     THE WITNESS:  Thank you,
20 Mr. Oxford.  You're very kind.
21     MR. BLESSINGTON:  Neil, if I can
22 have one minute, I may have two
23 questions.
24     MR. OXFORD:  Sure.
25     MR. BLESSINGTON:  So why don't we

Page 220

1  go off the record again for a very short
2  period of time.
3      THE VIDEOGRAPHER:  Going off the
4  record.
5      The time is 4:23 p.m. New York
6  time.
7      (Brief recess taken.)
8      THE VIDEOGRAPHER:  The time is
9  4:27 p.m. New York time.  We're back on
10 the record.
11     MR. BLESSINGTON:  I have questions.
12 EXAMINATION BY MR. BLESSINGTON:
13 Q   Good afternoon, Mr. Mitchell.
14 A   Mr. Blessington.
15 Q   I'm going to direct your attention
16 to exhibit what's been marked as Exhibit 128.
17     Can you pull that up on your
18 screen?
19 A   Yes, 128.
20 Q   All right.  And that's the power of
21 attorney that you signed on -- back on
22 March 27, 2012?
23 A   Yes.
24 Q   And do you remember that Mr. Oxford
25 asked you a bunch of questions about this

Page 221

1  document?
2  A   I know he asked a lot of questions.
3  I don't remember all of them.
4  Q   Yes, sir.  All right.
5      Did you, by executing this power of
6  attorney, authorize Acer to conduct trades on
7  your plan's behalf through ED & F?
8  A   Yes.
9  Q   And did those trades include
10 dividend arbitrage trades?
11 A   I believe so, yes.
12 Q   As you sit here today, without
13 speculating, are you aware of how those
14 plans -- those transactions were executed
15 through ED & F?
16 A   No, no clue.
17 Q   Without speculating, do you know
18 whether there was anyone or any entity that
19 provided capital in connection with those
20 transactions?
21     MR. OXFORD:  Object to the form.
22 A   No.
23 Q   Without speculating, do you know
24 who provided capital in connection with those
25 transactions?

Page 222

1  A     Specifically, no, I don't.
2        MR. OXFORD:  Objection to form.
3  A     Sorry.  No, I do not.
4  Q     Without speculating, do you know
5  how much capital was provided?
6        MR. OXFORD:  Object to the form.
7  A     No, I do not.
8  Q     So in connection with those trades
9  that were conducted in Denmark through
10 ED & F, did you rely entirely on Acer?
11 A     Absolutely.
12       MR. OXFORD:  Object to the form.
13       THE WITNESS:  I'm sorry.
14 A     Absolutely.
15 Q     All right directing your attention
16 to what I believe was marked Exhibit 139, but
17 for purposes of the questioning, it would be
18 Tab 22, can you pull that document out?
19       Do you have that in front of you?
20 A     Is that the tax voucher for TDEC?
21 Q     Correct.
22 A     Okay.
23 Q     And you might recall that
24 Mr. Oxford asked you a bunch of questions and
25 walked you through this exhibit?

Page 223

1  A     Yes, sir.
2  Q     And Mr. Oxford represented to you
3  that there was something known as the Annex E
4  vouchers.
5        Do you recall that?
6  A     He asked me about it, but I
7  didn't -- I don't -- I don't know anything
8  about that.
9  Q     And you might recall Mr. Oxford
10 represented to you that ED & F had made
11 some -- made some filings over in a
12 proceeding in the U.K.
13       Do you recall that?
14 A     I remember Mr. Oxford bringing that
15 up, yes.
16 Q     All right.  And -- and you have
17 never seen any of those filings made in the
18 U.K., have you?
19 A     No.  No, sir, I have not.
20 Q     And have you ever seen Annex E?
21 A     No, sir.
22 Q     Now, Mr. Oxford represented to you
23 that ED & F and those papers that they filed
24 over in the U.K. had said that certain
25 vouchers prepared for your plan contained

