UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to 1:18-CV-05053-LAK. | MASTER DOCKET<br><br>Case No. 1:18-MD-02865-LAK |

**THE GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN'S, SHELDON GOLDSTEIN'S, AND SCOTT GOLDSTEIN'S
REPLY IN FURTHER SUPPORT OF THEIR
<u>MOTION TO DISMISS AMENDED COMPLAINT</u>**

Instead of grappling with this Motion's new arguments explaining why the Amended Complaint's new allegations, including those against Scott Goldstein—a brand-new party—fail to state Plaintiff Skatteforvaltninge's ("**SKAT**") claims, SKAT largely rests on a brief it filed nearly two years ago. <u>Compare</u> Opp. at 28 n. 38 <u>and, e.g.</u>, <u>Corrado v. New York Unified Court Sys.</u>, 163 F. Supp. 3d 1, 17–18 (E.D.N.Y. 2016), <u>aff'd sub nom.</u>, 698 F. App'x 36 (2d Cir. 2017) ("discretionary" law of the case doctrine is irrelevant where there are new parties). Consolidating 184 cases into this MDL does not excuse SKAT's failure to plead every element of all six of its claims against each Goldstein Party. This Court should dismiss SKAT's Amended Complaint.

1

**I.     The Negligent Misrepresentation Claim Fails Because the Goldstein Parties Owe No "Special Duty," Fiduciary or Otherwise, to SKAT**

Even if the existence of a special relationship may "generally raise[] an issue of fact," here, SKAT fails to plead the allegations necessary to even reach that question. See Opp. at 33 (quoting Kimmell, 89 N.Y.2d at 264). Only "exceptional situation[s]" "justify depart[ing] from the usual judicial disfavor for finding a special relationship between two parties." Moslem v. Parietti & McGuire Ins. Agency, No. 07 Civ. 7962, 2011 WL 721653, at *4 (S.D.N.Y. Feb. 24, 2011) (Schiendlin, J.). SKAT fails to identify any authority that the Goldstein Plan's eight Applications—the only pleaded contacts between SKAT and the Plan, and eight out of thousands of applications giving rise to SKAT's claims—create even the inference of a "special relationship of trust and confidence," such as a fiduciary relationship, necessary to state a negligent misrepresentation claim. Compare Opp. at 33 (citing Kimmell v. Schaefer, 89 N.Y.2d 257, 264 (1996); LBBW Luxemburg S.A. v. Wells Fargo Securities LLC, 10 F. Supp. 3d 504, 526 (S.D.N.Y. 2014) (Oetken, J.)) and MTD at 29–32; compare also Opp. at 33 (arguing that these interactions were not "business transactions" without explaining why that characterization matters) and, e.g., Kimmell, 89 N.Y.2d at 261 (analyzing a negligent misrepresentation claim "[i]n the commercial context").

In Kimmell, the Court of Appeals held that the plaintiffs, investors in an infrastructure project spearheaded by a developer, pleaded a "special relationship" where they alleged that the defendant was the developer's chairman of the board, chief financial officer, and primary investor contact for that project. The defendant personally solicited the investors, including plaintiffs, and did so with countless representations in dozens of meetings, phone calls, and other communications, over the course of several years. Id. at 262–64. The Court of Appeals also noted that the "defendant was experienced with the sale of [that developer's] projects to investors"

2

through the relevant investment vehicles, that the "[p]laintiffs, who knew of [the] defendant's involvement with Cogeneration Projects, justifiably assumed that [the] defendant possessed expertise in this area and relied on his apparently unique knowledge of [the developer] and its operations," and that the complaint pleaded many facts showing that the defendant knew he was making false statements to plaintiffs. Id. at 264–65.

Similarly, in LBBW, Judge Oetken found a "special relationship" where a plaintiff alleged that the "defendants held expertise in U.S. mortgage-backed securities that rose above and beyond Plaintiff's own expertise as a sophisticated financial actor" and that one of the defendants, Wachovia, had "special access to data regarding the value of the underlying mortgages" "because of its various roles in the [collateral debt obligation] transaction." 10 F. Supp. 3d at 526.

But unlike in Kimmell or LBBW, SKAT does not plead that any of the Goldstein Parties conveyed their own "unique or special expertise" in a particular type of business or transaction, and SKAT does not and could not claim that the Goldstein Parties understood the Danish reclaim process better than SKAT. As the governmental body that processed the applications and issued the refunds, SKAT should have understood the process better than anyone else.

And despite SKAT's argument to the contrary, neither "superior knowledge of alleged wrongdoing" nor that of one's own corporate structure or transactions is the "type of unique or specialized expertise" necessary to state a "special relationship." Compare Opp. at 34 and MTD at 31–32 (citing RKA Film, 171 A.D.3d at 680; Greentech, 104 A.D.3d 540–41; MBIA Ins. Co., 914 N.Y.2d at 611).

