EXHIBIT D

2010 WL 4323273
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.

BANK OF AMERICA, Plaintiff,

v.

APOLLO ENTERPRISE SOLUTIONS,
LLC, Apollo Enterprise Solutions, Inc .,
and Moriah Partners, LLC, Defendants.

No. 10 Civ. 5707(DLC).
|
Nov. 1, 2010.

**Attorneys and Law Firms**

Richard Raysman, Francesca Morris, Christine Tramontano,
Holland & Knight LLP, New York, NY, for the plaintiff.

Joe R. Whatley, Jr., Deborah Clark–Weintraub, Whatley
Drake & Kallas LLC, New York, NY, Daniel P. Gleason,
Whatley Drake & Kallas LLC, Birmingham, AL, for the
defendant Moriah Partners, LLC.

*OPINION AND ORDER*

DENISE COTE, District Judge.

 **\*1** Bank of America ("the Bank") brings this action
against Apollo Enterprise Solutions, LLC ("Apollo LLC"),
Apollo Enterprise Solutions, Inc. ("Apollo Inc.") (collectively
"Apollo"), and Moriah Partners, LLC ("Moriah") seeking
various forms of relief against Apollo and alleging tortious
interference with contract against Moriah. Moriah has moved
to dismiss the complaint for lack of personal jurisdiction and
failure to state a claim. For the following reasons, the motion
is granted.

BACKGROUND

In April 2006, the Bank and Apollo LLC entered
into an "Application Service Provider Agreement" ("the

Agreement"). [1]  The Agreement grants the Bank a non-
exclusive license to use Apollo's IDS software, which allows
the Bank to accept online payments from its customers for
certain financial services through several websites created for
that purpose other than www.bankofamerica.com. Under the
terms of the Agreement, Bank of America paid Apollo an up-
front payment and agreed to pay monthly fees thereafter. The
original term of the Agreement was two years, after which
the Agreement would renew automatically for additional one-
year periods unless the conditions for termination, which are
hotly disputed by the Bank and Apollo, were met.

The Agreement was automatically renewed in April 2008 and
April 2009. [2]  In July 2009, Apollo notified the Bank that
Moriah had invested $7.65 million dollars in Apollo. Joseph
Konowiecki ("Konowiecki") and Adrian Gluck ("Gluck"),
managing partners of Moriah, were made the Chairman and
Chief Executive Officer, and the Executive Vice President,
respectively, of Apollo. After this change in personnel, the
invoices that Apollo sent to the Bank started to come from
Apollo Inc. rather than Apollo LLC, although the Bank never
received notice that Apollo LLC was no longer the party
performing under the Agreement. Apollo LLC no longer
exists.

In August 2009, the former President of Apollo visited
the Bank with Gluck to introduce Gluck to the Bank's
personnel. At that meeting, Gluck informed the Bank that he
believed Apollo's compensation under the Agreement should
be revisited. The Bank informed him of the procedure to
follow to raise that issue. In January 2010, the Bank and
Apollo agreed to an incremental increase to the monthly fee
payable to Apollo.

On January 11, 2010, Konowiecki gave notice that Apollo
wished to terminate the Agreement. In this notice, he
acknowledged that Apollo did not have the express right
to terminate the Agreement but, nonetheless, stated that the
Agreement would expire on April 12, 2010, which was
ninety days after notice was given. On February 5, 2010,
Konowiecki wrote the Bank a letter in which he accused
the Bank of materially breaching its obligations under the
Agreement and informing the Bank that Apollo intended
to terminate the Agreement effective March 31, 2010. The
February 5 letter listed a series of alleged breaches and
demanded unspecified compensation for the damages caused
by those breaches. In April 2010 and the months that
followed, Apollo sent the Bank "revised" invoices covering
the period from July 2008 to June 2010. The Bank had

already paid the invoiced amount of $13,425 for January 2010 when it received the revised invoice for January 2010 in the amount of $3.65 million. The revised invoices for each month between January and June 2010 sought between $2.39 and $3.65 million each.

**\*2** The revised invoices reflect a calculation of the fees owed by the Bank based on the number of "web hits" received by the websites that used Apollo software to accept payments from the Bank's customers. A schedule incorporated into the Agreement ("Schedule C") states: "All quoted and priced elements assume up to 170,000 web hits per month. Costs to support volumes above this level shall be mutually agreed upon." The term "web hits" is undefined in the Agreement. In a price chart in Schedule C, the number of "hits to web site" is listed as "unlimited" for the IDS software.

The revised invoices were calculated based on a number of web hits in excess of 170,000 per month. According to the Bank, the definition of web hits used by Apollo in the revised invoices is not the same as the definition the parties understood the term to mean when they entered into the Agreement. Apollo has used the new definition to demand higher fees from the Bank. Additionally, Apollo had exclusive possession of the information regarding the number of web hits per month, but had never, in the four years between April 2006 and April 2010, informed the Bank that there were more than 170,000 monthly web hits. Nor did Apollo seek increased payments from the Bank until January 2010.

