# EXHIBIT I

Case 1:18-md-02865-LAK    Document 445-9    Filed 08/20/20    Page 2 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

2015 WL 13650032
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

PRECISION ASSOCIATES, INC., et al., Plaintiffs,

v.

PANALPINA WORLD TRANSPORT
(HOLDING) LTD., et al., Defendants.

08-CV-42 (JG)(VVP)
|
Signed 06/24/2015

**Attorneys and Law Firms**

Imtiaz A. Siddiqui, Cotchett, Pitre & McCarthy, LLP, Lisa M. Pollard, Lockridge Grindal Nauen P.L.L.P., Benjamin Martin Jaccarino, Christopher Lovell, Gary Steven Jacobson, Christopher Michael McGrath, Merrick Scott Rayle, Lovell Stewart Halebian Jacobson LLP, Grant & Eisenhofer PA, New York, NY, Heidi M. Silton, R. Reid LeBeau, II, W. Joseph Bruckner, Anna M. Horning Nygren, Craig S. Davis, Kristen G. Marttila, Robert J. Schmit, Lockridge Grindal Nauen P.L.L.P., Daniel Gustafson, Daniel C. Hedlund, Joshua J. Rissman, Gustafson Gluek PLLC, Minneapolis, MN, Nancy L. Fineman, Adam John Zapala, Brian M. Schnarr, Gene Woo Kim, Niki B. Okcu, Steven N. Williams, Cotchett, Pitre & McCarthy, LLP, Burlingame, CA, Jennie L. Anderson, Andrus Anderson LLP, Derek G. Howard, Jack W. Lee, Sean Tamura-Sato, Minami Tamaki LLP, San Francisco, CA, John T. Murray, Murray & Murray Co. L.P.A., Sandusky, OH, John R. Malkinson, Malkinson & Halpern, P.C., Chicago, IL, David S. Corwin, Sher Corwin Winters LLC, Saint Louis, MO, Sharon S. Almonrode, The Miller Law Firm PC, Rochester, MI, Philip J. O'Beirne, Stein Mitchell Muse Cipollone & Beato LLP, Washington, DC, for Plaintiffs.

Douglas Michael Tween, Linklaters LLP, Mark Allen Robertson, Fulbright & Jaworski LLP, Richard L. Furman, Lindsay Anne Sakal, Philip W. Danziger, Carroll McNulty & Kull LLC, Ari M. Berman, Vinson & Elkins LLP, Steven Gary Kobre, Steven W. Perlstein, Zaharah Rachel Markoe, Kobre & Kim LLP, Joel M. Cohen, Brian Stryker Weinstein, Edward Nathaniel Moss, Jason Maxwell Spitalnick, Ronan P. Harty, Joshua Buchanan Dugan, Davis Polk & Wardwell LLP, Francis Allen Montbach, Michael R. Koblenz, Mound, Cotton, Wollan & Greengrass, Lawrence J. Zweifach, Gibson, Dunn & Crutcher LLP, George B. Yankwitt, Mary Margaret Chang, Squire Sanders (US) LLP, Brian P.R. Eisenhower, Hill Rivkins LLP, James A. Saville, Thomas E. Willoughby, Hill, Rivkins & Hayden, LLP, Mitchell A. Lowenthal, Cleary, Gottlieb, Steen & Hamilton, Amelia Katherine Brankov, Brian E. Maas, Frankfurt Kurnit Klein & Selz, P.C., Michael E. Norton, New York, NY, Eileen M. Cole, Peter J. Chase, John Mark Gidley, White & Case, LLP, Andrew Bullion, Brian A. Ratner, Michael D. Hausfeld, Ralph Johnson Bunche, III, Timothy S. Kearns, Hausfeld LLP, John R. Fornaciari, Robert M. Disch, Baker & Hostetler LLP, Steven Craig Sunshine, Tara L. Reinhart, Anisa A. Somani, Krisha A. Cerilli, Skadden, Arps, Slate, Meagher & Flom LLP, April Williams, Philip R. Seybold, Steven F. Cherry, Wilmer Cutler Pickering Hale & Dorr LLP, Barry A. Pupkin, Christopher H. Gordon, Squire Sanders (US) LLP, Gordon L. Lang, Nixon Peabody LLP, Daniel Culley, Jeremy Calsyn, Cleary Gottlieb Steen & Hamilton LLP, Anand Viswanathan, Bradley S. Lui, Morrison & Foerster LLP, Steven J. Kaiser, Washington, DC, Layne E. Kruse, Fulbright & Jaworski LLP, Houston, TX, Jeannine M. Kenney, Hausfeld LLP, Philadelphia, PA, Susan H. Booker, Levun Goodman & Cohen, LLP, Northbrook, IL, Joel S. Sanders, Rachel S. Brass, Gibson, Dunn & Crutcher LLP, Paul T. Friedman, Morrison & Foerster LLP, San Francisco, CA, Joseph P. Rodgers, Thomas S. Kilbane, Squire, Sanders & Dempsey L.L.P., Cleveland, OH, Matthew Edward Digby, Squire Sanders & Dempsey LLP, Los Angeles, CA, Joseph M. Graham, for Defendants.

## REPORT AND RECOMMENDATION

VIKTOR V. POHORELSKY, United States Magistrate Judge

**\*1** Currently pending before the court is a motion brought by defendants Hellmann Worldwide Logistics GmbH & Co. KG ("Hellmann GmbH") and Hellmann Worldwide Logistics Limited Hong Kong ("Hellmann HK"), seeking dismissal under Fed. R. Civ. P. 12(b)(6) of the claims brought against them in the plaintiffs' Corrected Third Amended Complaint ("CTAC"). The CTAC, which has been brought as a class action, alleges that Hellmann GmbH and Hellmann HK (along with dozens of other entities) "combined, conspired and agreed ... to fix, inflate and maintain new charges or prices for U.S. Freight Forwarding Services ... in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1." CTAC at ¶ 1. The Honorable John Gleeson has referred the motion to me pursuant to 28 U.S.C. 636(b)(1)(B) for a report and recommendation. For the reasons that follow, I recommend that the motion be granted.

Case 1:18-md-02865-LAK    Document 445-9    Filed 08/20/20    Page 3 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

## I. BACKGROUND

### A. FACTUAL [1] AND PROCEDURAL HISTORY

This putative class action concerns multiple alleged conspiracies to fix prices in the international commercial freight forwarding industry. The plaintiffs are various businesses who purchased freight forwarding services from the defendants during the class period, which is defined in the CTAC as "the period from at least as early as January 1, 2001 to [ ] January 4, 2011." *See* CTAC at ¶ 18. The defendants are sixty-four domestic and foreign providers of international freight forwarding services, three trade associations, and "John Doe Defendants 1-10." Plaintiffs allege eleven different conspiracies in violation of Section 1 of the Sherman Act—nine "local conspiracies," six of which comprise an overarching "Global Agreement" conspiracy, and the remaining three of which comprise an overarching Japanese regional conspiracy.

Plaintiffs initiated this action by filing their initial complaint on January 3, 2008. *See* Dkt. No. 1. On July 21, 2009, the plaintiffs filed their First Amended Class Action Complaint ("FACAC") (Dkt. No. 117), which was followed by the October 7, 2010 Second Amended Class Action Complaint ("SACAC") (Dkt. No. 460). Numerous motions to dismiss were then filed and addressed by this court in its January 4, 2011 report and recommendation (the "First R&R"), *see* Dkt. No. 468, which recommended dismissal without prejudice, with leave to replead the majority of the claims in the SACAC.[2] Judge Gleeson adopted the First R&R in its entirety on August 13, 2012 (*see* Dkt. No. 628).

Plaintiffs then filed a Third Amended Class Action Complaint ("TAC") on November 15, 2012, *see* Dkt. No. 677 (sealed version), and the CTAC on March 27, 2013. *See* Dkt. No. 746 (sealed version); Dkt. No. 772 (redacted version). Several individual and joint motions to dismiss were served on or about February 27, 2013 and filed on May 24, 2013. The court considered these motions in its September 20, 2013 report and recommendation (the "Second R&R"), *see* Dkt. No. 878 (sealed version); Dkt. No. 903 (redacted version),[3] which recommended denial of the majority of the dismissal motions. On January 28, 2014, Judge Gleeson adopted the Second R&R in its entirety. *See* Dkt. No. 992.[4]

### B. THE HELLMANN DEFENDANTS

**\*2** According to the CTAC, Hellmann GmbH is the parent company of both Hellmann HK and Hellmann Worldwide Logistics, Inc. ("Hellmann Inc."). *See* CTAC at ¶ 69. The first instance of any Hellmann entity being sued in this litigation was the July 21, 2009 filing of the FACAC, which named Hellmann Inc. as a defendant. *See* Dkt. No. 117. Hellmann GmbH and Hellmann HK were not named as defendants until the filing of the CTAC on March 27, 2013. Although the Second R&R considered the allegations in the CTAC, because the motions to dismiss that were the subject of that R&R were served before the filing of the CTAC (and accordingly, before Hellmann GmbH and Hellmann HK were parties to this action), the court granted Hellmann GmbH and Hellmann HK [5] leave to submit a post-amendment motion to dismiss. *See* Dkt. No. 933 at p. 9.

## II. LEGAL STANDARDS

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal, not the factual, sufficiency of a complaint. *See* 🚩 *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by* 📄 *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); 📄 *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.' ") (quoting 📄 *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)).

Under the standard set forth by the Supreme Court, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting 📄 *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). At this stage, the court accepts as true all factual allegations in the complaint, views the complaint in the light most favorable to the plaintiffs, and draws all reasonable inferences in their favor. *See* 📄 *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); ⚠️ *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001). Conclusory allegations or conclusions of law "couched" as factual allegations need not be accepted as true, however. *See* 📄 *Iqbal*, 556 U.S. at 678; 📄 *Twombly*, 550 U.S. at 555. To avoid dismissal, plaintiffs must plead facts that "nudg[e] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S.

Case 1:18-md-02865-LAK    Document 445-9    Filed 08/20/20    Page 4 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

at 570; *Iqbal*, 556 U.S. at 1949 (requiring factual allegations that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). "This standard requires factual allegations that, taken as true, demonstrate 'more than a sheer possibility that a defendant has acted unlawfully.' " *McAllister v. Metropolitan Transit Authority*, No. 13 Civ. 2060, 2013 WL 4519795, at *3 (E.D.N.Y. Aug. 26, 2013) (citing *Iqbal*, 556 U.S. at 678). "If a complaint allows a court to infer no more than 'the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief.' " *Id.* (quoting *Iqbal*, 556 U.S. at 679) (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original).

Courts may also consider documentary exhibits or written instruments annexed to the complaint, documents integral to the parties' case and on which the complaint relies heavily, and matters subject to judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citing 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004 and Supp. 2007)); *ATSI Commc'ns, Inc. v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007); *Int'l Audiotext Network, Inc. v. AT&T*, 62 F.3d 69, 72 (2d Cir. 1995); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991); *see also* Fed. R. Civ. P. 10(c).

## III. HELLMANN'S MOTION TO DISMISS

 **\*3**  Hellmann's motion proceeds on three grounds. It first asserts that the CTAC impermissibly lumps together each of the three independent Hellmann entities, thus failing to give any one of them adequate notice of the claims against them. It next attacks the sufficiency of four of the claims asserted against Hellmann. Finally, it argues that the claims against Hellmann are time-barred under the Sherman Act's four-year statute of limitations. As discussed below, the court rejects Hellmann's first two arguments, but agrees that the claims asserted against them in the CTAC are time-barred and should therefore be dismissed with prejudice. Accordingly, the court first addresses Hellmann's statute of limitations argument, since it is on that ground that the court recommends granting Hellmann's motion. It then considers Hellmann's other two arguments for dismissal, which will become relevant in the event the court's statute of limitations analysis is rejected.

