# EXHIBIT 4



Neil S. Binder
Binder & Schwartz LLP
366 Madison Avenue  6th Floor
New York, NY 10017

(T) 212.510.7031
(F) 212.510.7299
nbinder@binderschwartz.com

July 13, 2020

**By Email**

Neil J. Oxford
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482

      Re:    *In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Litigation*, 18-md-2865 (LAK)

Dear Neil:

      We write in response to your letter dated July 6, 2020.  In that letter, you seek to make various allegations regarding the discovery undertaken to date by ED&F Man Capital Markets Ltd. ("ED&F").  As set forth in further detail below, those allegations are without merit.

ED&F's Production of Documents Generally

      As you are aware, ED&F is still in the course of producing documents in this litigation.  Specifically, ED&F has been providing documents to your client (Skatteforvaltingen ("SKAT")) on a rolling basis as they have been reviewed.  Insofar as your letter seeks to make general criticisms of the completeness of ED&F's productions, we remind you that those productions are ongoing.  Consequently, many of the gaps you purport to identify will be addressed in the documentation provided by ED&F on the rolling basis, which ED&F represented in its letter to Judge Kaplan would not be complete until October 2020.  We expect to complete production of trade packs this month and to produce a tranche of custodial documents responsive to keywords in the beginning of August 2020 (with further tranches provided on a rolling basis thereafter).  We are making every effort is to provide documents as quickly as practicable.

The Trade Packs

      We have previously agreed to compile and provide key contemporaneous documents in ED&F's possession (1) relating to the trades in Danish shares which are the subject matter of the claims involving ED&F (the "**ED&F Danish Trades**") and (2) evidencing how the ED&F Danish Trades were effected by ED&F on behalf of its pension plan clients (the "**Trade Packs**").  By way of explanation, the Trade Packs comprise the following documentation (the "**Trade Pack Documentation**"):

      (i)    share orders sent by the Pension Plans (the "**PP**s") to ED&F (comprising emails from investment managers acting on behalf of the PPs (the "**PP Investment**



**Managers**") to ED&F's Equity Finance Desk (the "**ED&F EFD**") instructing ED&F to acquire shares on behalf of the PPs);

(ii) share confirmations sent by ED&F to the PPs (comprising emails from the ED&F EFD to the PP Investment Managers confirming (1) the fact of the share acquisition and (2) the terms thereof (including the agreed share price and settlement date));

(iii) confirmation emails exchanged from/to market counterparties evidencing the agreement of the trade, which are variously:

   (a) between the ED&F EFD and the market participant (the inter-dealer broker) from which ED&F acquired the shares;

   (b) between the affiliate inter-dealer broker and the market participant, the ultimate counterparty to the trade (where the shares were acquired from an affiliate inter-dealer broker);

   (c) any relevant pre-ex-date confirmation emails with the market (where the ultimate counterparty was another ED&F client).

(iv) hedging orders (comprising emails from the PP Investment Managers to the ED&F EFD instructing ED&F to obtain hedging to offset the market risk of acquiring shares on the terms agreed;

(v) hedging confirmations (comprising emails from the ED&F EFD to the PP Investment Managers confirming the terms of the hedge ordered pursuant to the email instruction from the PP Investment Managers set out in sub-paragraph (iv) above);

(vi) all entries on ED&F's internal trade booking systems evidencing the relevant trade (including the B-loan statements showing rehypothecation of shares);

(vii) automated MT545 SWIFT messages (confirming receipt of a financial instrument against payment) which show (1) the delivery of the shares from the trade counterparty to ED&F's sub-custodian and (2) payment from ED&F's sub-custodian on the Settlement Date;

(viii) the PP's equity statement on the Ex-Date (showing shares held by the PP on the date the dividend became payable);

(ix) a dividend reconciliation sheet (showing ED&F's calculation of the dividend due to the PP in respect of the shares held on the Ex-Date);



(x) automated MT566 SWIFT messages from ED&F's sub-custodian (confirming delivery and payment of the dividend) and/or emails from the market counterparty to the trade to ED&F's sub-custodian (confirming payment of the dividend to ED&F's sub-custodian); and

(xi) a screenshot from ED&F's internal Shadow software (showing ED&F allocating the dividend to the PP).

