**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

In re

CUSTOMS AND TAX ADMINISTRATION OF          MASTER DOCKET
THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND          18-md-02865-LAK
SCHEME LITIGATION

This document relates to:     The cases identified in
                              Appendix A

_____


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION FOR ISSUANCE OF A REQUEST FOR INTERNATIONAL JUDICIAL**
**<u>ASSISTANCE TO OBTAIN EVIDENCE IN DENMARK</u>**

## **TABLE OF AUTHORITIES**

### Cases

*Elliott Assocs. v. Republic of Peru*, Nos. 96 CIV. 7917 (RWS), 1997 WL 436493 (S.D.N.Y. Aug. 1, 1997)..................................................................................................................... 21

*In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244 (S.D.N.Y. 2011) ................................................. 21

*Joseph v. Gnutti Carlo S.p.A.*, No. l 5-cv-8910 (AJN), 2016 WL 4083433 (S.D.N.Y. July 25, 2016).................................................................................................................................. 20

*Lantheus Medical Imaging, Inc. v. Zurich American Ins. Co.*, 841 F. Supp. 2d 769 (S.D.N.Y. 2012).............................................................................................................................. 20, 21

*Pearlstein v. BlackBerry Ltd.*, 332 F.R.D. 117 (S.D.N.Y. 2019) ................................................. 20

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522 (1987) ...................................................................................................................... 21

### Statutes

28 U.S.C. § 1781................................................................................................................... 20

### Other Authorities

U.S. Dep't of State, Office of the Legal Advisor, Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 2012 (2012) ................ 21

### Rules

Fed. R. Civ. P. 26................................................................................................................ 20

Defendants respectfully submit this memorandum of law in support of their motion (the "Motion") for the issuance of letters of request to obtain testimony from non-party witnesses in Denmark pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Evidence Convention").  Proposed forms of Letters of Request are attached as Exhibits 1 through 14 to the Declaration of Sharon L. McCarthy, dated March 6, 2021 ("McCarthy Decl.").

SKAT does not oppose this motion with respect to the requests for discovery of Dorthe Pannerup Madsen, René Frahm Jørgensen, Laurits Cramer, Jens Sørensen, and Helen Sørensen, but intends to oppose the request as to the remaining witnesses.

## I.        PRELIMINARY STATEMENT

Plaintiff SKAT has brought suit in this Court to recover an alleged $2.1 billion that it claims Defendants and others deceived it into paying in the form of refunded dividend withholding tax.  Although SKAT claims it first learned of irregularities in the payment of dividend withholding tax refunds in June 2015[1], there were repeated ignored internal warnings about the severe lack of resources and internal controls within the dividend tax refund apparatus since at least 2006.  Indeed, documents and witness statements reveal that years before the alleged period of conduct, SKAT was aware that it lacked the ability to independently verify the ownership of stocks associated with reclaim applications, or to confirm whether dividend taxes had in fact been withheld with respect to such stocks.  SKAT knew that it was effectively refunding withholding tax reclaims blindfolded, and suspected that it was paying reclaims to shareholders without assessing whether they were entitled to them.  No matter, rather than heed

---

[1] *See, e.g.*, Am. Compl. ¶ 6, *Skatteforvatltningen v. Bernina Pension Plan & John van Merkensteijn*, No. 19-cv-01865, Dkt. No. 53 (S.D.N.Y. Apr. 20, 2020), McCarthy Decl. Ex. 15.

the repeated warnings from within, the Danish government chose to continue the refund regime. This decision bears directly on SKAT's equitable claims, and on defenses relating to causation, failure to mitigate, contributory or comparative fault, the statute of limitations, and even the revenue rule.  SKAT's retroactive repudiation of the refund processing regime in this case also makes its allegations of fraud particularly disingenuous.

Defendants seek the assistance of this Court in issuing letters of request seeking testimony from the following individuals with personal knowledge of the facts relevant to a resolution of this matter: [2]

1.   Dorthe Pannerup Madsen
2.   René Frahm Jørgensen
3.   Leif Normann Jeppesen
4.   Jette Zester
5.   Birgitte Normann Grevy
6.   Richard Hanlov
7.   Laurits Cramer
8    Jens Sørensen
9.   Peter Loft
10.  Kjeld Rasmussen
11.  Ivar Nordland
12.  Carl Helman
13.  Helen Sørensen
14.  Ditte Juulsgaard Andersen

As described in more detail below, the testimony of each of these witnesses is essential to establish the full extent to which SKAT and the Ministry of Taxation were aware of the risks and problems associated with the inadequate controls, the various proposals made since at least 2006 to remedy these risks, and the ultimate decisions to reject these proposals.

---

[2] Defendants requested that SKAT voluntarily produce for deposition those individuals on this list who are former SKAT employees:  Ms. Madsen, Mr. Jørgensen, Mr. Jeppensen, Ms. Zester, Ms. Grevy, Mr. Hanlov, Mr. Cramer, and Mr. Sørensen.  SKAT declined, notwithstanding its knowledge that the choice of forum in this matter rendered all of these witnesses beyond the subpoena power of this Court.

## II.   BACKGROUND

### A.   SKAT Paid Refunds Without Verification

Warnings about the critically underdeveloped Danish system for dividend reclaim administration began as early as 2002, when Lisbeth Rømer, the newly-installed head of the dividend tax unit within SKAT, began sounding alarm bells.[3]  According to Rømer, SKAT had no ability to verify whether any of the information on a reclaim application submitted by a foreign shareholder was accurate.  Specifically, SKAT had no ability to identify the foreign shareholder, whether they actually owned the shares or received the dividends in question, or whether the Danish government actually received the dividend tax withholdings for which a reclaim was being sought.[4]  Explained Rømer, "[t]here is no one whose work directly touched upon this situation who did not know that payments were being made blindly."[5]

Although she had previously raised concerns to her superiors, in 2006, Rømer wrote a formal memorandum in 2006 in response to a specific reclaim application by a small French company claiming to own 50% of all tradeable shares of a particular Danish security.[6]  Rømer outlined why SKAT had no ability to verify the fundamental facts alleged in the reclaim application and yet was poised to refund over a half billion Danish kroner without any serious investigation.[7]  The memo was circulated up the chain of command and reviewed by several

---

[3] SKAT has agreed to produce Lisbeth Rømer for a deposition.  The date for this deposition is still being negotiated.

[4] Tr. of Episode 1, *The Secret Shareholders*, DR (Nov. 6, 2020), https://www.dr.dk/radio/p1/de-hemmelige-aktionaerer, at 14:00, 18:00, McCarthy Decl. Ex. 17.

[5] *Id.* at 7:30.

[6] *Id.* at 16:30.

[7] *Id*.

3

senior officials, including SKAT's legal director, Leif Norman Jeppesen.[8]  Jeppesen, for his part,

wrote his own "Early Warning" memorandum and raised additional legal concerns about

beneficial ownership of dividends associated with borrowed shares, and SKAT's lack of

controls.[9]  SKAT failed to act on those warnings and the reclaim was paid to the French

applicant.

    Around the same time, Rømer and a colleague, Jette Zester, drafted an almost 30-page set

of policy proposals to improve SKAT's controls.[10]  This document, entitled the

"Problemkatalog," was also circulated within SKAT management, where it collected dust.  The

suggested reforms appear to have conflicted with a government policy to reduce administrative

burdens and to attract investors.[11]

    In 2010, an internal audit of SKAT's dividend withholding tax reclaim function was

completed.  Consistent with the prior warnings from Rømer, Jeppesen, and others, the 2010

Audit Report[12] made the following key observations:

- Omnibus accounts and nominee accounts mean that the real owners of
  the shares are not known, so SKAT pays refunds without proof of
  ownership and actual distribution.[13]

- SKAT does not carry out checks on whether the investor in question is
  actually a shareholder in the company in question or whether the
  investor in question is in fact liable for tax in the foreign country.  The

---

[8] *Id.* at 19:00.

