# EXHIBIT 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
MASTER DOCKET 18-MD-2865(LAK)
CASE NO. 18-CV-09797

```
_____
                                       )
IN RE:                                 )
                                       )
CUSTOMS AND TAX ADMINISTRATION OF      )
THE KINGDOM OF DENMARK                 )
(SKATTEFORVALTNINGEN) TAX REFUND       )
SCHEME LITIGATION                      )
                                       )
_____)
```

```
************************************
*                                  *
*          CONFIDENTIAL            *
*                                  *
************************************
```

REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL
EXAMINATION OF
CHRISTIAN EKSTRAND - VOLUME II
DATE: May 7, 2021


REPORTED BY: CHARLENE FRIEDMAN, CCR, RPR, CRR

Page 184

TRANSCRIPT of the videotaped deposition of the witness, called for Oral Examination in the above-captioned matter, said deposition being taken by and before MICHAEL FRIEDMAN, a Notary Public and Certified Court Reporter of the State of New Jersey, via WEBEX, ALL PARTIES REMOTE, on May 7, 2021, commencing at approximately 6:01 in the morning, EST, and 11:27 a.m., Denmark time.

Page 185

A P P E A R A N C E S:

HUGHES, HUBBARD & REED
One Battery Park Plaza
New York, NY 10004
BY:   NEIL OXFORD, ESQ.
      BILL MAGUIRE, ESQ.
      MARC A. WEINSTEIN, ESQ.
      BRITTANY LLEWELLYN, ESQ.
      Via VTC
Attorneys for SKAT

HANAMIRIAN LAW FIRM
40 E. Main Street
Moorestown, NJ 08057
BY:   JOHN M. HANAMIRIAN, ESQ.
      ELZA GRIGORYAN
      Via VTC
Attorneys for Acorn Capital

CAPLIN & DRYSDALE
600 Lexington Avenue
New York, NY 10022
BY:   MARK ALLISON, ESQ.
      Via VTC
Attorneys for Klugman

KAPLAN RICE
142 West 57th Street
New York, NY 10019
BY:   MICHELLE RICE, ESQ.
      Via VTC
Attorneys for Albedo, et al

Page 186

A P P E A R A N C E S:

KOSTELANETZ & FINK
250 Greenwich Street
New York, NY 10007
BY:   NICHOLAS H. BAHNSEN, ESQ.
      CAROLINE CIRAOLO, ESQ.
      SHARON MCCARTHY, ESQ.
      Via VTC
Attorneys for Azalea, et al

K&L GATES
One Lincoln Street
Boston, MA 02111
BY:   JOHN GAVIN, ESQ.
      BRANDON DILLMAN, ESQ.
      ANNA E. L'HOMMEDIEU, ESQ.
      Via VTC
Attorneys for Alexander Jamie Mitchell, et al

GUSRAE, KAPLAN & NUSBAUM
120 Wall Street
New York, NY 10005
BY:   KARI PARKS, ESQ.
      Via VTC
Attorneys for Goldstein

Page 187

A P P E A R A N C E S:

WILMER HALE
7 World Trade Center - 250 Greenwich Street
New York, NY 10007
BY:   ALAN SCHOENFELD, ESQ.
      CARY GLYNN, ESQ.
      JULIA C. PILCER, ESQ.
      RACHEL CRAFT, ESQ.
      ANDREW DULBERG, ESQ.
      Via VTC
Attorneys for Avanix, et al

BINDER & SCHWARTZ
366 Madison Avenue
New York, NY 10017
BY:   NEIL S. BINDER, ESQ.
      GREGORY C. PRUDEN, ESQ.
      Via VTC
ATTORNEYS for ED&F Man

DEWEY, PEGNO & KRAMARSKY
777 Third Avenue
New York, NY 10017
BY:   SEAN MULLEN, ESQ.
      Via VTC
Attorneys for Michael Ben-Jacob

WILLIAMS & CONNOLLY
725 12th STREET, NW
Washington, DC 20005
BY:   AMY B. MCKINLAY, ESQ.
      STEPHEN D. ANDREWS, ESQ.
      Via VTC
Attorneys for Sander Gerber Pension Plan

