# EXHIBIT 1

CONFIDENTIAL
Christian Ekstrand - May 6, 2021

Page 1

```
1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2              MASTER DOCKET 18-MD-2865(LAK)
                  CASE NO. 18-CV-09797
3
    _____
4                                            )
    IN RE:                                   )
5                                            )
    CUSTOMS AND TAX ADMINISTRATION OF        )
6   THE KINGDOM OF DENMARK                   )
    (SKATTEFORVALTNINGEN) TAX REFUND         )
7   SCHEME LITIGATION                        )
                                             )
8   _____)

9

10

11

12        *************************************
          *                                   *
13        *            CONFIDENTIAL           *
          *                                   *
14        *************************************

15

16

17   REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

18                  EXAMINATION OF

19            CHRISTIAN EKSTRAND - VOLUME I

20               DATE: May 6, 2021

21

22

23

24

25   REPORTED BY:  CHARLENE FRIEDMAN, CCR, RPR, CRR
```

Page 10

1    THE COURT REPORTER:  My name is
2  Charlene Friedman, a Certified Shorthand
3  Reporter.  This deposition is being held via
4  videoconferencing equipment.
5         The witness and reporter are not in
6  the same room.  The witness will be sworn in
7  remotely pursuant to agreement of all
8  parties.  The parties stipulate that the
9  testimony is being given as if the witness
10 was sworn in person.

Page 11

1    VIDEO OPERATOR:  We are now on
2  record.  This is the remote video recorded
3  deposition of Christian Ekstrand.
4         Today is Thursday, May 6, 2020.
5  The time is now 6:02 a.m. New York time.
6         We are here in the matter of In Re
7  Custom and Tax Administration of the Kingdom
8  of Denmark, et al.  All counsel have been
9  noted on record.
10        My name is Jose Rivera, remote
11 video technician on behalf of Gregory Edwards
12 LLC.
13        At this time, will the reporter,
14 Charlene Friedman, on behalf of Gregory
15 Edwards LLC, please swear in the interpreter.
16
17 I N G D R  G R E G E R S E N,
18        Called as the official interpreter in
19 this action, was duly sworn to faithfully translate
20 the questions to the witness from English to
21 Danish, and the answers from Danish to English.
22
23 C H R I S T I A N  E K S T R A N D,
24        called as a witness, having been first duly sworn
25 according to law, testifies as follows:

Page 12

1  EXAMINATION BY MR. SCHOENFELD:
2     Q    Good morning.
3          Could you please state your name
4  for the record?
5     A    My name is Christian Ekstrand.
6     Q    Mr. Ekstrand, do you understand
7  English?
8          THE INTERPRETER:  Yes, he does.
9     Q    Do you speak English?
10    A    Not fluently.
11    Q    Have you given presentations
12 concerning the facts at issue in this case in
13 English?
14    A    Only a very few times.
15    Q    Do you understand these questions
16 in English as I'm asking them to you?
17    A    Most of them, yes.
18    Q    Okay.  Mr. Ekstrand, can you tell
19 me everyone who's in the room with you?
20    A    Yes, I can.  The two ladies -- the
21 lawyers from Kammeradvokaten, the counsel to
22 the Danish government, and the two gentlemen
23 from our U.S. lawyers.
24         And then there's a Danish
25 representative of the other party of the

Page 13

1  defendants, and then there's the interpreter
2  and myself.
3     Q    The interpreter and yourself, is
4  that what you said?
5     A    Yes, that's correct.
6     Q    Okay.
7          MR. SCHOENFELD:  Because of the
8  challenges of this setup, I'm just going to
9  ask you, Ms. Gregersen, to wait to start your
10 translation until I've completed my question.
11    Q    And Mr. Ekstrand, I'll ask you to
12 wait to start answering the question until
13 Ms. Gregersen is completed, and I'll try to
14 do the same so we don't talk over each other.
15        MR. WEINSTEIN:  Alan, before you
16 keep going, I'm just going to ask Mr.
17 Ekstrand to keep his voice up.  Even though
18 it's not being put into the court reporter's
19 record, we want his voice to come through on
20 the video -- audio.  So can you just ask
21 Mr. Ekstrand to keep his voice up?
22    A    I will do.
23        MR. BINDER:  Excuse me.  This is
24 Neil Binder.  I'm sorry.  Before we begin,
25 we're getting a significant echo, making it

