# Exhibit 2

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
MASTER DOCKET 18-MD-2865(LAK)
CASE NO. 18-CV-09797

_____
                                       )
IN RE:                                 )
                                       )
CUSTOMS AND TAX ADMINISTRATION OF      )
THE KINGDOM OF DENMARK                 )
(SKATTEFORVALTNINGEN) TAX REFUND       )
SCHEME LITIGATION                      )
                                       )
_____)


```
*************************************
*                                   *
*           CONFIDENTIAL            *
*                                   *
*************************************
```

REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL
EXAMINATION OF
CHRISTIAN EKSTRAND - VOLUME I
DATE: May 6, 2021


REPORTED BY:  CHARLENE FRIEDMAN, CCR, RPR, CRR

Page 10

1  THE COURT REPORTER: My name is
2  Charlene Friedman, a Certified Shorthand
3  Reporter. This deposition is being held via
4  videoconferencing equipment.
5  The witness and reporter are not in
6  the same room. The witness will be sworn in
7  remotely pursuant to agreement of all
8  parties. The parties stipulate that the
9  testimony is being given as if the witness
10 was sworn in person.

Page 11

1  VIDEO OPERATOR: We are now on
2  record. This is the remote video recorded
3  deposition of Christian Ekstrand.
4  Today is Thursday, May 6, 2020.
5  The time is now 6:02 a.m. New York time.
6  We are here in the matter of In Re
7  Custom and Tax Administration of the Kingdom
8  of Denmark, et al. All counsel have been
9  noted on record.
10 My name is Jose Rivera, remote
11 video technician on behalf of Gregory Edwards
12 LLC.
13 At this time, will the reporter,
14 Charlene Friedman, on behalf of Gregory
15 Edwards LLC, please swear in the interpreter.
16
17 I N G D R  G R E G E R S E N,
18 Called as the official interpreter in
19 this action, was duly sworn to faithfully translate
20 the questions to the witness from English to
21 Danish, and the answers from Danish to English.
22
23 C H R I S T I A N  E K S T R A N D,
24 called as a witness, having been first duly sworn
25 according to law, testifies as follows:

Page 12

1  EXAMINATION BY MR. SCHOENFELD:
2      Q    Good morning.
3           Could you please state your name
4  for the record?
5      A    My name is Christian Ekstrand.
6      Q    Mr. Ekstrand, do you understand
7  English?
8           THE INTERPRETER: Yes, he does.
9      Q    Do you speak English?
10     A    Not fluently.
11     Q    Have you given presentations
12 concerning the facts at issue in this case in
13 English?
14     A    Only a very few times.
15     Q    Do you understand these questions
16 in English as I'm asking them to you?
17     A    Most of them, yes.
18     Q    Okay. Mr. Ekstrand, can you tell
19 me everyone who's in the room with you?
20     A    Yes, I can. The two ladies -- the
21 lawyers from Kammeradvokaten, the counsel to
22 the Danish government, and the two gentlemen
23 from our U.S. lawyers.
24          And then there's a Danish
25 representative of the other party of the

Page 13

1  defendants, and then there's the interpreter
2  and myself.
3      Q    The interpreter and yourself, is
4  that what you said?
5      A    Yes, that's correct.
6      Q    Okay.
7           MR. SCHOENFELD: Because of the
8  challenges of this setup, I'm just going to
9  ask you, Ms. Gregersen, to wait to start your
10 translation until I've completed my question.
11     Q    And Mr. Ekstrand, I'll ask you to
12 wait to start answering the question until
13 Ms. Gregersen is completed, and I'll try to
14 do the same so we don't talk over each other.
15          MR. WEINSTEIN: Alan, before you
16 keep going, I'm just going to ask Mr.
17 Ekstrand to keep his voice up. Even though
18 it's not being put into the court reporter's
19 record, we want his voice to come through on
20 the video -- audio. So can you just ask
21 Mr. Ekstrand to keep his voice up?
22     A    I will do.
23          MR. BINDER: Excuse me. This is
24 Neil Binder. I'm sorry. Before we begin,
25 we're getting a significant echo, making it

CONFIDENTIAL
Christian Ekstrand - May 6, 2021

5 (Pages 14 to 17)

