# Exhibit B



Neutral Citation Number: [2021] EWHC 1222 (Comm)

Case No: CL-2018-000297

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Rolls Building, Fetter Lane, London EC4A 1NL

Date: 11 May 2021

Before :

**MR JUSTICE ANDREW BAKER**
- - - - - - - - - - - - - - - - - - - - -
Between :

| | |
|---|---|
| **SKATTEFORVALTNINGEN (the Danish Customs and Tax Administration)** | **Claimant** |
| - and - | |
| **SOLO CAPITAL PARTNERS LLP (in special administration) and many others** | **Defendants** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Michael Fealy QC, Jamie Goldsmith QC, Sam O'Leary, Abra Bompas, James Ruddell, James Fox & K V Krishnaprasad** (instructed by **Pinsent Masons LLP**) for the **Claimant**
**Nigel Jones QC, Lisa Freeman & Laurence Page** (instructed by **Meaby & Co**) for **the Sanjay Shah Defendants**
**David Head QC, Alison Macdonald QC, Tom De Vecchi, Luke Tattersall & Sophia Dzwig** (instructed by **DWF Law**) for **the DWF Defendants**
**Paul Mitchell QC & Hannah Daly** (instructed by **David Rosen**, solicitor and general counsel) for **Acupay System LLC**
**Adam Zellick QC & Ian Bergson** (instructed by **Reed Smith LLP**) for **Messrs Knott & Hoogewerf**
**Andrew Hunter QC** (instructed by **CMS Cameron McKenna Nabarro Olswang LLP**) for **Anne Stratford**
**George McPherson** (instructed by **Rosenblatt Ltd**) for **ED&F Man Capital Markets Ltd**
**Daniel Edmonds** (instructed by **Stewarts Law**) for **the PS/GoC Defendants**
**Cameron Maxwell Lewis** (instructed by **CGS Legal**) for **Paul Preston**
**Jonathan Rose** (instructed by **CGS Legal**) for **Martin Smith**
**Kier Howie** (instructed by **PCB Byrne LLP**) for the **Lui Defendants**
**Fred Hobson** (instructed by **Howard Kennedy LLP**) for the **HK Defendants**
**Edward Rowntree** (instructed by **BAC Solicitors**) for **Jas Bains**

**Daniel Fletcher**, **Jonathan Godson**, **Mankash Jain** and **Anthony Patterson** appeared in person
The **Edo Barac Defendants**, **Anthony Patterson** and **IPIS UK (Battersea London 1) Ltd (in liquidation)** were represented by their respective solicitors, **Brown Rudnick LLP**, **Cadwalader, Wickersham & Taft LLP** and **Moon Beever LLP**
The **Other Defendants** did not appear and were not represented at this hearing

Hearing date: 6 May 2021

- - - - - - - - - - - - - - - - - - - -

## Approved Judgment

This is a reserved judgment the application to which of paragraph 2.3 of CPR PD 40E is unnecessary and is therefore hereby dispensed with.
Copies of this version as handed down may be treated as authentic.

**Covid-19 Protocol:**
This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and release to Bailii. The date and time for hand-down is deemed to be 10.15 am on 11 May 2021.

.............................

MR JUSTICE ANDREW BAKER

**MR JUSTICE ANDREW BAKER**  SKAT (Costs)
**Approved Judgment**

**Mr Justice Andrew Baker :**

1. On 27 April 2021, I handed down judgment following the trial of a preliminary issue ('the Revenue Rule Trial'), [2021] EWHC 974 (Comm). The judgment concluded that Dicey Rule 3 applied so that at common law all of SKAT's claims fell to be dismissed and that the court was not precluded by the Brussels-Lugano regime from applying Dicey Rule 3 to dismiss claims against Brussels-Lugano defendants (see the judgment at [4], [20] for how I defined those various terms). By Order of that date, I dismissed all of SKAT's claims and adjourned consideration of consequential matters generally to a hearing on 6 May 2021, with the interim relief obtained by SKAT (a freezing order and proprietary injunction) to continue until that hearing.

2. At the hearing on 6 May 2021, I granted SKAT permission to appeal on the Brussels-Lugano issue but refused permission to appeal on the applicability of Dicey Rule 3 at common law. I continued the interim relief, in the event without objection, until a yet further hearing now listed for 16 June 2021 for substantive consideration of SKAT's application for the continuation of the interim relief or a stay upon its discharge pending appeal, that is to say (a) in the case of Brussels-Lugano defendants, pending an appeal by SKAT, if brought, pursuant to the permission I granted, and (b) in the case of other defendants, pending an application to the Court of Appeal, if made by SKAT, for permission to appeal and, if permission be granted, any consequent appeal.

