# Exhibit A



ORDR-7568180821-0578



Claim No. CFI-048-2018

**THE DUBAI INTERNATIONAL FINANCIAL CENTRE COURTS**

**IN THE COURT OF FIRST INSTANCE**

BETWEEN:

**SKATTEFORVALTNINGEN**

**(the Danish Customs and Tax Administration)**

Claimant

and

**(1) ELYSIUM GLOBAL (DUBAI) LIMITED**

**(2) ELYSIUM PROPERTIES LIMITED**

Defendants

---

**ORDER WITH REASONS OF JUSTICE SIR JEREMY COOKE**

---

**UPON** reviewing the Defendants' Application No. CFI-048-2018/10 dated 31 May 2021 (the "**Application**")

**AND UPON** reviewing the Claimant's evidence in answer to the Application dated 6 July 2021

**AND UPON** reviewing the Defendant's evidence in reply dated 25 July 2021

**AND UPON** hearing Counsel for the Claimant and Counsel for the Defendants at a hearing on 4 August 2021

**IT IS HEREBY ORDERED THAT:**

1. The Application must fail and all of the orders sought are refused.

2. No order as to costs.

*[signature]*

Issued by:
**Nour Hineidi**
Registrar
Date of issue: 5 August 2021
Time: 2.00pm

**SCHEDULE OF REASONS**

1. It is not necessary for me to set out in any detail the facts giving rise to this application which is made by the two Defendants (together "**Elysium**") in this DIFC action. The essential basis for the Application is the decision made by Andrew Baker J on 27 April 2011 in the English Commercial Court where he decided that, by the application of Dicey Rule 3, all of the Plaintiff's ("**Skat**") claims fell to be dismissed. That decision is the subject of an application for permission to appeal to the Court of Appeal in England, which has not yet been determined. It should be noted that the English Court has not made any order of the kind which Elysium seeks from this Court in relation to the documents which have been produced pursuant to the Search Orders made by this Court.

2. Again, it is unnecessary to me to set out the details of the history of the proceedings in the DIFC which commenced with an *ex parte* application for search and freezing orders which I granted on 27 June 2018 and which have since been the subject of a number of amendments, mostly by consent. It was a term of the original freezing order that Elysium provide information about its assets and about a series of transactions in which it was involved. Permission was given to Skat to use the documents obtained in the searches for the pursuit of civil proceedings in relation to the same or related subject matter to the DIFC proceedings, both in England and in the on-shore Dubai Courts.

3. There are 2 relevant features of the applications and orders to which the parties specifically made reference. The first is that Skat, in making its application for search orders, not only did so in the context of the DIFC Claim but also claimed to be entitled to such an order on the basis that it was necessary/justifiable in support of foreign proceedings and on the basis of Norwich Pharmacal principles. Hence the original application included a request for permission to use the documents in on-shore Dubai and in England. The point appears clearly from the skeleton argument submitted in support of the *ex parte* order and the record of the discussions with the Court on the occasion of its grant. Similarly, in Elysium's skeleton argument for the first return date, it was acknowledged that a principal purpose of the relief sought was to obtain documents for use in foreign proceedings against other Defendants, including, in particular, Mr Shah.

4. An order dated 26 December 2018, made on the application of Skat, granted permission for the use of documents seized/disclosed in DIFC for the purpose of recovering monies in the USA and Malaysia where it was alleged that such monies

had been wrongly paid out by way of refund of withholding tax as the result of a large-scale fraud involving US and Malaysian Defendants, not including either of the DIFC Defendants or those affiliated to Mr Shah or his companies. Those documents had already been made available for the English Proceedings. The Schedule of Reasons given by me referred to Skat's entitlement to pursue such claims for recovery and the requirements of justice that the Courts in other jurisdictions should receive the maximum information available in the shape of relevant documentation. The powers of this Court to make orders in support of foreign proceedings are, as submitted by Skat, wide and unlimited by statute.

