# Exhibit 2

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

MASTER DOCKET 18-MD-2865(LAK)

CASE NO. 18-CV-09797

_____
                                        )
IN RE:                                  )
                                        )
CUSTOMS AND TAX ADMINISTRATION OF       )
THE KINGDOM OF DENMARK                  )
(SKATTEFORVALTNINGEN) TAX REFUND        )
SCHEME LITIGATION                       )
                                        )
_____)




REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

EXAMINATION OF

SHAHAB HASHEMI

DATE: October 7, 2021




REPORTED BY:  MICHAEL FRIEDMAN, CCR

Page 2

```
 1
 2
 3
 4
 5              TRANSCRIPT of the videotaped deposition
 6   of the witness, called for Oral Examination in the
 7   above-captioned matter, said deposition being taken
 8   by and before MICHAEL FRIEDMAN, a Notary Public and
 9   Certified Court Reporter of the State of New Jersey,
10   via WEBEX, ALL PARTIES REMOTE, on October 7, 2021,
11   commencing at approximately 7:06 in the morning.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   A P P E A R A N C E S :
 2
     HUGHES, HUBBARD & REED
 3   One Battery Park Plaza
     New York, NY  10004
 4   BY:   NEIL OXFORD, ESQ.
           BILL MAGUIRE, ESQ.
 5         MARC A. WEINSTEIN, ESQ.
           CAROLYN HARBUS, ESQ.
 6         JAMES HENSELER, ESQ.
           JOHN MCGOEY, ESQ.
 7         VALERIE CAHAN, ESQ.
           ERIN PAMUKCU, ESQ.
 8         VICTOR SANDOVAL, ESQ.
           MAUREEN HOWLEY, ESQ.
 9         GREGORY FARRELL, ESQ.
           ELIZABETH ZHOU, ESQ.
10         DEBBIE PLACID, ESQ.
           SIOBHAN D'ANGELO, ESQ.
11         Via VTC
     Attorneys for SKAT
12
13   HANAMIRIAN LAW FIRM
     40 E. Main Street
14   Moorestown, NJ  08057
     BY:   JOHN M. HANAMIRIAN, ESQ.
15         ELZA GRIGORYAN
           Via VTC
16   Attorneys for Acorn Capital
17   THE MOORE TAX LAW GROUP
     11 Broadway
18   New York, NY  10004
     BY:   ZHANNA ZIERING, ESQ.
19         Via VTC
     Attorneys for Kenning and Klugman
20
21   KAPLAN RICE
     142 West 57th Street
22   New York, NY  10019
     BY:   Y. KATIE WANG, ESQ.
23         MICHELLE RICE, ESQ.
           Via VTC
24   Attorneys for Albedo, et al
25
```

Page 4

```
 1   A P P E A R A N C E S :
 2
     KOSTELANETZ & FINK
 3   250 Greenwich Street
     New York, NY  10007
 4   BY:   NICHOLAS H. BAHNSEN, ESQ.
           BRYAN C. SKARLATOS, ESQ.
 5         CAROLINE CIRAOLO, ESQ.
           ERIC SMITH, ESQ.
 6         DANIEL DAVIDSON, ESQ.
           SHARON L. MCCARTHY, ESQ.
 7         JULIET L. FINK, ESQ.
           Via VTC
 8   Attorneys for Azalea, et al
 9
     K&L GATES
10   One Lincoln Street
     Boston, MA  02111
11   BY:   JOHN GAVIN, ESQ.
           BRANDON DILLMAN, ESQ.
12         DAVID FINE, ESQ.
           JOHN BLESSINGTON, ESQ.
13         ANNA E. L'HOMMEDIEU, ESQ.
           Via VTC
14   Attorneys for Alexander Jamie Mitchell, et al
15
16   GUSRAE, KAPLAN & NUSBAUM
     120 Wall Street
17   New York, NY  10005
     BY:   KARI PARKS, ESQ.
18         MARTIN H. KAPLAN, ESQ.
           Via VTC
19   Attorneys for Goldstein
20
21
22
23
24
25
```

Page 5

```
 1   A P P E A R A N C E S :
 2
     WILMER HALE
 3   7 World Trade Center - 250 Greenwich Street
     New York, NY  10007
 4   BY:   ALAN SCHOENFELD, ESQ.
           MICHAEL BONGIORNO, ESQ.
 5         CARY GLYNN, ESQ.
           JULIA C. PILCER, ESQ.
 6         RACHEL CRAFT, ESQ.
           ANDREW DULBERG, ESQ.
 7         BRITTANY LLEWELLYN, ESQ.
           Via VTC
 8   Attorneys for Avanix, et al
 9
10
     BINDER & SCHWARTZ
11   366 Madison Avenue
     New York, NY  10017
12   BY:   NEIL S. BINDER, ESQ.
           GREGORY C. PRUDEN, ESQ.
13         WENDY H. SCHWARTZ, ESQ.
           M. TOMAS MURPHY, ESQ.
14         Via VTC
     ATTORNEYS for ED&F Man
15
16   DEWEY, PEGNO & KRAMARSKY
     777 Third Avenue
17   New York, NY  10017
     BY:   SEAN MULLEN, ESQ.
18         DAVID PEGNO, ESQ.
           THOMAS E.L. DEWEY, ESQ.
19         Via VTC
     Attorneys for Michael Ben-Jacob
20
21   WILLIAMS & CONNOLLY
     725 12th STREET, NW
22   Washington, DC  20005
     BY:   AMY B. MCKINLAY, ESQ.
23         STEPHEN D. ANDREWS, ESQ.
           Via VTC
24   Attorneys for Sander Gerber Pension Plan
25
```

CONFIDENTIAL
Shahab Hashemi — October 7, 2021

3 (Pages 6 to 9)

---

Page 6

1  A P P E A R A N C E S :
2
3  KATTEN
   575 Madison Avenue
4  New York, NY  10022
   BY:   DAVID GOLDBERG, ESQ.
5        MICHAEL ROSENAFT, ESQ.
         Via VTC
6  Attorneys for Klugman
7
   SEWARD & KISSEL
8  One Battery Park Plaza
   New York, NY  10004
9  BY:   SHREY SHARMA, ESQ.
         THOMAS R. HOOPER, ESQ.
10        MARK J. HYLAND, ESQ.
          Via VTC
11 Attorneys for Bernard Tew
12
   LAW OFFICES OF SHELDON S. TOLL
13 2000 Town Center
   Southfield, MI  48075
14 BY:   SHELDON S. TOLL, ESQ.
         Via VTC
15 Attorneys for Hoffmeister
16
   MORVILLO, ABROMOWITZ, GRAND, IASON & ANELLO
17 565 5th Avenue
   New York, NY  10017
18 BY:   RICHARD WEINBERG, ESQ.
   Attorneys for Clove Pension Plan, Mill River
19 Pension Plan, Traden Investment Pension Plan
20
21
22
23
24
25

---

Page 7

1  ALSO PRESENT:    JOSE RIVERA, Videographer
2                   KIRSTEN MARIE DONATO, ESQ.
                    KAMMERADVOKATEN POUL SCHMITH
3
                    CHARLOTTE WOODWARD
4                   ROSENBLATT LAW
5                   KATRINE HOVGAARD B☐EGH, ESQ.
6                   CHRISTINE P. VINTHOR
7                   CHRISTIAN B☐LOW
8                   MARISE H☐RBY SALVESEN
9                   ANNE CHRISTINE K. EGHOLM
10                  ANNA L'HOMMEDIEU
11                  JENS KJAEGAARD
12                  JOHN ACKLEY
13                  LUTHER KISANGA
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 8

1               I N D E X
2
3  WITNESS NAME                                PAGE
   SHAHAB HASHEMI
4
5  Examination By:
               By Mr. Oxford                   13
6
7             * * * * * *
8
9             E X H I B I T S
10
11 NO.                                         PAGE
12 Exhibit 4150     Notice of Deposition       23
13 Exhibit 4151-4152  Schedule of agreed       24
                    facts, Appendix to
14                  Schedule of agreed
                    facts
15
   Exhibit 4154     ED&F 495253 – 495358       33
16
   Exhibit 4168     ED&F 443853 – 443854       64
17
   Exhibit 4188     ED&F 445009 – 445018       124
18
   Exhibit 4189     ED&F 74845 – 74852         142
19
   Exhibit 4191     ED&F 81183                 146
20
   Exhibit 4192     ED&F 81184                 155
21
22
23
24
25

---

Page 9

1          E X H I B I T S (CONTINUED)
2
3  NO.                                         PAGE
4  Exhibit 4194     ED&F 265430 – 265435       173
5  Exhibit 4195     ED&F 543500 – 543502       173
6  Exhibit 4205     ED&F 444864 – 444869,      183
                    ED&F 444937 – 444938
7
   Exhibit 4345     ED&F 44265 – 44301         191
8
   Exhibit 4344     ED&F 444026 – 444028       204
9
10
11
12             * * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25

---

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

4 (Pages 10 to 13)

Page 10

```
 1                  - - -
 2            Deposition Support Index
 3                  - - -
 4
 5  Direction to Witness Not to Answer
 6  Page  Line     Page  Line     Page  Line
 7  None
 8
 9  Request for Production of Documents
10  Page  Line     Page  Line     Page  Line
11  None
12
13  Stipulations
14  Page  Line     Page  Line     Page  Line
15  None
16
17  Questions Marked
18  Page  Line     Page  Line     Page  Line
19  None
20
21
22
23
24
25
```

