Page 86

1  MR. BINDER: Objection to form.
2  A    I do not, no.
3  Q    Is it correct that, generally
4  speaking, ED&F charged the plans fees at two
5  stages of the Danish securities transactions?
6  Specifically they charged an "up-front" fee
7  and a "behind" fee.
8       Are you familiar with those terms?
9  A    I'm familiar with the terms of an
10 "up-front" fee and a "behind" fee.
11 Q    Are you familiar with those terms
12 in the context of ED&F's fees charged to the
13 defendant plans in this case?
14 A    I'm sorry. Could you say that
15 again?
16 Q    Sure.
17      Are you familiar with those terms
18 "up-front fee" and "behind fee" and how they
19 worked in the context of ED&F's fees charged
20 to the defendant plans in this case?
21 A    I'm familiar with the up-front fees
22 and the behind fees charged to the pension
23 plans in the scope of this.
24 Q    Okay. Can you tell me what you
25 know about that topic?

Page 87

1  A    Of course. So my understanding is
2  that the up-front fees were charged to the
3  pension plans and covered -- the fees covered
4  certain costs, such as exchange fees, and it
5  covered -- I've seen, Mr. Oxford, in fee
6  agreements that has reference to a custody
7  fee.
8       And the up-front fee is charged to
9  the pension plans prior to the trading
10 strategy maturing. The behind fee, as I
11 understand it, is a fee that is charged to
12 the pension plans following the trading
13 strategy maturing, and any withholding tax
14 that is received by the pension plan.
15 Q    Is it fair to say that the up-front
16 fee that ED&F charged to the defendant plans
17 was typically 1 percent of the gross
18 dividend?
19 A    I believe the up-front fee varied,
20 and it was on a -- yeah, I don't think it was
21 constant as you're referring to it. And I
22 believe it also, as it captured exchange
23 fees, for example, it would have varied on a
24 case-by-case basis.
25 Q    Okay. Do you have any

Page 88

1  understanding of what it varied between?
2  What the range of up-front fees was charged
3  to the various defendant plans?
4  A    I don't know.
5  Q    Is it fair to say that the behind
6  fee that ED&F charged the plans ranged from
7  27 to 50 percent of the pension plan's
8  transaction profit?
9  A    From the spreadsheets that I saw, I
10 recall that the behind fees would be
11 calculated after the trading strategy
12 matured, as I mentioned, any withholding tax
13 to be received by the pension plans, and
14 covered all of the costs and -- associated
15 with it.
16      I don't know of the range,
17 Mr. Oxford. However, I don't recall seeing
18 any that exceeded 50 percent.
19 Q    Okay. Can I ask you to turn to
20 Tab -- Exhibit 4151, please? First binder,
21 Tab 29?
22 A    Okay.
23 Q    Can I ask you to turn to Page 39 of
24 that document? And I direct your attention
25 to Paragraph 140.

Page 89

1  MR. BINDER: I'm sorry. Neil, can
2  we get a specific? There --
3  it's -- there are letters on the
4  electronic versions. It was 4154.
5  Is it "G?"
6  MR. OXFORD: It's 4154 -- I'm
7  sorry, 51?
8  MR. BINDER: 4151.
9  MR. OXFORD: There should by no
10 letters.
11 MR. BINDER: Okay. Give me a
12 second, then.
13 A    Mr. Oxford, which page?
14 Q    Page 39.
15 MR. BINDER: Okay. You know, Neil,
16 if we're switching topics right now,
17 let's take a short break.
18 MR. OXFORD: Okay. We're not
19 switching topics.
20 MR. BINDER: All right. Well,
21 let's take a break anyway. We're
22 shifting documents.
23 MR. OXFORD: Well --
24 MR. BINDER: Let's just take a
25 short break.

Page 90

1          MR. OXFORD:  Okay.
2          MR. BINDER:  Thanks.
3          THE VIDEOGRAPHER:  Stand by.  The
4    time is 9:11 a.m. New York time and
5    we're going off the record.
6          (Brief recess taken.)
7          THE VIDEOGRAPHER:  Stand by.  The
8    time is 9:24 a.m. New York time and
9    we're back on record.
10    Q    So, before Mr. Binder called for a
11   break, Mr. Hashemi, I was trying to direct
12   your attention to Page 39, Paragraph 140 of
13   the Schedule of Agreed Facts.
14         Do you have that in front of you?
15   A    Yes, I have it in front of me.
16   Q    Okay.  Have you seen that paragraph
17   before?
18   A    (Witness reviewing.)
19         I have seen a version of this
20   paragraph.  And as I said, the version that I
21   had seen didn't include any of the markups.
22   Q    Okay.  Just so we're on the same
23   page, the "Agreed Transaction Fee" was the
24   fee that ED&F charged to its pension plan
25   clients for the Danish dividend -- withdrawn.

Page 91

1         The "Agreed Transaction Fee" was
2    the fee that ED&F charged its pension plan
3    clients for the trading in Danish securities.
4         Correct?
5    A    Sorry?  Could you start again?
6    Because I think I got a bit confused because
7    you started twice.
8    Q    Sure.  It's a lawyer's habit.  When
9    I say "withdrawn," that means I'm starting
10   the question again.
11        But I'll be more clear next time.
12   A    Sorry.  I didn't know that.
13   Q    There's a reference to "Agreed
14   Transaction Fee" in the first sentence.
15        Do you see that?
16   A    Yeah, I see that.
17   Q    What do you understand that to be?
18   A    I understand that "Agreed
19   Transaction Fee" to be the fees that ED&F Man
20   would charge their clients, the pension
21   plans, for their services.
22   Q    That was the fee that they charged
23   the plans in connection with their services
24   relating to Danish securities trading.
25        Correct?

Page 92

1    A    In -- for the scope of this
2    deposition, yes.
3    Q    And then, the last sentence,
4    ignoring the stuff that is written in color
5    which you haven't seen before, it says, "The
6    Agreed Transaction Fee varied between 27 to
7    50 percent of the transaction's profits and
8    between 3 percent and 10 percent of the net
9    dividend."
10        Do you see that?
11   A    I can see that's what the document
12   says.
13   Q    Do you understand that to be an
14   accurate statement?
15   A    Based on the documents that I have
16   seen, and -- that is an accurate statement.
17   Q    Okay.  That's all for that document
18   just now.
19        We talked about Acer earlier.
20        Do you remember that discussion?
21   A    I do.
22   Q    Did Acer have a business
23   relationship with ED&F?
24        MR. BLESSINGTON:  Object as to
25    form.  John Blessington.

Page 93

1    A    Acer was the investment manager of
2    ED&F Man's clients' pension plans.
3    Q    Right.  My question is a little
4    different, though, so I'm just going to ask
5    you to focus on that, if you wouldn't mind
6    terribly.
7         Did Acer have a business
8    relationship with ED&F?
9         MR. BINDER:  Objection, vague, and
10    object to form.
11   A    I don't know.
12   Q    Did Acer have accounts at ED&F?
13   A    Acer was the investment manager for
14   the pension plans, Mr. Oxford.
15   Q    I understand that.  You've said
16   that a number of times.  My question's a
17   little bit different.
18        Did Acer have accounts in its own
19   name at ED&F Man?
20   A    I do not believe Acer to have
21   accounts in its own name.
22   Q    Did Acer provide any services to
23   ED&F Man?
24        MR. BLESSINGTON:  Object as to
25    form.

Page 94

1  A  Acer would instruct on behalf of
2  ED&F Man's clients, the pension plans.
3  Q  Yeah. Again, I'm just going to ask
4  you if you wouldn't mind, because it will
5  make today go a lot easier, just to listen to
6  my question and try and answer that one.
7      My question is: Did Acer provide
8  any services to ED&F Man?
9      Just a yes-or-no question for
10 starters.
11     MR. BLESSINGTON: Objection to
12   form.
13  A  I do not believe Acer to have
14 provided any services to ED&F Man.
15  Q  Have you ever seen any invoices
16 that Acer sent to ED&F Man?
17  A  From the many documents I've seen,
18 I do recall -- I believe it was from Acer.
19 I'm not a hundred percent certain, but I
20 think I have.
21  Q  Okay. What do you recall about
22 that invoice?
23     What was it for?
24  A  It would have been in relation to a
25 trading strategy of -- of the pension plans.

