CONFIDENTIAL
Shahab Hashemi - October 7, 2021

43 (Pages 166 to 169)

Page 166

1          So what did Ms. Jenkins and
2  Ms. Wood tell you about the daily
3  reconciliations between the books and records
4  of ED&F Man and its sub-custodians?
5      A    Okay.  So the middle office -- or
6  sorry, the operations team would reconcile,
7  on a daily basis, the books and records of
8  ED&F Man with that of the sub-custodians, and
9  through, I believe, daily SWIFT messages.
10     Q    Can you explain to me in a little
11 more detail how the daily SWIFT messages were
12 the method through which the two sets of
13 books and records were reconciled?
14     A    Yeah.  I'm unsure at this moment in
15 time.  I don't quite remember right now.  But
16 at the time I was -- I had comfort on the
17 process.
18          But I'm sorry that I can't recall
19 the full details of the conversation at the
20 moment.
21     Q    Did the reconciliation procedure
22 that you had a conversation with those two
23 individuals about, was the reconciliation of
24 cash, or was it of securities, or was it of
25 both?

Page 167

1      A    I understand it was the
2  reconciliation of cash.  I'm uncertain right
3  now whether it also included the
4  reconciliation of securities.
5      Q    Okay.  So do you know one way or
6  another whether ED&F, in the time frame 2012
7  through 2015, had a process in place to
8  reconcile its securities positions with the
9  securities positions of its sub-custodians?
10     A    So from my preparations and
11 conversations, I understand there was a
12 process to reconcile the securities as well
13 as the cash.
14          I think I said, "to reconcile the
15 securities."
16     Q    Can you tell me everything you know
17 about that securities reconciliation process?
18          MR. BINDER:  Objection.
19     A    Sorry.  As I mentioned, I don't
20 remember right now the details.
21          But at the time, I was comfortable
22 with it.
23     Q    Okay.  But today, you don't?
24     A    Unfortunately not.
25     Q    Okay.  So going back to the --

Page 168

1  well, withdrawn.
2          Was there a process in place in
3  ED&F Man to reconcile the dividends that it
4  received with the dividends that it expected
5  to receive on behalf of its customers and
6  clients?
7      A    Yes, I believe there was.
8      Q    Please tell us how that process
9  worked.
10     A    What I understand is that a -- the
11 process is that a dividend reconciliation
12 sheet would be prepared based on the books
13 and records of ED&F Man and showing which
14 client held a security over the ex date.
15     Q    What do you mean, "over the ex
16 date?"
17     A    The ex date is the date in which
18 the purchaser of the share would have to have
19 purchased the share buy in order to be
20 entitled to a dividend.
21     Q    So is the ex date the last date on
22 which a purchaser can buy a share and be
23 entitled to the dividend?
24          MR. BINDER:  Objection to form.
25     Q    Is that your understanding?

Page 169

1      A    As I mentioned, the purchaser of
2  the share would have to hold the dividend
3  over the ex date and have to have ordered
4  prior to.
5      Q    What does "hold over the ex date"
6  mean?
7      A    The trade date on which they
8  purchased or acquired the shares would have
9  to have been prior to the ex date.
10     Q    Okay.  And you said the purchaser
11 would have to "hold over the ex date."
12          What did you mean by that
13 testimony?
14          MR. BINDER:  Objection to form.
15     A    I meant to have met -- to have
16 purchased or acquired prior and -- yeah,
17 sorry, that's -- withdraw -- to purchase or
18 acquire prior to the ex date.
19     Q    But your answer said the purchaser
20 was required to have -- to have to hold the
21 security over the ex date.
22          What did you mean by that?
23     A    I meant that the trade date would
24 have had to have been prior to the ex date.
25     Q    And was it ED&F's understanding

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

44 (Pages 170 to 173)

Page 170

1  that in order to be entitled to a dividend,
2  the security had to be held by the customer,
3  in this case the pension plan, for any
4  particular period?
5       A    Sorry.  Could you ask the question
6  again?
7       Q    Sure.
8            Was it ED&F's understanding that in
9  order to be entitled to a dividend, a
10  customer would have to hold the security for
11  any particular period after purchasing it
12  prior to the ex date?
13           MR. BINDER:  Objection, vague and
14       ambiguous.
15       A    So as I mentioned, the customer or
16  the pension plan would have to hold the
17  security over the ex date.
18       Q    Okay.  We can come back to that.
19  We jumped off onto the reconciliation
20  process.
21           So you said step one in the
22  reconciliation process was that ED&F would
23  look at its books and records to see who they
24  thought was entitled to a dividend.
25           Correct?

Page 171

1       A    So, in preparation of the dividend
2  reconciliation sheet, the books and records
3  would be checked to see which clients were
4  holding the shares over the ex date.
5       Q    Did ED&F do anything else as part
6  of its dividend reconciliation process?
7       A    I don't know.
8       Q    Did ED&F check whether the dividend
9  had, in fact, been received on behalf of its
10  client?
11       A    I'm unsure if that was at the point
12  of preparation of the dividend reconciliation
13  sheet.
14       Q    Were there any other steps in
15  preparing the dividend reconciliation sheet
16  that you're able to share with us?
17       A    Nothing further at this point.
18       Q    Okay.  Is it fair to say that in
19  the -- in the banking industry, when you
20  reconcile things, you've got two sources and
21  you're trying to see if they match.
22           Is that fair?
23           MR. BINDER:  Objection.  Beyond the
24       scope of his -- of his testimony as a
25       representative of ED&F.

Page 172

1       A    Could you ask the question again,
2  Mr. Oxford?
3       Q    Sure.
4            In the banking industry -- or I'll
5  tell you what, make it even easier.
6            As a speaker of the English
7  language, when you're trying to reconcile
8  things, are there usually more than one data
9  source that is trying to be reconciled, or is
10  it just one data source?
11           MR. BINDER:  Objection to form,
12       beyond the scope of the 30(b)(6) and his
13       representation of ED&F Man.
14       A    Mr. Oxford, I don't know.
15       Q    You don't know what "reconcile"
16  means?
17           MR. BINDER:  Objection to form.
18       Q    Let me ask it this way.
19           In the dividend reconciliation
20  sheet, what was being reconciled other than
21  ED&F's books and records?
22       A    I don't know.
23       Q    Just going back to -- just to
24  finish off this document -- Page 7 says that
25  "ED&F also has access to the following," and

Page 173

1  references "web portals of Deutsche Bank and
2  BNP."
3            Do you see that?
4       A    I can see that it says "access to
5  the following," and the first two I can see,
6  it says "web portal."
7       Q    Yeah.  Do you know whether -- one
8  way or another whether, as part of its
9  reconciliation process, ED&F had access to
10  web portals at BNP?
11       A    I do not know.
12       Q    Okay.  Could I ask you to turn next
13  to 4194?
14           MR. OXFORD:  Mark this as 4194.
15           (Whereupon the above mentioned was
16       marked for Identification.)
17           MR. OXFORD:  And 4195.
18           (Whereupon the above mentioned was
19       marked for Identification.)
20       Q    They're 72 and 73, respectively, in
21  your Binder 4.
22       A    Yeah.
23       Q    Which may be the first time we're
24  opening your fourth binder, which would
25  suggest we may be making some progress

Page 174

1 finally.
2      A      Which tabs, Mr. Oxford?
3      Q      So 72 and 73. Let's start with 72.
4      A      Okay.
5      Q      First of all, just take a quick
6 look and tell me whether you've seen this
7 document before.
8      A      (Witness reviewing.)
9      I don't recall seeing this document
10 before.
11      Q      Okay. So this is an e-mail
12 exchange between some personnel at BNP and
13 ED&F Man, correct, from March of 2014?
14      A      And I can see that there are ED&F
15 employees and the e-mail chain is with BNP
16 Paridas.com.
17      Q      Turning to the top of Page 2, Bates
18 number 431, is it correct that BNP is
19 "sending today's reports, which are
20 attached," and BNP attaches two files?
21      A      I can see that the e-mail -- that
22 this part of the e-mail, at the top of this
23 page, it says, "if you take today's reports,
24 attached."
25      Q      Okay.

