# Exhibit 3

Page 236

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

MASTER DOCKET 18-MD-2865(LAK)

CASE NO. 18-CV-09797


_____
                                        )
IN RE:                                  )
                                        )
CUSTOMS AND TAX ADMINISTRATION OF       )
THE KINGDOM OF DENMARK                  )
(SKATTEFORVALTNINGEN) TAX REFUND        )
SCHEME LITIGATION                       )
                                        )
_____)



C O N F I D E N T I A L



REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL
EXAMINATION OF
SHAHAB HASHEMI
VOLUME II
DATE: October 8, 2021






REPORTED BY:  MICHAEL FRIEDMAN, CCR

Page 237

5          TRANSCRIPT of the videotaped deposition
6  of the witness, called for Oral Examination in the
7  above-captioned matter, said deposition being taken
8  by and before MICHAEL FRIEDMAN, a Notary Public and
9  Certified Court Reporter of the State of New Jersey,
10 via WEBEX, ALL PARTIES REMOTE, on October 8, 2021,
11 commencing at approximately 7:02 in the morning.

Page 238

1  A P P E A R A N C E S :
2
   HUGHES, HUBBARD & REED
3  One Battery Park Plaza
   New York, NY  10004
4  BY:   NEIL OXFORD, ESQ.
         BILL MAGUIRE, ESQ.
5        MARC A. WEINSTEIN, ESQ.
         CAROLYN HARBUS, ESQ.
6        JAMES HENSELER, ESQ.
         JOHN MCGOEY, ESQ.
7        VALERIE CAHAN, ESQ.
         ERIN PAMUKCU, ESQ.
8        VICTOR SANDOVAL, ESQ.
         MAUREEN HOWLEY, ESQ.
9        GREGORY FARRELL, ESQ.
         ELIZABETH ZHOU, ESQ.
10       DEBBIE PLACID, ESQ.
         SIOBHAN D'ANGELO, ESQ.
11       Via VTC
   Attorneys for SKAT
12
13 HANAMIRIAN LAW FIRM
   40 E. Main Street
14 Moorestown, NJ  08057
   BY:   JOHN M. HANAMIRIAN, ESQ.
15       ELZA GRIGORYAN
         Via VTC
16 Attorneys for Acorn Capital
17 THE MOORE TAX LAW GROUP
   11 Broadway
18 New York, NY  10004
   BY:   ZHANNA A. ZIERING, ESQ.
19       Via VTC
   Attorneys for Klugman and Kenning
20
21 KAPLAN RICE
   142 West 57th Street
22 New York, NY  10019
   BY:   Y. KATIE WANG, ESQ.
23       MICHELLE RICE, ESQ.
         Via VTC
24 Attorneys for Albedo, et al
25

Page 239

1  A P P E A R A N C E S :
2
   KOSTELANETZ & FINK
3  250 Greenwich Street
   New York, NY  10007
4  BY:   NICHOLAS H. BAHNSEN, ESQ.
         BRYAN C. SKARLATOS, ESQ.
5        CAROLINE CIRAOLO, ESQ.
         ERIC SMITH, ESQ.
6        DANIEL DAVIDSON, ESQ.
         SHARON L. MCCARTHY, ESQ.
7        JULIET L. FINK, ESQ.
         Via VTC
8  Attorneys for Azalea, et al
9
   K&L GATES
10 One Lincoln Street
   Boston, MA  02111
11 BY:   JOHN GAVIN, ESQ.
         BRANDON DILLMAN, ESQ.
12       DAVID FINE, ESQ.
         JOHN BLESSINGTON, ESQ.
13       ANNA E. L'HOMMEDIEU, ESQ.
         Via VTC
14 Attorneys for Alexander Jamie Mitchell, et al
15
16 GUSRAE, KAPLAN & NUSBAUM
   120 Wall Street
17 New York, NY  10005
   BY:   KARI PARKS, ESQ.
18       MARTIN H. KAPLAN, ESQ.
         Via VTC
19 Attorneys for Goldstein
20
21
22
23
24
25

Page 240

1  A P P E A R A N C E S :
2
   WILMER HALE
3  7 World Trade Center - 250 Greenwich Street
   New York, NY  10007
4  BY:   ALAN SCHOENFELD, ESQ.
         MICHAEL BONGIORNO, ESQ.
5        CARY GLYNN, ESQ.
         JULIA C. PILCER, ESQ.
6        RACHEL CRAFT, ESQ.
         ANDREW DULBERG, ESQ.
7        BRITTANY LLEWELLYN, ESQ.
         Via VTC
8  Attorneys for Avanix, et al
9
10
   BINDER & SCHWARTZ
11 366 Madison Avenue
   New York, NY  10017
12 BY:   NEIL S. BINDER, ESQ.
         GREGORY C. PRUDEN, ESQ.
13       WENDY H. SCHWARTZ, ESQ.
         M. TOMAS MURPHY, ESQ.
14       Via VTC
   ATTORNEYS for ED&F Man
15
16 DEWEY, PEGNO & KRAMARSKY
   777 Third Avenue
17 New York, NY  10017
   BY:   SEAN MULLEN, ESQ.
18       DAVID PEGNO, ESQ.
         THOMAS E.L. DEWEY, ESQ.
19       Via VTC
   Attorneys for Michael Ben-Jacob
20
21 WILLIAMS & CONNOLLY
   725 12th STREET, NW
22 Washington, DC  20005
   BY:   AMY B. MCKINLAY, ESQ.
23       STEPHEN D. ANDREWS, ESQ.
         Via VTC
24 Attorneys for Sander Gerber Pension Plan
25

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

3 (Pages 241 to 244)

---

Page 241

```
 1  A P P E A R A N C E S:
 2
 3  KATTEN
    575 Madison Avenue
 4  New York, NY  10022
    BY:   DAVID GOLDBERG, ESQ.
 5        MICHAEL ROSENAFT, ESQ.
          Via VTC
 6  Attorneys for Klugman
 7
    SEWARD & KISSEL
 8  One Battery Park Plaza
    New York, NY  10004
 9  BY:   SHREY SHARMA, ESQ.
          THOMAS R. HOOPER, ESQ.
10        MARK J. HYLAND, ESQ.
          Via VTC
11  Attorneys for Bernard Tew
12
    LAW OFFICES OF SHELDON S. TOLL
13  2000 Town Center
    Southfield, MI  48075
14  BY:   SHELDON S. TOLL, ESQ.
          Via VTC
15  Attorneys for Hoffmeister
16
    MORVILLO, ABROMOWITZ, GRAND, IASON & ANELLO
17  565 5th Avenue
    New York, NY  10017
18  BY:   RICHARD WEINBERG, ESQ.
    Attorneys for Clove Pension Plan, Mill River
19  Pension Plan, Traden Investment Pension Plan
20
21
22
23
24
25
```

---

Page 242

```
 1  ALSO PRESENT:    JOSE RIVERA, Videographer
 2                   KIRSTEN MARIE DONATO, ESQ.
                     KAMMERADVOKATEN POUL SCHMITH
 3
                     CHARLOTTE WOODWARD
 4                   ROSENBLATT LAW
 5                   KATRINE HOVGAARD B□EGH, ESQ.
 6                   CHRISTINE P. VINTHOR
 7                   CHRISTIAN B□LOW
 8                   MARISE H□RBY SALVESEN
 9                   ANNE CHRISTINE K. EGHOLM
10                   ANNA L'HOMMEDIEU
11                   JENS KJAEGAARD
12                   JOHN ACKLEY
13                   LUTHER KISANGA
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 243

```
 1               I N D E X
 2
 3  WITNESS NAME                        PAGE
 4  SHAHAB HASHEMI
 5  Examination By:
 6           By Mr. Oxford               249
 7           By Mr. Kaplan               394
 8           By Mr. Blessington          416
 9
10               * * * * * *
11
12             E X H I B I T S
13
14  NO.                                 PAGE
15  Exhibit 4374-4375   ED&F 45042-45086 -    257
                        ED&F 44966-44984
16
    Exhibit 4376-4377   ED&F 190637-190639 -  262
17                      ED&F 190382-190384
18  Exhibit 4378        ED&F 20228            266
19  Exhibit 4381        ED&F 195700-195702    268
20  Exhibit 4382        ED&F 152620-152628    272
21  Exhibit 4383        ED&F 201770-201771    273
22
23
24
25
```

---

Page 244

```
 1           E X H I B I T S (CONTINUED)
 2
 3  NO.                                      PAGE
 4  Exhibit 4391      ED&F Pleading          276
 5  Exhibit 4385      ED&F 408662-408664     280
 6  Exhibit 4384      ED&F 190631-190635     281
 7  Exhibit 4400      ED&F 190500-190503     283
 8  Exhibit 4401      ED&F 436911            285
 9  Exhibit 4395      ED&F 408660            304
10  Exhibit 4366      Table of Proposed      318
                      Trades
11
    Exhibit 4423      ED&F 60769-60770       320
12
    Exhibit 4424      ED&F 195488            323
13
    Exhibit 4430      Statement of Facts     327
14
    Exhibit 4259      January 13, 2020 letter 336
15
    Exhibit 4210      Letter dated March 18, 350
16                    2020
17  Exhibit 4350      ED&F 390913            360
18  Exhibit 4353      ED&F 393904-393910     368
19  Exhibit 4354-4355 ED&F 189714, ED&F      370
                      342631
20
    Exhibit 4356      ED&F 393879-393880     378
21
22
23
24
25
```

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

4 (Pages 245 to 248)

| | Page 245 |
|---|---|
| 1 | E X H I B I T S (CONTINUED) |
| 2 | |
| 3 | NO.                                    PAGE |
| 4 | Exhibit 4357        ED&F 394429-394436        382 |
| 5 | Exhibit 4358        ED&F 338068, ED&F        384 |
| | 380816 |
| 6 | |
| | Exhibit 4338        ED&F 495359-495362        395 |
| 7 | |
| | Exhibit 4339        ED&F 346815-346818        397 |
| 8 | |
| | Exhibit 4411        ED&F 444029-444033        408 |
| 9 | |
| | Exhibit 4165        ED&F 444950-444954        408 |
| 10 | |
| | Exhibit 4271        ED&F 216655-216668        409 |
| 11 | |
| | Exhibit 4418        ED&F 53123-53125          411 |
| 12 | |
| 13 | |
| 14 | * * * * * * |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 246 |
|---|---|
| 1 | - - - |
| 2 | Deposition Support Index |
| 3 | - - - |
| 4 | |
| 5 | Direction to Witness Not to Answer |
| 6 | Page Line      Page Line      Page Line |
| 7 | None |
| 8 | |
| 9 | Request for Production of Documents |
| 10 | Page Line      Page Line      Page Line |
| 11 | None |
| 12 | |
| 13 | Stipulations |
| 14 | Page Line      Page Line      Page Line |
| 15 | None |
| 16 | |
| 17 | Questions Marked |
| 18 | Page Line      Page Line      Page Line |
| 19 | None |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 247

1    THE COURT REPORTER:  My name is
2  Michael Friedman, a Certified Shorthand
3  Reporter.  This deposition is being held
4  via videoconferencing equipment.
5    The witness and reporter are not in
6  the same room.  The witness will be
7  sworn in remotely pursuant to agreement
8  of all parties.  The parties stipulate
9  that the testimony is being given as if
10  the witness was sworn in person.
11  ///
12  ///
13  ///
14  ///
15  ///
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///

Page 248

1    THE VIDEOGRAPHER:  We are now on
2  record.  This is the continued remote
3  video-recorded deposition of Shahab
4  Hashemi.
5    Today is Friday, October 8, 2021.
6  The time is now 7:02 a.m. New York time.
7    We're here in the matter of In Re,
8  Customs and Tax Administration of the
9  Kingdom of Denmark Et Al.  All counsel
10  have been noted on record.
11    My name is Jose Rivera, remote
12  video technician, on behalf of Gregory
13  Edwards LLC.  At this time, will the
14  reporter, Michael Friedman, on behalf of
15  Gregory Edwards LLC, please re-swear in
16  the witness.
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

5 (Pages 249 to 252)

Page 249

