CONFIDENTIAL
Shahab Hashemi – October 8, 2021

25 (Pages 329 to 332)

Page 329

1 "GP" is?
2    A    I believe it's Gibraltarian
3 partnerships.
4    Q    "In relation to the services
5 provided by ED&F Man, ED&F Man on the one
6 hand, and on the other, each pension plan or
7 Gibraltarian partnership executed or agreed
8 to the terms of the following documents," and
9 then it lists a custody agreement, the
10 security and setoff date, the ISDA agreement,
11 the fee agreement letter, and ED&F Man's
12 terms of business.
13         Do you see that?
14    A    I do see that.
15    Q    And then 22 goes on to say that
16 "some but not all pension plans also executed
17 a global master securities lending agreement
18 with ED&F Man."
19         Do you see that?
20    A    I do see that.
21    Q    All right.  I take it from your
22 general comments that that -- those
23 statements in 21 and 22 are accurate from
24 ED&F Man's perspective?
25    A    I believe them to be accurate.

Page 330

1    Q    And that's a complete list of the
2 agreements governing the relationship between
3 ED&F Man and the defendant pension plans?
4         MR. BINDER:  Objection to form.
5    A    (Witness reviewing.)
6         I believe them to be a list of
7 agreements executed between ED&F Man and each
8 of the pension plans.
9    Q    Okay.  And do you believe it to be
10 a complete list?
11         MR. BINDER:  Objection to form.
12    A    I'm not sure.  I don't know.
13    Q    Okay.  New topic.
14         Are you familiar with the term
15 "payment agent," sir, in the context of this
16 case?
17    A    Could you -- can you explain to me
18 what you mean by "payment agent?"
19    Q    Yeah, sure.  I'm just referring to
20 the agent of the pension plan that submitted
21 reclaim applications to SKAT.
22    A    Okay.  I think I know the term "tax
23 reclaim agent."
24    Q    Okay.  We're talking about the same
25 thing.

Page 331

1         Okay.  great.
2         So is it your understanding that
3 when -- after ED&F Man produced tax vouchers,
4 that the tax reclaim agents would submit
5 those, along with other paperwork, to SKAT?
6         MR. BINDER:  Objection to form.
7    A    My understanding is that on
8 instruction of the pension plan or its
9 investment manager, ED&F Man would produce
10 tax vouchers and provide them to the
11 investment manager or the tax reclaim agent
12 on behalf of the investment manager.
13    Q    Okay.  And did you have any
14 understanding about what happened next in the
15 process?
16    A    I do not.
17    Q    Okay.  Do you have any
18 understanding, sir, of what happened after
19 SKAT granted the reclaim applications on
20 behalf -- withdrawn.
21         Do you have any understanding, sir,
22 of the process after SKAT granted the refund
23 applications submitted along with the ED&F
24 tax vouchers?
25         MR. BINDER:  Objection to form.

Page 332

1    A    From my preparations for this
2 deposition, I understand that when the
3 withholding tax was paid, this was either
4 received by ED&F Man from the tax reclaim
5 agent, which I understand is the more common
6 way.
7         I believe occasionally it was
8 received from SKAT directly, and sometimes it
9 went direct to the pension plans.
10    Q    Okay.  And when it went direct to
11 the pension plans, did it go to their pension
12 plan accounts at ED&F?
13    A    I don't believe it was received via
14 ED&F Man.
15    Q    Okay.  And in the circumstances
16 where the withholding tax reclaim was
17 received by ED&F Man from the tax reclaim
18 agent, was ED&F involved in the distribution
19 of the proceeds of that reclaim?
20         MR. BINDER:  Objection to form,
21    vague.
22    A    When -- from the documentation that
23 I've seen, when the withholding tax was
24 received, it was credited in the pension
25 plans cash account.

CONFIDENTIAL
Shahab Hashemi – October 8, 2021

Page 333

1    Q    And after it was credited from the
2  pension plan's cash account, was it
3  distributed further?
4         MR. BINDER:  Objection to form.  I
5    think your question may have an error in
6    it.
7         MR. OXFORD:  Well, it wouldn't be
8    the first time and I'm sure it won't be
9    the last.
10        I'm not sure I see it.
11        Mr. Hashemi, do you understand my
12   question?
13        MR. BINDER:  Objection, vague,
14   unclear.
15   A    Could you ask it again?
16   Q    Sure.
17        I think you told us a few moments
18 ago that in the majority of cases, after the
19 reclaim had been granted by SKAT, the tax
20 reclaim agent remitted those funds to the
21 pension plan's account at ED&F Man.
22        Is that correct?
23   A    Yeah, I would have said that these
24 would have been recorded in the pension
25 plan's cash account.

Page 334

1    Q    And is there a difference between
2  being recorded in the pension plan's cash
3  accounts and remitting those funds to the
4  pension plan's account at ED&F Man?
5         MR. BINDER:  Objection, form.
6    Q    What I'm trying to ask, is there a
7  difference?  Was it a book entry, or did
8  actual cash move?
9    A    I understand that the withholding
10 tax was received into the cash omnibus
11 account of ED&F Man, and it was then recorded
12 in the pension plan's cash account.
13   Q    Okay.  That's a helpful
14 clarification.  Thank you.
15        Did the -- did a hundred percent of
16 the refund remain recorded in the pension
17 plan's cash account at ED&F or was it
18 distributed to other parties?
19        MR. BINDER:  Objection to form,
20   mischaracterizes the evidence.
21   A    From the preparation that I did and
22 the documents that I saw, the withholding tax
23 that was received was credited to the pension
24 plan's cash account.  But you mentioned,
25 Mr. Oxford, that it was a hundred percent of

Page 335

1  the withholding tax, and I recall that there
2  were -- it was less tax reclaim agent fees.
3    Q    Okay.  That's fair.
4         But subject to the deduction of
5  fees by the tax reclaim agent, what happened
6  to the tax refund -- withdrawn.
7         What happened to the -- let me
8  start again.  That's a terrible question.
9         Subject to the deduction of fees by
10 the tax reclaim agent, what happened to the
11 cash in the ED&F Man omnibus account that was
12 credited to the pension plan's cash account?
13        MR. BINDER:  Objection to form.
14   A    So the amount of the withholding
15 tax that was received into the omnibus cash
16 account was credited to the -- in the pension
17 plan's cash account with ED&F Man.
18   Q    Okay.  And is that -- is that
19 refund -- is that refund still sitting in the
20 pension plan's cash account, or was it moved
21 somewhere?
22        MR. BINDER:  Objection to form,
23   vague, mischaracterizes the evidence.
24   A    I don't know.
25   Q    Okay.  Can I ask you to turn to

Page 336

1  your Binder 5, Tab 142, please?
2    A    Of course.
3         MR. BINDER:  Exhibit number?
4         MR. OXFORD:  Oh, I'm sorry, Neil.
5    4259.
6         (Whereupon the above mentioned was
7    marked for Identification.)
8    A    Binder 5.  Which tab, Mr. Oxford?
9    Q    142.
10   A    Okay.  This binder also appears to
11 be broken.
12   Q    There's a joke in there somewhere
13 that it's been a rough week for the binders.
14   A    142, right?
15   Q    142.
16   A    One second.  Okay.
17        I have the Tab 142 in front of me.
18   Q    Great.
19        And is that a letter from
20 Rosenblatt to Vincent Masons of January 13th
21 of 2020?
22   A    The letter appears to be from
23 Rosenblatt, and it's dated the 13th of
24 January, 2020.
25   Q    Okay.  Have you seen this document

Page 337

1 before, sir?
2     A    (Witness reviewing.)
3         As I've said, I've seen many
4 documents.  Right now, I don't recall seeing
5 this one before.
6     Q    Okay.  You don't -- sitting here
7 today, you don't think you saw this in
8 preparation for your testimony today?
9         MR. BINDER:  Objection to form.
10     Objection to form, misstates the
11     witness' testimony.
12     A    As I've said, I've seen many
13 documents as part of this preparation, and I
14 don't recall seeing this one right now.
15     Q    Okay.  Can we agree that this is
16 Rosenblatt's response to questions from
17 SKAT's English lawyers about the parties to
18 which ED&F paid sums received from agents in
19 respect of withholding tax applications
20 related to the Annex E tax vouchers and the
21 quantum of each payment?
22         MR. BINDER:  Objection to form,
23     compound, lacks foundation.
24     A    Mr. Oxford, I'd have to read the
25 entire letter.

Page 338

1     Q    Okay.  Well, why don't we start off
2 by reading Paragraph 1.
3     A    Okay.
4         (Witness reviewing.)
5         Should I read this out loud?
6     Q    You can just read it to yourself.
7     A    Okay.
8         (Witness reviewing.)
9         Okay.
10     Q    Are you finished with that
11 paragraph, sir?
12     A    I've read that paragraph.
13     Q    Okay.  So can we agree that
14 Rosenblatt is responding to inquiries from
15 SKAT's English lawyers about where the sums
16 received from agents in respect of the
17 Annex E withholding tax applications were
18 sent?
19     A    So it says here that it's referred
20 to SKAT second letter dated 12 September '19
21 and their inquiry as to who ED&F Man paid
22 those sums received from agents in respect to
23 the withholding tax applications, which
24 included the Annex E tax vouchers and the
25 quantum of each payment.

Page 339

1     Q    Okay.  It goes on, directing your
2 attention to the third paragraph, it says,
3 "ED&F Man instructed FTI to carry out a
4 review to identify how the withholding tax
5 funds received by each pension plan in
6 respect of the Annex E tax vouchers were then
7 applied by each pension plan."
8         Do you see that?
9     A    (Witness reviewing.)
10         I can see the third paragraph.
11     Q    Okay.  Can you tell us, please,
12 what instructions ED&F Man gave
13 FTI Consulting in respect of this review?
14     A    (Witness reviewing.)
15         MR. BINDER:  Objection to form.
16     A    Mr. Oxford, the letter says that
17 "ED&F Man instructed FTI Consulting to carry
18 out a review to identify how the WHT funds
19 received by each of the pension
20 plans -- received by --
21         THE WITNESS:  Sorry, Mike, I was
22     facing down again.
23     A    "WHD funds received by each of the
24 pension plans in respect of the Annex E tax
25 vouchers were then applied by each pension

Page 340

1 plans."
2     Q    Do you have -- beyond reading the
3 words on that page, do you have any
4 information about the details of the
5 instructions that ED&F Man gave to
6 FTI Consulting?
7         MR. BINDER:  Objection to form,
8     vague.  Also vague with respect to the
9     term "instructed," Mr. Oxford.
10     A    I don't know, Mr. Oxford.
11     Q    Okay.  Do you have any information
12 about the process by which ED&F prepared its
13 analysis in response to this instruction?
14         MR. BINDER:  Objection to form,
15     confusing, vague.
16     A    I don't know, Mr. Oxford, because I
17 don't know specifically what you're referring
18 to.
19     Q    I'm referring to the -- well, let's
20 do it this way.  The letter goes on.
21         "We enclose a spreadsheet at
22 Appendix 1 which details the analysis of this
23 review."
24         Do you see that?
25     A    I can see that's what the document

