# Exhibit 4



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: +1 (212) 837-6000
Fax: +1 (212) 422-4726
hugheshubbard.com

Neil J. Oxford
Partner
Direct Dial: +1 (212) 837-6843
Direct Fax: +1 (212) 299-6843
neil.oxford@hugheshubbard.com

October 18, 2021

BY EMAIL

Neil S. Binder, Esq.
Binder & Schwartz LLP
366 Madison Ave., 6th Floor
New York, New York 10017

      Re:    *In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation*, 18-md-2865 (LAK)

Dear Neil,

      We write on behalf of plaintiff Skatteforvaltningen ("SKAT") to request that ED&F Man Capital Markets, Limited ("ED&F") produce a properly prepared witness to testify about certain of the topics in SKAT's Federal Rule of Civil Procedure 30(b)(6) notice of deposition for which ED&F's representative witness Mr. Hashemi was egregiously unprepared at his October 7 and 8, 2021 deposition.

      Under Rule 30(b)(6), ED&F was required to designate a witness to testify about all "information known or reasonably available to" it concerning SKAT's designated topics. Fed. R. Civ. P. 30(b)(6). "To satisfy" this obligation, ED&F had "an affirmative duty" to designate a witness for each topic who could "give complete, knowledgeable and binding answers on its behalf." *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 268 (2d Cir. 1999) (internal quotation omitted). Thus, to the extent Mr. Hashemi lacked personal knowledge about the topics, ED&F had a duty to prepare him "to the extent matters are reasonably available, whether from documents, past employees, or other sources." *Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*, No. 10 Civ. 1391 (LGS)(JCF), 2013 WL 1286078, at *2 (S.D.N.Y. Mar. 28, 2013) (internal quotation omitted). ED&F failed to meet its obligation with respect to a number of SKAT's topics, as Mr. Hashemi was woefully unprepared, answering "I don't know" or "I don't recall" over a hundred times, in each instance to a question squarely within the noticed topics. Nonetheless, in an effort to narrow the remaining disputes and bring discovery to a close, SKAT seeks further testimony from ED&F with respect to only four topics of particular importance to the parties' claims and defenses in this litigation: the so-called "Annex E" and "Annex A" tax vouchers, ED&F's determination that the non-Annex E vouchers are accurate, and the Financial Conduct Authority ("FCA") investigation of ED&F.

      First, to the extent Mr. Hashemi was able to answer SKAT's questions concerning the

Annex E vouchers,[1] his testimony was evasive or at such a high level of generality as to render it practically useless. It is implausible, to say the least, that Mr. Hashemi's testimony represented the full extent of the information "known or reasonably available" to ED&F about the Annex E vouchers—information that is of critical importance to these cases, especially now that the Court directed the parties to identify a case involving Annex E vouchers as a summary judgment bellwether. For instance, on the critical question of why ED&F issued the false tax vouchers, Mr. Hashemi testified that in preparing for the deposition, all he learned was that "[t]he vouchers were produced incorrectly because the person producing them thought that it was . . . to be produced." (Hashemi Dep. Tr. at 256:12-18.) He did not even know why that person thought that the vouchers were "to be produced." (*Id.* at 256:19-22.) Yet, ED&F provided a written report to the FCA on how ED&F came to issue the Annex E vouchers—which ED&F wrongly claims is privileged along with all other written explanations of the Annex E vouchers—that surely provided more of an explanation than that a particular employee, for reasons unknown, thought the false tax vouchers were "to be produced." SKAT is entitled to the same factual information that ED&F provided to the FCA. That ED&F asserts the report itself is work product or protected by the English litigation privilege—even were it true—does not make the facts themselves work product or privileged or relieve ED&F of its obligation to prepare a witness to testify about them. *See, e.g.*, *Sec. Ins. Co. of Hartford v. Trustmark Ins. Co.*, 218 F.R.D. 29, 34 (D. Conn. 2003) (30(b)(6) "corporate representative was obliged to gain some understanding of the underlying facts, regardless of the source identifying underlying facts . . . . It matters not that the witness['] understanding was gleaned from documents protected as work product, as the facts within those documents are not subject to protection."). ED&F's conduct is a particularly egregious effort to withhold essential facts from the parties to this litigation because at the same time as it is withholding the FCA report as purported work product, it also refuses to prepare its witness to testify as to the critical facts included in the report.

