# Exhibit 1

Page 1

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
 2                  CASE NO.  18-MD-2865 (LAK)

 3      _____
                                               )
 4      IN RE:                                 )
                                               )
 5      CUSTOMS AND TAX ADMINISTRATION OF       )
        THE KINGDOM OF DENMARK                 )
 6      (SKATTEFORVALTNINGEN) TAX REFUND        )
        SCHEME LITIGATION                      )
 7                                             )
        This document relates to case nos.     )
 8      19-cv-01783; 19-cv-01788; 19-cv-01794; )
        19-cv-01798; 19-cv-01918               )
 9      _____)

10

11

12                C O N F I D E N T I A L

13           SUBJECT TO THE PROTECTIVE ORDER

14

15

16      REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

17                     EXAMINATION OF

18                   RICHARD MARKOWITZ

19                 DATE: April 8, 2021

20

21

22

23

24

25         REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

1              TRANSCRIPT of the videotaped deposition

2      of the witness, called for Oral Examination in the

3      above-captioned matter, said deposition being taken

4      by and before MICHAEL FRIEDMAN, a Notary Public and

5      Certified Court Reporter of the State of New Jersey,

6      via WEBEX, ALL PARTIES REMOTE, on April 8, 2021,

7      commencing at approximately 10:04 in the morning.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      R I C H A R D   M A R K O W I T Z,

 2              called as a witness, having been first

 3      duly sworn according to law, testifies as follows:

 4

 5

 6

 7      EXAMINATION BY MR. WEINSTEIN:

 8          Q    Good morning, Mr. Markowitz.

 9              MR. BONGIORNO:  Marc, before we get

10          going, I just wanted to mention that

11          Mr. Markowitz is diabetic and we're

12          going to have to just keep a close eye

13          on his levels.  So every, I don't know,

14          45, 50, 55 minutes or so, we're just

15          going to ask that he check it, see

16          whether or not he needs a break or a

17          snack or anything.  But I didn't want

18          to -- I'm obviously trying to do it in a

19          way that doesn't interrupt the flow of

20          the deposition.  I just wanted to let

21          you know.

22              MR. WEINSTEIN:  Right.  Thank you.

23          I appreciate that, and we'll accommodate

24          any needs there.

25          Q    Mr. Markowitz, my name is Marc
```

```
 1    founding.

 2         Q    Okay.  As of 2012, what were the

 3    ownership interests of the principals of

 4    Argre?

 5         A    25 percent each.

 6         Q    Okay.  Did that remain the same

 7    through 2015?

 8         A    Yes.

 9         Q    Did you or Argre invest in any

10    dividend arbitrage opportunities through

11    Mr. Raffi?

12         A    No.

13         Q    Why not?

14         A    He didn't offer us any investment

15    opportunities.

16         Q    And for what reason did he bring

17    the strategy to your attention if not to

18    offer you an investment opportunity?

19         A    To inform and educate us about the

20    opportunities.

21         Q    And did there come a time that you

22    did invest in a dividend arbitrage strategy?

23         A    Yes.

24         Q    When was the first time that you

25    invested in such a strategy?
```

1    A    2010.

2    Q    Can you describe what the strategy

3    was in 2010?

4         MR. BONGIORNO:  Objection.

5    A    I invested, or my partners and I

6    invested indirectly into a fund that had been

7    established in Ireland.

8    Q    Is that the Broadgate Fund?

9    A    Yes.

10   Q    Who brought the Broadgate Fund

11   investment opportunity to your attention?

12   A    Solo Capital.

13   Q    What was Solo Capital?

14   A    A financial firm that served as the

15   funds investment manager.

16        MR. BONGIORNO:  Can we pause for a

17        minute, Marc?  I think Mr. Markowitz

18        would like to take a brief break.

19   Q    Mr. Markowitz, do you need a break?

20        THE WITNESS:  Yes.

21        THE VIDEOGRAPHER:  Stand by.  The

22        time is 10:18 a.m. and we're going off

23        the record.

24        (Brief recess taken.)

25        THE VIDEOGRAPHER:  Stand by.  The

Page 28

```
 1          time is 10:33 a.m. and we're back on

 2          record.

 3          Q     Mr. Markowitz, was Solo Capital a

 4    financial firm that you had been familiar

 5    with based on your experience in the

 6    industry?

 7          A     No.

 8          Q     Okay.  And how did you first hear

 9    about Solo Capital?

10          A     They were introduced to us by Rob

11    Klugman.

12          Q     Who was Rob Klugman?

13          A     A friend and professional associate

14    that I had known for a number of years.

15          Q     What did Mr. Klugman tell you about

16    Solo Capital before he introduced them to

17    you?

18          A     That they were a firm in London,

19    acting as an investment manager for a fund

20    looking to do dividend arbitrage

21    transactions.

22          Q     At the time that Mr. Klugman made

23    the introduction, did you know if he had any

24    prior experience with Solo Capital?

25          A     I was not aware of it one way or
```

1    forward basis the sale of those stocks, and

2    therefore make money in the transaction.

3        Q    What did you understand would cause

4    that pricing difference for which you can

5    make money?

6        A    Differences in the pricing of the

7    securities as well as differences in the

8    value of the securities to a particular buyer

9    or seller.

10       Q    What did you understand would cause

11   the difference in the value of the securities

12   for particular buyers or sellers?

13       A    We understood that this fund

14   established in Ireland would be able to take

15   advantage of certain tax treaty benefits when

16   it owned shares of certain companies in

17   certain jurisdictions and received dividends

18   from those companies in those jurisdictions,

19   and, through the double taxation treaty, have

20   a preferential tax treatment versus other

21   investors.

22       Q    Did you have an understanding of

23   what countries would be involved in order to

24   obtain that tax preferential treatment?

25       A    According to the folks at Merrill

