# Exhibit 1

Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2                CASE NO.  18-MD-2865 (LAK)

 3       _____
                                                 )
 4       IN RE:                                  )
                                                 )
 5       CUSTOMS AND TAX ADMINISTRATION OF       )
         THE KINGDOM OF DENMARK                  )
 6       (SKATTEFORVALTNINGEN) TAX REFUND        )
         SCHEME LITIGATION                       )
 7                                               )
         This document relates to case nos.      )
 8       19-cv-01783; 19-cv-01788; 19-cv-01794; )
         19-cv-01798; 19-cv-01918                )
 9       _____)

10

11

12              C O N F I D E N T I A L

13           SUBJECT TO THE PROTECTIVE ORDER

14

15

16       REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

17                    EXAMINATION OF

18                  RICHARD MARKOWITZ

19                 DATE: April 8, 2021

20

21

22

23

24

25          REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

1            TRANSCRIPT of the videotaped deposition

2      of the witness, called for Oral Examination in the

3      above-captioned matter, said deposition being taken

4      by and before MICHAEL FRIEDMAN, a Notary Public and

5      Certified Court Reporter of the State of New Jersey,

6      via WEBEX, ALL PARTIES REMOTE, on April 8, 2021,

7      commencing at approximately 10:04 in the morning.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 13

```
 1    R I C H A R D   M A R K O W I T Z,

 2            called as a witness, having been first

 3    duly sworn according to law, testifies as follows:

 4

 5

 6

 7    EXAMINATION BY MR. WEINSTEIN:

 8        Q    Good morning, Mr. Markowitz.

 9            MR. BONGIORNO:  Marc, before we get

10        going, I just wanted to mention that

11        Mr. Markowitz is diabetic and we're

12        going to have to just keep a close eye

13        on his levels.  So every, I don't know,

14        45, 50, 55 minutes or so, we're just

15        going to ask that he check it, see

16        whether or not he needs a break or a

17        snack or anything.  But I didn't want

18        to -- I'm obviously trying to do it in a

19        way that doesn't interrupt the flow of

20        the deposition.  I just wanted to let

21        you know.

22            MR. WEINSTEIN:  Right.  Thank you.

23        I appreciate that, and we'll accommodate

24        any needs there.

25        Q    Mr. Markowitz, my name is Marc
```

```
 1    founding.
 2         Q    Okay.  As of 2012, what were the
 3    ownership interests of the principals of
 4    Argre?
 5         A    25 percent each.
 6         Q    Okay.  Did that remain the same
 7    through 2015?
 8         A    Yes.
 9         Q    Did you or Argre invest in any
10    dividend arbitrage opportunities through
11    Mr. Raffi?
12         A    No.
13         Q    Why not?
14         A    He didn't offer us any investment
15    opportunities.
16         Q    And for what reason did he bring
17    the strategy to your attention if not to
18    offer you an investment opportunity?
19         A    To inform and educate us about the
20    opportunities.
21         Q    And did there come a time that you
22    did invest in a dividend arbitrage strategy?
23         A    Yes.
24         Q    When was the first time that you
25    invested in such a strategy?
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

Page 27

```
 1        A     2010.

 2        Q     Can you describe what the strategy

 3   was in 2010?

 4              MR. BONGIORNO:  Objection.

 5        A     I invested, or my partners and I

 6   invested indirectly into a fund that had been

 7   established in Ireland.

 8        Q     Is that the Broadgate Fund?

 9        A     Yes.

10        Q     Who brought the Broadgate Fund

11   investment opportunity to your attention?

12        A     Solo Capital.

13        Q     What was Solo Capital?

14        A     A financial firm that served as the

15   funds investment manager.

16              MR. BONGIORNO:  Can we pause for a

17        minute, Marc?  I think Mr. Markowitz

18        would like to take a brief break.

19        Q     Mr. Markowitz, do you need a break?

20              THE WITNESS:  Yes.

21              THE VIDEOGRAPHER:  Stand by.  The

22        time is 10:18 a.m. and we're going off

23        the record.

24              (Brief recess taken.)

25              THE VIDEOGRAPHER:  Stand by.  The
```

Page 28

```
 1          time is 10:33 a.m. and we're back on
 2          record.
 3          Q     Mr. Markowitz, was Solo Capital a
 4     financial firm that you had been familiar
 5     with based on your experience in the
 6     industry?
 7          A     No.
 8          Q     Okay.  And how did you first hear
 9     about Solo Capital?
10          A     They were introduced to us by Rob
11     Klugman.
12          Q     Who was Rob Klugman?
13          A     A friend and professional associate
14     that I had known for a number of years.
15          Q     What did Mr. Klugman tell you about
16     Solo Capital before he introduced them to
17     you?
18          A     That they were a firm in London,
19     acting as an investment manager for a fund
20     looking to do dividend arbitrage
21     transactions.
22          Q     At the time that Mr. Klugman made
23     the introduction, did you know if he had any
24     prior experience with Solo Capital?
25          A     I was not aware of it one way or
```

1    forward basis the sale of those stocks, and

2    therefore make money in the transaction.

3        Q     What did you understand would cause

4    that pricing difference for which you can

5    make money?

6        A     Differences in the pricing of the

7    securities as well as differences in the

8    value of the securities to a particular buyer

9    or seller.

10        Q     What did you understand would cause

11    the difference in the value of the securities

12    for particular buyers or sellers?

13        A     We understood that this fund

14    established in Ireland would be able to take

15    advantage of certain tax treaty benefits when

16    it owned shares of certain companies in

17    certain jurisdictions and received dividends

18    from those companies in those jurisdictions,

19    and, through the double taxation treaty, have

20    a preferential tax treatment versus other

21    investors.

22        Q     Did you have an understanding of

23    what countries would be involved in order to

24    obtain that tax preferential treatment?

25        A     According to the folks at Merrill

Page 35

```
 1    Lynch and Solo Capital, it would be the tax

 2    treaty between Ireland and Germany.

 3         Q    Okay.  So this particular

 4    investment, the fund was going to focus on

 5    purchasing securities issued in Germany.

