## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION<br>OF THE KINGDOM OF DENMARK<br>(SKATTEFORVALTNINGEN) TAX<br>REFUND SCHEME LITIGATION | MASTER DOCKET<br><br>18-md-2865 (LAK) |

## JOINT RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, and Pretrial Order No. 29, Plaintiff Skatteforvaltningen ("SKAT") and Defendants and Third-Party Defendant listed on Exhibit A to this Statement respectfully state that the following are the material facts as to which there is no genuine issue to be tried:

## I.   The Plaintiff

1.     The plaintiff, SKAT, is the agency of the government of the Kingdom of Denmark charged with the assessment and collection of Danish taxes.  *Skatteforvaltningen v. RJM Capital Pension Plan et al.* ("RJM Compl."), No. 19-cv-01898 (S.D.N.Y.), ECF No. 60, ¶ 1; Response to Request for Admission No. 2.

2.     SKAT is part of the government of the Kingdom of Denmark.  Response to Request for Admission No. 1.

3.     SKAT is part of the Danish Ministry of Taxation.

4.      During the period 2012 to 2015, SKAT maintained multiple bank accounts in its own name for the purpose of carrying out its operations.  Declaration of Gry Ahlefeld-Engel, dated July 12, 2019, ECF No. 160, ¶ 5.

5.      During the period 2012 to 2015, SKAT received tax and other incoming payments into its bank accounts.  *Id.*

6.      During the period 2012 to 2015, SKAT paid tax refunds and other payments to third parties out of its bank accounts.  *Id.*

7.      SKAT paid the money to which the defendant pension plans claimed to be entitled to in the refund applications at issue to third parties designated by the defendant pension plans.  *See, e.g.*, *id.* ¶ 6.

8.      SKAT made all such payments to the defendant pension plans' designees from bank accounts SKAT maintained in its own name.  *See, e.g.*, *id.*

9.      After SKAT collects taxes into its own accounts, it transfers the tax revenues and other funds that it collects into an account at the Danish Central Bank.  Brochner Tr. 24:17-25:2.

10.      SKAT has no discretion as to what to do with the money it collects.  Brochner Tr. 26:13-17.

11.      The money that SKAT deposits in the account at the Danish Central Bank belongs to the Kingdom of Denmark.  Brochner Tr. 24:17-25:2, 25:24-26:3.

12.      Each year, the Danish parliament passes a Finance Act.  Brochner Tr. 23:25-24:16.

13.      The Finance Act lists all the taxes that SKAT is responsible for collecting.  Brochner Tr. 23:25-24:16.

14.     The Ministry of Finance is authorized to spend the tax revenues SKAT collects and deposits at the Danish Central Bank as set forth in the Finance Act or other spending legislation passed by the Danish Parliament.  Brochner Tr. 24:17-25:15.

15.     SKAT is obligated to collect all taxes due under the Finance Act for any particular year and transfer all the revenues it collects to the account at the Danish Central Bank.  Brochner 26:21-29:4

16.     SKAT has sued a Canadian pension plan in Denmark seeking the recovery of dividend withholding tax it previously paid to the pension plan.

17.     SKAT commenced the suit against the Canadian pension plan in its own name, not in the name of the Kingdom of Denmark.

## II.     SKAT's Administration Of Dividend Withholding Tax Refunds

18.     Between 2012 and 2015, Section 65 of the Danish Withholding Tax Act generally required Danish companies to withhold as tax 27% of the dividend distributed as to their shares. RJM Compl. ¶ 20; Response to Request for Admission No. 131.

19.     Danish companies are required to pay that tax directly to SKAT.

20.     Shares of listed Danish corporations exist in dematerialized form.  *See, e.g.*, Ekstrand Tr. 124:17-21.  This means that financial instruments exist only as book entry records. Regulation (EU) No 909/2014; Ekstrand Tr. 124:17-125:4.

21.     Electronic bookkeeping rather than the physical movement of paper securities was used at all material times with respect to trading in the stocks of the companies that issued dividends for which defendants requested reclaims.  Response to Request for Admission 56, 57.

22.     Recipients of dividends disbursed or paid by Danish companies who are resident in countries with which Denmark has a double taxation treaty may be entitled to pay less than 27% tax or no tax at all on dividends.  Response to Request for Admission No. 132.

23.     Shareholders may seek reclaims of dividend withholding tax by submitting to SKAT completed copies of SKAT Form 06.003 with supporting documents.  Ekstrand Tr. 71:9-72:10.

24.     SKAT refers to the process of seeking refunds by submitting Form 06.003 to SKAT as the "Form Scheme."  Rømer Tr. 49:17-50:14; Ekstrand Tr.71:21-72:15.

25.     Form 06.003 includes a box to indicate whether the submission is made by the beneficial owner or on behalf of the beneficial owner.

26.     On SKAT's Form 06.003, SKAT construed the term "beneficial owner" to refer to beneficial owner status under Danish law, which might include consideration of Danish tax law depending on the facts and circumstances of any particular claim and incorporated the concept of beneficial ownership as used in double taxation treaties and in the Model Tax Convention published by the Organisation for Economic Cooperation and Development ("OECD").  Response to Request for Admission Nos. 48, 49.

27.     Danish law, which might include consideration of Danish tax law depending on the facts and circumstances of any particular claim and incorporated the concept of beneficial ownership as used in double taxation treaties and in the Model Tax Convention published by the OECD, was the relevant law for determining who was the beneficial owner of shares that were the subject of claims for dividend withholding tax.  Response to Request for Admission Nos. 44, 45; Jeppesen Tr. 143:8-18.

28.    Danish law, which incorporated the concept of beneficial ownership as used in double taxation treaties and in the Model Tax Convention published by the OECD, was the relevant law for determining entitlement to refunds of dividend withholding tax.  Response to Request for Admission No. 42.

29.    A recipient of dividends whose dividend tax has been withheld in connection with the distribution of dividends from a Danish company may apply for a refund if the recipient is not fully liable to pay tax in Denmark and is subject to a double taxation treaty, in which case, the refund is a payment back of excess amounts of dividend tax.  SKAT_MDL_001_0075875.

30.    In such circumstances, the refund reflects the difference between the withheld dividend tax rate and the rate applicable to the shareholder based on the double taxation treaty.  SKAT_MDL_001_0075875.

31.    In addition to requiring applicants seeking reclaims of withheld dividend tax to submit Form 06.003, SKAT also required supporting documentation from third-party financial institutions and foreign tax authorities to be submitted with a claim.  *See, e.g.*, Ekstrand Tr. 43:13-46:14.

32.    SKAT verified the claimant's entitlement to a refund of withheld dividend tax by requiring supporting documentation from third-party financial institutions and foreign tax authorities to be submitted with the claim.  *See, e.g.*, Response to Request for Admission No. 9.

33.    SKAT knew as a matter of practice that it did not further verify the information from third-party financial institutions and/or foreign tax authorities before paying refunds.  Response to Request for Admission No. 16A; Rømer Tr. 199:3-10.

34.    United States pension plans could not obtain reclaims of withholding tax from any part of the Danish government other than SKAT.  *See* Ekstrand Tr. 72:11-15.

35.     Only SKAT could approve the payment of a refund of dividend withholding tax. Ekstrand Tr. 73:1-8.

36.     No other part of the Danish government can approve the payment of a refund of dividend withholding tax.  Ekstrand Tr. 73:1-8.

37.     On June 16, 2015, SKAT received information indicating that some unidentified claimants may have submitted fraudulent claims for refunds of dividend withholding tax based on the double taxation treaty between Denmark and Malaysia.  Response to Request for Admission No. 20; Ex. 3062.

38.     Prior to August 24, 2015, SKAT accepted a copy of Internal Revenue Service Form 6166 as sufficient evidence that the relevant claimant was a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the U.S. Internal Revenue Code.  Response to Request for Admission No. 52.

39.     Prior to August 24, 2015, SKAT did not require a U.S. pension plan claimant to provide any document other than a copy of Internal Revenue Service Form 6166 to demonstrate that such claimant was a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the U.S. Internal Revenue Code.  Response to Request for Admission No. 53.

40.     Prior to August 24, 2015, SKAT did not, at any point, inquire into or verify the source of any contribution to any U.S. pension plan claimant.  Response to Request for Admission No. 54.

41.     Prior to August 24, 2015, SKAT did not, at any point, inquire into or verify the nature of any business activities conducted by any sponsoring entity associated with any U.S. pension plan claimant.  Response to Request for Admission No. 55.

42.      Between January 1, 2012 and August 31, 2015, SKAT never asked a claimant, in connection with a claim, if it purchased shares from a short-seller.  Response to Request for Admission No. 59.

43.      Between January 1, 2012, and August 31, 2015, SKAT never asked a claimant, in connection with any claim, if it financed 100% of the cost of the shares referenced in any claim. Response to Request for Admission No. 62.

44.      Between January 1, 2012, and August 31, 2015, SKAT never asked a claimant, in connection with any claim, about the settlement terms of any purchase of any Danish shares. Response to Request for Admission No. 119.

45.      Between January 1, 2012, and August 31, 2015, SKAT never inquired about the length of time any claimant owned a stock prior to declaration of a dividend before SKAT paid a refund.  Response to Request for Admission No. 123.

46.      Between January 1, 2012, and August 31, 2015, SKAT did not require a claimant to have owned a stock for any specific minimum amount of time prior to declaration of a dividend in order to be eligible for a refund, so long as the claimant owned the stock as of the date of the declaration of the dividend and held the stock until after that date.  Response to Request for Admission No. 124.

47.      Between January 1, 2012, and August 31, 2015, SKAT did not require a claimant to have owned a stock for any specific minimum amount of time following declaration of the dividend in order to be eligible for a refund, so long as the claimant owned the stock as of the date of the declaration of the dividend and held the stock until after that date.  Response to Request for Admission No. 125.

48.     Between January 1, 2012, and August 31, 2015, SKAT did not inquire about the length of time a claimant held a stock in connection with any claim.  Response to Request for Admission No. 126.

49.     To be entitled to a refund for a dividend withholding tax, SKAT required, among other things, a claimant to have "a legal, binding agreement" to purchase the shares "at the latest, on the date of the annual general meeting" of the issuer.  Ekstrand Tr. 144:16-145:16.

50.     SKAT determined that certain claimants, including the defendant plans in each bellwether case, were not entitled to refunds of withholding tax based, in part, on Danish law principles which are restated in Section 69B of the Danish Withholding Tax Act.  Response to Request for Admission No. 51; SKAT_MDL_001_00059474 (RJM Capital); SKAT_MDL_001_00057166 (Basalt); SKAT_MDL_001_00056924 (Roadcraft); SKAT_MDL_001_0064473 (FWC); SKAT_MDL_001_046749 (Proper Pacific).

51.     Sven Nielsen was generally the person within SKAT primarily responsible for processing all incoming reclaim applications via the Form Scheme.  Ekstrand Tr. 32:15-33:10; Rømer Tr. 60:6–13, 81:25–82:19, 87:15-21; Madsen Tr. 24:8-28:9.

52.     All reclaim applications at issue in this matter were submitted via the Form Scheme.

53.     From January 1, 2012 to December 31, 2015, SKAT knew the amount of refunds SKAT paid every month.  Response to Request for Admission No. 38; Ekstrand Tr. 53:19-54:11.

54.     In 2010, SKAT paid refunds of dividend withholding tax totaling approximately DKK 0.7 billion, of which approximately DKK 0.2 billion was paid via SKAT's Form Scheme. Response to Request for Admission Nos. 27, 33.

55.     In 2011, SKAT paid refunds of dividend withholding tax totaling approximately DKK 1.1 billion, of which approximately DKK 0.3 billion was paid via SKAT's Form Scheme. Response to Request for Admission Nos. 28, 34.

56.     In 2012, SKAT paid refunds of dividend withholding tax totaling approximately DKK 1.5 billion, of which approximately DKK 0.4 billion was paid via SKAT's Form Scheme. Response to Request for Admission Nos. 29, 35.

57.     In 2013, SKAT paid refunds of dividend withholding tax totaling approximately DKK 2.8 billion, of which approximately DKK 1.5 billion was paid via SKAT's Form Scheme. Response to Request for Admission Nos. 30, 36, 78; SKAT_MDL_001_0075894.

58.     In 2014, SKAT paid refunds of dividend withholding tax totaling approximately DKK 6.1 billion, of which approximately DKK 4.1 billion was paid via SKAT's Form Scheme. Response to Request for Admission Nos. 31, 37, 79; SKAT_MDL_001_0075895.

59.     In each of May and June 2014, SKAT paid almost DKK 1 billion more in refunds than it had in the same months in 2013.  Response to Request for Admission No. 79; SKAT_MDL_001_0075895.

60.     From January to July 2014, SKAT had refunded approximately DKK 1.3 billion more than in all of 2013.  Response to Request for Admission No. 79; SKAT_MDL_001_0075895; Brochner Tr. 105:12–21.

61.     In the first seven months of 2015, SKAT paid refunds of dividend withholding tax totaling approximately DKK 8.7 billion.  Response to Request for Admission Nos. 32, 80; SKAT_MDL_001_0075835 (page -896).

62.     On at least one occasion prior to January 1, 2015, SKAT paid dividend withholding tax refunds in excess of the dividend withholding tax liability owed to SKAT for a particular dividend distribution.  Response to Request for Admission No. 106.

63.     Prior to January 1, 2015, SKAT had access to data that could have shown that SKAT paid refunds exceeding dividend withholding taxes owed to SKAT for certain dividend distributions.  Response to Request for Admission Nos. 107, 108, 109.

64.     As part of its administration of dividend withholding tax, SKAT did not analyze whether the claimant purchased shares from a seller who had borrowed the shares sold, or whether the claimant had loaned the shares for which it was seeking a refund.  Madsen Tr. 150:1-13, 162:22-163:20; Ex. 4006.

65.     Between June 16, 2015, and June 18, 2015, a whistleblower communicated multiple times with Anne Munksgaard, the director of SKAT's anti-fraud unit, via telephone and email to inform SKAT of a suspected fraud upon the Danish tax system involving dividend withholding tax reclaims.  Munksgaard Tr. 13:16–16:5, 27:15–29:2, 38:4-23; 41:8-23; Declaration of Sarah L. Cave, dated November 30, 2018, Ex. 3, ECF No. 41-3.

66.     Munksgaard replied to the whistleblower via email dated June 16, 2015 and stated: "We will look into it."  Munksgaard Tr. 36:18-22; Ex. 3063; Declaration of Sarah L. Cave, dated November 30, 2018, Ex. 3, ECF No. 41-3.

67.     In a June 16, 2015 email, the whistleblower identified five specific reclaim agents allegedly involved in the alleged fraud -- "Goal TaxBack Ltd., Tim Partners, acupay's, SEB Futures and SynTax GIS."  Declaration of Sarah L. Cave, dated November 30, 2018, Ex. 3, ECF No. 41-3; Munksgaard Tr. 33:14-34:17.

68.     On June 18, 2015, SKAT received additional information indicating the names of 25 "foreign companies" that "have allegedly been the formal owner of the shares represented by the reclaim agents in connection with their request for the payment of withholding dividend taxes."  Declaration of Sarah L. Cave, dated November 30, 2018, Ex. 3, ECF No. 41-3.  19 of the 25 "foreign companies" included "Pension Plan" in their titles.  One of the 25 "foreign companies" was listed as "RIM Capital Pension Plan."  *Id.*

69.     Beginning on or about July 27, 2015, officials from the UK tax authorities (HMRC) sent their Danish counterparts information related to a suspected fraud concerning dividend taxes.  SKAT_MDL_001_00683939 - SKAT_MDL_001_00683942; SKAT_MDL_001_00680772 – SKAT_MDL_001_00680774; Munksgaard Tr. 55:5-19.

70.     The information from HMRC included an identification of the reclaim agents, the custodians, and a description of the trading.  The letter also refers to the Dividend Credit Advices (DCAs).  SKAT_MDL_001_00680772 – SKAT_MDL_001_00680774.

71.     HMRC provided the information to SKAT under the relevant Exchange of Information provisions of the double taxation convention between Denmark and the United Kingdom, and HMRC explicitly requested the information not be used in judicial proceedings without HMRC's permission.  SKAT_MDL_001_00680772 – SKAT_MDL_001_00680774.

72.     The information from HMRC included the names of 184 entities allegedly used to receive dividend withholding tax refunds from SKAT.  SKAT_MDL_001_00683939 - SKAT_MDL_001_00683942; SKAT_MDL_001_00680829 – SKAT_MDL_001_00680832.

73.     Among the pension plans identified for SKAT by HMRC were RJM Capital LLC Pension Plan, Basalt Ventures LLC Roth 401(k) Plan, Roadcraft Technologies LLC Roth 401(k)

Plan, and The FWC Capital LLC Pension Plan.  SKAT_MDL_001_00680829 –

SKAT_MDL_001_00680832.

74.    Jens Brochner testified that the tip SKAT received was "very specific, so there

was a possibility of investigating it."  Brochner Tr. 113:9–16.

75.    SKAT noted coincidences between the information from the whistleblower in

June and the information it received from UK authorities.  SKAT_MDL_001_00683939 -

SKAT_MDL_001_00683942.

76.    On August 6, 2015, SKAT temporarily stopped paying refunds while it

investigated the purportedly fraudulent scheme.  Response to Request for Admission No. 22.

77.    By September 1, 2015, SKAT began an investigation concerning possibly

fraudulent reclaims submitted by Defendants.  Response to Request for Admission No. 5.

**III.    The Solo Pension Plans**

78.    Each bellwether pension plan defendant was organized under the laws of the

United States.  Response to Request for Admission No. 115.

