# Exhibit 52

# Entering into an agreement - share option agreements - employment deadlines

Previous instance: (SKM2009.766.ØLR) Judgment of the Eastern High Court of 1 December 2009, 3rd division, B-2138-08

| | |
|---|---|
| Date of release | 19 Aug 2011 08:48 |
| Date of judgment / ruling / decision / control signal | 15 Aug 2011 14:38 |
| SKM number | SKM2011.533.HR |
| Authority | Supreme Court |
| Case number | Section 2, 327/2009 |
| Document type | Dom |
| Overall topics | treasure |
| Topics Topics | Shares and other securities as well as intellectual property rights |
| Keywords | Waiver date, option, sale, shares, employment deadline |
| Summary | The Supreme Court ruled that a shareholding had been transferred at the time of entering into an option agreement, which contained both a put and a call option. A difference in the purchase price of 2.5 per cent if the shares were traded in accordance with the put option compared to the call option could not lead to a different result.<br><br>SKAT had originally taxed the profit in the income year 2000. However, the National Tax Court had found that the correct tax year was 2001, after which SKAT had increased the income for this year.<br><br>SKAT could have changed the taxpayer's tax assessment for the income year 2001 within the ordinary deadlines, as SKAT changed the tax assessment for the income year 2000. The taxpayer claimed that the increase was made too late, as it was made after the expiry of the ordinary deadlines in section 26 of the Tax Administration Act. found that the change for the income year 2001 regarding the same share gain had to be considered a direct consequence of the National Tax Court's ruling on the tax assessment for the income year 2000, so the change in the tax assessment for the income year 2001 was timely, cf. 1, No. 2. |
| Reference (s) | The Capital Gains Taxation Act § 2 (current)<br>The Tax Administration Act § 27, para. 1, No. 2 |
| Reference | Legal Guide 2011-2 CB2.1.6.1 |
| Reference | Legal Guide 2011-2 AA8.2.3.4 |

**Parties**

| |
|---|
| H1 ApS<br>(Lawyer Poul Bostrup)<br>against<br>Ministry of Taxation<br>(Chamber Advocate by Advocate Steffen Sværke) |

**Judged by the Supreme Court judges**

Lene Pagter Kristensen, Niels Grubbe, Poul Dahl Jensen, Henrik Waaben and Michael Rekling

**Background to the case and the allegations of the parties**

In a previous instance, a judgment was handed down by the 3rd High Court of the Eastern High Court on 1 December 2009.

**Allegations**

*The appellant, H1 ApS*, has reiterated its claims.

*The respondent, the Ministry of Taxation*, has claimed confirmation.

**Supplementary case presentation**

H2 ApS had financial years 1 May - 30 April. The company's financial year 1999/2000 corresponds to the income year 2000. The financial year 2000/2001 corresponds to the income year 2001 and the financial year 2001/2002 to the income year 2002.

In the National Tax Court's ruling of 11 January 2006, it is stated under the heading

"Comments and reasoning of the National Tax Tribunal":

"...

On June 30, 2000, the company entered into an agreement with G1 Scandinavia AB. The agreement

"Agreement of redemption of shares & option agreement",

contained provisions on the resale of shares from the company to G1, and in addition provisions regarding an option to transfer the rest of the company's shares in G1 from the company to G1 Scandinavia AB. Resale of shares to the issuing company and transfer of shares in accordance with the option agreement is thus part of an overall agreement on the transfer of the company's total shareholding in G1 to G1 Scandinavia AB.

It is stated in the company's accounts that there have been substantive negotiations between the parties in the income year 2000, covering the period 1 May 1999 to 30 April 2000, but the agreement was first signed by the parties on 30 June 2000 and 12 July 2000, respectively. .

Notwithstanding the judgment of the Supreme Court of 11 November 2005 in case no. 496/2004 ( SKM2005.490.HR .red.SKAT), there is no basis for making corrections to the company's taxable income in the income year 2000 regarding these points, of the company's shareholding in G1 can only be considered entered into in the income year 2001.

The National Tax Court then reduces the company's taxable income by DKK 6,419,412 and DKK 25,777,317, respectively, for a total of DKK 32,196,729.

