# Exhibit 46

# INTERNATIONAL UNIFORM BROKERAGE EXECUTION SERVICES ("GIVE-UP") AGREEMENT: CUSTOMER VERSION 2008[1]

**CAUTION: THIS AGREEMENT IS DESIGNED AS A BASIC DOCUMENT FOR MARKET PARTICIPANTS ENGAGING IN "GIVE-UP" TRANSACTIONS. IT IS NOT INTENDED TO SERVE AS AN ALL ENCOMPASSING DOCUMENT FOR USE BY ALL PARTIES UNDER ALL CIRCUMSTANCES. PARTIES SHOULD CAREFULLY CONSIDER THE FULL SCOPE OF REGULATORY (INCLUDING EXCHANGE) AND COMMERCIAL TERMS THAT MAY BE APPLICABLE TO THEIR PARTICULAR CIRCUMSTANCES AND MAY ELECT TO ENTER INTO MORE DETAILED CUSTOMER AGREEMENTS AT THE OUTSET OR DURING THE COURSE OF THEIR RELATIONSHIP.**

Agreement made this ___ day of _____, _____ by and among

__FGC Securities LLC_____ ("Executing Broker")

__Solo Capital Partners LLP_____ ("Clearing Broker")

__RJM Capital Pension Plan_____ ("Customer")

1. All transactions executed orally, in writing or through an electronic order facility or cleared hereunder shall be subject to applicable laws, governmental, regulatory, self-regulatory, exchange or clearing house rules, regulations, interpretations, protocols and the customs and usages of the exchange or clearing house on which they are executed and cleared, as in force from time to time ("Applicable Law"). All disputes relating to transactions executed or cleared under this Agreement shall be governed by and settled pursuant to Applicable Law and shall be subject to the jurisdiction of the exchange (and, if applicable, its clearing house) upon which the dispute arises. The parties to this Agreement shall perform their respective obligations and exercise their respective rights under this Agreement (including, but not limited to, rejecting a Customer order, calling a Customer for margin or providing any notice specified herein) using commercially reasonable judgement, in a commercially reasonable manner under the circumstances, and consistent with Applicable Law.

2. Customer authorizes Executing Broker to execute orders for Customer as transmitted orally, in writing or through an electronic order facility by Customer to Executing Broker, or, as permitted by Applicable Law, directly to an exchange. Executing Broker reserves the right to reject an order that Customer may transmit to Executing Broker for execution and shall promptly notify Customer of any such rejection. Clearing Broker may, upon prior notice to Executing Broker and Customer, place limits or conditions on the positions it will accept for give-up for Customer's account.

3. Unless otherwise agreed in writing, each of the parties authorizes Executing Broker and Clearing Broker to use the services of one or more other persons or entities in connection with their obligations under this Agreement; provided, however, that Executing Broker and Clearing Broker remain responsible to Customer for the performance (or failure of performance) of their respective obligations and responsibilities under this Agreement.

4. Customer, whether placing orders orally, in writing or through an electronic order facility, will be responsible for accurate and valid placement of orders. Executing Broker, and not Clearing Broker, will be responsible for determining that all orders are placed or authorized by Customer. Additionally, except as otherwise agreed in writing, Executing Broker will: (a) upon placement of orders by Customer, confirm the terms of the orders with Customer if customary and practicable; (b) be responsible for the accurate execution of all orders; (c) confirm the execution of such orders to Customer as soon as is practicable thereafter; and (d) transmit such executed orders to Clearing Broker as soon as practicable, but in no event later than the period mandated by Applicable Law. Subject to Section 2 herein, Clearing Broker shall be responsible for clearing all executed orders transmitted to Clearing Broker. Unless otherwise provided by Applicable Law, neither Executing Broker nor Clearing Broker shall be responsible or liable for losses or damages resulting from: (x) error, negligence or misconduct of Customer and/or exchange or clearing house; (y) failure of transmission, communication or electronic order facilities; or (z) any other cause or causes beyond their control.

5. Executing Broker will, where applicable, bill commissions for executing trades, as elected in Section 12 below, on a monthly basis. Customer or Clearing Broker, as elected in Section 12 below, shall be responsible for verifying billing and making payment. Clearing Broker will, where applicable, pay floor brokerage fees, as well as any exchange or clearing house fees, incurred for all transactions executed by Executing Broker for and on behalf of Customer and subsequently accepted by Clearing Broker.

6. In the event that Customer disputes or denies knowledge of any transaction, Clearing Broker or Executing Broker shall be authorized to liquidate or otherwise offset the disputed position. Where practicable, prior notice of such liquidation or offset shall be provided to the other parties to this Agreement.

7. In the event that Clearing Broker does not, for any reason, accept a trade transmitted to it by Executing Broker, Clearing Broker shall promptly notify Customer and Executing Broker of such non-acceptance, and Executing Broker, or its designated clearing broker if applicable, shall at its option be entitled to:

    (a) close out Customer's trade by such sale, purchase, disposal or other cancellation transaction as Executing Broker may determine, whether on the market, by private contract or any other appropriate method. Executing Broker shall promptly notify Customer of such close out. Any balance resulting from such close out shall be promptly settled between Executing Broker and Customer; or

    (b) transfer Customer's trades to another clearing broker as instructed by Customer; or

    (c) clear Customer's trade in accordance with the following terms:

i. Customer shall be fully liable for any and all obligations arising out of or related to transactions entered into or carried in Customer's account by Executing Broker, including, but not limited to: 1) debit balances, 2) exchange or clearing house fees, and 3) brokerage, commissions, and applicable fees charged by Executing Broker;

ii. Executing Broker shall have the right to call Customer for margin in such amounts, in such form, by such time and in such manner as may be required by Executing Broker. If Customer fails to meet such margin call within such specified time, or if Executing Broker, in its discretion, otherwise deems it appropriate for Executing Broker's protection, Executing Broker may close out Customer's trade pursuant to sub-paragraph (a) above;

iii. Customer acknowledges that Customer's trades may be subject to exercise or delivery assignments, where applicable.

