# Exhibit 141



Neutral Citation Number: [2022] EWCA Civ 234

Case No: A4/2021/0955 & 0956

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**
**MR JUSTICE ANDREW BAKER**
**[2021] EWHC 974 (Comm)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 25/02/2022

Before :

**SIR JULIAN FLAUX, CHANCELLOR OF THE HIGH COURT**
**LORD JUSTICE PHILLIPS**
and
**LORD JUSTICE STUART-SMITH**
- - - - - - - - - - - - - - - - - - - - -
Between :

|  |  |
|---|---|
| **SKATTEFORVALTNINGEN** | **Claimant /** |
| **(The Danish Customs and Tax Divisions)** | **Appellant** |
| **- and -** | |
| **SOLO CAPITAL PARTNERS LLP** | **Defendant /** |
| **(In Special Administration)** | **Respondent** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Lord Pannick QC, Michael Fealy QC, Jamie Goldsmith QC, Jonathan Schwarz, Abra Bompas, Andrew Scott and KV Krishnaprasad** (instructed by **Pinsent Masons LLP**) for the **Claimant / Appellant**
**Nigel Jones QC, Kieron Beal QC, Lisa Freeman and Laurence Page** (instructed by **Meaby & Co**) for the **Sanjay Shah Defendants / Respondents**
**Ali Malek QC and George McPherson** (instructed by **Rosenblatt**) for **ED&F Man Capital Markets Ltd**
**Alison Macdonald QC, Tom De Vecchi, Luke Tattersall and Sophia Dzwig** (instructed by **DWF Law LLP**) for the **DWF Defendants**
**Adam Zellick QC and Ian Bergson** (instructed **by Reed Smith LLP**) for **Messrs Knott & Hoogewerf**
**Daniel Edmonds** (instructed by **Stewarts**) for the **PS/GoC Defendants**
**Robert Palmer QC, Christopher Vajda QC and Conor McCarthy** (instructed by **SMK & SMB**) for the **SMB Defendants**
**John Devonshire appeared in person**

**Alexander Korner / Korner Unternehmensgruppe GMBH (formerly CEKA INVEST GMBH)** were represented by their solicitors **Penningtons Manches Cooper**
**Alba Brown and Gavin Brown** appeared in person
**Guenther Klar** was represented by solicitors **Howard Kennedy LLP**
**North Channel Bank** was represented by solicitors **BDB Pitmans LLP**
**Anthony Mark Patterson** was represented by solicitors **Cadwalader, Wickersham & Taft LLP**

Hearing dates : 25, 26 and 27 January 2022
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

**Sir Julian Flaux C:**

Introduction

1.     This appeal concerns whether the claims made in these proceedings by the claimant, which is the Danish tax authority (to which I will refer as "SKAT"), are not admissible before the English courts by reason of Rule 3(1) of *Dicey, Morris & Collins on the Conflict of Laws* 15th edition (to which I will refer as "Dicey Rule 3") which provides:

> "English courts have no jurisdiction to entertain an action:
> (1) for the enforcement, either directly or indirectly, of a penal, revenue or other public law of a foreign State;"

2.     SKAT appeals, with the permission of the judge below in relation to Ground 2 and of Males LJ in relation to Ground 1, against the Order of Andrew Baker J dated 27 April 2021, dismissing SKAT's claims on the basis that Dicey Rule 3 was applicable.

The factual and procedural background

3.     SKAT brought five separate claims in the Commercial Court (now consolidated) against 114 defendants for some £1.44 billion seeking to recover refunds made by it to the defendants or as directed by them of Danish withholding tax ("WHT"). In simple terms, WHT is a tax of 27% on dividends paid by Danish domiciled companies to their shareholders which the companies are obliged to withhold from the shareholders and pay over to SKAT. SKAT routinely refunds some or all of that WHT to foreign recipients of the dividends where the WHT exceeds the permissible taxation on the recipient under a relevant double taxation treaty ("DTA").

4.     SKAT made such refunds under a variety of schemes. This case concerns the "Forms Scheme" which operated by reference to a standard paper form produced by SKAT, Form No 06.003, which had to be completed and submitted with supporting documentation for approval by SKAT's accounting 2 department.

5.     Against the defendants other than the so-called "ED&F Man" SKAT alleges that the refunds that were paid out were induced by fraudulent misrepresentations by foreign entities ("the Solo etc Applicants") that they were shareholders in Danish companies which had withheld tax in respect of dividends paid to them in respect of which they sought a refund from SKAT. SKAT's case is that it was a victim of a sophisticated fraud in that the Solo etc Applicants never in fact held any shares in any of the relevant Danish companies, never received dividends from those companies and therefore had never had any tax withheld from them on those dividends so that there was no tax for SKAT to refund.

6.     This alleged fraud is said to have been principally orchestrated from or carried out through entities based in England. With a handful of exceptions the claims are not brought against the Solo etc Applicants themselves but against the individuals and corporate entities who are said to have procured or otherwise been involved in the making of the relevant applications for refunds and who received the bulk of the sums which were extracted from SKAT. The claims against these defendants (to whom I will refer, as do the SKAT pleadings, as "the alleged fraud defendants" without any question of pre-judging matters which are for a subsequent trial) are brought for damages for

deceit, fraudulent misrepresentation and unlawful means conspiracy, together with equitable claims for dishonest assistance, knowing receipt and equitable compensation together with other private law claims. For the purposes of this appeal, the detail of the claims does not matter. All that it is important to note at the outset is that the basis for all these claims is not that that there is outstanding tax which SKAT is seeking to recover, because, by definition, the Solo etc Applicants and the alleged fraud defendants were never liable to pay and never did pay WHT. Rather the claims are to recover sums which were wrongfully extracted from SKAT by the fraud.

7.    The position of ED&F Man is different in the sense that there is no allegation that they were implicated in a fraud. Although it is alleged that misrepresentations were made by them, the misrepresentations are said to have been negligent. I will return to their position later in the judgment but simply note that so far as they are concerned, SKAT accepted for the purposes of this appeal that, subject to its contentions as to the effect of the Brussels Recast Regulation and the Lugano Convention, Dicey Rule 3 applies to preclude the claims against them.

8.    Andrew Baker J is the designated or docketed judge in respect of all the SKAT claims in this jurisdiction. It should be noted that SKAT has brought similar claims in other jurisdictions in respect of alleged fraud by other defendants, principally in New York and Malaysia. So far as the claims here are concerned, at a case management conference in July 2020, Andrew Baker J determined that there should be three trial hearings:

(1)    A trial of a preliminary issue as to whether SKAT's claims offend Dicey Rule 3. The preliminary issue as ordered by the judge was:

"Are any of SKAT's claims, as alleged, inadmissible in this court under the rule of law stated, e.g., as Dicey Rule 3 (Dicey, Morris & Collins on the Conflict of Laws, 15th Ed., para 5R-019)? If so, which claims are inadmissible and why?"

It is the judgment and Order made following that trial which is the subject of the appeal.

(2)    The so-called Validity Trial, a trial of other preliminary issues defined to determine whether as SKAT contends the claims to refunds made by the defendants were not valid claims under Danish tax law. This was originally fixed for trial for 4-6 weeks in Michaelmas Term 2021, but has inevitably been adjourned pending this appeal.

(3)    The so-called Main Trial of all other issues which was originally fixed to be heard for the whole of 2023 and Hilary Term 2024.

The judgment below

9.    In a closely-reasoned and comprehensive judgment, the judge concluded that all SKAT's claims were inadmissible as a consequence of Dicey Rule 3. Having set out the factual and procedural background, he turned to consider Dicey Rule 3 and its ambit. At [17] he set out what he described as "high level statements of principle [which] were agreed":

(i) Dicey Rule 3 is not a rule of jurisdiction, despite the language in which it is articulated in *Dicey*. It is a substantive rule of English law leading to the dismissal of claims falling within it, on the ground that the court will not entertain them because they involve an attempt to have the court enforce extra-territorially the exercise of sovereign authority.

(ii) The rule demands an analysis of the substance of the claim rather than the form: the court must look past the cause(s) of action pleaded, or even (though not relevant here) the identity of the claimant, to the substance of the right sought to be vindicated, or the nature of the acts or actions upon which the claim is founded.

(iii) Dicey Rule 3 is a rule of English law applicable whether or not English law will govern the merits more generally by reference to English law conflict of laws rules; and it is for the court to decide for itself whether, given its substance, a claim falls within Dicey Rule 3. That is not a question for Danish law, for example, even if in this case Danish law is the governing law of a particular claim.

(iv) Whether Dicey Rule 3 applies in this case involves a question of characterisation, for any given claim, whether it is a claim to enforce, directly or indirectly, Danish revenue law, so as to fall within (as it has often been called) the rule in *Government of India* (after *Government of India v Taylor* [[1955] AC 491) and/or whether in some other way it amounts in substance to an attempt to exercise sovereign power extra-territorially.

(v) There is a distinction to be drawn between "an exercise of sovereign power and an action brought by a sovereign state which might equally be brought by an individual to recover losses for damage to property" (*Mbasogo v Logo* [2006] EWCA Civ 1370, [2007] QB 846 at [67]). The latter of these has been referred to, after inter alia Lord Keith in *Government of India*, as a 'patrimonial' claim; "when a state owns property in the same way as a private citizen there is no impediment to recovery" (*Iran v Barakat Galleries Ltd* [2007] EWCA Civ 1374, [2009] QB 22 at [136]).

(vi) There is a distinction between mere recognition of foreign penal, revenue or other public laws, or sovereign acts, including recognising the effects or consequences of the past exercise of sovereign power in the sovereign territory, for example the vesting of title to property by an act of expropriation completed in the territory of the expropriating sovereign, on the one hand, and enforcement, on the other hand. Dicey Rule 3 is not designed to preclude or prohibit the former.

Case 1:18-md-02865-LAK    Document 804-52    Filed 05/12/22    Page 7 of 46

Judgment Approved by the court for handing down.                                    SKAT v SOLO

10.    I do not propose to set out the judge's analysis of the authorities on Dicey Rule 3 since they will require consideration hereafter, but at [75] of his judgment the judge set out the applicable principles which he drew from his review of the authorities:

> "(i) A claim is not admissible before this court if, in substance, it is a claim directly or indirectly to enforce the Kingdom of Denmark's sovereign right to tax dividends declared by Danish companies.
>
> (ii) That may be the substance of a claim though it is not, in point of form, a claim for a tax debt or a claim against a party that was or could be a tax debtor.
>
> (iii) The substance of the claim is not determined by the private law cause(s) of action pleaded, indeed the relevant issue of substance over form arises at all only when, and because, the claim is framed in that way, that being a matter of form in this context, as is the identity of the claimant (though that aspect does not arise in the present case).
>
> (iv) Rather, the substance of the claim is determined by the central interest, in bringing the claim, of the sovereign by whom it is brought or in whose interests, directly or indirectly, it is brought.
>
> (v) The mechanism by which harm is said to have been suffered, in respect of which a claim seeks reparation, is material to consider, and may be important, in judging whether the central interest in bringing that claim is a sovereign (governmental) interest rather than a patrimonial (private law) interest.
>
> (vi) There is no rule of law that the voluntary act of the defendant, in engaging with the foreign sovereign, takes a case outside Dicey Rule 3 or disapplies it, though the nature of any interaction between defendant and sovereign will be one circumstance to be considered in deciding what right or interest, in substance, the claim serves to vindicate."

11.    The judge went on to consider in detail the application of those principles to the facts. For present purposes, it is not necessary to dwell on that detail save to note that at [88] the judge made the point that none of the authorities on Dicey Rule 3 had considered a claim to recoup a tax refund erroneously paid. At [89] he said that if such a claim was one directly or indirectly to enforce a foreign tax law (which he concluded it was) that was just as much the case where the error was induced by a dishonest misrepresentation by the refund applicant as in any other case. At [90] he said that he put to one side a case of a misrepresentation as to identity:

> "Mistakes as to identity can be seen as conceptually different to other errors and a decision that Dicey Rule 3 applies in the present case does not have to mean that it would apply to a case where SKAT's claim was not founded on an allegation that it had

made a payment to Party A, intending to pay a tax refund to which, in error, it had assessed Party A to be entitled, but on an allegation that it had made a payment to Party B mistakenly thinking it was paying Party A (as it happens intending to pay a tax refund to Party A). Without deciding the point, I can see how it might be said in the latter case that in substance, the fact that the payment was thought to be by way of tax refund was immaterial, and SKAT was not by the claim seeking to vindicate any exercise by it of sovereign authority in relation to tax, even if the opposite is true in the present case."

12.     The judge then reached his conclusions at [118] to [120]:

"118. For the reasons set out above, my conclusion is that all of SKAT's claims are, in substance, claims seeking to enforce here the Kingdom of Denmark's sovereign right to tax dividends declared by Danish companies, and the WHT and WHT refund systems established by the WHT Act, the Danish tax statute by which that right is given specific content. The central interest of SKAT, and of the Kingdom of Denmark in whose interests the claim is brought (if it is meaningful to distinguish between SKAT and the Danish state), in bringing all these claims, is to vindicate that sovereign right and have it enforced indirectly here.

119. Though SKAT has framed its claims as private law causes of action, what those claims seek, in substance, is payment to SKAT of amounts of dividend tax it failed to take in the tax years in question, it not being right to distinguish when characterising substance for the purpose of Dicey Rule 3 between dividend tax never paid and dividend tax conditionally collected as WHT but paid away by SKAT by way of WHT refunds. SKAT's claim against the WHT refund applicants for the WHT refund to be returned is, in substance, a claim to tax. Such claims are not admissible in this court. Or again – if this is saying anything different – the central interest in SKAT bringing its claims here is to vindicate its right to pay WHT refunds only where applicable revenue law eligibility conditions are satisfied, in other words its right to keep, as tax, 27% of Danish company dividends except where those conditions are satisfied.

120. In that way, considering substance rather than form, SKAT's claims seek indirectly to enforce here Danish revenue law. Unless the Brussels-Lugano regime mandates a different outcome for SKAT's claims against Brussels-Lugano defendants, all of SKAT's claims fall to be dismissed by operation of Dicey Rule 3."

