# Exhibit 1

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
MASTER DOCKET 18-MD-2865(LAK)
CASE NO. 18-CV-09797

_____
                                   )
IN RE:                             )
                                   )
CUSTOMS AND TAX ADMINISTRATION OF  )
THE KINGDOM OF DENMARK             )
(SKATTEFORVALTNINGEN) TAX REFUND   )
SCHEME LITIGATION                  )
                                   )
_____)


C O N F I D E N T I A L


REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL
EXAMINATION OF
MICHAEL BEN-JACOB
DATE: October 11, 2021


REPORTED BY:  MICHAEL FRIEDMAN, CCR

Page 18

1   Q   I'm asking you for your
2 understanding, in your words, if you
3 understand that's what you were called upon
4 to do?
5   A   Well, since I don't have a
6 recollection of using those words, I would
7 say it is not true that we were called upon
8 to use -- to -- I say "we," meaning my
9 firm -- was called upon to implement or
10 advise upon all aspects.
11       We were asked to advise upon U.S.
12 legal issues, U.S. tax and pension plan
13 issues, and occasional other coordination of
14 advice with foreign counsel and
15 administrative matters.
16       But I was certainly not involved in
17 all aspects.
18   Q   Let me ask you, please, to turn to
19 Exhibit 4480?
20       MR. MAGUIRE:  Mark 4480.
21       (Whereupon the above mentioned was
22    marked for Identification.)
23   A   I'm sorry.  Yes, so I have this
24 exhibit in front of me.
25   Q   And can you tell us, what is this

Page 19

1 exhibit, sir?
2   A   This is a memorandum from me to the
3 compensation committee of Kaye Scholer dated
4 February 1, 2015.
5   Q   If you could turn, sir, to the
6 second page of the document, at the end of
7 the first full paragraph, you'll see the last
8 sentence starts with the words, "For example,
9 we were called upon by my longstanding
10 client, Argre Management LLC, to implement
11 all aspects of annex dividend trading
12 strategy."
13       Do you see those words?
14   A   I do see those words.
15   Q   Were those words true when you
16 wrote them?
17   A   In the context in which they're
18 provided the compensation committee, yes,
19 they were, of course, true.
20   Q   Are they true today?
21   A   What I meant here by "all aspects"
22 is all aspects with respect to U.S. side tax
23 advice, pension advice, and other -- other
24 related matters as they applied, you know, to
25 U.S. law, not, for example, foreign law,

Page 20

1 Danish law, or other matters related to the
2 actual trading.
3   Q   Did you draft documentation for the
4 transactions that your former clients did
5 involving Danish securities?
6       MR. DEWEY:  Objection.
7   A   Well, draft documentation can mean
8 many things.
9       Can you please explain what you
10 mean by "documentation?"
11   Q   Draft documents.  You know,
12 partnership agreements.
13   A   Okay.  Yes.  As part of the
14 services the firm rendered to the clients, we
15 drafted documents such as partnership
16 agreements as part of the overall services
17 that we provided.
18   Q   And when you drafted documents with
19 respect to the Danish trading transactions,
20 did that mean that you approved your former
21 clients entering into the Danish trading
22 transactions?
23       MR. DEWEY:  Objection.
24   A   So to --
25       MR. DEWEY:  Go ahead.

Page 21

1   A   To clarify -- sorry.
2       Can you just rephrase or restate
3 your question?
4   Q   Let me give you a different
5 question.
6       Did you tell your clients that you
7 approved their entering into the Danish
8 trading transactions?
9   A   I did not tell my clients.  And to
10 my knowledge, others in the firm did not tell
11 the clients that we approved of the Danish
12 trading transactions, nor were we asked by
13 the clients to render that advice.
14   Q   Did you -- whether you told anyone
15 or not -- ever approve of your clients
16 entering into any Danish trading
17 transactions?
18       MR. DEWEY:  Objection.
19   A   What the firm approved were the
20 U.S. tax implications and treatment and U.S.
21 regulatory treatment of the -- yeah, of the
22 trading.
23   Q   Did you ever tell your clients that
24 you or your firm did not approve of any
25 aspects of any Danish trading transactions?

