# Exhibit 2

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO. 18-MD-2865 (LAK)

_____
                                      )
IN RE:                                )
                                      )
CUSTOMS AND TAX ADMINISTRATION OF     )
THE KINGDOM OF DENMARK                )
(SKATTEFORVALTNINGEN) TAX REFUND      )
SCHEME LITIGATION                     )
                                      )
This document relates to case nos.    )
19-cv-01783; 19-cv-01788; 19-cv-01794;)
19-cv-01798; 19-cv-01918              )
_____)


C O N F I D E N T I A L


REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL
EXAMINATION OF
JOHN VAN MERKENSTEIJN
DATE: April 19, 2021




REPORTED BY: MICHAEL FRIEDMAN, CCR

Page 162

1    A    We communicated to him that we were
2  not part of that bank in Germany that had
3  been bought by Matt and Jerome, and got to a
4  point where he understood we weren't part of
5  that exercise, which is what he was upset
6  about.
7         And therefore, he offered to
8  continue to trade with us, but not with Matt
9  and Jerome.
10   Q    Would the same entities, the same
11 plans be used going forward?
12   A    Well, the entities we had as Argre
13 which, in the end, stop trading, there was a
14 period where we talked about toning down the
15 Argre trades or something, but it got too
16 complicated.  And in the end, there were no
17 more Argre-related plans and we had to
18 substitute plans.
19   Q    Okay.  Were there any discussions
20 with Mr. Shah about how many plans could be
21 formed to continue the trading?
22   A    Yes.  As before, he would tell us
23 how many plans we could have.
24   Q    All right.  And so, for this period
25 of time, do you recall how many plans he said

Page 163

1  you could have?
2    A    I don't have an exact recollection.
3  I think it was 30-something.
4    Q    Was this the point in time in which
5  the fee and profit-sharing arrangement
6  changed from two-thirds to 75 percent?
7    A    I don't remember when that shifted,
8  percentages changed.
9    Q    Okay.  But whenever that shift
10 happened, the new split was 75 percent Solo,
11 25 percent to the plan?
12   A    I believe so.
13   Q    All right.  Just bear with me.  I'm
14 crossing one or two exhibits off my list
15 here, which is a good thing.
16   A    Sorry?
17   Q    I'm just crossing a few documents
18 off the list.  That's always a good thing, so
19 bear with me.
20        Can you turn, please, to
21 Exhibit 2265?
22   A    2265.  It's the other volume.
23   Q    Sorry.  Okay.  If you can turn to
24 the last page -- or the third page, at least,
25 at the top of it?

Page 164

1    A    (Witness reviewing.)
2         Yes.
3    Q    There's an e-mail from Peter Wells.
4         Was he an attorney at Kaye Scholer
5  assisting with the plans?
6    A    He was a partner, I believe, at
7  Kaye Scholer, yes.
8    Q    All right.  He writes to you and
9  Mr. Markowitz, "I wanted to follow up with
10 you both on the status of the additional
11 information regarding the new ex-dividend
12 trades.  As you may recall, you were going to
13 provide us with, among other things, a list
14 who is going to be involved in the various
15 partnerships and related LLCs," and it goes
16 on.
17        The reference to the "new
18 ex-dividend trades," was that the same
19 dividend trading strategy through Solo, but
20 with new plans?
21   A    Yes.  This is where Argre had
22 split, and Rich and I were going to do
23 separate.
24   Q    Okay.  So the -- you had made known
25 to the lawyers at Kaye Scholer that a new set

Page 165

1  of plans were going to be set up to continue
2  the trading?
3    A    Well, more than that.  Once Argre
4  split, Rich and I had no office, no
5  secretary, no staff, no assistants.
6         And since Kaye Scholer had been
7  involved in the trading from day one, and
8  knew every aspect of it, I asked the firm not
9  only to continue to work with us, but also to
10 fulfill the administerial functions.
11        So I told Michael Ben-Jacob that we
12 needed paralegal or other clerical
13 assistance, because we had nobody that worked
14 for us at all.  And therefore, I asked him to
15 undertake all of the organizational
16 paperwork, all of the documentation
17 paperwork.
18        And Michael assigned that work to
19 Peter Wells to supervise.  And then he had
20 associates and paralegals do the mechanical
21 parts.
22        So they did both the clerical
23 administrative stuff as well as the
24 continuing legal advice.
25   Q    The additional roles that you asked

