# Exhibit 8_E

23.   That response to reliance by Brussels-Lugano defendants on Dicey Rule 3 has the capacity to arise because:

   (i)   it is *acte clair* under the Brussels-Lugano regime that its concept of 'civil and commercial matters' – and therefore its companion concept of a 'revenue, customs or administrative matter' – is an autonomous concept that cannot differ from member state to member state,

      whereas

   (ii)  albeit a substantial element of its *raison d'etre* is an understanding that the inadmissibility of, e.g., tax claims, in the courts of a state other than the state claiming tax, is part of an accepted international order, Dicey Rule 3 is a rule of English law and its scope need not match precisely that of a 'revenue, customs or administrative matter' within Article 1(1) of the Brussels-Lugano regime, especially since there is a focus in the ECJ/CJEU jurisprudence on Article 1(1) upon matters that Dicey Rule 3 would treat as matters of form rather than substance.

## Dicey Rule 3

*Authorities*

24.   A very early *dictum* often cited, expressing the rule that the court will not give effect to a suit to recover foreign tax, is that of Lord Mansfield CJ in *Holman v Johnson* (1775) 1 Cowp 341, at 343: "*There are a great many cases which every country says shall be determined by the laws of foreign countries where they arise. But I do not see how the principles on which that doctrine obtains are applicable to the present case. For no country ever takes notice of the revenue laws of another.*" To similar effect, *per* Abbott CJ in *James v Catherwood* (1823) 3 Dow & Ry KB 190 at 191: "*... in a British court we cannot take notice of the revenue laws of a foreign State.*"

25.   The language of never 'taking notice' of foreign revenue laws should not be taken too far. English law sets its face against actions that, in substance, have the effect, directly or indirectly, of *enforcing* here, extra-territorially, a foreign revenue law, for the benefit of the foreign sovereign authority (see, e.g., *re Visser, Queen of Holland v Drukker* [1928] Ch 877, *per* Tomlin J at 883-884).

26.   In 1950, the authorities as they then stood led Kingsmill Moore J to conclude as follows in *Buchanan v McVey* [1955] AC 516 (approved by the House of Lords in, and reported as a note to, *Government of India*), namely that:

      "*[The cases on penal laws] would seem to establish that it is not the form of the action or the nature of the plaintiff that must be considered, but the substance of the right sought to be enforced; and that if the enforcement of such right would even indirectly involve the execution of the penal law of another State, then the claim must be refused. I cannot see why the same rule should not prevail where it appears that the enforcement of the right claimed would indirectly involve the execution of the revenue law of another State, and serve a revenue demand.*" (*ibid*, at 527)

27.    The suit in *Buchanan v McVey* was not brought by the Revenue, but by Mr McVey's
       former company, asset-stripped by him so as to frustrate the Revenue, and its
       liquidator. The cause of action pleaded was not for payment of taxes, or even for a
       liability of Mr McVey's to the Revenue in respect of the non-payment by the
       company of taxes. It was for an account of moneys due to the company from Mr
       McVey on account of his breaches of duty as director, trustee and agent. But the rule
       of law recognised and applied in the case, and endorsed by the House of Lords in
       *Government of India*, required the court to look past those matters – they were matters
       of form, not substance – to see that though "... *it is sought to enforce a personal right,
       but as that right is being enforced at the instigation of a foreign authority, and would
       indirectly serve claims of that foreign authority of such a nature as are not
       enforceable in the courts of this country [i.e. claims for unpaid taxes], relief cannot
       be given.*" (*ibid*)

28.    *Government of India* itself was less indirect – the substance was closer to the surface
       – in that the foreign sovereign power pursuing its right to tax was the plaintiff, and the
       foundation of the claim was expressly its unpaid tax demand. The defendant was not
       the taxpayer company, but its liquidator in a voluntary liquidation, and the
       proceedings, under rule 108 of the Companies (Winding-up) Rules 1949, sought to
       reverse his refusal to admit the plaintiff's proof of debt in the liquidation. The
       decision was that the plaintiff's claim for the debt in question could not be enforced in
       the English courts, and the refusal of the proof of debt was therefore sound upon a
       proper construction of s.302 of the Companies Act 1948 concerning matters for which
       a liquidator had to make provision in a liquidation. As Viscount Simonds put it at
       [1955] AC 508, "*the company ... could not on the day before its resolution to wind up
       became effective have been sued by the Indian Government for the recovery of tax in
       the courts of this country. But it is said that from the moment that the company went
       into liquidation the situation changed, the old rule of law was abrogated, and our
       courts became the means of collecting the taxes of a foreign power*"; the decision was
       that s.302 of the 1948 Act brought about no such change.

29.    The case actually decided in *Buchanan v McVey*, i.e. that of an asset-stripped
       company or its liquidator suing the company's former owner for breaches of the
       latter's duties to the company, in substance to secure the recovery by a foreign
       sovereign tax authority of taxes due from and unpaid by the company, came before
       the English courts in *QRS 1 ApS et al v Frandsen* [1999] 1 WLR 2169. The Court of
       Appeal confirmed that Dicey Rule 3 applies to such a case (though it seems from the
       judgment of Simon Brown LJ at 2173F-G that the contrary was not seriously argued).

30.    SKAT reminds the court often that it claims to be the victim of fraud, not only of
       negligent or unblameworthy conduct. Not so, as regards the ED&F Man Applications,
       where fraud or dishonesty is not alleged at all. But in any event, in my view, the fact
       that in some of its causes of action against some of the defendants SKAT alleges
       fraud or dishonesty by those defendants, or by others in circumstances that are said to
       result in a liability on the part of those defendants, does not assist SKAT on the
       characterisation issue raised by Dicey Rule 3.

31.    Thus, for example, the issue of characterisation when comparing this case to
       *Government of India* itself, was encapsulated in a submission by SKAT that a claim to
       recover money incorrectly paid out by a tax authority, ostensibly by way of tax
       refund, on the faith of misrepresentations, is not properly to be characterised as the

imposition of a tax or a claim otherwise arising under a foreign revenue law, alternatively is not properly so characterised if the payee of the ostensible refund had not originally paid the tax ostensibly refunded. The defendants contend to the contrary. The point now is that the formulation of the rival contentions, and thus the question of characterisation, has no reference to the nature or degree of any fault required for liability upon any given cause of action relied on by SKAT under the system of law that in general governs it.

32.     A plea to the character of the wrongful act, by reference to the nature or degree of fault involved in it, or to any consequent lack of sympathy the court might be invited to have for the defendant pursued abroad by the sovereign claimant, or sympathy for the claimant, has never been admitted as relevant. Thus, in *Buchanan v McVey*, considered above, Mr McVey engaged in a dishonest (at 522, "*highly fraudulent*") scheme to enable his company to evade tax; in *Mbasogo v Logo, supra,* considered in more detail below, the allegation was of a conspiracy to overthrow the lawful sovereign and government of Equatorial Guinea by a private armed coup.

33.     The rule of law as a consequence of Dicey Rule 3, and of the essence of the public policy that rule reflects, is that *so far as concerns ordinary private law causes of action as a possible means of redress*, parties amenable to the jurisdiction of this court may engage in dishonest conduct whereby to defraud a foreign sovereign tax authority in respect of its tax-collecting activities and, as Kingsmill Moore J put it in *Buchanan*, at 517, "*snap [their] fingers in the face of a disgruntled [foreign] Revenue.*" That was said as part of the judge's description of the intent behind Mr McVey's exercise in corporate asset-stripping and personal relocation to Ireland, the imposition on his companies by the Finance Act 1943 of an element of retroactive taxation having, as the judge put it, *ibid*, "*called forth the resources of his ingenuity*".

34.     The decision in the case, endorsed and relied on by the House of Lords in establishing the rule in *Government of India*, was that in an Irish court, Mr McVey could indeed snap his fingers at the Scottish Revenue exactly as he had planned; and if that be thought unacceptable to the foreign sovereign (in that case, the British Crown), the remedy was to seek a solution in the public international law arena by Treaty, Convention or other inter-state cooperation or mutual assistance, if any be available (for example, in modern times, by EU legislative instruments such as the Mutual Assistance Recovery Directive (Tax etc.), Directive 2010/24/EU ('MARD')). That is the way to ensure – which, again, is at the heart of the public policy given effect by Dicey Rule 3 – that if (for example) English companies are to be pursued here by tax demands from SKAT, then in a reciprocal and equivalent way Danish companies may be pursued there by tax demands from HMRC (or, if not so, only because an asymmetrical supranational arrangement has been concluded, in which case the asymmetry would be a matter of sovereign choice on the part of the Crown, acting by HMG). In short, there is no cause of action under English law, which in this respect overrides ordinary choice of law rules (see paragraph 17(iii) above), for fraud on a foreign revenue.

35.     That is not to say a foreign sovereign tax authority cannot bring a fraud claim here. Not every fraud against a foreign sovereign tax authority will be a fraud on the foreign revenue for which it is responsible. It will depend on the nature and subject matter of the fraud. A claim by SKAT alleging against a contractor that it had dishonestly overcharged SKAT for work done or services supplied, using inflated

invoices overstating what was done or the time spent, would be governed by the
ordinary rules of the law of contract, tort/delict, restitution, or as the case may be
depending on the cause of action pursued, of the system of law that applied under
ordinary choice of law rules; that would not be "*a claim that, by its nature, involves
the assertion of a sovereign right*", but a claim arising "*from acts that may be done
not only by the King, but also by anyone else: "actus qui a rege sed ut a quovis alio
fiant""*, to quote *Mbasogo v Logo, supra*, at [43], adopting an articulation of the
essential nature of a patrimonial claim that may be brought by a foreign sovereign as
much as by a private party in an article by Dr Mann, "*The International Enforcement
of Public Rights*" (1987) 19 New York University Journal of International Law and
Politics 603, at 629-630. Dr Mann there concluded that "*Careful assessment and
delimitation is required. The decision will not always be an easy one. Nor will the
results always be universally approved, for in many cases they will depend upon legal
judgment or instinct. What should not be open to dispute is the starting point and the
purpose of the reasoning. ... The true question is whether in substance the claim
asserts a public right.*"

36.     The notion of a patrimonial claim capable of arising as much for a private party as for
a foreign sovereign and therefore admissible when pursued by the latter as much as
when pursued by the former, in contradistinction to an inadmissible sovereign claim,
has been developed in relation to claims of wrongful interference with goods. Where
the foreign sovereign seeks only to vindicate a title to goods in the same way as might
a private party with the same kind of title to goods, the claim will be admissible, even
if the title was acquired through the territorial exercise of a sovereign power, e.g. by
expropriation or confiscation completed within the sovereign's territory.

