# Exhibit 8_J

130

Lehman Brothers office in Hong Kong, another offshore jurisdiction for which the United States imposed a 30% dividend withholding tax rate.

The first of Lehman's stock lending transactions utilizing its Cayman corporation was initiated in 2000.[66] It was implemented with clients in offshore jurisdictions where the withholding tax rate on U.S. stock dividends was 30%. The Lehman Brothers Cayman corporation would borrow stocks from clients in offshore jurisdictions where the withholding tax rate on U.S. stock dividends was 30%. The Cayman corporation would sell the stock to Lehman Brothers Special Financing Inc. (LBSF), a Delaware entity. To hedge itself against the sale of the stocks to LBSF, the Cayman entity would also enter into a LPS with Lehman Brothers Finance Ltd., a Swiss entity. LBSF and LBF also entered into a LPS with each other to hedge their positions. At the end of the loan, the entities would unwind the swaps, the Cayman entity would reacquire the stock from LBSF and return the stock to the client. Other than the clients, all of the other participants in the trade were Lehman Brothers entities.

Stock lending trades involving the second type of Cayman Islands trades were initiated in early 2004.[67] It was similar to the first trade, but incorporated more third parties into the transactions and reduced the number of the Lehman entities involved. The swap, sale, and repurchase transactions involving the borrowed securities were completed with third parties. A 2005 presentation prepared by Lehman's Equities Finance Group includes two detailed diagrams depicting the Cayman Island trades.[68] In 2003, Lehman's Cayco stock lending operations produced a profit of $12 million, and projected doubling those profits in 2004, to $25 million.[69]

**Tax-Driven Transactions.** Lehman documents show that it developed and aggressively marketed its dividend enhancement products as a way for offshore hedge funds to dodge payment of the 30% withholding tax on dividends.

A senior Lehman official who headed the firm's Hedge Fund Services group, for example, told an offshore hedge fund client that its CFD product was "a unique and simplified version of a Total Return

---

[66] Subcommittee staff interview of Ian Maynard, Lehman Brothers (Apr. 3, 2008).

[67] Subcommittee staff interview of Bruce Brier, Lehman Brothers (Apr. 8, 2008).

[68] Lehman Brothers presentation, "EFG US Dividend Exposures" (February 2005), Bates No. LBHIPSI00002533-40, at 2539-40.

[69] Lehman Brothers presentation, "Equity Finance Yield Enhancement"(undated), Bates No. LBHIPSI00174963-69.

131

28

Equity Swap that gives [the counterparty] all the economic upside/downside (price movement, dividends and corporate actions) of a security without [the counterparty] having a physical position in that security."[70] He explained: "The CFD is usually used for yield enhancement purposes (in this case [Lehman Brothers] hold[s] the physical in a US entity and receive[s] 100% of the dividend which we pass to you through the CFD, whereas you would only receive 70% if you physically owned the stock in the [hedge fund's] offshore fund)."[71] An employee of another offshore hedge fund that entered into these types of swaps with Lehman, when communicating with his colleagues, put it more succinctly: "[A] cfd is used to circumvent the tax."[72]

On another occasion in August 2004, a member of Lehman's Prime Broker Sales team sent an email to the entire Prime Broker Sales New York group stating: "There have been quite a few questions on our yield enhancement structure so I put together an explanation of the structures. There are two ways to yield enhance equities."[73] The first way is "using [the Lehman] SWAP/CFD product."[74] However:

"[t]he best method to enhance yield is our lending program. [Lehman] would borrow the securities from the client, then pay them 70% of the dividend and a stock loan fee of 18% of the dividend which would gross them up to 88%. This is the best structure, this is not a sale of the security only a loan so no capital gain or loss issues, no reporting issues."[75]

In November 2004, one Lehman employee emailed another a spreadsheet that "contains long positions for [an offshore hedge fund], which [Lehman Brothers] currently buy[s] into a swap to enhance [the hedge fund's] yield for dividends."[76] The author asked the recipient to "have a look at the top 5 to see if there is any withholding for a Cayman

---

[70] Email from Patrick Ryan, Executive Director, Hedge Fund Services, Lehman Brothers, to James Thalacker, Highbridge Capital Management, LLC., CFD Presentation (July 20, 2004), Bates No. LBHIPSI00033324.

[71] Id.

[72] Email from George Fink to Donna Howe, both of Angelo Gordon, Re: CFDs (Aug. 11, 2004), Bates No. ANG-PSI-0001088 (middle email).

[73] Email from John Carriero, Lehman Brothers, to Prime Broker Sales New York distribution list, Lehman Brothers, (no subject) (Aug. 5, 2004), Bates No. LBHIPSI00034221.

[74] Id.

[75] Id.

[76] Email from Anthony Demonte, Lehman Brothers, to Elizabeth Black, Lehman Brothers, copying Patrick Ryan and Matt Baldassano, Lehman Brothers, Highbridge LPS Basket (Nov. 22, 2004), Bates No. LBHIPSI00036060-61 (original email).

132

29

domiciled account."[77]  The request was made because Lehman was "trying to identify trades where it makes sense to leave long positions in [the hedge fund's Lehman Brothers International Europe prime broker] account. Without reducing their yield."[78]

After the email was forwarded to other Lehman employees, a member of the Lehman Hedge Fund Services group wrote the following to a senior member of the Lehman's Yield Enhancement Desk:

> "[T]he 4 US securities below pay cash [dividends] but are not subject to withholding since they are classified as hybrid securities (for tax purposes).  That would mean a Cayman holder would not suffer 30% withholding and would have no incentive to hold the positions in a synthetic structure.  Right now we are holding all of these securities in an LPS [Lehman Portfolio Swap]. ...  Based on this information I would like to move the positions back to their PB [prime brokerage] account but wanted to run it by you to see if I am missing something.  Would hate to do this and find out down the road that [the hedge fund] owe[s] withholding tax on the dividends."[79]

After it was determined that holding the securities in the LPS offered no withholding tax advantage for the client, the manager approved the move, demonstrating that a critical factor for placing and keeping securities in the LPS was dividend enhancement.

On July 20, 2004, Microsoft Corporation announced that it would issue a $3 special dividend on December 2, 2004.  In response to the Microsoft announcement, a senior member of Lehman Brothers' Equity Finance Products group outlined a campaign for Lehman to sell its "dividend enhancement" products to non-U.S. institutions that wanted to avoid tax withholding on the large dividend:

> "The Opportunity: $10mn P&L on this name this year Microsoft has declared a $3 dividend payable 2nd December 2004, subject to shareholder approval. . . . Lehman has sourced 10mn shares to date from offshore sources with the

---

[77] Id.

[78] Id.  This client review apparently related to an effort by Lehman, whenever possible, to move client securities out of swaps, which placed a demand on Lehman's balance sheet assets, and into the prime brokerage account, where the client would bear the cost of carrying the security.

[79] Email from Patrick Ryan, Lehman Brothers, to Ian Maynard, Lehman Brothers, FW: Highbridge LPS Basket (Nov. 29, 2004), Bates No. LHBIPSI00038360-61 (top email).

133

30

intention of using this asset to delta hedge third party swaps activity."[80]

The plan was greeted with enthusiasm from other Lehman officials. One of his superiors responded: "This summary is excellent. I am sure we will have a terrific result."[81] Later on, the Equity Finance Products group official reported: "Good progress so far this morning. . . . I have interest my side for over 30 [million] shares . . . . the cash register is opening!!!!"[82] His boss responded: "Outstanding. We needed a one off like this and hopefully this will meet our expectations. Let's drain every last penny out of this [market] opportunity. Please let me know if I can help in any way."[83]

Shortly thereafter, as work was proceeding on transactions related to the Microsoft special dividend, one Lehman employee sent an email to multiple colleagues entitled "Dividend Strategy" and addressed to "Dear Knights of the Dividend Round Table," leaving little doubt that the motivation of Lehman's Microsoft campaign was to maximize the dividend amounts returned to clients.[84]

Lehman's clients were also very clear that their motive in participating in certain transactions was to avoid withholding taxes. One Lehman employee sent an email to over 30 colleagues describing a meeting with an offshore hedge fund client. He wrote: "re US Business: [the hedge fund's business size is] currently small now though will dramatically increase during the summer of 2004. [I]nterested in [Lehman] product, specifically around grossing up of dividends to 100%."[85]

---

[80] Email from Ian Maynard, Lehman Brothers, to multiple Lehman colleagues, Microsoft Strategy, (July 22, 2004), Bates No. LBHIPSI00002530-31 (original email).

[81] Email from Jeffrey Dorman, Lehman Brothers, to Ian Maynard, Lehman Brothers, Re: Microsoft Strategy, (July 22, 2004), Bates No. LBHIPSI00002530-31 (second email from bottom).

[82] Email from Ian Maynard, Lehman Brothers, to Jeffrey Dorman, Lehman Brothers, Re: Microsoft Strategy, (July 22, 2004), Bates No. LBHIPSI00002530-31 (third email from bottom).

[83] Email from Jeffrey Dorman, Lehman Brothers, to Ian Maynard, Lehman Brothers, Re: Microsoft Strategy, (July 22, 2004), Bates No. LBHIPSI00002530-31 (top email).

[84] Email from Bruce Brier, Lehman Brothers, to multiple Lehman Brothers colleagues, Dividend Strategy, (July 30, 2004), Bates No. LBHIPSI00002502-03.

[85] Email from Matthew Pinnock, Lehman Brothers, to numerous Lehman Brothers employees, Marshall Wace Asset Management UK - Meeting - EFG Relationship Review and Development Discussion (May 8, 2004), Bates No. LBHIPSI00032569-70.

134

On another occasion, a Lehman employee sent an email to a colleague stating, "we will trade today [Oct. 25, 2004], settle on the 28th Record is the 29th. ... They are absolutely looking for the div. ... fyi, the only reason for [Highbridge, an offshore hedge fund] to swap is for yield enhancement."[86]

Another report noted that the client:

"estimates we won c. 40% of their yield enhancement trades which they do with 3 providers including us. They would prefer to do as much [yield enhancement] business here as possible as the CFD product is much easier than doing total return swaps elsewhere. ... Stressed that during div. season they don't have time to keep bidding back and forth on each position so if we want to guarantee a position we need to show them our best level immediately."[87]

In January 2005, a Lehman employee reported to the head of Capital Markets Prime Services that a hedge fund client owned three dividend paying stocks and "would like to do total return equity swaps on the three positions to mitigate/eliminate the tax withholding."[88] Clearly, eliminating the payment of dividend taxes was a key objective for both Lehman Brothers and its clients.

**Marketing.** Lehman used dividend enhancement transactions to attract and retain hedge fund clients, often having to match or outperform a competitor. For example, one Lehman employee wrote to three others that:

"Special [Dividend] coming up. . . . There is a shareholder vote on Oct 6th, the special div record date is not announced at the moment. [Hedge fund client] looking for Yield Enhancement on a large position. . . . We need to be as competitive as possible. They are 98 bid away from Lehman, at the very least we need to match."[89]

---

[86] Email from Anthony Demonte, Lehman Brothers, to James Metaxas, Lehman Brothers, RE: Trade Confirm (Oct. 25, 2004), Bates No. LBHIPSI00110753-56.

[87] Email from Katie Gillham, Lehman Brothers, to multiple Lehman Brothers colleagues, CQS Management UK - Entertainment - General catch up with their Finance team (July 28, 2004), Bates No. LBHIPSI00033591-92.

[88] Email from Jeffrey Seymour, Lehman Brothers, to John Wickham, Lehman Brothers, Total Return Equity Swaps for Fortress Off-Shore Fund (Jan. 19, 2005), Bates No. LBHIPSI00001474-76 (original email).

[89] Email from Anthony Demonte, Lehman Brothers, to Matt Baldassano, Ian Maynard, and Bob Boraczek, all Lehman Brothers, MCIP (Sept. 1, 2005), Bates No. LBHIPSI00131584.

135

32

The "98" refers to the percentage of the dividend payment that another financial institution was apparently willing to provide to the offshore hedge fund, instead of the 70% normally available after the 30% withholding tax.

On another occasion, Lehman wrote to an offshore hedge fund investment manager at Maverick Capital, after a meeting in which dividend enhancement transactions had been discussed. In a section of the letter regarding, "Dividend Enhancement Solutions," Lehman wrote: "We have a variety of solutions using swap and securities lending vehicles [to] achieve yield enhancement. We propose Maverick provide us an Interest List on a Weekly basis for possible enhancement trades. . . ."[90]

A few years later, Lehman was doing business with the same hedge fund, and a Lehman employee sent an email stating: "I notice that you transfer some of your long position out around their upcoming record dates to [a competitor]. I imagine that is because of the dividend payment. Is there something we can do for you that they are? I'd love to discuss if so."[91] The hedge fund trader responded by asking: "Do you have a dividend enhancement product for long or short US equities in the offshore accounts?"[92] The Lehman employee forwarded the question to a colleague and asked him to call the hedge fund manager "to discuss swaps" and "tell them about doing long swap/cfd business around record date items so that they get enhanced div treatment on us stocks and so they don't have to move them out to [a competitor] as they have been doing."[93]

At other times, rather than Lehman's initiating the discussion, its hedge fund clients pressed Lehman to arrange dividend enhancement transactions for them. For example, in 2005, one hedge fund CEO sent a message to Lehman asking: "[A]ny word where you are with swaps and CFDs? We have some deals that we need to get on to avoid withholding

---

[90] Letter from Lehman Brothers to Maverick Capital (April 24, 2001), Bates No. MAV0000794-99.

[91] Email from Christopher Antonelli, Lehman Brothers, to Jim Chen, Maverick Capital Management, Long Transfers (Jan. 30, 2004), Bates No. LBHIPSI00134533-34 (original email).

[92] Email from Jim Chen, Maverick Capital Management, to Christopher Antonelli, Lehman Brothers, Re: Long Transfers (Jan. 31, 2004), Bates No. LBHIPSI00134533-34 (middle email).

[93] Email from Christopher Antonelli, Lehman Brothers, to Matt Baldassano, Lehman Brothers, FW: Long Transfers (Feb. 4, 2004), Bates No. LBHIPSI00134533 (top email).

136

33

on [dividends]."[94] A Lehman employee responded: "We are getting close, give me the names you would like to do. I will do my best."[95]

In 2002, an offshore hedge fund pressed Lehman to provide it with 100% of the dividend amount, instead of the 92% that had been offered. In an email to colleagues, a Lehman employee wrote: "[Angelo Gordon, an offshore hedge fund] called regarding the swaps that [were] discussed on his [preferred shares]. He said he is being quoted by other brokers on the street 100% dividend doing it via a total return swap as opposed to the 92.5% we offered via CFD [a Lehman product]. . . . He wants a call back tomorrow either way so he knows how and with who to proceed."[96]

**Risk and Regulatory Concerns.** Throughout its promotion of dividend enhancement transactions, internal documents show that Lehman Brothers was aware of the tax risks posed by those transactions, and tried to limit that risk by capping its financial exposure and by adding features to its transactions to disguise their tax avoidance purpose.

In September 2004, for example, a senior Lehman Brothers Equity Finance official took a closer look at the firm's CFD transactions and identified "a number of areas for concern," including Lehman's "tax exposure":

- "The range of clients for whom we are guaranteeing 100% on long dividends has increased significantly recently[.]

- There would not appear to be any consistent requirements around minimum holding periods and churning of positions appears to be reasonably frequent. ...

- The annualised tax capacity numbers are in excess of circa $15mn whereas a previous limit of $10mn was recommended for this business. Feel that we need to reduce exposures selectively and certainly cap the tax exposure."[97]

---

[94] Bloomberg message between Pat Hess, University Capital Strategies Group, and Anthony Demonte, Lehman Brothers (Mar. 28, 2005), Bates No. LBHIPSI00109857.

[95] Id.

[96] Email from Steve Trommer, Lehman Brothers, to Alan Pace and Patrick Ryan, Lehman Brothers, Swaps for Angelo Gordon (May 6, 2002), Bates No. LBHIPSI00020695-96 (original email).

[97] Email from Ian Maynard, Lehman Brothers, to multiple Lehman colleagues, LBSF Capacity Using CFDs (Sept. 21, 2004), Bates No. LBHIPSI00018414-16.

137

34

A few days later, the Equity Finance official made a number of recommendations to address the identified tax risks. His recommendations included the following:

- "Set a maximum capacity limit within which we as a business will operate. This capacity limit will reflect a maximum WHT [withholding tax] at risk number (the 30% number as the counterparties are largely offshore entities) and will cover both CFD, LPS and single stock swap product. My initial suggestion for Risk Capacity threshold is $20mn. Given the fact that we are nearing this limit it will not leave us with significant room for expansion.

- … [M]inimum holding periods of stock to avoid excessive churning of stocks over dividend."[98]

Shortly afterwards, Lehman revised its guidelines for dividend enhancement transactions to stress features that would make it hard to depict them as designed to dodge dividend taxes. A senior vice president in the Equity Finance Group ("EFG") with tax expertise summarized the new guidelines for a colleague in an email:

"To summarize our discussion earlier today.

"First, there is no 'silver bullet' with respect to these issues but rather relative risks that should be priced accordingly. For lack of clarity, similar issues are present whether the transaction is effected as a swap, future, securities loan, or CFD. The guidelines below apply to CFDs, Swaps, and Securities Loans unless otherwise noted:

"1. The longer the better-3 to 6 months are the shortest duration we should consider. One year or greater swaps are preferred. CFDs are perps so this is not an issue. Longer term swaps or perps which are habitually terminated prematurely are suspect. Shorter term security loans are acceptable since this is market practice.

---

[98] Email from Ian Maynard, Lehman Brothers, to Jeffrey S. Dorman, Lehman Brothers, and Richard Story, Lehman Brothers, RE: LBSF Capacity Using CFDs (Sept. 23, 2004), Bates No. LBHIPSI00017487-89.   When asked about his concerns and recommendations as expressed in his September emails, Mr. Maynard told the Subcommittee that after conducting a more detailed review of the CFD and other transactions at issue, he believes the comments he made in 2004 were incorrect.  Subcommittee interview of Ian Maynard, Lehman Brothers (Apr. 3, 2008 and Aug. 20, 2008)

138

35

"2. Swaps-single equity swaps should be avoided. Baskets should generally exceed 20 referenced assets. Swaps that are liked to distribution transactions can have 10 referenced assets. Risk will be further reduced by including referenced assets that: i. do not pay dividends, ii. are issued by non-US corps, or iii. pay low dividend yields. For this reason, all other things remaining constant, Swaps are lower risk than CFDs.

"3. General background-offered transaction should be viewed in light of existing customer background including i. current notional balances, ii. trading patterns, iii. composition of referenced assets, iv. ex-dates, etc.

"4. All transactions have residual risk which should be priced accordingly. By definition, 100% dividend equivalent payments under price the inherent risk.

"5. The lowest risk transaction is the distribution business. Specifically. In this transaction LBIE borrows or buys vs. swap from an 85% country and loans or sells vs. swap to an 85% country."[99]

This same EFG vice president also had concerns about the stock lending transactions Lehman was implementing from Hong Kong via the Cayman Islands. In 2003, he explained to the head of Equity Finance for Europe why certain features of the Cayman Trades were necessary to reduce tax risk. For example, in response to a question about whether it was necessary to use a person from the Hong Kong office, as opposed to an office in another jurisdiction with the same tax rate (such as Luxembourg), he answered:

"The reason for the bodies is to thwart any argument that these entities are non-substantive shells. If a tax authority successfully argued this withholding and other taxes could be due. … Cayco is a division of Hong Kong for US tax (check the box) which is why the body can work in Hong Kong or Cayman." [100]

When asked whether the Lehman employee had to be physically present in Hong Kong, he explained: "Maximum reduction in US tax risk if resident in Hong Kong. Moreover, if person stayed in Japan HK

---

[99]Email from Bruce Brier, Lehman Brothers, to Alan Pace, and others, Lehman Brothers, Yield Enhancement Guidelines (Nov. 19, 2004), Bates No. LBHIPSI00017490-91.

[100] Email from Bruce Brier, Lehman Brothers, to Richard Story, Lehman Brothers, RE: US Cayman 70% Trade (May 25, 2005), Bates No. LBHIPSI00149673-76.

139

36

entity could be considered to have a Japanese branch."[101]  He also explained Lehman's tax risk was reduced by a plan to trade baskets of securities rather than a single type of security, and to include an additional swap in the transaction:

> "The safeguard issue is as follows:  IRS is [sic] could argue US withholding tax is due either on the in lieu made by Cayco or the swap payment made by LBSF.  This safeguard applies to the swap payment.  While the general rule is no withholding on swaps the IRS could argue that LBSF is a agent for Cayco and the dividends collected by LBSF are really for Cayco's. (i.e., the swap payment was in fact a dividend payment).  One existing safeguard is the use of baskets instead of swaps. In addition to the basket safeguard I proposed having LBSF sell and swap back so that LBSF receives swap payments instead of actual dividends.  If the IRS used the agent argument there would be no withholding since Cayco could receive swap payments directly. Unfortunately we have some regulatory issues here I am analyzing."[102]

In early 2005, the same EFG vice president explained why the second version of the Cayman trade, with more third parties involved in the transaction, reduced Lehman's tax risk:

> "It is not the Cayman borrow which makes this the best trade for Lehman risk adjusted it is what Cayman or LBIE does with the shares.  That is to say the transfer to an unrelated offshore broker dealer substantially reduces the US withholding tax risk.  This process, for lack of a better name, is called 'distribution.'"[103]

This EFG vice president also expressed concerns about Lehman's single equity swaps, which were finally halted in 2004.  He later explained some of the tax risks:

> "While single equity swaps do occur in the market most US tax lawyers would say such swaps warrant elevated attention for a few reasons.  First, the relevant regulations do not comport particularly well with the single equity model. Second, many finance and legal professionals in the industry

---

[101] Id.

[102] Id.

[103] Email from Bruce Brier, Lehman Brothers, to Kevin Harrison, Lehman Brothers, RE: Conclusion of US div meeting (Jan. 25, 2005), Bates No. LBHIPSI00175106-07 (top email).

140

37

believe a single equity swap can be equated to a securities loan. If this were the case, US withholding would likely be imposed on swap payments made from LBIE to hedge funds."[104]

In addition to advising on the structures of the dividend enhancement transactions to minimize their tax risk, the EFG vice president cautioned colleagues against leaving a paper trail related to the nature and purpose of the transactions being designed and implemented. For example, when discussing the diagram of a Cayco trade sent to him by a colleague, the attorney wrote back: "Personally, I would not prepare anything and leave a trail."[105]

**Risk Limits.** In January 2005, Lehman Brothers reorganized its operations and created a Capital Markets Prime Services group, which included the Equity Finance Group. Upon assuming control of the group, the Capital Markets group head initiated a review of the group's services and activities. As part of this review, Lehman's Equities Finance Group prepared a presentation entitled, "EFG US Dividend Exposures."[106] One chart in the presentation describing Lehman's "Yield Enhancement US Business" lists "Risk of Re-categorization" as one factor to consider, apparently referring to the risk that a tax authority could recategorize Lehman's swaps as transactions in which the dividend tax should have been withheld and remitted to the IRS.[107]

As a result of the review, Lehman decided to limit the use of its CFD swaps to non-U.S. clients and non-U.S. securities; limit the new single equity swap to portfolios of no more than 20 securities; and limit the LPS to baskets of 20 or more stocks,[108] changes apparently intended to reduce the likelihood that the transactions would be noticed and challenged by the authorities.

Because of its recognition of the tax risks associated with its dividend enhancement transactions, Lehman also developed and applied overall monetary risk limits on those trades. These limits imposed a cap

---

[104] Email from Bruce Brier, Lehman Brothers, to Richard Story, Lehman Brothers, and Peter Sugarman, Lehman Brothers, RE: US Total Return Equity Swaps for Fortress Off-Shore Fund (Jan. 21, 2005), Bates No. LBHIPSI00001474-76 (top email).

[105] Email from Bruce Brier, Lehman Brothers, to John Carriero, Lehman Brothers , RE: Cayco (Apr. 7, 2004), Bates No. LBHIPSI00040003-04 (top email).

[106] Lehman Brothers presentation, "EFG US Dividend Exposures" (Feb. 2005), Bates No. LBHIPSI00002533-40.

[107] Id. at 2538, chart entitled, "Yield Enhancement US Business."

[108] Email from Melanie Nunn, Lehman Brothers, to multiple Lehman Brothers colleagues, Urgent - Agenda - Synthetics Meeting Today (May 17, 2005), Bates No. LBHIPSI00012121.

141

38

on the financial exposure that could be incurred by Lehman from transactions in which dividend amounts were paid and passed onto a client, but no tax was withheld or remitted to the IRS. The purpose was to limit the amount of unpaid dividend taxes that Lehman might be held liable for, as a withholding agent, if the IRS were to invalidate or recategorize its transactions. For example, Lehman set a $10 million limit on its CFD transaction for 2004, only to discover later that its transactions had exceeded this limit by $5 million, for a total tax exposure of $15 million.[109] Lehman set separate limits on its stock loan transactions, and as the transactions became more popular with Lehman's clients, adjusted those limits upward. For example, Lehman established a $25 million limit on its Cayco trades in 2003, but doubled that limit the next year to $50 million.[110]

Lehman clients also sought to limit their financial exposure by obtaining tax indemnification agreements from Lehman to protect themselves against the imposition of any tax liability associated with Lehman's Cayman stock lending transactions. Lehman agreed to sign a number of indemnity agreements with such clients as Citigroup, Goldman Sachs Europe, JPMorgan Chase, and the Royal Trust Corporation of Canada.[111]

These and other documents make it clear that Lehman, as well as its clients, viewed its dividend-related transactions as exposing the firm to possible tax liability. Lehman nevertheless continued to engage in these transactions.

**Lost Tax Revenues.** The dividend enhancement swap and stock loan transactions implemented by Lehman proved to be very lucrative for its clients, and quite costly for the U.S. Government. While complete data is not available, documents produced to the Subcommittee help illustrate the size of the problem.

In February 2005, as part of an internal review of Lehman "dividend enhancement" products, Lehman's Equities Finance Group prepared a presentation entitled, "EFG US Dividend Exposures."[112] One

---

[109] Email from Ian Maynard, Lehman Brothers, to Jeffrey S. Dorman, Lehman Brothers, and Richard Story, Lehman Brothers (Sept. 21, 2004), Bates No. LBHIPSI00018414-16.

[110] Lehman Brothers, "Equity Finance Yield Enhancement," (undated), Bates No. LBHIPSI00174963-69.

[111] Subcommittee interview of Lehman Brothers representative (Sept. 8, 2008); see also, e.g., US Equity Lending Annex between Goldman Sachs Europe and Lehman Brothers Equity Finance (Cayman) Ltd. (Oct. 15, 2003), Bates No. GS-PSI-00427-28.

[112] Lehman Brothers presentation, "EFG US Dividend Exposures" (Feb. 2005), Bates No. LBHIPSI00002533-40.

142

chart, entitled "2004 Exposures," listed Lehman's five types of dividend-related transactions (single stock swap, LPS, CFD, Cayco I and Cayco II) and, for each, estimated the total amount of dividend payments that had been passed through to clients and the total amount of withholding tax that had not been paid, using a 30% tax rate.[113] The Lehman chart estimates that the single stock swaps generated $1 million in unpaid dividend taxes; the CFD swaps generated $24 million; the LPS swaps generated $15 million; and the Cayco I stock loan transactions generated $30 million. The Lehman chart indicates that no withholding risk was associated with the Cayco II transactions so that there were no unpaid taxes to report. However, the chart also estimates that Lehman forwarded $150 million in dividends to clients that year through the Cayco II transactions, which at a 30% rate means that they generated estimated unpaid dividend taxes totaling $45 million. Altogether then, for the single year of 2004, with respect to the five types of Lehman transactions analyzed in the chart, the amount of dividend taxes that were not withheld and paid to the U.S. Government totaled $115 million.

Another, more narrow analysis conducted by Lehman Brothers for the years 2004-2005, performed at the request of the IRS, identified a smaller subset of transactions using Lehman's SES, LPS, or CFD swaps, or its Cayman stock loans.[114] The transactions included in this analysis were restricted to those that met the following criteria:

1. A Lehman entity acquired a U.S. dividend paying stock directly or indirectly from a foreign counterparty, with settlement occurring between seven days prior to the dividend declaration date and the record date.

2. Lehman held the stock over the dividend record date and, after the record date, directly or indirectly sold the U.S. equity back to the foreign party.

Lehman calculated that, with respect to these specific dividend enhancement transactions, it had paid a total of about $35 million in dividend-based payments to clients and failed to withhold and remit to the IRS at least $10 million in dividend withholding taxes.

---

[113] Id. at 2535, chart entitled, "2004 Exposures." When asked about this chart, Lehman indicated that the figures were not based on specific data but consisted of general estimates that could include some transactions that did not involve dividends and could have omitted some transactions that should have been included.

[114] Lehman Brothers, Information Document Request Response to IDR IE-52 (Oct. 17, 2007), Bates No. LBHIPSI00021476-78.

143

Whether Lehman's tax exposure in 2004 was $10 million, as calculated in response to an IRS request, or $115 million, as estimated in its own internal analysis, it is clear that Lehman knew its dividend enhancement swap and stock loan products were built around enabling its clients to dodge U.S. dividend taxes.

## B. Morgan Stanley Case History

### 1. Background

Morgan Stanley is an international financial services firm, with 600 offices across 33 countries, headquarters in New York City, and international centers in London, Tokyo, and Hong Kong. [115] The company took its current form in 1997 following a merger with Dean Witter and employs about 50,000 employees worldwide. [116] It is organized into three business segments, Asset Management, Institutional Securities, and Global Wealth Management. [117] It conducts its securities transactions primarily through wholly-owned subsidiaries that include Morgan Stanley & Co. Incorporated (MS&Co), a registered U.S. broker-dealer. [118] Through its Institutional Securities segment, Morgan Stanley provides prime brokerage services for offshore hedge funds and other offshore financial institutions. [119] For fiscal year 2007, it reported assets of nearly $270 billion, and net income of $3.2 billion. [120] The current Chief Executive Officer and Chairman of the Board of Directors is John J. Mack. [121]

### 2. Dividend Tax Abusive Transactions

From at least 1999 until the present, Morgan Stanley has developed, marketed, and implemented a variety of transactions, using swaps, stock loans, and equity linked certificates, aimed at enabling its non-U.S. clients to dodge U.S. dividend taxes. In September 2005, a Morgan Stanley internal presentation on its "U.S. Equity Swaps Flow Business," estimated that 34%, or a third, of its revenue came from

---

[115] See http://www.morganstanley.com/about/company/index.html.

[116] Morgan Stanley, Annual Report on Form 10-K for the Fiscal Year Ended Nov. 30, 2007 at 1 (2008).

[117] Id. at 2.

[118] Id. at 2 and 9.

[119] See id. at 4.

[120] Id. at S-1 and S-2.

[121] Id. at 12.

144

41

dividend enhancement transactions.[122]  That presentation also indicated that "Dividend Enhancement" swaps alone had brought in over $25 million in revenue for Morgan Stanley in 2004, and would bring in an estimated $40 million in 2005.[123]

**Tax-Driven Transactions.**  In 1999, an investment advisor to offshore hedge funds prepared an internal memorandum noting: "Morgan Stanley has approached us about entering into stock loan agreements that would minimize the adverse effects of U.S. withholding."[124]  In 2001, a Morgan Stanley employee sent a group of colleagues an email entitled, "Trading Idea:  Dividend Yield Enhancement Swap for US Stock."[125]  It stated:  "Non-US investors (resident in Hong Kong, Taiwan, Singapore, Cayman Islands, Jersey etc.) typically suffer withholding tax on US dividends, ranging from 15-30%," and that "[i]nstead of buying/holding the stock directly, clients can enter into a Total Return Equity Swap with Morgan Stanley and achieve yield enhancement."[126]  These and other document suggest that, from their inception, Morgan Stanley's swap and stock loan "dividend yield enhancement" products were aimed at enabling non-U.S. clients to dodge U.S. dividend taxes.

These transactions continued over the following years.  Documents supplied to the Subcommittee by Citigroup, for example, in connection with its decision, described below, to reimburse the IRS for unpaid dividend taxes on certain stock swap transactions, identified swap transactions between Citigroup and Morgan Stanley over a three-year period, from 2003 to 2005, involving nearly $16 million in dividend payments and $2.3 million in unpaid dividend taxes.[127]  These figures related to Morgan Stanley's dividend-related swaps with just one counterparty.

---

[122] Morgan Stanley Presentation to Global Financing Products Group[:] "U.S. Equity Swaps Flow Business" (Sept. 6, 2005), Bates No. MS-PSI 021298, at 3.

[123] Id. at 5.  When asked about the basis for these figures, Morgan Stanley told the Subcommittee that the presentation had been compiled by the head of its U.S. swap trading desk using a "back of the envelope" analysis provided by its equity swaps head about why clients had entered into certain swap transactions.  Subcommittee staff interview of Alan Thomas, Morgan Stanley (July 2, 2008).

[124] Maverick memorandum, Dividend Enhancement Transactions, marked "Draft – As of 4/26/99," prepared by Keith Hennington (Apr. 22, 1999), Bates No. MAV0001082-83, at 1082.

[125] Email from Tommie Fang, Morgan Stanley, to numerous Morgan Stanley distribution lists and employees, Trading Idea: Dividend Yield Enhancement Swap for US Stock (June 14, 2001), Bates No. MS-PSI* 020758-60 (original email).

[126] Id.

[127] Citigroup untitled chart prepared for the IRS listing swap transactions from 2003 to 2005 (undated), Bates No. CITI_PSIWHTAX001460.  See also discussion of Citigroup case history.

145

42

In December 2005, an offshore hedge fund emailed Morgan Stanley's Institutional Equities Division stating that its "Global Financials team are thinking of purchas[ing] a US name which pays a special dividend of $6 and were wondering if they could potentially swap it out to get a div [dividend] enhancement."[128] The subject line of the email was "Possible Div Enhance Trade."[129] Morgan Stanley's Institutional Equities Division responded that it was willing to do the swap and re-sell the stock to the hedge fund after the dividend was paid. Its email stated that the hedge fund could "[o]pen pos[ition] by trading straight into swap[.] After the div [dividend] … [Morgan Stanley] can cross the stock to the client[']s [prime brokerage] acc[ount] if they do not want to close out [their position.]"[130]

**2004 Microsoft Dividend.** Morgan Stanley's knowing participation in the development, marketing, and implementation of transactions to facilitate nonpayment of U.S. dividend taxes by offshore clients is also illustrated by its response to the Microsoft special dividend. On July 20, 2004, Microsoft Corporation announced a $3 special dividend to be paid on December 2, using a record date of November 17.[131] The day after the announcement, the head of Morgan Stanley's trading desk for equity swaps emailed his colleagues urging them to develop dividend enhancement swaps for the Microsoft dividend. In a "WHY" section, he explained: "Morgan Stanley can enhance the dividend payout [to offshore hedge funds] from 70% to 100% through a total return equity swap." He wrote: "This is a great opportunity to highlight an application that is relevant to all dividend-paying securities (not just MSFT)."[132] He noted that, due to U.S. dividend taxes, the "bottom line" was that "[t]he incremental cost of having a swap versus owning MSFT is either zero or minimal depending on the client's situation."[133]

---

[128] Email from Justine Ayling, Landsdowne Partners Limited, to Declan Ryan, Morgan Stanley, Possible Div Enhance Trade (Dec. 14, 2005), Bates No. MS-PSI* 020744-46 (original email).

[129] Id.

[130] Email from Chirag Patel, Morgan Stanley, to the swap distribution list, copying the "fpgswap" distribution list, Morgan Stanley, RE: Possible Div Enhance Trade (Dec. 14, 2005), Bates No. MS-PSI* 020744-46 (second email from top). While this email clearly shows Morgan Stanley's knowledge of its client's motivation for utilizing a swap transaction, Morgan Stanley and the client did not cross shares on either end of the transaction they entered into.

[131] Microsoft Corp., "Microsoft Outlines Quarterly Dividend, Four-Year Stock Buyback Plan, And Special Dividend to Shareholders," (July 20, 2004), available at http://www.microsoft.com/presspass/press/2004/jul04/07-20boardPR.mspx.

[132] Email from Alan Thomas, Morgan Stanley, to multiple Morgan Stanley distribution lists and individuals, MSFT Total Return Swaps – FOR INTERNAL DISTRIBUTION (July 21, 2004), Bates No. MS-PSI 000798-800.

[133] Id.

146

43

The head of Morgan Stanley's equity swaps group urged early action on the swaps, because while the record date for the Microsoft dividend was November 17, transactions involving Microsoft stock had to be completed by November 12, to ensure that each transaction cleared the standard three business day settlement period for the purchase or sale of securities.[134]  The following day, a senior member of Morgan Stanley's equity trading division sent an email entitled, "MSFT div timing," urging even quicker action due to tax considerations:

> "Please note:
>
> "This trade is more urgent than people are assuming.  It should be traded NOW. Here's why:
>
> "Although the special is slated for November, we do NOT want to put on trades close to record date. Tax risk increases dramatically.
>
> "The trade should be put on well in advance of the record date.
>
> "There is also a regular dividend in August, which presents a perfect opportunity to get positioned in advance of the special.
>
> "Furthermore, we don't want to trade on top of that record date, either.
>
> "Bottom line, this is CURRENT BUSINESS, over the next 2-3 weeks.  Please do not let clients become complacent.
>
> ". . . .  We have first mover advantage and need to close."[135]

This email shows that Morgan Stanley was aware of the "tax risk" associated with its dividend-related transactions, and sought to avoid that tax risk by arranging swap trades that were not closely associated in time with the November record date for Microsoft's special dividend or its regular dividend payment date in August. By changing the timing, so that the swaps were not near in time to the dividend distributions, the Morgan Stanley employee apparently thought the firm could disguise the tax-driven nature of the swaps.

---

[134] See id.

[135] Email from Jeffrey Penney, Morgan Stanley, to multiple Morgan Stanley distribution lists and individuals, MSFT div timing (July 22, 2004), Bates No. MS-PSI* 020727.

147

44

On July 26, 2004, six days after the Microsoft announcement, Morgan Stanley circulated a document internally identifying "2 different trades that will allow a client to enhance the yield of their [Microsoft dividend] to 2 different levels depending on their sophistication/risk appetite."[136] Both trades were flexibly designed to incorporate a variety of financial instruments such as swaps, certificates, single stock futures, and options.[137]

The first transaction, deemed the "US Trade," allegedly provided Morgan Stanley clients with 100% of the Microsoft dividend, but cost between 20 and 50 basis points for financing and a $0.05 commission, which was characterized as "negotiable."[138] The document estimated that the two costs "will normally amount to about 5% of dividend," so the client would end up with 95% of the dividend amount.[139] The U.S. Trade transaction was described as follows: "Client Sells shares to Morgan Stanley. Morgan Stanley sells a derivative to the client. Enhancement is passed back through the derivative. In order to receive 100% of dividend, on unwind, Morgan Stanley must sell stock back to market (not the client) and close out the derivative."[140]

The second Morgan Stanley transaction, called the "European Trade," allegedly provided clients in a 70% jurisdiction, such as the Cayman Islands or Jersey, with 89% of the dividend amount, while clients in an 85% jurisdiction, such as the United Kingdom, were told they could obtain 92% of the dividend amount. The European Trade transaction was described as follows: "Client sells shares (through a broker) to Morgan Stanley. Morgan Stanley sells a derivative to the client. Enhancement is passed back through the derivative. On unwind the reverse occurs. Alternatively, the shares are simply lent to Morgan Stanley."[141]

The transactions designed by Morgan Stanley had no purpose other than to enable clients to dodge the U.S. taxes that would otherwise be withheld from the Microsoft dividend. Morgan Stanley actively pushed the transactions, reminding one offshore hedge fund, for example, about the need to execute a swap related to Microsoft stock: "Still plenty of

---

[136] Morgan Stanley presentation, "Microsoft Yield Enhancement" at 2 (July 26, 2004), Bates No. MS-PSI 020293-96.

[137] See id. at 3 and 4.

[138] See id. at 3.

[139] Id.

[140] Id. (emphasis omitted).

[141] Id. at 4. Morgan Stanley ultimately did not offer the "European Trade."

148

45

time, but I believe you had wanted me to contact you regarding MSFT div enhancement this week. We are ready when you are."[142] The hedge fund responded: "Yes … assuming we are in the swap for 30+ days prior to record date, I assume we could unwind the swap at any time subsequent to record date, correct?"[143] As indicated earlier, these swaps contributed to the $25 million in revenues that Morgan Stanley reported receiving from dividend enhancement swaps in 2004.

**Equity Linked Certificates.** In addition to equity swaps, Morgan Stanley marketed and employed another financial instrument – an equity linked certificate – to assist clients in avoiding the withholding tax on the 2004 Microsoft dividend.

An equity linked certificate is a security which references one or more stocks as the source for determining the certificate's value. The buyer typically purchases the certificate, whose price is determined in relation to one or more specified stocks on a specified date. In the Morgan Stanley certificates, buyers also received payments equal to any dividends paid on the referenced stock during the term of the certificate. Morgan Stanley also allowed the buyers to redeem the value of the certificate at or before its maturity date.

In early November 2004, Morgan Stanley's Jersey and Netherland subsidiaries issued 30 million certificates linked to Microsoft stock. The Jersey subsidiary issued 1 million certificates, while the Netherlands subsidiary issued 29 million. Morgan Stanley told the Subcommittee that its Microsoft certificate represented one of the two times when it has issued a certificate based upon a single U.S. stock. The certificate's maturity date was October 15, 2005, but purchasers were allowed to redeem the certificates before then. The payment at the maturity date consisted of three parts: the closing price of one share of Microsoft; the "Net Yield" which equaled 85% of the dividends paid on one share of Microsoft over the term of the certificate; and the "Outperformance" which equaled 6.99% of the dividends. Apparently, the "Outperformance" reflected the amount of "dividend enhancement" recovered through the transaction, and resulted in the purchasers receiving about 92% of the dividend amount.

Morgan Stanley's UK broker-dealer helped buy and sell the certificates, many of which were cashed in before the maturity date. About 12.4 million shares were sold out of the Netherlands and about

---

[142] Email from Alan Thomas, Morgan Stanley, to Steve Maresco, Eminence Capital, MSFT (Oct. 8, 2004), Bates No. MS-PSI 001402 (original email).

[143] Email from Steve Maresco, Eminence Capital, to Alan Thomas, Morgan Stanley, RE: MSFT (Oct. 8, 2004), Bates No. MS-PSI 001402 (top email).

149

46

513,000 were sold out of Jersey. According to Morgan Stanley representatives, many of the purchasers of the certificates sold physical shares of Microsoft stock and used the funds to purchase the certificates. It calculated that, in all but one instance, the amount of Microsoft shares bought or sold by Morgan Stanley on behalf of the certificate purchasers was equal to the number of certificates purchased. To hedge its own exposure to the certificates, Morgan Stanley decided not to acquire any Microsoft stock, but to use derivative transactions, apparently to ensure that the transactions would not be characterized and taxed as a stock repurchase or stock loan transaction.

The fact that most of the purchasers of the certificates switched from physical shares to Microsoft certificates, however, and held on to the certificates for only a short time surrounding the dividend payment period, strongly suggests that they were purchasing the certificates to escape payment of the withholding tax that would have applied to their physical shares.

**Abusive Stock Loans.** In addition to swaps and the Microsoft equity linked certificates, Morgan Stanley has used stock loan transactions since at least 1999, to enable its clients to dodge U.S. dividend taxes. These abusive stock loan transactions were conducted using a Cayman Islands "branch," MSDW Equity Finance Services I (Cayman) Limited, commonly referred to as "MS Cayman" or "Cayco."[144] Cayco, which is still in existence today, has no full time employees or any employees in the Cayman Islands at all.[145] As explained in its "Outline operating procedures," "Cayco is a thinly capitalised company and cannot absorb losses."[146] Further, "Cayco should never hold long stock positions" overnight. Yet, this entity borrowed enough securities to pay out over $1.1 billion in net dividends to clients between 2000 and 2007.[147] Among the top five clients were JPMorgan Chase Bank, which placed orders on behalf of multiple persons and received over $121 million in dividend payments; Goldman Sachs Europe, which placed orders on behalf of Goldman Sachs US Core Equity Portfolio and received over $73 million in dividend payments; and Blackrock Investment Management (UK) Ltd. which

---

[144] See Morgan Stanley diagram, "Yield Enhancement Transactions, Stock Loan of Fully Paid for U.S Securities By MS Cayman" (undated), Bates No. MS-PSI 020945.

[145] Subcommittee staff interview of Matthew Berke, Morgan Stanley (Aug. 21, 2008).

[146] MSDW Equity Finance Services I (Cayman) Limited ("Cayco") Outline operating procedures (undated), Bates No. MS-PSI 020270.

[147] Morgan Stanley, "MSDW Equity Finance Services I (Cayman) Ltd. - Stock Borrowing Transactions (2000-2007)," Bates. No. MS-PSI 019326-34.

150

47

placed orders on behalf of Merrill Lynch International Investment Funds and received $55 million in dividend funds.[148]

Morgan Stanley clearly pitched its Cayman stock loan transactions as a way for its clients to dodge U.S. dividend taxes. For example, a 1999 internal memorandum prepared by the Director of Tax of Maverick Capital, an investment advisor for several offshore hedge funds, reports the following:

> "Maverick is the advisor for several offshore funds that are having taxes withheld on dividends received from United States companies. Morgan Stanley has approached us about entering into stock loan agreements that would minimize the adverse effects of U.S. withholding. . . . Our Cayman Islands funds would enter into a stock loan on each U.S. security that is scheduled to pay a dividend. We would loan the security to a Cayman Morgan Stanley entity. They would pay us an amount equal to 70% of the dividend paid on that security (dividend entitlement). They would also pay us a stock loan fee equal to 13% of the dividend. . . . The end result would be that we would receive 83% of the dividend instead of the normal 70%. . . . Morgan is relying on Notice 97-66 to avoid withholding on the dividend entitlement."[149]

Maverick's Tax Director then compared the proposed stock loan transaction against the use of swaps to dodge payment of U.S. dividend taxes:

> "I will get several quotes on the cost of entering into swaps. I have talked to Paine Webber and Deutsche Bank. They are estimating that we would receive approximately 93% of dividends after expenses of the swap. . . . It sounded like the swaps would be much more difficult to manage and we would lose some of the flexibility we would have with the stock loan transaction. I plan to focus on the stock loan transaction unless we feel there is too much tax exposure."[150]

Seven years later, in December 2006, a Maverick document discussing "Dividend Enhancement Transactions" and focusing in particular on stock loans noted that "Maverick began using the dividend enhancement transaction in 1999. During that time, Maverick has done

---

[148] Letter from Morgan Stanley's legal counsel (Mar. 14, 2008), at 3.

[149] Maverick memorandum, Dividend Enhancement Transactions, marked "Draft – As of 4/26/99," prepared by Keith Hennington (Apr. 22, 1999), Bates No. MAV0001082-83, at 1082.

[150] Id. at 1083.

151

48

this transaction with Morgan Stanley, UBS, Lehman, Merrill Lynch, and ING."[151]

In 2004, Morgan Stanley pitched its Cayman stock loan transactions to another client by providing "an outline of the key points regarding a stock lending transaction as a way to increase the yield" on an equity.[152]  Morgan Stanley explained that the transaction "would lend your shares to Morgan Stanley for a period to be decided (typically a month)" and:

> "[a]t maturity of the stock lending period, Morgan Stanley
> would pay you:  1) a manufactured dividend equal to the
> dividends paid outr [sic] during the period net of the
> withholding tax that you normally incur ie 85% of gross
> dividends [and] 2) a stock lending fee equal to 6% of the
> gross dividends paid during the period[.]"[153]

On still another occasion, a member of Morgan Stanley's Equity Financing Services emailed a colleague in the Institutional Equities Division following a discussion of securities lending agreements, because a "[c]lient just called looking to trade some US names that are nearer record date."[154]  Later in the day, the same Morgan Stanley employee emailed six of his colleagues stating that he "would like to provide [the client] with some color [because] he's looking for US enhancements on his longs on MO (ex 3/11) and WWVY (ex 3/16)."[155]

Clearly, both Morgan Stanley employees and their clients saw its Cayman stock loan transactions as providing a way to dodge U.S. dividend taxes.

**Restrictions.** Aware of the tax risks associated with its dividend-related transactions, Morgan Stanley has taken a number of steps to limit its exposure.

Since at least 1994, for example, Morgan Stanley has not allowed its clients to both initiate a swap transaction by selling shares to Morgan

---

[151] Maverick memorandum, Description of Dividend Enhancement Transactions (Dec. 12, 2006), Bates No. MAV0001071-72.

[152] Email from Morgan Stanley to Eiger Capital, Stock Lending (Dec. 13, 2004), Bates No. MS-PSI 020249.

[153] Id.

[154] Email from Sean Rivera, Morgan Stanley, to Dennis De Coninck and Eric Groom, copying Ross McDougall, all Morgan Stanley, RE: Levin Cayman osla (Mar. 1, 2005), Bates No. MS-PSI 001478-80 (fifth email).

[155] Email from Sean Rivera, Morgan Stanley, to multiple Morgan Stanley recipients, RE: Levin Cayman osla (Mar. 1, 2005), Bates No. MS-PSI 001478-80 (eighth email).

152

49

Stanley (cross-in) and then repurchase those shares from the firm at the
conclusion of the swap (cross-out), in an effort to ensure that its swaps
are not recharacterized as a stock loan or stock repurchase subject to
dividend taxes.[156]  In 2005, Morgan Stanley went further and prohibited
its swap clients from engaging in either the initial stock sale or the
subsequent stock purchase with the firm.[157]  After this policy was
adopted, new clients were not allowed to sell their stock to the firm at
the beginning of a swap, but existing clients were "grandfathered" and
some were permitted to engage in this practice though 2007.[158]  In
October 2006, Morgan Stanley's Equity Risk Management group took
another significant step by deciding to stop offering its Cayman stock
loan transactions directly to hedge fund clients.[159]  Morgan Stanley told
the Subcommittee that this step was taken due to a concern over its
ability to maintain adequate control over the business.[160]

These steps suggest that Morgan Stanley has cut back, but has not
exited the dividend enhancement business.  It remains among the largest
financial institutions in the world, for example, in the stock lending
business.  One of its key activities is to borrow U.S. securities from
custodian banks and other entities with large supplies of securities in
30% withholding tax jurisdictions and then lend those securities to other
non-U.S. financial institutions such as ABN Amro Asian Financial
Services Limited, Bank of Nova Scotia Asia Limited, Fortis Global
Arbitrage (Asia) Limited, Hong Kong Shanghai Banking Corporation
Limited, ING Middenbank Curacao NV, Macquarie Asia Limited, and
Nomura International (Hong Kong) Limited.[161]  By playing this
intermediary role, Morgan Stanley may not be directly arranging
dividend enhancement transactions, but it may be a key facilitator of
dividend tax dodging arranged by its counterparties.

**Lost Tax Revenue.**  Like Lehman Brothers, Morgan Stanley
provided the Subcommittee with information indicating that its dividend
enhancement products led to the loss of significant tax revenues for the
U.S. Treasury.  For example, Morgan Stanley spreadsheets related to its

[156] Subcommittee staff interview, Matthew Berke, Morgan Stanley (Aug. 21, 2008).  Morgan
Stanley made an exception to this policy if it was covering a short position.

[157] Subcommittee staff interview of Alan Thomas, Morgan Stanley (July 2, 2008).

[158] Id.

[159] See email from Manish Vekaria, Morgan Stanley, to multiple Morgan Stanley distribution
lists and employees, PB and IPB US Borrows (Oct. 25, 2006), Bates No. MS-PSI* 020680
(original email).

[160] Subcommittee staff interview, Matthew Berke, Morgan Stanley (Aug. 21, 2008).

[161] Morgan Stanley, "MSDW Equity Finance Services I (Cayman) Ltd. - Stock On-Lending
Transactions (2000-2007)," Bates No. MS-PSI 019335.

153

50

Cayman stock loan transactions indicate that, over a seven-year period, from 2000 to 2007, its Cayman shell corporation paid out substitute dividends to clients in excess of $1.1 billion.[162] Using a 30% dividend tax rate indicates that those transactions cost the U.S. treasury about $300 million in unpaid dividend taxes.

Morgan Stanley also identified the top five recipients of the $1.1 billion in substitute dividends paid by its Cayman corporation. The data shows that those top five recipients obtained over one-third of the total, about $370 million, and escaped paying about $110 million in dividend taxes.[163]

In addition to its stock loan transactions, Morgan Stanley enabled its clients to dodge U.S. dividend taxes applicable to the 2004 Microsoft dividend. As indicated earlier, Morgan Stanley sold about 13 million Morgan Stanley certificates to clients, provided about $39 million in dividend-related payments to the certificate holders, and, assuming application of the 30% dividend tax rate, denied the U.S. treasury about $12 million in 2004.

Morgan Stanley also helped its clients dodge U.S. taxes on the Microsoft dividend through the use of swaps, as it did with respect to many other dividend-paying U.S. securities. Morgan Stanley provided spreadsheets on these swap transactions as well. An analysis of the transactions identified numerous red flags, but the Subcommittee was unable to determine how many had been undertaken for dividend enhancement purposes. Even without this swaps data, the evidence provided to the Subcommittee indicates that, over the seven-year period, from 2000 to 2007, Morgan Stanley's dividend tax transactions enabled its clients to escape U.S. dividend taxes in excess of $300 million.

### C. Deutsche Bank Case History

#### 1. Background

Deutsche Bank AG is a large global investment bank with 1,889 branches in 76 countries,[164] that generated over $9.5 billion in income in

---

[162] Morgan Stanley, "MSDW Equity Finance Services I (Cayman) Ltd. - Stock Borrowing Transactions (2000-2007)," Bates. No. MS-PSI 019326-34.

[163] Letter from Morgan Stanley's legal counsel (Mar. 14, 2008), at 3. In the same letter, Morgan Stanley disclosed that its UK subsidiary, Morgan Stanley & Co. International, which also engaged in stock lending transactions, had also paid dividends to clients, and the top five recipients over the same seven-year period, 2000-2007, had received in excess of $390 million. Applying a 15% tax dividend rate indicates that Morgan Stanley enabled those clients to dodge payment of nearly $60 million in dividend taxes. Id.

[164] Deutsche Bank AG, Annual Report on Form 20-F/A for the Fiscal Year Ended Dec. 31, 2007 at 17 (2008).

154

51

2007 with total assets of nearly $3 trillion.[165]  Founded in 1870, the bank
employs more than 80,000 people worldwide and operates three major
divisions:  The Corporate and Investment Bank, Private Clients and
Asset Management, and Corporate Investments.[166]  Deutsche Bank
conducts securities transactions through its Global Prime Broker service
within its Global Markets Division; U.S. securities transactions are
conducted primarily by Deutsche Bank Securities Inc., a U.S. securities
broker-dealer registered with the SEC.[167]  The Chairman of Deutsche
Bank's Management Board and Group Executive Committee is Dr. Josef
Ackermann.[168]

### 2. Dividend Tax Abusive Transactions

Beginning in the 1990s and continuing to the present, Deutsche
Bank has developed, marketed, and implemented a variety of abusive
dividend tax transactions, utilizing swaps and stock loans, to enable its
non-U.S. clients to dodge payment of U.S. taxes on U.S. stock
dividends.  Since 2004, it has conducted most of its abusive stock loan
transactions through a tax haven affiliate, Deutsche Bank Investment
Limited, located in the Isle of Jersey.  In 2007 alone, Deutsche Bank
Investment Limited engaged in stock lending transactions involving U.S.
dividend paying securities with a notional value of over $30 billion.[169]

**Tax-Driven Transactions.**  An internal memorandum from
Deutsche Bank's tax department estimated that, by 2002, the bank was
conducting millions of dollars in swap transactions that permitted its
clients to dodge payment of U.S. dividend taxes.  The memorandum
states:

> "An estimate of average annual notional on U.S. equity swaps for
> all clients for 2001 was $2.8billion, with approximately $2billion
> in notional with foreign persons (non-U.S.). … Based on an
> estimated annual dividend yield of 2.6%, U.S. withholding tax at
> the maximum rate of 30% on all manufactured dividends paid
> through swaps to foreign persons for this period, would be
> approximately $12.6 million."[170]

---

[165] See id. at 17.

[166] Id. at 17

[167] Id. at 52.

[168] Id. at 95.

[169] Letter from counsel to Deutsche Bank to Subcommittee (Mar. 6, 2008).

[170] Deutsche Bank memorandum from Jules Goodman and Adrienne S. Browning of DB
Americas Tax Department, to Jim Rowen and Julian Sale, Swap Tax Policy (Nov. 12, 2002),
Bates No. DB-PSI 00000043-46.

155

52

The purpose of the memorandum appears to have been to allow the Deutsche Bank tax department to suggest additional ways for the bank to "reduce its US withholding tax risk" by changing its "swap tax policy."[171]  The memorandum states:

> "The stated policy of the structured finance business in New York is that DB [Deutsche Bank] will not execute swaps around dividend dates.  The policy has been to require clients to hold swap positions for a minimum of 30 days.  We cannot force clients to maintain the positions for this period, but strongly discourage early terminations. …
>
> "The DB Americas Tax Department would like the structured finance business to continue to reduce its US withholding tax risk by increasing, as quickly and to the extent possible, the percentage of market executions around swap trading in US equities with foreign clients.  In this regard, it is preferable to execute trades in the market both in and out of the swap. …
>
> "The policy of trading for a minimum term should be modified to require a 45-day minimum term, increased from 30 days.  The 45 day term, while not mandated by any statute or regulation relating to swaps, conforms to the period of time the IRS believes is necessary to hold foreign stock for foreign tax credit capture, and may provide an analogy for this business as well."[172]

The memorandum shows Deutsche Bank tax lawyers suggesting two strategies to reduce the bank's "US withholding tax risk:"  imposing longer minimum time frames for U.S. equity swaps, and instituting a general practice of trading related U.S. stock in the market place rather than allowing a client to sell the stock to or buy it back from the bank itself.

Deutsche Bank eventually adopted these recommendations only in part.  By 2008, for example, its policy was still to "require" a 30-day minimum term, but "encourage" a 45-day holding period.[173]  At the same time, it authorized the head of its synthetic trading desk to permit swap terminations prior to the 30-day "minimum," if related to a "market event."[174] Deutsche Bank also expressly prohibited swap transactions within seven days of an ex-dividend date.[175]  With respect

---

[171] Id.

[172] Id.

[173] Subcommittee staff interview of Andrea Leung, Deutsche Bank (Feb. 7, 2008).

[174] Id.

[175] Id.

156

53

to market executions, by 2008, Deutsche Bank permitted swap clients to trade their physical shares directly with the bank at only one end of a transaction – either at the beginning or the conclusion of the swap.[176] Deutsche Bank also, however, permitted clients to sell their shares to the Bank, enter into a swap transaction using the purchasing price, and then exit the swap within a few weeks at an "objective" price, such as the "Market on Close" price, which is the price of the stock at the end of the trading day.  Using Market on Close pricing means that a client is able to exit the swap with Deutsche Bank and reacquire shares in the same security at the same price from another broker with virtually no market risk.  These practices suggest that Deutsche Bank remained interested in helping its clients regain their stock holdings with little market risk after conducting a swap transaction with the bank to avoid paying dividend taxes.

Other documents, including Deutsche Bank emails, show that Deutsche Bank personnel were well aware that their swap and stock loan transactions were used by clients to dodge U.S. dividend taxes.  In 1999, for example, an offshore hedge fund employee wrote a memorandum on discussions he had held with several financial institutions on "Dividend Enhancement Transactions," and indicated that Deutsche Bank would be sending him a price quote on the cost of entering into swaps, and was "estimating that we would receive approximately 93% of the dividends after expenses of the swap."[177]  In 2004, in an email discussing Microsoft's upcoming special dividend, a Deutsche Bank employee wrote:  "We are in the process of determining hedge fund demand for 'All In' enhancement to clients. …  We'll be hopefully sitting down as a group in the next week to outline our plan of action on 70% dividend liability underlying."[178]  On another occasion, a 2006 email sent by the director of Deutsche Bank's Global Prime Services group in New York to the investment professionals with Goldman Sachs offshore hedge funds stated:  "Are you all available next Tuesday 2/28 at 1 PM for a meeting to discuss securities lending in detail?  Specifically: - Yield Enhancement. …"[179]

---

[176] Id.

[177] Maverick memorandum, Dividend Enhancement Transactions, marked "Draft – As of 4/26/99," prepared by Keith Hennington (Apr. 22, 1999), Bates No. MAV0001082-83.

[178] Email from Paul Busby, Deutsche Bank, to multiple Deutsche Bank colleagues, Re: Extraordinary Dividend Rules and Microsoft One-Time Dividend (Sept. 16, 2004), Bates No. DB-PSI 00000084-85.

[179] Email from Scott Carter, Director of Global Prime Services at Deutsche Bank Securities, Inc. in New York, to Gary Chropuvka, Arlen Khodadadi, and Karl Wianecki, all of Goldman Sachs Asset Management, Meeting with Deutsche Bank (Feb. 23, 2006), Bates No. GS-PSI-05735.

157

54

A February 2007 communication between two Deutsche Bank traders shows how familiar each was with dividend-related transactions. One of the traders asked: "[M]ate – can you use NVS US for div [dividend]?"; the other responded: "[Y]ep we can use it – do you need dates?"[180] A March 2007 discussion between two Deutsche Bank traders was even more explicit.[181] The first trader asked:

> "Hi Martin – I understand you spoke to Shane last week about some US stocks – MO and RAI – related to dividends. . . . [D]o you want to trade 1,908,100 shares of MO US and 150,000 shares of RAI? We can give you 97.5% of the dividends on those names[.]"

His counterpart then agreed to the trades. Still another email observed: "us mkt for div is traded out of London," referring to Deutsche Bank's London branch.[182]

**Jersey Stock Loans.** Beginning in 2004, Deutsche Bank International Limited (DBIL), located on Jersey in the Channel Islands, began arranging offshore stock loan transactions involving U.S. dividend-paying stocks. According to an internal Deutsche Bank application seeking approval to develop, market, and implement those stock loan transactions,[183] DBIL entered the business because Deutsche Bank needed to interpose a "non-U.S. treaty entity" in its stock loan transactions to avoid dividend withholding and lower its stock loan pricing to match its competitors:

> "Broadly speaking, there are substantial US equities held offshore which are consistently included in basket pricing (baskets that would be borrowed on an exclusive basis for use within the overall equities business). We are currently not competitive in that pricing as any borrow of those US equities requires a deduction and payment of withholding tax on substitute payments equal to 15% of any dividend.[184] Our competitors do not have to account for this tax (given some of their offshore structures) and can therefore offer a more aggressive price to lenders. A non-US treaty is attractive as

---

[180] Bloomberg messages between Ben Davies to Chiraag Shah, both of Deutsche Bank London (Feb. 12, 2007), Bates No. DB-PSI 00001470.

[181] Bloomberg messages between Chiraag Shah and Martin Cornell, both of Deutsche Bank London (Mar. 12, 2007), Bates No. DB-PSI 00002358.

[182] Email from Simon Pearson to Adrian Todd, both of Deutsche Bank, Re: Travel Dates (Mar. 12, 2007), Bates No. DB-PSI 00007343.

[183] Deutsche Bank, New Product Application (Mar. 15, 2004), Bates No. DB-PSI 00000047-71.

[184] Deutsche Bank's London branch is subject to a 15% dividend tax rate because the United Kingdom has negotiated a 15% dividend tax rate with the United States.

158

55

the amount of withholding tax required to be deducted is reduced to 0% (providing certain criteria are met), therefore allowing us to be more competitive with our pricing."[185]

This document shows that, from its inception, the Jersey stock loans were tax-driven transactions.

The 2004 application, as well as a revised 2005 application, include charts and explanations of the stock loan transactions DBIL planned to offer.[186]  Essentially, DBIL proposed and later carried out transactions in which it borrowed a basket of U.S. securities from a non-U.S. client, sold that basket to the market, and entered into a derivative with Deutsche Bank London's branch to hedge itself against any market risk.[187]  The insertion of the Jersey entity into the proposed transactions was arranged solely for the purpose of invoking IRS Notice 97-66 and enabling Deutsche clients to dodge their U.S. dividend tax obligations.

In 2008, Deutsche Bank indicated that "approximately 98% of the loans transacted through the Deutsche Bank Jersey entity, Deutsche Bank Investment [sic] Limited ('DBIL'), involve U.S. dividend-paying securities."[188]  It reported that, in 2007 alone, DBIL engaged in stock lending transactions involving U.S. dividend paying securities with a notional value of over $30 billion.[189]  DBIL's major clients included Pioneer Fund, BGI, Merrill Lynch International Investment Fund, and AIG Global Funds, each of whom may have been trading on behalf of other non-U.S. stockholders.[190]

**Lost Tax Revenues.**  The documents produced to the Subcommittee did not contain data indicating the total volume of dividend-related swap transactions engaged in by Deutsche Bank over the years or the total amount of dividend taxes that were not paid to the U.S. Government as a result of its transactions.  The evidence does suggest, however, that Deutsche Bank has participated in transactions involving tens of millions of dollars in unpaid dividend taxes.  In a document cited earlier, for example, the Deutsche Bank tax department

---

[185] Deutsche Bank, New Product Application (Mar. 15, 2004), Bates No. DB-PSI 00000047-71, at 52.

[186] Id.; Deutsche Bank, New Product Application (Jan. 27, 2005), Bates No. DB-PSI 00007472-78.

[187] See id.

[188] Letter from Deutsche Bank legal counsel to the Subcommittee (Mar. 6, 2008), at 2.

[189] Id.

[190] See Deutsche Bank, DBIL Stock Lending Transaction Information, Bates DB-PSI 00000499; Letter from Deutsche Bank legal counsel to Subcommittee (June 12, 2008).

159

56

estimated that seven years ago, in 2001, Deutsche Bank handled U.S. equity swaps with non-U.S. persons that may have generated unpaid dividend taxes totaling about $12 million.[191] In documents supplied to the Subcommittee by Citigroup in connection with its decision, described below, to reimburse the IRS for unpaid dividend taxes on a limited number of swap transactions, data shows that Citigroup entered into swap transactions with Deutsche Bank, from 2003 to 2005, involving over $20 million in dividend related payments and $3.1 million in unpaid dividend taxes.[192] Those figures cover Deutsche Bank's swaps with just one counterparty. At the least, these documents show that Deutsche Bank structured transactions that enabled its clients to dodge payment of tens of millions of dollars in U.S. dividend taxes.

### D. UBS Case History

#### 1. Background

UBS AG is one of the largest financial institutions in the world, with over 2.2 trillion Swiss francs, approximately $2 trillion U.S. dollars, in total assets.[193] UBS is headquartered in Switzerland, operates in 50 countries[194] with more than 80,000 employees,[195] and maintains a large banking and securities presence in the United States. UBS AG is the parent company of the UBS Group which is organized into four major divisions, the Investment Bank, Global Asset Management, Global Wealth Management and Business Banking, and the Corporate Center. [196] In 2007, UBS reported a net loss of 5.247 billion Swiss francs, or approximately $4.7 billion U.S. dollars.[197] The current UBS Chairman of the Board is Marcel Ospel, and its Chief Executive Officer is Marcel Rohner.[198]

---

[191] Bloomberg messages between Chiraag Shah and Martin Cornell, both of Deutsche Bank London (Mar. 12, 2007), Bates No. DB-PSI 00002358.

[192] Citigroup untitled chart prepared for the IRS listing swap transactions from 2003 to 2005 (undated), Bates No. CITI_PSIWHTAX001460. See also discussion of Citigroup case history.

[193] UBS AG, Annual Report on Form 20-F/A for the Fiscal Year Ended Dec. 31, 2007 (2008) at 41.

[194] Id. at 23.

[195] See id. at 58.

[196] Id. at 10.

[197] Id. at 3.

[198] Id. at 5.

160

57

### 2. Dividend Tax Abusive Transactions

From at least 2000 until 2007, UBS engaged in abusive dividend tax transactions, marketing in particular stock loan transactions that utilized a Cayman affiliate. UBS data on its stock loan transactions during a four-year period from 2004 to 2007, indicate that UBS enabled its clients to dodge payment of U.S. dividend taxes totaling about $62 million; an eight-year analysis covering 2000 to 2007, conducted by a single hedge fund, estimated that UBS had helped it escape payment of U.S. dividend taxes totaling about $70 million. In 2007, however, UBS made a business decision to stop conducting Cayman stock loan transactions and no longer offers these transactions to its clients.

**Tax-Driven Transactions.** Like Lehman Brothers, Morgan Stanley, and Deutsche Bank, UBS documents make it plain that its dividend enhancement transactions were designed to enable its offshore hedge fund clients to dodge U.S. taxes on U.S. stock dividends.

This point was made explicitly, for example, in 2005 marketing materials developed for its "Dividend Enhancement" products. Using a question and answer format, the UBS document asks: "In general what does Dividend enhancement [on long positions] offer me?"[199] UBS then responds:

> "A Cayman Islands (or other offshore) domiciled Hedge Fund enjoys legal and administrative benefits associated with offshore incorporation. However, one downside to being domiciled in a jurisdiction that does not have an income tax treaty with the United States is that dividends on your US equity holdings are subject to a 30% withholding tax, which reduces the net yield of such holdings. Dividend enhancement provides incremental revenue to significantly mitigate this yield loss."[200]

Another UBS internal document, entitled "Why offer Dividend Enhancement?," presents several reasons for conducting these transactions, including using the products to attract and retain hedge

---

[199] UBS Investment Bank, "Dividend Enhancement on Long Positions" (2005), Bates No. UBS 000529-30. Note that UBS, like other financial institutions, had an active "dividend enhancement" business focusing on short equity positions, in which the financial institution would structure a transaction to require an offshore hedge fund to pay less than the 100% of the substitute dividend it should pay as the short equity party. The Subcommittee has not focused on short enhancements and this Report primarily discusses long equity dividend tax abuse transactions.

[200] Id.

161

58

fund clients, outmaneuver competitors, and generate profits.[201]  The first paragraph in the document states, for example, that offering dividend enhancement products "differentiates us from our competitors and provides an opportunity for us to speak with Hedge Funds."[202]  The next paragraph states: "It's profitable.  Estimated 2005 P&L is $5 million.  This amount should easily double next year after audited financials allow us to gather supply from external lenders."[203]  The next point is: "Often, Hedge Fund[s] will move positions in and leave them with us to gain the enhancement.  This increases balances.  Conversely, they will move positions to competitors if we can't offer enhancement."  The document concludes: "It wins us new/added business that can generate P&L in other firm 'silos,'" providing four examples of hedge funds which, after UBS began "enhancing" their dividends, increased their balances with the bank.[204]

UBS plainly pitched its dividend enhancement products to clients by citing its potential tax savings, as shown in this marketing effort aimed at Maverick Capital, an investment manager for several offshore hedge funds:

> "For US securities paying dividends, the IRS requires a 30% withholding tax be levied against offshore entities.  This means that a Cayman entity such as Maverick Fund LDC would only receive 70% value on their US dividends.  UBS offers a product known as "Dividend Enhancement", whereby Maverick LDC is able to realize a greater portion of their dividends, and pay an amount less than 100% of a dividend, if they are short a security.  It works on the basis that UBS can get more favorable treatment than an offshore entity and thus can put the following arrangement in place, whereby UBS passes an enhanced amount back to the client."[205]

On another occasion, UBS sent an email to an offshore hedge fund client entitled, "Dividend Enhancement," which provided, in part, the following:

---

[201] See UBS, "Why offer Dividend Enhancement?" (undated, but likely 2005), Bates No. UBS 000512.

[202] Id.

[203] Id.

[204] Id.

[205] "Dividend Enhancement" document attached to email sent from Veronica Wilthew, UBS, to Michael Madaio and Mark Niesen, both UBS, FW: Dividend Enhancement Flow (Nov. 1, 2004), Bates No. UBS 000509-11.

162

59

> "As per our conversation Friday we would like to sign your offshore account to a [Global Master Securities Lending Agreement] with our UBS Cayman entity so you can benefit from our enhanced dividend program.
>
> "Here is a brief description of how it works.
>
> "Long Positions
>
> "Currently you are entitled to 70% of any US dividend in the offshore account. With these agreements we would borrow your stock and loan it to a third party. By doing this we will be able to enhance your divide[n]d (85% on average)."[206]

**UBS Cayman Stock Loan Transactions.** UBS primarily used stock loan transactions, frequently along with an intercompany total return swap, to enable its clients to escape U.S. dividend taxes. To conduct these transactions, UBS made use of an offshore shell corporation in the Cayman Islands, called UBS Cayman Ltd., that "was formed in 1999 to facilitate long dividend enhancement for the firm's hedge fund clients."[207]

UBS Cayman Ltd. apparently had no employees of its own, no physical office, and no business operations other than to function as a placeholder in various UBS dividend-related transactions. When asked by the IRS about this corporation, UBS described it as follows:

> "UBSCL is not licensed, registered or regulated (e.g., by reason of capital adequacy requirements) as a broker/dealer or similar entity in any jurisdiction, cannot access the capital markets except through a broker/dealer, and does not hold itself out as a broker/dealer. UBSCL is not, and does not hold itself out as being, capable of servicing customers (e.g., it does not possess adequate systems or personnel), UBSCL's counterparties do not view themselves as UBSCL's customers, and UBSCL does not have any fiduciary duties to its counterparties. UBSCL does not make markets, possess inventory, or have an established place of business. UBSCL does not hold itself out as a merchant or as willing to enter into either side of securities or derivative trades."[208]

---

[206] Email from Anthony Silvio, UBS, to Catherin Carr, PCM-US, RE: Dividend Enhancement (Aug. 30, 2004), Bates No. UBS 000653-54.

[207] UBS Cayman Ltd. Capital Request – Request for Circular GEB Approval (Jan. 23, 2004), Bates No. UBS 000521-528.

[208] Technical analysis prepared by UBS' legal counsel for the IRS (undated), Bates No. UBS 000471-501, at 4 n.4.

163

60

Despite being a shell operation, UBS Cayman Ltd. was routinely used by UBS in its dividend-related stock loan transactions, most of which were "structured for a week or less."[209]

An internal UBS document explains how its "Dividend Enhancement" transactions typically worked.[210] The transaction was described as follows:

"1)  UBS Cayman borrows the US stock from [a Cayman hedge fund].

"2)  UBS Cayman executes a total return swap with UBS AG, whereby Cayman are 'long' the returns.

"3)  UBS Cayman sell[s] the stock to UBS AG London in order for UBS AG London to hedge the swap.

"4)  UBS AG London creates a long basket trade (in swap form), including the security that it received from UBS Cayman.

"5)  UBS AG London sell[s] the physical stock to the swap counterpart, as the other side of the swap transaction UBS AG London then receive returns on the swap, including 100% of the dividends value (as a part of the swap transaction), on the stock received from UBS Cayman.

"6)  UBS AG London returns 90% of the value of the dividend to UBS Cayman, this is done by way of a commission, to reflect 90% value of such dividend.

"7)  UBS Cayman passes the 90% dividend payment onto [the Cayman hedge fund]."[211]

The document also states: "At the expiration of the transaction UBS AG London purchases the stock, in the market, in the name of UBS Cayman. The stock is then returned to [the Cayman hedge fund], and the transaction is closed."[212] The position of UBS legal counsel is that this admittedly "convoluted structure" complies with IRS Notice 97-66, and

---

[209] Id.

[210] "Dividend Enhancement" document attached to email sent from Veronica Wilthew, UBS, to Michael Madaio and Mark Niesen, both UBS, FW: Dividend Enhancement Flow (Nov. 1, 2004), Bates No. UBS 000509-11.

[211] Id.

[212] Id.

164

61

enables UBS to omit any tax withholding for the offshore hedge fund involved in the transaction.[213]

A 2007 legal opinion prepared for UBS indicates that the bank continued to engage in these abusive stock loans until recently. The opinion describes a typical UBS Cayman stock loan transaction as follows: "UBS Cayman borrows voting shares of publicly-traded U.S. corporations from unrelated persons . . . or from UBS Zurich, a Swiss branch of UBS AG ('UBS Zurich'), and lends those shares to unrelated non-U.S. persons ineligible for the benefits of a tax treaty that reduces withholding tax on dividends."[214] The opinion notes that to carry out these transactions, "UBS Cayman conduct[ed] its activities by means of employees located in the United States that [we]re also employees of UBS Securities LLC."[215]

In June 2006, the UBS Head of Tax for the Americas made a presentation on the Cayman stock loan transactions to the UBS management board in Switzerland.[216] The board was asked to approve an increase in the stock lending business, but the board decided to hold the business at existing level and imposed a $72 million risk limit on the Cayman stock loan transactions, meaning that those particular transactions could generate no more than $72 million in substitute dividend payments.[217] UBS representatives informed the Subcommittee that in November 2007, the management board in Switzerland made the decision to terminate the Cayman Islands stock lending program.[218] UBS told the Subcommittee that the program was terminated because it was not making money and for policy reasons. UBS informed the Subcommittee that today it does not conduct any stock lending transactions based upon IRS Notice 97-66.[219]

**Lost Tax Revenues.** UBS provided the Subcommittee with spreadsheets and other documents containing detailed data related to its Cayman stock loan transactions over a four-year period, from 2004 to

---

[213] Id.

[214] Memorandum from Sullivan & Cromwell LLP to UBS, "Withholding Tax On Substitute Dividend Payments" (Aug. 17, 2007), Bates No. UBS 000664-68, at 2.

[215] Id.

[216] Subcommittee staff interview with Todd Tuckner, UBS Head of Tax for the Americas (Nov. 1, 2007).

[217] Id.

[218] Subcommittee staff interview with Todd Tuckner, UBS Head of Tax for the Americas (Aug. 25, 2008).

[219] Id.

165

62

2007. These spreadsheets show that, in 2004, UBS conducted stock loan transactions in which it passed through substitute dividend payments to its clients totaling about $42 million which, after application of the 30% dividend tax, meant that UBS had helped its clients dodge payment of about $12 million in dividend taxes.[220]  In 2005, the total amount of substitute dividends was about $67 million, and the total amount of unpaid dividend taxes was about $20 million.  In 2006, the total amount of substitute dividend payments was about $71 million, and the unpaid dividend taxes about $21 million.  In 2007, the year in which the program was terminated in November, the total amount of substitute dividends was about $26 million, and the unpaid dividend taxes about $8 million.  Altogether then, over the four-year period, UBS passed onto its clients substitute dividend payments totaling $206 million and helped them skip paying dividend taxes totaling about $62 million.

The spreadsheets also indicate that UBS' top clients during this four-year period were primarily offshore hedge funds.  In 2006 alone, for example, Maverick participated in Cayman stock loan transactions that generated a total of about $24 million in dividends, and enabled it to dodge dividend taxes totaling about $7 million.  Highsfield Capital participated in Cayman stock loan transactions that generated a total of about $17 million in dividends and unpaid dividend taxes of about $5 million.  Jana Master Fund participated in transactions that generated about $9 million in dividends and unpaid dividend taxes of about $3 million.  Other clients included S.A.C. Capital Associates, The Canyon Value Realization Fund (Cayman) Ltd., Oz Overseas Fund, and Black Diamond Offshore Ltd.

Another analysis, prepared by Maverick Capital, has additional information related to UBS and provides another perspective on the tax revenues lost as a result of its abusive dividend tax transactions.  In this analysis, which was prepared for Maverick's internal use, Maverick estimated the "Tax Benefit" from "U.S. Dividend Enhancements" conducted over an eight-year period, from 2000 to 2007, for several offshore funds that it managed.  Using specific data from past dividend enhancement transactions involving U.S. securities, Maverick estimated that, overall, of the U.S. dividend related payments made to its offshore hedge funds, the potential unpaid U.S. dividend taxes totaled about $95 million.  Of that $95 million, the data showed that the bulk of the

---

[220] The totals provided in this paragraph and the next were derived by the Subcommittee from UBS Cayman Substitute Payments spreadsheets, 2004, 2005, 2006, and 2007 (Feb. 28 and Mar. 17, 2008).

166

63

transactions had been brokered by UBS which had enabled Maverick to escape payment of about $70 million.[221]

A third analysis, prepared in 2007 by Citigroup in connection with its decision to voluntarily pay the IRS $24 million in unpaid dividend taxes associated with certain swap transactions (explained further below) identifies swaps that Citigroup conducted with UBS over a three-year period, from 2003 to 2005. Citigroup determined that these UBS brokered transactions had provided it with dividend-based payments totaling about $22 million, and allowed it to escape paying dividend taxes totaling about $3.4 million.[222]

Using different years and different counterparties, with some overlap, each of these totals, $62 million, $70 million, and $3.4 million, helps quantify the dividend taxes that were never withheld or remitted to the U.S. treasury due to transactions arranged by UBS. At the least, they show that UBS structured transactions that enabled its clients to dodge payment of tens of millions of dollars in U.S. dividend taxes.

### E. Merrill Lynch Case History

#### 1. Background

Merrill Lynch is a global investment bank with headquarters in New York City,[223] offices in more than 40 countries, and over 64,000 employees worldwide.[224] Through its subsidiaries, Merrill Lynch holds nearly $2 trillion in client assets,[225] as well as a 45% share in BlackRock, a financial firm with approximately $1.4 trillion in assets under management.[226] It conducts much of its trading operations through Merrill Lynch, Pierce, Fenner & Smith Incorporated, a registered U.S. broker-dealer. Other subsidiaries include ML IBK Positions, Inc., through which Merrill Lynch invests in private equity, and Merrill Lynch International Bank Limited, which is its primary non-U.S. banking entity. In 2007, Merrill reported a loss of $8.6 billion.[227]

---

[221] Maverick Funds charts entitled, "U.S. Dividend Enhancements" and "Summary of Domestic Enhancements (by broker)" (Dec. 31, 2007), Bates No. MAV0000856-57.

[222] Citigroup untitled chart prepared for the IRS listing swap transactions from 2003 to 2005 (undated), Bates No. CITI_PSIWHTAX001460. See also discussion of Citigroup case history.

[223] http://www.ml.com/media/92209.pdf.

[224] Merrill Lynch & Co Inc., Annual Report on Form 10-K for the Fiscal Year Ended Dec. 28, 2007 at 19 (2008).

[225] Id. at 20.

[226] Id.

[227] Id. at 22.

167

64

John Thain, former head of the New York Stock Exchange, became the firm's Chairman and Chief Executive Officer in December 2007.[228]

### 2. Dividend Tax Abusive Transactions

Merrill Lynch developed, marketed, and implemented a variety of abusive dividend tax transactions to enable its non-U.S. clients to dodge payment of U.S. taxes on U.S. stock dividends. These abusive transactions made use of not only swaps and stock loans, but also stock options, including coordinated puts and calls. In 2005, under a program called Project Gemini, Merrill began conducting abusive stock loan transactions using an offshore corporation established for that purpose called Merrill Lynch Equity Solutions Jersey (MLESJ). Some of its clients, worried about the tax risk involved in these loans, asked Merrill to indemnify them against the associated tax liability. In early 2008, apparently due to the Subcommittee investigation, Merrill suspended its Project Gemini stock loans.

**Tax-Driven Transactions.** Merrill documents clearly demonstrate that it has developed and marketed its dividend enhancement products as a way for its non-U.S. clients to dodge payment of U.S. dividend taxes.

This approach is clearly set out, for example, in 2004 documents related to the Microsoft $3 special dividend. On July 21, 2004, the day after Microsoft announced the special dividend, the head of Merrill's corporate equity derivatives group in London sent an email to several colleagues stating: "Okay, so we always use Microsoft as the 'no dividend' example in tax scenarios, and now that will have to stop! $32 billion dollars in dividends is a lot of dividends, and we should discuss whether there is value to be had. ... We will obviously need to discuss generally the Firm's position on [IRS Notice] 97-66 and look at derivative solutions."[229]

An employee in Merrill's Global Tax group in New York responded with several ideas for financial transactions to enable clients to dodge payment of U.S. dividend taxes on the Microsoft dividend, including transactions involving stock loans, total return swaps, and options. He observed:

---

[228] Id. at 167.

[229] Email from Jacqueline Duval-Major, Merrill Lynch International in London, to Elissa Shendalman and Mike Gaffney, both Merrill Lynch Global Tax in New York, Microsoft dividend (July 21, 2004), Bates No. ML-PSI-00147049-52 (original email). IRS Notice 97-66 is the notice that some financial institutions claim allows certain offshore stock loan transactions to eliminate the payment of U.S. dividend taxes, as explained earlier.

168

65

"We had in place a 97-66 structure out of our SNCFE-Hong Kong entity, as it related to our Luxembourg SICAV funds. This structure was put on hold because the systems infrastructure supporting the trade did not work as anticipated. We also know that Morgan Stanley had a 97-66 facility for a couple of years, and our 97-66 thing was an internal response to that. ... I also heard that the IRS is looking into this issue as part of the single stock futures project and there is some concern that whatever rules they devise as part of that could adversely impact the 97-66 trades. Other thoughts - ...[t]ypical total return swaps or collars to avoid [withholding] tax."[230]

In a second email on the same day, the Global Tax employee wrote:

"I also just heard that there is *extreme* interest in foreign holders replacing their long physical position with a put/call combo. ... The options exchange is pricing 100% of the dividend into the option, so the foreign holders have the incentive to do a 'conversion transaction' whereby they sell their stock to the specialist and simultaneously replace it with a put/call synthetic. ... [B]y holding options where the strikes automatically drop by 100% of the dividend, foreign holders can receive 100% of the dividend through the options."[231]

He also noted the tax risk associated with these transactions:

"Normally, we are concerned where a customer (i) sells stock to ML [Merrill Lynch]; (ii) at the same time faces ML on an OTC TRS [over-the-counter total return swap] or forward or put/call combo; and (iii) gets the stock back at the end, either via physical settlement or a cross out or what have you. I am not that concerned where the options are exchange traded because ML is technically not the counterparty and we could close out our position through offset on the exchange while our customer still has his options with OCC. However, OTC options don't have that argument available, thus may be a repo [stock repurchase], thus there may be withholding tax."[232]

The head of Merrill's corporate equity derivatives group responded:

[230] Email from Thomas Visone, Merrill Lynch Global Tax in New York, to Jacqueline Duval-Major and other Merrill Lynch colleagues in New York, London, and Montreal, RE: Microsoft dividend (July 22, 2004), Bates No. ML-PSI-00147049-51 (fourth email).

[231] Email from Thomas Visone, Merrill Lynch Global Tax in New York, to Jacqueline Duval-Major and other Merrill Lynch colleagues in New York, London, and Montreal, RE: Microsoft dividend (July 22, 2004), Bates No. ML-PSI-00147049-51 (sixth email) (emphasis in original).

[232] Id. at 50.

169

66

"Tom:  This is exactly what I had in mind – a synthetic long
structure for non-US holders to get as close to 100% of that
dividend value:  Put/call combo (or as you mentioned in an earlier
email, total rate of return swap). …  Maybe we could ameliorate
your concerns re recharacterization as a repo with an OTC by
making sure that either the sale or any potential purchase at the
close of our derivative potion to unwind the hedge (or both) are not
done directly with a client, but rather from a broker.  Also, I firmly
believe that when ML has synthetic in and sy[n]thetic out (your
example below on the short collar), it is hard to show a repo."[233]

These emails show that, in 2004, Merrill employees were actively
designing financial transactions to enable their "non-US holders" of
Microsoft stock to avoid dividend withholding, were aware of the tax
risk that the transactions might be recharacterized as a stock sale and
repurchase subject to dividend taxes, and were interested in including
features that would make it "hard to show a repo."

One month later, in August 2004, Merrill employees exchanged
emails regarding the transactions being developed:

"Can you speak to … the US swaps desk about Microsoft – after
our follow up phone call with tax dept today related to various
ways our clients are going to expect to see yield enhancement
trades on MSFT. …  Paul is writing up (again) a list of the trades
proposed and the advantages/disadvantages of each, with the view
to get Tax dept guidelines asap."[234]

One colleague responded:  "Our competitors are out there with
products and we need to get ours out there asap!"[235]

By early October, Merrill circulated an email describing a
proposed "Microsoft Trade," involving coordinated puts and calls.[236]
The author of the email stated:  "The beauty of the trade is that the
option strike is lowered by $3 on the XD [ex dividend] date, thereby

---

[233] Email from Jacqueline Duval-Major, Merrill Lynch International in London, to Thomas
Visone, Elissa Shendalman, and Mike Gaffney, all Merrill Lynch Global Tax in New York, RE:
Microsoft dividend (July 21, 2004), Bates No. ML-PSI-00147049-52 (seventh email).

[234] Email from Jacqueline Duval-Major, Merrill Lynch International in London, to Tobias
Gehrke, also in London, and Paul Cipriano, US swaps desk in New York, microsoft (Aug. 27,
2004), Bates No. ML-PSI-00054121-24 (original email).

[235] Email from Tobias Gehrke, Merrill Lynch London, to Jacqueline Duval-Major in London and
others, RE: microsoft (Aug. 31, 2004), Bates No. ML-PSI-00054121-24 (second email).

[236] Email from Andrew Miller, Merrill Lynch in London, to "Equity Convertible/Derivative
Sales" distribution list, Microsoft Trade yesterday (Oct. 7, 2004), Bates No. ML-PSI-00149878-
80 (original email).

170

giving 100% of the special dividend." The email provided an example of how the trade would be executed for a non-U.S. client subject to "a US dividend withholding rate of 15%." It indicated that the trade would return 100% of the withheld dividend, less Merrill's fee: "The fees of 6 cents per share (or $3 per option) equate to 2% of the special dividend. Therefore the client receives 100% gross of the dividend through the trade, or 98% net after costs." The same Merrill employee noted later that the transaction was "our only internally recommended listed trade, but clearly you have to be comfortable yourselves from a tax angle before you proceed."[237]

In October, Merrill's Corporate Equity Derivatives group head circulated an email to a wide group of Merrill relationship managers and corporate finance employees announcing a "yield enhancement opportunity for Clients that may hold Microsoft shares (MSFT US)."[238] The email stated: "Clients who hold Microsoft shares – whether as an free-standing shareholding or as part of a basket – and who will suffer withholding tax on such shareholding (whether at 15 or 30%) may benefit from one of the proposed transactions."[239] The email directed each employee to "[i]dentify Clients that may hold investments in MSFT US and could benefit from the yield enhancement," and to contact the Corporate Equity Derivatives group to discuss the transactions.[240] It also stated: "Our competitors are offering similar products, and time is of the essence."[241]

The attached presentation, whose first page was entitled "Microsoft Special Dividend: Yield Enhancement," was explicit in telling Merrill employees that the purpose of the newly-designed transactions was to help non-U.S. clients dodge payment of U.S. dividend taxes:

- "MSFT announced 20 July that it will pay $32 billion of dividend in a $3 per share special dividend, record date 17 November, pay date on 2 December ….

---

[237] Email from Andrew Miller, Merrill Lynch in London, to several Merrill colleagues, FW: Microsoft Trade yesterday (Oct. 27, 2004), Bates No. ML-PSI-00149878-80 (second email).

[238] Email from Jacqueline Duval-Major, Merrill Lynch International in London, to multiple Merrill Lynch distribution lists and employees, Microsoft Special Dividend: Yield Enhancement for Clients (Oct. 27, 2004), Bates No. ML-PSI-00147236.

[239] Id.

[240] Id.

[241] Id.

171

68

- Dividends paid to non-U.S. holders will be subject to US withholding tax at 30% or a less rate (usually 15%) under a tax treaty. **Depending on the tax status and application [of] the relevant domestic tax law, US withholding tax suffered may represent an absolute cost to the non-US holder.**

- The trade ideas in this presentation may provide a higher synthetic return to such holders than a physical dividend with withholding tax. Merrill Lynch makes money generally through the pricing of the dividend element of the synthetic transaction (and ML's hedge to that transaction).

- The Tax Department has approved these transaction parameters for yield enhancement transactions over MSFT shares. …

- Corporate Equity Derivatives will liaise with US Swaps Desk … to coordinate execution of the transactions."[242]

The presentation then provided charts and an explanation of three possible transactions, the first involving an equity total return swap, the second an exchange traded option called a "flex option," and the third an over-the-counter option. Another Merrill document shows that Merrill actually carried out the Microsoft related swap and option transactions with more than a dozen clients, primarily offshore hedge funds, affecting over 20 million shares of Microsoft stock and resulting in over $18.5 million in dividend taxes not being withheld and turned over to the U.S. treasury.[243]

Other documents show that Merrill continued to offer equity swaps to reduce or eliminate clients' dividend taxes. For example, an analysis prepared by Citigroup, in 2007, in connection with a decision to voluntarily pay the IRS $24 million in unpaid dividend taxes associated with certain swap transactions, explained in more detail below, included swaps with Merrill Lynch over a three-year period, from 2003 to 2005, involving nearly $23 million in dividend related payments and $3.4 million in unpaid dividend taxes.[244] In 2006, Merrill's Global Markets & Investment Banking Group prepared a lengthy presentation on its

---

[242] Merrill Lynch presentation, "Yield Enhancement Opportunity[:] Microsoft Special/Cash Dividend (MSFT US) Record Date November 17, 2004" (Sept. 23, 2004), Bates No. ML-PSI-0289-94 (emphasis in original).

[243] Merrill Lynch document, "Microsoft Counterparties" (undated), Bates No. ML-PSI-0485. One of the clients was a Merrill-related entity called "Merrill Lynch Investment Managers."

[244] Citigroup untitled chart prepared for the IRS listing swap transactions from 2003 to 2005 (undated), Bates No. CITI_PSIWHTAX001460. See also discussion of Citigroup case history.

172

development, marketing, and use of equity swap products.[245]  With
respect to U.S. stocks that pay dividends, the presentation stated:  "ML
can pay an amount equal to 100% of the ordinary dividend."[246]  When
discussing "Key Usage Considerations" for equity swaps, it listed as one
key consideration:  "Yield Enhancement[:]  Dividend enhancement
(recapture withheld dividends for foreign investors)."[247]  When
discussing "Swap Applications and Advantages," it stated:  "Dividend
Enhancement – As synthetic instruments, swaps are not subject to the
withholding taxes that may be incurred by non treaty or offshore
investors who own the physical shares of a dividend paying stock,"
citing the usual dividend withholding tax rates of 30% and 15%.[248]
Clearly, helping clients dodge payment of U.S. dividend taxes had
become an established part of Merrill's equity swap business.

**Project Gemini Stock Loans.**  Merrill Lynch also made use of
abusive stock loans to enable its clients to dodge U.S. dividend taxes.  In
2005, for example, Merrill launched Project Gemini, which it described
as "a program intended to provide selected international investment
funds holding US equities with an enhanced after tax return."[249]  It was
planned to be "broadly market[ed]" to "foreign pension funds and
investment funds with US equities."[250]

Project Gemini initially provided "dividend enhancements" to a
Luxembourg mutual fund controlled by Merrill called Merrill Lynch
International Investment Fund (MLIIF), which was already executing
the proposed stock loan transaction "with several of Merrill Lynch's
competitors."[251]  The Project then expanded to service other funds and
institutions.  The Project utilized an offshore corporation in the Isle of
Jersey called Merrill Lynch Equity Solutions Jersey Ltd. (MLESJ).  An

---

[245] Merrill Lynch presentation, "Global Financing Products Group" (Spring 2006), Bates No.
ML-PSI-0123-53.

[246] Id. at 141.

[247] Id. at 145.

[248] Id. at 147.

[249] Merrill Lynch presentation by its Global Markets & Investment Banking Group, "SSPC:
Discussion Materials[:] Project Gemini" (Aug. 4, 2005), Bates No. ML-PSI-0300-18, at 302.

[250] Id.

[251] Id.  In its presentation, Merrill described MLIIF as a SICAV fund incorporated in
Luxembourg, having only non-U.S. investors, and whose investments were managed by Merrill
Lynch.  SICAV stands for Societe d'Investissement à Capital Variable, "a Luxembourg based
public limited liability company whose capital is at any time equal to the net value of its assets."
Merrill wrote that, in 2005, MLIIF had "approximately $28 billion of assets, with roughly 25%
invested in US equities." It indicated that these U.S. securities were subject to a 30% dividend
tax. Id. at 305.

173

70

initial presentation on the Project explained that the proposed transaction involved: "[a] stock loan from MLIIF to a newly formed Jersey Island entity, a subsidiary of ML Group, Inc." and "[a] series of derivative transactions executed with the market by the Jersey entity and MLI to hedge ML market risk."[252] It then provided a series of charts explaining the transaction.

The presentation stated: "Summary of US Tax Analysis[:]  No payments into or between Merrill Lynch affiliates (MLI and [MLESJ]) will be subject to withholding tax.  Payments to MLIFF under the stock loan will not be subject to withholding tax."[253]  A subsequent page in the presentation estimated that the Gemini Project would protect about $72 million in annual U.S. dividends sent to Merrill clients from $21.6 million in U.S. dividend taxes, while bringing in a net economic benefit to Merrill Lynch of about $9.6 million.[254]

Project Gemini was approved by Merrill's product review committees in August 2005, and stock loan transactions began taking place in November of that year.  A month beforehand, in October 2005, an "Operating Plan" was drawn up.  The Plan began by observing: "Project Gemini is a structured transaction designed to provide yield enhancement to non-US clients of Merrill Lynch that own US dividend-paying equities.  From the client's perspective, the transaction involves a market standard stock loan to a subsidiary of Merrill Lynch [MLESJ]."[255]  The Operating Plan also stated:

> "The structure may impose some US tax risk on ML.  To manage any potential risk, ML has established a cap on the transaction which focuses on our economic return relative to potential tax risk. … Clients may not be offered enhancement of greater than 50% of potential US withholding taxes without approval. …  Several of our competitors offer similar products (most notably Morgan Stanley, Lehman Brothers, and many non-US banks) so many natural candidates for the transaction are already being serviced and may command pricing concessions (State Street, BGI). … The success of Project Gemini and our ability to achieve target economics relies on ML's superior reach and breadth of

---

[252] Id. at 302.

[253] Id. at 313.

[254] Id. at 317.

[255] Merrill Lynch document entitled, "Project Gemini Operating Plan as of October 11, 2005" (Oct. 11, 2005), Bates No. ML-PSI-00049447-53.

174

relationships relative to our competitors. Ideal candidates are likely to include SICAVs and Irish mutual fund companies."[256]

Following up on the Operating Plan's tax risk analysis, a Gemini Project review one month later disclosed that Merrill had, in fact, established a tax risk limit for the program: "Annual trading limit initially established at first to be reached of (a) $50 million annual gross withholding tax elimination, and (b) $25 million net withholding tax (=gross withholding tax less MLESJ fees). Limits will be reviewed after one year."[257]

In mid-November 2005, Merrill's Americas Equity Derivatives Sales & Structured Marketing Group conducted a review of its new product and trade development and prepared a presentation. The presentation noted that the Gemini Project had begun executing its "yield enhancement program" on November 15, and projected that it would obtain 2006 revenues of $10 million and 2007 revenues of up to $20 million.[258] In the meantime, the group noted that, even without the Gemini Project, during 2005, it had executed 18 transactions, of which 15 were "dividend yield enhancement."[259] It noted that these transactions involved "9 hedge funds, 1 bank, 1 mutual fund, 1 personal holding company."[260] It also observed that "[m]aturation of on-shore and off-shore hedge fund space creates large pool of high-volume clients focused on sophisticated tax and other structured products as a new asset class."[261]

For about two years, from late 2005 until late 2007, Project Gemini conducted stock loan transactions for non-U.S. clients to reduce their U.S. dividend taxes. In early 2008, after the Subcommittee had began this investigation and contacted several financial institutions and hedge funds, Merrill Lynch decided to suspend the Project and its transactions, as explained in this email sent by a Merrill employee to a client informing the client of the decision:

---

[256] Id.

[257] Merrill Lynch document entitled, "GMI New Product Review" (Oct. 25, 2005), Bates No. ML-PSI-0319-56, at 37.

[258] Merrill Lynch document entitled, "New Product & Trade Development," prepared by the Americas Equity Derivatives Sales & Structured Marketing Group (Nov. 17, 2005), Bates No. ML-PSI-00047439-43, at 40.

[259] Id.

[260] Id.

[261] Id.

175

72

> "Many thanks for meeting with us early on today on short notice.
> As explained verbally, as a result of the actions by the US Senate's
> Permanent Subcommittee on Investigations our Jersey entity
> (Merrill Lynch Equity Solutions Jersey or MLESJ) has had to
> cease trading in regards its stock lending activities for US stocks.
> As a result of this we are seeking to have the Lender recall the
> securities in line with the wording as set forth below. ... Our
> opinion is that as the securities lending business of MLESJ
> undertaken in these Agreements has been materially restricted ...
> the clause therefore requires the Lender to recall all outstanding
> loans, for the borrower to return all loaned securities and for the
> Agreement to terminate."[262]

Merrill Lynch informed the Subcommittee that Project Gemini
remains on suspension, although a decision could be made at some
future time to renew its operation.

**Tax Indemnity.** While Merrill Lynch was providing stock loan
transactions under Project Gemini, several of its clients, apparently
worried about the tax risk, asked the firm to indemnify them against U.S.
tax liability associated with the transaction.

For example, in 2007, Olayan Group, an investment firm based in
Saudi Arabia, but with a New York office, expressed concerns about the
potential tax risks posed by Gemini and asked Merrill Lynch to provide
it with a tax indemnification agreement. On March 29, 2007, a Merrill
marketing executive sent the requested language:

> "[S]orry this has taken so long to get to you - as a follow up to our
> meeting and our 'gemini' product that can enhance the effective
> dividend you get on physically held US stocks (like OXY), here is
> our standard 'indemnity' language that you were looking for -
> please review it and let me know your thoughts. if i'm doing my
> math right, i think this can save you around $7 million per year on
> OXY."[263]

The language provided:

> "[A]ll payments under this Agreement shall be made on the due
> date without any withholding or deduction whatsoever unless

---

[262] Email from Hamish Pritchard, Merrill Lynch in London, to Chris Poikonen and Mark Wilson,
eSecLending, a securities lending manager, with copies to two Merrill colleagues, Exclusive
Lending Agreements – Janus Capital and Foreign & Colonial (Jan. 17, 2008), Bates No. ML-
PSI-00001261-62 (original email).

[263] Email from Brian Abdoo, Merrill Lynch's Multi-Product Marketing group, to John O.
Wolcott, Olayan's New York office, FW: crescent/olayan follow up (Mar. 29, 2007), Bates No.
ML-PSI-00127174-76 (original email).

176

73

required by law on account of tax. If any deduction or withholding
on account of tax is required by law to be made from any payment
... then the payor shall pay in the same manner and at the same
time such additional amounts as would result in the receipt by the
payee, free from any such withholding or deduction, such amounts
as would have been received by the payee had no such deduction
or withholding been required to be made and shall at the same time
supply tax vouchers in respect of the same if requested."[264]

The potential client responded that its contact at a prominent U.S.
law firm, Shearman & Sterling, "report that they are apparently satisfied
that the transaction works. Once. Or maybe twice, but not necessarily
in succession, the reason being that repeated 'abuse' (my hyperbolic
word, not theirs) without a non-tax related business purpose would
quickly lead the IRS to such conclusion."[265] The Merrill employee
responded: "who did you talk to at sherman? i'm pretty sure that we
can get them comfortable, perhaps with a few modifications. They've
represented some of our other counterparties doing this trade with us."[266]

The client replied that its legal contact "has talked to a number of
his partners, all of whom tell him that the transaction works, as I said,
once, maybe twice because repeated use, coincidentally around dividend
payment time, would provide a strong case for the IRS to assert tax
evasion. So yes, looking at it in a vacuum, it works, it is the repeated
'overuse', e.g. pigs trying to be hogs, that proves problematic."[267]

After Merrill responded that "something is being
miscommunicated here somewhere," the client suggested that Merrill
have its lawyers talk to his, explaining that his legal contact "has
cautioned us that converting the JPM dividend to nontaxable ordinary
income lending the shares just long enough to cover the record dates
quarter after quarter does not [work]. And perhaps other clients are less

---

[264] Id.

[265] Email from John O. Wolcott, Olayan's New York office, to Brian Abdoo, Merrill Lynch's
Multi-Product Marketing group, RE: crescent/olayan follow up (Mar. 29, 2007), Bates No. ML-
PSI-00127174-76 (second email).

[266] Email from Brian Abdoo, Merrill Lynch's Multi-Product Marketing group, to John O.
Wolcott, Olayan's New York office, RE: crescent/olayan follow up (Apr. 19, 2007), Bates No.
ML-PSI-00127174-76 (third email).

[267] Email from John O. Wolcott, Olayan's New York office, to Brian Abdoo, Merrill Lynch's
Multi-Product Marketing group, RE: crescent/olayan follow up (Apr. 19, 2007), Bates No. ML-
PSI-00127174-76 (fourth email).

177

74

concerned about playing the audit lottery than are we."[268] A stock loan was never undertaken.

During the same time period, Merrill Lynch was also talking to another client, Goldman Sachs Asset Management (GSAM), the offshore hedge fund management arm of Goldman Sachs, that also had requested tax indemnity. In January 2007, Merrill Lynch had proposed that GSAM enter into a Project Gemini stock loan transaction with its Jersey subsidiary, MLESJ.[269] Before agreeing to do so, GSAM asked Merrill Lynch provide it with an indemnity agreement to protect it against any U.S. tax liability.[270] Merrill Lynch and GSAM then negotiated over the wording of the proposed agreement for the next three months.[271]

The provisions under discussion, which appear to have been written initially by GSAM, would have required Merrill, as borrower of the stock in question, to "fully comply with all applicable United States income tax withholding obligations if any," and state that Merrill will be "liable for and will fully indemnify the Lender for any United States tax liability, including any interest, penalties or additions to tax … with respect to any failure to withhold and timely pay to the U.S. Internal Revenue Service any United States withholding tax imposed on any substitute payments made to the Lender." Other provisions would have required GSAM, as the lender of the stock, to notify Merrill within 30 days of receiving any claim from the U.S. Government for withholding taxes; give Merrill the right to take over the defense against any IRS claim for taxes; and refuse to agree to any tax settlement without Merrill's written consent. Merrill also proposed a clause that would have prohibited GSAM from "consulting with U.S. governmental officials" without Merrill's consent, but GSAM stated that it could not agree to it.[272]

By May 2007, one GSAM employee told another that "it seems ML is re-evaluating the viability of this product. … I don't think this is

[268] Email from John O. Wolcott, Olayan's New York office, to Brian Abdoo, Merrill Lynch's Multi-Product Marketing group, RE: crescent/olayan follow up (Apr. 20, 2007), Bates No. ML-PSI-00127174 (sixth email).

[269] See Merrill Lynch presentation entitled, "Enhanced Stock Lending Over US Equities[:] GSAM" (Jan. 30, 2007), Bates Nos. GS-PSI-002397-2401.

[270] See email from Karl Wianecki, GSAM, to several GSAM colleagues, FW: Basic flows for US (Feb. 15, 2007), Bates No. GS-PSI-002396; Subcommittee interview with GSAM (Aug. 29, 2008).

[271] Emails between Merrill Lynch and GSAM personnel, RE: US stock lending to MLESJ (from Feb. 16 to May 15, 2007), Bates Nos. GS-PSI-002513-22 and GS-PSI-05768-78.

[272] Id. at GS-PSI-05775.

178

75

going to happen."[273] On May 15, Merrill Lynch announced to GSAM
that its tax department and business personnel had completed work on:

> "a standardized indemnity that we can offer in relation to these
> transactions going forward. Attached is a mark up showing how
> this changes from what we had been discussing. Note that we can
> accept no substantive changes to this. Apologies for the timing
> being during our negotiation, however this has been an ongoing
> project on our side. We look forward to discussing this with you
> and hope that it is acceptable."[274]

Apparently, however, the new proposal was not acceptable to GSAM,
and for that and other reasons, no stock loan transaction was
concluded.[275]

**Lost Tax Revenue.** The evidence associated with Merrill's
dividend tax transactions indicates that these transactions likely
produced substantial tax losses for the U.S. treasury. For example,
Merrill's internal presentation on Project Gemini projected that, each
year the program was in effect, the stock loans would enable Merrill
clients to avoid paying about $21.6 million in taxes on $72 million in
U.S. dividends.[276] Merrill established an even higher dollar-value limit
on the annual tax risk that could be incurred by the program, setting it at
the first to be reached of: "$50 million annual gross withholding tax
elimination" or "$25 million net withholding tax (+gross withholding
tax less [Merrill] fees)." A member of Merrill's Multi-Product
Marketing group told an offshore hedge fund client in 2007, that the
Gemini stock loan program could save it about $7 million in dividend
taxes per year on a single U.S. security.[277] These documents show that
Merrill expected its stock loan program to result in $20 to $50 million in
lost tax revenues for the United States each year. The program was
actually in operation for about two years, before being suspended in
January 2008.

---

[273] Email from Karl Wianecki to Cary Chropuvka, both of GSAM, RE: US stock lending to
MLESJ (May 3, 2007), Bates No. GS-PSI-05768–79, at 71.

[274] Email from Graham Seaton, Merrill Lynch, to Rachel Birnbaum, GSAM, with copies to other
Merrill Lynch and GSAM employees, RE: US stock lending to MLESJ (May 15, 2007), Bates
No. GS-PSI-002513.

[275] Subcommittee interviews with Merrill Lynch (Sept. 2, 2008) and GSAM (Aug. 29, 2008).

[276] Merrill Lynch presentation by its Global Markets & Investment Banking Group, "SSPC
Discussion Materials[:] Project Gemini" (Aug. 4, 2005), Bates No. ML-PSI-0300-18.

[277] Email from Brian Abdoo, Merrill Lynch's Multi-Product Marketing group, to John O.
Wolcott, Olayan's New York office, FW: crescent/olayan follow up (Mar. 29, 2007), Bates No.
ML-PSI-00127174-76 (original email).

179

76

Merrill's other dividend enhancement products also caused tax losses. In 2004, for example, its Microsoft swap and option transactions resulted in over $18.5 million in dividend taxes not being withheld or remitted to the IRS.[278] As mentioned earlier, from 2003 to 2005, Merrill conducted swap transactions with Citigroup that involved $23 million in dividend equivalent payments and about $3.4 million in unpaid dividend taxes.[279] Another client, Maverick Capital, calculated that, in just two years, from 2006 to 2007, Merrill had enabled its offshore hedge funds to escape paying dividend taxes totaling nearly $5 million.[280] Those figures indicate that Merrill's swap transactions were capable of producing millions of dollars in annual tax "savings" for each of its clients and an equivalent annual tax losses for the U.S. Government.

These multi-million-dollar totals, $21.6 million, $7 million, $18.5 million, $3.4 million and $5 million, which involve a limited portion of Merrill's dividend enhancement business, show that, in just four years, its transactions caused the U.S. treasury to lose out on tens of millions of dollars in unpaid dividend taxes.

Merrill Lynch has engaged in abusive dividend tax transactions, including stock swaps, loans, and options, for at least four years. These transactions became an established and profitable part of its business. The documents show that Merrill Lynch designed, marketed, and implemented these abusive transactions to enable its non-U.S. clients to dodge payment of U.S. dividend taxes, that Merrill Lynch personnel were well aware of the associated tax risk, and that Merrill Lynch took specific steps to limit its tax exposure. It was apparently only after this investigation launched an inquiry into these matters that Merrill Lynch decided to suspend one type of abusive dividend tax transaction, involving its Project Gemini stock loans.

### F. Citigroup Case History

#### 1. Background

Citigroup Inc. ("Citi") is one of the largest financial institutions formed and headquartered in the United States, with assets that, at the end of 2007, exceeded $2.18 trillion.[281] Citi currently operates in about

---

[278] Merrill Lynch document entitled, "Microsoft Counterparties" (undated), Bates No. ML-PSI-0485.

[279] Citigroup untitled chart prepared for the IRS listing swap transactions from 2003 to 2005 (undated), Bates No. CITI_PSIWHTAX001460. See also discussion of Citigroup case history.

[280] Maverick Funds charts entitled, "U.S. Dividend Enhancements" and "Summary of Domestic Enhancements (by broker)" (Dec. 31, 2007), Bates No. MAV0000856-57.

[281] Citigroup Inc., 2007 Annual Report at 66.

77

100 countries, employs over 385,000 individuals worldwide, and is organized into four major segments, Global Consumer Group, Citi Markets and Banking, Global Wealth Management, and Citi Alternative Investments.[282]  In fiscal year 2007, Citi reported a net income of $3.6 billion.[283]  Citi's current Chief Executive Officer is Vikram Pandit.[284]

### 2. Dividend Tax Abusive Transactions

This final case history presents a unique fact pattern in which, in 2007, Citi took the initiative to pay the IRS $24 million in withholding taxes on certain swap transactions that Citi had undertaken from 2003 to 2005, tied to U.S. stocks for which $160 million in dividend equivalents had been paid but no dividend taxes had been originally withheld.

Citi apparently began engaging in what it termed "dividend uplift" transactions in 2002.[285]  In a 2006 letter to the New York Stock Exchange, Citi explained that its Equity Finance Desk in New York, which dealt primarily with broker-dealers and hedge funds, had begun to engage in transactions "dedicated to achieving 'dividend uplift' for foreign customers in respect of U.S. equities ... with the most significant activity occurring in 2004 and early 2005."[286]  Citi described these transactions as follows:

> "U.S. tax rules provide that dividend equivalent amounts paid to a foreign investor under a derivative contract are not subject to withholding tax.  By contrast, actual dividends on U.S. equities are subject to U.S. withholding tax.  In the dividend uplift trades, CGML – Citigroup's U.K. broker/dealer – would acquire a U.S. equity security from an offshore fund or dealer (via a transaction between that entity and Citigroup Global Markets, Inc. ('CGMI')) and enter into a total return swap ('TRS') with that entity.  At the termination of the TRS, the offshore entity would in many instances reacquire the equities.  In exchange for a LIBOR-based return, CGML paid dividend equivalent amounts to the offshore entity under the TRS, and treated those amounts as paid on a bona fide derivative contract, rather than as a pass-through of dividends on stock held in a custodial-type capacity.  This treatment allowed the payments to be made free of the U.S. withholding taxes that

---

[282] Id. at 2. Note: Employment figure includes both full-time and part-time employees.

[283] See id. at 3.

[284] Id. at 4.

[285] See Letter from Citigroup to the New York Stock Exchange (Feb. 1, 2006) and attachments, Bates No. CITI_PSIWHTAX000738-43, at 739.

[286] Id.

181

78

would otherwise have been due to be withheld on dividends paid to the offshore entity. …

"Customers executing TRSs with the Desk frequently sell the underlying securities to the Desk at the beginning of the TRSs and then wish to reacquire the securities at the termination of the TRS, without any execution or other risk. However, if at the time the TRS was entered into the customer and the Desk had an understanding that at termination of the TRS the securities would be sold (directly or indirectly) back to the customer, the TRS may be recharacterized for tax purposes as a financing transaction, and the customer as the continuing owner of the securities. In that case, Citigroup … may be obligated to the IRS or another tax authority for payment of tax that should have been withheld on payments of dividends or dividend equivalent amounts. …

"Citigroup's Tax Department promulgated transaction guidelines for TRSs on U.S. equities in order to minimize the risk that such transactions would be recharacterized as financings and subsequently lose their intended tax benefits. The risk is mitigated principally by minimizing the chances that the underlying equities would be crossed back to customers. …

"[The Citigroup] Desk engaged in transactions in 2004 and 2005 in which it purchased U.S. … equities directly from customers … and then resold the equities back to the customers upon termination of the TRSs, either directly or through interdealer brokers."[287]

This letter shows that Citi knowingly used total return swaps to enable its offshore clients to dodge U.S. taxes on their stock dividends. The letter also makes it clear that, as part of its dividend uplift transactions, Citi often took physical possession of the shares of stock that were the subject of the swap, and then returned the shares to the client after the swap ended, in violation of its own stated policies. The letter shows that Citi was aware that this practice could lead to a determination that the client never really gave up ownership of the stock during the swap transaction, that Citi was really engaged in a stock loan, and that the real purpose of the transaction was to enable Citi to pass through stock dividend payments to the client tax free. The letter explains that, to avoid this outcome, Citi had promulgated transaction guidelines which consisted principally of telling its employees not to return stock to a client after a dividend uplift swap concluded.

---

[287] Id. at 739-740.

182

79

Despite these guidelines, Citi employees on the Equity Finance Desk apparently let clients know that Citi would re-deliver stock to them at the end of a dividend uplift swap. This practice was apparently uncovered after Citi's Internal Audit Department raised questions about whether certain dividend uplift swaps being conducted by the Equity Finance Desk complied with Citi's tax guidelines. That audit led to an investigation by outside counsel[288] which led, in turn, to Citi's deciding to disclose certain swap transactions to the IRS and offer to pay withholding tax on the dividend equivalent payments that had been provided to clients. The IRS, after receiving the disclosure from Citi, required the bank to provide additional information about the identified swaps and analyze other transactions as well.

**Citi Analysis.** Citi told the IRS that "extensive interviews" conducted in connection with its investigation had led it to conclude that "as to some total return swap transactions, there was an apparent understanding at the inception of the trade that the shares would effectively be delivered back to the counterparty at the termination of the trade through the use of a large volume market-on-close order, a direct cross to the counterparty, or an effective sale to the counterparty by way of an inter-dealer broker."[289] Citi said that two employees on its Equity Finance business unit were responsible for those "understandings" and had been subjected to "disciplinary action" as a result.[290]

Citi told the IRS that, because of the prior understanding that Citi would re-deliver purchased shares to a client at the close of the swap transaction, Citi had determined that those swaps could be recharacterized as stock repurchase agreements or securities loans,[291] and withholding tax could be assessed with respect to the dividend equivalent amounts that had been paid under the swaps.[292] Citi also noted that these transactions "were not in full compliance with" its Tax

---

[288] According to Citigroup representatives, the investigation examined all total return swaps entered into during the 2003-2005 time period and involving U.S. dividend-paying securities and non-U.S. parties.

[289] Citigroup memorandum to the IRS, "IRS Withholding Tax Examination (2003-2005): Total Return Swaps over US Equities" (June 14, 2007), Bates No. CITI_PSIWHTAX001208-29 (hereinafter "Citi Memorandum to IRS"), at 1209-10.

[290] Id. at 1210. Another document indicates that the disciplinary action taken with respect to one of the Citi employees was to suspend him from his position for two months. See Letter from Citigroup to the New York Stock Exchange (Feb. 1, 2006) and attachments, Bates No. CITI_PSIWHTAX000738-43, at 741.

[291] Citi Memorandum to IRS, at 1210.

[292] Id. at 1208.

183

80

Policy Guidelines, which had been designed to ensure that its equity
swaps would not incur these types of taxes.[293]

Citi told the IRS that all of the swaps in question had been
executed by its broker-dealers in the United Kingdom, which meant that
the applicable dividend withholding tax rate was 15%.[294]  After applying
this 15% rate to the $160 million in dividend payments, Citi paid the
IRS withholding taxes totaling $24 million.

While Citi's payment of withholding taxes to the IRS could be
viewed as an admission of wrongdoing, Citi states in its memorandum to
the IRS that it had "decided to pay US withholding tax on the dividend
equivalent amounts that had been paid under the transactions, even
though the tax liability was uncertain."[295]

**Excluded Transactions.**  While Citi took the initiative to pay
withholding taxes for certain equity swaps, Citi declined to take the
same action with respect to other swap transactions  identified in its
review as exhibiting troubling practices.  The transactions, most of
which were transacted with hedge funds, were conducted through Citi's
Equity Finance business unit and generated dividends of $239 million.
Citi's rational for not paying withholding on those transactions was that
there was no apparent understanding at the inception of the trade that the
counterparty would seek return of the shares at the termination of the
swap:

> "The Equity Finance transactions for which Citi did not pay
> withholding taxes included those transactions where it was
> unclear at the inception of the trade whether the counterparty
> would seek delivery of the shares back at the termination of
> the trade and, accordingly, there was generally no apparent
> understanding at the inception of the trade regarding possible
> re-delivery of the shares upon termination. These transactions
> involved approximately $239M of dividends, and were not
> executed with UK broker-dealers. Interviews indicated that
> most of these transactions were executed with hedge funds.
> Typically, the hedge funds were more interested in synthetic
> exposure, rather than delivery and re-delivery of shares."[296]

---

[293] Id. at 1209.  Citi's "Tax Policy Guidelines for Total Return Swaps on US Equities" (Dec. 1,
2003) can be found at 1214.

[294] Id. at 1210.

[295] Id.

[296] Id. at 1211.

184

81

However, many of those transactions included activities that raise concerns and are identified as "Red Flags" in this Report:

> "As noted in Citi's letter dated March 2, 2007, however, the transactions on which no withholding taxes were paid did include: (1) transactions where Citi purchased shares from the swap counterparty at inception of the swap and sold shares to the counterparty upon termination of the swap, (2) transactions where Citi purchased shares from and/or sold shares to an IDB, and (3) transactions where Citi purchased shares on an exchange (including shares purchased pursuant to market-on-close orders) at inception of the swap and/or sold shares on an exchange (including shares sold pursuant to market-on-close orders) upon termination of the swap. However, as stated above, there was generally no apparent understanding at the inception of the swap to deliver shares back to the counterparty at the termination of the trade."[297]

Citi also declined to pay withholding tax on equity swaps which had been conducted by its Equity Derivatives business unit and were tied to U.S. stock that paid another $36 million in dividends. Citi told the IRS that it had decided not to pay withholding taxes for these swaps because the transactions were "not clustered around dividend record dates" or "generally did not appear to involve an understanding regarding delivery of the shares back to the counterparty at the inception of the trades." [298]

Finally, Citi told the IRS that it was not identifying any transactions involving "security lending transactions, even though Citigroup also engaged in such transactions, because we believe these other transactions are not the focus of your present examination."[299] Evidence uncovered by the Subcommittee indicates, however, that stock loan transactions have been used by U.S. financial institutions on many occasions to enable clients to dodge payment of U.S. dividend taxes.

In August 2007, Citi reported to the IRS that it had identified additional transactions that had been conducted by its Derivatives Unit in which dividends had been paid but no taxes withheld. They consisted of 15 trades, all involving Microsoft stock, which had generated $5.7 million in dividends.[300]

---

[297] Id.

[298] Id.

[299] Letter from Citigroup to the IRS (Feb. 20, 2007), Bates No. CITI_PSIWHTAX001336-39, at 1337.

[300] Letter from Citigroup to the IRS (Aug. 24, 2007), Bates No. CITI_PSIWHTAX001455-56.

185

82

**Case History Implications.** The Citi case history is significant for at least three reasons. First, it provides additional evidence related to the amount of tax revenues lost due to nonpayment of dividend taxes. For a three-year period, 2003 to 2005, Citi acknowledged entering into equity swaps with non-U.S. clients tied to stock that paid dividends totaling about $440 million.[301] Normally, $440 million in dividends paid to non-U.S. persons would generate $50 million or more in dividend taxes depending upon whether the 15% or 30% dividend rate applied, but in these swap transactions, no dividend taxes were originally withheld on the ground that the taxable dividends had been transformed into tax-free dividend equivalents. Citi's $24 million payment to the IRS reflected its judgment that some of the dividend equivalent payments made to clients should have been treated as taxable dividends. This total would have been higher if some of the dividend equivalent payments made in connection with some of the other troubling swaps were also subjected to withholding. The total would also have been higher had the analysis included consideration of Citi's stock loan transactions.

The Citi case history is also significant because it shows how commonplace dividend enhancement products have become. In conducting analysis for the IRS, Citi examined over 6,000 total return swap transactions from 2003 to 2005, involving U.S. dividend-paying securities and non-U.S. clients.[302] Of those 6,000 swaps, Citi subsequently paid withholding taxes on about 1,350. Citi also admitted participating in stock loan transactions tied to U.S. dividend-paying stock, but did not specify the total number of stock loans or the total amount of dividends or substitute dividend payments involved.[303] Together, the Citi documents indicate that swaps and stock loan transactions tied to dividend-paying stock are in routine use across Citi business units, are popular with clients, and serve as potential vehicles for dividend tax abuse.

---

[301] This $440 million figure is derived from four figures supplied by Citi to the IRS: $160 million in dividends paid on stocks for which Citi issued equity swaps and decided to pay withholding taxes; $239 million in dividends paid on stocks for which Citi issued equity swaps and bought and returned stock to its clients but declined to pay withholding taxes; $36 million in dividends paid on additional equity swaps conducted by its Equity Derivatives business unit and for which Citi declined to pay withholding taxes; and $5.7 million in dividend-related payments in swap transaction related to the Microsoft special dividend.

[302] See, e.g., Form 4564 filed by Citigroup with the IRS, (Nov. 19, 2007), Bates No. CITI_PSIWHTAX001625-26 (stating Citi paid withholding tax on 1,352 total return swaps, but not on 4,720 other total return swaps); Memorandum from Citigroup to the IRS (Mar. 21, 2007), Bates No. CITI_PSIWHTAX001340-80; Memorandum from Citigroup to the IRS (Aug. 24, 2007), Bates No. CITI_PSIWHTAX001455-56.

[303] Letter from Citigroup to the IRS (Feb. 20, 2007), Bates No. CITI_PSIWHTAX001336-39, at 1337.

186

83

Finally, the Citi case history makes it clear that U.S. financial institutions are aware of the tax risks associated with their participation in transactions tied to dividend-paying stock. In this instance, Citi developed tax policy guidelines in 2003 for total return swaps tied to U.S. stock because it wanted "to ensure that Citi's transactions did not come anywhere remotely close" to transactions that could be characterized as stock repurchase agreements or securities loans.[304] Citi's Internal Audit Department chose to conduct a review of the bank's equity swaps and found many that failed to comply with Citi's tax policy. Citi then performed a detailed analysis of those swaps and determined that the facts were so troubling for certain swaps involving $160 million in dividend payments, that the better course of action was for Citi to pay $24 million in withholding taxes to the IRS.

## IV.   U.S. GOVERNMENT RESPONSE TO ABUSIVE DIVIDEND TAX TRANSACTIONS

The six case histories examined in this Report show that abusive dividend tax transactions first began to appear in the United States in the 1990s, and gradually expanded over the next ten years to multiple U.S. financial institutions and offshore entities. Milestones included the 1991 Treasury rule making swap payments to non-U.S. persons tax free; the 1997 IRS Notice which gave rise to new abusive stock loan transactions; the 2003 lowering of the individual U.S. dividend tax rate which encouraged U.S. firms to issue more dividends; the 2004 Microsoft special dividend which led to a burst of abusive transactions; and the development of financial instruments with features designed to disguise their objective of enabling offshore hedge funds and others to dodge U.S. dividend taxes. Using names like "dividend enhancement," "yield enhancement," and "dividend uplift," abusive dividend tax transactions have become commonplace among U.S. financial institutions and offshore clients, and continue to this day.

Many of the documents obtained by the Subcommittee show that the participating U.S. financial institutions and offshore hedge funds were well aware of the tax risks associated with their dividend-related transactions and took actions to limit their tax exposure. Some set annual monetary limits on the amount of unpaid dividends that could be associated with their transactions. Some clients obtained tax indemnity agreements. Tax experts wrote articles highlighting the problem of abusive dividend tax transactions.

---

[303] Citi Memorandum to IRS, at 1212.

187

84

Despite the pervasiveness of the problem over the last ten years, the U.S. Government has done little to stop the use of abusive dividend tax transactions. In 1997, the IRS promised to issue guidance on "how substitute dividend payments made by one foreign person to another foreign person are to be treated," but never did.

Due to their inaction on the issue of offshore dividend tax abuse, U.S. Treasury and the IRS have failed to send the signals needed to curb the development, marketing, and implementation of "dividend enhancement" transactions aimed at enabling clients to avoid payment of U.S. dividend taxes. Until U.S. Treasury and the IRS make their position known, in writing and through enforcement actions, that dividend enhancement transactions are impermissible, U.S. financial institutions will continue to offer these transactions, dividends will continue to be paid offshore under the guise of tax-free swap payments and substitute dividends, and offshore holders of U.S. securities will continue to dodge paying their fair share of taxes, leaving ordinary Americans to shoulder the U.S. tax burden.

The U.S. Treasury and the IRS can and should do more to enforce current law. First, the IRS should complete its pending review of dividend-related transactions and take civil enforcement action against delinquent taxpayers and the U.S. financial institutions that have participated in stock swap and loan transactions aimed at dodging U.S. taxes on stock dividends.

Second, to stop misuse of stock loan transactions to dodge U.S. dividend taxes, the IRS should issue a new regulation on the tax treatment of substitute dividend payments between foreign parties to make clear that inserting an offshore entity into a stock loan transaction does not eliminate U.S. tax withholding obligations.

Third, to stop misuse of equity swap transactions to dodge U.S. dividend taxes, the IRS should issue a new regulation to make dividend equivalent payments under equity swap transactions taxable to the same extent as U.S. stock dividends.

Fourth, Congress should do its part by enacting legislation making it clear that non-U.S. persons cannot avoid U.S. dividend taxes by using a swap or stock loan to disguise dividend payments. This legislation should end the abuse by eliminating the different tax rules for U.S. stock dividends, dividend equivalents, and substitute dividend payments, and making them all equally taxable in the same way as dividends. Like the U.S. Treasury and the IRS, Congress has not sent a clear signal that these abusive transactions distort the law, were never intended by the tax code, and have robbed the U.S. Treasury of tax revenues totaling billions

188

85

of dollars. Enactment of clarifying legislation would send a clear signal that abusive dividend tax transactions are unacceptable, strengthen the enforcement authority of the IRS, and help put an end to this particular offshore tax abuse.

## V.    ADDITIONAL MINORITY STAFF VIEWS ON THE REPORT

The factual findings presented in this bipartisan report are compelling and raise valid concerns that demonstrate the need to reevaluate the wisdom and effectiveness of certain tax laws and policies respecting the treatment of specific equity swap and loan transactions. The Subcommittee's investigation has revealed that, under specific facts and circumstances, a subset of such transactions may result in inappropriate non-payment of U.S. dividend taxes. We recognize that, for a foreign investor, there is a significant difference in the U.S. withholding tax consequences between investing synthetically through an equity swap versus investing directly in physical, U.S. equities and that this difference in treatment has led to certain abuses. There is no doubt that some institutions, in certain transactions, have pushed the tax-avoidance envelope too aggressively.

We believe, however, that articulating specific legislative or regulatory responses to these abuses requires a more comprehensive and in-depth analysis than this Report provides. Experts on tax law and policy are better equipped than we to arrive at an appropriate response. In light of the Subcommittee's findings, those experts, the relevant Executive Branch agencies, and the Congressional committees of jurisdiction should engage in a deliberative process to evaluate the various possible responses and determine the most appropriate path.

Therefore, we join with the Majority in this analysis insofar as it identifies and diagnoses the problem. We strongly urge, however, that any response to these abuses be clearly defined and carefully targeted to preserve the integrity and efficiency of our capital markets, prevent negative impact on foreign investment in the United States, and avoid unintended consequences.

# # #

189



How Offshore Entities Dodge Taxes on U.S. Stock Dividends:  Swaps

Hedge Fund
(Offshore)

Swap

Financial Institution

Hedge Fund
Investment Manager
(U.S.)

Senator Carl Levin

Permanent Subcommittee on Investigations
EXHIBIT #1

190

| From: | veronica.willhew@ubs.com |
|---|---|
| Sent: | Monday, November 01, 2004 12:41 PM |
| To: | Michael.Madalo@ubs.com; Mark.Nesee@ubs.com |
| Subject: | FW: Dividend Enhancement Flow |
| Importance: | High |
| Attachments: | Dividend Enhancement.doc |

Dividend
ancement.doc (26 I

Permanent Subcommittee on Investigations
EXHIBIT #2

UBS 000509

191

**Dividend Enhancement**

For US securities paying dividends, the IRS requires a 30% withholding tax be levied against offshore entities. This means that a Cayman entity such as Maverick Fund LDC would only receive 70% value on their US dividends. UBS offers a product known as "Dividend Enhancement", whereby Maverick LDC is able to realize a greater portion of their dividends, and pay an amount less than 100% of a dividend, if they are short a security. It works on the basis that UBS can get more favorable treatment than an offshore entity and thus can put the following arrangement in place, whereby UBS passes an enhanced amount back to the client. The OSLA executed between Maverick LDC and UBS Cayman Ltd governs the lending and borrowing of securities between the 2 Cayman entities, and allows the lender to be freed from paying additional withholding. The steps are as follows:

*Process*

1) UBS Cayman borrows the US stock from Maverick Fund LDC.
2) UBS Cayman executes a total return swap with UBS AG, whereby Cayman are 'long' the returns.
3) UBS Cayman sell the stock to UBS AG London in order for UBS AG London to hedge the swap.
4) UBS AG London creates a long basket trade (is swap firms), including the security that it received from UBS Cayman.
5) UBS AG London still the physical stock to the swap counterpart, as the other side of the swap transaction UBS AG London then receive returns on the swap, including 100% of the dividends value (as a part of the swap transaction), on the stock received from UBS Cayman.
6) UBS AG London returns 90% of the value of the dividend to UBS Cayman, that is done by way of a commission, to reflect 90% value of such dividend.
7) UBS Cayman passes the 90% dividend payment onto Maverick Fund LDC.

NOTE: The rationale for a Cayman registered entity to lend the applicable securities to UBS Cayman is due to IRS Note 97-66, which states that where lending is conducted between two entities in the same jurisdiction, the (foreign ie foreign) payment of the 'net dividend' will not be subject to US withholding tax. If a Cayman entity simply lent the stock to UBS London, for instance, that sub dividend, dice back 1 the Cayman entity, would be subject to US withholding tax. The sub dividend in this instance is the dividend that gets passed to the lender, as opposed to the true dividend that is paid to the holder of record. This note was issued by the IRS in 1997, and Paine Webber received an opinion, from external counsel, Cahill Gordon, that no US withholding would be applicable, hence the introduction of the Paine Webber Cayman branch, and Dividend Enhancement as a product.

At the expiration of the transaction UBS AG London purchases the stock, in the market, in the name of UBS Cayman. The stock is then returned to Maverick Fund LDC, and the transaction is closed.

The trade is executed ex-dividend date, and the loan stays open for a minimum of 30 days, and a maximum of 45 days. Generally however these transactions have 30-day maturities. The stock borrow is done at 100%, i.e. there is no margining or haircutting of the cash or securities, and UBS Cayman gives 100% of the cash value to Maverick is collateral on these trades.

*Mark to Market & Thresholds*

The Client Integration Team monitor the value of the securities borrowed against the loan, and may call or pay collateral on the basis of a $5.5 million collateral threshold. This limit was approved at the inception of this business, by CRC within UBS Financial Services, formerly PaineWebber. All stock loan exposures are reported on and monitored within the Credit Engine system.

The UBS Swaps both between UBS AG London and UBS Cayman as well as the one between UBS AG London and the street counterparts, are booked in WISDOM, which feeds GERONIMO. It should be noted that the swaps parts of this transaction are not exposure to Maverick, and thus are not seen within the credit systems. Rather they are UBS internal and external transactions enabling us to facilitate Maverick's requirements.

*UBS Group – Approvals*

This product was approved by the UBSW Executive Committee in March 2002 and Group Tax in May 2002.

An Overseas Securities Lending Agreement ('OSLA') needs to be executed for this product, between Maverick LDC and UBS Cayman Ltd. Also, tax approval is required for this product when it is first approved for any given client. However all trades thereafter are subject to a blanket approval.

The majority of dividend enhancement transactions are done with Maverick LDC, while occasionally a trade will be done with Maverick II. Limits and exposures are monitored in the PaineWebber Cayman module of the Credit Engine. For LDC, Volume exposure amounts to CHF 758 mio while risk exposure is CHF 95 mio as of Apr 21, 2004. These transactions take place over dividend payment period, which is quarterly in the US, and typically last for one month and a few days. The tenor of the trade is short, and exposure usually drops significantly after the first month. Below are lending risk and volume limits are recommended to cover the dividend enhancement trades:

**Confidential Treatment Requested**

UBS 000510

*Legal Opinion*

*Alternative Transactions*

It could be argued that a swap provides the same benefit in that the returns, to a client, will include the dividend value; therefore what would the rationale be for entering into the aforementioned convoluted structure? A Total Return Swap can often be used, and indeed is. However if a fund has underlying investors they may suffer capital gains ('CGT') consequences, if the underlying stock is sold, a Total Return Swap cannot be used. To examine the Swap, the stock needs to be sold as a hedge, thus the sale may attract CGT, possibly negating the dividend withholding gain. For this reason, many Cayman based funds use the Dividend Enhancement trades, versus Swaps, to achieve these benefits.

**Confidential Treatment
Requested**          **UBS 000511**

193

April 22, 1999                                          **DRAFT – AS OF 4/26/99**

To:    Maverick Fund, LDC File
       Maverick Fund II, Ltd. File

From:  Keith Hennington

### Dividend Enhancement Transactions

Maverick is the advisor for several offshore funds that are having taxes withheld on dividends received from United States companies. Morgan Stanley has approached us about entering into stock loan agreements that would minimize the adverse effects of U.S. withholding.

**Stock Loan**

Our Cayman Islands funds would enter into a stock loan on each U.S. security that is scheduled to pay a dividend. We would loan the security to a Cayman Morgan Stanley entity. They would pay us an amount equal to 70% of the dividend paid on that security (dividend entitlement). They would also pay us a stock loan fee equal to 13% of the dividend. This stock loan fee is negotiable. The end result would be that we would receive 83% of the dividend instead of the normal 70%. Morgan will then enter into a swap with a U.S. counterparty. They are taking the position that all payments under the swap are not subject to withholding. This removes the dividend from the U.S. without subjecting it to any withholding.

U.S. withholding taxes on dividend entitlement

Morgan is relying on Notice 97-66 to avoid withholding on the dividend entitlement. The premise of this Notice is that withholding is required on substitute dividend payments between foreign entities only if the foreign payor's U.S. withholding tax rate is lower than the payee's U.S. withholding tax rate. Since both the payor and payee in our transaction are Cayman entities subject to the same rate, there is presumably no withholding on the payment. This notice is designed to ensure that the appropriate U.S. tax is withheld but that it is only withheld once.

Notice 97-66 addresses a situation where all links in a chain of transactions are securities loans. It does not address a situation where one of the links is a swap. As mentioned above, this Notice assumes there is withholding at some point in the chain. It specifically states that "to the extent a foreign-to-foreign securities loan or sale-repurchase transaction would reduce U.S. withholding tax, an incremental amount of U.S. withholding tax is imposed on the substitute payment." When compared to a direct loan to a U.S. entity, this transaction reduces the U.S. withholding tax. However, we could argue that the swap

Permanent Subcommittee on Investigations
**EXHIBIT #3**

MAV0001082
CONFIDENTIAL

194

does not reduce the U.S. withholding because there would be no withholding if we had done the swap directly with a U.S. counterparty. Assuming the swap is not subject to withholding, the Service has not been harmed by the additional step of a foreign-to-foreign securities loan. The Notice appears to disregard the foreign-to-foreign loan when determining if U.S. withholding has been reduced because it states that "no withholding tax is required in situations where transactions are entered into between residents of the same country." It is the swap and not the loan that reduces the U.S. withholding so the exposure lies with that transaction, not the foreign to foreign loan.

Under this analysis, the foreign lender of the securities appears to have very little U.S. tax exposure. Even if there were exposure, the Service would look to the U.S. withholding agent for the payment of the withholding instead of the foreign lender. The withholding structure was set up to provide a means of collecting U.S. tax without involving the foreign entity ultimately liable for the tax. I am more worried about limiting Morgan's ability to come to us for reimbursement of the tax if the Service later rules that withholding should have taken place at some point in the chain. Their right to reimbursement is part of our contractual arrangement with them and should be clearly addressed in any written agreement with them. I think the attorneys should review any agreements we enter into on this transaction. I doubt the standard loan documentation will address the tax issues related to this transaction. Side letters may be required.

<u>U.S. withholding on stock loan fee</u>

The stock loan fee will be paid from one foreign entity to another. This fee should not be U.S. source income unless it is somehow classified as a substitute dividend payment. Once again, if the analysis above is correct, the stock loan should not create substitute dividends

<u>Source of income</u>

The dividend entitlement will be U.S. source since the security is a U.S. security. The stock loan fee should be a foreign source income since both the payor and payee are foreign.

**Total Return Swaps**

I will get several quotes on the cost of entering into swaps. I have talked to Paine Webber and Deutsche Bank. They are estimating that we would receive approximately 93% of dividends after expenses of the swap. They are sending us more detailed information. It sounded like the swaps would be much more difficult to manage and we would lose some of the flexibility we would have with the stock loan transaction. I plan to focus on the stock loan transaction unless we feel there is too much tax exposure. The additional 10% enhancement is probably not worth the additional administrative burden at this point.

MAV0001083
CONFIDENTIAL

195

December 12, 2006

Description of Dividend Enhancement Transactions

Maverick is the advisor for several offshore funds that currently participate in stock lending transactions. One of the benefits of these transactions is that U.S. and Foreign tax withholding may be reduced. The details of a typical U.S. dividend enhancement transaction are described below.

(1) Cayman Islands hedge fund ("Fund") lends U.S. security to a Cayman Islands prime broker ("PB") pursuant to a conventional securities lending agreement. The loan occurs prior to the dividend record date.

(2) PB posts equity collateral in exchange for the security. The term of the loan is flexible but historically has been greater than 30 days for domestic enhancements. Beginning in 2006, Fund began using a different PB for domestic enhancements and, consequently, the majority of its new securities loans have had a term less than 30 days. The security may be recalled at any time for regular settlement. Early recall may result in a fee payable by Fund.

(3) PB typically enters into an equity swap with a U.S. counterparty, but has no contractual obligation with Fund to do so. PB takes the position that all payments received in connection with the swap are not subject to U.S. tax withholding.

(4) At the end of the term, PB pays a fee to Fund equal to a percentage of the dividend. The fee is negotiable and has historically been in the neighborhood of 85% to 97% of the dividend.

Maverick began using the dividend enhancement transaction in 1999. During that time, Maverick has done this transaction with Morgan Stanley, UBS, Lehman, Merrill Lynch, and ING.

U.S. Tax Implications of Enhancement Transactions

Maverick and its PB's currently rely on IRS Notice 97-66 to avoid withholding on its dividend enhancement transactions. The premise of the notice is that withholding is required on substitute dividend payments between foreign entities only if the foreign payor's U.S. withholding tax rate is lower than the payee's U.S. withholding tax rate. Since both the payor and the payee in our transaction are Cayman entities subject to the same withholding rate, there is presumably no withholding on the payment from PB to Fund. This notice is designed to ensure that the appropriate U.S. tax is withheld but that it is only withheld once.

It should be noted that Notice 97-66 addresses a situation where all links in a chain of transactions are securities loans. It does not address a situation where one of the links is a swap. As mentioned above, Notice 97-66 assumes there is withholding at some point in the chain. It specifically states that "to the extent a foreign-to-foreign securities loan or sale-repurchase transaction would reduce U.S. withholding tax, an incremental amount of U.S. withholding tax is imposed on the substitute payment." When compared to a direct loan to a U.S. entity, this transaction reduces the U.S. withholding tax. However, Fund could choose to enter into a swap with a U.S. counterparty and avoid U.S. tax withholding. Under Regulation section §1.863-7(b)(1), "the source of notional principal contract income shall be determined by reference to the

Permanent Subcommittee on Investigations
EXHIBIT #4

MAV0001071
CONFIDENTIAL

196

December 12, 2006

residence of the taxpayer" who is the direct recipient of the income. Therefore, periodic or non-periodic payments received by a foreign person are not subject to U.S. withholding tax as long as the foreign person is not otherwise engaged in a U.S. trade or business. Consequently, Fund's use of a securities loan transaction does not reduce the U.S. tax withholding in this situation because there would have been no withholding if Maverick had entered into the swap directly with a U.S. counterparty. Assuming the swap income is not subject to U.S. withholding tax, the Service has not been harmed by the additional step of a foreign-to-foreign securities loan.

Notice 97-66 appears to disregard the foreign-to-foreign loan when determining if U.S. withholding has been reduced because it states that "no withholding tax is required in situations where transactions are entered into between residents of the same country." It is the swap transaction and not the loan that reduces the U.S. withholding tax so the exposure lies with that transaction, not the foreign-to-foreign loan. In fact, Maverick's research indicates that the Service has considered whether the scope of the proposed regulations should apply to dividend equivalent payments made in connection with notional principal contracts, such as an equity index swap structured to replicate the cash flows that would arise from an installment purchase of one or more equity securities. Perhaps one reason the Service has not acted on this matter is because notional principal contracts typically settle on a net basis and, consequently, there would be a possibility that any applicable withholding tax (calculated on a gross income basis) could exceed the net economic benefit that the transaction would ultimately yield.

Since PB is a foreign party, the stock loan fee received from PB will not be U.S. source income. If the analysis above is correct, the stock loan should not create substitute dividends.

Foreign Tax Implications of Enhancement Transactions

Maverick has also entered into transactions similar to that described above to enhance foreign dividends. Foreign enhancements have not historically been as large as those on the domestic side. Tax laws in each applicable foreign jurisdiction can warrant slight adjustments to the transaction described above but the same general structure is utilized. The obvious difference between a U.S. and Foreign enhancement is that the PB would not need to be a Cayman entity. Also, depending on the jurisdiction, the PB could opt to use a back-to-back stock loan rather than the swap transaction to achieve the desired tax result in that jurisdiction.

Maverick has worked with outside counsel to determine that its dividend enhancement procedures would more likely than not be upheld in the various foreign jurisdictions in which Maverick held securities.

Conclusion

Maverick has concluded that the position described above has a greater than 50% chance of being sustained were it to be reviewed by the Service. There could be some business risk associated with the transaction if it is ever determined that there should have been U.S. tax withholding on the swap transaction presumably entered into by PB. If that were to occur, the PB might be able to seek reimbursement from the funds pursuant to the contractual agreement in place with them at that time.

MAV0001072
CONFIDENTIAL

197

Maverick Capital
**Dividend Enhancement Transactions Memo**
6/30/05

**Domestic Securities - Long**

This memo is being written to document our understanding of the dividend enhancement transactions that Maverick Fund II, Ltd. and Maverick Fund LDC (the funds) participate in with Paine Webber-London (PW).

**Purpose**

Dividend enhancement on long securities is designed to gross up the funds' dividends received from U.S. based companies by transferring the shares owned in the funds to PW, a U.S. based entity, therefore causing there to be no dividend withholding taxes.

**Transaction**

When a U.S. based company, in which the funds own shares, declares a dividend the funds lend their shares to PW in exchange for collateral, which is defined by the agreement to be cash, U.S. treasuries, or a letter of credit in an amount equal to at least 100% of the market value of the securities lent.

A loan is initiated approximately 3 days before the ex-dividend date, allowing time for the transaction to settle and the shares to be registered to PW before the dividend ex-date, and is terminated approximately 30 days after the payment of the dividend. Upon termination of the loan agreement, the shares and the dividend are returned to the funds and the funds return the collateral to PW.

It is also noted that at anytime during this loan period Maverick may still sell the position that is on loan, the only consequence of this sell would be that PW would charge a larger percentage of the dividend for the facilitation of this transaction.

*Example of a dividend enhancement transaction and applicable entries:*

January 1, 2005 the funds purchase 10,000 shares of IBM at $100/share with 50% of the purchase on margin at 5% interest. January 6, 2005 IBM declares a $1/share cash dividend with an ex-dividend date of January 15, 2005.

**Purchase date entry:**

| | | |
|---|---|---|
| DR. Investment in IBM | $1,000,000 | |
| CR. Cash | | $500,000 |
| CR. Margin Debt | | $500,000 |

**Transfer Date, January 10, 2005:**

- Client does not make an entry on their books to account for the transfer of shares to PW, however the client surrenders the 10,000 shares to PW and PW remits to the client $1,000,000.

Permanent Subcommittee on Investigations
**EXHIBIT #5**

MAV0002059
CONFIDENTIAL

198

- *Note that Maverick still has a $500,000 margin loan from PW at this time and therefore is still accruing interest expense.*

- *Note that Maverick still has control of the investment and can sell the investment before the return of the shares but would incur a larger charge from PW.*

**Date of return of shares, February 15, 2005:**

- Client does not make an entry on their books for the return of the shares, but makes the following entry for revenues from dividend:

| | |
|---|---|
| DR. Cash | $9,000 |
| CR. Dividend revenue | $7,000 |
| CR. Int. Income – Stock loan | $2,000 |

- *Note that this entry is to achieve the recognition of income from both the dividend declared by the U.S. company and the interest income on the stock loan netted against an approximate 10% transaction charge by PW.*

**Accounting Treatment**

Currently, Maverick is including the shares exchanged with PW related to these transactions in their share register causing the applicable cash held to be classified as securities:



**Domestic Securities – Short**

Dividend enhancement on short securities held in Fund II and LDC is designed to decrease the amount of dividends paid on short domestic securities from 100% to 97%. Maverick transfers cash to PW, a U.S. based entity, to cover its short position, which results in a dividend enhancement receivable balance during the enhancement period. As is the case for long securities enhanced, Maverick makes no changes to its cash or position balances during the enhancement period. Rather, a receivable is booked at month end.

MAV0002060
CONFIDENTIAL

199

Upon completion of the enhancement period (generally 2 –4 weeks), PW returns the cash collateral to Maverick and the short position to Maverick's brokerage account.

**Foreign Securities**
Dividend enhancements on foreign securities are handled by Lehman Brothers (LB). When a foreign security is enhanced, Maverick lends the security to LB and receives cash collateral equal to the market value of the security. Upon completion of the enhancement period, the % of dividend paid to Maverick depends upon the circumstances surrounding the transaction such as demand for the security. LB returns the securities to Maverick and Maverick pays the cash collateral to LB. LB then pays Maverick the dividend less fees.

MAV0002061
CONFIDENTIAL

200

# CN=Keith Hennington/O=Maverick

From:      CN=Keith Hennington/O=Maverick
Sent:      11/11/2004 11:37:00 AM
To:        CN=Shari Robertson/O=Maverick@maverickcap
Subject:     Re: Fw: Microsoft strategy on capturing the $3.00 dividend for non-US holders only.

agree - Joe, Jim, and I looked at alternatives on this a couple of weeks ago.
Joe and Jim found the best deal through stock loan. We also thought any
special transactions on large dividends might stand out and the IRS might start
looking at any transactions in MSFT. Stock loan seemed like the more
conservative approach.

Shari Robertson/Maverick
11/11/2004 10:01 AM

To
Keith Hennington/Maverick@maverickcap
cc

Subject
Fw: Microsoft strategy on capturing the $3.00 dividend for non-US holders only.

******************************************************************************
******************************************************************
The information contained in this e-mail message is intended only for the
personal and confidential use of the recipient(s) named above. This message
may be an attorney-client communication and as such is privileged and
confidential. If the reader of this message is not the intended recipient or
an agent responsible for delivering it to the intended recipient, you are
hereby notified that you have received this document in error and that any
review, dissemination, distribution, or copying if this message is strictly
prohibited. If you have received this communication in error, please notify us
immediately by e-mail, and delete the original message.
******************************************************************************
******************************************************************
----- Forwarded by Shari Robertson/Maverick on 11/11/2004 10:01 AM -----

Joseph Manogue/Maverick
11/11/2004 10:00 AM

To
Shari Robertson/Maverick@maverickcap
cc
Jim Chen/Maverick@maverickcap
Subject
Fw: Microsoft strategy on capturing the $3.00 dividend for non-US holders only.

Permanent Subcommittee on Investigations
**EXHIBIT #6**

MAV0003248
CONFIDENTIAL

201

The strategy forwarded to you requires we sell our stock and buy call options and get 93% of the dividend.

Jim has been working on this for the last 2 months and he got UBS to match the more aggressive offers we were getting from the Street. For LDC only - we lent the stock out and will get 97% of the dividend.
—— Forwarded by Joseph Manogue/Maverick on 11/11/2004 09:56 AM ——

Shari Robertson/Maverick
11/11/2004 09:49 AM

To
Joseph Manogue/Maverick@maverickcap
cc

Subject
Fw: Microsoft strategy on capturing the $3.00 dividend for non-US holders only,

—— Forwarded by Shari Robertson/Maverick on 11/11/2004 09:49 AM ——

mboucher@CandW.ky
11/11/2004 09:11 AM

To
shari.robertson@maverickcap.com
cc

Subject
Fw: Microsoft strategy on capturing the $3.00 dividend for non-US holders only,

just passing this along...., let me know if the attachments make it, if not I'll resend it later when I get back in the office

"Blair Gauld" <bgauld@queensgate.com.ky> wrote:

> Hi Michelle,
>
> Nick Walker contacted me this morning after he had noted that Maverick holds a
> significant amount of Microsoft shares and that Microsoft had just declared a
> large dividend. He has a strategy that he has used in the past to avoid a
> large part of the withholding tax associated with US dividends. He asked me to

MAV0003249
CONFIDENTIAL

202

> forward the attached memo to you which describes the strategy and hopes that
> you can forward it to the appropriate person at Maverick. Below is an
e-mail
> from Alberto Muro, from York Stockbrokers, and attached is a short memo from
> Nick describing the strategy. Alberto's e-mail address is below if anyone
is
> interested in discussing the strategy with him or Nick..
>
> Regards,
>
> Blair
>
>
> -----Original Message-----
> From: Alberto Muro [mailto:muro@lotusconsult.com]
> Sent: 04/11/2004 11:59 AM
> To: Blair Gauld
> Subject: Microsoft strategy on capturing the $3.00 dividend for non-US
holders
> only.
>
>
> Hi Blair,
>
> Please find attached a strategy developed by us for non-US clients to avoid
> withholding on the big dividend payout that Microsoft is paying soon.
> If you have any Offshore Fund that you know , please show to them and if
they
> can do this trade thru us will be appreciated.
> Best Rdgs,
> Alberto.
>

This mail sent using CandW.ky Webmail - http://webmail.candw.ky
<MSFT .doc was removed>

MAV0003250
CONFIDENTIAL

203

# CN=Chad Chisolm/O=Maverick

| | |
|---|---|
| **From:** | CN=Chad Chisolm/O=Maverick |
| **Sent:** | 6/1/2007 4:31:59 PM |
| **To:** | CN=Jeffrey Liggitt/O=Maverick@maverickcap |
| **Subject:** | Fw: FIN 48 Tax Positions - DRAFT memos |

fyi

—— Forwarded by Chad Chisolm/Maverick on 06/01/2007 03:31 PM ——

debra.taylor@ey.com
06/01/2007 03:27 PM

To
Chad.Chisolm@maverickcap.com
cc
joseph.bianco@ey.com
Subject
Re: Fw: FIN 48 Tax Positions - DRAFT memos

Chad,

We'll look into this and get back to you at the beginning of the week.

Debra F. Taylor
International Tax Consulting
NY Financial Services Office
212-773-2978 Phone
866-244-5265 Fax
debra.taylor@ey.com

Chad.Chisolm@maverickcap.com
06/01/2007 03:57 PM

To
joseph.bianco@ey.com
cc
debra.taylor@ey.com
Subject
Re: Fw: FIN 48 Tax Positions - DRAFT memos

Permanent Subcommittee on Investigations
**EXHIBIT #7**

MAV0001115
CONFIDENTIAL

204

Joe:

Now that 6/15 is approaching, we are considering whether we need to go ahead and remit the 2006 income tax withholding that we accrued for FIN 48 purposes in connection with the stock loan fee income earned during 2006. Recall that Goldman withholds U.S. taxes on these transactions but our other brokers typically do not. We determined in December that we should probably accrue these taxes even though nothing is actually withheld by our other brokers. We will need to address whether or not to pay these taxes for pre-2006 years whenever we file protective returns for those years. As for the 2006 tax year, we will likely be filing a return for each of our foreign funds (extension due 6/15) that is treated as a corporation for U.S. tax purposes. My question to you is how/if we should remit these taxes given that the brokers did not deem these as subject to withholding and thus did not provide a 1042S to these entities.

We need to know what to do very soon as the 6/15 deadline is approaching.

Thanks.

joseph.bianco@ey.com

joseph.bianco@ey.com
12/22/2006 01:35 PM


To

keith.hennington@maverickcap.com


cc

Chad_Chisolm@maverickcap.com, keith_hennington@maverickcap.com, michelle.perrin@maverickcap.com, steven.menna@ey.com, Suzanne.Guthrie@maverickcap.com, Vahan.Zerounian@ey.com


Subject

Re: Fw: FIN 48 Tax Positions - DRAFT memos


I think that with that we should be good for 2006 - no need to talk further if interest, penalties, foreign issue turn out immaterial as you believe. Can follow up re 2007 after New Year. If we need to discuss next week - try me on

Redacted by the Permanent Subcommittee on Investigations

MAV0001116
CONFIDENTIAL

205

Happy holidays to everyone.

Regards,
Joe

Joseph Bianco
212-773-3807 - direct
212-773-7142 - fax
866-241-8999 - efax
joseph.bianco@ey.com - email
keith.hennington@maverickcap.com
12/22/2006 02:21 PM

To
joseph.bianco@ey.com
cc
Chad_Chisolm@maverickcap.com, keith_hennington@maverickcap.com,
steven.menna@ey.com, Vahan.Zerounian@ey.com, michelle.perrin@maverickcap.com,
Suzanne.Guthrie@maverickcap.com
Subject
Re: Fw: FIN 48 Tax Positions - DRAFT memos

Joe,

My main concern is that we have a firm agreement by the end of next week on how
to treat these transactions in the 2006 financials. As Steve will tell you we
like to have those things nailed down before the actual audit takes place. To
the extent that we need to have a call to discuss I am available at any time
next week. Here is where I think we are at this point.

Borrow fee - I agree with Matt's points and will do the following:

For 2006 - We will also compute interest and penalties on the amount we have
accrued. I doubt it will be material but if it is then we should add to the
liability. We will compute this by Wednesday of next week.

For 2007 - We should analyze the possibility of paying the liability that we
have already accrued and withholding on future payments.

Stock loan transaction

For 2006 - It appears that we are in agreement that we have met the 50%
threshold (at least for US securities). I don't want to assume too much so can
you confirm that EY is in agreement with that conclusion.

I believe that the foreign transactions are immaterial but we can quantify the
amount next week as well.

For 2007 - I would be interested to hear how Matt's analysis differs from ours.

MAV0001117
CONFIDENTIAL

206

We might also incorporate his views into our documentation. We will also file
protective returns so that the statute begins.

Thanks,

Keith
joseph.bianco@ey.com

joseph.bianco@ey.com
12/22/2006 08:31 AM

To

steven.menna@ey.com, keith_hennington@maverickcap.com,
Chad_Chisolm@maverickcap.com

cc

Vahan.Zeroumian@ey.com

Subject

Fw: FIN 48 Tax Positions - DRAFT memos

Please see below for comments - let me know if you would like to discuss
further.
Regards,
Joe

Joseph Bianco
212-773-3807 - direct
212-773-7142 - fax
866-241-8999 - efax
joseph.bianco@ey.com - email
—— Forwarded by Joseph Bianco/NewYork/TAX/EYLLP/US on 12/22/2006 09:34 AM
——
Matthew Blum/NATL/TAX/EYLLP/US

12/22/2006 07:10 AM

To
Joseph Bianco/NewYork/TAX/EYLLP/US@EY-NAmerica
cc

MAV0001118
CONFIDENTIAL

207

Debra F. Taylor/NewYork/TAX/EYLLP/US@EY-NAmerica, Howard
Leventhal/Cons/TAX/EYLLP/US@EY-NAmerica, David A.
Golden/National/TAX/EYLLP/US@EY-NAmerica
Subject
Re: Fw: FIN 48 Tax Positions – DRAFT memosLink

Joe,

As to the borrow fee issue, keep in mind that there are two sets of
liabilities: (a) prime broker has to withhold tax (Section 1442), and (b)
Maverick has to pay tax (section 881). Maverick can credit withholding done by
the prime broker against Maverick's own tax liability. If the prime broker
doesn't withhold, and the IRS catches the prime broker, then PERHAPS the prime
broker can go after Maverick for contribution or indemnification -- complex
point if the contract is silent. But if the IRS figures out what is going on,
the IRS can bypass the prime broker and go straight after Maverick for failure
to pay tax imposed under Section 881. The only limit is that the IRS may not
collect the tax twice.
Has Maverick considered filing for the back years to enhance chances of getting
any penalties abated and put the issue to rest? Also, don't we have to think
about interest/penalty accruals for amounts that were not withheld upon, since
if the prime broker didn't withhold, Maverick should have paid?
In other words, Maverick has duly noted the ferocity of the dog, but has not
acknowledged the need to beware of the owner as well.
As to the dividend planning issue, my analysis doesn't work quite the same way,
but I think I come out to the same place on the U.S. side -- I can accept the
client's assertion that > 50% chance of succeeding if transaction properly
structured. We definitely should talk about what we want to see; not being an
auditor, this is rather novel territory to me. As to transactions like this
using foreign securities, I would think, in my naive, non-auditor mindset, that
the first order of business is to determine whether amounts at stake are
material, and, if so, consult foreign colleagues.
Glad to discuss further, although I will leave on vacation tomorrow and not
return until Wednesday, January 10.
Best regards.

Matt Blum
Ernst & Young/International Tax Services
Boston
Phone: (617) 859-6040
Cell: (617) 642-7955
Fax: (866) 211-4729 (U.S. only), (516) 213-8845 (worldwide)
EYCONN: 2636040
Email: matt.blum@ey.com
Administrative assistant: Roslyn Guy (617) 570-8485
Joseph Bianco/NewYork/TAX/EYLLP/US

12/21/2006 07:08 PM

To
Debra F. Taylor/NewYork/TAX/EYLLP/US@EY-NAmerica
cc
Howard Leventhal/Cons/TAX/EYLLP/US@EY-NAmerica, Matthew

MAV0001119
CONFIDENTIAL

208

Blum/NATL/TAX/EYLLP/US@EY-NAmerica
Subject
Fw: FIN 48 Tax Positions - DRAFT memos

Deb:

This is what I have discussed with Maverick re FIN 48 - see attached for their
write-ups. Would love to get your quick toughts - they are looking for general
agreement as soon as possible. I think generally we should be ok getting to
more likely than not on these - please let me know asap if you have any strong
concerns.
Thanks,
Joe

Howard/Matt - curious your general comments as well and wanted to share one
clients documentation around FIN 48 for your thoughts as well.

Joe

Joseph Bianco
212-773-3807 - direct
212-773-7142 - fax
866-241-8999 - efax
Joseph.bianco@ey.com - email
—— Forwarded by Joseph Bianco/NewYork/TAX/EYLLP/US on 12/21/2006 06:55 PM
——

Chad.Chisolm@maverickcap.com

12/13/2006 12:13 PM

To
joseph.bianco@ey.com, steven.merina@ey.com
cc
joseph.tepfer@ey.com, Vahan.Zerounian@ey.com, keith.hennington@maverickcap.com,
michelle.pernia@maverickcap.com, Jeffrey.Liggitt@Maverickcap.com
Subject
FIN 48 Tax Positions - DRAFT memos

Hello,

We have completed draft FIN 48 memorandums summarizing our historical and
prospective positions on the dividend enhancement transaction and the stock
loan fee withholding issue for our offshore funds. Please review at your
earliest convenience as we would like to complete this analysis before the

MAV0001120
CONFIDENTIAL

209

holidays.

Thanks.

(See attached file: Description of Dividend Enhancement Transactions - for EY.doc)(See attached file: Stock Loan Fee - TEFRA Accrual (for FIN 48) - for EY.doc)

C. Chad Chisolm
Maverick Capital
Tax Manager
E-mail: chad_chisolm@maverickcap.com
Phone: 214-880-4064
Fax: 214-880-4159

Any U.S. tax advice contained in the body of this e-mail was not intended or written to be used, and cannot be used, by the recipient for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code or applicable state or local tax law provisions.

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Notice required by law: This e-mail may constitute an advertisement or solicitation under U.S. law, if its primary purpose is to advertise or promote a commercial product or service. You may choose not to receive advertising and promotional messages from Ernst & Young LLP (except for Ernst & Young Online and the ey.com website, which track e-mail preferences through a separate process) at this e-mail address by forwarding this message to no-more-mail@ey.com. If you do so, the sender of this message will be notified promptly. Our principal postal address is 5 Times Square, New York, NY 10036. Thank you. Ernst & Young LLP

<Description of Dividend Enhancement Transactions - for EY.doc was removed>
<Stock Loan Fee - TEFRA Accrual (for FIN 48) - for EY.doc was removed>

Any U.S. tax advice contained in the body of this e-mail was not intended or written to be used, and cannot be used, by the recipient for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code or applicable state or local tax law provisions.

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Notice required by law: This e-mail may constitute an advertisement or solicitation under U.S. law, if its primary purpose is to advertise or promote a commercial product or service. You may choose not to receive advertising and promotional messages from Ernst & Young LLP (except for Ernst & Young Online and the ey.com website, which track e-mail preferences through a separate

MAV0001121
CONFIDENTIAL

210

process) at this e-mail address by forwarding this message to no-more-mail@ey.com. If you do so, the sender of this message will be notified promptly. Our principal postal address is 5 Times Square, New York, NY 10036. Thank you. Ernst & Young LLP

Any U.S. tax advice contained in the body of this e-mail was not intended or written to be used, and cannot be used, by the recipient for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code or applicable state or local tax law provisions.

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Notice required by law: This e-mail may constitute an advertisement or solicitation under U.S. law, if its primary purpose is to advertise or promote a commercial product or service. You may choose not to receive advertising and promotional messages from Ernst & Young LLP (except for Ernst & Young Online and the ey.com website, which track e-mail preferences through a separate process) at this e-mail address by forwarding this message to no-more-mail@ey.com. If you do so, the sender of this message will be notified promptly. Our principal postal address is 5 Times Square, New York, NY 10036. Thank you. Ernst & Young LLP

MAV0001122
CONFIDENTIAL

211

# CN=Jeffrey Liggitt/O=Maverick

From:      CN=Jeffrey Liggitt/O=Maverick
Sent:      2/21/2007 5:01:49 PM
To:        Steve.Bokiess@ey.com
Cc:        Chad.Chisolm@maverickcap.com; "Shaheda Patel" <Shaheda.Patel@ey.com>
Subject:   Re: AMTD Dividend

No, it is from an arrangement with a broker where they hold our shares in their
name when the dividend is paid so they do not have to withhold tax due to
Levered's foreign ownership.


Steve.Bokiess@ey.com
02/21/2007 03:52 PM

To
Jeffrey.Liggitt@Maverickcap.com
cc
Chad.Chisolm@maverickcap.com, "Shaheda Patel" <Shaheda.Patel@ey.com>,
Steve.Bokiess@ey.com
Subject
Re: AMTD Dividend




Are you receiving the "dividend" as a swap payment?

Steven J. Bokiess
Ernst & Young, LLP
Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6301
Phone: 312-879-6560
Fax: 866-751-4482
E-Mail: steve.bokiess@ey.com


Jeffrey.Liggitt@Maverickcap.com
02/21/2007 12:02 PM


To
"Steve Bokiess" <steve.bokiess@ey.com>
cc
"Shaheda Patel" <Shaheda.Patel@ey.com>, Chad.Chisolm@maverickcap.com
Subject
AMTD Dividend

Permanent Subcommittee on Investigations
**EXHIBIT #8**

MAV0001413
CONFIDENTIAL

212

Hello -

We have an issue we wanted to run by you regarding a dividend received in Maverick Fund II, Ltd. (Levered).

In 2006, Levered received a $5 payment from AMTD which was classified as 50% dividend and 50% return of capital based on AMTD's calculations. Levered enhanced this dividend so all it was treated as substitute dividend. We were wondering if you know of any way that we could treat some of the enhanced dividend as return of capital instead of ordinary income (since it was a sub dividend). We have not found anything that would suggest such treatment but it could be quite beneficial from a tax perspective if we could justify a return of capital treatment.

Any thoughts?

Jeffrey Liggitt
Maverick Capital, Ltd.
300 Crescent Court, 18th Floor
Dallas, TX 75201
Phone: (214) 880-4025
Fax: (214) 880-4159

Any U.S. tax advice contained in the body of this e-mail was not intended or written to be used, and cannot be used, by the recipient for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code or applicable state or local tax law provisions.

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Notice required by law: This e-mail may constitute an advertisement or solicitation under U.S. law, if its primary purpose is to advertise or promote a commercial product or service. You may choose not to receive advertising and promotional messages from Ernst & Young LLP (except for Ernst & Young Online and the ey.com website, which track e-mail preferences through a separate process) at this e-mail address by forwarding this message to no-more-mail@ey.com. If you do so, the sender of this message will be notified promptly. Our principal postal address is 5 Times Square, New York, NY 10036. Thank you. Ernst & Young LLP

MAV0001414
CONFIDENTIAL

213

## Domestic Dividend Enhancements

### 1. General

Current domestic dividend enhancements are done at UBS PaineWebber. Stocks are borrowed from our account a few days before the ex-date of the dividend. UBS does a swap on their side with a third party to be held for 30 days. Maverick is able to freely sell the stock during this 30-day period, but any sale made reduces the stock loan interest from 90% of gross dividends to 85%. The 5% reduction is used to cover costs associated with UBS borrowing other shares to cover our sale. **Cost for sales are now the borrow costs of the securities sold (Market value * 40bps * # of days until swap termination / 360).**

### 2. Financing

When UBS borrows stocks set for enhancement, they replace them with cash collateral that is equivalent to the market value of the stocks. A separate spreadsheet is prepared by Leon Garry (212-713-7863) to track the cash collateral per fund. This spreadsheet is also used to calculate the margin interest expense associated with the cash collateral loan.

Leon will need instructions on where to send the collateral funds. **The funds must be sent to an offshore primebroker account to keep this an offshore transaction.** Currently, the options are UBS London (16USD1), Goldman London (17USD1), Lehman Brothers (18USD1), or Barclays Bank (20USD1 – not the Bank of New York instructions). Where to send the collateral depends on actual debit balances versus debit balance goals set on the daily PB report. Some juggling may be needed to keep everyone in a debit balance.

Book the collateral wires as cash transfers from UBS PaineWebber New York even though no cash is sent from there (This creates a rec. item on the cash rec.) The wires are actually sent from UBS Cayman, but since it's a short-term loan and not our money, we just treat it as a rec. item.

The sale of an enhancement stock or a mark to market on the value of the outstanding borrows are the two ways current collateral can change. They are booked on the UBS report as either a partial return (PT RTN COLL PHA) or a mark to market (Mark to MKT C) as shown below. Adjust current dividend rec. items by adding the collateral returned for partial returns, adding the collateral returned for negative marks to market, or by subtracting the additional collateral for positive marks to market. Make sure to adjust the specific rec. line that includes the stock. For instance: "PT RTN COLL PHA" would create an adjustment of positive $55,355.964 to the line rec. item which includes PHA. It would be titled "Dividend enhancements PHA, MO" or something similar. **Make sure to adjust the amount, not type over it.**



Permanent Subcommittee on Investigations

**EXHIBIT #9**

MAV0000837
CONFIDENTIAL

214



### 3. Month-end margin interest accruals.

At each month-end, there is an accrual booked for the cumulated margin interest expense derived from the collateral loan. Leon will email the accruals upon request. Make sure the fed funds open rates used are correct.  Add the cumulated margin interest for all outstanding dividend enhancements. Book the amounts in the following entry in Total return:  IM2.20 IMO

| | | |
|---|---|---|
| 700042 Margin interest expense: | XXXX | |
|     310110 Margin interest payable | | XXXX |

Ref: Margin interest-dvd enhance

Put all the support in the month-end UBS folder.

### 4. Booking dividends.

UBS books two entries when dividends are paid.  The first entry is the margin interest expense labeled "INT PWCAYMAN PHA" in the printout above.  This amount is the total margin interest due for the collateral loan of PHA during the entire holding period.  Leon will send an email for the calculation support.  Remember that part of the interest has already been recorded, so only the portion of new interest should be booked against margin interest expense.  The entry to Total Return includes these parts... the additional margin interest expense, the reversal of the interest payable, and the credit to UBS cash.  The reversal of interest payable will be the amount accrued in the previous month-end.  The amount will be on the interest sheet in the previous month-end UBS cash folder

> **Example**:  IM2.20 IMO – PHA is enhanced and shares are borrowed on 10/15.  From 10/15 to 10/31 interest accrued amounts to $30,000.  On 10/31, $30,000 would be booked in Total Return as a credit to 310110 (margin interest payable) and $30,000 would be booked as a debit to 700042 (margin interest

MAV0000838
CONFIDENTIAL

215

expense). Then on 11/15, the shares and loan are returned and UBS charges us the total margin interest amount of $50,000. $50,000 would be a credit to UBS cash, $30,000 would be a debit to margin interest payable, and $20,000 would be a debit to margin interest expense.

| | |
|---|---|
| 700042 Margin interest expense | 20,000 (additional interest expense not accrued) |
| 310110 Margin interest payable | 30,000 (amount accrued previous month-end) |
| 13USD UBS Cash | 50,000 (total interest expense) |

Ref: PHA marg int exp

The second entry UBS books is labeled "SUB PMT PHA." This amount will either be equal to 90% or 85% of the total gross dividend. 70% of the gross dividend will be booked as a regular dividend ("gross") with zero withholding - no tax was actually withheld) in Total Return. The other transaction in Total Return will be interest on stock loan (600021). The amount booked will either be 15% or 20% of the gross dividend depending if there was a stock sale or not. The two Total Return transactions should add up to the amount UBS pays.

Example: On 10/15, PHA is enhanced with 1,000,000 shares with a gross dividend rate of .10. No shares were sold during the enhancement period. On 11/15, shares are returned and UBS credits our account with $90,000. $70,000 (70% of gross $100,000) would be booked as a regular dividend with no withholding tax. $20,000 (20% of gross $100,000) would be booked as interest on stock loan.

Sometimes not all the shares we hold get enhanced, so there could be a dividend paid outside the enhancement along with the dividend enhancement. In these cases, interest on stock loan is not affected, but the regular dividend entry is modified.

Example: On 10/15, PHA is enhanced with 1,000,000 shares with a gross dividend rate of .10. 100,000 shares were outside of the enhancement on the night before ex-date. On the pay date of the dividend, UBS credits our account $10,000 for the gross dividend and debits our account $3,000 for the tax withholding (assuming LDC, Fund II will have a withholding rate of about 22%.) On 11/15, shares are returned and UBS credits our account with $90,000 (no shares were sold). This time, the regular dividend entry will be different. $80,000 (70% of gross $100,000 plus 100% of gross $10,000) would be booked as a regular dividend with $3,000 withholding tax. The interest on stock loan entry would stay the same...no additional shares were enhanced.

MAV0000839
CONFIDENTIAL

## EXCERPTS FROM UBS DOCUMENTS

"UBS Cayman Ltd. Was formed in 1999 to facilitate long dividend enhancement for the firm's hedge fund clients, and in 2001 added short dividend enhancement services."

UBS Cayman Ltd Capital Request -- Request for Circular GEB Approval
1/23/2004, UBS 000521

"In particular, UBSCL is not licensed, registered or regulated (e.g., by reason of capital adequacy requirements) as a broker/dealer or similar entity in any jurisdiction, cannot access the capital markets except though a broker/dealer, and does not hold itself out as a broker/dealer. UBSCL is not, and does not hold itself out as being, capable of servicing customers (e.g., it does not possess adequate systems or personnel), UBSCL's counterparties do not view themselves as UBSCL's customers, and UBSCL does not have any fiduciary duties to its counterparties. UBSCL does not make markets, possess inventory, or have an established place of business. UBSCL does not hold itself out as a merchant or as willing to enter into either side of securities or derivative trades."

Footnote 4 at page 4 of "technical analysis" prepared, at UBS's request, by
Sullivan & Cromwell LLP and provided to the Internal Revenue Service
[No Date Provided] UBS 000474

Permanent Subcommittee on Investigations
**EXHIBIT #10**

217



From: Ryan, Patrick D [pryan@lehman.com].    Sent:11/1/2004 3:03 PM.
To: [ · ]    Tong, Cindy [cindy.tong@lehman.com].
Cc: [ · ]
Bcc: [ · ]
Subject: Highbridge Utility Fund - Electronic Execution into CFD.

When: Tuesday, November 02, 2004 1:30 PM-2:00 PM (GMT-05:00) Eastern Time
(US & Canada).
Where: PB Conference Room (by PB desk in SE corner of 2nd)

*-*-*-*-*-*-*-*-*-*

Thought it would be useful to get us in a room for 20 mins to discuss the following;

I know there are numerous discussions and work underway with Highbridge around
using Lehman Links for execution on their Utilities Fund.
Since they PB with us, we are also in discussions with them around yield
enhancement on their long positions by using a CFD. This service involves tax risk
for the firm which would be reduced if we can route their electronic trades direct to
CFD instead of their PB account. Think we should get on the same page as to our
separate goals here and see if we can solve for both our issues. Thanks.

Permanent Subcommittee on Investigations
EXHIBIT #11

LBHIPSI00035461

218



From:    Ryan, Patrick D [pryan@lehman.com]    Sent: 11/29/2004 11:45 AM
To: [ - ]    Maynard, Ian [imaynard@lehman.com].
Cc: [ - ]    Ryan, Patrick D [pryan@lehman.com].
Bcc: [ - ].
Subject:  FW: Highbridge LPS Basket.

Hi Ian
According to the email below, the 4 US securities below pay cash divs
but are not subject to withholding since they are classified as hybrid
securities (for tax purposes). That would mean a Cayman holder would not
suffer 30% withholding and would have no incentive to hold the positions
in a synthetic structure. Right now we are holding all of these
securities in an LPS for Highbridge (and they are on Net B/S). Based on
this information I would like to move the positions back to their PB
account but wanted to run it by you to see if I am missing something.
Would hate to do this and find out down the road that HB owe withholding
tax on the dividends.
Would appreciate your thoughts on whether to proceed.
Thx
Paddy


> -----Original Message-----
> From: Murray, Karen
> Sent: Friday, November 26, 2004 9:48 AM
> To: Black, Elizabeth; Baldassano, Matt; Ryan, Patrick D; Taxops
> Subject: RE: Highbridge LPS Basket
>
> Anthony,
>
> The two remaining securities are tax exempt also
>
> Thanks
> Karen
>
> -----Original Message-----
> From: Murray, Karen
> Sent: Thursday, November 25, 2004 5:56 PM
> To: Black, Elizabeth; Baldassano, Matt; Ryan, Patrick D; Taxops
> Subject: RE: Highbridge LPS Basket
>
> Anthony,
>
> 816851208 SEMPRA ENERGY-8.5% PFD this
> pays a cash dividend, but is gross paying so the client will receive
> 100%
> 156700403 CENTURYTEL INC-6.875% PFD
> this pays a cash dividend, we don't see this as gross paying, but i
> will check
> 302571203 FPL GROUP INC FPL GROUP INC CORP UNITS this
> pays a cash dividend, but is gross paying so the client will receive
> 100%

Permanent Subcommittee on Investigations
EXHIBIT #12

LBHIPSI00038060

219

> 370442717 GENERAL MOTORS CORP-6.25% PF this
> pays a cash dividend, we don't see this as gross paying, but I will
> check
> 156700AH9 CENTURYTEL INC CTL 4 3/4 08/01/32
> this is a bond - it pays interest. The client will receive 100%
>
> I'll advise on the two outstanding tomorrow as I need to check this
> with someone in NY
>
> Thanks
> Karen
>
> -----Original Message-----
> From: Black, Elizabeth
> Sent: Thursday, November 25, 2004 3:35 PM
> To: Baldassano, Matt; Ryan, Patrick D; Taxops
> Subject: FW: Highbridge LPS Basket
>
>
> Antony
>
> I have sent this mail to London who will check the cusips and tell you
> if they are seen as interest payments or dividend payments
>
> If dividend payments then their USWT rate on real dividend income
> received is 30%
> If interest paymentes then their USWT rate on real interest income
> received is 0%
>
> Thanks
>
> Liz
>
> -----Original Message-----
> From: Demonte, Anthony V
> Sent: Monday, November 22, 2004 8:30 AM
> To: Black, Elizabeth
> Cc: Ryan, Patrick D; Baldassano, Matt
> Subject: Highbridge LPS Basket
>
> << File: Book1.xls >>
>
> Liz-
> The spreadsheet contains long positions for HB, which we currently buy
> into a swap to enhance their yield for dividends. Can you have a look
> at the top 5 to see if there is any withholding for a Cayman domiciled
> account. We are trying to identify trades where it makes sense to
> leave long positions in their LBIE PB account. Without reducing their
> yield.
> Thanks,
> AD

LBHIPSI00036061

220

**Verna Ramirez**

| | |
|---|---|
| From: | Donna Howe [DHowe@angelogordon.com] |
| Sent: | Wednesday, August 11, 2004 8:34 AM |
| To: | George Fink |
| Cc: | Joseph Weksolblatt |
| Subject: | Re: CFDs |

Hi George

I understand that they settle in cash. However it does not appear that they are booked correctly, nor are they documented correctly. I've got a call into Lehman. We may need to change the way we deal with them.

I'll keep you posted.

Donna

>>> George Fink 8/11/2004 6:33:42 AM >>>
donna:
all cfds settle in cash. a cfd is used to circumvent the tax.

>>> Donna Howe 08/10/04 04:53PM >>>
All,

I see a sycode SLRPRS CFD with Lehman that is booked in TPM as "PS" preferred stock. Obviously this gets booked as a cash instrument. How does it get confirmed? How do we notify Lehman in the trade upload process that this is a CFD rather than a security. I don't see any legal agreements for this. Do they margin us?

Two examples of SLRPRS CFD trades are TRXNUM A4063713 on April 1, 2004 and A4069046 on April 13, 2004 in CVPF

Thanks

Donna

Proprietary & Confidential Information

Permanent Subcommittee on Investigations
**EXHIBIT #13**

ANG-PSI-0001085

221

| From: | Sarah Robertson <SRobertson@angelogordon.com> |
|---|---|
| Sent: | Tuesday, July 18, 2006 8:12 PM (GMT) |
| To: | Michael Swotes <MSwotes@angelogordon.com> |
| Subject: | Notes from last meeting with Anthony Harpel. |

Meeting - February 28, 2006

update mtg with Swotes and Harpel
- team - working well together – can cover more ground -  - ability to go deeper and cover more names –
-event driven/special situations -
less positions -more conviction - evolving more into a stock pickers model

Can look overseas – UK, Germany , Hong Kong ---

-Contracts for Difference -- used mostly in offshore fund -- so we don't have dividend withholding
CFD is probably about 20% of portfolio

**Redacted
by
Permanent Subcommittee
on Investigations**

Proprietary & Confidential Information

Permanent Subcommittee on Investigations
**EXHIBIT #14**

ANG-PSI-0000003

222

| From: | PATRICK RYAN [pryan@lehman.com]. | Sent:12/30/2004 9:12 AM. |
|---|---|---|
| To: [ - ] | STEVE TROMMER [strommer@lehman.com]. | |
| Cc: [ - ] | . | |
| Bcc: [ - ] | . | |
| Subject: | - Bloomberg internal message sent from PATRICK RYAN <pryan@lehman.com>. | |

DO U KNOW WHEN PACEY IS GOING TO SPEAK TO A.G. ABOUT UNWINDING
THE CFD'S INTO PB?
Reply:
i did some more digging, challenged the tax group on their
first answer and it turns out the majority have partial
withholding so need to stay in CFD. TYPICAL !
Reply:
I GUESS THE BIGGER QUESTION IS THEN.. IS PACEY GOING TO TELL
GARY WOLF WE CAN'T PAY 100%
Reply:
dont think he has the nerve to!

Permanent Subcommittee on Investigations
EXHIBIT #15

LBHIPSI00036738

223



| From: | Trommer, Steven [LONDON] [STrommer@lehman.com]. | | Sent: 2/4/2005 8:09 AM |
| To: [ - ] | Baldassano, Matt [Matt.Baldassano@lehman.com]. | | |
| Cc: [ - ] | | | |
| Bcc: [ - ]. | | | |
| Subject | FW: SWAPS FOR ANGELO GORDON. | | |

> -----Original Message-----
> From: Okay, Bevin J
> Sent: Wednesday, May 08, 2002 1:37 PM
> To: Ryan, Patrick D; Story, Richard G
> Cc: Trommer, Steve; Pace, Alan; Dorman, Jeffrey S
> Subject: RE: SWAPS FOR ANGELO GORDON
>
> rich, I agree.....if the positions are for longer term we can pay
> 100%.
> I'd also like to take the short in CFD (if possible) to keep a hedged
> synthetic strategy.
> Going forward, please keep me in the dialog up front as it doesn't
> look good that we offered 92.5% and then
> changed pricing. We will generally pay 100% on synthetics if there is
> a term financing element. Multiple
> dividend % for US stocks confuses the picture as swaps/CFD's are not
> subject to withholding unless the sole purpose of the trade
> is for dividend.
> thanks
> -----Original Message-----
> From: Pace, Alan
> Sent: Wednesday, May 08, 2002 7:18 AM
> To: Okay, Bevin J; Trommer, Steve
> Subject: FW: SWAPS FOR ANGELO GORDON
>
> fyi
>
> -----Original Message-----
> From: Story, Richard G
> Sent: Tuesday, May 07, 2002 10:14 AM
> To: Pace, Alan; Dorman, Jeffrey S
> Subject: RE: SWAPS FOR ANGELO GORDON
>
> I think we have to do this to keep AG's business
> (if the prefs are long-term poans to be held > 3mths , but not for
> short-term trades over RD).
>
> Db have given CQS 100% divs + 55bp financing sprd (so we know that AG
> could get this price also).
> Since AG is today 60bp sprd (L+40, 20bp GC s.loan), its just a case of
> structuring the swaps/CFD's
>
> -----Original Message-----
> From: Pace, Alan

Permanent Subcommittee on Investigations
**EXHIBIT #16**

LBHIPSI00020695

224

> Sent: 07 May 2002 13:51
> To: Story, Richard G; Dorman, Jeffrey S
> Subject: FW: SWAPS FOR ANGELO GORDON
>
> what do you want to do?
>
> -----Original Message-----
> From: Trommer, Steve
> Sent: Monday, May 06, 2002 3:06 PM
> To: Pace, Alan; Ryan, Patrick D
> Subject: SWAPS FOR ANGELO GORDON
>
> Gary Wolf called regarding the swaps that was discussed on his
> pref's.
>
> He said he is being quoted by other brokers on the street 100%
> dividend doing it via a total return swap as opposed to the 92.5% we
> offered
> via CFD..
>
> He said he would be looking to do this on his more long term
> positions as opposed to one's that he knows they will be getting out
> of.
>
> He wants a call back tomorrow either way so he knows how and
> with who to proceed
>
> Steve

LBHIPSI00020696

225

# Equity Finance Yield Enhancement

[auto date]

Permanent Subcommittee on Investigations
**EXHIBIT #17**

LBHIPSI00174963

226

# Yield Enhancement

- The following products are either in the pipeline or in progress:

  - CayCo.
  - LuxCo.
  - DivCo.
  - Basket Transaction

Each item is described below.

[auto date]

LBHIPSI00174964

227

# Yield Enhancement-Cayco.

- CayCo.-an offshore vehicle organized in the Cayman Islands. This entity borrows shares from residents of 70% and 85% countries. These shares are then loaned, sold vs. swap, or sold outright.

- Approval was sought and received during FY03 for a $25million risk limit. This translated into $12million of P&L.

- Risk limit was increased to $50million in FY04. Anticipated P&L is $25million. Due to implementing suggested structural changes we believe overall risk is lower notwithstanding increased risk limit.

- Supplemental CayCo. Business
  - Final approval received this week to have Cayco. loan borrowed shares to 70% countries or sell vs. swap to 85% countries.
  - These transactions have little or no risk. Annual P&L anticipated to be $5-10 million.

[auto date]

228



From:    Ryan, Patrick D [pryan@lehman.com]                        Sent: 7/20/2004 10:03 AM
To: [ - ]    james.thalacker@hcmny.com [james.thalacker@hcmny.com]
Cc: [ - ]
Bcc: [ - ]
Subject:    CFD Presentation.

James
Here is the CFD (Contract for Difference) presentation I was speaking
about.

The Lehman CFD is a unique and simplified version of a Total Return
Equity Swap that gives you all the economic upside/downside (price
movement, dividends and corporate actions) of a security without you
having a physical position in that security. What happens is that Lehman
will buy or short the security on its own books and pass the economics
to you through the CFD, which is booked into your Prime Broker account
along with your physical positions.

The CFD is usually used for yield enhancement purposes (in this case we
hold the physical in a US entity and receive 100% of the dividend which
we pass to you through the CFD, whereas you would only receive 70% if
you physically owned the stock in the Highbridge offshore fund). The CFD
is also used to enable clients to trade UK securities without incurring
the 50bp stamp tax charge (Lehman London does not pay stamp tax since we
are market makers and therefore exempt).

Hope the presentation helps. Let me know if you have any further
questions.

Best regards
Patrick

<<CFD's presentation June 2003.ppt>>

Patrick Ryan
Executive Director
Hedge Fund Services
> LEHMAN BROTHERS
* 212 526 7142
Mob: 917 856 0503
* pryan@lehman.com

Permanent Subcommittee on Investigations
EXHIBIT #18

LBHIPSI00033324

229



Permanent Subcommittee on Investigations
EXHIBIT #19

LBHIPSI00002635

230



LBHI PS0000002634

## 2004 Exposures

| Trade Type | Client Base | Lehman Entities | 100% Dividends in 2004 | WHT to Risk in 2004 | Pricing of Risk | Notes |
|---|---|---|---|---|---|---|
| US Single Stock CFDs | Offshore Hedge Funds | LBIE - CFD LBSF - Hedge | $80mm | $24mm | Pay 100 cents on dollar | Net Balance Sheet $2.5BN |
| US Basket LPS | Offshore Hedge Funds | LBIE - LPS LBSF - Hedge | $50mm | $15mm | Pay 100 cents on dollar | Net Balance Sheet $3.5BN |
| US Single Stock Swaps | On Offshore Banks | LBSF | $5mm | $1mm | Pay 100 cents on dollar | Business halted in 2004 |
| YE Basket Swaps: Flow | Offshore Banks | LB Cayman | $150mm | zero | Pay 66 cents on dollar | Off Balance Sheet: Bond borrows |
| YE Basket Swaps: Prop | Internal | LB Cayman LBF - Swap LBSF - Hedge | $100mm | $10mm | Pay 66 cents on dollar 40% | Off Balance Sheet: Bond Borrows |

LEHMAN BROTHERS

LBHIPS400002535

# 2005 Exposures Extrapolated

| Trade Type | 100% DVD December 2004 | 100% DVD January 2005 | Extrapolated Full Year 2005 | WHT at Risk | Projected DVD Spread Revenues |
|---|---|---|---|---|---|
| US Single Stock CFDs | $2.5mm | $11mm | $110mm | $53mm | $6mm |
| US Basket UPS | $5.5mm | $2.8mm | $50mm | $15mm | $50mm |
| NE Basket Swaps Flow | $10mm | $19mm | $230mm | zero | $18mm |
| NE Basket Swaps - Prop | $5mm | $3mm | $48mm | $12mm | $14.5mm |

Note: Gross Figures/No stocks have been stripped out of the above risk analyses

LEHMAN BROTHERS

LBHI P3105002536

233

# 2005 Individual Client Exposures

| Client | 2 Month 100% DVD | WHT Risk Iberson | WHT Risk Extrapolated | Global 2004 LB Revenue |
|---|---|---|---|---|
| Angelo Gordon | $4.8mn | $1.5mn | $9mn | $12mn |
| Highbridge | $5.95mn | $1.8mn | $10.8mn | $20mn |
| CFM Ventus | $0.5mn | $0.15mn | $0.9mn | $12mn |
| Tykhe | $2mn | $0.6mn | $3.6mn | $2mn |
| CQS | $1.3mn | $0.4mn | $2.4mn | $14mn |
| KBC | $1.9mn | $0.5mn | $3mn | $11mn |
| PHZ Capital | $1.2mn | $0.4mn | $2.4mn | $1mn |
| IMG Triton | $8.5mn | $2.5mn | $15.3mn | $0 (2005 Account) |
| Total Selected | $26.05mn | $7.85mn | $47mn | |

LEHMAN BROTHERS

LBHIPS00002537

234

# Yield Enhancement US Business

- Capacity Restrictions set by US tax at $36mm
- Business projections are significantly below that limit for 2005 ($12mn projected)
- Box only utilised for small notional and low yield. Significant shift away from Proprietary risk announced and 2004/ 2005 projections highlight extent of shift achieved
- Proprietary trades are 3 month plus in duration
- Reserve maintained at 10% of WHT exposure on boxed positions
- Focus on monetised flow
- 4 Counterparties signed with Cayman: Nomura London Branch, ING London Branch ABN London Branch Cater Allen/ London Branch in process of completing with Societe Generale London Branch and Hypovereinsbank London Branch
- IBAL ( Hong Kong parent of LB Cayman)staff transact all aspects of trades with client base
- Stock sourced from offshore funds either directly or through agent lenders
- Risk of Re-categorisation
- QI restrictions
- Triparty agents appointed by LB Cayman to handle collateral movements

LEHMAN BROTHERS

LBHI PS000002934

235



LBHIPS2000002533

236



LBHIPSN00002540

237



| From: | Demonte, Anthony V [ademonte@lehman.com]. | | Sent:9/1/2005 8:00 AM. |
| To: [ - ] | Baldassano, Matt [Matt.Baldassano@lehman.com]; Maynard, Ian [imaynard@lehman.com]; Boraczek, Bob [bob.boraczek@lehman.com]. | | |
| Cc: [ - ] | Demonte, Anthony V [ademonte@lehman.com]. | | |
| Bcc: [ - ] | . | | |
| Subject: | MGIP. | | |

Special Div coming up...There is a shareholder vote on Oct 6th, the special div record date is not announced at the moment.
HB looking for Yield Enhancement on a large position. We would need to do VS a Swap..We can add to a existing LPS. They understand the way we would unwind the Swap. We need to be as competitive as possible.
They are 98 bid away from Lehman, at the very least we need to match.
The Counterpart offering 98 is UBS. Please keep there bid with UBS to yourself as I had to squeeze that information out of HB, they really weren't too comfortable with sharing that information.

HB looking for a answer ASAP

Thanks
AD


Anthony V. DeMonte
Equity Finance, VP
212-526-9025
ademonte@lehman.com

Permanent Subcommittee on Investigations
**EXHIBIT #20**

LBHIPSI00131584

238

| From: | Metaxas, James [jmetaxas@lehman.com]. | Sent:10/25/2004 4:51 PM. |
|---|---|---|
| To: [ -] | Demonte, Anthony V [ademonte@lehman.com]. | |
| Cc: [ - ] .. | | |
| Bcc: [ - ] .. | | |
| Subject: | RE: Trade Confirm .. | |

Got it, thanks again.


Jim


-----Original Message-----
From: Demonte, Anthony V
Sent: Monday, October 25, 2004 4:49 PM
To: Metaxas, James
Subject: RE: Trade Confirm


fyi, the only reason for HB to SWap is for yield enhancement

thx


-----Original Message-----
From: Metaxas, James
Sent: Monday, October 25, 2004 4:49 PM
To: Demonte, Anthony V
Subject: RE: Trade Confirm

Thanks, Anthony.


Jim


-----Original Message-----
From: Demonte, Anthony V
Sent: Monday, October 25, 2004 4:46 PM
To: Metaxas, James
Subject: RE: Trade Confirm


we will trade today, settle on the 28th Record is the 29th ...They are
absolutely looking for the div

thx


-----Original Message-----
From: Metaxas, James
Sent: Monday, October 25, 2004 4:38 PM
To: Demonte, Anthony V

**Permanent Subcommittee on Investigations**
**EXHIBIT #21**

LBHIPSI00110753

239

Subject: RE: Trade Confirm

Anthony -

Are they due the dividends on this as is, or does it have to be a short
settle?

Jim

-----Original Message-----
From: Demonte, Anthony V
Sent: Monday, October 25, 2004 4:19 PM
To: NY EQ Swap MO; Prime Highbridge
Subject: FW: Trade Confirm
Importance: High

all-

I will book a new LPS Smart Ticket to represent HI4

thx

-----Original Message-----
From: Demonte, Anthony V
Sent: Monday, October 25, 2004 4:16 PM
To: Anthony Demonte; Daniel Kryzanowski; Erazo, Christina; 'Jordan,
James'; Matthew Bowen; Michael Meys; NY EQ Swap MO; Prime Highbridge;
Thomas Regozzi
Subject: Trade Confirm
Importance: High

Trade Confirm

LBHIPSI00110754

240

Leh Code

Counter-party

Buy/Sell

Account

Desc

Ticker

Cusip

Qnt

Price

Proceeds

T/D

S/D

Basket

Lehman Swap

Buy from

PB High Bridge UTIL (193)

Alliant energy Corp

LNT

016802108

178,209

$ 25.90

$ 4,615,613.10

LBHIPSI00110755

241



10/25/2004
10/28/2004
HI4

LBHIPSI00110756

242

  LEHMAN BROTHERS    

April 24th, 2001

Maverick Capital
Attn: Sharyl M. Robertson, Partner
300 Crescent Court
Suite 1000
Dallas, TX 75201

Dear Sharyl,

It was a pleasure meeting with you, Michelle and Joe. As follow up to our meeting we are providing the following:

❖ **Credit and Financing**
Over the next two weeks, we propose a review with senior Lehman Brothers credit executives to provide a fuller understanding of Maverick's financial strength. This meeting will help facilitate expanding of credit lines; setting collateral parameters, cross-netting, secured and unsecured financing facilities, and committed notice provisions.

In addition to the above meeting, we also suggest Joe Manogue meet our Treasury group to gain more insight into Lehman's funding process and the Equity Finance funding framework.

❖ **Insurance Wrapper for Prime Brokerage**
Enclosed are official confirmations from Travelers Casualty and Surety (AA Rated) stating that it has fully insured the net equity for LBIE prime brokerage clients. The coverage extends to assets held on behalf of all Lehman Brothers Prime Brokerage clients at all Lehman custodians and sub-custodians. The policy is available for full legal review with our London counsel.

❖ **Prime Plus**
Our Prime Plus product provides U.S. based hedge funds risk based margin lending with all the benefits of traditional prime brokerage including the insurance wrapper for added protection. Competitive products re-class short securities into a principal stock loan which result in recall exposure and non-insured broker dealer credit. Added benefits of Prime Plus include "one account" processing and enhanced margin and interest reporting.

LEHMAN BROTHERS INC.
3 WORLD FINANCIAL CENTER  NEW YORK, NY 10285-0800  212 754-7015

**Permanent Subcommittee on Investigations**
**EXHIBIT #22**

MAV0000794
CONFIDENTIAL

243

❖ **Dividend Enhancement Solutions**
We have a variety of solutions using swap and securities lending vehicles for achieving yield enhancement. We propose Maverick provide us an *Interest List* on a weekly basis for possible enhancement trades which would result in quoted indicative pricing levels.

❖ **Electronic Connectivity**
We would like to demonstrate our new client web-portal Lehmanlive for both Maverick offices in Dallas and New York. Lehmanlive can provide Maverick personnel direct access to all Equity products including research, economics, prime brokerage, and portfolio analytics.

Lehman Brothers also provides electronic trade connectivity via FIX protocol. Maverick can electronically transmit and receive trade information directly from its order management system. We would like to demonstrate this connectivity in conjunction with the above Lehmanlive demonstration.

Our Securities Lending Desk can receive and transmit stock loan files via standard transmission methods. A WEB solution is under development and will be available in July 2001. We would like to discuss the current transmission methods and select the best solution for Maverick.

❖ **Portfolio Management Systems & Prime Brokerage Reporting**
Our head of prime brokerage technology Gareth Quinn will be contacting you regarding the current portfolio management marketplace. Gareth has years of experience with most vendors and will demonstrate the Beauchamp software previously discussed. We will also make available resource expertise with the GENEVA software product.

We have recently developed a new suite of prime brokerage reports for June 5th client delivery. Additional reports including accounting and P&L will be released later this year via GENEVA. We will send you a sample of the new report suite May 1st.

❖ **Lehman Brothers Financials**
Enclosed are Lehman Brothers' 2000 Business and Financial Review and our 2000 Annual Report. Highlights worth noting include:
- Total Stockholders Equity of $8.6bil.
- Total Capital of $43.8bil.
- Total Assets of $225bil.
- Conservative short-term debt profile of only 14% of total debt outstanding (GS @ 57% and MSDW @ 35%)
- Short-term debt to net asset ratio of only 4%
- Highest coverage of "less-liquid" assets in industry of 427% (GS @ 249% and MSDW @ 241%)
- Lowest OTC credit exposure in industry of 100% (GS @ 330% and MSDW @ 111%)

MAV0000795
CONFIDENTIAL

244

❖ **Lehman Brothers Prime Brokerage "Team Maverick"**
   Attached is our dedicated Lehman Brothers Global Prime Brokerage "Team Maverick"
   contact list. The team will customize their coverage specifically to meet Maverick's
   requirements.


We are very pleased to have the opportunity to expand the Maverick Capital/Lehman Brothers
business partnership and will formally present a comprehensive service and price proposal
immediately after the above follow-up items are completed to Maverick's satisfaction. I will call
you in a few days to discuss the above issues and initiate the immediate next steps.



Kindest regards.

**Howard Blechman**
Managing Director
Global Head-Global Prime Brokerage Group


CC:    Joseph M. Manogue
       Maverick Capital
       767 Fifth Avenue, 11th Floor
       New York, NY 10153

ENCLOSURES

MAV0000796
CONFIDENTIAL

245

# Lehman Brothers
*Team Maverick*
**Global Prime Brokerage Group**

| Senior Account Coverage |
| --- |

**Howard Blechman**
*Global Head - Global Prime Brokerage Group*
(212) 526-8645
hblechma@lehman.com

**John Seyda**
*Global Prime Brokerage Sales*
(212) 526-0715
jseyda@lehman.com

**Alan Pace**
*Global Prime Brokerage Sales*
(44) 207-260-3030
apace@lehman.com

| Securities Lending Coverage |
| --- |

**Joe Pagano**
*Primary U.S. Coverage*
(212) 528-0716 / Fax: (212) 526-6182
jpagano@lehman.com

**Steve Trommer**
*U.S. Coverage*
(212) 526-9025 / Fax: (212) 526-6182
strommer@lehman.com

**Patrick Ryan**
*Primary European Coverage*
(44) 207-260-2445
pryan@lehman.com

**Craig Morton**
*European Coverage*
(44) 207-260-2025
cmorton@lehman.com

**David Morris**
*Japan/Asian Coverage*
(813) 5571-7133
dmorris@lehman.com

MAV0000797
CONFIDENTIAL

246

## Global Prime Brokerage - Client Service Coverage

**Jackelyn Day**
*U.S. – Team Leader*
(212) 526-9234
jaday@lehman.com

**Eli Stathatos**
*U.S. – Primary Coverage*
(212) 526-7943
estathat@lehman.com

**Warran Reed**
*Europe – Team Leader*
(44) 207-256-4242
wreed@lehman.com

**Carmen Cox**
*Europe – Primary Coverage*
(44) 207-260-1348
ccox@lehman.com

## Global Prime Brokerage - Client Technology Coverage

**Gareth Quinn**
*Global Prime Brokerage Client Technology - London*
(44) 207-260-1503
gaquinn@lehman.com

**Norman Escoffery**
*Global Prime Brokerage Client Technology – New York*
(212) 526-6246
nescoffe@lehman.com

## Global Equity – Cash Research Sales

**Lou Schaufele**
*U.S. Sales - Dallas*
(214) 720-9471

**David De Luca, Chris Valli, Chris Mathews**
*U.S. Portfolio Sales – New York*
(212) 526-7032

**John Snyder, Peter Jarck**
*U.S. Trading – Listed, OTC*
(212) 526-7610, 528-7055

MAV0000798
CONFIDENTIAL

247

**Andy Gross, Robin Lowe, Britt Lintner**
*International Sales, Trading*
(212) 528-6308, 6306, (44) 207-260-3113

**Angel Gonzalez-Sanfeliu**
*Emerging Market Group Sales*
(212) 528-8600

**Jay Elkins, Jamie Axford**
*Hedge Fund Sales*
(212) 526-9130

MAV0000799
CONFIDENTIAL

248

| From: | Antonelli, Christopher G [CAntonel@lehman.com] | Sent:2/4/2004 1:43 AM |
|---|---|---|
| To: [ · ] | Baldassano, Matt [Matt.Baldassano@lehman.com] | |
| Cc: [ · ] | | |
| Bcc: [ · ] | | |
| Subject: | FW: Long Transfers. | |

By the way, you should call jim chen in dallas to discuss swaps. We
were going back and forth last week, but never connected. Since I'm
here, I think you'd be the best person to follow up with him. I think
they'd be open to putting some back on once they become comfortable with
the fact that we're not going to push them to sign a new isda. Also,
tell them about doing long swap/cfd business around record date items so
that they get enhanced div treatment on us stocks and so they don't have
to move them out to UBS as they have been doing.

His number is:

> Redacted by the Permanent
> Subcommittee on Investigations

Talk to you later.

-----Original Message-----
From: jim.chen@maverickcap.com [mailto:jim.chen@maverickcap.com]
Sent: Saturday, January 31, 2004 2:07 AM
To: Antonelli, Christopher G
Subject: Re: Long Transfers

Do you have a dividend enhancement product for long or short US equities
in the offshore accounts? For the long US equities we only do it for
our LDC account. For short domestic equities we try to save on our
dividend expense in our LDC and Fund II accounts. Let me know.

"Antonelli,

Christopher G" To: "Jim Chen"
<jim_chen@maverickcap.com>
<CAntonel@lehman. cc:

com> Subject: Long Transfers.

---

**Permanent Subcommittee on Investigations**
**EXHIBIT #23**

LBHIPSI00134533

249

01/30/2004 10:51

AM

Jim,
I notice that you transfer some of your long position out around their
upcoming record dates to UBS. I imagine that is because of the dividend
payment. Is there something we can do for you that they are? I'd love
to discuss if so.

Thank you.
Chris

Christopher Antonelli
Lehman Brothers
Equity Finance
> * 212-528-0700
> * 646-758-4540
>

----------------------------------------------------------------
------

This message is intended only for the personal and confidential use of
the designated recipient(s) named above. If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited. This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers. Email
transmission cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or
accurate and it should not be relied upon as such. All information is
subject to change without notice.

LBHIPSI00134534

250



From:    Harrison, Kevin A [harrison@lehman.com]                                Sent:5/27/2005 8:56 AM
To: [ ~]
Cc: [ ~]          Redacted by the Permanent
                  Subcommittee on Investigations
Bcc: [ ~ ].
Subject:    FW: US Cayman 70% trade.

> -----Original Message-----
> From: Story, Richard G
> Sent: Monday, June 16, 2003 5:02 AM
> To: Brier, Bruce
> Cc: Maynard, Ian; Harrison, Kevin A; Bacanovic, Paul
> Subject: US Cayman 70% trade
>
> so for questions 1 and 2, it seems like you're saying there is no
> alternative other than moving a person to HK ?
> As you know, EFG doesnt have any employees in HK today so there is a
> fairly large admin cost of moving somebody
> from say Tokyo (but its obviously feasible considering the PL we are
> talking about).
>
> Lets explore if a hybrid situation could work between HK/Tokyo :
> 1. can the person travel to HK to execute the trades, but still live
> mainly in Tokyo ?
> 2. If not, what is the minimum time required to be spent in HK per
> annum ?
> 3. can you clarify exactly what that person will have to physically do
> for each trade (in order to minimise US Tax risk) ?
>
> -----Original Message-----
> From: Brier, Bruce
> Sent: 13 June 2003 18:57
> To: Story, Richard G
> Cc: Maynard, Ian; Harrison, Kevin A; Bacanovic, Paul
> Subject: RE: US Cayman 70% trade
>
> Richard
>
> Let me try again with some comments. Please read italics see below.
>
> Bruce
>
> -----Original Message-----
> From: Story, Richard G
> Sent: Friday, June 13, 2003 3:42 AM
> To: Brier, Bruce
> Cc: Maynard, Ian; Harrison, Kevin A; Bacanovic, Paul
> Subject: RE: US Cayman 70% trade
>
> thanks Bruce - this all makes sense. Three questions :
>

Permanent Subcommittee on Investigations
**EXHIBIT #24**

LBHIPSI00149673

251

> 1. Is it critical to have the person in HK (because its a 70%
> jurisdiction) as opposed to Luxembourg (a 70 or 85% jurisdiction
> dependent on whether SICAV or FCP)?
> We have an EFG salesperson in Lux as of last week for EUR div.
> trades, but nobody in HK today, so could do Lux tomorrow but HK would
> take a bit of work. The reason for the bodies is to thwart any
> argument that these entities are non-substantive shells. If a tax
> authority successfully argued this withholding and other taxes could
> be due. Luxco is a separate entity which needs its own staff. Cayco is
> a division of Hong Kong for US tax (check the box) which is why the
> body can work in Hong Kong or Cayman.
>
> 2. If it has to be HK, do they need to be resident in HK or just
> employed by a HK company ? EFG employees resident in Tokyo are
> employed by LBJ but
> Im pretty confident we can arrange fairly easily to switch their
> legal employer to an LB HK co. Maximum reduction in US tax risk if
> resident in Hong Kong. Moreover, if person stayed in Japan HK entity
> could be considered to have a Japanese branch.
>
> 3. Can you explain the LBSF safeguard point you raise - not heard
> about that one ? The safeguard issue is as follows: IRS is could
> argue US withholding tax is due either on the in lieu made by Cayco or
> the swap payment made by LBSF. This safeguard applies to the swap
> payment. While the general rule is no withholding on swaps the IRS
> could argue that LBSF is a agent for Cayco and the dividends collected
> by LBSF are really for Cayco's.(i.e., the swap payment was in fact a
> dividend payment). One existing safeguard is the use of baskets
> instead of swaps. In addition to the basket safeguard I proposed
> having LBSF sell and swap back so that LBSF receives swap payments
> instead of actual dividends. If the IRS used the agent argument there
> would be no withholding since Cayco could receive swap payments
> directly. Unfortunately we have some regulatory issues here I am
> analyzing.
>
> I hope this helps clarify the issues,
>
> Bruce
>
> -----Original Message-----
> From: Brier, Bruce
> Sent: 12 June 2003 22:09
> To: Story, Richard G
> Cc: Maynard, Ian; Harrison, Kevin A; Bacanovic, Paul
> Subject: RE: US Cayman 70% trade
>
> Rich
>
>
>

Attorney Client Privilege

LBHIPSI00149674

252

Attorney Client Privilege

> Regards,
>
> Bruce
>
> -----Original Message-----
> From: Story, Richard G
> Sent: Thursday, June 12, 2003 12:40 PM
> To: Brier, Bruce; Maynard, Ian
> Subject: US Cayman 70% trade
>
> Bruce

Attorney Client Privilege

> Reason I ask is that we are getting very close to having large
> new supply available which would take us
> above our current approved Risk limit of $25m (per Tax dept
> definition of Risk Limit of the 15/30% WHT) :
>
> 1) currently utilising $12m of Risk Limit @ Jun03 split :
> BGI - $700m @ 2.5% yield of 70% Dublin stock = $5m
> BGI - $500m @ 2.5% yield of 85% Tokyo stock = $2m
> San Paolo - $700m @ 2.5% yield of 70% Lux stock = $5m
>

LBHIPSI00149675

253



> 2) potential utilisation within next 4 weeks of $37m of 'Risk'
> split :
> JPM - $3bn of 2.5% yielding 70% Lux stock = $22m
> Citi - $2bn of 2.5% yiedling 70% Lux stock = $14m
> SS - $200m 2.5% yielding 70% Dublin stock = $1m
>
> Having just spoken to Jeff on the topic, we think its probably
> an appropriate time to present a 1-pager to
> Joe Monico & Ian Lowitt on the trade to get their formal
> approval to raise the limit. What are your thoughts
> on this and what do you see as the obstacles in getting $50-100m
> limit approved ?
> Rich

LBHIPSI00149676

254



| From: | Wecker, Jeff (jwecker@lehman.com) | Sent: 1/25/2005 7:30 AM |
|---|---|---|
| To: [~] | Story, Richard G (rstory@lehman.com) | |
| Cc: [~] | | |
| Bcc: [~] | | |
| Subject | RE: Conclusions of US div meeting | |

Rich,

I read the note that you recently sent regarding div pricing at competitors. Are all the major competitors in the yield enhancement game? If not, who really competes for this business. Who are the biggest in the hedge fund client space?

Jeff

> -----Original Message-----
> From: Story, Richard G
> Sent: Tuesday, January 25, 2005 7:11 AM
> To: Okay, Bevin J; Harrison, Kevin A; Maynard, Ian; Wecker, Jeff
> Subject: RE: Conclusions of US div meeting
>
> Borrow via Cayman is considered by Tax dept to be lower risk than CFD
> in LBIE, so this is no.1 preference if
> Its operationally possible for Fortress to lend us their long posns ?
>
> Either way, suggest you show them 90% as a div. price on longs
>
>
> -----Original Message-----
> From: Okay, Bevin J
> Sent: Monday, January 24, 2005 3:58 PM
> To: Story, Richard G; Harrison, Kevin A; Maynard, Ian; Wecker, Jeff
> Subject: RE: Conclusions of US div meeting
>
> Kevin brought me up to speed on Fortress discussion.
> Please let me know what I can do.
>
> My thoughts:
> - We have CFD's docs in place with Drawbridge Quantitative Strategies
> so should be easy to rep.
> - If we go down the road of CFD, Fortress would need to understand
> that they relinquish control of the underlying (ie no votes, execution
> discretion, reporting etc) and can only give Lehman unwind levels for
> the CFD, that's it.
> - Not sure of the term of the trade but longer the better.
> - Better fact pattern that Fortress business is very broad across
> capital markets and not just this type of trading. Prime brokerage
> relationship includes div, non div names, US, UK, Asia, futures, etc
>
>
> -----Original Message-----
> From: Harrison, Kevin A

Permanent Subcommittee on Investigations
**EXHIBIT #25**

LBHIPSI00029336

255

> Sent: Monday, January 24, 2005 10:25 AM
> To: Okay, Bevin J
> Subject: FW: Conclusions of US div meeting
>
>
>
> -----Original Message-----
> From: Story, Richard G
> Sent: Friday, January 21, 2005 11:32 AM
> To: Wecker, Jeff; Harrison, Kevin A; Maynard, Ian
> Subject: Conclusions of US div meeting
>
> Jeff, Kevin
> 1) Fortress client discussion - I think Bevin is the coverage person
> to join this call ?
> 2) decision on clients to re-mark from 100% to say 85-90% - did John
> want to do this for stat clients or PB clients also ?
> Rich

LBHIPSI00029337

256

| From: | Thomas, Alan (IED) <Alan.Thomas@morganstanley.com> |
|---|---|
| Sent: | Wednesday, July 21, 2004 1:59 PM |
| To: | epm <epm@morganstanley.com>; Boak, Kathleen (IED) <Kathleen.Boak@morganstanley.com>; ssgna <ssgna@morganstanley.com>; mmhotwire <mmhotwire@morganstanley.com>; glbstraders <glbstraders@morganstanley.com>; nyiedhedge <nyiedhedge@morganstanley.com>; nycbdesk <nycbdesk@morganstanley.com> |
| Cc: | fpgswaptrading <fpgswaptrading@morganstanley.com> |
| Subject: | MSFT Total Return Swaps -- FOR INTERNAL DISTRIBUTION |
| Attach: | Message Text.txt |

Here are the main points regarding total return equity swaps on MSFT:

**WHY**
-- Offshore funds are subject to withholding tax of up to 30% on cash dividends from US stocks
-- Morgan Stanley can enhance the dividend payout from 70% to 100% through a total return equity swap
-- This is a great opportunity to highlight an application that is relevant to all dividend-paying securities (not just MSFT)

**WHEN**
-- The record date for the Special Cash is 11/17/04. We can enter into the transaction at any time, but should aim to do so no later than 11/12/04, for regular way settlement. In other words, there is time, but often the first call gets the trade

**COSTS**
-- Fees on the swap are the same as commissions on the underlying securities
-- If client already owns MSFT, Morgan Stanley will purchase the stock and enter into a swap transaction with no commissions up-front
-- Financing is the same as PB's "debit" rate
-- If client is not PB'ed at Morgan Stanley, the Financing rate will be competitive with the debit rate at the client's PB
-- If the client does not use leverage, the client has the option to fully collaterize to reduce the financing cost
-- *BOTTOM LINE -- The incremental cost of having a swap versus owning MSFT is either zero or minimal depending on the client's situation*

**CONTACTS**
Equity Product Marketing
Kevin Nowlin [PB] x2-5319
Jeff Penney x1-8670
Venk Lal x1-5974
Adam Langsam [Chicago] 3+726-4342
Bill Miller [Boston] 3+856-8781
Paul Zabaleta x1-8603
Tiffany Smith x1-5478

NY-Equity Sales
Kathy Boak [Research Sales] x1-9035

Permanent Subcommittee on Investigations
**EXHIBIT #26**

MS-PSI 000798

257

Equity Swaps Desk 212-761-8805
Alan, Scott, Matt, Larry, and Oleg

For those interested, please see "Other Swap Q&A" section below.

Thanks,
Alan

---

**Other Swap Q&A [primarily for Hedge Funds that are PB'ed with MS]**
☐ How are margin requirements different between PB and Total Return Equity Swap Transactions?
-- As long as the "Bridge Agreement" is executed, there will be no difference in the requirements

☐ How is margin / collateral reporting different between US equities in PB and Total Return Equity Swap Transactions?
-- As long as the "Bridge Agreement" is executed, the swap positions will be included in the PB margin reports along with the equity positions. The collateral that is systematically moved to a separate collateral account will be reflected on a separate interest report which is very similar to the PB interest reports.

☐ What additional costs are there with Total Return Equity Swap Transactions?
-- There are no costs beyond those incurred when trading and holding in PB the underlying securities
-- Fees on the swap are the same as commissions on the underlying securities
-- Financing is the same as PB's "debit" rate

☐ What percentage of the dividend will the Total Return Equity Swap Transaction pay?
-- In contrast to the 70% (30% withholding) of the dividend that is received on the underlying securities, the swap will pay 95-100% of the dividends.

☐ What credit exposure is associated with Total Return Equity Swap Transactions?
-- Performance under the equity swap transaction agreement is the obligation of the parties to that agreement. Therefore, the parties are subject to credit risk to each other.
-- Monthly resets are the standard, and go a long way to reducing the credit exposure.

☐ How are Total Return Equity Swap Transactions reported?
-- Transaction, position, dividend, financing, and corporate action data is available through ClientLink, and in a format that is very similar to the PB reports.

☐ Who will cover my client service needs for Total Return Equity Swap Transactions?
-- The same PB representatives that cover your needs today are well-versed in equity swaps and can handle related issues.

☐ How do I terminate a Total Return Equity Swap Transaction and use a different broker to MS for executions?

-- The client may short shares through another B/D. MS will then sell to the client the underlying securities to cover the short and terminate the swap.

☐ What documentation is needed prior to entering into Total Return Equity Swap Transactions?

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI 000799

258

— Master ISDA Agreement - contains general terms of swap transactions
— Credit Support Annex - contains collateral related terms
— ATS Annex - allows for Trade Activity Reports to be delivered and introduces the concept of deemed confirms (only initial confirmation needs to be executed), and therefore substantially simplifies the documentation process around equity swaps [Optional]
— Bridge Agreement - allows PB to set collateral requirements on the combined equity and swap positions [Optional]

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com. You should not use email to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via email will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI 000800

259

CRM (MOORE CAPITAL) - Microsoft total return equity swap / Moore Capital                Page 1 of 2

Cox, Byron

From:    Brennan, Daniel (IED) [Daniel.Brennan@morganstanley.com]
Sent:    Monday, August 09, 2004 1:59 PM
To:      Thomas, Alan (IED)
Subject: CRM (MOORE CAPITAL) - Microsoft total return equity swap / Moore Capital

MORGAN STANLEY                          CIS Call Report

FOR INTERNAL DISTRIBUTION ONLY

SUBJECT:  Microsoft total return equity swap / Moore Capital

   DATE: Aug 9 2004      TIME:  8:00AM

   AUTHOR: Daniel Brennan

LOCATION:

   TYPE:  Client Marketing (Phone Out)  CLASS: Full Note

   CLIENTS: MOORE CAPITAL
        MOORE CAPITAL

CLIENT ATTENDEES

Michael Melnick, CIO/Equit  MOORE CAPITAL        +1 212 7827503
William Soazzoro      MOORE CAPITAL           +1 212 7827356

MS ATTENDEES

Kathleen Boak, Managing Di  IED          +1 212 761-9035
Daniel Brennan, Executive  IED           +1 212 761-3578
Shaun Fallon, Executive D  IED           +1 212 761-5700
David Frost, Vice Presiden  IED          +1 212 761-5259
Roy Martins, Executive Dir  IED          +44 20 7425-665
Sunil Ragavin, Executive D  PBRK         +1 212 762-5105
Alan Thomas, Executive Dir  IED          +1 212 761-8805

CONFIDENTIAL SECTION

(ATTENTION: Confidential information should only be communicated in accordance with
      the need-to-know principle. Only those MSDW employees: (i) who have a
      legitimate business justification in connection with his or her duties
      in know the confidential information and (ii) have no responsibilities or
      duties that are likely to give rise to a conflict of interest (or appearance
      thereof) or the misuse of the information should have access to it.
      Material non-public information may not be communicated to sales, trading,
      research and investment management personnel without Control Group

1/18/2008

MS-INT 004375

MS-PSI 001408

Permanent Subcommittee on Investigations
EXHIBIT #27

260

CRM (MOORE CAPITAL) - Microsoft total return equity swap / Moore Capital

pre-clearance.)

Spoke with Bill Scazzero who works on Moore's trading desk to ascertain usefulness of the MSFT total return equity swap for Moore Capital. Bill informed me that Morgan Stanely and Moore Capital frequently transact such swaps to maximize returns given offshore status and dividend withholding issues and that these issues are mostly taken care of our Prime Brokerage group and Moore's back office. Scott Ragovin referred me to Roy Martin from our London financing team, who indicated that he spoke v recently with Tony Gallagher (Moore Dir of Operations) and his assistant Sal Belzno on, amongst other items, the MSFT total return swap. Since the start to end examation of the MSFT swap will be different from other dividend total return swaps we do with Moore, its a bit more complex. As well given Moore Capital trades in and out v frequently, it may not be beneficial for this trade, to be entered into. Given some special status attached to the MSFT trade, Alan Thomas thought it may make sense to pitch the MSFT trade details to someone at the PM or trading side vs relying on the operations group. I have let Mike Melnick and Bill Scazzero aware of the basic issues and offered up a conversation with our financing team to drill into the issues. Will look to set up a call with our financing team pending interest from Moore.

DISTRIBUTION

Jim Blum (jblum)
Kathleen Boak (kook)
Daniel Brennan (dbrennan)
Matthew Desalvo (mdsalvo)
Shaun Fallon (fallons)
Malathi Flanagan (flanagan)
David Frost (frostd)
Robert Kerofsky (kerof)
Roy Martins (rmartins)
Scott Ragovin (srag)
Marc Robert (marrc)
Alan Thomas (athomas)
Raymond Tierney (rya)
Call Report E-mail Subscribers

MS-INT 004376

MS-PSI 001409

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

261

| From: | Penney, D. Jeffrey (IED) <Jeff.Penney@morganstanley.com> |
|---|---|
| Sent: | Thursday, July 22, 2004 8:34 AM |
| To: | epm <epm@ms.com>; dmds <dmds@ms.com>; Boak, Kathleen (IED) <boak@ms.com> |
| Cc: | Portogallo, Richard (IED) <rport@ms.com>, Lalli, Steve (EFS) <lalli@ms.com>; fpgny <fpgny@ms.com>; fpgln <fpgln@ms.com>; Kermisch, Jamie (IED) <jamiek@ms.com> |
| Subject: | MSFT div timing |

Please note:

This trade is more urgent than people are assuming. It should be traded NOW. Here's why:

Although the special is slated for November, we do NOT want to put on trades close to record date. Tax risk increases dramatically. The trade should be put on well in advance of the record date.

There is also a regular dividend in August, which presents a perfect opportunity to get positioned in advance of the special. Furthermore, we don't want to trade on top of that record date, either.

Bottom line, this is CURRENT BUSINESS, over the next 2-3 weeks. Please do not let clients become complacent.

Finally, feedback from Goldman Sachs PB clients is that they have NOT heard from Goldman on this. We have first mover advantage and need to close.

Regards,

Jeff

Permanent Subcommittee on Investigations
EXHIBIT #28

MS-PSI* 020727

262

## MSDW Equity Finance Services I (Cayman) Limited ("Cayco")

### Outline operating procedures

It is the primary responsibility of any business looking to enter transaction on behalf of Cayco to ensure that these Operating Procedures are completed with.   Any transaction that does not comply with any of the terms of these Operating Procedures represents a 'new structure' and requires a sign off from the support areas listed in 5. below (or, where indicated, the specific support area mentioned).

**General Restrictions**

1.  Generally, Cayco is a thinly capitalised company and cannot absorb losses. Any transaction proposed for Cayco must take this into account, including where any profit or loss on the transaction will reside.  The business unit controllers and the legal entity controllers should be involved in any such proposals.

2.  Cayco should never hold long stock positions.  All securities should be sold, loaned or delivered out of Cayco intra day.

3.  Cayco must not enter into stocklending arrangements direct with MSIL.  If stock needs to be lent to MSIL, any stock should be lent to MSKG and MSKG should onlend the stock to MSIL.   An exception may be granted to this rule for deliberate monetisation trades; in such cases, a sign off should be sought on a case by case basis.

4.  Surplus cash in Cayco must not be lent to any affiliate or entity in the US without the approval of the Tax Department (because of s.956 (deemed dividend) problems).   Any such cash may be lent to MSIL, but only for a maximum of 364 days (otherwise there are interest withholding tax problems).

5.  If Cayco (i) is to enter into derivative transactions (including options and swaps); or (ii) is to have equity exposure (i.e. they are not delta flat), dispensation should always be obtained from Law & Compliance, Tax Department, Regulatory Capital controllers and the legal Entity controller.

**Specific US Restrictions**

6.  Cayco may sell stock positions to US institutional investors, using MS&CO as agent and follow rule 15a-6 procedures.

7.  Cayco may not enter into stock lending transactions with any US counterparts unless that counterpart is a registered US broker-dealer or bank lending for its own account and as agent for its customers.

8.  Cayco may not purchase securities from any person in the US other than a US broker-dealer or bank.

9.  Cayco may not enter into derivatives transactions with any US person.

10.  Cayco may not carry out any repo activity with any US person.

Permanent Subcommittee on Investigations
**EXHIBIT #29**

MS-PSI 020270

263

11.  Cayco may not source collateral from MS&CO or from any customer whose account is carried at MS&CO (directly or indirectly through MSIL).

12.  Cayco may not lend US equities against cash collateral unless the cash is equal to at least 200% of the value of the US equities or the borrower provides Cayco with a "permitted purpose" representation.

13.  Cayco may not carry out any advisory business.

14.  Cayco may not invest in futures.

15.  Cayco must maintain its books and records in accordance with the US GAAP and in a fair and consistent manner.

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI 020271

264



= Redacted by the Permanent
Subcommittee on Investigations

"SANJAY MADAN,
DEUTSCHE BANK
SECURIT"
<SMADAN@bloomberg.
net>

10/15/2004 04:12 PM

To: Andrea Leung/NewYork/DBNA/DeuBa@DBNA
cc:
Subject: SARAH WAS GOING TO LEAVE YOU A MESSAGE FROM ME.
DETAILS ON

SARAH WAS GOING TO LEAVE YOU A MESSAGE FROM ME.  DETAILS ON THE
QUESTION IF IT HELPS—
████████ AT PHOENIX INVESTMENT PARTNERS OWNS 400,000 SHARES
OF MSFT.  THE SPECIAL DIVIDEND PAYABLE IN MID NOV WILL CAUSE HIM
ACCOUNTING ISSUES.  HE SAYS THEY WILL HAVE TO TREAT THE $3 DIV
AS A 'RETURN OF CAPITAL' WHICH WILL CAUSE THEM TO HAVE TO 'AMEND
1099'S'.  HE IS LOOKING FOR A WAY TO MAINTAIN EXPOSURE TO MSFT
BUT AVOID THE DIVIDEND PAYMENT.  ARE YOU THE RIGHT GUY TO ASK AB
OUT POSSIBLE DERIVATIVE SOLUTIONS?  THANKS.  KEITH

-------------------------------------------------------------------

This has been prepared solely for informational purposes. It is not an offer,
recommendation or solicitation to buy or sell, nor is it an official
confirmation of terms. It is based on information generally available to the
public from sources believed to be reliable. No representation is made that it
is accurate or complete or that any returns indicated will be achieved.
Changes to assumptions may have a material impact on any returns detailed.
Past performance is not indicative of future returns. Price and availability
are subject to change without notice. Additional information is available upon
request.

Permanent Subcommittee on Investigations

**EXHIBIT #30**

Strictly Confidential--Not for Circulation/Committee Memb

DB-PSI 00000095

265

| | |
|---|---|
| Paul Busby@DBNA | To: JP Muir/NewYork/DBNA/DeuBa@DBNA@DEUBAINT |
| 09/16/2004 08:49 AM | cc: Andrea Leung/NewYork/DBNA/DeuBa@DBNA, EPS-NA, Richard Kennedy/NewYork/DBNA/DeuBa@DBNA, Adam York/NewYork/DBNA/DeuBa@DBNA, Edwin |
| | Subject: Re: Extraordinary Dividend Rules and Microsoft One-Time Dividend |

FYI -

We are in the process of determining hedge fund demand for "All In" enhancement to clients and our own proprietary trades with Simon Pearson. We'll be hopefully sitting down as a group in the next week to outline our plan of action on 70% dividend liability underlying.

Paul Busby
Director
Global Equity Prime Services
Securities Lending
Tel 212 250 5766
JP Muir/DBNA

| | |
|---|---|
| JP Muir@DBNA | To: EPS-NA, Richard Kennedy/NewYork/DBNA/DeuBa@DBNA, |
| 09/16/2004 08:37 AM | paul.busby@db.com, Andrea Leung/NewYork/DBNA/DeuBa@DBNA |
| | cc: |
| | Subject: Extraordinary Dividend Rules and ▆▆▆ One-Time Dividend |

perhaps useful info...
— Forwarded by JP Muir/NewYork/DBNA/DeuBa on 09/16/2004 08:33 AM —



| | |
|---|---|
| <Ernst Young.NYFSO@ ay.com> | To: JP Muir/NewYork/DBNA/DeuBa@DBNA |
| 09/14/2004 05:21 PM | cc: |
| Please respond to Ernst Young.NYFSO | Subject: Extraordinary Dividend Rules and ▆▆▆ One-Time Dividend |

As expected, the "qualified dividend" rules enacted last year have affected more than just the tax rate applicable to many dividends. The reduced tax rate on qualified dividends also has encouraged corporations to maintain or increase their dividend payments to investors.

Please click here to read more about Howard Leventhal's and Joe Bianco's comments.

Please click here to update your personal profile.

Please click here to refer a colleague to receive the Ernst & Young Hedge Fund Tax Alert.

**Important commercial e-mail notice:**

- This e-mail may constitute an advertisement or solicitation under US. law, if its primary purpose is to advertise or promote Ernst & Young LLP's products or services. Our principal postal address is 5 Times Square, New York, NY 10036.

- Please click here to remove this e-mail address from the subscription list for this alert.

Permanent Subcommittee on Investigations
EXHIBIT #31

trictly Confidential—Not for Circulation/Committee Mer

DB-PSI 00000064

266

- Use the link below to opt-out if you would prefer not to receive any advertising or promotional email from Ernst & Young LLP (except for Ernst & Young Online and the ey.com website, which track e-mail preferences through a separate process). Your e-mail address will be immediately removed from our central mailing list for newsletters and alerts, and all e-mails from Ernst & Young LLP designated as advertising or promotional will be automatically blocked as soon as necessary modifications to our e-mail system are completed.

  Click here to remove yourself from all Ernst & Young commercial emails

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.

Highly Confidential—Not for Circulation/Committee Members and Staff Only

DB-PSI 00000065

267

Prepared by Andy Pettit, Global Product Development.

**PROJECT: DBIL Rehypothecation: U.S. Record Date Availability Projection**

**Conference Call**
Tuesday, February 6, 2007
Attendees:
Laurence Pillon (London)
Simon Pearson (London)
Don Copans (NY)
SuiMin Zhang (NY)
Andy Pettit (NY)

**Background:** DBIL (Jersey) executes "blind" rehypothecation trades with U.S. PB clients for dividend capture purposes that run over record dates.

**Issue:** PB clients recall U.S. dividend stock prior to record date.

**Goal:** To identify clients that are likely to reduce their eligible U.S. stock positions prior to record date.

**Current Process:** SuiMin sends file 10 days prior to record date of holdings of the identified U.S. equities by client alias (client is not disclosed).

**Working Solution:** Utilizing CPort data, SuiMin will retrieve the 10 days prior to the last two record dates, going back 6 months, of the U.S. dividend stocks identified, of the positions held by PB client aliases. Priority order will be those U.S. stocks going record in the next thirty days. This data will be sent to Simon Pearson for analysis.

**Next Steps:**
   1) Deliver historical U.S. dividend stock holdings report to Simon Pearson.
   2) Simon will analyze and determine if the data is meaningful.
   3) PHASE I – If data has value, SuiMin will construct process to deliver historical U.S. dividend stock holdings history report by client alias 10 days prior to current record date for each applicable issue.
   4) PHASE II – Develop correlation analysis by client alias by issue of trading/holdings trends.

**Next Follow-up Meeting:** Tuesday, February 13, 2007

Permanent Subcommittee on Investigations
**EXHIBIT #32**

Strictly Confidential–Not for Circulation/Committee Men

DB-PSI 00004272

268



New Product Application

| | | | |
|---|---|---|---|
| Application ID: | AB104293-1 | Request Date: | 27 Jan 2005 |
| Product Area: | Prime Services | Product Name: | DBIL Sec Lending SEF Structure |
| Status: | Approved | Requestor: | Natasha Manning |

Application Form for CIB

**SECTION 1: BASIC DETAILS**

General

| | |
|---|---|
| Requestor Name: | Natasha Manning |
| Delegate Requestor Name: | Natasha Manning |
| Requestor Location: | Channel Islands |
| Business Sponsor: | Simon-Gef Pearson |
| Required Start Date: | 27 Jan 2005 |
| Original Required Start Date: | |

Business Line

| | |
|---|---|
| Group Division: | CIB |
| Business Division: | Global Markets |
| Business Area: | GM Equity |
| Product Area: | Prime Services |
| Desk/Dept: | Offshore Group Banking Division |

ictly Confidential - Not for Circulation/Committe

Permanent Subcommittee on Investigations
**EXHIBIT #33**

DB-PSI 00007472

269

Page 2 of

## NPA Category

| | | | |
|---|---|---|---|
| NPA Category: | Enhancement | Enhancement To: | AB104295-Securities Lending/Borrowing in DBIL |

**Support Groups Contacted**
DB Ldn Global Equities;DB Ldn Prime Brokerage;Tax;Controlling;Operations;Credit;Legal;Treasury - already signed off by mail in Oct 2004

## SECTION 2. PRODUCT DATA

**Product Name and Description**

| | |
|---|---|
| Product Name: | DBIL Sec Lending / SBF Structure |
| Product Description: | This is an alternative structure to the Securities Lending transactions approved for DBIL. This request for approval will essentially be for only one half of the previously signed off structure although we request that everyone re-sign this NPA just to formalise matters. DBIL will borrow US securities from an institutional investor as well as entering into the following transactions - sale of equity to the market, OTC derivative (option or forward). The securities lending transaction falls under the existing NPA. The additional approval is sought for the derivative component of the transaction only. The introduction of DBIL to the Securities Lending and OTC derivative environment will enhance existing DB Group activity in this marketplace. Institutional Client/Counterparty credit approval will be driven by the Securities Lending Marketing Team, Global Equities, but will also require approval by the Offshore Group Credit Committee within DBIL. Jersey Front office activities will be undertaken by the Wholesale Desk within the Jersey Banking Division. DBIL Jersey will operate a Prime Brokerage account with DB London to facilitate the transaction. The operation of this account will be covered by PB documentation between DBIL Jersey and DB London. Back Office functions will be facilitated via the Prime Brokerage account. Trade support and middle office functions will be performed by DB London under an agreed SLA. Please see attachment for detailed product structure. |

**Product Classification**

| | | | |
|---|---|---|---|
| Product Type: | STRUCTURED TRANSACTIONS | Asset Class: | Equity |

**Exchange Details**

| | | | |
|---|---|---|---|
| Exchange/OTC: | OTC | Exchange Name: | |

**Maturity**

| | |
|---|---|
| Maximum Maturity: | 1 Year |

**Underlying Index**

| | | | |
|---|---|---|---|
| Underlying Index: | | Commodities: Commodities | |

**Currencies**

| | |
|---|---|
| Currencies: | USD |

## SECTION 3. LOCATION DATA

**Legal Entity locations**

| | | | |
|---|---|---|---|
| Primary Legal Entity Location:Channel Islands | | Secondary Location: | |

ictly Confidential - Not for Circulation/Committee Members and Staff Only

DB-PSI 00007473

Page 1 of

Trading Locations
  Primary Proposed Location:Channel Islands

  Additional Proposed Locations:London          Existing Locations:    London, Frankfurt, New
                                                                        York, Sydney, Tokyo DSI
Client Target Group
  Customer Type:         Financial Institutions   Customer Locations:   Various

Sales/Origination Locations
  Sales/Origination Locations:London

DB Legal Entity Offering Product
  Deutsche Bank International Limited;Deutsche Bank AG London Prime Brokerage;Deutsche Bank AG London

SECTION 4. MODEL & OPERATIONAL DATA

Model & Pricing Information
  Model Name:            Not applicable           Pricing Source:

System Information
  Front Office Systems:  iDelta IMS               Settlement Systems:   Global 1 eSpan

SECTION 5. BUSINESS CASE

Business Case
  Transaction Volume:    100 per month            Revenue:    Eur 10m

SECTION 6. ATTACHMENTS

Attachments
  [ ] DBIL Sec Lending alternative structure (NPA) ) (See next page)
  doc).doc

271

**Deutsche Bank International Limited ("DBIL") Equity Finance alternative structure**

**Rationale**

The requirement from SEF to harness the use of one of the offshore group has been growing over at least a few years and GRPS or even equities as a division for a distinct divisibility from this.

Broadly speaking, there are substantial US equities held offshore which are consistently included in basket pricing elsewhere that would be borrowed on an exclusive basis for use within the overall equities business. We are currently not competitive in that pricing as any borrow of these US equities requires a deduction and payment of withholding tax, so substitute payments equal to 15% of any dividend. Our competitors do not have to account for that tax (given some of their offshore structures) and can therefore offer a more aggressive price to lenders. A non-US treaty entity is attractive as the amount of withholding tax required to be deducted is reduced to 0% (providing certain criteria are met), therefore allowing us to be more competitive with our pricing.

**Alternative Structure**



1.  A non-US treaty resident entity ("the lender") holds US equities. Part of its normal course of business is to lend these stocks to the market. It lends DBIL a basket ("the basket") of such equities.
2.  In lieu of the basket DBIL pledges collateral equal to the value of the stock + a small margin (this provision of collateral is standard in the general securities lending markets. The collateral would be either cash (USD or another major currency) or G7 debt (could be G10).
3.  Simultaneously to 1 and 2 above DBIL would sell the basket to the market (probably via UK broker market) in lieu of USD cash (DVP).
4.  As a hedge to 1 above either:

     DBIL buys a call option from DBIL and sells a put option to DBIL (with a maturity anywhere between 7 days and 60 days). The option would be physically settled giving DBIL the right to buy the shares with a strike slightly lower than the reference price. Both strikes would be equal, the resulting premium always payable by DBIL to DBIL.

     OR

     DBIL enters into a forward (again physically settled) agreeing to buy the shares back at a forward price, again there would only be a payment from DBIL to DBIL.

The rest is not part of the NFA but completing the picture of what we may do to stop a passive financing return.



272

1    Independently, DB London Branch ("DBL") buys a swap on a similar basket in terms of quantity
     and constituents from one of its Institutional Clients (interbank relationships). The sense of the
     swap would extend full of the options or forward above (ranging from 1 week to 90 days).

8    An assumption we could make would be that the Institutional client buys shares from the market
     to hedge this swap.

### More detailed Cash and collateral Flows

The transaction is fairly simple in nature and all complications arise from standard settlement, conditions
and raising collateral. Described below are some of the variations and problems that may occur and how we
propose to deal with them.

On trade date DBL would arrange for the loan of a basket of US equities ("the basket") in 3 days time (the
coincides with the standard US settlement cycle) from the lender. Collateral will be required in actual in
step 2 above and this could be in different forms.

*Cash collateral - Inception*

Standard cash transactions are DVP (delivery versus payment) meaning that the cash collateral and the
basket should move at the same time. The flow would be as follows:

*Steps 1 and 2*

i.    Trade date ("TD"), agreement of the loan takes place.
ii.   Settlement date ("SD"), DBL require turn-day funding to pledge cash collateral to the lender until
      borrow this cash turn-day from DBL.
iii.  The cash and stock move at the same time leaving DBL long stock and the lender long cash.

*Steps 3 and 4*

iv.   Simultaneously (to (i) above) on TD DBL executes a sale to the market (a broker) on a T + 3 basis.
      DBL also enters into a partial or fwd with DBL using the sale price as the reference price.
v.    On SD (after steps 1 and 2 happen), DBL receive stock from (iii) above and use this to settle the
      DVP sale transaction. DBL receive USD cash.
vi.   DBL uses this long cash to return the turn-day funding from DBL.

### Settlement fails - Steps 1 to 2 happen

Steps 1 and 2 must happen together as the starting point occurs with the intra-day funding from DBL,
moving to DBL. If this intra-day loan settled and the DVP settlement with lender is not possible on part of
the basket (e.g. some stocks are not available) then any where cash should be returned to DBL. If it is too
late to return cash to DBL, the positions will be swept. In the case of stock not settling into DBL from the
lender, the sale should be partially cancelled and the option/fwd amended to the new quantities. If this can
not be done (due to timing in the day) then a fail to the market will occur. Technically DBL are now in a
position to claim interest from the broker (to accommodate the interest accrued imbedded in the option/f
fwd).

If both steps 1 and 2 happen and perhaps they take place too late during the SD for 3 m settle, DBL will be
long stock and short the intra-day cash funding to DBL. As part of DBL's general business it has
consistent outstanding loans in DBL. We are relying on legal right of offset for any short cash to create
against existing loans. If this happens (but at night, overnight funding in this instance should be possible
under the arrangement DBL has with NY. Again, if possible the sale and option/fwd should be partially
cancelled, if not the sale will fail leaving DBL in this same position (but is quite normal in the equities
market). Any costs of failure will be borne by the relevant parties to the fail. This will be interest costs
generally as described above.

DB-PSI 00007476

273

Step 5 is DVP and the stock and cash movements occur at the same time. As these rely on the market broker involved any fail would put us back in the position above.

*Cash collateral – unwind*

The unwind in reverse should flow as follows:

*Steps 3 and 4*

i. On SD of the term date or the unwind minus 3 business days (normally the Valuation date "VD" for the swaps in steps 3 to 6 or indeed the VD for the options/bond) DBIL would buy shares from DBL on the exercise price of the option/bond, DVP against USD cash.

ii. DBIL repays intra-day funding from DBL in order to settle the DVP purchase

iii. The shares and cash move DVP leaving DBIL long stock and short intra-day funding to DBL.

*Steps 1 and 2*

iv. On SD of the term date minus 2 days DBIL will agree with the lender in return shares in lieu of the collateral (to coincide with iii) above)

v. SD, the shares and cash move DVP unwinding the loan transaction. This leaves DBIL long cash and short intra-day funding to DBL.

vi. DBIL returns the intra-day funding to DBL.

*Settlement fails – Steps 3 to 4 Unwind*

*Steps 3 and 4*

As these steps rely on the DBL purchase settling, if this fails DBIL will be left with the intra-day funding from DBL. Depending on the time of day of the fail this may be returned to DBL before the final deadline for daily funding or swept by treasury out of the sources (as described above)

*Steps 1 and 2*

If steps 1 and 4 fail then the above will happen. If they settle then DBIL will be long stock and short intra-day ends to DBL. In this case DBIL will rely on legal right of offset against existing loans. This will also be the case if steps 1 and 2 fail (as they are DVP).

*Non-cash collateral – inception*

Where non-cash collateral is required by the lender settlement of the collateral normally takes place one business day before settlement of the stock ("prepay"). In this case the flow would be as follows:

*Steps 1 to 4*

i. TD, agreement of the loan takes place (again SD is TD + 3 days)

ii. SD minus 1 ("SD – 1" or TD + 2). DBIL require non-cash collateral ("G10") which they get from a repo with DBL.

iii. DBIL prepay the G10 to the lender on SD - 1

iv. SD the lender gives stock to DBIL (against the prepayment of G10)

v. DBIL use the stock to settle DVP with the market broker. The cash raised is used to settle the repo with DBL.

In this context the repo G10 is delivered one day before the cash settles which implies an offset of exposure of against existing loans made by DBIL to DBL. The repo exposure will never exceed the loan outstanding.

*Settlement fails – steps 1 to 4 inception*

If the DBIL repo fails and DBIL do not receive the G10 (SD – 1) then the whole transaction will fail as DBIL can not prepay and get the stock on SD. All parties should be flat although DBIL may need to either unwind settlement of the sale to the market broker and the partially failing DBL (to accommodate the extra day settlement cycle). If this is not possible a market fail will occur and we are back to the situation described above of standard market interest rates.

trictly Confidential - Not for Circulation/Committee Members and Staff Only

DB-PSI 00007477

274

If DML receives the G10 from DBL and DBL are not able to pass it on to the lender then the whole transaction will fail. DBL in this instance will have prepaid the G10 a day earlier than required for actual settlement of the stock, which will set the offset described above. The position with extending terms of the sale and options is the same OR the market fail and interest claims at the same.

If the G10 makes it to the lender SD – 1, the first leg that could fail is the stock coming in DBL on SD. In this case the situation is exactly as describe above.

If the G10 settles with the lender SD – 1, the stock is passed to DBL by the lender but can not be settled by the market lender then the position is what as above.

NB: where prepay takes place a day too early the consequence is just an extra day's worth of credit risk on the prepaid collateral (and probably an extension of the repo by a day).

*Non-cash collateral – untried*

The repo is fairly simple as follows (although there may be a requirement to "prepay" of, provide collateral to the lender for an extra day - this is not a frequent requirement). In reverse order:

*Steps 1 and 4*

i.   On VD of the options'led DBL buy shares from the DBL at the exercise price of the options - fwd. DVP against USD cash

ii.  DBL require same-day funding from DBL, to settle the DVP purchase

iii. The shares and cash make a DVP leaving DBL long stock and short intra-day funding to DBL.

*Steps 1 and 2*

i.   On the same VD DBL will agree with the lender the return of the shares in lieu of collateral (to coincide with (i) above).

ii.  On SD the shares will move Fop (as the lender has G10 already), either the lender will return the G10 same day or there will be a prepay for one day.

iii. If the G10 is returned same day then the repo ends at this point and the G10 is returned for USD cash, the cash satisfying the intra funding. If the G10 is returned the following day then the repo will end day after unwind.

*Settlement fails – steps 1 to 4 Unwind*

If the purchase from DBL fails then DBL will have no stock to return and the whole loan and repo will need to be extended by one more day. DBL will be left with intra-day funding from DBL and depending upon the form of day offset this will be returned or owed from the market by treasury.

If the purchase settles then DBL will be long stock and short intra-day cash. If looking else settles then the short cash will offset against existing loans as described above.

If the stock settles back to the lender and DBL do not unwind the G10 then the positions is the same as above although in this case they have no stock.

DB-PSI 00007478

275



Strictly Confidential—Not for Circulation/Committee

**Permanent Subcommittee on Investigations**
**EXHIBIT #34**

DB-PSI 00000047

276

NPA Category

NPA Category:          Regular New Product          Enhancement To:

Support Groups Contacted:
DB Ldn Global Equities; DB Ldn Prime Brokerage; Tax; Controlling; Operations; Credit; Legal; Treasury

## SECTION 2. PRODUCT DATA

Product Name and Description
Product Name:          Lending/Borrowing in DBIL

Product Description:   Global Equities have identified clients who have US stock available for lending
                       together with a potential borrower of the same stock. DBIL Jersey will sit
                       in the middle of the transaction and take a margin from the borrower (a fee being paid
                       and received). The introduction of DBIL to the Securities Lending environment will
                       enhance existing DB Group activity in this marketplace. The financial
                       Client/Counterparty cross-approval will be driven by the Securities Lending
                       Marketing Teams/Global Equities, but will also receive approval by the Offshore
                       Group Credit Committee within DBIL Jersey. Front Office activities will be
                       undertaken by the Wholesale Desk within the Jersey Banking Division. DBIL Jersey
                       will operate a Prime Brokerage account with DB London to facilitate the transaction.
                       The operation of this account will be covered by the documentation between DBIL
                       and even DB London Back Office function will be facilitated via the Prime
                       Brokerage account. This product is potentially only an interim solution while we seek
                       to overcome UK "Controlled Foreign Companies" issues. Whilst we have done so it is
                       anticipated that this product will be developed into a more intricate structure which
                       will generate greater revenues for the DB Group as a whole and will not require the
                       participation of a third party. An NPA will be produced for this when the "CFC"
                       issues are resolved. We have complied with the local regs. [Please see Product
                       Description data.]

Product Classification
Product Type:          STOCK                          Asset Class:        0
                       LENDING/BORROWING

Exchange Details
Exchange/OTC:          OTC                            Exchange Name:

Maturity
Maximum Maturity:      1 Year

Underlying Index
Underlying Index:                                     Commodities:
                                                      Commodities:

Currencies
Currencies:            USD

## SECTION 3. LOCATION DATA

Legal Entity locations
Primary Legal Entity Location: Channel Islands        Secondary Location:

Trading Locations

https://npa.risk.intranet.db.com/NPA/display/PEAListApplication/action.do?PRODUCT_ID=AR108293    1/28/2008

Strictly Confidential--Not for Circulation/Committee Members and Staff Only

DB-PSI 00000243

277

Primary Proposed Location: Channel Islands

Additional Proposed Locations:                    Existing Locations:    London, Frankfurt, New York, Sydney, Tokyo DSI

Client Target Group
  Customer Type:         Financial Institutions      Customer Locations:   Various

Sales/Origination Locations
  Sales/Origination Location: London

DB Legal Entity Offering Product:
  Deutsche Bank International Limited;Deutsche Bank AG London Prime Brokerage

## SECTION 4. MODEL & OPERATIONAL DATA

Model & Pricing Information
  Model Name:            Not applicable               Pricing Sources:

Systems Information
  Front Office Systems:  iDelta                        Settlement Systems:   Global 1

## SECTION 5. BUSINESS CASE

Business Case
  Transaction Volume:    ? 3bln pa                     Revenue:              Eur 3m

## SECTION 6. ATTACHMENTS

Attachments
  [SB]   DBIL Securities Borrowing and Lending NPA support doc.doc.
  [SB]   DBIL Structure.doc
  [SB]   JerseyKeyOps.doc
  [SB]   London Tax Sign Off Restrictions.txt
  [SB]   Product Description.txt

https://npa.risk.intranet.db.com/NPA/display/NPALiveApplicationAction.do?PRODUCT_ID=AB104292   1/28/2008

Strictly Confidential--Not for Circulation/Committee Members and Staff Only.

DB-PSI 00008891

278

Deutsche Bank International Limited, Jersey ("DBIL") Securities Borrowing and Lending –
STA Standard Document

**Booking process**
DBIL will be borrowing these shares offshore. Traders will continue to manage their (DB3)
Trades will be booked via trade upload and added to DBIL. Here both the trades into Global 1 for
settlement.
Trades will be booked for T+0 settlement.
Any subsequent price maintenance that is required to be performed on the trades will be done via the
delta calculator and reported to...
Trades will be Non DTC tracking for dividend purposes.

**Systems**
Idelta – Idelta will be on the desktops of the users in Jersey. Trades will be entered directly into Idelta
Global 1 – will reside in Ops for settlement purposes. Users in Jersey will reference access to Global 1
Short+ billing manager system used by operations. Necessary set up required.
eSpeje – for trades settled directly from Global 1 to Ops preference is development work required to...
eSpeje. This has been identified. Below is covered if any operations to settle any development issues.
trades are to be input through eSpeje to be shown...
Eclipse – Global 1 will interface eclipse, which is governed local subject the set up systems in the...
above). Trades are to be input Eclipse as buy and sell trades on a good in manner, this real potential
accounts for any identifications Db-IT will, so this may be this side is happen to continued to be complete by end
February.
DPS – development work is need so for DPS under the feed from Global 1 in the comp structure
Development time for development work has been estimated 2 months. It has been decided that our
in ensure correct adherence work will not be completed until end of June. At this, ensure a brand
process is being developed to be sent and time, any solution until the DPS development work is
complete. This manual process will require signoff by group management for DPS.
Back Eraser – Back Manager via Global 1 per query of DBIL. These trades have the ability to this
feeds from other systems and therefore the trades inside will be input manually from reports supplied
by DB Ops.

**PB etc**
In order to facilitate the process, DBIL will become a client of Deutsche Bank AG London Prime
Brokerage ("PB"). In this instance PB will perform all back office functions for DBIL with regard to
the securities lending trades. The securities lending trades will be cleared through DB3 or as
Custodian.
PB will charge DBIL standard transaction charge for the use of their services.
PB will offset contractual settlement on these trades to be managed with fixed to meet delivery
requirements of DBIL.
If any fails occur resulting in DBIL being long or short then they will either be returned in trade or
upheld an overdraft charged respectively.

**Ops**
Lon Ops will perform all back office functions for the DBIL trades in Global 1, i.e. settlement, queries,
billing, payments etc.

**P&L**
P&L will be retained in DBIL from the securities lending transactions, whereby the stock is borrowed
and lent at a spread.
A profit split between DBIL and STA has been agreed and will be facilitated by DB3 transacting at the
agreed amounts within DBIL.

**Credit**
Clients are currently being reviewed. There is to be set therefore at the structure which is
determined which DB3 been set up as a table of lenders. Therefore primarily above amount
primarily deals with the DBIL. Lon shares should not be new trades. However the Deutsche Lending
will being loan will loan directly with credit in part the system this approval for their clients to trade
directly with DBIL.

279

### Used Clients

Where a US Investment Manager or Agent Lender acts on behalf of a foreign lender may become subject to the US 1441 regulations.

In this instance if DBIL transacts stock from these clients there is a requirement to record and settle the trades through DBIL as agent.

The process will be dealt with as a separate NPA.

### Exclusives

We will be taking some exclusive portfolio from clients. In this instance a dummy account (reference to the portfolio) will be booked to settle to accept the fees that is there as a service.

As a result of the exclusive trades will not actually transfer or settle (the residual delta to the actual value of the portfolio).

When settled stocks are taken down from the portfolio they are booked and settled per normal line with a rate that we are already securing the agreed fees via the NAV booking.

The NAV booking for the exclusive portfolio will not be sourced via Bank Master.

### Collateral

Collateral received from the lenders will range from Cash or Triparty debt. Where certain USD trades will be DVP. Where cash is non-USD accounts to be line of payment. Non cash collateral trades will be free of payment. Marquette will ensure the collateral required from the lenders against the trades will effectively secure the service level.

DB Line will be providing funding to Marquette to ensure that it meets the collateral requirements to DBIL (see outcome due).

### Funding

Although the transaction flow is designed to be cashflow neutral, there are various instances where DBIL could be long/short cash as a result due to this making it unable to complete the transaction flow. Due to compliance foreign companies regulations the amount of funding that can be obtained by DBIL from DB Line is severely limited.

DBIL are currently in the process of obtaining Legal and Tax agreements to allow them to set up their own funding with their cash deposits with the transparency DB Line is greatly reduce the amount of the controlled foreign institution limit and enable them to fund to cover delta in any structure.

As a FX perspective, DBIL will source funding from DB to meet settlement and payment obligations. DB's funding requirements are covered by DB Line Treasury.

Note: if the settlement not approved then we will have to revise the fund as DBIL will access only to cheap funding from DB Line.

### Legal

When opening a DB account, DBIL is required to signed FD documentation which outlines the services offered by FD and their legal obligations to act on behalf of their client.

With regard to legal documentation between DBIL and its clients, this will be via the terms of the GMSLA, which is an industry standard securities lending agreement.

### Reporting

P&L reports will be provided from Global DB Line Consulting, with the ability to interrogate the figures in detail.

Balance Sheet and Risk Weighted Asset reports will be available in detail.

Trade activity reports will be supplied from DB Line to show security and cash movements on the securities lending trades.

Strictly Confidential—Not for Circulation/Committee Members and Staff Only

DBJ-PSI 00000051

## Deutsche Bank International Limited ("DBIL") Securities Lending Structure

### Rationale

The requirement for a SBLP is to increase the net profit of the existing compensation by growing over at least a few years and GBPS or as an equilise on a dividend into a subject distribution from this.

Broadly speaking, there are a number of US equities held offshore which we consistently included in baskets giving clients so that would be borrowed so are certain class for as within the overall position (baskets). We are currently not responsible for withholding at any balance at these Offshore it requires a deduction and payment of withholding Tax for dividend payments equal to 15% of that dividend. Our expenditure do not have to account for our current stock of these dividend incomes under this distribution effect a more aggressive profit to lenders. A non-US transparent distribution in the amount of withholding tax incurred to be deducted is reduced to 0% (providing certain criteria are met), therefore allowing us to be more competitive with our pricing.

### Structure



1. A non-US treaty resident entity ("the lender") holds US equities. Part of its normal course of business is to lend these stocks to the market. It lends DBIL's basket ("the basket") of stocks equities...

2. In lieu of the basket DBIL pledges collateral equal to the value of the stock. In most margins DBIL transfers of collateral as matched in the general securities held in the market. This collateral would be either cash (USD or another major currency) or G7 debt (could be G10).

3. Simultaneously in 1 and 2 above DBIL would on-lend the stock to Macquarie Hong Kong (Macquarie HK - another non-US treaty credit/liability)?

4. In lieu of the basket Macquarie HK would pledge collateral to DBIL. It is anticipated that the collateral pledged by HK will be equivalent to that provided in 1 above (see below for more detail)?



5. Independently, DBIL lends Macquarie ("DBL") sells a basket of a similar basket of stock of equality and constitution to Macquarie Sydney. The term of the swap would ensure that all the loans above (ranging from 1 week to 1 month)

6. Depending on the collateral type DBL may enter into a reverse collateral loan with Macquarie Sydney to reduce the overall type of raising ()()G7 (different)

7. Either DBL buys shares to hedge a short from this market (4% shares would be held within the entity business) OR

8. DBL would buy a swap from another institution (probably UK)

### More detailed Cash and collateral flows

The transaction is fairly simple in nature and all considerations arise from different settlements, cashflows, and raising collateral. Described below are some of the variations and problems that can occur.

Strictly Confidential--Not for Circulation/Committee Members and Staff Only.

DB-PSI 60002052

281

On trade date DBIL would arrange for the loan of a bill or of US equities (the "basket") and a few days time (this coincides with the standard US settlement cycle) from the lender. Collateral will be released as noted in steps 2 and 4 above and that could be in different forms.

*Cash collateral / settlement:*
Standard cash settlements are DVP (delivery versus payment) where as the stock is moved as collateral and the basket should move at the same time). The flow would be as follows:

*Steps 1 and 2*
   i.   Trade date ("TD"), agreement of the loan takes place.
   ii.  Settlement date ("SD"), DBIL require intraday funding to pledge cash collateral to the lender. DBIL borrow this cash intra-day from DBIL.
   iii. The cash and stock move at the same time leaving DBIL long cash leaving the lender long cash.

*Steps 3 and 4*
   iv.  Simultaneously (in (i) above) on TD DBIL arrange to lend the basket to Macquarie HK.
   v.   Settlement date (after steps 3 and 2) Lend to Macquarie HK require funding to pledge cash collateral to DBIL.
   vi.  The cash and stock move at the same time leaving Macquarie HK long stock and DBIL long cash
   vii. DBIL uses this long cash to return the intra-day funding from DBIL.

*Settlement fails – Steps 1 to 4 discussion*
Steps 1 and 2 must happen together as the starting point comes with the intra-day funding from DBIL moving to DBIL. If settlement day fails settle and the DVP settlement with the stock is not possible on part of the brokerage i.e. below should not settle then any excess cash should be returned to DBIL. If it is too late to return cash to DBIL the amount will be steps.

If both steps 1 and 2 happen will not only stay into place for that settling the SD for 3 and 4 to occur, DBIL will be long stock and short the intra-day cash funding to DBIL. As part of DBIL's general treasury it has sufficient outstanding lines in DBIL. We are hoping no limitation of which can be used as collateral funding against existing lines. If this happens late at night, overnight funding of this amount should be possible under the arrangement DBIL has with NY.

Steps 3 and 4 are DVP and occur at the same time. As these rely on Macquarie HK any fail would put us back in the position above.

*Steps 5 and 6*
Steps 5 to 7 form part of the general SBL business therefore not requiring explanation (see below for loan cash collateral).

*Cash collateral – unwind*
The unwind or reverse should flow as follows:

*Steps 5 to 8*
As above – no explanation required

*Steps 1 to 4*
   i.   On SD (or the term date of the loan) date 1 business days (currently the 3 business date "TD" (for the coupon in step 1 to 3) Macquarie HK short shares with DBIL to return the shares DVP for the cash collateral).
   ii.  DBIL intra-day short day funding from DBIL in order to return collateral to Macquarie HK
   iii. SD, the shares and cash move DVP unwinding the loan transaction. This leaves DBIL long stock and short intra-day funding to DBIL.

282

*Steps 1 and 2.*

iv.   On SD of the term date minus 8 days DBIL will agree with the lender to return shares in lieu of the collateral.

v.    SD, the shares are held more DVP surrounding the loan borrowings. This terms DBIL long cash and short intra-day funding to DBIL.

vi.   DBIL returns the intra-day funding to DBIL.

*Settlement fails – Steps 1 to 4 Cleared.*

*Steps 3 and 4*

As these steps only on Macquarie HK, if between the stock fails into DBIL, it will be left with the intra-day funding from DBIL. Depending on the intra SD day, or the fail business be returned to DBIL before the final deadline for daily funding or temp by treasury out of the routine.

*Steps 3 and 4*

If steps 3 and 4 fail then the above will happen: If they settle then DBIL will be long stock and short intra day cash to DBIL. This will also be the net of steps 1 and 2 fail (as they are DVP).

*Non-cash collateral – Inception*

Where any cash collateral is required by the lender settlement of the collateral normally takes place one business day before settlement of the stock ("prepay") in this case the flows would be as follows:

*Step 1 to 4*

i.    TD, agreement of stock loan takes place (the borrow from the lender and the loan to Macquarie HK).

ii.   SD minus 1 ("SD – 1"), DBIL request non-cash collateral ("G10") which they get from Macquarie HK (Macquarie Osaka takes the collateral from a reverse collateral loan with DBIL – see below).

iii.  DBIL prepays the G10 to the lender on SD – 1.

iv.   SD the lender gives stock to DBIL (against the prepayment of G10).

v.    DBIL then stock to Macquarie HK (again against the prepayment of G10), leaving DBIL flat stock and flat G10.

*Settlement fails – Steps 1 to 4 Inception*

If Macquarie HK are not able to pass the G10 (SD – 1) to DBIL then the whole transaction will fail as DBIL can not prepay against the stock (so SD) will pass it should be that for below – reverse collateral loan).

If DBIL receive the G10 from Macquarie HK and DBIL are unable to pass it on to the lender then the whole transaction will fail. Macquarie HK in this instance will have prepaid the G10 a day earlier than required for actual settlement of the stock.

If the G10 settles (to the lender SD – 1 but the stock fails (no stock coming to DBIL on SD). In this case both Macquarie HK and DBIL will have prepaid a day early.

If the G10 settles with the lender (SD – 1 the stock is passed to DBIL by the lender but can not be moved to Macquarie HK (perhaps because it is too late to do settlement days), then DBIL will be long stock and Macquarie HK will have prepaid a day too early.

NB: where prepay takes place a day too early (in consequence is there is an extra day's worth of credit risk on the prepaid collateral (and probably an extension of the reverse collateral loan by a day).

*Reverse collateral loan and DBIL swap with Macquarie - Inception*

As discussed above the cost of Macquarie raising G10 is much greater than for the DB Group. This key is to reduce the cost of this for the structure and is linked to the swap DBIL writes with Macquarie. The flows will work as described below:

i.    On SD – 1 Macquarie HK require G10 to give to DBIL under it to generate collateral loan with Macquarie HK, but G10 is given along loan with DBIL in return for G10 cash (this is DVP). The

DB-PSI 00000054

those. By default in the jurisdiction would take financing the start date is one day earlier and the end date is one day later with the start date on the loan on the SLV.

ii. At the cost of Macquarie HK closing the trade it can negotiate DBIL provides simple on-SLV under the swap with Macquarie Sydney. The subject is about how we structure the cost that Macquarie HK pays to DBIL under its swap. The HK leg will only be provided until SB2 at which point Macquarie HK should have obtained cover looking for stock.

*Fails on the reverse collateral loan, margin on the swap – Exemplary*
Firstly if the margin on the swap fails from Macquarie Group will not have cash enough to fund the reverse stock loan. As this is DVP then the whole transaction will fail as no CHO will enter in the Macquarie group.

If the margin settles and the reverse stock loan does not the the whole transaction will fail as no CHO moves. In this case DBIL will just have to run on the swap on its own day and will be asking Macquarie credit risk for the same period.

If the margin and the reverse stock loan both settle then Macquarie have the CHO and any further fails are exactly as described above under "settlement fails – steps 1 to 6 inclusive.

*Reverse collateral loan and DBIL swap with Macquarie – Denied*
The reverse flows on the collateralose in the case of the lender not getting back the CHO on SB3 (what is know as a "recycle"). Thereby that grounds the proposed scenario as follows to deal with this by extending the reverse collateral loan for a day:

i. Macquarie HK retains the stock (they will at some point have to buy the stock in the market) on the SB2 of the loan. This will be FOP (free of payment) leaving them short stock and it is retained short cash linked to buy in the stock.

ii. DBIL retains the stock to the lender leaving them short collateral which they are obliged to return to Macquarie HK.

iii. In the event the lender does not recall the CHO then the next consequence of the recall is as Macquarie Group being short cash (it has taken the reverse collateral loan is extended by another day). Either Macquarie Group funds their short cash position for another day (DBIL extends the swap by an additional day and margin is provided to Macquarie Group which is does.

iv. When the lender settles their CHO to DBIL, DBIL will pass this onto Macquarie.

v. Macquarie Group will return the CHO to DBIL, it is not a trade that cash will then be used to either their intra-day funding – it is not assumed DBIL will provide their own day funding.)

*Fails on the reverse collateral loan, margin on the swap – Denied*
The fails are dealt with above and by the extension of the reverse collateral loan.

284



Deutsche Bank

*SECURITIES LENDING PROCEDURES MANUAL*

**Deutsche Bank International Limited**

**Securities Lending
Key Operating Procedures Manual**

Andrew Tate
December 2003

Strictly Confidential--Not for Circulation/Committee Members and Staff Only

DB-PSI 00000056



Deutsche Bank ☑

*Securities Lending Procedures Manual*

1.0 INTRODUCTION ........................................................... 1

2.0 TRADING ..................................................................... 2
  2.1 TRADE CAPTURE ........................................................ 2
  2.2 AMENDMENTS TO PENDING TRADES ............................. 3
  2.3 AMENDMENTS TO SETTLED TRADES ............................. 3
  2.4 TRADER LIMITS ........................................................... 3
  2.5 INTRA-DAY EXPOSURE LIMITS ................................... 3
  2.6 TERM TRADES ............................................................. 4
  2.7 END TRADE/CREDIT LIMIT CHECKING ......................... 4
  2.8 FAILS ......................................................................... 4
  2.9 NEW CLIENTS ............................................................. 4
  2.10 HONG KONG TRADES ................................................ 4
  2.11 MODCA ..................................................................... 5
  2.12 NEW MARKETS .......................................................... 5
  2.13 NEW PRODUCTS ........................................................ 5
  2.14 PRICING .................................................................... 5
  2.15 PROGRAMMES ......................................................... 6
  2.16 COLLATERAL ............................................................ 6
  2.17 BILLING .................................................................... 6
  2.18 HOT STOCKS ............................................................ 6

3.0 TRADE SUPPORT CONTROLS/REPORTS ....................... 7
  3.1 SHORTS ...................................................................... 7
  3.2 THRESHOLDS ............................................................ 7
  3.3 CASH DRAFTS ........................................................... 7
  3.4 TERM TRADES ............................................................ 7
  3.5 PRIOR COUPON DATE RETURNS ................................. 7
  3.6 CORPORATE ACTIONS ............................................... 7
  3.7 OVERSUBSCRIBED RETURNS ..................................... 8
  3.8 AUTOBORROWS ......................................................... 8
  3.9 REPORT DISTRIBUTION AND SIGN-OFFS .................... 8
  3.10 ONE MARKED TRADE REPORTING ............................ 8
  3.11 DAILY RESPONSIVE CREDIT REPORT ....................... 8
  3.12 BLOTTERS ............................................................... 8
  3.13 NEW ACCOUNTS ....................................................... 8

4.0 RISK EXPOSURES ....................................................... 9
  4.1 COUNTERPARTY RISK ................................................ 9
  4.2 MARKET RISK ............................................................ 9
  4.3 COUNTRY RISK .......................................................... 9
  4.4 LEGAL RISK ............................................................... 9
  4.5 ???????? ................................................................... 9
  4.6 BALANCE SHEET LIMITS ............................................ 9

5.0 SEGREGATION OF DUTIES ......................................... 9
  5.1 ACCOUNT OPENING ................................................. 10
  5.2 TRADE CAPTURE ...................................................... 10
  5.3 TRADE AMENDMENTS .............................................. 10
  5.4 TRADE AMENDMENTS .............................................. 10
  5.5 TRADE SETTLEMENT ................................................ 10
  5.6 CONFIRMATION WITH SLICE ................................... 10
  5.7 CASH PAYMENT/RECEIPTS ...................................... 10
  5.8 P&L CALCULATIONS ................................................. 10
  5.9 SETTING OF CREDIT LIMITS .................................... 10
  5.10 SIGN-OFF OF CLIENT EXPOSURE (INTRADAY) ....... 10

Strictly Confidential—Not for Circulation/Committee Members and Staff Only

DBUSH 00090057

**Deutsche Bank**

*SECURITIES LENDING PROCEDURES MANUAL*

5.11 CHANGES/ENHANCEMENTS TO IT SYSTEMS ............... 10
5.12 AMENDMENTS TO EXISTING SYSTEMS ............... 10

**6.0 LEGAL / DOCUMENTATION/ COMPLIANCE** ............... 11

6.1 CLIENT ACCOUNT OPENING PROCEDURES/REVIEWS ............... 11
6.3 MODELS ............... 11
6.3 NETTING ISR AGREEMENT IN PLACE (EXECUTED AND SENT TO QED) ............... 11
6.4 DOCUMENT SAFEKEEPING ............... 11
6.5 RESTRICTED STOCKS ............... 11

**7.0 SYSTEMS** ............... 12

7.1 ACCESS TO SYSTEMS ............... 12
7.2 CONTINGENCY ............... 12

**8.0 STOCK LENDING WEBSITE** ............... 12

**9.0 CREDIT** ............... 12

9.1 SETTING OF CLIENT LIMIT ............... 12
9.2 REQUESTS FOR CONTRAGREATER LIMITS ............... 12

**10.0 SUPPORT UNIT FUNCTIONS** ............... 13

10.1 OPERATIONS ............... 13
10.2 CORPORATE ACTION ............... 13
10.3 CONTROL ............... 13
10.4 CREDIT ............... 13
10.5 LEGAL ............... 13
10.6 TAX ............... 13
10.7 COMPLIANCE ............... 13
10.9 INFORMATION TECHNOLOGY ............... 13

**APPENDIX 1: SECURITIES LENDING - CONTACT LIST** ............... 14

Strictly Confidential—Not for Circulation/Committee Members and Staff Only

DB-PSI 00000091

Deutsche Bank

*SECURITIES LENDING PROCEDURES MANUAL*

## 1.0 Introduction

This guide describes the standards to be maintained in the Securities Lending Front Office at Deutsche Bank International Limited, Jersey.

The manual complements, includes and replaces the following documents:

The Compliance manual ...
The Deutsche Global Equities Key Operating Manual
The International Guidelines for Trading and Settlement
Global Equity Prime Services Trade Support Procedures Manual

This manual was originally written in January 2001 for the London business and has since been updated and adapted for other business units. Further updates will be required whenever a significant process enhancement or new system is introduced.

## 2.0 Trading

The securities lending market is intermediated by the most common short positions stock or loan and Prime Brokerage clients and to at least a partner or other institutions. A trader does not take outright positions, and therefore runs a book with no profit risk. As such by covering shorts and responding to and generating market demand, a trader is responsible for stimulating excess interests and generating dividend possibilities.

## 2.1 Trade Capture

The trades, when captured the deal books all trades in the Front Office deal capture system "Delta" which interfaces with the operating system. Global flex. In special circumstances, Traders Assistance aid in this process. All trades are booked on trade date, if this is not the case then the Head of the Trading Desk must sign off.

## 2.2 Amendments to Pending Trades

Trades in pending status should not be amended. Any pending trade that needs changing should be cancelled and re-booked by the Front Office.

## 2.3 Amendments to Settled Trades

Once a trade has settled, responsibility for amendments passes to Operations, except for basic changes such as settlement instructions (e.g. no capital movement), which may be made by the desk (diary access allows for this trade). Any other requests emanating from the Front must be communicated to Credit.

If a settled trade needs to be cancelled in a situation where a trade has been settled down in error, Operations should identify the trade and ensure that the Trade Support cancel the pending trade.

## 2.4 Trade Limits

Trades limits have and limit are bespoke. Securities Lending traders do not take market risk, as the borrower always has an obligation to return the above unperformed. As a result, market risk remains with the underlying lender of the shares (barring the transfer of beneficial ownership). The traders do however have to adhere to the credit limits that are set for all counterparties, and have to get any trade of over USD 50 million signed off by the Head of Desk.

Deutsche Bank                     *Securities Lending Procedures Manual*

**2.5 Intra-day exposure limits**

As noted above, the Head of the Desk oversees all intra-conditions greater than day exposure of more than USD 50 million.

**2.6 Term Trades**

All term trades must be checked (documentation) or otherwise verified with the Head of the Desk.

**2.7 Pre-trade credit check checking**

The credit department uses Moxy to monitor and track all limits. The limits in Moxy are sent to report format to the trading desk. It is the responsibility of the relationship banking trade to know counterparty limits and trade within these limits. Management ensures that pre-deal credit checks are performed for all counterparties who are not on the 80% exposure report and all counterparties are approved prior to trading.

Credit review columns in Moxy that are 80% or over, the day after a trade is recorded. The credit officer will then distribute a watch list to trading desk for review according to the meeting.

**2.8 Fails**

In the event that pre-trade is not performed the trade shall be cancelled and re-booked.

**2.9 New clients**

No trade may be undertaken until a client has been fully set up in the system, complete with all necessary documentation (including the legal agreement, IIC Address and Moxy as necessary), and an approved credit limit (including OUG, signoff). It is the trader's responsibility to ensure that this is all in place prior to trading.

**2.10 Hong Kong trades**

No Hong Kong trades may be undertaken unless a fully registered address, and it is the trader's responsibility to ensure that this has been put in place. A daily report maintained by the Securities Lending Trade Support is distributed detailing the residents that have been registered.

**2.11 MODIs**

MODIs are put in place with all eligible clients by the Securities Lending Markets representatives when an account is opened, and the original document is placed in the Legal department file after the signing. The Legal department retains receipt of the documentation in Questline and the Business Unit.

A spreadsheet detailing all MODIs is maintained by trade support and is a part of the Securities Lending checking team for each default. These process must be the instigation of a MODI trade support will begin processing automatically of trade documentation. If the MODI process requested any trade prior to deposit trades logged settlement the Securities Lending Business front desk documents who will liaise with the client directly. The process will then work at the time MODI settling and confirming notification.

In cases that a MODI is not matched, the Securities Lending checking team are responsible for flagging this to the Trading Desk, who will then this way arrange what concerning trading with the counterpart.

          DB-PSI 0000000D

Deutsche Bank ☑

*Specialized Lending Principles Manual*

### 2.12 New markets

A trader must ensure that all the diligence has been gone below relating to a new market, and that sign-off has been received from all the relevant groups (Operations, tax, compliance, legal, regulatory, credit).

### 2.13 New products

Any wish to trade a new product should be presented to the CEO of Business Manager, who will liaise with the relevant personnel in determining whether formal New Product Approval is required. If it is, a paper must be put before the committee at the New Product Approval Committee; this Committee must approve any new product before trading may start.

### 2.14 Billing

At the end of each month all client bills for that month are run by the operations department and sent to the client. In the event of a discrepancy occurring, the benefit must relate to a billing operational that is shared between the Business and Operations. As soon as [illegible] to all outstanding items, and that person is uncomfortable for solving the difference.

If solving a discrepancy necessitates a potential P&L write-off, it matters will be sent to the Head of the Trading Desk in whose discretion any portion of the bill may be written off.

A list of outstanding billing is sent weekly to the Head of Operations and Business Manager for their action.

### 2.15 P&L Review

Each day a detailed P&L is sent to the desk by operations, and is reviewed by the Desk Head and Country Managers. Any anomalies should be investigated with the appropriate parties and the Desk Head should sign-off the P&L on a weekly basis, all items having been corrected.

### 2.16 Collateral

The collateral provided by the stock borrower must meet the requirements for collateral from the stock lender.

Collateral placing/receiving for all new trades and daily mark fluctuations is the responsibility of Securities Lending Operations, who should liaise with the trade managers immediately. For example in desires the need for different types of collateral. Stock Loan traders should liaise with Operations whenever a trade of your own Operation as soon as order so that the most efficient collateral is available. Similarly all stock day traders should be highlighted to Securities Lending Operations in order that collateral as specified in a timely manner.

### 2.17 Buy-Ins

In any case where a stock cannot end up being bought in or ends in finance a desk faces a constrained, this should be discussed with the Head Trader at the earliest possible opportunity.

### 2.18 Hot Stocks

"Hot stocks" are those which are classified as difficult to borrow. Each day the trader is kept up-to-date the list (to keep the current "hot" stock).

Strictly Confidential–Not for Circulation/Committee Members and Staff Only

DB-PSI 00000061

Deutsche Bank   *Securities Lending Procedures Manual*

### 3.0 Trade Support Control Reports

On a daily basis, the Trade Support group compiles/reviews a number of reports that are critical to the control of our business. Among these are the following:

#### 3.1 Shorts

Trade Support use Shore's inventory management screens to cover short stock.

#### 3.2 Imbalances

Trade Support use the Trade Summary Imbalance Report to see where positions do not match loans.

#### 3.3 Contracts

Trades booked against a cash pool have their agreed basis (unless otherwise agreed). Trade support have a reconciliation of these trades for every EBRD and DB B/C and input new ones daily, amending Global One accordingly. All collateral positions agreed, collaterals input.

#### 3.4 Term Trades

After pulling off a daily reconciliation inventory, trade support balances the trades concerned if stock needs to be rolled or returned.

#### 3.5 Pre-reconciliation returns

A report is generated showing all securities lending that needs to be returned each day, this report can help to ensure that any return reconciliation prior to this day, that a lending overload positions... The front and inventory management system allows also displays/returned information, which is often used as a point of reference.

#### 3.6 Corporate actions

The record date, ex-date, is generated per trade support for certain individual securities approaching record date and ensure that no fails/reconciliance outstanding.

Trade support that book all trades recognized by a corporate action (such as bonus issues and stock splits) upon the instructions of the Corporate Actions desk within Operations.

#### 3.7 Overborrows/ Returns

An overborrow report is generated by Global.

#### 3.8 Autoborrows

Trade support review auto-borrows and determine what can be returned by either party's remaining do cost, risk, age, and return. They also monitor any cases where the agent has failed to return autoborrow despite having sufficient stock to purchase.

#### 3.9 Report distribution and sign-off

A number of reports are given to the Head Trader each day for sign off. Trade support file these in case of overfall at a later date.

#### 3.10 One year old trade rectifier

Trade support review positions with different support showing trades which have been outstanding for longer than one year, and follow-up on putting appropriate action in place.

DB-PSI 00008983

291

Deutsche Bank

*SECURITIES LENDING PROCEDURES MANUAL*

In addition, for Hong Kong trading, a report is produced and reviewed daily which shows any trades with a client who does not have signed repurchase Manuals in place. The Head of Trading Region and the Business Manager review this.

### 3.11 Distribution of credit report

The credit report is posted on the securities lending website and is sent daily via email. The report above contains the balances by client along with their compliance with collateral ratios. This also is available to all front office staff, the credit department, and credit teams for the Head of the Desk.

Once an account is active, it will fall into traffic with the credit operations team, the credit department, and will often be given a temporary account while it is providing account. The intent is to keep within the limit pending receipt of credit approval.

### 3.12 Hotlist

Each day London and Frankfurt trade interest reports made by their main London, Hong Kong and New York. These hotlist detail inter-company trades done between one and another and for London, and are used by trade support to check the trades as necessary.

In addition, a London hotlist, detailing trades done between counterparties and all the above entities, is compiled every day and sent to the relevant group.

### 3.13 New Accounts

Typically, new relationships are introduced to the Securities Lending group either through the Global Securities Lending Marketing Team or the Equity-Finance Sales desk and are introduced to a broker business to offer the range of solutions from client account positions.

The Deutsche Bank Credit department must first approve a new potential corporate lending counterparty before the legal department will begin the process of documentation. The approved process includes KYED check on corporate party and individual party and individual account may need consistent with firm-wide credit policy and signed off by Deutsche Group Credit Operations POLICY.

Accounts are opened by the Securities Lending Operations department only upon receipt of a copy of the completed document, signed by a credit line manager, the DOCS, and set up by the Securities Lending Trader. The Legal department keeps all the necessary...

### 4.0 Risks/Exposures

### 4.1 Counterparty Risk

It is normal practice in the securities lending market for the borrower of shares to deliver collateral to the lender. Although this type of collateral varies from one client to another, market practice dictates that the collateral value should equal 105% of the loan value.

It is the responsibility of the Operations department to "mark to market" the loans and balances on a daily basis and to revalue/reprice them as required. The thresholds can be reviewed to client loans, depending on the type and size of the book and level of collateral at the client account.

Operations monitors a daily report showing all collateral loans and collateral deficit/excesses. This aspect of operation is the most important one to ensure there is limited risk of deficit from exposures. Operation notify the Desk should there be any significant deficit and, if there is any significant exposure outstanding. This report is reviewed by the Securities Lending collateral manager.

292

Deutsche Bank  *Securities Lending Procedures Manual*

### 4.2 Market risk

As previously mentioned securities lending transactions can unwind/unfit damage by the lender, who retains ultimate ownership of the shares. Due to this, no hedging strategies are needed and no position limits are necessary.

### 4.3 Counterparty risk

Individual counterparty volatility is important that as the settlement is/not to confirm that it can reclaim. In times of increased volatility, it is therefore necessary that Operations can particularly close attention to exposures (running reports as/will times per day if necessary)

### 4.4 Legal risk

Securities Lending transactions conducted on the books of Deutsche Bank International (Limited Jersey) are all governed by the Overseas Lending Agreement (OSLA), the market standard agreement for international securities lending.

### 4.5 Large Exposures

It is necessary to stop particularly close attention to exposures for regulatory purposes. The Jersey Financial Services Commission (JFSC) regulations require that any exposure to a borrower which may exceed 25% of DBIL's capital base requires reporting to the local regulator. It should be noted that such amount is reported for any exposure greater than 25% of the capital base and is not possible to stock lending beyond this known client.

For the purposes of reporting, no exposure is allowed on collateral i.s. £100m exposure given against a stock borrow of £100m is reduced at a £5m exposure.

### 4.6 Balance Sheet Limits

Traders are responsible for ensuring that they comply with the relevant balance sheet limit. Compliance (who perform regular audits on balance sheet limits) should inform Securities Lending management if and when limits are being approached/exceeded.

### 5.0 Segregation of Duties

Separation of duties is necessary to assure fairness, independence and integrity in the following areas:

Trading Desk
Trade Support
Collateral Operations
Settlement Operations
Accounting
Marketing/Products

As a minimum requirement, the trading function must be separated from all other functions, and must not even process, where explicitly required, from the other areas.

### 5.1 Account opening

The Global Marketing Team identify business new client relationships. Once the necessary legal documentation has been signed (compliance sign-off obtained) and credit limits determined, the marketing team will complete an account opening form, which at that will cause Operations set their addresses. In turn this is then forwarded (by Operations) to Client Services, who sets the account ready for trading.

DB-PSI 00000064

Deutsche Bank ☑

*SECURITIES LENDING PROCEDURES MANUAL*

No trades may be entered or priced to completion of the above process.

### 5.2 Trade Capture

All trades are entered by the Front Office with the exception of stock borrow and loan event adjustments (not previously captured). Collateral and settlement details to not have the necessary approvals/limits to book trades/orders.

### 5.3 Trade Authorisation

When trades are booked in Global One they automatically feed down to a queue in Globe from where they are checked and authorised by authorised Operations.

### 5.4 Trade Amendments

There should be no change settlement amendments by either front office or Operations. Trades needing amendments must be cancelled and rebooked.

### 5.5 Trade Settlement

Trade settlement responsibilities resides solely with the Operations department, although most internal trades are booked with auto-settlement.

### 5.6 Communication with agents

All agent communication should continue from the Operations department. If the Front Office have a specific question for an agent, this must be routed through an Operations employee.

### 5.7 Cash movement/receipts

No Front Office employee is involved in making/receiving payments. All instruction, booking, authorisation and monitoring of payments takes place in the Operations department.

### 5.8 P&L Calculations

Exclusively the Operations performs all P&L calculations. The Front Office is responsible only for explaining trades to Operations when required. The reconciliation that P&L on a daily basis and compare it with the figures computed by Operations, with any differences between the two communicated to and investigated by the Front group.

### 5.9 Setting of credit limits

Credit limits are set independently of the Front Office. The only input the Front Office has in this process is the initial request to set the limits.

### 5.10 Signoff of client exposure (breaches)

Where we assume intraday credit risk of over USD1.5million, the trades concerned must have been signed off by the Head of the Trading Dept.

### 5.11 Changes/enhancements to IT systems

Any changes required to Securities Lending IT systems should be routed through the Business Manager or the Head of New Product Development under their control in the IT department.

DB-PSI 00000002

Deutsche Bank        *SECURITIES LENDING PROCEDURES MANUAL*

### 5.12 Amendments to client security state

All requests for amendments to client security state are made to the Business Resources Operations group, who in turn require intelligence to be made by the Collateral Services group.

### 6.0 Legal/Documentation/Compliance

It is the overall responsibility of the Securities Lending industry team to ensure that all documentation is in place and kept up to date at all times. The marketing department is the point of contact for legal matters.

### 6.1 Client approval/change procedures/practice

It is the responsibility of the legal department to negotiate client agreements on behalf of the securities lending desk.

### 6.2 MODIs

MODIs will be completed as necessary and kept by the legal department. Please see the section on MODIs previously in this document.

### 6.3 Political HK Addenda to client/counterparty agreements

Unless specifically not necessary, new clients should have a Hong Kong addenda in place. Where possible, this should be adopted at the time of inception. All new addenda need to be registered with the Hong Kong authorities within a month of being signed.

Securities lending marketing maintains a spreadsheet with details of every HK Addenda. Trades are not permitted to trade Hong Kong stocks in the absence of a registered Addenda.

In order to ensure that trades cannot be added in the absence of a registered Addenda, the HK client static is set up until the SBL vendor is registered on the GLOSS/Loan system. It is the duty of Operations to ensure that, in the absence of this client static, no manual transactions are done for HK/Japanese clients.

### 6.4 Document safekeeping

All original documents are retained by the legal department in a secure place. Photocopies of originals are retained in the Securities Lending binders.

### 6.5 Restricted stocks

Compliance posts a list of restricted stocks on the web site daily. The stocks situated into the cash account facility appears on a website. When a stock appears on the list, Global 2 will not allow more bookings on this security at inception, or a call must be placed to compliance in order to determine whether restricted stocks can be lent.

### 7.0 Systems

Securities Lending use Global One (a vendor system) for deal bookings, while the lending desk is aided by the use of GLOSS and clients for availability, short reports and inventory position management. If this is the front end the system is a tool environment that has not been developed for these hence it is new administrative functionality is overlaid to help deals within the inventory management system.

Deutsche Bank [Z]                    *SECURITIES LENDING PROCEDURE MANUAL*

### 7.1 Access to System

Each group involved in securities lending (risk, traders, trade support, operations, compliance and IT) is granted a different level of access to the system. Any managing staff here can have the application of data see data. To reduce the coverage, we can add to each video, while the appropriate group has no access to trade input screens in Global II.

Access to Global I and Globe is controlled by Information Security Services (ISS) who grant access based on the completion of forms and signed off by approved signatories only. The inventory management system, IBeta is controlled by Securities Lending IT.

### 7.2 Contingencies

In the event of either Globe or Global II not failing, the Securities Lending IT team are able to switch to a second place of hardware, located at Milton Keynes, is used to align the group on another Working. Currently, a Business Interruption procedure, which consists of all partly duplicate domed in London. This domed is best corresponded and held available at any server in a Non-functioning manner at the server at London and is a dedicated production server).

Globe backups are incrementally done every 15 minutes, so it is unreasonable that a great deal of data could be lost. With regard to Global Two, backups are full-only every minute at the end of each day, although the IT department are working on ensuring that changes such that backups are taken as frequently as for Globe.

### 8.0 Stock Lending Website

The securities lending website is a permanent source for Sant SFT and London overnight reports including the tradeability and Positioning report required by SLC or the reports on the website. Reports that used to be distributed by securities lending to all other areas can also be seen in the detail.

Trade information, Technology documentation and Operation procedures can also be viewed on the securities lending website.

### 9.0 Credit

### 9.1 Setting of Credit limits

The credit department assign limits to either individuals and cover these limits into Atlanta. They also send over a 1994 company report.

### 9.2 Request for new/increased limits

Traders should discuss increases for trade risks through our securities Lending marketing department, who will in turn approach the Securities Lending credit officers to request an increase.

### 10.0 Support Units/Functions

Below are detailed the key roles of the Securities Lending support units.

### 10.1 Operations

Following SWIFT instructions to Counterpart
Ensuring timely settlement of all products related or securities lending transactions

Deutsche Bank 

*SECURITIES LENDING PROCEDURES MANUAL*

Mark to market
Exposure management
Collateral management
Netting/margin/positions/locations
Clear/settling

## 10.2 Operating Actions

Communication of MODZ exports
Completion/maintenance of inputs/exports in MODZ lists
Maintaining and recording records/positions
Liaising with clients regarding trades/trade errors
Prepaid/receiving cash distributions, loans, trading firm counterparties(s?)
Amending/changing internal books for dividends and rights/calling out
Liaising with the Sales & Revenue
Informing trade support of trades that need to be booked or amended via corporate action

## 10.3 Controllers

Maintaining and reconciling the Firm's books and records
P&L reporting and analysis
Balance sheet reporting
Regulatory reporting
Management reporting

## 10.4 Credit

Approving credit limits
Monitoring credit exposure
Communication of specific concerns with regard to counterparties, markets, products etc.

## 10.5 Legal

Negotiating/approving all agreements
Advising on legal changes that affect the System
Ad-hoc advice as requested

## 10.6 Tax

Ad-hoc advice as requested

## 10.7 Compliance

Ensuring the business is conducted in an appropriate manner
Communicating changes in regulations to they affect Securities Lending
Ad-hoc advice as requested

## 10.8 Information/Technology

Providing and maintaining the different system and providing comprehensive user support
Upgrading the System as required
Enhancing the system as required

Strictly Confidential—Not for Circulation/Committee Members and Staff Only



Deutsche Bank

*SECURITIES LENDING PROCEDURES MANUAL*

**Appendix 1: Securities Lending – Contact List**

**London**

| | |
|---|---|
| Jean-Paul Nuncoso – | Global Head of Securities Lending |
| Ben Sofoluwe – | Head of International Trading |
| Darren Jones – | Global Business Manager |
| Roy Zimmerman – | Marketing Manager |
| Dermont Cheeban – | Head of Trade Support |
| Mitil Monis – | European Head of Securities Lending Operations |
| Roger Houghton – | Head of Controlling |
| David Krane – | European Head of Securities Lending IT |

**Jersey**

| | |
|---|---|
| Mark Vidgrass – | Global Head Offshore Group Banking |
| Andrew Felle – | Head of Wholesale Trading |
| Darren Langdon – | Wholesale Trading |
| Brett Island – | Head of Equity Controlling |
| Robert McConnell – | Risk Controlling |

Strictly Confidential–Not for Circulation/Committee Members and Staff Only

DB-PSI 00000003



Strictly Confidential—Not for Circulation/Committee Members and Staff Only

299



Strictly Confidential–Not for Circulation/Committee Members and Staff Only

DB-PSI 00000071

300

## SHEARMAN & STERLING LLP

599 LEXINGTON AVENUE | NEW YORK | NY | 10022-6069
WWW.SHEARMAN.COM | T +1.212.848.4000 | F +1.212.848.7179

tpark@shearman.com                                          September 30, 2008
(212) 848-5364

Via Hand Delivery

Mary D. Robertson
Chief Clerk
Permanent Subcommittee on Investigations
199 Russell Senate Office Building
Washington, DC 20510

Re:     Maverick Capital, Ltd. Transcript Errata and Letter to
        Sen. Levin for Record of September 11, 2008 Hearing

Dear Ms. Robertson:

On behalf of Maverick Capital, Ltd. ("Maverick"), please find enclosed for the record of
the September 11, 2008 proceedings the following: (1) a letter addressed to Senator Levin and
the Permanent Subcommittee addressing questions raised by Sen. Levin during the hearing, and
(2) a mark-up of the transcript of Joseph Manogue's testimony indicating all requested changes.

With respect to the transcript of Mr. Manogue's testimony, in addition to a few
typographical errors, we have indicated one minor clarification that we believe does not change
the substance or context of his testimony. The transcript (Tr. at 63:10-14) incorrectly suggests
that Maverick LDC fund is "owned" by Maverick. Since the fund is clearly owned by its
investors (and not Maverick), we believe that the suggested clarification better conveys Mr.
Manogue's intent simply to confirm Sen. Levin's assertion that Maverick LDC fund is a Cayman
Islands entity and that neither Maverick nor the fund has any employees there.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

Tai Park

Tai H. Park

Enclosures

ABU DHABI | BEIJING | BRUSSELS | DÜSSELDORF | FRANKFURT | HONG KONG | LONDON | MENLO PARK | MUNICH
NEW YORK | PARIS | ROME | SAN FRANCISCO | ... | ... | TOKYO | TORONTO | WASHINGTON, DC

SHEARMAN & STERLING LLP IS A LIMITED LIABILITY PARTNERSHIP ORG...

Permanent Subcommittee on Investigations
**EXHIBIT #35**

301

*U.S. SENATE*
*PERMANENT SUBCOMMITTEE ON INVESTIGATIONS*

———————

**Clarification submitted for page 63 (lines 13-14) of the hearing transcript as follows:**

**Mr. Manogue:** It is registered in the Caymans and has no employees there.

302

Maverick Capital
300 Crescent Court
18th Floor
Dallas, TX 75201
(214) 880-4000 Phone
(214) 880-4020 Fax

**Maverick**

September 26, 2008

**VIA HAND DELIVERY**

Sen. Carl Levin, Chairman
c/o Robert L. Roach, Majority Counsel & Chief Investigator
United States Senate Permanent Subcommittee on Investigations
199 Russell Senate Office Building
Washington, DC  20510

> Re:  Statement of Maverick Capital, Ltd. to Supplement
> <u>Testimony Provided at September 11, 2008 Hearing</u>

Dear Senator Levin:

As you requested, I respectfully submit the following to supplement my testimony at the Permanent Subcommittee's Hearing on dividend tax issues on September 11, 2008. Specifically, I would like to clarify for the record my response to the questions you raised regarding Hearing Exhibit #7, a series of emails marked as MAV0001115-0001122.

*Background*

Under an Interpretation promulgated by the Financial Accounting Standards Board that is popularly known as FIN 48, a company must accrue a liability for taxes unless it determines that it is more likely than not (i.e., a greater than 50% likelihood) that it is exempt from the tax. FIN 48 was originally scheduled to take effect at the beginning of 2007. In late 2006 Maverick's tax personnel therefore conducted an analysis of various transactions including its dividend enhancement stock loan transactions under the FIN 48 standard and sought the advice of tax professionals at Ernst & Young LLP in connection with its review. The email chain reflected in Hearing Exhibit #7 was created in the context of Maverick's FIN 48 analysis and addressed two separate and distinct issues.

*Points of Clarification*

The first issue addressed in the email chain related to the United States tax liability of Maverick's offshore funds with respect to stock loan fees earned in transactions that were totally unrelated to its dividend enhancement stock loans. In these transactions, the Maverick offshore funds earned fees as a result of lending their securities to United States persons without regard to whether a dividend was payable during the period of the stock loan. Some borrowers withheld

303

Sen. Carl Levin, Chairman
September 26, 2008
Page 2

United States tax from the payment of stock loan fees and others did not. With input from its Ernst & Young advisors, Maverick determined that there was less than a 50% likelihood that its offshore funds were exempt from United States tax and therefore made an accrual for United States tax liability related to the stock loan fees.

In the case of the dividend enhancement stock loan fees received by the Maverick offshore funds from borrowers in the Cayman Islands and certain other jurisdictions, Maverick, with the support of its Ernst & Young advisors, reached the conclusion that there was a greater than 50% likelihood that the Maverick offshore funds were exempt from United States tax. In the words of Ernst & Young's Matt Blum (MAV0001119), "I can accept the client's assertion that > 50% chance of succeeding if transaction properly structured." As a result, Maverick's offshore funds have never made any accrual for United States tax liability related to receipts associated with their dividend enhancement stock loans, nor have they made any payment of such tax to the Internal Revenue Service.

*    *    *

I hope that this letter clarifies my testimony with regard to the Maverick dividend enhancement stock loan transactions. Please contact me if you have any further questions.

Sincerely yours,

Joseph Manogue
Treasurer

304

### IRS STATEMENT FOR SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS HEARING RECORD REGARDING NOTICE 97-66

Notice 97-66 was issued in 1997 to address the potential duplication of tax liability in various securities lending transactions. However, the IRS is conducting a number of investigations where we believe that taxpayers have attempted to apply Notice 97-66 to highly structured transactions that were not intended to be covered by the Notice. The IRS is aggressively pursuing several such cases and will continue to do so. We have tools under current law to attack those highly structured securities lending transactions, as well as certain highly structured equity derivative transactions.

Notwithstanding our current capabilities, I am committed to raising this matter with the new Administration to determine whether any changes should be made to Notice 97-66. As I stated at the hearing, the Notice involves issues beyond tax and, as such, any changes should properly be considered in a broader economic context.

Permanent Subcommittee on Investigations
**EXHIBIT #36**

305

**Unknown**

| | |
|---|---|
| From: | ANTHONY FAUCI \(CITIGROUP GLOBAL MAR\) [afauci@bloomberg.net] |
| Sent: | Thursday, November 18, 2004 1:50 PM |
| To: | FRANK KOZAKIEWICZ \(AMARANTH GROUP INC.\) |

Hi Anthony. I have a general question for you. Long positions
we place in swap with you, will you loan those back out to the
street ever?
Reply:
not really but we could if we wanted to. generally there is no
mkt for the stuff we are long
Reply:
we we asked for a specific position not to be lent out, would
you be able to do that for us?
Reply:
of course

CONFIDENTIAL TREATMENT
REQUESTED BY CITIGROUP
GLOBAL MARKETS INC.

CITISWAPS 00524

Permanent Subcommittee on Investigations
**EXHIBIT #37**

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATI
AND STAFF ONLY

CITI_PSIWHTAX002282

306

-----Original Message-----
From: Cutts, Will [EQTY]
Sent: Tuesday, March 08, 2005 11:53 AM
To: Tuths, Anthony [FIN]
Cc: Henger, Steven [FIN]; Grbic, Susan [FIN]; Anzel, Keith J [FIN]
Subject: RE: Equity Swap Practices


Tony,

Here are your answers:

1. Our transactions are done within the scope of the guidelines you have set
out for us.

2. We see some increase in activity, not alot, maybe a 10%-15% increase to
our normal daily volumes. We actively turn away trades if they are going Ex
with 3/4 days and we see other broker/dealers doing the same (forces clients
to clean up their act and get organised). Since the Street is asking alot of
clients you tend to find alot of clients simply leave the positions on for a
longer period so that the stock is on long swap for 2-3 Ex Date cycles. In
non US equities we don't like seeing any activity at least 1 week before Ex
Date and in some markets only pay 85% and refuse to pay 100% ie: Netherlands
because of current legislation and the firms own opinion on the country.

3. Its not for us to tell you what Industry Groups you can/cannot join, that
is your prerogative. If anything sharing comments with SIA members will give
you the "Heads Up" on pertinent issues. As to approaching IRS/Treasury Dept
on guidance on single equity swaps and W/H tax, we would prefer if a
prominent Law firm like David Polk intermediated for you rather than the Tax
Dept. having to go face-to-face with the authorities. Depending on the US
Governments mood and "what has Citigroup has done lately in the press" your
answer may vary when your there in person vs via a law firm. its much more
generic and you have anonymity (like a swap!).

Can you please tell us the counterparties who are exhibiting concern? Would
like to know.

Hope this helps.

Regards


Will

-----Original Message-----
From: Tuths, Anthony [FIN]
Sent: Tuesday, March 08, 2005 10:10 AM
To: Cutts, Will [EQTY]; Ellis, Leonard [EQTY]; Breen, Daniel P [EQTY];
Heary, Jonathan [EQTY]
Cc: Henger, Steven [FIN]; Grbic, Susan [FIN]; Anzel, Keith J [FIN]
Subject: Equity Swap Practices

CONFIDENTIAL TREATMENT
REQUESTED BY CITIGROUP
GLOBAL MARKETS INC.

CITISWAPS 00076

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS
AND STAFF ONLY

CITI_PSIWHTAX001834

307

It has come to the tax department's attention that some of our competitors have formed a practice of permitting clients (e.g., hedge funds) to go long equities on swap just over dividend dates in an apparent effort to avoid source country withholding taxes. The tax departments at these competitors are concerned about this practice, especially with respect to U.S. equities and the lack of guidance regarding single equity swaps.

What I would like to know from each of you is:

1. Do you know of transactions that are done outside the scope of our equity swap guidelines (attached), which require one-year swaps with a minimum 45 day period till early termination?

2. Do you normally see increased swap activity on U.S. equities just before record dates, and if so, how much more activity and what is the typical term of a swap put on just before a record date?

3. Would you be opposed to Citigroup tax joining with an industry group (e.g., Securities Industry Association), in approaching the IRS/Treasury regarding guidance on single equity swaps and withholding tax implications?

Anthony J. Tutts
Citigroup Global Markets, Inc.
Director - Corporate Tax
388 Greenwich Street
32nd Floor
New York, N.Y. 10013
(212) 816-1364

CONFIDENTIAL TREATMENT
REQUESTED BY CITIGROUP
GLOBAL MARKETS INC.

CITISWAPS 00077

2

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS
AND STAFF ONLY

CITI_PSIWHTAX001835

308



ictly Confidential - Not for Circulation/Committ

Permanent Subcommittee on Investigations
**EXHIBIT #38**

DB-PSI 0000/472

309

## NPA Category

| | | | |
|---|---|---|---|
| NPA Category: | Enhancement | Enhancement To: | AB104205-Securities Lending/Borrowing in DBII |

### Support Groups Contacted

DB Ldn Global Equities;DB Ldn Prime Brokerage;Tax:Controlling/Operations:Credit;Legal;Treasury - already signed off by mail in Oct 2004

## SECTION 2. PRODUCT DATA

### Product Name and Description

| | |
|---|---|
| Product Name: | DBIL Sec Lending / SRF Structure |
| Product Description: | This is an alternative structure to the Securities Lending transactions approved for DBIL. This request for approval will essentially be for only one half of the previously signed off structure although we request that everyone re-sign this NPA just to formalise matters. DBIL will borrow US securities from an institutional investor as well as entering into the following transactions - sale of equity to the market, OTC derivative (option or forward). The securities lending transaction falls under the existing NPA. The additional approval is sought for the derivative component of the transaction only. The introduction of DBIL to the Securities Lending and OTC derivative environment will enhance existing DB Group activity in this marketplace. Institutional Client/Counterparty credit approval will be driven by the Securities Lending Marketing Team, Global Equities, but will also require approval by the Offshore Group Credit Committee within DBIL, Jersey Front office activities will be undertaken by the Wholesale Desk within the Jersey Banking Division. DBIL Jersey will operate a Prime Brokerage account with DB London to facilitate the transaction The operation of this account will be covered by PB documentation between DBIL Jersey and DB London. Back Office functions will be facilitated via the Prime Brokerage account. Trade support and middle office functions will be performed by DB London under an agreed SLA. Please see attachment for detailed product structure. |

### Product Classification

| | | | |
|---|---|---|---|
| Product Type: | STRUCTURED TRANSACTIONS | Asset Class: | Equity |

### Exchange Details

| | | | |
|---|---|---|---|
| Exchange/OTC: | OTC | Exchange Name: | |

### Maturity

| | |
|---|---|
| Maximum Maturity: | 1 Year |

### Underlying Index

| | | |
|---|---|---|
| Underlying Index: | | Commodities: |

### Currencies

| | |
|---|---|
| Currencies: | USD |

## SECTION 3. LOCATION DATA

### Legal Entity locations

| | | |
|---|---|---|
| Primary Legal Entity Location:Channel Islands | | Secondary Location: |

ictly Confidential - Not for Circulation/Committee Members and Staff Only

DB-PSI_00007473

310

Page 1 of

**Trading Locations**
Primary Proposed Location:Channel Islands

Additional Proposed Locations:London    Existing Locations:    London, Frankfurt, New
York, Sydney, Tokyo DSI

**Client Target Group**
Customer Type:    Financial Institutions    Customer Locations:    Various

**Sales/Origination Locations**
Sales/Origination Locations:London

**DB Legal Entity Offering Product**
Deutsche Bank International Limited;Deutsche Bank AG London Prime Brokerage;Deutsche Bank AG London

## SECTION 4. MODEL & OPERATIONAL DATA

*Model & Pricing Information*
Model Name:    Not applicable    Pricing Source:

*Systems Information*
Front Office Systems:    iDelta IMS    Settlement Systems:    Global I eSheet

## SECTION 5. BUSINESS CASE

*Business Case*
Transaction Volume:    100 per month    Revenue:    Eur 10m

## SECTION 6. ATTACHMENTS

*Attachments*
☒  DBIL See Lending alternative structure (HPA)  (*see next page*)
doc).doc.

311

### Deutsche Bank International Limited ("DBIL") Equity Finance alternative structure

**Rationale**

The requirement from SEF to harness the use of one of the offshore group has been growing over at least a few years and GBPS or even equities at a division has a distinct disability from that.

Broadly speaking, there are substantial US equities held offshore which are consistently included in basket pricing (baskets that would be borrowed on an exclusive basis for use within the overall equities business). We are currently not competitive in that pricing as any borrow of those US equities requires a deduction and payment of withholding tax on substitute payments equal to 15% of any dividend. One competitors do not have to account for this tax (given some of their offshore structures) and can therefore offer a more aggressive price to lenders. A non-US entity is attractive as the amount of withholding tax required to be deducted is reduced to 0% (providing certain criteria are met), therefore allowing us to be more competitive with our pricing.

**Alternative Structure**



1    A non-US entity realises entity ("the lender") holds US equities. Part of its normal course of business is to lend those stocks to the market. It lends DBIL a basket ("the basket") of such equities.

2    In lieu of the basket DBIL pledges collateral equal to the value of the stock + a small margin (this premium of collateral is standard in the general securities lending market). The collateral would be either cash (USD or another major currency) or G7 debt (could be G10).

3    Simultaneously to 1 and 2 above DBIL would sell the basket to the market (probably on UK broker market) in lieu of USD cash (DVP).

4    As a hedge to 1 above either:

DBIL buys a call option from DBIL and sells a put option to DBIL (with a maturity anywhere between 7 days and 40 days). The options would be physically settled giving DBIL the right to buy the shares with a strike slightly lower than the reference price. Both strikes would be equal, the resulting premium always payable by DBIL to DBIL.

OR

DBIL enters into a forward (again physically settled) agreeing to buy the shares back at a forward price, again there would only be a payment from DBIL to DBIL.

The rest is not part of the NPA but completing the picture of what we may do to reap a positive financial return:



ictly Confidential - Not for Circulation/Committee Members and Staff Only

DB-PSI 00007475

312

> Independently, DB London Branch ("DBL") buys a swap on a similar basket in terms of quantity and constitution from one of its Institutional Clients (Interbank relationships). The term of the swap would mirror that of the options or less and above (ranging from 1 week to 90 days).
> An assumption we could make would be that the Institutional client buys shares from the market to hedge that swap.

### More detailed Cash and collateral flows

The transaction is fairly simple in nature and all steps/actions arise from standard settlement, confirms and raising collateral. Described below are some of the variations and problems that can occur and how we propose to deal with them.

On trade date DBIL would arrange for the loan of a basket of US equities ("the basket") for 3 days time (the settlement with the standard US settlement cycle) from the lender. Collateral will be required as noted in step 2 above and this could be in different forms:

#### Cash collateral - inception

Standard cash transactions are DVP (delivery versus payment) meaning that the cash settlement and the basket should move at the same time. The flow would be as follows:

*Steps 1 and 3*
- i. Trade date ("TD"), agreement of the loan takes place
- ii. Settlement date ("SD"), DBIL require intra-day funding to pledge cash collateral to the lender. DBIL borrow this cash intra-day from DBL.
- iii. The cash and stock move at the same time leaving DBIL long stock and the lender long cash

*Steps 5 and 6*
- iv. Simultaneously (or (i) above) on TD DBL associate a sale in the market (a broker) on a T+3 basis. DBIL also enters into a contract or buy with DBL using the sale price or the reference price.
- v. On SD (after steps 1 and 3 happen), DBIL receive stock from (iv) above and use this to settle the DVP sale transaction. DBIL receive USD cash.
- vi. DBIL uses this long cash to return the intra-day funding from DBL.

#### Settlement fails - Steps 1 to 4 inception

Steps 1 and 2 must happen together as the starting point occurs with the intra-day funding from DBL, moving to DBIL. If the intra-day loan settles and the DVP settlement with lender is not possible on part or the basket (e.g. some stocks are not available) then any excess cash should be returned to DBL. If it is too late to return cash to DBL, the position will be swept. In the case of stock not settling too DBIL from the lender, the sale should be partially cancelled and the options/bid amended to the new quantities. If this does not be done (due to timing in the day) then a fail to the market will occur. Technically DBIL are now in a position to claim interest from the broker (at accommodate the interest accrual (embedded in the options) first).

If both steps 1 and 2 happen and perhaps they take place too late during the SD for 3 to settle, DBIL will be long stock and short the intra-day cash funding to DBL. As part of DBIL's general business it has consistent outstanding loans to DBL. We are relying on legal rights of offset for any short cash to create against existing loans. If this happens late at night, overnight funding in this instance should be possible under the arrangement DBIL has with NY. Again, if possible the sale and options/bid should be partially cancelled, if not the sale will fail leaving DBIL in the same position (this is quite normal in the equities market). Any costs of failure will be borne by the relevant parties to the full. This will be insofar as presently as described above.

Step 3 is DVP and the stock and cash movements occur at the same time. As these only net the market trades involved any fail would put us back in the position above.

**Cash collateral - unwind**
The unwind in reverse should flow as follows:

*Steps 3 and 4*
i. On SD of the term date of the put/call minus 3 business days previously the Valuation date "VD" for the swaps in steps 3 to 6 or indeed the VD for the optional/first) DBIL would buy shares from DBIL at the exercise price of the option/forward, DVP against USD cash.
ii. DBIL request intra-day funding from DGL in order to settle the DVP purchase
iii. The shares and cash move DVP leaving DBIL long stock and short intra-day funding to DGL

*Steps 1 and 2*
iv. On SD of the term date minus 3 days DBIL will agree with the lender to return shares in lieu of the collateral (as coincide with (iii) above)
v. SD, the shares and cash return DVP unwinding the loan transaction. This leaves DGIL long cash and short intra-day funding to DBIL
vi. DGIL returns the intra-day funding to DBIL

**Settlement fails - Steps 3 to 6 Unwind**
*Steps 3 and 4*
At these steps rely on the DBIL purchase settling, if this fails DBIL will be left with the intra-day funding from DGL. Depending on the time of day of the fail this may be returned to DGL before the final deadline for daily funding or swept by treasury out of the system (as described above)

*steps 1 and 2*
If steps 3 and 4 fail then the above will happen. If they settle then DBIL will be long stock and short intra-day cash to DGL. In this case DBIL will rely on legal right of offset against existing loans. This will also be the case if steps 1 and 2 fail (as they are DVP)

**Non-cash collateral - Inception**
Where non-cash collateral is required by the lender settlement of the collateral normally takes place one business day before settlement of the stock ("repay"). In this case the flow would be as follows:

*Steps 1 to 4*
i. TD, agreement of the loan takes place (again SD is TD + 3 days)
ii. SD minus 1 (*SD – 1* or TD + 2), DBIL require non-cash collateral ("OJ9") which they get from a repo with DBIL
iii. DBIL prepay the G10 to the lender on SD – 1
iv. SD the lender gives stock to DBIL (against the prepayment of G10)
v. DBIL use the stock to settle DVP with the market broker. The cash raised is used to satisfy the repo with DBIL.

In this context the repo G10 is delivered one day before the cash settles which implies an offset of exposure against existing loans made by DBIL to DGL. The repo exposure will never exceed the loan outstanding.

**Settlement fails - steps 1 to 4 Inception**
If the DBIL repo fails and DBIL do not receive the G10 (SD – 1) then the whole transaction will fail as DBIL can not prepay and get the stock on SD. All parties should be flat although DBIL may need to either unwind settlement of the sale to the market broker and the put/call failing DBIL (to accommodate the extra day settlement cycle). If this is not possible a market fail will occur and we are back in the situation described above of standard market interest claims.

DB-PSI 00007477

314

If DBIL receive the G10 from DBIL and DBIL are not able to pass it on to the lender then the whole transaction will fail. DBIL in this instance will have prepaid the G10 n day earlier than required for actual settlement of the stock, which will net the offset described above. This position with extending terms of this sale and upfront is the same OR the market fall and interest crimes at the same.

If the G10 makes it to the lender SD − 1, the first leg that could fail is the stock coming to DBIL on SD. In this case the situation is exactly as describe above.

If the G10 settles with the lender SD − 1, the stock is passed to DBIL by the lender but can not be settled by the market lender then the position is this as above.

NB: where prepay takes place a day too early the consequence is just an extra day's worth of credit risk via the prepaid collateral (and probably an extra line of the repo by a day).

*Non-cash collateral – nominal*

This again is fairly simple as follows (although there may be a requirement on "prepay" in, provide collateral to the lender for an extra day − this is just a frequent requirement). In reverse order:

*Steps 3 and 4*
    i.    On VD of the options/fwd DBIL buy shares from the DBIL at the exercise price of the options - Ivo DVP against USD cash
    ii.   DBIL request intra-day funding from DBIL to settle the DVP purchase
    iii.  The shares and cash move DVP leaving DBIL long stock and short intra-day funding to DBIL

*Step 1 and 2*
    iv.   On the same VD DBIL will agree with the lender the terms of the shares in lieu of collateral (to coincide with (i) above)
    v.    On SD the shares will move Fop (as the lender has G10 already, either the lender will return the G10 same day or there will be a postpay for one day.
    vi.   If the G10 is returned same day then the repo ends at this point and the G10 is returned for USD cash, the cash satisfying the loan funding. If the G10 is returned the following day then the repo will end day after actual.

*Settlement fails – steps 3 or 4 I'mwind*
If the purchase from DBIL fails then DBIL will have no stock to return and the whole loan and repo will need to be unwound by one extra day. DBIL will be left with intra-day funding from DBIL and depending upon the time of day either this will be removed or swept from the overnite by treasury.

If the purchase settled then DBIL will be long stock and short intra-day cash. If nothing else settles then the short cash will offset against existing loans as described above.

If the stock settles back to the lender and DBIL do not receive the G10 then the position is the same as above although in this case they leave on stock.

DB-PSI 00007478

315

Simon Pearson
02/14/2007 12:11 PM

To: Caroline-CON Richardson/DMGCON/DMG UK/DeuBa@DBEMEA
cc: Harcharn Purewal/DMGOPS/DMG UK/DeuBa@DBEMEA, Kathryn Marsden/dvt/dbcom@DBEMEA, Laurence Pillon/dbl/dbcom@DBEMEA, Peter Lau/DMGCON/DMG UK/DeuBa@DBEMEA, Will Kettlewell/DMGCON/DMG UK/DeuBa@DBEMEA
Subject: Re: Fw: DBIL - AIG TRACKED STOCK LOANS

Who booked them ?

Simon Pearson

_____

Inventory Management - Complex Equity
Office +44 207 547 3237
Mobile/Blackberry +44 7802 941 691
Home +44 1342 833 654
Fax +44 113 336 1598
Deutsche Bank AG London
Global Markets
1 Great Winchester Street
London EC2N 2EQ

Caroline-CON Richardson/DMGCON/DMG UK/DeuBa

Caroline-CON
Richardson/DMGCON/DMG
UK/DeuBa
02/14/2007 08:50 AM

To   Simon Pearson/DMGEQ/DMG UK/DeuBa@DBEMEA

cc   Peter Lau/DMGCON/DMG UK/DeuBa@DBEMEA, Kathryn Marsden/dbl/dbcom@DBEMEA, Will Kettlewell/DMGCON/DMG UK/DeuBa@DBEMEA, Laurence Pillon/dbl/dbcom@DBEMEA, Harcharn Purewal/DMGOPS/DMG UK/DeuBa@DBEMEA

Subject  Fw: DBIL - AIG TRACKED STOCK LOANS

Simon

Just to let you know that there is a $152k hit to P&L caused by an incorrect payment of tax to the IRS on borrows from AIG in Jersey. The borrows where incorrectly booked to be tracked through DTC, therefore AIG has received 70%, we have been charged 100% and the balance of 30% paid to the IRS. In theory, this is recoverable from the IRS, however after speaking with Harch on the practicalities of this we believe taking to P&L now is the most prudent approach.

In the background, Harch will create a reclaim trade in CAM and BAC will create a provision against it (hence the PL hit). The claim to recover the funds against the IRS will be made by the TaxOps team and if recovered, then the credit will back to our P&L.

Please let me know if you have an queries

Regards
Caroline

GM Equity
CIB Controlling - BAC

Strictly Confidential--Not for Circulation/Committee Members and Staff Only

DB-PSI 00007397

316

Tel +44 207 545 9299
Email: caroline-CON.richardson@db.com
—— Forwarded by Caroline-CON Richardson/DMGCON/DMG UK/DeuBa on 14/02/2007 08:11 ——

| Ken Ballantine/DMGOPS/DMG UK/DeuBa | To | Caroline-CON Richardson/DMGCON/DMG UK/DeuBa@DBEMEA |
|---|---|---|
| 14/02/2007 08:10 | cc | |
| | Subject | Fw: DBIL - AIG TRACKED STOCK LOANS |

Caroline,

As requested.

Kind Regards

Ken

—— Forwarded by Ken Ballantine/DMGOPS/DMG UK/DeuBa on 02/13/2007 09:54 AM ——

| Ken Ballantine/DMGOPS/DMG UK/DeuBa | To | Harcharn Purewal/DMGOPS/DMG UK/DeuBa |
|---|---|---|
| 02/05/2007 02:30 PM | cc | |
| | Subject | DBIL - AIG TRACKED STOCK LOANS |

Harch,

Here is the breakdown of trades and cash items for the tracked positions we had with AIG

I have attached the DTC reports and a screenshot of the outstanding nostros, where we have been debited 100% dividend.

Total USD @100%$507,849.13

Total overpayment @30% $152,354.73

Many Thanks

Ken

AIG TRACKING.txt   AIG NOSTROS.xls

Cusip 717081103 - PFIZER
305,215 Nominal = Dividend @100% $73,251.60  - 305,215 Nominal = Dividend @70% $51,276.12

Cusip 774341101 - Rockwell Collins
6,000 Nominal  = Dividend @100%   $960.00   - 6,000 Nominal = Dividend @70%   $672.00

Strictly Confidential--Not for Circulation/Committee Members and Staff Only

DB04300721309

317

Cusip 931142103 - Wal Mart
71,940 Nominal = Dividend @100%   $8,576.00 –   71,940 Nominal = Dividend @70%   $6,003.20

Cusip 983919101 - XILINX INC
63,300 Nominal = Dividend @100%   $5,697.00 –   63,300 Nominal = Dividend @70%   $3,987.90

Cusip 038222105 - APPLIED MATS
324,170 Nominal = Dividend @100% $16,209.00 –   324,170 Nominal = Dividend @70% $11,346.30

Cusip 438516106 - HONEYWELL
384,020 Nominal = Dividend @100% $87,124.54 - 384,020 Nominal = Dividend @70% $60,987.18

Cusip 166764100 - CHEVRON CORP
105,957 Nominal = Dividend @100% $55,097.64  –  105,957 Nominal = Dividend @70% $38,568.35

Cusip 291011104 - EMERSON ELEC
11,480  Nominal = Dividend @100%   $5,108.60 –   11,480 Nominal = Dividend @70%    $3,576.02

Cusip 30161N101 - EXELON CORP
16,890  Nominal = Dividend @100%   $6,756.00 –   16,890 Nominal = Dividend @70%    $4,729.20

Cusip 30231G102 - EXXON MOBIL
641,505 Nominal = Dividend @100% $205,281.60 - 641,505 Nominal = Dividend @70% $143,697.12

Cusip 501044101 - KROGER CO
37,660  Nominal = Dividend @100%   $2,447.90 –   37,660 Nominal = Dividend @70%     $1,713.53

Cusip 773903109 - ROCKWELL AUTO
183,730 Nominal = Dividend @100% $41,339.25 –  183,730 Nominal = Dividend @70% $28,937.48

Strictly Confidential--Not for Circulation/Committee Members and Staff Only

DB-RSL00002369

318



SHAHCHI.LNDB@bloo    To: FABCOHEN@bloomberg.net
mberg.net            cc:
03/14/2007 02:15 PM  Subject: Re: US names

=====Begin Message=====
Message#: 141241
Message Sent: 03/14/2007 09:15:01
From: SHAHCHI.LNDB@bloomberg.net|CHIRAAG SHAH|DEUTSCHE BANK AG,
LO|1726|135008
To: FABCOHEN@bloomberg.net|FABRICE COHEN|BNP PARIBAS| |
Subject: Re: US names


sorry fabrice - none of the names go over record date which is what we were
looking to do...are there any other names which go over record which you are
interested in trading?
----- Original Message -----
From: FABRICE COHEN, BNP PARIBAS
At: 3/14 12:38:38

no issue and after we can roll them ? let me know teh spread
----- Original Message -----
From: CHIRAAG SHAH, DEUTSCHE BANK AG, LO
At: 3/14 8:37:41

sorry mate - the maximum we could do is a 2 week trade...
----- Original Message -----
From: FABRICE COHEN, BNP PARIBAS
At: 3/14 12:36:29

we can trade a 3 months swap  against libor 1M, cancelable at each reset.
----- Original Message -----
From: CHIRAAG SHAH, DEUTSCHE BANK AG, LO
At: 3/14 8:33:21

Morning Fabrice - what dates are you looking to trade?
----- Original Message -----
From: FABRICE COHEN, BNP PARIBAS
At: 3/14 12:33:00

any idea ? thanks
----- Original Message ----- .
From: CHIRAAG SHAH, DEUTSCHE BANK AG, LO
At: 3/13 13:30:40

i am not too sure...peter is not in this afternoon, so i will have a chat
with
him and get back to you tommorow if that is ok?
----- Original Message -----
From: FABRICE COHEN, BNP PARIBAS
At: 3/13 17:27:35

which spread ?
----- Original Message -----
From: CHIRAAG SHAH, DEUTSCHE BANK AG, LO
At: 3/13 13:03:09

319

Hi Fabrice. I work with Peter and will be covering the US book here at
Deutsche.
 Peter forwarded me your request from last week and this is what we could
possibly do. Thanks, Chirag

| Ticker | Qty |
|--------|--------|
| ASD US | 40,812 |
| CTX US | 31,766 |
| PHM US | 59,025 |
| RBN US | 13,002 |
| TOL US | 25,802 |

=====End Message=======

Strictly Confidential-Not for Circulation/Committee Members and Staff Only                    DBSPSI 60002556

320

**Deutsche Bank**
OTC Equity Swap Ticket
LN-LN-SW-165822-2-o-o-d

### TRADE DETAILS

| | |
|---|---|
| Trade Status | Amend |
| Original Deal | bookup, up |
| Original Role | Trade Support |
| Trade Date | 12 Mar 2007 |
| Effective/Trade Start Date | 12 Mar 2007 |
| Amendment Date | 16 Mar 2007 |
| LN Effective Date | |

### FUNDAMENTALS

| | |
|---|---|
| DB Legal Entity | DBAG-LDN |
| DB as | Equity Payer |
| Counterparty | Deutsche Bank AG London (GED London Desk) [London, England, UK] |
| Cpty A/C No. | 10102000009 |
| Trading Sub A/C | |
| Maturity Date | 09 Apr 2007 |
| Pre-Appointment | Yes / No |
| Receive Dividends | Yes / No |
| Atlas | Yes / No |
| Initial Exchange | Yes / No |
| Final Exchange | Yes / No |
| Underlying Type | Stock |
| Equity Return Type | Dividend Only |
| Interest Type | Fixed |
| FX Feature | N/A |
| Termination Date Adj. | Adjusted / Unadjusted |
| Composite FX Rate | |
| FX Source | |
| Payment Date Convention | Three ccy bus. day follow the valuation |
| Blackout | |
| Price Source | Reuters |

### EQUITY PAYER

| | |
|---|---|
| Underlying RIC | RAI.N |
| Underlying Name | REYNOLDS AMERICAN |
| Underlying Ccy | USD |
| ISIN | US7617131062 |
| Exchange | New York Stock Exchange |
| Related Exchange | Chicago Board Options Exchange |
| Equity Reset Freq. | Once at Maturity |
| Notional Reset | Yes / No |
| Initial Fixing Date | 12 Mar 2007 |
| Initial Level | 61.07 |
| Final Level | Official Closing |
| Performance Multiplier | 1.00 |
| Number Units | 150000.0 |
| Notional | 9,160,500.00 |
| Payout Ccy | USD |
| Notional Frequency | Once at Maturity |
| First Period | Normal |
| Last Valuation Date | 09 Apr 2007 |
| Last Period | Normal |
| Last Valuation Date | 09 Apr 2007 |
| Payment Date Convention | Three ccy bus. day follow the valuation |
| Forward Price Valuation | Applicable / Inapplicable |
| Exchange Traded Contract | Futures |
| Valuation Time | Close |
| Valuation Time (Std MM) | |
| Valuation Location | |
| Dividend Type | Gross |
| Dividend Percentage | 25.00 |
| Dividend Pay Dates | Termination Dates |
| Dividend Reinvest | Yes / No |

### INTEREST PAYER – FIXED RATE

| | |
|---|---|
| Fixed Rate | 0.00 |

### INTEREST PAYER

| | |
|---|---|
| Notional | 9,160,500.00 |
| Payout Currency | USD |
| Notional Reset | |
| Interest Fixed Date | 12 Mar 2007 |
| Reset Frequency | Once at Maturity |
| Day Count Fraction | Act/360 |
| Notional Notional | Normal |
| Rate Period | Normal |
| First Payment Date | 12 Apr 2007 |
| Rate Period | Normal |
| Last Payment Date | 12 Apr 2007 |
| Payment Date Convention | Same Day |
| First Period Unscheduled | Yes / No |
| Last Period Unscheduled | Yes / No |
| Interest Rate Reference | By Trader |
| Compounding | Inapplicable / Applicable |
| Compounding Frequency | |
| Compounding Date | |
| Flat Compounding | Yes / No |

### TRADE CONTACTS

| | |
|---|---|
| Marketer Name | Trader(LDN-FTT) |
| Marketer Location | London |
| Marketer Desk | |
| Generic Broker | |
| Broker Trade | Yes / No |
| Broker Name | |

### SETTLEMENT/VALUATION

| | |
|---|---|
| SSI Payments | Yes / No |
| Trade Flow | External Client Direct |
| Payment Date Location | London |
| Payment Business Day | Modified Following |
| Rate Fix (Exp Days) | |
| Mkt. Price (Exp Off Days) | |
| Market Disruption | Standard |
| Correct To Rule | Standard |
| Settlement Frequency | |

### APPROVAL SIGNATURES

| | |
|---|---|
| Front Desk Trader | Risk Approved By Trader |
| Marketer Name | Trader(LDN-FTT) |

### INITIAL MARGIN

| | |
|---|---|
| Initial Margin Appr | Yes / No |

### COMMENTS

we pay 76% div of 150,000 div and receive 97.5% div on these shares

---

[LN-LN-SW-165822-2-o-o / Equity Swap]    Page 1 of 1

321

Dividend Yield Enhancement Meeting with Lehman                                    Page 1 of 1

**Lane-John, Debra**

From:      Qaiser, Amna [Amna.Qaiser@ny.email.gs.com]
Sent:      Thursday, October 05, 2006 9:33 PM
To:        Chropuvka, Gary
Cc:        Khodadadi, Arlen
Subject:   Dividend Yield Enhancement Meeting with Lehman

Lehman came in to talk about dividend yield enhancement service that they are able to provide us. For our
European positions, we went over three different options that we may have as far as dividend yield enhancement
is concerned and the pros and cons for each of the options.

1. Single stock yield enhancement: In this case we can negotiate yield enhancement on a stock by stock basis.
The benefit of this approach is that we can negotiate terms with a number of counterparties and pick a specific
one based on the yield offered. This however is operationally burdensome.

2. Rehypothecation: With rehypothecation, dividend yield enhancement is offered on the entire portfolio. We still
keep the right to remove specific names if we get a better rate with another counterparty and the process is much
easier than single stock yield enhancement because of fewer operational headaches. In order to receive yield
enhancement the security should be in the portfolio three days prior to the record date and must remain in the
portfolio for a specific period depending on the stock in question.

3. Exclusive: In this case the portfolio is reviewed on a yearly basis and based on the expected dividends in the
portfolio an upfront payment is made. A collar is also placed on the expected dividends so that if the dividends
vary within the collar the payment does not have to be partially reimbursed or increased. Beyond the collar, the
portfolio may have to pay back any expected dividend value that was not realized.

Lehman will send us indicative rates for the various markets shortly. They felt that rates would be comparable in
each of the scenarios above.

For US positions in our offshore funds, another option is somewhat similar to rehypothecation where a portfolio is
reviewed on a monthly basis and yield enhancement offered. The actual enhancement would be done through a
stock loan agreement and should be theoretically seamless to us, but would require some sort of collateral
management by our back office (collateral could be either in the form of securities, short term notes, or cash). We
again, maintain the right to recall the stocks.

Some of the issues to keep in mind when getting involved in yield enhancement are:

1. This should not be done for pass-through funds (i.e., our onshore funds) where clients would rather received
the dividends net of taxes instead of a manufactured dividend.

Some things to look into:

1. Emerging markets securities and the dividend yield enhancement available on these names.
2. Canada, and Japan may be of interest for yield enhancement.

3/3/2008

Confidential Proprietary Business Information
The Goldman Sachs Group Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

Permanent Subcommittee on Investigations
**EXHIBIT #39**

GS-PSI-04242

322

Goldman Sachs Agency Lending | Peterborough Court | 133 Fleet Street | London EC4A 2BB
Tel: 020 7774 1000
Regulated by the Financial Services Authority

September 21, 2004

The Directors
Goldman Sachs Funds SICAV
FAO:  Mr. Ted Sotir
Managing Director
Investment Management Division
Christchurch Court, 3rd Floor
10-15 Newgate Street
London, EC1A 7HD
United Kingdom

Dear Sirs:

In follow-up to our earlier discussions with Ted Sotir, I am writing to summarise the terms of our proposal to provide securities lending services through Goldman Sachs Agency Lending ("GSAL"), our U.K. agency lending entity.

For the second year of the lending program, we are offering an overall revenue guarantee of $3.2 million (vs. $2.0 million in Year 1) across the Luxembourg funds listed in Exhibit 1. Key terms of our proposal are as follows:

- Agency securities lending fee equal to 15% of the gross lending revenues (consistent with last year);
- GSAL will pay transaction costs related to securities lending, consistent with the fee schedule in place with the custodian;
- One year guarantee term extending from July 15, 2004 through July 14, 2005;
- Estimated annual net lending revenues of US$4.5 million; and
- Subject to the precise terms of the relevant agreements, including indemnification against borrower default.

Moving the contract term to a July to July cycle will facilitate a more timely and accurate annual review process by avoiding expiry in the middle of the busy Spring lending season (March to June).

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(3)

GS-PSI-00432C

September 21, 2004
Page Two

The revenue guarantee is subject to the assumptions outlined below along
with certain caveats regarding potential changes in the funds' portfolio
composition, and the tax or regulatory environment.

- 100% of each portfolio will be available to lend;
- All stocks will be available for loan over the dividend record date(s);
- Each portfolio will be made available for lending through the GSAL
  agency securities lending programme for a period of 12 months from
  the date specified in the relevant agreement(s);
- The funds' custodian will cooperate with GSAL in the movement of
  securities and cash in connection with the lending program;
- Dividend entitlements for the Funds will be in accordance with the
  attached schedule (see Exhibit 2); and
- Loans will be collateralised with G10 debt excluding Japan and Italy.

In the event that the portfolio manager liquidates positions of the Funds, there
is a change to the composition of the Funds, the Funds are made unavailable
for lending, or there is a change in asset class of the Funds, any of which in
the reasonable opinion of GSAL has a material adverse affect on the
constitution of the portfolios of the Funds and GSAL's use of the Funds, then
GSAL reserves the right to give notice to the Funds that it wishes to revise the
guaranteed fee, in which case the Funds shall agree to renegotiate in good
faith an appropriately adjusted guaranteed fee.

In the event that any securities become unavailable for loan due to changes in
a country's applicable law, regulation or market practice, or there is a change
in the fiscal regimes of these countries, then the stated guaranteed fees
above shall be subject to good faith renegotiation at that time.

Sincerely,

Sarah Cadogan
Executive Director

.cc    Tred McIntire

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

                                                        GS-PSI-00432D

324

**Exhibit 1**

The lending activity of the following portfolios is subject to these procedures:

| | | | |
|---|---|---|---|
| G420 | lending | Non-US fixed income | GS Global Fixed Income |
| G423 | lending | US Equities | GS US Value Opportunities |
| G424 | lending | US Fixed Income | GS Mortgage Back Secs |
| G425 | lending | US Equities | GS US Value Equity |
| G440 | lending | Non-US Equities | GS Global Equity |
| G443 | lending | Non-US Equities | GS European Specialist |
| G444 | lending | Non-US Equities | GS Asia |
| G445 | lending | Non-US Equities | GS Japan |
| G446 | lending | US Equities | GS US Core Equity |
| G447 | lending | Non-US Equities | GS Global Technology |
| G448 | lending | Non-US Equities | GS Europe |
| G449 | lending | Non-US Equities | GS Global Emerging Mkts |
| G453 | lending | Non-US fixed income | GS Global Broad Fixed Inc |
| G454 | lending | Non-US Equities | GS Sterling Fixed Income |
| G455 | lending | Non-US fixed income | GS Sterling Broad Fixed Inc |
| G456 | lending | Non-US Equities | GS UK Equity |
| G457 | lending | Non-US Equities | GS Continental Europe |
| G460 | lending | Non-US Equities | GS Japan Small Cap |
| G461 | lending | Non-US fixed income | GS Global High Yield |
| G463 | lending | US Fixed income | GS US Fixed Income |
| G464 | lending | Non-US Equities | GS Global Emerging Mkts |
| G466 | lending | Non-US fixed income | GS Euro Fixed Income |
| G467 | lending | Non-US Equities | GS Europe Core Equity |
| G469 | lending | US Equities | GS US Growth Equity |
| G471 | lending | Non-US Equities | GS Global Consumer Growth |
| G472 | lending | Non-US Equities | GS Global Financial Services |
| G473 | lending | Non-US Equities | GS Global Health Sciences |
| G474 | lending | Non-US Equities | GS Global Infrastructure |
| G475 | lending | US Equities | GS US Growth Opportunities |
| G400 | Collateral | N/A | Boston Global Advisors |

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVR5(b)(8)

GS-PSI-00432E

325

### Goldman Sachs Luxembourg Funds
### Securities Lending Proposal - 2005 Dividend Cycle
### Assumed Tax Withholding Rates

|  | Net Withholding Rate |
| --- | --- |
| Austria | 15% |
| Belgium | 25% |
| Canada | 25% |
| Denmark | 28% |
| Finland | 15% |
| France | 25% |
| Germany | 15% |
| Italy | 27% |
| Japan | 7% |
| Norway | 25% |
| Spain | 15% |
| Sweden | 30% |
| Switzerland | 35% |
| United States | 30% |

**Note:** The above withholding rates served as the basis for our revenue estimate and revenue guarantee.

31/08/2004  16:48

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

GSAM Ls# Exhibit 2 05.20.08

GS-PSI-00432F



Securities Lending Presentation to
Goldman Sachs SiCAV Board
February 27, 2006

GS-PSI-00433

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(s)

327



**Agenda**

I. Summary

II. Appendix

   A. GSAM Earnings: U.S. vs. Off-Shore Funds

   B. Other Off-Shore Lenders of U.S. Equities

   C. Agency Lending Flows

   D. PriceWaterhouseCoopers Tax Letter

   E. Indemnification Letters

      1. Lending Agent (GSAL)

      2. Borrowers

   F. List of Approved Borrowers

GS-PSI-00434

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

328

# I. Lending U.S. Equities - Summary

A  **Global Marketplace first borrows from regions with highest withholding tax rates due to lower borrowing cost ( i.e. borrower pays 70% of dividend plus a borrowing fee)**

- Makes sense that a Lux fund might earn 18 -23 bps and a U.S. fund earns 1-2 bps

A  **It is likely that end owners of stock are institutions/individuals which are not subject to 30% withholding (as stock is delivered into the market through a short sale)**

A  **Short-term borrowing around dividend record dates is more likely to be associated with explicit dividend enhancement transactions and reduce payments to the U.S. Government**

- Lux fund should establish minimum loan duration to minimize this risk

A  **Longer term borrowing cannot be proven to be associated only with dividend enhancement (potentially tax avoidance) because the market risk is generally greater than the revenue potential from the dividend enhancement opportunity**

GS-PSI-00435

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(2)

329

GS-PSI-00436

Confidential Proprietary Business Information
Produced Pursuant to Senate Rule XXVI(5)(b)(3)
The Goldman Sachs Group, Inc.



Borrower Economics

Notes
◆ This diagram shows three potential stock borrow options for a hedge
fund domiciled in a 30% withholding jurisdiction and the cost of each:
  1) Lux SICAV: pay 70% of dividend plus a stock loan fee.
  2) Italian Stock Lender: pay 85% of dividend plus a stock loan fee.
  3) U.S. Stock Lender: pay 100% of dividend plus a stock loan fee.

◆ Clearly, borrowing US stock from a Lux-domiciled lender
would be the cheapest alternative.

Borrower wants stock from #1 before #2 before #3.

330





GS-PSI-00437

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(3)

331

GS-PSI-00438

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI§8(b)(5)

# Lending Economics

## ⋏ Contribution to the funds



| Earnings | Lending Return on Fund Assets | | | |
| | 2004 | | 2005 | |
| | $000 | Bps | $000 | Bps |
| --- | --- | --- | --- | --- |
| U.S. Equities (1) | ▓▓▓ | ▓▓ | ▓▓▓ | ▓▓ |
| Other Equities | 2,668 | 23.2 | 4,366 | 26.3 |
| Total Lendables | 4,230 | 19.9 | 10,788 | 22.2 |
| Non-Lendable Assets (2) | N/A | N/A | N/A | N/A |
| Total | 4,230 | 17.3 | 10,788 | 18.6 |

(1) US equity lending was phased in between July and September, 2004. The basis point return in 2004 has been annualized for comparison purposes.

(2) Non Lendable Assets includes preferred stock, markets which are not lent (i.e. UK, Korea, Hong Kong), cash and cash equivalents.

⋏ Began lending Non-U.S. equities more than 5 years ago through State Street

⋏ U.S. Equity lending was added through State Street in December, 2002

⋏ GSAL replaced State Street as lending agent in March, 2003

332



# Risk Assessment and Recommendation

➤ **Goldman Sachs Tax Department Review**
- Trade Structure
- Comments on Tax Indemnification Letter

➤ **Tax Indemnification from the Lending Agent (GSAL) and Borrowers**

➤ **Lend to Approved Borrowers**

➤ **PWC Review and Memorandum**

➤ **Over-Collateralization of Loans (102% of loan value)**

➤ **Longer Duration Trades**
- Typically 30+ days
- Borrower is at risk

➤ **Enhanced stock lending disclosure in prospectus and financials (if required)**

**_Recommendation:_** Continue lending U.S. equities subject to minimum loan duration.

GS-PSI-00439

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

7

333

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(2)

GS-PSI-00440



## II. Appendix

A. GSAM Earnings: U.S. vs. Off-Shore Funds

B. Other Off-Shore Lenders of U.S. Equities

C. Agency Lending Flows

D. PriceWaterhouseCoopers Tax Letter

E. Indemnification Letters

    1. Lending Agent (GSAL)

    2. Borrowers

F. List of Approved Borrowers

334

GS-PSI-00441

## GSAM Earnings: U.S. vs. Off-Shore Funds



| Country | US Domiciled Funds Lendables ($MM) | Income ($M) | Return on Lend (bps) | Lux Domiciled Funds Lendables ($MM) | Income ($M) | Return on Lend (bps) | Difference (GSAM Lux - GSAM) Lendables ($MM) | Income ($M) | BP Return on Lend |
|---|---|---|---|---|---|---|---|---|---|
| Belgium | 16 | 36 | 22.3 | 18 | 87 | 46.3 | 3 | 70 | 9.7 |
| Finland | 10 | 58 | 58.5 | 19 | 128 | 68.1 | 100 | 769 | 22.9 |
| France | 126 | 309 | 24.7 | 225 | 1,072 | 47.6 | 47 | 146 | 4.2 |
| Germany | 87 | 168 | 19.2 | 134 | 314 | 23.4 | 23 | 68 | 5.7 |
| Italy | 20 | 58 | 18.8 | 43 | 106 | 24.5 | 47 | 180 | 4.9 |
| Japan | 275 | 121 | 4.4 | 322 | 301 | 9.3 | (17) | (420) | (187.2) |
| Luxembourg | 22 | 424 | 197.1 | 4 | 4 | 9.9 | 58 | 153 | 10.0 |
| Netherlands | 88 | 32 | 4.7 | 128 | 185 | 14.7 | 26 | 159 | 19.5 |
| Sweden | 32 | 57 | 17.4 | 58 | 215 | 37.0 | 72 | 209 | 13.4 |
| Switzerland | 70 | 18 | 2.6 | 142 | 228 | 16.1 | 21 | (7) | (4.4) |
| Other [1] | 37 | 33 | 9.0 | 58 | 27 | 4.6 | 21 | (7) | 6.2 |
| **Subtotal - Non-US** | **763** | **1,295** | **17.0** | **1,149** | **2,666** | **23.2** | **386** | **1,371** | **6.2** |
| United States [2] | 12,150 | 1,765 | | 2,602 | 1,564 | | (9,548) | (201) | |
| Other Non Lendable Assets [3] | 1,084 | N/A | N/A | 565 | N/A | N/A | (496) | N/A | N/A |
| **Total** | **13,977** | **3,060** | **2.2** | **4,317** | **4,230** | **17.3** | **(9,660)** | **1,170** | **15.1** |
| GS US Core Equity Port. (2) | 724 | 73 | | 1,456 | 602 | | 732 | 529 | |

**Notes:**

1) "Other" consists of the following markets: Australia, Austria, Denmark and Norway.

2) US equity lending for the Lux SICAV began on a phased basis between July and September, 2004. The above table reflects the actual income earned in 2004, however the return on lendable assets has been annualized to provide a more reasonable comparison to 2005.

3) "Other Non Lendable Assets" includes preferred stock, markets which are not lent (i.e. UK, Korea, Hong Kong), cash and cash equivalents.

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXV(5)(b)(5)

335

GS-PSI-00442



# GSAM Earnings: U.S. vs. Off-Shore Funds

2005

| Country | US Domiciled Funds | | | Lux Domiciled Funds | | | Difference (GSAM Lux - GSAM) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Lendables ($MM) | Income ($M) | BP Return on Lend. | Lendables ($MM) | Income ($M) | BP Return on Lend. | Lendables ($MM) | Income ($M) | BP Return on Lend. |
| Belgium | 45 | 171 | 37.9 | 59 | 475 | 91.1 | 13 | 304 | 43.2 |
| Finland | 7 | 6 | 6.3 | 31 | 85 | 27.8 | 24 | 80 | 19.5 |
| France | 171 | 432 | 25.3 | 293 | 1,130 | 38.5 | 123 | 697 | 13.2 |
| Germany | 138 | 347 | 25.1 | 197 | 356 | 18.1 | 58 | 9 | (7.0) |
| Italy | 26 | 41 | 15.8 | 76 | 136 | 17.9 | 50 | 94 | 2.1 |
| Japan | 390 | 184 | 4.7 | 446 | 590 | 13.2 | 57 | 406 | 8.5 |
| Luxembourg | 15 | 122 | 78.9 | 9 | <1 | <1 | (7) | (122) | (78.9) |
| Netherlands | 91 | 53 | 5.8 | 191 | 373 | 18.6 | 101 | 320 | 13.6 |
| Sweden | 29 | 34 | 11.9 | 82 | 709 | 86.7 | 53 | 675 | 74.9 |
| Switzerland | 69 | 38 | 5.6 | 148 | 488 | 33.0 | 79 | 450 | 27.4 |
| Other [1] | 138 | 173 | 12.5 | 128 | 25 | 1.9 | (10) | (148) | (10.5) |
| Subtotal - Non-US | 1,119 | 1,601 | 14.3 | 1,660 | 4,366 | 26.3 | 541 | 2,765 | 12.0 |
| United States [2] | 17,424 | 3,134 | [illegible] | 3,192 | 6,422 | [illegible] | (14,231) | 3,288 | [illegible] |
| Other Non-Lendable Assets [3] | 1,613 | N/A | N/A | 983 | N/A | N/A | (651) | N/A | N/A |
| Total | 20,156 | 4,735 | 2.3 | 5,815 | 10,788 | 18.6 | (14,341) | 6,053 | 16.2 |
| GS US Core Equity Port. [2] | 874 | 50 | [illegible] | 2,373 | 5,527 | [illegible] | 1,499 | 5,477 | [illegible] |

**Notes:**

1) "Other" consists of the following markets: Australia, Austria, Denmark and Norway.
2) US equity lending for the Lux SICAV began on a phased basis between July and September, 2004. The above table reflects the actual income earned in 2004, however the return on lendable assets has been annualized to provide a more reasonable comparison to 2005.
3) "Other Non Lendable Assets" includes preferred stock, markets which are not lent (i.e. UK, Korea, Hong Kong), cash and cash equivalents.

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(3)

10

336

## Other Off-Shore Lenders of U.S. Equities

| Entity | Entity Jurisdiction | Parent Jurisdiction |
|---|---|---|
| AXA Investments | Luxembourg | France |
| Fideuram Bank | Luxembourg | Italy |
| Gartmore Investment Management | Luxembourg | U.K. (1) |
| IKANO | Luxembourg | Sweden |
| Merrill Lynch Investment Management | Luxembourg | U.S. |
| SEI Investments | Canada | U.S. |
| State Street Global Advisors | Canada | U.S. |
| Russell Investments | Dublin | U.S. |
| San Paolo | Luxembourg | Italy |
| Schroders Investment Management | Luxembourg | U.K. |

Notes:
(1) Gartmore is owned by Nationwide Insurance of the U.S.
(2) The above information is anecdotal since there is limited transparency.

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(3)

GS-PSI-00443

337



GS-PSI-00444

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI§5(b)(3)
12

338



GS-PSI-00445

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(6)

339



GS-PSI-00446

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

**Indemnification Letters**

Goldman
Sachs

340



Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(3)

**List of Approved Borrowers**

- Barclays Capital Securities Ltd., London
- Bronco (Barclays Cayman) Ltd.
- Deutsche Bank AG
- Goldman Sachs International, Ltd.
- Lehman Brothers (Luxembourg) SA
- MSDW Equity Finance Service 1 (Cayman) Ltd.
- Societe Generale

GS-PSI-00447

341

GS-PSI-00448

## Important Notice

This material has been prepared and issued by the Equities Division of Goldman Sachs International and is not the product of the Research Department. This material is intended for the exclusive use of the person to whom it has been delivered by Goldman Sachs International and is for general guidance purposes only. This material does not constitute an offer to sell or the solicitation of an offer to buy any security or to enter into any agreement and neither Goldman Sachs International nor any of its affiliates (together "Goldman Sachs") is soliciting any action based upon this material. The material is based upon information that we consider reliable, but we do not represent that it is accurate or complete, and it should not be relied upon as such. Consequently, we accept no responsibility or liability for the accuracy or otherwise of such information. Opinions expressed are our current opinions only. This material is not, and under no circumstances is to be construed as a prospectus or advertisement. No part of this material may be (i) copied, photocopied, or duplicated in any form, by any means or (ii) redistributed without Goldman Sachs' prior written consent. However, we mutually agree that, subject to applicable law, you may disclose any and all aspects of this material that are necessary to support any U.S. federal income tax benefits, without Goldman Sachs imposing any limitation of any kind. Goldman Sachs, or persons involved in the preparation or issuance of this material, may from time to time, have long or short positions in, and buy or sell, the securities, commodities, futures, options, derivatives or other instruments and investments identical with or related to those mentioned herein. In addition, Goldman Sachs, by virtue of its status as an advisor, underwriter or otherwise, may possess or have access to non-public information relating to the companies and assets that are referred to in this material, and does not intend to disclose such status or non-public information. The contents of this material should not be construed as investment, financial, strategic, legal, regulatory, accounting or tax advice concerning the consequences of engaging in the business or strategies described herein. You should not rely on any of the information contained herein and you must retain your own independent investment, financial, strategic, legal, regulatory, accounting and tax advice from your professional advisors. This material has been prepared by Goldman Sachs International, which is regulated by the Financial Services Authority.

© Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

342



| From: | Brier, Bruce (bbrier@lehman.com). | Sent:3/18/2004 12:20 PM |
|---|---|---|
| To: [ - ] | Carriero, John P [john.carriero@lehman.com]. | |
| Cc: [ - ] | Pace, Alan [alan.pace@lehman.com]; Conniff, Kevin [kconniff@lehman.com]; Harrison, Kevin A [harrison@lehman.com], Maynard, Ian [imaynard@lehman.com]. | |
| Bcc: [ - ] | | |
| Subject: | RE: | |

John

Yes I did and I have some questions for you. As I explained, we have been doing pretty much the same thing out of our Cayco entity where we often buy at 85 and not 90. Stop by and we can compare and contrast.

Bruce

> -----Original Message-----
> From: Carriero, John P
> Sent: Thursday, March 18, 2004 11:11 AM
> To: Carriero, John P; Brier, Bruce
> Cc: Pace, Alan; Conniff, Kevin
> Subject: RE:
>
> Bruce, Did you have an opportunity to take a look at this?
>
> Kevin, Per our conversation, this is the trade that UBS does to
> enhance the yield on Maverick's portfolio. So that's the positions are
> moved to UBS over that period.
>
> John
>
> -----Original Message-----
> From: Carriero, John P
> Sent: Monday, March 15, 2004 5:38 PM
> To: Brier, Bruce
> Cc: Pace, Alan
> Subject:
>
> Bruce,
>
> Per our conversation, the trade that is provided to Hedge funds such
> as Maverick is offered as a part of the whole relationship so we buy
> the dividends at 90-92 1/2 and we sell at 97-98 on average. The
> duration of the trades is from one week to one month base on the
> unwind. The initial hedge is crossed to the counterparty and we buy
> back a total equity return swap. The hedge execution on the unwind of
> the one week trades goes down to the NYSE floor to be executed, so
> there is equity risk on these trades. When the duration goes to one
> month then a broker can be used to cross the shares at the closing
> price. The actual tax risk on both trades is passed to the
> counter-party that where the trade is executed. Let me know what we
> can provide to our hedge fund clients.
>

Permanent Subcommittee on Investigations
**EXHIBIT #40**

LBHIPSI0001461

343



LBHIPSI00001462

344

| From: | Brier, Bruce [bbrier@lehman.com] | | Sent:4/7/2004 4:27 PM |
|---|---|---|---|
| To: [ - ] | Carriero, John P [jcarriero@lehman.com]. | | |
| Cc: [ - ] | Pace, Alan [alan.pace@lehman.com]; Harrison, Kevin A [harrison@lehman.com]; Maynard, Ian [imaynard@lehman.com]. | | |
| Bcc: [ - ] | | | |
| Subject: | RE: Cayco. | | |

John

Our duration standard is longer.

Bruce

> -----Original Message-----
> From: Carriero, John P
> Sent: Wednesday, April 07, 2004 4:24 PM
> To: Brier, Bruce
> Cc: Pace, Alan; Harrison, Kevin A; Maynard, Ian
> Subject: RE: Cayco
>
> I will also get some US counterparties, what would be the duration?
> The standard most counter parties use over three days for shares not
> crossed both ways and seven days if crosses both ways.
>
> John P. Carriero
> Lehman Brothers Inc.
> 745 Seventh Avenue
> New York, NY 10019
> 212 526 6923
>
> -----Original Message-----
> From: Brier, Bruce
> Sent: Wednesday, April 07, 2004 3:42 PM
> To: Carriero, John P
> Cc: Pace, Alan; Harrison, Kevin A; Maynard, Ian
> Subject: Cayco
>
> John
>
> Thanks for the diagram. The way we left it the last time we met was
> that you were going to identify US counterparties that would be willing
> to pay 97-98% on the swap. I see here you have 100%, I assume the
> difference is built into the rate?
>
> Is this diagram prepared for the US counterparty?
>
> I would suggest a bit more discretion (ie, less reference to tax
> treaties) and, if this is for the unrelated US buyer, less detail of
> flows prior to the swap/sale.
>
> Bruce
>
> -----Original Message-----
> From: Carriero, John P
> Sent: Wednesday, April 07, 2004 11:25 AM
> To: Brier, Bruce
> Cc: Pace, Alan; Harrison, Kevin A
> Subject:
>
> Bruce,
>

LBHIPSI00131396

345



> Please review this trade and let me know how you want to proceed. I
> have a couple of counterparties that I've traded with in the past and
> I'll be speaking with to see if they have an interest in trading with
> us on the dividend side. This trade is initially being set up for
> Maverick but is offered by our competitors as part of a total
> financing relationship with hedge funds. Take a look at this and let
> me know any questions that you have, then let's set up a little time
> in the next day or so to go through all the issues that we've been
> discussing.
>
> John << File: Caymans Island Trade.ppt >>
>
> John P. Carriero
> Lehman Brothers Inc.
> 745 Seventh Avenue
> New York, NY 10019
> 212 526 5929
>

LBHIPSI00131397

346



From:    Curtis, Rob [rcurtis@lehman.com].                          Sent:7/27/2004 12:22 PM
To: [ - ]    Pinnock, Matthew [matthew.pinnock@lehman.com]; Ryan, Patrick D [pryan@lehman.com]; Bisesi, Brian
         [brian.bisesi@lehman.com].
Cc: [ - ]    Story, Richard G [rstory@lehman.com].
Bcc: [ - ]
Subject:    RE: Moore Cap update

Once I'd finished sobbing into the phone Steve apologised and said it
wasn't his intention to cause us problems but the div differential was
significant enough to consider moving. He did however state that our
relationship was far more important than the guy bidding the stk away
and hence once we matched more than happy to keep as is

-----Original Message-----
From: Pinnock, Matthew
Sent: Tuesday, July 27, 2004 5:15 PM
To: Curtis, Rob; Ryan, Patrick D; Bisesi, Brian
Cc: Story, Richard G.
Subject: Re: Moore Cap update


What was their response to your disappointment?


-----Original Message-----
From: Curtis, Rob <rcurtis@lehman.com>
To: Ryan, Patrick D <pryan@lehman.com>; Bisesi, Brian
<brian.bisesi@lehman.com>
CC: Story, Richard G <rstory@lehman.com>; Pinnock, Matthew
<matthew.pinnock@lehman.com>
Sent: Tue Jul 27 15:37:26 2004
Subject: RE: Moore Cap update

Just as a side to that...
Friday 4:00pm Moore wanted to unwind 1.4mm Aventis as they had a better
div bid elsewhere (lehman 85%, v 92% away) This trade was done
originally on the understanding that it came as a package with Sanofi
brrw, execution, funding etc... we haven't rate changed San borrow (we
did everyone else) hence we were slightly 'put-out', aside from the fact
we had traded the stk the other side. Result being we matched the 92%. I
have made them aware that this was a bit inconvenient aside from the
loss in p&l we would incur. This should add further leverage to our push
for PB, I can provide more details if necessary Rob

-----Original Message-----
From: Ryan, Patrick D
Sent: Tuesday, July 27, 2004 2:42 PM
To: Bisesi, Brian; Curtis, Rob
Subject: RE: Moore Cap update

I agree with you on P&L - its better in the LPS. Sounds like Steve was

LBHIPSI00033589

347



messed around by Goldman on the borrow of Aventis that Rob tried to put-through to them for Steve. If we continue to service steve in same fashion, I think we should be pushing for a PB account with him. The way we have serviced him on the sanofi/aventis deal is first class (as he would agree) - I plan to communicate that up the chain to Moore in NY (with sherman's help).

-----Original Message-----
From: Bisesi, Brian
Sent: Tuesday, July 27, 2004 9:05 AM
To: Ryan, Patrick D; Curtis, Rob
Subject: RE: Moore Cap update

Cool. I really think we need to get them on to LPS and eliminate all TRS clients. I know you agree. Per Rob's recent discussion with Moore re Aventis -- can we use this as leverage to promote the CFD Annex sooner rather than later? Or, maybe we are happier with LPS? In terms of P/L I'm actually much happier with LPS.

-----Original Message-----
From: Ryan, Patrick D
Sent: Tuesday, July 27, 2004 1:52 PM
To: Bisesi, Brian; Curtis, Rob
Subject: Moore Cap update

Spoke with Tony Gallagher and Marshall Terry yesterday.
The spin-out of SJL Moore Ltd is scheduled for Aug 1st.
They are looking to novate the existing swaps with us - they will send the novation requests to me. I talked them through the LPS and sent over a draft LPS confirm for review.
Will follow up with them tomorrow to see if they want that product instead of TRS.

Patrick Ryan
Executive Director
Hedge Fund Services
LEHMAN BROTHERS
* 212 526 7142
Mob: ▮▮▮▮▮▮▮
* pryan@lehman.com

▬▬▬ = Redacted by the Permanent
Subcommittee on Investigations

LBHIPSI0003359C

348

| From: | Trommer, Steven [LONDON] [STrommer@lehman.com] | Sent 3/16/2004 11:47 AM |
| To: [ - ] | Ryan, Patrick D [pryan@lehman.com] | |
| Cc: [ - ] | | |
| Bcc: [ - ] | | |
| Subject: | FW: CFM US Business via CFD. | |

> -----Original Message-----
> From: Ryan, Patrick D
> Sent: Friday, August 22, 2003 6:30 PM
> To: Harrison, Kevin A; Pace, Alan; Baldassano, Matt; Trommer, Steve;
> Cipriano, Paul; Ventura , Salvatore; Brannan, Paul F [London]; Wilson,
> Victoria; Bryan, Emma; Gillham, Katie; Seto, Karen
> Cc: Zorek, Jeffrey A; Lowrey, John
> Subject: CFM US Business via CFD
> Importance: High
>
>
> Guys
> For the CFM US business, it has finally been agreed with the client to
> book both long and short business as CFD.
> This will mean that the associated shorts will show as LBSF house
> shorts in DTC 5229 and Kevin has confirmed that his team will be
> responsible for covering the positions each day from a stock loan
> perspective.
> Unusually, we will not be booking any dummy stock loan to the client's
> accounts. In keeping with the existing arrangement for europe and
> japan, the service desk will charge the client the agreed stock loan
> fee on their daily US short balance.
>
> They are planning to cross the existing portfolio on Sept 2nd (1st is
> US holiday) and begin trading with Lehman that same day.
>
> Outstanding Issues
> Paul Cip - confirm end of day file format that program trading will
> send you and confirm that this is compatible with ADAT and can
> successfully be booked in RB/ITS
> Paul Cip - check tax status of manufactured dividends from LBSF back
> to LBI (via LBIE)
> Steve T - filter out the suggested daily stock loan trades for
> client's account in Short Coverage screen
>
> Please reply immediately if there are any other issues still to be
> addressed.
>
> Regards
> Patrick

LBHIPSI00034226

349



| From: | Maynard, Ian [imaynard@lehman.com] | | Sent:8/18/2004 1:24 PM |
|---|---|---|---|
| To: [ - ] | Harrison, Kevin A [harrison@lehman.com]. | | |
| Cc: [ - ] | Pace, Alan [alan.pace@lehman.com] | | |
| Bcc: [ - ] | | | |
| Subject: | US Dividend Queries. | | |

Have checked the LPS documentation on European stock LPS and we only ever pay 85% on longs.

LBIE has no capacity to make the reclaim of the 15% withheld.

On the US underlying LPS confirms that I have seen we are committing to pay 100% of the dividend.

The only way of getting 100% at source would be to utilise a domestic entity as holder of the stock. I understand that the longs are held in LBSF and we have an intercompany arrangement with LBIE.

Whatever way we look at it we are running a two tier pricing system here from a dividend perspective

Looking at it from a risk perspective we are dealing with 70 underlying entities

The YE business is haircut at 10% of the full reclaim at risk on all long dividend payments in LBSF (hence we only receive 97% in the P&L).

The YE business is bid at 90% max for 70 underlying baskets and 93 for 85 underlying baskets.We generally borrow for long term.

Going forward we must have some fundamental rules in common:

* Stock baskets not single stocks
* Minimum holding periods
* The dividend spread plus the reserve must be covered by incremental spreads to libor.

Suggest we have a call tomorrow to clarify rules of the road.

Rgds

LBHIPSI00000704

350



| From: | David, Marissa [mdavid@lehman.com] | Sent 9/1/2004 9:03 AM. |
| To: [ ~ ] | Prime Highbridge [Prime_Highbridge@lehman.com]; Demonte, Anthony V [ademonte@lehman.com]; EQSwapNY [eqswapny@lehman.com]. | |
| Cc: [ ~ ] | NY EQ Swap Finance [NYEQSwapFinance@EXAMNYC.lehman.com]; NY EQ Swap MO [nyeqswapmo@lehman.com]; Della Rosa, Alex [adrosa@lehman.com]. | |
| Bcc: [ - ] | | |
| Subject: | Concerns on Active trading with Short Settlements. | |

Highbridge team,

Highbridge is recently doing a number of transactions that takes advantage of dividends based on short settlement. The current infrastructure on LPS (whether Summit or D1) is not designed to account for varying settlement dates to calculate interests (especially if the rebalancing trade is composed of both short and regular settlements). Our numbers will be inaccurate during the later scenario.

In addition, dividend capture is manual because the current design in D1 is based on ex-date. A programming change will be requested to use record date.

Is there a way to convince them to shift to CFDs for these short settled trades?

Thanks,

Marissa

Marissa R. David
Lehman Brothers Inc.
Equity Swaps and Yield Enhancement - New York
Tel.: (212) 526-6278 (direct) /3160 (group)
Email: mdavid@lehman.com

LBHIPSI00098695

351



From:     Story, Richard G [rstory@lehman.com]                          Sent:9/13/2004 5:32 AM
To: [ ~ ]   Ryan, Patrick D [pryan@lehman.com].
Cc: [ ~ ]   Harrison, Kevin A [harrison@lehman.com]; Sherman, Neil H [nsherman@lehman.com]; Fleischman, Sandy
            [sfleisch@lehman.com].
Bcc: [ ~ ]
Subject:    Moore Capital.

The Bal.sheet impacts could be horrendous - remember CFD's are charged
to net bal.sheet which means :
1) We get charged 6bp cash cap by TSY (which Im sure will blow the
economics on a FID trade)
2) We use Net B/S capacity that is very valuable and on which the firm
makes > 250bp average
Kevin has agreed to set up some Bal.sheet training courses for the sales
team to run through all these issues
- once you've seen the implications you'll see this is a no-go.

As an aside, why would Moore want to use a CFD rather than cash PB for
markets without tax/access issues ?

> -----Original Message-----
> From: Ryan, Patrick D
> Sent: Friday, September 10, 2004 2:58 PM
> To: Story, Richard G
> Subject: Moore Capital
>
>
> Dicky
> Went through how the CFD account works with Tony Gallagher @ Moore
> yesterday (we are looking to go-live next week for Steve Chasen's RV
> fund).
> He really liked the simplicity of it and asked whether we could book
> FID securities into a CFD account (remember the majority of Moore's
> biz is FID).
> I know we can book CBs as CFD so figure we could book Govts and
> Corporates as CFD also - are you ok with this and can I pursue it with
> Tony ?
> Paddy
>
> Patrick Ryan
> Executive Director
> Hedge Fund Services
> LEHMAN BROTHERS                  ▢ = Redacted by the Permanent
> * 212 526 7142                        Subcommi
> Mob: ▮▮▮▮▮
> * pryan@lehman.com
>

LBHIPSI00038362

352

| From: | Pinnock, Matthew [matthew.pinnock@lehman.com]. | Sent:9/17/2004 6:12 AM |
|---|---|---|
| To: [ - ] | Dorman, Jeffrey S [jdorman@lehman.com]. | |
| Cc: [ - ] | | |
| Bcc: [ - ] | | |
| Subject: | RE: CQS MANAGEMENT UK - Meeting - Discussion re US Equity Yield Enhancement | |

It was discussed between Ian, matt and myself. Agree on the long side,
there is better use of our tax capacity and there is upside with the
shorts, as we only receive 96.5ai for distribution and 97ai for boxing.
I'll speak with Ian and revert.

-----Original Message-----
From: Dorman, Jeffrey S
Sent: Friday, September 17, 2004 10:23 AM
To: Pinnock, Matthew
Subject: Re: CQS MANAGEMENT UK - Meeting - Discussion US Equity Yield
Enhancement

I don't think we made the right decision on this. Who "approved" the
trade. Let's find a way to swap out to US taxpayers the long side.

-----Original Message-----
From: Pinnock, Matthew <matthew.pinnock@lehman.com>
To: Dorman, Jeffrey S <jdorman@lehman.com>
Sent: Fri Sep 17 02:11:17 2004
Subject: Re: CQS MANAGEMENT UK - Meeting - Discussion re US Equity Yield
Enhancement

This is the trade we discussed at our mthly meeting. Yes it has been
approved for now and we are in the process of gauging if the market is
moving to sub 100ai.

-----Original Message-----
From: Dorman, Jeffrey S <jdorman@lehman.com>
To: Pinnock, Matthew <matthew.pinnock@lehman.com>
Sent: Fri Sep 17 02:47:56 2004
Subject: Re: CQS MANAGEMENT UK - Meeting - Discussion re US Equity Yield
Enhancement

This trade is a garbage return. Did we approve it?

-----Original Message-----
From: Pinnock, Matthew <matthew.pinnock@lehman.com>
To: Challice, Ben <ben.challice@lehman.com>; Michelagnoli, Carla
<camichel@lehman.com>; Pinnock, Matthew <matthew.pinnock@lehman.com>;

LBHIPSI00018385

353

Bizer, David [LDN] <dbizer@lehman.com>; Harrison, Kevin A
<harrison@lehman.com>; Maynard, Ian <imaynard@lehman.com>; Rutherford,
Mark <mrutherf@lehman.com>; Story, Richard G <rstory@lehman.com>;
Brannan, Paul F [London] <pbrannan@lehman.com>; Dorman, Jeffrey S
<jdorman@lehman.com>; Baldassano, Matt <Matt.Baldassano@lehman.com>;
Curtis, Rob <rcurtis@lehman.com>; Gillham, Katie <kgillham@lehman.com>;
Hamilton, Lisa M <lhamilto@lehman.com>; Trommer, Steven [LONDON]
<STrommer@lehman.com>; Bisesi, Brian <brian.bisesi@lehman.com>;
D'Angelo, Claudio <cdangelo@lehman.com>; Fretigne, Gilles
<gilles.fretigne@lehman.com>; Froehlich, Thorsten
<thorsten.froehlich@lehman.com>; Mammoliti, Luca <lmammoli@lehman.com>;
Marchand, Stephane <SMarchan@lehman.com>; Zimmermann, Andrea
<azimmerm@lehman.com>; Pittam, Julian <jpittam@lehman.com>; Schilling,
Mark <mark.schilling@lehman.com>
Sent: Thu Sep 16 06:44:50 2004
Subject: CQS MANAGEMENT UK - Meeting - Discussion re US Equity Yield
Enhancement

<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>
CRM Journal Details
<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>
<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>

ACCOUNT : CQS MANAGEMENT UK - M040128
DATE : September 14,2004

SUBJECT : Discussion re US Equity Yield Enhancement

LEHMAN PARTICIPANTS :
Matthew Pinnock

CLIENT PARTICIPANTS :
Matt Coleman - Treasury Manager

OVERVIEW :

We entertained CQS for the evening and the following was discussed:
- CQS have shown us $250mm of US equity longs (pref shs) and $170mm
equity shorts (ords) to be placed on CFD with LB. These were previously
held away, where CQS received 100% of the dividend on the longs and paid
100% on the shorts. Recently, the CQS PB commenced paying 70% of the
dividend on the longs. (We believe this may be Deutsche)
- MC is happy to move the positions to LB on CFD, provided we can pay
100% on the longs.

FOLLOW-UP :

- transfer balance from CQS PB
- understand if other PBs are looking to move levels in market away from
100% or is this just an isolated incident with CQS. If the market is

LBHIPSI00018366

354



moving, look at balances on book where we pay 100% and, either re-rate
or leverage benefit into other things.

OUTCOME :

- agreed with Maynard/Baldassano to bring on balance, even though
account is consolidated. Once above analysis is complete, we will review
broader audience.

<http://my.lehman.com/LCM/int/interaction/maintenance/maintenance.jsp?do
cGUID=000000D810D68114BF0AA6A372313F3E&cid=8024AC2D801C11D494C600902792C
AC1&operation=updateInteraction&enot=Y> Click here to view/edit journal

LBHIPSI00018387

355



| From: | Ryan, Patrick D [pryan@lehman.com]. | Sent:9/30/2004 9:42 AM. |
|---|---|---|
| To: [ - ] | Antigua, Al [Al.Antigua@lehman.com]. | |
| Cc: [ - ] | | |
| Bcc: [ - ] | | |
| Subject: | RE: CFD. | |

We can trade CFD in most developed markets now except Asia where we are
still awaiting tax sign-off.
The main benefits are saving stamp tax (UK only, CFD saves clients 50bp
tax on every purchase), yield enhancement on dividends, capital gains
tax benefits (for US funds) and access to increased leverage (better
than Reg T margin financing for US clients). In addition, clients use
Equity Swaps (same as CFD apart from some operational aspects) to access
markets they are not allowed to trade in on cash basis (Korea, Taiwan
for example).

> -----Original Message-----
> From: Antigua, Al
> Sent: Wednesday, September 29, 2004 3:00 PM
> To: Ryan, Patrick D
> Subject: CFD
>
> Hi,
>
> Would you be able to tell me all the markets we trade in CFD as well
> as the benefits in each market.
>
>
> Al Antigua
> LEHMAN BROTHERS
> Vice President
> Hedge Fund Services
> *((212) 526-9231
> Fax ((646) 758-5267
>

LBHIPSI0003479S

356

| From: | Trommer, Steven [LONDON] [STrommer@lehman.com]. | | Sent:10/18/2004 7:47 AM |
| To: [ - ] | Okay, Bevin J [bokay@lehman.com]; Curtis, Rob [rcurtis@lehman.com]; Boraczek, Bob [bob.boraczek@lehman.com]; Ryan, Patrick D [pryan@lehman.com]; Morris, David [dmorris@lehman.com]. | | |
| Cc: [ - ]. | | | |
| Bcc: [ - ] | | | |
| Subject: | RE: Citadel & US Divs: | | |

Thx.. I'll pass this along

-----Original Message-----
From: Okay, Bevin J
Sent: Monday, October 18, 2004 12:46 PM
To: Trommer, Steven [LONDON]; Curtis, Rob; Boraczek, Bob; Ryan, Patrick D
Subject: Re: Citadel & US Divs


Cfd biz is book to a separate account and priced at +30/-30 which is
more than PB.
-----------

-----Original Message-----
From: Trommer, Steven [LONDON] <STrommer@lehman.com>
To: Curtis, Rob <rcurtis@lehman.com>; Okay, Bevin J <bokay@lehman.com>;
Boraczek, Bob <bob.boraczek@lehman.com>; Ryan, Patrick D
<pryan@lehman.com>
Sent: Mon Oct 18 03:29:05 2004
Subject: RE: Citadel & US Divs

Ian Maynard wants to know what the financing terms are for the Rouse
CFD.. I would have said it defaults to the PB financing however I do not
see this position booked in any of their PB accounts ... anyone know
where it is and what the terms are?


-----Original Message-----
From: Okay, Bevin J
Sent: Wednesday, October 13, 2004 10:37 AM
To: Boraczek, Bob; Ryan, Patrick D
Cc: Morris, David
Subject: RE: Citadel & US Divs

Rouse is being bought by General Growth Properties for 67.5 a share,
expected close 12/31. This should stay on until closing or a deal event
(a few months).We agreed with Citadel that this product was not to be
used for short term ex-date trading. Not sure why they have their own
CFD book but it could be because they execute directly into CFD (DMA)
which may help in reconciliations with Raptor.

Let me know if you need more info.
Thanks

LBHIPSI00035362

357

-----Original Message-----
From: Boraczek, Bob
Sent: Wednesday, October 13, 2004 10:05 AM
To: Ryan, Patrick D; Okay, Bevin J
Cc: Morris, David
Subject: RE: Citadel & US Divs

Bev/Paddy - what did you agree with Citadel ?

-----Original Message-----
From: Curtis, Rob
Sent: Wednesday, October 13, 2004 9:55 AM
To: Boraczek, Bob; Morris, David
Subject: Citadel & US Divs

Guys, what do we pay Citadel on US longs please over div ?
Ian M is very concerned that the recent CFD they wrote with us in RSE US
is a pure div strip using our tax capacity. Also, why do they have their
own CFD book (CDL) ? thx

Robert Curtis
Prime Broker Sales / Trading
+44 20 7103 3030

LBHIPSI00035363

358

| From: | Story, Richard G [rstory@lehman.com] | Sent:11/3/2004 6:28 AM |
|---|---|---|
| To: [ - ] | Ryan, Patrick D [pryan@lehman.com] | |
| Cc: [ - ] | Sherman, Neil H [nsherman@lehman.com]; Pace, Alan [alan.pace@lehman.com]; Bisesi, Brian [brian.bisesi@lehman.com]. | |
| Bcc: [ - ] | | |
| Subject: | Highbridge Utilities Fund - ROA and PL analysis. | |

Paddy
Good analysis - this is exactly type of analysis/metrics we should apply in PB Sales going forward.
One small request - pls could you add Tax capacity details (ie- are we enhancing US divs, if so how much is
The 30% enh. number that needs to be alloc to Highbridge .vs. the total we already use).

Have you already had feedback/approval on this biz whilst I was on hols ?
Rich

-----Original Message-----
From: Ryan, Patrick D
Sent: Tuesday, October 26, 2004 10:45 PM
To: Story, Richard G; Dorman, Jeffrey S; Maynard, Ian; Harrison, Kevin A; Pace, Alan; Baldassano, Matt
Subject: RE: Highbridge Utilities Fund - Yield Enhancement

As requested, pls see attachment for ROA and B/S usage (I have used existing pricing for this exercise).

Net Financing ROA on the new strategy is 25bp compared to 75bp on their existing PB account.

Net Divisional ROA on the new strategy is 100bp vs 139bp on existing business. I am assuming we get $1.5mm in comms on the new strategy out of estimated pool of $6mm...we are in advanced talks with them on moving to electronic execution which should secure the $1.5mm at a minimum.

Net net, the impact on the overall economics of Highbridge is minimal - Net Divisional ROA falls just 4bp from 139bp to 134bp.

Pls advise on how to respond to client.

Thx
Paddy

-----Original Message-----
From: Story, Richard G
Sent: Thursday, October 21, 2004 3:16 AM

LBHIPSI00035507

359

To: Dorman, Jeffrey S; Ryan, Patrick D; Maynard, Ian; Harrison, Kevin A;
Pace, Alan; Baldassano, Matt; Sherman, Neil H; Bisesi, Brian
Cc: Ventura , Salvatore; Brannan, Paul F [London]
Subject: Highbridge Utilities Fund - Yield Enhancement

In addition to Jeff's comments, I would add that for every piece of new
biz going forward we Need to calc the Bal.sheet utilisation (Net and
gross) + ROA + $ 'Tax capacity' used.

Pls include these metrics on the client approval forms and Sal pls also
include this Data as standard on the transition pipeline sheet.

Thx Richard

-----Original Message-----
From: Dorman, Jeffrey S
Sent: Thursday, October 21, 2004 1:24 AM
To: Ryan, Patrick D; Story, Richard G; Maynard, Ian; Harrison, Kevin A;
Pace, Alan; Baldassano, Matt
Subject: Re: Highbridge Utilities Fund - Yield Enhancement

Patrick,

Please coordinate pricing (etc) with Matt B and Kevin H. I would like to
see us move away from the last CQS style pricing decision. What percent
of comms can we expect?

Jeffrey

-----Original Message-----
From: Ryan, Patrick D <pryan@lehman.com>
To: Dorman, Jeffrey S <jdorman@lehman.com>; Story, Richard G
<rstory@lehman.com>; Maynard, Ian <imaynard@lehman.com>; Harrison, Kevin
A <harrison@lehman.com>; Pace, Alan <alan.pace@lehman.com>
Sent: Wed Oct 20 16:14:03 2004
Subject: Highbridge Utilities Fund - Yield Enhancement

The new Utilities strategy is up and running at Highbridge (see account
5600193) and we need to complete the discussions we have been having
with Potapchuk and the PM on yield enhancement. Our proposal to them was
to move EVERY long into CFD regardless of record date or whether the
stock pays or not (i.e. no cherry picking, no crossing in before record
date etc). Shorts would stay as physical. For unwinds on longs, they
would need to unwind the CFD first in order to avoid any short sale
rules.

LBHI/PSI00035508

360



Their current portfolio is about $75mm per side and the PM expects to
grow this to $200mm per side over the next 6-12 months. The average
number of longs will be 20-25 stocks with an average holding period of
3-6 months. The average yield is expected to be about 4%.

Assuming straight line growth over next 12 months from $75mm to $200mm
of longs, the value of the 30% enhancement for the next 12 months is
$1.65mm ($137.5mm x 4% x 30%).

Any issues with the proposed arrangement ?

Patrick Ryan
Executive Director
Hedge Fund Services
LEHMAN BROTHERS
* 212 526 7142
Mob:
* pryan@lehman.com

■ = Redacted by the Permanent
Subcommittee on Investigations

LBHIPSI00035509

361



From:    Brier, Bruce [bbrier@lehman.com].                    Sent:11/16/2004 1:58 PM.
To: [ -]    Pace, Alan [alan.pace@lehman.com].
Cc: [ -]    Brand, Nick [nbrand@lehman.com].
Bcc: [ -] :
Subject:    Yield Enhancement, ,

Alan

To summarize our discussion earlier today.

First, there is no "silver bullet" but rather relative risks that should
be priced accordingly. The same guidelines that apply to CFD, Swap, or
Securities Loan unless otherwise noted:
1. The longer the better-3 to 6 months are the shortest duration
we should consider. One year or greater swaps are preferred. Longer term
which are habitually terminated early are suspect.
2. Swaps-single equity swaps should be avoided. Baskets should
generally exceed 20 referenced assets. Swaps part of distribution
transactions can have 10 referenced asset. Better facts include
references assets that do not pay dividend, non-US issuer, or low
yielders. For this reason, all other things remaining constant, Swaps
preferred to CFD.
3. General background-offered transaction should be viewed in
light of existing customer background including current notional
balances, trading patterns, composition of referenced assets, ex-dates,
etc.
4. All transactions have residual risk which should be priced
accordingly. By definition, 100% dividend equivalent payment under
prices risk.
5. The lowest risk transaction is the distribution business.
Specifically, LBIE borrows or buys vs. swap from an 85% country and
loans or sells vs. swap to an 85% country.

Bruce

Bruce Brier
Lehman Brothers Inc.
office (212) 526-7214
cell
home
fax
home
email

━━━ = Redacted by the Permanent
       Subcommittee on Investigations

LBHIPSI00141693

362

| From: | Carriero, John P [john.carriero@lehman.com]. | Sent: 12/14/2004 3:10 PM |
| To: [ - ] | Meys, Michael [mmeys@lehman.com]; Krishnan, Anand [Anand.Krishnan@lehman.com] | |
| Cc: [ - ] | | |
| Bcc: [ - ] | | |
| Subject: | RE: LTD SSF; | |

We show them 100% on CFD with a basket of 10 positions, no more than 30%
in any one position and a 60 day financing. As far as the SSF trading
goes there are firms that currently offer ex minus one day trade
them out on ex. So to show them an uncompetitive price on a single stock
future for a long duration is not advantageous to us or the client. The
ABCs of cross border derivatives that I sent around earlier give a
pretty good explanation of taxation and the associated risks on
transactions. If you didn't receive a copy let me know.

John P. Carriero
Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019
212 526 6929

> -----Original Message-----
> From: Meys, Michael
> Sent: Tuesday, December 14, 2004 2:49 PM
> To: Krishnan, Anand; Carriero, John P
> Subject: RE: LTD SSF
>
> John,
>
> Were is the counterparty domiciled. This is clearly a yield
> enhancement trade and having this information is vital to correctly
> pricing the risk.
>
> Mike
>
> -----Original Message-----
> From: Krishnan, Anand
> Sent: Tuesday, December 14, 2004 2:39 PM
> To: Carriero, John P
> Cc: Meys, Michael
> Subject: RE: LTD SSF
>
> If it is an off shore we can not provide 100 % on the dividends. I am
> not sure how are they getting 100 % div on the swap. I can price
> this with 75 % div, if they need a pricing on this.
>
> -----Original Message-----
> From: Carriero, John P
> Sent: Tuesday, December 14, 2004 2:37 PM
> To: Krishnan, Anand
> Subject: RE: LTD SSF
>

LBHIPSI00105853

363

> They do swaps on them so they are getting 100% from other
> counterparties, I asked us to show them a price on the SSF.
>
> John P. Carriero
> Lehman Brothers Inc.
> 745 Seventh Avenue
> New York, NY 10019
> 212 526 6929
>
> -----Original Message-----
> From: Krishnan, Anand
> Sent: Tuesday, December 14, 2004 2:18 PM
> To: Carriero, John P
> Subject: RE: LTD SSF
>
> Thanks. What kind of tax withholding currently they are in. Thanks
>
> -----Original Message-----
> From: Carriero, John P
> Sent: Tuesday, December 14, 2004 2:17 PM
> To: Krishnan, Anand
> Subject: RE: LTD SSF
>
> The counterparty is UBS O' Connor and they are offshore.
>
> John P. Carriero
> Lehman Brothers Inc.
> 745 Seventh Avenue
> New York, NY 10019
> 212 526 6929
>
> -----Original Message-----
> From: Krishnan, Anand
> Sent: Tuesday, December 14, 2004 1:59 PM
> To: Carriero, John P
> Cc: Meys, Michael
> Subject: LTD SSF
>
> Hi John
>
> What is tax bracket. Does this client have a prime account in Lehman.
>
> Thanks

LBHIPSI00105854

364

| From: | Brannan, Paul F [London] [pbrannan@lehman.com]. | Sent:12/24/2004 6:30 AM. |
|---|---|---|
| To: [ -] | Bisesi, Brian [brian.bisesi@lehman.com]; O'Mara, Sean G [sean.omara@lehman.com]; Ryan, Patrick D [pryan@lehman.com] | |
| Cc: [ -] | Lucas, Vincent [vkicas@lehman.com]; D'Amico, Tom [Tom.Damico@lehman.com]; Freeman , Jill [Jill.Freeman@lehman.com] | |
| Bcc: [ -] | | |
| Subject: | RE: Moore Capital -- Lehman follow up materials | |

Sean,

I assume your guys set the accounts up. Can you please coordinate with Paddy and get changed. You are going to have to touch base with Moore in the US prior to making any changes.

Paul

-----Original Message-----
From: Bisesi, Brian
Sent: Friday, December 24, 2004 11:27 AM
To: O'Mara, Sean G; Ryan, Patrick D
Cc: Lucas, Vincent; Brannan, Paul F [London]; D'Amico, Tom; Freeman , Jill
Subject: FW: Moore Capital -- Lehman follow up materials

Guys -- I found the pricing. See below. As you can see, we only offer netting in cash PB. For CFD's -- I dressed it up a bit and sold it as "combined" financing. In other words -- our standard CFD product. We need to change. Thx, bb

-----Original Message-----
From: Bisesi, Brian
Sent: Thursday, May 20, 2004 5:29 PM
To: 'tony.gallagher@moorecap.com'
Cc: 'steve.chasan@moorecap.com'; Pace, Alan; Sherman, Neil H
Subject: FW: Moore Capital -- Lehman follow up materials

Tony,

It was good to touch base with you. I look fwd to speaking with you in detail around the differentiators of our Synthetic PB product. Let me know some times that work for you next week and I will coordinate call from my end.

To summarise, the major benefits that our Synthetic PB product provides are:

* Capital Efficiency = Cost Savings -- Lehman's Synthetic PB product (CFD's) operate exactly like a cash prime brokerage account from a margining, reporting, servicing, financing, and securities lending perspective. For example, free cash, margin, and short sale proceeds are all treated the same and can be used to pay down debit balances

LBHIPSI00036706

365

(i.e. fund long positions).
* Financing is charged at the account level across all synthetic positions -- not on notional longs and notional shorts (like in a traditional swap transaction). Since free cash, margin and short sale proceeds are all within the same account and are used against debit balances, the economic savings is significant.
* Accounting treatment like cash equities - i.e. no equity resets. P/L is realised upon sale.
* Margin call effected only if "net equity" in the account is less than the daily margin requirement.
* Automated yield enhancement in some markets and potential to further enhance yield through proactive coverage on a case by case basis.
* Provides significant transaction savings.
* Synthetic PB product is totally integrated with our DMA systems. We have a complete STP system from point of trade through to reporting. All fills are automatically financed (both long and short) into your Synthetic PB account without anyone touching the trade/booking a stock loan transaction.
* Traded under ISDA and CFD annex. Reduces operational hassle - no long trade confirms, resets.

Below, is the copy of the email that I sent to Steve. One thing that I mentioned to Steve was that we would spend as much time as necessary to help you with any operational or IT customisation that may be required. Likewise, on the documentation side of things we will prioritise to the top of our workload and minimise any legal back and forth -- i.e. we will lead with a very clean doc and make sure that the biz side tracks all comments to promote a more efficient negotiation.

Thank you for your time and consideration.

Regards,

Brian Bisesi
Head of European PB Sales

-----Original Message-----
From: Bisesi, Brian
Sent: Monday, May 10, 2004 1:50 PM
To: Chasan, Steve
Cc: Sherman, Neil H; Story, Richard G; Pace, Alan; Ryan, Patrick D
Subject: Moore Capital -- Lehman follow up materials

Steve,

It was good to chat with you on Thursday of last week and earlier today. I have provided you with some information on each of the points we discussed. If there is anything missing from this mail pls let me know and I'll get it to you asap. I have connected with my US colleagues regarding your visit and it looks like Monday or Tuesday would work well

LBHIPSI00036707

366

for us. Pls indicate your preference. I will work with the Team to create an Agenda to cover all the aspects of our product. Can you pls let me know who would attend the meeting in New York and pls indicate their functional responsibilities so I can coordinate appropriately.

Financing Levels
I have shown you two pricing scenarios below -- Option 1 is for Cash Prime Brokerage, and Option 2 is for Synthetic Prime Brokerage. Option 2 is priced slightly wider b/c of the balance sheet usage as well as the yield enhancement, tax and transaction savings benefits that come with synthetics. Furthermore, our Cash PB proposal includes full netting/consolidation of financing within currencies. Our synthetic PB proposal offers you combined financing -- in other words, the ability to use free cash and margin to pay down debit balances. As we don't promote the paying down of debit balances for obvious reasons, we find this to be a good compromise to full Net financing. For example, we receive better balance sheet treatment and the fund receives more aggressive financing and stock loan levels.

<< File: Moore Cap Fee Schedule.pdf >>
Standard CFD Annex
We will only need to execute the below Annex in conjunction with the existing ISDA(s) that you have in place with us.

<< File: CFD Annex draft 30.04.041.doc >>
Corporate Actions
The primary source of our corporate actions data is Fidelity. We maintain a Service Level Agreement that guarantees 98% accuracy on all announced corporate actions. In addition Lehman Brothers has a dedicated team of people that manage corporate actions including scrubbing the data and running it through other sources (e.g. Bloomberg and Reuters). As part of our PB service, you also receive automated emails informing you of an upcoming event on your Lehman PB portfolio as well as reminder emails and phone calls as the election deadline approaches.

In terms of your question around corporate actions on synthetics -- most of the time we are always on the same side of a corp action trade. We haven't had an issue in the past where we couldn't vote the way the client wanted. In the unlikely case that we were not able to vote per the client request, we would isolate/segregate the position to get the client to where they need to be.
<< File: corp actions.pdf >>

Product Presentations
<< File: CFDs.ppt >>
<< File: New Pitchbook.pdf >>
I can also confirm that we are able to do cross currency financing trades on all CFD's. Thank you for your consideration of Lehman Brothers. Please let me know if we have missed anything. In the meantime, I will coordinate with my NY colleagues.

LBHIPSI00036706

367



Kind regards,

Brian J. Bisesi
Senior Vice President
LEHMAN BROTHERS
25 Bank Street
London E14 5LE
(o) +44 207 103 1760
(m) +█████████████
(f) +44 207 102 3152

████████ = Redacted by the Permanent
Subcommittee on Investigations

LBHIPSI00036709

368



| From: | Baldassano, Matt [Matt.Baldassano@lehman.com]. | Sent:2/2/2005 12:02 PM. |
|---|---|---|
| To: | [ - ] | Sherman, Neil.H [nsherman@lehman.com]. |
| Cc: | [ - ] | |
| Bcc: | [ - ] | |
| Subject: | RE: Cayman Securities Lending. | |

Give me a call when you have a chance on this. Thanks

-----Original Message-----
From: Sherman, Neil H
Sent: Wednesday, February 02, 2005 11:23 AM
To: Baldassano, Matt
Subject: Re: Cayman Securities Lending

If need be just show the loan from client to leh cayman and not the whole transaction flow, which is our business. N

Sent from my Comstar Wireless Handheld (www.comstarinteractive.com)

-----Original Message-----
From: Baldassano, Matt <Matt.Baldassano@lehman.com>
To: Sherman, Neil H <nsherman@lehman.com>
Sent: Tue Feb 01 16:00:04 2005
Subject: RE: Cayman Securities Lending

Paul Bacanovic and I just spoke to Keith. He is requesting that we put flow diagrams together for CFDs, Swap and OSLA Cayman trade for YE purposes. I'm not comfortable providing any of those flows and confimed w/ Bruce Brier that its not a good idea. We can have a conversation, preferably face to face, with the client to discuss if you would like.

-----Original Message-----
From: Sherman, Neil H
Sent: Tuesday, February 01, 2005 2:25 PM
To: Baldassano, Matt
Cc: Overlander, Keith
Subject: Cayman Securities Lending

Matt,

Keith and I met with Dart Management on Friday afternoon about synthetics in a general fashion. Would you please call him. There is some short follow up that I think you would be best to do. Thanks. If you cannot do it, please pass it to Patrick Ryan.

Neil

LBHIPSI00138176

369

| From: | Meys, Michael [mimeys@lehman.com]. | | Sent:2/8/2005 8:44 AM. |
|---|---|---|---|
| To: [ - ] | Caplan, Andrew [London] [acaplan@lehman.com]; Regazzi, Thomas [tregazzi@lehman.com]; Krishnan, Anand [Anand.Krishnan@lehman.com]; Levi, Saar [saar.levi@lehman.com]; Hadingham, Peter [phadingh@lehman.com]. | | |
| Cc: [ - ] | | | |
| Bcc: [ - ] | | | |
| Subject: | CFD Business. | | |

Andrew,

Effective immediately, we will no longer be able to transact trades utilizing the CFD product. Can you please inform your clients. LPS or equity swap will be a viable replacement product.

Thanks,

Mike

LBHIPSI00103630

370

| From: | Barenthein, Peter [peter.barenthein@lehman.com]. | | Sent:4/20/2005 5:43 PM. |
| To: [ - ] | Zorek, Jeffrey A [jzorek1@lehman.com]. | | |
| Cc: [ - ] | Krishnan, Ashok [akrishna@lehman.com]. | | |
| Bcc: [ - ] | | | |
| Subject: | Tykhe Divs Paid - Monthly.xls. | | |

Jeff,

I condensed the analysis as much as possible to get to the point. For
Tykhe things seem normal until March. In the first quarter, the
dividend yield on the portfolio was in the mid 1.20's and the actual
comes in at 1.32, not a big deal, but the the last quarter the
annualized dividend yield ticks up significantly (2.24%). There may be
a a bit of gaming on the tax arb, and there is also some issue with
taking advantage of specials within the LPS structure. March may be an
aberration, but it certainly seems they took advantage of the tax status
the past month. It comes down to this for Thyke's tight margins: spread
between LIBOR and Fed Funds (we lose on average 11.8 bps - Ashok can
explain), some dividend arb, and specials.

Best regards,
Peter

LBHIPSI00056227

371

| From: | Baldassano, Matt [Matt.Baldassano@lehman.com]. | Sent:4/22/2005 6:55 AM. |
|---|---|---|
| To: [ - ] | Story, Richard G [rstory@lehman.com]; Ryan, Patrick D [pryan@lehman.com]; Sherman, Neil H [nsherman@lehman.com]. | |
| Cc: [ - ] | | |
| Bcc: [ - ] | . | |
| Subject: | RE: Synthetics Re-engineering. | |

Rich,
Just 2 comments:

- For SSS - if clients are going to execute 1 way only we should require
it be on way out otherwise it will be difficult and most likely
unmanageable to track who has crossed in and who has executed in.
- Would like to get a clear definition, and perhaps challenge what we
have been told so far, of what constitutes a "US Client".

Thanks
Matt

> -----Original Message-----
> From: Story, Richard G
> Sent: Thursday, April 21, 2005 4:07 AM
> To: Ryan, Patrick D; Sherman, Neil H; Baldassano, Matt
> Subject: Synthetics Re-engineering
>
> Paddy, Neil, Matt
> Pls review attached update of specific client details/positions
> attached - can you confirm the action steps Ive listed + Sales owner
> are correct ?
> Thx Rich
>
>
>
> Summary :
> - US + INTL clients doing hi-volume synthetic trading > 25posns
> -----> MUST use LPS + MUST execute both sides with LEH
> - US clients wanting to do low-volume synthetic trading ------>
> MUST use SSS single-stock-swap + MUST execute at least 1-side with LEH
>
> - INTL clients trading INTL stocks are the only ones allowed to use
> CFD going fwd
> - Old trades which don't conform to this framework will be allowed to
> unwind naturally (ie- no forced closure)
> - Client specific action steps laid out below
>
>
>
> Client Specifics :
>
> 1) US swaps (LPS) with US clients :
> Clients - Tykhe stat $1.5bn, Highbridge CB $1.0bn, Tudor quant
> $0.25bn, 4-5 other stat/quant clients $0.3bn

LBHIPSI00032417

372

> Street execution protocol - LEH, DB, CSFB, BOA, Bear, MS, GS all
> require min. 1-side execution (UBS only firm that doesnt per
> Highbridge ?)
> Summary action step -
> A) stat clients - execute both legs via LPS with LEH - NO ACTION
> B) Highbridge - exec 1-leg today in CB's, TBD whether Baldassano
> proposes SSS or LPS 'Point to liquidity' (o/s with Legal)
>
>
> 2) US CFDs with US clients :
> - clients - AG $0.6bn, JMG $0.7bn, PHZ $0.2bn, UCSG $10m
> << File: US CFDs ' US clients' Apr1 2005 .xls >>
> - LEH CFD product is diff. to street, so no street protocol
> Summary action step -
> PHZ move to LPS (Okay), JMG allow to close due to low ROA (Rossano),
> UCSG already moved to SSS (Ryan), AG - TBD (Pace)
>
>
> 3) US swaps with Intl clients :
> - nil
>
>
> 4) US CFDs with Intl clients :
> - LMV CFDs total $0.8bn
> - LEH clients CFM $230m, CQS $600m
> Summary action step -
> CFM - Lowrey switching to cash PB ($500k div.loss) or LPS (can CFM
> handle ops?), CQS - Pinnock discussing unwind of US book
>
>
> 5) Intl swaps (LPS) with US clients :
> - LMV swaps total $1.25bn
> Clients - Evnine $200m, Highbridge $500m, Millenium $200m, RQSI $40m,
> Tykhe $200m, SAC $100m
> Street protocol - LEH + other firms cross both legs for Intl stock
> (ie- don't need execution leg)
> Summary action step -
> All clients are stat who execute LPS and 2 legs with LEH, therefore NO
> ISSUE
>
>
>
> 6) Intl CFDs with US clients :
> - Total LMV CFDs $1.2bn
> << File: Intl CFDs ' US clients' Apr1 2005 .xls >>
> Clients - AG $10m, Highbridge $100m, Fortress $5m, Gruss $70m,
> Libertyview $10m, Mellon HBV $30m, Millenium $250m, Moore $100m, Perry
> $60m,
> Stark $30m, O'Connor $270m, GSAM $250m, UCSG $15m
> Summary action step -
> GSAM switched by Bisesi to LPS, other 10 clients awaiting legal

LBHIPSI00032418

373

```
> approval re. LPS 'UK point to liquidity' product (as per GSAM / UK mkt
> protocol)
>
>
> 7) Intl swaps with Intl clients :
> $0.4bn total LMV - No issues here since offshore
>
> 8) Intl CFDs with Intl clients :
> $4.7bn total LMV - No issues here since offshore
>
>
>
>
```

LBHIPSI00032419

374

| From: | Bisesi, Brian [brian.bisesi@lehman.com] | | Sent:6/8/2005 3:05 AM |
|---|---|---|---|
| To: [ - ] | Pinnock, Matthew [matthew.pinnock@lehman.com]; Story, Richard G [rstory@lehman.com]; Lowrey, John [JLowrey@lehman.com]; Morrar, Emad [emorrar@lehman.com]; Sherman, Neil H [nsherman@lehman.com]; Wecker, Jeff [jwecker@lehman.com]; Fernandez, Jeff [jeff.fernandez@lehman.com]; Curtis, Rob [rcurtis@lehman.com]; Maynard, Ian [imaynard@lehman.com]; Fleischman, Sandy [sfleisch@lehman.com] | | |
| Cc: [ - ] | Lucas, Vincent [vlucas@lehman.com]; Wannenmacher, Tim [tim.wannemacher@lehman.com] | | |
| Bcc: [ - ] | | | |
| Subject: | Re: Dividend Rates re LPS Clients | | |

Should change all – both active and non active. There is nothing that the client has
from us that would make them expect 85% across the board.

--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Pinnock, Matthew <matthew.pinnock@lehman.com>
To: Story, Richard G <rstory@lehman.com>; Bisesi, Brian
<brian.bisesi@lehman.com>; Lowrey, John <JLowrey@lehman.com>; Morrar,
Emad <emorrar@lehman.com>; Sherman, Neil H <nsherman@lehman.com>;
Wecker, Jeff <jwecker@lehman.com>; Fernandez, Jeff
<jeff.fernandez@lehman.com>; Curtis, Rob <rcurtis@lehman.com>; Maynard, Ian
<imaynard@lehman.com>; Fleischman, Sandy <sfleisch@lehman.com>
CC: Lucas, Vincent <vlucas@lehman.com>; Wannenmacher, Tim
<tim.wannemacher@lehman.com>
Sent: Wed Jun 08 07:50:29 2005
Subject: Dividend Rates re LPS Clients

A recent analysis uncovered we apply a blanket divided rate to all LPS clients,
regardless of underlying tax rate. In some markets, we are actually losing money
every time a dividend is paid. 85% was historically applied as LPS could only reflect
one dividend rate across the board, however, this has subsequently been changed
and multiple dividend rates can now be applied.

For all new clients, we should either reflect actual dividend rate or be aware of the
potential loss. For existing clients, we have the ability to change these, providing
there are no objections. The following accounts are those who currently have 85%
reflected in the system, who we should look to change. This includes both inactive
and active baskets:

Active Baskets
Evnine Albion
Evnine Worldwide
IKOS Europe
Ramsey
SAC Capital
Tykhe
Millenium
Horizon
Highbridge

LBHIPSI00012289

375

Buhl Personal Inv
ADI Kallista
Pioneer
Gran
Mandrake
Cheyne
Pentagon Special Purpose
Amajaro
Sentinel
Tudor BVI
Tudor Prop
Rivoli Equity Fd
Axa Vectris II


Inactive Baskets
Millenium
Pentagon
Moore Credit Fd
Lazard Freres - Cobalt
Lazard Freres Gestion - Phosphore
Armajaro
Centaurus
Centaurus Citi
Centaurus Green Way
Sentinel
Sabre Style Arbitrage Fund Ltd
Sabre Style Long/Short Fund Ltd
Sabre MSS
Sabre Lyxor
Elliott Intl LP
Elliott Intl LP (Liverpool LP)
AQR - Goldman Sachs
AQR - Global Yield Curve
AQR - Global Asset Alloc MAC 25
AQR - Global Asset Alloc Master LP
AQR - Absolute Return
AQR - Global Fixed Income
Systeia Stat Arb Fund
Systeia Multi Strat Fd
MLIM - UK Absolute Alpha Fd
Safra Mecsa


Please advise thoughts and comments regarding changing the underlying dividend
rates for the above clients.
Thanks and regards
Matt.

LBHIPSI00012290

376

| From: | Hurley, Janet T [janet.hurley@lehman.com]. | Sent:12/6/2005 9:13 AM: |
|---|---|---|
| To: [ - ] | Maynard, Ian [imaynard@lehman.com]; Bisesi, Brian [brian.bisesi@lehman.com]; Lee, Christine [christine.lee@lehman.com]; Schilling, Mark [mark.schilling@lehman.com]. | |
| Cc: [ - ] | Curtis, Rob [rcurtis@lehman.com]; EQSWAPLN - MIDDLE OFFICE [EQSwapLN@lehman.com]; Brier Bruce [bbrier@lehman.com]; Regazzi, Thomas [tregazzi@lehman.com]. | |
| Bcc: [ - ] | | |
| Subject: | RE: withholding | |

What Brian and I agreed with the client is that trades executed with us go into LPS. The client manages its LPS balances to keep them market neutral. Trades executed away are put into cash PB. To the extent they are net long in their cash PB account, they can execute single stocks swaps where we cross from their cash PB account into single stock swap and follow our guidelines with respect to the 14 day static holding period and unwinding at VWAP.

I did not agree any dividend rates, but what is in the system for LPS is 100 for US longs and shorts. I understand we have been paying this rate for years. We have not yet executed any single stock swaps so there is no precedent on dividend level.

I am totaling up the gross long dividends in Tudor BVI's LPS. I suggest we then look at what paying 85 would save. Once we have that, Brian and I plan to call Chip Leveroni and discuss what business we might lose if we switched them to 85. If the loss of other business outweighs the savings, I think we would agree we should stay at 100.

My belief is that the market pays 100 on long US dividends in all synthetic products; however, in return we should receive additional commission paying market share from the client. A different way to say this is to ask, what is Tudor giving us for the 100% they are getting? I am having someone pull together a list of clients and trades to see where we have paid less than 100 on synthetic longs so that we can evaluate where the market is on this issue.

A final point that is important to keep in mind is that with respect to synthetics, whether LPS or single stock swap, Tudor has only an OTC position and has no say in how we choose to hedge that position. His statement that we get 100 and therefore should pay 100 should be gently corrected; it is enough for him to know that we have agreed to pay him 100 on the synthetic and why we agree to that is not his concern.

Please let me know your reaction.

-----Original Message-----
From: Maynard, Ian
Sent: Tuesday, December 06, 2005 7:13 AM
To: Bisesi, Brian; Lee, Christine; Schilling, Mark; Hurley, Janet T
Cc: Curtis, Rob; EQSWAPLN - MIDDLE OFFICE
Subject: RE: withholding

LBHIPSI00098704

377

Janet,

Were any DVD rates agreed specifically with Tudor for both onshore and
offshore funds?

Rgds
-----Original Message-----
From: Bisesi, Brian
Sent: Tuesday, December 06, 2005 11:21 AM
To: Maynard, Ian; Lee, Christine; Schilling, Mark
Cc: Curtis, Rob; EQSWAPLN - MIDDLE OFFICE
Subject: RE: withholding

we were silent on divs as part of Event Deal as the funds were
pre-existing arrangements for other parts of Tudor's biz. Tudor have
two funds -- 1) Tudor Prop Trading (a US company) that would obviously
get 100%, and 2) Tudor BVI, the offshore version. Remember that they
split into Cash PB and LPS depending on composition of port (i.e. they
run a market neutral port in PB and then cross the long tails into
single stock swap) so you will have a mix of rates. All done with biz
is executed directly into LPS. Janet knows all detail as this was the
crux of the synthetic/crossing issue that we have addressed with them.
Let me know if I can help more. thx, B

-----Original Message-----
From: Maynard, Ian
Sent: Tuesday, December 06, 2005 11:05 AM
To: Lee, Christine; Schilling, Mark; Bisesi, Brian
Cc: Curtis, Rob; EQSWAPLN - MIDDLE OFFICE
Subject: RE: withholding

Brian...please confirm what has been agreed with the client..I assume
85%?
-----Original Message-----
From: Lee, Christine
Sent: Tuesday, December 06, 2005 10:59 AM
To: Schilling, Mark; Maynard, Ian
Cc: Curtis, Rob; EQSWAPLN - MIDDLE OFFICE
Subject: RE: withholding

Hi Mark/Ian - for single stock swaps, Tudor believes they should be
receiving 100% gross for their long posns in US securities. But a lot of
our tickets are written as 85% gross....can you please confirm what has
been agreed?

Thanks!

-----Original Message-----

LBHIPSI00098705

378

From: Guthrie, John E
Sent: Monday, December 05, 2005 7:38 PM
To: Joshua Langsam
Cc: Thayer Swallen
Subject: RE: withholding

Hey guys, sorry been off the desk most of the day.

For BVI, you would receive 100% of the gross in both BVI and TPT.

-----Original Message-----
From: Joshua Langsam [mailto:joshua.Langsam@tudor.com]
Sent: Monday, December 05, 2005 8:00 AM
To: Joshua Langsam; Guthrie, John E
Cc: Thayer Swallen
Subject: RE: withholding

John, can you follow up w/ dividend group this morning so we can get a
final answer concerning our tax liability for BVI for AT&T dividend.
Looking for explanation if in fact we do not receive 100% as well as
exact % we receive (believe we previously thought we receive 85%). As
usual, thanks for your help.

-----Original Message-----
From: Joshua Langsam
Sent: Friday, December 02, 2005 7:25 AM
To: 'Guthrie, John E'; Joshua Langsam
Cc: Thayer Swallen
Subject: RE: withholding
Importance: High

John, my trader is looking for a more detailed explanation on this
issue. If we held this position on swap w/ Lehman why do we not receive
Lehman's tax treatment on the dividend (ie 100% for the entire
position). Though there is a 15% withholding tax on offshore entities,
the position is held on swap, Lehman is receiving 100% of the dividend
and it would seem that should be passed through to us. Can you please
look at this ASAP as our trader believes we should be receiving enhanced
dividend treatment. Also, if you could provide me some sort of account
statement/invoice showing this dividend, that would be rather helpful.
Thanks.

-----Original Message-----
From: Guthrie, John E [mailto:john.guthrie@lehman.com]
Sent: Thursday, December 01, 2005 4:07 PM
To: Joshua Langsam
Cc: Thayer Swallen
Subject: RE: withholding

LBHIPSI00098706

379

yes
-----Original Message-----
From: Joshua Langsam [mailto:Joshua.Langsam@tudor.com]
Sent: Thursday, December 01, 2005 3:47 PM
To: Guthrie, John E; Joshua Langsam
Cc: Thayer Swallen
Subject: RE: withholding


So, BVI would receive 85% then, right?

-----Original Message-----
From: Guthrie, John E [mailto:john.guthrie@lehman.com]
Sent: Thursday, December 01, 2005 3:46 PM
To: Joshua Langsam
Subject: RE: withholding


provided you are domiciled in the US, you receive 100% of gross. if you
are domiciled overseas, you receive 85% of gross

-----Original Message-----
From: Joshua Langsam [mailto:Joshua.Langsam@tudor.com]
Sent: Thursday, December 01, 2005 3:23 PM
To: Guthrie, John E
Subject: FW: withholding


John, just to clarify, this would indicate that we receive 100% of gross
on our AT&T dividend, no?
-----Original Message-----
From: Thayer Swallen
Sent: Thursday, December 01, 2005 2:41 PM
To: Joshua Langsam
Subject: FW: withholding


From John Guthrie
-----Original Message-----
From: Guthrie, John E [mailto:john.guthrie@lehman.com]
Sent: Thursday, December 01, 2005 2:41 PM
To: Thayer Swallen; Lee, Christine
Subject: RE: withholding


USD w/h is long short 100% gross.

-----Original Message-----
From: Thayer Swallen [mailto:Thayer.Swallen@tudor.com]

LBHIPSI00098707

Sent: Thursday, December 01, 2005 12:29 PM
To: Lee, Christine; Thayer Swallen; Guthrie, John E
Subject: RE: withholding


John could you please advise on the US rate

-----Original Message-----
From: Lee, Christine [mailto:christine.lee@lohman.com]
Sent: Thursday, December 01, 2005 12:23 PM
To: Thayer Swallen; Guthrie, John E
Subject: RE: withholding


We have specific rates set up depending on the country - GBP is
long/short 100% net (or 90% gross). For other countries, for short posns
it is 100% gross. For long posns, rates are as follows:


Austria

75%


Belgium

75%


Denmark

72%


Finland

100%


France

85%


Germany

78.9%


Greece

LBHIPSi00098708

381

100%

Ireland

100%

Italy

85%

Luxembourg

80%

Netherlands

75%

Norway

85%

Portugal

75%

Spain

85%

Sweden

95%

Switzerland

65%

LBHIPSI00098709

382

This is for normal equities. For your index baskets, it is 85% long and 100% short.

-----Original Message-----
From: Thayer Swallen [mailto:Thayer.Swallen@tudor.com]
Sent: 01 December 2005 17:14
To: Guthrie, John E; Lee, Christine
Subject: withholding

Can you confirm that standard withholding for dividend payouts is 15% on your end for LBIELPS? I know that when we get payment advice on dividends, it seems to always be for 85% of the quantity* price per share.

Thanks,
Thayer

---------------------------------------------------------------
------
This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice.

---------------------------------------------------------------
------
This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice.
----------

LBHIPSI00098710

383



IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

-------------------------------------------------------------
------

This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice.

-------------------------------------------------------------
------

This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

-------------------------------------------------------------
------

This message is intended only for the personal and confidential use of

LBHIPSI00098711

384

the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice.

LBHIPSI00098712

385

| From: | Dewey, John Jr. [jdewey1@lehman.com]. | Sent:12/12/2005 2:09 PM. |
|---|---|---|
| To: [~] | Wecker, Jeff [jwecker@lehman.com]. | |
| Cc: [~] | | |
| Bcc: [~] | | |
| Subject | FW: Confirmation of accounting for stat arb expenses and use of LPS. | |

Here's the mail that I've asked Marie to author vs. agree to... I am not comfortable committing ourselves down a path based on a forwarded approval.


> -----Original Message-----
> From: Stewart, Marie
> Sent: Tuesday, November 22, 2005 6:25 PM
> To: Gassman, Paul R; Blumkin, Jason T
> Subject: RE: Confirmation of accounting for stat arb expenses and
> use of LPS
>
> Yes.
>
> -----Original Message-----
> From: Gassman, Paul R
> Sent: Friday, November 18, 2005 4:46 PM
> To: Stewart, Marie; Blumkin, Jason T
> Subject: Confirmation of accounting for stat arb expenses and use
> of LPS
>
> Marie / Jason,
>
> I just want to confirm our understanding regarding accounting for
> execution fees associated with stat arb client and the use of the
> Lehman Portfolio Swap (LPS). Since all fees and Lehman commissions
> are invoiced, booked and collected separately from the swap, we still
> consider this as applicable for net accounting (i.e. expenses booked
> to contra revenue and netted against revs). That is, even though
> Lehman trades in house accounts on behalf of our clients, all orders
> to the exchanges are one-for-one associated with a client order based
> on the specific terms that the client dictates (i.e., market or limit,
> quantity, security, etc.) The fact that we hold the positions and
> transfer all risk to the client via the LPS does not conflict with the
> concept that the expenses incurred by Lehman on behalf of the client
> are, in fact, client incurred expenses attributable not to Lehman but
> to the client. Thus, appropriate accounting would be on the same net
> basis as stat arb clients are currently accounted for who do not
> utilize the LPS.
>
> After your confirmation we can then communicate this determination and
> work to modify how such expenses are accounted for.
>
> Many Thanks,
>
> Paul

LBHIPSI00050268

386

| From: | Brier, Bruce [bbrier@lehman.com]. | | Sent:1/21/2005 8:10 AM |
| To: [ - ] | Meys, Michael [mmeys@lehman.com] | | |
| Cc: [ - ] | | | |
| Bcc: [ - ] | | | |
| Subject: | RE: Swap vs CFD for off-shore counterparties. | | |

> -----Original Message-----
> From: Meys, Michael
> Sent: Thursday, January 20, 2005 1:06 PM
> To: Harrison, Kevin A; Brier, Bruce
> Subject: Swap vs CFD for off-shore counterparties
>
> Below are pros/cons of 2 derivative products available for economic
> and dividend performance on single equity stocks:
>
> SWAP
>
> Pros
>
> Street wide acceptance of ISDA agreement
> ISDA is entity specific, although doc exemptions are available for
> other Lehman entities (simple web based process)
> Able to define terms of the trade for each specific transaction
> Including but not limited to, duration, resets, dividend pass though,
> swap rate.
> Variations of hedge execution to fit customer needs
> Monitored and managed in the DeltaOne Risk system
> Automated confirmation process via Smart ticket and Middle Office
> Easy to define various strategies for internal MIS
>
> Cons
>
> Currently not an acceptable structure for yield enhancement as stated
> by the tax department
> Potential tax risk (related to dividend enhancement)
> Market risk depending on hedge execution
> Considered a contract and not a security
> Possible recharacterization as securities loan with corresponding WHT.
>
>
> CFD
>
> Pros
>
> Acceptable structure for dividend yield enhancement
> Considered a perpetual structure
> Pricing consistent with traditional PB account
> Tax characterization not clear but most likely considered a derivative
> security issued by LBIE and not a notional principal contract
> Position can either be levered or not with the leverage in the form of

LBHIPSI00017382

387



> a margin loan.
> Ease of booking via Royal Blue
> Risk also managed via Royal Blue
>
> Cons
>
> Not flexible when pricing individual trades. Price (interest rate)
> tied to margin debit rate on PB account
> No defined terms. Clients can theoretically trade in and out of the
> same position in the same day
> P&L reporting not tied into US reporting creating MIS gaps
> Risk managed in Royal blue and not tied to Delta One
> Separate agreement from ISDA. Not doc exemptions available.
> Attracts considerable amount of Regulatory Capital through LER and CRR
> Tax characterization not certain at this juncture and tax opinion has
> not been received. Most likely characterization is above.
> Tax risks increase dramatically if cfd terminated within one year.
>
>

LBHIPSI00017383

388

| Clients Who Executed Offshore Stock Lending Agreements to Participate in Cayman Islands Stock Lending Transaction[1] |
| --- |
| **Clients** |
| Barclays Global Investors Ltd. |
| Goldman Sachs Europe |
| Greenlight Reinsurance, Ltd. |
| JPMorgan Chase Bank |
| LGT Bank in Liechtenstein AG |
| OZ Master Fund, Ltd. |
| Royal Trust Corporation of Canada |
| Société Européenne de Banque SA |
| State Street Bank and Trust Company |
| Union Bancaire Privee |

= Redacted by the Permanent Subcommittee on Investigations

[1] List is compiled from set of offshore stock lending agreements ▬▬▬▬

LBHIPSI00021557

389

Lehman can enhance the Client's Appreciation (Dividend Return) via Borrowing Stock
(Strict procedures apply, case by case basis)





1. Only Borrows

1. If 85 to 70, Then 15% WHT:
   <u>Not</u> good for LBIE
   "**OK**" for LB Cayman to borrow from Off-Shore HF

2. LB Cayman WHT gets 70%
   Passes 70% to HF

LBHIPSI00000055

390

Lehman can enhance the Client's Appreciation (Dividend Return): Borrow or Sell Via Swap
(Strict procedures apply, case by case basis)



2. Sell Via Swap

1. Borrow or Sell Via Swap

1. LB Cayman get securities via 70%
   Prices 70% back to HF

2. Brought into 85%
   Enhanced by 15%
   *Swap payments are not considered in-lieu,
   but do open up risk of tax withholding*

LBIE/LBSF can not borrow from LB Cayman

LBIE/LBSF can buy stock from LB Cayman
(and pay returns via swap – 10 names, 30
days, etc)

LBHIPSI00000056

391

Lehman can enhance the Client's Appreciation (Dividend Return): Borrow Then Sell Via Swap
(Strict procedures apply, case by case basis)




1. Sell Via Swap

1. Sell Via Swap

Borrow or Swap

1. LBSF 100% Swap payments are not considered in-lieu
   Risk that swap will be recharacterised as in-lieu
   (which could then be withheld at higher levels)

To mitigate basket, need basket to be:
1-month, 15-20 stocks
No more than 20% concentration in a single name

LBHIPSI00000057

392

Lehman can enhance the Client's Appreciation (Dividend Return): Swap vs. Outside Counterparty
(Strict procedures apply, case by case basis)




1.  Mitigates risk but needs basket

Stock loan can be o.k. for single stocks

*(Some HF's can __not lend stock__)*

*Stock Loan may be preferred*
*- Loaning Stock is __not__ a taxable event*
*- Selling Stock is a taxable event*

LBHIPSI00000058

393



# Synthetic Long Position

Lehman can enhance the Client's Appreciation (Dividend Return) via a Total Return Swap

(Strict procedures apply, case by case basis)

### Client "Long" Position

**Client**

**LEHMAN BROTHERS**

**Open Market**

1a. Lehman may Lend Stock for the Duration of the Swap

1. Lehman Buys Stock, Client Sells Stock (via Cross)

3. Client Receives Stock Appreciation + (% of Net Dividends)

3. Client Pays Stock Depreciation

2. Lehman Sells Stock (via Cross, VWAP, MOC, etc)

2. Lehman Receives Cash from Stock Sale

LBHIPSI00001581

394

LPS Guidelines

- Lehman c/p is LBIE [non-US customers referred to LBIE, what is importance of this?  Does it matter that all OTC customers are generally trade with LBIE?]
- Hedge fund customer [can institutions trade it?]
- Non-US customers [defined how—says ok if advisor is onshore.  Can US customers trade it?  Says cannot be engaged in a US trade or business— can't trade if they are?]
- Exposure can be long or short, or both.
- Pays the return on an index—does it matter that structured as a basket swap under ISDA?
- Underlying is publicly traded equities, including US provided they trade on NYSE, AMEX or NASDAQ, with market cap in excess of $5 billion.
- Documented under ISDA, separate confirm for each LPS; ok to have other swaps away from LPS; ok to be trading physical in PB account
- Daily reporting [check what this looks like]
- Changes to index run through filter (e.g. RTL) that rejects orders if Lehman can't hold as a hedge
- Changes can be daily, but some positions should be in place for several months
- Non-tax business reasons, including operational efficiency.  [Is it necessary that there be margin efficiency?]
- No bilateral collateral allowed?
- Collateral between 1-20% of value of notional.  [How to apply Reg U for US customers as required by Legal? What does footnote 11 mean?]; daily collateral marks.  [types of collateral allowed?], interest on collateral posted.
- Monthly resets.
- 1 to 1.5 year term
- Unilateral right to terminate
- Cash settled
- No crossing delta
- LBIE is calculation agent
- Hedge based pricing; ok if a hedge is always executed
- Customer cannot enter swap if a principal purpose is to avoid US withholding tax.  [How do we know?]
- LBSF/LBIE Hedge Swap has to anticipate significant netting of positions so that Hedge Swap doesn't equal LPS positions.
- LBIE has to make a profit, taking into account Hedge Swap [what is pricing of the Hedge Swap?]
- LBIE's officers have to exercise management and control over LBIE's activities [traders in US enter trades on LBIE's books – how do we monitor/control?]
- [How many names in the index?]

LBHIPSI00017450

395

- [What dividend level should we pay? Can we charge an offshore customer more than an onshore if terms are otherwise the same?]
- [is it necessary that client not direct exchange where hedge is executed?]

LBHIPSI00017451

396

## CN=Jeffrey Liggitt/O=Maverick

| | |
|---|---|
| **From:** | CN=Jeffrey Liggitt/O=Maverick |
| **Sent:** | 2/21/2007 5:01:49 PM |
| **To:** | Steve.Bokiess@ey.com |
| **Cc:** | Chad.Chisolm@maverickcap.com; "Shaheda Patel" <Shaheda.Patel@ey.com> |
| **Subject:** | Re: AMTD Dividend |

No, it is from an arrangement with a broker where they hold our shares in their name when the dividend is paid so they do not have to withhold tax due to Levered's foreign ownership.


Steve.Bokiess@ey.com
02/21/2007 03:52 PM

To
Jeffrey.Liggitt@Maverickcap.com
cc
Chad.Chisolm@maverickcap.com, "Shaheda Patel" <Shaheda.Patel@ey.com>,
Steve.Bokiess@ey.com
Subject
Re: AMTD Dividend




Are you receiving the "dividend" as a swap payment?

Steven J. Bokiess
Ernst & Young, LLP
Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6301
Phone: 312-879-6560
Fax: 866-751-4482
E-Mail: steve.bokiess@ey.com


Jeffrey.Liggitt@Maverickcap.com
02/21/2007 12:02 PM

To
"Steve Bokiess" <steve.bokiess@ey.com>
cc
"Shaheda Patel" <Shaheda.Patel@ey.com>, Chad.Chisolm@maverickcap.com
Subject
AMTD Dividend

Permanent Subcommittee on Investigations
**EXHIBIT #41**

MAV0001413
CONFIDENTIAL

397

Hello –

We have an issue we wanted to run by you regarding a dividend received in Maverick Fund II, Ltd. (Levered).

In 2006, Levered received a $5 payment from AMTD which was classified as 50% dividend and 50% return of capital based on AMTD's calculations. Levered enhanced this dividend so all it was treated as substitute dividend. We were wondering if you know of any way that we could treat some of the enhanced dividend as return of capital instead of ordinary income (since it was a sub dividend). We have not found anything that would suggest such treatment but it could be quite beneficial from a tax perspective if we could justify a return of capital treatment.

Any thoughts?

Jeffrey Liggitt
Maverick Capital, Ltd.
300 Crescent Court, 18th Floor
Dallas, TX 75201
Phone: (214) 880-4025
Fax: (214) 880-4159

Any U.S. tax advice contained in the body of this e-mail was not intended or written to be used, and cannot be used, by the recipient for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code or applicable state or local tax law provisions.

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Notice required by law: This e-mail may constitute an advertisement or solicitation under U.S. law, if its primary purpose is to advertise or promote a commercial product or service. You may choose not to receive advertising and promotional messages from Ernst & Young LLP (except for Ernst & Young Online and the ey.com website, which track e-mail preferences through a separate process) at this e-mail address by forwarding this message to no-more-mail@ey.com. If you do so, the sender of this message will be notified promptly. Our principal postal address is 5 Times Square, New York, NY 10036. Thank you. Ernst & Young LLP

MAV0001414
CONFIDENTIAL

398

ML-PSI-0088



# Enhancing Yield Through Dividend Strategies
## Total Return Swaps, Stock Loan

Fall 2006

**Merrill Lynch**
Global Markets & Investment Banking Group

Permanent Subcommittee on Investigations
**EXHIBIT #42**

399

ML-PSI-0089

## Dividend Enhancement Transactions

**Dividend Strategies**

- Dividends payable on equities issued by a foreign entity are generally subject to withholding taxes.

- Clients through various strategies can enhance the dividend yield on holdings of foreign stocks or indices and pick up additional yield

  - Owners of foreign stock are subject to withholding tax on dividends which can reach 30% depending on country where the fund is domiciled and where the stock is purchased

  - ADRs are treated as the underlying from a withholding tax perspective

  - Brokers may have the ability to obtain a higher dividend than clients holding such stocks

  - Investors can enter into a product whereby they receive an enhanced dividend

  - Assume dividend entitlement after withholding tax is 71%, a broker offers to pay 97%, for an enhancement of 26%. With a dividend notional of $5,000,000, the investor would pick up an additional $1,300,000.

- Dividend strategies may be packaged through a number of products, such as Swaps, Zero-Strike Calls or Stock Loan

- The level of enhancement ultimately depends oat eh market, the stock, the yield, trade size and duration

- Funds may not receive full benefits through custodian agreement as custodians may enter into trade for their own accounts

400

ML-PSI-0090



## Dividend Enhancement Transactions

**Illustrative Economics**

Client has invested EUR 1 bn in a portfolio of foreign equities with a 5% dividend yield subject to withholding taxes of 15%.

|  | Current Position | Enhancement Range | |
|---|---|---|---|
| Cash dividend received (in EUR) | 42,500,000 | 45,000,000 | 47,500,000 |
| Additional income (in EUR) |  | 2,500,000 | 5,000,000 |
| Enhanced yield (in bps) |  | 25.00 | 50.00 |

Note: the enhanced position will depend on the underlying equities and may be higher or lower than the amount shown.

401

ML-PSI-0091



402

ML-PSI-0092



# Dividend Enhancement Transactions

**Total Return Swap**

- Client sells equity in the market. MLI purchases equities in

- Client and MLI enter into a cash-settled total return swap (the "TRS")

- If Client doesn't already own security, then it may enter directly into a TRS with MLI to gain exposure to the shares

- Under the terms of the TRS, MLI will receive from Client a Euribor-based financing rate, as well as any depreciation in the value of the equities over the term of the TRS. In exchange, MLI will pay Client any appreciation in the value of the equities over the term of the TRS together with an agreed upon percentage of any dividend paid on the equities

- Dividend payments made through the swap are considered "manufactured dividends" and are not subject to withholding for offshore clients, but are treated as income for tax sensitive US based investors

- At maturity, the TRS will be cash settled and MLI will sell the equities into the market to unwind its hedge

- To maintain exposure to the securities, Client could renew the TRS contract or purchase the equities in the marketplace

ML-PSI-0093

# Dividend Enhancement Transactions

## Swaps vs. Stock Loan

| | Swaps | Stock Loan |
|---|---|---|
| **Minimum Holding Period** | 90 days | 15 days |
| **Documentation** | Requires ISDA (International Swaps and Derivatives Association) documentation | Requires OSLAs (Overseas Securities Lending Agreement) |
| **Collateral** | XXX | XXX |
| **Dividends\*** | Investors receive dividend equivalent payments through the swap, which are Non-Qualified | Investors receive substitute dividends through stock loan, which are Non-Qualified |
| **Costs** | Financing and commissions (for establishing new positions.) Existing positions may be crossed on one leg, or both - depending on the country | |
| **Withholding** | Withholding depends on the country. Average withholding for non-treaty countries is 25%; for US: 15% | |
| **Enhancement** | Average Level of enhancement varies between 90 and 97% of gross dividend and depends on the country, the stock, the yield, trade size, etc. | |
| **Swap vs. Stock Loan** | Swaps and stock loan generally return a similar level of enhancement, but in some markets, one may be more beneficial than the other | |
| | For existing positions, swaps may represent a taxable event | |

\*New qualified dividends are fixed at 25% for tax function US-based investors. Such swaps with a holding point of greater than one year would be an analysis

404

ML-PSI-0094

## Dividend Enhancement Transactions

**US Companies with Dividend Yields Greater Than 5%** (as of Jan 30, 06)

| Ticker | Company Name | Dividend Yield | (Jan 9 close) | Projected Dividend Payment | Next Projected Ex-Date |
|---|---|---|---|---|---|
| GM | General Motors Corp | 8.9% | $22.41 | $0.50 | Feb 09, 06 |
| CZN | Citizens Communications Co | 8.1% | $12.30 | $0.25 | Mar 16, 06 |
| EOP | Equity Office Properties Tr | 6.2% | $32.15 | $0.50 | Mar 29, 06 |
| PGL | People's Energy Corp | 6.0% | $36.63 | $0.55 | Mar 17, 06 |
| AIV | Apartment Invt &Mgmt -Cl A | 5.9% | $40.65 | $0.60 | May 18, 06 |
| PGN | Progress Energy Inc | 5.6% | $43.38 | $0.61 | Apr 07, 06 |
| UST | Ust Inc | 5.5% | $41.25 | $0.57 | Mar 10, 06 |
| T | At&t Inc | 5.4% | $25.02 | $0.33 | Apr 06, 06 |
| CAG | Conagra Foods Inc | 5.3% | $20.56 | $0.27 | Jan 26, 06 |
| VZ | Verizon Communications Inc | 5.3% | $31.48 | $0.42 | Apr 06, 06 |
| RAI | Reynolds American Inc | 5.2% | $99.55 | $1.25 | Mar 08, 06 |
| KSE | Keyspan Corp | 5.1% | $36.66 | $0.47 | Apr 11, 06 |

Source: Merrill Lynch Equity Derivatives Strategy

405

ML-PSI-0095

## Dividend Withholding Rates - Europe*

| Country | Rates | Frequency | Record Date Period |
|---|---|---|---|
| Austria | 25 | Annual | May, June, July |
| Belgium | | Annual | |
| Denmark | 28 | Annual | March, April, May |
| Finland | 29 | Annual | March, April, May |
| France | 25 | Annual | April, May, June, July |
| Germany | 21.1 | Annual | April, May, June |
| Greece | 0 | Annual | April, May, June |
| Hungary | 35 | Annual | May, June |
| Ireland | 20 | Semi-Annual | No Specific Dividend Season |
| Italy | 27 | Annual | April - November |
| Luxembourg | 20 | Annual | April, May, June |
| Netherlands | 25 | Semi-Annual | April - June; September - November |
| Norway | 25 | Annual | April - July |
| Portugal | 25 | Annual | May, June |
| Russia | 15 | Annual | May, June |
| South Africa | 0 | Semi-Annual | No Specific Dividend Season |
| Spain | 15 | Quarterly | No Specific Dividend Season |
| Sweden | 30 | Annual | April, May |
| Switzerland | 35 | Annual | April, May, June |
| Turkey | 15 | Varies | No Specific Dividend Season |
| U.K. | 0 | Semi-Annual | No Specific Dividend Season |

*From the perspective of an investor domiciled in a non-treaty jurisdiction (e.g. Cayman Islands). US based investors are generally subject to an average withholding of 15%

406

ML-PSI-0096

## Dividend Withholding Rates – Americas & Asia*

| Country | Rates | Frequency | Record Date Period |
|---|---|---|---|
| **Americas** | | | |
| Argentina | 35 | Varies | No Specific Dividend Season |
| Chile | 35 | Varies | No Specific Dividend Season |
| Canada | 25 | Quarterly | No Specific Dividend Season |
| Mexico | 5 | Varies | No Specific Dividend Season |
| Uruguay | 35 | Varies | No Specific Dividend Season |
| U.S. | 30 | Quarterly | No Specific Dividend Season |
| **Asia** | | | |
| Hong Kong | 0 | Semi-Annual | March – May, August – September |
| India | 0 | Annual | May – Aug |
| Japan | 7 | Semi-Annual | March, September |
| Korea | 27.5 | Annual | Dec. |
| New Zealand | 30 | Semi-Annual | Feb – April, July – Sept |
| Taiwan | 20 | Annual | May – Nov |

*From the perspective of an investor domiciled in a non-treaty jurisdiction (e.g. Cayman Islands). US Based investors are generally subject to an average withholding of 15%

407

ML-PSI-0097



## Contacts

**Multi Product Marketing Team**

**Paul Zabaleta, MD**
212-449-3373

**Brian Abdoo, MD**
212-449-4566
Brian_abdoo@ml.com

**David Clark, MD**
david_clark@ml.com

**Mary Foreman, Director**
312-469-6616
mary_foreman@ml.com

**Jim Roccas, Director**
212-449-1880
jim_roccas@ml.com

**Chantelle Streete, Associate**
212-449-4899
chantelle_streete@ml.com

408

ML-PSI-0098



## Disclaimers

This information is for your private information and is for discussion purposes only. We are acting solely in the capacity of an arm's length counterparty and not in the capacity of your financial advisor or fiduciary.

Generally, all over-the-counter ("OTC") derivative transactions involve the risk of adverse or unanticipated market developments, risk of illiquidity and other risks. Unless specifically stated otherwise, any transaction terms are indicative only and are subject to change and any prices mentioned here are not bids or offers by Merrill Lynch to purchase or sell any securities or financial instruments. All trades are subject to Credit approval. Prior to undertaking any trade, you should discuss with your professional tax or other adviser how such particular trade(s) affect you. This brief statement does not disclose all of the risks and other significant aspects of entering into any particular transaction.

This proposal is confidential, for your private use only, and may not be shared with others (other than your advisors) without Merrill Lynch's written permission, except that you (and each of your employees, representatives or other agents) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the proposal and all materials of any kind (including opinions or other tax analyses) that are provided to you relating to such tax treatment and tax structure. For purposes of the preceding sentence, tax refers to U.S. federal and state tax.

This proposal is for discussion purposes only. Merrill Lynch is not an expert on, and does not render opinions regarding, legal, accounting, regulatory or tax matters. You should consult with your advisers concerning these matters before undertaking the proposed transaction.

instruments mentioned here. We or our affiliates may have an investment banking or other commercial relationship with the issuer of any security or financial instrument mentioned here or related thereto.

409



CONFIDENTIAL

ML-PSI-00147141

410



CONFIDENTIAL                                                                ML-PSI-00147142

411



CONFIDENTIAL                    ML-PSI-00147143

412



CONFIDENTIAL                                                                 ML-PSI-00147144

413



CONFIDENTIAL

ML-PSI-00147145

414

Message                                                                    Page 1 of 2

**Cox, Byron**

From:    Molino, Neil (IED) [Neil.Molino@morganstanley.com]
Sent:    Monday, December 06, 2004 3:25 PM
To:      swap
Subject: FW: swap fills 11/03

is this where we tell him about side by side swap?

From: Mead, Jeff [WELCH CAPITAL PARTNERS LLC (New York)]
Sent: Monday, December 06, 2004 3:21 PM
To: Molino, Neil (IED)
Subject: RE: swap fills 11/03

Neil, one last thing. Are there any restrictions on us trading MSFT outside of the swap, would we end up taking the withholding if we
bought it outside of the swap? As I'm sure you know now, we didn't actually know the inner workings of this swap business, chalk
that up to our ignorance. We were expecting to hold the swap until the dividend was paid and then we would exit the swap and get
our shares back from you directly, or at least that's what we thought. You telling me that we need to hold the swap until we decide
to exit the position entirely changes the cost structure of the transaction because assuming we want to hold the position, we would
have to hold on to the swap longer. Is there any sort of time period we need to be out of the swap before we can buy MSFT back?
If we had already bought additional shares of MSFT after we entered the swap would we have exposed ourselves to the
withholding?

Jeff

          -----Original Message-----
          From: Molino, Neil (IED) [mailto:Neil.Molino@morganstanley.com]
          Sent: Monday, December 06, 2004 2:28 PM
          To: Jeff Mead
          Cc: swap
          Subject: RE: swap fills 11/03

          Hi Jeff,

          When you no longer want the economic position all you have to do is give us an order to unwind (or partially unwind) the
          swap. We are a full trading desk.

          Thanks so much,
          Neil

          From: Mead, Jeff [WELCH CAPITAL PARTNERS LLC (New York)]
          Sent: Monday, December 06, 2004 1:54 PM
          To: Molino, Neil (IED)
          Subject: RE: swap fills 11/03

          Neil if I wanted to exit out of this swap, now that the dividend has been paid, what do we need to do to get that going?

          Jeff

                    -----Original Message-----
                    From: Molino, Neil (IED) [mailto:Neil.Molino@morganstanley.com]
                    Sent: Wednesday, November 03, 2004 7:55 PM
                    To: Jeff Mead
                    Cc: rpgswaptrading
                    Subject: swap fills 11/03

                                                                                    MS-INT 004327

1/18/2008

                                                                          MS-PSI 001399

                    ┌─────────────────────────────────────────┐
                    │  Permanent Subcommittee on Investigations │
                    │            EXHIBIT #43                     │
                    └─────────────────────────────────────────┘

415

Message                                                                 Page 2 of 2

Please see attached swap fills.

Thanks much,
Neil

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com/servlet/tds. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com/servlet/tds. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

MS-INT 004328

1/18/2008

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI 001400

416

MSFT dividend enhancement – rules of engagement-Question.                          Page 1 of 1

| | |
|---|---|
| **From:** | john.marion@ubs.com |
| **Sent:** | Thursday, October 14, 2004 11:11 AM |
| **To:** | markus.foellmi@ubs.com |
| **Subject:** | MSFT dividend enhancement - rules of engagement-Question. |
| **Importance:** | High |

Hi Folks -

At long last (sorry for the wait, but there's been a lot of work involved), here are the final rules of engagement we have to adhere to for this kind of trade. This has been looked at by internal as well as external US tax, London tax, London compliance, Zurich compliance, etc... We all know that there are competitors out there offering trades with economic terms that seem better on the face of it, but our tax counsel is adamant that such trades are quite risky and at the end of the day, we will never get the legal opinion needed to put them on. In fact, for clients who are seriously considering those kinds of trades, we'd be happy to give them a copy of our legal opinion once we get it and/or get them on the phone with our legal counsel to discuss the trade details. I really think our attention to legal details will end paying off for us and our clients. People are concerned about this. It will get in the papers. We have to do it right. At least one client has already decided not to trade at all because of the possible legal problems, but we will try to change their minds once we show them our way.

We have 3 basic possibilities:

1) stock loan - client loans stock to UBS Caymans, receives 70% of the dividends + stock loan fee equal to 27% of the dividend, for a total of 97%

2) Liffe futures - see below

3) BLOC - see below

Please see below for the restrictions on the Liffe futures and BLOC trades. If you really think about it, it's not so bad. Mike Uebersax and I are fully versed on this stuff and stand ready to do whatever is necessary to get these trades done for our customers in as seamless a manner as possible. Please speak to one or the other of us if anything is unclear. ;-)

Let's go get 'em

Regards,
John

All trades:

1) UBS will not commit, upon entry into the LIFFE trade, to broker the client's unwind(s);

2) UBS will not in fact broker any "complete" unwinds (as opposed to client-size-related adjustments) of either the LIFFE or the BLOC trade within 30 days of entry into the trade;

3) if UBS in fact uses MOC pricing for either entry or unwind of a LIFFE or BLOC trade, UBS will not expect the trade-related volume in the MOC market on any day to exceed 20% of the MOC volume on that day; and

Permanent Subcommittee on Investigations
**EXHIBIT #44**

1/28/2008                                                                          UBS 000606

417

4) with respect to volume limitations in connection with the LIFFE trade, the client could take the offsetting position with the exchange even if UBS did not broker the unwind (i.e., the open volume resulting from the trade will not be so high that the exchange wouldn't take the client's unwind position absent a matching UBS position, or that the resulting "bid-ask spread" would be economically prohibitive).

Futures trade:

1) UBS would broker the sale of MSFT shares by the client;

2) UBS would broker the purchase of Liffe listed MSFT futures by the client, as well as provide liquidity (i.e. take the short side of the client's futures position);

3) 1 & the hedge for 2 above would not be crossed with each other, or done at the same time, however daily VWAP trades, risk prices or closing (if allowed) for each would be allowed;

4) the futures are true futures, i.e. margined, not prepaid and of the standard, exchange listed variety.

5) UBS will broker the sale of futures by the client before expiry (if so desired) versus VWAP r market close (if possible), as well as provide liquidity (i.e. take the long side of the lient's futures sale);

6) UBS will not broker the purchase of MSFT shares by the client on either trade date of the closing futures trade or expiry date of the futures;

7) UBS will encourage the client to hold the position a minimum of 30 days, but will provide liquidity if necessary (i.e. size of client's fund will fluctuate, so they may need to adjust their MSFT exposure fairly often);

8) UBS would like to be as much of the volume/open interest of the futures on the exchange as possible without jeopardizing our tax position (we need guidance on this but I can imagine being a large majority of both, if we can).

BLOC trade:

1) UBS would broker the sale of MSFT shares by the client;

2) UBS would issue and sell to the client a BLOC Certificate as described below;

3) 1 & hedge for 2 above would not be crossed with each other, or done at the same time, however daily VWAP trades, risk prices or closing (if allowed) for each would be allowed;

4) The BLOC is a Certificate which basically consists of a long position in a low-strike option ($0-$5), and a short position in a higher-strike option with the following characteristics: a) expiry will be 30 days to 5 years, b) cash settled, c) the delta of no more than 90% (i.e. 10% chance that the BLOC finishes out of the money if held to maturity);

5) Adjustment of the BLOC for the payment of a special dividend would be either by reducing both strikes by the amount of the special dividend while keeping the underlying as 1 MSFT share and then adding some percentage of the special dividend as cash, or by changing the underlying itself to a basket consisting of 1 share of MSFT and some percentage of the special dividend cash, while keeping the strike the same. (i.e. the cash can come out of the underlying if the strike of the low strike option is high enough to accommodate it by being adjusted down by the amount of the dividend, otherwise it will have to remain in the underlying);

6) UBS will make a market in the BLOC for the client on risk prices for small sizes (once again, client may have to adjust his position), while early unwind of the entire position (if so desired) would be versus VWAP or market close (if possible);

7) UBS will not broker the purchase of MSFT shares by the client on either trade date of the closing BLOC trade or expiry

1/28/2008                          **Confidential Treatment**                **UBS 000607**
                                      Requested

418

MSFT dividend enhancement - rules of engagement-Question.                    Page 3 of 3

date of the futures;

8) UBS will encourage the client to hold the position a minimum of 30 days, but will provide liquidity if necessary (i.e. size of client's fund will fluctuate, so they may need to adjust their MSFT exposure fairly often).

**Confidential Treatment
Requested**

**UBS 000608**

419



Mail (Plain Text, 4 Attachments)

From:      Madaio, Michael;
To:        Sippel, Eric [esippel@eastbournecapital.com];
Bcc:       Sippel, Eric [esippel@eastbournecapital.com];
Subject:   RE: Dividend Enha
Received:  Monday, November 15, 2004 3:37:44 PM

Eric,

Not sure what you've rec'd so far but here's more info. The 1st attachment is Mike Farber's draft that he mentioned on our call. Unfortunately, I can't send you our GMLSA (sec S/L agreement) directly. You should see it from our Credit group shortly. Pls call me if you have any questions.

Thx.

Mike

-----Original Message-----
From: Sippel, Eric [mailto:esippel@eastbournecapital.com]
Sent: Thursday, November 11, 2004 5:23 PM
To: Madaio, Michael
Subject: RE: Dividend Enhancement

Mike, I still have not heard anything from UBS regarding this. What do we need to do to to get this going?

-----Original Message-----
From: michael.madaio@ubs.com [mailto:michael.madaio@ubs.com]
Sent: Thursday, June 03, 2004 8:29 AM
To: Sippel, Eric
Subject: RE: Dividend Enhancement

Here's some info. I'll be sending more. Thx.
PS PW Cayman Ltd. was novated to UBS Cayman Ltd last year.

-----Original Message-----
From: Sippel, Eric [mailto:E.Sippel@eastbournecapital.com]
Sent: Thursday, June 03, 2004 11:14 AM
To: Madaio, Michael
Subject: RE: Dividend Enhancement

I am interested. Please send me information regarding the tax treatment. I will also consult with our tax advisers. Thanks.

-----Original Message-----
From: michael.madaio@ubs.com [mailto:michael.madaio@ubs.com]
Sent: Thursday, June 03, 2004 7:58 AM
To: Sippel, Eric
Cc: Michael Madaio@ubs.com
Subject: Dividend Enhancement

Eric,

On our last visit, both Charlie Dietz & myself mentioned our off-shore dividend enhancement program. I apologize for taking so long to get this information to you but it took longer than anticipated to get our S/L trader settled in London! Essentially, there are 3 options. Here is a brief summary of each. I'd like to schedule a call w/ you to discuss in further detail.

Option #1
The off-shore entity lends UBS Cayman Ltd. the shares over it'd initially, two "fully paid for" agreements are signed with UBS Cayman Ltd. One allows us to borrow your shares (like the existing agreement in place w/ UBS) and the other allows us to lend shares to your off entity. For long dividend enhancement, UBS Cayman Ltd. will borrow your sha for a time period that includes the record date & use those shares to cover existing o/s short position or loan.

EX. acct IJ30513 (Blackbear O/S Master Fd) is long 6.19MM EP & it pays a 5.04 dividend tomorrow!
We could borrow the shares to cover a similar sized short position on UBS Cayman Ltd.'s books. You would still receive only 70% of the dividend but a stock loan fee equivalent to 20% would be paid to Blackbear for lending the shares. In this example, the fee would be 549,520. Blackbear would effectively receive 90% of the total dividend. Keep in mind that you may have individual investors in the fund who are

**Confidential Treatment Requested**                          **UBS 000655**

420

not subject to the 30% withholding. You would want to subtract these
holders' positions from the shares to be enhanced.

For 'short dividend enhancement', UBS Cayman Ltd. lends the shares to
your o/s entity which is short the shares. Over rim, your entity will
be charged only 70% of the dividend plus a stock loan fee. This fee
will be anywhere from 25 to 27%
Ex. If the o/s acct is short 500,000 DOW, the account would be charged
70% of the div (33.5 cents) plus a borrow fee of say 26%. The total
savings would be 500M* 335*4% or 56,700.

Option #2
Buy the stock on swap and receive 100% of the dividend. This scenario
is the cheapest solution but it's meant only for positions where the
intent is to hold the position long term. There would also be financing
costs.

Option #3
Similar to option #1, the o/s entity lends shares to UBS Cayman Ltd.
which executes a swap with another side. This is a min 30 to 45 day
trade although it's possible to sell the shares before that (but it may
effect the pricing). We would use this scenario if there were no short
positions or lending opportunities in UBS Cayman Ltd.

Pls let me know if you are interested (especially in EP as it goes
record tomorrow). I'll send you some relevant info pertaining to IRS
Rule 97-66 shortly. If you have any questions, pls call me at (212)
713-1164.

Tnx.

Mike

This communication is issued by UBS AG or an affiliate ("UBS") by the
Sales or Trading Department to institutional investors only and is not
research. It is for informational purposes and is not an official
confirmation of terms. It is not guaranteed as to accuracy, nor is it
a complete statement of the financial products or markets referred to.
Opinions expressed are subject to change without notice and may differ
or be contrary to the opinions or recommendations of UBS Investment
Research or the opinions expressed by other business areas or groups
of UBS as a result of using different assumptions and criteria. UBS
may maintain long or short positions in the financial instruments
referred to and may transact in them as principal or agent. Unless
stated specifically otherwise, this is not a recommendation, offer or
solicitation to buy or sell and any prices or quotations contained
herein are indicative only. UBS may provide investment banking and
other services to, and/or its officers/employees may serve as
directors of, the companies referred to in this material. To the
extent permitted by law, UBS does not accept any liability arising
from the use of this communication. For additional information,
please contact your local sales or trading contact.

Copyright 2004 UBS. All rights reserved. Intended for recipient
only and not for further distribution without the consent of UBS.

IMPORTANT NOTICE:
This email (including any attachments) is confidential and intended only for the addressee named above. If you have received this email in error;
please delete it, notify the sender and do not retain, read, copy or disseminate this email. This email may not be provided to any other party without
the sender's consent. This email does not constitute any investment advice or any solicitation or offer to buy or sell any securities. No
representation is made on the accuracy or completeness of the information contained in this email, and the sender does not accept liability for any
errors or omissions in the contents of this email that arise as a result of email transmission. The sender may not update the information in this
email. The sender does not waive any rights, privileges or other protections that the sender may have with respect to the information in this email.

| UBS-withholding-draft.pdf (185 Kb) | Div-Notice 97-66.pdf (22 Kb) | S&C opinion.pdf (34 Kb) | cahill opinion.pdf (42 Kb) |

**Confidential Treatment
Requested**

UBS 000656

421

| | |
|---|---|
| From: | Madaio, Michael |
| Sent: | Tuesday, November 30, 2004 7:04 PM |
| To: | jim.chen@maverickcap.com |
| Subject: | RE: are u long any of the following away; |

good catch, thx!

-----Original Message-----
From: jim.chen@maverickcap.com [mailto:jim.chen@maverickcap.com]
Sent: Tuesday, November 30, 2004 5:51 PM
To: Madaio, Michael
Subject: Re: are u long any of the following away:


We hold CCL and TYC, but these companies were incorporated outside the US,
so they don't have any withholding tax. No reason for us to enhance them.



           <michael.madaio@ubs.c
           om>

To
           11/30/2004 04:44 PM            <JIM_CHEN@MAVERICKCAP.COM>

cc


Subject
                                          are u long any of the following

away:





| | | | |
|---|---|---|---|
| EK | 277461109 | EASTMAN KODAK CO COM USD2.50 | |
| (178,100) | | | |
| NILSY | 46626D108 | JSC MMC NORILSK NI ADR EACH REP 1 ORD RUB1 | |
| | (199,050) | | |
| IACI | 44919P102 | IAC INTERACTIVECOR COM USD0.01 | |
| (200,209) | | | |
| MER | 590188108 | MERRILL LYNCH & CO COM USD1.333 | |
| (242,850) | | | |

1    Confidential Treatment
        Requested                UBS 001114

422

| | | |
|---|---|---|
| TEVA<br>(340,457) | 881624209 | TEVA PHARMA IND ADR(CNV 1 ORD ILS0.10) |
| AGN<br>(343,100) | 18490102 | ALLERGAN INC COM USD0.01 |
| IGT<br>(345,800) | 459902102 | INTL GAME TECH COM USD0.000625 |
| LM<br>(346,200) | 524901105 | LEGG MASON INC COM USD0.10 |
| CNP<br>(348,000) | 15189T107 | CENTERPOINT ENERGY COM NPV |
| PHS<br>(364,300) | 695112102 | PACIFICARE HLTH SY COM USD0.01 |
| SIE<br>(415,600) | 826322109 | SIERRA HEALTH SVCS COM USD0.005 |
| DUK<br>(462,000) | 264399106 | DUKE ENERGY CORP COM NPV |
| CCL<br>(474,000) | 143658300 | CARNIVAL CORP COM USD0.01(PAIRED STOCK) |
| JNJ<br>(680,860) | 478160104 | JOHNSON & JOHNSON COM USD1 |
| GPS | 364760108 | GAP INC COM USD0.05          (833,038) |
| COST<br>(1,063,800) | 22160K105 | COSTCO WHOLESALE COM USD0.005 |
| LOW<br>(1,076,100) | 548661107 | LOWE'S COS INC COM USD0.50 |
| XRX | 984121103 | XEROX CORP COM USD1          (1,095,000) |
| MSFT<br>(1,155,000) | 594918104 | MICROSOFT CORP COM USD0.0000125 |
| TYC<br>(3,421,200) | | TYCO INTERNATIONAL COM USD0.20 |

Thx!

Mike

This communication is issued by UBS AG or an affiliate ("UBS") by the Sales
or Trading Department to institutional investors only and is not research.
It is for informational purposes and is not an official confirmation of
terms.  It is not guaranteed as to accuracy, nor is it a complete statement
of the financial products or markets referred to.
Opinions expressed are subject to change without notice and may differ or
be contrary to the opinions or recommendations of UBS Investment Research
or the opinions expressed by other business areas or groups of UBS as a
result of using different assumptions and criteria. UBS may maintain long
or short positions in the financial instruments referred to and may
transact in them as principal or agent. Unless stated specifically
otherwise, this is not a recommendation, offer or solicitation to buy or
sell and any prices or quotations contained herein are indicative only. UBS
may provide investment banking and other services to, and/or its
officers/employees may serve as directors of, the companies referred to in
this material. To the extent permitted by law, UBS does not accept any
liability arising from the use of this communication. For additional
information, please contact your local sales or trading contact.

Copyright 2004 UBS.  All rights reserved.  Intended for recipient only and

2

Confidential Treatment
Requested                    UBS 001115

423

not for further distribution without the consent of UBS.

Confidential Treatment
Requested

UBS 001116

424

Mail (Rich Text; 1 Attachment)

From:      Miller, Shari;
To:        Karkhanis, Sanjeev; Tuckner, Todd; Ince, Scott; DL-ORC-CPC-NBR; DL-ORC-Team-US; Herde, Michael; Buscemi, Ed;
           Dyrvik, Per; Cronin, Michael-J; Schwyter, Anneliese; Jain, Rahul; Eber, Louis; Kelly, David (IB-Legal); Amsten, Pamela;
           Jemiolo, Mike; DL-MRC-EQ-USApprovals; SH-Ops-NewBusiness; Pinho, Christopher; Spencer, Neil; Kobayashi, Mie; Keenan,
           David;
Cc:        Madaio, Michael; Niessen, Mark; Fusco, Alexander; Somma, Joseph; Allan, Mark; Giatini, Peter; Nacincik, John; Miller, Shari;
Bcc:       Karkhanis, Sanjeev; Tuckner, Todd; Herde, Michael; Dyrvik, Per; Jain, Rahul; Jemiolo, Mike; Pinho, Christopher; Kobayashi,
           Mie; Keenan, David; Allan, Mark; Ince, Scott; DL-ORC-CPC-NBR; DL-ORC-Team-US; Buscemi, Ed; Cronin, Michael-J;
           Schwyter, Anneliese; Eber, Louis; Kelly, David (IB-Legal); Amsten, Pamela; DL-MRC-EQ-USApprovals; SH-Ops-
           NewBusiness; Spencer, Neil; Madaio, Michael; Niessen, Mark; Fusco, Alexander; Somma, Joseph; Giatini, Peter; Nacincik,
           John; Miller, Shari;
Subject:   NBI request - Short Dividend Enhancement Arranging Business (NBAMS2147993221)
Received:  Thursday, September 21, 2006 5:57:32 PM

The following request has been delivered to your TRaPA Inbox for approval:

Overview:

UBS has been executing a small number of "short enhancement" transactions since 2001. This NBI proposal would allow the business to increase
the number of transactions subject to established risk limits (which encompass both the long and short enhancement transaction programs). A
"short enhancement" transaction involves UBS Cayman Ltd. borrowing a US dividend paying equity security (a "Security") from an entity domiciled
in a maximum (i.e., 30% ) withholding tax jurisdiction (the "Lender") and then lending such Security to another entity domiciled in a maximum
withholding tax jurisdiction (the Borrower). The Borrower then delivers the Security against a short position with the market.

UBS Securities LLC, acting as independent agent for UBS Cayman Ltd., would first identify a potential Lender (select prime brokerage clients,
institutional agent lenders, or other financial services entities that have access to a Security that they would be willing to finance in a manner that
would increase the dividend yield on such Security). UBS Securities would then identify a potential Borrower. Once both a potential Lender and a
potential Borrower are identified, UBS Securities LLC personnel (again acting as agents for UBS Cayman Ltd.) will negotiate the terms of back-to-
back securities loans used to affect the borrowing and lending of the Security by UBS Cayman Ltd. If such negotiations result in transaction terms
that will generate a reasonable economic profit for UBS Cayman Ltd. (taking into account the relative risk of the transactions and all costs
associated with implementing the trades). UBS Cayman Ltd. will enter into a securities lending agreement to borrow the Security from the Lender
as well as a securities lending agreement to lend the Security to the Borrower.

Approval is requested from the following:
BUC - Scott Ince
COO - Tanya Castelli
CRC - Sanjeev Karkhanis
Compliance - Michael Herde
FCD - Per Dyrvik
GroupTreas - Anneliese Schwyter
Legal - Louis Eber
MRC - Mike Jemiolo
OPRC - David Keenan
Operations - approval coordinated by Christina Smith
Tax - Todd Tuckner

Please ensure your approval decision is made by 12-Oct-2006. Please see http://wf-essao-wp.opf.swissbank.com/trapa/dn/trapaDRL?
requestID=NBAMS2147993221 for details.

NBIShortDivEnhancement
v5.ZIP
(488 Kb)

                                    **Confidential Treatment
                                         Requested**                              **UBS 000643**

425

**REDACTED**

From:    Niesen, Mark
Sent:    Thursday, September 21, 2006 4:03 PM
To:      Fusco, Alexander; Miller, Shari
Cc:      Tuckner, Todd; Karkhanis, Sanjeev; Hodalo, Michael
Subject:   NBI Cayman Short enhancement
Importance:   High

Please find attached the NBI for Cayman short enhancement, which we request be circulated for ratification
through the usual processes. (This replaces the one sent 9/14)  Either Mike or myself will be happy to provide
any clarifications and answer any questions which may arise.

Best regards,
Mark Niesen

Prime Brokerage Services
Executive Director
Tel: 212-713-2533
Email: mark.niesen@ubs.com
<<NBIShortDivEnhancement v5.ZIP>>

**Confidential Treatment
Requested**                    **UBS 000503**

426

 UBS Investment Bank

## UBS NEW BUSINESS PROPOSAL

| INITIATIVE NAME | Short Dividend Enhancement Arranging Business |
|---|---|
| OBJECTIVE | Obtain approval for UBS Securities to act as agent for UBS Cayman Ltd with respect to arranging "short enhancement" transactions. |
| APPROVAL REQUIRED BY | ASAP |
| TARGET GO AR DATE | ASAP. |
| BUSINESS SPONSOR | Michael Madaio |
| PROJECT CONTACT | Mark Nieson  212.713.2533 |
| RESPONSIBLE TRADER(S) | Michael Kelly |

### 1.0 BACKGROUND

❖ Many of UBS's US Equity Prime Brokerage hedge fund clients engage in programs designed to increase the yield associated with owning US dividend paying equities. Providing dividend yield enhancement services is essential to retaining existing prime brokerage clients and increasing trading volumes with respect to each client. Yield enhancement is fast becoming a core aspect of all equity prime brokerage platforms. UBS must provide yield enhancement services in order to remain competitive with our investment banking peers.

❖ The short enhancement program (as described below) is designed to be used in conjunction with the established long enhancement program to meet specific client needs and generate additional trade flow for UBS's prime brokerage business.

❖ UBS has been executing a small number of "short enhancement" transactions since 2001. This proposal would allow the business to increase the number of transactions subject to established risk limits (which encompass both the long and short enhancement transaction programs).

### 2.0 INITIATIVE SUMMARY/DESCRIPTION

❖ A "short enhancement" transaction involves UBS Cayman Ltd. borrowing a US dividend paying equity security (a "Security") from an entity domiciled in a maximum (i.e., 30% ) withholding tax jurisdiction (the "Lender") and then lending such Security to another entity domiciled in a maximum withholding tax jurisdiction (the "Borrower"). The Borrower then delivers the Security against a short position with the market.

❖ Consistent with the current method of executing short enhancement transactions, UBS Securities LLC, acting as independent agent for UBS Cayman Ltd., would first identify a potential Lender (select prime brokerage clients, institutional agent lenders, or other financial services entities that have access to a Security that they would be willing to finance in a manner that would increase the dividend yield on such Security). UBS Securities would then identify a potential Borrower. Once both a potential Lender and a potential Borrower are identified, UBS Securities LLC personnel (again acting as agents for UBS Cayman Ltd.) will negotiate the terms of back-to-back securities loans used to effect the borrowing and lending of the Security by UBS Cayman Ltd. If such negotiations result in transaction terms that will generate a reasonable economic profit for UBS Cayman Ltd. (taking into account the relative risk of the transactions and all costs associated with implementing the trades), UBS Cayman Ltd. will enter into a securities lending agreement to borrow the Security from the Lender, as well as a securities lending agreement to lend the Security to the Borrower.  More specifically, UBS Cayman may:

  1. Borrow a Security from a hedge fund hedged with a securities loan to another

Confidential Treatment Requested          UBS 000504

427

hedge fund;

    2. Borrow a Security from an institutional agent lender (acting as agent for a Lender) hedged with a securities loan to a hedge fund; or

    3. Borrow a Security from a hedge fund or agent lender hedged with a securities loan to a financial services entity (e.g., a subsidiary of ING, or Nomura).

❖ Short enhancement transactions are designed to allow UBS clients that wish to sell short a dividend paying US equity to do so at a lower cost than would be typical in the market. This cost savings results in a higher yield with respect to the short position. In a typical short sale transaction, the short seller would borrow shares to deliver against its short position, and would be required to pay substitute dividends to the securities lender equal to 100% of the dividends paid on the borrowed shares. In a short enhancement transaction, the short seller is contractually obligated to pay substitute dividends that are less than the actual dividend paid on the associated shares. For example, instead of paying 100% of the dividends, a short seller in a short enhancement transaction would be required to pay only 95% of the dividends paid on the relevant shares as a substitute payment to the securities lender. The short seller's economic return on the short sale is therefore "enhanced" by 5% of the dividend associated with the short position.

❖ The economic "enhancement" to the short seller is funded through the acquisition of shares that are on the whole cheaper to borrow than the overall cost charged to the short seller. These "cheap" shares are typically acquired by borrowing a Security from an entity resident in a maximum withholding tax jurisdiction in a manner which legally avoids the US withholding tax that would have otherwise been imposed upon the dividends paid on such Security. As no withholding tax is due with respect to such a transaction, Lenders can enjoy an economic benefit in the form of an increased post-tax dividend yield on their stock position. Lenders typically receive an amount equivalent to approximately [85%] of the actual dividend rather than the 70% actual dividend that they would have received on a physical long position in the same Security.

❖ By participating in short enhancement transactions, UBS Cayman Ltd. is able to earn a low risk arbitrage spread equal to the difference in rates on the cash collateral legs of the securities loans plus a spread on the dividend yield (the withholding tax being essentially equivalent to an economic carrying cost which is reduced through this booking model and divided among the parties to the transaction).

❖ For example, in a typical short enhancement transaction, UBS Cayman Ltd. would borrow a Security from a Lender and would be obligated to pay 85% of the gross dividend as a substitute dividend to that Lender. UBS Cayman Ltd. could then lend the Security acquired from the Lender to a Borrower. The Borrower would be contractually obligated to pay a substitute dividend to UBS Cayman Ltd. equal to 95% of the actual dividend. UBS Cayman Ltd. would therefore earn a spread equal to 10% of the dividend. This spread would be in addition to the interest spread it would earn on the cash collateral legs of the transactions.



❖ UBS Securities LLC will earn a fee for its agency arranging services equal to 25% of the profit earned by UBS Cayman Ltd. for entering into short enhancement transactions. This

**Confidential Treatment Requested**

UBS 000505

428

fee is consistent with fees charged to third party clients for similar services.

❖ Trades are documented under standard Securities Lending agreements (typically GMSLAs).

❖ Market intelligence indicates that similar products are being currently offered by Morgan Stanley, Goldman Sachs, Lehman Brothers, Merrill Lynch, ING, & others.

❖ Operations and systems are currently in place.

❖ This NBI excludes trades where stock is borrowed and traded vs. a swap (previously approved as the "Long Enhancement Program."

## 3.0 PROFITABILITY / REVENUE ANALYSIS

❖ Start up Costs – none

❖ Estimated annual revenue:
   UBS Cayman Ltd. - $3 to $10 million annual (direct).
   UBS Securities LLC – $750,000 to $2.5 million direct (25% of UBS Cayman Ltd.'s profits), as well as significant indirect (per below).

❖ Other revenue impact: Product is a significant factor in UBS Securities LLC's ability to attract & retain Equity Prime Brokerage clients.

❖ Impact on headcount – None to plus one (with growth).

❖ Expected average trade size - $30 million.

❖ Transaction volume 5 to 20 per week.

## 4.0 BOOKING/EXECUTION PROCEDURES

❖ Name of booking legal entity – UBS Cayman Ltd.
❖ Name systems where positions will be booked  - ADP, Loanet

## 5.0 SYSTEMS

❖ Additional systems used (analytics & reporting) - DSS, IDEAL.

## 6.0 CRITICAL ISSUES
❖ See 7.5 Tax and 7.6 Legal.

Confidential Treatment Requested          UBS 000506

429



**7.0 RISK CONTROL & LOGISTICS**

**7.1 CREDIT RISK CONTROL**

**7.2 MARKET RISK CONTROL**

Loanet marks borrows and loans to market daily, with collateral collected or returned as needed.

**7.3 OPERATIONS**

-Processes in place.  Stock Loan Operations (John Nacincik/Joe Somma/ Peter Giallini).

**7.4 BUC/BCO**

Processes in place.  Equity/PB Services/Cayman BUC (Scott Ince/ Mark Allan).

**REDACTED**

**7.5 LEGAL**

**7.7 COMPLIANCE**

**7.8.1 SECURITY RISK**

**Confidential Treatment
Requested**          **UBS 000507**

430

| 3D. RISK & CONTROL CONTACTS ALREADY INVOLVED IN THIS INITIATIVE | |
|---|---|
| CREDIT RISK: | |
| MARKET RISK: | |
| FCD: | Per Dyrvik |
| BUC: | |
| ACCOUNTING POLICY: | |
| TAX: | Todd Tuckner |
| LEGAL: | Lou Eber |
| COMPLIANCE: | |
| OPERATIONS: | |
| GROUP TREASURY: | |
| IT: | |
| SECURITY RISK: | |
| OTHER: | |

**ATTACHMENTS**

431

| | |
|---|---|
| From: | MS-141    (iED) |
| Sent: | Wednesday, January 09, 2002 9:05 AM |
| To: | TP-027    @chase.com |
| Cc: | TP-099    @jpmorgan.com;    TP-101    @jpmorgan.com; |
| | TP-102    @chase.com;    TP-104    @chase.com; |
| | TP-103    @jpmorgan.com |
| Subject: | Re: MSIL Lending |
| Attachments: | Cayco Indemnification for 97-663.doc |

Cayco
Iemnification for 97-

TP-027
I apologise for the delay in responding — but the year end, and holidays slowed the
process down.
Attached is the indemnity that we will sign for the US borrows with JP Morgan Chase — can
you let me know if this is acceptable Please give me a call on    Redacted    if you wish
to discuss Thanks    MS-141

Redacted    ?chase.com wrote:

> MS-141 -- As we discussed, JPMorgan Chase's interpretation of the US
> securities lending regulations and Notice 97-66 (intended to solve the
> "cascading withholding tax" issue) is that some form of proof of
> withholding is required. Section 4 of Notice 97-66 clearly indicates
> that Morgan Stanley Cayman is a US withholding agent. JPMorgan Chase
> is a US person and clearly a withholding agent. If this is done with
> our Lux sub as agent, then the notice covers them as well. The
> language of this provision
> says:
>
>     "If a U.S. withholding agent withholds the highest rate of tax
> which would be imposed on all foreign recipients...each foreign
> withholding agent will be treated as having satisfied its withholding
> obligation under section 1.1441-7."
>
> For any new business, we are requesting a confirmation that
> appropriate tax has been withheld. The examples in Section 5 of Notice
> 97-66 all state that tax has actually been withheld. In section 3, the
> language states that withholding may be reduced or eliminated"...to
> the extent that the total U.S. tax actually withheld on the underlying
> dividend and any previous substitute payments is greater that the
> amount of U.S withholding that would be imposed..." on the dividend.
> As such, again the ability to rely on the notice requires some showing of actual
withholding.
>
>     In light of all of this, I believe that we would need some form
> of letter from Morgan Stanley Cayman and possibly MSIL  (I have
> inserted names but we would need the correct names of the companies
> involved) with language as follows:
>
>     " Morgan Stanley Cayman and MSIL confirm that appropriate U.S.
> taxes have been withheld. Morgan Stanley Cayman and MSIL  further
> agree to indemnify and otherwise hold harmless JPMorgan Chase for (i) any U.S.
> withholding tax imposed on any substitute payment, and any interest or
> penalty for failure to properly remit such tax, and (ii) JPMorgan
> Chase's payment of any taxes, interest and/or penalty otherwise due
> from, or paid on behalf of, Morgan Stanley Cayman and MSIL . "

Permanent Subcommittee on Investigations
EXHIBIT #45 - FN 50

MS-PSI* 020806

432

```
>
>      I think that this is not necessarily indicating that tax has been
> withheld on a payment but is instead saying that if tax should have
> been withheld, it was. If Morgan Stanley's interpretation that no
> further tax needs be withheld is correct, then the statement would be accurate.
>
>      I look forward to your comments. Please call me on    Redacted
> if you wish to discuss further. I would also be pleased to discuss
> with your US tax personnel. I have dealt with a Mack Merlo in New York
> as part of an SIA committee but we have not discussed this subject.
>
> Regards
>
>    TP-027
```

2

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI* 020807

433



Permanent Subcommittee on Investigations
EXHIBIT #45 - FN 63

LBHIPSI00012296

434

# Table of Contents

Contents

The Power of Synthetics
 – Key Features
 – Potential Applications

◆ Lehman Synthetic Products
 – Total Return Swap
 – Lehman Portfolio Swap (LPS)
 – Contract for Differences (CFD)
 – Third Party Hedged Contract

◆ Reporting
 – Online Swap Confirmations and Alerts
 – Multiple Position and Financing Reports

◆ Documentation / Next Steps

LEHMAN BROTHERS

2

LBHIPSI00012297

435



# Executive Summary

Global Prime Brokerage

**Lehman Brothers is pleased to present the capabilities, products and services provided by the Equity Finance group.**

♦ In today's presentation we will review:

– Lehman Brothers global synthetic products (key features & uses)

– Detailed review of each product, reporting and services provided by Lehman Brothers

♦ Lehman Brothers offers the full suite of finance products and services on an integrated and personalized basis combined with the range of execution, research and technology resources of a bulge-bracket global investment bank.

**Core Products and Services**

– Clearing and Execution
– Margin Financing
– Securities Lending
– Capital Introductions
– *Synthetics / Derivatives*
– Enhanced Leverage
– Portfolio Accounting
– Risk Management
– Reporting
– Technology / Connectivity

**Selected Product Innovations**

– Linkage with Fixed Income and FX
– Interactive Corporate Actions Package
– Electronic Stock Loan
– Unique Margin Financing Solutions
– Options Clearing
– Corporate Finance and Advisory Services

LEHMAN BROTHERS

3

LBHIPSI00012298

436

**Synthetics Features and Applications**
Key Features
Potential Applications

LBHIPSI00012299

437

## The Power of Synthetics

Product Definitions

**Synthetics are structured products which transfer economic exposure of a security, basket or index without taking physical ownership or delivery.**

The products have the following characteristics:

- Delta 1 : A $1 movement in the underlying generates a $1 movement in the synthetic equity component

- Total Return : Economics will incorporate actions such as dividends, merger events, etc.

- Documentation:
  ISDA Master: International Swaps and Derivatives Association
  CFD Annex under ISDA

*"Lehman has provided excellent derivative support to our firm"*

*Global Custodian Survey-2003*

LEHMAN BROTHERS                                                    5

LBHIPSI00012300

438



LBHIPSI00012301

439

# Synthetics – Potential Applications

Potential Applications

◆ Leverage
  – Return on Capital
  – Risk Based Margin

◆ Transaction Savings
  – Execution + Financing + Maintenance
  – Stamp Tax
  – Ticket Fees
  – Soft Dollar

◆ Market Access
  – Ability to Short
  – Local Status

◆ Tax Management
  – Loss Recognition
  – Monetization
  – Long Term Capital Gain Achievement
  – Yield Enhancement
  – UBTI

◆ Reporting Requirements
  – Balance sheet treatment
  – Anonymity

◆ Simplify Operational Management
  – Corporate Actions
  – Settlements

◆ Customized Contract
  – Maturity
  – Payment Frequency

LEHMAN BROTHERS

7

LBHIPSI00012302

440

**Lehman Synthetic Products**
Equity Swap
Lehman Portfolio Swap (LPS)
Contract for Difference

LBHIPSI00012303

441



LBHIPSI00012304

442



LBHIPSI00012305

Case 1:18-md-02865-LAK   Document 808-17   Filed 05/12/22   Page 315 of 543

443

# Lehman Portfolio Swap (LPS)

LPS Features

*LPS - Trade a portfolio of securities within one Equity Swap*

## Day Two

| Security | Dir | Qty | Price | Notional |
|---|---|---|---|---|
| Barclays | S | 125,000 | 17.10 | (2,137,500) |
| Vodafone | B | 250,000 | 3.27 | 817,500 |
| Nat Power | B | 175,000 | 4.12 | (721,000) |
| Halifax | B | 440,000 | 6.30 | 2,772,000 |
| Diretxs | B | 500,000 | 2.95 | 1,475,000 |
| Total | | | GBP | 3,206,000 |

- Additional Buys/Sells incorporated into Original Positions
- New Position Detail
- Reserve Amounts for position closeout
- Updated Units
- New Portfolio Swap Summary

## Updated Portfolio

| Security | Dir | Qty | Price | Notional | Security | Dir | Qty | Price | Notional | Security | Dir | Qty | Price | Notional |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Barclays | L | 125,000 | 16.50 | 2,062,500 | Barclays | S | (125,000) | 17.10 | (2,137,500) | Barclays | R | | 3.26 | (75,000) |
| Vodafone | L | 410,000 | 3.25 | 1,332,500 | Vodafone | B | 250,000 | 3.27 | 817,500 | Vodafone | L | 660,000 | 3.26 | 2,130,000 |
| Nat Power | L | 365,000 | 4.00 | 1,460,000 | Nat Power | S | (175,000) | 4.12 | (721,000) | Nat Power | L | 190,000 | 3.89 | 795,000 |
| Sainsbury | L | 500,000 | 3.10 | 1,550,000 | | | | | | Sainsbury | L | 500,000 | 3.10 | 1,550,000 |
| | | | | | Halifax | B | 440,000 | 6.30 | 2,772,000 | Halifax | L | 440,000 | 6.30 | 2,772,000 |
| | | | | | Diretxs | B | 500,000 | 2.95 | 1,475,000 | Diretxs | L | 500,000 | 2.95 | 1,475,000 |
| Total | | | | 6,405,000 | Total | | | | 3,206,000 | Total | | | | 8,651,000 |

## Updated Swap

| Basket | Dir | Units | Unit Price | Notional | Basket | Dir | Units | Unit Price | Notional |
|---|---|---|---|---|---|---|---|---|---|
| Portfolio 1 | L | 64,050 | 100 | 6,405,000 | Portfolio 1 | L | 86,510 | 100 | 8,651,000 |

Note:   Examples are for illustrative purposes only.

LEHMAN BROTHERS

11

LBHIPSI00012306

444

# Lehman Portfolio Swap (LPS)

LPS Features

*LPS -Trade a portfolio of securities within one Equity Swap*

## Equity Performance

| Security | Dir | Qty | Price | Notional | Price | National | Security | MTM |
|----------|-----|-----|-------|----------|-------|----------|----------|-----|
| | | | | | Market Value | | Financing | |
| Vodafone | L | 660,000 | 3.26 | 2,150,000 | 3.31 | 2,184,600 | Vodafone | 34,600 |
| Nat Power | L | 190,000 | 3.89 | 739,000 | 3.96 | 752,400 | Nat Power | 13,400 |
| Sainsbury | L | 500,000 | 3.10 | 1,550,000 | 3.05 | 1,525,000 | Sainsbury | (25,000) |
| Halifax | L | 440,000 | 6.30 | 2,772,000 | 6.25 | 2,750,000 | Halifax | (22,000) |
| Dixons | L | 500,000 | 2.95 | 1,475,000 | 3.10 | 1,550,000 | Dixons | 75,000 |
| **Total** | | | | **8,686,000** | | **8,762,000** | | **76,000** |
| **Reserve** | | | | | | | | |
| Barclays | R | - | - | (75,000) | - | - | Barclays | 75,000 |
| | | | | **8,611,000** | | | | **151,000** |

## Economics

| | |
|---|---|
| Collateral | Increased to £ 868,600 to maintain 10% initial collateral level |
| Interest Leg | Client Pays LIBOR + Spread on £ 8,686,000 |
| Reserve | Swap maintains reserve amount of £ 75,000 until next reset |
| Equity Leg MTM | Current Value of Basket £ 8,762,000 gives performance of £ 151,000 (£ 76,000 Mark to Market + £ 75,000 Reserve) |

*Note   Examples are for illustrative purposes only*

**LEHMAN BROTHERS**                              12

LBHIPSI00012307

445

# Key Features of Lehman Brothers CFD

◆ Lehman Brothers CFD Annex under ISDA Master Agreement establishes the account

   – "Stand-alone" or integrated into Prime Broker account

◆ Terms and Conditions Rider (TCR) sets pre-agreed terms including:

   – Financing rates on: debit balances, floating rate and spread for short CFD Transactions and free cash

   – Short Spread Rate

   – Margin requirements

   – Dividend Passthrough

◆ Opinion from tax adviser on product integrity ("done-with" and "done-away")

◆ Underlying stock trades may be sourced from 3rd parties

◆ Available on most major markets

◆ Supported by Prime Broker technology and reporting platform

   – Prime Broker reporting and data extract suite

   – All positions within account effectively cross-netted and cross-margined

   – Capital efficiency by cross margining within Prime Broker account

LEHMAN BROTHERS                    13

LBHIPSI00012309

446

# Benefits of Lehman Brothers' CFD Program

◆ Orders handled by same "cash" sales/traders

◆ Choice of "stand-alone" CFD or combined with Prime Broker account

◆ Unique structure provides operational benefit:

– Daily accrual of Interest and Short Spread Rate at the account level across positions

– No operational resets with cash movements

– No margin calls unless account equity falls below minimum per TCR

– One way electronic confirmations via OASYS, fax, or email (no signature required)

– One aggregate position per underlying stock simplifies reconciliation

– Underlying stock tickers used on all confirms and reports (no bespoke identifiers)

◆ Access to LehmanLive "Account Query" and market leading Corporate Actions database

LEHMAN BROTHERS

14

LBHIPSI0001230g

447



LBHIPSI00012310

448



Third Party Hedged Illustration

Lehman permits 3rd party execution of underlying security for CFD and Swap clients
(Strict procedures apply, case by case basis)

Third Party Hedged

Client "Long" Position

Client

Client Receives Stock Appreciation + Dividends

Client Pays Stock Depreciation

LEHMAN BROTHERS

3) Lehman Brothers accepts 3rd Party hedge

3

2

2) Executing Broker makes offer to trade with Lehman Brothers

1

1) Client requests 3rd Party hedge on security

Broker

Executing Broker trades hedge

LEHMAN BROTHERS

16

LBHIPSI00012311

449



LBHIPSI00012312

450

## Equity Swap Reporting

Equity Swap Website

**One-Stop**

*Fully Integrated Web Platform:*

1) Number of Swaps

2) Notional USD Equivalent

3) View Reset Alerts

4) View Outstanding Notices

5) View ISDA Master Highlights

6) Trade Document History

7) Lehman Contact Information

LEHMAN BROTHERS

18

LBHIPSI00012313

451

# Equity Swap Website



LEHMAN BROTHERS

19

LBHIPSI00012314

452

# Equity Finance Website

## CFD positions can be easily queried in conjunction with all Prime Brokerage positions within the Account Query pages in LehmanLive



**One Stop**

*Fully Integrated Web Platform:*

1) View CFD positions within Prime Brokerage content

2) Use View, Filter, Sort functionality to view only CFD positions

3) Currency Sorter

4) View positions in one or all accounts

5) Excel Download

LEHMAN BROTHERS

20

LBHIPSI00012315

453

# CFD Reporting

Reporting

- ◆ Suite of reports for the CFD product including summary and detailed reports on trades, positions, margin and financing
- ◆ CFD positions are reported as any other Prime Brokerage position and are fully integrated with other custody and portfolio accounting reports
- ◆ Integrated reports for CFD and Prime Brokerage positions are available directly through LehmanLive
- ◆ Reports are available in several formats to suit individual client needs: pdf, csv file transfer and online through LehmanLive
- ◆ CFD Report Offering
  - – Portfolio Summary
    - • Account Summary
  - – Trade Date & Settlement Date Positions/Activity
    - • TD/SD Positions- Summary
    - • TD/SD Positions- Detail
    - • TD/SD Daily Activity- Summary
    - • TD/SD Daily Activity-Detail
  - – Margin
    - • Margin Requirements-Summary
  - – Financing
    - • MTD Interest- Detail
    - • Margin Requirements- Detail

LEHMAN BROTHERS

21

LBHIPSI00012316

454



LBHIPSI00012317

455

# Documentation / Next Steps

## Documentation

### *Equity Swap*

- ISDA Master Agreement or long form confirm
- U. K. Anti-Money Laundering Forms (LBIE)
- Corporate / Partnership Documents
- Authorization Form (wire and money movements)

### *Contract for Difference*

- ISDA Master Agreement
- CFD Annex under ISDA
- Terms and Conditions Rider "TCR" (Margin and Financing Terms)
- U. K. Anti-Money Laundering Forms
- Tax Forms
- Authorization Form (wire and money movements)

*Optional Paperwork for both Swaps & CFDs:*

- Prime Broker Agreement
- CPNA (Cross Product Netting Agreement)

## Next Steps

- Documentation Package to Key Contacts
- Credit and Risk Review
- Technology consultation

LEHMAN BROTHERS                    23

LBHIPSI00012318

456

# Product Comparison

| | Equity Swap | Lehman Portfolio Swap (LPS) | Classical Prime Brokerage |
|---|---|---|---|
| **Markets** | All major markets | All major markets | Most major markets |
| **Suggested Trading Strategy** | Non-EPS pairs, risk arb, relative value, single stocks | Puits, S en A/h, Medium to high volume | Puits, risk arb, relative value, single stocks, low to medium volume |
| **Documentation** | ISDA Master; Credit Support Annex (CSA); Cross Product Netting agreement (optional) | ISDA Master; Credit Support Annex (CSA); Cross Product Netting agreement (optional) | ISDA Master - CFTJ Annex; Terms & Conditions letter (TCA) (pre-agreed pricing and margin); Cross Product Netting Agreement (optional) |
| **Confirmations** | ISDA style confirmation for each new swap, novated and full termination; Signature required on confirmation for each trade per account | ISDA style confirmation per LPS (phone terms of all trades traded); Signature only required on an initial novation; Subsequent trades confirmed electronically | Cash style execution confirmation; No signature required till terms pre-agreed |
| **Margin / Collateral** | Initial Margin is fixed % of existing swap notional; Daily Variation Margin of fixed swap payable/receivable; Held in a separate ISDA collateral account, with separate interest accrual; Daily cash subject to Minimum Transfer Amount | Initial Margin is fixed % of daily swap notional; Daily Variation Margin of fixed swap payable/receivable; Held in a separate ISDA unlimited account, with separate interest accrual; Daily cash subject to Minimum Transfer Amount | Agreed (fixed % of daily market value or security; Held in standalone CFD account, for FB accounts; Margin offset against CFD debit cash balance; Margin req. compared to MV of CFDs plus net cash balance or downmargin daily with process |
| **Interest** | Separate daily accrual for each swap representing; Different Libor rate per swap; Settled at source at each swap reset; Interest on margin accrued separately; Based off Libor rate per each swap | One daily accrual per LPS based off daily swap notional value; One Libor rate per month (fixed in advance); Settled in arrears at each monthly swap reset; Interest on margin accrued separately; Based off daily swap notional value; Included in Libor leg of LPS | Account daily at account level on total Cash balances; Based off daily floating of 1 week Libor; Settled monthly in arrears; No separate accrual for margin; Choice of separate accrual on selected firm credit rate |
| **Stock Loan fee** | Included in Libor leg of each swap | Included in Libor leg of LPS | |
| **Resets** | Monthly or Quarterly with cash settlement of all profit/loss receivable | Monthly with cash settlement of all payments/receipts | Daily accrual but no cash settlement |
| **Dividends** | Settled on first reset at the pay date (at the dividend ex-date) | Settled on first reset, after ex-date of underlying security | Debited/credited on pay date at underlying security |
| **Breaking** | Separate swap for each execution; Can result in multiple swaps in same security | One CFD for all securities and executions; One position per security within a LPS; One CFD per security | Either an existing PB account, or stand alone account; One position per security |
| **Reporting** | Swap reporting via Lehman Live or FTP | Swap/Product reporting via email on FTP or through LehmanLive | Prime Broker style reporting via LehmanLive and/or FTP |

24

# LEHMAN BROTHERS

LBHIPSI00012319

457

**Disclaimer**

This document is for informational purposes only and should not be regarded as an offer to sell or a solicitation of an offer to buy the products mentioned in it. This information has been obtained from various sources; we do not represent that it is complete or accurate and it should not be relied upon as such. Swaps are not appropriate for all investors. In reaching a determination as to the appropriateness of any proposed transaction, clients should undertake a thorough independent review of the legal, regulatory, credit, tax, accounting and economic consequences of such transaction in relation to their particular circumstances. Lehman Brothers Inc. acts as agent for Lehman Brothers Finance S.A., and both are subsidiaries of Lehman Brothers Holdings Inc.

Lehman Brothers Inc. and/or its affiliated companies may make a market or deal as principal in the assets mentioned in this document or in options, futures, or other derivatives based thereon. In addition, Lehman Brothers Inc., its affiliated companies, shareholders, directors, officers and/or employees, may from time to time have long or short positions in such assets or in options, futures, or other derivative instruments based thereon. One or more directors, officers, and/or employees of Lehman Brothers Inc. or its affiliated companies may be a director of the issuer of the securities mentioned in this document. Lehman Brothers Inc. or its affiliated companies may have managed or co-managed a public offering of securities for any issuer mentioned in this document within the last three years. © 2001 Lehman Brothers Inc. All rights reserved. Member SIPC.

**LEHMAN BROTHERS**                                    25

LBHIPSI00012320

458

Intentionally Left Blank

Permanent Subcommittee on Investigations
EXHIBIT #45 - FN 65

LBHIPSI00039837

459



Tax department guidelines.

-----Original Message-----
From: Giedra, Bruce
Sent: Tuesday, August 20, 2002 11:33 AM
To: Levy, Benjamin
Subject: FW: Equity Swaps


-----Original Message-----
From: Giedra, Bruce
Sent: Friday, May 17, 2002 9:10 AM
To: Sherman, Neil H
Cc: Pace, Alan; Crowe, David
Subject: RE: Equity Swaps

Attached below are the guidelines developed by our US Tax department and outside counsel
regarding the use of swaps by our offshore customers. Similar rules should apply to CFDs.

Note Equity Finance/Derivatives agreed with Corporate Tax to an internal restrain of no more
than $25 million of withholding tax exposure per year across all our business units. Any CFD
exposure needs to be incorporated in this limit. Any exposure is the responsibility of the relevant
business unit not corporate tax.

-----Original Message-----
From: Dorman, Jeffrey S
Sent: Friday, November 10, 2000 7:16 AM
To: Giedra, Bruce; Story, Richard G; Crowe, David
Cc: Blechman, Howard
Subject: RE: Equity Swaps

All,

To the extent that we are to offer pricing to enhance a client's us divs, Richard or I should be
involved the process. This should be viewed as a service that we expect to be paid for, and
receive incremental business for.

JD

-----Original Message-----
From: Giedra, Bruce
Sent: Friday, November 03, 2000 12:21 PM
To: Story, Richard G; Crowe, David
Cc: Dorman, Jeffrey S; Blechman, Howard
Subject: FW: Equity Swaps

F00284-00213179


LBHIPSI00039838

460

Attached is the information you requested.

Based on the new withholding/ information reporting rules that will take effect in January hedge funds have become very interested in the use of equity swaps. The tax department guidelines we have discussed in the past are set forth below. Note, we also do not want to both buy from and sell back to our customers the underlying securities.

-----Original Message-----
From: Levy, Benjamin
Sent: Tuesday, May 16, 2000 11:36
To: Blechman, Howard
Cc: Lauricella, Leonard J; Monico, Joseph; Crowe, David; Giedra, Bruce; Taranto, Anthony J
Subject: RE: Equity Swaps

Howard,
wanted to inform you that after internal discussions within the Tax department and with outside counsel, we are in agreement that equity swaps done in conjunction with Prime Broker accounts should be done within the proposed guidelines described below.

Ben

-----Original Message-----
From: Giedra, Bruce
Sent: Monday, May 15, 2000 3:02 PM
To: Levy, Benjamin; Monico, Joseph; Taranto, Anthony J
Cc: Lauricella, Leonard J; Blechman, Howard; Crowe, David; Dorman, Jeffrey S
Subject: RE: Equity Swaps

The following are the proposed guidelines for equity swaps done in conjunction with Prime Broker accounts (per Howard Blechman and the Equity Derivatives group):

1) Duration of Swap Based on Number of Stocks in a Basket:

a) 1-2 Stocks : 1 year term

b) 3-5 Stocks : 6 month term

c) 6-9 Stocks : 9 month term

d) 10 or more Stocks : 45 day term

2) Early termination:

A penalty for early termination will be imposed. In no event will the Swap be terminated any sooner than a 21 day
period.

3) If possible the swaps will contain some non-dividend paying stocks.

F00294-00213170

LBHIPSI00039839

461

4) Creation of Basket of Stocks in the Swap:

a) Limited legging will be allowed based on the duration and number of stocks in the basket as set forth below:

i) 1-2 Stocks : 1 year term - Legging in not necessary

ii) 3-5 Stocks : 6 month term - Legging in allowed if accomplished within a 1 month period

iii) 6-9 Stocks : 3 month term - Legging in allowed if accomplished within a 3 week period

iv) 10 or more Stocks : 45 day term - Legging in not allowed

b) The client will be allowed to leg out of up to a maximum of 30% of the previous week's daily average volume of
that stock (limit based on the market volume of that particular stock and not the amount of the stock in the swap).

c) Other legging in and out possibilities will be determined on a case by case basis.

d) Mechanically transactions to change the basket will be completed as follows. Additions to the basket will be
completed by crossing positions into the swap. Market on close trades will be used to take stocks positions out
of the swap (For exchanges that do not have market on close mechanisms in place other alternatives will be
used).

5) Swap terms:

The Swaps will utilize standard terms and documents. All Swap payments will be made on a net basis.

6) The Swap traders will provide on a quarterly basis summary details regarding the Swap baskets.

F00284-00213179

LBHIPSI00039840

462



| From: | Carriero, John P [john.carriero@lehman.com]. | | Sent:8/5/2004 4:48 PM |
| To: [ - ] | Prime Broker Sales New York [nypb@lehman.com]. | |
| Cc: [ - ] | | |
| Bcc: [ - ] | | |
| Subject: | | |

There have been quite a few questions on our yield enhancement structure
so I put together an explanation of the structures.

There are two ways to yield enhance equities:

1) Using our SWAP/CFD product the fund could put their positions in our
SWAP/CFD product. If the fund currently owns the position then any sale
of the security would create a capital gain or loss on the position.
Since the sale of the equity then the purchase of the SWAP/CFD would
create a washed sale, any gain would be realized and any loss would be
carried forward until the position is sold. Any 13F filings would need
to be amended as well. If the fund is just purchasing then by putting
the equity position directly into SWAP/CFD these issues would be
avoided. While this is a very easy structure, it's best to explain the
implications of the sale of the security up front.

2) The best method to enhance yield is our lending program. We would
borrow the securities from the client, then pay them 70% of the dividend
and a stock loan fee of 18% of the dividend which would gross them up to
88%. This is the best structure, this is not a sale of the security only
a loan so no capital gain or loss issues, no reporting issues. When we
borrow the securities we would put up G7 government bonds as collateral,
JP Morgan will manage the collateral through a Tri Party arrangement
which Lehman Brothers will pick up the cost. It is very easy.

Morgan Stanley among others are showing Structure 1) to their clients,
to my knowledge they do not offer Structure 2).

If you have any questions please let me know.


John P. Carriero
Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019
212 526 6929

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 73**

LBHIPSI00034221

463



From:    Dorman, Jeffrey S [jdorman@lehman.com].                    Sent:7/22/2004 5:39 AM.
To: [ - ]    Maynard, Ian [imaynard@lehman.com].
Cc: [ - ]
Bcc: ] - ]
Subject:    Re: MICROSOFT STRATEGY.

Outstanding. We needed a one off like this and hopefully this will meet our
expectations. Let's drain every last penny out of this mkt opportunity. Please let me
know if I can help in any way.


-----Original Message-----
From: Maynard, Ian <imaynard@lehman.com>
To: Dorman, Jeffrey S <jdorman@lehman.com>
Sent: Thu Jul 22 05:22:05 2004
Subject: RE: MICROSOFT STRATEGY

Jeff,

Good progress so far this morning...I have interest my side for over 30mn
shares.....the cash register is opening!!!!

Rgds

-----Original Message-----
From: Dorman, Jeffrey S
Sent: Thursday, July 22, 2004 10:10 AM
To: Maynard, Ian
Subject: Re: MICROSOFT STRATEGY


Thanks for owning this Ian. This summary is excellent. I am sure we will have a
terrific result.


-----Original Message-----
From: Maynard, Ian <imaynard@lehman.com>
To: Dorman, Jeffrey S <jdorman@lehman.com>; Harrison, Kevin A
<charrison@lehman.com>; Baldassano, Matt <Matt.Baldassano@lehman.com>;
Pinnock, Matthew <matthew.pinnock@lehman.com>; Brier, Bruce
<bbrier@lehman.com>
CC: Story, Richard G <rstory@lehman.com>; Brier, Bruce <bbrier@lehman.com>
Sent: Thu Jul 22 03:32:45 2004
Subject: MICROSOFT STRATEGY

Meeting Minutes from 21st July Meeting

The Opportunity: $10mn P&L on this name this year
Microsoft has declared a $3 dividend payable 2nd December 2004, subject to
shareholder approval. There is a DRP option but the likelihood of its use would

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 80**

LBHIPSI00002530

464

appear limited as i)there is no discount and ii) in order to partake the shareholder would need to withdraw their shareholding from DTC and hold in physical form under their own name. Lehman has sourced 10mn shares to date from offshore sources with the intention of using this asset to delta hedge third party swaps activity.

We are presently distributing to ING, Abbey National, Nomura out of Cayman. (for 70 underlying stock).

We are looking to sign up Fortis, Societe Generale and Barclays Capital out of Cayman

Our distribution lines out of LBF/LBIE for 85 underlying stock are significantly broader.

Current market offer is 96.5%

We are presently 90 bid max for 70 underlying portfolios and 92.5 bid for 85 underlying portfolios.

Strategy

Distribution is the key axe. Proprietary should only be used as a no other option alternative. We need to source commitments on size and price from the swap counterparts (IM). KH to investigate distribution routes in the listed market and to coordinate feedback of bids on the OTC markets received by the swaps desk in NY to London.

BB can advise on structures that have been given the blessing of the tax department, should anyone need a refresh I urge you to speak directly to Bruce....anything away from these structures needs to pass Bruce for assessment and approval.

On the sourcing front we need to drive the axe with the various desks on the equity floor as well as investigate further sources of stock from our lending counterparties.

MP/IM to own the sourcing axe out of London.
MB to coordinate the axe with the hedge fund client base in coordination with BB IM to present strategy to sales desks (program/cash/derivatives) in London KH to present strategy to sales desks in NY.

FIRST Step is to assess the depth of our immediate market. Initial feedback required tomorrow prior to passing axe to the broader sales desks.

Will set up a meeting for this core group tomorrow to assess progress.

Rgds

LBHIPSI00002531

465



| From: | Brier, Bruce [bbrier@lehman.com]: | Sent:7/30/2004 8:47 AM |
|---|---|---|
| To: [ ~ ] | Maynard, Ian [imaynard@lehman.com]; Harrison, Kevin A [harrison@lehman.com]; Baldassano, Matt [Matt.Baldassano@lehman.com]; Pinnock, Matthew [matthew.pinnock@lehman.com]; Brand, Nick [nbrand@lehman.com]. | |
| Cc: [ ~ ] | Story, Richard G [rstory@lehman.com]; Dorman, Jeffrey S [jdorman@lehman.com]. | |
| Bcc: [ ~ ] | | |
| Subject: | Dividend Strategy | |

Dear Knights Of The Dividend Round Table:

The NY times article circulated earlier has been just some of the media attention given to the MSFT dividend. As election day approaches, and should GWB's re-election look uncertain, we could see many more companies declaring significant dividends. Were this the case, we could also see action from the US Treasury that adds a sudden cloud to this business. Moreover, if past conduct is any indication of future action, the cloud could arise in a way which harms those arbing the market.

The point of this is we should think about, if we have not already, structuring this business with an escape hatch in the form of a MAC ("Material Adverse Change") clause or similar device. This way, if the risk profile should suddenly change, we would be protected.

Please give me a call with your thoughts.

Bruce

> -----Original Message-----
> From: Maynard, Ian
> Sent: Thursday, July 22, 2004 3:33 AM
> To: Dorman, Jeffrey S; Harrison, Kevin A; Baldassano, Matt;
> Pinnock, Matthew; Brier, Bruce
> Cc: Story, Richard G; Brier, Bruce
> Subject: MICROSOFT STRATEGY
>
> Meeting Minutes from 21st July Meeting
>
> The Opportunity: $10mn P&L on this name this year
> Microsoft has declared a $3 dividend payable 2nd December 2004,
> subject to shareholder approval.
> There is a DRP option but the likelihood of its use would appear
> limited as i)there is no discount and ii) in order to partake the
> shareholder would need to withdraw their shareholding from DTC and
> hold in physical form under their own name.
> Lehman has sourced 10mn shares to date from offshore sources with the
> intention of using this asset to delta hedge third party swaps
> activity.
>
> We are presently distributing to ING, Abbey National, Nomura out of
> Cayman. (for 70 underlying stock).
>
> We are looking to sign up Fortis, Societe Generale and Barclays

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 84**

LBHIPSI00002502

466

> Capital out of Cayman
>
> Our distribution lines out of LBF/LBIE for 85 underlying stock are
> significantly broader.
>
> Current market offer is 96.5%
>
> We are presently 90 bid max for 70 underlying portfolios and 92.5 bid
> for 85 underlying portfolios.
>
> Strategy
>
> Distribution is the key axe. Proprietary should only be used as a no
> other option alternative.
> We need to source commitments on size and price from the swap
> counterparts (IM).
> KH to investigate distribution routes in the listed market and to
> coordinate feedback of bids on the OTC markets received by the swaps
> desk in NY to London.
>
> BB can advise on structures that have been given the blessing of the
> tax department, should anyone need a refresh I urge you to speak
> directly to Bruce...anything away from these structures needs to pass
> Bruce for assessment and approval.
>
> On the sourcing front we need to drive the axe with the various desks
> on the equity floor as well as investigate further sources of stock
> from our lending counterparties.
>
> MP/IM to own the sourcing axe out of London.
> MB to coordinate the axe with the hedge fund client base in
> coordination with BB
> IM to present strategy to sales desks (program/cash/derivatives) in
> London
> KH to present strategy to sales desks in NY.
>
> FIRST Step is to assess the depth of our immediate market. Initial
> feedback required tomorrow prior to passing axe to the broader sales
> desks.
>
> Will set up a meeting for this core group tomorrow to assess progress.
>
> Rgds
>

LBHIPSI00002503

467



Permanent Subcommittee on Investigations

**EXHIBIT #45 - FN 85**

LBHIPSI00032569

468

P&L reporting. This was reiterated by Magenta Pembrooke (who MW sought
feedback from) who also had experienced teething problems with
technology last year when transitioning.
- we explained the problems experienced were due to transacting via
single stock swap product, rather than LPS or CFD offering. The LPS
update is in testing and will fully cater for MW needs. JM confirmed
it's unlikely they will award any business to LB until Oct 2005
earliest. We encouraged them to revisit this, as technology was viewed
as strong plus point from other HF users of the LB products and the LPS
update would demonstrate this. JM agreed to start the testing in the new
LPS product when complete and then re-evaluate.
- re UK activity: MW expressed concern our CFD product looks like a cash
product and therefore should attract stamp. This is due to the way LB
post cash entries for CFD activity and we stressed this was not the case
and was being widely used already. MW will always award CFD business
with firm who executes for them.
- re borrow availability file: MW have experienced issues re cost of
borrow when they have attempted to execute with LB and would like
ability to execute based on information in file. We advised of recent
clean up of availability feeds and JM confirmed this was an industry wide
problem though would review LB files again.
- re put throughs: MW have negotiated zero put through chg with GS,
where there is a major price difference on the GS quote to the price
they execute at.
- re US Business: currently small now though will dramatically increase
during the summer of 2004. interested in LB product, specifically around
grossing up of dividends to 100%.
- re US Stat Arb: MW would like to send file with 500 names (for
example) and LB submit one locater number for all loans effected. We
confirmed it was not necessary to provide locater numbers in this way
and would revert with full details.

FOLLOW-UP :

- revert re LPS product when complete
- monitor availability file for completeness and accuracy
- revert re US Stat Arb and locater number
- follow up re US product and dividend gross up


Click here to view/edit journal
<http://my.lehman.com/LCM/int/interaction/maintenance/maintenance.jsp?do
cGUID=0000014B057281129BA5A6A372313F3E&cid=FE477E5A7F8B11D494C40
0902792C
AC1&operation=updateInteraction&enot=Y>

LBHIPSI00032570

469



Permanent Subcommittee on Investigations
EXHIBIT #45 - FN 87

LBHIPSI00033591

470

problems in that the improved dividend %'s have not fed through to the actual billing

They are still smarting over the margin issues that have been going on for nearly 2 months. Matt was particularly unhappy that he has had no update from risk since a meeting on 22nd June. They are now putting on all new split-capital trusts away from us and stressed that they are receiving what they consider to be fair margin treatment.

Cross-selling - very happy with current repo business, would like to do more if we had bigger balance sheet, mainly doing biz with Citibank.

Mentioned that we are expensive on JPY special borrows but that their JPY CB traders are exceptionally aggressive on borrow fees.

FOLLOW-UP :

Dividends - aim to pre-agree levels on all of their potential YE names prior to dividend season (as we did in 2002) potentially the best way to guarantee this business and also save us and them time bidding on each and every position.
Going forward all short YE trades will be booked at 85 underlying and an all-in fee rather than at a 0 fee with an all-in div as this is not the only client to have encountered this problem.

Margin - Have spoken to Matt Bowen who is handling this matter - responses have been delayed by vacation schedules on both sides.

Cross selling - Matt Coleman will work with me to make sure our x-selling initiative form is completely up-to-date - meeting TBA.

OUTCOME :

CQS continue to regard us as one of their top three providers, important to keep their attention focused on the excellent service we provide for them despite the recent margin issues.

<http://my.lehman.com/LCM/int/interaction/maintenance/maintenance.jsp?do cGUID=00000056498C81139AA7A6A372313F3E&cid=8024AC2D801C11D494C60 0902792C
AC1&operation=updateInteraction&enot=Y> Click here to view/edit journal

LBHIPSI00033592

471

| From: | Brier, Bruce [bbrier@lehman.com]. | | Sent 1/21/2005 8:48 AM. |
|---|---|---|---|
| To: [ - ] | Story, Richard G [rstory@lehman.com]; Sugarman, Peter [psugarma@lehman.com]. | | |
| Cc: [ - ] | Harrison, Kevin A [harrison@lehman.com]; Maynard, Ian [imaynard@lehman.com] | | |
| Bcc: [ - ] | | | |
| Subject: | RE: US Total Return Equity Swaps for Fortress Off-Shore Fund. | | |

Rich/Peter

I tried to reach you by phone but your asst. mentioned you were on the phone with your bookies.

This would be best as a phone call but let me take a shot.

> Attorney Client Privilege

While single equity swaps do occur in the market most US tax lawyers would say such swaps warrant elevated attention for a few reasons. First, the relevant regulations do not comport particularly well with the single equity model. Second, many finance and legal professionals in the industry believe a single equity swap can be equated to a securities loan. If this were the case, US withholding would likely be imposed on swap payments made from LBIE to hedge funds.

> Attorney Client Privilege

Ian, Nick, and I have formulated guidelines for the yield enhancement business. Attorney Client Privilege

> Attorney Client Privilege

My suggestion is to work with the client and suggest either a Cayco stock loan or a CFD. Both in my opinion carry a lower level of tax risk with regard to single equities.

> Attorney Client Privilege

-----Original Message-----

Permanent Subcommittee on Investigations

EXHIBIT #45 - FN 88

LBHIPSI00001474

472

From: Story, Richard G.
Sent: Friday, January 21, 2005 8:10 AM
To: Sugarman, Peter; Brier, Bruce
Subject: US Total Return Equity Swaps for Fortress Off-Shore Fund

Attorney Client Privilege

-----Original Message-----
From: Wickham, John
Sent: Thursday, January 20, 2005 2:04 PM
To: Story, Richard G; Sugarman, Peter; Coghlan, John; Wecker, Jeff;
Harrison, Kevin A; Vinciguerra, Marlisa
Subject: FW: Total Return Equity Swaps for Fortress Off-Shore Fund

This is the topic of tomorrow's call at 10:30.

-----Original Message-----
From: Seymour, Jeffrey
Sent: Thursday, January 20, 2005 7:28 AM
To: Wait, Jarett; Wickham, John
Subject: RE: Total Return Equity Swaps for Fortress Off-Shore Fund

The relevant positions are:

89,353 shares of Apollo Investment Corp (AINV)
127,500 shares of NorthStar Reality Finance Corp (NRF)
35,000 shares of Bay View Capital corp (BVC)

-----Original Message-----
From: Wait, Jarett
Sent: Wednesday, January 19, 2005 4:11 PM
To: Wickham, John; Seymour, Jeffrey
Subject: RE: Total Return Equity Swaps for Fortress Off-Shore Fund

thanks

-----Original Message-----
From: Wickham, John
Sent: Wednesday, January 19, 2005 2:59 PM
To: Seymour, Jeffrey

LBHIPSI00001475

473

Cc: Wait, Jarett
Subject: Re: Total Return Equity Swaps for Fortress Off-Shore Fund

I will take a look into it and come back to you.
----------------------------
Sent from my Comstar Wireless Handheld (www.Comstarinteractive.com)

-----Original Message-----
From: Seymour, Jeffrey <jseymour@lehman.com>
To: Wickham, John <jwickham@lehman.com>
CC: Wait, Jarett <jwait@lehman.com>
Sent: Wed Jan 19 14:06:43 2005
Subject: Total Return Equity Swaps for Fortress Off-Shore Fund

John,

Jarett Wait suggested I touch base with you on a total return swap
oprotunity we just received from Fortress Investments.

Fortress owns 3 dividend paying equities in their off-shore fund
(Drawbridge Special Opportunities Fund, Ltd.) The dividends are subject
to 30% tax witholding since the stocks are held in an off-shore fund.
Fortress would like to do total return equity swaps on the three
position to mitigate/eliminate the tax witholding.

I spoke to Mike Meys in Equities / Customer Financing and he said that
we were very familiar with these types of tax-driven transactions with
off-shore parties but we did not do them ourselves because of concerns
we have over their effectiveness. Mike suggested there might be a
structured solution with a larger number of positions in a trust, but
Fortress prefers the simplicity of a simple total return swap.

Is there any other area at Lehman I should discuss this potential trade
with ?

LBHIPSI00001476

474



ANY WORD WHERE YOU ARE WITH SWAPS AND CFDS? WE HAVE SOME DEALS
THAT WE NEED TO GET ON TO AVOID WITHHOLDING ON DIVS.
Reply:
WE ARE GETTING CLOSE, GIVE ME THE NAMES YOU WOULD LIKE TO DO
I WILL DO MY BEST. THX
Reply:
M-R
Reply:
HOW WILL WE SHOW MARKET RISK ON THE WAY OUT ? IF FOR EXAMPLE YOU
ARE SHORT IN PB WE CAN'T CROSS THE POSITION TO UPON THE RISK.
ARB CLOSING.

**Permanent Subcommittee on Investigations**
**EXHIBIT #45 - FN 94**

LBHIPSI00109857

475



Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 97**

LBHIPSI00018414

476

intercompany hedge) presently has the following US positions there within:
On all these positions we are paying 100% on longs and receiving 100% on shorts

$mn Bp
Counterparty 56 range Long CFD Notional Short CFD Notional Long Spread
Liberty View 5600337 1.5 0 40
University Capital 5600362 20.5 0 50
Highbridge 5600389 2 0 30
CQS 5600453 306 53 30
University Capital 5600564 3 0 50
University Capital 5600568 6.5 0 50
Liberty View 5600588 1 0 40
CFM 5600646 180 178 31
CFM 5600649 6 16 28
Angelo Gordon 5600705 1,010 0 40
Angelo Gordon 5600706 3 0 40
CQS 5600709 3 0 50
Suttonbrook 5600765 186 0 35
Millenium 5600931 6 0 30
UBS o'Connor 5604008 1.5 0 30
Gruss 5604012 9 2 40
Gruss 5604013 11 3 40
KBC 5605002 21 14 25
KBC 5605003 53 32 25
KBC 5605004 12 9 25
KBC 5605005 117 74 25
Polygon 5605030 0 46 30
Vegaplus 5605120 13 16 40
PHZ Capital 5605121 315 344 35
Citadel 5605155 121 0 30
Perry 5606145 1 0 0


Of the material Long Positions


Client 56 range Long Notional 30% Capacity Utilised (assuming 2% yield)
CQS 5600453 306mn 1,836,000
CFM 5600646 180mn 1,080,000
Angelo Gordon 5600705 1010mn 6,060,000
Suttonbrook 5600765 186mn 1,116,000
KBC 5605002 to 5005 203mn 1,218,000
PHZ Capital 5605121 315mn 1,890,000
Citadel 5605155 121mn 726,000
Other 88mn 528,000

Total 14.45mn


Whilst we have re-positioned the yield enhancement business to avoid using proprietary capacity

LBHIPSI00018415

477

on the US trade we are running the risk of increasing the risk exposure whilst at the same time increasing net balance sheet and regulatory capital as the long stock hedge is back to backed with the CFD position in LBIE (hence creating PB Counterparty Risk Requirement issues, Potential Future Exposure Issues and Large Exposure Requirement Issues)

I attach a relatively naïve and bullish P&L estimate (makes the assumption that we earn full spread on the long hedge). This makes the assumption that there is no material churning of the position (which in many instances does not match the actual the trading pattern). I have not reviewed holding periods for each of the above clients.

<<LBSF CFD Revenue Analysis(Best Case).xls>>



LBHIPSI00018416

478



**Permanent Subcommittee on Investigations**
**EXHIBIT #45 - FN 98**

LBHIPSI00017487

479

Rgds

> Jeff/Rich,
>
> Having conducted a very high level review of the US CFD business a number of areas for
concern arise specific to risk, regulatory capital, balance sheet and consistency of trade
structure.
> Please note that this is a high level review and I have not yet drilled down into the detail of the
specific accounts. The recommendations are again high level and clearly need significant further
discussion.
>
> * The range of clients for whom we are guaranteeing 100% on long dividends has increased
significantly recently
> * There would not appear to be any consistent requirements around minimum holding periods
and churning of positions appears to be reasonably frequent. Attorney Client Privilege
Attorney Client Privilege
> * The annualised tax capacity numbers are in excess of circa $15mn whereas a previous limit
of $10mn was recommended for this business. Feel that we need to reduce exposures selectively
and certainly cap the tax exposure. At the same time we need to increase the spreads charged
> * The real spreads earnt are significantly impacted by net balance sheet costs and reg capital
costs (see attached spreadsheet)
> * The LBIE Regulatory Capital costs arise as the CFD agreement with client is out of LBIE yet
the hedge held in LBSF..the intercompany hedge is therefore covered by a derivative contract
hence creating LER and PFE in LBIE.
> * The risk profile of this business has not, to my knowledge, received the same rigour of review
and sign off. This must happen forthwith
> * > We make no reserves against the revenue (One year trades in YE for example are hit with
a 10% of capacity reserve). We need to make reserves against this revenue stream.
Attorney Client Privilege

>
> The LBSF "CFD" book (hedge held in LBSF, client facing CFD in LBIE, back to back
intercompany hedge) presently has the following US positions there within:
> On all these positions we are paying 100% on longs and receiving 100% on shorts
>
> $mn Bp
> Counterparty 56 range Long CFD Notional Short CFD Notional Long Spread
> Liberty View 5600337 1.5 0 40
> University Capital 5600362 20.5 0 50
> Highbridge 5600389 2 0 30
> CQS 5600453 306 53 30
> University Capital 5600564 3 0 50
> University Capital 5600568 6.5 0 50
> Liberty View 5600588 1 0 40
> CFM 5600646 180 178 31
> CFM 5600649 6 16 28
> Angelo Gordon 5600705 1,010 0 40
> Angelo Gordon 5600706 3 0 40
> CQS 5600709 3 0 50
> Suttonbrook 5600765 186 0 35

LBHIPSI00017488

> Millenium 5600931 6 0 30
> UBS o'Connor 5604008 1.5 0 30
> Gruss 5604012 9 2 40
> Gruss 5604013 11 3 40
> KBC 5605002 21 14 25
> KBC 5605003 53 32 25
> KBC 5605004 12 9 25
> KBC 5605005 117 74 25
> Polygon 5605030 0 46 30
> Vegaplus 5605120 13 16 40
> PHZ Capital 5605121 315 344 35
> Citadel 5605155 121 0 30
> Perry 5606145 1 0 0
>
>
> Of the material Long Positions
>
>
> Client 56 range Long Notional 30% Capacity Utilised (assuming 2% yield)
> CQS 5600453 306mn 1,836,000
> CFM 5600646 180mn 1,080,000
> Angelo Gordon 5600705 1010mn 6,060,000
> Suttonbrook 5600765 186mn 1,116,000
> KBC 5605002 to 5005 203mn 1,218,000
> PHZ Capital 5605121 315mn 1,890,000
> Citadel 5605155 121mn 726,000
> Other 88mn 528,000
>
> Total 14.45mn
>
>
>
> Whilst we have re-positioned the yield enhancement business to avoid using proprietary
capacity on the US trade we are running the risk of increasing the risk exposure whilst at the
same time increasing net balance sheet and regulatory capital as the long stock hedge is back to
backed with the CFD position in LBIE (hence creating PB Counterparty Risk Requirement issues,
Potential Future Exposure Issues and Large Exposure Requirement Issues)
>
> I attach a relatively naïve and bullish P&L estimate (makes the assumption that we earn full
spread on the long hedge). This makes the assumption that there is no material churning of the
position (which in many instances does not match the actual the trading pattern). I have not
reviewed holding periods for each of the above clients.
>
>
> << File: LBSF CFD Revenue Analysis(Best Case).xls >>
>

LBHIPSI00017489

481



| From: | Brier, Bruce [bbrier@lehman.com]. | | Sent:11/19/2004 10:18 AM |
|---|---|---|---|
| To: [ - ] | Pace, Alan [alan.pace@lehman.com]. | | |
| Cc: [ - ] | Brand, Nick [nbrand@lehman.com]; Maynard, Ian [imaynard@lehman.com]; Harrison, Kevin A [harrison@lehman.com]; Bacanovic, Paul [Paul.Bacanovic@lehman.com]. | | |
| Bcc: [ - ] | . | | |
| Subject: | Yield Enhancement Guidelines. | | |

Alan:

To summarize our discussion earlier today.

First, there in no "silver bullet" with respect to these issues but rather relative risks that should be priced accordingly. For lack of clarity, similar issues are present whether the transaction is effected as a swap, future, securities loan, or CFD. The guidelines below apply to CFDs, Swaps, and Securities Loans unless otherwise noted:

1. The longer the better-3 to 6 months are the shortest duration we should consider. One year or greater swaps are preferred. CFDs are perps so this is not an issue. Longer term swaps or perps which are habitually terminated prematurely are suspect. Shorter term security loans are acceptable since this is market practice.

2. Swaps-single equity swaps should be avoided. Baskets should generally exceed 20 referenced assets. Swaps that are liked to distribution transactions can have 10 referenced assets. Risk will be further reduced by including referenced assets that: i.do not pay dividends, ii.are issued by non-US corps, or iii.pay low dividend yields. For this reason, all other things remaining constant, Swaps are lower risk than CFDs.

3. General background-offered transaction should be viewed in light of existing customer background including i.current notional balances, ii.trading patterns, iii.composition of referenced assets, iv.ex-dates, etc.

4. All transactions have residual risk which should be priced accordingly. By definition, 100% dividend equivalent payments under price the inherent risk.

5. The lowest risk transaction is the distribution business. Specifically. In this transaction LBIE borrows or buys vs. swap from an 85% country and loans or sells vs. swap to an 85% country.

Feel free to circulate this before the meeting to all those invited. Any questions, please give me a buzz.

Bruce

Bruce Brier.
Lehman Brothers Inc.
office (212) 526-7214

**Permanent Subcommittee on Investigations**
**EXHIBIT #45 - FN 99**

LBHIPSI00017490

482



LBHIPSI00017491

483



Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 103**

LBHIPSI00175106

484

```
>
> -----Original Message-----
> From: Harrison, Kevin A
> Sent: Monday, January 24, 2005 10:25 AM
> To: Okay, Bevin J
> Subject: FW: Conclusions of US div meeting
>
>
> -----Original Message-----
> From: Story, Richard G
> Sent: Friday, January 21, 2005 11:32 AM
> To: Wecker, Jeff; Harrison, Kevin A; Maynard, Ian
> Subject: Conclusions of US div meeting
>
> Jeff, Kevin
> 1) Fortress client discussion - I think Bevin is the coverage person
> to join this call ?
> 2) decision on clients to re-mark from 100% to say 85-90% - did John
> want to do this for stat clients or PB clients also ?
> Rich
```

LBHIPSI00175107



**Permanent Subcommittee on Investigations**
**EXHIBIT #45 - FN 105**

LBHIPSI00040003

486

> Is this diagram prepared for the US counterparty?
>
> I would suggest a bit more discretion (ie, less reference to tax
> treaties) and, if this is for the unrelated US buyer, less detail of
> flows prior to the swap/sale.
>
> Bruce
>
> -----Original Message-----
> From: Carriero, John P
> Sent: Wednesday, April 07, 2004 11:25 AM
> To: Brier, Bruce
> Cc: Pace, Alan; Harrison, Kevin A
> Subject:
>
> Bruce,
>
> Please review this trade and let me know how you want to proceed. I
> have a couple of counterparties that I've traded with in the past and
> I'll be speaking with to see if they have an interest in trading with
> us on the dividend side. This trade is initially being set up for
> Maverick but is offered by our competitors as part of a total
> financing relationship with hedge funds. Take a look at this and let
> me know any questions that you have, then let's set up a little time
> in the next day or so to go through all the issues that we've been
> discussing.
>
> John << File: Caymans Island Trade.ppt >>
>
> John P. Carriero
> Lehman Brothers Inc.
> 745 Seventh Avenue
> New York, NY 10019
> 212 526 6929
>

LBHIPSI00040004

487



From: Harrison, Kevin A [harrison@lehman.com]                         Sent:5/17/2005 2:20 PM
To: [ : ]    Krishnan, Anand [Anand Krishnan@lehman.com]; Regazzi, Thomas [tregazzi@lehman.com]; Meys  Michael
            [mmeys@lehman.com]
Cc: [ : ]
Bcc: [ : ]
Subject:   FW: URGENT - AGENDA - SYNTHETICS MEETING TODAY

FYI

> -----Original Message-----
> From: Nunn, Melanie
> Sent: Tuesday, May 17, 2005 10:28 AM
> To: Ryan, Patrick D; Sherman, Neil H; Pinnock, Matthew; Baldassano,
> Matt; Pace, Alan; Rossano, Mark; Okay, Bevin J; Lowrey, John; Maynard,
> Ian; Driscoll, Eamonn P; Bisesi, Brian; Coghlan, John; Nicholson, John
> C; Harrison, Kevin A
> Cc: Story, Richard G
> Subject: URGENT - AGENDA - SYNTHETICS MEETING TODAY
>
>
> Summary agenda :
> 0. Intro - overview of current Eq synthetic book by client
> RS
> 1. CFD applicability going fwd - Intl stocks + Intl clients ONLY
> RS
> 2. single-stock swap (SSS) applicability going fwd - portfolios with
> 1-20 posns RS
> 3. LPS applicability going fwd - portfolios with > 20 posns
> RS
> 4. approved give-up methodology for clearing swaps (ie- posns executed
> away) RS/PR
> 5. automation built for UK CFD give-up process that could be rolled
> out for LPS ? IM
> 6. client specific action steps
> NS
> 7. Product enhancements required for LPS a) auto-rec b) multi-mgn
> rates c) other ? PR
>
> Details :
> 0. Intro - synthetic book by client
> <<Eqs Synthetic Long Balance Sheet Report May05 .xls>>
> 1. CFD - can only be used for non-US clients + non-US securities going
> fwd. This means that US clients like O'Connor, Moore and others are
> NOT allowed to use this product. It also means Euro-based
> firms like CFM, GLG etc cannot use the product for US securities.
> 2. Single-swap - can be used for all products + clients, but only up
> to a portfolio of max 20 securities. Hence it is appropriate for
> occasional traders such as
> Risk-arb firms, but not for quant, stat and most L/S firms.
> 3. LPS - This can be used for all products + clients with portfolios >
> 20stocks using execution rules below, which we call 'offer/accept'
> process with 3rd party

Permanent Subcommittee on Investigations
EXHIBIT #45 - FN 108

LBHIPSI00012121

488

> executing brokers. We have been using these execution rules
> for 2yrs on UK CFD's anyway, so all desks should be familiar with
> them.
> The LPS product is operationally scalable + will become main
> synthetic product for LEH globally, though there are product
> improvement issues TBD
> 4. approved give-up method :
> <<LPS Procedures.doc>>
> 6) Client specific action steps :
> a) US swaps with US clients : Highbridge - already in SSS + using
> approved give-up rules ? (Baldassano)
> b) US CFDs with US clients :
> PHZ - still to move to LPS ? (Okay)
> JMG - allow to naturally unwind due to low ROA ? (Rossano)
> UCSG - already moved to SSS (Ryan)
> AG - still to move to SSS ? (Pace)
> c) US CFDs with Intl clients : CFM - Lowrey to switch to cash PB or
> LPS , CQS - Pinnock in process of completing unwind of US book
> d) Intl CFDs with US clients : AG $10m, Highbridge $100m, Fortress
> $5m, Gruss $70m, Libertyview $10m, Mellon HBV $30m, Millenium $250m,
> Moore $100m, Perry $60m, Stark $30m, O'Connor $270m, GSAM $250m,
> UCSG $15m



LBHIPSI00012122

489



From: Pinnock, Matthew [matthew.pinnock@lehman.com]    Sent 5/21/2004 3:17 PM.
To: [~] Dorman, Jeffrey S [jdorman@lehman.com], Baldassano, Matt [Matt.Baldassano@lehman.com]; Story, Richard G [rstory@lehman.com].
Cc: [~] :
Bcc: [~] :
Subject: Fw: LBSF Capacity Using CFDs

Are we in a position where we should initially highlight accounts which may be reduced?


-----Original Message-----
From: Maynard, Ian <imaynard@lehman.com>
To: Dorman, Jeffrey S <jdorman@lehman.com>; Story, Richard G <rstory@lehman.com>
CC: Baldassano, Matt <Matt.Baldassano@lehman.com>; Pace, Alan
<alan.pace@lehman.com>; Sherman, Neil H <nsherman@lehman.com>; Pinnock, Matthew
<matthew.pinnock@lehman.com>; Bisesi, Brian <brian.bisesi@lehman.com>; Brannan, Paul F
[London] <pbrannan@lehman.com>; Harrison, Kevin A <harrison@lehman.com>
Sent: Tue Sep 21 16:39:45 2004
Subject: LBSF Capacity Using CFDs


Jeff/Rich,

Having conducted a very high level review of the US CFD business a number of areas for
concern arise specific to risk, regulatory capital, balance sheet and consistency of trade
structure.
Please note that this is a high level review and I have not yet drilled down into the detail of the
specific accounts. The recommendations are again high level and clearly need significant further
discussion.

* The range of clients for whom we are guaranteeing 100% on long dividends has increased
significantly recently
* There would not appear to be any consistent requirements around minimum holding periods
and churning of positions appears to be reasonably frequent. Attorney Client Privilege
Attorney Client Privilege
* The annualised tax capacity numbers are in excess of circa $15mn whereas a previous limit of
$10mn was recommended for this business. Feel that we need to reduce exposures selectively
and certainly cap the tax exposure. At the same time we need to increase the spreads charged
* The real spreads earnt are significantly impacted by net balance sheet costs and reg capital
costs (see attached spreadsheet)
* The LBIE Regulatory Capital costs arise as the CFD agreement with client is out of LBIE yet the
hedge held in LBSF..the intercompany hedge is therefore covered by a derivative contract hence
creating LER and PFE in LBIE.
* The risk profile of this business has not, to my knowledge, received the same rigour of review
and sign off. This must happen forthwith
* We make no reserves against the revenue (One year trades in YE for example are hit with a
10% of capacity reserve). We need to make reserves against this revenue stream.

Attorney Client Privilege


The LBSF "CFD" book (hedge held in LBSF, client facing CFD in LBIE, back to back

**Permanent Subcommittee on Investigations**
**EXHIBIT #45 - FN 109**

LSHIPSI00018414

490

intercompany hedge) presently has the following US positions there within:
On all these positions we are paying 100% on longs and receiving 100% on shorts

$mn Bp
Counterparty 56 range Long CFD Notional Short CFD Notional Long Spread
Liberty View 5600337 1.5 0 40
University Capital 5600362 20.5 0 50
Highbridge 5600389 2 0 30
CQS 5600453 306 53 30
University Capital 5600564 3 0 50
University Capital 5600568 6.5 0 50
Liberty View 5600588 1 0 40
CFM 5600646 180 178 31
CFM 5600649 6 16 28
Angelo Gordon 5600705 1,010 0 40
Angelo Gordon 5600706 3 0 40
CQS 5600709 3 0 50
Suttonbrook 5600765 186 0 35
Millenium 5600931 6 0 30
UBS o'Connor 5604008 1.5 0 30
Gruss 5604012 9 2 40
Gruss 5604013 11 3 40
KBC 5605002 21 14 25
KBC 5605003 53 32 25
KBC 5605004 12 9 25
KBC 5605005 117 74 25
Polygon 5605030 0 46 30
Vegaplus 5605120 13 16 40
PHZ Capital 5605121 315 344 35
Citadel 5605155 121 0 30
Perry 5606145 1 0 0


Of the material Long Positions


Client 56 range Long Notional 30% Capacity Utilised (assuming 2% yield)
CQS 5600453 306mn 1,836,000
CFM 5600646 180mn 1,080,000
Angelo Gordon 5600705 1010mn 6,060,000
Suttonbrook 5600765 186mn 1,116,000
KBC 5605002 to 5005 203mn 1,218,000
PHZ Capital 5605121 315mn 1,890,000
Citadel 5605155 121mn 726,000
Other 88mn 528,000

Total 14.45mn


Whilst we have re-positioned the yield enhancement business to avoid using proprietary capacity

LBHIPSI00018415

491

on the US trade we are running the risk of increasing the risk exposure whilst at the same time increasing net balance sheet and regulatory capital as the long stock hedge is back to backed with the CFD position in LBIE (hence creating PB Counterparty Risk Requirement issues, Potential Future Exposure Issues and Large Exposure Requirement Issues)

I attach a relatively naïve and bullish P&L estimate (makes the assumption that we earn full spread on the long hedge). This makes the assumption that there is no material churning of the position (which in many instances does not match the actual the trading pattern). I have not reviewed holding periods for each of the above clients.

<<LBSF CFD Revenue Analysis(Best Case).xls>>



LBHIPSI00018416

492

TO 502071033110    P.12/13

## US Equity Lending Annex

This Annex is dated 8 July, 2004 and is between Goldman Sachs Europe acting in its capacity as agent for the disclosed Principals identified in the Agreement ("Agent") and Lehman Brothers Equity Finance (Cayman) Limited ("Borrower") and amends, supplements and forms part of the Overseas Securities Lenders Agreement between the parties dated 15 October, 2003, (the "Agreement").

(A)  **Application**

The parties hereby agree that this Annex applies to all loans of Securities under the Agreement where the Securities lent to Borrower are US Equity Securities (each such loan a "US Loan"), for this purpose "US Equity Securities" means equity securities and or instruments issued by an entity resident, incorporated or otherwise organized in the USA.

(B)  **Representations, Acknowledgements, Undertakings and Indemnities of Borrower**

In relation to substitute payments paid by the Borrower to the Principals, in lieu of US dividends on US Equity Securities pursuant to Clause 4(B) of the Agreement ("Substitute Payments"), the Borrower makes the following representations, acknowledgements and undertakings to and for the benefit of Agent and each Principal:

1.  Borrower hereby represents and warrants on a continuing basis to Agent and each Principal that Borrower is not resident in the United States of America and is not a US person for the purposes of the US Internal Revenue Code.

2.  Borrower hereby undertakes to Agent and Each Principal and agrees to: (i) if applicable, withhold US tax on Substitute Payments made to each Principal (ii) file an IRS Form 1042-S or such other form, if required, to report Substitute Payments transferred or paid to any Principal (or such Principal's agents) for the Principal's account; and (iii) to retain copies of the Forms 1042-S (if any) for at least seven years after the date of filing.

3.  Borrower acknowledges that Agent and each Principal (and their agents) are relying on the Borrower to ensure satisfaction of US tax withholding and reporting on the Substitute Payments, if any.

4.  Borrower hereby agrees to cooperate with Agent and each Principal (and their agents) in the event of any United States Internal Revenue Service ("IRS") inquiries and audits of Agent or a Principal (and/or their agents) role in those transactions, including, without limitation, Borrower will provide the Forms 1042-S it filed, if required, or such other form as the Borrower may file, on the transactions and confirm that the reported tax withholding, if any, was deposited with the IRS.

5.  The Borrower hereby acknowledges and understands that each Agent and each Principal (and it's agents) may have a US tax return filing obligation and tax liability in the event that it receives Substitute Payments and the tax liability with respect thereto has not been fully satisfied. The Borrower hereby agrees to hold harmless and indemnify Agent and each Principal (and their agents) against all actions, proceedings, claims, costs, demands and expenses arising there from which may be brought against, suffered or incurred by Agent and or each Principal (and their agents) in the event of (i) breach by Borrower of any of the representations, warranties or undertakings set out above in relation to substitute

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXV(5)(b)(5)

GS-PSI-00427

Permanent Subcommittee on Investigations
EXHIBIT #45 - FN 111

493

Payments and (ii) that the appropriate rate of US withholding tax in respect of any Substitute Payment is not paid to the IRS by Borrower (to include any penalties or interest the IRB may assess thereon) provided that:

(i) Agent provides written notice to Borrower within 30 days of receipt of any claim for U.S. withholding taxes by a U.S. governmental agency;

(ii) Borrower will have the right to assume the defense of the claim (at its own expense and with counsel which it shall select in its discretion) at any time after the Agent has given Borrower notice of the claim;

(iii) Through the date that is 10 days after Borrower has received the appropriate notice, or so long as Borrower has assumed the defense of the claim as provided for immediately above, Agent shall not (i) pay the claim, or (ii) consent to any settlement or other agreement with respect to the claim without the prior written consent of Borrower; and

Borrower shall not be obligated to indemnify and hold harmless Agent and Principal (and agents of Principal) in respect of such withholding tax, other taxes, interest and/or penalties to the extent that the obligation arose due to the negligence or bad faith of the Agent or Principal (or agents of Principal), as the case may be.

(C)    Miscellaneous

1.   All capitalized terms used herein and not otherwise defined shall bear the meaning ascribed to them in the Agreement

2.   In the event of any conflict between the terms of this Annex and the Agreement, the terms of this Annex will prevail.

This Annex will be governed by and construed in accordance with English law.

IN WITNESS WHEREOF, this Annex has been executed on behalf of the parties hereto on the date first before written.

For and on behalf of
Goldman Sachs Europe

For and on behalf of
Lehman Brothers Equity Finance (Cayman) Limited

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

GS-PSI-00428

** TOTAL PAGE.13 **

494

---

**INFORMATION DOCUMENT REQUEST RESPONSE**

TO:                    ▌▌▌▌    INTERNAL REVENUE AGENT

FROM:             BOB KUNZ, LEHMAN TAX DEPARTMENT

SUBJECT:       RESPONSE TO IDR IE-52

DATE:             **October 17, 2007**

▬▬▬ = Redacted by the Permanent
Subcommittee on Investigations

---

In response to information document request IDR IE-52 (dated August 27, 2007),
Lehman is providing the following responses:

**Request:** *This request is the second follow, issued on the date shown below, to your response to
IDRs IE 9 issued on 2/27/2007 and IE 17 & IE 19 issued on 3/13/2007.*

1. **Request:** *In order to determine that the documentation submitted on 6/8/07 and 7/13/07 with
respect to the Single Equity Swap (SES) and the Lehman Performance Swap (LPS) is relevant
and responsive to the above referenced IDRs, please confirm in writing and/or submit the
following:*

    *a.*    **Request:** *Your understanding of the criteria for the transactions responsive to
IDRs IE-9, IE-17, and IE-19 based on the oral agreement you cited in the June 8, July
13, and August 14 cover letters from Bob Kunz to* ▌▌▌▌

        **Answer:** Lehman's understanding of the criteria for the transactions responsive
to IDRs IE-9, IE-17, IE-19 based on the oral agreement you cited in the June 8, July 13,
and August 14 cover letters from Bob Kunz to ▌▌▌▌ was covered in the letter to
▌▌▌▌ and ▌▌▌▌ dated August 27, 2007. As noted in that letter, Lehman
understood transactions to be responsive if they met the following four criteria:

  1.   A U.S. Lehman entity (Lehman U.S.) acquired (as defined in IDR IE-19) a U.S.
equity directly or indirectly from a foreign person (Foreign Counterparty) with
settlement occurring as early as seven days before the dividend declaration date
for the U.S. equity and no later than the U.S. equity's dividend record date;

  2.   The same Foreign Counterparty and a Lehman entity (domestic or foreign)
entered into a "financial instrument" (as defined in IDR IE-9) with respect to the
same U.S. equity;

  3.   Lehman U.S. held the U.S. equity over the dividend record date and received
100% of the dividend from the issuer, or did not hold the U.S. equity but received
a substitute dividend payment determined with respect to dividends on such
equity because Lehman U.S. transferred the U.S. equity to another U.S. institution
pursuant to a stock lending agreement; and

---

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 114**

LBHIPSI00021476

495

▬▬▬ = Redacted by the Permanent
Subcommittee on Investigations

4.    After the dividend record date, the U.S. equity was directly or indirectly sold to the Foreign Counterparty by Lehman U.S.

In addition to these criteria, Lehman understands that the information requested in the IDRs generally relates to U.S. withholding taxes potentially applicable to U.S. source dividends paid to non-U.S. residents.

Finally, as we have noted, the Lehman Performance Swap (LPS) is also known as the Lehman Portfolio Swap.

b.    **Request:**  *Your understanding is that a transaction is deemed responsive, for purposes of IDR IE-9, when stocks were purchased from and sold by the taxpayer to the same counterparty, directly or indirectly through mechanisms such as other brokers, market on close orders and volume-weighed average price arrangements, and that such stock purchases made by the taxpayer or any affiliate included those purchases made through security lending agreements as well as outright purchases and sales.  If that is not your understanding, please clarify in writing.*

**Answer:**  The parties discussed this request and the definition of the term "indirectly" during a conference call on Tuesday, October 16.  As agreed during that call, Lehman has sent you suggested changes to that language in separate correspondence on October 17.

c.    **Request:**  *Your understanding is that a potential dividend is deemed to apply when a swap is terminated within a 45 day period, with offset by another instrument or transaction qualifying as a termination for this purpose.  If that is not your understanding, please clarify in writing.*

**Answer:**  As we noted in the October 2nd letter to ▬▬▬▬ ▬▬▬▬▬, informed Lehman previously that the IRS has decided to retract this request.  Therefore, Lehman will not respond to this request.

2. **Request:**  *Please provide a detailed description of the criteria utilized to identify the e-mails, power point presentations, and transactions deemed responsive.  In addition, provide a list of all the relevant search terms used for identifying the e-mails produced so far and future ones that you might consider responsive.*

**Answer:**  Lehman identified responsive transactions through a combination of the review of documents and email and discussions with knowledgeable Lehman employees.  Lehman utilized the criteria specified in IDR IE-9 and later modified in the discussions between the IRS and Lehman.  Lehman used the following search terms in email searches of the relevant employees to identify potentially responsive documents:

"Lehman performance swap"
"LPS"

2

LBHIPSI00021477

496

"portfolio swap"
"portfolio index"
"single equity swap"
"SES"
"contract for differences"
"CFD"
"hedge swap"
"internal swap"
"total return swap"
"Cayco"
"stock loan"
"stock lending"
"box trade"
"distribution trade"
"97-66"
"Notice 97-66"
"distribution model"
"yield enhancement"
"yield enhancement strategy"
"yield enhancement strategies"
"dividend arbitrage"
"tax efficiency strategy"
"tax efficiency strategies"
"tax avoidance strategy"
"tax avoidance strategies"

3

LBHIPSI00021478

497



Morgan Stanley

Presentation to Global Financing Products Group

# U.S. Equity Swaps Flow Business
September 6, 2005

Morgan Stanley Institutional Equity

Confidential Property of Morgan Stanley,
Do Not Copy Or Distribute

MS-PSI 021298

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

Permanent Subcommittee on Investigations
**EXHIBIT #45 – FN 122**

498



Confidential Property of Morgan Stanley,
Do Not Copy Or Distribute

MS-PS1 021299

499



Revenue By Client Application

Div Enhancement
34%

Index Access
27%

Other
7%

B/S & Accounting
11%

Equity Access
5%

Tax
7%

Regulatory
6%

Operational Ease
3%

Morgan Stanley

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

Confidential Property of Morgan Stanley,
Do Not Copy Or Distribute

MS-PSI 021300

3

500

# Components of the Business

- Dividend Enhancement Swaps
  - Largely commoditized pricing among the US hedge fund community
  - Financing set to match PB debit rates
  - Commission schedules match single name cash execution levels
- Special Situations
  - Dividend enhancement
  - Withholding treatment on the cash distributions
  - Capital gains treatment

Morgan Stanley

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

Confidential Property of Morgan Stanley,
Do Not Copy Or Distribute

MS-PSI 031301

4

501



Confidential Property of Morgan Stanley,
Do Not Copy Or Distribute

MS-PSI 021302

502

## Fundamental Shifts in the Business

- Revenue increase due to maturation of new 2004 clients

- New and more conservative tax policy

- 58% Increase in trading revenue and 39% increase in asset usage

- Unique positioning to take advantage of the new landscape

**Morgan Stanley**

Strictly Confidential
Not for Circulation
Subaccount Members and Staff Only

Confidential Property of Morgan Stanley,
Do Not Copy Or Distribute

MS-PSI 021303

6

503

## Scaling the Business

- Initiatives this year
  - Training the cash sales-trading force
  - Direct Market Access (DMA)
- Technology development required
  - Passport for swaps functionality
  - Swap destination in OMW
  - Automated swap booking from OMW
- Further marketing initiatives
  - Information flow to sales force to help them identify opportunities
  - Marketing overseas

Morgan Stanley

Strictly Confidential
Not for Circulation
Internal Distribution and Staff Only

Confidential Property of Morgan Stanley,
Do Not Copy Or Distribute

MS-PSI 021304

7

504

## Business Constraints

- Pricing
  - PB is getting consistently more aggressive than we can be to continue meeting ROE objectives
- Funding/Balance Sheet
  - Funding costs remain high, but improving
  - Access to balance sheet has been good, but for how long?
  - Credit capacity with balance sheet counterparties
- Tax Policy

**Morgan Stanley**

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

8

*Confidential Property of Morgan Stanley,*
*Do Not Copy Or Distribute*

MS-PSI 021305

505

# Swap Inventory : Proprietary overlay

- Use a proprietary trading strategy as an overlay to our inventory to identify opportunities to remain unhedged

- Strategy must be flexible enough to be tailored to our inventory

- Objectives
  - Improve tax and regulatory analysis
  - Generate alpha
  - Take advantage of opportunity to invert funding cost
  - Take advantage of opportunity to source "hot" borrow
  - Reduce balance sheet

**Morgan Stanley**

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

9

Confidential Property of Morgan Stanley,
Do Not Copy Or Distribute

MS-PSI 021306

506

## Target FY 2006 Goals

- Marketing
  - Arm the sales force
  - Marketing overseas
- Technology
  - Build further scalability into the flow business
- Balance Sheet
  - Push for a more aggressive credit analysis with B/D counterparties given the low risk nature of our trades
- Implement proprietary overlay to swap inventory

Morgan Stanley

Strictly Confidential
Not for Circulation
Subcommittee Isadore and Staff Only

10

Confidential Property of Morgan Stanley,
Do Not Copy Or Distribute

MS-PSI 021307

507

REDACTED



Div_May01.pdf

From: Loshiavo, Richard (EFS)
Sent: 18 June 2001 13:59
To: Chackman, Sylvan (IED)
Cc: McDougall, Ross (IED)
Subject: [Fwd: [Fwd: [Fwd: [Trading Idea: Dividend Yield Enhancement Swap for US Stock]]]]

Syl/Ross,

    Do you guys presently provide div enhancement trades on U.S stocks for
any PMM accounts?

-------- Original Message --------
Subject:    [Fwd: [Fwd: [Trading Idea: Dividend Yield Enhancement
Swap for US Stock]]]
Date:       Thu, 14 Jun 2001 14:46:49 -0400
From:       Martin Tell <Martin.Tell@morganstanley.com>
Reply-To:   Martin.Tell@morganstanley.com
Organization:     Morgan Stanley
To:  "West, Bruce" <Bruce.West@morganstanley.com>,"Olidge, Darilyn"
<Darilyn.Olidge@morganstanley.com>,"Loshiavo, Richard"
<Richard.Loshiavo@morganstanley.com>,"Gerspach, Jim"
<Jim.Gerspach@morganstanley.com>

Guys,
    What are your' thoughts?
Marty

-------- Original Message --------
Subject:    [Fwd: [Trading Idea: Dividend Yield Enhancement Swap
for US Stock]]
Date:       Thu, 14 Jun 2001 19:43:04 -0400
From:       Eddie Guillemette <Eddie.Guillemette@morganstanley.com>
Reply-To:   Eddie.Guillemette@morganstanley.com
Organization:     Morgan Stanley
To:    lopatteam <lopatteam@ms.com>

This piece on Dividend Yield Enhancement for US Stock was sent to PMM
sales people in Asia.
I have not investigated whether the swap structure only works for
clients in Asia or if this is a product that can be potentially used
with some of our non-US exclusive clients.  Let me know if you have any
further information on this product...eg

-------- Original Message --------                                    1

Permanent Subcommittee on Investigations
EXHIBIT #45 - FN 125

MS-PSI* 020758

508

Subject:    [Trading Idea: Dividend Yield Enhancement Swap for US Stock]
Date:       Thu, 14 Jun 2001 18:38:57 +0800
From:       Tommie Fang <Tommie.Fang@morganstanley.com>
Reply-To:   Tommie.Fang@morganstanley.com
Organization:   Morgan Stanley
To:         hpang <hpang@ms.com>, pwmg <pwmg@ms.com>, pwmhksa <pwmhksa@ms.com>, pwmhksales <pwmhksales@ms.com>, pwmsing <pwmsing@ms.com>,vchen <vchen@ms.com>, Kelvin K Ng <Kelvin.Ng@msdw.com>,hkedmkt <hkedmkt@ms.com>
CC:         Kelvin Ng <Kelvin.Ng@morganstanley.com>, hkedsp <hkedsp@ms.com>,Stevan Vrcelj <Stevan.Vrcelj@morganstanley.com>, Hogan <Simon.Hogan@morganstanley.com>,Stan Siao <Stan.Siao@morganstanley.com>

-Internal Use Only-

     Dear all,

     Below is a potential trading idea proposed by our equity derivative structure team. Please take some time read through the structure and attachment and call us if you have any feedback/questions at 2848-5993.

     Background:
     -> Non-US investors (resident in Hong Kong, Taiwan, Singapore, Cayman Islands, Jersey etc.) typically suffer withholding tax on US dividends, ranging from 15-30%
     -> Instead of buying/holding the stock directly, clients can enter into a Total Return Equity Swap with Morgan Stanley and achieve yield enhancement
     -> Target Client: Those who has held/will purchase large (more than US$10mil) US Stock portfolio and current receive less than 100% of the dividends

     Quick Sample:

     Assumptions:  Notional Value of US Shares US$ 100 'MM
                   Annual Dividend Yield (estimated) 1.20%
                   Annual Dividend US$ 1.20 'MM
                   Withholding tax 30% US$ (0.36) 'MM

     If clients enter into the Total Return Equity Swap:
     Annual Value of Morgan Stanley Yield Enhancement US$ 0.18 'MM (15% of the Annual Dividend)
     Estimated Pick-up on Notional p.a. 18 bps

     In this case, the sales credit would be 9 bps on the Notional on the top of normal commissions.

     Check List:
     (1) What % of the dividend does your client receive in (i) cash, and (2) tax credit:
     (2)  Can your client enter into derivative transactions? Do they have ISDA Docs?
     (3) Minimum size/break fees: US$10mil with $5,000 break fee if dividend received is less than US$80k.

     Attached please find:

     *     summary of estimated yields for each MSCI-US share
     *     Dividend withholding tax rates for each treaty country

     Thanks,

                                    1

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI* 020759

509

Tommie Fang

--
This e-mail, and any attachments, is confidential and is intended to be used
by the addressee(s) only.  Its contents is based on or derived from
information generally available to the public from sources we believe to be
reliable.  No representation is made that it is accurate or complete.  The
foregoing has been provided solely for information purposes and is not a
solicitation of an offer to buy or sell securities at these or any other
level.  Morgan Stanley Dean Witter may have positions in, and may effect
transactions, in securities and instruments of issuers mentioned herein and
may also perform or seek to perform investment banking services for such
issuers.  If you are not the intended recipient of this e-mail, any
dissemination, distribution or copying of this e-mail, and any attachments
hereto, is strictly prohibited.  If you have received this e-mail in error,
please notify the sender immediately by return e-mail and permanently delete
all copies of this e-mail and destroy any printouts of it.

1

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI* 020760

510



CITI_PSIWHTAX0014460

STRICTLY CONFIDENTIAL -- NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

**Permanent Subcommittee on Investigations**
**EXHIBIT #45 - FN 127**

511

| From: | Pecullan, Scott (IED) <Scott.Pecullan@morganstanley.com> |
| Sent: | Wednesday, December 14, 2005 12:59 PM |
| To: | Patel, Chirag (IED) <chiragp@ms.com>; swap <swap@ms.com> |
| Cc: | fpgswap <fpgswap@ms.com> |
| Subject: | RE: Possible Div Enhance Trade |

All confirmed. Thanks very much.

**From:** Patel, Chirag (IED)
**Sent:** Wednesday, December 14, 2005 10:40 AM
**To:** Patel, Chirag (IED); swap
**Cc:** fpgswap
**Subject:** RE: Possible Div Enhance Trade

Scott - To confirm our conversation, i have relayed the following to Lansdowne who will contact your group directly to trade if they decide to pull the trigger:

Open pos. by trading straight into swap
After the div...you can cross the stock to the clients PB acct. if they do not want to close out

Thx,
Chirag

Chirag Patel
25 Cabot Square
London
E14 4QA
Tel: +44 207 425 7332
Fax: +44 207 425 4546

---

**From:** Patel, Chirag (IED)
**Sent:** 14 December 2005 11:24
**To:** swap
**Cc:** fpgswap
**Subject:** FW: Possible Div Enhance Trade
**Importance:** High

Guys - Spoke to Lansdowne:

couple of different ways i think we can handle this:

1) They trade straight into swap with yourselves.....then trade straight out in the market with yourselves again - pls. confirm pricing and Div you can pay for this

2) They trade sraight into swap onto LN's books.......div is enhanced...then position is closed by entering

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 128**

MS-PSI* 020744

512

a VWAP order in the market.

Pls. let me know your thoughts/suggestions

Cheers./

Chirag Patel
25 Cabot Square
London
E14 4QA
Tel: +44 207 425 7332
Fax: +44 207 425 4546

---

**From:** Ryan, Declan (IED)
**Sent:** 14 December 2005 10:30
**To:** fpgswap
**Subject:** FW: Possible Div Enhance Trade
**Importance:** High

Pls get back to Justine on this,

Declan Ryan
Vice President
(P) +44 (0)20 7425 7331
(F) +44 (0)20 7425 4546

---

**From:** Justine Ayling [mailto:jayling@LansdownePartners.com]
**Sent:** 14 December 2005 08:46
**To:** Ryan, Declan (IED)
**Subject:** Possible Div Enhance Trade
**Importance:** High

Morning Declan,

Our Global Financials team are thinking of purchases a US name which pays a special dividend of $6 and were wondering if they could potentially swap it out to get a div enhancement.

The name of the stock is Ameritrade.
Please could you let me know if this is possible, the enhancement that we could expect to recieve and any additional information that we need to me made aware of

Thanks Justine

**Justine Ayling**

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI* 020745

513

*Lansdowne Partners Limited*
*15 Davies Street, London, W1K 3AG*
*Telephone: +44 (0)20 7290 5500*
*Facsimile: +44 (0)20 7409 1122*
*Email: jryling@LansdownePartners.com*

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is strictly prohibited. If you received this in error, please contact the sender and delete the material from any computer.
This communication is for informational purposes only. It does not and is not intended to constitute investment advice or an offer or solicitation for the purchase or sale of any financial instrument or as an official confirmation of any transaction. All market prices, data and other information are not warranted as to completeness or accuracy and are subject to change without notice. Any comments or statements made herein do not necessarily reflect those of Lansdowne Partners Limited Partnership or its affiliates.
Lansdowne Partners Limited is authorised and regulated by the Financial Services Authority of the United Kingdom and each of Lansdowne Partners Limited and Lansdowne Partners Limited Partnership is registered as an investment adviser with the Securities and Exchange Commission of the United States of America.
Lansdowne Partners Limited Registered Office: 15 Davies Street, London W1K 3AG, England.
WARNING: Computer viruses can be transmitted by email. The recipient must check this email and any attachments for the presence of viruses. We accept no liability for any damage caused by any virus transmitted by this email.

This e-mail has been scanned for all viruses by Star. The
service is powered by MessageLabs. For more information on a proactive
anti-virus service working around the clock, around the globe, visit:
http://www.star.net.uk

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI* 020746

514



# Microsoft Yield Enhancement

26th July 2004

Morgan Stanley fixed income research analysts produce proprietary research in conjunction with Morgan Stanley (trading desks that trade as principal in the instruments mentioned in this report. Morgan Stanley fixed income research is therefore not independent from the proprietary interests of Morgan Stanley, which may conflict with your interests.
Morgan Stanley fixed income research analysts receive compensation based in part on Morgan Stanley's trading and capital markets revenues. Morgan Stanley and/or its affiliates may have a position in the table of the Company or instruments discussed in this report.
Please see additional important disclosures at the end of this report.

Morgan Stanley

Permanent Subcommittee on Investigations
EXHIBIT #45 - FN 136

MS-PSI 020293

515



## General

- Microsoft (MSFT US) will pay an exceptional dividend of USD 3 (10.5% yield) in November in addition to the normal quarterly dividend (USD 0.08) in August.

- Investors will suffer either 30% withholding tax (offshore) or 15% withholding tax (onshore) on this dividend.

- Morgan Stanley has 2 different trades that will allow a client to enhance the yield of their holding to 2 different levels depending on their sophistication / risk appetite.

Morgan Stanley

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI 020294

516



## Scenario 1: The US Trade

- **Enhancement:** Client Receives 100% of dividend

- **Costs:**
  - Financing Cost (50 basis points or 20 bps if the position is "fully paid");
  - Commission (negotiable, usually USD 0.05).

  *2 costs are negotiable & will normally amount to about 5% of dividend\**

- **Structure:** Client Sells shares to Morgan Stanley. Morgan Stanley sells a derivative to the client. Enhancement is passed back through the derivative. In order to receive 100% of dividend, on unwind, Morgan Stanley *must sell stock back to market* (not the client) and close out the derivative.

- **Instrument(s) used:** Sale v Swap; Sale v (Listed) Certificate; Sale v SSF; Sale v (Listed) Option

\* Please speak to Sales Team / Traders if there are any queries

**Morgan Stanley**

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI 020295

517



## Scenario 2: The European Trade

- **Enhancement:** Offshore Client Receives 89% of dividend (from 70%)

  Onshore Client Receives 92% of dividend (from 85%)

- **Costs:** None

- **Structure:** Client sells shares (through a broker) to Morgan Stanley. Morgan Stanley sells a derivative to the client. Enhancement is passed back through the derivative. On unwind the reverse occurs. Alternatively, the shares are simply lent to Morgan Stanley.

- **Instrument(s) used:** Securities Lending; Sale v Swap; Sale v (Listed) Certificate; Sale v SSF; Sale v (Listed) Option; Equity Repo; Sell buyback

MorganStanley

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI 020296

518

RE: MSFT

### Cox, Byron

From:     Steve Maresco [sm@eminencecapital.com]
Sent:     Friday, October 08, 2004 9:48 AM
To:       Thomas, Alan (IED)
Subject:  RE: MSFT

Yes - I voicemailed you earlier today.  One timing question - assuming
we are in the swap for 30+ days prior to record date, I assume we could
unwind the swap at any time subsequent to record date, correct?

Thanks.

Steve

-----Original Message-----
From: Alan Thomas [mailto:Alan.Thomas@morganstanley.com]
Sent: Friday, October 08, 2004 11:42 AM
To: Steve Maresco
Subject: MSFT

Steve,
Still plenty of time, but I believe you had wanted me to contact you
regarding MSFT div enhancement this week.  We are ready when you are.
Have a nice weekend,
Alan

This is not an offer (or solicitation of an offer) to buy/sell the
securities/instruments mentioned or an official confirmation.  Morgan
Stanley may deal as principal in or own or act as market maker for
securities/instruments mentioned or may advise the issuers.  This may
refer to a research analyst/research report.  Unless indicated, these
views are the author's and may differ from those of Morgan Stanley
research or others in the Firm.  We do not represent this as accurate or
complete and we may not update this.  Past performance is not indicative
of future returns.  For additional information, research reports and
important disclosures, contact me or see https://secure.ms.com.  You
should not use email to request, authorize or effect the purchase or
sale of any security or instrument, to send transfer instructions, or to
effect any other transactions.  We cannot guarantee that any such
requests received via email will be processed in a timely manner.  This
communication is solely for the addressee(s) and may contain
confidential information.  We do not waive confidentiality by
mistransmission.  Contact me if you do not wish to receive these
communications.  In the UK, this communication is directed in the UK to
those persons who are market counterparties or intermediate customers
(as defined in the UK Financial Services Authority's rules).

MS-INT 004346

1/18/2008

MS-PSI 001402

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 142**

519



RE: MSFT                                                                                    Page 2 of 2



1/18/2008                                                          MS-INT 004347

Strictly Confidential          MS-PSI 001403
Not for Circulation
Subcommittee Members and Staff Only

520



MS-PSI 020945

Permanent Subcommittee on Investigations
EXHIBIT #45 - FN 144

521

MS-PSI 019326

MSD/V Equity Finance Services I (Cayman) Ltd. - Stock Borrowing Transactions (2000-2007)

| Order Phase Name | Principal Name | Total Net Dividends |
|---|---|---|
| Redacted by the | Permanent Subcommittee on Investigations | $706,166.00 |
| Redacted by the | Permanent Subcommittee on Investigations | $256,200.00 |
| Redacted by the | Permanent Subcommittee on Investigations | $19,892.30 |
| Redacted by the | Permanent Subcommittee on Investigations | $1,003,706.81 |
| Redacted by the | Permanent Subcommittee on Investigations | $553,203.72 |
| Redacted by the | Permanent Subcommittee on Investigations | $1,777,602.66 |
| Redacted by the | Permanent Subcommittee on Investigations | $10,764,410.47 |
| Redacted by the | Permanent Subcommittee on Investigations | $4,768.00 |
| Redacted by the | Permanent Subcommittee on Investigations | $256,995.10 |
| Redacted by the | Permanent Subcommittee on Investigations | $132,748.00 |
| Redacted by the | Permanent Subcommittee on Investigations | $997,653.87 |
| Redacted by the | Permanent Subcommittee on Investigations | $13,973,172.25 |
| Redacted by the | Permanent Subcommittee on Investigations | $3,299,043.35 |
| Redacted by the | Permanent Subcommittee on Investigations | $67,469.20 |
| Redacted by the | Permanent Subcommittee on Investigations | $164,368.88 |
| Redacted by the | Permanent Subcommittee on Investigations | $216,090.35 |
| Redacted by the | Permanent Subcommittee on Investigations | $5,337,995.41 |
| Redacted by the | Permanent Subcommittee on Investigations | $774,472.06 |
| Redacted by the | Permanent Subcommittee on Investigations | $427,720.30 |
| Redacted by the | Permanent Subcommittee on Investigations | $339,533.01 |
| Redacted by the | Permanent Subcommittee on Investigations | $253,633.12 |
| Redacted by the | Permanent Subcommittee on Investigations | $31,835.90 |
| Redacted by the | Permanent Subcommittee on Investigations | $12,613.66 |
| Redacted by the | Permanent Subcommittee on Investigations | $12,406.36 |
| Redacted by the | Permanent Subcommittee on Investigations | $65,553,577.98 |
| Redacted by the | Permanent Subcommittee on Investigations | $17,272.44 |
| Redacted by the | Permanent Subcommittee on Investigations | $469,651.16 |
| Redacted by the | Permanent Subcommittee on Investigations | $1,706,459.00 |
| Redacted by the | Permanent Subcommittee on Investigations | $1,540,197.42 |
| Redacted by the | Permanent Subcommittee on Investigations | $26,250.00 |
| Redacted by the | Permanent Subcommittee on Investigations | $5,079,464.78 |
| Redacted by the | Permanent Subcommittee on Investigations | $18,741,123.11 |
| Redacted by the | Permanent Subcommittee on Investigations | $10,500,235.05 |
| Redacted by the | Permanent Subcommittee on Investigations | $4,340,992.16 |
| Redacted by the | Permanent Subcommittee on Investigations | $1,545,097.41 |
| Redacted by the | Permanent Subcommittee on Investigations | $745,181.61 |
| Redacted by the | Permanent Subcommittee on Investigations | $118,565.25 |
| Redacted by the | Permanent Subcommittee on Investigations | $17,201.75 |
| Redacted by the | Permanent Subcommittee on Investigations | $24,362.80 |

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 147**

522

MSDW Equity Finance Services I (Cayman) Ltd. - Stock Borrowing Transactions (2000-2007)

| | |
|---|---|
| Redacted by the Permanent Subcommittee on Investigations | $17,609.35 |
| Redacted by the Permanent Subcommittee on Investigations | $1,313,751.25 |
| Redacted by the Permanent Subcommittee on Investigations | $109,340.00 |
| Redacted by the Permanent Subcommittee on Investigations | $96,200.00 |
| Redacted by the Permanent Subcommittee on Investigations | $37,203,555.66 |
| Redacted by the Permanent Subcommittee on Investigations | $1,688,557.93 |
| Redacted by the Permanent Subcommittee on Investigations | $1,416,401.82 |
| Redacted by the Permanent Subcommittee on Investigations | $2,016,532.26 |
| Redacted by the Permanent Subcommittee on Investigations | $891,359.23 |
| Redacted by the Permanent Subcommittee on Investigations | $990,468.71 |
| Redacted by the Permanent Subcommittee on Investigations | $519,838.79 |
| Redacted by the Permanent Subcommittee on Investigations | $3,749,744.04 |
| Redacted by the Permanent Subcommittee on Investigations | $8,504.85 |
| Redacted by the Permanent Subcommittee on Investigations | $8,025,976.98 |
| Redacted by the Permanent Subcommittee on Investigations | $50,269,213.66 |
| Redacted by the Permanent Subcommittee on Investigations | $107,600.00 |
| Redacted by the Permanent Subcommittee on Investigations | $3,544,295.14 |
| Redacted by the Permanent Subcommittee on Investigations | $58,263,117.78 |
| Redacted by the Permanent Subcommittee on Investigations | $1,558,626.29 |
| Redacted by the Permanent Subcommittee on Investigations | $11,417,633.25 |
| Redacted by the Permanent Subcommittee on Investigations | $406,997.00 |
| Redacted by the Permanent Subcommittee on Investigations | $3,779,389.65 |
| Redacted by the Permanent Subcommittee on Investigations | $21,782,030.36 |
| Redacted by the Permanent Subcommittee on Investigations | $4,900.00 |
| Redacted by the Permanent Subcommittee on Investigations | $1,605,891.25 |
| Redacted by the Permanent Subcommittee on Investigations | $4,450,831.14 |
| Redacted by the Permanent Subcommittee on Investigations | $5,240,020.45 |
| Redacted by the Permanent Subcommittee on Investigations | $107,725.33 |
| Redacted by the Permanent Subcommittee on Investigations | $48,308,111.65 |
| Redacted by the Permanent Subcommittee on Investigations | $25,339,296.71 |
| Redacted by the Permanent Subcommittee on Investigations | $15,336,749.60 |
| Redacted by the Permanent Subcommittee on Investigations | $12,699,243.00 |
| Redacted by the Permanent Subcommittee on Investigations | $4,611,297.50 |
| Redacted by the Permanent Subcommittee on Investigations | $1,016,348.75 |
| Redacted by the Permanent Subcommittee on Investigations | $23,105.00 |
| Redacted by the Permanent Subcommittee on Investigations | $207,025.00 |
| Redacted by the Permanent Subcommittee on Investigations | $322,600.00 |
| Redacted by the Permanent Subcommittee on Investigations | $1,918,603.75 |
| Redacted by the Permanent Subcommittee on Investigations | $25,037.00 |
| Redacted by the Permanent Subcommittee on Investigations | $1,740,700.08 |
| Redacted by the Permanent Subcommittee on Investigations | $3,621.00 |
| Redacted by the Permanent Subcommittee on Investigations | $1,545,344.21 |

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI 019327

MSDW Equity Finance Services I (Cayman) Ltd. - Stock Borrowing Transactions (2000-2007)

| | |
|---|---|
| Redacted by the Permanent Subcommittee on Investigations | $98,503.57 |
| Redacted by the Permanent Subcommittee on Investigations | $97,606.35 |
| Redacted by the Permanent Subcommittee on Investigations | $75,729.42 |
| Redacted by the Permanent Subcommittee on Investigations | $407,312.74 |
| Redacted by the Permanent Subcommittee on Investigations | $1,704,242.48 |
| Redacted by the Permanent Subcommittee on Investigations | $454,567.14 |
| Redacted by the Permanent Subcommittee on Investigations | $34,327.86 |
| Redacted by the Permanent Subcommittee on Investigations | $285,306.81 |
| Redacted by the Permanent Subcommittee on Investigations | $98,606.60 |
| Redacted by the Permanent Subcommittee on Investigations | $743,181.80 |
| Redacted by the Permanent Subcommittee on Investigations | $122,500.16 |
| Redacted by the Permanent Subcommittee on Investigations | $3,043,530.77 |
| Redacted by the Permanent Subcommittee on Investigations | $67,178.37 |
| Redacted by the Permanent Subcommittee on Investigations | $58,240.90 |
| Redacted by the Permanent Subcommittee on Investigations | $54,464.26 |
| Redacted by the Permanent Subcommittee on Investigations | $88,994.25 |
| Redacted by the Permanent Subcommittee on Investigations | $227,762.16 |
| Redacted by the Permanent Subcommittee on Investigations | $271,634.62 |
| Redacted by the Permanent Subcommittee on Investigations | $143,394.86 |
| Redacted by the Permanent Subcommittee on Investigations | $114,123.63 |
| Redacted by the Permanent Subcommittee on Investigations | $56,822.79 |
| Redacted by the Permanent Subcommittee on Investigations | $11,410,788.13 |
| Redacted by the Permanent Subcommittee on Investigations | $36,084,180.97 |
| Redacted by the Permanent Subcommittee on Investigations | $679,696.11 |
| Redacted by the Permanent Subcommittee on Investigations | $371,398.11 |
| Redacted by the Permanent Subcommittee on Investigations | $2,304,976.16 |
| Redacted by the Permanent Subcommittee on Investigations | $2,353,706.04 |
| Redacted by the Permanent Subcommittee on Investigations | $14,089,410.05 |
| Redacted by the Permanent Subcommittee on Investigations | $353,065.44 |
| Redacted by the Permanent Subcommittee on Investigations | $42,816.08 |
| Redacted by the Permanent Subcommittee on Investigations | $16,042.07 |
| Redacted by the Permanent Subcommittee on Investigations | $193,611.89 |
| Redacted by the Permanent Subcommittee on Investigations | $187,469.51 |
| Redacted by the Permanent Subcommittee on Investigations | $108,385.13 |
| Redacted by the Permanent Subcommittee on Investigations | $59,239.72 |
| Redacted by the Permanent Subcommittee on Investigations | $183,198.51 |
| Redacted by the Permanent Subcommittee on Investigations | $660,776.67 |
| Redacted by the Permanent Subcommittee on Investigations | $5,941,766.33 |
| Redacted by the Permanent Subcommittee on Investigations | $3,947,186.34 |
| Redacted by the Permanent Subcommittee on Investigations | $436,529.45 |
| Redacted by the Permanent Subcommittee on Investigations | $5,123,757.03 |

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI 019328

524

MSDW Equity Finance Services I (Cayman) Ltd. - Stock Borrowing Transactions (2000-2007)

| | |
|---|---|
| Redacted by the Permanent Subcommittee on Investigations | $43,768.88 |
| Redacted by the Permanent Subcommittee on Investigations | $43,130.00 |
| Redacted by the Permanent Subcommittee on Investigations | $164,076.45 |
| Redacted by the Permanent Subcommittee on Investigations | $70,366.00 |
| Redacted by the Permanent Subcommittee on Investigations | $2,214,944.74 |
| Redacted by the Permanent Subcommittee on Investigations | $173,092,653.00 |
| Redacted by the Permanent Subcommittee on Investigations | $10,030,634.99 |
| Redacted by the Permanent Subcommittee on Investigations | $687,623.84 |
| Redacted by the Permanent Subcommittee on Investigations | $107,486.59 |
| Redacted by the Permanent Subcommittee on Investigations | $74,184.26 |
| Redacted by the Permanent Subcommittee on Investigations | $58,887.93 |
| Redacted by the Permanent Subcommittee on Investigations | $29,007.79 |
| Redacted by the Permanent Subcommittee on Investigations | $9,803.50 |
| Redacted by the Permanent Subcommittee on Investigations | $1,604,864.11 |
| Redacted by the Permanent Subcommittee on Investigations | $1,708,337.82 |
| Redacted by the Permanent Subcommittee on Investigations | $1,089,672.46 |
| Redacted by the Permanent Subcommittee on Investigations | $906,982.79 |
| Redacted by the Permanent Subcommittee on Investigations | $6,528.45 |
| Redacted by the Permanent Subcommittee on Investigations | $500,734.00 |
| Redacted by the Permanent Subcommittee on Investigations | $960,823.63 |
| Redacted by the Permanent Subcommittee on Investigations | $38,342,261.72 |
| Redacted by the Permanent Subcommittee on Investigations | $548,772.72 |
| Redacted by the Permanent Subcommittee on Investigations | $244,980.34 |
| Redacted by the Permanent Subcommittee on Investigations | $263.56 |
| Redacted by the Permanent Subcommittee on Investigations | $109,379.47 |
| Redacted by the Permanent Subcommittee on Investigations | $31,153.00 |
| Redacted by the Permanent Subcommittee on Investigations | $2,402,190.86 |
| Redacted by the Permanent Subcommittee on Investigations | $823,746.15 |
| Redacted by the Permanent Subcommittee on Investigations | $120,602.82 |
| Redacted by the Permanent Subcommittee on Investigations | $241,664.88 |
| Redacted by the Permanent Subcommittee on Investigations | $138,956.70 |
| Redacted by the Permanent Subcommittee on Investigations | $1,161,156.62 |
| Redacted by the Permanent Subcommittee on Investigations | $894,721.83 |
| Redacted by the Permanent Subcommittee on Investigations | $200,024.02 |
| Redacted by the Permanent Subcommittee on Investigations | $4,670,163.15 |
| Redacted by the Permanent Subcommittee on Investigations | $1,365,714.85 |
| Redacted by the Permanent Subcommittee on Investigations | $1,369,380.90 |
| Redacted by the Permanent Subcommittee on Investigations | $337,076.02 |
| Redacted by the Permanent Subcommittee on Investigations | $337,884.71 |
| Redacted by the Permanent Subcommittee on Investigations | $236,767.73 |
| Redacted by the Permanent Subcommittee on Investigations | $217,460.81 |
| Redacted by the Permanent Subcommittee on Investigations | $148,976.77 |

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI 019329

525

MSDW Equity Finance Services I (Cayman) Ltd. - Stock Borrowing Transactions (2000-2007)

| | |
|---|---|
| Redacted by the Permanent Subcommittee on Investigations | $16,071.85 |
| Redacted by the Permanent Subcommittee on Investigations | $47,589.31 |
| Redacted by the Permanent Subcommittee on Investigations | $40,099.11 |
| Redacted by the Permanent Subcommittee on Investigations | $35,047.92 |
| Redacted by the Permanent Subcommittee on Investigations | $4,448.82 |
| Redacted by the Permanent Subcommittee on Investigations | $342,645.02 |
| Redacted by the Permanent Subcommittee on Investigations | $133,166.82 |
| Redacted by the Permanent Subcommittee on Investigations | $38,316.95 |
| Redacted by the Permanent Subcommittee on Investigations | $37,592.44 |
| Redacted by the Permanent Subcommittee on Investigations | $137,375.97 |
| Redacted by the Permanent Subcommittee on Investigations | $103,768.31 |
| Redacted by the Permanent Subcommittee on Investigations | $31,383.05 |
| Redacted by the Permanent Subcommittee on Investigations | $17,334.96 |
| Redacted by the Permanent Subcommittee on Investigations | $74,204.37 |
| Redacted by the Permanent Subcommittee on Investigations | $59,511.48 |
| Redacted by the Permanent Subcommittee on Investigations | $51,407.92 |
| Redacted by the Permanent Subcommittee on Investigations | $30,060,036.39 |
| Redacted by the Permanent Subcommittee on Investigations | $53,761.09 |
| Redacted by the Permanent Subcommittee on Investigations | $555,349.00 |
| Redacted by the Permanent Subcommittee on Investigations | $2,007,238.01 |
| Redacted by the Permanent Subcommittee on Investigations | $2,472,164.01 |
| Redacted by the Permanent Subcommittee on Investigations | $31,105,365.72 |
| Redacted by the Permanent Subcommittee on Investigations | $670,068.14 |
| Redacted by the Permanent Subcommittee on Investigations | $491,483.37 |
| Redacted by the Permanent Subcommittee on Investigations | $34,168.12 |
| Redacted by the Permanent Subcommittee on Investigations | $38,874,466.19 |
| Redacted by the Permanent Subcommittee on Investigations | $297,793.40 |
| Redacted by the Permanent Subcommittee on Investigations | $304,283.4 |
| Redacted by the Permanent Subcommittee on Investigations | $412,616.08 |
| Redacted by the Permanent Subcommittee on Investigations | $131,247.00 |
| Redacted by the Permanent Subcommittee on Investigations | $10,896,587.75 |
| Redacted by the Permanent Subcommittee on Investigations | $230,915,108.50 |
| Redacted by the Permanent Subcommittee on Investigations | $4,038,895.20 |
| Redacted by the Permanent Subcommittee on Investigations | $73,266,440.67 |
| Redacted by the Permanent Subcommittee on Investigations | $528,869,687.46 |
| Redacted by the Permanent Subcommittee on Investigations | $121,297,947.08 |
| Redacted by the Permanent Subcommittee on Investigations | $24,487,506.32 |
| Redacted by the Permanent Subcommittee on Investigations | $8,947,790.45 |
| Redacted by the Permanent Subcommittee on Investigations | $2,593,111.00 |
| Redacted by the Permanent Subcommittee on Investigations | $615,163.56 |
| Redacted by the Permanent Subcommittee on Investigations | $23,003.53 |

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

526

MS-PSI 019331

MSDW Equity Finance Services I (Cayman) Ltd. - Stock Borrowing Transactions (2000-2007)

| | |
|---|---|
| Redacted by the Permanent Subcommittee on Investigations | $603,250.40 |
| Redacted by the Permanent Subcommittee on Investigations | $16,910.02 |
| Redacted by the Permanent Subcommittee on Investigations | $366,564.33 |
| Redacted by the Permanent Subcommittee on Investigations | $483,735.66 |
| Redacted by the Permanent Subcommittee on Investigations | $54,974.23 |
| Redacted by the Permanent Subcommittee on Investigations | $251,178.22 |
| Redacted by the Permanent Subcommittee on Investigations | $11,014.72 |
| Redacted by the Permanent Subcommittee on Investigations | $396,695.55 |
| Redacted by the Permanent Subcommittee on Investigations | $1,070,647.31 |
| Redacted by the Permanent Subcommittee on Investigations | $16,622.87 |
| Redacted by the Permanent Subcommittee on Investigations | $31,169.76 |
| Redacted by the Permanent Subcommittee on Investigations | $183,958.12 |
| Redacted by the Permanent Subcommittee on Investigations | $832,125.30 |
| Redacted by the Permanent Subcommittee on Investigations | $142,696.03 |
| Redacted by the Permanent Subcommittee on Investigations | $106,430.91 |
| Redacted by the Permanent Subcommittee on Investigations | $428,786.83 |
| Redacted by the Permanent Subcommittee on Investigations | $359,991.34 |
| Redacted by the Permanent Subcommittee on Investigations | $21,942.71 |
| Redacted by the Permanent Subcommittee on Investigations | $337,657.01 |
| Redacted by the Permanent Subcommittee on Investigations | $676,259.64 |
| Redacted by the Permanent Subcommittee on Investigations | $492,741.46 |
| Redacted by the Permanent Subcommittee on Investigations | $349,350.45 |
| Redacted by the Permanent Subcommittee on Investigations | $314,697.66 |
| Redacted by the Permanent Subcommittee on Investigations | $159,781.10 |
| Redacted by the Permanent Subcommittee on Investigations | $665,313.35 |
| Redacted by the Permanent Subcommittee on Investigations | $71,715.18 |
| Redacted by the Permanent Subcommittee on Investigations | $754.04 |
| Redacted by the Permanent Subcommittee on Investigations | $25,309.70 |
| Redacted by the Permanent Subcommittee on Investigations | $2,317,166.30 |
| Redacted by the Permanent Subcommittee on Investigations | $4,588.35 |
| Redacted by the Permanent Subcommittee on Investigations | $374,592.08 |
| Redacted by the Permanent Subcommittee on Investigations | $166,663.55 |
| Redacted by the Permanent Subcommittee on Investigations | $542,310.28 |
| Redacted by the Permanent Subcommittee on Investigations | $139,533.35 |
| Redacted by the Permanent Subcommittee on Investigations | $341,973.35 |
| Redacted by the Permanent Subcommittee on Investigations | $243,802.81 |
| Redacted by the Permanent Subcommittee on Investigations | $4,545.77 |
| Redacted by the Permanent Subcommittee on Investigations | $5,492,843.14 |
| Redacted by the Permanent Subcommittee on Investigations | $309,755.57 |
| Redacted by the Permanent Subcommittee on Investigations | $1,886,544.60 |
| Redacted by the Permanent Subcommittee on Investigations | $10,428.15 |
| Redacted by the Permanent Subcommittee on Investigations | $24,202.15 |

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MSDW Equity Finance Services I (Cayman) Ltd. - Stock Borrowing Transactions (2000-2007)

| | |
|---|---|
| Redacted by the Permanent Subcommittee on Investigations | $75,401.16 |
| Redacted by the Permanent Subcommittee on Investigations | $47,682.44 |
| Redacted by the Permanent Subcommittee on Investigations | $3,348.00 |
| Redacted by the Permanent Subcommittee on Investigations | $1,150.11 |
| Redacted by the Permanent Subcommittee on Investigations | $9,096.10 |
| Redacted by the Permanent Subcommittee on Investigations | $142,236.76 |
| Redacted by the Permanent Subcommittee on Investigations | $50,391.72 |
| Redacted by the Permanent Subcommittee on Investigations | $551,585.25 |
| Redacted by the Permanent Subcommittee on Investigations | $5,497.92 |
| Redacted by the Permanent Subcommittee on Investigations | $175,633.35 |
| Redacted by the Permanent Subcommittee on Investigations | $458,580.55 |
| Redacted by the Permanent Subcommittee on Investigations | $13,154.46 |
| Redacted by the Permanent Subcommittee on Investigations | $3,992,424.10 |
| Redacted by the Permanent Subcommittee on Investigations | $1,609,692.00 |
| Redacted by the Permanent Subcommittee on Investigations | $5,423.00 |
| Redacted by the Permanent Subcommittee on Investigations | $452,153.93 |
| Redacted by the Permanent Subcommittee on Investigations | $46,720.00 |
| Redacted by the Permanent Subcommittee on Investigations | $286,775.75 |
| Redacted by the Permanent Subcommittee on Investigations | $315,000.00 |
| Redacted by the Permanent Subcommittee on Investigations | $26,700.00 |
| Redacted by the Permanent Subcommittee on Investigations | $290,080.00 |
| Redacted by the Permanent Subcommittee on Investigations | $5,966.90 |
| Redacted by the Permanent Subcommittee on Investigations | $2,127,656.85 |
| Redacted by the Permanent Subcommittee on Investigations | $67,403.00 |
| Redacted by the Permanent Subcommittee on Investigations | $20,000.00 |
| Redacted by the Permanent Subcommittee on Investigations | $41,208.21 |
| Redacted by the Permanent Subcommittee on Investigations | $117,357.07 |
| Redacted by the Permanent Subcommittee on Investigations | $743,030.10 |
| Redacted by the Permanent Subcommittee on Investigations | $47,044.95 |
| Redacted by the Permanent Subcommittee on Investigations | $497,119.92 |
| Redacted by the Permanent Subcommittee on Investigations | $118,078.86 |
| Redacted by the Permanent Subcommittee on Investigations | $103,564.17 |
| Redacted by the Permanent Subcommittee on Investigations | $17,184.16 |
| Redacted by the Permanent Subcommittee on Investigations | $13,481.35 |
| Redacted by the Permanent Subcommittee on Investigations | $10,989.26 |
| Redacted by the Permanent Subcommittee on Investigations | $5,940.36 |
| Redacted by the Permanent Subcommittee on Investigations | $1,082.87 |
| Redacted by the Permanent Subcommittee on Investigations | $1,351,992.94 |
| Redacted by the Permanent Subcommittee on Investigations | $1,176,548.00 |
| Redacted by the Permanent Subcommittee on Investigations | $682,750.11 |
| Redacted by the Permanent Subcommittee on Investigations | $493,305.41 |

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI 019332

MSDW Equity Finance Services I (Cayman) Ltd. - Stock Borrowing Transactions (2000-2007)

| Description | Amount |
|---|---|
| Redacted by the Permanent Subcommittee on Investigations | $431,784.10 |
| Redacted by the Permanent Subcommittee on Investigations | $229,696.78 |
| Redacted by the Permanent Subcommittee on Investigations | $60,638.20 |
| Redacted by the Permanent Subcommittee on Investigations | $81,191.12 |
| Redacted by the Permanent Subcommittee on Investigations | $54,965.24 |
| Redacted by the Permanent Subcommittee on Investigations | $29,504.90 |
| Redacted by the Permanent Subcommittee on Investigations | $5,623.65 |
| Redacted by the Permanent Subcommittee on Investigations | $165,558.66 |
| Redacted by the Permanent Subcommittee on Investigations | $88,731.39 |
| Redacted by the Permanent Subcommittee on Investigations | $65,936.27 |
| Redacted by the Permanent Subcommittee on Investigations | $61,751.35 |
| Redacted by the Permanent Subcommittee on Investigations | $55,439.79 |
| Redacted by the Permanent Subcommittee on Investigations | $27,947.55 |
| Redacted by the Permanent Subcommittee on Investigations | $22,952.11 |
| Redacted by the Permanent Subcommittee on Investigations | $16,344.06 |
| Redacted by the Permanent Subcommittee on Investigations | $851.70 |
| Redacted by the Permanent Subcommittee on Investigations | $1,591.17 |
| Redacted by the Permanent Subcommittee on Investigations | $35,541.72 |
| Redacted by the Permanent Subcommittee on Investigations | $21,790.60 |
| Redacted by the Permanent Subcommittee on Investigations | $139,705.39 |
| Redacted by the Permanent Subcommittee on Investigations | $1,157.21 |
| Redacted by the Permanent Subcommittee on Investigations | $337,103.54 |
| Redacted by the Permanent Subcommittee on Investigations | $33,869.14 |
| Redacted by the Permanent Subcommittee on Investigations | $11,393,884.15 |
| Redacted by the Permanent Subcommittee on Investigations | $9,277.00 |
| Redacted by the Permanent Subcommittee on Investigations | $2,071.44 |
| Redacted by the Permanent Subcommittee on Investigations | $10,116,842.87 |
| Redacted by the Permanent Subcommittee on Investigations | $41,085,948.78 |
| Redacted by the Permanent Subcommittee on Investigations | $30,512,760.06 |
| Redacted by the Permanent Subcommittee on Investigations | $84,144.16 |
| Redacted by the Permanent Subcommittee on Investigations | $23,967.03 |
| Redacted by the Permanent Subcommittee on Investigations | $286,554.00 |
| Redacted by the Permanent Subcommittee on Investigations | $58,056.00 |
| Redacted by the Permanent Subcommittee on Investigations | $6,000,365.60 |
| Redacted by the Permanent Subcommittee on Investigations | $7,097,474.85 |
| Redacted by the Permanent Subcommittee on Investigations | $4,211,361.66 |
| Redacted by the Permanent Subcommittee on Investigations | $1,477,168.58 |
| Redacted by the Permanent Subcommittee on Investigations | $1,430,103.42 |
| Redacted by the Permanent Subcommittee on Investigations | $361,807.51 |
| Redacted by the Permanent Subcommittee on Investigations | $330,231.14 |
| Redacted by the Permanent Subcommittee on Investigations | $138,569.01 |
| Redacted by the Permanent Subcommittee on Investigations | $1,525,365.00 |

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI 019333

529

MSDW Equity Finance Services I (Cayman) Ltd. - Stock Borrowing Transactions  (2000-2007)

| | |
|---|---|
| Redacted by the Permanent Subcommittee on Investigations | $748,999.31 |
| Redacted by the Permanent Subcommittee on Investigations | $360,762.33 |
| Redacted by the Permanent Subcommittee on Investigations | $216,615.33 |
| Redacted by the Permanent Subcommittee on Investigations | $32,588.59 |
| Redacted by the Permanent Subcommittee on Investigations | $9,109.06 |
| Redacted by the Permanent Subcommittee on Investigations | $7,659.95 |
| Redacted by the Permanent Subcommittee on Investigations | $3,101,911.75 |
| Redacted by the Permanent Subcommittee on Investigations | $43,100.00 |
| Redacted by the Permanent Subcommittee on Investigations | $37,514.45 |

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI 019334

530



Page 1 of 1

*FYI + brng in this*
*I'll try 2 clients with issue*
*Any queries with stock ?*
*due to us stock*

| MS-038 | (IED) |

From:      MS-038      (IED)
Sent:      13 December 2004 19:00
To:        TP-050      ( Redacted @eigercap.com)
Subject: Stock Lending

TP-050:

Here is an outline of the key points regarding a stock lending transaction as a way to increase the yield on your position in P

- You would lend your shares to Morgan Stanley for a period to be decided (typically a month)
- At maturity of the stock lending period, Morgan Stanley would pay you:
1) a manufactured dividend equal to the dividends paid over during the period net of the witholding tax that you normally incur ie 85% of gross dividends
2) a stock lending fee equal to 6% of the gross dividends paid during the period

As an example with a special dividend of usd2.0 and a regular quarterly dividend of usd0.20 declared on Dec 7 2004, going ex-dividend on dec 16 2004,
- the manufactured dividend payable to you would be 2.2 times 85% = usd 1.87 per share
- the stock lending fee payable to you would be : 2.2 x 6% = usd 0.132 per share

We would recommend that you look at this potential transaction with your advisors to review the stock lending strategy from a legal and tax standpoint

The next step would be to put a Stock lending agreement in place (OSLA is the generic name and form for these agreements). For this , all we woudl need is the name and address of the shareholding entity holding the P shares.

Given that the stock "goes ex-div" on december 16, 2004, Wednesday this week would be the very last time to implement this transaction.

Best regards
MS-038

All the above terms are purely indicative and will need to be refreshed prior to a transaction.

MS-038
Morgan Stanley & Co. International Limited
25 Cabot Square, Canary Wharf
London E14 4QA, UK
Phone:        Redacted
Fax:     Redacted
Redacted   @morganstanley.com

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may act up/act this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see http://tprsm.ms.com. You should not use email to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via email will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

13/12/2004

Permanent Subcommittee on Investigations
EXHIBIT #45 - FN 152

MS-PSI 020249

531

**From:** Kunukkasseril, Xavier (EFS)
**Sent:** Tuesday, March 01, 2005 10:38 AM
**To:** Rivera, Sean (EFS); Patel, Rajeev (IED); Groom, Eric (EFS); McDougall, Ross (IED); Offei-Addo, Eric (IED)
**Cc:** Abruzzo, Craig (EFS); Johnson, Bruce (IED)
**Subject:** RE: Levin Cayman osla

Sean,

Yes, as Rajeev mentioned, this activity is suspended until a couple of issues are sorted out. I will follow up with you to give you an overview of the outstanding issues.

Thanks,
Xavier

**From:** Rivera, Sean (EFS)
**Sent:** Tuesday, March 01, 2005 9:40 AM
**To:** Patel, Rajeev (IED); Groom, Eric (EFS); McDougall, Ross (IED); Kunukkasseril, Xavier (EFS); Offei-Addo, Eric (IED)
**Subject:** RE: Levin Cayman osla

Eric / Xavier,

I know it's a big issue here, but would like to provide Levin with some color b/c he's looking for some US enhancements on his longs on MO (ex 3/11) and WWVY (ex 3/16)

Sean

**From:** Patel, Rajeev (IED)
**Sent:** Tuesday, March 01, 2005 9:33 AM
**T :** Groom, Eric (EFS); Rivera, Sean (EFS); McDougall, Ross (IED)
**Subject:** RE: Levin Cayman osla

we need to hold off on everything until we get firm clarification on what we can and cant do and what collat we can and cant give

**From:** Groom, Eric (EFS)
**Sent:** 01 March 2005 14:27
**T :** Rivera, Sean (EFS); McDougall, Ross (IED); Patel, Rajeev (IED)
**Subject:** RE: Levin Cayman osla

Raj - Based on our conversations yesterday (re: Sowood), what are we going to be doing here w/r/t collateral ?

**From:** Rivera, Sean (EFS)
**Sent:** Tuesday, March 01, 2005 9:21 AM
**To:** De Coninck, Dennis (IED); Groom, Eric (EFS)

**MS-INT 001962**

file://C:\Documents and Settings\7069\Local Settings\Temp\RE Levin Cayman osla .htm       1/2/2008

**MS-PSI 001478**

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 154**

532

Cc: McDougall, Ross (IED)
Subject: RE: Levin Cayman osla

Hey Dennis.

Can we have an update here?. Client just called looking to trade some US names that are nearer record date.

thanks.

From: De Coninck, Dennis (IED)
Sent: Wednesday, February 23, 2005 12:05 PM
To: Groom, Eric (EFS)
Cc: McDougall, Ross (IED); Rivera, Sean (EFS)
Subject: RE: Levin Cayman osla

I'll have the agreement signed by Cayco overnight and by MS&CO tomorrow morning (Craig Abruzzo is in London), then e-mail signed version to the client.

-----Original Message-----
From: Groom, Eric (EFS)
Sent: 23 February 2005 17:03
To: De Coninck, Dennis (IED)
Cc: McDougall, Ross (IED); Rivera, Sean (EFS)
Subject: RE: Levin Cayman osla

Signed and faxed back to below number.

What is the next step?  The client called today wanting an update.

Thanks,
-eog.

From: De Coninck, Dennis (IED)
Sent: Wednesday, February 23, 2005 10:52 AM
To: Groom, Eric (EFS)
Cc: McDougall, Ross (IED); Rivera, Sean (EFS)
Subject: FW: Levin Cayman osla

-----Original Message-----
From: De Coninck, Dennis (IED)
Sent: 23 February 2005 15:52
To: McDougall, Ross (IED)
Cc: Rivera, Sean (EFS)
Subject: RE: Levin Cayman osla

We have agreed a final form and I e-mailed a sign-off sheet to Eric for signature on 21 Feb.

Eric,
Can you sign the sign-off sheet and fax back to +44.20.7056.1485?

MS-INT 001963

file://C:\Documents and Settings\7069\Local Settings\Temp\RE Levin Cayman osla .htm    1/2/2008

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

MS-PSI 001479

533

Thanks,
Dennis

-----Original Message-----
**From:** McDougall, Ross (IED)
**Sent:** 23 February 2005 15:49
**To:** De Coninck, Dennis (IED)
**Cc:** Rivera, Sean (EFS)
**Subject:** Levin Cayman osla

Dennis, can I get an update please

**Morgan Stanley**

Ross McDougall
Executive Director

MS-INT 001964

Strictly Confidential    MS-PSI 001480
Not for Circulation
Subcommittee M mbers and Staff Only

534

| From: | MS-084 | (IED) < | Redacted | @morganstanley.com> |
| Sent: | Friday, December 7, 2007 6:46 AM |
| To: | MS-134 | (IED) <Redacted@ms.com> |
| Subject: | FW: PB and IPB US Borrows |

---

**From:** MS-083  (IED)
**Sent:** 25 October 2006 08:41
**To:** =SMTP:fpgsource@morganstanley.com; =SMTP:epm@morganstanley.com
**Cc:** =SMTP:   MS-161   @morganstanley.com; =SMTP:   MS-218   @morganstanley.com;
=SMTP:   MS-219   @morganstanley.com;   MS-058  (EFS)
**Subject:** FW: PB and IPB US Borrows

As per Risk Management, we cannot borrow US assets from PB or IPB clients.  We can do so from non PB or IPB clients and are awaiting clarification with regard to dealing with managers who have multiple PB's where the stock we are looking to borrow is held at another PB.

**From:** Vekaria, Manish (IED)
**Sent:** 25 October 2006 08:24
**T :** iadgsp; fpgdiv; d1div
**Cc:** Vekaria, Manish (IED); Martins, Roy (IED); Herne, Nicholas (IED); Berke, Matt (IED)
**Subject:** PB and IPB US Borrows

URGENT AND IMPORTANT

As discussed, we must STOP from borrowing PB and IPB US assets over dividend dates – with immediate effect, this transaction is not approved by Equity Risk Management.

If you have any questions,  please feel free to have a chat with Roy or myself

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 159**

MS-PSI* 020680

535

MSDW Equity Finance Services I (Cayman) Ltd. - Stock On-Lending Transactions (2000-2007)

| Order Placer Name | Principal Name | Total Net Dividends |
|---|---|---|
| Redacted by the Permanent Subcommittee on Investigations | | $273,792,191.56 |
| Redacted by the Permanent Subcommittee on Investigations | | $276,537,466.85 |
| Redacted by the Permanent Subcommittee on Investigations | | $240,449,264.87 |
| Redacted by the Permanent Subcommittee on Investigations | | $58,055,000.16 |
| Redacted by the Permanent Subcommittee on Investigations | | $46,316,102.71 |
| Redacted by the Permanent Subcommittee on Investigations | | $12,601,112.14 |
| Redacted by the Permanent Subcommittee on Investigations | | $142,568,970.79 |
| | | $91,883,724.25 |
| | | $10,465,972.53 |

MS-PSI 019335

Strictly Confidential
Not for Circulation
Subcommittee Members and Staff Only

**Permanent Subcommittee on Investigations**
**EXHIBIT #45 - FN 161**

536

**ATTORNEY-CLIENT PRIVILEGED DOCUMENT
CONFIDENTIAL INTEROFFICE MEMORANDUM**

TO:        JIM ROWEN, JULIAN SALE

FROM:      JULES GOODMAN AND ADRIENNE S. BROWNING, DB AMERICAS TAX DEPT.

SUBJECT:   SWAP TAX POLICY

DATE:      NOVEMBER 12, 2002

**Summary of Meeting on 10/18/02**

Jim Rowen, Julian Sale, Andres Leung, Jules Goodman, and Adrienne Browning met at 3:00 p.m. to discuss the structured finance business conducted out of New York and the related US federal income tax risk related to this business. The discussion was based on a quantitative analysis completed by Nadeem Siddiqui (Controlling) on 9/23/02. The agenda for the meeting is attached.

The following points were noted:

➢ The structured finance business globally transacts swaps with counterparties on many different types of securities. The business traded in New York is based primarily on US securities including common stock, convertible preferred, convertible debt, RICS, REITS, and partnership interests, as well as ADRs. US equities comprise only approximately —% of the outstanding notional of the New York booked business. An estimate of average annual notional on US equity swaps for all clients for 2001 was $2.8billion, with approximately $2billion in notional with foreign persons (non-US) and $.8billion with US persons. Based on an estimated annual dividend yield of 2.6%, U.S. withholding tax at the maximum rate of 30% on all manufactured dividends paid through swaps to foreign persons for this period, would be approximately $12.6 million.

➢ Trading patterns have historically involved DB and the counterparty crossing stock off-exchange at both the commencement and maturity of the swap, with the exception of several clients who request market executions either at commencement or at maturity, or both. The structured finance trading desk has not had sufficient staff to support large-scale market executions. This is changing. Recently, additional clients have requested market execution one or both ways. It is estimated that between 20-25% of all notional amounts currently traded in New York (across all underlying securities) involve market execution one or both ways. In addition, a new trading group, to be run by Steve Miller, has been authorized to support hedge fund market executions. It is anticipated that additional clients will be brought on by the EPS sales team for market executions around swaps, increasing substantially the notionals executed in the market as well as commission revenue for the firm. The analysis reveals that the trading patterns for swaps with foreign vs. US clients are similar.

➢ The stated policy of the structured finance business in New York is that DB will not execute swaps around dividend dates. The policy has been to require clients to hold swap positions for a

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 170**

537

minimum term of 30 days. We cannot force clients to maintain the positions for this period, but strongly discourage early terminations. Nadeem's analysis supports DB's adherence to this policy, indicating an average term of 157 days for long swaps and 110 days for short swaps on US equities.

➢ The quantitative analysis was very difficult to perform because the current operational systems do not maintain the information in a format to support provision of this data. In addition, the transition from ESS4 to ESS5 has changed the way in which information is stored. Many aspects of this analysis had to be manually developed.

**Swap Trading- Going Forward**

The DB Americas Tax Department would like the structured finance business to continue to reduce its US withholding tax risk by increasing, as quickly and to the extent possible, the percentage of market executions around swap trading in US equities with foreign clients. In this regard, it is preferable to execute trades in the market both in and out of the swap. Where only one way market execution is possible, it is preferable to execute into the swap.

The policy of trading for a minimum term should be modified to require a 45-day minimum term, increased from 30 days. The 45 day term, while not mandated by any statute or regulation relating to swaps, conforms to the period of time the IRS believes is necessary to hold foreign stock for foreign tax credit capture, and may provide an analogy for this business as well.

**On-going Documentation**

It is very important to secure accurate data to document the amount of risk assumed by the business on a going forward basis. To this end, we would like you to provide to us the following information on a semi-annual basis:

1. The average notional of *all swaps* traded in New York, separated into foreign and US clients.

2. The same breakdown of all swaps on US equities, itemized by client.

3. The amount of dividends with record dates during the period, itemized per foreign client (one aggregate amount for US clients is fine).

4. Identification of those clients that execute in the market, whether they execute one or both ways, and percentage of notional with at least one way market executions.

5. Average term of swaps on US equities in ESS5 (based on individual transactions, not "basket"), for both US and foreign clients.

Please let us know if you have any questions.

DB-PSI 00000044

538

## APPENDIX A

### Alternative Trading Patterns Under Discussion

**Step-in:** Client has a PB account at another firm. It will direct that other firm to purchase x# shares for Client's account during the trading day. At the end of the day, before the close, Client calls DB and asks whether DB wants to take over the Client's order. If so, DB calls the other firm and directs it to sell the stock to DB at the price originally traded for the Client. DB settles against the other firm. Swap is struck at average acquisition price.

**Trading Along Side:** Client calls DB at beginning of trading day, and informs DB that it will be acquiring stock through another firm during the trading day; x% of which it wants to hold in PB and y% in swap. DB calls the other firm at the beginning of the day, and informs it that DB will purchase y% of stock purchased for Client during that day. DB settles against other firm.

**Market on Close (Listed Names):** DB puts in an order to acquire shares MOC – almost no cost to us. Client, however, will most likely have two commission costs: the first to acquire at its PB account as it accumulates the position, and the second for the MOC sale.

**Market on Close (NASDAQ Names):** DB puts in an order to acquire shares at the last independent closing price after 4pm – almost no cost to us. Client, however, will most likely have two commission costs: the first to acquire at its PB account as it accumulates the position, and the second for the sale. In addition, because there is no mechanism to guarantee the close on NASDAQ stocks, the client will be taking greater risk in the market.

**Securities Futures Contracts:** New financial product on single stock or narrow-based indices or baskets. Futures trade on designated exchanges (currently OneChicago and NQLX), and settle against the related clearinghouse. Further analysis will be done on derivative structures using SSFs.

3

Strictly Confidential--Not for Circulation/Committee Members and Staff Only

DB-PSI 00000045

539

**APPENDIX B**

**Agenda for Discussion**

A. **What is the Equity Prime Services ("EPS") business?**
    1. Swaps, stock lending, and prime brokerage for US and int'l equities PLUS other securities- convertibles, hedge funds, REITS
        a. Booking centers- NY, London, Tokyo, HK, Sidney
    2. Why do clients enter into swaps
        a. Primarily leverage and Reg T
        b. Secondarily: tax related issues- dividends, tax credits (UK), 875/1446 issues, FIRPTA, PFIC blocker trades
    3. Overall volumes and P&L for the global swap business
        a. Number of swaps, number of clients
        b. % volume in US equities
        c. % volume long vs. short

B. **Booking system**
    1. ESS4 to ESS5: what are the differences?
    2. Status of Transition

C. **Trading patterns**
    1. How are swaps traded? (Interaction bx sales and trading)
    2. Why would a client trade the underlying stock in the market vs. cross
        a. Change in trading patterns- more execution in DBSI
        b. How this change is being affected
        c. Single stock futures project
    3. How does a cross work? How is the pricing determined?
    4. Do all clients buy stock back after the swap ends?
    5. Average term: swaps vs. MAPS

D. **Information processing**
    1. What type of information can be obtained from current systems
    2. Prospective changes in IT

Strictly Confidential—Not for Circulation/Committee Members and Staff Only

540

| From: | Wianecki, Karl. | Sent: 02/23/06 6:44 PM. |
|---|---|---|
| To: | Khodadadi, Arlen; Chropuvka, Gary. | |
| Cc: | | |
| Bcc: | | |
| Subject: | RE: Meeting with Deutsche Bank. | |

Works for me

-----Original Message-----
From: Khodadadi, Arlen
Sent: Thursday, February 23, 2006 1:33 PM
To: Chropuvka, Gary; Wianecki, Karl
Subject: FW: Meeting with Deutsche Bank

Based on our outlook calendars, it looks like 1:30pm next Tuesday is free for everyone. Does that time work for you guys?

-----Original Message-----
From: scott.carter@db.com [mailto:scott.carter@db.com]
Sent: Thursday, February 23, 2006 1:08 PM
To: Chropuvka, Gary; Khodadadi, Arlen; Wianecki, Karl
Cc: scott.carter@db.com
Subject: Meeting with Deutsche Bank

Gary/Carl/Arlen,

Are you all available next Tuesday 2/28 at 1 PM for a meeting to discuss securities lending in detail?

Specifically:
- Yield Enhancement

- Response to Arlen's email on rates in the current book

Regards,

Scott

Scott Carter
Director
Global Prime Services
Deutsche Bank Securities, Inc.
60 Wall Street
New York, NY 10005
(P) 212-250-4950
(F) 212-797-7374
scott.carter@db.com

**Permanent Subcommittee on Investigations**
**EXHIBIT #45 - FN 179**

Confidential Proprietary Business Information
The Goldman Sachs Group Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

GS-PSI-05736

541



DAVIBEN.LNDB@bloo     To: SHAHCHI.LNDB@bloomberg.net
mberg.net             cc:
02/12/2007 04:40 PM   Subject:

=====Begin Message=====
Message#: 306247
Message Sent: 02/12/2007 11:40:41
From: DAVIBEN.LNDB@bloomberg.net|BEN DAVIES|DEUTSCHE BANK AG, LO|1726\7279|
To: SHAHCHI.LNDB@bloomberg.net|CHIRAAG SHAH|DEUTSCHE BANK AG, LO|1726|115008
Subject:

mate - can you use NVS US for div? Thanks
Reply:
yep we can use it - do you need dates?
Reply:
CHECK WITH THE GUYS ON THIS...ITS A GDR SO A LITTLE
DIFFERENT...ALSO CAN YOU GET ME THE PRU DATES PLEASE. CPTY
GOING NUTS AT ME
=====End Message=====

Permanent Subcommittee on Investigations
EXHIBIT #45 - FN 180

DB-PSI 0005147q

542

 CORNMAR.LNDB@blo
omberg.net          To: SHAHCHI.LNDB@bloomberg.net
                    cc:
03/12/2007 01:23 PM   Subject:

=====Begin Message=====
Message#: 164659
Message Sent: 03/12/2007 08:23:51
From: CORNMAR.LNDB@bloomberg.net|MARTIN CORNELL|DEUTSCHE BANK AG,
LO|1726|160513
To: SHAHCHI.LNDB@bloomberg.net|CHIRAAG SHAH|DEUTSCHE BANK AG, LO|1726|115005
Subject:

Hi Martin - I understand you spoke to Shane last week about
some US stocks - MO and RAI - related to dividends. I am going
to be trading these, and so I was wondering if the positions I
see in I-delta is what I can trade?
Reply:
Hi - what do you mean by I-delta?
Reply:
ok sorry - its our system which shows stock quantities. do you
want to trade 1,908,100 shares of MO US and 150,000 shares of
RAI? We can give you 97.5% of the dividends on those names
Reply:
yes, thats the correct size. thanks mate
=====End Message=====

Permanent Subcommittee on Investigations
EXHIBIT #45 - FN 181

DB-PSI 00002356

543

Simon Pearson            To: Adrian Todd/db/dbcom@DBAPAC
03/12/2007 06:20 PM      cc:
                         Subject: Re: Travel Dates

us mkt for div is traded out of London.  I think Rich resigned last week but not 100% sure.  Give me a call
tomorrow to discuss your US ideas if you want...cheers

Simon Pearson

Inventory Management - Complex Equity
Office +44 207 547 3237
Mobile/Blackberry ▇▇▇▇▇▇▇
Home ▇▇▇▇                                    ┌─────────────────────────────┐
Fax +44 113 336 1598                         │ ── = Redacted by the Permanent │
Deutsche Bank AG London                      │      Subcommittee on Investigations │
Global Markets                               └─────────────────────────────┘
1 Great Winchester Street
London EC2N 2EQ

Adrian Todd/db/dbcom@DBAPAC

        Adrian
        Todd/db/dbcom@DBAPAC         To  Simon-GEF Pearson/DMGEQ/DMG UK/DeuBa@DBEMEA
        03/11/2007 09.52 PM          cc

                                     Subject  Travel Dates


Chief

I'm in NY on 19th & 20th and London 21st-23rd

In NY - I intend to sit down w/ Rich Kennedy to follow up on some illiquid Equity trades we're doing, but
also to talk about structures that I developed many years ago, which might be of interest.  Do you get
involved in the US mkt at all?

Pencil in a slot for a catch up

Todd

Global Markets Equity - Structuring

Tel:      +61 2 8258 2322
Mob:      ▇▇▇▇▇▇▇

┌─────────────────────────────────────┐
│ Permanent Subcommittee on Investigations │
│       EXHIBIT #45 - FN 182               │
└─────────────────────────────────────┘

DB-PSI 00007343

544

| Code | Fund |
|------|------|
| **Counterparty Names for DBIL Stock Lending Transaction Information** | |
| A | |
| B | |
| C | |
| D | |
| E | |
| F | |
| G | |
| H | |
| I | |
| J | |
| K | |
| L | |
| M | |
| N | |
| O | |
| P | |
| Q | |
| R | |
| S | |
| T | |
| U | |
| V | |
| W | |
| X | |
| Y | |
| Z | |
| aa | |
| bb | |
| cc | |
| dd | |
| ee | |
| ff | |
| gg | |
| hh | |
| ii | |
| jj | |
| kk | |
| ll | |
| mm | |
| nn | |
| oo | |
| pp | |

**Redacted by Permanent Subcommittee on Investigations**

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 190**

545



| qq |
| rr |
| ss |
| tt |
| uu |
| vv |

**Redacted by Permanent Subcommittee on Investigations**

546

DB&L Stock Lending Transaction Information



THIS COLUMN REDACTED ON ALL PAGES BY THE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

ictly Confidential-Not for Circulation/Committe imbers and Staff Only

DB-PSI 00000499

547

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000500

548

DBTL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000501

549

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000502

550

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

551



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

552



DBL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000505

553

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000508

554



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000507

555



DBL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000508

556



DBL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000509

557

DBL Stock Lending Transaction Information.



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000510

558



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000511

559

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000512

560

DB/IL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000513

561

DBSL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

562

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000515

563

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000516

564

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

565



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000518

566



DBIL Stock Lending Transaction Information

DB-PSI 00000519

567

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

568

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000521

569

DB&L Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000522

570



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

571



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

572

DBL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000525

573

DBL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000526

574

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

575

DBL Stock Lending Transaction Information

| RegisterRef | Borrow Loan | Entity Code | PC | SecDescription | Cusip | Ticker | Initial Quantity | Initial Weighted AvgPx | InitialRate | ValueCcy | InitialValue | OpenDate | SettleDate | CloseDate Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000528

576

DBL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000529

577



DBIL Block Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 0000053C

578

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

579

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000532

580

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000533

581

DBIL Stock Lending Transaction Information

| BargainRef | Borrow Lent | Entity Code | FC | SecDescription | Cusip | Ticker | Curncy | Initial Quantity | Initial Weighted AvgFee | InterestRate | ValueCcy | InitialValue | OpenDate | Syndicate Date | Cancellation Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

582

DB/IL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000535

583



DB IL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000538

584

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

585

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000538

586

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

587

DB/IL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000540

588

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

589



DB-PSI Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000542

590

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

591



DBL Stock Lending Transaction Information

592



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000545

593

DB/IL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

594

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000547

595

DBL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000548

596

DBL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

597

DB/L Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000550

598

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000551

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

600



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

601



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000554

602

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

603

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000556

604

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000557

605

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

606

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000559

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000560

608

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

609



DBSL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000562

610

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000563

611

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

612

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committee Members and Staff Only

614

DB/L Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committee Members and Staff Only

615



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000568

616

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB Stock Lending Transaction Information



| Sopule/Ref | Barrow Loan | Entity Code | PC | SecDescription | Cusip | Ticker | Qnty | Initial Quantity | Initial Weighted Avg Fee | InitialRate | ValueQcy | InitialValue | OpenDate | SecSettle Date | CloseSettle Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

618

DB&L Stock Lending Transaction Information



| BorrowNum | Borrow Loan | Entity Code | P/C | Sect/Issue/Num | Cusip | Ticker | Qnty | Initial Quantity | Initial Weighted Average | InitialTrade | WtxtCcy | InitialValue | OpenDate | RealSettle Date | CloseSettle Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000571

619

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

620



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

621

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000574

622



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000575

623

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000576

624

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000577

625



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000578

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

627



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000580

628



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000581

629



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committee
Members and Staff Only

DB-PSI 00000582

630



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000583

631

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

632

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000585



633

DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000586

634

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000587

635



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000588

636

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000589

637

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

638



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

639

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000592

640



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000593

641

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000594

642

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

643



DBL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000596

644



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

645

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

646

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committee
Members and Staff Only

DB-PSI 00000599

647

DB/L Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

648



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

649

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000602

650



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000603

651

DB/IL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000604

652



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000605

653

DBL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

654

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committee Members and Staff Only

DB-PSI 00000607



DBIL Stock Lending Transaction Information

655

Strictly Confidential-Not for Circulation/Commitee Members and Staff Only

DB-PSI 00000608

656

DBIL Stock Lending Transaction Information



111

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000609

657

DBIL Stock Lending Transaction Information



112

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000610

658

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000611



659

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000612

660

DBL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

661

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000614

662

DBL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committee Members and Staff Only

663



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000616

664



DB/IL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000617

665

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PS1 00000618

666

DBL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committee Members and Staff Only

667

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000620

668



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000621

669

DBL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

670

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000623

671



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000924