Page 224

1  inaccurate information.
2        Do you recall that?
3  A     I remember Mr. Oxford saying that,
4  yes.
5  Q     Okay.  And without speculating, do
6  you know what information in those vouchers
7  is inaccurate?
8  A     No, sir.  I do not.
9        MR. BLESSINGTON:  That's all I
10 have.
11       Thank you very much, Mr. Mitchell.
12       MR. OXFORD:  John, I have no
13 follow-up.
14       (Whereupon a discussion was held
15 off the record.)
16       MR. WEINSTEIN:  Before we go off
17 the record, I just want to make sure
18 that we ask if there's any other counsel
19 for any other party who wanted to ask
20 questions today.
21       MR. OXFORD:  There's a deafening
22 silence, so I think you're in luck,
23 Mr. Mitchell.
24       THE WITNESS:  No luck about it, Mr.
25 Oxford.

Page 225

1        THE VIDEOGRAPHER:  This completes
2  the video deposition of Alexander James
3  Mitchell The Third, conducted virtually,
4  on May 14, 2020 at 4:34 p.m. New York
5  time.
6        We're off the record.
7        (Witness was excused.)

Page 226

1            C E R T I F I C A T E
2        I, MICHAEL FRIEDMAN, a Certified Court
3   Reporter and Notary Public, qualified in and for
4   the State of New Jersey do hereby certify that
5   prior to the commencement of the examination
6   ALEXANDER JAMIE MITCHELL, III was duly sworn by me
7   to testify to the truth the whole truth and nothing
8   but the truth.
9        I DO FURTHER CERTIFY that the foregoing
10  is a true and accurate transcript of the testimony
11  as taken stenographically by and before me at the
12  time, place and on the date hereinbefore set forth.
13       I DO FURTHER certify that I am neither a
14  relative of nor employee nor attorney nor counsel
15  for any of the parties to this action, and that I
16  am neither a relative nor employee of such attorney
17  or counsel, and that I am not financially
18  interested in the action.
19
20
21  _____
22  MICHAEL FRIEDMAN, CCR of the
23  State of New Jersey
24  License No: 30XI00228600
25  Date: March 18, 2020

Page 227

1                LAWYER'S NOTES
2   PAGE LINE
3   ____ ____   _____
4   ____ ____   _____
5   ____ ____   _____
6   ____ ____   _____
7   ____ ____   _____
8   ____ ____   _____
9   ____ ____   _____
10  ____ ____   _____
11  ____ ____   _____
12  ____ ____   _____
13  ____ ____   _____
14  ____ ____   _____
15  ____ ____   _____
16  ____ ____   _____
17  ____ ____   _____
18  ____ ____   _____
19  ____ ____   _____
20  ____ ____   _____
21  ____ ____   _____
22  ____ ____   _____
23  ____ ____   _____
24  ____ ____   _____
25  ____ ____   _____

Page 228

1              DEPOSITION ERRATA SHEET
2
3
4   Case Caption: In Re: SKAT
5
6
7        DECLARATION UNDER PENALTY OF PERJURY
8        I declare under penalty of perjury
9   that I have read the entire transcript of
10  my Deposition taken in the captioned matter
11  or the same has been read to me, and
12  the same is true and accurate, save and
13  except for changes and/or corrections, if
14  any, as indicated by me on the DEPOSITION
15  ERRATA SHEET hereof, with the understanding
16  that I offer these changes as if still under
17  oath.
18
19
20
21       Signed on the _____ day of
22       _____, 20____
23
24       _____
25       ALEXANDER JAMIE MITCHELL, III

Page 229

1              DEPOSITION ERRATA SHEET
2   Page No._____Line No._____Change to:_____
3   _____
4   Reason for change:_____
5   Page No._____Line No._____Change to:_____
6   _____
7   Reason for change:_____
8   Page No._____Line No._____Change to:_____
9   _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25       ALEXANDER JAMIE MITCHELL, III