Because SKAT alleges no "identifiable source of a special duty of care" that could have established the Plan's "exceptional duty regarding commercial speech and justifiable reliance," the Court should dismiss its negligent misrepresentation claim. See Kimmell, 89 N.Y.2d at 261.

## II. SKAT Cannot Dress Up Alleged Internal Revenue Code Violations as Common-Law Torts

To support its fraud and negligent misrepresentation claims, SKAT originally alleged that the Goldstein Plan made three types of false statements to SKAT: that the Goldstein Plan (1) "was a qualified U.S. pension plan entitled to a full refund under the Treaty," (2) owned the shares it represented to own, and (3) "suffered" withheld taxes. See Am. Compl. ¶¶ 40–41; accord Opp. at 31. SKAT's Amended Complaint adds that the Plan's "representation that it was a qualified pension plan was also false because [ . . . ] external funding would violate the funding requirements of the [IRC]." Id. ¶ 44. SKAT also now alleges that the Plan "falsely represented to SKAT that it was entitled to a full refund under the Treaty to the extent that it engaged in any activities that were debt-financed, in breach of the Treaty's prohibition on the carrying on of leveraged investment activities by a pension fund." Id. ¶ 45. SKAT ignores the fact that the IRC does not strip pension plans of their tax-exempt status if they engage in debt-financed transactions: it just taxes those transactions. Compare Opp. at 31 and MTD at 17 (citing 26 U.S.C. § 514).

After the Goldstein Parties' Motion highlighted that IRC violations can never plead any element of SKAT's claims, see generally MTD at 17–20, SKAT now argues that it "is not asserting [ . . . ] that the Goldsteins owed SKAT any duty under the [IRC]," but rather that the Plan "falsely represented" that it "met the requirements under the [Treaty] to be entitled to a refund." Opp. at 31. While SKAT identified exactly which IRC provisions the Plan allegedly violated, SKAT has never identified—in the Amended Complaint or even in its Opposition—exactly which Treaty provision establishes that prohibition, let alone that the Goldstein Parties knew of the prohibition at the time they submitted their Applications to SKAT. See generally Am. Compl.; Opp.

Without such basic notice, it appears that SKAT does, indeed, want to continue advancing the "frivolous" argument that the Plan's alleged IRC violations prove that the Plan made

4

misstatements to SKAT. See Burns v. Delaware Charter Guarantee & Trust Co., 805 F. Supp. 2d 12, 20 (S.D.N.Y. 2011) (Sweet, J.) (holding, inter alia, that IRC Section 408 does not give rise to actionable duties) (citing Sirna, 1997 WL 53194, at *2). The Court should reject this theory of SKAT's case. See, e.g., Lewis v. Delaware Charter Guarantee & Trust Co., No. 14-CV-1779 (KAM), 2015 WL 1476403, at *10–11 & n.10 (E.D.N.Y. Mar. 31, 2015) (Matsumoto, J.) (dismissing, inter alia, breach-of-contract claims where only non-conclusory allegation was that defendant breached IRC Section 408); Suozzo v. Bergreen, No. 00 Civ. 9649 (JGK), 2003 WL 256788, at *2 (S.D.N.Y. Feb. 5, 2003) (Koetl, J.) (rejecting "plaintiff's attempt to recast his [Section 401] claim as a breach of fiduciary duty" and ERISA claim); Reynolds, 2010 WL 743510, at *7 (dismissing Federal Insurance Contributions Act claims where plaintiff alleged that defendants violated the IRC by failing to withhold and remit payroll taxes); Sirna v. Prudential Sec. Inc., 95 Civ. 8422, 95 Civ. 9061, 96 Civ. 4534, 1997 WL 53194, at *3 (S.D.N.Y. Feb. 10, 1997) (Kaplan, J.) ("[T]here is no basis whatsoever for concluding that there is a private right of action under the [IRC]").

### III. The Amended Complaint Fails to Sufficiently Allege Scienter

SKAT also fails to identify any non-conclusory allegation that the Goldstein Parties knew or should have known that any of these allegedly-fraudulent statements were false, again resting the First Order. Compare Opp. at 29 and MTD at 21 (citations omitted).

In the First Order, this Court found that "the complaints clearly allege motive by stating, for example, that the Bradley Plan claimed refunds in the amount of $11 million dollars or more, and received payments from SKAT on those claims." First Op. at 37; but see Novak, 216 F.3d at 307 (cannot allege scienter by pleading "motive possessed by virtually all" similarly-situated defendants). The Court also found "strong circumstantial evidence of conscious recklessness"

5

sufficient to plead scienter because the Bradley Plan "claimed to own hundreds of millions of dollars of shares in Danish corporations within the first year of the existence," did not file a Form 5500-EZ the year that it submitted those refund claims, and because "it strain[ed] credulity to claim that defendants—one-participant plans and their agents—did not know whether the plans owned shares that were worth hundreds of millions of dollars or whether they were entitled to refunds from SKAT that were over 44 times greater than the total value of the plans' assets." First Op. at 37.