Bank of America filed its original complaint on July 28, 2010. On August 13, the plaintiff filed the FAC. On August 25, Moriah filed its motion to dismiss. The motion was fully submitted on September 20.

## DISCUSSION

Moriah, a non-resident of New York, [3] argues that the Court lacks personal jurisdiction over it. The plaintiff argues that personal jurisdiction exists pursuant to New York's long-arm statute, or alternatively, because Moriah is Apollo's alter ego.

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Penguin Grp. (USA) Inc. v. American Buddha,* 609 F.3d 30, 34–35 (2d Cir.2010) (citation omitted). The plaintiff may make this showing through its "own

affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant ." S. *New England Tel. Co. v. Global NAPs Inc.,* F.3d, No. 08–4518–CV, 2010 WL 3325962, at *9 (2d Cir. Aug.25, 2010) (citation omitted). "[W]here the issue [of personal jurisdiction] is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank,* 989 F.2d 76, 79–80 (2d Cir.1993).

### I. New York's Long–Arm Statute

"A federal court's jurisdiction over non-resident defendants is governed by the law of the state in which the court sits—including that state's long-arm statute—to the extent this law comports with the requirements of due process." *Arar v. Ashcroft,* 532 F.3d 157, 173 (2d Cir.2008), *vacated and superseded on other grounds by* 585 F.3d 559 (2d Cir.2009). "In New York, the question of long-arm personal jurisdiction over an out-of-state defendant is governed by N.Y. C.P.L.R. § 302." *Penguin Grp. (USA) Inc. v. Am. Buddha,* 609 F.3d 30, 35 (2d Cir.2010). Section 302 permits a court to exercise personal jurisdiction over an out-of-state party "who in person or through an agent ... commits a tortious act *within* the state." N.Y. C.P.L.R. § 302(a)(2) (emphasis supplied). To subject a non-resident defendant to New York jurisdiction pursuant to § 302(a)(2), the defendant or his agent must commit the tort while physically present in New York. *Bensusan Rest. Corp. v. King,* 126 F.3d 25, 28 (2d Cir.1997).

**\*3** The Bank alleges in its complaint that Moriah, acting through Konowiecki and Gluck, induced Apollo to adopt in bad faith a new interpretation of the Agreement in order to force the Bank to pay Apollo more money. It alleges that Konowiecki, "as an executive of both Moriah and Apollo has attended meetings in New York regarding the Agreement and the disputes that have arisen related to the Agreement." The Bank alleges "[o]n information and belief" that the meetings that Konowiecki attended in New York were with Moriah, and that "decisions made at the meetings tortiously interfered with the Agreement."

In support of Moriah's motion to dismiss, Konowiecki has submitted a declaration ("the Konowiecki Declaration") in which he swears the following to be true:

> The Complaint erroneously alleges that I had meetings in New York related to this matter. I have never had any meeting in New York related to Apollo, the Services Agreement between Apollo and [the Bank], or any other matter at issue between Apollo and [the Bank]. No other representative of Moriah has ever had any such meeting in New York.

In response, the bank submitted an affidavit from Earl Ronald Johnson ("Johnson"). Johnson has submitted a sworn statement that, in his capacity as Senior Vice President of the Supply Chain Management Division of the Bank, he had a telephone conversation with Konowiecki on May 20, 2010, during which the dispute over the Agreement was discussed ("the Johnson Declaration"). The declaration states:

> Mr. Konowiecki specifically told me that he *was going to fly to New York* for meetings to discuss the contract and the dispute with "people above him" who he said would want to arbitrate the dispute.... Mr. Konowiecki appeared to be representing himself as an intermediary between Bank of America's proposal and an unidentified third party in New York to whom he was accountable.

(Emphasis supplied).

The Bank has failed to state a prima facie claim of personal jurisdiction over Moriah. Even taking every statement in the Johnson Declaration as true and resolving all doubts in the plaintiff's favor, the Declaration does not establish jurisdiction over the defendant. At most, the Johnson Declaration shows that Konowiecki once intended to fly to New York to discuss the dispute with people senior to him. The plaintiff's

failure to assert any facts based on personal knowledge that Konowiecki or another representative for Moriah actually did come to New York for such a meeting, particularly when Konowiecki has submitted a sworn statement that neither he nor any other Moriah representative ever came to New York for a meeting regarding the Agreement, is fatal to the plaintiff's claim against Moriah.

Each of the Bank's two arguments in favor of finding that personal jurisdiction under New York's long-arm statute exists is unpersuasive. First, the Bank argues that Konowiecki's assertion that he was going to meet with "people above him" in New York must mean that he met with Moriah there. This is the case, the Bank argues, because as the CEO of Apollo, there was no one senior to him in that organization, which implies that the unidentified third party must have been Moriah. But, even if one could properly draw this inference, the plaintiff has still failed to show that the New York meeting took place.