### A. STATUTE OF LIMITATIONS

### 1. Introduction and Continuing Violation Doctrine

Hellmann argues for dismissal of the third, fifth, sixth, eighth, ninth and tenth claims on statute of limitations grounds. The statute of limitations for Sherman Act claims is "four years after the cause of action accrued," 15 U.S.C. § 15(b), and "[t]here is no dispute ... that an antitrust cause of action generally accrues 'when a defendant commits an act that injures a plaintiff's business.' " *In re Aggrenox Antitrust Litig.*, No. 3:14-MD-2516 (SRU), 2015 WL 1311352, at *6 (D. Conn. Mar. 23, 2015) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)) (emphases removed); First R&R at p. 92 (same). "Thus, with certain exceptions, a complaint that relies on acts committed prior to the four-year limitations period will usually be barred by the statute of limitations." First R&R at p. 92.

"If, however, an antitrust violation consists of a series of acts that repeatedly invade a plaintiff's interests and continue over time, a cause of action may accrue each time the plaintiff is injured anew." *Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 267 (E.D.N.Y. 2010) (citing authorities); *see also Zenith Radio Corp.*, 401 U.S. at 338 (in antitrust context, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and ... as to those damages, the statute of limitations runs from the commission of the act") (citing cases). Such "[a] continuing conspiracy or continuing violation occurs when 'the violator's actions consist not only of some definitive act in violation of the antitrust laws, but also of a series of subsequent acts that cause further injury to the plaintiff.' " First R&R at p. 92 (quoting 2 P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 320(c), p. 285 (3d ed. 2007)).

"When the continuing violation exception applies, '[a]n overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act.' " *Rite Aid*, 708 F. Supp. 2d at 268 (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987)); *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1984) (In "a price–fixing conspiracy ..., 'each overt act that is part of the violation and that injures the plaintiff,' *e.g.*, each sale to the plaintiff, 'starts the statutory period running again....' ") (quoting 2 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 338b p. 145 (rev. ed. 1995) and citing

cases). Significantly, though, "[a] plaintiff cannot ... 'use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period.' The continuing violation exception only allows a plaintiff to recover damages caused by overt acts committed inside the limitations period." *Rite Aid*, 708 F. Supp. 2d at 268 (quoting *Klehr*, 521 U.S. at 189-90) (internal citation omitted).

Hellmann takes great pains to establish that the last overt acts underlying each of the claims alleged against it occurred more than four years prior to the filing of the CTAC. Accordingly, it argues that the plaintiffs' claims against it are time-barred because "[n]one of the actual dates pleaded ... fall within the four years prior to March 27, 2013, when Plaintiffs filed their CTAC against the Hellmann defendants." *See* Defendants Hellmann Worldwide Logistics GmbH & Co. KG and Hellmann Worldwide Logistics Limited Hong Kong's Memorandum in Support of their Motion to Dismiss Plaintiffs' Corrected Third Amended Class Action Complaint ("Motion to Dismiss") at pp. 19-22.

  **\*4** While not incorrect that the latest dates explicitly pled in the CTAC predate March 27, 2009, [6] Hellmann's argument employs an overly strict standard. As this court wrote in the First R&R,

> [a]ntitrust law provides that, in the case of a "continuing violation," say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, "each overt act that is part of the violation and that injures the plaintiff," *e.g., each sale to the plaintiff*, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.' "

First R&R at pp. 92-93 (quoting *Klehr*, 521 U.S. at 189 and citing *In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000)) (emphasis added in First R&R). Accordingly, the plaintiffs may satisfy the overt act requirement by demonstrating that the plaintiffs sold to them freight forwarding services at artificially inflated prices during the limitations period. As such, the contention that none of the conspiratorial acts explicitly pleaded in the CTAC fall within the limitations period, even if accurate, is of no moment.

The court again turns to the First R&R to derive the applicable standard:

> There is no requirement that the plaintiffs identify specific conduct on the part of a defendant during the limitations period. The Complaint clearly alleges that the defendants formed a conspiracy that was active in selling price-fixed freight forwarding services until a time unknown and that the conspiracy could have been continuing to the date of the filing of the Complaint. It is possible that discovery will reveal that no overt acts did in fact occur during the limitations period, but reading the Complaint in the light most favorable to the plaintiffs, these allegations are sufficient to raise the inference that price fixing did indeed occur within the four-year period before the operative complaints were filed.

First R&R at p. 96 (citing *Thomas v. Petro-Wash, Inc.*, 429 F. Supp. 808, 812 (M.D.N.C. 1977)) (internal citation omitted). Accordingly, the plaintiffs are not, as Hellmann suggests, required to "identify specific conduct on the part of a defendant during the limitations period," *see id.*; *see also* Motion to Dismiss at pp. 19-22, but instead must simply "raise the inference that price fixing did indeed occur within the four-year period before the operative complaints were filed." *See* First R&R at p. 96.

Nevertheless, even under the more lenient standard articulated in the First R&R, the CTAC fails to "plausibly" state antitrust claims arising during the four-year period prior to the filing of the CTAC. The First R&R is now instructive largely by way of contrast. The "operative complaints" considered there were the original complaint, filed on January 3, 2008, and the FACAC, filed on July 21, 2009. Accordingly, the question before the court was whether it was reasonable to infer that price fixing occurred at some point after January 3, 2004, or alternatively, July 21, 2005. In light of, among other things, a Department of Justice Press Release stating "that these conspiracies extended to dates in 2006 and 2007," and the fact that "it is in 2007 that antitrust authorities announced their investigations into the international freight

Case 1:18-md-02865-LAK    Document 445-9    Filed 08/20/20    Page 6 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

forwarding industry," *see id.* at pp. 94-95; the court answered this question in the affirmative. *See id.* at p. 96.

**\*5** But with the CTAC as the presently "operative complaint[ ]," the court's calculus—and more significantly, its conclusion—is entirely different. As stated, the court must now be able to reasonably infer that price fixing occurred at some point within four years of the filing of the CTAC. The facts set forth above, while previously leading the court to make a parallel inference in regard to earlier complaints, now compel the opposite conclusion. The conspiracies at issue arguably extended until some point in late 2007, when "various worldwide antitrust authorities announced investigations into possible price-fixing conspiracies in the freight forwarding industry." *See id.* at p. 90. It is simply unreasonable to infer that the plaintiffs were still incurring damages in the form of conspiratorially inflated prices roughly eighteen months later. Thus, although the CTAC alleges in the abstract, for example, that "[t]he pricing practices that were unlawfully and systematically created ... continued after November 2007 and until January 4, 2011," and that the defendants reaped the benefits of these practices "until at least January 4, 2011," *see* CTAC at ¶ 182, in the absence of specific allegations of conspiratorial activity occurring after March 2009, the CTAC falls short of plausibly "rais[ing] the inference that price fixing did indeed occur within the four-year period before the [CTAC was] filed." *See* First R&R at p. 96.[7]

Significantly, despite Hellmann's comprehensive (albeit slightly misguided) argument that no overt conspiratorial acts occurred within four years of the filing of the CTAC, the plaintiffs make no effort to establish that any requisite acts, in the form of inflated sales or otherwise, did indeed occur within the statutory period. Instead, their Opposition relies *solely* on the doctrines of relation back and fraudulent concealment to render timely their claims against Hellmann. The court agrees with Hellmann that this amounts to a concession on the part of the plaintiffs that the CTAC does not raise the inference that price-fixing occurred within four years of March 27, 2013.

Accordingly, unless salvaged on the grounds of either relation back or fraudulent concealment, the plaintiffs' claims against Hellmann should be dismissed. The court now considers in turn these possible exceptions to the four-year statute of limitations.

**2. Fraudulent Concealment**

A plaintiff who seeks to toll the statute of limitations on the basis of fraudulent concealment must establish "(1) that the defendant concealed the existence of the cause of action from the plaintiff; (2) that the plaintiff brought suit within the applicable limitations period upon learning of the cause of action; and (3) that the plaintiff's ignorance of the claim did not result from a lack of diligence." First R&R at p. 97 (citing cases). Although a plaintiff must plead fraudulent concealment in accordance with Fed. R. Civ. P. 9(b)'s "particularity" standard, "at the Rule 12(b)(6) stage, a plaintiff need only plead fraudulent concealment, as opposed to affirmatively proving it." *Id.* (citing cases).

a. *First Prong—Concealment of the Cause of Action*

A plaintiff may satisfy the first prong by demonstrating "either that (1) 'the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury' or (2) 'that the wrong itself was of such a nature as to be self-concealing.' " *Id.* at p. 98 (quoting *State of N.Y. v. Hendrickson Bros.,* 840 F.2d 1065, 1083 (2d Cir. 1988) and citing *In re Nine W. Shoes Antitrust Litig.,* 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000)).

In the First R&R, the court concluded that although the operative allegations did not support a finding of affirmative concealment, "[t]he plaintiffs here have ... set forth sufficient allegations to demonstrate that the defendants' price fixing conduct was inherently self-concealing." *Id.* at pp. 100-01 (discussing features of alleged conspiracies evincing their self-concealing nature).

Hellmann's argument to the contrary is of no avail. It disputes the conspiracies' self-concealing nature only in passing, simply quoting the CTAC's allegation that the conspiracies were inherently self-concealing and stating that the plaintiffs have failed to establish with particularity "how Hellmann GmbH or Hellmann HK participated in any of the conspiracies alleged in the CTAC." *See* Motion to Dismiss at p. 23.[8] Because, however, (1) the court finds that the CTAC's allegations sufficiently connect Hellmann to the alleged conspiracies, *see generally* Section III.C, *infra,* and (2) the CTAC's discussion of fraudulent concealment is, with one minor exception, identical to that considered in the First

Case 1:18-md-02865-LAK   Document 445-9   Filed 08/20/20   Page 7 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

R&R, the court is unmoved that a departure is warranted from its finding that the defendants' price-fixing conduct was inherently self-concealing.

### b. *Third Prong—Due Diligence*

**\*6** Hellmann devotes a single sentence to arguing that the due diligence requirement has not been satisfied, writing that the plaintiffs have failed to make any "allegations regarding any actions that they took to discover their alleged claims against the Hellmann defendants." *See* Motion to Dismiss at p. 23. This argument is nearly identical to that offered in the defendants' Joint Motion to Dismiss, which wrote that the plaintiffs failed to allege "any specific inquiries of [Defendants], [or] detail when such inquiries were made, to whom, regarding what and with what response." First R&R at p. 102 (quoting Joint Motion to Dismiss at p. 28).