The Trade Packs have been collated by the Rosenblatt Ltd. law firm to assist SKAT. Had ED&F provided the Trade Pack Documentation (1) on a piecemeal basis with other unrelated materials and (2) without ensuring that relevant and related categories of documentation recording the ED&F Danish Trades were grouped together, it would have taken SKAT many months to understand the basis on which the ED&F Danish Trades were effected. Your suggestion that the Trade Packs have been "curated" by ED&F for a different self-serving purpose is baseless. As explained above, the Trade Pack Documentation shows that:

(i) the shares referred to in the disputed vouchers were acquired by the PPs on their express instruction;

(ii) the shares were acquired by ED&F on behalf of the PPs as their broker and in its normal course of business;

(iii) the transactions pursuant to which shares were acquired were settled and the shares delivered to ED&F; and

(iv) ED&F's own books and records treated such shares and the dividend received thereon as belonging to the PPs.

ED&F is on target to provide to SKAT the remaining Trade Packs (of which there are 420 in total) by July 31, 2020,

SKAT's Second Requests for Production

Your characterization that ED&F "refused to engage in the meet and confer process" as to your ad hoc request for information regarding the resignation of ED&F's CEO is entirely inaccurate. As reflected in the relevant correspondence, you asked whether ED&F intended to produce documents concerning the resignation of ED&F's CEO, without indicating to which document request you thought such information could be responsive. Based on prior conversations we understood you to be referring to Request 26 and responded that "[i]n order to avoid an unnecessary dispute, and without waiving ED&F's right to object to any other request for production, ED&F will agree that to the extent such documents responsive to Request 26 concern the resignation of ED&F's CEO, Steve Hawksworth, or ED&F's decision to close the equity finance desk, such documents, if they exist, will be produced (unless such document is subject to any privilege or other protection from production, in which case it will be included on

3



a privilege log)."

We understood our agreement to have resolved any dispute on this issue, and you did not indicate otherwise. You have now served additional document requests that you misleadingly state "call again for the production of documents concerning the closure of [ED&F's] equity finance business and resignation of its CEO." This characterization is not correct: prior to the requests sent on July 6, 2020, SKAT had never served a document request seeking documents concerning the closure of ED&F's equity finance desk or the resignation of its CEO.

ED&F's Response to SKAT's First Requests for Production

Regarding the purported issues raised in your letter as to the content of ED&F's document production to date, we repeat the general points made above and address your specific contentions in further detail below.

*Stock records*

Your letter makes several arguments regarding the stock record maintained by ED&F, all of which suggest some confusion on your part as to the content of the Trade Packs. First, it is incorrect, as you contend, that you were told that the Trade Packs would contain the day-to-day holding records of ED&F clients in the form of Shadow extracts. The Trade Packs include Equity Statements which show that the stock holdings were booked to ED&F clients' accounts and constitute ED&F's internal records of the day-to-day holdings of those clients. ED&F will additionally be producing MT536 SWIFT messages, which were received on a daily basis from ED&F's sub-custodian BNP and which confirm the Danish shares held by BNP for ED&F. ED&F is currently gathering these documents (with production expected by the end of August 2020).

Accordingly, your requests for an "extract from that system or systems," for confirmation as to whether Shadow was the "primary record of holdings and trades in the securities at issue in this litigation," and for further information on how Shadow was used by ED&F are beside the point for the purposes of ED&F's production of documents. While Shadow contains ED&F's *internal* bookings of the ED&F Danish Trades,[1] the relevant *external* documents (*i.e.*, the primary records) relating to and confirming the ED&F Danish Trades are the documents contained in the Trade Packs, and the primary records of the day-to-day holdings of ED&F's clients are the MT536 SWIFT messages that ED&F is in the course of locating and producing.

*Alleged back-dating of trades*

Your letter also asks why "ED&F backdated [a] trade, how many other trades relating to securities for which ED&F issued Tax Vouchers were backdated, and why." It is unhelpful as part of a meet and confer process to make such allegations, nor is it the proper forum to litigate

---

[1] We further note that ED&F used Shadow from 2013 forward and used a different system called Sec-Ops in 2012. This is why the records from 2012 may be formatted differently.