[9] *Id.* at 43:00.

[10] Tr. of Episode 2, *The Secret Shareholders*, DR (Nov. 6, 2020), https://www.dr.dk/radio/p1/de-hemmelige-aktionaerer, at 2:30, McCarthy Decl. Ex. 18.

[11] *Id.* at 3:30.

[12] SKAT initially produced only a Danish-language version of the 2010 Audit Report (the "2010 Audit Report").  A copy of that document is attached as Ex. 19 to the McCarthy Decl.  On January 15, 2021, SKAT produced an English translation of the 2010 Audit Report, which is attached as Ex. 20 to the McCarthy Declaration.  All references to the 2010 Audit Report are to the English translation.

[13] 2010 Audit Report, § 7.3.1, McCarthy Decl. Ex. 20.

form is reviewed by SKAT to check whether all information is included. The refund is then paid.[14]

- There are no automatic reconciliations in SKAT's systems between declarations and reports.  No manual reconciliations occur either.[15]

- A 2005 audit of the dividend tax function warned that it was possible for dividend recipients to receive dividend tax, even if the withheld dividend tax had not been paid to SKAT.[16]

- The use of Omnibus accounts means that several dividend notes are printed for a single share.  There is no check as to whether dividend tax is requested more than once per share.[17]

The 2010 Audit Report recommended the establishment of a central process management structure, as well as the creation of a control environment that "ensures that there is consistency between declaration and reporting."[18]

One of the specific policy proposals that Rømer and others at SKAT had been advocating for years was to provide for real-time reporting of dividends to SKAT.  For many years, dividend payments were reported to SKAT on an annual basis, and the report due date was not until January of the year *following* the year in which dividends were paid.[19]  Accordingly, it was impossible for SKAT to know, for example, in March whether a dividend reclaim application received and purportedly relating to a February dividend was genuine.  Rømer and her colleagues had been trying to institute a system of real-time reporting by the banks, but they were met with resistance at every level.  Finally, in 2009, the Danish parliament passed

---

[14] *Id*.

[15]  *Id*. § 7.2.4.

[16] *Id*. § 7.6.3.

[17] *Id*.

[18] *Id*. § 9.

[19] Tr. of Episode 1, *The Secret Shareholders*, at 12:30–20:00, McCarthy Decl. Ex. 17.

legislation granting the Minister of Taxation the authority to change, by ministerial order, the reporting deadline to provide SKAT with more timely information.[20]  That order was not signed until late 2012, when then-Minister of Taxation, Holger K. Nielsen, finally signed it.[21]  The signing of the order did not come close to addressing the myriad problems identified in the Problemkatalog, and not only did dividend tax refunds increase each year after 2012, but warnings about SKAT's administration of the reclaim process persisted.  *See* Dkt. 544 McCarthy Decl., Ex. 3 at 2.

**B.      The Potential Witnesses Have Relevant Knowledge**

      1.    <u>Dorthe Pannerup Madsen</u>

At the end of 2013, Rømer retired from SKAT.  Her responsibilities as head of the dividend tax office then fell to Dorthe Pannerup Madsen, a 30-plus year veteran of SKAT.[22]  Madsen oversaw the office during the key period of time when the volume of dividend tax reclaims increased substantially.[23]  Indeed, she oversaw the office during the period of time in which SKAT paid out most of the reclaims at issue in this litigation.  While head of the dividend tax office, Madsen communicated with at least one representative of the reclaim agents who submitted the very reclaim applications at issue in this matter.  Specifically, Madsen

---

[20] Tr. of Episode 4, *The Secret Shareholders*, DR (Nov. 6, 2020), https://www.dr.dk/radio/p1/de-hemmelige-aktionaerer, at 11:00, McCarthy Decl. Ex. 21.

[21] Tr. of Episode 6, *The Secret Shareholders*, DR (Nov. 6, 2020), https://www.dr.dk/radio/p1/de-hemmelige-aktionaerer, at 5:00, McCarthy Decl. Ex. 22.

[22] Mathias Sommer, *Tidligere leder I Skat om udbytteskandalen: Det hele var så uvirkeligt*  [*Former head of Tax on the dividend case: It was all so unreal*], DR (Sep. 24, 2019), https://www.dr.dk/nyheder/penge/tidligere-leder-i-skat-om-udbyttesagen-det-hele-var-saa-uvirkeligt, McCarthy Decl. Exs. 23, 24.

[23] *Id*.

communicated with Camilo Vargas of Syntax GIS.  Vargas reached out to Madsen in 2014 "on behalf of . . . US Pension Funds" seeking advice in connection with filing reclaim applications.[24]

In 2015, when news of the alleged fraud began to become public, Madsen was dismissed from her post at SKAT.[25]  Reflecting on her dismissal, Madsen recalls:  "I broke down and cried with my colleagues.  I did not understand the situation."[26]  In late September 2019, Madsen testified before the Danish Commission on Inquiry into Tax (the Commission).  Defendants seek to examine Madsen regarding her oversight of the dividend tax office and her touchpoints with the payments at issue here.

2.   René Frahm Jørgensen

René Frahm Jørgensen served as the deputy director of the Payment and Accounting section of SKAT from 2013 until he was dismissed in the autumn of 2015.[27]  In this role, he oversaw the disbursement of refunded dividend taxes.  Jørgensen was also responsible for approving, on a monthly basis, account statements that were sent to the Ministry of Taxation and to the National Audit Office.[28]  During Jørgensen's tenure, refunds of dividend tax grew from about DKK 2.7 billion in 2013 to approximately DKK 6.1 billion in 2014.[29]  In just the first seven months of 2015, Jørgensen's department issued another DKK 8.7 billion in reclaims.[30]  On

---

[24] E-mail from Dorthe Pannerup Madsen to Sven Nielsen (Apr. 24, 2014) (SKAT_MDL_001_00253505), McCarthy Decl. Ex. 25.

[25] *Id*.

[26] *Id*.

[27] Mathias Sommer and Jakob Ussing, *Tidligere skattedirektør i skudlinjen: Godkendte månedsregnskaber, mens pengene fossede ud af statskassen* [*Former Tax Director in the firing line: approved monthly accounts while the money flowed out of the treasury*], DR (Apr. 30, 2019), https://www.dr.dk/nyheder/penge/tidligere-skattedirektoer-i-skudlinjen-godkendte-maanedsregnskaber-mens-pengene, McCarthy Decl. Exs. 26, 27.

[28] *Id*.

[29] *Id*.

[30] *Id*.

more than one occasion during this time, the monthly account statements that Jørgensen approved purportedly showed that more was refunded than was collected in tax payments.[31] Nevertheless, Jørgensen generally reported that the difference between revenues and disbursements was "reasonable" and he did not flag the issue for his superiors.[32]

Jørgensen testified before the Commission on Inquiry into Tax on April 30, 2019.[33]  In his testimony, Jørgensen allegedly blamed significant budget cuts as an impediment to the proper administration of the department he oversaw.[34]  These cuts appear to have been compounded by SKAT's botched rollout of a new computer accounting infrastructure that, during the relevant period, actually required Jørgensen's short-staffed office to manually compute huge volumes of interest accruals.[35]  Meanwhile, Jørgensen allegedly disclaimed responsibility for implementing control measures outlined in a 2013 internal audit report.[36]  Jørgensen's understanding of the fundamental deficiencies in SKAT's processes and his oversight of refund payments at a time when there appeared to be vulnerabilities in SKAT's systems will bear directly on Defendants' arguments that SKAT's failures were both known and avoidable.