CONFIDENTIAL
Christian Ekstrand - May 7, 2021

3 (Pages 188 to 191)

Page 188

```
 1  A P P E A R A N C E S:
 2
 3  KATTEN
    575 Madison Avenue
 4  New York, NY  10022
    BY:    DAVID GOLDBERG, ESQ.
 5         MICHAEL ROSENAFT, ESQ.
              Via VTC
 6  Attorneys for Klugman
 7
    SEWARD & KISSEL
 8  One Battery Park Plaza
    New York, NY  10004
 9  BY:    SHREY SHARMA, ESQ.
           THOMAS R. HOOPER, ESQ.
10         MARK J. HYLAND, ESQ.
              Via VTC
11  Attorneys for Bernard Tew
12
    LAW OFFICES OF SHELDON S. TOLL
13  2000 Town Center
    Southfield, MI  48075
14  BY:    SHELDON S. TOLL, ESQ.
              Via VTC
15  Attorneys for Hoffmeister
16
    MORVILLO, ABROMOWITZ, GRAND, IASON & ANELLO
17  565 5th Avenue
    New York, NY  10017
18  BY:    RICHARD WEINBERG, ESQ.
    Attorneys for Clove Pension Plan, Mill River
19  Pension Plan, Traden Investment Pension Plan
20
21
22
23
24
25
```

Page 189

```
 1  ALSO PRESENT:   JOSE RIVERA, Videographer
 2                  THOMAS SPILLER
                    ROSENBLATT LAW
 3
                    ANNE CHRISTINE KJAER EGHOLM
 4
                    CHRISTINE P. VINTHER
 5
                    CHRISTIAN B☐LOW
 6
                    HELENE SCHWEIERING
 7
                    JENS KJAERGAARD
 8
                    INGDR GREGERSEN,  Interpreter
 9
                    KIRSTEN FOLLIN, Interpreter
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 190

```
 1              I N D E X
 2  WITNESS NAME                         PAGE
 3  CHRISTIAN EKSTRAND
 4
 5  Examination By:  Mr. Schoenfeld      195
 6                   Mr. Binder          295
 7                   Mr. Weinstein       298
 8                    * * * * * *
 9
10             E X H I B I T S
11  EKSTRAND NO.     DESCRIPTION          PAGE
12  3062             SKAT_MDL_001_00411777 -  198
                     00411778
13
    3063             SKAT_MDL_001_00437466 -  201
14                   00437468
15  3064             SKAT_MDL_001_00411550 -  206
                     00411553
16
    3065             SKAT_MDL_001_00405922    212
17
    3066             SKAT_MDL_001_00404831    215
18
    3067             SKAT_MDL_001_00503329 -  228
19                   00503333
20  3068             SKAT_MDL_001_00483489 -  229
                     00483491
21
    3002             SKAT_MDL_001_00281025 -  238
22                   00281029
23  3052             SKAT_MDL_001_00517918 -  245
                     00517939
24
    3003             SKAT_MDL_001_00281058 -  249
25                   00281080
```

Page 191

```
 1         E X H I B I T S (CONTINUED)
 2  EKSTRAND NO.     DESCRIPTION           PAGE
 3  3053             SKAT_MDL_001_00349334 -  258
                     00349338
 4
    3004             SKAT_MDL_001_00375736 -  260
 5                   00375739
 6  3009             SKAT_MDL_001_00281103 -  263
                     00281120
 7
    3056             SKAT_MDL_001_00439953 -  269
 8                   00439957
 9  3057             SKAT_MDL_001_00432034 -  276
                     00432037
10
    3071             SKAT_MDL_001_00475569 -  280
11                   00475570
12  3075             SKAT_MDL_001_00467931 -  289
                     00467943
13
14                    * * * * * *
15
16
17
18
19
20
21
22
23
24
25
```

Page 192

```
 1                    - - -
 2            Deposition Support Index
 3                    - - -
 4
 5   Direction to Witness Not to Answer
 6   Page  Line      Page  Line      Page  Line
 7   None
 8
 9   Request for Production of Documents
10   Page  Line      Page  Line      Page  Line
11   None
12
13   Stipulations
14   Page  Line      Page  Line      Page  Line
15   None
16
17   Questions Marked
18   Page  Line      Page  Line      Page  Line
19   None
20
21
22
23
24
25
```

Page 193