Page 90

1  these various measures will be put in place
2  until collection can take place.
3      Q    So is it fair to say that -- is it
4  fair to say that Danish companies pay taxes
5  to SKAT on a net basis?
6      A    I won't reclaim my answer that I
7  just gave.  They have to pay their taxes on
8  time.
9      Q    So I want to understand this.
10          Is it your understanding that
11 Danish companies must pay the total amount of
12 dividend withholding tax in connection with a
13 particular issuance of dividend by a
14 particular date, regardless of what their
15 other outstanding liabilities and credits
16 are?
17     A    Yes.  And that would be the natural
18 process as the company will pay out
19 dividends, as they are supposed to, as a
20 gross dividend, and they will just withhold
21 the relevant amount, the relevant percentage.
22          If they are to pay out, let's say,
23 ten billion, they will pay out ten billion,
24 and then withhold whatever amount is owed to
25 the Danish -- to SKAT.  It is of no

Page 91

1  significance to them because they have
2  reserved the amount that they will pay out to
3  their shareholders, whether it be ten billion
4  or not.
5           And so the amount of taxes is of no
6  consequence.
7      Q    Does SKAT keep records of the
8  remittance of particular amounts of dividend
9  withholding tax relative to the dividend
10 issuance date?
11          THE INTERPRETER:  Can I ask you to
12 repeat that, please?
13          MR. SCHOENFELD:  Sure.
14     Q    Does SKAT maintain records of the
15 remittance of particular amounts of dividend
16 withholding tax relevant to the dividend
17 issuance date?
18          THE INTERPRETER:  I'm not sure I
19 understand the question.
20     Q    Is there somewhere in SKAT you can
21 look to confirm that a Danish company has
22 paid the full amount of dividend withholding
23 tax, and only dividend withholding tax, on a
24 particular issuance?
25          MR. WEINSTEIN:  Objection to form.

Page 92

1      A    Yes, I would say so.  Because in
2  their tax account, you can see all payments
3  that have been made.
4           So therefore, you would also be
5  able to check whatever the -- the withholding
6  tax that they made.
7      Q    Is the company issuing the dividend
8  the only party responsible for withholding
9  dividend tax?
10     A    When you say "responsible," what do
11 you mean by "responsible?"
12     Q    Does SKAT ever receive dividend
13 withholding tax from any party other than the
14 company issuing the dividend?
15     A    Not to my knowledge.  And I can't
16 imagine what situation that would happen in.
17     Q    You referred earlier in your
18 deposition testimony to "dividend
19 compensation," right?
20     A    Yes, but you were asking about
21 CumEx in Germany.
22     Q    Are you aware of dividend
23 compensation being paid with respect to any
24 Danish shares or shares of any Danish
25 corporations?

Page 93

1      A    No, I'm not.
2      Q    You don't know one way or the other
3  whether dividend compensation is ever paid
4  with respect to shares in Danish companies?
5           MR. WEINSTEIN:  Objection to form.
6      A    No.
7      Q    Okay.  So I just want to -- I just
8  want to make sure I understand this.
9           Does SKAT receive any payments from
10 companies that are nothing other than
11 dividend withholding tax?
12          MR. WEINSTEIN:  Objection to form.
13     A    Are you saying whether we, as the
14 authorities, received other tax payments?
15     Q    So let me direct you to
16 Exhibit 3060.  3-0-6-0.
17          (Above-mentioned document marked
18 for Identification.)
19     Q    Do you have the document in front
20 of you?
21     A    Yes, if this is the correct
22 document.
23     Q    It's "SKAT's Responses and
24 Objections to Defendant's Second Set of
25 Interrogatories."