Page 14

1  difficult to hear.
2           MR. SCHOENFELD:  We are not hearing
3  that here.  So I'm not sure if there's
4  anything we can do about it.
5           MR. EURBGS:  Let's just make sure
6  everyone other than this room and Alan's room
7  are on mute.
8      Q     Mr. Ekstrand, did you bring any
9  documents with you this morning?
10     A     No, I didn't, but I've been given
11 this bundle.
12     Q     Okay.  Are you aware your lawyers
13 produced a set of documents this morning
14 related to this deposition?
15          THE INTERPRETER:  I'm sorry.  I
16 didn't hear the start of your question.
17          MR. SCHOENFELD:  I asked:  Are you
18 aware that your lawyers produced a set of
19 documents this morning related to this
20 deposition?
21     A     Yes, I am.
22     Q     Can you explain what those
23 documents are?
24     A     Documents related to this case.
25 It's reports, memos, rulings, and other

Page 15

1  things that we're going to talk about in this
2  case.
3      Q     Did you select those documents or
4  did your lawyers?
5      A     I did not select them.
6      Q     Did you review those documents in
7  preparation for this deposition?
8      A     Yes, I did review them in
9  connection with my preparation for the
10 deposition.
11     Q     Did you -- did you review any other
12 documents in connection with this deposition?
13     A     Yes, I did.  I've gone through a
14 good deal of materials, documents, in
15 connection with the preparation.
16     Q     Okay.  Mr. Ekstrand, are you
17 currently employed?
18     A     Yes, I do.
19     Q     And by whom are you currently
20 employed?
21     A     I work for the Danish tax agency.
22     Q     And when did you start working for
23 SKAT?
24     A     I started working for SKAT in 2005
25 when it was merged.  And before that, I

Page 16

1  worked for the local authorities in the
2  district, or the municipality as we call it
3  here, of Helsing□r.
4      Q     What was your role when you first
5  began working at SKAT in 2005?
6      A     I was a tax auditor and we audited
7  ordinary business people and companies.  So
8  it's probably -- so self-employed people and
9  companies.
10          And I was in -- the audit
11 department was focusing on financial crime,
12 and that was also what I did in the
13 municipality before I joined SKAT.
14     Q     What were your responsibilities as
15 an auditor?
16     A     Are you asking back in 2005?
17     Q     Correct.
18     A     I was part of the group together
19 with the rest of the workforce in the
20 department, and I did independent audits and
21 checks.
22     Q     Were taxpayers selected for audits
23 randomly or did you audit people after you
24 were tipped off that they might be part of
25 financial crime?

Page 17

1      A     It could be both.
2      Q     Does SKAT, or did SKAT at the time,
3  have policies about whom it would audit?
4      A     Yes, they did.  There was a general
5  policy of which company is to be audited.
6           And then there was also the
7  possibility that the auditors took up cases
8  on their own initiative based on
9  information -- received information in the
10 press and so on.
11     Q     For how long were you a tax
12 auditor?
13     A     I'm still a tax auditor by
14 education, but from 2010 to 2012, I started
15 getting more responsibility in projects, in
16 project management, regarding who we were
17 auditing.
18     Q     So just so I understand, between
19 2005 and 2010, you were a tax auditor.  And
20 then, between 2010 and 2012, you still
21 operated as a tax auditor, but with more
22 supervisory responsibility.
23          Is that correct?
24     A     That's correct.
25     Q     And at some point, did you join a

Page 30

```
 1             THE WITNESS:  Sorry.
 2       Q     Did Accounting 2 have any control
 3  functions?
 4             MR. WEINSTEIN:  Objection to form.
 5       A     You can say that the way we were
 6  organized, it is an accounting department.
 7  But they were responsible for controlling and
 8  checking refunds of dividend withholding tax.
 9       Q     When you say "they were responsible
10  for controlling and checking refunds of
11  dividend withholding tax," what do you mean?
12       A     I mean that when you claim refunds
13  of dividend withholding tax, you must meet
14  certain conditions and you have to document
15  those requirements in connection with your
16  claim for refund.  But Accounting 2 checks
17  with the claim board, including checking of
18  the documents, very fine documenting that you
19  are the beneficial owner or included in the
20  claim or the application for refund.
21             And the application of claim was
22  rejected if the requirements were not met.
23       Q     During the time period of January
24  2012 to August 2015, who was the head of
25  Accounting 2?
```