3. SKAT accepted that it could not resist, in general, an order that it pay all defendants' costs of the proceedings, to be assessed if not agreed. I confirmed at the hearing, for the avoidance of doubt, that any such order (a) did not affect prior orders in the case providing for a different definitive disposal in respect of particular costs and (b) had the effect that where defendants may have an undischarged liability to contribute to costs incurred by SKAT, under orders made for the sharing of certain costs *pro tem* without prejudice to ultimate responsibility, for example translation costs for Danish language documents disclosed by SKAT, that liability was effectively now overtaken by events.

4. Three main costs issues arose:

    (i) Whether, as SKAT submitted, there should be a percentage reduction to the agreed or assessed costs of the Revenue Rule Trial payable by SKAT to some of the defendants, to reflect the fact that the defendants did not succeed on every sub-issue raised in connection with Dicey Rule 3. I ruled against SKAT on that, giving reasons at the hearing.

    (ii) The basis for assessment of the defendants' costs payable by SKAT. I ruled that assessment should be on the indemnity basis and said I would provide my reasons in writing later. This judgment sets out those reasons.

    (iii) Whether, as SKAT submitted, payments on account of its costs liability should be stayed in respect of certain defendants, there being no opposition to the making of orders for payments on account and directions being made at the hearing for a determination on paper next week of the amounts to be paid to each defendant or defendant group. I acceded to that application only where it was founded on what appeared to be reasonable concern that the defendant in question might not have the means to repay a substantial payment on account

        made now were SKAT subsequently to succeed on appeal leading to an order for repayment by that defendant.

5.    As a condition of that stay, SKAT offered and I ordered that whatever amounts I fix for the defendants in question will be paid into court by SKAT. Those defendants are Daksha Bhudia, Paul Oakley, Owen Mitchell, Orca Investments Ltd, Mankash Jain, Jonathan Godson, Daniel Fletcher, Michael Murphy and Jas Bains. I gave them liberty to apply for the stay to be reconsidered by reference to evidence as to their means to overcome the concern justifying the stay, and I shall consider any such application, if made, on its individual merits, including whether it requires a hearing or can be dealt with on paper and whether, if it requires a hearing, it should be in private or subject to reporting restrictions to protect the privacy of personal financial information.

6.    The application for costs to be assessed on the indemnity basis was founded upon the court's general discretion as to whether costs should be payable by one party to another and, if so, in what amount, under CPR 44.2/44.3. The choice between the standard basis and the indemnity basis is an aspect of deciding the amount of costs that is to be payable, because the indemnity basis is apt to result in a greater recovery than the standard basis. I understand the typical difference between the two is not so great as is often supposed. Still, it can be expected to make a material difference, and some of the costs bills in the present case are large so that even a small percentage difference in recovery may be a significant sum in absolute terms. Even where the indemnity basis of assessment is ordered, the rule remains that the receiving party is only entitled to recover costs that were reasonably incurred and reasonable in amount: CPR 44.3(1).

7.    *Excelsior Commercial and International Holdings Ltd* [2002] EWCA Civ 879 remains the leading case. The Court of Appeal there made clear that (a) it is generally necessary, before assessment on the indemnity basis is ordered, for the conduct of the parties or the other circumstances of the case to have taken the proceedings "*out of the norm*", and (b) ultimately each case will be a decision on its own facts, so there is a danger, if the court attempted to lay down detailed guidance, of detracting from the width of the discretion or replacing the language of the rules with turns of phrase from judgments that are ultimately decisions as to the just order on particular facts.

8.    I was reminded of the exposition of circumstances under which the indemnity basis might be considered appropriate by Tomlinson J, as he was then, in *Three Rivers District Council et al v The Governor and Company of the Bank of England* [2006] EWHC 816 (Comm), at [25]. As Tomlinson J noted in that case, at [14], "*Whilst an indemnity costs order does carry at least some stigma the purpose of such an order is not to punish the paying party but to give a more fair result for the party in whose favour a costs order is made*", citing *Petrotrade Inc v Texaco Inc (Note)* [2002] 1 WLR 947, *per* Lord Woolf MR at 949 and *Victor Kermit Kiam II v MGN Ltd* [2002] EWCA Civ 66, *per* Simon Brown LJ at [12].