5. The second feature to note is that all these search orders contained a standard provision enabling Elysium to apply to vary or discharge the orders made. Reliance was placed on this feature by Elysium, as well as the terms of paragraph 2 (b) of the Court's order referred to in paragraph 5 below.

6. The key consent order was made on 30 September 2019 all and included the following:

> *"2. The DIFC Claim is stayed until 21 days after a decision of the English High Court on the merits of the English Claim, save that:*
>
> *(a) the Previous Orders shall remain in full force and effect [meaning the previous search orders];*
>
> *(b) the parties may apply (i) to vary or supplement the Previous DIFC Orders or (ii) for any order in support of any civil proceedings in any other jurisdiction related to the subject matter of the English Claim; and*
>
> *(c) the parties shall remain obliged to comply with all the terms of the Previous Orders, as varied or supplemented from time to time, or any subsequent orders made by the Court.*
>
> *3. If a party appeals against a decision of the English High Court on the merits of the English Claim:*
>
> *(a) the stay shall continue on the terms set out in paragraph 2 of this Order until 21 days after permission to appeal is refused or the appeal is determined; and*
>
> *(b) in the event a party seeks to appeal against a decision of the English Court of Appeal, the stay shall continue on the terms set out in paragraph 2 of this*

> *Order until 21 days after permission to appeal is refused or the appeal is determined.*
>
> 4. *Upon the termination of the stay at paragraph 2 and, if applicable, paragraph 3, of this Order, judgement shall be entered in the DIFC Claim on the same terms as any judgement entered by the English Courts and there is liberty to apply for that purpose.*
>
> 5. *The Defendant shall be debarred in the DIFC Claim from making any allegation of fact or law inconsistent with any finding of fact or law reached by the English Courts in the English Claim."*

7. Schedule A to the Consent Order consisted of a "Conduct of Claims Agreement" made between the parties which followed much the same form as the Consent Order. It was agreed between the parties that Elysium would submit to the jurisdiction of the English Court to determine the English Claim and that the DIFC Claim should be stayed until 21 days after the decision of the English High Court on the merits, with the same provisions as appeared in the Consent Order. Recital (B) referred to the agreement between the parties that Skat would proceed against Elysium in the English High Court and (*that any resulting judgement from the English Court, and the findings of fact and law on which it is based, shall be binding and enforceable in the UAE"*, which included, self-evidently the DIFC, but extended to the on-shore Dubai Courts also. There was a difference between clause 5 of the Consent Order and clause 2.5 of the Conduct of Claims Agreement. The latter read as follows:

*"After termination of the stay referred to at paragraphs 2.2 and, if applicable, paragraphs 2.3 and 2.4 above:*

*(a) Any and all findings of fact and law reached by the English Courts in the English Claim shall be binding on the Parties and the Parties shall not make any allegation of fact or law which is inconsistent with any judgement handed down by the English Courts.*

*(b) Elysium Dubai and Elysium Properties shall not object to and hereby waive all their rights whatsoever to object to:*

    *(i) the entry of judgement by the DIFC Court on the DIFC Claim in the terms of any judgement entered by the English Courts:*

   (ii) *the enforcement in the UAE, whether within the DIFC or outside the DIFC of any such judgement so entered;*

   (iii) *the enforcement of any English judgement by the DIFC Court; and*

   (iv) *the enforcement in the UAE Courts of any DIFC judgement in forcing any such English Judgement. All*

8. In accordance with the Conduct of Claims Agreement and Consent Order, Elysium submitted to the jurisdiction of the English Court. Neither of these Defendants in the DIFC Courts however became a party to the onshore Dubai proceedings which largely proceeded against members of the Shah family and employees of companies of which he was the Ultimate Beneficial Owner. The clear underlying purpose of the Consent Order was to take up the encouragement given by the DIFC Courts for substantive matters to be resolved in one forum, so far as possible. The DIFC Claim was stayed whilst the DIFC Courts remained in control of the Search Orders and the use of documents obtained thereby. By this time there were not only proceedings in England and Dubai but also proceedings in the USA and Malaysia, though the last two sets of proceedings also did not involve Elysium nor any of the related/affiliated Shah Defendants. Those proceedings were taken against the various individuals and trustees of pension funds which had made claims for tax refunds from Skat.