Page 11

```
 1          THE COURT REPORTER:  My name is
 2  Michael Friedman, a Certified Shorthand
 3  Reporter.  This deposition is being held
 4  via videoconferencing equipment.
 5          The witness and reporter are not in
 6  the same room.  The witness will be
 7  sworn in remotely pursuant to agreement
 8  of all parties.  The parties stipulate
 9  that the testimony is being given as if
10  the witness was sworn in person.
11  ///
12  ///
13  ///
14  ///
15  ///
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
```

Page 12

```
 1          THE VIDEOGRAPHER:  We are now on
 2  record.  This is the remote video
 3  recorded deposition of Shahab Hashemi.
 4          Today is Thursday, October 7, 2021.
 5  The time is now 7:06 a.m. New York time.
 6          We're here in the matter of In Re,
 7  Customs and Tax Administration of the
 8  Kingdom of Denmark Et Al.  All counsel
 9  have been noted on record.
10          My name is Jose Rivera, remote
11  video technician on behalf of Gregory
12  Edwards LLC.  At this time, will the
13  reporter, Michael Friedman, on behalf of
14  Gregory Edwards LLC, please swear in the
15  witness.
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
```

Page 13

```
 1          P R O C E E D I N G S
 2  S H A H A B   H A S H E M I,
 3          called as a witness, having been first
 4  duly sworn according to law, testifies as follows:
 5          * * * * * *
 6  EXAMINATION BY MR. OXFORD:
 7      Q    Good morning.
 8           I guess it's afternoon where you
 9  are, Mr. Hashemi?
10      A    Just about, yes.
11          MR. BINDER:  I'm sorry.  Neil,
12      before we begin, I just want to -- for
13      the court reporter, we want to review
14      and sign this transcript.  Thank you.
15      Q    Just before I get to my questions,
16  Mr. Hashemi, I just have one objection to put
17  on the record.
18          ED&F Man produced to us late Friday
19  night some 60,000 pages of documents, about
20  11,000 documents, which appear to be accounts
21  from BNP and SEB, two of ED&F Man's
22  custodians or sub-custodians in this case.
23  We've been requesting these documents for at
24  least 18 months and have been told they
25  didn't exist.
```

Page 14

```
 1          We haven't had an opportunity to
 2  review the documents and we still have a
 3  number of outstanding requests for production
 4  from ED&F Man.
 5          So we're content to proceed with
 6  the deposition today and make as much
 7  progress as we can, but for obvious reasons,
 8  we reserve the rights to call the witness
 9  back if necessary.
10          MR. BINDER:  So, Mr. Oxford, if
11      your position is that you're not ready
12      to take the entire deposition today,
13      that's something that should have been
14      raised.  I've been in conversations with
15      Dustin Smith at your office several days
16      in advance and I was advised that he
17      would have a team ready to review the
18      documents.  They were delivered last
19      Friday.
20          So we would object to any effort to
21      extend the time of this deposition
22      beyond that which has already been
23      agreed.
24          MR. OXFORD:  Okay.  Well, we have
25      our positions on the record.  If we need
```

Page 15

```
 1  to revisit it, we can revisit it.
 2      Q    With that --
 3          MR. KAPLAN:  Marty Kaplan, Gusrae,
 4      Kaplan & Nusbaum.  I would like to join
 5      in your objection for the record.
 6          MR. OXFORD:  You're most welcome,
 7      Marty.
 8          MR. KAPLAN:  Thank you.
 9          MR. OXFORD:  Anybody else want to
10      join my objection?
11          MR. BLESSINGTON:  This is John
12      Blessington.  I'll join just for the
13      record.
14          MR. OXFORD:  Appreciate it.  It's
15      an exclusive club, John.  You are very
16      welcome.
17          So, Mr. Hashemi, let's start with a
18  little bit of background.
19          Your current position with ED&F Man
20  is what?
21      A    I'm head of business management.
22      Q    What is "business management?"
23      A    My role is to support the CEO in
24  the management of our front office desks.
25      Q    How long have you worked for
```

Page 16

```
 1  ED&F Man?
 2      A    Seven years.
 3      Q    How long have you been head of
 4  business management?
 5      A    It's just under one year, if I
 6  recall correctly.
 7      Q    And I assume you had positions with
 8  ED&F before then.
 9          Can you give us a brief summary of
10  your professional history with ED&F Man?
11      A    Of course.  I started in October in
12  2014, and -- within the compliance function,
13  and then moved over to being a business
14  manager for the financial futures and options
15  desk, and then later progressed to becoming
16  the business manager for the EMEACU.
17      Q    Okay.  Can you describe in brief
18  your responsibilities as part of the
19  compliance function at ED&F?
20      A    Of course.  I joined as a graduate
21  and was part of the documentation and
22  onboarding team initially, and then moved to
23  the compliance assurance and monitoring part
24  of the team.
25      Q    And what rules and regulations were
```

Page 17

```
 1  you trying to assure a compliance with?
 2      A    In accordance with the firm's FCA
 3  registration.
 4      Q    And FCA is the Financial Conduct
 5  Authority?
 6      A    Correct.
 7      Q    And that's the regulator of
 8  ED&F Man Capital Markets.
 9          Correct?
10      A    Correct.
11      Q    And that was true in the period
12  2012 through 2015 as well.
13          Correct?
14      A    Correct.
15      Q    Next, you mentioned a role in
16  financial futures and options.
17          Can you give us a little flavor of
18  what you were doing in that role?
19      A    Sure.  So I was supporting the
20  global head of the desk in the day-to-day
21  management of the business, which spanned
22  across multiple offices, and -- and helping
23  to achieve the strategy of the desk.
24      Q    Did the desk deal with any other
25  financial instruments aside from futures and
```

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

6 (Pages 18 to 21)

Page 18

1  options?
2      A    No.
3      Q    Then you were promoted, or at least
4  I assume it was a promotion, to a business
5  manager in EMEA.
6          What was your role in that period?
7      A    So I was business manager to the
8  EMEA CEO, and supporting the businesses,
9  business development, should I say, and also
10  helping to implement the firm's strategy in
11  the region.
12      Q    And was that -- withdrawn.
13          Was the -- was your
14  role -- withdrawn.
15          Did your role relate to all aspects
16  of ED&F's business in the EMEA region in that
17  time?
18      A    I wouldn't -- I'm not sure "all
19  aspects" would be the correct term.
20      Q    Okay.  Prior to joining ED&F Man,
21  did you -- were you employed?
22      A    I was not then, not in permanent
23  employment.
24      Q    So ED&F Man was your first job out
25  of university?

Page 19

1      A    Correct.
2      Q    Where did you attend university and
3  which degrees did you get?
4      A    I attended the University of
5  Southampton, and I studied for a BSC,
6  Bachelor's of Science, in mathematics with
7  economics, and then studied for a Master's of
8  Science in business analytics and management
9  science.
10      Q    Not to be glib, I assume you don't
11  only study for those degrees, but you
12  actually were awarded those?
13      A    I was rewarded -- or awarded those
14  degrees.
15      Q    Do you have any professional
16  experience, sir, in equity finance?
17      A    I do not, no.
18      Q    Can you tell me how you became
19  lucky enough to be selected as ED&F Man's
20  witness today?
21          MR. BINDER:  And I would instruct
22      the witness, in answering this question,
23      not to disclose communications with
24      counsel.  So if you have knowledge of
25      why you were chosen separate from

Page 20

1      communications with counsel, you can
2      answer.  Otherwise, I instruct you not
3      to answer.
4      A    I don't know the details of why.
5      Q    Are you knowledgeable on the
6  mechanics of the various types of trades and
7  transactions that are typical in an equity
8  finance business?
9          MR. BINDER:  Objection to form.
10      A    Could you ask the question again,
11  Mr. Oxford?
12      Q    Sure.
13          Are you knowledgeable about the
14  mechanics of the various types of trades and
15  transactions that are typical in an equity
16  finance business?
17          MR. BINDER:  Objection to form.
18      A    I've prepared, as best I could, to
19  answer the questions today.
20      Q    Okay.  How did you prepare, as best
21  you could, to answer questions today?
22      A    I reviewed documents in relation to
23  this deposition, and had meetings with
24  ED&F Man's attorneys, and I had meetings with
25  people internally at ED&F Man.

Page 21

1      Q    Okay.  Can you generally describe
2  the documents you reviewed?
3      A    There were many which included
4  trade packs, and they included the agreements
5  that were signed, included onboarding packs.
6          Those are some that I can think of
7  off the top of my head.
8      Q    Okay.  Approximately how long did
9  you spend preparing for this deposition?
10      A    The 15 meetings with the attorneys
11  were of various lengths.  And I had, I
12  believe, six meetings with the internal staff
13  of ED&F Man, and have done in the region of
14  50 to 75 hours of preparation myself.
15      Q    I feel like I should award you
16  another honorary degree for all of that
17  effort.
18          Can you tell me who with ED&F Man
19  you met that consisted of external staff?
20      A    Catherine Odigie, O-D-I-G-I-E.
21  Richard Reed, Sara Hayward, Carlos Fernandez,
22  Lucy Jenkins, and Sue Wood.
23      Q    Thank you.  Are you familiar with
24  the term "dividend arbitrage," sir?
25      A    I am.