Page 95

1  Q  Okay. And what was Acer invoicing
2  ED&F for?
3  A  I don't recall at this moment in
4  time, but if you want, we can take a look at
5  the document, and I'll try my best to point
6  out --
7  Q  Okay. We might try and dig one up
8  later on.
9      Did you understand that Acer was
10 the investment manager, as we've defined the
11 term here, for nine pension plans that traded
12 through ED&F?
13     MR. BLESSINGTON: Object as to
14   form.
15  A  Mr. Oxford, I don't recall if it's
16 exactly nine, but it's around that figure.
17  Q  Okay. I'm just going to give you
18 the quick list so we have a clear record.
19     When I refer to "the Acer plans,"
20 I'm referring to the Goldstein Law Group
21 Plan, the American Investment Group Plan, the
22 Kamco Investments Plan, the Kamco LP Plan,
23 Moira Associates LLC Plan, Linden Associates
24 Defined Benefits Plan, Riverside Associates
25 Defined Benefits Plan, NewSong Fellowship

Page 96

1  Church 401(k) Plan and DW Construction, Inc.
2  Plan.
3      When I refer to the -- those as
4  "the Acer plans," will you understand what
5  I'm talking about?
6  A  I must point out, though, I
7  don't -- I don't recall exactly all of those
8  plans. But yes, I acknowledge what you mean
9  to when you refer to "the Acer plans."
10 Q  Great. Thank you.
11    Did ED&F -- withdrawn. Let me
12 start again.
13    In connection with the trading in
14 Danish shares on behalf of the defendant
15 plans, did ED&F have any risk of loss?
16 A  The trading strategies of the
17 pension plans were delta hedged -- or delta
18 neutral, should I say. And so, as the role
19 of the broker, like in many other businesses,
20 one of the risks that would be for the broker
21 is counterparty risk.
22 Q  What is -- what do you mean by
23 "counterparty risk?"
24 A  Counterparty risk is the risk
25 associated to a counterparty in a transaction

Page 97

1  potentially failing.
2  Q  Did ED&F face any risks in the
3  Danish trading other than counterparty risks?
4  A  None that I recall at this moment
5  in time, Mr. Oxford.
6  Q  Okay. Can I ask you to turn to
7  Exhibit 1924? It's Tab 17 in your Binder 1.
8  A  Yes, I have it.
9  Q  Thank you.
10    Have you seen this document before,
11 sir?
12 A  I don't recall this document.
13 Q  Okay. So this is a one-page
14 document produced to us by Acer ending in
15 Bates 379.
16    It's an e-mail from Stacey Kaminer
17 at Acer to Victoria Foster, March 4, 2014.
18    Do you see that?
19 A  March 4, 2014. Yes, I see the
20 e-mail.
21 Q  Do you understand that to be an
22 e-mail from Acer to Victoria Foster, formerly
23 of ED&F Man?
24 A  I can see that it's from Stacey
25 Kaminer and the e-mail address is "Acer

Page 98

1  Invest."  I don't recognize that e-mail, but
2  I can -- but it says "Tori Foster."
3      Q    Ms. Kaminer writes, "Vic, the
4  Danish and Belgium is our regular agreement,
5  right?  50/50 profit and risk, correct?"
6           Do you see that?
7      A    I can see that's what the document
8  says.
9      Q    But to your understanding as a
10 representative of ED&F Man today, was there
11 any agreement between Acer and ED&F Man
12 regarding splitting profit and/or risk on the
13 Danish securities trading done for the Acer
14 plans?
15     A    (Witness reviewing.)
16          I do not know.  I'm not aware of
17 any.
18     Q    So, other than counterparty risk,
19 is it your testimony that ED&F Man ran no
20 risk in the Danish trading that it did for
21 the Acer plans?
22     A    At this moment in time, I don't
23 recall any other risks that ED&F Man, as the
24 broker, had.
25     Q    Was ED&F at a risk of making a loss

Page 99

1  if the dividend refund application was not
2  granted by the tax authority, in this case
3  SKAT?
4      A    The ED&F -- sorry.  Excuse me.
5           ED&F Man would have facilitated the
6  client's trading strategy, and any such loss,
7  if any, would be for the pension plan.
8      Q    Focusing on the profit split aspect
9  of this e-mail, is -- is this consistent with
10 your understanding of what the profit split
11 agreement was between ED&F Man and Acer with
12 regard to Danish trading for the Acer plans?
13          MR. BINDER:  Objection to form,
14      misstates the evidence, lacks
15      foundation.
16          MR. BLESSINGTON:  Object as to
17      form.
18     A    I don't know, Mr. Oxford.  I can
19 see what the e-mail says.
20     Q    Well, let me ask it this way.
21          What was your understanding of the
22 agreement between Acer and ED&F with respect
23 to the split of profits on the Acer plan's
24 Danish trading?
25          MR. BINDER:  Objection to form,

Page 100

1      lacks foundation, misstates evidence.
2      A    As I answered previously, I have
3  seen spreadsheets of -- that I recall from
4  the transaction with one of the Acer plans,
5  and I have seen the -- in the spreadsheet,
6  there are the costs associated, as I
7  described, and a portion of the P&L, once the
8  trading strategy had matured, was allocated
9  to Acer.
10     Q    And what portion of the trading
11 P&L, once the transaction had matured, was
12 allocated to Acer for the Danish dividend
13 trading?
14     A    I don't recall exactly because I've
15 seen a number of documents.  But as I said, I
16 don't recall seeing any that exceeded
17 50 percent.
18     Q    In these transactions -- withdrawn.
19 Let me start again.
20          In the spreadsheets you looked at,
21 do you remember how much the Acer plans
22 received as a percentage of the transaction
23 profit at the maturity of the trade?
24     A    I do not recall.
25     Q    Do you know if it was more or less

Page 101

1  than Acer?
2      A    Sorry.  I don't understand the
3  question.
4      Q    In the spreadsheet that you've
5  seen, allocating the profit and loss on the
6  transactions that you've just described -- do
7  you remember telling me about spreadsheets?
8      A    I do, yes.
9      Q    And those spreadsheets allocated
10 the profit between ED&F Man, Acer, and the
11 Acer plans.
12          Correct?
13          MR. BINDER:  Objection to form,
14      misstates the evidence.
15          MR. BLESSINGTON:  Object as to
16      form.
17          MR. OXFORD:  I'm just going to
18      pause here.  Neil, do you see how
19      appropriately and professionally John
20      Blessington does his objections?
21      There's no commentary, there's no
22      coaching of the witness.  Please follow
23      John's excellent example.
24     Q    Let me ask my question again, sir.
25          MR. BINDER:  I am not coaching the

Page 102

1  witness.  These are proper objections.
2  Your questions are improper in that they
3  are -- seem to be mischaracterizing
4  evidence in a way to confuse the
5  witness, and I want to make the nature
6  of my objection clear on the record.
7        MR. OXFORD:  If I'm interested in
8  the nature of your objection, Neil, I
9  will be sure to ask you.  Otherwise,
10 please do what John does.
11    Q    In the spreadsheets that you
12 testified earlier, allocating the profit on
13 trade, who was the profit allocated between?
14       MR. BINDER:  Objection to form,
15 mischaracterizes the evidence.
16       MR. OXFORD:  There you go again.
17 You just can't help yourself, can you?
18       MR. BLESSINGTON:  Object as to
19 form.
20    A    I recall, as I said, Mr. Oxford,
21 the spreadsheets calculating, once the
22 trading structure had matured, the profit and
23 loss on the trade, incorporating the
24 transaction cost and fees, and that a portion
25 of that was allocated to Acer.

Page 103

1    Q    And the portion that wasn't
2  allocated to Acer was allocated to which
3  entity?
4    A    It might be easier if we could
5  bring up one of the spreadsheets, Mr. Oxford.
6    Q    I don't know which spreadsheets
7  you've looked at, sir.  It's just a simple
8  question.
9         The portion that wasn't allocated
10 to Acer, who was it allocated to?
11    A    I can't remember at this moment in
12 time if it was the entire portion that was
13 allocated as fees, or behind fees, as we
14 referred to before, for ED&F Man.
15        But a portion of them would
16 be -- would be allocated as the behind fees
17 for ED&F Man.
18    Q    Okay.  Let's leave Acer and try and
19 make a little progress on another topic.
20        Are you familiar with the Cubix
21 Managers Limited Partnership?
22    A    I've heard of Cubix.
23    Q    And did you understand that it was
24 a partnership based in Gibralter?
25    A    It sounds familiar to me, but I

Page 104

1  can't 100 percent confirm.
2    Q    Do you know who the investment
3  manager was for Cubix?
4    A    I don't recall.  I don't remember
5  at this moment in time.
6    Q    Do you know whether ED&F ever
7  received any legal advice on the wording of
8  the tax vouchers they had issued in
9  connection with securities held on behalf of
10 Cubix Managers Limited Partnership?
11    A    I don't know.  I haven't seen -- I
12 haven't been informed of them.
13       I haven't seen any.
14    Q    Can we agree that
15 where -- withdrawn.  Let me start again.
16       So ED&F had securities accounts for
17 all of the defendant plans.
18       Correct?
19    A    Had what?  Sorry.
20    Q    Securities accounts.  They opened
21 securities accounts for each of the defendant
22 plans?
23    A    Each of the plans had accounts with
24 ED&F Man.
25    Q    Okay.  And you seem to be quibbling