Page 175

1      A      And then, beneath that, there's
2 reference to attached files.
3      Q      Okay. And then, if you go to the
4 third page, there's -- Bates 432 -- there's
5 an e-mail from an ED&F Man employee, Paul
6 O'Sullivan?
7      A      I see that e-mail.
8      Q      Okay. He says, "Please see
9 attached our BNP cash summary report and
10 futures cash movement report."
11      Do you see that?
12      A      I can see that's what the document
13 says.
14      Q      Okay. As part of your preparation
15 for today, did you ever learn that regular
16 reports like this were sent to ED&F Man?
17      A      As I said, from my conversations
18 with Sue Wood and Lucy Jenkins, there were
19 reference to reports in
20 which -- reconciliations with the banks.
21      But I haven't seen this document
22 before.
23      Q      But you testified earlier, I
24 thought, that the reconciliation took place
25 by way of SWIFT messages for cash, and you

Page 176

1 had no information about how the securities
2 positions were settled.
3      Is that a fair summary of your
4 testimony?
5      MR. BINDER: Objection, misstates
6      prior testimony.
7      A      Mr. Oxford, I believe I said that
8 there were reconciliations with the
9 sub-custodians which would include SWIFTs,
10 daily SWIFTs.
11      Q      Yeah. But you were not aware, as
12 part of your conversations with those
13 individuals, that there were also cash
14 summaries sent daily by BNP.
15      Correct?
16      A      I don't remember at this point.
17      Q      Okay. Can I ask you to turn,
18 please, to Exhibit 4195? That's the next tab
19 in your binder, 73.
20      A      I have it up.
21      Q      Okay. So this is -- the cover
22 e-mail is Bates ending 500. It's an e-mail
23 from Sue Wood.
24      Is that one of the people that you
25 spoke to at ED&F Man?

Page 177

1      A      Yes.
2      Q      Okay. So it's from Ms. Wood to
3 some of her colleagues in ED&F Man on
4 November 18, 2013.
5      And the subject is "Stock Position
6 and Transaction Rec."
7      Do you see that?
8      A      I see that's what the document
9 says.
10      Q      Have you seen this document -- have
11 you seen this document before?
12      A      I have not seen this e-mail before.
13      Q      Okay. She says, "Hello, I printed
14 these off, but please see attached stock
15 positions and transaction rec."
16      Do you know what she's referring
17 to?
18      A      I believe she's referring to the
19 attachment in the e-mail.
20      Q      Okay. And as part of your
21 preparation for today, did you ever learn
22 about stock -- daily stock position and
23 transaction reconciliations referenced here?
24      A      I don't recall seeing a stock
25 positions and transactions rec.

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

46 (Pages 178 to 181)

Page 178

1    Q    Okay.  Can you turn -- I think we
2  can probably do this in hard copy for now.
3         Can you turn one page over to Bates
4  501?
5    A    Yeah.
6    Q    And you see there's a stock
7  transaction rec, "Shadow to BNP."  That's the
8  heading.
9    A    I'm sorry.  In the one that I have,
10 it says, "Document produced in native form."
11   Q    Okay.  Then let's go the native.
12        So could you open up the electronic
13 document like we did for Shadow?
14   A    Yeah.
15   Q    And, you see?  You're forcing me to
16 enter the 21st century.  But I'll trying not
17 to hold it against you.
18        (Witness reviewing.)
19        MR. BINDER:  Neil, are we opening
20     up 4195, Attachment 1?
21        MR. OXFORD:  Yes, we are.
22   A    (Witness reviewing.)
23   Q    Do you have it open, sir?
24   A    Yes, I have it.
25   Q    Okay.  Great.

Page 179

1         Could you turn to the first tab,
2  which should say what I hoped your hard copy
3  would.  Apologies for that.  "Stock
4  Transaction Rec, Shadow to BNP?"
5    A    Yes, I see it says that.
6    Q    Okay.  And that's under the
7  "Instructions" tab of this file.
8         Correct?
9    A    Under the "Instructions" tab,
10 correct.
11        MR. BINDER:  I'm sorry, Neil.  Now
12     I'm not with you.  Give me --
13        MR. OXFORD:  Attachment 1 is a
14     spreadsheet, Neil.  It has a number of
15     tabs.  If you turn to the first tab that
16     says "Instructions."
17        MR. BINDER:  I got it.
18   Q    Okay.  Directing your attention to
19 Row 8, sir, there are instructions that say,
20 "Save BNP Neil Link Confirmation Report."
21        Do you see that?
22   A    I can see that the document -- the
23 spreadsheet says that.
24   Q    Okay.  Do you know what a "BNP Neil
25 Link Confirmation Report" is?

Page 180

1    A    I don't know.
2    Q    Didn't come up in your
3  conversations with Ms. Wood?
4    A    Not that I recall.
5    Q    Okay.  Then, to the right of that,
6  the detail is a location where the files
7  should be saved, which is again, the "S
8  drive."
9         Correct?
10   A    I can see that there is a file name
11 and then a location.
12        MR. BINDER:  Shahab, you're going
13     to need to wait a second to give me an
14     opportunity to object before you answer.
15     Okay?
16        THE WITNESS:  Sure.
17        MR. BINDER:  Objection, lacks
18     foundation.
19   Q    Do you know whether the "Neil Link
20 Confirmation Reports" from BNP were named and
21 saved to the "S drive" location located here
22 or anywhere within BNP -- within ED&F?
23   A    I do not.
24   Q    Okay.  Can I ask you to open
25 Attachment 2 to this document, please?

Page 181

1    A    Of course.
2    Q    Do you have it open there, sir?
3    A    No.  It seems to be a large file
4  that's still opening.
5         Okay.  I have it open.
6    Q    Great.  Could you just go to the
7  tab -- it's probably six or seven, maybe
8  more, over -- called "BNP File?"
9    A    Yes, I am on the tab.
10   Q    Okay.  Do you know what the data is
11 in that column?
12   A    Sorry.  Which column?
13   Q    The -- oh, I'm sorry.
14        In that spreadsheet, in that tab of
15 the spreadsheet?
16   A    So could you say your question from
17 the beginning, please?
18   Q    Sure.
19        Do you know what data is contained
20 in the tab called "BNP File" in this
21 spreadsheet we're looking at, Attachment 2 to
22 Exhibit 49 -- 4195?
23   A    I don't -- I do not.  I don't
24 recall seeing this document before.
25   Q    Okay.  All right.

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

Page 182

1    Do you still have Attachment 1 open
2 by any chance?
3    A    I don't, but I can open it again.
4    Q    Yeah.  Sorry.  I should -- I had
5 one question to ask you on that that I
6 forgot.
7    Just while we're -- I think we may
8 be in a good place for a break after this
9 document, okay?
10    A    I have it opened now.
11    Q    Great.  Thank you.
12    Then, turning your attention to a
13 tab called "BNP Source File," do you have
14 that?  It's about eight or nine tabs along to
15 the right?
16    A    I'm just trying to find it.
17    Okay.  I'm on it.
18    Q    Great.
19    And do you have any information
20 about what data is included in this tab of
21 Attachment 1 to Exhibit 4195?
22    A    I don't recall seeing this document
23 before, so I don't know.
24    Q    Okay.
25    MR. OXFORD:  Let's go off the