```
1            P R O C E E D I N G S
2
3  S H A H A B   H A S H E M I,,
4            called as a witness, having been first
5  duly sworn according to law, testifies as follows:
6                    * * * * * *
7  CONTINUED EXAMINATION BY MR. OXFORD:
8       Q    Good afternoon and good morning,
9  Mr. Hashemi.
10           Could you please turn back to
11 Binder 1, Tab 28, which is the Notice of
12 Deposition?
13      A    Okay.
14      Q    You can turn to Topic 23, please.
15      A    Okay.
16      Q    Topic 23 concerns Annex E.
17           Correct?
18      A    So I missed the beginning of your
19 sentence.
20      Q    Topic 23 concerns Annex E.
21           Correct?
22      A    I can see that, yes.
23      Q    Great.
24           Tell me what you did to prepare
25 yourself on this topic.
```

Page 250

```
1       A    I reviewed tax vouchers -- sorry,
2  apologies.  I reviewed trade packs in
3  relation to Annex E and I asked questions
4  about it.
5            Yes, I asked questions about it.
6       Q    Okay.  Did you review any other
7  documents other than trade packs concerning
8  Topic 23?
9       A    I may have done, but I don't recall
10 right now.
11      Q    Okay.  Who did you ask questions
12 of?
13      A    I recall asking questions to
14 ED&F Man's attorneys.
15      Q    And what questions did you ask?
16      A    I don't recall specifically the
17 questions I asked, but it would have been in
18 relation to the substantive trades of Annex E
19 and the questions I may have had from
20 reviewing the trade packs.
21      Q    Do you remember any of the answers
22 they had to the questions that you may have
23 asked?
24           MR. BINDER:  So I would instruct
25      the witness, to the extent that
```

Page 251

```
1       attorneys conveyed factual information,
2       you can answer.  But beyond that, I
3       would instruct you not to answer.
4            If you recall at all.
5       A    Mr. Oxford, at this moment in time,
6  I don't recall exactly the answers to the
7  questions.
8       Q    Okay.  Do you recall, sitting here
9  today, what, if any, factual information
10 ED&F Man's lawyers conveyed to you on
11 Topic 23?
12           MR. BINDER:  Objection, asked and
13      answered.
14      A    I can't recall right now.
15      Q    Okay.  Is it correct that
16 ED&F Man's position is that Annex E
17 contains -- withdrawn.
18           Is it correct that ED&F Man's
19 position is that the Annex E tax vouchers
20 contain certain inaccuracies?
21      A    The Annex E tax vouchers contain
22 inaccuracies.
23      Q    Can you describe those inaccuracies
24 for me, please?
25      A    Are you able to be specific,
```

Page 252