Page 341

1 says.
2      Q      Okay.  And then there's a
3 spreadsheet at the back.
4            Can you just take a moment to
5 review the spreadsheet and tell me whether
6 you've ever seen it before?
7      A      Sorry.  Where am I looking for the
8 spreadsheet?
9      Q      It's attached to the letter, sir.
10      A      So in this -- in the binder in
11 front of me --
12      Q      We even have it -- I'm told we
13 might even have it in a native Excel.
14      A      Okay.
15      Q      So this is Exhibit 4259.
16      A      Okay.  It is -- I have it open.
17      Q      Great.  Just take a moment and let
18 me know if you've ever seen this before.
19      A      (Witness reviewing.)
20      MR. BINDER:  I'm going to object
21      because you're showing this to him in a
22      format of an Excel.  So, to the extent
23      he has -- he has seen this document in
24      the form it was attached to the letter,
25      I would -- I would just want the record

Page 342

1 to be clear that he's viewing this in an
2 Excel format, not as it would have been
3 attached originally as a PDF or however
4 it was delivered.
5      A      (Witness reviewing.)
6      MR. OXFORD:  Mr. Binder, I can note
7      for the record that your objection is
8      without foundation.  Because, as
9      provided to us, I understand there was
10      not a PDF, but an Excel file.
11      MR. BINDER:  All I'm saying is
12      I -- if he has seen it, he'll have to
13      answer that.  I don't know whether he
14      would have seen it in Excel or in PDF.
15      So it's just -- to the extent that the
16      formatting impacts his answer, I just
17      want that noted.
18            Mr. Hashemi, if you can answer
19      Mr. Oxford's question, if you're
20      familiar with this document?
21      A      Yeah, I'm just going through the
22 tabs.
23            (Witness reviewing.)
24            Mr. Oxford, this spreadsheet looks
25 familiar, and it's difficult for me to

Page 343

1 identify if I've seen this exact version,
2 and -- but the contents of this spreadsheet
3 look familiar to me.
4      Q      Okay.  Can you tell us if
5 this -- the data in this spreadsheet is
6 accurate?
7      A      (Witness reviewing.)
8            If it's the same spreadsheet that
9 I've seen, I think it might be.  I believe
10 the data in this document is accurate.
11      Q      Okay.  So just looking -- are you
12 on the first tab, sir, which I believe is
13 Acer?
14      A      Yeah.
15      Q      Okay.  Do you see there's a number
16 of column headings about two-thirds of the
17 way across the page.  There's one called
18 "Trading Loss on Share Acquisitions and
19 Hedging Transactions."
20      A      Column I.
21      Q      Yes.
22      A      Yes, I see Column I.
23      Q      How was -- well, withdrawn.
24            What information is contained in
25 that column?

Page 344

1      A      (Witness reviewing.)
2            That Column I, "Trading Loss on
3 Share Acquisitions and Hedging Transactions,"
4 includes, I believe, the P&L of the
5 securities transaction, the securities trade,
6 and the hedge after the transactions matured.
7      Q      Okay.  Can we agree that if the
8 pension plans make a trading loss, that's a
9 counterparty on the other side that makes a
10 trading gain?
11      MR. BINDER:  Objection, lacks
12      foundation.
13      A      Can you ask the question again?
14      Q      Sure.
15            Can we agree that if the pension
16 plans made a trading loss, there's a
17 counterparty on the other side of that
18 transaction that made a trading gain?
19      MR. BINDER:  Objection, lacks
20      foundation.
21      A      I'm not sure.
22      Q      Was any of the trading loss in
23 Column I paid to any legal entity in which
24 ED&F has an interest?
25      MR. BINDER:  Objection to form,

CONFIDENTIAL
Shahab Hashemi – October 8, 2021

29 (Pages 345 to 348)

Page 345

1 vague, lacks foundation.
2    A    The trading loss on share
3 acquisitions of hedging transactions titled
4 in Column I, and those P&L would be
5 referenced in the pension plan's statement.
6    Q    Right.  My question is a little bit
7 different, which is:  To the extent the plan
8 makes a loss and there's a debit to their
9 account, is the corresponding credit, was any
10 of that money in Column I, was that paid to
11 ED&F or any entity affiliated or related to
12 ED&F?
13        MR. BINDER:  Objection, vague,
14 lacks foundation.
15    A    I don't know.
16    Q    Do you know the process by which
17 ED&F searched for and identified any
18 documents to be provided to FTI in
19 preparation for this spreadsheet?
20    A    Can you ask me the question again,
21 please?
22    Q    Do you know the process by which
23 ED&F searched for and identified any
24 documents to be provided to FTI in
25 preparation for making this spreadsheet?

Page 346

1    A    I'm not sure.  I don't remember
2 right now.
3    Q    Do you know if FTI created any
4 materials that back up the work reflected in
5 this spreadsheet?
6    A    Sorry.  The beginning of your
7 sentence I didn't hear properly.
8    Q    Do you know if FTI created any
9 materials that link the conclusions or
10 numbers in this spreadsheet to the books and
11 records of ED&F Man?
12        MR. BINDER:  Objection to form.
13    A    Did you say "created materials?"
14    Q    Yes, sir.
15    A    And the answer to your question is
16 I don't know.
17    Q    Okay.  The next column over is
18 Column J, which is "Trading Fees."
19        Do you see that?
20    A    I do, yes.
21    Q    What are the trading fees reflected
22 in this column?
23    A    Trading fees in this column could
24 relate to custody fees, execution fees,
25 financing fees, so like interest passed on to

Page 347

1 the pension plans, brokerage fees.
2        That's all that I can remember now.
3    Q    Is it your testimony that the
4 trading fees could relate to those topics or
5 are related to those topics?
6    A    Sorry.  Could you ask the question
7 again, Mr. Oxford?
8    Q    Yeah.  You said that the trade fees
9 in this column could relate to, and then you
10 gave me a laundry list of fees.  I'm focusing
11 on the word "could."
12        I'm asking you if it is your
13 testimony that the trading fees did, in fact,
14 relate to those items, or whether you're
15 guessing?
16        MR. BINDER:  Objection to form.
17    A    The fees were — for my preparation
18 and all the documents and things that I saw,
19 the fees occasionally differed.  So the list
20 that I gave you was things that would have
21 been included in the trading fees.
22    Q    Okay.  Can you turn back to the
23 letter, please, and to Page 2 of that?
24    A    Page 2?  I have Page 2.
25    Q    It says, in the penultimate

Page 348

1 paragraph, "We have not been able to
2 ascertain at present to whom the trading fees
3 were paid."
4        Do you see that?
5    A    I can see that's what the document
6 says.
7    Q    Do you know why ED&F has not been
8 able to ascertain to whom the trading fees
9 were paid?
10        MR. BINDER:  Objection to form.
11    A    I don't know the answer to your
12 question.
13    Q    Do you know whether that position
14 has changed since January 13, 2020?
15    A    (Witness reviewing.)
16        Based on the documents that I saw
17 and a number of the spreadsheets that I saw,
18 the components of the trading fees which I
19 mentioned make up the up-front fee in the
20 fees charged by ED&F Man to the pension
21 plans.
22    Q    Right.  That's not my question.
23        My question is:  Do you know
24 whether, since January 13, 2020, the position
25 has changed, i.e., has ED&F been able to

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

Page 349

1  ascertain to whom the trading fees were paid?
2          MR. BINDER:  Objection to form.
3      A   I don't know.
4      Q   Just turning your attention back to
5  the spreadsheet for one more column, you'll
6  see that Column K is titled "MCM Fees."
7      A   (Witness reviewing.)
8          Sorry, Neil.  Did you ask me a
9  question?
10     Q   Yes, I did.
11     A   Can you repeat the question?
12     Q   Sure.
13         Do you see that, in Column K, the
14 heading is "MCM Fees?"
15     A   I can see that in Column K of this
16 Acer tab in the spreadsheet, and the title is
17 "MCM Fees," in brackets, "DKK."
18     Q   Okay.  How were the MCM fee numbers
19 in that column calculated?
20     A   From the documents that I saw in
21 preparation for this deposition, I believe
22 this to be the behind fees that were referred
23 to, and that MCM charged the pension plans
24 after the trading structure had matured.
25         And just to add to that, and after

Page 350

1  the withholding tax was received by the
2  pension plan.
3      Q   Okay.  Can you open, please, sir,
4  Exhibit 4210?  It's in Binder 4, Tab 88.
5          (Whereupon the above mentioned was
6          marked for Identification.)
7      A   Yeah.  Sorry.
8          Could you repeat which tab it was?
9      Q   Eighty-eight.
10     A   Thank you.  I have Tab 88 open.
11     Q   Okay.  You see that's an e-mail
12 from Brian Fraser at Ackerman to me and
13 several other lawyers, March 18, 2020?
14     A   I can see that the e-mail is from
15 Brian Fraser at Ackerman, dated March 18,
16 2020.
17     Q   Okay.  Turning your attention, if
18 you could turn to the second page of the
19 document, to Paragraph A?
20     A   Okay.
21     Q   The third sentence reads, "The
22 pension plans did not pay for the shares.
23 The share acquisitions were funded by
24 ED&F Man, such finance being a standard prime
25 brokerage service" --

Page 351

1      A   I'm sorry.  Mr. Oxford, I
2  apologize.  Where in "A" are you reading --
3  you didn't start from the beginning, did you?
4      Q   Yeah, that's absolutely correct.
5  That's why I said "the third sentence."
6      A   Sorry, I missed that.  Apologies.
7  Go ahead.
8      Q   Okay.  So let's just clean this up.
9          Do you see the third sentence of
10 Mr. Fraser's Paragraph A begins, "The pension
11 plans did not?"
12     A   I can see the sentence that says
13 "The pension plans did not."
14     Q   Okay.  Great.
15         So if you're following along, it
16 says, "The pension plans did not pay for the
17 shares.  The share acquisitions were funded
18 by ED&F Man, such finance being a standard
19 prime brokerage service provided in
20 accordance with our client's standard terms
21 and conditions."
22         Do you see that?
23     A   I can see that's what it says.
24     Q   Is that an accurate statement?
25     A   (Witness reviewing.)

Page 352

1          So I think as I mentioned
2  yesterday, as the role of the broker, one of
3  the services that ED&F Man provided to its
4  pension plans was securities financing.  And
5  I recall from the documents that I've seen as
6  part of the preparation of this deposition
7  that when the pension plans bought the
8  shares, their accounts would be debited for
9  the price of the shares that were acquired.
10     Q   Because ED&F was funding or
11 financing, as part of its services, the
12 acquisition of Danish shares by the defendant
13 plans.
14         Correct?
15     A   So one of the services that
16 ED&F Man was providing was securities
17 financing.
18     Q   And it was that securities
19 financing provided by ED&F Man that permitted
20 the defendant plans to purchase the Danish
21 shares.
22         Correct?
23     A   The financing services provided by
24 ED&F Man allowed the pension plans to
25 purchase the shares.