Further, Mr. Hashemi's testimony concerning the "inaccuracies" in the Annex E vouchers was similarly convoluted and opaque, *e.g.*, that the "inaccuracies" are that they "were incorrectly produced," and they were incorrectly produced "[b]ecause they are inaccurate." (Hashemi Dep. Tr. 252:5-18.) While he eventually testified as to ED&F's position as to why the Annex E vouchers were false, Mr. Hashemi still could not answer basic questions calling for information known or reasonably available to ED&F, such as (i) from whom MPT Dubai acquired the shares (without a right to a dividend) that it purportedly delivered to the plans, (ii) whether MPT Dubai purported to cover its short sales to the pension plans with the very shares it supposedly sold to the plans, (iii) the purpose of what appear to be "wash" trades entered into between ED&F's Equity Finance Desk and Interdealer Broker and between a pension plan and Marex (a non-ED&F broker),[2] (iv) why specific vouchers identified on Annex E are inaccurate,

---

1. SKAT's questions concerning the Annex E vouchers fall within the scope of at least topics number 23 ("The tax vouchers identified in Annex E to ED&F's Amended Defence dated September 6, 2019"), 19 ("The Tax Vouchers, including the representations made by ED&F contained in the Tax Vouchers") and 20 ("ED&F's internal decision to issue each Tax Voucher").

2. Mr. Hashemi was similarly unable to answer questions about any other aspect of these "wash" trades, including why they were entered into within minutes of each other on identical but perfectly offsetting terms, whether cash or shares moved in connection with these trades and whether the trades were reported to the FCA. (Hashemi Dep. Tr. 373:4-376:13.)

and (v) whether ED&F did anything to investigate whether the other vouchers it issued were accurate besides compiling the so-called "trade packs." (*Id.* at 252:22-253:22, 254:18-256:11, 278:14-279:23, 307:24-308:2, 373:4-374:17.)

Second, Mr. Hashemi's testimony as to the remaining non-Annex E tax vouchers was also incomplete and inadequate in that he was unable to fully respond to questions about how ED&F determined that the non-Annex E vouchers did not share the same problems as the Annex E vouchers. Instead, Mr. Hashemi made broad references to certain categories of documents that were allegedly unique to the non-Annex E trades, including SWIFT messages purportedly showing dividend receipts, SWIFT messages showing purportedly showing securities settlements, and cash statements purportedly showing that dividends were paid. However, these categories of documents exists for both Annex E and non-Annex E tax vouchers, and therefore could not serve as a basis to declare the non-Annex E vouchers accurate.[3] Beyond that limited and obviously incorrect answer, Mr. Hashemi was unable to provide any additional detail or explanation on how ED&F reached its determination that the non-Annex E tax vouchers were accurate and not subject to the same infirmities as the Annex E vouchers. (*See* Hashemi Dep. Tr. at 310:21-312:11.) ED&F must produce a witness to testify about the review that ED&F undertook to determine that the non-Annex E tax vouchers were valid and the information that it reviewed to reach this determination.

Third, Mr. Hashemi testified that he does not "actually know anything about Annex A" and learning about it was not part of his preparation for his deposition. (*Id.* at 325:20-326:6.) But questions about ED&F's issuance of the incorrect tax vouchers identified on Annex A and what became of the amounts that SKAT paid based on refund applications including them fit squarely within the scope of topic numbers 19 ("The Tax Vouchers"), 20 ("ED&F's internal decision to issue each Tax Voucher"), and 22 ("The Refunds, including ED&F's receipt and distribution of the Refunds"). ED&F must produce a witness to testify about all information known or reasonably available to it concerning Annex A.

Finally, Mr. Hashemi testified that with respect to topic number 24 (the FCA's investigation), all he did to prepare was ask ED&F's "attorneys" about it, who told him that "there was an investigation" and "it hasn't concluded." (Hashemi Dep. Tr. at 39:10-40:12.) That is clearly insufficient. Even on ED&F's own misguided privilege theories, not all information known or reasonably available to ED&F about the FCA's investigation is privileged. To confirm that the witness was inadequately prepared, SKAT asked Mr. Hashemi questions about key documents related to that investigation that ED&F itself prepared, sent to the FCA, and produced to SKAT. Mr. Hashemi was unable to answer basic questions about those documents. (*Id.* at 183:17-186:24, 187:14-189:9, 190:9-19, 204:25-207:23, 300:21-303:23.) ED&F must produce a witness to testify about all information known or reasonably available to ED&F about the FCA's investigation.

---

3   *Compare* ED&F 00044966 (a trade pack produced by ED&F for a non-Annex E tax voucher) with ED&F 00045169 (a trade pack produced by ED&F for an Annex E tax voucher) both of which contain SWIFT messages and cash statements (*i.e.*, records form the Shadow system) allegedly showing the purported payment of dividends by counterparties. *See also* ED&F 00409244 (email correspondence between ED&F MCM and ED&F Dubai requesting market compensation payments).

      We are available to meet and confer should you wish.  If so, please let us know when this week you are available.  If not, SKAT will consider this dispute ripe for resolution by the Court.

      Sincerely,

      */s/ Neil J. Oxford*

      Neil J. Oxford