```
 1    Lynch and Solo Capital, it would be the tax
 2    treaty between Ireland and Germany.
 3         Q    Okay.  So this particular
 4    investment, the fund was going to focus on
 5    purchasing securities issued in Germany.
 6              Is that right?
 7         A    Yes.
 8         Q    Do you see down below, on the same
 9    page, in the second paragraph under
10    "Investment Policies," it says that "the
11    investment manager will, at all times, seek
12    to maintain an overall market neutral
13    portfolio under which the fund's investment
14    returns are intended to be independent of
15    overall movements in equity markets."
16              Was that consistent with your
17    understanding?
18         A    Yes.
19         Q    Okay.  Can you explain what that
20    means to you?
21         A    If you were an owner of securities,
22    you are at risk for movements in the price of
23    those securities that relate to overall
24    movements in a stock market or the price of
25    those securities in that market.  And the
```

Page 38

 1    large international banks that participated

 2    in such transactions in order to learn about

 3    it, and were able to get knowledge about the

 4    importance of securities lending to those

 5    transactions.

 6         Q    And what was your understanding of

 7    the importance of securities lending to those

 8    transactions?

 9         A    No different than the importance of

10    securities lending to the functioning of the

11    financial markets.  Securities lending allows

12    investors to acquire securities through

13    borrow and allows investors to lend out

14    securities in exchange for cash and other

15    collateral on which they can earn a return or

16    receive cash in return.

17         Q    Did you have an understanding of

18    how the Broadgate Fund was going to employ

19    securities lending arrangements as part of

20    the strategy?

21         A    Not specifically.

22         Q    Three paragraphs below, it says,

23    "The fund is expected to commence trading

24    with leverage of 20 times the net asset value

25    of the fund."

```
 1                    Did you understand what that meant?

 2         A    Yes.

 3         Q    And what did it mean to trade "with

 4    leverage of 20 times the net asset value?"

 5         A    In our discussions with Merrill

 6    Lynch, which was acting as the prime broker

 7    for the fund, they explained to us that we

 8    would be able to borrow money from Merrill

 9    Lynch.  Merrill Lynch would likely use the

10    securities that they held on behalf of the

11    fund and achieve financing through stock

12    lending.

13                    And if the fund had ten dollars of

14    equity, Merrill Lynch would lend 20 times

15    that, or $200, in order to increase its

16    purchase power.

17         Q    Was investing with the use of

18    leverage something you were familiar with

19    from your time in the financial industry?

20         A    Yes.

21         Q    And did 20 times leverage seem like

22    a reasonable amount given your experience in

23    the financial industry?

24                    MR. BONGIORNO:  Objection.

25         A    No.   In my experience working on
```

1    capital for this investment?

2        A    I believe so.

3        Q    Did you end up investing in the

4    Broadgate Fund?

5        A    We worked with another corporate

6    client of ours who became the investor, or

7    one of the investors in the fund, and I

8    provided capital to that corporate client.

9    So my investment personally was indirect to

10   the fund.

11       Q    Were you the only investor into the

12   corporate client for this purpose?

13       A    No.

14       Q    Were other Argre principals?

15       A    Yes.

16       Q    Okay.  As a group, how much did you

17   put up in capital for the corporate client to

18   invest in the Broadgate Fund?

19       A    I'm sorry.  Can you just clarify

20   that question, repeat it one more time?

21       Q    Sure.

22            As a group of individuals, how much

23   capital did you put up for the corporate

24   client to invest in the Broadgate Fund?

25            MR. BONGIORNO:  The group of Argre

```
1          principals, Marc?
2               MR. WEINSTEIN:  Yes.
3          A    Thank you.  That was the
4     clarification I was in search of.
5               I don't recall specifically, but it
6     was probably close to $10 million.
7          Q    And that was the initial capital
8     for this investment?
9          A    I'm sorry.  It again glitched out.
10         Q    Sure.
11              Was the 10 million the initial
12    capital for the investment?
13         A    Assuming it was 10 million, that
14    was the amount that the Argre principals
15    provided to the client of ours that added
16    their own funds, and that became the
17    investment into the Broadgate Fund, if -- I
18    think that was the question you were asking,
19    perhaps.
20         Q    Yes.  And combined with the amount
21    that the corporate client put up, how much in
22    total did the corporate client invest into
23    the Broadgate Fund?
24         A    In total, I believe it was
25    approximately $50 million.
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

1       Q     How did that investment do?

2       A     We all received our money back with

3    a profit.

4       Q     And how much profit?

5       A     Twenty to 25 percent for a

6    one-month investment.

7       Q     All right.  Did you have an

8    understanding of how the Broadgate Fund

9    generated 20 to 25 percent profit in a month?

10      A     Yes.

11      Q     What -- what did it do to generate

12    that profit in a month?

13      A     Buy securities, receive dividends

14    on those securities, hedge those securities,

15    finance those securities with 20 times

16    leverage, and associated with the dividend

17    payments, apply for and receive rebates of

18    taxes that were withheld on those dividend

19    payments.

20      Q     For that investment, how

21    was -- withdrawn.

22            Was the 20 times leverage provided

23    by Merrill Lynch in this investment?

24      A     Yes.

25      Q     And do you know what kind of

1    financial instrument they used to effect that

2    leverage or financing?

3        A    They loaned money to the fund in a

4    margin account.

5        Q    What's a "margin account?"

6        A    An account offered by a brokerage

7    firm that allows you to borrow money from the

8    firm in order to make investments in

9    securities.

10       Q    All right.  In order to have such

11   an account, does the investor need to put a

12   certain amount into the account?

13       A    It depends on the requirements of

14   the brokerage firm.

15       Q    Okay.  And do you know, for the

16   Broadgate Fund, how much, if anything, the

17   Broadgate Fund had to put into an account at

18   Merrill Lynch in order to get the 20 times

19   leverage?

20       A    I don't believe there was a

21   minimum.  But if the fund put in one dollar,

22   it would receive $20 of leverage.  If the

23   firm put in a million dollars, it would have

24   received $20 million of leverage.

25       Q    I see.  So, in order to obtain

1          Yes.

2          Q    Okay.  And was this a -- a

3    memorandum of understanding as between Solo

4    Capital, Argre, and STOR Capital?

5          A    Yes.

6          Q    What was STOR Capital Consulting

7    LLC?

8          A    A business owned and operated by

9    Robert Klugman.

10         Q    Do you know what that business did?

11         A    I assume it provided consulting

12   services based on its name, and that Rob used

13   that firm to advise and consult in

14   transactions.