 6              Is that right?

 7         A    Yes.

 8         Q    Do you see down below, on the same

 9    page, in the second paragraph under

10    "Investment Policies," it says that "the

11    investment manager will, at all times, seek

12    to maintain an overall market neutral

13    portfolio under which the fund's investment

14    returns are intended to be independent of

15    overall movements in equity markets."

16              Was that consistent with your

17    understanding?

18         A    Yes.

19         Q    Okay.  Can you explain what that

20    means to you?

21         A    If you were an owner of securities,

22    you are at risk for movements in the price of

23    those securities that relate to overall

24    movements in a stock market or the price of

25    those securities in that market.  And the
```

1    large international banks that participated

2    in such transactions in order to learn about

3    it, and were able to get knowledge about the

4    importance of securities lending to those

5    transactions.

6         Q    And what was your understanding of

7    the importance of securities lending to those

8    transactions?

9         A    No different than the importance of

10   securities lending to the functioning of the

11   financial markets.  Securities lending allows

12   investors to acquire securities through

13   borrow and allows investors to lend out

14   securities in exchange for cash and other

15   collateral on which they can earn a return or

16   receive cash in return.

17        Q    Did you have an understanding of

18   how the Broadgate Fund was going to employ

19   securities lending arrangements as part of

20   the strategy?

21        A    Not specifically.

22        Q    Three paragraphs below, it says,

23   "The fund is expected to commence trading

24   with leverage of 20 times the net asset value

25   of the fund."

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 39

```
 1                 Did you understand what that meant?
 2        A    Yes.
 3        Q    And what did it mean to trade "with
 4   leverage of 20 times the net asset value?"
 5        A     In our discussions with Merrill
 6   Lynch, which was acting as the prime broker
 7   for the fund, they explained to us that we
 8   would be able to borrow money from Merrill
 9   Lynch.  Merrill Lynch would likely use the
10   securities that they held on behalf of the
11   fund and achieve financing through stock
12   lending.
13                 And if the fund had ten dollars of
14   equity, Merrill Lynch would lend 20 times
15   that, or $200, in order to increase its
16   purchase power.
17        Q    Was investing with the use of
18   leverage something you were familiar with
19   from your time in the financial industry?
20        A    Yes.
21        Q    And did 20 times leverage seem like
22   a reasonable amount given your experience in
23   the financial industry?
24                 MR. BONGIORNO:  Objection.
25        A    No.   In my experience working on
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

Page 43

```
 1    capital for this investment?
 2         A    I believe so.
 3         Q    Did you end up investing in the
 4    Broadgate Fund?
 5         A    We worked with another corporate
 6    client of ours who became the investor, or
 7    one of the investors in the fund, and I
 8    provided capital to that corporate client.
 9    So my investment personally was indirect to
10    the fund.
11         Q    Were you the only investor into the
12    corporate client for this purpose?
13         A    No.
14         Q    Were other Argre principals?
15         A    Yes.
16         Q    Okay.  As a group, how much did you
17    put up in capital for the corporate client to
18    invest in the Broadgate Fund?
19         A    I'm sorry.  Can you just clarify
20    that question, repeat it one more time?
21         Q    Sure.
22              As a group of individuals, how much
23    capital did you put up for the corporate
24    client to invest in the Broadgate Fund?
25              MR. BONGIORNO:  The group of Argre
```

```
 1          principals, Marc?
 2               MR. WEINSTEIN:  Yes.
 3          A    Thank you.  That was the
 4     clarification I was in search of.
 5               I don't recall specifically, but it
 6     was probably close to $10 million.
 7          Q    And that was the initial capital
 8     for this investment?
 9          A    I'm sorry.  It again glitched out.
10          Q    Sure.
11               Was the 10 million the initial
12     capital for the investment?
13          A    Assuming it was 10 million, that
14     was the amount that the Argre principals
15     provided to the client of ours that added
16     their own funds, and that became the
17     investment into the Broadgate Fund, if -- I
18     think that was the question you were asking,
19     perhaps.
20          Q    Yes.  And combined with the amount
21     that the corporate client put up, how much in
22     total did the corporate client invest into
23     the Broadgate Fund?
24          A    In total, I believe it was
25     approximately $50 million.
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

1        Q     How did that investment do?

2        A     We all received our money back with

3    a profit.

4        Q     And how much profit?

5        A     Twenty to 25 percent for a

6    one-month investment.

7        Q     All right.  Did you have an

8    understanding of how the Broadgate Fund

9    generated 20 to 25 percent profit in a month?

10       A     Yes.

11       Q     What -- what did it do to generate

12   that profit in a month?

13       A      Buy securities, receive dividends

14   on those securities, hedge those securities,

15   finance those securities with 20 times

16   leverage, and associated with the dividend

17   payments, apply for and receive rebates of

18   taxes that were withheld on those dividend

19   payments.

20       Q     For that investment, how

21   was -- withdrawn.

22             Was the 20 times leverage provided

23   by Merrill Lynch in this investment?

24       A     Yes.

25       Q     And do you know what kind of

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 46

1     financial instrument they used to effect that

2     leverage or financing?

3         A    They loaned money to the fund in a

4     margin account.

5         Q    What's a "margin account?"

6         A    An account offered by a brokerage

7     firm that allows you to borrow money from the

8     firm in order to make investments in

9     securities.

10        Q    All right.  In order to have such

11    an account, does the investor need to put a

12    certain amount into the account?

13        A    It depends on the requirements of

14    the brokerage firm.

15        Q    Okay.  And do you know, for the

16    Broadgate Fund, how much, if anything, the

17    Broadgate Fund had to put into an account at

18    Merrill Lynch in order to get the 20 times

19    leverage?

20        A    I don't believe there was a

21    minimum.  But if the fund put in one dollar,

22    it would receive $20 of leverage.  If the

23    firm put in a million dollars, it would have

24    received $20 million of leverage.

25        Q    I see.  So, in order to obtain

Page 75