79.    RJM Capital LLC was formed in 2007.  RJM Capital LLC sponsored the RJM

Capital Pension Plan ("the RJM Plan"), which is a prototype 401(k) plan formed on February 1,

2013.  Richard Markowitz was the sole participant.  Wagner Report ¶ 41 (quoting

WH_MDL_00331778; WH_MDL_00356182 at -193).

80.    The Basalt Ventures LLC was formed in June 2014.  JHVM_0002855;

JHVM_0001927.  Basalt Ventures LLC sponsored the Basalt Ventures LLC Roth 401(k) Plan

("the Basalt Plan"), which is a prototype 401(k) plan formed in July 2014.

WH_MDL_00147329; WH_MDL_00339896 - WH_MDL_00339997.  John van Merkensteijn

was the sole participant.  van Merkensteijn Tr. 61:14-20; Ex. 2273.

81.     The Roadcraft Technologies LLC was formed in June 2014.

WH_MDL_00337012.  The Roadcraft Technologies LLC sponsored the Roadcraft Technologies

LLC Roth 401(k) Plan ("the Roadcraft Plan"), which is a prototype 401(k) plan formed in July

2014.  WH_MDL_00413556; WH_MDL_00024959 - WH_MDL_00025059.  Ronald Altbach

was the sole participant.  Roadcraft Am. Compl. ¶ 18.

82.     Routt Capital LLC was formed in February 2014.  WH_MDL_00115030.  Routt

Capital LLC sponsored the Routt Capital LLC Solo 401k Plan ("the Routt Plan"), which was

formed in February 2014.  WH_MDL_00001365.  At the time of its formation, Richard

Markowitz was the sole participant.  The Routt Capital Trust ("Routt Trust") was formed in

February 2014 between Routt Capital LLC as the employer and Richard Markowitz as the

trustee.  WH_MDL_00000366; WH_MDL_00115030.

83.     The STOR Capital Consulting LLC was formed in December 2008.

STOR00001403-05.  The STOR Capital Consulting sponsored The Stor Capital Consulting LLC

401K Plan ("the STOR Plan"), which was formed in May 2014.  STOR00001214-1350.  Robert

Klugman was the sole participant.  STOR00000098.  The RAK Investment Trust ("RAK Trust")

was formed in May 2014 and Robert Klugman was the trustee.  STOR00001133.

84.     In August 2014, the Roadcraft Plan entered a partnership with the Routt Trust and

the RAK Trust.  WH_MDL_00029401.

85.     Under the partnership agreement, of the profits earned by the partnership, 70%

would be distributed to the Routt Trust, 25% would be distributed to the RAK Trust, and 5%

would be distributed to the Roadcraft Plan.  WH_MDL_00029401.

86.     The RJM Plan, the Basalt Plan, and the Roadcraft Plan relied on pre-approved

forms for the plans for which a volume submitter had obtained a determination letter from the

IRS approving the form of those plans.  WH_MDL_00356191 (RJM); WH_MDL_00139333-4 (Roadcraft); JHVM_0010127-JHVM_0010128 (Basalt); Reish Report ¶ 38.

87.    Each of the RJM Plan, the Basalt Plan, and the Roadcraft Plan's governing documents include trust provisions which may be found at WH_MDL_00000356, JHVM_0009979 – JHVM_0009980, and WH_MDL_00139411-12, respectively.

88.    The American Investment Group of New York, L.P. Pension Plan received an individual determination letter from the IRS that the plan was qualified as to form. ACER_00015174.

89.    The FWC Capital LLC Pension Plan (the "FWC Plan") was a prototype 401(k) plan in which Roger Lehman was the sole participant.  *See* FWCCAP00000414-543.  The FWC Plan was formed on October 22, 2014 and sponsored by The FWC Capital LLC, which was also formed in October 2014.  *Id.*; FWCCAP00000564-566.

90.    The Proper Pacific 401(k) Plan (the "Proper Pacific Plan") was a prototype 401(k) plan in which Doston Bradley was the sole participant.  *See* PROPPACIF00003619-3694; PROPPACIF00003696-3756.  The Proper Pacific Plan was formed in September 2014 and sponsored by Pacific India LLC, which was also formed in September 2014.  *Id.*; PROPPACIF00000375.

91.    The RJM Plan filed an Application for United States Residency Certification, Form 8802, with the IRS.  WH_MDL_00033719.

92.    In connection with each request to reclaim dividend withholding tax, reclaim agents acting on behalf of each pension plan defendant provided SKAT with Internal Revenue Code Form 6166 (Certification of U.S. Tax Residency) ("Form 6166").  *See, e.g.,*

SKAT_MDL_001_00059293; SKAT_MDL_001_00057073; SKAT_MDL_001_00056852; SKAT_MDL_001_00082801; and SKAT_MDL_001_00088872.

93.    The Form 6166 stated that to the best of the knowledge of the Internal Revenue Service ("IRS"), each defendant pension plan "is a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the U.S. Internal Revenue Code, which is exempt from U.S. taxation under section 501(a), and is a resident of the United States of America for purposes of U.S. taxation." *Id.*

94.    SKAT does not allege the IRS engaged in any fraudulent activity in connection with the issuance of any Form 6166 (Certification of U.S. Tax Residency) appended to any Claim.  Response to Request for Admission No. 127.

95.    SKAT does not allege the IRS made any false statement or misrepresentations to SKAT in connection with the issuance of any Form 6166 (Certification of U.S. Tax Residency) appended to any Claim.  Response to Request for Admission No. 128.

96.    The IRS conducted an audit of the RJM Plan.  WH_MDL_00356182.

97.    In the course of the RJM audit, the IRS requested all monthly bank and brokerage statements for 2012, 2013, 2014, 2015 and 2016 for the RJM Plan.  WH_MDL_00357011.  The RJM Plan provided documents in response to the IRS request, including WH_MDL_00357354; WH_MDL_00357028 – WH_MDL_00357113; WH_MDL_00524103 – WH_MDL_00524140; WH_MDL_00523307 – WH_MDL_00524102.

98.    In the course of the RJM audit, the RJM Plan provided the IRS with information about the plan's account at Solo Capital.  WH_MDL_00357011; WH_MDL_00524103 – WH_MDL_00524140.

99.     In the course of the RJM audit, the IRS received certain custodian account statements issued by Solo Capital that state that the RJM Plan made certain purchases of Danish securities.  WH_MDL_00524103 – WH_MDL_00524140.

100.     In the course of the IRS audit, the IRS requested documents identifying the sources of plan income (other than investment earnings) received from the plan's effective date through December 31, 2016.  WH_MDL_00356990. The RJM Plan provided the IRS with documents in response to this request, including WH_MDL_00523288 – WH_MDL_00523295.

101.     Documents provided to the IRS show that the RJM Plan was funded in 2013 but not in 2014 through 2016.

102.     At the conclusion of the audit, the IRS issued a "no change" letter. WH_MDL_00358607.

103.     On behalf of the RJM Plan, its sponsoring entity filed Form 5500-EZ with the IRS.  WH_MDL_00002741 – WH_MDL_00002748 (Form 5500-EZs filed for 2013-2016).

104.     The RJM Plan, Basalt Plan, and Roadcraft Plan filed Treasury International Capital (TIC) System Forms with the U.S. Federal Reserve Bank.  These TIC Forms represented to the Federal Reserve that the Plans engaged in purchases, sales, and holdings of foreign securities.  *See, e.g.*, WH_MDL_00112502; WH_MDL_00191254; MBJ_0020146.

105.     In a TIC Form submission to the Federal Reserve, the Roadcraft Plan represented to that it held approximately $1,828,000,000 of foreign securities as of May 29, 2015. MBJ_0020146.

106.     The RJM Plan filed a Report of Foreign Bank and Financial Accounts (FBAR) with the Financial Crimes Enforcement Network (FinCEN) for the year 2015.  This report disclosed the RJM Plan's account with Solo Capital.  WH_MDL_00450239.  The RJM Plan did

not file these reports for the years 2013 and 2014.  The Roadcraft Plan filed an FBAR for the year 2015, which listed the maximum value in its account at Solo Capital as $9,699,000 and the maximum value in its account at Old Park Lane Capital Plc as $186,000.  KF_MDL_15444.

## IV.   The Solo Trades

107.   Certain US pension plan defendants used Solo Capital, Old Park Lane Capital PLC ("Old Park Lane"), West Point Derivatives ("West Point"), or Telesto Markets LLP ("Telesto") (each a "Solo Custodian" and collectively, the "Solo Custodians") to provide custodial services.  Specifically, the RJM Plan used Solo Capital as its custodian in 2013 and 2014, MPSKAT00158808; the Basalt Plan used Old Park Lane and Telesto as its custodians in 2014 and 2015, WH_MDL_00035630, GUNDERSON00009434; the Roadcraft Plan used Solo Capital and Old Park Lane as its custodians in 2014 and 2015, WH_MDL_00020362, MPSKAT00008759; the FWC Plan used Solo Capital and Old Park Lane as its custodians in 2014 and 2015, FWCCAP00001033, FWCCAP00000194; and the Proper Pacific Plan used Old Park Lane and Telesto as its custodians in 2014 and 2015, PROPPACIF00000096, PROPPACIF00000955, PROPPACIF00000113.

108.   The Solo Custodians were registered with the U.K. regulator, the Financial Conduct Authority ("FCA"), and were subject to its FCA regulation. https://register.fca.org.uk/s/firm?id=001b000000NMaqQAAT (Solo Capital); https://register.fca.org.uk/s/firm?id=001b000000MgBgIAAV (Old Park Lane); https://register.fca.org.uk/s/firm?id=001b000000NMiEdAAL (Telesto); https://register.fca.org.uk/s/firm?id=001b000000MfavWAAR (West Point).

109.   Other than in the case of a special or interim dividend, issuers of Danish securities approved dividends on the date of their Annual General Meeting.

110.    The companies named in the tax refund applications to SKAT were all public issuers of securities in Denmark.  Section XV of this Statement is a summary of the relevant dividend events for these companies.

111.    In every case (excluding the issuance of special or interim dividends), documents issued by the Solo Custodians and by brokers state that the RJM Plan, the Basalt Plan, the Roadcraft Plan, the FWC Plan, and the Proper Pacific Plan purchased Danish shares on the date of the issuer's Annual General Meeting.

112.    Other than in the case of special or interim dividends, a broker issued a trade confirmation stating that the broker executed on behalf of the RJM Plan, the Basalt Plan, the Roadcraft Plan, the FWC Plan, and the Proper Pacific Plan purchases of shares of Danish securities on the day of the Annual General Meeting of the issuer of the relevant Danish securities.  *See, e.g.*, MPSKAT00077417, MPSKAT00077419, JHVM_0003574, WH_MDL_00035254; *see also* Carr Rebuttal Report ¶ 7, 11.  The brokers were executing brokers only, and did not clear or settle any trades.  *See* Markowitz Tr. 273:3-11; JHVM_0001267; WH_MDL_00023826; LEHMAN00022426 at 428.  The RJM, Basalt and Roadcraft Plans entered into International Uniform Brokerage Execution Services ("Give-Up") Agreements with certain brokers and custodians stating that the brokers would give up the trades to the custodian for clearance and settlement.  *See, e.g.*, MPSKAT00066947-51.

113.    In every case, a broker issued a trade confirmation stating that the broker executed on behalf of the RJM Plan, the Basalt Plan, the Roadcraft Plan, the FWC Plan, and the Proper Pacific Plan a purchase of shares of Danish securities before the ex-dividend date.  *See, e.g.*, MPSKAT00077417, MPSKAT00077419, JHVM_0003574.

114.    The broker confirmations state that the RJM Plan, the Basalt Plan, the Roadcraft Plan, the FWC Plan, and the Proper Pacific Plan purchased securities in their own name.

115.    On or about the trade date, a broker generated a trade confirmation stating that the broker executed a trade including the type of transaction (e.g., equity buy), number of shares purchased, the trade price, the trade date, the identity of the securities, the client on whose behalf the securities were purchased, and the commission charged.

116.    The trade prices listed in these confirmations were the close price of the day or between the high and low price of that day.  Carr Reply Report ¶38, Ex. 5.

117.    The trade confirmations provided by brokers listed a settlement date.  *See, e.g.*, MPSKAT00077417, MPSKAT00077419, JHVM_0003574.  The settlement date was also the date on which the issuer distributed dividends.

118.    Also on the trade date, the RJM Plan, the Basalt Plan, the Roadcraft Plan, the FWC Plan, and the Proper Pacific Plan entered into a flex futures contract or executed a forward contract.

119.    According to the terms of the transactions as stated in the trade confirmations, the flex futures or forward contract hedged the economic risk associated with price fluctuations in Danish equities.

120.    The clearance and settlement of RJM Capital's flex futures transactions, including those discussed in paragraphs 134-135 and 141-142, through BClear is reflected in statements issued by JP Morgan.  *E.g.*, SCPADMINISTRATORS_00042114, SCPADMINISTRATORS_00042440.

121.    The Solo Custodians' documents and emails between the pension plans and the securities lending counterparties state that after the trade date and after the issuer's record date,

each of the RJM Plan, the Basalt Plan, the Roadcraft Plan, the FWC Plan, and the Proper Pacific

Plan loaned the same number of shares it had purchased in exchange for cash collateral equal to

the purchase price of the equity buy transaction.

122.     The RJM Plan, the Basalt Plan, the Roadcraft Plan, the FWC Plan, and the Proper

Pacific Plan executed securities lending agreements that used the industry-accepted Global

Master Securities Lending Agreement ("GMSLA") as a template.

123.     According to the defendants, the collateral received from the securities lending

transactions was used to finance the purchase of the shares.

124.     The Solo Custodians issued account statements that stated that the RJM Plan, the

Basalt Plan, the Roadcraft Plan, the FWC Plan, and the Proper Pacific Plan purchased Danish

securities.  *See, e.g.*, MPSKAT00135581; JHVM_0003581; FWCCAP00000194;

FWCCAP00001033; PROPPACIF00000113; PROPPACIF00000955.

125.     The account statements generated by the Solo Custodians reflect credits for net

dividends to the RJM Plan, the Basalt Plan, the Roadcraft Plan, the FWC Plan, and the Proper

Pacific Plan.  *Id*.

126.     The Solo Custodians generated Dividend Credit Advice statements for the RJM

Plan, the Basalt Plan, the Roadcraft Plan, the FWC Plan, and the Proper Pacific Plan.

127.     The Dividend Credit Advice statements listed the name of the security, the

number of shares, the gross dividend, the tax, and the net dividend.  The Dividend Credit Advice

statements prepared by the Solo Custodians stated that the pension plan's account was credited

with an amount equal to the net dividend.  *Id*.  The Dividend Credit Advices provided to SKAT

on behalf of the RJM Plan, the Basalt Plan, the Roadcraft Plan, the FWC Plan, and the Proper

Pacific Plan reflected a net dividend amount that represented the gross dividend less 27%.

Response to Request for Admission No. 72.

128.    The Solo Custodians' documents, broker confirmations, and email correspondence (including with securities lending counterparties) state that, after the dividend payment date, the RJM Plan, the Basalt Plan, the Roadcraft Plan, the FWC Plan, and the Proper Pacific Plan recalled the shares they had loaned out, sold those shares, and purchased forward or futures contracts.  *See, e.g.*, MPSKAT00135581; JHVM_0003581; FWCCAP00000194; FWCCAP00001033; PROPPACIF00000113; PROPPACIF00000955; ].

## V.    Specific Solo Bellwether Trades

a.    RJM Plan Trade

129.    On April 11, 2013, the RJM Plan emailed FGC Securities seeking liquidity for a purchase of 10,400 shares of A.P. Møller Mærsk A/S – B, a public issuer of securities in Denmark, at a price of DKK 43,680.2893 per share, for a notional amount of DKK 454,275,008.72, with a settlement date of April 17, 2013.  MPSKAT00077088; MPSKAT00077295; MPSKAT00077418.

130.    The RJM Plan received an email from Solo approving the Plan's request. MPSKAT00077295.

131.    FGC Securities is a broker.

132.    The RJM Plan received a trade confirmation from FGC Securities. MPSKAT00077415; MPSKAT00077419.  The confirmation stated that on April 11, 2013, the Plan purchased 10,400 shares of MAERSKB stock at a price of DKK 43,680.2893 per share. MPSKAT00077419.  The confirmation included a commission fee of 11,356.88 DKK for executing the trade.  *Id.*

133.    An International Uniform Brokerage Execution Services ("Give-Up") Agreement among FGC, Solo Capital, and the RJM Plan stated that after FGC executed trades on behalf of the RJM Plan, FGC would give up the trades to Solo Capital for clearing and settlement. MPSKAT00066947-51.

134.    On April 11, 2013, the RJM Plan asked FGC Securities to sell 104 flex futures contracts on MAERSKB stock for DKK 42,821.31 per share.  MPSKAT00076965.

135.    The Plan received a trade confirmation from FGC Securities stating that FGC Securities executed the sale.  MPSKAT00077418.  The confirmation stated that on April 11, 2013, the Plan had entered into a sale of flex futures on MAERSKB stock for DKK 42,821.31 per share, with each contract covering 100 shares.  *Id.*  The confirmation stated that the flex futures trade was conducted through the Euronext – BClear exchange.  *Id.*; *see also* SCPADMINISTRATORS_00042114.

136.    Account statements issued by Solo, along with emails directly between the RJM Plan and Colbrook Ltd., state that on April 16, 2013, the RJM Plan entered into a stock loan agreement pursuant to which it agreed to loan 10,400 A.P. Møller Mærsk A/S – B shares to Colbrook Ltd., in exchange for DKK 454,275,008.72 (DKK 43,680.2893 per share), with settlement of April 17, 2013.  MPSKAT00135581 at 590; MPSKAT00077639; MPSKAT00077640.

137.    The stock lending agreement that the RJM Plan entered into was based on the standard security lending agreement template published by ISLA.  MPSKAT00068151-92.