... "

*In a statement of 1 March 2010 prepared by VK for the purpose of the case, VK* has stated the following:

"...

The undersigned VK hereby acknowledges its explanation as reproduced in the Eastern High Court's judgment of 1 December 2009, but wishes to clarify the following:

In 2000, H2 ApS did not want to sell its shares, as the company expected that the value of G1 Danmark A / S would increase significantly in the future, which is why a sale at a later date would lead to a higher sale price.

In 2000, there were a number of potential buyers other than G1 Scandinavia AB, including the large

In 2000, there were a number of potential buyers other than G1 Scandinavia AB, including the large Danish media houses. G1 Inc. thus also ended up selling its European activities to a German group.

In the opinion of the undersigned, there is a typing error in section 2.2. in the agreement of 10 July 2000 In my opinion, it was the intention that G1 Scandinavia AB should not pay any amount if G1 Danmark A / S entered into liquidation, etc.

... "

Supplementary on the legal basis regarding the tax procedural issue

Prior to 1999, the Danish Tax Agency contained - as section 4, subsection 3 - the following provision on the right to make consequential changes in certain cases outside the general deadlines:

"...

In cases where a resumption request is granted pursuant to para. 1 and 2, the tax authorities may, notwithstanding section 35, make such adjustments of tax assessments for other income years, which are a direct consequence of the requested change of employment. A resumption request that has been granted in accordance with para. 2, can not be revoked.

... "

By Act no. 381 of 2 June 1999 amending e.g. Section 4 of the Tax Agency Act was repealed, and a new Chapter 4 was inserted in the Act on "employment deadlines" containing, among other things, the following provision in section 35, subsection 1, no. 3, on the right to make consequential changes outside the general deadlines:

"...

Notwithstanding the time limits in section 34, a tax assessment may be made or changed, both at the request of the taxpayer and at the discretion of the tax authorities in the following cases:

...

3) To the extent that the tax assessment is a consequence of a tax assessment of the taxpayer relating to another income year.

... "

Regarding this provision, it is stated in the draft legislation for the law, among other things. (Folketingstidende 1998- 99, appendix A, L192, p. 4556 and p. 4564-4565):

"...

The provision implies that in general - and not only in connection with resumption requests - access is made to make consequential changes of tax assessments by the taxpayer regarding other income years that are outside the ordinary 3-year employment deadlines.

...

Under No. 3, it is proposed that in cases where a change in a tax assessment has derivative effects on the tax assessment of the taxpayer for other income years, such changes may be made as a direct consequence of this, even if the ordinary employment deadlines are thereby exceeded.

It can e.g. be the case where the tax authorities within the ordinary employment deadlines increase a tax assessment with the effect that a tax assessment for income years that are outside the ordinary employment deadlines must be reduced, or that the taxpayer within the ordinary deadlines requests a tax assessment reduced with that effect , that a tax assessment for income years that are outside the ordinary employment deadlines must be increased, e.g. the question of which income year an interest expense is to be attributed to.

... "

In the Deadline Committee's report no. 1426/2003, pp. 51-53 include stated the following regarding the conditions for applying the current Tax Agency Act, section 35, subsection. 1, No. 3:

"...

First of all, it must be a question of the consequential change being a consequence of

"an employment for another income year".

The assessment for the second income year may have been made both within and outside the deadline in SSL § 34. The consequence-triggering tax assessment may thus have been made within the deadline in SSL § 34, e.g. having regard to the existence of incorrect factual or legal facts. If the em-

ployment change has been made outside the 3-year deadline, it must have a separate legal basis in the Danish Tax Agency Act, section 35, subsection. It does not matter whether the tax assessment that triggers the consequential change was made at the request of the taxpayer or not.

The tax assessment in accordance with SSL § 35, para. 1, no. 3, must secondly be a "consequence" of the tax assessment relating to another income year.