8. Customer acknowledges that all notices and disclosures that are provided by Clearing Broker to Customer (or Customer's representative) pursuant to Applicable Law, will be deemed, for purposes of Section 7 of this Agreement, as if received by Customer from Executing Broker as well as from Clearing Broker. Clearing Broker represents, warrants and covenants to Executing Broker that it has provided, and will provide, all required notices and disclosures to Customer (or Customer's representative).

9. This Agreement may be terminated by any of the parties hereto upon prior written notice to the other parties. Any such termination shall have no effect upon any party's rights and obligations arising out of transactions executed prior to such termination.

10. This agreement shall be exclusively governed by, and construed in accordance with, the laws of the jurisdiction specified below without regard to principles of choice of law.

11. This Agreement shall not amend or vary any clearing or electronic services agreement between Clearing Broker and Customer or Executing Broker and Customer. In the event of a conflict between this Agreement and such other clearing or electronic services agreement with respect to the execution, clearing or carrying of Customer's trades, such other clearing or electronic services agreement will control with respect thereto.

12. Executing Broker, where applicable, will bill commissions per contract per half turn as specified on attached Addendum, rate schedule, or as separately agreed.

13. Each party consents to the electronic recording, without the use of an automatic warning tone, of all telephone conversations between or among the parties and their representatives.

14. Unless otherwise prohibited by Applicable Law, any party to this Agreement, from time to time, may add additional accounts of Customer to be governed by this Agreement by prior written notice (which may be by facsimile or other electronic transmission) to the other parties, provided that (i) the same fees agreed to herein apply and (ii) valid clearing accounts for such accounts exist at the Clearing Broker.

15. This Agreement may be executed and delivered in counterparts (including by facsimile or other electronic transmission), each of which will be deemed an original.

**Jurisdiction:** England and Wales

[1] This Uniform Agreement was prepared in consultation with the FIA, FOA and MFA. Any changes or additions to the wording of this standard document must be clearly indicated. Failure to do so constitutes a representation that the document is the International Uniform Brokerage Execution Services ("Give-Up") Agreement: Customer Version 2008 and has not been modified in any respect.

*Any party that has manually executed this Agreement represents, covenants and agrees that the version electronically executed by the other parties and stored on EGUS is the final version and sets forth the complete terms and conditions as agreed to by all of the parties.*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective authorized officers as of the date set forth above.

**Name of Executing Broker: FGC Securities LLC**

**By:** _____

**Name of Clearing Broker: Solo Capital Partners LLP**

**By:** _____

CUSTOMER FORM 201 - 10/05, revised December 2006 and April 2008 — Futures Industry Association, Inc. 2008        FIA EGUS Agreement ID 24353        Page 2

Highly Confidential                                              MPSKAT00066948



Name of Customer: RJM Capital Pension Plan
By: _Authorized Representative_
ADAM LAROSA

CONFORMED SIGNATURES WERE EXECUTED ELECTRONICALLY IN ACCORDANCE WITH THE FIA ELECTRONIC GIVE-UP AGREEMENT SYSTEM USER AGREEMENT.

Highly Confidential                                              MPSKAT00066949

# ADDENDUM TO INTERNATIONAL UNIFORM BROKERAGE EXECUTION SERVICES ("GIVE-UP") AGREEMENT
## MADE THIS ___ DAY OF _____, _____

### CONTACT PERSONS

*Any notices or problems regarding these transactions should immediately be brought to the attention of the contact persons of each of the parties hereto, whose names, addresses, and numbers are set forth below. Each party may change its operational contact by notice to the others.*

| *Executing Broker* | *Clearing Broker* |
|---|---|
| | *For Documentation* |
| | Name: **Solo Capital Partners LLP** |
| | Name of Person: **- Compliance** |
| | Address: **4 Throgmorton Avenue,** -, |
| | **London EC2N 2DL**, - - |
| | **United Kingdom** |
| | Telephone No.: **+44 (0) 207 382 4940** |
| | Fax No.: **+44 (0) 207 628 0143** |
| | Email: **compliance@solo.com** |

*Customer*

**Customer's Account Number**

| Account ID | Account Description | Effective Date | Expiration Date |
|---|---|---|---|
| TBA | | | |

### BILLING ADDRESS

*Invoices to be sent to the address set forth below.*

Bill To Party Name: **RJM Capital Pension Plan**

Address: **Select Country**

Attention:

CUSTOMER FORM 201 - 10/95 revised December 2006 and April 2008)  Futures Industry Association, Inc. 2008    FIA EGUS Agreement ID 24351 1    Page 4

Highly Confidential                                                                MPSKAT00066950



FGC Securities, LLC
12 Desbrosses St
New York, NY 10013
t: 212-931-0746

February 28, 2013

To whom it may concern:

This letter is to confirm the brokerage rates for FGC Securities, LLC.

Standard rate:
- We charge ¼ of a basis point on notional of any stock transactions
- We charge ¼ of a basis point on notional of any future transactions

Regards,

Stephen Wheeler
Director
swheeler@fgcsecurities.com

Member FINRA

Highly Confidential                                    MPSKAT00066951