13.     At [128] the judge reiterated the point he had made at [88] that the earlier authorities on Dicey Rule 3 do not decide the case of a claim to recoup a tax refund said to have been paid in error. He said:

> "A theme of this judgment, though, is the need to confront the implications of the doctrine of indirect enforcement (of *inter alia* foreign revenue laws), and the idea of a central interest served by the bringing of private law claims, first strikingly illustrated by *Buchanan v McVey*, as approved by the House of Lords in *Government of India*…"

14.     The judge then turned to the argument by SKAT that the proceedings are a "civil and commercial matter" under the Brussels-Lugano regime and that in relation to defendants domiciled in jurisdictions covered by that regime, the English court could not dismiss the claims under Dicey Rule 3. The judge noted the contrast in the Brussels-Lugano regime between the concept of a "civil and commercial matter" and "a revenue, customs or administrative matter" by way of classification of types of court proceedings. The regime ensures that in civil or commercial proceedings as opposed to public law proceedings, a common set of rules will apply in all member states as regards personal jurisdiction.

15.     At [133] the judge said that it was well-established that Article 1(1) [of the Brussels Recast Regulation and the Lugano Convention] was to be given an autonomous meaning but he noted that its origins lie in continental legal systems where public law proceedings are not classified as civil matters in contrast to the position in the United Kingdom.

16.     At [134] he noted that the purpose of the Brussels-Lugano regime is not the harmonisation of the substantive laws of member states i.e. their rules of law as to whether claims will succeed or fail or their choice of law rules. The former are not subject to EU harmonisation, the latter are harmonised by the Rome II Convention ("Rome II").

17.     The judge went on to consider the decision of the Court of Appeal in *QRS v Frandsen* [1999] 1 WLR 2169 where the defendant had asset-stripped the company and the liquidator was suing him for breaches of his duties to the company, in substance to recover on behalf of a foreign sovereign tax authority taxes due from and unpaid by the company. The defendant applied to strike out the claims as bound to fail because they were precluded by Dicey Rule 3. The judge at first instance struck out the claims and that decision was upheld by the Court of Appeal which confirmed that Dicey Rule 3 applied, although as Andrew Baker J noted the contrary was barely argued. The substantial argument was that the proceedings were a "civil and commercial matter" not a "revenue, customs or administrative matter" within Article 1(1) and that it was incompatible with the then Brussels Convention to apply Dicey Rule 3 to dismiss a claim.

18.     As the judge noted at [139] the Court of Appeal decided that the claim brought was in substance an indirect revenue claim as in *Buchanan v McVey* so it was a "revenue…matter" for the purpose of the Brussels Convention. It went on to decide *obiter* that, if it had been a "civil and commercial matter" for the purposes of the Convention, the claims would not have been struck out on the logic that there was jurisdiction under Article 2 to bring the claims against the defendant who was domiciled here and to use Dicey Rule 3 to decline to exercise that jurisdiction would clearly impair the effectiveness of the Convention.

19. The judge went on to consider academic criticism doubting the correctness of *Frandsen* by Professor Briggs and by the editors of *Dicey*, the latter on the basis that Dicey Rule 3 is not really a rule of jurisdiction but a substantive rule of law. The judge noted that the text of *Dicey* pre-dates the decision of the CJEU in *Revenue and Customs Commissioners v Sunico* [2014] QB 391 to which he turned. *Sunico* concerned claims by HMRC in respect of missing trader VAT carousel frauds in which they sought damages at common law for an alleged tortious conspiracy to defraud against defendants domiciled in Denmark. HMRC brought ancillary proceedings in Denmark to attach assets to which objection was taken on the basis that they were a "revenue…matter" excluded from the Brussels Regulation 44/2001 then in force. The Danish court referred the case to the CJEU.

20. The judge noted at [144] that the CJEU had concluded that because the claim was framed in tort rather than as a claim under a tax law, the proceedings were a "civil and commercial matter" rather than a "revenue…matter" for the purposes of Article 1(1) so long as "*the commissioners were in the same position as a person governed by private law in their action against Sunico and the other non-residents sued in the High Court of Justice*", in other words that they were not using sovereign public law powers in connection with the proceedings.

21. The judge went on to hold at [147] that, in agreement with the editors of *Dicey,* Dicey Rule 3 is a substantive rule of English law unaffected by the Brussels-Lugano regime, an overriding or mandatory rule of English law as the *lex fori*. He referred to how the Rule had been categorised in the authorities and how labels ought not to be determinative, saying he preferred "admissibility", that English law does not admit claims that are, in substance, attempts by a foreign sovereign, directly or indirectly, to exercise that sovereign power through the English courts.

22. He went on to conclude at [149] that the decision of the Court of Appeal that those proceedings were not a "civil and commercial matter" was inconsistent with the decision of the CJEU in *Sunico*, subject to the use of public powers point, and thus no longer binding on him, although part of the *ratio*. However the decision to strike out the claims was still correct because, contrary to the *obiter* view of Simon Brown LJ in that case, the classification of the proceedings as a "civil and commercial matter" or a "revenue…matter" for the purposes of applying the Brussels-Lugano regime does not touch the question whether Dicey Rule 3 applies so as to defeat the claim.

23. The judge went on to discuss in detail academic views expressed by Professors Briggs and Dickinson about *Sunico* and *Frandsen* concluding at [162] that:

> "Dicey Rule 3 operates in the realm of the Rome II Regulation, and its continued application by the English court in proceedings notwithstanding that they are a 'civil and commercial matter' for Brussels-Lugano and Rome II purposes is authorised by Article 16 of Rome II."

24. The judge went on to consider whether the SKAT claim was a "civil and commercial matter" or a "revenue…matter". He said at [164] that if *Frandsen* remained good law then "revenue…matters" within Article 1(1) would encompass any proceedings which fell foul of Dicey Rule 3, so his conclusion on the latter would dictate the answer on Article 1(1). However *Frandsen* was not now authority for that proposition because it

was inconsistent with the decision of the CJEU in *Sunico*. Unless the use of public powers qualification applies these proceedings are a "civil and commercial matter" even though they are inadmissible under Dicey Rule 3.

25.   The judge then considered the nature of the use of public powers qualification as clarified in subsequent decisions of the CJEU in *BUAK v Gradenistvo Korana* [2019] I.L.Pr. 12 and *Belgische Staat v Movic* [2020] I.L.Pr. 31. He concluded at [174] to [176]:

> "174. In the present litigation, I agree with the defendants that it is, as they put it, blindingly obvious that SKAT made use, and might well have continued to make use, of powers it has as a sovereign tax authority that no private litigant would have, to investigate and obtain evidence that it could use if it wished in the litigation and has to a material extent already used in the litigation. On the authority of *BUAK* and *Movic*, however, that is beside the point. SKAT was neither attempting nor able to change the rules of the litigation game, either as to the substantive rules of law that would apply in determining its claims, or as regards the procedural rules applicable in the litigation, or as regards the status or effect of any of the evidence it might deploy or disclose. SKAT was not by this litigation pursuing public law proceedings, in which liabilities are determined as if this were a judicial review of SKAT's actions, decisions or exercise of public law powers, rather than upon the same legal basis, substantive and procedural, as claims of the kind it seeks to pursue, e.g. for damages for deceit or for negligence, brought by a private law entity.
>
> Conclusion
>
> 175. That brings me full circle to Dicey Rule 3. It can apply (and, I have concluded, does apply), notwithstanding that in form SKAT does not assert tax law causes of action and that these are civil litigation proceedings subject to the ordinary rules of such proceedings, because Dicey Rule 3, as an overriding rule of English law as the *lex fori*, looks beyond such matters of form to examine the substance, in the sense of the central interest in bringing the claim of the sovereign authority by which or in whose interests the claim is brought (and I have concluded that the central interest here is the Kingdom of Denmark's sovereign right to tax Danish company dividends). But the fact that SKAT asserted, in point of form, only private law causes of action, not tax claims, in civil litigation proceedings that are subject to the ordinary rules of such proceedings, means the proceedings are a 'civil and commercial' matter, not a 'revenue [etc] matter' within Article 1(1) of the Brussels-Lugano regime.
>
> 176. To the extent that SKAT relied on the Brussels-Lugano regime as the basis for this court having jurisdiction over the Brussels-Lugano defendants that have been sued, including it

may be for serving proceedings out of the jurisdiction, in my judgment it was right to do so. But its having been entitled to do so did not oust or disapply Dicey Rule 3 in respect of those defendants."

Grounds of appeal

26.     SKAT pursues two grounds of appeal which, in summary, are:

(1) The Judge erred in law by concluding that SKAT's claims as alleged fall within the proper scope of Dicey Rule 3 and are inadmissible on that basis.

(2) The Judge erred in law by concluding that Dicey Rule 3 remained applicable to and barred SKAT's claims against the Brussels Defendants notwithstanding that such claims were "civil and commercial matters" under the Brussels Regulation.

27.     The judge gave permission to appeal on Ground 2 but refused it on Ground 1 which, before the judge, was pursued against all the defendants including ED&F Man. The application for permission to appeal on Ground 1 was renewed before this Court but not against ED&F Man. Permission to appeal was granted by Males LJ. Ground 1 was not pursued against ED&F Man for what were described by Mr Fealy QC for SKAT as "pragmatic reasons" from which it follows that, unless SKAT is successful on Ground 2 against  ED&F Man, it has to accept that its claim against them is inadmissible because of Dicey Rule 3.

28.     By their Respondents' Notices, the various defendants seek to uphold the judge's overall decision in relation to Dicey Rule 3 on the basis that he should have concluded that the proceedings were a "revenue…matter" not a "civil and commercial matter", so that the Brussels-Lugano regime was inapplicable.

The parties' submissions

29.     I turn to consider counsel's submissions to this Court on the appeal and respondents' notices. Where counsel referred the Court to passages in the authorities, I will set them out at this stage of the judgment to avoid repetition later.

30.     On behalf of SKAT, Lord Pannick QC submitted that in concluding that the so-called "revenue rule" within Dicey Rule 3 applied in the present case, the judge made a fundamental error of law in failing to recognise that the revenue rule only applies in circumstances where the claim is to recover tax due. This claim is not such a claim because SKAT is not seeking to recover due and unpaid dividend tax or indeed any tax, because the foundation of its argument is that in the case of the alleged fraud defendants there was no liability to pay tax, no shares, no dividends, no tax and no withholding tax. On the contrary, the claim is that the sums paid out by SKAT were induced by fraudulent misrepresentation when there was no tax due or withheld in relation to the Solo etc Applicants. The tax that was due was withheld under the Danish WHT Act from other people than the Solo etc Applicants or the alleged fraud defendants. There is no unsatisfied tax claim under Danish law that SKAT is seeking to enforce directly or indirectly by its claims in these proceedings. Equally there was never a taxpayer/tax authority relationship between the Solo etc Applicants or the alleged fraud defendants and SKAT.

31.  Lord Pannick QC submitted that on the authorities which define the scope of the revenue rule, the mere fact that the alleged fraud is committed in the context of taxation or against a foreign tax authority is insufficient to bring the matter within the rule which only applies where the claim is one, directly or indirectly, for tax which is due. The judge had failed to recognise that limitation on the revenue rule.

32.  He then took the Court to the relevant authorities, beginning with the speech of Lord Goff of Chieveley as to the nature and purpose of Dicey Rule 3 in *Re State of Norway's Application (No.2)* [1990] 1 AC 723 at 807-8. Having set out the Rule as stated in *Dicey* Lord Goff said:

> "In that rule, it is stated that the English courts have no jurisdiction to entertain such an action. However, in Dicey & Morris itself, at p. 101, it is recognised that the theoretical basis of the rule is a matter of some controversy. The editors express the opinion that the best explanation is to be found in the speech of Lord Keith of Avonholm in *Government of India v. Taylor*, where he said, at p. 511:
>
> > "One explanation of the rule . . . may be thought to be that enforcement of a claim for taxes is but an extension of the sovereign power which imposed the taxes, and that an assertion of sovereign authority by one state within the territory of another, as distinct from a patrimonial claim by a foreign sovereign, is (treaty or convention apart) contrary to all concepts of independent sovereignties."
>
> …
>
> It is not necessary for the purposes of the present case to decide what is the precise theoretical basis of the rule, though I am respectfully inclined to agree with Lord Keith of Avonholm's expression of opinion. At all events the rule cannot, in my view, go to the jurisdiction of the English court. What the English court does is simply to decline in such cases to exercise its jurisdiction, and on that basis the relevant proceedings will be either struck out or dismissed."

33.  As Lord Pannick QC said this statement of principle is not disputed by the defendants. He also submitted that what Dicey Rule 3 is concerned with is direct or indirect enforcement in this country of the revenue laws of a foreign state. The Rule does not prevent the recognition of the revenue laws of a foreign state. *Re the State of Norway's Application* was a good example where there was no problem with assisting Norway, in a tax context, by way of an order under section 1 of the Evidence (Proceedings in Other Jurisdictions) Act 1975 for witnesses resident in England to give evidence to assist the Norwegian court. The judge himself had noted (at [17(vi)] of his judgment, quoted above) that Dicey Rule 3 did not preclude recognition of a foreign revenue law as opposed to its enforcement.

34.  The starting point for the revenue rule being limited to claims by a foreign state to recover, directly or indirectly, tax due under its laws is *Government of India v Taylor*

where the Indian government was seeking to prove in the liquidation of an English registered company which had traded in India, sums due by way of Indian income tax and capital gains tax. The issue as identified by Viscount Simonds at the outset of his speech at 503 was "whether there is a rule of law which precludes a foreign state from suing in England for taxes due under the law of that State". He went on to hold that there was such a rule and the other Law Lords concurred. Lord Keith of Avonholm gave the matter the fullest treatment. As Lord Pannick QC pointed out he cited with approval the judgment of Kingsmill Moore J in the High Court of Ireland in 1950 in *Peter Buchanan Ltd v McVey*.  He described that case as in substance an attempt to enforce indirectly a claim to tax by the revenue authorities of another State.

35.     Lord Pannick QC also referred to the speech of Lord Somervell of Harrow who said at 514:

> "There is no decision binding on your Lordships' House and the matter therefore falls to be considered in principle. If one State could collect its taxes through the courts of another, it would have arisen through what is described, vaguely perhaps, as comity or the general practice of nations inter se. The appellant was therefore in a difficulty from the outset in that after considerable research no case of any country could be found in which taxes due to State A had been enforced in the courts of State B."