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

7 (Pages 22 to 25)

Page 22

1      MR. DEWEY:  Objection.
2      A    Again, to be clear, we did not
3  advise on the trading of Danish securities.
4  We advised only on the U.S. and pension
5  aspects -- U.S. tax aspects of the ownership
6  of those shares.
7      Q    Was there any aspect of the trading
8  in Danish shares in the establishment of any
9  LLCs, the sponsoring of any plans, the
10 trading or transactions associated with that,
11 or the making of any applications for
12 reclaims to Denmark?
13      Taking that entire ex-dividend
14 strategy as a whole, was there any aspect of
15 that as to which you or your firm told any of
16 your former clients they should not do or
17 that you believed it was not appropriate to
18 do?
19      MR. DEWEY:  Objection.
20      A    You listed seven or eight things.
21 I would have to ask you to take them one by
22 one.
23      Q    Let me put it to you as a more
24 broad and general question.
25      Is there any time in your

Page 23

1  representation of any of your former clients
2  where you said, "No, you should not do this?"
3      MR. DEWEY:  Objection.
4      A    With respect to the U.S. advice
5  that we were asked to render, I believe that
6  there were strategies or thoughts as to how
7  the ownership should be held or how payments
8  should be made among the clients or their
9  entities or their pension plans where the
10 appropriate lawyers with that substantive
11 area of expertise, typically on the pension
12 side, advised the clients that they should
13 not do whatever was at issue.
14      Q    Did you ever provide any assurance
15 to any of your former clients that it was
16 appropriate for a plan to represent to
17 Denmark that the plan was the beneficial
18 owner of Danish shares or Danish dividends?
19      MR. DEWEY:  Objection.
20      A    Can you please explain your
21 question?
22      Q    You understood that the plans that
23 were set up in this ex-dividend strategy were
24 going to be making reclaim applications to
25 Denmark.

Page 24

1  Correct?
2      A    Yes, I understood that.
3      Q    Did you ever provide any assurance
4  to any of your former clients that those
5  plans could appropriately represent that they
6  were the beneficial owners of Danish shares
7  or Danish dividends?
8      MR. DEWEY:  Objection.
9      A    My firm advised that for U.S. tax
10 and pension law purposes, the pension plans
11 that engaged in the trading were -- could
12 appropriately represent that they were the
13 owners of the shares, again, from a U.S. tax
14 and pension law perspective.
15      Q    That the plans could appropriately
16 represent, for U.S. tax purposes, that they
17 were the beneficial owners of the shares.
18      Is that correct?
19      A    That's correct.
20      Q    And to whom were the plans
21 representing, for U.S. tax purposes, that
22 they were the beneficial owners of the
23 shares?
24      A    Well, for example, to the IRS and
25 to -- from a regulatory perspective, to the

Page 25

1  Federal Reserve.
2      Q    And when did the plans represent to
3  the IRS that they were the beneficial owners
4  of the shares?
5      A    Well, perhaps it wasn't the plans
6  that represented to the IRS.  Perhaps it was
7  the individuals.
8      I'm thinking about, in particular,
9  their FBAR filings where they indicated they
10 had, you know, account balances that reflect
11 ownership of the shares.
12      Q    And in the FBAR filings, did the
13 partnerships represent that they were the
14 beneficial owners of the shares?
15      A    I don't recall if the partnerships
16 were required to file FBARs.
17      Q    Were the partnerships, in fact, the
18 beneficial owners of the shares?
19      MR. DEWEY:  Objection.
20      A    That's a question of, I believe,
21 you know, U.S. pension law that the pension
22 experts in my firm advised on.
23      It's my understanding that they
24 advised that they were the owner of the
25 shares.

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

14 (Pages 50 to 53)

Page 50

1  ask them who was Axel Haelterman?
2      Q    No, no, I'm sorry.  I thought you
3  had -- I thought you had indicated that you
4  spoke with Mr. Lhote or perhaps others of
5  your former clients who assured you that
6  notwithstanding Mr. Haelterman's advice, they
7  had received advice from a Belgian lawyer who
8  told them that the Belgian transactions were
9  permissible under Belgian law.
10          Is that correct?
11     A    Yes.
12     Q    Did you ask them who was that
13 Belgian lawyer who advised them that it was
14 permissible under Belgian law to do these
15 transactions notwithstanding this sort sale
16 issue?
17     A    I'm sorry.  The reason I find your
18 question difficult to understand is the
19 "notwithstanding the short sale issue" part
20 of the question.
21          If you can perhaps recast your
22 question so I can understand it more clearly?
23     Q    Sure.
24          Did any of your client group tell
25 you that they received a different legal