Page 166

1 Kaye Scholer to take on, were those things
2 that Argre Management employees had been
3 doing during the prior period?
4    A    Yeah, had done internally because
5 we had staff. We had a secretary. We had
6 Adam LaRosa, who was sophisticated.
7         So, organizing LLCs, and all the
8 mechanical documentation that went with
9 setting up accounts and "do you know your
10 customer," whatever it all entailed, a lot of
11 that mechanical stuff could be done within
12 Argre, but it couldn't be done by Rich and
13 me.
14   Q    Got it.
15        Was Kaye Scholer paid separately
16 for that aspect of its work than it was for
17 the legal services?
18   A    Well, we didn't ask them to break
19 it out. They just paid -- they just charged
20 us for whatever they did.
21   Q    Okay. So it was just hourly
22 charges just like the other stuff --
23   A    Yeah. You know, I just -- I agreed
24 with Michael that we would be willing to pay
25 full freight, pay a lot more, but not have to

Page 167

1 go hire our own secretary and rent our own
2 office and do all that stuff.
3    Q    Got it.
4         Your reference to "Michael," is
5 that Michael Ben-Jacob?
6    A    Michael Ben-Jacob, yes.
7    Q    For this work, was he the more
8 senior partner supervising the group?
9    A    Yeah. He had been involved in this
10 from day one, and so he supervised
11 everything.
12   Q    Got it. Okay.
13        In response to Mr. Wells' e-mail on
14 the prior page, you write, "Among other
15 things, we are talking with London on Friday
16 to review onboarding information required and
17 process."
18        Do you know who you're referring to
19 there when you say you're going to speak to
20 London?
21   A    No, I don't.
22   Q    Okay. Then you write, "We are
23 making a list of LLC and plan names. Any
24 suggestions?"
25        And when you're talking about a

Page 168

1 list there of LLCs and plan names, this is
2 for the continued participation in the
3 dividend arbitrage trading?
4    A    Correct.
5    Q    Okay. And at the top of the page,
6 it's part of an e-mail back from Mr. Wells.
7         And he writes, "I was thinking
8 about some ideas for names. The primary
9 names were just random, but as we discussed,
10 I was pairing them with names that sound like
11 financial entities; example, Starfish Capital
12 LLC, Granite Partners LLC, Basalt Ventures
13 LLC, Dolomite Management LLC."
14        What had you discussed with
15 Mr. Wells about having the names of the new
16 entities sound like financial entities?
17   A    Well, getting a name for an entity
18 is very difficult because most names are
19 used. So adding an adjective behind the name
20 makes it distinct from others who might have
21 the same first word. It didn't really matter
22 what the second word was.
23        I often form companies with
24 "international." "Something-Something
25 International." "Something-Something

Page 169

1 Capital."
2         And Peter apparently did, too.
3    Q    And when you tended to form
4 entities where you used names like that, that
5 was because you had been expecting to enter
6 into some kind of financial transactions
7 using those entities?
8    A    Well, it didn't matter what the
9 name was. I mean, I've done entities that
10 have names that have nothing to do with what
11 they do.
12   Q    Okay. You respond to Mr. Wells,
13 and say, "Good, but only one name from rocks,
14 one from fish, et cetera. We want to make
15 them sounds dissimilar."
16        When you refer to "we," are you
17 talking about you and Mr. Markowitz?
18   A    Yes, and Mr. Klugman.
19   Q    Why did the three of you want to
20 make the names of the entities sound
21 dissimilar?
22   A    Well, you always want to make them
23 sound dissimilar. When I was first
24 practicing law, I had a corporate senior
25 partner who had a client that had similar