37.     In that context, the rule of English law is that effect will only be given to a title
purportedly conferred by a foreign penal or tax law or power (for example a
prerogative power of forfeiture or confiscation) if the goods had been reduced into the
possession of the sovereign whilst within their territory to perfect their title. Where
that had never occurred, a claim here for wrongful interference with the goods
founded upon title said to be derived from the foreign public law or exercise of
sovereign power is inadmissible as an attempt, in substance, to give that law or
exercise of power extra-territorial effect.

38.     In *Brokaw et al v Seatrain UK Ltd* [1971] 2 QB 476 household effects belonging to
Mr and Mrs Shaheen, who were liable to tax in the US as citizens and residents there,
were carried from the US to Southampton by the US-flagged *Transoregon*, owned by
Seatrain Lines Inc, a US company, consigned to Interdean Ltd, an English company,
for ultimate delivery to Mr and Mrs Shaheen's son-in-law, Mr Brokaw. The US
Treasury served a notice of levy on the shipowners demanding that they surrender Mr
and Mrs Shaheen's belongings, with a view to securing the payment of taxes by them.
The notice of levy was served when the ship was on the high seas.

39.     The US Government's claim to be awarded possession of Mr and Mrs Shaheen's
belongings was denied, though in form it was not a claim for payment of any tax debt.
The cargo had never been in the US Government's possession; any claimed right to
possession derived solely from US tax law giving effect under US law to the notice of
levy. The claim therefore failed as being, in substance, a claim for the enforcement
here of that foreign revenue law. Lord Denning MR explained the decision as follows,
at 482G-H:

"*It is well established in English law that our courts will not give their aid to enforce, directly or indirectly, the revenue law of another country. ... The United States Government submit that that rule only applies to actions in the courts of law by which a foreign government is seeking to collect taxes, and that it does not apply to this procedure by notice of levy, which does not have recourse to the courts. I cannot accept this submission. If this notice of levy had been effective to reduce the goods into the possession of the United States Government, it would, I think, have been enforced by these courts, because we would then be enforcing an actual possessory title. There would be no need for the United States Government to have recourse to their revenue law.*";

and at 483C-D, having concluded that the notice of levy was not sufficient to reduce the cargo into the possession of the US Government:

"*... the United States Government are seeking the aid of these courts. They come as claimants in these interpleader proceedings. By doing so they are seeking the aid of our courts to collect tax. It is not a direct enforcement (as it would be by action for tax in a court of law), but it is certainly indirect enforcement by seizure of goods. It comes within the prohibition of our law whereby we do not enforce directly or indirectly the revenue law of another country.*"

40.     In *A-G of New Zealand v Ortiz* [1984] AC 1, the Government of New Zealand (the effective plaintiff) was refused delivery up of a great carved totaro wood door, an important Maori artefact, that had been exported from New Zealand in breach of the New Zealand Historic Articles Act 1962, s.12(2) of which provided for such unlawfully exported artefacts to be forfeited to the state. The final decision in the case, by the House of Lords, was that s.12(2) did not purport to vest any title to the door in the state without its being seized.

41.     The Court of Appeal had also taken that view of s.12(2), differing from Staughton J at first instance. In his speech in the House of Lords, with which the other Law Lords agreed without adding anything, Lord Brightman did not consider whether New Zealand's claim would still have failed if s.12(2) had been to different effect. The Court of Appeal dealt fully with that question, *obiter*, concluding that indeed the claim would still have failed:

    (i)    Lord Denning MR concluded, at 24E, G-H, after a masterly review of the law, that: "*... if any country should have legislation prohibiting the export of works of art, and providing for the automatic forfeiture of them to the state should they be exported, then that falls into the category of "public laws" which will not be enforced by the courts of the country to which it is exported, or any other country, because it is an act done in the exercise of sovereign authority which will not be enforced outside its own territory*"; "*The retrieval of such works of art must be achieved by diplomatic means. Best of all, there should be an international convention on the matter where individual countries can agree and pass the necessary legislation.*"

    (ii)    Ackner LJ put it thus, *ibid* at 33H-34C: "*... the claim is made by the Attorney-General on behalf of the state. It is not a claim by a private individual. Further, the cause of action does not concern a private right which demands reparation or compensation. It concerns a public right – the preservation of*

*historic articles within New Zealand – which right the state seeks to vindicate.
... The vindication is sought through confiscation. ... It seems to me to be
wholly unreal to suggest that when a foreign state seeks to enforce these
forfeiture provisions in another country, it is not seeking to enforce a foreign
penal statute. No doubt the general purpose of the Act of 1962 is to preserve in
New Zealand its historic articles. However, this does not mean that a suit to
enforce the forfeiture provisions contained in section 12 is not a suit by the
state to vindicate the public justice.*"

(iii)    O'Connor LJ agreed with both.

42.    In *Mbasogo v Logo, supra*, at [41], before quoting from and agreeing with Dr Mann
as I mentioned in paragraph 35 above, the Court of Appeal said that: "*The importance
of the speech of Lord Keith in Government of India ... and the judgment of Lord
Denning MR in ... Ortiz ... is that they both sought to explain the rationale for the
well established rule that the courts will not enforce the penal and revenue laws of
another country. In short, it is that the courts will not enforce or otherwise lend their
aid to the assertion of sovereign authority by one state in the territory of another. The
assertion of such authority may take different forms. Claims to enforce penal or
revenue laws are good examples of acts done by a sovereign by virtue of his sovereign
authority ("jure imperii"). In each case, it is necessary to see whether the relevant act
is of a sovereign character. Penal and revenue laws are assumed to be of a sovereign
character.*"

43.    More recently, considering and explaining the decisions in *Brokaw* and *Ortiz*, the
Court of Appeal in *Government of Iran v Barakat, supra*, held that title to certain
antiquities, and an immediate right to possession, vested in Iran prior to their removal
to England, an illegal export according to Iranian law. The claim here founded upon
that title therefore did not fail on the basis of Dicey Rule 3. There was a distinction to
be drawn by reference to how the foreign sovereign claimed to have acquired the title
it asserted to justify a claim to goods situated abroad at the time of the suit:

"*148. ... the distinction between the two categories of case, those where the
foreign state will be able to claim its property in England even if it has not
reduced it into its possession, and those where it may not claim unless it has
reduced the property into its possession, depends on the way in which it has
acquired ownership. If it has acquired title under public law by confiscation or
compulsory process from the former owner then it will not be able to claim the
property in England from the former owner or his successors in title unless it has
had possession. If it has taken the property into its possession then its claim will
be treated as depending on recognition; if it has not had possession it will be
seeking to exercise its sovereign authority.*

*149. But in these proceedings Iran does not assert a claim based on its
compulsory acquisition from private owners. It asserts a claim based upon title to
antiquities which form part of Iran's national heritage, title conferred by
legislation that is nearly 30 years old. This is a patrimonial claim, not a claim to
enforce a public law or to enforce sovereign rights. We do not consider that this
is within the category of case where recognition of title or the right to possess
under the foreign law depends upon the state having taken possession.*"

44.     The subject matter in *Barakat* was found objects of antiquity and value with no
        known or identifiable owner, i.e. treasure trove. Title in such objects as found, and
        any question of an immediate right to possession of them in the hands of the finder,
        was governed by Iranian law as the *lex situs*; the Iranian legislation referred to by the
        Court of Appeal at [149] was part of that law. There was no extra-territorial
        enforcement of sovereign authority, in the sense eschewed by Dicey Rule 3, in
        proceeding to determine the claim brought here from the starting point, as a matter of
        Iranian legal fact, that pursuant to that legislation the Iranian State owned and had an
        immediate right to possession of the artefacts, at and from the moment they were
        found, just as there would have been no difficulty of admissibility of the claim if the
        legislation had conferred title upon the owner of the land on which they were found, if
        they had been found on privately owned land, and that owner had been the plaintiff.
        Either way, the founding original tort, committed in Iran, was a conversion by the
        finder in keeping the artefacts for themselves upon finding them.

45.     The Iranian legislation, therefore, was not by nature confiscatory. Though there were
        provisions in the legislation that were penal in nature, indeed it was "*in large part
        penal in that it created criminal offences with criminal penalties for unlawfully
        excavating or dealing with antiquities*", the provisions in relation to ownership of
        antiquities when found, which were all that Iran needed, "*were not penal or
        confiscatory. They did not take effect retroactively. They did not deprive anyone who
        already owned antiquities of their title to them. They altered the law as to the
        ownership of antiquities that had not yet been found, with the effect that these would
        all be owned by the state, subject to the entitlement of the chance finder to a reward*"
        (*ibid*, at [111]).

46.     If the rule of Iranian law for treasure trove had been 'finders, keepers', but an Iranian
        statute had rendered the artefacts liable to forfeiture to the state in certain subsequent
        circumstances, e.g. an unlicensed export as in *Ortiz*, then Dicey Rule 3 would have
        applied. If that had been the case, the Court of Appeal said, *obiter*, that as a matter of
        policy a claim by a state to recover antiquities forming part of its national heritage
        should not then be shut out by Dicey Rule 3. More precisely, the view expressed (at
        [163]) was that as a matter of public policy Dicey Rule 3 should not ground a "*refusal
        to recognise the title of a foreign state, conferred by its law, to antiquities unless they
        had come into the possession of such state ...*". Read in context, this seems to me to
        be a view, *obiter*, contrary to the view taken, also *obiter*, in *Ortiz*, that the English
        court *would* give extra-territorial effect to foreign confiscatory legislation if it served
        the interest of the protection of the foreign State's cultural heritage. It will not be
        necessary to consider at any length that more difficult aspect of *Barakat*.