But here, SKAT alleges that the Goldstein Plan was founded 15 years before it submitted its first reclaim Application. See id. ¶ 104. SKAT does not claim that the Goldstein Plan failed to file U.S. tax documents, or any documents at all. See generally id. SKAT does not claim that the Goldstein Plan did not know what securities they owned or whether they were entitled to refunds. See generally id. While SKAT alleged connections to Shah Entities in 154 of its initial 183 MDL complaints, it has never claimed that the Goldstein Parties were connected to Shah, nor identified any similarities between the Goldstein Parties and the Shah Scheme. See ATPC ¶ 197–209 (summarizing first 183 MDL complaints).

And just two months before filing the Amended Complaint, SKAT filed amended pleadings in England in which it admitted that it no longer believed the Goldstein Parties were part of the "Shah Scheme" that falsely represented their ownership of shares, receipt of dividends, and "suffering" of taxes. See Further Particulars (Feb. 28, 2020), Parks Decl. Exhibit 9 ¶¶ 3, 13–47, 46.5 (pleading that there is no overlap between the Shah Scheme defendants and ED&F Man defendants); see also In re Refco Inc. Sec. Litig., No. 07-MD-1902 (JSR), 2010 WL 11500542, at *4 (S.D.N.Y. Oct. 22, 2010), report and recommendation adopted as modified sub nom., No. 07 MDL 1902 JSR, 2011 WL 6097724 (S.D.N.Y. Dec. 7, 2011) ("Review of a motion to dismiss is

of course not limited to the four corners of the complaint" and may consider, inter alia, "documents plaintiffs had either in its possession or had knowledge of and upon which they relied in bringing suit").

The Amended Complaint fails to plead facts suggesting that scienter was an inference "at least as compelling" as any innocent explanation for the Goldstein Parties' allegedly-false statements. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 304, 324 (2007) ("[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."). The Court should dismiss SKAT's fraud claims against the Goldstein Parties.

### IV. Denmark, Itself, Admits that SKAT Did Not Reasonably Rely on the Applications

SKAT does not dispute that it failed to plead any "facts showing that it fulfilled its own duties to verify the Goldstein Applications' 'true nature and real quality.'" Compare Opp. at 34 and MTD at 26–27 (citations omitted). SKAT also does not dispute the authenticity of the 2010 and 2016 Audit Reports annexed to the Goldstein Parties' Motion and discussed at length, nor does SKAT dispute that it received and had actual notice of the 2010 Audit Report before it processed the Goldstein Applications. See generally Opp.; see also Garber v. Legg Mason, Inc., 347 F. App'x 665, 669 (2d Cir. 2009) (motion to dismiss may consider documents subject to judicial notice to show that information was "publicly available," but not for the truth of the matter asserted).

Consequently, SKAT does not dispute that as early as 2010, SKAT's predecessor agency "placed [it] on guard" that its tax refund processes and procedures were woefully inadequate:

- SKAT lacked the reporting and information necessary to correctly calculate net proceeds from dividend tax withholding;
- It was possible for dividend tax to be "refunded" before the tax was ever paid or reported to SKAT;
- SKAT was unable to determine "whether dividend tax is requested more than once per share;"

7

- "[T]here [were] no checks [ . . . ] as to whether the investor is actually a shareholder" or liable for tax; and
- "[I]t does not appear that the previous investigations initiated by SKAT have been followed up on."

Since then, Denmark's National Audit Office has investigated the very same scandal that caused SKAT to file this MDL's lawsuits and concluded that "SKAT's administration and the Ministry of Taxation's supervision of the refunds of dividend tax have been very unacceptable [and] extremely inadequate. [ . . . ] [V]ery simple analyses of the development in the refunds of dividend tax would have called attention to problems in the area that should have resulted in a closer look at the area." 2016 Audit, Parks Decl. Exhibit 4 at 2–4; cf. Long Island Savings Bank, FSB v. U.S., 63 Fed. Cl. 157, 164–65 (Fed. Cl. 2004) (deponents employed by various federal agencies are "party–opponents" where party is the United States).

SKAT cannot "argue with straight faces" that it was unaware of its own failures that caused it to pay out the Goldstein refunds. See L. Capital Partners, L.P. v. Rockefeller Center Properties, Inc., 921 F. Supp. 1174, 1184 (S.D.N.Y. 1996) (Kaplan, J.). The Court should dismiss all of its claims against the Goldstein Parties.