**\*4** The plaintiff argues that the Johnson Declaration's evidence of Konowiecki's then-existing state of mind-his intent to travel to New York-is not inadmissible hearsay. Fed.R.Evid. 803(3); *see also* 🔖 *United States v. Best,* 219 F.3d 192, 198 (2d Cir.2000). But, the admissibility of the Johnson Declaration is undisputed. The relevant inquiry remains whether the Bank has sufficiently alleged *"facts* that, if credited, would suffice to establish jurisdiction over the defendant." *S.* 🔖 *New England Tel. Co.,* 2010 WL 3325962, at *9 (emphasis supplied and citation omitted). This the plaintiff has not done. The only fact that the plaintiff has established is that Konowiecki told the Bank that he intended to go to New York to discuss the dispute with an unidentified third party. The plaintiff's evidence of an intention is not sufficient to overcome Konowiecki's denials that he ever made the trip. The plaintiff has not shown that a statement of future intent is sufficient to establish a prima facie case for personal jurisdiction in the face of a detailed, sworn refutation.

### II. Alter Ego Jurisdiction
The Bank argues in the alternative that it has sufficiently pleaded facts that support a finding of alter ego jurisdiction, *i.e.,* that personal jurisdiction over Apollo is sufficient to establish personal jurisdiction over Moriah because Apollo and Moriah are alter egos. It is undisputed that personal jurisdiction over Apollo exists. "[I]n general, alter egos are treated as one entity for jurisdictional purposes."

*Transfield ER Cape Ltd. v. Indus. Carriers, Inc.,* 571 F.3d 221, 224 (2d Cir.2009) (citation omitted); *see also S. New England Tel. Co.,* 2010 WL 3325962, at *10. When determining whether personal jurisdiction exists over an entity alleged to be an alter ego, courts apply a "less onerous standard" than that necessary to pierce the corporate veil for liability purposes under New York law. *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981); *see also Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 120–22 (2d Cir.1984). Specifically, a plaintiff must establish only that one entity was a shell for the other, *Marine Midland Bank,* 664 F.2d at 904, *i.e.,* that one entity was subject to the "complete domination" of the other. *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC,* 268 F.3d 58, 63 (2d Cir.2001) (citation omitted); *see also Lowen v. Tower Asset Mgmt.,* Inc., 829 F.2d 1209, 1221 (2d Cir.1987).

The following factors determine whether one entity is merely a shell for another:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.,* issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question

had property that was used by other of the corporations as if it were its own.

**\*5** *In re Vebeliunas,* 332 F.3d 85, 90 n. 3 (2d Cir.2003) (citation omitted).

The Bank has not sufficiently pleaded an alter ego relationship between Moriah and Apollo to make a prima facie showing of personal jurisdiction over Moriah. The entirety of the Bank's allegation regarding alter ego status is as follows: After investing in Apollo, Moriah placed two of its managing partners in control of Apollo and they continued to serve as managing partners of Moriah. Before "Moriah's domination and control" of Apollo, both Apollo and the Bank performed under the Agreement without a problem. Moriah, acting through Konowiecki and Gluck, ignored the terms of the Agreement and induced Apollo to adopt a different interpretation of the Agreement in bad faith. Through Konowiecki and Gluck, "Moriah ... has operated Apollo for Moriah's own benefit, not for the benefit of Apollo which had been satisfied with the Agreement. Thus, Moriah has abused the privilege of doing business in the corporate form."

These allegations fail to address most of the factors relevant to the determination of alter ego status and are insufficient to plead that Apollo was Moriah's alter ego. *See S. New England Tel. Co.,* 2010 WL 3325962, at *10 (determining that allegations of alter ego status were not conclusory because they were bolstered by sufficient factual support). At most, the Bank alleges an overlap in officers and in conclusory form asserts domination by Moriah.

New York courts have rejected arguments in favor of personal jurisdiction based on far greater factual assertions of control. For example, jurisdiction based on alter ego status was not established even where two companies shared an address and phone number, used the same website and promotional brochure, and shared all the same officers and directors because the two companies provided different services and did not have a parent-subsidiary relationship or serve as agents for one another. *Parsons v. Kal Kan Food, Inc.,* 68 A.D.3d 1501, 892 N.Y.S.2d 246, 248 (App. Div.3d Dep't 2009).

CONCLUSION

Because the Court lacks personal jurisdiction over Moriah, it is unnecessary to decide whether the Bank stated a claim for tortious interference by Moriah. Moriah's August 25 motion to dismiss is granted.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 4323273

## Footnotes

1    For the purposes of the motion, the allegations contained in the First Amended Complaint ("FAC") are assumed to be accurate. Facts are also taken from the Agreement, which was attached to the FAC. *See* *Chapman v. N.Y. State Div. for Youth,* 546 F.3d 230, 234 (2d Cir.2008).

2    Whether the Agreement was renewed in April 2010 is a disputed fact that does not affect the outcome of this motion.

3    In reply to the Court's inquiries regarding its subject matter jurisdiction over this suit, Moriah has informed the Court that all of its members are residents of California, Georgia, or Florida. The LLC exists under the laws of the Delaware and has a principal place of business in California.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.