The First R&R acknowledged the accuracy of this contention, but disagreed with the premise that it necessitates a conclusion that the due diligence prong has not been satisfied. It noted that "[i]n the antitrust context, '[t]he requisite notice required to defeat a claim of fraudulent concealment is an awareness of sufficient facts to identify ... the particular cause of action at issue.' " *Id.* at p. 103 (quoting *Molecular Diagnostics Labs. v. Hoffmann-La Roche Inc.*, 402 F. Supp. 2d 276, 284 (D.D.C. 2005) and citing *Merck & Co. v. Reynolds*, 130 S.Ct. 1784, 1798 (2010)). The defendants point to no such awareness here. The mere fact that several defendants simultaneously imposed similar surcharges is not sufficient, because that "could be reflective not of any collusive agreement, but of the fact that the competitors were confronted with the same sets of external variables and already had similar pricing structures in place," and "[i]t is natural to assume that ... such a reaction would not result from any conspiracy." *Id.* at p. 103 (quoting *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MDL-1775 (JG) (VVP), 2010 WL 10947344, at \*19 (E.D.N.Y. Sept. 22, 2010)). Thus, because there were no public statements concerning the existence of a possible conspiracy until October 2007, the court declined to find that plaintiffs had failed to satisfy the due diligence prong, and concluded that "the question of diligence for purposes of fraudulent concealment is better left for" summary judgment or trial. *Id.* at pp. 104-05 (citing cases).

In sum, plaintiffs' failure to affirmatively plead acts of diligence in pursuing a potential cause of action is eclipsed by the overarching fact that the defendants have not identified information of which the plaintiffs were, or should have been, aware that would have triggered the requirement that they take action to discover their claims. Accordingly, ignorance of their claims arose not from their lack of diligence, but instead from the nature of the defendants' activities, which reasonably could have been construed as innocuous, parallel reactions to market forces. Hellmann having offered no novel arguments regarding the due diligence requirement, the court once again adheres to its prior conclusion that the absence of any allegations concerning plaintiffs' affirmative acts of diligence is not fatal to their fraudulent concealment argument.

### c. *Second Prong—Timely Initiation of Action*

Finally, the court turns to the question of whether the plaintiffs brought their claims against Hellmann within four years of discovery. In the First R&R this court wrote that "nothing indicates that the plaintiffs have not asserted their claims within four years of discovering them," since the plaintiffs first discovered their claims in October 2007 and subsequently filed the original complaint in January 2008, and the FACAC in July 2009, both of which are well within the four-year limitations period. *See* First R&R at pp. 101-02. Accordingly, plaintiffs argue that since "this Court has already upheld Plaintiffs' fraudulent concealment allegations," it follows that "[t]he analysis is equally applicable to the Hellmann Defendants." *See* Plaintiffs' Memorandum of Law in Opposition to the Hellmann Defendants' Motion to Dismiss the Third Amended Class Action Complaint ("Opposition") at p. 13.

**\*7** The court disagrees with the plaintiffs' broad-brush conclusion. Unlike the original complaint and the FACAC, the filing of the March 27, 2013 CTAC (which, as noted, was the first time that Hellmann GmbH and Hellmann HK were named as defendants in this action) did not take place within four years of the plaintiffs' discovery of their claims. Accordingly, the court's prior fraudulent concealment analysis is decidedly not "equally applicable to the Hellmann Defendants." To the contrary, unless the CTAC is held to relate back to the prior complaint (a question addressed in detail below), satisfaction of the second fraudulent concealment prong will require the plaintiffs to demonstrate that they were not aware of their specific claims against Hellmann GmbH and Hellmann HK until March 27, 2009,

Case 1:18-md-02865-LAK   Document 445-9   Filed 08/20/20   Page 8 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

*i.e.* four years before the claims were first brought against these defendants. *Cf.* 📑 *Schenker AG v. Societe Air France,* No. 14 Civ. 04711 (JG)(VVP), 2015 WL 1951422, at *5 (E.D.N.Y. Apr. 23, 2015) (where allegations "permitt[ed] the inference that [plaintiff] did not suspect Qantas was involved in the conspiracy," court accepted fraudulent concealment argument that plaintiff lacked knowledge of potential antitrust claim against Qantas) (citing 📑 *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.,* No. 11 Civ. 564 (JG), 2014 WL 5394950, at *2 (E.D.N.Y. Sept. 16, 2014)); 📑 *DPWN Holdings,* 2014 WL 5394950, at *2 (denying motion to dismiss centering on plaintiff's knowledge of potential antitrust claim where plaintiff "allege[d] that it did not have any direct evidence of United's participation in the conspiracy until" a later date).

A careful reading of the various complaints as well as plaintiffs' motion papers, however, belies such an interpretation. As discussed in Section III.A.3, *infra*, plaintiffs go to great lengths to establish that their naming in the FACAC of only Hellmann Inc. and not Hellmann GmbH or Hellmann HK was the result of a mistake as to the proper defendants' identity. *See* Plaintiffs' Supplemental Memorandum in Further Opposition to the Motion of Defendants Hellmann Worldwide Logistics GmbH & Co. KG and Hellmann Worldwide Logistics Hong Kong to Dismiss Plaintiffs' Corrected Third Amended Class Action Complaint ("Plaintiffs' Supplemental Opposition") at pp. 1-2 ("[T]he FACAC ... mistakenly alleged that Messrs. Poon, Hellmann and Lai [who were invited to attend meetings concerning the Peak Season Surcharge] were employees of Hellmann [Inc.]. In fact, ... they were employees of Hellmann HK. Plaintiffs corrected their mistake by adding Hellmann [GmbH] and Hellmann HK as Defendants in the CTAC...."); *id.* at p. 10 ("The FACAC mistakenly identified Hellmann [Inc.] as invited [to] and/or participating, through identified individuals, in meetings concerning surcharge conspiracies. Plaintiffs fixed this mistake in the CTAC....").

As impliedly conceded by plaintiffs, therefore, this case (unlike *Schenker* and *DPWN Holdings*) is not one in which, at the time they filed the FACAC, the plaintiffs lacked the information necessary for the discovery of Hellmann GmbH's and Hellmann HK's involvement in the alleged conspiracies. To the contrary, Plaintiffs' Supplemental Opposition expressly states that "[a]s corrected, the CTAC alleges Hellmann's involvement in the same conspiratorial meetings, through the same identified individuals, as the

FACAC does." *See id.* at p. 10. Accordingly, the fact that the court previously recommended that the statute of limitations be tolled in part because the prior complaints were brought within four years of the plaintiffs learning of their cause of action does not, as plaintiffs assert, dictate that the same holds true here. Rather, because the plaintiffs failed to bring any claims against Hellmann GmbH or Hellmann HK within four years of possessing the information necessary to bring an action against those defendants, the second requirement for fraudulent concealment is not satisfied.

Plaintiffs' fraudulent concealment argument thus fails. Accordingly, the claims against Hellmann GmbH and Hellmann HK are timely only if the filing of the CTAC relates back to the date of the FACAC. It is to this issue which the court now turns.

### 3. Relation Back

#### a. *Introduction*

The parties' supplemental memoranda address the question of whether Fed. R. Civ. P. 15's relation back doctrine renders timely the plaintiffs' addition of Hellmann HK and Hellmann GmbH in the CTAC. Because, as discussed above, the CTAC was filed after the expiration of the applicable statute of limitations, the amendment would be time-barred if it is not held to relate back to the filing of the FACAC.

**\*8** Fed. R. Civ. P. 15(c)(1)(c) provides that an amendment to a pleading relates back to the date of the original pleading when

> the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1) (B) is satisfied [9] and if, within the period provided by Rule 4(m) [10] for serving the summons and complaint, the party to be brought in by amendment:
>
> (I) received such notice of the action that it will not be prejudiced in defending on the merits; and
>
> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(C). The parties' key point of contention is whether the plaintiffs' failure to name Hellmann

Case 1:18-md-02865-LAK    Document 445-9    Filed 08/20/20    Page 9 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

HK and Hellmann GmbH in the FACAC was the result of a "mistake" within the meaning of the Rule.

The Supreme Court's decision in *Krupski v. Costa Crociere*, 560 U.S. 538 (2010) provides the starting point for the Rule 15(c)(1)(C)(ii) "mistake" inquiry. In *Krupski*, the plaintiff was injured aboard a cruise ship and sued Costa Cruise Lines, which had issued her ticket. *Id.* at 541. Costa Cruise Lines thereafter informed the plaintiff that Costa Crociere, the ship's carrier, was the proper defendant. *See id.* at 543. After the statute of limitations had expired, the plaintiff sought, and was granted, leave to amend her complaint to add Costa Crociere as a defendant. *Id.* at 544. When the plaintiff then filed an amended complaint and Costa Cruise Lines was dismissed from the case, Costa Crociere moved for dismissal on the grounds that the amended complaint did not relate back to the prior complaint and was therefore untimely. *Id.* at 544-45. The Court rejected Costa Crociere's argument, concluding that, on those facts, Rule 15's "mistake" requirement had been met. *See id.* at 556-57.

*Krupski* primarily stands for the notion that the correct inquiry under Rule 15(c)(1)(C)(ii) is not whether a plaintiff knew or should have known that the proposed defendant was the proper party to be sued, but instead "whether [the proposed defendant] knew or should have known that it would have been named as a defendant but for an error." *Id.* at 548. Information in the plaintiff's possession is relevant only insofar as is "bears on the defendant's understanding of whether the plaintiff made a mistake regarding the proper party's identity." *Id.*

The most immediately significant portion of *Krupski* lies elsewhere, however. The Court stated that "it would be error to conflate knowledge of a party's existence with the absence of mistake," that is, a plaintiff may know of a party's existence and still "mak[e] a mistake with respect to that party's identity." *Id.* at 548-49. Accordingly,

[a] plaintiff may know that a prospective defendant—call him party A—exists, while erroneously believing him to have the status of party B. Similarly, a plaintiff may know generally what party A does while misunderstanding the roles that party A and party B played in the "conduct, transaction, or occurrence" giving rise to her claim. If the plaintiff sues party B instead of party A under these

circumstances, she has made a "mistake concerning the proper party's identity" notwithstanding her knowledge of the existence of both parties.

**\*9** *Id.* at 549.

As such, a plaintiff who knows that a prospective defendant exists, but, due to a misunderstanding about that party's status or role with respect to her claim, mistakenly chooses to sue a different defendant, may still satisfy the requirements of Fed. R. Civ. P. 15. *See id.* By contrast, the requirements of Rule 15 are not satisfied when "the failure to name the prospective defendant in the original complaint was the result of a fully informed decision as opposed to a mistake concerning the proper defendant's identity." *Id.* at 552.

In a vacuum, *Krupski* is straightforward enough and, for present purposes, can be summarized as follows: initially, a court considering the question of "mistake" for relation back purposes must consider the knowledge in the possession of the prospective defendant, not the plaintiff. Further, a Rule 15(c) "mistake" is not necessarily limited to instances in which the plaintiff is unaware of the prospective defendant's existence; rather, the rule contemplates scenarios in which the plaintiff knows of a party's existence, but nonetheless harbors a mistake about its status or involvement in the events underlying the plaintiff's claim.

There has emerged, however, significant discord within the Second Circuit concerning one aspect of *Krupski*'s reach. In *In re Vitamin C Antitrust Litig.*, 995 F. Supp. 2d 125 (E.D.N.Y. 2014), Judge Cogan framed the following binary regarding two types of relation back cases:

The first category, "wrong party" cases, is where a plaintiff has sued the wrong party or used the wrong name and seeks to amend to substitute the right party or the right name. The second category, "additional party" cases, is where the defendants originally sued are indeed exposed to liability on the theories alleged, but the plaintiff has omitted an additional party against whom the plaintiff also could have stated a claim.