4



the case.  However, we note that we are advised that the investment manager made the relevant purchase request orally to the ED&F EFD, prior to sending the email.

*Allegedly opaque extracts from Shadow System*

Your requests for "metadata" from the Shadow database extracts appears to rest on a misunderstanding, as a database is only producible in documentary form if it is queried at the time of production.  Accordingly, no relevant contemporaneous metadata for a database extract exists.  Second, your request for a "complete Shadow extract" implies without basis that the extracts that we have provided as to the trades in question are incomplete—they are not.  We will, moreover, be providing a consolidated Shadow download of the relevant Danish trade bookings in Excel spreadsheet format.  Third, the fact that Rosenblatt produced a separate spreadsheet for ED&F's clients to assist them in identifying their own trades does not mean that the extracts we have produced to the parties in this litigation are not complete.  To the extent you think there is specific data that should have been included in the extracts we have provided, please identify it and we can confirm or deny whether such data exists.

*Alleged deficiencies in the Trade Packs*

    a.    *Missing documents*

Your contention that the Trade Packs produced by ED&F are missing documents suggests a misunderstanding regarding the nature of the documentation contained in the Trade Packs, as discussed above.  For the avoidance of doubt, ED&F states the following in response to each of your specific subsections.

(i)    First, while it is correct that the Trade Packs do not contain "SWIFT messages showing ED&F's stock holdings on a daily basis," the assertion is beside the point.  The Trade Packs are designed to gather the documents evidencing the trades, not the net holdings.  As discussed above, ED&F received SWIFT messages showing the stock holdings of ED&F's clients—the MT536 SWIFT messages—that will be produced separately and will demonstrate the day-end net holdings of ED&F's clients.

(ii)    Second, regarding your contention that the Trade Packs to not "include any information about how the proceeds obtained from SKAT were distributed," we note that account statements for each of the ED&F pension plans were produced on July 10, 2020.

(iii)    Regarding your contention that the trade packs should have been produced with metadata, you misunderstand the representations made by ED&F.  Because the trade packs were assembled by ED&F's counsel, they cannot be produced with metadata.  Underlying standalone documents with metadata will be provided

5



   separately on a rolling basis, along with the other keyword search documents that ED&F is producing.

   b. *Stock lending*

The information provided in the Trade Pack Documentation in relation to stock lending is neither incomplete nor inconsistent with prior explanations provided by ED&F to your firm and the English Court. To provide further background on the Shadow data in the Trade Packs:

   (i) the "Borrow" entries you reference do not reflect the borrowing of shares by ED&F from third parties, but rather reflect the exercise by ED&F of its right to rehypothecate and use the PPs' shares;

   (ii) upon the exercise of ED&F's right of rehypothecation in respect of such shares, the shares were (1) (before the ex-date) returned to and held by the PP, as indicated in the Trade Packs, and (2) were not sold, lent or disposed of by the PP until after the ex-date. The result is that the PP held the shares over the period of time stated in the Tax Voucher;

   (iii) Any "Borrow" is booked to a PP's B-Loan account and not the PP's main trading account. ED&F's "Return" of the shares is therefore recorded in the daily B-loan statement;

   (iv) the "Borrow" is not recorded on the PP's equity statement (referable to the Pension Plan's main trading account) because the PP at all times owned and retained the economic interest in and right to recall the shares.

The shares referred to in your third paragraph were acquired pursuant to an over-the-counter transaction on a principal to principal basis, consistent with ED&F's Re-Amended Defence in the English proceedings. Any suggestion to the contrary rests on a misunderstanding of the trade.

   c. *"Swiss Cheese" complaint*

Finally, your general criticisms of the contents of the Trade Pack Documentation are without merit. As set out in detail above, the basis on which the Trade Pack Documentation has been prepared and are in the course of reviewing the specific points raised in sub-paragraphs (i) to (vi). To the extent that our review indicates that any available documentation is missing from the Trade Pack Documentation, we will produce such documentation to you.

6



Conclusion and Next Steps

      ED&F has worked hard to fulfill its discovery obligations to date in a timely, co-operative and effective manner and to assist the efficient case management of this litigation, particularly taking into account the many millions of documents involved.

      Sincerely,

      Neil S. Binder