3.   Leif Normann Jeppesen

Leif Normann Jeppesen was the new director of SKAT's legal department in 2006 when Rømer wrote to warn of the small French company's application claiming to have owned half of the shares of a Danish security.  Jeppesen shared Rømer's concern that the French company had

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

concealed its identity from authorities through the use of omnibus or nominee accounts.[37]

Jeppesen further identified a risk that the shares were lent to the applicant, and were not owned.[38]

He forwarded Rømer's memorandum up the chain to the most senior lawyer at SKAT along with

a note that specifically referenced a risk of fraud.[39]  Commenting on the lack of controls in place

at the time, Jeppesen recalled: "I was surprised that there was such a discrepancy between the

control measures available and the magnitude of the actual payments.  We simply cannot

perform those checks when we're dealing with owners whose names we cannot establish.  That

is self-evident."[40]

Jeppesen also wrote the 2007 Early Warning memorandum raising serious concerns

about the issues raised by borrowed shares and beneficial ownership.  To Jeppesen's mind, it was

possible for that little French company (or any other foreign reclaim applicant) to execute a

declaration attesting to facts which, under the foreign jurisdiction's rules, would suggest

entitlement to a dividend reclaim, but that still would not establish entitlement as a question of

*Danish tax law*.[41]  In particular, borrowed shares gave rise to precisely this risk, according to

Jeppesen.  Jeppesen circulated these warnings within SKAT almost a decade prior to the alleged

discovery of any fraud.  Thus, by early 2007, it was already clear to Jeppesen that SKAT was

open to significant risks and was not equipped to manage them, prompting him to call for an

---

[37] Tr. of Episode 1, *The Secret Shareholders*, at 26:00, McCarthy Decl. Ex. 17.

[38] *Id*. at 27:00.

[39] *Id*. at 29:30.

[40] *Id*. at 31:00.

[41] *Id*. at 43:00–43:30. ("The declaration might well be compliant; especially when it comes to foreign authorities or institutions issuing declarations, such declarations can perfectly well be compliant from the point of view of the relevant country's rules. However, that does not mean that the Danish tax rules in the area in question are being complied with.").

overhaul of the system.[42]  Defendants ought to be permitted to explore with Jeppesen how he

responded to Rømer's warnings, his understanding of Danish tax law and the prerequisites to

establishing that a shareholder is a beneficial owner of Danish shares such that she is entitled to

the dividend (and withheld tax), and his knowledge of how market activity might bear on

SKAT's need to alter its controls.

      4.    <u>Jette Zester</u>

      Jette Zester was a special consultant at SKAT who was responsible for ensuring that

SKAT received the information it needed and avoided control deficiencies.[43]  Along with Lisbeth

Rømer, Zester was a principal architect of the 2006 Problemkatalog that outlined proposals for

addressing the control gaps within SKAT's dividend function.[44]  Zester's efforts in this regard

began as early as 2002, and they continued for more than a decade.[45]  For example, one of

Zester's proposals for eliminating SKAT's blindness to the identity of foreign shareholders was

to abolish the use of nominee accounts.[46]  In another, Rømer and Zester proposed moving the

deadline for reporting dividend payments forward so that it would align with SKAT's schedule

for payment of refunds and provide some basis for verifying the information in the reclaim

applications. [47]  According to Zester, the warnings that SKAT was paying refunds blindly were

"brushed aside" by the Ministry of Taxation because the proposals "would make extra work for

---

[42] *Id*. at 47:30.

[43] Tr. of Episode 2, *The Secret Shareholders*, McCarthy Ex. 18, at 2:00.

[44] *Id*. at 2:30.

[45] *Id*.

[46] *Id*. at 24:30.

[47] Tr. Episode 3, *The Secret Shareholders*, DR (Nov. 6, 2020), https://www.dr.dk/radio/p1/de-hemmelige-aktionaerer, at 22:00, McCarthy Decl. Ex. 41.

the banks."[48]  Her testimony on what warnings she raised and why, apparently, they were not

addressed, is plainly relevant to the facts critical to this case.

     5.    <u>Birgitte Normann Grevy</u>

     Birgitte Normann Grevy was a SKAT employee under Lisbeth Rømer who worked in

bookkeeping.[49]  Grevy was responsible for the accounting of reports and payments of dividend

tax.[50]  In testimony before the Commission, Grevy spoke critically of the lack of control and

resources in her department.[51]  Grevy likely corresponded and met with members of a working

group concerning an Internal Audit report related to dividend tax in early 2014.  In May 2014,

Grevy sent an email noting that "there are large payouts in April May and June."[52]  Grevy likely

participated in a meeting with Madsen and Sven Nielsen on August 25, 2015, concerning

SKAT's investigations into allegations of fraudulent refunds.  Defendants seek to take Grevy's

testimony about the purported lack of controls and resources at SKAT.

     6.    <u>Richard Hanlov</u>

     Richard Hanlov was the deputy director of SKAT in charge of development.[53]  He served

in this role up through September 24, 2015, when he was dismissed and then investigated by

---

[48] *Id*. at 33:30s–34:00.

[49] Asger Skovdal Jepsen, *Afhøringer i udbyttesagen: Knappe ressourcer, rodede IT-systemer og manglende kontrol skabte kaos* [*Interrogations in the dividend case: Scarce resources, cluttered IT systems and lack of control created chaos*], Berlingske (Mar. 19, 2019), https://www.berlingske.dk/business/afhoeringer-i-udbyttesagen-knappe-ressourcer-rodede-it-systemer-og, McCarthy Decl. Exs. 30, 31.

[50] *Id*.

[51] *Id*.

[52] *Advokatundersøgelse* ("Bech-Bruun Report") at 374, McCarthy Decl. Ex. 42

[53] Jakob Ussing, *Tidligere chef i Skat beskylder Karsten Lauritzen for politisk indblanding i hjemsendelser* [*Former head of Tax accuses Karsten Lauritzen of political interference in repatriations*], DR (May 22, 2019), https://www.dr.dk/nyheder/penge/tidligere-chef-i-skat-beskylder-karsten-lauritzen-politisk-indblanding-i-hjemsendelser, McCarthy Decl. Exs. 32, 33.

Danish authorities.[54]  In testimony before the Commission on May 22, 2019, Hanlov accused former Minister of Taxation Karsten Lauritzen of politically-motivated interference in connection with that decision.[55]  SKAT apparently contemplated moving responsibility for a part of the dividend tax function under Hanlov's control; however, that change was never implemented because SKAT could not provide the extra 70 people Hanlov required to complete the task.[56]  Instead, Hanlov supervised an IT function within SKAT and claims to have proposed an IT project that may have helped SKAT avoid some of the problems it later claimed to have identified.[57]  Hanlov's understanding of why he was deprived of the opportunity to take on meaningful oversight responsibility for SKAT's dividend tax function—and the changes he sought to implement—is relevant to the claims and defenses at issue.

       7.    <u>Laurits Cramer</u>

Laurits Cramer was a chief consultant at SKAT's dividend tax center until the end of 2013.[58]  Cramer has spoken openly of how SKAT acted blindly when it paid out billions of Danish kroner in refunds to foreign shareholders.[59]  Further, Cramer claims that he and his colleagues warned SKAT management for years of the control problems and the risks they posed.[60]  Specifically, Cramer recalled that nobody in his office knew how to verify whether a

---

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] Rasmus Bøttcher Christensen, *Tidligere medarbejder i Skat om milliardsvindel: - Det var en åben ladeport* [*Former employee of Skat about billion fraud: It was an open charging port*] DR (Sept. 3, 2015), https://www.dr.dk/nyheder/penge/tidligere-medarbejder-i-skat-om-milliardsvindel-det-var-en-aaben-ladeport, McCarthy Decl. Exs. 36, 37.