```
 1           THE COURT REPORTER:  My name is
 2   Charlene Friedman, a Certified Shorthand
 3   Reporter.  This deposition is being held via
 4   videoconferencing equipment.
 5           The witness and reporter are not in
 6   the same room.  The witness will be sworn in
 7   remotely pursuant to agreement of all
 8   parties.  The parties stipulate that the
 9   testimony is being given as if the witness
10   was sworn in person.
```

Page 194

```
 1           VIDEO OPERATOR:  We are now on
 2   record.  This is the continued remote video
 3   deposition of Christian Ekstrand.
 4           Today is Friday, May 7, 2020.  The
 5   time is now 6:01 a.m. New York time.
 6           We are here in the matter of In Re
 7   Custom and Tax Administration Kingdom of
 8   Denmark et al.  All counsel have been noted
 9   on record.
10           My name is Jose Rivera, remote
11   video technician on behalf of Gregory Edwards
12   LLC.  At this time, will the reporter,
13   Charlene Friedman, on behalf of Gregory
14   Edwards LLC, please re-swear in the
15   interpreter and the witness.
16
17   I N G D R  G R E G E R S E N,
18           Called as the official interpreter in
19   this action, was duly sworn to faithfully translate
20   the questions to the witness from English to
21   Danish, and the answers from Danish to English.
22
23   C H R I S T I A N  E K S T R A N D,
24           called as a witness, having been first duly
25   sworn according to law, testifies as follows:
```

Page 195