Page 94

1  Do you see that?
2  A  Yes.
3  Q  Okay. Mr. Ekstrand, have you seen
4  this document before?
5  A  No, I have not.
6  Q  If you turn to Page 10 of the
7  document -- I apologize.
8  If you turn to the last page of the
9  document, you'll see it's signed by
10 Gry Ahlefeld-Engel.
11 Do you see that?
12 A  Yes.
13 Q  Do you know who Mr. Ahlefeld-Engel
14 is?
15 A  Gry is a female. So she is a
16 director within the Danish tax agency.
17 Q  What are her responsibilities?
18 A  I am not aware of all the areas
19 that she handles, but she does work on this
20 case. She's responsible for this case.
21 Q  When you say she's "responsible"
22 for this case, what does that mean?
23 A  It is part of her work portfolio.
24 Q  Okay. If you look at Page 10 of
25 the Interrogatory response -- and you should

Page 95

1  review as much of this document as you need
2  to -- but I'm drawing your attention to --
3  MR. WEINSTEIN: It's in English,
4  so -- and there are very technical terms in
5  there. So you'll need to have it translated.
6  Q  Okay. Well, I'm drawing your
7  attention to the statement on Page 10 that
8  says, "Subject to and without waiving any
9  objections, SKAT responds by stating that
10 company taxes are paid on a balance principle
11 in which a company's tax liabilities to SKAT
12 are an aggregate and an offset by any tax
13 credits/refunds due from SKAT to that
14 company, and the company pays the final
15 balance to SKAT."
16 Then it says, "SKAT's collection of
17 dividend withholding tax will consequently
18 depend on other taxes due from any
19 credits/refunds due to the dividend-issuing
20 company, and therefore it's not separately
21 accounted."
22 MR. SCHOENFELD: So I'm going to
23 pause for a second and allow Kirsten to
24 translate for Mr. Ekstrand.
25 Q  Mr. Ekstrand, is this consistent

Page 96

1  with your understanding that dividend
2  withholding tax paid by Danish companies is
3  not separately accounted for within SKAT?
4  A  So, my understanding, and I may
5  very well have misunderstood that, but my
6  understanding is that in the company's tax
7  account, you will be able to see any
8  outstanding amounts. And that is how I -- it
9  is based on this understanding that I made or
10 I gave my answers earlier.
11 Q  So let's use an example, just to
12 make sure we understand this.
13 Let's say that --
14 THE INTERPRETER: Give me one
15 second.
16 MR. SCHOENFELD: Sure.
17 THE INTERPRETER: Yes. Sorry.
18 Q  So we're going to use an example.
19 Suppose that TDC owes SKAT dividend
20 withholding tax of 50 million kroner and
21 other taxes of 50 million kroner.
22 Do you have that in mind?
23 A  Yes.
24 Q  And so TDC has a total tax
25 liability of 100,000,000 kroner in this

Page 97

1  example, right?
2  A  Correct.
3  Q  So now suppose the TDC is owed
4  90 million kroner in tax credits or
5  repayments by SKAT. Okay?
6  A  Yes.
7  Q  Okay. So in that example, TDC
8  would make a payment of only 10 million
9  kroner to SKAT, right?
10 A  Yes. But it is still my belief
11 that if the two amounts of 50 million and 50
12 million, if they're not made in time, then
13 you cannot do this whole
14 calculation -- sorry, correction -- that
15 these two amounts are due at the same time.
16 Q  Is your understanding -- well, let
17 me ask this differently.
18 Do you have any reason to disagree
19 with the Interrogatory response that we just
20 read?
21 A  No, but I think that we are
22 basically saying the same thing.
23 Q  Explain for me how your testimony
24 is consistent with the statement in the
25 Interrogatory, "dividend withholding tax is

Page 98

1  paid on a balance principle and not
2  separately accounted."
3      MR. WEINSTEIN:  Objection to form.
4    A   Yes, I will try.
5      So the company had one tax account,
6  which is what I said earlier.  So once there
7  is an amount outstanding and there is a
8  payment deadline, this will be recorded in
9  your account as an amount due.
10     So if you do not pay the amount,
11 then the amount remains in the account.  And
12 then -- so then, again, with the example of
13 the 50 million, there are -- you have the
14 50 million that is withholding tax,
15 50 million, something other taxes, and
16 100 million in total -- these amounts will
17 afford you, in succession, and that
18 was -- stand up in your account, then
19 obviously, if there are any credits or
20 whatever due, then that will be -- offset
21 this amount and then you will have to pay the
22 remaining amount.
23     But if you had no other taxes to
24 pay other than your withholding, this tax
25 would be in your account and then due.  So in