Page 31

```
 1       A     As I remember it, Lisbeth Rømer was
 2  the head of the department until October '13,
 3  approximately, when she retired, and Dorthe
 4  Pannerup took over the position.
 5  D-O-R-T-H-E, and last name, P-A-N-N-E-R-U-P.
 6       Q     Do you know about how many
 7  employees Accounting 2 had during that
 8  period?
 9       A     I don't know for the entire
10  department exactly, but probably about a
11  man count of 20, but if you're talking
12  specifically about Accounting 2, it was five
13  or six people.
14       Q     Did that stay consistent over the
15  2012 to 2015 time period?
16       A     Yes, that was during that period.
17  It could vary, too, because people might have
18  stopped working and new employees come in.
19       Q     Were there budget cuts to
20  Accounting 2 during the period 2005 to 2015?
21       A     Could you repeat the period?
22  Apparently I got that wrong.
23             You were asking about which period?
24       Q     2005 to 2015.
25       A     Okay.  I don't know about the
```

Page 32

```
 1  specific budget cuts.  But generally, there
 2  were budget cuts in the tax agency during
 3  that period.
 4       Q     Were there complaints from
 5  personnel in Accounting 2 about a lack of
 6  resources?
 7             MR. WEINSTEIN:  Objection to form.
 8  Are you talking about for a ten-year period?
 9             MR. SCHOENFELD:  Correct.
10             MR. WEINSTEIN:  Objection to form.
11       A     I don't think I can answer
12  specifically, but as in all instances of
13  SKAT, there was some frustration about
14  resources during the period.
15       Q     Who is Sven Neilsen?
16       A     He was an employee of Accounting 2.
17       Q     During what time period?
18       A     He was employed during the period
19  you're asking about.  If you want the
20  specific period, I don't have that, but I can
21  look it up.
22       Q     During that time period, what were
23  Sven's responsibilities?
24       A     He was responsible for handling the
25  reclaims and for entering them into the 3S
```

Page 33

```
 1  system.
 2       Q     Was anyone other than Sven Nielsen
 3  responsible for handling reclaims?
 4       A     Well, there were other employees.
 5  There was a person called Laurits Cramer who
 6  was -- generally, he was opening the mailing
 7  and sorting it.
 8             And there were two ladies who did
 9  some inputs in the system, but it was
10  generally Sven who did it.
11       Q     Was Sven's work in processing
12  reclaims subject to any auditing?
13             MR. WEINSTEIN:  Objection to form.
14       A     I don't understand the question, so
15  could you ask it again?  Rephrase it, please?
16       Q     Did anyone in Accounting 2 or in
17  Payments and Accounting have responsibility
18  for auditing Sven's work in approving or
19  rejecting reclaim applications?
20             MR. WEINSTEIN:  Objection to form.
21       A     I don't know if anybody was
22  responsible for auditing Sven's work, but
23  when you're talking about payments of
24  disbursements, there's a functional
25  separation as always.
```

Page 50

1  dividend, and you could not hold the shares
2  for anybody else, for any other party.
3       That's as I understood what it
4  meant.
5    Q   Do you know that's what Sven
6  Neilsen -- do you know whether that's what
7  Sven Neilsen and Mr. Cramer understood the
8  definition of "beneficial ownership" was for
9  the period 2012 to 2015?
10   A   It's difficult for me to answer
11 that, but it's the general understanding in
12 the Danish tax agency.
13   Q   Was that definition written down in
14 any document, or policy, or procedure, for
15 purposes of withholding dividend tax refund
16 applications?
17   A   Well, it's in our legal guidelines
18 that stated what we considered to be the
19 beneficial owner.  And it's also -- as far as
20 I know, it's stated in the double taxation
21 treaty.
22       But if you want to do more
23 investigation into the concept of "beneficial
24 owner," you probably need a legal expert.
25   Q   What I'm interested in is knowing

Page 51

1  what Mr. Nielsen and Mr. Cramer applied as
2  the definition of "beneficial ownership" in
3  reviewing dividend withholding tax refunds.
4       Were they provided with any
5  guidance, written or otherwise, about the
6  meaning of "beneficial ownership" for
7  purposes of approving these applications?
8       MR. WEINSTEIN:  Objection to form.
9    A   Under legal guidelines binding on
10 us as tax employees.  And whether or not they
11 were aware of those guidelines, they were the
12 guidelines they had to apply.
13   Q   But you don't know one way or the
14 other whether they were provided with
15 guidance as to how to define "beneficial
16 ownership" for these purposes?
17       MR. WEINSTEIN:  Objection to form.
18 Asked and answered.
19   A   No, I don't know.
20   Q   Are you familiar with the concept
21 of CumEx transactions?
22       MR. WEINSTEIN:  Objection to form.
23   A   Are you talking about the CumEx
24 scandal in Germany?  So that's what I know
25 about it, at least.