9.    If a correct perspective is kept upon what assessing costs on the indemnity basis does, and the reason why, therefore, it is ordered, I respectfully question whether it is true today that an indemnity costs order necessarily carries stigma. Where such an order is made, the reasons for it may include or imply criticism of the paying party's conduct or that of its legal representatives. If that is the case, it will be the expressing of those

reasons by the court that carries "*at least some stigma*", as Tomlinson J put it, for the party or legal representatives criticised. But such criticism is not a pre-requisite, and the proper focus is upon the second half of what Tomlinson J said, namely that the purpose of ordering assessment on the indemnity basis is to give a fairer result for the party entitled to costs.

10. The sole question, ultimately, is thus whether in the circumstances of the case at hand, the just outcome is that:

    (i) the amount payable should not be constrained by the principle that the paying party should only have to pay costs that are "*proportionate to the matters in issue*" (CPR 44.3(2)(a)), and

    (ii) the paying party should have to prove that admissible cost in fact incurred was unreasonably incurred or unreasonable in amount so as to have it disallowed (CPR 44.3(3)),

    always bearing well in mind that the presumption built into the CPR is that limiting recovery to proportionate costs, and putting upon the receiving party the burden of proving the reasonableness of the admissible cost actually incurred, will ordinarily be the just result.

11. In that formulation, I use the term 'admissible cost' to distinguish between questions of whether an item of expenditure capable in principle of being recovered under a costs order should be allowed or disallowed on assessment from questions of whether the receiving party has included items that are not by nature recoverable as costs at all. For example, and though I do not have a sense yet of how significant the amounts might be, there may in this case be a question for some of the litigants in person whether they are claiming costs charged to them by a Danish law firm for acting as *McKenzie* friend that cannot be recovered from SKAT.

12. Given the nature of the question, something can be "*out of the norm*" in this context without being something that happens only exceptionally, or very infrequently, as was made clear by Waller LJ (who had been part of the court in *Excelsior*) in *Esure Services Ltd v Quarcoo* [2009] EWCA Civ 595, at [17]-[26], concluding that "*the Rules entitle a court to take account of the conduct of the parties whether that conduct occurs on many occasions or whether it is rare*" (*ibid* at [26]). That was said in a case where the particular context was that of putting forward a dishonest claim, but the proposition is not sensibly limited to that type of case.

13. In *Clutterbuck and Paton v HSBC plc et al* [2015] EWHC 3233 (Ch), David Richards J (as he was then) accepted a submission that costs should be on the indemnity basis where a case in deceit had been withdrawn, without apology, by the discontinuance of the claim on the eve of the hearing of an application to strike it out. It was submitted (*ibid* at [14]) that "*the discontinuance of a claim based on fraud is itself sufficient to take this case out of the ordinary and make it an appropriate case in which to order costs on the indemnity basis*". David Richards J reasoned as follows:

    "16. … *The general provision in relation to cases in which allegations of fraud are made is that, if they proceed to trial and the case fails, then in the ordinary course of events the claimants will be ordered to pay costs on an indemnity basis.*

> *Of course the court retains a complete discretion in the matter and there may well be factors which indicate that notwithstanding the failure of the claim in fraud indemnity costs are not appropriate, but the general approach of the court is to adopt the course that I have indicated.*
>
> *17. The underlying rationale of that approach is that the seriousness of allegations of fraud [is] such that where they fail they should be marked with an order for indemnity costs because, in effect, the defendant had no choice but to come to court to defend his position.*
>
> *18. In circumstances where, instead of the matter proceeding to trial and failing, the claimant serves a notice of discontinuance, thereby abandoning the case in fraud, it is … appropriate for the court to approach the question of costs in the same way.*
>
> *…*
>
> *20. I therefore consider that allegations of fraud will in general justify the court in ordering costs upon an indemnity basis where the claimant serves notice of discontinuance. In <u>Jarvis plc v PricewaterhouseCoopers</u> [2000] 2 ECLC 368, Lightman J took the same view.*"

14.  That approach was followed by Rose J (as she was then) in *PJSC Aeroflot v Leeds et al* [2018] EWHC 1735 (Ch). Allegations of fraud had been made and vigorously pursued against the defendants but were entirely abandoned on the eve of trial by a discontinuance of the claim. Costs were ordered to be assessed on the indemnity basis. Rose J said this, at [53]:

> "*In my judgment there is no basis for distinguishing <u>Clutterbuck</u> from the present case. On the contrary, the present case is stronger given that the allegations of fraud were pursued over eight years and the proceedings were prosecuted vigorously up to a few hours before the whole claim was abandoned the afternoon before the trial. I accept [the] submission that it would be going too far to refer to "the rule in <u>Clutterbuck</u>" … . But I respectfully consider that the approach in <u>Clutterbuck</u> is sound. Where a claimant makes serious allegations of fraud, conspiracy and dishonesty and then abandons those allegations, thereby depriving the defendant of any opportunity to vindicate his reputation, an order for indemnity costs is likely to be the just result, unless some explanation can be given as to why the claimant has decided that the allegations are bound to fail.*"

15.  In these proceedings, many of the defendants were accused of fraud, conspiracy or dishonesty, or other actionable conduct involving a taint of impropriety that, if true, could seriously damage professional reputations, or were threatened with such allegations. On that latter point (the threat), SKAT has been throughout openly on the lookout for evidence enabling it to 'upgrade' its case against those not to date accused of dishonest wrongdoing. I do not criticise SKAT or its advisers for that, given the starting point from which they were operating, namely (they said) there had been a 'massive fraud' and many individuals and businesses had become involved. It does mean, though, that I agree with submissions made that it would not be sensible or fair in this case to draw a line between defendants against whom allegations of fraud or other dishonesty had been made and those against whom no such allegations had (yet)

been made. To the extent that the nature of SKAT's primary allegations has an impact on the basis of assessment of costs that should be ordered, in my judgment in this case it would not be right to apply that consideration only to those defendants against whom the most serious allegations of wrongdoing had to date been pleaded.

16. The defendants variously submitted that the approach adopted in *Clutterbuck* should be adopted here. Just as David Richards J (and Rose J in *Aeroflot*) said in effect that, subject to considering any explanation offered for it, the withdrawal of allegations of dishonest wrongdoing should be equated, when considering costs, with a finding that they were not well-founded, so also, it was said, the court should say that SKAT having made such serious allegations and its claims having failed, that without more should be treated as justifying assessment of costs on an indemnity basis.

17. I do not accept that submission. It cannot be said that SKAT's allegations of fraud, conspiracy and dishonesty have been abandoned without explanation, inviting them to be treated like allegations that would not have held up at a trial. That is not to say that they would have held up at a trial. In the event, the litigation did not get near to beginning to consider that. Nor does it mean that the nature of the allegations SKAT pursued is irrelevant, as it remains a central feature of the case that shaped the way it was conducted. But it does mean that the dismissal of SKAT's claims on a ruling that as a matter of law they are claims of a type the court is bound to dismiss, even if as a matter of fact all the serious wrongdoing alleged by SKAT did occur, does not without more make it appropriate for costs to be assessed on the indemnity basis.

18. This extraordinary litigation was, however, out of the norm when considered in the round, not stopping at the mere fact that claims involving allegations of very serious wrongdoing have been dismissed:-

    (i) The allegations made, most acutely in the case of those accused of fraud or other dishonest conduct, but also in the case of those on the edges but still sued for vast damages, such as ED&F Man and Acupay, put substantial professional or business reputations at risk. The defence of the allegations, as much as the making of them, was always going to be about more than just the money.

    (ii) SKAT's litigation effort was materially assisted, particularly as regards the Solo etc Applications but also more generally, by documents obtained through a search and seizure order sought from the DIFC Court against the Sanjay Shah Defendants on what, so far as this court is concerned, has now been held to have been a false premise that SKAT had admissible private law claims to bring.

    (iii) The litigation was brought and aggressively pursued, by a sovereign state with a willingness to expend effectively unlimited resources, as much to set an example to the world and make an example of all those involved (whether said to be guilty of dishonesty or not), that where it believed it had been the victim of dishonest wrongdoing there would be consequences, as to make a financial recovery. It was litigation that was politically as well as financially motivated.