9. Following the decision of Andrew Baker J, Elysium applied to this Court for various forms of relief which have since been refined. Initially it sought a stay of the Search Orders, an order that Skat's lawyers cease reviewing or making use of the documents made available by Elysium pursuant to the search orders and that they take steps to prevent any use made of all such documents in any proceedings worldwide.

10. In my judgment, the entitlement to the relief sought by Elysium essentially turns on the terms of the Consent Order and the Conduct of Claims Agreement. It is clear, to my mind, that the stay of the DIFC Claim was to operate pending final resolution in England of the English Claim, save for the purpose of putting into effect the Search Orders which had been made, which were to remain in place and to be administered in accordance with the various amending Orders to which I have already referred. It was not envisaged that the Search Orders would be abrogated or discharged and the documents retrieved whilst the English Claim was still pending.

11. Whilst Elysium relied on the terms of clause 2 (b) of the Consent Order and the standard provision in each of the Search Orders as entitling it to apply for a variation

of the previous DIFC Orders, one of the underlying purposes of the Consent Order and Conduct of Claims Agreement was that, with the extensive machinery put in place with the SLR to identify and separate privileged material, the searches should continue and the documents be produced for use in proceedings elsewhere, and in particular in the English Courts, to whose jurisdiction Elysium had, as DIFC resident Defendants, submitted. It would run entirely counter to the whole tenor of the Consent Order and the Conduct of Claims Agreement if there was now to be a wholesale variation of those arrangements prior to the final disposal of the English Claim, on the basis of a first instance decision where permission to appeal is being sought. Whilst I accept Elysium's argument that there is no prohibitory bar on making application to the DIFC Courts for variation by reason of the terms of that order and that agreement, the whole scheme was founded on the basis of the operation of the search orders until final disposal of the English Proceedings, including potential and actual appeals.

12. To the extent that it is relevant, the first instance decision in England is not a "material change of circumstances" because the Consent Order made express provision as to what was to occur in circumstances where an appeal, or permission to appeal was pending. There is therefore no particular reason for revisiting the Consent Order made at any time before the stay on the DIFC Claim is lifted on final determination "on the merits of the English Claim", a phrase which, in itself, may give rise to debate.

13. It is nothing to the point for Elysium to rely upon paragraph 4 of the Consent Order and clause 2.5 (a) of the Conduct of Claims Agreement and the provisions that all findings of fact and law reached by the English Courts are to be binding on the Parties, with judgment be entered in the DIFC Claim on the same terms as any judgment entered by the English Courts, when those provisions only apply after termination of the stay referred to earlier in the Agreement which, in turn, can only happen on final disposal of the English Claim. The findings of the English Court do not require the DIFC Courts to follow suit as yet, whatever the true effect of Andrew Baker J's judgment may be.

14. To my mind, this is sufficient to dispose of Elysium's application, because the whole scheme of the arrangements set out in the Consent Order and the Conduct of Claims Agreement, when seen against the previous search orders made which were by paragraph 2 (a) to "remain in full force and effect", envisaged the documents emerging from such searches to be available for use, not only in the English proceedings but also in on-shore Dubai, the USA and Malaysia. It would not be right to derogate in any way from those orders at any time before final disposition of the English Claim, where the seized documents are currently being deployed, let alone to nullify them, which is

what Elysium effectively seeks. Whilst Elysium has succeeded at first instance in England it is not said that Skat does not have any realistic prospects of success on appeal, where the decision on permission to appeal is currently awaited. Whatever the prospects, the parties agreement, as contained in the Claims Conduct Agreement and Consent Order make provisions which apply until final disposition of the English Claim.