Page 22

1    Q    Can you explain what your
2 understanding is of that term, "dividend
3 arbitrage," as a trading strategy?
4    A    Dividend arbitrage is a trading
5 strategy in which ED&F Man's clients, the
6 pension plans, would enter into transactions
7 to purchase shares in which they would be
8 entitled a dividend.
9    Q    Anything else?  Do you have any
10 more detail of your understanding of that
11 strategy?
12   A    No.
13   Q    Are you familiar with the term
14 "cum ex trading?"
15   A    I have heard of it.
16   Q    What does it mean to you in the
17 context of dividend arbitrage strategies?
18   A    I don't know, Mr. Oxford.  I'm not
19 able to -- I can't explain.
20   Q    Okay.  I guess we'll come back to
21 that.
22        So you should have with you some
23 documents that we've provided to you
24 electronically.  And we've endeavored to send
25 you a hard copy set in case you're a Luddite

Page 23

1 like me and prefer paper.
2        Do you have those binders available
3 to you?
4    A    Yes, the binders are here.
5    Q    Can I ask you to turn to
6 Exhibit 4150, please?  It should be the
7 Notice of Deposition.
8        MR. OXFORD:  Mark 4150.
9        (Whereupon the above mentioned was
10   marked for Identification.)
11   Q    Do you have that there, sir?
12   A    I'm not inside it.  You don't
13 happen to know in which volume of binder it's
14 in, do you?
15   Q    It should be Volume 1, Tab 28, I'm
16 reliably informed.
17   A    Okay, bear with me.
18        Okay.  I have it here.
19   Q    Okay.  Have you seen this document
20 before, sir?
21   A    I have.
22   Q    Did you review it as part of
23 preparing for the deposition?
24   A    I reviewed it as part of preparing
25 for the deposition, yes.

Page 24

1    Q    Are you familiar with the topics
2 listed in this notice?
3    A    I'm familiar with the topics in
4 this notice.
5    Q    And you're prepared to testify
6 today on behalf of ED&F Man on each of the
7 topics in this notice?
8    A    I've prepared, as best I could, to
9 testify as to each topic.
10   Q    Tell me where you're sitting today,
11 sir.
12        Are you in the offices of
13 Rosenblatt?
14   A    I'm in the offices of Rosenblatt.
15   Q    Who are English solicitors to
16 ED&F Man, correct?
17        And just so I have it, who's in the
18 room with you?
19   A    There's nobody in the room.
20   Q    Okay.  Now, can I ask you to turn
21 to Exhibits 4151 and 4152, please?
22        MR. OXFORD:  Mark this as 4151 and
23   4152.
24        (Whereupon the above mentioned was
25   marked for Identification.)

Page 25

1    Q    It should be Tabs 29 and 30 in your
2 binder, sir.
3        MR. BINDER:  Neil, we don't yet --
4   we sent ours out for printing but they
5   will not arrive until 9:00, so we're
6   going to need a little more help.
7        So what are the exhibits?
8        MR. OXFORD:  4151 and 4152.
9        MR. BINDER:  All right.  Give me a
10   second.
11        MR. OXFORD:  It's the Schedule of
12   Agreed Facts in the appendix.
13        MR. BINDER:  Okay.  I see it.
14   A    Yes, I have it here.
15   Q    Okay.  Terrific.
16        So 4151 is a draft Schedule of
17 Agreed Facts and 4152 is the appendix to that
18 draft schedule.
19        Correct?
20   A    Yes.
21   Q    And are you familiar with these
22 documents, sir?
23        MR. BINDER:  And I would just note
24   that they're multiple versions of this
25   document.  So, Mr. Hashemi, you should

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

8 (Pages 26 to 29)

Page 26

1      take a look at the one in front of you
2      and make sure that this is the one --
3          Q    I will represent to you,
4   Mr. Hashemi, that this is the version we sent
5   to your counsel, Mr. Binder, yesterday in
6   connection with so that you could be
7   adequately prepared.
8          MR. BINDER:  Okay.  Hang on a
9      second.  So this was sent to me
10     yesterday.  I requested a copy of it at
11     8:51 a.m. yesterday morning, and it was
12     sent to me at 12:32 yesterday, which
13     would have been 5:32 in London.
14         So I don't know -- so we did not
15     have an opportunity to share this copy
16     with Mr. Hashemi.  So I do not know
17     whether he has actually reviewed this
18     version.  I know he's seen some version.
19     I do not know if he's seen this one.
20     But you can ask the witness that.
21         But we did not receive it in time
22     to get it to him, notwithstanding my
23     request.
24         Q    Okay.  Tell me if you're familiar
25   with this document, sir.

Page 27

1      A    Not this version of it.
2      Q    Okay.  Are you familiar with other
3   versions of this document?
4      A    I have seen another version of this
5   document.
6      Q    Okay.  And how is it you're certain
7   that you have seen a version of this
8   document, but not this version?
9      A    Because this version has markups in
10  red.
11     Q    I see.  You've seen a clean version
12  of this document?
13     A    Yes.
14         MR. BINDER:  Objection to form,
15     lacks foundation.
16     A    I've seen a version of this
17  document.
18     Q    Okay.  You're aware, sir, that
19  ED&F Man is a defendant in SKAT's litigation
20  in England.
21         Correct?
22     A    Yes.
23     Q    And if I refer to those -- that
24  litigation as the "English claims," you'll
25  know what I'm talking about.

Page 28

1          Correct?
2      A    Sorry?  Say that again?
3      Q    If I refer to the English
4   litigation as the "English claims," you'll
5   understand what I'm asking about.
6          Correct?
7      A    Okay.
8      Q    And you're aware that ED&F Man is
9   also a third-party defendant in certain cases
10  in the U.S. litigation.
11         Correct?
12     A    Correct.
13     Q    Okay.  And just while we're on the
14  definitional section of the deposition, I'm
15  going to define the 31 defendants in the U.S.
16  litigation that were clients of ED&F Man as
17  "the plans" or "the defendant plans."
18         Will you understand if I use those
19  references?
20     A    Yes.
21     Q    Okay.  I just want to walk through
22  some of the other legal entities we will be
23  talking about today.
24         Is it correct that ED&F -- well,
25  let's step back.

Page 29

1          ED&F Man Capital Markets is also
2   known as ED&F MCM?
3      A    It is referred to as MCM.
4      Q    Okay.  So if I refer in my
5   questions to ED&F or ED&F MCM, I'm referring
6   to the same entity, ED&F Man Capital Markets.
7          Do you understand that?
8      A    I understand.
9      Q    And the parent company of that
10  entity is ED&F Man Holdings, Limited.
11         Correct?
12     A    I believe the ultimate parent to be
13  ED&F Man Holdings.
14     Q    And ED&F used to have an affiliate
15  they operated in Dubai.
16         Correct?
17     A    Sorry?  Could you ask the question
18  again?
19     Q    Sure.
20         ED&F used to have an affiliate that
21  operated out of Dubai.
22         Correct?
23     A    There was a subsidiary of the
24  ultimate parent that operates in Dubai.
25     Q    And that was known as MPT Dubai or

Page 30

1  Man Professional Trading Dubai.
2          Correct?
3      A    Yes.
4      Q    Okay.
5      A    I believe the entity was ED&F Man
6  Professional Trading Dubai.
7      Q    Okay.  So I'll refer to that as
8  "ED&F Dubai" or "MPT Dubai."
9          Will we be on the same page if I
10 describe it thus?
11     A    Yes.
12     Q    ED&F also --
13     A    Sorry, Mr. Oxford.  I think
14 Mr. Binder was trying to say something.
15         MR. BINDER:  MPT Dubai, not ED&F,
16     since it -- okay, let's just have, so as
17     not to confuse things.  If you want to
18     refer to it in a shorthand, "MPT Dubai"
19     is how we refer to it.  I think it
20     would -- I think it would be clearer
21     that way.
22         MR. OXFORD:  Okay.  Well, I have
23     the witness' answer.  It seems pretty
24     clear to him.
25     A    I would prefer if -- Mr. Oxford, I

Page 31

1  would prefer if you would refer to it as "MPT
2  Dubai."
3      Q    Okay.  I'll do my best.  But when I
4  refer to it as "ED&F Dubai," please
5  understand that I'm asking you about
6  MPT Dubai.
7          Okay?
8          MR. BINDER:  Objection.
9      Q    Understood?
10     A    I would prefer if you could use
11 MPT Dubai, but I understand what you said.
12     Q    Okay.  Thank you.
13         ED&F also had an affiliate in
14 Switzerland called Volcafe.
15         Correct?
16     A    There was a subsidiary of the
17 ultimate parent company in Switzerland.
18     Q    Called Volcafe.
19         Correct?
20     A    Called Volcafe, correct.
21     Q    Is Volcafe still operational today?
22     A    I don't know.
23     Q    Is MPT Dubai still operational
24 today?
25     A    I also don't know.