Page 105

1  with my term "securities accounts."
2         What term -- what kind of accounts
3  did they have?
4    A    Well, for example, they would have
5  a cash account with ED&F Man.
6    Q    But they wouldn't hold the shares
7  in the cash account, I assume?
8    A    They wouldn't hold the shares in
9  the cash account.
10   Q    Which kind of account would they
11 hold the shares in?
12   A    In a -- I suppose a custody or
13 securities account.
14   Q    Okay.  And where -- just to take an
15 example, let's say the Cubix Managers
16 Partnership Limited has a custody or
17 securities account at ED&F Man, and that
18 holds Danish securities.
19       Would you agree that legal title to
20 those securities is held by the account
21 owner?  In this case, Cubix Managers Limited
22 Partnership?
23       MR. BINDER:  Objection, calls for a
24 legal conclusion.
25   A    Could you ask your question again,

Page 106

1  please?
2      Q    Sure.  I gave you an example of
3  Cubix Managers Partnership Limited, which has
4  a custody or securities account with
5  ED&F Man.
6           Are you with me so far?
7      A    Yes.
8      Q    If that custody account holds
9  Danish securities, would you agree with me
10 that legal title to those securities, under
11 the plan's various agreements with ED&F Man,
12 is held by the account owner, in this case,
13 Cubix Managers Limited Partnership?
14          MR. BINDER:  Objection, calls for a
15     legal conclusion.
16     A    Mr. Oxford, ED&F Man as a broker
17 would, of course, acquire the shares, as
18 instructed by the pension plans, for them.
19     Q    And would the shares, once acquired
20 by ED&F Man as broker and are sitting in the
21 securities or custody account at ED&F, is the
22 legal title to those securities held by, in
23 my example, Cubix Managers Partnership
24 Limited or someone else?
25          MR. BINDER:  Objection to form,

Page 107

1      calls for a legal conclusion.
2           MR. BLESSINGTON:  Object as to
3      form.
4      A    I don't know.
5      Q    Are you familiar -- I think you
6  told me you were familiar with Zeta Financial
7  Partners.
8           Correct?
9      A    -- zeta, did you say?
10     Q    All right.  You say, "potato," I
11 say "potato."
12     A    My apologies.  No, I wasn't sure if
13 I heard correctly.
14     Q    Zeta --
15     A    Yes.
16     Q    -- Financial Partners?
17     A    Yes, I'm familiar with them as an
18 investment manager.
19     Q    Okay.  And are you familiar with
20 the plans to which they were investment
21 manager?
22     A    I don't remember the exact plans
23 right now.
24     Q    I'm going to refer -- there's only
25 three, so it's a little bit easier than Acer.

Page 108

1  The Acorn Capital Plan -- withdrawn.  Let me
2  start again.
3           I will refer to three plans; the
4  Acorn Capital Strategies LLC Employee Pension
5  Profit-sharing Plan, the Sterling Alpha LLC
6  401(k) Profit Sharing Plan, and the Cambridge
7  Way LLC 401(k) Profit Sharing Plan.  I will
8  refer to those three as "the Zeta plans."
9           Will you understand what I'm
10 talking about?
11     A    Okay.  Yes, I understand.
12     Q    Okay.  Similar question to the one
13 I had with Acer.
14          What was Zeta's business
15 relationship, if any, with ED&F Man?
16     A    I know that Zeta was the investment
17 manager for a number of pension plans that
18 were clients of ED&F Man.
19     Q    Did Zeta provide any services to
20 ED&F Man?
21     A    I am not aware of any services that
22 Zeta provided to ED&F Man.
23     Q    Did ED&F Man provide any services
24 to Zeta?
25     A    I'm not aware of any services that

Page 109

1  ED&F Man provided to Zeta.
2      Q    Are you aware that prior to
3  onboarding the three Zeta plans at ED&F Man,
4  Zeta conducted dividend arbitrage strategy
5  trading for some of the Zeta plans through
6  Solo Capital Partners LLP?
7      A    I'm sorry.  Could you ask that
8  again?
9      Q    Sure.
10          Are you aware that prior to
11 onboarding the three Zeta plans at ED&F Man,
12 Zeta conducted dividend arbitrage trading for
13 some of the Zeta plans through a company
14 called Solo Capital Partners?
15     A    I don't know.
16     Q    Do you know one way or the other
17 whether ED&F was aware, prior to onboarding
18 the three Zeta plans, that Zeta and the Zeta
19 plans had a prior relationship with Solo
20 Capital Partners?
21     A    I do not know.
22     Q    Can I ask you to turn to
23 Exhibit 4181?  It's in Binder 3, Tab 59.
24     A    Sorry.  Which tab, Mr. Oxford?
25     Q    Fifty-nine.  Five-nine.

Page 110

1  A   Yeah.
2        MR. BINDER: This is 4181?
3        MR. OXFORD: Oh, yeah, sorry.
4  That's my -- I'm taking you to exactly
5  the wrong document. Apologies. I can't
6  read my own handwriting. Let's try
7  again.
8  Q   Exhibit 1590? Slightly different.
9  Binder 1, Exhibit 5, Tab 5.
10 A   Binder 1, Tab 5.
11 Q   Yeah.
12 A   Okay. Bear with me.
13 Q   Sure.
14     Are you with me?
15 A   Yeah.
16 Q   So you should have a three-page
17 document with a "John Doscas Exhibit 1590" on
18 it?
19 A   I see that.
20 Q   Great. Okay.
21     Are you familiar with this
22 document, sir? Have you seen it before?
23 A   I don't recall seeing this document
24 before.
25 Q   Are you familiar with the powers of

Page 111

1  attorney that the Zeta plans entered into
2  with Zeta Financial Partners?
3  A   I've seen other powers of attorney.
4  I don't recall seeing this one or not.
5      I'm not familiar with any
6  specific --
7  Q   Okay. Do you know one way or
8  another whether ED&F required this type of
9  power of attorney to be entered into between
10 the Zeta plans and Zeta?
11     MR. BINDER: Objection to form,
12 vague.
13 A   I recall the powers -- power of
14 attorneys were signed for the Zeta plans and
15 Zeta.
16 Q   Okay. Beyond the fact the power of
17 attorneys were signed, do you have any more
18 information about the background and why any
19 specific terms were included in the powers of
20 attorney?
21 A   No, I don't.
22 Q   Directing your attention to the
23 first paragraph that begins, "References
24 made" -- are you with me?
25 A   Yes.

Page 112

1  Q   "References made to transactions
2  under which the plan will engage ED&F Man
3  Capital Markets Limited to set up a synthetic
4  liquidity facility under which the plan will
5  enter into a series of documents and
6  agreements."
7      Do you see that?
8  A   I can see that's what the document
9  says.
10 Q   Did the plan -- in this case, the
11 Sterling Alpha LLC 401(k) Plan -- set up a
12 synthetic liquidity facility with ED&F Man?
13 A   I don't know.
14 Q   Do you have any understanding of
15 what a "synthetic liquidity facility" is?
16 A   I don't have an understanding of
17 what a synthetic liquidity facility is.
18 Q   The next paragraph says, "This will
19 enable the plan to execute a Delta One
20 arbitrage trading strategy in listed equities
21 and futures and OTC options, and to buy and
22 sell equities and futures and in furtherance
23 of same," and it goes on.
24     Did you understand that the
25 Sterling Alpha Plan was executing a Delta One

Page 113

1  arbitrage trading strategy in listed Danish
2  equities?
3  A   (Witness reviewing.)
4      Mr. Oxford, could you ask the
5  question again?
6  Q   Sure.
7      Did you understand that the
8  Sterling Alpha Plan was executing a Delta One
9  arbitrage trading strategy in listed Danish
10 equities?
11 A   I -- I don't know.
12 Q   Did you have any understanding of
13 what the trading strategy was of the Sterling
14 Alpha Plan, or any of the defendant plans
15 was, with respect to Danish securities?
16 A   I believe they were dividend
17 arbitrage trading strategies.
18 Q   Okay. And what does that mean to
19 you when you tell us that they were "dividend
20 arbitrage trading strategies?"
21 A   Dividend arbitrage trading
22 strategies that the pension plans had were to
23 acquire shares prior to an ex date in order
24 to receive a dividend. And I understand
25 these to be shares in which they believed

Page 114

1 they were entitled to a hundred percent of
2 the dividend.
3     Q    What does the "arbitrage" portion
4 of "dividend arbitrage trading" mean in your
5 answer?
6     A    "Arbitrage" refers -- oh, I think
7 Mr. Binder is --
8         MR. OXFORD:  He appears to have low
9     bandwidth.  Insert your own joke.  Let's
10    pause until we get Mr. Binder back.
11        THE VIDEOGRAPHER:  Stand by.  The
12    time is 10:04 a.m. New York time and
13    we're going off the record.
14        (Brief recess taken.)
15        THE VIDEOGRAPHER:  Stand by.  The
16    time is 10:20 a.m. New York time and
17    we're back on record.
18        MR. OXFORD:  Mike, can I trouble
19    you to read back the last two questions
20    just for context?  Mr. Hashemi was
21    halfway through an answer when
22    Mr. Binder's connection cut out.
23        (Whereupon the record was read back
24    by the reporter.)
25    Q    Okay.  Would you please complete

Page 115

1 your answer?
2     A    "Arbitrage" refers to the
3 opportunity -- which, in this case, was the
4 pension plans -- being entitled to
5 100 percent of the dividend.
6     Q    You reference in your earlier
7 answer that the pension plans believed they
8 were entitled to a hundred percent of the
9 dividend.
10        Does ED&F have a view on whether
11 the pension plans were entitled to 100
12 percent of the dividend on the tax vouchers
13 that they issued to the defendant plans?
14    A    This was the pension plan's
15 strategy, and in line with their tax
16 exemptions, which were checked as part of the
17 onboarding process when onboarding the
18 pension plans.
19    Q    My question's a little different,
20 though, sir.
21        Did ED&F have a view on whether the
22 pension plans were entitled to 100 percent of
23 the dividend on the tax vouchers that they
24 issued to defendant pension plans?
25    A    I don't know.