Page 183

1 record.
2    THE VIDEOGRAPHER:  Stand by.  The
3 time is 12:27 p.m. New York time and
4 we're going off the record.
5    (Lunch recess taken.)
6    THE VIDEOGRAPHER:  The time is
7 1:32 p.m. New York time and we're back
8 on record.
9    Q    Good afternoon, Mr. Hashemi.
10 Getting close to good evening to you.
11    Could you please open Exhibit 4205?
12 It should be in Tab 83 of Binder 4 for you.
13    MR. OXFORD:  Mark this as 4205.
14    (Whereupon the above mentioned was
15    marked for Identification.)
16    A    Okay.  83 of Binder 4?
17    Q    Yes.  It should be an e-mail from
18 Anthony Field to someone at the FCA, Bates
19 starting 864.
20    A    Yes, I have it in front.
21    Q    Okay.  I take it from your prior
22 answers this is not a document that you would
23 have reviewed in preparation for your
24 deposition today?
25    A    I have not seen this document

Page 184

1 before.
2    Q    Okay.  Mr. Field writes at
3 Paragraph 4 to the FCA, "The checks completed
4 by MCM to evidence receipt and/or payment of
5 net dividends when preparing the dividend
6 credit advice were explained in the
7 memorandum entitled, quotes, Process For
8 Issuing Tax Vouchers, quotes, prepared by
9 Christina McKinnon and submitted to the FCA
10 on 13 June 2018."
11    Do you see that?
12    A    I see that's what the document
13 says.
14    Q    Okay.  Do you believe you have seen
15 the 13 June 2018 memo previously?
16    A    I have not.
17    Q    Okay.  Could you turn to Bates 937?
18 It's a few pages later.
19    It's the memo that is referenced in
20 the cover e-mail.
21    A    Okay.
22    Q    Do you see there's a memo entitled
23 "Process for Issuing of Tax Vouchers?"
24    A    I see the title says, "Process for
25 the Issuing of Tax Vouchers."

Page 185

1    Q    Yeah, thanks.  I forgot the
2 definite article.  I appreciate you adding it
3 back in there.
4    It goes on to say, "The issuing of
5 tax vouchers will only be completed once the
6 relevant dividend event has been reconciled
7 and validated by both the operations team and
8 the front office and all necessary cash
9 receipts accounted for."
10    Do you see that?
11    A    I can see that that's what the
12 document says.
13    Q    Okay.  To your understanding, is
14 this an accurate summation of the process by
15 which ED&F prepared the tax vouchers it
16 issued to each of the defendant plans?
17    A    Could you ask the question again,
18 please?
19    Q    Sure.
20    To your knowledge, is this -- is
21 that statement an accurate summary of the
22 process by which ED&F prepared the tax
23 vouchers it issued to each of the defendant
24 plans?
25    A    (Witness reviewing.)

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

48 (Pages 186 to 189)

Page 186

1        As I mentioned before, in
2  preparation to my -- for the deposition, I
3  understand the dividend reconciliation sheet
4  to be the process which the operations team
5  would carry out to prepare the tax vouchers.
6      Q    And is this summary consistent or
7  inconsistent with your understanding?
8        MR. BINDER:  Objection to form,
9  vague, ambiguous.
10     A    The document says what it says,
11 Mr. Oxford.
12     Q    Do you know what the reference here
13 to "relevant dividend event" is?
14     A    I believe that would be a -- let me
15 think.  "Relevant dividend event."
16        I believe that's in reference to a
17 corporate action such as the dividend.
18     Q    Okay.  Can you explain for us what
19 the reference to "all necessary cash receipts
20 accounted for" means?
21        MR. BINDER:  Objection to form,
22 lacks foundation.
23     A    I can see that's what the document
24 says, but I don't know anything further.
25     Q    Do you have any information in

Page 187

1  connection with the dividend reconciliation
2  process at ED&F Man about how cash receipts
3  were accounted for?
4      A    I recall from the conversations, as
5  I mentioned, with Sue Wood and Lucy Jenkins
6  that there was a process for reconciling the
7  cash accounts daily, and which I believe came
8  from the SWIFT messages.
9      Q    But beyond that, you have no
10 information about what that process was.
11        Is that fair?
12     A    I don't remember at this point in
13 time.
14     Q    Okay.  Below the -- some
15 information about the particular Danske Bank
16 security, the memo goes on to say, "During
17 the dividend reconciliation, we'll identify
18 all clients who have a cum dividend position
19 and are therefore entitled to receive the
20 distribution."
21        Do you see that?
22     A    I can see that's what the document
23 says.
24     Q    Do you know what the reference to a
25 "cum dividend position" is?

Page 188

1        MR. BINDER:  Objection to form,
2  lacks foundation.
3      A    I do not.
4      Q    It says, "The next step is to
5  confirm the client's position and dividend
6  entitlement by comparing to the record date
7  analysis of positions held" -- sorry.
8  Withdrawn.  Let me clean that up.
9        Below the next table, it says, "The
10 next step is to confirm the client's position
11 and dividend entitlement by comparing to the
12 record date analysis of positions prepared by
13 the front office."
14        Do you see that?
15     A    I see that's what the document
16 says.
17     Q    Do you have any information about
18 what that's referring to?
19        MR. BINDER:  Objection, lacks
20 foundation.
21     A    I do not.
22     Q    Below the next table, it says,
23 "After receipt of dividends from the entitled
24 market position, and once relevant postings
25 had been made to the client account, we will

Page 189

1  then prepare a tax voucher."
2        Do you see that?
3      A    I can see that's what the document
4  says.
5      Q    Do you know what the reference to
6  "entitled market position" is?
7        MR. BINDER:  Objection, lacks
8  foundation.
9      A    I do not.
10     Q    Do you know whether, as part of the
11 dividend reconciliation process at ED&F, any
12 steps were taken to confirm that a market
13 payment received by ED&F was a dividend as
14 opposed to a contractual payment?
15        MR. BINDER:  Objection, vague.
16     A    Could you ask the question again,
17 please?
18     Q    Sure.
19        Do you know whether, as part of the
20 dividend reconciliation process at ED&F,
21 whether or not any steps were taken to
22 confirm that a market payment received by
23 ED&F was a dividend as opposed to a
24 contractual payment?
25        MR. BINDER:  Objection, vague.

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

49 (Pages 190 to 193)

Page 190

1      A    I know that it's part of the
2  dividend reconciliation process, that the
3  books and records of ED&F Man would be
4  checked in preparing the sheet.
5      Q    Beyond that, you have no
6  information to answer my question?
7          MR. BINDER: Objection.
8      A    I do not.
9      Q    The next sentence says, "The tax
10 vouchers are prepared by extracting the
11 already checked and verified information
12 recorded on the dividend stock record sheet."
13         Do you see that?
14     A    (Witness reviewing.)
15         I can see that's what the document
16 says.
17     Q    Do you know what a "dividend stock
18 record sheet" is at ED&F Man?
19     A    I do not.
20     Q    Do you have any information about
21 the role of a dividend stock record sheet in
22 ED&F Man's process for issuing tax vouchers?
23     A    I know that a dividend
24 reconciliation sheet was used in preparation
25 for preparing tax vouchers for the clients.

Page 191

1      Q    Okay.  That's all for that
2  document.
3          Can you open Binder 6, please?
4          MR. OXFORD: So Neil, this is
5  Exhibit 4345.
6          (Whereupon the above mentioned was
7  marked for Identification.)
8          MR. BINDER:  Exhibit 43 --
9          MR. OXFORD:  4345.
10     A    Which tab number, Mr. Oxford?
11     Q    It's 228 for you, I believe.
12     A    Okay.  You have to bear with me
13 because this binder is broken.
14     Q    Are you there, sir?
15     A    No, sorry.  This binder is broken,
16 so it's difficult for me to --
17     Q    Okay.  We can do it -- you can do
18 it from the electronic versions if that's
19 going to be easier.
20     A    I've managed to -- 228, you said?
21     Q    228.  The first page should be a
22 tax voucher for Cook?
23     A    I see -- I have the document in
24 front.
25     Q    Great.  So it's Bates ending 265.