```
1  Mr. Oxford?
2       Q    It's just a general question.
3  ED&F Man's position is that Annex E
4  references tax vouchers that are inaccurate.
5            I'm asking for your understanding,
6  as a corporate representative on a notice
7  topic here, whether you have any
8  understanding of what those inaccuracies are?
9       A    The inaccuracies are that the tax
10 vouchers in Annex E were incorrectly
11 produced.
12      Q    Can you explain what you mean,
13 "incorrectly produced?"
14      A    What I mean is that they should not
15 have been produced.
16      Q    Why should they not have been
17 produced?
18      A    Because they are inaccurate.
19      Q    In what sense are they inaccurate?
20      A    Could you repeat the question,
21 please?
22      Q    In what sense are they inaccurate?
23      A    Because -- they were inaccurate
24 because the pension plans weren't due a
25 dividend from the company.
```

Page 253

1    Q    Why were the pension plans not due
2 a dividend from the company?
3    A    Because the shares which they
4 acquired were not entitled or not due a
5 dividend.
6    Q    From whom did the pension plans
7 acquire the shares?
8    A    The pension plans instructed the
9 finance desk to source the shares and the
10 ultimate counterparty in Annex E was
11 MPT Dubai.
12    Q    And why were the shares that the
13 plans acquired not entitled or due a
14 dividend?
15    A    Sorry, Mr. Oxford.  Could you say
16 that again?
17    Q    Yeah.  Why were the shares that the
18 plans acquired not entitled or due a
19 dividend?
20    A    Because on the trade date,
21 MPT Dubai did not have a contractual right to
22 the shares in which it sold.
23    Q    Did MPT Dubai ever acquire the
24 contractual right to the Annex E shares it
25 sold to the plans?

Page 254

1    A    Sorry.  Could you ask the question
2 again?
3    Q    Did MPT Dubai ever acquire the
4 contractual right to the Annex E shares it
5 sold to the plans?
6    A    I'm not sure I understand the
7 complete question.
8         So would you mind saying it again?
9 Sorry.
10    Q    Sure.  Third time.
11         Did MPT Dubai ever acquire the
12 contractual right to the Annex E shares it
13 sold to the plan?
14    A    The trades settled and so the
15 shares were delivered.  But the shares that
16 were delivered, MPT did not have the right on
17 the trade date.
18    Q    From whom did MPT Dubai -- if
19 anyone, from whom did they acquire the shares
20 to deliver to the pension plans?
21         MR. BINDER:  Objection.
22    A    It would have been through an IDB.
23    Q    Was it through ED&F's IDB or an
24 external IDB?
25         MR. BINDER:  Objection, compound.

Page 255

1    A    I don't recall at this moment in
2 time.
3    Q    We can agree that if the shares
4 were acquired through ED&F's IDB, then ED&F
5 would know from which counterparty the shares
6 were acquired?
7         MR. BINDER:  Objection, vague,
8    ambiguous.
9    A    I'm not sure, Mr. Oxford.  I don't
10 know.
11    Q    When did ED&F discover that the
12 vouchers were inaccurate?
13    A    I think it was as part of the work
14 that the attorneys were doing.
15    Q    Okay.  My question was a timing
16 question, please.  I ask you to listen to my
17 question.
18         When did ED&F discover that the
19 vouchers were inaccurate?
20    A    Are you looking for a date?
21    Q    Yes.  Hence the question, "when."
22         MR. BINDER:  Well, Mr. Oxford, he
23    did give you an answer to the "when."
24    It just wasn't in the form of a date.
25    A    I don't know an exact date.

Page 256

1    Q    What's the most exact date you can
2 give me?
3    A    It's difficult for me to give a
4 date.  I just know it's through the work,
5 when the attorneys were doing the work they
6 did.
7    Q    Okay.  Was it difficult for you to
8 give a date because you don't know the
9 answer?
10    A    It's difficult for me to give an
11 exact date because I don't know what that is.
12    Q    Did you learn anything about why
13 ED&F issued these inaccurate tax vouchers?
14    A    So, in preparation for this topic,
15 it was something that I asked.  The vouchers
16 were produced incorrectly because the person
17 producing them thought that it was -- it was
18 to be produced.
19    Q    Why did he think that?
20         MR. BINDER:  Objection, lacks
21    foundation.
22    A    I don't know why he thought that.
23    Q    Is that person Michael Meade?
24    A    Yes, the person is Michael Meade.
25    Q    To your knowledge, did ED&F take

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

7 (Pages 257 to 260)

Page 257

1  any steps to confirm that the non-Annex E tax
2  vouchers did not contain similar
3  inaccuracies?
4        A    I don't know.
5        Q    Okay.  Can you turn to Exhibits
6  473 and -- sorry, 4374 and 4375?  They're in
7  your Binder 6.
8             MR. OXFORD:  Mark 4374 and 4375.
9             (Whereupon the above mentioned was
10       marked for Identification.)
11       A    Which tab is it?
12       Q    Tabs 257 and 259.
13       A    Okay.  257.
14       Q    Great.  Do you also have 259 there?
15  It should be --
16       A    Yeah.
17       Q    It should be two tabs afterwards,
18  if my math is correct at this early hour.
19            So 4374 is the trade pack produced
20  by ED&F Man for Coloplast shares for the
21  Cambridge Way plan.
22            Correct?
23       A    So I'm looking at Tab 257 first.
24       Q    Yes, sir.
25       A    I can see here this is a tax

Page 258

1  voucher.  It says Cambridge Way LLC 401(k)
2  Profit Share Plan and the security is
3  Coloplast.
4        Q    Okay.  And the amount is 2 million
5  shares.
6             Correct?
7        A    A quantity of 2 million shares,
8  yes.
9        Q    Okay.  Great.
10            Then, flipping to your Tab 259,
11  which is Exhibit 4375, you'll see that's
12  another voucher for Coloplast.
13            Correct?
14       A    (Witness reviewing.)
15            This tax voucher also relates to
16  Coloplast.
17       Q    Okay.  And it's 1.8 million shares.
18            Correct?
19       A    Correct.
20       Q    And this one is for the Acorn
21  Capital Strategies LLC Plan.
22            Correct?
23       A    Yes, correct.
24       Q    And the Acorn and Cambridge Way
25  plans were Zeta plans as we defined them

Page 259

1  yesterday.
2             Correct?
3        A    I believe so.
4             MR. BINDER:  I'm sorry.
5  Mr. Oxford, can you remind me what the
6  Zeta plans include?
7             MR. OXFORD:  It's -- Acorn
8        Cambridge Way plus one other that is not
9        top of my mind for which Zeta was the
10       investment manager.
11            MR. BINDER:  Thank you.
12            MR. OXFORD:  You're welcome.
13       Q    So, it's correct, is it not, sir,
14  that the Acorn and Cambridge Way plans
15  collectively claimed to own 3.8 million
16  shares of Coloplast in December 2013?
17       A    So based on these two documents,
18  Cambridge Way, it says here, confirms
19  2 million, and Acorn, it says here,
20  1.8 million, as we said.
21            So 2 million plus 1.8 million is
22  3.8 million, if my math is correct.
23       Q    I think so.  I became a lawyer so I
24  didn't have to do math, but I'm with you so
25  far.  I think we're on the same page.

Page 260

1             And so, is it correct that ED&F
2  acquired those shares over several
3  transactions just before the dividend
4  declaration date?
5        A    I would have to go through the
6  trade packs.
7        Q    Okay.  I'll walk you through some
8  documents shortly.
9             But let me represent to you what I
10  think the documents show is that 2.8 million
11  shares were acquired from Mitsubishi, 500,000
12  shares were from --
13            MR. OXFORD:  I will spell this for
14       you, Mike.
15       Q    -- Lutetia Patrimoine,
16  L-U-T-E-T-I-A, P-A-T-R-I-M-O-I-N-E, and
17  another 500,000 shares from Volcafe.
18            MR. BINDER:  So Mr. Oxford, if you
19       want him to understand where the shares
20       are from, you're going to have to let
21       him go through the document, rather than
22       represent to him what you interpret the
23       documents to say.
24            MR. OXFORD:  I'm just letting --
25       there's no question pending.  So Neil,

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

8 (Pages 261 to 264)

Page 261

1    if you have an objection when there's a
2    question, you can put it on the record.
3    Otherwise, it's my deposition. I'd ask
4    you to keep quiet.
5        MR. BINDER: That's fine. But
6    I'm -- we're not accepting the
7    representation.
8        MR. OXFORD: I don't expect you to.
9    Q    So, before the interruption, I
10   think I was talking about 500,000 shares from
11   Volcafe.
12       Sir, do you know whether any of the
13   shares that are on these vouchers were
14   contained on the Annex E list of inaccurate
15   vouchers?
16   A    Mr. Oxford, say again? So there
17   was 2.8 million that you think is wrong.
18   Q    Mitsubishi, 500,000 from Lutetia
19   Patrimoine and 500,000 from Volcafe?
20       MR. BINDER: Objection.
21   Q    So my question is --
22   A    Your question is?
23   Q    Do you know if any of those
24   3.8 million are in Annex E?
25   A    I would have to look into these

Page 262

1    trade packs to see. I can't answer based on
2    that.
3    Q    Okay. Can I ask you to turn -- so
4    keeping it in Binder 6, can I ask you to turn
5    to Tabs 260 and 261?
6        MR. OXFORD: Neil, this is Exhibits
7    4376 and 4377.
8        (Whereupon the above mentioned was
9    marked for Identification.)
10   A    I have 260 in this binder, but
11   there doesn't appear to be a 261.
12   Q    Oh, I'm sorry. That's in Binder 7.
13   A    Bear with me one second because the
14   Binder 7 is also broken.
15   Q    Are you there, sir?
16   A    One second. The binder for
17   Volume 7 is also broken and the hole punches
18   aren't 100 percent done. But if you bear
19   with me, maybe that -- okay.
20       I have Tab 260 of Volume 6 and 261
21   of Volume 7 in front of me.
22   Q    Great. Great. Thank you.
23       So starting with your Tab 260 which
24   is Exhibit 4376, you see the front page,
25   which is Bates 637, there's an e-mail from

Page 263

1    Piers Canute of Zeta to the equity finance
2    desk of ED&F?
3    A    On the 5th of December, Piers
4    Canute, Zeta -- yes, I see that.
5    Q    Okay. And he's placing an order
6    for 1.8 million shares of Coloplast.
7        Correct?
8    A    Bear with me one second.
9        (Witness reviewing.)
10       I can see this is an instruction to
11   purchase Coloplast.
12   Q    Via ED&F Man.
13       Correct?
14   A    It says here, "Please can you
15   execute on our behalf with ED&F," is what the
16   document says.
17   Q    Do you know whether the reference
18   "T plus 4" makes it a cum ex trade?
19       MR. BINDER: Objection to form,
20       lacks foundation.
21   A    I do not know.
22   Q    If the -- can we agree that if the
23   shares were to settle after the record date,
24   the plans would not have received a dividend
25   directly from the issuer?

Page 264

1    A    Mr. Oxford, sorry.
2        Could you repeat one more time?
3    Q    Sure.
4        Can we agree that if the trades
5    settle after the record date, they
6    wouldn't -- the plans would not have received
7    a dividend directly from the issuer?
8    A    If the trade settled after the
9    record date, the pension plans would not have
10   received the dividend directly from the
11   issuer, correct.
12   Q    ED&F would have had to make a claim
13   to the provider of the shares for the
14   equivalent cash amount to the dividend.
15       Correct?
16       MR. BINDER: Objection to form,
17       mischaracterizes the evidence.
18   A    Mr. Oxford, could you ask me the
19   question again?
20   Q    Sure.
21       ED&F would have had to make a claim
22   to the provider of the shares for the
23   equivalent amount in cash of the dividend?
24       MR. BINDER: Objection to form,
25       mischaracterizes the evidence.

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

9 (Pages 265 to 268)

Page 265

1     A     I have seen cases in which there