Page 353

1    Q    Okay.  Can you go back, please -- I
2  think you probably have it in hard
3  copy -- Exhibit 4430?
4         That's the Agreed Schedule of Facts
5  we marked a few moments ago.
6    A    Okay.
7    Q    Okay.  Can I ask you turn, please,
8  to Paragraph 85 on Page 23?
9    A    I am on Page 23.
10   Q    Okay.  Do you see Paragraph 85?
11   A    I do see Paragraph 85.
12   Q    It says, "When onboarded as
13  clients, the pension plans were required to
14  make an initial cash deposit into their
15  pension plan and cash accounts to cover the
16  transaction costs of trades brokered by
17  ED&F Man, with such monies paid into
18  ED&F Man's London commercial account with
19  JP Morgan."
20        Do you see that?
21   A    (Witness reviewing.)
22        I can see that's what Paragraph 85
23  says.
24   Q    Okay.  And it's ED&F Man's position
25  that that's an accurate statement.

Page 354

1         Correct?
2    A    Correct.
3    Q    Paragraph 86 below says, "The
4  trades involved some" -- withdrawn.
5         Paragraph 86 below says, "The
6  trades all" -- it may be time for a break.
7  Sorry.  Let me clean this up.
8         Paragraph 86 below says, "The
9  trades involve all or some of the following
10  third-party transaction costs."  Then it goes
11  on to list IDB fees, futures fees, ED&F Man
12  fees, and funding fees.
13        Do you see that?
14   A    I can see that's what Paragraph 86
15  says.
16   Q    And is that, in ED&F's view, an
17  accurate list of the transaction costs
18  incurred by the plan?
19   A    (Witness reviewing.)
20        So the statement says, "The trade
21  involved all or some of the following
22  third-party transaction costs."
23   Q    My question is just whether that's
24  accurate or not.
25        Is Paragraph 86, as written in this

Page 355

1  document, accurate?
2    A    Paragraph 86 as written in this
3  document is accurate.
4    Q    Great.  Thank you.
5         Can you turn, please, to Page 28 of
6  the document?
7         And I direct your attention to
8  Paragraph 113.
9    A    I am on Page 28.  I can see
10  Paragraph 113.
11   Q    Okay.  Directing your attention to
12  the third paragraph beginning, "The agreed
13  transaction fee varied" -- are you with me?
14   A    I am -- the final sentence, right?
15   Q    The final sentence.
16        Correct.
17   A    Okay.  I can see the final
18  sentence.
19   Q    Okay.  And the -- it says, "The
20  agreed transaction fee varied between 27 to
21  50 percent of the transaction's profits, and
22  between three and 10 percent of the net
23  dividend."
24        Do you see that?
25   A    I do see that.

Page 356

1    Q    Okay.  And is this an accurate
2  recitation of the fees that ED&F charged the
3  pension plans for the transactions that
4  underpinned the Danish tax vouchers?
5    A    (Witness reviewing.)
6         Sorry.  That was a long question.
7         Can you ask it again, please?
8    Q    Let me take a look and see if I can
9  ask you a shorter question.
10        Is the sentence we just read an
11  accurate statement of the range of fees that
12  ED&F Man charged to the pension plans in
13  relation to the transactions in Danish shares
14  that underpinned the tax vouchers that
15  ED&F Man issued?
16        MR. BINDER:  Objection to form.
17   A    The statement is accurate in
18  relation to the scope of this Schedule of
19  Agreed Facts.
20   Q    Okay.  Were the ED&F fees discussed
21  in Paragraph 113 contingent on the defendant
22  pension plans making successful withholding
23  tax refund applications?
24        MR. BINDER:  Objection to form.
25   A    The documents that I've seen, and

Page 357

1  in my preparations, the up-front fees were
2  charged to the pension plans prior to any
3  withholding tax being received by the pension
4  plans.
5       Q    And were the behind fees contingent
6  on the defendant pension plans making
7  successful withholding tax refund
8  applications?
9       A    The behind fees were charged by
10 ED&F Man upon completion of the transaction.
11      Q    And where the transactions were
12 completed and SKAT did not grant the refund
13 application, did ED&F still charge behind
14 fees?
15           MR. BINDER:  Objection to form,
16      lacks foundation.
17      A    (Witness reviewing.)
18           I don't remember right now,
19 Mr. Oxford.
20      Q    Okay.  Turning your attention to
21 Paragraph 88, it's on Page 24 of the
22 document?
23      A    I'm on Page 24 and can see
24 Paragraph 88.
25      Q    Great.

Page 358

1           Paragraph 88 says, "All purchase
2  trades were settled with funds provided by
3  ED&F Man, ED&F Man having the power to settle
4  its client transactions pursuant to
5  Clause 9-A of the custody agreement and
6  Clause 2-E of the ED&F terms."
7           Do you see that?
8       A    I do see that in Paragraph 88.
9       Q    Is that an accurate statement?
10      A    That is an accurate statement.
11      Q    Did ED&F notify the pension plans
12 that it was settling the transactions on this
13 basis?
14      A    (Witness reviewing.)
15           I understand the terms.  And so
16 what you're referring to would be governed by
17 the custody agreement and the ED&F terms of
18 business that each of the pension plans
19 allocated.
20      Q    Can you turn to Paragraph 90?
21      A    I can see Paragraph 90.
22      Q    Okay.  Can you just read that to
23 yourself and then tell me whether that is an
24 accurate statement from ED&F Man's
25 perspective?

Page 359

1       A    So just to be clear, I'm starting
2  at 90 through to 90.4?
3       Q    Yes.  So starting on 24, going
4  through 25.
5       A    Yeah, just checking.  Thanks.
6       Q    Thank you.
7       A    (Witness reviewing.)
8           I have read Paragraph 90 from
9  Pages 24 through to 25, and I confirm it is
10 accurate.
11      Q    Great.  Thank you.
12           Let's go off the record.
13           MR. BINDER:  Before we go off the
14      record, Neil, has this document been
15      marked as an exhibit to this deposition?
16           MR. OXFORD:  Yes.  I marked it the
17      first time that I used it.
18           MR. BINDER:  Okay, great.
19      Thank you.
20           THE VIDEOGRAPHER:  Stand by.  The
21      time is 11:07 a.m. New York time and
22      we're going off the record.
23           (Brief recess taken.)
24           THE VIDEOGRAPHER:  Stand by.  The
25      time is 11:34 a.m. New York time and

Page 360

1      we're back on record.
2       Q    Mr. Hashemi, I'm going to ask you a
3  series of questions about the trades in
4  Pandora in 2015 that underlie the reclaims
5  made by the Linden plan.
6           Can you turn, please, to
7  Exhibit 4350, which is in Binder 6, Tab 233?
8           (Whereupon the above mentioned was
9      marked for Identification.)
10      A    Which tab, Mr. Oxford?
11      Q    It is Tab 233.
12      A    Okay, I have Tab 233 open.
13      Q    Okay.  Great.
14           And it's a one-page document with a
15 Bates ending in 913?
16      A    One page ending 913.
17      Q    Okay.  Terrific.
18           So what's happening here is that
19 ED&F is borrowing 400,950 shares of Pandora
20 from ABN Amro, A-M-R-O.
21           Correct?
22      A    (Witness reviewing.)
23           Okay.  I can see that the original
24 sender at the bottom is Victor Macein, ABN
25 Amro.  And the message says, "Borrow Pandora

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

Page 361

1   345950 at 89 A 1903 to 2303."
2        "ABN" -- and then in brackets,
3   "Acer" -- and then it says, "Ollie, please
4   find below the confirmations for Pandora DC."
5        So this Bloomberg original that
6   Oliver Bottomley sent this on the 13th of
7   February at 1207, and then, on the 3rd of
8   March, Freddy Ireland sent a message
9   -- sorry.  One second.
10        In the original details at the
11   bottom there, the one that I read originally,
12   at the bottom it says, "Note, details to be
13   amended when DIV is announced."
14        And then the next message is sent
15   from Freddy Ireland on the 3rd of March and
16   in asterisks, it says, "increase to 400,950
17   shares."
18   Q    So is the answer to my question
19   "yes?"
20        MR. BINDER:  Objection.
21   A    Could you ask your question again,
22   please, Mr. Oxford?
23   Q    What is happening here is ED&F is
24   borrowing 400,950 shares from -- of Pandora
25   from ABN Amro?

Page 362

1   A    I -- I don't know.
2   Q    The price is 60.75 Euros?
3   A    I can see in the original Bloomberg
4   message from Victor Macein, ABN Amro, at the
5   bottom, above the note that I read out, it
6   says, "Pandora DC 345950."  It then says,
7   "Euro 60.75 AI 89 DR 85, gross one spot
8   074654."
9   Q    Do you know what any of those
10   numbers mean or is it just alphabet soup to
11   you?
12   A    345,950 refers to a quantity of
13   shares.
14   Q    Okay.  Is the next number the
15   price?
16   A    It is a currency.  I'm not -- I'm
17   not sure, Mr. Oxford, exactly what it is.
18   Q    Okay.  Does "AI" refer to "all-in?"
19   A    I'm not sure right now.
20   Q    If it does refer to "all-in," do
21   you know what "all-in" means in the context
22   of a stock loan?
23        MR. BINDER:  Objection to form,
24   compound.
25   A    Right now, I don't remember.

Page 363

1   Q    Okay.  Do you know if "all-in" is a
2   reference to the total cost of acquiring the
3   dividend expressed as a percentage of the
4   gross dividend?
5   A    I'm -- I'm not sure, Mr. Oxford.
6   Q    So you see the -- there's a
7   reference to "Value Date, March 19th."
8        Do you see that?
9   A    I can see in the original Bloomberg
10   message, it says "TD 1302 VD 1903."
11   Q    And "VD" is a reference to value
12   date.
13        Correct?
14   A    I believe "VD" would be reference
15   to value date.
16   Q    And that's when the stock loan
17   settles in the sense that the loans are moved
18   pursuant to the stock loan agreement?
19   Withdrawn.
20        The value date is when the stock
21   loan settles in the sense that the shares are
22   moved pursuant to the lending agreement.
23        Correct?
24   A    I believe the value date would be
25   the settlement date in which the shares

Page 364

1   are -- where the trade settles.
2   Q    I'll represent to you that the
3   declaration date with respect to these
4   Pandora shares in 2015 was March 18th, so
5   March 18, 2015.
6        Can you explain for us, please, why
7   ED&F was borrowing shares that settled after
8   the declaration date?
9   A    Mr. Oxford, can you explain what
10   you mean by "declaration date?"
11   Q    Yes.  I'll use the -- your
12   testimony from yesterday where you told us it
13   was the day the company declared a dividend.
14        MR. BINDER:  Objection, misstates
15   prior testimony.
16   A    I don't recall using the word
17   "declare."
18   Q    Okay.  Let's do it this way.
19        Are you familiar with the term
20   "ex date," sir?
21   A    I'm familiar with the term
22   "ex date."
23   Q    And that's the date when the shares
24   start trading without rights to a dividend.
25        Correct?