15         Q    Okay.  And so, because the name

16   "consulting" is in the LLC's name, you're

17   making the assumption that that's the service

18   that it provided?

19         A    And my experience with Rob in

20   receiving invoices or services from

21   STOR Capital.

22         Q    Okay.  For what purposes did

23   STOR Capital issue invoices to you?

24         A    Pursuant to this memorandum of

25   understanding, which spelled out certain

1    fees, as well as a finder's fee that we

2    agreed to pay to STOR Capital and Rob Klugman

3    for transactions that we did with respect to

4    dividend arbitrage transactions that he

5    helped us with.

6        Q    But what was the purpose of this

7    memorandum of understanding?

8        A    As it states, to set forth the

9    terms and conditions that we agreed to to try

10   to have a way of working on transactions

11   together on a going-forward basis.

12       Q    Okay.  And specific to dividend

13   arbitrage?

14       A    This defines it as "equity

15   arbitrage," but my understanding was the two

16   terms were one and the same.

17       Q    Okay.  If you look on Page 3, the

18   "Fees and Profit-Sharing" section?

19       A    Yes.

20       Q    Were the percentage splits

21   negotiated?

22       A    I'm going to ask you to repeat

23   that, Mr. Weinstein.

24       Q    Sure.

25            Were the percentage splits of the

```
 1    transaction.
 2         Q    Okay.  When you say "additional,"
 3    additional to what?
 4         A    Additional to our original
 5    Broadgate transaction; one other transaction.
 6         Q    So did these profit-sharing splits
 7    apply to the Broadgate transaction?
 8         A    Yes.
 9         Q    Okay.  So for the Broadgate deal,
10    any profits made went 61 percent to Argre, as
11    between the parties to this agreement?
12         A    Approximately, yes.
13         Q    Okay.  What was the other deal that
14    was executed pursuant to this agreement?
15         A    A dividend arbitrage transaction in
16    2011.
17         Q    Who was involved in that dividend
18    arbitrage transaction?
19         A    We worked with a not-for-profit
20    entity located here in the U.S. that became
21    an investor and owner of securities.
22         Q    Was that the Ezra Academy of
23    Queens?
24         A    Yes.
25         Q    How were you introduced to the Ezra
```

Page 80

1       Academy of Queens?

2            A     Through a law firm that we were

3       working with previously, and at the time.

4            Q     Which law firm?

5            A     Kaye Scholer.

6            Q     What services were Kaye Scholer

7       providing to you and Argre at the time?

8                  MR. BONGIORNO:  Object to the form.

9            A     Can you repeat the question,

10      please?

11           Q     What services was Kaye Scholer

12      providing to you and Argre at the time?

13           A     A wide variety of services, both

14      professional —— as professionally related to

15      potential transaction and to some of us

16      personally.

17           Q     Okay.  What were the circumstances

18      of Kaye Scholer introducing Ezra Academy of

19      Queens to the Argre principals?

20           A     We became aware that a U.S.

21      not-for-profit organization would have a

22      different and better tax profile for certain

23      dividend arbitrage transactions, better, more

24      efficient than an entity located in Ireland.

25      And Solo had identified one or more parties

```
 1    that would -- they would work with, again, as
 2    investment advisor.
 3              And we wanted to identify a
 4    not-for-profit organization in the U.S. and
 5    we asked our attorneys if they were familiar
 6    with any who might be able to participate in
 7    this transaction along with us.
 8       Q    Okay.  So at the time you and your
 9    Argre partners were looking to do additional
10    dividend arbitrage trading?
11       A    Yes.
12       Q    Okay.  And you understood that a
13    charitable organization in the United States
14    or a not-for-profit would have a better tax
15    preference than the Broadgate Fund had had in
16    Ireland?
17       A    Well, the tax treaties between the
18    United States and Germany provided different
19    rules for withholding tax refunds and
20    reclaims and payments than the treaty between
21    Ireland and Germany.
22       Q    Okay.  And so your understanding
23    was that under the U.S. German tax treaty, a
24    not-for-profit in the United States could get
25    a bigger refund back, percentage-wise, than
```

Page 87

```
 1    actually didn't hear anything you just said.

 2         Q    Sure.

 3              In the first e-mail in this

 4    document, you're forwarding to a number of

 5    people a transactional diagram for the

 6    Ezra Academy transaction.

 7              Is that right?

 8         A    Yes.

 9         Q    All right.  And is that -- if you

10    turn to the next page, is that the diagram?

11         A    Yes.

12         Q    In the diagram, there's a box for

13    the charitable foundation, and it's with an

14    arrow to the custodian.  And it says, next to

15    the arrow, "Account opened with custodian and

16    funds invested into account."

17              Do you know, as part of the

18    transaction, were funds invested into the

19    account at the custodian on behalf of the

20    charitable organization?

21         A    Are you speaking about the

22    custodian listed in this box diagram?

23         Q    Well, ultimately, was there a

24    custodian for this transaction?

25         A    Yes.
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 88

```
 1          Q      Which entity served as custodian?

 2          A      Deutsche Bank.

 3          Q      Okay.  And so, if we replace SEI

 4    with Deutsche Bank in this diagram, did the

 5    Ezra Academy deposit funds to invest into the

 6    account at Deutsche Bank?

 7          A      Yes.

 8          Q      How much money?

 9          A      I believe approximately

10    $40 million.

11          Q      Do you know how Ezra Academy

12    sourced that money?

13          A      Through a total return swap with

14    investors.

15          Q      What is a "total return swap?"

16          A      I'm sorry.  Can you repeat that?

17          Q      What's a "total return swap?"

18          A      It has all different uses.  It's

19    basically two parties agreeing to exchange

20    funds or securities, sometimes fixed for

21    floating, sometimes floating for floating.

22                 So it can run the gamut as a common

23    transaction used in the financial world.

24          Q      Who were the investors who entered

25    into a total return swap with the Ezra
```

```
1     Academy?

2          A    It was a corporate client of ours.

3          Q    And "ours," you mean Argre?

4          A    Yes.

5          Q    And which corporate client?

6          A    I don't recall the exact name of

7     the company.

8          Q    Did the Argre principals provide

9     any of that funding?