```
 1              Yes.
 2         Q    Okay.  And was this a -- a
 3    memorandum of understanding as between Solo
 4    Capital, Argre, and STOR Capital?
 5         A    Yes.
 6         Q    What was STOR Capital Consulting
 7    LLC?
 8         A    A business owned and operated by
 9    Robert Klugman.
10         Q    Do you know what that business did?
11         A    I assume it provided consulting
12    services based on its name, and that Rob used
13    that firm to advise and consult in
14    transactions.
15         Q    Okay.  And so, because the name
16    "consulting" is in the LLC's name, you're
17    making the assumption that that's the service
18    that it provided?
19         A    And my experience with Rob in
20    receiving invoices or services from
21    STOR Capital.
22         Q    Okay.  For what purposes did
23    STOR Capital issue invoices to you?
24         A    Pursuant to this memorandum of
25    understanding, which spelled out certain
```

1    fees, as well as a finder's fee that we

2    agreed to pay to STOR Capital and Rob Klugman

3    for transactions that we did with respect to

4    dividend arbitrage transactions that he

5    helped us with.

6        Q    But what was the purpose of this

7    memorandum of understanding?

8        A    As it states, to set forth the

9    terms and conditions that we agreed to to try

10    to have a way of working on transactions

11    together on a going-forward basis.

12        Q    Okay.  And specific to dividend

13    arbitrage?

14        A    This defines it as "equity

15    arbitrage," but my understanding was the two

16    terms were one and the same.

17        Q    Okay.  If you look on Page 3, the

18    "Fees and Profit-Sharing" section?

19        A    Yes.

20        Q    Were the percentage splits

21    negotiated?

22        A    I'm going to ask you to repeat

23    that, Mr. Weinstein.

24        Q    Sure.

25             Were the percentage splits of the

```
 1    transaction.
 2         Q    Okay.  When you say "additional,"
 3    additional to what?
 4         A    Additional to our original
 5    Broadgate transaction; one other transaction.
 6         Q    So did these profit-sharing splits
 7    apply to the Broadgate transaction?
 8         A    Yes.
 9         Q    Okay.  So for the Broadgate deal,
10    any profits made went 61 percent to Argre, as
11    between the parties to this agreement?
12         A    Approximately, yes.
13         Q    Okay.  What was the other deal that
14    was executed pursuant to this agreement?
15         A    A dividend arbitrage transaction in
16    2011.
17         Q    Who was involved in that dividend
18    arbitrage transaction?
19         A    We worked with a not-for-profit
20    entity located here in the U.S. that became
21    an investor and owner of securities.
22         Q    Was that the Ezra Academy of
23    Queens?
24         A    Yes.
25         Q    How were you introduced to the Ezra
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

Page 80

```
 1    Academy of Queens?
 2         A    Through a law firm that we were
 3    working with previously, and at the time.
 4         Q    Which law firm?
 5         A    Kaye Scholer.
 6         Q    What services were Kaye Scholer
 7    providing to you and Argre at the time?
 8              MR. BONGIORNO:  Object to the form.
 9         A    Can you repeat the question,
10    please?
11         Q    What services was Kaye Scholer
12    providing to you and Argre at the time?
13         A    A wide variety of services, both
14    professional -- as professionally related to
15    potential transaction and to some of us
16    personally.
17         Q    Okay.  What were the circumstances
18    of Kaye Scholer introducing Ezra Academy of
19    Queens to the Argre principals?
20         A    We became aware that a U.S.
21    not-for-profit organization would have a
22    different and better tax profile for certain
23    dividend arbitrage transactions, better, more
24    efficient than an entity located in Ireland.
25    And Solo had identified one or more parties
```

```
1    that would -- they would work with, again, as
2    investment advisor.
3              And we wanted to identify a
4    not-for-profit organization in the U.S. and
5    we asked our attorneys if they were familiar
6    with any who might be able to participate in
7    this transaction along with us.
8         Q    Okay.  So at the time you and your
9    Argre partners were looking to do additional
10   dividend arbitrage trading?
11        A    Yes.
12        Q    Okay.  And you understood that a
13   charitable organization in the United States
14   or a not-for-profit would have a better tax
15   preference than the Broadgate Fund had had in
16   Ireland?
17        A    Well, the tax treaties between the
18   United States and Germany provided different
19   rules for withholding tax refunds and
20   reclaims and payments than the treaty between
21   Ireland and Germany.
22        Q    Okay.  And so your understanding
23   was that under the U.S. German tax treaty, a
24   not-for-profit in the United States could get
25   a bigger refund back, percentage-wise, than
```

Page 87

```
 1    actually didn't hear anything you just said.

 2         Q    Sure.

 3              In the first e-mail in this

 4    document, you're forwarding to a number of

 5    people a transactional diagram for the

 6    Ezra Academy transaction.

 7              Is that right?

 8         A    Yes.

 9         Q    All right.  And is that -- if you

10    turn to the next page, is that the diagram?

11         A    Yes.

12         Q    In the diagram, there's a box for

13    the charitable foundation, and it's with an

14    arrow to the custodian.  And it says, next to

15    the arrow, "Account opened with custodian and

16    funds invested into account."

17              Do you know, as part of the

18    transaction, were funds invested into the

19    account at the custodian on behalf of the

20    charitable organization?

21         A    Are you speaking about the

22    custodian listed in this box diagram?

23         Q    Well, ultimately, was there a

24    custodian for this transaction?

25         A    Yes.
```

```
 1          Q     Which entity served as custodian?

 2          A     Deutsche Bank.

 3          Q     Okay.  And so, if we replace SEI

 4    with Deutsche Bank in this diagram, did the

 5    Ezra Academy deposit funds to invest into the

 6    account at Deutsche Bank?

 7          A     Yes.

 8          Q     How much money?

 9          A     I believe approximately

10    $40 million.

11          Q     Do you know how Ezra Academy

12    sourced that money?

13          A     Through a total return swap with

14    investors.

15          Q     What is a "total return swap?"

16          A     I'm sorry.  Can you repeat that?

17          Q     What's a "total return swap?"

18          A     It has all different uses.  It's

19    basically two parties agreeing to exchange

20    funds or securities, sometimes fixed for

21    floating, sometimes floating for floating.

22                So it can run the gamut as a common

23    transaction used in the financial world.

24          Q     Who were the investors who entered

25    into a total return swap with the Ezra
```

Page 89

```
 1    Academy?

 2         A    It was a corporate client of ours.

 3         Q    And "ours," you mean Argre?

 4         A    Yes.

 5         Q    And which corporate client?

 6         A    I don't recall the exact name of

 7    the company.

 8         Q    Did the Argre principals provide

 9    any of that funding?

10         A    Yes, although I don't know if we

11    were parties to the total return swap or, as

12    in Broadgate, provided funding to the

13    corporate client who then entered into the

14    total return swap.

15              So it was either direct or

16    indirect.

17         Q    Okay.  Without, you know, putting

18    titles on it, where did the 40 million come

19    from?

20         A    The total return swap.

21         Q    Okay.  But who -- from whose bank

22    account did $40 million leave in order for

23    the Ezra Academy to deposit it into the

24    custodian's account?

25              MR. BONGIORNO:  Objection.
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 90

```
1          A    The money was deposited by Ezra.