138.    On June 13, 2013, the RJM Plan emailed Colbrook Ltd. requesting to recall the 10,400 loaned shares of MAERSKB.  MPSKAT00085264.

139.    On June 13, 2013, the RJM Plan emailed FGC Securities seeking liquidity for the sale of 10,400 shares of MAERSKB stock at DKK 40,750.2863 per share.  MPSKAT00085175-76.

140.    The plan received a trade confirmation from FGC Securities stating that FGC Securities executed the sale.  MPSKAT00085288-89.

141.    On June 13, 2013, the RJM Plan asked FGC Securities to buy 104 flex futures contracts on MAERSKB stock for DKK 40,750.94 per share.  MPSKAT00085108.

142.    The Plan received a trade confirmation from FGC Securities stating that FGC Securities executed the purchase of these flex futures.  MPSKAT00085290-MPSKAT00085291; *see also* SCPADMINISTRATORS00042440.

143.    Other trades by the RJM Plan, the Basalt Plan, the Roadcraft Plan, the FWC Plan, or the Proper Pacific Plan through Solo Custodians included the same steps described above, differing only in whether the Plan traded a future or a forward and in the identity of the broker and/or stock loan counterparty.

144.    The RJM Plan received a document entitled Dividend Credit Advice from Solo Capital.  WH_MDL_00268445.  The RJM Plan received a statement from Solo Capital stating that the Plan purchased 10,400 MAERSKB shares.  MPSKAT00135582.

145.    The RJM Plan received a statement from Solo Capital stating that Solo Capital credited it with an amount equal to the net dividend payment associated with 10,400 MAERSKB shares.  MPSKAT00135581.

146.    The Solo Custodians' documents, broker confirmations, and email correspondence (including with securities lending counterparties) state that the RJM Plan

engaged in a total of 12 trades of Danish securities with the same or similar steps as outlined

above for the 10,400 A.P. Møller Mærsk A/S – B shares.  These trades are listed in Appendix A.

      b.     Basalt Trades

     147.    On March 26, 2015, the Basalt Plan emailed Sunrise Brokers seeking to purchase

178,044 shares of Carlsberg A/S – B, the shares of a public issuer of securities in Denmark, at

DKK 571.50 per share, for a notional amount of DKK 101,752,146.00, with a settlement date of

March 31, 2015.  WH_MDL_00040949; JHVM_0003573 - JHVM_0003574;

WH_MDL_00040596.

     148.    The Basalt Plan received a trade confirmation from Sunrise Brokers.  The

confirmation stated that on March 26, 2015, Sunrise Brokers executed for the Basalt Plan a

purchase of 178,044 shares of CARLB stock at a price of DKK 571.50 per share.

JHVM_0003573 - JHVM_0003574.  The confirmation included a commission fee of DKK

635.95 for executing the trade.  *Id.*

     149.    An email sent by Telesto to the Basalt Plan states that on March 30, 2015, the

Basalt Plan entered into a stock loan agreement pursuant to which it agreed to loan 178,044

shares of Carlsberg A/S – B shares to Prince Solutions Limited, in exchange for DKK

101,752,146.00 (DKK 571.50 per share), with a settlement date of March 31, 2015.

WH_MDL_00041680.

     150.    On August 7, 2014, the Basalt Plan emailed Bastion Capital London Ltd. seeking

liquidity for the purchase of 2,876,867 shares of TDC A/S, a public issuer of securities in

Denmark, at DKK 51.35 per share, for a notional amount of DKK 147,727,120.45, with a

settlement date of August 13, 2014.  WH_MDL_00035160; WH_MDL_00035237;

WH_MDL_00034875.

151.    Email correspondence between the Basalt Plan and Gnosis, along with the Solo Custodians' documents, state that on August 12, 2014, the Basalt Plan entered into a stock loan agreement pursuant to which it agreed to loan 2,876,867 TDC A/S shares to Gnosis Capital Ltd., in exchange for DKK 147,727,120.45 (DKK 51.35 per share), with a settlement date of August 13, 2014.  WH_MDL_00035347 - WH_MDL_00035348; JHVM_0003755 - JHVM_0003757.

152.    The Solo Custodians' documents, broker confirmations, and email correspondence state that the Basalt Plan engaged in a total of 15 trades of Danish securities with similar steps (but in some cases with different counterparties) as the ones described in connection with the 178,044 shares of Carlsberg and A/S – B and the 2,876,867 shares of TDC A/S.  These trades are documented in Appendix A.

c.    Roadcraft Trades

153.    On March 26, 2015, someone emailed the broker The TJM Partnership on behalf of the Roadcraft Plan seeking to purchase 887,986 shares of Carlsberg A/S – B, a public issuer of securities in Denmark, at DKK 571.50 per share, for a notional amount of DKK 507,483,999.00, with a settlement date of March 31, 2015.  WH_MDL_00021154; WH_MDL_00137241 - WH_MDL_00137244; WH_MDL_00021131.

154.    A trade confirmation issued by The TJM Partnership stated that on March 26, 2015, 887,986 shares of CARLB stock were purchased on behalf of the Roadcraft Plan at a price of DKK 571.50 per share.  WH_MDL_00137241 - WH_MDL_00137244.

155.    According to email correspondence, on March 30, 2015, a stock loan agreement was entered into on behalf of the Roadcraft Plan pursuant to which 887,986 shares of Carlsberg A/S – B shares were loaned to Colbrook Limited, in exchange for DKK 504,483,999.00 (DKK 571.50 per share), with a settlement date of March 31, 2015.  WH_MDL_00021355.

156.    On August 7, 2014, someone emailed the broker Bastion Capital London on behalf of the Roadcraft Plan seeking liquidity for purchase of 2,803,027 shares of TDC A/S, a public issuer of securities in Denmark, at DKK 51.35 per share, for a notional amount of DKK 143,935,436.45, with a settlement date of August 13, 2014.  WH_MDL_00065626 – 27; WH_MDL_00035254.

157.    The Solo Custodians' documents, broker confirmations, and email correspondence state that the Roadcraft Plan engaged in a total of 15 trades of Danish securities with similar steps (but in some cases with different counterparties) as the ones described in connection with the 887,986 shares of Carlsberg A/S – B.  These trades are documented in Appendix A.

        d.     FWC Trades

158.    On March 26, 2015, the FWC Capital Plan emailed the broker The TJM Partnership seeking to purchase 903,635 shares of Carlsberg A/S – B, a public issuer of securities in Denmark, at DKK 571.50 per share, for a total notional amount of DKK 516,427,402.50, with a settlement date of March 31, 2015.  FWCCAP00002047; FWCCAP00000035.

159.    The FWC Capital Plan received a trade confirmation from TJM Partnership LLC. The confirmation stated that on March 26, 2015, The FWC Capital LLC Pension Plan purchased 903,635 shares of Carlsberg A/S – B at a price of DKK 571.5 per share.  FWCCAP00000035; FWCCAP00002048.

160.    Email correspondence between the FWC Plan and Diverse Vision Limited states that on March 30, 2015, the FWC Capital Plan entered into a stock loan agreement pursuant to which it agreed to loan 903,635 Carlsberg A/S– B shares to Diverse Vision Limited, in

exchange for DKK 516,427,402.50, with a settlement date of March 31, 2015. FWCCAP00002078; FWCCAP00002079.

161.    On November 27, 2014, the FWC Capital Plan emailed the broker Bastion Capital London seeking liquidity for the purchase of 846,864 shares of Chr. Hansen Holding A/S, a public issuer of securities in Denmark, at DKK 258.9 per share, for a total notional amount of DKK 219,253,089.60, with a settlement date of December 2, 2014.  FWCCAP00001240.

162.    The FWC Capital Plan received a trade confirmation from Bastion Capital London Ltd.  The confirmation stated that on November 27, 2014, The FWC Capital LLC Pension Plan purchased 846,864 shares of Chr. Hansen Holding A/S at a price of DKK 258.9 per share.  The confirmation included a commission fee of DKK 2740.66.  FWCCAP00001248; FWCCAP00001249.

163.    Email correspondence between the FWC Plan and Gnosis states that on December 1, 2014, the FWC Capital Plan entered into a stock loan agreement pursuant to which it agreed to loan 846,864 Chr. Hansen shares to Gnosis Capital Ltd, in exchange for DKK 219,253,089.60, with a settlement date of December 2, 2014. FWCCAP00001250; FWCCAP00001253.

164.    The FWC Capital Plan engaged in a total of 16 trades of Danish securities with the same steps (but in some cases with different counterparties) as the ones described in connection with the 903,635 shares of Carlsberg A/S – B and  the 846,864 shares of Chr. Hansen Holding A/S.  These trades are identified in Appendix A.

e.    Proper Pacific Trades

165.     On March 26, 2015, the Proper Pacific Plan emailed the broker Sunrise Brokers seeking liquidity for the purchase of 180,313 shares of Carlsberg A/S – B, a public issuer of securities in Denmark, at DKK 571.5 per share, for a total notional amount of DKK

103,048,879.50, through the broker Sunrise Brokers, with a settlement date of March 31, 2015.  PROPPACIF00002195; PROPPACIF00002209.

166.    The Proper Pacific Plan received a trade confirmation from Sunrise Brokers.  The confirmation stated that on March 26, 2015, the Proper Pacific Plan purchased 180,313 shares of Carlsberg A/S – B at a price of DKK 571.5 per share.  The confirmation included a commission fee of DKK 644.06.  PROPPACIF00002209-2210.

167.    Email correspondence between the Proper Pacific Plan and Treehurst Limited states that on March 30, 2015, the Proper Pacific Plan entered into a stock loan agreement pursuant to which it agreed to loan 180,313 Carlsberg A/S– B shares to Treehurst Limited, in exchange for DKK 103,048,879.50, with a settlement date of March 31, 2015. PROPPACIF00002247.

168.    On November 27, 2014, the Proper Pacific Plan emailed the broker Bastion Capital seeking liquidity for the purchase of 839,500 shares of Chr. Hansen Holding A/S, a public issuer of securities in Denmark, at DKK 258.9 per share, for a total notional amount of DKK 217,346,550, with a settlement date of December 2, 2014.  PROPPACIF00001323.

169.    The Proper Pacific Plan received a trade confirmation from Bastion Capital London Ltd.  The confirmation stated that on November 27, 2014, the Proper Pacific Plan purchased 839,500 shares of Chr. Hansen Holding A/S execution at the price of DKK 258.90 per share. The confirmation included a commission fee of DKK 2716.83.  PROPPACIF00001326; PROPPACIF00001327.

170.    Email correspondence between the Proper Pacific Plan and Gnosis states that on December 1, 2014, the Proper Pacific Plan entered into a stock loan agreement pursuant to

which it agreed to loan 839,500 Chr. Hansen shares to Gnosis Capital Ltd, in exchange for DKK 217,346,550, with a settlement date of December 2, 2014. PROPPACIF00001330.

171.    The Proper Pacific Plan engaged in a total of 16 trades of Danish securities with the same steps outlined above (but in some cases with different counterparties) as the ones described in connection with the 180,313 shares of Carlsberg A/S – B and the 839,500 shares of Chr. Hansen Holding A/S. These trades are identified in Appendix A.

## VI.    Solo Bellwether Reclaim Submissions

a.    RJM Plan

172.    On April 3, 2013, Goal TaxBack submitted a tax reclaim application, on behalf of the RJM Plan. Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.008, which was a predecessor version of Form 06.003)); 3) a dividend credit advice issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166. The Form 06.008 stated that the RJM Plan, as the "owner/usufructuary" of shares of TDC A/S, "hereby claim[ed] relief from Danish taxation on the dividends from shares or participations as specified below." Below, the form listed the number of shares (3,250,000), the gross dividend (DKK 7,475,000), and the amount of the refund claim (DKK 2,018,250). The dividend credit advice issued by Solo Capital stated that Solo Capital had credited the account of the RJM Plan with a payment that "represents the dividend shown below." The dividend credit advice also included information on the gross dividend (DKK 7,475,000), the number of shares (3,250,000), the tax (DKK 2,018,250) and the net dividend (DKK 5,456,750). SKAT_MDL_001_00059293.

173.    On April 8, 2013, Goal TaxBack submitted a tax reclaim application, on behalf of the RJM Plan. Included with the application were: 1) a cover letter on the reclaim agent's

letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.008); 3) a dividend credit advice issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form 06.008 stated that the RJM Plan, as the "owner/usufructuary" of shares of DSV A/S, "hereby claim[ed] relief from Danish taxation on the dividends from shares or participations as specified below."  Below, the form listed the number of shares (1,200,000), the gross dividend (DKK 1,500,000), and the amount of the refund claim (DKK 405,000).  The dividend credit advice issued by Solo Capital stated that Solo Capital had credited the account of the RJM Plan with a payment that "represents the dividend shown below."  The dividend credit advice also included information on the gross dividend (DKK 1,500,000), the number of shares (1,200,000), the tax (DKK 405,000) and the net dividend (DKK 1,095,000).  SKAT_MDL_001_00059293.

174.    On April 8, 2013, Goal TaxBack submitted a tax reclaim application, on behalf of the RJM Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.008); 3) a dividend credit advice issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form 06.008 stated that the RJM Plan, as the "owner/usufructuary" of shares of Carlsberg A/S – B, "hereby claim[ed] relief from Danish taxation on the dividends from shares or participations as specified below."  Below, the form listed the number of shares (640,000), the gross dividend (DKK 3,840,000), and the amount of the refund claim (DKK 1,036,800).  The dividend credit advice issued by Solo Capital stated that Solo Capital had credited the account of the RJM Plan with a payment that "represents the dividend shown below."  The dividend credit advice also included information on the gross dividend (DKK 3,840,000), the number of shares (640,000), the tax (DKK 1,036,800) and the net dividend (DKK 2,803,200).   SKAT_MDL_001_00059293.

175.    On April 12, 2013, Goal TaxBack submitted a tax reclaim application, on behalf of the RJM Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.008); 3) a dividend credit advice issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form 06.008 stated that the RJM Plan, as the "owner/usufructuary" of shares of Novo Nordisk A/S – B, "hereby claim[ed] relief from Danish taxation on the dividends from shares or participations as specified below."  Below, the form listed the number of shares (2,400,000), the gross dividend (DKK 43,200,000), and the amount of the refund claim (DKK 11,664,000).  The dividend credit advice issued by Solo Capital stated that Solo Capital had credited the account of the RJM Plan with a payment that "represents the dividend shown below."  The dividend credit advice also included information on the gross dividend (DKK 43,200,000), the number of shares (2,400,000), the tax (DKK 11,664,000) and the net dividend (DKK 31,536,000). SKAT_MDL_001_00059293.

176.    On April 17, 2013, Goal TaxBack submitted a tax reclaim application, on behalf of the RJM Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.008); 3) a dividend credit advice issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form 06.008 stated that the RJM Plan, as the "owner/usufructuary" of shares of FLSmidth & Co A/S, "hereby claim[ed] relief from Danish taxation on the dividends from shares or participations as specified below."  Below, the form listed the number of shares (285,000), the gross dividend (DKK 2,565,000), and the amount of the refund claim (DKK 692,550).  The dividend credit advice issued by Solo Capital stated that Solo Capital had credited the account of the RJM Plan with a payment that "represents the dividend shown below."  The dividend credit advice also

included information on the gross dividend (DKK 2,565,000), the number of shares (285,000), the tax (DKK 692,550) and the net dividend (DKK 1,872,450).   SKAT_MDL_001_00059293.

177.    On April 23, 2013, Goal TaxBack submitted a tax reclaim application on behalf of the RJM Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) dividend credit advices issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 4,730,000.  The dividend credit advices issued by Solo Capital stated that: a) in connection with 4,200 shares of A.P. Møller Mærsk A/S - A, Solo Capital had credited the account of RJM Capital with a payment in the amount of DKK 3,679,200.00 that represented a dividend net of withholding tax of DKK 1,360,800.00; and b) in connection with 10,400 shares of A.P. Møller Mærsk A/S – B, Solo Capital had credited the account of the RJM Plan with a payment in the amount of DKK 9,110,400.00 that represented a dividend net of withholding tax of DKK 3,369,600.00.  SKAT_MDL_001_00059293; WH_MDL_00268445.

178.    On April 26, 2013, Goal TaxBack submitted a tax reclaim application on behalf of the RJM Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) a dividend credit advice issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 1,123,200.  The dividend credit advice issued by Solo Capital stated that in connection with 160,000 shares of Tryg A/S, Solo Capital

had credited the account of the RJM Plan with a payment in the amount of DKK 3,036,800 that represented a dividend net of withholding tax of DKK 1,123,200.  SKAT_MDL_001_00059293.

179.     On April 30, 2013, Goal TaxBack submitted a tax reclaim application on behalf of the RJM Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) a dividend credit advice issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 572,400.  The dividend credit advice issued by Solo Capital stated that in connection with 1,060,000 shares of Lundbeck A/S, Solo Capital had credited the account of the RJM Plan with a payment in the amount of DKK 1,547,600 that represented a dividend net of withholding tax of DKK 572,400.  SKAT_MDL_001_00059293.

180.     On August 21, 2013, Goal TaxBack submitted a tax reclaim application on behalf of the RJM Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) a dividend credit advice issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 1,559,250.  The dividend credit advice issued by Solo Capital stated that in connection with 3,850,000 shares of TDC A/S, Solo Capital had credited the account of the RJM Plan with a payment in the amount of DKK 4,215,750 that represented a dividend net of withholding tax of DKK 1,559,250.  SKAT_MDL_001_00059293.

181.     On December 6, 2013, Goal TaxBack submitted a tax reclaim application on behalf of the RJM Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) a

- 33 -

dividend credit advice issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166. The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 1,318,621.36. The dividend credit advice issued by Solo Capital stated that in connection with 780,157 shares of Chr. Hansen Holding A/S, Solo Capital had credited the account of the RJM Plan with a payment in the amount of DKK 3,565,161.46 that represented a dividend net of withholding tax of DKK 1,318,621.36. SKAT_MDL_001_00059293.