The comments state, cf. L192, Parliamentary Year 1998/1999, that such changes can be made that are a "direct consequence" of the tax assessment for another year. According to the comments, this can e.g. be the case where the tax authorities, within the ordinary employment deadlines, increase a tax assessment with the effect that a tax assessment for income years that are outside the ordinary employment deadlines must be reduced, or that the taxpayer, within the ordinary deadlines, requests a tax assessment reduced by the effect that a tax assessment for income years that are outside the ordinary employment deadlines must be increased, e.g. the question of which income year an interest expense is to be attributed to.

A delimitation of the provision seems, in the light of the remarks' use of the term "direct consequence", to require a distinction between indirect and direct consequences of an increase and a reduction, respectively. It is stated in theory that the requirement of direct consequence corresponds to the requirement of connection between the consequence-triggering employment and the consequential employment, respectively.

...

... The concept of connectivity alone states that the requirements must have the same commonality of origin, while in the term "direct consequence" it seems that a regulation in one year entails consequential changes in another year concerning the same relationship. With the previous provision in SSL § 4, para. 3, in mind, only direct consequential changes must be covered, and there does not seem in the comments to be any indication that this should be the same as the far wider concept of connectivity. However, the precise scope of the provision raises doubts.

The comments on the provision thus say nothing further about when there is a "direct consequence", but only mention the example of accrual of interest expenses, cf. above. The provision must be assumed to have its main area regarding the question of "correct accrual". If, for example, it turns out that an income or a deduction has been incorrectly accrued, a reduction or increase authorized in SSL § 34 and 35 will automatically result in a corresponding corresponding increase or reduction in another income year. In these cases, the consequential change directly concerns the same relationship as the original employment.

...

Cases covered by the provision

No case law has been published in which SSL § 35, para. 1, no. 3 has been applied. The comments on the provision, cf. L192, the Folketing year 1998/1999 and the Tax Law Council's report 1339/1997 mention the accrual of interest expenses and other accrual issues as covered by the provision.

The scope of the provision is stated in Circular No. 116 of 1 July 1999:

"...

The provision can e.g. applies in cases where the tax authorities increase a tax assessment within the normal employment deadlines, with the effect that a tax assessment for income years that are outside the ordinary employment deadlines must be reduced, or that the taxpayer outside the ordinary time limits requests a tax assessment reduced by the effect that the tax assessment for income years that are outside the ordinary employment deadlines must be increased, e.g. the question of which income year an interest expense is to be attributed to. As a starting point, the provision can also be ap-
plied in cases where the tax authorities have lost a case in which year a taxable income must be

plied in cases where the tax authorities have lost a case in which year a taxable income must be taxed, so that the income can be attributed to taxation in another income year, even if it is outside the deadlines under section 34.

... "

On the other hand, it must be assumed that, pursuant to section 35, subsection 1, no. 3, resumption of employment may take place back to year 1, if a company from year 1 is tax-declared and resembled as an independent business enterprise, and in year 5 it is settled that the company is not commercial, as it, despite promising budgets, have constantly run deficits. The increase outside the deadline will not be characterized as a direct consequence, but only an indirect consequence of the increase within the ordinary employment deadline, as each income year is in principle treated separately. Finally, it must in itself be considered doubtful whether consequential increases due to an increase for another income year, as is the case in the example, are covered by the provision, cf. above.

... "

Chapter 7 of the report concerning the Deadline Committee's deliberations, pp. 133-134, states the following regarding the committee's views on the right to make extraordinary consequential changes:

"...

The deadline committee has initially discussed whether the current access to make extraordinary impact changes should be maintained. On the one hand, it can thus be stated that the consideration behind the deadline rules is to create clarification for both the taxpayer and the authorities. The time limits hereby imply that new claims cannot be made after the expiry of the time limit, regardless of whether it turns out that such a claim actually existed. The deadline rules will thus, by their nature, mean that certain employment changes cannot be made, regardless of whether the employment is / will be materially incorrect.

will be materially incorrect.

On the other hand, there may be good reasons why the deadlines can be broken through in more specific cases, where the consideration of the materially correct employment outweighs the consideration of the finality of the employment, which section 35 is precisely an expression of.

It is the Deadline Committee's assessment that there should continue to be access to extraordinary resumption in the event of certain consequential changes. However, in the Committee's view, it is unclear which situations the provision in section 35, subsection 1, no. 3, in its current wording includes.