36.     *Peter Buchanan Ld. v. McVey* is reported as a note in the Appeal Cases immediately after *Government of India* at [1955] AC 516. Lord Pannick QC referred to the headnote which indicated that the case concerned a businessman in Scotland who entered a scheme to avoid retrospective tax by selling all the company's whisky stocks and transferring the proceeds and his own assets to Ireland where he then moved himself, thereby committing a fraud on the Scottish revenue. The Scottish revenue took action to wind up the company and levied assessments to tax. The company was wound up and a liquidator appointed who brought proceedings in Ireland to recover the sums due. Kingsmill Moore J, having cited earlier authorities, said at 526:

> "These decisions establish that the courts of our country will not enforce the revenue claims of a foreign country in a suit brought for the purpose by a foreign public authority or the representative of such an authority, and that, even if a judgment for a foreign penalty or debt be obtained in the country in which it is incurred, it is not possible successfully to sue in this country on such judgment."

37.     Later, at 529, he said:

> "If I am right in attributing such importance to the principle, then it is clear that its enforcement must not depend merely on the form in which the claim is made. It is not a question whether the plaintiff is a foreign State or the representative of a foreign State or its revenue authority. In every case the substance of the claim must be scrutinized, and if it then appears that it is really a suit brought for the purpose of collecting the debts of a foreign

> revenue it must be rejected… For the purpose of this case it is sufficient to say that when it appears to the court that the whole object of the suit is to collect tax for a foreign revenue, and that this will be the sole result of a decision in favour of the plaintiff, then a court is entitled to reject the claim by refusing jurisdiction."

38.    Lord Pannick QC referred to the fact that the defendants placed particular reliance on what the judge had said immediately before that passage where he said: "Safety lies only in universal rejection." However, he submitted that begged the question: rejection of what? He submitted that the answer was in the next passage, rejection of claims seeking directly or indirectly to collect "the debts of a foreign revenue", in other words a claim to tax. This was made clear on 530 where the judge held as follows:

> "I hold as a fact - and, indeed, I understand it to be admitted - that the sole object of the liquidation proceedings in Scotland was to collect a revenue debt… I hold that the sole object of the present proceedings before me is also to collect a Scottish revenue debt…"

39.    The decision of Kingsmill Moore J was upheld on appeal by the Irish Supreme Court, also reported in the Note. Lord Pannick QC referred to the judgment of Maguire CJ who said at 533 in dismissing the appeal:

> "The position seems clearly to be as found by the trial judge, that these proceedings were started in Scotland with the purpose of collecting a tax - and that apart from costs and the expenses of the liquidator any moneys recovered will inevitably pass to the Revenue."

40.    Lord Pannick QC accepted that *Peter Buchanan Ld. v. McVey*, as approved by Lord Keith in *Government of India*, supports the proposition that Dicey Rule 3 prohibits a claim to collect tax whether indirectly or indirectly for a foreign revenue even where the taxpayer has acted fraudulently. However in the present case SKAT was not seeking to recover tax due, directly or indirectly. There is a clear distinction of principle between the dishonesty in *Peter Buchanan Ld. v. McVey* and that here. That case involved dishonesty in seeking to evade tax due and the foreign revenue cannot bring a claim to recover tax due even if they allege fraud. Here the claim based on fraud is one where no tax was ever due from the alleged fraud defendants or is now due so the revenue rule does not apply.

41.    Lord Pannick QC submitted that if there were any doubt as to the scope of the revenue rule, this was clarified by the House of Lords in *Williams & Humbert Ltd v W&H Trade Marks (Jersey) Ltd* [1986] AC 368. Lord Mackay of Clashfern, with whom Lords Scarman, Bridge and Brandon agreed, dealt with the revenue rule. Having cited extensively from the speeches in *Government of India* and the judgment in *Peter Buchanan Ld. v. McVey* he set out at 440 the argument raised:

> "From the decision in the *Buchanan* case [1955] A.C. 516 counsel for the appellants sought to derive a general principle that even when an action is raised at the instance of a legal person

> distinct from the foreign government and even where the cause of action relied upon does not depend to any extent on the foreign law in question nevertheless if the action is brought at the instigation of the foreign government and the proceeds of the action would be applied by the foreign government for the purposes of a penal revenue or other public law of the foreign State relief cannot be given."

42.     In rejecting the proposition that there was any such general principle as a matter of English law, Lord Mackay said at 440-1:

> "Having regard to the questions before this House in *Government of India v. Taylor* [1955] A.C. 491 I consider that it cannot be said that any approval was given by the House to the decision in the *Buchanan* case except to the extent that it held that there is a rule of law which precludes a state from suing in another state for taxes due under the law of the first state. No countenance was given in *Government of India v. Taylor*, in *Rossano's* case [1963] QB 352 nor in *Brokaw v Seatrain U.K. Ltd.* [1971] 2 Q.B. 476 to the suggestion that an action in this country could be properly described as the indirect enforcement of a penal or revenue law in another country when no claim under that law remained unsatisfied. The existence of such unsatisfied claim to the satisfaction of which the proceeds of the action will be applied appears to me to be an essential feature of the principle enunciated in the *Buchanan case* [1955] A.C. 516 for refusing to allow the action to succeed."

43.     Lord Pannick QC emphasised that last sentence as making it clear that an essential feature of the revenue rule was that there is an unsatisfied claim to tax under the relevant foreign revenue law. In his submissions in reply he made the point that the suggestion made in the submissions of Ms Macdonald QC for the DWF defendants that the requirement for the revenue rule to apply that there be an outstanding claim to tax did not apply where the claim in the proceedings was being brought by the foreign state itself, as here, was simply wrong. It was contrary to what Lord Mackay said which was expressed in general terms without any such qualification.

44.     He submitted that since there was no question of an outstanding claim to tax here, Lord Mackay's essential feature was not satisfied and the revenue rule did not apply. The same conclusion has been reached in the proceedings brought by SKAT in the United States. In the *SKAT Tax Refund Scheme Litigation* before Federal Judge Lewis A Kaplan in the Southern District of New York, motions to dismiss the claims in reliance on the revenue rule were brought by the defendants. These were dismissed by the judge. At page 4 of his Memorandum Opinion dated 9 January 2019 he said:

> "Defendants, relying on the revenue rule, seek dismissal of these actions at the outset. If plaintiff can prove that the defendants never in fact owned the relevant Danish stocks – and the Court is obliged to accept their allegations as true for present purposes – the revenue rule would not apply because the substance of the

claims would be for garden variety commercial fraud. Accordingly, the motion to dismiss is denied."

45.     At page 11 the judge said:

"These actions plainly do not seek direct enforcement of Danish tax law. The defendants' attempt to frame them as seeking to recover lost tax revenue – when the only reason the money was lost is because the defendants in effect allegedly stole it, and the only reason it supposedly concerns tax revenue is because the defendants' alleged victim was the Danish tax authority – is too clever by half."

Lord Pannick QC commended to this Court this robust analysis in relation to what was essentially the same fraud on SKAT in the present proceedings.

46.     He then referred to the reliance placed by the defendants on the administrative decisions made by SKAT annulling the decisions to pay the refunds, noting that the judge had not relied upon this in his judgment. The defendants were seeking to argue that the central interest of SKAT in bringing these proceedings was to unwind sovereign tax determinations. This was misconceived, as these proceedings served a different purpose from the proceedings before the Danish tax tribunal, namely to recover compensation in respect of funds paid out as a result of fraudulent misrepresentations. As I said in the course of argument, there is no question of it being a pre-condition of SKAT pursuing the claim here that they had to issue some administrative decision in Denmark. As Lord Pannick QC said, whatever the position in Denmark, the revenue rule does not apply to the proceedings against the alleged fraud defendants. He also made the point that by these proceedings SKAT was not exercising or enforcing any public powers. It was not, as the defendants suggest, seeking to vindicate an exercise of public powers but to resile from it.

47.     Lord Pannick QC then turned to consider the wider rule within Dicey Rule 3 that the English courts will not assist a foreign sovereign state in proceedings in England to vindicate or enforce sovereign powers. He accepted that there was such a wider rule but submitted that it was clearly not applicable here. The existence of the wider rule was recognised by the Court of Appeal in *Mbasogo v Logo Ltd* [2006] EWCA Civ 1370; [2007] QB 846, the case where the head of state of Equatorial Guinea and the state itself brought proceedings for damages for an unlawful means conspiracy to overthrow the government in a coup d'etat which failed. The claims included ones for damage to the state's commercial interests and infrastructure and for the costs of investigating the conspiracy.

48.     Lord Pannick QC referred the Court to the analysis of Dicey Rule 3 in the judgment of the Court (Sir Anthony Clarke MR, Dyson and Moses LJJ, although as stated at the outset of the judgment, the relevant "Justiciability" section was principally written by Dyson LJ). The analysis runs through all the authorities on Dicey Rule 3. He drew particular attention to [41] et seq. At [41] the court said:

"The importance of the speech of Lord Keith in [*Government of India*] and the judgment of Lord Denning MR in the *Ortiz* case [1984] AC 1 is that they both sought to explain the rationale for

the well-established rule that the courts will not enforce the penal and revenue laws of another country. In short, it is that the courts will not enforce or otherwise lend their aid to the assertion of sovereign authority by one state in the territory of another. The assertion of such authority may take different forms. Claims to enforce penal or revenue laws are good examples of acts done by a sovereign by virtue of his sovereign authority ("jure imperii"). In each case, it is necessary to see whether the relevant act is of a sovereign character. Penal and revenue laws are assumed to be of a sovereign character."

49.    At [42] the Court quoted a passage from an article written by Dr FA Mann in 1954, by which Lord Denning MR had made clear his judgment in *Ortiz* was influenced. The passage, with which the Court of Appeal said it agreed, was:

"Where the foreign state pursues a right that by its nature could equally well belong to an individual, no question of a prerogative claim arises and the state's access to the courts is unrestricted. Thus a state whose property is in the defendant's possession can recover it by an action in detinue. A state which has a contractual claim against the defendant is at liberty to recover the money due to it. If a state's ship has been damaged in a collision, an action for damages undoubtedly lies. On the other hand, a foreign state cannot enforce in England such rights as are founded upon its peculiar powers of prerogative. Claims for the payment of penalties, for the recovery of customs duties or the satisfaction of tax liabilities are, of course, the most firmly established examples of this principle."

50.    At [43] the Court referred to a later article by Dr Mann in 1987, with which they also agreed:

"Dr Mann said that the decisive question is whether the plaintiff asserts a claim that, by its nature, involves the assertion of a sovereign right. Quoting Grotius, he suggested that claims are capable of international enforcement if they arise from acts that may be done not only by the King, but also by anyone else: "actus qui a rege sed ut a quovis alio fiant.""

51.    They then referred to the decision of the High Court of Australia in the Spycatcher case: *Attorney General in and for the United Kingdom v Heinemann Publishers Australia Pty Ltd* (1988) 165 CLR 30. The Court of Appeal then set out its conclusions of principle. Lord Pannick QC referred in particular to [50]:

"The critical question is whether in bringing a claim, a claimant is doing an act which is of a sovereign character or which is done by virtue of sovereign authority; and whether the claim involves the exercise or assertion of a sovereign right. If so, then the court will not determine or enforce the claim. On the other hand, if in bringing the claim the claimant is not doing an act which is of a sovereign character or by virtue of sovereign authority and the

> claim does not involve the exercise or assertion of a sovereign right and the claim does not seek to vindicate a sovereign act or acts, then the court will both determine and enforce it. As we see it, that was the broad distinction of principle which the court was seeking to draw in the *Emperor of Austria* case 3 De GF & J 217. In deciding how to characterise a claim, the court must of course examine its substance, and not be misled by appearances: see, for example, *Huntington v Attrill* [1893] AC 150."

52.   The Court of Appeal went on to hold, perhaps unsurprisingly given the nature of the claims, that none of them was enforceable in the English courts. Lord Pannick QC also referred to [67] where the court sought to delineate which claims by a sovereign state were justiciable and which were not:

> "In short, we consider that the issue of justiciability turns on the distinction, which Sir Sydney recognised should be drawn, between an exercise of sovereign power and an action brought by a sovereign state which might equally have been brought by an individual to recover losses for damage to property. For the reasons that we have given, we are of the opinion that no part of the claim for special damages pleaded in para 40 of the re-amended particulars of claim should be entertained by our courts, since, as we have explained, this action has been brought as an integral part of the second claimant's attempts to protect itself from revolution."

53.   Lord Pannick QC also referred to the decision of the Court of Appeal in *Government of the Islamic Republic of Iran v The Barakat Galleries Ltd* [2007] EWCA Civ 1374; [2009] QB 22. In that case antiquities had been brought from Iran following unlicensed excavations in circumstances where under a 30 year old law, the Government of Iran had obtained title to all such antiquities as a matter of Iranian law. The Court of Appeal (Lord Phillips MR, Wall and Lawrence Collins LJJ) held that the Government's claim in conversion based on that title was a patrimonial claim (in other words a claim based on ownership of the relevant asset) rather than a claim to enforce a public law or to assert sovereign rights, distinguishing *Ortiz*. Lord Pannick QC referred to that case for what was said in the judgment of the Court about *Mbasogo* at [123]:

> "…the *Mbasogo* case in the Court of Appeal is not in fact a case involving the attempted enforcement of foreign public law. Although the court approved the residual category of "other public law" the ratio is that a claim involving the exercise or assertion of a sovereign right is not justiciable. This is not far removed from the test adopted by the High Court of Australia, and the Court of Appeal accepted, at para 50, the correctness of the expression of opinion by the Privy Council, which itself appears to give some approval to the test suggested by the High Court of Australia."

54.   Just as that case was not one to enforce the relevant Iranian law although the Court recognised that law, so Lord Pannick QC submitted, in this case SKAT was not asking the Court to enforce any public law of Denmark. Although the proceedings would

require the Court to recognise the Danish tax laws, there was no objection to such recognition under Dicey Rule 3. The claim was one to recover from the alleged fraud defendants payments obtained by fraud.