Page 51

1  opinion from Freshfields on this short sale
2  issue?
3          MR. DEWEY:  Objection.
4      A    To the best of my recollection we
5  didn't have discussions specific to, as you
6  put it, this short sale issue.  The
7  discussions we had as they related to Belgian
8  and foreign law were general discussions of
9  "did you vet this fully with your foreign
10 lawyers, did they approve the transaction?"
11          We did not have, to the best of my
12 recollection, discussions that went into any
13 detail.
14     Q    So you never asked your former
15 clients, "What about the short sale position
16 and who is the Belgian lawyer who says it's
17 okay to do these transactions?"
18          MR. DEWEY:  Objection.
19     A    To be clear, my area of expertise
20 is trusts and estates, related tax, and
21 income tax, and estate tax matters.  I don't
22 have -- I wouldn't know to ask the question
23 "what is the short sale issue."  I couldn't
24 even tell you what a short sale is.
25          So forgive me for my naivete on

Page 52

1  these matters, but no, that's not a question
2  I would have asked.
3      Q    So you never went back to your
4  client and said, "You have a lawyer who tells
5  you you're on shaky legal grounds.  Can you
6  explain how you managed to go forward with
7  transactions?"
8      A    I don't have a recollection --
9          MR. DEWEY:  I'm sorry, objection.
10         Go ahead and finish the question.
11     Q    Let me rephrase the question.
12         MR. DEWEY:  Good enough.
13     Q    Did you ever ask your clients how
14 they could go forward with any transaction
15 after receiving an opinion telling them that
16 their position under Belgian law was somewhat
17 doubtful or on shaky legal grounds?
18         MR. DEWEY:  Objection.
19     A    I don't recall one way or the
20 other.
21         MR. DEWEY:  We've been going about
22     an hour.  Whenever a good time is to
23     take the first break?
24         MR. MAGUIRE:  Sure.  Can we finish
25     up one document, Tom?  Is that okay?

Page 53

1          MR. DEWEY:  Sure.
2      Q    Sir, if you can look at Exhibit
3  2260?
4      A    Bear with me.  I'm just going to
5  read it here.
6      Q    Of course.
7      A    (Witness reviewing.)
8          Okay.  Yes.  What are your
9  questions?
10     Q    Is this an e-mail that you received
11 from Mr. Van Merkensteijn on or about
12 October 29, 2014?
13     A    I don't have a recollection of this
14 e-mail, but that's what the e-mail states.
15     Q    You'll see on the second page there
16 is a reference to Belgian trades?
17     A    Yes.
18     Q    And this part, I believe, is an
19 e-mail from Rich Markowitz.
20          Right?
21     A    It's from Richard Markowitz to John
22 Van Merkensteijn and Robert Klugman.
23     Q    And on Belgian trades, he points
24 out the economics of the deal with Sanjay,
25 points out that the numbers are that each

Page 234

1  Mr. Markowitz your comments on the Solo
2  documents?
3      A    I don't have a specific
4  recollection of this e-mail or surrounding
5  conversations, but I have the general
6  impression and recollection that we looked at
7  this document from a U.S. tax perspective
8  consistent with our review of other
9  documents.
10          In the course of that review, we
11 may have raised other general points as they
12 may have occurred to us from a common sense
13 perspective.  But ours was a -- was sort of,
14 again, a tax review, the U.S. tax review.
15          And that's, I believe, why Louis
16 Tuchman was copied on the balance of the
17 exchanges.
18     Q    Do you know what law applies to
19 these Solo documents?
20     A    I do not recall the document.
21     Q    If you turn to the page that ends
22 with the Bates number 564?
23     A    Yes, I have that.
24     Q    You'll see there's a give-up
25 agreement in the middle of the page?

Page 235

1      A    Yes.
2      Q    In Section 1, you note, "It appears
3  that any disputes would need to be heard in
4  Belgium, which may foreclose, as a practical
5  matter, the ability to bring a claim against
6  the executing broker."
7           Do you see that?
8      A    I do.
9      Q    And what did you mean by that?
10     A    As I mentioned, I don't have a
11 specific recollection of this e-mail
12 surrounding exchanges.  But as I sit here
13 now, it seems that the -- what I'm trying to
14 say is, again, part of that common sense
15 general review.
16          If there's a breach of a contract
17 and you need to file suit in Belgium, it's
18 going to cost you a lot of money.  So it may
19 be impractical to bring a lawsuit.
20     Q    And if you turn just two headings
21 down, you'll see there's a "Beneficial Owner
22 Declaration Form?"
23     A    I do.
24     Q    And you say, "Ultimately, I think
25 we are okay with the document, but I think