47.     In *Barakat*, where the claim was for wrongful interference with goods, the effect of
        applying Dicey Rule 3 (had it applied) was described as a refusal to *recognise* a title
        conferred by foreign law; so it is not correct to say without more that the essence of
        Dicey Rule 3 is a dichotomy between recognising and enforcing a foreign law or its
        effects. A claim founded upon and vindicating Iran's title to found objects was
        enforced here, and that title was derived from the Iranian treasure trove legislation.
        The cases arising out of alleged wrongful interference with goods also indicate that it
        is not sufficient, for Dicey Rule 3 to apply, that a foreign law relied on by the
        claimant to establish its title to sue is penal (confiscatory) in character.

48.    The point that emerges from these authorities, leaving aside the controversial
       invocation of public policy, *obiter*, in *Barakat*, is that under English law the exercise
       of a sovereign penal (confiscatory) power is not accepted as being capable of vesting
       ownership of or a right to possession in goods *extra-territorially*, i.e. of granting
       proprietary or possessory title to goods situated beyond that sovereign's borders at the
       time of the (purported) vesting of title. As Dr Mann put it in "*Prerogative Rights of
       Foreign States and the Conflict of Laws*" (1955) 40 Tr Gro Soc 25, at p.27: "*The
       distinction between the application and the enforcement of foreign laws ... is a fruitful
       one, provided the term "enforcement" is understood in a narrow sense. Every law
       that is being applied may be said to be enforced. The peculiar enforcement envisaged
       [by Dicey Rule 3] pre-supposes that it is a foreign State or one of its instrumentalities
       that asserts before an English Court the public authority conferred upon it by its own
       law.*"

49.    *Williams and Humbert Ltd v W&H Trade Marks (Jersey) Ltd* [1986] 1 AC 368 was
       therefore similar to the wrongful interference cases, but *a fortiori*, relating to shares
       rather than goods. English and Spanish companies pursued claims that existed prior to
       and independently of certain expropriation decrees vesting control over the Spanish
       companies in the Kingdom of Spain. It did not offend Dicey Rule 3 to admit those
       claims. The Spanish state ownership of the Spanish companies, achieved through
       expropriation, was not material to the claims, and in any event the expropriation had
       been completed in Spain, so the English court was not being asked to grant relief by
       which, directly or indirectly, the Kingdom of Spain might attain it.

50.    The decision in *Williams and Humbert Ltd* says nothing on the question of
       characterisation that arises in this case, but observations of Lord Mackay of Clashfern
       about *Buchanan v McVey* and *Government of India* were relied on by SKAT. Lord
       Mackay said this, at 440D-441A:

              "*From the decision in the Buchanan case ... counsel for the appellants sought to
              derive a general principle that even when an action is raised at the instance of a
              legal person distinct from the foreign government and even where the cause of
              action relied upon does not depend to any extent on the foreign law in question
              nevertheless if the action is brought at the instigation of the foreign government
              and the proceeds of the action would be applied by the foreign government for the
              purposes of a penal revenue or other public law of the foreign State relief cannot
              be given. ... Most important there was [in Buchanan] an outstanding revenue
              claim in Scotland against the company which the whole proceeds of the action
              apart from the expenses of the action and the liquidation would be used to meet.
              No other interest was involved. ...*

              *Having regard to the questions before this House in Government of India ... I
              consider that it cannot be said that any approval was given by this House to the
              decision in the Buchanan case except to the extent that it held that there is a rule
              of law which precludes a state from suing in another state for taxes due under the
              law of the first state. No countenance was given ... to the suggestion that an
              action in this country could be properly described as the indirect enforcement of
              a penal or revenue law in another country when no claim under that law
              remained unsatisfied. The existence of such unsatisfied claim to the satisfaction of
              which the proceeds of the action will be applied appears to me to be an essential*

*feature of the principle enunciated in the <u>Buchanan</u> case ... for refusing to allow
the action to succeed.*"

51.    That explanation of *Buchanan v McVey* and *Government of India* supports the
defendants' argument in this case, subject to the prior question, which is the real
question here, whether SKAT's unsatisfied claim to recoup what it paid out by
mistake is to be regarded for the purposes of Dicey Rule 3 as a revenue claim. The
claim that in *Buchanan* the liquidator's suit sought in substance indirectly to enforce
was the Revenue's claim against the company for unpaid tax. That was, without room
for argument concerning characterisation, an "*outstanding revenue claim*" or a "*claim
under [a foreign revenue] law [that] remained outstanding*". Lord Mackay cannot
sensibly be taken to have been expressing a view on the point raised by this case, and
not raised by or considered in *Williams and Humbert Ltd*, which is whether, as the
defendants say, there is no material distinction for the purpose of Dicey Rule 3,
between a claim for tax due and unpaid, and a claim for the return of a tax refund
mistakenly granted and paid.

52.    If the defendants are right about that, then SKAT's unsatisfied claims for the return by
the WHT refund applicants of tax refunds wrongly paid to them fulfil Lord Mackay's
requirement. If not, then Lord Mackay's requirement is not fulfilled, but that will be
because of the decision as to characterisation made now, not because what Lord
Mackay said somehow already decided it.

53.    Whether it is material to distinguish between, on the one hand, taxes due and unpaid,
and, on the other hand, tax refunds or credits wrongly granted and not returned, was
considered but in a different context by some of their Lordships in *Revenue and
Customs Commissioners v Total Network SL* [2008] UKHL 19, [2008] 1 AC 1174. In
that case, HMRC sued a Spanish company alleging participation in VAT missing
trader carousel frauds. The claim was for damages for an unlawful means conspiracy
causing loss to the Revenue.

54.    In a missing trader carousel fraud against the UK VAT system: Company X, in
another EU member state, would sell goods to Company Y, in the UK, a zero-rated
supply for VAT purposes; Company Y would sell to Company Z in the UK, charging
VAT; Company Z would sell to Company X, zero-rated; and Company Y would
become the missing trader by failing to account in the UK for the VAT charged to
Company Z.

55.    There might be more intra-UK sales, not just a single sale, Y to Z; one or more of the
UK links in the chain, other than Y, might be privy to the fraud, but not necessarily;
that is true even of Z, i.e. they need not necessarily be privy. Ignoring any profit
margins, likely to be very small, in any links in the sales chain, and since the goods
start and finish with X, the substantial net value transfer is from HMRC to X/Y, the
dishonest traders, through Z paying VAT to Y and claiming that amount from HMRC
but Y not paying VAT to HMRC. It might be thought natural to see HMRC's loss as
the VAT not paid by Y, if a failure by a tax authority to collect tax can be seen as a
loss for the purposes of a common law damages claim; or it might be said that the
dishonest scheme causes HMRC to pay money away to Z, a loss to HMRC in the
amount paid which would be repaired by a recovery from Y but which, if unrepaired,
is the loss for which damages may be awarded. If Z is privy, it may not be difficult, in
addition, to construct a case around implied representations in its VAT return

inducing HMRC to make a refund, again so as to argue that HMRC's loss is that refund.

56.     There was an argument that by the damages claim HMRC was "*levying money for or to the use of the Crown*" without legislative basis, contrary to article 4 of the Bill of Rights (1689). That argument was rejected – pursuing a damages claim, even if the loss was a loss of tax revenue, was not itself the levying of tax under article 4 – but the House of Lords divided 3:2 on whether the Value Added Tax Act 1994 ('the VAT Act') created a code so exhaustively defining HMRC's rights and remedies in relation to VAT as to preclude the claim. Lord Scott, Lord Walker and Lord Mance said it did not; Lord Hope and Lord Neuberger dissented.

57.     SKAT relied on *Total Network* in its written submissions, and Acupay responded in some detail, but I do not think it assists in deciding the issue in this case. Foreign taxation was not involved; *Total Network* is not a case on Dicey Rule 3 at all.

58.     In *HMRC v Shahdadpuri et al* [2011] SGCA 30, a claim by HMRC alleging involvement in VAT carousel frauds said to have been masterminded by a Danish company, Sunico ApS, was struck out on the basis that it offended against Dicey Rule 3. The Singapore Court of Appeal allowed an appeal, reasoning that the law was not clear enough for a strike-out and saying:

    (i)     at [39]-[40], that the decision in *Total Network* "*was not a ruling that <u>as a general principle of law</u>, any conspiracy claim for carousel fraud was not a prerogative claim for tax or the levying of tax*", and "*was arrived at in the context of a <u>purely domestic</u> dispute governed by UK law ... . It does not necessarily follow that under Singapore law, the Appellant's claim ... which is similar to the claim in <u>Total Network</u> would not be regarded as an indirect revenue claim or as a claim to enforce the interests of the UK government*"; and

    (ii)    at [42], that "*... the Appellant's central interest in bringing the Present Claim was to recover the money which it had paid to the Exporter pursuant to the latter's claim for reimbursement of input tax. But, this still raised the question of whether the Appellant's claim could legitimately be characterised as an action to enforce the sovereign rights or interests of a foreign state. ... This was a novel and complex issue of law which ... merited a fuller consideration of the revenue rule and/or the rule against enforcing the sovereign rights of a foreign state (given, especially, the evolving environment of increasing cooperation between states to combat transnational crime)*".

59.     The VAT carousel frauds alleged against Sunico ApS were also considered by the CJEU, in the context of the Brussels-Lugano regime, and I deal with the CJEU's decision below (at paragraph 142*ff*). In a Case Comment on *Sunico* (C-49/12, *Revenue and Customs Commissioners v Sunico ApS* [2014] QB 391) that referred also to *Total Network* and certain US decisions, "*The enforcement of foreign revenue laws*" (2014) 130 LQR 353, Lord Collins took it to be plain that a claim by a foreign revenue authority brought in an English court for damages in respect of a VAT carousel fraud on that foreign revenue would be "*an inadmissible claim for the indirect enforcement of foreign taxes*" (*ibid* at 354). I refer to Professor Briggs' writing when considering *Sunico*. He puts forward argument on its consequences for *QRS v Frandsen, supra*,

not all of which I accept. At this point, I note that Prof Briggs seems to agree (as his argument assumes without demur) that the tort claims made in *Sunico* (which were the same as those made in *Total Network*) are within the scope of Dicey Rule 3 on the law as it stands, given the approval of *Buchanan v McVey* by the House of Lords in *Government of India*.