**V.     SKAT Does Not State Claims Against Sheldon or Scott Goldstein**

SKAT does not dispute that its failed to allege any wrongful acts personally committed by Sheldon or Scott Goldstein, and instead argues that the *alter ego* theory justifies its claims against both men. See Opp. at 29. But the *alter ego* theory, designed to pierce the corporate veil, only applies to "a **corporation** used by an individual in conducting personal business"—and a pension plan like the Goldstein Plan is a statutorily-defined benefit, not a corporation. Compare 29 U.S.C. § 1002(2) ("Pension Plan" means "any **plan, fund, or program** [ . . . ]") and, e.g., William Wrigley Jr. Co. v. Waters, 890 F.2d 594, 600 (2d Cir. 1989) ("[A]lter ego liability is an exception to the general principal that individual owners, officers, and shareholders **of a corporation** are not

8

personally liable for corporate act.") (emphasis added). To hold otherwise would make no sense, particularly in the pension plan context: individuals' retirement accounts like the Goldstein Plan **should** be controlled by their investor–beneficiaries, such as Sheldon and Scott. There is nothing improper about that.

Even if *alter ego* could apply to a pension plan, SKAT still cannot state claims against either Sheldon or Scott unless it alleges that each man committed a "fraud or inequity" in his very "use of the corporate form"—the underlying cause of action, "at least by itself, does not supply the necessary fraud or injustice." Soroof Trading Dev. Co. v. GE Microgen, Inc., 283 F.R.D. 142, 151–52 (S.D.N.Y. 2012) (citations omitted) (applying Delaware law and noting that S.D.N.Y. courts "have observed that the law of Delaware on this subject is substantially similar to the law of New York."); see also, e.g., Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 268 (D. Del. 1989) ("Any breach of contract and any tort [ . . . ] is, in some sense, an injustice. Obviously this type of 'injustice' is not what is contemplated by" the *alter ego* doctrine).

For example, in the First Opinion, the Court held that SKAT pleaded claims against Gavin Crescenzo by alleging that "[he] 'participated in incorporating limited liability companies associated with fifteen different claimants that were created shortly before the claimants submitted their initial tax refund claims to SKAT,'" "had a hand in dissolving those entities, all on the same date," and [that] all five shared Crescenzo's home address." See First Opinion at 34–35.

Here, however, SKAT has not alleged that Sheldon or Scott ever personally committed wrongful acts to benefit from the Plan's alleged misconduct, such as by draining the Plan's accounts or otherwise disrespecting the Plan's separate status. See generally Am. Compl., Opp. SKAT does allege, however, that—unlike the vast majority of this MDL's other defendants—the Plan existed for fifteen years before it submitted any Application to SKAT. And while the

9

Goldstein Plan and Scott currently share an address, at the time of the Applications, they did not: the Plan was located in Manhattan and Scott was in Putnam County, New York.

SKAT fails to plead any non-conclusory, factual allegations suggesting that Sheldon or Scott misused the Plan in order to perpetrate a fraud. See generally Am. Compl. The Plan simply is not a "sham" that "exist[s] for no other purpose than as a vehicle for [Sheldon's and / or Scott's] fraud." See In re Alper Holdings USA, No. 07-12148BRL, 2008 WL 541154, at *5 (Bankr S.D.N.Y. Feb. 25, 2008), aff'd sub nom. 398 B.R. 736 (S.D.N.Y. 2008).

## CONCLUSION

Five years after it began investigating the Shah Scheme, and two years into this case—after extensive discovery in several jurisdictions—SKAT still fails to plead "every element of every claim against every [Goldstein] defendant." See Meimaris v. Royce, 18-CV-04363 (GBD) (BCM), 2019 WL 5722130, at *10 (S.D.N.Y. Aug. 20, 2019) (Moses, M.J.), report and recommendation adopted, 2019 WL 4673572 (S.D.N.Y. Sept. 25, 2019) (Daniels, J.) (dismissing claims as time-barred).

Even if SKAT stated claims against the Plan, its failure to allege **any** wrongful conduct—or any allegations that even allow for the reasonable inference of wrongful conduct, let alone an "at least as compelling" inference necessary to plead scienter—warrants dismissing Sheldon and Scott Goldstein from this case.

Therefore, the Goldstein Parties respectfully request that this Court dismiss the Amended Complaint pursuant to Rule 12(b)(6), with prejudice.

Dated: New York, New York
      August 20, 2020

                                          GUSRAE KAPLAN NUSBAUM PLLC

                                          By: /s/ Martin H. Kaplan
                                          Martin H. Kaplan
                                          Kari Parks
                                          120 Wall Street
                                          New York, New York 10005
                                          Telephone: (212) 269-1400
                                          Fax: (212) 809-5449
                                          mkaplan@gusraekaplan.com
                                          kparks@gusraekaplan.com

                                          *Counsel for Defendants The Goldstein Law Group PC 401(K) Profit Sharing Plan, Sheldon Goldstein, and Scott Goldstein*