Case 1:18-md-02865-LAK    Document 445-9    Filed 08/20/20    Page 10 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

*Id.* at 129 (internal citation omitted). *Krupski* "was a wrong party case if ever there was one, and emphatically not an additional party case," *id.* at 130, insofar as the plaintiff sued one defendant, and upon learning that defendant to be the wrong party, later sought to sue the "right" one. It is beyond cavil that this constitutes a Rule 15 mistake, and that relation back applies in these situations. What remains unclear, however, is whether an amendment may also relate back in "additional-party" cases; those where a plaintiff sues one defendant, and later seeks to add another one. The instant matter falls squarely within the latter camp, and as such, the parties now contest whether the "mistake" prong articulated in Rule 15 and construed by the *Krupski* Court applies in the present "additional-party" case. As discussed below, the court agrees with Hellmann's argument (which is premised almost entirely on *Vitamin C*) that this question should be answered in the negative, and therefore finds that the relation back doctrine does not render timely the CTAC's addition of Hellmann GmbH and Hellmann HK.

b. *In re Vitamin C Antitrust Litig.*

**\*10**  As noted, the *Vitamin C* court considered

whether [Rule 15's] final clause—the proposed party "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity"—refers not only to the substitution of a proper party for an erroneously named party, but also to the addition of a new party when all of the parties previously named were themselves proper parties.

*See id.* at 128.

The court in *Vitamin C* answered the question as follows:

Rule 15(c)(1)(c) does not encompass just any mistake. It requires a mistake "concerning *the proper party's identity.*" (Emphasis added.) As a matter of plain language, this provision would appear to include only "wrong party" cases, and not "additional party" cases. This is because the "mistake" has to "concern[ ]" the "identity" of the "proper party [ ]." In an "additional party"

case ..., there generally will be no "mistake concerning" the proper party's "identity." The plaintiff has sued the right defendant, and simply neglected to sue another defendant who might also be liable. If the drafters of Rule 15 had meant to allow relation back in this situation, they could have easily done so.

*Id.* at 129. Judge Cogan found support in the Rule's Advisory Committee notes, writing that an interpretation that limits Fed. R. Civ. P. 15 to wrong party cases "is consistent with the Advisory Committee notes to Rule 15(c), which address the concept of 'wrong party' cases without ever mentioning 'additional party' cases." *See id.* n.2.[11] He concluded that "Rule 15(c)(1)(c) is addressed to the situation where a plaintiff has sued the wrong party, and the right party, reasonably aware of the error, sits on the sidelines while the statute of limitations runs out." *Id.* at 130.

Citing several of the cases upon which Hellmann's present argument is premised, *see* Section III.A.3.c *infra*, Judge Cogan "recognize[d] that, in the wake of the Supreme Court's decision in *Krupski*, several district courts have ... held that Rule 15(c) can be satisfied where the plaintiff '[lacked] knowledge regarding the conduct or liability' of the newly added party, even where the originally named party was proper." *See id.* (citing cases and quoting ⚠ *Abdell v. City of New York*, 759 F. Supp. 2d 450, 457 (S.D.N.Y. 2010)) (internal citation omitted). However, Judge Cogan took issue with these courts' construction of *Krupski*, writing that

**\*11**  although *Abdell* and the other decisions cited relied on *Krupski*, they failed to recognize that *Krupski* was a wrong party case if ever there was one, and emphatically not an additional party case.... Because *Krupski* spent so much analysis considering the proposed new defendant's knowledge that it was the party that should have been sued (and discounting the significance of the plaintiff's knowledge), it is easy to slide into the belief, as *Abdell* and its progeny did, that all that matters is what the proposed new party knows. However, the starting point for *Krupski* was a suit against the wrong party, and all of its discussion of knowledge must be seen in that context. Where a plaintiff has not mistakenly sued the wrong party, a court need not consider what a defendant knows and when the defendant knew it; the threshold requirement

Case 1:18-md-02865-LAK    Document 445-9    Filed 08/20/20    Page 11 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

for Rule 15(c)(1)(C)—a "mistake concerning the proper party's identity"—has not been met.

*Id.* at 130-31 (citing *Turner v. Nicoletti,* No. 12 Civ. 1855, 2013 WL 3989071, at *3 (W.D. Pa. Aug. 2, 2013)).

Applying this distinction, Judge Cogan wrote that, unlike the plaintiff in *Krupski,* the *Vitamin C* plaintiffs "did not 'mistakenly choose to sue' [the original defendant] based on any 'misimpression.' They correctly sued [the original defendant], and for whatever reason did not sue [the proposed additional defendant] as well." *Id.* at 131. He therefore concluded that the proposed claims did not relate back under Rule 15 to the timely-filed complaint. *See id.*

In the short time since its passage, *Vitamin C* has been met with approval. The court in *Velasquez v. Digital Page, Inc.,* No. 11 Civ. 3892 (LDW)(AKT), 2014 WL 2048425 (E.D.N.Y. May 19, 2014), for example, cited *Vitamin C* for the proposition that "Rule 15(c) does not apply in cases where a plaintiff seeks to add an *additional* party as a defendant." *Id.* at *3; *see* *Erdogan v. Nassau Cnty.,* No. 10 Civ. 05837 (AKT), 2014 WL 1236679, at *11 (E.D.N.Y. Mar. 25, 2014) (same); *see also Zeller v. PDC Corp.,* No. 13 Civ. 5035 (ARR) (JO), 2015 WL 1223719, at *2 (E.D.N.Y. Mar. 17, 2015) (quoting *Vitamin C* that "[a]s a matter of plain language, this provision [subsection (c) ] would appear to include only 'wrong party' cases, and not 'additional party' cases.").

c. *Analysis*

To be sure (and as acknowledged by Judge Cogan), there exists substantial authority to the contrary. The court in *Doe v. Whelan,* No. 3:08 Civ. 846 (CSH), 2010 WL 5093102 (D. Conn. Dec. 8, 2010), for example, addressed the question whether, on a motion to amend a complaint pursuant to Rule 15, "Mysogland may be *added* as a third defendant, as Plaintiffs wish, or whether, as Defendants argue, Mysogland must be *substituted* for an existing defendant ... who must in turn be dismissed." *Id.* at *1. In permitting the addition of the new defendant, the court expressly declined to read *Krupski* as requiring the substitution of one defendant for another. *See id.* at *3 n.3 ("Regardless of whether [*Krupski*] involved the addition or substitution of defendants, the rationale expressed therein for permitting the relation back, namely the preference for enabling decisions on the merits by permitting the correction of errors, supports a finding that it is

appropriate here as well."); *see also* *Patrick v. Garlick,* No. 13 Civ. 6365L, 2014 WL 6883634, at *2-3 (W.D.N.Y. Dec. 4, 2014) (permitting addition of defendant to relate back where naming of original defendant demonstrated that plaintiffs "clearly harbored a misunderstanding as to" latter's status;

*S.A.R.L. Galerie Enrico Navarra v. Marlborough Gallery, Inc.,* No. 10 Civ. 7547 (KMW) (RLE), 2013 WL 1234937, at *5 (S.D.N.Y. Mar. 26, 2013) (court upheld relation-back to additional defendants where "the information regarding their involvement only recently came to light," thus constituting a mistake under Rule 15), *reconsideration denied,* No. 10 Civ. 7547 (KMW)(RLE), 2013 WL 5677045 (S.D.N.Y. Oct. 18, 2013); *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC,* 289 F.R.D. 401, 405 (S.D.N.Y. 2013) ("[T]he three-year statute of limitations does not prohibit an amendment adding ACH as a defendant at this stage because the proposed Second Amended Complaint relates back to the original complaint.");

*Roe v. Johnson,* No. 07 Civ. 2143 (RJD)(RER), 2011 WL 8189861, at *4 (E.D.N.Y. Aug. 12, 2011) (*Krupski*'s "holding applies equally to cases where the 'mistake concerning the proper party's identity' results in the substitution or addition of defendants") (citing cases), *report and recommendation adopted,* No. 07 Civ. 2143 (RJD) (RER), 2012 WL 2575340 (E.D.N.Y. July 3, 2012); *Abdell,* 759 F. Supp. 2d at 456-57 (S.D.N.Y. 2010) ("Careful review of the *Krupski* opinion ... belies [a] narrow understanding of a Rule 15(c) 'mistake' " under which relation back is limited to wrong-party cases and does not contemplate mistakes consisting of "lack of knowledge regarding the involvement of additional parties.").[12]

**\*12** In light of the above, it is clear that there exists considerable authority supporting the notion that a Rule 15 "mistake" permits the addition—as opposed to merely the substitution—of a defendant to relate back to the original complaint. This is true even if the plaintiff was aware of the proposed defendant's existence at the time of the initial pleading, so long as the plaintiff can demonstrate that she misapprehended that party's status or role in the events underlying her claim. Such a reading entails an extension of the decidedly "wrong-party" *Krupski* to the "additional-party" arena.

Ultimately, however, the court is persuaded by Judge Cogan's compelling analysis in *Vitamin C,* which demonstrated that the plain meaning of Rule 15, the Rule's Advisory Committee Notes, and *Krupski* all evince a preference for limiting Rule

Case 1:18-md-02865-LAK    Document 445-9    Filed 08/20/20    Page 12 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

15(c) mistakes to wrong-party cases. The Rule plainly refers to mistakes concerning the proper party's identity, which, as Judge Cogan noted, "would appear to include only 'wrong party' cases, and not 'additional party' cases," *Vitamin C, 995 F. Supp. 2d at 129*, an interpretation that finds support in the Rule's Advisory Committee Notes. Similarly, *Krupski* contemplated a scenario in which "the plaintiff sues party B instead of party A." *Krupski, 560 U.S. at 549*. It did not, however, discuss one in which the plaintiff sues *only* party B instead of *both* party A and party B. The implication, then, is that *Krupski* is directed toward those scenarios in which one party is sued instead of another party—*i.e.* wrong party cases—to the exclusion of additional party cases, where a plaintiff's need for an amendment stems from her failure to vigorously determine the identities of all potential defendants. In view of this "starting point," therefore, the court agrees with *Vitamin C* that "all of [*Krupski*'s] discussion of knowledge must be seen in th[e wrong party] context," *see Vitamin C, 995 F. Supp. 2d at 130*, a significant factor that appears to have been overlooked by the opposing authority.

Despite being widely discussed amongst the district courts, *Krupski* has been cited only twice by the Second Circuit. Both matters, *Hogan v. Fischer, 738 F.3d 509 (2d Cir. 2013)* and *Scott v. Vill. of Spring Valley, 577 Fed.Appx. 81 (2d Cir. 2014)* were "John Doe" cases in which the plaintiff sought to amend a complaint to name defendants whose identities were unknown at the time the original complaint was filed. *Hogan* and *Scott* both relied upon the seminal "John Doe" decision in *Barrow v. Wethersfield Police Dept., 66 F.3d 466 (2d Cir. 1995)*, where the Second Circuit wrote that "the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake." *Barrow, 66 F.3d at 470*.

Because the present case, like *Krupski*, does not involve John Doe defendants, *Barrow* and its progeny (*e.g.*, *Hogan* and *Scott*) is not directly applicable. It is instructive, however, insofar as both John Doe cases and garden-variety additional-party cases such as this contemplate the same general type of "mistake" arising from a plaintiff's failure to sue a party she knows (or should know) to be involved in her cause of action. In the former instance, this takes the form of the plaintiff being unable to specifically identify the additional party; in the latter, it presents as the plaintiff, "for whatever reason," choosing not to sue it. *See Vitamin C, 995 F. Supp. 2d at 131*. Since the plaintiff in both scenarios has or

should have at least a general awareness that the additional party should have been sued, it follows that her "lack of knowledge does not constitute a 'mistake' for relation back purposes." *See id. at 130* (citing *Barrow, 66 F.3d at 470*). Wrong-party cases such as *Krupski*, however, are analytically distinguishable in that their geneses is not a correctly-sued party, but instead a more fundamental mistake as to the correct target of the litigation. Stated otherwise, additional-party cases are, for present purposes, conceptually analogous to John Doe cases, where the Second Circuit does not allow lack of information about the identities of additional parties to constitute a "mistake" under Rule 15. Thus, although John Doe cases such as *Barrow*, *Hogan*, and *Scott* are categorically distinguishable from the case *sub judice*, they provide indirect support for the court's conclusion that *Krupski* should not extend to additional-party matters.