[59] *Id.*

[60] *Id.*

stamp from a foreign jurisdiction was authentic, and Cramer recounted instructions to just push through anything with a stamp of any kind.[61]  Further, Cramer noted that resource constraints, including a very small staff, precluded any sort of meaningful review of dividend reclaim applications.[62]  Cramer was also a member of a working group on dividend tax, tasked with addressing the 2010 Audit Report.  Cramer attended various meetings of the working group in 2011.  In a note from Rømer to Jørgensen on June 4, 2013, addressing, in part, refunds paid to foreign shareholders, Rømer wrote that "Laurits Cramer … prepares everything and is the one who knows most about everything."[63]  In that regard, Cramer is knowledgeable about the events in issue and Defendants are entitled to understand why Cramer's unit was so ill-prepared to assess refund applications.

### 8.   Jens Sørensen

Jens Sørensen was a director within SKAT from January 2009 until he, too, was removed from his position in September 2015.[64]  Between 2013 and 2015, Sørensen served as the Director of Recovery within SKAT.  As such, the dividend tax unit overseen by Lisbeth Rømer and then Dorthe Pannerup Madsen, was within his functional control.[65]  The precise chains of command and division of responsibility between the dividend tax unit and Sørensen's office are not clear.[66]

---

[61] *Id.*

[62] *Id.*

[63] Bech-Bruun Report at 319, McCarthy Decl. Ex. 42.

[64] Mathias Sommer, *Arbejdsgruppe i Skat 'løste' problemerne: Samtidig fossede udbytte-milliarder ud af statskassen* [*Working group in Tax 'solved' the problems : At the same time, dividend billions flowed out of the treasury*], DR (Mar. 4, 2020), https://www.dr.dk/nyheder/penge/arbejdsgruppe-i-skat-loeste-problemerne-samtidig-fossede-udbytte-milliarder-ud-af, McCarthy Decl. Exs. 34, 35.

[65] *Id.*

[66] *Id.*

13

Sørensen was ostensibly in charge of working groups tasked with addressing the concerns raised in the 2010 Audit Report and in a second critical audit report issued in 2013.[67] Witnesses who testified before the Commission stated that Sørensen was responsible for addressing those concerns.[68] However, it appears that the working group formed in response to the 2013 audit report did not take robust action, and the quarterly reports to the Executive Committee suggest regular postponements of the group's work.[69] Defendants seek to understand Sørensen's account of these working groups designed to improve SKAT's processes, the deficiencies it was seeking to ameliorate, and its failure to do so before 2015.

9.   Peter Loft

Peter Loft was the Head of Department, the Ministry of Taxation's chief civil administrative official, until March 2012, when he was replaced by Jens Brøchner (who SKAT has agreed to produce for a deposition in this case without the need for resort to letters rogatory).[70] In 2009, Loft was informed of high volumes of dividend withholding tax refunds issued to foreign shareholders.[71] Loft did not sweep this knowledge under the rug. He was so concerned, in fact, that he ordered an internal audit to investigate further.[72] The result was the 2010 Audit Report, described above, which was submitted to Loft's attention in May 2010. Of course, the conclusions of the 2010 Audit Report could not have been more clear. SKAT had no control over foreign shareholders claiming dividend tax reclaims, and no ability to check whether

---

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] Jakob Ussing, *Tidligere skatte-topchef: Jeg har et medansvar – men det er der flere, der har* [*Former chief tax officer: I have a co-responsibility - but there are several who have*] DR, (Oct. 27, 2020), https://www.dr.dk/nyheder/penge/tidligere-skattechef-jeg-har-et-medansvar-men-det-er-der-flere-der-har, McCarthy Decl. Exs. 28, 29.

[71] *Id.*

[72] *Id.*

14

more than one reclaim was submitted or paid per share.[73]  Loft then served as chairman of the audit committee established to monitor compliance with the Report's recommendations.[74]

And yet, the warnings of the 2010 Audit Report largely went unheeded.  In testimony before the Commission in October 2020, Loft acknowledged his role in failing to close the gaps, but also confirmed that the 2010 Audit identified the weaknesses in dividend refund administration that led to the alleged losses in the future, explaining:  "[w]hen you know how it all ended five or six years later, you cannot help but be annoyed that I was not a little more aggressive in my follow-up."[75]  Loft maintained that several others shared responsibility, and that he relied upon others to follow up with answers to his questions, which he never received.[76]  Loft's testimony will help complete Defendants' understanding of what SKAT knew and how it responded to the warnings contained in audit reports.

  10. <u>Kjeld Rasmussen</u>

Kjeld Rasmussen served as the head of the Ministry of Taxation's internal auditing unit, the SIR, between 2010 and 2013.[77]  According to news reports of testimony before the Commission, Rasmussen and his department did not enjoy the confidence of Jens Brøchner, successor to Peter Loft, chief civil servant within the Ministry, and Rasmussen's ultimate supervisor.[78]  Indeed, Brøchner appears to have thought so poorly of the quality of SIR's work

---

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] Mathias Sommer, *Rigsrevisor revser vigtig vagthund: Risiko for milliardsvindel nåede aldrig frem til de ansvarlige* [*Auditor General reprimands important watchdog : Risk of billion-dollar fraud never reached those responsible*] (Nov. 10, 2020), https://www.dr.dk/nyheder/penge/rigsrevisor-revser-vigtig-vagthund-risiko-milliardsvindel-naaede-aldrig-frem-til-de, McCarthy Decl. Exs. 38, 39.

[78] *Id.*

that he largely ignored Rasmussen for an entire year.[79]  Meanwhile, SIR is the office that

conducted the reviews of SKAT and produced the critical 2010 and 2013 audit reports

identifying the serious control gaps and administrative failures.  Clearly, Rasmussen was aware

of the risks.  By ignoring Rasmussen and his department at any level, Brøchner likely missed

additional warnings from Rasmussen and his team about the myriad challenges facing SKAT.[80]

Defendants should be able to take Rasmussen's testimony to better understand the SIR audit

reports that his office prepared, and the actions taken—and not taken—in response.

      11.    <u>Ivar Nordland</u>

     Ivar Nordland was the head of the Ministry of Taxation's international office.[81]  When he

learned of a compromise proposal by Rømer and the Danish Banker's Association that would

have required certain verifications by Danish banks on behalf of reclaim applicants (the "net

settlement scheme"), Nordland stepped in and put a halt to further action.[82]  Nordland had

serious questions about the practical operation of the net settlement scheme and its overall ability

to provide value to SKAT.  In response to Nordland's questions, Rømer explained that she and

her colleagues had, for years, been paying refunds blindly; the net settlement scheme would have

allowed SKAT to exercise some control and limit the possibility for unlimited, duplicative

refund payments – a possibility against which SKAT then had no defense.[83]  Nordland was

concerned that the net settlement scheme effectively handed SKAT's control over dividend tax

---

[79] *Id*.

[80] *Id*.

[81] Tr. of Episode. 5, *The Secret Shareholders*, DR (Nov. 6, 2020), https://www.dr.dk/radio/p1/de-hemmelige-aktionaerer, at 30:30, McCarthy Decl. Ex. 40.

[82] *Id*. at 33:30.

[83] *Id*. at 34:00–35:00.

administration to the banks.[84]  Ultimately, Nordland cut off communications with Rømer and

advised her that she would need to pursue change through the normal chain of command.[85]

Understanding why Nordland made that determination is critical to Defendants' understanding of

the facts and cannot be gleaned from Rømer's testimony.

  12. <u>Carl Helman</u>

  Carl Helman was a lawyer for the Ministry of Taxation.  From at least 2007 to 2008, he

participated in a variety of communications regarding problems with dividend withholding tax

refund administration.  For instance, in September 2007, he received a memorandum "warning

that SKAT's dividends unit in Ballerup was refunding dividend tax despite not having any

information about who the dividend recipients were."[86]  In his words, "Lisbeth Rømer … had

come forward and once again drawn attention to some problems relating to [her] unit and the

rules she was required to administer.  And so I was asked to look into the hows and whys and

give the issue a good all-round examination."[87]  He analyzed memoranda from SKAT explaining

that "it was impossible to verify whether applicants were in fact shareholders who were entitled

to a refund of Danish dividend tax and should have the money disbursed to them."[88]  He also has

knowledge of the Ministry of Taxation's response to these issues.  He is aware of SKAT's early

concerns regarding fraud in the dividend withholding tax refund process.  Indeed, he was one of

the employees at the Ministry of Taxation responding to the concerns of Rømer and other SKAT

employees.