```
 1
 2   CONTINUED EXAMINATION BY MR. SCHOENFELD:
 3       Q    Good morning, Mr. Ekstrand.
 4       A    Good morning.
 5       Q    Mr. Ekstrand, do I understand
 6   correctly that you had no involvement with
 7   dividend withholding tax until 2015?
 8           MR. WEINSTEIN:  Objection to form.
 9       A    Yes, I have had no dealings with
10   the dividend withholding tax until 2015 when
11   I received this case.
12       Q    And when in 2015 did you receive
13   this case?
14       A    That was in June 2015.
15       Q    What were your responsibilities as
16   of the date that you first learned about this
17   case?
18           So what I'm asking is:  What was
19   your sort of general job description when you
20   first came into this case?
21       A    At the time, I was project
22   manager/investigator.  So the two, project
23   manager and investigator, in cases regarding
24   economic crime, financial crime.
25       Q    How did cases come to you in that
```

Page 196

1  capacity?  Were they -- well, how did cases
2  come to you in that capacity?
3      A    I would receive or we would receive
4  these cases in a number of different ways.
5  They could come from other departments in the
6  tax administration.
7           We could pick up cases on our own
8  initiative in case we had seen things where
9  we thought there was something to
10 investigate.  We would receive cases from
11 private individuals, from businesses and
12 companies, or from other authorities as
13 a -- where they filed a report on something.
14     Q    And within the office where you
15 worked, how many project managers were there?
16     A    At the time, we were -- at that
17 time, we were two in the department; one
18 covering eastern Denmark, which was me, and
19 one covering western Denmark.
20     Q    Who was covering western Denmark?
21     A    Her name was Line Haslev.  It's
22 L-I-N-E, and then Haslev, H-A-S-L-E-V.
23     Q    Did you have any employees
24 reporting directly into you at this point in
25 time?

Page 197

1      A    No.
2      Q    Who did you directly report into?
3      A    Into my department manager, Lill
4  Drost.
5      Q    Okay.  So what is the first you
6  learn about this issue in June of 2015?
7      A    We had a meeting at the time that
8  we --
9           MR. SCHOENFELD:  I'm sorry.  Can we
10 pause you, Ms. Gregersen?  We're having
11 trouble hearing you.  It's breaking up on
12 your end.
13     A    We had a meeting at the time for
14 the whole Special Control department or
15 function.  I'm not quite sure whether it was
16 called Special Control at the time, but that
17 was it.
18          It was a kind of a theme or topic
19 they -- at the meeting, I was contacted by
20 our deputy director at the time, Ann
21 Munksgaard, who had received reports through
22 a Danish lawyer who, on behalf of a client,
23 had reported that somebody or somebodies was
24 defrauding Denmark with respect to dividend
25 tax.

Page 198

1           Ann passed on this information to
2  me and asked me to look into the matter.
3      Q    Do you know why the -- the tipster
4  reached out to Ann Munksgaard?
5      A    Because she was -- Ann Munksgaard
6  was the deputy director of the department
7  handling financial crime at the time.
8      Q    Did she have a relationship with
9  the lawyer who sent in the tip?
10          MR. WEINSTEIN:  Objection.
11     A    I wouldn't imagine so, but I don't
12 know.
13     Q    Let's take a look at Exhibit 3062.
14          MR. WEINSTEIN:  Can you say the
15 exhibit number again, Alan?
16          MR. SCHOENFELD:  3062.
17          (Above-mentioned document for
18 Identification.)
19     Q    Do you have the document in front
20 of you?
21     A    Yes, we have the document in front
22 of us.
23     Q    Okay.  The e-mail from Mr. Amstrup
24 to Ms. Munksgaard refers to a telephone
25 conversation they had just had.

Page 199

1           Do you see that?
2      A    Yes.
3      Q    Did Ms. Munksgaard inform you what
4  the telephone conversation she had with
5  Mr. Amstrup was?
6      A    He only told me that he'd had the
7  telephone conversation and that he would
8  submit some information on the -- on the
9  issue, I would say.
10     Q    The letter mentions or the e-mail
11 mentions that the fraud allegedly consists of
12 borrowed shares circulating between a number
13 of companies.
14          Did that mean anything to you at
15 that time?  Did you have any understanding of
16 what that was referring to?
17          MR. WEINSTEIN:  Objection to form.
18     A    Yes.  As I read the e-mail, I do
19 understand that it concerns shares that
20 people do not own but that they've borrowed
21 them.
22     Q    And you understood that this issue
23 of borrowed shares had something to do with
24 alleged tax fraud, correct?
25          MR. WEINSTEIN:  Objection to form.

CONFIDENTIAL