Page 99

1  my mind, my thinking is the same as well as
2  stated in the text that we read out loud.
3    Q   So let's say that on January 1st,
4  you've got 50 million kroner in tax credits
5  in your account, and 50 million kroner in
6  dividend withholding taxes is due to SKAT on
7  January 10th.
8      Do you have that in mind?
9    A   Just to -- just to check, are you
10 saying that 50 million outstanding plus
11 50 million withholding tax, or both amounts
12 due, or did you say 50 million tax credit and
13 50 million withholding tax?
14   Q   50 million tax credit in the
15 account on the day that 50 million in
16 withholding tax is due to be paid to SKAT.
17   A   So they even each other out, and
18 then, of course, you do not have to pay
19 50 million.
20   Q   Right.  So on the date that the
21 company is obligated to remit the withholding
22 tax to SKAT, it doesn't actually pay any
23 money to SKAT, correct?
24     MR. WEINSTEIN:  Objection to form.
25   A   These are amounts that fall due, so

Page 100

1  they are obligated to pay the 50 million.  So
2  in itself, it didn't change anything.
3    Q   The company in this example has
4  still paid its withholding tax, right?
5    A   Yes, because they have a tax credit
6  of 50 million and they have to pay
7  withholding tax of 50 million.
8      So those amounts even out each
9  other, and so then the account is zero.
10   Q   And so is it fair to say, as a
11 result of this netting process, SKAT doesn't
12 have any direct evidence that the company has
13 remitted withholding tax to the agency?
14     MR. WEINSTEIN:  Objection to form.
15   A   I'm not sure I understand the
16 reasoning, because they have the tax credit
17 of 50 million.  Then they have to pay
18 resulting taxes of 50 million.
19     So the money is still paid.
20   Q   But there's no evidence
21 of -- there's no -- nothing SKAT can point to
22 to show the actual payment of the withholding
23 tax, right?  It's just obligations and
24 liabilities netted in the account?
25     MR. WEINSTEIN:  Objection to form.

Page 101

1    A   So I still don't understand the
2  reasoning behind your argument, because there
3  may not be something specific you can point
4  to, but they had to pay withholding tax of
5  50 million.
6      Then they had a tax credit that is
7  offset against the payment.  So they still
8  make their payment.
9    Q   But there won't be a bank receipt
10 or a SWIFT confirm for the payment of the
11 withholding tax, correct?
12   A   No, because there was no bank
13 transfer.
14   Q   Okay.
15     MR. SCHOENFELD:  Do you want to
16 take a short break now?
17     MR. WEINSTEIN:  Sure.
18     VIDEO OPERATOR:  Please stand by.
19 The time is 10:24 a.m. New York time, and
20 we're going off the record.
21     (Brief recess taken.)
22     VIDEO OPERATOR:  The time is
23 10:40 a.m. New York time and we're back on
24 record.
25   Q   Mr. Ekstrand, what's the name of

Page 158

1  for you to repeat the question and maybe
2  break it down a little bit for me.
3           MR. SCHOENFELD:  Sure.  Well, let
4  me repeat it back to you slowly and see if we
5  can do it that way.
6       Q    Could an account holding
7  institution net trades in the same stock by
8  merging those trades into fewer --
9           THE INTERPRETER:  Go on, please.
10      Q    So can an account holding
11 institution net trades in the same stock,
12 merge those trades into fewer trades for
13 reporting to a central clearing counterparty?
14          MR. WEINSTEIN:  Objection to form
15 and same objections as made.
16          Can you hear us?
17          MR. SCHOENFELD:  We can hear you
18 but can't see you.  Why don't we go off the
19 record while you're figuring this out.
20          VIDEO OPERATOR:  Stand by.  The
21 time is 1:44 p.m. New York time, and we're
22 going off the record.
23          (Brief recess taken.)
24          VIDEO OPERATOR:  The time is
25 1:49 p.m. New York time.  We're back on the