Page 52

1    Q   When did you learn about the CumEx
2  scandal in Germany?
3       THE INTERPRETER:  Did you say
4  "when" or did you say "what?"
5    Q   When did you learn about it?
6    A   I think it was around August 15th.
7    Q   What's your understanding of the
8  CumEx scandal in Germany?
9       MR. WEINSTEIN:  Objection.  And
10 that's his understanding of the CumEx fraud
11 in another country.  It's not a subject under
12 the 30(b)(6) notice.
13      I should also add that as you were
14 asking the question, Madam Reporter said that
15 it might be time for her to have a break.
16   Q   Okay.  Why don't you answer this
17 question to the extent you know in your
18 individual capacity and then we can take a
19 break.
20   A   So briefly, what I understand about
21 the CumEx situation is that you circulate
22 borrowed shares.  And in that connection, so
23 the real owner or the correct owner gets the
24 dividend, and the person who's borrowed the
25 shares gets a net dividend which is -- a

Page 53

1  "dividend compensation" is what they call it.
2       And then this bank thinks that he
3  has got dividends.  So they issue a dividend
4  compensation or a check compensation
5  certificate which he uses to reclaim the
6  dividend withheld.
7       We don't have those rules in
8  Denmark, so it cannot be done in that way in
9  Denmark.
10      That's my understanding of it.
11      MR. SCHOENFELD:  Okay.  Why don't
12 we take a break now?
13      VIDEO OPERATOR:  Stand by.  The
14 time is 8:08 a.m. New York time, and we are
15 going off the record.
16      (Brief recess taken.)
17      VIDEO OPERATOR:  The time is 8:22
18 a.m. New York time, and we're back on record.
19   Q   Mr. Ekstrand, did the department
20 responsible for processing dividend refund
21 claims track the volume of refunds that were
22 paid?
23      MR. WEINSTEIN:  Objection.
24   A   What year are we talking about
25 here?

Page 54

1    Q    2012 to 2015.
2    A    Monthly reporting is done of income
3  and expenses or revenue taken in and
4  disbursements being made.
5         So, in that way, it was checked.
6    Q    Do you know whether there were
7  specific approvals or reports concerning the
8  amount of dividend withholding tax that was
9  refunded during the period of 2012 to 2015?
10   A    Well, there are monthly approvals
11 of the accounts.
12   Q    Is there a legal requirement that
13 monthly approvals for disbursements be filed
14 within the agency?
15        MR. WEINSTEIN: Objection. I'm not
16 sure what you mean by "a legal requirement."
17   A    As far as I remember, we have
18 accounting instructions requiring monthly
19 reporting of revenue and disbursement that
20 must be filed, that reporting being an
21 authority. Their accounting instructions
22 require that this authority files monthly
23 reporting stating revenue and disbursements,
24 meaning that there was accounting instruction
25 stating that, as an authority, they have to

Page 55

1  file monthly reports stating revenue and
2  disbursements.
3    Q    Let's look at a document that's
4  been previously labeled or previously used as
5  Exhibit 3005. That should be in your binder.
6         Do you have that in front of you?
7         THE INTERPRETER: Yes, he has that.
8         (Above-mentioned document marked
9  for Identification.)
10   Q    Have you seen this document before?
11   A    No, I don't remember having seen
12 that before.
13   Q    Okay. Do you recognize this as a
14 monthly report submitted by SAP38?
15   A    I just need to take a look at the
16 document.
17   Q    Sure.
18        (Witness reviewing.)
19   A    All this looks like a balance sheet
20 memo and not the monthly reporting.
21   Q    It's called a "Final Accounting
22 Approval" for the period of July 2014,
23 correct?
24   A    Yes, that's correct.
25   Q    So what is this report meant to