    (iv) The litigation was the subject of ill-judged public statements by senior Danish politicians appearing to pre-judge the factual issues that would have fallen to be determined by the court. They both confirmed, or reinforced, the impression

          that there was a substantial political dimension to the bringing and vigorous pursuit of the claims brought here, in particular that their purpose was punishment and deterrence as much as it was financial recovery for the Danish taxpayer, and also involved a degree of 'playing to the gallery' in response to the significant media interest this affair has generated in Denmark. Mr Fealy QC said in response to reliance on this feature of the case, in the context of the debate about costs, in effect, that such statements should not be held against his client, which was only SKAT, not the Danish Parliament or Government. That was unrealistic and unattractive in circumstances where SKAT has accepted that it is not a separate legal entity from the Kingdom of Denmark, and where the public statements effectively claimed ownership of, and credit for, the litigation activity of SKAT, as part of the Danish state's response to a loss of tax revenue that has been a significant public scandal in Denmark.

(v)    Many additional defendants were joined beyond those alleged to be central or who might have been necessary for the pursuit of the causes of action pleaded, without seeming concern as to whether they had the means to afford legal representation to mount a fully effective defence, let alone make a meaningful contribution to repairing the £1.5 billion hole in SKAT's dividend tax accounts.

(vi)   SKAT prosecuted the proceedings, as it seemed to me, without any sense that cost should be constrained by what was proportionate to any given task, unless it could be said (and perhaps SKAT would say) that the sums at stake and the scale and complexity of the litigation meant there was no limit to the level of cost that could properly be regarded as proportionate.

(vii)  The ranging without evident limit of the financial and political resources of a state against the defendants, and the joinder of such a large number of defendants, many of whom would not be in a position to fund active or legally represented defences, placed an unusual and disproportionate burden on those defendants or defendant groups with the means to mount an active and well represented case for the defence.

19.    The consequence of this 'no stone left unturned' approach to the case, and the deployment materially without limit of the resources of the Danish state to pursue it, was inevitably going to be the maximising, subject only to the constraint of what they could each afford, of the defendants' efforts in response. SKAT was entitled to bring litigation on the scale it did, making the allegations it made and pursued in the way it was pursued, having that consequence. But having lost, and even though the loss was not because its allegations of serious wrongdoing have been found wanting on the facts, in my judgment it would not be fair for SKAT to be allowed to limit its liability in costs by arguing that costs incurred by defendants had been disproportionate, and it would be only just to make the rebuttable presumption in the defendants' favour that what they and those acting for them, where that applies, chose to do in defending the claims was reasonably done at reasonable cost.

20.    Other points were made by individual defendants or groups of defendants. For example:

(i) Mr Mitchell QC for Acupay invited me to say that the primary claim against Acupay, as SKAT proposed to re-plead it in the light of my judgment refusing Goal Taxback's summary judgment application, was thin, weak or speculative, reinforcing the justice of favouring Acupay as receiving party when it came to costs;

(ii) Mr Jones QC for the Sanjay Shah Defendants emphasised that their legal costs had been subject to a significant degree of supervision and control by the court already, applying '*Marino* principles' because of the proprietary interim injunction (*Marino v FM Capital Partners Ltd* [2016] EWCA Civ 1301, see also *Kea Investments Ltd v Watson* [2020] EWHC 472 (Ch)), strengthening the justice of presuming the reasonableness of that expenditure so that the burden should be on SKAT to show the contrary;

(iii) Mr McPherson for ED&F Man complained that the taint by association was particularly strong for his clients, where the nature of SKAT's case in respect of the ED&F Man Applications was very different to its case in respect of the Solo etc Applications, yet SKAT insisted on involving ED&F Man in this massive consolidated litigation, using substantially similar language to describe the dividend arbitrage trading model used by ED&F Man to that alleged to have been dishonest in the case of the Solo etc Applications, and was still as recently as January 2021 pointedly reminding ED&F Man of the possibility of the case against it being upgraded to one of dishonesty.

21. Those points had some weight, in my view, and reinforced for those defendants the aptness of concluding for the reasons given in paragraphs 18 and 19 above, which are sufficient in any event, that this was litigation that was out of the norm.

22. I thus concluded that it would be unjust to apply the default rule potentially limiting cost recovery by defendants to proportionate costs and requiring them to prove the reasonableness of the costs incurred in defending the claims. Rather, the just outcome is that there be no reference to proportionality, if that might otherwise have been a constraint in this case, and it should be for SKAT to show that costs are to be disallowed as unreasonably incurred or unreasonable in amount. I repeat that the rule will still be that each defendant is entitled to recover only cost that was reasonably incurred and reasonable in amount. But it is fair to presume in all the defendants' favour that admissible cost in fact occurred was reasonable, requiring SKAT to show otherwise for any item or amount of cost to which it objects.