15. Whilst it would be possible to draw a distinction between (i) those documents which have been seen by Elysium's lawyers and the SLR but which have not yet been released to Skat; (ii) the documents which have been released to Skat but not deployed in any of the extent proceedings; and (iii) those documents which have been deployed, there is no principled reason for doing so, at least so far as concerns the English Claim.

16. Elysium accepts now, whether or not it did so before, that its lawyers and the SLR should continue with the process of identifying privileged documents for release to Skat, in the event that any appeal succeeds, rather than stopping this process, only to have to restart it in that event, but that the documents thus sifted should not be supplied to Skat because the Search Orders made in DIFC were obtained, as Andrew Baker J has found, so far as the English Court was concerned, on the "false premise that Skat had admissible private law claims to bring".

17. It is clearly possible for that process to continue (and it may now have finished) without transmission of the sifted documents to Skat, but the notion that an order should be made that documents already disclosed to Skat should be no longer utilised would produce chaos. The reason for this is that the documents which have been the subject of production as a result of the searches have been extensively used in the English, on-shore Dubai and US proceedings. They have been the basis of claims made there for the alleged fraud. If Skat was to be prevented from making use of those documents, it would not be able to refer to them in the Court of Appeal in London in its application for permission and any appeal which might follow, despite that being the basis upon which its claim had largely been presented to the first instance judge. Similarly, in the on-shore Dubai proceedings and the US proceedings, it would be necessary to withdraw a large volume of documents which are already before the court and have been the basis upon which witnesses have been deposed and the case has been presented. Disclosure has been made to Defendants and, in the USA, there is no suggestion that such documents could be retrieved. If a Defendant wishes to rely on a particular document because it was thought to be to his/her advantage, it would be illogical and unjust if other documents which showed a fuller picture were not also available. To the extent that any documents have been deployed in one jurisdiction or

another, whether by presentation to the court, disclosure to other parties or as the basis for pleadings, depositions, witness statements, expert reports or examination, the "cat is out of the bag" and cannot be put back in without causing mayhem in the existing proceedings in other parts of the world, even if proceedings in Malaysia have not progressed very far.

18. Whilst, as matters currently stand, on the basis of the first instance judgment in the English Claim, the search orders would not be justifiable as a matter of English law, the parties agreed, by way of the Consent Order and Conduct of Claims Agreement to the scheme for production of documents found in the searches until such time as a final determination was made by the English Courts and that scheme should not be disturbed. The status quo should be maintained until such final determination.

19. I should add that there is an issue which arises in relation to the judgment of Andrew Baker J, as to what he actually decided. Elysium contends that he found that Dicey Rule 3 (1) is a substantive rule of English law and not a jurisdiction issue so that his determination would apply in any forum where an English law claim was being determined. This does not appear to me to be a correct reading of the Judgment. The Judge held, at paragraphs 17 (iii), 107, 147 and 148 that Dicey Rule 3 was a mandatory rule of English law as *lex fori*, regardless of the proper law which governed the cause of action. It is a substantive rule of English law that applies even if the applicable choice of Law rules say that, in general, the suit in question is not governed by English law. He held that the claim was not "admissible", preferring that term to "non-justiciable", but the essential point he made was that, on the basis of the authorities as he understood them, English law does not admit claims that are, in subsequent, attempts by a foreign sovereign, directly or indirectly to exercise its sovereign power through the English courts, such as enforcement of taxation. He characterised the claim as a claim to enforce, directly or indirectly, Danish revenue law, so as to fall within the rule against the extraterritorial enforcement of the exercise of sovereign authority. Had it been otherwise he could not have dismissed all the claims brought by Skat which were based primarily on an English law cause of action, but alternatively on a Danish law cause of action.