Page 32

1      Q    Are you familiar with the process
2  to produce documents to SKAT in either the
3  English or U.S. litigations?
4      A    Can you ask me the question again,
5  please?
6      Q    Sure.
7          Are you familiar with the process
8  that was undertaken to produce documents to
9  SKAT in the English and U.S. litigations?
10     A    I'm not.
11     Q    When was ED&F's equity finance
12 business created?
13     A    I believe it was 2012.
14     Q    Why did ED&F decide in 2012 to add
15 an equity finance business to their
16 portfolio?
17     A    I believe it was to be able to
18 provide these financial services to
19 prospective customers.
20     Q    Okay.  What financial services did
21 the equity finance desk provide to customers?
22     A    They provided, from what I recall,
23 execution, clearing, custodian services, and
24 securities financing as well.
25     Q    Can I ask you to turn to

Page 33

1  Exhibit 4154, which should be a couple of
2  tabs -- Binder 2, Tab 32, sir?
3          MR. OXFORD:  Mark this as 4154.
4          (Whereupon the above mentioned was
5          marked for Identification.)
6      A    Yeah, Binder 2.
7      Q    Do you have it there, sir?
8      A    Binder 2, Tab 32?
9      Q    Yes.
10     A    Yes.
11     Q    So the first document should be an
12 e-mail from Jacqueline Kilgour to Mr. Oxford,
13 in April of 2019.
14         Is that -- are we on the same page
15 there?
16     A    Tenth of April, 2019.
17     Q    Bingo.  And the Bates number --
18         MR. OXFORD:  -- because I know you
19     love this, Mr. Binder, the Bates number
20     ends in 253, especially for you.
21     A    Yes, 253.
22     Q    Okay.  Great.
23         Are you familiar with this e-mail,
24 sir?  And without flicking through all the
25 attachments, can you tell me if you've seen

CONFIDENTIAL
Shahab Hashemi – October 7, 2021

Page 34

1  it before?
2      A    I don't recall seeing this e-mail
3  before.
4      Q    Okay.  Do you know whether or not
5  this presentation was made by ED&F Man to the
6  FSA in connection with their application to
7  get permission to open their equity finance
8  business?
9          MR. BINDER:  And Mr. Hashemi, you
10     should take the time to review the
11     document so you understand what
12     Mr. Oxford is referring to.
13     A    Yeah.
14         (Witness reviewing.)
15     Q    If I could direct your attention to
16 the first page of the e-mail, sir, there's an
17 e-mail from Chris Smith to the FSA.
18         Who is Mr. Smith?  Is he an
19 employee of ED&F Man?
20     A    Yes, he is.
21     Q    What's his role?
22     A    He is the global CEO.
23     Q    And he -- Mr. Smith writes to
24 Russell Moore, M-O-O-R-E, at the FSA, saying,
25 "Thank you for meeting with us at short

Page 35

1  notice yesterday.  As agreed, I attach the
2  documents you requested in support of MCM's
3  VOP application focusing on the proposed
4  equity business."
5          Do you see this?
6      A    I see that's what the document
7  says.
8      Q    And do you know what "VOP" is a
9  reference to?
10     A    I believe it's "variation of
11 permission."
12     Q    In your experience, is it typical,
13 when a variation of permission is being
14 requested from the FSA, that an applicant
15 such as ED&F Man would make certain
16 presentations and representations to the FSA?
17         In your experience, is it typical,
18 when a variation of permission is requested
19 by the FSA, of the FSA, that the applicant
20 will make certain presentations and
21 representations?
22         MR. BINDER:  Objection, lacks
23     foundation.
24     A    I don't know.
25     Q    Okay.  Would you expect the FSA to

Page 36

1  rely on representations and presentations
2  made to it by ED&F Man?
3          MR. BINDER:  Objection, lacks
4      foundation.  Also, he's a 30(b)(6)
5      corporate representative.  These don't
6      really go to corporate knowledge.
7      Q    Can you answer the question, sir?
8      A    I don't know, Mr. Oxford.
9      Q    Who's Mr. Hawksworth?
10     A    Mr. Hawksworth was an employee of
11 ED&F Man.
12     Q    What were his -- what was his job
13 title?
14     A    I believe he was EMEA's CEO.
15     Q    And when did he depart that
16 position?
17     A    I believe it was in 2019.
18     Q    Is it correct that he resigned
19 under investigation by the FCA?
20         MR. BINDER:  Objection to form,
21     compound, lacks foundation.
22     A    I don't know.
23     Q    Do you have any information about
24 the circumstances of Mr. Hawksworth's
25 departure from ED&F Man?

Page 37

1      A    I do not.
2      Q    All right.  Are you familiar with
3  the -- withdrawn.
4          Are you familiar with an
5  investigation into ED&F Man's equity finance
6  business by the FCA?
7          MR. BINDER:  Objection to form,
8      vague.
9      A    Could you ask me the question
10 again, please?
11     Q    Sure.
12         Are you familiar with an
13 investigation by the FCA into ED&F Man's
14 equity finance business?
15         MR. BINDER:  Objection to form,
16     vague.
17     A    Sorry, Mr. Oxford, one more time.
18         Did you say "familiar?"
19     Q    Yes.  Are you familiar?
20         Do you know anything about it?
21     A    I do not, no.
22     Q    Are you aware of the fact that the
23 FCA was, at least at one point, investigating
24 ED&F Man's equity finance business?
25         MR. BINDER:  Objection to form.

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

11 (Pages 38 to 41)

Page 38

1    A    Yes.
2    Q    Okay.  Beyond being aware of that
3 fact, do you have any information at all
4 about that investigation?
5    A    I do not, no.
6    Q    Okay.  Can I ask you to turn back
7 to the deposition notice?  It's Exhibit 4150.
8         I think we said it was Tab 28,
9 Binder 1?
10   A    I'm sorry.  Which tab?
11   Q    I think we said 28.
12   A    Okay.
13   Q    Can I ask you to turn to Topic 24?
14   A    Okay.
15   Q    Do you see the 24 -- the top of 24
16 is the "U.K. Financial Conduct Authority's
17 Investigation into ED&F Man's Custody
18 Business and Trading in Danish Shares."
19        Do you see that?
20   A    I see that's what the document
21 says.
22   Q    Okay.  And this was a document you
23 reviewed in preparation for your testimony
24 today, sir?
25   A    This is the document I reviewed in

Page 39

1 preparation.
2    Q    And this is a document that you
3 told us you were prepared about -- prepared
4 to testify on these topics to the best of
5 your ability.
6         Correct?
7    A    This is the document that I said I
8 used to prepare, as best I can, for today's
9 deposition.
10   Q    Okay.  Just take as long as you
11 want, give me as much detail as you can.
12 Tell me everything you did to prepare
13 yourself to testify on Topic 24.
14        MR. BINDER:  I'll just note for the
15        record that the witness was not provided
16        documents that would contain privileged
17        information for use at this deposition
18        because such information would not be
19        appropriate -- to the extent it's
20        privileged, would not be appropriately
21        obtained through a 30(b)(6) deposition.
22        MR. OXFORD:  Okay.
23   A    I asked ED&F Man's attorneys about
24 this topic, Topic 24.
25   Q    What did they tell you?

Page 40

1    A    I was informed that there was an
2 investigation, and -- but I do not know if it
3 has -- I was informed that it hasn't
4 concluded.
5    Q    Anything else?
6    A    That is all.
7    Q    And just so we have a very clear
8 record, because we might need this, did you
9 do anything else to prepare yourself to
10 testify today on Topic 24?
11   A    (Witness reviewing.)
12        I did not.
13   Q    You keep looking down, sir.
14        Are you looking down at something
15 in particular?
16   A    No, it's just my default when I
17 think.  I either look down or maybe up.
18        You're more than welcome to see.  I
19 can move the camera if you'd like to see.
20   Q    That's fine.  Quite often in these
21 circumstances, witnesses like to prepare,
22 their lawyers like to prepare by providing
23 some notes.
24        But I take it you have no notes to
25 assist you with your preparation today?

Page 41

1    A    No.  If you'd like to see, I'm more
2 than willing to move the camera.
3    Q    I trust your representation, sir.
4 I was just asking the question.
5    A    Okay.
6    Q    I understand you haven't seen it
7 before, but let's just take a look because it
8 will help guide some of the questions.
9         Can you turn to -- back to the
10 Exhibit 4154?  I think that was back in
11 Binder 2, Tab 32.
12   A    Okay.
13   Q    And then there should be a Tab G
14 there?
15   A    Okay.
16   Q    Do you have that?
17   A    Yes, I have that.
18   Q    Okay.  So this is -- do you have
19 any information about who this presentation
20 is made to?
21        MR. BINDER:  Objection to form.
22        Lacks foundation.
23   A    I do not.
24   Q    Okay.  Do you know what the
25 Financial Risk Committee is within ED&F Man?

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

Page 42

```
 1      A    Yes.
 2      Q    Okay.  What are its
 3  responsibilities?
 4      A    I believe it's the risk committee
 5  of the ED&F Man group.
 6      Q    And can you tell me, please, what
 7  involvement the risk committee had in
 8  reviewing or approving the dividend arbitrage
 9  trades that were conducted by the defendant
10  plans through ED&F Man?
11      A    I don't know.
12      Q    Can you turn to Page 3 of this
13  presentation?  It has the names of two
14  individuals; Mark Whitehead and Victoria
15  Foster.
16           Page 316?
17      A    Yes, I can see that.
18      Q    Are you familiar with
19  Mr. Whitehead's background prior to joining
20  ED&F Man?
21      A    From -- from reviewing documents,
22  yes.
23      Q    What is that background?
24      A    It says here he was most recently
25  the global head of equity finance for
```

Page 43

```
 1  MF Global in London.
 2      Q    Okay.  Is it fair to say that the
 3  --
 4           MR. BINDER:  Neil, could you tell
 5      me, what exhibit are you on?
 6           MR. OXFORD:  I'm on Exhibit 4154.
 7           MR. BINDER:  Okay.
 8      Q    Is it fair to say, Mr. Hashemi,
 9  that ED&F Man's equity finance business came
10  over from MF Global after MF Global
11  collapsed?
12      A    I -- I don't know.
13      Q    Was Mr. Whitehead head of ED&F's
14  equity finance desk in London?
15      A    He was, yes.
16      Q    What was Mr. Whitehead's role with
17  MPT Dubai?
18      A    I don't know.
19           MR. BINDER:  Objection, foundation.
20      Q    Do you know one way or another
21  whether Mr. Whitehead had a role with
22  MPT Dubai?
23      A    I do not.
24      Q    To whom did Mr. Whitehead report in
25  the period 2012 through 2015?
```