Page 116

1     Q    Can you turn, please, to the
2 deposition notice again?  I think it's the
3 first binder.
4     A    Yeah, it's 28.
5     Q    Something like that, 28, 29.
6     A    Okay.  I have it.
7     Q    Great.  Okay.
8         Turning your attention to
9 Paragraph 13?
10    A    Okay.
11    Q    Are you there, sir?
12    A    Topic 13, yes.
13    Q    Great.  So Topic 13 is "ED&F's
14 Shadow system, including the process by which
15 records were entered and controls over such
16 entries."
17        Do you see that?
18    A    I do see that in the document.
19    Q    And is that a topic on which you
20 prepared yourself to testify today?
21    A    It is the topic -- it is a topic
22 which I've prepared, as best I could, to
23 testify today.
24    Q    Okay.  What was the -- tell us
25 about your best.

Page 117

1         How did you prepare on this topic?
2     A    I reviewed numerous documents,
3 numerous extracts from Shadow, Mr. Oxford.  I
4 then spoke with Sue Wood and Lucy Jenkins,
5 and -- to learn more about -- or ask
6 questions I would have had about Shadow,
7 and -- yes, that's it.
8     Q    What is Shadow?
9     A    Shadow is a software that's used
10 for back office and settlements.
11    Q    Can you explain what you mean by
12 "back office" in this answer?
13    A    Used by -- or should I say, used
14 for the operations to support the -- the
15 equity finance desk.
16    Q    Is it a proprietary software or
17 does ED&F Man license it?
18    A    It is not a proprietary software.
19 It is licensed by, I believe,
20 Shadow -- Shadow Financial Systems, Inc. or
21 something along those lines.
22    Q    Turning the page to Topic 14,
23 Topic 14 is "ED&F's book and records,
24 including ED&F's recording of the purchase
25 sale, borrowing, lending, hedging, and

Page 118

1  ownership of shares, and any cash transferred
2  in connection with any transaction relating
3  to the shares, including purported dividend
4  income on shares."
5      Do you see that?
6   A  Yes, I see that.
7   Q  Is that a topic on which you are
8  prepared to testify today?
9   A  It is a topic which I've prepared,
10 as best I could, to testify today.
11  Q  Tell us, please, everything you did
12 to prepare to testify on that topic.
13  A  Again, I saw many documents of
14 ED&F Man's books and records, and extracts
15 which referred to the -- the extracts which
16 referred to the recordings that are mentioned
17 in the topic.  It says "including ED&F
18 recordings of."
19      And then I spoke with, again,
20 Sue Wood and Lucy Jenkins.
21  Q  The documents that you reviewed,
22 did they include ED&F Man's policies with
23 respect to the maintenance of the books and
24 records mentioned in Topic 14?
25  A  I've seen so many documents,

Page 119

1  Mr. Oxford, that I don't recall exactly a
2  policy referring to this exact -- what you
3  referred to.
4   Q  Did the documents you reviewed in
5  preparation for your testimony on Topic 14
6  include the desk procedures for the equity
7  finance desk?
8   A  I recall seeing desk procedures.
9   Q  Okay.  So, just generally, can you
10 walk me through how ED&F Man -- withdrawn.
11 Let me start again.
12      Can you walk me through the process
13 ED&F followed for recording client trades
14 that were made through the equity finance
15 desk?
16  A  The trades would be inputted into a
17 trade blotter called "Super Booker."
18  Q  Good name.
19  A  Excuse me?
20  Q  That's a good name.
21  A  Which would, through STP, go into
22 Shadow and -- and would consist of the books
23 and records of ED&F Man for the -- for a
24 trade.
25  Q  Okay.  How were trades initiated?

Page 120

1      Is it fair to say all trades were
2  initiated by clients in the equity finance
3  desk?
4   A  In the majority of the cases, from
5  my preparations that I have seen, and the
6  clients have instructed the equity finance
7  desk to acquire those shares.
8   Q  And in the minority of cases, did
9  the instruction happen in a different manner?
10  A  Actually, sorry.  I would like to
11 rephrase what I said.
12      From all the cases that I recall
13 seeing, the investment manager instructed the
14 equity finance desk to acquire shares.
15  Q  So it's fair to say the trades were
16 not initiated by ED&F Man.
17      Rather, they were initiated by the
18 investment manager?
19  A  Yeah.  So to recall from all of the
20 documents that I recall seeing, the
21 instruction comes from, typically, the
22 investment manager.
23  Q  Okay.  And the request from the
24 investment manager comes how?  Does it come
25 by e-mail, by phone?

Page 121

1      Any other ways?
2   A  I've seen, obviously, many e-mail
3  instructions, but I recall from the mandates
4  of the desk that they're able to take orders
5  by voice.
6   Q  So ED&F could consider a trade
7  placed when that trade is placed orally.
8      Is that correct?
9   A  By telephone, yes.
10  Q  And how -- in the case -- the
11 example you've just given me of a telephone
12 order to place a trade, how would that be
13 recorded in ED&F's systems?
14  A  So the telephones of the front
15 office desk, the trading desk, would be a
16 recorded medium.
17  Q  So did ED&F keep records of all
18 communications, including trade requests that
19 were placed via ED&F's official telephones?
20  A  Sorry.  Could you ask that again?
21  Q  Yeah, that was a crappy question.
22 Let me try again.
23      So if a trade order was placed by
24 telephone to an ED&F telephone line, would
25 that communication, that voice communication,

Page 122

1  be recorded by ED&F Man?
2       A    So the telephones that were
3  recorded, the recorded mediums would be
4  stored by ED&F Man in line with regulations
5  at the time.
6       Q    And what was the retention policy
7  for communications made in the manner you've
8  described between 2015 and -- sorry, 2012 and
9  2015?
10           MR. BINDER:  Objection, vague.
11      A    Sorry, Mr. Oxford.
12      Q    If the -- let me ask it again.
13           If -- if a trade was placed by
14 telephone in -- let's say 2015, and that
15 trade was placed on an official desk line,
16 that communication would be recorded by ED&F.
17           Correct?
18      A    So, yes.  What I said last time was
19 the telephone lines that were recorded for
20 the front office desk were recorded medium
21 and stored in line with the regulations at
22 the time, yes.
23      Q    Okay.  And for recordings that were
24 made in 2015, how long were those required to
25 be kept for under FCA regulations?

Page 123

1       A    Having asked the question, I
2  believe it was 30 days, but I must point that
3  I'm not sure I remember exactly.
4            But I believe it was 30 days.
5       Q    Okay.  So after an order has been
6  made, whether by e-mail or by telephone, how
7  does that information get into ED&F's
8  systems?
9            Is it first inputted into the trade
10 blotter?
11      A    So after the trade has been
12 executed, it would be inputted into the trade
13 blotter.
14      Q    What do you mean by "executed?"
15      A    So -- as in once the order has been
16 filled.
17      Q    What do you mean, "the order has
18 been filled?"
19      A    So an instruction would come in to
20 the desk.  And once that instruction has been
21 filled, I believe it would then be inputted
22 into Super Booker, the trade blotter.
23      Q    And who, in terms of personnel,
24 would enter that information into the trade
25 blotter?

Page 124

1       A    It would be the people on
2  that -- the finance desk.
3       Q    And would that information from the
4  trade book blotter automatically be
5  transferred into Shadow?
6       A    Yes.  So it's through STP, through
7  to Shadow.
8       Q    What's STP?
9       A    Straight-Through Processing.
10      Q    Can I ask you to turn to
11 Exhibit 4188?  It's in -- it's Binder 3,
12 Tab 66.
13           MR. OXFORD:  Mark this as
14      Exhibit 4188.
15           (Whereupon the above mentioned was
16      marked for Identification.)
17      A    Okay.
18      Q    This is a structured equity
19 desk -- finance desk procedures document
20 starting at Bates 009.
21           Do you have the same document I do?
22      A    I believe I do, yes.
23      Q    Great.
24           Is this a document that you're
25 familiar with, sir?