Page 192

1          So this is a tax voucher issued by
2  ED&F Man in relation to the Tryg securities
3  and Hamlyn LP.
4          Do you see that?
5      A    (Witness reviewing.)
6          Yes, I can see that.
7      Q    Okay.  And there's some information
8  after the security description.  There's the
9  ex date, which is given as the 19th of
10 April of 2013.
11         Do you see that?
12     A    I can see that.
13     Q    Okay.  And what is the "ex date" in
14 an ED&F Man tax voucher?
15     A    The ex date is the date in which
16 the pension plan would have to hold the
17 security over to be entitled to a dividend.
18     Q    And let's say the ex date is the
19 19th.
20         When does the pension plan have to
21 start holding the security in order to be
22 entitled to a dividend?
23     A    The trade date would have to be the
24 day before, prior to that date.
25         Just can I retract or amend when I

Page 193

1  said the date?  It would have to be prior to
2  the ex date.
3      Q    Yeah, I think that's what you said.
4      A    Okay.
5      Q    The record date is below that,
6  April 23rd.
7          Do you see that?
8      A    Twenty-third.  Yes, I can see that.
9      Q    And what is the "record date"?
10     A    The record date is the date in
11 which the company checks its records to see
12 who it pays a dividend to.
13     Q    And the "pay date" is what?
14     A    The pay date is the date in which
15 the dividend is paid.
16     Q    Okay.  Directing your attention to
17 the first paragraph, "ED&F confirms that the
18 amount was paid into the account of Hamlyn LP
19 which held the security -- held the below
20 security over dividend date."
21         Do you see that?
22     A    "Confirmed that the amount was
23 paid" --
24         (Witness reviewing.)
25         Sorry.  I was just reading back the

CONFIDENTIAL
Shahab Hashemi – October 7, 2021

Page 194

1   sentence.
2           Yes, I can see that, Mr. Oxford.
3   Q   Okay.
4   A   I can see the document says that.
5   Q   In an ED&F tax voucher, what does
6   it mean when ED&F says that the customer
7   "held the below security over dividend date?"
8   A   (Witness reviewing.)
9           It means that the -- the pension
10  plan held the share prior to the ex date and
11  over the ex date.
12  Q   What do you mean, "and over the ex
13  date?"
14  A   So the trade date was prior to the
15  ex date, and the pension plan held the
16  security for the share over the ex date.
17  Q   So in this example, the trade date
18  would have to be on or before the 18th of
19  April of 2013.
20          Correct?
21  A   The trade date would have to have
22  been on or before the 18th of April.
23  Q   In order to retain its entitlement
24  to the dividends issued by Tryg, how long, in
25  ED&F's view, would the customer have to hold

Page 195

1   the security?
2           MR. BINDER:  Objection to form.
3   A   (Witness reviewing.)
4           Can you ask me the question again,
5   please, Mr. Oxford?
6   Q   Sure.
7           In order to retain its entitlement
8   to the dividends in Tryg, assuming a trade
9   date of the 18th of April 2013, in ED&F's
10  view, how long would the customer have to
11  hold the security?
12          MR. BINDER:  Objection to form,
13      calls for a legal conclusion.
14  A   I don't know.
15          THE WITNESS:  And just to note,
16      Mr. Binder, I can't hear you very well.
17      Just you're not very clear, just to let
18      you know.
19          MR. BINDER:  Thank you.
20  Q   You don't know one way or the other
21  whether ED&F's view is -- well, withdrawn.
22          If, in this situation, the ED&F's
23  customer, Hamlyn LP, had entered into an
24  agreement with -- to purchase the shares with
25  the trade date of the 18th of April, and

Page 196

1   sold them again on the 18th of April 2013,
2   would, in ED&F's view, the customer have held
3   them over the dividend date?
4   A   I believe the client was Del Mar,
5   Mr. Oxford.  You said Hamlyn.
6           And so could you ask the question
7   again?
8   Q   Well, that's a whole other can of
9   worms, so let me anonymize the question.
10  Let's see if we can get a clear answer.
11          Is it ED&F's view that if the
12  customer holding the positions -- withdrawn.
13          Is it ED&F's view that if a client
14  of ED&F entered an agreement with -- to
15  purchase these securities, Tryg, on the
16  18th of April, and entered another
17  agreement also on the 18th of April to sell
18  the same securities, would that customer have
19  held the securities over the dividend date?
20          MR. BINDER:  Objection, asked and
21      answered, calls for a legal conclusion.
22  A   The customer would have to hold the
23  dividend over the ex date to be entitled --
24  to hold the share, sorry -- over the ex date
25  to be entitled to a dividend.

Page 197

1   Q   Are you saying that the customer
2   could not sell the security until April 19,
3   2013, at the earliest, in order to retain
4   rights to the dividend and so hold the
5   security over the dividend date?
6           MR. BINDER:  Objection, calls for a
7      legal conclusion.
8           MR. BLESSINGTON:  Object as to
9      form.
10  A   The client would have to hold the
11  share over the ex date to be entitled to
12  dividend.
13  Q   Okay.  And what does "hold over the
14  ex date" mean?
15          MR. BINDER:  Objection, calls for a
16      legal conclusion.
17          MR. BLESSINGTON:  Object as to
18      form.
19  A   The trade date to acquire the share
20  would have to be prior to the ex date.
21  Q   And what's the earliest date that
22  the customer in this tax voucher could have
23  sold these securities and still retained the
24  rights to the dividend, in ED&F's view?
25          MR. BINDER:  Objection, lacks

CONFIDENTIAL
Shahab Hashemi — October 7, 2021

51 (Pages 198 to 201)

Page 198

1      foundation, calls for a legal
2      conclusion.
3      A    I don't know.
4      Q    When you say the customer had to
5  hold the securities over the ex date, do you
6  mean -- withdrawn.
7           When you say that the customer had
8  to hold the securities over the ex date, what
9  do you mean by "held?"
10     A    The client would have to acquire
11 the shares prior to the ex date and held over
12 the ex date.  I don't know how else to say
13 it.
14     Q    Okay.  Let me give you an example.
15          The ex date here is the 19th of
16 April 2013.
17          Correct?
18     A    That's what the document says.
19     Q    Is there a specific point in time
20 on a specific date by which the customer will
21 be considered to have held the security over
22 the ex date?
23          For example, if the customer holds
24 the security at 12:01 a.m. on the 19th of
25 April, does ED&F Man consider that holding

Page 199

1  over the ex date?
2           MR. BINDER:  Objection to form,
3      calls for a legal conclusion.
4           MR. BLESSINGTON:  Object as to
5      form.
6      A    The client would have had to have
7  acquired the shares prior to the ex date.
8      Q    And if the client sold the shares
9  on the ex date at 12:01 a.m., would the
10 client still have held the security over the
11 dividend date?
12          MR. BINDER:  Objection, calls for a
13     legal conclusion.
14          MR. BLESSINGTON:  Object as to
15     form.
16          MR. BINDER:  Sorry.  You can
17     answer.  I wasn't sure if you could hear
18     me.
19          THE WITNESS:  Yeah, I already did.
20     I said I don't know.
21     Q    In ED&F's view, did the trade need
22 to have settled prior to the ex date in order
23 for the customer to consider -- to be
24 considered to have held the securities over
25 the dividend date?

Page 200

1           MR. BINDER:  Objection, calls for a
2      legal conclusion.
3           MR. BLESSINGTON:  Object as to
4      form.
5      A    The trades -- the shares would need
6  to have been acquired by the clients prior to
7  the ex date.
8      Q    What does "acquired" mean?
9      A    The -- it means the trade date
10 would have to be prior to the ex date.
11     Q    The settlement date didn't have to
12 be after -- prior to the ex date?
13          Is that what you're saying?
14     A    Sorry.  Say that again?
15     Q    Is it your -- is it ED&F's view
16 that the settlement date -- in order to
17 maintain the entitlement to a dividend, the
18 trade did not have to settle prior to the
19 ex date?
20     A    The trade did not have to settle
21 prior to the ex date.
22     Q    In order to have held the security
23 over the dividend date, to use ED&F's
24 language from the tax voucher, does it matter
25 when the trade settles?