2  are market recourse to the counterparty whose
3  name was on the record date, was on the
4  record on record date, claiming that
5  equivalent dividend.
6     Q     Is that sometimes also known as a
7  "market claim?"
8     A     I'm not sure.
9     Q     Do you know why any of the pension
10 plan trades through ED&F were structured to
11 settle after the record date?
12        MR. BINDER:  Objection to form,
13     lacks foundation.
14     A     I do not know.
15     Q     Okay.  So turning to your
16 Binder 7261, do you see there's a similar
17 document -- this is Exhibit 4377 -- a similar
18 document from Zeta on behalf of the Cambridge
19 Way plan requesting a purchase of 1 million
20 shares of Coloplast on the same terms as the
21 exhibit that we just looked at?
22     A     (Witness reviewing.)
23        Okay.  So I can see that this is an
24 e-mail from Piers Canute at Zeta to the
25 finance desk.  It's an instruction, Cambridge

Page 266

1  Way LLC 401(k) Profit Sharing Plan, and the
2  instructions for 1 million shares of COLOB DC
3  at T plus 4.  And it says, "Please can you
4  execute on behalf with ED&F" is what the
5  document says.
6     Q     Great.  And can you then turn to,
7  keeping in Binder 7262?
8        MR. OXFORD:  Neil, it's
9     Exhibit 4378.
10        (Whereupon the above mentioned was
11     marked for Identification.)
12     A     Okay.  I have 2 -- Tab 262.
13     Q     Great.  And that's Bates number
14 ending 228?
15     A     Bates number ending 228, yeah.
16     Q     Okay.  And this is a trade confirm
17 for the equity finance desk of ED&F to buy
18 2.8 million shares of Coloplast on the same
19 trade date, settlement date, and same price
20 as the two preceding exhibits.
21        Correct?
22     A     This is a Bloomberg confirmation
23 from --
24        THE WITNESS:  Sorry, Mike.
25     A     This is a Bloomberg confirmation

Page 267

1  from Paul Scofield to Rizwan Ali of
2  Mitsubishi USA Securities, and the
3  confirmation confirms Mitsubishi sells
4  2.8 million of Colo, trade date, 5th of
5  December, value date, 11th of December.
6     Q     And do you have any reason to doubt
7  that these are the 2.8 million shares that
8  ED&F acquired for the Cambridge Way and
9  Acorn plans?
10     A     I couldn't tell for certain.
11     Q     All right.  But no reason to doubt?
12     A     The document says what the document
13 says, Mr. Oxford.  I can only tell you what
14 the document says.
15     Q     Okay.  It's an ED&F document.
16     Correct?
17        MR. BINDER:  Objection.
18     A     This is a Bloomberg confirmation
19 from Paul Scofield of the IDB desk.
20     Q     Paul Scofield is at the IDB desk,
21 or the finance desk?
22     A     Paul Scofield works for the IDB
23 desk.
24     Q     Thanks.  Okay.
25        And then, turning to Binder 6,

Page 268

1  Tab 257 for you, it's Exhibit 437 --
2  actually, hold on.  Sorry.
3        Binder 7, Tab 265 is Exhibit 4381.
4        (Whereupon the above mentioned was
5     marked for Identification.)
6     A     Binder 7, Tab --
7     Q     265.
8     A     Okay.  Yes, 265.
9     Q     Okay.  And you see on Page 2, which
10 ends in Bates 701, can you confirm this is a
11 market claim made by Mr. Meade of ED&F Man
12 relating to shares of Coloplast?
13     A     (Witness reviewing.)
14        I can see an e-mail from 11
15 December 2013 from Michael Meade to -- the
16 e-mail is addressed to Lucy Doyle, David
17 Tillings.  It says "OPS Equity Asset
18 Servicing."
19        From the signature above, which is
20 from another e-mail, it appears that Dave
21 Tillings works at Mitsubishi USA, and Michael
22 Meade's e-mail, the document says, "We are
23 claiming the below dividend" --
24        THE WITNESS:  I'm reading out of
25     the e-mail, Mike.

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

10 (Pages 269 to 272)

Page 269

1    A    "We are claiming the below dividend
2 due to cum dividend trades settling after the
3 dividend record date.  Please see details
4 below."  And then it lists Coloplast, the
5 ISIN, the record date, the pay date, the DIV
6 rate, the currency.
7    Q    And the market claim is made to
8 Mitsubishi.
9         Correct?
10    A    This e-mail is sent to Mitsubishi.
11    Q    For the same Coloplast dividend
12 that is on the two tax vouchers for
13 Cambridge Way and Acorn that we looked at at
14 the start of this line of questioning?
15    A    Can I just double-check the dates
16 on the tax voucher again, please?
17    Q    Sure.
18    A    Which tab was it, Mr. Oxford?
19    Q    It was -- I've gotten into a bit of
20 a habit of once we're finished with the
21 document, I screw up this helpful little
22 piece of paper someone gives me to tell me
23 which exhibit it is.  So going backwards is
24 difficult for me.  Hold on one second.
25    A    Sorry.

Page 270

1    Q    Binder 6, 261, and Binder 7, 262.
2         MR. BINDER:  This is 4374 and 4375?
3         MR. OXFORD:  Correct.
4    A    261 is the tax voucher.
5    Q    Yeah.  So you should be in
6 Binder 6, 260, and Binder 7, 261.
7    A    Yes.  Sorry, Mr. Oxford.  I asked
8 which tab was the one that the tax voucher
9 was on.
10         260 doesn't have the tax voucher.
11    Q    Okay.  Let's start with just 261.
12         Is 261 the trade pack?
13    A    261, which is in Volume 7, is an
14 e-mail from Piers Canute to the equity
15 finance desk.
16    Q    Hold on.  I've clearly misdirected
17 you.  Give me one second.
18    A    Sure.
19    Q    So Binder 6, 257 and 259.
20    A    Okay.  Thank you.
21    Q    My apologies.  It's a trouble when
22 your binder does not line up with my binder.
23         MR. BINDER:  Okay.  And just to
24    complete it, the 257 corresponds to what
25    exhibit?  And 259 corresponds to what

Page 271

1    exhibit?
2         MR. OXFORD:  257 corresponds to
3    Exhibit 4374, and 259 corresponds to
4    Exhibit 4375.
5    A    Your final question to me
6 was -- can you repeat that question?
7    Q    It's the market claim that we were
8 looking at.
9         Is that the same Coloplast dividend
10 that's on the two tax vouchers that appear,
11 and the tax that you're looking at now,
12 Exhibits 4374 and 4375?
13    A    Okay.  So the security name in this
14 e-mail is the same as the tax voucher.  The
15 ISIN is the same on the tax voucher.
16         In the e-mail, it says "Record
17 Date, 10th of November 2013."  On the tax
18 voucher, I can see it says the record date is
19 10th of December 2013.  In the e-mail it says
20 "Pay Date, 11th December 2013."
21         I can see in the tax voucher the
22 pay date says 11th of December 2013.  The
23 gross DIV rate in the e-mail is the same as
24 the tax voucher, is 7, the currency is DKK,
25 the same as the tax voucher, and the tax rate

Page 272

1 is 27 percent, which is the same as the tax
2 voucher.
3    Q    Okay.  So my question is:  Do you
4 believe that the market claim relates to
5 those two tax vouchers?
6    A    I don't know, Mr. Oxford.
7    Q    Okay.  Can you turn, please to
8 Exhibit 4382?
9         (Whereupon the above mentioned was
10    marked for Identification.)
11    Q    It's in your Binder 7 at Tab 266.
12    266.  Are you there?
13    A    Yes.  I have Tab 266 in front of
14 me.
15    Q    Great.  And can you turn to the
16 third page, which should end Bates 63?
17         MR. BINDER:  Mr. Oxford, that's
18    exhibit what?
19         MR. OXFORD:  4382.
20    A    The third page with a reference
21 number -- what was it, Mr. Oxford?
22    Q    Ending 623.
23    A    The third page for me ends 622.
24    Q    Okay.  Then can you turn it another
25 page?

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

Page 273

1    A    Yeah, of course.  Bear with me.
2  Okay.
3         I have here the page that
4  ends -- reference ends in 623.
5    Q    Terrific.  Okay.
6         Do you see there's an e-mail from
7  Piers Canute to the ED&F equity finance desk
8  requesting, on behalf of the Cambridge Way
9  plan, the purchase of 500,000 more shares of
10  Coloplast on the same terms as the previous
11  requests we just looked at?
12    A    Okay.  So yes, I can see the
13  e-mails from Piers Canute on the 5th of
14  December to the finance desk, and the
15  instruction is on behalf of Cambridge Way LLC
16  401(k) Plan, and it's to buy 500,000 shares
17  of COLOB DC at T plus 4.
18         "Please can you execute on our
19  behalf with Paul Scofield at ED&F" is what
20  the document says.
21    Q    Okay.  And can you turn please to
22  Exhibit 4380 -- excuse me, 4383, which is in
23  your Binder 7, Tab 267.
24         (Whereupon the above mentioned was
25         marked for Identification.)

Page 274

1    A    Yeah, I have in front of me
2  Tab 267.
3    Q    Okay.  And do you see this is a
4  Bloomberg exchange between a Mr. Brunet,
5  B-R-U-N-E-T, and Paul Regan, R-E-G-A-N, at
6  ED&F?
7         MR. BINDER:  Objection, form.
8    A    I can see that this Bloomberg
9  message is sent from Paul Regan to Bruce
10  Brunet.
11    Q    And Mr. Brunet is offering, on
12  behalf of Lutetia, to sell 500,000 shares of
13  Coloplast.
14         Correct?
15    A    (Witness reviewing.)
16         So can you ask me your question
17  again?
18         MR. OXFORD:  Can you read it back,
19         Mike, please?
20         (Whereupon the record was read back
21         by the reporter.)
22    A    I can see one of the messages here
23  is from Mr. Brunet and it says, "Hello," an
24  asterisk, "Buy COLOB DC," and his message
25  says, "I am a buyer of the following 500,000

Page 275

1  COLOB DC at DKK 353.  Any interest?"
2    Q    Okay.  So any reason to doubt that
3  this is the source of the 500,000 shares that
4  Mr. Canute of Zeta was seeking on behalf of
5  the Cambridge Way plan?
6    A    Sorry.  Repeat that one more time,
7  please, Mr. Oxford?
8    Q    Do you have any reason to doubt
9  that this trade confirm is the source of the
10  500,000 shares that Mr. Canute of Zeta was
11  seeking on behalf of the Cambridge Way plan?
12         MR. BINDER:  Objection to form,
13         misstates the document.
14    A    (Witness reviewing.)
15         I'm not sure.  I can only see what
16  the document says.
17    Q    Okay.  Can I ask you to turn to
18  your Binder 2, Tab 275.
19    A    Binder 2, you said?
20    Q    Let me just check.  It's Tab 275.
21    A    Okay.  I think it's in the same
22  binder.
23    Q    Oh, yeah.  I'm sorry.  Binder 7.
24         My bad.
25         MR. BINDER:  Exhibit number?

Page 276

1         MR. OXFORD:  4391.
2         (Whereupon the above mentioned was
3         marked for Identification.)
4    A    I have Tab 275 open.
5    Q    Okay.  Great.  And you see this is
6  a pleading on behalf of ED&F Man.  It's the
7  re-amended defense in England.
8         Correct?
9    A    I can see it says "re-amended
10  defense."
11    Q    Great.
12         And then, if you could turn to the
13  back of the document to find Annex E that you
14  testified about earlier?
15    A    Sorry.  Where am I going to?
16    Q    Go to the back of the document, and
17  then go in ten pages.
18    A    Okay.
19    Q    Okay.  Do you have Annex E,
20  Schedule 1 in front of you?
21    A    Annoyingly, these don't have
22  reference dates at the bottom.  I went ten
23  pages in, and the top says "Annex E,
24  Incorrect Tax Vouchers," and in brackets,
25  "Number 2."

Page 277

1    Q    Okay.  Could you go a couple pages
2 back and find something that's headed
3 "Annex E, Schedule 1, Incorrect Tax
4 Vouchers?"
5    A    Okay.  I see -- I went back and I
6 see "Annex A, Incorrect Tax Vouchers."
7 That's not what you're referring to.  Let's
8 see, Annex B --
9    Q    It's after B.
10    A    Okay.  Maybe it was the page after.
11 So I see a spreadsheet here, a
12 table -- sorry -- and the title of this page,
13 it says number "1" at the bottom, is
14 "Annex E, Schedule 1, Incorrect Tax
15 Vouchers."
16         Is that the document that you're
17 referring to?
18    Q    Bingo.  I knew we would get there
19 eventually.  Okay.
20         So looking at the first item there,
21 there's an entry for 500,000 shares of
22 Coloplast.
23         Do you know what?  After all of
24 that, I actually sent you to the wrong page.
25         Could you go back to Schedule 2?