Page 365

1  A   The ex date is the date in which
2 the pension plans would have had to have
3 acquired the share prior to and held over to
4 be entitled to dividend.
5  Q   Right.  And if the pension plans
6 acquired the shares on the ex date or
7 afterwards, they wouldn't get a right to a
8 dividend.
9  Correct?
10  A   If the pension plans acquired the
11 shares on or after the ex date, they wouldn't
12 be entitled to a dividend.
13  Q   Okay.  I'll represent to you that
14 the ex date for these shares is March 19,
15 2015.
16  Do you understand that
17 representation, sir?
18  A   Sorry.  I think the first time
19 around you said the 18th.  Is it --
20  Q   I did, but that was a
21 different -- you were quibbling with my use
22 of the term "declaration date," so I'm
23 representing to you, sir -- listen carefully
24 if you would --
25  A   Sure.

Page 366

1  Q   -- that the ex date for the Pandora
2 shares in 2015 was March 19, 2015.
3  Do you understand that
4 representation?
5  A   I'm sorry, Mr. Oxford.
6  Can you say it one more time?
7  Q   I'm representing to you that the
8 ex date for the Pandora shares in 2015 was
9 March 19, 2015.
10  Are you able to comprehend that
11 representation, sir?
12  A   I understand what you're saying.
13  Q   Terrific.  Okay.
14  So can you tell me why --
15  MR. BINDER:  Mr. Oxford, you're
16  jumping around with dates.  He wants
17  clarification.  Your tone is not
18  appropriate here.  And so I would ask
19  you -- I would ask you to speak to the
20  witness in a respectful manner.
21  MR. OXFORD:  I am speaking to the
22  witness in a respectful manner.  I'm
23  asking that the witness actually answer
24  my questions.
25  MR. BINDER:  The witness is

Page 367

1  answering your questions and he's trying
2  to understand you.  What -- you are
3  raising your voice to the witness and
4  speaking to him in a disrespectful
5  manner.
6  MR. OXFORD:  I'm absolutely not.  I
7  totally disagree with that
8  characterization.
9  Q   So, Mr. Hashemi, could you please
10 tell me why ED&F is borrowing the Pandora
11 shares from ABN Amro with a settlement date
12 that begins on the ex date?
13  A   Is it possible to see the rest of
14 the trade pack, Mr. Oxford?
15  Q   Mr. Binder can show you the trade
16 pack if he wishes to, if he chooses to
17 examine you.  This is my examination.  I will
18 show you a series of documents.
19  I'm not going to have you flip
20 through the trade pack and waste the
21 remainder of my time.
22  A   Okay.  I imagine it would have been
23 on instruction of -- I don't know,
24 Mr. Oxford.
25  Q   Okay.  The answer -- if the answer

Page 368

1 is "I don't know," that's fine.  I just need
2 to know what you know.  If you don't know,
3 you don't know.
4  Can you please turn to
5 Exhibit 4353?  It's Tab 236 in your binder.
6  (Whereupon the above mentioned was
7  marked for Identification.)
8  A   Okay.  I have it in front of me.
9  Q   Okay.  Could you please turn to
10 Bates number 3909?
11  A   Okay.
12  Q   It's a one-page e-mail from
13 Mr. Bottomley that pastes a Bloomberg
14 confirmation in it.
15  Correct?
16  A   It is a one-page e-mail from
17 Mr. Bottomley and it appears to be a
18 Bloomberg message.
19  Q   Okay.  And it's for the -- it's
20 confirmation that ED&F Man is buying for -- a
21 100,950 shares of Pandora with the trade date
22 of the 17th of March and the value date on
23 the 19th of March.
24  Correct?
25  A   This -- excuse me.

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

35 (Pages 369 to 372)

Page 369

1           (Witness reviewing.)
2           The sender of the message is Ross
3  Liddard to confirm ED&F Man buys the
4  following 409-- 400,950 Pandora DC, trade
5  date, 17th of March, value date, 19th of
6  March.
7      Q    Mr. Bottomley works for the equity
8  finance desk at ED&F.
9           Correct?
10     A    Oliver Bottomley works for the
11 equity finance desk.
12     Q    Okay.  And Mr. Liddard worked for
13 the IDB at ED&F, right?  The interdealer
14 broker?
15     A    Yes.  Mr. Liddard worked for the
16 IDB desk.
17     Q    And where did the IDB desk get the
18 shares it was selling?
19     A    Looking at this one e-mail, I
20 wouldn't be able to tell you.
21     Q    Do you have any reason to believe
22 that -- withdrawn.
23          Have you any reason to dispute my
24 representation that what happened here is the
25 ED&F equity finance desk borrowed the shares

Page 370

1  from ABN Amro and then sold them to the IDB
2  desk?
3          MR. BINDER:  Objection to form, and
4      to counsel testifying.
5      A    (Witness reviewing.)
6          I don't know, Mr. Oxford.
7      Q    Okay.  Can you -- can you open up,
8  please, Exhibits 4354 and 4355?
9          (Whereupon the above mentioned was
10     marked for Identification.)
11     A    Those are Tabs 237 and 238 of your
12 Binder 6.
13     A    Okay.  I have them in front of me.
14     Q    Okay.  Do you see that -- looking
15 at 4354, which is your Tab 237 with the Bates
16 number at the end is 714?
17     A    Bates number 714 is what I have in
18 front of me.
19     Q    Okay.  And this reflects the sale
20 by the equity finance desk to the ED&F IDB?
21     A    So this e-mail is on the 17th of
22 March from Ross Liddard.  It's a Bloomberg
23 message from Ross Liddard to Freddy Ireland
24 to confirm ED&F Man sells the following;
25 400,950 Pandora DC.

Page 371

1      Q    At 35 -- 635 Danish krones.
2          Correct?
3      A    It says here, "at DKK 635."
4      Q    And the trade date is the 17th of
5  March and the value date is the 19th of
6  March.
7          Correct?
8      A    The trade date, as it says here, is
9  the 17th of March, and the value date, it
10 says the 19th of March.
11     Q    And the date of the e-mail message
12 confirming the trade is -- withdrawn.
13          This e-mail is sent at March -- on
14 March 17, 2015 at 2:59 p.m.
15          Correct?
16     A    I believe this to be a Bloomberg
17 message, but the date at the top on this
18 document is Tuesday, March 17th, 2015 at
19 2:59 p.m.
20     Q    Okay.  And can you turn, please, to
21 the next exhibit, 4355?
22     A    Okay.
23     Q    And what's happening here is that
24 Mr. Bottomley of the equity finance desk is
25 agreeing that he will buy back the shares

Page 372

1  from the IDB.
2          Correct?
3      A    (Witness reviewing.)
4          So I can see in the original
5  Bloomberg message from Oliver Bottomley at
6  1448 p.m., 2:48 p.m., it says, "Can you help
7  on some more Pandora DC for today?  Buy
8  Pandora DC, 400,950 shares at DKK 635,
9  T plus 2."
10     Q    Okay.  So the trade date is the
11 same as the confirm that we just looked at in
12 Exhibit 4354, correct?
13          Both the 17th of March?
14     A    That was the -- Tab 237, right?
15     Q    Correct.
16     A    So this one is all done to confirm
17 on the way.  This correspondence is sent on
18 the 17th of March.  And then, in Tab 237,
19 in the confirmation, it says, "Trade date,
20 17th of March."
21     Q    So the answer to my question is
22 "yes?"
23     A    (Witness reviewing.)
24          The correspondence in Tab 238 is on
25 the 17th of March where -- where Ross

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

Page 373

1  Liddard confirmed the transaction.
2      Q    My question's a little different,
3  sir.
4          Is the trade date in both of the
5  confirmations we're looking at the same?
6      A    The trade date hasn't specifically
7  been specified in the Bloomberg confirmation,
8  this correspondence.  But I understand it
9  would be on the 17th of March.
10     Q    Okay.  And the settlement date or
11 value date is the same between the two
12 confirmations as well.
13         Correct?
14     A    So let me double-check.  This is
15 T plus 2.
16         (Witness reviewing.)
17         So the other one is 19th of
18 March, the value date.  This is T plus 2.
19         I can only assume that that would
20 be a working day and would be the 19th of
21 March.
22     Q    Okay.  And it's the same number of
23 shares and same price of shares.
24         Correct?
25     A    Let me double-check.

Page 374

1          (Witness reviewing.)
2          So this one is 400,950 at DKK 635.
3  And the other one was 400,950 at DKK 635.
4      Q    Can you tell me, sir, why
5  ED&F Man's interdealer broker and equity
6  finance desk are entering into trades
7  reflected in these two exhibits, 4354 and
8  55 -- please let me finish my question.  Let
9  me start again.
10         Can you tell me, please, why
11 ED&F Man's equity finance desk and its
12 interdealer broker are entering into these
13 offsetting transactions reflected in Exhibits
14 4354 and 4355?
15         MR. BINDER:  Objection to form,
16     assumes facts, lacks foundation.
17     A    I don't know, Mr. Oxford.
18     Q    Did shares move in connection with
19 this transaction?
20         MR. BINDER:  Objection, vague.
21     A    Based on these two documents that
22 you've showed me, Mr. Oxford, I don't know.
23     Q    Is this a wash trade, sir?
24         MR. BINDER:  Objection to form,
25     vague, lacks foundation.

Page 375

1      A    I don't know.
2      Q    Are the equity finance desk and
3  interdealer broker located within the same
4  legal entity in London at the time of this
5  e-mail in 2015?
6          MR. BINDER:  Objection to form,
7      vague.
8      A    Could you ask the question again,
9  please?
10     Q    Sure.
11         Were the equity finance desk and
12 the interdealer broker located in the same
13 legal entity?  Were they both part of
14 ED&F Man Capital Markets?
15         MR. BINDER:  Objection, form,
16     vague, compound.
17     A    I'm not certain.  I don't remember
18 right now.
19     Q    Were these trades reported by
20 ED&F Man to the FCA?
21         MR. BINDER:  Objection to form.
22     A    I don't know.
23     Q    Did either the equity finance desk
24 or the interdealer broker charge any fees in
25 connection with this transaction?

Page 376

1      A    Can you ask me the question again,
2  please?
3      Q    Did either the interdealer broker
4  or the equity finance desk charge any fees in
5  connection with these two transactions?
6      A    Based on the two documents that
7  you've shown me, I don't know.
8      Q    Presumably, you don't know whether
9  any fees were then passed through to the
10 pension plan for which the Pandora shares in
11 these trade confirms relate?
12         MR. BINDER:  Objection to form.
13     A    I don't know.
14     Q    Can you go back, please, to
15 Exhibit 4353?  So that's 236 of your binder.
16     A    Yeah.  236?
17     Q    236.  Thirty, 30, 36.
18     A    Okay.
19     Q    Directing your attention to the
20 first page, Bates 904, you'll see that the
21 Linden plan is placing a trade not only for
22 the purchase of 400,950 shares of Pandora,
23 but is also selling Pandora futures.
24         Correct?
25     A    (Witness reviewing.)