10         A    Yes, although I don't know if we

11    were parties to the total return swap or, as

12    in Broadgate, provided funding to the

13    corporate client who then entered into the

14    total return swap.

15              So it was either direct or

16    indirect.

17         Q    Okay.  Without, you know, putting

18    titles on it, where did the 40 million come

19    from?

20         A    The total return swap.

21         Q    Okay.  But who -- from whose bank

22    account did $40 million leave in order for

23    the Ezra Academy to deposit it into the

24    custodian's account?

25              MR. BONGIORNO:  Objection.
```

Page 90

```
 1          A    The money was deposited by Ezra.

 2          Q    Okay.  And did Ezra Academy have

 3     $40 million prior to entering this deal?

 4          A    I don't know.

 5          Q    Okay.  It didn't put up its own

 6     40 million.

 7               Is that right?

 8          A    Again, it entered into a total

 9     return swap which legally gave it

10     $40 million.  So its own money did -- was

11     used because of the nature of the total

12     return swap.

13          Q    Where did the 40 million come from

14     in order to transact in the total return

15     swap?

16          A    The Federal Reserve Bank who prints

17     the money, or the U.S. Treasury.

18          Q    Okay.  You didn't call up the Fed

19     and say "fund this transaction," right?  It

20     came from someone's bank account?

21          A    Again, you asked the question.  I

22     don't mean to say this, but you asked the

23     question, "where did the money come from?"

24               The legal transaction, total return

25     swap, provided money to Ezra, which legally
```

```
 1    became its money that it used to invest in

 2    the transaction.

 3              That's how I understood and

 4    continue to understand how total return swaps

 5    work.

 6         Q    Who was the counterparty to Ezra in

 7    the total return swap?

 8         A    The corporate client we've been

 9    speaking about, and perhaps some of us

10    individually, as we discussed a few moments

11    ago.

12         Q    Okay.  How much did some of you

13    individually invest into that total return

14    swap?

15         A    Either directly or indirectly,

16    perhaps 10 to $15 million.

17         Q    Okay.  And the rest was funded by

18    the corporate client?

19         A    Yes.

20         Q    Do you know where the corporate

21    client got the 25 to 30 million to fund that

22    investment?

23         A    Its bank account.

24         Q    Okay.  But you don't remember what

25    client that is?
```

```
 1        A    I don't remember the name of the
 2   client, no.
 3        Q    Okay.  So the money that went into
 4   the Deutsche Bank custodial account from Ezra
 5   came from a total return swap where some of
 6   the Argre principals and Argre corporate
 7   client put the money into that deal.
 8             Is that right?
 9        A    No.
10        Q    Okay.  How's that wrong?
11        A    Ezra deposited money into its
12   account at Deutsche Bank.  Ezra obtained the
13   money through -- by entering into a total
14   return swap with a corporate client and Argre
15   principals.
16        Q    Okay.  Were you one of the Argre
17   principals that put money into that
18   transaction?
19        A    Yes.
20        Q    Okay.  And how much did you put up?
21        A    Around $2 million.
22        Q    Do you know how much leverage was
23   being provided by Deutsche Bank, if any, on
24   the 40 million that came in from Ezra
25   Academy's account?
```

Page 93

```
1        A    I don't recall.

2        Q    Do you have a ballpark figure that

3   you recall?

4        A    I don't believe it was very much

5   leverage.

6        Q    And by "not very much," do you

7   mean -- what, less than 20 percent?

8        A    Yes.

9        Q    Okay.  Less than 10 percent?

10       A    I don't recall.

11       Q    Was -- there's a reference on this

12  diagram to a sub-custodian.

13            Do you know if a sub-custodian was

14  used in the transaction?

15       A    Not that I'm aware of.

16       Q    Okay.  And so there's then an arrow

17  from the sub-custodian to exchanges and

18  brokers where it says "delivery of shares and

19  payments of cash."

20            In the actual transaction, would

21  that arrow be from Deutsche Bank, as

22  custodian, to the exchanges and brokers?

23       A    Yes.

24       Q    Okay.  And was it your

25  understanding that when the transactions went
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 101

```
 1                    (Brief recess taken.)

 2                    THE VIDEOGRAPHER:  Stand by.  The

 3          time is 1:01 p.m. and we're back on

 4          record.

 5          Q    Mr. Markowitz, can you turn to

 6     Exhibit 1744?

 7                    Mr. Shah starts this e-mail chain

 8     by informing you and Matt Stein that "SEI

 9     called to say that BBH cannot process our

10     business."

11                    Is this in connection with the

12     dividend arbitrage strategy?

13          A    Yes.

14          Q    Okay.  SEI is what entity?

15          A    I don't recall what the initials

16     stand for.

17          Q    Okay.  BBH is Brown Brothers

18     Harriman?

19          A    Yes.

20          Q    Okay.  That's a well-known

21     financial institution that you were familiar

22     with from your time in the financial

23     industry?

24          A    I was aware of the firm, yes.

25          Q    Okay.  And he goes on to say that
```

```
 1      they have credit exposure to the trades at
 2      the time the trades are instructed, and
 3      again, that BBH believed they have credit
 4      exposure to the foundations to the value of
 5      the purchases.
 6              Do you understand what "credit
 7      exposure" is being referred to there?
 8          A    No.
 9          Q    Do you know what role BBH was to
10      serve in the transaction?
11          A    (Witness reviewing.)
12              Either as a custodian or a
13      sub-custodian.
14          Q    Okay.  There is an e-mail, if you
15      look at the page just prior, at the bottom,
16      an e-mail from Mr. Klugman.
17              Do you see that?
18          A    If you could give me a minute,
19      Mr. Weinstein, I would like to read the
20      entire chain of e-mails so I have everything
21      in context?
22          Q    Sure.
23          A    (Witness reviewing.)
24              Okay.
25          Q    Okay.  So if you look at the bottom
```

```
 1    of the second page, there's an e-mail from
 2    Mr. Klugman.
 3              Do you see at the very bottom of
 4    the page, he says, "If there is any real
 5    credit risk, it is hard to imagine another
 6    custodian taking it?"
 7       A    (Witness reviewing.)
 8              I see those words, yes.
 9       Q    Okay.  And is this in the context
10    of Solo is trying to get a custodian onboard
11    to serve in that role for the dividend
12    arbitrage trades?
13       A    I believe they were trying to have
14    Brown Brothers Harriman and SEI work together
15    in a trade.  And the issue became, as I read
16    this entire e-mail, the relationship between
17    the two and how each accounted for their
18    securities and cash accounts.
19       Q    And -- but where he says that "it's
20    hard to imagine another custodian taking it
21    if there's any real credit risk," is it your
22    understanding that Solo is searching here for
23    a custodian to be part of this trading
24    strategy?
25       A    Solo's role and responsibility once
```

1    we signed an MOU was to identify

2    counterparties to the trade; prime brokers,

3    custodians, all those parties.  And that's

4    what they were doing.