2          Q    Okay.  And did Ezra Academy have

3     $40 million prior to entering this deal?

4          A    I don't know.

5          Q    Okay.  It didn't put up its own

6     40 million.

7               Is that right?

8          A    Again, it entered into a total

9     return swap which legally gave it

10    $40 million.  So its own money did -- was

11    used because of the nature of the total

12    return swap.

13         Q    Where did the 40 million come from

14    in order to transact in the total return

15    swap?

16         A    The Federal Reserve Bank who prints

17    the money, or the U.S. Treasury.

18         Q    Okay.  You didn't call up the Fed

19    and say "fund this transaction," right?  It

20    came from someone's bank account?

21         A    Again, you asked the question.  I

22    don't mean to say this, but you asked the

23    question, "where did the money come from?"

24               The legal transaction, total return

25    swap, provided money to Ezra, which legally
```

```
 1    became its money that it used to invest in

 2    the transaction.

 3               That's how I understood and

 4    continue to understand how total return swaps

 5    work.

 6         Q    Who was the counterparty to Ezra in

 7    the total return swap?

 8         A    The corporate client we've been

 9    speaking about, and perhaps some of us

10    individually, as we discussed a few moments

11    ago.

12         Q    Okay.  How much did some of you

13    individually invest into that total return

14    swap?

15         A    Either directly or indirectly,

16    perhaps 10 to $15 million.

17         Q    Okay.  And the rest was funded by

18    the corporate client?

19         A    Yes.

20         Q    Do you know where the corporate

21    client got the 25 to 30 million to fund that

22    investment?

23         A    Its bank account.

24         Q    Okay.  But you don't remember what

25    client that is?
```

Page 92

```
 1        A    I don't remember the name of the
 2   client, no.
 3        Q    Okay.  So the money that went into
 4   the Deutsche Bank custodial account from Ezra
 5   came from a total return swap where some of
 6   the Argre principals and Argre corporate
 7   client put the money into that deal.
 8             Is that right?
 9        A    No.
10        Q    Okay.  How's that wrong?
11        A    Ezra deposited money into its
12   account at Deutsche Bank.  Ezra obtained the
13   money through -- by entering into a total
14   return swap with a corporate client and Argre
15   principals.
16        Q    Okay.  Were you one of the Argre
17   principals that put money into that
18   transaction?
19        A    Yes.
20        Q    Okay.  And how much did you put up?
21        A    Around $2 million.
22        Q    Do you know how much leverage was
23   being provided by Deutsche Bank, if any, on
24   the 40 million that came in from Ezra
25   Academy's account?
```

```
1          A    I don't recall.

2          Q    Do you have a ballpark figure that

3    you recall?

4          A    I don't believe it was very much

5    leverage.

6          Q    And by "not very much," do you

7    mean -- what, less than 20 percent?

8          A    Yes.

9          Q    Okay.  Less than 10 percent?

10         A    I don't recall.

11         Q    Was -- there's a reference on this

12   diagram to a sub-custodian.

13              Do you know if a sub-custodian was

14   used in the transaction?

15         A    Not that I'm aware of.

16         Q    Okay.  And so there's then an arrow

17   from the sub-custodian to exchanges and

18   brokers where it says "delivery of shares and

19   payments of cash."

20              In the actual transaction, would

21   that arrow be from Deutsche Bank, as

22   custodian, to the exchanges and brokers?