182.    On December 13, 2013, Goal TaxBack submitted a tax reclaim application on behalf of the RJM Plan. Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) a dividend credit advice issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166. The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 1,746,360. The dividend credit advice issued by Solo Capital stated that in connection with 924,000 shares of Coloplast A/S, Solo Capital had credited the account of the RJM Plan with a payment in the amount of DKK 4,721,640 that represented a dividend net of withholding tax of DKK 1,746,360. SKAT_MDL_001_00059293.

b.    Basalt Plan

183.    On November 27, 2014, Goal TaxBack submitted a tax reclaim application on behalf of the Basalt Plan. Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) a dividend credit advice issued by Old Park Lane; 4) a Power of Attorney; and 5) an IRS Form 6166. The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a

"claim for refund of Danish dividend tax" in the total amount of DKK 1,165,131.14. The dividend credit advice issued by Old Park Lane stated that in connection with 2,876,867 shares of TDC A/S, Old Park Lane had credited the account of the Basalt Plan with a payment in the amount of DKK 3,150,169.36 that represented a dividend net of withholding tax of DKK 1,165,131.14.   SKAT_MDL_001_00057073.

184.   On April 14, 2015, Goal TaxBack submitted a tax reclaim application on behalf of the Basalt Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) dividend credit advices issued by Telesto; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 8,381,677.50. The dividend credit advices issued by Telesto stated that: a) in connection with 7,873 shares of A.P. Møller Mærsk A/S - A, Telesto had credited the account of the Basalt Plan with a payment in the amount of DKK 11,327,908.59 that represented a dividend net of withholding tax of DKK 4,189,774.41; and b) in connection with 7,877 shares of A.P. Møller Mærsk A/S - B, Telesto had credited the account of the Basalt Plan with a payment in the amount of DKK 11,333,663.91 that represented a dividend net of withholding tax of DKK 4,191,903.09.  SKAT_MDL_001_00057073.

185.   On April 16, 2015, Goal TaxBack submitted a tax reclaim application on behalf of the Basalt Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) a dividend credit advice issued by Telesto; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 8,705,084.85. The dividend credit advice

issued by Telesto stated that in connection with 6,448,211 shares of Novo Nordisk A/S – B, Telesto had credited the account of the Basalt Plan with a payment in the amount of DKK 23,535,970.15 that represented a dividend net of withholding tax of DKK 8,705,084.85. SKAT_MDL_001_00057073.

186.    On April 21, 2015, Goal Taxback submitted a tax reclaim application on behalf of the Basalt Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) dividend credit advices issued by Telesto; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 5,621,940.22. The dividend credit advices issued by Telesto stated that: a) in connection with 178,044 shares of Carlsberg A/S - B, Telesto had credited the account of the Basalt Plan with a payment in the amount of DKK 1,169,749.08 that represented a dividend net of withholding tax of DKK 432,646.92; b) in connection with 3,271,664 shares of Danske Bank A/S, Telesto had credited the account of the Basalt Plan with a payment in the amount of DKK 13,135,730.96 that represented a dividend net of withholding tax of DKK 4,858,421.04; and c) in connection with 765,908 shares of DSV A/S, Telesto had credited the account of the Basalt Plan with a payment in the amount of DKK 894,580.54 that represented a dividend net of withholding tax of DKK 330,872.26. SKAT_MDL_001_00057073.

187.    On April 23, 2015, Goal Taxback submitted a tax reclaim application on behalf of the Basalt Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) dividend credit advices issued by Telesto; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form

(06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 1,986,272.82. The dividend credit advices issued by Telesto stated that: a) in connection with 80,009 shares of FLSmidth & Co A/S, Telesto had credited the account of the Basalt Plan with a payment in the amount of DKK 525,659.13 that represented a dividend net of withholding tax of DKK 194,421.87; b) in connection with 777,153 shares of Novozymes A/S - B, Telesto had credited the account of the Basalt Plan with a payment in the amount of DKK 1,701,965.07 that represented a dividend net of withholding tax of DKK 629,493.93; c) in connection with 3,283,965 shares of TDC A/S, Telesto had credited the account of the Basalt Plan with a payment in the amount of DKK 2,397,294.45 that represented a dividend net of withholding tax of DKK 886,670.55; and d) in connection with 35,209 shares of Tryg A/S, Telesto had credited the account of the Basalt Plan with a payment in the amount of DKK 745,374.53 that represented a dividend net of withholding tax of DKK 275,686.47.  SKAT_MDL_001_00057073.

188.     On April 27, 2015, Goal Taxback submitted a tax reclaim application on behalf of the Basalt Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) dividend credit advices issued by Telesto; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 1,635,387.41. The dividend credit advices issued by Telesto stated that: a) in connection with 605,292 shares of GN Store Nord A/S, Telesto had credited the account of the Basalt Plan with a payment in the amount of DKK 397,676.84 that represented a dividend net of withholding tax of DKK 147,085.96; b) in connection with 450,631 shares of Pandora A/S, Telesto had credited the account of the Basalt

Plan with a payment in the amount of DKK 2,960,645.67 that represented a dividend net of withholding tax of DKK 1,095,033.33; and c) in connection with 373,474 shares of Vestas Wind Systems A/S, Telesto had credited the account of the Basalt Plan with a payment in the amount of DKK 1,063,280.48 that represented a dividend net of withholding tax of DKK 393,268.12. SKAT_MDL_001_00057073.

189.    On May 15, 2015, Goal Taxback submitted a tax reclaim application on behalf of the Basalt Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) a dividend credit advice issued by Telesto; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 358,034.98. The dividend credit advice issued by Telesto stated that in connection with 294,679 shares of Coloplast A/S – B, Telesto had credited the account of the Basalt Plan with a payment in the amount of DKK 968,020.52 that represented a dividend net of withholding tax of DKK 358,034.98. SKAT_MDL_001_00057073.

c.    Roadcraft Plan

190.    On November 27, 2014, Goal Taxback submitted a tax reclaim application on behalf of the Roadcraft Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) a dividend credit advice issued by Old Park Lane; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 1,135,225.94. The dividend credit advice issued by Old Park Lane stated that in connection with 2,803,027 shares

of TDC A/S, Old Park Lane had credited the account of the Roadcraft Plan with a payment in the amount of DKK 3,069,314.56 that represented a dividend net of withholding tax of DKK 1,135,225.94.  SKAT_MDL_001_00056852.

191.    On April 28, 2015, Goal Taxback submitted a tax reclaim application on behalf of the Roadcraft Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) dividend credit advices issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 65,045,912.65. The dividend credit advices issued by Solo Capital stated that: a) in connection with 39,785 shares of A.P. Møller Mærsk A/S - A, Solo Capital had credited the account of Roadcraft Plan with a payment in the amount of DKK 57,243,851.55 that represented a dividend net of withholding tax of DKK 21,172,383.45; b) in connection with 40,179 shares of A.P. Møller Mærsk A/S - B, Solo Capital had credited the account of Roadcraft Plan with a payment in the amount of DKK 57,810,750.57 that represented a dividend net of withholding tax of DKK 21,382,058.43; c) in connection with 887,986 shares of Carlsberg A/S - B, Solo Capital had credited the account of Roadcraft Plan with a payment in the amount of DKK 5,834,068.02 that represented a dividend net of withholding tax of DKK 2,157,805.98; d) in connection with 3,217,471 shares of Danske Bank A/S, Solo Capital had credited the account of Roadcraft Plan with a payment in the amount of DKK 12,918,146.06 that represented a dividend net of withholding tax of DKK 4,777,944.44; e) in connection with 633,514 shares of DSV A/S, Solo Capital had credited the account of Roadcraft Plan with a payment in the amount of DKK 739,944.35 that represented a dividend net of withholding tax of DKK 273,678.05; f) in connection with 399,512 shares of FLSmidth & Co A/S, Solo Capital had

credited the account of Roadcraft Plan in the amount of DKK 2,624,793.84 that represented a dividend net of withholding tax of DKK 970,814.16; g) in connection with 591,012 shares of GN Store Nord A/S, Solo Capital had credited the account of Roadcraft Plan with a payment in the amount of DKK 388,294.88 that represented a dividend net of withholding tax of DKK 143,615.92; h) in connection with 6,296,082 shares of Novo Nordisk A/S – B, Solo Capital had credited the account of Roadcraft Plan with a payment in the amount of DKK 22,980,699.30 that represented a dividend net of withholding tax of DKK 8,499,710.70; i) in connection with 681,437 shares of Novozymes A/S – B,  Solo Capital had credited the account of Roadcraft Plan with a payment in the amount of DKK 1,492,347.03 that represented a dividend net of withholding tax of DKK 551,963.97; j) in connection with 443,167 shares of Pandora A/S, Solo Capital had credited the account of Roadcraft Plan with a payment in the amount of DKK 2,911,607.19 that represented a dividend net of withholding tax of DKK 1,076,895.81; k) in connection with 2,572,455 shares of TDC A/S, Solo Capital had credited the account of Roadcraft Plan with a payment in the amount of DKK 1,877,892.15 that represented a dividend net of withholding tax of DKK 694,562.85; l) in connection with 174,450 shares of Tryg A/S, Solo Capital had credited the account of Roadcraft Plan with a payment in the amount of DKK 3,693,106.50 that represented a dividend net of withholding tax of DKK 1,365,943.50; and m) in connection with 1,878,951 shares of Vestas Wind Systems A/S, Solo Capital had credited the account of Roadcraft Plan with a payment in the amount of DKK 5,349,373.50 that represented a dividend net of withholding tax of DKK 1,978,535.40. SKAT_MDL_001_00056852.

192.    On May 15, 2015, Goal Taxback submitted a tax reclaim application on behalf of the Roadcraft Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) a dividend credit

advice issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166. The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 1,789,899.12. The dividend credit advice issued by Solo Capital stated that in connection with 1,473,168 shares of Coloplast A/S – B, Solo Capital had credited the account of the Roadcraft Plan with a payment in the amount of DKK 4,839,356.88 that represented a dividend net of withholding tax of DKK 1,789,899.12. SKAT_MDL_001_00056852.

    d.    FWC Plan

193.    On April 13, 2015, Syntax submitted a tax reclaim application on behalf of the FWC Plan. Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) a dividend credit advice issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166. The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 21,231,986.49. The dividend credit advice issued by Solo Capital stated that in connection with 39,897 shares of A.P. Møller Mærsk A/S – A, Solo Capital had credited the account of the FWC Plan with a payment in the amount of DKK 57,405,000.51 that represented a dividend net of withholding tax of DKK 21,231,986.49. SKAT_MDL_001_00082801.

194.    On April 16, 2015, Syntax submitted a tax reclaim application on behalf of the FWC Plan. Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) dividend credit advices issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166. The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund

of Danish dividend tax" in the total amount of DKK 30,807,804.06. The dividend credit advices

issued by Solo Capital stated that: a) in connection with 40,288 shares of A.P. Møller Mærsk A/S

– B, Solo Capital had credited the account of the FWC Plan with a payment in the amount of

DKK 57,967,583.04 that represented a dividend net of withholding tax of DKK 21,440,064.96;

and b) in connection with 6,939,066 shares of Novo Nordisk A/S – B, Solo Capital had credited

the account of the FWC Plan with a payment in the amount of DKK 25,327,590.90 that

represented a dividend net of withholding tax of DKK 9,367,739.10..

SKAT_MDL_001_00082801.

195.     On April 23, 2015, Syntax submitted a tax reclaim application on behalf of the

FWC Plan.  Included with the application were: 1) a cover letter on the reclaim agent's

letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) dividend credit

advices issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form

(06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund

of Danish dividend tax" in the total amount of DKK 6,300,496.17. The dividend credit advices

issued by Solo Capital stated that: a) in connection with 749,199 shares of Novozymes A/S - B,

Solo Capital had credited the account of the FWC Plan with a payment in the amount of DKK

1,640,745.81 that represented a dividend net of withholding tax of DKK 606,851.19; b) in

connection with 617,170 shares of DSV A/S, Solo Capital had credited the account of the FWC

Plan with a payment in the amount of DKK 720,854.56 that represented a dividend net of

withholding tax of DKK 266,617.44; c) in connection with 3,192,314 shares of Danske Bank

A/S, Solo Capital had credited the account of the FWC Plan with a payment in the amount of

DKK 12,817,140.71 that represented a dividend net of withholding tax of DKK 4,740,586.29;

and d) in connection with 2,542,375 shares of TDC A/S, Solo Capital had credited the account of

the FWC Plan with a payment in the amount of DKK 1,855,933.75 that represented a dividend
net of withholding tax of DKK 686,441.25.  SKAT_MDL_001_00082801.

196.    On April 28, 2015, Syntax submitted a tax reclaim application on behalf of the
FWC Plan.  Included with the application were: 1) a cover letter on the reclaim agent's
letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) dividend credit
advices issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form
(06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund
of Danish dividend tax" in the total amount of DKK 6,777,871.45. The dividend credit advices
issued by Solo Capital stated that: a) in connection with 903,635 shares of Carlsberg A/S – B,
Solo Capital had credited the account of the FWC Plan with a payment in the amount of DKK
5,936,881.95 that represented a dividend net of withholding tax of DKK 2,195,833.05; b) in
connection with 651,369 shares of GN Store Nord A/S, Solo Capital had credited the account of
the FWC Plan with a payment in the amount of DKK 427,949.43 that represented a dividend net
of withholding tax of DKK 158,282.67; c) in connection with 439,702 shares of Pandora A/S,
Solo Capital had credited the account of the FWC Plan with a payment in the amount of DKK
2,888,842.14 that represented a dividend net of withholding tax of DKK 1,068,475.86; d) in
connection with 174,983 shares of Tryg A/S, Solo Capital had credited the account of the FWC
Plan with a payment in the amount of DKK 3,704,390.11 that represented a dividend net of
withholding tax of DKK 1,370,116.89; and e) in connection with 1,885,245 shares of Vestas
Wind Systems A/S, Solo Capital had credited the account of the FWC Plan with a payment in the
amount of DKK 5,367,292.52 that represented a dividend net of withholding tax of DKK
1,985,162.98.  SKAT_MDL_001_00082801.

197.    On April 30, 2015, Syntax submitted a tax reclaim application on behalf of the FWC Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) dividend credit advices issued by Old Park Lane; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 3,037,306.22. The dividend credit advices issued by Old Park Lane stated that: a) in connection with 1,074,214 shares of Coloplast A/S - B, Old Park Lane had credited the account of the FWC Plan with a payment in the amount of DKK 5,881,321.65 that represented a dividend net of withholding tax of DKK 2,175,283.35; and b) in connection with 846,864 shares of Chr. Hansen Holding A/S, Old Park Lane had credited the account of the FWC Plan with a payment in the amount of DKK 2,330,654.41 that represented a dividend net of withholding tax of DKK 862,022.87.  SKAT_MDL_001_00082801.

198.    On May 15, 2015, Syntax submitted a tax reclaim application on behalf of the FWC Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) a dividend credit advice issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 1,786,282.06. The dividend credit advice issued by Solo Capital stated that in connection with 1,470,191 shares of Coloplast A/S – B, Solo Capital had credited the account of the FWC Plan with a payment in the amount of DKK 4,829,577.44 that represented a dividend net of withholding tax of DKK 1,786,282.06.. SKAT_MDL_001_00082801.

199.    On May 28, 2015, Syntax submitted a tax reclaim application on behalf of the FWC Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) a dividend credit advice issued by Solo Capital; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 988,514.28. The dividend credit advice issued by Solo Capital stated that in connection with 406,796 shares of FLSmidth & Co A/S, Solo Capital had credited the account of the FWC Plan with a payment in the amount of DKK 2,672,649.72 that represented a dividend net of withholding tax of DKK 988,514.28.. SKAT_MDL_001_00082801.

e.    Proper Pacific Plan

200.    On April 20, 2015, Goal Taxback submitted a tax reclaim application on behalf of the Proper Pacific Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) dividend credit advices issued by Old Park Lane; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 2,738,198.25. The dividend credit advices issued by Old Park Lane stated that: a) in connection with 839,500 shares of Chr. Hansen Holding A/S, Old Park Lane had credited the account of the Proper Pacific Plan with a payment in the amount of DKK 2,310,387.95 that represented a dividend net of withholding tax of DKK 854,527.05; and b) in connection with 930,208 shares of Coloplast A/S – B, Old Park Lane had credited the account of the Proper Pacific Plan with a payment in the amount of DKK

5,092,888.80 that represented a dividend net of withholding tax of DKK 1,883,671.20. SKAT_MDL_001_00088872.

201.    On April 21, 2015, Goal Taxback submitted a tax reclaim application on behalf of the Proper Pacific Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) dividend credit advices issued by Telesto; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 17,451,427.59. The dividend credit advices issued by Telesto stated that: a) in connection with 6,634,763 shares of Novo Nordisk A/S - B, Telesto had credited the account of the Proper Pacific Plan with a payment in the amount of DKK 24,216,884.95 that represented a dividend net of withholding tax of DKK 8,956,930.05; b) in connection with 7,879 shares of A.P. Møller Mærsk A/S – A, Telesto had credited the account of the Proper Pacific Plan with a payment in the amount of DKK 11,336,541.57 that represented a dividend net of withholding tax of DKK 4,192,967.43; and c) in connection with 8,083 shares of A.P. Møller Mærsk A/S – B, Telesto had credited the account of the Proper Pacific Plan with a payment in the amount of DKK 11,630,062.89 that represented a dividend net of withholding tax of DKK 4,301,530.11.  SKAT_MDL_001_00088872.