The application of the current provision is thus triggered by a tax assessment made within or outside the deadlines in SSL § 34, and the employment that must be made on the basis of SSL § 35, para. 1, no. 3, must also, according to the wording, be a consequence of the first-mentioned employment. This presumably includes a requirement that the accompanying employment must relate to the same circumstances as the employment that gave rise to the change, and be a direct consequence or a direct consequence of this. On the other hand, it is not sufficient that the appointments have connectivity. However, the precise scope of the provision raises doubts, as the wording only uses the term "follow".

The Committee also agrees with the Tax Law Council, cf. Appendix 1 to the report, section 2.3.2.1, that it is unclear whether the current provision applies where an increase relating to an income year outside the general deadline in section 34 is a consequence of an increase within the ordinary time limit. However, it has hardly been the intention that the provision should authorize an increase as a result of an increase, and the possibility of consequential changes should therefore not exist in these cases.

It is then the opinion of the Deadline Committee that it should be a condition for making an extraordinary tax assessment that the employment is a direct consequence of an employment concerning another income year or concerning the spouse. Against this background, the Deadline Committee recommends that it be clarified that the provision only applies if the employment is a "direct consequence" of another tax assessment.

Furthermore, the Committee does not find that it can be considered a "direct consequence" if the tax authorities increase the tax assessment by the tax assessment, and a later national tax court ruling or judgment shows that the amount should be attributed to a previous income year. In this case, in the Committee's view, there should be no right to increase the tax assessment for the correct year if this year is obsolete, unless other grounds for limitation of deadlines can be invoked.

... "

Bill L 175, which was submitted on 12 March 2003, contains the following - general and special - remarks regarding the bill to the Tax Agency Act, section 35, subsection. 1, no. 2 (FT 2002-03, Appendix A, p. 4595 and p. 4607):

"...

2.1.2.2. Extraordinary tax assessment - section 35 of the Danish Tax Agency Act

It is proposed that the conditions for extraordinary tax assessment pursuant to section 35 of the Danish Tax Agency Act be amended on the points below. In addition, the proposal contains minor changes of a predominantly editorial nature.

a. Changes in employment as a result of another tax assessment, cf. the proposal for section 35 (1) of the Danish Tax Agency Act, 1, No. 2

of the Danish Tax Agency Act. 1, No. 2.

According to the current § 35, para. 1, no. 3, of the Danish Tax Agency Act, an assessment may be made or amended to the extent that the tax assessment is a consequence of a tax assessment concerning the taxpayer for another income year. Correspondingly, an employment can be made or changed in accordance with the current section 35, subsection. 1, no. 4, as a result of an employment concerning the taxpayer's spouse.

It is proposed, cf. the proposal for section 35, subsection 1, no. 2, that § 35, para. 1, nos. 3 and 4, are combined in a provision, and that the provision is additionally extended to also apply where the tax assessment is a direct consequence of a tax assessment for a company that was jointly taxed with the taxpayer in the income year to which the employment relates.

...

The proposal for 35, para. 1. no. 2, is a continuation of the current § 35, para. 1, nos. 3 and 4, in addition to which it is proposed that the provision be extended to also apply where the tax assessment is a direct consequence of a tax assessment for another company that was jointly taxed with the taxpayer in the income year to which the employment relates.

The proposal also clarifies that the provision only applies if the consequential change (the secondary employment) is a direct consequence of the second tax assessment (the primary employment).

The provision will then apply where the tax authorities increase a tax assessment relating to the taxpayer, his spouse or a jointly taxed company with the effect that a tax assessment for income years that are outside the ordinary employment deadlines must be reduced. The provision will also apply if the taxpayer, his spouse or a company that is jointly taxed with the taxpayer requests a reduction of the employment with the consequence that the tax assessment for an income year that is outside the ordinary employment deadlines must be increased.

On the other hand, the provision does not apply if an increase in the tax assessment for an income year that is within the ordinary employment deadlines gives rise to an increase in a tax assessment for an income year that is outside the ordinary employment deadlines.