55.    Lord Pannick QC referred to the statement of principle in [5-040] of *Dicey, Morris & Collins:*

> "The result of the authorities in the Court of Appeal is that the English court will not enforce a claim based on foreign public law if the claim involves the exercise or assertion of a sovereign right, unless it is contrary to public policy for the claim to be shut out. In the *Iran* case the Court of Appeal also considered what types of public law would be likely to fall within the prohibition. It approved the test suggested by Lord Denning M.R. in *Att-Gen of New Zealand v Ortiz* that the question depended on whether the claim involved acts done by a sovereign jure imperii, by virtue of sovereign authority. The Court of Appeal concluded that exchange control legislation, and (perhaps) export restrictions would so fall. In practice probably the most important rules falling within the category are those which authorise governmental interference with private property, whether in the form of requisition, nationalisation or confiscation."

56.    He submitted that what the editors envisage as the scope of the principle is a very long way from common or garden fraud as in the present case. He also submitted that SKAT's case that a claim such as the present to recover monies paid out induced by fraudulent misrepresentation is not within Dicey Rule 3 is supported by United States authority, specifically two New York state cases.

57.    In the decision of the Appellate Division of the Supreme Court of New York in *Nordrhein-Westfalen v Rosenthal* (1962) 232 N.Y.S.2d 963, the plaintiff was one of the German federal states. The defendant was a former German national now resident in New York who had made successful claims under the federal indemnification law for compensation for damages suffered as a victim of Nazi persecution. The plaintiff alleged that the defendant had intentionally or at least grossly negligently misrepresented material facts. It had revoked the monetary awards granted and contended the defendant was obligated to repay them which he had refused to do.  The Court concluded that the plaintiff was entitled to recover stating:

> "our courts may nevertheless decline to recognize determinations of tribunals of foreign countries if they contravene our public policy…We find no contravention here. While plaintiff is a sovereign, its aim is merely the restoration of an outlay wrongfully obtained from it. The object of the action is not "vindication of the public justice", but "reparation to one aggrieved.""

58.    Lord Pannick QC submitted that this was a correct statement of principle that where, under public law, a state pays money to someone and it has cause to believe the money was wrongfully obtained, an action to recover the money is not a sovereign act or the

vindication of sovereign authority, but rather an action to recover money wrongfully paid out.

59.    That case was followed and applied in another decision of the Appellate Division of the Supreme Court of New York in *Harvardsky v Kozeny* (2014) 980 N.Y.S. 2d 240. A Czech criminal court had ordered the defendant to pay compensation to the victims of his fraud. One of the victims brought a claim in the New York courts to enforce the Czech judgment and the defendant resisted the claim on the basis that the Court should not enforce foreign penal judgments. The Court held that it was doing no such thing, citing the earlier case with approval and saying:

> "Indeed,    this    Court    has    applied    this    test in an action that likewise sought to recover monies obtained by fraud. We observed that even though the plaintiff was "a sovereign, its aim is merely the restoration of an outlay wrongfully obtained from it. The object of the action is not vindication of the public justice but reparation to one aggrieved.""

60.    Lord Pannick QC submitted that even if, contrary to SKAT's submissions, there were to be the possibility in this case of the application of a wider sovereign powers rule within Dicey Rule 3, there is in relation to that wider rule a limitation, as recognised in the passage at [5-40] of *Dicey* itself on which he relied, of public policy. The court will not decline to hear a case on the grounds that the claimant is seeking to exercise sovereign powers if there is a public policy reason to do so. The existence of this exception was recognised, albeit *obiter*, in the *Iran* case. At [151] and [154] the Court of Appeal said:

> "151.  If we are wrong in the view that this is not a claim to enforce foreign public law, then we do not consider that it should be precluded by any general principle that this country will not entertain an action whose object is to enforce the public law of another state…
>
> 154.  In our judgment, there are positive reasons of policy why a claim by a state to recover antiquities which form part of its national heritage and which otherwise complies with the requirements of private international law should not be shut out by the general principle invoked by *Barakat*. Conversely, in our judgment it is certainly contrary to public policy for such claims to be shut out. A degree of flexibility in dealing with claims to enforce public law has been recommended by the Institut de droit international (in particular where it is justified by reason of the subject matter of the claim and the needs of international co-operation or the interests of the states concerned: *Annuaire de l'Institut de Droit International* (1977), vol 57-II, p 329) and the International Law Association: *Dicey* , vol 1, para 5–040, n 80."

61.    Lord Pannick QC noted that, at [92] of his judgment, Andrew Baker J had rejected the suggestion that a public policy exception could apply to a case of fraud such as the present:

> "The only countervailing public policy suggested was that of combating or giving redress in respect of fraud, yet that has never ousted the Rule or prevented a type of claim from falling within it that otherwise would. For completeness, I venture to suggest that the proper role for a public policy argument of the kind considered, *obiter*, in *Barakat*, is only in assessing whether Dicey Rule 3 is to be extended to a category of foreign public law or species of prerogative or similar power not covered by existing authority. Where, by reference to the type of foreign law or power being considered, Dicey Rule 3 applies, it would be "*unwise ... to attempt to discriminate between those claims which [the courts] would and those which they would not enforce. Safety lies only in universal rejection*", *per* Kingsmill Moore J in *Buchanan v McVey*, *supra*, at 529."

62.    Lord Pannick QC submitted that there was confusion here. SKAT accepted that, within the scope of the narrow revenue rule, there was no public policy exception, but to the extent that the defendants' case was being put forward under a broader sovereign powers rule within Dicey Rule 3, there is a public policy exception as recognised at [5-40] of *Dicey*. The applicable public policy is that victims of an international fraud including foreign revenue authorities should have a remedy before the English courts. Lord Pannick QC relied on the well-known maxim that fraud unravels all or is a thing apart.

63.    Lord Pannick QC submitted that for the English courts to refuse to consider the substance of the fraud allegations in this case would only encourage fraudsters in this country to target foreign public bodies confident in the knowledge that no claim could be brought here. He relied on what this Court said recently in *NatWest Markets v Bilta (UK) Ltd* [2021] EWCA Civ 680, at [2] of the judgment of the Court (Asplin, Andrews and Birss LJJ):

> "Whenever a situation creates the opportunity for large amounts of money to be obtained dishonestly, especially at the expense of the Revenue, criminals will be swift to take advantage of it. The phenomenon known as missing trader intra-community VAT fraud ("MTIC fraud") is a good example of this."

64.    Lord Pannick QC also addressed briefly the question of international conventions, specifically the EU Mutual Assistance Directive ("MARD"), to which the defendants contend that SKAT could have had resort. However, as I pointed out in argument, they are of no relevance to the issues the Court has to decide. SKAT is either right or wrong in its argument on Ground 1.

65.    In relation to Ground 2, it was common ground that since these proceedings were pending on 31 December 2020, the end of the transition period under the Withdrawal Agreement, by virtue of Articles 4 and 67 of the Withdrawal Agreement and section 7A of the EU (Withdrawal) Act 2018, the Brussels Recast Regulation continues to apply.

66.    The first issue raised on Ground 2 is whether the judge was right to say that this was a "civil and commercial matter" rather than a "revenue etc. matter" for the purposes of

Article 1(1) of the Brussels Recast Regulation. Lord Pannick QC submitted that the judge was right as a matter of EU law. Merely because the claimant is a public body, it does not follow that the claim ceases to be a civil or commercial matter. The test is whether the public body is acting in the exercise of its public powers. He referred the Court to [49] of the judgment of the CJEU in *BUAK* and then referred in detail to *Sunico*, upon which the judge had relied.

67. He submitted that the judgment of the CJEU in that case supported a number of propositions: (i) that in the present case as in *Sunico* as the CJEU said at [37] the basis of the claim is not Danish tax law, although that forms the background. The basis of the claim against the alleged fraud defendants is the tort of conspiracy to defraud and against ED&F Man it is for misrepresentation; (ii) As in *Sunico* (see [38]) the defendants are not persons who are liable to pay tax. There was no tax or liability to pay tax; (iii) As in *Sunico* (see [39]) the claim is being pursued through normal legal channels in the Courts, not by the use of special powers. SKAT will have to prove its case in Court in the usual way; (iv) Accordingly, as was said at [40] of *Sunico*, the legal relationship between SKAT and the defendants is not based on public law, here tax law; (v) This case is stronger than *Sunico* since in that case there was an outstanding claim for output tax albeit not against the particular defendant.

68. *Sunico* also dealt with the relevance of the use of evidence obtained by the use of public powers. At [42] the Court said:

> "as to whether the request for information which the Commissioners addressed to the Danish authorities on the basis of Regulation No 1798/2003 before bringing proceedings before the High Court of Justice affects the nature of the legal relationship between the Commissioners and Sunico, it should be observed that it is not apparent from the documents in the file before the Court that in the proceedings pending before the High Court of Justice the Commissioners used evidence obtained in the exercise of their powers as a public authority."

69. The Court went on to say that it was for the referring court to determine whether or not this was the case. Lord Pannick QC noted that Andrew Baker J had correctly said that this part of the *Sunico* judgment had been clarified by the later CJEU judgments in *BUAK* and *Movic*. The test which emerges is whether the public authority has used the evidence in such a way that it has a special status in the proceedings. As Lord Pannick QC put it, if the public authority is in a specially privileged position in the proceedings, for example because it has made a determination which is binding or its evidence has a special force or effect, then the proceedings will not be within the scope of a civil or commercial matter. The judge had correctly concluded at [174] of his judgment (which I quoted at [25] above) that there was no question of SKAT being in some such privileged position so that the proceedings remained a civil or commercial matter.

70. Lord Pannick QC also pointed out that the material which SKAT had obtained from other tax authorities abroad had all been disclosed to the defendants and, in any event, SKAT either had not used it in these proceedings or was not seeking to use it in a way which gave it special status or authority.

71.     In support of its case that the judge had been right to conclude that these proceedings were a civil or commercial matter, SKAT also relied upon the decision of the CJEU in *Land Berlin v Sapir* [2013] I.L.Pr. 29 which, like the New York case, concerned erroneous overpayment to victims of Nazi persecution. The Court held that the claim in the German courts to recover the overpayment was a civil or commercial matter. At [37]-[38], the Court said:

> "37      Furthermore, it must be observed that the action in the main proceedings concerns recovery of an overpayment erroneously made when the *Land Berlin* gave effect to the victims' payment rights. First, the restitution of that overpayment is not part of the administrative procedure laid down by the Vermögensgesetz and the Investitionsvorranggesetz. Second, for the purposes of the recovery of that overpayment, the owner, whether a public or a private person, must bring an action against the victims before the civil courts. Likewise, the legal basis for that recovery consists of the rules laid down in Paragraph 812(1) of the German Civil Code concerning restitution based on unjust enrichment.

> 38      In the light of all the foregoing, the answer to the first question is that Article 1(1) of Regulation No 44/2001 must be interpreted as meaning that the concept of 'civil and commercial matters' includes an action for recovery of an amount unduly paid in the case where a public body is required, by an authority established by a law providing compensation in respect of acts of persecution carried out by a totalitarian regime, to pay to a victim, by way of compensation, part of the proceeds of the sale of land, has, as the result of an unintentional error, paid to that person the entire sale price, and subsequently brings legal proceedings seeking to recover the amount unduly paid."

72.     Lord Pannick QC submitted that the judge had been correct to conclude that the ratio of the decision of the Court of Appeal in *Frandsen* that the proceedings there were not a civil or commercial matter, but a revenue matter, could not stand with the later decisions of the CJEU specifically in *Sapir* and *Sunico* and had to give way to those decisions.

73.     The second issue under Ground 2 is whether, on the basis that these proceedings are a civil or commercial matter and that, contrary to SKAT's primary case against the alleged fraud defendants, Dicey Rule 3 would otherwise apply, Dicey Rule 3 does not apply because to apply it would derogate from or impair the effectiveness of the Brussels Recast Regulation. Lord Pannick QC submitted that this is a question of EU law and that the correct answer is that, contrary to the judge's conclusion, Dicey Rule 3 does not apply since it would involve the English Court declining to exercise its jurisdiction where the Regulation mandates that this Court has jurisdiction, by virtue of Article 4, over defendants domiciled here. He submitted that if this was a civil or commercial matter within Article 1 of the Regulation, as the judge found, it cannot be open to this Court to apply its own rules as to claims of a sovereign nature to refuse to hear the claim. For the English Court to say that because we categorise this claim as

one of sovereign authority even though the CJEU does not under Article 1, the claim may not be brought in the Courts of the defendants' domicile would be to substitute a national rule for the rules of EU law which expressly cover the same issue.

74.    Lord Pannick QC submitted that the application of Dicey Rule 3 in these circumstances was to be distinguished from other situations where the English courts would dismiss a claim such as for illegality or because it was time barred, because in the present circumstances the English Court cannot rely on a rule which allows it to decline to exercise its jurisdiction where the whole point of the Regulation is to confirm jurisdiction.

75.    He referred the Court to the decision of the Court of Appeal in *Frandsen* where, at 2178, Simon Brown LJ addressed this issue albeit *obiter*. He relied upon this as the correct analysis that to apply Dicey Rule 3 here would impair the effectiveness of the Brussels Recast Regulation:

> "Assuming that the present claim is a civil matter within article 1 and, therefore, that under article 2 there is jurisdiction to bring it in England against the defendant as someone domiciled here, the plaintiffs submit that rule 3 of *Dicey & Morris* cannot properly be invoked so that the court immediately then declines to exercise its jurisdiction: such an application of rule 3 of *Dicey & Morris* would clearly "impair the effectiveness of the Convention"
>
> Mr. Ivory, for the defendant, submits the contrary. He argues that rule 3 of *Dicey & Morris* is not concerned with the appropriate place for the trial of this action. There is, he submits, really no difference between striking out the claim under rule 3 of *Dicey & Morris* and striking it out because on some other ground it is bound to fail, for example, for lack of merit or under the Limitation Act 1980.
>
> On this issue it seems to me that the plaintiffs' argument is plainly right. The necessary corollary of rule 3 of *Dicey & Morris* is that any such claim as this can only properly be brought in the tax authority's own courts. Were the Convention to apply, rule 3 would seem to me not merely to impair its effectiveness but indeed substantially to derogate from it."

76.    Lord Pannick QC also relied upon the fact that where the English Court has jurisdiction by virtue of what is now Article 4 of the Brussels Recast Regulation (what was Article 2 of Regulation 44/2001) there is no power in the Court to decline jurisdiction on the grounds that it would be more suitable for the dispute to be settled elsewhere. He referred to the decision of Gloster J in *Viking Line v International Transport Workers Federation* [2005] EWHC 1222 (Comm); [2005] 1 CLC 951 in a passage at [70]-[71] with which the Court of Appeal in that case agreed (see [2] of the judgment of Waller LJ at [2005] EWCA Civ 1299; [2005] 2 CLC 720).