Page 236

1  that it is a close thing."
2           What did you mean by that?
3      A    Well, again, I'm -- I believe,
4  without having a recollection of the
5  specifics of this e-mail exchange or related
6  conversations.  But as I sit here now looking
7  at this, I believe I was saying that from a
8  U.S. tax law perspective, we were comfortable
9  with the provisions of the document.
10     Q    Did you ever tell your former
11 clients that you or your firm were okay with
12 the beneficial owner declarations that they
13 made for Denmark?
14         MR. DEWEY:  Object to form.  Could
15     I have the question back, please?
16     Q   Let me give you the question again.
17         MR. DEWEY:  Thank you, Bill.
18     Q    Did you ever tell your former
19 clients that you or your firm were okay with
20 the beneficial owner declarations they were
21 making to Denmark?
22         MR. DEWEY:  Objection.
23     A    I don't recall one way or the other
24 having a conversation where we used the
25 words, "The beneficial declaration forms

Page 237

1  you're submitting to Denmark are okay."
2      Q    Do you recall, in substance,
3  communicating that view to your client group?
4          MR. DEWEY:  Objection.
5      A    I generally recall, in substance,
6  communicating the view to the client group
7  that the firm was comfortable.  From a U.S.
8  tax pension regulatory perspective, the plans
9  were -- were the beneficial owners of the
10 Danish securities.
11     Q    And outside of that U.S. tax and
12 regulatory boundary, with respect to the
13 representations that were made to the Danish
14 government, with respect to those
15 representations, did you ever tell your
16 former clients that you or your firm were
17 okay, or words to that effect, with making
18 those declarations to Denmark?
19         MR. DEWEY:  Objection.
20     A    As I think I might have mentioned
21 in the past, we -- neither me nor my firm
22 gave advice on non-U.S. law except to the
23 limited extent that we had some of our
24 German -- of our colleagues in our German
25 office provide some advice on German law

Page 238

1  matters.
2      With respect to Danish law and the
3  interpretation of beneficial ownership, we
4  relied on Jerome Lhote's representations to
5  us that he had investigated the matter.
6      Q    At the top of the page -- the
7  previous page that ends with the Bates 563,
8  you'll see there's a statement by
9  Mr. Markowitz that he spoke with Solo about a
10 few of the points you raised.
11     A    I see that.
12     Q    And do you understand, in that, he
13 communicated that Solo did not intend for
14 reclaims for withholding tax to be treated as
15 TTC?
16          MR. DEWEY:  The question is, does
17     he see that?
18          MR. MAGUIRE:  Yes.
19     A    I see those words in the e-mail,
20 yes.
21     Q    And do you understand "TTC" to be
22 "title transfer collateral?"
23     A    No.  I have no understanding today
24 and no recollection if I had an understanding
25 then of what "TTC" refers to.

Page 239

1      Q    The next paragraph, he says, "On a
2  related point, the whole working of TTC and
3  having accounts pooled is critical to be able
4  to have long and short client positions net
5  out for regulatory and capital purposes, so
6  this should remain."
7           Do you see that?
8      A    I do see those words.
9      Q    Did you understand that the plan
10 accounts needed to be pooled at the custodian
11 with the assets of other clients?
12     A    Again, I have no recollection of
13 this e-mail exchange or surrounding
14 conversations, so I can't tell you what I
15 understood or did not understand at the time.
16 And as I sit here today, I can read the words
17 and have just a general understanding of the
18 basic words.
19     Q    If you could turn to Exhibit 2266?
20     A    I have that.
21     Q    Is this an e-mail that
22 Mr. Markowitz copied you on around July 14 of
23 2014?
24     A    The first page is, but I'm going to
25 review the balance of the exchange for a

Page 240

1  moment.
2           (Witness reviewing.)
3           Yes, I've gone through the
4  exchange.
5      Q    And on the second page of the
6  document, the one Bates stamp 862 -- do you
7  see that?
8      A    I do.
9      Q    There's an e-mail from Mel Piasek,
10 M-E-L, P-I-A-S-E-K, and he refers to the
11 maximum contribution to a retirement plan,
12 which was $23,000.
13          Do you see that?
14     A    I do.
15     Q    And he makes the point that you can
16 only contribute that amount, no matter how
17 many plans you have?
18     A    That seems to be the point he's
19 making, yes.
20     Q    So his point is, to take advantage
21 of that full 23,000, you only need to set up
22 one Roth 401(k) plan.
23          Right?
24     A    That appears to be what he's
25 saying.