60.     That brings me finally, and on the facts most exotically, to the claim by the President and Government of Equatorial Guinea that Simon Mann, a former British Army officer turned private security contractor and mercenary, was part of a plot to seize control of Equatorial Guinea, intent on seizing control of the state and its assets, especially its oil and gas reserves, killing or abducting the President, Teodore Mbasogo, and installing in his place Severo Moto, a national of Equatorial Guinea living in Spain. The losses for which damages were claimed comprised (1) costs incurred in responding to or otherwise by reason of the conspiracy alleged, including costs incurred in the detention and prosecution of suspects and costs of increased security in the country, and (2) damage to the nation's commercial activities causing economic loss, including through delay to major infrastructure projects (see [2007] QB 846 at [19] on 862-864, quoting from the particulars of claim in the English proceedings).

61.     In *President of the State of Equatorial Guinea et al v The Royal Bank of Scotland International et al* [2006] UKPC 7, the Privy Council allowed an appeal from the Guernsey Court of Appeal, restoring a *Norwich Pharmacal* order granted at first instance in support of the substantive claim to be pursued in England. In doing so, however, their Lordships:

        (i)     expressed disquiet (at [23]) that no point had been taken on whether the *Norwich Pharmacal* claim should have been dismissed under Dicey Rule 3;

        (ii)    said (at [24]) it was *"well arguable that the claims which the appellants say they wish to make in the English proceedings represent an exercise of sovereign authority, namely the preservation of the security of the state and its ruler"*, the issue being *"whether the "central interest" of the state bringing the action is governmental in nature"* (a reference to the approach of the High Court of Australia in the *Spycatcher* case, *A-G (United Kingdom) v Heinemann Publishers Australia Pty Ltd* (1988) 165 CLR 30 at 46); and

        (iii)   therefore (see at [28]), though they restored the *Norwich Pharmacal* order, directed that it be suspended pending a decision in the English court on the viability of the substantive claim.

62.     That decision came in *Mbasogo v Logo, supra*, and was that the claim fell to be dismissed under Dicey Rule 3. The main conclusion of principle, *ibid* at [50], was that:

        "*The critical question is whether in bringing a claim, a claimant is doing an act which is of a sovereign character or which is done by virtue of sovereign authority; and whether the claim involves the exercise or assertion of a sovereign right. If so, then the court will not determine or enforce the claim. On the other hand, if in bringing the claim the claimant is not doing an act which is of a sovereign character of by virtue of sovereign authority and the claim does not*

*involve the exercise or assertion of a sovereign right and the claim does not seek to vindicate a sovereign act or acts, then the court will both determine and enforce it. ... In deciding how to characterise a claim, the court must of course examine its substance, and not be misled by appearances ... ."*

63. The Court of Appeal concluded at [63] that "*none of the pleaded claims is enforceable in our courts. Just as a claim for taxes is "an extension of the sovereign power" to use the words of Lord Keith in Government of India ... [at] 511, so too is a claim for relief (damages and an injunction) arising from the claimants' exercise of sovereign power in responding to the alleged attempted coup by the defendants.*"

64. That conclusion was said at [64]-[66] to be fortified by policy considerations around the undesirability of the court sitting in judgment over aspects of the claimants' conduct in their response to the attempted coup they alleged. I agree with Mr Fealy QC that this invocation of a species of comity concern was not a ground for the decision, which rested squarely "*on the distinction ... between an exercise of sovereign power and an action brought by a sovereign state which might equally have been brought by an individual to recover losses for damage to property*" (*ibid* at [67]). The degree to which entertaining a claim might tend to a need to consider matters it might be thought unseemly for the English court to decide, because they seem more apt for international relations between sovereigns, might inform a decision on the issue of characterisation; but that does not make a potential for embarrassing HMG in international relations a ground for rejecting a claim if, properly characterised, it is not, in substance, a claim to give extra-territorial effect to foreign public laws or sovereign powers.

65. That reading of the basis of decision in *Mbasogo* is confirmed by *Barakat, supra*, where (at [123]) the Court of Appeal concluded that: "*... the Mbasogo case ... is not ... a case involving the attempted enforcement of foreign public law. Although the court approved the residual category of "other public law" [i.e. in Dicey Rule 3 as stated in the textbook] the ratio is that a claim involving the exercise or assertion of a sovereign right is not justiciable. This is not far removed from the test adopted by the High Court of Australia [in Spycatcher], and the Court of Appeal [in Mbasogo] accepted, at para 50, the correctness of the expression of opinion by the Privy Council [in Equatorial Guinea v RBS], which itself appears to give some approval to [that] test ...*"

66. It is inherent in the Court of Appeal's decision in *Mbasogo* (paragraph 62 above) that, in the context of Dicey Rule 3, *how loss was suffered* is an aspect of identifying the substance of the claim, in order to determine whether it is sovereign in character. That is confirmed and reinforced by how the Court of Appeal dealt with the heads of loss alleged, at [58]-[59]:

"*58. The special damages claimed ... are in respect of losses incurred as a direct result of their response to the alleged conspiracy. ... With one possible exception, they are losses which could only be suffered by the governing body of the state. They arose as a direct result of the government's decisions as to how to respond to the conspiracy and (subject to the possible exception) are of a kind that could not be suffered by anyone else.*

> 59.   The possible exception is [the plea] that, as a result of the defendants'
> actions, projects for roads and other civil engineering works were delayed by
> reason of the exodus of foreign nationals "in the wake of the coup". In our
> judgment, it is artificial to describe these losses as property losses caused by the
> defendants' actions and treat them as if they were similar in kind to, for example,
> the cost of repairing a government building damaged in the course of a coup. It is
> clear from ... the pleading that it was not the defendants' action alone which
> caused the foreign nationals to leave. It was the claimants' declaration of a state
> of emergency and the security checks carried out ... which affected the
> willingness and ability of foreign nationals to continue working in Equatorial
> Guinea. In our view, on a proper analysis, the [subject] losses do not fall into a
> different category from the other losses."

67.   I therefore accept a submission by Ms Macdonald QC that in considering the question
of characterisation raised by Dicey Rule 3, the mechanism of harm is important – how
it is said that allegedly wrongful conduct caused the harm in respect of which the
claimant pursues a claim, including the nature (character) of any actions (including
decisions) of the sovereign that were involved. It may indeed be central to the analysis
in a claim brought by a sovereign entity against private parties alleging tortious
conduct (e.g. deceit, conspiracy, negligence), as it was in *Mbasogo*. How the claim is
put against the defendants is treated by Dicey Rule 3 as a matter of form rather than
substance. The whole point of the rule, exemplified by *Buchanan v McVey* or
*Mbasogo*, is to look past the fact that the claim has been framed in a way that a claim
might be framed between private parties, treating that as a matter of form, to examine
and identify the central interest served by the pursuit of the claim. Considering the
mechanism of harm, as alleged, including the sovereign function (if any) involved
therein, at the level of the factual detail of the particular case (not in the abstract as,
for example, 'additional personnel costs' or 'payments induced by fraud'), is both
appropriate and likely to be unavoidable in that exercise.

68.   In *Mann* (1987), *supra*, some consideration is given to the characterisation, for the
purpose of Dicey Rule 3, of certain types of claim by sovereign authorities for the
return of benefits conferred on private parties. There is criticism of a decision in
Germany to refuse as inadmissible a claim by the Dutch State to recoup
unemployment benefits alleged to have been obtained fraudulently by a defendant
who had emigrated to Germany (*ibid*, at 613-614). The true issue, it is argued, "*should
have been whether the Dutch claim involved the assertion of Dutch sovereign power
within Germany*"; and it is submitted that it did not. Dr Mann then generalised the
thought (*ibid*, at 617*ff*), suggesting a category of claim that should not be caught by
Dicey Rule 3, namely where a foreign state or public authority "*asserts a public right
that in substance is so close to a private right that there should be no objection
against its enforcement.*" He returned to the Dutch unemployment benefits case (*ibid*,
at 624-625) to compare it to *Regierungspraesident Land Nordrhein-Westfalen v
Rosenthal* 17 A.D.2d 145, 232 N.Y.S.2d 963, in which a defendant had received
payments to which he was not entitled under a German indemnification law, section 7
of which entitled Nordrhein-Westfalen to repayment: "*The action succeeded. The
Appellate Division acknowledged that section 7 created a public right, but held that
"[t]he object of the action is not 'vindication of the public justice', but 'reparation to
one aggrieved.'" This, indeed, is the decisive point: damages for fraud were in issue.*"

69. Other examples identified by Dr Mann included: a claim by the Municipality of Vienna to recoup the cost of work carried out on the defendant's house in his absence to prevent danger to adjoining properties; a defendant in receipt of social security subject to a conditional obligation to repay if later having the means to do so; student 'loans' ("*education expenses advanced by the state on the condition that the student repay them by instalments once he begins to receive a salary*"). In such cases, Dr Mann suggested (*ibid*, at 618-619):

"… *a state's claim should be allowed to succeed because it concerns payment for, or repayment of, a benefit that was voluntarily accepted. While the claim may have its basis in the state's sovereign rights, its substance is of a commercial or private law character. Thus, the state should be allowed to maintain a claim for repayment when it discharges the defendant's liabilities by paying maintenance to the defendant's spouse or child, or when it pays damages to the victim of an accident and then through assignment seeks indemnification from the defendant-wrongdoer.*

*Perhaps the decisive feature of all these cases is that in the last resort the claim arises due to the defendant's voluntary act, or to phrase it differently, the defendant could have avoided the assertion of claims against him. Municipal Council of Sydney v Bull illustrates this distinction. In that case, an Australian municipality carried out improvements of a road on which the defendant's house was situated. By virtue of a local statute, the municipality held the defendant liable for a proportionate contribution payment. The claim in England failed because, among other reasons, it concerned a charge analogous to a tax. Although the defendant derived some advantage from the plaintiff's work, the benefit was imposed upon the defendant independently of his own will. Therefore, there is a marked difference between Bull and the Vienna case ..., where the municipality acted for the benefit or at the (imputed) request of the defendant.*" (*Municipal Council of Sydney v Bull* is reported at [1909] 1 KB 7.)