**\*13** In light of the above, the court finds that Fed. R. Civ. P. 15(c)(1)(C)(ii)'s "mistake" prong has not been satisfied. [13] The CTAC's claims against Hellmann therefore do not relate back to the filing of the prior complaint and, accordingly, are time-barred.

## B. CORPORATE GROUPING

The discussion that follows addresses corporate grouping and plausibility, the two other areas of argument advanced by Hellmann in support of its motion. As noted at the outset of this opinion, this discussion becomes significant only if the court rejects the recommendation above that the claims against Hellmann be dismissed on statute of limitations grounds.

### 1. Introduction

Hellmann has also sought dismissal on the strength of an improper corporate grouping argument with which the Court is intimately familiar, having addressed similar arguments in both the First and Second R&Rs. *See* First R&R at pp. 28-41; Second R&R at pp. 22-31. Hellmann contends that the plaintiffs have "impermissibly lumped" together Hellmann GmbH, Hellmann HK, and Hellmann Inc. without providing any factual basis to distinguish their conduct. These allegations, according to Hellmann, fail to satisfy the minimum pleading standard, since none of the individual Hellmann entities has been provided fair notice of the claims asserted against it. *See generally* Motion to Dismiss at pp. 6-8.

Case 1:18-md-02865-LAK    Document 445-9    Filed 08/20/20    Page 13 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

Armed with the benefit of having previously considered two sets of corporate grouping allegations—the first in the SACAC, which the First R&R deemed insufficient to withstand dismissal, and the second in the CTAC, which the Second R&R held to satisfy the pleading standard —the court need not begin its analysis at square one. Instead, its task in assessing Hellmann's grouping argument is straightforward: it must determine whether the allegations concerning Hellmann's corporate structure more strongly resemble the analogous portions of the SACAC or the CTAC previously considered by the court. Further, because both the First and Second R&Rs invoked the SACAC's and CTAC's allegations concerning the corporate structure of defendants Panalpina World Transport (Holding) Ltd. and Panalpina, Inc. (collectively "Panalpina") as specific examples, respectively, of insufficient (in the SACAC) and sufficient (in the CTAC) allegations concerning corporate structure, a comparison of the CTAC's allegations discussing the Hellmann corporate family with the similar portions of the SACAC and CTAC concerning Panalpina will serve as a useful springboard for the court's analysis.

## 2. SACAC / First R&R

As noted, the First R&R considered the SACAC's allegations regarding Panalpina's corporate structure, the entirety of which was a brief discussion of Panalpina World Transport (Holding) Ltd.'s status as Panalpina, Inc.'s parent, and assertions that both the parent and subsidiary "directly or through [their] subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States." *See* SACAC at ¶¶ 23-24. Accordingly, the court wrote that while the plaintiffs "allege that a representative of 'Panalpina' participated in a meeting on a certain date, seeking to attribute the agreement to conspire on that date to all Panalpina entities," they fail to explain "why *these* Panalpina entities, rather than any other Panalpina entities, entered into the agreements to fix prices." *See* First R&R at p. 29.

**\*14**  Observing that "[t]his type of pleading is repeated for the majority of the defendants," the court continued that

[t]he plaintiffs do not specifically allege that the parents, subsidiaries, or affiliates of these corporate defendants either joined the alleged conspiracies individually nor were aware of their existence. They also make no claim that the separate corporate existence of these entities should be ignored. Instead, they rely on what appears to be a

joint liability theory to put entire corporate families on the hook for antitrust violations.... The plaintiffs' complaint thus fails the basic pleading requirement that ... [they] "indicate clearly the defendants against whom relief is sought, and the basis upon which relief is sought against the particular defendants." ... [T]he plaintiffs wish to put individual defendants on the hook for antitrust violations based on corporate affiliation alone, arguing that because they have alleged that each defendant "directly or through its subsidiaries and affiliates, sold Freight Forwarding Services throughout the United States" the Court can infer that those subsidiaries and affiliates also conspired in violation of antitrust laws. This is not a reasonable inference to be drawn. The conduct that forms the basis for the plaintiffs' conspiracy claims is collusion in the charging of fixed fees and surcharges, not the sale of freight forwarding services generally.

*Id.* at pp. 29-30, 34-35 (quoting *Yucyo, Ltd. v. Republic of Slovenia*, 984 F. Supp. 209, 219 (1997)).

We thus concluded that "the plaintiffs['] corporate group pleading method only leaves 'open the possibility that [they] might later establish some set of [undisclosed] facts to support recovery' against the affiliates. This is not enough." *Id.* at p. 38 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)) (internal citation and quotation marks omitted). The court therefore recommended dismissal (without prejudice) of the claims asserted against the improperly grouped defendants. *See id.* at pp. 39-40.

## 3. CTAC / Second R&R

In contrast to the SACAC's meager allegations concerning the defendants' corporate structures, the plaintiffs in the CTAC offered a thorough exposition of how "the various corporate families acted as single enterprises with the parent companies exercising substantial control over their subsidiaries." *See* CTAC at p. 36; *id.* at ¶¶ 105-79. Included are allegations concerning (1) the nature of the freight forwarding industry; (2) defendant representatives acting on behalf of their entire corporate families; (3) collusive agreements being directed from the top-down; and (4) perhaps most significantly, itemized, defendant-specific "[e]xamples of corporate control over subsidiaries and affiliates and unified activity between corporate families."[14] *See generally* CTAC at ¶¶ 105-79.

Case 1:18-md-02865-LAK    Document 445-9    Filed 08/20/20    Page 14 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

**\*15** Accordingly, in the Second R&R we wrote the following regarding the defendants' improper grouping argument:

> The plaintiffs [in the CTAC] have offered extensive allegations as to both the defendants' corporate structure and the means and method of executing the conspiracies. The allegations support the inference that corporate affiliates both entered into the agreements and aided and assisted in executing them. The allegations of the [C]TAC, which provide significantly more detail as to the role of the affiliated entities in the alleged conspiracies than the previous complaint, adequately allege that each entity joined the conspiracy and/or acted as an agent of its affiliates in carrying out the conspiracies.... Unlike the SAC[AC], ... the [C]TAC includes significant detail that establishes how the antitrust misconduct here naturally involved (and often required) the knowledge and participation of the members of corporate families in the conspiracies. Thus, the [C]TAC includes allegations that each representative at a meeting or discussion acted on behalf of its affiliates and reported the agreements to the entire corporate family.

Second R&R at pp. 23-24 (citing CTAC at ¶¶ 105, 107).

In light of the foregoing—coupled with "[t]he plaintiffs' allegations regarding the nature of the industry and the methods of executing the conspiracies"—we recommended denial of the defendants' improper corporate grouping argument. *See generally* Second R&R at pp. 25-31.

### 4. Application

Against this backdrop the court now turns to the CTAC's allegations concerning Hellmann's corporate structure. As was the case with the CTAC's allegations against Panalpina

(and the other corporate defendants, for that matter), the allegations regarding Hellmann suffice to survive dismissal on improper grouping grounds.

First, almost all of the portions of the CTAC referenced in the Second R&R's core grouping discussion either find an expressly Hellman-centric analogue in the CTAC, or, by logical extension, apply with the same force to Hellmann as to the other defendants. *See* Second R&R at pp. 24-26 (citing CTAC ¶¶ 34-97 (discussing each defendant's corporate structure), ¶¶ 105-08 (nature of freight forwarding industry necessitated companies to operate as single enterprises), ¶¶ 109-33 (examples of how defendants "required an integrated enterprise in order to achieve their conspiratorial aims," discussions of corporate representatives acting on behalf of "entire corporate famil[ies]" and collusive agreements being directed from top down)).

Significantly, the Second R&R's conclusion was not undercut by the fact that the CTAC lacked examples for each corporate defendant "of instances where co-conspirators communicated and oversaw their affiliates' knowing participation in the surcharge conspiracies"; such were not necessary because, "[g]iven the nature of the industry and the conspiracies at issue in the [C]TAC, it makes economic sense and is reasonable to infer that the corporate affiliates grouped together acted in concert and individually joined the conspiracies." *See id.* at p. 26. Similarly, although the CTAC's illustrations of "how employees of one corporate family member would report back to its corporate affiliates regarding the collusive surcharges ... do not include every corporate family, that is not fatal because on a motion to dismiss, the plaintiffs need not prove their allegations; they only have to make plausible ones." *Id.* at p. 28. To this end, the fact that Hellmann is not mentioned in the section of the CTAC that provides "examples of how the Defendants ... required an integrated enterprise in order to achieve their conspiratorial aims," *see* CTAC ¶¶ 109-33, does not undermine the Second R&R's applicability.

**\*16** Further, among the CTAC's "[e]xamples of corporate control over subsidiaries and affiliates and unified activity between corporate families" is a discussion of Hellmann GmbH's "corporate control" over its subsidiaries as well as the "unified activity" between the three Hellmann entities. *See* CTAC at ¶ 179. The CTAC's Hellmann-specific allegations thus suggest the same conclusion as that reached in the Second R&R—that the plaintiffs "adequately allege that each [Hellmann] entity joined the conspiracy and/or acted as an

agent of its affiliates in carrying out the conspiracies." *See* Second R&R at p. 24.

It also follows that the Second R&R's discussion of *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010) ("CRT") and *In re: TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009) ("*Flat Panel*")—which, notably, Hellmann has not even attempted to distinguish—is as apposite here as in its original context. Specifically, the court's assertion that "[t]he defendants' arguments are without merit because the allegations in the [C]TAC are very similar to, and at times even more detailed, than those cited as sufficient in *CRT* and *Flat Panel*," Second R&R at p. 28, applies four-square to Hellmann. [15]

Hellmann's arguments to the contrary do not compel a departure from the court's conclusion in the Second R&R. Perhaps most telling is Hellmann's somewhat disingenuous attempt to sidestep the impact of the court's prior holdings. In its motion, Hellmann states that "Plaintiffs allege nothing beyond corporate affiliations, which the Court has already held is insufficient to satisfy pleading requirements." Motion to Dismiss at p. 7. In purported support, however, Hellmann proceeds to quote from Judge Gleeson's August 13, 2012 Order adopting the *First* R&R—which concerned the SACAC, *not* the CTAC. Moreover, after writing that "[p]laintiffs plead only the following bare allegations" regarding the individual Hellmann entities, Hellmann cites only the portion of the CTAC (¶ 69) which provides general information about the Hellmann corporate family, while ignoring the curative ¶ 179, which mirrors the portions of the CTAC previously deemed sufficient to defeat the joint defendants' corporate grouping argument. *See* Motion to Dismiss at pp. 7-8. Hellmann's argument thus relies upon facts and conclusions of law that ceased to be relevant once the plaintiffs filed the TAC, and subsequently, the CTAC.