---

[84] *Id*. at 3:30.

[85] *Id*. at 36:00

[86] Tr. of Episode 3, *The Secret Shareholders*, at 5:00, McCarthy Decl. Ex. 41.

[87] *Id.* at 5:30.

[88] *Id.* at 6:30.

In addition, Helman is familiar with the results of studies by economists at the Ministry who determined that large amounts of refunds were paid to foreign shareholders.  Helman has also taken some ownership for the deficiencies at SKAT:  "When I hear that Denmark has been defrauded to the tune of many billions, I think back to hearing Lisbeth Rømer warning that, if nothing was done about this, it would end in massive tax fraud in this area. … I realised from the start that she was right and that we should have listened more to her.  And obviously, one might say, I also think I have personal responsibility for this."[89]  Defendants ought to be permitted to examine Mr. Helman about the warnings he received, the explanation for his failure to adequately respond to those warnings, and the problems that plagued SKAT's administration of the dividend withholding tax reclaim process.

13.    Helen Sørensen

Helen Sørensen is a product manager at VP Securities, the Danish central securities depository, which has played a role in the dividend tax refund system in Denmark.  Defendants understand that Ms. Sørensen serves as a member of a working group at the Danish Ministry of Taxation tasked with designing a new dividend tax system.

Ms. Sørensen would provide relevant testimony on a range of topics related to dividend withholding tax refund administration.  First, she could testify as to the "VP scheme" a method through which claimants could request dividend withholding tax refunds—possibly in addition to requesting refunds through the "form scheme" that SKAT alleges was the target of fraud.  More specifically, given her position at VP Securities, Ms. Sørensen could testify as to Danish securities processes and regulations relevant to the transactions in this case, including net

---

[89] Tr. Episode 6, *The Secret Shareholders*, at 35:30, McCarthy Decl. Ex. 22.

settlement, book entry, dematerialized shares, share ownership, dividend entitlement, stock

lending and/or short selling, and entitlement to dividend withholding tax refunds, including how

VP and SKAT verify facts, if at all, related to these topics.  Ms. Sørensen could testify as to VP's

interactions with broker-custodians who played roles in the transactions at issue in this litigation,

VP's knowledge of ownership of shares in the custody of those broker-custodians, and netting

transactions within custodian banks.  Third, Ms. Sørensen could testify as to her work as a

member of a working group at the Ministry of Taxation tasked with designing a new dividend

tax system, including her knowledge as to any efforts to eliminate fraud.

      14.    <u>Ditte Juulsgaard Andersen</u>

      Ditte Juulsgaard Andersen is a caseworker at the Danish National Tax Tribunal (DNTT)

who had responsibility for reviewing SKAT's decision to reverse or revoke the reclaims issued

to certain pension plans, including several at issue in this case.  Ms. Andersen is likely to be

knowledgeable about SKAT's basis for believing the reclaims ought to be rescinded and her

view of the basis for that determination.  Moreover, having been personally involved with

several plans involved in these proceedings, Ms. Andersen can speak to the DNTT's position as

to the facts concerning any claimed deficiencies in those plans' reclaim requests.  Defendants

ought to be permitted to explore these topics through Ms. Andersen's testimony.

*     *     *

      To the extent that these witnesses have offered testimony before the Commission,

Defendants have not been able to secure copies of it, and, critically, it does not appear that such

testimony was given under oath.  Defendants now seek additional information from these

witnesses.  None of these witnesses is a party to this lawsuit, and all are foreign citizens and not

otherwise subject to the jurisdiction of this Court.  Therefore, Defendants to seek to obtain

19

evidence under the Hague Evidence Convention.  At this time, Defendants do not contemplate bringing additional requests for assistance.

### III.     LEGAL STANDARD

Letters rogatory provide the means for a court in one country to formally request a court in another country to lend it judicial assistance in obtaining evidence or performing some other judicial act.  *Lantheus Medical Imaging, Inc. v. Zurich American Ins. Co.*, 841 F. Supp. 2d 769, 775-76 (S.D.N.Y. 2012).  Rule 28(b)(l)(B) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1781(b)(2) authorize federal courts to issue letters rogatory to enable a U.S. litigant to obtain non-party evidence from a foreign entity.  Letters may be sent directly from this Court without transmittal by the State Department.  28 U.S.C. § 1781(b)(2).

In considering an application for issuance of letters rogatory, United States courts apply the discovery principles embodied by Rule 26.  A party may seek discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  The party seeking discovery bears the burden of demonstrating that the evidence sought is relevant, but that burden "is not heavy."  *Pearlstein v. BlackBerry Ltd.*, 332 F.R.D. 117, 120 (S.D.N.Y. 2019).  "While not 'unlimited, relevance, for purposes of discovery, is an extremely broad concept.'"  *Joseph v. Gnutti Carlo S.p.A.*, No. l 5-cv-8910 (AJN), 2016 WL 4083433, at *1 (S.D.N.Y. July 25, 2016) (quoting *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 561 (S.D.N.Y. 2013)).  Once relevance is shown, the burden shifts to the party opposing discovery to show that the discovery is improper.  *Id.*

### IV.     ARGUMENT

The United States and Denmark are both signatories to the Hague Evidence Convention. U.S. Dep't of State, Office of the Legal Advisor, Treaties in Force: A List of Treaties and Other

20

International Agreements of the United States in Force on January 1, 2012 (2012), 398.

Defendants seek evidence from the witnesses who are the subject of this motion, all believed to

be individuals located in Denmark, to support their defenses against SKAT in these actions.

Recourse to the Hague Evidence Convention is "available whenever [it] will facilitate the

gathering of evidence by the means authorized in the Convention." *Societe Nationale*

*Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 541 (1987).

Letters rogatory are appropriately used to obtain evidence from witnesses who cannot be

compelled to appear in a U.S. court. *See In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244, 259

(S.D.N.Y. 2011).  Where, as here, the witnesses subject to the Defendants' motion are not parties

to the lawsuit and are not otherwise subject to the jurisdiction of the U.S. court, it is appropriate

to turn to the Hague Evidence Convention. *Elliott Assocs. v. Republic of Peru*, Nos. 96 CIV.

7916 & 7917 (RWS), 1997 WL 436493, at *2 (S.D.N.Y. Aug. 1, 1997); *Lantheus*, 841 F. Supp.

2d at 782 (S.D.N.Y. 2012) ("[P]arties seek, and U.S. courts will usually issue, letters rogatory

where the court otherwise lacks jurisdiction to compel discovery[.]").  "The party opposing the

issuance of a letter of request must show some good reason to deny the application." *Elliott*,

1997 WL 436493, at *2.  The testimony of each of the witnesses is directly relevant to multiple

defenses in this litigation including causation, failure to mitigate, statute of limitations,

contributory or comparative fault, and, more fundamentally, to any understanding of the

dividend withholding tax regime in Denmark.

SKAT routinely refunded dividend taxes blindly for at least a decade prior to 2015.  The

blind refunds were raised by numerous SKAT employees to their superiors, and to those at the

Ministry of Taxation charged with SKAT's oversight.  Instead of giving SKAT the tools to

actually evaluate the dividend tax reclaim applications it received, the Danish authorities

21

repeatedly rejected changes that would have significantly reduced SKAT's distributions of dividend tax refunds.  The Danish government ignored clear and consistent warnings for over a decade.  While SKAT has alleged one explanation for allegedly "losing" billions, an accurate accounting requires further investigation.[90]  In brief, the witnesses will help establish who knew what, and when it was known.