Christian Ekstrand - May 7, 2021

6 (Pages 200 to 203)

Page 200

1    A    Well, I read the information that's
2  in the e-mail and I understand what the issue
3  is, yes, you can say that, but I did not know
4  the specific legal basis at the time.
5    Q    And lower down in the e-mail, it
6  mentions a group of reclaim companies that
7  are alleged to have participated in the
8  fraud.  You see Goal Taxback and others.
9         Do you see that?
10   A    Yes.
11   Q    Did you do anything with this
12 information, the list of potentially involved
13 entities, when you received this e-mail?
14   A    Yes.  The first thing is, what we
15 normally do is, when we find out this
16 information, whether we can confirm this
17 information or have confirmation that this
18 information is correct.
19   Q    What steps did you take, if any, on
20 or about June 16, 2015 to confirm whether the
21 information was correct?
22   A    So as it's stated in this e-mail,
23 it says, "Hi, we have to follow up on this
24 matter tomorrow."
25        So no steps were taken on the 16th,

Page 201

1  and the lawyer at that time promised us more
2  information, so we await that information.
3    Q    And does the lawyer follow up with
4  additional information?
5    A    Yes, she did.  She did.
6    Q    If you flip to Exhibit 3063?
7         (Above-mentioned document marked
8  for Identification.)
9    Q    If you look in the middle of the
10 second page, there's a response from Ann
11 Munksgaard to Michael Amstrup.
12        Do you see that?
13   A    Yes.
14   Q    So, on June 16th, she tells Michael
15 Amstrup, "We're looking into it," correct?
16   A    Yes, it says so.
17   Q    What were you doing on the 16th to
18 look into this alleged fraud?
19   A    I don't remember doing anything on
20 the 16th.  As Ann wrote to me, "We have to
21 follow up and talk about this tomorrow."
22        So we had to -- we told them that
23 we had to agree how to handle it, what to do
24 in this matter.
25   Q    Mr. Amstrup mentions in his initial

Page 202

1  e-mail that he suspects the fraud to involve
2  around 500 million kroner, correct?
3    A    Yes, that's correct.
4    Q    Is that the largest case that was
5  ever referred to you at that time in terms of
6  the kroner value of the case?
7    A    Yes.
8    Q    On the 17th, Mr. Amstrup e-mails
9  again, correct?
10   A    Yes, that's correct.
11   Q    And he says -- he again mentions a
12 gentleman named Sanjay Shah, correct?
13   A    Yes, that's correct.
14   Q    And he offers to provide a list of
15 companies that allegedly acted as fictitious
16 owners of the shares, correct?
17   A    Yes.
18   Q    Do you know whether Ms. Munksgaard
19 ever requested that information?
20   A    I don't think she actually asked
21 for the information, but he sends that
22 information.
23   Q    Did you have any direct
24 communications with Mr. Amstrup at this time?
25   A    I did not have any communication

Page 203

1  with Mr. Amstrup at that time, and I haven't
2  had communication with him later.
3    Q    So in this letter or in this
4  e-mail, Mr. Amstrup again provides the names
5  of the reclaim agents.
6    A    What e-mail are we talking about?
7    Q    The e-mail on June 17, 2015.
8    A    Yes.
9    Q    And he provides the names of other
10 individuals and other entities potentially
11 involved in the fraud, correct?
12   A    Yes, that's correct.
13   Q    Do you do anything on the 17th of
14 June to try to learn more about these
15 entities or individuals?
16   A    I don't remember particularly doing
17 anything on the 17th.  But in the days after,
18 we started looking into this matter to see
19 what was on it.  We didn't have a case at
20 that time.
21        We had received a lot of
22 information that we had to try to verify
23 whether it was correct or not, whether it's
24 the substance in what was reported or -- and
25 whether it can form the basis for starting a

Page 204

1  case altogether, starting up a case.
2     Q    Do you -- at this point in time, do
3  you have any understanding of where within
4  SKAT the dividend withholding tax processing
5  unit lies?
6          MR. WEINSTEIN:  Objection to form.
7     A    No, at the time, I didn't know
8  precisely which department holds dividend
9  withholding tax reclaims.
10    Q    And at some point did you learn it
11 was Accounting 2?
12    A    Yes.  In connection with my
13 investigation, I found out how this is
14 processed.  And we have a list of tasks for
15 that purpose where you can look at the tasks,
16 the handle in the Tax Administration, all
17 together.
18         I do that and I find a person's
19 name, Sven Neilsen.  So I sent him an e-mail
20 and tell him that I need some information.
21    Q    Do you recall when you e-mailed
22 Sven Neilsen?
23    A    I'm not quite certain, but I think
24 it's the 24th June.