Page 159

1  record.
2       Q    Mr. Ekstrand, I don't think the
3  court reporter got your answer to the last
4  question.
5       A    The answer was "I have no idea."
6       Q    Okay.  Mr. Ekstrand, are you
7  familiar with the decision to cancel reclaims
8  that were filed with SKAT?
9       A    Yes.
10      Q    Were you involved in the process to
11 cancel the reclaims at issue in this case?
12      A    Yes.
13      Q    What role did you play?
14      A    So I was the -- I had the project
15 responsibility for the staff in -- the staff
16 who undertook the letter writing at the
17 period.  So I was the one in charge of
18 the -- what we referred to as the dividend
19 withholding tax case.
20           I was in charge of what we refer to
21 as the dividend withhold tax case.  I was in
22 charge of the people carrying out the
23 verification of this.
24           They reported to me at this time as
25 regards the professional aspect, not the

Page 160

1  management aspect.
2       Q    What is the difference between the
3  professional aspect and the management
4  aspect?
5       A    So I did not have any management
6  responsibility.  I could not tell them to do
7  this, that, or the other.
8            But the professional responsibility
9  for this was with me.
10      Q    Who did have management
11 responsibility over the personnel responsible
12 for implementing the decision to cancel the
13 reclaims?
14      A    So my supervisor, as previously
15 mentioned, Lill Drost.
16      Q    And so what, exactly, was Lill
17 Drost's role in the process for revoking the
18 prior approval of the reclaims?
19      A    So she was in charge of the
20 management aspect for this and for the
21 decisions that were made.  Since they are in
22 excess of 10 million, she also had to sign
23 the letters.
24      Q    Do you recall when the decision was
25 first made to revoke any of the reclaims at

Page 161

1  issue in this case?
2       A    I don't remember specifically.
3       Q    Do you remember roughly what year?
4       A    So there was a process first where
5  we reviewed the applications that we had
6  received, but where we had yet to pay out any
7  refunds.  And in that process we uncovered
8  that many of these applications were not
9  actually entitled to receive a refund.
10           Then we began the process of
11 revoking previous positions that we had made
12 because there were many repetitions.
13           So I think that we were around
14 2017, but this is guesswork.  It would be
15 stated in the letters.
16      Q    Were applications identified for
17 review for potential revocation?
18      A    Are we talking about applications
19 or applicants?
20      Q    So I want to understand the
21 process.
22           At some point, you become aware of
23 a -- allegations of fraud, correct?
24      A    Yes.
25      Q    And do you then determine that

Page 166

1  for Identification.)
2       Q    Do you have the document in front
3  of you?
4       A    Yes.
5       Q    Okay.  Do you recognize this
6  document?
7       A    Yes.
8       Q    What is it?
9       A    So this is a decision made in our
10 unit about a recall of previous decisions on
11 withholding tax refunds.
12      Q    Can you describe the process that
13 SKAT undertook to reach the decision to issue
14 this determination?
15      A    So this is a decision made about
16 recall and cancellation of previous
17 decisions.  In connection with review of
18 requests that had yet to be paid out, we
19 contacted all pension plans asking them about
20 the documentation of ownership.
21           We also contacted the U.S.
22 authorities to get more information about
23 the -- these pension plans, about the
24 ownership.
25           So we then determined that we had

Page 167

1  documentation that in these cases where we
2  rejected the application, that they did not
3  have ownership of the shares that were the
4  focus of their application, and there were
5  several repetitions within this group of
6  people being denied who were also -- there
7  were several repetitions within this group of
8  companies that were being denied who had
9  already had application approved and paid out
10 previously.
11           Thus we decided to review decisions
12 that had already led to refunds.  That means
13 that we contacted the American RS.  We got
14 information about the various pension plans,
15 about their capital foundation, whether they
16 had filed tax returns, et cetera.
17           And on the basis of this, we -- we
18 reopened our case review of these
19 applications and we contacted the -- the
20 pension plans in question.  We wrote to them
21 that we were planning to cancel the refunds
22 and that we would be requesting repayment of
23 the refunds.
24           So the process is that you write
25 them, right, to say "this is what we are