Page 56

1  convey?
2    A    I haven't seen this memo before. I
3  haven't seen this document before or this
4  memo before, but it looks like reporting of
5  revenues and disbursements for the period of
6  a specific area or department.
7         There's an increase from last year
8  and it's normal, when you compare periods
9  like that, and -- and you explain, and
10 there's an explanation, and it's -- it's been
11 issued by the head of Accounts 2.
12   Q    Do you know, from looking at this
13 document now, to whom it would have been
14 submitted?
15   A    Offhand, its reporting -- it's
16 reported by Dorthe Pannerup, and I would
17 imagine that it's through her deputy
18 director, but that's a guess.
19        I don't know for certain.
20   Q    What is a "plausibility check?"
21        THE WITNESS: Plausibility or
22 possibility?
23        MR. WEINSTEIN: Plausibility.
24   A    It's a check that's made in
25 accounts -- in accounting, and it has, when

Page 57

1  you look at whether it's plausible, whether
2  it's -- it's likely that it's correct that
3  is -- that it's correct as stated.
4    Q    Is it required within SKAT to
5  perform plausibility checks for all
6  accounting approvals?
7    A    Yes, it is a requirement because we
8  have to make true and fair accounts to submit
9  to the accounts.
10   Q    Do you know whether a requirement
11 was introduced?
12   A    I think that's a very
13 common -- normal requirement within financial
14 statements for accounting, and we are subject
15 to these requirements also in the ministry.
16   Q    As part of the plausibility
17 check -- I apologize.
18        Were you still speaking?
19        MR. WEINSTEIN: Hold on, Alan.
20   A    Not in the Ministry. But as an
21 authority, a government authority, you have
22 to follow those rules also of public
23 authority.
24   Q    As part of a plausibility check,
25 the memo says that "at the end of July 2014,

Page 252

1  problem is that there was no -- the problem
2  was that the bank scheme and the form scheme
3  did not correspond, which means that you
4  could have an application under the
5  spreadsheet scheme that also had been
6  submitted under the form scheme.
7       That was how I understood it.
8   Q   On Page 12 of the report, SIR makes
9  certain findings, right?
10  A   Yes.
11  Q   So starting at the bottom, SIR
12 finds that "previous investigations initiated
13 by SKAT have not been followed up on,"
14 correct?
15  A   Correct.
16  Q   Did SKAT agree with that finding?
17  A   I have no knowledge about that.
18  Q   What do you mean you have no
19 knowledge about that fact?
20  A   I have no knowledge about whether
21 there was no follow-up on previous reports
22 made.
23  Q   Well, did you do anything to
24 educate yourself about that finding or SKAT's
25 follow-up on previous investigations?

Page 253

1   A   No.  I have referred to what the
2  report says.
3   Q   In the bullet above that, it says,
4  "SIR finds that there are no checks in
5  connections with refund requests as to
6  whether the investor is actually a
7  shareholder and whether the investor is, in
8  fact, liable for tax in Denmark or not."
9       Was that accurate as of 2010?
10  A   I wouldn't say so, no.
11  Q   Why not?
12  A   So there was a process in place and
13 we've discussed that several times.  When we
14 submit an application, or when we receive an
15 application, first we review whether it's in
16 compliance with the conditions.
17      That is already when mail is
18 opened, where their applications are divided
19 into two parts.  Subsequently, we go through
20 whether the application complies with the
21 criterias for being awarded a refund.
22      I -- whether the form has been
23 printed and signed, whether a certificate
24 from the domicile is included, and whether a
25 dividend credit advice has been included from

Page 254

1  a third party, and whether this matches the
2  application submitted before this is inputted
3  into the system.
4       So there are checks in place.
5   Q   The purpose of that process was to
6  confirm that a shareholder was
7  the then -- sorry.
8       The purpose of that process was to
9  confirm that a dividend withholding tax
10 applicant was the beneficial owner of the
11 dividend, correct?
12  A   Yes.
13  Q   And SIR is observing here that
14 there -- that in its view, there are
15 deficiencies in that process, correct?
16      MR. WEINSTEIN:  Objection to form.
17 Asked and answered.
18  A   No, I do not think that's what
19 they're doing.  Maybe they're referring to
20 the spreadsheet scheme where we do not
21 perform this control.
22  Q   Do you know whether, in response to
23 the findings in this audit report, SIR spoke
24 with anyone in Accounting 2 and shared its
25 observations about the process for dividend