20. It is not necessary for me to decide, at this stage, what the impact of that decision is, should permission to appeal be refused in England or the decision be upheld on appeal, in the context of paragraphs 4 and 5 of the Consent Order and clause 2.5(a) of the Conduct of Claims Agreement. Elysium submits that a dismissal of the claim in England would result, by reason of paragraph 4 of the Consent Order, in a dismissal

of the DIFC Claim in this Court. There appears to be no relevant finding of fact, since the Judge appears to have gone out of his way to avoid finding facts. His decision turned on the characterisation of the claim as framed in England and the application of Dicey Rule 3. It is Skat's case that this is a question of English public policy which would not be binding in the DIFC and that, in maintaining the claim in the DIFC, Skat would not be making any allegation of law which is inconsistent with the judgment of the English Court at first instance. Skat submits that any judgment entered by the English Courts which would fall to be entered in the DIFC Claim would be no more than a ruling that the Skat claim was not admissible/justiciable in the English Court. By refusing to admit the claim for determination at all, the English Court's decision could not either bind the parties nor result in an inability on the part of the DIFC Courts to determine the substantive merits of the claim. That debate can wait another day.

21. Contrary to Elysium's submissions, the search orders, when made, were made in part on the footing that they were required in support of foreign proceedings in on-shore Dubai, the USA and Malaysia. By the time of the Consent Order, life had moved on and the sole purpose of maintaining the DIFC proceedings appeared to be as an adjunct to proceedings elsewhere. It was envisaged that there would be substantive proceedings in on-shore Dubai, the USA and Malaysia, regardless of the position in England. The existence of proceedings in the USA and Malaysia, both of which are common law jurisdictions, where it seems that the Courts have so far rejected the application of a "Revenue Rule" along the lines of Dicey Rule 3, are capable of amounting to a good reason for the continued production of documents to SKAT, so that the fullest possible information and evidence is available to those Courts, even if the English Claim is dismissed as a result of the refusal of permission to appeal or a failure on appeal. I can see no basis for drawing a distinction between documents which have been "deployed" in one jurisdiction rather than another. The permission given was for use of any of the seized documents in any of the specified proceedings.

22. There is no question of "forum shopping" on Skat's part. It has to sue Defendants where it finds them. Any question of *forum conveniens* must be decided by the individual court where there is seen to be a duplication of parties and claims. The DIFC Courts would only be likely to entertain a substantive claim against Defendants to the English Claim in circumstances where the English Court has refused to entertain such a claim. That too is a matter for debate on another day, should it require resolution. Whether or not there is a "Revenue Rule" in the DIFC is a hotly contested issue which it is agreed I cannot and do not decide this stage.

23. If it be relevant, as to any questions of balance of prejudice, apart from the expense of completing the sifting exercise for privilege, there would appear to be no downside for Elysium, other than further elucidation of the inner workings of the schemes described in the English Claim and the DIFC Claim, for which the best evidence should be available for whichever Courts have to determine the issues between the parties. There is obviously prejudice to Skat if it cannot now utilise documents which it has seen which have been made available and if it has to retrieve them or withdraw them, if that is achievable. It would then have to pursue the proceedings without the benefit of them. As previously stated, that would create chaos and is not realistically possible.

24. The bottom line is that, whether or not the English Court considers the claim inadmissible in England under the "Revenue Rule", each Court presented with the claims made by Skat will have to decide for itself whether the claims should be admitted and should succeed or fail, subject to their own conflicts of law rules, rules on issue estoppel and public policy, if relevant. Similarly, each Court will have to decide what, if any use is to be made of the documents which the DIFC Courts has ordered to be seized and made available for such proceedings.

25. In these circumstances, the Defendants' applications must fail and all of the orders sought are refused.

26. I have not heard any submissions on costs but, in the absence of any special considerations it appears inevitable that costs must follow the event. I make no order because the parties have not had any opportunity to make submissions, but give that indication in the hope that this element can be agreed without the need to revert to the Court.