Page 44

```
 1      A    I believe it was Steven Hawksworth.
 2      Q    Does Mr. Whitehead still work for
 3  ED&F Man?
 4      A    Excuse me?
 5      Q    Does Mr. Whitehead still work for
 6  ED&F Man?
 7      A    He does not.
 8      Q    When did Mr. Whitehead and ED&F Man
 9  diverge?  When did he leave ED&F Man?
10      A    I don't know.
11      Q    Do you know when?
12      A    No, I don't know when.
13      Q    Do you know if Mr. Whitehead had a
14  role at Volcafe?
15      A    I do not.
16      Q    Okay.  Can I ask you to turn to
17  Page 4 of the presentation?  The heading is
18  "Revenue and Capital Metrics."  It's
19  the -- Page 4, yes, Bates 317.
20           The first bullet references "an
21  expectation of generation of net revenues of
22  6 million from yield enhancement strategies."
23           What does "yield enhancement
24  strategies" mean in ED&F Man?
25           MR. BINDER:  And again,
```

Page 45

```
 1      Mr. Hashemi, you should review as much
 2      of this page or document as you think
 3      necessary to answer Mr. Oxford's
 4      question.
 5      A    (Witness reviewing.)
 6           MR. OXFORD:  I'm just asking
 7      whether he's familiar with the term
 8      "yield enhancement strategies" in
 9      ED&F Man.
10           MR. BINDER:  Well, you pointed him
11      to a page in the document.  So if you
12      want him to set the document aside and
13      ask him questions, then you should do
14      that.
15      Q    Can you answer the question, sir?
16      A    Yes, so --
17           (Witness reviewing.)
18           Yield enhancement is typically a
19  strategy in which the yield of an asset is
20  improved.
21      Q    Do you understand this to be a
22  reference to dividend arbitrage strategies?
23           MR. BINDER:  Objection to form,
24      vague.
25      A    I don't know.
```

CONFIDENTIAL
Shahab Hashemi – October 7, 2021

13 (Pages 46 to 49)

Page 46

1     Q     The sentence continues that "the
2  desk expects to generate $12 million from
3  client facilitation."
4           What does "client facilitation"
5  mean at ED&F Man?
6     A     I believe it meant to facilitate
7  client strategies.
8     Q     And the revenue is generated by
9  charging fees on facilitation of those
10  strategies.
11          Correct?
12    A     Revenues would be generated for
13  providing brokerage services to the clients.
14    Q     Do you agree that there is a
15  reputational risk to ED&F Man of engaging in
16  arbitrage strategies around corporate
17  actions?
18          MR. BINDER:  Objection to form.
19    And again, this is beyond his role as a
20  corporate representative.
21    A     Mr. Oxford, could you ask the
22  question again?
23    Q     Sure.
24          Do you agree that there's a
25  reputational risk to ED&F Man of engaging in

Page 47

1  arbitrage strategies --
2     A     I didn't hear the beginning of your
3  question.
4     Q     Do you agree that there's a
5  reputational risk to ED&F Man of engaging in
6  arbitrage strategies around corporate actions
7  or dividends?
8           MR. BINDER:  Objection.
9     A     I don't know.
10    Q     Did ED&F Man obtain legal or tax
11  opinions for any market in which it engaged
12  in dividend arbitrage trading?
13          MR. BINDER:  Objection.  It's
14  overbroad, lacks foundation.
15    A     I have -- I have not seen any.
16    Q     So is it your testimony on behalf
17  of ED&F Man that ED&F Man did not obtain any
18  tax or legal opinion in connection with the
19  trading in Danish shares undertaken by the
20  defendant plans?
21    A     As part of this preparation, as
22  part of the preparation for this deposition,
23  Mr. Oxford, I didn't see any.
24    Q     Right.  I'm asking you a different
25  question, sir.

Page 48

1           You're a designated 30(b)(6)
2  witness on the topic of tax and legal
3  opinions related to the plans that were
4  relied upon by ED&F Man in connection with
5  the trading of Danish shares conducted by the
6  defendant plans.
7           Were you aware of that fact?
8     A     I'm sorry.  I don't understand the
9  question you're asking me.
10          Could you ask me again, maybe a
11  little bit clearer?
12    Q     Sure.  Well, let's go back to
13  your -- can you pull up your deposition
14  notice again?  I feel like you should just
15  keep that in front of you.
16          Binder 1, Tab 28, just keep it out
17  in front of you.  We're going to need that
18  all day, it seems.
19    A     I have it here.
20    Q     Okay.  Great.
21          Can you turn to Topic 2?
22    A     Yes, I see Topic 2.
23    Q     Okay.  And you see Topic 2 says,
24  "Any tax or legal opinion or memorandum
25  relating to the plans, investment managers,

Page 49

1  claims, and/or the shares relied upon by
2  ED&F Man in connection with the trades in the
3  shares by the plans were provided by ED&F Man
4  to the plans."
5           Do you see that?
6     A     I see that's what the document
7  says.
8     Q     Sure.  And that was a topic that
9  you reviewed in advance of your testimony
10  today.
11          Correct?
12    A     Yes.
13    Q     And you told us under oath that you
14  were prepared to testify to the best of your
15  ability on that topic.
16          Correct?
17    A     I prepared to the best of my
18  ability, yes.
19    Q     And you understand that what you
20  testify today is binding upon ED&F Man.
21          Correct?
22          MR. BINDER:  Objection, calls for a
23  legal conclusion.
24    Q     Is that your understanding, sir?
25    A     Could you ask me the question

Page 50

1  again?
2      Q     Sure.
3          Do you understand that your
4  testimony today is binding upon ED&F Man?
5          MR. BINDER:  Objection, calls for a
6  legal conclusion.
7      A     I'm -- I'm here to answer the
8  questions that ED&F Man -- on behalf of
9  ED&F Man, on behalf of the corporate.
10     Q     So let me ask you this way.
11         Did ED&F Man obtain any tax or
12  legal opinion or memorandum related to the
13  plans, the investment managers' claims, or
14  shares in connection with the trades in
15  shares by the defendant plans?
16         MR. BINDER:  Objection, asked and
17  answered.
18     A     Mr. Oxford, I've not seen any in
19  preparation for this deposition.
20     Q     Do you know if ED&F Man sought such
21  legal opinions or tax opinions from any third
22  party such as its clients or their advisors?
23     A     In preparation for this deposition,
24  I asked ED&F Man's attorneys, who I believe
25  were told by Victoria Foster that Mark

Page 51

1  Whitehead had seen documents from the
2  clients.
3      Q     So is it your testimony that
4  ED&F Man's attorneys were told by Victoria
5  Foster that Mark Whitehead had seen legal
6  opinions relating to Danish trading at
7  ED&F Man?
8          MR. BINDER:  Objection to form,
9  misstates prior testimony.
10     A     As I mentioned, as part of my
11  preparation, I asked ED&F Man's attorneys on
12  this topic, and they informed me that
13  Victoria Foster told them that Mark Whitehead
14  had seen some documents from the clients.
15     Q     Did those documents relate to
16  Danish trading?
17     A     I don't know.
18     Q     When did the conversation between
19  ED&F Man's attorneys and Victoria Foster take
20  place?
21     A     I also don't know.
22     Q     Did ED&F Man's attorneys tell you
23  whether Mr. Whitehead ever received copies of
24  the documents that you testified to?
25     A     I haven't -- I haven't seen any.

Page 52

1      Q     That's not my question, sir.  My
2  question is different.
3          Did ED&F Man's attorneys tell you
4  whether Mr. Whitehead had ever received
5  copies of the documents you told us about?
6      A     ED&F Man's attorneys told me that
7  we did not have any record of any copies.
8      Q     Okay.  Let's go off the record.
9          THE VIDEOGRAPHER:  Stand by.  The
10     time is 8:02 a.m. New York time and
11     we're going off the record.
12         (Brief recess taken.)
13         THE VIDEOGRAPHER:  Stand by.  The
14     time is 8:15 a.m. New York time and
15     we're back on record.
16     Q     Just before the break, you were
17  testifying about the -- about Topic 2 in the
18  deposition notice.
19         Do you remember that?
20     A     Topic 2, yeah.
21     Q     Tax and legal opinions.
22  Correct?
23     A     Yeah, Topic 2.
24     Q     Okay.  Can you tell me everything
25  that you did to prepare for that topic?

Page 53

1          MR. BINDER:  Objection, asked and
2  answered.
3      A     Mr. Oxford, I already told you.
4  I -- I spoke with ED&F Man's attorneys in
5  order to understand about Topic 2.
6      Q     Beyond a conversation with
7  ED&F Man's attorneys, did you do anything
8  else?
9      A     I didn't identify anything further
10  to do.
11     Q     Did you have any discussions with
12  ED&F Man's attorneys about the
13  representations to ED&F's regulators on the
14  topic of legal or tax opinions referenced in
15  Topic 2?
16         MR. BINDER:  Hang on one second.
17     First, the question lacks foundation.
18         MR. OXFORD:  If you're going to
19     tell the witness not to answer, tell the
20     witness not to answer and the basis of
21     it.  Otherwise, just --
22         MR. BINDER:  I'm considering your
23     question.  I'm just focusing on your
24     question to see the extent to which I
25     think it raises a privilege issue.