Page 125

1       A    I have seen a document of this type
2  before.  I don't know if it's this exact
3  version.
4       Q    Did you see a document of this type
5  as you were preparing for your deposition?
6       A    I did see a document of this type
7  in my preparations for this deposition.
8       Q    Great.  That should speed things up
9  a little bit.
10           What's the purpose of this
11 document?
12      A    The desk procedures outline some of
13 the, I guess, operational procedures of the
14 desk.
15           I believe we've -- we seem to have
16 lost Mr. Binder again.  Oh, no, he's back.
17           Sorry.
18      Q    Okay.  Were you finished with your
19 answer?  I have, "The desk procedures outline
20 some of the, I guess, operational procedures
21 of the desk."
22      A    Yes, I was done with my question,
23 with my response.
24      Q    Okay.  Is it fair to say that this
25 document outlines the policies and procedures

Page 126

1  that the equity finance desk was required to
2  follow when booking trades?
3       MR. BINDER:  Objection to form.
4     A    The procedures outline operational
5  procedures.
6     Q    Which the equity finance desk is
7  required to follow when booking trades.
8       Correct?
9       MR. BINDER:  Objection to form.
10    A    I don't know.
11    Q    What's -- if the equity finance
12 desk wasn't required to follow the
13 instructions in this document, what's the
14 purpose of the document?
15      MR. BINDER:  Objection to form,
16      vague, lacks foundation.
17    A    Mr. Oxford, I don't know how else
18 to say it.  Desk procedures, they outline
19 some of the operational procedures of the
20 desk.
21    Q    Okay.  I think we're just talking a
22 little bit past each other.
23      I assume this is intended to
24 reflect reality on what the equity desk both
25 did do and was intending to do?

Page 127

1       MR. BINDER:  Objection to form,
2       compound, vague.
3     A    The desk procedures intend to
4  describe the operational sum of -- the
5  operational procedures of the desk.
6     Q    Okay.  Can you turn to Page 2?
7  You'll see a heading, "Trade Mandate."
8     A    I see that.
9     Q    Okay.  Is it correct that that sets
10 out four items that the equity finance desk
11 employees were required to do or to confirm
12 before trading?
13    A    (Witness reviewing.)
14      I can see that's what the document
15 says.
16    Q    Does this document reflect the
17 requirements that the equity finance desk
18 must comply with before booking a trade?
19    A    Sorry.  Are you referring to
20 the -- under the section of the "Trade
21 Mandate," or are you referring to the whole
22 document as a whole?
23    Q    The "Trade Mandate."
24    A    (Witness reviewing.)
25      I can see the document lists four

Page 128

1  items.  It says here, "Ahead of trading, the
2  desk must confirm."
3     Q    Did you see any record kept of
4  whether these steps were complied with for
5  ED&F's execution of Danish trading on behalf
6  of the defendant plans?
7     A    I don't know.
8     Q    Under the heading, "Trade
9  Execution," it says, "Prior to initiating
10 structured client trade involving a
11 derivative hedge" -- let's just pause there.
12      Did the Danish trading done by the
13 defendant plans involve a derivative hedge?
14    A    The trading structures of the
15 pension plans involved a derivative hedge.
16    Q    So can we agree that this
17 procedures document requires the equity
18 finance desk to create a trade ticket
19 detailing the economics involved, including
20 the trade date, settlement date, prices,
21 quantity, and expected P&L?
22      MR. BINDER:  Objection to form.
23    A    I can see here that it says, "The
24 desk will create a trade ticket detailing the
25 economics involved, including trade dates,

Page 129

1  settlement date, prices, quantity, and
2  expected P&L."
3     Q    And does that reflect the procedure
4  that the equity finance desk was required to
5  follow in 2012 through 2015?
6     A    I don't know.
7     Q    Do you know one way or another
8  whether the equity finance desk did, in fact,
9  create a trade ticket as described in that
10 first sentence?
11    A    I don't know.
12    Q    The next sentence says, "Trade
13 tickets will be saved in the following
14 location," and then gives a location in what
15 appears to be an "S drive."
16      Do you see that?
17    A    I can see that's what the document
18 says.
19    Q    And the "S drive" is a server held
20 by ED&F Man.
21      Correct?
22    A    The "S drive" is a shared drive in
23 ED&F Man.
24    Q    Do you know whether the equity
25 finance desk followed the instructions in the

Page 130

1  desk procedures manual and saved the trade
2  tickets in that location on the "S drive?"
3     A     I do not know.
4     Q     Did you ask the lawyers whether the
5  trade tickets were saved to the "S drive?"
6     A     I don't recall, Mr. Oxford.
7     Q     The last paragraph refers to stock
8  loans.  It says, "When the equity finance
9  desk transacts a stock loan, the term trade
10 sheets will be created."
11          Do you see that?
12    A     I see it differently to how you
13 read it.  I see it says "when the equity
14 finance desk transacts a stock loan, trade
15 term sheets will not be created."
16    Q     Oh, you're quite right.  Thank you
17 for the correction.
18          It says, "All economics will be
19 recorded within the trade blotter."
20          Do you see that?
21    A     Yes, I see that.
22    Q     So does that mean that for stock
23 loan transactions executed through the equity
24 finance desk, the economics are recorded in
25 the trade blotter and then transferred to

Page 131

1  Shadow?
2     A     The document says, "All economics
3  will be recorded within the trade blotter."
4     Q     And do you know one way or another
5  whether that happened?
6     A     I have seen extracts in Shadow that
7  include stock loans.
8     Q     What kind of information about a
9  structured client trade would be entered into
10 the trade blotter by the equity finance desk?
11    A     Would you mind please asking the
12 question again?
13    Q     Sure.
14          The document references a
15 "structured client trade."
16          What kind of information about a
17 structured client trade would be entered by
18 the equity finance desk into the trade
19 blotter?
20    A     Details in relation to the equity
21 and also the hedge.
22    Q     Would those details include trade
23 date?
24    A     I believe they would.
25    Q     Would those details include

Page 132

1  settlement date?
2     A     I believe they would.
3     Q     Would those details include price?
4     A     From the extracts of Shadow I've
5  seen, I think they would.
6     Q     Would they include counterparty?
7     A     Excuse me?
8     Q     Would they include counterparty?
9     A     I do not recall seeing
10 counterparty.
11    Q     Any other details you recall that
12 the equity finance desk would enter into the
13 trade blotter on a structured client trade?
14    A     Quantity.
15          We mentioned price, right?
16    Q     We did.
17    A     Details of the trade.  If it was a
18 buy, for example.  It could have been a sell.
19    Q     Would it include the date on which
20 a stock loan was terminated or returned?
21          MR. BINDER:  Objection to form,
22    lacks foundation.
23          THE WITNESS:  I'm sorry,
24    Mr. Binder.  I can't hear you very well.
25          MR. BINDER:  I'm sorry.  Objection

Page 133

1     to form, lacks foundation.
2     Q     He's trying to tell you you don't
3  know.
4     A     No.  Mr. Oxford, could you
5  repeat --
6          MR. BINDER:  Hang on, hang on, hang
7     on.  I'm making an objection for the
8     record.  Mr. Oxford, I would ask that
9     you stop making commentary and just ask
10    questions.
11         MR. OXFORD:  Okay.  If you can
12    limit your objections to form, then I
13    will.
14         MR. BINDER:  Objection, form.
15    A     Mr. Oxford, could you kindly repeat
16 your question?
17    Q     Sure.
18          Would the information entered into
19 the trade blotter regarding stock loan
20 include the date on which the stock loan was
21 terminated or returned?
22         MR. BINDER:  Objection, lacks
23    foundation.
24    A     I don't recall.  I don't remember
25 at this point in time.

Page 134

1   Q   Can I ask you to go back to
2   Binder 2 and open Tab 32?
3       It's the short e-mail with many
4   attachments that Mr. Smith sent to the FSA.
5       MR. BINDER:  What exhibit number is
6       that?
7       MR. OXFORD:  It is 4154.
8   A   Mr. Oxford, could you remind us me
9   when you said -- point to which tab?
10  Q   I just scribbled on my piece of
11  paper with that important piece of
12  information.  Thirty-two.
13  A   Yes, I have the document in front
14  of me.
15  Q   Great.  Can you turn, please, to
16  Attachment O, as in "Oxford?"
17      MR. BINDER:  Could I get a Bates
18      number, please?
19      MR. OXFORD:  351.
20  A   Okay.
21  Q   Do you have it there, sir?  It says
22  "Securities Operation, Middle and Back
23  Office, Day One Procedures."
24  A   I can see that's what the document
25  says.

Page 135

1   Q   Have you seen this before?
2   A   I may have done, but I don't
3   recall -- I don't recall at this moment in
4   time.
5   Q   Okay.  Just directing your
6   attention to the bottom of the first page,
7   there's a list of systems.
8       Were those systems that the middle
9   and back office was required to use in
10  connection with equity finance operations?
11      MR. BINDER:  Objection, compound,
12      lacks foundation.
13  A   I can see that there is systems
14  listed here, Mr. Oxford.
15  Q   And were these systems used in
16  generating and maintaining the books and
17  records of ED&F as described in Topic 14 of
18  the deposition notice?
19      MR. BINDER:  Objection to form.
20  A   (Witness reviewing.)
21      Some of these systems are familiar,
22  that I have seen as part of my preparation.
23  Q   Which ones?
24  A   The first one, CBS, Shadow, and
25  Bloomberg.