Page 201

1           MR. BINDER:  Objection to form,
2      calls for a legal conclusion.
3      A    I don't know.
4      Q    In order to have held the security
5  over the dividend date, to use ED&F's
6  language from the tax voucher, does the trade
7  have to settle at some point?
8           MR. BINDER:  Objection, calls for a
9      legal conclusion.
10     A    I don't know.
11     Q    Okay.  Let's have a new topic.
12          So in the tax vouchers that ED&F
13 issued, they all relate to Danish securities
14 that are listed on the NASDAQ Nordic
15 exchange.
16          Correct?
17     A    I -- I don't remember at this time.
18     Q    Is it correct that ED&F acquired
19 the Danish securities for their pension plan
20 customers in two ways?  One, by purchasing
21 them, and two, by borrowing them?
22     A    ED&F Man as the broker would
23 acquire shares and -- as instructed by its
24 client, either through purchasing or
25 borrowing.

CONFIDENTIAL
Shahab Hashemi – October 7, 2021

52 (Pages 202 to 205)

Page 202

1    Q    And whose decision would it be in a
2 particular case whether to acquire the shares
3 by way of purchase or borrow?
4    A    I think it would depend on the
5 availability of the shares.
6    Q    And who would determine the
7 availability of the shares?  Is that the
8 equity finance desk or someone else?
9    A    The equity finance desk would seek
10 to source the shares through an interdealer
11 broker.
12    Q    And, depending on the availability
13 of the equity finance desk, would either
14 borrow them or purchase them.
15        Is that correct?
16        MR. BINDER:  Objection to form.
17    A    I don't know.
18    Q    Is it correct that all of the
19 trades that were done in Danish securities
20 for the defendant plans were done over the
21 counter?
22    A    So, from the trade packs that I've
23 seen, the share for the security transaction
24 was OTC.
25    Q    Why were the security transactions

Page 203

1 done OTC?
2    A    This is -- this is normal market
3 practice.  They're done OTC typically because
4 it doesn't distort the price, the market.
5        It doesn't distort the market or
6 affect its price.
7    Q    Can we agree it wouldn't have been
8 possible to do the majority of the securities
9 transactions that ED&F transacted for its
10 pension plan clients because those were done
11 on an abnormal settlement cycle?
12        MR. BINDER:  Objection to form,
13    lacks foundation.
14    A    I don't know.
15    Q    Yeah.  We talked about cum ex this
16 morning.
17        Do you remember I asked you a
18 couple of questions at the start?
19    A    I recall.
20    Q    Okay.  Any further recollection
21 about what a cum ex transaction is this
22 afternoon?
23    A    No.
24    Q    Have you ever heard that a cum ex
25 transaction is one where the trade date is

Page 204

1 prior to the ex date, but the settlement date
2 takes place after the record date?
3        MR. BINDER:  Objection to form.
4    A    I haven't.  I don't know.
5    Q    So you don't know one way or
6 another whether it would have even been
7 possible to do the securities transactions on
8 an exchange?
9        MR. BINDER:  Objection, form.
10    A    I know, from the trading packs that
11 I saw, the securities transaction was done
12 OTC.
13    Q    Beyond that, you don't know
14 anything more?
15    A    I do not.
16    Q    Can you turn, please, to Exhibit
17 4344?
18        MR. OXFORD:  Mark this as 4344.
19        (Whereupon the above mentioned was
20    marked for Identification.)
21        MR. OXFORD:  I'll get you the
22    binder reference in one second.
23    Q    So it is Binder 6, Tab 227.
24    A    Okay.
25    Q    This was a document we understand

Page 205

1 was sent to the FCA as part of their
2 investigation on February 23, 2018.
3        MR. BINDER:  Neil, give me one
4    second to find the document.  4344?
5        MR. OXFORD:  Correct.
6        MR. BINDER:  All right.  I'm there.
7    Thank you.
8    Q    Have you seen this document before,
9 sir?
10    A    (Witness reviewing.)
11        I have not.
12    Q    Okay.  Looking at it now, does it
13 correctly set out the basic trade structure
14 of a securities transaction from the
15 perspective of the ED&F interdealer broker?
16    A    Where exactly are you referring to,
17 Mr. Oxford?
18    Q    Page 1.
19    A    (Witness reviewing.)
20        Based on what I read on Page 1 --
21 so, Mr. Oxford, could you ask the question
22 again?
23    A    Sure.
24        Does it correctly set out the basic
25 trade structure of a securities transaction

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

Page 206

1  from the perspective of the ED&F interdealer
2  broker?
3          MR. BINDER:  Objection, vague.
4      A   From the perspective of the
5  ED&F Man interdealer broker?  I don't know.
6      Q   Turning to Page 2, there's a
7  heading, "Future."
8      A   Okay.
9      Q   Point 4 says, "The IDB desk
10  executes a block transaction on the future
11  exchange."
12          Do you see that?
13      A   I can see that's what the document
14  says.
15      Q   Okay.  What's a "block
16  transaction?"
17          MR. BINDER:  Objection to form,
18      lacks foundation.
19      A   (Witness reviewing.)
20      I don't know enough detail to be
21  able to explain it to you.
22      Q   The next point says, "Operations
23  will give up the trades to the client's
24  clearing broker."
25          Do you know what that means?

Page 207

1      A   (Witness reviewing.)
2      I believe it refers to when a
3  futures contract is executed, the trade is
4  then, in essence, given up to the client's --
5  I realize I'm repeating what it says, but it
6  is what it means -- the trade is then given
7  up to the client's clearing broker.
8      Q   Which means, in essence, the
9  client's clearing broker will clear it rather
10  than ED&F clearing it?
11          MR. BINDER:  Objection to form.
12      A   The trade that is -- the futures
13  contract after execution will be given up to
14  the client's clearing broker.
15      Q   And the alternative to giving up is
16  what?
17      A   I don't know.
18      Q   It says, "If either client is
19  internal, this will be self-cleared."
20          Do you know what that means?
21      A   (Witness reviewing.)
22      I believe it's referring to if the
23  client is internal, then ED&F is the clearer.
24      Q   Is it correct that for the
25  securities trades in their customer

Page 208

1  accounts -- withdrawn.
2          Is it correct that for the
3  securities trades in their ED&F accounts, the
4  plans all ultimately faced either ED&F or
5  Volcafe?
6          MR. BINDER:  Objection to form.
7      A   I don't know.
8      Q   Did the equity finance deck use
9  brokers other than ED&F's own interdealer
10  broker to acquire shares for the defendant
11  pension plans?
12      A   In the trade packs that I have
13  seen, and also the approved list of IDBs, I
14  have seen brokers other than ED&F Man's own
15  equity IDB desk.
16      Q   What do you mean by an "approved
17  list?"
18      A   And that, in one of the documents,
19  it refers to a list of IDBs which have been,
20  if I'm not mistaken, approved for the desk to
21  deal with.
22      Q   Can you turn back to Exhibit 4152?
23  It's the Schedule of Agreed Facts, which is
24  your binder -- yeah, I'm sorry.
25          It's the appendix to the Schedule

Page 209

1  of Agreed Facts.  It's Binder 1, Tab 30.
2      A   Okay.
3      Q   Can you turn, please, to -- well,
4  first of all, have you seen this document
5  before?
6          It's an appendix to the Schedule of
7  Agreed Facts that we talked about earlier.
8      A   I've seen a version of this
9  document, but not this exact one.
10      Q   Okay.  Turning your attention to
11  Paragraph 11, which is on -- starts on Page 5
12  and goes through Page 7?
13      A   Okay.
14      Q   It says, "The below table lists
15  interdealer brokers used for the security
16  acquisitions and their settlement agent
17  details."
18          Do you see that?
19      A   I see that's what it says.
20      Q   Have you seen information similar
21  to this in other versions of the agreed
22  schedule of facts?
23      A   I have seen information similar to
24  this in other versions of this Appendix 2 of
25  the Schedule of Agreed Facts.