Page 278

1 My apologies.  So if you just flip forwards
2 in the document a couple pages, you'll get to
3 Schedule 2.
4         I'm terribly sorry.
5    A    I'm skipping forward in the
6 document.
7    Q    Well, towards the back of the
8 document, Schedule 2 follows Schedule 1.
9    A    So that's fine.  Yeah.  So I have a
10 table here.  The bottom of the page has the
11 number "1", Page 1, and it's titled "Annex E,
12 Schedule 2, Incorrect Tax Vouchers."
13    Q    Great.
14         And the first entry is for
15 Cambridge Way.
16         Correct?
17    A    (Witness reviewing.)
18         Yes.  So at the top, beneath the
19 titles, Row Number 1 is for -- it's Schedule
20 1 reference is 527 and it says that the
21 pension plan is Cambridge Way LLC 401(k)
22 Profit Sharing Plan.
23    Q    Okay.  And that relates to share
24 holdings in Coloplast.
25         Correct?

Page 279

1    A    I can see that the document
2 in -- says in Column D, which is titled
3 "Shareholding," it says there, "2 million
4 Coloplast AS-B."
5    Q    So the answer to my question is
6 "yes?"
7    A    Reading here what the document
8 says, yes.
9    Q    Okay.  And is it correct that
10 this -- the tax voucher for Cambridge Way
11 ED&F concedes was incorrect because instead
12 of having a share holding of 2 million which
13 it represented, ED&F now says the share
14 holding should have only been 1.5 million.
15         Correct?
16    MR. BINDER:  Objection to form.
17    A    So could you ask the question
18 again?
19    MR. OXFORD:  Can you read it back,
20    Mike?
21         (Whereupon the record was read back
22    by the reporter.)
23    A    I don't know.
24    Q    Okay.  Can I ask you to turn,
25 please, to Exhibit 4385?

Page 280

1         (Whereupon the above mentioned was
2    marked for Identification.)
3    Q    Which is tab -- your Binder 7, 269.
4    A    Okay.  I have Tab 269 in front of
5 me.
6    Q    Okay.  Is this a trade
7 confirmation, starting at the Bates number
8 ending 662, between Volcafe and ED&F Man
9 Professional Dubai or MPT?
10    A    I can see this is a -- an e-mail
11 from Mr. Goodwin.  It's a confirmation and
12 the confirmation is to -- it says here,
13 "ED&F MCN on behalf of ED&F Man Professional
14 Dubai."
15    THE WITNESS:  Sorry, Mike.
16    A    And this is for a million shares of
17 Coloplast on the same trade date and value
18 date and at the same price that the plans
19 were purchasing the shares.
20         Correct?
21    A    This is for one million shares, a
22 trade date, 5th of December, value date, 11th
23 of December.
24    Q    And the price is 352.8, correct,
25 Danish krones?

Page 281

1     A    The price is 352 spot 8 DKK, as it
2  says on the document.
3     Q    Okay.  Can you turn, please, to
4  Exhibit 4384, which is Tab 268 of your
5  Binder 7?
6         (Whereupon the above mentioned was
7      marked for Identification.)
8     A    Okay, I'm on Tab 268.
9     Q    Okay.  I think we looked at this
10  before.
11         This is a request from Mr. Canute
12  for Cambridge Way, order two.  He's seeking
13  from ED&F, from Cambridge Way, 500,000 shares
14  of Coloplast, T plus 4, and the price is
15  352.8.
16         Do you see that?
17     A    I can see that this e-mail is from
18  Piers Canute.  It's the instruction that I
19  believe we saw before for Cambridge Way LLC
20  plan, and the instruction is to buy 500,000
21  shares of COLOB DC —
22     Q    Got it.
23     A    Sorry.  Go ahead.
24     Q    And the confirm is attached.  He
25  says that.

Page 282

1         Right?
2     A    The e-mail from Sara Mina says,
3  "Hi, Piers, confirms attached."
4     Q    And if you turn the page, she does,
5  in fact, attach a confirm.
6         Correct?
7     A    Okay.  So I turned the page.
8         This is an e-mail from Rich
9  Goodwin, Volcafe, cash equity confirmation.
10  This is a confirmation e-mail.
11     Q    And the confirmation is that the
12  Cambridge Way plan, through ED&F, is buying
13  500,000 shares of Coloplast from Volcafe.
14         Correct?
15     A    So the trade date, 5th of December,
16  value date, 11th of December — yes, 500,000
17  shares of Coloplast is the security, and it's
18  ED&F MCM on behalf of Cambridge Way plan.
19     Q    Okay.  So what's happening here, is
20  it not, sir, that ED&F Dubai sells shares to
21  Volcafe, and Volcafe sells the shares to
22  Cambridge Way?
23     A    Sorry.  Sorry.
24         Can you say that again?
25     Q    Sure.

Page 283

1         What is happening here is ED&F Man
2  Dubai, MPT Dubai sells shares of Coloplast to
3  Volcafe, and Volcafe sells them via ED&F Man
4  in London to the Cambridge Way plan.
5         Correct?
6         MR. BINDER:  Objection to form,
7      vague.
8     A    This confirmation e-mail is from
9  Volcafe to ED&F MCM, who is purchasing, on
10  behalf of Cambridge Way LLC, 500,000 shares
11  of Coloplast.
12     Q    Do you know how MPT Dubai
13  determined it was going to sell a million
14  shares of Coloplast to Volcafe?
15         MR. BINDER:  Objection to form,
16      lacks foundation.
17     A    I don't know.
18     Q    Okay.  Can I ask you to turn,
19  please, to Exhibit 4400?
20         (Whereupon the above mentioned was
21      marked for Identification.)
22     Q    Tab 285 in your Binder 7.
23     A    Yeah.  Okay.
24     Q    Okay.  So you have — the first
25  page should end in Bates 500?

Page 284

1     A    Yeah, the first page ends in 500.
2     Q    Okay.  That's a request for trade
3  from Mr. Canute of Zeta to the equity finance
4  desk in London.
5         Correct?
6     A    So this is an e-mail from Piers
7  Canute on the 6th of December to the equity
8  finance desk.  The e-mail says, "Please can
9  you approve the following trades:  Cambridge
10  Way LLC 401(k) Profit Sharing Plan would like
11  to sell 500,000 shares of COLO DC at DKK 3.7
12  spot 5, T plus 3.  Please can you execute on
13  our behalf with Paul Scofield at ED&F."
14     Q    Yeah.  So the Cambridge Way plan is
15  selling back to ED&F the 500,000 shares of
16  Coloplast it just purchased.
17         Correct?
18     A    This is an instruction to sell
19  500,000 shares of COLO DC.
20     Q    Okay.  And the settlement date
21  is — well, actually if you — can you turn
22  the page to look at the trade confirm?
23     A    I have turned the page, and I can
24  see a trade on the front.
25     Q    And the settlement date of that

Page 285

1  trade is December 11th.
2         Correct?
3     A    The e-mail here says, "Trade date,
4  6th of December, value date, 11th of
5  December."
6     Q    And that's the same date as the
7  purchases had settled.
8         Correct?
9     A    Excuse me?
10    Q    It's the same date as the purchase
11  that we just looked at, the Cambridge Way
12  purchase of 500,000.
13         The purchase settled the same day
14  as the sale settled?
15    A    The document says, "Trade date, 6th
16  of December, value date, 11th of December."
17    Q    Okay.  Can you turn please to
18  Exhibit 4401?
19         (Whereupon the above mentioned was
20  marked for Identification.)
21    Q    Which is 286 in your Binder 7.
22    A    I have Tab 286 in front of me.
23    Q    Okay.  Bates number ending 911?
24    A    Bates number ending 911.
25    Q    And this trade confirm reflects a

Page 286

1  sale by ED&F Man in London to ED&F Dubai or
2  MPT of the same 500,000 shares of Coloplast,
3  same trade date, same settlement date, and
4  same price as we just looked at.
5         Correct?
6         MR. BINDER:  Objection to form.
7     A    So this is a Bloomberg
8  correspondence.  The original message in this
9  Bloomberg correspondence is from Paul Regan
10  on the 6th of December, 2013.
11         And it says, "To confirm, ED&F
12  Dubai buy the following:  500,000 COLOB DC,
13  trade date, 6th of December, value date, 11th
14  of December.
15    Q    Okay.  So what is happening here,
16  sir, is that the Cambridge Way plan is
17  selling back, via Volcafe, the same shares
18  that it just purchased via Volcafe to
19  MPT Dubai.
20         Correct?
21         MR. BINDER:  Objection to form.
22    A    Sorry.  Could you ask the question
23  again, please?
24         MR. OXFORD:  Mike, can you read it
25     back, please?

Page 287

1         (Whereupon the record was read back
2     by the reporter.)
3     A    I can see in this document that you
4  referred to, this confirmation confirms that
5  ED&F Dubai buy 500,000 COLOB DC.
6     Q    And they're buying up, via Volcafe,
7  from the Cambridge Way plan.
8         Correct?
9     A    (Witness reviewing.)
10         The Bloomberg message comes from
11  Paul Regan.
12    Q    Okay.  So they're buying via the
13  IDB?
14    A    I believe Paul Regan worked for the
15  IDB desk.
16    Q    So MPT Dubai is buying back from
17  the Cambridge Way plan the same 500,000
18  shares of Coloplast that it just purchased
19  from them.
20         Correct?
21    A    This confirm is from Paul Regan and
22  it says, "To confirm, ED&F Dubai buy 500,000
23  COLOB."
24    Q    Which the plan had just sold to the
25  IDB, and then the IDB is selling back to

Page 288

1  MPT Dubai.
2         Correct?
3         MR. BINDER:  Objection to form.
4     A    Mr. Oxford, I can only tell you
5  what this document that you pointed me to
6  says.
7     Q    Sure.  But I pointed you to a
8  series of documents.  I'm asking if you can
9  draw any conclusions from the series of
10  documents.
11         MR. BINDER:  Objection.
12    Q    If the answer is you can't, that's
13  the answer.
14         MR. BINDER:  Sorry.  Is there
15     a -- what is the question that's
16     pending?
17    Q    Are you able to draw any
18  conclusions from this series of documents
19  that I have just showed you?
20         MR. BINDER:  Objection, vague.
21    A    (Witness reviewing.)
22         Mr. Oxford, I can't tell you
23  anything further.
24         MR. BINDER:  We've been going over
25     an hour and 15.  How about a break?

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

Page 289

1        MR. OXFORD:  Yeah.  Could I just
2    finish this line, Neil?  I will just be
3    one minute.
4        Q    Can you agree with me, Mr. Hashemi,
5    that what's happening here is the shares are
6    moving in a loop?
7        ED&F, MPT, and Dubai sells 500,000
8    shares of Coloplast via an intermediary,
9    which is an ED&F affiliate to the Cambridge
10   Way plan, and then the same shares are sold
11   back to MPT Dubai on the same settlement
12   date?
13       MR. BINDER:  Objection to form.
14       A    So could you ask the question
15   again, please?
16       MR. OXFORD:  Mike, can you read it
17   back?
18       (Whereupon the record was read back
19   by the reporter.)
20       A    I can see through these
21   confirmations that the securities are being
22   sold -- bought and sold through IDBs.
23       Q    Beyond that, you can't answer my
24   question?
25       A    I don't know.

Page 290

1        MR. OXFORD:  Let's go off.
2        THE VIDEOGRAPHER:  Stand by.  The
3    time is 8:17 a.m. New York time and
4    we're going off the record.
5        (Brief recess taken.)
6        THE VIDEOGRAPHER:  Stand by.  The
7    time is 8:40 a.m. New York time and
8    we're back on record.
9        Q    Mr. Hashemi, earlier this morning
10   we were talking about Annex E and whether
11   MPT Dubai ever acquired the rights to the
12   shares that it purported to sell to the plans
13   for the Annex E trades.
14       Do you remember those?  Do you
15   remember those questions?
16       A    I recall the conversation.
17       Q    Okay.  Do you know whether
18   MPT Dubai ever acquired rights to the Annex E
19   shares that it purported to sell to the
20   defendant plans?
21       MR. BINDER:  Asked and answered.
22       A    So as I -- as I would have said
23   before, MPT Dubai did not hold the rights to
24   the shares which they sold on trade date in
25   the Annex E subset of trades.

Page 291

1        Q    Okay.  Did MPT Dubai, at any point,
2    hold the rights to the shares which they sold
3    on the Annex E subset of trades?
4        A    Mr. Oxford, as I would have said
5    before, the trades settled, so the shares
6    would be delivered to the pension plans.