Page 377

1     Okay.  So from this confirmation
2 e-mail from Oliver Bottomley, it says,
3 "Confirms attached."  The bottom part, which
4 is in reference to Linden ADBPL, says
5 "Pandora DC, trade date, March 17th,
6 settlement date, March 19th, quantity
7 400,950, buy stock at 65, sell futures at
8 626-point -- spot or .7586."
9     Q     Okay.  Can I turn your attention to
10 the last page of this exhibit, ending
11 Bates 3910?
12     A     Sorry, 39 -- my pack -- oh, no, I
13 have it.
14     Q     It's a trade confirmation from
15 Sunrise?
16     A     3910.  Okay.
17     It's in front of me.
18     Q     What was the relationship between
19 ED&F Man and Sunrise Brokers?
20     A     I believe, if I recall correctly,
21 that Sunrise Brokers are an IDB.
22     Q     And this is a trade confirm for the
23 futures that Mr. Bottomley confirmed in the
24 cover e-mail, correct?  The price is the
25 same, 626.5 -- .7586?

Page 378

1     MR. BINDER:  Objection to form.
2     A     Okay.  So this is from Sunrise.
3     It says here, "Trade confirmation
4 reference to ED&F Man Capital Markets
5 Limited, Oliver Bottomley, trade date, 17th
6 of March, Pandora being the underlying asset,
7 Pandora DC to future, 626 spot 7586 is the
8 premium reference 65 exchange on ICE."
9     It says here that ED&F Man sell
10 4,009 units of Pandora DC, the futures.
11     Q     It says the brokerage fee is zero.
12     Why is the brokerage fee zero?
13     MR. BINDER:  Objection to form,
14     foundation.
15     A     I don't know.
16     Q     Can you turn, please, to
17 Exhibit 4356?
18     (Whereupon the above mentioned was
19     marked for Identification.)
20     Q     Which is Tab 239 of your binder.
21     A     Okay.  I have it in front of me.
22     Q     So on the same day that ED&F Man
23 sold the futures for Pandora that we just
24 looked at on behalf of the Linden plan, this
25 trade confirm reflects that ED&F also bought

Page 379

1 those exact same futures from Sunrise?
2     MR. BINDER:  Objection to form.
3     A     So was there a question?
4     Q     Yes.
5     A     I'm so sorry.  Could you say it
6 again, please?
7     Q     Okay.  Is it correct that on the
8 same day that ED&F Man sold the futures for
9 Pandora that we just looked at, ED&F also
10 bought those exact same futures from Sunrise,
11 and that's reflected on the document we're
12 looking at, 4356?
13     MR. BINDER:  Objection to form.
14     A     Okay.  So looking at the trade
15 confirmation from Sunrise, which is on the
16 second page of Tab 239, which I'm on, that
17 was a trade confirmation referenced to
18 ED&F Man Capital Markets, Freddy Ireland.
19 The trade date is 17th of March 2015.  The
20 underlying asset is Pandora
21 Bloomberg -- Pandora DC.
22     It is a future premium, 626 spot
23 7586, on ICE, summary of the trade listed
24 futures.
25     This is a confirmation for a buy of

Page 380

1 the future of 4,009 units Pandora DC.
2     Q     So was the answer to my question
3 "yes," sir?
4     MR. BINDER:  Objection.
5     A     Can you ask your question again?
6     Q     Is it correct that on the same day
7 that ED&F Man sold the futures for Pandora
8 that we looked at in the prior exhibit, this
9 exhibit you have in front of you now reflects
10 that ED&F bought those exact same futures
11 from Sunrise, and that is reflected on this
12 Exhibit 4356?
13     MR. BINDER:  Objection.
14     A     I can see here from the trade
15 confirmation from Sunrise, the Bates
16 reference ending in 880, that this is a
17 confirmation to ED&F Man Capital Markets
18 Limited to buy 4,009 units, Pandora DC
19 futures.
20     Q     Sir, that wasn't my question.
21     Do you remember what my question
22 was?
23     A     Well, I did at the time of
24 answering.
25     Q     I doubt that.  Let me try it one

CONFIDENTIAL
Shahab Hashemi – October 8, 2021

Page 381

1 more time, because I think you're just
2 reading from documents and you're not even
3 attempting to answer my questions.
4          MR. BINDER: Mr. Oxford,
5     Mr. Hashemi is answering your questions.
6          MR. OXFORD: He is not. He's
7     saying words.
8          MR. BINDER: You've made choices
9     about what you want to put in front of
10    him, and he is doing his best to provide
11    you with the best answers that he's able
12    to provide.
13         MR. OXFORD: I respectfully could
14    not disagree more.
15    Q     One more time.
16         Is it correct, sir, that on the
17    same day that ED&F Man sold the futures for
18    Pandora on the prior exhibit, ED&F Man is
19    also purchasing those exact same futures from
20    Sunrise?
21         Yes or no?
22         MR. BINDER: Asked and answered.
23    A     Mr. Oxford, I don't know how else
24    to answer the question.
25    Q     Can you go to 4357, please?

Page 382

1          (Whereupon the above mentioned was
2     marked for Identification.)
3     Q     It's 240 in your binder.
4     A     Sure.
5          MR. BINDER: Neil, in case you're
6     not already aware, there are 15 minutes
7     left of the agreed ten hours of
8     Mr. — of your questioning of
9     Mr. Hashemi.
10         MR. OXFORD: Okay. Well, I was
11    aware and that agreement is obviously
12    subject to a reservation of rights that
13    is in writing between us, Neil. And
14    I'll have some others at the end of this
15    examination as well.
16    Q     Okay. Do you have the document,
17    sir?
18    A     Tab 240, I have in front of me.
19    Q     So the first page shows Bates
20    ending 429?
21    A     Ending 429, yes.
22    Q     Okay. And turning to the second
23    page, 430, Ms. Stacey Kaminer of Acer writes
24    to Sara Linden.
25         Do you see that? Sorry.

Page 383

1          Sara Mina.
2     A     Okay, I can see on the second page
3     that there is an e-mail from Stacey Kaminer
4     to Sara Mina and Oliver Bottomley.
5     Q     And Ms. Kaminer writes that "Linden
6     would like to sell its position in Pandora,"
7     and asks for liquidity.
8          Do you see that?
9     A     Okay. So it says — her e-mail
10    says, "Linden would like to sell its position
11    in Pandora DC. Please let me know if you can
12    source any liquidity."
13    Q     And Mr. Bottomley confirms the
14    trade and attaches a trade confirm.
15         Correct?
16    A     (Witness reviewing.)
17         So then Oliver Bottomley replies,
18    "Hi, Stacey. Seeing the liquidity as below."
19    And Stacey replies saying, "Thank to you,
20    Ollie. Those terms are acceptable to
21    Linden."
22         And then Oliver then says, "Great.
23    We'll come back one filled."
24         And then, in the final e-mail
25    that's on this document, it says "attached,"

Page 384

1 if I — shall I go forward, Mr. Oxford?
2     Q     If I can direct your attention to
3     the page Bates number ending 435?
4     A     Okay. Okay. Bates number 435.
5          It's in front of me.
6     Q     That's a trade confirm on behalf of
7     the Linden Associates Defined Benefit Plan to
8     sell 400,950 shares of Pandora.
9          Correct?
10    A     Okay. So this is a trade confirm
11    on the 19th of March. The customer is
12    Linden Associates Defined Benefit Plan to
13    sell Pandora, quantity 400,950.
14    Q     And that trade date is — the
15    19th settlement date is the 23rd of
16    March 2015.
17         Correct?
18    A     It says here in this confirmation,
19    correct, that the trade date is 19th of
20    March 2015, and the settlement date is 23rd
21    of March 2015.
22    Q     Okay. Can you turn please to the
23    next exhibit, which is 4358?
24         (Whereupon the above mentioned was
25    marked for Identification.)

CONFIDENTIAL
Shahab Hashemi – October 8, 2021

39 (Pages 385 to 388)

Page 385

1    Q    Which is 241 in your binder.
2    A    Okay.  I have Tab 241 open.
3    Q    Okay.  So this is a composite
4  exhibit.  It's made from two documents that
5  were produced to us by ED&F Man but not
6  produced as the same document, just so we're
7  clear.
8         The first document in this -- the
9  first page in the exhibit has Bates number
10  ending in 068.
11         Do you see that?
12    A    Yes, the first page ends in 068.
13    Q    This is an e-mail from -- or a
14  trade confirm from Mr. Bottomley of ED&F Man.
15         Correct?
16         MR. BINDER:  Mr. Oxford, can you
17    just explain to the witness what you
18    mean by "a composite document" just so
19    he understands.
20         MR. OXFORD:  I've already done
21    that.
22         MR. BINDER:  Well, I'm going to
23    object because I don't know, and it
24    could be confusing.
25         MR. OXFORD:  You know very well.

Page 386

1    Q    Mr. Hashemi, do you have my
2  question in mind?
3    A    What was your question again,
4  please?
5    Q    This is a trade confirm from
6  Mr. Bottomley of ED&F Man on March 19, 2015?
7    A    Okay.  I can see here, and this
8  is -- I'm looking at the 068 reference
9  document -- that this is an e-mail from
10  Oliver Bottomley's Bloomberg account to
11  Oliver Bottomley's -- to, I think,
12  undisclosed recipients copied on his ED&F Man
13  Capital e-mail address.
14         The original sender here, it says
15  James Fulloway of Mint Partners and Jaime
16  Fulloway of Mint Partners.
17         The confirm says, "ED&F sell
18  400,950 Pandora DC, DKK 617, T plus 2, many
19  thanks, Jaime."
20    Q    Okay.  Who is Mint Partners?
21    A    I understand Mint Partners to be
22  an IDB.
23    Q    The next page is confirmation that
24  Mint Partners is selling -- withdrawn.
25         So the document we were just

Page 387

1  looking at, the first page ending in 68, ED&F
2  is selling shares of Pandora to Mint.
3         Correct?
4         MR. BINDER:  Objection to form.
5    A    Okay.  Sorry.  Say that again?
6  Sorry.
7    Q    So on the first page ending in
8  068 --
9    A    Right.
10    Q    -- ED&F is selling shares to Mint.
11         Correct?
12    A    So the confirm says, "ED&F sell
13  400,950 shares."
14    Q    Right.  And if you look at the next
15  page, can we agree that the document, which
16  is also dated March 19, 2015, ED&F is
17  agreeing to buy the same number of shares
18  back from Mint?
19         MR. BINDER:  Objection to form,
20    mischaracterizes the evidence.
21    A    I can see here that this is a
22  confirm from -- or a Bloomberg message
23  confirm from Jaime Fulloway at Mint Partners
24  to Freddy Ireland.  And the confirm says that
25  ED&F Man -- ED&F buy 400,950 shares.