5          Q    Okay.  And as part of that role,

6    the context here is searching for a custodian

7    to fit in the -- in the trading.

8          Correct?

9          A    A custodian who could handle

10   securities and futures transactions and

11   potentially provide financing, yes.

12         Q    All right.  And is it fair to say

13   that Brown Brothers Harriman never ended up

14   serving in that role for the dividend

15   arbitrage strategy that you were involved

16   with?

17         A    That's correct.

18         Q    All right.  And if you turn to the

19   first page, at the very top, you see Sanjay

20   Shah provides an update?

21         A    Yes.

22         Q    And do you see the second bullet

23   says, "The account rep then suggested that

24   the management still wouldn't approve the

25   activity due to, in quotes, their concerns of

```
 1    the arbitrage nature of our model, and that

 2    this is not a core business for them."

 3              Do you see that?

 4        A    Yes.

 5        Q    And did you have any discussions

 6    with Mr. Shah about the concerns of the

 7    arbitrage nature of the model?

 8        A    I don't recall if we had any phone

 9    conversations after receiving this e-mail.

10        Q    Okay.  Did you have an

11    understanding of what BBH's concerns were

12    about the arbitrage nature of the model?

13        A    That it was a dividend arbitrage

14    transaction.

15        Q    And why would that -- if that was

16    done in the market by a lot of financial

17    institutions, why was that a concern for

18    them?  What did you understand?

19        A    I never had any discussions with

20    Brown Brothers Harriman, so I can't speak to

21    their decision-making.

22        Q    Okay.  The next bullet says, "We

23    suspect that senior management rejected the

24    trade on reputational grounds and the credit

25    issue was a smoke screen."
```

```
 1              Do you know what reputational
 2    grounds Mr. Shah was referring to that senior
 3    management at BBH had?
 4         A    No.
 5         Q    Do you have any understanding of
 6    why senior management at a financial
 7    institution would have had reputational
 8    concerns getting involved in this
 9    transaction?
10         A    Yes.
11         Q    And what were the reputational
12    concerns you were aware of?
13         A    Well, from my experience, primarily
14    at Goldman Sachs and elsewhere, a firm always
15    looks at transactions, no matter how simple
16    or complex, and analyzes all different types
17    of risks, including legal risks, making sure
18    the transactions comply with the laws, and
19    also what is generally referred to as
20    reputational risk.  I will give you an
21    example.
22              When I was at Goldman Sachs, we
23    purchased three different 747-400 aircraft
24    for about $500 million, each one put in a
25    separate company.  The chairman of the firm
```

Page 117

```
 1        A    I believe it was in the first or

 2   second quarter -- early second quarter of

 3   2012, after we were working with some other

 4   investment managers on potentially looking at

 5   Belgian dividend arbitrage trades.

 6        Q    Okay.  Did you end up working with

 7   other investment managers on those kind of

 8   trades?

 9        A    Yes.

10        Q    Other than Solo Capital, what other

11   investment managers did you end up working

12   with on dividend arbitrage trades?

13        A    A firm called Duet Capital

14   Management, I believe the name was.

15             I recall them as Duet.

16        Q    Okay.  Was Mr. Shah affiliated --

17   let me start over.

18             Was Mr. Shah affiliated with Duet?

19        A    Not that I was aware of.

20        Q    Okay.  Did you end up making any

21   investments with Duet?

22        A    We made investments or participated

23   in investments in which Duet acted as an

24   investment manager.

25        Q    Okay.  And by "we," who do you
```

Page 118

```
 1    mean?

 2         A    The principals of Argre.

 3         Q    All right.  Did the principals of

 4    Argre provide any capital for that

 5    investment?

 6         A    Yes.

 7         Q    How much?

 8         A    I believe it was under a million

 9    dollars.

10         Q    Do you know how much leverage was

11    employed for that investment?

12         A    I don't recall the specific amount,

13    but it was well in excess of 20 times.

14         Q    And what does "well in excess"

15    mean?

16         A    It may have supported purchases of

17    two or three hundred million dollars worth of

18    securities.  I'll let you do that math

19    because you promised me you would do some

20    math during the day.

21         Q    I'm going to hold off for now.  But

22    I mean, when you're talking about 200 million

23    on a one million investment, that's 200 times

24    leverage.

25              Correct?
```

```
 1        A    Yes.

 2        Q    All right.  That much I could do.

 3             Had you ever heard of Duet Capital

 4   Management before this deal that we're

 5   talking about now?

 6        A    Yes.

 7        Q    In what context?

 8        A    I was aware that they managed one

 9   or more hedge funds or hedge fund

10   investments, and was aware of some of those

11   investments into U.S. funds in the United

12   States.  And then we learned that they also

13   had a division that was working on dividend

14   arbitrage transactions.

15        Q    Okay.  How long did you continue to

16   trade with them as your investment manager?

17        A    I'm sorry.  Can you repeat that

18   question?

19        Q    How long did the Argre principals

20   continue to trade with Duet as the investment

21   manager?

22        A    We started working with Duet on a

23   variety of structures, I believe in 2011,

24   perhaps late 2011.  And they -- their job was

25   to identify prime brokers or custodians, and
```