23         A    Yes.

24         Q    Okay.  And was it your

25   understanding that when the transactions went
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 101

```
 1              (Brief recess taken.)
 2              THE VIDEOGRAPHER:  Stand by.  The
 3         time is 1:01 p.m. and we're back on
 4         record.
 5         Q    Mr. Markowitz, can you turn to
 6    Exhibit 1744?
 7              Mr. Shah starts this e-mail chain
 8    by informing you and Matt Stein that "SEI
 9    called to say that BBH cannot process our
10    business."
11              Is this in connection with the
12    dividend arbitrage strategy?
13         A    Yes.
14         Q    Okay.  SEI is what entity?
15         A    I don't recall what the initials
16    stand for.
17         Q    Okay.  BBH is Brown Brothers
18    Harriman?
19         A    Yes.
20         Q    Okay.  That's a well-known
21    financial institution that you were familiar
22    with from your time in the financial
23    industry?
24         A    I was aware of the firm, yes.
25         Q    Okay.  And he goes on to say that
```

```
 1    they have credit exposure to the trades at

 2    the time the trades are instructed, and

 3    again, that BBH believed they have credit

 4    exposure to the foundations to the value of

 5    the purchases.

 6           Do you understand what "credit

 7    exposure" is being referred to there?

 8       A    No.

 9       Q    Do you know what role BBH was to

10    serve in the transaction?

11       A    (Witness reviewing.)

12           Either as a custodian or a

13    sub-custodian.

14       Q    Okay.  There is an e-mail, if you

15    look at the page just prior, at the bottom,

16    an e-mail from Mr. Klugman.

17           Do you see that?

18       A    If you could give me a minute,

19    Mr. Weinstein, I would like to read the

20    entire chain of e-mails so I have everything

21    in context?

22       Q    Sure.

23       A    (Witness reviewing.)

24           Okay.

25       Q    Okay.  So if you look at the bottom
```

```
 1    of the second page, there's an e-mail from

 2    Mr. Klugman.

 3              Do you see at the very bottom of

 4    the page, he says, "If there is any real

 5    credit risk, it is hard to imagine another

 6    custodian taking it?"

 7        A    (Witness reviewing.)

 8              I see those words, yes.

 9        Q    Okay.  And is this in the context

10    of Solo is trying to get a custodian onboard

11    to serve in that role for the dividend

12    arbitrage trades?

13        A    I believe they were trying to have

14    Brown Brothers Harriman and SEI work together

15    in a trade.  And the issue became, as I read

16    this entire e-mail, the relationship between

17    the two and how each accounted for their

18    securities and cash accounts.

19        Q    And -- but where he says that "it's

20    hard to imagine another custodian taking it

21    if there's any real credit risk," is it your

22    understanding that Solo is searching here for

23    a custodian to be part of this trading

24    strategy?

25        A    Solo's role and responsibility once
```

```
 1    we signed an MOU was to identify

 2    counterparties to the trade; prime brokers,

 3    custodians, all those parties.  And that's

 4    what they were doing.

 5         Q    Okay.  And as part of that role,

 6    the context here is searching for a custodian

 7    to fit in the -- in the trading.

 8             Correct?

 9         A    A custodian who could handle

10    securities and futures transactions and

11    potentially provide financing, yes.

12         Q    All right.  And is it fair to say

13    that Brown Brothers Harriman never ended up

14    serving in that role for the dividend

15    arbitrage strategy that you were involved

16    with?

17         A    That's correct.

18         Q    All right.  And if you turn to the

19    first page, at the very top, you see Sanjay

20    Shah provides an update?

21         A    Yes.

22         Q    And do you see the second bullet

23    says, "The account rep then suggested that

24    the management still wouldn't approve the

25    activity due to, in quotes, their concerns of
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

1    the arbitrage nature of our model, and that

2    this is not a core business for them."

3          Do you see that?

4      A    Yes.

5      Q    And did you have any discussions

6    with Mr. Shah about the concerns of the

7    arbitrage nature of the model?

8      A    I don't recall if we had any phone

9    conversations after receiving this e-mail.

10     Q    Okay.  Did you have an

11   understanding of what BBH's concerns were

12   about the arbitrage nature of the model?

13     A    That it was a dividend arbitrage

14   transaction.

15     Q    And why would that -- if that was

16   done in the market by a lot of financial

17   institutions, why was that a concern for

18   them?  What did you understand?

19     A    I never had any discussions with

20   Brown Brothers Harriman, so I can't speak to

21   their decision-making.

22     Q    Okay.  The next bullet says, "We

23   suspect that senior management rejected the

24   trade on reputational grounds and the credit

25   issue was a smoke screen."

1           Do you know what reputational

2    grounds Mr. Shah was referring to that senior

3    management at BBH had?

4        A    No.

5        Q    Do you have any understanding of

6    why senior management at a financial

7    institution would have had reputational

8    concerns getting involved in this

9    transaction?

10       A    Yes.

11       Q    And what were the reputational

12   concerns you were aware of?

13       A    Well, from my experience, primarily

14   at Goldman Sachs and elsewhere, a firm always

15   looks at transactions, no matter how simple

16   or complex, and analyzes all different types

17   of risks, including legal risks, making sure

18   the transactions comply with the laws, and

19   also what is generally referred to as

20   reputational risk.  I will give you an

21   example.

22           When I was at Goldman Sachs, we

23   purchased three different 747-400 aircraft

24   for about $500 million, each one put in a

25   separate company.  The chairman of the firm

```
 1        A     I believe it was in the first or
 2    second quarter -- early second quarter of
 3    2012, after we were working with some other
 4    investment managers on potentially looking at
 5    Belgian dividend arbitrage trades.
 6        Q     Okay.  Did you end up working with
 7    other investment managers on those kind of
 8    trades?
 9        A     Yes.
10        Q     Other than Solo Capital, what other
11    investment managers did you end up working
12    with on dividend arbitrage trades?
13        A     A firm called Duet Capital
14    Management, I believe the name was.
15              I recall them as Duet.
16        Q     Okay.  Was Mr. Shah affiliated --
17    let me start over.
18              Was Mr. Shah affiliated with Duet?
19        A     Not that I was aware of.
20        Q     Okay.  Did you end up making any
21    investments with Duet?
22        A     We made investments or participated
23    in investments in which Duet acted as an
24    investment manager.
25        Q     Okay.  And by "we," who do you
```

Page 118

```
 1    mean?

 2          A    The principals of Argre.

 3          Q    All right.  Did the principals of

 4    Argre provide any capital for that

 5    investment?

 6          A    Yes.

 7          Q    How much?

 8          A    I believe it was under a million

 9    dollars.

10          Q    Do you know how much leverage was

11    employed for that investment?

12          A    I don't recall the specific amount,

13    but it was well in excess of 20 times.

14          Q    And what does "well in excess"

15    mean?

16          A    It may have supported purchases of

17    two or three hundred million dollars worth of

18    securities.  I'll let you do that math

19    because you promised me you would do some

20    math during the day.

21          Q    I'm going to hold off for now.  But

22    I mean, when you're talking about 200 million

23    on a one million investment, that's 200 times

24    leverage.

25               Correct?
```

1      A    Yes.

2      Q    All right.  That much I could do.

3           Had you ever heard of Duet Capital

4    Management before this deal that we're

5    talking about now?

6      A    Yes.

7      Q    In what context?

8      A    I was aware that they managed one

9    or more hedge funds or hedge fund

10   investments, and was aware of some of those

11   investments into U.S. funds in the United

12   States.  And then we learned that they also

13   had a division that was working on dividend

14   arbitrage transactions.

15     Q    Okay.  How long did you continue to

16   trade with them as your investment manager?

17     A    I'm sorry.  Can you repeat that

18   question?

19     Q    How long did the Argre principals

20   continue to trade with Duet as the investment

21   manager?

22     A    We started working with Duet on a

23   variety of structures, I believe in 2011,

24   perhaps late 2011.  And they -- their job was

25   to identify prime brokers or custodians, and

Page 120

1    we worked extensively with our law firm,

2    reviewed a lot of documentation, negotiated

3    documentation with prime brokers and other

4    parties.  And ultimately, the transaction did

5    not go forward in 2011.

6              And I believe we resurfaced it in

7    2012 with other parties.  And ultimately we

8    did a transaction with -- with Duet assisting

9    as an investment advisor -- I'm sorry,

10   investment manager, I believe in 2013.

11        Q    Was that transaction a dividend

12   arbitrage transaction?

13        A    Yes.

14        Q    Okay.  And is that the one where

15   you invested a million dollars or so, and

16   they used two hundred to three hundred times

17   leverage?

18        A    Yes.

19        Q    Okay.  Who else was involved in

20   that deal?

21        A    My fellow partners at Argre.

22        Q    Was Solo involved?

23        A    No.

24        Q    Who was the custodian?

25        A    I believe it was ED&F Man.