202.    On April 27, 2015, Goal Taxback submitted a tax reclaim application on behalf of the Proper Pacific Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) dividend credit advices issued by Telesto; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 8,488,609.08. The dividend credit advices

issued by Telesto stated that: a) in connection with 683,931 shares of Novozymes A/S – B, Telesto had credited the account of the Proper Pacific Plan with a payment in the amount of DKK 1,497,808.89 that represented a dividend net of withholding tax of DKK 553,984.11; b) in connection with 3,293,727 shares of TDC A/S, Telesto had credited the account of the Proper Pacific Plan with a payment in the amount of DKK 2,404,420.71 that represented a dividend net of withholding tax of DKK 889,306.29; c) in connection with 692,422 shares of DSV A/S, Telesto had credited the account of the Proper Pacific Plan with a payment in the amount of DKK 808,748.90 that represented a dividend net of withholding tax of DKK 299,126.30; d) in connection with 2,906,712 shares of Danske Bank A/S, Telesto had credited the account of the Proper Pacific Plan with a payment in the amount of DKK 11,670,448.68 that represented a dividend net of withholding tax of DKK 4,316,467.32; e) in connection with 400,364 shares of Pandora A/S, Telesto had credited the account of the Proper Pacific Plan with a payment in the amount of DKK 2,630,391.48 that represented a dividend net of withholding tax of DKK 972,884.52; f) in connection with 622,804 shares of GN Store Nord A/S, Telesto had credited the account of the Proper Pacific Plan with a payment in the amount of  DKK 409,182.23 that represented a dividend net of withholding tax of DKK 151,341.37; g) in connection with 34,813 shares of Tryg A/S, Telesto had credited the account of the Proper Pacific Plan with a payment in the amount of DKK 736,991.21 that represented a dividend net of withholding tax of DKK 272,585.79; h) in connection with 81,037 shares of FLSmidth & Co A/S, Telesto had credited the account of the Proper Pacific Plan with a payment in the amount of DKK 532,413.09 that represented a dividend net of withholding tax of DKK 196,919.91; i) in connection with 180,313 shares of Carlsberg A/S – B, Telesto had credited the account of the Proper Pacific Plan with a payment in the amount of DKK 1,184,656.41 that represented a dividend net of withholding tax

of DKK 438,160.59; and j) in connection with 377,809 shares of Vestas Wind Systems A/S, Telesto had credited the account of the Proper Pacific Plan with a payment in the amount of DKK 1,075,622.22 that represented a dividend net of withholding tax of DKK 397,832.88. SKAT_MDL_001_00088872.

203.     On May 15, 2015, Goal Taxback submitted a tax reclaim application on behalf of the Proper Pacific Plan.  Included with the application were: 1) a cover letter on the reclaim agent's letterhead; 2) a "Claim to Relief from Danish Dividend Tax" (Form 06.003); 3) a dividend credit advice issued by Telesto; 4) a Power of Attorney; and 5) an IRS Form 6166.  The Form (06.003) stated that it was filed "on behalf of the beneficial owner" and made a "claim for refund of Danish dividend tax" in the total amount of DKK 357,659.55. The dividend credit advice issued by Telesto stated that in connection with 294,370 shares of Coloplast A/S – B, Telesto had credited the account of the Proper Pacific Plan with a payment in the amount of DKK 967,005.45 that represented a dividend net of withholding tax of DKK 357,659.55. SKAT_MDL_001_00088872.

**VII.    Solo Bellwether Reclaim Payments by SKAT**

204.     In total, in 2013 and 2014, the RJM Plan submitted tax reclaim forms requesting dividend withholding tax refunds in the amount of DKK 59,487,351.62, and SKAT made payments in response to each of the RJM Plan's refund claims for a total of DKK 59,487,351.62. SKAT_MDL_001_00352472 (DKK 2,018,250.00, DKK 405,000.00 DKK 1,036,800.00); SKAT_MDL_001_00352526  (DKK 3,369,600.00, DKK 1,360,800.00, DKK 1,123,200.00); SKAT_MDL_001_00450550 (DKK 692,550.00, DKK 11,664,000.00); SKAT_MDL_001_00352806  (DKK 1,559,250.00); SKAT_MDL_001_00352551 (DKK 2,363,610.94, DKK 825,567.80, DKK 2,141,783.64); SKAT_MDL_001_00352550 (DKK

1,123,022.88, DKK 15,018,623.50); SKAT_MDL_001_00352471 (DKK 3,364,956.00, DKK 4,087,314.00, DKK 785,184.03); SKAT_MDL_001_00352829 (DKK 1,482,621.57); SKAT_MDL_001_00352502 (DKK 572,400.00); SKAT_MDL_001_00353059 (DKK 1,746,360.00); SKAT_MDL_001_00353024 (DKK 652,756.32); SKAT_MDL_001_00352975 (DKK 1,318,621.36); SKAT_MDL_001_00352964 (DKK 103,298.63); SKAT_MDL_001_00352594 (DKK 671,780.93).

205.    SKAT made these payments on the following dates: April 15, 2013; April 29, 2013; May 7, 2013; May 13, 2013; September 9, 2013; December 17, 2013; December 20, 2013; March 26, 2014; April 23, 2014; April 24, 2014; May 6, 2014; June 17, 2014; September 3, 2014; and October 9, 2014.  *See id.*

206.    SKAT paid each of these refund payments to payment agent Goal Taxback Limited, as directed by the RJM Plan.  Goal Taxback Limited took 0.85% (with a cap of 12,000 Euro per reclaim) of each of the refunds as a fee.  MPSKAT00003889 at MPSKAT00003897.

207.    The RJM Plan paid custodial and other fees to Solo Capital.  MPSKAT00158799.

208.    In total, the Basalt Plan claimed dividend withholding tax refunds in the amount of DKK 27,853,528.92, and SKAT made payments in response to each of the Basalt Plan's refund claims for a total of DKK 27,853,528.92.  SKAT_MDL_001_00352681  (DKK 4,189,774.41, DKK 4,191,903.09); SKAT_MDL_00100352759 (DKK 393,268.12, DKK 147,085.96, DKK 1,095,033.33); SKAT_MDL_001_00352713 (DKK 330,872.26, DKK 432,646.92, DKK 4,858,421.04); SKAT_MDL_001_00352751 (DKK 629,493.93, DKK 886,670.55, DKK 275,686.47, DKK 194,421.87); SKAT_MDL_001_00353058 (DKK 358,034.98); SKAT_MDL_001_00352880 (DKK 1,165,131.14); SKAT_MDL_001_00352717 (DKK 8,705,084.85).

209.    SKAT made these payments on the following dates: December 19, 2014; May 8, 2015; May 19, 2015; June 24, 2015; and July 1, 2015.  *See id*.

210.    SKAT paid each of these refunds to payment agent Goal Taxback Limited, as directed by the Basalt Plan.  Goal Taxback Limited took 0.85%, with a cap of 10,000 Euro per reclaim, of each of the refunds as a fee.  MBJ_0062438

211.    The Basalt Plan transferred $926,850.13 from its custodial account to its account at Wells Fargo Bank.  JHVM_0001821 at -836; JHVM_0001821 at -852.

212.    In total, tax reclaim forms requesting dividend withholding tax refunds in the amount of DKK 67,971,037.72 were submitted on behalf of the Roadcraft Plan, and SKAT made payments totaling DKK 67,971,037.72 purportedly in connection therewith. SKAT_MDL_001_00352880 (DKK 1,135,225.94); SKAT_MDL_001_00352759 (DKK 551,963.97, DKK 1,978,535.40, DKK 694,562.85, DKK 21,172,383.45, DKK 21,382,058.43, DKK 143,615.92, DKK 1,365,943.50, DKK 1,076,895.81, DKK 970,814.16, DKK 273,678.05, DKK 2,157,805.98, DKK 4,777,944.44, DKK 8,499,710.70); SKAT_MDL_001_00353058 (DKK 1,789,899.12).

213.    SKAT made these payments on the following dates: December 19, 2014; June 24, 2015; and July 1, 2015.  *See id*.

214.    SKAT paid each of these refunds to payment agent Goal Taxback Limited, as directed by Goal Taxback Limited acting as a purported agent for the Roadcraft Plan.  Goal Taxback Limited took 0.85% of each of the refunds as a fee.  WH_MDL_00324151; WH_MDL_00246802.

215.    In total, the FWC Plan submitted tax reclaim forms requesting dividend withholding tax refunds in the amount of DKK 70,930,260.73, and SKAT made payments in

response to each of the FWC Plan's refund claims for a total of DKK 70,930,260.73. SKAT_MDL_001_00352714 (DKK 1,985,162.98; DKK 158,282.67; DKK 1,370,116.89; DKK 1,068,475.86; DKK 2,195,833.05); SKAT_MDL_001_00352765 (DKK 1,786,282.06); SKAT_MDL_001_00352736 (DKK 606,851.19; DKK 686,441.25; DKK 266,617.44; DKK 4,740,586.29); SKAT_MDL_001_00352831 (DKK 988,514.28); SKAT_MDL_001_00352889 (DKK 862,022.87; DKK 2,175,283.35); SKAT_MDL_001_00352602 (DKK 21,440,064.96; DKK 9,367,739.10); SKAT_MDL_001_00352549 (DKK 21,231,986.49).

216.    SKAT made these payments on the following dates: April 24, 2015; May 8, 2015; May 27, 2015; July 3, 2015; and July 6, 2015.  *See id*.

217.    SKAT paid each of these refunds to payment agent Syntax GIS as directed by the FWC Plan.  For each refund claim, Syntax GIS took the lower of 0.75% of the net reclaim amount and EUR 10,000 as a fee.  CSCCCAP00000593.

218.    In total, the Proper Pacific Plan submitted tax reclaim forms requesting dividend withholding tax refunds in the amount of DKK 29,035,894.47, and SKAT made payments in response to each of the Proper Pacific Plan's refund claims for a total of DKK 29,035,893.47. SKAT_MDL_001_00353009 (DKK 2,738,198.25); SKAT_MDL_001_00352713 (DKK 17,451,427.59); SKAT_MDL_001_0073743 (DKK 8,488,608.48); SKAT_MDL_001_00353058 (DKK 357,659.55).

219.    SKAT made these payments on the following dates:  May 8, 2015; June 24, 2015; and July 1, 2015. *See id*.

220.    SKAT paid each of these refunds to payment agent Goal Taxback Limited as directed by the Proper Pacific Plan.  For each refund claim, Goal Taxback took 1% of each of the refunds as a fee.  PROPPACIF00000533.

## VIII.   Solo Sub-Custodian Records

221.     Pursuant to a January 30, 2020 letter of request to the competent authority of

Denmark for documents from SEB, SKAT requested account statements, SEB's stock record,

and any other documents showing Danish securities held for, among others, the Solo Custodians

during the period of January 1, 2012 to December 31, 2015.  *See* ECF No. 253 Ex. 1.

222.     In response to the letter of request, SEB produced a sworn declaration of the

Chief Operating Officer of SEB.  Declaration of Anders Peter Bryde Rasmussen, May 17, 2021.

SEB did not produce any documents reflecting holdings in Danish securities on behalf of the

Solo Custodians during the period of January 1, 2012 to December 31, 2015.

223.     Pursuant to an April 14, 2021 letter of request to the competent authority of the

United Kingdom for documents from the administrators in the Solo Custodians' insolvency

proceedings ("Solo Administrators"), SKAT requested "[t]he statements of the Solo Custodians'

accounts holding Danish Securities at any Sub-Custodian, during the Applicable Period" and

"[t]he bank account statements of the Solo Custodians into which any Dividend was paid, during

the Applicable Period."  ECF No 563 Ex. 1 at 10.

224.     In response to the letter of request, the Solo Administrators produced, among

other things, Société Générale account statements.  These account statements do not reflect

holdings of Danish securities in the name of the Solo Custodians.

SCPADMINISTRATORS_00000096-2911.

225.     Pursuant to April 14, 2021 letters of request to the competent authority of the

United Kingdom for documents from JPMorgan Chase, SKAT requested account statements, JP

Morgan Chase's stock record, and any other documents showing Danish securities held for,

among others, the Solo Custodians during the period of January 1, 2012 to December 31, 2016. See ECF No. 569 Exs. 1, 2.

226.    In response to the letter of request, JPMorgan Chase produced a sworn declaration of the Vice President and Assistant General Counsel for JPMorgan Chase.   Declaration of Matthew J. Totman, December 15, 2021.  JPM did not produce any documents reflecting holdings in Danish equities on behalf of the Solo Custodians during the period of January 1, 2012 to December 31, 2016.

227.    Solo Capital sub-custodian account records from JP Morgan reflect the clearance of single stock flex futures contracts for the future delivery of Danish securities in 2013.  *See, e.g.*, SCPADMINISTRATORS_00041860-2757.  These flex futures were cleared and settled by BClear, an NYSE Euronext platform, which Solo Capital accessed through JP Morgan. SCPADMINISTRATORS_00041860-2757.

## IX.    SKAT's Approval and Revocation of Reclaims

228.    Following its receipt of Form 06.003 and all accompanying materials, SKAT made an administrative decision to approve the payment of each application for refund of dividend withholding tax at issue in this litigation.

229.    SKAT paid out reclaims to the US pension plan defendants between 2012 and mid-2015.

230.    SKAT conducted an investigation into the reclaims paid out to the US pension plan defendants.  In the course of its investigation, SKAT met with officials from the IRS in Washington, D.C.  *See, e.g.*, Drost Tr. 81:7-11, 91:3-5.

231.    The Joint International Taskforce on Shared Intelligence and Collaboration (JITSIC) is a platform that enables national tax administrations to collaborate and exchange

information.  *See, e.g.*, https://www.irs.gov/businesses/international-businesses/joint-international-tax-shelter-information-centre.

232.    SKAT met with the IRS and received information from the IRS pursuant to JITSIC.  *See* Drost Tr. 90:15-91:2.

233.    In correspondence from the IRS to SKAT, the IRS stated explicitly that it was providing information to SKAT pursuant to the Treaty, and the information could only be used as permitted under the terms of the Treaty.  *See, e.g.*, Ex _ (SKAT_MDL_001_00828252).

234.    Between November 2015 and June 2018, SKAT had periodic communications (including at certain meetings) with the IRS by which SKAT requested and was provided with information pursuant to Article 26 of the double taxation treaty between the US and Denmark. Ex. 3962, ¶ 33.1 (SKAT Reply To The Defence of Mr. Knott and Mr. Hoogewerf, Signed by Gry Ahlefeld-Engel on 3 March 2021).

235.    The purpose of these communications was, in part, to assist SKAT in determining whether its "previous administrative decisions to accept WHT applications on behalf of US pension plans were wrong as a matter of Danish tax or administrative law (including because SKAT had been defrauded)." Ex. 3962, ¶ 33.1(b) (SKAT Reply To The Defence of Mr. Knott and Mr. Hoogewerf, Signed by Gry Ahlefeld-Engel on 3 March 2021).

236.    Several years after it had approved reclaim payments to the US pension plan defendants, SKAT issued letters to the US pension plan defendants informing them that it "has decided to revoke the previous decisions on dividend tax refunds." *See, e.g.*, Ex. 3077.

237.    In its letters revoking previously-approved requests for refunds, SKAT offered several reasons for its position, including the following:

      a.      The pension plan did not own the shares

b.      The pension plan did not receive dividends

c.      The pension plan did not have the capital required to make the investments that formed the basis of the claim for refund

d.      The pension plan was newly established

e.      The pension plan had one participant only

f.      The pension plan did not submit Form 5500 to the IRS

g.      The pension plan "does not fulfill the conditions for refunds of dividend tax withheld on Danish shares, see article 10 of the double taxation convention between Denmark and the USA." *Id.*

238.    In its letters revoking previously-approved requests for refunds, SKAT stated that "on behalf of the Danish Tax Agency, Kammeradvokaten (the legal advisor to the Danish government) will raise a claim for repayment and damages" against the pension plan. *Id.*

239.    SKAT has not raised a claim for repayment and damages against any defendant in the above-captioned litigation in Denmark.

240.    SKAT has only pursued claims against the defendants in the above-captioned litigation in the United States.

## X.      SKAT's Equitable Claims Against Michel Ben-Jacob

241.    SKAT asserts claims against Michael Ben-Jacob for payment by mistake, unjust enrichment, and money had and received in conjunction with its claims against the Basalt Plan and the Roadcraft Plan, Basalt Am. Compl. ¶¶ 81-94; Roadcraft Am. Compl. ¶¶ 92-105, as well as 37 other pension plans that pursued reclaims of withheld dividend taxes related to dividends paid on Danish securities from 2014-2015, which are the plans identified in Schedule B to the

June 16, 2021 Complaint in *Skatteforvaltningen v. Ben-Jacob*, No. 21-cv-05339 (S.D.N.Y.) (all 39 plans collectively, the "Post-Argre Plans").

242.   SKAT paid funds in response to reclaim applications made on behalf of the Post-Argre Plans.  These payments occurred in 2014 and 2015, and not in any other years.  Basalt Am. Compl. ¶ 46; Roadcraft Am. Compl. ¶ 50.

243.   SKAT made those payments to reclaim agents engaged by the Post-Argre Plans, and those reclaim agents distributed payments received by SKAT to entities as instructed by the Post- Argre Plans.  Basalt Am. Compl. ¶ 65; Roadcraft Am. Compl. ¶ 76; R. Markowitz Tr. 198:3-199:21.

244.   Neither Michael Ben-Jacob nor his firm, Kaye Scholer LLP ("Kaye Scholer"), received any funds related to any reclaim applications by the Post-Argre Plans directly from SKAT or directly from any reclaim agents.  Response to Request for Admission from Ben-Jacob Nos. 43, 44 & 45; Klugman Tr. 300:09-22.