It will also not be a direct consequence if the tax authorities e.g. in the calculation of the income year 2001, the tax assessment increases by an amount which in a later national tax court ruling proves to be correctly attributable to the income year 1997. In this case, the provision can not be used to make the increase for 1997 instead, as this year is obsolete, unless others reasons for deadline breakthrough can be asserted.

... "

The bill's special remarks correspond verbatim to the special remarks to
section 35, subsection 1, no. 2, in the Deadline Committee's draft law, cf. report no. 1426, pp. 169-170.

**Justification and result of the Supreme Court**

The tax procedural issue

On 25 February 2005, H1 ApS complained about the tax authorities' tax assessment, whereby the company's taxable income for the income year 2000 had been increased by e.g. 25,777,317 as the company had not owned the shares for three years at the time of the transfer. The complaint was based in principle on the fact that the company had not disposed of the shares at the time of the exercise of the option on 22 December 2001, or in the alternative - if the sale was deemed completed on 30 June 2000 - that the sale was not completed until the income year 2001.

By the National Tax Court's ruling of 11 January 2006, the tax authorities' tax assessment was changed. The National Tax Court agreed in the ruling that the transfer of the shares in accordance with the option agreement was part of a total transfer of the company's total shareholding in G1 Danmark A / S, which had taken place by the agreement, but when this was first signed by the parties on 30. June 2000 and 12 July 2000, the National Tax Court found that there was no basis for making corrections

to the company's taxable income in the income year 2000, as the agreement on the transfer of the company's shareholding in G1 Denmark could only be considered entered into in the income year 2001.

It thus follows from the National Tax Tribunal's amendment of the tax assessment for the income year 2000 that the increase complained of was only disregarded as a result of it having been attributed to the income year 2001.

Furthermore, the contested increase was made at a time when the general period of employment for

the 2001 income year had not expired and the tax authorities were in possession of such information that they could have complied with that period.

In these circumstances, it must be considered as a direct consequence of the National Tax Court's change of the incorrect tax assessment for the income year 2000 that the tax authorities subsequently notified a change in the company's tax assessment for the income year 2001. Such a direct consequence is covered by section 27 (1) of the Tax Administration Act. . 1, no. 2, as this provision must be understood according to its wording, prehistory and preparatory work, cf. hereby also the Minister of Taxation's answer to question 28, which is quoted in the High Court's judgment.

Following this, the Supreme Court agrees that the change in the tax assessment for the income year 2001 has been notified in time.

The time of the transfer of the shares

The agreement of 30 June 2000 between G1 Scandinavia AB and H2 ApS was based on G1 Inc.'s strategy of owning the group's subsidiaries 100% and H2's strategy of withdrawing from G1 Danmark A / S when the company was built up. The agreement concerned H2's entire holding of a nominal DKK 316,834 shares in G1 Denmark, as a part, DKK 66,384, was to be immediately disposed of by G1 Danmark's purchase of these shares as own shares, while the rest, DKK 250,000, was covered by the agreement on a buy and sell option. In connection with the agreement, G1 Scandinavia made a capital increase in G1 Denmark with a cash deposit of approx. 13 mio. DKK, which was partly used to finance G1 Denmark's purchase of own shares from H2 for approx. 6.4 million Liquidity for the continuation of G1 Denmark's activities, which until the 29th. January 2000 had been secured by a declaration of solidarity from all shareholders, was in the declaration valid until the end of February 2001 secured by a declaration only from G1 Scandinavia. The call option could be exercised approx. 1½ years after the conclusion of the agreement; namely no earlier than 22 December 2001, 3 years and one day after H2's most recent acquisition of shares in G1 Denmark on 21 December 1998.

With these remarks and otherwise for the reasons stated by the High Court, the Supreme Court agrees that the shares must be deemed to have been disposed of for tax purposes at the time of the conclusion of the agreement on 30 June and 12 July 2000.

The Supreme Court then upholds the verdict.

**T hi is known for right**

The judgment of the High Court is upheld.

In legal costs before the Supreme Court, H1 ApS must pay DKK 250,000 to the Ministry of Taxation.

The awarded costs of legal costs must be paid within 14 days after the Supreme Court has ruled and bear interest in accordance with section 8 a of the Danish Interest Act.