77.    Lord Pannick QC noted that at [162] of the judgment, the judge had said that Dicey Rule 3 was in substance an overriding mandatory obligation within Article 16 of Rome

II. He submitted that the problem with that argument is that the CJEU has held that the application of national rules, whatever their status, is impermissible in an area of law that has been fully harmonised by the EU. He relied upon the decision in *Pippig v Hartlauer* [2004] All ER (EC) 1156, where the question was whether the national court could apply stricter rules on misleading advertising than the EU Directive. The Court held not because the Directive had carried out an exhaustive harmonisation of the conditions as to when comparative advertising in Member States was lawful. Lord Pannick QC submitted that the position was the same with the Brussels-Lugano regime where Article 1 lays down the criteria and the national court cannot depart from them.

78.    The defendants divided up their submissions between the various different counsel teams. First of all Mr Nigel Jones QC made submissions on behalf of the Sanjay Shah defendants. They are essentially only concerned with Ground 1 since very few of them of them are domiciled in a Member State for the purposes of the Brussels-Lugano regime. Accordingly his submissions addressed only Ground 1. He began by seeking to clarify that this was not a case in which there were no shares or dividends. This was contrary to my understanding of Lord Pannick QC's analysis, which was that the relevant Danish companies had paid out dividends and had withheld WHT so that tax was paid by the shareholders, but the Solo etc Applicants were not shareholders, never received or were entitled to dividends and never paid WHT.

79.    Mr Jones QC drew the Court's attention to the SKAT Particulars of Claim and said that it all came back so far as the alleged fraud defendants are concerned to four core allegations of representations set out at [19] which were then alleged to have been fraudulent misrepresentations:

> "(a) The WHT Applicant was the beneficial owner of the shares in the Danish company described in the Credit Advice Note (on the day before the ex-date recorded therein, where stated); and/or
>
> (b) The WHT Applicant had beneficially received the dividend, net of tax, described in the Credit Advice Note (on the payment date described therein, where stated); and/or
>
> (c) The dividend had been paid to the WHT Applicant, after the Danish company had withheld the tax described in the Credit Advice Note; and/or
>
> (d) The WHT Application was a genuine application (i.e. made with an honest belief as to the truth of the statements of fact in it) to reclaim tax deducted from a dividend paid to the WHT Applicant by the named Danish company."

80.    He submitted that three of those core allegations related to what he called validity matters. He submitted that there were seven stages of the process: (i) the dividend tax imposed by SKAT on Danish companies, so the creation and imposition of WHT; (ii) the payment by the relevant Danish companies of the WHT which may be a temporary stage depending on whether refunds are available; (iii) making of applications by WHT applicants for refunds; (iv) consideration by SKAT of those applications and its

decision by way of its tax powers assessment as to how much tax is to be refunded or retained; (v) payment out by SKAT to WHT applicants of refunds it has approved in the exercise of its sovereign powers which necessarily involves SKAT deciding that those applicants paid too much tax initially; (vi) the administrative decision by SKAT to rescind its earlier decision to refund; and (vii) the claim seeking recovery of the allegedly overpaid refund.

81.    Mr Jones QC effectively used his seven stage process to contend that, at the preliminary issues trial, the judge was not hidebound by SKAT's pleading of fraud, but had to look at the substance of the claim overall which included the defences and take account of the fact that if the case went ahead there would be what Mr Jones QC described as a "deep dive" trial on issues of validity which would include how SKAT administered its own revenue system, together with the alleged fraud defendants' case that there were trading structures in place which led to the Solo etc Applicants having the ability to claim the refunds. He submitted that the judge had been right to say at [101] of the judgment that what SKAT asserted: "As a result, none of the proceeds of the present action will go to discharge any such tax or other public law liability in Denmark" begged the question the Court had to answer which was, as the judge put it: "whether the return of a tax refund payment erroneously paid, the error being that no tax refund was due as SKAT had thought when paying, should be seen as different in kind for the purpose of Dicey Rule 3."  He submitted that this was an entirely appropriate conclusion for the judge to draw in what was essentially a characterisation judgment. Mr Jones QC submitted that the judge had made the same point, correctly, at [119] (which I quoted in [12] above).

82.    Mr Jones QC then contended that, because Lord Pannick QC accepted that, if the revenue rule applied, the fact that the defendant had been engaged in fraudulent activity was irrelevant (as illustrated by *Peter Buchanan Ltd v McVey*), then the starting point for this appeal should be that the fraud alleged is irrelevant and SKAT's case that the fraud here made all the difference involved a potential inconsistency.

83.    He submitted that Andrew Baker J had intended the preliminary issue to be dispositive which is why the judge undertook a wider analysis of the case than that advocated by Lord Pannick QC. Mr Jones QC submitted that the judge had taken the correct approach of identifying the true substance of the claim which was a tax claim. Contrary to Lord Pannick QC's submission one did not look at the case at one moment in time and allege that this particular feature was fraudulent so one ignored everything else. When the case was examined overall, it was all about tax, how the Danish revenue system creates and implements the system for WHT and how it assesses WHT refund applications. He submitted that in answering the question whether there was an unsatisfied claim for tax one had to look at the entire period of time up until the claim form that was issued in 2018. He submitted that there was an unsatisfied claim to tax at that time.

84.    Submissions were then made by Ms Alison Macdonald QC on behalf of the DWF defendants. She submitted that the judge had correctly concluded that the substance of the claim is determined by the central interest in bringing the claim by the sovereign by whom it is brought. An important part of judging that issue is the mechanism by which the alleged harm is said to have been suffered, which in this case was SKAT's sovereign decisions to grant and pay tax refund applications.

85.    Ms Macdonald QC referred to the judgment of Lord Denning MR in *Attorney-General of New Zealand v Ortiz* [1984] AC 1. In that case the Government of New Zealand sought to recover cultural property pursuant to New Zealand legislation prohibiting the export of works of cultural heritage and forfeiting them to the state. It was held that the claim was precluded by Dicey Rule 3 since that was a public law which could not be enforced in England. Lord Denning MR said at 20-1:

> "…what is the general concept which embraces "penal" and "revenue" laws and others like them? It is to be found, I think, by going back to the classification of acts taken in international law. One class comprises those acts which are done by a sovereign "jure imperii," that is, by virtue of his sovereign authority. The others are those which are done by him "jure gestionis," that is, which obtain their validity by virtue of his performance of them.
>
> …
>
> I suggest that the first thing in such a case as the present is to determine which is the relevant act. Then to decide whether it is of a sovereign character or a non-sovereign character. Finally, to ask whether it was exercised within the territory of the sovereign state - which is legitimate, or beyond it - which is illegitimate."

86.    She submitted that Lord Denning did not consider that the relevant principles differ according to whether the case involves penal, revenue or other public laws. On the contrary, he saw those categories as simply examples of the general concept of sovereignty. As Ms Macdonald QC pointed out, the same approach was taken by the Court of Appeal in *Mbasogo* at [41] (which I quoted at [48] above). She submitted that the Court returned to this point at [51] where it said: "It is true that most of the cases concern actions for the enforcement of penal or revenue laws. But as we have pointed out, these are merely examples of a wider principle." Ms Macdonald QC placed particular emphasis on that second sentence. Whilst she submitted that the case was a tax case, the real issue for the judge was whether SKAT's claim was a sovereign one rather than a patrimonial one so that, contrary to SKAT's submissions, he did not take account of erroneous or irrelevant considerations.

87.    It was at this point in her submissions that Ms Macdonald QC submitted that the requirement referred to by Lord Mackay in *Williams & Humbert* that, for the revenue rule to apply there has to be an outstanding tax claim, did not apply where the claim was being brought by the foreign sovereign itself, which was not the case there but was the case here. She submitted that where the claim was by the sovereign itself, the Court should just apply the sovereignty test as enunciated in *Ortiz* and *Mbasogo* without any additional gloss of there having to be an unsatisfied tax claim. She submitted that, where the claim is by the sovereign itself, whether there is an unsatisfied tax claim is just one of the factors to be taken into account by the Court in determining whether the claim is precluded by Dicey Rule 3.

88.    Ms Macdonald QC submitted that the touchstone in this case, as in all Dicey Rule 3 cases, as the judge rightly found, is to pay close attention to exactly how the loss was sustained. She referred to what the Court of Appeal in *Mbasogo* said at [50] (as quoted

at [51] above) about the three features a claim must have to escape Dicey Rule 3: "if in bringing the claim the claimant is not doing an act which is of a sovereign character or by virtue of sovereign authority and the claim does not involve the exercise or assertion of a sovereign right and the claim does not seek to vindicate a sovereign act or acts, then the court will both determine and enforce it".

89.     She went on to make submissions about the way in which that principle was analysed on the facts in *Mbasogo*, specifically at [55] and [56]. In the latter paragraph the Court stated the principle:

> "It is necessary to look at all the circumstances to see whether in substance the losses which are the subject of the claim have been suffered by virtue of an exercise of sovereign authority."

Ms Macdonald QC submitted that although SKAT might have been induced to pay the refunds by fraud as it alleged, its decision to pay and payment out of the money were acts of sovereign authority. They were the last of a series of sovereign acts, starting with the assessment of WHT as being due and the decision to grant the refund applications.

90.     During the course of argument, the Court explored with Ms Macdonald QC whether there was some difference in principle between this case where, as alleged by SKAT, it was induced by fraud to pay out money to the Solo etc Applicants to which they were not entitled and a case where X was a shareholder in respect of whom WHT was withheld and who was legitimately entitled to a refund but Y, a fraudster, came along and impersonated X, inducing SKAT to pay the wrong person on the wrong basis. It seemed to the Court that, on Ms Macdonald QC's case, both payments would be an act of sovereign authority and yet, as I have already noted, the judge was inclined to think that the latter case of mistaken identity was outside Dicey Rule 3.  Ms Macdonald QC submitted the latter case was still one of an act of sovereign authority. It was to be contrasted with the example which she had posited before the judge of identity theft where SKAT pays out the refund intending it to go to the legitimate recipient X but Y intercepts the money pretending to be X.  That would be outside Dicey Rule 3 because the sovereign aspects are all complete before the fraud. In contrast, although the act of paying the money to the Solo etc Applicants may have been induced by fraud, she submitted that it was still a sovereign act.

91.     Ms Macdonald QC submitted that the points the alleged fraud defendants were making were made good in the key paragraphs [110] to [114] of the judgment where the judge concluded that the fact that SKAT was alleging that the transactions behind the Solo etc Applications were fictitious and the Applications fraudulent did not alter the characterisation of the claims it is making for repayment of the refund payments it was induced to make as foreign revenue claims precluded by Dicey Rule 3. She submitted the judge was well aware of SKAT's case that this was all fraudulent but rightly concluded that it made no difference.

92.     Much was made by the alleged fraud defendants of the fact that, if the appeal on Ground 1 were to succeed and the case proceed to the next stage of a long validity trial, the English Court would be called upon to adjudicate on a number of aspects of SKAT's system such as its knowledge of dividend arbitrage activities, what systems and controls it had in place, the legality of its decisions to annul previous refund decisions and the

conduct of the Danish Finance Ministry, all of which was said to demonstrate, as it was put, that the tax apparatus and sovereign decisions of the foreign state were at the heart of the claims.

93.     These sort of points on the tax aspects were developed in submissions by Mr Kieron Beal QC who also appeared on behalf of the Sanjay Shah defendants and who was brought into the appeal to deal with tax issues at short notice not long before the hearing, when the appeal in relation to another defendant was compromised. He advanced three propositions in his written submissions: (i) the claims necessarily involve the assertion of a right to recover allegedly overpaid tax refunds; (ii) that the answer to the suggestion that if Dicey Rule 3 applies SKAT cannot get satisfaction anywhere else is that it could have deployed MARD. It chose to flip from a tax assessment procedure into a civil claim here rather than in Denmark which Mr Beal QC surmised was based on the ability to obtain a worldwide freezing order against the relevant assets; (iii) SKAT exercised sovereign executive information gathering powers when pursuing its claim. He developed (i) in detail in his oral submissions and touched briefly on (ii). (iii) he left to the written submissions but we have considered those.

94.     He submitted that although, as Lord Pannick QC accepted, this case was closely analogous to *Sunico*, a ground of distinction is that unlike in that case, where there was no direct relationship between HMRC and the fraudsters, here there is a relationship between SKAT and the Solo etc Applicants as a result of the Application process, albeit because of the Applicants' conduct. He referred the Court to an article by Lord Collins in the Law Quarterly Review ((2014) 130 LQR 353): the Enforcement of Foreign Revenue Laws. In that article, Lord Collins was critical of *Sunico* saying that the result in that case was surprising:

> "This is a surprising result. The test for what amounts to a civil or commercial matter has no direct equivalent in the English conflict of laws, but the rule in England is that the English court will not allow a claim for the direct or indirect enforcement of a penal, revenue or other public law of a foreign state, and no doubt if an English court were considering an action by (say) the Irish Government in a similar claim against an English company it would regard the claim as being an inadmissible claim for the indirect enforcement of foreign taxes: *Dicey*...para 5-025."

95.     Mr Beal QC submitted that there was Lord Collins, an acknowledged expert in the field of Conflict of Laws, saying without equivocation that fraud is not the dividing line between what is and what is not within Dicey Rule 3. Lord Collins then goes on to discuss various U.S. cases not cited to the CJEU including the decision of the United States Supreme Court in *Pasquantino v United States of America* [2005] 7 ITLR 774. The Supreme Court considered the revenue rule in the context of a criminal prosecution. In footnote 1 on page 779 the Supreme Court said:

> "We express no view on the related question whether a foreign government, based on wire or mail fraud predicate offenses, may bring a civil action under the Racketeer Influenced and Corrupt Organizations Act for a scheme to defraud it of taxes. See *A-G of Canada v RJ Reynolds Tobacco Holdings, Inc* (2001) 4 ITLR

> 290 at 297, 268 F 3d 103 at 106 (CA2) (holding that the Government of Canada cannot bring a civil RICO suit to recover for a scheme to defraud it of taxes); *Republic of Honduras v Philip Morris Companies Inc* (2003) 6 ITLR 79 at 82, 341 F 3d 1253 at 1255 (CA11) (same with respect to other foreign governments)."