Page 241

1      Q    And then, on the front page,
2  Mr. Markowitz notes, at the end of the e-mail
3  at the very top, that he is aware of the
4  maximum contribution limit.
5           Right?
6      A    That's what he says at the e-mail
7  at the top, yes.
8      Q    And he says, "There's still a
9  benefit to us for setting up multiple 401(k)
10 plans, even with that limit?"
11     A    I see that language.
12     Q    What was the benefit to your client
13 group in setting up multiple 401(k) plans?
14     A    You would need to ask Richard
15 Markowitz what he meant by that statement.
16     Q    Wasn't the benefit to the client
17 group the ability to have more plans
18 participating in Danish trades on the Solo
19 platform?
20          MR. DEWEY:  Objection.
21     A    You would need to ask Richard
22 Markowitz what he meant by that statement.
23     Q    Are you aware of any other benefit
24 to Richard Markowitz or any of your client
25 group other than that the more plans they

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

67 (Pages 262 to 265)

Page 262

1  with the Bates number 914?
2      A   Yes, I have that page.
3      Q   If you could look at the -- near
4  the bottom of the page, there's a paragraph,
5  little "G" as in "George."
6          It's entitled "Indicia of
7  Ownership?"
8      A   Yes, I see it.
9      Q   Do you understand what "Indicia of
10 Ownership" is?
11         MR. DEWEY:  Objection.
12     A   I understand generally what the
13 word "indicia" means.
14     Q   This says, "The trustee shall not
15 hold the indicia of ownership of any assets
16 of the trust fund outside of the jurisdiction
17 of the district courts of the United States
18 unless in compliance with Section 404(B) of
19 ERISA and the regulations thereunder."
20         Do you see that?
21     A   I do.
22     Q   Did you understand that all of the
23 plan assets here were held in accounts at
24 Solo or related custodians in the United
25 Kingdom?

Page 263

1          MR. DEWEY:  Objection.
2      A   (Witness reviewing.)
3          This, if I understand you
4  correctly, is speaking to "unless in
5  compliance with Section 404(B) of ERISA,"
6  which is a pension provision, to the best of
7  my knowledge.
8          And so, to the extent that one
9  might interpret assets as being held outside
10 the United States, that would have been an
11 issue -- that would be a pension issue
12 addressed by Mr. Woodard.
13     Q   Did Mr. Woodard address that issue?
14     A   I don't know.
15     Q   Do you have an understanding as to
16 whether the plans holding their assets with a
17 U.K. custodian was in compliance with this
18 provision --
19         MR. DEWEY:  Objection.
20     Q   -- of the plan?
21     A   To the extent that this speaks to
22 an issue of pension law, I'm not familiar
23 with pension law and have -- had no -- I've
24 no recollection of having a view then, and I
25 have no view now.

Page 264

1      Q   Can you describe generally for us,
2  sir, your -- the nature of your practice and
3  any specialties that you have in your
4  practice?
5      A   My practice involves representing
6  high net worth individuals, families, family
7  offices with respect to their estate and gift
8  planning, income tax minimization, and
9  family -- family planning needs.
10     Q   And what areas of law does that
11 general practice require you to be involved
12 in?
13     A   Certain areas of income tax, not
14 pensions, estate and gift tax, and to a
15 certain extent, certain levels of corporate
16 income tax and partnership income tax, what
17 I'll call compliance reporting, the necessary
18 forms one needs to file with the IRS to
19 report certain types of ownership, and then
20 trust law and estate law.
21     Q   And when you say "high net worth
22 individuals," what do you mean?
23     A   People that have more money than
24 me.  It's a vague term.  It just means, you
25 know, people of substantial means and

Page 265

1  substance, and we have clients in a broad
2  range of net worth categories.
3      Q   And when you say "in a broad range
4  of net worth," what are the upper and lower
5  boundaries of that broad range?
6          MR. DEWEY:  Objection.
7      A   I might have a few clients in
8  the -- let's call it $5 million net worth
9  range, and I have one outlier in the probably
10 20 billion range, and then sort of a
11 concentration, if you can call it that, in
12 the hundred million to 3 billion range.
13     Q   And when you say "a concentration,"
14 can you tell us approximately how many people
15 you have in that hundred -- how many clients
16 you have in that hundred million to $3
17 billion range?
18         MR. DEWEY:  Objection.
19     A   I would tell -- I mean, this is not
20 at all scientific and I'm just guessing,
21 but -- yeah, I'm not going to speculate as to
22 numbers.  I couldn't.
23         I couldn't speculate.
24     Q   Can you give us a general range?
25     A   Yeah, it would just be speculation.