70. Dr Mann's comment that in the *Nordrhein-Westfalen* case what was decisive was that the claim was for damages for fraud is over-stated, if it means that where a claim is so framed it cannot fall within Dicey Rule 3. I do not imagine that was Dr Mann's intent, however, for that would be to judge on form, not substance, and as Dr Mann put it 30 years earlier (*Mann* (1955), *supra*, at 35): "*It is ... certain that in these matters the Court will not allow itself to be misled by appearances: on the contrary, it will investigate whether what the plaintiff asserts is in substance a prerogative right the direct or indirect enforcement of which is being sought. Thus if in truth a prerogative right is being asserted, the Court will reject it, although the claimant is a person other than the foreign State and although the claim sounds in contract or in tort.*"

71. I did not understand Mr Fealy QC to submit that where SKAT alleges fraud (or conspiracy to defraud), that without more, i.e. the mere fact that SKAT so frames the claim, takes the claim in question outside Dicey Rule 3. However, he did rely on Dr Mann's discussion of payments for, or repayments of, benefits conferred by a public body, together with *Briggs* (2014), "*Private International Law in English Courts*", at 3.193, contrasted with a Scottish case mentioned by Dr Mann, *Metal Industries (Salvage) Ltd v Owners of the S.T. "Harle"* 1062 S.L.T. 114, to submit that claims arising out of the defendant's voluntary act, where the defendant could have avoided

the assertion of the public body's claim, should always be held to fall outside the Rule.

72.     In my judgment, that takes Dr Mann's thought too far. The question raised by each of the examples Dr Mann considered is whether the public authority's particular claim, framed as a claim for payment for or repayment of a benefit conferred, is in substance a claim to tax the defendant (or to levy payment from him akin to tax), *given the nature of the benefit allegedly conferred and how it was conferred*. In none of the examples did the benefit itself have anything to do with taxation; an alleged obligation to pay for (or repay) a non-tax benefit looks like taxation only where, as in *Municipal Council of Sydney v Bull*, it is imposed by an exercise of sovereign authority over the defendant. In this jurisdiction today, we would immediately identify the claim in *Bull*, and reject it accordingly, as effectively a claim for council tax, albeit made under a specific local law providing for a particular public road improvement scheme rather than under legislation that was by name a taxation statute.

73.     That SKAT's submission takes Dr Mann's observations too far can also be seen by marking that the decision by an international investor to invest in Danish shares is a voluntary act. That would not allow SKAT to pursue the investor here for dividend tax, if SKAT did not operate a WHT scheme in relation to dividend tax. Dicey Rule 3 would lead straightforwardly to the dismissal of the claim. Then take the case of an excessive refund claim by such an investor, where there is a WHT scheme, pursuant to which he receives a tax refund payment to which he was not entitled. Suppose 27% WHT and a full refund, but a true refund entitlement of only 12% (i.e. a true tax rate for the investor, taking into account an applicable DTA, of 15%). When SKAT pursues the investor for the excessive refund, there is on any view a serious argument that it is, in substance, seeking thereby to enforce its right to tax the investor at 15%, the upshot of the WHT collection and excessive refund having been that the investor was taxed at the time at 0%. That making the application for a full refund was a voluntary act on the part of the investor is to my mind neither here nor there in judging that argument.

74.     So while, in the case of a non-tax benefit conferred at the request of the defendant, Dr Mann suggested that the request rather than any sovereign authority should be seen as, in substance, the source of any alleged obligation to pay for, or return, the benefit, that suggestion does not address the question of characterisation of a claim to recoup a tax refund wrongly paid out. As a result, it is not necessary to express a view on the correctness of Dr Mann's particular examples, but for instance, the proper characterisation of student 'loan' repayment obligations may be a nice one, given the functional equivalence of student loans to an additional income tax upon graduates, depending on earnings.

*Applicable Principles*

75.     I draw from that review of the authorities the following principles:

(i)     A claim is not admissible before this court if, in substance, it is a claim directly or indirectly to enforce the Kingdom of Denmark's sovereign right to tax dividends declared by Danish companies.

(ii)    That may be the substance of a claim though it is not, in point of form, a claim for a tax debt or a claim against a party that was or could be a tax debtor.

(iii)   The substance of the claim is not determined by the private law cause(s) of action pleaded, indeed the relevant issue of substance over form arises at all only when, and because, the claim is framed in that way, that being a matter of form in this context, as is the identity of the claimant (though that aspect does not arise in the present case).

(iv)    Rather, the substance of the claim is determined by the central interest, in bringing the claim, of the sovereign by whom it is brought or in whose interests, directly or indirectly, it is brought.

(v)     The mechanism by which harm is said to have been suffered, in respect of which a claim seeks reparation, is material to consider, and may be important, in judging whether the central interest in bringing that claim is a sovereign (governmental) interest rather than a patrimonial (private law) interest.

(vi)    There is no rule of law that the voluntary act of the defendant, in engaging with the foreign sovereign, takes a case outside Dicey Rule 3 or disapplies it, though the nature of any interaction between defendant and sovereign will be one circumstance to be considered in deciding what right or interest, in substance, the claim serves to vindicate.

*Application to the Facts*

76.    The *Kildeskattelovens* (Danish Withholding Tax Act, 'the WHT Act') is at the heart of SKAT's case. It provides the foundation for all of SKAT's claims, as pleaded, without reliance on which none of SKAT's claims could exist or be formulated.

77.    By s.2(1).6 of the WHT Act, legal persons not tax resident in Denmark are liable to tax under that Act on dividends obtained from Danish companies (other than investment companies) within the scope of s.16A(1)-(2) of the *Ligningsloven* (Danish Tax Assessment Act), read with s.2(1)(c) of the *Selskabsskatteloven* (Danish Corporation Tax Act). The tax residency concept for that purpose is that of s.1(1) of the WHT Act, rendering liable to tax under the Act (i) Danish (permanent) residents, (ii) those resident in Denmark for at least six months in the tax year in question, (iii) certain categories of person serving or residing aboard Danish-registered ships and (iv) Danish public servants posted abroad. By s.2(11), the general rate of tax under s.2(1).6 is set at 27%.

78.    By s.65(1) of the WHT Act, the general obligation of a Danish company resolving to pay or credit to shareholders a dividend is to withhold 27% of the dividend, the section providing that the amount withheld is called a 'dividend tax'. The company's obligation, a revenue law liability for the purposes of Dicey Rule 3, is to pay the dividend tax to SKAT. The Danish Minister for Taxation is empowered by s.65(3) of the WHT Act to make rules providing for dividend tax not to be withheld from dividends that are not taxable income in the recipient's hands and for the publication of a database of companies and associations entitled to receive dividends without any dividend tax withholding.

79.    Then s.69B(1) of the WHT Act provides, so far as material, as follows:

> "*If a person who is liable to pay tax pursuant to section 2 hereof ... has received dividends ..., of which tax at source has been withheld pursuant to sections 65-65D which exceeds the final tax under a double taxation treaty ..., the amount must be repaid within six months from the receipt by [SKAT] of a claim for repayment. If repayment is made after this time, the taxpayer is entitled to interest [at a specified rate].*"

80.    That primary provision, specifying SKAT's obligation to make WHT refund payments, is complemented by s.69B(2), providing that if SKAT cannot check whether the conditions for repayment of WHT have been met, due to the circumstances of the proposed recipient, the six-month payment period is interrupted until those circumstances "*no longer prevent control*", and by s.69B(3), providing that if SKAT assesses that payment as claimed will involve an obvious risk of loss, it may require security from the recipient, but only if the claim is disputed and not finally decided by an administrative appeals body or the courts.

81.    The concept and structure is clear:

   (i)     dividend tax is an income tax;

   (ii)    a dividend payee not tax resident in Denmark is liable to dividend tax at 27%, an extra-territorial imposition of income tax by the Danish state, sometimes referred to as a 'limited' tax liability because it is limited to a particular source of income, but (I should be clear) by using the term 'dividend payee' I do not mean to express any view on when precisely there will be liability to tax, upon the proper construction of s.2(1).6 of the WHT Act, that being a contentious issue in the litigation not for determination now;

   (iii)   the obligation on a Danish company to pay SKAT dividend tax of 27% of a declared dividend is a tax obligation imposed on the company by the Kingdom of Denmark, a simple tax levy based on domicile;

   (iv)    payment of that tax by the company to SKAT will operate to discharge the dividend tax liability of those taxable on the receipt of the dividend in question, but as in (ii) above without by that meaning to express any view on who precisely is so taxable;

   (v)     an entitlement under s.65 of the WHT Act is therefore an entitlement to a dividend tax refund, and a payment under s.65 is appropriately called a refund or repayment although, by the nature of a withholding tax regime, the refund payee will not have made the dividend tax payment to SKAT in respect of which the refund was granted;

   (vi)    the WHT refund applicant will be claiming by its application that as regards the referenced dividend, the 27% dividend tax payment that SKAT will have received from the company will have been a payment discharging a dividend tax liability owed by it (the applicant) under s.2(1).6 of the WHT Act;

(vii)    acceptance and payment by SKAT of a WHT refund application is therefore an acceptance of the applicant as a taxpayer pursuant to the WHT Act, and an agreement to pay, and payment of, a sum of money to the applicant *qua* dividend tax refund.

82.    SKAT says in most of its claims that it was misled into *mistakenly* treating the refund applicant as having paid tax on the dividends in question, and the issue as regards Dicey Rule 3 is whether the fact that SKAT claims to have been misled in that way affects the proper characterisation of the substance of its claims. The exceptions, where the mistake alleged is different but still concerns the incidence or amount of tax liabilities, relate to ED&F Man Applications. As I noted in paragraph 13 above, for most of those (336 of 400), SKAT advances an alternative claim (arising if, which SKAT does not admit, dividends were received) that the WHT applicant was rightly treated as having paid tax but wrongly treated as entitled to a refund (because, SKAT says, if dividends were received, they were received beneficially for ED&F Man), and for 16 of those cases there is also a further alternative claim that if (as ED&F Man says) they were only excessive refund applications, then the WHT applicant was rightly treated as having paid tax but wrongly treated as entitled to a full refund where only a partial refund was due.

83.    That the WHT Act provides the foundation for every claim made by SKAT in these proceedings means this case is not like a theft or robbery of cash from a SKAT vault, or a loss of SKAT's cash caused by actionable negligence in circumstances in which it was simply beside the point that SKAT was the Danish sovereign tax authority or that the cash may have been received in payment of taxes. Some of their Lordships in *Total Network* drew a comparison between theft or robbery of cash and the torts alleged in that VAT carousel fraud case, but that was to assess whether HMRC had power to pursue private law claims, not whether a VAT carousel fraud claim brought here by a foreign sovereign tax authority should be treated like a theft claim so as to fall outside Dicey Rule 3.