**\*17** In sum, the allegations concerning Hellmann's corporate structure (which are supported by entries from Hellmann's website and corporate linkedin.com page) are analogous to those which the court has previously held sufficient to survive a motion to dismiss, and far more robust than those which the court has found to be inadequate. Accordingly, the court recommends denying Hellmann's motion insofar as it seeks dismissal on the grounds of improper corporate grouping. [16]

## C. PLAUSIBILITY OF THE CLAIMS

Hellmann further argues for dismissal of the Third, Fifth, Ninth, and Tenth Claims for their failure to make specific allegations against Hellmann supportive of a claim under Section 1 of the Sherman Act. It also asserts that the Tenth Claim should be dismissed because the allegations contained therein are "[i]nherently [c]ontradictory." The court now addresses *seriatim* the plausibility of these claims' allegations as asserted against Hellmann.

### 1. Third Claim—New Export System Fee Agreement ("NES Claim")

Hellmann contends that the CTAC's third claim, which concerns the 2002 New Export System Fee ("NES") Agreement, must be dismissed as against it for failing to satisfactorily allege a claim under the Sherman Antitrust Act. The court in the Second R&R considered a similar individual motion seeking to dismiss the NES claim as against the DSV Defendants. Like Hellmann, DSV argued that the allegations concerning its representative's involvement in the NES conspiracy fell "far short of alleging that any DSV entity engaged in any conduct that constitutes entering into a price fixing agreement." *See* Dkt. No. 779 at p. 7 (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

The court disagreed and upheld the Third Claim as against the DSV Defendants. Its conclusion rested on the allegations that an employee of DFDS (one of the entities comprising the DSV Defendants, *see* CTAC at ¶ 61) [redacted text]. *See* Second R&R at pp. 52-53 (citing CTAC at ¶¶ 342-51). The court wrote that "[s]uch allegations, that a defendant knowingly agreed to a conspiracy to fix prices with its competitors, are sufficient to state a claim against that defendant." *Id.* at p. 53 (citing *Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 135-36 (2d Cir. 2013); *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012)).

**\*18** The NES allegations against Hellmann carry equal weight. The CTAC alleges that Peter Cochrane, a Hellmann representative, attended a meeting with representatives from several other corporate defendants at which the attendees "agreed to implement a NES fee on their customers" and "discussed how they would monitor each other's compliance with their agreement." *See* CTAC at ¶¶ 345-46; *id.* at ¶

Case 1:18-md-02865-LAK    Document 445-9    Filed 08/20/20    Page 16 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

349 [redacted text] The CTAC also alleges that the NES Defendants (a group to which Hellmann is alleged to have belonged, *see id.* at p. 99) imposed the agreed-upon NES fee. *See id.* at ¶ 348. Having found essentially identical allegations sufficient to withstand DSV's motion to dismiss, the court sees no reason to grant dismissal of the NES claim as against Hellmann. [17]

The only novel argument set forth by Hellmann is that the NES claim provides an overly vague time frame, thereby failing to provide Hellmann with fair notice of the claims pleaded against it. *See* Motion to Dismiss at pp. 13-14. Hellmann's argument is unavailing. First, the NES Claim provides an October 1, 2002 date for the meeting attended by Hellmann representative Peter Cochrane, *see* CTAC at ¶¶ 345-46, as well as several critical dates for the creation and implementation of the NES conspiracy. *See, e.g.*, CTAC at ¶ 339 ("Such Defendants made and implemented this agreement through the use of code words, emails and clandestine meetings held on or about October 1, 2002, in June 2004, and in October 2004 as alleged below."). Further, the fact that the alleged conspiracy continued "until a date unknown" does not, as Hellmann argues, preclude fair notice of the claims, nor does Hellmann provide any authority that it does. *See, e.g.*, *Young-Wolff v. McGraw-Hill Sch. Educ. Holdings*, LLC, No. 13-CV-4372 KMW, 2015 WL 1399702, at *4 (S.D.N.Y. Mar. 27, 2015) (complaint that "although somewhat imprecise, provides fair notice of the approximate time period of Defendants' alleged [misdeeds] ... is all that Rule 8 requires.") (citing cases); *accord* *United States v. Miller*, 771 F.2d 1219, 1227 (9th Cir. 1985) ("Although it is true that this [antitrust] indictment places the conspiracies within an open-ended time frame, this defect alone does not automatically render it insufficient.... [I]t does contain sufficient factual particularity to afford appellants adequate notice of the charges against them.").

**\*19** In light of the above, the court recommends that Hellmann's argument for dismissal of the NES Claim be rejected.

### 3. Fifth Claim—2005 Chinese Currency Adjustment Factor Surcharge Agreement ("CAF Claim")

Hellmann has also moved to dismiss the CTAC's Fifth Claim, which concerns allegations of a 2005 Chinese Currency Adjustment Factor ("CAF") surcharge. In addition to rehashing its contentions of improper corporate grouping and lack of notice due to the CTAC's indefinite time frame, Hellmann contends that dismissal is warranted because the allegations of its involvement in the CAF Conspiracy are particularly anemic. The argument has some appeal. Indeed, Hellmann is named only twice throughout the sixty-seven-paragraph CAF Claim: once in ¶ 397, which provides that [redacted text] *see* CTAC at ¶ 389, and once in ¶ 402, which references [redacted text]

Although the specific allegations against Hellmann are not particularly damning, the court finds that the plaintiffs have sufficiently alleged Hellmann's participation in the CAF Conspiracy. As Judge Gleeson wrote in his August 13, 2012 Order adopting this court's First Report and Recommendation, "only 'slight evidence' is necessary to connect a defendant to an antitrust conspiracy once the conspiracy is established." *See* Dkt. No. 628 at p. 3 and n.4 (citing *Vandervelde v. Put & Call Brokers & Dealers Ass'n*, 344 F. Supp. 118, 154-55 (S.D.N.Y. 1972)) ("Courts have commented with respect to antitrust conspiracies that once the conspiracy itself has been established only 'slight evidence' is necessary to connect individual defendants with it."), *opinion supplemented*, 344 F.Supp. 157 (S.D.N.Y. 1972); *Safeway Stores, Inc. v. F.T.C.*, 366 F.2d 795, 801 (9th Cir. 1966) ("Once the existence of the common scheme is established, very little is required to show that defendant became a party—slight evidence may be sufficient to connect a defendant to it.") (internal quotation marks omitted); *accord* *United States v. Consol. Packaging Corp.*, 575 F.2d 117, 126 (7th Cir. 1978) ("Even a single act may be sufficient to draw a defendant within the ambit of a conspiracy where the act is such that one may infer from it an intent to participate in the unlawful enterprise.") (citing *United States v. Cardi*, 478 F.2d 1362, 1369 (7th Cir. 1973), *cert. denied*, 414 U.S. 852 (1973)).

To this end, the court has previously denied motions to dismiss made by defendants with similarly tenuous links to various conspiracies. In addressing defendants Kintetsu's and Nippon's motion to dismiss the Peak Surcharge Claim, for example, the court wrote, in language equally applicable here, that the

allegations of parallel conduct, while sparse, are sufficient to tie these

Case 1:18-md-02865-LAK    Document 445-9    Filed 08/20/20    Page 17 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

defendants to the conspiracy asserted in the Peak Season Surcharge claim. The plaintiffs have provided a great amount of detail as to the who, what, when, where and how of the Peak Season Surcharge conspiracy, and in most instances have identified the defendants who were present at in-person meetings and have alleged that other unidentified individuals were also present at the meetings. In this context, allegations that a co-conspirator told others that he would inform Kintetsu and Nippon of the conspiracy and that Kintetsu and Nippon later imposed the conspiratorial surcharges makes it plausible that they joined the conspiracy.[18]

**\*20** Second R&R at p. 61. Accordingly, where the "who, what, when, where, and how" of a conspiracy is well-described, parallel conduct, *i.e.* imposition of the surcharge, is sufficient to tie a defendant to the conspiracy.

This principle serves to plausibly connect Hellmann to the CAF Conspiracy. Initially, the CTAC describes the formation and execution of the CAF Conspiracy in considerable detail, including allegations of an email group (the "Yahoo Group"), a series of five meetings, and a conference call—all geared toward furthering the alleged conspiracy—as well as additional steps taken to implement the surcharge through the Shanghai International Freight Forwarding Association. *See generally* CTAC at ¶¶ 379-446.

Further, the CTAC sufficiently alleges Hellmann to have imposed the CAF Surcharge. It names Hellmann as belonging to a cohort referred to as the "CAF Surcharge Defendants," *see id.* at p. 109, which is alleged to have "combined, conspired and agreed to fix and maintain ... the [CAF] Surcharge," *see id.* at ¶ 380, and to have taken a number of collusive actions in furtherance of the CAF Conspiracy. *See id.* at ¶ 405; [redacted text] *id.* at ¶¶ 412-14 (CAF Surcharge Defendants "sen[t] letters to their customers with the exact or substantively identical language and in this way, among others, implemented their CAF Surcharge agreement"); *id.* at ¶ 416 (CAF Surcharge Defendants took "actions to ensure customers could not negotiate paying the CAF Surcharge.").

Most significantly, the CTAC expressly states that "the CAF Defendants ... did impose artificially fixed and inflated CAF fees." *Id.* at ¶ 443. Thus, although the Fifth Claim makes scant *explicit* reference to Hellmann's participation in the CAF Conspiracy, it does plausibly connect Hellmann with the conspiracy by way of Hellmann's inclusion among the parties collectively alleged to have formulated the CAF Conspiracy and imposed the CAF Surcharge.[19]

**\*21** In sum, the combination of the CTAC's detailed description of the CAF Surcharge and Hellmann's inclusion among the group of defendants alleged to have imposed the surcharge (as well as the CTAC's allegation that Hellmann was contacted by a codefendant in connection with the alleged conspiracy) suffice to plausibly connect Hellmann to the CAF Conspiracy. This principle has justified the survival of claims against several similarly situated defendants, and Hellmann has not demonstrated, nor does the court believe, that departure from these prior conclusions is warranted. Accordingly, the court recommends denying Hellmann's motion for dismissal of the Fifth Claim.

### 4. Ninth Claim—U.S. Customs Ocean "AMS" Charge Agreement

Hellmann similarly seeks dismissal of the CTAC's Ninth Claim, which concerns the U.S. Customs Ocean AMS Charge Agreement (the "Ocean AMS Claim"). Both Hellmann's and the plaintiffs' respective arguments center on the court's prior discussion of defendant Geodis. In the Second R&R, the court upheld the Ocean AMS Claim as against Geodis—notwithstanding the fact that Geodis is only mentioned in the Ocean AMS Claim's caption—because

the plaintiffs here have alleged more than parallel conduct by [Geodis]. In the Ocean AMS claim the plaintiffs go through great detail as to the formation and execution of this conspiracy, providing specific dates, locations of meetings, and the names of participants and the defendants who they represented. The plaintiffs have done more than allege "conscious parallelism," or even "allegations of parallel conduct ... in a context that raises a suggestion of a preceding agreement[.]" They have sufficiently and plausibly alleged the conspiratorial agreement between the Ocean AMS defendants who are alleged to have participated in the conspiratorial meetings and communications. Although the plaintiffs may have barely alleged Geodis' participation in this conspiracy by

Case 1:18-md-02865-LAK   Document 445-9   Filed 08/20/20   Page 18 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

only alleging that it imposed the collusive surcharges,[20] that is enough at this stage to assert a claim against Geodis.

Second R&R at p. 57 (quoting *Twombly*, 550 U.S. at 553; *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 322 (2d Cir. 2010) and citing Dkt. No. 628 at p. 3 & n.4) (internal citations omitted).