For example, Jette Zester will testify to the complete range of efforts that she and Lisbeth Rømer took to identify the control gaps in SKAT's process, develop proposals to address these gaps, and then lobby individuals at all levels of the Danish government to effect the changes that would have protected SKAT from the very losses it now claims to have suffered.  While some key pieces of this story have been reported, the complete story, including a specific identification of the individuals with whom Ms. Zester attempted to effect change, remains unknown.  Mr. Helman will testify to his own recollections and his own interactions and concerns after Ms. Rømer's warnings.

Similarly, Leif Normann Jeppesen claims to have identified certain specific risks related to borrowed shares.  Defendants will ask him to explain his understanding of both the factual and legal basis for those risks, as well as the steps he took to advise others of those risks.

Other former SKAT employees, like Laurits Cramer and Birgitte Normann Grevy, both of whom served in more functional roles, have made statements critical of the control gaps and resource constraints at SKAT.  Defendants will ask each of them to explain their understanding of the specific facts that led them to draw these conclusions.  For example, Laurits Cramer has

---

[90] The Danish government concurs. The Undersøgelses-Kommissionen Om SKAT (translated as the "Danish Commission on Inquiry into Tax") is a government commission currently focused on dividend withholding tax and reclaim applications.  *See* https://kommissionenomskat.dk/ (last visited Feb. 25, 2021).

suggested that he warned others of the issues he saw, but it is not clear who he warned or the content of his warnings.  Ms. Grevy indicated that she ended up as the only person in her office responsible for bookkeeping, which itself is probative of the lack of attention SKAT provided to operating a multi-billion Kroner refund process.

It was during Dorthe Pannerup Madsen's tenure as head of the SKAT dividend office that the greatest escalation in refunds occurred.  Defendants will ask her to explain how given her predecessor's significant efforts to implement control measures what steps, if any, did she took to continue or extend this work.

Defendants will ask Rene Frahm Jorgensen to testify how he approved monthly account statements reflecting dramatic increases in dividend tax disbursements, but appears to never have sought further inquiry.  In deposing Jens Sørensen, Defendants will ask why the various working groups he was tasked with leading failed to address the issues identified in the audit reports. Defendants would ask Richard Hanlov what IT proposals he allegedly made and the impact those proposals might have had on SKAT's operations.

Meanwhile, Defendants will ask Ministry of Taxation officials like Peter Loft, to whom the 2010 Audit Report is addressed, to explain exactly what steps they took in response to the warnings they received.  Similarly, Ivar Nordland appears to have understood the risks raised by Ms. Rømer and others, but allegedly intervened to stop the implementation of a solution to the problems that Ms. Rømer identified.  Defendants will ask him to explain his actions, and the consequences of his decision to prevent Ms. Rømer from pursuing much-needed reforms.

Defendants will ask Kjeld Rasmussen to fill in the gaps about who, within the Ministry of Taxation, he was working with to ensure the issues his division identified in the audit reports were actually implemented.  Helen Sørensen will be asked how the working group at the Danish

23

Ministry of Taxation tasked with designing a new dividend tax system is changing its practices and what historical information they have examined.  It is clear that Ms. Sørensen will have valuable information about both past practices and current reform efforts.  Finally, Ditte Juulsgaard Andersen can speak to issues pertaining to the DNTT's review of SKAT's decision to rescind certain reclaims, including the DNTT's view of the basis for that decision, and how and why that decision was made as to certain plans at issue in this case.

It is important to hear from *each* of these individuals, not only because they have separate areas of knowledge, experience, and expertise, but also because, due to the sensitive and potentially embarrassing nature of the controversy SKAT's dereliction has caused in Denmark, key information may be siloed or suppressed.  In all of the foregoing cases, the witness testimony bears on whether SKAT and the Danish government's own actions contributed to their alleged injuries, as well as the precise date on which the facts giving rise to SKAT's claims were actually known to SKAT.

## V.    CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court grant their Motion for Issuance of Requests for International Judicial Assistance to Obtain Evidence.


Dated: New York, New York
       March 6, 2021

                                         Respectfully submitted,

                                         KOSTELANETZ & FINK, LLP

                                    By:  /s/ Sharon L. McCarthy
                                         SHARON L. MCCARTHY
                                         7 World Trade Center, 34th Floor
                                         New York, New York 10007
                                         Tel:     (212) 808-8100

Fax:    (212) 808-8108
smccarthy@kflaw.com

*Attorneys for Defendants John van
Merkensteijn, III, Elizabeth van
Merkensteijn, Azalea Pension Plan,
Basalt Ventures LLC Roth 401(K)
Plan, Bernina Pension Plan, Bernina
Pension Plan Trust, Michelle
Investments Pension Plan, Omineca
Pension Plan, Omineca Trust,
Remece Investments LLC Pension
Plan, Starfish Capital Management
LLC Roth 401(K) Plan, Tarvos
Pension Plan, Voojo Productions
LLC Roth 401(K) Plan,Xiphias LLC
Pension Plan*

WILMER CUTLER PICKERING
  HALE AND DORR LLP

By:   /s/ Alan E. Schoenfeld
      ALAN E. SCHOENFELD
      7 World Trade Center
      250 Greenwich Street
      New York, NY 10007
      Telephone: (212) 230-8800
      alan.schoenfeld@wilmerhale.com

*Attorneys for Defendants Richard
Markowitz, Jocelyn Markowitz,
Avanix Management LLC Roth
401(K) Plan, Batavia Capital
Pension Plan, Calypso Investments
Pension Plan, Cavus Systems LLC
Roth 401(K) Plan, Hadron Industries
LLC Roth 401(K) Plan, RJM Capital
Pension Plan, RJM Capital Pension
Plan Trust, Routt Capital Pension
Plan, Routt Capital Trust*

CAPLIN & DRYSDALE,
  CHARTERED

25

By:   /s/ Mark D. Allison
     Mark D. Allison
     CAPLIN & DRYSDALE,
     CHARTERED
     600 Lexington Avenue, 21st Floor
     New York, New York 10022
     Phone: (212) 379-6060
     Email: mallison@capdale.com

*Attorneys for Defendants Robert Klugman, RAK Investment Trust, Aerovane Logistics LLC Roth 401K Plan, Edgepoint Capital LLC Roth 401K Plan, Headsail Manufacturing LLC Roth 401K Plan, The Random Holdings 401K Plan, The Stor Capital Consulting LLC 401K Plan*

KAPLAN RICE LLP

By:   /s/ Michelle A. Rice
     Michelle A. Rice
     Kaplan Rice LLP
     142 West 57th Street
     Suite 4A
     New York N.Y. 10019
     (212) 333-0227
     mrice@kaplanrice.com

*Attorneys for Defendants Joseph Herman, David Zelman, Edwin Miller, Ronald Altbach, Perry Lerner, Robin Jones, Ballast Ventures LLC Roth 401(K) Plan, Bareroot Capital Investments LLC Roth 401(K)Plan, Albedo Management LLC Roth 401(K) Plan, Dicot Technologies LLC Roth 401(K) Plan, Fairlie Investments LLC Roth 401(K) Plan, First Ascent Worldwide LLC Roth 401(K) Plan, Battu Holdings LLC Roth 401(K) Plan, Cantata Industries LLC Roth 401(K) Plan, Crucible Ventures LLC*

26

*Roth 401(K) Plan, Monomer Industries LLC Roth 401(K) Plan, Limelight Global Productions LLC Roth 401(K) Plan, Loggerhead Services LLC Roth 401(K) Plan, PAB Facilities Global LLC Roth 401(K) Plan, Plumrose Industries LLC Roth 401(K) Plan, Pinax Holdings LLC Roth 401(K) Plan, Roadcraft Technologies LLC Roth 401(K) Plan, Sternway Logistics LLC Roth 401(K) Plan, Trailing Edge Productions LLC Roth 401(K) Plan, True Wind Investments LLC Roth 401(K) Plan, Eclouge Industry LLC Roth 401(K) Plan, Vanderlee Technologies Pension Plan, Vanderlee Technologies Pension Plan Trust, Cedar Hill Capital Investments LLC Roth 401(K) Plan, Green Scale Management LLC Roth 401(K) Plan, Fulcrum Productions LLC Roth 401(K) Plan, Keystone Technologies LLC Roth 401(K) Plan, Tumba Systems LLC Roth 401(K) Plan*