25    Q    Okay.  What steps do you take, if

Page 205

1  any, on June 17th or the days after to learn
2  more about the people or entities mentioned
3  in Mr. Amstrup's e-mail?
4     A    In SKAT, we have several different
5  case and recording filing systems.  And the
6  procedure we normally follow, irrespective of
7  the nature, we do searches in these systems
8  to see if we can find any information on the
9  issue or the parties involved.
10    Q    What are the systems called?
11    A    "Work Zone" is one and "Tax
12 Assessment," "Skattvurdering," which means
13 "tax assessment."  So the system is called
14 "Tax Assessment," if we translate the
15 department name or the system name.
16         So "Work Zone" and "Tax
17 Assessment."
18    Q    What sort of information is
19 included in Tax Assessment?
20    A    Tax assessment information on
21 individuals.  And it's the same information,
22 but primarily for foreign instances.
23    Q    Any other systems you consulted?
24    A    Well, there's a planning system,
25 but we do a normal Google search to find out

Page 206

1  if -- about companies or individuals, or
2  other parties mentioned in this report that
3  was filed.
4     Q    If you look at Exhibit 3064?
5          (Above-mentioned document marked
6  for Identification.)
7     Q    There's another e-mail from Michael
8  Amstrup to Ann Munksgaard, and then an e-mail
9  from Ann Munksgaard to you.  And she mentions
10 that she's spoken to Search and Control.
11         Do you see that?
12    A    Yes.
13    Q    What's Search and Control?
14    A    Well, you can say that all reports
15 that come into tax have to be filed in the
16 correct place, and in this case, that's
17 Search and Control.
18         So the normal procedure would be
19 that you file your report with Search and
20 Control and they review the information and
21 they report and ensure that it is sent to the
22 administrator of the project where they
23 believe it belongs.
24         So here it's gone directly to a
25 deputy director.  But in order to get it

Page 207

1  correctly in the system and recorded,
2  Search and Control would have been the right
3  place to make this phone call to.
4     Q    Is Search and Control a team or a
5  unit within SKAT?
6     A    Yes.
7     Q    And does it have access to systems
8  other than Tax Assessment and Work Zone to
9  identify information about individuals or
10 companies?
11    A    To my knowledge, they have access
12 to the same systems as I have.
13    Q    Do they have access to prior
14 internal reports concerning issues of concern
15 to SKAT?
16         MR. WEINSTEIN:  Objection to form.
17    A    I don't know.
18    Q    If a SKAT employee had previously
19 indicated concerns about potential fraud
20 relating to dividend withholding tax, would
21 you expect Tax Assessment, Work Zone, or
22 Search and Control to have access to that
23 information?
24         MR. WEINSTEIN:  Objection to form.
25         THE INTERPRETER:  Would you please

Page 228

1  beginning when I received this information.
2      Q    Okay.  Let's look at the next
3  exhibit, which is 3067.
4           (Above-mentioned document marked
5  for Identification.)
6      Q    Do you have that in front of you?
7      A    Yes.
8      Q    On August 4th, you e-mail Ann
9  Munksgaard and you say, "There's finally a
10 hole through to Taastrup, T-A-A-S-T-R-U-P.  I
11 found the right people around recovery of
12 dividend taxes."
13     A    Yes.
14     Q    What did you mean, "there's finally
15 a hole through to Taastrup?"
16     A    So as made in previous
17 communication, I had tried, on several
18 occasions, to establish contact to
19 individuals in Taastrup.  And finally, as far
20 as I remember, this was on August the 3rd, I
21 was able to reach the unit head in Taastrup.
22     Q    And that's Dorthe Madsen?
23     A    Yes.
24     Q    Taastrup is the city where
25 Accounting 2 is located.

Page 229

1           Is that right?
2      A    Taastrup is where the unit dealing
3  with the dividend tax case is located.
4      Q    What unit is that?
5      A    This is Accounting 2.
6      Q    Okay.  So what decisions are made
7  at the August 6th meeting?
8      A    As far as I remember, no decisions
9  were made.  A communication for a decision
10 was made.
11          As so, far as I remember, Dorthe
12 Pannerup made a recommendation to stop
13 payment, and the recommendation was made to
14 her deputy director.
15     Q    Please look at Exhibit 3068.
16          (Above-mentioned document marked
17 for Identification.)
18     Q    You send this e-mail on August 7,
19 2015 to Ann Munksgaard and Lill Drost,
20 correct?
21     A    Yes.
22     Q    And in the second paragraph of the
23 e-mail, you say, "I know this case is already
24 at the deputy director level, Rene Jørgensen.
25 They must take action on this payment."

Page 230

1           Is that right?