Page 168

1  planning to do," and then give them the
2  opportunity to make objections.  And they can
3  then, maybe, whatever they want to do, submit
4  further documentation stating that they
5  have -- that this is what they're demanding.
6           But if we did not receive any
7  documentation or anything, then we would then
8  be able to approve.  And then we would go
9  ahead and make a decision on recalling the
10 refund.
11      Q    Anything else?
12      A    So, by and large, that is the
13 process.
14      Q    On Page 10 of this letter, the
15 second paragraph from the bottom, the
16 paragraph starting -- I'll read it in
17 English.
18           Do you see that paragraph,
19 Mr. Ekstrand, the second from the bottom?
20      A    Yes.
21      Q    How did SKAT come to the decision
22 that the plan here did not own -- "does not
23 own and did not own the shares mentioned in
24 the claim forms and did not receive dividends
25 on the shares mentioned on the claim forms?"

Page 169

1       A    This was based on our investigation
2  into this matter.  And this is a -- the
3  pension plan in question here was newly
4  established, meaning that they have very
5  limited funds, which is why we find it
6  unlikely that they thought -- that the
7  establishment would be able to invest
8  hundreds of millions in Danish shares.
9           We cannot see that the dividends
10 that they say to have obtained have been
11 transferred to their pension plan.  So,
12 therefore, we see them as not being the
13 beneficial owners of the securities that
14 formed the basis of their application.
15      Q    When you say "we can't see" -- so
16 let me start with the first of these.
17           How would you determine that they
18 had limited funds?
19      A    We had been informed that this
20 pension plan was newly established.  This is
21 what is referred to as a "one participant
22 pension plan" and we --
23           THE INTERPRETER:  Just one second,
24 please.
25      A    So a "one participant pension

Page 170

1  plan," and, therefore, with a limited capital
2  payment of $12,500 up until $53,000,
3  depending on how old you are.
4         So if you're talking about a newly
5  established pension plan and that you only
6  have $12,500 to work with, we find it highly
7  unlikely that you would be able to invest.
8         We announced that, I stated, in
9  Section 1.3 in this decision.
10     Q    You also rely on the fact that the
11 plan didn't submit a Form 5500 to the IRS,
12 correct?
13     A    What we had been informed was that
14 you need to file a tax return if you have
15 more than 250,000 U.S. dollars in your
16 pension plan.
17     Q    Who informed you of that?
18     A    This is information that we got
19 from the IRS.
20     Q    And based on your conversations
21 with the IRS, what was your understanding of
22 who was required to file a Form 5500?
23     A    The pension plans had to file the
24 Form 5500.
25     Q    And the basis for your

Page 171

1  understanding of that requirement is
2  discussions with the IRS.
3         Is that right?
4      A   Yes.
5      Q   And did you specifically ask the
6  IRS to produce the Form 5500 at the pension
7  plan?
8      A   So, as far as I remember, we have a
9  standard request with the -- with the IRS
10 about the pension plans, about the time
11 that -- the day that they were established,
12 whether they have submitted any kind of tax
13 return.
14     Q   Did you ask for any tax information
15 as associated with the employer associated
16 with the pension plan?
17     A   We did not know.
18     Q   Did you ask for any information
19 regarding the plan administrator associated
20 with the pension plan?
21     A   No.
22     Q   You also said that -- you also said
23 that you reached a determination that the
24 dividends had not been paid to these pension
25 plans, correct?

Page 172

1      A   What I said was that we weren't
2  able to determine that dividends had been
3  paid to these pension plans, and this was not
4  stated anywhere.
5      Q   What process did you undertake to
6  determine whether dividends had been paid to
7  any of the pension plans?
8      A   So, first of all, we looked again
9  to the IRS to find -- to uncover whether
10 there was any kind of income information for
11 these pension plans.  Then, of course, we
12 weren't able to locate their custodian
13 anywhere.
14        So there are various explanations
15 to this.  The pension plans did not explain
16 where the custodian could be found in this
17 connection.
18     Q   What do you mean, that there are
19 "various explanations" to the pension plans?
20     A   So our main argument is that we do
21 not believe that they owned the shares
22 because they do not have the necessary
23 capital.  There is no tax returns stating
24 where income or capital would have come from.
25        So then we investigated to see if