Page 255

1  withholding tax refunds?
2   A   No.
3   Q   A working group was established
4  following the issuance of this audit report,
5  correct?
6   A   A working group was established at
7  some point, yes.
8   Q   Do you know whether it was in
9  response to this audit report?
10  A   No.
11  Q   And so I take it you don't know
12 what that working group -- well, do you know
13 what that working group did, if anything, in
14 response to the findings of the 2010 audit
15 report?
16  A   I don't remember.  But if there's a
17 memo to that effect, let's review it.
18  Q   Are you aware of a 2016 report by
19 the Rigsrevisionen?
20  A   Yes.
21  Q   And how are you familiar with that
22 report?
23  A   I have read it.
24  Q   Did you read it in preparation for
25 this deposition?

CONFIDENTIAL
Christian Ekstrand - May 7, 2021

31 (Pages 300 to 303)

Page 300

1   A   Yes, it was.
2   Q   Okay.  You can put that aside.
3       You testified about a meeting that
4   you attended on 6th of August, 2015 with
5   Dorthe Pannerup and others.
6   A   Correct.
7   Q   At that meeting, there was
8   discussion about stopping refund payments.
9       Is that right?
10  A   Correct.
11  Q   You mentioned that it was not the
12  ultimate decision whether SKAT could stop
13  payments.
14      Is that right?
15  A   Correct.
16  Q   Did SKAT stop making refund
17  payments after that meeting?
18  A   They did, yes.
19  Q   Did it stop the payments the same
20  day as the meeting took place?
21  A   Yes.
22  Q   I want to ask you to turn to
23  Page 291 of the 30(b)(6) document bundle that
24  you have.
25      You were asked earlier today about

Page 301

1   a working group that was set up after the
2   SIR 2010 report was issued.
3   A   Yes.
4   Q   Is this memo at Page 291 a memo of
5   the working group dated June 8th of 2011?
6   A   Correct.
7   Q   It discusses the work of the
8   working group?
9   A   Correct.
10  Q   I'm going to have you turn now to
11  Exhibit 3009.  This is the ER2013 report we
12  looked at earlier today.
13  A   Yes.
14  Q   If you turn to Section 3.8, does
15  that section identify action steps that SKAT
16  took in response to the SIR 2002 audit
17  report?
18  A   Yes.
19      MR. WEINSTEIN:  We have no further
20  questions, Mr. Ekstrand.
21      MR. SCHOENFELD:  Nothing further
22  here.
23      VIDEO OPERATOR:  Please stand by.
24  The time is 11:27 a.m. New York time and
25  we're going off the record.

Page 302

1       (Whereupon, the deposition was
2   concluded at 11:27 a.m.)
3       (Witness was excused.)
4       THE COURT REPORTER:  Just recapping
5   orders, Hughes Hubbard, two realtime hookups,
6   rough draft, two-day final.
7       Hanamirian, standard delivery copy.
8       Kostelanetz, standard delivery
9   copy, plus one realtime hookup.
10      K&L Gates, rough draft, standard
11  delivery copy, plus one realtime hookup.
12      Wilmer Hale, five realtime hookups,
13  rough draft, standard delivery copy.
14      Binder & Schwartz, one realtime
15  hookup, rough draft, standard delivery copy.
16      Dewey Pegno, rough draft, standard
17  delivery copy.

Page 303

1           C E R T I F I C A T E
2       I, CHARLENE FRIEDMAN, a Certified Court
3   Reporter and Notary Public, qualified in and for
4   the State of New Jersey do hereby certify that
5   prior to the commencement of the examination
6   CHRISTIAN EKSTRAND was duly sworn by me to testify
7   to the truth the whole truth and nothing but the
8   truth.
9       I DO FURTHER CERTIFY that the foregoing
10  is a true and accurate transcript of the testimony
11  as taken stenographically by and before me at the
12  time, place and on the date hereinbefore set forth.
13      I DO FURTHER certify that I am neither a
14  relative of nor employee nor attorney nor counsel
15  for any of the parties to this action, and that I
16  am neither a relative nor employee of such attorney
17  or counsel, and that I am not financially
18  interested in the action.
19
20
21
22  CHARLENE FRIEDMAN, RPR, CRR, CCR of the
23  State of New Jersey
24  License No:  30XI00204900
25  Date:  May 7, 2021