Page 54

1        So I object on the basis of
2    foundation.  If you had any such
3    conversations, you can -- I object on
4    the basis of foundation, and you can
5    answer "yes" or "no" if you know and
6    we'll go from there.
7        A    So could you ask the question
8    again?
9        Q    Sure.
10            Did you have any discussions with
11   ED&F Man's attorneys about representations
12   ED&F Man made to its regulators on the topic
13   of the legal or tax opinions referenced in
14   notice -- Topic Number 2?
15            MR. BINDER:  Objection to form,
16       lacks foundation, assumes facts.
17       A    No.
18       Q    How many conversations did you have
19   with ED&F Man's attorneys on Topic 2?
20       A    I don't recall the exact number of
21   conversations.
22       Q    Sure.
23            What's your best estimate today?
24       A    It's difficult for me to estimate.
25       Q    How many conversations did you

Page 55

1    have?
2            MR. BINDER:  Objection to form,
3       asked and answered.
4       A    I had 15 meetings overall.
5       Q    Okay.  And how many conversations
6    did you have with them about Topic 2?
7            MR. BINDER:  Asked and answered.
8       A    Mr. Oxford, I don't recall.
9       Q    How long were those 15 meetings,
10   sir, on average?
11       A    Well, they were varying lengths.
12       Q    Okay.  On average?
13            MR. BINDER:  Objection.
14       A    They ranged from a full day to a
15   number of hours.
16       Q    Are you familiar with how the
17   equity finance desk at ED&F Man was financed?
18       A    Yes.
19       Q    How was it financed?
20       A    Through an annual -- or should I
21   say through a budgeting process.  A budget
22   would be allocated to ED&F Man, and a subset
23   of that would be allocated to the equity
24   finance desk.
25       Q    In the years 2012 through 2015,

Page 56

1    approximately what was the budget allocated
2    to the equity finance desk?
3       A    I believe in 2013, it was
4    $600 million.  In 2014, it was $1.7 billion.
5    And 2015, if I recall correctly, it was just
6    in excess of $800 million.
7       Q    Did ED&F use that budget or capital
8    to facilitate the purchase of Danish shares
9    by the defendant plans?
10       A    Sorry.  Say that again?
11       Q    Did ED&F use that budget of the
12   equity finance desk to facilitate the
13   purchase of Danish shares by the defendant
14   plans?
15            MR. BINDER:  I'm sorry, Neil.  Are
16       you asking about the equity finance
17       desk?
18            MR. OXFORD:  That's why I used the
19       phrase "equity finance desk" in my
20       question, yes.
21       A    The financing or the funds were
22   used to provide the brokerage services to the
23   clients of the equity finance desk.
24       Q    Okay.  We'll come back to that in a
25   little more detail.

Page 57

1        You have the notice -- deposition
2    notice still in front of you?
3       A    It is, yes.
4       Q    Great.  Thank you.
5            Can you turn to Topic 12 on
6    sub-custodians?
7       A    Okay.
8       Q    Do you have it there, sir?
9       A    I do.
10       Q    Okay.  Could you tell me everything
11   that you did to prepare for this topic?
12       A    (Witness reviewing.)
13            So I reviewed the documents in
14   relation to the trade packs, and also spoke
15   with Sue Wood and Lucy Jenkins on this topic.
16       Q    What's Sue Wood's title at
17   ED&F Man?
18       A    I'm not sure of her title today,
19   but she was a business analyst in the
20   security operation, yes.
21       Q    Why did you speak to Lucy Jenkins?
22       A    Lucy Jenkins was the ex-COO.
23       Q    Okay.  And other than the trade
24   packs, did you review any documents on this
25   topic?

Page 58

1      A      I'm sure I would have done, but I
2  don't recall at this time.
3      Q      Okay.  ED&F's prior counsel before
4  Mr. Binder was retained represented to us
5  that ED&F held Danish securities just at two
6  sub-custodians in that period, 2012 through
7  2015, BNP and SEB.
8          Is that representation consistent
9  with your understanding?
10     A      I understand that ED&F Man had two
11 sub-custodians that were SEB and BNP.
12     Q      Are you aware of any other
13 sub-custodians that ED&F Man used to
14 sub-custody Danish shares in that period?
15     A      I'm not aware of any.
16     Q      Do you know why ED&F Man moved its
17 accounts from BNP to SEB in 2014?
18         MR. BINDER:  Objection to form.
19     A      I don't know.
20     Q      Can you explain to us how ED&F used
21 sub-custodians in its equity finance
22 business?
23     A      Sir, how do you mean?
24     Q      What was the role of sub-custodians
25 in ED&F's equity finance business?  How did

Page 59

1  ED&F use them?
2          MR. BINDER:  Objection, vague.
3      A      ED&F Man would have had
4  relationships with BNP and SEB to provide
5  sub-custodian services so that ED&F Man were
6  able to provide the services, the brokerage
7  services, to their clients.
8      Q      What sub-custodial services did BNP
9  and SEB provide to ED&F Man?
10     A      Custody services, Mr. Oxford.
11     Q      Do you know whether MPT Dubai had
12 additional sub-custodians beyond SEB and BNP?
13         MR. BINDER:  Objection to form,
14     lacks foundation.
15     A      I do not know.
16     Q      Do you know whether Volcafe —
17         MR. BINDER:  Objection to form,
18     lacks foundation.
19         MR. OXFORD:  Let me finish, please.
20     I'm sure you'll have an objection, Neil,
21     but let me finish.
22     Q      Do you know whether Volcafe used
23 additional sub-custodians beyond SEB and BNP?
24         MR. BINDER:  Objection to form,
25     lacks foundation.

Page 60

1      A      I do not know.
2      Q      Did ED&F Man also have an
3  interdealer broker?
4      A      Yes.
5      Q      Okay.  Just actually one more
6  question before we leave custodial.
7          What does a custodian like SEB or
8  BNP do?  What function does it perform?
9          MR. BINDER:  Objection, beyond the
10     scope of his role as a corporate
11     representative, and vague.
12     A      I don't know, Mr. Oxford.
13     Q      You don't know what a custodian
14 does for — withdrawn.
15         Is your testimony that you don't
16 know what BNP or SEB actually did as a
17 sub-custodian for ED&F Man?
18         MR. BINDER:  Objection, misstates
19     prior testimony.
20     A      As I — as I said, they provided
21 the custody services to ED&F Man so ED&F Man
22 was able to provide them and provide their
23 clients with brokerage services.
24     Q      Okay.  And what's a "custody
25 service" in that last answer?

Page 61

1      A      Custody of assets.
2      Q      Beyond that, do you have any
3  information?
4      A      I do not.
5      Q      Did ED&F Man, in 2012 through 2015,
6  also have an interdealer broker?
7      A      ED&F Man also had an interdealer
8  broker.
9      Q      What's an "interdealer broker?"
10     A      An interdealer broker is a broker
11 that transacts with other counterparties.
12     Q      And what's its function in that
13 transaction?
14         MR. BINDER:  Objection to form,
15     vague.
16     A      Sorry, Mr. Oxford.
17         In which transaction?
18     Q      Well, you just testified that an
19 interdealer broker is a broker that transacts
20 with other counterparties.
21         I'm asking you, in those
22 transactions that you just testified about,
23 what does the interdealer broker do?
24         MR. BINDER:  Objection, form,
25     vague, and misstates prior testimony.

Page 62

1     A     An interdealer broker transacts
2  with other counterparties, but more
3  specifically, would source shares or
4  derivatives on instruction.
5     Q     Did ED&F's interdealer broker ever
6  hold any proprietary positions 2012 through
7  2015?
8        MR. BINDER:  Objection to form,
9     beyond the scope of his role as a
10    corporate representative for ED&F Man
11    Capital, Limited.
12    Q     Do you know the answer?  Yes or no,
13 sir?
14    A     I don't know the answer.
15    Q     Was Volcafe also an interdealer
16 broker?
17    A     I believe it was.
18    Q     Was MPT Dubai also an interdealer
19 broker?
20    A     I do not believe MPT Dubai was an
21 interdealer broker.
22    Q     What's that belief based on, sir?
23    A     I have seen some prospective
24 documents of MPT Dubai.
25    Q     Are you familiar with a service

Page 63

1  agreement between MPT Dubai and ED&F Man
2  Capital Markets?
3     A     I do not know specifically about
4  the service agreement.
5     Q     Do you know generally what the
6  business relationship was between MPT Dubai
7  and ED&F Man Capital Markets?
8     A     Yeah.  Having spoken to Sue Wood
9  and Lucy Jenkins, I believe that back office
10 or middle office functions were provided to
11 MPT.
12        MPT was a client of ED&F Man.
13    Q     Okay.  What's a "back office
14 function?"
15    A     Back office -- excuse me?
16    Q     Oh, sorry.  I was just asking a
17 question to one of my colleagues.  Please
18 continue.
19        What's a "back office function?"
20    A     Right.  It is an operations
21 function.
22    Q     What does it do?
23    A     An operations function typically
24 supports the front office desk.
25    Q     How does it do that?

Page 64

1     A     Through providing operations
2  services such as settlements.
3     Q     What's a "middle office function?"
4     A     A middle office function is also an
5  operations function.
6     Q     What does the middle office do?
7     A     I don't -- sorry, was that -- you
8  weren't talking to me.
9        MR. BINDER:  Neil, your side
10    comments are being picked up, so I think
11    it's distracting the witness from his
12    answer.
13    Q     Okay.  The question is:  What does
14 the middle office do?
15        MR. BINDER:  Objection, vague,
16    overbroad.
17    A     It's an operations function again.
18    Q     Okay.  Beyond telling me it's an
19 operation function, do you have any
20 information about that?
21    A     I do not.
22    Q     All right.  Can you turn, please,
23 to Exhibit 4168, which is Binder 3, Tab 46?
24        MR. OXFORD:  Mark this as Exhibit
25    4168.