Page 136

1   Q   Okay.  You're not familiar with the
2   other systems mentioned there?
3   A   (Witness reviewing.)
4       Not in the scope of this
5   deposition.
6   Q   And otherwise, do you have personal
7   knowledge of any of these other systems
8   mentioned at the bottom of Page 3?
9   A   I have personal knowledge of Toms.
10  Q   What is Toms?
11  A   If it refers to what I believe it
12  refers to, which is Bloomberg/Toms, which is
13  a trade blotter.
14  Q   Is that the same trade blotter you
15  were telling us about earlier?
16  A   No.  I was telling you about
17  Super Booker.
18  Q   I see.  At some point, did the
19  equity finance desk move from using the Toms
20  trade blotter to Super Booker?
21  A   I don't know.
22  Q   You mentioned Shadow again.
23      Is it accurate that the Shadow data
24  reflects the booking of trades but not the
25  settlement of trades?

Page 137

1   A   When a trade is settled, I believe
2   that is reflected in Shadow.
3   Q   If a trade settles later than
4   anticipated, is that late settlement
5   reflected anywhere in Shadow?
6   A   If a trade settles, it will be
7   reflected in Shadow.
8   Q   And if it settles later than
9   anticipated, will that late settlement be
10  reflected in Shadow?
11  A   I believe it would.
12  Q   In what form did ED&F Man receive
13  settlement records?
14  A   These would be, I believe, in the
15  form of SWIFTs.
16  Q   These would be from ED&F Man's
17  sub-custodians, BNP and SEB, that we talked
18  about earlier?
19  A   I believe so.
20  Q   Does Shadow include data for
21  borrows and loans of securities?
22  A   I believe Shadow does include data
23  for borrows and loans.
24  Q   And if a security is transferred
25  between the accounts of two clients of

Page 138

1  ED&F Man, would that transfer be reflected in
2  Shadow?
3       A    Shadow will reflect all
4  information -- actually, to rephrase -- any
5  amendments or changes to a trade will be
6  reflected in Shadow.
7       Q    Are you familiar with a term
8  "rehypothecation?"
9       A    I'm familiar with the term
10 "rehypothecation."
11      Q    And what does it mean to you?
12      A    Rehypothecation is where ED&F Man
13 as the broker, and in line with -- I believe
14 it's Clause 10(B)2 of the Terms of
15 Business -- has a right to those assets.
16           Actually, could I rephrase,
17 Mr. Oxford?  I mean to say "has a charge over
18 those assets."
19      Q    And what is "rehypothecation?"
20      A    Rehypothecation is where the broker
21 in this case, ED&F Man, is able to use or has
22 a charge to use the assets owned by the
23 pension plans for other purposes.
24      Q    And if ED&F were to rehypothecate a
25 security owned by a defendant plan, would

Page 139

1  that rehypothecation be reflected in Shadow?
2       A    The rehypothecation would be
3  reflected in Shadow, in the B-line accounts.
4       Q    You told us earlier that Shadow
5  contains data from trade confirmations.
6            What other sources of information
7  is -- are fed into Shadow?
8       A    Sorry, Mr. Oxford.  I don't recall
9  saying information necessarily from trade
10 confirmations.
11      Q    I'm sorry.  I didn't mean to
12 misquote you.
13      A    It's okay.  The equity finance desk
14 would input the relevant details to a trade
15 into Super Booker, which would, through STP,
16 flow into Shadow.
17      Q    If a trade is amended after it has
18 been entered into Super Booker, how is any
19 amendment reflected in Shadow, if it is?
20      A    Amendments are reflected in Shadow.
21 It's -- there is typically a -- a new entry
22 to reflect the amendment, with original entry
23 marked as an original and the new amended
24 entry to be marked as replacement.
25      Q    Is any information ever deleted

Page 140

1  from Shadow?
2       A    I don't believe information can be
3  deleted from Shadow.
4       Q    Is it accurate that Shadow has a
5  number of -- I think they're termed
6  "environments" within ED&F?
7       A    Could you be a bit more specific
8  about what you mean by "environments?"
9       Q    Yeah.  There are different -- I
10 hesitate to use the word "versions," but
11 there are different instances of Shadow where
12 data -- different data may be stored.
13           For example, there may be a version
14 or an instance of Shadow that contains data
15 from Volcafe.
16      A    Okay.
17      Q    Do you get what I'm trying to say?
18           MR. BINDER:  So, with that
19      explanation, maybe just ask the question
20      again, Neil, just to make sure we're
21      clear?
22           MR. OXFORD:  Sure.
23      Q    Is it accurate there are a number
24 of different environments in ED&F's Shadow
25 system?

Page 141

1       A    There are different environments,
2  or should I say points of entry in Shadow.
3       Q    And is there a different
4  environment or point of entry for
5  transactions involving MPT Dubai?
6       A    So MPT Dubai would have its own
7  environment which is segregated from the
8  other entities, unless, of course,
9  Mr. Oxford, as I said earlier, where it was
10 acting as a -- or it was a client of
11 ED&F Man.
12      Q    I see.  That's helpful.
13           Is the same true of Volcafe?
14      A    I believe it is.
15      Q    Is the Dubai -- is the MPT Dubai
16 instance of Shadow called "D-1?"
17      A    I don't know.
18      Q    Is the Volcafe instance of Shadow
19 known as "V-1?"
20      A    I don't know.
21      Q    All of your -- the information that
22 you've described for us in -- that's
23 contained in Shadow and how it works, is that
24 reflected, to the best of your knowledge, on
25 the extracts of Shadow that have been

Page 142

1  produced to SKAT in this litigation?
2          MR. BINDER: Objection to form,
3      lacks foundation.
4      A    The information that I described to
5  you is in line with all of the documents that
6  I saw, which I believe have been prepared for
7  SKAT.
8      Q    Can you turn just briefly -- I have
9  a similar document for you to look at.  It's
10 in Binder 3, Tab 67 for you.
11         MR. OXFORD: Neil, that's
12     Exhibit 4189.
13         (Whereupon the above mentioned was
14     marked for Identification.)
15     Q    Okay.  So we're on the same page,
16 this is Bates 74845, and the front page is an
17 "ED&F Man Capital Markets Equity Finance
18 Operations High Level Overview."
19         Correct?
20     A    Yes.  This is the same document I'm
21 seeing.
22     Q    Right.  Great.
23         Have you seen this document before,
24 sir?
25     A    (Witness reviewing.)

Page 143

1          I don't recall this exact document.
2      Q    Turning your attention to Page 5 at
3  the bottom, there's a heading, "Manufactured
4  Dividends."
5      A    Okay.
6      Q    The second paragraph below says,
7  "The role will be supported by Shadow, our
8  in-house dividend processing and
9  reconciliation tool."
10         Do you see that language?
11     A    I can see it says that.
12     Q    What do you understand by the
13 description of Shadow as a "dividend
14 processing and reconciliation tool?"
15     A    (Witness reviewing.)
16         I understand the part of
17 reconciliation, because in my preparations, I
18 understood that the information in Shadow
19 would be used to reconcile with all of
20 ED&F Man's books and records.
21         However, I'm unsure as to the other
22 parts of dividend processing.
23     Q    How was Shadow used to reconcile
24 with all of ED&F Man's books and records with
25 respect to dividends?

Page 144

1      A    I know that the information in
2  Shadow was used to reconcile to SWIFTs from
3  the sub-custodian, but that's as far as I'm
4  able to comment.
5      Q    Who was responsible for that
6  reconciliation process?
7      A    It would have been someone in the
8  securities operations team.
9      Q    Was any of the dividend
10 reconciliation automated?
11     A    I don't know.
12     Q    Is it fair to say from your earlier
13 answers that you're not familiar with any of
14 the information that ED&F provided to the FCA
15 in connection with its investigation relating
16 to MPT Dubai?
17     A    I don't know.
18     Q    You don't know whether you're
19 familiar with it or --
20     A    Sorry.  Apologies.
21         Could you ask the question again?
22     Q    Sure.
23         Do you remember our discussion
24 earlier about the deposition topic, which was
25 24, the FCA's investigation into ED&F Man's

Page 145

1  custody business and trading in Danish
2  shares?
3      A    I recall our conversation.
4      Q    Are you familiar with any of the
5  information that ED&F has provided to the FCA
6  relating to MPT Dubai in connection with that
7  investigation?
8      A    I'm not familiar.
9      Q    Okay.  Can I go off for one second?
10 Thanks.
11         THE VIDEOGRAPHER: Do you want to
12     go off record, Neil?
13         (Whereupon a discussion was held
14     off the record.)
15         MR. OXFORD: Yeah, can we go off
16     for two minutes?
17         THE VIDEOGRAPHER: Stand by.  The
18     time is 11:14 a.m. New York time and
19     we're going off the record.
20         (Brief recess taken.)
21         THE VIDEOGRAPHER: Stand by.  The
22     time is 11:26 a.m. New York time and
23     we're back on record.
24     Q    Okay.  Mr. Hashemi, I would like to
25 ask you some questions about some of the

Page 146

1  Shadow extracts that are produced to us.  It
2  seems like you will have reviewed them in
3  your preparation, which will speed things
4  along, and I appreciate that.
5          I would like to start with
6  Exhibit 4189, but I'd like you to open the
7  native format.
8          Is that something that you can do?
9      A   I think so.
10         MR. BINDER:  Shahab, do you have
11     the documents on the e-mail on
12     the computer that you're using?
13         THE WITNESS:  Yeah, there's a flash
14     drive here.
15     Q   Right.  Could you open up
16  Exhibit 4198, please -- oh, sorry, 4193.
17  Yeah -- you know, let's start at the
18  beginning.  Let's do 4191.
19         MR. OXFORD:  Mark 4191.
20         (Whereupon the above mentioned was
21     marked for Identification.)
22         MR. BINDER:  So just so we're
23     clear, we're looking at an Excel
24     spreadsheet right now, right?
25         MR. OXFORD:  Yeah.