Page 210

1    Q    Do you understand this list of
2  interdealer brokers to equate to the list of
3  approved brokers you told us about a moment
4  ago?
5    A    (Witness reviewing.)
6         These interdealer brokers are in
7  line with the trade packs that I've seen.
8    Q    Okay.  And are they also in line
9  with the approved list of brokers you told us
10 about a few minutes ago?
11   A    I don't remember at this moment in
12 time, Mr. Oxford.
13   Q    When ED&F is purchasing shares
14 through one of these brokers listed in Table
15 11, Paragraph 11, is it correct that no one
16 at ED&F would know the ultimate source of the
17 shares?
18        MR. BINDER:  Objection to form,
19     compound.
20   A    Can you please ask the question
21 again?
22   Q    Sure.
23        Is it correct that when ED&F
24 purchased securities through one of the
25 brokers listed in Paragraph 11, that ED&F

Page 211

1  would not know the ultimate source or seller
2  of the shares?
3         MR. BINDER:  Objection, compound.
4    A    I'm sorry.  I don't remember at
5  this exact moment in time.
6    Q    Do you know, from your experience
7  in the market with -- when dealing with
8  third-party brokers, do you see the ultimate
9  counterparty on the other side, or just the
10 broker?
11        MR. BINDER:  Objection to form.
12   A    I can't comment in relation to the
13 scope of this deposition.
14   Q    Okay.  And do you have any
15 experience, working with ED&F Man for the
16 last seven years, that enables you to answer
17 my question?
18        MR. BINDER:  Objection, beyond the
19     scope of the -- as a corporate
20     representative.
21   A    On a futures contract that's bought
22 on exchange, the counterparty is the
23 exchange.  Other than that, I'm not able to
24 speak from my experience.
25   Q    Okay.  Is it correct that when the

Page 212

1  Danish securities were acquired ultimately
2  for the defendant pension plans, through
3  either ED&F Man's interdealer broker or
4  Volcafe, ED&F was able to trace the ultimate
5  counterparty to those transactions?
6         MR. BINDER:  Objection to form.
7    A    Can you please ask me the question
8  again?
9    Q    Is it correct that when the Danish
10 securities were ultimately acquired for the
11 defendant pension plans, through either
12 ED&F Man's own interdealer broker or Volcafe,
13 ED&F was able to trace the ultimate
14 counterparty to those transactions?
15   A    I'm not sure.  I don't know.
16   Q    Okay.  Can you turn to Paragraph
17 10?  It's the preceding paragraph of the
18 Schedule to the Agreed -- the appendix to the
19 Schedule of Agreed Facts?
20   A    Okay.  Okay.  I see it.
21   Q    Okay.  You see it says, "Where the
22 security was acquired for the pension plans
23 through ED&F Man's interdealer broker or
24 Volcafe, the ultimate counterparty can be
25 traced as one of the following," and then it

Page 213

1  lists 15 different counterparties.
2         Do you see that?
3    A    Yes, I can see that in the
4  document.
5    Q    Do you know whether that list is
6  correct?
7    A    The counterparties are in line with
8  what I have seen in the trade pack.
9    Q    Can you -- withdrawn.
10        Is it correct that the trade packs
11 were compiled by ED&F's English attorneys,
12 Rosenblatt?
13   A    I believe so.
14   Q    How did Rosenblatt determine the
15 counterparty from which ED&F acquired the
16 shares for the plans?
17        MR. BINDER:  Objection to form,
18     lacks foundation.
19   A    I don't know.
20   Q    Can you turn, please, to Exhibit --
21 where are we -- 4345, which is Binder 6, Tab
22 228.
23   A    Okay.
24   Q    Are you familiar with that
25 document, sir?

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

55 (Pages 214 to 217)

Page 214

1    A    It's the same one we just saw.
2    Q    Yeah.  And are you familiar with
3 the documents behind the tax voucher we
4 looked at?
5    A    I've seen so many tax -- so many
6 trade packs that I'm not sure if I've seen
7 this exact one.  But I should be familiar
8 with the information in it.
9    Q    Okay.  So can I ask you to turn to
10 the second page?
11    A    So what's the reference at the
12 bottom?
13    Q    266.
14    A    Okay.  Yes, I have it in front of
15 me.
16    Q    Okay.  So this is a request from
17 Mr. Manek at Duet to some folks at ED&F.
18         Correct?
19    A    The e-mail?  Yes, from Sanjeet
20 Manek of Duet to people at ED&F Man.
21    Q    Okay.  And what Mr. Manek is asking
22 is to buy 1.5 million shares of Tryg at T
23 plus 4 settlement.
24    A    (Witness reviewing.)
25         I can see that's what the document

Page 215

1 says.
2    Q    Okay.  And then Ms. Mina replies,
3 and says, "Hi, Sanjeet.  I have attached both
4 the actual confirm and the e-mail showing the
5 time stamp of when the trade was done."
6         Do you see that?
7    A    I can see that's what the document
8 says.
9    Q    Why was the time of the trade
10 important?
11    A    I don't know.
12    Q    Is the time of the trade relevant
13 to dividend entitlement in ED&F's view?
14    A    The pension plan would have to hold
15 the share prior to the ex date to be entitled
16 to dividend.
17    Q    Was there a particular time on the
18 day prior to the ex date where the trade
19 would need to be agreed, again in order to
20 ensure entitlement to a dividend?
21    A    I don't know.
22    Q    Can you turn to page with the Bates
23 Number 270?  It's the Volcafe confirmation.
24    A    Okay.
25    Q    It's a confirmation showing a sale

Page 216

1 of 1.5 million shares of Tryg to Hamlyn LP.
2         Correct?
3    A    I can see that the total quantity
4 is 1.5 million and it's sold to ED&F Man
5 Capital Markets Limited on behalf of Hamlyn
6 LP.
7    Q    Do you know why the 1.5 million
8 shares are split into those three lots of
9 600,000, 500,000, and 400,000?
10    A    I do not know.
11    Q    Are those referred to as "splits"
12 or "shapes" in the business?
13    A    I'm familiar with these being
14 referred to as "splits" or "shapes."
15    Q    What's the reason for splitting
16 into splits or shapes like this, if you know?
17    A    Typically, trades are split into
18 shapes to aid -- to aid settlement.
19    Q    And how does splitting into shapes
20 aid settlement?
21    A    By reducing the number of the
22 quantity of shares in each shape reduces the
23 risk of a settlement failing.
24    Q    Do you know where Volcafe acquired
25 the shares to sell to Hamlyn?

Page 217

1    A    I would have to look at the rest of
2 the trade pack to see if I can identify it.
3    Q    Okay.  Turning your attention to
4 the next page, Bates 271?
5    A    Okay.
6    Q    Is this a trade confirmation from
7 Mr. Scofield of the ED&F interdealer broker
8 confirming that Mitsubishi is selling the
9 1.5 million shares of Tryg to ED&F's IDB?
10         MR. BINDER:  Objection to form.
11    A    Excuse me.  Say that again, please?
12         MR. OXFORD:  Can you read it back,
13 Mike?
14         (Whereupon the record was read back
15 by the reporter.)
16    A    This is a Bloomberg confirmation
17 sent by Paul Scofield to Rizwan Addie at
18 Mitsubishi USA Securities.
19    Q    And what information does the
20 Bloomberg confirm say?
21    A    The Bloomberg confirmation to
22 Rizwan Addie Mitsubishi USA Securities says
23 that "to confirm, Mitsubishi USA sell the
24 following," and it's 1.5 million shares of
25 Tryg.