7        So these would not be shares that
8    MPT Dubai had a contractual right to on the
9    trade date.
10       Q    Do you have any information about
11   where those shares you say settled came from?
12       A    I don't at this moment in time.
13       Q    Can I ask you to turn to
14   Exhibit 4382, which is Tab 266 in your
15   Binder 7?
16       A    Okay.  I have Tab 266.
17       Q    Okay.  So the first document ends
18   in Bates 620.
19       Are you there?
20       A    Yeah, the first document ends in
21   620.
22       Q    Great.
23       Can you flip over to the one ending
24   in 622, please?
25       A    Okay.  I have the one ending 622.

Page 292

1        Q    Great.
2        So at the top of the page, this is
3    an e-mail exchange between Mr. Bottomley and
4    Mr. Howard of ED&F.
5        Correct?
6        A    At the top of the e-mail, it says
7    the e-mail is from Oliver Bottomley to Marcus
8    Howard.
9        Q    And the subject is "COLOB," which
10   is short for Coloplast.
11       Correct?
12       A    The subject says, "Forward
13   COLOB DC-CW Order."
14       Q    Do you understand "COLOB" to be a
15   reference to Coloplast?
16       A    Looking at the rest of the e-mail,
17   "COLOB DC" would refer to the Coloplast
18   shares.
19       Q    Okay.  And given the relationship
20   between Zeta and the Cambridge Way plan, do
21   you also understand this to be a trade that
22   Mr. Canute, on behalf of Zeta, is trying to
23   place for the Cambridge Way plan?
24       A    So the original message in this
25   forwarded message is from Piers Canute to the

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

16 (Pages 293 to 296)

Page 293

1  MPT finance desk. It says, "Please can you
2  approve the following trades?"
3       And then it says that "the
4  Cambridge Way LLC 401(k) Plan would like to
5  buy 500,000 shares of COLOB DC at DKK 348
6  spot 9, T plus 3."
7       It then says, "Please can you
8  execute on our behalf with Marex, sell
9  500,000 shares of COLOB DC at DKK 348 spot 9,
10 T plus 3? Please can you execute on our
11 behalf with Marex?"
12      Q   Is it correct that Mr. Canute, on
13 behalf of the Cambridge Way plan, is seeking
14 to have ED&F execute an order to buy and sell
15 the same shares on the same day at the same
16 price with the same settlement date?
17      A   So the e-mail has an instruction,
18 "Buy" —
19          MR. BINDER:  Objection, form.
20          THE WITNESS:  Thank you for
21      mentioning that, Mike, because I didn't
22      hear Mr. Binder say anything.
23      Q   Is it important that you hear his
24 objection to form?
25      A   It is important that I hear

Page 294

1  everyone on this call.
2          MR. BINDER:  That's not a real
3      question. Please go ahead.
4      A   So, to answer your question,
5  Mr. Oxford, I can see that the e-mail
6  says — it's an instruction to buy 500,000
7  shares of COLOB at 348 spot 9, T plus 3.
8          And then, the next sentence says,
9  to instruct — "execute on our behalf, sell
10 to Marex, sell 500,000 shares of COLOB DC at
11 348 spot 9, T plus 3."
12      Q   Okay. So are you able to answer my
13 question, sir? Let me give it to you again
14 to see whether we can do it the second time
15 around.
16          Is it correct that Mr. Canute, on
17 behalf of the Cambridge Way plan, is seeking
18 to have ED&F execute an order to buy and sell
19 the same shares on the same day at the same
20 price with the same settlement date?
21          MR. BINDER:  Objection to form,
22      compound, lacks foundation.
23      A   So the e-mail from Piers Canute to
24 the equity finance desk on behalf of
25 Cambridge Way Profit-Sharing Plan has an

Page 295

1  instruction to buy 500,000 shares of COLOB DC
2  at 348 spot 9, T plus 3.
3          THE WITNESS:  I'm sorry, Mike.
4      A   So the instruction in this e-mail,
5  it has an instruction of — to buy 500 shares
6  of COLOB DC at 348 spot 9, T plus 3.
7          And then, the following sentence is
8  an instruction to sell 500 shares of COLOB DC
9  at 348 spot 9, T plus 3.
10      Q   Are you finished with your answer?
11      A   I've finished with my answer.
12      Q   Okay. So I'm going to ask it
13 again.
14          Is it correct that Mr. Canute, on
15 behalf of the Cambridge Way plan, is seeking
16 to have ED&F execute an order to buy and sell
17 the same shares, on the same day, at the same
18 price, with the same settlement date?
19          MR. BINDER:  Objection to form,
20      lacks foundation.
21      A   So Mr. Canute sent an e-mail
22 instructing the equity finance desk to
23 execute the buy of 500,000 shares of COLOB DC
24 at 348 spot 9, T plus 3. In the same e-mail
25 the following sentence, there's also an

Page 296

1  instruction to sell the 500,000 shares of
2  COLOB DC at 348 spot 9, T plus 3.
3      Q   So is the answer to my question
4  "yes?"
5          MR. BINDER:  Objection, asked and
6      answered, vague.
7      A   I'm reading to you what the
8  document says.
9      Q   Right, sir. And I think that's
10 — exactly. I'm glad you said that because
11 that's exactly the nub of the problem.
12 You're reading the document. I'm not asking
13 you to read the document.
14          I'm asking, as ED&F's 30(b)(6)
15 witness, whether this document is instructing
16 ED&F Man, on behalf of the Cambridge Way
17 plan, to execute a trade to buy and sell the
18 same shares on the same day, at the same
19 price, with the same settlement date?
20          MR. BINDER:  Objection to form,
21      calls for speculation. The document
22      speaks for itself.
23          MR. OXFORD:  It doesn't call for
24      speculation. It calls for a knowledge
25      of the English language and ED&F Man's

Page 297

1  business.  He's a 30(b)(6) witness.
2  It's ridiculous he can't answer this
3  question.
4      MR. BINDER:  You're showing him a
5  document.  It says what it says.  And
6  now you're asking him to say more than
7  what it says.
8      MR. OXFORD:  Yes.  He's a witness.
9  He's to testify.  His job here is not to
10 read documents, Mr. Binder, as I think
11 you know.  He's a 30(b)(6) witness.
12 He's absolutely and adequately prepared,
13 and this is becoming a very difficult
14 examination if all the witness is going
15 to do is read documents and not actually
16 answer my question.
17     Q   Let me -- just so we have it a
18 fourth time, I'm going to ask you one more
19 time and then I guess we've got a very good
20 record here.
21     MR. BINDER:  And I'm going to
22 object.  I'm going to object because I
23 don't think the substance of this e-mail
24 even falls within any of the subject
25 matters of this 30(b)(6) deposition.

Page 298

1      Q   Okay.  So I'm going to "give it one
2  more good old college try," as we say in the
3  United States, sir.
4      After reading this e-mail to me
5  four times, can we agree that what
6  Mr. Canute, on behalf of the Cambridge Way
7  plan, is asking ED&F Man to do is to execute
8  a buy and a sell of the same shares, on the
9  same day, at the same price, with the same
10 settlement date?
11     MR. BINDER:  Objection, asked and
12 answered.
13     MR. OXFORD:  It's asked, certainly.
14 Not answered.
15     A   So what I can see from the document
16 that you referred me to is that Mr. Canute
17 has sent an instruction to the equity finance
18 desk to buy 500 -- or execute the transaction
19 to buy 500,000 shares of COLOB DC at 348
20 spot 9, T plus 3, and has also asked -- in
21 the following sentence, there is an
22 instruction to sell 500,000 shares of COLOB
23 DC at 348 spot 9, T plus 3.
24     Q   Did ED&F comply with this
25 instruction or request?

Page 299

1      MR. BINDER:  Objection to form.
2      A   Can I see the rest of the document?
3      Q   Sure.
4      A   (Witness reviewing.)
5      Q   Any luck, Mr. Hashemi?
6      A   Sorry.  So going through the
7  documents in this tab, I don't know if that's
8  all of the documents in relation to this
9  transaction.  But having looked -- I haven't
10 gone ahead or before in this tab, but I don't
11 see -- I can't -- withdrawn.  Let me
12 rephrase.
13     Based on the documents in this tab,
14 which is 266 in Volume 7, I don't see any
15 further e-mails in relation to these two
16 instructions.
17     Q   Are you familiar with the term
18 "wash trade" in the industry, sir?
19     MR. BINDER:  Objection to form,
20 outside the scope of his testimony as a
21 corporate representative.
22     A   I've heard of the term.
23     Q   What does it mean to you, sir?
24     A   I don't really know.
25     Q   You were in compliance at ED&F for

Page 300

1  a couple of years.
2      Right?
3      A   I worked in the compliance
4  department.
5      Q   And then you've been assistant
6  to -- sorry, I don't wish to mischaracterize.
7      What -- remind me what you've been
8  doing since you moved out of the compliance
9  role.
10     A   My first role was business manager
11 for the financial futures and options
12 business.  And then I became business manager
13 for the EMEA CEO.
14     Q   Are you familiar, in any of those
15 roles, with ED&F Man's policy on wash trades?
16     MR. BINDER:  Objection, outside the
17 scope of the 30(b)(6) topics in his role
18 as corporate representative.
19     A   Mr. Oxford, I don't remember right
20 now.
21     Q   Okay.  Can you turn, please, to
22 your Binder 3?  It's Tab 46?
23     MR. OXFORD:  Neil, it's
24 Exhibit 4168.
25     A   Binder 3, Tab --

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

Page 301

1   Q      Forty-six.
2   A      Okay.
3   Q      You should have a two-page memo.
4   The first page ends in Bates 853.
5   A      Yeah, first page ends in 853.
6   Q      Okay.  So this is a document
7   produced by ED&F Man in response to requests
8   by the FCA as part of their investigation.
9           Have you seen this document before,
10  sir?
11  A      (Witness reviewing.)
12          I don't recall seeing this document
13  before.
14  Q      It wasn't part of your preparation
15  for this deposition today and yesterday?
16  A      Sorry.  Say that again?
17  Q      It wasn't part of your preparation
18  for the deposition today and yesterday?
19  A      I don't recall seeing this document
20  before.
21  Q      Okay.  Do you see at the bottom of
22  the first page, just above the diagram, it
23  says, "MCM's understanding of MPT's trading
24  strategy in respect of the relevant
25  transactions was for MPT to enter a short

Page 302

1   sale of stock to an interdealer broker and
2   hedge that sale by buying a future in the
3   same stock."
4           Do you see that?
5   A      I can see that's what the document
6   says.
7   Q      Do you know where -- what the
8   source of MCM's understanding is?
9       MR. BINDER:  Objection to form.
10  A      No, I'm not sure.
11  Q      Okay.  Could you turn the page,
12  please?  And I direct your attention to the
13  first paragraph on the top of Page 2.
14          It says, "Some days later, MPT
15  would buy stock from an IDB and this time
16  hedge the purchase by selling a future."
17          Do you see that?
18  A      I can see that's what the document
19  says, yeah.
20  Q      Okay.  Then, after the diagram
21  below, it says, "The sale and purchase of the
22  stock would be executed with the same
23  settlement date, which meant that MPT had a
24  covered short position."
25          Do you see that?

Page 303

1   A      Yes, I can see that's what it says.
2   Q      Do you know what that means?
3   A      (Witness reviewing.)
4           Further to what the document says,
5   Mr. Oxford, I've nothing to add.
6   Q      Okay.  So other than reading and
7   the words on the page, you can't give us any
8   information about the contents of this memo?
9   A      (Witness reviewing.)
10          No, nothing, nothing further.
11  Q      Okay.  Just one last question.
12          The next sentence says, "Therefore,
13  as MPT effectively held a matched position,
14  MPT did not need to hold a long position or
15  borrow the stock."
16          Do you see that, sir?
17  A      (Witness reviewing.)
18          I can see that's what it says.
19  Q      And beyond reading the words on the
20  page, are you able to give us any information
21  about what that means?