Page 388

1    Q    Okay.  And they're buying the same
2  shares at the same price and on the same
3  settlement date as they just sold them in the
4  page previously.
5         Correct?
6         MR. BINDER:  Objection to form.
7    A    This confirm is for "ED&F buy,
8  400,950 shares."
9    Q    So what -- can you tell me why ED&F
10  is selling shares to Mint in the first page
11  and then buying them back on exactly the same
12  terms in the second page?
13         MR. BINDER:  Objection,
14    mischaracterizes the evidence.
15    Q    Do you have any explanation for
16  that, sir?
17    A    Based on these two documents that
18  you are showing me, I don't know.
19    Q    Okay.  You told us earlier that
20  after the plans bought the shares, ED&F would
21  sometimes rehypothecate those shares.
22         Correct?
23    A    On the Clause 10(B)2 of the Terms
24  of Business, ED&F Man had a right to
25  rehypothecate the shares.

CONFIDENTIAL
Shahab Hashemi – October 8, 2021

Page 389

1    Q    And at some point, did ED&F return
2 those shares to the plans?
3         MR. BINDER:  Objection to form.
4    A    The pension plans had a right to
5 recall those shares at any point.  And I have
6 seen, in the preparation that I have done and
7 instructions from the pension plans, to
8 recall shares.
9    Q    How did ED&F record the return of
10 shares to the plans in its books and records?
11   A    This was done -- the -- sorry.
12        Can you repeat the question,
13 please?
14   Q    How did ED&F record the return of
15 shares to the plans in its books and records?
16   A    This was recorded in the B-loan
17 accounts and is in Shadow.
18   Q    Is it correct that ED&F sometimes
19 borrowed shares from the market in order to
20 return them to the plans?
21        MR. BINDER:  Objection, lacks
22   foundation.
23   A    I don't remember at this moment in
24 time.
25   Q    Is it correct that ED&F sometimes

Page 390

1 borrowed less than 100 percent of the total
2 amount of shares that it was required to
3 return to the pension plans?
4    A    I don't know.
5    Q    Is it correct that ED&F sometimes
6 used the same shares to settle -- withdrawn.
7         Is it correct that ED&F sometimes
8 used the same shares multiple times to settle
9 share sales on behalf of the plans?
10        MR. BINDER:  Objection, vague,
11   lacks foundation.
12   A    I don't know.
13   Q    Can you please turn to your
14 Binder 1, Tab 23?
15   A    Yeah.
16        MR. OXFORD:  Previously marked
17   2502.
18        MR. BINDER:  You said 2502?  I'm
19   not seeing that.
20   Q    Do you have the document,
21 Mr. Hashemi?
22   A    So Binder 1, Tab --
23   Q    Twenty-three.
24   A    I have that in front of me.
25   Q    Great.  Directing your attention to

Page 391

1 Ms. Mina's e-mail on the first page, she says
2 in the second paragraph, "Denmark is slightly
3 more efficient settlement-wise than Belgium,
4 so 25 percent coverage should suffice, i.e.,
5 500,000,000 Euros."
6         Do you see that?
7    A    (Witness reviewing.)
8         I see that's what the document
9 says.
10   Q    And do you know what Ms. Mina is
11 communicating here?
12   A    (Witness reviewing.)
13        I do not.
14        MR. BINDER:  Mr. Oxford, we're now
15   at the ten-hour mark.  That concludes
16   your time.
17        MR. OXFORD:  Okay.  Well, we'll
18   have to agree to disagree.  I will pause
19   my questioning of the witness here.  In
20   addition to the objection that I put on
21   the record at the start of this
22   deposition yesterday relating to
23   ED&F Man's failure to produce documents
24   and late production of documents that
25   SKAT has been asking for for about 18

Page 392

1 months, I have an additional objection
2 that this witness was not prepared or
3 able to answer questions that were
4 squarely within the terms of SKAT's
5 30(b)(6) notice.  And in that regard, we
6 reserve all rights to recall this
7 witness or a better-prepared witness.
8         MR. BINDER:  And I will say that
9 this witness has been fully prepared.
10 He's met -- he spent, I think he
11 testified, 50 to 75 hours.  He's met
12 over many, many days, approximately a
13 dozen times, with his attorneys to go
14 over and prepare.
15        You -- I specifically gave you the
16 opportunity to identify specific
17 documents that you would like him to be
18 questioned on and go over.  You
19 identified 85 trade packs which is an
20 enormous amount, it would be a lot of
21 trade packs, and your questioning seemed
22 to proceed by taking documents out of
23 the trade packs so there's no context
24 for him to understand them.
25        He has answered all your questions

Page 393

1  to the best of his ability and was fully
2  prepared to do so.  With respect to
3  document productions, all outstanding
4  issues, we don't think there are any
5  reasonable disputes, but all of the
6  issues that were in dispute were known
7  to you prior to the taping of the
8  deposition.
9      All of the issues that were in
10  dispute were known to you prior to the
11  deposition and we do not think there are
12  any significant documents that you do
13  not already have.  But any decision to
14  go forward with the deposition without
15  resolution, to the extent you think
16  these issues needed to be resolved, was
17  your choice.  But the witness has gone
18  to great length to be available.
19      It's been a very long two days of
20  questioning, and it's, of course, five
21  hours later in London, and it's now
22  5:30.
23      MR. OXFORD:  All right.  Just for
24  the record, we didn't identify trade
25  packs to you.  We identified trades.  I

Page 394

1  asked him about documents that were not
2  included, some might say deliberately
3  excluded from your trade packs.  That's
4  one of the reasons I conducted the
5  examination that way, which is my right.
6      Let's go off the record and we can
7  discuss further proceedings today, if
8  any.
9      THE VIDEOGRAPHER:  Stand by.  The
10  time is 12:32 p.m. New York time and
11  we're going off the record.
12      (Brief recess taken.)
13      THE VIDEOGRAPHER:  Stand by.  The
14  time is 12:51 p.m. New York time and
15  we're back on record.
16      MR. KAPLAN:  I have questions.
17  Thank you.
18
  EXAMINATION BY MR. KAPLAN:
19
20      Q    Mr. Hashemi, my name is Marty
21  Kaplan, Gusrae Kaplan.  We represent the
22  Goldstein defendants and third-party
23  plaintiffs.
24      Sir, does ED&F Man have a stock
25  loan desk?

Page 395

1      I think you're on mute, maybe?
2      A    You were right.  I was on mute.  I
3  apologize.
4      I don't know.
5      Q    Are you aware of whether or
6  not -- withdrawn.  "I don't know" was good
7  enough.
8      So if I can address your attention,
9  please, to Book 6, and I guess it's Tab 221?
10      Sorry.  221.
11      MR. BINDER:  Is this Exhibit 221?
12      MR. KAPLAN:  It's Exhibit 4338.
13  I'm sorry.
14      (Whereupon the above mentioned was
15  marked for Identification.)
16      A    I have Tab 221 in front of me.
17      Q    Right.  And there's two pages,
18  Bates stamped at the bottom 495359, and the
19  next one, 60, which are black boxes which
20  I assume means something was redacted, and
21  then the next one, 495361.
22      Do you see that?
23      A    Based on 495361, I --
24      Q    You have that, correct?
25      A    Yes, I have it in front of me.

Page 396

1      Q    Thank you.
2      Mr. Hashemi, have you seen this
3  document before?
4      A    (Witness reviewing.)
5      I do not recall seeing this
6  document before.
7      Q    Okay.  So let me ask you:  In
8  connection with the closing -- I know.
9      Are you aware that the board of
10  directors of ED&F Man approved the closing of
11  the equity finance desk?
12      A    I have seen the board minutes of a
13  meeting of the ED&F Man Capital Markets
14  board.
15      Q    And in that -- those minutes that
16  you just identified in your answer, the board
17  approved the closing down of the equity
18  finance desk of ED&F Man?
19      A    In the minutes of the board meeting
20  I referred to, it was decided to close down
21  the equity finance desk.
22      Q    Now, are you aware as to whether or
23  not there were parting contracts with those
24  who were terminated, who were let go in
25  connection with the cessation and closing

Page 397

1  down of the equity finance desk?
2         MR. BINDER: I'm going to object.
3  These questions are beyond the scope of
4  the notice topics for a 30(b)(6) notice.
5         MR. KAPLAN: Well, we disagree.
6  Your objection is noted. We'll deal
7  with it.
8         But are you directing him not to
9  answer?
10        MR. BINDER: No, I'm just saying
11 his answer will not be an answer on
12 behalf of the company.
13     A   Sorry, sir. Would you mind
14 repeating the question again?
15        MR. KAPLAN: Mr. Reporter, would
16 you read back the question, please?
17        (Whereupon the record was read back
18 by the reporter.)
19        MR. BINDER: Objection.
20     A   I don't know.
21     Q   Now, if I can address your
22 attention to Tab 222 of Binder 6, which is
23 Exhibit 4339?
24        (Whereupon the above mentioned was
25 marked for Identification.)

Page 398

1      A   I have Tab 222 in front of me.
2      Q   Thank you. And you can flip the
3  first page and look at the second and third
4  page, please.
5          Are these the board minutes that
6  you earlier testified that you had seen?
7      A   (Witness reviewing.)
8          I am unsure as to whether it was
9  this version of the document.
10     Q   And the version of the document
11 that you saw, was it actually executed by the
12 chairman as per Page 4 of this exhibit?
13        MR. BINDER: Objection to form,
14 lacks foundation.
15        MR. KAPLAN: I'll withdraw the
16 question.
17     Q   Let's make it directly direct.
18        Please look at Page 4 of
19 Exhibit 4339.
20     A   Is it a Bates reference ending in
21 818?
22     Q   Yes, sir.
23     A   I have it in front of me.
24     Q   Okay. Did the version of this
25 document or the document that you saw

Page 399

1  evidencing board minutes, was it executed by
2  the chairman, or were they executed by the
3  chairman?
4          MR. BINDER: Objection, vague,
5  lacks foundation, beyond the scope.
6      A   (Witness reviewing.)
7          I've seen many documents in
8  preparation for this deposition. I don't
9  remember, Mr. Kaplan, right now.
10     Q   Okay. Thank you.
11         Now, during the course of your
12 two-day deposition, you've been shown various
13 documents that originate with ED&F Man in
14 connection with activities relating to the
15 transactions that are the subject of the
16 litigation here.
17         So do you, in connection with your
18 activities and as an employee, once upon a
19 time a compliance officer, would you say that
20 the confirms and statements prepared by
21 ED&F Man in connection with the documents
22 that you reviewed were prepared and -- under
23 the control of ED&F Man?
24         MR. BINDER: Objection, lacks
25 foundation. And again, beyond the scope

Page 400

1  of any notice deposition topic.
2          MR. KAPLAN: Books and records were
3  clearly within the description of what
4  was asked for, and this is clearly
5  within the concept of books and records.
6      Q   Please, Mr. Hashemi?
7          MR. BINDER: Hang on. Are you
8  asking about his personal experience at
9  ED&F as an employee?
10         MR. KAPLAN: I'm asking for him to
11 answer as the spokesman for ED&F Man.
12         MR. BINDER: Objection, overbroad,
13 lacks foundation, outside the scope.
14     A   It was a very long question, Mr. --
15     Q   I'll break it out again for you,
16 and I'll try to make the question smaller.
17         Are you familiar with confirms
18 issued by ED&F Man, generally?
19         MR. BINDER: Objection, vague,
20 beyond the scope.
21     A   Specifically, are you relating
22 to -- are you referring to a particular
23 confirm or document?
24     Q   No, generally. A confirm.
25         Are you familiar -- what is a

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

43 (Pages 401 to 404)

Page 401

1  "confirm" in the securities business?
2          MR. BINDER:  Objection, beyond the
3      scope.
4      A    A part of preparations and the
5  documents that I have seen, and that we've
6  seen in this two-day deposition, I have seen
7  trade confirmations.
8      Q    And do those
9  confirmations -- withdrawn.
10         Are those confirmations reports
11 prepared by ED&F Man of transactions that
12 ED&F Man did for the particular customer that
13 is the recipient of the confirm?
14         MR. BINDER:  Objection, overbroad.
15     A    I don't know, Mr. Kaplan.  If you
16 want to bring a specific document, I can try
17 to explain it to you.
18         MR. KAPLAN:  Mr. Reporter, would
19     you read back the question, please?
20         (Whereupon the record was read back
21     by the reporter.)
22     A    I don't know the answer to your
23 question, but if you'd like to bring up a
24 specific confirm -- confirmation, I can -- I
25 can point to that.