Page 120

```
 1    we worked extensively with our law firm,

 2    reviewed a lot of documentation, negotiated

 3    documentation with prime brokers and other

 4    parties.  And ultimately, the transaction did

 5    not go forward in 2011.

 6              And I believe we resurfaced it in

 7    2012 with other parties.  And ultimately we

 8    did a transaction with -- with Duet assisting

 9    as an investment advisor -- I'm sorry,

10    investment manager, I believe in 2013.

11        Q    Was that transaction a dividend

12    arbitrage transaction?

13        A    Yes.

14        Q    Okay.  And is that the one where

15    you invested a million dollars or so, and

16    they used two hundred to three hundred times

17    leverage?

18        A    Yes.

19        Q    Okay.  Who else was involved in

20    that deal?

21        A    My fellow partners at Argre.

22        Q    Was Solo involved?

23        A    No.

24        Q    Who was the custodian?

25        A    I believe it was ED&F Man.
```

Page 121

```
 1          Q     Did that investment generate any
 2    profits to the Argre principals?
 3          A     It generated profits to the
 4    investor in the trade, and through, I
 5    believe, a total return swap or other
 6    structure worked on with our lawyers, Argre
 7    principals received profit as well.
 8          Q     How much?
 9          A     Under $2 million.
10          Q     Is that on top of the one million
11    that was put up or is that everything that
12    you received in return?
13          MR. BONGIORNO:  Objection.
14          A     I believe that was on top of what
15    we put up.
16          Q     Okay.  So you put up approximately
17    a million, and ultimately got back somewhere
18    under three million?
19          A     Including the initial capital?  Is
20    that what you're saying?
21          Q     Did you get your initial capital
22    back out?
23          A     Yes.
24          Q     Yes, then including that.
25          A     Yes.
```

Page 122

```
 1        Q    Okay.  How long did you do that
 2   type of trading with Duet Capital Management
 3   as the investment advisor?
 4        A    Well, as I said, we worked with
 5   them for a long period of time, had a couple
 6   of fits and starts as they were doing their
 7   business, their job.  And we did this one
 8   series of trades in 2013 through a dividend
 9   season.
10        Q    I see.  With what country?
11        A    The United States and Belgium.
12        Q    Okay.  So there were Belgian shares
13   and there was a tax reclaim filed with
14   Belgium?
15             MR. BONGIORNO:  Objection.
16        A    No.
17        Q    Okay.  Was the investor Ezra
18   Academy?
19        A    No.
20        Q    Who was the investor?
21        A    I believe it was Mill River Capital
22   Pension Plan.
23        Q    Okay.  Is that a pension plan
24   associated with Adam LaRosa?
25        A    Yes.
```

1    involved a foreign government and the tax

2    authorities there.

3        Q    Okay.  And it turned out that

4    Macquarie also passed on the opportunity.

5            Correct?

6        A    Excuse me?

7        Q    It turned out that Macquarie also

8    passed on getting involved in this

9    opportunity?

10       A    (Witness reviewing.)

11           "Macquarie are considering

12   providing leverage.  But they would require

13   more than half of the P&L as a fee."

14           I assume we would not have accepted

15   those terms.

16       Q    Okay.  Why would you not accept the

17   term where another party makes half the

18   fee -- half the P&L as a fee?  Yeah, I'll

19   start again.

20           Why would you -- why would you not

21   accept terms where another party in the

22   transaction is earning more than half the P&L

23   as a fee?

24       A    Our experience with the dividend

25   arbitrage trades and knowledge of the market,

Page 136

```
 1    the first production in profit results in the
 2    trading level of the shares.  We spoke about
 3    that earlier.
 4              And typically, that would be 50-50
 5    with the seller of the shares.  And so,
 6    already the buyer of the shares is left with
 7    50 percent based on the market trading level.
 8              And then we were paying fees to a
 9    custodian or prime broker.  We were paying
10    fees to brokerage firms, and we were paying a
11    34 percent fee to Solo Capital.
12              If the prime broker wanted to take
13    half of what we were already left with, we
14    felt we could do better.
15         Q    Okay.  Did you end up doing better?
16         A    Yes.
17         Q    And who ultimately was Solo Capital
18    able to find as the leverage provider for the
19    dividend arbitrage trading?
20         A    I don't think they provided us with
21    a leverage provider.
22         Q    Okay.  And so is it fair to say
23    that the effort, they're seeking to find a
24    leverage provider, they're saying no one
25    other than Macquarie will touch it.
```

```
 1     actual transactions of securities or anything
 2     else that would ultimately lead to the filing
 3     of a reclaim.
 4          A    That an investor, be it a pension
 5     fund or any investor, would purchase shares
 6     on or before the annual general meeting of a
 7     company located in Denmark, would pay for
 8     those shares on a settlement date.
 9               At the time of the acquisition of
10     the shares, the trade date would hedge the
11     transactions, hedge out the market risk, and
12     receive the dividend on the dividend payment
13     date.
14               And we worked with reclaim agents
15     to work on our behalf to file the requisite
16     forms and information that the tax
17     authorities in any jurisdiction would
18     require.
19          Q    And the investors in this strategy
20     turned out to be pension plans.
21               Correct?
22          A    Yes.
23          Q    Okay.  How -- in this strategy, how
24     was the pension plan going to finance its
25     purchase of the shares prior to the general
```

Page 148

1    assembly date?

2         A    It wasn't going to finance the

3    purchase of the shares prior to the annual

4    general meeting.

5         Q    Okay.  But it was going to actually

6    enter into a trade prior to the annual

7    general meeting.

8              Correct?

9         A    Yes.

10        Q    All right.  How was the pension

11   plan going to finance that purchase?

12        A    On the settlement date, the pension

13   plan entered into a stock lending transaction

14   in which it lent out the shares that were

15   being settled, and the stock borrower had to

16   post collateral to the pension plan's

17   account.

18             And that was one source of funds

19   that could be used to acquire the shares.

20        Q    With respect to the strategy that

21   involved Denmark, were there any other

22   sources of the financing for the purchase of

23   shares other than the stock lending

24   transaction that you just described?