```
1          Q     Did that investment generate any

2    profits to the Argre principals?

3          A     It generated profits to the

4    investor in the trade, and through, I

5    believe, a total return swap or other

6    structure worked on with our lawyers, Argre

7    principals received profit as well.

8          Q     How much?

9          A     Under $2 million.

10         Q     Is that on top of the one million

11   that was put up or is that everything that

12   you received in return?

13               MR. BONGIORNO:  Objection.

14         A     I believe that was on top of what

15   we put up.

16         Q     Okay.  So you put up approximately

17   a million, and ultimately got back somewhere

18   under three million?

19         A     Including the initial capital?  Is

20   that what you're saying?

21         Q     Did you get your initial capital

22   back out?

23         A     Yes.

24         Q     Yes, then including that.

25         A     Yes.
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 122

```
 1        Q    Okay.  How long did you do that
 2   type of trading with Duet Capital Management
 3   as the investment advisor?
 4        A    Well, as I said, we worked with
 5   them for a long period of time, had a couple
 6   of fits and starts as they were doing their
 7   business, their job.  And we did this one
 8   series of trades in 2013 through a dividend
 9   season.
10        Q    I see.  With what country?
11        A    The United States and Belgium.
12        Q    Okay.  So there were Belgian shares
13   and there was a tax reclaim filed with
14   Belgium?
15             MR. BONGIORNO:  Objection.
16        A    No.
17        Q    Okay.  Was the investor Ezra
18   Academy?
19        A    No.
20        Q    Who was the investor?
21        A    I believe it was Mill River Capital
22   Pension Plan.
23        Q    Okay.  Is that a pension plan
24   associated with Adam LaRosa?
25        A    Yes.
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 135

```
1       involved a foreign government and the tax

2       authorities there.

3           Q    Okay.  And it turned out that

4       Macquarie also passed on the opportunity.

5               Correct?

6           A    Excuse me?

7           Q    It turned out that Macquarie also

8       passed on getting involved in this

9       opportunity?

10          A    (Witness reviewing.)

11              "Macquarie are considering

12      providing leverage.  But they would require

13      more than half of the P&L as a fee."

14              I assume we would not have accepted

15      those terms.

16          Q    Okay.  Why would you not accept the

17      term where another party makes half the

18      fee -- half the P&L as a fee?  Yeah, I'll

19      start again.

20              Why would you -- why would you not

21      accept terms where another party in the

22      transaction is earning more than half the P&L

23      as a fee?

24          A    Our experience with the dividend

25      arbitrage trades and knowledge of the market,
```

Page 136

1    the first production in profit results in the

2    trading level of the shares.  We spoke about

3    that earlier.

4            And typically, that would be 50-50

5    with the seller of the shares.  And so,

6    already the buyer of the shares is left with

7    50 percent based on the market trading level.

8            And then we were paying fees to a

9    custodian or prime broker.  We were paying

10    fees to brokerage firms, and we were paying a

11    34 percent fee to Solo Capital.

12            If the prime broker wanted to take

13    half of what we were already left with, we

14    felt we could do better.

15        Q    Okay.  Did you end up doing better?

16        A    Yes.

17        Q    And who ultimately was Solo Capital

18    able to find as the leverage provider for the

19    dividend arbitrage trading?

20        A    I don't think they provided us with

21    a leverage provider.

22        Q    Okay.  And so is it fair to say

23    that the effort, they're seeking to find a

24    leverage provider, they're saying no one

25    other than Macquarie will touch it.

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 147

1    actual transactions of securities or anything

2    else that would ultimately lead to the filing

3    of a reclaim.

4         A    That an investor, be it a pension

5    fund or any investor, would purchase shares

6    on or before the annual general meeting of a

7    company located in Denmark, would pay for

8    those shares on a settlement date.

9              At the time of the acquisition of

10   the shares, the trade date would hedge the

11   transactions, hedge out the market risk, and

12   receive the dividend on the dividend payment

13   date.

14             And we worked with reclaim agents

15   to work on our behalf to file the requisite

16   forms and information that the tax

17   authorities in any jurisdiction would

18   require.

19        Q    And the investors in this strategy

20   turned out to be pension plans.

21             Correct?

22        A    Yes.

23        Q    Okay.  How -- in this strategy, how

24   was the pension plan going to finance its

25   purchase of the shares prior to the general

1    assembly date?

2         A    It wasn't going to finance the

3    purchase of the shares prior to the annual

4    general meeting.

5         Q    Okay.  But it was going to actually

6    enter into a trade prior to the annual

7    general meeting.

8              Correct?

9         A    Yes.

10        Q    All right.  How was the pension

11   plan going to finance that purchase?

12        A    On the settlement date, the pension

13   plan entered into a stock lending transaction

14   in which it lent out the shares that were

15   being settled, and the stock borrower had to

16   post collateral to the pension plan's

17   account.

18             And that was one source of funds

19   that could be used to acquire the shares.

20        Q    With respect to the strategy that

21   involved Denmark, were there any other

22   sources of the financing for the purchase of

23   shares other than the stock lending

24   transaction that you just described?

25        A    Yes.

```
 1    or shares at a date in the future for a price

 2    that's agreed upon today.

 3         Q    Similar to the future at the time

 4    that the trade is entered into, is there any

 5    exchange of shares or money?