245.   Michael Ben-Jacob and Kaye Scholer provided services to their clients John van Merkensteijn, Richard Markowitz, and Robert Klugman related to the Post-Argre Plans' reclaim applications.  Those clients paid fees to Kaye Scholer for those services.  *E.g.,* WH_MDL_00355444.

246.   SKAT does not contend any amount of the dividend tax refund claims raised in the Complaints filed against the Post-Argre Plans was paid, directly or indirectly, to Michael Ben-Jacob or to Kaye Scholer, except insofar as SKAT contends Kaye Scholer provided services to clients in relation to the Post-Argre Plans' tax refund applications to SKAT, Kaye Scholer's fees for those services were paid from the funds paid by SKAT, and Michael Ben-Jacob was then compensated for those services, in part, from the fees paid to Kaye Scholer.  Response to May

28, 2021 Interrogatories from Ben-Jacob Nos. 1, 2, & 3; Response to Request for Admission from Ben-Jacob Nos. 43, 44 & 45.

247.    The only funds SKAT paid in response to the Post-Argre Plans' reclaim applications that SKAT contends Michael Ben-Jacob personally received is that portion of his personal compensation SKAT contends derived from the legal fees paid to Kaye Scholer by the firm's clients for services provided in relation to those reclaim applications.  Response to September 3, 2021 Interrogatory from Ben-Jacob No. 13.

248.    Michael Ben-Jacob's compensation for 2014 from Kaye Scholer was $1,303,873. MBJ_0052786.

249.    Michael Ben-Jacob's compensation for 2015 from Kaye Scholer was $1,700,000. MBJ_0052795.

## XI.    ED&F Bellwether Plan Formation & Funding

250.    The American Investment Group of New York, L.P. Pension Plan ("AIG Plan") is a prototype 401(k) plan formed in October 2002, effective as of January 1, 2002.[1]

251.    Crema is the sole participant in and beneficiary of the AIG Plan.[2]

252.    Crema is a citizen of a State of the United States.[3]

253.    Crema is a U.S. citizen.[4]

254.    Crema was at all relevant times a trustee of the AIG Plan.[5]

---

1.    AIG_00000368.
2.    Amended Compl. ¶¶ 18, 47, 1:18-cv-09841-LAK, Dkt. No. 89 (Apr. 22, 2020); Answer ¶¶ 18, 47, 1:18-cv-09841-LAK, Dkt. No. 113 (July 2, 2020); Crema Dep. 153:6–14; AIG Plan Resp. to SKAT's First Req. for Admis. ("AIG Plan RFA") at Req. No. 36.
3.    Amended Compl. ¶ 18, 1:18-cv-09841-LAK, Dkt. No. 89 (Apr. 22, 2020); Answer ¶ 18, 1:18-cv-09841-LAK, Dkt. No. 113 (July 2, 2020).
4.    Amended Compl. ¶ 17, 1:18-cv-09841-LAK, Dkt. No. 89 (Apr. 22, 2020); Answer ¶ 17, 1:18-cv-09841-LAK, Dkt. No. 113 (July 2, 2020).
5.    Crema Dep. 88:14-18.

255.    Kaminer was at all relevant times a trustee of the AIG Plan.[6]

256.    Kaminer is a citizen of a State of the United States.[7]

257.    The sponsoring entity of the AIG Plan is American Investment Group of New York, L.P.[8]

258.    American Investment Group of New York, L.P., was formed in June 1984.[9]

259.    The AIG Plan received an individual determination letter from the Internal Revenue Service ("IRS"), stating that the plan was qualified as to form.[10]

260.    A Form 5500-EZ was filed for the AIG Plan with the IRS in 2013 and 2014.[11]

261.    The Riverside Associates Defined Benefit Plan ("Riverside Plan") was established in 1995.[12]

262.    At all relevant times, Schulman was the sole participant in the Riverside Plan.[13]

263.    Schulman is a U.S. citizen.[14]

264.    Schulman is citizen of the State of New York.[15]

265.    At all relevant times, Schulman was a trustee of the Riverside Plan.[16]

266.    The Riverside Plan has no sponsoring entity.[17]

---

6.    AIG_00000508.
7.    Amended Compl. ¶ 19, 1:18-cv-09841-LAK, Dkt. No. 89 (Apr. 22, 2020); Answer ¶ 19, 1:18-cv-09841-LAK, Dkt. No. 113 (July 2, 2020).
8.    AIG_00000368.
9.    AIG_00000315; ACER_00015105-21 at ACER_00015106; AIG_00000599-600 at AIG_00000599.
10.    ACER_00015174.
11.    AIGKAMCO_00001040; ACER_00009302.
12.    RIVER_00001979.
13.    David Schulman Dep. Tr. 59:14.
14.    Amended Compl. ¶ 17, 1:18-cv-09840-LAK, Dkt. No. 88 (Apr. 22, 2020); Answer ¶ 17, 1:18-cv-09840-LAK, Dkt. No. 110 (July 2, 2020).
15.    Amended Compl. ¶ 18, 1:18-cv-09840-LAK, Dkt. No. 88 (Apr. 22, 2020); Answer ¶ 18, 1:18-cv-09840-LAK, Dkt. No. 110 (July 2, 2020).
16.    D. Schulman Dep. 65:6-8.
17.    Riverside Plan's Answer to SKAT's First Set of Interrog. ("Riverside Interrog. Resp.") at Resp. No. 9. ("the Plan does not have a sponsoring entity as it is a defined benefit plan.").

267.    Schulman made a single contribution of $200,000 to the Riverside Plan in 1995.[18]

268.    The Riverside Plan received an individual determination letter from the IRS, stating that the plan was qualified as to form.[19]

269.    A Form 5500-EZ was filed for the Riverside Plan with the IRS in 2014 and 2015.[20]

## XII.    ED&F Custody Relationship, Powers of Attorney

270.    ED&F Man Capital Markets, Ltd. ("ED&F") is a London-based financial brokerage business, authorized and regulated by the Financial Conduct Authority ("FCA").[21]

271.    The AIG Plan was a client of ED&F.[22]

272.    The AIG Plan opened its account at ED&F in or about March 2012.[23]

273.    The Riverside Plan was a client of ED&F.[24]

274.    The Riverside Plan opened its account at ED&F in or about March 2012.[25]

275.    ED&F provided financial brokerage, settlement and custody services to the AIG Plan and the Riverside Plan (together, the "Plans") in relation to transactions in Danish securities.[26]

---

18.    Riverside Plan Resp. to SKAT's First Req. for Admis. ("Riverside Plan RFA") at Req. No. 1.
19.    ED&F-00162301.
20.    ACER_00009326; RIVER_00001953.
21.    See https://register.fca.org.uk/s/firm?id=001b000000MfISLAA3.
22.    See ED&F-00015573.
23.    See ED&F-00015573.
24.    See ED&F-00005435.
25.    See ED&F-00005435.
26.    AIG Plan RFA 54; ED&F-00039750 (AIG Plan General Ledger); Riverside Plan RFA at Req. No. 39; ED&F-00040756 (Riverside Plan General Ledger).

276.     The AIG Plan and the Riverside Plan each entered into the following agreements (the "Agreements"), which, among others, governed the Plans' respective relationships with ED&F.[27]

      a.      Terms and Conditions of Business;[28]

      b.      Variation to Terms of Business;[29]

      c.      Custody Agreement;[30]

      d.      Security and Set-Off Deed;[31] and

      e.      ISDA Master Agreement and Schedule.[32]

277.     Robert Crema, on behalf of the AIG Plan, executed a "Confirmation of Election Statement/FSA Client Categorisation."[33]

278.     David Schulman, on behalf of the Riverside Plan, executed a "Confirmation of Election Statement/FSA Client Categorisation."[34]

279.     Acer obtained legal advice on the Custody Agreement, the Security and Set-Off Deed, ISDA Schedule, GMSLA Schedule, and Terms and Conditions of Business and discussed the terms of the Custody Agreement, the Security and Set-Off Deed, ISDA Schedule, GMSLA Schedule, and Terms and Conditions of Business with ED&F on behalf of the Plans.[35]

---

27.  AIG Plan RFA at Req. No. 50; Riverside Plan RFA at Req. No. 35; Expert Report of Richard Salter QC, dated Feb. 1, 2022 ("Initial Salter Report") ¶ 89.3.
28.  ACER_00011097.
29.  ED&F Man00001026 (First Variation Letter to AIG Plan; March 26, 2012); AIG_00000604 (Second Variation Letter to AIG Plan; May 17, 2013); RIVER_00000308 (First Variation Letter to Riverside Plan; March 26, 2012); ACER_00000285 (Second Variation Letter to Riverside Plan; May 17, 2013).
30.  AIG_00000605 (AIG Plan); RIVER_00000221 (Riverside Plan).
31.  AIG_00000674 (AIG Plan); RIVER_00000291 (Riverside Plan).
32.  AIG_00000627 and AIG_00000655 (AIG Plan); RIVER_00000243 and RIVER_00000271 (Riverside Plan).
33.  AIG_00000624 (AIG Plan).
34.  RIVER_00000240 (Riverside Plan).
35.  *See, e.g.*, ED&F-00461071; ED&F-00461113; ACER_00022688; ACER_00022678; ACER_00022667; ACER_00024600; ACER_00024595.

280.    The Terms and Conditions of Business, the Custody Agreement, the Security and

Set-Off Deed, and the ISDA Master Agreement and Schedule are governed by English law. [36]

281.    Kaminer sent the Agreements to David Schulman, trustee for the Riverside Plan,

to be signed. [37]

282.    Kaminer sent the Agreements to Robert Crema, trustee for the AIG Plan, to be

signed. [38]

## XIII.    Acer Investment Group, LLC

283.    Acer Investment Group, LLC ("Acer") is a financial services firm incorporated in

the State of Delaware. [39]

284.    Acer was formed on October 27, 2000. [40]

285.    At all relevant times, Crema was an officer of Acer. [41]

286.    The AIG Plan authorized Acer to act as its representative and agent in connection

with the AIG Plan's trading in Danish securities conducted through ED&F. [42]

287.    The Riverside Plan authorized Acer to act as its representative and agent in

connection with the Riverside Plan's trading in Danish securities conducted through ED&F. [43]

---

36.    Expert Report of Felicity Toube QC, dated Dec. 17, 2021 ("Initial Toube Report") ¶ 16; Initial Salter Report ¶ 89.5.
37.    David Schulman Dep. Tr. 150:9-11; 143:22-144:7; 142:14-16.
38.    Robert Crema Dep. Tr. 168:1-19; 170:2-22.
39.    See Amended Compl. ¶ 20, 1:18-cv-09841-LAK, Dkt. No. 89 (Apr. 22, 2020); Answer ¶ 20, 1:18-cv-09841-LAK, Dkt. No. 156 (Jan. 15, 2021).
40.    ACER_00013287 at 89; ACER_00013891 at 95.
41.    Amended Compl. ¶ 18, 1:18-cv-09841-LAK, Dkt. No. 89 (Apr. 22, 2020); Answer ¶ 18, 1:18-cv-09841-LAK, Dkt. No. 113 (July 2, 2020).
42.    Amended Compl. ¶ 62, 1:18-cv-09841-LAK, Dkt. No. 89 (Apr. 22, 2020); Answer ¶ 62, 1:18-cv-09841-LAK, Dkt. No. 113 (July 2, 2020); Acer Investment Group LLC's Answer to SKAT's First Set of Interrog. ("Acer Interrog. Resp.") at Resp. No. 8; AIG_00000669 (Power of Attorney); Crema Dep. 89:4-21.
43.    Amended Compl. ¶ 60, 1:18-cv-09840-LAK, Dkt. No. 88 (Apr. 22, 2020); Answer ¶ 60, 1:18-cv-09840-LAK, Dkt. No. 110 (July 2, 2020); Acer Interrog. Resp. No. 8; RIVER_00000285 (Power of Attorney).

288.     Acer was authorized to manage the AIG Plan's account with ED&F pursuant to a power of attorney executed by the AIG Plan and signed by Robert Crema on behalf of the AIG Plan.[44]

289.     Acer was authorized to manage the Riverside Plan's account with ED&F pursuant to a power of attorney executed by the Riverside Plan and signed by David Schulman on behalf of the Riverside Plan.[45]

290.     By the powers of attorney, the AIG Plan and the Riverside Plan gave, and Acer accepted, full power and authority to, on behalf of the AIG Plan and Riverside Plan, invest and trade the cash, assets, and investments in the relevant plan's trading account at ED&F in accordance with agreements with ED&F.[46]

## XIV.   **The English Litigation**

291.     In 2018, SKAT filed claims against numerous parties, including ED&F, in the High Court of Justice, Business and Property Courts (the "English Action").  SKAT's claim against ED&F in the English Action concerned 420 tax vouchers prepared by ED&F, including tax vouchers used in tax refund applications submitted to SKAT by or on behalf of the AIG Plan and the Riverside Plan.  The 420 tax vouchers at issue in the English Action involve the same shares and transactions, and were included in the same withholding tax refund applications, as are at issue in the MDL.[47]

292.     In or about February 2020, SKAT filed a Re-Re-Amended Particulars of Claim and "Further Particulars Regarding the Validity of WHT Refund Applications" in the English

---

44.    AIG_00000669; AIG Plan RFA Req. No. 55.
45.    Riverside Plan RFA Req. Nos. 36, 41; RIVER_00000285.
46.    AIG_00000669 (Power of Attorney)(Acer given "full power and authority to invest and trade the cash, assets and investments in the Account in accordance with the Agreement (including the cover letter, account opening form and terms of business) . . . ."); RIVER_00000291 (Power of Attorney)(same).
47.    See SKAT Particulars of Claim.

Action and set out its allegations in Re-Amended Schedule 5T to the Re-Re-Amended Particulars of Claim.

293.    Paragraph [3(k)] of SKAT's  Re-Re-Amended Particulars of Claim expressly stated that "SKAT does not allege fraud or dishonesty against ED&F Man, or that the ED&F Man Applications were made as part of a fraudulent scheme."  Rather, SKAT's allegations as to why the representations were false were contained in paragraph 18 of the Re-Amended Schedule 5T.[48]

294.    In March 2021, the English High Court of Justice conducted a hearing on the preliminary issue of whether any of SKAT's claims alleged in the English Action were inadmissible under "Dicey Rule 3."

295.    On April 27, 2021, Mr. Justice Andrew Baker dismissed all of the claims asserted by SKAT in the English Action on the ground that the claims were inadmissible under Dicey Rule 3, which he concluded was not a rule of jurisdiction but a substantive rule of law.  See Order dated April 27, 2021; Approved Judgment dated April 27, 2021.  Mr. Justice Andrew Baker concluded that SKAT's claims, in substance, sought "indirectly to enforce . . . Danish revenue law."  See Approved Judgment dated April 27, 2021.

296.    SKAT appealed Mr. Justice Andrew Baker's order on two grounds.  Ground 1 was that the Judge had erred in law in concluding that SKAT's alleged claims were barred because they fell within the proper scope of Dicey Rule 3.  Ground 2 was that the Judge had erred in law by concluding that Dicey Rule 3 remained applicable to and barred SKAT's claims against defendants domiciled in jurisdictions subject to the EU Brussels Recast Regulation (the "Brussels Regulation"), notwithstanding that such claims were "civil and commercial matters"

---

48.    Schedule 5T 18(e).

under the Brussels Regulation.   *See* Court of Appeal Approved Judgment dated February 25, 2022.

297.    SKAT chose not to pursue its appeal on Ground 1 as against ED&F.  SKAT accepted in its appeal (subject to its contentions as to the effects of the Brussels Regulation) that Dicey Rule 3 applied to preclude the claims against ED&F.  *See* Court of Appeal Approved Judgment dated February 25, 2022.