96.   *Canada v Reynolds* and *Honduras v Phillip Morris* were Federal Court of Appeals decisions where the Court concluded that, even where there was a fraudulent scheme to evade tax, the foreign government could not recover damages for loss of the tax revenue because of the revenue rule. Mr Beal QC also relied upon the decision of the Court of Appeals for the Second Circuit in *European Community v RJR Nabisco Inc* [2005] 8 ITLR 323, which involved the EU's claim for lost excise duty on smuggled cigarettes. The Court had decided, before *Pasquantino*, that the claim failed because of the revenue rule, but the matter was then remitted by the Supreme Court for the Court of Appeals to reconsider its judgment in the light of *Pasquantino*. The Court of Appeals reinstated its original decision as precedent because *Pasquantino* did not cast doubt upon it. Giving the judgment of the Court on the remission, Sotomayor CJ set out at 328 the rationale for the revenue rule:

> "We stressed in our opinion that the revenue rule is designed to address two concerns: first, that policy complications and embarrassment may follow when one nation's courts analyze the validity of another nation's tax laws; and second, that the executive branch, not the judicial branch, should decide when our nation will aid others in enforcing their tax laws."

97.   Mr Beal QC also placed particular reliance on a passage at 331 where the Court of Appeals said:

> "As we held in *Canada*, 'what matters is not the form of the action, but the substance of the claim.' 4 ITLR 290 at 325, 268 F 3d 103 at 130. Here, the substance of the claim is that the defendants violated foreign tax laws. 'When a foreign nation appears as a plaintiff in our courts seeking enforcement of its revenue laws, the judiciary risks being drawn into issues and disputes of foreign relations policy that are assigned to—and better handled by—the political branches of government.' *Canada*, 4 ITLR 290 at 306–307, 268 F 3d 103 at 114. In *Pasquantino*, this concern was alleviated by the direct participation of the political branches in the litigation. See 7 ITLR 774 at 789, 125 S Ct 1766 at 1779–1780. Here we have no such assurance. We therefore see no reason why *Pasquantino's* analysis should disturb our conclusion that the revenue rule bars civil RICO suits by foreign governments against smugglers. 10 *Pasquantino* casts no doubt on the reasoning or the result of *EC I*."

98.   Mr Beal QC submitted that that line of authority demonstrates that fraud is not an answer to the revenue rule. It is not the case in this context that fraud unravels all. He submitted that there were a number of cases where a claim for a VAT refund was

fraudulently induced and any suggestion that HMRC could enforce a claim to recover in a foreign Court would fall straight into the Dicey Rule 3 analysis. He submitted that what mattered was not whether there was fraud but the nature of the claim which was being advanced which was an indirect enforcement of a claim for tax.

99.    To make good that submission, Mr Beal QC took the Court through how the Solo etc Applicants' claims for refund were dealt with under the WHT legislative framework and how they were processed by SKAT. He referred to the Danish WHT Act with the broad imposition of 27% income tax on any dividend but with an exception bringing it down to 15% for cases where there is a DTA. Section 65 of the Act imposes the obligation on a Danish company to withhold the 27%. Section 69B then provides for the repayment to the taxpayer of tax where the taxpayer is only liable to pay 15%, in other words, the refund. By way of example of a DTA, Mr Beal QC referred the Court to the US-Denmark Treaty. In his written submissions he said that SKAT had obtained permission from the US Internal Revenue Service ("IRS") for the disclosure of information for the purposes of these proceedings on the basis that they were for tax administration purposes.

100.    He submitted that this case involved both direct and indirect claims to enforce a refund claim for tax. The direct claims were in respect of the seven defendants who had been actual WHT Applicants alleged to have made fraudulent applications. The indirect claims were those against people like the alleged fraud defendants who had been advisers or accessories to the claim for a refund alleged to have been fraudulent.

101.    There were a number of instances here of the exercise of sovereign authority: (i) SKAT chose to tax dividends paid by Danish companies; (ii) SKAT charged 27% income tax on those dividends; (iii) SKAT withheld tax at source. They could have charged 15% up front then levied an additional charge taking it up to 27% where there was no DTA obligation but instead SKAT levied a 27% charge and then allowed refunds where applicable; and (iv) under section 69B of the WHT Act SKAT chose to say it could review applications for a refund and suspend a decision until it had sufficient information or ask for security in cases of doubt.

102.    Mr Beal QC took the Court to an example of an application form under which Acupay (a defendant who has settled with SKAT) claimed an entitlement to a refund on behalf of the Aria Pension Fund. He took us through the documents submitted to SKAT. SKAT decided to pay out on this and other applications but there came a time when, as Mr Beal QC put it rather euphemistically, SKAT realised not all the applications were sound. He showed the Court the letter to Aria in March 2017 setting out the provisional decision in which SKAT proposed that Aria repaid the "previously refunded dividend tax". The document stated that Aria did not have the capital to buy or own the shares, did not receive the dividend in respect of the shares and was not the beneficial owner of the shares, what Mr Beal QC said was, in a nutshell, the tax validity issue. The letter went on to state that, accordingly, SKAT had refunded the dividend taxes to Aria on an incorrect/wrongful basis. It was then said that SKAT reclaimed the dividend tax according to the rules stipulated in section 69B and referred to the limitation period applicable to such a claim. He submitted that this was a standard public law claim made under the relevant Danish tax statute. The letter went on to say SKAT was going to reopen previous applications.

103.    He also took the Court to the decision in April 2018 revoking SKAT's previous decisions to pay refunds to Aria on the basis that Aria was not entitled to those refunds. SKAT relied upon its statutory powers as the basis for revocation. This decision incorporated the provisional decision and Aria's comments on it. The letter said the adviser to the Danish Government would submit a demand notice, but that never happened. Rather this civil claim was brought in England.

104.    Mr Beal QC referred the Court to the Danish version of Hansard where a report of the Danish Parliament in December 2019 stated that there had been a suspected fraud on the Danish revenue through unauthorised WHT refunds. The report referred to number of criminal and civil channels serving the same fundamental purpose to recover the largest possible amount for Danish public funds. He submitted that this was a further demonstration that this was a tax claim precluded by Dicey Rule 3.

105.    Mr Beal QC then made brief oral submissions on the MARD point. He drew attention to the fact that, if Denmark had chosen to proceed by invoking MARD, the United Kingdom Government could have obtained a worldwide freezing order on its behalf. This had been done by HMRC on behalf of the South African Revenue authorities in *HMRC v Ben Nevis Holdings Ltd* [2012] EWHC 1807 (Ch); [2012] STC 2157. Mr Beal QC submitted that the revenue rule rarely arose before the English Courts precisely because attempts by foreign tax authorities to enforce a tax liability before these Courts were rare. Resort was usually had to mutual assistance under international conventions like MARD.

106.    Mr Adam Zellick QC then made brief submissions on Ground 1 on behalf of the defendants Knott and Hoogewerf. He noted that, as was accepted by SKAT, whether its claims are within Dicey Rule 3 is a question of the characterisation of those claims. The true nature of these claims is a conspiracy to defraud the Danish revenue, to stop the Danish revenue receiving the tax which was due to it. He sought to argue that, when the Solo etc Applicants made their applications for refunds, they put themselves within the Danish tax system and its rules and became Danish taxpayers. Because the conspiracy to defraud the Danish revenue used the Danish tax legislation and rules, defrauding SKAT by way of its tax gathering and tax paying powers, the claim to recover it was the wrong side of the line so far as Dicey Rule 3 is concerned. The claim involves the unwinding of SKAT's administrative revenue decisions to pay out the refunds.

107.    Mr Ali Malek QC for ED&F Man made submissions on Ground 2. He had two overall points: (i) that given that there is no appeal in relation to his clients on Ground 1, it has to be accepted by SKAT that the claim against ED&F Man is precluded by Dicey Rule 3 and on that basis, the claim was a revenue matter for the purposes of the Brussels-Lugano regime so that Article 1 (1) does not apply at all; (ii) that if, contrary to that point the claim against the defendants was a "civil and commercial matter" within Article 1(1) as the judge concluded, Dicey Rule 3 was not overridden by Article 1(1) because they were dealing with different matters. The Brussels Recast Regulation was dealing with jurisdiction whereas Dicey Rule 3 was a rule of substantive law. As he pointed out, the Rule does not deal just with revenue, penal or other public laws but act of state.

108.    Mr Malek QC submitted that there were six features of the claim against ED&F Man which demonstrated that it was a "revenue matter": (i) the Danish WHT Act is the

foundation of SKAT's claims, without which the claims could not exist; (ii) the taxation of dividends under that Act is as the judge held at [95] of his judgment: "in substance a single exercise of sovereign authority to take in tax a proportion of declared Danish company dividends"; (iii) as the judge held at [97] by its claim SKAT is seeking to enforce its entitlement to keep as tax what is collected up front by the WHT scheme; (iv) as held by the judge at [98] the claim to recover a tax refund payment made in error is conceptually and functionally the same for SKAT as a claim for tax due and unpaid; (v) the real and central interest of SKAT in bringing its claim against ED&F Man is to repair the hole in the dividend tax take (judgment [102]); and (vi) as held in [109] the legal relationship between ED&F Man and SKAT was one of taxpayer and sovereign tax authority.

109.    In his oral submissions, Mr Malek QC dealt principally with his second point as to why, if the claim was a "civil or commercial matter" within Article 1(1), the Brussels Recast Regulation did not preclude the application of Dicey Rule 3. He noted that in dealing with this point at [147] to [161] of his judgment, the judge had concluded that Dicey Rule 3 and the Regulation were performing different functions. The Rule is a substantive rule of law available as a defence to a defendant, even one amenable to the jurisdiction. The Regulation is concerned with rules as to jurisdiction between Member States, not with harmonisation of their substantive laws.

110.    Mr Malek QC submitted that the judge's reasoning was entirely correct. It would be highly surprising if the revenue rule, which is a long-established rule of the common law and of English public policy, were precluded by the Regulation which does not deal with revenue matters. He submitted that the analogy which SKAT sought to draw between the revenue rule and the doctrine of *forum non conveniens* (the application of which was excluded by the jurisdiction rules of the Brussels Recast Regulation) was inapt.

111.    He submitted that, once it was recognised that the revenue rule was a substantive rule of law not a rule of jurisdiction (as was common ground reflected in [17(i)] of the judgment), there is no basis to support the conclusion that the revenue rule would impair the effectiveness of the Brussels Recast Regulation. Simon Brown LJ's *obiter* conclusion in *Frandsen* was simply wrong and inadequately reasoned. Mr Malek QC relied on Professor Briggs' critique of *Frandsen* and particularly the point he made that if it had been intended that the Regulation should abolish the revenue rule, the Regulation would have made revenue matters subject to the exclusive jurisdiction of the courts of the taxing state, which did not happen.

112.    In view of the conclusion I have reached on Ground 2 and the respondents' notices, it is not necessary to summarise Mr Malek QC's other submissions as to why Dicey Rule 3 was unaffected by the Brussels-Lugano regime.

113.    Finally, Mr Robert Palmer QC on behalf of the SMB defendants made submissions on the issue whether, if the claims against the defendants were  inadmissible by virtue of Dicey Rule 3, they were nonetheless a civil and commercial matter within Article 1(1) of the Regulation as the judge concluded or a revenue matter as all the defendants contend. His short overall submission was that, if this Court concluded that the claims were barred by Dicey Rule 3, that dictated the answer under Article 1 because, contrary to the judge's conclusion, they simply cannot be a civil or commercial matter as opposed to a revenue matter.

114.    He noted that, at [144] of the judgment, the judge proceeded on the basis that in the Brussels-Lugano regime one looked at the claim as a matter of form: it was framed as a claim in tort and not a claim under tax law, so it was a civil and commercial matter. He contrasted that approach with the one under Dicey Rule 3 which looked at the substance not the form of the claim. The judge went on to say at [164] that if *Frandsen* remained good law, having concluded that Dicey Rule 3 applied, it would be a revenue matter. However the judge considered that *Frandsen* was inconsistent with the decision of the CJEU in *Sunico*. Mr Palmer QC's essential submission was that this was wrong, that *Frandsen* remains good law and is not inconsistent with *Sunico*.

115.    Mr Palmer QC submitted that the judge had misinterpreted the CJEU jurisprudence under which the primary test is to ask whether the basis of the action is either a right which arises from an exercise of public powers or a legal relationship characterised by an exercise of public powers, which is a test of substance not of form. The secondary test, if the primary test does not lead to the conclusion that the case is outside the Brussels-Lugano regime, is to ask whether information gathering powers have been used by the public body claimant and whether the information so gathered has been used in the proceedings. This was the point which emerged in *Sunico* and was developed in the later cases, *BUAK* and *Movic*.

116.    He submitted that these tests, particularly the primary one, were to be applied and interpreted according to principles of public international law which the EU jurisprudence reflects and the same principles of which underlie Dicey Rule 3, at root the principle of territorial sovereignty. Whilst he accepted that the test under the EU jurisprudence and the test under Dicey Rule 3 are not identical, he submitted that any claim captured by Dicey Rule 3 would necessarily be excluded from civil and commercial matters under the Brussels-Lugano regime.

117.    Mr Palmer QC referred to the most recent decision of the CJEU in this area *Supreme Site Services GmbH v SHAPE* [2021] 1 WLR 955. He took the Court to extensive passages in the Opinion of the Advocate General summarising the previous authorities and setting out the two tests. The Court itself set out the principles at [55]-[57] of the judgment. Mr Palmer QC then took the Court through all the relevant authorities in chronological order. It is not necessary to refer to all of them here but I am satisfied that they establish the principles for which Mr Palmer QC contended. One case which is instructive, to which Lord Pannick QC also referred, is *Preservatrice Fonciere Tiard SA v The Netherlands* [2004] I. L. Pr. 32. The underlying dispute concerned customs duties payable by an association of hauliers to the Dutch state. They were required to provide a guarantee which was put up by an insurer, TIARD. In proceedings on the guarantee before the Dutch court, TIARD pleaded that the court had no jurisdiction because the claim was a civil and commercial matter within Article 1(1) of the then Brussels Convention so that it should be sued in the courts of its domicile.