84.    Nor is this case like that of a cyber-attack, or the suborning of a SKAT employee, to gain access to a SKAT bank account from which to take a payment, or negligent advice to SKAT on how it might invest its funds, or a dishonest investment trick such as inducing SKAT to put funds into a Ponzi scheme.

85.    In all the examples in paragraphs 83 and 84 above, SKAT could say it had suffered loss of the same kind in the same way as might a private individual. It would not be necessary or material for SKAT to mention the WHT Act, or any other Danish taxing statute or sovereign power, to found its claim. It would be a contrivance if defendants referred to the WHT Act (or other Danish revenue laws), or SKAT's status as sovereign tax authority, to suggest that taxation was, in substance, the interest served by the pursuit of the claim.

86.    In this case, by contrast, every cause of action against every defendant starts with and must be pleaded by reference to the delivery (or prospective delivery, for conspiracy allegations) of a completed Form 06.003, as required by SKAT for a "Claim to Relief from Danish Dividend Tax", and the foundational allegation that accepting and paying that claim was (or would be) a mistake, SKAT being induced by the applicant's information erroneously to conclude that the tax refund claimed was due under s.69B(1) of the WHT Act.

87. The defendants' essential point is not simply that the source of SKAT's funds is taxation. It is that making dividend tax refund payments is an integral part of SKAT's function as sovereign tax authority, and the return of a payment made by way of dividend tax refund is in substance a payment of tax, SKAT's entitlement to which, if any, derives from its power to tax Danish company dividends in the first place. That characterisation of substance, the defendants argue, should not be affected by the fact that, if SKAT is right on the facts (including as to Danish tax law) it was wrong to make the refund payment it now seeks to claw back. The WHT refund system is an aspect of the Danish system of dividend tax collection; a claim to recoup a WHT refund payment is a claim to reduce the amount of WHT given back; and a claim to reduce the amount of WHT given back is, in substance, a claim to increase the amount of dividend tax taken in. As will become apparent, I agree.

88. The decided cases on Dicey Rule 3 to date have not considered the case of a tax refund wrongly paid by a sovereign tax authority and a claim to recoup that erroneous payment, or compensation for it. The point for decision now is exactly that, i.e. whether Dicey Rule 3 should be held to cover such a case, and the arguments for and against are the same whether they are seen as arguments about extending (or not) the rule in *Government of India* on the extra-territorial collection of taxes, or as arguments over whether the recovery of tax refunds falls within the principle underlying Dicey Rule 3 and giving it content, namely that claims are not admissible that in substance (whatever the form) seek to enforce extra-territorially a foreign revenue law or other exercise of sovereign authority.

89. If a claim seeking a recovery in respect of a tax refund payment made through error induced by misrepresentation by the refund applicant is, by nature, a claim seeking directly or indirectly to enforce a foreign revenue law, that is so as much where the misrepresentation is dishonest as where it is innocent or negligent, just as a claim for tax unpaid following an under-reporting of, or total failure to report, taxable income, or an excessive or invalid claim of deductible expenses, is a tax claim whether the mis-declaration or failure to declare is honest, careless or dishonest. Depending on the rules of the system of law that would govern it, and the nature and circumstances of the particular defendant, fault of some kind or degree may be required for liability on a private law cause of action, if available; but that is a different point.

90. In saying that, I put to one side misrepresentation as to identity, on which it is not necessary to take a view to decide the present case. Mistakes as to identity can be seen as conceptually different to other errors and a decision that Dicey Rule 3 applies in the present case does not have to mean that it would apply to a case where SKAT's claim was not founded on an allegation that it had made a payment to Party A, intending to pay a tax refund to which, in error, it had assessed Party A to be entitled, but on an allegation that it had made a payment to Party B mistakenly thinking it was paying Party A (as it happens intending to pay a tax refund to Party A). Without deciding the point, I can see how it might be said in the latter case that in substance, the fact that the payment was thought to be by way of tax refund was immaterial, and SKAT was not by the claim seeking to vindicate any exercise by it of sovereign authority in relation to tax, even if the opposite is true in the present case.

91. Similarly to paragraph 89 above, if as SKAT said in its alternative submission its proprietary claims should not be regarded as claims directly or indirectly to enforce Danish revenue law, that would not be because (if this be so) such proprietary claims

arise only where there has been a fraud, meaning that SKAT would have to prove fraud to establish those claims; it would be because they were regarded as cases of retrieving SKAT's property rather than as cases of enforcing foreign revenue law, even though the loss was incurred by the making of tax refund payments in error. If, as the defendants say, that last factor – the way in which the loss was suffered – means that SKAT's resulting proprietary claims are foreign revenue claims for the purposes of Dicey Rule 3 just as much as their claims for damages or unjust enrichment, then that is so whether or not the extraction of payment from SKAT was achieved dishonestly.

92. It follows also that it does not matter whether in principle, as SKAT submitted by reference to *Barakat* (see paragraph 46 above), arguments of public policy can be raised against the application of Dicey Rule 3 to a case of a type falling within its scope, or whether, as the defendants submitted, the Rule is absolute, i.e. the relevant rule of public policy is that claims of such a character as to fall within the Rule are never admitted. The only countervailing public policy suggested was that of combatting or giving redress in respect of fraud, yet that has never ousted the Rule or prevented a type of claim from falling within it that otherwise would. For completeness, I venture to suggest that the proper role for a public policy argument of the kind considered, *obiter*, in *Barakat*, is only in assessing whether Dicey Rule 3 is to be extended to a category of foreign public law or species of prerogative or similar power not covered by existing authority. Where, by reference to the type of foreign law or power being considered, Dicey Rule 3 applies, it would be "*unwise ... to attempt to discriminate between those claims which [the courts] would and those which they would not enforce. Safety lies only in universal rejection*", *per* Kingsmill Moore J in *Buchanan v McVey, supra*, at 529.

93. SKAT cannot avoid Dicey Rule 3 by pointing to the fact that it is not suing here the WHT refund applicants themselves, whose refund applications SKAT says it paid wholly or partly in error (see paragraph 18 above); and conversely if claims against the applicants themselves, to recoup the erroneous refunds, would not fall within Dicey Rule 3, then neither would any of the claims made here against other parties alleging an involvement in the making of the refund applications or the receipt of funds or other enrichment deriving therefrom. The argument on Dicey Rule 3 can and should be determined upon how claims against the allegedly wrongly paid applicants, to recoup the payments made by SKAT, would stand under the Rule. Indeed, such claims are made in the proceedings, in that a few of the defendants here were WHT refund applicants, even if for the most part litigation against applicants themselves is before courts or tribunals in other jurisdictions.

94. In my judgment, applying the principles set out in paragraph 75 above, such claims do fall within Dicey Rule 3, as submitted by the defendants, because this case is properly to be characterised as an attempt by SKAT:

(i) to vindicate its right, a creature of Danish tax law under the WHT Act and DTAs concluded by Denmark, to retain Danish company dividend tax collected by way of WHT except where refund claims are made to it by qualifying applicants under s.69B of the WHT Act,

and therefore

     (ii)     indirectly to enforce Denmark's underlying sovereign right, given effect by the
            WHT Act, to tax Danish company dividends.

95.     The making of payments by way of WHT refunds pursuant to the WHT Act, and, as a
resulting practical necessity, the creation and operation of a system for the making
and processing of WHT refund applications, is an integral part of the taxing of Danish
corporate dividends. It is a key element of the assessment and collection by SKAT of
the amount that Danish law entitles it to take as tax, as an exercise of the sovereign
authority of the Kingdom of Denmark, from such dividends. The taxation of
dividends under the WHT Act is, in substance, a single exercise of sovereign
authority to take in tax a proportion of declared Danish company dividends, the true
entitlement from time to time being a function of the tax rate set by the WHT Act
(27% at all times material to SKAT's claims), the international distribution of
entitlements to receive dividends (in whatever sense that is required by s.2(1).6 of the
WHT Act so as to create a liability to tax), and the terms of any DTAs concluded by
the Kingdom of Denmark that are rendered pertinent by that distribution.

96.     Collecting 27% up front and making available to non-residents a refund application
system is no doubt convenient to SKAT. WHT schemes of this type, as Mr Baker QC
submitted, may be seen as creatures of the international understanding that revenue
laws will not be enforced extra-territorially except as may be provided for by
supranational legal instruments entitling the taxing sovereign to international
assistance. SKAT's right and interest are the same whether or not the technique of
WHT and a refund application system is used. Where that technique is used, *ex
hypothesi* the initial collection (here, 27% of dividends, collected from companies
declaring them) is conditional by nature because of SKAT's obligation to pay a partial
or total refund if eligibility conditions are satisfied.

97.     An obligation and a right will generally be opposite sides of a single legal coin; and in
my judgment that is the case here. To say that SKAT is obliged to pay a WHT refund
if eligibility conditions are satisfied is to say that SKAT is entitled to keep, as tax,
what it collected up front only to the extent that those eligibility conditions are not
satisfied. A conditional entitlement to keep, as tax, amounts collected up front, in
effect pending final assessment of the tax due, is conceptually and functionally the
same as an entitlement to assess and collect tax due by reference to those eligibility
conditions; and it is that entitlement to keep as tax what it had collected up front that
SKAT seeks to enforce by its claims.

98.     SKAT's claim to recover from a WHT reclaim applicant an amount it had assessed as
payable, and had therefore paid, by way of tax refund, founded on the proposition that
the assessment was in error, is conceptually and functionally the same, for SKAT, as a
claim for tax due and unpaid. It is, in substance, a tax claim. As part of that
characterisation, it seems to me the defendants are correct to say that the acceptance
and payment of funds by way of tax refund, in response to a WHT refund application,
is an exercise of sovereign authority. That it is an assessment carried out, application
by application, by Danish state tax officials, rather than the prior act of making the
law those officials are seeking to apply, does not change that characterisation of their
conduct.