The court finds that plaintiffs have likewise sufficiently alleged the Ocean AMS Claim as against Hellmann. As noted above, once an antitrust conspiracy has been established, "only 'slight evidence' is necessary to connect a defendant" to it. *See* Dkt. No. 628 at p. 3 and n.4 (citing *Vandervelde v. Put & Call Brokers & Dealers Ass'n*, 344 F. Supp. 118, 154-55 (S.D.N.Y. 1972)), *opinion supplemented*, 344 F.Supp. 157 (S.D.N.Y. 1972); *Safeway Stores, Inc. v. F.T.C.*, 366 F.2d 795, 801 (9th Cir. 1966). Thus, as was the case with Geodis, "[a]lthough the plaintiffs may have barely alleged [Hellmann's] participation in this conspiracy by only alleging that it imposed the collusive surcharges, that is enough at this stage to assert a claim against" Hellmann. *See* Second R&R at p. 57 (citing Dkt. No. 628 at p. 3 and n.4).

Hellmann's argument for dismissal rests upon the court's recommendation to dismiss the Tenth Claim as against Geodis because "Geodis is not mentioned at all in Claim 10 except in the Caption." *See* Motion to Dismiss at p. 15 (quoting Second R&R at p. 36). Hellmann argues that it, too, should be dismissed from the Ninth Claim, in which it similarly is named only in the caption. *See id.*

**\*22** The above discussion demonstrates, however, that the fact that a defendant is mentioned only in a claim's caption does not vitiate the prospect of liability. Instead, the court must analyze the caption's reference to that defendant—a fleeting one, to be sure—against the backdrop of the claim's substantive allegations.

So viewed, Hellmann's argument for dismissal of the Ninth Claim is unconvincing. The Global Agreement (along with the Japanese Regional Conspiracy) is *sui generis* in that, unlike the individual conspiracies, it comprises several component agreements. Liability for the Global Agreement, therefore, entails a different (and indeed, higher) standard than that for the individual conspiracies. *See* Second R&R at p. 36 (dismissing Tenth Claim because "the only factual allegations connecting these defendants to the global conspiracy are the defendants' imposition of

some, but not all, of the surcharges at issue in the global conspiracy claim.... [T]he naked allegation that a defendant joined a conspiracy whose goal was to pass on all future surcharges without at least the allegation that it imposed those surcharges is implausible.") (citing *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 895 (N.D. Ill. 2009)). Accordingly, the logic underlying the court's decision to dismiss the Tenth Claim as against Geodis is unique to that cause of action, and as such has little conceptual bearing on the Ocean AMS Claim.

Thus, although the court previously dismissed the Tenth Claim against Geodis in part because Geodis is only mentioned in the claim's caption, the logic behind that determination is peculiar to that claim. By contrast, the rationale underlying the court's recommendation to uphold the Ocean AMS Claim against Geodis—despite the fact that Geodis likewise is mentioned only in that claim's caption —applies with equal force to Hellmann, which is situated identically to Geodis *viz-a-viz* the Ninth Claim. Accordingly, the court finds that the plaintiffs have adequately pled the Ocean AMS Conspiracy as against Hellmann, and therefore recommends denying Hellmann's motion to dismiss the Ninth Claim.

### 5. Tenth Claim—Global Agreement

Hellmann also seeks dismissal of the Global Agreement asserted in the CTAC's Tenth Claim. The court has previously addressed head-on the prospect of dismissal of this claim as against Hellmann Inc. It concluded in the Second R&R that

> [t]he plaintiffs have also presented sufficient allegations that the defendant Hellman [Inc.] joined the global conspiracy. Hellman [Inc.] is alleged to have joined the global conspiracy at a "later date." While this sentence alone is conclusory, Hellman [Inc.] is also alleged to have imposed all of the collusive surcharges that formed the global conspiracy other than the security surcharge in Claim 1. That Hellman [Inc.] imposed all of the surcharges at issue in the global conspiracy after a certain date makes

the plaintiffs' allegation that Hellman [Inc.] "later" joined the conspiracy plausible at this stage.

Second R&R at p. 35 (quoting CTAC ¶ 571 and citing Dec. & Order, at 3 & n.4 that only "slight evidence" is necessary to join a defendant to an established conspiracy) (internal citation omitted).

The court explicitly distinguished the CTAC's allegations against Hellmann from those concerning defendants Dachser, UPS, BAX Global, and Geodis, against which the Tenth Claim was dismissed (the "dismissed defendants"), writing that "[u]nlike Hellman, these defendants are not alleged to have consistently imposed all of the surcharges at issue after a certain date. The lack of concerted action on their part undermines the inference that they joined a global conspiracy to fix all surcharges." *Id.* at p. 36 (citing 🔖 *Standard Iron Works*, 639 F. Supp. 2d at 895).

 **\*23** While the Second R&R's conclusion concerning Hellmann Inc. may rightly be applied to the each of the Hellmann entities, the arguments in the instant motion merit further discussion. First, Hellmann notes the court's finding that the allegations tying Dachser and UPS to the Global Agreement consisted of nothing more than a "conclusory statement that at an unspecified 'later date, [they] joined the Global Agreement to pass on surcharges to their customers,' " and argues that "[t]hat is all that is pleaded as to Hellmann GmbH and Hellmann HK as well." *See* Motion to Dismiss at p. 16 (quoting Second R&R at p. 35).

While not incorrect that the Tenth Claim's allegations connecting Hellmann to the Global Agreement are somewhat sparse, Hellmann's argument overlooks the above passage's broader context. The court's decision to uphold the Tenth Claim against Hellmann did not rest upon the foregoing allegation; to the contrary, regarding both the dismissed defendants *as well as* Hellmann, the court found this allegation to be conclusory and therefore insufficient to establish a plausible claim. *See* Second R&R at p. 35. Instead, it was the fact that the CTAC alleged Hellmann to have "imposed all of the collusive surcharges that formed the global conspiracy other than the security surcharge in Claim 1" that rendered plausible the allegation that Hellmann later joined the Global Agreement, *see id.*, and conversely, that the same did not hold true with regard to the dismissed defendants that led the court to dismiss the Tenth Claim as

against them. *See id.* at p. 36 ("[T]he only factual allegations connecting these defendants to the global conspiracy are the defendants' imposition of some, but not all, of the surcharges at issue in the global conspiracy claim. Unlike Hellman, these defendants are not alleged to have consistently imposed all of the surcharges at issue....").

Hellmann nonetheless disputes the Second R&R's conclusion, arguing that since Hellmann (1) is not alleged to have participated in the Security Surcharge Agreement; and (2) is only mentioned in the caption of the Ninth Claim, it follows that "Hellmann is not alleged to have been part of at least two agreements that form part of the purported Global Agreement," and is therefore similarly situated to the dismissed defendants for purposes of the Tenth Claim. *See* Motion to Dismiss at pp. 16-17. However, as the court has found the Ninth Claim to state a claim as against Hellmann, *see* Section III.C.4, *supra*, there remains only one claim within the Global Agreement (*i.e.* the Security Surcharge Claim) that does not implicate Hellmann. Thus, for purposes of comparison with the dismissed defendants, Dachser is alleged to have joined three of the six conspiracies underlying the Global Agreement (Claims No. 1, 5, and 8); UPS is alleged to have joined four of the six (Claims No. 3, 5, 6, and 8), and Hellmann is alleged to have joined all but the Security Surcharge. [21]

To be sure, then, the distinction between the *number* of conspiracies Hellmann is alleged to have joined (five) and those Dachser and UPS are alleged to have joined (three and four, respectively) is not terribly vast. But a careful review of the chronology of the CTAC's allegations places Hellmann and Dachser/UPS on categorically distinct footing for purposes of the Global Agreement. Significantly, the only conspiracy within the Global Agreement that does not implicate Hellmann, *i.e.* the Security Surcharge Conspiracy, predates each of the other underlying conspiracies. *See* CTAC at ¶¶ 307-14 (referencing October 2001 Security Surcharge meetings). Thus, it is entirely plausible to read the CTAC as alleging that Hellmann, although not getting in on the Global Agreement's ground floor, "*[a]t a later date*, ... joined the Global Agreement to pass on surcharges to their customers," *see* CTAC at ¶ 571 (emphasis added), and was a full-fledged participant in the overarching conspiracy from that point forward. *See* Second R&R at p. 35 ("That Hellman imposed all of the surcharges at issue in the global conspiracy after a certain date makes the plaintiffs' allegation that Hellman 'later' joined the conspiracy plausible at this stage.") (citing Dkt. No. 628 at p. 3 and n.4). In light of its

alleged participation in each of the subsequent component conspiracies, Hellmann's absence from the initial stages of the Global Agreement is not indicative, let alone dispositive, of the notion that it did not join in the Global Agreement.

**\*24** Such a reading, however, does not extend to Dachser and UPS, both of which are absent from the CTAC's allegations concerning multiple component conspiracies arising at various times from 2001 through 2007. Accordingly, Dachser's and UPS's imposition of some of the surcharges falling under the Global Agreement is more plausibly read as incidental to the overarching conspiracy, rather than indicative of their participation in it. Accordingly, Hellmann's contention that it is on similar footing as Dachser and UPS for purposes of the Global Agreement is incorrect. As the court found in the Second R&R, the CTAC has plausibly alleged Hellmann's involvement in the Global Agreement, despite the fact that Hellmann is not alleged to have joined in the Security Surcharge Conspiracy. The court therefore recommends denying Hellmann's argument for dismissal of the Tenth Claim. [22]

### CONCLUSION

The plaintiffs' allegations against Hellmann GmbH and Hellmann HK do not improperly group these entities with Hellmann, Inc., and satisfy the minimum pleading standards necessary to avoid dismissal at the Rule 12(b)(6) stage. However, because the CTAC was filed outside the applicable limitations period and is not salvaged on either fraudulent concealment or relation-back grounds, the claims against Hellmann GmbH and Hellmann HK are time-barred. I therefore recommend that the court grant the motion to dismiss the claims against Hellmann GmbH and Hellmann HK with prejudice.

Copies of this sealed opinion will be provided only to the parties. The plaintiffs shall provide the court with a redacted copy of this opinion that complies with the protective order applicable to this action for public filing within ten days, and with three days notice to the defendants. The plaintiffs should contact the court by telephone for further instructions on how to submit the redacted document.

\* \* \* \* \* \* \* \* \* \* \*

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see, e.g., Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985); *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2nd Cir. 2002); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), *cert. denied*, 113 S. Ct. 825 (1992); *Small v. Secretary of Health and Human Serv.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

### All Citations

Not Reported in Fed. Supp., 2015 WL 13650032

### Footnotes

1    As discussed below, the court has previously issued two reports and recommendations which detail the facts underlying this action. Familiarity with the prior R&Rs is assumed and facts not directly relevant to the instant motion will not be repeated.

2    Although the dismissal motions were submitted before the filing of the SACAC, because the latter consisted of "ministerial changes" from the prior complaint, *see* First R&R at p. 4 n.3, the motions to dismiss were deemed responsive to the SACAC. *Id.*

3    This opinion will refer to the page numbers in the ECF versions of the First and Second R&Rs. The First R&R is also available at *Precision Associates, Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08 Civ. 42 (JG)(VVP), 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011), *report and recommendation adopted*, No.

08 Civ. 00042 (JG)(VVP), 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012), and the Second R&R is available at *Precision Associates, Inc. v. Panalpina World Transp., (Holding) Ltd.*, No. 08 Civ. 42 (JG)(VVP), 2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013), *report and recommendation adopted*, No. 08 Civ. 00042 (JG)(VVP), 2014 WL 298594 (E.D.N.Y. Jan. 28, 2014).