DEWEY PEGNO & KRAMARSKY LLP

By:  /s/ Thomas E.L. Dewey
    Thomas E.L. Dewey
    777 Third Avenue – 37th Floor
    New York, New York 10017
    Tel.: (212) 943-9000
    Fax: (212) 943-4325
    E-mail:  tdewey@dpklaw.com

    *Attorneys for Defendant*
    *Michael Ben-Jacob*

27

WILLIAMS & CONNOLLY LLP

By:   /s/ Stephen D. Andrews
       Stephen D. Andrews
       Amy B. McKinlay
       Williams & Connolly LLP
       725 Twelfth Street, N.W.
       Washington, DC 20005
       (202) 434-5000
       amckinlay@wc.com
       sandrews@wc.com

       *Attorneys for Defendants Sander
       Gerber and Sander Gerber Pension
       Plan*


K&L GATES LLP

By:   /s/ John D. Blessington
       John D. Blessington (*pro hac vice*)
       K&L GATES LLP
       State Street Financial Center
       One Lincoln Street
       Boston, MA  02111
       T: 617.261.3100
       F: 617.261.3175
       E: john.blessington@klgates.com

       *Attorneys for Defendants / Third-
       Party Plaintiffs Acer Investment
       Group LLC, American Investment
       Group of New York, L.P. Pension
       Plan, DW Construction, Inc.
       Retirement Plan, Kamco Investments
       Inc. Pension Plan, Kamco LP Profit
       Sharing Pension Plan, Linden
       Associates Defined Benefit Plan,
       Moira Associates LLC 401K Plan,
       Newsong Fellowship Church 401K
       Plan, Riverside Associates Defined
       Benefit Plan, Robert Crema, Stacey
       Kaminer, Alexander Jamie Mitchell
       III, David Schulman, Joan
       Schulman, and Darren Wittwer*

GUSRAE KAPLAN NUSBAUM
PLLC

By:   /s/ Martin H. Kaplan
　　　Martin H. Kaplan
　　　Kari Parks
　　　Gusrae Kaplan Nusbaum PLLC
　　　120 Wall Street
　　　New York, NY  10005
　　　T: (212) 269-1400
　　　Mkaplan@gusraekaplan.com
　　　Kparks@gusraekaplan.com

*Attorneys for Defendants Sheldon
Goldstein, Scott Goldstein, and the
Goldstein Law Group PC 401(K)
Profit Sharing Plan*

29

**APPENDIX A**

| Defendants | Counsel | Associated Case(s) |
|---|---|---|
| John van Merkensteijn, III | Sharon L. McCarthy<br>Caroline Ciraolo<br>Nicholas S. Bahnsen<br>Kostelanetz & Fink LLP<br>7 World Trade Center, 34th Floor<br>New York, New York 10007<br>Tel: (212) 808-8100<br>Fax: (212) 808-8108<br>cciraolo@kflaw.com<br>smccarthy@kflaw.com<br>nbahnsen@kflaw.com | 19-cv-01866<br>19-cv-01865<br>19-cv-01906<br>19-cv-01894<br>19-cv-01911<br>19-cv-01871<br>19-cv-01930<br>19-cv-01873<br>19-cv-01794<br>19-cv-01798<br>19-cv-01788<br>19-cv-01918<br>19-cv-01928<br>19-cv-01931<br>19-cv-01800<br>19-cv-01803<br>19-cv-01809<br>19-cv-01818<br>19-cv-01801<br>19-cv-01810<br>19-cv-01813 |
| Elizabeth van Merkensteijn | | 19-cv-01893 |
| Azalea Pension Plan | | 19-cv-01893 |
| Basalt Ventures LLC Roth 401(K) Plan | | 19-cv-01866 |
| Bernina Pension Plan | | 19-cv-01865 |
| Bernina Pension Plan Trust | | 19-cv-10713 |
| Michelle Investments Pension Plan | | 19-cv-01906 |
| Omineca Pension Plan | | 19-cv-01894 |
| Omineca Trust | | 19-cv-01794<br>19-cv-01798<br>19-cv-01788<br>19-cv-01918<br>19-cv-01928 |

| | | |
|---|---|---|
| | | 19-cv-01931 |
| | | 19-cv-01800 |
| | | 19-cv-01803 |
| | | 19-cv-01809 |
| | | 19-cv-01818 |
| | | 19-cv-01801 |
| | | 19-cv-01810 |
| | | 19-cv-01813 |
| Remece Investments LLC Pension Plan | | 19-cv-01911 |
| Starfish Capital Management LLC Roth 401(K) Plan | | 19-cv-01871 |
| Tarvos Pension Plan | | 19-cv-01930 |
| Voojo Productions LLC Roth 401(K) Plan | | 19-cv-01873 |
| Xiphias LLC Pension Plan | | 19-cv-01924 |
| Richard Markowitz | Alan E. Schoenfeld Wilmer Cutler Pickering Hale and Dorr LLP 7 World Trade Center 250 Greenwich Street New York, NY 10007 Telephone: (212) 230-8800 alan.schoenfeld@wilmerhale.com | 19-cv-01867 19-cv-01895 19-cv-01869 19-cv-01868 19-cv-01898 19-cv-10713 19-cv-01896 19-cv-01783 19-cv-01922 19-cv-01926 19-cv-01929 19-cv-01812 19-cv-01870 19-cv-01792 19-cv-01806 19-cv-01808 19-cv-01815 |
| Jocelyn Markowitz | | 19-cv-01904 |
| Avanix Management LLC Roth 401(K) Plan | | 19-cv-01867 |

| | | |
|---|---|---|
| Batavia Capital Pension Plan | | 19-cv-01895 |
| Calypso Investments Pension Plan | | 19-cv-01904 |
| Cavus Systems LLC Roth 401(K) Plan | | 19-cv-01869 |
| Hadron Industries LLC Roth 401(K) Plan | | 19-cv-01868 |
| RJM Capital Pension Plan | | 19-cv-01898 |
| RJM Capital Pension Plan Trust | | 19-cv-10713 |
| Routt Capital Pension Plan | | 19-cv-01896 |
| Routt Capital Trust | | 19-cv-01783 |
| | | 19-cv-01922 |
| | | 19-cv-01926 |
| | | 19-cv-01929 |
| | | 19-cv-01812 |
| | | 19-cv-01870 |
| | | 19-cv-01792 |
| | | 19-cv-01806 |
| | | 19-cv-01808 |
| | | 19-cv-01815 |
| Rob Klugman | Mark D. Allison | 18-cv-07828 |
| | Caplin & Drysdale, Chartered | 18-cv-07827 |
| | 600 Lexington Avenue | 18-cv-07824 |
| | 21st Floor | 18-cv-07829 |
| | New York, NY 10022 | 18-cv-04434 |
| | Tel: (212) 379-6000 | |
| RAK Investment Trust | mallison@capdale.com | |
| | zziering@capdale.com | |
| Aerovane Logistics LLC Roth 401(K) Plan | | 18-cv-07828 |
| Edgepoint Capital LLC Roth 401(K) Plan | | 18-cv-07827 |
| Headsail Manufacturing LLC Roth 401(K) Plan | | 18-cv-07824 |