2      A    Yes.
3           THE INTERPRETER:  So after Rene
4  Jørgensen, can you read to me again what
5  you -- what your translation said?
6      Q    Well, were you saying that -- were
7  you recommending that they take action to
8  stop payment on dividend reclaims?
9      A    No, I did not, because I am not
10 authorized to make such recommendations.
11 That should come from Dorthe Pannerup and
12 this is what René should decide that he wants
13 to do.
14     Q    Why did René have responsibility
15 for making this decision?
16     A    Because he's head of Payment and
17 Account is the name of Account 2 before.
18     Q    In the paragraph starting "Vi har
19 fundet," do you see the sentence beginning
20 "Der er aldrig?"
21          Do you see that?
22     A    Yes.
23     Q    In that paragraph, you're
24 describing your understanding of how the
25 fraud was conducted, correct?

Page 231

1      A    Based on the information that we
2  had received from the U.K.
3      Q    And you say that "physical
4  transfers of equities, securities, or
5  payments have never been made."
6           Is that right?
7      A    Yes, it is true.  Because in the
8  report it says that we're only talking about
9  a number of items listed in the books without
10 shares or without money.
11          That is what we are basing this on.
12     Q    Explain what you mean when you say
13 that you're "talking about a number of items
14 listed in the books without shares or without
15 money."
16     A    So what we were told is that in
17 this case there are no shares and there --
18 there is no money.  And when we see the case,
19 if we see documentation, now I am, of course,
20 trying to interpret what I've seen.
21          What we were seeing was only
22 bookkeeping figures on a piece of paper
23 without any actual contents, which means that
24 no shares and no money were actually involved
25 in it.

Page 276

1  our first analysis with A.P. M☐eller Maersk.
2  A.P. M-☐-E-L-L-E-R, and then M-A-E-R-S-K.
3       As far as I remember, we did our
4  first analysis for -- on A.P. M☐eller Maersk.
5  I think that, in connection with payment
6  of -- from 2014, I think that was over
7  100 percent.
8       Q    So is that -- are you referring to
9  Exhibit 3057?
10      A    Yes.
11           (Above-mentioned document marked
12  for Identification.)
13      Q    Mr. Ekstrand, the analysis that
14  you're performing in these documents in 2016,
15  this could have been performed in 2014,
16  correct, based on information available to
17  SKAT?
18           MR. WEINSTEIN:  Objection to the
19  form.
20      A    As I said before, in theory, you
21  can conduct these investigations.  We only
22  made these investigations based on the report
23  we received that fraud had been going on,
24  which, for us, was the -- was the impetus to
25  get started on this whole investigation

Page 277

1  process.
2       Q    So we talked earlier this morning
3  about the series of events in the summer of
4  2015 where you learned about allegations that
5  a fraud was being perpetrated on SKAT.
6       A    Correct.
7       Q    And so, I think where we left
8  things was at the August 6, 2015 meeting that
9  Dorthe Pannerup convened.
10           Can you explain to me what happened
11  after that meeting with respect to the
12  decision to stop paying reclaims?
13      A    No, I can't explain because that
14  process was out of my hands.  This was solely
15  a process handled by Dorthe.
16           My focus was on the -- was on the
17  fraud perpetrated.
18      Q    So explain to me how you began to
19  investigate the fraud?
20      A    So, after the meeting, I went with
21  Sven Neilsen to his office.  I asked him to
22  show me system 3S.
23           I asked him to check -- make some
24  random pension plan names that I had brought
25  with me.  And we discovered hits for these

Page 278

1  companies, that payments had been made to
2  these companies.
3           I asked him to find the relevant
4  applications.  And that way, we could work
5  our way to locating a substantial number of
6  applications that had been made in connection
7  with the company in question.
8           And then a more extensive
9  verification process began, because by that
10  time, we had a list of -- as far as I
11  remember, 180 names, and lists we had
12  received from the U.K. authorities.
13          And so we did various searches with
14  these -- on these names and found various
15  material pertaining to them, in order
16  to -- in order to calculate the amount that
17  we had paid out to these various pension
18  plans.
19      Q    Did you make any factual
20  determinations as to how these pension plans
21  had perpetrated the fraud on SKAT?
22      A    So, no.  What this was about was
23  establishing the amount in total that had
24  been paid out, and to collect the relevant