Page 173

1  we could find a custodian.  Then, we -- next,
2  we tried to find a custodian of Solo Capital.
3         And there may be good reasons that
4  they had their custodian registered with an
5  omnibus account.
6         THE INTERPRETER:  Hold on one
7  second.  So I -- the last part of my answer
8  was -- the last part I translated was
9  incorrect.  So here goes the correct version.
10     A   We tried to determine whether there
11 was a custodian account.  We weren't able to
12 find that, and there may be an explanation as
13 it could be in an omnibus account.
14        So we have not seen any
15 documentation showing that there is a
16 custodian account, which would include quite
17 a significant amount of shares as a -- or
18 related to a significant amount of shares, as
19 a number of pension plans was -- were went
20 through at this time with a substantial
21 amount of Danish shares.
22     Q   Is that referenced anywhere in the
23 cancellation order?
24     A   If you look at 1.4, it says that
25 they were looking for and were unable to

CONFIDENTIAL
Christian Ekstrand - May 7, 2021

30 (Pages 296 to 299)

Page 296

1  dividend withholding tax refunds requested by
2  U.S. pension plans, correct?
3       A    Well, not only to the American
4  pension plan.  The stock was for everyone.
5       Q    But you understand that some of the
6  transactions underlying those requests were
7  executed through Solo Capital Partners,
8  right?
9       A    Yes, we know Solo from this case.
10      Q    Are you aware that some of the
11 pension plans executed trades through
12 ED&F Man Capital Markets?
13      A    Yes.
14      Q    Are you familiar with the
15 transactions that the pension plans executed
16 through ED&F Man Capital Markets that were
17 the subject of withholding tax reclaims?
18      A    So you say "aware."  What I can say
19 is that I've seen ED&F Man in several of the
20 cases.
21      Q    My question is:  Do you have
22 familiarity with the transactions that the
23 pension plans executed through ED&F Man
24 Capital Markets?
25           MR. WEINSTEIN:  Objection to the

Page 297

1  form.
2       A    We have received some transcripts
3  from ED&F Man as custodian.
4       Q    I'm going to refer to the pension
5  plans that executed trades through ED&F Man
6  as the "ED&F Man pension plans," okay?
7       A    Yes.
8       Q    Are you familiar with the term
9  "Annex E" as it relates to the transactions
10 concerning the ED&F Man pension plans?
11      A    Which Annex E are you referring to?
12      Q    Are you familiar with any documents
13 known as "Annex E?"
14      A    I can't say, really, because
15 Annex E is a fairly standard designation for
16 an annex.
17           So to what are you referring?
18      Q    I'm referring to a document that
19 was Annex E to the amended defense that
20 ED&F Man filed in the English proceedings.
21      A    Well, I don't think so.
22      Q    Okay.  Thank you.
23           MR. BINDER:  I have no further
24 questions.
25           MR. WEINSTEIN:  Are there any other

Page 298

1  questions from any defense counsel?  Okay.
2           Let's take a five-minute break and
3  we'll come back and see if we have any
4  follow-up questions.
5           VIDEO OPERATOR:  Stand by.  The
6  time is 11:09 a.m. New York time and we're
7  going off the record.
8           (Brief recess taken.)
9           VIDEO OPERATOR:  The time is
10 11:18 a.m. New York time and we're back on
11 record.
12 EXAMINATION BY MR. WEINSTEIN:
13      Q    Mr. Ekstrand, are you a lawyer?
14      A    No.
15      Q    Are you an expert in the securities
16 industry?
17      A    No.
18      Q    Are you an expert in Danish law?
19      A    No.
20      Q    Can you turn to Exhibit 3077?
21           This was the revocation letter sent
22 to the Michelle Investments Plan.
23           Is that right?
24      A    Correct.
25      Q    Can you turn to the last page with

Page 299

1  the signatures?
2       A    Yes.
3       Q    In connection with the
4  investigation leading to the revocations, did
5  Mr. Christiansen report to you?
6       A    Yes, in relation to this
7  transaction.
8       Q    Would he report his factual
9  findings to you as part of his work?
10          MR. SCHOENFELD:  I'm sorry.
11 Objection.
12      A    He did, yes.
13      Q    Lill Drost was who signed the
14 letter?
15      A    Correct.
16      Q    Was Ms. Drost personally involved
17 in the process of gathering facts that were
18 relied upon in the revocation letter?
19      A    She was not, no.
20      Q    Why did Ms. Drost sign the letter?
21      A    She was our unit head.  She was our
22 unit head.  Therefore, it was necessary for
23 her to sign our decision.
24      Q    Did it require someone at her level
25 in SKAT to sign off on the revocation?