Page 65

1        (Whereupon the above mentioned was
2     marked for Identification.)
3     Q     Okay.  Do you have this, sir?
4        Have you seen this document before,
5  sir?
6     A     I don't recall seeing this document
7  before.
8     Q     Okay.  The title is "FCA
9  Investigation, ED&F Man Capital Markets."
10       Do you see that?
11    A     I see that's what it says, yes.
12    Q     Okay.  And we're on Bates number
13 ending in 853.
14       Correct?
15    A     853, correct.
16    Q     I wanted to ask you lots of
17 questions about this because it's a topic in
18 our deposition notice.
19       I just want to confirm you have no
20 information about this document, you've never
21 seen it before.
22       Correct?
23    A     If you could just give me a second?
24    Q     Sure.
25    A     (Witness reviewing.)

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

18 (Pages 66 to 69)

Page 66

1        I don't recall seeing this document
2  before.
3      Q    Okay.
4        MR. BINDER:  And I'll just -- since
5  we're commenting, Mr. Oxford, I'll put
6  on the record that we had conversations.
7  And I asked that if there was specific
8  documents that you wanted the witness to
9  look at, you should provide them in
10  advance of the deposition.
11        MR. OXFORD:  Okay.  Well, that's
12  not my obligation to do so and you know
13  that where you have a deposition notice.
14  And it's very clear the witness hasn't
15  prepared properly for that.  Let's just
16  move on.
17        MR. BINDER:  Well, we disagree with
18  that characterization.
19        MR. OXFORD:  Of course you do.
20        MR. BINDER:  This witness has spent
21  extensive time, has reviewed voluminous
22  documents.  If he didn't review a
23  specific document that you had in mind
24  and you wanted him to attend to it, then
25  you should have taken us up on our offer

Page 67

1  made many months ago to provide
2  documents that you'd like him to review.
3        MR. OXFORD:  Well, first of all, I
4  don't think that offer was made many
5  months ago and the witness has his
6  obligations to prepare as ED&F Man has
7  obligations to prepare its witness.
8  Let's not waste any more time on this.
9  We can take this up afterwards as
10  necessary.
11      Q    Are you familiar, Mr. Hashemi, with
12  a number of entities that are referred to as
13  the "investment managers" of the defendant
14  plans?
15      A    I'm familiar with them, yes.
16      Q    Okay.  So if I refer to a group of
17  entities, including Acer Investment Group,
18  Kingham Capital, Arunvill Capital U.K.,
19  Limited, Hollbeach Investment Management LLP,
20  Ballance Capital U.K., Belador Advisors U.K.,
21  Limited, Kingly Capital, Limited, Duet Asset
22  Management LLP, and Zeta Financial Partners,
23  if I refer to them as "investment managers,"
24  you'll know what I'm talking about?
25      A    So can you --

Page 68

1        MR. BLESSINGTON:  Hold on.  This is
2  John Blessington.  I'm going to object
3  to your characterization of Acer as an
4  asset manager.
5        MR. OXFORD:  I didn't call it an
6  asset manager, John.
7        MR. BLESSINGTON:  I'm sorry.
8  Investment manager.  Same objection.
9      A    Mr. Oxford, I'm sorry.
10        Could you repeat your list?
11      Q    Yes.  I gave you a list of
12  investment managers.
13        Are you ready?
14      A    Yes.
15      Q    Okay.  Acer Investment Group LLC,
16  did you understand them, just generally, to
17  play the role of investment manager in Danish
18  trading?
19        MR. BLESSINGTON:  Same objection.
20      A    Yes, Mr. Oxford.
21      Q    Same question for Kingham Capital?
22      A    I'm not familiar with Kingham
23  Capital.
24      Q    How about Arunvill Capital U.K.?
25  Did you understand they were an investment

Page 69

1  manager to some of the funds, the plans?
2      A    I'm familiar with Arunvill, yes.
3      Q    And that they were an investment
4  manager to some of the plans?
5      A    That they were investment manager
6  to the plans.
7      Q    Same question for Hollbeach
8  Investment Management.
9        Did you know they were an
10  investment manager?
11      A    I did not know.
12      Q    How about Ballance Capital U.K.?
13  Did you know they were an investment manager
14  to some of the plans?
15      A    Yes, Ballance was an investment
16  manager to some of the plans.
17      Q    How about Belador Advisors U.K.?
18  Did you know they were an investment manager
19  to some of the plans?
20      A    Not familiar with Belador as an
21  investment manager to the plans.
22      Q    Kingly Capital Limited?  Did you
23  know if they were an investment manager to
24  some of the plans?
25      A    I'm not familiar with Kingly

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

19 (Pages 70 to 73)

Page 70

1  Capital as one of the investment managers to
2  some of the plans.
3      Q     How about Duet Asset Management
4  LLP?  Did you know they were an investment
5  manager to some of the plans?
6      A     I'm familiar with Duet as an
7  investment manager to some of the plans.
8      Q     The last one is Zeta Financial
9  Partners.
10             Did you understand that they were
11 investment managers to some of the plans?
12     A     I'm familiar with Zeta as an
13 investment manager to some of the plans.
14     Q     And so if I refer to "investment
15 managers," and I mean these entities I've
16 described, you'll know what I'm talking
17 about.
18             Correct?
19     A     For the ones that I recognized as
20 investment managers, yes.
21     Q     Sure.
22             Can you describe the business
23 relationship between ED&F Man and the
24 investment advisors, at least those you're
25 familiar with?

Page 71

1      A     Sorry.  Can you repeat your
2  question?
3      Q     Sure.
4             Can you describe for me, please,
5  the business relationship, if any, between
6  ED&F Man and the investment advisors you are
7  familiar with?
8      A     I've mentioned the investment
9  managers that you referred to in your
10 original question.  So the investment
11 managers would be the investment managers of
12 the pension plans who were ED&F Man's
13 clients.
14     Q     And was there any business
15 relationship between ED&F Man and those
16 investment managers?
17         MR. BINDER:  Objection, vague,
18         compound.
19     A     The investment managers would
20 instruct to ED&F Man on behalf of the pension
21 plans.
22     Q     Did ED&F Man have any agreements
23 with any of the investment managers with
24 respect to fees?
25     A     I do not know.

Page 72

1      Q     Are you familiar with ED&F Man's
2  introducing broker policy?
3      A     I know that ED&F Man has an
4  introducing broker policy.
5      Q     Did ED&F Man consider that any of
6  the investment managers were introducing
7  brokers?
8      A     The investment managers were
9  investment managers of the pension plans.
10     Q     Right.  Not my question, sir.
11     A     I do not know, Mr. Oxford.
12     Q     You don't know one way or the other
13 whether ED&F Man considered any of the
14 investment managers to be introducing brokers
15 under the introducing broker policy at
16 ED&F Man that you are familiar with?
17         MR. BINDER:  Objection to form.  It
18         misstates prior question and answer.
19         MR. OXFORD:  Just say "objection to
20         form" and move on, Neil.  That's all
21         you're entitled to do.  Please keep it
22         quiet.
23     A     So what was your last question,
24 Mr. Oxford?
25     Q     Do you know one way or another

Page 73

1  whether ED&F Man considered any of the
2  investment managers you're familiar with to
3  be investment-introducing brokers under the
4  introducing broker policy at ED&F Man?
5         MR. BINDER:  Objection to form,
6         lacks foundation.
7      A     I do not know if ED&F Man
8  considered what you're referring to.
9      Q     Do you know how the -- any of the
10 investment managers were compensated in
11 connection with the trading in Danish shares
12 that they instructed on behalf of their plans
13 through ED&F Man?
14     A     Yes, I've seen fee spreadsheets,
15 and -- as part of the documentation
16 preparation --
17     Q     Okay.
18     A     -- which included the investment
19 managers.
20     Q     So, just generally, can you tell me
21 how the investment managers you're familiar
22 with were compensated in connection with the
23 trading in Danish shares that they instructed
24 on behalf of their plans through ED&F Man?
25     A     Fees varied across the investment

CONFIDENTIAL
Shahab Hashemi – October 7, 2021

20 (Pages 74 to 77)

Page 74

1  managers.
2       Q    So take the first one, the Acer.
3  You said you were familiar with Acer.
4            Correct?
5       A    I'm familiar with Acer.
6       Q    Generally, can you tell me how Acer
7  was compensated in connection with trading in
8  Danish shares that they instructed on behalf
9  of their plans through ED&F Man?
10           MR. BLESSINGTON:  Object.  This is
11  John Blessington.  Object as to form.
12      A    Mr. Oxford, I recall seeing fee
13  spreadsheets in relation to a particular
14  transaction, which refers to a –– the fee for
15  the investment manager for the pension plan.
16      Q    Without reference to those
17  particular spreadsheets, do you have any
18  information about how the five investment
19  managers you've told us you were familiar
20  with were compensated in connection with the
21  trading in Danish shares that they instructed
22  on behalf of their plans through ED&F Man?
23           MR. BLESSINGTON:  John Blessington.
24      Object as to form.
25      A    In relation to the documents that I

Page 75

1  just referred to, that I saw in the
2  preparation, which include –– included a fee
3  spreadsheet for a specific transaction, I
4  recall that once the trading strategy
5  had –– the pension plan's trading strategy
6  had matured, that fee spreadsheet accounted
7  for the –– any profits and loss, any
8  transactional charges, any transaction costs,
9  and then calculated the P&L after the
10  transaction had matured.
11           So any dividends were received, and
12  then there was a portion of which was
13  allocated to the investment manager, which is
14  Acer and the one –– and the one I recall.
15      Q    All right.  Was the profit and loss
16  also calculated after the dividend refund
17  application was received from SKAT?
18      A    It was when the –– the whole
19  trading strategy had matured.
20      Q    And that includes receipt of any
21  refund from SKAT?
22           Correct?
23      A    That would include receipt of
24  any –– of all dividends.
25      Q    My question's not about dividends.