Page 147

1      Q   Can you take a moment, sir, and
2  tell me if you're familiar with this
3  document?
4      A   (Witness reviewing.)
5          MR. BINDER:  Shahab, do you have it
6      opened yet?
7          THE WITNESS:  Yeah, it's just
8      opened, if you can bear with me.
9      Q   Sure.
10     A   (Witness reviewing.)
11         Okay.
12     Q   Is that a document that you've seen
13  before, sir?
14     A   I'm not sure if I've seen this
15  exact document.  As I said, I've seen many.
16         But the contents seem familiar.
17     Q   Does it appear to be an extract of
18  Shadow data which is at least similar to that
19  which has been produced to us by ED&F?
20     A   (Witness reviewing.)
21     Q   Well, let me withdraw that question
22  and ask you a better one.
23         I'll represent to you that
24  Mr. Binder and his firm produced this to us
25  as an extract of Shadow data from ED&F

Page 148

1  relating to Danish trading.
2          Do you understand that
3  representation?
4      A   I do, yes.
5      Q   Okay.  And then, as part of your
6  preparation for today, did you review
7  documents that at least appear to be similar
8  to this?
9      A   I did, yes.
10     Q   Okay.  Great.  Thank you.
11         Do you know from which Shadow
12  environment these files were exported?
13     A   (Witness reviewing.)
14         I -- I'm unsure.
15     Q   Okay.  Mr. Binder had represented
16  to us that the Shadow data "clearly
17  identifies each and every case where a trade
18  was amended, canceled, or settled, and
19  includes the date of such amendments."
20         Is that an accurate description of
21  the information contained in Shadow
22  generally?
23         MR. BINDER:  And just for the
24     record, I'm not looking at what letter
25     you're reading from, so you'll have your

Page 149

1      representation.  But I just -- I'm not
2      necessarily disagreeing with it, but I
3      don't want my silence in this context to
4      be taken as an implicit agreement,
5      although I may agree in fact.
6      A   Okay.  So could you ask the
7  question again?
8      Q   Sure.
9          Mr. Binder had represented to us
10  that the Shadow data "clearly identifies each
11  and every case where a trade was amended,
12  canceled, or settled, and Shadow includes the
13  date of such amendments."
14         Is that an accurate description of
15  the Shadow data generally?
16     A   That is -- yes, that is accurate of
17  the data in Shadow.
18     Q   Is it also an accurate statement as
19  to the data that you understand was produced
20  to SKAT?
21     A   Correct.
22     Q   So it's your understanding that the
23  data that ED&F produced to SKAT includes
24  information about where Shadow entries were
25  amended?

Page 150

1      MR. BINDER: Objection to form,
2    lacks foundation.
3    A    In the documents that I've seen,
4 Mr. Oxford, I've seen Shadow extracts where
5 there were amendments in it.
6    Q    And how were those amendments
7 indicated? How is it identified as an
8 amendment?
9    A    As I mentioned, I recall seeing the
10 original trade being marked as "ORG," and the
11 amended trade, which was a new entry, being
12 marked as "REP," replacement.
13   Q    And there's a field or a column for
14 that information in the Shadow extracts
15 you're talking about?
16   A    Yes, there was a column.
17   Q    Were entries ever canceled in
18 Shadow?
19   A    I don't know.
20   Q    Had it -- how did Shadow record the
21 settlement of trades?
22   A    I think -- I believe -- or I should
23 say I recall seeing a column that was "Trade
24 Status," I think.
25   Q    And the "Trade Status" would

Page 151

1 reflect whether a trade had settled or not?
2 Is that what you're telling us?
3    A    I think so. I'm not a hundred
4 percent certain, because as I said, I have
5 seen so many of these documents.
6         And -- but I think -- I think so.
7         MR. BINDER: So Mr. Oxford, could I
8    interrupt you? Let me -- I just want to
9    go back. I see a representation from
10   you that this is an extract from Shadow.
11   We do not understand this to be an
12   extract from Shadow.
13        MR. OXFORD: What do you understand
14   it to be an extract from, Mr. Binder?
15        MR. BINDER: From something I
16   believe -- SEC Ops is what it's --
17   Q    So is that consistent with your
18 understanding, sir? Mr. Hashemi?
19   A    Yes, it is.
20   Q    I think I asked you about SEC Ops
21 earlier, and you said you didn't know what it
22 was.
23        Is your information any better now
24 than it was a couple of hours ago?
25   A    No, it's just -- I acknowledge that

Page 152

1 the data here is slightly different from that
2 I recall from Shadow, as I was trying to
3 allude to earlier. But that's as far as I'm
4 able to say.
5    Q    Okay. So let's go back.
6         What is "SEC Ops?"
7    A    SEC Ops refers to -- at least as I
8 know it -- to the securities operations team
9 within ED&F Man. But I noticed in the
10 document that it was also there from the
11 systems.
12   Q    And do you understand SEC Ops to be
13 a system or database within ED&F Man?
14   A    I'm not familiar with SEC Ops.
15   Q    Okay. So when you were answering
16 my questions earlier, before Mr. Binder's
17 interjection about SEC Ops, were you
18 answering my questions with respect to the
19 Shadow data, rather than SEC Ops data with
20 which you're not familiar?
21   A    Yes, I thought it would have been
22 an extract from Shadow. But as I said, I did
23 acknowledge that information was slightly
24 different.
25   Q    Yeah. But in general, my question

Page 153

1 is about how, for example, any amendments are
2 represented in Shadow. And you told us about
3 the ORG and REP codes.
4         Those types of questions you were
5 answering with respect to your understanding
6 of Shadow.
7         Correct?
8    A    Yes, from my preparation for this
9 deposition, and my understanding of Shadow.
10   Q    Okay. Again, then, without
11 reference -- so let me ask you this way.
12        Do you understand, having had a
13 chance to look at this, that -- the data in
14 this exhibit, which is 4191, do you have any
15 understanding of what the data is?
16        MR. BINDER: First of all,
17   Mr. Hashemi, have you had a chance to
18   actually review this document?
19        MR. OXFORD: He had three minutes
20   at the front of the questioning, Neil.
21        MR. BINDER: No, I -- do you need
22   to look at this document? We started
23   this, Neil, with a -- what you -- a
24   representation from you that this was an
25   extract from Shadow. That was not

Page 154

1  correct.
2       This is the second deposition where
3  you've made representations about
4  something from ED&F. The other one was
5  in Ms. Kaminer's deposition that was
6  inaccurate. So it's confusing to the
7  witness to be looking at something based
8  on a representation on which he is
9  expecting to be one thing and then
10 finding out that it's not.
11      So if, Mr. Hashemi, you need time
12 to look at this document to answer
13 Mr. Oxford's question, you should take
14 all the time that you need.
15      MR. OXFORD: Okay. And I object to
16 that mischaracterization, which you will
17 not be astonished to learn I disagree
18 with.
19 Q    But if you need time to review this
20 document and understand what it is, please
21 feel free to take a moment.
22 A    (Witness reviewing.)
23      Yeah, if you could give me a
24 second.
25      (Witness reviewing.)

Page 155

1       MR. OXFORD: While he's doing that,
2  Neil, just to speed things along, could
3  you take a look at the next two
4  exhibits, 4192 and 4193, and let me know
5  if you would agree with the
6  representation that those were, in fact,
7  produced to us by ED&F from the Shadow
8  database?
9       MR. BINDER: No. I'm going to
10 stick with the deponent and follow along
11 in deposition. And when you get to it,
12 we can deal with it.
13 A    Okay. Mr. Oxford, so I can see
14 that there are 4,912 rows in this
15 spreadsheet. And so it would be impossible
16 for me to, obviously, go through the whole
17 thing.
18      But if there's something specific
19 that you'd like to ask me, I think I'm okay
20 to.
21 Q    Okay. Why don't we open -- can you
22 open 4192, please?
23      MR. OXFORD: Mark this as 4192.
24      (Whereupon the above mentioned was
25 marked for Identification.)