CONFIDENTIAL
Shahab Hashemi — October 7, 2021

56 (Pages 218 to 221)

Page 218

1    Q    Do you know if these are the same
2 shares that Volcafe sold to Hamlyn?
3    A    Is it okay to see the rest of the
4 trade pack, Mr. Oxford?
5    Q    Let me just finish the specific
6 questions, and then let's revisit that
7 question, if we may.
8    A    Sure.
9    Q    Can you turn to Pages 12 to 14 of
10 the document?  The Bates numbers start at 76
11 and go through 78.
12    A    Okay.
13    Q    Okay.  Are these SWIFT messages?
14    A    These are SWIFT messages.
15    Q    Okay.  Who sent them?
16    A    (Witness reviewing.)
17        MR. OXFORD:  Just for the record,
18    the witness has been reviewing the three
19    pages for the last three minutes.
20    Q    Can you tell me, sir, if there's
21 any information in these SWIFT messages that
22 tells you who sent them?
23    A    Yeah.  I'm sorry.
24        MR. BINDER:  Just for the record, I
25    don't actually think it was three

Page 219

1    minutes, but there's a time stamp on the
2    transcript.
3        THE WITNESS:  Sure.
4    A    Mr. Oxford, I can't seem to
5 identify it at this point in time.
6    Q    So sitting here today, you can't
7 point us to anywhere in this SWIFT that
8 indicates that this settlement record is for
9 shares from Mitsubishi for sure.
10    Right?
11        MR. BINDER:  Hang on one second.
12    So that is a different question than
13    your prior question.  If you want more
14    time to review the document to answer
15    Mr. Oxford's question, you should take
16    it.  And when you're done with your
17    review, you're ready to answer his
18    question, you can do that.
19        But Mr. Oxford, you can't cut him
20    off in the middle of reviewing the
21    document.  So what is the question you'd
22    like him to answer?
23        MR. OXFORD:  Can you read it back,
24    Mike?
25        (Whereupon the record was read back

Page 220

1    by the reporter.)
2        MR. BINDER:  So objection,
3    mischaracterizes the evidence.  And Mr.
4    Hashemi, take your time and —— take your
5    time, and when you're done reviewing,
6    then you can answer Mr. Oxford's
7    question.
8        THE WITNESS:  Sure.
9    A    So ——
10        THE WITNESS:  I'm sorry.  But Mike,
11    could you reread Mr. Oxford's last
12    question, please?
13        MR. OXFORD:  Let me ask a simpler
14    one.
15    Q    Who sent the SWIFT?
16    A    Right now, I don't know.  But I
17 would like to ask if I —— can I take a break,
18 please?
19        We've been going for over an hour,
20 and I quite desperately need the break.
21    Q    Well, there's a question pending.
22 Just answer the question, and then you can
23 take a break.
24    A    Sorry.  I thought I answered it.
25        I said right at this moment in

Page 221

1 time, I can't point out where on the SWIFT.
2    Q    Okay.  Are you finished with your
3 answer?
4        MR. BINDER:  So, Mr. Oxford, if you
5    want to give him more time to look at it
6    and review it, you're going to have to
7    let him take a break.  He's testified
8    that based upon the amount of time he's
9    reviewed it, he can't identify it now.
10    So we're not going to hold him up from
11    having to go to the restroom which he's
12    asked for.
13        MR. OXFORD:  Let's go off the
14    record.
15        THE VIDEOGRAPHER:  Stand by.  The
16    time is 2:38 p.m. New York time and
17    we're going off the record.
18        (Brief recess taken.)
19        THE VIDEOGRAPHER:  Stand by.  The
20    time is 2:55 p.m. New York time and
21    we're back on record.
22    Q    Mr. Hashemi, I understand from your
23 counsel that after the consideration of the
24 break, you wished to correct an earlier
25 statement.

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

Page 222

1    A    Yeah.  Mr. Oxford, you asked me
2 about when the share can be sold, and -- and
3 I just wanted to clarify my answer, that
4 after -- on or after the ex date, the share
5 can be sold.
6         So, to be clear, the pension plan
7 or client withhold the share, or the trade
8 date would be prior to the ex date, and hold
9 on or over the ex date, and -- but to answer
10 your question of when it can be sold, and in
11 line with the Schedule of Agreed Facts which
12 I refreshed myself with, it can be sold on or
13 after the ex date.
14   Q    Okay.  It's just a yes-or-no
15 question.
16        Did you talk to any counsel
17 representing ED&F Man on the break?
18   A    Yes.
19   Q    When you say "on or after the
20 ex date," is there a particular time on or
21 after the ex date the share can be sold and
22 the pension plan retains the right to a
23 dividend?
24   A    The pension plan needs to hold the
25 share over the ex date, which would mean over

Page 223

1 midnight of the ex date.
2    Q    So it's your testimony that at
3 12:01 a.m. on the ex date, the pension plan
4 could sell the shares and still retain the
5 right to the dividend?
6    A    I understand that if a pension plan
7 instructed to sell a share one minute past
8 midnight of the ex date, they're entitled to
9 the dividend.
10   Q    And what is your understanding
11 based on, sir?
12   A    The Schedule of Agreed Facts
13 states -- apologies.  I said that the
14 Schedule of Agreed Facts that states the
15 company's position in this Volume 1 that I'm
16 seeing, on Clause 82.
17   Q    So you're referring to Exhibit
18 4151?
19   A    It's Tab 29 of Volume 1.
20   Q    Yes.  That's Exhibit 4151.
21        MR. OXFORD:  Could we go off the
22 record for one second?
23        THE VIDEOGRAPHER:  Stand by.  The
24 time is 2:59 p.m. New York time and
25 we're going off the record.

Page 224

1         (Whereupon a discussion was held
2 off the record.)
3         THE VIDEOGRAPHER:  Stand by.  The
4 time is 3:00 p.m. New York time and
5 we're back on record.
6    Q    So, Mr. Hashemi, do you have
7 Paragraph 82 of the Schedule of Agreed Facts
8 in front of you?
9    A    I do, yes.
10   Q    Okay.  Can you point me to the
11 section that you refreshed your recollection
12 on over the break?
13   A    It says here -- it's under the
14 heading, it says "16, Pension Plan Sell
15 Orders and Confirmations," and then it's 82,
16 and it says, "On or after the ex date, the
17 equity finance desk either," and then it's
18 got the two paragraphs.
19   Q    And it's from that that you
20 conclude that ED&F's position is that the
21 pension plan can sell the share at 12:01 a.m.
22 on the ex date and retain rights to the
23 dividend?
24   A    (Witness reviewing.)
25        Yes.  It's from this document that

Page 225

1 I refreshed my memory that the pension plan
2 can sell the share on or after the ex date
3 and being still entitled to dividend.
4    Q    Okay.  Thank you for that
5 clarification.
6         Can we go back to the document we
7 were looking at just before the break, which
8 was Exhibit 4345?
9         You should still have it open, sir.
10   A    Yeah.  It says Tab 228, right?
11   Q    Tab 228 in Binder 6 for you, yes.
12   A    Okay.
13   Q    Okay.  You'll see at Line 29 on the
14 SWIFTs, it's the same for all three, the
15 seller uses an account number ending in 373.
16   A    Yes, I can see that row -- I'm
17 sorry.  Let me withdraw.
18        In Row 29, I can see that the
19 account number ends in 373.
20   Q    And that's the same for all three
21 shapes.
22        Correct?
23   A    For all three of these SWIFT
24 confirmations in Row 29, the final three
25 digits are 373.