22  A      (Witness reviewing.)
23          No, I can't right now.
24  Q      Okay.  That's all for that
25  document, sir.

Page 304

1           Can I ask you, please, to turn to
2   your Binder 7, Exhibit 27 -- it's either "3"
3   or "5," I'm just looking for confirmation in
4   the room.  But if you get there, by the time
5   you get to the 270s, I will have an answer
6   for you.
7       MR. OXFORD:  It's 4395.
8           (Whereupon the above mentioned was
9       marked for Identification.)
10  Q      I think it's 280, Tab 280, sir.  It
11  should be the "Re-Amended Defense of
12  ED&F Man."
13  A      I've got Tab 280, but it doesn't
14  appear to be what you're saying it is.
15  Q      Okay.  Bear with me one second.  I
16  appear to have messed up my numbers again.
17          So it's Exhibit 4391, and it is
18  Tab 275 in your Binder 7.
19          Please, can you let me know if that
20  is the "Re-Amended Defense?"
21  A      Yeah.  Tab 275 says "Re-Amended
22  Defense."
23  Q      Great.
24          Are you familiar with this
25  document, sir?

CONFIDENTIAL
Shahab Hashemi – October 8, 2021

19 (Pages 305 to 308)

Page 305

1        A        (Witness reviewing.)
2                 I believe I've seen a version,
3     Mr. Oxford, but I don't know if it's this
4     exact one.
5        Q        Okay.  I'll represent to you that
6     this is the version that Rosenblatt filed in
7     the English case.
8                 Can I turn your attention, please,
9     to Page 4?  There should be, just towards the
10    bottom, there's a Paragraph 4.2 beginning,
11    "No misstatements."
12       A        Okay.  I'm on Page 4.
13       Q        Okay.  Great.
14                This paragraph says, "No
15    misstatements.  With respect to the tax
16    vouchers, with respect -- with the exception
17    of the nine identified at Annex A hereto and
18    the 80 identified at Annex E hereto, any
19    representations made thereby were accurate as
20    evidenced by the contemporaneous documentary
21    records retained by ED&F Man in respect of
22    the ED&F Man applications."
23                Do you see that?
24       A        Yes, I see that.
25       Q        Do you have an understanding of

Page 306

1     what that statement is intended to convey?
2        A        It's saying that, with the
3     exception of the Annex A tax vouchers and the
4     Annex E tax vouchers, that the
5     representations made were accurate.
6        Q        And are you able to tell us
7     anything about the reasons why ED&F believes
8     the representations other than Annex E and
9     Annex A are accurate?
10                MR. BINDER:  You're referring to
11       the representations in the tax vouchers,
12       Neil?
13                MR. OXFORD:  Yes.
14       A        I'm sorry, Mr. Oxford.  Could you
15    ask your question again, please?
16       Q        Yeah.  Let me try and ask a better
17    one, actually.
18       A        That's fine, if you could repeat
19    it.
20       Q        I reserve the right to be smarter
21    now than I was a second ago.  Time will tell
22    whether that's true or not.
23                Can you tell me, please, what
24    ED&F Man did to assure itself that the
25    representations, other than on the Annex E

Page 307

1     and Annex A tax vouchers -- so the remaining
2     tax vouchers -- were accurate?
3        A        So on the basis of the trade packs
4     which I reviewed, and which weren't the
5     Annex A or Annex E, they included all the
6     relevant information -- allow me to rephrase.
7                 They included supporting
8     information to the tax voucher that was
9     produced by ED&F Man to include the trade
10    instructions, the trade confirms, both for
11    the security and the hedge, and it included
12    SWIFT messages showing the securities being
13    received, and it also included SWIFT
14    messages -- MT 566s, I believe -- showing the
15    dividend being received from the company.
16                In the event that there wasn't an
17    MT 566 from the company and there was a -- a
18    market recall, in those packs there are the
19    correspondence of the dividend being paid by
20    the counterparty whose name was on the -- on
21    the record on the record date, and had the
22    sufficient information to confirm that the
23    tax vouchers were accurate.
24       Q        So did ED&F do any investigation
25    beyond compiling the trade packs?

Page 308

1                 MR. BINDER:  Objection to form.
2        A        I'm not sure right now.
3        Q        Did the -- withdrawn.
4                 You gave us a list of documents
5     that were contained in the non-Annex E trade
6     packs a few moments ago.
7                 Correct?
8        A        I did, yes.
9        Q        Were those or similar documents
10    also contained in the Annex E trade packs
11    that ED&F compiled?
12       A        There would have been some of those
13    documents in there.  However, the one that
14    I -- or the ones that I specifically referred
15    to, the SWIFT messages from the sub-custodian
16    banks, showing the dividends being received.
17                And in the event that the SWIFT
18    messages weren't there, there are
19    correspondence with the counterparties whose
20    name was on the record on the record date,
21    and then showing the dividend being paid.
22                And there were also the cash
23    statements and the cash entries showing the
24    dividends being received.
25       Q        Okay.

Page 309

1    A    Yes.
2    Q    Do you remember the question you
3  were answering, sir?
4    A    I did at the time of answering.
5    Q    It was a long time ago, several
6  seconds.
7         My question was:  When you gave me
8  a list of documents that were contained in
9  the non-Annex E trade packs -- do you
10 remember that?
11   A    Yes.
12   Q    Were those or similar documents
13 also contained in the Annex E trade packs?
14   A    So I explained that some of them
15 would be similar.  But the one that I
16 referred to or the ones about the dividends
17 being received, issued from the company or in
18 the market recall, wouldn't be in the Annex E
19 packs.
20   Q    Any other differences between the
21 Annex E and non-Annex E trade packs in terms
22 of material documentation in your testimony,
23 sir?
24   A    From the ones that I can remember
25 at the moment, Mr. Oxford, would be the cash

Page 310

1  account entries showing the dividends coming
2  from -- from the market counterparty or the
3  company.
4    Q    Anything else?
5    A    Not that I remember at this moment
6  in time.
7    Q    Okay.  Can we agree that the
8  Annex E trades were all cum ex trades?
9         MR. BINDER:  Objection to form,
10        lacks foundation.
11   A    I don't know, Mr. Oxford.
12   Q    Do you know whether
13 ED&F -- withdrawn.
14        Do you know whether the defendant
15 plans did cum ex trades that resulted in
16 vouchers that are not on Annex E?
17        MR. BINDER:  Objection to form.
18        Objection to form, and also
19        mischaracterizes the evidence.
20   A    I don't know.
21   Q    Do you know whether ED&F did
22 anything to determine whether the
23 counterparties to the non-Annex E cum ex
24 transactions had a right to the relevant
25 Danish shares on the trade dates, and so did,

Page 311

1  in fact, receive dividends from the
2  underlying Danish company?
3    A    As I mentioned, Mr. Oxford, the
4  information in the trade packs of the
5  non-Annex E trades included the SWIFT
6  messages confirming the receipt of the
7  dividend.  And if -- if the -- if the
8  dividend was then paid to the counterparty
9  whose name was on the record sheet on the
10 record date, then there is the
11 confirmation -- sorry -- the correspondent of
12 that dividend being paid.  And also there's
13 the cash statements which reflect that, which
14 shows that the dividends were paid.
15        And the SWIFTs, the other SWIFTs
16 also show that the securities were received.
17   Q    And what did ED&F do to assure
18 itself that the counterparties in those
19 non-Annex E cum ex transactions were not in
20 the exactly the same position as MPT Dubai?
21        MR. BINDER:  Objection to form,
22        lacks foundation.  Also mischaracterizes
23        the documents and misstates evidence.
24        MR. OXFORD:  I think actually
25        you've missed -- I think there's a

Page 312

1  rulebook somewhere.  I think you missed
2  one or two objections if you were trying
3  to go bingo.
4    A    The -- Mr. Oxford, the SWIFT
5  messages show that the dividend had been
6  issued by the company and received.  And the
7  cash statements reflect the receipt of the
8  dividend.
9    Q    Beyond that, do you have anything
10 to add to your answer?
11   A    Not that I remember right now.
12   Q    Okay.  Are you familiar with
13 Annex -- a document called "Annex A?"
14   A    Would I be able to see it?
15   Q    I think almost certainly.  But
16 let's just start with my question.
17   A    As I said, I've seen many, many
18 documents.  I'm not sure, right now, exactly
19 which one it is.
20   Q    Okay.  Can you then turn to your
21 Binder 7?
22   A    Yeah.
23   Q    It's Exhibit 275.  It's what we
24 just looked at, actually.
25        It's the "Re-Amended Defense?"

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

21  (Pages 313 to 316)

Page 313

1    A    Okay.
2    Q    And at the end of the pleading, you
3  recall we looked at Annex E?
4        MR. BINDER:  What exhibit are we
5    talking about?
6        MR. OXFORD:  4395 -- no, 4391.  I
7    get that wrong every single time.  My
8    apologies.  I'm sorry.  4391.
9    Q    Do you have it there, sir?
10   A    I have a Tab 275 open.
11   Q    Great.
12       And is that the "Re-Amended
13  Defense," sir?
14   A    On the front page, it says
15  "Re-amended Defense."
16   Q    Okay.  Then can you turn to the
17  back and go to Annex A?
18   A    Yeah.  Bear with me.  Okay.
19   Q    Okay.  You're with me, sir?  It's
20  the first annex to the "Re-Amended Defense?"
21  They have, I think, "Annex A Incorrect Tax
22  Vouchers."
23   A    Yes, I can see the title says that.
24   Q    Okay.  Are you familiar with this
25  document, sir?

Page 314

1    A    (Witness reviewing.)
2        As I said, I've seen so many
3  documents, I'm sure I've seen it.  But I
4  don't recall it right now.
5    Q    Okay.  Do you have any information
6  about why these tax vouchers are incorrect?
7    A    Bear with me, please.
8        (Witness reviewing.)
9        Because my understanding, based on
10  seeing this table, Annex A, Mr. Oxford, is
11  that the actual share holding of the pension
12  plans listed in the third column were less
13  than the claimed share holding.
14   Q    Okay.  So said differently, did the
15  tax vouchers on Annex A over -- withdrawn.
16       Is it fair to say that the tax
17  vouchers on the Annex A overstated the number
18  of shares in Lundbeck that the listed plans
19  held?
20       MR. BINDER:  Objection.  I just
21    want to say Annex E is not a -- Annex A
22    is not a subject of testimony on the
23    30(b)(6) notice, I believe.  And so it
24    would be outside of the scope of his
25    testimony as a corporate representative.

Page 315

1        MR. OXFORD:  Well, I think it is
2    within the notice.  And we specifically
3    listed this trade on Schedule B to the
4    notice, Mr. Binder.  So respectfully,
5    this is clearly within the topic.
6        MR. BINDER:  Can you point me to
7    the paragraph you think is the relevant
8    paragraph?
9        MR. OXFORD:  Yeah.  It's
10   Schedule B.
11       MR. BINDER:  On the notice I have,
12   I'm not looking -- I don't see a
13   schedule.  There may be one on some
14   other version.  So what I see on
15   Schedule B is a list of securities, a
16   list of corporations.  Okay.  But
17   you -- you're -- okay.
18       So for the record, there's nothing,
19   there's no topic listed mentioning
20   Annex A in any of the topics, and it's
21   our position this is beyond the scope of
22   his role as a corporate representative
23   on behalf of ED&F Man Capital Markets
24   Limited.
25       MR. OXFORD:  Okay.  Well, if you