Page 402

1      Q    We'll do that in a moment, but let
2  me ask you this.
3          During the course of your review,
4  and as early -- it's been described in
5  various ways, but certainly it's been
6  presented as an expansive review by your
7  counsel.
8          During the course of your review,
9  did you identify any confirmations that you
10 were able to identify as being inaccurate in
11 what they reported?
12     A    Not that I recall.
13     Q    Now, during the course of your
14 review of documents in this case, am I
15 correct that you reviewed many confirmations,
16 perhaps in those multiple trade packages,
17 that have been the subject of this, and in
18 your general review in preparation for today?
19     A    I reviewed many trade packs in
20 preparation for today, which included, each,
21 a number of confirmation statements.
22     Q    Now, as you reviewed those packages
23 and the confirmations, did you have an
24 understanding who prepared the confirmations?
25         MR. BINDER:  Objection, overbroad,

Page 403

1      vague.
2      A    Mr. Kaplan, I don't know the answer
3  to your broad question.  But if you'd like to
4  bring up a specific confirmation, I can try
5  and point it out to you.
6      Q    We can do that.  I'm trying to do
7  this quickly as per our earlier discussion.
8  Let me ask you this.
9          Do you think a customer of ED&F Man
10 who receives a confirmation from ED&F Man can
11 rely on that confirmation as being accurate?
12         MR. BINDER:  Objection.
13         MR. OXFORD:  Objection to form.
14     A    I don't know.
15     Q    And do you have any knowledge as
16 to -- withdrawn.
17         You've identified various tax
18 vouchers earlier and there were discussions.
19 And again, I'm trying to do this quickly.
20         You know what I mean by "the tax
21 voucher."
22         Correct?
23     A    I do know what you're referring to
24 when you say "tax vouchers."
25     Q    And if I understood your testimony

Page 404

1  earlier, you said that those tax vouchers
2  were prepared by ED&F Man?
3      A    Those tax vouchers were prepared by
4  ED&F Man.
5      Q    Do you believe that a customer
6  is -- can rely on tax vouchers prepared by
7  ED&F Man?
8          MR. BINDER:  Objection, beyond the
9      scope of the notice topics.
10     A    I don't know.
11     Q    Okay.  Do you know whether or not
12 the former ED&F Man associated persons or
13 people who worked at the equity finance desk
14 received severance?
15         MR. BINDER:  Objection.
16     A    I don't know.
17     Q    Are you aware of what the financial
18 arrangement was prior to the closing of the
19 equity financing desk between the various
20 people who worked at the desk and ED&F Man?
21     A    In line with the other desks in
22 ED&F Man, there was a P&L for the equity
23 finance desk.
24     Q    Did you say "CMO?"
25     A    Sorry.  No.  Let me start again.

Page 405

1       In line with -- or should I say
2   similar to the other desks at ED&F Man, the
3   equity finance desk had a P&L.  The P&L would
4   include the revenues generated and costs
5   associated to the business, and a portion of
6   the profit of the P&L would go into a bonus
7   pool for the desk.
8       Q     And are you aware of how that bonus
9   pool was allocated?
10      A     Based on my conversation with
11  Carlos Fernandez where I asked him about this
12  matter.  And the bonus pool was allocated by
13  the head of the desk, with the approvals,
14  with necessary approvals.
15      Q     And -- thank you.
16            Are you aware of who in the
17  compliance department of ED&F Man was
18  responsible to oversee the operations of the
19  equity finance desk?
20      A     I do not know.
21      Q     Now, do you recall that Mr. Oxford
22  asked you a series of questions about the
23  Annex E tax vouchers?
24      A     I recall.
25      Q     Now, I don't want to focus on

Page 406

1   Annex E.  I want to focus on the non-Annex E
2   tax vouchers.
3             So when preparing the non-Annex E
4   tax vouchers, what did ED&F do to make sure
5   that the information contained in those
6   vouchers was accurate?
7       A     ED&F Man -- sorry, withdrawn.  Let
8   me rephrase.
9             There was a process to preparing
10  the tax vouchers through checking the books
11  and records of ED&F Man.  The process
12  included preparing a dividend reconciliation
13  sheet.
14            Now, in order to prepare the
15  dividend record reconciliation sheet, the
16  books and records would be checked to include
17  SWIFT messages or receipt of the shares, and
18  SWIFT messages, MT 566s, I believe, for
19  receipt of the dividend, and -- from the
20  company, in the event that the record -- on
21  record date, the name of the counterparty was
22  on the record, then there would be a
23  confirmation of receipt of the dividend from
24  the counterparty, and the SWIFT message to
25  that effect.

Page 407

1             In addition, the books and records
2   and accounts, including the B-loan accounts,
3   would be checked for assets that were
4   rehypothecated and recalled.  And
5   then -- that's all that I can remember right
6   now, Mr. Kaplan.
7       Q     So if shares were rehypothecated by
8   ED&F Man prior to the ex date, and those
9   shares had not been recalled, would ED&F Man
10  prepare a tax voucher?
11      A     ED&F Man would not prepare a tax
12  voucher.
13      Q     Why not?
14      A     The client would not -- you
15  mentioned in your question that the client
16  hadn't recalled the shares.
17      Q     They had not -- not the client.
18  The shares had not been recalled.
19            Yes, that's true.  I did just say
20  that.
21      A     So could you read me the question
22  again?
23      Q     Right.  Sure.
24            If shares were rehypothecated by
25  ED&F Man prior to the ex date, and assuming

Page 408

1   that those shares had not been recalled,
2   would ED&F prepare a tax voucher for those
3   shares?
4       A     As I said earlier, they would not.
5       Q     Let me address your attention if I
6   can now to Binder 7, Tab 296, Exhibit 4411.
7             (Whereupon the above mentioned was
8       marked for Identification.)
9       A     Which -- sorry.  Which tab number?
10      Q     Tab 296, Binder 7, Exhibit 4411.
11      A     Okay.  I think I have it in front
12  of me.
13      Q     Okay.  So tell me, Mr. Hashemi,
14  have you seen this document before?
15      A     (Witness reviewing.)
16            As I've said, I've seen many
17  documents in the process of preparing for
18  this deposition.  I don't recall seeing this
19  document right now.
20      Q     Okay.  Thank you.
21            Let me address your attention, if I
22  can, to Book 3, Tab 43, Exhibit 4165.
23            (Whereupon the above mentioned was
24      marked for Identification.)
25      A     Tab -- which tab?

CONFIDENTIAL
Shahab Hashemi – October 8, 2021

Page 409

1    Q    Forty-three.  Book 3, Tab 43.
2    A    Okay.  I have it in front of me.
3    Q    Have you seen this Exhibit 4165
4  before?
5    A    (Witness reviewing.)
6         Are you referring to the document
7  that's -- the Bates reference ends in 950?
8    Q    Yes.
9    A    (Witness reviewing.)
10        I don't remember right now if I've
11  seen this document before.
12   Q    So if I went through each of these
13  pages, which all reflect schematics of
14  structure of the entity or points of the
15  entity of ED&F Man, would your answer be the
16  same?
17   A    My answer would be the same.
18   Q    Thank you.
19        So if I can address your attention,
20  please, to Exhibit 4271?
21        (Whereupon the above mentioned was
22  marked for Identification.)
23   Q    It's in Book 5, and it's Tab 154.
24   A    Mr. Kaplan, can you remind me of
25  the tab number, please?

Page 410

1    Q    Sure.  154.
2    A    Okay.  I have Tab 154 open in front
3  of me.
4    Q    Now, it's a multipage document.
5  Will you take a look?
6         Have you seen Exhibit 4271 before?
7    A    (Witness reviewing.)
8         I have seen a version of this
9  document before.  I'm not sure if it was this
10  exact one.
11   Q    Well, do you know who prepared the
12  version that you saw?
13   A    I'm unsure.
14   Q    Now, addressing your attention to
15  Page 1 of Exhibit 4271, it's the cover
16  e-mail.
17        Do you see that?
18        It's Bates stamped 655.
19   A    Bates ending 655.  I see the
20  e-mail.
21   Q    Right.  So can you tell me who
22  Phil Howell is?
23   A    I understand Phil Howell to have
24  been an employee of the ED&F Man Group at the
25  time, the parent company of ED&F Man.

Page 411

1    Q    And is Mr. Howell still employed at
2  ED&F Man?
3    A    I do not believe he is.
4    Q    And do you know when Mr. Howell
5  ceased being affiliated with ED&F Man?
6    A    I do not know.
7    Q    Do you know if Mr. Howell's
8  departure has something to do with the
9  closing down of the equity finance desk?
10        MR. BINDER:  Objection.  This is
11  beyond the scope of the notice topics.
12   A    I do not know.
13   Q    Thank you.  One last question about
14  Mr. Howell.
15        Do you know when he was -- he
16  ceased being an employee of ED&F Man?
17   A    I do not know.
18   Q    Thank you.
19        Now, let me address your attention
20  to -- it's Exhibit 4418.
21        (Whereupon the above mentioned was
22  marked for Identification.)
23   Q    And it's in Binder 7 at Tab 303.
24   A    Did you say Tab 303?
25   Q    Tab 303, correct.

Page 412

1    A    Okay.
2    Q    So do you have it?
3    A    Yes, I have it in front of me.
4    Q    Thank you.
5         You see that this is an e-mail from
6  Oliver Bottomley?
7    A    I can see that this is an e-mail
8  from Oliver Bottomley.
9    Q    And can you identify Oliver
10  Bottomley's position with ED&F Man?
11   A    Oliver Bottomley was a junior on
12  the equity finance desk.
13   Q    And this is a multipage document.
14        Have you seen this document before?
15   A    (Witness reviewing.)
16        I do not recall seeing this
17  document before.
18   Q    Now, do you know when the equity
19  finance desk was opened by ED&F Man?
20   A    I do not know the exact date.
21   Q    Would you agree with me it was
22  sometime in 2012?
23   A    Based on the documents that I have
24  seen, I think it would have been sometime in
25  2012.