25        A    Yes.

```
 1    or shares at a date in the future for a price

 2    that's agreed upon today.

 3        Q    Similar to the future at the time

 4    that the trade is entered into, is there any

 5    exchange of shares or money?

 6            MR. BONGIORNO:  Objection.

 7        A    Not in my experience.

 8        Q    Can you turn to what's been marked

 9    Exhibit 2120?

10            MR. WEINSTEIN:  Mark this as 2120.

11            (Whereupon the above mentioned was

12        marked for Identification.)

13        A    (Witness reviewing.)

14            Okay.

15        Q    Okay.  This looks like it's an

16    account statement from Solo Capital for the

17    Michelle Investments Pension Plan.

18            Is that right?

19        A    Yes.

20        Q    All right.  And that's one of the

21    plans that was opened -- or, I'm sorry, was

22    established in the -- in 2012 after Mr. Shah

23    sent that e-mail to you?

24        A    Yes.

25        Q    Okay.  The -- do you see on the
```

```
 1    first page, in the middle of the page,

 2    there's an account financial summary.  It

 3    says "Open Cash Balance," and it's got

 4    a -- Euros, zero and DKK, zero?

 5        A    Yes.

 6        Q    All right.  Did you understand DKK

 7    was the currency in Denmark, and it would be

 8    related to any transactions in Danish

 9    securities?

10             MR. BONGIORNO:  Objection.

11        A    (Witness reviewing.)

12             Yes.

13        Q    Did the Michelle Investments

14    Pension Plan deposit any capital into this

15    account at Solo before it started trading?

16        A    I'm sorry.  Before?

17        Q    Before it started trading?

18        A    (Witness reviewing.)

19             No.

20        Q    Can you turn to Page 2, please?  In

21    the middle of the page, it says there's a

22    trade date of August 12th for a purchase of

23    TDC securities.

24             Do you see that?

25        A    No.  I think you misread the date,
```

1      Q    That was your understanding, that

2    the plan negotiated because more was better

3    to get the cash required?

4      A    Yes.  In my experience, the more

5    days you have to settle the trade, the better

6    it is for the party obligated to pay.

7      Q    Okay.  And what was your

8    understanding as to why the seller of the

9    shares in this case would be willing to give

10    you more time to buy the shares than is the

11    standard settlement time in the country?

12      A    Part of the negotiation on the

13    price at which the transaction would be done.

14      Q    Wasn't the transaction

15    negotiated —— wasn't the price negotiated to

16    just be end-of-day market price?

17      A    As I explained earlier, the seller

18    and the market pricing allocates a certain

19    amount of the profit of a dividend arbitrage

20    transaction to the other counterparties in

21    the deal, including the seller.  So accepting

22    a certain share, or pricing and market terms,

23    they would have agreed to this "T plus 4."

24      Q    Who undertook this negotiation with

25    the seller on behalf of the Michelle plan?

```
 1          A      Back in April of 2012, following

 2     the e-mail you mentioned, we had a call with

 3     Solo in which we learned that they were

 4     becoming a custodian, and terms of trades and

 5     liquidity in the market and pricing in the

 6     market was explained to us at that time.

 7                 And that included a share between

 8     the seller and the buyer.

 9          Q      Okay.  Were you part of that

10     discussion that you just described happened

11     with Mr. Shah?

12          A      Yes.

13          Q      Where did that take place?

14          A      A telephone discussion.

15          Q      Okay.  Who was a participant?

16          A      I was on the call, one or more of

17     my partners may have been on the call, and

18     representatives of Solo Capital were on the

19     call.

20          Q      Okay.  And during that call, the

21     Solo people said that they were becoming a

22     custodian?

23          A      That they had become a custodian.

24          Q      Okay.  And so we saw a bunch of

25     e-mails earlier where they were trying to get
```

Page 159

```
1    other financial institutions to serve as

2    custodian.

3              Did they not get any that would

4    serve in that role?

5         A    I don't know.

6         Q    Okay.  But it turned out that when

7    the dividend arbitrage trading began with

8    Denmark, it was going to be Solo Capital who

9    was the custodian for the trading?

10        A    The discussions we had with Solo

11   initially were that the trading would be in

12   Belgium and those were the trades we did

13   initially.

14        Q    Okay.  And for the Belgian trades

15   initially, Solo Capital was going to be the

16   custodian?

17        A    Yes.

18        Q    And then, as we see in August of

19   2012, this plan started trading in Denmark.

20             Was Solo Capital --

21        A    Yes.

22        Q    Was Solo Capital the custodian as

23   well?

24        A    Yes.

25        Q    Okay.  So tell me,
```

```
 1    what -- withdrawn.

 2          What did the Solo folks tell you on

 3    that phone call about how the trading would

 4    work and the counterparties?

 5      A    They said that Solo had worked to

 6    get approvals from the British regulators to

 7    become a custodian, that they had hired legal

 8    and compliance staff, securities finance

 9    people, and that with customers who became

10    clients of Solo as a custodian, they would be

11    able to purchase shares from -- through

12    brokers, from the market, for other sellers

13    of the shares, and hedge those transactions

14    through their accounts at Solo for futures

15    contracts and, if needed, lend shares to a

16    borrower who would post collateral pursuant

17    to a standard stock lending agreement.

18      Q    Okay.  You mentioned earlier

19    that -- something about that there would be

20    negotiations with the sellers of the shares

21    about terms such as price and settlement

22    date.

23          What did they tell you on that

24    phone call about that?

25      A    That the pricing -- market pricing
```

1        Q    Can you turn to the next page of

2    that account statement?  It's got the Bates

3    number at the bottom, 125.

4        A    Yes.

5        Q    And do you see, there's four trades

6    on August 8th of 2012?

7        A    Yes.

8        Q    And are those derivatives for the

9    TDC stock?

10        A    They are futures contracts.

11        Q    Okay.  And that's the hedging

12    transaction?

13        A    Yes.

14        Q    Okay.  Do you know why it was

15    broken up into four transactions?

16        A    No.

17        Q    Okay.  But ultimately, the four

18    combined are meant to sell futures in the

19    same amount of shares of TDC that was

20    purchased on August 8th.

21             Correct?

22        A    Yes.

23        Q    All right.  And then, if you turn

24    to the next -- you know, another page over,

25    the Bates is 127, do you see that there's a

1    transaction on August 14, 2012?

2            The transaction type is "SL" and

3    it's with Aquila (Cayman) as the

4    counterparty?