 6              MR. BONGIORNO:  Objection.

 7         A    Not in my experience.

 8         Q    Can you turn to what's been marked

 9    Exhibit 2120?

10              MR. WEINSTEIN:  Mark this as 2120.

11              (Whereupon the above mentioned was

12         marked for Identification.)

13         A    (Witness reviewing.)

14              Okay.

15         Q    Okay.  This looks like it's an

16    account statement from Solo Capital for the

17    Michelle Investments Pension Plan.

18              Is that right?

19         A    Yes.

20         Q    All right.  And that's one of the

21    plans that was opened -- or, I'm sorry, was

22    established in the -- in 2012 after Mr. Shah

23    sent that e-mail to you?

24         A    Yes.

25         Q    Okay.  The -- do you see on the
```

```
 1    first page, in the middle of the page,

 2    there's an account financial summary.  It

 3    says "Open Cash Balance," and it's got

 4    a -- Euros, zero and DKK, zero?

 5         A    Yes.

 6         Q    All right.  Did you understand DKK

 7    was the currency in Denmark, and it would be

 8    related to any transactions in Danish

 9    securities?

10              MR. BONGIORNO:  Objection.

11         A    (Witness reviewing.)

12              Yes.

13         Q    Did the Michelle Investments

14    Pension Plan deposit any capital into this

15    account at Solo before it started trading?

16         A    I'm sorry.  Before?

17         Q    Before it started trading?

18         A    (Witness reviewing.)

19              No.

20         Q    Can you turn to Page 2, please?  In

21    the middle of the page, it says there's a

22    trade date of August 12th for a purchase of

23    TDC securities.

24              Do you see that?

25         A    No.  I think you misread the date,
```

1      Q    That was your understanding, that

2   the plan negotiated because more was better

3   to get the cash required?

4      A    Yes.  In my experience, the more

5   days you have to settle the trade, the better

6   it is for the party obligated to pay.

7      Q    Okay.  And what was your

8   understanding as to why the seller of the

9   shares in this case would be willing to give

10   you more time to buy the shares than is the

11   standard settlement time in the country?

12      A    Part of the negotiation on the

13   price at which the transaction would be done.

14      Q    Wasn't the transaction

15   negotiated -- wasn't the price negotiated to

16   just be end-of-day market price?

17      A    As I explained earlier, the seller

18   and the market pricing allocates a certain

19   amount of the profit of a dividend arbitrage

20   transaction to the other counterparties in

21   the deal, including the seller.  So accepting

22   a certain share, or pricing and market terms,

23   they would have agreed to this "T plus 4."

24      Q    Who undertook this negotiation with

25   the seller on behalf of the Michelle plan?

Page 158

```
 1        A    Back in April of 2012, following

 2   the e-mail you mentioned, we had a call with

 3   Solo in which we learned that they were

 4   becoming a custodian, and terms of trades and

 5   liquidity in the market and pricing in the

 6   market was explained to us at that time.

 7             And that included a share between

 8   the seller and the buyer.

 9        Q    Okay.  Were you part of that

10   discussion that you just described happened

11   with Mr. Shah?

12        A    Yes.

13        Q    Where did that take place?

14        A    A telephone discussion.

15        Q    Okay.  Who was a participant?

16        A    I was on the call, one or more of

17   my partners may have been on the call, and

18   representatives of Solo Capital were on the

19   call.

20        Q    Okay.  And during that call, the

21   Solo people said that they were becoming a

22   custodian?

23        A    That they had become a custodian.

24        Q    Okay.  And so we saw a bunch of

25   e-mails earlier where they were trying to get
```

Page 159

```
 1    other financial institutions to serve as

 2    custodian.

 3            Did they not get any that would

 4    serve in that role?

 5        A    I don't know.

 6        Q    Okay.  But it turned out that when

 7    the dividend arbitrage trading began with

 8    Denmark, it was going to be Solo Capital who

 9    was the custodian for the trading?

10        A    The discussions we had with Solo

11    initially were that the trading would be in

12    Belgium and those were the trades we did

13    initially.

14        Q    Okay.  And for the Belgian trades

15    initially, Solo Capital was going to be the

16    custodian?

17        A    Yes.

18        Q    And then, as we see in August of

19    2012, this plan started trading in Denmark.

20            Was Solo Capital --

21        A    Yes.

22        Q    Was Solo Capital the custodian as

23    well?

24        A    Yes.

25        Q    Okay.  So tell me,
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 160

```
1      what -- withdrawn.
2              What did the Solo folks tell you on
3      that phone call about how the trading would
4      work and the counterparties?
5          A    They said that Solo had worked to
6      get approvals from the British regulators to
7      become a custodian, that they had hired legal
8      and compliance staff, securities finance
9      people, and that with customers who became
10     clients of Solo as a custodian, they would be
11     able to purchase shares from -- through
12     brokers, from the market, for other sellers
13     of the shares, and hedge those transactions
14     through their accounts at Solo for futures
15     contracts and, if needed, lend shares to a
16     borrower who would post collateral pursuant
17     to a standard stock lending agreement.
18         Q    Okay.  You mentioned earlier
19     that -- something about that there would be
20     negotiations with the sellers of the shares
21     about terms such as price and settlement
22     date.
23              What did they tell you on that
24     phone call about that?
25         A    That the pricing -- market pricing
```

```
1          Q    Can you turn to the next page of
2     that account statement?  It's got the Bates
3     number at the bottom, 125.
4          A    Yes.
5          Q    And do you see, there's four trades
6     on August 8th of 2012?
7          A    Yes.
8          Q    And are those derivatives for the
9     TDC stock?
10         A    They are futures contracts.
11         Q    Okay.  And that's the hedging
12    transaction?
13         A    Yes.
14         Q    Okay.  Do you know why it was
15    broken up into four transactions?
16         A    No.
17         Q    Okay.  But ultimately, the four
18    combined are meant to sell futures in the
19    same amount of shares of TDC that was
20    purchased on August 8th.
21              Correct?
22         A    Yes.
23         Q    All right.  And then, if you turn
24    to the next -- you know, another page over,
25    the Bates is 127, do you see that there's a
```

1     transaction on August 14, 2012?

2           The transaction type is "SL" and

3     it's with Aquila (Cayman) as the

4     counterparty?