298.    On February 25, 2022, the English Court of Appeal affirmed the dismissal of SKAT's claims against ED&F but allowed SKAT's appeal on Ground 1 with respect to defendants other than ED&F. *Id.*

299.    However, because SKAT had not pursued Ground 1 against ED&F, SKAT was "fixed with [Mr Justice Andrew Baker's] conclusion that, so far as ED&F Man are concerned, Dicey Rule 3 makes the claim inadmissible" and that SKAT had to "accept" that Dicey Rule 3 applied "in relation to the claim against ED&F Man." *See id.*

## XV.    Danish Issuers / Dividend Events[49]

300.    Chr Hansen Holding A/S is a Danish company, which issued the following dividend:

|                               |              |
| ----------------------------- | ------------ |
| Dividend Amount Per Share:    | DKK 6.26     |
| Ex-Date:                      | 11/27/2013   |
| Record Date:                  | 11/29/2013   |
| Pay Date:                     | 12/2/2013    |
|                               |              |
| Dividend Amount Per Share:    | DKK 3.77     |
| Ex-Date:                      | 11/28/2014   |
| Record Date:                  | 12/1/2014    |
| Pay Date:                     | 12/2/2014    |

301.    Coloplast A/S is a Danish company, which issued the following dividends:

|                               |              |
| ----------------------------- | ------------ |
| Dividend Amount Per Share:    | DKK 7.00     |

---

[49]    The parties stipulate to the facts in paragraphs 300 - 315.

|                            |            |
|----------------------------|------------|
| Ex-Date:                   | 12/6/2013  |
| Record Date:               | 12/10/2013 |
| Pay Date:                  | 12/11/2013 |
|                            |            |
| Dividend Amount Per Share: | DKK 4.00   |
| Ex-Date:                   | 5/9/2014   |
| Record Date:               | 5/13/2014  |
| Pay Date:                  | 5/14/2014  |
|                            |            |
| Dividend Amount Per Share: | DKK 7.50   |
| Ex-Date:                   | 12/5/2014  |
| Record Date:               | 12/8/2014  |
| Pay Date:                  | 12/9/2014  |
|                            |            |
| Dividend Amount Per Share: | DKK 4.50   |
| Ex-Date:                   | 5/7/2015   |
| Record Date:               | 5/8/2015   |
| Pay Date:                  | 5/11/2015  |

302.    Danske Bank A/S is a Danish company, which issued the following dividends:

|                            |           |
|----------------------------|-----------|
| Dividend Amount Per Share: | DKK 2.00  |
| Ex-Date:                   | 3/19/2014 |
| Record Date:               | 3/21/2014 |
| Pay Date:                  | 3/24/2014 |
|                            |           |
| Dividend Amount Per Share: | DKK 5.50  |
| Ex-Date:                   | 3/19/2015 |
| Record Date:               | 3/20/2015 |
| Pay Date:                  | 3/23/2015 |

303.    D/S Norden A/S is a Danish company, which issued the following dividend:

|                            |           |
|----------------------------|-----------|
| Dividend Amount Per Share: | DKK 3.00  |
| Ex-Date:                   | 4/25/2013 |
| Record Date:               | 4/30/2013 |
| Pay Date:                  | 5/1/2013  |
|                            |           |
| Dividend Amount Per Share: | DKK 5.00  |
| Ex-Date:                   | 4/24/2014 |
| Record Date:               | 4/28/2014 |
| Pay Date:                  | 4/29/2014 |

304.    DSV A/S is a Danish company, which issued the following dividend:

|                            |          |
|----------------------------|----------|
| Dividend Amount Per Share: | DKK 1.25 |

| | |
|---|---|
| Ex-Date: | 3/22/2013 |
| Record Date: | 3/26/2013 |
| Pay Date: | 3/27/2013 |
| | |
| Dividend Amount Per Share: | DKK 1.60 |
| Ex-Date: | 3/13/2015 |
| Record Date: | 3/16/2015 |
| Pay Date: | 3/17/2015 |

305.     AP Moeller - Maersk A/S is a Danish company, which issued the following

dividends:

| | |
|---|---|
| Dividend Amount Per Share: | DKK 1200.00 |
| Ex-Date: | 4/12/2013 |
| Record Date: | 4/16/2013 |
| Pay Date: | 4/17/2013 |
| | |
| Dividend Amount Per Share: | DKK 1400.00 |
| Ex-Date: | 4/1/2014 |
| Record Date: | 4/3/2014 |
| Pay Date: | 4/4/2014 |
| | |
| Dividend Amount Per Share: | DKK 1971.00 |
| Ex-Date: | 3/31/2015 |
| Record Date: | 4/1/2015 |
| Pay Date: | 4/7/2015 |

306.     Novo Nordisk A/S is a Danish company, which issued the following dividends:

| | |
|---|---|
| Dividend Amount Per Share: | DKK 18.00 |
| Ex-Date: | 3/21/2013 |
| Record Date: | 3/25/2013 |
| Pay Date: | 3/26/2013 |
| | |
| Dividend Amount Per Share: | DKK 4.50 |
| Ex-Date: | 3/21/2014 |
| Record Date: | 3/25/2014 |
| Pay Date: | 3/26/2014 |
| | |
| Dividend Amount Per Share: | DKK 5.00 |
| Ex-Date: | 3/20/2015 |
| Record Date: | 3/23/2015 |
| Pay Date: | 3/24/2015 |

307.     Novozymes A/S is a Danish company, which issued the following dividends:

Dividend Amount Per Share:    DKK 2.20
Ex-Date:    3/1/2013
Record Date:    3/5/2013
Pay Date:    3/6/2013

Dividend Amount Per Share:    DKK 2.50
Ex-Date:    2/27/2014
Record Date:    3/3/2014
Pay Date:    3/4/2014

Dividend Amount Per Share:    DKK 3.00
Ex-Date:    2/26/2015
Record Date:    2/27/2015
Pay Date:    3/2/2015

308.    Pandora A/S is a Danish company, which issued the following dividend:

Dividend Amount Per Share:    DKK 5.50
Ex-Date:    3/21/2013
Record Date:    3/25/2013
Pay Date:    3/26/2013

Dividend Amount Per Share:    DKK 6.50
Ex-Date:    3/20/2014
Record Date:    3/24/2014
Pay Date:    3/25/2014

Dividend Amount Per Share:    DKK 9.00
Ex-Date:    3/19/2015
Record Date:    3/20/2015
Pay Date:    3/23/2015

309.    TDC A/S is a Danish company, which issued the following dividends:

Dividend Amount Per Share:    DKK 2.30
Ex-Date:    3/8/2013
Record Date:    3/12/2013
Pay Date:    3/13/2013

Dividend Amount Per Share:    DKK 1.50
Ex-Date:    8/8/2013
Record Date:    8/12/2013
Pay Date:    8/13/2013

Dividend Amount Per Share:    DKK 2.20
Ex-Date:    3/7/2014

| | |
|---|---|
| Record Date: | 3/11/2014 |
| Pay Date: | 3/12/2014 |
| | |
| Dividend Amount Per Share: | DKK 1.50 |
| Ex-Date: | 8/8/2014 |
| Record Date: | 8/12/2014 |
| Pay Date: | 8/13/2014 |
| | |
| Dividend Amount Per Share: | DKK 1.00 |
| Ex-Date: | 3/6/2015 |
| Record Date: | 3/9/2015 |
| Pay Date: | 3/10/2015 |

310.　Carlsberg A/S is a Danish company, which issued the following dividends:

| | |
|---|---|
| Dividend Amount Per Share: | DKK 6.00 |
| Ex-Date: | 3/22/2013 |
| Record Date: | 3/26/2013 |
| Pay Date: | 3/27/2013 |
| | |
| Dividend Amount Per Share: | DKK 8.00 |
| Ex-Date: | 3/21/2014 |
| Record Date: | 3/25/2014 |
| Pay Date: | 3/26/2014 |
| | |
| Dividend Amount Per Share: | DKK 9.00 |
| Ex-Date: | 3/27/2015 |
| Record Date: | 3/30/2015 |
| Pay Date: | 3/31/2015 |

311.　FLSmidth & Co. A/S is a Danish company, which issued the following dividends:

| | |
|---|---|
| Dividend Amount Per Share: | DKK 9.00 |
| Ex-Date: | 4/8/2013 |
| Record Date: | 4/10/2013 |
| Pay Date: | 4/11/2013 |
| | |
| Dividend Amount Per Share: | DKK 9.00 |
| Ex-Date: | 3/27/2015 |
| Record Date: | 3/30/2015 |
| Pay Date: | 3/31/2015 |

312.　H. Lundbeck A/S is a Danish company, which issued the following dividends:

| | |
|---|---|
| Dividend Amount Per Share: | DKK 2.00 |
| Ex-Date: | 3/22/2013 |

|  | |
|---|---|
| Record Date: | 3/26/2013 |
| Pay Date: | 3/27/2013 |

313.    Tryg A/S is a Danish company, which issued the following dividends:

| | |
|---|---|
| Dividend Amount Per Share: | DKK 26.00 |
| Ex-Date: | 4/19/2013 |
| Record Date: | 4/23/2013 |
| Pay Date: | 4/24/2013 |

| | |
|---|---|
| Dividend Amount Per Share: | DKK 27.00 |
| Ex-Date: | 4/4/2014 |
| Record Date: | 4/8/2014 |
| Pay Date: | 4/9/2014 |

| | |
|---|---|
| Dividend Amount Per Share: | DKK 29.00 |
| Ex-Date: | 3/26/2015 |
| Record Date: | 3/27/2015 |
| Pay Date: | 3/30/2015 |

314.    GN Store Nord A/S is a Danish company, which issued the following dividends:

| | |
|---|---|
| Dividend Amount Per Share: | DKK 0.90 |
| Ex-Date: | 3/20/2015 |
| Record Date: | 3/23/2015 |
| Pay Date: | 3/24/2015 |

315.    Vestas Wind Systems A/S is a Danish company, which issued the following dividends:

| | |
|---|---|
| Dividend Amount Per Share: | DKK 3.90 |
| Ex-Date: | 3/31/2015 |
| Record Date: | 4/1/2015 |
| Pay Date: | 4/7/2015 |

## XVI.  **The AIG Plan and Riverside Plan's Trades in Danish Securities**

316.    In Denmark, all securities issued by Danish listed companies are housed at a central securities depository ("CSD") known as VP Securities.  VP Securities acts as the "record keeper of the general ledger" of each Danish issued security and issues ISIN codes for them so

that they can be held in custodial accounts, and settlement of transactions in those securities may be recorded by VP Securities.  *See* Helen Sorensen Dep. Tr. at 34:8-35:9.

317.    The transactions in Danish securities undertaken by the AIG Plan and the Riverside Plan through ED&F were all over-the-counter ("OTC") transactions.[50]

318.    The AIG Plan engaged in a total of 14 relevant trades in Danish securities as identified on Appendix B.[51]

319.    The Riverside Plan engaged in a total of 11 relevant trades in Danish securities as identified in Appendix B.[52]

320.    For each transaction, ED&F executed a trade on behalf of the AIG or Riverside Plans to acquire the shares of Danish securities on the trade date, which in each case was before the ex-dividend date of the relevant Danish securities.

321.    For each trade, Acer sent a written trade instruction on behalf of the AIG or Riverside Plans to ED&F.  In every case, the decision to purchase shares of Danish securities was communicated to ED&F by Acer on behalf of the AIG or Riverside Plans.

322.    On the trade date for each trade, Acer received a trade confirmation from ED&F that included a description of the securities and stated the number of shares purchased by the AIG or Riverside Plans, the trade price, and the trade date.[53]

## XVII. Tax Vouchers Prepared by ED&F for the Riverside Plan

323.    ED&F prepared tax vouchers on behalf of the AIG Plan and the Riverside Plan (the "Tax Vouchers").

a.    Kaminer instructed ED&F to send the Tax Vouchers for the Acer Plans to

---

50.    The parties stipulate to this fact.
51.    Appendix B.
52.    Appendix B.
53.    *See*, *e.g.*, ED&F-00040949.

Goal Taxback Limited ("Goal").[54]

    b.    Kaminer testified that her purpose in making this request was to facilitate submission of reclaim applications for dividend withholding tax to SKAT on behalf of, among others, the AIG Plan and the Riverside Plan.[55]

    c.    On the instructions of Acer, ED&F emailed the Tax Vouchers to Goal, copying Acer.

324.    ED&F prepared a tax voucher for the Riverside Plan in which it "confirms" that the Riverside Plan held 2,150,000 shares of TDC A/S stock over the "dividend date". The tax voucher indicates "Amount Received" in the amount of DKK 3,452,900.00 and "WHT Suffered" in the amount of DKK 1,277,100.00 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the Riverside Plan.[56]

325.    ED&F prepared a tax voucher for the Riverside Plan in which it "confirms" that the Riverside Plan held 2,000,000 shares of Danske A/S stock over the "dividend date". The tax voucher indicates "Amount Received" in the amount of DKK 2,920,000.00 and "WHT Suffered" in the amount of DKK 1,080,000.00 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the Riverside Plan.[57]

---

54.    S. Kaminer Dep. Tr. Vol. II 318:8-14.
55.    *Id.*
56.    ED&F-00041310.
57.    ED&F-00046709.

326.     ED&F prepared a tax voucher for the Riverside Plan in which it "confirms" that the Riverside Plan held 2,000,000 shares of Novo Nordisk A/S stock over the "dividend date". The tax voucher indicates "Amount Received" in the amount of DKK 6,570,000.00 and "WHT Suffered" in the amount of DKK 2,430,000.00 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the Riverside Plan.[58]

327.     ED&F prepared a tax voucher for the Riverside Plan in which it "confirms" that the Riverside Plan held 175,000 shares of Tryg A/S stock over the "dividend date". The tax voucher indicates "Amount Received" in the amount of DKK 3,449,250.00 and "WHT Suffered" in the amount of DKK 1,275,750.00 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the Riverside Plan.[59]

328.     ED&F prepared a tax voucher for the Riverside Plan in which it "confirms" that the Riverside Plan held 322,500 shares of D/S Norden A/S stock over the "dividend date". The tax voucher indicates "Amount Received" in the amount of DKK 1,177,125.00 and "WHT Suffered" in the amount of DKK 435,375.00 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the Riverside Plan.[60]

---

58.   ED&F-00049490.
59.   ED&F-00044891.
60.   ED&F-00076758.

329.    ED&F prepared a tax voucher for the Riverside Plan in which it "confirms" that the Riverside Plan held 850,000 shares of Coloplast A/S stock over the "dividend date". The tax voucher indicates "Amount Received" in the amount of DKK 2,482,000.00 and "WHT Suffered" in the amount of DKK 918,000.00 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the Riverside Plan.[61]

330.    ED&F prepared a tax voucher for the Riverside Plan in which it "confirms" that the Riverside Plan held 2,000,000 shares of TDC A/S stock over the "dividend date". The tax voucher indicates "Amount Received" in the amount of DKK 1,460,000 and "WHT Suffered" in the amount of DKK 540,000 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the Riverside Plan.[62]

331.    ED&F prepared a tax voucher for the Riverside Plan in which it "confirms" that the Riverside Plan held 850,000 shares of DSV A/S stock over the "dividend date". The tax voucher indicates "Amount Received" in the amount of DKK 992,800.00 and "WHT Suffered" in the amount of DKK 367,200 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the Riverside Plan.[63]

---

61.    ED&F-00045466.
62.    ED&F-00043382.
63.    ED&F-00038285.

332.     ED&F prepared a tax voucher for the Riverside Plan in which it "confirms" that the Riverside Plan held 300,000 shares of Pandora A/S stock over the "dividend date".  The tax voucher indicates "Amount Received" in the amount of DKK 1,971,000.00 and "WHT Suffered" in the amount of DKK 729,000 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the Riverside Plan.[64]

333.     ED&F prepared a tax voucher for the Riverside Plan in which it "confirms" that the Riverside Plan held 1,200,000 shares of Danske A/S stock over the "dividend date".  The tax voucher indicates "Amount Received" in the amount of DKK 4,818,000.00 and indicates "WHT Suffered" in the amount of DKK 1,782,000 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the Riverside Plan.[65]

334.     ED&F prepared a tax voucher for the Riverside Plan in which it "confirms" that the Riverside Plan held 1,400,000 shares of Novo Nordisk A/S stock over the "dividend date". The tax voucher indicates "Amount Received" in the amount of DKK 5,110,000.00 and "WHT Suffered" in the amount of DKK 1,890,000 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the Riverside Plan.[66]

---

64.   ED&F-00043997.
65.   ED&F-00047364.
66.   ED&F-00049905.

## XVIII. Tax Vouchers Prepared by ED&F for the AIG Plan

335.    ED&F prepared a tax voucher for the AIG Plan in which it "confirms" that the AIG Plan held 500,000 shares of Coloplast A/S stock over the "dividend date".  The tax voucher indicates "Amount Received" in the amount of DKK 2,555,000 and "WHT Suffered" in the amount of DKK 945,000 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the AIG Plan.[67]

336.    ED&F prepared a tax voucher for the AIG Plan in which it "confirms" that the AIG Plan held 5,000,000 shares of TDC A/S stock over the "dividend date".  The tax voucher indicates "Amount Received" in the amount of DKK 8,030,000.00 and "WHT Suffered" in the amount of DKK 2,970,000.00 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the AIG Plan.[68]

337.    ED&F prepared a tax voucher for the AIG Plan in which it "confirms" that the AIG Plan held 7,750,000 shares of Danske A/S stock over the "dividend date".  The tax voucher indicates "Amount Received" in the amount of DKK 11,315,000.00 and "WHT Suffered" in the amount of DKK 4,185,000 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding"

---

67.    ED&F-00044985.
68.    ED&F-00040919.

and that the "dividends specified on this credit advice were paid net of withholding tax to" the AIG Plan.[69]

338.    ED&F prepared a tax voucher for the AIG Plan in which it "confirms" that the AIG Plan held 3,500,000 shares of Novo Nordisk A/S stock over the "dividend date".  The tax voucher indicates "Amount Received" in the amount of DKK 11,497,500.00 and "WHT Suffered" in the amount of DKK 4,252,500.00 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the AIG Plan.[70]

339.    ED&F prepared a tax voucher for the AIG Plan in which it "confirms" that the AIG Plan held 750,000 shares of Novozymes A/S stock over the "dividend date".  The tax voucher indicates "Amount Received" in the amount of DKK 1,642,500.00 and "WHT Suffered" in the amount of DKK 607,500 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the AIG Plan.[71]

340.    ED&F prepared a tax voucher for the AIG Plan in which it "confirms" that the AIG Plan held 50,000 shares of Tryg A/S stock over the "dividend date".  The tax voucher indicates "Amount Received" in the amount of DKK 985,500 and "WHT Suffered" in the amount of DKK 364,500 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and

---

69.   ED&F-00045804.
70.   ED&F-00048728.
71.   ED&F-00076389.

that the "dividends specified on this credit advice were paid net of withholding tax to" the AIG Plan.[72]

341.    ED&F prepared a tax voucher for the AIG Plan in which it "confirms" that the AIG Plan held 1,000 shares of AP Moeller – Maersk A/S B stock over the "dividend date".  The tax voucher indicates "Amount Received" in the amount of DKK 1,022,000.00 and "WHT Suffered" in the amount of DKK 378,000 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the AIG Plan.[73]

342.    ED&F prepared a tax voucher for the AIG Plan in which it "confirms" that the AIG Plan held 3,400,000 shares of TDCA/S stock over the "dividend date".  The tax voucher indicates "Amount Received" in the amount of DKK 3,723,000.00 and "WHT Suffered" in the amount of DKK 1,377,000 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the AIG Plan.[74]

343.    ED&F prepared a tax voucher for the AIG Plan in which it "confirms" that the AIG Plan held 800,000 shares of Chr. Hansen Holding A/S stock over the "dividend date".  The tax voucher indicates "Amount Received" in the amount of DKK 2,201,680 and "WHT Suffered" in the amount of DKK 814,320 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in

---

72.    ED&F-00044535.
73.    ED&F-00077536.
74.    ED&F-00042261.

the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the AIG Plan.[75]

344.    ED&F prepared a tax voucher for the AIG Plan in which it "confirms" that the AIG Plan held 1,500,000 shares of Coloplast A/S stock over the "dividend date".  The tax voucher indicates "Amount Received" of DKK 8,212,500 and "WHT Suffered" in the amount of DKK 3,037,500 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the AIG Plan.[76]

345.    ED&F prepared a tax voucher for the AIG Plan in which it "confirms" that the AIG Plan held 4,000 shares of AP Moeller - Maersk A/S B stock over the "dividend date".  The tax voucher indicates "Amount Received" in the amount of DKK 5,755,320.00 and "WHT Suffered" in the amount of DKK 2,128,680.00 at a tax rate of 27% of the gross dividend amount. The tax voucher also stated that "ED&F Man Capital Markets Limited has no beneficial interest in the holding" and that the "dividends specified on this credit advice were paid net of withholding tax to" the AIG Plan.[77]

## XIX.   ED&F Trades – Funding

346.    The AIG Plan initially funded its ED&F account with $200,000.[78]

347.    The Riverside Plan initially funded its ED&F account with $300,000.[79]

348.    ED&F provided financing to the AIG Plan and the Riverside Plan to facilitate all of the AIG Plan and Riverside Plan's purchases of Danish securities.[80]

---

75.    ED&F-00026785.
76.    ED&F-00045535.
77.    ED&F-00078083.
78.    ED&F-00039750.
79.    ED&F-00040756.
80.    AIG Plan RFA Req. No. 40; Riverside RFA Req. No. 24; Acer RFA Req. No. 178.