118.    The CJEU noted that the contract of guarantee was a new contractual relationship separate from that between the government and the road haulage association and that TIARD had freely entered the contract the terms of which were not dictated by the government but negotiated with the road haulage association. The Court concluded at [36]:

        "In the light of all these considerations, the answer to the first question must be that the first paragraph of Article 1 of the

> Brussels Convention must be interpreted as meaning that 'civil and commercial matters', within the meaning of the first sentence of that provision, covers a claim by which a contracting State seeks to enforce against a person governed by private law a private-law guarantee contract which was concluded in order to enable a third person to supply a guarantee required and defined by that State, in so far as the legal relationship between the creditor and the guarantor, under the guarantee contract, does not entail the exercise by the State of powers going beyond those existing under the rules applicable to relations between private individuals."

119.    The Court went on to say at [41] and [43]:

> "41 This analysis applies even if the guarantor may raise pleas in defence which necessitate an investigation into whether the customs debt, whose payment the guarantee contract guarantees, is owed.
>
> 43 Where the subject-matter of an action is the enforcement of a guarantee obligation owed by a guarantor in circumstances which permit the inference that that obligation falls within the scope of the Brussels Convention, the fact that the guarantor may raise pleas in defence relating to whether the guaranteed debt is owed, based on matters excluded from the scope of the Brussels Convention, has no bearing on whether the action itself is included in the scope of that convention."

120.    Mr Palmer QC then focused on *Land Berlin v Sapir* upon which Lord Pannick QC had relied in support of the proposition that, although what was involved was the exercise of public powers through a compensation scheme for victims of Nazi persecution, the claim for overpayment was treated as a civil and commercial matter. Mr Palmer QC submitted that this was a mis-analysis and what emerged from [35] and [36] of the judgment was that although Land Berlin was a public owner of land, under the relevant legislation it was under the same obligation as a private owner. He emphasised what he said was an important point in the second sentence of [36]:

> "Likewise, as is clear from the order for reference, the administrative procedure which relates to the rights of victims to compensation is identical whatever the status of the owner concerned. Furthermore, in those proceedings, that owner, whether a private person or a public body, does not have any prior right to a decision as regards the determination of the victim's rights to restitution."

121.    Next Mr Palmer QC referred to *Sunico* making the point that the Court had accepted the submission of the UK government that the claim there was entirely independent of the claim to tax in the UK and was not a substitute for the recovery of tax. The claim was made in ordinary civil proceedings because the defendant was not a taxpayer so there was no question of the exercise of special powers. He submitted that in the judgment the Court had referred to the earlier authorities and then applied the stablished

principles to the facts, not enunciated some new principle. The key point was made in [40]:

> "It follows that the legal relationship between the Commissioners and Sunico is not a legal relationship based on public law, in this instance tax law, involving the exercise of powers of a public authority."

122.    Mr Palmer QC submitted that *Sunico* was thus not pointing in a different direction from Dicey Rule 3. If the legal relationship had been a tax relationship and HMRC had been exercising public powers, the Court would have reached the opposite conclusion, which was the same conclusion as would have been reached under Dicey Rule 3. He submitted that both Dicey Rule 3 and Article 1(1) were asking the same question: is the basis of the claim tax law or the exercise of a sovereign power? The answer should be the same in each case and there was no basis for the assertion that if SKAT failed under Dicey Rule 3, it could succeed under the Brussels Recast Regulation on the basis that this was a civil and commercial matter not a revenue matter.

123.    Mr Palmer QC submitted that the Court in *BUAK* had cited *Sunico* not in support of some new principle but of well-established principles of EU law which set out what he described as the primary and secondary tests. This was clear from [48]-[49]:

> "48 In order to determine whether a matter falls within the scope of Regulation No 1215/2012, it is necessary to identify the legal relationship between the parties to the dispute and to examine the basis and the detailed rules governing the bringing of the action (see, to that effect, judgments [in *Sapir* and *Sunico*]).
>
> 49    As the Court has repeatedly held, although certain actions between a public authority and a person governed by private law may come within the scope of Regulation No 1215/2012, it is otherwise where the public authority is acting in the exercise of its public powers (see, to that effect, judgment [in *Sunico*] and the case-law cited). The exercise of public powers by one of the parties to the case, because it exercises powers falling outside the scope of the ordinary legal rules applicable to relationships between private individuals, excludes such a case from civil and commercial matters within the meaning of Article 1(1) of Regulation No 1215/2012 (see, by analogy, judgment of 23 October 2014, *flyLAL-Lithuanian Airlines*, C-302/13, paragraph 31)."

124.    The last in the line of EU authorities to which Mr Palmer QC referred was *LG v Rina SPA* [2020] 1. L. Pr. 20. The context there was a private law claim for pecuniary and non-pecuniary losses arising out of the sinking of a vessel in 1998 with the loss of 1,000 lives made against Rina, the classification society. In proceedings before the Italian court Rina sought to argue that the court lacked jurisdiction because the classification and certification had been carried out under delegation from the Republic of Panama so were a manifestation of the sovereign powers of that state, so making Rina immune from the jurisdiction. That argument was rejected by the CJEU. Mr Palmer QC referred

to [32]-[33] where the Court set out what he described as the primary and secondary tests:

> "32 Thirdly, it should be noted that, in order to determine whether a matter falls within the scope of Regulation No 44/2001, the elements which characterise the nature of the legal relationships between the parties to the dispute or the subject matter thereof must be examined (judgment of 23 October 2014, *flyLAL-Lithuanian Airlines*, C-302/13, paragraph 26).
>
> 33 The Court has thus held that, although certain actions between a public authority and a person governed by private law may come within the scope of Regulation No 44/2001 where the legal proceedings relate to acts performed *iure gestionis*, the position is otherwise where the public authority is acting in the exercise of its public powers (see, to that effect, judgment of 23 October 2014, *flyLAL-Lithuanian Airlines*, C-302/13, paragraph 30 and the case-law cited)."

125.    Mr Palmer QC also referred to the statement at [54] in the context of the claim to sovereign immunity that: "the rules which constitute an expression of customary international law are binding, as such, upon the EU institutions and form part of the EU legal order". A similar statement was made in the context of immunity from execution in the *Supreme Site* case. He submitted that since all these concepts had their root in sovereign territorial authority the same answer should be reached as under Dicey Rule 3. He submitted that the decision of the Court of Appeal in *Frandsen* remains good law.

Discussion

126.    The critical starting point for the purposes of Ground 1 of this appeal is to focus on the scope of Dicey Rule 3. What it renders inadmissible (whether under the narrower revenue rule or the wider sovereign powers rule) is an action, that is a claim, to enforce directly or indirectly a foreign revenue, penal or other public law. In its narrower form, the revenue rule, what it prohibits is enforcement of a direct or indirect claim for tax which is due but unpaid, as is clear from the speeches of the House of Lords in *Government of India* and from the passages from the speech of Lord Mackay in *Williams & Humbert* which I cited at [41]-[42] above. In its wider form, the sovereign powers rule, it focuses on whether the claim is one which involves the exercise or assertion of a sovereign right, as stated in the passage in [50] of the decision of this Court in *Mbasogo*:

> "The critical question is whether in bringing a claim, a claimant is doing an act which is of a sovereign character or which is done by virtue of sovereign authority; and whether the claim involves the exercise or assertion of a sovereign right. If so, then the court will not determine or enforce the claim."

127.    It is also clear from a number of authorities that, in determining whether a claim is inadmissible by virtue of Dicey Rule 3, the Court must examine the substance of the claim to see whether it is really a claim to recover foreign revenue. In the present case,

the claim against the alleged fraud defendants is one which is predicated upon the Solo etc Applicants not having been shareholders in the relevant Danish companies, not having been entitled to or having received dividends and therefore never having been liable to pay income tax on dividends. The basis of the claim is that, by fraudulent misrepresentations, the alleged fraud defendants induced SKAT to believe that the Solo etc Applicants had been shareholders who had received dividends and were thus liable to pay income tax which was withheld at 27%, but who were entitled to receive a refund. However, no tax was ever in fact due from the Solo etc Applicants. Whatever tax was due on the dividends of the relevant Danish companies was paid by legitimate shareholders. It follows that, although SKAT was induced by the fraud to believe that what it was refunding to the Solo etc Applicants was that portion of withholding tax which was not due because of the operation of a DTA, in reality the "refunds" were not of tax at all, but were abstraction of SKAT's funds in the same way as if the alleged fraud defendants had broken into the safe in SKAT's office and stolen the money.

128.    In my judgment, this claim against the SKAT defendants is not a claim to unpaid tax or a claim to recover tax at all. It is a claim to recover monies which had been abstracted from SKAT's general funds by fraud. The alleged fraud defendants' submission that the claim to the refund is still a claim to tax is simply wrong as a matter of analysis and the judge fell into error in accepting that submission. Furthermore, because there is no unsatisfied claim to tax, the "essential feature" of the revenue rule as Lord Mackay described it in *Williams & Humbert* is absent. There is no qualification in his judgment of that essential feature where the claimant is the sovereign foreign state itself, as suggested by Ms Macdonald QC. Rather he expresses the limitation on the revenue rule in quite categorical terms. Accordingly, there being no unsatisfied claim to tax in the present case, the revenue rule does not apply, even though SKAT may be an emanation of the Danish state.

129.    The argument by the alleged fraud defendants that the claim is precluded by the wider sovereign powers rule within Dicey Rule 3 is equally misconceived. In bringing a claim to recover the monies of which it was defrauded, SKAT is not doing an act of a sovereign character or enforcing a sovereign right, nor is it seeking to vindicate a sovereign power. Rather it is making a claim as the victim of fraud for the restitution of monies of which it has been defrauded, in the same way as if it were a private citizen.

130.    The alleged fraud defendants sought to challenge that conclusion, particularly through the submissions of Mr Beal QC, by seeking to characterise the payment of the refunds to the Solo etc Applicants as a sovereign act. I very much doubt whether payments induced by fraudulent misrepresentation can properly be described as sovereign acts, since, as Lord Pannick QC submitted, the effect of the fraud is to render those payments a nullity or invalid, but even if they could be described as sovereign acts, it simply does not follow that the claim to recover the monies is somehow a sovereign act or the vindication of a sovereign power. On the contrary, in revoking the refunds and seeking to recover the monies, SKAT is not seeking to vindicate those acts even if they were sovereign, but to invalidate them. The alleged fraud defendants' submissions confuse the circumstances in which the fraud was perpetrated with the claim to recover the monies.

131.    Although there is no English authority directly on point which decides that a claim such as the present one is not a sovereign act or the vindication of a sovereign act, that was clearly the view of Dr Mann in the articles which were expressly approved by this Court

in *Mbasogo*. Thus, in his 1954 article quoted at [42] of the judgment in *Mbasogo*, Dr Mann said:

> "Where the foreign state pursues a right that by its nature could equally well belong to an individual, no question of a prerogative claim arises and the state's access to the courts is unrestricted. Thus a state whose property is in the defendant's possession can recover it by an action in detinue. A state which has a contractual claim against the defendant is at liberty to recover the money due to it. If a state's ship has been damaged in a collision, an action for damages undoubtedly lies."

132.    In the conclusion to his 1987 article, also approved by this Court at [43] of the judgment in *Mbasogo*, Dr Mann said:

> "The decisive question is whether the plaintiff asserts a claim that, by its nature, involves the assertion of a sovereign right. Where the state's claims arise from '*actus qui a rege sed ut a quovis alio fiant*,' [the quotation from Grotius which roughly translates as 'acts which may be done not only by the king but by anyone else'] then they are capable of international enforcement."

133.    Contrary to what Ms Macdonald QC submitted, claims by a state which will be categorised as ones which could just as well be brought by a private citizen and thus outside Dicey Rule 3, are not limited to "patrimonial" claims, that is claims in respect of rights in real or personal property. This is clear from the examples which Dr Mann gives. It is also clear from the New York state cases to which Lord Pannick QC referred the Court. As the Court said in *Nordrhein-Westfalen v Rosenthal*, the case where the German federal state sought repayment of monies wrongfully demanded by the defendant under the Nazi indemnification laws: "The object of the action is not 'vindication of the public justice' but 'reparation to one aggrieved'". In my judgment, that description of the object of the action is an entirely apt one in the present case.

134.    The U.S. federal authorities relied upon by Mr Beal QC, *Canada, Honduras* and *Nabisco*, are nothing to the point. They are all cases which were fairly and squarely within the revenue rule because they were claims to recover unpaid tax and the fact that there had been fraud in evading tax did not take the case outside the revenue rule. Likewise, *HMRC v Ben Nevis* on which Mr Beal QC relied was a case where tax was due, as in the US federal cases. Lord Pannick QC accepted from the outset that, where the revenue rule applies, fraud by the taxpayer, as in *Peter Buchanan Ltd v McVey*, does not prevent its application. However the fraud here was not fraud by the taxpayer in evading tax. There was no tax due and those who committed the fraud were never taxpayers. Contrary to the alleged fraud defendants' submissions, there never was a taxpayer/tax authority relationship between the Solo etc Applicants and SKAT, nor was one created by the Solo etc Applicants and the alleged fraud defendants having abused the withholding tax and refund system to defraud SKAT. As Judge Kaplan pithily put it in his Memorandum Opinion in the SKAT Litigation in New York referred to at [44] and [45] above: "the only reason the money was lost is because the defendants in effect allegedly stole it, and the only reason it supposedly concerns tax revenue is because the defendants' alleged victim was the Danish tax authority."

135.    This is also the answer to the alleged fraud defendants' reliance on the article by Lord Collins in the Law Quarterly Review. What Lord Collins was focusing on was fraud by a taxpayer in evading tax which is due and he was making the point quite rightly (and as Lord Pannick QC accepted) that, in that scenario, the fraud does not take the case outside the revenue rule. However, the present alleged fraud is of a completely different kind. It involved the abstraction by the fraudsters of monies from a victim which happened to be the Danish tax authority, what Judge Kaplan called "garden variety commercial fraud", which is what we would call on this side of the Atlantic common or garden or ordinary commercial fraud, not tax fraud as in *Peter Buchanan Ltd v McVey*. Nothing in Lord Collins' criticism of *Sunico* assists the alleged fraud defendants in this case, where there is no outstanding tax debt, nor has there ever been.