99.     The substance of SKAT's claims is in my judgment that by conduct of a kind
ordinarily regarded as actionable in tort, the defendants have diverted from SKAT

amounts to which it was entitled as dividend tax on Danish corporate dividends. The mechanism by which that was done, on SKAT's case, was that of WHT refund applications that SKAT was misled into accepting and paying. But in the context of Dicey Rule 3, that is a matter of form, once it is accepted (as is now long established, and was common ground before me) that in the field of foreign tax claims, Dicey Rule 3 is not restricted to claims by a foreign sovereign tax authority against a defendant alleging, in terms, a liability on the part of that defendant for unpaid tax. The question, under Dicey Rule 3, whether the substance here is an attempt by SKAT directly or indirectly to enforce the Kingdom of Denmark's sovereign right to tax Danish corporate dividends, arises only and precisely because SKAT is not pursuing, in that narrow and formal sense, a claim for unpaid tax.

100. I agree with SKAT that on its case, as alleged, at all events for the Solo etc Applications (the position for the ED&F Man Applications is more complex): the WHT refund applicant was not a person liable to tax under s.2(1).6 of the WHT Act on the dividend referenced in the application, as SKAT assessed them to have been, and the applicant therefore did not have a primary tax liability that was discharged by a WHT payment received by SKAT from a Danish company. That does not mean Dicey Rule 3 is inapplicable, though it may mean that the sense in which SKAT's claims seek to enforce Danish sovereign taxation rights is a degree more indirect than in other cases. It is just another way of saying that the case involves payments made by way of tax refund said not to have been due and raises for decision whether claims to recoup such payments should be treated any differently than claims for tax due but unpaid, from the perspective of Dicey Rule 3.

101. SKAT said as a further consequence of that premise (*viz.* that the WHT refund applicant had not been a person liable to tax under s.2(1).6 of the WHT Act as regards the dividend in question) that "*As a result, none of the proceeds of the present action will go to discharge any such tax or other public law liability in Denmark*". I agree that a recovery now from a WHT refund applicant (or, by extension, a recovery of damages from a defendant who was not the applicant) where the applicant never had a primary tax liability under s.2(1).6 of the WHT Act cannot discharge such a liability. If SKAT's quoted contention was intended to go further than that, it merely asserts the result desired by SKAT, begging the question for decision, which is whether the return of a tax refund payment erroneously paid, the error being that no tax refund was due as SKAT had thought when paying, should be seen as different in kind for the purpose of Dicey Rule 3.

102. What SKAT's claims seek to do is repair the hole in its dividend tax take for the years in question caused by its misjudgment of its obligations to make tax refund payments pursuant to s.69B(1) of the WHT Act. Its claims, framed as private law causes of action, that it was induced into making that misjudgment by actionable conduct on the part of the defendants, define the grounds upon which SKAT proposes that the defendants could be required by the court to repair that hole, if the claims be admissible. They do not mean that SKAT's real or central interest in bringing those claims is not the repair of that hole, which is a purely sovereign interest.

103. SKAT pleads that Danish tax legislation does not empower it to raise tax assessments against the WHT refund applicants that would have force under Danish law (subject to any rights of challenge before a Danish tax tribunal). I understand that to be contentious, but I do not need to resolve the point. If SKAT is right on it, the Danish

legislature has not given SKAT, as it might have done, a separate public law mechanism for pursuing its relevant entitlement, so that (like HMRC in the *Total Network* case) SKAT has to use private law causes of action, if it can, to pursue that entitlement. That does not change the proper characterisation of the substance under Dicey Rule 3; it does not mean that English law must allow a cause of action for this (alleged) fraud, given that substance.

104. If anything, consideration of that aspect of the matter reinforces the characterisation of SKAT's claims as, in substance, claims indirectly to enforce sovereign tax rights. It would be quite natural if Danish tax legislation granted a power of assessment, binding on the recipient, subject to any tax law appeals processes, in respect of tax refunds SKAT concluded to have been wrongly granted. If it did, then when issuing administrative decisions revoking its decisions to accept WHT refund applications (as SKAT did – it matters not whether it did so in every instance), SKAT could have raised concomitant tax assessments. It would seem perfectly fitting for Danish law, and SKAT, in that way to treat SKAT's claim to claw back the WHT refund payments as a tax demand. I do not accept the submission Mr Fealy QC made in reply that had the Danish tax legislation empowered SKAT to assess for repayment in the manner here being considered, its resulting claim founded upon an exercise of that power, if brought here, would not be rejected under Dicey Rule 3. In my view, plainly it would be so rejected, but the logic of SKAT's position indeed required it to submit otherwise as Mr Fealy QC's submission acknowledged.

105. Were I wrong in concluding that it is not necessary to resolve whether SKAT is empowered under Danish tax law to assess WHT refund applicants for sums paid to them in error as tax refunds, but rather resolving that point would determine whether Dicey Rule 3 applied, then I would wish to explore with the parties how most efficiently to resolve it as an extension of the Revenue Rule Trial. I would be interested in particular to see whether that could sensibly be achieved this summer, to conclude this phase of the litigation in good time before the Validity Trial listing. As it is, my conclusion that the point does not need to be resolved means that a final decision on Dicey Rule 3 can be made now, without any finding on that particular point of Danish law.

106. It is to my mind telling that SKAT formulated its key argument as follows:

"... *a claim to recover money incorrectly paid out by a tax authority on the faith of misrepresentations is not properly characterised as the imposition of a "tax" (or as a claim otherwise arising under "revenue" law). Such a claim, if brought under ordinary principles of private law, does not constitute the compulsory imposition by the state of a public law liability on a subject to pay money or transfer property to the state, to which the state otherwise has no interest.*"

(i) Firstly, SKAT omits a key characteristic of the case, namely that it concerns money paid out by a tax authority *by way of tax refund*. Thus SKAT over-generalises so as to beg the question whether overpaying by mistake for, say, office supplies, and making a payment mistakenly assessed to be due by way of tax refund, should be regarded as equivalent when characterising the central interest involved in the making of a claim to recoup the payment.

(ii)    Secondly, SKAT's submission in terms relies on form to characterise substance ("*Such a claim, if brought under ordinary principles of private law* ...", my emphasis).

(iii)   Thirdly, the submission is inconsistent with the well-established scope of Dicey Rule 3. Returning again to *Buchanan v McVey*, for instance, the claims against Mr McVey did not impose on him, if well founded, a public law liability as a British subject to pay money to the British Crown; but they were brought indirectly to enforce the Revenue's claim to tax his asset-stripped company.

(iv)   Thus, SKAT's key submission, on analysis, does not answer, rather it substantially dodges, the question of characterisation that has to be answered to determine whether Dicey Rule 3 applies in this case. Of itself, that cannot mean the defendants' answer to that question must be correct, but it suggests at least that it is more difficult than SKAT's submissions sought to portray to identify why the defendants' answer is wrong. In the event, as I have sought to explain, I have concluded that the defendants' answer is correct.

107.    The mechanism of alleged wrongdoing, then, may be the making of WHT refund applications conveying misinformation. But the central interest of SKAT in bringing the claim, and the right that in substance SKAT seeks to enforce by what are, in point of form, private law claims, is SKAT's interest and right in collecting what was due to it by way of dividend tax for the tax years in question. Dicey Rule 3, a mandatory rule of English law as *lex fori*, has the effect that there is no cause of action for a fraud on a foreign revenue, and I agree with the defendants' submission that at its highest SKAT here claims to have been the victim of such a fraud. It cannot sensibly say in relation to the claims pursued here that it was the victim of a fraud such as might be committed against a private individual or corporate entity. *A fortiori*, there is no cause of action for negligently causing loss to a foreign revenue.

108.    As I said in paragraph 35 above, that is not to say that SKAT could never pursue here a claim for damages for a tort committed against it because it is a sovereign tax authority. Leaving aside, as I am in this judgment, any subtlety over whether strictly SKAT is a legal person in its own right at all, SKAT may be the victim of a tort that is not a tort against the Danish *fisc*. On one view, that is what the argument on the scope of Dicey Rule 3 comes down to. Considering the nature of SKAT's pleaded claims, in substance SKAT is alleging torts against the Danish *fisc*, with the collection and management of which SKAT is charged, rather than torts against SKAT as a legal person conducting personal or business affairs akin to those that might be conducted by a private party. There is no cause of action in this court for torts against a foreign revenue.

109.    If it is preferred to consider the question by considering the legal relationship involved, the legal relationship of WHT refund applicant and tax authority is that of taxpayer and sovereign taxation authority. That is the relationship created by the submission to SKAT of WHT refund applications, at all events where they are accepted and paid by SKAT. If it be appropriate to apply an ordinary private law analysis to that relationship, it might be said to have been voidable if induced, as SKAT says it was, by misrepresentation. But that does not mean it was not, by nature, while it existed, a taxpayer-tax authority relationship.

110.    I do not overlook that in respect of the Solo etc Applications (but not the ED&F Man
        Applications), SKAT has pleaded that the transactions underlying and generating the
        dividend vouchers issued by custodians that were submitted to SKAT with 06.003
        Forms were 'manufactured', 'fictitious', or 'sham'. The primary substance of that plea
        is not that no transactions were entered into, but rather that given their terms and
        effect (in particular, taking the package of transactions as a whole) they did not create
        such rights, or result in any such payment or payment entitlement in respect of
        dividends, as might have qualified the WHT refund applicant to a refund payment
        from SKAT under s.69B(1) of the WHT Act.

111.    SKAT says that closed loops of share sale and share lending transactions were put in
        place between parties none of whom had or would ever acquire any interest in or
        rights relating to shares in the Danish company in question, apart from any interest or
        rights generated by the transactions in the loop. Those transactions, it is said, therefore
        did not create any such interest or rights as might make for a valid WHT refund claim.
        The dispute about that is the central validity issue in the litigation as regards the Solo
        etc Applications, relevant defendants contending as they do that a bare contractual
        right to acquire shares as provided for by the transaction structures used *did* result in
        an eligible WHT refund claim.

112.    That does not in my view alter the proper characterisation of SKAT's resulting
        claims, for the purpose of Dicey Rule 3. It remains the case that their fundamental
        premise is SKAT's contention that the WHT applications it accepted at the time had
        not qualified the applicants to the refunds sought and paid; SKAT is still, in
        substance, suing to recover (compensation for) making tax refund payments it was not
        obliged to make. From the perspective of Dicey Rule 3, those are in my view foreign
        revenue claims.