4     One significant point warrants discussion at the outset. Hellmann GmbH and Hellmann HK have correctly pointed out that the Second R&R (as well as the First R&R, for that matter) considered motions that were served before they were named as defendants in this case. To be sure, it might be procedurally improper if the court were to rely on a law-of-the-case theory to address their arguments for dismissal. *See, e.g.*, 🔖 *In re Manhattan Inv. Fund Ltd.*, 310 B.R. 500, 513 (Bankr. S.D.N.Y. 2002) ("The District Court's ruling in that class action is not binding upon the Trustee because she was not a party to that action.") (citing 🔖 *Ackerman v. Schultz*, 250 B.R. 22, 27-28 (Bankr. E.D.N.Y. 2000)); *Bricklayers & Allied Craftsmen, Local Union No. 44 v. Corbetta Const. Co.*, 511 F. Supp. 1386, 1390 (S.D.N.Y. 1981) ("[A]pplication of the [law of the case] doctrine would be particularly inappropriate [in part because] Laborers was not a party to the prior proceeding."). However, although the present opinion invokes—and discusses in considerable detail—the analyses contained in the prior R&Rs, I do not consider those opinions as binding against the newly-named Hellmann GmbH and Hellmann HK. Rather, I refer to the prior R&Rs to obviate the need to begin the instant analysis at square one. Hellmann GmbH's and Hellmann HK's absence from the prior proceedings does not bar the court from doing so. And to the extent Hellmann GmbH and Hellmann HK contend they were not afforded the opportunity to formally object to prior R&Rs, they have had ample opportunity in their submissions on this motion to take issue with the court's previous rulings.

5     Except where otherwise indicated, the court hereinafter refers to Hellmann GmbH and Hellmann HK collectively as "Hellmann."

6     Specifically, the last overt acts to be alleged in connection with each claim asserted against Hellmann occurred as follows: Third Claim: November 2004, *see* CTAC at ¶ 346; Fifth Claim: March 2006, *id.* at ¶¶ 439-40; Sixth Claim: January 2008, *id.* at ¶ 450; Eighth Claim: February 2005, *id.* at ¶ 525; [redacted text] he First Claim, which alleges a final overt act in October 2001. *Id.* at ¶ 314.

7     The court acknowledges that it wrote in the First R&R that "[t]aking the allegations at face value, the plaintiffs continued to buy freight forwarding services from the defendants throughout the entire [class] period," which extended until the filing of the FACAC on July 21, 2009. *See* First R&R at pp. 3, 94. This does not dictate, however, that the conspiracies at issue lasted until that date.

8     Hellmann similarly states that since the plaintiffs "failed to plead facts sufficient to allege conspiratorial conduct on behalf of the Hellmann Defendants, Plaintiffs have failed to plead facts supportive of the first element of fraudulent concealment as to the Hellmann Defendants." Defendants Hellmann Worldwide Logistics GmbH & Co. KG and Hellmann Worldwide Logistics Limited Hong Kong's Memorandum in Support of their Motion to Dismiss Plaintiffs' Corrected Third Amended Class Action Complaint ("Motion to Dismiss") at p. 23.

9     Rule 15(c)(1)(B) requires that "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."

10     The relevant time period is 120 days after the complaint is filed. Fed. R. Civ. P. 4(m).

11     The court agrees that the Advisory Committee Notes betray a concern for situations involving changing, rather than adding, parties. *See* Fed. R. Civ. P. 15 advisory committee's note ("In actions between private parties, the problem of relation back of amendments *changing* defendants has generally been better handled by the courts, but incorrect criteria have sometimes been applied, leading sporadically to doubtful results. Rule 15(c) has been amplified to provide a general solution.") (emphasis added) (internal citation omitted). The Advisory Committee's statement that "a complaint may be amended at any time to correct a *formal defect such as a misnomer or misidentification*" further suggests a narrow, substitution-centric reading of Rule 15. *See id.* (emphasis added).

Case 1:18-md-02865-LAK    Document 445-9    Filed 08/20/20    Page 22 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

12    Plaintiffs also cite as support *VVK Corp. v.* *National Football League*, 244 F.3d 114 (2d Cir. 2001), in which the Second Circuit allowed the addition of a defendant to relate back to the timely-filed complaint. *See id.* at 128-29. However, *VVK Corp.* well predates *Krupski*, and as such, carries limited weight.

13    In view of this conclusion, it is unnecessary to address the question of whether the relation back requirements set forth in Fed. R. Civ. P. 15(c)(1)(B) and Fed. R. Civ. P. 15(c)(1)(C)(I) have been satisfied.

14    For instance, the CTAC alleged that the Panalpina "parent corporation treats its subsidiaries as mere divisions of the company rather than separate entities" and that it exerts "substantial control over its subsidiaries such that it is a single enterprise." *See* CTAC at ¶¶ 140-41.

15    In addition, since the issuance of the Second R&R, both *CRT* and *Flat Panel* have been met with approval.

The court in *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 (YGR), 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014), for example, relied upon these decisions in denying a motion to dismiss premised upon an improper corporate grouping argument. Citing both cases as support, the *Lithium* court wrote that "[t]he mere failure to observe fine distinctions among corporate entities ... does not ... render implausible the suggestion of collusion." *Id.* at *32. It concluded that

"[a]lthough Plaintiffs will need to provide evidence of each Defendants' participation in any conspiracy, they now [*i.e.* at the motion to dismiss stage] only need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy." ... The inference ... that generic references to NEC ... implicate both NEC Corp. and NEC Tokin—is plausible, and the competing inference, that in informal communication defendants' employees carefully delineated between similarly branded corporate entities ... is not.

*Id.* at *34 (quoting *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008)).

16    Hellmann also argues that the CTAC does not support a plausible inference of liability on either corporate veil-piercing or agency theories. *See generally* Motion to Dismiss at pp. 8-12. As stated in the Second R&R, however,

[i]n antitrust cases, courts analyze allegations that group together corporate families under various standards—they look to the standards for agency, for piercing of the corporate veil, or to whether the allegations sufficiently allege that each corporate affiliate individually joined the conspiracy. There is not a clear distinction in the cases between these standards—rather, it depends primarily on the type of case, type of industry, and nature of the antitrust violation.

Second R&R at p. 23.

Accordingly, the paramount inquiry is "whether, based on the allegations, one can plausibly infer that each defendant knowingly joined and played some role in the conspiracy." *See id.* Having answered this question in the affirmative based on the foregoing corporate grouping analysis, the court need not separately address the related doctrines of veil-piercing and agency. *See id.* at p. 24 n.12 (declining to conduct veil-piercing analysis, but noting that "the allegations in the TAC are sufficient to allege that some of the parent defendants here controlled their subsidiaries as to the transactions at issue.") (citing *American Fuel Corp. v. Utah Energy Development Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997)).

17    Hellmann here also rehashes its improper corporate grouping argument, asserting that the NES claim fails because it makes the Hellmann entities "a 'corporate family' unit without alleging a basis for doing so," and accordingly "fail[s] to allege sufficient facts to support a claim of conspiracy" against any of the individual Hellmann entities. *See* Motion to Dismiss at p. 12. In the Second R&R, the court considered the DSV Defendants' similar argument for dismissal which asserted that the plaintiffs "do not allege which corporate entity employed [a DSV representative] nor do plaintiffs allege he was acting for either DSV A/S or DSV Solutions." *See* Dkt. No. 779 at pp. 6-7. Although, as we do here, the Second R&R found this argument to fail "[f]or the reasons discussed in the grouping section above," the court's elucidation for its DSV-specific finding —namely, that the plaintiffs adequately alleged that the DSV parent and a DSV subsidiary "are responsible

Case 1:18-md-02865-LAK   Document 445-9   Filed 08/20/20   Page 23 of 23

Precision Associates, Inc. v. Panalpina World Transport..., Not Reported in Fed....

for the conduct of [a second DSV subsidiary] or independently joined the agreements," *see* Second R&R at pp. 53-54—further supports the court's identical holding here. To wit, the court noted that "[t]he TAC alleges that DSV A/S ... is the parent company of both DSV Solutions and DFDS." *Id.* at p. 54 (citing TAC ¶¶ 59-61). This, coupled with "the allegations of corporate control, the nature of the freight forwarding industry, and the allegations that the participation of corporate affiliates was necessary to the conspiracies" sufficed to "make[ ] it plausible that these defendants acted in concert and individually joined the conspiracies." *See id.* Here too, the CTAC alleges that Hellmann Inc. and Hellmann HK are subsidiaries of Hellmann GmbH, *see* CTAC ¶ 69, and, as noted above, the discussions of corporate control, the nature of the freight forwarding industry, and the necessity of the full participation of corporate affiliates apply with equal force to Hellmann as they did to DSV. So too, therefore, does the conclusion that these entities plausibly "acted in concert and individually joined the conspiracies."

18    The court reached a similar conclusion regarding defendant Geodis' motion to dismiss. *See* Second R&R at pp. 57-58 ("Although the plaintiffs may have barely alleged Geodis' participation in this conspiracy by only alleging that it imposed the collusive surcharges," in light of details as to formation and execution of AMS Conspiracy, plaintiffs' allegations were "enough at this stage to assert a claim against Geodis.") (citing Dkt. No. 628 at p. 3 and n.4).

19    Although, as noted above, the CAF allegations lodged against Hellmann are not particularly robust, it bears restating that they consist of more than a mere reference to Hellmann as one of the CAF Defendants. Thus, the allegation that Hellmann was contacted by a co-defendant in connection with the CAF Conspiracy— coupled with the factors described above—further supports tying Hellmann to the CAF Conspiracy. *See* Second R&R at p. 61 (connecting defendants Kintetsu and Nippon to Peak Season Surcharge Conspiracy on the strength of similar allegations).

Nor is the court's conclusion undermined by the fact that the CTAC fails to establish that a Hellmann representative participated in the CAF meetings and conference call, since the CTAC makes clear that the lists of defendants involved in these proceedings is not exhaustive. *See* CTAC at ¶ 388 (meeting attended by "representatives of *at least*" defendants named therein) (emphasis added); *id.* at ¶¶ 424, 426, 429 (same); *id.* at ¶ 419 (listing, "among others," attendees at August 12, 2005 meeting); *see also* Second R&R at p. 55 (failure to name specific defendant as attending conspiratorial meeting not fatal because defendant was alleged to have imposed surcharge, and list of meeting attendees not exhaustive); First R&R at pp. 48-49 (same); First R&R at pp. 45-46 (allegation that participants in meetings and conference call included "at least" specified defendants indicates that others may have been present).

20    Plaintiffs impliedly made this allegation by writing that the Ocean AMS Defendants—a group which Geodis (and Hellmann, for that matter) is alleged to have belonged—imposed the Ocean AMS surcharge. *See* CTAC at p. 148 and ¶ 558.

21    Because the CTAC alleges that Dachser and UPS, like Hellmann, joined the global conspiracy, but makes no similar reference to BAX and Geodis, *see* CTAC at ¶ 571, the court's analysis will center on Dachser and UPS, rather than BAX and Geodis, since the allegations against the latter are facially distinguishable from those against Hellmann.

22    It bears mention that the court's finding that the CTAC plausibly alleges the Global Conspiracy as against Hellmann lends credence to the plausibility of the component conspiracies as alleged against Hellmann.

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.