| | | |
|---|---|---|
| The Random Holdings 401(K) Plan | | 18-cv-07829 |
| The Stor Capital Consulting LLC 401(K) Plan | | 18-cv-04434 |
| Joseph Herman | Michelle A. Rice<br>Kaplan Rice LLP<br>142 West 57th Street<br>Suite 4A<br>New York N.Y. 10019<br>(212) 333-0227<br>mrice@kaplanrice.com | 1:19-cv-01785<br>1:19-cv-01781<br>1:19-cv-01791<br>1:19-cv-01794<br>1:19-cv-01918<br>1:19-cv-01783<br>1:19-cv-01798<br>1:19-cv-01788 |
| David Zelman | | |
| Edwin Miller | | 1:19-cv-01926<br>1:19-cv-01922<br>1:19-cv-01928<br>1:19-cv-01929<br>1:19-cv-01931 |
| Ronald Altbach | | 1:19-cv-01809<br>1:19-cv-01800<br>1:19-cv-01803<br>1:19-cv-01812<br>1:19-cv-01818 |
| Perry Lerner | | 1:19-cv-01806<br>1:19-cv-01870<br>1:19-cv-01792<br>1:19-cv-01808<br>1:19-cv-01815 |
| Robin Jones | | 1:19-cv-01801<br>1:19-cv-01810<br>1:19-cv-01813 |
| Ballast Ventures LLC Roth 401(K) Plan | | 1:19-cv-01781 |
| Bareroot Capital Investments LLC Roth 401(K) Plan | | 1:19-cv-01783 |

| | | |
|---|---|---|
| Albedo Management LLC Roth 401(K) Plan | | 1:19-cv-01785 |
| Dicot Technologies LLC Roth 401(K) Plan | | 1:19-cv-01788 |
| Fairlie Investments LLC Roth 401(K) Plan | | 1:19-cv-01791 |
| First Ascent Worldwide LLC Roth 401(K) Plan | | 1:19-cv-01792 |
| Battu Holdings LLC Roth 401(K) Plan | | 1:19-cv-01794 |
| Cantata Industries LLC Roth 401(K) Plan | | 1:19-cv-01798 |
| Crucible Ventures LLC Roth 401(K) Plan | | 1:19-cv-01800 |
| Monomer Industries LLC Roth 401(K) Plan | | 1:19-cv-01801 |
| Limelight Global Productions LLC Roth 401(K) Plan | | 1:19-cv-01803 |
| Loggerhead Services LLC Roth 401(K) Plan | | 1:19-cv-01806 |
| PAB Facilities Global LLC Roth 401(K) Plan | | 1:19-cv-01808 |
| Plumrose Industries LLC Roth 401(K) Plan | | 1:19-cv-01809 |
| Pinax Holdings LLC Roth 401(K) Plan | | 1:19-cv-01810 |
| Roadcraft Technologies LLC Roth 401(K) Plan | | 1:19-cv-01812 |
| Sternway Logistics LLC Roth 401(K) Plan | | 1:19-cv-01813 |

| | | |
|---|---|---|
| Trailing Edge Productions LLC Roth 401(K) Plan | | 1:19-cv-01815 |
| True Wind Investments LLC Roth 401(K) Plan | | 1:19-cv-01818 |
| Eclouge Industry LLC Roth 401(K) Plan | | 1:19-cv-01870 |
| Vanderlee Technologies Pension Plan | | 1:19-cv-01918 |
| Vanderlee Technologies Pension Plan Trust | | 1:19-cv-01918 |
| Cedar Hill Capital Investments LLC Roth 401(K) Plan | | 1:19-cv-01922 |
| Green Scale Management LLC Roth 401(K) Plan | | 1:19-cv-01926 |
| Fulcrum Productions LLC Roth 401(K) Plan | | 1:19-cv-01928 |
| Keystone Technologies LLC Roth 401(K) Plan | | 1:19-cv-01929 |
| Tumba Systems LLC Roth 401(K) Plan | | 1:19-cv-01931 |
| Sander Gerber | Stephen D. Andrews Amy B. McKinlay | 18-cv-4899 |
| Sander Gerber Pension Plan | Williams & Connolly LLP 725 Twelfth Street, N.W. Washington, DC 20005 (202) 434-5000 amckinlay@wc.com sandrews@wc.com | 18-cv-4899 |
| Michael Ben-Jacob | Thomas E. L. Dewey Dewey Pegno & Kramarsky LLP 777 Third Avenue – 37th Floor New York, New York 10017 Tel.: (212) 943-9000 Fax: (212) 943-4325 E-mail:  tdewey@dpklaw.com | 1:18-cv-04434 1:18-cv-07824 1:18-cv-07827 1:18-cv-07828 1:18-cv-07829 1:19-cv-01781 1:19-cv-01783 |

| | | |
|---|---|---|
| | | 1:19-cv-01785 |
| | | 1:19-cv-01788 |
| | | 1:19-cv-01791 |
| | | 1:19-cv-01792 |
| | | 1:19-cv-01794 |
| | | 1:19-cv-01798 |
| | | 1:19-cv-01800 |
| | | 1:19-cv-01801 |
| | | 1:19-cv-01803 |
| | | 1:19-cv-01806 |
| | | 1:19-cv-01808 |
| | | 1:19-cv-01809 |
| | | 1:19-cv-01810 |
| | | 1:19-cv-01812 |
| | | 1:19-cv-01813 |
| | | 1:19-cv-01815 |
| | | 1:19-cv-01818 |
| | | 1:19-cv-01866 |
| | | 1:19-cv-01867 |
| | | 1:19-cv-01868 |
| | | 1:19-cv-01869 |
| | | 1:19-cv-01870 |
| | | 1:19-cv-01871 |
| | | 1:19-cv-01873 |
| | | 1:19-cv-01894 |
| | | 1:19-cv-01896 |
| | | 1:19-cv-01918 |
| | | 1:19-cv-01922 |
| | | 1:19-cv-01926 |
| | | 1:19-cv-01928 |
| | | 1:19-cv-01929 |
| | | 1:19-cv-01931 |
| Acer Investment Group LLC | John C. Blessington<br>K&L GATES LLP<br>State Street Financial Center<br>One Lincoln Street<br>Boston, MA  02111<br>T: 617.261.3100<br>F: 617.261.3175<br>E:  john.blessington@klgates.com | 18-cv-09841<br>18-cv-09797<br>18-cv-09836<br>18-cv-09837<br>18-cv-09838<br>18-cv-09839<br>18-cv-09840<br>18-cv-10100<br>18-cv-05053 |
| American Investment Group of New York, L.P. Pension Plan | | 18-cv-09841 |

| | | |
|---|---|---|
| DW Construction, Inc. Retirement Plan | | 18-cv-09797 |
| Kamco Investments Inc. Pension Plan | | 18-cv-09836 |
| Kamco LP Profit Sharing Pension Plan | | 18-cv-09837 |
| Linden Associates Defined Benefit Plan | | 18-cv-09838 |
| Moira Associates LLC 401K Plan | | 18-cv-09839 |
| Newsong Fellowship Church 401K Plan | | 18-cv-10100 |
| Riverside Associates Defined Benefit Plan | | 18-cv-09840 |
| Robert Crema | | |
| Stacey Kaminer | | 18-cv-09841 |
| | | 18-cv-09841 |
| | | 18-cv-09797 |
| | | 18-cv-09836 |
| | | 18-cv-09837 |
| Alexander Jamie Mitchell III | | 18-cv-09839 |
| David Schulman | | 18-cv-10100 |
| Joan Schulman | | 18-cv-09840 |
| Darren Wittwer | | 18-cv-09838 |
| | | 18-cv-09797 |
| Sheldon Goldstein<br><br>Scott Goldstein<br><br>The Goldstein Law Group PC 401(k) Profit Sharing Plan | Martin H. Kaplan<br>Kari Parks<br>Gusrae Kaplan Nusbaum PLLC<br>120 Wall Street<br>New York, NY 10005<br>T: (212) 269-1400<br>mkaplan@gusraekaplan.com | 18-cv-5053 |

| | kparks@gusraekaplan.com | |
|---|---|---|