25  material supporting this, and send everything

Page 279

1  to the police for further investigation.
2       Q    And remind me, how did you assemble
3  the list of pension plans that you had
4  provided to obtain more information on?
5       A    So this was a list that I had
6  received from the U.K. authorities.
7       Q    Did you do anything else with the
8  list or was it just the contents of that
9  list?
10           MR. WEINSTEIN:  Objection to form.
11      A    So the list contained names of
12  applicants.  So obviously, we used the names
13  to search for information.
14      Q    Did you make any effort to relate
15  the applicants to each other, or relate them
16  to additional applicants that weren't on the
17  list from the U.K. authorities?
18           MR. WEINSTEIN:  Objection to form.
19      A    So we have made reporting on this
20  case on three occasions to the police.  The
21  first report we made to the police is placed
22  with the 180-odd names of companies.
23           And based on that, we, of course,
24  expanded outside parameters to see if there
25  were any more similar cases, whether there

Page 300

1  A   Yes, it was.
2  Q   Okay. You can put that aside.
3      You testified about a meeting that
4  you attended on 6th of August, 2015 with
5  Dorthe Pannerup and others.
6  A   Correct.
7  Q   At that meeting, there was
8  discussion about stopping refund payments.
9      Is that right?
10 A   Correct.
11 Q   You mentioned that it was not the
12 ultimate decision whether SKAT could stop
13 payments.
14     Is that right?
15 A   Correct.
16 Q   Did SKAT stop making refund
17 payments after that meeting?
18 A   They did, yes.
19 Q   Did it stop the payments the same
20 day as the meeting took place?
21 A   Yes.
22 Q   I want to ask you to turn to
23 Page 291 of the 30(b)(6) document bundle that
24 you have.
25     You were asked earlier today about

Page 301

1  a working group that was set up after the
2  SIR 2010 report was issued.
3  A   Yes.
4  Q   Is this memo at Page 291 a memo of
5  the working group dated June 8th of 2011?
6  A   Correct.
7  Q   It discusses the work of the
8  working group?
9  A   Correct.
10 Q   I'm going to have you turn now to
11 Exhibit 3009. This is the ER2013 report we
12 looked at earlier today.
13 A   Yes.
14 Q   If you turn to Section 3.8, does
15 that section identify action steps that SKAT
16 took in response to the SIR 2002 audit
17 report?
18 A   Yes.
19     MR. WEINSTEIN: We have no further
20 questions, Mr. Ekstrand.
21     MR. SCHOENFELD: Nothing further
22 here.
23     VIDEO OPERATOR: Please stand by.
24 The time is 11:27 a.m. New York time and
25 we're going off the record.

Page 302

1      (Whereupon, the deposition was
2  concluded at 11:27 a.m.)
3      (Witness was excused.)
4      THE COURT REPORTER: Just recapping
5  orders, Hughes Hubbard, two realtime hookups,
6  rough draft, two-day final.
7      Hanamirian, standard delivery copy.
8      Kostelanetz, standard delivery
9  copy, plus one realtime hookup.
10     K&L Gates, rough draft, standard
11 delivery copy, plus one realtime hookup.
12     Wilmer Hale, five realtime hookups,
13 rough draft, standard delivery copy.
14     Binder & Schwartz, one realtime
15 hookup, rough draft, standard delivery copy.
16     Dewey Pegno, rough draft, standard
17 delivery copy.

Page 303

1          C E R T I F I C A T E
2      I, CHARLENE FRIEDMAN, a Certified Court
3  Reporter and Notary Public, qualified in and for
4  the State of New Jersey do hereby certify that
5  prior to the commencement of the examination
6  CHRISTIAN EKSTRAND was duly sworn by me to testify
7  to the truth the whole truth and nothing but the
8  truth.
9      I DO FURTHER CERTIFY that the foregoing
10 is a true and accurate transcript of the testimony
11 as taken stenographically by and before me at the
12 time, place and on the date hereinbefore set forth.
13     I DO FURTHER certify that I am neither a
14 relative of nor employee nor attorney nor counsel
15 for any of the parties to this action, and that I
16 am neither a relative nor employee of such attorney
17 or counsel, and that I am not financially
18 interested in the action.
19
20
21     _____
22     CHARLENE FRIEDMAN, RPR, CRR, CCR of the
23     State of New Jersey
24     License No: 30XI00204900
25     Date: May 7, 2021

CONFIDENTIAL
Christian Ekstrand - May 7, 2021

32 (Pages 304 to 307)

### Page 304

LAWYER'S NOTES

PAGE  LINE

(blank lined form, lines 3–25)

### Page 305

DEPOSITION ERRATA SHEET

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 20____

_____
CHRISTIAN EKSTRAND

### Page 306

DEPOSITION ERRATA SHEET

Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____

SIGNATURE: _____ DATE: _____
        CHRISTIAN EKSTRAND

### Page 307

DEPOSITION ERRATA SHEET

Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____

SIGNATURE: _____ DATE: _____
        CHRISTIAN EKSTRAND