CONFIDENTIAL
Christian Ekstrand - May 7, 2021

31 (Pages 300 to 303)

Page 300

1   A   Yes, it was.
2   Q   Okay.  You can put that aside.
3       You testified about a meeting that
4   you attended on 6th of August, 2015 with
5   Dorthe Pannerup and others.
6   A   Correct.
7   Q   At that meeting, there was
8   discussion about stopping refund payments.
9       Is that right?
10  A   Correct.
11  Q   You mentioned that it was not the
12  ultimate decision whether SKAT could stop
13  payments.
14      Is that right?
15  A   Correct.
16  Q   Did SKAT stop making refund
17  payments after that meeting?
18  A   They did, yes.
19  Q   Did it stop the payments the same
20  day as the meeting took place?
21  A   Yes.
22  Q   I want to ask you to turn to
23  Page 291 of the 30(b)(6) document bundle that
24  you have.
25      You were asked earlier today about

Page 301

1   a working group that was set up after the
2   SIR 2010 report was issued.
3   A   Yes.
4   Q   Is this memo at Page 291 a memo of
5   the working group dated June 8th of 2011?
6   A   Correct.
7   Q   It discusses the work of the
8   working group?
9   A   Correct.
10  Q   I'm going to have you turn now to
11  Exhibit 3009.  This is the ER2013 report we
12  looked at earlier today.
13  A   Yes.
14  Q   If you turn to Section 3.8, does
15  that section identify action steps that SKAT
16  took in response to the SIR 2002 audit
17  report?
18  A   Yes.
19      MR. WEINSTEIN:  We have no further
20  questions, Mr. Ekstrand.
21      MR. SCHOENFELD:  Nothing further
22  here.
23      VIDEO OPERATOR:  Please stand by.
24  The time is 11:27 a.m. New York time and
25  we're going off the record.

Page 302

1       (Whereupon, the deposition was
2   concluded at 11:27 a.m.)
3       (Witness was excused.)
4       THE COURT REPORTER:  Just recapping
5   orders, Hughes Hubbard, two realtime hookups,
6   rough draft, two-day final.
7       Hanamirian, standard delivery copy.
8       Kostelanetz, standard delivery
9   copy, plus one realtime hookup.
10      K&L Gates, rough draft, standard
11  delivery copy, plus one realtime hookup.
12      Wilmer Hale, five realtime hookups,
13  rough draft, standard delivery copy.
14      Binder & Schwartz, one realtime
15  hookup, rough draft, standard delivery copy.
16      Dewey Pegno, rough draft, standard
17  delivery copy.

Page 303

1              C E R T I F I C A T E
2       I, CHARLENE FRIEDMAN, a Certified Court
3   Reporter and Notary Public, qualified in and for
4   the State of New Jersey do hereby certify that
5   prior to the commencement of the examination
6   CHRISTIAN EKSTRAND was duly sworn by me to testify
7   to the truth the whole truth and nothing but the
8   truth.
9       I DO FURTHER CERTIFY that the foregoing
10  is a true and accurate transcript of the testimony
11  as taken stenographically by and before me at the
12  time, place and on the date hereinbefore set forth.
13      I DO FURTHER certify that I am neither a
14  relative of nor employee nor attorney nor counsel
15  for any of the parties to this action, and that I
16  am neither a relative nor employee of such attorney
17  or counsel, and that I am not financially
18  interested in the action.
19
20
21  _____
22  CHARLENE FRIEDMAN, RPR, CRR, CCR of the
23  State of New Jersey
24  License No:  30XI00204900
25  Date:  May 7, 2021