Page 76

1  So, sir, I'm just going to have to ask you to
2  listen a little more carefully.
3       A    Sure.
4       Q    Does the profit and loss
5  calculation that you just told us about
6  include a calculation of the dividends
7  received –– withdrawn.
8            The profit and loss –– third time.
9            Does the profit and loss
10  calculation you just testified to include the
11  dividend refunds received from, in this
12  particular case, SKAT?
13      A    So, in the one that I recall
14  seeing, and for the trading strategy which
15  the fee spreadsheet was calculated, was
16  prepared, after the trading strategy had
17  matured, it included the withholding tax that
18  was received –– the pension plans received
19  from, in this case, SKAT.
20      Q    How was –– withdrawn.
21           Was Arunvill compensated in a –– in
22  the same or similar way as Acer?
23      A    I don't recall at this moment in
24  time.
25      Q    How about Ballance?  Do you recall

Page 77

1  how Ballance was compensated?
2       A    I don't, no.  But if you wanted to
3  show me some of the spreadsheets, I'll try to
4  point out to you.
5       Q    Well, I don't know what
6  spreadsheets you reviewed to prepare.
7            How about Duet?  Do you know how
8  Duet was compensated?
9       A    I do not recall.
10      Q    How about Zeta?  Do you know how
11  Zeta was compensated?
12      A    I do not recall.  Again, it would
13  be easier if –– I'm happy to try and point
14  something out to you.
15      Q    Okay.  Are you familiar with the
16  agreements that ED&F Man entered into with
17  its clients, the defendant plans?
18      A    I'm familiar with the agreements
19  that ED&F Man entered into as part of the
20  onboarding process.
21      Q    Okay.  And you still have the
22  deposition notice in front of you?
23      A    Yeah.
24      Q    Can you turn to Topic 3, please?
25      A    Okay.  I see Topic 3.

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

21 (Pages 78 to 81)

Page 78

1      Q    And that's "the circumstances and
2 substance of any agreements between ED&F Man
3 and the plans and/or their investment
4 managers governing the trading in shares,"
5 and it goes on.
6           Do you see that?
7      A    I see that, yes.
8      Q    What did you do -- please tell me
9 everything you did to prepare to testify on
10 this topic today.
11     A    I -- I reviewed the relevant
12 documentation, and I saw -- I reviewed some
13 onboarding packs, and I spoke to Sara Hayward
14 about the onboarding process, and I spoke to
15 Catherine Odigie about the agreement.
16     Q    Why did you speak to Catherine
17 Odigie about the agreements?
18     A    Catherine Odigie is the head of
19 legal at ED&F Man Capital Markets.
20     Q    What information did Ms. Odigie
21 give you about the agreements?
22     A    I don't recall exactly. I would
23 have had some questions in which she would
24 have asked.
25     Q    But sitting here today, you can't

Page 79

1 remember any details of that conversation?
2      A    Well, as I mentioned, I would have
3 had questions about the agreements
4 and -- that she would have answered.
5      Q    But beyond you had questions and
6 she had answers, you have nothing to share
7 with us today?
8           MR. BINDER:  Objection to form,
9 vague.
10     A    As I said, to prepare for this
11 topic, one of the things I did was speak with
12 Catherine Odigie, who was the head of -- or
13 is the head of ED&F Man Capital Markets, and
14 asked questions I would have had after
15 reviewing the agreements and the onboarding
16 packs.
17     Q    Right.  You said that three times.
18          And I'm just asking you -- it's a
19 simple question, sir -- do you remember
20 anything about that conversation?
21     A    For example, one of the things I
22 remembered, I would have asked Catherine
23 about the ISDA agreement.
24     Q    Okay.  What did you ask Catherine
25 about the ISDA agreement?

Page 80

1      A    I would have asked her what it
2 stands for.
3      Q    Okay.  Anything else?  Do you
4 remember any other questions and answers with
5 the head of --
6      A    Yes.  I would have asked her about
7 the nature of -- so what an ISDA governs.
8      Q    Okay.  What did she tell you?
9      A    She told me that the ISDA is
10 a -- the ISDA agreement is an agreement that
11 governs derivatives, OTC derivatives
12 contracts.
13     Q    Was that new to you?  You didn't
14 know what an ISDA was prior to preparing for
15 this deposition?
16     A    I asked Catherine in relation,
17 specifically, to the pension plans, the
18 clients, what the ISDA governed.
19     Q    And what did she tell you?
20     A    That it governed the OTC
21 derivatives contracts, the transactions.
22     Q    What are the OTC derivative
23 contracts you're referring to?
24     A    So it governs an OTC transaction.
25 For example, a swap.

Page 81

1      Q    Okay.  We've talked about the fees
2 to the investment managers.
3           You're aware that one of the topics
4 you're designated on today is the fees by
5 ED&F Man in connection with the trading in
6 Danish shares?
7      A    Yes, I recall the fees being one of
8 the topics.
9      Q    Can you tell me generally how ED&F
10 structured the fees that it charged the
11 defendant plans in connection with the
12 trading in Danish shares?
13     A    So, like many of its services, many
14 of its desks, ED&F Man charges a fee to its
15 clients, and -- for the services that it
16 provides.
17          And in this case, for the equity
18 finance desk, the services or the fees that
19 would be charged to the client would be for
20 execution services, custodian services, and,
21 for example, financing of the transactions.
22     Q    So just picking up on the last part
23 of your answer, is it correct that ED&F
24 provided financing or lending to the
25 defendant plans so that they could make their

CONFIDENTIAL
Shahab Hashemi – October 7, 2021

22 (Pages 82 to 85)

Page 82

1  trades in Danish securities?
2      A    Excuse me.  One of the services the
3  equity finance desk provided was securities
4  financing to the pension plans.
5      Q    So it lent money -- in essence, it
6  lent money to the plans so they could buy the
7  shares.
8          Correct?
9          MR. BINDER:  Objection to form.
10     A    ED&F Man would receive the funds
11  that were allocated from the group treasury
12  and use them as working capital to provide
13  the service of securities financing to the
14  pension plans to acquire shares.
15     Q    Okay.  And just in layman's terms,
16  because I'm a simple country lawyer, does
17  that mean that ED&F Man's equity finance desk
18  loaned or extended credit to the defendant
19  plans so that they could purchase the Danish
20  securities?
21         MR. BINDER:  Objection, asked and
22         answered, vague.
23     A    The equity finance desk used funds
24  that was allocated to them from the process
25  that I mentioned to provide securities

Page 83

1  financing services to the pension plans.
2          They acquired shares.
3      Q    And did those securities financing
4  services, including -- include extending
5  credit to the plans so they could buy the
6  Danish shares?
7          MR. BINDER:  Objection to form.
8      A    I don't know.
9      Q    So you know the term "securities
10  financing," but you don't know what security
11  financing actually is?
12         MR. BINDER:  Objection, objection.
13         Misstates testimony.  It's also
14         harassment.
15         MR. OXFORD:  It's not harassment.
16     Q    What's securities financing, sir,
17  in your last answer?  What does it mean?
18     A    It means providing the capital for
19  the pension plans to acquire shares.
20     Q    So the pension plans don't have the
21  money to buy shares, so ED&F Man provides
22  that.
23         Correct?
24     A    One of the services that ED&F Man
25  provided was securities financing for the

Page 84

1  pension plans to acquire shares.
2      Q    Okay.  But just -- again, I'm just
3  trying to make sure we have a clear
4  understanding, because you're a banker sir,
5  and I'm just a simple lawyer.
6          Does that mean that ED&F loaned
7  money to the plans so they could buy the
8  Danish shares?
9          MR. BINDER:  Objection to form.
10         Objection to counsel testifying.
11         MR. BLESSINGTON:  Object as to
12         form.
13     A    ED&F Man provided securities
14  financing to the pension plans, Mr. Oxford.
15  I don't know how else to say it, to acquire
16  shares.
17     Q    How did it provide that financing
18  to the plans?
19     A    Through the funds that were drawn
20  down from group treasury, to provide it to
21  acquire the shares.
22     Q    Okay.  But that's kind of the
23  source of where the funds came from.
24         I'm asking how, mechanically, in
25  the securities financing transaction, the

Page 85

1  ED&F Man provided financing to the plans?
2      A    Of the financing that the equity
3  finance desk would receive, a budget, they
4  would allocate a portion of that as available
5  to the -- to each of the pension plans and
6  their trading structures.
7      Q    Beyond that, do you have anything
8  to add to your answer?
9      A    I do not, no.
10     Q    Do you know the terms on which the
11  financing was provided by ED&F to the
12  defendant plans?
13     A    So what do you mean?
14     Q    Were there terms and conditions?
15  Did ED&F charge interest?
16     A    So ED&F Man would pass through the
17  costs of drawing down those funds to
18  the -- to the pension plans.
19     Q    So, in essence, ED&F would charge
20  interest to the plans on the securities
21  financing?
22     A    They would charge interest that was
23  charged to them by group treasury.
24     Q    Do you know offhand what that
25  interest rate was?