Page 156

1  Q    Let me know when you're there.
2  A    Okay. It's open.
3  Q    Okay. Can you tell me which system
4  this data was -- withdrawn.
5       This data was produced to us by
6  ED&F Man by Mr. Binder and his cohorts.
7       Can you tell me from which database
8  or source within ED&F this data came?
9  A    Let me look at the document.
10      (Witness reviewing.)
11      Okay. So the information in this
12 spreadsheet is in line with the types of
13 information that I recall seeing in the
14 extracts from Shadow.
15 Q    Okay. Taking a look at Column B,
16 the heading is "TR-ID."
17      What does that mean?
18 A    I believe that means "Transaction
19 ID," either -- Mr. Oxford, it's either
20 Trade ID or Transaction ID.
21 Q    And is that a unique identifier for
22 the transaction at that particular line entry
23 in the extract?
24 A    I believe it to be a unique
25 identifier.

Page 157

1  Q    Okay. Column G is headed "Ticket
2  Sequence."
3       What does that mean?
4  A    "Ticket Sequence" is a number -- as
5  you can see, it's a number, and given to a
6  particular trade.
7  Q    Column J, "E-X-T, R-E-F, I-D."
8       What does that reference?
9  A    I'm uncertain, but if I had to
10 guess, "EXT" may refer to External Reference
11 ID.
12      But again, I must note that I'm not
13 sure.
14 Q    Okay. If you scroll to the right,
15 do you see a column headed "Ticket State?"
16      You'll see it in Column Y?
17 A    Column Y?
18 Q    Yes. What does that mean?
19 A    I see Column Y, "Ticket State."
20 This refers to what I was explaining earlier,
21 I believe, as to the type of tickets it is,
22 to the type of entry it is, with the REP and
23 the ORGs being as I referred to earlier.
24 Q    Okay. That's helpful. Thank you.
25      And then, next to that, Column Z,

Page 158

1  "Trade Transaction."
2     A    Yeah, I see the column that says
3  "Trade Transaction."
4     Q    What information is contained in
5  that column?
6     A    I understand that to mean type of
7  transaction.  So to give you a little further
8  detail, "BUY" being a buy and "SEL" being a
9  sell.
10    Q    Okay.  And do you see "Trade
11 Account" to the right?
12    A    Bear with me.
13    Q    Column O?  Actually, sorry.  I sent
14 you in the wrong direction.
15         My apologies, Mr. Hashemi.
16    A    Oh, it's to the left.
17    Q    It's to the left.
18         "My bad," as they say over here.
19    A    It's okay.  Bear with me.
20         "Trade Account," Column O.
21         I see that.
22    Q    Yes.  What information is in that
23 column?
24    A    I believe that refers to a -- an
25 account number or an account of the -- of an

Page 159

1  entity.
2     Q    Of -- which kind of entity?
3  Clients of ED&F Man?
4     A    I imagine it would include the
5  clients of ED&F Man, yeah.
6     Q    But it could also include external
7  non-clients?
8     A    I think it could include -- I'm
9  uncertain, Mr. Oxford.  But it includes the
10 client accounts and other accounts used
11 by -- by the desk.
12    Q    There's a Column AY -- so back to
13 the right -- that is headed "Counterparty."
14         Can you take a look at that and
15 tell me what information is in there, please?
16    A    (Witness reviewing.)
17         Okay.  I see it, Column AY.  It
18 says -- it's titled "Counterparty."
19         I believe it's -- it refers to the
20 relevant counterparties for this ticket.
21    Q    And then, if you could scroll to
22 the right, Column BM is headed "Master
23 Account?"
24    A    Yeah, B -- was that "M" for
25 "mother" or "November?"

Page 160

1     Q    "M" for "mother."
2     A    Okay.  I see it says "Master
3  Account."
4     Q    What information is in that column?
5     A    In Shadow, as I understand it from
6  the conversations and preparations that I've
7  had, is that there are accounts -- or should
8  I say master accounts -- so related accounts,
9  like subaccounts, maybe, or a parent account.
10         I believe that refers to a -- a
11 master account, which is a -- which would be
12 a parent account.
13    Q    Okay.  And then, lastly, BG and BH,
14 in those columns, there's a "Location 1" and
15 a "Location 2."
16         Could you take a look at those and
17 tell me what data is in there, please?
18    A    Yeah.
19         (Witness reviewing.)
20         And I'm unsure, Mr. Oxford, of the
21 data in these two columns.
22    Q    So there's a reference -- I'm
23 looking in the first few rows to a prefix of
24 a number of letters, and then "BNP."
25         Does it relate to the sub-custodian

Page 161

1  where securities may be held?
2          MR. BINDER:  Objection, lacks
3     foundation.
4     A    I'm just scrolling a bit further
5  down.  Sorry, I lost the column.
6          You said it was "B" --
7     Q    "G" and "BH."
8     A    BG and BH.  Yes, I found it.
9  Sorry.
10         (Witness reviewing.)
11         I'm sorry.  I don't know,
12 Mr. Oxford.
13    Q    Okay.  Do you also know why some of
14 those rows are blank in Columns BG and BH?
15         MR. BINDER:  Objection.  Withdrawn.
16    A    (Witness reviewing.)
17         No.  I'm sorry.
18         I don't know why.
19    Q    When buys and sells are recorded in
20 Shadow, are they recorded from the ED&F
21 perspective or the ED&F client's perspective?
22    A    I believe them to be recorded from
23 ED&F's perspective.
24    Q    Thank you.  That's all I have for
25 that document.  Thank you, sir.

Page 162

1  Could I ask you to turn back to
2  5154? We looked at it earlier.
3  Let me just -- it's in your
4  Binder 2, Tab 32.
5  A  Yeah.
6  MR. BINDER: What is the exhibit
7  number?
8  MR. OXFORD: It is 4154.
9  Q  And if you could turn to
10 Attachment O as in "Oxford?" Again, it's the
11 document we were looking at --
12 A  Yeah.
13 Q  -- before we had our Shadow detour,
14 and also our SEC Ops detour. Who knew?
15 Do you have the document there,
16 sir?
17 A  I do.
18 Q  Okay. Could I ask you to turn to
19 Page 7, please? There's a heading,
20 "Reconciliation and Controls."
21 It's on Bates 357.
22 A  Okay. I see the heading.
23 MR. BINDER: Neil, hang on. I'm
24 having a little trouble.
25 So we're at document 4154?

Page 163

1  MR. OXFORD: 4154, and Attachment O
2  as in --
3  MR. BINDER: Yeah, so I -- I just
4  need the attachment. But if you'd just
5  give me the Bates number?
6  MR. OXFORD: It is beginning 495351
7  and we're on Page 7.
8  MR. BINDER: Give me one second. I
9  don't have it. I don't have a document
10 495351, so.
11 MR. OXFORD: Any luck, Mr. Binder?
12 MR. BINDER: I'm not. So the
13 printout is literally missing that one
14 page. So I'm having to find it on --
15 electronically.
16 So I have 4154. Is it "OP?"
17 MR. OXFORD: It's in "O," as in
18 "Oh, my goodness, we're having such a
19 good time."
20 MR. BINDER: 495351. I'm there.
21 Thank you.
22 MR. OXFORD: Okay. Great.
23 Q  So it says, "To reconcile bank
24 accounts versus what we are expecting on our
25 dividend front sheet, we will receive daily

Page 164

1  statements from our agent banks, and we also
2  have access to the following."
3  So just pausing there for a moment,
4  what is a "dividend front sheet?"
5  A  I don't know. In my preparations,
6  Mr. Oxford, I have seen documents
7  called -- referred to as "dividend
8  reconciliation sheets."
9  I'm unsure of what a "dividend
10 front sheet" is.
11 Q  Okay. This document states that
12 "ED&F will receive daily statements from its
13 agent banks."
14 Did ED&F, in fact, receive daily
15 statements from its agent banks?
16 A  From my conversations with Lucy
17 Jenkins and Sue Wood in preparation, where I
18 asked about reconciliation.
19 And I recall them saying that they
20 were daily reconciliations with the
21 sub-custodians via SWIFTs, if I'm not
22 mistaken.
23 Q  Okay. We'll get back to that in
24 one second, sir.
25 But my question was: Did ED&F, in

Page 165

1  fact, receive daily statements from its agent
2  banks as suggested in this document we're
3  looking at, which is the "Securities
4  Operations, Day One Procedures" of ED&F Man
5  Capital Markets?
6  MR. BINDER: Objection, lacks
7  foundation.
8  A  I tried to answer as best I could.
9  I'm unsure, Mr. Oxford. I don't know.
10 Q  Okay. So you don't know one way or
11 another whether ED&F received a daily
12 statement from its agent banks?
13 A  I don't know.
14 Q  Okay. Just following up, then, on
15 your conversation with Lucy Jenkins and
16 Sue Wood, can you tell me everything they
17 told you about the dividend reconciliation
18 process within ED&F Man?
19 A  Sorry. I asked -- when I refer to
20 my statement, I said about reconciliations,
21 it was books and records.
22 Are you now asking specifically
23 about dividend reconciliation?
24 Q  Oh, okay. Well, I can -- I think I
25 probably am asking about both.