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

58 (Pages 226 to 229)

Page 226

1       Q      Can we agree that that is an
2    account used by both Volcafe and ED&F Man's
3    interdealer broker?
4       A      Could I -- could I take a look at
5    Appendix 2, please, Mr. Oxford?
6       Q      Sure.  So that's Exhibit 4152, Tab
7    30 of your first binder.
8       A      (Witness reviewing.)
9       Q      Are you looking at Page 5?
10              It's the Table 11 that we looked at
11   earlier, sir.
12      A      Yes, I'm looking at Page 5.
13      Q      Okay.  And you'll see that the
14   second entry is ED&F Man's IDB and the
15   security account ends in 373.
16              And it's the same account at the
17   bottom of the page for Volcafe.
18              Correct?
19      A      Yes, I can see that in the
20   document.
21      Q      Okay.  So can you agree with me
22   that the SWIFTs included in the trade pack
23   for Hamlyn that we're looking at represent
24   the sales from Volcafe to Hamlyn, and not
25   from Mitsubishi?

Page 227

1       A      (Witness reviewing.)
2              These trades, these SWIFTs, would
3    be in relation to Volcafe sending to ED&F Man
4    on behalf of Hamlyn.
5       Q      Is there any evidence in this trade
6    pack of the settlement of the sale by
7    Mitsubishi to the ED&F IDB?
8       A      If you -- if you'd give me some
9    time to look at the trade pack, please?
10      Q      Sure.
11      A      (Witness reviewing.)
12              MR. BINDER:  Sorry.  What exhibit
13      are we looking at right now?  Are we
14      looking at --
15              MR. OXFORD:  It's the trade pack.
16      It's Exhibit 4345.
17              MR. BINDER:  Thank you.
18      A      (Witness reviewing.)
19              Mr. Oxford, what was your question?
20      Q      Is there any evidence in this trade
21   pack of the settlement of the sale by
22   Mitsubishi to the ED&F IDB?
23              MR. BINDER:  Objection.
24      A      (Witness reviewing.)
25              Mr. Oxford, I don't know.  I can't

Page 228

1    point anything out with this one at this
2    moment in time.
3       Q      Okay.  New topic.
4              You mentioned that, as part of your
5    preparation, you talked to an ED&F colleague
6    about stock lending agreements.
7              Do you remember telling me that
8    towards the start of the day?
9       A      I do remember.
10      Q      Okay.  Can you remind me who the
11   colleague was that you spoke to?
12      A      Catherine Odigie.
13      Q      She's the head of legal?
14      A      She is.
15      Q      And what information did she tell
16   you about the stock lending arrangements that
17   were relevant to the defendant plans trading
18   in Danish securities at ED&F Man?
19      A      I would have asked her about which
20   agreement governed securities lending, to
21   which she pointed out to me that the GMSLA
22   was the underlying agreement.
23      Q      Did you discuss any particular
24   terms to the GMSLA with her?
25      A      I don't remember right now,

Page 229

1    Mr. Oxford.  But I would have asked her
2    questions and I would have found comfort at
3    the time having spoken to her.
4       Q      What -- when you say "comfort at
5    the time," what would you have gotten
6    comfortable at the time about?
7       A      Comfortable on the questions that I
8    had.
9       Q      Okay.  Sitting here today, can you
10   remember one of the questions?  Just one?
11      A      Yes.  One of the questions I
12   remember asking was what the "GMSLA" stands
13   for.
14      Q      Okay.  Other than what "GMSLA"
15   stands for, did you ask her any questions
16   that you can recall today about stock lending
17   arrangements relevant to the defendant plans
18   trading in Danish securities?
19      A      I don't remember right now.
20              MR. OXFORD:  Let's go off the
21      record.
22              THE VIDEOGRAPHER:  Stand by.  The
23      time is 3:12 p.m. New York time and
24      we're going off the record.
25              THE COURT REPORTER:  Recapping

Page 230

```
1   orders, Hughes Hubbard, nine realtime
2   hookups, rough draft, two business day
3   final.
4        Wilmer Hale, two realtime hookups,
5   rough draft, regular final.
6        Hanamirian, two realtime hookups,
7   rough draft, regular final.
8        Kostelanetz, one realtime, regular
9   final.
10        K&L Gates, one realtime, rough
11   draft, regular final.
12        Binder Schwartz, two realtime
13   hookups, rough draft, regular final.
14        Rosenblatt Law, one realtime
15   hookup.
16
17
18
19
20
21
22
23
24
25
```

Page 231

```
1           C E R T I F I C A T E
2
3        I, MICHAEL FRIEDMAN, a Certified Court
4   Reporter and Notary Public, qualified in and for
5   the State of New Jersey do hereby certify that
6   prior to the commencement of the examination SHAHAB
7   HASHEMI was duly sworn by me to testify to the
8   truth the whole truth and nothing but the truth.
9        I DO FURTHER CERTIFY that the foregoing
10   is a true and accurate transcript of the testimony
11   as taken stenographically by and before me at the
12   time, place and on the date hereinbefore set forth.
13        I DO FURTHER certify that I am neither a
14   relative nor employee nor attorney nor counsel
15   for any of the parties to this action, and that I
16   am neither a relative nor employee of such attorney
17   or counsel, and that I am not financially
18   interested in the action.
19
20   _____
21
22   MICHAEL FRIEDMAN, CCR of the
23   State of New Jersey
24   License No:  30XI00228600
25   Date:  October 8, 2021
```

Page 232

```
1                LAWYER'S NOTES
2   PAGE  LINE
3   ____  ____    _____
4   ____  ____    _____
5   ____  ____    _____
6   ____  ____    _____
7   ____  ____    _____
8   ____  ____    _____
9   ____  ____    _____
10   ____  ____    _____
11   ____  ____    _____
12   ____  ____    _____
13   ____  ____    _____
14   ____  ____    _____
15   ____  ____    _____
16   ____  ____    _____
17   ____  ____    _____
18   ____  ____    _____
19   ____  ____    _____
20   ____  ____    _____
21   ____  ____    _____
22   ____  ____    _____
23   ____  ____    _____
24   ____  ____    _____
25   ____  ____    _____
```

Page 233

```
1        DEPOSITION ERRATA SHEET
2
3   DECLARATION UNDER PENALTY OF PERJURY
4        I declare under penalty of perjury
5   that I have read the entire transcript of
6   my Deposition taken in the captioned matter
7   or the same has been read to me, and
8   the same is true and accurate, save and
9   except for changes and/or corrections, if
10   any, as indicated by me on the DEPOSITION
11   ERRATA SHEET hereof, with the understanding
12   that I offer these changes as if still under
13   oath.
14
15
16
17   Signed on the _____ day of
18   _____, 20____
19
20   _____
21        SHAHAB HASHEMI
22
23
24
25
```

CONFIDENTIAL
Shahab Hashemi - October 7, 2021

60 (Pages 234 to 235)

| | Page 234 |
|---|---|

```
1              DEPOSITION ERRATA SHEET
2    Page No. _____Line No. _____Change to:_____
3    _____
4    Reason for change:_____
5    Page No. _____Line No. _____Change to:_____
6    _____
7    Reason for change:_____
8    Page No. _____Line No. _____Change to:_____
9    _____
10   Reason for change:_____
11   Page No. _____Line No. _____Change to:_____
12   _____
13   Reason for change:_____
14   Page No. _____Line No. _____Change to:_____
15   _____
16   Reason for change:_____
17   Page No. _____Line No. _____Change to:_____
18   _____
19   Reason for change:_____
20   Page No. _____Line No. _____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25             SHAHAB HASHEMI
```

| | Page 235 |
|---|---|

```
1              DEPOSITION ERRATA SHEET
2    Page No. _____Line No. _____Change to:_____
3    _____
4    Reason for change:_____
5    Page No. _____Line No. _____Change to:_____
6    _____
7    Reason for change:_____
8    Page No. _____Line No. _____Change to:_____
9    _____
10   Reason for change:_____
11   Page No. _____Line No. _____Change to:_____
12   _____
13   Reason for change:_____
14   Page No. _____Line No. _____Change to:_____
15   _____
16   Reason for change:_____
17   Page No. _____Line No. _____Change to:_____
18   _____
19   Reason for change:_____
20   Page No. _____Line No. _____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25             SHAHAB HASHEMI
```