Page 316

1    look at -- just for example, there are
2    many others -- but if you look at 19,
3    for example, Topic 19 says, "The tax
4    vouchers, including the representations
5    made by ED&F contained in the tax
6    vouchers."  So respectfully, Neil,
7    you're dead wrong.
8    Q    Okay.  Mr. Hashemi, I believe after
9  that fascinating colloquy, there was a
10  question somewhere.
11       MR. OXFORD:  Mike would you mind --
12    oh, here we go.  I've got it.
13   Q    Let me just put the question to you
14  again, because I imagine that was
15  distracting.
16       Is it fair to say that the tax
17  vouchers on Annex A overstated the number of
18  shares in Lundbeck that the listed plans
19  held?
20       MR. BINDER:  Objection.
21   A    I can see in this table that it
22  shows that the claimed share holding was
23  greater than the actual share holding by the
24  pension plans in the third column.
25   Q    So is the answer to my question

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

Page 317

1   "yes?"
2           MR. BINDER:  Objection.
3       A   Can you ask the question again
4   please, Mr. Oxford?
5       Q   Okay.  Sure.  Third time.
6           Is it fair to say that the tax
7   vouchers in Annex A overstated the number of
8   shares in Lundbeck that the listed plans
9   held?
10          MR. BINDER:  Objection.
11      A   What I can see here is that the
12  claimed share holding is greater than the
13  actual share holdings of the pension plans.
14      Q   So the answer to my question is --
15  it yes or no?
16          MR. BINDER:  Objection.
17      A   I don't know.
18          MR. OXFORD:  Okay.  So just to
19      complete our record, Mr. Binder, this
20      table -- this trade is also in the table
21      of trades which we've marked as Exhibit
22      4366, or is in the binder as Exhibit
23      4366, which Mr. Smith of Hughes, Hubbard
24      & Reed sent to you on April 30th of this
25      year.  So the idea that this is beyond

Page 318

1   the scope is beyond the pale.
2       Q   Do you have any information,
3   Mr. Hashemi, about how ED&F came to issue
4   these incorrect tax vouchers on Annex A?
5           (Whereupon the above mentioned was
6       marked for Identification.)
7           MR. BINDER:  Objection.
8       A   I don't recall right now.
9       Q   Do you know when ED&F discovered
10  that the vouchers were incorrect?
11      A   I believe it would have been when
12  ED&F's attorneys were doing their -- their
13  work in relation to this.
14      Q   Okay.  What's that belief based on,
15  sir?
16      A   From my understanding from when I
17  was preparing, from conversations with ED&F's
18  attorneys.
19      Q   So ED&F's attorneys told you as
20  part of your preparation for this 30(b)6,
21  sir, that the incorrect nature of the tax
22  vouchers on Annex A was discovered when?
23          Like at what point in time?
24          MR. BINDER:  Objection to form,
25      asked and answered.

Page 319

1       A   Based on my preparation and
2   conversations, Mr. Oxford, my understanding
3   is that it was when ED&F's attorneys were
4   carrying out their work.
5       Q   And what period of time was that?
6   After SKAT brought litigation?
7           MR. BINDER:  Objection to form,
8       vague.
9       A   I'm not sure.
10      Q   In fact, ED&F was aware of these
11  errors on the Annex A tax vouchers way back
12  in 2013.
13          Is that not the case?
14          MR. BINDER:  Objection to form.
15      Leading, lacks foundation.
16          MR. OXFORD:  A leading question on
17      cross examination?  That's absolutely
18      objectionable.
19      Q   Can you answer my question, sir?
20          MR. BINDER:  We're not defendants
21      in your lawsuit, Mr. Oxford.
22      A   Can you ask me the question again,
23  please, Mr. Oxford?
24      Q   Sure.
25          In fact, ED&F was aware of these

Page 320

1   errors on the Annex A tax vouchers way back
2   in 2013?
3           MR. BINDER:  Objection, leading,
4       mischaracterizes prior testimony.
5       A   I don't know, Mr. Oxford.
6       Q   Okay.  Can I ask you, please, to
7   turn to Exhibit 4423?
8           (Whereupon the above mentioned was
9       marked for Identification.)
10      Q   Which is in your Binder 7 at 308.
11      A   Sorry.  Which tab?
12      Q   308.
13      A   Okay.  Okay.  Tab 308.
14      Q   Okay.  Sorry.  I mislabeled that
15  particular document.
16          Do you have that document in front
17  of you, sir?
18      A   Tab 308, right?
19      Q   Tab 308.  It should be -- the first
20  page has Bates ending 769?
21      A   Yeah, ends in 769, yeah.
22      Q   You see this is an e-mail from
23  Marcus Howard to a number of other people at
24  ED&F Man.  And the subject is "Danish Tax
25  Reclaims, Arunvill."

Page 321

1          Do you see that?
2     A     I see that, yes.
3     Q     And this e-mail is sent on July 3,
4  2013.
5          Correct?
6     A     The e-mail was sent on July 3,
7  2013.
8          Could I just make a point,
9  Mr. Oxford?  I said yes to people at
10 ED&F Man.  I don't actually recognize all of
11 those names.
12         But based on the way that they are,
13 I said yes.
14    Q     But the date of this, we can agree
15 the date is back in 2013.
16         Correct?
17    A     Yes.  The 3rd of July, 2013.
18    Q     Terrific.  And Mr. Howard writes,
19 "Please can you move the difference of
20 312,120 DKK to Suspense and clearly label
21 this as, quote, Excess Credit Received From
22 Danish Tax Reclaim in LUN DC, quotes?  We
23 will advise what to do with that in due
24 course."
25         Do you see that, sir?

Page 322

1     A     I see that's what the document
2  says.
3     Q     Okay.  You didn't see this document
4  as part of your preparation for today?
5     A     As I've said, I've seen a lot of
6  documents.  But at this moment in time, I
7  don't recall this one right now.
8     Q     Okay.  Do you know what SKAT
9  did with -- withdrawn.
10         Do you know what ED&F Man did with
11 the excess funds that they had claimed from
12 SKAT in relation to the Annex A vouchers?
13         MR. BINDER:  Objection to form,
14 mischaracterizes the evidence, lacks
15 foundation.
16    A     I don't know.
17    Q     You would have expected ED&F to
18 return the money to SKAT, I assume?
19         MR. BINDER:  Objection to form,
20 mischaracterizes the evidence, lacks
21 foundation.
22    A     I don't know, Mr. Oxford.
23    Q     Okay.  Can I ask you to turn to
24 Exhibit 4424?
25         (Whereupon the above mentioned was

Page 323

1     marked for Identification.)
2     Q     In your binder, sir, it is Tab 309
3  in Binder 7, so just the next page over.
4     A     Yeah.
5     Q     Have you seen this document before?
6     A     (Witness reviewing.)
7          I do not recall seeing this exhibit
8  document before.
9     Q     Okay.  The initial e-mail is
10 written by Michael Meade.  He's the guy at
11 ED&F responsible for preparing tax vouchers.
12         Correct?
13    A     I believe so.
14    Q     And he created all of the Annex E
15 and non-Annex E tax vouchers as well.
16         Correct?
17         MR. BINDER:  Objection to form.
18    A     (Witness reviewing.)
19         I know that Michael Meade
20 was -- prepared the tax vouchers.
21    Q     And he also prepared the Annex A
22 tax vouchers.
23         Correct?
24         MR. BINDER:  Objection to form.
25    A     I understand that he prepared the

Page 324

1  tax vouchers.
2     Q     He writes, "After investigation, it
3  transpires that this is an excess amount
4  after a tax reclaim on LUN DC."  It's the
5  shorthand for Lundbeck.
6          "The full tax reclaim of DKK
7  312,120 was posted on March 7th" -- oh sorry.
8  "It was posted on 3/7/13 with only 306,600
9  Danish krones being debited from the account
10 on 25, 7, 13."
11         Do you see that?
12    A     I can see that's what the e-mail
13 says.
14    Q     Do you know what the reference to
15 306,600 krones is?
16    A     I do not.
17    Q     Okay.  Who is Christina MacKinnon?
18    A     Christina MacKinnon was an employee
19 of ED&F Man and her role was head of the
20 securities operations team, I think.
21    Q     And Ms. MacKinnon writes that "the
22 excess should be posted to P&L."
23         Do you see that?
24    A     I can see that the e-mail says,
25 "Please post this amount to P&L, please."

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

24 (Pages 325 to 328)

Page 325

1    Q    Okay.  "P&L" is a reference to
2  profit and loss, isn't it?
3    A    It's what the e-mail says.
4  I -- typically I refer to it as profit and
5  loss.
6         But that's what the e-mail says.
7    Q    Fair to assume she's talking about
8  ED&F's profit and loss?
9         MR. BINDER:  Objection to form.
10   A    I don't know.
11   Q    Okay.  Let's take a break.  Let's
12 go off the record.
13        THE VIDEOGRAPHER:  Stand by.  The
14   time is 9:40 a.m. New York time and
15   we're going off the record.
16        (Brief recess taken.)
17        THE VIDEOGRAPHER:  Stand by.  The
18   time is 10:08 a.m. New York time and
19   we're back on record.
20   Q    Mr. Hashemi, just before we went
21 back on, I understand from your counsel that
22 you have a correction to make to your
23 testimony.
24   A    I do, yes.  Mr. Oxford, you asked
25 me about -- a number of questions about

Page 326

1  Annex A, and I got confused.
2         And I just wanted to state that
3  I don't actually know anything about Annex A.
4    Q    Annex A was not part of your
5  preparation for the testimony today?
6    A    No.
7    Q    Okay.  Can you please turn to
8  Exhibit 4430, which was the draft of the
9  Agreed Schedule of Facts that was provided to
10 us last night by Mr. Binder, with a
11 representation that that was the version of
12 the document that you had reviewed as part of
13 your preparation for your testimony?
14        MR. OXFORD:  Mr. Binder, please, of
15   course, tell me if that representation
16   is incorrect.
17        MR. BINDER:  So I will say yes,
18   this is the document that Mr. Hashemi
19   had in his preparation.  But also, just
20   so the record is clear, this is
21   obviously a document that SKAT and its
22   counsel had as well during the course
23   of -- you know, for quite some time.  We
24   didn't produce this document in this
25   litigation.  This was a document we all

Page 327

1  had, right?
2         MR. OXFORD:  Understood, clear, no
3    suggestion to the contrary.  I think we
4    just were trying to clear up
5    certain -- basically version control
6    between the version we had marked
7    yesterday and a version of the same
8    document, which I freely acknowledge was
9    negotiated and drafted between counsel
10   for SKAT in England and counsel for
11   ED&F Man in England.
12        (Whereupon the above mentioned was
13   marked for Identification.)
14   Q    Okay.  So with that violate
15 agreement in place, can you take a look,
16 please, at Exhibit 4430, Mr. Hashemi?
17   A    Okay.  I have it in front of me.
18   Q    Can you confirm that is, in fact,
19 the version of the -- that is, in fact, a
20 version of the draft Schedule of Agreed Facts
21 that you reviewed in preparation for your
22 deposition?
23   A    (Witness reviewing.)
24        Yes, it appears to be the version
25 that I had reviewed.

Page 328

1    Q    Okay.  Are you aware of any
2  incorrect statements in this document?
3    A    (Witness reviewing.)
4         I'm not aware of any incorrect
5  statements in this document.
6    Q    Okay.  So, from ED&F's point of
7  view, the statements in here, you believe,
8  are accurate?
9    A    This document reflects ED&F Man's
10 position.
11   Q    Okay.  Thank you.  That's helpful.
12        So can I ask you just to quickly
13 turn to Paragraphs 20 and 2 -- sorry, 21 and
14 22, which are on Page 6 of the document?
15   A    Okay.
16   Q    And the heading is "B-5 Contractual
17 Documentation."
18        Do you see that?
19   A    I do.
20   Q    And then it lists five agreements
21 that were -- withdrawn.
22        It says, "In relation to the
23 services provided by ED&F Man, ED&F Man and
24 each pension plan or GP."
25        Do you know what the reference to