Page 413

1     Q     Now, I ask you to address your
2 attention to Page 2 of Exhibit 4418.
3           Do you have it?
4     A     Which tab is that in?
5     Q     Same tab you're in.  The document
6 that you're just looking at.
7     A     Okay.  Right.
8     Q     It should say, at the bottom, Bates
9 stamp 53124?
10    A     Yes, I see it.
11    Q     Now, would you take a moment and
12 read this page -- well, let me do this
13 differently.
14          Who is Volcafe?
15    A     Volecafe is an IDB.
16    Q     And is Volcafe owned by ED&F Man?
17    A     Volcafe is a subsidiary of the
18 ultimate parent of ED&F Man.
19    Q     During the course of your
20 preparation to testify, did you -- excuse me
21 one second.
22          During the course of your
23 preparation to testify, did you come across
24 documents and communications that were from
25 MF Global?

Page 414

1     A     I do not recall any such document.
2     Q     Were you aware that the -- based on
3 your review, that the individuals who were
4 proposing that ED&F Man open an equity
5 finance desk were associated prior to that
6 proposal with MF Global?
7           MR. BINDER:  Objection, lacks
8      foundation, and beyond the scope of the
9      notice topics.
10    A     I don't know.
11    Q     During the course of your
12 preparation, did you review payments to those
13 who were part of the equity finance desk?
14          MR. BINDER:  Objection, vague.
15    A     I don't know.
16    Q     And during the course of your
17 preparation, were you provided with P&L
18 relating to the activities of the equity
19 finance desk?
20    A     During the preparation that I did,
21 I spoke with Carlos Fernandez about the P&L
22 process of the equity finance desk.
23    Q     When you say "the P&L process," you
24 mean -- what do you mean?
25    A     I mean about -- and I'll withdraw.

Page 415

1           I asked Carlos Fernandez about the
2 P&L of the desk and payment structure of the
3 desk, as I referred to.
4     Q     And did you see actual financial
5 computations of that P&L structure with the
6 equity finance desk?
7     A     I don't remember right now.  I
8 don't remember seeing any.
9     Q     And do you recall reviewing any
10 document that did a year-by-year analysis of
11 how the equity finance was doing when
12 comparing years that it functioned at
13 ED&F Man?
14    A     Mr. Kaplan, there may have been,
15 but I've reviewed so many documents, I
16 don't -- I don't recall right now.
17          I don't remember seeing some.
18    Q     Are you able to tell me what the
19 compensation to the equity finance desk was
20 for any year that the equity finance desk was
21 operating at ED&F Man?
22          MR. BINDER:  Objection, vague.
23    A     I do not know.
24    Q     Okay.
25          MR. KAPLAN:  I'm going to pass the

Page 416

1 witness to John Blessington.
2           MR. BINDER:  John, are you going to
3      have questions?
4           MR. BLESSINGTON:  Hey, everyone.
5      Yeah, let me just -- off the record for
6      like five minutes.
7           MR. BINDER:  Sure.
8           MR. BLESSINGTON:  All right.
9           THE VIDEOGRAPHER:  Stand by.  The
10     time is 1:33 p.m. New York time and
11     we're going off the record.
12          (Brief recess taken.)
13          THE VIDEOGRAPHER:  Stand by.  The
14     time is 1:44 p.m. New York time and
15     we're back on record.
16          MR. BLESSINGTON:  I have questions.
17
EXAMINATION BY MR. BLESSINGTON:
18
19    Q     Good afternoon or good evening,
20 Mr. Hashemi.
21          How are you?
22    A     I'm very good, thank you.
23    Q     My name is John Blessington and I
24 represent what we, for shorthand purposes,
25 refer to as Utah plans and the one

CONFIDENTIAL
Shahab Hashemi - October 8, 2021

47 (Pages 417 to 420)

Page 417

1  Pennsylvania plan.  And I have one question
2  for you.
3           Sir, as the 30(b)(6) representative
4  for ED&F, are you aware that the plans
5  learned for the first time of the
6  inaccuracies of Annex E and A vouchers in
7  September of 2019 through the amended defense
8  filed in the U.K. proceeding?
9      A   Mr. Blessington, can you ask the
10  question again, please?
11     Q   Sure.
12          Are you aware, I guess in preparing
13  for your deposition today, did you learn that
14  the plans -- we'll call it the ED&F plans --
15  the plans that traded through the ED&F
16  platform learned for the first time of the
17  inaccuracies of the vouchers contained in
18  Annex E and Annex A in September 2019 when
19  ED&F filed an amended defense in the U.K. or
20  English proceeding?
21     A   I don't know, Mr. Blessington.
22     Q   Okay.  And are you then aware that,
23  other than that filing, ED&F has never
24  informed its clients -- in this case, the
25  plans -- of the inaccuracies in the vouchers

Page 418

1  contained on Annex E and Annex A?
2           MR. OXFORD:  Objection, form.
3           MR. BINDER:  Objection, form,
4  foundation.
5      A   I don't know, sir.
6      Q   All right.  It wasn't one question,
7  it ended up being two.  But thank you very
8  much, Mr. Hashemi.
9           MR. BLESSINGTON:  I, too, am just
10  going to reserve the right, to the
11  extent given some of the answers to, if
12  necessary, to recall an ED&F
13  representative.  I'm not saying we will,
14  but just given some of the answers or
15  non-answers.  So thank you for your
16  time, Mr. Hashemi.
17          MR. BINDER:  Anybody else?
18          MR. KAPLAN:  Excuse me one second,
19  Neil.  Just for the record, I don't
20  think anybody has waived their ability
21  to move on the 30(b)(6) representative
22  sufficiency or the problem that we got
23  production of documents relatively near
24  the deposition of the identified
25  30(b)(6) representative.

Page 419

1           So I would point out that as far
2  as -- I believe we all have that right.
3  And I certainly -- if for some reason
4  someone thinks I don't, then I join in
5  Mr. Blessington's comment.
6           MR. BINDER:  We would object, but
7  obviously everybody is entitled to
8  assert whatever position they'd like.
9           Any questions, Eric?  You said you
10  might have questions?
11          MR. SMITH:  No, I'm good.  I don't
12  have any questions at this point.
13          MR. BINDER:  Okay.  Great.  Thank
14  you everybody.
15          THE VIDEOGRAPHER:  Stand by.  The
16  time is 1:47 p.m. New York time and
17  we're going off the record.
18          THE COURT REPORTER:  Recapping
19  orders, Hughes Hubbard, eight realtime
20  connections, rough draft, two-day final.
21          Wilmer Hale, rough draft, regular
22  final.
23          Hanamirian, two realtime
24  connections, rough draft, regular final.
25          Kostelanetz, one realtime

Page 420

1  connection, regular final.
2           K&L Gates, one realtime connection,
3  rough draft, regular final.
4           Rosenblatt, one realtime
5  connection, only.
6           Binder & Schwartz, two realtime
7  connections, rough draft, regular final.
8           Moore Tax Law Group, rough draft,
9  regular final.

CONFIDENTIAL
Shahab Hashemi – October 8, 2021

48 (Pages 421 to 424)

Page 421

```
 1              C E R T I F I C A T E
 2
 3        I, MICHAEL FRIEDMAN, a Certified Court
 4  Reporter and Notary Public, qualified in and for
 5  the State of New Jersey do hereby certify that
 6  prior to the commencement of the examination SHAHAB
 7  HASHEMI was duly sworn by me to testify to the
 8  truth the whole truth and nothing but the truth.
 9        I DO FURTHER CERTIFY that the foregoing
10  is a true and accurate transcript of the testimony
11  as taken stenographically by and before me at the
12  time, place and on the date hereinbefore set forth.
13        I DO FURTHER certify that I am neither a
14  relative nor employee nor attorney nor counsel
15  for any of the parties to this action, and that I
16  am neither a relative nor employee of such attorney
17  or counsel, and that I am not financially
18  interested in the action.
19
20
21  _____
22  MICHAEL FRIEDMAN, CCR of the
23  State of New Jersey
24  License No:  30XI00228600
25  Date:  October 10, 2021
```

Page 422

```
 1              LAWYER'S NOTES
 2  PAGE  LINE
 3  ____  ____   _____
 4  ____  ____   _____
 5  ____  ____   _____
 6  ____  ____   _____
 7  ____  ____   _____
 8  ____  ____   _____
 9  ____  ____   _____
10  ____  ____   _____
11  ____  ____   _____
12  ____  ____   _____
13  ____  ____   _____
14  ____  ____   _____
15  ____  ____   _____
16  ____  ____   _____
17  ____  ____   _____
18  ____  ____   _____
19  ____  ____   _____
20  ____  ____   _____
21  ____  ____   _____
22  ____  ____   _____
23  ____  ____   _____
24  ____  ____   _____
25  ____  ____   _____
```

Page 423

```
 1           DEPOSITION ERRATA SHEET
 2
 3      DECLARATION UNDER PENALTY OF PERJURY
 4        I declare under penalty of perjury
 5  that I have read the entire transcript of
 6  my Deposition taken in the captioned matter
 7  or the same has been read to me, and
 8  the same is true and accurate, save and
 9  except for changes and/or corrections, if
10  any, as indicated by me on the DEPOSITION
11  ERRATA SHEET hereof, with the understanding
12  that I offer these changes as if still under
13  oath.
14
15
16
17      Signed on the _____ day of
18  _____, 20____
19
20  _____
21        SHAHAB HASHEMI
22
23
24
25
```

Page 424

```
 1           DEPOSITION ERRATA SHEET
 2  Page No. _____Line No. _____Change to:_____
 3  _____
 4  Reason for change:_____
 5  Page No. _____Line No. _____Change to:_____
 6  _____
 7  Reason for change:_____
 8  Page No. _____Line No. _____Change to:_____
 9  _____
10  Reason for change:_____
11  Page No. _____Line No. _____Change to:_____
12  _____
13  Reason for change:_____
14  Page No. _____Line No. _____Change to:_____
15  _____
16  Reason for change:_____
17  Page No. _____Line No. _____Change to:_____
18  _____
19  Reason for change:_____
20  Page No. _____Line No. _____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25        SHAHAB HASHEMI
```

CONFIDENTIAL
Shahab Hashemi — October 8, 2021

49 (Page 425)

```
                                        Page 425
 1              DEPOSITION ERRATA SHEET
 2   Page No. _____Line No. _____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No. _____Line No. _____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No. _____Line No. _____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No. _____Line No. _____Change to:_____
12   _____
13   Reason for change:_____
14   Page No. _____Line No. _____Change to:_____
15   _____
16   Reason for change:_____
17   Page No. _____Line No. _____Change to:_____
18   _____
19   Reason for change:_____
20   Page No. _____Line No. _____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25            SHAHAB HASHEMI
```