5        A    Yes.

6        Q    And is this the stock lending piece

7    of the transaction?

8        A    Yes.

9        Q    Okay.  And prior to working with

10   Solo, had you ever heard of Aquila (Cayman)?

11       A    No.

12       Q    Okay.  Did you — do you know

13   anything about that entity other than that it

14   entered into stock lending transactions with

15   your plan?

16       A    Prior to the onboarding of other

17   entities that we worked with — not pension

18   plans — with Solo prior to onboarding, we

19   would have received due diligence information

20   about a stock lender.

21            I believe in certain circumstances,

22   on the advice of our lawyers, we asked them

23   to sign certain letters, Patriot Act letters,

24   AML letters, and I believe we would have

25   received that from this company.

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 178

```
 1        Q    Okay.  And the Patriot Act and AML
 2    letters you're talking about are
 3    certifications that they'll comply with
 4    various, you know, anti-money laundering type
 5    rules?
 6        A    That's my recollection.
 7        Q    Okay.  Other than those letters,
 8    did you receive any documentation in
 9    connection with this due diligence regarding
10    a stock lender such as Aquila (Cayman)?
11        A    We may have received information on
12    the owners or principals of the company.  But
13    I don't recall specifically.
14        Q    Okay.  And was that -- you received
15    that in documentation, document form, or you
16    just verbally were told who the owners were?
17             MR. BONGIORNO:  Objection.
18        A    I don't recall.
19        Q    Okay.  Other than AML and Patriot
20    Act certifications, do you have any documents
21    regarding due diligence or information on any
22    of the stock lenders that were used,
23    including Aquila (Cayman)?
24        A    No.
25        Q    As you sit here today, do you know
```

```
 1    anything about that entity?

 2         A    No.

 3         Q    And so your -- the Michelle Pension

 4    Plan lent out 322 million kroner worth of

 5    stock to this entity, Aquila (Cayman).

 6              Correct?

 7         A    We lent out 7,750,000 shares to

 8    Aquila (Cayman) and received cash in exchange

 9    as collateral.

10         Q    Okay.  And when you purchased those

11    shares, the initial amount of the purchase

12    was about 322 million kroner.

13              Correct?

14         A    (Witness reviewing.)

15              Yes.

16         Q    All right.  And that was the market

17    price on August 8th of 2012?

18         A    Yes.

19         Q    All right.  And when you purchased

20    it, it was just before the dividend date.

21              Correct?

22         A    Yes.

23         Q    All right.  And then, August 14th,

24    six days later, that would be after the

25    dividend date?
```

```
 1     strategy from this time in 2012 through the

 2     middle of 2015?

 3          A    Yes.

 4          Q    Okay.  And with respect to each --

 5     each time a pension plan purchased Danish

 6     shares, there was a corresponding stock loan

 7     transaction similar to what we just looked

 8     at.

 9               Is that right?

10          A    Yes.

11          Q    Okay.  Were there other stock

12     lending counterparties besides Aquila

13     (Cayman)?

14          A    Yes.

15          Q    Do you recall which entities served

16     as stock loan counterparties?

17          A    I'm sorry.  Can you repeat that,

18     please?

19          Q    Do you recall which entities served

20     as stock loan counterparties for some of the

21     other transactions?

22          A    No, I do not.

23          Q    Okay.  Prior to entering into stock

24     lending transactions with those other

25     counterparties, had you heard of any of them
```

```
 1    before the deal?

 2         A    No.

 3         Q    And did you do any due diligence on

 4    any of them, other than obtaining an AML and

 5    Patriot Act certificate?

 6         A    It would have been the same due

 7    diligence that we've previously discussed.

 8         Q    Okay.  And that entailed getting an

 9    AML certificate and a Patriot Act

10    certificate.

11              Correct?

12         A    In certain cases.  I'm not sure we

13    did it in all cases.

14         Q    Okay.  But beyond that, whether you

15    did that or not, there was no other aspect of

16    the due diligence on the stock lending

17    counterparties.

18              Correct?

19         A    Correct.

20         Q    Can you turn to what's been marked

21    Exhibit 2160?  It's in Binder 2.

22              (Whereupon the above mentioned was

23         marked for Identification.)

24              MR. BONGIORNO:  Major progress.

25              MR. WEINSTEIN:  Unfortunately,
```

Page 218

```
 1              MR. BONGIORNO:  Objection.

 2       A    It was based on liquidity

 3   information, it was based on dividend

 4   information, based on our willingness to

 5   enter into certain transactions or avoid and

 6   skip certain transactions if the

 7   profitability was not significant enough for

 8   us.  So it was a profitable transaction,

 9   which is why, starting in 2008, we decided we

10   should explore and work with leading

11   institutions and law firms to be able to

12   execute this particular type of transaction.

13       Q    So when the Michelle plan started

14   to trade Danish securities in August of 2012,

15   we saw that the plan had not deposited money

16   into the account.

17              How was it able to execute that

18   initial trade?

19       A    Through funds that it received,

20   either income on securities or through the

21   stock lending agreements and stock loans it

22   entered into, it was able to arrange for and

23   pay for those shares on settlement date.

24       Q    And so, if the plan had not put

25   money into the account before that trade, and
```

Page 459

```
 1    been paid.  So it was less than $24 million.

 2         Q    Well, did the plans or the

 3    partnerships receive any monies after the

 4    date of this e-mail?

 5         A    Possibly, but I don't -- I don't

 6    recall.

 7         Q    Okay.  Do you know how much you

 8    ended up making combined between the

 9    partnerships and the pension plans?

10         A    Between 20 and $24 million.

11         Q    Okay.  Do you know how much you

12    ended up making from the Argre era

13    partnerships and pension plans?

14         A    I don't recall that amount.

15         Q    Do you have a ballpark figure for

16    that time period?

17         A    Between ten and $20 million.

18         Q    Can you turn, please, to

19    Exhibit 2271, which I'm pretty confident will

20    be the last exhibit in the last binder?

21              MR. WEINSTEIN:  Mark this as 2271.

22              (Whereupon the above mentioned was

23         marked for Identification.)

24         Q    Are you familiar with this exhibit?

25         A    (Witness reviewing.)
```