5           A     Yes.

6           Q     And is this the stock lending piece

7     of the transaction?

8           A     Yes.

9           Q     Okay.  And prior to working with

10    Solo, had you ever heard of Aquila (Cayman)?

11          A     No.

12          Q     Okay.  Did you -- do you know

13    anything about that entity other than that it

14    entered into stock lending transactions with

15    your plan?

16          A     Prior to the onboarding of other

17    entities that we worked with -- not pension

18    plans -- with Solo prior to onboarding, we

19    would have received due diligence information

20    about a stock lender.

21          I believe in certain circumstances,

22    on the advice of our lawyers, we asked them

23    to sign certain letters, Patriot Act letters,

24    AML letters, and I believe we would have

25    received that from this company.

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 178

```
 1        Q     Okay.  And the Patriot Act and AML
 2    letters you're talking about are
 3    certifications that they'll comply with
 4    various, you know, anti-money laundering type
 5    rules?
 6        A     That's my recollection.
 7        Q     Okay.  Other than those letters,
 8    did you receive any documentation in
 9    connection with this due diligence regarding
10    a stock lender such as Aquila (Cayman)?
11        A     We may have received information on
12    the owners or principals of the company.  But
13    I don't recall specifically.
14        Q     Okay.  And was that -- you received
15    that in documentation, document form, or you
16    just verbally were told who the owners were?
17             MR. BONGIORNO:  Objection.
18        A     I don't recall.
19        Q     Okay.  Other than AML and Patriot
20    Act certifications, do you have any documents
21    regarding due diligence or information on any
22    of the stock lenders that were used,
23    including Aquila (Cayman)?
24        A     No.
25        Q     As you sit here today, do you know
```

1    anything about that entity?

2         A    No.

3         Q    And so your —— the Michelle Pension

4    Plan lent out 322 million kroner worth of

5    stock to this entity, Aquila (Cayman).

6              Correct?

7         A    We lent out 7,750,000 shares to

8    Aquila (Cayman) and received cash in exchange

9    as collateral.

10        Q    Okay.  And when you purchased those

11   shares, the initial amount of the purchase

12   was about 322 million kroner.

13             Correct?

14        A    (Witness reviewing.)

15             Yes.

16        Q    All right.  And that was the market

17   price on August 8th of 2012?

18        A    Yes.

19        Q    All right.  And when you purchased

20   it, it was just before the dividend date.

21             Correct?

22        A    Yes.

23        Q    All right.  And then, August 14th,

24   six days later, that would be after the

25   dividend date?

1      strategy from this time in 2012 through the

2      middle of 2015?

3          A    Yes.

4          Q    Okay.  And with respect to each --

5      each time a pension plan purchased Danish

6      shares, there was a corresponding stock loan

7      transaction similar to what we just looked

8      at.

9               Is that right?

10         A    Yes.

11         Q    Okay.  Were there other stock

12     lending counterparties besides Aquila

13     (Cayman)?

14         A    Yes.

15         Q    Do you recall which entities served

16     as stock loan counterparties?

17         A    I'm sorry.  Can you repeat that,

18     please?

19         Q    Do you recall which entities served

20     as stock loan counterparties for some of the

21     other transactions?

22         A    No, I do not.

23         Q    Okay.  Prior to entering into stock

24     lending transactions with those other

25     counterparties, had you heard of any of them

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

```
 1    before the deal?

 2         A    No.

 3         Q    And did you do any due diligence on

 4    any of them, other than obtaining an AML and

 5    Patriot Act certificate?

 6         A    It would have been the same due

 7    diligence that we've previously discussed.

 8         Q    Okay.  And that entailed getting an

 9    AML certificate and a Patriot Act

10    certificate.

11              Correct?

12         A    In certain cases.  I'm not sure we

13    did it in all cases.

14         Q    Okay.  But beyond that, whether you

15    did that or not, there was no other aspect of

16    the due diligence on the stock lending

17    counterparties.

18              Correct?

19         A    Correct.

20         Q    Can you turn to what's been marked

21    Exhibit 2160?  It's in Binder 2.

22              (Whereupon the above mentioned was

23         marked for Identification.)

24              MR. BONGIORNO:  Major progress.

25              MR. WEINSTEIN:  Unfortunately,
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 218

```
 1              MR. BONGIORNO:  Objection.
 2         A    It was based on liquidity
 3    information, it was based on dividend
 4    information, based on our willingness to
 5    enter into certain transactions or avoid and
 6    skip certain transactions if the
 7    profitability was not significant enough for
 8    us.  So it was a profitable transaction,
 9    which is why, starting in 2008, we decided we
10    should explore and work with leading
11    institutions and law firms to be able to
12    execute this particular type of transaction.
13         Q    So when the Michelle plan started
14    to trade Danish securities in August of 2012,
15    we saw that the plan had not deposited money
16    into the account.
17              How was it able to execute that
18    initial trade?
19         A    Through funds that it received,
20    either income on securities or through the
21    stock lending agreements and stock loans it
22    entered into, it was able to arrange for and
23    pay for those shares on settlement date.
24         Q    And so, if the plan had not put
25    money into the account before that trade, and
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 9, 2021

Page 459

```
 1   been paid.  So it was less than $24 million.
 2        Q    Well, did the plans or the
 3   partnerships receive any monies after the
 4   date of this e-mail?
 5        A    Possibly, but I don't -- I don't
 6   recall.
 7        Q    Okay.  Do you know how much you
 8   ended up making combined between the
 9   partnerships and the pension plans?
10        A    Between 20 and $24 million.
11        Q    Okay.  Do you know how much you
12   ended up making from the Argre era
13   partnerships and pension plans?
14        A    I don't recall that amount.
15        Q    Do you have a ballpark figure for
16   that time period?
17        A    Between ten and $20 million.
18        Q    Can you turn, please, to
19   Exhibit 2271, which I'm pretty confident will
20   be the last exhibit in the last binder?
21             MR. WEINSTEIN:  Mark this as 2271.
22             (Whereupon the above mentioned was
23        marked for Identification.)
24        Q    Are you familiar with this exhibit?
25        A    (Witness reviewing.)
```