349.     Without the financing provided by ED&F, the AIG Plan and the Riverside Plan did not have sufficient capital to pay for all of the Danish securities identified in Appendix B, and in making the trades in Danish securities, incurred financing costs payable to ED&F.[81]

## XX.     Reclaim Submissions to SKAT on Behalf of the AIG Plan and the Riverside Plan

350.     The AIG Plan authorized Goal to prepare reclaims for dividend withholding tax and to submit the reclaims to SKAT on its behalf.[82]

351.     Stacey Kaminer served at all relevant times as the authorized representative for the AIG Plan with respect to the AIG Plan's withholding-tax refund claims submitted by Goal.[83]

352.     Goal acted as agent for the AIG Plan under a power of attorney granted by the AIG Plan and signed by Stacey Kaminer as trustee of the AIG Plan.[84]

353.     The Riverside Plan authorized Goal to prepare reclaims for dividend withholding tax and to submit the reclaims to SKAT on its behalf.[85]

354.     At all relevant times, Schulman served as the authorized representative for the Riverside Plan with respect to the Riverside Plan's withholding-tax refund claims submitted by Goal.[86]

355.     Goal acted as agent for the Riverside Plan under a power of attorney granted by the Riverside Plan and signed by Schulman as trustee of the Riverside Plan.[87]

---

81.    AIG Plan RFA Resp. No. 42; Riverside Plan RFA Resp. No. 26.
82.    Amended Compl. ¶ 49, 1:18-cv-09841-LAK, Dkt. No. 89 (Apr. 22, 2020); Answer ¶ 49, 1:18-cv-09841-LAK, Dkt. No. 113 (July 2, 2020); Stacey Kaminer Dep. Tr. Vol. II 312:12-14; 324:13-23; AIG Plan RFA Resp. No. 38.
83.    Amended Compl. ¶ 19, 1:18-cv-09841-LAK, Dkt. No. 89 (Apr. 22, 2020); Answer ¶ 19, 1:18-cv-09841-LAK, Dkt. No. 113 (July 2, 2020); S Kaminer Dep. 373:17-19, 374:5-9.
84.    ACER_00016703.
85.    Amended Compl. ¶ 48, 1:18-cv-09840-LAK, Dkt. No. 88 (Apr. 22, 2020); Answer ¶ 48, 1:18-cv-09840-LAK, Dkt. No. 110 (July 2, 2020); .Stacey Kaminer Dep. Tr. Vol. II 312:12-14; 324:13-23; Riverside Plan RFA Resp. No. 19; ACER_00016920.
86.    Amended Compl. ¶ 18, 1:18-cv-09840-LAK, Dkt. No. 88 (Apr. 22, 2020); Answer ¶ 18, 1:18-cv-09840-LAK, Dkt. No. 110 (July 2, 2020)
87.    ACER_00016918.

356.    All of the withholding tax refund applications submitted to SKAT on behalf of the AIG Plan were submitted by Goal, as agent for the AIG Plan.[88]

357.    All of the withholding tax refund applications submitted to SKAT on behalf of the Riverside Plan were submitted by Goal, as agent for the Riverside Plan.[89]

358.    Goal, as agent for the AIG Plan, submitted nine applications for refunds of dividend withholding tax to SKAT.[90]

359.    The AIG Plan Applications each included one or more Tax Vouchers created by ED&F.[91]

360.    In connection with each dividend withholding tax refund claim submitted to SKAT on behalf of the AIG Plan, Goal provided SKAT with Internal Revenue Code Form 6166 (Certification of U.S. Tax Residency) ("Form 6166").[92]

361.    The Form 6166 stated that to the best of the knowledge of the IRS, the AIG Plan "is a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the U.S. Internal Revenue Code, which is exempt from U.S. taxation under section 501(a), and is a resident of the United States of America for purposes of U.S. taxation."[93]

362.    Each Form 6166 submitted to SKAT on behalf of the AIG Plan was prepared by the IRS.[94]

---

88.    Amended Compl. ¶ 36, 1:18-cv-09841-LAK, Dkt. No. 89 (Apr. 22, 2020); Answer ¶ 36, 1:18-cv-09841-LAK, Dkt. No. 113 (July 2, 2020).
89.    Amended Compl. ¶ 35, 1:18-cv-09840-LAK, Dkt. No. 88 (Apr. 22, 2020); Answer ¶ 35, 1:18-cv-09840-LAK, Dkt. No. 110 (July 2, 2020).
90.    AIG Plan RFA Resp. Nos. 23, 37 – 39; see also SKAT_MDL_001_017584 – 96; SKAT_MDL_001_00081821 – 65.
91.    SKAT_MDL_001_017584 – 96; SKAT_MDL_001_00081821 – 65.
92.    SKAT's Amended Complaint against AIG Plan, ¶ 30; AIG Plan's Answer to Amended Complaint, ¶ 30.
93.    See e.g. SKAT_MDL_001_017588 (AIG Form 6166).
94.    SKAT's Response to Acer's Second Request for Admission No. 48.

363.    SKAT does not allege that the IRS engaged in any fraudulent activity in connection with the issuance of any Form 6166 (Certification of U.S. Tax Residency) appended to any dividend withholding tax refund claims submitted to SKAT on behalf of the AIG Plan.[95]

364.    SKAT does not allege the IRS made any false statements or misrepresentations to SKAT in connection with the issuance of any Form 6166 (Certification of U.S. Tax Residency) appended to any dividend withholding tax refund claims submitted to SKAT on behalf of the AIG Plan.[96]

365.    In connection with each dividend withholding tax refund claim submitted to SKAT on behalf of the AIG Plan, SKAT accepted a copy of IRS Form 6166 as sufficient evidence that the AIG Plan was a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the U.S. Internal Revenue Code.[97]

366.    In connection with each dividend withholding tax refund claim submitted to SKAT on behalf of the AIG Plan, SKAT did not require the AIG Plan to provide any document other than a copy of IRS Form 6166 to demonstrate that it was a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the U.S. Internal Revenue Code.[98]

367.    Goal, as agent for the Riverside Plan, submitted 8 applications for refunds of dividend withholding tax to SKAT.[99]

368.    The Riverside Plan Applications each included one or more Tax Vouchers created by ED&F.[100]

---

95.   SKAT's Response to Defendants' Request for Admission No. 127.
96.   SKAT's Response to Defendants' Request for Admission No. 128.
97.   SKAT's Response to Defendants' Request for Admission No. 52.
98.   SKAT's Response to Defendants' Request for Admission No. 53.
99.   Riverside Plan RFA Resp. Nos. 9, 19 – 21; *see also* SKAT_MDL_001_00082179 – 240.
100.  SKAT_MDL_001_00082179 – 240.

369.    In connection with each dividend withholding tax refund claim submitted to SKAT on behalf of the Riverside Plan, Goal provided SKAT with Form 6166. [101]

370.    Each Form 6166 submitted to SKAT on behalf of the Riverside Plan was prepared by the IRS. [102]

371.    The Form 6166 stated that to the best of the knowledge of the IRS, the Riverside Plan "is a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the U.S. Internal Revenue Code, which is exempt from U.S. taxation under section 501(a), and is a resident of the United States of America for purposes of U.S. taxation." [103]

372.    SKAT does not allege that the IRS engaged in any fraudulent activity in connection with the issuance of any Form 6166 (Certification of U.S. Tax Residency) appended to any dividend withholding tax refund claims submitted to SKAT on behalf of the Riverside Plan. [104]

373.    SKAT does not allege the IRS made any false statements or misrepresentations to SKAT in connection with the issuance of any Form 6166 (Certification of U.S. Tax Residency) appended to any dividend withholding tax refund claims submitted to SKAT on behalf of the Riverside Plan. [105]

374.    In connection with each dividend withholding tax refund claim submitted to SKAT on behalf of the Riverside Plan, SKAT accepted a copy of IRS Form 6166 as sufficient

101.   SKAT's Amended Complaint against Riverside Plan, ¶ 29; Riverside Plan's Answer to Amended Complaint, ¶ 29.
102.   SKAT's Response to Acer's Second Request for Admission No. 48.
103.   *See e.g.* SKAT_MDL_001_00082192 (Riverside Plan Form 6166).
104.   SKAT's Response to Defendants' Request for Admission No. 127.
105.   SKAT's Response to Defendants' Request for Admission No. 128.

evidence that the Riverside Plan was a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the U.S. Internal Revenue Code.[106]

375.    In connection with each dividend withholding tax refund claim submitted to SKAT on behalf of the Riverside Plan, SKAT did not require the Riverside Plan to provide any document other than a copy of IRS Form 6166 to demonstrate that it was a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the U.S. Internal Revenue Code.[107]

376.    In total, the AIG Plan, through its agent Goal, claimed dividend withholding tax refunds for the AIG Plan in the amount of DKK 21,060,000 and, subsequently, SKAT made payments to Goal in the amount of DKK 21,060,000.[108]

377.    In total, the Riverside Plan, through its agent Goal, claimed dividend withholding tax refunds for the Riverside Plan in the amount of DKK 12,724,425 and, subsequently, SKAT made payments to Goal in the amount of DKK 12,724,425.[109]

378.    SKAT paid each of these refunds to payment agent Goal as directed by Goal, as agent for the Plans.[110]

379.    For each refund claim, Goal was contractually entitled to 0.85% of the refund amount as a fee, capped at $16,400 or €12,000.[111]

---

106.  SKAT's Response to Defendants' Request for Admission No. 52.
107.  SKAT's Response to Defendants' Request for Admission No. 53.
108.  Acer RFA Req. No. 24; AIG Plan RFA Req. No. 35; SKAT_MDL_001_00352582 (945,000 DKK);
      SKAT_MDL_00352551 (2,970,000 DKK); SKAT_MDL_001_00352440 (8,437,500 DKK);
      SKAT_MDL_00352471 (742,500 DKK); SKAT_MDL_001_00352964 (1,377,000 DKK);
      SKAT_MDL_001_00352880 (814,320 DKK); SKAT_MDL_001_00353051 (3,037,500 DKK);
      SKAT_MDL_001_00352510 (607,500 DKK); SKAT_MDL_001_00352681 (2,128,680 DKK).
109.  SKAT_MDL_001_00352551 (1,277,100 DKK); SKAT_MDL_001_00352440 (3,510,000 DKK);
      SKAT_MDL_001_00352486 (907,200 DKK); SKAT_MDL_001_00352471 (1,275,750 DKK);
      SKAT_MDL_001_00352735 (4,401,000 DKK); SKAT_MDL_001_00353024 (1,353,357 DKK).
110.  See e.g. ACER_00000190; ACER_00001016 – 25; ACER_00001026; ACER_00001065; ED&F-00039750 –
      ED&F-00039785 (AIG Plan); ED&F-00040756 - ED&F-00040778 (Riverside Plan).
111.  ACER_00002224; ACER_00016709 (AIG Plan Goal SLA); ACER_00016920 (Riverside Plan Goal SLA).

380.    Goal transferred the remainder of the funds from the refund payments to ED&F, which credited the Plans' custodial accounts with those amounts.[112]

381.    The AIG Plan received the full amount of the refunds paid by SKAT following SKAT's receipt of the AIG Plan's withholding tax reclaim applications, minus the fee deducted by Goal.[113]

382.    The Riverside Plan received the full amount of the refunds paid by SKAT following SKAT's receipt of the Riverside Plan's withholding tax reclaim applications, minus the fee deducted by Goal.[114]

## XXI.   Fees and Payments to ED&F

383.    In addition to financing fees, ED&F charged the AIG Plan and the Riverside Plan Custody and Clearance fees (the "Custody and Clearance Fees") for custody and brokerage services provided in relation to transactions it facilitated for the Plans.[115]

384.    ED&F charged a total of 11,307,554.73 DKK in Custody and Clearance Fees to the AIG Plan, as follows:[116]

| Security | | ED&F Custody Fee (DKK) | ED&F Clearance Charge (DKK) | Total (DKK) |
|---|---|---|---|---|
| Coloplast A/S - B | | 35,000.00 | 225,361.27 | 260,361.27 |
| TDC A/S | | 110,000.00 | 1,069,829.00 | 1,179,829.00 |
| Danske Bank A/S | | 155,000.00 | 1,242,262.09 | 1,397,262.09 |
| Novo Nordisk A/S - B | | 157,500.00 | 2,838,020.00 | 2,995,520.00 |
| A.P. Møller Mærsk A/S - B | | 14,000.00 | 64,223.00 | 78,223.00 |
| Tryg A/S | | 13,500.00 | 354,411.52 | 367,911.52 |
| TDC A/S | | 51,000.00 | 387,337.67 | 438,337.67 |
| Chr. Hansen Holding A/S | | - | 2,731,236.23 | 2,731,236.23 |
| Coloplast A/S - B | | 112,500.00 | 587,554.35 | 700,054.35 |

---

112.  ED&F-00039750 - ED&F-00039785 (AIG Plan); ED&F-00040756 - ED&F-00040778 (Riverside Plan); *see also supra* n.110.
113.  AIG Interrog. Resp.. Nos. 1, 13, and 14.
114.  Riverside Interrog. Resp. Nos. 1, 13, and 14.
115.  ED&F-00039750; ED&F-00040756.
116.  ED&F-00039750.

| | | | |
|---|---|---|---|
| Novozymes A/S - B | | - | 567,670.04 | 567,670.04 |
| A.P. Møller Mærsk A/S - B | | 78,840.00 | 512,309.56 | 591,149.56 |
| Total | | | | 11,307,554.73 |

385.    ED&F charged a total of 5,938,663.52 DKK in Custody and Clearance Fees to the

Riverside Plan, as follows:[117]

| Security | | ED&F Custody Fee (DKK) | ED&F Clearance Charge (DKK) | Total (DKK) |
|---|---|---|---|---|
| TDC A/S | | 47,300.00 | 725,144.00 | 772,444.00 |
| Danske Bank A/S | | 40,000.00 | 536,226.45 | 576,226.45 |
| Novo Nordisk A/S - B | | 90,000.00 | 1,621,726.00 | 1,711,726.00 |
| Tryg A/S | | 47,250.00 | 609,895.37 | 657,145.37 |
| Dampskibsselskabet Norden A/S | | 16,125.00 | 270,201.08 | 286,326.08 |
| Coloplast A/S - B | | 34,000.00 | 534,638.98 | 568,638.98 |
| TDC A/S | | 20,000.00 | 126,068.86 | 146,068.86 |
| DSV A/S | | 13,600.00 | 33,441.37 | 47,041.37 |
| Danske Bank A/S | | 66,000.00 | 490,729.56 | 556,729.56 |
| Pandora A/S | | 27,000.00 | 141,922.35 | 168,922.35 |
| Novo Nordisk A/S - B | | 70,000.00 | 377,394.50 | 447,394.50 |
| Total | | | | 5,938,663.52 |

## XXII.  Specific Facts as to Robert Crema

386.    On December 1, 2015, Stacey Kaminer provided SKAT with copies of the Plan

Document for the AIG Plan.[118]

387.    Crema executed the AIG Plan Document as a partner of the plan sponsor,

American Investment Group of New York, L.P.[119]

388.    Crema also executed the AIG Plan Document as trustee of the AIG Plan.[120]

389.    On December 1, 2015, Stacey Kaminer provided SKAT with a copy of the

Security and Set-Off Deed agreed to by the AIG Plan and ED&F on June 21, 2012.[121]

---

117.  ED&F-00040756.
118.  SKAT MDL 001 007792.
119.  SKAT_MDL_001_007793 at SKAT_MDL_001_007864.
120.  SKAT_MDL_001_007793 at SKAT_MDL_001_007864.
121.  SKAT_MDL_001_007875.

390.     On October 28, 2016, SKAT issued its final decision concerning the AIG Plan's tax refund request dated August 13, 2015.[122]

391.     In SKAT's October 2016 final decision concerning the AIG Plan's tax refund request dated August 13, 2015, SKAT described the AIG Plan as a sole-participant pension plan.[123]

---

122.   SKAT_MDL_001_008102.
123.   SKAT_MDL_001_008102.