136.    The submission by Mr Zellick QC that by making applications for refunds the Solo etc Applicants brought themselves within the Danish tax system and became Danish taxpayers is equally misconceived. As the Court pointed out during the course of argument, their applications were all based on the lie that they had paid tax in the first place, which on SKAT's case they had not. That attempt to characterise themselves as taxpayers cannot possibly bind SKAT as the victim of their fraud and the alleged fraud defendants cannot seek to take advantage of their own wrongdoing to bring themselves within Dicey Rule 3.

137.    In their submissions about the mechanism by which the harm is said to have been suffered, the alleged fraud defendants contended that that mechanism was SKAT's sovereign decisions to grant and pay the tax refund applications made by the Solo etc Applicants. Accordingly they submitted that the judge had been right to conclude that the present claim was to vindicate a sovereign act or in the exercise of sovereign powers. However, this is wrong as a matter of analysis. On SKAT's case the granting and payment of the refund applications was induced by fraud and, whilst exploitation of the Danish WHT regime may have been the mechanism by which the fraud was committed, it does not follow that the claim involves the enforcement of that regime. As I have already said, it is a claim for the recovery of monies from SKAT's general funds of which SKAT was defrauded. This claim clearly has the three features which the Court of Appeal in *Mbasogo* at [50] identified as necessary to escape Dicey Rule 3: "if in bringing the claim the claimant is not doing an act which is of a sovereign character or by virtue of sovereign authority and the claim does not involve the exercise or assertion of a sovereign right and the claim does not seek to vindicate a sovereign act or acts, then the court will both determine and enforce it".

138.    Much was sought to be made by the alleged fraud defendants of the fact that, at any validity trial, there would be a detailed examination of the Danish WHT regime and possible criticism of it and of SKAT's systems and control. However, that does not somehow convert the claim into one to enforce that tax regime. It would be no more than recognition of the relevant Danish tax laws and the regime they put in place as part of the determination by the Court as to whether the alleged fraud was committed. Recognition of foreign revenue laws is permissible. As Lord Keith put it in *Government of India* in his approval of *Peter Buchanan Ltd v McVey*: "there are circumstances in which the courts will have regard to the revenue laws of another country." Another example of a case where the English Courts have recognised a foreign law, outside the revenue context, is the decision of this Court in *Iran*.

139.    In this context, Mr Beal QC relied upon what the Court of Appeals for the Second Circuit identified in *Nabisco* (as referred to at [96]-[97] above) as one of the concerns the revenue rule was designed to address: "policy complications may follow when one nation's courts analyze the validity of another nation's tax laws." However, having considered the preliminary issues annexed to the judge's July 2020 CMC Order, the issues for determination at the validity trial are not concerned with the validity of the WHT Act or the regime as such. In any event: (i) the revenue rule does not apply here because there is no claim to outstanding tax for the reasons I have given and (ii) at least in this jurisdiction, the preferred rationale for the revenue rule, even if it did apply, is that an assertion of sovereign authority by a foreign state within the territory of our Courts is not admissible here; see the citation from the speech of Lord Goff in *Re State of Norway's Application* at [32] above. The fact that, at the validity trial the Court may have to engage in a detailed examination or even critique of the Danish WHT regime, as I have said, does not convert the claim into an assertion of sovereign power by SKAT or otherwise bring it within Dicey Rule 3. This is simply an example of the recognition by the Court of the relevant foreign laws in order to resolve the dispute before the Court.

140.    Furthermore, as I have already intimated at [46] above, the alleged fraud defendants' reliance on the administrative procedures in which SKAT engaged to revoke its decisions to pay refunds is nothing to the point. There is no question of those administrative decisions somehow being a pre-condition of the present claims being brought and, far from supporting the alleged fraud defendants' case that by these proceedings SKAT is exercising sovereign powers, they support SKAT's case that it is seeking to resile from the powers that it was induced by fraud to exercise. Likewise, the first six stages of Mr Jones QC's seven-stage process referred to at [81] above are just part of the background to how the fraud was committed and, even if they could be characterised as sovereign acts, notwithstanding that at least stages (iii) to (v) were induced by fraud, they do not render the seventh stage, the claim made in these proceedings, either a claim for unpaid tax or the exercise of a sovereign power.

141.    There is also nothing in the point made by the alleged fraud defendants about the Decision documentation sent by SKAT to the Aria Pension Plan. As Phillips LJ pointed out during the course of argument, that documentation set out in terms SKAT's case that Aria had not owned shares in the relevant Danish companies or received dividends. Although reference was made there and in the Danish Hansard to tax proceedings in Denmark, as Lord Pannick QC pointed out in reply, there never were any such proceedings brought by SKAT, no doubt because SKAT realised there was no legislative authority to recover the overpayments as a tax debt. SKAT had to proceed as it did in these proceedings by way of a normal civil claim for damages for fraud. Lord Pannick QC pointed out that it was specifically pleaded in the Reply that there was no provision in the Danish WHT legislation which entitled SKAT to recover these overpayments, nor had any of the defendants identified any provision which would entitle SKAT to bring tax proceedings to recover the overpayments.

142.    Furthermore, I agree with Lord Pannick QC that there is nothing in the US-Denmark DTA which entitles SKAT to recover the overpayments induced by fraud. Judge Kaplan dealt with the US-Denmark DTA in his Memorandum Opinion in the SKAT Litigation in New York saying that the DTA was irrelevant because SKAT's claims did not seek to collect tax owed by the defendants and covered by the DTA.  Mr Beal QC relied upon the fact that SKAT had invoked mutual assistance at international level in order

to obtain information from a number of other states including from the IRS. However, contrary to his submission, this does not demonstrate that SKAT is exercising sovereign powers in pursuing this claim. It has been open with the alleged fraud defendants as to the information it has obtained and has not sought to use it in these proceedings so as to give itself some special advantage only available to a sovereign body. It has not made some binding determination which has a special evidential effect in these proceedings.

143.   As Phillips LJ put it during the course of argument, it is important to have in mind that SKAT's claim is one for repayment and what SKAT is saying entitles it to repayment is not that the Solo etc Applicants or the alleged fraud defendants owe it tax or have cheated it out of tax, but that it was induced by fraudulent misrepresentation to pay away monies to these persons to which they were not entitled on any basis. SKAT had been paid all the tax to which it was entitled by the genuine shareholders. Whilst, because it was induced to do what it did by fraud, SKAT thought it was making repayments or refunds to the Solo etc Applicants, they were not in fact repayments or refunds at all, but abstraction of monies by the fraudsters, as I have said, in the same way as if they had broken into SKAT's safe and stolen the monies. The suggestion by Mr Zellick QC that somehow by making the claims to monies to which they were not entitled the Solo etc Applicants became Danish taxpayers is without merit and, even if there were anything in the point, it would not alter the fact that SKAT's claim is not one for repayment of tax or otherwise a claim to enforce a sovereign right, but a claim as a victim of fraud to reimbursement of the monies of which it has been defrauded.

144.   One of the oddities of this appeal, aside from the apparent inconsistency in SKAT's approach to ED&F Man as compared with the alleged fraud defendants is that, whilst he did not decide the point, the judge appears to have thought that a claim by SKAT to recover money paid out on the basis of a misrepresentation as to identity would not be precluded by the revenue rule. At [90] he postulated that, if SKAT made a payment to Party B mistakenly thinking it was paying Party A (intending to pay a tax refund to Party A to which it was entitled), it could be said that the fact that the payment was thought to be by way of tax refund was immaterial and SKAT was not by the claim seeking to vindicate any exercise of sovereign authority. As a matter of logical analysis, it does not seem to me that there is any difference in principle between the claim in that example and the claim in the present case against the alleged fraud defendants. In both cases SKAT has lost monies by mistakenly paying them away to someone whom it thought was entitled to a refund.

145.   However, because SKAT has not pursued Ground 1 against ED&F Man, this Court does not need to determine whether the same analysis as the one I have adopted in respect of a claim founded on fraudulent misrepresentation would apply to a claim founded on negligent misrepresentation or mistake. Without deciding the point since we do not have to (and it would be invidious to do so given the concession SKAT makes against ED&F Man), it does seem to me that where the claim is against a defendant who has obtained a refund by misrepresentation, even if not fraudulent, to which it was not entitled because it was never a shareholder, never received a dividend and was never a taxpayer, there is much to be said for the conclusion, which seems to have found favour with the New York state courts in *Nordrhein-Westfalen v Rosenthal* and *Harvardsky v Kozeny* referred to at [57] to [59] above, that in those circumstances, the revenue rule should not apply.

146.    Given the firm conclusion I have reached that Ground 1 should succeed because the claim against the alleged fraud defendants is not inadmissible by virtue of Dicey Rule 3, it is not necessary to reach any conclusion on SKAT's alternative case that, if the wider sovereign powers rule were otherwise applicable, the public policy exception to that rule should apply here. All that it is necessary to say is that, contrary to the argument on behalf of the alleged fraud defendants that Dicey Rule 3 is always absolute, it seems to me that the view expressed *obiter* by this Court in *Iran* that there is a public policy exception to the wider sovereign powers rule, is correct. Whilst not deciding the point, I can see much force in Lord Pannick QC's submission that the exception should apply here in a case of a major international fraud.

147.    So far as Ground 2 and the respondents' notice point about whether this is a "civil and commercial matter" or a "revenue matter" for the purposes of Article 1(1) of the Brussels Recast Regulation are concerned, given my conclusion that the appeal succeeds on Ground 1, those issues are entirely academic so far as the case against the alleged fraud defendants is concerned. The "civil and commercial matter" versus "revenue matter" issue is only of relevance to the case against ED&F Man.

148.    Given that SKAT has not appealed Ground 1 against ED&F Man, as I have already noted, SKAT has to accept that as against those defendants the claim is inadmissible by virtue of Dicey Rule 3 unless it can satisfy this Court: (i) that the claim is a "civil and commercial matter" not a "revenue matter" for the purposes of Article 1(1) of the Brussels Recast Regulation; and (ii) that the operation of Dicey Rule 3 is precluded because, contrary to the judge's analysis, it would impair the effectiveness of the Brussels Recast Regulation.

149.    So far as the first of those points is concerned, for a number of reasons I consider that, contrary to the conclusion the judge reached and to Lord Pannick QC's submissions, the claim against ED&F Man is a "revenue matter" falling outside the Brussels Recast Regulation. First, I agree with Mr Palmer QC that the CJEU jurisprudence does reflect that the primary test or question is to ask whether the basis of the action is either a right which arises from an exercise of public powers or a legal relationship characterised by an exercise of public powers. If the answer is in the affirmative, the action is not a civil and commercial matter but a revenue, customs or administrative matter. Nothing in *Sunico* points to a different test applying. On the contrary [33] and [34] of the judgment in that case encapsulate that primary test:

> "33    In that regard, it must be stated that the scope of Regulation No 44/2001 is, like that of the Brussels Convention, limited to 'civil and commercial matters'. It follows from settled case-law of the Court that that scope is defined essentially by the elements which characterise the nature of the legal relationships between the parties to the dispute or the subject-matter thereof (see, in particular, Case C-406/09 *Realchemie Nederland* [2011] ECR I-0000, paragraph 39, and *Sapir and Others*, paragraph 32).
>
> 34    The Court has thus held that, although certain actions between a public authority and a person governed by private law may come within the scope of Regulation No 44/2001, it is otherwise where the public authority is acting in the exercise of

its public powers (see, in particular, *Sapir and Others*, paragraph 33 and the case-law cited).”

150.    Second, whatever the reason for SKAT not having pursued Ground 1 against ED&F Man (and although it was said that it was done for reasons of pragmatism, as I have already said, there does seem to be an inconsistency of approach) SKAT is fixed with the judge's conclusion that, so far as ED&F Man are concerned, Dicey Rule 3 makes the claim inadmissible. It must follow that either so far as those defendants are concerned the revenue rule applies, or the claim involves the exercise or assertion of a sovereign right. Whilst the test for the application of Dicey Rule 3 may not be identical to that for determining what is a "revenue etc matter" for Article 1(1) of the Brussels Recast Regulation, it can be seen that its application leads to the same answer. If Dicey Rule 3 applies (as SKAT has to accept it does in relation to the claim against ED&F Man) then by the same reasoning, the basis for the claim by SKAT against those defendants is either a right which arises from an exercise of public powers or a legal relationship characterised by an exercise of public powers, from which it necessarily follows that the claim is a revenue matter outside the Brussels Recast Regulation.

151.    Third that conclusion corresponds with the *ratio* of the decision of this court in *Frandsen* which was summarised by Simon Brown LJ at 2177C:

> "the present case is indistinguishable from *Buchanan*: both are to be regarded as cases where the liquidator, as nominee for a foreign State, in substance is seeking a remedy designed to give extra-territorial effect to foreign revenue law. In my judgment such claims plainly fall within the compass of revenue matters as that expression would be understood by all Member States for the purposes of Article 1 of the Convention."

152.    Contrary to the judge's conclusion that *ratio* is not inconsistent with the decision of the CJEU in *Sunico* or with any of the other EU jurisprudence, from which it follows that the judge fell into error in concluding that he could depart from the *ratio* of *Frandsen*. It remains good law and was binding on the judge as it is on this Court.

153.    Given that the claim against ED&F Man is thus a revenue matter outside the Brussels Recast Regulation, Ground 2 is academic as against those defendants as it is against the alleged fraud defendants, albeit for different reasons. Since the issue whether Dicey Rule 3 is precluded because it would impair the effectiveness of the Brussels Recast Regulation is academic and its determination would require the Court to proceed on an artificial, hypothetical basis, contrary to my primary conclusion on Ground 1 as against the alleged fraud defendants and contrary to my conclusion that the claim against ED&F Man is a revenue matter, I consider it best not to address Ground 2 further.

Conclusion

154.    For the reasons I have set out the appeal succeeds on Ground 1. The claims of SKAT against the alleged fraud defendants are not inadmissible by virtue of Dicey Rule 3. The claims against ED&F Man remain inadmissible by virtue of Dicey Rule 3, although for a different reason from that given by the judge, namely that, in my judgment those claims are a revenue matter so that the Brussels Recast Regulation does not apply to them.

**Lord Justice Phillips**

155.    I agree.

**Lord Justice Stuart-Smith**

156.    I also agree.