113.    That is my conclusion also as regards the one way in which the 'fictitious' or 'sham'
        transactions plea is put by SKAT that might be said not to fit the description in
        paragraphs 110-111 above. SKAT goes as far as to say that the transactions were
        (purportedly) concluded without any intention to create legal relations so as to be
        contracts at all. Even in that case, the substance remains that the WHT refund
        applicants were claiming to be, and were assessed by SKAT to be, limited Danish
        taxpayers eligible for a tax refund. The character or quality of the payment made by
        SKAT, and of the return thereof (or compensation equivalent thereto) now sought by
        SKAT, is the same. It is inherent in, and of the essence of, the 'central interest' test
        for ascertaining the substance of a claim brought by or in the interests of a foreign
        sovereign, that the character or quality of the sovereign's relevant activity is the most
        material consideration.

114.    This strongest version of SKAT's case – alleging that the 'transactions' were not
        contracts at all – is ultimately just a particular way of accusing the WHT applicants of
        having not merely claimed incorrectly to be limited Danish taxpayers eligible for a tax
        refund, but pretended to be such (i.e. made that claim knowing it to be an incorrect
        claim). That does not change the character or quality of SKAT's relevant activity. In
        accepting and paying the WHT refund claim, and now in claiming to reverse the
        same, even if in point of form that claim is presented by reference to the ingredients
        of private law causes of action, SKAT was and is acting as the Danish sovereign tax
        authority in the interests of the Danish *fisc*, and not as a private party could or might
        act. The central interest in pursuit of which SKAT brings these claims remains that of

taxing Danish company dividends properly (accurately) in accordance with Danish tax law and DTAs, a purely sovereign interest.

115. If that be correct generally, as I have concluded that it is, SKAT argued that its proprietary claims nonetheless fall outside Dicey Rule 3. They seek, SKAT submitted, only the recovery of SKAT's property so as to be patrimonial claims such as were considered in the wrongful interference cases culminating in *Barakat*. I do not agree. At this point in the analysis, it is important to be precise in the use of proprietary language (*cf* paragraph 9 above). SKAT's relevant claims are to equitable ownership of assets belonging to certain of the defendants, on the basis that they represent the traceable proceeds of payments made by SKAT by mistake induced by fraud. SKAT does not sue to vindicate some title it had, and claims still to have, in an asset that was situated in Denmark when SKAT acquired its title. If an analogy is to be drawn with the wrongful interference cases, the case is on the *Brokaw / Ortiz* side of the line, not the *Barakat / Williams & Humbert* side of the line.

116. The proprietary interests asserted are remedial in nature. They require SKAT first to establish one or more of the alleged personal liabilities the pursuit of which I have concluded offends against Dicey Rule 3. It would not have assisted in *Buchanan v McVey* to allege that Mr McVey's companies had proprietary claims founded upon dishonest breaches of fiduciary duty; and indeed he *was* sued alleging a liability to account *inter alia* as trustee (see [1955] AC at 520), and on the facts (*ibid* at 518-519) it seems that some at least of the funds Mr McVey dishonestly extracted from his company, so as to evade the Revenue, were put to his personal use. If that did not save the claims against Mr McVey from the operation of Dicey Rule 3, then neither can SKAT's assertion of proprietary rights in some of its claims save those claims from the Rule if otherwise it applies in this type of case.

117. Although I apprehend it was legitimate to use the language of SKAT seeking a 'return' of WHT refund payments when examining the central interest behind SKAT's claims, as required for a consideration of Dicey Rule 3, that does not mean Mr Fealy QC was correct to contend as he did that by its proprietary claims SKAT is merely seeking the return of its property, as a private legal person might whose property has been converted. In this case, SKAT had and has no property rights it can ask this court to vindicate but that it first succeed before the court on claims the pursuit of which is denied to it by Dicey Rule 3.

*Conclusion*

118. For the reasons set out above, my conclusion is that all of SKAT's claims are, in substance, claims seeking to enforce here the Kingdom of Denmark's sovereign right to tax dividends declared by Danish companies, and the WHT and WHT refund systems established by the WHT Act, the Danish tax statute by which that right is given specific content. The central interest of SKAT, and of the Kingdom of Denmark in whose interests the claim is brought (if it is meaningful to distinguish between SKAT and the Danish state), in bringing all these claims, is to vindicate that sovereign right and have it enforced indirectly here.

119. Though SKAT has framed its claims as private law causes of action, what those claims seek, in substance, is payment to SKAT of amounts of dividend tax it failed to take in the tax years in question, it not being right to distinguish when characterising

substance for the purpose of Dicey Rule 3 between dividend tax never paid and dividend tax conditionally collected as WHT but paid away by SKAT by way of WHT refunds. SKAT's claim against the WHT refund applicants for the WHT refund to be returned is, in substance, a claim to tax. Such claims are not admissible in this court. Or again – if this is saying anything different – the central interest in SKAT bringing its claims here is to vindicate its right to pay WHT refunds only where applicable revenue law eligibility conditions are satisfied, in other words its right to keep, as tax, 27% of Danish company dividends except where those conditions are satisfied.

120. In that way, considering substance rather than form, SKAT's claims seek indirectly to enforce here Danish revenue law. Unless the Brussels-Lugano regime mandates a different outcome for SKAT's claims against Brussels-Lugano defendants, all of SKAT's claims fall to be dismissed by operation of Dicey Rule 3.

*Coda – MARD et al.*

121. On the view I have taken, it is not necessary to consider a further argument advanced principally by Mr Baker QC, so I shall deal with it only briefly and not in any detail, though that may do a disservice to the expert skill with which Mr Baker QC developed the point. The argument, in essence, was that in line with a long public international law history, the cross-border recovery of tax refunds wrongfully procured is seen as or assumed to be a matter of revenue law requiring to be dealt with (if at all) by supranational legal instrument.

122. Mr Baker QC submitted, for example, going back to a 1925 League of Nations experts' report, "*Double Taxation and Tax Evasion*" (Document F.212, February 1925), that for at least a century, "*abuse of claims for relief from taxation, in as much as we are dealing both with exemption from and repayment of tax*" (*ibid* at p.23), has been seen as a cross-border problem requiring a public international law solution.

123. The cross-border solution presently adopted by the EU is MARD. By Article 2(1)(a), it applies *inter alia* "*to claims relating to ... (a) all taxes and duties of any kind levied by or on behalf of a Member State ...*". Mr Fealy QC submitted that a claim by SKAT to recover from a WHT refund applicant a WHT refund paid out in error would not fall within the scope of MARD. That is, I think, an impossible submission on the language of Article 2(1)(a). I cannot imagine Denmark wishing to advance it but that it was perceived to assist its desire to avoid the operation of Dicey Rule 3 in this litigation.

124. There were points of detail, with which I shall not lengthen this judgment, as to whether the substantive provisions of MARD would afford SKAT (or, it may be, the Kingdom of Denmark acting by a different instrumentality) an effective remedy for the recovery from payees domiciled in the EU or the UK* of WHT refunds erroneously paid out. Whether or not they would, I think it inconceivable that a request for assistance in respect of recovering a WHT refund said by the requesting tax authority to have been wrongly paid out could or would be resisted on the ground that it fell outside the scope of MARD as defined by Article 2(1)(a).

\* MARD has effect in the UK for an extended period, beyond the EU exit transitional period that expired at the end of 2020.

125.    Whether SKAT could have made use of MARD, or could still do so, against EU or
        UK domiciled parties, it could and did make use of Article 26(1) of the US-Denmark
        DTA, so as to obtain information from the IRS in connection with SKAT's claims,
        though that mutual assistance provision covers only "*such information as is relevant
        for carrying out the provisions of this Convention or of the domestic laws of the
        Contracting States concerning taxes covered by the Convention ..., including
        information relating to the assessment or collection of, the enforcement or
        prosecution in respect of, or the determination of appeals in relation to, the taxes
        covered by the Convention*". Rather starkly, SKAT has confirmation from the IRS that
        it may disclose the information provided in these proceedings because the view has
        been taken that they are concerned with the administration of a Danish tax falling
        within the scope of the Convention (which, in context, must mean Danish state
        income tax as referred to in Article 2(1)(b)(i) of the DTA).

126.    The IRS's view that by these proceedings this court is (in the language of Article
        26(1) of the DTA) "*involved in the assessment, collection, or administration of [or]
        the enforcement or prosecution in respect of*" Danish income tax no doubt does not
        bind SKAT, or the court; and if the IRS provided their assistance on a mistaken basis,
        so be it, that would not render the evidence obtained by SKAT inadmissible or the
        proceedings here an abuse. That said:

        (i)     It is not obvious that the IRS's view might be wrong. On the language of
                Articles 27.1, 27.4 and 27.9 of the US-Denmark DTA, a claim by Denmark to
                be repaid an amount erroneously paid to a US party by way of WHT refund
                seems to be treated as a "*revenue claim*", and acceptance by the US of an
                application by Denmark for its collection is to be treated by the US as a tax
                assessment under US law against the party from whom collection is sought:

                "*Art 27.1    The Contracting States undertake to lend assistance to each other in the
                collection of taxes referred to in Article 2 (Taxes Covered), together with interest,
                costs, additions to such taxes, and civil penalties, referred to in this Article as a
                "revenue claim".

                Art 27.4    Where an application for collection of a revenue claim in respect of a
                taxpayer is accepted

                        a)  by the United States, the revenue claim shall be treated by the United States
                            as an assessment under United States laws against the taxpayer as of the
                            time the application is received; and

                        b)  by Denmark, the revenue claim shall be treated by Denmark as an
                            assessment under Danish laws against the taxpayer as of the time the
                            application is received.

                Art 27.9    Each of the Contracting States shall endeavor to collect on behalf of the
                other Contracting State such amounts as may be necessary to ensure that relief
                granted by the Convention from taxation imposed by that other State does not inure to
                the benefit of persons not entitled thereto.*"

        (ii)    Mr Baker QC's main point was that the court can and should take comfort,
                from the way the US-Denmark DTA has been naturally and successfully
                invoked, that the claims brought here do indeed serve, as the central interest