# Exhibit 8_K

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000625



673

DBL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

674



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000627

675

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

676

DBL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

677



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000630

678



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000631

679

UBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

680

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000633

681

DB SL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committee Members and Staff Only

DB-PSI 00000634

682

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000635

683

DBL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

684

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000637

685

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000638

686



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000639

687

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

688



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

689



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

690

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000643

691



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000644

692



DBL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

693

DBIL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

694



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000647

695

DB/L Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI 00000648

696

DB/IL Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000849

697



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

698

DBSI Stock Lending Transaction Information



Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI 00000651

699



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

700



DBIL Stock Lending Transaction Information

Strictly Confidential-Not for Circulation/Committe
Members and Staff Only

DB-PSI  00000653

DBIL Stock Lending Transaction Information

| BargltdRef | Borrow Loan | Entity Code | PC | SecDescription | Cusip | Ticker | Cparty | mtm Quantity | mtm Weighted AvgPrice | mtmRate | ValueCcy | valueValue | OpenDate | SecSettle Date | CcyBSettle Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | B | DBL | | CHUGOKU BANK | | | | | | | USD | | | | |
| | B | DBL | | PROCTER & GAMBLE CO | | | | | | | USD | | | | |
| | B | DBL | | SPROCTER & GAMBLE CO | | | | | | | USD | | | | |
| | B | DBL | | CITIGROUP INC | | | | | | | USD | | | | |
| | B | DBL | | PROCTER & GAMBLE CO | | | | | | | USD | | | | |
| | B | DBL | | HARVEST COMMUNICATIONS INTL | | | | | | | USD | | | | |
| | B | DBL | | HASBRO INC | | | | | | | USD | | | | |
| | B | DBL | | EUR Cash Security | | | | | | | EUR | | | | |
| | B | DBL | | EUR Cash Security | | | | | | | EUR | | | | |
| | B | DBL | | EUR Cash Security | | | | | | | EUR | | | | |
| | B | DBL | | PROCTER & GAMBLE CO | | | | | | | USD | | | | |
| | B | DBL | | GOLDMAN SACHS GROUP INC | | | | | | | USD | | | | |
| | B | DBL | | AMERICAN INTERNATIONAL GROUP | | | | | | | USD | | | | |
| | B | DBL | | SOUTHWEST AIRLINES CO | | | | | | | USD | | | | |
| | B | DBL | | BANK OF AMERICA CORPORATION | | | | | | | USD | | | | |
| | B | DBL | | SOUTHERN CO | | | | | | | USD | | | | |
| | B | DBL | | EUR Cash Security | | | | | | | EUR | | | | |
| | B | DBL | | EUR Cash Security | | | | | | | EUR | | | | |

Strictly Confidential-Not for Circulation/Committe Members and Staff Only

DB-PSI  00000654

702


UBS Investment Bank

# Dividend Enhancement

## On Long Positions

- **In general what does Dividend enhancement offer me?**

A Cayman Islands (or other offshore) domiciled Hedge Fund enjoys legal and administrative benefits associated with offshore incorporation. However, one downside to being domiciled in a jurisdiction that does not have an income tax treaty with the United States is that dividends on your US equity holdings are subject to a 30% withholding tax, which reduces the net yield of such holdings. Dividend enhancement provides incremental revenue to significantly mitigate this yield loss.

- **How do I get started?**

We will evaluate your long positions to determine enhancement potential.   Please advise us of any positions held at other brokers or custodians and we will include those positions in our analysis.

UBS will conduct a suitability review and processes internal approvals.

Simultaneously, we will ask you to execute a Global Master Securities Lending Agreement (GMSLA) with UBS Cayman Ltd.   We will also need to obtain from you an updated W-8 tax form.

- **Once I'm signed up, what's next?**

We'll contact you in advance of each enhancement opportunity.   We will confirm the number of shares and the value of the enhancement with you.   The enhancement provides you with (a) a 'substitute dividend' equivalent to your original 70% entitlement, plus (b) a stock borrow fee that increases your total yield to 85% or more.

**Example:**

200,000 shares Altria (MO); Dividend $0.73/qtr

**Without enhancement:**
Gross dividend: 200,000 x $0.73 = $146,000
Withholding for Cayman holder (30%) = ($43,800)
Net Dividend Received (70%) = $102,200

**With enhancement:**
Gross dividend: 200,000 x $0.73 = $146,000
Withholding for Cayman holder (30%) = ($43,800)
Substitute Dividend Received (70%) = $102,200
Stock Borrow Fee (20%) = $29,200
All-in yield (90%) = $131,400
Enhancement benefit: $29,200 (quarterly)

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 199**

**UBS 000529**

703

 UBS Investment Bank

- **How does the Stock Borrow work?**

There is an active market in borrowing and lending US securities. The borrower pays a fee to the lender for the use of stock for a period of time. UBS Cayman Ltd. (UBSC) borrows your stock (which it uses to facilitate the trading strategy of its clients) and pays you a stock borrow fee. While the stock is borrowed, UBSC provides cash equal to the stock's market value as collateral to you. You can invest this cash. The stock borrow fee that you receive (minus the 'rebate' paid by you on the cash collateral) enhances your investment yield.

- **Will this impact my trading or positions in any other way?**

In some cases, we may ask you to hold a position for up to 45 days but most trades are structured for a week or less. For the longer-term trades, the fund's Portfolio Manager may be consulted to confirm the intention to hold the shares for the longer period. We realize that in certain instances portfolios may unexpectedly sell shares that have committed to a term loan, and we can accommodate this, however in this event, restructuring costs may reduce the stock borrow fee.

- **What is a 'substitute dividend' and implications to me?**

When your shares are loaned over a dividend record date, instead of receiving the actual dividend, UBS Cayman Ltd. pays you a dividend equivalent amount as a substitute dividend. When the beneficial owner of the loaned stock position is a non-U.S. resident, there is generally no difference between the receipt of actual or substitute dividend payments. If the offshore entity is a partnership with some U.S. resident partners, receipt of an actual dividend may be preferable to a substitute, depending on the value of the stock borrow fee (enhancement) and other factors such as holding period of the stock and whether the position is hedged.

- **Is lending my shares a taxable event?**

No. Stock loans are not recognized as taxable events as long as conditions set forth in I.R.C. § 1058 are met. These include an agreement for borrower to return identical securities, the payment of substitute dividends from borrower to lender, and no change in lender's exposure to market gain and loss as a result of entering into the lending transaction. UBS Cayman's enhancement transaction with you is structured to meet these requirements.

As with all tax matters, you are strongly urged to consult with your own tax advisors with respect to any questions that you may have with respect to enhancement opportunities.

UBS Securities LLC is a subsidiary of UBS AG.UBS Investment Bank is a business group of UBS AG.
© 2005 UBS. All rights reserved.

**Confidential Treatment
Requested**

**UBS 000530**

704

 UBS Investment Bank

# Dividend Enhancement

## On Short Positions

♦ **In general what does Short Dividend Enhancement offer me?**

When a fund is short over a stock's record date, it is generally obligated to pay a manufactured dividend to the stock lender in order to make such lender whole with respect to the dividend that it would have received had it not loaned the stock. Under current market convention where US stocks are typically borrowed from US lenders, the amount of such manufactured payment is equal to 100% of the actual dividend amount. The goal of short dividend enhancement is to reduce the manufactured dividend charge to an amount less than 100% of the dividend.

♦ **How do I get started?**

We will evaluate your short positions in order to determine enhancement potential.    Please advise us of any short positions held at other brokers or custodians and we will also include those in our analysis.

UBS conducts a suitability review and processes internal approvals.

Simultaneously, we will ask you to execute a Global Master Securities Lending Agreement (GMSLA) with UBS Cayman Ltd.   We will also need to obtain an updated W-8 tax form from you.

♦ **How does it work?**

Short sellers normally pay a manufactured dividend equal to 100% of the actual dividend because US lenders are entitled to receive 100% of the underlying dividend and therefore require 100% in order to be made whole.  However, UBS Cayman Ltd. has access to shares owned by holders domiciled in countries that do not have an income tax treaty with the United States and therefore are not entitled to the full 100% of the dividend amount.  UBS Cayman Ltd. lends these 'cheaper shares' directly into your account, taking back margin release cash as collateral.  On record date, we record your account as flat (rather than short).  Instead, you are borrowing the shares and will be charged a dividend charge of 70%.  In addition, you will incur a stock loan fee.  Together, these charges will reflect a savings of approximately 3 to 5% of the short dividend charge.  The borrowed stock and cash collateral are returned after 4 to 5 days.

♦ **Once I'm signed up, what's next?**

We'll contact you in advance of each enhancement opportunity in the event that shares are available from an off-shore lender to cover your position.

UBS Securities LLC is a subsidiary of UBS AG.UBS Investment Bank is a business group of UBS AG.
© 2005 UBS. All rights reserved.

**Confidential Treatment Requested**

UBS 000531

705



**An example:**

Short 500,000 shares Merck (MRK); Dividend $0.38/qtr

**Without enhancement:**
Dividend charge to short: 500,000 x $0.38 = $190,000

**With enhancement:**
Stock Loan charge at 96% of dividend = $182,400
Enhancement benefit: $7,600 (quarterly)

- **Are there any other requirements for successful short dividend enhancement?**

The short position needs to be maintained over record date. If the position is covered before that date, enhancement will not be possible.

UBS Securities LLC is a subsidiary of UBS AG. UBS Investment Bank is a business group of UBS AG.
© 2005 UBS. All rights reserved.

**Confidential Treatment
Requested**

**UBS 000532**

706

# Why offer Dividend Enhancement?

It differentiates us from our competitors and provides an opportunity for us to speak with Hedge Funds.

It's profitable. Estimated 2005 P&L is $5 million. This amount should easily double next year after audited financials allow us to gather supply from external lenders. Currently, BGI, MLIM, JPM, SSB and others lend '70%' stock which we could borrow cheaply to enhance short positions.

Often, Hedge Fund will move positions in and leave them with us to gain the enhancement. This increases balances. Conversely, they will move positions to competitors if we can't offer enhancement.

It wins us new / added business that can generate P&L in other firm 'silos'. Some examples:

-2003 Carlson begins year with $40 million in short balances. We begin long & short enhancing & their balance jumps to $1.2 billion by year-end.

-2002 Highfields awards highly sought after PB mandate to CSFB yet we begin to enhance as a way to build a relationship. In early 2004, we are called in to pitch PB as a replacement for DB whom they intend to fire. Today's short balance is $500+ million.

-2005 Canyon Capital rejects adding another PB but is willing to develop a relationship. We begin long and short enhancing as well as fully paid borrows on bonds and equities. Confident this will lead to a PB mandate.

-2005 SAC Capital similar to Canyon situation mentioned above.

-2005 Principled begins enhancing and after becoming comfortable with our reports, agree to lend us fully paid securities. We immediately borrow $200 million of hard to borrow Calpine bonds for Prop and Hedge Funds to short.

-2004 Och Ziff begins to actively enhance. Balances are up substantially.

Permanent Subcommittee on Investigations

**EXHIBIT #45 - FN 201**

**UBS 000512**

707

Orchestria iConsole

Mail (Plain Text, No Attachments)

| | |
|---|---|
| From: | Silvio, Anthony |
| To: | Catherine Carr [ccarr@pcm-us.com]; |
| Bcc: | Catherine Carr [ccarr@pcm-us.com]; |
| Subject: | RE: Dividend Enhancement |
| Received: | Wednesday, September 01, 2004 11:04:58 AM |

Thank you.

-----Original Message-----
From: Catherine Carr [mailto:ccarr@pcm-us.com]
Sent: Wednesday, September 01, 2004 11:05 AM
To: Silvio, Anthony
Subject: RE: Dividend Enhancement

Mom my CFO is still looking at this to make sure there are no issues -
I will let you know as soon as I can - thx

-----Original Message-----
From: Anthony.Silvio@ubs.com [mailto:Anthony.Silvio@ubs.com]
Sent: Wednesday, September 01, 2004 11:01 AM
To: Catherine Carr
Subject: RE: Dividend Enhancement

Catherine,

Did you have any questions?

-----Original Message-----
From: Catherine Carr [mailto:ccarr@pcm-us.com]
Sent: Monday, August 30, 2004 11:23 AM
To: Silvio, Anthony
Subject: RE: Dividend Enhancement

Mom - I am pretty sure we will want to do this but would like to
forward it on to my CFO and also Garry just to make sure they have no
issues - thx will come back to you asap

-----Original Message-----
From: Anthony.Silvio@ubs.com [mailto:Anthony.Silvio@ubs.com]
Sent: Mon 8/30/2004 11:15 AM
To: Catherine Carr
Cc:
Subject: Dividend Enhancement

Catherine,

As per our conversation Friday we would like to sign your
offshore accounts to a GMSLA agreement with our UBS Cayman entity so you
can benefit from our enhanced dividend program.

Here is a brief description of how it works.

Long positions

Currently you are entitled to 70% of any US dividend in the
offshore account. With these agreements we would borrow your stock and
lend it to a third party. By doing this we will be able to enhance your
dividend (85% on average).

e.g. Expressway Partners is long 144700 BAC.

70% of the dividend comes out to $45,580. If we are able to find
an offshore short we can enhance your dividend and additional 15%
($9,767.25) for each quarter you have the position.

Short positions

You are currently liable for 100% of the dividend. If we cover
your short (lend you the shares) through the Cayman entity we can reduce
your liability. (97% on average)

**Confidential Treatment**

UBS 000653

Permanent Subcommittee on Investigations
EXHIBIT #45 - FN 206

http://nstm0645pww.stm.swissbank                                GetMailSum...    1/30/2008

708

We are currently providing this service to a great number of our
clients. Please let me know if you have any questions.

Regards,

Anthony Silvio

Director
Global Equity Finance
Telephone: 212-713-4310
Facsimile: 212-713-2816
Anthony.silvio@ubs.com

This communication is issued by UBS AG or an affiliate ("UBS")
by the
Sales or Trading Department to institutional investors only and
is not
research. It is for informational purposes and is not an
official
confirmation of terms. It is not guaranteed as to accuracy, nor
is it
a complete statement of the financial products or markets
referred to.
Opinions expressed are subject to change without notice and may
differ
or be contrary to the opinions or recommendations of UBS
Investment.
Research or the opinions expressed by other business areas or
groups
of UBS as a result of using different assumptions and criteria.
UBS
may maintain long or short positions in the financial
instruments
referred to and may transact in them as principal or agent.
Unless
stated specifically otherwise, this is not a recommendation,
offer or
solicitation to buy or sell and any prices or quotations
contained
herein are indicative only. UBS may provide investment banking
and
other services to, and/or its officers/employees may serve as
directors of, the companies referred to in this material. To the
extent permitted by law, UBS does not accept any liability
arising
from the use of this communication. For additional information,
please contact your local sales or trading contact.

Copyright 2004 UBS. All rights reserved. Intended for
recipient
only and not for further distribution without the consent of
UBS.

**Confidential Treatment**
**Requested**                    **UBS 000654**

709

αβ

STRICTLY PRIVATE AND CONFIDENTIAL

23 January 2004

# UBS Cayman Ltd Capital Request

**Request for Circular GEB Approval**

To:    Members of the GEB

UBSIB Executive Committee

Contact: Jonathan Britton                                              19 31 72258

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 207**    UBS 000521    Page 1 of 4

710

αβ

Confidential Treatment
Requested

UBS 000522

| 1. | Request | | | | | |
|---|---|---|---|---|---|---|
| UBS IB Executive Committee requests the following facilities for UBS Cayman Ltd and UBS PW Int'l Inc. | | | | | | |
| Type of Facility all in million | | Existing Limits | Increase | New Limit/Capital | Tenor | Counter-party |
| Unsecured, Uncommitted Money Market Line for **UBS PW Int'l Inc.** | | – | USD 170 (CHF 212.5) | USD 170 (CHF 212.5) | 1y | UBS AG, Cayman |
| Capital Injection for **UBS Cayman Ltd.** | | USD 40 | USD 160 | USD 200 | – | UBS PW Int'l Inc |

**2.      Executive Summary**

UBS Hedge Fund Services (HFS) provides dividend enhancement to hedge fund clients through the entity, UBS Cayman Ltd. (UBSC).  To be competitive on price and service, UBSC must maintain relationships and adequate credit lines with lenders of stock.  The better capitalization will address concerns of institutional clients with respect to credit quality and will allow expansion of its stock borrowing and lending relationships to non-affiliate counterparts.

The injection will yield US$ 8 million in direct revenues in year 1 plus give us a significant engine for growth of our Prime Brokerage franchise. In contrast, as the capital injection will be 100% leveraged, from a Parent Bank (UBS AG) perspective, only the loan to UBS PW Int'l Inc requires Regulatory Capital underpinning at 8% meaning a capital impact of $13.6 million. On a Group consolidated basis the impact is zero.

**3.      Reasoning and Background**

**Ownership/Purpose of Subsidiary:**

UBS Cayman Ltd. is a wholly owned subsidiary of UBS PW Int'l Inc., which is wholly owned by UBS Americas Inc.  UBS Americas Inc. is a wholly owned subsidiary of UBS AG.

UBS Cayman Ltd. was formed in 1999 to facilitate long dividend enhancement for the firm's hedge fund clients, and in 2001 added short dividend enhancement services.

**Business Summary/Rationale**

The HFS business group (Hedge Fund Services) provides services for the Bank's hedge fund clients, including clearance, custody, financing, securities borrowing and lending, trade executions, reporting, and capital introductions.  Revenue is generated in the form of interest spreads, fees, and commissions.

Many offshore clients are domiciled in the Cayman Islands.  To attract, retain, and grow clients, HFS provides valued-added Services. Long dividend enhancement allows a client

711

αβ

**Confidential Treatment** **UBS 000523**
**Requested**

to maximize net after tax dividend yield on long positions. Short dividend enhancement allows clients to minimize dividend and fee costs incurred on short positions. Our ability to provide these services is a key selling point for clients. Our success is dependent upon access to a strong market supply of borrowable, low cost stock.

We currently borrow stock into Cayman via UBS affiliates in London and Zurich, incurring a 15% tax withholding cost (due to UK and Switzerland treaties with the U.S.). UBSC can eliminate this cost and broaden its supply base by borrowing directly from market counterparts.

HFS has worked closely with Regional Tax, Group Treasury, Compliance, Legal, FCD, outside counsel and counterparts to find a solution to our business need. We vetted and rejected several alternatives, including a parental guarantee and/or use of affiliate intermediaries, none of which were acceptable from a tax, regulatory, or bank policy standpoint.

Stock lenders have advised that UBSC's modest capitalization would result in small or no credit lines, or a request for greater over-collateralization (possibly up to 120%) which carries (a) a direct capital charge, (b) increased credit risk to UBS and (c) incremental costs of borrowing. Some competitors (MS, Barclays, ING) have addressed this issue by providing a parental guarantee of their Cayman entity. As stated UBS Group policy is not to give guarantees (with very few exceptions made) this solution is not available to UBSC due to other pre-existing business in the Cayman subsidiary which does not require a guarantee and UBS restrictive approach for parental support. Hence a leveraged capital injection is the optimal route.

Since lenders generally limit the number of counterparts they sign, we need to establish UBS relationships as soon as possible to avoid being locked out of key sources of supply

**Revenue and Client penetration impact:**

Besides supporting short dividend enhancements for clients, stock obtained can be put on swap with our proprietary desk which has similar demand. In addition, we will sign up with other Cayman market borrowers to on-lend excess stock at a spread.

Anticipated benefits include:

-Year one incremental revenue of $8mm from short dividend enhancements and swap facilitation. (scalable upwards without further needed capital).

-Significant factor in support of HFS efforts to attract, retain, and grow hedge fund clients. . (Example: Carlson Capital, a tier 1 bank client, had $40 million short balances with HFS when we offered this product to them. Their balance is now over $1 billion).

Initial targeted clients include Highbridge, Highfields, Andor, Canyon, Blue Ridge, & Lone Pine.

**Funding/Capital Issues:**

UBS PW Int'l Inc will receive a loan of $170mm to allow for interest to be capitalized during the year until dividends are paid. UBS PW Int'l Inc. will inject $160mm as capital into UBS Cayman Ltd. Therefore UBS AG need only underpin the loan to UBS PW Int'l Inc with 8% ($13.6 mm reg.capital).

712

αβ

As the capital will not be needed to fund business activities, funds will be invested back to UBS AG Cayman branch in the same tenor (rolled on a monthly basis) as the capital.

On a Group level the capital injection is netted out upon consolidation.

The $160mm infusion level provides adequate capital (based on counterpart meetings and competitive knowledge) for needed credit extensions.  UBSC's resulting $200mm capital ($40mm currently) is leveragable for lines across multiple market lenders. Any future profits will be paid as dividends annually to the parent in order to keep the capital level at $200mm. Capital can be repatriated without negative tax or legal consequences.

**Bulk Risk Issues:**
The entity is exempt from the bulk risk calculation.

## REDACTED

| 4. | Approvals |
|----|-----------|

The facility is requested and supported by Richard Del Bello and Ian Stratford-Taylor.

**Confidential Treatment Requested**       **UBS 000524**       Page 4 of 4

713

αβ

STRICTLY PRIVATE AND CONFIDENTIAL

23 January 2004

# UBS Cayman Ltd Capital Request

**Request for Circular GEB Approval**

To:   Members of the GEB

714

αβ

Confidential Treatment Requested          UBS 000526

| 1. Request | | | | | |
|---|---|---|---|---|---|
| UBS IB Executive Committee requests the following facilities for UBS Cayman Ltd and UBS PW Int'l Inc. | | | | | |
| Type of Facility *all in million* | Existing Limits | Increase | New Limit/Capital | Tenor | Counter-party |
| Unsecured, Uncommitted Money Market Line for **UBS PW Int'l Inc.** | – | USD 170 (CHF 212.5) | USD 170 (CHF 212.5) | 1y | UBS AG, Cayman |
| Capital Injection for **UBS Cayman Ltd. (RXM C12478)** | USD 40 | USD 160 | USD 200 | – | UBS PW Int'l Inc |

**2.    Executive Summary**

UBS Hedge Fund Services (HFS) provides dividend enhancement to hedge fund clients through the entity, UBS Cayman Ltd. (UBSC).  To be competitive on price and service, UBSC must maintain relationships and adequate credit lines with lenders of stock.  The better capitalization will address concerns of institutional clients with respect to credit quality and will allow expansion of its stock borrowing and lending relationships to non-affiliate counterparts.

The injection will yield US$ 8 million in direct revenues in year 1 plus give us a significant engine for growth of our Prime Brokerage franchise. In contrast, as the capital injection will be 100% leveraged, from a Parent Bank (UBS AG) perspective, only the loan to UBS PW Int'l Inc requires Regulatory Capital underpinning at 8% meaning a capital impact of $13.6 million. On a Group consolidated basis the impact is zero.

**3.    Reasoning and Background**

**Ownership/Purpose of Subsidiary:**

UBS Cayman Ltd. is a wholly owned subsidiary of UBS PW Int'l Inc., which is wholly owned by UBS Americas Inc.  UBS Americas Inc. is a wholly owned subsidiary of UBS AG.

UBS Cayman Ltd. was formed in 1999 to facilitate long dividend enhancement for the firm's hedge fund clients, and in 2001 added short dividend enhancement services.

**Business Summary/Rationale**

The HFS business group (Hedge Fund Services) provides services for the Bank's hedge fund clients, including clearance, custody, financing, securities borrowing and lending, trade executions, reporting, and capital introductions.  Revenue is generated in the form of interest spreads, fees, and commissions.

Many offshore clients are domiciled in the Cayman Islands.  To attract, retain, and grow clients, HFS provides valued-added Services.  Long dividend enhancement allows a client

715

αβ

Confidential Treatment
Requested

UBS 000527

to maximize net after tax dividend yield on long positions. Short dividend enhancement allows clients to minimize dividend and fee costs incurred on short positions. Our ability to provide these services is a key selling point for clients. Our success is dependent upon access to a strong market supply of borrowable, low cost stock.

We currently borrow stock into Cayman via UBS affiliates in London and Zurich, incurring a 15% tax withholding cost (due to UK and Switzerland treaties with the U.S.). UBSC can eliminate this cost and broaden its supply base by borrowing directly from market counterparts.

HFS has worked closely with Regional Tax, Group Treasury, Compliance, Legal, FCD, outside counsel and counterparts to find a solution to our business need. We vetted and rejected several alternatives, including a parental guarantee and/or use of affiliate intermediaries, none of which were acceptable from a tax, regulatory, or bank policy standpoint.

Stock lenders have advised that UBSC's modest capitalization would result in small or no credit lines, or a request for greater over-collateralization (possibly up to 120%) which carries (a) a direct capital charge, (b) increased credit risk to UBS and (c) incremental costs of borrowing. Some competitors (MS, Barclays, ING) have addressed this issue by providing a parental guarantee of their Cayman entity. As stated UBS Group policy is not to give guarantees (with very few exceptions made) this solution is not available to UBSC due to other pre-existing business in the Cayman subsidiary which does not require a guarantee and UBS restrictive approach for parental support. Hence a leveraged capital injection is the optimal route.

Since lenders generally limit the number of counterparts they sign, we need to establish UBS relationships as soon as possible to avoid being locked out of key sources of supply

**Revenue and Client penetration impact:**

Besides supporting short dividend enhancements for clients, stock obtained can be put on swap with our proprietary desk which has similar demand. In addition, we will sign up with other Cayman market borrowers to on-lend excess stock at a spread.

Anticipated benefits include:

-Year one incremental revenue of $8mm from short dividend enhancements and swap facilitation. (scalable upwards without further needed capital).

-Significant factor in support of HFS efforts to attract, retain, and grow hedge fund clients. . [Example: Carlson Capital, a tier 1 bank client, had $40 million short balances with HFS when we offered this product to them. Their balance is now over $1 billion].

Initial targeted clients include Highbridge, Highfields, Andor, Canyon, Blue Ridge, & Lone Pine.

**Funding/Capital issues:**

UBS PW Int'l Inc will receive a loan of $170mm to allow for interest to be capitalized during the year until dividends are paid. UBS PW Int'l Inc. will inject $160mm as capital into UBS Cayman Ltd. Therefore UBS AG need only underpin the loan to UBS PW Int'l Inc with 8% ($13.6 mm reg capital).

716

αβ

As the capital will not be needed to fund business activities, funds will be invested back to
UBS AG Cayman branch in the same tenor (rolled on a monthly basis) as the capital.

On a Group level the capital injection is netted out upon consolidation.

The $160mm infusion level provides adequate capital (based on counterpart meetings and
competitive knowledge) for needed credit extensions. UBSC's resulting $200mm capital
($40mm currently) is leveragable for lines across multiple market lenders. Any future profits
will be paid as dividends annually to the parent in order to keep the capital level at
$200mm. Capital can be repatriated without negative tax or legal consequences.

**Bulk Risk Issues:**
The entity is exempt from the bulk risk calculation.

**REDACTED**

| 4. | Approvals |
|----|-----------|

The facility is requested and supported by Richard Del Bello and Ian Strafford-Taylor.
Approvals, by the decisions of:

| Approval Group Treasury | Date: 3/10/04 ** |
| Approval IB EC | Date: 3/2/04 |
| Approval IB CFO | Date: 2/16/04 |

** Group Treasury approves the proposal on condition that:
  1) The capital increase of UBS Cayman Ltd has absolutely no impact on the capital
     requirement at the level of UBS Americas Inc.;
  2) The funds will be invested to UBS AG Cayman branch;
  3) Any future profits will be paid as dividends annually to the parent, and only as long as
     the capital level of USD 200million is necessary to get sufficient credit lines from stock
     lenders to support the HFS business.

717

SULLIVAN & CROMWELL LLP

August 17, 2007

Via E-mail

MEMORANDUM TO:  Christopher St. Victor-de Pinho
(UBS)

FROM:  Ronald E. Creamer

RE:  Withholding Tax On Substitute Dividend Payments

You asked whether substitute dividend payments would be subject to US withholding tax in the case of payments made by a securities borrower to UBS Cayman Ltd. ("UBS Cayman") and in the case of payments made by UBS Cayman to a securities lender, as further described below.

Our views are based on the facts and assumptions set out below in this memorandum. They do not encompass any facts of which we are not currently aware. The tax consequences of the transactions could be altered by additional or different facts or assumptions. Our views are based on current law, and the tax consequences of the transactions could be affected by future changes in law. In any case, you should be aware that our views are not binding on the Internal Revenue Service ("IRS") or the courts, and we do not represent or warrant that the IRS or the courts will agree with our views. The advice in this memorandum is limited to the one or more U.S. federal income tax issues addressed herein and additional issues may exist that could affect the U.S. federal income tax treatment of the transactions that are the subject of this advice. This advice does not consider or provide a conclusion with respect to any issues not specifically addressed herein.

NY12529-402588.5

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 214**

UBS 000664

718

**Facts**

UBS Cayman is a Cayman Island entity classified for US tax purposes as a corporation. UBS Cayman borrows voting shares of publicly-traded U.S. corporations from unrelated persons who we assume for purposes of conservatism are non-U.S. persons ineligible for the benefits of a tax treaty that reduces withholding tax on dividends (and in the case of lenders that are partnerships for U.S. tax purposes, the partners of which are such treaty ineligible non-U.S. persons) or from UBS Zurich, a Swiss branch of UBS AG ("UBS Zurich"), and lends those shares to unrelated non-U.S. persons ineligible for the benefits of a tax treaty that reduces withholding tax on dividends (and in the case of borrowers that are partnerships for U.S. tax purposes, the partners of which are such treaty ineligible non-U.S. persons). The ultimate borrowers have borrowed the securities in order to deliver them against a short position or to replace the borrow for an existing short position.

Currently UBS Cayman conducts its activities by means of employees located in the United States that are also employees of UBS Securities LLC. You have represented to us for purposes of this advice that dual employees observe proper formalities as to their actions on behalf of their respective employers. It is proposed that in the future UBS Cayman conduct its activities by means of entering into a written agreement with arm's length terms appointing UBS Securities LLC as its agent to effectuate its activities. The proposed agency agreement will be terminable by UBS Cayman for any reason upon 60 days' notice, and UBS Cayman's officers and employees located outside the United States (who will not also be employees of UBS Securities LLC) (i) will be legally authorized to oversee, and practically capable of overseeing, the

-2-         **Confidential Treatment Requested**        **UBS 000665**

719

agency agreement and (ii) will have and exercise the right and practical ability to reject

trades. UBS Cayman will be legally and regulatorily capable of acting as principal, and

UBS Securities LLC will be legally and regulatorily capable of acting as agent, under the

agency agreement. UBS Cayman will keep separate accounts, will have a reasonable

expectation of earning a pre-tax profit by reason of earning a positive arbitrage/financing

spread on the transactions, and will reinvest its capital in third-party assets. The

securities lender wishes to lend to UBS Cayman in order to (i) leverage its exposure to

the underlying securities and (ii) exchange its investment in the physical securities for a

synthetic investment which is not subject to US withholding tax. The securities borrower

wishes to borrow from UBS Cayman in order to maintain a short position at the cheapest

rate.

We have advised you in a separate memorandum of even date herewith

that, for US federal income tax purposes, UBS Cayman should be respected as an entity

separate from UBS Securities LLC and should be respected as undertaking its activities

as principal, and we so assume for purposes of this memorandum.

**Legal Analysis**

Under the relevant Treasury regulations, substitute dividend payments

made in a securities lending transaction in respect of a dividend paid by a US corporation

are for withholding tax purposes US source income.[1] As a consequence the substitute

dividends are subject to withholding at a 30% rate except to the extent provided by a tax

treaty.

---

[1]      Regs. §1.861-3(a)(6).

NYI2529.402588.3

-3-

**Confidential Treatment
Requested**

**UBS 000666**

720

In order to avoiding possible over withholding under the regulations, the IRS announced in Notice 97-66 that the US withholding tax on a substitute dividend payment received by a lender should be calculated by determining the excess, if any, of (1) the rate of US withholding tax due on a notional dividend paid directly to the lender over (2) the rate of US withholding tax due on a notional dividend paid directly to the borrower and then applying the rate differential to the amount of the dividend.[2]  The focus of the Notice is on whether the borrower would otherwise reduce the US tax that would have been imposed on the lender's receipt of an actual dividend.

In the case of substitute dividend payments made by the borrower to UBS Cayman, there would be no withholding tax under the Notice – that is, there would be no excess of the 30% withholding tax that would be due on a notional dividend paid directly to UBS Cayman over the 30% withholding tax that would be due on a notional dividend paid directly to the borrower.

In the case of substitute dividend payments made by UBS Cayman to the lender, there would likewise be no excess, since the rate of withholding tax on a notional dividend paid directly to UBS Cayman would be 30% and the rate of withholding tax on a notional dividend paid directly to any lender could not be higher.

This is the appropriate application of Notice 97-66, notwithstanding that the ultimate borrower disposes of the security and is therefore not subject to withholding on the actual dividend.  It is clear under the Notice that there does not need to be any withholding tax on the actual dividend in order to invoke the rules limiting cascading substitute dividend withholding.  We note, moreover, that the United States will have

---

[2]    Section 3 of Notice 97-66, 1997-2 C.B. 328.

NY12529:402588.5

-4-

**Confidential Treatment Requested**

**UBS 000667**

721

taxing jurisdiction over one actual dividend (in the hands of the ultimate purchaser), and

the foregoing rules simply prevent greater tax by reason of the securities lending

arrangements.

R.E.C.

cc:    Willard B. Taylor

**Confidential Treatment Requested**    **UBS 000668**

722

MAV0000856
CONFIDENTIAL

Maveric Fund
Dividend Enhancements
December 31, 2007

## U.S. DIVIDEND ENHANCEMENTS

| Year | LGC | FUND3 | UBA | BUL | MET[†] | MEL | ELF | TOTAL |
|---|---|---|---|---|---|---|---|---|
| 2000 | $ 5,445,598.85 | $ 449,109.39 | $ | $ | $ | $ | $ | $ 5,895,168.23 |
| 2001 | $ 5,474,456.37 | $ 444,717.23 | $ | $ | $ | $ | $ | $ 5,919,173.60 |
| 2002 | $ 6,163,606.02 | $ 735,303.75 | $ | $ | $ | $ | $ | $ 6,898,669.77 |
| 2003 | $ 7,062,954.45 | $ 916,770.09 | $ | $ | $ | $ | $ | $ 8,001,724.54 |
| 2004 | $ 6,442,829.63 | $ | $ | $ | $ | $ | $ | $ 6,442,829.63 |
| 2005 | $ 5,586,843.64 | $ 2,604,095.56 | $ | $ | $ | $ | $ | $ 8,402,742.50 |
| 2006 | $ 9,244,393.56 | $ 5,905,962.33 | $ | $ 110,635.77 | $ 40,961.12 | $ 74,438.91 | $ 49,203.52 | $ 15,388,380.31 |
| 2007 | $ 3,256,301.95 | $ 2,805,253.31 | $ | $ 12,102.02 | $ 7,626.69 | $ 33,667.02 | $ 37,864.55 | $ 9,292,846.43 |
| Total[*] | (b) $ 48,709,193.97 | $ 14,015,433.65 | $ | $ 122,722.79 | $ 49,587.80 | $ 108,105.93 | $ 87,068.17 | $ 53,091,631.01 |
| Est. Broker Fee | (l) $ 24,354,591.94 | $ 7,007,966.33 | $ | $ 61,341.40 | $ 24,298.90 | $ 54,052.97 | $ 43,544.09 | $ 31,545,915.51 |
| Est. Tax Benefit | (l+b) $ 73,863,775.91 | $ 21,023,398.86 | $ | $ 184,064.19 | $ 72,896.70 | $ 162,158.90 | $ 130,630.24 | $ 94,537,446.52 |

[*] Net economic benefit of enhancement. This base does not include the broker's fee in connection with these transactions. Generally, the amount reported above has been approximately 67% of the estimated tax benefit and the broker fee would comprise the remaining 33%.

Permanent Subcommittee on Investigations
**EXHIBIT #4S - FN 221**

723



**Summary of Domestic Enhancements (by Broker)**

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | TOTAL | % |
|---|---|---|---|---|---|---|---|---|---|---|
| UBS/PW | 5,695,185.23 | 5,919,173.60 | 6,898,086.77 | 9,001,724.54 | 8,442,628.63 | 9,402,743.50 | 4,527,355.16 | 1,544,121.93 | 47,631,602.36 | 75.50% |
| ING | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,154,956.78 | 1,387,793.79 | 11,542,750.57 | 18.30% |
| MERRILL LYNCH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 648,068.37 | 2,564,809.14 | 3,210,877.51 | 5.09% |
| NOMURA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 706,120.57 | 706,120.57 | 1.12% |
| TOTAL | 5,695,185.23 | 5,919,173.60 | 6,898,086.77 | 9,001,724.54 | 8,442,628.63 | 9,402,743.50 | 15,330,380.31 | 6,202,845.43 | 63,091,631.01 | 100.00% |

MAV0000857
CONFIDENTIAL

724

| From: | Duval-Major, Jacqueline (London) <Jacqueline_Duval-Major@ml.com> |
|---|---|
| Sent: | Thursday, July 22, 2004 3:48 PM (GMT) |
| To: | Garcia-Peri, Cristina (London) <cristina_garcia-peri@ml.com>; Fairbairn, Glen (London) <glen_fairbairn@ml.com> |
| Subject: | FW: Microsoft dividend |

-----Original Message-----
**From:** Duval-Major, Jacqueline (London)
**Sent:** 22 July 2004 15:28
**To:** Visone, Thomas (Global Tax - New York); Shendalman, Elissa (Global Tax - New York); Gaffney, Mike (Global Tax - New York)

**Cc:** Gut, Erica (Global Tax - London); Kleinman, Larry (Global Tax - New York); Limoges, Isabelle (Montreal); Cipriano, Paul

**Subject:** RE: Microsoft dividend

Tom: This is exactly what I had in mind — a synthetic long structure for non-US holders to get as close to 100% of that dividend value. Put/call combo (or as you mentioned in an earlier email, total rate of return swap). It makes sense as well what you say about pushing up against our trading limits on exchange traded contracts (and I agree with you that there is more comfort on the repo recharacterization analysis there, as you face the exchange as counterparty)

It will be hard to source from mutual funds and others entitled to the US favourable dividend rate for the exact reason you cite — they will call their shares back over dividend (unless our normal systems reimburse them). The more likely place to try to source the shares would be from non-US holders (again, synthetically: e.g. sale versus a derivative).

Maybe we could ameliorate your concerns re recharacterization as a repo with an OTC by making sure that either the sale or any potential purchase at the close of our derivative position to unwind the hedge (or both) are not done directly with a client, but rather from a broker. Also, I firmly believe that when ML has synthetic in and sythetic out (your example below on the short collar), it is hard to try to show a repo. Hedging a swap with a swap, e.g., should bring some comfort.

I will contact Paul directly as well.

-----Original Message-----
**From:** Visone, Thomas (Global Tax - New York)
**Sent:** 22 July 2004 15:53
**To:** Duval-Major, Jacqueline (London); Visone, Thomas (Global Tax - New York); Shendalman, Elissa (Global Tax - New York); Gaffney, Mike (Global Tax - New York)

**Cc:** Gut, Erica (Global Tax - London); Kleinman, Larry (Global Tax - New York); Limoges, Isabelle (Montreal); Cipriano, Paul

**Subject:** RE: Microsoft dividend

Jackie:

I also just heard that there is extreme interest in foreign holders replacing their long physical position with a put/call combo. The exchange traded options will automatically lower their strikes by $3 (as well as the $.08 quarterly dividend) when the stock goes ex. The options exchange is pricing 100% of the dividend into the option, so the foreign holders have the incentive to do a "conversion transaction" whereby they sell their stock to the specialist and simultaneously replace it with a put/call synthetic, say strike around $30. Embedded financing rate L+50. Therefore, by holding options where the strikes automatically drop by 100% of the dividend, foreign holders can receive 100% of the dividend through the options.

I was told that ML will ultimately push up against our position limits on exchange traded options. This means that

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 229**

CONFIDENTIAL

ML-PSI-00147049

725

we would have an interest in doing an OTC structure priced exactly like the exchange traded options. At the same time, stock that has been loaned by mutual funds, margin accounts, etc. to ML to enable us to hedge short collar positions for insiders of MSFT will likely get called around the dividend date because the stock lenders will want the favorable rate. ML may therefore get squeezed around that time.

Normally, we are concerned where a customer (i) sells stock to ML; (ii) at the same time faces ML on an OTC TRS or forward or put/call combo; and (iii) gets the stock back at the end, either via physical settlement or a cross out or what have you. I am not that concerned where the options are exchange traded because ML is technically not the counterparty and we could close out our position through offset on the exchange while our customer still has his options with OCC. However, OTC options don't have that argument available, thus may be a repo, thus there may be withholding tax. It has been pointed out, however, that ML currently is short 19mm physical shares as hedges against short collars done with insiders. Those stock loans will likely get called in November. Therefore, these put/call combos will not be hedged with physical stock - it will have been returned to the stock lenders - but instead, up to 19mm shares, our position will be purely synthetic: long collars to insiders, short put/call combos to foreigners. A natural synthetic hedge. Is it a repo to the foreigners where ML no longer holds the physical shares? Maybe not. Also, I think that the fact that our options will exactly track exchange traded options is helpful.

What do you think?

Also, I know that Canadian pension funds and charities are exempt from withholding tax in the US. Maybe there's something we can do with that.

Thanks

Tom

-----Original Message-----
**From:** Duval-Major, Jacqueline (London)
**Sent:** Thursday, July 22, 2004 9:55 AM
**To:** Vicane, Thomas (Global Tax - New York); Shendelman, Elissa (Global Tax - New York); Gaffney, Mike (Global Tax - New York)

**Cc:** Gul, Erica (Global Tax - London); Kleinman, Larry (Global Tax - New York); Limoges, Isabelle (Montreal)
**Subject:** RE: Microsoft dividend

I was involved in initial structuring/advice on the Morgan Stanley structure (was this something like MS Equity Capital Cayman?), but when I left lost track of what they did with the entity. I would assume that you are completely right on request to use the ML entity, although it may also have been a way for the trading desk to get around volume limits/total tax credit exposure limits imposed by the tax department on the use of that entity (complete speculation).

All you other ideas are well worth talking about – let me have a little think about them, and then let's sit down in NY?

Thanks!

Jacquie

-----Original Message-----
**From:** Vicane, Thomas (Global Tax - New York)
**Sent:** 22 July 2004 14:47
**To:** Duval-Major, Jacqueline (London); Shendelman, Elissa (Global Tax - New York); Gaffney, Mike (Global Tax - New York)

**Cc:** Gul, Erica (Global Tax - London); Vicane, Thomas (Global Tax - New York); Kleinman, Larry (Global Tax - New York); Limoges, Isabelle (Montreal)

**Subject:** RE: Microsoft dividend

CONFIDENTIAL

ML-PSI-00147050

726

We had in place a 97-66 structure out of our SNCFE-Hong Kong entity, as it related to our Luxembourg SICAV funds. This structure was put on hold because the systems infrastructure supporting the trade did not work as anticipated. We also know that Morgan Stanley had a 97-66 facility for a couple of years, and our 97-66 thing was an internal response to that. Subsequent to our 97-66 trade, I heard that Morgan Stanley was asking ML to be on the "other side" of a trade, meaning that they would have paid us a fee to interpose our SNCFE entity in a stock loan, which could have indicated that they had a level of discomfort as to their level of exposure on the issue. Maybe not, but I had a hard time figuring out why else they would have made the proposal. I also heard that the IRS is looking into this issue as part of the single stock futures project and there is some concern that whatever rules they devise as part of that could adversely impact the 97-66 trades.

Other thoughts -

(1) Someone who owns MSFT could be in a position to incur an ordinary dividend - not qualifying for capital gains rate (1059, bad hedge, short holding period) - and a capital loss when the price of the stock drops ex-div. Maybe there's something we can do about that.

(2) Typical total return swaps or collars to avoid w/h tax.

(3) I'm wondering if there are DRD structures we can put together.

(4) MSFT is 25% of our Software HOLDRs product. Maybe we can do something with that.

I also got a call from Isabelle Limoges in Canada re: MSFT. We should call her and see what she's thinking about.

> —Original Message—
> From:   Oval-Major, Jacqueline (London)
> Sent:   Thursday, July 22, 2004 9:20 AM
> To:     Shendelman, Elissa (Global Tax - New York); Gaffney, Mike (Global Tax - New York)
> Cc:     Gut, Erica (Global Tax - London); Visone, Thomas (Global Tax - New York); Kleeman, Larry (Global Tax - New York)
>
> Subject:    RE: Microsoft dividend
>
> Thanks for that – I will speak to Tom and Larry in due course. In any case, it will give us something to talk about while I am in NY 4-6 August!
>
> Regards
>
> Jacquie
>
> > —Original Message—
> > From:   Shendelman, Elissa (Global Tax - New York)
> > Sent:   22 July 2004 13:57
> > To:     Oval-Major, Jacqueline (London); Shendelman, Elissa (Global Tax - New York); Gaffney, Mike (Global Tax - New York)
> >
> > Cc:     Gut, Erica (Global Tax - London); Visone, Thomas (Global Tax - New York); Kleeman, Larry (Global Tax - New York)
> >
> > Subject:    RE: Microsoft dividend
> >
> > Jacquie– I forwarded this to Tom Visone yesterday. I don't know if he's called you. Tom and Larry have been one's working on 97-66 stuff so you should speak with one of them. Tom is in today but out tomorrow. Larry is out this week. I think both of them are around next week. If you set up a time to speak with them please invite me. I'd like to listen in.

CONFIDENTIAL                                        ML-PSI-00147051

727

Regards,
Elissa

-----Original Message-----
From:   Duval-Major, Jacqueline (London) [SMTP/Jacqueline_Duval-Major@ml.com]
Sent:   Wednesday, July 21, 2004 9:09 AM
To:     Shendelman, Elissa (Global Tax - New York); Gaffney, Mike (Global Tax - New York)
Cc:     Gut, Erica (Global Tax - London)
Subject:   Microsoft dividend

Elissa/Mike

Okay, so we always use Microsoft as the "no dividend" example in tax scenarios,
and now that will have to stop!  But $32 billion dollars in dividends is a lot of
dividends, and we should discuss whether there is value to be had.

I have put a meeting in on Friday with Erica and her team to discuss what we can
and can't do with US dividends.  Of course, any US tax suffered in MLI would be
a cost as not creditable in the US, so I will assume that away.  We will obviously
need to discuss generally the Firm's position on 97-65 and look at derivative
solutions.

Would either of you like to be at that initial meeting (in which case I will change
the time) or maybe we can have this preliminary one with the London team (and
then we can follow up when I am in NY in a couple of weeks).

We have a little time here – Record date 17 November, pay 2 December.  We
are asking the trading side about supply levels and costs.

Any thoughts gladly appreciated.


Kind regards

Jacquie


Jacqueline Duval-Major
EMEA Corporate Equity Derivatives
Merrill Lynch International
Tel +44 20 7996 1753
Mob: ███████████
jacqueline_duval-major@ml.com

████████ = Redacted by the Permanent
Subcommittee on Investigations

CONFIDENTIAL

ML-PSI-00147052

728

| From: | Brock, Lee (London) <lee_brock@ml.com> |
|---|---|
| Sent: | Wednesday, September 1, 2004 4:40 PM (GMT) |
| To: | Cipriano, Paul <p_cipriano@ml.com> |
| Subject: | FW: microsoft |

Paul,

Quick question.

Have Tax signed off on the Swaps? Seems to be some confusion.

Thanks

Lee

----Original Message----
**From:** Gehrke, Tobias (London)
**Sent:** Wednesday, September 01, 2004 12:47 PM
**To:** Duval-Major, Jacqueline (CM&F EMEA)
**Cc:** Brock, Lee (London); Clark, David (Converts/Derivs); Stuerm, Albert (London)
**Subject:** RE: microsoft

Jacqueline,

According to Paul tax and legal have given their sign-off on the swaps trades outlined below.  Paul is still waiting for sign-off on a number of other structures.

Tobias

----Original Message----
**From:** Duval-Major, Jacqueline (CM&F EMEA)
**Sent:** Wednesday, September 01, 2004 11:50 AM
**To:** Gehrke, Tobias (London)
**Cc:** Brock, Lee (London); Clark, David (Converts/Derivs); Stuerm, Albert (London)
**Subject:** RE: microsoft

Tobias

Are you sure that tax and legal have signed off on these?  When we spoke to them a couple of days ago, we were pushing on the swaps, but they were still not clearly comfortable, and I brought up the LIFFE futures, which they had not considered yet.  Just want to make sure we all have the same message – it is the exchange traded options and the exchange traded flex options they seemed most comfortable with.

Paul was going to synopsize for tax the various trades – and then they were going to do a more final review.  I have sent Paul a separate email to make sure he has gotten final sign off– it is best to be sure. We explained to them that time was of the essence.

Thanks

Permanent Subcommittee on Investigations
**EXHIBIT #45 – FN 234**

CONFIDENTIAL                                    ML-PSI-00054121

729

Jacquie

-----Original Message-----
**From:** Gehrke, Tobias (London)
**Sent:** 01 September 2004 11:96
**To:** Brock, Lee (London); Duval-Major, Jacqueline (CM&F EMEA); Clark, David (Converts/Derivs); Stuerm, Albert (London); +London Futures Sales

**Subject:** microsoft

Below is an email from Paul Cipriano that outlines the 2 structures (both are total return swaps) that have been approved by tax and legal. We are still awaiting feedback from tax and legal on a number of different structures including LIFFE single stock futures.

We will create a presentation asap and look to setup a road show to visit clients in the near future.

Tobias

-----Original Message-----
**From:** Cipriano, Paul
**Sent:** Tuesday, August 31, 2004 6:18 PM
**To:** Gehrke, Tobias (London)
**Subject:** RE: microsoft

Tobias,

I've attached two term sheets.

One covers a 1-mth trade where the client pays Libor flat financing and receives a discounted portion of the dividend (98.5%). The VWAP execution on our end is guaranteed with $0.00 commissions. If the client wishes to reacquire his shares he may do so by obtaining a VWAP guarantee to buy stock from another broker. This would probably add $0.01 to $0.02 per share to the cost of the trade.

The other covers a more open-ended maturity (minimum = 1 mth / maximum = 1 yr) where the client pays a Libor + 30 bps financing rate and receives 100% of the dividend. This trade charges a commission of $0.04 per share. If you work out the math the economics are roughly the same if the trade is on for 1 month.

If you would like an "all-in" quote as a percentage of the dividend for a time period of more than one month (i.e. today through the div payout) we can price that up as well. We can also offer the same economics for a counterparty who would prefer to trade a cash-settled OTC put/call combination instead of a swap. We are awaiting news from tax/legal to see if we can offer a different settlement method as well as single stock futures structures. I will certainly keep you in the loop as I get information.

Let me know what you think.

Regards,

Paul << File: MSFT TRS 30 day (VWAP) LF 0comm.doc >>  << File: MSFT TRS 1yr (VWAP) 30bps 100% doc >>

-----Original Message-----

CONFIDENTIAL

ML-PSI-00054122

730

From: Gehrke, Tobias (London)
Sent: Tuesday, August 31, 2004 12:15 PM
To: Cipriano, Paul
Subject: RE: microsoft

Paul,

Can you send me the term sheets for the total return swaps?

Thx

Tobias

----Original Message----
From: Cipriano, Paul
Sent: Tuesday, August 31, 2004 12:14 PM
To: Gehrke, Tobias (London); Duval-Major, Jacqueline (CM&F EMEA)
Cc: Clark, David (Converts/Derivs); Stuerm, Albert (London); Klawonn, Larry (Global Tax - New York); Visone, Thomas (Global Tax - New York)

Subject: RE: microsoft

Tobias,

I have proposed the LIFFE futures to our internal Tax dept in the US. I am awaiting their reply. I am free for a call whenever you are ready.

Paul

----Original Message----
From: Gehrke, Tobias (London)
Sent: Tuesday, August 31, 2004 7:37 AM
To: Duval-Major, Jacqueline (CM&F EMEA)
Cc: Cipriano, Paul; Clark, David (Converts/Derivs); Stuerm, Albert (London)
Subject: RE: microsoft

Can we meet today to discuss game plan and timing. Our competitors are out there with products and we need to get ours out there asap!

With regards to exchange traded contracts are we ok to trade the LIFFE futures?

Tobias

----Original Message----
From: Duval-Major, Jacqueline (CM&F EMEA)
Sent: Friday, August 27, 2004 4:33 PM
To: Gehrke, Tobias (London)
Cc: Cipriano, Paul
Subject: microsoft

CONFIDENTIAL                                                    ML-PSI-00054123

731

Tobias

Can you speak to Paul Cipriano of the US swaps desk about Microsoft – after our follow up phone call with tax dept today related to various ways our clients are going to expect to see yield enhancement trades on MSFT – it looks like they are pushing to keep within the exchange traded options and exchange traded flex-options world – I am sure you are more familiar with this than I am – in any case, we have been trying to point out that OTC contracts, including swaps and options, are going to be what many of our European and US clients are familiar with. They are not happy with a zero strike physically settled warrant, and we should talk about alternatives to this.

In any case, Paul is writing up (again) a list of the trades proposed and the advantages/disadvatages of each, with the view to get Tax dept guidelines asap. If you would not mind, it would be great to have your input there as well, to ensure we are presenting the full complement of trades was are expecting.

Thanks!
jftc

Jacqueline Duval-Major
EMEA Corporate Equity Derivatives
Merrill Lynch International
Tel +44 20 7996 1753
Mob: ▮▮▮▮▮▮▮▮▮
jacqueline_duval-major@ml.com

= Redacted by the Permanent
Subcommittee on Investigations

CONFIDENTIAL

ML-PSI-00054124

732

| From: | Bamping, Graham (MLIM) <graham_bamping@ml.com> |
|-------|-----|
| Sent: | Wednesday, October 27, 2004 8:05 AM (GMT) |
| To: | Tombs, Matt (Global Tax-London) <matt_tombs@ml.com> |
| Cc: | Miller, Andrew (London) <andrew_miller@ml.com>; Doherty, Philip (MLIM) <philip_doherty@ml.com>; Lovell, John (MLIM) <john_lovell@ml.com>; Whiteley, Simon (MLIM) <simon_whiteley@ml.com>; Martin, Trevor (Global Tax - London) <trevor_martin@ml.com>; Stevens, Nigel (Global Tax - London) <nigel_stevens@ml.com>; Church, Carl (Global Tax - London) <carl_church@ml.com>; Kleinman, Larry (Global Tax - New York) <larry_kleinman@ml.com>; Whiteley, Simon (MLIM) <simon_whiteley@ml.com>; Ironmonger, Kevin (MLIM) <kevin_ironmonger@ml.com> |
| Subject: | RE: Microsoft Trade yesterday |

Matt,
As discussed this morning, we need to be aware that there could be a need to unwind the derivative position should our fundamental view on Microsoft change. Would this bring with it any additional tax issues?

Regards,
Graham

-----Original Message-----
**From:** Tombs, Matt (Global Tax-London)
**Sent:** 27 October 2004 08:57
**To:** Bamping, Graham (MLIM)
**Subject:** FW: Microsoft Trade yesterday

FYI

-----Original Message-----
**From:** Tombs, Matt (Global Tax-London)
**Sent:** 27 October 2004 08:41
**To:** Miller, Andrew (London); Doherty, Philip (MLIM); Lovell, John (MLIM); Whiteley, Simon (MLIM); Martin, Trevor (Global Tax - London); Stevens, Nigel (Global Tax - London); Church, Carl (Global Tax - London); Kleinman, Larry (Global Tax - New York)
**Subject:** RE: Microsoft Trade yesterday

Thanks Andrew

Carl - can we discuss when you have a sec please.  Not sure if this is an exact replica of what you guys have done and so is a no brainer or whether we need a call of interested parties?

Regards

Matt

-----Original Message-----
**From:** Miller, Andrew (London)
**Sent:** 27 October 2004 08:28
**To:** Doherty, Philip (MLIM); Lovell, John (MLIM); Whiteley, Simon (MLIM); Tombs, Matt (Global Tax-London)
**Subject:** FW: Microsoft Trade yesterday

Please find attached mechanics of the trade. As it involves exchange listed options there is no term sheet or

CONFIDENTIAL

Permanent Subcommittee on Investigations
**EXHIBIT #45 – FN 236**

ML-PSI-00149878

733

legal documentation as such. This is our only internally recommended listed trade, but clearly you have to be comfortable yourselves from a tax angle before you proceed.

----Original Message----
**From:** Miller, Andrew (London)
**Sent:** 07 October 2004 09:57
**To:** i-Equity Convertible/Derivative Sales
**Subject:** Microsoft Trade yesterday

**Mechanics of the trade:**

There is a $3 special dividend and also a $0.08 ordinary quarterly dividend, both of which go XD Nov 17th.
Client sells MSFT common stock.
Clients buys a European Style Flex Option Call on MSFT
Clients sells a European Style Flex option Put on MSFT
(Call strike and Put strike are identical, giving synthetic performance of MSFT stock).
The price of the option synthetic is determined using 100% of both dividends.
The fees/commissions for the transaction will be 6 cents per share ($3 per option contract)
The beauty of the trade is that the option strike is lowered by $3 on the XD date, thereby giving 100% of the special dividend.

Also it is physically settled, so no unwind trade is necessary (the long call is either exercised or the short put assigned).

There is a small pin risk associated with the trade, in that at expiry there is a small chance the stock expires on the strike. If this looks likely, we would recommend an unwind close to expiry.

Below is a theoretical cash flow comparison for 1 million shares using an ATM synthetic:

Assumptions:
Share price is constant throughout period.
Client is an income tax treaty based holder with a US dividend withholding rate of 15% (non-treaty holders face 30% withholding tax)

**1. Holding 1m MSFT common stock (price $27.65)**
Dividends received:

| | |
|---|---|
| $3.00 x 85% = $2.55 | $2,550,000 |
| $0.08 x 85% = $0.068 | $68,000 |
| | $2,618,000  A |

| | |
|---|---|
| 100% of both dividends | $3,080,000 |
| Tax Paid (15% withholding) | ($462,000) |
| | $2,618,000 |

**2. Selling 1m MSFT common stock & Buying 1m synthetics.**

| | |
|---|---|
| Sell 1m MSFT @ $27.65 | $27,650,000 |
| Estimated interest on cash on deposit for 74 days | $110,000 |
| Pay $0.03 for $27.65 strike synthetic | ($30,000) |
| Option commissions of $0.06 per share | ($60,000) |
| | $27,670,000  B |

| | |
|---|---|
| At expiry Buy 1m MSFT @ $24.65 | $24,650,000  C |

CONFIDENTIAL

ML-PSI-00149979

734

($3.00 drop in strike price)

| | | |
|---|---|---|
| Net Position B -C | $3,020,000 | D |
| Net benefit / Pick up  D-A | $402,000  ($0.402 per share or 145 bps) | |

Dividends received effectively:
$3.00 x 98% = $2.94        $2,940,000
$0.08 x 100%= $0.08         $80,000
                          ―――――――――
                           $3,020,000

The fees of 8 cents per share (or $3 per option) equate to 2% of the special dividend. Therefore the client receives 100% gross of the dividend through the trade, or 98% net after costs.

CONFIDENTIAL                                    ML-PSI-0014988C

735

| From: | Duval-Major, Jacqueline (London) <Jacqueline_Duval-Major@ml.com> |
|---|---|
| Sent: | Wednesday, October 27, 2004 10:44 AM (GMT) |
| To: | +CCMF (EMEA) <CCMF@exchange.uk.ml.com>; +IBK (EMEA-Officers) <IBKEMEA-Officers@exchange.uk.ml.com>; +ECM EMEA - Originators <+ECMEMEA-Originators@exchange.uk.ml.com>; +IBK Country Heads (IBK EMEA) <IBKCountryHeads@exchange.uk.ml.com>; +IBK Industry Heads (IBK EMEA) <IBK.IndustryHeadsIBKEMEA@exchange.uk.ml.com> |
| Cc: | Garcia-Peri, Cristina (London) <cristina_garcia-peri@ml.com>; Hammond, Michael (CM&F EMEA) <michael_hammond@ml.com> |
| Subject: | Microsoft Special Dividend: Yield Enhancement for Clients |
| Attach: | microsoft internal presentation.ppt |

The attached presentation describes a yield enhancement opportunity for Clients that may hold Microsoft shares (MSFT US).

Microsoft has announced a special dividend and a cash dividend (totalling $3.08) payable in December.

Clients who hold Microsoft shares – whether as an free-standing shareholding or as part of a basket– and who will suffer withholding tax on such shareholding (whether at 15 or 30%) may benefit from one of the proposed transactions.

**Next Steps:**

**1. Review attached slides (internal use only).**
**2. Identify Clients that may hold investments in MSFT US and could benefit from the yield enhancement.**
**3. Contact Cristina Garcia-Peri (6 1129) or Jacquie Duval-Major (6 1753) of Corporate Equity Derivatives to discuss whether the transaction may be appropriate for the Client.**

Our competitors are offering similar products, and time is of the essence.  Deadline for transaction is prior to the MSFT shareholders' meeting on 9 November 2004 (due to internal approval parameters).

<<microsoft internal presentation.ppt>>
Please note the presentation is marked "For Internal Use Only" and may not be distributed outside the Firm.

Kind regards

Jacquie Duval-Major

Jacqueline Duval-Major
Director
EMEA Corporate Equity Derivatives
Merrill Lynch International
Tel +44 20 7996 1753.
Mob. ▇▇▇▇▇▇▇▇
jacqueline_duval-major@ml.com

▅ = Redacted by the Permanent Subcommittee on Investigations

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 238**

CONFIDENTIAL                                    ML-PSI-00147236

736



Permanent Subcommittee on Investigations
**EXHIBIT #45 – FN 242**

ML-PSI-0289

737

## Microsoft Special Dividend: Yield Enhancement

### Overview

- MSFT announced 20 July that it will pay $32 billion of dividend in a $3 per share special dividend, record date 17 November, pay date on 2 December (there is also a regular cash dividend of $.08 payable with the same record date.)

- Dividends paid to non-US holders will be subject to US withholding tax at 30% or a lesser rate (usually 15%) under a tax treaty. Depending on the tax status and application the relevant domestic tax law, US withholding tax suffered may represent an absolute cost to the non-US holder.

- The trade ideas in this presentation may provide a higher synthetic return to such holders than a physical dividend with withholding tax. Merrill Lynch makes money generally through the pricing of the dividend element of the synthetic transaction (and ML's hedge to that transaction).

- The Tax Department has approved these transaction parameters for yield enhancement transactions over MSFT shares.

- Next Steps: Identify clients who have long physical positions in MSFT US and discuss yield enhancement with them. The stakes to be identified do not need to be strategic stakes in terms of percentage, etc -- just large enough to warrant the extra value that the derivatives transaction may provide them.

- Corporate Equity Derivatives will liaise with US Swaps Desk (Paul Cipriano, Rich Jessop) to coordinate execution of the transactions.



1

ML-PSI-0290

738

## Microsoft Special Dividend: Yield Enhancement

**Talking Points/Considerations**

- Does Client hold MSFT either as a free-standing investment, or as a part of a basket or index (the relevant fact is that the Client is entitled to a *real* MSFT dividend.)

- What withholding rate is generally applicable to Client in respect of US equities?  For most Clients organized in jurisdictions with a tax treaty with the US, this will generally be 15%.  For non-treaty jurisdictions (e.g., Cayman Islands, Hong Kong, etc), the rate will be 30%.  The relevant Client entity is the actual entity holding the MSFT shares.

- Does the Client currently get any benefit from the withholding tax suffered on US dividends?  This generally means that Client can take a foreign tax credit in respect of the withholding tax.  This is not possible in all jurisdictions, and there may be other limitations on *foreign* tax credits that reduce the value to the Client.

- Will there be any negative consequences to the Client receiving a payment under a derivative as opposed to a dividend on a share?  This may depend on the jurisdiction of the Client, and on the form of derivative transaction.  Please discuss with Corporate Equity Derivatives on a case by case basis.

- The transactions described in the following slides are based on the requirements approved by the Tax Department for these transactions.  Any deviations from the terms described must be approved by the Tax Department.



ML-PSI-0291

739



ML-PSI-0292

740



ML-PSI-0293

741



## Microsoft Special Dividend: Yield Enhancement

**Option: Over the Counter**

- Client is long MSFT US. Client sells MSFT to MLFPS, or sells to market.
- MLI sells / Customer buys OTC call on MSFT
- MLI buys / Customer sells OTC put on MSFT
- Option contracts should be written as similarly to listed option contracts as possible.
- Contracts must include a clause that in the event of a corporate action or special dividend the counterparties agree to adjust their contracts in the same method as the CBOE (Exchange Adjustment)
- Contracts must be cash settled
- Trade must be entered prior to MSFT shareholder meeting approval of dividend.
- The final level will be listed as the VWAP on the primary exchange (NASD) on the final valuation date. We cannot terminate the options using a closing price as a reference level.
- If the client wishes to BUY shares of MSFT on the final valuation date or the early termination date he may not use any ML entity as his executing broker.

ML-PSI-0294

742

## MICROSOFT COUNTERPARTIES

A.  **Entities that traded swaps:**

- Connor, Clark & Lunn Arrowstreet Capital obo CCL Arrowstreet Sy
- Sandell Asset Management Europe Ltd
- Kingdon Capital Management LCC obo M Kindgon Offshore Ltd.
- Swisscanto Asset Management AG

B.  **Entities that traded options:**

- PIM Gestion France
- Scottish Widows Investment Partnership Limited
- Connor, Clark & Lunn Capital Markets Inc.
- Liberty View Capital Management (Inc)
- Sirios Capital Management
- Kommunal Landspensjonskasse
- Dawson-Herman Capital Management, Inc.
- Liberty View Capital Management (Inc)
- Merrill Lynch Investment Managers ("MLIM")
- Henderson Global Investors Ltd.
- Bear Stearns Asset Management

**Permanent Subcommittee on Investigations**
**EXHIBIT #45 - FN 243**

ML-PSI-0485

743

ML-PSI-0123



## Global Financing Products Group

Spring 2006

**Merrill Lynch**
Global Markets & Investment Banking Group

Permanent Subcommittee on Investigations
EXHIBIT #45 - FN 245

744

ML-PSI-0124



Table of Contents

## Global Financing Products Group

- Value Proposition
- Product Spectrum
- Market Capabilities
- Regional Operations
- Equity Swaps Basics
- Key Usage Considerations
- Contacts

2



ML-PSI-0125

745

# Global Financing Products Group
## Equity Swaps

### Value Proposition

**Best in Class Service**

- Global coverage through 4 Swaps desks offering 24 hour access to over 45 markets
- Global platform ensures consistent service throughout world markets
- The Global Swap Team offers
  - Dedicated marketing team and swap client service representatives
  - On-Floor ISDA negotiating team
  - Dedicated multi-regional derivative capabilities
  - Tax and Regulatory consulting services
- Ability to execute through cash sales in US, and through cash sales/DMA in Pan European and Asian markets

**Innovative Products**

- Unique product offerings (e.g. cross country baskets, options on underlying baskets)
- Portfolio swap which offers increased levels of operational efficiency, such as the "reserve"
- Portfolio Analysis product which identifies return enhancing opportunities within a portfolio

**Operational Ease & Enhanced Client Facilitation**

- Operational efficiencies (negative affirmation, web delivery, etc)
- Cross netting for Prime Brokerage clients
- Cross margining uses a client's total equity ML positions to reduce margin requirements
- Bloomberg customization helps clients efficiently manage basket/index exposures
- PB integration facilitates valuation reports combining physical and synthetic positions



ML-PSI-0126

## Global Financing Products Group
### Equity Swaps

### Value Proposition

#### ML Franchise Benefits

- ML has one of the best Global Footprints. Client Driven - Capital Markets/Origination, Research, Trading, Distribution
- ML has invested more of its own capital, directly and through strategic ventures, than our leading competitors
- ML has credit ratings among the best in the industry
- ML has extended more credit to hedge funds and their principals, creating levered share classes and transporting alpha
- ML's appetite for risk increases its willingness to commit capital and make risk markets on swap products
- ML's robust global in-house inventory provides the benefits of cost efficiency and stable borrow which does not exist to the same extent at other firms

  – Extensive and diverse supply which includes "hard to borrow" names is a direct function of the strong retail box and institutional borrowing relationships

    - US supply - $29B ($4B from ML "Box", $25B from access to over 300 portfolios).
    - Japan - $15B of exclusive supply from ML internal inventory, exclusive portfolios and private client.
    - Asia - $60B of inventory through institutional lending relationships ($3B in India, Korea and Taiwan).
    - UK - $150B through exclusives, internal inventory and first call relationships.
    - Europe - $185B through exclusives, internal inventory and ML European offices. (>$1B of Emerging Europe)



ML-PSI-0127

## Global Financing Products Group
### Equity Swaps

**Value Proposition**

*Merrill Lynch Delta One Bloomberg Page*
- The umbrella page is MLDO, and the regional pages are MDOA, MDOE, MDOJ & MDOU (Asia-Pac, Europe, Japan and USA/Canada respectively).
- MLDO illustrates multiple product offering swaps, warrants, indices, ETFs, & synthetic stock loan



950 n Index MLDO

Merrill Lynch
250 Vesey St.
New York, NY 10281
U.S.A.
Contact: Yukito Mita
Tel: 1 212 449 5738

MERRILL LYNCH DELTA ONE PRODUCTS

1) MDOA Delta-One Americas
2) MDOE Delta-One EMEA
3) MDOW Delta-One Asia-Pac
4) MDOJ Delta-One Japan
5) MLDO Global Swap Axes

**Global Axes:**

Americas Swap Run = Justin Dowds

Asia-Pac Swap Run = Jennifer Kong

Japan Swap Run = John Fahy / Brian Cunniffe

EMEA Swap Run = Bo Bjurgert / Nicco Ferrarini





749

ML-PSI-0129



Market/Product Capability and Indicative Pricing

# Global Financing Products Group

## Market Capability

| | | Securities | | Synthetic | | | | Sector Baskets | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Lending | GFX | Port Swap | Discrete Swap | Futures | CB | (customized swaps) | P Notes | DMA |
| Developed Europe | Austria | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| | Belgium | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| | England | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| | France | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| | Germany | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| | Ireland | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| | Italy | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| | Spain | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| | Sweden | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| | Switzerland | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| EMEA | Bahrain | | | ✓ | ✓ | | | ✓ | ✓ | |
| | Czech Republic | | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ |
| | Dubai | | Fits in USD | ✓ | ✓ | | | ✓ | ✓ | |
| | Greece | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| | Egypt | | | | | | | | | |
| | Estonia | | | ✓ | ✓ | | | | | |
| | Hungary | | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ |
| | Israel | | | ✓ | ✓ | | ✓ | ✓ | ✓ | |
| | Jordan | | | ✓ | ✓ | | ✓ | ✓ | ✓ | |
| | Lebanon | | ✓ | ✓ | ✓ | | | ✓ | ✓ | |
| | Morocco | | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | |
| | Poland | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| | Qattar | | | ✓ | ✓ | | | | | |
| | Russia | | | ✓ | ✓ | | ✓ | ✓ | ✓ | |
| | Slovakia | | | ✓ | ✓ | | | | | |
| | Slovenia | | | ✓ | ✓ | | | | | |
| | South Africa | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| | Tunisia | | | ✓ | ✓ | | | | | |
| | Turkey | | ✓ | | ✓ | | ✓ | ✓ | | ✓ |
| Asia | China | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | |
| | Hong Kong | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| | India | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| | Indonesia | ✓ | NDF only | ✓ | ✓ | | ✓ | | ✓ | |
| | Japan | ✓ | | ✓ | ✓ | | ✓ | | ✓ | |
| | Malaysia | ✓ | NDF only | ✓ | ✓ | ✓ | ✓ | | ✓ | |
| | Pakistan | ✓ | | | ✓ | | | | ✓ | |
| | Phillippines | ✓ | NDF only | ✓ | ✓ | | ✓ | | ✓ | |
| | Singapore | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | |
| | South Korea | ✓ | NDF only | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| | Taiwan | ✓ | NDF only | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| | Thailand | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | |
| | Vietnam | ✓ | | | ✓ | | | ✓ | | |
| Latin America | Argentina | | | | | | | | | |
| | Brazil | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| | Chile | | | ✓ | ✓ | | ✓ | ✓ | ✓ | |
| | Colombia | | | | ✓ | | | ✓ | | |
| | Mexico | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| | Peru | | | | ✓ | | | ✓ | | |
| | Venezuela | | | | | | | | | |

ML-PSI-0131



752

ML-PSI-0132



Regional Operations

753

ML-PSI-0133

## Global Financing Products Group
### Regional Operations

**Americas**

- The Merrill Lynch Swaps desk combined with the Global Equity Derivatives team delivers financing products covering North America, Canada, Europe, Asia and Africa to clients based in the Americas. It is the only financing desk on the street that has dedicated multi-regional derivative capabilities

- Merrill Lynch is a leading US derivatives house
  - Full range of option products from plain vanilla to exotics. Merrill stands out from its peers by delivering unique product offerings– such as sector/customized baskets options, variance options, hybrid options on multiple security baskets (e.g. gold, oil and FX)

- Merrill Lynch is a top rated equity franchise, and is ranked #1 in both Listed and ADRs[*]

- Product innovation and improved functionality are contributing to Merrill capturing a larger market share of the global financing business. ML continues to develop products that address the needs of our clients

- Merrill Lynch was recently named the #1 firm in Convertibles New Issues in 2006

- The Merrill Lynch Swaps desk takes the basic services, bundles it, and delivers a value-added package[◊]
  - 11 person trading team and ability to send orders to cash sales
  - International index swaps trader
  - Combined financing and risk-taking capabilities
  - Tax and Regulatory consulting services
  - Market Impact and other analytical tools
  - Dedicated Marketing Team available for client consultation
  - Swap/Client Service Representatives
  - On-Floor ISDA negotiating team

*YTD rankings as of April 30, 2006 according to AutEx

41

754



ML-PSI-0134

## Global Financing Products Group
### Regional Operations

**ASIA**

- Leading Asian Equities Derivatives Franchise
- 8 person Asian Financing Desk
  - Financing desks located in Japan and Hong Kong
- Full Sales coverage based in the US
- Largest Non Deliverable Market Inventory
- Innovative CB and PIPEs structure
- Geographic Footprint – offices in 14 Asian markets
- Top 3 Ranked Equity franchise by Market Turnover
- Full Service Asian Prime Brokerage Offering
- Merrill Lynch is a leader in the sector swap market
- IFR ranked Merrill Lynch Equity House of the Year
- Merrill Lynch has consistently been a global leader in 9 Asian countries

12

755

ML-PSI-0135



## Global Financing Products Group
### Regional Operations

**Developed Europe**

- The 11 person European Financing desk is comprised of 6 single stock and 5 index swap traders, based in London provide coverage across Developed and Emerging European markets

- Established 12 years ago, the Financing desk is well positioned in the European market and is considered a leader in terms of product innovation and flexibility

■ Merrill Lynch controls a large market share in European Sector Swaps

■ Merrill Lynch recently announced the combination of the Hedge Fund Flow Derivatives, U.K. Institutional and Convertible Bond sales forces into a cohesive Equity Derivatives Sales team led by Michael Ward, which will facilitate an integration across equity-linked products

  – International Financing Review (IFR) voted Merrill Lynch European Equity Equity House of the Year

  – The 2006 ISF Stock Lending Survey highlighted the significant improvement made by ML globally in the last 2 years – ML's ranking improved in 7 of 8 categories

13

756

ML-PSI-0136



**Global Financing Products Group**
Regional Operations

**Emerging Europe, Africa and the Middle East**

- Merrill Lynch is leading the next generation by combining European emerging markets equity finance, derivative and cash risk into one group

- **Trading and Research Highlights**

  – As per Autex, 31.5% market share of advertised EM trade volume for 2005 (#1 market share)

  – With more broker/dealers only now investing in expanding their EM research capabilities, ML is well positioned with over 30 analysts in most of the major EMEA markets

  – ML has been II ranked consistently in the Top 3 since 2000, with the number 1 and 2 slots in Turkey and Israel respectively

  – In South Africa, ML consistently ranks 1 or 2 in trading JSE volume. It is the first Intl self clearing member of Safex, which offers futures clearing and execution to International clients. ML is consistently #1 in execution

- **Expansion Plans**

Redacted
by
Permanent Subcommittee
on Investigations

14

757

ML-PSI-0137

## Global Financing Products Group
### Equity Swaps

**Latin America**

- ML currently maintains a presence in three Latin American markets – Brazil, Mexico and Chile – primarily trading swaps, FX futures and synthetic futures

- ML maintains an experienced 3-person "on the ground" derivatives team in Brazil to handle local flow. International access is covered out of New York, through the Global Equity Derivatives Desk

- **Brazil**
  - Hedge Funds access Brazil locally through swap primarily for the tax benefits
  - Largest synthetic futures book- Finite capacity contributes to client selection/pricing power
  - Number 1 or 2 position in equity trading volume
  - ML's market share is expanding significantly

- **Mexico**
  - ML has cash traded the Mexican market since 1995, derivatives traded since 2001
  - ML competitive advantage comes from being one of only a few brokers who can access the local equity derivative markets Other Broker/Dealers access the markets through Merrill

- **Chile**
  - ML has increased market its market share in Chile
  - Recent acquisitions have placed ML at a competitive advantage, now being able to provide the ability to gain short exposure



15

ML-PSI-0138



# Equity Swaps Basics
Features, Pricing, Execution, Operations, Key Usage Considerations

759

ML-PSI-0139



## Global Financing Products Group
### Equity Swaps Basics

**Features**

- An equity swap is a customized contract between the Client and Merrill Lynch governed by ISDA (International Swap and Derivative Association) terms and conditions

- The swap provides economic exposure to an underlying equity, equity-related security, equity basket, or equity index

- Under a swap agreement, two parties agree to exchange total return (or price) performance of an underlying asset in exchange for a stream of payments

  - A client long a swap would pay ML LIBOR plus some predetermined spread and any depreciation in the security. ML pays any dividends and any appreciation in the security

  - A client short a swap would receive LIBOR less some predetermined spread from ML, in addition to any security depreciation. The client would pay ML dividends and any security appreciation

**Flows**

- Long Swap:

- Short Swap:

Long swap exposure closely replicates the economics of the underlying assets – clients receive equity performance, manufactured dividends and manufactured corporate actions, but lose voting rights associated with physical ownership of shares

760

ML-PSI-0140

## Global Financing Products Group
Equity Swaps Basics

### Sample Term sheet

**IBM Total Return Equity Swap**
*Terms of Deal Done as of April, 2006*

| | |
|---|---|
| Investor | > xxxxxx |
| Merrill Lynch Entity | > Merrill Lynch International (MLI) |
| Trade Date | > April 2006 |
| Effective Date | > (t+3) |
| Valuation Date | > May 2006 (13 months) |
| Settlement Date | > t+3 |
| Underlying Securities | > IBM common equity |
| Shares / Total Notional Value> | > USD 20,000,000 (250,000 shares) |
| Strike | > $80.00 |
| Investor Receives | > The Negative Total Return of IBM |
| | > 3 Month USD LIBOR - 35bps |
| Investor Pays | > The Positive Total Return of IBM |
| Initial LIBOR (3 mo LIBOR on Trade Date) | > [5.31%] |
| Spread | > 35bps |
| Initial All-in Rate | > [4.96%] |
| Dividend Assumption | > 100% to be included in Total Return on an ex-date basis payable at Reset Date |
| Reset Frequency | > Monthly |
| Commissions & Fees | > 3 cent per share commission (taken off strike price) |

18



761

ML-PSI-0141

## Global Financing Products
### Equity Swaps Basics

**Pricing Considerations**

- **Commissions**
  - Generally consistent with cash execution rates
  - (ML offers both risk and agency executions)

- **Financing**
  - Long Performance: Term LIBOR (at time t) + spread
  - Short Performance: Term LIBOR (at time t) – spread
  - (Spread is based on Prime Brokerage financing rates where applicable)

- **Dividends**
  - US equities
    - Long positions- ML can pay an amount equal to 100% of the ordinary dividend
    - Short Positions – Clients pays an amount equal to 100% of the ordinary dividend
  - International Equities
    - Percent of dividend pass thru will depend on particular country, markets, security name and position size

19



ML-PSI-0142

**Global Financing Products**
Equity Swaps Basics

## Execution

- **ML Interface**
  - Clients can transact directly by calling
    - the swaps trading desk
    - their cash equity sales trader
    - their derivatives salesperson or sales trader

- **Electronic Order Transmission (depends on market)**
  - Developed Europe – Equity swap clients have full DMA capabilities to execute stocks trading on Pan European exchanges
    - DMA execution ability is independent of where the client is domiciled
  - Asia – DMA capabilities being developed in Japan and other Asian markets
  - Emerging Markets – We are in the process of establishing DMA for Emerging Markets, currently testing South Africa, Greece, Czech, and Hungary, with Poland, Israel & Turkey due to be set up shortly

- **Other Broker Executions**
  - In certain markets, clients have flexibility of executing with another broker and giving up the trade to Merrill

20

ML-PSI-0143

763

## Global Financing Products
### Equity Swaps Basics

**Documentation**

- ISDA* documentation required to trade swap product
  - Credit Support Annex (CSA) – Governs margin agreement between ML and the client
    - Prime Brokerage terms are incorporated into the CSA for existing PB clients
- Equity Swap Addendum (ESA)- Sent in addition to ISDA
- Client is consenting to negative affirmation and to master swap confirmations for both total return swaps and portfolio swaps
- Standard ESA with Global Swap language available for
  - Portfolio swap in Europe and US
  - Discrete swaps in US, Canada and Brazil
  - Upcoming regions: Emerging Europe
- Negative affirmation requires a client to contact ML within a predefined number of days of receiving a confirm to request an amendment if they do not agree with the terms of the confirm. Otherwise the confirm stands.
  - Improves operation efficiency by minimizing documentation overhead

*International Swaps and Derivatives Association

21

764

ML-PSI-0144



Swap Applications

765

ML-PSI-0145

## Swap Applications

### Key Usage Considerations

- Sector/Index Exposure
  - Access to sector, country, regional and multi regional indices through options, swaps and synthetic futures

- Yield Enhancement
  - Dividend enhancement (recapture withheld dividends for foreign investors)
  - Trading tax mitigation (ex: Stamp Tax in UK)
  - Synthetic Stock Loan

- Tax Management
  - US Income Tax (timing and character trades)
  - Capital gains tax mitigation (Germany, Turkey, Portugal, Brazil)

- Market Access
  - Synthetic long access in countries where trading restrictions prevent foreign ownership of local shares
  - Synthetic short access in countries with restrictions on short selling and relatively undeveloped stock loan markets
  - Long/short access to a variety of MSCI indices
  - Emerging market index and single stock discounted long exposure

- Operational Efficiency
  - Leverage
  - Synthetic Prime Brokerage
  - Diversifying Stock Loan

- Barra Factor Swaps
  - Hedging Alternatives
  - Risk Management

23

766

ML-PSI-0146



## Swap Applications and Advantages

### Index and Exposure Customization – Alternatives to ETFs

- Sector/Index Swaps – Provides long or short exposure to an index on which there is no other tradable instrument with comparable liquidity or ability to go short

- Sector exposures are available on the following

  · US – S&P 400, 500, 600, 1500

  · Europe – Dow Jones 600, Dow Jones Euro Stoxx

  · Japan – ML Designed Indices

  · Country – Local and MSCI Indices

  · Regional Cross-Country Indices

- Customized baskets can be created for more efficient and granular exposure

- ETF replacement – Swaps can be used to trade the underlying components of the ETF when the borrow goes hot

- Investors can use index/sector swaps as a powerful hedging or equitization tool

24

ML-PSI-0147

## Swap Applications and Advantages

### Yield Enhancement

- **Dividend Enhancement** – As synthetic instruments, swaps are not subject to the withholding taxes that may be incurred by non treaty or offshore investors who own the physical shares of a dividend paying stock or a convertible preferred

  - Withholding rates for US investors on European stocks are generally 15%
  - Withholding rates for offshore investors domiciled in non-treaty countries investing in the US or in Europe is generally 30%
  - In Canada, US investors are withheld 15%, while Non Treaty domiciled funds are withheld 25%
  - Convertible preferred, generally a high yielding security, can be transacted through swap

- **Stamp Tax Mitigation** – Investors incur a 50bps Stamp Duty on all purchases of UK physical securities. Total return swaps are exempt from this charge

- **Synthetic Stock Loan** – Investors may own shares for which there is substantial stock borrow demand. By entering into a long swap with ML on those shares, the client could own enhanced yield based on the stock loan value

26

768

ML-PSI-0148

## Swap Applications and Advantages

**Market Access**

- **Emerging Market Long Access** – In certain emerging markets there are trading restrictions or limitations on foreign investors which can hinder direct physical exposure. The alternative could be the ADR/GDRs, but these can trade at a premium to the local security. The easiest way is to access these markets synthetically through a total return swap

- **Emerging Market Short Access** – Swaps can provide short access in markets which prohibit or restrict short selling and in those with relatively immature stock loan capabilities

- **Emerging Market Index Exposure** – Lack of a well developed futures and options market can limit index exposure in most emerging markets. Equity swaps can provide long and short exposure to local indices, as well as those which comprise numerous stocks in various currencies

  - Synthetic Futures give investors index exposure in markets where futures may not be CFTC approved

- **Outperformance** – Discounted synthetic long swaps offer investors a reasonable substitute for long stock positions if there is high demand from other investors to borrow the shares

  - Back to Back swaps provide discounted long exposure on one side and synthetic short exposure on the other side

26

769

ML-PSI-0149

## Swap Applications and Advantages

**Tax Efficiency**

- **US Income Tax** – Through various swap structures such as Loss Recognition and Gain Deferral strategies, investors can harness tax value in their portfolios, by changing the timing of taxable events

  - **Loss Recognition** – Investors can retain economic exposure and generate losses to offset gains

  - **Gain Deferral** – Investors may defer position gains by entering into structured swaps that partially hedge economic exposure

  - **Character Trades** – Short term into Long term.  A short position held in swap for over a year, will generate a long term gain/loss.  A short physical stock position will always generate a short term gain, no matter how long the security held

- **Capital Gains Tax** – In certain markets, investors domiciled in a non-treaty region may be subject to capital gains tax on physical ownership of shares.  Synthetic access of these markets may be optimal for such clients

  - India, Turkey, Germany, Brazil

27

770

ML-PSI-0150

## Swap Applications and Advantages

### Operational Efficiency

- **Leverage** – Equity Swaps are primarily and over-the-counter financing instrument that can provide leverage
  - Amount of leverage will depend on the underlying

- **Packaged Execution** – There can be potential savings as well as ease of execution from bundling financing, dividends, stock borrow, currency and collateral in one product

- **Synthetic Prime Brokerage** – Investors may be able to reduce their administrative, operational and clearing requirements through swaps
  - In addition, for hedge funds not looking to open a new prime brokerage account, the total return swap may be the ideal way to diversify balances

- **Diversifying Stock Loan** – One advantage of shorting through a swap is the potential for term borrow, which insures against the borrow getting called
  - Particularly relevant for indices and baskets where a typical stock loan desk may not be as efficient in pricing up a portfolio of shorts

28

771

ML-PSI-0151



## Swap Applications and Advantages

### Barra Factor Swaps

- Clients can gain or hedge exposures to BARRA factors such as volatility or momentum through the usage of BARRA factor swaps

  - Factors are quantifiable variables that explain portfolio behavior

- The BARRA factors are largely uncorrelated to each other as well as standard instruments such as sector swaps so are an ideal way to get long or short exposure

- A BARRA factor overlay can significantly reduce portfolio risk with no or minimal performance reduction

29

ML-PSI-0152

# Global Financing Products Group

## Contacts

**Hong Kong**
Giles Scott — giles_scott@ml.com — +852 2536 3763

**Japan**
Brian Canniffe — brian_canniffe@ml.com — +813 6225 6284

**London**
Donald Pepper — donald_pepper@ml.com — +44 20 7995 7531

**New York**
Yuriko Mita — yuriko_mita@ml.com — +1 212 449 5738



30

773

ML-PSI-0153

## Disclaimer

Copyright 2006 Merrill Lynch & Co Inc. All rights reserved. Any unauthorised use or disclosure is prohibited. This document has been prepared and issued by Merrill Lynch International Limited ("MLI"). The services described within this document are not available to private individuals.

This document does not have regard to the specific investment objectives, financial situation and the particular needs of any specific person who may receive this report. The information contained herein was obtained from various publicly available sources, we do not guarantee its accuracy or completeness. In all cases, you should conduct your own investigation and analysis of such information before taking or omitting to take any action. Accordingly, in entering (or omitting to enter) into any transaction, you do so in reliance on your own judgment.

We shall not in any circumstances be responsible for giving taxation, legal or accountancy advice and shall not be required to take into account the taxation, legal or accountancy consequences of investments for you. You should take independent advice, including (without limitation) tax, legal or accountancy advice, where you consider it appropriate to do so.

Neither the information nor any opinion expressed constitutes an offer, or an invitation to make an offer, to buy or sell any securities or any options, futures or other derivatives related to such securities.

The information contained herein forms no part of any order or contract with MLI.

31

774

ML-PSI-0300



Permanent Subcommittee on Investigations
EXHIBIT #45 – FN 249

775

ML-PSI-0301



776

ML-PSI-0302

## Project Gemini

### Executive Summary

- Project Gemini is a program intended to provide selected international investment funds holding US equities with an enhanced after tax return.

- The following materials contemplate a transaction with MLIIF, a MLIM Luxembourg fund, as an illustrative transaction intended to represent the trade. We are seeking program approval to execute transactions with MLIIF and other international funds.

- Target counterparties include foreign pension plans and investment funds with US equities.

- The transaction involves:
  (1) A stock loan from MLIIF to a newly formed Jersey Island entity, a subsidiary of ML Group Inc.
  (2) A series of derivative transactions executed with the market by the Jersey entity and MLI designed to hedge ML market risk.

- Similar programs are offered by numerous Wall Street investment banks. MLIIF is currently executing these trades with several of Merrill Lynch's competitors and is interested in executing trades with Merrill Lynch.

- A similar transaction with MLIIF was executed by Merrill Lynch in the fall of 2000 relying upon a Hong Kong based ML subsidiary. The entity was shutdown by local regulators due to unrelated problems in derivative trading. Additionally, the entity experienced operational difficulties with the transaction. We intend to engage the Bank of New York to perform stock borrow, collateral and other logistics to ensure ongoing smooth execution.

- Merrill Lynch role in transaction: Merrill Lynch, through MLI and a newly formed Jersey corporation and subsidiary of ML Group, Inc., will engage in stock borrow, equity and OTC transactions and will be transacting as a principal.

- Covered Party: we intend to broadly market the Gemini transaction and expect counterparties (as yet unidentified) to be Covered Parties.

- The transaction received conditional NPR approval (notably requiring completion of systems development work) and CSOC approval on July 21, 2005.



CONFIDENTIAL INTERNAL DISTRIBUTION ONLY

2

777

ML-PSI-0303



778

ML-PSI-0304



Transaction Steps

779

ML-PSI-0305



780

ML-PSI-0306



Project Gemini

Transaction 1: Capitalization of JerseyCo

ML Group will borrow [$800] million from ML&Co.

ML Group will contribute the [$800] million to JerseyCo as exchange (or equity)

99% of the JerseyCo equity will be mandatorily redeemable after 20 years.

CONFIDENTIAL: INTERNAL DISTRIBUTION ONLY

7

781

ML-PSI-0307



782

ML-PSI-0308



**Project Gemini**

**Transaction 2: JerseyCo Borrows Equities and Sells Short to Market (Cont'd)**

JerseyCo will hire a broker's broker (e.g., Prebon) to sell short on its behalf high yielding equity securities to a Market Counterparty and receive [$400] million in cash. The Market Counterparty will be a US corporation. It is expected that the equities will consist of S&P 500 names with concentration of $20-25 million per name.

JerseyCo will borrow the shorted securities from one or more of the MLIIF funds (the "Stock Loan") in order to settle its short sale.

JerseyCo will post cash collateral of [113% or $452 million] of the value of the underlying stock to MLIIF under the stock borrow agreement (cash to be obtained from existing cash balance and short sale proceeds).

The Stock Loan will be terminable by either party at any time. MLIIF will use the Bank of New York ("BONY") as custodian.

ML & Co. will provide JerseyCo with a financing facility for ongoing collateral true-ups for mark to market volatility.

MLIIF will invest the collateral received into money market funds.

JerseyCo will lend the balance of its cash ([$248 million]) to ML & Co or an affiliate in the form of a demand note to be guaranteed by ML & Co.

JerseyCo will engage [BONY] as custodian / arranger to perform the following activities:
    Stock borrow logistics and collateral maintenance oversight
    Delivery and settlement for the short sales

CONFIDENTIAL INTERNAL DISTRIBUTION ONLY

ML-PSI-0309

## Project Gemini

### Transaction 3: JerseyCo Hedges Stock Exposure

JerseyCo enters into a forward contract over the securities with MLI to hedge its exposure.

The forward contract will be executed on a portfolio basis and will be cash settle only.

The forward contract will have a term of one year and will not be cancelable before 15 days. JerseyCo will have the right to exit the contract at any time after 15 days at fair market value.

MLI enters into a total return swap with the market to hedge the exposure.

The total return swap will be executed on a portfolio basis and will be cash settle only.

The total return swap will have a term of one year and will not be cancelable before 15 days.

ML & Co.

JerseyCo

(1) Forward Contract

MLI

(2) Total Return Swap

Market (US)

Stock

CONFIDENTIAL INTERNAL DISTRIBUTION ONLY

18



ML-PSI-0310

784

785

ML-PSI-0311



786

ML-PSI-0312



Transaction Analysis

787

ML-PSI-0313



788

ML-PSI-0314

## Project Gemini
## Transaction Analysis

### Summary of US GAAP Analysis

- JerseyCo is expected to be consolidated by Merrill Lynch.

- On a consolidated basis, Merrill Lynch is expected to record an asset equal to the collateralized stock borrow amount and liabilities for the stock held in inventory and any over-collateralization funding as follows:

| Merrill Lynch Consolidated | | |
|---|---|---|
| **Assets** | | |
| Cash | - | |
| Stock Borrow | 452 | |
| Interest Demand Note | - | |
| | | 452 |
| **Liabilities & Equity** | | |
| Inventory (Stock Short Sale) | 400 | |
| Interest Debt | - | |
| Borrow From the Street | 52 | |
| | | 452 |

- On a consolidated basis, Merrill Lynch is expected to record interest income related to the stock borrow and will record principal transactions related to the MTM on the short sale and the total return swap hedge executed with the street.

### Summary of UK GAAP Analysis

- Under UK GAAP (both current and revised rules for periods from January 1, 2006), MLI, as a broker/dealer, will carry both the total return swap and the forward agreement on a mark to market basis (i.e., at fair market value) with gain/loss being recognized immediately in the profit and loss account.

CONFIDENTIAL: INTERNAL DISTRIBUTION ONLY

16

789

ML-PSI-0315



## Project Gemini
### Other Considerations

**Legal, Regulatory and Rating Agency Issues**

- **Rating Agency**
  The transaction will not be rated and has no related issues.

- **Regulatory**
  The mark on the total return swap and forward agreement will attract minimal regulatory capital charges in the UK as the trades are expected to have a term of 15 – 30 days. Additionally, the affiliate exposure for MLI arising from the forward agreement to JerseyCo is within acceptable limits.

- **Compliance**
  The activities of JerseyCo would not require the entity to be registered as a broker/dealer in the US.

**Merrill Lynch Employee Interest**

- **Financial Interest in Transaction**
  None

- **Involvement of ML Employees in SPEs or Covered Parties.**
  The newly established Jersey entity will have officers and directors including Merrill Lynch employees and other non-Merrill Lynch persons.

CONFIDENTIAL INTERNAL DISTRIBUTION ONLY

16

790

ML-PSI-0316



## Project Gemini
## Other Considerations

### Documentation

| | |
|---|---|
| 1 | Loan Agreement between ML & Co., as landlord, and ML Group, as borrower (U.S. law) |
| 2 | Jersey law document(s) to govern capital contribution from ML Group to JerseyCo. and equity issuance to ML Group |
| 3 | Short Stock Sale between JerseyCo., as seller, and market counterparty, as buyer (U.K. law) |
| 4 | Stock Borrow Agreement to govern loan by MLIIF to JerseyCo. (U.K. law) |
| 5 | Cash Collateral Account Agreement by JerseyCo. in favor of MLIIF, to secure obligations under Stock Borrow Agreement (U.K. law) |
| 6 | Revolver Loan Agreement by ML Group, as lender, to JerseyCo., as borrower (U.S. law) |
| 7 | Guarantee by ML & Co. in favor of ML Group, guaranteeing ML Group Revolver Loan Agreement (U.S. law) |
| 8 | Custodial Agreement between JerseyCo. and [Bank of New York] ([U.S. law]) |
| 9 | Forward Contract between JerseyCo. and MLI (U.K. law) |
| 10 | Total Return Swap by MLI with market counterparties (U.K. law) |
| 11 | [ISDA between JerseyCo and MLIIF] |
| 12 | ISDA between JerseyCo and MLI (UK Law) |
| 13 | Jersey Service Agreement MLI [and MLIM CI] |

CONFIDENTIAL-INTERNAL DISTRIBUTION ONLY

17

791

ML-PSI-0317



792

ML-PSI-0318



# Project Gemini
## Preliminary Forward Contract Term Sheet

### 360 Day Cash / Physical Settled US Equity Forward
### Indicative Terms and Conditions as of May 2nd, 2005

| | |
|---|---|
| Buyer: | ML Jersey |
| Seller: | Merrill Lynch International |
| Underlying Equity: | TBD |
| Currency Type: | USD |
| Spot Price: | 100% |
| Reference Interest Rate: | USD LIBOR flat |
| Assumed Dividend: | [95% or as agreed] |
| Notional Amount: | Approximately $600,000,000 |
| Forward Price: | TBD |
| Trade Date: | TBD |
| Initial Settlement Date: | T+3 |
| Expiration Date: | Trade Date + 360 days |
| Settlement Date at Maturity: | Expiration Date + 3 days |
| Settlement type: | Cash / Physical |
| Closing Price: | The closing price as agreed between the counterparties on the Expiration Date. |
| Dividend Adjustment: | Not Applicable |
| Credit terms: | As per ML credit |

CONFIDENTIAL INTERNAL DISTRIBUTION ONLY

18

793


*Global Debt Markets*

## PROJECT GEMINI
*OPERATING PLAN*
*as of October 11, 2005*

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 255**

CONFIDENTIAL

ML-PSI-00049447

794

**PROJECT GEMINI**
*OPERATING PLAN*
*as of October 11, 2005*

<u>Introduction</u>

Project Gemini is a structured transaction designed to provide yield enhancement to non-US clients of Merrill Lynch that own US dividend-paying equities. From the client's perspective, the transaction involves a market standard stock loan to a subsidiary of Merrill Lynch ("ML Equity Solutions Jersey Ltd" or "MLESJ"). The client realizes economic enhancement through the stock lending fee.

MLESJ is a newly-formed trading entity established to effect stock lending transactions with clients and to enter into derivative transactions and short sales to hedge its trading positions. MLESJ has $300m of capital and a lending facility from ML&Co. MLESJ will have stand-alone audited financial statements.

<u>Marketing Guidelines</u>

The marketing of Project Gemini will be done on a very selective basis. All prospective clients should be pre-screened by John Addis (212 449 5342), the product sponsor, before any marketing takes place.

The structure may impose some US tax risk on ML. To manage any potential risk, ML tax has established a cap on the transaction which focuses on our economic return relative to potential tax risk. *Therefore, it is imperative that we achieve optimal economics on the transaction.* Clients may not be offered enhancement of greater than 50% of potential US withholding taxes without approval from John Addis. As balance sheet impact and funding costs are identical regardless of withholding tax rates, clients in 30% jurisdictions are preferred although for appropriate economies, clients in 15% jurisdictions may receive consideration.

Several of our competitors offer similar products (most notably Morgan Stanley, Lehman Brothers, and many non-US banks) so many natural candidates for the transaction are already being serviced and may command pricing concessions (State Street, BGI). Additionally, clients such as hedge funds which may be active in the equity swap market will generally not be candidates for the product.

The success of Project Gemini and our ability to achieve target economics relies on ML's superior reach and breadth of relationships relative to our competitors. Ideal candidates are likely to include SICAVs and Irish mutual fund companies.

CONFIDENTIAL

795

**Entity Summary**

**Merrill Lynch Equity Solutions Jersey ("MLESJ")**

*Newly formed Jersey corporation, wholly owned subsidiary of ML Group Inc.*

| | |
|---|---|
| Location | Jersey (UK) |
| Directors and Officers | Mr T Beck, Mr I Webster, Mr G Hamilton, Mrs T A Fritot |
| | All are employed by MLIMCI and are Jersey residents |
| Authorized Trading Activity | Securities lending, equities long & short, forward contracts with MLI |
| Bank Account | Bank of New York |
| Custodian | Bank of New York |
| MLESJ Stock Borrow Trading | MLI to trade on MLESJ's behalf as directed under the Trade Support Agreement (initial trader on stock borrow expected to be Ian Bower of MLI London and Rob Cleasby of MLI NY) |
| MLESJ Forward / Short Sale Trading | MLI to trade on MLESJ's behalf as directed under the Trade Support Agreement (initial trader expected to be Giles Hitchcock of MLI London) |
| Operations Manager | Al Howell (NY, short sale settlement) |
| | Joe Janosi (NY, stock loan) |
| Stock Borrow Frequency | Expect at least one portfolio per week. |
| Financial Statement Preparation | MLESJ will retain D&T Jersey to conduct audit(s); Mourant to prepare to fulfill annual reporting obligations; periodic statements will be prepared out of the ML General Ledger system by ML London Corporate Reporting. |

**Merrill Lynch International**

*Existing Merrill Lynch subsidiary.*

| | |
|---|---|
| Location | United Kingdom |
| Related Trading Activity | Forward sale contracts to MLESJ; total return swaps with external counterparties |
| MLI Traders | Rich Jessop (US), Paul Cipriano (US) (subject to change at MLI election) |
| Operations Manager | Anthony DeGennaro (NY, TRS and forward) |
| Total Return Swap Counterparty | External counterparties (e.g., established arms of large international banks) |

CONFIDENTIAL

ML-PSI-00049449

796

**Operational Requirements**

1. Stock Loan Counterparty Establishment
   a. MLESJ BOD approval will be required for all new counterparties (may be done by authorized Board member with review of full Board at quarterly meeting).
   b. Counterparties will be submitted to ML Credit for approval – netting opinions to be obtained.
   c. OGC to confirm netting provision for counterparty jurisdiction (note that ML Credit's approval is subject to netting opinion confirmation for all new counterparties).
   d. Proposed economics to be reviewed.
   e. Stock loan agreement to be executed. Counterparties must be able to effect stock lending transactions. No trading will take place until a client enters into a master stock lending agreement with MLESJ.
   f. Counterparty to provide W8 IMY/BEN

2. MLI Swap Counterparty: each swap counterparty master agreement must be confirmed by ML Legal to contain gross-up language.

3. MLESJ Loan to Merrill Lynch over excess cash.
   a. Demand loan must have a term of less than 183 days. Loan documented with term of 180 days.
   b. At termination of each loan (every 180 days), each successive loan will need to be to a new ML entity. If existing loan is to a US ML entity, next loan must be to a non-US ML affiliate. The loan may switch between two ML entities. Each entity must be guaranteed by ML & Co.
   c. Initial loan was executed on August 17, 2005 with 180 day term; consequently, the first loan matures on February 13, 2006 and must be re-executed with a different non-US ML entity.

4. MLESJ Loan Facility
   a. Overnight funding facility provided by ML & Co.
   b. Facility size = $1.0 billion.
   c. General MLESJ business practice will be to draw on the Loan Facility for funding needs rather than the Demand Note (described above).

5. MLESJ Board of Directors
   a. Initial directors = Tim Beck (MLIM CI), Ian Webster (MLIM CI), Grant Hamilton (MLIM CI), and Tracy Fritot (MLIM CI). All are Jersey residents.
   b. Any future director must be non-US. Any UK director requires approval of ML Tax department.
   c. Directors fees are envisaged at $10,000 p.a. per director. This will be ceded back to the relevant divisions under which the directors operate.
   d. Board will meet quarterly; business group will provide detailed presentation of business at each meeting.

6. Service Agreements / Agents
   a. MLIM CI: provide board members, facilities and administration support. MLESJ will enter into a formal agreement with MLIM CI for compensation to Board members and employees.
   b. Mourant: Jersey legal, finance and administration.
   c. BONY: settlement and clearing over cash transactions.
   d. MLI: Trade Support Agreement with regard to forward contract and stock borrows.

7. Responsibilities and Authority of MLESJ
   a. MLESJ will have full authority over all agents and traders and will have the ability to replace or rescind any servicing agreements.

CONFIDENTIAL

ML-PSI-00049450

797

b.  MLESJ will have the full authority to reject trades prior to execution.
c.  MLESJ will review all financial statements and trading summaries.
d.  MLESJ will file annual statements to the Jersey authorities on shareholders and share capitals.
e.  MELSJ will manage process of engaging Deloitte Touche Jersey will be hired to provide audited financials, some work may be outsourced to London D&T.  MLESJ to oversee audit process.
f.  Books and records of MLESJ will be maintained jointly by MLI London (John Jack) and MLIM CI.

8.  IRS for 1042/1042S: [BNY to prepare and submit on behalf of MLESJ]

9.  Terms of Forward Contract between MLESJ and MLI
a.  executed on a portfolio basis;
b.  cash settle only;
c.  term of one year, not cancelable before 15 days (terminable thereafter at fair market value).
d.  documented as forward contract, booked as price swap.

10.  Role of Bank of New York ("BNY")
a.  clearing and settlement on MLESJ cash trading activity (stock borrow vs. short sale)
b.  [tax compliance: form 1042/1042S]
c.  [dividend flows – confirm with cleasby]
d.  [intra day funding]
e.  fee to BNY dictated by BNYs fee schedule - [subject to final negotiation]

**Trade Process Summary (Non-Exclusive Trades)**
*Note that the following references to specific MLI traders (Giles Hitchcock and Ian Bower) are for clarity only – in practice, MLI will manage the trading process and appoint individual traders at its discretion.  All trading of stocks or stock baskets, forwards, and swaps will occur prior to the NY market open at the prior day's closing prices.*

*Trade processes for exclusive trades (wherein MLESJ will bid to have exclusive rights to borrow a fund's securities for extended periods (e.g., one year))will have identical steps to the below except that the*
**A. Trade Initiation**
1.  Approved Counterparty contacts Ian Bower and provides summary of proposed stock loan.  Counterparty follows with email to Giles Hitchcock and MLESJ with details of portfolio and pricing.
2.  Giles Hitchcock or Ian Bower contacts Rich Jessop and Paul Cipriano to determine hedge (forward contract) availability.
3.  MLESJ Board or authorized Board member will be notified of potential transaction.
4.  Paul and Rich attempt to locate hedge counterparty in market and, if successful, reply to Giles and MLESJ with pricing levels.
5.  Unless stock loan is rejected by MLESJ Board or authorized Board member, stock loan is agreed between Ian Bower and Counterparty.
6.  Ian Bower sends emails to (a) Counterparty authorizing the stock borrow and (b) Rich Jessop / Paul Cipriano authorizing the forward.
7.  Giles instructs a selected "broker's broker" such as Tullets or ICAP to sell equities short on a [principal/agent] basis. Equity portfolio is sold short through selected broker. Broker will be responsible for locating buyer.  ML will have no visibility to the ultimate purchaser of the shares and will have no knowledge or way of knowing the identity of the ultimate purchaser.

5

CONFIDENTIAL                                                              ML-PSI-00049451

798

8. Stock borrow and forward contract are executed. London operations, on behalf of MLESJ, will book the trades.

9. BONY, as agent to MLESJ, will handle settlement and clearance on the stock borrow against the short position.

**B. Trade Unwind after Total Return Swap lockout date**

1. Counterparty contacts Ian Bower providing notice of stock borrow unwind. Ian sends email to notify Giles, Cipriano, Jessop and MLESJ of forward contract unwind.

2. Giles instructs broker to acquire equities in the market and receives intraday funding from [BONY/ML & Co. Treasury]. ML will have no visibility to the ultimate eller of the shares and will have no knowledge or way of knowing the identity of the ultimate seller.

3. MLESJ and MLI unwind the forward contract and total return swaps.

4. BONY, as agent to MLESJ, will effect clearing and settlement of the above transactions.

5. Counterparty and MLESJ make payments under the stock borrow and Counterparty returns the cash collateral to MLESJ; MLESJ repays intraday funding.

**C. Trade Unwind before Total Return Swap lockout date**

1. Counterparty contacts Ian Bower providing notice of stock borrow unwind.

2. Ian borrows (or may instruct broker to borrow) identical equities from a market counterparty [or from a MLI]. London operations, on behalf of MLESJ, will book the trades.

3. BONY, as agent to MLESJ, will settle the borrow of equities from the market counterparty and deliver the equities to Counterparty under the stock borrow agreement.

4. Once the TRS lockout date is reached, trade unwind proceeds as detailed in B above except MLESJ returns equities to the new market counterparty on the stock borrow rather than Counterparty.

**Trade Process Summary (Exclusive Trades)**

*Exclusive trades involves competitive bids in which MLESJ will bid to have exclusive rights to borrow a fund's securities for extended periods of time (e.g., one year). MLESJ will coordinate with MLI on the pricing of the bid. If MLESJ wins a bid, the following steps may be executed at any time during the exclusive period.*

**A. Trade Initiation**

1. MLI on behalf of MLESJ will determine attractive equities to borrow. Giles Hitchcock or Ian Bower contacts Rich Jessop and Paul Cipriano to determine hedge (forward contract) availability. MLESJ Board or authorized Board member will be notified of potential transaction.

2. Paul and Rich attempt to locate hedge counterparty in market and, if successful, reply to Giles and MLESJ with pricing levels.

3. Unless stock loan is rejected by MLESJ Board or authorized Board member, stock loan is agreed between Ian Bower and Counterparty.

4. Ian Bower sends emails to (a) Counterparty authorizing the stock borrow and (b) Rich Jessop / Paul Cipriano authorizing the forward.

5. Giles instructs a selected "broker's broker" such as Tullets or ICAP to sell equities short on a [principal/agent] basis. Equity portfolio is sold short through selected broker. Broker will be responsible for locating buyer. ML will have no visibility to the ultimate purchaser of the shares and will have no knowledge or way of knowing the identity of the ultimate purchaser.

6. Stock borrow and forward contract are executed. London operations, on behalf of MLESJ, will book the trades.

7. BONY, as agent to MLESJ, will handle settlement and clearance on the stock borrow against the short position.

**B. Trade Unwind**

1. Ian sends email to notify Giles, Cipriano, Jessop and MLESJ of forward contract unwind.

6

CONFIDENTIAL

ML-PSI-00049452

799

2. Giles instructs broker to acquire equities in the market and receives intraday funding from [BONY/ML & Co. Treasury].
3. MLESJ and MLI unwind the forward contract and total return swaps.
4. BONY, as agent to MLESJ, will effect clearing and settlement of the above transactions.
5. Counterparty and MLESJ make payments under the stock borrow and Counterparty returns the cash collateral to MLESJ; MLESJ repays intraday funding.

CONFIDENTIAL

ML-PSI-00049453

800

## GMI NEW PRODUCT REVIEW

### EXECUTIVE SUMMARY

| MEETING DATE: October [25], 2005 | PREPARER: Peter Cross, Alan Levy |
|---|---|
| Product: Project Gemini | Product Sponsor: John Addis |
| Sponsoring Business Unit:<br>Global Structured Product | Pre-Review: Regional COO Approval<br>Discussed with: Roger Anerella<br><br>Accountable manager: Mac Taylor |
| Regions:<br>US , UK , Jersey Island | Types of Trades:<br>Stock borrow, equity swaps / forward,<br>Equity sell / buy<br>Is the Product Currency Restricted? (If so, state the currency): No (USD) |
| Legal Entity:<br>MLI, ML Group Inc, Merrill Lynch Equity Solutions Jersey ("MLESJ") | Average Life Expectancy of Trade/Instrument:<br>Rolling 15 – 30 day trades on average |
| Is the Legal Entity Regulated?  Yes<br>Regulator (if yes): MLI - FSA | Expected Volumes: (i.e. trades, assets,)<br>a) Initial $100m: initial MLIIF credit and board approval;<br>b) $300m: target full volume from MLIIF expected within 6 months;<br>c) $2.0b: program total representing multiple counterparties expected within 2 years. |
| To Seek an Approval for: Product  X      Structure       or One-Off Transaction | |

Introduction

- Project Gemini is a structured transaction designed to provide yield enhancement to non-US clients of Merrill Lynch that own US dividend-paying equities.

- Target counterparties include foreign pension plans and investment funds with US equities.

- The transaction involves:
  (1) A short sale to the market of US equities by Merrill Lynch Equity Solutions Jersey ("MLESJ"), a newly formed Jersey Island entity and subsidiary of ML Group Inc., and a stock loan from counterparty to MLESJ to cover the short position.
  (2) A series of derivative transactions executed with the market by MLESJ and MLI designed to hedge ML market risk.

- The initial counterparty will be Merrill Lynch International Investment Fund ("MLIIF"), a MLIM SICAV fund incorporated in Luxembourg.

- Similar programs are offered by numerous Wall Street investment banks.  MLIIF is currently executing these trades with several of Merrill Lynch's competitors.

1

Permanent Subcommittee on Investigations<br>EXHIBIT #45 - FN 257

ML-PSI-0319

801

| GMI NEW PRODUCT REVIEW |
| --- |

## Summary of Entities Organization & Responsible Party List

**Entity Summary**

Merrill Lynch Equity Solutions Jersey

*Newly formed Jersey corporation, wholly owned subsidiary of ML Group Inc.*

| | |
| --- | --- |
| Location | Jersey (UK) |
| Directors and Officers | Mr T Beck, Mr I Webster, Mr G Hamilton, Mrs TA Fritot<br>All are employed by MLIMCI and are Jersey residents |
| Authorized Trading Activity: | Securities lending, equities long & short, forward contracts with MLI |
| Bank Account | Bank of New York ("BNY") |
| Custodian | BNY |
| MLESJ Stock Borrow Trading | MLI to trade on MLESJ's behalf as directed under the Trade Support Agreement (initial trader on stock borrow expected to be Ian Bower of MLI London) |
| MLESJ Forward / Short Sale Trading | MLI to trade on MLESJ's behalf as directed under the Trade Support Agreement (initial trader expected to be Giles Hitchcock of MLI London) |
| Stock Borrow Frequency | Expect at least one portfolio per week. |
| Financial Statement Preparation | MLESJ will retain D&T UK to conduct audit(s); Mourant to fulfill annual reporting obligations; periodic statements will be prepared out of the ML General Ledger system by ML London Corporate Reporting. |

Merrill Lynch International

*Existing Merrill Lynch subsidiary*

| | |
| --- | --- |
| Location | United Kingdom |
| Related Trading Activity | Forward sale contracts to MLESJ; total return swaps with external counterparties |
| MLI Traders | Rich Jessop (US), Paul Cipriano (US) (subject to change at MLI election) |
| Operations Manager | Anthony DeGennaro (NY, TRS and forward) |
| Total Return Swap Counterparty | External counterparties (e.g., established arms of large international banks) |

**Operational Requirements**

1.  Stock Loan Counterparty Establishment

    a.  MLESJ BOD approval will be required for all new counterparties (may be done by authorized Board member with review of full Board at quarterly meeting).

2

ML-PSI-0320

802

## GMI NEW PRODUCT REVIEW

    b.  Counterparties will be submitted to ML Credit for approval – netting opinions to be obtained.

    c.  OGC to confirm netting provision for counterparty jurisdiction (note that ML Credit's approval is subject to netting opinion confirmation for all new counterparties).

    d.  Proposed economics to be reviewed.

    e.  Stock loan agreement to be executed. Counterparties must be able to effect stock lending transactions. No trading will take place until a client enters into a master stock lending agreement with MLESJ.

    f.  Counterparty to provide W8 IMY/BEN

2.  MLI Swap Counterparty: each swap counterparty master agreement must be confirmed by ML Legal to contain gross-up language.

3.  MLESJ Loan to Merrill Lynch over excess cash.

    a.  Demand loan must have a term of less than 183 days. Loan documented with term of 180 days.

    b.  At termination of each loan (every 180 days), each successive loan will need to be to a new ML entity.
If existing loan is to a US ML entity, next loan must be to a non-US ML affiliate. The loan may switch between two ML entities. Each entity must be guaranteed by ML & Co and must have the independent financial ability to make interest and principal payments on the loan.

    c.  Initial loan was executed on August 17, 2005 with 180 day term; consequently, the first loan matures on February 13, 2006 and must be re-executed with a different non-US ML entity.

4.  MLESJ Loan Facility

    a.  Overnight funding facility provided by ML & Co.

    b.  Facility size = $1.0 billion

    c.  General MLESJ business practice will be to draw on the Loan Facility for funding needs rather than the Demand Note (described above).

5.  MLESJ Board of Directors

    a.  Initial directors = Tim Beck (MLIM CI), Ian Webster (MLIM CI), Grant Hamilton (MLIM CI), and Tracy Fritot (MLIM CI). All are Jersey residents.

    b.  Any future director must be non-US. Any UK director requires approval of ML Tax department.

    c.  Directors fees are envisaged at $10,000 p.a. per director. This will be ceded back to the relevant divisions under which the directors operate.

    d.  Board will meet quarterly; business group will provide detailed presentation of business at each meeting.

6.  Service Agreements / Agents

    a.  MLIM CI: provide board members, facilities and administration support. MLESJ will enter into a formal agreement with MLIM CI for compensation to Board members and employees

    b.  Mourant: Jersey legal, finance and administration.

    c.  BNY: settlement and clearing over cash transactions.

3

ML-PSI-0321

803

## GMI NEW PRODUCT REVIEW

    d.  MLI: Trade Support Agreement with regard to forward contract and stock borrows.

7.  Responsibilities and Authority of MLESJ

    a.  MLESJ will have full authority over all agents and traders and will have the ability to replace or rescind any servicing agreements.

    b.  MLESJ will have the full authority to reject trades prior to execution.

    c.  MLESJ will review all financial statements and trading summaries.

    d.  MLESJ will file annual statements to the Jersey authorities on shareholders and share capitals.

    e.  MELSJ will manage process of engaging Deloitte Touche Jersey will be hired to provide audited financials, some work may be outsourced to London D&T.  MLESJ to oversee audit process

    f.  Books and records of MLESJ will be maintained jointly by (i) MLE London (John Jack) in conjunction with Business Unit Finance in respect of the company's financial records and (ii) Mourants in respect of the company secretarial records.

8.  IRS form 1042/1042S: BNY to prepare and submit on behalf of MLESJ or BNY to assist ML in preparation of form on behalf of MLESJ

9.  Terms of Forward Contract between MLESJ and MLI

    a.  executed on a portfolio basis;

    b.  cash settle only;

    c.  term of one year, not cancellable before 15 days (terminable thereafter at fair market value).

    d.  documented as forward contract, booked as price swap.

10. Role of Bank of New York

    a.  clearing and settlement on MLESJ cash trading activity (stock borrow vs. short sale)

    b.  tax compliance: form 1042/1042S

    c.  intra day funding: BNY has offered daylight funding, ML Treasury to consider.

    d.  fee to BNY dictated by BNY's fee schedule - [subject to final negotiation]

**Trade Process Summary (Non-Exclusive Trades)**
*Note that the following references to specific tradersare for clarity only – in practice, MLI will manage the trading process and appoint individual traders at its discretion.  All trading of stocks or stock baskets, forwards, and swaps will occur prior to the NY market open at the prior day's closing prices.*

Indicative traders:
MLI on behalf of MLESJ:
Stock Borrow: UK Stock Loan desk = Ian Bower
Forward Contract: UK Equity Swaps desk = Giles Hitchcock


MLI (counterparty to MLESJ on Forward Contract & Total Return Swap)
Forward Contract: US Equity Swaps desk = Paul Cipriano & Rich Jessop

ML-PSI-0322

804

## GMI NEW PRODUCT REVIEW

Total Return Swap: US Equity Swaps desk = Paul Cipriano & Rich Jessop

### A. Trade Initiation

1. Approved Counterparty contacts Ian Bower and provides summary of proposed stock loan. Counterparty follows with email to Giles Hitchcock and MLESJ with details of portfolio and pricing.

2. Giles Hitchcock or Ian Bower contacts Rich Jessop and Paul Cipriano to determine hedge (forward contract) availability.

3. MLESJ Board or authorized Board member will be notified of potential transaction.

4. Paul and Rich attempt to locate hedge counterparty in market and, if successful, reply to Giles and MLESJ with pricing levels.

5. Unless stock loan is rejected by MLESJ Board or authorized Board member, stock loan is agreed between Ian Bower and Counterparty.

6. Ian Bower sends emails to (a) Counterparty confirming the stock borrow and (b) Rich Jessop / Paul Cipriano authorizing the forward.

7. Giles instructs a selected "broker's broker" such as Tullets or ICAP to sell equities short on a [principal/agent] basis. Equity portfolio is sold short through selected broker. Broker will be responsible for locating buyer. ML will have no visibility to the ultimate purchaser of the shares and will have no knowledge or way of knowing the identity of the ultimate purchaser.

8. Stock borrow and forward contract are executed. London operations, on behalf of MLESJ, will book the trades.

9. BNY, as agent to MLESJ, will handle settlement and clearance on the stock borrow against the short position.

### B. Trade Unwind after Total Return Swap lockout date

1. Counterparty contacts Ian Bower providing notice of stock borrow unwind. Ian sends email to notify Giles, Cipriano, Jessop and MLESJ of forward contract unwind.

2. Giles instructs a selected "broker's broker" such as Tullets or ICAP to acquire equities a [principal/agent] basis and receives intraday funding from [BNY/ML & Co. Treasury]. Broker will be responsible for locating seller. ML will have no visibility to the ultimate seller of the shares and will have no knowledge or way of knowing the identity of the ultimate seller.

3. MLESJ and MLI unwind the forward contract and total return swaps.

4. BNY, as agent to MLESJ, will effect clearing and settlement of the above transactions.

5. Counterparty and MLESJ make payments under the stock borrow and Counterparty returns the cash collateral to MLESJ; MLESJ repays intraday funding.

### C. (a) Trade Unwind before Total Return Swap lockout date

1. Counterparty contacts Ian Bower providing notice of stock borrow unwind.

2. Ian borrows (or may instruct broker to borrow) identical equities from a market counterparty [or from MLI]. London operations, on behalf of MLESJ, will book the trades.

3. BNY, as agent to MLESJ, will settle the borrow of equities from the market counterparty and deliver the equities to Counterparty under the stock borrow agreement.

4. Once the TRS lockout date is reached, trade unwind as detailed in B above except MLESJ returns equities to the new market counterparty on the stock borrow rather than Counterparty.

5

ML-PSI-0323

805

# GMI NEW PRODUCT REVIEW

**C: (b) Alternate Trade Unwind prior to TRS lockout date**

The following may be used if MLESJ is unable to enter into a new stock borrow (e.g., prior to execution of stock borrow agreement with separate counterparties).

1. Counterparty contacts Ian Bower providing notice of stock borrow unwind.
2. MLESJ acquires stocks to cover the borrow where MLESJ receives intraday funding from [BNY/ML & Co. Treasury].
3. MLI on behalf of MLESJ returns stocks to Counterparty. BNY handles settlement and clearing on the above trades.
4. MLIIF releases the cash collateral and MLESJ repays the intraday funding.
5. Cipriano and Jessop enter into a total return swap with MLESJ that will offset MLESJ's exposure under the Forward.
6. At the end of the lockout period, the two swaps are terminated at no net cost.

**Trade Process Summary (Exclusive Trades)**

*Exclusive trades involves competitive bids in which MLESJ will bid to have exclusive rights to borrow a fund's securities for extended periods of time (e.g., one year). MLESJ will coordinate with MLI on the pricing of the bid. Any bid will require the approval of the MLESJ board. If MLESJ wins a bid, the following steps may be executed at any time during the exclusive period.*

**A. Trade Initiation**

1. MLI on behalf of MLESJ will determine attractive equities to borrow. Giles Hitchcock or Ian Bower contacts Rich Jessop and Paul Cipriano to determine hedge (forward contract) availability. MLESJ Board or authorized Board member will be notified of potential transaction.
2. Paul and Rich attempt to locate hedge counterparty in market and, if successful, reply to Giles and MLESJ with pricing levels.
3. Unless stock loan is rejected by MLESJ Board or authorized Board member, stock loan is agreed between Ian Bower and Counterparty.
4. Ian Bower sends emails to (a) Counterparty authorizing the stock borrow and (b) Rich Jessop / Paul Cipriano authorizing the forward.
5. Giles instructs a selected "broker's broker" such as Tullets or ICAP to sell equities short on a [principal/agent] basis. Equity portfolio is sold short through selected broker. Broker will be responsible for locating buyer. ML will have no visibility to the ultimate purchaser of the shares and will have no knowledge or way of knowing the identity of the ultimate purchaser.
6. Stock borrow and forward contract are executed. London operations, on behalf of MLESJ, will book the trades.
7. BNY, as agent to MLESJ, will handle settlement and clearance on the stock borrow against the short position.

**B.C. Trade Unwind: Same as Non-Exclusive Trades**

Are there any major control concerns?

**None**

6

806

## GMI NEW PRODUCT REVIEW

Are there any Pre or Post-Trading Conditions which will delay trading? *(If so, please explain):*
*Pre-Trading Conditions:*

- Final documentation to be executed (stock loan agreement with MLIIF, forward contract ISDA, service agreements);
- Technology testing work to be completed;
- Finalization of Bank of New York terms of engagement (final testing, tax compliance role and fee negotiation).

*Post-Trading Conditions:*

- Compliance to review detailed flows of initial trade.
- Subject to tax limits:
  - *Annual trading limit initially established at first to be reached of (a) $50 million annual gross withholding tax elimination, and (b) $25 million net withholding tax (=gross withholding tax less MLESJ fees). Limits will be reviewed after one year.*
- Subject to Corporate Actions volume constraint during manual stage:
  - *At two week intervals the desk will borrow and sell baskets of no more than 20 stocks. The dividend team can only track a maximum of 20 names at a time.*
  - *The initial trade will be a basket of fewer than 10 stocks.*
  - *Trading will be limited to MLIM funds at the start with only 5 funds participating.*
  - *Only cash dividends can be supported without the technology. Any other event announced on a stock requires that particular stock to be removed from the basket.*
  - *ADRs cannot be supported.*
- ML Credit condition:
  - *Business must contact credit prior to trading for each new stock loan counterparty to establish appropriate credit limits. At that time, the business must confirm if a positive netting opinion has been provided by OGC for the relevant MLESJ stock loan agreement/counterparty jurisdiction.*

7

ML-PSI-0325

807

# EXECUTIVE SUMMARY

**ML& Co. Consolidated Revenue Forecast**

| $'s in thousands | Note | Year 1 | Year 2 | Year 3 |
|---|---|---|---|---|
| REVENUES (Year 1 revenues assume 1 quarter of the year) | A | 250 | 10,000 | 20,000 |
| | | | | |
| Variable expenses | B | 30 | 300 | 500 |
| Fixed & Semi-fixed expenses (year 1 includes build costs) | C | 380 | 100 | 50 |
| PRE-TAX CONTROLLABLE CONTRIBUTION | | (160) | 9,600 | 19,450 |
| | | | | |
| Tax on Controllable Contribution | | (56) | 3,360 | 6,807 |
| AFTER TAX CONTROLLABLE CONTRIBUTION | | (104) | 6,240 | 12,643 |
| | | | | |
| Additional headcount per year | | 0 | 0 | 0 |
| Equity | | 2,000 | 16,000 | 33,000 |
| | | | | |
| ROE | | NA | 38% | 38% |

| Assumptions and calculations: | | Year 1 | Year 2 | Year 3 |
|---|---|---|---|---|
| Start data  VOLUMES & COMMISSION REVENUES | | Nov. 5, '05 | | |
| Trade volumes | | See Corp. Actions limits | 100 per month | 150 per month |
| | | | | |
| Annual volume increase | | | | |
| Execution commission rate | | | | |
| Clearing commission rate | | | | |
| | | | | |
| B VARIABLE EXPENSES | | | | |
| BC&E | | 30 | 300 | 500 |
| Other | | | | |
| | | 30 | 300 | 500 |
| C FIXED AND SEMI-FIXED EXPENSES | | | | |
| Headcount | | 0 | 0 | 0 |
| Fees | | 0 | 0 | 0 |
| Technology | | 380 | 0 | 0 |
| Other | | 0 | 50 | 50 |
| | | | | |
| D PRE-TAX CONTROLLABLE CONTRIBUTION (A-B-C) | | (160) | 9,600 | 19,450 |

**Pre-Tax Controllable Contribution by Legal Entity (Represents D Above)**

| s in whole numbers (list all ML legal entities involved | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| e-Tax Controllable Contribution For MLESJ* | (160) | 9,600 | 19,450 |
| e-Tax Controllable Contribution For MLI* | TBD | TBD | TBD |
| e-Tax Controllable Contribution For | | | |
| e-Tax Controllable Contribution For | | | |

*The MLESJ/MLI split will be determined at time of trade.*

ML-PSI-0326

808

Projected Balance Sheet Usage ($'s in whole numbers)

| Balance Sheet | | | | | |
|---|---|---|---|---|---|
| (in 000's) | ML&Co. | Elimination | ML Legal Entity ML Group Inc. | ML Legal Entity MLESJ | MLI |
| ASSETS: | | | | | |
| Cash | | | | | |
| Securities Financing Transactions | 452,000,000 | | | 452,000,000 | |
| Trading Assets at Fair Value | | | | | |
| Investment Securities | | | | | |
| Securities Received as Collateral | | | | | |
| Other Receivables (Inter – Co) | 0 | 548,000,000 | 300,000,000* | 248,000,000*** | |
| Loans, Notes and Mortgages | | | | | |
| Equipment and Facilities | | | | | |
| Goodwill | | | | | |
| Other Assets | | | | | |
| TOTAL ASSETS | 452,000,000 | 548,000,000 | 300,000,000 | 700,000,000 | |
| LIABILITIES: | | | | | |
| Securities Financing Transactions | | | | | |
| Deposits | | | | | |
| Trading Liabilities at Fair Value | 400,000,000 | | | 400,000,000 | |
| Obligation to Return Securities Received as Collateral | | | | | |
| Other Payables (Inter-Co) | 0 | 600,000,000 | 300,000,000 ** | 300,000,000 * | |
| Liabilities in Insurance Subsidiaries | | | | | |
| Long-Term Borrowings | 52,000,000**** | | | | |
| TOTAL LIABILITIES | 452,000,000 | | 300,000,000 | 700,000,000 | |

*Newly formed entity will be capitalized with $300 million of equity. The equity will be 99% redeemable thus debt for GAAP purposes and 1% pure equity. For purposes of the above I have included the entire $300 million as an Interco Item on MLESJ and ML Group Inc.'s balance sheet.
**ML Group Inc. will borrow $300 million from ML&CO to fund its investment in MLESJ.
***MLESJ will lend excess cash to ML Affiliates as determined to be appropriate by ML Tax Group
****Represents ML&CO's true funding requirement.
*****MLI will have matched derivative contracts on its books, i.e. forward against MLESJ, and a TRS versus the street. Initial notional amount expected to be $400 million on both derivative contracts.

## EXECUTIVE SUMMARY

0

ML-PSI-0327

809

| Area | Systems to be Used | Existing/ New/ Modified | Additional Head Count Required? | Straight Through Processing? (Yes/No) | Does a Disaster Recovery Plan Exist? | Does the contingency plan satisfy ML standards? | Additional Cost |
|---|---|---|---|---|---|---|---|
| Trading | RAM/ Janus | Modified | No | Yes | Yes | Yes | JANUS - $70,000 RAM $35,500 |
| ISS | Oracle G/L/ E-Bar/RAM/ Janus/ BUCS | Modified for Oracle and BUCS  Modified for E-Bar, Ram and Janus | No | Yes | Yes | Yes | ORACLE $22,128  EBAR $15,787 |
| GT&CS | RAM/ Janus/E-Bar/RECON | Modified for E-Bar, Ram and Janus and RECON and TESS | No | Yes | Yes | Yes | RECON $40,255  TESS $32,957 |
| Credit | RAM/ Janus/ Glacier | Modified JANUS Feed | No | Yes | Yes | Yes | None |
| Market Risk | RAM/ Janus/ Scenarios | Existing | No | Yes | Yes | Yes | None |
| Regulatory | Oracle G/L/ E-Bar/RAM/ Janus | Modified for Oracle  Modified for E-Bar, Ram and Janus | No | Yes | Yes | Yes | None |
| Treasury | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Legal | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

**Netting Agreements:**

| | |
|---|---|
| What legal and netting agreement(s) will be signed in accordance with this product? (e.g., ISDA, Bond Market Association Agreement (BMA), etc.) | ISDA & Master Securities Loan Agreement |
| Is there a valid netting opinion? | Yes |

| PRODUCT OVERVIEW | |
|---|---|
| Proposed start date: | 11/5/2005 |

10

ML-PSI-0328

810

| | |
|---|---|
| Market size ($): | >$10 billion |
| Existing market participants: | Majority of major Wall Street firms |
| Legal entity where trades booked: | MLI / ML Group Inc. / MLESJ |
| Does trade flow through a regulated entity: | Yes: MLI |
| Traders – Physical location: | London, New York |
| - Legal entity: | MLI, MLESJ. |
| Sales Force - Physical location: | New York/London |
| - Legal entity: | MLPF&S/MLI |
| Any Agency agreement? | No |
| Initial counterparties: | MLIIF (a MLIM Luxembourg SICAV fund) |
| Counterparties – location: | Luxembourg (initial) |
| Counterparties – business area / type: | Investment funds, pension funds, other international funds holding US equities. |
| Counterparties – other examples: | |
| Other required authorisations obtained? | Completed: SPC, CSOC |

| PROJECTED RETURNS, TRADING VOLUMES, INVENTORY | |
|---|---|
| Year 1 Trading volumes – Value ($): | a) Initial $100m: initial MLIIF credit and board approval;<br>b) $300m: target full volume from MLIIF expected within 6 months; |
| Trading Volumes – Number of trades per day: | Initial limit: max 20 stocks traded at once, for esp period of 2 weeks. |
| Type of transaction flow -Agency % | 0% |
| -Proprietary % | 100% |
| Inventory – Proprietary position: | 100% |
| Customer "hold" positions: | NA |
| Impact on ML&Co – Estimated Year 1 net revenue ($): | $250k 2005, $10m 2006 |
| Year 1 – Estimated market share (%): | <10% |
| Currency mix – highlighting any convertibility issues: | NA – All USD |

| TRADE / TRANSACTION FLOW | |
|---|---|
| How are trades slated? | Stock Borrows in Janus, Shorts and Derivatives in RAM |
| Trade settlement details: | Regular way |
| Custodian bank / location: | BNY / NY & London |
| Paying agent / location: | NA |
| Broker / location: | NA |

ML-PSI-0329

811

## TRANSACTION DIAGRAM

Please insert a flow chart/diagram detailing the transaction structure of the new product.

**Summary Diagram**



1. Merrill Lynch Equity Solutions Jersey Limited ("MLESJ"), a newly established Jersey Island corporation and subsidiary of ML Group Inc., will sell short US equity securities to the market.

2. In order to fill its short position, MLESJ will borrow the US equity securities from Counterparty and MLESJ will post [113%] cash collateral.
   Counterparty will invest the collateral received into money market funds.

3. ML & Co. has provided MLESJ with a $1.0 billion financing facility for ongoing collateral true-ups for mark to market volatility.

4. MLESJ enters into a forward contract over the securities with MLI to hedge its exposure.

5. MLI enters into a total return swap with a market counterparty to hedge its exposure.

12

ML-PSI-0330

812

**Capitalization of MLESJ (completed on August 17, 2004)**



1.  ML Group Inc., a wholly owned subsidiary of ML & Co, borrowed $300 million from ML & Co.

2.  ML Group Inc. contributed the $300 million to MLESJ in exchange for equity.

    Note that 99% of the shares of MLESJ are redeemable after 20 years.

3.  MLESJ lent the $300 million to ML & Co in the form of a demand note. The demand note has a term of 180 days and will periodically be re-executed with ML & Co., or an affiliate guaranteed by ML & Co. Each successive loan will need to be to a new ML entity (but may switch between two entities).

4.  On August 19, MLESJ entered into a credit facility with ML & Co. under which MLESJ can borrow amounts up to $1.0 billion upon one day notice.

13

ML-PSI-0331

813

ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:
**GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE**
**CONTROL TEMPLATE**

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| **Market Risk Management**<br>**DISCUSSED WITH: Zahid Naseem** | | |
| 1. Please describe the proposed transaction or product and all involved counterparties. | | Stock loan and associated forward agreement with SICAV fund. Plus inter-entity back to back equity swaps. |
| 2. Is this product currently traded in a different region or by a different business unit at Merrill Lynch? | | Similar product for different entity has been traded in EMEA. |
| 3. Is the product new to the market? Who are ML's competitors? What would be the consequences of ceasing activity in this new product? | | Product currently offered by other Stock Loan desks. |
| 4. Which trading desk will be responsible for risk managing this product? | | Trade booked in GEF Swaps and Stock Loan. |
| 5. Is the product subject to specific external regulation? Provide details? | | Standard stock loan and swap rules. |
| 6. Which legal entities will this product use? | | MLI and new MLESJ |
| 7. What trading book (s) will be used for the booking process? | | New books opened in RAM and Janus. |
| 8. In which trading system will these transactions be booked? | | Swaps, forward and short sale in RAM, stock loan in Janus. |
| 9. How will required market risk data be generated and fed to Scenarios? Will any of the processes be manual? If yes, provide details. Will Scenarios data be sent in timely (T+1)? | | All automated feeds from RAM |
| 10. How will the Scenarios data sent to risk be reconciled? Who will be responsible for this process? | | Standard RAM feeds and reconciliation process. |
| 11. Describe the valuation methodology used in calculating market and risk data. List all the models used for valuation. Has risk management reviewed and approved the models? | | Standard RAM models. |
| 12. List all inputs for valuation purposes and describe the sources for these data. Please highlight any parameters that require estimation (i.e. are not market observable) and how this estimation will be done? | | Standard RAM inputs from exchange |
| 13. Describe all market risks associated with the product, any hedging techniques, key assumptions, the liquidity of the product and any associated hedges. Please highlight any risks that cannot be hedged and any risk concentrations. | | Trade is back to back – no significant market risk. |
| 14. Do any entity/regional specific limits apply? | No | |
| 15. Is each of market risks associated with this product constrained by desk operational limits? How are these limit monitored? What is the process for reporting these risks vs. limits on a daily basis and who is responsible? | Yes | Corporate actions volume limits during manual periods. |
| 16. Quantify and/or assess the possible worst case scenario for ML and for our counterparties? Please quantify with an example. | | Worst case would be no enhanced return from trade – ML would lose cost of its bid – this is a sunk cost. |

14

ML-PSI-0332

814

**ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:**
**GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE**
**CONTROL TEMPLATE**

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| 17.  Please specify which of the following reserves/valuation adjustments will be required for this product and describe the methodology, procedure and calculation frequency for each:<br>•  Portfolio liquidity reserve (e.g. bid-offer)<br>•  Deal specific liquidity reserve (e.g. where bid-offer is not observable for a material exposure)<br>•  Model specific valuation adjustments (e.g. for observable parameters not included in model or, uncertainty arising from model implementation)<br>•  Hedge specific valuation adjustments (e.g. re-hedge assumption not captured by pricing model)<br>•  Credit specific valuation adjustments (e.g. purchase of credit protection)<br>•  Parameter uncertainty reserves (e.g.   position in an unobservable parameter)<br>•  Other (please specify) |  | There are no specific reasons for reserves on this trade. |
| 18.  Describe the P&L process that will be used.  Please comment on:<br>•  How are all the sources of risk identified captured in the estimation process?<br>•  How is residual P&L broken down and how are cross terms quantified? |  | Standard accrual accounting for swaps. |
| 19.  Do current Market Risk policy/procedures/control manuals adequately describe all processes required to support and control this new product? | Yes |  |
| Other comments: | | |

ML-PSI-0333

815

ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:
GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE
CONTROL TEMPLATE

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| **Credit Risk Management** <br> **DISCUSSED WITH: Richard Restaino, Tony Dawson** | | |
| 1. Who will be the typical counterparties? Are there any new or existing clients? What ratings are anticipated? | | Counterparties on the Total Return Swap (TRS) will be banks and other financial institutions with which MLI presently trades. Other mutual and pension funds from which we will borrow stock may be new or existing clients. |
| 2. Have all counterparty credit limits, if applicable been approved? | | Limits will be set by credit for new counterparties. |
| 3. What credit terms are expected for this product? | | On the stock borrow, ML will post cash collateral to the client fund. Credit terms on the TRS will be set as for any other TRS (TRS is not a new product). |
| 4. In which countries/industries will the product be targeted? | | Initially, European and American mutual and pension funds. |
| 5. Are there aspects of this product, such as the client requiring financing, that will result in additional credit risk? | No | |
| 6. What system will this product be traded on? | | The TRS will be booked in RAM. The short sale will also be booked in RAM. The stock borrow will be booked in Janus. The intercompany forward will be booked in RAM. |
| 7. Will there be an automated daily feed to Credit? | Yes | All components will be booked in systems with existing feeds to GLACIER. (see #6). |
| 8. Will the data feed the credit system in compliance with Credit's minimum data standards? | Yes | |
| 9. Will there be any inventory exposure as a result of this new product? | No | |
| 10. Has Credit approved a potential exposure calculation for this product? | Yes | Potential Exposure (PE) calculations are already in place for both the TRS and stock borrows. |
| 11. Will Credit be receiving sufficient data to calculate potential exposure correctly (i.e., all attributes used in pricing the transaction)? | Yes | |
| 12. How will the potential exposure calculation be implemented systematically in the credit system? | | Automated Potential Exposure (PE) calculations are already in place for both the TRS and stock borrows. |

16

ML-PSI-0334

816

**ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:**
**GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE**
**CONTROL TEMPLATE**

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| 13. Will all credit terms be supported by Operations?   Will all collateral be marked daily and fed to CXS/ICE? | Yes | |
| 14. Has a daily feed to Collateral Management been established with approved pricing sources? | Yes | |
| 15. Is this product in full compliance with existing credit policy? If not, has a change to or exemption from existing credit policy been authorized? | Yes | |
| 16. Are there any remaining open Credit issues? | No | |
| 17. Does Credit require additional headcount? | No | |
| 18. Do current Credit Risk policy/procedures/control manuals adequately describe all processes required to support and control this new product? | Yes | Credit policies are currently in place for all individual components of the structure. |

Other Comments:

Business must contact credit prior to trading for each new stock loan counterparty to establish appropriate credit limits. At that time, the business must confirm if a positive netting opinion has been provided by OGC for the relevant MLESJ stock loan agreement/counterparty jurisdiction.

17

ML-PSI-0335

817

**ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:**
**GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE**
**CONTROL TEMPLATE**

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| **Taxation**<br>**DISCUSSED WITH: Larry Klieuman/ Nizam Siddiq** | | - |
| 1. Are there potential cross border issues? | No. | |
| 2. Is there risk of an unwanted permanent establishment? | No. | |
| 3. How will the product be treated for tax purposes? Have any tax opinions from outside counsel been solicited or received? | | Yes (King & Spalding initial memo received, final opinion expected shortly) |
| 4. Which Merrill Lynch legal entity will issue or hold this product? | | MLESJ, MLI |
| 5. U.S. Tax Shelter Regulations: | | |
| (a) Will Merrill Lynch be required to register the product with the U.S. IRS as a Tax Shelter? Have all engagement letters, term sheets and presentation materials sent to clients included a statement to the effect that the transaction presented is not confidential? | | No. |
| (b) Will Merrill Lynch be required to maintain a list of investors in the product pursuant to the U.S. Tax Shelter regulations? | | No. |
| (c) Will Merrill Lynch be required to disclose the transaction pursuant to the U.S. tax shelter regulations? | | No. |
| (d) Will outside counsel opinion address the requirements under the tax shelter regulations? | | No. |
| 6. Will this transaction require Special and Structured Product Committee (SSPC) and/or Structured Products Committee (SPC) review? If so, has the SSPC and/or SPC review been scheduled or approval received? | | SPC approval attained |
| 7. Will this transaction require disclosure to any tax authority under any Tax Avoidance Disclosure rules? If so, has the Global Tax Compliance & Analytics group been notified? | | No. |
| 8. In what legal entity, country and business unit will the P&L and Balance Sheet from this product be recorded for GAAP and FMR? Is this consistent with our current transfer pricing methodology? Is adequate transfer pricing documentation in place, and are transfer pricing arrangements covered by existing service fee agreements? Are any new service fee agreements required? | | MLI, MLESJ<br>Global Equity Finance (USSPBU)<br>Jersey & London<br><br>Intercompany service and trade support agreements. |
| 9. How will this product be hedged and where will the hedges be recorded? | | Short sale, Forwards and Total Return Swaps. |
| 10. Does the product have any embedded debt elements? Are there any off-balance sheet assets or liabilities? | | No.<br>Yes (2 cash settled derivatives: forward and total return swap). |

18

ML-PSI-0336

818

ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:
GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE
CONTROL TEMPLATE

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| 11. What is the statutory tax rate of the legal booking entity that has been used to measure profitability of this product? | | 30% MLI<br>39% MLESJ |
| 12. Will the product be integrated into our existing tax reporting system? If not, who will perform the appropriate tax reporting? | | No. Procedures must be made to complete Forms 1042 and 1042S for MLESJ. Currently discussing with BNY tax team. |
| 13. Are there any withholding taxes (foreign or domestic) relating to this product? If yes – | | |
| a) Will Merrill Lynch be responsible for withholding taxes on payments made to customers? If yes –<br>  (i) Has the firm obtained the appropriate forms/ representations to ensure that withholding taxes are minimized?<br>  (ii) Will Merrill Lynch be responsible for a tax "gross up" payment to the extent that withholding taxes are subsequently imposed by a taxing authority?<br>  (iii) Does the issuer have the ability to terminate or transfer/ assign the position for any tax event?<br>  (iv) Whose responsibility (which parties or departments) is it to deduct, pay over and report withholding taxes? | | No. |
| b) Will Merrill Lynch be receiving payments subject to with-holding taxes? If yes –<br>  (i) What type of withholding taxes (dividend, fee, interest, etc.)?<br>  (ii) What assumptions were made with regards to the ability to claim a credit for these taxes? Is profitability dependent on the ability to claim credits?<br>  (iii) Have efforts been made to minimise the impact of withholding taxes or obtain a "gross-up" from the counter-party? | | No. |
| 14. Are there any foreign or domestic transaction taxes (e.g. VAT, Stamp Duty or Insurance Premium Tax) relating to This product? If so, have efforts been made to minimize the impact of the transaction taxes or obtain a "gross-up" from the counterparty? | | No. |
| 15. Are there any special tax compliance aspects to this product? What arrangements have been made to ensure that they will be satisfied? | | See #12: IRS form 1042 to be completed periodically. |
| 16. What is the VAT liability of the services arising from this product? Will there be any related service fees? If so, what is the VAT Treatment? | | None. |

Other Comments:
Annual trading limit initially established at first to be reached of (a) $50 million annual gross withholding tax elimination, and (b) $25 million net withholding tax (=gross withholding tax less MLESJ fees). Limits will be reviewed after one year.

ML-PSI-0337

819

**ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:**
**GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE**
**CONTROL TEMPLATE**

| FUNCTIONAL AREA | | YES/NO | REMARKS |
|---|---|---|---|
| **Legal** **DISCUSSED WITH: Joe Hamilton, Sarah Evans,** **Martin Sandler, John McGreevy** | | | |
| 1. | Has all documentation including confirmation templates been approved by Legal? | Yes | Subject to standard tax gross-up provisions in the Master ISDA agreement for the total return swaps (TRS's). Documentation should be standard total return swap documents. |
| 2. | Have Master Agreements been signed? | | The ISDA Master Agreement for the forward transaction between MLI and the MLSJ expected to be executed shortly. Master Security Lending agreements to be signed with counterparties prior to engaging in stock borrow transactions. OSLA between MLESJ and MLIIF in final stages of negotiation. |
| 3. | Is a pledge required? If so, is it executed? | Yes | Documented under the Master Securities Lending Agreement |
| 4. | What system will be used to track legal documentation? | | DOC.CCARS |
| 5. | Does required compliance information exist? | Yes | See Question 9 in the compliance section |
| 6. | Have all legal issues been resolved? | Yes | |
| 7. | Have all relevant netting agreements been obtained? | Yes | Netting opinions required for each new jurisdiction. |
| 8. | Will additional headcount be needed? | No | |
| 9. | What attorney is responsible for this product (Is outside counsel used, if so what for and what review will inside counsel perform)? | | Sarah Evans, Joe Hamilton, Martin Sandler and John McGreevy King & Spalding is outside counsel |
| 10. | Are there special licensing or registration issues required to sell this product? | No | |
| 11. | Patent protection should be explored for all newly offered New Products. Consider your New Product in relation to comparable existing products/services offered. Is your product novel and/or innovative? Is it offered in a way that is novel and/or innovative? If yes, please contact Jill Gaffney. | No | |
| 12. | Do current Legal policy/procedures/control manuals adequately describe all processes required to support and control this new product? | Yes | |
| Other Comments | | | |

20

ML-PSI-0338

820

ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:
GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE
CONTROL TEMPLATE

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| **Compliance**<br>**DISCUSSED WITH: Lauri Scoran, Lesley Kumar** | | |
| 1. What Regulatory bodies govern this product / business? | | CSE - US derivatives transactions. US SRO's -cash equity short sales. FSA - various MLI activities. |
| 2. Are there specific regulatory concerns & issues? | | None noted at this time |
| 3. Specific ML legal entities required? Cross-border requirements? | Yes | Detailed in transaction diagram. |
| 4. What region will clients/counterparties reside? | | All non-US counterparties |
| 5. Will there be a specific U.S. PATRIOT Act requirements? | | Regional specific anti money-laundering procedures will apply to all counterparties |
| 6. Are there specific local requirements and marketing restrictions? Registrations? | | None |
| 7. Specific client qualifications? | | Institutional investors and market counterparties as a defined term |
| 8. Specific trading and booking requirements? | | MLESJ cash equity transactions cannot be reflected on MLPFS books and records |
| 9. Are the transactions processed in a manner such that the transactions are available for internal compliance monitoring? | | Compliance will review technology enhancements upon completion*** |
| 10. Additional educational and training requirements? | | No additional training requirements noted at this time |
| 11. Please describe the supervisory process including, interim/tactical/strategic procedures? | | The Service Agreement between MLI and MLJES details authorized activities and required controls. There are no additional supervisory controls required |
| 12. Compliance Officer assigned? | | Lauri Scoran - US Lesley Kumar - MLI |
| 13. Have all compliance issues been resolved? | | See below |
| 14. Do Compliance current policy/procedures/control manuals adequately describe all processes required to support and control this new product? | | MLI policies and procedures adequately support this new product. |

Other Comments

**** As all technology enhancements are being reviewed in a "test" environment, GMI Compliance requires notification when the first transactions is executed to test that books and records of MLPF&S are not affected.

21

ML-PSI-0339

821

**ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:**
**GLOBAL MARKETS AND INVESTMENT BANKING–NEW PRODUCT REVIEW COMMITTEE**
**CONTROL TEMPLATE**

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| **Integrated Support Services ("ISS")** **DISCUSSED WITH:** Ted Campbell/ Simon Thompson, Kevin Martin, Rob Caggiano | | |
| **General** | | |
| 1. Are there incremental resource requirements to support this product? Does this new product require additional headcount? | No | |
| 2. Does this product utilize an SPE? Is the SPE part of the SPE program? If an SPE is involved, then it must be included in the SPE database. Further information on SPEs is available at https://mifinori.dats.ml.com:3777/pls/portal30/url/page/SPENTITIES | No | |
| 3. Will GT&CS settle this new product transaction? If yes, responsible GT&CS Group needs to complete the GT&CS Section. | Yes | |
| 4. Does the product involve transactions that are reportable to a Regulator? If Yes, which system and who will deliver the transaction reports? What controls will be used to ensure the accuracy and completeness of reports to Regulator? | Yes | MLI – As existing business MLESJ - Jersey annual filings completed by Mourant (local admin. agent to MLESJ) |
| **Risk and Control** | | |
| 5. Has the process flow been documented and have the key control points within ISS been established. | Yes | See appendix |
| 6. Will there be straight through processing from the trading system through operations to the general ledger. If not, what manual intervention is necessary? | Yes | Dividends processed manually until CAPS build (planned end of Q1'06) – TCS will set volume limits |
| 7. If manual intervention, Will ISS impose any transaction or volume limits? If so, state these are daily or cumulative limits. | Yes | See above – limits are for daily volume |
| 8. Are all ISS process and accounting procedures in place to handle the product? | | |
| – Daily P&L flash reporting and P/L Explain | Yes | |
| – Estimate to actual reconciliation | Yes | |
| – G/L account ownership reconciliation. | Yes | |
| 9. Have all G/L accounts been established and ownership assigned? And in what Oracle general ledger account (provide account number)? | | |
| 10. Does this product need a new trading book? If so, what will be the profile of the Book (Hedge or Naked Inventory)? What data feeds will be required for this new book (CAMS, RISK)? If the product requires new trading books, will these be set up in the Book Map database (linking trading books to ledger accounts)? | Yes | MLI Book feeds as normal from RAM. MLESJ Book – MLI process (EBAR) cloned. All feeds replicated & UAT'd |
| 11. How will the feeds to Credit and Collateral be completed? What will be the process to make sure that they are reconciled and balanced? Does this information also feed Market Risk scenarios? | Yes | Via RAM Same feeds to Glacier & CAMS as used in BUCS |
| 12. Where will the hedges for this product be recorded? (Systems and entities) | | RAM – MLI & MLESJ |
| 13. Are there procedures or controls in place to check that on a regular basis there will be no operational breaks or unmatched fails with respect to the new product? | Yes | Daily fails reporting in TCS See control rec's in appendix |

22

ML-PSI-0340

822

**ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:**
**GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE**
**CONTROL TEMPLATE**

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| 14. Are there any non-standard client requirements to settle this product? Any special wers, currency issues, special calculations. | No | |
| 15. If there are multiple order collection points, state where. Have all respective Process Support teams signed-off the process flow that has been produced for Question 4? | No | Client lends stock to MLESJ |
| 16. Are Client Valuations required and, if so, are we in a position to provide these efficiently? Will this process use a standard approved template? | Yes | As existing process |
| 17. Which location will the Operations Client Service support to the Client/Business come from? What support requirements have been provisioned for support outside normal business hours? | | MLI – NY<br>MLESJ – London |
| 18. Have all accountancy issues for the product been resolved? | Yes | |
| 19. Are there any remote booking issues (e.g. MLI booking by NY trading)? | No | |
| 20. Will the transaction be recorded on multiple ML entities? What systems and entities will be used to reconcile both intercompany balances and transactions?<br><br>Which Group is the primary owner of these intercompany transactions?<br><br>Are there formal intercompany reconciliation procedures in place to ensure intercompany transactions are properly recorded on legal and FMR basis?<br><br>If complex intercompany transactions are proposed, prepare a pro forma consolidating financial statements. | Yes | MLI & MLESJ<br>EBAR on MLI & MLESJ<br><br><br>NY BU finance (MLESJ)<br>MLI Corporate Reporting<br><br>Standard Equity Operating procedure – EBAR on both entities feed Oracle.Stella Yan will face off with Ben Ryan group in London<br>n/a |
| 21. Who are the legal entity controllers and have they signed-off? | | MLESJ – John Jack<br>MLI – David Thomson |
| 22. What is the balance sheet tail impact, i.e. what assets will theoretically remain on the balance sheet that will not produce acceptable returns for the future of the trade (e.g. NPV'd forward trades). | n/a | Expect trades to have approx. 2 week duration |
| 23. How will MTM's and asset values be independently verified? What source? | | Standard RAM process |
| 24. Does the New Product fall within a current reserve policy? If not, why not? | No | Stock Loan trades fully collateralized. Sales to market, no req't for standard cash equity activity. Intercompany forward with MLI, no reserve req't. |
| **Margin and Collateral Management** | | |
| 25. Will this product fall within the scope of products currently supported by Collateral Management? i.e. OTC trades under an ISDA Master agreement and/or repo transactions covered under a PSA ISMA agreement. | Yes | MLI TRS – as standard<br>MLI v. MLESJ forward: drafted<br>MLI OSLA: drafted |
| 26. If Collateral Margining is done in the business (e.g. ML Pro), has the process been approved by the business risk manager? | n/a | |

23

ML-PSI-0341

823

**ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:**
**GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE**
**CONTROL TEMPLATE**

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| 27. Has a daily automated transaction feed to the Collateral Management system (i.e. CAMS) been established and tested? If not, how will exposure be provided to Collateral Management to monitor margin requirements. | Yes | |
| 28. What will the process be to ensure that daily transaction feeds to Collateral Management are reconciled to books and records? | n./a | Daily RAM to EBAR reconciliation. No feed required to ISS Collateral group – see #29 |
| 29. Are the collateral types required currently identified as eligible collateral types that can be supported by Collateral Management? | n/a | MLESJ will have an OTC with MLI. There are no up front or MTM collateral provisions in the agreement. With Regard MLI's TRS with the street, this will be as currently collateralized. |
| 30. Is the custodian identified currently supported by Collateral Management? If not, what control procedures will be implemented to ensure that CAMS is updated with accurate collateral balances? | | As Q29 |
| 31. Have all legal and tax issues been resolved regarding the safekeeping of collateral? e.g. Are there any operational steps required to perfect interest in the collateral or any potential tax withholding implications for holding the collateral? | | As Q29 |
| 32. Are prices for the collateral readily available from an automated source and currently provided to CAMS ? | | As Q29 |
| 33. Are procedures in place to independently verify collateral prices? | | As Q29 |
| 34. Are there any special (i.e. non-standard) margin parameters required by Credit? e.g. deal haircuts, product carve-outs, etc. If so, what control procedures will be implemented to ensure they are properly monitored? | | As Q29 |
| **FX Control** | | |
| 35. If this is a new legal entity or trading will be in a new currency, please contact Global FX Control (Tony Pica/ Ray Conover) to discuss. | | ALL USD |
| **Operation Risk** | | |
| 36. Are there any unresolved process risk issues (e.g. significant reliance on manual procedures, knowledge dependence on few key people, data quality, lack of clear accountability and the inability to properly supervise). Please highlight the relevant processes. | No | Manual dividend processing until end of Q1'06. Limits placed on volume by TCS until CAPS fully in place |
| **Other** | | |
| 37. Do ISS current policy/procedures/control manuals adequately describe all processes required to support and control this new product? | Yes | See attached process flows & controls |
| Other Comments See Appendix | | |

24

ML-PSI-0342

824

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| **Transaction & Custody Services ("TCS")** DISCUSSED WITH: Marie Russo, Patrice Bleach, Pilar Jimenez, Barry Clements | | |
| **Trade Processing** | | |
| 1. How will the product settle? Will local settlement agent be used? | Yes | Bank of New York with be the custodian for this activity. |
| 2. Are there any Depot Management changes to be considered? | No | |
| 3. Does the product have any non-standard settlement attributes (i.e. calculations)? | No | |
| 4. Will there be Straight-Through Processing from the Trading Systems through TCS systems to the General Ledger? If not, what manual intervention is necessary? | Yes | Swift messaging to/from BNY, STP for both instructions being sent and confirms back to ML |
| **Custody** | | |
| 5. Are there any unusual interest/redemption requirements for Reorg. and Dividends? | NO | |
| 6. Will there be Straight-Through Processing from the TCS Systems to the Trading Systems and the General Ledger? If not, what manual intervention is necessary? | No | The dividend booking process will be manual until the proper automation is in place. |
| 7. Is Operations responsible for retrieving tax receipts? If not, specify who is. | No | The dividend process will not require the retrieval of tax receipts |
| 8. Will an outside Custodian/Trustee be needed? Has the required due diligence and service level been agreed by ISS and TCS? | Yes, | BNY |
| 9. Will there be any discretionary Corporate Actions? If so, how will they be processed? | No | |
| 10. Has provisioning been considered for long term reserves? | No | Trades are expected to be 2 week duration |
| 11. Is TCS required to act as Custodian? If so, can the assets be Re-Hypothecated? | No | BNY is acting as custodian |
| **Client Money/Asset Segregation** | | |
| 12. Have requirements been reviewed to ensure there is adequate reporting of client assets for segregation purposes? | N/A | No clients in this transaction. |
| **General** | | |
| 13. Will there be any new reconciliations for TCS? If so, are they to be included in the normal Reconciliation reporting process? | Yes | BNY will send cash movements/balances and securities movements/balances (MT535, MT536, and MT940/950). Reconciliations have been put in place in RECON to balance these statements versus MLESJ's books and records in EBAR |
| 14. Will the Unit Charging cost allocation methodology be utilized for the New Product? Have any incremental hires been included in the unit charge calculation? | | As normal |
| 15. Are there sufficient Disaster Recovery Procedures in places to handle this New Product? | Yes | Covered under existing systems and procedures. |
| **Client/Product Data** | | |

25

ML-PSI-0343

825

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| 16. Where will the product data reside?  Will the product require different indicative data information from that currently available in the existing databases (e.g., SMDB, S3D, STS)? What systems will this product data need to be distributed to, and who will be responsible for setting up the data and monitoring its distribution? | | Trader will be responsible for setting up swap in RAM , same as current process.  Activity will not require a ML Security #. Data will flow STP from RAM to EBAR.  Janus will require underlying equity data from S3D via PME, same as current process.  PDS is responsible for data in S3D and PME. |
| 17. Can sufficient documentation be obtained from the client and third party sources to verify the clients' details and perform the required regulatory checks (e.g. money laundering)? Who will be responsible for setting up new clients at the legal entity level? Who will be responsible for setting up new clients at the fund / account level? Will all new clients (entities and funds) carry CoPeR identifiers? | Yes | MLESJ new counterparties to follow standard account opening procedures. |
| **Other** | | |
| 18. Do TCS current policy/procedures/control manuals adequately describe all processes required to support and control this new product? | Yes | Procedures and controls as per attached controls summary. Settlement procedures to be finalized with BNY. |
| Other Comments  Corporate Actions:  Volume restrictions will be in place until the CAPS build is completed in Q1/2 of 2006.  Any other Corporate Action event outside of Cash Dividends will be unwound immediately by the trading desk. | | |

26

ML-PSI-0344

826

| FUNCTIONAL AREA | | YES/NO | REMARKS |
|---|---|---|---|
| **Treasury** DISCUSSED WITH: Lee Whitley/Anjali Bhattacharjee | | | |
| **Funding & Liquidity** | | | |
| 1. | What is the estimated range amount of funding required? Please note relevant currency(s). | | $300 mm equity investment in MLESI. All other funding requirements, other than intraday funding from ML Group to extinguish short sale, are self-funded. Intraday funding is $400mm in example, but could be as high as $2.5 bb (total program size). Expected term of trades: 15-30 days. All figures in US$. |
| 2. | How much funding will be provided by: (a) Treasury, (b) the secured markets, (c) deposits, and/or (d) other (please explain)? | | |
| 3. | What is the likely term of any assets booked? What is the expected holding period of such assets? What is the exit strategy (e.g., sell, securitize, etc.)? | | |
| 4. | Will this proposal generate cash? | No | |
| 5. | Will any specific financing pricing be required? | No | |
| 6. | If Treasury funding is required, have intercompany loan accounts been arranged? | Yes | $300mm Demand Note and $1.0b Credit Facility with ML&Co. have been established. |
| 7. | Does this proposal commit Merrill Lynch to provide any funding at a future date? If so, please describe in detail. | No | |
| 8. | Will ML need to issue product specific liabilities (e.g., structured notes)? | No | |
| 9. | Are there any open issues related to the incorporation of the business/product into Treasury's systems or forecasting processes? Please describe intended cash forecasting process. | No | |
| 10. | For ML Banking entities, are there any 23A or 23B issues precluding certain affiliate transactions? | No | |
| **Credit Enhancement** | | | |

ML-PSI-0345

827

**ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:**
**GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE**
**CONTROL TEMPLATE**

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| 11. Is there anything about this product/transaction that is linked to ML&Co. credit either directly (by providing a guarantee) or indirectly (through rating triggers, cross defaults, etc)? If so, please describe in detail. | No | |
| 12. Will collateral be required to support any activities associated with the initiative? Will any collateral be received as a result of this initiative? If so, can it be rehypothecated? Please describe the type of collateral pledged to/from ML. | Yes | Cash will be posted by MLESJ to collateralize the stock loan from MLIIF. No collateral to be received. |
| 13. Will this product require a new ML&Co. guarantee? If so, please contact Treasury regarding approval under ML's guarantee policy (3.09). | No | |
| **Financial Statements and Notes** | | |
| 14. Can this proposal be handled within GMI's existing balance sheet limits? | Yes | |
| 15. Are there any special disclosure requirements in ML&Co.'s financial statements, or in the footnotes, as result of this new product (e.g., SPEs, credit triggers, guarantees)? | No | |
| **Subsidiary Capital Planning** | | |
| 16. Which existing legal entities are impacted? Will any new entities be required? Will they be consolidated? | Yes | Impacted entities: ML Group, MLI, ML&Co. New consolidated entity required: MLESJ. |
| 17. Are there any intercompany transactions? Please describe. | Yes | Equity investment (ML Group /MLESJ.) Temporary cash loan (MLESJ/ML&Co.) Credit Facility (ML&Co./MLESJ) Forward Contract (MLI/MLESJ.) |
| 18. On the margin, does this product require subsidiary capital? Regulatory capital (regulated entity) or legal capital (unregulated entity)? | Yes | Minimal incremental reg capital in MLI to support mark on total return swap and forward contract as trades expected to have term of 15-30 days. |
| **ML Risk Equity** | | |
| 19. Can MLRE be calculated using Corporate Risk Management's event risk analysis (market risk) and credit capital model (default risk)? If not, how will MLRE be determined? | Yes | |
| **Insurance** | | |

28

ML-PSI-0346

828

ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:
GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE
CONTROL TEMPLATE

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| 20. Will any non-ML employee serve on the board of a legal entity where ML has an ownership interest? Will any ML employee serve on the board of a non-ML entity? If so, have D&O insurance issues been addressed? | No | |
| **FX** | | |
| 21. If applicable, has the FX hedging strategy been mapped out and all execution issues resolved? Have all booking and risk reporting issues related to the hedging activity been resolved? | NA | |
| **Banking & Operations Impact** | | |
| 22. Will any bank services be purchased (e.g., trust, custody, tri-party, cash management functions, etc.)? | Yes | BNY custody, clearing and cash management. |
| 23. Will this require new external bank or custodian accounts? Who has the authority to operate the new external bank accounts? | Yes | Noreen O'Hanlon et al. |
| 24. Is any intra-day credit or overnight bank credit required? | Yes | Intraday credit from ML&Co. to fund reversal of short sale. US$400 million in example, but could be higher. Also discussing economics of daylight funding with BNY. |
| 25. Are there any other external credit requirements (e.g, letters of credit)? | No | |
| **Other** | | |
| 26. Do Treasury current policy/procedures/control manuals adequately describe all processes required to support and control this new product? | Yes | |
| **Other Comments** | | |

29

ML-PSI-0347

829

**ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:**
**GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE**
**CONTROL TEMPLATE**

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| **Regulatory Reporting**<br>**DISCUSSED WITH: Martin Abbott/Richard Groves/Mike Cahill** | | . |
| 1. Does required regulatory information exist for inclusion in ML's regulatory filings? | Yes | |
| 2. Are there automated data feeds to Regulatory Reporting? | Yes | |
| 3. Have all regulatory capital and reporting issues been agreed with Regulatory Reporting? | Yes | |
| 4. What legal entity(s) will this product be booked on? Will there be any remote booking? Is the entity authorised for this activity? | | MLI will be used for TRS\Forward.<br>Remote Booking guidelines will apply |
| 5. Are any Regulatory approvals required? | No | |
| 6. Will this product be excluded from the scope of any VAR-based reporting? If so, has Regulatory approved the justification for exclusion, and any compensating controls required? | No | |
| 7. Will the introduction of this product necessitate pre-notification to regulators? | No | |
| 8. What is the anticipated Regulatory Capital usage of the new product for ML&Co., as well as for each legal entity where this product is booked? What is the basis for the calculation of this regulatory capital charge for ML&Co. and for each legal entity for which regulatory capital is required? | | MLI will be market risk flat .<br>This proposal will therefore only attract regulatory capital in respect of counterparty credit risk.<br>Assuming maximum aggregate notional of $1bn, reg cap would be less than $15m. |
| 9. Have all initial and ongoing filing requirements, that are to be met as a result of any new exchange memberships or similar organizations, been addressed. | n/a | |
| Other Comments | | |

30

ML-PSI-0348

830

**ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:**
**GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE**
**CONTROL TEMPLATE**

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| **Accounting Policy**<br>**DISCUSSED WITH: Anthony Galante** | | |
| 1.  General Legal Entity Issues: | | |
| •  Does the product require the establishment of a new entity? | Yes (1 entity) | MLESJ. |
| •  Will the product require the consolidation of the new entity by MLI? | Yes | MLESJ. |
| •  Does the product involve any external legal entity reporting which is not currently in place? | No | |
| •  Identify any legal entity (entities) that will carry inventory, investment or other balance sheet positions.<br>•  Identify entities in which income/loss will be recognized. | | • MLI: accrual total return swap with market and accrual forward (really a TRS) with MLESJ.<br>• MLESJ.: accrue stock borrow from MLIIF, mtm short sale with market, accrual forward (really a TRS) with MLI and accrue any interco loans or debt.<br>• ML Group: records loan or investment in affiliate (MLESJ) |
| •  Does the information exist for inclusion in ML's corporate filing?<br>• | Yes | |
| 2.  Are there any FAS 140/FRS 5/IAS 39 True sale issues (e.g., Sales to SPE's, sales with calls or puts, etc)? | No | Standard stock borrow accounting under FAS 140 |
| 3.  Are there any consolidation issues – are there any SPE's involved? | Yes | ML Group expected to consolidate MLESJ |
| 4.  If an SPE is involved, is it a QSPE, VIE or Voting Interest Model?<br>•  If a VIE, has the FIN 46 consolidation test been completed? | VIE<br><br>N/A | |
| 5.  Is there an expectation that the new product will generate significant day one profits?<br>•  If so, are there any initial revenue recognition items that need to be discussed with the 02-03 Committee? | No | Profit will be generated on an accrual basis via the stock borrow transactions |

ML-PSI-0349

831

**ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:**
**GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE**
**CONTROL TEMPLATE**

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| 6. General – Financial Statement Treatment:<br>• How would the new product appear on ML&Co.'s consolidated balance sheet and/or subsidiary balance sheets (assets/liabilities)?<br><br>• How would the new product appear on ML&Co.'s consolidated statement of operations and/or subsidiary statement of operations (revenues/expenses)? | | • Securities Borrowing Asset (MLESJ stand alone)Short Inventory Liability (MLESJ stand alone)Treasury Financing Liability (ML Group stand alone)<br>• Total return swap (MLI stand alone)<br><br>**Principal Transactions**<br>• · Mtm Gain/Loss on Short Inventory<br>• Mtm Gain/Loss on TRS Hedges<br>**Net Interest**<br>• Securities Borrowing Fee |
| • Does the new product involve a consolidated entity with minority interest?<br>• Does the new product provide for any guarantees by a ML entity?<br>• Are there any other footnote or MD&A disclosures issues associated with the product? | No<br><br>No<br><br>No | Part of standard FAS 140 disclosure and guarantee (if any) disclosure |
| 7. Use of Public Accounting Firms:<br>• Will the product require the employment of a public accounting firm? | Yes | D&T has performed initial audit of MLESJ |
| • Is there an opinion from an external accounting firm? | Yes | Audit Opinion for audited financials |
| 8. Have all initial and ongoing filing requirements, that are to be met as a result of any new exchange memberships or similar organizations, been addressed. | N/A | |
| 9. Other Items<br>• Describe any non-US GAAP considerations<br>• Are there any open accounting issues? | None<br>None | |

Other comments

Conclusions subject to review of final documents – not a pre-trading condition.

32

ML-PSI-0350

832

**ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:**
**GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE**
**CONTROL TEMPLATE**

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|

33

ML-PSI-0351

833

ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:
GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE
CONTROL TEMPLATE

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| **Technology**<br>**DISCUSSED WITH: Mark Taylor & Jay Danziger /**<br>**Gulzar Patel** | | |
| 1. Understanding of requirements and impact on Technology | | |
| a) Has Technology received sufficient information in respect of the new product to be able to determine the impact on current Technology applications, connectivity, support levels and capacity requirements? | Yes | Design document provided to all tech teams impacted by change with a detailed build list agreed. |
| b) Has a volume (to be provided by the business) / capacity (to be calculated by technology) projection for the anticipated workload over the next two years been prepared? | Yes | volumes being under 50 Baskets a month, which each technology team has individually assessed any workload impact. |
| 2. Applicability of this section of the NPR | | |
| a) Does this new product require: | | |
| • New Technology applications or enhancements? | Yes | Enhancements to accommodate new entity |
| • New Technology equipment or capacity? | No | Existing infrastructure |
| • New or modified links to internal or external systems, clients counter-parties or exchanges? | Yes | Modified internal interfaces between system to process new entity data |
| • New or increased usage of Global Technology & Services? | | |
| • New or enhanced business continuity, contingency & recovery or information security arrangements? | | |
| b) Does this product delay the retirement of any applications? | Yes | Somewhat increased usage in terms of maintaining new entity |
| c) Does this new product require Technology investment/ project costs or incremental ongoing Technology costs? | No | All existing platforms |
| If the answer is NO to all of Questions 2 (a) to (c) then questions three through to eleven within the Technology section of the NPR checklist do not need to be completed | No | |
| | Yes | Total cost of delivering the change across all systems is $382,900. No incremental ongoing cost as part of existing structure |
| 3. Application developments and enhancements | | |
| a) What is the planned release date for the new applications/ modifications for this product? | | 5th Nov 2005 |
| b) Are future developments/ enhancements planned? | Yes | Automated CAPS feed to process dividend payments. Manual process in Place till Feb 06 |
| c) What, if any, information will be maintained off line or in note or comments fields in the applications? | | |
| d) Are there any known system limitations or required manual workarounds and have these limitations been explained to the users and signed off by them? | n/a | |
| e) Are there any additional training implications of the Technology changes and is this training planned? | No | |
| f) Has approval been obtained from change management? | | |
| | No | All existing users of the technology |
| | No | PRR In place ready for approval based on UAT sign off |

34

ML-PSI-0352

834

ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:
GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE
CONTROL TEMPLATE

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| 4.  Application Retirement | | |
| a)  Have any of the applications required to process this product been scheduled for retirement, and if so when? | No | |
| b)  Will this product delay the scheduled retirement of any application? If so please provide details. | No | |
| 5.  Equipment and capacity | | |
| What are the incremental support requirements for this product re: | | |
| a)  Application hardware (e.g. Servers)? | None | All existing hardware |
| b)  Data storage, requirements on Managed Storage Service and replication? | None | Due to the small volumes incorporated into existing storage |
| c)  Backup and recovery requirements and profile? | | |
| d)  Other technology equipment? | None | |
| | None | |
| 6.  Global Technology & Services | | |
| a)  Who in Global Technology Services (GT&S) has reviewed the GT&S support requirements and incremental costs? | | Jay Danziger, Lee Nicholls, William Wong, Chris Long |
| b)  Are there any GT&S support capacity limitations and if so have these been documented and agreed with the business? | No | |
| c)  Are there any special support requirements outside of Mon-Fri 9am to 5pm? | No | |
| d)  Do GT&S have any outstanding issues with respect to their capability to support this product? | No | |
| 7.  Connectivity and processing | | |
| a)  Are there any issues which will remain outstanding following the launch of the product, and if so how/when they will be resolved with: | | |
| ▪  Market data feeds and connection to third parties or exchanges? | No | Existing infrastructure with New entity data in place |
| ▪  Network connections or increased network bandwidth requirements? | No | |
| ▪  Interaction with clients, counter-parties and exchanges? | No | |
| ▪  Prices and valuation models? | No | |
| ▪  Feeds to Credit, Market risk, Finance and settlement? | No | |
| ▪  Particular time zone issues for this product? e.g. will the product require the same market data feeds at different times, or will the product require booking to an application outside the hours it is supported? | No | |
| b)  Will the new product require valuation models? | | |
| ▪  Have these valuation models been approved by QRM? | No | |

ML-PSI-0353

835

ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:
GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE.
CONTROL TEMPLATE

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| **8. Testing** | | |
| a) Is there a documented test plan? | Yes | UAT Pack sent to all business users required for testing and sign off agreed 26th Sept |
| b) Is testing complete? If so what are the results, if not when is it due to be completed? | No | Due to complete UAT by 21st October |
| c) Has integration testing been performed and, where necessary, does it include end to end testing with third parties e.g. clearing and exchange systems? | Yes | Integration testing complete 30th Sept. BNY custodian testing 14th – 19th October |
| d) Was load testing required? | Yes | Performance testing in EBAR scheduled 26th – 28th October |
| e) Which users are signing off on the UAT? | Yes | Sign –off by each business area manger in charge of testing |
| f) What is the planned end date for UAT? | Yes | 21st September |
| g) Have any critical bugs/limitations been identified? | No | All bugs been resolved |
| h) Are there any outstanding issues? | No | |
| **9. Business Continuity Planning and Contingency and Recovery** | | |
| a) Has a criticality assessment been made of the applications required to process trade, risk manage and settle this product? | No | |
| b) Where are the production and DR systems located? | | See Table below |
| c) Where are the production and back up data stored? | | |
| d) When were the DR arrangements re these critical applications and data storage last tested? | | |
| e) Have the BCP and C&R arrangements for this product been documented and agreed with the Business? | No | |
| f) Have any shortfalls in BCP and C&R arrangements been explained to and accepted by the Business? | No | |
| **10. Information security** | | |
| a) Does the new product/system meet the minimum security control guidelines contained in the Merrill Lynch & Co., Inc. Information Protection Standards (details at http://mlisp.worldnet.ml.com/policies_procedures/isp.htm)? | Yes | Architecture is all standard equities for new entity |
| b) Does the product have any external connectivity requirements? If so, have any firewall requirements been discussed with Information Security? | No | |
| c) Have security administration activities of the product been discussed with the Security Admin. Group? | No | |

36

ML-PSI-0354

836

**ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:**
**GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE**
**CONTROL TEMPLATE**

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|
| 11. Technology Costs | | |
| a)  Do the forecast technology costs for this new product cover: | | |
| •    Each of application development, application support, GTS, GTS utility and user paid technology costs, and | Yes | Covers all Development support and production costs |
| •    Include both project costs and incremental ongoing costs.  If not please detail them. | Yes | No incremental ongoing costs as part of existing infrastructure |
| b)  Have the forecast application development and support costs been calculated and signed off by both Business Technology and Business Technology Finance (please list individuals)? | Yes | Forecast vs Actual presented in Weekly steering. Figures obtained from BEN and finance at month end. Ron Depoala, and Jay Danziger (tech). Ted Campbell and Rob Classby (Business) |
| c)  Have the forecast GTS costs (including Utilities) been calculated and signed off by both GTS and GTS Finance? | Yes | Same as above |
| d)  Have the Technology costs been approved by the relevant Technology governance body, budgeted for and included in the Technology cost forecast? | Yes | |
| e)  Have each of the technology cost forecasts (including user paid costs) been explained to, and signed off by the Business? | Yes | Breakdown of build vs cost presented to the business |
| 12.  Do Technology current policy/procedures/control manuals adequately describe all processes required to support and control this new product? | Yes | Reviewed flows with team to ensure this flow is covered by existing procedures. |
| Other Comments: | | |

| System | Contact | Prod System Location | DR Location | Prod Data Location | Backup data location | Last DR test |
|---|---|---|---|---|---|---|
| RAM | Bill Wong | MLFC | NY: Telepot | London: MLFC | London: GV | NY: 21/9/2005, LN: Q1 2005 |
| TESS | Stuart Freeman | MLFC | Greenwich View | MLFC | Greenwich View | 05-May |
| JANUS | Matt Thornton | MLFC | GV | MLFC | GV | May-05 |
| EBAR | Mark Taylor | MLFC | GV | MLFC | GV | May-05 |
| RECON | Howard Breen | MLFC | GV | MLFC | GV | May-05 |
| BUCS | Kevin Mitchell | London: MLFC, NY: Telepot | London: GV, NY: North Tower | London: MLFC | London: GV | NY: 21/9/2005, LN: Q1 2005 |

87

ML-PSI-0355

837

ALL QUESTIONS IN THIS SECTION MUST BE ADDRESSED:
GLOBAL MARKETS AND INVESTMENT BANKING-NEW PRODUCT REVIEW COMMITTEE
CONTROL TEMPLATE

| FUNCTIONAL AREA | YES/NO | REMARKS |
|---|---|---|

| **Contingency Planning Control** DISCUSSED WITH: Michael Giobbe | | |
|---|---|---|
| 1. Are documented and tested contingency plans in place on all new technology infrastructures? | N/A | Using all existing infrastructure |
| 2. Are contingency plans satisfying ML standards on existing technology infrastructures? | Yes | Desktop and Server recovery in place as using existing systems. |
| Other Comments: | | |

| **Corporate Audit** DISCUSSED WITH: Steven Perkins | | |
|---|---|---|
| 1. Are there any special or other issues that should be noted? | No | |

| **Front Office/COO** DISCUSSED WITH: Roger Anerella, John Thurlow | | |
|---|---|---|
| 1. Do current front office guideline documents addressing trader mandates, legal entity usage and management oversight adequately reflect controls over this new product? | Yes | |

38

ML-PSI-0356

838



New Product & Trade Development

Permanent Subcommittee on Investigations
EXHIBIT #45 - FN 258

ML-PSI-00047439

CONFIDENTIAL

839



# Americas Equity Derivatives Sales & Structured Marketing
## New Product & Trade Development

### 2005 Analysis

**State of the Industry**

- The business has two major segments – Client Solutions and Proprietary Trading. Competitive landscape: Client Solutions – MS, Lehman, DB, BoA. Proprietary Trading – BarCap, BoA, DB, MS, Lehman and others are active in the market.
- Tremendous untapped domestic and cross-border opportunities for ML. Cross-border yield enhancement and arbitrage are areas where ML has not previously focused within equities. Active client base includes corporates, mutual funds, banks, and hedge funds.
- Maturation of on-shore and off-shore hedge fund space creates large pool of high-volume clients focused on sophisticated tax and other structured products in a new asset class.
- Proprietary trading strategies (such as DSG capture) are highly lucrative opportunity for ML. BoA and Lehman each realized previous equivalent revenue of greater than $100mm from DSG capture transactions in 2005.

**State of the ML Business**

- Mid-year start-up in 2005 with long lead-time products. 2005 revenue of approximately $904,000.
- Executed 18 transactions with 12 clients in 2005 (9 hedge funds, 1 bank, 1 mutual fund, 1 personal holding company)
  - 15 of 18 trades were involved yield enhancement
- 13 financial products approved for marketing in 2005, 8 products executed.
  - 4 of 13 approved transaction were dividend yield enhancement
  - 3 of 8 products executed were dividend yield enhancement
- Managed global equity balance sheet initiative including development of new trading strategies.
- Developed and implemented Project Cirrus, a yield enhancement program for non-US investors. Program commenced trading Nov. 15th – 2006 expected global revenue of $50mm (2007 revenue of $18-20mm).
- [Redacted] will provide ML substantial annuity revenue in 2006 and beyond with little correlation to traditional equity businesses.

**Business Profile**

| | |
|---|---|
| 2006 Annualized Revenue* | $1,205,582 |
| 2005 Actual Revenue | $904,412 |
| Total Number of Clients | 12 |
| Average Number of Trades per Client per Year | 1.25 |
| Concentration | 70% of revenue from hedge funds |
| Production per Client | $75,400 (average) |

\* Adjusted for April 1 establishment of Product Development Group.

**Cross-Product Penetration**
Product Development Clients Also Trading ML Products

* Redacted by the Permanent Subcommittee on Investigations



# Americas Equity Derivatives Sales & Structured Marketing
## New Product & Trade Development

### 2006 Analysis

**Market Prognosis**

- Ever changing tax, accounting, and regulatory frameworks both inside and outside the US create tremendous opportunities for high value-added structured solutions.
- Maturation of hedge funds has created a natural, sophisticated client base focused on incremental returns.
- Cross-border business is in state of transition due to changes in UK tax regime. Creates opportunities for ML to create new products for UK clients. Additionally, represents an advantage for ML as equity business less reliant on UK counterparties than many competitors.
- Sales force communicates consistent demand for deferral and recharacterization products.

**Marketing & Development Plan**

- Sales & marketing efforts focused on:
  - Communicating product opportunities and expertise to select teams (particularly Multi-Product Marketing, Institutional Structured Marketing, and OTC)
  - Responding to client areas with tailored solutions
- Client diversification.
  - Hedge funds accounted for 75% of clients in 2005. We anticipate reduction to 50% in 2006 with addition of mutual fund and banks (State Street, Northern Trust for yield enhancement and Deutsche, BarCap, RBC for prop trading strategies).

2006 New Product Targets

- Launch 5 new product offerings for clients. Focus on:
  - Yield enhancement;
  - Deferral and recharacterization;
  - Fund structures;
  - Financing and monetization.
- Develop/implement 1 new prop trading strategy.

**Revenue Growth Assumptions**

- 15 new dividend enhancement clients
- 8 new clients for Project Gemini

**Revenue Opportunity & Budget**

| Clients | Targets | Potential Opportunity | Potential Growth | 2006 Budget | 2006 Growth |
|---|---|---|---|---|---|
| Core Business | 12 | $4,500,000 | n/a | $3,349,200 | n/a |
| New Clients | 24 | $37,000,000 | n/a | $14,799,292 | n/a |
| Total Business* | 36 | $48,500,000 | n/a | $18,124,292 | n/a |

\* $24,773,000 Pre-MLEMEA split

CONFIDENTIAL

— Redacted by the Permanent Subcommittee on Investigations

ML-PSI-00047441

841



Redacted
by
Permanent Subcommittee
on Investigations

CONFIDENTIAL

ML-PSI-00047442

842



CONFIDENTIAL
ML-PSI-00047443

843

| From: | Wilson, Ashley (London) <A_Wilson@ml.com> |
|---|---|
| Sent: | Friday, January 18, 2008 5:34 AM |
| To: | Addis, John (Structured Equity Finance & Trading) <john_addis@ml.com> |
| Bcc: | Addis, John (Structured Equity Finance & Trading) <jaddis@ml.com> |
| Subject: | FW: Exclusive Lending Agreements - Janus Capital and Foreign & Colonial |

-----Original Message-----
**From:** Wilson, Ashley (London)
**Sent:** 18 January 2008 10:33
**To:** 'Chris Polkonen'; Pritchard, Hamish (London); Patel, Rajeev (London)
**Cc:** Jay Lovejoy
**Subject:** RE: Exclusive Lending Agreements - Janus Capital and Foreign & Colonial

Chris,
Thanks for your prompt response.
The advice we have received from external counsel differs from your interpretation below, however, I believe you are
currently working with Raj on a non legal solution.
I hope this matter comes to a swift resolution
Regards
Ashley

-----Original Message-----
**From:** Chris Polkonen [mailto:cpolkonen@FSECLENDING.com]
**Sent:** 17 January 2008 18:45
**To:** Pritchard, Hamish (London); Wilson, Ashley (London); Patel, Rajeev (London)
**Cc:** Jay Lovejoy
**Subject:** RE: Exclusive Lending Agreements - Janus Capital and Foreign & Colonial

Hamish / Ashley / Raj,

After deliberating with my colleagues on this issue, we would like to further discuss the Janus and F&C ESLA's with
Merrill in an effort to resolve Merrill's concerns:

1) SFTC disagrees with Merrill's position that the wording in Section 8 of the Janus ESLA (Section 7 of the
F&C ESLA) should serve as grounds for termination. No regulatory, legal or political event has taken place
which has had the result of terminating or materially restricting the securities lending business (either
generally or as relates specifically to either the lender or borrower). The derivatives inquiry by the IRS
and/or the senate subcommittee does not itself rise to the level of a regulatory, legal or political event as
applied to securities lending; or even in the general sense, as no action has been taken by either body to
restrict or terminate securities lending. Merrill appears to be making a business decision based
on Merrill's assessment of the climate surrounding this trade and factors particular to Merrill, as opposed to
a regulatory, legal or political event which materially restricts lending.

2) Additionally, as of yesterday's close of business market values, no Material Change event has
been trigger in relation to any of the four lots at issue (please see the attached spreadsheet). The
appropriate benchmark reference in the Janus ESLA is the market value of the awarded lots as of Term
Start Date, and in regards to the F&C ESLA, the number included in Schedule 1 (which reflects the market
value of the US component of Lot 11 as of auction date). It should be noted that recent market trends
would suggest that a potential breach of these triggers is more likely than not, but at present has not
happened.

Any assistance that eSec can provide to Merrill is based solely on eSec's business relationship with Merrill, which
we highly value, and not as a result of the contractual terms of the aforementioned ESLA's. We would like to
note that to date Merrill is the only borrower counterparty in our program that is seeking to terminate an ESLA as a
result of the IRS and/or Senate probe into offshore derivatives trading.

We have every intent and hope that this issue can be resolved in the context of continuing what has been to this
point a mutually beneficial relationship.
I look forward to discussing this in greater detail with you at your earliest convenience.

Permanent Subcommittee on Investigations
**EXHIBIT #45 – FN 262**

CONFIDENTIAL

ML-PSI-00001261

844

Regards,
Chris

**From:** Pritchard, Hamish (London) [mailto:hamish_pritchard@ml.com]
**Sent:** Thursday, January 17, 2008 7:54 AM
**To:** Chris Polkonen; Mark Wilson
**Cc:** Wilson, Ashley (London); Patel, Rajeev (London)
**Subject:** Exclusive Lending Agreements - Janus Capital and Foreign & Colonial


Dear Chris & Mark
Many thanks for meeting with us early on today on short notice. As explained verbally, as a result of the actions by the US Senate's Permanent Subcommittee on Investigations our Jersey entity (Merrill Lynch Equity Solutions Jersey or MLESJ) has had to cease trading in regards its stock lending activities for US stocks. As a result of this we are seeking to have the Lender recall the securities in line with the wording as set forth below. The wording can be found in Clause 8 of the ESLA between MLESJ and Janus Capital dated 30 Oct 2007 and Clause 7 in the ESLA between MLESJ and F&C dated 6 Nov 2007.

Our opinion is that as the securities lending business of MLESJ undertaken in these Agreements has been materially restricted, (to the point where we are unable to borrow any of the US securities within the lots), the clause therefore requires the Lender to recall all outstanding loans, for the borrower to return all loaned securities and for the Agreement to terminate.

We feel that this is the best and most appropriate way of handling the unfortunate situation for all concerned as it will allow the yourselves and the Lender to take the lots and look to re-bid / place them elsewhere with an entity who is able to utilise them. Whilst MLESJ has the right to renegotiate and ultimately terminate if a new fee level cannot be agreed (such agreement of a new fee would be difficult given MLESJ's position) on a number of the Janus lots (38 & 27) due to their performance having decreased by 20% or more we would prefer to avoid this route as it would (in our view) merely prolong the process.

I understand you will wish to consult with your colleagues and legal counsel and look forward to your response. Please let me know if I can be of further assistance.

Kind Regards
Hamish


Clause 7/8

"If by reason of a regulatory, legal, political or any other similar event, Lender suspends all securities lending, and/or the securities lending business is terminated or materially restricted, Lending Agent shall recall all outstanding Loaned Securities, no new Loans will be allowed, and this Agreement shall terminate on the day after the day on which all Loaned Securities are returned. The Exclusive Fee shall continue to accrue on all Loanable Securities until all Loaned Securities are returned."

This message w/attachments (message) may be privileged, confidential or proprietary, and if you are not an intended recipient, please notify the sender, do not use or share it and delete it. Unless specifically indicated, this message is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of Merrill Lynch. Subject to applicable law, Merrill Lynch may monitor, review and retain e-communications (EC) traveling through its networks/systems. The laws of the country of each sender/recipient may impact the handling of EC, and EC may be archived, supervised and produced in countries other than the country in which you are located. This message cannot be guaranteed to be secure or error-free. This message is subject to terms available at the following link: http://www.ml.com/e-communications_terms/. By messaging with Merrill Lynch you consent to the foregoing.


CONFIDENTIAL                                                    ML-PSI-00001262

845

| From: | Abdoo, Brian (Multi-Product Marketing) <brian_abdoo@ml.com> |
|---|---|
| Sent: | Wednesday, April 25, 2007 8:22 PM (GMT) |
| To: | Seaton, Graham (ML Strategic Solutions Group) <graham_seaton@ml.com> |
| Bcc: | Seaton, Graham (ML Strategic Solutions Group) <gseaton@ml.com> |
| Subject: | FW: crescent/olayan follow up |
| Attach: | image001.gif |

-----Original Message-----
**From:** John O. Wolcott (JOW) [mailto:J.Wolcott@Olayangroup.com]
**Sent:** Friday, April 20, 2007 3:37 PM
**To:** Abdoo, Brian (Multi-Product Marketing)
**Subject:** RE: crescent/olayan follow up

Brian—

Just for the avoidance of doubt as Sonny and his brethren say, it works with IBM, then JPM, then AIG, ad nauseum
as long as you change names and have a business reason for doing so, but Don has cautioned us that converting the
JPM dividend to nontaxable ordinary income lending the shares just long enough to cover the record dates quarter
after quarter does not. And perhaps other clients are less concerned about playing the audit lottery than are we. Why
not take this back around the from the other way and ask John to ask his Shearman contacts to talk to Don who
would then revert to us?

Good weekend—

—John

**From:** Abdoo, Brian (Multi-Product Marketing) [mailto:brian_abdoo@ml.com]
**Sent:** Friday, April 20, 2007 2:25 PM
**To:** John O. Wolcott (JOW)
**Subject:** RE: crescent/olayan follow up

sorry for the confusion on this but I'm convinced that something is being miscommunicated here somewhere - i'm pretty
sure that S+S has acted as outside council for some of our existing counterparties while they were looking at this trade - i
think those counterparties are fairly conservative and would not be doing this without S+S's consent especially since they
"trade" much more frequently than i think you would (they own many more stocks i think). I'll check with john and make
sure my facts are right and if they are lets work to set up that call and hopefully straighten things out. (I'll call you before
doing anything)

-----Original Message-----
**From:** John O. Wolcott (JOW) [mailto:J.Wolcott@Olayangroup.com]
**Sent:** Thursday, April 19, 2007 5:33 PM
**To:** Abdoo, Brian (Multi-Product Marketing)
**Subject:** RE: crescent/olayan follow up

Our contact, Brian, is Don Lonczak, who says he knows John pretty well. Don has talked to a number of his
partners, all of whom tell him that the transaction works, as I said, once, maybe twice because repeated use,
coincidentally around dividend payment time, would provide a strong case for the IRS to assert tax evasion. So

Permanent Subcommittee on Investigations
**EXHIBIT #45 – FN 263**

CONFIDENTIAL                                                                    ML-PSI-00127174

846

yes, looking at it in a vacuum, it works, it is the repeated "overuse" , e.g. pigs trying to be hogs, that proves problematic.

But I'd be happy to listen to them discuss its merits.

—John

**From:** Abdoo, Brian (Multi-Product Marketing) [mailto:brian_abdoo@ml.com]
**Sent:** Thursday, April 19, 2007 4:29 PM
**To:** John O. Wolcott (JOW)
**Subject:** RE: crescent/olayan follow up

hey john - I wanted to get back to you on this. who did you talk to at sherman ? i'm pretty sure that we can get them comfortable, perhaps with a few modifications. they've represented some of our other counterparties doing this trade with us. it might be best to get all the relevant people on a call - you, john addis, and your sherman contact along with anyone else you can think of. what do you think ?

------Original Message-----
**From:** John O. Wolcott (JOW) [mailto:J.Wolcott@Olayangroup.com]
**Sent:** Thursday, March 29, 2007 4:33 PM
**To:** Abdoo, Brian (Multi-Product Marketing)
**Subject:** RE: crescent/olayan follow up

Thanks, Brian. I'm told that our contacts at Shearman know John Addis quite well and report that they are apparently satisfied that the transaction works. Once. Or maybe twice, but not necessarily in succession, the reason being that repeated "abuse" (my hyperbolic word, not theirs) without a non-tax related business purpose would quickly lead the IRS to such conclusion. Might John have further comment?

—John

**From:** Abdoo, Brian (Multi-Product Marketing) [mailto:brian_abdoo@ml.com]
**Sent:** Thursday, March 29, 2007 1:27 PM
**To:** John O. Wolcott (JOW)
**Subject:** FW: crescent/olayan follow up

john - sorry this has taken so long to get to you - as a follow up to our meeting and our "gemini" product that can enhance the effective dividend you get on physically held US stocks (like OXY), here is our standard "indemnity" language that you were looking for - please review it and let me know your thoughts. if I'm doing my math right, I think this can save you around $7 million per year on OXY. thanks.

"6.5   Unless otherwise agreed, all payments under this Agreement shall be made on the due date without any withholding or deduction whatsoever unless required by law on account of tax. If any deduction or withholding on account of tax is required by law to be made from any payment between the parties hereto, then the payor shall pay in the same manner and at the same time such additional amounts as would result in the receipt by the payee, free from any such withholding or deduction, such amounts as would have been received by the payee had no such deduction or withholding been required to be made and shall at the same time supply tax vouchers in respect of the same if requested."

CONFIDENTIAL

ML-PSI-00127175

847

Brian Abdoo
Managing Director
Multi Product Marketing
212-449-4566 (work)
_____ (cell)
brian_abdoo@ml.com

= Redacted by the Permanent
Subcommittee on Investigations

If you are not an intended recipient of this e-mail, please notify the sender, delete it and do not read,
act upon, print, disclose, copy, retain or redistribute it. Click here for important additional terms
relating to this e-mail.    http://www.ml.com/email_terms/

This communication and any files transmitted with it may be confidential or privileged. Disclosure,
distribution or copying of this
communication may be prohibited. Website: http://www.olayan.com

Offices: Athens, London, New York, Riyadh, Al-Khobar, Jeddah, Vienna



This communication and any files transmitted with it may be confidential or privileged. Disclosure,
distribution or copying of this
communication may be prohibited. Website: http://www.olayan.com

Offices: Athens, London, New York, Riyadh, Al-Khobar, Jeddah, Vienna

This communication and any files transmitted with it may be confidential or privileged. Disclosure,
distribution or copying of this
communication may be prohibited. Website: http://www.olayan.com

Offices: Athens, London, New York, Riyadh, Al-Khobar, Jeddah, Vienna

CONFIDENTIAL

ML-PSI-00127176

848



Enhanced Stock Lending Over US Equities

GSAM

*Global Equity Finance*

*30 January 2007*

Merrill Lynch
Global Markets & Investment Banking Group

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

Permanent Subcommittee on Investigations
**EXHIBIT #45 – FN 269**

GS-PSI-002397

849



Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

GS-PSI-002398

850



## Enhanced Stock Lending Over US Equities

### Summary

❖ Merrill Lynch is able to offer enhanced levels on loans of US equities to non-US Clients.

❖ Pricing levels are circa 90% of the dividends on underlying US stocks.

❖ The transaction is executed as a 15 day stock loan under standard GMSLA documentation.

❖ The stock loan counterparty is a Jersey (UK) entity in the Merrill Lynch group.

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

GS-PSI-002399

851



Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

GS-PSI-002400

852



## Enhanced Stock Lending Over US Equities

### ML Borrow Counterparty – "Merrill Lynch Equity Solutions Jersey"

❖ Merrill Lynch Equity Solutions Jersey is a corporation located in Jersey, UK.

❖ 100% subsidiary of Merrill Lynch.

❖ Capitalised with $300m of equity.

❖ $1bn funding facility with and $300m demand loan to Merrill Lynch & Co. Inc.

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

853

Basic flows for US                                                                 Page 1 of 1

## Lane-John, Debra

| From: | Wianecki, Karl [Karl.Wianecki@ny.email.gs.com] |
|-------|------------------------------------------------|
| Sent: | Thursday, February 15, 2007 12:00 PM |
| To: | Harmon, Mary L (Tax); Birnbaum, Rachel |
| Cc: | Chropuvka, Gary; Khodadadi, Arian; Bronner, Neille |
| Subject: | FW: Basic flows for US |

Mary/Rachel
Here is a flow-chart of the ML program we discussed yesterday. Please let me know if you have questions.

Also, have you received the agreement with the indemnification language from ML yet?

Karl

**From:** Conde, Lisa (GEF - Americas) [mailto:Lisa_Conde@ml.com]
**Sent:** Thursday, February 15, 2007 11:21 AM
**To:** Wianecki, Karl
**Subject:** Basic flows for US

<<gsamUS.ppt>>

Karl - let me know what you think of these flows and details about duration of loan, etc.
Lisa

_____

If you are not an intended recipient of this e-mail, please notify the sender, delete it and do not
read, act upon, print, disclose, copy, retain or redistribute it. Click here for important additional
terms relating to this e-mail.    http://www.ml.com/email_terms/

Confidential Proprietary Business I
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 270**

GS-PSI-002396

854

**Lane-John, Debra**

| | |
|---|---|
| **From:** | Seaton, Graham (ML Strategic Solutions Group) [graham_seaton@ml.com] |
| **Sent:** | Tuesday, May 15, 2007 8:28 AM |
| **To:** | Birnbaum, Rachel |
| **Cc:** | Harmon, Mary L (Tax); Chropuvka, Gary; Wlanecki, Karl; Addis, John (ML Strategic Solutions Group); Doran, Steve (GEF - Americas); Conde, Lisa (GEF - Americas) |
| **Subject:** | RE: US stock lending to MLESJ |

Rachel,

Group Tax and the business side here have produced a standardised
indemnity that we can offer in relation to these transactions going
forward. Attached is a mark up showing how this changes from what we had
been discussing. Note that we can accept no substantive changes to this.
Apologies for the timing being during our negotiation, however this has
been an ongoing project on our side.

We look forward to discussing this with you and hope that it is
acceptable.

Best regards,

Graham.

---------------------
---------------------
Graham Seaton | Director | Merrill Lynch | Global Markets Financing &
Services
4 World Financial Center | New York NY 10080
ph +1 212 449 7773 | fax +1 646 736 5138 | mob +█████████
graham_seaton@ml.com

Merrill Lynch - "A major force in prime brokerage" - Global Custodian,
2007

Merrill Lynch does not provide tax, accounting or regulatory advice.
Any tax statement contained herein were not intended or written to be
used, and cannot be used for the purpose of avoiding U.S., federal,
state or local tax penalties. Please consult your advisor as to any
tax, accounting or legal statements made herein.

For very important information relating to this e-mail please click on
this link: http://www.ml.com/legal_info.htm

-----Original Message-----
From: Birnbaum, Rachel [mailto:Rachel.Birnbaum@gs.com]

_____ = Redacted by the Permanent
         Subcommittee on Investigations

2/15/2008

Confidential Proprietary Business
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 271**

GS-PSI-002513

Sent: Thursday, April 19, 2007 10:00 AM
To: Seaton, Graham (ML Strategic Solutions Group); Harmon, Mary L (Tax)
Cc: Chropuvka, Gary (gs.com); Wianecki, Karl; Addis, John (ML Strategic
Solutions Group); Doras, Steve (GEF - Americas); Conde, Lisa (GEF -
Americas)
Subject: RE: US stock lending to MLESJ

Graham,

I am not sure I understand your reference to part (d) of Rider 1B,
because the latest draft of the reps is formatted as (i) - (iii).
However, I believe your language below at the end of (iii), which is
where I believe you intended it to go (although we included some
revisions to (b) and (c) and I deleted your (d) as we cannot agree to
that provision). Please have your tax group review the revised reps
(see attached) and let us know if you have any additional comments or
questions as soon as possible.

Regards,
--Rachel

>IRS Circular 230 disclosure: Any statement contained in this
communication (including any attachments) concerning U.S. tax matters is
not intended or written to be used, and cannot be used, for the purpose
of (i) avoiding penalties under the Internal Revenue Code, or (ii)
promoting, marketing, or recommending to another party any transaction
or matter addressed herein. This communication is for internal use
only.
>
>This message may contain information that is confidential or
privileged. If you are not the intended recipient, please advise the
sender immediately and delete this message. See
http://www.gs.com/disclaimer/email for further information on
confidentiality and the risks inherent in electronic communication.
>

-----Original Message-----
From: Seaton, Graham (ML Strategic Solutions Group)
[mailto:graham_seaton@ml.com]
Sent: Friday, April 13, 2007 1:12 PM
To: Birnbaum, Rachel; Harmon, Mary L (Tax)
Cc: Chropuvka, Gary; Wianecki, Karl; Addis, John (ML Strategic Solutions
Group); Doran, Steve (GEF - Americas); Conde, Lisa (GEF - Americas)
Subject: RE: US stock lending to MLESJ

Rachel,

To give that indemnity, we need the following language inserted at the
end of part (d) of Rider 1B. The comments you sent over are still

2/15/2008

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

GS-PSI-002514

RE: US stock lending to MLESJ

subject to further review by Group Tax here.

Thanks.

...provided that:

(a) Lender provides written notice to Borrower within thirty (30) days of receipt of any claim for U.S. withholding taxes by a U.S. governmental agency;

(b) Borrower will have the right to assume the defense of the claim (at its own expense and with counsel which it shall select in its discretion) at any time after Lender has given Borrower notice of the claim;

(c) Through to the date that is ten (10) days after Borrower has received the appropriate notice, or so long as Borrower has assumed the defense of the claim as provided for immediately above, Lender shall not (i) pay the claim, or (ii) consent to any settlement or other agreement with respect to the claim without the prior written consent of Borrower, which will not unreasonably be withheld or delayed;

(d) Lender shall not consult with U.S. governmental officials regarding whether Lender would be required to effect payment of any U.S. federal income withholding tax in respect of the borrowings of securities of U.S. issuers from Lender or any other matter described herein without the prior written consent of Borrower, which consent will not unreasonably be withheld or delayed.

Graham Seaton | Director | Merrill Lynch | Global Markets Financing & Services
4 World Financial Center | New York NY 10080
ph +1 212 449 7773 | fax +1 646 736 5138 | mob + ▇▇▇▇▇▇
graham_seaton@ml.com

| ▆▆▆▆ = Redacted by the Permanent Subcommittee on Investigations |

Merrill Lynch Prime Brokerage-"Top Rated" among Multi-Strategy and $1B+ Hedge Funds-Global Custodian, 2006

Merrill Lynch does not provide tax, accounting or regulatory advice. Any tax statement contained herein were not intended or written to be used, and cannot be used for the purpose of avoiding U.S., federal, state or local tax penalties. Please consult your advisor as to any tax, accounting or legal statements made herein.

For very important information relating to this e-mail please click on this link: http://www.ml.com/legal_info.htm

2/15/2008

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

GS-PSI-002515

857

----Original Message----
From: Birnbaum, Rachel [mailto:Rachel_Birnbaum@gs.com]
Sent: Wednesday, February 28, 2007 6:24 PM
To: Seaton, Graham (ML Strategic Solutions Group); Harmon, Mary L (Tax)
Cc: Chropuvka, Gary (gs.com); Wisnecki, Karl; Addis, John (ML Strategic
Solutions Group)
Subject: RE: US stock lending to MLESJ

Graham,

I am attaching a markup of the lending agreement you forwarded to us,
which reflects representations that we would like to see included in the
agreement.
Please let us know if you want to discuss the markup.

Regards,
--Rachel

>
>Goldman, Sachs & Co.
>180 Maiden Lane / 40th Floor, New York, NY 10038
>*Tel: 212-357-2217 | 7 Fax: 212-256-6352
>* e-mail: rachel.birnbaum@gs.com          GOLDMAN
>
SACHS
    Rachel Birnbaum
>Vice President
>Tax Department
>
>
>IRS Circular 230 disclosure: Any statement contained in this
communication (including any attachments) concerning U.S. tax matters is
not intended or written to be used, and cannot be used, for the purpose
of (i) avoiding penalties under the Internal Revenue Code, or (ii)
promoting, marketing, or recommending to another party any transaction
or matter addressed herein. This communication is for internal use
only.
>
>This message may contain information that is confidential or
privileged. If you are not the intended recipient, please advise the
sender immediately and delete this message. See
http://www.gs.com/disclaimer/email for further information on
confidentiality and the risks inherent in electronic communication.
>

----Original Message----
From: Seaton, Graham (ML Strategic Solutions Group)
[mailto:graham_seaton@ml.com]

2/15/2008

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)                 GS-PSI-002516

858

RE: US stock lending to MLESJ

Sent: Friday, February 16, 2007 5:33 PM
To: Harmon, Mary L (Tax); Birnbaum, Rachel
Cc: Chropuvka, Gary; Wisnecki, Karl; Addis, John (ML Strategic Solutions Group)
Subject: US stock lending to MLESJ

Mary, Rachel,

Thanks for your time on Wednesday morning to discuss the US stock lending opportunity. As promised, attached is our standard lending agreement for your review. This includes the tax language that you wished to see.

Please note that should we proceed we will send over a document for your legal team to review and provide comments on, however the relevant language will be identical.

We look forward to your comments and to moving this forward.

Thanks and regards,

Graham.

---

Graham Seaton | Director | Merrill Lynch | Global Markets Financing & Services
4 World Financial Center | New York NY 10080
ph +1 212 449 7773 | fax +1 646 736 5138 | mob + ▇▇▇▇▇
graham_seaton@ml.com

```
┌──────────────────────────────────┐
│ ▇▇▇ = Redacted by the Permanent   │
│       Subcommittee on Investigations │
└──────────────────────────────────┘
```

Merrill Lynch Prime Brokerage-"Top Rated" among Multi-Strategy and $1B+ Hedge Funds-Global Custodian, 2006

Merrill Lynch does not provide tax, accounting or regulatory advice. Any tax statement contained herein were not intended or written to be used, and cannot be used for the purpose of avoiding U.S., federal, state or local tax penalties. Please consult your advisor as to any tax, accounting or legal statements made herein.

For very important information relating to this e-mail please click on this link: http://www.ml.com/legal_info.htm

<<MLESJ Standard GMSLA2.doc>>

---

If you are not an intended recipient of this e-mail, please notify the sender, delete it and do not read, act upon, print, disclose, copy, retain or redistribute it. Click here for important additional terms

2/15/2008

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

GS-PSI-002517

859

RE: US stock lending to MLESJ                                    Page 6 of 6

relating to this e-mail.    http://www.ml.com/email_terms/
-------------------------------------------------------------

2/15/2008

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)                    GS-PSI-002518

860

*The Borrower hereby represents and warrants that:

(i) it will fully comply with all applicable United States income tax withholding obligations if any, including, without limitation, U.S. Internal Revenue Service regulations and administrative guidance requiring the withholding of tax from substitute payments made to the Lender (either directly or through any agent of the Lender) pursuant to this Agreement;

(ii) except as otherwise provided herein, it will be liable for and will fully indemnify the Lender for any United States tax liability, including any interest, penalties or additions to tax and including any United States withholding tax imposed on such indemnity payment, with respect to any failure to withhold and timely pay to the U.S. Internal Revenue Service any United States withholding tax imposed on any substitute payments made to the Lender (either directly or through any agent of the Lender) pursuant to this Agreement; and

(iii) it will provide the U.S. Internal Revenue Service and the Lender with a timely and accurately completed Form 1042S or other required form and will cooperate with the Lender (and its agents) in the event of any U.S. Internal Revenue Service inquiry, including providing to the Lender (or its agent) any other tax forms reasonably requested by the Lender, provided that.

The foregoing representations and warranties in (i) through (iii) shall be effective and binding upon Borrower only to the extent that all of the following conditions in (a) through (d) are and remain in force and are fully complied with by Lender:

(a)  Lender provides shall provide written notice to Borrower within thirty (30) days of receipt of any claim for U.S. withholding taxes by a U.S. governmental agency;

(b)  Borrower will have the right to assume the defense of the claim (at its own expense and with counsel which it shall select in its discretion) at any time after Lender has given Borrower notice of the claim, although Lender shall also be entitled to participate in observe any such proceeding (at its own expense and with counsel which it shall select in its discretion); and

(c)  Through to the date that is ten (10) days after Borrower has received the appropriate notice, or for so long as Borrower has assumed the defense of the claim as provided for immediately above, Lender shall not (i) pay the claim, or (ii) consent to any settlement or other agreement with respect to the claim without the prior written consent of Borrower, which will not unreasonably be withheld or delayed; provided, however, that Lender may pay such claim or consent to such settlement or agreement if required by law. upon a final determination of such liability; and

(d) Lender shall consult with Borrower prior to the submission of any written correspondence to (and copy Borrower on all written correspondence sent to), and Borrower shall be entitled to observe (at its own expense and with counsel which it shall select in its discretion) any other communication with, any U.S. government officials in respect of the transactions contemplated hereby, provided, however, that in no event shall Lender be required to copy Borrower

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

GS-PSI-002519

861

on any correspondence that would, prior to being sent to Borrower, be attorney-client privileged.

Any payment from Borrower to Lender under (i) through (ii) above shall be reduced by an amount equal to the sum of (A) the sum of the difference between (i) the payments of interest that would have been made on the Collateral as of each interest payment date prior to the date of the final determination if the interest rate on the Collateral had been the Federal Target Rate and (ii) the amount of interest actually paid on each such interest payment date, and (B) interest at the Federal Target Rate in respect of each such difference from and including each related interest payment date to (and excluding) the date of such payment from Borrower to Lender, compounded on a daily basis.

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

GS-PSI-002520

Document comparison done by DeltaView on Wednesday, May 09, 2007 10:02:52 PM

| Input: | |
|---|---|
| Document 1 | PowerDocs://DCDOCS01/356712/1 |
| Document 2 | PowerDocs://DCDOCS01/356713/1 |
| Rendering set | Shearman & Sterling |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

**Redline Summary:**

| No. | Change | Text |
|---|---|---|
| 1 | Insertion | Agreement; and |
| 2-3 | Change | "by the Lender; provided that;" changed to "by the Lender." |
| 4 | Insertion | The forgoing...complied with by Lender: |
| 5-6 | Change | "(a) Lender provides written notice" changed to "(a) Lender shall provide written notice" |
| 7-8 | Change | "entitled to participate in any such proceeding" changed to "entitled to observe any such proceeding" |
| 9 | Deletion | discretion); and |
| 10 | Change | "notice, or so long as Borrower" changed to "notice, or for so long as Borrower" |
| 11-12 | Change | "such claim or consent to...if required by |

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

GS-PSI-002521

863

| | | law." changed to "such claim upon a final...of such liability; and" |
|---|---|---|
| 13 | Insertion | (d) Lender shall copy...privileged. |
| 14 | Insertion | (iv) In the event of a...on a daily basis. |

**Statistics**

| | Count |
|---|---|
| Insertions | 9 |
| Deletions | 5 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 14 |

Confidential Proprietary Business Information
The Goldman Sachs Group, Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

GS-PSI-002522

864

| From: | Chropuvka, Gary. | | Sent:5/10/2007 6:27 PM. |
|---|---|---|---|
| To: [ - ] | Khodadadi, Arlen. | | |
| Cc: [ - ] | | | |
| Bcc: [ - ] | Khodadadi, Arlen. | | |
| Subject: | Re: US stock lending to MLESJ. | | |

He is now in NY. I will see him tuesday. Alternatively, kilgallen will have it.

-----------------------
Sent from my BlackBerry Wireless Handheld

----- Original Message -----
From: Khodadadi, Arlen
To: Chropuvka, Gary
Sent: Thu May 10 15:40:49 2007
Subject: RE: US stock lending to MLESJ

Monday or Tuesday are fine with me.

By the way, do you happen to have Jason's mailing address? Never got a chance to send him his thank you card & box of chocolates before he left Tokyo.

thanks

From: Chropuvka, Gary
Sent: Tuesday, May 08, 2007 7:35 PM
To: Khodadadi, Arlen
Subject: RE: US stock lending to MLESJ

Yes, ask the PBs. I would like to understand what the industry practice may be (I also know you were looking for an excuse to call either Ben, Kenna or Doran).

As for the re-scheduling, I am actually taking off tomorrow to go to my son's school and on vacation the rest of the week. Can we meet next Monday at 9, 9:30 or 10 or Tuesday anytime between 10:30 and 1?

Good luck in the 2 1/2 hour meeting - anything interesting?

On the recruiting front there are ~ 11 phone screens that will happen in the next week or so. Hopefully, this will help with our resource needs.

Let me know if there are any new issues that you have encountered.

Thanks.

From: Khodadadi, Arlen
Sent: Tuesday, May 08, 2007 7:21 PM
To: Chropuvka, Gary
Subject: RE: US stock lending to MLESJ

**Permanent Subcommittee on Investigations**
**EXHIBIT #45 - FN 271**

Confidential Proprietary Business Information
The Goldman Sachs Group Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(S)

GS-PSI-05758

865

Ask the PBs? I'm sure they will do whatever we ask... but we should discuss internally: this would be a big thing (ie, something the division & firm would probably need to weigh in on).

Btw, do you mind if we re-schedule our meeting tomorrow? I have some other meeting between 9-11:30.

thanks

---

From: Chropuvka, Gary
Sent: Tuesday, May 08, 2007 7:16 PM
To: Khodadadi, Arlen; Dempsey, Tom; Bronner, Nellie; Alford, Andrew; Wianecki, Karl
Subject: RE: US stock lending to MLESJ

Arlen, this may be a good question for a Prime Broker in how they make the payments. If this split were the case for dividend enhancement, I would think the entry/journal would not touch the client account (e.g. if there was a 50/50 split, there would be two accounts that were credited : GSAM Prop account and Fund account). Can you ask around?

Thanks.

---

From: Khodadadi, Arlen
Sent: Tuesday, May 08, 2007 7:04 PM
To: Chropuvka, Gary; Dempsey, Tom; Bronner, Nellie; Alford, Andrew; Wianecki, Karl
Subject: RE: US stock lending to MLESJ

I'm not advocating this (despite Gary's comment) but I wonder if this is the "market convention" for yield enhancement as well (since we can basically get similar economics through what we call yield enhancement or what others may call sec lending). Our current revenue for yield enhancement in just GEO is on the order of 7-8mm USD per year (and this is without any US securities involved).

---

From: Chropuvka, Gary
Sent: Tuesday, May 08, 2007 6:48 PM
To: Khodadadi, Arlen; Dempsey, Tom; Bronner, Nellie; Alford, Andrew; Wianecki, Karl
Subject: RE: US stock lending to MLESJ

FYI...I just spoke to a friend of mine (loosely defined) who currently works at Northern Trust on the passive side and used to work at BGI. He said that both of those banks receive securities lending proceeds directly into their Firm P&L. He mentioned that most managers that employ proprietary securities lending capabilities receive anywhere from 50 - 80% of the lending received. He also said that this is becoming a more competitive landscape so pricing is compressing. They also do a lot of lending for non-custodied accounts (i.e. separate accounts). In fact, he claims that BGI did not custody any of their own assets, whereas NTCO does.

This would obviously be an enormous business opportunity given the amount of AUM we have. Our clients in most of our proprietary commingled funds see the benefits through the use of BGA and I guess GS&Co sees some benefit since BGA is a wholly owned sub (I think). But given the above information (which we should verify) we are giving a large

Confidential Proprietary Business Information
The Goldman Sachs Group Inc
Produced Pursuant to Senate Rule XXVI(5)(a)(5)

GS-PSI-05759

866

portion back to our clients i.e 80 - 85% v 20 - 50% and our group (QIS or GSAM) is not receiving the revenue from even the 20%.

We should either make a much bigger deal in our marketing materials or we may want to consider keeping a portion of the BGA revenue with GSAM since the number is way below market (Arlen's suggestion). We may also want to work out a deal with BGA and pitch their services to our separate account clients (or attempt to mandate it in our guidelines - we currently allude to it - we should just confirm with Legal that this is implied - see below). Granted many clients may have this in place with custodians, but given the revenue opportunities someone should take the ball on this GSAM wide effort. (Karl, I think you were working on some hires in this space, but alternatively we can have someone start to work with BGA on their connectivity to our client's custodians, do some market research, and then possibly prioritize a list of accounts' to target).

Lending:

Permitted to lend securities long in the Account to institutions, such as certain broker-dealers and banks; provided, however, that such loans are secured according to market practice by collateral in cash, cash equivalents, or U.S. Government securities. The lending agent guarantees that all securities on loan will be recalled by settlement dates of sell transactions. If for some reason securities are not recalled on time and settlements fail then the agent would compensate the portfolio for all fees and changes related to failed settlements. The compensation would insure that the account performance is not affected negatively.


Gary Chropuvka

Goldman Sachs Asset Management

P : (212) 357-9094

F : (212) 428-1824



From: Khodadadi, Arlen
Sent: Thursday, May 03, 2007 9:58 PM
To: Chropuvka, Gary; Dempsey, Tom; Bronner, Neilie; Alford, Andrew
Subject: RE: US stock lending to MLESJ


Could we setup an agency lending agreement and try to make up the income that way?



From: Chropuvka, Gary
Sent: Thursday, May 03, 2007 9:54 PM
To: Dempsey, Tom; Khodadadi, Arlen; Bronner, Neilie; Alford, Andrew
Subject: FW: US stock lending to MLESJ


Not good....

Confidential Proprietary Business Information
The Goldman Sachs Group Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

867

From: Wianecki, Karl
Sent: Thursday, May 03, 2007 11:19 AM
To: Chropuvka, Gary
Subject: RE: US stock lending to MLESJ

just received vmail from Steve, it seems ML is re-evaluating the viability of this product. He asked for 48 hours for internal discussions involving senior ML people. My optimism has vanished, I don't think this is going to happen....

---

From: Wianecki, Karl
Sent: Wednesday, May 02, 2007 5:04 PM
To: Chropuvka, Gary
Subject: FW: US stock lending to MLESJ

fyi

---

From: Birnbaum, Rachel
Sent: Wednesday, May 02, 2007 4:44 PM
To: Harmon, Mary L (Tax); Wianecki, Karl
Subject: FW: US stock lending to MLESJ

FYI -- I will leave the meeting as is for now (Friday from 10-11) but seems likely they will push back.

IRS Circular 230 disclosure: Any statement contained in this communication (including any attachments) concerning U.S. tax matters is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein. This communication is for internal use only.

This message may contain information that is confidential or privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. See http://www.gs.com/disclaimer/email for further information on confidentiality and the risks inherent in electronic communication.

---

From: Conde, Lisa (GEF - Americas) [mailto:Lisa_Conde@ml.com]
Sent: Wednesday, May 02, 2007 4:43 PM
To: Birnbaum, Rachel
Subject: RE: US stock lending to MLESJ

Hi Rachel
Please change this time in your diary to tentative.
I have just heard that our tax department is requesting more time and an additional internal meeting.
I will have more info tomorrow but this may push into next week.

Confidential Proprietary Business Information
The Goldman Sachs Group Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

GS-PSI-05771

868

Tx for your patience.
Steve Doran and I will call Karl tomorrow to give him an update (Steve is out of the office today).
Regards,
Lisa

——Original Message——
From: Birnbaum, Rachel [mailto:Rachel.Birnbaum@gs.com]
Sent: Wednesday, May 02, 2007 12:44 PM
To: Conde, Lisa (GEF - Americas)
Subject: RE: US stock lending to MLESJ


Lisa,

As of now, Mary and I are available tomorrow (Thursday) from 2 pm - 3 pm and Friday 10 - 11 am and from 2:30 - 4 pm.
Please let us know as soon as possible if a time within these times works for a call (so we don't get booked up with other
calls / meetings).

Thanks,
--Rachel


IRS Circular 230 disclosure: Any statement contained in this communication (including any attachments) concerning U.S.
tax matters is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the
Internal Revenue Code, or (ii) promoting, marketing, or recommending to another party any transaction or matter
addressed herein. This communication is for internal use only.

This message may contain information that is confidential or privileged. If you are not the intended recipient, please
advise the sender immediately and delete this message. See http://www.gs.com/disclaimer/email for further information
on confidentiality and the risks inherent in electronic communication.



From: Conde, Lisa (GEF - Americas) [mailto:Lisa_Conde@ml.com]
Sent: Wednesday, May 02, 2007 12:16 PM
To: Birnbaum, Rachel
Subject: Re: US stock lending to MLESJ

┌──────────────────────────────┐
│ ▪ = Redacted by the Permanent │
│   Subcommittee on Investigations │
└──────────────────────────────┘

Here you go:

Lisa Conde | Director | Merrill Lynch
222 Broadway, 6th Floor | New York, NY 10038
o: 212-670-1975 | m: ███████████ lisa_conde@ml.com

Merrill Lynch Prime Brokerage—"Top Rated" among Multi-Strategy and $1B+ Hedge Funds—Global Custodian, 2006


——Original Message——
From: Conde, Lisa (GEF - Americas)
To: 'Birnbaum, Rachel' <Rachel.Birnbaum@gs.com>; Wianecki, Karl <Karl.Wianecki@gs.com>; Doran, Steve (GEF -
Americas)
CC: Harmon, Mary L (Tax) <mary.harmon@gs.com>

Confidential Proprietary Business Information
The Goldman Sachs Group Inc
Produced Pursuant to Senate Rule XXV(5)(a)(5)

GS-PSI-05772

869

Sent: Wed May 02 09:11:05 2007
Subject: RE: US stock lending to MLESJ

Hi
I am still awaiting response from our tax department.
Will advise as soon as I hear from them.
Lisa

-----Original Message-----
From: Birnbaum, Rachel [mailto:Rachel.Birnbaum@gs.com]
Sent: Tuesday, May 01, 2007 5:28 PM
To: Wianecki, Karl; Doran, Steve (GEF - Americas); Conde, Lisa (GEF - Americas)
Cc: Harmon, Mary L (Tax)
Subject: RE: US stock lending to MLESJ

Mary and I are available between 11 am and 1 pm tomorrow (Wednesday May
2). Let us know if there is a time in this period that works for
others.

Thanks,
—Rachel

>IRS Circular 230 disclosure: Any statement contained in this
communication (including any attachments) concerning U.S. tax matters is
not intended or written to be used, and cannot be used, for the purpose
of (i) avoiding penalties under the Internal Revenue Code, or (ii)
promoting, marketing, or recommending to another party any transaction
or matter addressed herein. This communication is for internal use
only.
>
>This message may contain information that is confidential or
privileged. If you are not the intended recipient, please advise the
sender immediately and delete this message. See
http://www.gs.com/disclaimer/email for further information on
confidentiality and the risks inherent in electronic communication.
>

-----Original Message-----
From: Wianecki, Karl
Sent: Tuesday, May 01, 2007 11:43 AM
To: 'Doran, Steve (GEF - Americas); Conde, Lisa (GEF - Americas);
Birnbaum, Rachel
Subject: RE: US stock lending to MLESJ

Rachel
Please reply to Steve with time for you & marny (if necessary), I will
try work around your schedule to attend.

Thanks

-----Original Message-----
From: Doran, Steve (GEF - Americas) [mailto:stephen_doran@ml.com]
Sent: Tuesday, May 01, 2007 11:14 AM
To: Wianecki, Karl; Conde, Lisa (GEF - Americas)
Subject: RE: US stock lending to MLESJ

Confidential Proprietary Business Information
The Goldman Sachs Group Inc.
Produced Pursuant to Senate Rule XXVI(5)(d)(5)

GS-PSI-05773

870

Karl ,
Just left u a vm , pls come back to me w/ times or have
Rachel call me .

I will facilitate discussion .

Thx SD

-----Original Message-----
From: Wianecki, Karl [mailto:Karl Wianecki@gs.com]
Sent: Tuesday, May 01, 2007 11:04 AM
To: Doran, Steve (GEF - Americas); Conde, Lisa (GEF - Americas)
Subject: FW: US stock lending to MLESJ

Steve
Seems the ball is in MLs court on this? How do we close this?

Thx
Karl

-----Original Message-----
From: Birnbaum, Rachel
Sent: Tuesday, May 01, 2007 11:02 AM
To: Wianecki, Karl
Subject: FW: US stock lending to MLESJ

This is the guy who they said would call us. As I mentioned, neither
Mary nor I have heard from him. Let me know if you want me to talk to
Mary about calling him (I believe she knows him / has his number).
Thanks.


>IRS Circular 230 disclosure: Any statement contained in this
communication (including any attachments) concerning U.S. tax matters is
not intended or written to be used, and cannot be used, for the purpose
of (i) avoiding penalties under the Internal Revenue Code, or (ii)
promoting, marketing, or recommending to another party any transaction
or matter addressed herein. This communication is for internal use
only.
>
>This message may contain information that is confidential or
privileged. If you are not the intended recipient, please advise the
sender immediately and delete this message. See
http://www.gs.com/disclaimer/email for further information on
confidentiality and the risks inherent in electronic communication.
>

-----Original Message-----
From: Seaton, Graham (ML Strategic Solutions Group)
[mailto:graham_seaton@ml.com]
Sent: Monday, April 23, 2007 5:07 PM
To: Birnbaum, Rachel; Harmon, Mary L (Tax)
Cc: Addis, John (ML Strategic Solutions Group)
Subject: RE: US stock lending to MLESJ

Confidential Proprietary Business Information
The Goldman Sachs Group Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

GS-PSI-05774

871



Mary, Rachel,

Larry Kleinman will be calling you directly to discuss.

Thanks and regards.

Graham Seaton | Director | Merrill Lynch | Global Markets Financing &
Services 4 World Financial Center | New York NY 10080 ph +1 212 449 7773
| fax +1 646 736 5138 | mob + ████████ graham_seaton@ml.com

= Redacted by the Permanent
Subcommittee on Investigations

Merrill Lynch - "A major force in prime brokerage" - Global Custodian,
2007

Merrill Lynch does not provide tax, accounting or regulatory advice. Any
tax statement contained herein were not intended or written to be used,
and cannot be used for the purpose of avoiding U.S., federal, state or
local tax penalties. Please consult your advisor as to any tax,
accounting or legal statements made herein.

For very important information relating to this e-mail please click on
this link: http://www.ml.com/legal_info.htm

-----Original Message-----
From: Birnbaum, Rachel [mailto:Rachel.Birnbaum@gs.com]
Sent: Thursday, April 19, 2007 10:00 AM
To: Seaton, Graham (ML Strategic Solutions Group); Harmon, Mary L (Tax)
Cc: Chropuvka, Gary (gs.com); Wianecki, Karl; Addis, John (ML Strategic
Solutions Group); Doran, Steve (GEF - Americas); Conde, Lisa (GEF -
Americas)
Subject: RE: US stock lending to MLESJ

Graham,

I am not sure I understand your reference to part (d) of Rider 1B,
because the latest draft of the reps is formatted as (i) - (iii).
However, I included your language below at the end of (iii), which is
where I believe you intended it to go (although we included some
revisions to (b) and (c) and I deleted your (d) as we cannot agree to
that provision). Please have your tax group review the revised reps
(see attached) and let us know if you have any additional comments or
questions as soon as possible.

Regards,
--Rachel

>IRS Circular 230 disclosure: Any statement contained in this
communication (including any attachments) concerning U.S. tax matters is
not intended or written to be used, and cannot be used, for the purpose
of (i) avoiding penalties under the Internal Revenue Code, or (ii)
promoting, marketing, or recommending to another party any transaction
or matter addressed herein. This communication is for internal use

Confidential Proprietary Business Information
The Goldman Sachs Group Inc
Produced Pursuant to Senate Rule XXVI(5)(b)(3)

GS-PSI-08774

872

only.
>
>This message may contain information that is confidential or
privileged. If you are not the intended recipient, please advise the
sender immediately and delete this message. See
http://www.gs.com/disclaimer/email for further information on
confidentiality and the risks inherent in electronic communication.
>

-----Original Message-----
From: Seaton, Graham (ML Strategic Solutions Group)
[mailto:graham_seaton@ml.com]
Sent: Friday, April 13, 2007 1:12 PM
To: Birnbaum, Rachel; Harmon, Mary L (Tax)
Cc: Chropuvka, Gary; Wianecki, Karl; Addis, John (ML Strategic Solutions
Group); Doran, Steve (GEF - Americas); Conde, Lisa (GEF - Americas)
Subject: RE: US stock lending to MLESJ

Rachel,

To give that indemnity, we need the following language inserted at the
end of part (d) of Rider 1B. The comments you sent over are still
subject to further review by Group Tax here.

Thanks.

...provided that:

(a) Lender provides written notice to Borrower within thirty (30)
days of receipt of any claim for U.S. withholding taxes by a U.S.
governmental agency;

(b) Borrower will have the right to assume the defense of the claim
(at its own expense and with counsel which it shall select in its
discretion) at any time after Lender has given Borrower notice of the
claim;

(c) Through to the date that is ten (10) days after Borrower has
received the appropriate notice, or so long as Borrower has assumed the
defense of the claim as provided for immediately above, Lender shall not
(i) pay the claim, or (ii) consent to any settlement or other agreement
with respect to the claim without the prior written consent of Borrower,
which will not unreasonably be withheld or delayed;

(d) Lender shall not consult with U.S. governmental officials
regarding whether Lender would be required to effect payment of any U.S.
federal income withholding tax in respect of the borrowings of
securities of U.S. issuers from Lender or any other matter described
herein without the prior written consent of Borrower, which consent will
not unreasonably be withheld or delayed.

_____ = Redacted by the Permanent
Subcommittee on Investigations

_____
Graham Seaton | Director | Merrill Lynch | Global Markets Financing &
Services 4 World Financial Center | New York NY 10080 ph +1 212 449 7773
| fax +1 646 735 5138 | mob ▬▬▬▬▬ graham_seaton@ml.com

Confidential Proprietary Business Information
The Goldman Sachs Group Inc.
Produced Pursuant to Senate Rule XXV(5)(b)(5).

873

Merrill Lynch Prime Brokerage-"Top Rated" among Multi-Strategy and $1B+
Hedge Funds-Global Custodian, 2006

Merrill Lynch does not provide tax, accounting or regulatory advice. Any
tax statement contained herein were not intended or written to be used,
and cannot be used for the purpose of avoiding U.S., federal, state or
local tax penalties. Please consult your advisor as to any tax,
accounting or legal statements made herein.

For very important information relating to this e-mail please click on
this link: http://www.ml.com/legal_info.htm


-----Original Message-----
From: Birnbaum, Rachel [mailto:Rachel.Birnbaum@gs.com]
Sent: Wednesday, February 28, 2007 5:24 PM
To: Seaton, Graham (ML Strategic Solutions Group); Harmon, Mary L (Tax)
Cc: Chropuvka, Gary (gs.com); Wianecki, Karl; Addis, John (ML Strategic
Solutions Group)
Subject: RE: US stock lending to MLESJ


Graham,

I am attaching a markup of the lending agreement you forwarded to us,
which reflects representations that we would like to see included in the
agreement. Please let us know if you want to discuss the markup.

Regards,
--Rachel

                _____

>
>Goldman, Sachs & Co.
>180 Maiden Lane / 40th Floor, New York, NY 10038
>*Tel: 212-357-2217 | 7 Fax: 212-256-6352
>* e-mail: rachel.birnbaum@gs.com GOLDMAN
>
SACHS
Rachel Birnbaum
>Vice President
>Tax Department _____
>
>IRS Circular 230 disclosure: Any statement contained in this
communication (including any attachments) concerning U.S. tax matters is
not intended or written to be used, and cannot be used, for the purpose
of (i) avoiding penalties under the Internal Revenue Code, or (ii)
promoting, marketing, or recommending to another party any transaction
or matter addressed herein. This communication is for internal use
only.
>
>This message may contain information that is confidential or
privileged, If you are not the intended recipient, please advise the
sender immediately and delete this message. See
http://www.gs.com/disclaimer/email for further information on

Confidential Proprietary Business Information
The Goldman Sachs Group Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5).

GS-PSI-05777

874



confidentiality and the risks inherent in electronic communication
>

——Original Message——
From: Seaton, Graham (ML Strategic Solutions Group)
[mailto:graham_seaton@ml.com]
Sent: Friday, February 16, 2007 5:33 PM
To: Harmon, Mary L (Tax); Birnbaum, Rachel
Cc: Chropuvka, Gary; Wianecki, Kart; Addis, John (ML Strategic Solutions
Group)
Subject: US stock lending to MLESJ

Mary, Rachel,

Thanks for your time on Wednesday morning to discuss the US stock
lending opportunity. As promised, attached is our standard lending
agreement for your review. This includes the tax language that you
wished to see.

Please note that should we proceed we will send over a document for your
legal team to review and provide comments on, however the relevant
language will be identical.

We look forward to your comments and to moving this forward.

Thanks and regards,

Graham.

─── = Redacted by the Permanent
Subcommittee on Investigations

Graham Seaton | Director | Merrill Lynch | Global Markets Financing &
Services 4 World Financial Center | New York NY 10080 ph +1 212 449 7773
| fax +1 646 736 5138 | mob ▮▮▮▮▮▮▮▮graham_seaton@ml.com

Merrill Lynch Prime Brokerage-"Top Rated" among Multi-Strategy and $1B+
Hedge Funds-Global Custodian, 2006

Merrill Lynch does not provide tax, accounting or regulatory advice. Any
tax statement contained herein were not intended or written to be used,
and cannot be used for the purpose of avoiding U.S., federal, state or
local tax penalties. Please consult your advisor as to any tax,
accounting or legal statements made herein.

For very important information relating to this e-mail please click on
this link: http://www.ml.com/legal_info.htm


<<MLESJ Standard GMSLA2.doc>>

If you are not an intended recipient of this e-mail, please notify the
sender, delete it and do not read, act upon, print, disclose, copy,
retain or redistribute it. Click here for important additional terms
relating to this e-mail. http://www.ml.com/email_terms/

Confidential Proprietary Business Information
The Goldman Sachs Group Inc.
Produced Pursuant to Senate Rule XXVI(5)(b)(5)

GS-PSI-05778

875



CITRS0000738
CITI_PSIWHTAX000738

876

May-06-2005 08:56pm  From-SSB LEGAL                    +12126271457        T-827  P.024/028  F-835

= Redacted by the Permanent
Subcommittee on Investigations

<u>Response to NYSE Preliminary Investigation Request of 10/24/05</u>

On September 23, 2005, the NYSE received a U-5 for Citigroup Global Markets Inc (the "Firm") concerning ▮▮▮▮▮ (the "registered representative"). In order to assist us in our review of the matter referred to in the U-5, please supply us with the following information: Please advise us immediately if you have previously received a written request from another self-regulatory organization, or the Securities and Exchange Commission, requiring the submission of information pertaining to this matter.

No such other request.

    1.  A statement from the Firm providing the details of its examination of this matter, including findings and conclusions. Additionally, please indicate how and when the Firm became aware of the matter.

The Equity Finance Desk (the "Desk") of Citigroup's Global Corporate Investment Bank engages in stock lending, as well as equity derivative and related stock hedging transactions. Its customers consist largely of broker/dealers and hedge funds. In recent years, a portion of the Desk's business in New York has been dedicated to achieving "dividend uplift" for foreign customers in respect of U.S. equities. The customer trades at issue in this matter occurred from approximately 2002 through 2005, with the most significant activity occurring in 2004 and early 2005.

U.S. tax rules provide that dividend equivalent amounts paid to a foreign investor under a derivative contract are not subject to withholding tax. By contrast, actual dividends on U.S. equities are subject to U.S. withholding tax. In the dividend uplift trades, CGML – Citigroup's U.K. broker/dealer – would acquire a U.S. equity security from an offshore fund or dealer (via a transaction between that entity and Citigroup Global Markets, Inc. ("CGMI")) and enter into a total return swap ("TRS") with that entity. At the termination of the TRS, the offshore entity would in many instances reacquire the equities. In exchange for a LIBOR-based return, CGML paid dividend equivalent amounts to the offshore entity under the TRS, and treated those amounts as paid on a bona fide derivative contract, rather than as a pass-through of dividends on stock held in a custodial-type capacity. This treatment allowed the payments to be made free of the U.S. withholding taxes that would otherwise have been due to be withheld on dividends paid to the offshore entity. (The Desk's UK traders used similar techniques in connection with transactions in which CGML acquired various European equities.)

In another type of trade, CGML would borrow non-US equities from the Street and sell them (via an interdealer broker) to CGML. CGML would then enter into a swap with a CGML affiliate. These trades generated tax reclaims for CGML, and incurred foreign withholding taxes that were claimed as US foreign tax credits for Citigroup. The trades were executed from approximately 2000 through 2003, with the most significant activity occurring in 2003.

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITITRS0000739
CITI_PSIWHTAX000739

May-26-2006  01:52pm  From-SSB LEGAL                    +12120571457          T-827  P 025/028  F-035

Customers executing TRSs with the Desk frequently sell the underlying securities to the Desk at the beginning of the TRSs and then wish to reacquire the securities at the termination of the TRSs, without any execution or other risk. However, if at the time the TRS was entered into the customer and the Desk had an understanding that at termination of the TRS the securities would be sold (directly or indirectly) back to the customer, the TRS may be recharacterized for tax purposes as a financing transaction, and the customer as the continuing owner of the securities. In that case, Citigroup: (i) may be obligated to the IRS or another tax authority for payment of tax that should have been withheld on payments of dividends or dividend equivalent amounts; as well as (ii) may not be entitled to applicable non-U.S. tax reclaims and U.S. foreign tax credits.

Citigroup's Tax Department promulgated transaction guidelines for TRSs on U.S. equities in order to minimize the risk that such transactions would be recharacterized as financings and subsequently lose their intended tax benefits. The risk is mitigated principally by minimizing the chances that the underlying equities would be crossed back to customers. These internal tax guidelines are attached hereto as Attachment A.

In mid-2005, an internal audit of the Desk revealed that certain New York traders were not in certain instances fully complying with the tax guidelines. Citigroup engaged outside counsel to review the Desk's trading activity with respect to the dividend uplift trades. That review found, among other things, that the Desk engaged in transactions in 2004 and 2005 in which it purchased U.S. and non-U.S. equities directly from customers (largely non-U.S. broker/dealers) and then resold the equities back to the customers upon termination of the TRSs, either directly or through interdealer brokers.

As a result of this trading activity, Citigroup established accruals/reserves in the second and third quarters of 2005 based upon a determination that certain TRSs associated with the U.S. and certain non-U.S. dividend uplift trades may not be considered derivative transactions for tax purposes, and therefore may not give rise to preferential U.S. tax treatment and/or non-U.S. tax reclaims or U.S. foreign tax credits.

2. **Signed statement from the registered representative addressed to the Exchange in response to the allegations.**

Please see Attachment A.

3. **Copies of all correspondence and memoranda referring or relating to this matter.**

Will be provided.

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CitiTRS0000740
CITI_PS/WHTAX000074O

May-05-2008  03:51pm  From-SSB LEGAL                    +8120571487        T-827  P 026/029  F-636

═ = Redacted by the Permanent
Subcommittee on Investigations

4.  **What factors or evidence did the Firm consider before drawing its conclusion to
    discipline the registered representative?  What considerations formed the basis for
    the severity of the discipline and have the obligations pursuant to the disciplinary
    action been satisfied?**

The following is a non-exhaustive list of facts discovered during the course of outside counsel's
review of the Desk that formed the basis for the recommendation that disciplinary action be
taken against ▒▒▒▒▒▒

*   ▒▒▒▒ misled Citigroup's Tax Department with respect to the execution of certain non-US
    equities.

*   ▒▒▒▒ engaged in and/or allowed violations of certain provisions of the internal TRS tax
    guidelines including failing to ensure that the TRSs: (i) had a term of at least one year;
    (ii) were not in fact terminated before 45 days had elapsed; (iii) had at least one periodic
    payment; and (iv) represented less than 20% of the anticipated market-on-close volume
    on the specified exchange on the termination date.

*   ▒▒▒▒ also failed to acknowledge such violations when questioned more than a year later
    about compliance with the tax guidelines.

Based on the foregoing, the Firm decided to suspend ▒▒▒▒▒▒  effective August 30, 2005.
▒▒▒▒ was reinstated on October 31, 2005.

Citigroup's Tax Department has revised the internal TRS tax guidelines to better ensure that
TRSs and similar transactions entered into by the Desk are respected as derivative transactions
for tax purposes.  In addition, Citigroup's Compliance Department and the Desk are instituting
certain monitoring procedures for the revised tax guidelines and the Desk is implementing a
comprehensive policy with respect to TRSs.  Copies of these new policies and procedures will be
forwarded to the NYSE as soon as they are finalized.

As previously indicated, Citigroup is willing to meet with the NYSE to discuss this matter in
further detail.

5.  **Copies of the Firm's relevant policies and procedures.**

Please see Attachment B.

**Has the Firm received any other complaints regarding the registered representative,
which are open or were resolved within the preceding three years of the date of the
current reportable event?**  No.

3

STRICTLY CONFIDENTIAL – NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

879

Attachment A

To:  The New York Stock Exchange
     February 1, 2006

As a trader on the Equity Finance Desk (the "Desk") at Citigroup Global Markets,
Inc. ("CGMI" or the "Firm"), I am involved in swaps with sophisticated institutional
counterparties relating to U.S. and non-U.S. equities. In September 2004, I received an
inquiry from CGMI's Tax Department regarding certain hedging transactions relating to
non-U.S. equities. It appears that I misunderstood the thrust of the inquiry and that I was
hasty in my response, and therefore I may have unintentionally misled the Tax
Department.

In 2003, the Firm issued guidelines (the "Guidelines") intended to assist in the
structuring of total rate of return swaps based on U.S. equities so as to preserve their tax
benefits. The Guidelines included a requirement that CGMI sell the equities into the
market based on market-close pricing at the termination of the swap. To comply with
this requirement, CGMI often used an inter-dealer broker ("IDB") to buy and sell the
equities. When selling equities to an IDB on the unwind of a swap, CGMI was not
supposed to communicate with the IDB concerning the identity of our swap counterparty.
A routine internal audit indicated that one of the traders whom I supervised had helped an
IDB locate a buyer for the equities at unwind of the related swap.

In early 2005, I responded to an inquiry from the CGMI Tax Department
regarding the Desk's compliance with the Guidelines. My response focused on the
requirement of a minimum 45-day period before early termination. In a number of prior
conversations, a senior Tax Department attorney had consistently explained to me and
other members of my department that the 45-day requirement related to a weighted
average considered on a portfolio basis of our entire book. Thus, I responded that the
Desk was complying with the Guidelines, because on average the swaps were kept on for
45 days or longer.

In late 2005, the Firm issued clearer and more detailed guidelines, and the Desk
now has enhanced control over the structuring and execution of its business.



= Redacted by the Permanent
Subcommittee on Investigations

ny-675351

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CIITRS0000742
CITI_PSIWHTAX000742

880

May-05-2008  01:51pm  From-SSB LEGAL          +212887I467          T-927  P 026/028  F-035

Attachment B

December 1, 2003

**Equity Finance**
**Equity Derivatives**

**Tax Policy Guidelines for Total Return Swaps on US Equities**

When structuring a total return equity swap with respect to dividend-paying US equities ("TRS") with a foreign counterparty, the following execution parameters must be followed:

1. The underlying US equity must be actively traded (i.e., large cap, liquid market);

2. The desk may buy its hedge (i.e., the underlying equity) from the swap counterparty;

3. The TRS must have a term of at least one year, but must not in fact be terminated before 45 days have elapsed;

4. The TRS must provide for periodic payments (e.g., monthly), and in fact at least one such payment must be made during the time period in which the swap is open (so that it qualifies as a notional principal contract for tax purposes);

5. The final payment under the TRS at termination is based on the market-at-close price of the underlying equity and the desk anticipates selling its equity hedge into the market on the termination date based on market-close-pricing;

6. The desk must reasonably expect that the number of shares underlying the TRS represents less than 20% of the anticipated market-at-close volume on the specified exchange on the termination date; and

7. If our foreign counterparty wishes to purchase the referenced equity, it must execute that buy order through a broker other than a Citigroup affiliate.

To the extent the underlying equity is thinly traded, the termination payment cannot be based on market-at-close prices and should probably be based on a formula that effectively incorporates a collar around the beginning stock price.  The width of the band can vary depending on how illiquid the underlying security is, the maturity of the swap and whether the counterparty contemplates buying the equity back, preferably through another broker, at TRS termination.

4

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CitiTRS0000743
CITI_PSI/WHTAX000743

881

 **citigroup**
corporate and
investment banking

Keith J. Anzel
Managing Director
Chief Tax Officer
Corporate Tax Department

Citigroup Corporate and
Investment Banking
388 Greenwich Street - 22nd Floor
New York, NY 10013-2375

Tel 212-816-0234
Fax 212-816-0288
keith.j.anzel@citigroup.com

June 14, 2007

To:          ████████, IRS

From:        Keith Anzel

Re:          IRS Withholding Tax Examination (2003-2005): Total Return Swaps
             over US Equities

━━━━ = Redacted by the Permanent
Subcommittee on Investigations

As discussed, we are writing to provide a summary of Citi's[1] transactions involving Total Return
Swaps over US Equities, Citi's Tax Department guidelines for such transactions and Citi's
internal review of the execution of these transactions. This information has been discussed with
the IRS at previous meetings, including our most recent meeting of May 10, 2007.

**Total Return Swaps over US Equities:**

Pursuant to a typical total return swap over a US equity, Citi agrees to make payments to the
counterparty equal to the price appreciation and any dividends for the referenced stock, and the
counterparty agrees to make payments to Citi equal to the price depreciation in the stock and a
financing payment (typically, based on LIBOR). Citi enters into total return swaps with a wide
range of customers in its capacity as a dealer in a broad range of over-the-counter derivative
investments. As a dealer in swaps, Citi typically hedges its exposure to the market risks
attendant to any derivative contracts into which it enters. Citi's most straightforward hedge of a
total return swap under which Citi pays total returns on a stock to a counterparty (a "short" swap,
from Citi's perspective) is for Citi to acquire the underlying stock.

The applicable trades were all documented as derivative transactions using standard ISDA
documentation, and satisfied all the formal requirements of notional principal contracts. The
non-tax allocation of legal risks and rewards under the transactions (e.g., absence of counterparty
voting power over the underlying equities and Citi's acceptance of counterparty credit risk) were
also identical to the allocation of those critical risks and rewards in other notional principal
contracts.

The law is clear that no withholding generally is required with respect to payments to non-US
persons under notional principal contracts. If a total return swap over a US equity were re-
characterized as a repurchase agreement or as a securities loan, however, there could be a
withholding tax requirement with respect to dividend equivalent amounts paid under the total
return swap. The law is unclear as to when such a re-characterization might be appropriate.

---

[1] For purposes of this memorandum, the term "Citi" encompasses all affiliates, including CGMI, CGML, and
Citibank.

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 289**

Citigroup Global Markets Inc.

CITI_PSIWHTAX001208

882

**Tax Department Guidelines:**

Therefore, in light of a lack of authority on when a total return swap might be re-characterized, Citi's Tax Department provided guidance for these trades to its Equity Finance and Equity Derivatives business units throughout the period of this IRS examination (2003-2005). The Tax Department initially provided its guidance to the business units orally and, later, issued a written set of "Tax Policy Guidelines for Total Return Swaps on US Equities" for the units (the "Tax Policy Guidelines," a copy of which is attached as Exhibit 1).[4] These very conservative guidelines set forth various parameters with respect to the execution of total return swap transactions, in order to prevent any situation from arising in which a total return swap might be potentially susceptible to re-characterization as a repurchase agreement or as a securities loan.

The vast majority of the total return swaps over US equities in the current IRS audit occurred after the Tax Policy Guidelines became effective. Hence, the Tax Policy Guidelines were applicable to the vast majority of the swaps now being examined by the IRS.

Under the Tax Policy Guidelines, Citi's business units generally were permitted to acquire a hedge consisting of the stock underlying a total return swap from the total return swap counterparty at the beginning of the trade. The Tax Policy Guidelines did not, however, generally contemplate delivery of the stock back to the counterparty at the termination of the trade. More specifically, the Tax Policy Guidelines stated as follows:

"......5. The final payment under the TRS at termination is based on the market-at-close price of the underlying equity and the desk anticipates selling its equity hedge into the market on the termination date based on market-close-pricing."

The Tax Department guidelines with respect to these transactions changed over time, however. Interim and revised guidelines were circulated by the Tax Department in 2005. A copy of the revised guidelines (as provided to the New York Stock Exchange on May 4, 2006) is attached as Exhibit 2.[5] In addition, the guidelines have continued to evolve in some respects. In particular, as of October of last year, delivery of the stock back to the counterparty at the termination of the trade has been allowed under certain circumstances.

During 2005, Citi's Internal Audit Department conducted an internal review of the manner in which total return swaps over US equities were executed, for purposes of reviewing compliance with the Tax Policy Guidelines. Citi's Internal Audit Department found that the Equity Finance business was not in full compliance with the Tax Policy Guidelines. Based on this finding, Citi engaged outside counsel to conduct a further review of total return swap transactions from January 2003 through the date of the review. As a result of this further review, certain total return swap transactions were determined to have been executed in ways that failed to comply with the Tax Policy Guidelines. In particular, the review found that, as to some total return swap transactions, there was an apparent understanding at the inception of the trade that the shares would effectively be delivered back to the counterparty at the termination of the trade through

[4] Although dated December 1, 2003, the Tax Policy Guidelines did not become effective until the first quarter of 2004.
[5] Although dated October 20, 2005, and effective from October 20, 2005, the revised guidelines were not finalized until May 2006.

2

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001208

the use of a large volume market-on-close order, a direct cross to the counterparty, or an effective sale to the counterparty by way of an inter-dealer broker (an "IDB"). The review resulted in disciplinary action being taken against two individuals in the Equity Finance business unit. Furthermore, the results of the review were reported to the New York Stock Exchange in connection with Citi's obligations as a registered broker-dealer. The New York Stock Exchange then initiated its own review focusing on supervisory controls (which is still pending).

**Equity Finance – Transactions Where Withholding Taxes Were Paid:**

Because of the non-compliance with the Tax Policy Guidelines, Citi determined that certain of the total return swap transactions entered into by the Equity Finance business unit could potentially be re-characterized as repurchase agreements or as securities loans. If the transactions were re-characterized, a withholding tax could be required on the dividend equivalent amounts that had been paid on the transactions.

Through extensive interviews, Citi identified the trades for which its traders appeared to have an understanding with the counterparty at the inception of the trade to deliver shares back at the termination of the trade. Citi then decided to pay US withholding tax on the dividend equivalent amounts that had been paid under the transactions, even though the tax liability was uncertain. Indeed, these transactions were documented like any other derivative transaction, and the legal risks and rewards in these transactions were allocated in the same manner as the risks and rewards for any other notional principal contract.

The trades that involved an apparent understanding regarding delivery back to the counterparty were all executed with UK broker-dealers. Such transactions were, accordingly, segregated in Citi's analysis. For those transactions with UK broker-dealers that had closed by mid-2005 (when the internal review was being conducted), Citi paid withholding taxes. As discussed in greater detail below, if a transaction had closed and was not executed with a UK broker-dealer (e.g., a transaction with a hedge fund), no withholding taxes were paid. Transactions still open as of mid-2005 were required to be closed out with no direct or indirect delivery of the shares back to the counterparty, regardless of any prior understanding and, hence, no withholding taxes were paid on these trades.

With regard to the Equity Finance business unit, the transactions with UK broker-dealers on which withholding taxes were paid involved approximately $160M of dividends ($112M for transactions involving delivery back to the counterparty through IDBs, $28M for transactions involving delivery through direct crosses, and $20M for transactions involving delivery through transactions on an exchange). Since withholding on these transactions was eligible for treaty benefits (and Citi was provided appropriate Forms W-8BEN by its counterparties), the applicable withholding tax rate was 15%, resulting in a withholding tax of approximately $24M.

At the time this withholding tax of approximately $24M was calculated by Citi, Citi was in an overpayment situation because it had incorrectly withheld tax (in an aggregate amount greater than $24M) on certain other payments that were completely unrelated to the total return swap transactions. As a result, Citi's liability of approximately $24M resulting from the total return swap transactions reduced the pre-existing overpayment amount.

Citi prepared worksheets (copies of which are attached as Exhibit 3) to compute the amount

3

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY.    CITI_PSIWHTAX00210

884

of US withholding taxes due to the IRS as a result of the determination that withholding taxes should be paid in respect of certain of the total return swap transactions and filed Forms 1042 and Forms 1042-S for 2003 (amended return filed), 2004, and 2005 (copies previously provided to the IRS).

**Equity Finance – Transactions Where Withholding Taxes Were Not Paid:**

The Equity Finance transactions for which Citi did not pay withholding taxes included those transactions where it was unclear at the inception of the trade whether the counterparty would seek delivery of the shares back at the termination of the trade and, accordingly, there was generally no apparent understanding at the inception of the trade regarding possible re-delivery of the shares upon termination. These transactions involved approximately $239M of dividends, and were not executed with UK broker-dealers. Interviews indicated that most of these transactions were executed with hedge funds. Typically, the hedge funds were more interested in synthetic exposure, rather than delivery and re-delivery of shares.

As noted in Citi's letter dated March 2, 2007, however, the transactions on which no withholding taxes were paid did include: (1) transactions where Citi purchased shares from the swap counterparty at inception of the swap and sold shares to the counterparty upon termination of the swap, (2) transactions where Citi purchased shares from and/or sold shares to an IDB, and (3) transactions where Citi purchased shares on an exchange (including shares purchased pursuant to market-on-close orders) at inception of the swap and/or sold shares on an exchange (including shares sold pursuant to market-on-close orders) upon termination of the swap. However, as stated above, there was generally no apparent understanding at the inception of the swap to deliver shares back to the counterparty at the termination of the trade.

**Equity Derivatives:**

With regard to the Equity Derivatives business unit (involving approximately $36M in dividends), Citi determined that no withholding was required because the applicable transactions either (i) were not clustered around dividend record dates; or (ii) generally did not appear to involve an understanding regarding delivery of the shares back to the counterparty at the inception of the trades.

**Conclusion:**

A thorough investigation of these transactions was conducted in connection with Citi's internal review. The transactions were clearly documented as notional principal contracts, and on their face met all the requirements of being notional principal contracts: the transactions were documented as derivative transactions using standard ISDA documentation; they satisfied all the formal requirements of notional principal contracts; and the non-tax allocation of legal risks and rewards under the transactions (e.g., absence of counterparty voting power over the underlying equities and Citi's acceptance of counterparty credit risk) was identical to the allocation of those critical risks and rewards in other notional principal contracts. As a result, Citi continues to believe that there are valid reasons to conclude that the transactions in question should be treated as notional principal contracts and that the payments thereunder should be exempt from US withholding tax. Nonetheless, Citi considered the possibility that certain of the transactions

4

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001211

885

could potentially be re-characterized as repurchase agreements or as securities loans and, therefore, withholding was applied where there was an apparent understanding, at the inception of the trade, to return the shares to the counterparty at the conclusion of the transaction. The Tax Policy Guidelines were intended to ensure that Citi's transactions did not come anywhere remotely close to this result. When Citi discovered that traders appeared to have violated those guidelines, Citi reported this non-compliance to the New York Stock Exchange in connection with its obligations as a registered broker-dealer, and also took the view that violating its own internal conservative guidelines should result in a US withholding tax liability, notwithstanding all of the important reasons why, even in these cases, the transactions fairly could still be construed as notional principal contracts.

Keith Anzel
Enclosures

3

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001212

886

*EXHIBIT 1*

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY    CITI_PSIWHTAX001213

887

December 1, 2001

Equity Finance
Equity Derivatives

Tax Policy Guidelines for Total Return Swaps on US Equities

When structuring a total return equity swap with respect to dividend-paying US equities ("TRS") with a foreign counterparty, the following execution parameters must be followed:

1. The underlying US equity must be actively traded (i.e., large cap, liquid market);

2. The desk may buy its hedge (i.e., the underlying equity) from the swap counterparty;

3. The TRS must have a term of at least one year, but must not in fact be terminated before 45 days have elapsed;

4. The TRS must provide for periodic payments (e.g., monthly), and in fact at least one such payment must be made during the time period in which the swap is open (so that it qualifies as a notional principal contract for tax purposes);

5. The final payment under the TRS at termination is based on the market-at-close price of the underlying equity and the desk anticipates selling its equity hedge into the market on the termination date based on market-close-pricing;

6. The desk must reasonably expect that the number of shares underlying the TRS represents less than 20% of the anticipated market-at-close volume on the specified exchange on the termination date; and

7. If our foreign counterparty wishes to purchase the referenced equity, it must execute that buy order through a broker other than a Citigroup affiliate.

To the extent the underlying equity is thinly traded, the termination payment cannot be based on market-at-close prices and should probably be based on a formula that effectively incorporates a collar around the beginning stock price. The width of the band can vary depending on how illiquid the underlying security is, the maturity of the swap and whether the counterparty contemplates buying the equity back, preferably through another broker, at TRS termination.

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001214

888

*EXHIBIT 2*

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY     CITI_PSIWHTAX001215

889



global corporate &
investment banking group

| Policy Owner(s): | Corporate Tax – Structured Products |
| | Equities Compliance |
| Subject: | Procedures for Structuring Total Return Equity Swaps and Other |
| | Delta One Derivative Transactions ("DOTS") |
| Contact person(s): | See List at End of Document |
| Scope of coverage: | All |
| Date of issuance: | October 20, 2005 |

This memorandum describes the Firm's rules and procedures regarding the structuring of total return equity swaps including Contract for Differences ("CFDs") and all other delta one derivative transactions[1] (collectively "DOTS"). These procedures apply to all Citigroup entities and are effective until further notice. Written approval from the tax department is required for any exception to the rules set forth herein as well as any transaction that fails to comply with the principles of these rules as set out below.

**Principles:** The purpose of these rules and procedures is to ensure that (i) Citigroup's underlying hedge will be treated as beneficially owned by Citigroup and not the DOTS counterparty for U.S. tax purposes, where required; and (ii) Citigroup is viewed for U.S. tax purposes as entering into a financial derivative transaction rather than a repurchase agreement, stock loan or custodian relationship with the counterparty.

**Scope:** All DOTS where (i) Citigroup's counterparty is economically long U.S. or non-U.S. equity positions, (ii) the counterparty is, directly or indirectly, receiving the return on such position, and (iii) dividends with respect to the underlying equity are subject to source-country withholding tax or would be subject to such withholding tax if such equity were held by the DOTS counterparty directly.[2]

For the sake of clarity this policy does not apply to transactions that:
(i) are not DOTS;

[1] "Delta one derivative transactions" for this purpose is intended to encompass all derivative transactions (e.g., swaps, forwards, options, etc...) where the risk retained by the Citigroup trading desk with respect to price movements of the underlying asset(s) is de minimis. Transactions with a delta in excess of 0.90 will be deemed to be DOTS.

[2] These procedures do not apply to U.K. equities since the U.K. does not impose a withholding tax on dividends; however, there are rules regarding swaps and CFDs on U.K. equities relating to stamp duty issues and the London tax department should be consulted with respect to such swaps and CFDs.

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY  CITI_PS/WHTAX001216

890

  (ii)    are DOTS on equity positions which are not expected to pay a dividend;[1]

  (iii)   are DOTS where the counterparty is paying the return of the equity to Citigroup (e.g., short positions in total return equity swaps);

  (iv)   are DOTS on non-U.S. equity positions the dividends on which are not subject to source-country withholding tax, either to Citigroup or to the counterparty if the counterparty were to hold the position directly and Citigroup has received the proper documentation, if any;

  (v)    are DOTS on non-U.S. equity positions where the equity is held outside the U.S. and, based on the jurisdiction of the Citigroup holder and the law of the relevant source jurisdiction, dividends with respect to such equity are not subject to source-country withholding (assuming proper local jurisdiction legal advice has been obtained);

  (vi)   are exchange listed DOTS entered into in Citigroup's role as a market maker (i.e., where Citigroup must enter the trade due to its market making role and is unaware of the identity of the DOTS counterparty);

  (vii)  are DOTS on equities that are not crossed-in from the counterparty where Citigroup does not hold the underlying equities for any period of the DOTS;

  (viii) are DOTS on non-U.S. equities where the DOTS counterparty is paid underlying dividends net of source country withholding taxes and the trading desk is not paid any "gross-up" from the tax department (e.g., Asian access products); or

  (ix)   are DOTS on U.S. equities where the counterparty is a U.S. person and Citigroup has received the appropriate tax documentation.

**Definitions:**

For purposes of this document the following terms shall have the stated meaning:

Average Daily Trading Volume:  The most current 30-day trailing average daily trading volume for the relevant equity.

Cross-in / out:  DOTS execution process whereby Citigroup purchases / sells its physical hedge from/to the DOTS counterparty (including, with respect to Cross-out, a physical hedge that constitutes non-cash merger consideration for the original crossed-in hedge position).  This term also includes any purchase or sale to or from an Inter-Dealer Broker (IDB) or any execution based on Market on Close (MOC), Market on Open (MOO) or any other objective price other than full day VWAP.

---

[1]   For this purpose if a dividend has actually been declared or paid with respect to an equity at any time during the previous 12 months, it would be inappropriate to expect that the equity will not pay a dividend during the term of the DOTS.  No expectations may be formed with respect to companies or shares in existence less than 12 months.  Furthermore, if the issuer has announced a future dividend declaration (in connection with a merger or otherwise) it must be assumed that such dividend will be paid.

2

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY     CITI_PSIWHTAX001217

891

Execution Pricing: DOTS execution process whereby Citigroup calculates the initial or final reference price of a DOTS by reference to Citigroup's actual execution price for the purchase or sale of its physical hedge as the case may be. In such cases the DOTS counterparty may direct the form of Citigroup's execution (e.g., limit order, market order, best efforts, etc…) except that the execution order may not be MOO, MOC, time limited VWAP or any other objective price other than full day VWAP. All Execution Pricing trades must be executed at least 20 minutes after the open and at least 20 minutes before the close of regular trading on the relevant exchange.

Risk-bid Pricing: DOTS execution process whereby the desk quotes a DOTS counterparty a firm price to initiate or terminate a swap, as the case may be, BEFORE the desk has obtained a firm buy or sell order for its related physical hedge position, if any. In order to ensure a proper audit trail the desk must time-stamp a trade ticket with the share quantity and price for audit comparison to the time-stamp for the hedge position trade.

VWAP: The full day volume weighted average price for a particular equity as published by the primary exchange for such equity.

**PROCEDURES:**

I.  *General:* The following rules are separated into two categories based on whether the underlying equity is purchased from the counterparty (i.e., crossed-in) or not. No other pricing alternatives may be used other than those described in Section II, III and IV below without prior written approval from the tax department. *Transactions that technically meet these procedures but are outside the principles of this policy, as set out above, should be brought to the tax department for specific review.*

II. *Situations Where the Underlying Equity is NOT Crossed-In from the DOTS Counterparty:*

   ➢ Initial Reference Price of DOTS –

   ➢ The initial reference price of a DOTS may be based on:

   • VWAP subject to a 40% Average Daily Trading Volume limitation;*
   • Risk-Bid Pricing; or

---

*  If the equity is acquired by cross-in or risk-bid and the exit is anticipated to be VWAP, any notional amount of the hedge in excess of this amount will need to be disposed of over a multi-day period in order to satisfy this limitation. Thus, notional sizes should be limited with this in mind. VWAP trades (in or out) in excess of the 40% average daily trading volume limit will be considered to be a Cross-in or Cross-out trade, as the case may be. The tax department may be contacted for exemptions from the volume limitation where unusual market events have transpired.

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY     CITI_PSIWHTAX001218

892

- Execution Pricing

➢ Final Reference Price of DOTS:

➢ The final reference price (including upon early termination) of a DOTS may be based on:

- VWAP subject to a 40% Average Daily Trading Volume limitation;
- Risk-Bid Pricing; or
- Execution Pricing.

➢ When utilizing VWAP as the initial or final reference price (including upon early termination) the desk may not directly or indirectly guarantee, pay for any guarantee, compensate the counterparty for its costs or otherwise be involved with the DOTS counterparty obtaining guaranteed VWAP pricing on any acquisition of the referenced equity;

➢ All DOTS of this type are subject to the General DOTS Procedures attached hereto as Appendix A.

III.  *Situations Where the Underlying Equity Is Crossed-In from the DOTS Counterparty:*

➢ The initial reference price of a DOTS may be based on the actual prices at which the trading desk purchases the underlying equity from the DOTS counterparty;

➢ The final reference price (including upon early termination) of a DOTS may be based on:

- VWAP subject to a 40% Average Daily Trading Volume limitation; or
- Risk-Bid Pricing.

➢ All DOTS of this type are subject to the General DOTS Procedures attached hereto as Appendix A.

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001219

893

IV. *Pre-Existing DOTS*

➤ With respect to pre-existing DOTS, the final reference price under the DOTS may be MOC if, and only if, Citigroup is contractually obligated to do so under a pre-existing DOTS;[1]

➤ Pre-existing DOTS are NOT subject to the General DOTS Procedures but pre-existing equity swaps and CFDs ARE subject to the Interim Equity Swap Guidelines (e.g., such swaps and CFDs are subject to a 1.3% average daily volume limit on the unwind of any hedge position).

---

[1]   A pre-existing DOTS means a DOTS entered into on or before June 1, 2005 (and not extended or materially modified thereafter).

5

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY     CITI_PSIWHTAX001220

894

**APPENDIX A – General DOTS Procedures**

I. *Opening the DOTS:*

➤ The DOTS must have a minimum term of at least one year;

➤ The DOTS must not in fact terminate before 45 days have elapsed[5] (if the DOTS is over a basket of equities, no equity name may be removed / replaced in the basket in less than 45 days), unless there has been no ex-dividend date for the relevant equity during the term it has been underlying the DOTS. Termination for this purpose includes Citigroup's participation in an offsetting transaction (e.g. mirror swap) with the DOTS counterparty that effectively eliminates the counterparty's economic exposure to the DOTS;[7] Control groups (e.g., credit, legal, tax, compliance) will retain the ability to force terminations regardless of the time elapsed since the positions were established.

➤ If the DOTS is a swap, the DOTS must provide for periodic payments (e.g., weekly, monthly – not counting any payment upon termination) and, in fact, at least one such periodic payment must be made during the time period the DOTS is open;[8]

➤ If the DOTS is a swap, the DOTS must be cash settled only;

➤ The initial collateral posted by the DOTS counterparty and / or Citigroup must not exceed 30% of the notional amount. Master ISDA CSA and variation margin is permitted;

➤ The DOTS documentation must not provide the DOTS counterparty with the ability to vote the underlying equities, provide that anyone will vote the equities at the DOTS counterparty's direction or otherwise make the voting ability related to the underlying equities available to the DOTS counterparty;

➤ The DOTS documentation must clearly state that Citigroup is not required to hold the underlying equity position for any period;

---

[5]  The 45-day period is measured from Trade Date to Termination Date.

[7]  It is understood that market movements and other external events may cause Citigroup or DOTS counterparties to seek to unwind DOTS positions in less than 45 days. In such cases the desk must seek a written exception from this policy from the tax department.

[8]  The periodic payments for this purpose may be an equity (or change-in-value) payment or a funding payment.

6

CITI_PSIWHTAX001221

895

> The DOTS documentation must state that Citigroup will not knowingly sell, directly or indirectly, the underlying equity upon scheduled or early termination of the DOTS to the DOTS counterparty or any affiliate thereof;

> Any equity underlying a DOTS must be a publicly[§] and actively traded, liquid stock; and

> Written tax department approval is required for every DOTS where the underlying equity is an "Approval Required Equity" as defined below in Section V.

II.  *Establishment of Hedge:*

> Where the hedge position is crossed-in from the DOTS counterparty the trading desk may purchase the hedge position from the DOTS counterparty at the prevailing market price;

> Where Citigroup does not cross-in the underlying equity from the DOTS counterparty, if Citigroup chooses to hedge the risk associated with the DOTS, the hedge should be executed during normal market hours on the principal exchange for the given equity at the current market price and NOT:

  - via an execution through an inter-dealer broker;
  - via any objective price (e.g., MOC, MOO) other than the current market price (limit orders are acceptable) or full day VWAP;[10]
  - via a purchase of the securities from any party where the DOTS counterparty directs the source of the purchase (e.g., a "give-up" or "give-in");
  - via a purchase of the securities from the DOTS counterparty or an affiliate or any agent thereof; or
  - by any means where there exists any direct or indirect communication or coordination between the desk and the DOTS counterparty (including any affiliate or intermediary thereof) as to the timing / price of the purchase of the desk's hedge position, if any, and the sale, if any, of the DOTS counterparty's physical equity position.[11]

---

[§]  Publicly traded for this purpose is defined as an equity that trades regularly on a recognized stock exchange. Such exchanges include, but are not limited to, the NYSE, NASDAQ System and any stock exchange registered with the U.S. Securities and Exchange Commissions as a national securities exchange; the London Stock Exchange and any other recognized investment exchange within the meaning of the Financial Services Act 1986 or the Financial Services and Markets Act 2000; and any other similarly regulated exchanges of other jurisdictions.

[10]  Citigroup, as an entity, may not purchase guaranteed VWAP pricing from another financial institution.

[11]  It is understood that there will be communication between the DOTS counterparty and the desk involving timing and pricing of the opening of the DOTS, which may in fact impact the timing, and price of the purchase of a hedge position in the public markets.

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY    CITI_PSI/WHTAX001222

**III.** *Terminating the DOTS:*

> The DOTS may be terminated (including at term or by early termination) with a final reference price determined by:

- VWAP subject to a 40% Average Daily Trading Volume limitation;
- Risk-Bid Pricing; or
- Execution Pricing, assuming the equity was not originally Crossed-In.

**IV.** *Disposition of Hedge Position:*

> Citigroup's disposition of its hedge position, if any, must be executed on the principal exchange or market for the given equity at the current market price or in an effort to beat daily VWAP, and NOT:

- In excess of 40% of the average daily trading volume of such equity if the DOTS terminated at VWAP; [1]
- via an execution through an inter-dealer broker;
- via any objective price (e.g., MOC, MOO, limited time VWAP) other than the current market price (limit orders are acceptable) or full day VWAP;
- via a sale of the securities by any party where, directly or indirectly, the DOTS counterparty directs or indicates the identity of the purchaser (e.g., a "give-up");
- via a transfer of the securities, directly or indirectly, to the DOTS counterparty, an affiliate, or an agent or nominee thereof;
- under circumstances where there exists arrangements or understandings by which the DOTS counterparty is able to reacquire the referenced equity from Citigroup directly or indirectly through any intermediary; or
- within the final twenty minutes of official exchange trading on any day on the relevant exchange.

---

[1] If the position is in excess of this amount is must be disposed of over a multi-day period so that this limitation is satisfied.

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

897

**V.  *Approval Required Equity for DOTS:***

> The trading desk must seek prior written tax department approval before entering any DOTS where the underlying equity may be:
>  * A partnership interest including an MLP (Master Limited Partnership) interest;
>  * Equity in a REIT;
>  * An interest in a hedge fund;
>  * A Dutch equity; or
>  * Any equity where the issuer jurisdiction applies the maximum withholding tax rate and requires the beneficial holder who would otherwise be entitled to a reduced rate of withholding (by virtue of a treaty or other exemption) to file for a reclaim or apply for a refund of the withholding tax (e.g., a Swiss equity);

**VI.  *Special Rules for Non-U.S. Equities:*** Where the underlying equity is a non-U.S. equity:

> The transaction must be a customer transaction as opposed to a proprietary transaction (i.e., there must be a customer counterparty and the trade must be a normal and customary dealer type activity);

> The relevant legal requirements of the jurisdictions involved regarding beneficial ownership and / or treaty benefits must be satisfied and appropriate documentation obtained; and

> The transaction must be pre-tax profitable treating any withholding tax as an expense of the trade and taking into consideration any and all related expenses, including internal funding costs. The trading desk is responsible for maintaining complete and accurate records of such profitability on a trade-by-trade basis. Such records will be audited by both the tax department and internal audit and thus, the manner in which such records are maintained should lend itself to such review.

**Any exceptions from these procedures must be approved in writing by the tax department prior to execution.**

STRICTLY CONFIDENTIAL – NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY    CITI_PSI/WH1AX001224

898

APPENDIX B – Tax Risk Assessment Table

Tax Risk Assessment for Delta One Derivative Transactions[1]

Most Risk →→→ Less Risk

| | Cross In and Cross Out[2] | Cross In and Execution Out | Cross In and VWAP Out | Cross In and Risk-Bid Out | Execution In and Execution Out | Execution In and VWAP or Risk-Bid Out | VWAP or Risk-Bid In and Execution Out | VWAP or Risk-Bid In and VWAP or Risk-Bid Out |
|---|---|---|---|---|---|---|---|---|
| Allowable Under Current DOT Policy? | No | No | Yes | Yes | Yes | Yes | Yes | Yes |
| Volume Limit | None | None | 40% of ADTV[3] | None | None | 40% of ADTV for VWAP[3] | 40% of ADTV for VWAP[3] | 40% of ADTV for VWAP[3] |

10

CITI_PSIWHTFAX001225

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

899

1. This table is purely for reference to general execution methods and is not intended to act as a substitute for a thorough understanding of the Citigroup Policy for Structuring Total Return Equity Swaps and Other Delta One Derivative Transactions.

2. For purposes of this table, the terms cross-in and cross-out include executions via inter-dealer brokers or at market on close.

3. Volume limit to prevent trade from driving VWAP.

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001226

900

Tax related questions should be directed to the following individuals:

**Corporate Tax – Structured Products**

| | |
|---|---|
| Susan Gibie | 212-816-5046 |
| Anthony Tuths | 212-816-1364 |
| Javier A. Gonzalez | 8-986-6221 |
| Steven Henger | 8-986-6130 |

Trading related questions should be directed to the following individuals:

**Equities Compliance**

| | |
|---|---|
| Julius Leiman-Carbia | 212-723-4899 |
| Edward R. Arnold | 212-723-4502 |

Legal related questions should be directed to the following individuals:

**Legal**

| | |
|---|---|
| Donald Bendernagel | 212-723-3806 |
| Steven J. Keltz | 212-723-3837 |
| Robert F. Klein | 212-723-3843 |
| Catherine Curristine | 212-723-3840 |

12

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001227

901

*EXHIBIT 3*

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY    CITI_PSIWHTAX001228



CITI_JPSMWHTAX00/1229

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

904

██████████████

= Redacted by the Permanent
Subcommittee on Investigations

February 20, 2007
Page 2

**Response:** Yes. Based on our understanding of the transactions (as discussed at our 2/09/07 meeting), Citigroup engaged in such transactions during 2003-2005.

As discussed at our 2/9/07 meeting, we understand that you wish to focus your examination on transactions in which Citigroup acquired stock of a U.S. publicly traded corporation and, along with the acquisition, executed a total return swap (or similar notional principal contract) that referenced such stock, during a period in which dividends were paid on such stock, with a foreign counterparty.

Under a total return swap, Citigroup agrees to make payments to the counterparty equal to the price appreciation and any dividends for the referenced stock, and the counterparty agrees to make payments to Citigroup equal to the price depreciation in the stock and a financing payment (typically, based on LIBOR). Citigroup enters into total return swaps with a wide range of customers in its capacity as a dealer in a broad range of over-the-counter derivative investments. As a dealer, Citigroup typically hedges its exposure to the market risks attendant to any derivative contracts into which it enters. Citigroup's most straightforward hedge of a total return swap under which Citigroup pays total returns on a stock to a counterparty (a "short" swap, from Citigroup's perspective) is for Citigroup to acquire the underlying stock.

Based on our understanding that your examination would focus on total return swaps (or similar notional principal contracts) on U.S. equities with a foreign person during a period when dividends were paid on the referenced U.S. stock, our list of transactions (described in (e) below) will include all such total return swaps entered into by Citigroup that were outstanding during the period 2003-2005. However, as discussed, our list will not include other transactions described in your 1/11/07 IDR, such as, for example, short sales or security lending transactions, even though Citigroup also engaged in such transactions, because we believe these other transactions are not the focus of your present examination in connection with these IDRs.

*b)    Original documentation that describes and discusses the strategy/transactions(s).*

**Response:** We understand your request for "original documentation" to refer to contemporaneous transactional documents. Accordingly, attached is a sample ISDA Agreement for a U.S. Equity Total Return Swap, which describes the basic components of the transaction. We have other contemporaneous and post-transactional documents relating to total return swaps; please clarify which, if any, of these documents you might be seeking.

*c)    Summary of the tax benefits associated with the strategy/transaction(s).*

**Response:** Foreign persons may participate in the economic performance of a U.S. stock by entering into a total return swap rather than acquiring the stock itself. Payments received by foreign persons from a total return swap that references U.S. stock are also generally not subject to U.S. withholding tax (a U.S. tax benefit).

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001337

905



□ = Redacted by the Permanent
Subcommittee on Investigations

February 20, 2007
Page 3

Persons that enter into total return swaps obtain an economic position similar to that of a
leveraged position in the stock without being subject to margin restrictions applicable to certain
secured financing and without incurring more expensive unsecured financing (a non-tax benefit).
Moreover, the terms of the implicit financing are fixed for the life of the swap (another non-tax
benefit). On the other hand, such persons participating in the economics of a U.S. stock through
a total return swap do not have voting rights with respect to the referenced shares (a non-tax
detriment), and such persons accept the credit risk of the dealer counterparty (in this case
Citigroup) (another non-tax detriment).

    *d)    Support that there exists a reasonable basis that the strategy/transaction(s)
    operates within applicable tax law (statutory reference) including any analysis
    prepared by the company or for its use.*

Response: In general, Citigroup did not withhold U.S. tax on payments to foreign persons on
total return swaps on the basis of Treas. Reg. § 1.863-7, which provides that payments to foreign
persons on notional principal contracts generally are foreign source and, thus, exempt from
withholding. However, based on a post-transaction review of compliance with internal policies
for total return swaps, Citigroup discovered that, with respect to certain swaps, Citigroup and the
foreign counterparty appeared to have an understanding, at the inception of the transaction,
regarding delivery of the referenced stock from the foreign counterparty to Citigroup upon
entering into the swap and the redelivery of the stock by Citigroup to the foreign counterparty
upon termination of the swap. Because of this apparent understanding, Citigroup decided to pay
U.S. withholding tax on the dividend equivalent payments for these swaps. Citigroup did not
pay U.S. withholding tax on dividend equivalent payments for swaps for which there did not
appear to be such an understanding.

    As discussed at our 2/9/07 meeting, we are deferring our response to your request for
"any analysis prepared by the Company or for its use," pending further clarification of this
request.

    *e)    A specific counter-proposal as to what documents you will provide as a substitute
    for the items requested per the above IDRs.*

Response: Citigroup proposes to compile a list of all total return swaps described in response (a)
above that were outstanding during any portion of the period from 2003-2005, and for which
Citigroup may have hedged by acquiring the underlying stock. The list will identify the
referenced U.S. equity, the number of shares involved in the transaction, the inception date and
termination date of the swap, and the amount of dividends paid on the referenced shares during
the term of the swap. Citigroup's list will include and identify those swap transactions for which
Citigroup paid U.S. withholding taxes, as well as other types of transactions. We estimate that
the list will be submitted to you by 2/28/07.

    As discussed at our 2/9/07 meeting, Citigroup's list will not, at this time, include the
name of the foreign counterparty. Similarly, as we discussed, we are deferring our response to

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

906

= Redacted by the Permanent
Subcommittee on Investigations

February 20, 2007
Page 4

that portion of CGMI's IDR #1.E.2, CGML's IDR #1.E.3 and CFPI's IDR #1.E.3 which requests documents that, "in the aggregate," identify accountholders who engaged in the transactions at issue, pending your clarification of this request. Additionally, if you request the specific identity of the accountholders who engaged in these transactions, we respectfully ask that you issue a summons in connection with this request for the reason we discussed.

Please let me know if you have any questions about our above understandings, our above counter-proposal, or any other matter related to our responses to your questions.

Sincerely,

Jack Burns
Citigroup Global Markets Inc.

Enclosures

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001339

907



Corporate Tax Department
388 Greenwich Street, 22nd Floor
New York, NY 10013-2375

□□□ = Redacted by the Permanent
Subcommittee on Investigations

cı̇tı̇

August 24, 2007

To:        ████████, IRS

From:      Jack Burns

On March 21, 2007, we provided to you a list of transactions executed during the relevant time period by our Equity Derivatives business unit. The attached transactions were not included in that list, but came to our attention after further information gathering efforts.

*Jack Burns*
Jack Burns

**Permanent Subcommittee on Investigations**
**EXHIBIT #45 - FN 300**

CITI_PS/WHTAX001455

908

## Microsoft Certificates

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| Various | 08/19/2005 | 993922910 | CGMHI - MICROSOFT | 659,630.00 | $2,153,961.20 |
| 8/26/2004 | 08/12/2005 | 993922910 | CGMHI - MICROSOFT | 688,600.00 | $2,234,712.00 |
| 8/20/2004 | 08/03/2005 | 993922910 | CGMHI - MICROSOFT | 5,200.00 | $16,600.00 |
| 9/22/2004 | 07/12/2005 | 993922910 | CGMHI - MICROSOFT | 14,100.00 | $45,684.00 |
| 9/22/2004 | 04/29/2005 | 993922910 | CGMHI - MICROSOFT | 33,300.00 | $106,808.00 |
| 8/20/2004 | 04/14/2005 | 993922910 | CGMHI - MICROSOFT | 4,000.00 | $12,960.00 |
| 8/20/2004 | 03/30/2005 | 993922910 | CGMHI - MICROSOFT | 3,500.00 | $11,340.00 |
| 9/22/2004 | 03/10/2005 | 993922910 | CGMHI - MICROSOFT | 40.00 | $126.40 |
| 10/29/2004 | 02/17/2005 | 993922910 | CGMHI - MICROSOFT | 136,550.00 | $431,340.00 |
| 8/20/2004 | 02/15/2005 | 993922910 | CGMHI - MICROSOFT | 6,310.00 | $19,939.60 |
| 8/20/2004 | 02/03/2005 | 993922910 | CGMHI - MICROSOFT | 4,000.00 | $19,939.60 |
| 9/22/2004 | 01/27/2005 | 993922910 | CGMHI - MICROSOFT | 1,500.00 | $4,620.00 |
| 9/22/2004 | 01/20/2005 | 993922910 | CGMHI - MICROSOFT | 1,200.00 | $3,696.00 |
| 8/20/2004 | 12/16/2004 | 993922910 | CGMHI - MICROSOFT | 900.00 | $2,844.00 |
| 8/20/2004 | 01/14/2005 | 993922910 | CGMHI - MICROSOFT | 210,000.00 | $663,600.00 |
| | | | Totals | 1,769,600 | $5,724,270.80 |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX0314S6

909

| Form 4564 | Department of the Treasury<br>Internal Revenue Service<br>Information Document Request | Request Number<br>I.E. 7 |
|---|---|---|

| Citigroup Global Markets Inc.<br>388 Greenwich Street<br>New York, New York 10013<br>EIN# 11-2418191 | Subject:<br>Form 1042<br>Tax years 2003,2004, 2005 |
|---|---|
| | Submitted to:<br>Jack Burns |
| | Dates of Previous Requests: |

**Description of Documents Requested:**

Reference: Form 1042

Information Document Request
Form 1042 Examination

This IDR is to confirm oral requests for information that have been submitted in the last 3 weeks regarding total return swaps (TRS).

A schedule reconciling the total number of total return swaps (TRS) in the database into the following classifications.

TRS on which W/H tax was paid
TRS on which no W/H tax was paid
TRS with U.S. counterparties
TRS on non U.S. securities
TRS on fixed income products

━━ = Redacted by the Permanent
Subcommittee on Investigations

| Information Due By _____ At Next Appointment ☐ Mail In ☐ | |
|---|---|
| Name and Title of Requestor | Date:<br>11/19/07 |
| FROM    Office Location:<br>110 West 44ᵗʰ St.<br>New York, NY  10036 | Page 1 |
| Form 4564 | |

Permanent Subcommittee on Investigations
**EXHIBIT #45 - FN 302**

CITI_PSI/WHTAX001625

910

*FORWARD TO IRS*
*ON 12/11/09*

| Reconciliation of the 15, 851 trades | Number of TRS Trades |
|---|---|
| TRS on which WH tax was paid | 1352 |
| TRS on which WH tax was not paid | 4720 |
| TRS with U.S. counterparties | 2564 |
| TRS on non U.S. securities | 745 |
| TRS on fixed income products | 4574 |
| Other[1] | 1450 |
| Additional research required | 446 |
| **Total Trades** | **15851** |

[1] This category includes (1) trades that were cancelled, (2) trades where we did not hold the reference security as a hedge, (3) trades where we were long swap and short equity and (4) trades with securities other than fixed income or equity products.

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001626

911



March 21, 2007

To:        ████████, IRS          �no ██████ = Redacted by the Permanent
                                              Subcommittee on Investigations

From:      Jack Burns

As discussed, we are continuing to provide a list of transactions described in our 2/20/07 letter on a rolling basis.

As you know, our first submission was the list of transactions that were executed during the relevant time period by our Equity Finance business unit (which is the unit that entered into the largest number of total return swaps over U.S. equities).

The list from the first submission was comprised of two parts. The first portion of the list represented all of the transactions for which U.S. withholding taxes were paid. The second portion of the list represented transactions for which no U.S. withholding taxes were paid. With respect to the transactions in the second portion of the list, dividend information was not provided at that time, as we were still accumulating that information.

Enclosed as our first supplemental submission is the list of transactions executed during the relevant time period by our Equity Finance business unit, including dividend information, for which no U.S. withholding taxes were paid.

Upon information and belief, we believe this list to be substantially complete. We are continuing our review of these transactions, however, and there may be a limited number of transactions that will either be deleted from, or added to, this list. If it is necessary to delete transactions that are non-responsive to the IDR (or add transactions that are responsive), we will supplement our list with that information as it becomes available.

We will keep you informed as to the status of our ongoing submissions with respect to transactions executed by other business units.

*Jack Burns*

Jack Burns

cc:     ████████, IRS

Permanent Subcommittee on Investigations

**EXHIBIT #45 - FN 302**

Citigroup Global Markets Inc.

CITI_PSIWHTAX001340

912

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001341

913

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| | | | | | |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001342

914

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001342

915

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| 2/13/2004 | 4/5/2004 | 339030108 | FLEETBOSTON FINANCIAL CORP | 980,000 | $308,000.00 |
| 2/13/2004 | 3/16/2004 | 931422108 | WALGREEN CO NEW | 140,000 | $8,027.00 |
| 2/13/2004 | 3/16/2004 | 931422108 | WALGREEN CO NEW | 200,000 | $11,213.00 |
| 2/19/2004 | 3/24/2004 | 493579100 | KEYSPAN CORP | 136,900 | $0.00 |
| 2/19/2004 | 2/25/2004 | 493579100 | KEYSPAN CORP | 131,900 | $0.00 |
| 2/20/2004 | 2/20/2004 | 208464872 | CONSECO INC CVT PFD 10.50% ($2.625) 09/04 THEREAFTER 11.00% | 1,567,400 | $79,802.50 |
| 2/20/2004 | 4/6/2004 | 208464872 | CONSECO INC CVT PFD 10.50% ($2.625) 09/04 THEREAFTER 11.00% | 849,400 | $46,471.50 |
| 2/20/2004 | 4/23/2004 | 208464872 | CONSECO INC CVT PFD 10.50% ($2.625) 09/04 THEREAFTER 11.00% | 819,000 | $30,331.00 |
| 2/23/2004 | 4/5/2004 | 339030108 | FLEETBOSTON FINANCIAL CORP | 849,500 | $299,975.00 |
| 2/23/2004 | 2/27/2004 | 493579100 | KEYSPAN CORP | 106,950 | $0.00 |
| 2/24/2004 | 3/31/2004 | 257469108 | DOMINION RESOURCES INC VA NEW | 38,700 | $25,013.10 |
| 2/24/2004 | 3/31/2004 | 257469108 | DOMINION RESOURCES INC VA NEW | 72,020 | $46,492.80 |
| 2/24/2004 | 4/5/2004 | 835699209 | SORRENTO NETWORKS CORP NEW | 336,700 | $0.00 |
| 2/24/2004 | 3/1/2004 | 493579100 | KEYSPAN CORP | 76,950 | $0.00 |
| 2/24/2004 | 7/7/2004 | 06423A107 | BANK ONE CORP | 288,400 | $259,736.50 |
| 2/25/2004 | 3/2/2004 | 493579100 | KEYSPAN CORP | 38,950 | $0.00 |
| 2/25/2004 | 7/7/2004 | 06423A107 | BANK ONE CORP | 220,000 | $197,450.00 |
| 2/25/2004 | 7/7/2004 | 06423A107 | BANK ONE CORP | 1,500,000 | $1,346,250.00 |
| 2/26/2004 | 7/7/2004 | 06423A107 | BANK ONE CORP | 468,100 | $420,119.75 |
| 2/26/2004 | 7/7/2004 | 06423A107 | BANK ONE CORP | 30,000 | $26,720.00 |
| 3/1/2004 | 3/8/2004 | 172474108 | CINERGY CORP | 85,470 | $0.00 |
| 3/1/2004 | 3/5/2004 | 264388108 | DUKE ENERGY CORP | 170,393 | $0.00 |
| 3/1/2004 | 3/24/2004 | 458450127 | INTERACTIVECORP EXP 02/04/2009 | 1,438,230 | $0.00 |
| 3/1/2004 | 4/2/2004 | 458450127 | INTERACTIVECORP EXP 02/04/2009 | 210,717 | $0.00 |
| 3/1/2004 | 4/6/2004 | 532716107 | LIMITED BRANDS INC | 1,900,000 | $234,000.00 |
| 3/1/2004 | 3/9/2004 | 90863O102 | UNITED COMMUNITY FINANCIAL | 252,865 | $0.00 |
| 3/2/2004 | 4/6/2004 | 060505104 | BANK OF AMERICA CORP | 35,000 | $14,000.00 |
| 3/2/2004 | 4/6/2004 | 060505104 | BANK OF AMERICA CORP | 80,000 | $28,000.00 |
| 3/2/2004 | 4/6/2004 | 382388106 | GOODRICH CORP | 139,833 | $24,111.00 |
| 3/2/2004 | 4/6/2004 | 382388106 | GOODRICH CORP | 229,445 | $44,389.50 |
| 3/2/2004 | 4/6/2004 | 718647107 | PHILLIPS FINANCIAL CORP | 484,700 | $191,270.52 |
| 3/3/2004 | 3/8/2004 | 172474108 | CINERGY CORP | 40,470 | $0.00 |
| 3/3/2004 | 3/3/2004 | 208464872 | CONSECO INC CVT PFD 10.50% ($2.625) 09/04 THEREAFTER 11.00% | 78,174 | $0.00 |
| 3/3/2004 | 4/6/2004 | 208464872 | CONSECO INC CVT PFD 10.50% ($2.625) 09/04 THEREAFTER 11.00% | 47,297 | $0.00 |
| 3/3/2004 | 4/23/2004 | 208464872 | CONSECO INC CVT PFD 10.50% ($2.625) 09/04 THEREAFTER 11.00% | 30,870 | $0.00 |
| 3/3/2004 | 3/5/2004 | 264388108 | DUKE ENERGY CORP | 70,382 | $0.00 |
| 3/4/2004 | 7/7/2004 | 06423A107 | BANK ONE CORP | 71,800 | $64,446.50 |
| 3/5/2004 | 4/6/2004 | 405513510 | HALLIBURTON CO HOLDINGS CO | 140,000 | $17,500.00 |
| 3/5/2004 | 7/7/2004 | 06423A107 | BANK ONE CORP | 135,800 | $121,701.00 |
| 3/8/2004 | 4/6/2004 | 26969P107 | EAGLE MATERIALS INC CL B | 356,740 | $0.00 |
| 3/8/2004 | 7/7/2004 | 06423A107 | BANK ONE CORP | 20,000 | $17,950.00 |
| 3/8/2004 | 4/14/2004 | 713291107 | PEPCO HOLDINGS INC | 70,220 | $17,555.00 |
| 3/8/2004 | 4/14/2004 | 713291107 | PEPCO HOLDINGS INC | 129,620 | $32,405.00 |
| 3/8/2004 | 4/6/2004 | 718647107 | PHILLIPS FINANCIAL CORP | 99,700 | $41,036.30 |
| 3/9/2004 | 3/31/2004 | 210795208 | CONTINENTAL AIRLINES INC CL B | 1,002,918 | $0.00 |
| 3/10/2004 | 6/14/2004 | 210795208 | CONTINENTAL AIRLINES INC CL B | 175,000 | $0.00 |
| 3/11/2004 | 1/5/2005 | 819801109 | SEMPRA ENERGY | 5,000 | $4,500.00 |
| 3/11/2004 | 4/16/2004 | 92243M108 | VECTOR GROUP LTD | 38,133 | $9,730.84 |
| 3/11/2004 | 4/16/2004 | 92243M108 | VECTOR GROUP LTD | 61,967 | $17,811.86 |
| 3/13/2004 | 6/14/2004 | 210795208 | CONTINENTAL AIRLINES INC CL B | 62,500 | $0.00 |
| 3/13/2004 | 3/15/2004 | 532716107 | LIMITED BRANDS INC | 400,000 | $0.00 |
| 3/13/2004 | 3/15/2004 | 532716107 | LIMITED BRANDS INC | 400,000 | $0.00 |
| 3/13/2004 | 4/6/2004 | 532716107 | LIMITED BRANDS INC | 835,500 | $0.00 |
| 3/15/2004 | 6/14/2004 | 210795208 | CONTINENTAL AIRLINES INC CL B | 25,000 | $0.00 |
| 3/15/2004 | 4/6/2004 | 26969P107 | EAGLE MATERIALS INC CL B | 59,690 | $0.00 |
| 3/16/2004 | 6/14/2004 | 210795208 | CONTINENTAL AIRLINES INC CL B | 50,000 | $0.00 |
| 3/16/2004 | 4/15/2004 | 26969P107 | EAGLE MATERIALS INC CL B | 94,000 | $0.00 |
| 3/16/2004 | 11/1/2004 | 32086Q101 | COMMUNITY FIRST BANKSHARES INC | 500,000 | $240,000.00 |
| 3/17/2004 | 4/6/2004 | 532716107 | LIMITED BRANDS INC | 3,465,500 | $0.00 |
| 3/17/2004 | 3/18/2004 | 761520507 | REVLON INC CLASS A | 1,000,000 | $0.00 |
| 3/17/2004 | 3/22/2004 | 761520507 | REVLON INC CLASS A | 1,000,000 | $0.00 |
| 3/17/2004 | 3/23/2004 | 761520507 | REVLON INC CLASS A | 739,500 | $0.00 |
| 3/18/2004 | 6/14/2004 | 210795208 | CONTINENTAL AIRLINES INC CL B | 50,000 | $0.00 |
| 3/18/2004 | 3/24/2004 | 292659104 | ENERGY CONVERSION DEVICES INC | 532,000 | $0.00 |
| 3/18/2004 | 3/24/2004 | 761520507 | REVLON INC CLASS A | 413,100 | $0.00 |
| 3/18/2004 | 1/5/2005 | 984121809 | XEROX CORP CVT PFD 6.25% DTD 09/25/2003 SERIES C | 51,378 | $240,534.36 |
| 3/18/2004 | 1/5/2005 | 984121809 | XEROX CORP CVT PFD 6.25% DTD 09/25/2003 SERIES C | 37,563 | $176,217.10 |
| 3/19/2004 | 6/14/2004 | 210795208 | CONTINENTAL AIRLINES INC CL B | 50,000 | $0.00 |
| 3/19/2004 | 3/24/2004 | 292659104 | ENERGY CONVERSION DEVICES INC | 232,000 | $0.00 |
| 3/19/2004 | 4/26/2004 | 717599103 | PFIZER INC | 773,148 | $0.00 |
| 3/19/2004 | 3/24/2004 | 761520507 | REVLON INC CLASS A | 1,000,000 | $0.00 |
| 3/19/2004 | 3/29/2004 | 761520507 | REVLON INC CLASS A | 762,400 | $0.00 |
| 3/22/2004 | 4/2/2004 | 002449100 | AMVESCAP CORP | 1,300,000 | $0.00 |
| 3/22/2004 | 3/23/2004 | 532716107 | LIMITED BRANDS INC | 400,000 | $0.00 |
| 3/22/2004 | 3/29/2004 | 717599107 | PFIZER INC | 273,148 | $0.00 |
| 3/22/2004 | 3/29/2004 | 761520507 | REVLON INC CLASS A | 812,400 | $0.00 |
| 3/22/2004 | 3/30/2004 | 761520507 | REVLON INC CLASS A | 382,400 | $0.00 |
| 3/23/2004 | 3/24/2004 | 761520507 | REVLON INC CLASS A | 382,400 | $0.00 |
| 3/24/2004 | 3/26/2004 | 292659104 | ENERGY CONVERSION DEVICES INC | 402,781 | $0.00 |
| 3/24/2004 | 3/29/2004 | 761520507 | REVLON INC CLASS A | 282,400 | $0.00 |
| 3/24/2004 | 3/30/2004 | 761520507 | REVLON INC CLASS A | 162,400 | $0.00 |
| 3/25/2004 | 4/15/2004 | 06423A107 | BANK ONE CORP | 186,200 | $0.00 |
| 3/25/2004 | 5/7/2004 | 989561101 | ZIMMER HOLDINGS INC | 100,000 | $0.00 |
| 3/25/2004 | 4/1/2004 | 761520507 | REVLON INC CLASS A | 162,400 | $0.00 |
| 3/26/2004 | 4/1/2004 | 210795208 | CONTINENTAL AIRLINES INC CL B | 476,916 | $0.00 |
| 3/26/2004 | 5/7/2004 | 902973304 | US BANCORP DEL NEW | 110,800 | $29,082.00 |
| 3/26/2004 | 5/7/2004 | 902973304 | US BANCORP DEL NEW | 225,500 | $49,302.00 |
| 3/29/2004 | 5/13/2004 | 210795208 | CONTINENTAL AIRLINES INC CL B | 459,916 | $0.00 |
| 3/29/2004 | 4/6/2004 | 06423A107 | BANK ONE CORP | 43,800 | $0.00 |
| 3/30/2004 | 4/15/2004 | 06423A107 | BANK ONE CORP | 43,800 | $0.00 |
| 3/31/2004 | 4/2/2004 | 060505104 | BANK OF AMERICA CORP | 466,984 | $0.00 |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001344

916

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| | | | BANK OF AMERICA CORP | | |
| | | | BANK OF AMERICA CORP | | |
| | | | CONTINENTAL AIRLINES INC CL B | | |
| | | | ABINGTON BANCORP INC | | |
| | | | ABINGTON BANCORP INC | | |
| | | | BANK OF AMERICA CORP | | |
| | | | BANK OF AMERICA CORP | | |
| | | | BSB BANCORP INC | | |
| 4/1/2004 | 4/18/2004 | | CONSECO INC CVT PFD 10.50% ($2.625) 09/04 THEREAFTER 11.00% | | $0.00 |
| 4/1/2004 | 4/23/2004 | | CONSECO INC CVT PFD 10.50% ($2.625) 09/04 THEREAFTER 11.00% | | $0.00 |
| 4/1/2004 | 4/23/2004 | | CONSECO INC CVT PFD 10.50% ($2.625) 09/04 THEREAFTER 11.00% | | $0.00 |
| 4/1/2004 | 4/23/2004 | | CONSECO INC CVT PFD 10.50% ($2.625) 09/04 THEREAFTER 11.00% | | $0.00 |
| | | | EAGLE MATERIALS INC CL B | | |
| | | | EAGLE MATERIALS INC CL B | | |
| | | | EAGLE MATERIALS INC CL B | | |
| | | | EAGLE MATERIALS INC CL B | | |
| | | | FIRSTFED AMERICA BANCORP INC | | |
| | | | FIRSTFED AMERICA BANCORP INC | | |
| | | | FIRSTFED AMERICA BANCORP INC | | |
| | | | FIRSTFED AMERICA BANCORP INC | | |
| | | | HALLIBURTON CO HOLDINGS CO | | |
| | | | HALLIBURTON CO HOLDINGS CO | | |
| | | | JPMORGAN CHASE & CO | | |
| | | | JPMORGAN CHASE & CO | | |
| | | | LIMITED BRANDS INC | | |
| | | | LIMITED BRANDS INC | | |
| | | | LIMITED BRANDS INC | | |
| | | | LIMITED BRANDS INC | | |
| | | | LIMITED BRANDS INC | | |
| | | | REGIONS FINANCIAL CORP | | |
| | | | REGIONS FINANCIAL CORP | | |
| | | | REGIONS FINANCIAL CORP | | |
| | | | REGIONS FINANCIAL CORP | | |
| | | | REGIONS FINANCIAL CORP | | |
| | | | STATEN ISLAND BANCORP INC | | |
| | | | STATEN ISLAND BANCORP INC | | |
| | | | CONTINENTAL AIRLINES INC CL B | | |
| | | | LIMITED BRANDS INC | | |
| | | | LIMITED BRANDS INC | | |
| | | | NEXTEL CORP COM PAR $0.02 | | |
| | | | ITC COMMUNICATIONS INC | | |
| | | | WESTPOINT CORP | | |
| | | | LIMITED BRANDS INC | | |
| | | | NATIONAL CITY CORP | | |
| | | | NATIONAL CITY CORP | | |
| | | | ABINGTON BANCORP INC | | |
| | | | ABINGTON BANCORP INC | | |
| | | | CONTINENTAL AIRLINES INC CL B | | |
| | | | COLE NATIONAL CORP NEW CL A | | |
| | | | COLE NATIONAL CORP NEW CL A | | |
| | | | REGIS CORP/MN | | |
| | | | REGIS CORP/MN | | |
| | | | LIMITED BRANDS INC | | |
| | | | GREENPOINT FINL CORP | | |
| | | | COLE NATIONAL CORP NEW CL A | | |
| | | | COLE NATIONAL CORP NEW CL A | | |
| | | | EAGLE MATERIALS INC CL B | | |
| | | | GREENPOINT FINL CORP | | |
| | | | GREENPOINT FINL CORP | | |
| | | | BANK NEW YORK INC | | |
| | | | BANK NEW YORK INC | | |
| 4/14/2004 | 4/23/2004 | | CONSECO INC CVT PFD 10.50% ($2.625) 09/04 THEREAFTER 11.00% | | $0.00 |
| | | | DUKE ENERGY CORP | | |
| | | | GREENPOINT FINL CORP | | |
| | | | ABINGTON BANCORP INC | | |
| | | | ABINGTON BANCORP INC | | |
| | | | SEPRACOR CORP | | |
| | | | CONTINENTAL AIRLINES INC CL B | | |
| | | | SEPRACOR CORP | | |
| | | | ONEOK INC NEW | | |
| | | | CONTINENTAL AIRLINES INC CL B | | |
| | | | COLE NATIONAL CORP NEW CL A | | |
| | | | COLE NATIONAL CORP NEW CL A | | |
| | | | COLE NATIONAL CORP NEW CL A | | |
| | | | NCS HC | | |
| | | | INDEPENDENCE COMMUNITY BANK | | |
| | | | INDEPENDENCE COMMUNITY BANK | | |
| | | | REGIONS FINANCIAL CORP | | |
| | | | REGIONS FINANCIAL CORP | | |
| | | | CONTINENTAL AIRLINES INC CL B | | |
| | | | EASTMAN KODAK CO | | |
| | | | CONTINENTAL AIRLINES INC CL B | | |
| | | | COLE NATIONAL CORP NEW CL A | | |
| | | | COLE NATIONAL CORP NEW CL A | | |
| | | | PATRIOT BANK CORP PA NEW | | |
| | | | WAYPOINT FINANCIAL CORP | | |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001345

917

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001346

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001347

919

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| 7/1/2004 | 8/14/2004 | 635406100 | NATIONAL CITY CORP | 828,028 | $220,108.90 |
| 7/2/2004 | 7/22/2004 | 210795508 | CONTINENTAL AIRLINES INC CL B | 12,600 | $0.00 |
| 7/2/2004 | 8/27/2004 | 562587107 | MANDALAY RESORT GROUP | 480,000 | $121,500.00 |
| 7/6/2004 | 12/2/2004 | 918551108 | STAFFMA ENERGY | 7,366 | $3,850.00 |
| 7/6/2004 | 10/12/2004 | 163421107 | CHELSEA PHY GROUP INC | 147,300 | $88,500.00 |
| 7/6/2004 | 8/12/2004 | 574598109 | MASCO CORP DE | 90,000 | $14,400.00 |
| 7/6/2004 | 8/13/2004 | 574598109 | MASCO CORP DE | 210,000 | $33,600.00 |
| 7/6/2004 | 8/13/2004 | 617446448 | MORGAN STANLEY | 90,000 | $15,000.00 |
| 7/6/2004 | 8/13/2004 | 617446448 | MORGAN STANLEY | 140,800 | $35,600.00 |
| 7/7/2004 | 10/6/2004 | 163421102 | CHELSEA PPFY GROUP INC | 120,400 | $72,240.00 |
| 7/7/2004 | 7/13/2004 | 925520109 | VIAD CORP | 45,555 | $0.00 |
| 7/7/2004 | 7/13/2004 | 925520109 | VIAD CORP | 23,521 | $0.00 |
| 7/8/2004 | 8/13/2004 | 210795308 | CONTINENTAL AIRLINES INC CL B | 20,000 | $0.00 |
| 7/8/2004 | 9/27/2004 | 562587107 | MANDALAY RESORT GROUP | 150,000 | $40,500.00 |
| 7/9/2004 | 8/13/2004 | 210795308 | CONTINENTAL AIRLINES INC CL B | 25,000 | $0.00 |
| 7/9/2004 | 9/27/2004 | 564737400 | RESOURCE INC | 370,700 | $89,281.00 |
| 7/12/2004 | 8/2/2004 | 16090310? | CHARTER ONE FINL INC | 300,000 | $143,000.00 |
| 7/13/2004 | 8/2/2004 | 175673507 | DOBSON COMMUNICATIONS PM PFD 13.00% DTD 09/05/1999 | 10,158 | $327,491.98 |
| 7/13/2004 | 8/16/2004 | 769713687 | FREEPORT MCMORAN COPPER & GOLD CL B | 267,200 | $41,440.00 |
| 7/13/2004 | 8/18/2004 | 03949020W | ARCH COAL INC CVT PFD 5.00%($2.50) DTD 01/31/2003 | 70,000 | $43,750.00 |
| 7/14/2004 | | 125686802 | CMS ENERGY CORP CVT PFD 4.50%($3.25) PARTIAL EXCH TO 125686878 | 253,730 | $143,734.38 |
| 7/14/2004 | 7/23/2004 | 001957909 | AT&T CORP NEW | 75,000 | $0.00 |
| 7/15/2004 | 7/23/2004 | 210795308 | CONTINENTAL AIRLINES INC CL B | 12,600 | $0.00 |
| 7/15/2004 | 7/15/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 1,487 | $0.00 |
| 7/15/2004 | 7/15/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 12,420 | $0.00 |
| 7/15/2004 | 7/15/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 13,860 | $0.00 |
| 7/15/2004 | 7/15/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 18,000 | $0.00 |
| 7/15/2004 | 7/15/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 21,960 | $0.00 |
| 7/15/2004 | 7/15/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 26,180 | $0.00 |
| 7/15/2004 | 7/15/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 35,280 | $0.00 |
| 7/15/2004 | 7/15/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 36,000 | $0.00 |
| 7/15/2004 | 7/15/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 54,900 | $0.00 |
| 7/15/2004 | 7/15/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 84,168 | $0.00 |
| 7/15/2004 | 7/15/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 180,000 | $0.00 |
| 7/15/2004 | 11/22/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 180,000 | $0.00 |
| 7/15/2004 | 12/30/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 1,487 | $99.22 |
| 7/15/2004 | 12/30/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 6,753 | $402.18 |
| 7/15/2004 | 12/30/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 10,089 | $604.80 |
| 7/15/2004 | 12/30/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 11,224 | $673.44 |
| 7/15/2004 | 12/30/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 12,420 | $743.30 |
| 7/15/2004 | 12/30/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 13,860 | $831.60 |
| 7/15/2004 | 12/30/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 14,000 | $1,260.00 |
| 7/15/2004 | 12/30/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 21,960 | $1,311.60 |
| 7/15/2004 | 12/30/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 26,180 | $1,871.40 |
| 7/15/2004 | 12/30/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 35,280 | $2,116.80 |
| 7/15/2004 | 12/30/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 36,000 | $2,160.00 |
| 7/15/2004 | 12/30/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 54,900 | $3,294.00 |
| 7/15/2004 | 12/30/2004 | 70213P102 | PARTNERS TRUST FINANCIAL GROUP NEW | 84,168 | $5,050.08 |
| 7/16/2004 | 7/26/2004 | 001957908 | AT&T CORP NEW | 100,000 | $0.00 |
| 7/16/2004 | 8/13/2004 | 12582214107 | CROWN CASTLE INTL COMY. PFD. 6.25% | 474,900 | $0.00 |
| 7/16/2004 | 10/12/2004 | 163421108 | CHELSEA PHFY GROUP INC | 300,000 | $180,000.00 |
| 7/16/2004 | 3/14/2005 | 001967300? | AT&T CORP NEW | 25,000 | $21,937.50 |
| 7/19/2004 | 8/27/2004 | 172941108 | CINERGY CORP | 351,005 | $185,352.00 |
| 7/19/2004 | 10/14/2004 | 163421107 | CHELSEA PHFY GROUP INC | 200,000 | $138,280.80 |
| 7/19/2004 | 9/27/2004 | 557601107 | INTERMEDY CORP | 598,000 | $224,737.50 |
| 7/20/2004 | 7/23/2004 | 210795308 | CONTINENTAL AIRLINES INC CL B | 30,000 | $0.00 |
| 7/20/2004 | 8/13/2004 | 210795308 | CONTINENTAL AIRLINES INC CL B | 102,000 | $0.00 |
| 7/20/2004 | 8/2/2004 | 209464807 | CONSECO INC CVT PFD 5.50%($1.375) | 223,460 | $0.00 |
| 7/20/2004 | 10/5/2004 | 396364103 | GREENPOINT FINL CORP | 68,430 | $8,484.50 |
| 7/20/2004 | 10/6/2004 | 396364102 | GREENPOINT FINL CORP | 81,630 | $12,243.00 |
| 7/20/2004 | 8/13/2004 | 458413128? | INTERNATIONAL DISPLAYWORKS INC | 1,391,980 | $0.00 |
| 7/20/2004 | 8/14/2004 | 458413102 | INTERNATIONAL DISPLAYWORKS INC | 100,000 | $0.00 |
| 7/20/2004 | 8/20/2004 | 548030300? | MEDIX CORP COM PAR $0.00 | 430,000 | $0.00 |
| 7/20/2004 | 7/26/2004 | 001961007 | AT&T CORP NEW | 550 | $0.00 |
| 7/20/2004 | 8/14/2004 | 892320509? | TOYS R US INC EQUITY SECURITY UNITS DTD 05/28/2002 6.25% | 376,600 | $0.00 |
| 7/21/2004 | 7/27/2004 | 548030300? | MEDIX CORP COM PAR $0.00 | 400,000 | $0.00 |
| 7/21/2004 | 11/29/2004 | 01311042? | ALIBRIS INC | | $0.00 |
| 7/22/2004 | 8/23/2004 | 007544100? | ADVANCED FIBRE COMMUNICATIONS | 5,366 | $1,588.50 |
| 7/22/2004 | 8/23/2004 | 007544108 | ADVANCED FIBRE COMMUNICATIONS | 150,000 | $0.00 |
| 7/22/2004 | 7/22/2004 | 558855101? | BSB BANCORP INC | 350,000 | $0.00 |
| 7/22/2004 | 8/23/2004 | 222370502? | FEDERAL REAL ESTATE INVEST CO CVT PFD SER A $1.5875 | 7,073 | $0.00 |
| 7/22/2004 | 8/24/2004 | 209464807 | CONSECO INC CVT PFD 5.50%($1.375) | 77,400 | $22,662.74 |
| 7/22/2004 | 7/23/2004 | 007481109? | COMMON RESOURCES INTL VA NEW | 112,700 | $0.00 |
| 7/22/2004 | 8/24/2004 | 44989XXX? | IMC GLOBAL INC PFD CVT 7.50% DTD 06/00/2001 MAT 07/01/2006 SER MEDX | 24,000 | $15,480.00 |
| 7/22/2004 | 7/29/2004 | 548030300? | MEDIX CORP COM PAR $0.00 | 300,000 | $0.00 |
| 7/22/2004 | 12/28/2004 | 668087102? | NORTHROP GRUMMAN CORP | 26,900 | $8,132.00 |
| 7/22/2004 | 10/27/2004 | 717266500? | PHILLIPS PDGE CORP PREF CONV | 11,800 | $19,912.50 |
| 7/22/2004 | 3/2/2005 | 70213P102? | PARTNERS TRUST FINANCIAL GROUP NEW | 208,789 | $12,527.34 |
| 7/22/2004 | 3/9/2005 | 70213P102? | PARTNERS TRUST FINANCIAL GROUP NEW | 25,483 | $1,527.78 |
| 7/22/2004 | 11/29/2004 | 72755ABA? | PLATINUM UNDERWRITERS CVT PFD 7.00% DTD 11/06/2002 | 84,100 | $0.00 |
| 7/23/2004 | 8/23/2004 | 584413109? | NERGX CORP CVT PFD 4.35% DTD 06/28/2003 SERIES C | 23,600 | $38,875.00 |
| 7/23/2004 | 8/20/2004 | 548030300? | MEDIX CORP COM PAR $0.00 | 200,000 | $0.00 |
| 7/23/2004 | 8/18/2004 | 892320509? | TOYS R US INC EQUITY SECURITY UNITS DTD 05/28/2002 6.25% | 208,330 | $0.00 |
| 7/26/2004 | 8/9/2004 | 086516101? | BEST BUY INC | 3,902 | $0.00 |
| 7/27/2004 | 8/2/2004 | 20825C104? | CONOCOPHILLIPS | 80,585 | $13,670.78 |
| 7/27/2004 | 8/2/2004 | 20825C104? | CONOCOPHILLIPS | 145,345 | $31,868.48 |
| 7/27/2004 | 8/2/2004 | 842587107? | SOUTHERN CO | 130,145 | $50,375.84 |
| 7/27/2004 | 8/2/2004 | 842587107? | SOUTHERN CO | 300,525 | $125,305.54 |
| 7/28/2004 | 8/4/2004 | 001957909? | AT&T CORP NEW | 75,550 | $23,826.58 |
| 7/28/2004 | 8/9/2004 | 086516101? | BEST BUY INC | 41,424 | $0.00 |
| 7/28/2004 | 10/5/2004 | 20451M107? | COMPASS MINERALS INTL INC | 250,000 | $62,500.00 |
| 7/28/2004 | 8/10/2004 | 458140100? | I-FLOW INTERACTIVECORP PDF 03/04/2009 | 250,717 | $0.00 |
| 7/28/2004 | 8/4/2004 | 458140102? | INTEL CORP | 30,000 | $0.00 |
| 7/28/2004 | 8/10/2004 | 45772310? | INSPIRE PHARMACEUTICALS INC | 12,000 | $0.00 |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001348

920

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001349

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| 6/28/2004 | 1/31/2005 | 247361109 | DELTA AIR LINES INC DE | 27,800 | $0.00 |
| 6/28/2004 | 10/15/2004 | 02209N103 | ALTRIA GROUP INC | 413,430 | $301,798.60 |
| 6/28/2004 | 10/15/2004 | 02209N102 | ALTRIA GROUP INC | 177,160 | $129,341.40 |
| 6/28/2004 | 9/27/2004 | 69351T100 | PPL CORP | 1,004,500 | $318,172.50 |
| 6/28/2004 | 11/15/2004 | 779277101 | ROUSE CO | 267,800 | $818,380.73 |
| 6/28/2004 | 9/27/2004 | 836515106 | SOUTH JERSEY INDUSTRIES INC | 587,300 | $74,418.70 |
| 6/28/2004 | 9/30/2004 | 929903102 | WACHOVIA CORP 2ND NEW | 278,800 | $110,780.00 |
| 9/27/2004 | 10/14/2004 | 458140100 | INTEL CORP | 10,000 | $0.00 |
| 8/27/2004 | 11/15/2004 | 779277101 | ROUSE CO | 108,200 | $330,453.71 |
| 8/30/2004 | 9/7/2004 | 459411102 | INTERNATIONAL DISPLAYWORKS INC | 90,000 | $0.00 |
| 8/30/2004 | 11/15/2004 | 779277101 | ROUSE CO | 538,800 | $1,648,340.47 |
| 8/30/2004 | 9/27/2004 | 806806102 | SCANA CORP NEW | 305,400 | $109,840.00 |
| 8/31/2004 | 10/13/2004 | 730753105 | RAILAMERICA INC | 150,000 | $0.00 |
| 8/31/2004 | 11/15/2004 | 779277101 | ROUSE CO | 84,370 | $257,829.85 |
| 8/31/2004 | 11/15/2004 | 779277101 | ROUSE CO | 177,857 | $543,520.32 |
| 8/31/2004 | 8/31/2004 | 30231G102 | EXXON MOBIL CORP | 10,000 | $0.00 |
| 9/1/2004 | 9/13/2004 | 459411102 | INTERNATIONAL DISPLAYWORKS INC | 50,000 | $0.00 |
| 9/1/2004 | 10/13/2004 | 730753105 | RAILAMERICA INC | 200,000 | $0.00 |
| 9/1/2004 | 9/10/2004 | 779277101 | ROUSE CO | 50,000 | $0.00 |
| 9/2/2004 | 9/10/2004 | 023404102 | AMEREN CORP | 340,000 | $216,800.00 |
| 9/2/2004 | 11/15/2004 | 779277101 | ROUSE CO | 78,200 | $238,874.51 |
| 9/2/2004 | 3/8/2005 | 98454B102 | TRI CONTINENTAL CORP | 1,050,100 | $273,076.00 |
| 9/2/2004 | 10/5/2005 | 98454B102 | TRI CONTINENTAL CORP | 1,050,100 | $336,032.00 |
| 9/2/2004 | 9/7/2005 | 98963A104 | DWEG FUND INC | 1,843,900 | $1,088,057.10 |
| 9/2/2004 | 10/5/2005 | 98963A104 | DWEG FUND INC | 1,843,900 | $1,088,057.10 |
| 9/2/2004 | 9/16/2004 | 106618101 | BEST BUY INC | 825 | $0.00 |
| 9/3/2004 | 10/13/2004 | 730753102 | RAILAMERICA INC | 144,000 | $0.00 |
| 9/7/2004 | 9/16/2004 | 023808102 | AMEREN CORP | 327,050 | $207,678.75 |
| 9/7/2004 | 10/14/2004 | 023808102 | AMEREN CORP | 172,000 | $109,858.00 |
| 9/7/2004 | 10/5/2004 | 154765109 | CENTRAL PKG CORP | 10,000 | $120.90 |
| 9/8/2004 | 10/14/2004 | 21037T107 | CONSTELLATION ENERGY GROUP | 50,000 | $0.00 |
| 9/8/2004 | 9/14/2004 | 459411102 | INTERNATIONAL DISPLAYWORKS INC | 30,000 | $0.00 |
| 9/8/2004 | 9/30/2004 | 484287607 | ISHARES RUSSELL 2000 INDEX FD | 70,000 | $9,263.94 |
| 9/8/2004 | 10/14/2004 | 500219104 | KRAFT FOODS INC CLASS A | 175,000 | $35,875.00 |
| 9/8/2004 | 10/15/2004 | 02209N103 | ALTRIA GROUP INC | 143,500 | $104,755.00 |
| 9/8/2004 | 10/14/2004 | 69351T100 | PPL CORP | 175,000 | $35,875.00 |
| 9/8/2004 | 2/18/2005 | 022603102 | AMEREN CORP | 3,500 | $4,445.00 |
| 9/8/2004 | 9/27/2004 | 22822T401 | CROWN CASTLE INTL CONV. PFD 6.25% | 341,564 | $0.00 |
| 9/8/2004 | 11/16/2004 | 459461107 | INTERCEPT INC | 500,000 | $0.00 |
| 9/8/2004 | 9/13/2004 | 459411102 | INTERNATIONAL DISPLAYWORKS INC | 35,000 | $0.00 |
| 9/8/2004 | 9/30/2004 | 635405103 | NATIONAL CITY CORP | 629,025 | $0.00 |
| 9/8/2004 | 9/15/2004 | 635405103 | NATIONAL CITY CORP | 479,025 | $0.00 |
| 9/8/2004 | 10/15/2004 | 63853Q302 | NATIONWIDE HEALTH PROP CVT PFD 7.75% | 18,900 | $36,618.15 |
| 9/9/2004 | 11/12/2004 | 652482802 | NEWS CORP LTD SPONSORED ADR REPSTG PFD LTD VTG ORD | 1,488,700 | $0.00 |
| 9/9/2004 | 9/22/2004 | 758115102 | REEBOK INTL LTD | 29,300 | $0.00 |
| 9/10/2004 | 10/22/2004 | 191310107 | FEDERATED DEPARTMENT STORES | 250,000 | $18,875.00 |
| 9/10/2004 | 11/18/2004 | 191216100 | COCA-COLA CO | 18,100 | $9,050.00 |
| 9/10/2004 | 11/18/2004 | 191216100 | COCA-COLA CO | 76,700 | $38,350.00 |
| 9/10/2004 | 12/14/2004 | 56845X108 | MARINER HEALTH CARE INC | 300,000 | $0.00 |
| 9/10/2004 | 9/16/2004 | 635405103 | NATIONAL CITY CORP | 328,028 | $0.00 |
| 9/13/2004 | 9/22/2004 | 023606102 | AMEREN CORP | 323,550 | $0.00 |
| 9/13/2004 | 9/21/2004 | 106618101 | BEST BUY INC | 1,530 | $0.00 |
| 9/13/2004 | 9/16/2004 | 635405103 | NATIONAL CITY CORP | 179,025 | $0.00 |
| 9/13/2004 | 4/20/2005 | 743877100 | PROVINCE HEALTHCARE CO | 500,000 | $0.00 |
| 9/14/2004 | 9/23/2004 | 92553A205 | VIACOM INC CL B | 566,050 | $0.00 |
| 9/14/2004 | 9/30/2004 | 166764100 | CHEVRON CORP | 80,100 | $0.00 |
| 9/14/2004 | 9/24/2004 | 44919P138 | IAC INTERACTIVECORP EXP 02/04/2009 | 344,070 | $0.00 |
| 9/14/2004 | 9/24/2004 | 44919P178 | IAC INTERACTIVECORP EXP 02/04/2009 | 1,351,980 | $0.00 |
| 9/16/2004 | 9/27/2004 | 106618101 | BEST BUY INC | 4,532 | $0.00 |
| 9/17/2004 | 10/22/2004 | 163421107 | CHELSEA PPTY GROUP INC | 5,516 | $3,814.62 |
| 9/17/2004 | 10/22/2004 | 163421107 | CHELSEA PPTY GROUP INC | 174,063 | $120,343.58 |
| 9/17/2004 | 10/15/2004 | 02209N102 | ALTRIA GROUP INC | 81,500 | $0.00 |
| 9/17/2004 | 10/4/2004 | 758115102 | REEBOK INTL LTD | 23,800 | $0.00 |
| 9/20/2004 | 10/7/2004 | 02209N102 | AMEREN CORP | 310,250 | $0.00 |
| 9/20/2004 | 9/24/2004 | 458140100 | INTEL CORP | 10,000 | $0.00 |
| 9/21/2004 | 10/13/2004 | 44919P138 | IAC INTERACTIVECORP EXP 02/04/2009 | 301,857 | $0.00 |
| 9/21/2004 | 10/13/2004 | 44919P178 | IAC INTERACTIVECORP EXP 02/04/2009 | 1,315,693 | $0.00 |
| 9/21/2004 | 10/8/2004 | 458140100 | INTEL CORP | 5,000 | $0.00 |
| 9/21/2004 | 10/15/2004 | 02209N102 | ALTRIA GROUP INC | 45,000 | $0.00 |
| 9/21/2004 | 10/15/2004 | 02209N102 | ALTRIA GROUP INC | 5,000 | $0.00 |
| 9/21/2004 | 4/20/2005 | 743877100 | PROVINCE HEALTHCARE CO | 500,000 | $0.00 |
| 9/21/2004 | 9/27/2004 | 896774108 | TRITON PCS HOLDINGS INC CL A | 350,000 | $0.00 |
| 9/22/2004 | 9/23/2004 | 92553A209 | VIACOM INC CL B | 503,000 | $0.00 |
| 9/22/2004 | 11/3/2004 | 00837J101 | AIR T INC | 55,000 | $0.00 |
| 9/23/2004 | 9/30/2004 | 018522102 | ALLETE | 298,100 | $0.00 |
| 9/23/2004 | 11/15/2004 | 22822T401 | CROWN CASTLE INTL CONV. PFD 6.25% | 341,564 | $0.00 |
| 9/22/2004 | 10/4/2004 | 172471102 | CINERGY CORP | 351,600 | $0.00 |
| 9/22/2004 | 10/26/2005 | 185896300 | CLEVELAND CLIFFS INC CVT PFD 3.25% | 35,000 | $0.00 |
| 9/22/2004 | 10/26/2005 | 185896300 | CLEVELAND CLIFFS INC CVT PFD 3.25% | 21,400 | $0.00 |
| 9/22/2004 | 10/11/2004 | 163421107 | CHELSEA PPTY GROUP INC | 86,100 | $59,541.71 |
| 9/22/2004 | 10/26/2004 | 257460108 | DOMINION RESOURCES INC VA NEW | 395,500 | $0.00 |
| 9/22/2004 | 11/8/2004 | 257460108 | SHERWIN CORP | 640,700 | $0.00 |
| 9/22/2004 | 2/17/2005 | 29472N105 | EQUITY OFFICE PPTYS TR PFD CVT 5.25% (42.625) | 1,100,000 | $2,186,825.00 |
| 9/22/2004 | 10/25/2004 | 29454M107 | EQUITABLE RESOURCES INC | 366,300 | $0.00 |
| 9/22/2004 | 10/8/2004 | 337932107 | FIRSTENERGY CORP | 599,300 | $0.00 |
| 9/22/2004 | 10/12/2004 | 39638H107 | GREENPOINT FINL CORP | 8,000 | $1,350.00 |
| 9/22/2004 | 10/1/2004 | 39638H107 | GREENPOINT FINL CORP | 81,900 | $9,150.00 |
| 9/22/2004 | 10/1/2004 | 39638H107 | GREENPOINT FINL CORP | 730,300 | $83,500.00 |
| 9/22/2004 | 11/3/2004 | 00884U104 | ADESA INC | 597,300 | $0.00 |
| 9/22/2004 | 11/3/2004 | 56256110 | MANDALAY RESORT GROUP | 450,000 | $0.00 |
| 9/22/2004 | 10/3/2004 | 56256110 | MANDALAY RESORT GROUP | 450,000 | $0.00 |
| 9/22/2004 | 10/15/2004 | 02209N102 | ALTRIA GROUP INC | 7,500 | $0.00 |
| 9/22/2004 | 11/8/2004 | 564738105 | IRESOURCE INC | 370,700 | $0.00 |
| 9/22/2004 | 2/15/2005 | 88556Y107 | ORBCB INC NEW | 612,500 | $479,500.00 |
| 9/22/2004 | 12/7/2004 | 88221T100 | IPR CORP | 1,054,500 | $0.00 |
| 9/22/2004 | 10/28/2004 | 80089M102 | SCANA CORP NEW | 305,400 | $0.00 |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001350

922

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| | | | | | |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001351

923

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001352

924

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| 11/9/2004 | 2/9/2005 | 023561401 | AMERADA HESS CORP CVT PFD 7.02%($3.50) EXCHANGE TO CUSIP 426109 C08 | 100,000 | $87,500.00 |
| 11/8/2004 | 12/15/2004 | 067021102 | BOEING CO | 214,000 | $42,800.00 |
| 11/8/2004 | 12/17/2004 | 060505104 | BANK OF AMERICA CORP | 10,000 | $4,500.00 |
| 11/8/2004 | 12/8/2004 | 210795308 | CONTINENTAL AIRLINES INC CL B | 2,235,716 | $0.00 |
| 11/9/2004 | 12/8/2004 | 12508B802 | CMS ENERGY CORP CVT PFD 4.50%($2.25) PARTIAL EXCH TO 125893176 | 151,250 | $48,078.13 |
| 11/9/2004 | 11/19/2004 | 20825P109 | CONSOL ENERGY INC | 25,250 | $7,377.50 |
| 11/8/2004 | 12/15/2004 | 25459810 | DUKE ENERGY CORP | 180,000 | $52,200.00 |
| 11/8/2004 | 12/16/2004 | 29449E102 | EQUITABLE RESOURCES INC | 25,000 | $4,750.00 |
| 11/9/2004 | 12/16/2004 | 30161N101 | EXELON CORP | 204,410 | $81,764.00 |
| 11/8/2004 | 11/16/2004 | 739910109 | REEBOK INTL LTD | 3,250 | $0.00 |
| 11/9/2004 | 12/15/2004 | 931422308 | WALGREEN CO NEW | 500,000 | $36,250.00 |
| 11/8/2004 | 12/15/2004 | 983024107 | WYETH | 300,000 | $69,000.00 |
| 11/9/2004 | 2/28/2005 | 12754P101 | CAESARS ENTERTAINMENT INC | 2,500,000 | $0.00 |
| 11/9/2004 | 11/15/2004 | 29449E100 | EQUITABLE RESOURCES INC | 147,500 | $28,025.00 |
| 11/9/2004 | 12/16/2004 | 30161N101 | EXELON CORP | 50,000 | $20,000.00 |
| 11/8/2004 | 11/15/2004 | 776721100 | ROUSE CO | 26,400 | $48,268.82 |
| 11/9/2004 | 2/9/2005 | 53015K504 | LIBERTY ALL-STAR EQUITY FD | 45,000 | $18,800.00 |
| 11/9/2004 | 2/9/2005 | 53015K504 | LIBERTY ALL-STAR EQUITY FD | 225,000 | $96,000.00 |
| 11/9/2004 | 11/22/2004 | 02290B102 | AMERGEN CORP | 255,140 | $0.00 |
| 11/10/2004 | 3/3/2005 | 228221401 | CROWN CASTLE INTL CONV. PFD. 8.25% | 283,764 | $0.00 |
| 11/10/2004 | 11/16/2004 | 29449E100 | EQUITABLE RESOURCES INC | 104,700 | $19,893.00 |
| 11/10/2004 | 12/17/2004 | 379402507 | GLOBAL PAYMENTS INC | 275,000 | $6,600.00 |
| 11/10/2004 | 11/21/2005 | 718076103 | PHARMOS FUND INC | 250,000 | $0.00 |
| 11/11/2004 | 11/15/2004 | 29356N104 | ENERGEN CORP | 560,900 | $56,382.88 |
| 11/12/2004 | 11/16/2004 | 29356N104 | EMERGEN CORP | 325,900 | $81,540.36 |
| 11/12/2004 | 12/17/2004 | 56064R301 | MARATHON OIL CORP | 817,621 | $156,805.86 |
| 11/15/2004 | 11/23/2004 | 228221104 | CPI CORP CL A | 19,581 | $0.00 |
| 11/15/2004 | 12/23/2004 | 166764102 | CHEVRON CORP | 300,000 | $120,000.00 |
| 11/15/2004 | 11/16/2004 | 29356N104 | ENERGEN CORP | 485,900 | $48,787.68 |
| 11/15/2004 | 12/23/2004 | 78352F207 | GABELLI ASSET MANAGEMENT PRFDS | 408,900 | $0.00 |
| 11/15/2004 | 2/22/2005 | 435686108 | HOLLINGER INTERNATIONAL INC CL A | 350,000 | $1,925,000.00 |
| 11/15/2004 | 2/22/2005 | 435686108 | HOLLINGER INTERNATIONAL INC CL A | 150,000 | $825,000.00 |
| 11/15/2004 | 11/23/2004 | 398337312 | HM COMPANY | 90,000 | $32,400.00 |
| 11/16/2004 | 11/22/2004 | 20825P109 | CONSOL ENERGY INC | 3,250 | $0.00 |
| 11/16/2004 | 11/26/2004 | 25746U109 | DOMINION RESOURCES INC VA NEW | 38,400 | $0.00 |
| 11/16/2004 | 11/22/2004 | 29356N104 | ENERGEN CORP | 449,800 | $0.00 |
| 11/18/2004 | 2/22/2005 | 530514102 | LIBERTY MEDIA CORP A | 500,000 | $0.00 |
| 11/16/2004 | 11/26/2004 | 666807102 | NORTHROP GRUMMAN CORP | 76,492 | $0.00 |
| 11/16/2004 | 11/26/2004 | 666807102 | NORTHROP GRUMMAN CORP | 76,492 | $0.00 |
| 11/16/2004 | 11/29/2004 | 71647F101 | TRIZEC PROPERTIES INC | 100,000 | $0.00 |
| 11/16/2004 | 11/29/2004 | 71647F101 | TRIZEC PROPERTIES INC | 100,000 | $0.00 |
| 11/17/2004 | 1/26/2004 | 02290B102 | AMERGEN CORP | 248,160 | $157,681.50 |
| 11/17/2004 | 11/23/2004 | 29356N104 | ENERGEN CORP | 471,300 | $0.00 |
| 11/17/2004 | 11/23/2005 | 37661F109 | GOLD BANC CORP | 53,700 | $11,486.00 |
| 11/17/2004 | 1/26/2005 | 532861102 | ICI INC | 2,929,000 | $1,171,250.00 |
| 11/17/2004 | 10/25/2005 | 90114M004 | THE MILLS CORP CVT PFD 8.75% DTD 09/23/2004 RULE 144A | 1,500 | $61,687.00 |
| 11/17/2004 | 12/14/2004 | 70213F107 | PARTNERS TRUST FINANCIAL GROUP NEW | 100,521 | $0.00 |
| 11/17/2004 | 12/23/2004 | 744320102 | PRUDENTIAL FINANCIAL INC | 207,600 | $129,375.00 |
| 11/18/2004 | 11/23/2004 | 29356N104 | ENERGEN CORP | 269,400 | $0.00 |
| 11/18/2004 | 11/24/2004 | 02290B102 | AMERGEN CORP | 243,400 | $0.00 |
| 11/18/2004 | 11/26/2004 | 37661F109 | GOLD BANC CORP | 2,500 | $453.60 |
| 11/18/2004 | 4/19/2005 | 00846U101 | ADESA INC | 316,800 | $53,256.00 |
| 11/18/2004 | 7/20/2005 | 80086M107 | SCANA CORP NEW | 214,900 | $245,030.00 |
| 11/18/2004 | 11/24/2004 | 745338105 | QUESTAR CORP | 347,000 | $74,905.00 |
| 11/18/2004 | 1/29/2004 | 74439E107 | US WEST INC | 61,000 | $13,115.00 |
| 11/18/2004 | 12/15/2004 | 957616702 | WESTAR ENERGY INC | 191,500 | $43,100.00 |
| 11/18/2004 | 1/26/2004 | 29356N104 | ENERGEN CORP | 185,402 | $0.00 |
| 11/18/2004 | 11/26/2004 | 37661F109 | GOLD BANC CORP | 2,500 | $630.00 |
| 11/18/2004 | 74439E107 | 74439E107 | QUESTAR CORP | 342,000 | $73,530.00 |
| 11/22/2004 | 12/8/2004 | 165167107 | CHESAPEAKE ENERGY CORP | 542,000 | $73,530.00 |
| 11/22/2004 | 1/26/2005 | 204110107 | COMPASS MINERALS INTL INC | 224,000 | $0.00 |
| 11/22/2004 | 1/3/2005 | 220811109 | DANA CORP | 10,000 | $2,500.00 |
| 11/22/2004 | 1/1/2005 | 251561102 | DEVELOPERS DIVERSIFIED RLTY CP CORP | 10,000 | $3,100.00 |
| 11/22/2004 | 1/3/2005 | 302577107 | FPL GROUP INC | 181,760 | $54,998.40 |
| 11/22/2004 | 1/20/2005 | 364720101 | GANNETT CO INC | 5,000 | $1,350.00 |
| 11/22/2004 | 11/25/2005 | 379857107 | GOLD BANC CORP | 28,500 | $5,216.40 |
| 11/22/2004 | 12/27/2004 | 44107P104 | HOST HOTELS & RESORTS INC | 88,500 | $4,417.50 |
| 11/22/2004 | 1/6/2005 | 191216100 | COCA-COLA CO | 148,413 | $36,103.75 |
| 11/22/2004 | 3/14/2005 | 552624304 | MBNA CORP | 198,413 | $36,103.75 |
| 11/22/2004 | 1/3/2005 | 521865106 | LEAR CORP | 10,000 | $2,800.00 |
| 11/22/2004 | 1/3/2005 | 539830109 | LOCKHEED MARTIN CORP | 100,000 | $20,000.00 |
| 11/22/2004 | 1/3/2005 | 600544107 | MILLER HERMAN INC | 114,700 | $38,875.00 |
| 11/22/2004 | 1/26/2005 | 637640103 | NATIONAL SEMICONDUCTOR CORP | 338,470 | $25,844.06 |
| 11/22/2004 | 1/3/2005 | 758796102 | REGAL ENTERTAINMENT GROUP CL A | 10,000 | $300.50 |
| 11/22/2004 | 7/7/2005 | 758796109 | REGAL ENTERTAINMENT GROUP CL A | 85,000 | $19,550.00 |
| 11/22/2004 | 1/3/2005 | 758796102 | REGAL ENTERTAINMENT GROUP CL A | 13,300 | $17,920.00 |
| 11/22/2004 | 1/3/2005 | 762438102 | RACKSPACE CORP | 181,100 | $163,071.50 |
| 11/22/2004 | 1/3/2005 | 783612103 | SBC COMMUNICATIONS INC | 500,000 | $150,000.00 |
| 11/22/2004 | 1/3/2005 | 690344102 | OVERSTOCK.COM | 80,000 | $0.00 |
| 11/22/2004 | 11/29/2004 | 71647F107 | TRIZEC PROPERTIES INC | 261,400 | $38,210.00 |
| 11/22/2004 | 11/29/2004 | 71647F107 | TRIZEC PROPERTIES INC | 80,000 | $0.00 |
| 11/22/2004 | 11/29/2004 | 971855100 | TAU CORP | 80,000 | $0.00 |
| 11/22/2004 | 12/7/2004 | 973165107 | TAU CORP | 1,411,200 | $0.00 |
| 11/22/2004 | 1/3/2005 | 92990U010 | WACHOVIA CORP 2ND NEW | 284,900 | $74,406.45 |
| 11/22/2004 | 1/3/2005 | 02616A100 | DOMINION RESOURCES INC VA NEW | 150,000 | $69,000.00 |
| 11/23/2004 | 2/4/2005 | 263534108 | DU PONT CORP | 104,000 | $89,595.00 |
| 11/23/2004 | 3/4/2005 | 263534108 | DU PONT CORP | 6,250 | $600.00 |
| 11/23/2004 | 11/29/2004 | 71647F107 | TRIZEC PROPERTIES INC | 176,250 | $14,100.00 |
| 11/23/2004 | 2/22/2005 | 435686108 | HOLLINGER INTERNATIONAL INC CL A | 2,400 | $441.00 |
| 11/23/2004 | 2/22/2005 | 435686108 | HOLLINGER INTERNATIONAL INC CL A | 560,000 | $3,080,000.00 |
| 11/23/2004 | 1/5/2005 | 72766MAA1 | PLATINUM UNDERWRITERS CVT PFD 7.00%($1.75) DTD 11/01/2002 | 84,100 | $1,300,502.50 |
| 11/23/2004 | 11/30/2004 | 71647F107 | TRIZEC PROPERTIES INC | 81,800 | $0.00 |
| 11/23/2004 | 11/30/2004 | 71647F107 | TRIZEC PROPERTIES INC | 81,700 | $0.00 |
| 11/23/2004 | 12/7/2004 | 973165100 | TXU CORP | 1,506,200 | $373,325.10 |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001353

925

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001354

926

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PS/WHTAX001355

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001356

928

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001357

929

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001358

| Inception Date | TerminationDate | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| 2/22/2005 | 2/23/2006 | '369604103' | GENERAL ELECTRIC CO | 12,000 | $10,920.00 |
| 2/22/2005 | 4/6/2005 | '577778103' | MAY DEPARTMENT STORES CO | 16,188 | $3,961.16 |
| 2/22/2005 | 8/8/2005 | '577778103' | MAY DEPARTMENT STORES CO | 170,907 | $83,744.43 |
| 2/22/2005 | 8/8/2005 | '577778103' | MAY DEPARTMENT STORES CO | 221,262 | $108,418.38 |
| 2/22/2005 | 1/9/2006 | '552691107' | MCI INC | 998,542 | $5,991,252.00 |
| 2/22/2005 | 1/9/2006 | '552691107' | MCI INC | 1,583,689 | $9,502,134.00 |
| 2/22/2005 | 6/8/2005 | '55972F203' | MAGNUM HUNTER RESOURCES INC | 200,000 | $0.00 |
| 2/22/2005 | 4/15/2006 | '88579Y101' | 3M COMPANY | 12,000 | $5,040.00 |
| 2/22/2005 | 3/4/2005 | '651639106' | NEWMONT MINING CORP | 32,500 | $0.00 |
| 2/22/2005 | 4/7/2005 | '717081103' | PFIZER INC | 131,250 | $0.00 |
| 2/22/2005 | 4/27/2005 | '770323103' | ROBERT HALF INTERNATIONAL INC | 3,000 | $210.00 |
| 2/23/2005 | 9/2/2006 | '060505104' | BANK OF AMERICA CORP | 30,800 | $27,720.00 |
| 2/23/2005 | 6/2/2005 | '079860102' | BELLSOUTH CORP | 200,000 | $64,000.00 |
| 2/23/2005 | 3/1/2006 | '127687101' | CAESARS ENTERTAINMENT INC | 1,500,000 | $0.00 |
| 2/23/2005 | 6/2/2005 | '46612J101' | JDS UNIPHASE CORP-OLD | 38,000 | $0.00 |
| 2/23/2005 | 4/6/2005 | '552691107' | MCI INC | 136,815 | $54,726.00 |
| 2/23/2005 | 6/8/2005 | '55972F203' | MAGNUM HUNTER RESOURCES INC | 300,000 | $0.00 |
| 2/23/2005 | 4/18/2005 | '589331107' | MERCK & CO INC | 25,000 | $9,500.00 |
| 2/23/2005 | 2/16/2006 | '589331107' | MERCK & CO INC | 22,500 | $34,200.00 |
| 2/23/2005 | 3/3/2006 | '64128G109' | NEUBERGER BERMAN RLTY INCOME FD INC | 891 | $1,583.37 |
| 2/23/2005 | 3/3/2006 | '64128G109' | NEUBERGER BERMAN RLTY INCOME FD INC | 1,068 | $1,898.82 |
| 2/23/2005 | 6/16/2005 | '717081103' | PFIZER INC | 37,500 | $7,125.00 |
| 2/23/2005 | 3/10/2005 | '60871R209' | MOLSON COORS BREWING CO CL B | 106,400 | $34,048.00 |
| 2/23/2005 | 3/10/2005 | '60871R209' | MOLSON COORS BREWING CO CL B | 319,200 | $102,144.00 |
| 2/24/2005 | 3/31/2006 | '060505104' | BANK OF AMERICA CORP | 950,000 | $427,500.00 |
| 2/24/2005 | 3/2/2005 | '127687101' | CAESARS ENTERTAINMENT INC | 500,000 | $0.00 |
| 2/24/2005 | 3/2/2005 | '256069105' | DOBSON COMMUNICATIONS CORP CLA | 57,021 | $0.00 |
| 2/24/2005 | 3/2/2005 | '256069105' | DOBSON COMMUNICATIONS CORP CLA | 19,008 | $0.00 |
| 2/24/2005 | 10/4/2005 | '28336L109' | EL PASO CORP | 96,475 | $11,577.00 |
| 2/24/2005 | 10/5/2005 | '28336L109' | EL PASO CORP | 242,815 | $29,137.80 |
| 2/24/2005 | 3/8/2005 | '552691107' | MCI INC | 1,360,000 | $544,000.00 |
| 2/24/2005 | 4/8/2005 | '552691107' | MCI INC | 45,241 | $18,096.40 |
| 2/24/2005 | 4/11/2005 | '552691107' | MCI INC | 337,500 | $138,000.00 |
| 2/24/2005 | 1/9/2006 | '552691107' | MCI INC | 463,717 | $2,782,302.00 |
| 2/24/2005 | 1/9/2006 | '552691107' | MCI INC | 621,774 | $3,730,644.00 |
| 2/24/2005 | 6/8/2005 | '55972F203' | MAGNUM HUNTER RESOURCES INC | 75,500 | $0.00 |
| 2/24/2005 | 10/3/2005 | '758766109' | REGAL ENTERTAINMENT GROUP CL A | 500 | $450.00 |
| 2/24/2005 | 10/5/2005 | '758766109' | REGAL ENTERTAINMENT GROUP CL A | 5,000 | $4,500.00 |
| 2/24/2005 | 10/5/2005 | '758766109' | REGAL ENTERTAINMENT GROUP CL A | 34,500 | $31,050.00 |
| 2/24/2005 | 8/1/2005 | '879868107' | TEMPLE INLAND INC | 41,000 | $18,450.00 |
| 2/24/2005 | 8/1/2005 | '879868107' | TEMPLE INLAND INC | 55,000 | $24,750.00 |
| 2/24/2005 | 5/19/2005 | '873168108' | TXU CORP | 114,300 | $32,175.45 |
| 2/24/2005 | 8/19/2006 | '873168108' | TXU CORP | 582,700 | $182,180.05 |
| 2/25/2005 | 3/3/2005 | '20854P109' | CONSOL ENERGY INC | 84,250 | $0.00 |
| 2/25/2005 | 3/3/2005 | '127687101' | CAESARS ENTERTAINMENT INC | 2,060,000 | $0.00 |
| 2/25/2005 | 5/25/2005 | '256069105' | DOBSON COMMUNICATIONS CORP CLA | 38,271 | $0.00 |
| 2/25/2005 | 5/26/2005 | '256069105' | DOBSON COMMUNICATIONS CORP CLA | 12,756 | $0.00 |
| 2/25/2005 | 6/8/2005 | '55972F203' | MAGNUM HUNTER RESOURCES INC | 8,000 | $0.00 |
| 2/25/2005 | 6/16/2005 | '717081103' | PFIZER INC | 37,500 | $7,125.00 |
| 2/25/2005 | 3/4/2005 | '69351T106' | PPL CORP | 216,050 | $0.00 |
| 2/25/2005 | 3/8/2005 | '69351T106' | PPL CORP | 681,250 | $0.00 |
| 2/25/2005 | 3/11/2005 | '758110100' | REEBOK INTL LTD | 24,975 | $3,746.25 |
| 2/25/2005 | 8/1/2005 | '95988E204' | WESTERN WIRELESS CORP CL A | 36,000 | $0.00 |
| 2/28/2005 | 3/4/2005 | '228227401' | CROWN CASTLE INTL CONV. PFD. 6.25% | 233,764 | $0.00 |
| 2/28/2005 | 3/4/2005 | '20854P109' | CONSOL ENERGY INC | 71,750 | $0.00 |
| 2/28/2005 | 3/4/2005 | '127687101' | CAESARS ENTERTAINMENT INC | 1,050,000 | $0.00 |
| 2/28/2005 | 6/3/2005 | '44107P104' | HOST HOTELS & RESORTS INC | 4,000,000 | $320,000.00 |
| 2/28/2005 | 5/16/2005 | '70213F102' | PARTNERS TRUST FINANCIAL GROUP NEW | 25,483 | $1,782.41 |
| 2/28/2005 | 5/16/2005 | '70213F102' | PARTNERS TRUST FINANCIAL GROUP NEW | 208,789 | $14,615.23 |
| 2/28/2005 | 5/17/2005 | '81119Q100' | SCUDDER RREEF REAL ESTATE FD INC | 39,200 | $15,523.20 |
| 2/28/2005 | 3/24/2005 | '868168105' | SUPERIOR INDUSTRIES INTL INC | 23,000 | $0.00 |
| 3/1/2005 | 4/8/2005 | '026874107' | AMERICAN INTL GROUP INC | 12,000 | $1,500.00 |
| 3/1/2005 | 10/17/2005 | '020002101' | ALLSTATE CORP | 5,800 | $5,376.00 |
| 3/1/2005 | 4/7/2005 | '228227401' | CROWN CASTLE INTL CONV. PFD. 6.25% | 183,764 | $0.00 |
| 3/1/2005 | 3/18/2005 | '20854P109' | CONSOL ENERGY INC | 46,750 | $0.00 |
| 3/1/2005 | 3/11/2005 | '127687101' | CAESARS ENTERTAINMENT INC | 250,000 | $0.00 |
| 3/1/2005 | 7/25/2005 | '29412E100' | EON LABS INC | 1,500,000 | $0.00 |
| 3/1/2005 | 7/25/2005 | '29412E100' | EON LABS INC | 500,000 | $0.00 |
| 3/1/2005 | 3/8/2005 | '28336L109' | EL PASO CORP | 217,480 | $8,699.20 |
| 3/1/2005 | 3/8/2005 | '28336L109' | EL PASO CORP | 580,900 | $23,236.00 |
| 3/1/2005 | 3/8/2005 | '28336L109' | EL PASO CORP | 2,382,894 | $95,315.76 |
| 3/1/2005 | 10/17/2005 | '316326107' | FIDELITY NATIONAL FINANCIAL | 12,100 | $0.00 |
| 3/1/2005 | 6/8/2005 | '55972F203' | MAGNUM HUNTER RESOURCES INC | 75,000 | $0.00 |
| 3/1/2005 | 3/7/2005 | '651639106' | NEWMONT MINING CORP | 27,000 | $0.00 |
| 3/1/2005 | 3/9/2005 | '69351T106' | PPL CORP | 213,300 | $0.00 |
| 3/1/2005 | 7/22/2005 | '852061100' | SPRINT NEXTEL CORP | 1,417,500 | $354,375.00 |
| 3/1/2005 | 1/17/2006 | '78442P106' | SLM CORP | 15,000 | $12,750.00 |
| 3/1/2005 | 9/7/2005 | '792860108' | ST PAUL TRAVELERS COS INC | 15,100 | $3,322.00 |
| 3/1/2005 | 3/30/2005 | '91729Q101' | USF CORP | 250,000 | $23,333.25 |
| 3/1/2005 | 8/1/2005 | '95988E204' | WESTERN WIRELESS CORP CL A | 150,000 | $0.00 |
| 3/2/2005 | 6/8/2005 | '55972F203' | MAGNUM HUNTER RESOURCES INC | 111,400 | $0.00 |
| 3/2/2005 | 3/10/2005 | '69351T106' | PPL CORP | 208,500 | $47,955.00 |
| 3/2/2005 | 3/11/2005 | '69351T106' | PPL CORP | 921,060 | $211,841.50 |
| 3/2/2005 | 8/1/2005 | '95988E204' | WESTERN WIRELESS CORP CL A | 250,000 | $0.00 |
| 3/3/2005 | 3/9/2005 | '210795308' | CONTINENTAL AIRLINES INC CL B | 535,716 | $0.00 |
| 3/3/2005 | 3/10/2005 | '28336L109' | EL PASO CORP | 187,385 | $7,495.40 |
| 3/3/2005 | 3/10/2005 | '28336L109' | EL PASO CORP | 528,370 | $21,134.80 |
| 3/3/2005 | 3/10/2005 | '28336L109' | EL PASO CORP | 2,070,519 | $82,820.76 |
| 3/3/2005 | 3/18/2005 | '552691107' | MCI INC | 380,000 | $0.00 |
| 3/3/2005 | 6/8/2005 | '55972F203' | MAGNUM HUNTER RESOURCES INC | 205,000 | $0.00 |
| 3/3/2005 | 2/3/2006 | '64128G109' | NEUBERGER BERMAN RLTY INCOME FD INC | 285,700 | $467,579.03 |
| 3/3/2005 | 3/9/2005 | '69351T106' | PPL CORP | 676,250 | $0.00 |
| 3/3/2005 | 8/2/2005 | '852061100' | SPRINT NEXTEL CORP | 1,000,000 | $250,000.00 |
| 3/3/2005 | 8/1/2005 | '95988E204' | WESTERN WIRELESS CORP CL A | 80,000 | $0.00 |
| 3/3/2005 | 3/27/2006 | '76195Q919' | RESOURCES CAPITAL CORP REG S | 600,000 | $0.00 |
| 3/3/2005 | 3/27/2006 | '76195Q919' | RESOURCES CAPITAL CORP REG S | 80,000 | $0.00 |
| 3/4/2005 | 6/27/2005 | '023608102' | AMEREN CORP | 25,000 | $31,750.00 |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

| Inception Date | TerminationDate | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| 3/4/2005 | 7/8/2005 | '019589704' | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 90,000 | $35,155.80 |
| 3/4/2005 | 10/28/2005 | '019589704' | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 15,000 | $64,453.05 |
| 3/4/2005 | 10/28/2005 | '019589704' | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 5,000 | $21,484.35 |
| 3/4/2005 | 10/28/2005 | '019589704' | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 6,000 | $25,781.22 |
| 3/4/2005 | 10/28/2005 | '019589704' | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 40,000 | $171,874.80 |
| 3/4/2005 | 10/28/2005 | '019589704' | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 20,000 | $85,937.40 |
| 3/4/2005 | 10/28/2005 | '019589704' | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 15,000 | $64,453.05 |
| 3/4/2005 | 10/28/2005 | '019589704' | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 17,500 | $75,195.23 |
| 3/4/2005 | 10/28/2005 | '019589704' | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 67,000 | $287,890.29 |
| 3/4/2005 | 10/28/2005 | '019589704' | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 37,450 | $160,917.78 |
| 3/4/2005 | 3/16/2005 | '210795308' | CONTINENTAL AIRLINES INC CL B | 265,716 | $0.00 |
| 3/4/2005 | 3/18/2005 | '20854P109' | CONSOL ENERGY INC | 12,500 | $0.00 |
| 3/4/2005 | 3/31/2005 | '133131102' | CAMDEN PROPERTY TRUST SBI | 188,236 | $41,170.78 |
| 3/4/2005 | 3/31/2005 | '133131102' | CAMDEN PROPERTY TRUST SBI | 95,241 | $20,831.11 |
| 3/4/2005 | 9/7/2005 | '55262L100' | MBNA CORP | 21,500 | $8,020.00 |
| 3/4/2005 | 10/28/2005 | '529043309' | LEXINGTON CORP CVB PFD DIV 6.50% ($3.25) DTD 12/08/2004 | 200 | $144.00 |
| 3/4/2005 | 9/12/2005 | '02209S103' | ALTRIA GROUP INC | 15,300 | $22,338.00 |
| 3/4/2005 | 3/7/2005 | '69351T106' | PPL CORP | 929,550 | $0.00 |
| 3/4/2005 | 3/7/2005 | '69351T106' | PPL CORP | 210,000 | $0.00 |
| 3/4/2005 | 3/15/2005 | '758110100' | REEBOK INTL LTD | 17,550 | $2,632.50 |
| 3/4/2005 | 3/4/2005 | '866239106' | SUMMIT PROPERTIES INC | 241,283 | $0.00 |
| 3/4/2005 | 3/4/2005 | '866239106' | SUMMIT PROPERTIES INC | 122,084 | $0.00 |
| 3/4/2005 | 3/11/2005 | '873168108' | TXU CORP | 12,000 | $0.00 |
| 3/4/2005 | 4/22/2005 | '95709T100' | WESTAR ENERGY INC | 15,000 | $3,450.00 |
| 3/4/2005 | 8/1/2005 | '95988E204' | WESTERN WIRELESS CORP CL A | 100,000 | $0.00 |
| 3/7/2005 | 10/28/2005 | '019589704' | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 30,000 | $128,906.10 |
| 3/7/2005 | 10/28/2005 | '019589704' | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 5,000 | $21,484.35 |
| 3/7/2005 | 8/11/2005 | '87235A101' | TD BANKNORTH INC | 18,865 | $7,923.30 |
| 3/7/2005 | 6/14/2005 | '28336L109' | EL PASO CORP | 172,060 | $6,882.00 |
| 3/7/2005 | 6/14/2005 | '28336L109' | EL PASO CORP | 501,605 | $20,064.20 |
| 3/7/2005 | 6/14/2005 | '28336L109' | EL PASO CORP | 1,915,119 | $76,604.76 |
| 3/7/2005 | 6/6/2005 | '55972F203' | MAGNUM HUNTER RESOURCES INC | 130,000 | $0.00 |
| 3/7/2005 | 4/6/2005 | '65248E104' | NEWS CORP CLASS A | 2,000,000 | $360,000.00 |
| 3/7/2005 | 3/11/2005 | '69351T106' | PPL CORP | 206,200 | $47,426.00 |
| 3/7/2005 | 4/18/2005 | '69351T106' | PPL CORP | 50 | $11.50 |
| 3/7/2005 | 3/11/2005 | '95709T100' | WESTAR ENERGY INC | 164,000 | $0.00 |
| 3/7/2005 | 8/1/2005 | '95988E204' | WESTERN WIRELESS CORP CL A | 90,000 | $0.00 |
| 3/8/2005 | 10/28/2005 | '019589704' | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 20,000 | $85,937.40 |
| 3/8/2005 | 10/28/2005 | '019589704' | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 21,270 | $91,394.42 |
| 3/8/2005 | 4/5/2005 | '36239Q109' | GABELLI GLOBAL MULTIMEDIA TR | 132,500 | $80,825.00 |
| 3/8/2005 | 6/6/2005 | '55972F203' | MAGNUM HUNTER RESOURCES INC | 130,000 | $0.00 |
| 3/8/2005 | 3/16/2005 | '69351T106' | PPL CORP | 205,400 | $47,242.00 |
| 3/8/2005 | 3/16/2005 | '69351T106' | PPL CORP | 916,850 | $210,875.50 |
| 3/8/2005 | 6/7/2005 | '745769109' | PULITZER INC | 400,000 | $80,000.00 |
| 3/8/2005 | 3/15/2005 | '758110100' | REEBOK INTL LTD | 9,750 | $0.00 |
| 3/8/2005 | 3/3/2006 | '81119R108' | SCUDDER RREEF REAL ESTATE II | 3,300 | $7,260.00 |
| 3/8/2005 | 4/28/2005 | '873168108' | TXU CORP | 12,750 | $0.00 |
| 3/8/2005 | 4/28/2005 | '873168108' | TXU CORP | 1,300 | $0.00 |
| 3/8/2005 | 2/3/2006 | '19248A109' | COHEN & STEERS SELECT UTILITY FUND INC | 13,700 | $14,864.50 |
| 3/8/2005 | 3/17/2005 | '95709T100' | WESTAR ENERGY INC | 109,000 | $0.00 |
| 3/8/2005 | 8/1/2005 | '95988E204' | WESTERN WIRELESS CORP CL A | 250,000 | $0.00 |
| 3/9/2005 | 10/28/2005 | '019589704' | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 3,500 | $15,039.05 |
| 3/9/2005 | 3/27/2006 | '229393103' | CRYSTAL RIVER CAPITAL INC RULE 144A | 125,000 | $0.00 |
| 3/9/2005 | 3/27/2006 | '229393103' | CRYSTAL RIVER CAPITAL INC RULE 144A | 125,000 | $0.00 |
| 3/9/2005 | 4/22/2005 | '278865100' | ECOLAB INC | 55,000 | $4,812.50 |
| 3/9/2005 | 3/18/2005 | '55262L100' | MBNA CORP | 57,500 | $8,050.00 |
| 3/9/2005 | 6/6/2005 | '55972F203' | MAGNUM HUNTER RESOURCES INC | 125,700 | $0.00 |
| 3/9/2005 | 8/25/2005 | '02209S103' | ALTRIA GROUP INC | 430,506 | $628,538.76 |
| 3/9/2005 | 2/3/2006 | '00888R107' | AIM SELECT REAL ESTATE INCOME FD | 188,400 | $502,963.12 |
| 3/9/2005 | 4/8/2005 | '832110100' | SMITH INTERNATIONAL INC DE | 12,000 | $720.00 |
| 3/9/2005 | 5/20/2005 | '748356102' | QUESTAR CORP | 82,700 | $0.00 |
| 3/9/2005 | 5/23/2005 | '748356102' | QUESTAR CORP | 8,800 | $0.00 |
| 3/9/2005 | 5/20/2005 | '873168108' | TXU CORP | 7,500 | $0.00 |
| 3/9/2005 | 5/20/2005 | '873168108' | TXU CORP | 42,600 | $0.00 |
| 3/9/2005 | 10/5/2005 | '895436103' | TRI CONTINENTAL CORP | 275,900 | $46,903.00 |
| 3/9/2005 | 8/1/2005 | '95988E204' | WESTERN WIRELESS CORP CL A | 180,000 | $0.00 |
| 3/10/2005 | 5/27/2005 | '55972F203' | MAGNUM HUNTER RESOURCES INC | 400,000 | $0.00 |
| 3/10/2005 | 6/6/2005 | '55972F203' | MAGNUM HUNTER RESOURCES INC | 130,000 | $0.00 |
| 3/10/2005 | 3/17/2005 | '69331C108' | P G & E CORPORATION | 103,100 | $0.00 |
| 3/10/2005 | 3/17/2005 | '69331C108' | P G & E CORPORATION | 586,900 | $0.00 |
| 3/10/2005 | 7/5/2005 | '748356102' | QUESTAR CORP | 5,000 | $1,125.00 |
| 3/10/2005 | 7/8/2005 | '748356102' | QUESTAR CORP | 30,000 | $6,750.00 |
| 3/11/2005 | 6/22/2005 | '401698105' | GUIDANT CORP | 574,400 | $57,440.00 |
| 3/11/2005 | 6/6/2005 | '55972F203' | MAGNUM HUNTER RESOURCES INC | 30,600 | $0.00 |
| 3/11/2005 | 3/17/2005 | '69351T106' | PPL CORP | 902,350 | $0.00 |
| 3/11/2005 | 3/17/2005 | '69351T106' | PPL CORP | 202,900 | $0.00 |
| 3/11/2005 | 6/6/2005 | '78462F103' | UTS SPDR TRUST SER 1 | 79,500 | $37,133.88 |
| 3/11/2005 | 3/3/2006 | '81119R108' | SCUDDER RREEF REAL ESTATE II | 19,500 | $38,300.00 |
| 3/14/2005 | 4/28/2005 | '29364G103' | ENTERGY CORPORATION-NEW | 241,100 | $0.00 |
| 3/14/2005 | 4/28/2005 | '29364G103' | ENTERGY CORPORATION-NEW | 41,900 | $0.00 |
| 3/14/2005 | 6/1/2005 | '52729N100' | LEVEL 3 COMMUNICATIONS INC | 7,420 | $0.00 |
| 3/14/2005 | 6/1/2005 | '52729N100' | LEVEL 3 COMMUNICATIONS INC | 3,910 | $0.00 |
| 3/14/2005 | 6/1/2005 | '52729N100' | LEVEL 3 COMMUNICATIONS INC | 2,780 | $0.00 |
| 3/14/2005 | 6/1/2005 | '52729N100' | LEVEL 3 COMMUNICATIONS INC | 4,180 | $0.00 |
| 3/14/2005 | 6/1/2005 | '52729N100' | LEVEL 3 COMMUNICATIONS INC | 3,040 | $0.00 |
| 3/14/2005 | 6/1/2005 | '52729N100' | LEVEL 3 COMMUNICATIONS INC | 2,180 | $0.00 |
| 3/14/2005 | 6/1/2005 | '52729N100' | LEVEL 3 COMMUNICATIONS INC | 300,000 | $0.00 |
| 3/14/2005 | 6/1/2005 | '52729N100' | LEVEL 3 COMMUNICATIONS INC | 20,920 | $0.00 |
| 3/14/2005 | 6/1/2005 | '52729N100' | LEVEL 3 COMMUNICATIONS INC | 55,570 | $0.00 |
| 3/14/2005 | 6/6/2005 | '55972F203' | MAGNUM HUNTER RESOURCES INC | 80,000 | $0.00 |
| 3/14/2005 | 4/18/2005 | '69331C108' | P G & E CORPORATION | 101,600 | $30,480.00 |
| 3/14/2005 | 4/18/2005 | '69331C108' | P G & E CORPORATION | 578,400 | $173,520.00 |
| 3/14/2005 | 3/18/2005 | '69351T106' | PPL CORP | 898,350 | $0.00 |
| 3/14/2005 | 3/18/2005 | '69351T106' | PPL CORP | 196,900 | $0.00 |
| 3/14/2005 | 3/14/2005 | '70213A103' | PARTNERS TRUST FINANCIAL GROUP INC | 193,310 | $0.00 |
| 3/14/2005 | 3/14/2005 | '70213A103' | PARTNERS TRUST FINANCIAL GROUP INC | 44,243 | $0.00 |
| 3/14/2005 | 3/14/2005 | '70213A103' | PARTNERS TRUST FINANCIAL GROUP INC | 435,981 | $0.00 |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

932

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001361

933

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001362

934

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001363

| Inception Date | TerminationDate | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| 4/22/2005 | 7/8/2005 | 64044P207 | NEW YORK COMMUNITIES CAPITAL TRUST V(BONUSES) 8.00% DTD 11/04/2002 | 202,100 | $0.00 |
| 4/22/2005 | 9/2/2005 | 690397001 | OVERSTOCK COM INC DEL | 200,500 | $0.00 |
| 4/22/2005 | 4/29/2005 | 74435E102 | QUESTAR CORP | 2,500 | $0.00 |
| 4/22/2005 | 4/29/2005 | 74435E102 | QUESTAR CORP | 31,500 | $0.00 |
| 4/22/2005 | 10/3/2005 | 00187T109 | AT&T CORP-NEW | 500 | $191.25 |
| 4/22/2005 | 10/6/2005 | 00187T109 | AT&T CORP-NEW | 36,500 | $13,610.00 |
| 4/25/2005 | 7/1/2005 | 231020307 | CUMMINS ENGINE CVT PFD 7.00% ($3.50) RATE EFF. DATE 12/12/2011 | 56,000 | $43,750.00 |
| 4/25/2005 | 7/1/2005 | 231020307 | CUMMINS ENGINE CVT PFD 7.00% ($3.50) RATE EFF. DATE 12/12/2011 | 20,000 | $17,500.00 |
| 4/25/2005 | 7/1/2005 | 231020307 | CUMMINS ENGINE CVT PFD 7.00% ($3.50) RATE EFF. DATE 12/12/2011 | 25,000 | $21,875.00 |
| 4/25/2005 | 4/29/2005 | 29364G103 | ENTERGY CORPORATION-NEW | 202,100 | $0.00 |
| 4/25/2005 | 4/29/2005 | 29364G103 | ENTERGY CORPORATION-NEW | 34,900 | $0.00 |
| 4/25/2005 | 5/2/2005 | 375766102 | GILLETTE CO | 28,000 | $4,550.00 |
| 4/25/2005 | 5/4/2005 | 375766102 | GILLETTE CO | 474,359 | $77,083.34 |
| 4/25/2005 | 5/7/2005 | 375766102 | GILLETTE CO | 474,359 | $77,083.34 |
| 4/25/2005 | 5/17/2005 | 428656102 | HIBERNIA CORP CL A | 984,400 | $196,880.00 |
| 4/25/2005 | 5/7/2005 | 428656102 | HIBERNIA CORP CL A | 752,423 | $150,484.60 |
| 4/25/2005 | 7/8/2005 | 64044P207 | NEW YORK COMMUNITIES CAPITAL TRUST V(BONUSES) 8.00% DTD 11/04/2002 | 139,900 | $0.00 |
| 4/25/2005 | 5/9/2005 | 69351T106 | PPL CORP | 346,500 | $0.00 |
| 4/25/2005 | 5/9/2005 | 69351T106 | PPL CORP | 140,500 | $0.00 |
| 4/25/2005 | 10/26/2005 | 019589704 | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 2,000 | $5,781.74 |
| 4/26/2005 | 10/26/2005 | 019589704 | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 15,000 | $84,453.05 |
| 4/26/2005 | 8/31/2005 | 20648487 | CONSECO INC CVT PFD 5.50% ($1.375) | 100,600 | $34,375.00 |
| 4/26/2005 | 8/1/2005 | 13645R102 | ICU CORP | 100,000 | $0.00 |
| 4/26/2005 | 6/13/2005 | 263534102 | E I DU PONT DE NEMOURS & CO | 400,000 | $188,500.00 |
| 4/28/2005 | 8/24/2005 | 29364G103 | ENTERGY CORPORATION-NEW | 400 | $218.00 |
| 4/29/2005 | 8/24/2005 | 29364G103 | ENTERGY CORPORATION-NEW | 6,000 | $3,564.00 |
| 4/29/2005 | 7/28/2005 | 31428X108 | FEDEX CORP | 49,800 | $3,982.00 |
| 4/28/2005 | 10/3/2005 | 375766102 | GILLETTE CO | 2,791,337 | $144,275.10 |
| 4/28/2005 | 3/3/2008 | 544488108 | NEW GERMANY FUND INC | 45,000 | $24,750.00 |
| 4/29/2005 | 5/6/2005 | 404119109 | HCA INC | 1,225,000 | $183,750.00 |
| 4/28/2005 | 10/26/2005 | 443785109 | HUDSON HIGHLAND GROUP INC | 12,700 | $0.00 |
| 4/28/2005 | 5/3/2005 | 585055109 | MEDTRONIC INC | 154,500 | $14,822.50 |
| 4/28/2005 | 5/1/2005 | 585511107 | MELLON FINL CORP | 3,500,000 | $700,000.00 |
| 4/28/2005 | 9/3/2005 | 713448108 | PEPSICO INC | 170,100 | $45,526.00 |
| 4/28/2005 | 5/13/2005 | 742410102 | PROLOGIS SH DEB INT | 100,000 | $37,000.00 |
| 4/28/2005 | 9/6/2005 | 90611107 | SCHWAB CHARLES CORP | 250,500 | $5,000.00 |
| 4/29/2005 | 8/18/2005 | 74435E102 | QUESTAR CORP | 170,200 | $0.00 |
| 4/29/2005 | 8/18/2005 | 74435E102 | QUESTAR CORP | 30,600 | $0.00 |
| 4/28/2005 | 5/2/2005 | 87314610F | TXU CORP | 4,550 | $0.00 |
| 4/28/2005 | 3/2/2005 | 87314610F | TXU CORP | 126,800 | $0.00 |
| 4/29/2005 | 8/13/2005 | 93960J107 | WACHOVIA CORP 2ND NEW | 150,000 | $89,000.00 |
| 4/26/2005 | 8/13/2005 | 94974B107 | WELLS FARGO & CO NEW | 400,000 | $96,000.00 |
| 4/28/2005 | 5/9/2005 | 939322107 | WASHINGTON MUTUAL INC | 100,000 | $47,000.00 |
| 4/26/2005 | 6/13/2005 | 302215107 | EXXON MOBIL CORP | 900,000 | $261,000.00 |
| 4/27/2005 | 10/26/2005 | 019589704 | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 12,500 | $53,710.89 |
| 4/27/2005 | 10/26/2005 | 019589704 | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 40,500 | $171,674.92 |
| 4/27/2005 | 10/26/2005 | 019589704 | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 12,900 | $54,089.84 |
| 4/27/2005 | 10/26/2005 | 019589704 | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 10,000 | $42,968.72 |
| 4/27/2005 | 9/14/2005 | 17247A108 | CIMERGY CORP | 150,000 | $72,000.00 |
| 4/27/2005 | 8/29/2005 | 13063410? | CELL THERAPEUTICS INC NEW | 500,000 | $0.00 |
| 4/27/2005 | 6/17/2005 | 263534108 | E I DU PONT DE NEMOURS & CO | 10,500 | $3,885.00 |
| 4/27/2005 | 3/3/2006 | 544488108 | NEW GERMANY FUND INC | 45,400 | $24,970.00 |
| 4/27/2005 | 1/5/2006 | 526057102 | LENNAR CORP CLASS B | 77,400 | $33,669.00 |
| 4/27/2005 | 5/16/2005 | 70412B107 | PAYCHEX INC | 300,000 | $36,000.00 |
| 4/27/2005 | 5/6/2005 | 87314610F | TXU CORP | 91,500 | $0.00 |
| 4/27/2005 | 3/5/2005 | 87314610F | TXU CORP | 23,400 | $0.00 |
| 4/27/2005 | 6/24/2005 | 910185104 | UNITED DEFENSE INDS INC | 1,000,000 | $125,500.00 |
| 4/28/2005 | 5/13/2005 | 01381T109 | ALCOA INC | 410,000 | $61,500.00 |
| 4/28/2005 | 6/6/2005 | 01879A104 | ALLIANCEBERNSTEIN GLOBAL HIGH INCOME FUND INC | 49,800 | $48,280.80 |
| 4/28/2005 | 10/26/2005 | 019589704 | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 5,000 | $21,484.35 |
| 4/28/2005 | 10/26/2005 | 019589704 | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 2,000 | $8,593.74 |
| 4/28/2005 | 6/13/2005 | 03522B107 | ANHEUSER-BUSCH COMPANIES INC | 90,000 | $22,050.00 |
| 4/28/2005 | 6/1/2005 | 22237Z104 | COUNTRYWIDE FINANCIAL CORP | 107,946 | $18,186.70 |
| 4/28/2005 | 6/13/2005 | 231021109 | CUMMINS INC | 39,076 | $11,722.80 |
| 4/28/2005 | 8/16/2005 | 22160K105 | COSTCO WHOLESALE CORP NEW | 20,000 | $9,750.00 |
| 4/29/2005 | 8/13/2005 | 314211103 | FEDERATED INVS INC PA CL B | 15,000 | $2,250.00 |
| 4/29/2005 | 3/16/2005 | 375766102 | GILLETTE CO | 23,000 | $3,737.50 |
| 4/29/2005 | 6/1/2005 | 459200101 | INTL BUSINESS MACHINES CORP | 400,000 | $80,000.00 |
| 4/29/2005 | 6/13/2005 | 460146103 | INTERNATIONAL PAPER CO | 90,500 | $22,625.00 |
| 4/29/2005 | 5/13/2005 | 48666K108 | KB HOME | 150,000 | $36,125.00 |
| 4/29/2005 | 5/3/2005 | 532457108 | ELI LILLY & CO | 235,000 | $93,500.00 |
| 4/28/2005 | 6/24/2005 | 42984010F | BOWAC CAP TR I COM PFD 0.00% RATE EFF. DATE 11/15/2031 | 2,000 | $0.00 |
| 4/28/2005 | 5/13/2005 | 656844100 | NORFOLK SOUTHERN CORP | 58,000 | $4,180.00 |
| 4/29/2005 | 3/2/2005 | 683572103 | OPPENHEIMER MULTI-SECTOR INCOME TR SBI | 50,000 | $3,750.00 |
| 4/13/2005 | 7/17/2005 | 68389X105 | PFIZER INC | 1,000,000 | $190,000.00 |
| 4/13/2005 | 7/7/2005 | 773903109 | ROCKWELL AUTOMATION INC | 79,300 | $17,617.50 |
| 4/13/2005 | 8/19/2005 | 808513107 | SCHERING PLOUGH CORP | 2,300,000 | $126,500.00 |
| 4/13/2005 | 6/8/2005 | 983519107 | WHIRLPOOL CORP | 37,000 | $0.00 |
| 4/13/2005 | 5/13/2005 | 962166107 | WEYERHAEUSER CO | 65,500 | $32,500.00 |
| 4/13/2005 | 5/13/2005 | 301176107 | WYETH | 2,075,000 | $476,100.00 |
| 4/14/2005 | 6/13/2005 | 30231G102 | EXXON MOBIL CORP | 550,000 | $158,500.00 |
| 4/29/2005 | 7/22/2005 | 01920A104 | ALLIED CAPITAL CORP | 56,000 | $28,900.00 |
| 4/29/2005 | 3/11/2005 | 386966107 | GREAT LAKES CHEMICAL CORP | 300,500 | $0.00 |
| 4/29/2005 | 10/29/2005 | 443785109 | HUDSON HIGHLAND GROUP INC | 12,500 | $0.00 |
| 4/29/2005 | 6/13/2005 | 48666K108 | KB HOME | 150,000 | $28,125.00 |
| 4/29/2005 | 3/11/2005 | 65240C101 | NIKE INC | 25000 | $0.00 |
| 4/29/2005 | 3/11/2005 | 56642410? | NORTH FORK BANCORPORATION NY | 20,000 | $13,300.00 |
| 4/29/2005 | 6/22/2005 | 737628102 | POTLATCH CORP | 303 | $45.45 |
| 4/29/2005 | 6/22/2005 | 737628107 | POTLATCH CORP | 8,795 | $1,319.40 |
| 4/29/2005 | 3/16/2005 | 720219108 | PIONEER NATL RESOURCES CO | 150,500 | $15,050.00 |
| 5/2/2005 | 5/23/2005 | 00105510? | AFLAC INC | 10,500 | $0.00 |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PS/WHTAX001364

936

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| | | | | | |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PS/WHTAX001385

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| 5/9/2005 | 6/27/2005 | | ZIONS BANCORP | 36,189 | $13,028.04 |
| 5/9/2005 | | | ADAMS EXPRESS CO MARYLAND | 31,200 | $76,266.00 |
| 5/9/2005 | 7/1/2005 | | BOSTON PRIV FINL DIV 4.875% ($2.4375) | 100,000 | $0.00 |
| 5/9/2005 | 7/1/2005 | | CUMMINS ENGINE CVT PFD 7.00% ($3.50) RATE EFF. DATE 12/13/2001 | 200,000 | $175,000.00 |
| 5/9/2005 | 6/20/2005 | | CAESARS ENTERTAINMENT INC | 1,600,000 | $0.00 |
| 5/9/2005 | 10/28/2005 | | EQUITY OFFICE PRPTS TR PFD CVT 5.25% ($2.625) | 83,900 | $0.00 |
| 5/9/2005 | 6/28/2005 | | GENTECH CORPORATION NEW | 100,600 | $34,200.00 |
| 5/9/2005 | 6/15/2005 | | PIONEER STANDARD FINL TR PFD DIV 6.75% (3.375) DTD 03/17/1998 | 2,385 | $0.00 |
| 5/9/2005 | 5/9/2005 | | AIM SELECT REAL ESTATE INCOME FD | 29,500 | $72,376.70 |
| 5/9/2005 | 3/3/2005 | | SCUDDER RREEF REAL ESTATE 5 | 26,600 | $58,814.00 |
| 5/10/2005 | 10/28/2005 | | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 15,000 | $64,453.05 |
| 5/10/2005 | 10/28/2005 | | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 2,500 | $10,742.19 |
| 5/10/2005 | 10/28/2005 | | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 1,000 | $4,296.87 |
| 5/10/2005 | 6/28/2005 | | BOEING CO | 278,900 | $69,725.00 |
| 5/10/2005 | 7/29/2005 | | CUMMINS ENGINE CVT PFD 7.00% ($3.50) RATE EFF. DATE 12/13/2001 | 27,300 | $23,887.50 |
| 5/10/2005 | 7/20/2005 | | CUMMINS ENGINE CVT PFD 7.00% ($3.50) RATE EFF. DATE 12/13/2001 | 22,700 | $19,862.50 |
| 5/10/2005 | 6/20/2005 | | CAESARS ENTERTAINMENT INC | 655,000 | $0.00 |
| 5/10/2005 | 6/30/2005 | | EXELON CORP | 263,400 | $105,360.00 |
| 5/10/2005 | 8/18/2005 | | CHECK INC NEW | 438,500 | $0.00 |
| 5/10/2005 | 8/18/2005 | | PPL CORP | 538,200 | $0.00 |
| 5/10/2005 | 8/18/2005 | | PPL CORP | 139,100 | $0.00 |
| 5/10/2005 | 7/29/2005 | | SIMON PROPERTY GROUP INC CVT PFD 6.00% | 2,200 | $1,500.00 |
| 5/10/2005 | 3/15/2005 | | TXU CORP | 24,900 | $0.00 |
| 5/10/2005 | 9/13/2005 | | TXU CORP | 15,500 | $0.00 |
| 5/10/2005 | 3/18/2005 | | TXU CORP | 34,600 | $0.00 |
| 5/11/2005 | 3/18/2005 | | TXU CORP | 15,300 | $0.00 |
| 5/11/2005 | 6/30/2005 | | APARTMENT INVESTMENT & MANAGEMENT CO CLASS A | 34,372 | $30,623.20 |
| 5/11/2005 | 8/30/2005 | | BEMIS CO INC | 40,793 | $7,342.74 |
| 5/11/2005 | 6/30/2005 | | CONOCOPHILLIPS | 245,080 | $73,058.00 |
| 5/11/2005 | 6/30/2005 | | CENTRAL PACIFIC FINANCIAL CORP | 9,000 | $1,710.00 |
| 5/11/2005 | 8/30/2005 | | CHEVRON CORP | 975,438 | $438,947.03 |
| 5/11/2005 | 6/20/2005 | | CAESARS ENTERTAINMENT INC | 85,000 | $0.00 |
| 5/11/2005 | 7/15/2005 | | GREAT LAKES CHEMICAL CORP | 247,400 | $0.00 |
| 5/11/2005 | 8/18/2005 | | HONEYWELL INTL INC | 442,596 | $91,285.43 |
| 5/11/2005 | 6/30/2005 | | MACERICH COMPANY | 18,110 | $11,771.60 |
| 5/11/2005 | 3/30/2005 | | MICROSOFT CORP | 1,309,800 | $96,768.00 |
| 5/11/2005 | 11/29/2005 | | MICROSOFT CORP | 3,000 | $1,920.00 |
| 5/11/2005 | 6/24/2005 | | CHECK INC NEW | 418,500 | $0.00 |
| 5/11/2005 | 6/30/2005 | | OUTBACK STEAKHOUSE INC | 32,264 | $4,198.23 |
| 5/11/2005 | 8/30/2005 | | PACCAR INC -DEL- | 67,550 | $8,457.00 |
| 5/11/2005 | 6/30/2005 | | PARKER-HANNIFIN CORP | 48,873 | $9,314.60 |
| 5/11/2005 | 6/30/2005 | | UNITED TECHNOLOGIES CORP | 430,040 | $94,608.80 |
| 5/11/2005 | 8/30/2005 | | WAL-MART STORES INC | 289,900 | $43,380.00 |
| 5/12/2005 | 6/20/2005 | | CAESARS ENTERTAINMENT INC | 175,000 | $0.00 |
| 5/12/2005 | 9/16/2005 | | DOMINION RESOURCES INC | 292,000 | $0.00 |
| 5/12/2005 | 5/8/2005 | | SCUDDER RREEF REAL ESTATE FD INC | 30,800 | $4,657.50 |
| 5/13/2005 | 10/28/2005 | | CONSECO INC CVT PFD 5.50%($3.375) | 75,000 | $25,781.25 |
| 5/13/2005 | 6/20/2005 | | CAESARS ENTERTAINMENT INC | 137,500 | $0.00 |
| 5/13/2005 | 8/18/2005 | | EXELON CORP | 200,200 | $0.00 |
| 5/13/2005 | 3/18/2005 | | EXELON CORP | 52,800 | $0.00 |
| 5/13/2005 | 10/28/2005 | | HUDSON HIGHLAND GROUP INC | 7,000 | $0.00 |
| 5/13/2005 | 9/15/2005 | | KANSAS CITY SOUTHERN INDS NEW | 30,000 | $0.00 |
| 5/13/2005 | 10/13/2005 | | POTLATCH CORP | 256 | $76.80 |
| 5/13/2005 | 10/31/2005 | | POTLATCH CORP | 8,455 | $2,536.50 |
| 5/13/2005 | 8/30/2005 | | PPL CORP | 476,200 | $0.00 |
| 5/13/2005 | 8/18/2005 | | PPL CORP | 129,100 | $0.00 |
| 5/13/2005 | 7/18/2005 | | QUESTAR CORP | 137,700 | $0.00 |
| 5/13/2005 | 7/18/2005 | | QUESTAR CORP | 23,300 | $0.00 |
| 5/13/2005 | 10/28/2005 | | TRUSTREET PROPERTIES INC CVT PFD 7.50%($1.875) | 3,600 | $3,656.25 |
| 5/13/2005 | 10/28/2005 | | TRUSTREET PROPERTIES INC CVT PFD 7.50%($1.875) | 5,200 | $4,875.00 |
| 5/13/2005 | 10/28/2005 | | TRUSTREET PROPERTIES INC CVT PFD 7.50%($1.875) | 20,000 | $18,750.00 |
| 5/13/2005 | 9/13/2005 | | TXU CORP | 35,900 | $0.00 |
| 5/16/2005 | 8/18/2005 | | UNITED STATES STEEL CORP NEW | 18,250 | $7,925.00 |
| 5/16/2005 | 5/23/2005 | | APLAC INC | 4,500 | $0.00 |
| 5/16/2005 | 6/30/2005 | | CROWN CASTLE INTERNATIONAL | 31,754 | $0.00 |
| 5/16/2005 | 6/15/2005 | | CLEAR CHANNEL COMMUNICATIONS | 7,500 | $1,406.25 |
| 5/16/2005 | 10/3/2005 | | CLEAR CHANNEL COMMUNICATIONS | 1,000 | $375.00 |
| 5/16/2005 | 10/3/2005 | | CLEAR CHANNEL COMMUNICATIONS | 21,500 | $28,312.50 |
| 5/16/2005 | 8/18/2005 | | CHEVRON CORP | 334,050 | $145,906.00 |
| 5/16/2005 | 7/18/2005 | | CHEVRON CORP | 3,000,000 | $1,350,000.00 |
| 5/16/2005 | 6/20/2005 | | CAESARS ENTERTAINMENT INC | 80,000 | $0.00 |
| 5/16/2005 | 8/18/2005 | | EXELON CORP | 173,300 | $0.00 |
| 5/16/2005 | 8/18/2005 | | EXELON CORP | 29,300 | $0.00 |
| 5/16/2005 | 12/5/2005 | | GOLD BANC CORP | 279,675 | $27,967.50 |
| 5/16/2005 | 10/28/2005 | | HUDSON HIGHLAND GROUP INC | 5,000 | $0.00 |
| 5/16/2005 | 7/1/2005 | | HOME WELL BEL INC | 4,000,000 | $525,000.00 |
| 5/16/2005 | 6/28/2005 | | LIBERTY MEDIA CORP A | 18,410,585 | $0.00 |
| 5/16/2005 | 6/7/2005 | | REINSURANCE GROUP CONV PFD 5.75%($2.875) RATE EFF. DATE 12/18/2001 | 23,000 | $0.00 |
| 5/16/2005 | 6/7/2005 | | REINSURANCE GROUP CONV PFD 5.75%($2.875) RATE EFF. DATE 12/18/2001 | 25,000 | $0.00 |
| 5/18/2005 | 6/20/2005 | | QUESTAR CORP | 6,800 | $0.00 |
| 5/16/2005 | 6/20/2005 | | QUESTAR CORP | 1,900 | $0.00 |
| 5/16/2005 | 11/7/2005 | | AT&T CORP-NEW | 4,400 | $2,838.00 |
| 5/16/2005 | 6/30/2005 | | TRUSTREET PROPERTIES INC CVT PFD 7.50%($1.875) | 15,000 | $14,062.50 |
| 5/16/2005 | 9/13/2005 | | TXU CORP | 11,800 | $0.00 |
| 5/16/2005 | 9/13/2005 | | TXU CORP | 65,400 | $0.00 |
| 5/17/2005 | 7/27/2005 | | WAL-MART STORES INC | 651,185 | $97,674.75 |
| 5/17/2005 | 8/18/2005 | | UNITED STATES STEEL CORP NEW | 8,125 | $912.50 |
| 5/17/2005 | 8/18/2005 | | EXELON CORP | 126,700 | $0.00 |
| 5/17/2005 | 8/23/2005 | | EXELON CORP | 21,300 | $0.00 |
| 5/17/2005 | 9/15/2005 | | KANSAS CITY SOUTHERN INDS NEW | 18,400 | $0.00 |
| 5/17/2005 | 8/30/2005 | | MAY DEPARTMENT STORES CO | 1,200,000 | $396,000.00 |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001366

938

| Integration Date | TerminationDate | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| 5/17/2005 | 8/30/2005 | 577778102 | MAY DEPARTMENT STORES CO | 1,800,000 | $882,000.00 |
| 5/17/2005 | 8/2/2005 | 693913104 | PPL CORP | 128,400 | $28,532.00 |
| 5/17/2005 | 8/2/2005 | 693817106 | PPL CORP | 473,400 | $108,997.00 |
| 5/17/2005 | 7/5/2005 | 824348108 | SHERWIN WILLIAMS CO | 250,000 | $91,250.00 |
| 5/17/2005 | 8/23/2005 | 748350102 | QUESTAR CORP | 1,700 | $0.00 |
| 5/17/2005 | 8/23/2005 | 748356102 | QUESTAR CORP | 81,500 | $0.00 |
| 5/17/2005 | 7/6/2005 | 876120104 | TARGET CORP | 200,000 | $16,000.00 |
| 5/17/2005 | 7/5/2005 | 931142103 | WAL-MART STORES INC | 450,000 | $67,500.00 |
| 5/18/2005 | 6/23/2005 | 001055102 | AFLAC INC | 5,500 | $0.00 |
| 5/18/2005 | 5/19/2005 | 228227401 | CROWN CASTLE INTL CONV. PFD. 6.25% | 726,843 | $0.00 |
| 5/18/2005 | 6/24/2005 | 301819101 | EXELON CORP | 19,800 | $7,920.00 |
| 5/18/2005 | 6/24/2005 | 301819101 | EXELON CORP | 118,200 | $47,280.00 |
| 5/18/2005 | 6/16/2005 | 375766102 | GILLETTE CO | 41,600 | $0.00 |
| 5/18/2005 | 10/5/2005 | 375766102 | GILLETTE CO | 41,600 | $6,760.00 |
| 5/18/2005 | 2/3/2006 | 485170507 | KANSAS CITY SOUTHERN INDS NEW | 5,900 | $0.00 |
| 5/18/2005 | 5/31/2005 | 485170706 | KANSAS CITY SOUTHERN INDS INC CVT PFD 4.25% DTD 05/05/2003 | 43,900 | $0.00 |
| 5/18/2005 | 5/18/2005 | 577778102 | MAY DEPARTMENT STORES CO | 85,024 | $0.00 |
| 5/18/2005 | 8/30/2005 | 577778102 | MAY DEPARTMENT STORES CO | 85,024 | $41,661.76 |
| 5/18/2005 | 6/17/2005 | 552691107 | MCI INC | 149,450 | $0.00 |
| 5/18/2005 | 1/9/2006 | 552691107 | MCI INC | 149,450 | $836,920.00 |
| 5/18/2005 | 8/24/2005 | 653601220F | INDYMAC CAP TR I CONV PFD. 8.00% RATE EFF. DATE 11/13/2001 | 939,216 | $0.00 |
| 5/18/2005 | 7/6/2005 | 648449730F | NEW YORK COMMUNITIES CAPITAL TRUST V(BONUSES) 6.00% DTD 11/04/2002 | 209,600 | $0.00 |
| 5/18/2005 | 8/7/2005 | 748356102 | QUESTAR CORP | 8,700 | $1,307.50 |
| 5/18/2005 | 8/7/2005 | 748356102 | QUESTAR CORP | 36,700 | $6,123.50 |
| 5/18/2005 | 5/24/2005 | 001957507 | AT&T CORP NEW | 265,560 | $0.00 |
| 5/19/2005 | 11/21/2005 | 001957507 | AT&T CORP NEW | 265,560 | $199,350.10 |
| 5/19/2005 | 1/3/2006 | 134657202 | ORE CORP NEW CLASS B | 800,000 | $176,000.00 |
| 5/19/2005 | 5/26/2005 | 228227401 | CROWN CASTLE INTL CONV. PFD. 6.25% | 48,643 | $0.00 |
| 5/19/2005 | 5/26/2005 | 228227401 | CROWN CASTLE INTL CONV. PFD. 6.25% | 82,720 | $0.00 |
| 5/19/2005 | 7/1/2005 | 231029067 | CUMMINS ENGINE CVT PFD 7.00% ($3.50) RATE EFF. DATE 12/13/2005 | 60,000 | $52,500.00 |
| 5/19/2005 | 7/1/2005 | 231029067 | CUMMINS ENGINE CVT PFD ($3.50) RATE EFF. DATE 12/13/2005 | 60,000 | $52,500.00 |
| 5/19/2005 | 7/6/2002 | 182589Y101 | COMANCH SERVICES CORP INCM DEP SECS CL A STK & SR SECD NOTES DUE 2034 | 53,500 | $9,433.00 |
| 5/19/2005 | 10/28/2005 | 294741909F | EQUITY OFFICE PPTYS TR PFU CVT 5.25% ($2.625) | 500 | $0.00 |
| 5/19/2005 | 10/5/2005 | 375766102 | GILLETTE CO | 280,000 | $45,500.00 |
| 5/19/2005 | 8/23/2005 | 401988107F | GUIDANT CORP | 500,000 | $50,000.00 |
| 5/19/2005 | 8/31/2005 | 577778102 | MAY DEPARTMENT STORES CO | 5,434,804 | $2,663,998.96 |
| 5/19/2005 | 8/8/2005 | 985037102 | OWENS ILLINOIS CORP | 851,736 | $34,069.44 |
| 5/19/2005 | 6/6/2005 | 985677105F | YELLOW ROADWAY CORP | 812,706 | $0.00 |
| 5/20/2005 | 7/1/2005 | 231029067 | CUMMINS ENGINE CVT PFD 7.00% ($3.50) RATE EFF. DATE 12/13/2005 | 40,000 | $35,000.00 |
| 5/20/2005 | 8/21/2005 | 345385206F | FORD MOTOR CO CAP TRUST II CONV PFD 6.50% ($3.25) DTD 01/30/2002 | 72,278 | $0.00 |
| 5/20/2005 | 8/21/2005 | 345385206F | FORD MOTOR CO CAP TRUST II CONV PFD 6.50% ($3.25) DTD 01/30/2002 | 75,536 | $0.00 |
| 5/20/2005 | 8/31/2006 | 35671D792 | FREEPORT-MC COPP PFD CVT 5.50% | 2,000 | $0.00 |
| 5/20/2005 | 6/21/2005 | 35671D792 | FREEPORT-MC COPP PFD CVT 5.50% | 1,000 | $0.00 |
| 5/20/2005 | 3/9/2006 | 401988108F | GUIDANT CORP | 357,500 | $105,600.00 |
| 5/20/2005 | 7/6/2005 | 448480203 | IPC CAPITAL TRUST III DIV 8.78% ($2.1875) | 300 | $159.31 |
| 5/20/2005 | 6/24/2005 | 485170706 | KANSAS CITY SOUTHERN INDS INC CVT PFD 4.25% DTD 05/05/2003 | 25,734 | $0.00 |
| 5/20/2005 | 7/6/2005 | 648449730F | NEW YORK COMMUNITIES CAPITAL TRUST V(BONUSES) 6.00% DTD 11/04/2002 | 21,000 | $0.00 |
| 5/23/2005 | 3/2/2006 | 178387Y103 | SBC COMMUNICATIONS INC | 134,000 | $43,215.00 |
| 5/23/2005 | 8/5/2005 | 309660106 | SCHERING PLOUGH CORP CVT PFD 6.00%($3.00) | 100,000 | $0.00 |
| 5/23/2005 | 10/26/2005 | 988640206F | TRUSTNEST PROPERTIES INC CVT PFD 7.50%($1.875) | 10,000 | $9,375.00 |
| 5/23/2005 | 7/6/2005 | 936325846 | WASHINGTON MUTUAL INC CVT 5.375% ($2.6875) | 30,000 | $0.00 |
| 5/23/2005 | 10/26/2005 | 019089704 | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 10,000 | $42,968.70 |
| 5/23/2005 | 10/26/2005 | 019089704 | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/09/2005 | 20,000 | $85,937.40 |
| 5/23/2005 | 5/26/2005 | 228227401F | CROWN CASTLE INTL CONV. PFD. 6.25% | 29,720 | $0.00 |
| 5/23/2005 | 7/13/2005 | 401988102F | GUIDANT CORP | 500,000 | $50,000.00 |
| 5/23/2005 | 10/26/2005 | 443783106 | HUDSON HIGHLAND GROUP INC | 10,000 | $0.00 |
| 5/23/2005 | 7/11/2005 | 577778102 | MAY DEPARTMENT STORES CO | 2,500,000 | $612,500.00 |
| 5/23/2005 | 8/8/2005 | 589712207 | MAGNUM HUNTER RESOURCES INC | 6,000 | $0.00 |
| 5/23/2005 | 9/30/2005 | 640264302 | NEIMAN MARCUS GROUP INC CL A | 25,758 | $0.00 |
| 5/23/2005 | 10/7/2005 | 640264302 | NEIMAN MARCUS GROUP INC CL A | 25,758 | $3,863.85 |
| 5/23/2005 | 6/8/2005 | 690312102 | OVERSEAS CORP | 247,956 | $9,923.32 |
| 5/23/2005 | 8/7/2005 | 758361307 | REINSURANCE GROUP CONV PFD 5.75%($2.875) RATE EFF. DATE 12/18/2001 | 50,000 | $0.00 |
| 5/23/2005 | 3/2/2006 | 852061107 | SPRINT NEXTEL CORP | 500,000 | $87,500.00 |
| 5/23/2005 | 6/15/2005 | 882362103 | BUNGARD DATA SYSTEMS INC | 94,148 | $0.00 |
| 5/23/2005 | 7/22/2005 | 882336100 | TOYS R US INC | 99,448 | $0.00 |
| 5/24/2005 | 6/13/2006 | 165167603 | CHESAPEAKE ENERGY CORP CVT PFD 4.125% RULE 144A | 1,260 | $0.00 |
| 5/24/2005 | 6/13/2006 | 165167603 | CHESAPEAKE ENERGY CORP CVT PFD 4.125% RULE 144A | 400 | $0.00 |
| 5/24/2005 | 3/6/2006 | 337124107 | FIRST ITR FROM LIFE UNVREND FD | 178,800 | $358,368.00 |
| 5/24/2005 | 5/31/2005 | 375766102 | GILLETTE CO | 372,780 | $0.00 |
| 5/24/2005 | 10/26/2005 | 443783106 | HUDSON HIGHLAND GROUP INC | 10,000 | $0.00 |
| 5/24/2005 | 6/23/2005 | 428685108 | HIBERNIA CORP CL A | 784,400 | $0.00 |
| 5/24/2005 | 3/9/2006 | 591020107F | MERRILL SUBMARINE INC | 350,000 | $175,500.00 |
| 5/24/2005 | 3/3/2006 | 852061107 | SPRINT NEXTEL CORP | 400,000 | $70,000.00 |
| 5/24/2005 | 3/2/2006 | 868293500 | SURGUTNEFTEGAZ ADR | 300,000 | $37,500.00 |
| 5/24/2005 | 3/2/2006 | 872318103 | SWISS HELVETIA FD INC | 10,800 | $17,344.00 |
| 5/24/2005 | 7/13/2005 | 902961107 | UGI CORP NEW | 608,600 | $152,077.50 |
| 5/24/2005 | 10/11/2005 | 902961106 | UGI CORP NEW | 885,600 | $149,394.00 |
| 5/24/2005 | 10/26/2005 | 902961106 | UGI CORP NEW | 20,000 | $6,750.00 |
| 5/25/2005 | 5/26/2005 | 228227401F | CROWN CASTLE INTL CONV. PFD 6.25% | 23,710 | $0.00 |
| 5/25/2005 | 5/26/2005 | 228227401F | CROWN CASTLE INTL CONV. PFD 6.25% | 329,300 | $0.00 |
| 5/25/2005 | 6/31/2005 | 35671D792F | FREEPORT-MC COPP PFD CVT 5.50% | 43,300 | $0.00 |
| 5/25/2005 | 7/6/2005 | 317923105 | FINISH LINE INC CL A | 50,000 | $1,250.00 |
| 5/25/2005 | 5/31/2005 | 401988102 | GUIDANT CORP | 78,800 | $7,880.00 |
| 5/25/2005 | 6/1/2005 | 428685108 | HIBERNIA CORP CL A | 614,400 | $0.00 |
| 5/25/2005 | 7/11/2005 | 589712103F | SUNTRUST EDUCATION INC | 150,000 | $82,500.00 |
| 5/26/2005 | 6/3/2005 | 369652104 | GENL AMERICAN INVESTORS CO INC | 47,700 | $0.00 |
| 5/26/2005 | 6/3/2005 | 401988107 | GUIDANT CORP | 300,000 | $38,000.00 |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001357

939

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001368

940

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| 6/9/2005 | 6/15/2005 | 013817101 | ALCOA INC | 205,008 | $0.00 |
| 6/9/2005 | 6/21/2005 | 283385100 | EL PASO CORP | 127,580 | $0.00 |
| 6/9/2005 | 6/21/2005 | 283385100 | EL PASO CORP | 1,480,807 | $0.00 |
| 6/9/2005 | 6/21/2005 | 283385100 | EL PASO CORP | 425,629 | $0.00 |
| 6/9/2005 | 6/13/2005 | 488690104 | KB HOME | 75,000 | $0.00 |
| 6/9/2005 | 6/13/2005 | 488690104 | KB HOME | 75,000 | $0.00 |
| 6/9/2005 | 6/15/2005 | 717281102 | PHELPS DODGE CORP | 145,400 | $0.00 |
| 6/9/2005 | 6/13/2005 | 806605101 | SCHERING PLOUGH CORP | 1,190,000 | $0.00 |
| 6/9/2005 | 6/24/2005 | 98426N107 | WESTERN GAS RESOURCES INC | 110,800 | $19,250.00 |
| 6/9/2005 | 6/13/2005 | 983024107 | WYETH | 1,028,000 | $0.00 |
| 6/10/2005 | 6/13/2005 | 013817101 | ALCOA INC | 102,500 | $0.00 |
| 6/10/2005 | 6/16/2005 | 040336108 | ARGOSY GAMING CO | 56,800 | $0.00 |
| 6/10/2005 | 6/24/2005 | 375766102 | GILLETTE CO | 1,685,678 | $0.00 |
| 6/10/2005 | 6/13/2005 | 488690104 | KB HOME | 37,500 | $0.00 |
| 6/10/2005 | 6/15/2005 | 717281102 | PHELPS DODGE CORP | 75,400 | $0.00 |
| 6/10/2005 | 6/13/2005 | 806605101 | SCHERING PLOUGH CORP | 511,111 | $0.00 |
| 6/10/2005 | 6/24/2005 | 98426N107 | WESTERN GAS RESOURCES INC | 140,200 | $24,500.00 |
| 6/13/2005 | 6/17/2005 | 013817101 | ALCOA INC | 51,250 | $0.00 |
| 6/13/2005 | 6/17/2005 | 040336108 | ARGOSY GAMING CO | 36,800 | $0.00 |
| 6/13/2005 | 6/17/2005 | 035229103 | ANHEUSER BUSCH COMPANIES INC | 89,000 | $0.00 |
| 6/13/2005 | 6/17/2005 | 210795308 | CONTINENTAL AIRLINES INC CL B | 187,248 | $0.00 |
| 6/13/2005 | 6/17/2005 | 222372104 | COUNTRYWIDE FINANCIAL CORP | 53,699 | $0.00 |
| 6/13/2005 | 6/20/2005 | 172347109 | CINERGY CORP | 135,000 | $0.00 |
| 6/13/2005 | 6/17/2005 | 231021108 | CUMMINS INC | 29,307 | $0.00 |
| 6/13/2005 | 6/17/2005 | 314211102 | FEDERATED DEPT STORES INC | 11,250 | $0.00 |
| 6/13/2005 | 6/17/2005 | 459200101 | INTL BUSINESS MACHINES CORP | 320,000 | $0.00 |
| 6/13/2005 | 6/17/2005 | 460146103 | INTERNATIONAL PAPER CO | 80,333 | $0.00 |
| 6/13/2005 | 6/13/2005 | 488690104 | KB HOME | 62,500 | $0.00 |
| 6/13/2005 | 6/17/2005 | 488690104 | KB HOME | 25,000 | $0.00 |
| 6/13/2005 | 6/17/2005 | 488690104 | KB HOME | 25,000 | $0.00 |
| 6/13/2005 | 6/17/2005 | 532457108 | ELI LILLY & CO | 185,833 | $0.00 |
| 6/13/2005 | 6/20/2005 | 590188108 | MERRILL LYNCH & CO INC | 106,000 | $0.00 |
| 6/13/2005 | 6/17/2005 | 655844108 | NORFOLK SOUTHERN CORP | 19,200 | $0.00 |
| 6/13/2005 | 6/20/2005 | 704326107 | PAYCHEX INC | 270,000 | $0.00 |
| 6/13/2005 | 6/17/2005 | 717281102 | PHELPS DODGE CORP | 38,400 | $0.00 |
| 6/13/2005 | 6/17/2005 | 717081103 | PFIZER INC | 750,000 | $0.00 |
| 6/13/2005 | 6/29/2005 | 730215104 | POST HOLDINGS INC | 136,000 | $0.00 |
| 6/13/2005 | 6/17/2005 | 773903109 | ROCKWELL AUTOMATION INC | 62,840 | $0.00 |
| 6/13/2005 | 6/13/2005 | 806605107 | SCHERING PLOUGH CORP | 1,096,111 | $0.00 |
| 6/13/2005 | 7/21/2005 | 00188F107 | AT&T CORP NEW | 32,000 | $18,330.00 |
| 6/13/2005 | 11/21/2005 | 00188F107 | AT&T CORP NEW | 32,000 | $20,640.00 |
| 6/13/2005 | 9/30/2005 | 936828640 | WASHINGTON MUTUAL INC CVPF 5.375% ($2.6875) | 33,000 | $0.00 |
| 6/13/2005 | 6/17/2005 | 960390109 | WRIGHTS INTERNATIONAL INC | 17,896 | $0.00 |
| 6/13/2005 | 6/24/2005 | 98426N107 | WESTERN GAS RESOURCES INC | 38,500 | $6,737.50 |
| 6/13/2005 | 6/17/2005 | 983322103 | WHIRLPOOL CORP | 24,667 | $10,608.81 |
| 6/13/2005 | 6/13/2005 | 982486104 | WEYERHAEUSER CO | 48,750 | $0.00 |
| 6/13/2005 | 6/15/2005 | 983024107 | WYETH | 983,250 | $0.00 |
| 6/14/2005 | 6/17/2005 | 983024107 | WYETH | 465,750 | $0.00 |
| 6/14/2005 | 6/17/2005 | 302130107 | EXXON MOBIL CORP | 275,000 | $0.00 |
| 6/14/2005 | 6/17/2005 | 013817101 | ALCOA INC | 51,250 | $0.00 |
| 6/14/2005 | 6/16/2005 | 040336108 | ARGOSY GAMING CO | 488,100 | $0.00 |
| 6/14/2005 | 6/17/2005 | 035229103 | ANHEUSER BUSCH COMPANIES INC | 60,000 | $0.00 |
| 6/14/2005 | 6/29/2005 | 210795308 | CONTINENTAL AIRLINES INC CL B | 134,860 | $0.00 |
| 6/14/2005 | 6/17/2005 | 222372104 | COUNTRYWIDE FINANCIAL CORP | 53,988 | $0.00 |
| 6/14/2005 | 6/17/2005 | 231021108 | CUMMINS INC | 29,307 | $0.00 |
| 6/14/2005 | 6/16/2005 | 278762102 | ECHOSTAR COMMS CORP CLASS A | 20,000 | $0.00 |
| 6/14/2005 | 6/17/2005 | 314211102 | FEDERATED DEPT STORES INC PA CL B | 11,250 | $0.00 |
| 6/14/2005 | 6/17/2005 | 459200101 | INTL BUSINESS MACHINES CORP | 320,000 | $0.00 |
| 6/14/2005 | 6/17/2005 | 460146103 | INTERNATIONAL PAPER CO | 80,333 | $0.00 |
| 6/14/2005 | 6/17/2005 | 488690104 | KB HOME | 62,500 | $0.00 |
| 6/14/2005 | 6/17/2005 | 532457108 | ELI LILLY & CO | 185,833 | $0.00 |
| 6/14/2005 | 7/20/2005 | 59248V200 | NEWS CORPORATION FINANCE TR 6 BD 0.75% DTD 03/21/2003 MAT 03/15/2023 RULE 144A/REGS | 17,400 | $0.00 |
| 6/14/2005 | 5/15/2006 | 59248V200 | NEWS CORPORATION FINANCE TR 6 BD 0.75% DTD 03/15/2003 MAT 03/15/2023 RULE 144A/REGS | 17,400 | $0.00 |
| 6/14/2005 | 6/17/2005 | 655844108 | NORFOLK SOUTHERN CORP | 19,200 | $0.00 |
| 6/14/2005 | 6/22/2005 | 717281102 | PHELPS DODGE CORP | 1,400 | $0.00 |
| 6/14/2005 | 6/20/2005 | 717081103 | PFIZER INC | 750,000 | $0.00 |
| 6/14/2005 | 6/17/2005 | 773903109 | ROCKWELL AUTOMATION INC | 62,840 | $0.00 |
| 6/14/2005 | 6/13/2005 | 806605107 | SCHERING PLOUGH CORP | 511,111 | $0.00 |
| 6/14/2005 | 6/17/2005 | 960390109 | WRIGHTS INTERNATIONAL INC | 17,896 | $0.00 |
| 6/14/2005 | 6/24/2005 | 98426N107 | WESTERN GAS RESOURCES INC | 28,500 | $4,637.50 |
| 6/14/2005 | 6/22/2005 | 963322103 | WHIRLPOOL CORP | 24,667 | $10,608.81 |
| 6/14/2005 | 6/22/2005 | 982486104 | WEYERHAEUSER CO | 48,750 | $0.00 |
| 6/14/2005 | 6/22/2005 | 983024107 | WYETH | 465,750 | $0.00 |
| 6/15/2005 | 6/17/2005 | 302130107 | EXXON MOBIL CORP | 275,000 | $0.00 |
| 6/15/2005 | 6/21/2005 | 040336108 | ARGOSY GAMING CO | 406,100 | $0.00 |
| 6/15/2005 | 6/21/2005 | 210795308 | CONTINENTAL AIRLINES INC CL B | 102,325 | $0.00 |
| 6/15/2005 | 6/20/2005 | 172347109 | CINERGY CORP | 135,000 | $0.00 |
| 6/15/2005 | 6/21/2005 | 278762102 | PRZ TENERGY CORP | 80,000 | $0.00 |
| 6/15/2005 | 6/21/2005 | 375766102 | GILLETTE CO | 1,200,000 | $0.00 |
| 6/15/2005 | 6/21/2005 | 375766102 | GILLETTE CO | 1,535,678 | $0.00 |
| 6/15/2005 | 12/22/2005 | 379663107 | GOLD BANC CORP | 78,888 | $7,988.90 |
| 6/15/2005 | 6/22/2005 | 590188108 | MERRILL LYNCH & CO INC | 50,000 | $0.00 |
| 6/15/2005 | 6/20/2005 | 704326107 | PAYCHEX INC | 140,000 | $0.00 |
| 6/15/2005 | 6/21/2005 | 717281102 | PHELPS DODGE CORP | 64,400 | $0.00 |
| 6/15/2005 | 6/20/2005 | 718172100 | PBG-I IMPORTS INC-DEL | 120,000 | $0.00 |
| 6/15/2005 | 7/21/2005 | 744480102 | PROVIDIAN FINL CORP | 46,000 | $0.00 |
| 6/15/2005 | 10/3/2005 | 744480102 | PROVIDIAN FINL CORP | 46,000 | $0.00 |
| 6/15/2005 | 6/20/2005 | 00188F107 | AT&T CORP NEW | 64,000 | $36,540.00 |
| 6/16/2005 | 11/21/2005 | 00188F107 | AT&T CORP NEW | 64,000 | $41,280.00 |
| 6/16/2005 | 6/20/2005 | 040336108 | ARGOSY GAMING CO | 369,100 | $0.00 |
| 6/16/2005 | 6/21/2005 | 210795308 | CONTINENTAL AIRLINES INC CL B | 89,253 | $0.00 |
| 6/16/2005 | 6/22/2005 | 283385100 | EL PASO CORP | 106,725 | $0.00 |
| 6/16/2005 | 6/22/2005 | 283385100 | EL PASO CORP | 1,241,602 | $0.00 |
| 6/16/2005 | 6/22/2005 | 283385100 | EL PASO CORP | 369,065 | $0.00 |
| 6/16/2005 | 6/22/2005 | 375766102 | GILLETTE CO | 1,235,678 | $0.00 |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001369

941

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001370

942

| Inception Date | TerminationDate | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| 6/23/2005 | 7/1/2005 | 737628107 | POTLATCH CORP | 887 | $0.00 |
| 6/23/2005 | 7/1/2005 | 737628107 | POTLATCH CORP | 60 | $0.00 |
| 6/23/2005 | 6/29/2005 | 720279108 | PIER 1 IMPORTS INC-DEL | 80,000 | $0.00 |
| 6/23/2005 | 6/29/2005 | 914906107 | UNIVISION COMMUNICATIONS INC | 4,500,000 | $0.00 |
| 6/23/2005 | 6/30/2005 | 040338108 | APOGEE GAMING CO | 55,200 | $0.00 |
| 6/23/2005 | 6/30/2005 | 17247410F | SYNERGY CORP | 45,000 | $0.00 |
| 6/23/2005 | 6/30/2005 | 093442103 | ENTERGY CORPORATION-NEW | 90,000 | $0.00 |
| 6/23/2005 | 6/30/2005 | 375766102 | GILLETTE CO | 444,875 | $72,250.18 |
| 6/23/2005 | 6/29/2005 | 44107P107 | HOST HOTELS & RESORTS INC | 800,000 | $80,000.00 |
| 6/23/2005 | 6/29/2005 | 983960107 | ONEOK INC NEW | 326,500 | $0.00 |
| 6/23/2005 | 6/30/2005 | 704326107 | PAYCHEX INC | 90,000 | $0.00 |
| 6/23/2005 | 6/30/2005 | 720279108 | PIER 1 IMPORTS INC-DEL | 40,000 | $0.00 |
| 6/23/2005 | 7/6/2005 | 91131110F | UNITED PARCEL SERVICE CL B | 28,500 | $0.00 |
| 6/24/2005 | 6/29/2005 | 914906107 | UNIVISION COMMUNICATIONS INC | 3,900,000 | $0.00 |
| 6/24/2005 | 6/29/2005 | 401698105 | GUIDANT CORP | 108,845 | $0.00 |
| 6/24/2005 | 6/29/2005 | 401698105 | GUIDANT CORP | 121,865 | $0.00 |
| 6/24/2005 | 6/30/2005 | 982960107 | ONEOK INC NEW | 280,500 | $0.00 |
| 6/24/2005 | 7/5/2005 | 74438510Z | QUESTAR CORP | 2,800 | $0.00 |
| 6/24/2005 | 7/5/2005 | 74438510Z | QUESTAR CORP | 14,500 | $0.00 |
| 6/24/2005 | 11/01/2005 | 02189703F | AT&T CORP-NEW | 300,000 | $192,500.00 |
| 6/24/2005 | 6/30/2005 | 914906102 | UNIVISION COMMUNICATIONS INC | 2,800,000 | $0.00 |
| 6/27/2005 | 7/1/2005 | 097023102 | BOEING CO | 328,400 | $0.00 |
| 6/27/2005 | 8/19/2005 | 14911310Z | SATELLITE DEV CORP (REIT)-NEW | 100,000 | $34,000.00 |
| 6/27/2005 | 7/1/2005 | 17247410F | SYNERGY CORP | 30,000 | $0.00 |
| 6/27/2005 | 7/1/2005 | 20825C104 | CONOCOPHILLIPS | 170,000 | $0.00 |
| 6/27/2005 | 7/1/2005 | 166764107 | CHEVRON CORP | 224,900 | $0.00 |
| 6/27/2005 | 7/1/2005 | 28336L109 | EL PASO CORP | 65,365 | $0.00 |
| 6/27/2005 | 7/1/2005 | 28336L109 | EL PASO CORP | 1,029,852 | $0.00 |
| 6/27/2005 | 7/1/2005 | 28336L109 | EL PASO CORP | 351,680 | $0.00 |
| 6/27/2005 | 7/1/2005 | 093442103 | ENTERGY CORPORATION-NEW | 90,000 | $0.00 |
| 6/27/2005 | 7/1/2005 | 30161N101 | EXELON CORP | 233,400 | $0.00 |
| 6/27/2005 | 7/1/2005 | 65284010F | PAYCHEX INC | 234,500 | $0.00 |
| 6/27/2005 | 7/1/2005 | 704326107 | PAYCHEX INC | 60,000 | $0.00 |
| 6/27/2005 | 7/1/2005 | 720279108 | PIER 1 IMPORTS INC-DEL | 30,000 | $0.00 |
| 6/27/2005 | 11/01/2005 | 00195700F | AT&T CORP-NEW | 200,000 | $129,000.00 |
| 6/27/2005 | 7/6/2005 | 939332844 | WASHINGTON MUTUAL INC CVPF 5.375% ($2.6875) | 15,000 | $0.00 |
| 6/28/2005 | 7/6/2005 | 097023102 | BOEING CO | 178,900 | $0.00 |
| 6/28/2005 | 8/19/2005 | 14911310Z | SATELLITE DEV CORP (REIT)-NEW | 325,000 | $175,500.00 |
| 6/28/2005 | 7/5/2005 | 17247410F | SYNERGY CORP | 15,000 | $0.00 |
| 6/28/2005 | 7/5/2005 | 20825C104 | CONOCOPHILLIPS | 95,000 | $0.00 |
| 6/28/2005 | 7/6/2005 | 166764102 | CHEVRON CORP | 124,000 | $0.00 |
| 6/28/2005 | 7/1/2005 | 28336L109 | EL PASO CORP | 79,610 | $0.00 |
| 6/28/2005 | 7/15/2005 | 28336L109 | EL PASO CORP | 852,697 | $0.00 |
| 6/28/2005 | 7/15/2005 | 28336L109 | EL PASO CORP | 340,175 | $0.00 |
| 6/28/2005 | 7/6/2005 | 093442103 | ENTERGY CORPORATION-NEW | 70,000 | $0.00 |
| 6/28/2005 | 7/6/2005 | 30161N101 | EXELON CORP | 203,400 | $0.00 |
| 6/28/2005 | 7/6/2005 | 982960107 | ONEOK INC NEW | 188,500 | $0.00 |
| 6/28/2005 | 7/6/2005 | 704326107 | PAYCHEX INC | 30,000 | $0.00 |
| 6/28/2005 | 7/5/2005 | 737628107 | POTLATCH CORP | 16 | $0.00 |
| 6/28/2005 | 7/5/2005 | 737628107 | POTLATCH CORP | 21,375 | $0.00 |
| 6/28/2005 | 7/6/2005 | 720279108 | PIER 1 IMPORTS INC-DEL | 15,000 | $0.00 |
| 6/28/2005 | 8/29/2005 | 74438510Z | QUESTAR CORP | 4,300 | $0.00 |
| 6/28/2005 | 8/29/2005 | 74438510Z | QUESTAR CORP | 23,500 | $0.00 |
| 6/28/2005 | 7/6/2005 | 90286110F | UGI CORP-NEW | 860,500 | $0.00 |
| 6/28/2005 | 7/6/2005 | 097023102 | BOEING CO | 125,900 | $0.00 |
| 6/28/2005 | 8/19/2005 | 14911310Z | SATELLITE DEV CORP (REIT)-NEW | 250,000 | $67,500.00 |
| 6/29/2005 | 7/6/2005 | 20825C104 | CONOCOPHILLIPS | 20,000 | $0.00 |
| 6/29/2005 | 7/6/2005 | 19298W107 | COMHACH SERVICES CORP INCM DEP SECS CL A BTK & SR SECD NOTES DUE 2024 | 43,500 | $0.00 |
| 6/29/2005 | 7/6/2005 | 28364Q107 | ENTERGY CORPORATION-NEW | 90,000 | $0.00 |
| 6/29/2005 | 7/6/2005 | 30161N101 | EXELON CORP | 173,400 | $0.00 |
| 6/29/2005 | 7/7/2005 | 66907430F | NORTHWESTERN CORP | 1,303,000 | $0.00 |
| 6/29/2005 | 7/6/2005 | 982960107 | ONEOK INC NEW | 142,500 | $0.00 |
| 6/29/2005 | 7/13/2005 | 737628107 | POTLATCH CORP | 13,962 | $0.00 |
| 6/29/2005 | 7/13/2005 | 737628107 | POTLATCH CORP | 466 | $0.00 |
| 6/29/2005 | 7/6/2005 | 824348109 | SHERWIN WILLIAMS CO | 230,000 | $0.00 |
| 6/29/2005 | 7/6/2005 | 74438510Z | QUESTAR CORP | 4,500 | $0.00 |
| 6/29/2005 | 7/6/2005 | 74438510Z | QUESTAR CORP | 25,800 | $0.00 |
| 6/29/2005 | 7/6/2005 | 876120106 | TARGET CORP | 150,000 | $0.00 |
| 6/29/2005 | 7/6/2005 | 90286110F | UGI CORP-NEW | 831,500 | $0.00 |
| 6/29/2005 | 7/6/2005 | 931142103 | WAL-MART STORES INC | 315,000 | $0.00 |
| 6/30/2005 | 7/6/2005 | 097023102 | BOEING CO | 78,900 | $0.00 |
| 6/30/2005 | 7/15/2005 | 11175410F | BROOKLINE BANCORP INC | 224,079 | $0.00 |
| 6/30/2005 | 8/19/2005 | 14911310Z | SATELLITE DEV CORP (REIT)-NEW | 400,000 | $108,000.00 |
| 6/30/2005 | 7/6/2005 | 20825C104 | CONOCOPHILLIPS | 180,000 | $0.00 |
| 6/30/2005 | 7/6/2005 | 19298W107 | COMHACH SERVICES CORP INCM DEP SECS CL A BTK & SR SECD NOTES DUE 2024 | 37,500 | $0.00 |
| 6/30/2005 | 7/6/2005 | 28364Q103 | ENTERGY CORPORATION-NEW | 50,000 | $0.00 |
| 6/30/2005 | 7/6/2005 | 30161N101 | EXELON CORP | 143,400 | $0.00 |
| 6/30/2005 | 7/7/2005 | 401698105 | GUIDANT CORP | 1,210,000 | $0.00 |
| 6/30/2005 | 7/13/2005 | 982960107 | ONEOK INC NEW | 90,500 | $0.00 |
| 6/30/2005 | 7/6/2005 | 824348109 | SHERWIN WILLIAMS CO | 210,000 | $0.00 |
| 6/30/2005 | 7/6/2005 | 74438510Z | QUESTAR CORP | 3,300 | $0.00 |
| 6/30/2005 | 7/6/2005 | 74438510Z | QUESTAR CORP | 19,800 | $0.00 |
| 6/30/2005 | 7/6/2005 | 87612810F | TARGET CORP | 100,000 | $0.00 |
| 6/30/2005 | 7/7/2005 | 90286110F | UGI CORP-NEW | 796,500 | $0.00 |
| 6/30/2005 | 8/6/2005 | 931142103 | UNITED PARCEL SERVICE CL B | 20,000 | $9,600.00 |
| 6/30/2005 | 7/6/2005 | 931142103 | WAL-MART STORES INC | 190,000 | $0.00 |
| 6/30/2005 | 10/28/2005 | 019456704 | ALLIED WASTE INDUSTRIES INC CVT PFD 6.25% DTD 03/06/2003 | 80,000 | $234,375.00 |
| 7/1/2005 | 7/6/2005 | 401698105 | GUIDANT CORP | 449,500 | $0.00 |
| 7/1/2005 | 7/8/2005 | 44813MP10F | INVERNESS MEDICAL INNOVATIONS INC-NEW | 499,300 | $0.00 |
| 7/1/2005 | 7/8/2005 | 44813MP10F | INVERNESS MEDICAL INNOVATIONS INC-NEW | 55,300 | $0.00 |
| 7/1/2005 | 1/3/2006 | 552953102 | MBIA CORP | 50,000 | $6,400.00 |
| 7/1/2005 | 7/15/2005 | 577778102 | MAY DEPARTMENT STORES CO | 1,920,000 | $0.00 |
| 7/1/2005 | 7/15/2005 | 577778102 | MAY DEPARTMENT STORES CO | 480,000 | $0.00 |
| 7/1/2005 | 7/8/2005 | 66907430F | NORTHWESTERN CORP | 1,207,000 | $0.00 |
| 7/1/2005 | 8/5/2005 | 75878610F | REGAL ENTERTAINMENT GROUP CL A | 10,326 | $0.00 |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001371

943

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001372

944

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001373

945

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL – NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001374

946

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001375

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSIWHTAX001378

948



STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PS/WHTAX001377

949

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001378

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|
| 10/25/2005 | 9/3/2006 | 75145200F | RAMCO-GERSHENSON PROP TR PFD 7.95%($2.26875) SERIES C | 150,000 | $234,883.50 |
| 10/25/2005 | 9/3/2006 | 89640430F | TRUSTREET PROPERTIES INC CVT PFD 7.50%($1.875) | 113,800 | $106,687.50 |
| 10/25/2005 | 9/29/2006 | 912909207 | UNITED STATES STEEL CORP CVT PFD 7.00% ($3.50) | 101,430 | $355,005.00 |
| 10/26/2005 | 11/1/2005 | 737628107 | POTLATCH CORP | 3,404 | $0.00 |
| 10/26/2005 | 11/1/2005 | 737628107 | POTLATCH CORP | 105 | $0.00 |
| 10/27/2005 | 11/2/2005 | 901958107 | QUIDANT CORP | 3,397,599 | $0.00 |
| 10/27/2005 | 11/2/2005 | 737628107 | POTLATCH CORP | 1,848 | $0.00 |
| 10/27/2005 | 11/2/2005 | 737628107 | POTLATCH CORP | 96 | $0.00 |
| 10/27/2005 | 2/22/2006 | 68269540F | SCC CAPITAL CORPORATION | 2,064,797 | $331,683.48 |
| 10/28/2005 | 12/22/2005 | 901958107 | QUIDANT CORP | 2,067,880 | $296,789.80 |
| 10/28/2005 | 11/3/2005 | 737628107 | POTLATCH CORP | 1,153 | $0.00 |
| 10/28/2005 | 11/3/2005 | 737628107 | POTLATCH CORP | 51 | $0.00 |
| 10/31/2005 | 2/27/2006 | 786890283F | EAGLE MATERIALS INC CL B | 60,400 | $180,800.00 |
| 10/31/2005 | 11/4/2005 | 737628107 | POTLATCH CORP | 10,025 | $0.00 |
| 10/31/2005 | 11/4/2005 | 737628107 | POTLATCH CORP | 321 | $0.00 |
| 10/31/2005 | 12/13/2005 | 982517106 | PPL CORP | 120,100 | $36,035.00 |
| 10/31/2005 | 12/13/2005 | 982517106 | PPL CORP | 676,000 | $169,575.00 |
| 10/31/2005 | 11/21/2005 | 00184070F | AT&T CORP-NEW | 51,063 | $0.00 |
| 10/31/2005 | 11/21/2005 | 00184070F | AT&T CORP-NEW | 2,433 | $0.00 |
| 10/31/2005 | 3/3/2006 | 98454910F | TRI CONTINENTAL CORP | 60,700 | $3,946.00 |
| 10/31/2005 | 3/3/2006 | 98866410F | ZWEIG FUND INC | 115,400 | $51,216.80 |
| 10/31/2005 | 3/3/2006 | 98963710F | ZWEIG TOTAL RETURN FD INC | 316,300 | $98,056.70 |
| 11/1/2005 | 11/7/2005 | 737628107 | POTLATCH CORP | 4,325 | $0.00 |
| 11/1/2005 | 11/7/2005 | 737628107 | POTLATCH CORP | 121 | $0.00 |
| 11/1/2005 | 11/9/2005 | 737628107 | POTLATCH CORP | 12,370 | $0.00 |
| 11/2/2005 | 11/8/2005 | 737628107 | POTLATCH CORP | 418 | $0.00 |
| 11/2/2005 | 11/18/2005 | 75879910F | REGAL ENTERTAINMENT GROUP CL A | 14,830 | $0.00 |
| 11/2/2005 | 11/16/2005 | 75879910F | REGAL ENTERTAINMENT GROUP CL A | 182,375 | $0.00 |
| 11/3/2005 | 11/18/2005 | 75879910F | REGAL ENTERTAINMENT GROUP CL A | 5,675 | $0.00 |
| 11/4/2005 | 11/17/2005 | 737628107 | POTLATCH CORP | 177 | $19.05 |
| 11/4/2005 | 11/17/2005 | 737628107 | POTLATCH CORP | 3,281 | $469.10 |
| 11/8/2005 | 12/9/2005 | 786075102F | SAFFRON FUND INC | 200,000 | $0.00 |
| 11/9/2005 | 11/23/2005 | 594918104 | MICROSOFT CORP | 52,000 | $4,160.00 |
| 11/10/2005 | 11/18/2005 | 75879810F | REGAL ENTERTAINMENT GROUP CL A | 7,375 | $0.00 |
| 11/10/2005 | 11/18/2005 | 75879810F | REGAL ENTERTAINMENT GROUP CL A | 85,145 | $0.00 |
| 11/14/2005 | 11/18/2005 | 75879810F | REGAL ENTERTAINMENT GROUP CL A | 3,450 | $0.00 |
| 11/14/2005 | 11/17/2005 | 02200810F | ALTRIA GROUP INC | 290,520 | $0.00 |
| 11/14/2005 | 7/11/2006 | 02200810F | ALTRIA GROUP INC | 46,800 | $112,512.00 |
| 11/14/2005 | 7/11/2006 | 02200810F | ALTRIA GROUP INC | 294,500 | $708,960.00 |
| 11/15/2005 | 12/30/2005 | 37990710F | GOLD BANC CORP | 257,500 | $0.00 |
| 11/15/2005 | 1/4/2006 | 37990710F | GOLD BANC CORP | 297,850 | $0.00 |
| 11/17/2005 | 12/30/2005 | 373405207 | GENTEK INC-NEW | 58,838 | $0.00 |
| 11/17/2005 | 7/31/2006 | 02200810F | ALTRIA GROUP INC | 750 | $1,800.00 |
| 11/17/2005 | 6/17/2006 | 02200810F | GOLD BANC CORP | 51,750 | $124,200.00 |
| 11/17/2005 | 9/13/2006 | 02200810F | ALTRIA GROUP INC | 750 | $1,800.00 |
| 11/18/2005 | 11/29/2005 | 37990710F | GOLD BANC CORP | 13,700 | $0.00 |
| 11/18/2005 | 7/31/2006 | 02200810F | ALTRIA GROUP INC | 1,500 | $3,600.00 |
| 11/18/2005 | 9/13/2006 | 02200810F | ALTRIA GROUP INC | 150 | $360.00 |
| 11/18/2005 | 9/13/2006 | 02200810F | ALTRIA GROUP INC | 10,350 | $24,840.00 |
| 11/18/2005 | 11/29/2005 | 584918104 | MICROSOFT CORP | 22,500 | $0.00 |
| 11/21/2005 | 12/1/2005 | 37990710F | GOLD BANC CORP | 1,150 | $0.00 |
| 11/21/2005 | 11/29/2005 | 78387010F | SBC COMMUNICATIONS INC | 7 | $0.00 |
| 11/21/2005 | 11/23/2005 | 78387010F | SBC COMMUNICATIONS INC | 3 | $0.00 |
| 11/21/2005 | 11/29/2005 | 78387010F | SBC COMMUNICATIONS INC | 39,465 | $0.00 |
| 11/21/2005 | 12/1/2005 | 78387010F | SBC COMMUNICATIONS INC | 333,965 | $0.00 |
| 11/21/2005 | 12/1/2005 | 78387010F | SBC COMMUNICATIONS INC | 9,078 | $0.00 |
| 11/21/2005 | 3/21/2006 | 903861102 | UGI CORP-NEW | 3,600 | $1,215.90 |
| 11/21/2005 | 4/3/2006 | 56295610F | UGI CORP-NEW | 11,400 | $3,850.35 |
| 11/22/2005 | 3/21/2006 | 04690010F | ATMOS ENERGY CORP | 52,000 | $32,760.00 |
| 11/22/2005 | 3/21/2006 | 04690010F | ATMOS ENERGY CORP | 293,000 | $185,590.00 |
| 11/22/2005 | 9/15/2006 | 25159110F | DEVELOPERS DIVERSIFIED RLTY CP CORP | 10,000 | $17,200.00 |
| 11/22/2005 | 3/17/2006 | 26186610F | DNR COMMUNITIES TRUST | 140,000 | $31,861.50 |
| 11/22/2005 | 2/23/2006 | 26186210F | DNR COMMUNITIES TRUST | 95,000 | $21,612.50 |
| 11/22/2005 | 1/3/2006 | 56262100F | MBNA CORP | 20,000 | $2,600.00 |
| 11/22/2005 | 6/6/2006 | 76621310F | REGENCY ASSOCIATES REALTY CORP | 30,000 | $0.00 |
| 11/22/2005 | 6/6/2006 | 76621310F | REGENCY ASSOCIATES REALTY CORP | 30,200 | $0.00 |
| 11/23/2005 | 12/2/2006 | 12506867F | CMS ENERGY CORP CVT PFD 4.50%($2.25) DTD 12/05/2003 | 808,170 | $0.00 |
| 11/23/2005 | 5/2/2006 | 56262100F | MBNA CORP | 100,200 | $14,000.00 |
| 11/28/2005 | 12/1/2005 | 37990710F | GOLD BANC CORP | 1,800 | $0.00 |
| 11/28/2005 | 12/2/2005 | 78387010F | SBC COMMUNICATIONS INC | 195,428 | $0.00 |
| 11/28/2005 | 12/2/2005 | 78387010F | SBC COMMUNICATIONS INC | 3,874 | $0.00 |
| 11/28/2005 | 2/1/2006 | 12566867F | CMS ENERGY CORP CVT PFD DIV 4.50%($2.25) DTD 12/05/2003 | 406,170 | $0.00 |
| 11/28/2005 | 12/6/2005 | 37990710F | GOLD BANC CORP | 17,282 | $0.00 |
| 11/29/2005 | 12/8/2005 | 836518106F | SOUTH JERSEY INDUSTRIES INC | 98,000 | $0.00 |
| 11/30/2005 | 12/8/2005 | 836518106F | SOUTH JERSEY INDUSTRIES INC | 273,800 | $0.00 |
| 11/30/2005 | 12/8/2005 | 37990710F | GOLD BANC CORP | 239,332 | $0.00 |
| 11/30/2005 | 12/8/2005 | 836518106F | SOUTH JERSEY INDUSTRIES INC | 56,200 | $0.00 |
| 11/30/2005 | 12/8/2005 | 836518106F | SOUTH JERSEY INDUSTRIES INC | 231,200 | $0.00 |
| 11/30/2005 | 3/3/2006 | 98963710F | ZWEIG TOTAL RETURN FD INC | 40,000 | $16,297.60 |
| 12/1/2005 | 12/7/2005 | 37990710F | GOLD BANC CORP | 165,332 | $0.00 |
| 12/1/2005 | 12/7/2005 | 836518106F | SOUTH JERSEY INDUSTRIES INC | 55,600 | $0.00 |
| 12/2/2005 | 12/8/2005 | 836518106F | SOUTH JERSEY INDUSTRIES INC | 314,800 | $0.00 |
| 12/2/2005 | 12/21/2005 | 37990710F | GOLD BANC CORP | 109,332 | $0.00 |
| 12/2/2005 | 12/8/2005 | 836518106F | SOUTH JERSEY INDUSTRIES INC | 47,000 | $9,450.00 |
| 12/2/2005 | 12/8/2005 | 836518106F | SOUTH JERSEY INDUSTRIES INC | 237,800 | $53,906.00 |
| 12/5/2005 | 1/3/2006 | 12468730F | C B RICHARD ELLIS CLASS B | 251,378 | $0.00 |
| 12/6/2005 | 1/6/2006 | 836518106F | SOUTH JERSEY INDUSTRIES INC | 41,300 | $9,270.00 |
| 12/6/2005 | 1/6/2006 | 836518106F | SOUTH JERSEY INDUSTRIES INC | 232,800 | $52,396.00 |
| 12/6/2005 | 12/12/2007 | 78687910F | SAFFRON FUND INC | 250,000 | $0.00 |
| 12/6/2005 | 6/16/2006 | 84253605D | SOUTHERN AFRICA FUND INC ESCROW | 4,600 | $0.00 |
| 12/6/2005 | 6/16/2006 | 84253705D | SOUTHERN AFRICA FUND INC ESCROW | 122,000 | $0.00 |
| 12/8/2005 | 12/19/2005 | 982517106 | PPL CORP | 118,800 | $29,850.00 |
| 12/8/2005 | 12/19/2005 | 982517106 | PPL CORP | 671,400 | $167,850.00 |
| 12/13/2005 | 12/19/2005 | 982517106 | PPL CORP | 117,900 | $0.00 |
| 12/13/2005 | 12/19/2005 | 982517106 | PPL CORP | 667,200 | $0.00 |
| 12/13/2005 | 12/6/2006 | 70213F102 | PARTNERS TRUST FINANCIAL GROUP NEW | 345,742 | $24,411.84 |

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PSI/WHTAX001379

| Inception Date | Termination Date | Cusip Number | Security Description | Position Quantity | Dividends Paid |
|---|---|---|---|---|---|

STRICTLY CONFIDENTIAL - NOT FOR CIRCULATION/SUBCOMMITTEE MEMBERS AND STAFF ONLY

CITI_PS/WHTAX001380

# Exhibit 39

Case 1:18-md-02865-LAK    Document 808-18    Filed 05/12/22    Page 283 of 1574

GAARs – A Key Element of Tax Systems in the Post-BEPS Tax World - Chapter 1: General Report: GAARs - Books (Last Reviewed:15 December 2015)

# Chapter 1: General Report: GAARs

**Author**

Richard Krever

## 1.1. Introduction

While they are very recent additions to some countries' tax laws, GAARs have played a central role in other tax systems for well over a century. [1] Quite possibly no other feature of tax law provides a better insight into a nation's tax psyche than its anti-avoidance rules. The intersection of general anti-avoidance rules (GAARs) – as well as their ancillary specific anti-avoidance rules (SAARs) – with operative provisions of tax law reveals much about all aspects of a country's tax system: citizens' tax morale; judicial perspectives on taxation and legal interpretation; drafters' inclinations towards technical or principled drafting; and legislators' willingness to confront politically sensitive issues or their tendency to delegate the tough decisions to administrators and courts. A comparative analysis of the role of GAARs (or the lack of any GAAR) in tax systems such as that found in this volume can thus offer unique perspectives on tax law across jurisdictions. [2]

At the same time, comparative study of GAARs raises challenges rarely encountered in other areas of tax law. While some tax concepts – transfer pricing, thin capitalization and permanent establishment, for example – have common meanings across jurisdictions and tax systems, even if the details vary at the margins, there appears to be no universal understanding of what constitutes a GAAR or, for that matter, what constitutes "tax avoidance", the notional target of a GAAR. At one end of the spectrum, the avoidance label is limited to convoluted and, at best, quasi-legal transactions verging on evasion; [3] at the other, legitimate choices between alternatives yielding different tax outcomes can amount to avoidance in some circumstances.

There is an equally wide spectrum of definitions of a GAAR. In most countries, the GAAR takes the form of a statutory rule, albeit with an extremely large range of constructions. This is not always the case, however. In a jurisdiction lacking a statutory rule, a doctrinal approach based only on judicial interpretation might be considered a GAAR. [4]

There is similarly a divergence of views on the merits of, or drawbacks to, reliance on a GAAR as a tool to safeguard the integrity of a tax system. The most commonly cited drawbacks are uncertainty for taxpayers and unfairness resulting from selective application. The two perceived problems are related. Because a GAAR is only applied after the fact, taxpayers cannot make investments predicting particular after-tax rates of return – a key expectation essential to the efficient allocation of capital in any market economy – as they cannot know with certainty what the tax consequences of their intended actions will be after possible application of a GAAR. [5] For the same reason, the law will apply differently to different taxpayers in the same circumstances. Unlike a substantive tax rule, which sets out general rules for all taxpayers in a particular situation, a GAAR applies to each case separately, and its elements, including the taxpayer's purpose (to the extent this is incorporated into the rule), must be considered separately for each case. [6] Only a portion of the pool of taxpayers who may have entered into similar transactions are subject to audit and only some of those transactions might be identified as transactions to which the GAAR might apply, with the rule applied successfully only to a portion of this subset. Equal application to all taxpayers of a rule that looks at the totality of circumstances in each case – including, as it does in most instances, the motives of each particular taxpayer – is not possible.

Commentators sympathetic to the use of GAARs view these concerns as exaggerated. While they may have some legitimacy prior to the first GAAR cases being heard, proponents of GAARs argue, once the outcomes of attempts to apply the GAAR are known, the rule can act as a supplement to substantive measures by showing how particular types of arrangements are likely to be treated under the rule, inhibiting behaviour similar to that known to be caught. To the extent that the concerns of critics are valid, supporters might further argue, the rule is nevertheless necessary to protect the integrity of the tax law, given the inherent limitations on drafters' ability to anticipate every possible alternative transaction open to taxpayers. [7] The most realistic of supporters concede that there is inherent uncertainty arising from a GAAR but argue that this is a price that has to be paid in the interest of the larger goal of protecting the integrity of the tax base.

---

1.  See, for example, New Zealand, which has had a GAAR for 139 years.
2.  This general report analysis refers to chapters in this volume on specific jurisdictions by use of the name of the country covered in the chapter.
3.  Russian jurisprudence, for example, merges avoidance and evasion into a single issue; see Russia.
4.  See, for example, Norway and Russia.
5.  See, for example, Poland. It has been suggested that the latitude afforded tax authorities by a GAAR is fundamentally incompatible with the certainty that Adam Smith saw as a cornerstone of legitimate taxation; see Ireland.
6.  See Germany.
7.  See Finland.

© Copyright 2021  BFD: No part of this information may be reproduced or distributed without permission of  BFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 17 Dec. 2021 by Stephen.shay@ropesgray.com.

Case 1:18-md-02865-LAK    Document 808-18    Filed 05/12/22    Page 284 of 1574

GAARs – A Key Element of Tax Systems in the Post-BEPS Tax World - Chapter 1: General Report: GAARs - Books
(Last Reviewed:15 December 2015)

Whatever their merits or flaws, there is no doubt that the lack of precise borders in a GAAR transfers great power and responsibility to the adjudicators. Supporters of a GAAR have to hope that the judges will exercise those powers, in the words of a minister who oversaw the introduction of a GAAR in the Netherlands, "as good men". [8]

While GAARs have proliferated in modern times, they are not universal and proposals to introduce GAARs sometimes flounder in the face of resolute opposition, including that of the legislature. [9] Jurisdictions reluctant to adopt GAARs delegate to the courts the task of identifying cases where the taxpayer's characterization of transactions could or should be rejected [10] or rely on specific legislative responses where the courts decline to look beyond legal form even where transactions were carried out in a particular form with the clear objective of tax avoidance. [11] In the rarest cases, there is no effective remedy in the absence of a GAAR. [12]

Somewhat ironically, the absence of a GAAR in a jurisdiction may be interpreted by courts as a sign that the legislature is willing to tolerate avoidance when other jurisdictions with similar legal backgrounds have adopted GAARs. In these cases, it may be an implicit judicial invitation that prompts enactment of a GAAR. [13] Also, ironically, adoption of a GAAR may have the opposite effect: there is a risk that adoption of a statutory GAAR will inhibit courts from adopting more robust interpretation doctrines to reduce opportunities for avoidance on the assumption that the legislature has fully occupied the anti-avoidance field. [14]

## 1.2. Models

While the forms of GAARs vary widely, they generally fall into four groups.

One group, the "acts and benefits" group, comprises rules that allow the tax authorities to identify a transaction or series of transactions that had the purpose or (more rarely) effect of providing a tax benefit and then recompute the taxpayer's liability on the basis of a hypothetical transaction that the tax authorities surmise would have been the one used had the taxpayer not followed the tax-effective path it did. GAARs in this group look at acts carried out and benefits realized, without the need to identify an economic substance. [15]

A second group, usually with a statutory base but on occasion derived solely from judicial practice, [16] sets out rules that mandate an interpretation and application of tax law to the economic substance of a transaction (or series of transactions) rather than the legal form. [17] The rule will normally allow the tax authorities to reassess the taxpayer on the basis of a hypothetical legal transaction that better reflects the underlying economic substance. While almost all jurisdictions with a statutory substance over form rule regard the rule as a GAAR, [18] this characterization of the rule is not universal. [19] Nor is the view that a judicial substance over form rule (or variations such as the "true import" of an arrangement) amounts to a GAAR. [20]

A possible third model, it is argued by some, is a judicial "GAAR" based on the adoption by the courts of a broad abuse of law doctrine. [21]

A fourth model is a statutory abuse of law model that applies where a taxpayer adopts a fictitious arrangement or one that is valid in law but used to defeat the intention of the tax legislation. [22]

Whether a GAAR takes the form of the classic tax benefit identification rule or an economic substance or abuse of law rule, it can only be effective if it allows a reassessment on the basis of a hypothetical alternative transaction different from the legal form chosen by the taxpayer to minimize tax. In the case of an explicit reconstruction rule, the tax authorities are allowed to substitute an appropriate arrangement for the one used by the taxpayer. An economic substance rule, in contrast, opens the door to assessment on the basis of applying the tax law directly but interpreting the circumstances to fit into the law.

The difference between the two can be illustrated with the example of a taxpayer entering into a complex set of arrangements to avoid a loan having the form of a debt. Under the explicit reconstruction rule, the tax authorities would be allowed to substitute a fictional transaction (a direct loan) for the arrangements used by the taxpayer. Under the economic substance approach, the

---

8.  See the Netherlands.
9.  See, for example, Mexico and, initially, the United Kingdom (the UK position has since reversed, and a GAAR was adopted in 2013).
10. See, for example, Brazil. Croatia has an  economic substance  provision, but some argue this does not amount to a GAAR.
11. See, for example, Denmark.
12. See, for example, Mexico.
13. See, for example, Ireland.
14. See Australia.
15. The  acts and benefits  GAARs are mostly found in Anglo jurisdictions such as Australia, Canada, India, New Zealand, South Africa and the United Kingdom, although some other GAARs, including China's and the current (but not the proposed replacement) Italian GAAR, also satisfy this definition.
16. In one case, the judicial substance over form test was subsequently codified; see United States.
17. In the case of Turkey, this is labelled the  real  substance; see Turkey.
18. See, for example, Switzerland.
19. See, for example, the debate in Korea.
20. See, for example, Sweden, where the true import alternative is considered quite distinct from the GAAR.
21. See, for example, the Czech Republic.
22. See, for example, France.

Exported / Printed on 17 Dec. 2021 by Stephen.shay@ropesgray.com.

Case 1:18-md-02865-LAK    Document 808-18    Filed 05/12/22    Page 285 of 1574

**GAARs – A Key Element of Tax Systems in the Post-BEPS Tax World - Chapter 1: General Report: GAARs - Books (Last Reviewed:15 December 2015)**

tax authorities can look at the totality of the arrangements and find that there actually is a loan, albeit by a somewhat complex route, and apply the tax law for debt directly. Commonly, the power of the tax authorities to reassess on the basis of an alternative hypothetical transaction is clear, whether it is based on an explicit or an implicit construction of the GAAR. In some rarer cases, however, there is debate over how the GAAR operates in this respect. [23]

# 1.3. When is the GAAR used?

While GAARs differ significantly in form and language, there are some remarkable similarities between the types of cases in which tax authorities have sought (not always successfully) to invoke the GAAR. These appear to fall into three broad categories.

The most common situation is where the tax law offers, on its face, alternative tax outcomes depending on the form or structure of a transaction, and taxpayers have arranged affairs to enjoy the reduced (or nil) taxation available with one alternative rather than adopt the version, preferred by the tax authorities, that would incur a higher tax liability. These are not cases where the law offers a concession and the taxpayer has, in response to the government subsidy for targeted activities, invested or acted as the government sought. Nor are they cases where the law provides a tax advantage to achieve a tax policy outcome such as avoiding double taxation [24] or features structural asymmetries such as providing lower capital gains tax rates for taxpayers who hold assets for longer periods or providing different tax rates for taxpayers who choose to operate through different types of companies. [25] Rather, they are cases where a taxpayer changes the form of a transaction to shift from one tax rule to another.

To achieve the shift, the taxpayer often substitutes a multi-step and multi-party arrangement for the simple transaction that attracts a higher tax burden. For example, rather than lend money directly to a borrower, a lender might interpose a company and convert what would have been taxable interest paid to the lender into tax-free inter-corporate dividends from the interposed company. [26] Similarly, rather than buy immovable property or shares directly, a taxpayer may use an intermediary company to acquire the property or shares and sell interests in the intermediary company rather than the underlying assets if capital gains on the sale of interests in an intermediary company fall outside the scope of the tax law. [27] Other examples include the interposition of entities between a service provider and clients so the income can be diverted to related individuals facing lower marginal tax rates, [28] the use of an interposed entity to avoid social security taxes otherwise payable in respect of employees [29] and the creation of an interposed entity between partners and clients to provide a vehicle for distribution of tax-free benefits (by way of interest-free loans) to the former partners. [30] A further example is the creation of intellectual property, such as a copyright, to convert remuneration for personal labour services to property rights that can then be transferred to an interposed entity so the income it generates is diverted to related persons in lower tax brackets. [31]

In the second group of tax avoidance cases to which a GAAR is sometimes applied, the taxpayer seeks to shift a transaction from one tax rule to another not by establishing alternative structures and arrangements but simply by relabelling a transaction in a different form. For example, if lower tax liabilities apply when a person providing labour services is a contractor than if the person is an employee, the parties might agree to substitute a contract calling the person an independent contractor rather than an employee, without any change to the actual working conditions. [32] Similarly, an investor may fund a company by way of what is described on paper as debt but which is in fact equity with a variable "interest" rate that is actually based on the profits of the so-called borrower. [33] In theory, the arrangements could be attacked under the civil law – tax authorities could show that what seemed to be a loan was in fact an equity investment or could have a purported contractor agreement declared a sham. The problem with this approach is that it lacks any reconstruction rule that could be used as the basis for reassessment by reference to a substitute arrangement. Relying on a recharacterization of the transaction, the tax authorities could alter the assessment of the taxpayer in respect of the issue in dispute. It may be much more difficult, however, to extend that characterization to all the consequential issues that would follow in respect of the taxpayer and all other parties to the transaction. From the tax authorities' perspective, a GAAR with a provision to deal with the consequences of recharacterization is the preferable tool for attacking the arrangement.

A third category of cases in which a GAAR can be used is where taxpayers seek to exploit literal interpretations of rules accepted by courts that are inconsistent with the purpose of those rules. For example, all tax laws allow deductions for expenses incurred

---

23.   For example, in Austria, one school of thought sees the GAAR as having an independent reconstruction power, while another sees it as authorizing interpretation on the basis of an economic substance approach.
24.   See, for example, Norway.
25.   See, for example, Portugal.
26.   See, for example, Canada and Portugal.
27.   See, for example, China and Croatia.
28.   See, for example, New Zealand.
29.   See, for example, Russia.
30.   See, for example, South Africa.
31.   See, for example, South Africa.
32.   See, for example, Hungary.
33.   See, for example, India.

© Copyright 2021   BFD: No part of this information may be reproduced or distributed without permission of  BFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Case 1:18-md-02865-LAK    Document 808-18    Filed 05/12/22    Page 286 of 1574

GAARs – A Key Element of Tax Systems in the Post-BEPS Tax World - Chapter 1: General Report: GAARs - Books (Last Reviewed:15 December 2015)

to derive income so only net gains are subject to tax. Consistent with this goal, dual-purpose expenses incurred only in part to derive income and in part to achieve a tax goal unrelated to derivation of income only partially meet the threshold for deductibility. A GAAR could be used to overcome an interpretation of the law that ignored the aim of the deduction section and instead allowed a deduction for expenses that deliberately exceed expected income to achieve other tax goals. [34]

# 1.4. Taxpayer's purpose

GAARs cannot be used by tax authorities to substitute alternative hypothetical arrangements simply because a higher tax alternative exists. The trigger for application of a GAAR is almost always a subjective test – an impugned transaction or arrangement will be subject to the GAAR if the taxpayer's purpose in using the transaction or arrangement under attack was to avoid tax. While the GAAR may set out objective indicators to be used in determining the taxpayer's purpose [35] or an objective limb may be tacked onto the GAAR, [36] at the end of the day, the taxpayer's purpose usually needs to be proved or disproved. [37] Although the concept of a "purpose" sounds inherently subjective, it can be fashioned in a more objective manner by, for example, adopting an objective test such as whether it is reasonable to conclude the taxpayer's main purpose was to obtain a tax benefit. [38]

The requirement for a tax reduction purpose before the GAAR can be applied seems to be present even in cases where the law makes no mention of purpose and even in a non-statutory GAAR based on judicial substance over form doctrines. [39] For example, if the GAAR is triggered whenever the form used by the taxpayer does not conform to the ultimate economic substance of the transaction, read literally, the GAAR would apply even to cases where the taxpayer mistakenly adopted a form with no intention of reducing a tax liability. A provision of this sort will nevertheless commonly be read down and interpreted as requiring an intention to reduce tax before it is applied. [40] The argument that tax law should be wholly objective in nature, with no room for subjective intent in a GAAR, [41] has not found traction in practice.

Among other things, the taxpayer's purpose will depend on how broadly the impugned transaction is defined. The ultimate purpose of most transactions is commercial, apart from a limited group of avoidance schemes that generate after-tax profits when they would yield real-world economic losses. Taxpayers can almost always show that the ultimate goal of the arrangements was an economic outcome – a purchase, a sale, an investment, etc. The primary tactic of tax administrators, therefore, is to look not at the commercial goal of the entire scheme but rather to assert that there is no valid commercial explanation for a subsidiary step or series of steps undertaken for tax minimization reasons. [42] The distinction is between the aim of achieving a commercial outcome and the goal of minimizing tax by pursuing a particular path to achieve the broader outcome. [43]

There is wide variation in the threshold level of the avoidance "purpose" necessary to trigger a GAAR. Relatively rare, but not unknown, are thresholds that trigger the application of a GAAR only in cases that have no plausible rationales other than obtaining a tax benefit, that is, where this is "essentially" the purpose of a transaction [44] or the "sole" purpose of the arrangements [45] or the "decisive" (the only or by far the most important) reason for the transactions. [46] An alternative high threshold construction can state that the GAAR applies only to transactions that have "no valid commercial reasons". [47]

The need for a very high or exclusive tax avoidance motive could also be stated in a negative fashion: the GAAR will not apply if there is a business purpose as well, even if it is a limited business purpose. [48] The original version of the EU's GAAR included in the CCCTB proposal, since modified, adopted a "sole" purpose tax avoidance test for application of the GAAR. [49] However, the norm is for the GAAR to apply if obtaining a tax benefit was the "main" or "primary" or "greater" purpose of a taxpayer. [50]

In some cases, it may be necessary to read the purpose test for triggering the GAAR in the context of the entire GAAR to ascertain the true threshold. For example, the apparently high threshold of a main or sole purpose test can be mitigated if the GAAR is

---

34.  See, for example, Germany.
35.  See, for example, Australia.
36.  See, for example, the Netherlands.
37.  In one case, there is no explicit or implicit reference to purpose in a GAAR, only an authorization for the tax authorities to recharacterize a transaction in accordance with its real substance; see Turkey. In practice, however, the will of the taxpayer becomes an element in the application of the GAAR.
38.  See, for example, the United Kingdom.
39.  See, for example, Norway.
40.  See, for example, Finland.
41.  See, for example, Germany.
42.  See, for example, Spain.
43.  See, for example, France.
44.  See, for example, Liechtenstein and Italy. The latter is being changed from solely to essentially .
45.  See, for example, France.
46.  See, for example, the Netherlands.
47.  See, for example, Italy. The current rule is to be replaced. However, the replacement GAAR may be interpreted as enjoying an equally high trigger threshold, applying to transactions that lack any economic substance.
48.  See Norway.
49.  The proposal has since been changed to the main purpose.
50.  The Portuguese requirement of wholly or mainly implies a possibly higher standard than simply mainly in that jurisdiction; see Portugal.

© Copyright 2021  BFD: No part of this information may be reproduced or distributed without permission of  BFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Case 1:18-md-02865-LAK     Document 808-18     Filed 05/12/22     Page 287 of 1574

GAARs – A Key Element of Tax Systems in the Post-BEPS Tax World - Chapter 1: General Report: GAARs - Books (Last Reviewed:15 December 2015)

constructed in such a way that it assumes the threshold is met using objective indicators and shifts the onus onto the taxpayer to prove otherwise. [51]

In some cases, the purpose element of the GAAR is implicit rather than explicit, with the provision applying, for example, where there is no reasonable business purpose for the form taken. [52] In others, the level of unacceptable purpose is unstated – the law simply refers to the purpose of avoiding tax – but this is interpreted as meaning the main purpose of the taxpayer. [53] There are, in addition, cases where the law is silent and "the jury is still out" on what level of avoidance purpose the courts will need to recognize for the GAAR to apply. [54]

While GAARS usually turn on a single explicit or implicit purpose test, one of the most recent GAARs adopted utilizes a two-pronged test with both a positive purpose limb and a second, tainted element, negative limb. To invoke the GAAR, the tax authorities have to show, first, that the main purpose of the targeted transaction is to obtain a tax benefit and, second, that the arrangement fits into one of four categories of tainted transactions. [55] It remains too early to know how this approach will operate in practice compared to more traditional approaches.

The fact that purpose is central to the operation of even a non-statutory GAAR developed by the courts in the form of interpretation doctrines [56] illustrates the importance of purpose in almost all GAAR systems and the assumption in most systems that GAARs should only be invoked where it can be shown that transactions or arrangements were adopted mostly or exclusively for the purpose of reducing tax rather than for a commercial or private reason.

The most significant deviation from the general rule that GAARs are implicitly or explicitly triggered by the taxpayer's tax saving purpose in adopting a particular course of action or a particular set of arrangements is found in a very small number of GAARs that may be triggered both by *purpose* and *effect*. These GAARs look to the purpose behind the arrangements under attack and also, as an alternative, whether the effect of the transactions was obtaining a tax benefit, whatever the taxpayer's motivation might have been. [57] On their face, the "effect" tests look to be easier to apply from the perspective of the tax authorities, as there is no need to rely on evidence of the taxpayer's subjective intent or objective factors that could point towards particular motives.

However, the application of the "effect" test confronts the same problem raised by the purpose test in terms of how narrowly the inquiry needs to be focused. Apart from the rare cases where taxpayers turn economic losses into after-tax gains through mismatches (for example, non-recognition of some income and full recognition of related expenses), most schemes subject to GAARs are based on actual commercial transactions. The end goal is legitimate – a takeover, an investment, a sale, etc. – and the only issue is whether the steps taken to secure the outcome were deliberately chosen to reduce taxes. A GAAR that relies on purpose can only be invoked if it is restricted to some tax-driven elements of the overall plan. Similarly, the overall *effect* of the transaction will be a commercial outcome – the taxpayer will have acquired the target entity, divested the assets it wanted to sell, shifted ownership from one entity to another, and so on. A GAAR that relies on effect will also only be effective if it is possible to isolate particular transactions or arrangements and find that the effect of those elements, viewed in isolation, was a reduction in tax liability, even though the effect of the entire arrangement was a commercial outcome.

## 1.5. Counterfactual

The importance of a counterfactual to the success of a GAAR cannot be understated. There is no tax recouped simply by striking down a tax-motivated transaction or arrangement on the authority of a GAAR. Tax can only be recovered if the tax authorities are allowed to develop a counterfactual to the tax-motivated events that actually took place and assess on the basis of that hypothetical transaction. This is equally true for classic GAARs that look for transactions that were used to generate a tax benefit and "substance over form" GAARs that recharacterize the transactions actually used as another transaction that yields the same economic outcome. Tax can only be assessed on the basis of a specific transaction, be it a hypothetical alternative or a recharacterized transaction that achieves the same economic outcome as the steps in fact taken. A fully effective GAAR must also envisage a hypothetical "nil transaction" – the fiction that the taxpayer would not have entered into any transaction if the actual one undertaken is disregarded for tax purposes. [58]

GAARs differ dramatically in terms of the leeway they grant authorities for developing the counterfactual transaction to be taxed. The trend has been to enhance the power of tax authorities to use counterfactuals as the basis for assessment. Thus, for example, under the GAAR formerly used in Belgium, taxpayers were able to defeat counterfactuals by showing that they had

---

51.  See, for example, South Africa.
52.  See, for example, China.
53.  See, for example, Finland.
54.  See, for example, Serbia.
55.  See India.
56.  See Norway.
57.  See, for example, New Zealand and, in respect of the GST, Australia.
58.  See Ireland.

R. Krever, Chapter 1  General Report  GAARs in GAARs – A Key Element of Tax Systems in the Post-BEPS Tax World (M. Lang et al. eds., IBFD 2016), Books IBFD (accessed 5 August 2021).     5
© Copyright 2021   BFD: No part of this information may be reproduced or distributed without permission of  BFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Case 1:18-md-02865-LAK    Document 808-18    Filed 05/12/22    Page 288 of 1574

GAARs – A Key Element of Tax Systems in the Post-BEPS Tax World - Chapter 1: General Report: GAARs - Books (Last Reviewed:15 December 2015)

legitimate commercial aims in achieving particular legal outcomes that are not replicated in any hypothetical arrangement. Recent amendments have shifted the balance of power to the tax authorities, who can now "presume" alternatives for tax-motivated transactions, with the onus on the taxpayer to show its choice of arrangements was not tax motivated.

In every case, however, the question remains whether the alternative hypothetical transaction that the tax authorities seek to substitute for the one that took place in legal form at least is the most appropriate alternative. [59] Taxpayers may wish to argue that, if they had known the tax benefits from the transaction they entered into would be cancelled, they would have engaged in a transaction or series of transactions different from that postulated by the tax authorities. To address this problem, the laws are interpreted in most cases to shift the onus onto the taxpayer to show the tax authorities' counterfactual is not the one that would have been used to realize the economic outcome that was achieved. In the event of doubt, this priority of the tax authorities' hypothetical may be legislated. [60]

## 1.6. Abuse of the anti-abuse rule

GAARs are adopted as a means of stymying arrangements made by taxpayers that abuse the form, intent or structure of tax laws to reduce their tax liability. GAARs are subject to the same interpretative issues as other parts of tax law, however, and just as taxpayers have found ways of avoiding tax through weaknesses in the substantive tax law, tax authorities could try to find ways to abuse the GAAR and apply it to increase tax liability beyond the level envisaged in the substantive law. [61] A GAAR intended to apply where taxpayers have real net profits and no taxable income thanks to tax avoidance, for example, has been used by tax authorities to assess a taxpayer with large gross proceeds but no net profit as a result of poor business judgments. [62] Assessing on the basis of cash movements rather than actual profits might be considered an abuse of the anti-abuse rule.

## 1.7. GAARs and SAARs

All tax jurisdictions have SAARs that can operate alongside a GAAR. [63] GAARs and SAARs appear to be quite compatible – there are no reported conflicts between the two. Where a SAAR applies to the particular facts of an arrangement, it will be used in preference to the GAAR as a matter of practice and, in one case, [64] legislative fiat. On the other hand, tax authorities might be inclined to rely on the GAAR in cases where taxpayers have deliberately structured a transaction to circumvent a SAAR. [65]

One reason for the apparent compatibility of GAARs and SAARs is the fundamentally different goals and modi operandi of the two types of rules. A GAAR dismantles, for tax purposes, arrangements or agreements that can continue to be effective for civil law purposes and substitutes hypothetical arrangements and agreements in their place to recompute tax liability. A SAAR, in contrast, generally accepts the legitimacy of transactions constructed for tax purposes but negates the tax benefits from aspects of the transactions that exceed the boundaries set by the SAAR.

For example, a thin capitalization rule does not prevent investors from funding subsidiaries by way of debt rather than equity, but it establishes a limit on the interest deductions that will be available in respect of the debt. A taxpayer can avoid the operation of the SAAR completely by remaining inside the safe harbour boundaries it establishes. Similarly, a rule that removes the tax benefit from low-interest or nil-interest loans to shareholders will apply where interest charged falls below the SAAR trigger threshold, but it has no impact on loans bearing higher interest rates. [66]

By setting boundaries for the use of particular tax rules, SAARs also provide signals on what is and is not considered abusive. For example, a controlled foreign corporation (CFC) rule does not unwind any investment in a tax haven, but it does attribute some of the income to the ultimate indirect owners under some conditions. There is no suggestion that the tax authorities would seek to invoke a GAAR to attribute income to the indirect owners where the income is earned by a subsidiary in a lower tax jurisdiction not covered by the CFC regime rules or the income is of a type explicitly not attributed under the CFC rules.

The different roles of GAARs and SAARs do not preclude simultaneous application of the two types of anti-avoidance rules in appropriate circumstances. An example is the use of loans from related companies to avoid the application of thin capitalization rules that only apply to loans directly made by parent companies. The tax authorities might first apply the GAAR to recharacterize the loans from related companies as loans from the parent company and then apply the thin capitalization SAAR to limit the interest deductions available to the borrower. [67]

---

59.   The Liechtenstein law explicitly refers to the   appropriate   counterfactual as the one mandated by law.
60.   See, for example, Australia and New Zealand.
61.   Note the warning of the Finance Minister in India.
62.   See, for example, Hungary.
63.   Some narrow SAARs in the United Kingdom may be described as TAARs, or targeted anti-avoidance rules; see the United Kingdom.
64.   See Germany.
65.   See the view offered in Ireland.
66.   See, for example, Liechtenstein.
67.   For examples, see Russia and Spain.

© Copyright 2021   BFD: No part of this information may be reproduced or distributed without permission of  BFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Case 1:18-md-02865-LAK    Document 808-18    Filed 05/12/22    Page 289 of 1574

GAARs – A Key Element of Tax Systems in the Post-BEPS Tax World - Chapter 1: General Report: GAARs - Books (Last Reviewed:15 December 2015)

An interesting question in respect of the relationship between GAARs and SAARs is what happens if there is no SAAR and the taxpayer enters into a transaction that would be caught by SAARs in other jurisdictions. This would be the case, for example, if a taxpayer used very high levels of debt to provide capital to a foreign subsidiary when there is no thin capitalization rule or invested via subsidiaries in low-tax jurisdictions when there is no CFC rule in effect. It has been suggested that the inaction of a legislature in areas such as these implicitly signals acceptance of the arrangements that would have transgressed the boundaries established by a SAAR. [68] The proposition remains untested in the courts.

## 1.8. GAARs and tax treaties

Can a GAAR in a country's domestic law be used to deny the benefits of a tax treaty? The Commentaries on the OECD Model Convention suggest that domestic GAARs are compatible with the application of a treaty. [69] This is despite the fact that, through a variety of mechanisms including constitutional design, [70] almost all countries ensure that treaties will override domestic law.

In some cases, the compatibility of domestic law GAARs and treaties that override domestic law derives from the treaties themselves (or ancillary agreements). Thus, treaties may include a measure that states directly that the treaties will not prevent authorities from applying domestic anti-avoidance rules. [71] Alternatively, the parties may agree jointly in supplementary materials that domestic GAARs can be used to counter transactions that seek to abuse the treaty. [72]

In most cases, however, treaties are silent on the question of domestic GAAR rules. While a country's domestic law or a mechanism that establishes the priority of a tax treaty over domestic tax law can explicitly provide for the continued operation of a domestic GAAR despite any application of a treaty, [73] this is not the case in many jurisdictions. Nevertheless, even in the absence of a clear mandate to allow a domestic GAAR to deny a treaty benefit, courts will generally accept the application of a GAAR to an arrangement that is seen as abuse of a provision of the treaty. [74] How is this apparent contradiction resolved?

The answer appears to be the order in which domestic law and treaties are applied. There is no question that a treaty will prevail in any case where the treaty removes or qualifies a jurisdiction's ability to assess particular types of income or where the treaty stipulates a maximum tax rate to be imposed on some types of income that is lower than the rate which would apply under domestic law. But before the treaty can be invoked, domestic law will determine the income to which the treaty will apply. Unlike the assessment or rate provisions of domestic law that are explicitly addressed and overridden by a treaty, GAARs operate in the background of a domestic tax law, allowing tax authorities to recharacterize and establish net income at a stage prior to consideration of how the treaty will apply. Put simply, there is no scope for the treaty to apply to an arrangement that no longer exists once a transaction has been viewed differently under domestic law following the application of a GAAR reconstruction rule. [75] This interpretation of the operation of a GAAR is arguably consistent with the treaties and the Commentary on the OECD Model. [76] Importantly, it involves no treaty override.

It could, however, be more difficult to make this argument if the treaty provides definitions that prima facie cover the transaction established by a taxpayer. For example, if the taxpayer's tax return includes an amount that would be treated as a royalty under the treaty definition, it might be difficult for the tax authorities to assert that it can view the taxpayer's gain as interest or a dividend following a reconstruction of the arrangement under the GAAR. There is a view that in these circumstances the GAAR cannot be invoked to yield a result different from the result obtained following direct application of the treaty using the treaty definitions. [77]

The effect of applying a GAAR in a transaction involving treaties could involve assessment of a non-resident, raising questions of how tax can be collected. For example, if investors in a third country invest by way of a nominee or holding company established in a treaty partner state to shield themselves from tax on the sale of assets in the source state, the GAAR could be used to reconstruct the arrangement as a direct sale by the ultimate owners, outside the protection of the treaty. However, unless there is a way of collecting tax by imposing a withholding obligation on a local taxpayer, [78] the local authorities may end up assessing an entity in a tax haven, making collection of the tax problematic. [79]

---

68.    See, for example, India.
69.    See paragraph 22 of the Commentary on Article 1 of the OECD Model Convention.
70.    See, for example, Ireland.
71.    See, for example, Hungary and Liechtenstein.
72.    See, for example, Ireland.
73.    See, for example, Australia and Romania.
74.    See, for example, Canada.
75.    See, for example, Austria and New Zealand.
76.    See, for example, Poland.
77.    See, for example, Norway.
78.    See, for example, China.
79.    See, for example, Korea.

© Copyright 2021  BFD: No part of this information may be reproduced or distributed without permission of  BFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Case 1:18-md-02865-LAK    Document 808-18    Filed 05/12/22    Page 290 of 1574

GAARs – A Key Element of Tax Systems in the Post-BEPS Tax World - Chapter 1: General Report: GAARs - Books (Last Reviewed:15 December 2015)

## 1.9. GAARs and EU law

In the past decade and a half, the ECJ has walked a very challenging tightrope seeking to reconcile two potentially conflicting principles: on the one side, the power of Member States to legislate in the direct tax field, an area of Member State competence, and, on the other side, the prohibition on Member States adopting policies that prejudice nationals of other Member States contrary to the fundamental freedoms enshrined in EU law. It has balanced the two by allowing national laws, which would include GAARs, to apply in cases where a taxpayer has adopted an abusive practice, generally defined in terms of its artificiality combined with its tax avoidance purpose. [80] The question of when arrangements can be attacked by a GAAR without infringing fundamental freedoms is fraught with uncertainty, and commentators have questioned whether tax authorities in their jurisdictions would succeed in all cases in which they might seek to use a GAAR to stop what they perceive as intra-European tax avoidance. [81] Also uncertain is whether the proportionality principle would permit the use of a GAAR to prevent tax avoidance in a situation that falls short of a wholly artificial arrangement. [82]

On the surface, there appears to be more certainty regarding the supremacy of EU law over anti-avoidance provisions in the indirect (VAT) tax laws, perhaps in part because there is a de facto European VAT law in the form of the VAT Directive, a measure that has no direct tax counterpart. On closer examination, however, it could be argued that the domestic "anti-avoidance" rules found to be inconsistent with, and consequently overridden by, EU law are in fact not anti-avoidance rules but poorly targeted and burdensome measures used by local authorities as a substitute for sound auditing to expose fraud (rather than avoidance in the strict sense of the word). [83]

## 1.10. Alternatives to a GAAR

GAARs are adopted in environments in which courts have interpreted tax laws in a way that allows taxpayers to achieve tax outcomes inconsistent with those intended for the economic outcomes resulting from particular transactions. Such interpretations may be possible because of vague borderlines in the law where receipts or expenditures on either side of the border are subject to very different tax rules. [84] These interpretations may also be possible because economically similar transactions can attract different tax consequences if they adopt different legal forms. In some cases, the result is attributable to tax law being structured in a way that allows taxpayers to dissect overall transactions into separate parts and exploit the manner in which the separate rules for each step operate together.

Almost every example of a situation that has prompted the adoption of a GAAR or that was made subject to reassessment on the basis of a GAAR has pointed to an issue with the underlying law. Not surprisingly, a number of national commentators have suggested that the simplest alternative to a GAAR is better drafted tax law. [85]

Whether this is possible remains an open question. The unlimited flexibility of commercial law in market economies provides countless legal alternatives that yield the same economic substance. Taxpayers and legislative drafters think in terms of legal and economic arrangements with which they are familiar and tax laws are drafted accordingly. Only after the fact might they discover that an alternative substance or form of transaction can achieve similar commercial outcomes. Some argue that it is impossible for legislators to draft laws so ideal that their applicability to every variation of every type of transaction can be identified.

There are also external constraints faced by the drafters of tax laws. Tax laws do not operate in isolation from other national laws. They must incorporate legal concepts – companies, partnerships, spouses, employees, and so on – based in other areas of law and these concepts often impose restrictions on tax law drafters that are difficult to overcome. Tax laws also apply to transactions that cross borders, and the ability of national drafters to modify domestic laws may be limited as a result of external factors such as the regulations or directives of an economic community to which a country belongs or treaties to which it is a party.

Tax law drafters also face inevitable political constraints. In virtually all jurisdictions, second-guessing social needs and the economy, politicians use tax laws to subsidize a range of social and economic activities. The resulting tax expenditures establish sometimes vague borderlines and invite restructuring and reorganization by taxpayers seeking to portray their activities or situations as meeting the criteria for preferential tax treatment. The political imperatives that prompt social or economic intervention and the granting of concessions in the first place may also inhibit the legislature from setting out unambiguous borderlines between alternative tax rules. The legislature may find it easier to leave line-drawing to tax authorities armed with a GAAR to attack what they perceive to be particularly egregious attempts to recharacterize transactions to take advantage of tax preferences.

---

80.    See, for example, Germany and the Netherlands.
81.    See, for example, Austria.
82.    See Finland.
83.    See, for example, Hungary.
84.    See, for example, the distinction between  ordinary income  and  capital gains  in Australia.
85.    See, for example, Austria and the Czech Republic.

---

© Copyright 2021   BFD: No part of this information may be reproduced or distributed without permission of  BFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

There are, nevertheless, clear statutory alternatives to a GAAR in many cases in which they are used. The insertion of a tax haven company between a lender and borrower to convert taxable interest to non-taxable inter-corporate dividends calls into question the wisdom of an exemption for dividends from subsidiaries located in tax havens. [86] Similarly, the use of interposed entities to avoid gains on the sale of shares or immovable property can be addressed easily by the standard provision that treats interests in interposed entities as interests in underlying property where gains on the direct sale of underlying property would be subject to tax. [87] Another case where a GAAR appears to be a blunt instrument is where it is used to attack the insertion of one-person companies or other entities between customers and individuals providing personal-services labour, [88] such as an actress providing acting services or an author writing a book. [89] Rather than attack the transaction as tax motivated and assess the individual using the GAAR, many jurisdictions rely on far more certain and consistently applied (that is, fairer) personal-service income attribution rules.

Support for the view that addressing shortcomings in the substantive tax legislation is a preferable alternative to a GAAR, with its inherent uncertainty and selective application, might be found in the uniqueness of schemes attacked with GAARs in some jurisdictions. The fact that the schemes are not widespread suggests other jurisdictions have adequate alternative statutory rules in place. For example, a GAAR has been used to attack a transfer of copyright for inadequate consideration by an author with the aim of splitting income with related persons. [90] This is an arrangement that in many other jurisdictions would trigger a capital gain (the cost base of the assigned property being zero and the consideration for transfer to related persons being the present value of the future income stream) that would render the avoidance scheme ineffective. Similarly, a transfer of a partnership business to a lower taxed company and a distribution of profits in excess of the salaries drawn by the partners in the form of interest-free loans could easily be addressed through a better definition of dividends to include non-market rate loans. [91] A thin capitalization rule that fails to take into account indirect loans made by a parent through related parties [92] could be modified so that it covers direct and indirect loans from the parent. A capital gains regime that allows taxpayers to transfer assets to related parties at book value so that the related entity can on-sell at market value, shifting the profits to the related entity, [93] can be set right by ensuring that non-arm's length sales take place at market value. An income tax that lacks dividend washing rules and that allows foreign equity owners to sell cum-dividend shares to local investors to avoid withholding tax on the dividends and then reacquire the shares ex-dividend with a small premium paid to the local party for its tax avoidance services [94] can simply incorporate conventional dividend washing measures.

The same access to alternatives is true in the case of judicial doctrines that act, in the view of some, as quasi-GAARs. A court could say it is an abuse of law if a taxpayer makes a deductible "gift" to a school but is relieved of paying tuition for the taxpayer's children. The simpler alternative is to simply note that, in the context of the purpose of the concession (tax savings for gifts to eligible institutions), the amount paid was not a "gift": a donation or gift, by definition, involves no quid pro quo.

Whether judicial doctrines, particularly substance over form approaches, form an adequate alternative to a GAAR will depend on how courts exercise their interpretative powers. It seems that, in many instances, there is scope for interpretation that would render a GAAR superfluous (although some dissent from this view [95] and others wonder whether such an approach might lead to equal uncertainty [96]). On the other hand, there are instances where substance over form interpretations have proven inadequate to the task, prompting the legislature to intervene with a statutory rule. [97]

## 1.11. Looking forward

It is only on the rarest of occasions that jurisdictions have repealed or watered down a GAAR after it has been enacted. Much more common is the amendment of GAARs to strengthen their operation. And while GAARs are not universal, they are becoming the norm in most income tax systems, with a wave of adoptions in recent times.

It appears that there are viable alternatives to GAARs including better drafted tax law in general, better drafted SAARs, better designed tax expenditures, and shifts to principle-based drafting that remove many of the weaknesses currently exploited by taxpayers seeking to minimize tax. For a variety of reasons, however, there are precious few examples of jurisdictions moving to principle-based drafting or other drafting techniques to overcome the features in their tax laws that have given rise to avoidance

---

86.    See Canada.
87.    See China.
88.    See, for example, Finland.
89.    See, for example, France and South Africa.
90.    See, for example, South Africa.
91.    See, for example, South Africa.
92.    See, for example, Russia and Spain.
93.    See, for example, Korea.
94.    See Switzerland.
95.    See, for example, Spain.
96.    See, for example, Switzerland.
97.    See, for example, the Slovak Republic.

© Copyright 2021  BFD: No part of this information may be reproduced or distributed without permission of  BFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 17 Dec. 2021 by Stephen.shay@ropesgray.com.

**GAARs – A Key Element of Tax Systems in the Post-BEPS Tax World - Chapter 1: General Report: GAARs - Books (Last Reviewed:15 December 2015)**

opportunities. In the absence of alternative designs for tax laws, advocates of GAARs argue that they are needed as a stopgap to address the inherent limitations to legislative drafting. It seems legislatures agree.

In contrast to the prevailing trend, there remain instances where judicial doctrines have limited scope and no statutory GAAR is in place. It remains an open question how long this state of affairs can continue, particularly for European nations in the context of EU support for strengthened anti-avoidance rules. [98]

---

98.    See, for example, Slovenia.

*R. Krever, Chapter 1  General Report  GAARs in GAARs – A Key Element of Tax Systems in the Post-BEPS Tax World (M. Lang et al. eds., IBFD 2016), Books IBFD (accessed 5 August 2021).*    10
© Copyright 2021  BFD: No part of this information may be reproduced or distributed without permission of  BFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

# Exhibit 40

**United States**

Branch Reporters
Hoon Lee[1]
Candice M. Turner[2]

## Summary and conclusions

Unlike many other countries, the United States does not have a statutory general anti-avoidance rule ("GAAR"). Rather, the general anti-avoidance rules in the United States were created by judicial doctrine and developed over time. Those judicial doctrines include the business purpose doctrine, the substance-over-form doctrine, the sham transaction doctrine, the step transaction doctrine, and the economic substance doctrine. Although each of these doctrines can be independently analyzed, the lines between their applications are not particularly clear. Each of the doctrines overlap and are conceptually related. Indeed, the economic substance doctrine is thought by some to have subsumed each of the other doctrines.

In 2005, the US Congress was becoming increasingly concerned that taxpayers were using the technical language of the tax law to structure transactions for tax benefits that were not squarely within the purpose of Congress in creating those laws. Additionally, the judicially created anti-abuse rules were not interpreted the same way by the various US Courts. The Joint Committee drafted a report to Congress proposing to address these issues by codifying the economic substance doctrine. In 2010, Congress finally followed this proposal by passing § 7701(o) of the Internal Revenue Code. This provision was not intended to change the existing law. The provision essentially provides that, with respect to any transaction to which the economic substance doctrine is relevant, a transaction will have economic substance only if the transaction changes the taxpayer's economic position in a meaningful way and the taxpayer has a substantial purpose, apart from federal income tax effects, for entering into the transaction.

In parsing the application of § 7701(o), the first criteria that must be considered is whether the economic substance doctrine is "relevant". Much has been written regarding relevancy of the economic substance doctrine. Generally, the economic substance doctrine is not relevant when a taxpayer is seeking to take advantage of a tax benefit arguably intended by Congress. This requirement acknowledges that Congress has enacted many tax laws that allow taxpayers to structure transactions in particular form solely for tax benefits. If the benefits the taxpayer is seeking to take advantage of are not specifically intended by the law, the economic substance doctrine might be relevant.

Once the relevancy hurdle is crossed, a transaction will only have economic substance if two conditions are met. First, the transaction must change in a meaningful way the taxpayer's economic position. What constitutes meaningful for this purpose is not clear or defined. Second, the taxpayer must have a non-tax, business purpose for the transaction.

---

[1]    Director, Tax - Asia at Corning.
[2]    Principal in the M&A practice of KPMG. She leads the US Institutional Investors Group and focuses on foreign pensions and sovereign wealth funds. The reporters are grateful for the valuable contributions to this paper made by Jacob Heyka, in particular as regards GAAR in the treaty context and taxpayer protections.

UNITED STATES

Importantly, § 7701(o) makes clear that both criteria must be satisfied for economic substance to apply.

While § 7701(o) is the closest thing the United States has to a GAAR, another important anti-avoidance measure in US tax law is the limitation on benefits provision (the "LOB") contained in most US income tax treaties. The LOB is intended to prevent a taxpayer from treaty shopping by creating residence in treaty jurisdiction to take advantage of the treaty provisions. The LOB provides that only qualifying persons are entitled to the benefits of the treaty. Even if the LOB provision is met, treaty benefits can be denied under domestic law if the transaction for which treaty benefits are claimed is a conduit financing transaction.

## Part One: General Anti-Avoidance Rules or Doctrines

### 1.1. General overview

The oft-quoted Judge Learned Hand has stated the fundamental principle of tax avoidance law in the United States, "*[A]nyone may arrange his affairs so that his taxes shall be as low as possible; he is not bound to choose that pattern which best pays the treasury. There is not even a patriotic duty to increase one's taxes. Over and over again the Courts have said that there is nothing sinister in so arranging affairs as to keep taxes as low as possible. Everyone does it, rich and poor alike and all do right, for nobody owes any public duty to pay more than the law demands.*"[3] This language and the case in which it arose have been interpreted as drawing a distinction between tax avoidance, which is permissible, and tax evasion, which is not.

The chief problem with this legal distinction is that what constitutes tax avoidance as opposed to tax evasion is not clear. Chief Justice Oliver Wendell Holmes found the difference to be outcome determinative, i.e., that tax evasion is merely an unsuccessful attempt to avoid taxation, "*[w]e do not speak of evasion because, when the law draws a line, a case is on one side of it or the other and, if on the safe side, it is none the worse legally that a party has availed himself of the full of what the law permits. When an act is condemned as an evasion, what is meant is that it is on the wrong side of the line indicated by the policy if not by the mere letter of the law.*"[4] Taxpayers were, thus, left with the understanding that they were permitted to avoid tax, indeed had no patriotic, moral or other duty not to do so, as long as they did not cross a line that was very unclearly defined. A rich body of case law developed from the *Helvering* case and attempted to provide some clarity with regard to this line. This case law established the doctrine that a taxpayer could not arrange his or her affairs to avoid taxes if that transaction lacked economic substance.[5] In addition to the economic substance doctrine, several different but greatly overlapping anti-avoidance doctrines were created by the courts to distinguish between permissible and impermissible avoidance. The judicial creation of these doctrines is discussed in more detail in Part II below.

In 2004, the US Congress became concerned about taxpayers that were venturing

---

[3]    *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934), *aff'd*, 293 US 465 (1935).
[4]    *Bullen v. Wisconsin*, 240 US 625, 630–631 (1916), *see also*, Superior Oil Co. v. Mississippi, 280 US 390, 395–396 (1930).
[5]    *See, e.g., Coltec Indus., Inc. v. US*, 454 F3d 1340 (Fed. Cir. 2006), *cert. denied*, 549 US 1206 (2007) (corporate tax shelter disregarded under "economic substance doctrine," even though statute mechanically applied); *see also, Hines v. United States*, 912 F.2d 736, 741 (4th Cir. 1990).

6

extremely close to the impermissible avoidance line in transactions that relied on highly technical tax provisions to produce consequences not intended in the enactment of those provisions. Senator Max Baucus, the ranking member of the US Senate Committee on Finance, and Senator Charles Grassley, another member of the committee, asked the staff of the Joint Committee on Taxation to issue periodic reports to Congress containing proposals, inter alia, to curtail tax shelters.[6] In its 2005 report responding to this request, the Joint Committee recommended codification of the economic substance doctrine, stating "*[a] strictly rule-based tax system cannot efficiently prescribe the appropriate outcome of every conceivable transaction that might be devised and is, as a result, incapable of preventing all unintended consequences.*"[7] The Joint Committee discussed the economic substance doctrine developed by the courts, but stated that the "*[a]pplication of this doctrine to certain categories of transactions having the characteristics of tax shelters should be clarified and strengthened in order to improve its effectiveness at deterring unintended consequences and to promote greater uniformity.*"[8] Eventually, in 2010, Congress did codify the economic substance doctrine as discussed below.

Unlike many of other countries which share the US heritage of English law, the United States does not have a statutory general anti-avoidance rule (GAAR).[9] Therefore, the codification of the economic substance doctrine is the closest analogous provision to a GAAR under US law. As discussed in more detail below, however, US law also contains other specific anti-abuse statutes and anti- "treaty shopping" measures in most of its tax treaties.

## 1.2. The tax avoidance scheme, arrangement or transaction

The Health Care and Education Reconciliation Act of 2010 (H.R. 4872), signed into law by President Barack Obama on March 30, 2010, added § 7701(o) to the Internal Revenue Code of 1986, as amended (the "Code"). Section 7701(o) codified the economic substance doctrine previously developed by the courts:

1. Clarification of economic substance doctrine.
2. Application                         of                         doctrine.
   In the case of any transaction to which the economic substance doctrine is relevant, such a transaction shall be treated as having economic substance only if-
   A. the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and
   B. the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such a transaction.
3. Special rule whereby taxpayer relies on profit potential.
   A. In general. The potential for profit from a transaction shall be taken into account in determining whether the requirements of subparagraphs (A) and (B) of paragraph (1) are met with respect to the transaction only if the present value of the reasonably expected pre-tax profit from the transaction is substantial in relation to the present value of the expected net tax benefits that would be allowed if the transaction were respected.

---

[6]   Letter dated 26 February 2004.
[7]   Staff of J. Comm. on Taxation, 109th Cong., JCS-2-05, Options To Improve Tax Compliance And Reform Tax Expenditures, 18 (Comm. Print 2005).
[8]   *Id.*
[9]   Canada, Australia, and the United Kingdom, for example, each have a GAAR.

UNITED STATES

    B.  Treatment of fees and foreign taxes. Fees and other transaction expenses shall be taken into account as expenses in determining pre-tax profit under subparagraph (A). The Secretary shall issue regulations requiring foreign taxes to be treated as expenses in determining pre-tax profit in appropriate cases.

4.  State and local tax benefits.

5.  For purposes of paragraph (1), any State or local income tax effect which is related to a Federal income tax effect shall be treated in the same manner as a Federal income tax effect.

6.  Financial accounting benefits.

7.  For purposes of paragraph (1)(B), achieving a financial accounting benefit shall not be taken into account as a purpose for entering into a transaction if the origin of such financial accounting benefit is a reduction of Federal income tax.

8.  Definitions and special rules.

9.  For purposes of this subsection-

    A.  Economic substance doctrine. The term "economic substance doctrine" means the common law doctrine under which tax benefits under subtitle A, with respect to a transaction, are not allowable if the transaction does not have economic substance or lacks a business purpose.

    B.  Exception for personal transactions of individuals. In the case of an individual, paragraph (1) shall apply only to transactions entered into in connection with a trade or business or an activity engaged in for the production of income.

    C.  Determination of application of doctrine not affected. The determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if this subsection had never been enacted.

    D.  Transaction. The term "transaction" includes a series of transactions.

Notably, the provision applies only to transactions entered into after its passage and, with respect to individuals, only to transactions entered into in connection with a trade or business or an activity engaged in for the production of income.

    In considering whether § 7701(o) should apply to a particular transaction, the first element to consider is whether the economic substance doctrine is "relevant." The Joint Committee attempted to clarify when the economic substance doctrine is relevant:

*The determination of whether the economic substance doctrine is relevant to a transaction is made in the same manner as if the provision had never been enacted. Thus, the provision does not change present law standards in determining when to utilize an economic substance analysis.*

    *The provision is not intended to alter the tax treatment of certain basic business transactions that, under longstanding judicial and administrative practice, are respected merely because the choice between meaningful economic alternatives is largely or entirely based on comparative tax advantages. Among these basic transactions are (1) the choice between capitalizing a business enterprise with debt or equity; (2) a US person's choice between utilizing a foreign corporation or a domestic corporation to make a foreign investment; (3) the choice to enter a transaction or series of transactions that constitute a corporate organization or reorganization under subchapter C; and (4) the choice to utilize a related-party entity in a transaction, provided that the arm's length standard of section 482 and other applicable concepts are satisfied. Leasing transactions, like all other types of transactions, will continue to be analyzed in light of all the facts and circumstances. As under present law, whether a particular transaction meets the requirements for specific treatment under any of these provisions is a question of facts and circumstances. Also, the fact that a transaction meets the requirements for specific treatment under any provision of the Code is not determinative of whether a transaction or a*

8

*series of transactions of which it is a part has economic substance.*[10]

Put more succinctly, the Joint Committee stated, *"If the realization of the tax benefits of a transaction is consistent with the Congressional purpose or plan that the tax benefits were designed by Congress to effectuate, it is not intended that such tax benefits be disallowed."*[11] Prior to the enactment of the § 7701(o), many commentators, in contemplation of its passage, considered when the economic substance doctrine should be used. As a general theme, the commentators acknowledged that Congress specifically provided for certain transactions that would yield favorable tax consequences without any economic motive; for example, a like-kind exchange under § 1031 of the Code. As the New York Bar Association Tax Section explained, what implicates the economic substance doctrine is a taxpayer seeking to obtain benefits that were not envisioned by Congress; if a taxpayer enters into a transaction that has no non-tax business purpose and does not meaningfully change the taxpayer's economic position, the taxpayer's form of transaction will still be respected if Congress might reasonably have envisioned a taxpayer applying the rules in such a way.[12]

### 1.3. The tax benefit, gain or advantage

Once determined that the economic substance doctrine is relevant, the second element of the economic substance doctrine can be found in § 7701(o)(1)(A) (commonly referred to as the "objective prong" or "economic substance" prong). Specifically, in order to successfully assert that a transaction has economic substance, a taxpayer must show that the transaction changed the taxpayer's economic position in a "meaningful" way (apart from federal income tax effects).[13] For these purposes, any state or local income tax effect which is related to a federal income tax effect is treated in the same manner as a federal income tax effect.[14] In short, a taxpayer must show that the transaction actually resulted in a meaningful non-tax change to their economic circumstances.

No statutory definition is given regarding what causes a change to be "meaningful" enough for these purposes. Moreover, while the IRS has clarified that it will apply pre-codification case law in making this determination,[15] it has further clarified that it will not issue private letter rulings or determination letters regarding whether a transaction complies with this prong.[16]

The above notwithstanding, the most prominent method a taxpayer can use to meet this prong is to argue the existence of a profit potential related to the transaction prior to its commencement. This may only be raised if the present value of the reasonably expected pre-tax profit from the transaction can be shown to be substantial in relation to the present

---

[10]  Staff of J. Comm. on Taxation, 111th Cong., JCX-27-10, Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as amended, in Combination with the "Patient Protection and Affordable Care Act", 152-53 (Comm. Print 2010).

[11]  Id. at 152 n. 344.

[12]  New York State Bar Assoc. Tax Section, Summary Report on the Provisions of Recent Senate Bills that Would Codify the Economic Substance Doctrine, May 21, 2003 (citing *Cottage Savings Ass'n v. Commissioner*).

[13]  Code § 7701(o)(1)(A).

[14]  Code § 7701(o)(3).

[15]  Notice 2010-62 at page 4.

[16]  Id. at page 7.

UNITED STATES

value of the expected net tax benefits that would be allowed if the transaction were respected.[17] While fees and other transaction expenses are explicitly included when making this determination, regulations governing the treatment of foreign taxes for these purposes have not yet been promulgated (although courts are still free to consider the issue in the interim).[18]

To this point, neither Congress nor the IRS have clarified when reasonably expected pre-tax profits rise to the level of "substantial" mentioned above. While the phrase has been analyzed differently depending on the situation, it should be noted that economic substance cases are highly context-dependent and will turn on the facts and circumstances of a given situation.

In the absence of a profit potential, a taxpayer may also meet this prong by asserting a less quantifiable economic change such as the formation of a non-US corporation for the purpose of holding oil and gas leases.[19]

### 1.4. The taxpayer's purpose or intent

The third element of the economic substance doctrine can be found in § 7701(o)(1)(B) (commonly referred to as the "subjective prong" or the "business purpose" prong). In addition to showing that a transaction possessed economic substance, a taxpayer must also show that he or she had a substantial business purpose in entering into the transaction (apart from federal income tax effects).[20] Similar to the objective prong, any state or local income tax effect which is related to a federal income tax effect is treated in the same manner as a federal income tax effect.[21] Likewise, the IRS has stated (i) that it will apply pre-codification case law in analyzing this prong,[22] and (ii) that it will not issue private letter rulings or determination letters regarding whether a transaction complies with this prong as well.[23]

As with the objective prong, little guidance is available regarding how to analyze this requirement post-codification. No clear definition has been given regarding what qualifies a business purpose as "substantial," although the Code clearly states that achieving a financial accounting benefit in relation to a reduction of federal income tax is not sufficient for these purposes.[24] Here as well, the presence or absence of a profit motive is a prominent lens through which the prong is analyzed. In *Peat Oil & Gas Assocs. v. Commissioner*, the Tax Court stated that the test relating to a taxpayer's profit objective should be whether the taxpayer possessed an "actual and honest" profit objective in relation to the transaction at issue.[25] This rule, while not binding on the federal appellate courts, has been cited at least once by each US Circuit Court of Appeals.[26]

The above notwithstanding, pre-codification case law is replete with examples of courts

---

[17] Code § 7701(o)(2)(A).
[18] Code § 7701(o)(2)(B).
[19] See, e.g., *Bass v. Commissioner,* 50 T.C. 595 (1968).
[20] Code § 7701(o)(1)(B).
[21] Code § 7701(o)((2) and (3).
[22] Notice 2010-62 at page 4.
[23] Id. at page 7.
[24] Code § 7701(o)(4).
[25] 100 T.C. at 281-83.
[26] Id.

using a variety of factors to determine the presence of a subjective business purpose in the absence of a profit motive. For example: in *Andantech, LLC v. Commissioner*, the Tax Court analyzed (i) the presence of arm's-length price negotiations; (ii) the relationship between an asset's sales price and fair market value; (iii) the structure of the financing; (iv) how closely the parties adhere to applicable contract terms; (v) the reasonableness of the income and residual value projections (in the context of lease transactions); and (vi) the use of other entities.[27] Likewise, in *Cottage Sav. Ass'n v. Commissioner*, a taxpayer's exchange of mortgages to avoid the risk of closure by a federal regulatory agency was deemed valid by the Supreme Court for these purposes.[28]

## 1.5. The consequences of the GAAR application to a given case

Currently, no reported cases include any analysis or application of § 7701(o). Section 7701(o) is not applicable to any transactions occurring prior to March 30, 2010. Accordingly, the majority of federal tax cases being heard and reported by the district and circuit courts to which a tax avoidance argument might apply involve transactions occurring prior to the applicability of the relatively new rule. Several cases have mentioned § 7701(o), but noted that it would not apply to the transaction at issue in the case because the transaction occurred before March 30, 2010.[29] Some of those cases also stated that the result would have been the same if § 7701(o) did apply.[30]

## 1.6. Conflicts between domestic and treaty GAAR or between domestic GAAR and SAAR

US tax treaties are incorporated into domestic tax law under § 884 of the Code. Section 884(a)(1) provides that the provisions of the Code are to be applied to any taxpayer "*with due regard to any treaty obligation of the United States which applies to such taxpayer.*" Although rules to combat treaty shopping exist in US domestic law, the US has advocated for treaty-based GAAR and SAAR, most notably in the Limitation on Benefits (LOB) article. This article serves to deny treaty benefits to a resident of a treaty country if it does not satisfy one of several alternative tests to be considered a "qualified person." The LOB article in US tax treaties has generally required that a company seeking to obtain treaty benefits should satisfy one of (i) a "publicly traded company" test, (ii) an "ownership/base erosion" test, or (iii) an "active trade or business" test.

In 2016, the Department of the Treasury released a new Model Income Tax Convention, which serves as the model for US tax treaty negotiation.[31] Among other measures added for

---

[27]  T.C. Memo 2002-97 at 131.

[28]  400 US 554 (1991).

[29]  *See e.g.*, *The Bank of NY Mellon Corp. v. Comm'r*, 801 F.3d 104 (2d Cir 2015) (stating that because § 7701(o) is not retroactive, it does not apply to the case); *Salem Financial Inc. v. US*, 786 F.3d 932 (Fed Cir 2015), *Nevada Partners Fund v. US*, 720 F.3d 594 (5th Cir 2013).

[30]  *Santander Holdings USA, Inc. v. US*, 844 F.3d 15 (1st Cir 2016) (stating that the holding is not in conflict with § 7701(o)).

[31]  US Department of the Treasury, "Treasury Announces Release of 2016 Model Income Tax Treaty" (17 February 2016). Available at: https://www.treasury.gov/press-center/press-releases/Pages/jl0356.aspx.

UNITED STATES

the first time in the US Model treaty, the "derivative benefits" test and the "headquarters company" test (which tests had been included in newer tax treaties negotiated with certain treaty partners) were included as additional methods to satisfy the LOB article and have the right to treaty benefits.[32]

Similar LOB provisions were included in the OECD's Multilateral Instrument (MLI) , as tests that contracting jurisdictions could choose to apply in addition to the "principal purposes test" of the MLI's "Prevention of Treaty Abuse" article – a concession in the development of the MLI to encourage signature by the United States.[33] However, the US has not signed the MLI to date.

is also not expected to increase its adherence to the OECD's BEPS project in the near future in any marked fashion. Thus, the LOB articles and other specific anti-abuse of existing US tax treaties should be viewed as the extent of the US's treaty-specific GAAR and SAAR for the time being.

Finally, it may be noted that the 2016 US Model Income Tax Convention also adopts additional anti-abuse provisions in line with the OECD's BEPS recommendations, including a revised preamble clarifying that the intention of the Convention is to prevent double taxation without creating opportunities for double non-taxation, a rule against contract-splitting for purposes of the permanent establishment threshold for construction or instal-lation sites, and a 12-month ownership requirement for the five-percent withholding rate for direct dividends.[34] The included provisions could be viewed as GAAR or SAAR in their own right but the LOB is the pinnacle of treaty-based GAAR in US international tax law.

Even if a resident of a treaty country satisfies the LOB article of the treaty, a domestic anti-abuse rule may apply to disallow treaty benefits. Specifically, Treasury Regulation § 1.881-3 provides rules to combat treaty shopping involving "*the participation of one or more intermediate entities in a financing arrangement whereby such entities are acting as conduit entities.*"[35] Where these so-called "anti-conduit rules" apply, the Internal Revenue Service may disregard such participation by one or more intermediate entities for the purposes of Code § 881 (i.e., taxation of foreign persons on a gross basis as enforced by withholding).

The anti-conduit rules define "financing arrangement" as a series of transactions pursuant to which one person (the financing entity) advances money or other property, or grants rights to use property, and another person (the financed entity) receives money or other property, or rights to use property, if the advance and receipt are effected through one or more other persons (intermediate entities) and, with certain exceptions, there are

---

[32]    US Department of the Treasury, "US Model Income Tax Convention" (17 February 2016) Available at https://www.treasury.gov/resource-center/tax-policy/treaties/Documents/Treaty-US%20Model-2016.pdf

[33]    OECD, "Multilateral Convention to Implement Tax Treaty Related Measures to Prevent Base Erosion and Profit Shifting" (24 November 2016) at art 7.

[34]    US Department of the Treasury, "Preamble to 2016 US Model Income Tax Convention" (17 February 2016) Available at: https://www.treasury.gov/resource-center/tax-policy/treaties/Documents/Preamble-US%20Model-2016.pdf at pp 8-9.

[35]    This regulation is issued under authority of Code § 7701(l), enacted as part of the Omnibus Budget Reconcili-ation Act of 1993, which provides the Treasury Department broad authority to prescribe regulations to "rechar-acterize any multiple-party financing transaction as a transaction directly between any two or more parties" where appropriate to prevent avoidance of tax.

There are other specific rules in the treaty context which deal with potential abuse other than treaty shopping, such as the regulations under Code § 894(c). These regulations, which have been incorporated in the text of many recent US tax treaties, deal with whether income is "derived" by a foreign person claiming treaty benefits when a hybrid (or reverse hybrid) entity is involved, and are not explored in this paper.

"financing transactions" linking the financing entity, each of the intermediate entities in the chain, and the financed entity.[36] Accordingly, the anti-conduit rules generally apply to multi-party transactions consisting of debt, lease, license, certain debt-like equity and any other transaction *"pursuant to which a person makes an advance of money or other property or grants rights to use property to a transferee who is obligated to repay or return a substantial portion of the money or other property advanced, or the equivalent in value,"* and do not apply where any part of the chain is an ordinary equity arrangement.[37]

A further limitation in the anti-conduit rules provides that an intermediate entity may be disregarded only if it is a "conduit entity." An intermediate entity is a conduit entity with respect to a financing arrangement if: (1) its participation reduces US withholding tax under § 881; (2) its participation is pursuant to a tax avoidance plan; and (3) either the intermediate entity is related to the financing entity or the financed entity, or the intermediate entity would not have participated in the financing arrangement on substantially the same terms but for the fact that the financing entity engaged in the financing transaction with the intermediate entity.[38] Importantly, in circumstances where there is not a financing transaction between related persons, but a principal purpose for the structure is to prevent the characterization of such an arrangement as a financing arrangement, the related persons may be treated as a single intermediate entity.[39] The rules make it clear that, when the participation of an intermediate entity is disregarded, it is disregarded for all the purposes of § 881, including for the purposes of applying any relevant income tax treaties.[40]

There is no theoretical limitation preventing the application of other anti-avoidance rules, such as the substance-over-form, step transaction and economic substance doctrines, in the treaty context. For example, in *Del Commercial Properties, Inc. v. Commissioner*, 251 F.3d 210 (D.C. Cir. 2001), the Court of Appeals for the D.C. Circuit affirmed the Tax Court's application of the step transaction doctrine to disallow zero interest withholding under the US-Netherlands tax treaty to interest paid to a Dutch financing affiliate, where the financing was part of a multi-step arrangement involving a third-party Canadian bank and affiliates in Canada and other jurisdictions. Withholding tax on interest under the US-Canada treaty would have been 15 percent.

The transaction in *Del Commercial Properties* predated the promulgation of the anti-conduit rules under Treasury Regulation § 1.881-3. It may be noted that in Field Service Advice 200227006, the IRS considered the application of general substance-over-form principles, such as applied in *Del Commercial Properties*, separately from the anti-conduit rules.[41] In that Field Service Advice, the IRS determined that the anti-conduit rules did not apply, and also that the facts were insufficient to warrant the application of the general substance-over-form doctrine.

Nevertheless, following the extensive inclusion of an LOB article in most US tax treaties, as well as the promulgation of the specific anti-conduit rules in Treasury Regulation § 1.881-3,

---

[36]    Treas. Reg. § 1.881-3(a)(2)(i)(A).

[37]    Treas. Reg. §1.881-3(a)(2)(ii)(A).

[38]    Treas. Reg. § 1.881-3(a)(4).

[39]    Treas. Reg. §1.881-3(a)(2)(i)(B).

[40]    Treas. Reg. § 1.881-3(a)(3)(ii)(C). Another provision of § 881 to which the anti-conduit rules may apply is the portfolio interest exemption, which exempts interest income from withholding tax if certain requirements are satisfied, such as that the creditor not be a "10% shareholder" of the debtor.

[41]    Field Service Advice memoranda do not constitute authority having precedential value, but may indicate the views and legal analysis of the IRS.

UNITED STATES

situations warranting the application of the GAARs to combat treaty shopping are likely limited.

## Part Two: Case law on statutory or court-developed GAARs

### 2.1. Judicially created anti-abuse rules

As noted above, the vast majority of the US anti-avoidance law is judicially created. The anti-avoidance doctrines utilized in the administration of the Code arose as creations of judicial common law. In 1935, in the landmark case *Gregory v. Helvering*,[42] the Supreme Court introduced the idea that US courts reassign the tax consequences of a transaction or series of transactions if, essentially, the form of the transaction or transactions did not match the substance and, as a result, the taxpayer received tax benefits that the taxpayer would otherwise not be entitled to receive. This idea was gradually expanded across the US federal court system to the point where a number of easily identifiable doctrines currently exist, including (i) the business purpose doctrine, (ii) substance over form, (iii) the sham transaction doctrine, (iv) the step transaction doctrine and (v) the economic substance doctrine (as discussed above). While each can be analyzed as discrete from the others, attempting to isolate and draw distinct boundaries between them is ill-advised; they are closely related and conceptually overlap in many places. Arguably, the economic substance doctrine has at least partially subsumed the others, although each doctrine merits separate discussion.

#### a. Business Purpose Doctrine

Arguably, it was the business purpose doctrine that was applied by the Supreme Court in *Gregory v. Helvering*,[43] with a search for "economic substance" merely being part of its broader analysis.[44] The business purpose doctrine generally encapsulates the idea that transactions structured solely to avoid taxes should not be recognized without some independent business purpose for the transaction (hence the name). Courts generally applied this doctrine by analyzing the subjective intent of the taxpayer, that is, whether the taxpayer had an independent, non-tax purpose for entering into the transaction.[45]

Several issues quickly arose from attempts to apply a doctrine which punished a taxpayer for his or her subjective intent to avoid tax. First, the courts needed to determine if the business purpose doctrine applied if the taxpayer had a legitimate business purpose in entering into a transaction and could have completed the transaction in a way which did not avoid tax, but instead completed the transaction in a way which resulted in less tax. For example, as indicated in *United Parcel Serv. of Am., Inc. v. Commissioner*, a taxpayer's choice between financing a transaction with debt or equity may be chosen solely due to the resulting tax implications, but this does not necessarily invalidate the taxpayer's choice, as

[42]   *Gregory v. Helvering, supra.*
[43]   *Id.*
[44]   *Zmuda v. Commissioner*, 731 F.2d 1417 (9th Cir. 1984).
[45]   *Kirchman v. Commissioner*, 862 F.2d 1486 (11th Cir. 1989).

14

this would otherwise eliminate tax-planning.[46] Second, courts were also required to determine if the business purpose doctrine required nullifying the tax benefits of a transaction in cases in which significant tax implications arose from a transaction with minor non-tax business purposes, i.e., determining at what point the tax results so dwarf the business purpose that the business purpose should be disregarded.[47] This issue of whether the business purposes need to be the sole motivation for the transaction or whether it could be one of several purposes calls to mind the principle purpose test as part of the ongoing BEPS implementation. Eventually, the business purpose doctrine was incorporated into the larger economic substance doctrine as its "subjective prong".[48]

*b. Sham Transaction Doctrine*

In addition to situations in which the IRS may challenge a taxpayer's chosen form of a transaction by arguing that it differs from the actual underlying substance, the IRS may invoke the sham transaction doctrine in situations where the taxpayer has presented false or incomplete facts and, as a result, the transaction, or part of the transaction, is merely a sham. The Supreme Court, in the landmark *Frank Lyon* case, defined a sham transaction as *"an elaborate financing scheme designed to provide economic benefits to [a third party] and a guaranteed return to [the taxpayer]."* Unlike the business purpose doctrine, in a sham transaction doctrine analysis, taxpayer motive is inconsequential, provided that there is no function to the transaction aside from the generation of a tax benefit.[49] Courts have also distinguished between sham transactions comprised of transactions which never actually took place (factual shams) and those lacking economic substance (economic shams).[50]

*a. Economic Shams*

There is no standard definition for an economic sham. The Tax Court described an economic sham as *"the expedient of drawing up papers to characterize transactions contrary to objective economic realities* and *which have no economic significance beyond expected tax benefits."*[51] Other courts have applied different criteria to find an economic sham. For example, other courts have used a similar definition, with the exception that an offending transaction is one that satisfies neither the objective *nor* the subjective of these prongs.[52] Regardless of which formulation is used, the economic sham definition is commonly observed to be functionally equivalent to a test under the economic substance doctrine. In fact, the report by the Joint Committee on Taxation released in 2005 describes the entire sham transaction doctrine as "closely related" to and "sometimes interchangeable" with the economic substance

---

[46]   *United Parcel Serv. of Am., Inc. v. Commissioner*, 254 F.3d 1014 (11th Cir. 2001).

[47]   *ACM P'Ship v. Commissioner* (73 T.C.M. 2189).

[48]   *Frank Lyon Co. v. United States*, 435 US 561 (1978).

[49]   *Kirchman v. C.I.R.* (862 F.2d 1486, 1491).

[50]   See, e.g., *Goldstein v. Commissioner* (TBD), distinguishing between transactions which were "sham in substance," which must generally meet the general standard of economic substance (see below), and "sham in fact," in which the transaction is deemed to have never actually occurred (i.e., merely a paper transaction).

[51]   *Falsetti v. Commissioner* (TBD). Emphasis added.

[52]   *Friedman v. Commissioner*.

UNITED STATES

doctrine.[53] As such, this particular doctrine is frequently collapsed into the economic substance doctrine.

### b. Shams-in-Fact

To analyze whether a transaction qualifies as a sham-in-fact is to ask whether it actually occurred in the first place. While in some cases this is obvious (e.g., when securities trades are executed which artificially create tax losses for a taxpayer but, aside from bookkeeping entries, the trades were never executed[54]), in the absence of such egregious conduct, the IRS has a difficult time prevailing under this argument.[55]

### c. Substance over Form

The substance-over-form doctrine is the proposition that the tax consequences of a transaction or series of transactions should rely on the substance of the underlying activity, rather than on its legal form.[56] The doctrine is predicated on the idea that, should a taxpayer structure a transaction in a manner such that the form yields more advantageous tax consequences than the substance, then the IRS should be able to disregard the form in order to protect Congressional intent.[57] If instead, the substance of a transaction differs from its form in a manner which is disadvantageous to the taxpayer, then the IRS can generally force the taxpayer to abide by the form under the theory that the taxpayer had chosen the form and could have structured the transaction differently if he or she had so chosen.[58]

   While seemingly clear on its face, the substance-over-form doctrine is not necessarily easy for the IRS to invoke. The courts have held that the IRS may not disregard a taxpayer's choice of form merely by stating that the substance is different. In *Newman v. Commissioner*, the Second Circuit described a list of criteria that must be taken into account when analyzing whether a transaction's form should be respected, including (i) the existence of a business purpose, (ii) whether the transaction changed the parties' economic interests, (iii) whether the transaction's terms were arm's length terms and (iv) whether the parties respected their own form. Despite these limitations, the substance-over-form doctrine has been frequently applied in a variety of different types of situations, including cases involving leasing transac-

---

[53]   Options to Improve Tax Compliance and Reform Tax Expenditures, 1/27/05, p. 14.

[54]   See, e.g., *Brown v. Commissioner* (TBD), *Seykota v. Commissioner* (TBD).

[55]   See, e.g., *Dow Chemicals v. United States* (TBD), *IRS v. CM Holdings, Inc.* (TBD), *Winn-Dixie v. Commissioner* (TBD), and *Am. Elec. Power Co. v. United States* (TBD).

[56]   *See, e.g., Commissioner v. Court Holding Co.*, 324 US 331 (1941); *True v. United States*, 190 F.3d 1165, 1174 (10th Cir. 1999); *Newman v. Commissioner*, 894 F.2d 560, 562 (2d Cir. 1990); *Kuper v. Commissioner*, 533 F.2d 152, 155 (5th Cir. 1976); *Derr v. Commissioner*, 77 T.C. 708, 722 (1981); Rev. Rul. 2002-69, 2002-2 C.B. 760.

[57]   *See, e.g., Crenshaw v. United States*, 450 F.2d 472 (1971) (stating that, "…such a result would completely thwart the Congressional policy to tax transactional realities rather than verbal labels…Otherwise, form, rather than substance, would invariably prevail.").

[58]   There are situations in which a taxpayer can successfully have its own chosen form of a transaction disregarded, although this is usually very difficult to accomplish and further discussion is beyond the scope of this report.

tions,[59] related parties,[60] transactions between a shareholder/employee and a company,[61] debt versus equity analyses,[62] and whether a property transfer occurred.[63] In short, the substance-over-form doctrine can be generally applied to any situation in which a taxpayer may attempt to either hide or disguise underlying economic activity (or lack thereof) in order to obtain a tax benefit they would otherwise not be entitled to receive.

*d. Step Transaction Doctrine*

The step transaction doctrine is arguably better understood as a means of understanding whether the form of a transaction or series of transactions differs from its/their substance. Essentially, a court may treat separate transactions or steps as a single, unified transaction for tax purposes, i.e., "*the step transaction doctrine generally applies in cases where a taxpayer seeks to get from point A to point D and does so stopping in between at points B and C. The whole purpose of the unnecessary stops is to achieve tax consequences that differ from those which a direct path from A to D would have produced...courts are not bound by the twisted path taken by the taxpayer, and the intervening stops may be disregarded or rearranged.*"[64] By and large, the substance must differ from the form, and the difference has to be abusive from a tax perspective.

Should the IRS successfully assert this doctrine, the applicable court can either disregard certain unnecessary steps or transactions[65] or rearrange them.[66] While the former is more prevalent, in either case the IRS must assert a "*... logically plausible alternative explanation that accounts for all the results of the transaction.*"[67] It should also be noted that, even if each step or transaction has a business purpose/economic substance, some courts may still apply the doctrine, while others may preclude its use.

One factor that is frequently analyzed with regard to the step transaction doctrine involves the timing between the steps. In short, absent some other indication of the steps being related, the longer the time lapse between steps, the less likely a court will collapse them together. For example: in one case the Tax Court neglected to collapse two steps which were separated by six months,[68] while it chose to collapse a corporate formation, cash capitalization, and subsequent sale of property to the corporation for the cash and all related notes when the entire series of transactions occurred in less than 10 days.[69] To this effect, the time lapse may also affect which test is applied to the facts at issue.[70]

---

59  *See, e.g., Helvering v. F. & R. Lazarus & Co.*, 308 US 1939; *Frank Lyon Co.* at 573.
60  *See, e.g., Helvering v. Clifford*, 309 US 331 (1940); *Davis v. Commissioner*, 585 F.2d 807 (6th Cir. 1978); *Teong-Chan Gaw v. Commissioner*, T.C. Memo 1995-531 at 130-31; *Goodman v. Commissioner*, 74 T.C. 684, 707-09 (1980), aff'd without pub. Opin., 673 F.2d 1332 (7th Cir. 1981); *Bolger v. Commissioner*, 59 T.C. 760 (1973).
61  *See, e.g., United States v. Ingalls* (TBD), *Higgins v. Smith* (TBD).
62  *See, e.g., Estate of Mixon v. Commissioner* (TBD), *Laidlaw Transp., Inc. v. Commissioner* (TBD). See also Notice 94-47.
63  See, e.g., *Falsetti v. Commissioner* (TBD), *Grodt & McKay Realty, Inc. v. Commissioner* (TBD), *Frank Lyon* (id.).
64  *Smith v. Comm'r* (TBD).
65  308.
66  309.
67  312.
68  *Litton Indus. v. Commissioner* (TBD).
69  *D'Angelo Assocs., Inc. v. Commissioner* (TBD).
70  367.

17

UNITED STATES

*a. The Three Tests*

Courts have used three distinct tests when deciding whether to apply the step transaction doctrine: (i) binding commitment, (ii) end result, and (3) mutual interdependence.

i. Binding Commitment

Courts that use the binding commitment test will only apply the step transaction doctrine if, once the first "step" is taken, the taxpayer was bound to complete the remaining steps. In other words, the steps can only be collapsed into one transaction if, once begun, they were all legally required to occur. As stated by the US Tax Court, "*[i]t is seldom used and is applicable only when a substantial period of time has passed between the steps that are subject to scrutiny.*"[71] Moreover, due to the overly strict criteria required for its application, "*there have been objections to the [binding commitment] test on the ground that result is easily manipulable by taxpayers.*"[72] When a court is considering applying the test, it will usually search for a formal commitment to complete the remaining steps (although this is not required).[73]

ii. The End-Result Test

The end-result test is used in situations where the IRS asserts that a series of separate transactions were merely parts of one single transaction that were all executed with an ultimate goal in mind. The Tax Court explains, "*there is no independent tax recognition of the individual steps unless the taxpayer shows that, at the time the parties engaged in the individual step, its result was the intended end result in and of itself.*"[74] As in the binding commitment test, a court will not apply this test unless it can find some proof that the transacting parties intended to achieve the end result over the course of the transactions.[75] Thus, the test can be best understood as a test of the subjective intent of the taxpayer to achieve the end result of the transactions as a whole.[76] Should this be the case, the court may collapse the series of steps or transactions into one.

iii. The Mutual-Interdependence Test

Under the mutual-interdependence test, the doctrine will apply if, generally, the steps rely on each other to a degree that any one in particular would have been useless without the others.[77] In short, this test analyzes whether each step is independent of the others, rather than the end result of the steps as a whole. Taxpayers may argue against the application of the doctrine via this test by showing that each step possesses independent economic justification,[78] possibly in the context of comparing the transaction at issue to other similar transactions that are considered justified.[79] This test is often applied in the context of corporate transactions.[80]

---

[71]    *Andantech LLC v. Commissioner* (TBD).
[72]    *Penrod v. Commissioner* (TBD).
[73]    336, *Merrill Lynch & Co. v. Commissioner* (TBD).
[74]    Andantech at (TBD).
[75]    344.
[76]    347.
[77]    352.
[78]    355.
[79]    357.
[80]    358-360.

*e. The Economic Substance Doctrine*

Since *Frank Lyon Co.*, the economic substance doctrine has stood for the idea that a taxpayer must prove that a transaction has legitimate non-tax economic substance (objectively and/ or subjectively) to avoid having the resulting tax consequences recharacterized. Prior to 2010 (when the economic substance doctrine was codified in the Internal Revenue Code), a circuit split had developed within the federal judiciary regarding whether (i) the taxpayer had to show a subjective business purpose AND objective economic substance to prevail,[81] (ii) whether the taxpayer could prevail by showing EITHER of these factors[82] or (iii) whether both were merely two of multiple factors that a court could analyze.

## 2.2 Relation of the economic substance doctrine to Other Anti-Abuse Doctrines

As previously stated, the economic substance doctrine and other judicially created anti-abuse doctrines overlap in many ways. Some have arguably been subsumed into others (e.g., the business purpose doctrine gradually becoming the subjective prong of the wider economic substance doctrine), while others have been referred to as "interchangeable" in Congressional reports (e.g., the 2005 JCT Report referring to the sham transaction doctrine and economic substance doctrine). To this point, courts have frequently invoked more than one at a time when doing so.[83] One glaring example can be seen in *Coltec Indus.*, in which the court described the economic substance doctrine as merely a composite of the business purpose, substance-over-form, and sham transaction doctrines. However, at a later date the IRS Chief Counsel described the economic substance doctrine, business purpose, step transaction, and sham transaction doctrines as mere subcategories of the substance-over-form doctrine. In short, while there is arguably no formal way to organize these doctrines in relation to each other, they are all tools used to help courts reach a primary goal (determining the economic reality of a transaction in spite of how it was structured by a taxpayer).

# Part Three: GAAR and taxpayer safeguards

## 3.1. General overview

As explained, above, the law concerning the economic substance and substance over form doctrines, which comprise US GAARs, was developed over time by the courts. Accordingly, US GAARs generally were not designed as comprehensive legislation with procedural rules and safeguards. So a taxpayer who disagrees with an examining agent would have the same recourse under these doctrines as a taxpayer would have with issues not involving US GAARs. Such recourse includes administrative appeal (IRS Appeals) and litigation in court, which may require review of existing rulings and case law and their application to the

---

[81]     See, e.g. *ACM*.
[82]     See, e.g., *Wells Fargo v. United States*, 143 F.Supp.3d 827 (D. Minn. 2015); *Compaq v. Comm'r*, 277 F.3d 778 (5th Cir. 2015).
[83]     401.

UNITED STATES

specific case at hand. While the IRS has provided certain institutional support for taxpayers, as discussed below, the measures have been limited. For example, there is no formal administrative practice or process of applying US GAARs to protect taxpayers under US law.

Nevertheless, there are substantive limitations to the application of the economic substance and substance-over-form doctrines as discussed below.

## 3.2. Economic Substance Doctrine

The legislative history of the economic substance doctrine and the codified requirements for its application under § 7701(o) suggest that, for certain business transactions, taxpayers may be entitled to protection from the application of the economic substance doctrine. Specifically, as noted above in section 1.2, the Joint Committee Report stated that the codification of the economic substance doctrine was not meant to alter the tax treatment of business transactions that had been respected. Despite requests from practitioners, the IRS has not yet published a list of bright-line exclusions from application of § 7701(o).[84] Nevertheless, § 7701(o)(5)(C) provides that the determination of whether a transaction is subject to the economic substance doctrine shall be made in the same manner as if § 7701(o) had never been enacted, and § 7701(o)(1) applies *"in the case of any transaction to which the economic substance doctrine is relevant."* Consistent with the provisions, Notice 2010-62 affirmed that:

*"[T]he IRS will continue to analyze when the economic substance doctrine will apply in the same fashion as it did prior to the enactment of § 7701(o). If authorities, prior to the enactment of § 7701(o), provided that the economic substance doctrine was not relevant to whether certain tax benefits are allowable, the IRS will continue to take the position that the economic substance doctrine is not relevant to whether those tax benefits are allowable."*

As evidenced by this Notice, the IRS appears to have narrowly interpreted the scope of relevant transactions under the economic substance doctrine. Nevertheless, the legislative history discussed above may provide a "safe harbor" from the application of the economic substance doctrine to the four examples of basic business transactions enumerated in the legislative history.[85]

## 3.3. Substance-Over-Form Doctrine

Unlike the economic substance doctrine, the substance-over-form and the closely related step transaction doctrines apply to all transactions and do not have a carve-out for certain transactions. Taxpayers engaging in a transaction that is not merely transitory or otherwise a sham and that meets the statutory requirements may have an expectation that the transaction would not be recharacterized contrary to its form. This expectation is consistent with the oft-cited words of Judge Learned Hand in the Second Circuit case in *Gregory v. Helvering*: *"[a]nyone may so arrange his affairs that his taxes shall be as low as possible; he is not*

[84]    See American Bar Association Section of Taxation, *Comments on Notice 2010-62* (18 January 2011).
[85]    In Notice 2014-58, the IRS itself referred to the House Budget Committee Report as legislative history in support of its guidance on the meaning of the term "transaction" in § 7701(o).

20

*bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes."*[86]

More recently, in *Summa Holdings, Inc. v. Commissioner*,[87] a federal appellate court ruled that the substance over form doctrine cannot be used to recharacterize steps taken in order to take advantage of tax benefits permitted under the statute. The Court described the limitation on applying the doctrine as follows:

*"Each word of the 'substance-over-form doctrine', at least as the Commissioner has used it here, should give pause. If the government can undo transactions that the terms of the Code expressly authorize, it's fair to ask what the point of making these terms accessible to the taxpayer and binding on the tax collector is. 'Form' is 'substance' when it comes to law. The words of law (its form) determine content (its substance). How odd, then, to permit the tax collector to reverse the sequence—to allow him to determine the substance of a law and to make it govern 'over' the written form of the law—and to call it a 'doctrine' no less.*

*As it turns out, the Commissioner does not have such sweeping authority. And neither do we. Because Summa Holdings used the DISC and Roth IRAs for their congressionally sanctioned purposes—tax avoidance—the Commissioner had no basis for recharacterizing the transactions and no basis for recharacterizing the law's application to them."*

When a taxpayer engages in additional transactions that allow the transaction benefiting from a tax statute to proceed, the step transaction doctrine may apply as discussed, above. A notable derogation is the case of *Esmark, Inc. v. Commissioner*,[88] in which the Tax Court declined to apply the step transaction doctrine where the other transactions had economic significance. The taxpayer (Esmark) engaged in a multi-step transaction that, following the form, allowed it to dispose of shares it held in its subsidiary without recognizing the gain on the sale of its shares. This was made possible because the buyer first acquired the shares of the seller via a public tender offer and then the seller redeemed those shares using shares in its subsidiary. The government recharacterized the transaction as a sale of the subsidiary's shares to the buyer, followed by redemption of the seller's shares from the public in substance. The court held that the recharacterization impermissibly created fictitious steps and ignored the fact that the buyer's tender offer had an independent economic significance, i.e., of reducing Esmark's outstanding capital stock.

Thus, *Esmark* arguably stands for the principle that the step transaction doctrine could apply to disregard meaningless steps, but cannot create fictitious steps or ignore steps that have independent economic significance. Together with *Summa Holdings*, this case law may serve as a limitation on the government's attempt to apply the substance-over-form doctrine expansively against taxpayers seeking to take advantage of benefits permitted under US federal tax statutes.

Institutionally, the IRS has pursued two initiatives in an effort to show that a taxpayer's rights are on their agenda. The first and most robust is the Taxpayer Advocate Service (TAS). The TAS has evolved in a series of iterations starting in 1979, but, in theory, serves as a

---

[86]    69 F.2d 809 (2d Cir. 1934). In *Gregory v. Helvering*, the Supreme Court affirmed the recharacterization of a purported corporate reorganization under the substance over form doctrine.

[87]    848 F.3d 779 (6th Cir. 2017).

[88]    90 T.C. 171 (1988).

UNITED STATES

taxpayer's ombudsman.[89] In function, the TAS follows issues in the IRS and courts relating to taxpayer rights, and presents two reports each year to the Committee on Ways and Means of the House of Representatives and the Senate Committee on Finance. The first report identifies the objectives of the TAS for the year and the second report takes a comprehensive status report on the TAS' work and findings. Taxpayers can also contact the TAS with inquiries relating to a series of issues, including trouble paying taxes or difficulties in communicating with the IRS, though the TAS has refocused its work scope at times.[90] The true effectiveness in addressing taxpayer needs is unclear.

The second initiative is the publication, "taxpayer's bill of rights," (the "TBOR") which is available on the IRS website.[91] However, the TBOR is not codified and only exists as a framework for the IRS' approach to collecting tax, despite repeated recommendations from the TAS that it be formalized in law or regulation.[92] So, for the time being, the TBOR has no binding effect or legal weight.

The publication lists ten "fundamental rights" that each taxpayer should be aware of when dealing with the IRS, specifically the right to (i) be informed, (ii) quality service, (iii) pay no more than the correct amount of tax, (iv) challenge the IRS's position and be heard, (v) appeal an IRS decision in an independent forum, (vi) finality, (vii) privacy, (viii) confidentiality, (ix) retain representation, and (x) a fair and just tax system.

*The Right to Be Informed*

This right stands for the idea that each taxpayer should know what is required of them to comply with US tax laws. The right appears to be divided into two areas. On one hand, the IRS has committed to making its publications, forms, notices, correspondence and instructions easy to understand and, if a taxpayer requires more information, the IRS will also post clarifying information online (either on its website or via social media). On the other, the IRS has committed to ensuring that notices regarding outstanding tax obligations/liability are clear, contain all required information, and provide explanations as to why the obligation exists in the first place. In short, a taxpayer should have the right to not only to know what the law is, but also how it is affecting them and how they can best comply with it.

*The Right to Quality Service*

This right focuses more on the taxpayer's actual interactions with the IRS. Specifically, the IRS has stated that taxpayers have the right to receive prompt, courteous, and professional assistance when dealing with the IRS, and that the IRS will objectively listen to a taxpayer should they have any questions. The IRS has also committed to contact taxpayers only

[89]  For discussion, see *Christians, Allison, Taxpayer Rights in the United States* (October 14, 2016). "Derecho Tributario Y Derechos Humanos/tax Law and Human Rights", César Alejandro Ruiz Jiménez, ed. (2016).

[90]  IRS, *Taxpayer Advocate Service Clarifies Case Acceptance Criteria*, undated, available at https://taxpayeradvocate.irs. gov/Media/Default/Documents/TAS_change_case_criteria_6_12_12.pdf

[91]  See IRS Publication 1, *Your Rights as a Taxpayer.* (Rev. 12-2014), available at https://www.irs.gov/pub/irs-pdf/ p1.pdf.

[92]  For discussion, see *Christians, Allison, Taxpayer Rights in the United States* (October 14, 2016). "Derecho Tributario Y Derechos Humanos/tax Law and Human Rights", *César Alejandro Ruiz Jiménez,* ed. (2016).

se 1:18-md-02865-LAK    Document 808-18    Filed 05/12/22    Page 312 of 15

during reasonable hours when collecting tax, and will be courteous and professional during these interactions. In short, a taxpayer should have the right to have all interactions with the IRS be professional and transparent.

*The Right to Pay No More than the Correct Amount of Tax*

Taxpayers should have the right to file for refunds if it is determined that they have overpaid. To this point, the IRS will allow a taxpayer to provide information substantiating such overpayment and file an amended return. The IRS will also remove amounts due for a variety of other reasons (e.g., the statute of limitations has expired). The IRS will also abate interest that accrues due to its own unreasonable delay, and will consider compromise offers from taxpayers regarding their tax debt rather than demand full payment in every situation.

*The Right to Challenge the IRS's Position and Be Heard*

The above notwithstanding, should a taxpayer choose to challenge the IRS's position, they should be made aware of how to do this and should be able to do so promptly. Specifically, the IRS will give a taxpayer a 60-day window to correct minor errors on a tax return and has committed to adjusting the return accordingly and providing documentation to the taxpayer should the error be corrected. Should the IRS choose not to agree with the taxpayer, it will inform the taxpayer of the adjustment, provide an explanation as to why it has made the adjustment, and notify them of (i) their right to challenge this position in the Tax Court and (ii) how to do so. Similarly, the IRS has committed to giving taxpayers the opportunity to challenge deficiencies/adjustments before an independent Office of Appeals before taking enforcement action (i.e., garnishing wages or levying a bank account).

*The Right to Appeal an IRS Decision in an Independent Forum*

As discussed in the above sections, a taxpayer has the right to challenge IRS determinations with regard to their tax liability in front of the Office of Appeals and/or the Tax Court. Moreover, the IRS has made a publication available that informs taxpayers of their rights in these cases.

*The Right to Finality*

Taxpayers should be aware of the timing with regard to disputes with the IRS, such as how long a tax year is open for audit, how long the IRS has to collect unpaid taxes, how long a taxpayer has to file a refund claim, etc. In short, a taxpayer should know when an issue will be permanently resolved.

*The Right to Privacy*

A taxpayer should have the right to protect certain items and wages from IRS levy. A taxpayer

UNITED STATES

should also have the right to withhold certain information when making a settlement offer, and the IRS has committed to not seeking intrusive and extraneous information about a taxpayer unless there is a reasonable indication that the taxpayer has underreported income. In short, the taxpayer should be free from having the IRS pry into their affairs without due process.

*The Right to Confidentiality*

The IRS will not disclose tax information to third parties without prior authorization from the taxpayer, nor will it contact third parties with regard to a taxpayer's liability without prior notification. Taxpayers generally have the same confidentiality protection in dealing with the IRS that they have with attorneys, and tax return preparers who disclose/use a taxpayer's information knowingly or recklessly may be subject to criminal penalties.

*The Right to Retain Representation*

Taxpayers may retain advisors (attorneys, CPAs, or enrolled agents) when interacting with the IRS. Moreover, as in most criminal proceedings an IRS interview must be suspended if a taxpayer requests a representative. Such representatives may represent a taxpayer without them being present provided they have been granted power of attorney, and a taxpayer may request assistance from an independent Low-Income Taxpayer Clinic if their income falls below a certain level.

*The Right to a Fair and Just Tax System*

Taxpayers should have the right to enter into a payment plan with the IRS if they cannot pay their tax debt in full, as well as propose compromises to the IRS with regard to the debt. The IRS publishes information about local living costs in order to better assess when a taxpayer should be able to offer compromises and enter into payment plans, and has committed to not levying all of a taxpayer's wages (so that the taxpayer can meet such costs). Moreover, taxpayers have access to the Taxpayer Advocate Service and Low-Income Taxpayer Clinics to assist them with IRS disputes, and can demand an abatement on certain liabilities and interest, provided they have been unfairly assessed (e.g., if the statute of limitations has run, or if the interest accrued due to unreasonable delay on the part of the IRS).

   In short, the IRS has published guidelines outlining how it intends to interact with taxpayers both proactively and over the course of disputes. It has committed to making materials and resources available to better inform taxpayers, to deal with taxpayers and their concerns in a professional and helpful manner, and to respect a taxpayer's privacy.

24

# Exhibit 41

DEPARTMENT OF THE TREASURY TECHNICAL EXPLANATION OF THE
CONVENTION BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND THE GOVERNMENT OF THE KINGDOM OF DENMARK FOR THE
AVOIDANCE OF DOUBLE TAXATION AND THE PREVENTION OF FISCAL EVASION
WITH RESPECT TO TAXES ON INCOME SIGNED AT WASHINGTON, AUGUST 19, 1999

GENERAL EFFECTIVE DATE UNDER ARTICLE 29: 1 JANUARY 2001

INTRODUCTION

This is a Technical Explanation of the Convention and Protocol between the United States and Denmark signed at Washington on August 19, 1999 (the "Convention" and "Protocol"). References are made to the Convention between the United States and Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income signed at Washington, D.C., on May 6, 1948 (the "prior Convention"). The Convention replaces the prior Convention.

Negotiations took into account the U.S. Treasury Department's current tax treaty policy, as reflected in the U.S. Treasury Department's Model Income Tax Convention of September 20, 1996 (the "U.S. Model") and its recently negotiated tax treaties, the Model Income Tax Convention on Income and on Capital, published by the OECD in 1992 and amended in 1994, 1995 and 1997 (the "OECD Model"), and recent tax treaties concluded by Denmark.

The Technical Explanation is an official guide to the Convention and Protocol. It reflects the policies behind particular Convention provisions, as well as understandings reached with respect to the application and interpretation of the Convention and Protocol. In the discussions of each Article in this explanation, the relevant portions of the Protocol are discussed. This Technical Explanation has been provided to Denmark. References in the Technical Explanation to "he" or "his" should be read to mean "he or she" and "his or her."

TABLE OF ARTICLES

Article 1---------------------------------General Scope
Article 2---------------------------------Taxes Covered
Article 3---------------------------------General Definitions
Article 4---------------------------------Residence
Article 5---------------------------------Permanent Establishment
Article 6---------------------------------Income from Real Property
Article 7---------------------------------Business Profits
Article 8---------------------------------Shipping and Air Transport
Article 9---------------------------------Associated Enterprises
Article 10--------------------------------Dividends
Article 11--------------------------------Interest
Article 12--------------------------------Royalties
Article 13--------------------------------Capital Gains

Article 14-------------------------------Independent Personal Services
Article 15-------------------------------Dependent Personal Services
Article 16-------------------------------Directors' Fees
Article 17-------------------------------Artistes and Sportsmen
Article 18-------------------------------Pensions, Social Security, Annuities, Alimony
                                         and Child Support Payments
Article 19-------------------------------Government Service
Article 20-------------------------------Student and Trainees
Article 21-------------------------------Other Income
Article 22-------------------------------Limitation of Benefits
Article 23-------------------------------Relief from Double Taxation
Article 24-------------------------------Non-Discrimination
Article 25-------------------------------Mutual Agreement Procedure
Article 26-------------------------------Exchange of Information
Article 27-------------------------------Administrative Assistance
Article 28-------------------------------Diplomatic Agents and Consular Officers
Article 29-------------------------------Entry into Force
Article 30-------------------------------Termination

ARTICLE 1
General Scope

*Paragraph 1*

Paragraph 1 of Article 1 provides that the Convention applies to residents of the United States or Denmark, except where the terms of the Convention provide otherwise. Under Article 4 (Residence), a person is generally treated as a resident of a Contracting State if that person is, under the laws of that Contracting State, liable to tax therein by reason of his domicile or other similar criteria. If, however, a person is considered a resident of both Contracting States, Article 4 provides rules for determining a single state of residence (or no state of residence). This determination governs for all purposes of the Convention.

Certain provisions are applicable to persons who may not be residents of either Contracting State. For example, Article 19 (Government Service) may apply to an employee of a Contracting State who is resident in neither State. Paragraph 1 of Article 24 (Non-Discrimination) applies to nationals of the Contracting States. Under Article 26 (Exchange of Information), information may be exchanged with respect to residents of third states.

*Paragraph 2*

Paragraph 2 states the generally accepted relationship both between the Convention and domestic law and between the Convention and other agreements between the Contracting States (i.e., that no provision in the Convention may restrict any exclusion, exemption, deduction, credit or other benefit accorded by the tax laws of the Contracting States, or by any other agreement between the Contracting States). The relationship between the non-discrimination provisions of

the Convention and other agreements is not addressed in paragraph 2 but in paragraph 3.

For example, if a deduction would be allowed under the U.S. Internal Revenue Code (the "Code") in computing the U.S. taxable income of a resident of Denmark, the deduction also is allowed to that person in computing taxable income under the Convention. Paragraph 2 also means that the Convention may not increase the tax burden on a resident of a Contracting State beyond the burden determined under domestic law. Thus, a right to tax given by the Convention cannot be exercised unless that right also exists under internal law.

It follows that under the principle of paragraph 2 a taxpayer's liability to U.S. tax need not be determined under the Convention if the Code would produce a more favorable result. A taxpayer may not, however, choose among the provisions of the Code and the Convention in an inconsistent manner in order to minimize tax. For example, assume that a resident of Denmark has three separate businesses in the United States. One is a profitable permanent establishment and the other two are trades or businesses that would earn taxable income under the Code but that do not meet the permanent establishment threshold tests of the Convention. One is profitable and the other incurs a loss. Under the Convention, the income of the permanent establishment is taxable, and both the profit and loss of the other two businesses are ignored. Under the Code, all three would be subject to tax, but the loss would be offset against the profits of the two profitable ventures. The taxpayer may not invoke the Convention to exclude the profits of the profitable trade or business and invoke the Code to claim the loss of the loss trade or business against the profit of the permanent establishment. (See Rev. Rul. 84-17, 1984-1 C.B. 308.) If, however, the taxpayer invokes the Code for the taxation of all three ventures, he would not be precluded from invoking the Convention with respect, for example, to any dividend income he may receive from the United States that is not effectively connected with any of his business activities in the United States.

Similarly, nothing in the Convention can be used to deny any benefit granted by any other agreement between the United States and Denmark. For example, if certain benefits are provided for military personnel or military contractors under a Status of Forces Agreement between the United States and Denmark, those benefits or protections will be available to residents of the Contracting States regardless of any provisions to the contrary (or silence) in the Convention.

*Paragraph 3*

Paragraph 3 specifically relates to non-discrimination obligations of the Contracting States under other agreements. The provisions of paragraph 3 are an exception to the rule provided in paragraph 2 of this Article under which the Convention shall not restrict in any manner any benefit now or hereafter accorded by any other agreement between the Contracting States.

Subparagraph (a) of paragraph 3 provides that, notwithstanding any other agreement to which the Contracting States may be parties, a dispute concerning whether a measure is within the scope of this Convention shall be considered only by the competent authorities of the Contracting States, and the procedures under this Convention exclusively shall apply to the dispute. Thus, procedures for dealing with disputes that may be incorporated into trade, investment, or other agreements between the Contracting States shall not apply for the purpose of determining the

scope of the Convention.

Subparagraph (b) of paragraph 3 provides that, unless the competent authorities determine that a taxation measure is not within the scope of this Convention, the non-discrimination obligations of this Convention exclusively shall apply with respect to that measure, except for such national treatment or most-favored-nation ("MFN") obligations as may apply to trade in goods under the General Agreement on Tariffs and Trade ("GATT"). No national treatment or MFN obligation under any other agreement shall apply with respect to that measure. Thus, unless the competent authorities agree otherwise, any national treatment and MFN obligations undertaken by the Contracting States under agreements other than the Convention shall not apply to a taxation measure, with the exception of GATT as applicable to trade in goods.

Subparagraph (c) of paragraph 3 defines a "measure" broadly. It would include, for example, a law, regulation, rule, procedure, decision, administrative action or guidance, or any other form of governmental action or guidance.

*Paragraph 4*

Paragraph 4 contains the traditional saving clause found in U.S. tax treaties. The Contracting States reserve their rights, except as provided in paragraph 5, to tax their residents and citizens as provided in their internal laws, notwithstanding any provisions of the Convention to the contrary. For example, if a resident of Denmark performs independent personal services in the United States and the income from the services is not attributable to a fixed base in the United States, Article 14 (Independent Personal Services) would by its terms prevent the United States from taxing the income. If, however, the resident of Denmark is also a citizen of the United States, the saving clause permits the United States to include the remuneration in the worldwide income of the citizen and subject it to tax under the normal Code rules (i.e., without regard to Code section 894(a)). However, paragraph 5(a) of this Article preserves the benefits of special foreign tax credit rules applicable to the U.S. taxation of certain U.S. income of its citizens resident in Denmark. See paragraph 2 of Article 23 (Relief from Double Taxation).

For purposes of the saving clause, "residence" is determined under Article 4 (Residence). Thus, if an individual who is not a U.S. citizen is a resident of the United States under the Code, and is also a resident of Denmark under its law, and that individual has a permanent home available to him in Denmark and not in the United States, he would be treated as a resident of Denmark under Article 4 and for purposes of the saving clause. The United States would not be permitted to apply its statutory rules to that person if they are inconsistent with the treaty. Thus, an individual who is a U.S. resident under the Internal Revenue Code but who is deemed to be a resident of Denmark under the tie-breaker rules of Article 4 (Residence) would be subject to U.S. tax only to the extent permitted by the Convention. However, the person would be treated as a U.S. resident for U.S. tax purposes other than determining the individual's U.S. tax liability. For example, in determining under Code section 957 whether a foreign corporation is a controlled foreign corporation, shares in that corporation held by the individual would be considered to be held by a U.S. resident. As a result, other U.S. citizens or residents might be deemed to be United States shareholders of a controlled foreign corporation subject to current inclusion of Subpart F income recognized by the corporation. See Treas. Reg. section 301.7701(b)-7(a)(3).

Under paragraph 4 each Contracting State also reserves its right to tax former citizens and long-term residents whose loss of citizenship or long-term residence had as one of its principal purposes the avoidance of tax. The United States generally treats an individual as having a principal purpose to avoid tax if

(a) the average annual net income tax of such individual for the period of 5 taxable years ending before the date of the loss of status is greater than $100,000, or

(b) the net worth of such individual as of such date is $500,000 or more.

An individual shall not be treated as a lawful permanent resident for any taxable year if such individual is treated as a resident of the foreign country under the provisions of a tax treaty between the United States and the foreign country and the individual does not waive the benefits of such treaty applicable to residents of the foreign country. This provision may be applied for a period of 10 years following such loss. In the United States, such a former citizen or long-term resident is taxable in accordance with the provisions of section 877 of the Code.

Some provisions are intended to provide benefits to citizens and residents even if such benefits do not exist under internal law. Paragraph 5 sets forth certain exceptions to the saving clause that preserve these benefits for citizens and residents of the Contracting States. Subparagraph (a) lists certain provisions of the Convention that are applicable to all citizens and residents of a Contracting State, despite the general saving clause rule of paragraph 3:

(i) Paragraph 2 of Article 9 (Associated Enterprises) grants the right to a correlative adjustment with respect to income tax due on profits reallocated under Article 9;

(ii) Paragraph 7 of Article 13 (Capital Gains) allows a resident to elect to be treated in his State of residence as having alienated and repurchased a property where the gain has been subject to tax in the other State, and paragraph 8 permits the competent authorities to coordinate the timing of the recognition of gain with respect to cross-border reorganizations;

(iii) Paragraphs 1(c), 2 and 5 of Article 18 (Pensions, Social Security, Annuities, Alimony and Child Support Payments) deal with certain pension benefits, social security benefits and child support payments, respectively. Subparagraph 1(c) requires a Contracting State to treat certain pension benefits as arising in the other Contracting State, even if they would otherwise be treated as arising in the first-mentioned State under its domestic law. The inclusion of paragraph 2 in the exceptions to the saving clause means that the granting of exclusive taxing right of social security benefits to the paying country applies to deny, for example, to the United States the right to tax its citizens and residents on social security benefits paid by Denmark. The inclusion of paragraph 5, which exempts child support payments from taxation by the State of residence of the recipient, means that if a resident of Denmark pays child support to a citizen or resident of the United States, the United States may not tax the recipient;

(iv) Article 23 (Relief from Double Taxation) confirms the benefit of a credit to citizens and residents of one Contracting State for income taxes paid to the other;

(v) Article 24 (Non-Discrimination) requires one Contracting State to grant

national treatment to residents and citizens of Denmark in certain circumstances. Excepting this Article from the saving clause requires, for example, that the United States give such benefits to a resident or citizen of Denmark even if that person is a citizen of the United States;

(vi) Article 25 (Mutual Agreement Procedure) may confer benefits on citizens and residents of the Contracting States.

For example, the statute of limitations may be waived for refunds and the competent authorities are permitted to use a definition of a term that differs from the internal law definition. As with the foreign tax credit, these benefits are intended to be granted by a Contracting State to its citizens and residents.

Subparagraph (b) of paragraph 5 provides a different set of exceptions to the saving clause. The benefits referred to are all intended to be granted to temporary residents of a Contracting State (for example, in the case of the United States, holders of non-immigrant visas), but not to citizens or to persons who have acquired permanent residence in the other Contracting State. If beneficiaries of these provisions travel from one of the Contracting States to the other, and remain in the other long enough to become residents under its internal law, but do not acquire permanent residence status (i.e., in the U.S. context, they do not become "green card" holders) and are not citizens of the other Contracting State, the host State will continue to grant these benefits even if they conflict with the statutory rules. The benefits preserved by this paragraph are the host country exemptions for the following items of income: government service salaries and pensions under Article 19 (Government Service); certain income of visiting students and trainees under Article 20 (Students and Trainees); and the income of diplomatic agents and consular officers under Article 28 (Diplomatic Agents and Consular Officers).


ARTICLE 2
Taxes Covered

This Article specifies the U.S. taxes and the Danish taxes to which the Convention applies. Unlike Article 2 in the OECD Model, this Article does not contain a general description of the types of taxes that are covered (i.e., income taxes), but only a listing of the specific taxes covered for both of the Contracting States. With two exceptions, the taxes specified in Article 2 are the covered taxes for all purposes of the Convention. A broader coverage applies, however, for purposes of Articles 24 (Non-Discrimination) and 26 (Exchange of Information). Article 24 (Non-Discrimination) applies with respect to all taxes, including those imposed by state and local governments. Article 26 (Exchange of Information) applies with respect to all taxes imposed at the national level.

Subparagraph 1(a) provides that the United States covered taxes are the Federal income taxes imposed by the Code, together with the excise taxes imposed with respect to private foundations (Code sections 4940 through 4948). Although they may be regarded as income taxes, social security taxes (Code sections 1401, 3101, 3111 and 3301) are specifically excluded from coverage. It is expected that social security taxes will be dealt with in bilateral Social Security Totalization Agreements, which are negotiated and administered by the Social Security

Administration. Except with respect to Article 24 (Non-Discrimination), state and local taxes in the United States are not covered by the Convention.

In this Convention, like the U.S. Model, the Accumulated Earnings Tax and the Personal Holding Companies Tax are covered taxes because they are income taxes and they are not otherwise excluded from coverage. Under the Code, these taxes will not apply to most foreign corporations because of a statutory exclusion or the corporation's failure to meet a statutory requirement.

Subparagraph 1(b) specifies the existing taxes of Denmark that are covered by the Convention. These taxes are the income tax to the State (indkomstskatten til staten), the municipal income tax (den kommunale indkomstskat); the income tax to the county municipalities (den amtskommunale indkomstskat); and the taxes imposed under the Hydrocarbon Tax Act (skatter i henhold til kulbrinteskatteloven).

Under paragraph 2, the Convention will apply to any taxes that are identical, or substantially similar, to those enumerated in paragraph 1, and which are imposed in addition to, or in place of, the existing taxes after the date of signature of the Convention. The paragraph also provides that the competent authorities of the Contracting States will notify each other of significant changes in their taxation laws or of other laws that affect their obligations under the Convention. The use of the term "significant" means that changes must be reported that are of significance to the operation of the Convention. Other laws that may affect a Contracting State's obligations under the Convention may include, for example, laws affecting bank secrecy.

The competent authorities are also obligated to notify each other of official published materials concerning the application of the Convention. This requirement encompasses materials such as technical explanations, regulations, rulings and judicial decisions relating to the Convention.

ARTICLE 3
General Definitions

Paragraph 1 defines a number of basic terms used in the Convention. Certain others are defined in other articles of the Convention. For example, the term "resident of a Contracting State" is defined in Article 4 (Residence). The term "permanent establishment" is defined in Article 5 (Permanent Establishment). The terms "dividends," "interest" and "royalties" are defined in Articles 10, 11 and 12, respectively. The introduction to paragraph 1 makes clear that these definitions apply for all purposes of the Convention, unless the context requires otherwise. This latter condition allows flexibility in the interpretation of the treaty in order to avoid unintended results. Terms that are not defined in the Convention are dealt with in paragraph 2.

Subparagraph 1(a) defines the term "person" to include an individual, an estate, a trust, a partnership, a company and any other body of persons. The definition is significant for a variety of reasons. For example, under Article 4, only a "person" can be a "resident" and therefore eligible for most benefits under the treaty. Also, all "persons" are eligible to claim relief under

Article 25 (Mutual Agreement Procedure).

The term "company" is defined in subparagraph 1(b) as a body corporate or an entity treated as a body corporate for tax purposes according to the laws of the state where it is organized.

The terms "enterprise of a Contracting State" and "enterprise of Denmark" are defined in subparagraph 1(c) as an enterprise carried on by a resident of a Contracting State and an enterprise carried on by a resident of Denmark. The term "enterprise" is not defined in the Convention, nor is it defined in the OECD Model or its Commentaries. Despite the absence of a clear, generally accepted meaning for the term "enterprise," the term is understood to refer to any activity or set of activities that constitute a trade or business.

Like the U.S. Model, subparagraph 1(c) also provides that these terms also encompass an enterprise conducted through an entity (such as a partnership) that is treated as fiscally transparent in the Contracting State where the entity's owner is resident. This phrase has been included in the Convention in order to address more explicitly some of the problems presented by fiscally transparent entities. In accordance with Article 4 (Residence), entities that are fiscally transparent in the country in which their owners are resident are not considered to be residents of a Contracting State (although income derived by such entities may be taxed as the income of a resident, if taxed in the hands of resident partners or other owners). Given the approach taken in Article 4, an enterprise conducted by such an entity arguably could not qualify as an enterprise of a Contracting State under the OECD Model because the OECD definition of enterprise requires that the enterprise be conducted by a resident, although most countries would attribute the enterprise to the owners of the entity in such circumstances. The definition in the Convention is intended to make clear that an enterprise conducted by such an entity will be treated as carried on by a resident of a Contracting State to the extent its partners or other owners are residents. This approach is consistent with the Code, which under section 875 attributes a trade or business conducted by a partnership to its partners and a trade or business conducted by an estate or trust to its beneficiaries.

An enterprise of a Contracting State need not be carried on in that State. It may be carried on in the other Contracting State or in a third state (e.g., a U.S. corporation doing all of its business in Denmark would still be a U.S. enterprise).

Subparagraph 1(d) defines the term "international traffic." The term generally means any transport by a ship or aircraft except when transport is solely between places within a Contracting State. This definition is applicable principally in the context of Article 8 (Shipping and Air Transport). The definition in the OECD Model refers to the operator of the ship or aircraft having its place of effective management in a Contracting State (i.e., being a resident of that State). The present Convention does not include this limitation. The broader definition combines with paragraphs 2 and 3 of Article 8 to exempt from tax by the source State income from the rental of ships, aircraft or containers that is earned both by lessors that are operators of ships and aircraft and by those lessors that are not (e.g., banks or container leasing companies).

The exclusion from international traffic of transport solely between places within one of

the Contracting States means, for example, that carriage of goods or passengers solely between New York and Chicago would not be treated as international traffic, even if carried by a Danish carrier. The substantive taxing rules of the Convention relating to the taxation of income from transport, principally Article 8 (Shipping and Air Transport), therefore, would not apply to income from such carriage. Thus, if the carrier engaged in internal U.S. traffic were a resident of Denmark (assuming that were possible under U.S. law), the United States would not be required to exempt the income from that transport under Article 8. The income would, however, be treated as business profits under Article 7 (Business Profits), and therefore would be taxable in the United States only if attributable to a U.S. permanent establishment of the foreign carrier, and then only on a net basis. The gross basis U.S. tax imposed by section 887 would never apply under the circumstances described.

If, however, goods or passengers are carried by a carrier resident in Denmark from a non-U.S. port to, for example, New York, and some of the goods or passengers continue onto Chicago, the entire transport would be international traffic. This would be true if the international carrier transferred the goods at the U.S. port of entry from a ship to a land vehicle, or even if the overland portion of the trip in the United States was handled by an independent carrier under contract with the original international carrier, so long as both parts of the trip were reflected in original bills of lading. For this reason, the Convention, like the U.S. Model, refers, in the definition of "international traffic," to "such transport" being solely between places in that State, while the OECD Model refers to the ship or aircraft being operated solely between such places. The Convention definition is intended to make clear that, as in the above example, even if the goods are carried on a different aircraft for the internal portion of the international voyage than is used for the overseas portion of the trip, the definition applies to that internal portion as well as the external portion.

Finally, a "cruise to nowhere," i.e., a cruise beginning and ending in a port in the same Contracting State with no stops in a foreign port, would not constitute international traffic.

Subparagraphs 1(e)(i) and (ii) define the term "competent authority" for the United States and Denmark, respectively. The U.S. competent authority is the Secretary of the Treasury or his delegate. The Secretary of the Treasury has delegated the competent authority function to the Commissioner of Internal Revenue, who in turn has delegated the authority to the Assistant Commissioner (International). With respect to interpretative issues, the Assistant Commissioner acts with the concurrence of the Associate Chief Counsel (International) of the Internal Revenue Service. The Danish competent authority is the Minister for Taxation or his authorized representative.

The term "United States" is defined in subparagraph 1(f) to mean the United States of America, including the states, the District of Columbia and the territorial sea of the United States. The term does not include Puerto Rico, the Virgin Islands, Guam or any other U.S. possession or territory. This Convention explicitly includes certain areas under the sea within the definition of the United States. For certain purposes, the definition is extended to include the seabed and subsoil of undersea areas adjacent to the territorial sea of the United States. This extension applies to the extent that the United States exercises sovereignty in accordance with international law for the purpose of natural resource exploration and exploitation of such areas. This extension of the

definition applies, however, only if the person, property or activity to which the Convention is being applied is connected with such natural resource exploration or exploitation. Thus, it would not include any activity involving the sea floor of an area over which the United States exercised sovereignty for natural resource purposes if that activity was unrelated to the exploration and exploitation of natural resources.

The term "Denmark" is defined in subparagraph 1(g). It means the Kingdom of Denmark, including any area outside the territorial sea of Denmark which in accordance with international law has been or may hereafter be designated under Danish laws as an area within which Denmark may exercise sovereign rights with respect to the exploration and exploitation of the natural resources of the sea-bed or its subsoil and the superjacent waters and with respect to other activities for the exploration and economic exploitation of the area.

Thus, the Convention defines each of the countries as including its continental shelf. At the time the prior Convention was negotiated, the concept of the "continental shelf" as included within the definition of a country was just emerging. Denmark did not claim rights over its continental shelf until 1963; in the United States, a similar situation pertained. However, over the past three decades each country has imposed taxes on oil and gas exploration and exploitation activities on its continental shelf. The Convention simply clarifies the practice of both parties under the present treaty in terms consistent with modern international law and with the domestic laws of both countries.

The term "Denmark" does not comprise the Faroe Islands or Greenland. Paragraph 2 of the Protocol provides that the Convention may be extended to any territory or U.S. possession which imposes taxes substantially similar to those covered by the Convention. Such an extension would require the conclusion of a supplementary Convention which would be subject to ratification in the case of the United States, and approval in accordance with Denmark's constitutional procedures.

The term "national," as it relates to the United States and Denmark, is defined in subparagraphs 1(h)(i) and (ii), respectively. This term is relevant for purposes of Articles 19 (Government Service) and 24 (Non-Discrimination). A national of one of the Contracting States is
(1) an individual who is a citizen or national of that State, and
(2) any legal person, partnership or association deriving its status as such from the law in force in the State where it is established.

This definition is closely analogous to that found in the OECD Model.

The term "qualified governmental entity" is defined in subparagraph 1(i). This definition is relevant for purposes of Articles 4 (Residence) and 10 (Dividends). The term means:
(i) the Government of a Contracting State or of a political subdivision or local authority of the Contracting State;
(ii) A person wholly owned by a governmental entity described in subparagraph (i), that satisfies certain organizational and funding standards; and
(iii) a pension fund that meets the standards of subparagraphs (i) and (ii)

and that provides government service pension benefits, described in Article 19 (Government Service).

A qualified governmental entity described in subparagraphs (ii) and (iii) may not engage in any commercial activity.

Paragraph 2 provides that in the application of the Convention, any term used but not defined in the Convention will have the meaning that it has under the law of the Contracting State whose tax is being applied, unless the context requires otherwise. The paragraph makes clear that if the term is defined under both the tax and non-tax laws of a Contracting State, the definition in the tax law will take precedence over the definition in the non-tax laws. Finally, there also may be cases where the tax laws of a State contain multiple definitions of the same term. In such a case, the definition used for purposes of the particular provision at issue, if any, should be used.

If the meaning of a term cannot be readily determined under the law of a Contracting State, or if there is a conflict in meaning under the laws of the two States that creates difficulties in the application of the Convention, the competent authorities, as indicated in Article 25 (Mutual Agreement Procedure), may establish a common meaning in order to prevent double taxation or to further any other purpose of the Convention. This common meaning need not conform to the meaning of the term under the laws of either Contracting State.

The language of paragraph 2 makes clear that the reference to the internal law of a Contracting State means the law in effect at the time the Convention is being applied, not the law as in effect at the time the Convention was signed. The use of "ambulatory" definitions, however, may lead to results that are at variance with the intentions of the negotiators and of the Contracting States when the Convention was negotiated and ratified. The reference in both paragraphs 1 and 2 to the caveat "unless the context otherwise requires" a definition different from the treaty definition, in paragraph 1, or from the internal law definition of the Contracting State whose tax is being imposed, under paragraph 2, refers to a circumstance where the result intended by the negotiators or by the Contracting States is different from the result that would obtain under either the paragraph 1 definition or the statutory definition. Thus, flexibility in defining terms is necessary and permitted.

ARTICLE 4
Residence

This Article sets forth rules for determining whether a person is a resident of a Contracting State for purposes of the Convention. As a general matter, only residents of the Contracting States may claim the benefits of the Convention. The treaty definition of residence is to be used only for purposes of the Convention. The fact that a person is determined to be a resident of a Contracting State under Article 4 does not necessarily entitle that person to the benefits of the Convention. In addition to being a resident, a person also must qualify for benefits under Article 22 (Limitation on Benefits) in order to receive benefits conferred on residents of a Contracting State.

The determination of residence for treaty purposes looks first to a person's liability to tax

as a resident under the respective taxation laws of the Contracting States. As a general matter, a person who, under those laws, is a resident of one Contracting State and not of the other need look no further. For purposes of the Convention, that person is a resident of the State in which he is resident under internal law. If, however, a person is resident in both Contracting States under their respective taxation laws, the Article proceeds, where possible, to use tie-breaker rules to assign a single State of residence to such a person for purposes of the Convention.

*Paragraph 1*

The term "resident of a Contracting State" is defined in paragraph 1. In general, this definition incorporates the definitions of residence in U.S. and Danish law by referring to a resident as a person who, under the laws of a Contracting State, is subject to tax there by reason of his domicile, residence, citizenship, place of management, place of incorporation, or any other similar criterion. Thus, residents of the United States include aliens who are considered U.S. residents under Code section 7701(b). Subparagraphs (a) through (d) each address special cases that may arise in the context of Article 4.

Certain entities that are nominally subject to tax but that in practice rarely pay tax also would generally be treated as residents and therefore accorded treaty benefits. For example, RICs, REITs and REMICs are all residents of the United States for purposes of the treaty. Although the income earned by these entities normally is not subject to U.S. tax in the hands of the entity, they are taxable to the extent that they do not currently distribute their profits, and therefore may be regarded as "liable to tax." They also must satisfy a number of requirements under the Code in order to be entitled to special tax treatment.

Subparagraph (a) provides that a person who is liable to tax in a Contracting State only in respect of income from sources within that Contracting State will not be treated as a resident of that Contracting State for purposes of the Convention. Thus, a consular official of Denmark who is posted in the United States, who may be subject to U.S. tax on U.S. source investment income, but is not taxable in the United States on non-U.S. source income, would not be considered a resident of the United States for purposes of the Convention. (See Code section 7701(b)(5)(B)). Similarly, an enterprise of Denmark with a permanent establishment in the United States is not, by virtue of that permanent establishment, a resident of the United States. The enterprise generally is subject to U.S. tax only with respect to its income that is attributable to the U.S. permanent establishment, not with respect to its worldwide income, as it would be if it were a U.S. resident.

Subparagraph (b) provides that certain tax-exempt entities such as pension funds and charitable organizations will be regarded as residents regardless of whether they are generally liable for income tax in the State where they are established. An entity will be described in this subparagraph if it is generally exempt from tax by reason of the fact that it is organized and operated exclusively to perform a charitable or similar purpose or to provide pension or similar benefits to employees, including self-employed individuals. The reference to "similar benefits" is intended to encompass employee benefits, such as health and disability benefits.

The inclusion of this provision is intended to clarify the generally accepted practice of

treating an entity that would be liable for tax as a resident under the internal law of a State but for a specific exemption from tax (either complete or partial) as a resident of that Contracting State for purposes of paragraph 1. The reference to a general exemption is intended to reflect the fact that under U.S. law, certain organizations that generally are considered to be tax-exempt entities may be subject to certain excise taxes or to income tax on their unrelated business income. Thus, a U.S. pension trust, or an exempt section 501(c) organization (such as a U.S. charity) that is generally exempt from tax under U.S. law is considered a resident of the United States for all purposes of the treaty.

Subparagraph (c) specifies that a qualified governmental entity (as defined in Article 3) is to be treated as a resident of the Contracting State when it is established.

Subparagraph (d) addresses special issues presented by fiscally transparent entities such as partnerships and certain estates and trusts. This subparagraph applies to any resident of a Contracting State who is entitled to income derived through an entity that is treated as fiscally transparent under the laws of either Contracting State. Entities falling under this description in the United States would include partnerships, common investment trusts under section 584 and grantor trusts. This paragraph also applies to U.S. limited liability companies ("LLC"s) that are treated as partnerships for U.S. tax purposes.

Subparagraph (d) provides that an item of income derived by such a fiscally transparent entity will be considered to be derived by a resident of a Contracting State if the resident is treated under the taxation laws of the State where he is resident as deriving the item of income. For example, if a corporation resident in Denmark distributes a dividend to an entity that is treated as fiscally transparent for U.S. tax purposes, the dividend will be considered derived by a resident of the United States only to the extent that the taxation laws of the United States treat one or more U.S. residents (whose status as U.S. residents is determined, for this purpose, under U.S. tax laws) as deriving the dividend income for U.S. tax purposes. In the case of a partnership, the persons who are, under U.S. tax laws, treated as partners of the entity would normally be the persons whom the U.S. tax laws would treat as deriving the dividend income through the partnership. Thus, it also follows that persons whom the U.S. treats as partners but who are not U.S. residents for U.S. tax purposes may not claim a benefit for the dividend paid to the entity under the Convention. Although these partners are treated as deriving the income for U.S. tax purposes, they are not residents of the United States for purposes of the treaty. If, however, they are treated as residents of a third country under the provisions of an income tax convention which that country has with Denmark, they may be entitled to claim a benefit under that convention. In contrast, if an entity is organized under U.S. laws and is classified as a corporation for U.S. tax purposes, dividends paid by a corporation resident in the other Contracting State to the U.S. entity will be considered derived by a resident of the United States since the U.S. corporation is treated under U.S. taxation laws as a resident of the United States and as deriving the income.

These results would obtain even if the entity were viewed differently under the tax laws of Denmark (e.g., as not fiscally transparent in the first example above where the entity is treated as a partnership for U.S. tax purposes or as fiscally transparent in the second example where the entity is viewed as not fiscally transparent for U.S. tax purposes). These results also follow regardless of where the entity is organized, i.e., in the United States, Denmark, or in a third

country. For example, income from sources in Denmark received by an entity organized under the laws of Denmark, which is treated for U.S. tax purposes as a corporation and is owned by a U.S. shareholder who is a U.S. resident for U.S. tax purposes, is not considered derived by the shareholder of that corporation even if, under the tax laws of the other State, the entity is treated as fiscally transparent. Rather, for purposes of the treaty, the income is treated as derived by an entity resident in Denmark. These results also follow regardless of whether the entity is disregarded as a separate entity under the laws of one jurisdiction but not the other, such as a single owner entity that is viewed as a branch for U.S. tax purposes and as a corporation for tax purposes of Denmark.

The taxation laws of a Contracting State may treat an item of income, profit or gain as income, profit or gain of a resident of that State even if, under the taxation laws of that State, the resident is not subject to tax on that particular item of income, profit or gain. For example, U.S.-source dividends would be regarded as income or gain of a resident of Denmark who otherwise derived the income or gain, despite the fact that the resident could be exempt from tax in Denmark on the dividend because of Denmark's participation exemption.

Where income is derived through an entity organized in a third state that has owners resident in one of the Contracting States, the characterization of the entity in that third state is irrelevant for purposes of determining whether the resident is entitled to treaty benefits with respect to income derived by the entity.

These principles also apply to trusts to the extent that they are fiscally transparent in either Contracting State. For example, if X, a resident of Denmark, creates a revocable trust and names persons resident in a third country as the beneficiaries of the trust, X would be treated as the beneficial owner of income derived from the United States under the Code's rules. If Denmark has no rules comparable to those in sections 671 through 679 then it is possible that under Denmark's law neither X nor the trust would be taxed on the income derived from the United States. In these cases subparagraph (d) provides that the trust's income would be regarded as being derived by a resident of the other Contracting State only to the extent that the laws of that State treat residents of that State as deriving the income for tax purposes.

*Paragraph 2*

If, under the laws of the two Contracting States, and, thus, under paragraph 1, an individual is deemed to be a resident of both Contracting States, a series of tie-breaker rules are provided to determine a single State of residence for that individual. These tests are to be applied in the order in which they are stated. The first test is based on where the individual has a permanent home. If that test is inconclusive because the individual has a permanent home available to him in both States, he will be considered to be a resident of the Contracting State where his personal and economic relations are closest (i.e., the location of his "center of vital interests"). If that test is also inconclusive, or if he does not have a permanent home available to him in either State, he will be treated as a resident of the Contracting State where he maintains an habitual abode. If he has an habitual abode in both States or in neither of them, he will be treated as a resident of the State of which he is a national. If he is a national of both States or of neither, the competent authorities shall endeavor to settle the question by mutual agreement.

*Paragraph 3*

Paragraph 3 seeks to settle dual-residence issues for a person other than an individual. Such a person is treated as resident in the United States if it is created or organized under the laws of the United States or a political subdivision. Denmark employs two criteria to determine corporate residence, only one of which has to be satisfied in order for a corporate entity to be considered a resident of Denmark. The first is the same as the United States' "place-of-incorporation" rule. Alternatively, a corporation is also considered a resident of Denmark if its seat of management is located in Denmark. For this "seat-of-management" test, the location of the day-to-day management is normally decisive. Denmark's seat-of-management test coupled with the United States' rule could lead to cases of dual corporate residence, in the case of a company incorporated in the United States with its seat of management located in Denmark. Under paragraph 3, the residence of such a company will be considered by the competent authorities, who will endeavor to settle the question and to determine the mode of application of the Convention to such person.

*Paragraph 4*

Paragraph 4 provides that a U.S. citizen or alien lawfully admitted for permanent residence in the United States (i.e., a "green card" holder) will be treated as a resident of the United States for purposes of the Convention, and, thereby entitled to treaty benefits, only if he has a substantial presence (see section 7701(b)(3)), permanent home or habitual abode in the United States. If, however, such an individual is a resident both of the United States and Denmark under the general rule of paragraph 1, whether he is to be treated as a resident of the United States or of Denmark for purposes of the Convention is determined by the tie-breaker rules of paragraph 4 of the Article, regardless of how close his nexus to the United States may be. If, however, he is resident in the United States and not Denmark but has ties to a third State, in the absence of paragraph 4 he would always be a resident of the United States, no matter how tenuous his relationship with the United States relative to that with the third State. However, the fact that a U.S. citizen who does not have close ties to the United States may not be treated as a U.S. resident under the Convention does not alter the application of the saving clause of paragraph 4 of Article 1 (General Scope) to that citizen. For example, a U.S. citizen who pursuant to the "citizen/green card holder" rule is not considered to be a resident of the United States still is taxable on his worldwide income under the generally applicable rules of the Code.

ARTICLE 5
Permanent Establishment

This Article defines the term "permanent establishment," a term that is significant for several articles of the Convention. The existence of a permanent establishment in a Contracting State is necessary under Article 7 (Business Profits) for the taxation by Denmark of the business profits of a resident of Denmark. Since the term "fixed base" in Article 14 (Independent Personal Services) is understood by reference to the definition of "permanent establishment," this Article is also relevant for purposes of Article 14. Articles 10, 11 and 12 (dealing with dividends, interest,

and royalties, respectively) provide for reduced rates of tax at source on payments of these items of income to a resident of the other State only when the income is not attributable to a permanent establishment or fixed base that the recipient has in the source State. The concept is also relevant in determining which Contracting State may tax certain gains under Article 13 (Capital Gains) and certain "other income" under Article 21 (Other Income).

*Paragraph 1*

The basic definition of the term "permanent establishment" is contained in paragraph 1. As used in the Convention, the term means a fixed place of business through which the business of an enterprise is wholly or partly carried on. As indicated in the OECD Commentaries (see paragraphs 4 through 8), a general principle to be observed in determining whether a permanent establishment exists is that the place of business must be "fixed" in the sense that a particular building or physical location is used by the enterprise for the conduct of its business, and that it must be foreseeable that the enterprise's use of this building or other physical location will be more than temporary.

*Paragraph 2*

Paragraph 2 lists a number of types of fixed places of business that constitute a permanent establishment. This list is illustrative and non-exclusive. According to paragraph 2, the term permanent establishment includes a place of management, a branch, an office, a factory, a workshop, and a mine, oil or gas well, quarry or other place of extraction of natural resources.

*Paragraph 3*

This paragraph provides rules to determine whether a building site or a construction, assembly or installation project, or an installation or drilling rig or ship used for the exploration of natural resources constitutes a permanent establishment for the contractor, driller, etc. An activity does not create a permanent establishment unless the site, project, etc. lasts or continues for more than twelve months. It is only necessary to refer to "exploration" and not "exploitation" in this context because exploitation activities are defined to constitute a permanent establishment under subparagraph (f) of paragraph 2. Thus, a drilling rig does not constitute a permanent establishment if a well is drilled in only six months, but if production begins in the following month the well becomes a permanent establishment as of the date on which production begins.

The twelve-month test applies separately to each site or project. The twelve-month period begins when work (including preparatory work carried on by the enterprise) physically begins in a Contracting State. A series of contracts or projects by a contractor that are interdependent both commercially and geographically are to be treated as a single project for purposes of applying the twelve-month threshold test. For example, the construction of a housing development would be considered as a single project even if each house were constructed for a different purchaser. Several drilling rigs operated by a drilling contractor in the same sector of the continental shelf also normally would be treated as a single project.

If the twelve-month threshold is exceeded, the site or project constitutes a permanent

establishment from the first day of activity. In applying this paragraph, time spent by a sub-contractor on a building site is counted as time spent by the general contractor at the site for purposes of determining whether the general contractor has a permanent establishment. However, for the sub-contractor itself to be treated as having a permanent establishment, the sub-contractor's activities at the site must last for more than 12 months. If a sub-contractor is on a site intermittently then, for purposes of applying the 12-month rule, time is measured from the first day the sub-contractor is on the site until the last day (i.e., intervening days that the sub-contractor is not on the site are counted).

The second sentence of paragraph 3, which includes subparagraphs (a) and (b), further provides that, for purposes of this paragraph, if a resident of a Contracting State is carrying on activities described in paragraph 3 in the other Contracting State and another person that is associated with the first mentioned resident is also carrying on activities that are substantially the same as those carried on by the last-mentioned enterprise and are concerned with the same project or operation, that other person's activities will be regarded as having been carried on by the first-mentioned resident. This rule does not apply to the extent that these activities are carried on at the same time. This rule is intended to prevent taxpayers from avoiding the time threshold by artificially splitting activities between different entities. Thus, the rule will not apply to the extent that the activities of the two persons are being carried on at the same time. If the principal and the related person each exceed the time threshold, both will be considered to have a permanent establishment. If the principal is present for, say, 11 months, and the related party is present for 2 months, during which time period the principal is not present, the principal will have a permanent establishment, but the related party will not.

These interpretations of the Article are based on the Commentary to paragraph 3 of Article 5 of the OECD Model, which contains language substantially the same as that in the Convention (except for the absence in the OECD Model of a rule for drilling rigs). These interpretations are consistent with the generally accepted international interpretation of the relevant language in paragraph 3 of Article 5 of the Convention.

Paragraph 5 of Article 8 (Shipping and Air Transport) confirms that the treatment of profits of an enterprise of a Contracting State from the transport by ships or aircraft of supplies or personnel to a location where offshore activities in connection with the operation or exploitation of natural resources are being carried on in the other Contracting State, or from the operation of tugboats and similar vessels in connection with such activities are taxable only in the Contracting State of the enterprise.

*Paragraph 4*

This paragraph contains exceptions to the general rule of paragraph 1, listing a number of activities that may be carried on through a fixed place of business, but which nevertheless do not create a permanent establishment. The use of facilities solely to store, display or deliver merchandise belonging to an enterprise does not constitute a permanent establishment of that enterprise. The maintenance of a stock of goods belonging to an enterprise solely for the purpose of storage, display or delivery, or solely for the purpose of processing by another enterprise does not give rise to a permanent establishment of the first-mentioned enterprise. The maintenance of a

fixed place of business solely for the purpose of purchasing goods or merchandise, or for collecting information, for the enterprise, or for other activities that have a preparatory or auxiliary character for the enterprise, such as advertising, or the supply of information do not constitute a permanent establishment of the enterprise. Thus, a news bureau of a newspaper would not constitute a permanent establishment of the newspaper.

Subparagraph 4(f) provides that a combination of the activities described in the other subparagraphs of paragraph 4 will not give rise to a permanent establishment if the combination results in an overall activity that is of a preparatory or auxiliary character. This combination rule, derived from the OECD Model, differs from that in the U.S. Model. In the U.S. Model, any combination of otherwise excepted activities is not deemed to give rise to a permanent establishment, without the additional requirement that the combination, as distinct from each constituent activity, be preparatory or auxiliary. It is assumed that if preparatory or auxiliary activities are combined, the combination generally will also be of a character that is preparatory or auxiliary. If, however, this is not the case, a permanent establishment may result from a combination of activities.

*Paragraphs 5 and 6*

Paragraphs 5 and 6 specify when activities carried on by an agent on behalf of an enterprise create a permanent establishment of that enterprise. Under paragraph 5, a dependent agent of an enterprise is deemed to be a permanent establishment of the enterprise if the agent has and habitually exercises an authority to conclude contracts in the name of the enterprise. If, however, the agent's activities are limited to those activities specified in paragraph 4 which would not constitute a permanent establishment if carried on by the enterprise through a fixed place of business, the agent is not a permanent establishment of the enterprise.

The Convention uses the OECD Model term "in the name of that enterprise," rather than the term "binding on the enterprise," which is the term used in the U.S. Model. There is no substantive difference. As indicated in paragraph 32 to the OECD Commentaries on Article 5, the application of paragraph 5 of the Article is not limited to "an agent who enters into contracts literally in the name of the enterprise; the paragraph applies equally to an agent who concludes contracts which are binding on the enterprise, even if those contracts are not actually in the name of the enterprise."

The contracts referred to in paragraph 5 are those relating to the essential business operations of the enterprise, rather than ancillary activities. For example, if the agent has no authority to conclude contracts in the name of the enterprise with its customers for, say, the sale of the goods produced by the enterprise, but it can enter into service contracts in the name of the enterprise for the enterprise's business equipment used in the agent's office, this contracting authority would not fall within the scope of the paragraph, even if exercised regularly.

Under paragraph 6, an enterprise is not deemed to have a permanent establishment in a Contracting State merely because it carries on business in the other Contracting State through an independent agent, including a broker or general commission agent, if the agent is acting in the ordinary course of his business as an independent agent. Thus, there are two conditions that must

be satisfied: the agent must be both legally and economically independent of the enterprise, and the agent must be acting in the ordinary course of its business in carrying out activities on behalf of the enterprise.

Whether the agent and the enterprise are independent is a factual determination. Among the questions to be considered are the extent to which the agent operates on the basis of instructions from the enterprise. An agent that is subject to detailed instructions regarding the conduct of its operations or comprehensive control by the enterprise is not legally independent.

In determining whether the agent is economically independent, a relevant factor is the extent to which the agent bears business risk. Business risk refers primarily to risk of loss. An independent agent typically bears risk of loss from its own activities. In the absence of other factors that would establish dependence, an agent that shares business risk with the enterprise, or has its own business risk, is economically independent because its business activities are not integrated with those of the principal. Conversely, an agent that bears little or no risk from the activities it performs is not economically independent and is not described in paragraph 6.

Another relevant factor in determining whether an agent is economically independent is whether the agent has an exclusive or nearly exclusive relationship with the principal. Such a relationship may indicate that the principal has economic control over the agent. A number of principals acting in concert also may have economic control over an agent. The limited scope of the agent's activities and the agent's dependence on a single source of income may indicate that the agent lacks economic independence. It should be borne in mind, however, that exclusivity is not in itself a conclusive test: an agent may be economically independent notwithstanding an exclusive relationship with the principal if it has the capacity to diversify and acquire other clients without substantial modifications to its current business and without substantial harm to its business profits. Thus, exclusivity should be viewed merely as a pointer to further investigation of the relationship between the principal and the agent. Each case must be addressed on the basis of its own facts and circumstances.

*Paragraph 7*

This paragraph clarifies that a company that is a resident of a Contracting State is not deemed to have a permanent establishment in Denmark merely because it controls, or is controlled by, a company that is a resident of that other Contracting State, or that carries on business in that other Contracting State. The determination whether a permanent establishment exists is made solely on the basis of the factors described in paragraphs 1 through 6 of the Article. Whether a company is a permanent establishment of a related company, therefore, is based solely on those factors and not on the ownership or control relationship between the companies.

ARTICLE 6
<u>Income from Real Property</u>

*Paragraph 1*

Paragraph 1 states the general rule that income of a resident of a Contracting State derived from real property situated in the other Contracting State may be taxed in the Contracting State in which the property is situated. The paragraph specifies that income from real property includes income from agriculture and forestry. Income from agriculture and forestry are dealt with in Article 6 rather than in Article 7 (Business Profits) in order to conform the U.S. Model to the OECD Model. Given the availability of the net election in paragraph 5, taxpayers generally should be able to obtain the same tax treatment in the situs State regardless of whether the income is treated as business profits or real property income. Paragraph 3 clarifies that the income referred to in paragraph 1 also means income from any use of real property, including, but not limited to, income from direct use by the owner (in which case income may be imputed to the owner for tax purposes) and rental income from the letting of real property.

This Article does not grant an exclusive taxing right to the situs State; the situs State is merely given the primary right to tax. The Article does not impose any limitation in terms of rate or form of tax on the situs State, except that, as provided in paragraph 5, the situs State must allow the taxpayer an election to be taxed on a net basis.

*Paragraph 2*

The term "real property" is defined in paragraph 2 by reference to the internal law definition in the situs State. In the case of the United States, the term has the meaning given to it by Reg. § 1.897-1(b). In addition to the statutory definitions in the two Contracting States, the paragraph specifies certain additional classes of property that, regardless of internal law definitions, are to be included within the meaning of the term for purposes of the Convention. This expanded definition conforms to that in the OECD Model. The definition of "real property" for purposes of Article 6 is more limited than the expansive definition of "real property situated in the Other Contracting State" in paragraph 2 of Article 13 (Capital Gains). The Article 13 term includes not only immovable property as defined in Article 6 but certain other interests in real property.

*Paragraph 3*

Paragraph 3 makes clear that all forms of income derived from the exploitation of real property are taxable in the Contracting State in which the property is situated. In the case of a net lease of real property, if a net taxation election has not been made, the gross rental payment (before deductible expenses incurred by the lessee) is treated as income from the property. Income from the disposition of an interest in real property, however, is not considered "derived" from real property and is not dealt with in this Article. The taxation of that income is addressed in Article 13 (Capital Gains). Also, the interest paid on a mortgage on real property and distributions by a United States real estate investment trust are not dealt with in Article 6. Such payments would fall under Articles 10 (Dividends), 11 (Interest) or 13 (Capital Gains). Finally, dividends paid by a United States real property holding corporation are not considered to be income from the exploitation of real property: such payments would fall under Article 10 or 13.

*Paragraph 4*

Paragraph 4 specifies that the basic rule of paragraph 1 (as elaborated in paragraph 3) applies to income from real property of an enterprise and to income from real property used for the performance of independent personal services. This clarifies that the situs State may tax the real property income (including rental income) of a resident of the other Contracting State in the absence of attribution to a permanent establishment or fixed base in the situs State. This provision represents an exception to the general rule under Articles 7 (Business Profits) and 14 (Independent Personal Services) that income must be attributable to a permanent establishment or fixed base, respectively, in order to be taxable in the situs State.

*Paragraph 5*

Paragraph 5 provides that a resident of one Contracting State that derives real property income from the other may elect, for any taxable year, to be subject to tax in that other State on a net basis, as though the income were attributable to a permanent establishment in that other State. The election may be terminated with the consent of the competent authority of the situs State. In the United States, revocation will be granted in accordance with the provisions of Treas. Reg. section 1.871-10(d)(2).


ARTICLE 7
Business Profits

This Article provides rules for the taxation by a Contracting State of the business profits of an enterprise of the other Contracting State.

*Paragraph 1*

Paragraph 1 states the general rule that business profits (as defined in paragraph 7) of an enterprise of one Contracting State may not be taxed by the other Contracting State unless the enterprise carries on business in that other Contracting State through a permanent establishment (as defined in Article 5 (Permanent Establishment)) situated there. When that condition is met, the State in which the permanent establishment is situated may tax the enterprise, but only on a net basis and only on the income that is attributable to the permanent establishment. This paragraph is identical to paragraph 1 of Article 7 of the OECD Model.

*Paragraph 2*

Paragraph 2 provides rules for the attribution of business profits to a permanent establishment. The Contracting States will attribute to a permanent establishment the profits that it would have earned had it been an independent enterprise engaged in the same or similar activities under the same or similar circumstances. This language incorporates the arm's length standard for purposes of determining the profits attributable to a permanent establishment. The computation of business profits attributable to a permanent establishment under this paragraph is subject to the rules of paragraph 3 for the allowance of expenses incurred for the purposes of earning the profits.

The "attributable to" concept of paragraph 2 is analogous but not entirely equivalent to the "effectively connected" concept in Code section 864(c). The profits attributable to a permanent establishment may be from sources within or without a Contracting State.

Paragraph 2 also provides that the business profits attributed to a permanent establishment include only those profits derived from that permanent establishment's assets or activities. This rule is consistent with the "asset-use" and "business activities" test of Code section 864(c)(2).

This Article does not contain a provision corresponding to paragraph 4 of Article 7 of the OECD Model. That paragraph provides that a Contracting State in certain circumstances may determine the profits attributable to a permanent establishment on the basis of an apportionment of the total profits of the enterprise. Any such approach, however, must be designed to approximate an arm's length result. This paragraph has not been included in the Convention because it is unnecessary. The U.S. view is that paragraphs 2 and 3 of Article 7 authorize the use of such approaches independently of paragraph 4 of Article 7 of the OECD Model because total profits methods are acceptable methods for determining the arm's length profits of associated enterprises under Article 9 (Associated Enterprises). Accordingly, it is understood that, under paragraph 2 of this Article, it is permissible to use methods other than separate accounting to determine the arm's length profits of a permanent establishment where it is necessary to do so for practical reasons, such as when the affairs of the permanent establishment are so closely bound up with those of the head office that it would be impossible to disentangle them on any strict basis of accounts. This view is confirmed by paragraph 3 of the Protocol, which states that nothing in Article 7 or in Article 24 (Non-Discrimination) prevents either of the Contracting States from applying their special rules dealing with the taxation of insurance companies. In the United States, the applicable rules are found in Code sections 842 (a) and (b).

*Paragraph 3*

Paragraph 3 provides that in determining the business profits of a permanent establishment, deductions shall be allowed for the expenses incurred for the purposes of the permanent establishment, ensuring that business profits will be taxed on a net basis. This rule is not limited to expenses incurred exclusively for the purposes of the permanent establishment, but includes a reasonable allocation of expenses incurred for the purposes of the enterprise as a whole, or that part of the enterprise that includes the permanent establishment. Deductions are to be allowed regardless of which accounting unit of the enterprise books the expenses, so long as they are incurred for the purposes of the permanent establishment. For example, a portion of the interest expense recorded on the books of the home office in one State may be deducted by a permanent establishment in the other if properly allocable thereto.

The paragraph specifies that the expenses that may be considered to be incurred for the purposes of the permanent establishment are expenses for research and development, interest and other similar expenses, as well as a reasonable amount of executive and general administrative expenses. This rule permits (but does not require) each Contracting State to apply the type of expense allocation rules provided by U.S. law (such as in Treas. Reg. sections 1.861-8 and 1.882-5).

Paragraph 3 does not permit a deduction for expenses charged to a permanent establishment by another unit of the enterprise. Thus, a permanent establishment may not deduct a royalty deemed paid to the head office. Similarly, a permanent establishment may not increase its business profits by the amount of any notional fees for ancillary services performed for another unit of the enterprise, but also should not receive a deduction for the expense of providing such services, since those expenses would be incurred for purposes of a business unit other than the permanent establishment.

*Paragraph 4*

Paragraph 4 provides that no business profits can be attributed to a permanent establishment merely because it purchases goods or merchandise for the enterprise of which it is a part. This rule applies only to an office that performs functions for the enterprise in addition to purchasing. The income attribution issue does not arise if the sole activity of the permanent establishment is the purchase of goods or merchandise because such activity does not give rise to a permanent establishment under Article 5 (Permanent Establishment). A common situation in which paragraph 4 is relevant is one in which a permanent establishment purchases raw materials for the enterprise's manufacturing operation conducted outside the United States and sells the manufactured product. While business profits may be attributable to the permanent establishment with respect to its sales activities, no profits are attributable to it with respect to its purchasing activities.

*Paragraph 5*

Paragraph 5 provides that profits shall be determined by the same method each year, unless there is good reason to change the method used. This rule assures consistent tax treatment over time for permanent establishments. It limits the ability of both the Contracting State and the enterprise to change accounting methods to be applied to the permanent establishment. It does not, however, restrict a Contracting State from imposing additional requirements, such as the rules under Code section 481, to prevent amounts from being duplicated or omitted following a change in accounting method.

*Paragraph 6*

Paragraph 6 coordinates the provisions of Article 7 and other provisions of the Convention. Under this paragraph, when business profits include items of income that are dealt with separately under other articles of the Convention, the provisions of those articles will, except when they specifically provide to the contrary, take precedence over the provisions of Article 7. For example, the taxation of dividends will be determined by the rules of Article 10 (Dividends), and not by Article 7, except where, as provided in paragraph 6 of Article 10, the dividend is attributable to a permanent establishment or fixed base. In the latter case the provisions of Articles 7 or 14 (Independent Personal Services) apply. Thus, an enterprise of one State deriving dividends from the other State may not rely on Article 7 to exempt those dividends from tax at source if they are not attributable to a permanent establishment of the enterprise in the other State. By the same token, if the dividends are attributable to a permanent establishment in the other State, the dividends may be taxed on a net income basis at the source State's full corporate tax

rate, rather than on a gross basis under Article 10 (Dividends).

As provided in Article 8 (Shipping and Air Transport), income derived from shipping and air transport activities in international traffic described in that Article is taxable only in the country of residence of the enterprise regardless of whether it is attributable to a permanent establishment situated in the source State.

*Paragraph 7*

The term "business profits" is defined generally in paragraph 7 to mean income derived from any trade or business. In accordance with this broad definition, the term "business profits" includes income attributable to notional principal contracts and other financial instruments to the extent that the income is attributable to a trade or business of dealing in such instruments, or is otherwise related to a trade or business (as in the case of a notional principal contract entered into for the purpose of hedging currency risk arising from an active trade or business). Any other income derived from such instruments is, unless specifically covered in another article, dealt with under Article 21 (Other Income).

The paragraph states the longstanding U.S. view that income earned by an enterprise from the furnishing of personal services is business profits. Thus, a consulting firm resident in one State whose employees perform services in the other State through a permanent establishment may be taxed in that other State on a net basis under Article 7, and not under Article 14 (Independent Personal Services), which applies only to individuals or groups of individuals. The salaries of the employees would be subject to the rules of Article 15 (Dependent Personal Services).

The paragraph also specifies that the term "business profits" includes income derived by an enterprise from the rental of tangible personal property. The inclusion of income derived by an enterprise from the rental of tangible personal property in business profits means that such income earned by a resident of a Contracting State can be taxed by the other Contracting State only if the income is attributable to a permanent establishment maintained by the resident in that other State, and, if the income is taxable, it can be taxed only on a net basis. Income from the rental of tangible personal property that is not derived in connection with a trade or business is dealt with in Article 21 (Other Income).

*Paragraph 8*

Paragraph 8 incorporates into the Convention the rule of Code section 864(c)(6). Like the Code section on which it is based, paragraph 8 provides that any income or gain attributable to a permanent establishment or a fixed base during its existence is taxable in the Contracting State where the permanent establishment or fixed base is situated, even if the payment of that income or gain is deferred until after the permanent establishment or fixed base ceases to exist. This rule applies with respect to paragraphs 1 and 2 of Article 7 (Business Profits), paragraph 6 of Article 10 (Dividends), paragraph 3 of Articles 11 (Interest), 12 (Royalties) and 13 (Gains), Article 14 (Independent Personal Services) and paragraph 2 of Article 21 (Other Income).

The effect of this rule can be illustrated by the following example. Assume a company that is a resident of Denmark and that maintains a permanent establishment in the United States winds up the permanent establishment's business and sells the permanent establishment's inventory and assets to a U.S. buyer at the end of year 1 in exchange for an interest-bearing installment obligation payable in full at the end of year 3. Despite the fact that Article 13's threshold requirement for U.S. taxation is not met in year 3 because the company has no permanent establishment in the United States, the United States may tax the deferred income payment recognized by the company in year 3.

*Relation to Other Articles*

This Article is subject to the saving clause of paragraph 4 of Article 1 (General Scope) of the Model. Thus, if a citizen of the United States who is a resident of Denmark under the treaty derives business profits from the United States that are not attributable to a permanent establishment in the United States, the United States may, subject to the special foreign tax credit rules of paragraph 3 of Article 23 (Relief from Double Taxation), tax those profits, notwithstanding the provision of paragraph 1 of this Article which would exempt the income from U.S. tax.

The benefits of this Article are also subject to Article 22 (Limitation on Benefits). Thus, an enterprise of Denmark that derives income effectively connected with a U.S. trade or business may not claim the benefits of Article 7 unless the resident carrying on the enterprise qualifies for such benefits under Article 22.

ARTICLE 8
Shipping And Air Transport

This Article governs the taxation of profits from the operation of ships and aircraft in international traffic. The term "international traffic" is defined in subparagraph 1(d) of Article 3 (General Definitions). The taxation of gains from the alienation of ships, aircraft or containers is not dealt with in this Article but in paragraph 4 of Article 13 (Gains).

*Paragraph 1*

Paragraph 1 provides that profits derived by an enterprise of a Contracting State from the operation in international traffic of ships or aircraft are taxable only in that Contracting State. Because paragraph 6 of Article 7 (Business Profits) defers to Article 8 with respect to shipping income, such income derived by a resident of one of the Contracting States may not be taxed in the other State even if the enterprise has a permanent establishment in that other State. Thus, if a U.S. airline has a ticket office in the other State, Denmark may not tax the airline's profits attributable to that office under Article 7. Since entities engaged in international transportation activities normally will have many permanent establishments in a number of countries, the rule avoids difficulties that would be encountered in attributing income to multiple permanent establishments if the income were covered by Article 7 (Business Profits).

*Paragraph 2*

The income from the operation of ships or aircraft in international traffic that is exempt from tax under paragraph 1 is defined in paragraph 2.

In addition to income derived directly from the operation of ships and aircraft in international traffic, this definition also includes certain items of rental income that are closely related to those activities. First, income of an enterprise of a Contracting State from the rental of ships or aircraft on a full basis (i.e., with crew) when such ships or aircraft are used in international traffic is income of the lessor from the operation of ships and aircraft in international traffic and, therefore, is exempt from tax in the other Contracting State under paragraph 1. Also, paragraph 2 encompasses income from the lease of ships or aircraft on a bareboat basis (i.e., without crew), either when the ships or aircraft are operated in international traffic by the lessee, or when the income is incidental to other income of the lessor from the operation of ships or aircraft in international traffic. The scope of Article 8 is thus the same as the U.S. Model, but broader than that of the OECD Model as it covers rentals from bareboat leasing that are not incidental to the operation of ships or aircraft by the resident itself.

Paragraph 2 also clarifies, consistent with the Commentary to Article 8 of the OECD Model, that income earned by an enterprise from the inland transport of property or passengers within either Contracting State falls within Article 8 if the transport is undertaken as part of the international transport of property or passengers by the enterprise. Thus, if a U.S. shipping company contracts to carry property from Denmark to a U.S. city and, as part of that contract, it transports the property by truck from its point of origin to an airport in Denmark (or it contracts with a trucking company to carry the property to the airport) the income earned by the U.S. shipping company from the overland leg of the journey would be taxable only in the United States. Similarly, Article 8 also would apply to income from lighterage undertaken as part of the international transport of goods.

Finally, certain non-transport activities that are an integral part of the services performed by a transport company are understood to be covered in paragraph 1, though they are not specified in paragraph 2. These include, for example, the performance of some maintenance or catering services by one airline for another airline, if these services are incidental to the provision of those services by the airline for itself. Income earned by concessionaires, however, is not covered by Article 8.

*Paragraph 3*

Under this paragraph, profits of an enterprise of a Contracting State from the use, maintenance or rental of containers (including equipment for their transport) that are used for the transport of goods in international traffic are exempt from tax in the other Contracting State. This result obtains under paragraph 3 regardless of whether the recipient of the income is engaged in the operation of ships or aircraft in international traffic, and regardless of whether the enterprise has a permanent establishment in the other Contracting State. By contrast, Article 8 of the OECD Model covers only income from the use, maintenance or rental of containers that is incidental to other income from international traffic.

*Paragraph 4*

This paragraph clarifies that the provisions of paragraphs 1 and 3 also apply to profits derived by an enterprise of a Contracting State from participation in a consortium, pool, joint business or international operating agency. This refers to various arrangements for international cooperation by carriers in shipping and air transport. For example, airlines from two countries may agree to share the transport of passengers between the two countries. They each will fly the same number of flights per week and share the revenues from that route equally, regardless of the number of passengers that each airline actually transports. Paragraph 4 makes clear that with respect to each carrier the income dealt with in the Article is that carrier's share of the total transport, not the income derived from the passengers actually carried by the airline.

According to paragraph 1 of the Protocol, the Scandinavian Airlines System (SAS) is a consortium within the meaning of Article 8, its participating members being SAS Danmark A/S, SAS Norge ASA and SAS Sverige AB. Thus, the income share of SAS Danmark A/S from the participation in SAS is subject to the provisions of Article 8 in accordance with paragraphs 1, 3 and 5.

*Paragraph 5*

This paragraph clarifies that, notwithstanding the provisions of paragraph 2(f) and paragraph 3 of Article 5 (Permanent Establishment), the profits of an enterprise of a Contracting State from the transport by ships or aircraft of supplies or personnel to a location where offshore activities in connection with the exploration or exploitation of natural resources are being carried on in the other Contracting State, or from the operation of tugboats and similar vessels in connection with such activities, shall be taxable only in the first-mentioned State. This clarification is similar to a clarification as to the tax treatment of these activities in the Danish Model Income Tax Treaty.

*Relation to Other Articles*

As with other benefits of the Convention, the benefit of exclusive residence country taxation under Article 8 is available to an enterprise only if it is entitled to benefits under Article 22 (Limitation on Benefits).

This Article also is subject to the saving clause of paragraph 4 of Article 1 (General Scope). Thus, if a citizen of the United States who is a resident of Denmark derives profits from the operation of ships or aircraft in international traffic, notwithstanding the exclusive residence country taxation in paragraph 1 of Article 8, the United States may, subject to the special foreign tax credit rules of paragraph 2 of Article 23 (Relief from Double Taxation), tax those profits as part of the worldwide income of the citizen. (This is an unlikely situation, however, because non-tax considerations (e.g., insurance) generally result in shipping activities being carried on in corporate form.)

ARTICLE 9
Associated Enterprises

This Article incorporates in the Convention the arm's length principle reflected in the U.S. domestic transfer pricing provisions, particularly Code section 482. It provides that when related enterprises engage in a transaction on terms that are not arm's length, the Contracting States may make appropriate adjustments to the taxable income and tax liability of such related enterprises to reflect what the income and tax of these enterprises with respect to the transaction would have been had there been an arm's length relationship between them.

*Paragraph 1*

This paragraph addresses the situation where an enterprise of a Contracting State is related to an enterprise of the other Contracting State, and there are arrangements or conditions imposed between the enterprises in their commercial or financial relations that are different from those that would have existed in the absence of the relationship. Under these circumstances, the Contracting States may adjust the income (or loss) of the enterprise to reflect what it would have been in the absence of such a relationship.

The paragraph identifies the relationships between enterprises that serve as a prerequisite to application of the Article. The necessary element in these relationships is effective control, which is also the standard for purposes of section 482. Thus, the Article applies if an enterprise of one State participates directly or indirectly in the management, control, or capital of the enterprise of the other State. Also, the Article applies if any third person or persons participate directly or indirectly in the management, control, or capital of enterprises of different States. For this purpose, all types of control are included, i.e., whether or not legally enforceable and however exercised or exercisable.

The fact that a transaction is entered into between such related enterprises does not, in and of itself, mean that a Contracting State may adjust the income (or loss) of one or both of the enterprises under the provisions of this Article. If the conditions of the transaction are consistent with those that would be made between independent persons, the income arising from that transaction should not be subject to adjustment under this Article.

Similarly, the fact that associated enterprises may have concluded arrangements, such as cost sharing arrangements or general services agreements, is not in itself an indication that the two enterprises have entered into a non-arm's length transaction that should give rise to an adjustment under paragraph 1. Both related and unrelated parties enter into such arrangements (e.g., joint venturers may share some development costs). As with any other kind of transaction, when related parties enter into an arrangement, the specific arrangement must be examined to see whether or not it meets the arm's length standard. In the event that it does not, an appropriate adjustment may be made, which may include modifying the terms of the agreement or recharacterizing the transaction to reflect its substance.

It is understood that the "commensurate with income" standard for determining appropriate transfer prices for intangibles, added to Code section 482 by the Tax Reform Act of

1986, was designed to operate consistently with the arm's-length standard. The implementation of this standard in the section 482 regulations is in accordance with the general principles of paragraph 1 of Article 9 of the Convention, as interpreted by the OECD Transfer Pricing Guidelines.

The Contracting States preserve their rights to apply internal law provisions relating to adjustments between related parties. They also reserve the right to make adjustments in cases involving tax evasion or fraud. Such adjustments -- the distribution, apportionment, or allocation of income, deductions, credits or allowances -- are permitted even if they are different from, or go beyond, those authorized by paragraph 1 of the Article, as long as they accord with the general principles of paragraph 1, i.e., that the adjustment reflects what would have transpired had the related parties been acting at arm's length. For example, while paragraph 1 explicitly allows adjustments of deductions in computing taxable income, it does not deal with adjustments to tax credits. It does not, however, preclude such adjustments if they can be made under internal law.

This Article also permits tax authorities to deal with thin capitalization issues. They may, in the context of Article 9, scrutinize more than the rate of interest charged on a loan between related persons. They also may examine the capital structure of an enterprise, whether a payment in respect of that loan should be treated as interest, and, if it is treated as interest, under what circumstances interest deductions should be allowed to the payor. Paragraph 2 of the Commentary to Article 9 of the OECD Model, together with the U.S. observation set forth in Paragraph 15 thereof, sets forth a similar understanding of the scope of Article 9 in the context of thin capitalization.

*Paragraph 2*

When a Contracting State has made an adjustment that is consistent with the provisions of paragraph 1, and the other Contracting State agrees that the adjustment was appropriate to reflect arm's-length conditions, that other Contracting State is obligated to make a correlative adjustment (sometimes referred to as a "corresponding adjustment") to the tax liability of the related person in that other Contracting State.

Article 9 leaves the treatment of "secondary adjustments" to the laws of the Contracting States. When an adjustment under Article 9 has been made, one of the parties will have in its possession funds that it would not have had at arm's length. The question arises as to how to treat these funds. In the United States the general practice is to treat such funds as a dividend or contribution to capital, depending on the relationship between the parties. Under certain circumstances, the parties may be permitted to restore the funds to the party that would have the funds at arm's length, and to establish an account payable pending restoration of the funds. See Rev. Proc. 65-17, 1965-1 C.B. 833.

The Contracting State making a secondary adjustment will take the other provisions of the Convention, where relevant, into account. For example, if the effect of a secondary adjustment is to treat a U.S. corporation as having made a distribution of profits to its parent corporation in Denmark, the provisions of Article 10 (Dividends) will apply, and the United States may impose a 5 percent withholding tax on the dividend. Also, if under Article 23 (Relief from Double

Taxation) the other State generally gives a credit for taxes paid with respect to such dividends, it would also be required to do so in this case.

The competent authorities are authorized by paragraph 2 to consult, if necessary, to resolve any differences in the application of these provisions. For example, there may be a disagreement over whether an adjustment made by a Contracting State under paragraph 1 was appropriate.

If a correlative adjustment is made under paragraph 2, it is to be implemented, pursuant to paragraph 2 of Article 25 (Mutual Agreement Procedure), notwithstanding any time limits or other procedural limitations in the law of the Contracting State making the adjustment. If a taxpayer has entered a closing agreement (or other written settlement) with the United States prior to bringing a case to the competent authorities, the U.S. competent authority will endeavor only to obtain a correlative adjustment from Denmark. See Rev. Proc. 96-13, 1996-13 I.R.B. 31, Section 7.05.

*Relationship to Other Articles*

The saving clause of paragraph 4 of Article 1 (General Scope) does not apply to paragraph 2 of Article 9 by virtue of the exceptions to the saving clause in paragraph 5(a) of Article 1. Thus, even if the statute of limitations has run, a refund of tax can be made in order to implement a correlative adjustment. Statutory or procedural limitations, however, cannot be overridden to impose additional tax, because paragraph 2 of Article 1 provides that the Convention cannot restrict any statutory benefit.

ARTICLE 10
Dividends

Article 10 provides rules for the taxation of dividends paid by a resident of one Contracting State to a beneficial owner that is a resident of the other Contracting State. The article provides for full residence country taxation of such dividends and a limited source-State right to tax. Article 10 also provides rules for the imposition of a tax on branch profits by the State of source. Finally, the article prohibits a Contracting State from imposing a tax on dividends paid by companies resident in the other Contracting State and from imposing taxes, other than a branch profits tax, on undistributed earnings.

*Paragraph 1*

The right of a shareholder's country of residence to tax dividends arising in the source country is preserved by paragraph 1, which permits a Contracting State to tax its residents on dividends paid to them by a resident of the other Contracting State. For dividends from any other source paid to a resident, Article 21 (Other Income) grants the residence country exclusive taxing jurisdiction (other than for dividends attributable to a permanent establishment or fixed base in the other State).

*Paragraph 2*

The State of source may also tax dividends beneficially owned by a resident of the other State, subject to the limitations in paragraph 2. Generally, the source State's tax is limited to 15 percent of the gross amount of the dividend paid. If, however, the beneficial owner of the dividends is a company resident in the other State that holds at least 10 percent of the voting shares of the company paying the dividend, then the source State's tax is limited to 5 percent of the gross amount of the dividend. Indirect ownership of voting shares (through tiers of corporations) and direct ownership of non-voting shares are not taken into account for purposes of determining eligibility for the 5 percent direct dividend rate. Shares are considered voting shares if they provide the power to elect, appoint or replace any person vested with the powers ordinarily exercised by the board of directors of a U.S. corporation.

The benefits of paragraph 2 may be granted at the time of payment by means of reduced withholding at source. It also is consistent with the paragraph for tax to be withheld at the time of payment at full statutory rates, and the treaty benefit to be granted by means of a subsequent refund so long as such procedures are applied in a reasonable manner.

Paragraph 2 does not affect the taxation of the profits out of which the dividends are paid. The taxation by a Contracting State of the income of its resident companies is governed by the internal law of the Contracting State, subject to the provisions of paragraph 4 of Article 24 (Non-Discrimination).

The term "beneficial owner" is not defined in the Convention, and is, therefore, defined as under the internal law of the country imposing tax (i.e., the source country). The beneficial owner of the dividend for purposes of Article 10 is the person to which the dividend income is attributable for tax purposes under the laws of the source State. Thus, if a dividend paid by a corporation that is a resident of one of the States (as determined under Article 4 (Residence)) is received by a nominee or agent that is a resident of the other State on behalf of a person that is not a resident of that other State, the dividend is not entitled to the benefits of this Article. However, a dividend received by a nominee on behalf of a resident of that other State would be entitled to benefits. These limitations are confirmed by paragraph 12 of the OECD Commentaries to Article 10. See also, paragraph 24 of the OECD Commentaries to Article 1 (General Scope).

Companies holding shares through fiscally transparent entities such as partnerships are considered for purposes of this paragraph to hold their proportionate interest in the shares held by the intermediate entity. As a result, companies holding shares through such entities may be able to claim the benefits of subparagraph (a) under certain circumstances. The lower rate applies when the company's proportionate share of the shares held by the intermediate entity meets the 10 percent voting stock threshold. Whether this ownership threshold is satisfied may be difficult to determine and often will require an analysis of the partnership or trust agreement.

*Paragraph 3*

Paragraph 3 provides rules that modify the maximum rates of tax at source provided in paragraph 2 in particular cases. The first sentence of paragraph 3 denies the lower direct

investment withholding rate of paragraph 2(a) for dividends paid by a U.S. Regulated Investment Company (RIC) or a U.S. Real Estate Investment Trust (REIT). The second sentence states that dividends paid by a RIC will qualify for the 15 percent rate provided by subparagraph 2(b).

The third sentence denies the benefits of both subparagraphs (a) and (b) of paragraph 2 to dividends paid by REITs in certain circumstances, allowing them to be taxed at the U.S. statutory rate (30 percent). The United States limits the source tax on dividends paid by a REIT to the 15 percent rate only when the beneficial owner of the dividend satisfies one or more of three criteria. First, the dividend may qualify if the beneficial owner is an individual resident of the other State who owns a not more than 10 percent interest in the REIT. Second, the dividend may qualify for the 15% rate if it is paid with respect to a class of stock that is publicly traded and the beneficial owner of the dividends is a person holding an interest of not more than 5 percent of any class of the REIT's stock. Finally, the dividend may qualify for the 15 percent rate if the beneficial owner of the dividend is a person holding an interest of not more than 10 percent of the REIT and the REIT is diversified.

For this purpose, a REIT will be considered diversified if the value of no single interest in the REIT's real property exceeds 10 percent of the REIT's total interests in real property. For purposes of this rule, foreclosure property and mortgages will not be considered an interest in real property unless, in the case of a mortgage, it has substantial equity components. With respect to partnership interests held by a REIT, the REIT will be treated as owning directly the interests in real property held by the partnership.

The denial of the 5 percent withholding rate at source to all RIC and REIT shareholders, and the denial of the 15 percent rate to REIT shareholders that do not meet one of the 3 tests described above, is intended to prevent the use of these entities to gain unjustifiable source taxation benefits for certain shareholders resident in the other Contracting State. For example, a corporation resident in Denmark that wishes to hold a diversified portfolio of U.S. corporate shares may hold the portfolio directly and pay a U.S. withholding tax of 15 percent on all of the dividends that it receives. Alternatively, it may acquire a diversified portfolio by purchasing a 10 percent or more of the interests in a RIC. Since the RIC may be a pure conduit, there may be no U.S. tax costs to interposing the RIC in the chain of ownership. Absent the special rule in paragraph 3, such use of the RIC could transform portfolio dividends, taxable in the United States under the Convention at 15 percent, into direct investment dividends taxable only at 5 percent.

Similarly, a resident of Denmark directly holding U.S. real property would pay U.S. tax either at a 30 percent rate on the gross income or at graduated rates on the net income. As in the preceding example, by placing the real property in a REIT, the investor could transform real estate income into dividend income, taxable at the rates provided in Article 10, significantly reducing the U.S. tax that otherwise would be imposed. This policy avoids a disparity between the taxation of direct real estate investments and real estate investments made through REIT conduits. In the cases covered by the exceptions, the holding in the REIT is not considered the equivalent of a direct holding in the underlying real property.

*Paragraph 4*

Exemption from tax in the state of source is provided for dividends paid to qualified governmental entities. The exemption of paragraph 4 is analogous to that provided to foreign governments under section 892 of the Code. Paragraph 4 makes that exemption reciprocal. A qualified governmental entity is defined in paragraph 1(i) of Article 3 (General Definitions). The definition does not include a governmental entity that carries on commercial activity. Further, a dividend paid by a company engaged in commercial activity that is controlled (within the meaning of Treas. Reg. section 1.892-5T) by a qualified governmental entity that is the beneficial owner of the dividend is not exempt at source under paragraph 4 because ownership of a controlled company is viewed as a substitute for carrying on a business directly.

*Paragraph 5*

Paragraph 5 defines the term dividends broadly and flexibly. The definition is intended to cover all arrangements that yield a return on an equity investment in a corporation as determined under the tax law of the state of source, as well as arrangements that might be developed in the future.

The term "dividends" includes income from shares, or other corporate rights that are not treated as debt under the law of the source State, that participate in the profits of the company. The term also includes income that is subject to the same tax treatment as income from shares by the law of the State of source. Thus, a constructive dividend that results from a non-arm's length transaction between a corporation and a related party is a dividend. In the case of the United States the term dividend includes amounts treated as a dividend under U.S. law upon the sale or redemption of shares or upon a transfer of shares in a reorganization. See, e.g., Rev. Rul. 92-85, 1992-2 C.B. 69 (sale of foreign subsidiary's stock to U.S. sister company is a deemed dividend to extent of subsidiary's and sister's earnings and profits). Further, a distribution from a U.S. publicly traded limited partnership, which is taxed as a corporation under U.S. law, is a dividend for purposes of Article 10. However, a distribution by a limited liability company is not characterized by the United States as a dividend and therefore is not a dividend for purposes of Article 10, provided the limited liability company is not characterized as an association taxable as a corporation under U.S. law. Finally, a payment denominated as interest that is made by a thinly capitalized corporation may be treated as a dividend to the extent that the debt is re-characterized as equity under the laws of the source State.

*Paragraph 6*

Paragraph 6 excludes from the general source country limitations under paragraph 2 dividends paid with respect to holdings that form part of the business property of a permanent establishment or a fixed base. Such dividends will be taxed on a net basis using the rates and rules of taxation generally applicable to residents of the State in which the permanent establishment or fixed base is located, as modified by the Convention. An example of dividends paid with respect to the business property of a permanent establishment would be dividends derived by a dealer in stock or securities from stock or securities that the dealer held for sale to customers.

In the case of a permanent establishment or fixed base that once existed in the State but that no longer exists, the provisions of paragraph 6 also apply, by virtue of paragraph 8 of Article

7 (Business Profits), to dividends that would be attributable to such a permanent establishment or fixed base if it did exist in the year of payment or accrual. See the Technical Explanation of paragraph 8 of Article 7.

*Paragraph 7*

A State's right to tax dividends paid by a company that is a resident of the other State is restricted by paragraph 7 to cases in which the dividends are paid to a resident of that State or are attributable to a permanent establishment or fixed base in that State. Thus, a State may not impose a "secondary" withholding tax on dividends paid by a nonresident company out of earnings and profits from that State. In the case of the United States, paragraph 7, therefore, overrides the ability to impose taxes under sections 871 and 882(a) on dividends paid by foreign corporations that have a U.S. source under section 861(a)(2)(B).

The paragraph also restricts a State's right to impose corporate level taxes on undistributed profits, other than a branch profits tax. The accumulated earnings tax and the personal holding company taxes are taxes covered in Article 2 (Covered Taxes). Accordingly, under the provisions of Article 7 (Business Profits), the United States may not impose those taxes on the income of a resident of the other State except to the extent that income is attributable to a permanent establishment in the United States. Paragraph 7 also confirms the denial of the U.S. authority to impose those taxes. The paragraph does not restrict a State's right to tax its resident shareholders on undistributed earnings of a corporation resident in the other State. Thus, the U.S. authority to impose the foreign personal holding company tax, its taxes on subpart F income and on an increase in earnings invested in U.S. property, and its tax on income of a passive foreign investment company that is a qualified electing fund is in no way restricted by this provision.

*Paragraph 8*

Paragraph 8 permits a State to impose a branch profits tax on a corporation resident in the other State. The tax is in addition to other taxes permitted by the Convention. Since the term "corporation" is not defined in the Convention, it will be defined for this purpose under the law of the first-mentioned (i.e., source) State.

A State may impose a branch profits tax on a corporation if the corporation has income attributable to a permanent establishment in that State, derives income from real property in that State that is taxed on a net basis under Article 6, or realizes gains taxable in that State under paragraph 1 of Article 13. The tax is limited, however, to the aforementioned items of income that are included in the "dividend equivalent amount."

Paragraph 8 permits the United States generally to impose its branch profits tax on a corporation resident in the other State to the extent of the corporation's

(i) business profits that are attributable to a permanent establishment in the United States

(ii) income that is subject to taxation on a net basis because the corporation has elected under section 882(d) of the Code to treat income from real property not otherwise taxed on a net basis as effectively connected income and

             (iii) gain from the disposition of a United States real property interest, other than an interest in a United States real property holding corporation.

The United States may not impose its branch profits tax on the business profits of a corporation resident in Denmark that are effectively connected with a U.S. trade or business but that are not attributable to a permanent establishment and are not otherwise subject to U.S. taxation under Article 6 (Income from Real Property) or paragraph 1 of Article 13 (Capital Gains).

       The term "dividend equivalent amount" used in paragraph 8 has the same meaning that it has under section 884 of the Code, as amended from time to time, provided the amendments are consistent with the purpose of the branch profits tax. Generally, the dividend equivalent amount for a particular year is the income described above that is included in the corporation's effectively connected earnings and profits for that year, after payment of the corporate tax under Articles 6, 7 or 13, reduced for any increase in the branch's U.S. net equity during the year or increased for any reduction in its U.S. net equity during the year. U.S. net equity is U.S. assets less U.S. liabilities. See Treas. Reg. section 1.884-1. The dividend equivalent amount for any year approximates the dividend that a U.S. branch office would have paid during the year if the branch had been operated as a separate U.S. subsidiary company. If in the future Denmark were to impose a branch profits tax, the base of its tax is limited to an amount that is analogous to the dividend equivalent amount.

*Paragraph 9*

       Paragraph 9 provides that the branch profits tax permitted by paragraph 8 shall not be imposed at a rate exceeding the direct investment dividend withholding rate of five percent specified in subparagraph 2(a).

*Relation to Other Articles*

       Notwithstanding the foregoing limitations on source country taxation of dividends, the saving clause of paragraph 4 of Article 1 permits the United States to tax dividends received by its residents and citizens, subject to the special foreign tax credit rules of paragraph 3 of Article 23 (Relief from Double Taxation), as if the Convention had not come into effect.

       The benefits of this Article are also subject to the provisions of Article 22 (Limitation on Benefits). Thus, if a resident of Denmark is the beneficial owner of dividends paid by a U.S. corporation, the shareholder must qualify for treaty benefits under at least one of the tests of Article 22 in order to receive the benefits of this Article.

<div align="center">

ARTICLE 11

Interest

</div>

       Article 11 specifies the taxing jurisdiction over interest income of the States of source and residence and defines the terms necessary to apply the article.

*Paragraph 1*

This paragraph grants to the State of residence the exclusive right, subject to exceptions provided in paragraphs 3 and 5, to tax interest beneficially owned by its residents and arising in the other Contracting State. The term "beneficial owner" is not defined in the Convention, and is, therefore, defined as under the internal law of the country imposing tax (i.e., the source country). The beneficial owner of the interest for purposes of Article 11 is the person to which the interest income is attributable for tax purposes under the laws of the source State. Thus, if interest arising in a Contracting State is received by a nominee or agent that is a resident of the other State on behalf of a person that is not a resident of that other State, the interest is not entitled to the benefits of this Article. However, interest received by a nominee on behalf of a resident of that other State would be entitled to benefits. These limitations are confirmed by paragraph 8 of the OECD Commentaries to Article 11. See also paragraph 24 of the OECD Commentaries to Article 1 (General Scope).

*Paragraph 2*

The term "interest" as used in Article 11 is defined in paragraph 2 to include, inter alia, income from debt claims of every kind, whether or not secured by a mortgage. Penalty charges for late payment are excluded from the definition of interest. Interest that is paid or accrued subject to a contingency is within the ambit of Article 11. This includes income from a debt obligation carrying the right to participate in profits. The term does not, however, include amounts that are treated as dividends under Article 10 (Dividends).

The term interest also includes amounts subject to the same tax treatment as income from money lent under the law of the State in which the income arises. Thus, amounts that the United States will treat as interest include

(i) the difference between the issue price and the stated redemption price at maturity of a debt instrument, i.e., original issue discount (OID), which may be wholly or partially realized on the disposition of a debt instrument (section 1273),

(ii) amounts that are imputed interest on a deferred sales contract (section 483),

(iii) amounts treated as interest or OID under the stripped bond rules (section 1286),

(iv) amounts treated as original issue discount under the below-market interest rate rules (section 7872),

(v) a partner's distributive share of a partnership's interest income (section 702),

(vi) the interest portion of periodic payments made under a "finance lease" or similar contractual arrangement that in substance is a borrowing by the nominal lessee to finance the acquisition of property,

(vii) amounts included in the income of a holder of a residual interest in a REMIC (section 860E), because these amounts generally are subject to the same taxation treatment as interest under U.S. tax law, and

(viii) embedded interest with respect to notional principal contracts.

*Paragraph 3*

Paragraph 3 provides an exception to the exclusive residence taxation rule of paragraph 1 in cases where the beneficial owner of the interest carries on business through a permanent establishment in the State of source or performs independent personal services from a fixed base situated in that State and the interest is attributable to that permanent establishment or fixed base. In such cases the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services) will apply and the State of source will retain the right to impose tax on such interest income on a net basis.

In the case of a permanent establishment or fixed base that once existed in the State but that no longer exists, the provisions of paragraph 3 also apply, by virtue of paragraph 8 of Article 7 (Business Profits), to interest that would be attributable to such a permanent establishment or fixed base if it did exist in the year of payment or accrual. See the Technical Explanation of paragraph 8 of Article 7.

*Paragraph 4*

Paragraph 4 provides that in cases involving special relationships between persons, Article 11 applies only to that portion of the total interest payments that would have been made absent such special relationships (i.e., an arm's length interest payment). Any excess amount of interest paid remains taxable according to the laws of the United States and Denmark, respectively, with due regard to the other provisions of the Convention. Thus, if the excess amount would be treated under the source country's law as a distribution of profits by a corporation, such amount could be taxed as a dividend rather than as interest, but the tax would be subject, if appropriate, to the rate limitations of paragraph 2 of Article 10 (Dividends).

The term "special relationship" is not defined in the Convention. In applying this paragraph the United States considers the term to include the relationships described in Article 9, which in turn correspond to the definition of "control" for purposes of section 482 of the Code.

This paragraph does not address cases where, owing to a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the interest is less than an arm's length amount. In those cases a transaction may be characterized to reflect its substance and interest may be imputed consistent with the definition of interest in paragraph 2. Consistent with Article 9 (Associated Enterprises), the United States would apply section 482 or 7872 of the Code to determine the amount of imputed interest in those cases.

*Paragraph 5*

Paragraph 5 provides anti-abuse exceptions to the source-country exemption in paragraph 1 for two classes of interest payments.

The first exception, in subparagraph (a) of paragraph 5, deals with so-called "contingent interest." Under this provision interest arising in one of the Contracting States that is determined by reference to the receipts, sales, income, profits or other cash flow of the debtor or a related person, to any change in the value of any property of the debtor or a related person or to any

dividend, partnership distribution or similar payment made by the debtor to a related person also may be taxed in the Contracting State in which it arises, and according to the laws of that State, but if the beneficial owner is a resident of the other Contracting State, the gross amount of the interest may be taxed at a rate not exceeding the rate prescribed in subparagraph (b) of paragraph 2 of Article 10 (Dividends).

The second exception, in subparagraph (b) of paragraph 5, is consistent with the policy of Code sections 860E(e) and 860G(b) that excess inclusions with respect to a real estate mortgage investment conduit (REMIC) should bear full U.S. tax in all cases. Without a full tax at source foreign purchasers of residual interests would have a competitive advantage over U.S. purchasers at the time these interests are initially offered. Also, absent this rule the U.S. FISC would suffer a revenue loss with respect to mortgages held in a REMIC because of opportunities for tax avoidance created by differences in the timing of taxable and economic income produced by these interests.

*Relation to Other Articles*

Notwithstanding the foregoing limitations on source country taxation of interest, the saving clause of paragraph 4 of Article 1 permits the United States to tax its residents and citizens, subject to the special foreign tax credit rules of paragraph 3 of Article 23 (Relief from Double Taxation), as if the Convention had not come into force.

As with other benefits of the Convention, the benefits of exclusive residence State taxation of interest under paragraph 1 or limited source taxation under paragraph 5(b) of this Article are available to a resident of the other State only if that resident is entitled to those benefits under the provisions of Article 22 (Limitation on Benefits).

<div align="center">

ARTICLE 12
Royalties

</div>

Article 12 specifies the taxing jurisdiction over royalties of the States of residence and source and defines the terms necessary to apply the article.

*Paragraph 1*

Paragraph 1 grants to the State of residence the exclusive right, subject to the exception in paragraph 3, to tax royalties beneficially owned by its residents and arising in the other Contracting State.

The term "beneficial owner" is not defined in the Convention, and is, therefore, defined as under the internal law of the country imposing tax (i.e., the source country). The beneficial owner of the royalty for purposes of Article 12 is the person to which the royalty income is attributable for tax purposes under the laws of the source State. Thus, if a royalty arising in a Contracting State is received by a nominee or agent that is a resident of the other State on behalf of a person that is not a resident of that other State, the royalty is not entitled to the benefits of this Article.

However, a royalty received by a nominee on behalf of a resident of that other State would be entitled to benefits. These limitations are confirmed by paragraph 4 of the OECD Commentaries to Article 12. See also paragraph 24 of the OECD Commentaries to Article 1 (General Scope).

*Paragraph 2*

Paragraph 2 defines the term "royalties" as used in this Article to include payments of any kind received as a consideration for the use of, or the right to use, any copyright of a literary, artistic, scientific or other work; for the use of, or the right to use, any patent, trademark, design or model, plan, secret formula or process, or other like right or property; or for information concerning industrial, commercial, or scientific experience. It does not include income from leasing personal property.

The term royalties is defined in the Convention and therefore is generally independent of domestic law. Certain terms used in the definition are not defined in the Convention, but these may be defined under domestic tax law. For example, the term "secret process or formulas" is found in the U.S. Internal Revenue Code, and its meaning has been elaborated in the context of sections 351 and 367. See Rev. Rul. 55-17, 1955-1 C.B. 388; Rev. Rul. 64-56, 1964-1 C.B. 133; Rev. Proc. 69-19, 1969-2 C.B. 301.

Consideration for the use or right to use cinematographic films, or works on film, tape, or other means of reproduction in radio or television broadcasting is specifically included in the definition of royalties. It is intended that subsequent technological advances in the field of radio and television broadcasting will not affect the inclusion of payments relating to the use of such means of reproduction in the definition of royalties.

If an artist who is resident in one Contracting State records a performance in the other Contracting State, retains a copyrighted interest in a recording, and receives payments for the right to use the recording based on the sale or public playing of the recording, then the right of such other Contracting State to tax those payments is governed by Article 12. See Boulez v. Commissioner, 83 T.C. 584 (1984), aff'd, 810 F.2d 209 (D.C. Cir. 1986).

Computer software generally is protected by copyright laws around the world. Under the Convention, consideration received for the use, or the right to use, computer software is treated either as royalties or as business profits, depending on the facts and circumstances of the transaction giving rise to the payment.

The primary factor in determining whether consideration received for the use, or the right to use, computer software is treated as royalties or as business profits is the nature of the rights transferred. See Treas. Reg. section 1.861-18. The fact that the transaction is characterized as a license for copyright law purposes is not dispositive. For example, a typical retail sale of "shrink wrap" software generally will not be considered to give rise to royalty income, even though for copyright law purposes it may be characterized as a license.

The means by which the computer software is transferred are not relevant for purposes of the analysis. Consequently, if software is electronically transferred but the rights obtained by the

transferee are substantially equivalent to rights in a program copy, the payment will be considered business profits.

The term "royalties" also includes gain derived from the alienation of any right or property that would give rise to royalties, to the extent the gain is contingent on the productivity, use, or further alienation thereof. Gains that are not so contingent are dealt with under Article 13 (Gains).

The term "industrial, commercial, or scientific experience" (sometimes referred to as "know-how") has the meaning ascribed to it in paragraph 11 of the Commentary to Article 12 of the OECD Model Convention. Consistent with that meaning, the term may include information that is ancillary to a right otherwise giving rise to royalties, such as a patent or secret process.

Know-how also may include, in limited cases, technical information that is conveyed through technical or consultancy services. It does not include general educational training of the user's employees, nor does it include information developed especially for the user, such as a technical plan or design developed according to the user's specifications. Thus, as provided in paragraph 11 of the Commentary to Article 12 of the OECD Model, the term "royalties" does not include payments received as consideration for after-sales service, for services rendered by a seller to a purchaser under a guarantee, or for pure technical assistance.

The term "royalties" also does not include payments for professional services (such as architectural, engineering, legal, managerial, medical, software development services). For example, income from the design of a refinery by an engineer (even if the engineer employed know-how in the process of rendering the design) or the production of a legal brief by a lawyer is not income from the transfer of know-how taxable under Article 12, but is income from services taxable under either Article 14 (Independent Personal Services) or Article 15 (Dependent Personal Services). Professional services may be embodied in property that gives rise to royalties, however. Thus, if a professional contracts to develop patentable property and retains rights in the resulting property under the development contract, subsequent license payments made for those rights would be royalties.

*Paragraph 3*

This paragraph provides an exception to the rule of paragraph 1 that gives the state of residence exclusive taxing jurisdiction in cases where the beneficial owner of the royalties carries on business through a permanent establishment in the state of source or performs independent personal services from a fixed base situated in that State and the royalties are attributable to that permanent establishment or fixed base. In such cases the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services) will apply.

The provisions of paragraph 8 of Article 7 (Business Profits) apply to this paragraph. For example, royalty income that is attributable to a permanent establishment or a fixed base and that accrues during the existence of the permanent establishment or fixed base, but is received after the permanent establishment or fixed base no longer exists, remains taxable under the provisions of Articles 7 (Business Profits) or 14 (Independent Personal Services), respectively, and not under this Article.

*Paragraph 4*

Paragraph 4 provides that in cases involving special relationships between the payor and beneficial owner of royalties, Article 12 applies only to the extent the royalties would have been paid absent such special relationships (i.e., an arm's length royalty). Any excess amount of royalties paid remains taxable according to the laws of the two Contracting States with due regard to the other provisions of the Convention. If, for example, the excess amount is treated as a distribution of corporate profits under domestic law, such excess amount will be taxed as a dividend rather than as royalties, but the tax imposed on the dividend payment will be subject to the rate limitations of paragraph 2 of Article 10 (Dividends).

*Relation to Other Articles*

Notwithstanding the foregoing limitations on source country taxation of royalties, the saving clause of paragraph 4 of Article 1 (General Scope) permits the United States to tax its residents and citizens, subject to the special foreign tax credit rules of paragraph 3 of Article 23 (Relief from Double Taxation), as if the Convention had not come into force.

As with other benefits of the Convention, the benefits of exclusive residence State taxation of royalties under paragraph 1 of Article 12 are available to a resident of the other State only if that resident is entitled to those benefits under Article 22 (Limitation on Benefits).

ARTICLE 13
Capital Gains

Article 13 assigns either primary or exclusive taxing jurisdiction over gains from the alienation of property to the State of residence or the State of source and defines the terms necessary to apply the Article.

*Paragraph 1*

Paragraph 1 preserves the non-exclusive right of the State of source to tax gains attributable to the alienation of real property situated in that State. The paragraph therefore permits the United States to apply section 897 of the Internal Revenue Code to tax gains derived by a resident of Denmark that are attributable to the alienation of real property situated in the United States (as defined in paragraph 2). Gains attributable to the alienation of real property include gain from any other property that is treated as a real property interest within the meaning of paragraph 2.

*Paragraph 2*

This paragraph defines the term "real property situated in the other Contracting State." The term includes real property referred to in Article 6 (i.e., an interest in the real property itself), a "United States real property interest" (when the United States is the other Contracting State under

paragraph 1), and an equivalent interest in real property situated in Denmark.

Under section 897(c) of the Code the term "United States real property interest" includes shares in a U.S. corporation that owns sufficient U.S. real property interests to satisfy an asset-ratio test on certain testing dates. The term also includes certain foreign corporations that have elected to be treated as U.S. corporations for this purpose. Section 897(i). In applying paragraph 1 the United States will look through distributions made by a REIT. Accordingly, distributions made by a REIT are taxable under paragraph 1 of Article 13 (not under Article 10 (Dividends)) when they are attributable to gains derived from the alienation of real property.

*Paragraph 3*

Paragraph 3 deals with the taxation of certain gains from the alienation of movable property forming part of the business property of a permanent establishment that an enterprise of a Contracting State has in the other Contracting State or of movable property pertaining to a fixed base available to a resident of a Contracting State in the other Contracting State for the purpose of performing independent personal services. This also includes gains from the alienation of such a permanent establishment (alone or with the whole enterprise) or of such fixed base. Such gains may be taxed in the State in which the permanent establishment or fixed base is located.

A resident of Denmark that is a partner in a partnership doing business in the United States generally will have a permanent establishment in the United States as a result of the activities of the partnership, assuming that the activities of the partnership rise to the level of a permanent establishment. Rev. Rul. 91-32, 1991-1 C.B. 107. Further, under paragraph 3, the United States generally may tax a partner's distributive share of income realized by a partnership on the disposition of movable property forming part of the business property of the partnership in the United States.

Paragraph 8 of Article 7 (Business Profits) refers to paragraph 3 of Article 13. That rule clarifies that income that is attributable to a permanent establishment or a fixed base, but that is deferred and received after the permanent establishment or fixed base no longer exists, may nevertheless be taxed by the State in which the permanent establishment or fixed base was located. Thus, under Article 13, gains derived by a resident of a Contracting State from the sale of movable property forming part of the business property of a permanent establishment in the other Contracting State may be taxed by that other State even if the income is deferred and received after the permanent establishment no longer exists.

*Paragraph 4*

Paragraph 4 limits the taxing jurisdiction of the state of source with respect to gains from the alienation of ships, boats, aircraft or containers operated or used in international traffic or movable property pertaining to the operation or use of such ships, boats, aircraft or containers. Under paragraph 4, when such income is derived by an enterprise of a Contracting State, it is taxable only in that Contracting State. Notwithstanding paragraph 3, the rules of this paragraph apply even if the income is attributable to a permanent establishment maintained by the enterprise in the other Contracting State. This result is consistent with the general rule under Article 8

(Shipping and Air Transport) that confers exclusive taxing rights over international shipping and air transport income on the state of residence of the enterprise deriving such income.

*Paragraph 5*

Paragraph 5 preserves the right of a Contracting State (the host State) to tax the gains derived by an enterprise of the other Contracting State from the deemed alienation of an installation, drilling rig, or ship used in the host State for the exploration for or exploitation of oil and gas resources, but only to the extent of any depreciation taken in the host State. Thus, at the time of deemed alienation of the property under the law of the host State, an enterprise of the other Contracting State may be required to recapture the depreciation claimed in the host State of an oil or gas exploration or exploitation installation, drilling rig or ship. Because the amount that may be taxable is limited to the amount of any gain, depreciation will be recaptured only to the extent it has reduced the basis of the property below its fair market value.

Paragraph 5 is included in order to permit Denmark to impose its income tax, to the extent permitted under paragraph 5, at the time that an oil or gas exploration or exploitation installation, drilling rig or ship is deemed alienated under the income tax laws of Denmark. However, an accompanying provision is included under paragraph 7 in order to prevent double taxation that might otherwise result from the rule. Under this provision, which is discussed more fully below, a person who is subject to taxation on gain in connection with property deemed alienated can elect to be liable to tax in the residence State in the same year as if he had sold and repurchased the property, thus reducing the risk of double taxation because of timing differences.

*Paragraph 6*

Paragraph 6 grants to the State of residence of the alienator the exclusive right to tax gains from the alienation of property other than property referred to in paragraphs 1 through 5. For example, gain derived from shares, other than shares described in paragraphs 2 or 3, debt instruments and various financial instruments, may be taxed only in the State of residence, to the extent such income is not otherwise characterized as income taxable under another article (e.g., Article 10 (Dividends) or Article 11 (Interest)). Similarly, gain derived from the alienation of tangible personal property, other than tangible personal property described in paragraphs 3 or 4, may be taxed only in the State of residence of the alienator. Gain derived from the alienation of any property, such as a patent or copyright, that produces income taxable under Article 12 (Royalties) is taxable under Article 12 and not under this article, provided that such gain is of the type described in paragraph 2(b) of Article 12 (i.e., it is contingent on the productivity, use, or disposition of the property). Thus, under either article such gain is taxable only in the State of residence of the alienator. Sales by a resident of a Contracting State of real property located in a third state are not taxable in the other Contracting State, even if the sale is attributable to a permanent establishment located in the other Contracting State.

*Paragraph 7*

Both paragraphs 7 and paragraph 8 provide rules intended to coordinate the timing of the recognition of income under the U.S. and Danish tax systems.

Paragraph 7 provides a rule to coordinate U.S. and Danish taxation of gains in circumstances where a resident of one of the Contracting States is subject to tax in both Contracting States and one Contracting State deems a taxable alienation of property by such resident to have occurred, while the other Contracting State at that time does not find a realization, recognition or inclusion of income and thus defers, but does not forgive, taxation. In such a case the resident may elect in the annual return of income for the year of such alienation to be liable to tax in the latter Contracting State as if he had sold and repurchased the property for an amount equal to its fair market value at a time immediately prior to the deemed alienation. This provision would be useful in a case where a U.S. corporation transfers its drilling rig in Denmark, on which depreciation has been taken in Denmark, to its home office in the United States. Under the provisions of paragraph 5, Denmark could tax the built-in gain (limited to the amount of depreciation taken in Denmark) upon the deemed alienation. However, absent paragraph 7, the United States would defer taxation of any gain until the property was actually sold. If the period for foreign tax credit carryovers had already run at the time of actual disposition, the U.S. corporation might not receive a foreign tax credit, resulting in double taxation. If the U.S. corporation elected the benefits of paragraph 7, it would be subject to U.S. tax currently on the built-in gain, and take a new tax basis in the property.

Unlike paragraph 8, paragraph 7 is self-executing and does not require the agreement of the relevant competent authority. However, if in one Contracting State there are losses and gains from deemed alienation of different properties, then paragraph 7 must be applied consistently in the other Contracting State within the taxable period with respect to all such properties. Paragraph 7 only applies, however, if the deemed alienation of the properties results in a net gain.

*Paragraph 8*

Paragraph 8 deals with the treatment of gain on alienation of property in the course of a corporate or other reorganization. Under this provision, if a transaction is tax-deferred in the State of residence, then the transferee may ask the competent authority of the source State to enter into an agreement to defer tax to the extent necessary to avoid double taxation.

Paragraph 8 provides authority for coordination of Danish and U.S. rules with respect to the non-recognition of gain on corporate organizations, reorganizations, mergers, or similar transactions. Where a resident of one of the Contracting States alienates property in such a transaction, and profit, gain or income with respect to such alienation is not recognized for income tax purposes in the Contracting State of residence, the competent authority of the other State may agree, pursuant to paragraph 8, if requested by the person acquiring the property, to defer the recognition of the profit, gain or income with respect to such property. This deferral shall be for such time and under such conditions as may be stipulated in the agreement.

One situation in which this provision might be useful is the merger of two companies that are resident in one Contracting State, both of which have permanent establishments in the other Contracting State. For example, if two U.S. resident corporations, each with a permanent establishment in Denmark, merged in a transaction that qualified as a tax-free reorganization under section 368 but was taxable in Denmark, Denmark could tax built-in gain on assets of the

permanent establishments. When those assets eventually were sold, the United States might also tax the gain, but without a foreign tax credit if the period for tax credit carryovers had already run. In that case, the company surviving the merger could request that the Danish competent authority defer recognition of the gain until actual disposition of the assets, in order to assure a U.S. foreign tax credit for the Danish tax. Whether deferral should be granted is a matter entirely within the discretion of the competent authority.

*Relation to Other Articles*

Notwithstanding the foregoing limitations on taxation of certain gains by the State of source, the saving clause of paragraph 4 of Article 1 (General Scope) permits the United States to tax its citizens and residents as if the Convention had not come into effect. Thus, any limitation in this Article on the right of the United States to tax gains does not apply to gains of a U.S. citizen or resident. However, paragraphs 7 and 8 are excepted from the saving clause by virtue of paragraph 5(a) of Article 1. Thus, under paragraph 7, a U.S. corporation that is subject to tax upon a transfer of property from its Danish permanent establishment to it U.S. head office may elect to be subject to tax in the United States on the built-in gain and receive a step-up in basis for U.S. tax purposes. In addition, a U.S. citizen resident in Denmark may, subject to the discretion of the U.S. competent authority, obtain relief under paragraph 8 in the form of deferred recognition of profit, gain or income that is otherwise recognized or included in income under the Code but not under Danish law.

The benefits of this Article are also subject to the provisions of Article 22 (Limitation of Benefits). Thus, only a resident of a Contracting State that satisfies one of the conditions in Article 22 is entitled to the benefits of this Article.

ARTICLE 14
Independent Personal Services

The Convention deals in separate articles with different classes of income from personal services. Article 14 deals with the general class of income from independent personal services and Article 15 deals with the general class of income from dependent personal services. Articles 16 through 20 provide exceptions and additions to these general rules for directors' fees (Article 16); performance income of artistes and sportsmen (Article 17); pensions in respect of personal service income, social security benefits, annuities, alimony, and child support payments (Article 18); government service salaries and pensions (Article 19); and certain income of students and trainees (Article 20).

*Paragraph 1*

Paragraph 1 provides the general rule that an individual who is a resident of a Contracting State and who derives income from performing personal services in an independent capacity will be exempt from tax in respect of that income by the other Contracting State. The income may be taxed in the other Contracting State only if the services are performed there and the income is attributable to a fixed base that is regularly available to the individual in that other State for the

purpose of performing his services.

Income derived by persons other than individuals or groups of individuals from the performance of independent personal services is not covered by Article 14. Such income generally would be business profits taxable in accordance with Article 7 (Business Profits). Income derived by employees of such persons generally would be taxable in accordance with Article 15 (Dependent Personal Services).

The term "fixed base" is not defined in the Convention, but its meaning is understood to be similar, but not identical, to that of the term "permanent establishment," as defined in Article 5 (Permanent Establishment). The term "regularly available" also is not defined in the Convention. Whether a fixed base is regularly available to a person will be determined based on all the facts and circumstances. In general, the term encompasses situations where a fixed base is at the disposal of the individual whenever he performs services in that State. It is not necessary that the individual regularly use the fixed base, only that the fixed base be regularly available to him. For example, a U.S. resident partner in a law firm that has offices in Denmark would be considered to have a fixed base regularly available to him in Denmark if work space in those offices (whether or not the same space) were made available to him whenever he wished to conduct business in Denmark, regardless of how frequently he conducted business in Denmark. On the other hand, an individual who had no office in Denmark and occasionally rented a hotel room to serve as a temporary office would not be considered to have a fixed base regularly available to him.

It is not necessary that the individual actually use the fixed base. It is only necessary that the fixed base be regularly available to him. For example, if an individual resident in the U.S. has an office in Denmark that he can use if he chooses when he is present in Denmark, that fixed base will be considered to be regularly available to him regardless of whether he conducts his activities there.

The term "personal services of an independent character" is not defined. It clearly includes those activities listed in paragraph 2 of Article 14 of the OECD Model, such as independent scientific, literary, artistic, educational or teaching activities, as well as the independent activities of physicians, lawyers, engineers, architects, dentists, and accountants. That list, however, is not exhaustive. The term includes all personal services performed by an individual for his own account, whether as a sole proprietor or a partner, where he receives the income and bears the risk of loss arising from the services. The taxation of income of an individual from those types of independent services which are covered by Articles 16 through 20 is governed by the provisions of those articles. For example, taxation of the income of a corporate director would be governed by Article 16 (Directors' Fees) rather than Article 14.

This Article applies to income derived by a partner resident in the Contracting State that is attributable to personal services of an independent character performed in the other State through a partnership that has a fixed base in that other Contracting State. Income which may be taxed under this Article includes all income attributable to the fixed base in respect of the performance of the personal services carried on by the partnership (whether by the partner himself, other partners in the partnership, or by employees assisting the partners) and any income from activities ancillary to the performance of those services (for example, charges for facsimile services).

Income that is not derived from the performance of personal services and that is not ancillary thereto (for example, rental income from subletting office space), will be governed by other Articles of the Convention.

The application of Article 14 to a service partnership may be illustrated by the following example: a partnership formed in Denmark has five partners (who agree to split profits equally), four of whom are resident and perform personal services only in Denmark at Office A, and one of whom performs personal services from Office B, a fixed base in the United States. In this case, the four partners of the partnership resident in Denmark may be taxed in the United States in respect of their share of the income attributable to the fixed base, Office B. The services giving rise to income which may be attributed to the fixed base would include not only the services performed by the one resident partner, but also, for example, if one of the four other partners came to the United States and worked on an Office B matter there, the income in respect of those services also. As noted above, this would be the case regardless of whether the partner from Denmark actually visited or used Office B when performing services in the United States.

Paragraph 8 of Article 7 (Business Profits) refers to Article 14. That rule clarifies that income that is attributable to a permanent establishment or a fixed base, but that is deferred and received after the permanent establishment or fixed base no longer exists, may nevertheless be taxed by the State in which the permanent establishment or fixed base was located. Thus, under Article 14, income derived by an individual resident of the United States from services performed in Denmark and attributable to a fixed base there may be taxed by Denmark even if the income is deferred and received after there is no longer a fixed base available to the resident in Denmark.

*Paragraph 2*

Paragraph 2 incorporates the principles of paragraph 3 of Article 7 (Business Profits) into Article 14. Thus, all relevant expenses, including expenses not incurred in the Contracting State where the fixed base is located, must be allowed as deductions in computing the net income from services subject to tax in the Contracting State where the fixed base is located.

*Relation to Other Articles*

If an individual resident of Denmark who is also a U.S. citizen performs independent personal services in the United States, the United States may, by virtue of the saving clause of paragraph 4 of Article 1 (General Scope) tax his income without regard to the restrictions of this Article, subject to the special foreign tax credit rules of paragraph 3 of Article 23 (Relief from Double Taxation).

ARTICLE 15
Dependent Personal Services

Article 15 apportions taxing jurisdiction over remuneration derived by a resident of a Contracting State as an employee between the States of source and residence.

*Paragraph 1*

Paragraph 1 contains the general rule of Article 15. Remuneration derived by a resident of a Contracting State as an employee may be taxed by the State of residence, and the remuneration also may be taxed by that other Contracting State to the extent derived from employment exercised (i.e., services performed) in the other Contracting State. Paragraph 1 also provides that the more specific rules of Articles 16 (Directors' Fees), 18 (Pensions, Social Security, Annuities, Alimony and Child Support), and 19 (Government Service) apply in the case of employment income described in one of these articles. Thus, even though the State of source has a right to tax employment income under Article 15, it may not have the right to tax that income under the Convention if the income is described, e.g., in Article 18 (Pensions, Social Security, Annuities, Alimony and Child Support) and is not taxable in the State of source under the provisions of that article.

Article 15 applies to "salaries, wages and other remuneration." Article 15 applies to any form of compensation for employment, including payments in kind, regardless of whether the remuneration is "similar" to salaries and wages. The U.S. position on in-kind payments was confirmed by the addition of paragraph 2.1 to the Commentary to Article 15 of the OECD Model in 1997.

Consistent with Code section 864(c)(6), Article 15 also applies regardless of the timing of actual payment for services. Thus, a bonus paid to a resident of the United States with respect to services performed in Denmark with respect to a particular taxable year would be subject to Article 15 for that year even if it was paid after the close of the year. Similarly, an annuity received for services performed in a taxable year would be subject to Article 15 despite the fact that it was paid in subsequent years. In either case, whether such payments were taxable in the State where the employment was exercised would depend on whether the tests of paragraph 2 were satisfied. Consequently, a person who receives the right to a future payment in consideration for services rendered in a Contracting State would be taxable in that State even if the payment is received at a time when the recipient is a resident of the other Contracting State.

*Paragraph 2*

Paragraph 2 sets forth an exception to the general rule that employment income may be taxed in the State where the employment is exercised. Under paragraph 2, the State where the employment is exercised may not tax the income from the employment if three conditions are satisfied:

(a) the individual is present in the other Contracting State for a period or periods not exceeding 183 days in any 12-month period that begins or ends during the relevant (i.e., the year in which the services are performed) calendar year;

(b) the remuneration is paid by, or on behalf of, an employer who is not a resident of that other Contracting State; and

(c) the remuneration is not borne as a deductible expense by a permanent establishment or fixed base that the employer has in that other State.

In order for the remuneration to be exempt from tax in the source State, all three conditions must

be satisfied. This exception is identical to that set forth in the OECD Model.

The 183-day period in condition (a) is to be measured using the "days of physical presence" method. Under this method, the days that are counted include any day in which a part of the day is spent in the host country. (Rev. Rul. 56-24, 1956-1 C.B. 851.) Thus, days that are counted include the days of arrival and departure; weekends and holidays on which the employee does not work but is present within the country; vacation days spent in the country before, during or after the employment period, unless the individual's presence before or after the employment can be shown to be independent of his presence there for employment purposes; and time during periods of sickness, training periods, strikes, etc., when the individual is present but not working. If illness prevented the individual from leaving the country in sufficient time to qualify for the benefit, those days will not count. Also, any part of a day spent in the host country while in transit between two points outside the host country is not counted. These rules are consistent with the description of the 183-day period in paragraph 5 of the Commentary to Article 15 in the OECD Model.

Conditions (b) and (c) are intended to ensure that a Contracting State will not be required to allow a deduction to the payor for compensation paid and at the same time to exempt the employee on the amount received. Accordingly, if a foreign person pays the salary of an employee who is employed in the host State, but a host State corporation or permanent establishment reimburses the payor with a payment that can be identified as a reimbursement, neither condition (b) nor (c), as the case may be, will be considered to have been fulfilled.

The reference to remuneration "borne by" a permanent establishment or fixed base is understood to encompass all expenses that economically are incurred and not merely expenses that are currently deductible for tax purposes. Accordingly, the expenses referred to include expenses that are capitalizable as well as those that are currently deductible. Further, salaries paid by residents that are exempt from income taxation may be considered to be borne by a permanent establishment or fixed base notwithstanding the fact that the expenses will be neither deductible nor capitalizable since the payor is exempt from tax.

*Paragraph 3*

Paragraph 3 contains a special rule applicable to remuneration for services performed by a resident of a Contracting State as an employee aboard a ship or aircraft operated in international traffic. Such remuneration may be taxed only in the State of residence of the employee if the services are performed as a member of the regular complement of the ship or aircraft. The "regular complement" includes the crew. In the case of a cruise ship, for example, it may also include others, such as entertainers, lecturers, etc., employed by the shipping company to serve on the ship throughout its voyage. The use of the term "regular complement" is intended to clarify that a person who exercises his employment as, for example, an insurance salesman while aboard a ship or aircraft is not covered by this paragraph. This paragraph does not apply to persons dealt with in Article 14 (Independent Personal Services).

*Relation to Other Articles*

If a U.S. citizen who is resident in Denmark performs services as an employee in the United States and meets the conditions of paragraph 2 for source country exemption, he nevertheless is taxable in the United States by virtue of the saving clause of paragraph 4 of Article 1 (General Scope), subject to the special foreign tax credit rule of paragraph 3 of Article 23 (Relief from Double Taxation).

ARTICLE 16
Directors' Fees

This Article follows the OECD Model and provides that fees and other payments derived by a resident of a Contracting State in his capacity as a member of the board of directors of a company that is a resident of the other Contracting State may be taxed in that other State. This rule is an exception to the more general rules of Articles 14 (Independent Personal Services) and 15 (Dependent Personal Services). Thus, for example, in determining whether a director's fee paid to a non-employee director is subject to tax in the country of residence of the corporation, it is not relevant to establish whether the fee is attributable to a fixed base in that State.

The provision in the Convention is identical to the analogous provision in the OECD Model. The U.S. Model reached a different result, providing that the State of residence of the company may tax nonresident directors with no time or dollar threshold, but only with respect to remuneration for services performed in that State.

Because this Article does not restrict taxation by either Contracting State, the saving clause of paragraph 4 of Article 1 (General Scope) is irrelevant. If a U.S. citizen who is a Danish resident is a director of a Danish corporation, the United States may tax his full remuneration for those services, subject, however, to the special provisions of paragraph 3 of Article 23 (Relief from Double Taxation).

ARTICLE 17
Artistes and Sportsmen

This Article deals with the taxation in a Contracting State of artistes (i.e., performing artists and entertainers) and sportsmen resident in the other Contracting State from the performance of their services as such. The Article applies both to the income of an entertainer or sportsman who performs services on his own behalf and one who performs services on behalf of another person, either as an employee of that person, or pursuant to any other arrangement. The rules of this Article take precedence, in some circumstances, over those of Articles 14 (Independent Personal Services) and 15 (Dependent Personal Services).

This Article applies only with respect to the income of performing artists and sportsmen. Others involved in a performance or athletic event, such as producers, directors, technicians, managers, coaches, etc., remain subject to the provisions of Articles 14 and 15. In addition, except as provided in paragraph 2, income earned by juridical persons is not covered by this Article.

*Paragraph 1*

Paragraph 1 describes the circumstances in which a Contracting State may tax the performance income of an entertainer or sportsman who is a resident of the other Contracting State. Under the paragraph, income derived by an individual resident of a Contracting State from activities as an entertainer or sportsman exercised in the other Contracting State may be taxed in that other State if the amount of the gross receipts derived by the performer exceeds $20,000 (or its equivalent in Danish kroner) for the taxable year. The $20,000 includes expenses reimbursed to the individual or borne on his behalf. If the gross receipts exceed $20,000, the full amount, not just the excess, may be taxed in the State of performance.

Tax may be imposed under paragraph 1 even if the performer would have been exempt from tax under Articles 14 (Independent Personal Services) or 15 (Dependent Personal Services). On the other hand, if the performer would be exempt from host-country tax under this Article, but would be taxable under either Article 14 or 15, tax may be imposed under either of those Articles. Thus, for example, if a performer derives remuneration from his activities in an independent capacity, and the remuneration is not attributable to a fixed base, he may be taxed by the host State in accordance with this Article if his remuneration exceeds $20,000 annually, despite the fact that he generally would be exempt from host State taxation under Article 14. However, a performer who receives less than the $20,000 threshold amount and therefore is not taxable under Article 17, nevertheless may be subject to tax in the host country under Articles 14 or 15 if the tests for host-country taxability under those Articles are met. For example, if an entertainer who is an independent contractor earns $19,000 of income in a State for the calendar year, but the income is attributable to a fixed base regularly available to him in the State of performance, that State may tax his income under Article 14.

Since it frequently is not possible to know until year-end whether the income an entertainer or sportsman derived from performances in a Contracting State will exceed $20,000, nothing in the Convention precludes that Contracting State from withholding tax during the year and refunding after the close of the year if the taxability threshold has not been met.

Article 17 applies to all income connected with a performance by the entertainer, such as appearance fees, award or prize money, and a share of the gate receipts. Income derived from a Contracting State by a performer who is a resident of the other Contracting State from other than actual performance, such as royalties from record sales and payments for product endorsements, is not covered by this Article, but by other articles of the Convention, such as Article 12 (Royalties) or Article 14. For example, if an entertainer receives royalty income from the sale of live recordings, the royalty income would be exempt from source country tax under Article 12, even if the performance was conducted in the source country, although he could be taxed in the source country with respect to income from the performance itself under this Article if the dollar threshold is exceeded.

In determining whether income falls under this Article or another article, the controlling factor will be whether the income in question is predominantly attributable to the performance itself or other activities or property rights. For instance, a fee paid to a performer for endorsement of a performance in which the performer will participate would be considered to be so closely

associated with the performance itself that it normally would fall within this Article. Similarly, a sponsorship fee paid by a business in return for the right to attach its name to the performance would be so closely associated with the performance that it would fall under this Article as well. A cancellation fee would not be considered to fall within this Article but would be dealt with under Article 7 (Business Profits), 14 or 15.

Where an individual fulfills a dual role as performer and non-performer (such as a player-coach or an actor-director), but his role in one of the two capacities is negligible, the predominant character of the individual's activities should control the characterization of those activities. In other cases there should be an apportionment between the performance-related compensation and other compensation.

Consistent with Article 15, Article 17 also applies regardless of the timing of actual payment for services. Thus, a bonus paid to a resident of a Contracting State with respect to a performance in Denmark with respect to a particular taxable year would be subject to Article 17 for that year even if it was paid after the close of the year.

*Paragraph 2*

Paragraph 2 is intended to deal with the potential for abuse when a performer's income does not accrue directly to the performer himself, but to another person. Foreign performers frequently perform in the United States as employees of, or under contract with, a company or other person.

The relationship may truly be one of employee and employer, with no abuse of the tax system either intended or realized. On the other hand, the "employer" may, for example, be a company established and owned by the performer, which is merely acting as the nominal income recipient in respect of the remuneration for the performance (a "star company"). The performer may act as an "employee," receive a modest salary, and arrange to receive the remainder of the income from his performance in another form or at a later time. In such case, absent the provisions of paragraph 2, the income arguably could escape host-country tax because the company earns business profits but has no permanent establishment in that country. The performer may largely or entirely escape host-country tax by receiving only a small salary in the year the services are performed, perhaps small enough to place him below the dollar threshold in paragraph 1. The performer might arrange to receive further payments in a later year, when he is not subject to host-country tax, perhaps as deferred salary payments, dividends or liquidating distributions.

Paragraph 2 seeks to prevent this type of abuse while at the same time protecting the taxpayers' rights to the benefits of the Convention when there is a legitimate employee-employer relationship between the performer and the person providing his services. Under paragraph 2, when the income accrues to a person other than the performer, and the performer or related persons participate, directly or indirectly, in the receipts or profits of that other person, the income may be taxed in the Contracting State where the performer's services are exercised, without regard to the provisions of the Convention concerning business profits (Article 7) or independent personal services (Article 14). Thus, even if the "employer" has no permanent establishment or

fixed base in the host country, its income may be subject to tax there under the provisions of paragraph 2. Taxation under paragraph 2 is on the person providing the services of the performer. This paragraph does not affect the rules of paragraph 1, which apply to the performer himself. The income taxable by virtue of paragraph 2 is reduced to the extent of salary payments to the performer, which fall under paragraph 1.

For purposes of paragraph 2, income is deemed to accrue to another person (i.e., the person providing the services of the performer) if that other person has control over, or the right to receive, gross income in respect of the services of the performer. Direct or indirect participation in the profits of a person may include, but is not limited to, the accrual or receipt of deferred remuneration, bonuses, fees, dividends, partnership income or other income or distributions.

Paragraph 2 does not apply if the performer establishes that neither he nor any persons related to him participate directly or indirectly in the receipts or profits of the person providing the services of the performer. Assume, for example, that a circus owned by a U.S. corporation performs in Denmark, and promoters of the performance in Denmark pay the circus, which, in turn, pays salaries to the circus performers. The circus is determined to have no permanent establishment in Denmark. Since the circus performers do not participate in the profits of the circus, but merely receive their salaries out of the circus' gross receipts, the circus is protected by Article 7 and its income is not subject to host-country tax. Whether the salaries of the circus performers are subject to host-country tax under this Article depends on whether they exceed the $20,000 threshold in paragraph 1.

Since pursuant to Article 1 (General Scope) the Convention only applies to persons who are residents of one of the Contracting States, if the star company is not a resident of one of the Contracting States then taxation of the income is not affected by Article 17 or any other provision of the Convention.

*Relationship to Other Articles*

This Article is subject to the provisions of the saving clause of paragraph 4 of Article 1 (General Scope). Thus, if an entertainer or a sportsman who is resident in Denmark is a citizen of the United States, the United States may tax all of his income from performances in the United States without regard to the provisions of this Article, subject, however, to the special foreign tax credit provisions of paragraph 3 of Article 23 (Relief from Double Taxation). In addition, benefits of this Article are subject to the provisions of Article 22 (Limitation on Benefits).


ARTICLE 18
Pensions, Social Security, Annuities, Alimony and Child Support Payments

This Article deals with the taxation of private (i.e., non-government service) pensions and annuities, social security benefits, alimony and child support payments.

*Paragraph 1*

Subparagraph 1(a) provides that, except as provided in subparagraph (b), distributions from pensions and other similar remuneration beneficially owned by a resident of a Contracting State in consideration of past employment are taxable only in the State in which they arise. Paragraph 4 of the Protocol defines a payment that is treated as a pension distribution under paragraph 1. Paragraph 4(a) provides that a payment shall be treated as a pension distribution for this purpose if it is a payment under a pension scheme recognized for tax purposes in the Contracting State where the pension scheme is established. Paragraph 4(b) provides that, for this purpose, pension schemes recognized for tax purposes shall include the schemes listed under clause (i) in the case of the United States and under clause (ii) in the case of Denmark. With reference to U.S. Law, clause (i) lists qualified plans under section 401(a), individual retirement plans (including individual retirement plans that are part of a simplified employee pension plan that satisfies section 408(k), individual retirement accounts, individual retirement annuities, section 408(p) accounts and Roth IRAs under section 408A), section 403(a) qualified plans, and section 403(b) plans. With reference to Danish law, clause (ii) lists pension schemes under Section I of the Act on Taxation of Pension Schemes (*pensionsbeskatningslovens afsnit I*). Subparagraph 1(d) makes explicit the fact that the term "pension distributions and other similar remuneration" includes both periodic and lump sum payments.

Under the prior Convention, distributions were taxable only in the country of residence. Since many retirees may have relied on the old rule when deciding to move from one Contracting State to another, subparagraph 1(b) provides a grandfather rule to prevent the tax burden of such retirees from being suddenly increased. This rule states that, if prior to the time of entry into force of this Convention, a person was a resident of a Contracting State and was receiving pension distributions arising in the other Contracting State, that person shall be taxable on pension distributions referred to in subparagraph (a) only in the first-mentioned State. Thus, subparagraph (b) provides for taxation only in the residence State, rather than taxation only in the source State, in the case of a pension distribution received by a citizen of one Contracting State who, before this Convention enters into force, is receiving a pension distribution arising in the other Contracting State.

Subparagraph 1(c) provides a rule for administrative convenience under which pension distributions shall be deemed to arise in a Contracting State only if paid by a pension scheme established in that State. This rule eliminates the necessity of dividing pension distributions between different countries on the basis of services performed in the various countries.

*Paragraph 2*

The treatment of social security benefits is dealt with in paragraph 2. This paragraph provides that, notwithstanding the provision of paragraph 1, payments made by one of the Contracting States under the provisions of its social security or similar legislation to a resident of the other Contracting State or to a citizen of the United States will be taxable only in the Contracting State making the payment. This paragraph applies to social security beneficiaries whether they have contributed to the system as private sector or Government employees.

The phrase "similar legislation" is intended to refer to United States tier 1 Railroad Retirement benefits. The reference to U.S. citizens is necessary to ensure that a social security

payment by Denmark to a U.S. citizen who is not resident in the United States will not be taxable by the United States.

*Paragraph 3*

Under paragraph 3, annuities that are derived and beneficially owned by an individual resident of a Contracting State are taxable only in that State. An annuity, as the term is used in this paragraph, means a stated sum paid periodically at stated times during a specified number of years, or for life, under an obligation to make the payment in return for adequate and full consideration (other than for services rendered). An annuity received in consideration for services rendered would be treated as deferred compensation and generally taxable in accordance with Article 15 (Dependent Personal Services).

*Paragraphs 4 and 5*

Paragraphs 4 and 5 deal with alimony and child support payments, respectively. Alimony and child support payments are defined as periodic payments made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support. Paragraph 4, however, deals only with payments of that type that are deductible to the payor and taxable to the payee. Under that paragraph, alimony (i.e., a deductible payment that is taxable in the hands of the recipient) paid by a resident of a Contracting State to a resident of the other Contracting State is taxable under the Convention only in the State of residence of the recipient. Paragraph 5 deals with those periodic payments that are for the support of a child and that are not covered by paragraph 4 (i.e., those payments that either are not deductible to the payor or not taxable to the payee). These types of payments by a resident of a Contracting State to a resident of the other Contracting State shall be taxable only in the first-mentioned Contracting State.

*Relationship to Other Articles*

Paragraphs 3 and 4 of Article 18 are subject to the saving clause of paragraph 4 of Article 1 (General Scope). Thus, a U.S. citizen who is resident in Denmark, and receives either an annuity or alimony payment from the United States, may be subject to U.S. tax on the payment, notwithstanding the rules in those two paragraphs that give the State of residence of the recipient the exclusive taxing right. Paragraph 1, with the exception of subparagraph (c), also is subject to the saving clause. Therefore, a U.S. citizen who is resident in Denmark, and receives a pension payment from a pension scheme established in Denmark may be subject to U.S. tax on the payment, but the United States will treat that payment as arising in Denmark for foreign tax credit purposes. Paragraphs 2 and 5 are excepted from the saving clause by virtue of paragraph 5(a) of Article 1. Thus, the United States will allow U.S. citizens and residents the benefits of paragraph 2 and 5.

ARTICLE 19
<u>Government Service</u>

*Paragraph 1*

Subparagraphs (a) and (b) of paragraph 1 deal with the taxation of government compensation (other than a pension addressed in paragraph 2). Subparagraph (a) provides that remuneration paid from the public funds of one of the States or its political subdivisions or local authorities to any individual who is rendering services to that State, political subdivision or local authority, which are in the discharge of governmental functions, is exempt from tax by the other State. Under subparagraph (b), such payments are, however, taxable exclusively in the other State (i.e., the host State) if the services are rendered in that other State and the individual is a resident of that State who is either a national of that State or a person who did not become resident of that State solely for purposes of rendering the services. The paragraph applies both to government employees and to independent contractors engaged by governments to perform services for them.

The remuneration described in paragraph 1 is subject to the provisions of this paragraph and not to those of Articles 14 (Independent Personal Services), 15 (Dependent Personal Services), 16 (Director's Fees) or 17 (Artistes and Sportsmen). If, however, the conditions of paragraph 1 are not satisfied, those other Articles will apply. Thus, if a local government sponsors a basketball team in an international tournament, and pays the athletes from public funds, the compensation of the players is covered by Article 17 and not Article 19, because the athletes are not engaging in a governmental function when they play basketball.

*Paragraph 2*

Paragraph 2 deals with the taxation of a pension paid from the public funds of one of the States or a political subdivision or a local authority thereof to an individual in respect of services rendered to that State or subdivision or authority in the discharge of governmental functions. Subparagraph (a) provides that such a pension is taxable only in that State. Subparagraph (b) provides an exception under which such a pension is taxable only in the other State if the individual is a resident of, and a national of, that other State. Pensions paid to retired civilian and military employees of a Government of either State are intended to be covered under paragraph 2. Subparagraph 2 (b) is to be interpreted and applied consistently with the U.S., Danish and OECD Models. When benefits paid by a State in respect of services rendered to that State or a subdivision or authority are in the form of social security benefits, however, those payments are covered by paragraph 2 of Article 18 (Pensions, Social Security, Annuities, Alimony and Child Support). As a general matter, the result will be the same whether Article 18 or 19 applies, since social security benefits are taxable exclusively by the source country and so are government pensions. The result will differ only when the payment is made to a citizen and resident of the other Contracting State, who is not also a citizen of the paying State. In such a case, social security benefits continue to be taxable at source while government pensions become taxable only in the residence country.

The phrase "functions of a governmental nature" is not defined. In general it is understood to encompass functions traditionally carried on by a government. It generally would not include functions that commonly are found in the private sector (e.g., education, health care, utilities). Rather, it is limited to functions that generally are carried on solely by the government (e.g., military, diplomatic service, tax administrators) and activities that directly support the carrying out of those functions.

The use of the phrase "paid from the public funds of a Contracting State" is intended to clarify that remuneration and pensions paid by such entities as government-owned corporations are covered by the Article, as long as the other conditions of the Article are satisfied.

*Paragraph 3*

Paragraph 3 provides that if the services are performed in connection with a business carried on by the State or individual subdivision or local authority, then paragraphs 1 and 2 do not apply. In such cases, the ordinary rules apply: Article 15 for wages and salaries, Article 16 for directors fees and other similar payments, Article 17 for artistes and sportsmen, and Article 18 for pensions.

*Relation to Other Articles*

Under paragraph 5(b) of Article 1 (General Scope), the saving clause (paragraph 4 of Article 1) does not apply to the benefits conferred by one of the States under Article 19 if the recipient of the benefits is neither a citizen of Denmark, nor a person who has been admitted for permanent residence there (i.e., in the United States, a "green card" holder). Thus, a resident of a Contracting State who in the course of performing functions of a governmental nature becomes a resident of the other State (but not a permanent resident), would be entitled to the benefits of this Article. However, an individual who receives a pension paid by the Government of Denmark in respect of services rendered to that Government is taxable on that pension only in Denmark unless the individual is a U.S. citizen or acquires a U.S. green card.


ARTICLE 20
Student and Trainees

This Article provides rules for host-country taxation of visiting students, apprentices or business trainees. Persons who meet the tests of the Article will be exempt from tax in the State that they are visiting with respect to designated classes of income. Several conditions must be satisfied in order for an individual to be entitled to the benefits of this Article.

First, the visitor must have been, either at the time of his arrival in the host State or immediately before, a resident of the other Contracting State.

Second, the purpose of the visit must be the full-time education or training of the visitor. Thus, if the visitor comes principally to work in the host State but also is a part-time student, he would not be entitled to the benefits of this Article, even with respect to any payments he may receive from abroad for his maintenance or education, and regardless of whether or not he is in a degree program. Whether a student is to be considered full-time will be determined by the rules of the educational institution at which he is studying. Similarly, a person who visits the host State for the purpose of obtaining business training and who also receives a salary from his employer for providing services would not be considered a trainee and would not be entitled to the benefits of this Article.

Third, a student must be studying at an accredited educational institution. (This requirement does not apply to business trainees or apprentices.) An educational institution is understood to be an institution that normally maintains a regular faculty and normally has a regular body of students in attendance at the place where the educational activities are carried on. An educational institution will be considered to be accredited if it is accredited by an authority that generally is responsible for accreditation of institutions in the particular field of study.

The host-country exemption in the Article applies only to payments received by the student, apprentice or business trainee for the purpose of his maintenance, education or training that arise outside the host State. A payment will be considered to arise outside the host State if the payor is located outside the host State. Thus, for example, if an employer from one Contracting State sends an employee to the other State for training, the payments the trainee receives from abroad from his employer for his maintenance or training while he is present in the host State will be exempt from host country tax. In all cases substance over form will prevail in determining the identity of the payor. Consequently, payments made directly or indirectly by the U.S. person with whom the visitor is training, but which have been routed through a non-host-country source, such as, for example, a foreign bank account, would not be treated as arising outside the United States for this purpose. Moreover, if a U.S. person reimbursed a foreign person for payments by the foreign person to the visitor, the payments by the foreign person would not be treated as arising outside the United States.

In the case of an apprentice or business trainee, the benefits of the Article will extend for a period of three years from the time that the visitor first arrives in the host country. If, however, an apprentice or trainee remains in the host country for a fourth year, thus losing the benefits of the Article, he would not retroactively lose the benefits of the Article for the first three years.

Finally, the exemption only applies to income from research undertaken in the public interest. Income from research undertaken for private benefit does not qualify for the exemption.

The saving clause of paragraph 4 of Article 1 (General Scope) does not apply to this Article with respect to an individual who is neither a citizen of the host State nor has been admitted for permanent residence there. The saving clause, however, does apply with respect to citizens and permanent residents of the host State. Thus, a U.S. citizen who is a resident of Denmark and who visits the United States as a full-time student at an accredited university will not be exempt from U.S. tax on remittances from abroad that otherwise constitute U.S. taxable income. A person, however, who is not a U.S. citizen, and who visits the United States as a student and remains long enough to become a resident under U.S. law, but does not become a permanent resident (i.e., does not acquire a green card), will be entitled to the full benefits of the Article.

Article 21
Other Income

Article 21 generally assigns taxing jurisdiction over income not dealt with in the other

articles (Articles 6 through 20) of the Convention to the State of residence of the beneficial owner of the income and defines the terms necessary to apply the article. An item of income is "dealt with" in another article if it is the type of income described in the article and it has its source in a Contracting State. For example, all royalty income that arises in a Contracting State and that is beneficially owned by a resident of the other Contracting State is "dealt with" in Article 12 (Royalties).

Examples of items of income covered by Article 21 include income from gambling, punitive (but not compensatory) damages, covenants not to compete, and income from certain financial instruments to the extent derived by persons not engaged in the trade or business of dealing in such instruments (unless the transaction giving rise to the income is related to a trade or business, in which case it is dealt with under Article 7 (Business Profits)). The article also applies to items of income that are not dealt with in the other articles because of their source or some other characteristic. For example, Article 11 (Interest) addresses only the taxation of interest arising in a Contracting State. Interest arising in a third State that is not attributable to a permanent establishment, therefore, is subject to this Article.

Distributions from partnerships and distributions from trusts are not generally dealt with under this Article because partnership and trust distributions generally do not constitute income. Under the U.S. Internal Revenue Code, partners include in income their distributive share of partnership income annually, and partnership distributions themselves generally do not give rise to income. Also, under the Code, trust income and distributions have the character of the associated distributable net income and therefore would generally be covered by another article of the Convention.

*Paragraph 1*

Paragraph 1 contains the general rule of Article 21. Items of income not dealt with in other articles and beneficially owned by a resident of a Contracting State will be taxable only in the State of residence. This exclusive right of residence State taxation applies whether or not the residence State exercises its right to tax the income covered by the Article.

This paragraph refers to "items of income beneficially owned by a resident of a Contracting State" rather than simply to "items of income of a resident of a Contracting State." This reference makes explicit the implicit understanding in other treaties that the exclusive residence taxation provided by paragraph 1 applies only when a resident of a Contracting State is the beneficial owner of the income. This should also be understood from the phrase "income of a resident of a Contracting State." The addition of a reference to beneficial ownership merely removes any possible ambiguity. Thus, source taxation of income not dealt with in other articles of the Convention is not limited by paragraph 1 if it is nominally paid to a resident of the other Contracting State, but is beneficially owned by a resident of a third State.

*Paragraph 2*

Paragraph 2 provides an exception to the general rule of paragraph 1 for income, other than income from real property, that is attributable to a permanent establishment or fixed base

maintained in a Contracting State by a resident of the other Contracting State. The taxation of such income is governed by the provisions of Articles 7 (Business Profits) and 14 (Independent Personal Services). Therefore, income arising outside the United States that is attributable to a permanent establishment maintained in the United States by a resident of Denmark generally would be taxable by the United States under the provisions of Article 7. This would be true even if the income is sourced in a third State.

There is an exception to this general rule with respect to income a resident of a Contracting State derives from real property located outside the other Contracting State (whether in the first-mentioned Contracting State or in a third State) that is attributable to the resident's permanent establishment or fixed base in the other Contracting State. In such a case, only the first-mentioned Contracting State (i.e., the State of residence of the person deriving the income) and not the host State of the permanent establishment or fixed base may tax that income. This special rule for foreign-situs property is consistent with the general rule, also reflected in Article 6 (Income from Real Property (Immovable Property)), that only the situs and residence States may tax real property and real property income. Even if such property is part of the property of a permanent establishment or fixed base in a Contracting State, that State may not tax it if neither the situs of the property nor the residence of the owner is in that State.

*Relation to Other Articles*

This Article is subject to the saving clause of paragraph 4 of Article 1 (General Scope). Thus, the United States may tax the income of a resident of Denmark that is not dealt with elsewhere in the Convention, if that resident is a citizen of the United States. The Article is also subject to the provisions of Article 22 (Limitation on Benefits). Thus, if a resident of Denmark earns income that falls within the scope of paragraph 1 of Article 21, but that is taxable by the United States under U.S. law, the income would be exempt from U.S. tax under the provisions of Article 21 only if the resident satisfies one of the tests of Article 22 for entitlement to benefits.

ARTICLE 22
Limitation of Benefits

*Purpose of Limitation of Benefits Provisions*

The United States views an income tax treaty as a vehicle for providing treaty benefits to residents of the two Contracting States. This statement begs the question of who is to be treated as a resident of a Contracting State for the purpose of being granted treaty benefits. The Commentaries to the OECD Model authorize a tax authority to deny benefits, under substance-over-form principles, to a nominee in one State deriving income from the other on behalf of a third-country resident. In addition, although the text of the OECD Model does not contain express anti-abuse provisions, the Commentaries to Article 1 contain an extensive discussion approving the use of such provisions in tax treaties in order to limit the ability of third-state residents to obtain treaty benefits. The United States holds strongly to the view that tax treaties should include provisions that specifically prevent misuse of treaties by residents of third countries. Consequently, all recent U.S. income tax treaties contain comprehensive Limitation on Benefits

provisions.

A treaty that provides treaty benefits to any resident of a Contracting State permits "treaty shopping:" the use, by residents of third states, of legal entities established in a Contracting State with a principal purpose to obtain the benefits of a tax treaty between the United States and the other Contracting State. It is important to note that this definition of treaty shopping does not encompass every case in which a third-state resident establishes an entity in a U.S. treaty partner, and that entity enjoys treaty benefits to which the third-state resident would not itself be entitled. If the third- country resident had substantial reasons for establishing the structure that were unrelated to obtaining treaty benefits, the structure would not fall within the definition of treaty shopping set forth above.

Of course, the fundamental problem presented by this approach is that it is based on the taxpayer's intent, which a tax administrator is normally ill-equipped to identify. In order to avoid the necessity of making this subjective determination, Article 22 sets forth a series of objective tests. The assumption underlying each of these tests is that a taxpayer that satisfies the requirements of any of the tests probably has a real business purpose for the structure it has adopted, or has a sufficiently strong nexus to the other Contracting State (e.g., a resident individual) to warrant benefits even in the absence of a business connection, and that this business purpose or connection is sufficient to justify the conclusion that obtaining the benefits of the Convention is not a principal purpose of establishing or maintaining residence.

For instance, the assumption underlying the "active trade or business" test under paragraph 3 is that a third-country resident that establishes a "substantial" operation in the other State and that derives income from a related activity in the United States would not do so primarily to avail itself of the benefits of the Convention; it is presumed in such a case that the investor had a valid business purpose for investing in the other State, and that the link between that trade or business and the U.S. activity that generates the treaty-benefited income manifests a business purpose for placing the U.S. investments in the entity in the other State. It is considered unlikely that the investor would incur the expense of establishing a substantial trade or business in the other State simply to obtain the benefits of the Convention. A similar rationale underlies other tests in Article 22.

While these tests provide useful surrogates for identifying actual intent, these mechanical tests cannot account for every case in which the taxpayer was not treaty shopping. Accordingly, Article 22 also includes a provision (paragraph 7) authorizing the competent authority of a Contracting State to grant benefits. While an analysis under paragraph 7 may well differ from that under one of the other tests of Article 22, its objective is the same: to identify investors whose residence in the other State can be justified by factors other than a purpose to derive treaty benefits.

Article 22 and the anti-abuse provisions of domestic law complement each other, as Article 22 effectively determines whether an entity has a sufficient nexus to the Contracting State to be treated as a resident for treaty purposes, while domestic anti-abuse provisions (e.g., business purpose, substance-over-form, step transaction or conduit principles) determine whether a particular transaction should be recast in accordance with its substance. Thus, internal law

principles of the source State may be applied to identify the beneficial owner of an item of income, and Article 22 then will be applied to the beneficial owner to determine if that person is entitled to the benefits of the Convention with respect to such income.

*Structure of the Article*

The structure of the Article is as follows: Paragraph 1 states the general rule that residents are entitled to benefits otherwise accorded to residents only to the extent provided in the Article. Paragraph 2 lists a series of attributes of a resident of a Contracting State, the presence of any one of which will entitle that person to all the benefits of the Convention. Paragraph 3 provides that, with respect to a person not entitled to benefits under paragraph 2, benefits nonetheless may be granted to that person with regard to certain types of income. Paragraph 4 describes the general "derivative benefits" test. Paragraph 5 provides for limited "derivative benefits" for shipping and air transport income. Paragraph 6 provides definitions. Paragraph 7 discusses the competent authorities' discretionary powers.

*Paragraph 1*

Paragraph 1 provides that a resident of a Contracting State will be entitled to the benefits otherwise accorded to residents of a Contracting State under the Convention only to the extent provided in the Article. The benefits otherwise accorded to residents under the Convention include all limitations on source-based taxation under Articles 6 through 21, the treaty-based relief from double taxation provided by Article 23 (Relief from Double Taxation), and the protection afforded to residents of a Contracting State under Article 24 (Non-Discrimination). Some provisions do not require that a person be a resident in order to enjoy the benefits of those provisions. These include paragraph 1 of Article 24 (Non-Discrimination), Article 25 (Mutual Agreement Procedure), and Article 28 (Diplomatic Agents and Consular Officers). Article 22 accordingly does not limit the availability of the benefits of these provisions.

*Paragraph 2*

Paragraph 2 has seven subparagraphs, each of which describes a category of residents that are entitled to all benefits of the Convention. It is intended that the provisions of paragraph 2 will be self executing. Unlike the provisions of paragraph 7, discussed below, claiming benefits under paragraph 2 does not require advance competent authority ruling or approval. The tax authorities may, of course, on review, determine that the taxpayer has improperly interpreted the paragraph and is not entitled to the benefits claimed.

*Individuals -- Subparagraph 2(a)*

Subparagraph 2(a) provides that individual residents of a Contracting State will be entitled to all treaty benefits. If such an individual receives income as a nominee on behalf of a third-country resident, benefits may be denied under the respective articles of the Convention by the requirement that the beneficial owner of the income be a resident of a Contracting State.

*Governmental Entities -- Subparagraph 2(b)*

Subparagraph 2(b) provides that a Contracting State, a political subdivision or local authorities thereof, or any agency or instrumentality of such State, subdivision or authority, will be entitled to all benefits of the Convention.

*Publicly-Traded Corporations -- Subparagraph 2(c)(i) and 2(c)(ii)*

Subparagraph 2(c) applies to two categories of corporations: publicly-traded corporations and subsidiaries of publicly-traded corporations. Clause (i) of subparagraph 2(c) provides that a company will be entitled to all the benefits of the Convention if all the shares in the class or classes of shares that represent more than 50 percent of the voting power and value of the company are listed on a recognized stock exchange and substantially and regularly traded on one or more "recognized stock exchanges". Paragraph 6(c) provides that the term "recognized stock exchange" means

> (i) the NASDAQ System owned by the National Association of Securities Dealers, and any stock exchange registered with the Securities and Exchange Commission as a national securities exchange for purposes of the Securities Exchange Act of 1934;
> (ii), the Copenhagen Stock Exchange and the stock exchanges of Amsterdam, Brussels, Frankfurt, Hamburg, London, Paris, Stockholm, Sydney, Tokyo and Toronto; and
> (iii) any other stock exchanges agreed upon by the competent authorities of both Contracting States.

If a company has only one class of shares, it is only necessary to consider whether the shares of that class are regularly traded on a recognized stock exchange. If the company has more than one class of shares, it is necessary as an initial matter to determine whether one of the classes accounts for more than half of the voting power and value of the company. If so, then only those shares are considered for purposes of the regular trading requirement. If no single class of shares accounts for more than half of the company's voting power and value, it is necessary to identify a group of two or more classes of the company's shares that account for more than half of the company's voting power and value, and then to determine whether each class of shares in this group satisfies the regular trading requirement. Although in a particular case involving a company with several classes of shares it is conceivable that more than one group of classes could be identified that account for more than 50% of the shares, it is only necessary for one such group to satisfy the requirements of this subparagraph in order for the company to be entitled to benefits. Benefits would not be denied to the company even if a second, non-qualifying, group of shares with more than half of the company's voting power and value could be identified.

The term "substantially and regularly traded" is defined in the Convention under paragraph 6 (f)(i) and (ii). Under paragraph  (f)(i) of the convention a class is considered to be "substantially and regularly traded" if two requirements are met: trades in the class of shares are effected on one or more recognized stock exchanges in other than de minimis quantities during every quarter, and the aggregate number of shares of that class traded on stock exchange or exchanges during the previous fiscal year is at least 6 percent of the average number of shares or units outstanding in that class (including shares held by taxable nonstock corporations) during that

taxable year.

The "substantially and regularly traded" requirement can be met by trading on any recognized exchange or exchanges located in either State. Trading on one or more recognized stock exchanges may be aggregated for purposes of this requirement. Thus, a U.S. company could satisfy the regularly traded requirement through trading, in whole or in part, on a recognized stock exchange located in Denmark.

Clause (ii) of subparagraph 2 (c) provides a test under which certain companies that are directly or indirectly controlled by taxable nonstock corporations ("TNCs") entitled to benefits under paragraph (g) but that otherwise would meet the publicly-traded test may be entitled to the benefits of the Convention. This test is necessary because it is common for a TNC to hold 100% of the "Class A" shares of another company (either a holding company or an operating company). The Class A shares have a disproportionate amount of the voting power but have little or no rights to dividends. The subsidiary operating company or holding company also issues "Class B" shares, which have preferential treatment as to dividends. Class A shares held by TNCs are listed but not traded on the Copenhagen stock exchange. Any class A shares that are not held by TNCs and all Class B shares are both listed and traded on the Copenhagen stock exchange. This rule is included to ensure that a corporation whose voting shares are substantially owned by a Danish TNC is not precluded from qualifying as a publicly-traded company, so long as there is sufficient trading in the rest of its shares.

A company will qualify under this test if one or more such TNCs own shares representing more than 50 percent of the voting power of the company and all other shares are listed on a recognized stock exchange and are substantially and regularly traded on one or more recognized stock exchanges. For purposes of determining whether a company satisfies the requirements of clause (c)(ii) of paragraph 2, the term "substantially and regularly traded" in paragraph 6 (f)(i) is applied as if all the shares issued by the company were one class of shares, and shares held by taxable nonstock corporations will be considered outstanding for purposes of determining whether 6 percent of the outstanding shares have been traded during a taxable year. Without this rule, it might be possible for a small class of shares to qualify a company as substantially and regularly traded.

*Subsidiaries of Publicly-Traded Corporations -- Subparagraph 2(c)(iii)*

Clause (iii) of subparagraph 2(c) provides a test under which certain companies that are directly or indirectly controlled by companies satisfying the publicly-traded test of subparagraph 2(c)(i) or (ii) may be entitled to the benefits of the Convention. Under this test, a company will be entitled to the benefits of the Convention if at least 50 percent of each class of shares in the company is directly or indirectly owned by five or fewer companies entitled to benefits under subparagraph 2(c)(i) or (ii), or any combination thereof.

The test under clause (iii) differs from that under subparagraph 2(c)(i) in that at least 50 percent of each class of the company's shares, not merely the class or classes accounting for more than 50 percent of the company's votes and value, must be held by publicly-traded companies described in subparagraph 2(c)(i). Thus, the test under subparagraph 2(c)(iii) considers the

ownership of every class of shares outstanding, while the test under subparagraph 2(c)(i) only considers those classes that account for a majority of the company's voting power and value.

Clause (iii) permits indirect ownership. Consequently, the ownership by five or fewer publicly-traded companies described in clause (i) or (ii), or any combination thereof, need not be direct. However, any intermediate owners in the chain of ownership must themselves be entitled to benefits under paragraph 2.

*Tax Exempt Organizations -- Subparagraph 2(d)*

Subparagraph 2(d) provides that the tax exempt organizations described 8in subparagraph 1(b)(i) of Article 4 (Residence) will be entitled to all the benefits of the Convention. These entities are entities that generally are exempt from tax in their State of residence and that are organized and operated exclusively to fulfill religious, educational, scientific and other charitable purposes. Like the U.S. Model, this provision does not limit the uses to which the charity may put its funds. Thus, a Danish charity would qualify even if all of its funds were used to provide humanitarian relief to refugees in a third country.

*Pension Funds -- Subparagraph 2(e)*

Subparagraph 2(e) provides that a legal person, whether or not exempt from tax, organized under the laws of a Contracting State to provide a pension or other similar benefits to employees, including self-employed individuals, pursuant to a plan, will be entitled to all the benefits of the Convention, provided that more than 50 percent of the person's beneficiaries, members or participants are individuals resident in either Contracting State. In the United States, these are the tax-exempt organizations described in subparagraph 1(b)(ii) of Article 4 (Residence). However, Denmark now taxes some pension funds, so the U.S. Model language was modified. For purposes of this provision, the term "beneficiaries" should be understood to refer to the persons receiving benefits from the organization.

*Ownership/Base Erosion -- Subparagraph 2(f)*

Subparagraph 2(f) provides a two-part test, the so-called ownership and base erosion test. This test applies to any form of legal entity that is a resident of a Contracting State. Both parts of the test must be satisfied for the resident to be entitled to benefits under subparagraph 2(f).

The ownership part of the test, under clause (i), requires that 50 percent or more of the beneficial interest in the person (in the case of a corporation, 50 percent or more of the vote and value of the company's shares) be owned on at least half the days of the person's taxable year by persons who are themselves entitled to benefits under other tests of paragraph 2 (i.e., subparagraphs (a), (b), (c), (d), or (e)). The ownership may be indirect through other persons themselves entitled to benefits under paragraph 2.

Trusts may be entitled to benefits under this provision if they are treated as residents under Article 4 (Residence) and they otherwise satisfy the requirements of this subparagraph. For purposes of this subparagraph, the beneficial interests in a trust will be considered to be owned by

its beneficiaries in proportion to each beneficiary's actuarial interest in the trust. The interest of a remainder beneficiary will be equal to 100 percent less the aggregate percentages held by income beneficiaries. A beneficiary's interest in a trust will not be considered to be owned by a person entitled to benefits under the other provisions of paragraph 2 if it is not possible to determine the beneficiary's actuarial interest. Consequently, if it is not possible to determine the actuarial interest of any beneficiaries in a trust, the ownership test under clause i) cannot be satisfied, unless all beneficiaries are persons entitled to benefits under the other subparagraphs of paragraph 2.

The base erosion part of the test under subparagraph 2(f) requires that less than 50 percent of the person's gross income for the taxable year be paid or accrued, in the form of payments that are deductible for tax purposes in the entity's State of residence directly or indirectly, to non-residents of either State (unless the payment is attributable to a permanent establishment situated in either Contracting State).

Paragraph 6 (a) provides that "gross income" for purposes of subparagraph 2 (f) will be gross income for the first taxable period preceding the current taxable period, provided that the amount of gross income for the first taxable period preceding the current taxable period shall be deemed to be no less than the average of the annual amounts of gross income for the four taxable periods preceding the current taxable period.

Paragraph 6 (b)(i) provides that the term "deductible payments" for purposes of subparagraph 2(f) includes payments for interest or royalties, but does not include payments at arm's length for the purchase or use of or the right to use tangible property in the ordinary course of business or remuneration at arm's length for services performed in the Contracting State in which the person making such payments is a resident.

To the extent they are deductible from the taxable base, trust distributions would be considered deductible payments. Depreciation and amortization deductions, which are not "payments," are disregarded for this purpose. The purpose of this provision is to determine whether the income derived from the source State is in fact subject to the tax regime of either State. Consequently, payments to any resident of either State, as well as payments that are attributable to permanent establishments in either State, are not considered base-eroding payments for this purpose (to the extent that these recipients do not themselves base erode to non-residents).

*Danish Taxable Nonstock Corporations -- Subparagraph 2(g)*

Paragraph 2(g) provides a special rule for a Danish TNC, which is a vehicle to preserve control of operating companies by the TNC through its control of voting shares, with public shareholders receiving most rights to dividends of the operating company. A TNC may qualify for all the benefits of the Convention if it meets specific requirements under a two-part test.

Under paragraph 6(e), the term "taxable nonstock corporation" ("TNC") as used in paragraph 2 means a foundation that is taxable in accordance with paragraph 1 of Article 1 of the Danish Act on Taxable Nonstock Corporations (*fonde der beskattes efter fondsbeskatningsloven*)." A TNC is a legal person that is controlled by a professional board of

directors, the majority of which must be unrelated to the persons that founded the TNC. As a foundation, a TNC must have a charter governing the corporation's operations and identifying any TNC beneficiaries and their entitlement to distributions from the TNC. One TNC cannot own another. A TNC's capital is irrevocably separated from the control of any person ("founder") contributing assets to the TNC at the time the TNC is established. A TNC's assets can never be inherited nor can such assets be paid out in liquidation except to creditors. TNCs are subject to income tax at the same rate (32%) and in exactly the same way as Danish corporations, except that a TNC can deduct charitable contributions, whereas a regular Danish corporation cannot deduct them, and a TNC, like any other foundation, can deduct distributions to members of the founder's family provided that these family members are resident in Denmark and are taxable in Denmark at the full rate, which is from 45% to 59%. Distributions to other persons, e.g., Danish nonresidents, are not deductible.

The two-part test in subparagraph (g) is a modification of the ownership-base erosion test that is necessary because TNCs do not have owners and thus cannot be subject to any ownership test. This test was included for TNCs in order to treat them as similarly as possible to other Danish corporations.

The first part of the test under subparagraph (g)(i) is satisfied if no more than 50% of the amount of its gross income (excluding the TNC's tax-exempt income) is paid or accrued in the form of deductible payments in the taxable year and in each of the preceding three taxable years, directly or indirectly, to persons who are not entitled to benefits under subparagraphs (a), b), ((i), (c)(iii) by virtue of (c)(i), (d) or (e). This means that no more than 50% of the amount of the TNC's gross income (excluding its tax-exempt income) can be paid to persons other than residents of either Contracting State that qualify for treaty benefits as an individual (subparagraph (a)), a Contracting State, etc. (subparagraph b)), a company that is publicly traded (subparagraph (c) (i)), a corporation that is owned directly or indirectly by publicly traded companies (subparagraph (c)(iii) by virtue of subparagraph (c)(i)), a charitable organization, etc. (subparagraph (d)) or a pension plan (subparagraph (e).

The second part of the test under subparagraph (g)(ii) is satisfied if no more than 50% of the amount of the total income of the TNC (including its tax-exempt income) is paid or accrued, in the form of deductible payments and non-deductible distributions, in the taxable year and in each of the preceding three taxable years, directly, or indirectly to persons who are not entitled to benefits under subparagraphs (a), b), (c)(i), (c)(iii) by virtue of (c)(i), (d), or (e).

The term "gross income" is not defined in the Convention. Thus, in accordance with paragraph 2 of Article 3 (General Definitions), in determining whether a person deriving income from United States sources is entitled to the benefits of the Convention, the United States will ascribe the meaning to the term that it has in the United States. In such cases, "gross income" means gross receipts, or where an enterprise is engaged in a business which includes the manufacture or production of goods, gross receipts reduced by the direct costs of labor and materials attributable to such manufacture or production and paid or payable out of such receipts.

For purposes of paragraph 2 (g), the term "deductible payments" is defined, under paragraph 6 (b)(i), to include payments for interest or royalties, but not payments at arm's length

for the purchase or use of or the right to use tangible property in the ordinary course of business or remuneration at arm's length for services performed in the Contracting State in which the person making the payments is a resident and, under paragraph 6 b)(ii), to include deductible distributions made by a taxable non-stock corporation.

*Paragraph 3*

Paragraph 3 sets forth a test under which a resident of a Contracting State that is not generally entitled to benefits of the Convention under paragraph 2 may receive treaty benefits with respect to certain items of income that are connected to an active trade or business conducted in its State of residence. Paragraph 3 provides an alternative test for any entity that satisfies its terms.

Subparagraph 3(a) sets forth a three-pronged test that must be satisfied in order for a resident of a Contracting State to be entitled to the benefits of the Convention with respect to a particular item of income. First, the resident must be engaged in the active conduct of a trade or business in its State of residence. Second, the income derived from the other State must be derived in connection with, or be incidental to, that trade or business. Third, if there is common ownership of the activities in both States, the trade or business must be substantial in relation to the activity in the other State that generated the item of income. These determinations are made separately for each item of income derived from the other State. It therefore is possible that a person would be entitled to the benefits of the Convention with respect to one item of income but not with respect to another. If a resident of a Contracting State is entitled to treaty benefits with respect to a particular item of income under paragraph 3, the resident is entitled to all benefits of the Convention insofar as they affect the taxation of that item of income in the other State. Set forth below is a discussion of each of the three prongs of the test under paragraph 3.

*Trade or Business -- Subparagraphs 3(a)(i) and (b)*

The term "trade or business" is not defined in the Convention. Pursuant to paragraph 2 of Article 3 (General Definitions), when determining whether a resident of the other State is entitled to the benefits of the Convention under paragraph 3 with respect to income derived from U.S. sources, the United States will ascribe to this term the meaning that it has under the law of the United States. Accordingly, the United States competent authority will refer to the regulations issued under section 367(a) for the definition of the term "trade or business." In general, therefore, a trade or business will be considered to be a specific unified group of activities that constitute or could constitute an independent economic enterprise carried on for profit. Furthermore, a corporation generally will be considered to carry on a trade or business only if the officers and employees of the corporation conduct substantial managerial and operational activities. See Code section 367(a)(3) and the regulations thereunder.

Notwithstanding this general definition of trade or business, subparagraph 3(b) provides that the business of making or managing investments will be considered to be a trade or business only when part of banking, insurance or securities activities conducted by a bank, insurance company, or registered securities dealer. Conversely, such activities conducted by a person other than a bank, insurance company or registered securities dealer will not be considered to be the

conduct of an active trade or business, nor would they be considered to be the conduct of an active trade or business if conducted by a banking or insurance company or registered securities dealer but not as part of the company's banking, insurance or dealer business.

Because a headquarters operation is in the business of managing investments, a company that functions solely as a headquarters company will not be considered to be engaged in an active trade or business for purposes of paragraph 3.

*Derived in Connection With Requirement -- Subparagraphs 3(a)(ii) and (d)*

Subparagraph 3(d) provides that income is derived in connection with a trade or business if the income-producing activity in the other State is a line of business that forms a part of or is complementary to the trade or business conducted in the State of residence by the income recipient. Although no definition of the terms "forms a part of" or "complementary" is set forth in the Convention, it is intended that a business activity generally will be considered to "form a part of" a business activity conducted in the other State if the two activities involve the design, manufacture or sale of the same products or type of products, or the provision of similar services. In order for two activities to be considered to be "complementary," the activities need not relate to the same types of products or services, but they should be part of the same overall industry and be related in the sense that the success or failure of one activity will tend to result in success or failure for the other. In cases in which more than one trade or business is conducted in the other State and only one of the trades or businesses forms a part of or is complementary to a trade or business conducted in the State of residence, it is necessary to identify the trade or business to which an item of income is attributable. Royalties generally will be considered to be derived in connection with the trade or business to which the underlying intangible property is attributable. Dividends will be deemed to be derived first out of earnings and profits of the treaty-benefited trade or business, and then out of other earnings and profits. Interest income may be allocated under any reasonable method consistently applied. A method that conforms to U.S. principles for expense allocation will be considered a reasonable method.

Finally, a resident in one of the States also will be entitled to the benefits of the Convention with respect to income derived from the other State if the income is "incidental" to the trade or business conducted in the recipient's State of residence. Subparagraph 3(d) provides that income derived from a State will be incidental to a trade or business conducted in the other State if the production of such income facilitates the conduct of the trade or business in the other State. An example of incidental income is the temporary investment of working capital derived from a trade or business.

*Substantiality -- Subparagraphs 3(a)(iii) and (c)*

As indicated above, subparagraph 3(a)(iii) provides that income that a resident of a State derives from the other State will be entitled to the benefits of the Convention under paragraph 3 only if the income is derived in connection with a trade or business conducted in the recipient's State of residence and that trade or business is "substantial" in relation to the income-producing activity in the other State. Subparagraph 3(c) provides that whether the trade or business of the income recipient is substantial will be determined based on all the facts and circumstances. These

circumstances generally would include the relative scale of the activities conducted in the two States and the relative contributions made to the conduct of the trade or businesses in the two States.

In addition to this subjective rule, subparagraph 3(c) provides a safe harbor under which the trade or business of the income recipient may be deemed to be substantial based on three ratios that compare the size of the recipient's activities to those conducted in the other State. The three ratios compare: the value of the assets in the recipient's State to the assets used in the other State; the gross income derived in the recipient's State to the gross income derived in the other State; and the payroll expense in the recipient's State to the payroll expense in the other State. The average of the three ratios with respect to the preceding taxable year must exceed 10 percent, and each individual ratio must exceed 7.5 percent. If any individual ratio does not exceed 7.5 percent for the preceding taxable year, the average for the three preceding taxable years may be used instead. Thus, if the taxable year is 1998, the preceding year is 1997. If one of the ratios for 1997 is not greater than 7.5 percent, the average ratio for 1995, 1996, and 1997 with respect to that item may be used.

The term "value" also is not defined in the Convention. Therefore, this term also will be defined under U.S. law for purposes of determining whether a person deriving income from United States sources is entitled to the benefits of the Convention. In such cases, "value" generally will be defined using the method used by the taxpayer in keeping its books for purposes of financial reporting in its country of residence. See Treas. Reg. §1.884-5(e)(3)(ii)(A).

Only items actually located or incurred in the two Contracting States are included in the computation of the ratios. If the person from whom the income in the other State is derived is not wholly-owned by the recipient (and parties related thereto) then the items included in the computation with respect to such person must be reduced by a percentage equal to the percentage control held by persons not related to the recipient. For instance, if a United States corporation derives income from a corporation in the other State in which it holds 80 percent of the shares, and unrelated parties hold the remaining shares, for purposes of subparagraph 3(c) only 80 percent of the assets, payroll and gross income of the company in the other State would be taken into account.

Consequently, if neither the recipient nor a person related to the recipient has an ownership interest in the person from whom the income is derived, the substantiality test always will be satisfied (the denominator in the computation of each ratio will be zero and the numerator will be a positive number). Of course, the other two prongs of the test under paragraph 3 would have to be satisfied in order for the recipient of the item of income to receive treaty benefits with respect to that income. For example, assume that a resident of a Contracting State is in the business of banking in Denmark. The bank loans money to unrelated residents of the United States. The bank would satisfy the substantiality requirement of this subparagraph with respect to interest paid on the loans because it has no ownership interest in the payers.

The substantiality requirement is intended to prevent a narrow case of treaty-shopping abuses in which a company attempts to qualify for benefits by engaging in de minimis connected business activities in the treaty country in which it is resident, i.e., activities that have little

economic cost or effect with respect to the company's business as a whole.

The application of the substantiality test only to income from related parties focuses only on potential abuse cases, and does not hamper certain other kinds of non-abusive activities, even though the income recipient resident in a Contracting State may be very small in relation to the entity generating income in the other Contracting State. For example, if a small U.S. research firm develops a process that it license to a very large, unrelated, Danish pharmaceutical manufacturer, the size of the U.S. research firm would not have to be tested against the size of the Danish manufacturer. Similarly, a small U.S. bank that makes a loan to a very large unrelated Danish business would not have to pass a substantiality test to receive treaty benefits under subparagraph (c).

*Paragraph 4*

Paragraph 4 sets forth a limited derivative benefits test that applies to all treaty benefits. In general, a derivative benefits test entitles the resident of a state to treaty benefits if the beneficial owner of the resident would have been entitled to the same benefit had the income in question flowed directly to that owner. Paragraph 4 provides a derivative benefits test under which a company that is a resident of a Contracting State may be entitled to some or all of the benefits of the Convention. In order to be entitled to all the benefits of the Convention under this paragraph, the company must meet an ownership test, a base reduction test, and a derivative benefits test. These tests are described below.

Subparagraph 4(a)(i) sets forth the ownership test. Under this test, at least 95 percent of the aggregate vote and value of the company's shares must be owned by any combination of seven or fewer persons that are entitled to all of the benefits of the Convention under paragraph 2 or are residents of member states of the European Union or of the European Economic Area or of parties to NAFTA and that meet the requirements of subparagraph (c). Ownership may be direct or indirect.

Subparagraph 4(a)(ii) sets forth the base reduction test. This test is the same as the base reduction test in subparagraph 2(c)(iii), except that for purposes of this test amounts paid or accrued to persons that are residents of a member state of the European Union or the European Economic Area or of a party to NAFTA are excluded from deductible payments. Subparagraph 6 b)(i), which defines the term "deductible payments" for certain purposes, applies for purposes of paragraph 4. Therefore, under the base reduction test of paragraph 4, the term "deductible payments" includes payments for interest or royalties, but does not include payments at arm's length for the purchase or use of or the right to use tangible property in the ordinary course of business or remuneration at arm's length for services performed in the Contracting State in which the person making such payments is a resident.

However, under subparagraph 4(b), this ownership test will not be met, and benefits will not be granted, if the majority of a "disproportionate" class of shares is held by persons other than residents of a member state of the European Union or of the European Economic Area or a party to the North American Free Trade Agreement that meet the requirements of subparagraph (c). In general, a class of shares is "disproportionate" for these purposes if they entitle the shareholder to

a disproportionately higher participation in the earnings that the company generates in the other State through particular assets or activities of the company. Such participation may take any form, including dividends or redemption payments. Such a class of shares would include so-called alphabet stock or tracking stock that entitles the holder to earnings produced by a particular division or subsidiary of the company in the source State. This provision applies if the disproportionate class of shares is issued by the company claiming benefits, or by a company that controls the company claiming benefits. In this context, control does not require majority ownership.

Pursuant to subparagraph 4(c)(i), a person will be considered a resident of a member state of the European Union, the European Economic Area, or of a party to NAFTA for purposes of this paragraph only if the person would be entitled to the benefits of a comprehensive income tax convention in force between any Member State of the European Union or of the European Economic Area or a party to the North American Free Trade Agreement and the Contracting State from which the benefits of this Convention are claimed. However, if that treaty does not contain a comprehensive limitation on benefits provision including provisions similar to those of subparagraphs (c) and (f) of paragraph 2 and paragraph 3 of this Article) then that person must be a person who would still have qualified for the benefits of that treaty under provisions analogous to the provisions of paragraph 2 of this Article had that treaty contained a limitation on benefits provision with those provisions.

Notwithstanding subparagraph 4(a), subparagraph 4(c)(ii) sets forth an additional requirement that must be satisfied in order for a company that is a resident of a Contracting State to be entitled to the benefits of the Convention accorded under Articles 10 (Dividends), 11 (Interest) or 12 (Royalties). This provision requires a comparison of the rate of tax imposed on a particular payment under the Convention to the rate of tax that would be imposed under the income tax convention between the source state and any European Union or European Economic Area member state or party to NAFTA whose residents account for some of the ownership interest described in subparagraph 4(a)(i). Benefits will be extended with respect to such a payment under this provision only if at least 95 percent of the company's shares are owned by persons resident in a European Union or European Economic Area member state or a party to NAFTA for which the rate (or rates) of withholding tax provided in the income tax convention between the source state and such state is less than or equal to the rate or rates imposed under the Convention. This rate comparison is by definition satisfied for persons owning shares that are entitled to benefits under paragraph 2 of this Article. If for a particular payment less than 95 percent of the ownership interest is accounted for by persons that satisfy the rate comparison, then paragraph 4 does not apply to that payment (although it may apply to other payments and would apply to items of income, profit or gain other than those referred to in subparagraph 4(b)).

The rates of tax to be compared under this paragraph are the rate of withholding tax that the source State would impose under the Convention and the rate that would be imposed had the European Union, European Economic Area or NAFTA resident directly received its proportionate share of the dividend, interest or royalty payment. For example, assume that a U.S. company pays interest to DanCo, a company resident in Denmark. DanCo has two equal shareholders, a corporation resident in Canada and a corporation resident in Denmark. Each person's proportionate share of the interest payment is 50 percent of the interest. If the Canadian

corporation had received this portion of the interest directly, it would be subject to a withholding tax of 10 percent under the income tax treaty between the United States and Canada. If the Danish corporation had received its portion of the interest directly, it would be subject to a withholding tax of 0 percent under the Convention. These rates are not the same rates that would apply under the Convention. Therefore, the test under subparagraph 4 is not satisfied with respect to these interest payments.

The provisions of paragraph 4 are intended to be self executing. Unlike the provisions of paragraph 7, discussed below, claiming benefits under paragraph 4 does not require advance competent authority ruling or approval. The tax authorities may, of course, on review, determine that the taxpayer has improperly interpreted the paragraph and is not entitled to the benefits claimed.

*Paragraph 5*

Paragraph 5 provides that a resident of one of the States that derives income from the other State described in Article 8 (Shipping and Air Transport) and that is not entitled to the benefits of the Convention under paragraphs 1 through 3, shall nonetheless be entitled to the benefits of the Convention with respect to income described in Article 8 if it meets one of two tests. These tests in substance duplicate the rules set forth under Code section 883 and therefore afford little additional benefit beyond those provided by the Code. These tests are described below.

First, a resident of one of the States will be entitled to the benefits of the Convention with respect to income described in Article 8 if at least 50 percent of the beneficial interest in the person (in the case of a company, at least 50 percent of the aggregate vote and value of the stock of the company) is owned, directly or indirectly, by qualified persons or citizens of the United States or individuals who are residents of a third state that grants by law, common agreement, or convention an exemption under similar terms for profits as mentioned in Article 8 to citizens and corporations of the other State. This provision is analogous to the relief provided under Code section 883(c)(1).

Alternatively, a resident of one of the States will be entitled to the benefits of the Convention with respect to income described in Article 8 if at least 50 percent of the beneficial of the person (in the case of a company, at least 50 percent of the aggregate vote and value of the stock of the company) is owned directly or indirectly by a company or combination of companies the stock of which is substantially and regularly traded on an established securities market in a third state, provided that the third state grants by law, common agreement or convention an exemption under similar terms for profits as mentioned in Article 8 to citizens and corporations of the other State. This provision is analogous to the relief provided under Code section 883(c)(3).

The provisions of paragraph 5 are intended to be self executing. Unlike the provisions of paragraph 7, discussed below, claiming benefits under paragraph 5 does not require advance competent authority ruling or approval. The tax authorities may, of course, on review, determine that the taxpayer has improperly interpreted the paragraph and is not entitled to the benefits claimed.

A resident of a Contracting State that derives income from the other State described in Article 8 (Shipping and Air Transport) but that does not meet all the requirements of paragraph 5 will nevertheless qualify for treaty benefits if it meets the requirements of any other test under Article 22, i.e., the test under paragraph 2(c)(publicly traded test) or the test under paragraph 3 (active trade or business test).

*Paragraph 6*

Paragraph 6 defines certain terms used in this Article, which are discussed above in connection with the relevant paragraphs.

*Paragraph 7*

Paragraph 7 provides that a resident of one of the States that is not otherwise entitled to the benefits of the Convention may be granted benefits under the Convention if the competent authority of the other Contracting State so determines. This discretionary provision is included in recognition of the fact that, with the increasing scope and diversity of international economic relations, there may be cases where significant participation by third country residents in an enterprise of a Contracting State is warranted by sound business practice or long-standing business structures and does not necessarily indicate a motive of attempting to derive unintended Convention benefits.

The competent authority of a State will base a determination under this paragraph on whether the establishment, acquisition, or maintenance of the person seeking benefits under the Convention, or the conduct of such person's operations, has or had as one of its principal purposes the obtaining of benefits under the Convention. Thus, persons that establish operations in one of the States with the principal purpose of obtaining the benefits of the Convention ordinarily will not be granted relief under paragraph 7.

The competent authority may determine to grant all benefits of the Convention, or it may determine to grant only certain benefits. For instance, it may determine to grant benefits only with respect to a particular item of income in a manner similar to paragraph 3. Further, the competent authority may set time limits on the duration of any relief granted.

It is assumed that, for purposes of implementing paragraph 7, a taxpayer will not be required to wait until the tax authorities of one of the States have determined that benefits are denied before he will be permitted to seek a determination under this paragraph. In these circumstances, it is also expected that if the competent authority determines that benefits are to be allowed, they will be allowed retroactively to the time of entry into force of the relevant treaty provision or the establishment of the structure in question, whichever is later.

Finally, there may be cases in which a resident of a Contracting State may apply for discretionary relief to the competent authority of his State of residence. For instance, a resident of a State could apply to the competent authority of his State of residence in a case in which he had been denied a treaty-based credit under Article 23, (Relief from Double Taxation) on the grounds

that he was not entitled to benefits of the article under Article 22.

ARTICLE 23
Relief from Double Taxation

This Article describes the manner in which each Contracting State undertakes to relieve double taxation. Both the United States and Denmark use the foreign tax credit method under its internal law, and by treaty.

*Paragraph 1*

The United States agrees, in paragraph 1, to allow to its citizens and residents a credit against U.S. tax for income taxes paid or accrued to Denmark. Paragraph 1 also provides that Denmark's covered taxes are income taxes for U.S. purposes.

In most cases, the credit under the Convention is allowed in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, so long as the general principle of this Article, i.e., the allowance of a credit, is retained. Thus, although the Convention provides for a foreign tax credit, the terms of the credit are determined by the provisions, at the time a credit is given, of the U.S. statutory credit.

As indicated, the U.S. credit under the Convention is subject to the various limitations of U.S. law (see Code sections 901 - 908). For example, the credit against U.S. tax generally is limited to the amount of U.S. tax due with respect to net foreign source income within the relevant foreign tax credit limitation category (see Code section 904(a) and (d)), and the dollar amount of the credit is determined in accordance with U.S. currency translation rules (see, e.g., Code section 986). Similarly, U.S. law applies to determine carryover periods for excess credits and other inter-year adjustments. When the alternative minimum tax is due, the alternative minimum tax foreign tax credit generally is limited in accordance with U.S. law to 90 percent of alternative minimum tax liability. Furthermore, nothing in the Convention prevents the limitation of the U.S. credit from being applied on a per-country basis (should internal law be changed), an overall basis, or to particular categories of income (see, e.g., Code section 865(h)).

Subparagraph (b) provides for a deemed-paid credit, consistent with section 902 of the Code, to a U.S. corporation in respect of dividends received from a corporation resident in Denmark of which the U.S. corporation owns at least 10 percent of the voting stock. This credit is for the tax paid by the corporation of Denmark on the profits out of which the dividends are considered paid.

The provisions of subparagraph (c) refer to taxes paid to Denmark by residents or nationals of the United States under the Danish Hydrocarbon Tax Act, and may allow for greater foreign tax credits than under U.S. statutory law. The Danish Hydrocarbon Tax Act encompasses a number of different taxes. First, under Section 4 of the Act, taxpayers with oil and gas concessions are required to pay a company tax at the same rate (currently 32 percent) as other companies, which is assessed under ordinary rules, but with additional limitations. For example,

income subject to tax under Section 4, and thus potentially subject to the Hydrocarbon Tax is calculated under a special "separate assessment," under which losses from other activities cannot be used to offset income derived from the extraction of hydrocarbons in Denmark (Danish law, however, does permit the use of losses from hydrocarbon extraction activities to offset income from other activities). In addition, taxpayers with income at or above a certain level (i.e., income exceeding 250% of their investment) are required to pay the Hydrocarbon Tax (currently 70 percent).

The Hydrocarbon Tax Act also encompasses taxes on other income earned in relation to oil and gas activities, including: wages, income of companies without concessions, income of persons engaged in the liberal professions of every kind, including consultants, income of a personally owned business (unincorporated businesses) and on the income of estates of persons subject to the tax. However, a person subject to these provisions of the Hydrocarbon Tax Act is not considered as having derived income that is separately assessed, and therefore is not subject to the provisions of subparagraph (c). Such persons would be subject to the normal rules of this Article.

Under subparagraph (c)(i), the United States agrees to allow to its nationals and residents, as a direct or a deemed-paid credit against their U.S. tax, the appropriate amount of taxes (as defined below) paid or accrued to Denmark by or on behalf of such nationals or residents on income separately assessed under the Hydrocarbon Tax Act. However, theses credits are subject to the following limitations imposed by subparagraphs (c)(i) and (c)(iii) for persons claiming credits under the Convention:

(1) With respect to income taxes paid or accrued to Denmark on oil and gas extraction income from oil or gas wells in Denmark, the appropriate amount allowed as a credit for a taxable year shall not exceed the maximum U.S. statutory corporate tax rate for the taxable year to which such U.S. resident or national is subject, multiplied by the amount of Danish source oil and gas extraction income.

(2) With respect to income taxes paid or accrued to Denmark on Danish source oil-related income (other than oil and gas extraction income from oil or gas wells in Denmark), the appropriate amount allowed as a credit for the taxable year shall not exceed the maximum U.S. statutory corporate tax rate to which the U.S. resident or national is subject, multiplied by the amount of Danish source oil-related income.

(3) With respect to income taxes paid or accrued to Denmark on other separately assessed Danish source income (other than oil and gas extraction income from oil or gas wells in Denmark and other Danish source oil-related income), the appropriate amount allowed as a credit for a taxable year shall not exceed the maximum U.S. statutory corporate rate to which the U.S. resident or national is subject, multiplied by the amount of such other Danish source income.

In addition to these limitations, subparagraph (c) (ii) states that the appropriate amounts described above are subject to the limitations imposed under the law of the United States that apply to creditable taxes under sections 901 and 903 under the Code. Thus, as is generally the case under U.S. income tax conventions, provisions such as Code sections 901(c), 902, 904, 905, 907, 908 and 911 apply for purposes of computing the allowable credit under subparagraphs (c).

The amount of Danish source oil and gas extraction income from oil or gas wells in

Denmark is determined under the principles of section 907(c) of the Code. U.S. principles are also used to determine the amount of Danish source oil-related income and other Danish source income.

Subparagraph (c) (ii) imposes a limit on the carryover of credits for taxes paid or accrued to Denmark on oil and gas extraction income from oil or gas wells in Denmark separately assessed under the Hydrocarbons Tax Act which are in excess of the amount allowed as a credit in subparagraph (c)(i). These excess credits may only be used as a credit in another taxable year (subject to the carryover rules under U.S. domestic law), and only against U.S. taxes on other oil and gas extraction income separately assessed under the Hydrocarbon Tax Act. The carryover credits are allowable in the year in which deemed paid or accrued subject to any relevant limitations provided by the Code, such as those of sections 904(a) and 907(b). The same limitations apply to the carryover of credits for taxes paid or accrued to Denmark on Danish source oil-related income and other Danish source income separately assessed under the Hydrocarbon Tax Act.

If the provisions of the Convention are relied upon to claim a foreign tax credit for Danish income taxes paid by a person earning income separately assessed under the Hydrocarbon Tax Act, and any such payments would not otherwise be creditable under the Code, then the limitations of subparagraph (c) apply, whether or not the tax is paid in the taxable year, and all such Danish income taxes must be treated as provided in the Convention.

If the taxes paid or accrued to Denmark by a person earning income separately assessed under the Hydrocarbon Tax Act are creditable under the Code, and such taxes exceed the proportion of U.S. tax that taxable income attributable to Danish sources (as determined under the Convention) bears to entire income, such taxes are creditable under the Code against U.S. tax with respect to income from other foreign sources on the same basis as other creditable taxes and subject to the limitations of the Code. Moreover, if a person earning income separately assessed under the Hydrocarbon Tax Act chooses in a year not to rely upon the provisions of the Convention relevant to a claim for a foreign tax credit for any amounts paid to Denmark, then the Convention limitations contained in subparagraph (c) would not apply in that year and, pursuant to the current overall foreign tax credit limitation of the Code, Danish taxes creditable under the Code and creditable taxes paid to any other country can offset U.S. tax on income from Danish and other foreign sources.

Finally, paragraph 1 provides that for the purposes of this Article, the Danish taxes referred to in paragraphs 1 (b) and 2 of Article 2 (Taxes Covered) are considered to be income taxes and are allowed as credits against U.S. tax on income, subject to all of the provisions and limitations of this paragraph.

*Paragraph 2*

Paragraph 2 provides special rules for the tax treatment in both States of certain types of income derived from U.S. sources by U.S. citizens who are resident in Denmark. Since U.S. citizens, regardless of residence, are subject to United States tax at ordinary progressive rates on their worldwide income, the U.S. tax on the U.S. source income of a U.S. citizen resident in

Denmark may exceed the U.S. tax that may be imposed under the Convention on an item of U.S. source income derived by a resident of Denmark who is not a U.S. citizen.

Subparagraph (a) provides special credit rules for Denmark with respect to items of income that are either exempt from U.S. tax or subject to reduced rates of U.S. tax under the provisions of the Convention when received by residents of Denmark who are not U.S. citizens. The tax credit of Denmark allowed by paragraph 3(a) under these circumstances, to the extent consistent with the law of Denmark, need not exceed the U.S. tax that may be imposed under the provisions of the Convention, other than tax imposed solely by reason of the U.S. citizenship of the taxpayer under the provisions of the saving clause of paragraph 4 of Article 1 (General Scope). Thus, if a U.S. citizen resident in Denmark receives U.S. source portfolio dividends, the foreign tax credit granted by Denmark would be limited to 15 percent of the dividend -- the U.S. tax that may be imposed under subparagraph 2(b) of Article 10 (Dividends) -- even if the shareholder is subject to U.S. net income tax because of his U.S. citizenship. For interest and royalty income that is exempt under the provisions of Articles 11 (Interest) and 12 (Royalties), Denmark would be permitted to tax the entire amount.

Paragraph 2(b) eliminates the potential for double taxation that can arise because subparagraph 2(a) provides that Denmark need not provide full relief for the U.S. tax imposed on its citizens resident in Denmark. The subparagraph provides that the United States will credit the income tax paid or accrued to Denmark, after the application of subparagraph 2(a). It further provides that in allowing the credit, the United States will not reduce its tax below the amount that is taken into account in Denmark in applying subparagraph 2(a).

Since the income described in paragraph 2 is U.S. source income, special rules are required to resource some of the income to Denmark in order for the United States to be able to credit Denmark's tax. This resourcing is provided for in subparagraph 2(c), which deems the items of income referred to in subparagraph 2(a) to be from foreign sources to the extent necessary to avoid double taxation under paragraph 2(b). The rules of paragraph 2(c) apply only for purposes of determining U.S. foreign tax credits with respect to taxes referred to in paragraphs 1(b) and 2 of Article 2 (Taxes Covered).

The following two examples illustrate the application of paragraph 2 in the case of a U.S. source portfolio dividend received by a U.S. citizen resident in Denmark. In both examples, the U.S. rate of tax on residents of Denmark under paragraph 2(b) of Article 10 (Dividends) of the Convention is 15 percent. In both examples the U.S. income tax rate on the U.S. citizen is 36 percent. In example I, Denmark's income tax rate on its resident (the U.S. citizen) is 25 percent (below the U.S. rate), and in example II, the rate on its resident is 40 percent (above the U.S. rate).

|  | Example I | Example II |
|---|---|---|
| Paragraph 2(a) |  |  |
| U.S. dividend declared | $100.00 | $100.00 |
| Notional U.S. withholding tax |  |  |

|                                          |          |          |
|------------------------------------------|---------:|---------:|
| per Article 10(2)(b)                     | 15.00    | 15.00    |
|                                          |          |          |
| Danish taxable income                    | 100.00   | 100.00   |
| Danish tax before credit                 | 25.00    | 40.00    |
| Danish foreign tax credit                | 15.00    | 15.00    |
| Net post-credit Danish tax               | 10.00    | 25.00    |

Paragraphs 2(b) and (c)

|                                          |          |          |
|------------------------------------------|---------:|---------:|
| U.S. pre-tax income                      | $100.00  | $100.00  |
| U.S. pre-credit citizenship tax          | 36.00    | 36.00    |
| Notional U.S. withholding tax            | 15.00    | 15.00    |
| U.S. tax available for credit            | 21.00    | 21.00    |
| Income re-sourced from U.S. to Denmark   | 27.77    | 58.33    |
| U.S. tax on re-sourced income            | 10.00    | 21.00    |
| U.S. credit for other Denmark tax        | 10.00    | 21.00    |
| Net post-credit U.S. tax                 | 11.00    | 0.00     |
|                                          |          |          |
|                                          |          |          |
| Total U.S. tax                           | 26.00    | 15.00    |
| Total Danish tax                         | 10.00    | 25.00    |

In both examples, in the application of paragraph 2(a), Denmark credits a 15 percent U.S. tax against its residence tax on the U.S. citizen.

In example I, the net Danish tax after foreign tax credit is $10.00; in the second example it is $25.00. In the application of paragraphs 2(b) and 2(c), from the U.S. tax due before credit of $36.00, the United States subtracts the amount of the U.S. source tax of $15.00, against which no U.S. foreign tax credit is to be allowed. This provision assures that the United States will collect the tax that it is due under the Convention as the source country. In both examples, the maximum amount of U.S. tax against which credit for Danish tax may be claimed is $21.00. Initially, all of the income in these examples was U.S. source. In order for a U.S. credit to be allowed for the full amount of the Danish tax, an appropriate amount of the income must be re-sourced. The amount that must be resourced depends on the amount of Danish tax for which the U.S. citizen is claiming a U.S. foreign tax credit. In example I, the Danish tax was $10.00. In order for this amount to be creditable against U.S. tax, $27.77 ($10 divided by .36) must be resourced as foreign source. When the Danish tax is credited against the U.S. tax on the resourced income, there is a net U.S. tax of $11.00 due after credit. In example II, the Danish tax was $25 but, because the amount available for credit is reduced under subparagraph 3(c) by the amount of the U.S. source tax, only $21.00 is eligible for credit. Accordingly, the amount that must be resourced is limited to the amount necessary to ensure a foreign tax credit for $21 of Danish tax, or $58.33 ($21 divided by 0.36). Thus, even though other State tax was $25.00 and the U.S. tax available for credit was $21.00, there is no excess credit available for carryover.

*Paragraph 3*

Specific rules are provided in paragraph 3 under which Denmark, in imposing tax on its residents, provides relief for U.S. taxes paid by those residents. Subparagraph (a) provides that when a resident of Denmark derives income which, in accordance with the provisions of the Convention, may be taxed by the United States, Denmark shall allow as a credit against Danish income taxes an amount equal to those taxes paid to the United States.

Subparagraph (b) limits the credits against Danish taxes to those taxes which are attributable to the income that has been taxed by the United States. This restriction based on the U.S. tax is consistent with the "per-country" foreign tax credit limitations imposed under Denmark's domestic law.

Subparagraph (c) provides that when a resident of Denmark derives income which, in accordance with the provisions of the Convention, may be taxed by the United States, Denmark shall allow the credit against Danish tax described in subparagraph (b). However, subparagraph (c) also permits Denmark to include the income corresponding to the U.S. tax in the resident's tax base for purposes of determining the Danish tax. This rule is a variation of the "exemption with progression rule," adapted to accommodate Denmark's credit system. It is also similar to U.S. domestic law, which permits credits for foreign taxes paid, while at the same time taxing residents on worldwide income. Finally, subparagraph (c) provides that for the purposes of this Article, the U.S. taxes referred to in paragraphs 1(a) and 2 of Article 2 (Taxes Covered) are considered to be income taxes and are allowed as credits against Danish tax on income, subject to all of the provisions and limitations of this paragraph.

*Relation to Other Articles*

By virtue of the exceptions in subparagraph 5(a) of Article 1 this Article is not subject to the saving clause of paragraph 4 of Article 1 (General Scope). Thus, the United States will allow a credit to its citizens and residents in accordance with the Article, even if such credit were to provide a benefit not available under the Code.

ARTICLE 24
Non-Discrimination

This Article assures that nationals of a Contracting State, in the case of paragraph 1, and residents of a Contracting State, in the case of paragraphs 2 through 4, will not be subject, directly or indirectly, to discriminatory taxation in the other Contracting State. For this purpose, non-discrimination means providing national treatment. Not all differences in tax treatment, either as between nationals of the two States, or between residents of the two States, are violations of this national treatment standard. Rather, the national treatment obligation of this Article applies only if the nationals or residents of the two States are comparably situated.

Each of the relevant paragraphs of the Article provides that two persons that are comparably situated must be treated similarly. Although the actual words differ from paragraph to paragraph (e.g., paragraph 1 refers to two nationals "in the same circumstances," paragraph 2 refers to two enterprises "carrying on the same activities" and paragraph 4 refers to two

enterprises that are "similar"), the common underlying premise is that if the difference in treatment is directly related to a tax-relevant difference in the situations of the domestic and foreign persons being compared, that difference is not to be treated as discriminatory (e.g., if one person is taxable in a Contracting State on worldwide income and the other is not, or tax may be collectible from one person at a later stage, but not from the other, distinctions in treatment would be justified under paragraph 1). Other examples of such factors that can lead to non-discriminatory differences in treatment will be noted in the discussions of each paragraph.

The operative paragraphs of the Article also use different language to identify the kinds of differences in taxation treatment that will be considered discriminatory. For example, paragraphs 1 and 4 speak of "any taxation or any requirement connected therewith that is more burdensome," while paragraph 2 specifies that a tax "shall not be less favorably levied." Regardless of these differences in language, only differences in tax treatment that materially disadvantage the foreign person relative to the domestic person are properly the subject of the Article.

*Paragraph 1*

Paragraph 1 provides that a national of one Contracting State may not be subject to taxation or connected requirements in the other Contracting State that are more burdensome than the taxes and connected requirements imposed upon a national of that other State in the same circumstances. The definition of "national" extends beyond citizens to cover juridical persons that are nationals of a Contracting State as well.

A national of a Contracting State is afforded protection under this paragraph even if the national is not a resident of either Contracting State. Thus, a U.S. citizen who is resident in a third country is entitled, under this paragraph, to the same treatment in Denmark as a national of Denmark who is in similar circumstances (i.e., presumably one who is resident in a third State). The term "national" in relation to a Contracting State is defined in subparagraph 1(h) of Article 3 (General Definitions) as any individual possessing the nationality or citizenship of that State and any legal person, partnership, or association deriving its status as such from the laws in force in that State.

Because the relevant circumstances referred to in the paragraph relate, among other things, to taxation on worldwide income, paragraph 1 does not obligate the United States to apply the same taxing regime to a national of Denmark who is not resident in the United States and a U.S. national who is not resident in the United States. United States citizens who are not residents of the United States but who are, nevertheless, subject to United States tax on their worldwide income are not in the same circumstances with respect to United States taxation as citizens of Denmark who are not United States residents. Thus, for example, Article 24 would not entitle a national of Denmark resident in a third country to taxation at graduated rates of U.S. source dividends or other investment income that applies to a U.S. citizen resident in the same third country.

*Paragraph 2*

Paragraph 2 provides that a Contracting State may not tax a permanent establishment or

fixed base of an enterprise of the other Contracting State less favorably than an enterprise of that first-mentioned State that is carrying on the same activities. This provision, however, does not obligate a Contracting State to grant to a resident of the other Contracting State any tax allowances, reliefs, etc., that it grants to its own residents on account of their civil status or family responsibilities. Thus, if a sole proprietor who is a resident of Denmark has a permanent establishment in the United States, in assessing income tax on the profits attributable to the permanent establishment, the United States is not obligated to allow to the resident of Denmark the personal allowances for himself and his family that he would be permitted to take if the permanent establishment were a sole proprietorship owned and operated by a U.S. resident, despite the fact that the individual income tax rates would apply.

The fact that a U.S. permanent establishment of an enterprise of Denmark is subject to U.S. tax only on income that is attributable to the permanent establishment, while a U.S. corporation engaged in the same activities is taxable on its worldwide income is not, in itself, a sufficient difference to deny national treatment to the permanent establishment. There are cases, however, where the two enterprises would not be similarly situated and differences in treatment may be warranted. For instance, it would not be a violation of the non-discrimination protection of paragraph 2 to require the foreign enterprise to provide information in a reasonable manner that may be different from the information requirements imposed on a resident enterprise, because information may not be as readily available to the Internal Revenue Service from a foreign as from a domestic enterprise. Similarly, it would not be a violation of paragraph 2 to impose penalties on persons who fail to comply with such a requirement (see, e.g., sections 874(a) and 882(c)(2)). Further, a determination that income and expenses have been attributed or allocated to a permanent establishment in conformity with the principles of Article 7 (Business Profits) implies that the attribution or allocation was not discriminatory.

Section 1446 of the Code imposes on any partnership with income that is effectively connected with a U.S. trade or business the obligation to withhold tax on amounts allocable to a foreign partner. In the context of the Convention, this obligation applies with respect to a share of the partnership income of a partner resident in Denmark, and attributable to a U.S. permanent establishment. There is no similar obligation with respect to the distributive shares of U.S. resident partners. It is understood, however, that this distinction is not a form of discrimination within the meaning of paragraph 2 of the Article. No distinction is made between U.S. and non-U.S. partnerships, since the law requires that partnerships of both U.S. and non-U.S. domicile withhold tax in respect of the partnership shares of non-U.S. partners. Furthermore, in distinguishing between U.S. and non-U.S. partners, the requirement to withhold on the non-U.S. but not the U.S. partner's share is not discriminatory taxation but, like other withholding on nonresident aliens, is merely a reasonable method for the collection of tax from persons who are not continually present in the United States, and as to whom it otherwise may be difficult for the United States to enforce its tax jurisdiction. If tax has been over-withheld, the partner can, as in other cases of over- withholding, file for a refund. (The relationship between paragraph 2 and the imposition of the branch tax is dealt with below in the discussion of paragraph 5.)

Paragraph 2 obligates the host State to provide national treatment not only to permanent establishments of an enterprise of the other Contracting State, but also to other residents of that State that are taxable in the host State on a net basis because they derive income from independent

personal services performed in the host State that is attributable to a fixed base in Denmark. Thus, an individual resident of Denmark who performs independent personal services in the United States, and who is subject to U.S. income tax on the income from those services that is attributable to a fixed base in the United States, is entitled to no less favorable tax treatment in the United States than a U.S. resident engaged in the same kinds of activities. With such a rule in a treaty, the host State cannot tax its own residents on a net basis, but disallow deductions (other than personal allowances, etc.) with respect to the income attributable to the fixed base. Similarly, in accordance with paragraph 5 of Article 6 (Income from Real Property), the situs State would be required to allow deductions to a resident of the other State with respect to income derived from real property located in the situs State to the same extent that deductions are allowed to residents of the situs State with respect to income derived from real property located in the situs State.

*Paragraph 3*

Paragraph 3 prohibits discrimination in the allowance of deductions. When an enterprise of a Contracting State pays interest, royalties or other disbursements to a resident of the other Contracting State, the first-mentioned Contracting State must allow a deduction for those payments in computing the taxable profits of the enterprise as if the payment had been made under the same conditions to a resident of the first-mentioned Contracting State. An exception to this rule is provided for cases where the provisions of paragraph 1 of Article 9 (Associated Enterprises), paragraph 4 of Article 11 (Interest) or paragraph 4 of Article 12 (Royalties) apply, because in those situations, the related parties have entered into transactions on a non-arm's length basis. This exception would include the denial or deferral of certain interest deductions under Code section 163(j).

The term "other disbursements" is understood to include a reasonable allocation of executive and general administrative expenses, research and development expenses and other expenses incurred for the benefit of a group of related persons that includes the person incurring the expense.

Paragraph 3 also provides that any debts of an enterprise of a Contracting State to a resident of the other Contracting State are deductible in the first-mentioned Contracting State for computing the capital tax of the enterprise under the same conditions as if the debt had been contracted to a resident of the first-mentioned Contracting State. Even though, for general purposes, the Convention covers only income taxes, under paragraph 6 of this Article, the non discrimination provisions apply to all taxes levied in both Contracting States, at all levels of government. Thus, this provision may be relevant for both States. Although Denmark may have eliminated its capital taxes, in the United States such taxes are imposed by some local governments.

*Paragraph 4*

Paragraph 4 requires that a Contracting State not impose more burdensome taxation or connected requirements on an enterprise of the other Contracting State that is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State, than the taxation or connected requirements that it imposes on other similar enterprises of

that first-mentioned Contracting State. For this purpose it is understood that "similar" refers to similar activities or ownership of the enterprise.

This rule, like all non-discrimination provisions, does not prohibit differing treatment of entities that are in differing circumstances. Rather, a protected enterprise is only required to be treated in the same manner as other enterprises that, from the point of view of the application of the tax law, are in substantially similar circumstances both in law and in fact. The taxation of a distributing corporation under section 367(e) on an applicable distribution to foreign shareholders does not violate paragraph 4 of the Article because a foreign-owned corporation is not similar to a domestically-owned corporation that is accorded non-recognition treatment under sections 337 and 355.

For the reasons given above in connection with the discussion of paragraph 2 of the Article, it is also understood that the provision in section 1446 of the Code for withholding of tax on non-U.S. partners does not violate paragraph 4 of the Article.

It is further understood that the ineligibility of a U.S. corporation with nonresident alien shareholders to make an election to be an "S" corporation does not violate paragraph 4 of the Article. If a corporation elects to be an S corporation (requiring 75 or fewer shareholders), it is generally not subject to income tax and the shareholders take into account their pro rata shares of the corporation's items of income, loss, deduction or credit. (The purpose of the provision is to allow an individual or small group of individuals to conduct business in corporate form while paying taxes at individual rates as if the business were conducted directly.) A nonresident alien does not pay U.S. tax on a net basis, and, thus, does not generally take into account items of loss, deduction or credit. Thus, the S corporation provisions do not exclude corporations with nonresident alien shareholders because such shareholders are foreign, but only because they are not net-basis taxpayers. Similarly, the provisions exclude corporations with other types of shareholders where the purpose of the provisions cannot be fulfilled or their mechanics implemented. For example, corporations with corporate shareholders are excluded because the purpose of the provisions to permit individuals to conduct a business in corporate form at individual tax rates would not be furthered by their inclusion.

*Paragraph 5*

Paragraph 5 confirms that no provision of the Article will prevent either Contracting State from imposing the branch tax described in paragraph 8 of Article 10 (Dividends). Since imposition of the branch tax is specifically sanctioned by paragraph 8 of Article 10 (Dividends), its imposition could not be precluded by Article 24, even without paragraph 5. Under the generally accepted rule of construction that the specific takes precedence over the more general, the specific branch tax provision of Article 10 would take precedence over the more general national treatment provision of Article 24.

*Paragraph 6*

As noted above, notwithstanding the specification  in Article 2 (Taxes Covered) of taxes covered by the Convention for general purposes, for purposes of providing non-discrimination

protection this Article applies to taxes of every kind and description imposed by a Contracting State or a political subdivision or local authority thereof. Customs duties are not considered to be taxes for this purpose.

*Relation to Other Articles*

The saving clause of paragraph 4 of Article 1 (General Scope) does not apply to this Article, by virtue of the exceptions in paragraph 5(a) of Article 1. Thus, for example, a U.S. citizen who is a resident of Denmark may claim benefits in the United States under this Article.

Nationals of a Contracting State may claim the benefits of paragraph 1 regardless of whether they are entitled to benefits under Article 22 (Limitation of Benefits), because that paragraph applies to nationals and not residents. They may not claim the benefits of the other paragraphs of this Article with respect to an item of income unless they are generally entitled to treaty benefits with respect to that income under a provision of Article 22.

ARTICLE 25
Mutual Agreement Procedure

This Article provides the mechanism for taxpayers to bring to the attention of the competent authorities issues and problems that may arise under the Convention. It also provides a mechanism for cooperation between the competent authorities of the Contracting States to resolve disputes and clarify issues that may arise under the Convention and to resolve cases of double taxation not provided for in the Convention. The competent authorities of the two Contracting States are identified in paragraph 1(e) of Article 3 (General Definitions).

*Paragraph 1*

This paragraph provides that where a resident of a Contracting State considers that the actions of one or both Contracting States will result in taxation that is not in accordance with the Convention he may present his case to the competent authority of the Contracting State of which he is a resident or national.

Although the typical cases brought under this paragraph will involve economic double taxation arising from transfer pricing adjustments, the scope of this paragraph is not limited to such cases. For example, if the United States treats income derived by a company resident in Denmark as attributable to a permanent establishment in the United States, and the resident believes that the income is not attributable to a permanent establishment, or that no permanent establishment exists, the resident may bring a complaint under paragraph 1 to the competent authority of Denmark.

It is not necessary for a person bringing a complaint first to have exhausted the remedies provided under the national laws of the Contracting States before presenting a case to the competent authorities, nor does the fact that the statute of limitations may have passed for seeking

a refund preclude bringing a case to the competent authority. No time limit is provided within which a case must be brought, and assessment and collection procedures and suspended during the pendency of the mutual agreement proceeding.

*Paragraph 2*

This paragraph instructs the competent authorities in dealing with cases brought by taxpayers under paragraph 1. It provides that if the competent authority of the Contracting State to which the case is presented judges the case to have merit, and cannot reach a unilateral solution, it shall seek an agreement with the competent authority of the other Contracting State pursuant to which taxation not in accordance with the Convention will be avoided. During the period that a proceeding under this Article is pending, any assessment and collection procedures shall be suspended. Any agreement is to be implemented even if such implementation otherwise would be barred by the statute of limitations or by some other procedural limitation, such as a closing agreement. In a case where the taxpayer has entered a closing agreement (or other written settlement) with the United States prior to bringing a case to the competent authorities, the U.S. competent authority will endeavor only to obtain a correlative adjustment from Denmark. See Rev. Proc. 96-13, 1996-3 I.R.B. 31, section 7.05. Because, as specified in paragraph 2 of Article 1 (General Scope), the Convention cannot operate to increase a taxpayer's liability, time or other procedural limitations can be overridden only for the purpose of making refunds and not to impose additional tax.

*Paragraph 3*

Paragraph 3 authorizes the competent authorities to resolve difficulties or doubts that may arise as to the application or interpretation of the Convention. The paragraph includes a non-exhaustive list of examples of the kinds of matters about which the competent authorities may reach agreement. This list is purely illustrative; it does not grant any authority that is not implicitly present as a result of the introductory sentence of paragraph 3. The competent authorities may, for example, agree to the same attribution of income, deductions, credits or allowances between an enterprise in one Contracting State and its permanent establishment in the other (subparagraph (a)) or between related persons (subparagraph (b)). These allocations are to be made in accordance with the arm's length principle underlying Article 7 (Business Profits) and Article 9 (Associated Enterprises). Agreements reached under these subparagraphs may include agreement on a methodology for determining an appropriate transfer price, common treatment of a taxpayer's cost sharing arrangement, or upon an acceptable range of results under that methodology. Subparagraph (g) makes clear that they may also agree to apply this methodology and range of results prospectively to future transactions and time periods pursuant to advance pricing agreements.

As indicated in subparagraphs (c), (d), (e) and (f), the competent authorities also may agree to settle a variety of conflicting applications of the Convention. They may agree to characterize particular items of income in the same way (subparagraph (c)), to characterize entities in a particular way (subparagraph (d)), to apply the same source rules to particular items of income (subparagraph (e)), and to adopt a common meaning of a term (subparagraph (f)). Subparagraph (h) makes clear that the competent authorities can agree to the common application,

consistent with the objective of avoiding double taxation, of procedural provisions of the internal laws of the Contracting States, including those regarding penalties, fines and interest.

Since the list under paragraph 3 is not exhaustive, the competent authorities may reach agreement on issues not enumerated in paragraph 3 if necessary to avoid double taxation. For example, the competent authorities may seek agreement on a uniform set of standards for the use of exchange rates, or agree on consistent timing of gain recognition with respect to a transaction to the extent necessary to avoid double taxation. Agreements reached by the competent authorities under paragraph 3 need not conform to the internal law provisions of either Contracting State.

Finally, paragraph 3 authorizes the competent authorities to consult for the purpose of eliminating double taxation in cases not provided for in the Convention and to resolve any difficulties or doubts arising as to the interpretation or application of the Convention. This provision is intended to permit the competent authorities to implement the treaty in particular cases in a manner that is consistent with its expressed general purposes. It permits the competent authorities to deal with cases that are within the spirit of the provisions but that are not specifically covered. An example of such a case might be double taxation arising from a transfer pricing adjustment between two permanent establishments of a third-country resident, one in the United States and one in Denmark. Since no resident of a Contracting State is involved in the case, the Convention does not apply, but the competent authorities nevertheless may use the authority of the Convention to prevent the double taxation.

*Paragraph 4*

Paragraph 4 authorizes the competent authorities to increase any dollar amounts referred to in the Convention to reflect economic or monetary developments. Under the Convention, this refers only to Article 17 (Artistes and Sportsmen). The rule under paragraph 4 is intended to operate as follows: if, for example, after the Convention has been in force for some time, inflation rates have been such as to make the $20,000 exemption threshold for entertainers unrealistically low in terms of the original objectives intended in setting the threshold, the competent authorities may agree to a higher threshold without the need for formal amendment to the treaty and ratification by the Contracting States. This authority can be exercised, however, only to the extent necessary to restore those original objectives. This provision can be applied only to the benefit of taxpayers, i.e., only to increase thresholds, not to reduce them.

*Paragraph 5*

Paragraph 5 provides that the competent authorities may communicate with each other for the purpose of reaching an agreement. This makes clear that the competent authorities of the two Contracting States may communicate without going through diplomatic channels. Such communication may be in various forms, including, where appropriate, through face-to-face meetings of the competent authorities or their representatives.

*Other Issues*

*Treaty effective dates and termination in relation to competent authority dispute resolution*

A case may be raised by a taxpayer under a treaty with respect to a year for which a treaty was in force after the treaty has been terminated. In such a case the ability of the competent authorities to act is limited. They may not exchange confidential information, nor may they reach a solution that varies from that specified in its law.

A case also may be brought to a competent authority under the Convention with respect to a year when the prior Convention was in force. The scope of the competent authorities to address such a case is not constrained by the fact that the Convention was not in force when the transactions at issue occurred, and the competent authorities have available to them the full range of remedies afforded under this Article to the extent that they exceed those available under the prior Convention.

*Triangular competent authority solutions*

International tax cases may involve more than two taxing jurisdictions (e.g., transactions among a parent corporation resident in country A and its subsidiaries resident in countries B and C). As long as there is a complete network of treaties among the three countries, it should be possible, under the full combination of bilateral authorities, for the competent authorities of the three States to work together on a three-sided solution. Although country A may not be able to give information received under Article 26 (Exchange of Information) from country B to the authorities of country C, if the competent authorities of the three countries are working together, it should not be a problem for them to arrange for the authorities of country B to give the necessary information directly to the tax authorities of country C, as well as to those of country A. Each bilateral part of the trilateral solution must, of course, not exceed the scope of the authority of the competent authorities under the relevant bilateral treaty.

*Relation to Other Articles*

This Article is not subject to the saving clause of paragraph 4 of Article 1 (General Scope) by virtue of the exceptions in paragraph 5(a) of that Article. Thus, rules, definitions, procedures, etc. that are agreed upon by the competent authorities under this Article may be applied by the United States with respect to its citizens and residents even if they differ from the comparable Code provisions. Similarly, as indicated above, U.S. law may be overridden to provide refunds of tax to a U.S. citizen or resident under this Article. A person may seek relief under Article 25 regardless of whether he is generally entitled to benefits under Article 22 (Limitation on Benefits). As in all other cases, the competent authority is vested with the discretion to decide whether the claim for relief is justified.

ARTICLE 26
Exchange of Information

*Paragraph 1*

This Article provides for the exchange of information between the competent authorities

of the Contracting States. The information to be exchanged is that which is relevant for carrying out the provisions of the Convention or the domestic laws of the United States or of Denmark concerning the taxes covered by the Convention. The language differs from that of the OECD Model which refers to information that is "necessary" for carrying out the provisions of the Convention, etc. This term consistently has been interpreted as being equivalent to "relevant," and as not requiring a requesting State to demonstrate that it would be unable to enforce its tax laws unless it obtained a particular item of information. To remove any potentially wrong impression that the term "necessary" created a higher threshold than relevance, the U.S. Model and the Convention adopt the term "relevant."

The taxes covered by the Convention for purposes of this Article constitute a broader category of taxes than those referred to in Article 2 (Taxes Covered). As provided in paragraph 4, for purposes of exchange of information, covered taxes include all taxes imposed by the Contracting States. Exchange of information with respect to domestic law is authorized insofar as the taxation under those domestic laws is not contrary to the Convention. Thus, for example, information may be exchanged with respect to a covered tax, even if the transaction to which the information relates is a purely domestic transaction in the requesting State and, therefore, the exchange is not made for the purpose of carrying out the Convention.

An example of such a case is provided in the OECD Commentary: A company resident in the United States and a company resident in the other Contracting State transact business between themselves through a third-country resident company. Neither Contracting State has a treaty with the third State. In order to enforce their internal laws with respect to transactions of their residents with the third-country company (since there is no relevant treaty in force), the Contracting State may exchange information regarding the prices that their residents paid in their transactions with the third-country resident.

Paragraph 1 states that information exchange is not restricted by Article 1 (General Scope). Accordingly, information may be requested and provided under this Article with respect to persons who are not residents of either Contracting State. For example, if a third-country resident has a permanent establishment in Denmark which engages in transactions with a U.S. enterprise, the United States could request information with respect to that permanent establishment, even though it is not a resident of either Contracting State. Similarly, if a third-country resident maintains a bank account in Denmark, and the Internal Revenue Service has reason to believe that funds in that account should have been reported for U.S. tax purposes but have not been so reported, information can be requested from Denmark with respect to that person's account.

Paragraph 1 also provides assurances that any information exchanged will be treated as secret, subject to the same disclosure constraints as information obtained under the laws of the requesting State. Information received may be disclosed only to persons, including courts and administrative bodies, involved with the assessment, collection, enforcement or prosecution in respect of the taxes to which the information relates, or to persons involved with the administration of these taxes or with the oversight of such activities. The information must be used by these persons in connection with these designated functions. Persons in the United States involved with the oversight of the administration of taxes include legislative bodies, such as the

tax-writing committees of Congress and the General Accounting Office. Information received by these bodies must be for use in the performance of their role in overseeing the administration of U.S. tax laws. Information received may be disclosed in public court proceedings or in judicial decisions.

The Article authorizes the competent authorities to exchange information on a routine basis, on request in relation to a specific case, or spontaneously. It is contemplated that the Contracting States will utilize this authority to engage in all of these forms of information exchange, as appropriate.

*Paragraph 2*

Paragraph 2 provides that the obligations undertaken in paragraph 1 to exchange information do not require a Contracting State to carry out administrative measures that are at variance with the laws or administrative practice of either State. Nor is a Contracting State required to supply information not obtainable under the laws or administrative practice of either State, or to disclose trade secrets or other information, the disclosure of which would be contrary to public policy. Thus, a requesting State may be denied information from the other State if the information would be obtained pursuant to procedures or measures that are broader than those available in the requesting State.

While paragraph 2 states conditions under which a Contracting State is not obligated to comply with a request from the other Contracting State for information, the requested State is not precluded from providing such information, and may, at its discretion, do so subject to the limitations of its internal law.

*Paragraph 3*

Paragraph 3 sets forth two exceptions from the dispensations described in paragraph 2. First, the first sentence of the paragraph provides that the competent authority has the authority to obtain and provide information held by financial institutions or intermediaries. This includes the disclosure of information regarding the beneficial owner of an interest in a person.

Second, paragraph 3 provides that when information is requested by a Contracting State in accordance with this Article, the other Contracting State is obligated to obtain the requested information as if the tax in question were the tax of the requested State, even if the other Contracting State has no direct tax interest in the case to which the request relates. The OECD Model does not state explicitly in the Article that the requested State is obligated to respond to a request even if it does not have a direct tax interest in the information. The OECD Commentary, however, makes clear that this is to be understood as implicit in the OECD Model.

Paragraph 3 further provides that the requesting State may specify the form in which information is to be provided (e.g., depositions of witnesses and authenticated copies of original documents) so that the information is usable in the judicial proceedings of the requesting State. The requested State should, if possible, provide the information in the form requested to the same extent that it can obtain information in that form under its own laws and administrative practices

with respect to its own taxes.

*Paragraph 4*

As noted above in the discussion of paragraph 1, the exchange of information provisions of the Convention apply to all taxes imposed by a Contracting State, not just to those taxes designated as covered taxes under Article 2 (Taxes Covered). The U.S. competent authority may, therefore, request information for purposes of, for example, estate and gift taxes or federal excise taxes.

*Treaty Effective Dates and Termination in Relation to Information Exchange*

A tax administration may seek information with respect to a year for which a treaty was in force after the treaty has been terminated. In such a case the ability of the other tax administration to act is limited. The treaty no longer provides authority for the tax administrations to exchange confidential information. They may only exchange information pursuant to domestic law.

The competent authority also may seek information under the Convention, but with respect to a year in which the prior Convention was in force. The scope of the competent authorities to address such a case is not constrained by the fact that the prior Convention was in force when the transactions at issue occurred, and the competent authorities have available to them the full range of information exchange provisions afforded under this Article to the extent they exceed those under the prior Convention.

ARTICLE 27
Administrative Assistance

*Paragraph 1*

This Article obligates the Contracting States to undertake to lend assistance to each other in the collection of taxes referred to in Article 2 (Taxes Covered), together with interest, costs, additions to such taxes, and civil penalties, which are referred to in the Article as a "revenue claim." This provision is similar in scope to Article XVIII (Administrative Assistance) of the income tax treaty between the United States and Denmark signed on May 6, 1948. The differences between that treaty and the text of this Convention reflect changes incorporated into the administrative assistance provisions of newer U.S. tax treaties, such as with the Netherlands and with Canada.

*Paragraph 2*

Paragraph 2 requires a Contracting State applying for collection assistance (the "applicant State") to certify that the revenue claim for which collection assistance is sought has been "finally determined." Under paragraph 2 a revenue claim has been finally determined when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been

exhausted.

*Paragraph 3*

Paragraph 3 of the Article clarifies that the Contracting State from which assistance was requested (the "requested State") has discretion as to whether to accept a particular application for collection assistance. However, if the application for assistance is accepted, paragraph 3 requires that the requested State grant assistance under its existing procedures as though the claim were the requested State's own revenue claim finally determined under the laws of that State. This obligation under paragraph 3 is limited by paragraph 7 of the Article, which provides that, although generally treated as a revenue claim of the requested State, a claim for which collection assistance is granted shall not have any priority accorded to the revenue claim of the requested State.

*Paragraph 4*

Paragraph 4 provides that, when the United States accepts a request for assistance in collection, the claim will be treated by the United States as an assessment as of the time the application was received. Similarly, when Denmark accepts a request, a revenue claim shall be treated by Denmark as an assessment under Danish laws against the taxpayer as of the time the application is received.

*Paragraph 5*

Paragraph 5 provides that nothing in the Article shall be construed as creating in the requested State any rights of administrative or judicial review of the applicant State's finally determined revenue claim. Thus, when an application for collection assistance has been accepted, the substantive validity of the applicant State's revenue claim cannot be challenged in an action in the requested State. Paragraph 5 further provides that, if the applicant's State's revenue claim ceases to be finally determined, the applicant State is obligated to withdraw promptly any request that had been based on that claim.

*Paragraph 6*

Paragraph 6 provides that, as a general rule, the requested State is to forward the entire amount collected to the competent authority of the applicant State. The ordinary costs incurred in providing collection assistance will normally be borne by the requested State and only extraordinary costs will be borne by the applicant State. The application of this paragraph, including rules specifying which collection costs are to be borne by each State and the time and manner of payment of the amounts collected, will be agreed upon by the competent authorities, as provided for in paragraph 11.

*Paragraph 7*

Paragraph 7 provides that a revenue claim of the applicant State accepted for collection shall not have in the requested State any priority accorded to the revenue claims of the requested

State. Thus, in bankruptcy proceedings, such claim would be treated in the same way as the claim of any other unsecured creditor.

*Paragraph 8*

Paragraph 8 provides that no assistance is to be given under this Article for a claim in respect of an individual taxpayer, to the extent that the taxpayer can demonstrate that he was a citizen of the requested State during the taxable period to which the revenue claim relates. Similarly, in the case of a company, estate, or trust, no assistance is to be given to the extent that the entity can demonstrate that it derived its status as such under the laws in force in the requested State during the taxable period to which the claim relates.

*Paragraph 9*

Paragraph 9 provides that each of the Contracting States shall endeavor to collect on behalf of the other Contracting State such amounts as may be necessary to ensure that relief granted by the Convention from taxation imposed by that other State does not inure to the benefit of persons not entitled thereto. For example, if a U.S. source dividend is paid to an addressee in a treaty partner, the withholding agent probably will withhold at the treaty's portfolio dividend rate of 15 percent. If, however, the addressee is merely acting as a nominee on behalf of a third-country resident, paragraph 9 would obligate the other Contracting State to withhold and remit to the United States the additional tax that should have been collected by the U.S. withholding agent.

*Paragraph 10*

Paragraph 10 makes clear that the Contracting State asked to collect the tax is not obligated, in the process of providing collection assistance, to carry out administrative measures that are different from those used in the collection of its own taxes, or that would be contrary to its public policy (ordre public).

*Paragraph 11*

Paragraph 11 requires the competent authorities to agree upon the mode of application of this Article, including agreement to ensure comparable levels of assistance to each of the Contracting States.

*Paragraph 12*

Paragraph 12 provides that the Contracting State asked to collect the tax is not obligated to accede to the request of the applicant State if the applicant State has not pursued all appropriate collection in its own jurisdiction or in those cases where the administrative burden for the requested State is disproportionate to the benefit to be derived by the applicant State.

*Treaty Effective Dates and Termination in Relation to Administrative Assistance*

A tax administration may request administrative assistance with respect to a year for

which a treaty was in force after the treaty has been terminated. In such a case the ability of the other tax administration to act is limited. The treaty no longer provides authority for the tax administrations to provide administrative assistance. They may only provide such assistance pursuant to domestic law.

The competent authority also may seek administrative assistance information under the Convention, but with respect to a year in which the prior Convention was in force. The scope of the competent authorities to address such a case is not constrained by the fact that the prior Convention was in force when the transactions at issue occurred, and the competent authorities have available to them the full range of administrative assistance provisions afforded under this Article to the extent they exceed those under the prior Convention.

ARTICLE 28
Diplomatic Agents and Consular Officers

This Article confirms that any fiscal privileges to which diplomatic or consular officials are entitled under general provisions of international law or under special agreements will apply notwithstanding any provisions to the contrary in the Convention. The agreements referred to include any bilateral agreements, such as the Vienna Convention on Diplomatic Relations and the Vienna Convention on Consular Relations. The United States generally adheres to the latter because its terms are consistent with customary international law.

The Article does not independently provide any benefits to diplomatic agents and consular officers. Article 19 (Government Service) does so, as do Code section 893 and a number of bilateral and multilateral agreements. In the event that there is a conflict between the tax treaty and international law or such other treaties, under which the diplomatic agent or consular official is entitled to greater benefits under the latter, the latter laws or agreements shall have precedence. Conversely, if the tax treaty confers a greater benefit than another agreement, the affected person could claim the benefit of the tax treaty.

Pursuant to subparagraph 5(b) of Article 1 (General Scope), the saving clause of paragraph 4 of Article 1 does not apply to override any benefits of this Article available to an individual who is neither a citizen of the United States nor has immigrant status in the United States.

ARTICLE 29
Entry into Force

This Article contains the rules for bringing the Convention into force and giving effect to its provisions.

*Paragraph 1*

Paragraph 1 provides that each State shall notify the other as soon as its requirements for

entry into force have been complied with.

In the United States, the process leading to ratification and entry into force is as follows: Once a treaty has been signed by authorized representatives of the two Contracting States, the Department of State sends the treaty to the President who formally transmits it to the Senate for its advice and consent to ratification, which requires approval by two-thirds of the Senators present and voting. Prior to this vote, however, it generally has been the practice for the Senate Committee on Foreign Relations to hold hearings on the treaty and make a recommendation regarding its approval to the full Senate. Both Government and private sector witnesses may testify at these hearings. After receiving the Senate's advice and consent to ratification, the treaty is returned to the President for his signature on the ratification document. The President's signature on the document completes the process in the United States.

*Paragraph 2*

Paragraph 2 provides that the Convention will enter into force on the date on which the second of the two notifications of the completion of requirements for the entry into force of the Convention has been received. The date on which a treaty enters into force is not necessarily the date on which its provisions take effect. Paragraph 2, therefore, also contains rules that determine when the provisions of the treaty will have effect. Under paragraph 2(a), the Convention will have effect with respect to taxes withheld at source (principally dividends, interest and royalties) for amounts paid or credited on or after the first day of the second month following the date on which the Convention enters into force. For example, if the second notification is received on April 25 of a given year, the withholding rates specified in paragraph 2 of Article 10 (Dividends) would be applicable to any dividends paid or credited on or after June 1 of that year. This rule allows the benefits of the withholding reductions to be put into effect without waiting until the following year. The delay of one to two months is required to allow sufficient time for withholding agents to be informed about the change in withholding rates. If for some reason a withholding agent withholds at a higher rate than that provided by the Convention (perhaps because it was not able to re-program its computers before the payment is made), a beneficial owner of the income that is a resident of the other Contracting State may make a claim for refund pursuant to section 1464 of the Code.

For all other taxes, paragraph 2(b) specifies that the Convention will have effect for taxable periods beginning on or after January 1 of the year following entry into force.

As discussed under Articles 25 (Mutual Agreement Procedure), 26 (Exchange of Information) and 27 (Administrative Assistance), the powers afforded the competent authority under these articles apply retroactively to taxable periods preceding entry into force.

*Paragraph 3*

Paragraph 3 provides that the prior Convention will cease to have effect at the time this Convention takes effect under the provisions of paragraphs 2 and 4 of this Article. The prior Convention shall terminate on the last date on which it has effect in accordance with the

foregoing provisions of this Article.

*Paragraph 4*

Paragraph 4 provides a general exception to the effective date rules of paragraph 2. Under this paragraph, if the prior Convention would have afforded any greater relief from tax than this Convention, the prior Convention shall, at the election of any person that was entitled to benefits under the prior Convention, continue to have effect in its entirety for one year after the date on which the provisions of this Convention would otherwise first have had effect under the provisions of paragraph 2 of this Article.

Thus, a taxpayer may elect to extend the benefits of the prior Convention for one year from the date on which the relevant provision of the new Convention would first take effect. For example, suppose the instruments of ratification are exchanged on February 1, 2000 and the Convention thus enters into force on that date. The new Convention would take effect with respect to taxes withheld at source for amounts paid or credited on or after April 1, 2000. If the election is made, the provisions of the prior Convention regarding withholding would continue to have effect for amounts paid or credited at any time prior to April 1, 2001. With regard to assessed taxes, the new Convention would be applicable for fiscal periods beginning on or after January 1, 2001. Therefore, with respect to the branch tax, which is imposed on an assessment basis, an election would allow the prior Convention to continue, thus preventing the imposition of the branch tax until the first taxable year beginning on or after January 1, 2002.

*Paragraph 5*

Paragraph 5 provides that the prior Convention terminates on the last date on which it has effect in accordance with the foregoing provisions of this Article.

Article 30
Termination

The Convention is to remain in effect indefinitely, unless terminated by one of the Contracting States in accordance with the provisions of Article 30. The Convention may be terminated by giving notice of termination through diplomatic channels at any time after the year in which the Convention enters into force. If notice of termination is given, the provisions of the Convention with respect to withholding at source will cease to have effect for amounts paid or credited after the expiration of a period of six months beginning with the delivery of notice of termination. For other taxes, the Convention will cease to have effect as of taxable periods beginning after the expiration of this six month period.

A treaty performs certain specific and necessary functions regarding information exchange and mutual agreement. In the case of information exchange the treaty's function is to override confidentiality rules relating to taxpayer information. In the case of mutual agreement its function is to allow competent authorities to modify internal law in order to prevent double taxation and

tax avoidance. With respect to the effective termination dates for these aspects of the treaty, therefore, if a treaty is terminated as of January 1 of a given year, no otherwise confidential information can be exchanged after that date, regardless of whether the treaty was in force for the taxable year to which the request relates. Similarly, no mutual agreement departing from internal law can be implemented after that date, regardless of the taxable year to which the agreement relates. Therefore, for the competent authorities to be allowed to exchange otherwise confidential information or to reach a mutual agreement that departs from internal law, a treaty must be in force at the time those actions are taken and any existing competent authority agreement ceases to apply.

Article 30 relates only to unilateral termination of the Convention by a Contracting State. Nothing in this Article should be construed as preventing the Contracting States from concluding a new bilateral agreement, subject to ratification, that supersedes, amends or terminates provisions of the Convention without the six-month notification period.

Customary international law observed by the United States and other countries, as reflected in the Vienna Convention on Treaties, allows termination by one Contracting State at any time in the event of a "material breach" of the agreement by the other Contracting State.

# Exhibit 42

## BENEFICIAL OWNERSHIP: AFTER *INDOFOOD*

### by Philip Baker

What does the term "beneficial owner" mean in a tax treaty? In principle, we ought to know exactly what it means. The term has been used in tax treaties since the 1940s; it is in the OECD and UN and US Models; it is found in virtually every tax treaty which the United Kingdom has entered into. Curiously, we have had very little guidance as to the meaning of the term until a recent Court of Appeal decision in the case of *Indofood International Finance Ltd v. JP Morgan Chase Bank NA*[1].

The term "beneficial owner" is usually found in the dividend, interest and, sometimes, the royalties article of a tax treaty. These articles generally provide for a reduced level of withholding tax on the relevant category of income: however, the reduced tax is only available if the beneficial owner of the dividends, interest or royalties is a resident of the state which is a party to the treaty. Hence, the beneficial ownership limitations – or "BO limitation" to its friends – is a restriction on the availability of the reduced tax rate.

It is pretty clear that the BO limitation was introduced to counter treaty shopping by the channelling of the relevant income through a resident of a state with a suitably attractive treaty provision. The issue for some time has been, however, exactly how broad is the scope of the BO limitation. Put another way, how artificial

must the conduit arrangement have been for the benefit of the treaty to be denied?

At one extreme, one can imagine situations where simply by registering shares or loan notes in the name of a nominee who was resident in a treaty state, one might try to claim the benefit of the relevant treaty. At the other end of the spectrum, all companies ultimately distribute the income they receive to shareholders or other stakeholders: if a company were to be denied the benefit of a treaty because the income received might ultimately be paid on to a third party, then when would any company or collective investment vehicle ever be entitled to the benefit of the three central provisions of most tax treaties?

Surprisingly, there has been virtually no case law on the meaning of beneficial ownership until the *Indofood* case. There was a Dutch case a few years ago where a UK company acquired a usufruct to receive the dividends on certain Dutch shares: the Amsterdam Court held that a person who is entitled to a usufruct over the dividends only was not the beneficial owner, but the Hoge Raad correctly reversed this by holding that the mere fact that the company had an entitlement only to the dividends and not to the corpus of the shares themselves did not prevent it from being a beneficial owner. There has been a more recent Swiss case[2] where the treaty benefit was denied on the grounds that the taxpayer had failed to prove that it was the beneficial owner. More tantalising, ten years or so ago a case was being prepared for trial before the UK Special

Commissioners concerning a Luxembourg bank in liquidation: was the bank still the beneficial owner of interest it received from the United Kingdom? Sadly, the case was settled before it went for trial.

There is Commentary from the OECD on the meaning of beneficial ownership. This has developed over the years. The original Commentary to Articles 10 and 11 of the OECD Model referred to the exclusion of agents or nominees who were interposed in an attempt to obtain treaty benefits. Following the Conduit Companies Report[3] the Commentary was extended to include conduits which had such narrow powers over the income they received that they were in the position of mere fiduciaries with regard to that income. This seemed, in fact, to be as far as the OECD could achieve consensus on the meaning of beneficial ownership. And a very sensible point it was too: it meant that the BO limitation excluded very obvious cases of treaty shopping, but went no further. States that wished to go further than this in deterring treaty shopping could – and did – include more elaborate anti-treaty shopping provisions in specific treaties. If one looks, for example, at the anti-conduit provisions of the current UK/US Tax Treaty, they provide strong evidence that the BO limitation is of relatively narrow scope, and that the treaty partners (or at least one of them) wanted a broader anti-treaty shopping provision.

The OECD Commentary, with its emphasis on agents, nominees and conduit companies acting as mere fiduciaries, provided a fairly useful rule of thumb for

17

determining beneficial ownership. If the recipient entity went into liquidation, and it was a mere fiduciary, then any dividends etc., it had received could be claimed by the "real beneficial owner" and would not be available for general creditors in the liquidation. If, however, the dividends etc., really belonged to the entity in liquidation, then the income would be available for its general creditors and it would have been the beneficial owner of that income itself.

As explained, since March 2006 we do have a Court of Appeal case on the meaning of beneficial ownership, though some would doubt whether it has done much to clarify our understanding of the meaning of the term.

For a case which has sought to clarify one of the key expressions used in international taxation, what is surprising is that it was not technically a tax case. It was a civil case brought between the two parties to a loan agreement. The background is relatively complicated, but can be simplified. An Indonesian company wished to raise a loan for business purposes: if it had done so directly, there would have been a 20% withholding tax on the interest it paid. Instead of raising the loan directly, it established a Mauritius subsidiary which then issued the loan, with JP Morgan acting as trustee for the bondholders. Interest paid from Indonesia to Mauritius benefited from the Indonesia-Mauritius Tax Treaty, with a reduced withholding tax of 10%. Interest paid from Mauritius for the benefit of the bondholders was not subject to any withholding tax.

The precise terms of the arrangement with the Mauritius finance subsidiary were important. The identical amount of money was borrowed by the Mauritian company as was then lent on to the Indonesian parent: the rate of interest on the loan to and from Mauritius was identical. The terms of the documentation provided for interest to be paid by the Indonesian parent to the Mauritian subsidiary on day 1, and from the Mauritian subsidiary to the trustee for the bondholders on day 2: in fact, it was found as a fact that the interest was paid directly from the Indonesian parent to the trustee for the bondholders, missing out the Mauritian subsidiary. According to the Court of Appeal, the terms of the loan documentation precluded the Mauritian subsidiary from meeting its interest obligations to the bondholders from any source other than interest paid by its Indonesia parent[4], thus the Court of Appeal seems to have considered that both in practice and according to the documentation, the Mauritian subsidiary was effectively obliged to pay on every dollar received from its Indonesian parent to the bondholders: none of the interest received could be retained by the Mauritian subsidiary.

Then the Indonesia-Mauritius Tax Treaty was terminated.

The termination of the Treaty would have meant that the tax to be withheld on the interest from the Indonesian parent reverted to the normal domestic rate of 20%. However, the loan documentation contained a provision that, if the tax rate on the interest was

increased, the payer had to gross up the amount paid so that, net of the higher tax, the bondholders received the same return as previously. Because this put a heavy burden on the borrower, it had the option, *if there were no reasonable steps it could take to revert to the reduced withholding tax*, to repay the loan early.

Now one comes to the final nub of the *Indofood* case: the Indonesian borrower said that there were no reasonable steps it could take to maintain the low withholding tax, so it should be allowed to repay the loan early. By contrast, JP Morgan, acting for the bondholders, said that there was a very reasonable step which could be taken; that the Indonesian borrower should take this step; and there was no reason to repay the loan early. Pretty obviously, the interest rates available had changed so that it was attractive to the borrower to repay early and refinance, while JP Morgan, acting for the bondholders, wanted the loan to remain in place.

The simple solution proposed was to interpose a Dutch entity between the Indonesian borrower and the Mauritius entity and get the benefit of the Indonesia-Netherlands Tax Treaty, which also had a 10% reduced withholding tax (or even the possibility of a zero withholding tax).

Two arguments were raised to show that the proposed Dutch company would simply not work: that it would not be the beneficial owner of the interest; and that it would not be a resident of the Netherlands for treaty purposes. If either of these could be shown to be

correct, then the proposed Dutch company would simply not achieve the reduced withholding tax, and a measure which was doomed to failure could not be a reasonable measure to take.

Technically, the question was whether the Dutch company would be entitled to the reduced withholding tax under the Indonesia-Netherlands Tax Treaty. This was essentially a question of how the Indonesian Revenue would respond to the Dutch company – would they regard it as the beneficial owner – and, if they rejected a treaty application, how would the Indonesian Courts respond? Technically, therefore, the issue was one of Indonesian law and practice. The litigation came to London, however, because the loan agreements had a choice of jurisdiction clause which gave jurisdiction to the English High Court.

At first instance, Evan-Lombes J held that, if the Mauritian company had been the beneficial owner of the interest, so would the interposed Dutch company. Of course, there is a very simple answer to this: maybe the Mauritian company should not have been regarded as the beneficial owner in the first place.

The Court of Appeal reversed the first instance judgment. Unanimously, they considered that the proposed Dutch company would not be the beneficial owner of the interest. This meant that, for the first time, an English court had to provide a definition of the term "beneficial owner" in a tax treaty. Unfortunately, the way they did so has provided little clarity to the meaning of the term.

Two important points should be made about the Court of Appeal. First, none of the judges, and none of the counsel involved in the case, was an expert in taxation, let alone in international taxation. It is, in many respects, one of the most bizarre features of this case that a key issue concerning the meaning of a term used in multiple tax treaties was decided without any representation from a revenue authority and without the participation of anyone with any expertise in international tax before the Court of Appeal.

Secondly, as a technical matter, the Court of Appeal had only to decide whether the interposition of the Dutch company was a reasonable measure for the borrower to follow. It might have been sufficient simply to state that the Indonesian Revenue had gone on record that they would not regard such an interposed company as the beneficial owner: litigation in Indonesia was certain to follow if the proposed route was adopted, and one imagines that a route that was certain to lead to difficult litigation could hardly be a reasonable measure. That was not, however, the short cut route which the Court of Appeal adopted. Rather, the Court decided to face squarely the question of the meaning of beneficial ownership.

One of the great fears of international tax lawyers has been for many years that a question concerning beneficial ownership would come before a court in a common law country with little or no expertise in international tax. The fear was that the judges would recognise the term "beneficial ownership" from their

knowledge of equity and the law of trusts, and would assume that the term had the meaning under the common law system with which they were familiar: that is, that there was a distinction between legal ownership and beneficial ownership. The meaning of the term would then be muddled up with the distinction between the separate ownership interest of the trustee and his beneficiary under a trust. Not only would the resulting meaning lead to unintended consequences for trustees seeking to claim the benefit of tax treaties, but it would also lead to a meaning of the term "beneficial ownership" which non-common law countries would have difficulty in following.

At the end of the day, the term "beneficial ownership" is used in multiple treaties entered into between countries with common law systems and countries which have continental European civil law systems, or other systems that have totally different historical origins. What the term needed was a "international fiscal meaning" rather than a meaning that depended on the domestic law of the country where the issue arose[5].

If one were to applaud any point in the Court of Appeal's judgment, it is that the Court decided that the term "beneficial owner" should not take a meaning according to the domestic law of the United Kingdom, but that it should have an "international fiscal meaning". This is understood to mean that the Court thought it should have a meaning which would be the same in all countries, and not vary from one country to another.

23

The question was how to find this international fiscal meaning. Here, there are some good things and bad things about the judgment. The good things are that the Court of Appeal referred to the OECD Commentary and appeared to endorse that Commentary as giving the international fiscal meaning. The bad elements were some unfortunate references to statements from the Director General of Income Tax in Indonesia to the effect that it meant "the full privilege to directly benefit from the income". That phrase gives little, if any, clarification to the meaning of the term. Also rather less helpful were statements by the Court of Appeal that a technical and legal approach to beneficial ownership should not be adopted, but regard should be had to "the substance of the matter". Often in cross-border arrangements, great care is taken on the technical and legal aspects – a broad brush, substance approach was bound to lead to uncertainty.

At the end of the day, and on the basis of the facts of the case (and it is very important to recall that this was decided on the facts of the particular case) the proposed Dutch company would not have been the beneficial owner of the interest. On that basis, therefore, the proposed solution would not work, and it was not reasonable to require the borrower to go down a route that would not work.

Where does this all take us to?

If one observed the flurry of activity in the City of London after the judgment came out, one might have concluded that this was some earth-shaking revelation

which no-one could have foreseen. If one draws back for a moment, however, and looks at the facts of the case, can one really be surprised at the outcome? Recall: the Mauritian company borrowed the identical amount that it on-lent, at the same interest at which it on-lent, and the Court of Appeal found as a fact that the Mauritian company could do nothing with the interest it received but use it to pay the identical amount of interest that it had to pay on. In this type of egregious circumstance, is there any real surprise that the Dutch company which was proposed to take the place of the Mauritian company would not have been the beneficial owner? If beneficial ownership had any meaning at all, surely it would exclude the type of interposed entity which had no function whatsoever but to receive income and pay on the identical amount of income: in fact, it had so little function that, according to the Court of Appeal, the actual flows of money missed it out completely.

The biggest difficulty with the case is not that it confirms that the proposed Dutch company would not have been the beneficial owner. The real difficulty is how far the judgment extends: what other arrangements would be held to fall foul of the BO limitation?

In principle, therefore, the case itself should have had a relatively limited impact. In practice, nervous advisers have worried that it may have much broader implication, and call in question existing financial structures.

At the time of writing this short note, discussions between City law firms, the Law Society and HM

Revenue & Customs has led to the publication of draft guidance by HMRC on the impact of the *Indofood* case. The guidance seems to have been prompted by a desire to reassure the City that many existing structures would not be subject to any adverse scrutiny as a result of the case. However, it is fair to say that the approach adopted by HMRC to reach this comforting result is not particularly appealing from an intellectual point of view.

Many of the City law firms seem to have tried to bury the *Indofood* case by arguing that it was concerned with a finding of fact as to the possible outcome of a claim for treaty benefit in Indonesia, and had nothing to do with UK tax law. Technically, this may be correct. However, as a practical matter, the decision is clearly of broader import. Once the Court of Appeal accepted that the term "beneficial ownership" should have an international fiscal meaning, there was no reason why that meaning should not equally apply if similar facts arose with regard to the United Kingdom. At the very least, there is strong persuasive authority from the Court of Appeal as to the meaning they would give to this phrase.

HMRC, in its guidance, accepts that the Court of Appeal has provided guidance as to the meaning of the phrase in UK law (and not simply in Indonesia). However, they emphasise that this meaning should be seen in the context of the object and purpose of a treaty: the object and purpose includes combating international tax avoidance through treaty shopping. The guidance suggests, therefore, that the phrase only has its

international fiscal meaning when treaty shopping is intended, but does not have its international fiscal meaning when there is no treaty shopping intention. Intellectually, this is a very unattractive position to take, and it is hard to see any legal support for this approach. The approach allows HMRC, however, to identify a number of accepted commercial arrangements which, provided there is no treaty shopping intended, will not be denied treaty benefits on the grounds that the international fiscal meaning of beneficial ownership should be applied.

Whether this draft guidance becomes a final text remains to be seen.

In the meantime, the somewhat unusual circumstances of the *Indofood* case have provided us with the first real discussion of the meaning of beneficial ownership around the world. Whether one is any the wiser after this decision, remains to be seen.

---

[1] Court of Appeal, 2nd March 2006, (2006) 8 ITLR 653; [2006] STC 1195.

[2] *Re v. SA* (2001) 4 ITLR 191.

[3] 1986.

[4] In fact, examination of the terms of the loan documentation – not, sadly, quoted in either the High Court or the Court of Appeal, but which have been made available to the author – show that this was probably not correct. Instead, while it was unlikely that the Mauritian subsidiary could have raised money from any other

_____

source, it was in principle capable of doing so and was not
precluded.
[5] As would happen if the term was given its domestic law meaning
by operation of the equivalent of Article 3(2) of the OECD Model.

# Exhibit 43

**OECD**                                                                    *Prof. Dr Robert Danon\**

# Clarification of the Meaning of "Beneficial Owner" in the OECD Model Tax Convention – Comment on the April 2011 Discussion Draft

**In April 2011, the OECD released an important discussion draft that is intended to clarify the meaning of the term "beneficial ownership" under articles 10, 11 and 12 of the OECD Model (2010). This article discusses these proposals and demonstrates that some refinement is necessary.**

## 1. Introduction

The "beneficial ownership" requirement was introduced into articles 10 (Dividends), 11 (Interest) and 12 (Royalties) of the OECD Model (1977)[1] to deal with a specific form of abuse affecting the source state, i.e. the transfer of treaty-favoured income to residents of a third state. Where an entity is interposed in the residence state, this transfer may take place through the payment of deductible expenses ("stepping stone strategy") or a subsequent dividend distribution ("direct conduit strategy").[2]

The Commentary on Article 10 of the OECD Model (1977) ("Commentary" or "Commentaries", in general, as appropriate), however, contained very little information on the interpretation of this fundamental requirement. It simply stated that:[3]

> Under paragraph 2 [of Art. 10 (dividends) and 11 (interest) and 1 of Art. 12 (royalties)], the limitation of tax in the state of source is not available when an intermediary, such as an agent or nominee, is interposed between the beneficiary and the payer, unless the beneficial owner is a resident of the other Contracting State.

Yet, as a result of reports published by the OECD in 1987[4] and 2002,[5] the Commentary on Article 10 of the OECD Model (2003) further clarified the meaning of beneficial ownership as follows:[6]

> The term "beneficial owner" is not used in a narrow technical sense, rather, it should be understood in its context and in light of the object and purposes of the Convention, including avoiding double taxation and the prevention of fiscal evasion and avoidance.

and:[7]

> Where an item of income is received by a resident of a Contracting State acting in the capacity of agent or nominee it would be inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption merely on account of the status of the immediate recipient of the income as a resident of the other Contracting State ... It would be equally inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption where a resident of a Contracting State, otherwise than through an agency or nominee relationship, simply acts as a conduit for another person who in fact receives the benefit of the income concerned. For these reasons, the report from the Committee on Fiscal Affairs

entitled "Double Taxation Conventions and the Use of Conduit Companies" concludes that a conduit company cannot normally be regarded as the beneficial owner if, though the formal owner, it has, as a practical matter, very narrow powers which render it, in relation to the income concerned, a mere fiduciary or administrator acting on account of the interested parties.

Finally, the Commentary on Article 1 of the OECD Model (2010) now contains guidance on the application of the beneficial ownership requirement to collective investment vehicles:[8]

> Accordingly, a vehicle that meets the definition of a widely-held CIV will also be treated as the beneficial owner of the dividends and interest that it receives, so long as the managers of the CIV have discretionary powers to manage the assets generating such income (unless an individual who is a resident of that State who would have received the income in the same circumstances would not have been considered to be the beneficial owner thereof).

It is, therefore, fair to say that the current Commentary provides a fairly comprehensive discussion of the beneficial ownership requirement. Yet, the appropriate meaning to be given to this term still remains one of the most debated questions of international tax law. In fact, scholarly writing on this subject has become so important that it can no longer be enumerated. In recent years, the increasing number of court decisions given in the OECD Member countries[9] has also continued to fuel the controversy. Whilst these court decisions, in particular, *Indofood International Finance Limited v. JPMorgan Chase*

\*    **Ordinary Professor of Swiss and International Taxation and Director of the Executive Master of Advanced Studies in International Taxation (MAS) of the University of Neuchâtel (www.unine.ch/mas-international-taxation); of counsel to PricewaterhouseCoopers. The author can be contacted at robert.danon@unine.ch.**

1.   *OECD Model Tax Convention on Income and on Capital* (11 Apr. 1977), Models IBFD.
2.   OECD, *Double Taxation Conventions and the Use of Conduit Companies in International Tax Avoidance and Evasion*, Issues in International Taxation Series No. 1, 98 (1986), Intl. Orgs.' Docn. IBFD.
3.   *OECD Model Tax Convention on Income and on Capital: Commentary on Article 10* para. 12(11 Apr. 1977), Models IBFD.
4.   OECD, *supra* n. 2.
5.   OECD, *La limitation du droit aux avantages des conventions fiscales*, in *questions de fiscalité internationale*, No. 8 (2002).
6.   *OECD Model Tax Convention on Income and on Capital: Commentary on Article 10* para. 12(28 Jan. 2003), Models IBFD.
7.   Para. 12.1 *OECD Model: Commentary on Article 10* (2003).
8.   *OECD Model Tax Convention on Income and on Capital: Commentary on Article 1* para. 6.14 (22 July 2010), Models IBFD.
9.   For a presentation of recent case law, see, inter alia, L. Verdoner, R. Offermanns & S. Huibregtse, *A Cross-Country Perspective on Beneficial Ownership - Parts 1 and 2*, 50 Eur. Taxn. 9 & 10 (2010), Js. IBFD and C. du Toit, *The Evolution of the Term "Beneficial Ownership" in relation to International Taxation over the Past 45 Years*, 64 Bull Intl. Taxn. 10 (2010), Js. IBFD.

Robert Danon

*Bank NA* (2006),[10] and *Prévost Car Inc. v. Her Majesty the Queen* (2008) and (2009),[11] shed some light on important issues, they also confirm that the essential components of beneficial ownership remain, ultimately, difficult to grasp.

Working Party I of the OECD Committee on Fiscal Affairs, therefore, decided to submit proposals designed to clarify the interpretation that should be given to the beneficial ownership requirement under the Commentaries. These proposals, which take the form of a discussion draft released in April 2011,[12] deal with fundamental issues, such as the nature (*see* section 2.) and the content (*see* section 3.) of the beneficial ownership requirement, its application to trusts (*see* section 4.) and, finally, its relationship to other anti-abuse rules (*see* section 5.).

The purpose of this article is not to revisit the beneficial ownership requirement,[13] but, rather, to formulate certain critical comments with regard to the approach adopted by the OECD in this discussion draft. Whilst the discussion draft is a welcome development, several of the proposals presented should, in the author's opinion, be refined, in particular, to be consistent with the work produced so far by the OECD in this area.

## 2. Nature of the Beneficial Ownership Requirement

### 2.1. Introductory remarks

The first, and now well-known, interpretative question arising with regard to the beneficial ownership requirement is whether this term should be defined by reference to the domestic tax law of the source state or whether it should be given a contextual meaning under article 3(2) of the OECD Model (2010). Currently, it is widely accepted by scholars that a contextual interpretation should prevail.[14] Commentators have, in particular, argued that the first and foremost reason why the term cannot be construed by reference to the domestic law of the source state stems from the fact that none of the national systems of the OECD Member countries offer a precise definition of "beneficial owner" or "*bénéficiaire effectif*". The need to adopt a uniform contextual meaning also flows from the fact that the "beneficial ownership" test determines the availability of treaty benefits and the allocation of taxing rights amongst the contracting states. Accordingly, it is definitely not the intention of the OECD Member countries to allow situations where double taxation arises due to diverging positions taken on who the beneficial owner is. Whilst court decisions and the practice of OECD Member countries are not always clear on this point, the UK Court of Appeal also endorsed this approach in *Indofood* in holding that beneficial ownership, "is to be given an international fiscal meaning not derived from the domestic laws of the contracting States".[15] Further, there is little doubt, to date, that the contextual approach is favoured by the Commentary (2003), which states that beneficial ownership should be "understood in its context and in light of the object and purposes of the Convention".[16]

### 2.2. Discussion draft

In this context, therefore, the new language proposed by the OECD discussion draft comes as a surprise. The discussion draft, indeed, states that the contextual interpretation of the term:[17]

> ... does not mean, however, that the domestic law meaning of "beneficial owner" is automatically irrelevant for the interpretation of that term in the context of the Article: that domestic law meaning is applicable to the extent that it is consistent with the general guidance included in this Commentary.

On this point, the discussion draft presumably seeks to achieve some sort of compromise. The domestic law of the source state would apply, but this would have to be tested against the contextual meaning proposed by the Commentary.

### 2.3. Comments: contextual meaning should prevail

In the author's view, this language is unfortunate. First, from a dogmatic point of view, if the contextual interpretation is subscribed to, the meaning of beneficial ownership must exclusively be derived from the relevant tax treaty by closely following article 31 et seq. of the Vienna Convention on the Law of Treaties (1969).[18] Second, from a practical point of view, this language is difficult to reconcile with the objective of the proposed amendments to the Commentaries on Articles 10, 11 and 12 of the OECD Model, which, as stated in the introduction to the discussion draft, are designed to avoid, "risks of double taxation and non-taxation arising from these different interpretations".[19] Clearly opening the door to a domestic law characterization of beneficial ownership exacerbates the risk of diverging interpretations and double taxation that the OECD wants to avoid. Last but not least, recently, it has been the intention of the OECD to clarify the application of the beneficial ownership requirement in respect of complex arrangements, such as collective investment vehicles and trusts. In the author's opinion, putting this ambitious objective into effect undoubtedly requires a uniform definition of beneficial ownership that leaves no ambiguity, whatsoever, as to the autonomous nature of

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

10. UK: CA, 2 Mar. 2006, *Indofood International Finance Limited v. JPMorgan Chase Bank NA, London Branch*, [2006] EWCA Civ 158, Tax Treaty Case L. IBFD (stepping stone strategy confirmed).

11. CA: FCA, 26 Feb. 2009, *Prévost Car Inc. v. Her Majesty the Queen*, A-252-08, Tax Treaty Case L. IBFD, affirming CA: TCC, 22 Apr. 2008, *Prévost Car Inc. v. Her Majesty the Queen*, 2004-2006(IT)G and 2004-4226(IT)G, Tax Treaty Case L. IBFD (direct conduit strategy denied).

12. OECD, *Clarification of the Meaning of "Beneficial Owner" in the OECD Model Tax Convention Discussion Draft* (OECD: 2011).

13. For an in-depth presentation of the author's opinions on beneficial ownership, see, for example, R. Danon, *Le concept de bénéficiaire effectif dans le cadre du MC OCDE. Réflexions et analyse de la jurisprudence récente*, IFF Forum für Steuerrecht 1, 38 et seq. (2007) and *Switzerland's Direct and International Taxation of Private Express Trusts* 329 (Schulthess 2003).

14. Inter alia, K. Vogel & M. Lehner, *Doppelbesteuerungsabkommen, Kommentar*, 5th ed., 895, No. 15 (Beck 2008); C. Du Toit, *Beneficial Ownership of Royalties in Bilateral Tax Treaties* 178 (IBFD 1999); S. van Weeghel, *Improper Use of Tax Treaties* 68 (Kluwer 1997); and Danon, *Switzerland's Direct and International Taxation of Private Express Trusts, supra* n. 13.

15. *Indofood* (2006).

16. Para. 12.1 *OECD Model: Commentary on Article 10* (2003).

17. Para. 12.1 *Proposed OECD Model: Commentaries on Articles 10, 11 and 12.*

18. *Vienna Convention on the Law of Treaties* (23 May 1969), Treaties IBFD.

19. OECD, *Discussion Draft, supra* n. 12, Introduction.

© IBFD

Case 1:18-md-02865-LAK    Document 808-18    Filed 05/12/22    Page 430 of 1574

Clarification of the Meaning of "Beneficial Owner" in the OECD Model Tax Convention – Comment on the April 2011 Discussion Draft

this term. The author would, therefore, recommend not including the proposed language in the Commentaries.

## 3. General Definition of Beneficial Ownership

### 3.1. Discussion draft

For the first time, the OECD has attempted to propose a general definition of beneficial ownership. According to the discussion draft:[20]

> The recipient of a dividend is the "beneficial owner" of that dividend where he has the full right to use and enjoy the dividend unconstrained by a contractual or legal obligation to pass the payment received to another person. Such an obligation will normally derive from relevant legal documents but may also be found to exist on the basis of facts and circumstances showing that, in substance, the recipient clearly does not have the full right to use and enjoy the dividend; also, the use and enjoyment of a dividend must be distinguished from the legal ownership, as well as the use and enjoyment, of the shares on which the dividend is paid.

The discussion draft also clarifies that beneficial and ultimate beneficial ownership are not to be equated. According to the discussion draft:[21]

> Since, in the context of Article 10, the term beneficial owner is intended to address difficulties arising from the use of the word "paid" in relation to dividends, it would be inappropriate to consider a meaning developed in order to refer to the individuals who exercise "ultimate effective control over a legal person or arrangement".

If preferred, an entity to which the income is paid may well be regarded as the beneficial owner, even if other persons (typically shareholders) exercise "ultimate effective control" over the entity.

### 3.2. Comment: control should be preferred over enjoyment

The definition proposed by the discussion draft should be approved for a number of reasons. First, it confirms that the "beneficial ownership" requirement is a test that focuses exclusively on ownership attributes of the recipient of the income. The terms "beneficial" and "*effectif*" also confirm that these ownership attributes must be tested on the basis of a substance-over-form approach. On the other hand, it follows that, subject to the requirements in article 4 of the OECD Model, the nature of the recipient's connection with the residence state is immaterial for the purpose of the beneficial ownership requirement. Whether, for example, the recipient of the income carries on a commercial activity, is a stock listed company or simply a pure passive holding company, is of no importance. From this perspective, the beneficial ownership requirement is conceptually different from an active trade and business or "stock exchange" test. These tests attempt to detect abuse by scrutinizing the connections with the residence state. Beneficial ownership, on the other hand, looks at the intensity of the ownership attributes enjoyed by the recipient over the item of income. A definition of beneficial ownership that implies a substance requirement (personnel, offices, etc.) is, therefore, not compatible with the literal interpretation of this term. Similarly, the tax status of the recipient (ordinary taxation, objective or subjective exemption) is equally not relevant.

In addition, the definition proposed by the discussion draft correctly makes it clear that the OECD Model only refers to the beneficial owner of an item of income. Accordingly, whether or not the recipient of the income is also the owner of the underlying asset is not decisive.

The distinction made by the discussion draft between beneficial and ultimate ownership is also to be endorsed. As demonstrated by *Prévost*, in a group structure, it is perfectly conceivable for an intermediary holding company to satisfy the beneficial ownership requirement.

This said, the emphasis placed by the discussion draft on the ability of the recipient to have "the full right to use and enjoy" the income received is misleading. First, a teleological interpretation dictates, in the author's view, that beneficial ownership focus primarily on the level of economic control exercised by the recipient over the income received. Indeed, the crucial element of a treaty shopping structure is the legal, economic or factual ability of a person of a third country to compel an entity interposed in the residence state to transfer to the former the income received from the source state. Accordingly, it must be recognized that, where the entity of the residence state genuinely holds the power to control the attribution of the income it derives from the source state, it would be difficult to allege that it was interposed by a treaty shopper, as this person is then no longer in a position to secure the transfer of the income in its favour. In contrast, the fact that the recipient may, through the exercise of this power, economically benefit from the item received is not per se the element that conclusively prevents treaty shopping schemes from being implemented. Being superfluous, this element should, therefore, not be taken into account for the purpose of defining beneficial ownership.

Second, as is demonstrated in section 4., a definition of beneficial ownership focusing on the enjoyment of income is not consistent with the approach taken by the discussion draft with regard to trusts. The discussion draft recognizes that the trustees of a discretionary trust may, under certain conditions, be regarded as the beneficial owners of the income they derive. However, this position is only sustainable if the focus is on the level of control enjoyed by the recipient as, essentially, the trustees of a trust never avail themselves of any economic enjoyment over the trust income.

Accordingly, under the interpretation that the author advocates, the beneficial owner under articles 10, 11 and 12 of the OECD Model should refer to "the person who legally, economically or factually has the power to control the attribution of the income".[22] This definition, which excludes agents, nominees and conduit companies with limited powers in stepping stone or direct conduit structures, is very much in line with the position taken by the Commentary (2010), which places great importance on "discretionary powers to manage the assets generat-

---

20. Para. 12.4 *Proposed OECD Model: Commentaries on Articles 10, 11 and 12.*
21. Para. 12.6 *Proposed OECD Model: Commentaries on Articles 10, 11 and 12.*
22. Danon, *Switzerland's Direct and International Taxation of Private Express Trusts, supra* n. 13, at 340.

Robert Danon

ing" the income. As observed by a paper released by the OECD, "under this test, a conduit company therefore fails because it normally does not have the ability to vary either its investments or its obligations".[23]

### 3.3. Comment: what about fiscal attribution without ownership attributes?

In the author's opinion, there is little doubt that beneficial ownership should be clearly distinguished from the "personal attribution of income requirement" embodied in the OECD Model. Together with others, the author has argued that this personal attribution of income requirement is expressed by terms such as "paid to" or "derived by" contained in the distributive rules. Under the interpretation that the author advocates and following the general recommendation of the Partnership Report (OECD 1999),[24,25] income arising in the source state can be regarded as "paid to" a recipient in the residence state if, under its own fiscal attribution rules, the latter state allocates this item to that person.[26] The beneficial ownership requirement, therefore, cannot simply be regarded as a clarification of, or be equated to, the personal attribution of income requirement. If that were true, the beneficial ownership requirement would have no scope of its own.

Yet, in this context, situations in which income is fictitiously attributed to (and taxed in the hands of) a person without this person holding any ownership attribute over the item received is problematic. Where such a deemed attribution rule is applied by the residence state, income may well be regarded as paid to the recipient within the meaning of the distributive rules, but, strictly speaking, this person may not be regarded as the beneficial owner of the income. At the same time, however, there is no abuse, as the income arising in the source state is not transferred to a non-resident.

The discussion draft does not address this issue. Rather, it assumes that, in non-abusive situations, the person to whom income is fiscally attributed always holds some sort of ownership attributes over this item. This is, however, not always true, as, for various policy reasons, a state may choose to adopt attribution rules that completely deviate from any form of ownership.

In the author's view, it would be appropriate for the Commentary to refer to this problem and possibly to suggest that, where, under a deemed attribution rule, the recipient is taxed on an item of income arising in the source state, the contracting states may deem this person to be the beneficial owner, even if, in this particular instance, this person does not hold any ownership attribute over the income received. In this circumstance, this common agreed meaning would prevail[27] over the general definition of beneficial ownership based on the control criterion.

## 4. Beneficial Ownership and Trusts

### 4.1. Discussion draft

In the discussion draft, the OECD, for the first time, directly attempts to address one of the most controversial questions relating to the beneficial ownership requirement, namely its application to trusts. In a footnote, the discussion draft, relying on a definition of beneficial ownership that does not coincide with that adopted under the common law, states that:[28]

> For example, where the trustees of a discretionary trust do not distribute dividends earned during a given period, these trustees, acting in their capacity as such (or the trust, if recognised as a separate taxpayer), could constitute the beneficial owners of such income for the purposes of Article 10 notwithstanding that the relevant trust law might distinguish between legal and beneficial ownership.

### 4.2. Comment: the adoption of distinct commentaries on trusts

In regard to this point, the position adopted by the discussion draft should be fully endorsed, as it is consistent with a definition of beneficial ownership based on the level of control enjoyed by the recipient. Under this definition, therefore, the trustees of a fixed trust, who have an obligation to distribute trust income, as it arises, to ascertained beneficiaries, do not satisfy the beneficial ownership requirement. Rather, in regard to such a trust, this requirement is normally satisfied by the beneficiaries.

Having said this, it is unfortunate that the discussion draft has chosen to address such an important issue in a mere footnote. In the author's opinion, the OECD should, rather, seriously consider amending the Commentary on Article 1 with a view to incorporating in a separate section dealing with the application of the OECD Model to trusts. This addition would not only be consistent with the adoption of the Commentaries relating to partnerships (2000) and collective investment vehicles (2010), but could also greatly rely on the recommendations proposed in these two areas.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

23. *Report of the Informal Consultative Group on the Taxation of Collective Investment Vehicles and Procedures for Tax Relief for Cross-Border Investors (ICG) on the Granting of Treaty Benefits with respect to the Income of Collective Investment Vehicles, Annex I: Background Regarding the Meaning of "Beneficial Owner" in Tax Treaties* N3 (12 Jan. 2009), available at http://www.oecd.org/dataoecd/34/26/41974553.pdf .

24. OECD, *The Application of the OECD Model Tax Convention to Partnerships* (OECD: 1999), Intl. Orgs.' Docn. IBFD.

25. OECD *Model Tax Convention on Income and on Capital: Commentary on Article 1* para. 6.3. (29. Apr. 2000).

26. A decisive systematic argument, which, in the author's view, supports this approach, relates to the relationship that exists between the distributive rules and the personal scope of tax treaties. Tax treaties only apply, "to persons who are residents of one or more or both of the Contracting States" (art. 1). As treaties concluded in the field of taxation are being considered here, it is a logical conclusion that this principle implies that tax treaties only have effect within the limits of the taxing jurisdiction (or fiscal sovereignty) of the contracting states. It can, therefore, be maintained that the application of a tax treaty requires the income covered by the relevant distributive rule to enter into the taxing jurisdiction of the other contracting state. Under this line of reasoning, it must, therefore, be recognized that turning to the attribution rules of the residence state to ascertain whether or not this is the case is the most convincing solution.

27. Art. 31(4) *Vienna Convention*.

28. Footnote to para. 12.1 *Proposed OECD Model: Commentaries on Articles 10, 11 and 12.*

© IBFD

Case 1:18-md-02865-LAK    Document 808-18    Filed 05/12/22    Page 432 of 1574

Clarification of the Meaning of "Beneficial Owner" in the OECD Model Tax Convention – Comment on the April 2011 Discussion Draft

This new section should, in the author's view, first confirm that trusts should be regarded as persons falling within the meaning of article 3 of the OECD Model. Second, the Commentary should also clarify that a trust, to the extent that it is treated as a separate taxpayer in the residence state, is a person liable to tax within the meaning of article 4 of the OECD Model, even if it enjoys, for example, a distribution deduction. Third, this new section could also note that the principles developed in the Partnership Report (OECD 1999), which are intended to resolve source-residence conflicts of attribution, are equally applicable to trusts. Finally, in line with the approach adopted with regard to collective investment vehicles and the latest discussion draft on beneficial ownership, the new Commentary could state that whether or not a trust satisfies the beneficial ownership requirement depends on whether its trustees enjoy discretion over the income arising in the source state.

## 5. Relationship between Beneficial Ownership and Other Anti-Abuse Rules

### 5.1. Discussion draft

The discussion draft also briefly discusses another important issue, which is the relationship between the beneficial ownership requirement and other anti-abuse rules. According to the discussion draft:[29]

> Whilst the concept of "beneficial owner" deals with some forms of tax avoidance (i.e. those involving the interposition of a recipient who is obliged to pass the dividend to someone else), it does not deal with other cases of treaty shopping and must not, therefore, be considered as restricting in any way the application of other approaches to addressing such cases.

### 5.2. Comment

This statement of the discussion draft is of critical importance. Under the OECD Model, which does not incorporate any other express anti-abuse requirement, the main issue arising is the relationship between the beneficial ownership requirement and the "guiding principle" in paragraph 9.5 of the Commentary on Article 1 of the OECD Model (2003), which provides that:

> ... the benefits of a double taxation convention should not be available where a main purpose for entering into certain transactions or arrangements was to secure a more favourable tax position and obtaining that more favourable treatment in these circumstances would be contrary to the object and purpose of the relevant provisions.

In the author's opinion, even if it were accepted that treaty benefits are subject to this guiding principle, the conclusion must be drawn that this principle is of a subsidiary nature and cannot be used to test a segment of the fact pattern that is already covered by the beneficial ownership requirement. The cumulative application of both the beneficial ownership requirement and the guiding principle to the same fact pattern would undermine a literal reading of the OECD Model. It is, therefore, essential to distinguish between the scope of the beneficial ownership requirement and the guiding principle. In the author's view, the elements of the fact pattern that relate to the manner in which the income arising in the source state

is transferred to the residence state should exclusively be tested in light of the beneficial ownership requirement. The guiding principle, on the other hand, may be used to test other elements of the fact pattern, such as the circumstances surrounding the transfer of shares to a company residing in the residence state. The parallel application of these two principles may be illustrated by the following basic example.

**Example:**

Company A, a resident of State S, is wholly owned by Company B, a resident of State X. Company B transfers its shares in Company A to Company C, a resident of State R. The shareholders of Company A and C are also residents of State X. In line with the OECD Model, State S has concluded a tax treaty with State X that provides for a 5% residual tax on dividends distributed to a parent company. On the other hand, State S has concluded a tax treaty with State R that is also based on the OECD Model, but which provides for a nil rate on dividend distributions. Shortly after the transfer, Company A distributes a large amount of its retained earnings to Company C.

In this example, the question of whether or not treaty benefits are to be denied on the basis of the fact that income arising in State S is abusively transferred to residents of State X through Company C should exclusively be tested in light of the beneficial ownership requirement (ownership aspect of the fact pattern). In this respect, it is critical to determine whether or not Company C is in a position to control the ultimate attribution of the income it receives. The guiding principle of the Commentary, on the other hand, may be used to test the other elements of the fact pattern (restructuring aspect of the fact pattern), i.e. whether or not a large distribution of retained earnings shortly after the share transfer is abusive within the meaning of this principle.

## 6. Conclusions

The OECD discussion draft, which is intended to clarify the meaning of the beneficial ownership requirement, is a welcome development. However, as was demonstrated in this article, the OECD proposals are not entirely consistent with the OECD's earlier work in this area and need to be refined. First, the OECD should make it very clear that beneficial ownership is a treaty concept that leaves no room for the application of the domestic law of the source state. Second, the general definition proposed by the OECD places too much emphasis on the enjoyment of income by the recipient. As noted, the OECD should, rather, favour a definition based on "economic control". In the author's opinion, the beneficial owner is the person, "who legally, economically or factually has the power to control the attribution of the income". Last but not least, rather than discussing the application of the beneficial ownership requirement to trusts in a mere footnote, the author believes that the Commentary on Article 1 should be amended to

---

29. Para. 12.5 *Proposed OECD Model: Commentaries on Articles 10, 11 and 12.*

Robert Danon

include a specific section dealing with the application of the OECD Model to trusts. This section could easily be prepared, as it would essentially be based on the work undertaken by the OECD in the area of partnerships and collective investment vehicles.

# Cumulative Index

## Editorial

**International**
*Sophie Witteveen and Fraser Dickinson:*
A New Style Special Issue – But It's Still Special                                                        175

## Articles

**Argentina**
*Carlos Forcada:*
The Economic Effect of Taxation on the Flow of Software Copyright Royalties in MERCOSUR – *available online at http://online.ibfd.org/kbase*

**Australia**
*Tapan Sarker and Elise Whalan:*
Reform Issues in Mineral Tax Policy for Economic Development: The Mineral Resource Rent Tax in Australia – *available online at http://online.ibfd.org/kbase*

*Sybrand A. van Schalkwyk:*
Tax Harmonization in Australia and New Zealand: Lessons from the European Union – *available online at http://online.ibfd.org/kbase*

*Nolan Cormac Sharkey:*
Proposed New Controlled Foreign Company Regime: Simpler and More Competitive with Significant Practical Implications                                          416

**Brazil**
*Carlos Forcada:*
The Economic Effect of Taxation on the Flow of Software Copyright Royalties in MERCOSUR – *available online at http://online.ibfd.org/kbase*

**Egypt**
*Mahmoud Mohamed Abdellatif:*
Withholding Tax and Cross-Border Intellectual Property Transactions in Developing Countries: The Example of Egypt and India – *Available online at http://online.ibfd.org/kbase.*

**European Union**
*Tony Anamourlis and Les Nethercott:*
The EU-US ("Brussels") Agreement on European Banking Secrecy and the Effect on Tax Information Exchange Agreements – *available online at http://online.ibfd.org/kbase*

*Philip Baker, Ernst Czakert, Arie van Eijsden, Maria Amparo Grau Ruiz and Liselott Kana:*
International Assistance in the Collection of Taxes                                                    281

*E.C.J.M. van der Hel-van Dijk:*
The European Union and More Effective Tax Audits                                                       161

*H.T.P.M. van den Hurk:*
The Common Consolidated Corporate Tax Base: A Desirable Alternative to a Flat EU Corporate Income Tax?                260

*Patricia Lampreave:*
Fiscal Competitiveness versus Harmful Tax Competition in the European Union Union – *available online at http://online.ibfd.org/kbase*

*Gemma Martínez Bárbara:*
The Role of Good Governance in the Tax Systems of the European Union        270

*Lisa Paterno:*
State Aid and Fiscal Protectionism in the European Union from the Perspective of Competitors                                                343

*Roman Seer and Isabel Gabert:*
European and International Tax Cooperation: Legal Basis, Practice, Burden of Proof, Legal Protection and Requirements                                             88

*Sybrand A. van Schalkwyk:*
Tax Harmonization in Australia and New Zealand: Lessons from the European Union – *available online at http://online.ibfd.org/kbase*

*Maarten F. de Wilde:*
What if Member States Subjected Non-Resident Taxpayers to Unlimited Income Taxation whilst Granting Double Tax Relief under a Netherlands-Style Tax Exemption? – *available online at http://online.ibfd.org/kbase*

**Germany**
*Aleksandra Bal:*
Taxation of Virtual Wealth                           147

**India**
*Rajarshi Sen:*
Taxation of Business Alliances in India: A Practitioner's Guide                             99

*Mahmoud Mohamed Abdellatif:*
Withholding Tax and Cross-Border Intellectual Property Transactions in Developing Countries: The Example of Egypt and India – *Available online at http://online.ibfd.org/kbase.*

**International**
*Mahmoud Mohamed Abdellatif:*
Withholding Tax and Cross-Border Intellectual Property Transactions in Developing Countries: The Example of Egypt and India – *Available online at http://online.ibfd.org/kbase.*

*Philip Baker, Ernst Czakert, Arie van Eijsden, Maria Amparo Grau Ruiz and Liselott Kana:*
International Assistance in the Collection of Taxes                                                    281

*Aleksandra Bal:*
Taxation of Virtual Wealth                           147

*Peter H. Blessing:*
Tax Indemnities in Mergers and Acquisitions and Other Commercial Transactions                                         469

*Guglielmo Maisto:*
The Pursuit of Harmonization Regarding Taxes on Death and the International Implications                                        253

*Annet Wanyana Oguttu and Christian Schulze:*
The Role of Tax Havens in the Global Financial Crisis: A Critique of International Initiatives and Measures to Curb the Resultant Fiscal Challenges and the Example of South Africa – *available online at http://online.ibfd.org/kbase*

*Andrea Parolini, Carlos Bechara, Mariken van Hilten, Des Kruger, Rebecca Millar and Greg Sinfield:*
VAT and Group Companies                              349

*Jessica Salom:*
The Attribution of Income in Swiss and International Tax Law                              394

*Roman Seer and Isabel Gabert:*
European and International Tax Cooperation: Legal Basis, Practice, Burden of Proof, Legal Protection and Requirements                                             88

*Alfred Storck:*
The Financing of Multinational Companies and Taxes: An Overview of the Issues and Suggestions for Solutions and Improvements                                          27

*Rainer Zielke:*
–  International Tax Planning with Tax Havens – Objectives and Strategies in a Multinational Group of Affiliated Corporations                                        80

*Rainer Zielke:*
–  The Changing Role of Tax Havens – An Empirical Analysis of the Tax Havens Worldwide                              42

**Mauritius**
*Kumari Juddoo:*
The New Mauritian Individual Income Tax Regime – *available online at http://online.ibfd.org/kbase*

[continued on page 452]

© IBFD

# Exhibit 44

# Treaty Interpretation - Global Tax Treaty Commentaries

Author

John F. Avery Jones[*]

Latest Information:

This chapter is based on information available up to 1 May 2018. Please find below the main changes made to this chapter up to that date:

Fully reviewed and updated chapter, including recent developments relating to:

The 2017 version of the OECD Model and Commentary.

## 0. Abbreviations and Terms

| AD | Appellate Division |
|---|---|
| AD | Appellate Division |
| AN | Audiencia Nacional (National Court) |
| ATO | Australian Taxation Office |
| BDG/TF | Bundesgericht/Tr bunal fédéral (Federal Supreme Court) |
| BEPS | Base erosion and profit shifting |
| BFH | Bundesfinanzhof (Federal Tax Court) |
| BV | Besloten vennootschap |
| BVBA | Besloten vennootschap met beperkte aansprakelijkheid (limited liability company) |
| CA | Court of Appeal(s) |
| CC | Constitutional Court |
| CE | Conseil d'Etat (Supreme Administrative Court) |
| CFC | Court of Federal Claims |
| CGI | Code Général des Impôts (General Tax Code) |
| CIVs | Collective investment vehicles |
| CTAs | Covered Tax Agreements |
| EAW | European Arrest Warrant |
| ECJ | Court of Justice of the European Union |
| ECtHR | European Court of Human Rights |
| EStG | Einkommensteuergesetz (Income Tax Law) |
| EWCA | England and Wales Court of Appeal |
| FC | Federal Court |
| FCA | Federal Court of Appeal |
| FCAus | Federal Court of Australia |
| FFCA | Full Federal Court of Australia |
| FTT | First-Tier Tribunal |
| GAAR | General anti-avoidance rule |
| HB/CA | Hof van Beroep/Cour d'Appel (Court of Appeals) |
| HC | High Court |
| HF | Högsta Förvaltningsdomstolen (Supreme Administrative Court) |
| HL | House of Lords |
| HR | Hoge Raad (Supreme Court) |
| HS | Høyesterett (Supreme Court) |
| ICJ | International Court of Justice |
| ITAT | Income Tax Appellate Tribunal |
| KHO | Korkein hallinto-oikeus (Supreme Administrative Court) |
| LB | Wet op de loonbelasting (Wage Tax Law) |
| LIS | Ley del Impuesto sobre Sociedades (Corporate Income Tax Law) |
| LLC | Limited liability corporation |

---

\* Before his retirement, John F. Avery Jones CBE was a Judge of the Upper Tribunal (Tax and Chancery Chamber) in the United Kingdom and a Visiting Professor at the London School of Economics.

---

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.

Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

| AD | Appellate Division |
|---|---|
| MAP | Mutual agreement procedure |
| MLI | The OECD Multilateral Convention |
| NATO | North Atlantic Treaty Organization |
| OECD | Organisation for Economic Co-operation and Development |
| OECD Commentary/ies | Commentary/ies on the OECD Model |
| OEEC | Organisation for European Economic Co-operation |
| ØL | Østre Landsret (Eastern Division of the High Court) |
| PE | Permanent establishment |
| RÅ | Regeringsrätten (Supreme Administrative Court) |
| SC | Supreme Court |
| SCNSW | Supreme Court of New South Wales |
| SpC | Special Commissioners |
| SPRL | Société privée à responsabilité limitée (limited liability company) |
| STF | Supremo Tribunal Federal (Supreme Federal Court) |
| TC | Tax Court |
| TCC | Tax Court of Canada |
| TF | Tribunal Fédéral (Federal Supreme Court) |
| TFJA | Tribunal Federal de Justicia Administrativa (Federal Court of Administrative Justice) |
| TIEA | Tax information exchange agreement |
| TS | Tribunal Supremo (Supreme Court) |
| UT | Upper Tribunal |
| Vienna Convention (1969) | Vienna Convention on the Law of Treaties (1969) |
| Vwgh | Verwaltungsgerichtshof (Supreme Administrative Court) |
| WCC | Western Cape High Court |

# 1. Policy and History

## 1.1. Policy

### 1.1.1. Summary

This chapter deals with the interpretation of tax treaties. A point should be made at the outset that it is irrelevant that a tax treaty may also be, or become, part of domestic law. So, as far as interpretation is concerned, it remains a tax treaty and part of international law. Any rules of domestic law, such as that a taxing act must be construed against the taxing authorities, do not apply. It used to be the case that tax professionals interpreted tax treaties as if they were domestic law, but, recently, there has been more understanding that treaty interpretation is a topic in itself. There are two main topics to be considered: (i) the Vienna Convention (1969) [1] (*see* section 3.); and (ii), in addition to the definitions in several treaty articles and the definitions in article 3(1), article 3(2) of the OECD Model[2] (*see* section 3.). The role of the Commentaries on the OECD Model[3] in interpretation is dealt with in section 3. Article 3(2) of the OECD Model is considered in section 4. Finally, a number of interpretation issues in tax treaties are dealt with in section 5. Before dealing with interpretation proper, some issues concerning the effect of tax treaties in domestic law that may result in a treaty not having the effect that its interpretation suggests are dealt with in section 2.

### 1.1.2. Policy

#### 1.1.2.1. The status of interpretative materials

The Vienna Convention (1969) unsurprisingly does not deal with commentaries to a model tax treaty, which are unusual. Normally, interpretative material is specific to a particular tax treaty, whether bilateral or multilateral, and the interpretative provisions of the Vienna Convention (1969) give these the status of

---

1. Vienna Convention on the Law of Treaties (23 May 1969), Treaties IBFD.
2. OECD Model Tax Convention on Income and on Capital (21 Nov. 2017), Models IBFD.
3. OECD Model Tax Convention on Income and on Capital: Commentaries (21 Nov. 2017), Models IBFD.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

context under article 31(2) or (3), which will apply to the Explanatory Statement to the OECD Multilateral Convention (MLI) (2017)[4] (*see* section 5.3.1.). However, the Commentaries on the OECD Model, which are unrelated to a particular treaty and specifically state that they are not legally binding, are difficult to reconcile with the terms of the Vienna Convention (1969). Various different views on the status of the OECD Commentaries are discussed in section 3.11. Whether it would be possible to improve this state of affairs is a policy question. It would clearly not be possible for the OECD Commentaries to be binding, both because of the variety of material that they contain and because this would inhibit their development, as states would have to be very careful about what they contained. The following statement in the OECD Commentaries, dating from 2000, is useful in providing encouragement to courts to pay attention to the Commentaries:

> 29.3 Bilateral tax treaties are receiving more and more judicial attention as well. The courts are increasingly using the Commentaries in reaching their decisions. Information collected by the Committee on Fiscal Affairs shows that the Commentaries have been cited in the published decisions of the courts of the great majority of member countries. In many decisions, the Commentaries have been extensively quoted and analysed, and have frequently played a key role in the judge's deliberations. The Committee expects this trend to continue as the worldwide network of tax treaties continues to grow and as the Commentaries gain even more widespread acceptance as an important interpretative reference.

The only other approach possible would be for the Commentaries on the OECD Model to deal with the issue of the relationship with the Vienna Convention (1969), for those courts that like a peg on which to hang their use of the Commentaries, perhaps saying that they are intended to have higher weight than article 32 material. However, once it is accepted that the Commentaries are not binding, using of them becomes a matter of the weight that should be accorded to them, which will always be a matter of judgment in any given case.

### 1.1.2.2. Common interpretation

The general rules of treaty interpretation produce the generally sensible result that a tax treaty receives a common interpretation in the states that are parties to it. The policy issue for tax treaties in relation to common interpretation relates to the existence of article 3(2) of the OECD Model, under which, apart from the competent authorities having the power to agree to a common interpretation by virtue of a change to the article made in the 2017 update (*see* section 4.3.1.), each state can interpret a term differently, depending on its domestic law. This works to their advantage, because taxation arises under domestic law and relief from taxation arises under tax treaties. The effect of applying domestic law to an undefined treaty term is that the treaty relief from taxation corresponds exactly with the taxation of that term in domestic law. If that were not the case and the term had a common meaning in both states that was wider than the domestic law meaning of the term, the disadvantage would be that if the treaty provided that a particular type of income was taxable in given circumstances, there would not necessarily be any taxation as this would depend on domestic law applying to what in domestic law was a different type of income. Consequently, applying a common meaning does not result in the same tax treatment in both states. It is less problematic if the treaty requires exemption of the type of income in given circumstances, because both states will exempt the income within the common meaning, even

---

4.     OECD Multilateral Convention to Implement Tax Treaty Related Measures to Prevent Base Erosion and Profit Shifting (7 June 2017), Treaties IBFD.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

though this is wider than the domestic law meaning. However, if that meaning were narrower than the domestic law meaning, it would leave some income taxable under domestic law that is exempted by the tax treaty. Initially, many states were reluctant to accept this if the result were that different domestic law meanings in the two states affected the relief article and looked for possible reasons why the context would require that domestic law should not be used. However, since the Commentary on Article 23 of the OECD Model provides that in such a case the residence state, in giving relief,[5] should generally[6] accept the source state's application of its domestic law in taxing the income, this is not a problem for states accepting this interpretation. Unless the competent authorities agree to a common interpretation, article 3(2) of the OECD Model means that common interpretation in the sense of a term having an autonomous meaning can arise only if the context otherwise requires the domestic law meaning not to be applied, which, because of the need to keep the treaty relieving provisions in line with the domestic law tax charge, is likely to be infrequent. Judging from the US experience, where the power to make mutual agreements on interpretation that override the rest of article 3(2) is contained in about 38 of their treaties since 1982, this power is also likely to be used infrequently.

The other aspect of a common interpretation is the use of foreign court decisions. Apart from the difference caused by article 3(2) of the OECD Model and more specific treaty provisions that produce a similar result,[7] there is scope for a common interpretation particularly of treaty issues not depending on the meaning of terms, for example, the issue of whether two domestic subsidiaries of a treaty partner holding company can group their profits and losses under whatever method domestic law prescribes.[8] A common interpretation does not imply that a court should automatically follow any foreign court decision. It is suggested that the following is a reasonable approach:

> As respects decisions of foreign courts, the persuasive value of a particular court's decision must depend on its reputation and its status, the extent to which its decisions are binding on courts of co-ordinate and inferior jurisdiction in its own country and the coverage of the national law reporting system. For instance your Lordships would not be fostering uniformity of interpretation of the convention if you were to depart from the prima facie view which you had yourselves formed as to its meaning in order to avoid conflict with a decision of a French court of appeal that would not be binding on other courts in France, that might be inconsistent with an unreported decision of some other French court of appeal and that would be liable to be superseded by a subsequent decision of the Court of Cassation that would have binding effect on lower courts in France.[9]

The courts in some states are clearly reluctant to refer to foreign court decisions because of their legal background in relation to domestic law. In international law, however, such a reference is merely one type of supplementary means of interpretation authorized by article 32 of the Vienna Convention (1969), so there is no reason to ignore them because they conflict with the approach in domestic law, and every

---

5.   Paras. 32.1 to 32.7 *OECD Model: Commentary on Article 23*.

6.   While art. 3(2) *OECD Model* usually points to the source state, that is not invariably the case, for example where art. 19(1) precludes taxation by the residence state.

7.   *See* arts. 6(2) and 10(3) *OECD Model*, third limb, which, however, are different in specifying that the definition in the source state (location of immovable property, residence of the company paying a dividend) is to be applied.

8.   *See* NL: HR, 23 Dec. 1992, Case 27.843, BNB 1993/71c, Tax Treaty Case Law IBFD; FI: KHO, Decision 10.05.2000/864; SE: RÅ, 1996 ref. 69 and 1998 ref. 49; FI: KHO: 1992-B-509 and 1992-B-510; and UK: FTT, 1 Apr. 2010, *FCE Bank plc v. HMRC*, [2010] UKFTT 136 (TC), which referred to all of the above decisions as confirmation of the decision it had reached, i.e. as supplementary means of interpretation (the foreign decisions aspect was not dealt with on appeal).

9.   UK: HL, 10 July 1980, *Fothergill v. Monarch Airlines* [1981] AC 251, 284, per Lord Diplock.

---

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

reason to consider them. Care is required in considering foreign decisions that may be based on later versions of the OECD Commentaries than the treaty being interpreted.

There is now a lot of similarity between methods of interpretation in different countries. The Commentaries on the OECD Model are now used widely by the courts, and there is starting to be a tendency, which should be encouraged, to consider treaty interpretation decisions by courts in other jurisdictions.

## 1.2. History

### 1.2.1. League of Nations

Early model tax treaties did not contain any definitions of types of income, with the exception that "income from movable capital" was defined in the League of Nations Mexico Draft (1943). Article 3(2) was first used in the United Kingdom-United States Income Tax Treaty (1945).[10] Unfortunately, there does not seem to be any archive material in either country about its origins. However, there had been two earlier indications of the same approach: (i) the Canada-United States Income Tax Treaty (1942)[11] (which was used as a basis for the initial draft of the United Kingdom-United States treaty (1945)) provided that "person", "individual" and "corporation" had the same meaning as "under the revenue laws of the taxing state"; and (ii) a similar but unilateral approach was contained in the US Regulations[12] made under the Sweden-United States Income and Capital Tax Treaty (1939),[13] which provided that

[a]ny word or term used in these Regulations which is not defined in the Convention but is defined in the Internal Revenue Code shall be given the definition defined therein.

### 1.2.2. The OEEC/OECD to 1963

Article 3(2) of the OECD Model seems to be a natural progression from these. The qualification "unless the context otherwise requires" is a familiar one in UK statutes and agreements. *See* section 1.2.3. and section 4.3.1. for the current version of article 3(2).

The OECD 1963 Draft version read as follows:

As regards the application of the Convention by a Contracting State any term not otherwise defined shall, unless the context otherwise requires, have the meaning which it has under the laws of that Contracting State relating to the taxes which are the subject of the Convention.

### 1.2.3. The OEEC/OECD to 1977

The OECD Model (1977) contained minor drafting changes and read as follows:

---

10. The UK-US. Income Tax Treaty art. II(3) (1945), Treaties IBFD.
11. The Can.-US Income Tax Treaty Protocol 3(a) (1942), Treaties IBFD.
12. US Regs. TD4975, 1940-2 Cum. Bull. 43.
13. The Swed.-US Income and Capital Tax Treaty (1939), Treaties IBFD.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

As regards the application of the Convention by a Contracting State any term not defined shall, unless the context otherwise requires, have the meaning which it has under the law of that Contracting State relating to the taxes which are the subject of the Convention.

From 1995 to 2017, it read as follows:

As regards the application of the Convention at any time by a Contracting State, any term not defined therein shall, unless the context otherwise requires, have the meaning that it has at that time under the law of that State for the purposes of the taxes to which the Convention applies, any meaning under the applicable tax laws of that State prevailing over a meaning given to the term under other laws of that State.

The change was made to clarify that its effect was ambulatory, following a decision to the contrary in the Canadian case of *Melford* (1961),[14] but there are many other decisions to the effect that the earlier version was already ambulatory (*see* section 4.8.2.).

A further change was made in 2017, so that it now reads as follows:

As regards the application of the Convention at any time by a Contracting State, any term not defined therein shall, unless the context otherwise requires *or the competent authorities agree to a different meaning pursuant to the provisions of Article 25*, have the meaning that it has at that time under the law of that State for the purposes of the taxes to which the Convention applies, any meaning under the applicable tax laws of that State prevailing over a meaning given to the term under other laws of that State.

The words in italics were added to enable the competent authorities to agree on a common interpretation pursuant to the mutual agreement procedure article that is different from domestic law in the state applying the tax treaty even though the context did not require that domestic law should not be used (*see* section 4.3.1.).

## 1.2.4. Other historical sources

### 1.2.4.1. Treatment of treaties like statutes

Earlier, many states did not make any distinction between the interpretation of domestic statutes and treaties,[15] but now there is general acceptance of applying the interpretative provisions of the Vienna Convention (1969) where they differ from those applying to the interpretation of domestic law. Some differences that can be found are that sometimes in domestic law a hierarchy of methods of interpretation are applied, or that greater use is made of supplementary materials, or a different emphasis is given to purpose compared to the wording. An early article in 1977 entitled "Principles to be Applied in Interpreting Tax Treaties"[16] drew attention to the potentially different methods of interpretation

---

14.    CA: SC, 28 Sept. 1982, Melford v. Her Majesty the Queen, 2 SCR 504, Tax Treaty Case Law IBFD.

15.    For instance, *see* AU: HC, 5 June 1969, The English, Scottish and Australian Bank Limited v. Federal Commissioner of Taxation, 118 CLR 651, Tax Treaty Case Law IBFD; and AU: SCNSW, 9 Feb. 1984, *Max Factor and Co v. Federal Commissioner of Taxation*, 84 ATC 4070.

16.    David A. Ward, *Principles To Be Applied in Interpreting Tax Treaties*, 25 Canadian Tax Journal 3, pp. 263-270 (1977).

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

of treaties compared to domestic law. This was followed by an article in 1984[17] after the entry into force of the Vienna Convention (1969) in 1980 that raised the profile of the topic. Today most judgments about tax treaties refer to the Vienna Convention (1969).

**1.2.4.2. Vienna Convention (1969) interpretation provisions**

During the preparations for the Vienna Convention (1969), it was decided that treaty interpretation had to be elaborated on without trying to be comprehensive. In doing so, the International Law Commission (ILC) "confined itself to trying to isolate and codify the comparatively few general principles which appear to constitute general rules for the interpretation of treaties".[18] Sir Humphrey Waldock, as Special Rapporteur to the ILC, prepared a first draft in the Third Report, which, after a number of drafting changes, became articles 31 to 33 (*see* sections 3.4. and 3.5.).[19]

Guidance was mainly needed to deal with the difference between those favouring the "intentions of the parties" approach, who would use supplementary means of interpretation freely, and those favouring the "textual" approach, who would limit the use of supplementary materials to resolving ambiguities or preventing absurd or unreasonable results. It will be seen that the ILC decided it was desirable to "take a clear position in regard to the role of the text in treaty interpretation",[20] which was that the interpretation provisions are

> based on the view that the text must be presumed to be the authentic expression of the intentions of the parties, and that, in consequence, the starting point of interpretation is the elucidation of the meaning of the text, not an investigation ab initio into the intentions of the parties.[21]

This was a continuation of the major principles of interpretation set out by Sir Gerald Fitzmaurice in 1956. The approach is demonstrated by the existence of a primary rule in article 31 of the Vienna Convention (1969) referring to the ordinary meaning of language in its context, and the limited use allowed for supplementary means of interpretation in article 32 – to confirm the article 31 interpretation, or to determine the meaning where article 31 leaves it ambiguous or obscure, or leads to a result that is manifestly absurd or unreasonable.

These interpretation provisions are generally considered to be statements of existing rules and are therefore applied even to treaties made before the Vienna Convention entered into force and by states that have not signed or ratified it. Gardiner states: "That the [International Court of Justice] views the Vienna rules [of interpretation] as general, or customary international law seems incontrovertible."[22] There are examples where the court has applied them to a state that is not a party to the Vienna Convention. Gardiner traces the development of the court's recognition of this over a period of more than 20 years.[23]

---

17.    John F. Avery Jones et al., *The Interpretation of tax Treaties with Particular Reference to Article 3(2) of the OECD Model*, British Tax Review, pp. 14-54 and 90-108 (1984).
18.    Para. 5 Vienna Convention: Commentary (1969).
19.    The history of the interpretation provision is summarized in F. Engelen, Interpretation of Tax Treaties under International Law ch. 4 (IBFD 2004), Online Books IBFD.
20.    Para. 5 Vienna Convention: Commentary (1969).
21.    Para. 11 Vienna Convention: Commentary (1969).
22.    R. Gardiner, *Treaty Interpretation*, 2nd edn, p. 16 (Oxford University Press 2015).
23.    Id., at 14 onwards.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

## 1.3. Relationship to basic principles of international taxation

Not applicable at present.

# 2. Interpretation versus Operation in Domestic Law

## 2.1. The difference between interpretation and operation in domestic law: In general

An initial distinction should be made between interpretation of a treaty, which is the meaning that an international court applying the correct principles of treaty interpretation would give it (assuming that an international court with jurisdiction existed) and the operation that the treaty has in domestic law. Normally, these will be the same, but a number of factors can mean that they are different. Principally, the difference will arise because of a feature of domestic law that means that the treaty does not have the effect that it should have. These include the issues set out in section 2.2.

## 2.2. The difference between interpretation and operation in domestic law: Specific issues

### 2.2.1. Override of the treaty by domestic law

> *See also*: K. Vogel et al., Tax Treaties and Domestic Law ch. 4 (G. Maisto ed., IBFD 2006), Online Books IBFD

> *See also*: Tax treaties and tax avoidance: application of anti-avoidance provisions (IFA Cahiers, vol. 95A 2010), Online Books IBFD

> *See also*: T. Kulcsár & J. Rogers-Glabush, Treaty Override: Reviving a Long-Forgotten Debate in the Name of Anti-Avoidance, 53 Eur. Taxn. 9/Special Issue, Journals IBFD

#### 2.2.1.1. Basic principles: Dualist and monist states

While a treaty is binding on a state in international law and must be performed in good faith, what matters to taxpayers is the effect of the treaty in domestic law. There are circumstances in which in some states domestic law can override a treaty, depending on how treaties are given effect in domestic law. In monist states, international and domestic law are part of the same system in which international obligations have a higher status, while, in dualist states, where international and domestic law are separate systems, a treaty has to be given effect in domestic law. The possibility of treaty override in general follows this distinction. Later domestic law can override a treaty in dualist states, as the treaty was given effect by an earlier domestic law, and so later domestic law can take away some of that effect. This is possible in Australia, Austria, Canada,[24] Denmark, Italy,[25] Finland, Sweden and the

---

24.    But the legislation giving effect to the tax treaty provides that the tax treaty cannot override the Income Tax Conventions Interpretation Act.
25.    But the constitution provides that legislative power must be exercised in compliance with international obligations (including the obligations stemming from treaties) and so any later domestic law overriding a tax treaty may be challenged before the *Corte Costituzionale* (Constitutional Court) as being in violation of article 117 of the Italian Constitution.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

United Kingdom. There are conflicting decisions on this issue in the courts in South Africa.[26] As treaties in Singapore are given effect by regulations and regulations cannot be inconsistent with statutes, it is possible for a statute to override a treaty though there has not been any case law on the issue. There are exceptions in dualist states: in Argentina, having incorporated the treaty into domestic law, it is given a higher status than domestic law generally. In monist states, it is generally not possible for domestic law to override a treaty as the treaty has a higher status to domestic law, although it might be still possible for a change in the constitution to override a treaty. This is the case in Belgium, China, France, Germany,[27] Italy, Japan, Mexico and the Netherlands. Nevertheless, in some monist states, it is possible for domestic law to override a treaty; this is the case in Spain and Switzerland (but this has never been applied to a tax treaty). Even where domestic law and treaty law have the same hierarchical status, as in the United States, and so there is nothing, in principle, to prevent later domestic law from overriding a treaty, there is another possibility of preventing override. The Brazilian *Supremo Tribunal Federal* (Supreme Federal Court, STF) has given priority to treaty law over later domestic law on the basis that the treaty is special law (*lex specialis*) which prevailed over general laws (*lex generalis*), thus preventing treaty override.[28] In Brazil, although treaties and domestic law have the same status and in general treaties can be overridden by later law, a tax law provision prevents this outcome.

## 2.2.1.2. Domestic law overrides

The fact that domestic law can override a treaty does not necessarily mean that later law will override a treaty. In general, the law will try to give effect to the treaty, but there will be a point at which this is no longer possible. As was said in *Maxwell on the Interpretation of Statutes* (quoted with approval by the UK House of Lords (HL) in *Collco Dealings* (1961)),[29]

[u]nder the same general presumption that the legislature does not intend to exceed its jurisdiction, every statute is to be so interpreted and applied, as far as its language admits, as not to be inconsistent with the comity of nations, or with the established rules of international law ... But if the statute is unambiguous, its provisions must be followed, even if they are contrary to international law.[30]

Similar statements are found in the US courts.[31] The same approach can also be found in the Swedish *Högsta förvaltningsdomstolen* (Supreme Administrative Court, HF) in *Skatteverket v. A*,[32] in which the HF said that, while there was no formal or constitutional rule that prevented override, the general

---

26. As decided by the Constitutional Court (CC) in ZA: CC, 17 Mar. 2011, *Glenister v. President of the Republic of South Africa* 2011 3 SA 347 (CC) (a non-tax case) to the effect that the treaty has priority and the Western Cape High Court (WCC) in ZA: WCC, 22 Nov. 2011, *South African Revenue Service v. Werner van Kets* 2012 3 SA 399 (WCC), Tax Treaty Case Law IBFD, (a tax treaty case) to the effect that the two should be "reconciled and read as one coherent whole".

27. Where the German *Bundesfinanzhof* (Federal Tax Court, BFH) has held that treaty overrides, in that case, DE: Einkommensteuergesetz [Income Tax Law, EStG], sec. 50d(8), comply with German constitutional law only in exceptional cases. A case was decided on this issue by the *Bundesverfassungsgericht* (Federal Constitutional Court) on 15 December 2015, thereby confirming the validity of treaty override without its being limited to exceptional cases (*see* Press Release No. 9/2016 of 12 February 2016).

28. BR: STF, 17 May 2012, *National Treasury v. COPESUL – CIA/Petroquímica do Sul*, Special Appeal No. 1.161.467 – RS (2009/0198051 – 2, Tax Treaty Case Law IBFD.

29. UK: HL, 2 Mar. 1961, *Commissioners of Inland Revenue v. Collco Dealings Ltd.*, (1961) 39 TC 509, Tax Treaty Case Law IBFD.

30. The current edition (with minor changes to the quoted passage) is P. St. J. Langan, *Maxwell on the Interpretation of Statutes* 12th edn, p. 183 (Sweet & Maxwell 1969).

31. *See* the decisions of the US Supreme Court (SC) in US: SC, 10 June 1957, *Reid v. Covert*, 354 U.S. 1 (1957) and US: SC, 9 Jan. 1888, *Whitney v. Robertson*, 124 U.S. 190, 194 (1888).

32. SE: HF, 14 Dec. 2010, *Skatteverket v. A*, 283-10, Tax Treaty Case Law IBFD.

---

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

approach was that later legislation did not override a treaty, unless the legislature clearly expressed the intention that it overrode treaties.

If there is an override, the other state may be able to terminate the treaty for material breach caused by a serious override (*see* section 3.8.3.), but this is unusual. Termination of the treaty will leave the objectionable domestic law in place and so termination will not benefit the other state or its taxpayers, and, indeed, will deny all the other treaty benefits to them. Not all override is bad for taxpayers; there are cases of states widening the effect of the tax treaty for the benefit of the taxpayer by override. One example is that, when the United Kingdom changed its death duties from estate duty to capital transfer tax (now called inheritance tax) in 1974, tax treaties concluded when estate duty applied (which applied only to that duty) were applied in the United Kingdom to the new tax.

### 2.2.1.3. The OECD and treaty override

The OECD has published a Report on Tax Treaty Override[33] containing some hypothetical examples and setting out the strong opposition to it by the Committee on Fiscal Affairs, while recognizing that there are circumstances in which a state may legitimately need to override a treaty, particularly to counteract treaty abuse. Preventing treaty abuse is part of the minimum standard under Action 6 of the OECD/G20 Base Erosion and Profit Shifting (BEPS) Project, and, as a result, it is possible that treaty override may become more common.

It should be noted that, while article 3(2) of the OECD Model (under which undefined terms in the tax treaty may have the meaning which they have in domestic law; *see* section 4.3.) states that this means domestic law as it is when the tax treaty is being applied (an ambulatory interpretation), and the same is implied in earlier versions of article 3(2), a change in domestic law is not an override, as the tax treaty contemplates that domestic law may change. It may, however, be possible to argue that the context requires that the later domestic law does not apply, for example, because the change in domestic law was not made in good faith (*see* section 4.6.).

### 2.2.2. Incomplete incorporation of the treaty in dualist states

The opposite of override (which might be called "underride") is when the treaty is never given full effect in domestic law. This usually occurs when domestic law in a dualist country uses secondary legislation that limits the effect that a treaty can have. An example is that, in the United Kingdom, tax treaties are given effect for income tax, corporation tax and capital gains tax and so a provision in the tax treaty that states that it applies to all taxes, such as articles 24(6) and 27(1) of the OECD Model, cannot have effect in domestic law in the United Kingdom (but may do so in the other state). Nor can a provision applying the tax treaty to substantially similar taxes[34] have any effect without domestic legislation. Another example in the United Kingdom is provided by *Sun Life of Canada* (1984),[35] in which the High Court (HC) decided that a credit for foreign tax was not available to a permanent establishment (PE) by virtue of the non-discrimination article, as the legislation[36] gave relief "subject to the provisions of this Part [of the Taxes Act 1988]", one of which provided that only residents qualified for relief.[37]

---

33.    OECD, Report on Tax Treaty Override (OECD 1989).
34.    Art. 2(4) OECD Model (2017).
35.    UK: HC, 17 Apr. 1984, Sun Life of Canada v. Pearson [1984] STC 461, 516b. The decision was appealed, but not on this point.
36.    UK: Income and Corporation Taxes Act 1988, sec. 788(3), National Legislation IBFD, now UK: Taxation (International and Other Provisions) Act 2010, sec. 18(4).
37.    The law has since been changed to give relief.

---

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

The problem does not arise in dualist states where the treaty is incorporated into domestic law by primary legislation, as in Australia (except that in the past tax treaties were given effect for the purposes of Australian tax, which may have meant that there was incomplete implementation, for example, in relation to exchange of information; with regard to exchange of information, any problem in this respect was removed by section 23 of the International Tax Agreements Act 1953, which also applies to tax information exchange agreements (TIEAs)), Brazil, Canada, Denmark, Finland, Germany (where both the lower and upper legislative bodies (*Bundestag* (Federal Diet) and *Bundesrat* (Federal Council), respectively must declare their formal consent to a treaty by passing a formal act (*Zustimmungsgesetz*)) and Sweden, as incorporation must be complete. The problem cannot arise in monist countries, where the treaty does not need to be incorporated into domestic law. There are the following two types of monist countries: (i) those where the treaty has effect without any further requirement, such as China and Switzerland; and (ii) those where some Parliamentary approval or publication in an official journal is also required, as in Belgium, France, Italy, Japan (under the Constitution the treaty must be approved by the Diet), the Netherlands (although a court cannot take account of a failure to do this), Spain and the United States (where the "advice and consent" of the Senate is necessary for ratification).

### 2.2.3. Cherry picking between treaty and domestic law

Another issue is whether or not a taxpayer can use the tax treaty in relation to one item of income and domestic law in relation to another. For instance, if, in domestic law, business profits are taxable in the absence of a PE, so that the treaty PE concept cuts down domestic law, can the taxpayer apply the tax treaty to avoid paying tax on business profits where there is no PE, but use domestic law to claim to use losses? Or can the taxpayer use the tax treaty in relation to an item of income for one tax year but not another? There does not seem to be any consensus regarding this issue and domestic law is relevant.

In some countries, the benefit of the tax treaty has to be claimed before it can be applied. This is the case in Mexico, the United Kingdom and the United States (where the taxpayer must disclose the use of the tax treaty in the return or attached statement). In countries where the benefit of the tax treaty must be claimed, cherry picking is possible over different years by claiming or not claiming the benefit of the tax treaty. There is no possibility in these countries of a court itself giving effect to the tax treaty without such a claim having been made by the taxpayer. Where the benefit of the tax treaty does have to be claimed by the taxpayer, civil law courts, in France, for example, can give effect to the tax treaty ex officio; in general, common law courts will not deal with a point that has not been argued by the parties.

The US Technical Explanation (2003)[38] to the United Kingdom-United States Income Tax Treaty (2001)[39] contains the following statement on cherry picking:

It follows that, under the principle of paragraph 2 [i.e. that the treaty cannot hurt a taxpayer], a taxpayer's U.S. tax liability need not be determined under the Convention if the Code would produce a more favorable result. A taxpayer may not, however, choose among the provisions of the Code and the Convention in an inconsistent manner in order to minimize tax. For example, assume that a resident of the United Kingdom has three separate businesses in the United

---

38.    Department of the Treasury Technical Explanation of the Convention between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income and on Capital Gains art. 1(2) (5 Mar. 2003), Treaties IBFD, also available at www.treasury.gov/resource-center/tax-policy/treaties/Documents/teus-uk.pdf.

39.    The UK-US Income Tax Treaty (2001), Treaties IBFD.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

States. One is a profitable PE and the other two are trades or businesses that would earn taxable income under the Code but that do not meet the permanent establishment threshold tests of the Convention. One is profitable and the other incurs a loss. Under the Convention, the income of the permanent establishment is taxable in the United States, and both the profit and loss of the other two businesses are ignored. Under the Code, all three would be subject to tax, but the loss would offset the profits of the two profitable ventures. The taxpayer may not invoke the Convention to exclude the profit of the profitable trade or business and invoke the Code to claim the loss of the losing trade or business against the profit of the permanent establishment. See Rev. Rul. 84-17, 1984-1 C.B. 308. If, however, the taxpayer invokes the Code for the taxation of all three ventures, the taxpayer would not be precluded from invoking the Convention, for example, with respect to any dividend income the taxpayer may receive from the United States that is not effectively connected with any of the taxpayer's business activities in the United States.

### 2.2.4. Can the treaty extend taxing rights?

Normally, it is understood that the tax treaty relieves from tax, although there are a few countries, such as France[40] and Japan, where, if the tax treaty provides for something to be taxable that domestic law does not otherwise tax, taxation has effect for domestic law purposes. A more limited example of the same point is that, in Australia and Japan, treaty source rules also have effect for domestic law, which can have the result that tax is payable under domestic law as a result of the tax treaty that would not have been under domestic law on its own. This cannot arise in other countries, where, in general, tax treaties only relieve from tax, but there can be borderline cases where a taxpayer can be worse off as a result of the tax treaty than it would have been in domestic law. For instance, if a loss is made when carrying on business in a state without a PE that could be used under domestic law, the effect of the tax treaty not taxing the business because there is no PE may be that the loss cannot be used. China's position is unclear. As a result of the enlarged preamble to tax treaties effected by article 6 of the MLI, which states that relieving from tax must be accomplished "without creating opportunities for non-taxation or reduced taxation through tax evasion or avoidance", it is possible that states may in future be more willing to consider changing domestic law to enable tax treaties to impose tax.

### 2.2.5. Mutual agreement on interpretation: Binding in international law, but not necessarily in domestic law

As a matter of international law, an agreement between states on the interpretation of the treaty is binding (*see* section 3.4.5.). The treaty is a contract, and if both parties agreed that it means something, that is the meaning. However, that may not be the effect in domestic law in respect of tax treaties for the reasons given in section 3.14.

### 2.2.6. Subsequent practice: relevant to interpretation in international law but may not be so in domestic law

Subsequent practice of the treaty parties is part of the context according to article 31(3)(b) of the Vienna Convention (1969) on the basis that it establishes the understanding of the parties as to the

---

40.    In min c/ Sté Interhome AG (FR: CE, 20 June 2003, Case No. 224407), the CE applied this principle in a case involving article 209 of the *Code Général des Impôts* (General Tax Code, CGI), which provides that only profits deriving from an enterprise operated in France are subject to French corporate income tax (principle of territoriality). However, as the very end of this provision indicates that corporate income tax also concerns profits "taxation of which is attributed to France by an international convention", the CE authorized the French tax authorities to tax a non-resident company on the combined grounds of article 209 of the CGI and the provisions of the Fr.-Switz. Income and Capital Tax Treaty (1966), Treaties IBFD. *See* FR: CE 31 July 2009, Case No. 296471, Overseas Thoroughbred Racing Stud Farms Ltd, Tax Treaty Case Law IBFD, for another example.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

interpretation of the treaty. As with mutual agreements, this may not be the effect in domestic law for tax treaties for the reasons given in section 3.14.

### 2.2.7. Domestic law use of material not permitted in international law

In section 2.1., it was assumed that a domestic court applied the same principles of interpretation of the treaty which an international court would do if it had jurisdiction. In some countries, a domestic court may use materials that would not be proper for international law treaty interpretation, such as unilateral material, or give additional weight to the interpretation of the tax authorities, both of which occur in the United States (*see* section 5.2.2.2.).

# 3. Vienna Convention (1969) and the OECD Models

*See also*: F. Engelen, Interpretation of Tax Treaties under International Law (IBFD 2004), Online Books IBFD

*See also*: J.A. Becerra, Interpretation and Application of Tax Treaties in North America – Second revised edition ch. 4 (IBFD 2013), Online Books IBFD

*See also*: P. Arginelli, Multilingual Tax Treaties: Interpretation, Semantic Analysis and Legal Theory (IBFD 2015), Online Books IBFD

*See also*: S. Douma et al., The Legal Status of the OECD Commentaries (S. Douma et al. eds., IBFD 2008), Online Books IBFD

## 3.1. In general

The Vienna Convention (1969) has far wider application than simply interpretation, including such matters as the relationship with domestic law, the non-retroactivity of treaties and termination of treaties (*see* section 3.8.).

In particular, the Vienna Convention (1969) has its own preparatory work: the Commentary on the Vienna Convention (1969), which is useful in its interpretation. The Commentary on the Vienna Convention (1969) was drafted by the International Law Commission before the finalization of the text of the Vienna Convention (1969) and the article numbers changed in the final version. References to article numbers have, therefore, been updated in the quotations in section 3.

It should be noted that, while the Vienna Convention (1969) applies only to treaties concluded after 27 January 1980, the interpretation provisions are generally regarded, including by the International Court of Justice (ICJ), as reflecting existing international law and are, therefore, applicable whenever the particular treaty was entered into. Statements by courts or tax authorities to that effect can be found in Australia, Belgium, Brazil (in relation to a different provision of the Vienna Convention (1969)), Canada,

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

France (which has not signed the Convention), Germany, India (which has not signed the Convention), Italy, the Netherlands, Norway, South Africa (which has not signed the Convention), Spain, Switzerland, the United Kingdom and the United States (which has signed, but not ratified the Convention). The Vienna Convention (1969) has not been signed or ratified by Singapore and the position of the tax authorities on this point has not been published.

## 3.2. Limited purpose of the interpretation provisions of the Vienna Convention (1969)

It should be emphasized that the Vienna Convention (1969) set out with a limited purpose in including the interpretation provisions of articles 31 to 33. The Commentary on the Vienna Convention (1969) states that

> [a]ccordingly the [International Law] Commission confined itself to trying to isolate and codify the comparatively few general principles which appear to constitute general rules for the interpretation of treaties.[41]

It should not be surprising that the effect of the Commentaries on the OECD Model, which are peculiar to the OECD Model and not found generally in other treaties, should not be covered (*see* sections 3.10. to 3.12. for consideration of the OECD Commentaries as an aid to interpretation of tax treaties). The reason why the International Law Commission wanted to set out a few general principles was that there were diverging opinions concerning interpretation, with some placing the main emphasis on the subjective intentions of the parties (for which they would apply *travaux préparatoires* liberally), some on the teleological (or object and purpose) approach, and others (the majority) emphasizing the primacy of the text, while giving some place to extrinsic evidence about the intentions of the parties and the object and purpose of the treaty. The conclusion of the International Law Commission on this debate was that the interpretation provisions are

> based on the view that the text must be presumed to be the authentic expression of the intentions of the parties, and that, in consequence, the starting point of interpretation is the elucidation of the meaning of the text, not an investigation *ab initio* into the intentions of the parties.[42]

## 3.3. The distinction between primary and secondary interpretative material

The interpretation provisions of the Vienna Convention (1969) make a fundamental distinction between the general rule ("rule" in the singular is important) in article 31 (*see* section 3.4.) and supplementary means of interpretation in article 32 (*see* section 3.5.). The purpose of defining context, which is the largest element dealt with in article 31 of the Vienna Convention (1969), is, first, to limit the materials that are considered when applying that article. In practice, parties will refer the court to supplementary means as part of the argument, so that the court will be aware of their content. However, when coming to its decision it is always necessary for the court to find an interpretation according to article 31 of the Vienna Convention (1969) without using supplementary means of interpretation and then apply article 32 either "to confirm the meaning resulting from the application of Article 31", and so, if it does not

---

41.    Para. 5 Vienna Convention: Commentary (1969).
42.    Id., at para. 11.

---

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

confirm the meaning (and the second part of article 32 is inapplicable), the article 31 interpretation must stand and cannot be contradicted by supplementary means (but *see* section 3.5.1.2.). Second, article 32 of the Vienna Convention (1969) can be used to determine the meaning where the interpretation according to article 31: (i) leaves the meaning ambiguous or obscure; or (ii) leads to a result that is manifestly absurd or unreasonable. Both of these alternatives refer to a meaning already ascertained from article 31 of the Vienna Convention (1969) before article 32 can be used for those limited purposes.

In summary, these interpretative provisions are more about what can be considered to be part of the main rule of interpretation[43] and what can be used only in limited circumstances,[44] than about how the process of interpretation operates, thus confirming the statement of the Commentary on the Vienna Convention (1969) regarding the limited purpose of the interpretation provisions in the Vienna Convention (1969) (*see* section 3.1.). Essentially, therefore, these provisions, while limiting the material that may be used in coming to the primary interpretation under article 31 of the Vienna Convention (1969), do not tell the interpreter how to use them, apart from saying that the treaty is to be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context (as so defined), and in the light of its object and purpose (necessarily also determined by its terms). A great deal of leeway is, therefore, left to the interpreter.

## 3.4. Article 31 of the Vienna Convention (1969): General rule of interpretation

### 3.4.1. The provision

Article 31 of the Vienna Convention (1969) reads:

1.    A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

As noted in section 3.3., the heading of article 31 of the Vienna Convention (1969) is the "general rule" [in the singular] "of interpretation", emphasizing that it is a single whole and not a hierarchy. As paragraph 8 of the Commentary on the Vienna Convention (1969) states, this is

intended to indicate that the application of the means of interpretation in the article would be a single combined operation. All the various elements, as they were present in any given case, would be thrown into the crucible, and their interaction would give the legally relevant interpretation. Thus, is entitled "General *rule* of interpretation" in the singular, not "General *rules*" in the plural, because the Commission desired to emphasize that the process of interpretation is a unity and that the provisions of the article form a single, closely integrated rule.[45]

### 3.4.2. Article 31 of the Vienna Convention (1969): The elements

The elements in the single combined operation of interpretation in article 31 of the Vienna Convention (1969) are: (i) good faith (*see* section 3.4.3.); (ii) ordinary meaning (*see* section 3.4.4.); (iii) context

---

43.    Art. 31 Vienna Convention (1969).
44.    Id., at art. 32.
45.    Para. 8 Vienna Convention: Commentary (1969).

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(*see* sections 3.4.5. to 3.4.9.); and (iv) object and purpose (*see* section 3.4.10.). In this regard, the Commentary on the Vienna Convention (1969) states,

> the first – interpretation in good faith – flows directly from the rule *pacta sunt servanda*. The second principle is the very essence of the textual approach: the parties are to be presumed to have that intention which appears from the ordinary meaning of the terms used by them. The third principle is one both of common sense and good faith; the ordinary meaning of a term is not to be determined in the abstract but in the context of the treaty and in the light of its object and purpose.[46]

### 3.4.3. Good faith

The treaty must be performed in good faith: the rule *pacta sunt servanda*. It follows logically that no interpretation of the treaty can fail to be made in good faith, as otherwise the performance of the treaty based on its interpretation would not be in good faith. The Commentary on the Vienna Convention (1969) explains that

> [w]here a treaty is open to two interpretations one of which does and the other does not enable the treaty to have appropriate effects, good faith and the objects and purposes of the treaty demand that the former interpretation should be adopted. Properly limited and applied, the maxim does not call for an "extensive" or "liberal" interpretation in the sense of an interpretation going beyond what is expressed or necessarily to be implied in the terms of the treaty.[47]

It should be noted that statements, such as "liberal" interpretation, will impliedly be making a comparison with domestic law interpretation. Such statements are not helpful, as they are comparisons with each state's domestic law. The application of good faith "is determined at any particular time by the compelling standards of honesty, fairness and reasonableness prevailing in the international community at that time".[48] Good faith, therefore, requires that technicalities of interpretation do not apply. One apparent oddity is that article 32 of the Vienna Convention (1969) deals with the situation where the interpretation according to article 31 is absurd or unreasonable, which would not be expected to be the result of an interpretation made in good faith. Perhaps, the explanation is that other elements may be given greater weight so that, even where good faith has been tried and has failed to find a reasonable interpretation, the supplementary means are available to assist.

An important aspect of good faith is the extent to which article 3(2) of the OECD Model applies changes in domestic law occurring after the tax treaty is signed (*see* section 4.6.).

In the Netherlands, the *Hoge Raad* (Supreme Court, HR) in various cases based its decision on the good faith principle. For instance, in its decisions of 19 June 2009, the HR held that the exit tax on private pension claims with pension funds established in the Netherlands was incompatible with the good faith principle to be observed in the interpretation and application of the tax treaties.[49] The HR decided that this exit charge imposed by way of a preserving assessment to be enforced at a later time

---

46.    Id., at para. 12.
47.    Id., at para. 6.
48.    J. F. O'Connor, *Good Faith in International Law* p. 109 (Dartmouth 1991).
49.    NL: HR, 19 June 2009, Cases 43.978, 07/13267, 08/02288, Tax Treaty Case Law IBFD.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

in the event of realization other than through periodic payments was incompatible with that principle if it implied that, in fact, income, which was allocated for taxation, or potential taxation, to the states where the taxpayers emigrated to were to be taxed in the Netherlands. The assessment was computed on the basis of the fair market value of the pension claims at the time of emigration, deemed to be derived as taxable income at the time immediately preceding emigration. Finally, the HR took the view that this deeming provision could not have the effect that the taxable income would become excluded from the scope of the provisions of tax treaties regarding pensions. Another example is that the HR, in a decision of 18 November 2016,[50] relied on good faith to decide that the Netherlands-Portugal Income and Capital Tax Treaty (1999)[51] prevented the fictitious wages charged on a 5% shareholder of a Dutch company working for the company from applying to a resident of the treaty partner state, Portugal, which did not have any similar concept in its domestic law (*see* section 5.1.1.).

### 3.4.4. Ordinary meaning

The ordinary meaning of words always depends on their context. Ordinary meaning is not a dictionary definition of a word divorced from the context. As was said by the Canadian Federal Court (FC) in *Gladden* (1985)[52] (cited with approval by the Supreme Court of Canada (SC) in *Crown Forest* (1995)),[53]

> [a] literal or legalistic interpretation must be avoided when the basic object of the treaty might be defeated or frustrated in so far as the particular item under consideration is concerned.

While there can be several ordinary meanings, the applicable one must be chosen from the context of the treaty.[54] Words used in the treaty may be used in a different sense than domestic law and the treaty meaning should not be coloured by such domestic law meanings. *See* section 3.4.11. for the possibility of a special meaning applying.

### 3.4.5. Context

#### 3.4.5.1. Article 31(2) of the Vienna Convention (1969): Definition of context

Article 31 of the Vienna Convention (1969) contains a wide, though not unlimited, definition of context to specify how far material other than the treaty itself (including the preamble and annexes) comprises material that may be used in the article 31 interpretative process, rather than supplementary means of interpretation (effectively, including all other relevant material, except for context that may be used for only limited purposes (*see* section 3.5.)). Context should, therefore, be regarded as meaning primary interpretative material. The first part of the definition of context is as follows:

> 2.    The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:
>
> (a)    any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;

---

50.    NL: HR, 18 Nov. 2016, BNB 2017/34.
51.    Neth.-Port. Income and Capital Tax Treaty (1999), Treaties IBFD.
52.    CA: FC, 22 Jan. 1995, Gladden v. Her Majesty the Queen, [1985] 1 CTC 163 at 166-7, Tax Treaty Case Law IBFD.
53.    CA: SC, 22 June 1995, Crown Forest Industries Ltd v. Her Majesty the Queen, [1995] 2 SCT 902, at 43, Tax Treaty Case Law IBFD.
54.    Gardiner, *supra* n. 22, at pp. 183-184.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(b)    any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

### 3.4.5.2. Article 31(2) of the Vienna Convention (1969): Interpretation

The opening sentence relates to the treaty itself, including all parts of it. The material in article 31(2) (a) and (b) of the Vienna Convention (1969) is "in addition to the text" and, therefore, impliedly not part of the treaty, but is, nevertheless, effectively treated as if it were for interpretation purposes. All this material (and the material in article 31(3) of the Vienna Convention (1969) (*see* section 3.4.5.4.)) is context and is, therefore, given greater weight than supplementary means of interpretation within article 32 (*see* section 3.5.). It will be noted that all of these items have a bilateral element. The reason why these two items are limited to documents "in connexion with the conclusion of the treaty" is that it may not be clear whether or not statements made during negotiations represent the final agreement made by the parties; however, such material can still be considered, but only as supplementary means of interpretation within article 32 of the Vienna Convention (1969). Unilateral material is never part of the context, unless it has been accepted by the other parties as falling within article 31(2)(b) of the Vienna Convention (1969) (an example is that Canada has specifically agreed to the US Technical Explanations[55] to the Canada-United States Income and Capital Tax Treaty (1980)[56] and its subsequent Protocols) or is included as part of the text of the tax treaty, such as the reference to domestic law in article 3(2) of the OECD Model (*see* section 4.2.).

This provision merely says that the listed material is part of the context. It does not say what weight is to be given to it, which will depend on its nature. A definition provision in the tax treaty itself, such as resident of a contracting state, immovable property, and (for the purpose only of each of those articles) dividends, interest and royalties, will be used in a binding way to interpret the provision under consideration. An exception should be made where the definition is subject to the context "otherwise requiring", as is the case with the definitions in article 3(1) of the OECD Model, when the possibility of its not being a binding interpretation for this reason must be considered (*see* section 5.1.2.). The definition is part of the context in which the terms of the treaty are being interpreted. (It should be noted that, in the OECD Model, context does not have the same meaning as the definition in the Vienna Convention (1969) (*see* section 4.4.).) As it is a definition, it is intended that it should be binding; in these circumstances, there is no room for the operation of the other elements of good faith, ordinary meaning, and object and purpose (except in relation as to whether or not the context otherwise requires where the definition is subject to this qualification). A definition in an agreement referred to in article 31(2)(a) of the Vienna Convention (1969) (or an instrument that is accepted by all parties within article 31(2)(b)) is in exactly the same category for interpretation purposes. The Commentary on the Vienna Convention (1969) explains that

---

55.    Treasury Department Technical Explanation of the Convention between the United States of America and Canada with respect to Taxes on Income and on Capital Signed at Washington, D.C. on September 26, 1980, as Amended by the Protocol Signed at Ottawa on June 14, 1983 and the Protocol Signed at Washington on March 28, 1984 (1997), Treaties IBFD; Treasury Department Technical Explanation of the Protocol Amending the Convention between the United States of America and Canada with respect to Taxes on Income and on Capital Signed at Washington on September 26, 1980, as Amended by the Protocols Signed on June 14, 1983 and March 28, 1984 (1997), Treaties IBFD; Department of the Treasury Technical Explanation of the Protocol between the United States of America and Canada Signed at Ottawa on July 29, 1997 Amending the Convention between the United States of America and Canada with respect to Taxes on Income and on Capital Signed at Washington on September 26, 1980 as Amended by the Protocols Signed on June 14, 1983, March 28, 1984 and March 17, 1995 (1997), Treaties IBFD; and Department of the Treasury Technical Explanation of the Protocol Done at Chelsea on September 21, 2007 Amending the Convention between the United States of America and Canada with respect to Taxes on Income and on Capital Done at Washington on September 26, 1980, as Amended by the Protocols Done on June 14, 1983, March 28, 1994, March 17, 1995, and July 29, 1997 (2007), Treaties IBFD.

56.    The Can.-US Income and Capital Tax Treaty (1980), Treaties IBFD.

---

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

it is well settled that when an agreement as to the interpretation of a provision is established as having been reached before or at the time of the conclusion of the treaty, it is to be regarded as forming part of the treaty ... .[57]

The Commentary on the Vienna Convention (1969) also points to the time of the conclusion of the treaty, which is suggested more strongly by the French version ("*à l'occasion de la conclusion du traité*") than the English version ("in connection with the conclusion of the treaty"). The word "agreement" is wider than the defined term "treaty",[58] which is restricted to written agreements governed by international law. It could, therefore, include an oral agreement, although this is unlikely in practice.

In circumstances in which article 31(2)(a) and (b) of the Vienna Convention (1969) is, therefore, not in point and where an undefined term or phrase is being interpreted (and article 3(2) of the OECD Model is inapplicable), the whole of the items comprising the context must be considered, but, as none of it has binding force for this purpose, it will be considered together with all the other elements (good faith, ordinary meaning, and object and purpose) together in reaching the interpretation.

### 3.4.5.3. Article 31(2) of the Vienna Convention (1969): illustration

By way of illustration, the Explanatory Statement to the MLI states that it reflects the agreed understanding of the negotiators and that the 99 members of the ad hoc group adopted it at the same time as adopting the text of the convention. It is, therefore, context within the meaning of article 31(2)(a) of the Vienna Convention (1969) in relation to the 99 members of the ad hoc group; in relation to any other state, it would be context within the meaning of article 31(2)(b) only if such state accepted it as an instrument related to the MLI (*see* section 5.3.3.). The joint Council of Europe and OECD Convention on Mutual Administrative Assistance in Tax Matters (1988),[59] which is a multilateral convention, has an Explanatory Report[60] commenting on each article in a similar manner to the Commentaries on the OECD Model. The Explanatory Report contains a statement to the effect that "[t]he text of the Explanatory Report prepared by the committee of experts and transmitted to the Committee of Ministers of the Council of Europe and the Council of the OECD and approved by OECD's Committee on Fiscal Affairs … does not constitute an instrument providing an authoritative interpretation of the text of the Convention although it may facilitate the understanding of the Convention's provisions", which is a normal provision in Council of Europe treaties. It is suggested that it is part of the context, as it would still have been agreed by the contracting states.[61] However, in such a case, as a definition in it is expressly not an authoritative interpretation, it would be given less weight than a binding contemporaneous agreement, but appropriate weight should be given to it when considering all the elements together, and certainly more weight than if it had been contained in supplementary means of interpretation. In practice, therefore, such a non-binding definition will normally still prevail. If confirmed by practice, it may also achieve the status of subsequent practice (*see* section 3.4.7.).[62] The European Court of

---

57.   Para. 14 *Vienna Convention: Commentary* (1969).
58.   Art. 2 Vienna Convention (1969).
59.   Convention between the Member States of the Council of Europe and the Member Countries of the OECD on Mutual Administrative Assistance in Tax Matters (25 Jan. 1988), Treaties IBFD.
60.   Technical Explanation of the Convention between the Member States of the Council of Europe and the Member Countries of the OECD on Mutual Administrative Assistance in Tax Matters (1 Sept. 1989), Treaties IBFD.
61.   A non-binding Council of Europe Explanatory Report was so regarded in UK: HL, 1989, *R v. Secretary of State for the Home Department ex p. Read*, [1989] AC 1014, 1052, per Lord Bridge. It would alternatively be a supplementary means of interpretation within article 32 of the Vienna Convention (1969); *see* section 3.5.
62.   Gardiner, *supra* n. 22, at p. 273.

---

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Human Rights (ECtHR) has also used non-binding material, such as recommendations and resolutions of the Committee of Ministers and the Parliamentary Assembly, as part of the context for interpretation purposes in *Demir and Baykara v. Turkey* (2008),[63] citing earlier authority. There is no reason to consider that this is incorrect in international law.

Treating the material in article 31(2)(a) and (b) of the Vienna Convention (1969) as context, particularly so if the interpretation is a binding one, can lead to problems with tax treaties where the tax treaty itself may go through a Parliamentary procedure, which is not only the process in dualist states, and the contemporaneous agreement may or may not be included in the process, and the subsequent agreement will normally not be included. While the agreement may be binding in international law between the states, it may not be binding in domestic law and, consequently, not binding on the taxpayer where the courts will determine the meaning without reference to the items in article 31(2) of the Vienna Convention (1969) if they have not been through the correct internal procedure. Even when it has, a court may find that there is a limit to what a subsequent agreement can do to change the meaning of a treaty.

### 3.4.5.4. Article 31(3) of the Vienna Convention (1969): Further category of context

Article 31(3) adds a further category of context:

3.    There shall be taken into account, together with the context:

    (a)    any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

    (b)    any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

    (c)    any relevant rules of international law applicable in the relations between the parties.

The opening words of this paragraph ("There shall be taken into account, together with the context") are different from those of article 31(2) of the Vienna Convention (1969) ("The context ... shall comprise"). Any implication that these items are of lesser importance deriving from the difference is wrong, as it is part of the general rule in article 31, and such an interpretation is not supported by the preparatory works.[64] The other language versions do not suggest that any difference was intended. The French version says: "*Il sera tenu compte, en même temps que du contexte*", which suggests that it is something to be taken into account at the same time as the context and so is equivalent to the context. The variation in wording is probably used to differentiate between real context, which is restricted to contemporaneous documents being intrinsic elements, and extrinsic elements, such as subsequent agreements and practice. These are still equivalent to context (or are treated as if they were context) and so are to be used as part of the interpretative process under article 31 of the Vienna Convention (1969), rather than as supplementary means of interpretation. This supports the suggestion that context really means primary interpretative material.

---

63.   TR: ECtHR, 12 Nov. 2008, *Demir and Baykara v. Turkey* (No. 34503/97, at 74).

64.   *See* Gardiner, *supra* n. 22, at p. 230. It was suggested in CA: FCA, 30 Sept. 1996, Coblentz v. Her Majesty the Queen, [1997] 1 FC 368, Tax Treaty Case Law IBFD, that a subsequent agreement might be given less weight, but this was not necessary to the decision.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

### 3.4.6. Subsequent agreements

The Commentary on the Vienna Convention (1969) describes article 31(3)(a) of the Vienna Convention (1969) as "a further authentic element of interpretation to be taken into account together with the context". In exactly the same way as it says of the material in article 31(2) of the Vienna Convention (1969), it says of article 31(3)(a),

> [s]imilarly, an agreement as to the interpretation of a provision reached after the conclusion of the treaty represents an authentic interpretation by the parties which must be read into the treaty for the purposes of its interpretation.[65]

A subsequent agreement would have to go through the same Parliamentary procedure as the treaty itself in order to become binding in domestic law in most countries. An example of this is that the following agreement was made in 2012[66] in relation to the Switzerland-United Kingdom Income Tax Treaty (1977) (together with the Protocols (1981), (1993), (2007) and (2009)):[67]

1. In respect of requests for information under Article 25 (Exchange of information) of the Convention, the following rule shall be applied and observed: while the details to be given when making a request for information are important procedural requirements that are intended to ensure that "fishing expeditions" do not occur, they nevertheless need to be applied in such a way as not to frustrate the effective exchange of information.

2. Accordingly, provided the request is not a fishing expedition, it is agreed that an administrative assistance request shall be complied with if the requesting State

   a) identifies the person under examination or investigation; such identification may be provided by other means than by indicating the name and address of the person concerned, and

   b) indicates, to the extent known, the name and address of any person believed to be in possession of the requested information.

In the United Kingdom, the agreement was approved by Parliament as a schedule to a statutory instrument[68] using the same procedure as is used for making tax treaties.

Where the tax treaty itself provides for subsequent agreements, as in the mutual agreement article, article 25(3) of the OECD Model stating that: "The competent authorities of the Contracting States shall endeavour to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention", the question arises in domestic law as to whether or not the Parliamentary approval given to the tax treaty containing this provision is sufficient Parliamentary approval to give effect to the agreement in domestic law. The OECD Model (2017) (like many earlier US tax treaties (*see* section 4.9.)) is even more explicit, in stating, "in particular the competent authorities

---

65.    Para. 14 *Vienna Convention: Commentary* (1969).
66.    Exchange of Letters of 3 and 6 May 2012.
67.    The Switz.-UK Income Tax Treaty (1977), Treaties IBFD.
68.    UK: Double Taxation Relief and International Enforcement (Switzerland) Order 2012.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

of the Contracting States may agree ... to a common meaning of a term", which is a clear delegation to them to make a binding subsequent agreement without further Parliamentary approval. In Spain, mutual agreements are published in the Official Gazette, although there may be delays and the agreements may be expressed to apply prior to their signature. For instance, the interpretative mutual agreement regarding limited liability corporations (LLCs) and S Corporations in the Spain-United States Income Tax Treaty (1990)[69] was signed in January-February 2006 and published in the Official Gazette on 13 August 2009, but it is stated to be effective from 1 January 1998.

### 3.4.7. Subsequent practice

The Commentary on the Vienna Convention (1969) explains with regard to article 31(3)(b) of the Vienna Convention (1969) that, in relation to subsequent practice which establishes the understanding of the parties regarding its interpretation,

> the importance of such subsequent practice in the application of the treaty, as an element of interpretation, is obvious; for it constitutes objective evidence of the understanding of the parties as to the meaning of the treaty.[70]

Thus, where both states operate a treaty in the same way after the treaty has been concluded, the result is the same as if they had agreed that this was its interpretation, they saw no need to agree the interpretation as such. It should be noted that the rule is limited to subsequent practice that establishes the agreement of the parties regarding its interpretation, so that both (or all in a multilateral treaty) states must adopt the same practice, or at least knowingly accept the other state(s) doing so if the practice is inapplicable to one state. An unchallenged Foreign and Colonial Office circular giving guidance on whether a member of a diplomatic mission was permanently resident in the United Kingdom (and hence liable to tax) was accepted as subsequent practice in a UK tax case.[71] A borderline example of practice being applicable in only one state arose in the UK SC, which was faced with the interpretation of the European Council Framework Decision (2002/584/JHA), as to whether or not a European Arrest Warrant (EAW) that had been issued by the Swedish public prosecutor (which has no equivalent in the United Kingdom and, consequently, no practice that could be relevant in the United Kingdom) had been issued by a "judicial authority" in accordance with article 6.[72] Subsequent practice was relied on by Sweden in that 11 Member States had designated a prosecutor as the issuing judicial authority. In this respect, Lord Dyson (one of the majority) said,

> [t]he fact that it is only in the majority (and not all) of the Member States that the issuing judicial authority is a judge is not inconsistent with the existence of an agreement established by subsequent practice that a public prosecutor may be a judicial authority within the meaning of the Framework Decision. There is nothing to suggest that Member States which do not have public prosecutors as their issuing judicial authorities criticise those that do. More particularly, we have been shown no evidence that, until the present case, any executing state objected to surrendering a person on the grounds that the EAW was issued by a public prosecutor. In my view, this is powerful

---

69.    The Spain-US Income Tax Treaty (1990), Treaties IBFD.
70.    Para. 15 Vienna Convention: Commentary (1969).
71.    UK: SpC, 23 June 2004, Jimenez v. IRC, [2004] STC (SCD) 371, at para. 69.
72.    UK: SC, 30 May 2012, Assange v. The Swedish Prosecution Authority, [2012] UKSC 22.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

evidence that even those Member States whose issuing judicial authorities are judges acquiesce in EAWs being issued in other Member States by public prosecutors. That is a sufficient practice to establish agreement by the Member States.[73]

On the other hand, Lady Hale (in the course of a dissenting judgement) did not consider that this was sufficient to establish the agreement of the parties:

> While the *practice* need not be that of all the parties to the treaty (as in this case it obviously is not) the practice has to be such as to establish the *agreement* of all the parties as to its interpretation. Given the lack of common or concordant practice between the parties, is the failure to date of those countries which do not authorise prosecutors and other bodies to object to those who do sufficient to establish their agreement? Nobody in this country seems to have addressed their mind to the issue until it arose in this case. Failure to address minds to an issue is not the same as acquiescence in a particular state of affairs.[74]

A similar issue could arise with a tax treaty where the tax treaty made no change to the domestic law of one state and so it was only in the other state that subsequent practice was relevant.

### 3.4.8. Relevant rules of international law

The reference in article 31(3)(c) of the Vienna Convention (1969) to any relevant rules of international law means that the interpretation of a treaty must be considered in the light of the rules of international law at the time it was entered into. The wording used in the treaty being interpreted would have been chosen taking into account the state of the law at the time, and so both are properly part of the context. In an earlier draft of the Vienna Convention (1969), there was a reference to the relevant rules in force at the time of the conclusion of the treaty. These were deleted, as they failed to deal with the problem of the effect of an evolution of the law on the interpretation of legal terms in a treaty. However, the law at the time of when the treaty was concluded would seem to be of greater importance. As Sir Ian Sinclair explains,

> there is scope for the narrow and limited proposition that the evolution and development of the law can be taken into account in interpreting certain terms in a treaty which are by their very nature expressed in such general terms as to lend themselves to an evolutionary interpretation. But this must always be on condition that such an evolutionary interpretation does not conflict with the intentions and expectations of the parties as they may have been expressed during the negotiations preceding the conclusion of the treaty.[75]

An example of the use of this provision is contained in a decision of the ICJ:

---

73.   Id., at 131.
74.   Id., at 191.
75.   *The Vienna Convention on the Law of Treaties* 2nd edn, p. 140 (Manchester U. Press 1984).

---

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

The Court cannot accept that Article XX, paragraph 1(d), of the 1955 Treaty was intended to operate wholly independently of the relevant rules of international law on the use of force, so as to be capable of being successfully invoked, even in the limited context of a claim for breach of the Treaty, in relation to an unlawful use of force. The application of the relevant rules of international law relating to this question thus forms an integral part of the task of interpretation entrusted to the Court by Article XXI, paragraph 2, of the 1955 Treaty.[76]

An earlier tax treaty between the same parties would qualify under this heading, as the later tax treaty being interpreted was made in the light of the earlier tax treaty. For instance, a difference in wording between the tax treaties might indicate an intention that they were not to have the same meaning; or, alternatively, the difference in wording may have been included because of a change in domestic law, without the intention of it having any wider implication.[77] It is possible that the Commentaries on the OECD Model should, by analogy, be included in this category as material that is in the minds of both parties when negotiating the tax treaty and the closest material that exists to accepted international tax rules (*see* section 3.11.1.).

It has been suggested[78] that EU law may qualify as a relevant rule of international law for this purpose, thus enabling its use to determine the meaning of terms that are undefined in the treaty but defined in EU law. EU law seems to be accepted as being part of international law, and so this provision is potentially applicable. For the use of EU law in connection with article 3(2), *see* section 4.5.

### 3.4.9. Material excluded from context

The point has been made in section 3.4.5.1. that the definition of context is wide, but not unlimited. Material that is not context and, therefore, is, at best, supplementary means of interpretation is considered in section 3.5., and will include the following five items: (i) preparatory work (*travaux préparatoires*) of the treaty in question; (ii) the wording of other tax treaties to which one of the states was a party (but an earlier or later tax treaty between the same parties would be context, as would some non-tax treaties, including the Vienna Convention (1969) itself, as containing relevant rules of international law applicable in the relations between the parties within article 31(3)(c)); (iii) decisions of courts in other states on the same treaty wording; (iv) domestic law in the treaty partner states; and (v) writings of experts. Accordingly, this material can be considered for the limited purposes set out in article 32, in respect of which *see* section 3.5.

### 3.4.10. Object and purpose

The object and purpose of a treaty may be demonstrated by the preamble to the treaty or any other document that is context. Object and purpose are objective concepts, necessarily so, as, if the parties are in dispute regarding the interpretation of a treaty, it is unlikely that they will have the same subjective intentions. This is also necessarily a secondary consideration to the text and context, which are to be interpreted in the light of its (the treaty's) object and purpose. Logically, therefore, it is necessary to start with the words of the text that is being interpreted, which is considered at the same time in its (documentary) context, which, in turn, because of the definition of context, may include material not

---

76.    IR/US: ICJ: 6 Nov. 2003, *Iran v. United States*, at 41.

77.    For an example, *see* UK: SC, 1 July 2015, Anson v. HMRC, [2015] UKSC 44, Tax Treaty Case Law IBFD, at para. 96.

78.    F. Avella, Using EU Law To Interpret Undefined Treaty Terms: Article 31(3)(c) of the Vienna Convention on the Law of Treaties and Article 3(2) of the OECD Model Convention, 4 World Tax J. 2 (2012), Journals IBFD.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.

Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

forming part of the treaty, such as contemporaneous agreements and subsequent agreements and practice, and then look at this material in the light of the object and purpose of the treaty as a whole as demonstrated by those documents. The OECD Model contained a footnote from 1992 stating that "States wishing to do so may follow the widespread practice of including in the title a reference to either the elimination of double taxation or to both the elimination of double taxation and the prevention of fiscal evasion". This referred to evasion, but not avoidance, although some tax treaties included both. This was useful in showing the object and purpose of the treaty.[79] The MLI has expanded the preamble to include reference to both evasion and avoidance. It now reads as follows:

(State A) and (State B) … Intending to conclude a Convention for the elimination of double taxation with respect to taxes on income and on capital without creating opportunities for non-taxation or reduced taxation through tax evasion or avoidance (including treaty-shopping arrangements aimed at obtaining reliefs provided in this Convention for the indirect benefit of residents of third States [or, in article 6(1) of the MLI, residents of third jurisdictions]) …

This is also emphasized in the opening paragraph of the Explanatory Statement, which states as follows:

> The Multilateral Convention to Implement Tax Treaty Related Measures to Prevent Base Erosion and Profit Shifting (the Convention) is one of the outcomes of the OECD/G20 Project to tackle Base Erosion and Profit Shifting (the "BEPS Project") i.e. tax planning strategies that exploit gaps and mismatches in tax rules to artificially shift profits to low or no-tax locations where there is little or no economic activity, resulting in little or no overall corporate tax being paid.

It is obviously intended that the preamble should have more importance in future. Paragraph 23 of the Explanatory Statement to the MLI states that "[t]he inclusion of this reference in the preamble to the Convention is intended to clarify the intent of the Parties to ensure that Covered Tax Agreements be interpreted in line with the preamble language foreseen in Article 6(1)".

### 3.4.11. Article 31(4) of the Vienna Convention (1969): Special meaning

Article 31(4) of the Vienna Convention (1969) provides as follows:

4.     A special meaning shall be given to a term if it is established that the parties so intended.

This paragraph deals with the case that the parties intended a special meaning, rather than the apparent meaning of the term in its context. The official French version refers to "*un sens particulier*", which means a "particular meaning", so that the English "special" should not be interpreted as meaning an exceptional meaning. In context, a technical meaning may become the ordinary meaning. This is particularly true in the context of tax treaties, where tax expressions frequently have a meaning that is different from the ordinary meaning of the words (for example, the difference between the phrases "liable to tax" and "subject to tax" (*see* section 5.2.3.2.) or between "avoidance" and "evasion", which it seems the MLI intends to continue to apply (*see* the discussion regarding the French equivalents in paragraph 80 of the Explanatory Statement and section 5.2.3.4.)). It should be noted that a special meaning applies only if it is established that the parties so intended. As article 31(4) is part of article 31 of the

---

79.     OECD Model Tax Convention on Income and on Capital (1 Sept. 1992), Models IBFD.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Vienna Convention (1969), supplementary means cannot be used to establish this, although they can confirm it. The Commentary on the Vienna Convention (1969) seems to regard the special meaning as an alternative to the ordinary meaning in the context, in which case its use is still subject to the other elements (good faith, object and purpose). However, as the special meaning applies only if it is established that the parties so intended, it is closer to a contemporaneous agreement on interpretation, which is "to be regarded as forming part of the treaty"[80] and is, therefore, determinative, leaving no room for the application of the other elements. This conflict may be more apparent than real, as there seems little scope for the other elements to apply in practice if the parties intend a term to have a special meaning.

It has been suggested that the Commentaries on the OECD Model fit this paragraph well. For the use of the OECD Commentaries as a means of interpretation, *see* sections 3.10. to 3.12. The same could be said of the Explanatory Statement to the MLI in relation to its provisions that change Covered Tax Agreements (CTAs); in relation to the provisions of the MLI itself, the Explanatory Statement would be context within the meaning of the Vienna Convention (1969) (*see* section 5.3.3.).

## 3.5. Article 32 of the Vienna Convention (1969): Supplementary means of interpretation

### 3.5.1. The provisions

#### 3.5.1.1. Article 32 of the Vienna Convention (1969): The text

Article 32 of the Vienna Convention (1969) reads as follows:

> Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:
>
> (a)    leaves the meaning ambiguous or obscure; or
>
> (b)    leads to a result which is manifestly absurd or unreasonable.

#### 3.5.1.2. Article 32 of the Vienna Convention (1969): Interpretation

The Commentary on the Vienna Convention (1969) emphasizes the supplementary nature of article 32 of the Vienna Convention (1969):

> The word "supplementary" emphasizes that article 32 does not provide for alternative, autonomous, means of interpretation but only for means to aid an interpretation governed by the principles contained in article 31.[81]

Article 32 of the Vienna Convention (1969) expressly limits the use of supplementary means (i) "to confirm the meaning resulting from the application of article 31"; or (ii) "to determine the meaning when the interpretation according to article 31: (a) leaves the meaning ambiguous or obscure; or (b) leads to a result which is manifestly absurd or unreasonable". The Commentary of the Vienna Convention

---

80.    Para. 14 *Vienna Convention: Commentary* (1969).
81.    Id., at para. 19.

---

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(1969) explains that "the Commission considered that the exception must be strictly limited, if it is not to weaken unduly the authority of the ordinary meaning of the terms".[82]

Nonetheless, the Commentary on the Vienna Convention (1969)[83] earlier recognizes that, in practice in court proceedings, the court of its own motion or the parties will refer the court to supplementary means as part of the argument, so that the court will be aware of their content. However, before basing its decision on supplementary means, it is necessary to determine a meaning by the use of article 31 of the Vienna Convention (1969) alone as required by the wording of both limbs. Accordingly, in interpreting a tax treaty, a separation should be made between article 31 of the Vienna Convention (1969) and the use of any supplementary means by article 32. It also follows that, in the last resort, if the supplementary means do not confirm the meaning resulting from article 31 of the Vienna Convention (1969), it cannot override it. However, in practice, if the supplementary means do not confirm the meaning resulting from article 31 of the Vienna Convention (1969), this may demonstrate the existence of another possible meaning under article 31, which can be confirmed by the supplementary means; or it may disclose an ambiguity that had not previously been seen, which can be resolved by the supplementary means.[84] The supplementary means and the circumstances of the conclusion of the treaty may shed light on the object and purpose of the treaty provision, but strictly it is the object and purpose of the treaty as a whole that is relevant to article 31 of the Vienna Convention (1969). The preparatory works of the Vienna Convention (1969) itself indicate that the process of treaty interpretation is intended to be a unity even though consisting of various elements, that there is no "rigid line" between articles 31 and 32 and that the elements set out in the Convention were not intended to be exhaustive of the principles and maxims used in practice in the interpretation of treaties.[85] The main purpose of articles 31 and 32 of the Vienna Convention (1969) is to establish the primacy of the treaty text in interpretation.

### 3.5.1.3. *Travaux préparatoires*

The usual supplementary means of interpretation for treaties generally is the preparatory work (*travaux préparatoires*), but these are normally of little importance for tax treaties, which are negotiated in secret with no *travaux préparatoires* being published (though, *see* section 3.13. for the possibility of accessing this material in national archives). However, a taxpayer before the Canadian Tax Court (TC) succeeded in obtaining an order for discovery of the *travaux préparatoires* of one article of the relevant tax treaty.[86] Whether or not this is possible in other countries depends on domestic law. Because of the words "including the preparatory work", supplementary means are not limited to *travaux préparatoires*, which are not defined: "the Commission did not think that anything would be gained by trying to define *travaux préparatoires*; indeed, to do so might only lead to the possible exclusion of relevant evidence".[87] Article 32 of the Vienna Convention (1969) also refers to "the circumstances of its [the treaty's] conclusion", which in normal cases will relate to the historical setting in which the treaty was entered into. This is unlikely to have much relevance to tax treaties, which are not usually entered into because of a particular historical imperative.

---

82.    Id.
83.    Id., at para. 18.
84.    *See* R. Gardiner, *Treaty Interpretation* p. 309 (Oxford U. Press 2008).
85.    Paras. 1-10 *Vienna Convention: Commentary* (1969).
86.    CA: TC, 1 May 2007, *Klaboe v. Her Majesty the Queen,* (2007) 9 ITLR 1099.
87.    Para. 20 *Vienna Convention: Commentary* (1969).

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

### 3.5.1.4. Foreign court decisions

More relevant as possible supplementary means of interpretation are foreign court decisions[88] on the same treaty wording (normally that of the OECD Model) that seem to be impossible to fit within the material of article 31 of the Vienna Convention (1969) (*see* section 3.4.), the writings of experts (the work of Vogel (1997)[89] has been widely cited by courts (*see* section 3.5.2.)), and (if it is not part of the context by analogy, or containing a special meaning) the Commentaries on the OECD Model. Unilateral material may be used as supplementary means of interpretation, but with care, as there is no certainty that the other state agrees with it. If the other state does not agree, it has no value as an aid to interpretation. Comparisons are sometimes made with the wording of other treaties. Since each treaty is negotiated separately and any difference in wording may be explained by the requirements of the other country in the second treaty rather than that the different wording was intended to have a different meaning, this has limited value as an aid to interpretation.

### 3.5.2. The use of decisions on treaty interpretation in other countries

It is obviously desirable that courts faced with a treaty interpretation issue, particularly one on the widely used wording of the OECD Model, should be aware of how courts in other countries have decided the same issue. Such decisions on the same treaty wording must qualify as supplementary means of interpretation (*see* section 3.5.) and may be used for the limited purposes permitted for supplementary means. Being aware of such decisions is not the same as being bound to follow them, although it should help to ensure a common interpretation of widely used provisions. As was said in a UK HL case in relation to a non-tax treaty (the CMR Convention on the Contract for the International Carriage of Goods by Road),

> [i]f a corpus of law had grown up overseas which laid down the meaning of [a particular treaty provision], our courts would no doubt follow it for the sake of the uniformity which it is the object of the convention to establish.[90]

However, in another decision on the same treaty, the UK Court of Appeal (CA) referred to 30 decisions of continental European courts leading to 12 different interpretations of the treaty.[91]

The status of the foreign court is important, as is the respect that courts in the same country would give to the decision. As Lord Diplock said in the UK HL case of *Fothergill v. Monarch Airlines* (1980)[92] in relation to the Warsaw Convention (1929) on carriage of goods by air,

> [a]s respects decision of foreign courts, the persuasive value of a particular court's decision must depend on its reputation and its status, the extent to which its decisions are binding on courts of co-ordinate and inferior jurisdiction in its own country and the coverage of the national law reporting system. For instance your Lordships would not be fostering uniformity of interpretation of the convention if you were to depart from the prima facie view which you had yourselves formed as

---

88.   In this respect, *see* W. Wijnen, Some Thoughts on Convergence and Tax Treaty Interpretation, 67 Bull. Intl. Taxn. 11 (2013), Journals IBFD.

89.   K. Vogel: *Klaus Vogel on Double Taxation Conventions* 3rd edn (Kluwer L. Intl 1997).

90.   Viscount Dilhorne in UK: HL, 9 Nov. 1977, James Buchanan & Co Ltd v. Babco Forwarding and Shipping Ltd, [1977] 3 All ER 1048, 1060.

91.   UK: CA, 13 Jan. 1977, *Ulster-Swift Ltd. v. Taunton Meat Haulage Ltd.*, [1997] 1 WLR 625.

92.   UK: HL, 10 July 1980, Fothergill v. Monarch Airlines, [1980] 2 All ER 696.

---

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

to its meaning in order to avoid conflict with a decision of a French court of appeal that would not be binding on other courts in France, that might be inconsistent with an unreported decision of some other French court of appeal and that would be liable to be superseded by a subsequent decision of the Court of Cassation that would have binding effect on lower courts in France.[93]

Another important matter is that care needs to be taken that, if the other country's court was influenced by the Commentaries on the OECD Model (which can be the case even though the court does not expressly refer to them), these were the same as the time of the conclusion of the tax treaty being considered by the court. Given the small amount of litigation on tax treaties in most countries with the result that judges have limited experience of interpreting tax treaties (or, in some countries, treaties generally), the benefit of looking at decisions of the courts of other countries to giving treaty terms a common meaning is significant. In practice, the decisions of the courts of other countries have been used little in interpreting tax treaties, but there are signs that this is changing. Given the wider availability of material, particularly material in English, this change is desirable.

Examples of decisions of courts in other countries being considered can be found mainly between common law countries, where looking at decisions in other common law countries is quite normal, but reference to decisions on treaty interpretation (country of the decision in brackets) can be found in common law countries in Australia (many decisions from both common law and civil law countries), Canada (Australia, Belgium, Finland, France, India, Norway, the United Kingdom and the United States), India (Australia, Canada, Germany, Switzerland, the United Kingdom and the United States), New Zealand (Germany), South Africa (Canada and the United Kingdom), the United Kingdom (Canada, Finland, Germany, the Netherlands, New Zealand, South Africa, Sweden and the United States) and the United States (Canada and Germany). Referring to foreign court decisions is much less common in civil law countries, but has been done by the courts in Argentina (Canada, France, Spain, the United Kingdom and the United States), Brazil (Finland, France, Japan, Mexico, the Netherlands and Sweden), Germany (Austria, Luxembourg, Switzerland, the United Kingdom and the United States), Italy (France, Germany and the United States), the Netherlands (Germany), Japan (France), Spain (Norway and France), and Switzerland (Germany). In France, although the courts have not relied on foreign decisions, several *rapporteurs publics* (formerly *commissaires du gouvernement*) before the *Conseil d'Etat* (Supreme Administrative Court, CE) have referred to such decisions in the opinion they have delivered. Italian and Mexican courts have never referred to decisions by courts in other countries.

It has sometimes been suggested[94] that use of court decisions should be limited to decisions on the same treaty, but there is no reason in principle why this should be so. Any decisions on the same treaty wording could be relevant as an aid to interpretation.

The same is true of the willingness of courts to refer to writers, who may also cite other countries' court decisions. As mentioned in section 3.5.1.4., the work of Vogel (1997 and subsequent editions) has been widely used. Courts vary considerably in the amount of writings that they are willing to quote, with the United Kingdom at the end of the scale where quotation is least usual, although there is now a greater willingness to do so than before, and Austria and Germany at the other end where it is extremely common. As Lord Diplock said in *Fothergill v. Monarch Airlines* in relation to the Warsaw Convention

---

93.   Id., at 708.
94.   For instance, before the Federal Court of Australia (FCA) in AU: FC, 1977, *Lamesa Holdings BV v. Commissioner of Taxation*, [1997] FCA 134 (although on appeal to the Full Federal Court of Australia (FFCA) in AU: FCCA, 20 Aug. 1997, Lamesa Holdings BV v. Commissioner of Taxation, [1997] FCA 785, Tax Treaty Case Law IBFD, the FCA would have accepted decisions on the treaty partner on other tax treaties).

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(1929) on carriage by air: "[t]he persuasive effect of learned commentaries ... will depend upon the cogency of their reasoning".[95]

## 3.6. Summary of the rules of the Vienna Convention (1969)

As stated in section 3.3., an important distinction is made between the primary method of interpretation in article 31 of the Vienna Convention (1969), which has to be carried out in all cases, and the use of supplementary means of interpretation that can be used only to confirm interpretation under article 31 or to determine the meaning that is ambiguous or obscure or leads to a manifestly absurd or unreasonable result. The primary purpose of defining context is to limit the materials that can be used to obtain the meaning of article 31 of the Vienna Convention (1969) and, therefore, the context represents the primary interpretative material. If a definition is found in the context, that definition is to be used (unless the definition is itself subject to the context "otherwise requiring") (*see* section 3.4.5.). Beyond that, the Vienna Convention (1969) says very little as to what the interpreter should do with the materials, other than using good faith, ordinary meaning, and the object and purpose of the treaty. Interpretation is, therefore, essentially an exercise of the interpreter's judgement.

After establishing a meaning under article 31, the interpreter can turn to supplementary means of interpretation within article 32 for the purposes set out in article 32 of the Vienna Convention (1969). It is, nonetheless, intended that the interpretation process be a unity rather than a hierarchy.

## 3.7. Different language versions of a treaty and country practice in tax treaties in using a third language

### 3.7.1. Divergence of meaning in different official language versions

#### 3.7.1.1. Article 33 of the Vienna Convention (1969): The text

Article 33 of the Vienna Convention (1969) deals with treaties authenticated in two or more languages. This reads as follows:

1. When a treaty has been authenticated in two or more languages, the text is equally authoritative in each language, unless the treaty provides or the parties agree that, in case of divergence, a particular text shall prevail.

2. A version of the treaty in a language other than one of those in which the text was authenticated shall be considered an authentic text only if the treaty so provides or the parties so agree.

3. The terms of the treaty are presumed to have the same meaning in each authentic text.

4. Except where a particular text prevails in accordance with paragraph 1, when a comparison of the authentic texts discloses a difference of meaning which the application of articles 31 and 32 does not remove, the meaning which best reconciles the texts, having regard to the object and purpose of the treaty, shall be adopted.

---

95.　*Fothergill* (1980), *supra* n. 92.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

### 3.7.1.2. Article 33 of the Vienna Convention (1969): Interpretation

Normally, a tax treaty will have official versions in the languages of each of the states (and sometimes one of the states will use more than one language in its treaties, such as Belgium and Canada) that are equally authoritative. In some cases, tax treaties provide that a third language version will prevail in case of divergence of meanings of the first two language versions (*see* section 3.7.2.). The Vienna Convention (1969) distinguishes between authenticated and merely official texts, but this distinction will not arise with tax treaties. As each language version is equally authentic, there is nothing wrong with the natural tendency for courts to rely only on their own language version of a tax treaty and only deal with differences where these are pointed out. In other disputes between states in international law, it is more common for different language versions to be in issue, as each state will rely on its language version to support its position. With tax, the dispute is normally confined to one state and so other language versions are less likely to be in issue.

### 3.7.1.3. Commentary on the Vienna Convention (1969)

The Commentary on Article 33 of the Vienna Convention (1969) makes the following important point:

> But it needs to be stressed that in law there is only one treaty – one set of terms accepted by the parties and one common intention with respect to those terms – even when two authentic texts appear to diverge.[96]

Naturally, the normal methods of interpretation are applied to each language version to see if there is a difference in meaning. Differences in language versions potentially create an ambiguity that is not evident in either of the different language texts considered separately, as the treaty might equally well mean what each language says. Such an ambiguity has to be resolved using the same methods as if it arose in one language: try to find a single meaning by applying article 31 of the Vienna Convention (1969) and, if that is not possible, use supplementary means in accordance with article 32 to resolve the ambiguity. Article 33(4) of the Vienna Convention (1969) adds a further method if none of the previous ones resolves the ambiguity. The Commentary on Article 33 of the Vienna Convention (1969) expressly rejects any other methods, such as favouring the text with a clear meaning or the language version in which the treaty was drafted.[97] While these are rejected as a general rule, the effect of applying articles 31 and 32 of the Vienna Convention (1969) may be to give preference to either of these in a particular case.

### 3.7.1.4. One language version to explain another version

Sometimes one language version may help to explain the other. For instance, in relation to the Canada-United States Income and Capital Tax Treaty (1980), which is in English and French, the Canadian Federal Court of Appeal (FCA) referred to the French text of the tie-breaker for individuals to explain the English text:

---

96.    Para. 6 Vienna Convention: Commentary on Article 33 (1969).
97.    Id., at para. 9.

---

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

The concept of "habitual abode", as evidenced by the clearer French version of the text (*séjourne de façon habituelle*) involves notions of frequency, duration and regularity of stays of a quality which are more than transient.[98]

### 3.7.1.5. Differences result from the use of technical terms

Commonly, the difference in languages will be the result of tax technical terms not translating exactly. An example from a French case before the CE [99] concerned the refund of the *avoir fiscal* under the former France-United Kingdom Income Tax Treaty (1968)[100] when the taxpayer was a UK resident taxed on the remittance basis (i.e. the amount brought into the United Kingdom) when the dividends were not remitted. The tax treaty had the usual "liable to tax" test for residence, but also contained a provision that stated in the English version that the refund "shall not apply if the recipient of the dividends ... is not *subject to United Kingdom tax* in respect of those dividends" (emphasis added). If the dividends were not remitted to the United Kingdom, they would not be subject to tax and so the refund would not apply according to the English version. The French version said: "*n'est pas* assujetti à l'impôt au Royaume-Uni *à raison de ces dividendes*" (emphasis added), which is the same French expression used in relation to the "liable to tax" test in article 4(1) of the tax treaty, under which he would qualify for the refund because he would be liable to tax if the dividends were remitted. The CE applied the English version having regard to the purpose of the provision which was to avoid double taxation. Using the French version would result in no taxation. The ambiguity could be resolved in accordance using article 31 of the Vienna Convention (1969) having regard to object and purpose. The difference between liable to tax and subject to tax in English and French is dealt with in section 5.2.3.2. Article 79 of the Vienna Convention (1969) contains a procedure for the retrospective correction of errors in a treaty (*see* section 3.8.5.), which could include errors caused by differences in language versions, although this may not be appropriate for use in relation to a tax treaty because of the retrospective element.

### 3.7.1.6. Other sources of divergence

On other occasions, the divergence may be due to the fact that the underlying legal concepts do not translate exactly because the same concept does not exist in the other system. This arises particularly between common law and civil law. For instance, one state may make a distinction between income and capital gains and the other state may consider that capital gains are included in income. A reference to "income" in the tax treaty may mean something different to each. In the OECD Model, where there is a capital gains article and the title refers to taxes on income and on capital, capital gains are regarded as a type of income. The relief articles, referring to "derives income" would provide for relief from tax where the other state taxes capital gains. In actual tax treaties, the result may be different because of the context. In UK tax treaties, although both income and capital gains can be taxed on the remittance basis, the treaty provision dealing with unremitted income is usually drafted in terms of income only and the question arises as to whether or not this drafting should be read as including capital gains. The Swedish *Regeringsrätten* (Supreme Administrative Court, RÅ),[101] in interpreting a provision in the Sweden-United Kingdom Income Tax Treaty (1960) added in the Protocol (1968),[102] which referred to "income from a source", by a majority decided that it did not. "Income from a source" has a meaning

---

98.   CA: FCA, 10 June 2010, Lingle v. Her Majesty the Queen, (2010) 12 ITLR 996.
99.   FR: CE, 27 July 2012, Case Nos. 337656 and 337810, Ministre du Budget c Regazzacci.
100.  The Fr.-UK Income Tax Treaty (1968), Treaties IBFD.
101.  SE: RÅ, 23 Dec. 1987, Case 1169-1987, RÅ 1987, ref. 162, Tax Treaty Case Law IBFD.
102.  The Swed.-UK Income Tax Treaty (1960), Treaties IBFD.

---

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

in UK tax law that is not applicable to capital gains, as they do not have a source but depend on the *situs* of the asset. Nor do capital gains have a source in Sweden. The context pointed to the provision applying to income and not capital gains, although the object and purpose of the provision would have been better served if capital gains had been included, as otherwise Sweden would have to relieve a capital gain from tax that was not taxed in the United Kingdom because it was not remitted.[103]

### 3.7.1.7. Article 33(4) of the Vienna Convention (1969): The last resort rule

Article 33(4) of the Vienna Convention (1969) is a rule of last resort, rather than the one that will normally be used. Examples of cases in international law generally show that it is generally possible to resolve the dispute without recourse to article 33(4) of the Vienna Convention (1969). In the last resort, the meaning that best reconciles the texts, having regard to the object and purpose of the treaty, should be applied. While the object and purpose of a treaty is one of the components of interpretation under article 31 of the Vienna Convention (1969) that will already have been considered along with other elements and will not necessarily have been conclusive, here it is given decisive force. Normally, this will mean preferring one language version over another. In a tax treaty, the result is likely to be the one that avoids double taxation and results in single taxation rather than double taxation or double non-taxation, or, particularly if the revised preamble substituted by the MLI applies (*see* section 3.4.10.), the one that prevents tax avoidance.

### 3.7.1.8. Dualist countries

An issue in dualist countries is that only the local language version (or versions) is incorporated into legislation and, therefore, given effect in law. In such circumstances, is it possible to refer to the other authentic language version? It is suggested that it should be, as the home language version contains a statement that both language versions are equally authentic and so it is a part of the local language version that the other version is equally authentic and, therefore, should be consulted in case there is a divergence in meaning. Support for this approach is provided by a UK case on the CMR Convention on the Contract for the International Carriage of Goods by Road where the English and French texts were equally authentic, but only the English text had been incorporated into the statute giving effect to the treaty in UK law, which would be the same in relation to a tax treaty (*see* section 3.5.2.). The UK HL has also stated that it was perfectly legitimate to look for assistance to the French text.[104] In some cases, the Dutch *Hoge Raad* (Supreme Court, HR) has taken another language version into account. One case concerned the deduction of alimony and support payments under the Belgium-Netherlands Income and Capital Tax Treaty (1970).[105] In answering the question as to whether or not those payments were covered by the phrase "personal allowances, reliefs and deductions on account of civil status or family responsibilities" in article 25(3) of the tax treaty, the HR took the French version into consideration.[106] A second example concerned the interpretation of the term "temporarily" regarding the application of the 183-day rule in article 10(2) of the Germany-Netherlands Income and Capital Tax Treaty (1959),[107] in respect of which the HR looked at both the Dutch and German language versions.[108] Germany has also accepted that, although the legislation giving effect to the treaty (*Zustimmungsgesetz*) is in German, this does not prevent it from considering the other official language.

---

103. For a note on this case from the UK perspective, *see* J.F. Avery Jones & J.D.B. Oliver, *How Others See Us*, Brit. Tax Rev., p. 437 (1988) and, from the Swedish point of view, *see* P. Sundgren, *Interpretation of Tax Treaties – A Case Study*", Brit. Tax Rev., p. 286 (1990).
104. *James Buchanan* (1977), *supra* n. 90.
105. The Belg.-Neth. Income and Capital Tax Treaty (1970), Treaties IBFD.
106. NL: HR, 6 Nov. 1996, Case 30.245, Tax Treaty Case Law IBFD.
107. The Ger.-Neth. Income and Capital Tax Treaty (1959), Treaties IBFD.
108. NL: HR 29 Sept. 1999, Cases 33.267 and 34.482, Tax Treaty Case Law IBFD.

---

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

### 3.7.2. Country practice in using a third language prevailing text or single third language text

It is not uncommon with tax treaties for the tax treaty to provide that, in addition to the authentic texts in each of the treaty partners' languages, a third language text, often English, prevails in case of divergence of meanings. This is commonly used where the treaty partners are not familiar with the other state's language and do not want to be at risk that the other language version might prevail in the case of a difference. It is safer to use a third language with which both treaty parties are familiar, particularly one where there is an official OECD version. In such cases, it is necessary first to establish that there is a divergence of meaning between the languages, without attempting to resolve it, and then apply the third language text that is to prevail. In practice, states might try to resolve the difference between the original two languages first before accepting that there is a divergence of meaning. The matter is probably one of degree.[109]

In order to give an indication of the extent of the use of a prevailing third language version in tax treaties, in a survey of European countries in 2005,[110] it was found that 22 Austrian, 20 Belgian, 29 German, 42 Italian, 39 Netherlands and 37 Swiss tax treaties had adopted this approach in their tax treaties. Although this count has not been updated, there is no reason to suppose that the picture will be different now, and the practice is not confined to European countries. France and Canada never use this approach. It is also uncommon for English-speaking countries, but the India-United Kingdom Income Tax Treaty (1993)[111] has equally authoritative versions in English and Hindi, but with English having priority in the case of divergence in meaning. Alternatively, some states may not use their own language at all, but just have a third language version; for example, the Albania-Belgium Income Tax Treaty (2002)[112] is only in English and the same was true of 25 other Belgian tax treaties in the 2005 survey.[113] There are 23 Japanese treaties in English only and the same is true of a substantial number of Dutch and Swedish treaties.

## 3.8. Other relevant articles of the Vienna Convention (1969)

### 3.8.1. Article 27 of the Vienna Convention (1969): Internal law and observance of treaties

Article 27 of the Vienna Convention (1969) provides that

> [a] party may not invoke the provisions of its internal law as justification for its failure to perform a treaty. This rule is without prejudice to Article 46. [Article 46 deals with the formation of treaties and says that a state may not invoke that its consent to be bound by a treaty was expressed in violation of a provision of its internal law regarding competence to concluding treaties.]

While tax treaties necessarily prevail over domestic law and so the situation envisaged in this article should not apply, it can be relevant to tax treaties that have not been properly implemented into domestic law or when later internal law overrides the tax treaty. These situations are dealt with in section 2.2. This aspect is one where there can be a conflict between international law dealt with in this article, under which a state cannot use domestic law as a justification for its failure to perform a treaty and domestic

---

109. Para. 4 Vienna Convention: Commentary on Article 33 (1969).
110. *See* Multilingual Texts and Interpretation of Tax Treaties and EC Tax Law secs. 8.4., 9.7., 11.7., 12.6.1., 13.5. and 14.8. (G. Maisto ed., IBFD 2005), Online Books IBFD.
111. The India-UK Income Tax Treaty (1993), Treaties IBFD.
112. he Alb.-Belg. Income and Capital Tax Treaty (2002), Treaties IBFD.
113. Maisto ed., *supra* n. 110, at sec. 9.7.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

law that will necessarily be applied in domestic courts in cases where the treaty does not apply from the domestic law point of view. Accordingly, this rule effectively has no operation on tax treaties, but a breach would entitle the other state to terminate the tax treaty (*see* section 3.8.3.).

## 3.8.2. Article 28 of the Vienna Convention (1969): Non-retroactivity of treaties

Article 28 of the Vienna Convention (1969) provides that

[u]nless a different intention appears from the treaty or is otherwise established, its provisions do not bind a party in relation to any act or fact which took place or any situation which ceased to exist before the date of the entry into force of the treaty with respect to that party.

A tax treaty will always state the period from which it starts to apply, the normal formula being that the treaty enters into force after instruments of ratification are exchanged (either immediately or after a set period) and will then have effect with respect to taxes levied for fiscal years beginning on or after a particular date. Issues of retroactivity will not, therefore, normally apply, but they can arise in relation to exchange of information and assistance in collection particularly when these are added to an existing tax treaty. The issue is whether or not they are subject to the same starting period as the treaty itself. A UK case related to a protocol that added an assistance-in-collection article and substituted a new exchange-of-information article, both relating to all taxes, stating that they applied to requests made on or after the date of the protocol. Specifically, the UK CA held that they were not also subject to the starting provision of the tax treaty itself (which was expressed to apply only to taxes covered by the tax treaty), and so had retrospective effect subject only to any general law limits that were cut down by an unpublished Memorandum of Understanding.[114]

## 3.8.3. Article 60 of the Vienna Convention (1969): Termination for breach

Article 60 of the Vienna Convention (1969) provides as follows:

1.   A material breach of a bilateral treaty by one of the parties entitles the other to invoke the breach as a ground for terminating the treaty or suspending its operation in whole or in part.

2.   [relates to multilateral treaties]

3.   A material breach of a treaty, for the purposes of this article, consists in:

     (a)   a repudiation of the treaty not sanctioned by the present Convention; or

     (b)   the violation of a provision essential to the accomplishment of the object or purpose of the treaty.

4.   The foregoing paragraphs are without prejudice to any provision in the treaty applicable in the event of a breach.

---

114.   UK: CA, 23 May 2013, (1) Ben Nevis (Holdings) Ltd (2) Metlika Trading Limited v. Commissioners for HM Revenue & Customs, [2013] EWCA Civ 578, Tax Treaty Case Law IBFD. *See also* J. Schwarz, Tax Treaty Interpretation after Ben Nevis (Holdings) Ltd v. Her Majesty's Revenue and Customs (2013), 68 Bull. Intl. Taxn. 1 (2014), Journals IBFD.

---

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

5.    Paragraphs 1 to 3 do not apply to provisions relating to the protection of the human person contained in treaties of a humanitarian character, in particular to provisions prohibiting any form of reprisals against persons protected by such treaties.

It would be under this provision that a state could terminate a tax treaty for material breach by the other party. Tax treaties typically provide for termination by notice after a relatively short specified period of operation, commonly 6 months, so that a party that wishes to terminate can do so without the need to rely on breach. In the past, tax treaties were rarely terminated even under this notice provision. More recently, termination on notice has become more common.

### 3.8.4. Article 70 of the Vienna Convention (1969): Consequences of the termination of a treaty

Article 70 states that termination of a treaty in accordance with its provisions or in accordance with the Vienna Convention (1969): (i) releases the parties from any obligation further to perform the treaty; and (ii) does not affect any right, obligation or legal situation of the parties created through the execution of the treaty prior to its termination. In relation to tax treaties, where a tax treaty replaces an earlier one, the new tax treaty sometimes contains a provision to the effect that the earlier tax treaty continues to apply for a limited period if it is more favourable. Where income has accrued during the earlier tax treaty and is paid after the new tax treaty comes into force, domestic law would normally provide that the relevant time for application of the tax treaty is when the income is recognized for tax purposes.

### 3.8.5. Article 79 of the Vienna Convention (1969): Correction of errors

Article 79 of the Vienna Convention (1969) contains provisions for correcting errors with retrospective effect where the parties are agreed on the error. So far as the author is aware, this has not been used in relation to tax treaties, as the retrospective effect may not be appropriate in the tax area and because of the need for the amendment to go through the appropriate domestic Parliamentary procedure to be effective. Normally, therefore, correction of errors will be done via a protocol.

## 3.9. State succession

Although not dealt with in the Vienna Convention (1969), it is convenient to deal here with the problems that have arisen with tax treaties over changes in the status of states, including: (i) formerly dependent territories becoming independent; (ii) states reunifying as with Germany; and (iii) states splitting as in respect of Czechoslovakia, the Union of Soviet Socialist Republics (USSR) and Yugoslavia. There is a Vienna Convention on Succession of States in respect of Treaties (1978), which few states have signed and which only came into force in 1996 when 15 states (all newly independent states) had signed. This treaty does not reflect modern state practice, much of which arose after it was negotiated in 1978. Customary rules of international law, therefore, mostly continued to apply to other states. If a new state does not want to be bound by existing treaties, the treaty partner will, in practice, have to accept this. In any event, as tax treaties can normally be terminated on short notice, commonly 6 months, the problem can be resolved in this way if a state does not wish to be bound by a tax treaty.

State succession is addressed in section 5.1.1. of the GTTC Chapter on Article 3.

## 3.10. The Commentaries on the OECD Models

In discussing the relevance of the Commentaries on the OECD Models to treaty interpretation, a firm distinction must be made between: (i) the OECD Commentaries current when the particular tax treaty was concluded, which is dealt with in section 3.11.; and (ii) later OECD Commentaries, which by

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

definition cannot have been in the minds of the treaty negotiators, which is dealt with in section 3.12. The time the tax treaty was concluded probably means when it was signed as the tax treaty will not change after this and subsequently changes to the OECD Commentaries are unlikely to be considered when the tax treaty is going through a ratification process. However, there may be exceptions where the countries concerned are OECD member countries who will know about changes in the OECD Commentaries in advance and, on the other hand, where signing is held up (as in the case of the Austria-Italy Income Tax Treaty (1981),[115] which is known to have been negotiated in 1974 and not changed before signing in 1981). The courts in most countries have referred to the OECD Commentaries, although there are no examples of such reference in Brazil or Singapore.

One qualification regarding the version of the Commentaries on the OECD Model existing at the time of the conclusion of a tax treaty that should be mentioned is that in 1974, the OECD issued revised texts of 20 articles (not articles 5, 14, 15, 17, 20, 23 or 28 to 30) and Commentary of the OECD Draft (1963),[116] which were substantially in the form of the OECD Model (1977).[117] Some tax treaties after this time and before the OECD Model (1977) would have been negotiated on the basis of those texts. It may, therefore, be permissible to refer to the Commentaries on the OECD Model (1977)[118] to the extent that this is the same. For instance, the Spain-United Kingdom Income and Capital Tax Treaty (1975)[119] contains a number, but by no means all, of the changes from the OECD Draft (1963) contained in the 1974 document and was presumably negotiated on the basis of it, with the departures from it being the deliberate result of negotiations. In addition, as the OECD has adopted the practice in recent years of releasing drafts of revisions to the OECD Commentaries, in many cases some years before final inclusion in the OECD Commentaries, the same approach may be appropriate for such changes.

Naturally, if a state has made an observation disagreeing with the interpretation in the Commentaries on the OECD Model, such an interpretation cannot be used against that state. A distinction may also need to be made between the relevance of the OECD Commentaries in a tax treaty between two OECD member countries and between other states, although, if the non-OECD member country is one of the 31 states whose positions are included in the OECD Model, there seems no reason to treat them differently if they have not made any observation disagreeing with the OECD Commentaries. As far as other states are concerned, if they adopt wording from the OECD Model in their tax treaties, whether or not concluded with an OECD member country, it is reasonable to assume that they were aware of the content of the OECD Commentaries when doing so. There are examples of states accepting the use of the OECD Commentaries in relation to a tax treaty involving a non-OECD member country, both in courts in an OECD member country, such as in the Norwegian *Høyesterett* (Supreme Court, HS)[120] regarding the Ivory Coast-Norway Income Tax Treaty (1978)[121] and also, more significantly, in a non-OECD member country, before the Indian Income Tax Appellate Tribunal (ITAT)[122] regarding the Canada-India Income Tax Treaty (1985).[123] Accordingly, no distinction in this respect is made in discussing this issue.

---

115.   The Austria-It. Income and Capital Tax Treaty (1981), Treaties IBFD.
116.   OECD Draft Tax Convention on Income and on Capital (30 July 1963), Models IBFD.
117.   OECD Model Tax Convention on Income and on Capital (11 Apr. 1977), Models IBFD.
118.   OECD Model Tax Convention on Income and on Capital: Commentaries (11 Apr. 1977), Models IBFD.
119.   The Spain-UK Income and Capital Tax Treaty (1975), Treaties IBFD.
120.   NO: HS, 8 June 2004, PGS Geophysical AS v. Government of Norway, 7 ITLR 51, Tax Treaty Case Law IBFD.
121.   The Ivory Coast-Nor. Income Tax Treaty (1978), Treaties IBFD.
122.   IN: ITAT, 30 Sept. 2005, Metchem Canada Inc. v. Deputy Commissioner of Income Tax, 8 ITLR 1043, Tax Treaty Case Law IBFD. *See also* IN: ITAT, 12 Apr. 2013, Income Tax Officer v. Right Florists Pvt. Ltd., (2013) ITA No. 1336/Kol/2011, Tax Treaty Case Law IBFD.
123.   The Can.-India Income Tax Treaty (1985), Treaties IBFD.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

## 3.11. Current Commentaries on the OECD Model

### 3.11.1. The provisions

#### 3.11.1.1. The Commentaries on the OECD Models and the Vienna Convention (1969)

Not surprisingly, there is no reference to the Commentaries on the OECD Models in the Vienna Convention (1969), as commentaries on a model treaty are unusual. It is, however, not unusual to find an explanatory report to a multilateral treaty, such as the Explanatory Statement to the MLI (*see* section 5.3.3.). The joint Council of Europe and OECD Convention on Mutual Administrative Assistance in Tax Matters (1988) has been mentioned above (*see* section 3.4.5.3.). It was suggested there that, although it is stated that the Explanatory Report does not constitute an instrument providing an authoritative interpretation of the text of the Convention, it would still be context within the meaning of the Vienna Convention (1969), as it would have been "an agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty".[124] The OECD Commentaries are of a similar status, also being non-binding, but different in that the tax treaty to be interpreted is a bilateral one, based on the OECD Model, rather than a multilateral one, to which the Explanatory Report relates (although, at the time of the OECD Draft (1963), a multilateral treaty based on it was still under consideration). The point has already been made (*see* section 3.1.) that the interpretative provisions of the Vienna Convention (1969) have a limited function:

> [T]he [International Law] Commission confined itself to trying to isolate and codify the comparatively few general principles which appear to constitute general rules for the interpretation of treaties.

The Commentaries on the OECD Model do not fit well into the definition of context, not being an agreement (assuming that they can be said to represent an agreement of OECD member countries) relating to the particular treaty and made in connection with its conclusion (and similarly for article 31(2)(b) of the Vienna Convention (1969), although this deals with multilateral treaties and so is not directly relevant to bilateral tax treaties). It is suggested in section 3.11.2.2. that they might be treated as context by analogy.

#### 3.11.1.2. The non-binding nature of the Commentaries on the OECD Model

The Commentaries on the OECD Models themselves make the point that they are not intended to be binding:

> Although the Commentaries are not designed to be annexed in any manner to the conventions signed by member countries, which unlike the Model are legally binding international instruments, they can nevertheless be of great assistance in the application and interpretation of the conventions and, in particular, in the settlement of any disputes.[125]

If the Commentaries on the OECD Model say that something must be (or must not be) included within the meaning of a term, then, if the OECD Commentaries were binding, it would mean that a court could not decide that it is not (or is) so, even when such a decision would be within the ordinary meaning of the

---

124.  Art. 31(2)(a) *Vienna Convention* (1969).
125.  Para. 29 OECD Model: Commentaries: Introduction (2017).

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

term. In practice, this situation is unlikely and normally this is a grey area where the ordinary meaning of a term might or might not include (or exclude) something. An example is the meaning of the phrase "being present" in a state "for a period or periods not exceeding in the aggregate 183 days in any twelve months" in article 15 of the OECD Model. The Commentary on Article 15 of the OECD Model says that parts of a day are included and that days spent in transit in the course of a trip between two points outside the state of activity are excluded.[126] It is possible for a court to decide on the ordinary meaning of the term "present" in its context that only whole days count (at the time of the OECD Report (1992) on the 183-day rule two countries (or three in relation to days of departure if not related to the activity) did say this, and in one of them, the Irish HC subsequently confirmed in relation to counting days for the purpose of the residence article, which in the tax treaty concerned had a reference to the number of days of presence, that parts of a day did not count (*Kinsella* (2007)[127]), which is discussed in section 5.1.2.4.2.4.), or to decide that (assuming parts of a day are included) a part of a day in transit is a day of presence. If the OECD Commentaries are legally binding, such decisions would be wrong. On the other hand, it is equally possible for a court to decide that parts of a day counted, or that a person was not present in a real sense while in transit (there was one state that took this view in the OECD Report (1992)), and so in such a case it would not matter whether or not the OECD Commentaries are binding.

The fact that the Commentaries on the OECD Model are not binding does not mean that they cannot fall within article 31 of the Vienna Convention (1969). It has already been suggested that an Explanatory Report that was not binding as to interpretation would still be within the definition of "context". To continue with the example of the 183-day rule, if a court were faced with the two issues mentioned in the previous paragraph in this section and it were permissible to read the Commentaries on the OECD Model as part of the interpretative process under article 31 of the Vienna Convention (1969), the court would be likely to consider that the interpretation in the OECD Commentaries is a possible one within the ordinary meaning of the term, perhaps backed up by the object and purpose, and decide in favour of that interpretation. It can always be said that the ordinary meaning, or even an agreed meaning (being context but not part of the treaty), is not as such binding because the other elements (good faith, object and purpose) might trump it in any particular circumstances, although in practice, this would be unlikely. It seems, therefore, that whether or not the OECD Commentaries are binding has relatively little significance.

### 3.11.1.3. Other possibilities

One other possibility that has already been mentioned (*see* section 3.4.11.) is that the Commentaries on the OECD Model may indicate a special meaning of a term, in which case it has to be established that the parties intended this, i.e. with article 31(4) of the Vienna Convention (1969) (*see* section 3.11.2.).

It has also been suggested that the Commentaries on the OECD Model, while not binding as such, are effectively binding on the basis of acquiescence (by not protesting against a proposal by one party the other party can be taken as agreeing to it tacitly) or estoppel (one party representing that a fact exists that the other party relies on so that the other party is led to believe that the first party agrees), which are concepts recognized in international law. The relevance of these concepts is that, if OECD member countries (and some non-OECD member countries) disagree with the OECD Commentaries, they have the opportunity of making an observation (*see* section 3.11.3. for the meaning of this) or stating this during negotiations in respect of the tax treaty in question. It is argued by proponents of

---

126.   Para. 5 OECD Model: Commentary on Article 15 (2017).
127.   IE: HC, 31 July 2007, Kinsella v. Revenue Commissioners [2007] IEHC 250; (2007) 10 ITLR 63.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

this suggestion that if states do not do so, they must be taken as having agreed to the interpretation in them (*see* section 3.11.3.).

In addition, a suggestion has been made that the Commentaries on the OECD Model have become customary international law (*see* section 3.11.4.).

Finally, as a last resort, the Commentaries on the OECD Model may be supplementary means of interpretation within article 32 of the Vienna Convention (1969) (*see* section 3.11.5.). All these possibilities will be considered in turn.

### 3.11.2. The Commentaries on the OECD Model and article 31 of the Vienna Convention (1969)

#### 3.11.2.1. An issue of principle?

The principal issue is whether the Commentaries on the OECD Models should be used as part of the process under article 31 of the Vienna Convention (1969) or whether they should be limited to use as supplementary means, in which case they can be used only to confirm a meaning already established, or to resolve the meaning where the meaning established without their use is ambiguous or obscure, or gives a manifestly absurd or unreasonable result. Looking at the matter as one of principle, the former seems desirable and in accordance with the presumed intention of the parties. While the OECD Commentaries are by no means limited to matters of interpretation, given their central relevance to the OECD Model on which the wording of the particular tax treaty being interpreted is likely to be based, why should their use be deliberately confined to the limited permissible purposes under article 32 of the Vienna Convention (1969)? There seems no point in the interpreter deliberately closing his eyes to the OECD Commentaries when coming to the primary decision on the interpretation under article 31. In nature, they are closer to the more normal Explanatory Report to a multilateral treaty like the MLI (*see* section 5.3.3.), which is clearly part of the context. It has been suggested that it would still be context if the Explanatory Report stated that it was non-binding, as is the case with the joint Council of Europe and OECD Convention on Mutual Administrative Assistance in Tax Matters (1988), because it would have been agreed by the contracting parties. Historically, at the time of the OECD Draft (1963), it was possible that the Draft would be the basis for a multilateral tax treaty, either between groups of countries, particularly European countries, or, as an ultimate objective, between all of the OECD member countries.[128] Accordingly, the OECD Commentaries were originally designed to serve the same purpose as the Explanatory Report. If the OECD Commentaries would have been context had the OECD Draft (1963) developed into a multilateral convention, it seems illogical not to give them the same weight in relation to bilateral tax treaties. The main difference is that when entering into a multilateral agreement states will no doubt take the Explanatory Report more seriously because they are becoming bound by the treaty and the Explanatory Report (even though an explanatory report may state that it does not contain an authoritative interpretation of the treaty) and will have to make a reservation if they want to avoid this. Both of these are clearly within the meaning of context in the Vienna Convention (1969). But they might take the OECD Commentaries less seriously when they are not entering into a particular tax treaty or in agreeing to something that is within the definition of context (and, at least in theory, may never enter into a bilateral tax treaty containing a particular wording). While they should still make a reservation or observation, there is less impetus to do so. The difference seems to be one of slight degree rather than a major one. The conclusion is that one should consider the OECD Commentaries to be context by analogy even though they do not fit the wording of the Vienna Convention (1969).

---

128.    OECD, Introduction to the Draft, Possibilities Concerning the Implementation of the Draft Convention III.B paras. 57-61 (OECD 1963).

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

### 3.11.2.2. Interpretation of the OECD Model by analogy to article 31(3)(c) of the Vienna Convention (1969)

The Commentaries on the OECD Model are perhaps more analogous to article 31(3)(c) of the Vienna Convention (1969), although they almost certainly do not fit the words of "relevant rules of international law applicable in the relations between the parties" not being binding rules, on the basis that they are material that both parties (and that is true whether or not they are both OECD member countries) have in their minds as background material when they are negotiating and are, therefore, the closest material that exists to accepted international tax rules. In this respect, the US Court of Federal Claims (CFC) in *National Westminster Bank* (1999)[129] said of the OECD Commentaries that they "are presumed to have been in the minds of the negotiators when they drafted the treaty".

### 3.11.2.3. Article 31 of the Vienna Convention (1969) generally

It should be said that, even if the Commentaries on the OECD Model are used as part of the process under article 31 of the Vienna Convention (1969), all that this means is that they may be considered as part of the primary interpretation process. Their meaning will not necessarily be followed, as other elements (good faith, ordinary meaning, and object and purpose) may be given greater weight, although if the OECD Commentaries establish a clear meaning this is perhaps unlikely.

While there is no support in the definition of "context" for this approach, the use of the Commentaries on the OECD Model would not be prevented on the basis that the Vienna Convention (1969) merely sets out to "codify the comparatively few general principles which appear to constitute general rules for the interpretation of treaties". On that basis, the use of other interpretative material is possible and the meaning given by the OECD Commentaries could be a factor, probably a very strong factor, to be taken into account as part of the interpretation process either as indicating the ordinary meaning of the terms in the tax context in which they appear or as additional context that the Vienna Convention (1969) might have mentioned had it been drawn to their attention (if it is necessary to find a peg in the Convention to hang them on, which it is suggested it is not).

### 3.11.2.4. The contrary argument

The contrary argument to that advanced in section 3.11.2.3. is that ordinary meaning should be the meaning that it would convey to a reader (in the context of a tax treaty), rather than some technical meaning explained by the Commentaries on the OECD Model. For instance, "permanent home" and "the state with which his personal and economic relations are closer" are ordinary language that would be understood by anyone. The Commentary on Article 4 of the OECD Model gives some explanations that may, or may not, be within the ordinary meaning, such as, in relation to permanent home, a rented furnished room qualifying and accommodation for attending a course at a school not qualifying, and that the dwelling must be available at all times continuously.[130] Whether this is confirming the ordinary meaning or expanding on it may depend on the facts, for example, how long is the school course? In relation to closer personal and economic relations, the OECD Commentary on Article 4 says "it is nevertheless obvious that considerations based on the personal acts of the individual must receive special attention".[131] The author of the latter statement (and, hence, the OECD) considered it obvious that personal relations were more important than economic relations, in which case he (and the OECD) would say that this is the ordinary meaning of the term. Others, including perhaps a reader from France

---

129.  US: CFC, 27 July 1999, National Westminster Bank v. United States, (1999) 1 ITLR 725, 737, Tax Treaty Case Law IBFD.
130.  Para. 13 OECD Model: Commentary on Article 4 (2017).
131.  Id., at para. 15.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

where centre of economic interests is a criterion for domestic law residence,[132] might say that it was not so obvious, in which case the OECD Commentaries are giving it a special meaning. The conclusion is that there will be some cases where the OECD Commentaries confirm the ordinary meaning, in which case it does no harm to apply them as part of the interpretation process. However, in others, where the OECD Commentaries are not explaining the ordinary meaning, but expanding on it, or changing it, that will not be sufficient and it will be necessary to rely on article 31(4) of the Vienna Convention (1969) as considered in section 3.4.11.

### 3.11.2.5. Relevant tax cases

The US Court of Appeals (CA) has referred to the Commentaries on the OECD Model as part of the "entire context" (an expression used in earlier cases to indicate part of the interpretation process, rather than something specifically related to the Vienna Convention (1969), which the United States has not ratified) of the tax treaty in *National Westminster Bank* (2008).[133] In the Australian HC, in *Thiel* (1990),[134] Dawson J said,

> [f]or my part, I do not see why the OECD Model Convention and Commentaries should not be regarded as having been made in connection with and accepted by the parties to a bilateral treaty subsequently concluded in accordance with the framework of the Model.

However, he referred to doubts that had been expressed about this and turned to article 32 of the Vienna Convention (1969), and McHugh J relied on article 32. The SC of Canada in *Crown Forest* (1995)[135] regarded the OECD Commentaries as part of the "legal context" to be used "without the need to first find an ambiguity before turning to such materials", thus suggesting that legal context equated to context in article 31 of the Vienna Convention (1969) and not to the supplementary means of article 32. This statement was made in agreeing with the US government's submission (as intervener in the case), which had stated that a court may refer to extrinsic materials that form part of the legal context (using the term "context" in a different sense to the Vienna Convention (1969) that would regard article 31(2) as intrinsic, and article 31(3) as extrinsic material). This is similar to common law statutory interpretation, which regards material similar to article 31(2) of the Vienna Convention (1969) as legal context, rather than extrinsic material.[136] Using that distinction between legal context and extrinsic material would put the OECD Commentaries into part of the context of article 31(2) of the Vienna Convention (1969). In Spain, the *Tribunal Supremo* (Supreme Court, TS) has referred to the OECD Commentaries as "context", against which tax treaties should be interpreted.[137] In the Netherlands, in some cases of the HR, the OECD Commentaries have been treated as context.[138] In Mexico, the OECD Commentaries are regarded as a privileged source of interpretation of tax treaties based on article 31(2)(a) of the Vienna Convention (1969).[139]

---

132.  M. Henderson, France – Individual Taxation sec. 1.1.4.1., Country Analyses IBFD.
133.  US: CA, 15 Jan. 2008, National Westminster Bank, PLC v. Internal Revenue Service, (2008) 10 ITLR 423, 432, Tax Treaty Case Law IBFD.
134.  AU: HC, 22 Aug. 1990, Thiel v. Federal Commissioner of Taxation, [1990] HCA 37, Tax Treaty Case Law IBFD.
135.  Crown Forest (1995), supra n. 53, at 5396.
136.  See R. Sullivan, Sullivan on the Construction of Statutes, 5th edn (LexisNexis 2008), at 574-5.
137.  ES: TS, 15 Oct. 2009, Rec. 10106/2003.
138.  See, for example: NL: HR, 21 Sept. 2012, Case 10/05268; NL: HR, 25 Nov. 2005, Case 40.858, Tax Treaty Case Law IBFD; NL: HR, 21 Feb. 2003, Case 37.011, Tax Treaty Case Law IBFD; and NL: HR, 21 Feb. 2003, Case 37.024, Tax Treaty Case Law IBFD.
139.  See MX: TFJA, 27 Apr. 2016, Case 26709/14-17-02-4/171/16-PL-05-04, Tax Treaty Case Law IBFD; and MX: TFJA, 10 Aug. 2016, Case 2892/14-03-01-2-811-15-PL-02-04, Tax Treaty Case Law IBFD.

---

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

### 3.11.2.6. Article 31(4) of the Vienna Convention (1969) and the OECD Model

Article 31(4) of the Vienna Convention (1969) seems to be a strong candidate for supporting the use of the Commentaries on the OECD Model as part of the article 31 process. Normally, the significance of a special meaning is to put the burden of proof on the person contending for it. But in the context of the OECD Model, it would not be difficult to say that the parties intended that a meaning clearly set out in the OECD Commentaries, even though non-binding, should be used for interpretation. The OECD Model and the OECD Commentaries are a combined work that is familiar to those who negotiate tax treaties, whether or not their state is an OECD member country. The examples given regarding the tie-breaker in respect of individuals may be cases of giving ordinary words a special meaning in the particular context, as is the distinction between the phrases "liable to tax" and "subject to tax" (*see* section 5.2.3.2.).

Article 31(4) of the Vienna Convention (1969) gives the meaning of a term in the Commentaries on the OECD Model a higher status than if the Commentaries are taken into account with other elements as part of the general article 31 process. Article 31(4) of the Vienna Convention (1969) is strongly worded, leaving little or no room for the use of the other elements in article 31(1): "[a] special meaning *shall* be given to a term if it is established that the parties so intended" (emphasis added). It is analogous to a contemporaneous agreement on interpretation that is to be "regarded as forming part of the treaty".[140] There is an apparent conflict between the OECD Commentaries stating that they are not binding and the contracting states intending that the meaning of a term in the Commentaries shall apply, in which case the meaning in the Commentaries is binding. This conflict may be more apparent than real, as it is not the nature of the OECD Commentaries that makes the meaning binding, but the agreement between the parties intending that an otherwise non-binding meaning should be binding (or even that it should be binding subject to the other elements to be taken into account). As a practical matter, the meaning of a term given by the OECD Commentaries is likely to have been intended by the parties. The fact that both states intend the meaning of a term given by the OECD Commentaries does not mean that there will be no disputes about the interpretation, as it is the taxpayer who may be disputing the correctness of the meaning. Even if article 31(4) of the Vienna Convention (1969) effectively makes the meaning in the OECD Commentaries binding on the states, there is still the issue of whether or not it is binding on the taxpayer who wishes to argue for a different meaning. In such circumstances, it may also be the case that the practice of both parties subsequent to the entering into of the tax treaty establishes their agreement regarding its interpretation, but that may not be admissible in domestic law (*see* section 3.14.).

### 3.11.3. The Commentaries on the OECD Model binding by acquiescence or estoppel

### 3.11.3.1. The matter in question

It has been suggested by Douma and Engelen (2008)[141] that a meaning of a term set out in the Commentaries on the OECD Model is effectively binding by acquiescence or estoppel (the meanings of which are explained in section 3.11.1.3.). The argument for its application is if a state fails to indicate, whether by making an observation that they do not agree with the OECD Commentaries on a particular point or by not stating its disagreement during negotiations for the particular tax treaty, it is presumed to have acquiesced in the interpretation in the OECD Commentaries. Therefore (it is argued), when entering into a particular tax treaty, a tacit agreement is made based on the failure to

---

140.    Para. 14 *Vienna Convention: Commentary* (1969).
141.    The Legal Status of the OECD Commentaries (S. Douma & F. Engelen eds., IBFD 2006), Online Books IBFD.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

make an observation when the OECD Commentaries were made or to say that it disagreed with the Commentaries when the actual tax treaty was concluded.

In only one case has the ICJ based its decision on acquiescence and estoppel, although in a number of other cases parties have been unsuccessful in arguing it.[142] Both concepts require that the party which remained silent was under an obligation to say that it disagreed with some proposition. In practice, states do not seem to regard themselves as being under this obligation in relation to the Commentaries on the OECD Model, and there are situations where states have not made an observation but are known to disagree with the OECD Commentaries.[143] The fact that the OECD Commentaries are expressly not binding makes it more difficult to argue that there was an obligation on a state: (i) to make an observation; and (ii) to tell the other state during negotiations for an actual tax treaty that it disagreed with an interpretation in the Commentaries.[144] The point should be made that many statements in the OECD Commentaries are not strictly interpretative but descriptive, as when they say that most OECD member countries do something. Those OECD member countries who do not, see no need to make an observation, saying that this because the OECD Commentaries are not setting out an interpretation, but are, rather, stating a fact about what states do in practice.

**3.11.3.2. Observations by States on the Commentaries on the OECD Model**

The Introduction to the OECD Model states as follows:

30.     Observations on the Commentaries have sometimes been inserted at the request of Member countries that are unable to concur in the interpretation given in the Commentary on the Article concerned. These observations thus do not express any disagreement with the text of the Convention, but usefully indicate the way in which those countries will apply the provisions of the Article in question. Since the observations are related to the interpretations of the Articles given in the Commentaries, no observation is needed to indicate a country's wish to modify the wording of an alternative or additional provision that the Commentaries allow countries to include in their bilateral conventions.

(On the last point, if an alternative or additional provision that the Commentaries on the OECD Model allow is adopted, the Commentaries may also say something about the interpretation of such other provision so that the same point can arise.) The quotation is interesting in showing that the observation is a warning to other states that, if they conclude a tax treaty, the interpretation given in the observation will be applied by the state making it when the wording of the OECD Model is used. It does not go as far as saying that the state will be correct in applying the tax treaty in this way. Nor does the quotation suggest that states are under an obligation to make an observation. Indeed, the first sentence suggests that observations are made only if the state requests it. The tax treaty can have only one meaning and if one state says in advance that it will apply it in a particular way (in accordance with its observation) and the other state applies it in a different way (in accordance with the OECD Commentaries), it still needs to be decided which interpretation is the correct one. That quotation also comes shortly after the statement in the OECD Commentaries that they are not intended to be legally binding. Reading these

---

142.   H. Thirlway, *The Role of the International Law Concepts of Acquiescence and Estoppel*, in Douma & Engelen, *supra* n. 141. *See also* KH/TH: ICJ, 11 Nov. 2013, *Temple of Preah Vihear*.

143.   D.A. Ward, *Is There an Obligation in International Law of OECD Member Countries To Follow the Commentaries on the Model?*, in Douma & Engelen, *supra* n. 141, at sec. 12.

144.   Thirlway, *supra* n. 142.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

two together seems to show, in the author's view, that, if the OECD Commentaries are not binding, it is unlikely that a tacit agreement caused by not making an observation disagreeing with the interpretation in the Commentaries should be any more binding, and nor should a state be made to adhere to an interpretation because it has not made an observation.

### 3.11.3.3. The author's opinion

Regardless of whether or not these doctrines can apply in relation to the Commentaries on the OECD Model, the author's view is that points of interpretation arise on particular facts, rather than in the abstract and depend on deciding between two possible meanings both of which are within the ordinary meaning of the term in its context. It is unlikely that any statement in the OECD Commentaries goes as far as fixing an interpretation applying to all possible facts and so, even if acquiescence or estoppel can apply, it is unlikely to resolve the particular interpretation issue being considered.

### 3.11.3.4. The taxpayer's position

The position of the taxpayer in this process should also be recognized. The taxpayer did not take part in the making of the Commentaries on the OECD Model or the making (or failing to make) an observation and is entitled to have the tax treaty interpreted using the correct approach, whether one of the states is tacitly bound by or estopped from advancing a different interpretation. In a situation where a state makes an observation, the fact of doing so shows that there is not unanimity regarding the correctness of the interpretation shown by the OECD Commentaries, which is something that a court may wish to take into account in deciding what weight to give to the Commentaries as one of the factors that lead to the court's interpretation.

### 3.11.3.5. Final comments

The author is not aware of any decision of a court in relation to a tax treaty that applies the Commentaries on the OECD Model on the ground of acquiescence or estoppel.

### 3.11.4. The Commentaries on the OECD Model as customary international law

The widespread use of the Commentaries on the OECD Model might suggest that they had achieved the status of customary international law, which would be binding. For this to be the case, the OECD Commentaries would have to be customarily recognized as binding. The difficulty with such an argument is that: (i) the OECD Commentaries expressly state that they are not binding (*see* section 3.11.3.); and (ii) there is very little support among courts or academic writing that they are binding. It seems to be clear that at present the OECD Commentaries cannot qualify as customary international law. The author is not aware of any decision of a court in relation to a tax treaty that has decided in favour of this approach. However, this would not prevent the use of the OECD Commentaries on this basis by analogy on the ground that they are undoubtedly material in the minds of the parties when negotiating the treaty (*see* section 3.11.2.).

### 3.11.5. The Commentaries on the OECD Model as supplementary means of interpretation within article 32 of the Vienna Convention (1969)

If all the arguments above for using the Commentaries on the OECD Model as part of the interpretation process under article 31 of the Vienna Convention (1969) fail, there is the issue of whether or not the Commentaries qualify as supplementary means of interpretation and, accordingly, they can be used for the limited purposes set out in article 32 (*see* section 3.4.5.). The OECD Commentaries are not *travaux préparatoires* as normally understood because they do not relate to the preparatory work of any

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

particular treaty. On the other hand, article 32 of the Vienna Convention (1969) deliberately does not define preparatory work expressly so as not to exclude relevant material (*see* section 3.5.). Therefore, there seems no basis to exclude the OECD Commentaries from the limited effect permitted under article 32 of the Vienna Convention (1969). As a matter of principle, this seems to give the OECD Commentaries too little weight. It seems unlikely that states would intend the OECD Commentaries to have this limited purpose, given their extent and the work that goes into the continuous process of updating.

Even if the Commentaries on the OECD Model could be used only as supplementary means of interpretation the point might still not be significant. The court might decide, by using article 31 of the Vienna Convention (1969), that either of two possible meanings, say that parts of a day did or did not count, was equally possible, in which case the OECD Commentaries, as supplementary means, could be used to resolve the ambiguity. If the OECD Commentaries could not be used under article 31 of the Vienna Convention (1969) that would matter only if the court had decided contrary to the meaning in the Commentaries, but within the scope of the ordinary meaning of the term in its context because the Commentaries, as supplementary means, could not be used to contradict that decision, unless the decision were absurd or unreasonable, which is unlikely. As a practical matter, a court faced with a problem of interpretation is more likely to find an ambiguity that the OECD Commentaries resolve than to say that the ordinary meaning is clear and the meaning in the Commentaries is wrong.

Courts in some countries have regarded the OECD Commentaries as falling within article 32 of the Vienna Convention (1969): in Australia (HC);[145] France (CE);[146] Japan (SC);[147] Spain (TS);[148] and, in some cases in the Netherlands (HR),[149] as an alternative to the Commentaries being context.

## 3.12. Later Commentaries on the OECD Model

### 3.12.1. What the Commentaries on the OECD Model say

This section considers the status of Commentaries on the OECD Model issued after that the tax treaty concerned was concluded and so the contents cannot have been in the contemplation of the parties when the tax treaty was concluded. On this, the OECD Commentaries themselves state as follows:

33.     When drafting the 1977 Model Convention, the Committee on Fiscal Affairs examined the problems of conflicts of interpretation that might arise as a result of changes in the Articles and Commentaries of the 1963 Draft Convention. At that time, the Committee considered that existing conventions should, as far as possible, be interpreted in the spirit of the revised Commentaries, even though the provisions of these conventions did not yet include the more precise wording of the 1977 Model Convention. It was also indicated that Member countries wishing to clarify their positions in this respect could do so by means of an exchange of letters between competent authorities in accordance with the mutual agreement procedure and that, even in the absence of such an exchange of letters, these authorities could use mutual agreement procedures to confirm this interpretation in particular cases.

---

145.   *Thiel* (1990), *supra* n. 134, McHugh J at 16 and Dawson J at 10 (who also would have used the Commentaries on the OECD Model under article 31 of the Vienna Convention (1969)).

146.   FR: CE, 27 July 2001, Case No. 215124, SA Golay Buchel France, Tax Treaty Case Law IBFD; and *Interhome* (2003), *supra* n. 40.

147.   JP: SC, 29 Oct. 2009, Glaxo Kabush ki Kaisha, Minshu Vol. 63, No. 8, 1881, Tax Treaty Case Law IBFD.

148.   ES: TS, 20 Oct. 2011, Rec. No. 1903/2009.

149.   *See* Case 10/05268 (2012), *supra* n. 138; and Case 30.245 (1996), *supra* n. 106.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

34.   The Committee believes that the changes to the Articles of the Model Convention and the Commentaries that have been made since 1977 should be similarly interpreted.

35.   Needless to say, amendments to the Articles of the Model Convention and changes to the Commentaries that are a direct result of these amendments are not relevant to the interpretation or application of previously concluded conventions where the provisions of those conventions are different in substance from the amended Articles. However, other changes or additions to the Commentaries are normally applicable to the interpretation and application of conventions concluded before their adoption, because they reflect the consensus of the OECD Member countries as to the proper interpretation of existing provisions and their application to specific situations.

36.   Whilst the Committee considers that changes to the Commentaries should be relevant in interpreting and applying conventions concluded before the adoption of these changes, it disagrees with any form of a contrario interpretation that would necessarily infer from a change to an Article of the Model Convention or to the Commentaries that the previous wording resulted in consequences different from those of the modified wording. Many amendments are intended to simply clarify, not change, the meaning of the Articles or the Commentaries, and such a contrario interpretations would clearly be wrong in those cases.

36.1   Tax authorities in Member countries follow the general principles enunciated in the preceding four paragraphs. Accordingly, the Committee on Fiscal Affairs considers that taxpayers may also find it useful to consult later versions of the Commentaries in interpreting earlier treaties.[150]

This encourages the use of later Commentaries on the OECD Model by tax authorities and suggests that taxpayers might find it useful to do the same. Such an approach is beneficial to taxpayers, as they can expect the tax authorities to apply later OECD Commentaries (and may be able to force the tax authorities to do so on the basis of legitimate expectation), but are free to argue against them in court. In one case, the decision of the Danish *Østre Landsret* (Eastern Division of the High Court, ØL) was based on the tax authorities not applying later OECD Commentaries dealing with the meaning of the term "employer" in article 15 to the detriment of the taxpayer.[151]

### 3.12.2. The opinions of the courts

As far as courts are concerned, later Commentaries on the OECD Model are clearly not part of the tax treaty for the purposes of the Vienna Convention (1969). The only way in which the OECD Commentaries could be context is in relation to "any subsequent agreement between the parties regarding the interpretation of the treaty" in article 31(3)(a) of the Vienna Convention (1969), which, like agreements in article 31(2)(a), does not fit the OECD Commentaries well. However, just as it is suggested in section 3.11.2.2. that the existing OECD Commentaries should be treated as context by analogy, the same approach is suggested to be taken to subsequent Commentaries. This would mean no more than that the OECD Commentaries could be considered to be primary interpretative material and not that any particular weight should be given to them. In principle, there seem to be cases where an interpreter of a tax treaty would have to use them as primary material (*see* section 3.12.4. and the software example considered there). Alternatively, while the OECD Commentaries cannot strictly be

---

150.   OECD Model (2017): Introduction.
151.   DK: ØL, 3 Feb. 2000, Casino Copenhagen K/S v. Ministry of Taxes, 3 ITLR 447, Tax Treaty Case Law IBFD.

---

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

*travaux préparatoires* either, as they are subsequent to the tax treaty, there is nothing to prevent them from being another type of supplementary means of interpretation.

### 3.12.3. Context and observations regarding later Commentaries on the OECD Model

The real issue is less as to whether or not later Commentaries on the OECD Model are context, but, rather, that they should be recognized as being later and consideration given to what weight, if any, should be given to them. If a state does not agree with later OECD Commentaries, it has the option of making an observation, in which case it will be known that later Commentaries cannot be treated as being a subsequent agreement by that state, even by analogy. Not all later OECD Commentaries are equivalent. For instance, such OECD Commentaries may fill a gap in existing Commentaries, amplify existing Commentaries, record what states have been doing in practice or contradict existing Commentaries. The answer will be different according to their type.

### 3.12.4. Use of later Commentaries on the OECD Model: Examples

An example of the first of these is the discussion of software in relation to the royalties article. Software was not an issue at the time of the OECD Model (1977) and, subsequently, the question arose how it should be treated in relation to the existing definition of royalties. There was no intention to change the meaning of the definition; it was a matter of how something new fitted into it. If the new Commentaries on the OECD Model represent a consensus on how this should be done, there is no reason, in principle, to ignore them and do the same exercise without the assistance of the later material. The Finnish *Korkein hallinto-oikeus* (Supreme Administrative Court, KHO)[152] dealt with receipts for the use of software that had been licensed for use by the licensee in its own business without the licensee having the right to make copies and license others under old tax treaties that made no reference to software. If the receipt was a royalty, it had to be for the use of, or the right to use, copyright. The only right to copy the software was for making back-ups which the later OECD Commentaries ignored as being an integral part of the use of the program. The KHO, relying on the later OECD Commentaries, held that the income was business income and not a copyright royalty, and no credit was given for withholding taxes imposed in the source states. The interpretation follows the treaty wording and merely confirms that copying occurring as an integral part of using the software is not considered to be using copyright. It is suggested that this is an entirely appropriate use of later OECD Commentaries. There would be no point in saying that a court was bound to come to an initial decision in relation to software without using the later OECD Commentaries and only then turn to them for confirmation of their decision or the resolution of ambiguities or unreasonable results.

An example of the opposite extreme where later Commentaries on the OECD Model contradict the earlier ones is that in the Commentary on Article 17 of the OECD Model (1977), which said that

> [t]he purpose of paragraph 2 is to counteract certain tax avoidance devices in cases where remuneration for the performance of an entertainer or athlete is not paid to the entertainer or athlete himself but to another person, e.g. a so-called artiste-company …[153]

---

152.  FI: KHO, 12 Dec. 2011, Re Company X (Software Payments), (2012) 14 ITLR 990, Tax Treaty Case Law IBFD.
153.  Para. 4 OECD Model: Commentary on Article 17 (1977).

---

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

The Commentary on Article 17 of the OECD Model (1992) onwards includes that, as a reference to a situation in which it was applicable, the income of a team, troupe, orchestra, etc., which is constituted as a legal entity, is being paid to the entity.[154] The latter is far wider than the original statement, which dealt with tax avoidance. It would, therefore, not be appropriate to give any weight to the later addition in interpreting an earlier tax treaty, as the Swedish HF has now decided in relation to the Ireland-Sweden Income Tax Treaty (1986),[155] when the former wording applied.[156]

### 3.12.5. Amplification of existing Commentaries on the OECD Model

Examples of amplification of the existing Commentaries on the OECD Model can be found in relation to the meaning of a PE, such as those in the Commentary on Article 5 of the OECD Model (2003) as to whether premises are at a person's disposal and the tests to be applied in determining whether an agent is independent.[157]

### 3.12.6. Commentaries on the OECD Model and state practice

An example of the Commentaries on the OECD Model recording what states have been doing in practice is that the Commentary on Article 5 of the OECD Model (2003) records that, normally, states have not regarded an activity carried on in a country through a fixed place of business one that was maintained for less than 6 months.[158] This was applied to the Ivory Coast-Norway Income Tax Treaty (1978) by the Norwegian *Høyesterett* (Supreme Court) in *PGS Geophysical*[159] to decide that seismic exploration on the continental shelf off the Ivory Coast for 25 days by one vessel and 41 days by another vessel did not constitute a PE in the Ivory Coast, with the result that the Norwegian resident taxpayer could not claim exemption for the profits attributed to it.

### 3.12.7. A relevant tax case

Courts in many countries have referred to later Commentaries on the OECD Model, often without noting that they are subsequent and so the court may not have addressed the issue. Where courts have addressed the issue, subsequent OECD Commentaries have been described as "somewhat suspect" (Canada, FCA),[160] but were used by the Swiss *Bundesgericht/Tribunal fédéral* (Federal Supreme Court, BDG/TF) in circumstances where there had been no substantial change.[161] An example of a valid use of subsequent OECD Commentaries is the US TC case of *Taisei Fire & Marine Insurance* (1995),[162] where the OECD Draft (1963) stated that

> [a]gents who may be deemed to be permanent establishment must be strictly limited to those who are dependent, both from the legal and economic points of view, upon the enterprise.

---

154. OECD Model Tax Convention on Income and on Capital: Commentary on Article 17, para. 8 (1 Sept. 1992), Models IBFD.
155. Ire.-Swed. Income Tax Treaty (1986), Treaties IBFD.
156. SE: HF, 20 June 2016, Case No. 3960-14.
157. OECD Model Tax Convention on Income and on Capital: Commentary on Article 5 (2003), paras. 4.1-4.6 and 38-38.8 (28 Jan. 2003), Models IBFD (now expanded as paras. 10-20 and 104-110 of the *OECD Model: Commentary on Article 5* (2017)).
158. Id., at para. 6.
159. *PGS Geophysical* (2004), *supra* n. 120.
160. CA: FCA, 19 Oct. 1998, Cudd Pressure Control Inc. v. Her Majesty the Queen, A-369-95, Tax Treaty Case Law IBFD.
161. CH: BDG/TF, 28 Nov. 2005, 2A.239/2005, = RDAF II (2006), 239 = StR 2006, 217, cons. 3.4.5, Tax Treaty Case Law IBFD.
162. US: TC, 2 May 1995, Taisei Fire and Marine Insurance Co., Ltd., et al. v. Commissioner of Internal Revenue, 14296-92, 14297-92, 14298-92 and 14299-92, Tax Treaty Case Law IBFD.

---

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

The League of Nations Draft (1928) on which this was stated to be based said of independent agents "absolute independence, both from the legal and economic point of view", which if translated to a statement about dependent agents should logically have been "legal *or* economic". The OECD Model (1977) had corrected this, which the TC used in relation to a pre-1977 tax treaty to confirm their view that the "and" should have been "or". The US CFC (the lower court), in *National Westminster Bank* (2003),[163] declined to refer to the OECD Discussion Draft relating to the redrafting of article 7, as

> [g]iven the above-noted statements in the 2001 Discussion Draft [that is, it was acknowledged that the new Draft may not reflect the original intent or historical practice and interpretation of article 7], the 2001 Discussion Draft is of no assistance to the court in interpreting the proper scope of the 1975 Treaty. It simply offers no insights into the "genuine shared expectations of the contracting parties" …[164]

The Spanish TS has explicitly stated that interpretation of tax treaties "should preferably be dynamic" and has applied later Commentaries on the OECD Model on this basis.[165] German courts (*Bundesfinanzhof* (Federal Tax Court, BFH)) do not refer to later OECD Commentaries, as these cannot reflect the intention of the parties at the time of signing the tax treaty.[166] Italian courts generally make reference to the last available version of the OECD Commentaries, without giving reasons for why such Commentaries, and not that available at the date of the conclusion of the relevant tax treaty, should be taken as a relevant source of interpretation. French and South African courts have not referred to later OECD Commentaries.

### 3.12.8. Treaty content specifically on the status of the Commentaries on the OECD Model

Material in tax treaties specifically dealing with the status of the Commentaries on the OECD Model is unusual, but the following, from the Protocol (2000) to the Austria-Germany Income and Capital Tax Treaty (2000),[167] which was concluded at the same time as the tax treaty, is an exception:

16.     Interpretation of the Convention

It is understood that provisions of the Convention which are drafted according to the corresponding provisions of the OECD Model Convention on Income and on Capital shall generally be expected to have the same meaning as expressed in the OECD Commentary thereon. The understanding in the preceding sentence will not apply with respect to the following:

(a)     all observations made by both Contracting States to the OECD Commentary;

(b)     all contrary interpretations contained in this protocol;

---

163.  US: CFC, 14 Nov. 2003, National Westminster Bank, PLC v. United States (Internal Revenue Service), 58 Fed. Cl. 491 (2003), Tax Treaty Case Law IBFD.
164.  Id., at 568.
165.  ES: TS, 18 May 2005, Rec. No. 754/2000.
166.  DE: BFH, 25 May 2011, I R 95/10, *Deutsches Steuerrecht* 2011, 1553, 1555 with further references.
167.  The Austria-Ger. Income and Capital Tax Treaty (2000), Treaties IBFD.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(c)   all contrary interpretations made by one of the Contracting States in a published statement, transmitted to the competent authority of the other Contracting State before the entry into force of the Convention;

(d)   all contrary interpretations agreed by the competent authorities following the entry into force of the Convention.

The OECD Commentary – as it may be revised from time to time – constitutes a means of interpretation in the sense of the Vienna Convention of 23 May 1969 on the Law of Treaties.

Longquote EndThis gives effect to the meanings in the existing Commentaries on the OECD Model as a primary means of interpretation, subject to the qualification expressed, which are all cases where the parties would want other material to take precedence. The last paragraph dealing with later OECD Commentaries puts them into the category of article 32 of the Vienna Convention (1969), based on the assumption that "a means of interpretation" is intended to refer to supplementary means. This corresponds to the result that it is suggested above would be the case without any special provision in the tax treaty.

A similar example can be found in the Protocol (2008) to the Bosnia and Herzegovina-Spain Income and Capital Tax Treaty (2008),[168] which was again concluded at the same time as the tax treaty and adds two provisions. The first refers to interpretation of the treaty according to the OECD Commentaries and the second makes it clear that the Commentaries (as they may be revised from time to time) constitute "a means of interpretation in the sense of the Vienna Convention of 23 May 1969 on the Law of Treaties".

## 3.13. Effect of other materials produced by international organizations

What is said in sections 3.10. to 3.12. regarding the Commentaries on the OECD Models is equally applicable to the OECD Reports that have been adopted by the OECD Council. The normal method of working is that a report is produced and the report contains changes to the OECD Commentaries, which are later incorporated into the next update. There can be an advantage in referring to the report, because it may contain the reasoning behind the changes. Other current materials produced by the UN and the Andean Community (*see*, for example, Decision no. 578, on avoiding double taxation and preventing tax evasion) may, where applicable, also be relevant.

Other historical material may be relevant as supplementary means of interpretation. In this respect, the archives of the Organisation for European Economic Co-operation (OEEC) and the OECD up to 1977 are available.[169] These can be useful in explaining why provisions were originally adopted. Earlier League of Nations material is also available[170] and can still be relevant.

Archive material on older tax treaties may be available in some countries. In the United Kingdom, for example, access to material on tax treaties is restricted for 75 years, but, in practice, minutes regarding the negotiation of tax treaties are derestricted earlier. Some insights into treaty negotiations can be

---

168.   The Bosn. & Herz.-Spain Income and Capital Tax Treaty Protocol II (2008), Treaties IBFD.
169.   Available at www.taxtreatieshistory.org.
170.   Available at http://setis.l brary.usyd.edu.au/oztexts/parsons.html (*see* under Legislative History of US Tax Conventions, vol. 4, pt. 1 (League of Nations) and pt. 2 (OEEC)).

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

obtained by comparing the available material in both treaty parties. This was done very effectively in relation to the Australia-United Kingdom Income Tax Treaty (1946)[171] by Taylor (2010).[172]

## 3.14. Mutual agreements and subsequent practice

In article 25(3) of the OECD Model, the states delegate to the competent authorities power to resolve difficulties or doubts arising as to the interpretation or application of the tax treaty. Such an agreement may not bind the states, because: (i) the agreement does not resolve difficulties or doubts, but, rather, changes the tax treaty and, therefore, goes beyond the delegation; or (ii) constitutionally such an agreement would require the same Parliamentary approval as the tax treaty itself before it can take effect in domestic law.

An example of (i) is a decision of the *Hof van Beroep/Cour d'Appel* (Court of Appeals, HB/CA)[173] of Gent involving the Belgium-Netherlands Income and Capital Tax Treaty (1970). The mutual agreement determined that the income of an active partner of a Belgian *Société privée à responsabilité limitée* (SPRL)/*Besloten vennootschap met beperkte aansprakelijkheid* (BVBA) (limited liability company) was categorized as directors' fees under the tax treaty. Originally, under Belgian law such income was classed as business profits, but the law was changed in 1976 to create a separate category of remuneration of active partners in companies of persons. The effect was that the income fell under the other income article of tax treaties. The mutual agreement with the Netherlands, treating the income as directors' fees, was entered into in order to preserve Belgium's right to tax in circumstances in which the Netherlands exempted it in the hands of a Netherlands resident. On that basis, the effect of the mutual agreement was to impose tax on the taxpayer. The HB/CA found that it was clear from the tax treaty that a Netherlands resident receiving such income was taxable under the other income article and, therefore, exempt from tax in Belgium. While the competent authorities had power to resolve difficulties or doubts as to the interpretation of the tax treaty, here there were no doubts or difficulties and the other income article clearly applied. The mutual agreement was, therefore, not valid under the terms of the treaty.

Another example is a recent decision of the Dutch HR, which held that, as that court had previously decided on the meaning of a provision in the Germany-Netherlands Income and Capital Tax Treaty (1959) relating to termination payments of an employment, there were no difficulties or doubts, so a mutual agreement with Germany on the topic, which would have disadvantaged the taxpayer compared to the earlier decision, was invalid, in spite of the fact that the German BFH had interpreted the treaty differently.[174] The contrary view, which appeals to the author, is that the conflict between the highest courts of the treaty partners proved that there were difficulties or doubts to be resolved by a mutual agreement (and if the Netherlands could not increase the tax beyond what it would have been in accordance with the previous decision of the HR, that is invoking its internal law as justification for its failure to perform a treaty, contrary to article 27 of the Vienna Convention (1969) (*see* section 3.8.1.), rather than a reason for the mutual agreement to be invalid).

For the same reason as for mutual agreements, domestic law may not give effect to subsequent practice in domestic law, as Parliamentary approval is required for it to do so.

---

171.    The Austrl.-UK Income Tax Treaty (1946), Treaties IBFD.
172.    J. Taylor, ch. 9, in *Studies in the History of Tax Law* vol. 4, (J. Tiley ed., Hart Publishing 2010).
173.    BE: HB/CA, 20 June 1996, AFT 1996, 461, Tax Treaty Case Law IBFD.
174.    NL: HR, 6 Jan. 2017, 15/05836, Tax Treaty Case Law IBFD; *see* 20 ITLR 84.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

## 4. Article 3(2) of the OECD Model

### 4.1. Application

The Vienna Convention (1969) is of general application. The interpretation provisions that apply specifically to tax treaties are the following: (i) terms that are defined in the tax treaty without the qualification "unless the context otherwise requires", for example, resident of a contracting state, PE, immovable property, and (for the purpose only of each of those articles) dividends, interest and royalties; (ii) terms that are defined in article 3(1) of the OECD Model, subject to the context "otherwise requiring"; and (iii) article 3(2), which provides that undefined terms have their domestic law meaning, unless the context otherwise requires. Article 3(2) of the OECD Model serves exactly the same function as the definitions in article 3(1), which are also subject to the context otherwise applying. This article is different only in that it incorporates by reference to the meaning that the undefined treaty term has under domestic law of the state applying the tax treaty for the purpose of the taxes subject to the treaty. Apart from these, the Vienna Convention (1969) operates in full. The Vienna Convention (1969) can, and should, therefore, also be used to interpret article 3(2) of the OECD Model itself.

### 4.2. The different meaning of context in the Vienna Convention (1969) and article 3 of the OECD Model

A possible source of confusion is that both article 3(2) of the OECD Model and the Vienna Convention (1969) use the expression "context", but they do so in a different way. The Vienna Convention (1969) uses the term "context" to differentiate primary interpretative material to be used under article 31 from secondary material to be used under article 32. Article 3(2) of the OECD Model has a different purpose, i.e. to decide whether or not the domestic law meaning should not apply for which any relevant interpretative material can be used. As explained in more detail in section 5., article 3(2) of the OECD Model does not refer to domestic law and context as different concepts; where article 3(2) applies, domestic law will always be included as part of the context. If it is decided that the domestic law meaning should not apply, the meaning derived from the Vienna Convention (1969) will apply. This is necessarily the case where there is no domestic law meaning of the term. The context can otherwise require not fully but partly by giving a term a domestic law meaning up to a point where the context requires that it should not be used, for example, because the Commentaries on the OECD Model provide for this (the meaning of employer is an example; *see* section 4.4.). The difference in meaning of "context" in the Vienna Convention (1969) and article 3 of the OECD Model is dealt with more fully in section 5.

Article 3(2) of the OECD Model will be considered next in section 4.3. Whether the context otherwise requires in relation to the definitions in article 3(1) of the OECD Model or domestic law in article 3(2) will be dealt with in section 5.

### 4.3. The scope of Article 3(2) of the OECD Model

#### 4.3.1. In general

Article 3(2) of the OECD Model is an important additional element to the Vienna Convention (1969) regarding the interpretation of tax treaties. It provides as follows:

As regards the application of the Convention at any time by a Contracting State, any term not defined therein shall, unless the context otherwise requires *or the competent authorities agree to*

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.

Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

*a different meaning pursuant to the provisions of Article 25*, have the meaning that it has at that time under the law of that State for the purposes of the taxes to which the Convention applies, any meaning under the applicable tax laws of that State prevailing over a meaning given to the term under other laws of that State.

As can be seen, undefined terms have their meaning under domestic law for taxes covered by the tax treaty, unless the context otherwise requires. The words in italics were added in the 2017 update. A similar point had previously been made in the Commentary, and paragraph 13.2 of the Commentary on Article 3 of the OECD Model (2017) now says that the Model was amended to remove any doubt (*see* section 4.3.3.). The same paragraph states the option of changing the phrase "pursuant to the provisions of Article 25" to read "pursuant to the provisions of paragraph 3 of Article 25" so as to limit the effect to mutual agreements made under that article; alternatively, it gives the option of omitting the added words for states which consider that that competent authorities cannot be given power to agree to a meaning that would prevent recourse to domestic law. Previously, the added words had been used in treaties by the United States (*see* section 4.9.).

The European Court of Justice (ECJ), in its capacity as arbitrator under the Austria-Germany Income and Capital Tax Treaty (2000), has considered article 3(2) in a way that the author regards as unsatisfactory.[175] It said of article 3(2), "such a rule of interpretation by a single State at a given point in time is not to be regarded as a rule intended to arbitrate between divergencies of interpretation between the two States Parties" and that "[a] construction to the contrary would, furthermore, deprive of all practical effect the provisions of Article 25(5) of that convention [the arbitration provision], whose mutual agreement procedure and clause conferring jurisdiction on the Court would have scarcely any meaning if the States Parties had intended that convention to be interpreted only by reference to national laws alone …".[176] As to the first point, the opposite is the case: if the tax treaty exempts particular income from tax, the effect is that domestic law exempts everything that is taxed under domestic law, which is the desired result, in spite of divergencies between the domestic laws of the two states. As to the second point, the opposite is also the case because of the exception for the context otherwise requiring, so whether or not domestic law applies would be the precise issue in the arbitration, which certainly does not deprive the arbitration provision of all practical effect. It should be emphasized that the court's quoted remarks were obiter, since there was no finding about domestic law in Germany and, it may be added, there is no domestic law meaning of the term in issue in Germany.[177] Article 3(2) was therefore irrelevant, and it is submitted that the court's decision based on the context of the treaty was correct.

Early model treaties did not contain any definitions of types of income, with the exception that "income from movable capital" was defined in the League of Nations Mexico Draft (1943). Article 3(2) was first used in the United Kingdom-United States Income Tax Treaty (1945).[178] There are the following two earlier indications of the same approach: (i) the Canada-United States Income Tax Treaty (1942)[179] provided that the definitions of "person, "individual" and "corporation" had the same meaning as "under the revenue laws of the taxing state"; and (ii) a similar but unilateral approach was contained in the

---

175. AT: ECJ, 12 Sept. 2017, Case C-648/15, *Austria v. Germany*, Tax Treaty Case Law IBFD.
176. Id., at paras. 36 and 37.
177. DE: BFH, 26 Aug. 2010, I R 53/09, Tax Treaty Case Law IBFD, was a decision on the interpretation of the same treaty based on the context of the treaty, and not a decision in which domestic law was even in issue; it is not relevant to the meaning of the term in question in German domestic law. The author and Prof. Jürgen Lüdicke have expanded on this criticism of the case in their commentary in 20 ITLR 385.
178. The UK-US Income Tax Treaty art. II(3) (1945), Treaties IBFD.
179. The Can.-US Income Tax Treaty Protocol 3(a) (1942), Treaties IBFD.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

US Regulations[180] made under the Sweden-United States Income and Capital Tax Treaty (1939),[181] which provided that

> [a]ny word or term used in these Regulations which is not defined in the Convention but is defined in the Internal Revenue Code shall be given the definition defined therein.

The qualification "unless the context otherwise requires" is a familiar one in UK statutes and agreements.

It is at first sight strange that the treaty partners would wish for a treaty term, particularly one categorizing a type of income, to have different meanings in each state, which is the likely consequence of each state applying its domestic law. The reason is that normally domestic law taxes and the tax treaty relieves from taxation. It is more important to giving effect to the purpose of the tax treaty that when it exempts a particular type of income from tax in the source state that state should exempt the whole of what it taxes as that type of income, rather than that both states should exempt exactly the same scope of income. The same approach applies in the fewer cases where it is the residence state that exempts income under the distributive rules of the tax treaty. In the OECD Model, this applies to government service (article 19), students (article 20) and an alternative in the Commentary on Article 18 of the OECD Model relating to pensions.[182] The residence state exempts everything that its domestic law would have taxed under those headings. Whether or not the residence state applies article 3(2) of the OECD Model in other circumstances is considered in section 4.7.

An interesting issue before the courts in the United Kingdom is the effect on treaties of tax law deeming one category of income to be another. Where a diver is working in the sea on the UK Continental Shelf as an employee, tax law provides that "the performance of the duties of employment is instead treated for income tax purposes as the carrying on of a trade in the UK".[183] The First-Tier Tribunal (FTT) found that the business profits article applied, because that was what it was deemed to be, with the result that the income was exempt, as there was no PE. However, the Upper Tribunal found that the employment income article applied, because there was an employment as understood in tax law, with the result that the income was taxable (but the withholding provisions did not apply, as it was taxed as trading income).[184] The author's view is that the FTT's decision is to be preferred, because it keeps the taxing and treaty exempting provisions in line. It is understood that an appeal will be heard in May 2018. The Dutch HR has taken a strict view of deeming provisions, refusing to apply the domestic law on fictitious wages (*see* section 5.1.1.).

Sections 4.3.2. to 4.9. deal with some points on the interpretation of article 3(2) of the OECD Model. Whether or not the context otherwise requires that domestic law should not be used will be dealt with in section 5.

---

180.   US Regs. TD4975, 1940-2 Cum. Bull. 43.
181.   The Swed.-US Income and Capital Tax Treaty (1939), Treaties IBFD.
182.   Para. 15 OECD Model: Commentary on Article 18 (2017).
183.   ITTOIA 2005 s 15.
184.   UK: FTT, 12 Apr. 2016, *Fowler v. HMRC*, [2016] UKFTT 0234 (TC); and UK: UT, 30 May 2017, *HMRC v. Fowler*, [2017] UKUT 219 (TCC).

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

## 4.3.2. Meaning of "term" and "not otherwise defined"

### 4.3.2.1. Terms and application

The OECD Model uses the expression "term" throughout the defined expressions in article 3(1) and (2) in English. In French, "*terme*" is used in article 3(1) of the OECD Model for the definition of a single word, such as "*personne*" and "*société*", while "*expression*" is used for definitions of more than one word, such as "*entreprise d'un État contractant*" and "*autorité compétente*". Both "*terme ou expression*" is used in article 3(2) of the OECD Model. In both languages, therefore, the same words are used in article 3(2) of the OECD Model as are used to cover all the definitions in article 3(1). This raises the issue of whether the meaning of "term" in English and "*terme ou expression*" in French in article 3(2) of the OECD Model covers only definitions or is wider in including concepts. It is relevant that domestic law may not use the precise expression used in the OECD Model. For instance, UK tax law refers to "land" rather than "immovable property", does not use "profits of an enterprise", uses "disposal" rather than "alienation" in relation to capital gains, and "earnings" rather than "salaries, wages and other similar remuneration" in relation to employment income. It would be contrary to the purpose of the OECD Model (and a tax treaty based on it) not to apply the equivalent domestic law in such cases. This suggests that "term" in article 3(2) of the OECD Model should be given a wide meaning, not restricted to identical words, but, rather, to the equivalent domestic law concept. Regardless of the normal meaning of "*terme*" the French CE has applied article 3(2) of the OECD Model to a phrase in *Golay Buchel* (2001).[185] The CE interpreted the phrase "income from debt claims of every kind" in the equivalent of article 11(3) of the OECD Model, noting that, under French domestic law, interest on commercial credits was not categorized for tax purposes as interest, but, rather, as being of the same nature as the purchase price of the goods or services to which it related. For treaty purposes this domestic law classification was applied pursuant to article 3(2) of the OECD Model, with the result that the payment fell within article 7 and in the absence of a PE could be taxed in France. The width of the meaning of "term" can be even more extreme where a tax treaty provides that, in cases of different meanings of two language texts, a third language version is to prevail or where the only official version of a tax treaty is in a third language (*see* section 3.5.2.). As domestic law will not be written in the third (or sole other) language, there will never be an identical word in domestic law and so it is essential to give a meaning to "term" that conveys the equivalent concept.

### 4.3.2.2. Interpretation in practice

The word "term" has in practice been interpreted widely to include, in the United States, what expenses are "incurred for the purposes of the permanent establishment" in the former version of article 7(3) of the OECD Model[186] and what expenses are deductible for tax purposes.[187] On the other hand, as the word "exempt" was not defined in domestic law, it was given a general meaning to include release from the economic burden of taxation by the US CA.[188]

Although article 3(2) of the OECD Model covers undefined terms, often an undefined term occurs in the course of a definition of a defined term. Article 3(2) of the OECD Model is, of course, applicable to such undefined terms, as the undefined term in question is the one used in the course of the definition

---

185.   *Golay Buchel* (2001), *supra* n. 146.
186.   I.R.S. Rev. Rul. 89-115, Administrative Documentation IBFD.
187.   I.R.S. Rev. Rul. 80-243, Administrative Documentation IBFD.
188.   US: CA, 8 July 1957, American Trust Company v. James G. Smyth, Collector of Internal Revenue and United States, 247 F.2d 149 (1957), Docket No. 15339, Tax Treaty Case Law IBFD.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

not the one in the definition itself. For instance, "the term 'company' means any body corporate ...".[189] What is a body corporate will be determined pursuant to article 3(2) of the OECD Model under domestic law, probably non-tax domestic law, subject to the context "otherwise requiring". And what is covered by copyright within the definition of royalty in article 12(2) of the OECD Model will also be determined by domestic non-tax law, again subject to the context "otherwise requiring".

The wording of article 3(2) of the OECD Model ("any term not defined therein") suggests that when there is a partial definition, for example, that "the term 'person' *includes* an individual, a company and any other body of persons" (emphasis added),[190] there is no scope for the use of domestic law in relation to items not covered by the definition on the basis that the term is defined. It is suggested, however, that this is too literal a reading, as it leaves a lacuna as to how the definition applies to items that are not specified. If there had been no definition, it is clear that domestic law would apply (subject to the context "otherwise requiring") to supply the whole content of the meaning of the term. There is no purposive reason why the result should be different if the term is defined but only inclusively. It is suggested that the result should be that (subject to the context "otherwise requiring") domestic law still applies, but the words of inclusion apply in addition even though they would not be included in domestic law. Thus, in the example of the inclusive definition of "person", if domestic law regarded trustees (or trusts) as persons, although not a body of persons, they would be included.

Article 3(2) of the OECD Draft (1963) was clearer in this respect in referring to a term not "otherwise" defined, thus recognizing the possibility of a term being partially defined. The Canadian Income Tax Conventions Interpretation Act also makes the same distinction between a term not defined in the tax treaty and a term not fully defined in the tax treaty, which deals with this point specifically.

There is a more extreme situation of article 3(2) of the OECD Model applying where a term is fully defined, which makes it necessary to depart from a literal reading of the words. Where the context requires that a defined term in article 3(1) of the OECD Model should not apply, effectively the term becomes undefined with the result that article 3(2) can apply. An example is given in section 5.1.2.3.

### 4.3.3. The 2017 addition on the relationship with mutual agreement

The exception "or the competent authorities agree to a different meaning pursuant to the provisions of Article 25" was added in the 2017 update and is explained in paragraph 13.2 of the Commentary on Article 3 of the OECD Model (2017). The same point had previously been made in the Commentary, and paragraph 13.2 now explains that the article was amended to remove any doubt that a mutual agreement on interpretation had priority over domestic law. US treaties have commonly contained such an exception, which is also contained in the US Model (2016). It is suggested that the change is one of substance, going further than removing doubts. Before the addition of the new words, if the application of article 3(2) of the OECD Model was clear there would be no "difficulties or doubts" to which article 25(3) could apply. However, there can be cases in which there are difficulties or doubts (the words used in article 25(3)) about the application of article 3(2), for example where there is more than one domestic tax law meaning (*see* section 4.4.). Paragraph 13.2 of the Commentary on Article 3 of the OECD Model (2017) goes on to say that some states consider that the new exception should be limited to agreements pursuant to article 25(3), in which case the wording could be changed to "pursuant to the provisions of paragraph 3 of Article 25". Since this paragraph contains the only reference to interpretation in article 25, it is difficult to see that any other part of the article could be relevant. The same paragraph also

---

189.    Art. 3(1)(b) OECD Model (2017).
190.    Id. at art. 3(1)(a).

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

notes that other states that do not consider that a state should have the power to agree to the meaning of a term in priority to domestic law are free to omit the new exception.

## 4.4. Tax law containing more than one definition or incorporating a meaning from non-tax domestic law

### 4.4.1. Application

Article 3(2) of the OECD Model applies the meaning of a term in the domestic law for the purpose of the taxes covered by the tax treaty to the interpretation of the same term in the tax treaty. As the relevant meaning is that applying for the "purposes of" the taxes covered by the tax treaty, there is no need for the definition to be found in the law imposing the taxes covered by the tax treaty. In some cases, the meaning used for the purposes of tax law may be found in non-tax law. In the example already given of the definition in article 3(1) of the OECD Model (*see* sections 4.3.2.1. and 4.3.2.2.) that "the term 'company' means any body corporate ...", what is a body corporate will be determined under domestic law using article 3(2), and it is likely that the corporate law meaning will be used for the purpose of tax law. The meaning found elsewhere must, however, be used for the purpose of the law of a tax covered by the tax treaty. If a term used in the tax treaty is not found in the law of the taxes covered by the tax treaty, it is not possible to use a meaning found in any other (tax or non-tax) law. This restriction to the meaning "for the purposes of the taxes to which the Convention applies" causes a difficulty in the interpretation of treaty provisions that apply to all taxes, such as articles 24, 26 and 27 of the OECD Model. The reference to "taxes to which the Convention applies" mirrors the wording of article 2 of the OECD Model and so applies to the treaty in general. Strictly, therefore, it seems that when applying, say, the non-discrimination article to a tax not covered by the tax treaty, it is necessary to use not the meaning of an undefined term in such a tax, but, rather, the meaning in a tax covered by the tax treaty. It is likely that, in such a case, the context would prevent use of the latter. However, this leaves open what meaning should be applied instead. Possibly, it could be argued that the tax treaty applies in this respect to the other tax and so the meaning in that tax can be used.

In determining the meaning of the term for the purpose of the taxes covered by the tax treaty, the final phrase of article 3(2) of the OECD Model states that any meaning under the applicable tax laws of the state prevails over a meaning given to the term under other laws of the state. In this respect, the Commentary on Article 3(2) of the OECD Model (2017) states that

> where a term is defined differently for the purposes of different laws of a Contracting State, the meaning given to that term for purposes of the laws imposing the taxes to which the Convention applies shall prevail over all others, including those given for the purposes of other tax laws.[191]

It is difficult to see how this could not be the case, as the meaning has to be that for the purposes of the taxes covered by the tax treaty. However, the point must have been considered doubtful in France which made a reservation having the same effect in the OECD Model (1992) which was deleted when the addition to the text was made in the OECD Model (1995).[192] The reservation was later shown to have been justified when, in the 1999 French decision in *Banque Française de l'Orient* (1999),[193] which

---

191.   Para. 13.1 OECD Model: Commentary on Article 3 (2017).
192.   OECD Model Tax Convention on Income and on Capital (1995), Models IBFD.
193.   FR: CE 13 Oct. 1999, Case No. 190083, Banque française de l'Orient.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

dealt with the application of article 10 to money transferred to a parent as a result of a non-arm's length price, the CE decided that the word "dividends" had to be interpreted according to its meaning in French corporate law, even though the French *Code Général des Impôts* (General Tax Code, CGI) provided that such an advantage resulting from a non-arm's length transfer price was deemed to be a distribution (the CGI did not refer expressly to "dividends" but to "distributed income").[194]

### 4.4.2. Where a term has more than one meaning

A term may have more than one meaning in a particular tax law of a tax covered by the tax treaty or different meanings in different tax laws that are taxes covered by the tax treaty. In both cases, it would be expected that the relevant meaning is the one applicable to the issue in question in the tax in question. The Technical Explanation to the US Model (2006) adopts this approach: "Finally, there also may be cases where the tax laws of a State contain multiple definitions of the same term. In such a case, the definition used for purposes of the particular provision at issue, if any, should be used".[195] The article does not say this expressly, but it is possible to reach the result by considering for each possible meaning whether or not the context otherwise requires that it should not be used, which is likely to remove all except the most relevant one. Alternatively, it could be possible to reach the same result through the application of good faith.

An example of two different meanings in two different taxes which are covered by the treaty resulting in different treaty categorization in each is found in a Dutch HR case in 2003 on the repurchase of shares by a company under the Belgium-Netherlands Income and Capital Tax Treaty (1970).[196] This was categorized in the facts of the case both as a capital gain for income taxes and as a dividend for dividend withholding tax. The issue in the case was income tax and the HR applied the categorization applicable to that tax. Another example is that there are various definitions of director for different purposes in UK income tax law, including sections 18 (time of receipt of remuneration), 67 (benefits in kind) and 548 (share options) of the Income Tax (Earnings and Pensions) Act (2003), all including, in addition to a member of a board of directors, a single director, the members of a company who manage the company and also a shadow director (a person in accordance with whose directions or instructions the directors are accustomed to act), and another definition in section 452 (close company) of the Corporation Tax Act (2010),[197] which includes a shadow director and a manager owning or able to control (with his associates) 20% of the ordinary share capital. The question arises as to which of these definitions would be relevant in interpreting the equivalent of the directors' fees article in the OECD Model. Because of the context referring to a member of the "board" of directors, it would presumably exclude cases where the company did not have a board, such as the single director in a case where there had to be a single director only as opposed to a case where there happens to be only one member of the board of directors at the time in question, or the members of a company managed by its members. It would probably include a shadow director, as this is included in the definition for remuneration purposes. It is unlikely to include a manager owning or controlling 20% of the ordinary share capital because this is part of the definition of a close company and not relevant to directors' remuneration.

---

194. This is the opposite result from that in FR: CE, 27 May 2002, Case No. 125959, Sté Superseal Corporation, Tax Treaty Case Law IBFD, in which the CE applied the definition of immovable property in French tax law, but the Can.-Fr. Income and Capital Tax Treaty (1975), Treaties IBFD, provided in the immovable property article that "[i]n the case of France, the term 'law of the Contracting State' shall mean French taxation laws".

195. US Model Tax Convention on Income: Technical Explanation on Article 3(2) (15 Nov. 2006), Models IBFD.

196. NL: HR, 12 Dec. 2003, Case 38.461, V-N 2004/2.9; BNB 2004/123c*, Tax Treaty Case Law IBFD.

197. UK: Corporation Tax Act(2010), National Legislation IBFD.

---

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

In the OECD Draft (1963), what is now the reference to "the law ('*droit*') of that State concerning the taxes to which the Convention applies" was to then "the laws ('*législation*') of that Contracting State relating to the taxes which are the subject of the Convention". This suggested a narrower interpretation referring only to tax law. But, if tax law incorporates general law concepts, it is obviously necessary that these should be included. Nor was there any reference in the pre-1995 version of article 3(2) of the OECD Model (*see* section 4.8.) to the meaning in applicable tax laws prevailing over the meaning under other laws, but for most countries this seems to state the obvious.

## 4.5. Tax law including other treaties

### 4.5.1. Reference to the tax law of a state

The issue arises as to whether or not the reference to the tax law of a state includes other tax treaties. For instance, if a person is the loser under the dual residence tie-breaker of one tax treaty, does the person remain resident in that state for the application of another tax treaty? The Commentary on Article 4(1) of the OECD Model states, without giving any reasons, that

> [i]t [the second sentence of article 4(1)] also excludes companies and other persons who are not subject to comprehensive liability to tax in a Contracting State because these persons, whilst being residents of that State under that State's tax law, are considered to be residents of another State pursuant to a treaty between these two States.[198]

The argument is presumably that, by virtue of the dual residence provision of the first tax treaty coupled with the distributive rules of the same tax treaty, the person is now "liable to tax in that State in respect only of income from sources in that State"[199] and so is not a resident of that state for the purpose of a second tax treaty. It is implicit in this argument that the source of PE income of a resident of another state is the PE itself and not the income of the PE that could include third state income (such as interest received by the PE from a resident of another state). This argument was advanced by the Dutch Ministry of Finance and is also supported by a decision of the Dutch HR.[200] However, the tax treaty in question containing the dual residence provision was the Belgium-Netherlands Income and Capital Tax Treaty (1970), which also stated in the Protocol (1970) that "[t]he expression 'under the law of that State' used in article 4, paragraph 1, means the law of that State as amended or supplemented by international agreements".[201] The HR relied in part on this. Whether the decision has effect for other tax treaties depends on whether the dual residence article amends or supplements domestic law or whether the Protocol (1970) refers only to other treaties, such as the North Atlantic Treaty (1949) of the North Atlantic Treaty Organization (NATO), which may change residence for internal law purposes.

### 4.5.2. Winner and loser states

Although the result in the Commentaries on the OECD Model is consistent with the purpose of the tax treaty between the loser state under the dual residence provision and the third (source) state, as the person is not taxable in the loser state on the third state income because it is excluded by the tax treaty containing the dual residence provision, there are difficulties with this argument. The first is that the

---

198. Para. 8.2 OECD Model: Commentary on Article 4(1) (2017).
199. Art. 4(1), second sentence OECD Model (2017).
200. NL: HR, 28 Feb. 2001, Case 35.557, Tax Treaty Case Law IBFD.
201. Protocol II Belg.-Neth. Income and Capital Tax Treaty (1970), Treaties IBFD.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

definition of resident is determined according to "the laws of that State". These clearly do not include the tax treaty by which the person's dual residence is resolved, otherwise it would be impossible to get to the tie-breaker. So why should that expression include the first tax treaty when looking at another tax treaty? The point can be made that, in the second sentence, there is no reference to the liability to tax being under the laws of that state, but as the second sentence cuts down the effect of the first it would not be difficult to imply them.

### 4.5.3. Involvement of three states

The same issue can arise with three residence states. For instance,[202] suppose the taxpayer is a domestic law resident of States A, B and C, has a permanent home available to him in States A and B, but not State C, and as between States A and B the centre of his vital interests is in State A. The tie-breaker in the State A-State B Tax Treaty resolves the dual residence in favour of State A. Similarly, the tie-breaker in the State A-State C Tax Treaty resolves the dual residence in favour of State A (on account of permanent home in State A). In the State B-State C Tax Treaty, if the State A-State B Tax Treaty is ignored, the tie-breaker resolves the dual residence in favour of State B (on account of permanent home in State B) with the result that State C reduces its source tax, even though the taxpayer is not taxable in State B on State C income because of the effect of the State A-State B Tax Treaty, as it is income taxable only in State A. The result is that State C has to reduce its source tax in respect of the same taxpayer both under the State A-State C and the State B-State C Tax Treaties, which may have different results. If, on the other hand, in applying the State B-State C Tax Treaty, the State A-State B and State A-State C Tax Treaties are taken into account, the taxpayer is not a resident of State B (as he is not liable to tax on State C income, as this is income taxable only in State A under the State A-State B Tax Treaty) or State C (as he is not liable to tax on State B income as this is income taxable only in State A under the State A-State C Tax Treaty) and so the State B-State C Tax Treaty is inapplicable (article 1 is not satisfied on the basis that residence in that article is after applying the tie-breaker and the reference to residence in one or both of the states should be ignored). The problems are avoided, which is in accordance with the purpose of the State B-State C Tax Treaty, as there is no double taxation between those states. However, it is difficult to reach the result on the ordinary meaning of the words of the tax treaty. Whether or not the position in the Commentaries on the OECD Models prevails may depend on the weight that a court gives to the Commentaries.

If, however, the tax treaties among the countries have different tie-breaker rules in article 4(2) of the OECD Model, for example, by omitting one or more of the tests, it may be the case that not all tax treaties will point in the same direction in resolving the dual residence issues with the result that it will not be possible to arrive at a solution by reading each tax treaty in the light of the others.

### 4.5.4. EU law and Member States

A related argument is whether for Member States, EU law is included as tax law of the Member State. In principle, it is difficult to see why it should not be, as EU law becomes domestic law and the argument based on the context against applying other tax treaties would not apply. If that is right, it is possible that a definition in EU law might be applied to the interpretation of a tax treaty. It has been suggested[203] that EU law may be used for the definition of beneficial owner (defined in the Interest and Royalties Directive

---

202.  Based on J. Sasseville, *A Tax Treaty Perspective: Special Issues*, in *Tax Treaties and Domestic Law* sec. 3.3. (G. Maisto ed., IBFD 2006).
203.  *See* Avella, *supra* n. 78.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(2003/49)),[204] centre of vital interests (via the EU term normal residence) and transfer pricing (via the EU Arbitration Convention (90/436),[205] for example, in relation to the determination of the 3-year period in article 25(1) of the OECD Model. Some care needs to be applied because EU law may, for example, define the type of income differently. In this respect, the ECJ held in *Asscher* (Case C-107/94)[206] that the relevant income was under the treaty directors' fees and under EU law business income, as the person was the sole shareholder of the company. The difference was relevant to the treaty non-discrimination article. Alternatively, EU law may conflict with the Commentaries on the OECD Model.

## 4.6. Limit on changes in domestic law

So far, domestic law has been considered as it existed when the tax treaty was entered into so that the parties could be aware of it when they made the tax treaty. Tax law is subject to frequent change and the issue arises of the extent to which such changes could be used under article 3(2) of the OECD Model. The text has since the OECD Model (1995) made this clear: "[a]s regards the application of the Convention *at any time* any term not defined therein shall ... have the meaning that it has *at that time* under the law of that State ..." (emphasis added). In principle, the reference to domestic law is ambulatory (*see* section 4.8. for the position under older tax treaties). However, as with article 3(2) of the OECD Model generally, this is subject to the context not "otherwise requiring". The Commentary on Article 3(2) of the OECD Model[207] attempts to deal with this by saying that part of the context is the intention of the parties when the tax treaty is signed. It goes on to refer to the balance between ensuring the permanency of commitments entered into when signing (as a state should not be allowed to make a tax treaty partially inoperative by amending in its domestic law the scope of undefined terms in the tax treaty) and the need to be able to apply the tax treaty in a convenient and practical way (thus, avoiding the need to refer to outdated concepts). The OECD Commentary on Article 3(1) does not satisfactorily deal with how to resolve this balance. It is suggested that it is a matter of good faith (*see* section 3.4.3.). If the change to domestic law was made in good faith, for example, to clarify a borderline, the change should apply for treaty purposes. But if the change was made in order for the state to enlarge its taxing jurisdiction, it should not be used for treaty purposes. Obviously, many changes will not fall neatly into these categories, but good faith should be the test.

An example of the application of good faith in this way is a Dutch HR decision[208] in which the Netherlands changed domestic law from the position at the time of the tax treaty (containing article 3(2) of the OECD Model as it was before the 1995 version, *see* section 4.8.1.) that a lump-sum commutation of pension rights was pension income taxable in the residence state (Singapore) to employment income, so that the Netherlands (as source state) could impose tax on the lump sum immediately before it was paid so far as it related to services performed in the Netherlands. The HR found that giving effect to the new law would not give rise to an interpretation in good faith, with the result that the new domestic law did not apply to the tax treaty. Similarly, in a further decision,[209] the HR decided that the Belgium-Netherlands Income and Capital Tax Treaty (1970) (containing article 3(2) of the OECD Model as it was before the 1995 version) prevented the application of a change in domestic law to tax lump-sum pension rights (as source state) prior to the pensioner's emigration. Without the new domestic law,

---

204. Council Directive 2003/49/EC of 3 June 2003 on a Common System of Taxation Applicable to Interest and Royalty Payments Made between Associated Companies of Different Member States, OJ L 157 (2003), EU Law IBFD.
205. EU Arbitration Convention 90/436/EEC of 23 July 1990 on the Elimination of Double Taxation in Connection with the Adjustment of Profits of Associated Enterprises, EU Law IBFD.
206. NL: ECJ, 27 June 1996, Case C-107/94, *P.H. Asscher v. Staatssecretaris van Financiën*, ECJ Case Law IBFD.
207. Paras. 12 and 13 OECD Model: Commentary on Article 3(1) (2017).
208. NL: HR, 5 Sept. 2003, Case 37.657, Tax Treaty Case Law IBFD.
209. NL: HR, 13 May 2005, Case 39.610, Tax Treaty Case Law IBFD.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

the pension would have been taxed only in the pensioner's new residence state (Belgium). The new domestic law changed the categorization of the pension income to employment income, which was not a change made in good faith. On the other hand, a change in domestic law taxing a capital gain before emigration was not in breach of the good faith principle, as, in accordance with the Commentary on Article 13 of the OECD Model, alienation could include deemed alienation and here the deemed alienation occurred while the taxpayer was resident in the Netherlands.[210] This applied to the Belgium-Netherlands Income and Capital (1970), the Netherlands-United Kingdom Income and Capital (1980)[211] and the Netherlands-United States Income (1992)[212] Tax Treaties, all containing the former version of article 3(2) of the OECD Model. As article 3(2) of the OECD Model contemplates changes in domestic law, either expressly in the current version or impliedly under the former versions (*see* section 4.8.), many of which will have the effect of changing the category of the income in domestic law and by article 3(2) under a tax treaty, it cannot be that any change in the categorization of income will be one made in bad faith. What matters is the reason for the change. The changes from pension income to employment income in the first case referred to in this paragraph and that in the second regarding tax pension rights before emigration both seem to be examples of changes made in order to impose tax that was not previously due under the tax treaty and were, therefore, made in bad faith. The change considered in the capital gains case was not, because a charge on a deemed alienation was contemplated by the Commentary on Article 3 of the OECD Model.

## 4.7. Qualification conflicts and use of article 3(2) of the OECD Model by the residence state

### 4.7.1. Application

As noted in section 4.3.1., one of the purposes of article 3(2) of the OECD Model is to ensure that where the tax treaty relieves a particular type of income from tax it relieves everything that domestic law taxes. In a few cases (in the OECD Model, government service and students, and an alternative in the Commentary on Article 18 of the OECD Model relating to pensions) where it is the residence state that relieves from tax, the same is true. Leaving aside such cases, where the residence state relieves from tax the issue arises as to how the residence state applies article 3(2) of the OECD Model. Suppose income of a particular type is permitted to be taxed by the source state, but the residence state would not have taxed that item of income under that heading. Is the residence state obliged to give relief for the source state tax? This question is dealt with in more detail in the chapter on Qualification Conflicts. Briefly, the answer is that the residence state must give relief. The source state has correctly applied the tax treaty by using article 3(2) of the OECD Model to determine that it is permitted to tax that particular income under the tax treaty. The application of the tax treaty by the residence state is different. It is required (by the wording of article 23 of the OECD Model, which is not always followed in tax treaties) to apply the tax treaty to give relief in respect of income "which, in accordance with the provisions of this Convention, may be taxed in the other Contracting State". The residence state must ensure that (from the source state's point of view) the income may be taxed in the source state; it is not required to ask whether, if it had been the source state, it would have taxed that income because it is not applying the treaty to a term that is a type of income in the same way as the source state does, but it is merely asking whether the source state tax is "in accordance with the provisions of this Convention". This is

210.  NL: HR, 20 Feb. 2009, Cases 07/12314, 42.701 and 43.760, Tax Treaty Case Law IBFD.
211.  The Neth.-UK Income Tax Treaty (1980), Treaties IBFD.
212.  The Neth.-US Income Tax Treaty (1992), Treaties IBFD.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

the view in the Commentary on Article 23A(1) of the OECD Model,[213] although it should be noted that the Netherlands and (in relation only to changes in domestic law after the tax treaty) Switzerland have made observations disagreeing with it,[214] and it was not followed by the German BFH.[215] It should be emphasized that this approach applies where domestic law is different in the two states, thus giving rise to the different categorization of the income; the residence state is not required to give relief where the source state has wrongly applied the tax treaty or where the two states take a different view of the facts.

## 4.7.2. Partnerships

The issue discussed in section 4.7.1. can arise with partnerships. France does not accept the conclusions of the OECD Partnership Report (1999)[216] in relation to French partnerships which are considered as French residents, which means that they can benefit from the tax treaty between France and the source country, no matter whom France taxes. The German tax administration has indicated that it will follow the Commentaries on the OECD Model in this respect in relation to partnerships,[217] but the German BFH has taken the opposite view.[218] In many countries, there are no published statements on whether the country agrees with the OECD Commentaries on this point. These include: Argentina, Australia (but the tax authorities accept the OECD Partnership Report (1999) in relation to source taxation; *see* ruling TD 2011/25), Brazil, China (People's Rep.), India (which is not an OECD member country, but has observer status), Italy (although rulings relating to collective investment vehicles (CIVs) are consistent with it), Japan, Singapore, South Africa and Spain (although the mutual agreement procedure (MAP) of 15 February 2006 with the United States regarding the treatment in Spain of LLCs and S corporations is consistent with the OECD's approach). In Canada, in *TD Securities (USA) LLC* (2010),[219] the Tax Court of Canada (TCC) stated that

[i]t is not disputed that the CRA has a long-standing practice of characterizing the income earned by a foreign partnership made up of foreign partners consistent with the OECD Partnership Report.[220]

The preamble to the US Treasury Department Final Regulations (2000) regarding the eligibility of treaty benefits in the case of fiscally transparent entities stated that

[t]he approach adopted in these regulations is consistent with the evolving multilateral consensus among the member countries of the ... [OECD] on the appropriate method for source countries

---

213.  Paras. 32.1 onwards OECD Model: Commentary on Article 23A(1) (2017).
214.  Paras. 80 and 81 OECD Model: Commentary on Article 23A and 23B (2017).
215.  I R 95/10, (2011), *supra* n. 166.
216.  OECD, The Application of the OECD Model Tax Convention to Partnerships (OECD 1999), International Organizations' Documentation IBFD [hereinafter *OECD Partnership Report* (1999)].
217.  DE: *Anwendung der Doppelbesteuerungsabkommen (DBA) auf Personengesellschaften* [Decree Concerning the Application of Double Tax Conventions to Partnerships], 26 Sept. 2014, BStBl. I, 2014, 1258. The Decree also deals with cross-border guaranteed payments, which have traditionally been characterized as part of PE income when granted to a partner domiciled abroad. Ref. 5.1 of the Decree finds this practice to be in line with the *OECD Partnership Report* (1999), *supra* n. 216. The view taken by the administration is in open contradiction to the current practice of the BFH, which avoids a qualification conflict by attributing guaranteed payments to the particular articles of the tax treaty (interest, royalties etc.), thereby excluding them from PE income.
218.  I R 95/10 (2011), *supra* n. 166, in which a Hungarian partnership was treated as opaque in Hungary and as transparent in Germany. From the Hungarian perspective, the Ger.-Hun. Income and Capital Tax Treaty art. 7(1) (1977), Treaties IBFD, would generally provide for taxation in Hungary. The BFH did not follow the qualification in Hungary and applied the tax treaty only from the perspective of the partners, some of them resident in Germany. In relation to articles 3(2) and 23, the BFH saw no reason to follow the qualification of the source state, i.e. Hungary.
219.  CA: TCC, 8 Apr. 2010, TD Securities (USA) LLC v. Her Majesty the Queen, 2010 Carswell Nat 788, 2010 TCC 186, 2010 D.T.C. 1137 (Eng.), [2010] D.T.C. 2426, Tax Treaty Case Law IBFD.
220.  Id., at 80.

---

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

to follow to determine if they should provide treaty benefits on items of income paid to fiscally transparent entities, particularly when an entity classification conflict exists between the source and residence states. This evolving multilateral consensus is described in greater detail in the OECD report, "Application of the OECD Model Tax Convention to Partnerships" ...[221]

This approach does not deal with those cases where it is the residence state that exempts income from tax and the source state takes a different view of the scope of the income to which the exemption applies and also exempts it (there is no problem if the source state taxes it, as there is tax in the source state only, which is the correct result where the residence state exempts). The conflict results in double exemption, unusually even in a tax credit state, that the OECD Model does not resolve.

## 4.8. Static or ambulatory reference to domestic law under treaties based on the earlier OECD Model (1995) and earlier

### 4.8.1. The issue

The statement that article 3(2) of the OECD Model refers to the law at the time of application of the tax treaty was added to the OECD Model (1995). Before that, it read as follows:

> As regards the application of the Convention by a Contracting State any term not defined shall, unless the context otherwise requires, have the meaning which it has under the laws of that Contracting State relating to the taxes which are the subject of the Convention.

This version is also found in the current OECD Model on Estates, Inheritances and Gifts (1982).[222] The earlier OECD Draft (1963) and OECD Draft on Estates and Inheritances (1966)[223] have slight differences in wording but are materially similar. The Canadian SC, in *Melford* (1982),[224] decided that the reference to domestic law in an article similar to the former version was static, although the arguments seem to have been mixed up with issues of override. Canadian domestic law was immediately changed (*see* section 3 of the Income Tax Convention Interpretation Act), on the basis that its treaty partners had been consulted and all considered the treaty provision was ambulatory. The OECD then changed article 3(2) of the OECD Model to confirm this view, the then Commentary on Article 3(2) of the OECD Model stating that the amendment confirmed the general and consistent understanding of the OECD member countries.

### 4.8.2. Court opinions regarding static or ambulatory reference

There are many examples of courts applying the ambulatory approach to the former wording of article 3(2) of the OECD Model, thus confirming the OECD's view of the understanding of the OECD member countries. The three Dutch HR cases referred to in section 4.6. proceeded on the basis that the new domestic law potentially applied for treaty purposes in tax treaties containing the former version of article 3(2) of the OECD Model and went on to consider whether or not the change in domestic law was made in good faith. Another example concerned an HR decision of 2003[225] on the taxation of

---

221.    US Treas. Reg. TD 8889 (30 June 2000).
222.    OECD Model Tax Convention on Estates, Inheritances and Gifts (3 June 1982), Models IBFD.
223.    OECD Draft Tax Convention on Estates and Inheritances (28 June 1966), Models IBFD.
224.    CA: SC, 28 Sept. 1982, Melford v. Her Majesty the Queen, 2 SCR 504, Tax Treaty Case Law IBFD.
225.    NL: HR, 5 Sept. 2003, Case 37.651, Tax Treaty Case Law IBFD.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

"deemed salary" derived by a director/substantial shareholder under the Netherlands-Belgium Income and Capital Tax Treaty (1970). In this case, the director/substantial shareholder was a resident of Belgium and was a director of a Dutch *Besloten vennootschap* (BV), which was a resident of the Netherlands. Generally, a person is a substantial shareholder if he owns 5% or more of the shares in a company; the pertinent shareholder owned 100% of the shares in the BV. The BV and the director agreed that he would not receive any remuneration for his activities. From 1 January 1997, the Dutch *Wet op de loonbelasting* (Wage Tax Law, LB) 1964[226] stated in article 12a that the salary of such a director/substantial shareholder must be equal to at least 70% of the salary which is customary for similar employment. The tax authorities used this provision to adjust the 1997 salary from no remuneration to NLG 150,000 (approximately EUR 68,180). The HR held that article 12a of the LB 1964 could lead to a result that the taxpayer was taxed on income that he did not receive. However, the HR held that this in itself was insufficient to conclude that the Netherlands was expanding its taxation rights beyond the scope of the tax treaty. The HR observed that, when certain items of income according to their character, as determined by the source from which they spring, are allocated to the Netherlands for taxation, article 3(2) of the tax treaty leaves the Netherlands scope to tax these items of income in accordance with its domestic legislation, including provisions on notional income. This is, however, different in cases where the provisions on notional income lead to a change in the division of taxation rights between the contracting states. Article 3(2) of the tax treaty does not permit this, as it would be equivalent to a unilateral amendment of the tax treaty. In this case, article 12a of the LB 1964 resulted in the taxation of income that was not actually derived by the taxpayer and which, in the future, could be derived either in the form of dividends or capital gains. As the tax treaty contains different attribution rights for employment income, dividends and capital gains, the HR decided that the tax treaty prevented the application of article 12a of the LB 1964.

Further recent examples can be given. In the FC of Australia, in *Virgin Holdings* (2008),[227] Edmonds J stated,

> [I]est I be misunderstood, I want to make it quite clear that insofar as Art 3(2) of the Model Convention and its analogue in the Swiss Agreement mandates recourse to domestic law meanings, assuming they exist, cf., *Thiel* 171 CLR at 343 in [29] above, I am firmly of the view that the better and preferred approach should be ambulatory and not static. That was the conclusion reached by the OECD Committee on Fiscal Affairs (1992 OECD Model, Official Commentary on Art 3, para 11), which led to the 1995 amendment to Art 3(2) of the Model Convention to adopt, specifically, the ambulatory approach.[228]

The same approach was followed in another case before the FC, *Undershaft* (2009).[229] The effect of these cases was that reference to the "Australian income tax" in the Australia-Switzerland Income Tax Treaty (1980)[230] in the former case or the "Commonwealth income tax" in the Australia-United Kingdom Income Tax Treaty (1967)[231] in the latter case, both tax treaties being concluded before Australia taxed capital gains under its income tax, was held to include tax on capital gains. As Vann

---

226.  NL: Wet op de loonbelasting [Wage Withholding Tax Law], 1964, National Legislation IBFD.
227.  AU, FC, 10 Oct. 2008, Virgin Holdings SA v. Federal Commissioner of Taxation, [2008] FCA 1503, Tax Treaty Case Law IBFD.
228.  Id., at 43.
229.  AU: FC, 3 Feb. 2009, Undershaft (No 1) Ltd v. Commissioner of Taxation, [2009] FCA 41, Tax Treaty Case Law IBFD.
230.  The Austrl.-Switz. Income Tax Treaty (1980), Treaties IBFD.
231.  The Austrl.-UK Income Tax Treaty (1967), Treaties IBFD.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(2009)[232] has pointed out in his case comment on both cases, if reference had been made to the *travaux préparatoires* (which would have been context for the purpose of deciding whether or not domestic law meaning of the Australian income tax from time to time should not be applied) available in the archives in both Australia and the United Kingdom (which was the relevant tax treaty in *Undershaft*), the opposite conclusion would have been reached. In the second example, before the Spanish *Audiencia Nacional* (National Court, AN) decision in *International Business Machines* (2010),[233] the tax treaty in question[234] provided for a 5% withholding tax on royalties for the use of copyrights of literary, dramatic, musical or artistic work, 8% for copyrights on scientific work and 10% on other royalties. The courts had previously classified software royalties as falling within the literary category (5%), rather than the scientific one (8%). In 2003, Spanish copyright law listed software in a separate category from literary, artistic or scientific works. From that time onwards, domestic law showed that software royalties were no longer regarded as being within the literary category. The AN applied an ambulatory approach in holding that the residual 10% treaty category applied. There are also examples of states legislating on the assumption that a change will affect tax treaties by providing for transitional relief, as occurred in the United Kingdom on the introduction of corporation tax in 1965 in relation to dividends, interest and royalties.[235] The US Treasury regards it as ambulatory (*see*, for example, the Department Technical Explanation[236] to the Ireland-United States Income Tax Treaty (1997):

> Like the U.S. Model, the Convention clarifies that the reference in paragraph 2 to the internal law of a Contracting State means the law in effect at the time the treaty is being applied, not the law as in effect at the time the treaty was signed ... .[237]

In France, the domestic tax treatment is addressed before the application of the tax treaty, which means that it is the domestic law at the time of the case.[238]

Exceptions are known: after the change to the wording of article 3(2) of the OECD Model, the Austrian *Verwaltungsgerichtshof* (Supreme Administrative Court, Vwgh) started to interpret the reference to domestic law in all existing tax treaties as a static one.[239] It is suggested that the fact of the change in wording is not sufficient to support an assumption that the meaning has changed when there was a good reason to clarify the position after the Canadian case of *Melford* (1982).[240] In South Africa, there is one court case, *Baldwins (South Africa)* (1961),[241] in which the Appellate Division (AD) declined to apply later domestic law in the other state.

---

232.  *Virgin Holdings SA* (2008), *supra* n. 227 and *Undershaft Ltd* (2009), *supra* n. 229.
233.  ES: AN, 15 April 2010, SAN 1545/2010, Rec. No. 440/2008, 13 ITLR 191, Tax Treaty Case Law IBFD.
234.  The Spain-US Income Tax Treaty (1990), Treaties IBFD.
235.  *See* sections 30 to 33 of the Finance Act 1966.
236.  Department of the Treasury Technical Explanation of the Convention between the Government of the United States of America and the Government of Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income and Capital Gains Signed at Dublin on July 28, 1997 and the Protocol Signed at Dublin on July 28, 1997 art. 3 (1997), Treaties IBFD.
237.  The Ire.-US Income Tax Treaty (1997), Treaties IBFD.
238.  Reaffirmed in FR: CE 28 June 2002, Case No. 232276, min c/ Schneider Electric, Tax Treaty Case Law IBFD, where the CE stated that: "if, pursuant to article 55 of the [French] Constitution, a bilateral convention concluded with a view to avoiding double taxation supersedes domestic tax law on specific items, it cannot be in itself a legal basis for a decision pertaining to taxation; consequently, in addressing a claim against a tax treaty, the judge shall perform his analysis under the domestic tax law in the first instance in order to determine whether the challenged tax is validly assessed and, to the extent it is the case, under which legal classification; the judge shall then, as the case may be, compare this classification with the provisions provided for by the convention in order to determine ... if the convention prevents the application of the said [domestic] tax law ..." [unofficial translation].
239.  AT: Vwgh, 19 Dec. 2006, 2005/15/0158, Tax Treaty Case Law IBFD.
240.  *Melford* (1982), *supra* n. 224.
241.  ZA: AD, 17 June 1961, Baldwins (South Africa) Ltd v. The Commissioner for Inland Revenue, (1961 (3) SA 843 (A), Tax Treaty Case Law.

---

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

### 4.8.3. Conclusion regarding earlier versions of article 3(2) of the OECD Model

Accordingly, it is suggested that the older version of article 3(2) of the OECD Model, which is still found in tax treaties, also requires that the reference to domestic law should be interpreted in an ambulatory way.

### 4.9. Variations to article 3(2) of the OECD Model in US tax treaties

US tax treaties since 1982 add a further qualification to "unless the context otherwise requires", namely "or the competent authorities agree to a common meaning pursuant to the provisions of Article 25 (Mutual Agreement Procedure)" (*see* section 3.4.6.). It is clear that the effect of such an agreement would prevent domestic law from being used under article 3(2) of the OECD Model. This variation has now been adopted by the OECD and is dealt with in section 4.3.3.

## 5. Specific Treaty Interpretation Issues

### 5.1. The meaning of "context" in article 3 of the OECD Model and the Vienna Convention (1969)

#### 5.1.1. In general

The qualification "unless the context otherwise requires" is used in the OECD Model both for the defined expressions in article 3(1) and in article 3(2). It is a familiar expression in some common law countries, where definitions are used in statutes or legal documents. It conveys that there may be circumstances in which the definition is not appropriate. "Requires" is a reasonably strong word that conveys that there must be a good reason to displace the defined meaning[242] or the domestic law meaning.[243] This means that a higher threshold than the balance of probabilities will prevail to displace the defined meaning or the domestic law meaning (*see* section 4.3.3. for the power of the competent authorities to agree to a different interpretation).

The term "context" in article 3(1) and (2) of the OECD Model cannot have the same meaning as in the Vienna Convention (1969) (*see* section 3.4.6.), where it is defined for the purpose of separating primary material to be used for interpretation from secondary material, a distinction that has no relevance to the question whether or not the domestic law meaning of a term should be used. If secondary material within article 32 of the Vienna Convention (1969), the use of which is permitted by the Convention for limited purposes of interpretation (*see* section 3.5.), showed an intention that the domestic law meaning of a term should not be used, it would make no sense to argue that the secondary material (which is not context for the Convention) was not context for article 3(2) of the OECD Model and should, therefore, be ignored with the result that the domestic law meaning was applied. The relationship between the two meanings of context has been explored by Van der Bruggen (2003).[244] As the title implies, Van der Bruggen (2003) would equate the meaning of "context" in article 3(2) of the OECD Model with any permitted interpretative material in the Vienna Convention (1969), which is wider than the defined term "context" in the Vienna Convention (1969), and he is, therefore, saying that the context for article 3(2) of the OECD Model includes any permitted interpretative material.

---

242. Art. 3(1) OECD Model (2017). As was said in an English case, a defined meaning in a contract could be displaced only if "necessary, rather than merely sensible or reasonable". *See* UK: EWCA, 21 Dec. 2009, *Hammonds v Jones*, [2009] EWCA Civ 1400, at 32.
243. Id., at art. 3(2).
244. E. van der Bruggen, *Unless the Vienna Convention Otherwise Requires: Notes on the Relationship between Article 3(2) of the OECD Model Tax Convention and Articles 31 and 32 of the Vienna Convention on the Law of Treaties*, 43 Eur. Taxn. 5 (2003), Journals IBFD.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

The Commentary on Article 3 of the OECD Model shows that the meaning may be even wider by including as context "the meaning given to the term in the legislation of the other Contracting State (an implicit reference to reciprocity on which the Convention is based)".[245] This provides a route (in addition to the words added to article 3(2) of the OECD Model (2017); *see* section 4.3.3.) to an interpretation that gives a common meaning to a term, as illustrated by a case in the Dutch *Hoge Raad* [246] concerning the fictitious wage attributed to an individual who owns 5% or more of the capital of a company and performs personal activities for the company. If the actual wage is less than the amount of the normal wage determined in accordance with the legislation, the taxpayer is deemed to have received the difference as a fictitious wage; and if there is no actual employment, there is deemed to be one. The case concerned a taxpayer, resident in Portugal, with a 5% shareholding in a Dutch company to which he provided services in the Netherlands in circumstances such that the fictitious wage applied. The facts were that if domestic law applied to interpret the undefined term "wages" in the employment article of the tax treaty (or "directors' fees" in that article), the Netherlands was entitled to tax the fictitious wage. In considering whether the context required that domestic law should not be used to interpret those terms, the court referred to the OECD Commentary on Article 3, under which the meaning of the term "wages" (or "directors' fees") in Portugal was included in the context. That meaning did not include any equivalent to fictitious wages. The court therefore considered that, in interpreting the tax treaty, "wages" (or "directors' fees") did not include the Dutch fictitious wage, so the Netherlands, as source state, could not tax the fictitious wage. Since Portugal did not tax it either, this resulted in reciprocity, as neither state taxed the fictitious wage.

However, reciprocity is achieved only if the source state has a wider definition of a type of income that the tax treaty permits it to tax than the residence state. If it has a narrower one, there is no point in referring to the other state's wider definition, because the tax treaty cannot increase the tax in the source state (except in certain states; *see* section 2.2.4.). It also follows that the wider definition in the residence state is unaffected by the tax treaty, either because the only treaty issue in that state is the amount of relief for the source state's tax or because of the saving clause in article 1(3) of the OECD Model (2017), added by the MLI (*see* the GTTC Chapter on Article 1 (forthcoming)), which would prevent an argument that the tax treaty could be interpreted in the same way as in the Dutch case. If, therefore, the states in the Dutch case had been reversed, with the Netherlands being the residence state and Portugal being the source state, the result would have been different and reciprocity would not have been achieved, because both states would continue to tax under their domestic law. Indeed, reciprocity would not be achieved even if the Netherlands, as residence state, were to have a wider definition of a type of income, so long as the Netherlands was entitled to tax that income under the tax treaty and this did not result in a shift in the taxation rights of the parties under the treaty.[247]

The Dutch case was also unusual in that fictitious wages were not included within the scope of another item of income. Normally, if a state has a wider definition of a type of income than the other state, the other state is likely to tax the difference in width as a different type of income, such as when interest is treated by the source state as a dividend, while the residence state treats it as interest.[248] Allowing

---

245.  Para. 12 OECD Model: Commentary on Article 3 (2017).
246.  BNB 2017/34 (18 Nov. 2016), *supra* n. 50.
247.  For an example, *see* NL: HR, 23 May 2014, Case 13/02237, BNB 2014/170, Tax Treaty Case Law IBFD. The case concerned the notional yield from savings and investments, because the tax treaties in question assigned the right to tax dividends (or in the absence of actual dividends, capital gains) to the Netherlands.
248.  This may not be a good example, because the definition of dividend in the OECD Model includes income from other corporate rights which is subjected to the same taxation treatment as income from shares in the source state, and the definition of interest does not refer to domestic law, but the same principle apples where both types of income are undefined.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

domestic law to apply enables the tax treaty to have effect, since the residence state will, in accordance with the OECD Commentary on conflicts of qualification,[249] respect the source state's taxation and give relief accordingly. If, on the other hand, the source state restricts the width of the definition of a type of income to correspond to the width in the other state, as in the Dutch case, it is likely that the residence state will tax the difference in scope as income of a different type. Reciprocity would still not be achieved.

It should be noted that saying that the domestic law in the other state is context does not mean that the context will require domestic law not to apply; it is merely one of the factors to be considered.

Looking at the other state's law is not restricted to article 3(2) of the OECD Model, which applies only where the state has a domestic law definition. An example is the Canadian case of *Gladden* (1985),[250] where, at the time of the Canada-United States Income Tax Treaty (1942), only the United States taxed capital gains and used an expression from its domestic law: sale or exchange. The issue arose, when Canada later taxed capital gains, as to whether or not this expression included a deemed disposition on death that was taxable in Canada, the FC holding that it did so on the basis that the surrounding circumstances at the time the tax treaty was signed accounted for the use of a US domestic law expression. Applying article 32 of the Vienna Convention (1969) on the basis that it would be absurd to exempt gains from actual disposals and not those from deemed disposals, indicated that there was a general intention to exempt residents of the other state, in this case, the United States, from tax on capital gains. (Article 3(2) of the OECD Model was not directly in point because the tax treaty did not contain it.) A more recent example, where article 3(2) of the OECD Model is in point, is that the Canada-United States Income and Capital Tax Treaty (1980) has a limitation-of-benefits provision, which originally only applied to the United States, containing expressions taken from US domestic law (such as "regularly traded"). When the provision later became applicable from a Canadian perspective by virtue of the Protocol (2007),[251] Canada announced that it would adopt the US meaning of those terms until it had its own definitions.

The following four cases exist: (i) where there is a domestic law meaning of an undefined term in both states, and paragraph 12 of the Commentary on Article 3 of the OECD Model says that the domestic law in the other state provides a context for the first state's domestic law not to be used; (ii) where there is domestic law in the first state but none in the other state, which falls outside the scope of paragraph 12 of the Commentary on Article 3 of the OECD Model but may still provide context that indicates that the domestic law meaning should not be used in the first state (*see* section 5.1.2.4. for examples); (iii) where there is no domestic law meaning in the first state but there is in the other state, as in the example in the *Gladden* case, which falls outside the scope of article 3(2) of the OECD Model, but the other state's law may be relevant under the Vienna Convention (1969); and (iv) where there is no domestic law in either state, which would be a good situation for having an agreement on interpretation under the power given by the words added to the article in the 2017 update (*see* section 4.3.3.).

Accordingly, there seems no need to limit the meaning of "context" in respect of article 3(2) of the OECD Model. Any relevant material that throws light on whether or not domestic law should not be used should, therefore, be considered.

---

249.   Para. 32.1 onwards OECD Model: Commentary on Article 23 (2017).
250.   *Gladden* (1985), *supra* n. 52.
251.   The Protocol to the Can.-US Income and Capital Tax Treaty (1980) (2007), Treaties IBFD.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

### 5.1.2. Whether the context otherwise requires: The interaction between different meanings of context in article 3 of the OECD Model and the Vienna Convention (1969)

#### 5.1.2.1. The issue

Article 3(2) of the OECD Model fits into the scheme of interpretation in the Vienna Convention (1969) in a similar way to the treaty definitions in article 3(1) of the OECD Model that are also subject to the context "otherwise requiring". The difference is that, instead of the definition being set out as in article 3(1) of the OECD Model, the definition incorporates external material by reference – the meaning under domestic law of the state applying the tax treaty. What is suggested to be the correct approach to applying article 3(2) of the OECD Model may be approached in stages by starting with defined expressions that are not subject to the context "otherwise requiring", such as the definitions of resident of a contracting state, PE, immovable property, and (for the purpose only of each of those articles) dividends, interest and royalties.[252] It is interesting to note in passing that many of these definitions rely in part on domestic law: the definition of immovable property is pure domestic law with some overriding changes, that of dividends incorporates income from other corporate rights subject to the same domestic tax law as income from shares, and that of royalties incorporates domestic copyright, patent, trademark law, etc. The context for the Vienna Convention (1969) has been explained as meaning the primary interpretative materials to be used in interpreting the treaty under article 31 (*see* section 3.4.5.). When interpreting such an expression when it is used in the tax treaty, the context is effectively only the treaty definition; there is little or no room for other items of context or other elements, such as good faith and object and purpose, to be considered. Whenever, say, the tax treaty refers to a PE, there is very little room to argue that the definition in article 5 does not apply. An exception could be made for PEs in a third state, as at least part of the definition[253] is limited to a PE in the treaty partner state only. Presumably the definition could be applied in a particular context to include one in a third state by making the necessary consequential changes, which would not involve a change in the basic meaning of the term. Another exception is that article 1 of the OECD Model refers to persons who are residents of one or both of the contracting states, while the definition in article 4 resolves dual residence in favour of one state, and so the reference to both states seems either to be referring to article 4(1) only (or possibly to the situation during the time the dual residence is being resolved, or cannot be resolved, which is now more of an issue with the MLI change to the dual residence provision for companies; *see* section 5.3.1.), or it is superfluous. Although the definition of resident of a contracting state is not subject to the context "otherwise requiring", there may be limited circumstances in which the context could affect the definition.

It is the same for agreed interpretations outside the tax treaty itself. The Commentary on the Vienna Convention (1969) explains that

> it is well settled that when an agreement as to the interpretation of a provision is established as having been reached before or at the time of the conclusion of the treaty, it is to be regarded as forming part of the treaty ... .[254]

And it says the same of subsequent agreements:

252. *See* J.F. Avery Jones et al., Whether the Definition of Dividend Limited to the Dividend Article Applies to the Double Taxation Relief Article Granting Underlying Credit, 53 Bull. Intl. Fiscal Docn. 3 (1999), Journals IBFD.
253. Art. 5(5) and (7) OECD Model (2017).
254. Para. 14 *Vienna Convention: Commentary* (1969).

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Similarly, an agreement as to the interpretation of a provision reached after the conclusion of the treaty represents an authentic interpretation by the parties which must be read into the treaty for the purposes of its interpretation.[255]

## 5.1.2.2. Whether the context otherwise requires in relation to the definitions in article 3(1) and (2) of the OECD Model

### 5.1.2.2.1. The matter in question

Just as the context within the meaning of the Vienna Convention (1969) of a defined expression that is not subject to the context "otherwise requiring" includes the definition, both the definitions in article 3(1) of the OECD Model and domestic law (which is a definition incorporated by reference into the tax treaty) are part of the text of the tax treaty and are, therefore, within the context for the Vienna Convention (1969). As context for the purposes of article 3 of the OECD Model is wider than the context of the Vienna Convention (1969), they are also part of the context for article 3. Thus, when considering whether for the purposes of article 3 of the OECD Model the context otherwise requires, it is necessary to include the definition in article 3(1) itself and domestic law in relation to article 3(2). The issue is not one of considering: (i) the definition[256] or domestic law;[257] and (ii) a meaning to be derived from the context for article 3 of the OECD Model as alternatives, but, rather, one of using the definition or domestic law to consider whether the context for article 3 (including the definition or domestic law) requires them not to be used. At this stage, the analysis is a purely negative issue as to whether or not the definitions do not apply, which must be answered using the context for article 3 of the OECD Model alone (although applying good faith), and not other interpretative elements, such as object and purpose. If they do not apply, what does apply in their place is considered in sections 5.1.2.2.2. to 5.1.2.2.6.

### 5.1.2.2.2. The definition of article 3(1) of the OECD Model the only context required

In many cases, the definition of article 3(1) of the OECD Model itself will be the only context regarding article 3 necessary to decide that the definition should not be applied. An example is given in section 5.1.2.3., where applying the definition had the result of a whole sentence in the tax treaty having no effect in either state.

### 5.1.2.2.3. Domestic law the only context of article 3 of the OECD Model required

Similarly, in many cases domestic law itself will be the only context for article 3 of the Model necessary to decide that domestic law should not be applied under article 3(2). Two examples are given in section 5.1.2.4.: one where Australian domestic law used "carried on" in distinction to "carried out", a distinction obviously inappropriate to the use of "carried on" in the OECD Model and a UK example, where a domestic law definition was made for the purpose of a particular section of domestic tax law that had no relevance to the purposes of the tax treaty. In both cases, the domestic law definition itself was sufficient context for article 3 of the OECD Model to decide that it should not be used to interpret a particular undefined term used in the tax treaty. Taking the example of interpreting "beneficial owner" in a tax treaty between the United Kingdom, which uses the term in domestic law, and another country, which does not, the context for article 3 of the OECD Model includes both the UK domestic law meaning and that of the Commentaries on the OECD Model. The process of considering whether or not the context

---

255. Id.
256. Art. 3(1) OECD Model (2017).
257. Id., at art. 3(2).

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

for article 3 of the OECD Model "otherwise requires" would include considering the consequences if UK domestic law applied (which might be that there was no beneficial owner in some circumstances) compared to the consequences of a different meaning derived from the OECD Commentaries applying, and the arguments for a universal meaning of that term in all tax treaties, which would readily lead to the conclusion that the context of article required that the UK domestic law meaning should not be applied.

Where there are several different domestic law meanings to be considered (*see* section 4.4.), it may be necessary to consider for each of them whether or not the context for article 3 "otherwise requires", until either only one meaning is left, or that context has eliminated all of them. There is now more scope for other items of context and other elements, such as good faith and object and purpose, to be considered in order to establish the relevant domestic law meaning.

### 5.1.2.2.4. A first practical application regarding article 3 of the OECD Model

The approach to the definitions of article 3(1) and the undefined terms in article 3(2) of the OECD Model can be combined in order to interpret undefined terms used in the course of a defined term (for example, to interpret "body corporate" within the definition of "company" by reference to the domestic law meaning) or to use domestic law when the definition is an inclusive one and domestic law applies it to a case other than the words of inclusion. In this respect, the example is given in section 4.3.2. of using domestic law to apply the inclusive definition of "person" to include trustees (or trusts).

Article 3(1) and (2) of the OECD Model can also apply in turn if it is decided that the context requires that the definition of article 3(1) should not be used, as the term then effectively becomes undefined and so article 3(2) operates. An example is given in section 5.1.2.3., where the context requires the definition not to be applied and domestic law was applied. It would be possible to have a situation in which the context required that domestic law did not apply either, leaving a meaning to be established by the Vienna Convention (1969).

If it is decided that the context for article 3 of the OECD Model "otherwise requires", the next step is to establish a different meaning under article 31 using the material within the (narrower) context of the Vienna Convention (1969), but now necessarily excluding the definition[258] or domestic law,[259] plus the other interpretative elements, such as ordinary meaning and object and purpose. If an attempt is to combine the process of determining whether or not the context of article 3 of the OECD Model "otherwise requires" with finding an alternative meaning, there is a danger that the definition (or domestic law) is excluded from the context of article 3 for the former and that the context of article 3 is used for the latter, instead of the context of the Vienna Convention (1969) to establish a meaning under article 31. Article 32 of the Vienna Convention (1969) can then be applied, if there is any relevant material, for the limited purposes permitted, such as confirming the meaning already ascertained or determining a meaning when the process under article 31 gives rise to ambiguities or unreasonable results.

The approach to the application of article 3(2) of the OECD Model to the effect that first domestic law is considered and then whether or not the context requires that it should not be used has been applied in a number of countries, including Australia, Spain, the United Kingdom and the United States. In this context, the US SC has stated,

---

258.   Id., at art. 3(1).
259.   Id., at art. 3(2).

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

[t]he word "person" is not defined in the treaty and we are referred by Article II(3) [the equivalent of article 3(2) of the OECD Model] of the Convention, therefore, to the domestic tax law of the country applying the treaty, in this case the United States, to determine its meaning.[260]

The US TC, in relation to "full and adequate consideration" as applied to an annuity in the Israel-United States Income Tax Treaty (1975),[261] has stated,

[t]he term "adequate and full consideration" appears extensively in the Internal Revenue Code, generally followed by the phrase "in money or money's worth", in a multitude of contexts.[262]

### 5.1.2.2.5. Alternative approach to the context "otherwise requiring" for article 3(2) of the OECD Model

An alternative approach to whether or not the context "otherwise requires" has been adopted by the German BFH and the Swiss and Swedish courts. For instance, in a German case,[263] a German resident employed by a German company who worked in Spain for a Spanish company for less than 183 days, continued to be paid by the German company which recharged the cost to the Spanish company. The issue was whether or not the Spanish company was his employer for the purposes of article 15(2)(b) of the OECD Model. While the Spanish company would probably not have been his employer in German domestic law, the BFH applied an economic meaning of employer and concluded that it was his employer on the basis of the context of the Germany-Spain Income and Capital Tax Treaty (1966).[264] The BFH considered that, in the context of the tax treaty, Spain should have the right to tax, as the salary was deductible there. In doing so, the BFH applied the following sequence for interpreting treaties:

(1)     applying the definition given by the treaty itself;

(2)     in the absence of a treaty definition by considering the context of the treaty clause concerned; and

(3)     if the context does not indicate the meaning of the word, by referring to domestic law.[265]

The Swiss *Tribunal Fédéral* (Federal Supreme Court, TF) has applied a similar approach.[266]

A similar approach has been advanced by the Swedish RÅ:

Domestic tax rules shall be applied only unless the context otherwise requires. The meaning of this restriction according to the [National Tax] Board's opinion may be summed up as follows: Where a term of the treaty, as used in any treaty provision, does not give a clear indication of its meaning it

---

260.   US: SC, 29 Apr. 1963, Andre Maximov v. United States (1963) 373 U.S. 49, 63-1 USTC (CCH) ¶ 9438, 11 AFTR 2d (RIA) ¶ 63-602, Tax Treaty Case Law IBFD.
261.   The Isr.-US Income Tax Treaty (1975), Treaties IBFD.
262.   US: TC, 29 June 2004, Ismat M. Abeid v. Commissioner of Internal Revenue, 122 T.C. 404 (2004), Tax Treaty Case Law IBFD.
263.   DE: BFH, 21 Aug. 1985, IR 63/80, Tax Treaty Case Law IBFD.
264.   The Ger.-Spain Income and Capital Tax Treaty (1966), Treaties IBFD.
265.   *See also* DE: BFH, 30 May 1990, I R 179/86, Tax Treaty Case Law IBFD, regarding the Austria-Ger. Income and Capital Tax Treaty (1954), Treaties IBFD, and DE: BFH, 25 Feb. 2004, I R 42/02, Tax Treaty Case Law IBFD, regarding the Ger.-Ire. Income and Capital Tax Treaty (1962), Treaties IBFD. However, there are also German cases in which the BFH followed a different order, citing article 3(2) of the applicable tax treaty, then stating the meaning of the term in question under domestic law and only finally adding that no different meaning of the term follows from the wording and the context of the tax treaty (for example, in DE: BFH, 13 Feb. 2008, I R 63/06, Tax Treaty Case Law IBFD, regarding the Ger.-Switz. Income and Capital Tax Treaty (1971), Treaties IBFD).
266.   2A.239/2005 (2005), *supra* n. 161.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

is necessary to try to establish the intentions of the contracting parties. In so doing guidance should be sought from the terminology of the treaty as a whole, its structure and systematic approach, the function of the article in question, its introduction and historical context as well as other relevant circumstances. Only if such an investigation does not lead to any result should recourse be made to the meaning of the term under domestic law of the state applying the treaty.[267]

This has also been proposed by Lang (2000).[268]

### 5.1.2.2.6. The author's opinion

The author respectfully disagrees with the approach of looking for a contextual meaning before domestic law, though not necessarily with the result of the German case.[269] It is not clear whether this is more of a disagreement with the way that the order is expressed or a fundamental disagreement. The reasons for disagreement, which will be apparent from the description of the interpretation process noted in section 5.1.2.2.4., are, first, that it seems to conflate the following two processes requiring the use of different materials: (i) deciding whether or not the context "otherwise requires" by using the wider context for article 3 of the OECD Model, including domestic law; and (ii) determining the meaning on the basis that it does "otherwise require" by using the narrower context for the Vienna Convention (1969) (but now excluding domestic law), and all other relevant interpretative elements, such as ordinary meaning of language and object and purpose. The approach treats domestic law and the context for article 3 of the OECD Model as if they were mutually exclusive concepts when, in fact, domestic law is always necessarily part of the context for article 3 when interpreting an undefined term, just as the definitions of article 3(1) are part of the context for the Vienna Convention (1969) (and, hence, the context for article 3) when interpreting the defined term. It is not clear which context is referred to in the second step in the German reasoning set out in section 5.1.2.2.5. Examples are given in section 5.1.2.4. where the domestic law itself was the only context necessary to conclude that the context required that it should not be used. Second, the ordinary meaning of the words "shall, unless the context otherwise requires have the meaning that it has ... under the law of that State ..." do not permit concluding that domestic law does not apply without considering the effect of its applying, particularly so when there are more than one domestic law meanings, for each of which it must be considered whether or not the context otherwise requires. Third, if it were to be concluded that the context "otherwise requires" that domestic law should not be used, a meaning will necessarily have to be obtained from the context for the Vienna Convention (1969) and, therefore, saying "if the context [presumably for article 3] does not indicate the meaning of the word" as part of deciding whether or not the context "otherwise requires" seems to be a non sequitur, leading to the inevitable result that domestic law can never be used, as the Vienna Convention (1969) assumes that it is always possible to find a contextual meaning. This approach is equivalent to saying the opposite of article 3(2) of the OECD Model to the effect that the meaning derived from the context for the Vienna Convention (1969) applies, unless it requires one to use domestic law.

The author suggests that the approach in the case (*see* section 5.1.2.2.5.), where the person was working in Spain, should have been to consider the effect of the domestic law meaning of employer in the context of the tax treaty in exactly the same way as if employer was a defined expression in article 3(1) of the OECD Model that incorporated domestic law. The same result could have been reached on

---

267.   Case 1169-1987, *supra* n. 101 (translation from Sundgren, *supra* n. 103, at p. 287).
268.   M. Lang, *The Application of the OECD Model Tax Convention to Partnerships* (Linde & Kluwer 2000).
269.   IR 63/80 (1985), *supra* n. 263.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

the basis that applying domestic law would mean that Germany could tax, which might be considered to be contrary to the context of article 3 of the OECD Model, as the tax deduction was in Spain.

### 5.1.2.3. Examples of the context requiring definitions of article 3(1) of the OECD Model not to be used

It is more likely that the context will require domestic law to be displaced than a defined expression, but there are examples of the latter applying. The OECD Draft (1963) defined "national" in the non-discrimination article (not subject to the context "otherwise requiring"), but the phrase "notwithstanding the remedies provided by the national laws of those States" was contained in the MAP article. It would be clear from the context that the definition of "national" did not apply to national laws, and this would have been equally true if that definition of national had been in article 3(1) (as it is in the OECD Model (1992) onwards) and, therefore, subject to the context "otherwise requiring". Or if a tax treaty defined "national" in article 3(1) and also contained a definition of recognized stock exchange as meaning a national securities exchange, it would be clear from the context that the definition of "national" did not apply there. These would be clear examples of the context "otherwise requiring".

An extreme example, considered by the UK HC, arose under the United Kingdom-United States Income Tax Treaty (1945). Article XV (redrafted by the Protocol (1966),[270] which was presumably the cause of failing to apply the defined expressions properly), provided that

> [d]ividends and interest paid by a corporation of one Contracting Party shall be exempt from tax by the other Contracting Party except where the recipient is a citizen, resident, or corporation of that other Contracting Party. This exemption shall not apply if the corporation paying such dividend or interest is a resident of the other Contracting State.[271]

One of the definitions in the tax treaty, which was subject to the context not "otherwise requiring", was "the term 'resident of the United Kingdom' means any person (*other than ... a United States corporation*) who is resident in the United Kingdom for the purposes of United Kingdom tax ..." (emphasis added). If the payer of the dividends or interest was a US corporation (defined as one created or organized in or under the laws of the United States), the effect of applying the definition of resident of the United Kingdom in the second sentence of article XV of the tax treaty was that the sentence became meaningless because a US corporation could never be a resident of the United Kingdom, as US corporations were specifically excluded by the definition from being a resident of the United Kingdom. In the reverse situation of a UK corporation (one created under the laws of the United Kingdom) paying dividends or interest, there was no possibility of a UK corporation being within the treaty definition of resident in the United States, as this was limited to US corporations. Thus, the second sentence of article XV of the tax treaty had no effect in either state if the treaty definitions were incorporated. The context, therefore, required that the definition should not be applied in the sentence quoted, even though it did apply in the previous sentence, as had been decided in an earlier case,[272] which the HC considered was correct. The obvious alternative, for which the (then) Inland Revenue were contending, was the domestic law meaning, which is an application of the equivalent of article 3(2) of the OECD Model; having decided that the context required the definition in the equivalent of article 3(1) not to be used. Presumably when drafting the Protocol (1966) to make the first sentence reciprocal (previously,

---

270.   The Protocol to the UK-US Income Tax Treaty (1945) (1966), Treaties IBFD.
271.   UK: HC, 1 Mar. 1982, Commissioners of Inland Revenue v. Exxon Corporation, [1982] STC 356, Tax Treaty Case Law IBFD.
272.   UK: HC, 23 June 1972, Lord Strathalmond v. Commissioners of Inland Revenue, 48 TC 537, Tax Treaty Case Law IBFD.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

it applied only to dividends paid by a UK corporation) and adding the second sentence, the parties overlooked the definitions and intended the domestic law meaning of resident to apply. This is an interesting example of the application of the equivalent of article 3(1) and (2) of the OECD Model in turn.

### 5.1.2.4. Examples of the context requiring the domestic law meaning not to be used

#### 5.1.2.4.1. The matter in question

In article 3(2) of the OECD Model, there is greater scope for the context "otherwise requiring" than for defined expressions in article 3(1) or its equivalent in the particular tax treaty. As far as types of income are concerned, if the tax treaty relieves from tax in the source state, it would normally be expected that the domestic law meaning of undefined expressions determining the type of income would apply, so that the relieving provision exactly mirrored the taxing provision in domestic law. Thus, "pensions" in article 18 of the OECD Model, which are relieved from tax in the source state, would be expected to be given the domestic law meaning in each state, regardless of whether or not the meanings are the same. Any other interpretation would either not relieve the whole of what one state taxed as pensions or would relieve more than the state taxed as pensions which means that the excess, which the state taxed as something else, was exempted. Neither result would be consistent with the object and purpose of the tax treaty.

#### 5.1.2.4.2. Use of other terms
#### 5.1.2.4.2.1. Opening remarks

Where terms other than types of income are concerned, there is more scope for the context "otherwise requiring", as, in many cases, the purpose of the tax treaty would be better served by their having a common meaning.

Sometimes it is possible to find a treaty term used in the tax law of a tax covered by the tax treaty, but in a different sense. UK tax law does not use either "enterprise" or "business" as a taxing criterion, but there was until 2008, for example, a rule applicable to expenditure of small or medium-sized enterprises containing a definition of "business" for the purpose of the particular section to mean an individual, and a partnership of which all the members are individuals, etc.[273] Clearly, such a definition, while applicable to income tax which is a tax covered by the tax treaty, would not be used to interpret references to "business" in the OECD Model (or a tax treaty based on it), as the definition was intended for the purpose of the particular section only.

The scope for the context "otherwise requiring" is greater in connection with changes in domestic law after a tax treaty has been concluded. This is considered in section 4.6.

This issue is particularly likely to arise where only one of the states has a domestic law meaning of a term. This might result in that state applying domestic law and the other state a general meaning, which would not be symmetrical. The following possible examples set out in sections 5.1.2.4.2.2. to 5.1.2.4.2.6. can be given.

#### 5.1.2.4.2.2. Beneficial owner

The term "beneficial owner" is used extensively in UK and Australian domestic legislation and case law has given it a meaning that is not necessarily appropriate to tax treaties, for example, there are cases where there is no beneficial owner. This is a term the purpose of which indicates that a common

---

273.   UK: Capital Allowances Act 2001, sec. 48.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

interpretation should be given that would not be achieved by using domestic law in one of the states and a general meaning in the other; a common meaning should be used in both states.

### 5.1.2.4.2.3. Habitual abode

The use of the term "habitual abode" in the tie-breaker for individuals in article 4(2) of the OECD Model is translated in German tax treaties as "*gewöhnlicher Aufenthalt*", a term that is used in domestic law to mean 6 months' residence. If the OECD Model had intended to indicate a 6-month test, it could have said so, but, instead, used a more general expression for which there is nothing in the Commentary on Article 4 of the OECD Model to suggest that a 6-month rule was intended to be used in one of the states. The context would, it is suggested, require that the domestic law meaning should not be used.

### 5.1.2.4.2.4. Days

In relation to counting days of presence in a state for the purposes of article 15 of the OECD Model, domestic law may provide that for residence purposes a day counts only if the person is present at midnight. Such a rule is inconsistent with the Commentaries on the OECD Model, which set out a detailed rule for counting days. In the case of *Kinsella* (2007)[274] before the Irish HC, the Ireland-Italy Income Tax Treaty (1971)[275] contained a provision in the residence article for counting days: that a person was resident in Italy if, amongst other things, he was present in Ireland for a period or periods not exceeding 91 days in the fiscal year. Irish domestic law (introduced after the conclusion of the tax treaty) counted days for the purposes of domestic law residence only if the person was present at midnight. The HC applied this rule to the tax treaty, finding that the taxpayer was not resident in Ireland for 91 days, and was, accordingly, a resident of Italy; if parts of a day had been counted, the taxpayer would have been resident in Ireland for more than 91 days. It is respectfully suggested that it is in conflict with the object and purpose of the tax treaty to the effect that a person could be in Ireland from one minute after midnight at the beginning of a particular day and leave one minute before midnight at the end of the same day without the day counting as a day of residence for the purpose of counting days in the residence article. The HC did not consider whether or not the same interpretation should not be given to the similar wording in article 15 of the OECD Model.

In 2003, the Dutch HR decided two cases[276] on the interpretation of the term "presence" for the application of the 183-day rule under the Brazil-Netherlands (1990)[277] and Netherlands-Nigeria (1991)[278] Income Tax Treaties. The Brazil-Netherlands Income Tax Treaty (1990) was concluded in the Netherlands, Portuguese and English languages, all three texts being equally authentic, and, in case of any divergence of interpretation, the English text prevails. The Netherlands-Nigeria Income Tax Treaty (1991) was in the English language only. The HR first referred to the English definition of article 15(2)(a) of the tax treaties, which read: "the recipient is present in the other State for a period or periods not exceeding in the aggregate 183 days in the fiscal year concerned". The HR observed that this definition is also not entirely clear. Therefore, the HR decided that, under article 31(1) of the Vienna Convention (1969), an interpretation of a treaty term should be in accordance with the ordinary meaning of that term in its context. The HR held that the context of article 15(2)(a) of the tax treaties pointed unmistakably at physical presence. Neither the other parts of the tax treaties nor the accompanying notes contained any indication that the treaty partners supported an interpretation deviating from the text of article 15(2)

---

274.    *Kinsella* (2007), *supra* n. 127.
275.    The Ire.-It. Income Tax Treaty (1971), Treaties IBFD.
276.    Case 37.011 (2003), *supra* n. 138; and Case 37.024 (2003), *supra* n. 138.
277.    The Braz.-Neth. Income Tax Treaty (1990), Treaties IBFD.
278.    The Neth.-Nig. Income Tax Treaty (1991), Treaties IBFD.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(a) of the tax treaties. This view is supported by the Commentary on Article 15 of the OECD Model,[279] which explicitly states that the term refers to physical presence.

#### 5.1.2.4.2.5. Enterprise

One problem is that the term "enterprise" is not generally used in common law countries in tax law, and the Commentary on Article 4 of the OECD Model says that

> [t]he question whether an activity is performed within an enterprise or is deemed to constitute in itself an enterprise has always been interpreted according to the provisions of the domestic laws of the Contracting States.[280]

In the HC of Australia, in *Thiel* (1990), Mason CJ, Brennan and Gaudron JJ said of the term "enterprise",

> [a]rticle 3(2) provides no assistance in ascertaining the meaning of the words "enterprise" or "profits" because these words have no particular or established meaning under the laws relating to Australian income tax which is relevant to the outcome of the question for decision. That question must be resolved by reference to the Agreement itself and any extrinsic materials which may properly be considered.[281]

And in relation to "carried on", they said,

> [h]owever, the meaning of "carried on" in Australian income tax law has been influenced by the fact that the Income Tax Assessment Act 1936 (Cth) uses in juxtaposition both expressions "carrying on" and "carrying out" and that a distinction has been drawn between them, the former meaning "the habitual pursuit of a course of conduct" and the latter meaning "the carrying into execution of a plan or venture which does not involve repetition or system": see, for example, Premier Automatic Ticket Issuers Ltd. v. Federal Commissioner of Taxation [1933] HCA 51; (1933) 50 CLR 268 at pp 297-298. Decisions as to the meaning of expressions such as "carrying on the business of a skin dealer" (see Smith v. Capewell (1979) 142 CLR 509 at pp 514-515, 517-518) are not strictly part of the law relating to Australian income tax and are therefore not made relevant by Art. 3(2). In any case, the use of the term "business" distinguishes such phrases from that presently under consideration. If Australian income tax law does not ascribe a particular meaning to "carry on" otherwise than by reference to its association with "carry out", then it provides no assistance in ascertaining the meaning of "carry on" in the context of the Agreement, because those words are not used in association with "carry out" in the Agreement (cf. the expression "the carrying out of international conventions" in Art. 22(3)).[282]

Dawson J said,

---

279.　Para. 5 OECD Model: Commentary on Article 15 (2017).
280.　Id., at para. 4.
281.　*Thiel* (1990), *supra* n. 134, at 4.
282.　Id, at 7.

---

© Copyright 2018　IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

[t]his provision [article 3(2)] is, however, of no assistance because, as will be seen, the case turns upon the meaning of the term "enterprise" and that term has no established meaning in Australian tax law. It is from the Agreement itself that the meaning of the term must be deduced.[283]

McHugh J said,

[t]he Agreement does not define the terms "enterprise", "profits" and "business profits." Nor does it define the compound expressions "profits of an enterprise" and "enterprise carried on." Moreover, none of these terms or expressions has any settled meaning in Australian income tax law. ... But the narrow meaning given to the words "carrying on" in s. 26(a) is the product of its juxtaposition with the words "carrying out" in the same paragraph. Judicial decisions on the expression "carrying on" in the context of s. 26(a) of the Income Tax Assessment Act, therefore, cannot be regarded as settling the meaning of the expression "carried on" in Art. 3(1)(f) or the expression "carries on" in Art. 7(1). It follows that, within the meaning of Art. 3(2), none of the relevant terms or expressions in the Agreement has any particular or settled meaning in Australian income tax law. The meaning of those terms and expressions must be ascertained from the Agreement.[284]

While the context required that "carried on" should not be interpreted in accordance with domestic law, as the context in which it was used in domestic law was different, it would have been possible to reach the same conclusion, that "enterprise" included transactions that were entered into for business or commercial purposes, by equating "enterprise" to business in domestic law, and profit to taxable income in domestic law (in fact the Australian International Tax Agreements Act 1953, which gives effect to treaties in domestic law, says that profits means taxable income). This would be on the basis that one of the essential purposes of "enterprise" in the OECD Model is to differentiate between self-employment and employment income as far as individuals are concerned. On the basis suggested in section 4.3.2. that "term" should include the equivalent domestic law concept rather than a concept using the same term only, enterprise can be equated to the heading under which self-employment income is taxed in domestic law, for example, in the UK profits of a trade, profession or vocation. If domestic law were not used, taxability under domestic law would not equate to exemption under the tax treaty. For instance, assume that the facts are such that, under the tax treaty, employment income is taxable and self-employment income is exempt (for example, there is no PE and the person is present in the state for more than 183 days) and that, in one state, what is domestic law self-employment income becomes treaty employment income because a common meaning of each of them is agreed. The effect is that, in that state, part of what was domestic self-employment income becomes taxable employment income for treaty purposes. Whether or not tax is actually charged on this part, as permitted by the tax treaty, depends on domestic law under which the income is still self-employment income; if domestic law also applies a PE threshold, it will not be taxed, with the result that the change of definition has no effect. It should be noted that a move in the opposite direction, i.e. increasing the scope of exempt self-employment income for treaty purposes, would be effective because there is no problem in the tax treaty exempting from tax as self-employment income something that was employment income in domestic law.

---

283.   Id., at 3.
284.   Id., at 11.

---

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

It has been argued by Lang (2011)[285] that domestic law cannot be used to interpret "enterprise", as it is now a defined expression ("the term 'enterprise' applies to the carrying on of any business" and that "the term 'business' includes the performance of professional services and of other activities of an independent character"). It was suggested in section 4.3.2. in relation to inclusive definitions that these do not exclude the possibility of domestic law being applied outside the scope of the words of inclusion, and the same argument would be made here. Lang (2011) adds that

> [t]he result cannot be qualified by the contradictory statements in para 10.2 of the OECD Commentary 2000, which partly refer to an autonomous interpretation and partly to an interpretation in reliance on national law.[286]

That paragraph states that "business" should have its domestic law meaning, but, in view of the definition that it includes professional services, it must be given a treaty meaning to include professional services even though it does not do so in domestic law. It can be argued to the contrary that this is a case where the domestic meaning of business (assuming it to exclude professional services) is used, but enlarged so as to include professional services (also defined using its domestic meaning). Applied to what is suggested to be the UK equivalent of "enterprise", trade, profession or vocation, it would have excluded professions when the tax treaty contained article 14 of the OECD Model, but included them when that article is excluded and the new definitions apply. As the taxation of trades and professions are the same, this makes no practical difference. It is suggested that this is not a case where the context otherwise requires.

It is possible for the Commentaries on the OECD Model to say that domestic law applies to a term, but that there are limits beyond which domestic law may not go. This is a case with article 3(2) of the OECD Model applying, but the Commentary on Article 3(2) of the OECD Model setting limits, so that it is only beyond the limit that the context requires that domestic law not be applied. An example can be found in connection with the meaning of employer in article 15 of the OECD Model where the Commentary on Article 15 of the OECD Model[287] deals with the possibility that domestic law permits a state to question a formal contractual relationship, but sets limits to be applied on the basis of objective criteria beyond which domestic law may not go.

### 5.1.2.4.2.6. Interest

The definition of interest applies for the purposes of article 11 of the OECD Model only. The term "interest" is also used in the deductibility non-discrimination provision in article 24(4) of the OECD Model. If in domestic tax law a state defines interest paid to a non-resident to be a dividend in the case of thin capitalization, applying domestic law prevents the application of the non-discrimination provision and so this might be a case where the context requires that domestic law should not be used.

---

285.  M. Lang, *The Term "Enterprise" in Art 24 of the OECD Model Convention*, in The Meaning of "Enterprise", "Business" and "Business Profits" under Tax Treaties and EU Tax Law ch. 7 (G. Maisto ed., IBFD 2011), Online Books IBFD.
286.  Id., at sec. 7.5.
287.  Para. 8.11 OECD Model: Commentary on Article 15 (2017).

---

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

## 5.2. Specific treaty interpretation issues

### 5.2.1. General legal culture: Use of Parliamentary material, binding decisions of higher courts

There is an incorrect tendency for courts to adopt practices that apply to domestic law when interpreting tax treaties. This may include referring to unilateral documents, such as Parliamentary proceedings. Unilateral material should never be used to interpret a tax treaty (*see* section 2.2.7.), although there are cases where the treaty partner state's material has been relied on.

The extent to which courts are prepared to consider court decisions in other jurisdictions may depend on how it regards domestic cases. Common law courts are used to citing foreign cases and may be more willing to do so in relation to tax treaties. While cases in other jurisdictions are never binding, it is proper to give greater weight to a decision of a higher court particularly when the lower courts in the country concerned would be bound by it. But, if in that country little attention would be paid to the decision of a lower court, it would be inappropriate for courts in another country to give it great weight. *See* section 3.5.2. for a discussion of the relevance of court decisions in other countries.

In countries where decisions of higher courts bind lower courts, it is possible that a higher court may have given a decision on interpretation of the same wording in another tax treaty. There would be a tendency for a lower court to follow this decision when interpreting a different tax treaty, but there are dangers to this practice, particularly when the higher court was influenced by the Commentaries on the OECD Model, which may have been different when the tax treaty being interpreted was concluded.

### 5.2.2. Variation in state practice

#### 5.2.2.1. Australia

Contrary to the Vienna Convention (1969), recourse to unilateral material, such as the Explanatory Memorandum produced by Australia in relation to each tax treaty, is possible, but it has lesser weight than bilateral material.[288]

#### 5.2.2.2. United States

Courts in the United States give great weight to the views of the tax authorities. Another expression is that they give "deference to the consistent interpretation of the treaty advanced by the US agencies charged with its administration", but they do not regard such material as "controlling" (and in the case where this observation was made the court in fact decided against the position of the tax authorities),[289] although the US CA noted that "an agency's position merits less deference where an agency and another country disagree on the meaning of a treaty".[290] Giving such weight to the views of the tax authorities is not permissible under the Vienna Convention (1969) (which the United States has not ratified) and the HC in the United Kingdom has refused to follow a US decision on the same wording of another tax treaty on this ground.[291] There is dispute regarding the relevance of testimony from treaty negotiators regarding the meaning and interpretation of a tax treaty. There are examples of a court acknowledging such testimony in the form of affidavits submitted to the courts, for example, the CA.[292] In another case, *National Westminster Bank* (2008),[293] the taxpayer apparently submitted affidavits

---

288.  *See* paras. 116 and 117 of ATO TR 2001/13; *see* para. 101 et seq. for the views of the ATO on various kinds of material.
289.  *National Westminster Bank* (1999), *supra* n. 129, at 302.
290.  *National Westminster Bank* (2008), *supra* n. 133, at 438.
291.  UK: HC, 9 Feb. 1990, Inland Revenue Commissioners v. Commerzbank AG [and *Inland Revenue Commissioners v. Banco do Brasil SA*], [1990] STC 285, 302, Tax Treaty Case Law IBFD.
292.  US: CA, 6 Dec. 1994, Xerox Corporation v. United States (Internal Revenue Service), 41 F.3d 647 (1994), Tax Treaty Case Law IBFD.
293.  *National Westminster Bank* (2008), *supra* n. 133.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

from individuals who had been involved in the negotiation of the United Kingdom-United States Income and Capital Tax Treaty (1975). The court did not refer to this information in its decision.

### 5.2.2.3. Spain

There is case law with regard to the effects of article 9 of the OECD Model and the corresponding provision of tax treaties that attributes to domestic transfer pricing provisions an effect they do not have. Domestically, the *Ley del Impuesto sobre Sociedades* (Corporate Income Tax Law, LIS)[294] is regarded as a valuation provision, but courts have decided that provisions corresponding to article 9 (in tax treaties) can be used to recharacterize and/or disregard transactions and/or structures used by taxpayers. (It should be noted that Spain has a general anti-avoidance rule (GAAR) in article 15 of the LIS, but, according to the TS,[295] this requires the application of a specific procedure that is by-passed with the administrative and/or judicial doctrine on the effects of article 9 of the OECD Model.)

## 5.2.3. Common treaty terminology

### 5.2.3.1. "Shall be taxable only" versus "may be taxed"

The following two phrases are adopted throughout the OECD Model: (i) income that "may be taxed" in a contracting state (for example, articles 6, 7(1) (if there is a PE), 10, 11, 13(1), (2) and (4), 15(1) and (3), 16, 17, 21(1), and 22(1) and (2)); and (ii) income that "shall be taxable only" in a contracting state (for example, articles 8(1) and (2), 12, 13(3) and (5), 15(2), 18, 19, and 22(3) and (4)). The expression "may be taxed" means that the income "may be taxed" in the state in question, but says nothing about its taxation in the other state. By implication, the income "may be taxed" also in the second state, in which case the tax treaty will provide for relief from double taxation. The expression "shall be taxable only" means what it says and prevents the other state from taxing.[296]

Sometimes, tax treaties modify the OECD Model without fully taking the implications into account. Suppose a tax treaty does not have a tie-breaker to resolve dual residence, but merely states that the parties shall endeavour to settle the question by mutual agreement. The tax treaty, therefore, envisages that they may be unable to do so. How then should, for example, a statement that certain capital gains "shall be taxable only in the Contracting State of which the alienator is a resident" be read? Such a formula works well in the OECD Model, as there will be only one contracting state of which the alienator is a resident, but, under a tax treaty that does not necessarily resolve dual residence, it is not meaningful to say that the gain is taxable only in the contracting state of which the alienator is a resident, when presumably the intended result is that it is taxable in both states (which leaves open the question of who gives relief for the other state's tax first). Currently, treaty negotiators usually provide an express rule that, in the absence of an agreement, the person is not entitled to benefits under the tax treaty. This is the case under the dual residence provisions of the MLI relating to companies, according to which, in the absence of agreement, the person is not entitled to any relief or exemption from tax provided by the covered tax treaty, except as may be agreed (*see* section 5.3.1.).

---

294. ES: Ley del Impuesto sobre Sociedades [Corporate Income Tax Law, LIS], art. 16, National Legislation IBFD.
295. ES: TS, 18 July 2012, Ren. No. 3779/2009.
296. Paras. 6 and 7 OECD Model: Commentary on Article 23 (2017).

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

## 5.2.3.2. "Liable to tax" versus "subject to tax"

### 5.2.3.2.1. The matter in question

Article 4 uses the expression "liable to tax" in relation to a person; and, although not used in the OECD Model itself, the Commentaries on the OECD Model contains a number of alternatives[297] that use the expression "subject to tax" in relation to income. "Subject to tax" provisions are also found in many older tax treaties, especially those of the United Kingdom; they were replaced in many cases by the introduction of beneficial ownership provisions, which serve a similar purpose. Unfortunately, it is possible to find tax treaties that do not conform to this distinction between persons being "liable to tax" and income being "subject to tax" in English. For instance, the Australia-Germany Income and Capital Tax Treaty (1972)[298] says "the term 'person' means an individual, a company and any other entity subject to tax", thus applying "subject to tax" to a person (the German uses "*Besteuerung unterliegen*", the term normally used in relation to income).

### 5.2.3.2.2. "Liable to tax"

The term "liable to tax" in article 4(1) of the OECD Model ("*assujettie à l'impôt*" in the French version) means that the person is potentially taxable on at least some foreign income (if he were taxable only on domestic income the second sentence of article 4(1) would prevent him from being a resident for treaty purposes). There is no requirement that the person should be actually taxed on the income in question. This is because residence is an attribute of a person and a person is either resident or not. Historically, some countries applied tax treaties to nationals and a person was either a national or not; there would be no question of being a national in respect of certain types of income.

### 5.2.3.2.3. "Subject to tax"

### 5.2.3.2.3.1. In English

The term "subject to tax" means that the income is actually taxed (or would be taxed, but for the effect of some other relief, such as relief for losses, but not an exemption). It is used in relation to particular items of income, as in this provision in the Commentary on Article 1 of the OECD Model dealing with remittance basis taxation:

> Where under any provision of this Convention income arising in a Contracting State is relieved in whole or in part from tax in that State and under the law in force in the other Contracting State a person, in respect of the said income, is subject to tax [*soumise à l'impôt*] by reference to the amount thereof which is remitted to or received in that other State and not by reference to the full amount thereof, then any relief provided by the provisions of this Convention shall apply only to so much of the income as is taxed in the other Contracting State ...[299]

Although expressed in terms of the person being subject to tax, the provision operates only on particular items of income ("in respect of the said income") that are taxable on the remittance basis, and so is categorized as relating to income rather than the person (where the item of income is not relevant to liability to tax). The implication is that a resident (a person "liable to tax") need not be "subject to tax" on

---

297.   *See*, for example, paras. 26 and 38 of the Commentary on Article 1 of the OECD Model (2017) and para. 15(d) of the Commentary on Article 18 of the OECD Model (2017).

298.   The Austrl.-Ger. Income and Capital Tax Treaty (1972), Treaties IBFD.

299.   Para. 108 OECD Model: Commentary on Article 1 (2017).

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

all foreign income. It is sufficient if he is taxable on foreign income if, for example, it is remitted to the United Kingdom; hence, the need for this provision to deny treaty benefits to income that is not "subject to tax" because it is not remitted.

### 5.2.3.2.3.2. Other languages

#### 5.2.3.2.3.2.1. Initial comments

The distinction between expressions used for persons and for income noted in section 5.2.3.2.3.1. regarding the English version of the OECD Model is not always found in other languages, as the following examples from French (*see* section 5.2.3.2.3.2.2.) and German (*see* section 5.2.3.2.3.2.3.) tax treaties illustrate. No distinction between the two expressions is made in the Spanish language, and so the meaning must be deducted from the context. *See* section 5.2.3.2.3.2.4. for comments regarding tax treaties involving the Baltic States.

#### 5.2.3.2.3.2.2. In French

French has two expressions, "*assujettie à l'impôt*" and "*soumis à l'impôt*", but the same distinction as in English, applying one to persons and the other to income, is not made, as they are both used interchangeably in relation to persons, with the former being preferred in a legal context, while the latter is used of income. The earlier Commentaries on the OECD Model contain some variations on this, probably as different provisions were drafted by different people at different times, but these have been improved in the 2017 version. In an alternative provision in the OECD Commentaries, where the English is "subject to tax" in relation to income, the expression[300] "*soumis à l'impôt*" is used in French, and, in another,[301] a different expression, "*ne sont pas imposables*", is used. In another draft,[302] where the English uses "liable to tax" in relation to persons, the French uses both expressions (paragraph 3(b) of the OECD Commentary on Article 28 being explained by the fact that it includes other obligations):

Table 1. Alternative provision in paragraph 3 of the OECD Commentary on Article 28: English versus French

| | |
|---|---|
| Notwithstanding the provisions of Article 4, an individual who is a member of a diplomatic mission or a consular post of a Contracting State which is situated in the other Contracting State or in a third State shall be deemed for the purposes of the Convention to be a resident of the sending State if: | *Nonobstant les dispositions de l'article 4, toute personne physique qui est membre d'une mission diplomatique ou d'un poste consulaire d'un État contractant qui est situé dans l'autre État contractant ou dans un État tiers est considérée, aux fins de la Convention, comme un résident de l'État accréditant, à condition:* |
| (a)    in accordance with international law he is not *liable to tax* in the receiving State in respect of income from sources outside that State or on capital situated outside that State, and | (a)    *que, conformément au droit international, elle ne soit pas assujettie à l'impôt dans l'État accréditaire pour les revenus de sources extérieures à cet État ou pour la fortune située en dehors de cet État, et* |
| (b)    he is *liable* in the sending State to the same obligations in relation to tax on his total | |

---

300.   Para. 15(d) OECD Model: Commentary on Article 18 (2017).
301.   Para. 2 OECD Model: Commentary on Article 28 (2017).
302.   Id., at para. 3.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

| income or on capital as are residents of that State. | (b) | *qu'elle soit soumise dans l'État accréditant aux mêmes obligations, en matière d'impôts sur l'ensemble de son revenu ou de sa fortune, que les résidents de cet État* [emphasis added]. |
|---|---|---|

A survey of Canadian tax treaties, all of which are in French and English, reveals that, while the equivalent of article 4 uses "liable to tax"/"*assujettie à l'impôt*", most tax treaties contain provisions not based on the OECD Model using "subject to tax"/"*assujettie à l'impôt*" in relation to income (with a few exceptions where "*soumis à l'impôt*" or some other expression is used). There is also a consistent use of "liable to tax"/"*soumis à l'impôt*" in relation to a different provision relating to diplomats which contains a provision similar to paragraph (b) quoted previously from the alternative provision contained in paragraph 3 of the Commentary on Article 28 of the OECD Model. In tax treaties containing the remittance provision similar to the one in paragraph 108 of the OECD Commentary on Article 1, some use "*assujettie*" (as did the former France-United Kingdom Income Tax Treaty (1968), referred to in section 3.7.1.) and others use "*soumis*", applied to income.

**5.2.3.2.3.2.3. In German**

German also has different expressions: "*ist steuerpflichtig*", which is the equivalent of "liable to tax" in article 4 of the OECD Model, and "*wird besteuert*" (literally, "is taxed"), and also "*unterliegt der Besteuerung*"/"*unterliegt der Steuer*"/"*unterliegt dem Steuersatz*". These are generally used consistently in relation to persons and income respectively. Exceptions can, however, be found. The remittance provision in the Germany-United Kingdom Income Tax Treaty (2010),[303] which can be categorized as relating to income, uses "*steuerpflichtig*".

**5.2.3.2.3.2.4. In tax treaties involving the Baltic states**

There are a few examples of tax treaties in which it is unclear as to whether "subject to tax" is applied to persons in respect of income generally or to particular types of income. For example, the Lithuania-United Kingdom Income Tax Treaty (2001)[304] states as follows:[305]

> Notwithstanding the provisions of any other Article of this Convention, a resident of a Contracting State who, as a consequence of domestic law concerning incentives to promote foreign investment, is not subject to tax or is subject to tax at a reduced rate in that Contracting State on income or capital gains, shall not receive the benefit of any reduction in or exemption from tax provided for in this Convention by the other Contracting State if the main purpose or one of the main purposes of such resident or a person connected with such resident was to obtain the benefits of this Convention.

The French text of the Canadian tax treaties with the Baltic States,[306] which is equally authentic (as are the Estonian, Latvian and Lithuanian texts), reads as follows:

---

303. The Ger.-UK Income and Capital Tax Treaty (2010), Treaties IBFD.
304. The Lith.–UK Income Tax Treaty (2001), Treaties IBFD.
305. *See also* the Est.–UK Income Tax Treaty (1994), Treaties IBFD; the Lat.-UK Income Tax Treaty (1996), Treaties IBFD; and the Taiwan-UK Income Tax Agreement (2002), Treaties IBFD.
306. The Can.-Est. Income and Capital Tax Treaty (1995), Treaties IBFD; the Can.-Lat. Income and Capital Tax Treaty (1996), Treaties IBFD; and the Can.-Lith. Income and Capital Tax Treaty (1996), Treaties IBFD.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

*Nonobstant les dispositions d'un article quelconque de la présente Convention, un résident d'un État contractant qui, suite à l'application de la législation interne concernant les mesures d'encouragement à la promotion des investissements étrangers, n'est pas assujetti à l'impôt dans cet État contractant, ou y est assujetti à un taux réduit, sur les bénéfices, revenus ou gains, n'a pas droit aux bénéfices des réductions ou exonérations d'impôt prévues en vertu de la présente Convention par l'autre État contractant si le but principal ou l'un des buts principaux de tel résident ou de personnes qui lui sont associées était de tirer avantage des bénéfices de la présente Convention.*

Although drafted in terms of a resident not being "subject to tax" (or being "subject to tax" at a reduced rate, which must apply to particular income), it may impliedly relate to particular income, as the reduction in or exemption from tax must apply to particular income and there would be no point in the provision in relation to income that is fully "subject to tax".

### 5.2.3.3. "Avoidance" and "evasion" in English and French

As mentioned in section 3.4.10., the MLI has added a reference to preventing avoidance and evasion to the preamble to the OECD Model as part of the minimum standard for protection against the abuse of tax treaties under BEPS Action 6. Paragraph 23 of the Explanatory Statement to the MLI states that "[t]he inclusion of this reference in the preamble is intended to clarify the intent of the Parties to ensure that CTAs be interpreted in line with the preamble language foreseen in Article 6(1)". The distinction between "avoidance" and "evasion" is clear in English in the tax context, and the Explanatory Statement discusses the French equivalents of "*d'évasion ou de fraude fiscal*" and "*évitement fiscal*", the last of these being the term used for tax avoidance in certain countries.

## 5.3. The Multilateral Instrument

### 5.3.1. General effect

The MLI, developed as Action 15 of the BEPS Project, was prepared by an ad hoc group of 99 countries. It is accompanied by an Explanatory Statement, also approved by the ad hoc group. It has now been signed by 78 jurisdictions and is open for signature by more (six more jurisdictions having already indicated their intention to do so).[307] The MLI takes the novel form of a multilateral treaty modifying bilateral tax treaties (CTAs) made between the parties to it. It will continue to exist together with the CTAs so that, in any given case, both will have to be considered. Parties have to list the CTAs and can accordingly decide not to modify all of them. The MLI contains a limited number of opt-out provisions in so far as they relate to the minimum standards set down by the BEPS Project. For provisions not forming part of the minimum standards, states may opt out of the provision entirely (or in part) by means of permitted reservations. In addition, states may opt out of provisions of the MLI to preserve existing provisions that have specific, objectively defined characteristics (examples of this are found in reservations (b) to (d) in section 5.3.2.).

The method adopted by the MLI may be illustrated by the following example relating to dual resident entities. The OECD Model currently resolves the dual residence of persons other than individuals by

---

307.    *See* http://www.oecd.org/tax/treaties/beps-mli-signatories-and-parties.pdf. Country-by-country status overview of the positions taken by the signatories to the MLI, with links to more detailed information, can be found in IBFD's MLI Country Monitor, available at https://online.bfd.org/kbase/#topic=mlit-compare&format=ghtml.

© Copyright 2018  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

reference to place of effective management. The MLI replaces this in the CTA by a provision (the new provision) that the competent authorities shall endeavour to determine by mutual agreement (a stand-alone provision not related to article 25 of the OECD Model, thus denying the possibility of arbitration because there would not be taxation otherwise than in accordance with the CTA)[308] the jurisdiction in which the entity is resident for treaty purposes having regard to various listed factors. In the absence of such an agreement, the person is not entitled to any relief or exemption from tax, except as agreed. This is stated to apply *in place of* or *in the absence of* any dual residence provisions relating to persons other than individuals in the CTA, so that potentially applies in all cases, but not tie-breaker provisions specifically addressing dual-listed companies (a narrower concept than entities other than individuals).[309]

### 5.3.2. Permitted reservations

The permitted reservations are:

(a)     to opt out of the new provision entirely in its CTAs (39 of the original signatories have made this reservation);

(b)     not to apply it where the CTA contains provisions requiring parties to endeavour to resolve dual residence by mutual agreement (Ireland and Russia are examples of states adopting this reservation in respect of treaties containing this provision);

(c)     not to apply it where the CTA denies treaty benefits to dual residents completely without requiring resolution by mutual agreement (Indonesia and Mexico are examples);

(d)     not to apply it where the CTA requires the parties to endeavour to resolve the dual residence by mutual agreement and also sets out the treatment where agreement cannot be reached, so that this treatment can be different from that in the new provision (Mexico and Romania are examples);

(e)     to provide instead that, in the absence of mutual agreement, the person is not entitled to any relief or exemption, so that there is no possibility of giving relief by agreement (four jurisdictions have made this reservation); and

(f)     not to apply the new provision where the reservation in (e) is made by the other party, so as not to apply the new provision at all (otherwise it would be bound to apply the article as modified by (e) in accordance with the first party's reservation)[310] (Ireland is an example).

Parties making reservations must notify the depositary of the article numbers of the CTAs not modified by reservations in (b) to (d), all of which relate to existing treaty provisions, in which case the new provision will apply (or will apply as modified by reservation (e)) where both parties make no such reservations. If only one party to a CTA makes for example the reservation in (d), the CTA provision will continue to apply. If the two parties to the CTA make different reservations, for example one adopting reservation (c) and the other (e), the CTA provision would also continue to apply. Since reservations (b) to (d) depend on the terms of the CTA there is less scope for divergent reservations, but even so one party may not necessarily want to continue with the solution in the CTA. Alternatively, if one party opts out of the new provision under reservation (a) and the other party makes no reservation, again

---

308.    *See* para. 58 Explanatory Statement to the MLI.
309.    *See* para. 53 Explanatory Statement to the MLI.
310.    *See* the effect of a reservation to modify the treaty with respect to all other parties (and the other party in the treaty with the reserving party) in article 28(3) of the MLI and paragraph 270 of the Explanatory Statement to the MLI.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

the existing CTA provision (if any) would continue to apply. There can be partial application of the new provision, for example if one party makes reservation (e) and the other does nothing, the new provision will apply with the last sentence modified in accordance with reservation (e).[311]

Since the effect of the MLI on a particular CTA depends on the reservations made by both parties, it is hoped that states will agree how each particular treaty is modified. There are provisions in article 29 of the MLI for provisional notifications (or expected notifications) of how these operate on a particular CTA on signature (which most countries provided but Norway's followed later) and for final notifications at the time of ratification. If disagreements arise in the last resort they are settled by a conference of the parties in accordance with article 31.

### 5.3.3. Interpretation of the MLI

Since the MLI contains provisions substituting for those in the CTA, but without incorporating them into the CTA because the MLI provision continues to exist, the interpretation of the MLI is a topic in its own right that is dealt with below.

The MLI contains its own interpretation provision in article 2(2) of the MLI that "[a]s regards the application of this Convention at any time by a Party, any term not defined herein shall, unless the context otherwise requires, have the meaning that it has at that time under the relevant CTA". This contains no reference to domestic law but, assuming that article 3(2) of the OECD Model is contained in the CTA, this provides a route to using domestic law. The absence of any reference to domestic law in article 2(2) of the MLI may be explained by the problems regarding the question of whose domestic law that this would cause in a multilateral treaty. For example, there could be no equivalent to looking at the other state's domestic law as in CTAs. Since the MLI contains provisions substituting for those in the CTA, but without incorporating them into the CTA as the MLI provision continues to exist, this has to be read fairly widely to make the MLI work. This is done by reading "the meaning that it has" to include "the meaning that it had" before the MLI in the case of an MLI provision applying in place of one in the CTA and also the meaning that it would have in the future if it had been contained in the CTA and domestic law changes. A more difficult case is where the MLI provision applies in the absence of a CTA provision, or modifies an existing provision by introducing a term not used in the CTA, where one needs to read "has" as including "would have had" if the provision had been contained in the CTA. While this is at the limit of interpretation as opposed to rewriting, a difference depending on whether the term was used in the CTA originally or only as a result of the MLI makes no sense so that the author considers that one should imply this extended meaning. Fortunately, there seem to be few provisions in the MLI that use new undefined terms,[312] but it is a pity that this was not dealt with more clearly.

As far as explanatory material is concerned, the MLI has its own Explanatory Statement, which states as follows:

It therefore reflects the agreed understanding of the negotiators with respect to the Convention. It includes descriptions of the types of treaty provisions which are intended to be covered and the ways in which they are intended to be modified. The members of the ad hoc group adopted

---

311.   *See supra* n. 23.
312.   A poss ble example is in the expression in article 9 of the MLI, "shares or comparable interests, such as interests in a partnership or trust", where domestic law can be used to interpret "partnership", because it is used in the definition of national in the CTA following the OECD Model, but not "trust", assuming that the term is not used elsewhere in the CTA.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

this Explanatory Statement on 24 November 2016 at the same time as adopting the text of the Convention.

In terms of the Vienna Convention (1969), this is therefore context under article 31(2)(a) in relation to the 99 members of the ad hoc group that negotiated the MLI (on the basis that they adopted it at the same time as the text and it is therefore in connection with the conclusion of the MLI when this is signed by those countries even though it was adopted before its conclusion). In relation to another state signing the MLI (see article 27) it would be context under article 31(2)(b) only so long as the state accepted it as an instrument related to the MLI, which it could do by signing the MLI and adopting the Explanatory Statement. The Explanatory Statement deals with such things as explaining the effect of permitted reservations and the resolution of conflicts between them.

As far as the substantive provisions of the MLI modifying the CTAs are concerned, the Commentary on the relevant BEPS provision will apply in a similar way as the Commentary on the OECD Model and would seem to have similar status. The Explanatory Statement says that they should be interpreted in accordance with normal treaty interpretation provisions, quoting the wording of article 31 of the Vienna Convention (1969) and stating that: "In this regard, the object and purpose of the Convention is to implement the tax treaty-related BEPS measures". This makes it clear that BEPS reports should be considered for interpretation purposes as object and purpose rather than context. The Explanatory Statement also provides that any deviation in the wording from the BEPS provisions are not intended to make substantive changes, but merely to deal with the fact of the MLI amending numerous CTAs.

A further interpretative complication is that the MLI (and the Explanatory Statement) is in English and French, which are equally authentic (see the final clause of the MLI), whereas the CTA that it amends may be in a completely different language, or in one of these languages, and may often provide for a third language text to prevail in case of inconsistencies. The effect is that for a CTA solely in English some provisions are substituted, without actually incorporating them into the CTA, with equally authentic English and French versions, and similarly for a treaty solely in French, which seems to add an unnecessary complication, since under article 33(3) of the Vienna Convention (1969) both language texts are presumed to have the same meaning, but may in fact have different meanings. It is worse for a CTA in, say, Spanish and German with an English prevailing text, as substituted provisions will be in equally authentic English and French with no prevailing text. Many states need a text in their own language for use by Parliament but it is thought that this can be satisfied by a non-authentic text. If states do not like different languages being used for part of their treaties they are permitted by article 30 of the MLI to modify their CTAs, which could reproduce the MLI material in the same language(s) as the rest of the treaty. While this has the advantage of consistency, it would defeat the point of having only two authentic language texts of the MLI, the interpretation of which could develop unhindered by further language versions.

*See* section 3.4.10. on the possible effect on interpretation of the change in the preamble to tax treaties made by the MLI and section 5.2.3.3. on avoidance and evasion.

# 6. Relationship to Other Articles

## 6.1. Express provisions

Not applicable

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

## 6.2. Implicit provisions

Not applicable.

## 6.3. Terms defined elsewhere

Not applicable

## 6.4. Metatopics

Relevant issues regarding time in tax treaties are addressed in the GTTC Chapter on Time in Tax Treaties.

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

# Exhibit 45

**OECD**

**Income and Capital Model Convention and Commentary**

> **Status:** Not Applicable
>
> **Date:** 28 January 2003.
>
> **Note:**
>
> The PDF version of the 2003 OECD Model Tax Convention on Income and on Capital is also available here.
>
> **Note:**
>
> Data © OECD, 1992, 1994, 1995, 1997, 2000, 2003.
>
> OECD grants you the right to use and quote these OECD materials for private or other personal and professional use only, provided that any quotation is limited to insignificant portions, which in them selves have no commercial value in the context in which they are used. Unauthorised reproduction, lending, hiring, transmission or distribution of all or part of OECD materials is prohibited. You must treat these OECD materials and any elements thereof like any other copyrighted material. OECD does not warrant, and shall not be liable for, the accuracy and completeness of OECD materials.
>
> Applications for permission to reproduce all or part of these OECD materials should be made to:
>
> OECD Publications
>
> 2 rue André-Pascal
>
> 75775 PARIS Cedex 16
>
> France
>
> e-mail - rights@oecd.org

**Model Tax Convention
on Income and on Capital**

**Preamble**

**CONDENSED VERSION**

**28 JANUARY 2003**

**OECD Committee on Fiscal Affairs**

**ORGANISATION FOR ECONOMIC CO-OPERATION**

**AND DEVELOPMENT**

Pursuant to Article 1 of the Convention signed in Paris on 14th December 1960, and which came into force on 30th September 1961, the Organisation for Economic Co-operation and Development (OECD) shall promote policies designed:

- to achieve the highest sustainable economic growth and employment and a rising standard of living in Member countries, while maintaining financial stability, and thus to contribute to the development of the world economy;

- to contribute to sound economic expansion in Member as well as non-member countries in the process of economic development; and

- to contribute to the expansion of world trade on a multilateral, non-discriminatory basis in accordance with international obligations.

The original Member countries of the OECD are Austria, Belgium, Canada, Denmark, France, Germany, Greece, Iceland, Ireland, Italy, Luxembourg, the Netherlands, Norway, Portugal, Spain, Sweden, Switzerland, Turkey, the United Kingdom and the United States. The following countries became Members subsequently through accession at the dates indicated hereafter: Japan (28th April 1964), Finland (28th January 1969), Australia (7th June 1971), New Zealand (29th May 1973), Mexico (18th May 1994), the Czech Republic (21st December 1995), Hungary (7th May 1996), Poland (22nd November 1996), Korea (12th December 1996) and the Slovak Republic (14th December 2000). The Commission of the European Communities takes part in the work of the OECD (Article 13 of the OECD Convention).

*Publié en français sous le titre* :

**Modèle de convention fiscale concernant le revenu et la fortune**

VERSION ABRÉGÉE

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.                                    1

## OECD

## Commentaries on the Articles of the Model Tax Convention

**Status:** Not In Force
**Date of Conclusion:** Not applicable.
**Entry into Force:** Not applicable.
**Effective Date:** Not applicable.

## COMMENTARY ON ARTICLE 1

## CONCERNING THE PERSONS COVERED BY THE CONVENTION

1. Whereas the earliest conventions in general were applicable to "citizens" of the Contracting States, more recent conventions usually apply to "residents" of one or both of the Contracting States irrespective of nationality. Some conventions are of even wider scope because they apply more generally to "taxpayers" of the Contracting States; they are, therefore, also applicable to persons, who, although not residing in either State, are nevertheless liable to tax on part of their income or capital in each of them. It has been deemed preferable for practical reasons to provide that the Convention is to apply to persons who are residents of one or both of the Contracting States. The term "resident" is defined in Article 4.

**Application of the Convention to partnerships**

2. Domestic laws differ in the treatment of partnerships. These differences create various difficulties when applying tax Conventions in relation to partnerships. These difficulties are analysed in the report by the Committee on Fiscal Affairs entitled "The Application of the OECD Model Tax Convention to Partnerships",[1] the conclusions of which have been incorporated below and in the Commentary on various other provisions of the Model Tax Convention.

3. As discussed in that report, a main source of difficulties is the fact that some countries treat partnerships as taxable units (sometimes even as companies) whereas other countries adopt what may be referred to as the fiscally transparent approach, under which the partnership is ignored for tax purposes and the individual partners are taxed on their respective share of the partnership's income.

4. A first difficulty is the extent to which a partnership is entitled as such to the benefits of the provisions of the Convention. Under Article 1, only persons who are residents of the Contracting States are entitled to the benefits of the tax Convention entered into by these States. While paragraph 2 of the Commentary on Article 3 explains why a partnership constitutes a person, a partnership does not necessarily qualify as a resident of a Contracting State under Article 4.

5. Where a partnership is treated as a company or taxed in the same way, it is a resident of the Contracting State that taxes the partnership on the grounds mentioned in paragraph 1 of Article 4 and, therefore, it is entitled to the benefits of the Convention. Where, however, a partnership is treated as fiscally transparent in a State, the partnership is not "liable to tax" in that State within the meaning of paragraph 1 of Article 4, and so cannot be a resident thereof for purposes of the Convention. In such a case, the application of the Convention to the partnership as such would be refused, unless a special rule covering partnerships were provided for in the Convention. Where the application of the Convention is so refused, the partners should be entitled, with respect to their share of the income of the partnership, to the benefits provided by the Conventions entered into by the States of which they are residents to the extent that the partnership's income is allocated to them for the purposes of taxation in their State of residence (cf. paragraph 8.4 of the Commentary on Article 4).

6. The relationship between the partnership's entitlement to the benefits of a tax Convention and that of the partners raises other questions.

6.1 One issue is the effect that the application of the provisions of the Convention to a partnership can have on the taxation of the partners. Where a partnership is treated as a resident of a Contracting State, the provisions of the Convention that restrict the other Contracting State's right to tax the partnership on its income do not apply to restrict that other State's right to tax the partners who are its own residents on their share of the income of the partnership. Some states may wish to include in their conventions a provision that expressly confirms a Contracting State's right to tax resident partners on their share of the income of a partnership that is treated as a resident of the other State.

6.2 Another issue is that of the effect of the provisions of the Convention on a Contracting State's right to tax income arising on its territory where the entitlement to the benefits of one, or more than one, Conventions is different for the partners and the partnership. Where, for instance, the State of source treats a domestic partnership as fiscally transparent and therefore taxes the partners on their share of the income of the partnership, a partner that is resident of a State that taxes partnerships as companies would not be able to claim the benefits of the Convention between the two States with respect to the share of the partnership's income that the State of source taxes in his hands since that income, though allocated to the person claiming the benefits of the Convention under the laws of the State of source, is not similarly allocated for purposes of determining the liability to tax on that item of income in the State of residence of that person.

---

1    This report is reproduced in Volume II of the loose-leaf version of the OECD Model Tax Convention, at page R(15)-1.

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.     21
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

6.3 The results described in the preceding paragraph should obtain even if, as a matter of the domestic law of the State of source, the partnership would not be regarded as transparent for tax purposes but as a separate taxable entity to which the income would be attributed, provided that the partnership is not actually considered as a resident of the State of source. This conclusion is founded upon the principle that the State of source should take into account, as part of the factual context in which the Convention is to be applied, the way in which an item of income, arising in its jurisdiction, is treated in the jurisdiction of the person claiming the benefits of the Convention as a resident. For States which could not agree with this interpretation of the Article, it would be possible to provide for this result in a special provision which would avoid the resulting potential double taxation where the income of the partnership is differently allocated by the two States.

6.4 Where, as described in paragraphs 6.2, income has "flowed through" a transparent partnership to the partners who are liable to tax on that income in the State of their residence then the income is appropriately viewed as "paid" to the partners since it is to them and not to the partnership that the income is allocated for purposes of determining their tax liability in their State of residence. Hence the partners, in these circumstances, satisfy the condition, imposed in several Articles, that the income concerned is "paid to a resident of the other Contracting State". Similarly the requirement, imposed by some other Articles, that income or gains are "derived by a resident of the other Contracting State" is met in the circumstances described above. This interpretation avoids denying the benefits of tax Conventions to a partnership's income on the basis that neither the partnership, because it is not a resident, nor the partners, because the income is not directly paid to them or derived by them, can claim the benefits of the Convention with respect to that income. Following from the principle discussed in paragraph 6.3, the conditions that the income be paid to, or derived by, a resident should be considered to be satisfied even where, as a matter of the domestic law of the State of source, the partnership would not be regarded as transparent for tax purposes, provided that the partnership is not actually considered as a resident of the State of source.

6.5 Partnership cases involving three States pose difficult problems with respect to the determination of entitlement to benefits under Conventions. However, many problems may be solved through the application of the principles described in paragraphs 6.2 to 6.4. Where a partner is a resident of one State, the partnership is established in another State and the partner shares in partnership income arising in a third State then the partner may claim the benefits of the Convention between his State of residence and the State of source of the income to the extent that the partnership's income is allocated to him for the purposes of taxation in his State of residence. If, in addition, the partnership is taxed as a resident of the State in which it is established then the partnership may itself claim the benefits of the Convention between the State in which it is established and the State of source. In such a case of "double benefits", the State of source may not impose taxation which is inconsistent with the terms of either applicable Convention therefore, where different rates are provided for in the two Conventions, the lower will be applied. However, Contracting States may wish to consider special provisions to deal with the administration of benefits under Conventions in situations such as these, so that the partnership may claim benefits but partners could not present concurrent claims. Such provisions could ensure appropriate and simplified administration of the giving of benefits. No benefits will be available under the Convention between the State in which the partnership is established and the State of source if the partnership is regarded as transparent for tax purposes by the State in which it is established. Similarly no benefits will be available under the Convention between the State of residence of the partner and the State of source if the income of the partnership is not allocated to the partner under the taxation law of the State of residence. If the partnership is regarded as transparent for tax purposes by the State in which it is established and the income of the partnership is not allocated to the partner under the taxation law of the State of residence of the partner, the State of source may tax partnership income allocable to the partner without restriction.

6.6 Differences in how countries apply the fiscally transparent approach may create other difficulties for the application of tax Conventions. Where a State considers that a partnership does not qualify as a resident of a Contracting State because it is not liable to tax and the partners are liable to tax in their State of residence on their share of the partnership's income, it is expected that that State will apply the provisions of the Convention as if the partners had earned the income directly so that the classification of the income for purposes of the allocative rules of Articles 6 to 21 will not be modified by the fact that the income flows through the partnership. Difficulties may arise, however, in the application of provisions which refer to the activities of the taxpayer, the nature of the taxpayer, the relationship between the taxpayer and another party to a transaction. Some of these difficulties are discussed in paragraphs 19.1 of the Commentary on Article 5 and paragraphs 6.1 and 6.2 of the Commentary on Article 15.

6.7 Finally, a number of other difficulties arise where different rules of the Convention are applied by the Contracting States to income derived by a partnership or its partners, depending on the domestic laws of these States or their interpretation of the provisions of the Convention or of the relevant facts. These difficulties relate to the broader issue of conflicts of qualification, which is dealt with in paragraphs 32.1 ff. and 56.1 ff. of the Commentary on Article 23.

**Improper use of the Convention**

7. The principal purpose of double taxation conventions is to promote, by eliminating international double taxation, exchanges of goods and services, and the movement of capital and persons. It is also a purpose of tax conventions to prevent tax avoidance and evasion.

7.1 Taxpayers may be tempted to abuse the tax laws of a State by exploiting the differences between various countries' laws. Such attempts may be countered by provisions or jurisprudential rules that are part of the domestic law of the State concerned. Such a State is then unlikely to agree to provisions of bilateral double taxation conventions that would have the effect of allowing abusive transactions that would otherwise be prevented by the provisions and rules of this kind contained in its domestic law. Also, it will not wish to apply its bilateral conventions in a way that would have that effect.

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

8. It is also important to note that the extension of double taxation conventions increases the risk of abuse by facilitating the use of artificial legal constructions aimed at securing the benefits of both the tax advantages available under certain domestic laws and the reliefs from tax provided for in double taxation conventions.

9. This would be the case, for example, if a person (whether or not a resident of a Contracting State), acts through a legal entity created in a State essentially to obtain treaty benefits that would not be available directly. Another case would be an individual who has in a Contracting State both his permanent home and all his economic interests, including a substantial shareholding in a company of that State, and who, essentially in order to sell the shares and escape taxation in that State on the capital gains from the alienation (by virtue of paragraph 5 of Article 13), transfers his permanent home to the other Contracting State, where such gains are subject to little or no tax.

9.1 This raises two fundamental questions that are discussed in the following paragraphs:

- whether the benefits of tax conventions must be granted when transactions that constitute an abuse of the provisions of these conventions are entered into (cf. paragraphs 9.2 and following below); and

- whether specific provisions and jurisprudential rules of the domestic law of a Contracting State that are intended to prevent tax abuse conflict with tax conventions (cf. paragraphs 22 and following below).

9.2 For many States, the answer to the first question is based on their answer to the second question. These States take account of the fact that taxes are ultimately imposed through the provisions of domestic law, as restricted (and in some rare cases, broadened) by the provisions of tax conventions. Thus, any abuse of the provisions of a tax convention could also be characterised as an abuse of the provisions of domestic law under which tax will be levied. For these States, the issue then becomes whether the provisions of tax conventions may prevent the application of the anti-abuse provisions of domestic law, which is the second question above. As indicated in paragraph 22.1 below, the answer to that second question is that to the extent these anti-avoidance rules are part of the basic domestic rules set by domestic tax laws for determining which facts give rise to a tax liability, they are not addressed in tax treaties and are therefore not affected by them. Thus, as a general rule, there will be no conflict between such rules and the provisions of tax conventions.

9.3 Other States prefer to view some abuses as being abuses of the convention itself, as opposed to abuses of domestic law. These States, however, then consider that a proper construction of tax conventions allows them to disregard abusive transactions, such as those entered into with the view to obtaining unintended benefits under the provisions of these conventions. This interpretation results from the object and purpose of tax conventions as well as the obligation to interpret them in good faith (see Article 31 of the Vienna Convention on the Law of Treaties).

9.4 Under both approaches, therefore, it is agreed that States do not have to grant the benefits of a double taxation convention where arrangements that constitute an abuse of the provisions of the convention have been entered into.

9.5 It is important to note, however, that it should not be lightly assumed that a taxpayer is entering into the type of abusive transactions referred to above. A guiding principle is that the benefits of a double taxation convention should not be available where a main purpose for entering into certain transactions or arrangements was to secure a more favourable tax position and obtaining that more favourable treatment in these circumstances would be contrary to the object and purpose of the relevant provisions.

9.6 The potential application of general anti-abuse provisions does not mean that there is no need for the inclusion, in tax conventions, of specific provisions aimed at preventing particular forms of tax avoidance. Where specific avoidance techniques have been identified or where the use of such techniques is especially problematic, it will often be useful to add to the Convention provisions that focus directly on the relevant avoidance strategy. Also, this will be necessary where a State which adopts the view described in paragraph 9.2 above believes that its domestic law lacks the anti-avoidance rules or principles necessary to properly address such strategy.

10. For instance, some forms of tax avoidance have already been expressly dealt with in the Convention, e.g. by the introduction of the concept of "beneficial owner" (in Articles 10, 11, and 12) and of special provisions such as paragraph 2 of Article 17 dealing with so-called artiste-companies . Such problems are also mentioned in the Commentaries on Article 10 (paragraphs 17 and 22), Article 11 (paragraph 12) and Article 12 (paragraph 7).

10.1 Also, in some cases, claims to treaty benefits by subsidiary companies, in particular companies established in tax havens or benefiting from harmful preferential regimes, may be refused where careful consideration of the facts and circumstances of a case shows that the place of effective management of a subsidiary does not lie in its alleged state of residence but, rather, lies in the state of residence of the parent company so as to make it a resident of that latter state for domestic law and treaty purposes (this will be relevant where the domestic law of a state uses the place of management of a legal person, or a similar criterion, to determine its residence).

10.2 Careful consideration of the facts and circumstances of a case may also show that a subsidiary was managed in the state of residence of its parent in such a way that the subsidiary had a permanent establishment (e.g. by having a place of management) in that state to which all or a substantial part of its profits were properly attributable.

11. A further example is provided by two particularly prevalent forms of improper use of the Convention which are discussed in two reports from the Committee on Fiscal Affairs entitled "Double Taxation Conventions and the Use of Base Companies"

© Copyright 2021 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 1 Nov. 2021 by isabelle.farrar@ropesgray.com.

and "Double Taxation Conventions and the Use of Conduit Companies".[2] As indicated in these reports, the concern expressed in paragraph 9 above has proved to be valid as there has been a growing tendency toward the use of conduit companies to obtain treaty benefits not intended by the Contracting States in their bilateral negotiations. This has led an increasing number of Member countries to implement treaty provisions (both general and specific) to counter abuse and to preserve anti-avoidance legislation in their domestic laws.

12. The treaty provisions that have been designed to cover these and other forms of abuse take different forms. The following are examples derived from provisions that have been incorporated in bilateral conventions concluded by Member countries. These provide models that treaty negotiators might consider when searching for a solution to specific cases. In referring to them there should be taken into account:

- the fact that these provisions are not mutually exclusive and that various provisions may be needed in order to address different concerns;

- the degree to which tax advantages may actually be obtained by a particular avoidance strategy;

- the legal context in both Contracting States and, in particular, the extent to which domestic law already provides an appropriate response to this avoidance strategy, and

- the extent to which bona fide economic activities might be unintentionally disqualified by such provisions.

*Conduit company cases*

13. Many countries have attempted to deal with the issue of conduit companies and various approaches have been designed for that purpose. One solution would be to disallow treaty benefits to a company not owned, directly or indirectly, by residents of the State of which the company is a resident. For example, such a "look-through" provision might have the following wording:

"A company that is a resident of a Contracting State shall not be entitled to relief from taxation under this Convention with respect to any item of income, gains or profits if it is owned or controlled directly or through one or more companies, wherever resident, by persons who are not residents of a Contracting State."

Contracting States wishing to adopt such a provision may also want, in their bilateral negotiations, to determine the criteria according to which a company would be considered as owned or controlled by non-residents.

14. The "look-through approach" underlying the above provision seems an adequate basis for treaties with countries that have no or very low taxation and where little substantive business activities would normally be carried on. Even in these cases it might be necessary to alter the provision or to substitute for it another one to safeguard bona fide business activities.

15. General subject-to-tax provisions provide that treaty benefits in the State of source are granted only if the income in question is subject to tax in the State of residence. This corresponds basically to the aim of tax treaties, namely to avoid double taxation. For a number of reasons, however, the Model Convention does not recommend such a general provision. Whilst this seems adequate with respect to a normal international relationship, a subject-to-tax approach might well be adopted in a typical conduit situation. A safeguarding provision of this kind could have the following wording:

"Where income arising in a Contracting State is received by a company resident of the other Contracting State and one or more persons not resident in that other Contracting State

a)  have directly or indirectly or through one or more companies, wherever resident, a substantial interest in such company, in the form of a participation or otherwise, or

b)  exercise directly or indirectly, alone or together, the management or control of such company,

any provision of this Convention conferring an exemption from, or a reduction of, tax shall apply only to income that is subject to tax in the last-mentioned State under the ordinary rules of its tax law."

The concept of "substantial interest" may be further specified when drafting a bilateral convention. Contracting States may express it, for instance, as a percentage of the capital or of the voting rights of the company.

16. The subject-to-tax approach seems to have certain merits. It may be used in the case of States with a well-developed economic structure and a complex tax law. It will, however, be necessary to supplement this provision by inserting bona fide provisions in the treaty to provide for the necessary flexibility (cf. paragraph 19 below); moreover, such an approach does not offer adequate protection against advanced tax avoidance schemes such as "stepping-stone strategies".

17. The approaches referred to above are in many ways unsatisfactory. They refer to the changing and complex tax laws of the Contracting States and not to the arrangements giving rise to the improper use of conventions. It has been suggested that the conduit problem be dealt with in a more straightforward way by inserting a provision that would single out cases of improper use with reference to the conduit arrangements themselves (the channel approach). Such a provision might have the following wording:

"Where income arising in a Contracting State is received by a company that is a resident of the other Contracting State and one or more persons who are not residents of that other Contracting State

---

2    These two reports are reproduced in Volume II of the loose-leaf version of the OECD Model Tax Convention, at pages R(5)-1 and R(6)-1.

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.                24

a)  have directly or indirectly or through one or more companies, wherever resident, a substantial interest in such company, in the form of a participation or otherwise, or

b)  exercise directly or indirectly, alone or together, the management or control of such company

any provision of this Convention conferring an exemption from, or a reduction of, tax shall not apply if more than 50 per cent of such income is used to satisfy claims by such persons (including interest, royalties, development, advertising, initial and travel expenses, and depreciation of any kind of business assets including those on immaterial goods and processes)."

18. A provision of this kind appears to be the only effective way of combatting "stepping-stone" devices. It is found in bilateral treaties entered into by Switzerland and the United States and its principle also seems to underly the Swiss provisions against the improper use of tax treaties by certain types of Swiss companies. States that consider including a clause of this kind in their convention should bear in mind that it may cover normal business transactions and would therefore have to be supplemented by a bona fide clause.

19. The solutions described above are of a general nature and they need to be accompanied by specific provisions to ensure that treaty benefits will be granted in bona fide cases. Such provisions could have the following wording:

a)  *General bona fide provision*

"The foregoing provisions shall not apply where the company establishes that the principal purpose of the company, the conduct of its business and the acquisition or maintenance by it of the shareholding or other property from which the income in question is derived, are motivated by sound business reasons and do not have as primary purpose the obtaining of any benefits under this Convention."

b)  *Activity provision*

"The foregoing provisions shall not apply where the company is engaged in substantive business operations in the Contracting State of which it is a resident and the relief from taxation claimed from the other Contracting State is with respect to income that is connected with such operations."

c)  *Amount of tax provision*

"The foregoing provisions shall not apply where the reduction of tax claimed is not greater than the tax actually imposed by the Contracting State of which the company is a resident."

d)  *Stock exchange provision*

"The foregoing provisions shall not apply to a company that is a resident of a Contracting State if the principal class of its shares is registered on an approved stock exchange in a Contracting State or if such company is wholly owned - directly or through one or more companies each of which is a resident of the first-mentioned State - by a company which is a resident of the first-mentioned State and the principal class of whose shares is so registered."

e)  *Alternative relief provision*

In cases where an anti-abuse clause refers to non-residents of a Contracting State, it could be provided that the term "shall not be deemed to include residents of third States that have income tax conventions in force with the Contracting State from which relief from taxation is claimed and such conventions provide relief from taxation not less than the relief from taxation claimed under this Convention."

These provisions illustrate possible approaches. The specific wording of the provisions to be included in a particular treaty depends on the general approach taken in that treaty and should be determined on a bilateral basis. Also, where the competent authorities of the Contracting States have the power to apply discretionary provisions, it may be considered appropriate to include an additional rule that would give the competent authority of the source country the discretion to allow the benefits of the Convention to a resident of the other State even if the resident fails to pass any of the tests described above.

20. Whilst the preceding paragraphs identify different approaches to deal with conduit situations, each of them deals with a particular aspect of the problem commonly referred to as "treaty shopping". States wishing to address the issue in a comprehensive way may want to consider the following example of detailed limitation-of-benefits provisions aimed at preventing persons who are not resident of either Contracting States from accessing the benefits of a Convention through the use of an entity that would otherwise qualify as a resident of one of these States, keeping in mind that adaptations may be necessary and that many States prefer other approaches to deal with treaty shopping:

"1. Except as otherwise provided in this Article, a resident of a Contracting State who derives income from the other Contracting State shall be entitled to all the benefits of this Convention otherwise accorded to residents of a Contracting State only if such resident is a "qualified person" as defined in paragraph 2 and meets the other conditions of this Convention for the obtaining of such benefits.

2. A resident of a Contracting State is a qualified person for a fiscal year only if such resident is either:

a)  an individual;

b)  a qualified governmental entity;

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 1 Nov. 2021 by isabelle.farrar@ropesgray.com.

c) a company, if

   (i) the principal class of its shares is listed on a recognised stock exchange specified in subparagraph *a*) or *b*) of paragraph 6 and is regularly traded on one or more recognized stock exchanges, or

   (ii) at least 50 per cent of the aggregate vote and value of the shares in the company is owned directly or indirectly by five or fewer companies entitled to benefits under subdivision *i*) of this subparagraph, provided that, in the case of indirect ownership, each intermediate owner is a resident of either Contracting State;

d) a charity or other tax-exempt entity, provided that, in the case of a pension trust or any other organization that is established exclusively to provide pension or other similar benefits, more than 50 per cent of the person's beneficiaries, members or participants are individuals resident in either Contracting State; or

e) a person other than an individual, if:

   (i) on at least half the days of the fiscal year persons that are qualified persons by reason of subparagraph *a*), *b*) or *d*) or subdivision *c*) *i*) of this paragraph own, directly or indirectly, at least 50 per cent of the aggregate vote and value of the shares or other beneficial interests in the person, and

   (ii) less than 50 per cent of the person's gross income for the taxable year is paid or accrued, directly or indirectly, to persons who are not residents of either Contracting State in the form of payments that are deductible for purposes of the taxes covered by this Convention in the person's State of residence (but not including arm's length payments in the ordinary course of business for services or tangible property and payments in respect of financial obligations to a bank, provided that where such a bank is not a resident of a Contracting State such payment is attributable to a permanent establishment of that bank located in one of the Contracting States).

A resident of a Contracting State will be entitled to benefits of the Convention with respect to an item of income, derived from the other State, regardless of whether the resident is a qualified person, if the resident is actively carrying on business in the first-mentioned State (other than the business of making or managing investments for the resident's own account, unless these activities are banking, insurance or securities activities carried on by a bank, insurance company or registered securities dealer), the income derived from the other Contracting State is derived in connection with, or is incidental to, that business and that resident satisfies the other conditions of this Convention for the obtaining of such benefits.

b) If the resident or any of its associated enterprises carries on a business activity in the other Contracting State which gives rise to an item of income, subparagraph *a*) shall apply to such item only if the business activity in the first-mentioned State is substantial in relation to business carried on in the other State. Whether a business activity is substantial for purposes of this paragraph will be determined based on all the facts and circumstances.

c) In determining whether a person is actively carrying on business in a Contracting State under subparagraph *a*), activities conducted by a partnership in which that person is a partner and activities conducted by persons connected to such person shall be deemed to be conducted by such person. A person shall be connected to another if one possesses at least 50 per cent of the beneficial interest in the other (or, in the case of a company, at least 50 per cent of the aggregate vote and value of the company's shares) or another person possesses, directly or indirectly, at least 50 per cent of the beneficial interest (or, in the case of a company, at least 50 per cent of the aggregate vote and value of the company's shares) in each person. In any case, a person shall be considered to be connected to another if, based on all the facts and circumstances, one has control of the other or both are under the control of the same person or persons.

4. Notwithstanding the preceding provisions of this Article, if a company that is a resident of a Contracting State, or a company that controls such a company, has outstanding a class of shares

a) which is subject to terms or other arrangements which entitle its holders to a portion of the income of the company derived from the other Contracting State that is larger than the portion such holders would receive absent such terms or arrangements ("the disproportionate part of the income"); and

b) 50 per cent or more of the voting power and value of which is owned by persons who are not qualified persons

   the benefits of this Convention shall not apply to the disproportionate part of the income.

5. A resident of a Contracting State that is neither a qualified person pursuant to the provisions of paragraph 2 or entitled to benefits under paragraph 3 or 4 shall, nevertheless, be granted benefits of the Convention if the competent authority of that other Contracting State determines that the establishment, acquisition or maintenance of such person and the conduct of its operations did not have as one of its principal purposes the obtaining of benefits under the Convention.

6. For the purposes of this Article the term "recognized stock exchange" means:

a) in State A .........;

b) in State B .........; and

c) any other stock exchange which the competent authorities agree to recognize for the purposes of this Article."

*Provisions which are aimed at entities benefiting from preferential tax regimes*

© Copyright 2021 IBFD: No part of this information may be reproduced or distributed without permission of IBFD. Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 1 Nov. 2021 by isabelle.farrar@ropesgray.com.

21. Specific types of companies enjoying tax privileges in their State of residence facilitate conduit arrangements and raise the issue of harmful tax practices. Where tax-exempt (or nearly tax-exempt) companies may be distinguished by special legal characteristics, the improper use of tax treaties may be avoided by denying the tax treaty benefits to these companies (the exclusion approach). As such privileges are granted mostly to specific types of companies as defined in the commercial law or in the tax law of a country, the most radical solution would be to exclude such companies from the scope of the treaty. Another solution would be to insert a safeguarding clause which would apply to the income received or paid by such companies and which could be drafted along the following lines:

"No provision of the Convention conferring an exemption from, or reduction of, tax shall apply to income received or paid by a company as defined under section ... of the ... Act, or under any similar provision enacted by ... after the signature of the Convention."

The scope of this provision could be limited by referring only to specific types of income, such as dividends, interest, capital gains, or directors' fees. Under such provisions companies of the type concerned would remain entitled to the protection offered under Article 24 (non-discrimination) and to the benefits of Article 25 (mutual agreement procedure) and they would be subject to the provisions of Article 26 (exchange of information).

21.1 Exclusion provisions are clear and their application is simple, even though they may require administrative assistance in some instances. They are an important instrument by which a State that has created special privileges in its tax law may prevent those privileges from being used in connection with the improper use of tax treaties concluded by that State.

21.2 Where it is not possible or appropriate to identify the companies enjoying tax privileges by reference to their special legal characteristics, a more general formulation will be necessary. The following provision aims at denying the benefits of the Convention to entities which would otherwise qualify as residents of a Contracting State but which enjoy, in that State, a preferential tax regime restricted to foreign-held entities (i.e. not available to entities that belong to residents of that State):

"Any company, trust or partnership that is a resident of a Contracting State and is beneficially owned or controlled directly or indirectly by one or more persons who are not residents of that State shall not be entitled to the benefits of this Convention if the amount of the tax imposed on the income or capital of the company, trust or partnership by that State (after taking into account any reduction or offset of the amount of tax in any manner, including a refund, reimbursement, contribution, credit or allowance to the company, trust or partnership, or to any other person) is substantially lower than the amount that would be imposed by that State if all of the shares of the capital stock of the company or all of the interests in the trust or partnership, as the case may be, were beneficially owned by one or more residents of that State."

*Provisions which are aimed at particular types of income*

21.3 The following provision aims at denying the benefits of the Convention with respect to income that is subject to low or no tax under a preferential tax regime:

"1. The benefits of this Convention shall not apply to income which may, in accordance with the other provisions of the Convention, be taxed in a Contracting State and which is derived from activities the performance of which do not require substantial presence in that State, including:

    a) such activities involving banking, shipping, financing, insurance or electronic commerce activities; or

    b) activities involving headquarter or coordination centre or similar arrangements providing company or group administration, financing or other support; or

    c) activities which give rise to passive income, such as dividends, interest and royalties

where, under the laws or administrative practices of that State, such income is preferentially taxed and, in relation thereto, information is accorded confidential treatment that prevents the effective exchange of information.

2. For the purposes of paragraph 1, income is preferentially taxed in a Contracting State if, other than by reason of the preceding Articles of this Agreement, an item of income:

    a) is exempt from tax; or

    b) is taxable in the hands of a taxpayer but that is subject to a rate of tax that is lower than the rate applicable to an equivalent item that is taxable in the hands of similar taxpayers who are residents of that State; or

    c) benefits from a credit, rebate or other concession or benefit that is provided directly or indirectly in relation to that item of income, other than a credit for foreign tax paid."

*Anti-abuse rules dealing with source taxation of specific types of income*

21.4 The following provision has the effect of denying the benefits of specific Articles of the convention that restrict source taxation where transactions have been entered into for the main purpose of obtaining these benefits. The Articles concerned are 10, 11, 12 and 21; the provision should be slightly modified as indicated below to deal with the specific type of income covered by each of these Articles:

"The provisions of this Article shall not apply if it was the main purpose or one of the main purposes of any person concerned with the creation or assignment of the [Article 10: "shares or other rights"; Article 11: "debt-claim"; Articles 12 and 21: "rights"] in

© Copyright 2021 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 1 Nov. 2021 by isabelle.farrar@ropesgray.com.

respect of which the [Article 10: "dividend"; Article 11: "interest"; Articles 12 "royalties" and Article 21: "income"] is paid to take advantage of this Article by means of that creation or assignment."

*Provisions which are aimed at preferential regimes introduced after the signature of the convention*

21.5 States may wish to prevent abuses of their conventions involving provisions introduced by a Contracting State after the signature of the Convention. The following provision aims to protect a Contracting State from having to give treaty benefits with respect to income benefiting from a special regime for certain offshore income introduced after the signature of the treaty:

"The benefits of Articles 6 to 22 of this Convention shall not accrue to persons entitled to any special tax benefit under:

a)  a law of either one of the States which has been identified in an exchange of notes between the States; or

b)  any substantially similar law subsequently enacted."

22. Other forms of abuse of tax treaties (e.g. the use of a base company) and possible ways to deal with them, including "substance-over-form", "economic substance" and general anti-abuse rules have also been analysed, particularly as concerns the question of whether these rules conflict with tax treaties, which is the second question mentioned in paragraph 9.1 above.

22.1 Such rules are part of the basic domestic rules set by domestic tax laws for determining which facts give rise to a tax liability; these rules are not addressed in tax treaties and are therefore not affected by them. Thus, as a general rule and having regard to paragraph 9.5, there will be no conflict. For example, to the extent that the application of the rules referred to in paragraph 22 results in a recharacterisation of income or in a redetermination of the taxpayer who is considered to derive such income, the provisions of the Convention will be applied taking into account these changes.

22.2 Whilst these rules do not conflict with tax conventions, there is agreement that Member countries should carefully observe the specific obligations enshrined in tax treaties to relieve double taxation as long as there is no clear evidence that the treaties are being abused.

23. The use of base companies may also be addressed through controlled foreign companies provisions. A significant number of Member and non-member countries have now adopted such legislation. Whilst the design of this type of legislation varies considerably among countries, a common feature of these rules, which are now internationally recognised as a legitimate instrument to protect the domestic tax base, is that they result in a Contracting State taxing its residents on income attributable to their participation in certain foreign entities. It has sometimes been argued, based on a certain interpretation of provisions of the Convention such as paragraph 1 of Article 7 and paragraph 5 of Article 10, that this common feature of controlled foreign companies legislation conflicted with these provisions. For the reasons explained in paragraphs 10.1 of the Commentary on Article 7 and 37 of the Commentary on Article 10, that interpretation does not accord with the text of the provisions. It also does not hold when these provisions are read in their context. Thus, whilst some countries have felt it useful to expressly clarify, in their conventions, that controlled foreign companies legislation did not conflict with the Convention, such clarification is not necessary. It is recognised that controlled foreign companies legislation structured in this way is not contrary to the provisions of the Convention.

24-25. [Deleted]

26. States that adopt controlled foreign companies provisions or the anti-abuse rules referred to above in their domestic tax laws seek to maintain the equity and neutrality of these laws in an international environment characterised by very different tax burdens, but such measures should be used only for this purpose. As a general rule, these measures should not be applied where the relevant income has been subjected to taxation that is comparable to that in the country of residence of the taxpayer.

**Remittance based taxation**

26.1 Under the domestic law of some States, persons who qualify as residents but who do not have what is considered to be a permanent link with the State (sometimes referred to as domicile) are only taxed on income derived from sources outside the State to the extent that this income is effectively repatriated, or remitted, thereto. Such persons are not, therefore, subject to potential double taxation to the extent that foreign income is not remitted to their State of residence and it may be considered inappropriate to give them the benefit of the provisions of the Convention on such income. Contracting States which agree to restrict the application of the provisions of the Convention to income that is effectively taxed in the hands of these persons may do so by adding the following provision to the Convention:

"Where under any provision of this Convention income arising in a Contracting State is relieved in whole or in part from tax in that State and under the law in force in the other Contracting State a person, in respect of the said income, is subject to tax by reference to the amount thereof which is remitted to or received in that other State and not by reference to the full amount thereof, then any relief provided by the provisions of this Convention shall apply only to so much of the income as is taxed in the other Contracting State."

In some States, the application of that provision could create administrative difficulties if a substantial amount of time elapsed between the time the income arose in a Contracting State and the time it were taxed by the other Contracting State in the hands of a resident of that other State. States concerned by these difficulties could subject the rule in the last part of the above provision, i.e. that the income in question will be entitled to benefits in the first-mentioned State only when taxed in the other State, to the condition that the income must be so taxed in that other State within a specified period of time from the time the income arises in the first-mentioned State.

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 1 Nov. 2021 by isabelle.farrar@ropesgray.com.

**Limitations of source taxation: procedural aspects**

26.2 A number of Articles of the Convention limit the right of a State to tax income derived from its territory. As noted in paragraph 19 of the Commentary on Article 10 as concerns the taxation of dividends, the Convention does not settle procedural questions and each State is free to use the procedure provided in its domestic law in order to apply the limits provided by the Convention. A State can therefore automatically limit the tax that it levies in accordance with the relevant provisions of the Convention, subject to possible prior verification of treaty entitlement, or it can impose the tax provided for under its domestic law and subsequently refund the part of that tax that exceeds the amount that it can levy under the provisions of the Convention. As a general rule, in order to ensure expeditious implementation of taxpayers' benefits under a treaty, the first approach is the highly preferable method. If a refund system is needed, it should be based on observable difficulties in identifying entitlement to treaty benefits. Also, where the second approach is adopted, it is extremely important that the refund be made expeditiously, especially if no interest is paid on the amount of the refund, as any undue delay in making that refund is a direct cost to the taxpayer.

**Observations on the Commentary**

27. [Deleted]

27.1 The *Netherlands* will adhere to the conclusions on the application of the Convention to partnerships incorporated in the Commentary on Article 1 and in the Commentaries on the other relevant provisions of the Convention only, and to the extent to which, it is explicitly so confirmed in a specific tax treaty, as a result of mutual agreement between competent authorities as meant in Article 25 of the Convention or as unilateral policy.

27.2 *France* has expressed a number of reservations on the report on "The Application of the OECD Model Tax Convention to Partnerships". In particular, France does not agree with the interpretation put forward in paragraph 5 and 6 above according to which if a partnership is denied the benefits of a tax convention, its members are entitled to the benefits of the tax conventions entered into by their State of residence. France believes that this result is only possible, to a certain extent, if provisions to that effect are included in the convention entered into with the State where the partnership is situated. This view is also shared by *Mexico* .

27.3 *Portugal* , where all partnerships are taxed as such, has expressed a number of reservations on the report on "The Application of the OECD Model Tax Convention to Partnerships" and considers that the solutions put forward in that report should be incorporated in special provisions only applicable when included in tax conventions. This is the case, for example, of the treatment of the situation of partners of partnerships - a concept which is considerably fluid given the differences between States - that are fiscally transparent, including the situation where a third State is inserted between the State of source and the State of residence of the partners. The administrative difficulties resulting from some of the solutions put forward should also be noted, as indicated in the report itself in certain cases.

27.4 *Belgium* cannot share the views expressed in paragraph 23 of the Commentary. Belgium considers that the application of controlled foreign companies legislation is contrary to the provisions of paragraph 7 of Article 5, paragraph 1 of Article 7 and paragraph 5 of Article 10 of the Convention. This is especially the case where a Contracting State taxes one of its residents on income derived by a foreign entity by using a fiction attributing to that resident, in proportion to his participation in the capital of the foreign entity, the income derived by that entity. By doing so, that State increases the tax base of its resident by including in it income which has not been derived by that resident but by a foreign entity which is not taxable in that State in accordance with the Convention. That Contracting State thus disregards the legal personality of the foreign entity and therefore acts contrary to the Convention (see also paragraph 40.1 of the Commentary on Article 7 and paragraph 68.1 of the Commentary on Article 10).

27.5 Concerning potential conflicts between anti-abuse provisions (including controlled foreign company - CFC - provisions) in domestic law and the provisions of tax treaties, *Ireland* considers that it is not possible to have a simple general conclusion that no conflict will exist or that any conflict must be resolved in favour of the domestic law. This will depend on the nature of the domestic tax provision and also on the legal and constitutional relationship in individual member countries between domestic law and international agreements and law. Also, Ireland does not agree with the deletion of the language in paragraph 26 (as it read until 2002), which stated: "It would be contrary to the general principles underlying the Model Convention and to the spirit of tax treaties in general if countearcing measures were to be extended to activities such as production, normal rendering of services or trading of companies engaged in real industrial or commercial activity, when they are clearly related to the economic environment of the country where they are resident in a situation where these activities are carried out in such a way that no tax avoidance could be suspected".

27.6 *Luxembourg* does not share the interpretation in paragraphs 9.2, 22.1 and 23 which provide that there is generally no conflict between anti-abuse provisions of the domestic law of a Contracting State and the provisions of its tax conventions. Absent an express provision in the Convention, Luxembourg therefore believes that a State can only apply its domestic anti-abuse provisions in specific cases after recourse to the mutual agreement procedure.

27.7 The *Netherlands* does not adhere to the statements in the Commentaries that as a general rule domestic anti-avoidance rules and controlled foreign companies provisions do not conflict with the provisions of tax conventions. The compatibility of such rules and provisions with tax treaties is, among other things, dependent on the nature and wording of the specific provision, the wording and purpose of the relevant treaty provision and the relationship between domestic and international law in a country. Since tax conventions are not me27.8 ant to facilitate the improper use thereof, the application of national

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

rules and provisions may be justified in specific cases of abuse or clearly unintended use. In such situations the application of domestic measures has to respect the principle of proportionality and should not go beyond what is necessary to prevent the abuse or the clearly unintended use.

27.8 Whenever the prevailing hierarchy of tax conventions regarding internal law is not respected, *Portugal* will not adhere to the conclusions on the clarification of domestic anti-abuse rules incorporated in the Commentary on Article 1.

27.9 *Switzerland* does not share the view expressed in paragraph 7 according to which the purpose of double taxation conventions is to prevent tax avoidance and evasion. Also, this view seems to contradict the footnote to the Title of the Model Tax Convention. With respect to paragraph 22.1, Switzerland believes that domestic tax rules on abuse of tax conventions must conform to the general provisions of tax conventions, especially where the convention itself includes provisions intended to prevent its abuse. With respect to paragraph 23, Switzerland considers that controlled foreign corporation legislation may, depending on the relevant concept, be contrary to the spirit of Article 7.

**Reservation on the Article**

28. The *United States* reserves the right, with certain exceptions, to tax its citizens and residents, including certain former citizens and long-term residents, without regard to the Convention.

**COMMENTARY ON ARTICLE 2**

**CONCERNING TAXES COVERED BY THE CONVENTION**

1. This Article is intended to make the terminology and nomenclature relating to the taxes covered by the Convention more acceptable and precise, to ensure identification of the Contracting States' taxes covered by the Convention, to widen as much as possible the field of application of the Convention by including, as far as possible, and in harmony with the domestic laws of the Contracting States, the taxes imposed by their political subdivisions or local authorities, to avoid the necessity of concluding a new convention whenever the Contracting States' domestic laws are modified, and to ensure for each Contracting State notification of significant changes in the taxation laws of the other State.

*Paragraph 1*

2. This paragraph defines the scope of application of the Convention: taxes on income and on capital; the term "direct taxes" which is far too imprecise has therefore been avoided. It is immaterial on behalf of which authorities such taxes are imposed; it may be the State itself or its political subdivisions or local authorities (constituent States, regions, provinces, *départements* , cantons, districts, *arrondissements* , *Kreise* , municipalities or groups of municipalities, etc.). The method of levying the taxes is equally immaterial: by direct assessment or by deduction at the source, in the form of surtaxes or surcharges, or as additional taxes *(centimes additionnels* ), etc.

*Paragraph 2*

3. This paragraph gives a definition of taxes on income and on capital. Such taxes comprise taxes on total income and on elements of income, on total capital and on elements of capital. They also include taxes on profits and gains derived from the alienation of movable or immovable property, as well as taxes on capital appreciation. Finally, the definition extends to taxes on the total amounts of wages or salaries paid by undertakings ("payroll taxes"; in Germany, *"Lohnsummensteuer"* ; in France, *"taxe sur les salaires"* ). Social security charges, or any other charges paid where there is a direct connection between the levy and the individual benefits to be received, shall not be regarded as "taxes on the total amount of wages".

4. Clearly a State possessing taxing powers - and it alone - may levy the taxes imposed by its legislation together with any duties or charges accessory to them: increases, costs, interest, etc. It has not been considered necessary to specify this in the Article, as it is obvious that in the levying of the tax the accessory duties or charges depend on the same rule as the principal duty. Practice among Member countries varies with respect to the treatment of interest and penalties. Some countries never treat such items as taxes covered by the Article. Others take the opposite approach, especially in cases where the additional charge is computed with reference to the amount of the underlying tax. Countries are free to clarify this point in their bilateral negotiations.

5. The Article does not mention "ordinary taxes" or "extraordinary taxes". Normally, it might be considered justifiable to include extraordinary taxes in a model convention, but experience has shown that such taxes are generally imposed in very special circumstances. In addition, it would be difficult to define them. They may be extraordinary for various reasons; their imposition, the manner in which they are levied, their rates, their objects, etc. This being so, it seems preferable not to include extraordinary taxes in the Article. But, as it is not intended to exclude extraordinary taxes from all conventions, ordinary taxes have not been mentioned either. The Contracting States are thus free to restrict the convention's field of application to ordinary taxes, to extend it to extraordinary taxes, or even to establish special provisions.

*Paragraph 3*

6. This paragraph lists the taxes in force at the time of signature of the Convention. The list is not exhaustive. It serves to illustrate the preceding paragraphs of the Article. In principle, however, it will be a complete list of taxes imposed in each State at the time of signature and covered by the Convention.

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 1 Nov. 2021 by isabelle.farrar@ropesgray.com.

16. The *Czech Republic* , *Finland, Hungary, Mexico, Norway,* and *Switzerland* reserve the right not to insert paragraph 2 in their conventions. The Czech Republic, however, is prepared in the course of negotiations to accept this paragraph and at the same time to add a third paragraph limiting the potential corresponding adjustment to bona fide cases.

17. With respect to paragraph 2, *Belgium* , *France, Hungary Poland* and *Portugal* reserve the right to specify in their conventions that they will proceed to a correlative adjustment if they consider this adjustment to be justified.

18. *Australia* reserves the right to propose a provision to the effect that, if the information available to the competent authority of a Contracting State is inadequate to determine the profits to be attributed to an enterprise, the competent authority may apply to that enterprise for that purpose the provisions of the taxation law of that State, subject to the qualification that such law will be applied, as far as the information available to the competent authority permits, in accordance with the principles of this Article.

19. *Canada* reserves the right not to insert paragraph 2 in its conventions unless the commitment to make an adjustment is subject to certain time limitations and does not apply in the case of fraud, wilful default or neglect.

## COMMENTARY ON ARTICLE 10

## CONCERNING THE TAXATION OF DIVIDENDS

I. Preliminary remarks

1. By "dividends" is generally meant the distribution of profits to the shareholders by companies limited by shares,[1] limited partnerships with share capital[2] limited liability companies[3] or other joint stock companies.[4] Under the laws of the OECD Member countries, such joint stock companies are legal entities with a separate juridical personality distinct from all their shareholders. On this point, they differ from partnerships insofar as the latter do not have juridical personality in most countries.

2. The profits of a business carried on by a partnership are the partners' profits derived from their own exertions; for them they are business profits. So the partner is ordinarily taxed personally on his share of the partnership capital and partnership profits.

3. The position is different for the shareholder; he is not a trader and the company's profits are not his; so they cannot be attributed to him. He is personally taxable only on those profits which are distributed by the company (apart from the provisions in certain countries' laws relating to the taxation of undistributed profits in special cases). From the shareholders' standpoint, dividends are income from the capital which they have made available to the company as its shareholders.

II. **Commentary on the provisions of the Article**

*Paragraph 1*

4. Paragraph 1 does not prescribe the principle of taxation of dividends either exclusively in the State of the beneficiary's residence or exclusively in the State of which the company paying the dividends is a resident.

5. Taxation of dividends exclusively in the State of source is not acceptable as a general rule. Furthermore, there are some States which do not have taxation of dividends at the source, while as a general rule, all the States tax residents in respect of dividends they receive from non-resident companies.

6. On the other hand, taxation of dividends exclusively in the State of the beneficiary's residence is not feasible as a general rule. It would be more in keeping with the nature of dividends, which are investment income, but it would be unrealistic to suppose that there is any prospect of it being agreed that all taxation of dividends at the source should be relinquished.

7. For this reason, paragraph 1 states simply that dividends may be taxed in the State of the beneficiary's residence. The term "paid" has a very wide meaning, since the concept of payment means the fulfilment of the obligation to put funds at the disposal of the shareholder in the manner required by contract or by custom.

8. The Article deals only with dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State. It does not, therefore, apply to dividends paid by a company which is a resident of a third State or to dividends paid by a company which is a resident of a Contracting State which are attributable to a permanent establishment which an enterprise of that State has in the other Contracting State (for these cases, cf. paragraphs 4 to 6 of the Commentary on Article 21).

*Paragraph 2*

9. Paragraph 2 reserves a right to tax to the State of source of the dividends, i.e. to the State of which the company paying the dividends is a resident; this right to tax, however, is limited considerably. The rate of tax is limited to 15 per cent, which appears to be a reasonable maximum figure. A higher rate could hardly be justified since the State of source can already tax the company's profits.

---

1    "Sociétés anonymes".
2    "Sociétés en commandite par actions".
3    "Sociétés à responsabilité limitée".
4    "Sociétés de capitaux".

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.                                                                              64

10. On the other hand, a lower rate (5 per cent) is expressly provided in respect of dividends paid by a subsidiary company to its parent company. If a company of one of the States owns directly a holding of at least 25 per cent in a company of the other State, it is reasonable that payments of profits by the subsidiary to the foreign parent company should be taxed less heavily to avoid recurrent taxation and to facilitate international investment. The realisation of this intention depends on the fiscal treatment of the dividends in the State of which the parent company is a resident (cf. paragraphs 49 to 54 of the Commentary on Articles 23 A and 23 B).

11. If a partnership is treated as a body corporate under the domestic laws applying to it, the two Contracting States may agree to modify subparagraph *a* ) of paragraph 2 in a way to give the benefits of the reduced rate provided for parent companies also to such partnership.

12. The requirement of beneficial ownership was introduced in paragraph 2 of Article 10 to clarify the meaning of the words "paid ... to a resident" as they are used in paragraph 1 of the Article. It makes plain that the State of source is not obliged to give up taxing rights over dividend income merely because that income was immediately received by a resident of a State with which the State of source had concluded a convention. The term "beneficial owner" is not used in a narrow technical sense, rather, it should be understood in its context and in light of the object and purposes of the Convention, including avoiding double taxation and the prevention of fiscal evasion and avoidance.

12.1 Where an item of income is received by a resident of a Contracting State acting in the capacity of agent or nominee it would be inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption merely on account of the status of the immediate recipient of the income as a resident of the other Contracting State. The immediate recipient of the income in this situation qualifies as a resident but no potential double taxation arises as a consequence of that status since the recipient is not treated as the owner of the income for tax purposes in the State of residence. It would be equally inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption where a resident of a Contracting State, otherwise than through an agency or nominee relationship, simply acts as a conduit for another person who in fact receives the benefit of the income concerned. For these reasons, the report from the Committee on Fiscal Affairs entitled "Double Taxation Conventions and the Use of Conduit Companies"[5] concludes that a conduit company cannot normally be regarded as the beneficial owner if, though the formal owner, it has, as a practical matter, very narrow powers which render it, in relation to the income concerned, a mere fiduciary or administrator acting on account of the interested parties.

12.2 Subject to other conditions imposed by the Article, the limitation of tax in the State of source remains available when an intermediary, such as an agent or nominee located in a Contracting State or in a third State, is interposed between the beneficiary and the payer but the beneficial owner is a resident of the other Contracting State (the text of the Model was amended in 1995 to clarify this point, which has been the consistent position of all Member countries). States which wish to make this more explicit are free to do so during bilateral negotiations.

13. The tax rates fixed by the Article for the tax in the State of source are maximum rates. The States may agree, in bilateral negotiations, on lower rates or even on taxation exclusively in the State of the beneficiary's residence. The reduction of rates provided for in paragraph 2 refers solely to the taxation of dividends and not to the taxation of the profits of the company paying the dividends.

14. The two Contracting States may also, during bilateral negotiations, agree to a holding percentage lower than that fixed in the Article. A lower percentage is, for instance, justified in cases where the State of residence of the parent company, in accordance with its domestic law, grants exemption to such a company for dividends derived from a holding of less than 25 per cent in a non-resident subsidiary.

15. In subparagraph *a* ) of paragraph 2, the term "capital" is used in relation to the taxation treatment of dividends, i.e. distributions of profits to shareholders. The use of this term in this context implies that, for the purposes of subparagraph *a* ), it should be used in the sense in which it is used for the purposes of distribution to the shareholder (in the particular case, the parent company).

a)   As a general rule, therefore, the term "capital" in subparagraph a) should be understood as it is understood in company law. Other elements, in particular the reserves, are not to be taken into account.

b)   Capital, as understood in company law, should be indicated in terms of par value of all shares which in the majority of cases will be shown as capital in the company's balance sheet.

c)   No account need be taken of differences due to the different classes of shares issued (ordinary shares, preference shares, plural voting shares, non-voting shares, bearer shares, registered shares, etc.), as such differences relate more to the nature of the shareholder's right than to the extent of his ownership of the capital.

d)   When a loan or other contribution to the company does not, strictly speaking, come as capital under company law but when on the basis of internal law or practice ("thin capitalisation", or assimilation of a loan to share capital), the income derived in respect thereof is treated as dividend under Article 10, the value of such loan or contribution is also to be taken as "capital" within the meaning of subparagraph *a* ).

---

5       Reproduced at page R(6)-1 of Volume II of the loose-leaf version of the OECD Model Tax Convention.

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.                    65
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

e)   In the case of bodies which do not have a capital within the meaning of company law, capital for the purpose of subparagraph *a* ) is to be taken as meaning the total of all contributions to the body which are taken into account for the purpose of distributing profits.

In bilateral negotiations, Contracting States may depart from the criterion of "capital" used in subparagraph *a* ) of paragraph 2 and use instead the criterion of "voting power".

16. Subparagraph *a* ) of paragraph 2 does not require that the company receiving the dividends must have owned at least 25 per cent of the capital for a relatively long time before the date of the distribution. This means that all that counts regarding the holding is the situation prevailing at the time material for the coming into existence of the liability to the tax to which paragraph 2 applies, i.e. in most cases the situation existing at the time when the dividends become legally available to the shareholders. The primary reason for this resides in the desire to have a provision which is applicable as broadly as possible. To require the parent company to have possessed the minimum holding for a certain time before the distribution of the profits could involve extensive inquiries. Internal laws of certain OECD Member countries provide for a minimum period during which the recipient company must have held the shares to qualify for exemption or relief in respect of dividends received. In view of this, Contracting States may include a similar condition in their conventions.

17. The reduction envisaged in subparagraph *a* ) of paragraph 2 should not be granted in cases of abuse of this provision, for example, where a company with a holding of less than 25 per cent has, shortly before the dividends become payable, increased its holding primarily for the purpose of securing the benefits of the above-mentioned provision, or otherwise, where the qualifying holding was arranged primarily in order to obtain the reduction. To counteract such manoeuvres Contracting States may find it appropriate to add to subparagraph *a* ) a provision along the following lines:

"provided that this holding was not acquired primarily for the purpose of taking advantage of this provision".

18. Paragraph 2 lays down nothing about the mode of taxation in the State of source. It therefore leaves that State free to apply its own laws and, in particular, to levy the tax either by deduction at source or by individual assessment.

19. The paragraph does not settle procedural questions. Each State should be able to use the procedure provided in its own laws. It can either forthwith limit its tax to the rates given in the Article or tax in full and make a refund (see, however, paragraph 26.2 of the Commentary on Article 1). Specific questions arise with triangular cases (see paragraph 53 of the Commentary on Article 24).

20. It does not specify whether or not the relief in the State of source should be conditional upon the dividends being subject to tax in the State of residence. This question can be settled by bilateral negotiations.

21. The Article contains no provisions as to how the State of the beneficiary's residence should make allowance for the taxation in the State of source of the dividends. This question is dealt with in Articles 23 A and 23 B.

22. Attention is drawn generally to the following case: the beneficial owner of the dividends arising in a Contracting State is a company resident of the other Contracting State; all or part of its capital is held by shareholders resident outside that other State; its practice is not to distribute its profits in the form of dividends; and it enjoys preferential taxation treatment (private investment company, base company). The question may arise whether in the case of such a company it is justifiable to allow in the State of source of the dividends the limitation of tax which is provided in paragraph 2. It may be appropriate, when bilateral negotiations are being conducted, to agree upon special exceptions to the taxing rule laid down in this Article, in order to define the treatment applicable to such companies.

*Paragraph 3*

23. In view of the great differences between the laws of OECD Member countries, it is impossible to define "dividends" fully and exhaustively. Consequently, the definition merely mentions examples which are to be found in the majority of the Member countries' laws and which, in any case, are not treated differently in them. The enumeration is followed up by a general formula. In the course of the revision of the 1963 Draft Convention, a thorough study has been undertaken to find a solution that does not refer to domestic laws. This study has led to the conclusion that, in view of the still remaining dissimilarities between Member countries in the field of company law and taxation law, it did not appear to be possible to work out a definition of the concept of dividends that would be independent of domestic laws. It is open to the Contracting States, through bilateral negotiations, to make allowance for peculiarities of their laws and to agree to bring under the definition of "dividends" other payments by companies falling under the Article.

24. The notion of dividends basically concerns distributions by companies within the meaning of subparagraph *b* ) of paragraph 1 of Article 3. Therefore the definition relates, in the first instance, to distributions of profits the title to which is constituted by shares, that is holdings in a company limited by shares (joint stock company). The definition assimilates to shares all securities issued by companies which carry a right to participate in the companies' profits without being debt-claims; such are, for example, "jouissance" shares or "jouissance" rights, founders' shares or other rights participating in profits. In bilateral conventions, of course, this enumeration may be adapted to the legal situation in the Contracting States concerned. This may be necessary in particular, as regards income from "jouissance" shares and founders' shares. On the other hand, debt-claims participating in profits do not come into this category; (cf. paragraph 19 of the Commentary on Article 11); likewise interest on convertible debentures is not a dividend.

25. Article 10 deals not only with dividends as such but also with interest on loans insofar as the lender effectively shares the risks run by the company, i.e. when repayment depends largely on the success or otherwise of the enterprise's business.

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 1 Nov. 2021 by isabelle.farrar@ropesgray.com.

Articles 10 and 11 do not therefore prevent the treatment of this type of interest as dividends under the national rules on thin capitalisation applied in the borrower's country. The question whether the contributor of the loan shares the risks run by the enterprise must be determined in each individual case in the light of all the circumstances, as for example the following:

- the loan very heavily outweighs any other contribution to the enterprise's capital (or was taken out to replace a substantial proportion of capital which has been lost) and is substantially unmatched by redeemable assets;

- the creditor will share in any profits of the company;

- repayment of the loan is subordinated to claims of other creditors or to the payment of dividends;

- the level or payment of interest would depend on the profits of the company;

- the loan contract contains no fixed provisions for repayment by a definite date.

26. The laws of many of the States put participations in a *société à responsabilité limitée* (limited liability company) on the same footing as shares. Likewise, distributions of profits by co-operative societies are generally regarded as dividends.

27. Distributions of profits by partnerships are not dividends within the meaning of the definition, unless the partnerships are subject, in the State where their place of effective management is situated, to a fiscal treatment substantially similar to that applied to companies limited by shares (for instance, in Belgium, Portugal and Spain, also in France as regards distributions to *commanditaires* in the *sociétés en commandite simple*). On the other hand, clarification in bilateral conventions may be necessary in cases where the taxation law of a Contracting State gives the owner of holdings in a company a right to opt, under certain conditions, for being taxed as a partner of a partnership, or, vice versa, gives the partner of a partnership the right to opt for taxation as the owner of holdings in a company.

28. Payments regarded as dividends may include not only distributions of profits decided by annual general meetings of shareholders, but also other benefits in money or money's worth, such as bonus shares, bonuses, profits on a liquidation and disguised distributions of profits. The reliefs provided in the Article apply so long as the State of which the paying company is a resident taxes such benefits as dividends. It is immaterial whether any such benefits are paid out of current profits made by the company or are derived, for example, from reserves, i.e. profits of previous financial years. Normally, distributions by a company which have the effect of reducing the membership rights, for instance, payments constituting a reimbursement of capital in any form whatever, are not regarded as dividends.

29. The benefits to which a holding in a company confer entitlement are, as a general rule, available solely to the shareholders themselves. Should, however, certain of such benefits be made available to persons who are not shareholders within the meaning of company law, they may constitute dividends if:

- the legal relations between such persons and the company are assimilated to a holding in a company ("concealed holdings") and

- the persons receiving such benefits are closely connected with a shareholder; this is the case, for example, where the recipient is a relative of the shareholder or is a company belonging to the same group as the company owning the shares.

30. When the shareholder and the person receiving such benefits are residents of two different States with which the State of source has concluded conventions, differences of views may arise as to which of these conventions is applicable. A similar problem may arise when the State of source has concluded a convention with one of the States but not with the other. This, however, is a conflict which may affect other types of income, and the solution to it can be found only through an arrangement under the mutual agreement procedure.

*Paragraph 4*

31. Certain States consider that dividends, interest and royalties arising from sources in their territory and payable to individuals or legal persons who are residents of other States fall outside the scope of the arrangement made to prevent them from being taxed both in the State of source and in the State of the beneficiary's residence when the beneficiary has a permanent establishment in the former State. Paragraph 4 is not based on such a conception which is sometimes referred to as "the force of attraction of the permanent establishment". It does not stipulate that dividends flowing to a resident of a Contracting State from a source situated in the other State must, by a kind of legal presumption, or fiction even, be related to a permanent establishment which that resident may have in the latter State, so that the said State would not be obliged to limit its taxation in such a case. The paragraph merely provides that in the State of source the dividends are taxable as part of the profits of the permanent establishment there owned by the beneficiary which is a resident of the other State, if they are paid in respect of holdings forming part of the assets of the permanent establishment or otherwise effectively connected with that establishment. In that case, paragraph 4 relieves the State of source of the dividends from any limitations under the Article. The foregoing explanations accord with those in the Commentary on Article 7.

32. It has been suggested that the paragraph could give rise to abuses through the transfer of shares to permanent establishments set up solely for that purpose in countries that offer preferential treatment to dividend income. Apart from the fact that such abusive transactions might trigger the application of domestic anti-abuse rules, it must be recognised that a particular location can only constitute a permanent establishment if a business is carried on therein and, also, that the requirement that a shareholding be "effectively connected" to such a location requires that the shareholding be genuinely connected to that business.

© Copyright 2021 IBFD: No part of this information may be reproduced or distributed without permission of IBFD. Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

*Paragraph 5*

33. The Article deals only with dividends paid by a company which is a resident of a Contracting State to a resident of the other State. Certain States, however, tax not only dividends paid by companies resident therein but even distributions by non-resident companies of profits arising within their territory. Each State, of course, is entitled to tax profits arising in its territory which are made by non-resident companies, to the extent provided in the Convention (in particular in Article 7). The shareholders of such companies should not be taxed as well at any rate, unless they are residents of the State and so naturally subject to its fiscal sovereignty.

34. Paragraph 5 rules out the extra-territorial taxation of dividends, i.e. the practice by which States tax dividends distributed by a non-resident company solely because the corporate profits from which the distributions are made originated in their territory (for example, realised through a permanent establishment situated therein). There is, of course, no question of extra-territorial taxation when the country of source of the corporate profits taxes the dividends because they are paid to a shareholder who is a resident of that State or to a permanent establishment situated in that State.

35. Moreover, it can be argued that such a provision does not aim at, or cannot result in, preventing a State from subjecting the dividends to a withholding tax when distributed by foreign companies if they are cashed in its territory. Indeed, in such a case, the criterion for tax liability is the fact of the payment of the dividends, and not the origin of the corporate profits allotted for distribution. But if the person cashing the dividends in a Contracting State is a resident of the other Contracting State (of which the distributing company is a resident), he may under Article 21 obtain exemption from, or refund of, the withholding tax of the first-mentioned State. Similarly, if the beneficiary of the dividends is a resident of a third State which had concluded a double taxation convention with the State where the dividends are cashed, he may, under Article 21 of that convention, obtain exemption from, or refund of, the withholding tax of the last-mentioned State.

36. Paragraph 5 further provides that non-resident companies are not to be subjected to special taxes on undistributed profits.

37. It might be argued that where the taxpayer's country of residence, pursuant to its controlled foreign companies legislation or other rules with similar effect seeks to tax profits which have not been distributed, it is acting contrary to the provisions of paragraph 5. However, it should be noted that the paragraph is confined to taxation at source and, thus, has no bearing on the taxation at residence under such legislation or rules. In addition, the paragraph concerns only the taxation of the company and not that of the shareholder.

38. The application of such legislation or rules may, however, complicate the application of Article 23. If the income were attributed to the taxpayer then each item of the income would have to be treated under the relevant provisions of the Convention (business profits, interest, royalties). If the amount is treated as a deemed dividend then it is clearly derived from the base company thus constituting income from that company's country. Even then, it is by no means clear whether the taxable amount is to be regarded as a dividend within the meaning of Article 10 or as "other income" within the meaning of Article 21. Under some of these legislation or rules the taxable amount is treated as a dividend with the result that an exemption provided for by a tax convention, e.g. an affiliation exemption, is also extended to it. It is doubtful whether the Convention requires this to be done. If the country of residence considers that this is not the case it may face the allegation that it is obstructing the normal operation of the affiliation exemption by taxing the dividend (in the form of "deemed dividend") in advance.

39. Where dividends are actually distributed by the base company, the provisions of a bilateral convention regarding dividends have to be applied in the normal way because there is dividend income within the meaning of the convention. Thus, the country of the base company may subject the dividend to a withholding tax. The country of residence of the shareholder will apply the normal methods for the elimination of double taxation (i.e. tax credit or tax exemption is granted). This implies that the withholding tax on the dividend should be credited in the shareholder's country of residence, even if the distributed profit (the dividend) has been taxed years before under controlled foreign companies legislation or other rules with similar effect. However, the obligation to give credit in that case remains doubtful. Generally the dividend as such is exempted from tax (as it was already taxed under the relevant legislation or rules) and one might argue that there is no basis for a tax credit. On the other hand, the purpose of the treaty would be frustrated if the crediting of taxes could be avoided by simply anticipating the dividend taxation under counteracting legislation. The general principle set out above would suggest that the credit should be granted, though the details may depend on the technicalities of the relevant legislation or rules) and the system for crediting foreign taxes against domestic tax, as well as on the particularities of the case (e.g. time lapsed since the taxation of the "deemed dividend"). However, taxpayers who have recourse to artificial arrangements are taking risks against which they cannot fully be safeguarded by tax authorities.

III. **Effects of special features of the domestic tax laws of certain countries**

40. Certain countries' laws seek to avoid or mitigate economic double taxation i.e. the simultaneous taxation of the company's profits at the level of the company and of the dividends at the level of the shareholder. There are various ways of achieving this:

- company tax in respect of distributed profits may be charged at a lower rate than that on retained profits;

- relief may be granted in computing the shareholder's personal tax;

- dividends may bear only one tax, the distributed profits not being taxed at the level of the company.

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

The Committee on Fiscal Affairs has examined the question whether the special features of the tax laws of the Member countries would justify solutions other than those contained in the Model Convention.

### A. *Dividends distributed to individuals*

41. In contrast to the notion of juridical double taxation, which has, generally, a quite precise meaning, the concept of economic double taxation is less certain. Some States do not accept the validity of this concept and others, more numerously, do not consider it necessary to relieve economic double taxation at the national level (dividends distributed by resident companies to resident shareholders). Consequently, as the concept of economic double taxation was not sufficiently well defined to serve as a basis for the analysis, it seemed appropriate to study the problem from a more general economic standpoint, i.e. from the point of view of the effects which the various systems for alleviating such double taxation can have on the international flow of capital. For this purpose, it was necessary to see, among other things, what distortions and discriminations the various national systems could create; but it was necessary to have regard also to the implications for States' budgets and for effective fiscal verification, without losing sight of the principle of reciprocity that underlies every convention. In considering all these aspects, it became apparent that the burden represented by company tax could not be wholly left out of account.

1. *States with the classical system*

42. The Committee has recognised that economic double taxation need not be relieved at the international level when such double taxation remains unrelieved at the national level. It therefore considers that in relations between two States with the classical system, i.e. States which do not relieve economic double taxation, the respective levels of company tax in the Contracting States should have no influence on the rate of withholding tax on the dividend in the State of source (rate limited to 15 per cent by subparagraph *b* ) of paragraph 2 of Article 10). Consequently, the solution recommended in the Model Convention remains fully applicable in the present case.

2. *States applying a split rate company tax*

43. These States levy company tax at different rates according to what the company does with its profits: the high rate is charged on any profits retained and the lower rate on those distributed.

44. None of these States, in negotiating double taxation conventions, has obtained, on the grounds of its split rate of company tax, the right to levy withholding tax of more than 15 per cent (cf. subparagraph *b)* of paragraph 2 of Article 10) on dividends paid by its companies to a shareholder who is an individual resident in the other State.

45. The Committee considered whether such a State (State B) should not be recognised as being entitled to levy withholding tax exceeding 15 per cent on dividends distributed by its companies to residents of a State with a classical system (State A), with the proviso that the excess over 15 per cent, which would be designed to offset, in relation to the shareholder concerned, the effects of the lower rate of company tax on distributed profits of companies of State B, would not be creditable against the tax payable by the shareholder in State A of which he is a resident.

46. Most Member countries considered that in State B regard should be had to the average level of company tax, and that such average level should be considered as the counterpart to the charge levied in the form of a single-rate tax on companies resident of State A. The levy by State B of an additional withholding tax not credited in State A would, moreover, create twofold discrimination: on the one hand, dividends, distributed by a company resident of State B would be more heavily taxed when distributed to residents of State A than when distributed to residents of State B, and, on the other hand, the resident of State A would pay higher personal tax on his dividends from State B than on his dividends from State A. The idea of a "balancing tax" was not, therefore, adopted by the Committee.

3. *States which provide relief at the shareholder's level*

47. In these States, the company is taxed on its total profits, whether distributed or not, and the dividends are taxed in the hands of the resident shareholder (an individual); the latter, however, is entitled to relief, usually as a tax credit against his personal tax, on the grounds that - in the normal course at least - the dividend has borne company tax as part of the company's profits.

48. Internal law of these States does not provide for the extension of the tax relief to the international field. Relief is allowed only to residents and only in respect of dividends of domestic sources. However, as indicated below, some States have, in some conventions, extended the right to the tax credit provided for in their legislation to residents of the other Contracting State.

49. In many States that provide relief at the shareholder's level, the resident shareholder receives a credit in recognition of the fact that the profits out of which the dividends are paid have already been taxed in the hands of the company. The resident shareholder is taxed on his dividend grossed up by the tax credit; this credit is set off against the tax payable and can possibly give rise to a refund. In some double taxation conventions, some countries that apply this system have agreed to extend the credit to shareholders who are residents of the other Contracting State. Whilst most States that have agreed to such extensions have done so on a reciprocal basis, a few countries have concluded conventions where they unilaterally extend the benefits of the credit to residents of the other Contracting State.

50. Some States that also provide relief at the shareholder's level claim that under their systems the company tax remains in its entirety a true company tax, in that it is charged by reference solely to the company's own situation, without any regard to the person and the residence of the shareholder, and in that, having been so charged, it remains appropriated to the Treasury. The

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

tax credit given to the shareholder is designed to relieve his personal tax liability and in no way constitutes an adjustment of the company's tax. No refund, therefore, is given if the tax credit exceeds that personal tax.

51. The Committee could not reach a general agreement on whether the systems of the States referred to in paragraph 50 above display a fundamental difference that could justify different solutions at the international level.

52. Some Member countries were of the opinion that such a fundamental difference does not exist. This opinion leaves room for the conclusion that the States referred to in paragraph 50 above should agree to extend the tax credit to non-resident shareholders, at least on a reciprocal basis, in the same way as some of the countries referred to in paragraph 49 above do. Such a solution tends to ensure neutrality as regards dividends distributed by companies of these countries, the same treatment being given to resident and non-resident shareholders. On the other hand, it would in relation to shareholders who are residents of a Contracting State (a State with a classical system in particular) encourage investment in a State that provides relief at the shareholder's level since residents of the first State would receive a tax credit (in fact a refund of company tax) for dividends from the other State while they do not receive one for dividends from their own country. However, these effects are similar to those which present themselves between a State applying a split rate company tax and a State with a classical system or between two States with a classical system one of which has a lower company tax rate than the other (paragraphs 42 and 43 to 46 above).

53. On the other hand, many Member countries stressed the fact that a determination of the true nature of the tax relief given under the systems of the States referred to in paragraph 50 above reveals a mere alleviation of the shareholder's personal income tax in recognition of the fact that his dividend will normally have borne company tax. The tax credit is given once and for all ( *forfaitaire* ) and is therefore not in exact relation to the actual company tax appropriate to the profits out of which the dividend is paid. There is no refund if the tax credit exceeds the personal income tax.

54. As the relief is in essence not a refund of company tax but an alleviation of the personal income tax, the extension of the relief to non-resident shareholders who are not subject to personal income tax in the countries concerned does not come into consideration. On the other hand, however, on this line of reasoning, the question whether States which provide relief at the shareholder's level should give relief against personal income tax levied from resident shareholders on foreign dividends deserves attention. In this respect it should be observed that the answer is in the affirmative if the question is looked at from the standpoint of neutrality as regards the source of the dividends; otherwise, residents of these States will be encouraged to acquire shares in their own country rather than abroad. But such an extension of the tax credit would be contrary to the principle of reciprocity: not only would the State concerned thereby be making a unilateral budgetary sacrifice (allowing the tax credit over and above the withholding tax levied in the other State), but it would do so without receiving any economic compensation, since it would not be encouraging residents of the other State to acquire shares in its own territory.

55. To overcome these objections, it might be a conceivable proposition, amongst other possibilities, that the State of source - which will have collected company tax on dividends distributed by resident companies - should bear the cost of the tax credit that a State which provides relief at the shareholder's level would allow, by transferring funds to that State. As, however, such transfers are hardly favoured by the States this might be more simply achieved by means of a "compositional" arrangement under which the State of source would relinquish all withholding tax on dividends paid to residents of the other State, and the latter would then allow against its own tax, not the 15 per cent withholding tax (abolished in the State of source) but a tax credit similar to that which it gives on dividends of domestic source.

56. When everything is fully considered, it seems that the problem can be solved only in bilateral negotiations, where one is better placed to evaluate the sacrifices and advantages which the Convention must bring for each Contracting State.

57-58. [Deleted]

B. *Dividends distributed to companies*

59. Comments above relating to dividends paid to individuals are generally applicable to dividends paid to companies which hold less than 25 per cent of the capital of the company paying the dividends. Moreover, the Committee on Fiscal Affairs has not covered in the Commentary the special problem of dividends paid to collective investment institutions (investment companies or investment funds).

60. In respect of dividends paid to companies which hold at least 25 per cent of the capital of the company paying the dividends, the Committee has examined the incidence which the particular company taxation systems quoted in paragraphs 42 and following have on the tax treatment of dividends paid by the subsidiary.

61. Various opinions were expressed in the course of the discussion. Opinions diverge even when the discussion is limited to the taxation of subsidiaries and parent companies. They diverge still more if the discussion takes into account more general economic considerations and extends to the taxation of shareholders of the parent company.

62. In their bilateral conventions States have adopted different solutions, which were motivated by the economic objectives and the peculiarities of the legal situation of those States, by budgetary considerations, and by a whole series of other factors. Accordingly, no generally accepted principles have emerged. The Committee did nevertheless consider the situation for the more common systems of company taxation.

1. *Classical system in the State of the subsidiary*

(paragraph 42 above)

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

63. The provisions of the Convention have been drafted to apply when the State of which the distributing company is a resident has a so-called "classical" system of company taxation, namely one under which distributed profits are not entitled to any benefit at the level either of the company or of the shareholder (except for the purpose of avoiding recurrent taxation of inter-company dividends).

2. *Split-rate company tax system in the State of the subsidiary*

(paragraphs 43 to 46 above)

64. States of this kind collect company tax on distributed profits at a lower rate than on retained profits which results in a lower company tax burden on profits distributed by a subsidiary to its parent company. In view of this situation, most of these States have obtained, in their conventions, rates of tax at source of 10 or 15 per cent, and in some cases even above 15 per cent. It has not been possible in the Committee to get views to converge on this question, the solution of which is left to bilateral negotiations.

3. *Imputation system in the State of the subsidiary*

(paragraphs 47 and following)

65. In such States, a company is liable to tax on the whole of its profits, whether distributed or not; the shareholders resident of the State of which the distributing company is itself a resident are subject to tax on dividends distributed to them, but receive a tax credit in consideration of the fact that the profits distributed have been taxed at company level.

66. The question has been considered whether States of this kind should extend the benefit of the tax credit to the shareholders of parent companies resident of another State, or even to grant the tax credit directly to such parent companies. It has not been possible in the Committee to get views to converge on this question, the solution of which is left to bilateral negotiations.

67. If, in such a system, profits, whether distributed or not, are taxed at the same rate, the system is not different from a "classical" one at the level of the distributing company. Consequently, the State of which the subsidiary is a resident can only levy a tax at source at the rate provided in subparagraph *a* ) of paragraph 2.

**Observation on the Commentary**

68. *Canada* and the *United Kingdom* do not adhere to paragraph 24 above. Under their law, certain interest payments are treated as distributions, and are therefore included in the definition of dividends.

68.1 *Belgium* cannot share the views expressed in paragraph 37 of the Commentary. Belgium considers that paragraph 5 of Article 10 is a particular application of a general principle underlying various provisions of the Convention (paragraph 7 of Article 5, paragraph 1 of Article 7, and paragraphs 1 and 5 of Article 10), which is the prohibition for a contracting State, except in exceptional cases expressly provided for in the Convention, to levy a tax on the profits of a company which is a resident of the other contracting State. Paragraph 5, which deals with taxation where the income has its source, confirms this general prohibition and provides that the prohibition applies even where the undistributed profits derived by the entity that is a resident of the other contracting State arise from business carried out in the State of source. Paragraph 5 prohibits the taxation of the undistributed profits of the foreign entity even where the State where those profits arise taxes them in the hands of a resident shareholder.

68.2 With reference to paragraph 37, *Ireland* notes its general observation in paragraph 27.5 of the Commentary on Article 1.

**Reservations on the Article**

*Paragraph 2*

69. *New Zealand* reserves the right to tax, at a rate of 15 per cent, dividends paid by a company that is a resident of New Zealand for purposes of its tax.

70-71. [Deleted]

72. The *United States* reserves the right to provide that shareholders of certain pass-through entities, such as Regulated Investment Companies and Real Estate Investment Trusts, will not be granted the direct dividend investment rate, even if they would qualify based on their percentage ownership.

73. *Italy* reserves its position concerning the percentage envisaged for the holding (25 per cent) and can only agree to a rate of tax of 5 per cent for a direct holding of more than 50 per cent.

74. [Deleted]

75. *Portugal* , *Mexico* and *Turkey* reserve their positions on the rates of tax in paragraph 2.

76. *Spain* reserves its position on the rate of tax of 5 per cent and the determination of the minimum percentage for the holding.

77. *Poland* reserves its position on the minimum percentage for the holding (25 per cent) and the rates of tax (5 per cent and 15 per cent).

*Paragraph 3*

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

78. *Belgium* reserves the right to broaden the definition of dividends in paragraph 3 so as to cover expressly income-even when paid in the form of interest-which is subjected to the same taxation treatment as income from shares by its internal law.

79. *Denmark* reserves the right, in certain cases, to consider as dividends the selling price derived from the sale of shares.

80. *France* reserves the right to amplify the definition of dividends in paragraph 3 so as to cover all income subjected to the taxation treatment of distributions.

81. *Canada, Germany, Ireland* and *Spain* reserve the right to amplify the definition of dividends in paragraph 3 so as to cover certain interest payments which are treated as distributions under their domestic law.

81.1 *Portugal* reserves the right to amplify the definition of dividends in paragraph 3 so as to cover certain payments, made under profit participation arrangements, which are treated as distributions under its domestic law.

81.2 *Luxembourg* reserves the right to expand the definition of dividends in paragraph 3 in order to cover certain payments which are treated as distributions of dividends under its domestic law.

*Paragraph 4*

82. *Italy* reserves the right to subject dividends to the taxes imposed by its law whenever the recipient thereof has a permanent establishment in Italy, even if the holding on which the dividends are paid is not effectively connected with such permanent establishment.

*Paragraph 5*

83. *Canada* and the *United States* reserve the right to impose their branch tax on the earnings of a company attributable to a permanent establishment situated in these countries. Canada also reserves the right to impose this tax on profits attributable to the alienation of immovable property situated in Canada by a company carrying on a trade in immovable property.

84. [Deleted]

85. *Turkey* reserves the right to tax, in a manner corresponding to that provided by paragraph 2 of the Article, the part of the profits of a company of the other Contracting State that carries on business through a permanent establishment situated in Turkey that remains after taxation pursuant to Article 7.

## COMMENTARY ON ARTICLE 11

## CONCERNING THE TAXATION OF INTEREST

I. **Preliminary remarks**

1. "Interest" is generally taken to mean remuneration on money lent, being remuneration coming within the category of "income from movable capital" ( *revenus de capitaux mobiliers* ). Unlike dividends, interest does not suffer economic double taxation, that is, it is not taxed both in the hands of the debtor and in the hands of the creditor. Unless it is provided to the contrary by the contract, payment of the tax charged on interest falls on the recipient. If it happens that the debtor undertakes to bear any tax chargeable at the source, this is as though he had agreed to pay his creditor additional interest corresponding to such tax.

2. But, like dividends, interest on bonds or debentures or loans usually attracts tax charged by deduction at the source when the interest is paid. This method is, in fact, commonly used for practical reasons, as the tax charged at the source can constitute an advance of the tax payable by the recipient in respect of his total income or profits. If in such a case the recipient is a resident of the country which practises deduction at the source, any double taxation he suffers is remedied by internal measures. But the position is different if he is a resident of another country: he is then liable to be taxed twice on the interest, first by the State of source and then by the State of which he is a resident. It is clear that his double charge of tax can reduce considerably the interest on the money lent and so hamper the movement of capital and the development of international investment.

3. A formula reserving the exclusive taxation of interest to one State, whether the State of the beneficiary's residence or the State of source, could not be sure of receiving general approval. Therefore a compromise solution was adopted. It provides that interest may be taxed in the State of residence, but leaves to the State of source the right to impose a tax if its laws so provide, it being implicit in this right that the State of source is free to give up all taxation on interest paid to non-residents. Its exercise of this right will however be limited by a ceiling which its tax cannot exceed but, it goes without saying, the Contracting States can agree to adopt an even lower rate of taxation in the State of source. The sacrifice that the latter would accept in such conditions will be matched by a relief to be given by the State of residence, in order to take into account the tax levied in the State of source (cf. Article 23 A or 23 B).

4. Certain countries do not allow interest paid to be deducted for the purposes of the payer's tax unless the recipient also resides in the same State or is taxable in that State. Otherwise they forbid the deduction. The question whether the deduction should also be allowed in cases where the interest is paid by a resident of a Contracting State to a resident of the other State, is dealt with in paragraph 4 of Article 24.

II. **Commentary on the provisions of the Article**

*Paragraph 1*

© Copyright 2021 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 1 Nov. 2021 by isabelle.farrar@ropesgray.com.

# Exhibit 46

# Issues in International Taxation

# 2002 Reports Related to the OECD Model Tax Convention



OECD

**No. 8**

Issues in International Taxation

# 2002 Reports Related to the OECD Model Tax Convention

## No. 8



OECD

ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT

Case 1:18-md-02865-LAK   Document 808-18   Filed 05/12/22   Page 552 of 1574

# ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT

Pursuant to Article 1 of the Convention signed in Paris on 14th December 1960, and which came into force on 30th September 1961, the Organisation for Economic Co-operation and Development (OECD) shall promote policies designed:

– to achieve the highest sustainable economic growth and employment and a rising standard of living in member countries, while maintaining financial stability, and thus to contribute to the development of the world economy;

– to contribute to sound economic expansion in member as well as non-member countries in the process of economic development; and

– to contribute to the expansion of world trade on a multilateral, non-discriminatory basis in accordance with international obligations.

The original member countries of the OECD are Austria, Belgium, Canada, Denmark, France, Germany, Greece, Iceland, Ireland, Italy, Luxembourg, the Netherlands, Norway, Portugal, Spain, Sweden, Switzerland, Turkey, the United Kingdom and the United States. The following countries became members subsequently through accession at the dates indicated hereafter: Japan (28th April 1964), Finland (28th January 1969), Australia (7th June 1971), New Zealand (29th May 1973), Mexico (18th May 1994), the Czech Republic (21st December 1995), Hungary (7th May 1996), Poland (22nd November 1996), Korea (12th December 1996) and the Slovak Republic (14th December 2000). The Commission of the European Communities takes part in the work of the OECD (Article 13 of the OECD Convention).

*Publié en français sous le titre*:

**Rapports de 2002 relatifs au Modèle de convention fiscale de l'OCDE**

**No.8**

© OECD 2003

Permission to reproduce a portion of this work for non-commercial purposes or classroom use should be obtained through the Centre français d'exploitation du droit de copie (CFC), 20, rue des Grands-Augustins, 75006 Paris, France, tel. (33-1) 44 07 47 70, fax (33-1) 46 34 67 19, for every country except the United States. In the United States permission should be obtained through the Copyright Clearance Center, Customer Service, (508) 750-8400, 222 Rosewood Drive, Danvers, MA 01923 USA, or CCC Online: *www.copyright.com*. All other applications for permission to reproduce or translate all or part of this book should be made to OECD Publications, 2, rue André-Pascal, 75775 Paris Cedex 16, France.

*PART I*

**RESTRICTING THE ENTITLEMENT TO TREATY BENEFITS**

# RESTRICTING THE ENTITLEMENT TO TREATY BENEFITS

## 1.     Introduction

1.     In April 1998, the Council of the OECD adopted the Report entitled "Harmful Tax Competition: an Emerging Global Issue" (the "1998 Report on harmful tax competition"). One of the issues for follow-up work identified in the Report was a possible restriction of the entitlement to treaty benefits.

2.     This note is the result of the work done by the Committee on Fiscal Affairs on this issue.

## 2.     Nature of the work done by the Committee

3.     Recommendation 9 of the 1998 Report on harmful tax competition read as follows:

> "that countries consider including in their tax conventions provisions aimed at restricting the entitlement to treaty benefits for entities and income covered by measures constituting harmful tax practices and consider how the existing provisions of their tax conventions can be applied for the same purpose; that the Model Tax Convention be modified to include such provisions or clarifications as are needed in that respect."

4.     Paragraphs 119 and 120 of the Report clarified what types of provisions were envisaged:

> "119.   Various approaches have been used by countries to reduce that risk. In some cases, countries have been able to determine that the place of effective management of a subsidiary lies in the State of the parent company so as to make it a resident of that country either for domestic law or treaty purposes. In other cases, it has been possible to argue, on the basis of the facts and circumstances of the cases, that a subsidiary was managed by the parent company in such a way that the subsidiary had a permanent establishment in the country of residence of the parent company so as to be able to attribute profits of the subsidiary to that latter country. Another example involves denying companies with no real economic function treaty benefits because these companies are not considered as

beneficial owner of certain income formally attributed to them. The Committee intends to continue to examine these and other approaches to the application of the existing provisions of the Model Tax Convention, with a view to recommending appropriate clarification to the Model Tax Convention.

120.     There are, however, a number of additional provisions, such as limitation of benefits rules, which have been included in some tax treaties to specifically restrict access to their benefits. The Committee has also been reviewing these provisions with a view to propose changes to the Model Tax Convention aimed at denying the tax treaty benefits to entities and income covered by practices constituting harmful tax competition. The Committee intends to continue its work in this area with a view to modify the Model Tax Convention or the Commentary so as to include such provisions that countries will be able to incorporate in their tax treaties."

5.     Based on the preceding, the work that the Committee was asked to carry out in relation to a possible restriction of the entitlement to treaty benefits dealt with the following:

– using the concepts of place of effective management and permanent establishment to reduce benefits obtained under a tax convention;

– the possible inclusion in the Model of various types of provisions aimed at ensuring that income sheltered from taxation through regimes constituting harmful tax competition do not inappropriately get the benefits of tax conventions;

– possible ways of ensuring that, where a country that is a party to a tax convention introduces measures resulting in harmful tax competition after the conclusion of the tax convention, benefits of the convention are not inappropriately granted with respect to income covered by such measures;

– the clarification of the concept of "beneficial ownership".

6.     During its work, the Committee also discussed the extent to which one possible approach to dealing with the issues described above might be through a narrowing of the concept of residence in Article 4 of the Model Tax Convention. It concluded that it would not be appropriate to make changes to Article 4 or the Commentary on that Article because:

– to do so could damage the position of persons who are legitimately entitled to treaty benefits; and

– other more effective approaches could be pursued to prevent treaty benefits claims by entities associated with regimes constituting harmful tax competition.

## 3. Use of the concepts of place of effective management and permanent establishment

### a) *Changes adopted by the Committee*

7. The Committee decided that the following changes should be made to the Commentary on Article 1 of the Model Tax Convention:

*Add the following new paragraphs 10.1 and 10.2 to the Commentary on Article 1:*

"10.1 Also, in some cases, claims to treaty benefits by subsidiary companies, in particular companies established in tax havens or benefiting from harmful preferential regimes, may be refused where careful consideration of the facts and circumstances of a case shows that the place of effective management of a subsidiary does not lie in its alleged state of residence but, rather, lies in the state of residence of the parent company so as to make it a resident of that latter state for domestic law and treaty purposes (this will be relevant where the domestic law of a state uses the place of management of a legal person, or a similar criterion, to determine its residence).

10.2 Careful consideration of the facts and circumstances of a case may also show that a subsidiary was managed in the state of residence of its parent in such a way that the subsidiary had a permanent establishment (e.g. by having a place of management) in that state to which all or a substantial part of its profits were properly attributable."

### b) *Background*

8. In some cases, countries have been able to determine, on the basis of the facts and circumstances of the cases, that the place of effective management of a subsidiary lies in the State of the parent company so as to make it a resident of that country either for domestic law or treaty purposes. In other cases, it has been possible to argue, on the basis of the facts and circumstances of the cases, that a subsidiary was managed by the parent company in such a way that the subsidiary had a permanent establishment in the country of residence of the parent company so as to be able to attribute profits of the subsidiary to that latter country.

9. Both of these approaches result in a reduction of the benefits that a taxpayer might otherwise claim under a tax convention. The Committee has considered these approaches and it emerged that some Member countries have used them in practice to resist inappropriate treaty claims, as shown by the examples below which are based on the experience of one country.

*The place of effective management of a company and thus its residence is located with its parent company*

10.     Company A is constituted under the law of Country A, a low tax jurisdiction, and is a resident of that country under its domestic tax law. All of the shares in A are owned by trust B which is constituted under the law of Country B, another low tax jurisdiction, and which is a resident of that country. Company A owns all of the shares of company C, which is a resident of Country C. The sole director of company C is Mr D, who is a resident of Country C as well. Mr D is directly and fully entitled to the property of trust B. The income of company A consists of dividends from company C, interest on loans to company C and interest on bonds issued by a Country C bank. Investigations by the Country C tax administration showed that company A had no office or personnel of its own. All contacts with the bank concerning the bonds were conducted by Mr D. Later, a sale of all the shares and loans held by company A was negotiated and conducted by Mr D.

11.     According to the Country C Supreme Court, in general it is to be assumed that the effective management of a company is exercised by its board of directors and that the place of residence of the company is congruent with the place where its board of directors exercises its duties. However, if judging from the circumstances it is to be assumed that the effective management of the company is exercised by some other person and not by the board of directors, then there may be ground to regard the place from which effective management is exercised by that other person as the place of residence of the company. In the case described above the Supreme Court concluded that company A was effectively managed in Country C by Mr D and thus the company was to be regarded as a resident of Country C, for the purposes of both Country C domestic tax law and the tax arrangement between Country C and Country A.

*A place of management and thus a permanent establishment of a subsidiary is located with its parent company*

12.     Company X is constituted under the law of Country A and is a resident of that country according to its domestic tax law. Company X acts as a captive insurance company for a multinational group of enterprises. The top holding company of the group, company Y, is a resident of Country C. The main activities of the group are conducted from the offices of company Y. Investigations by the Country C tax administration showed the following facts. Company X employs one part-time director, who has little if any knowledge of the insurance business and two "local" staff members. It occupies space in an office building, the main user of which is another member of the group. The insurance contracts between company X and the members of the group follow standardised conditions set by company Y. These contracts are reinsured with independent insurance companies, through the intermediary of an insurance broker. The reinsurance contract is negotiated and concluded by personnel from company Y, following strategies set by company Y.

13.     The Country C Court decided that, judging from the factual circumstances of the case, the place of effective management of company X was not located in Country C and company X was therefore not a resident of Country C. However, according to the Court, it was to be assumed that to a certain extent the daily management of company X was exercised at the office of company Y. The Court was of the opinion that this extent was such that it exceeded the normal amount of influence that a parent company has on its subsidiary on account of its position as shareholder. The Court therefore concluded that to the extent of that daily management a permanent establishment of company X was located with company Y in Country C.

## 4.     New provisions aimed at restricting the benefits of tax conventions

### a)     *Changes adopted by the Committee*

14.     The Committee discussed a proposal for amending the part of the Commentary on Article 1 that deals with the Improper Use of Tax Conventions. This led to the adoption of the following changes to that part of the Commentary:

> *Add the following paragraph 9.6 and replace paragraphs 10 to 21 of the Commentary on Article 1 by the following (changes to the existing text of the Commentary appear in* **bold italics** *for additions and* ~~strikethrough~~ *for deletions):*

> "9.6     The potential application of general anti-abuse provisions does **not mean that there is no need for the inclusion, in tax conventions, of specific provisions aimed at preventing particular forms of tax avoidance. Where specific avoidance techniques have been identified or where the use of such techniques is especially problematic, it will often be useful to add to the Convention provisions that focus directly on the relevant avoidance strategy. Also, this will be necessary where a State which adopts the view described in paragraph 9.2 above believes that its domestic law lacks the anti-avoidance rules or principles necessary to properly address such strategy.**

> 10.     **For instance, some forms of tax avoidance have already been expressly dealt with in the Convention,** *e.g.* by the introduction of the concept of "beneficial owner" (in Articles 10, 11, and 12) and of special provisions **such as paragraph 2 of Article 17 dealing with** ~~for~~ so-called artiste-companies ~~(paragraph 2 of Article 17)~~. Such problems are also mentioned in the Commentaries on Article 10 (paragraphs 17 and 22), Article 11 (paragraph 12) and Article 12 (paragraph 7). ~~It may be appropriate for Contracting States to agree in bilateral negotiations that any relief from tax should not apply in certain cases, or to agree that the application of the provisions of domestic laws against tax avoidance should not be affected by the Convention.~~

11.    *A further example is provided by two particularly prevalent forms of improper use of the Convention which* ~~Improper uses of the Convention~~ are discussed in two reports from the Committee on Fiscal Affairs entitled "Double Taxation Conventions and the Use of Base Companies" and "Double Taxation Conventions and the Use of Conduit Companies".[1]  As indicated in these reports, the concern expressed in paragraph 9 above has proved to be valid as there has been a growing tendency toward the use of conduit companies to obtain treaty benefits not intended by the Contracting States in their bilateral negotiations. This has led an increasing number of Member countries to implement treaty provisions (both general and specific) to counter abuse and to preserve anti-avoidance legislation in their domestic laws.

12.    *The treaty provisions that have been designed to cover these and other forms of abuse take different forms. The following are examples derived from provisions that have been incorporated in bilateral conventions concluded by Member countries.* ~~Several solutions have been considered but, for the reasons set out in the above mentioned reports, no definitive texts have been drafted, no strict recommendations as to the circumstances in which they should be applied made, and no exhaustive list of such possible counter measures given. The texts quoted below are merely intended as suggested benchmarks~~. *These provide models* that treaty negotiators might consider when searching for a solution to specific cases. In referring to them there should be taken into account:

– the fact that these provisions are not mutually exclusive and that various provisions may be needed in order to address different concerns;

– the degree to which tax advantages may actually be obtained by a particular avoidance strategy ~~conduit companies~~;

– the legal context in both Contracting States and, in particular, the extent to which domestic law already provides an appropriate response to this avoidance strategy; and

– the extent to which bona fide economic activities might be unintentionally disqualified by such provisions.

*Conduit company cases*

13.    *Many countries have attempted to deal with the issue of conduit companies and various approaches have been designed for that purpose.* One

---

1.    These two reports are reproduced in Volume II of the loose-leaf version of the OECD Model Tax Convention at pages R(5)-1 and R(6)-1.

solution ~~A solution to the problem of conduit companies~~ would be to disallow treaty benefits to a company not owned, directly or indirectly, by residents of the State of which the company is a resident. For example, such a "look-through" provision might have the following wording:

> "A company that is a resident of a Contracting State shall not be entitled to relief from taxation under this Convention with respect to any item of income, gains or profits if it is owned or controlled directly or through one or more companies, wherever resident, by persons who are not residents of a Contracting State."

Contracting States wishing to adopt such a provision may also want, in their bilateral negotiations, to determine the criteria according to which a company would be considered as owned or controlled by non-residents.

14.    The "look-through approach" ***underlying the above provision*** seems an adequate basis for treaties with countries that have no or very low taxation and where little substantive business activities would normally be carried on. Even in these cases it might be necessary to alter the provision or to substitute for it another one to safeguard bona fide business activities.

~~15.    Conduit situations can be created by the use of tax exempt (or nearly tax exempt) companies that may be distinguished by special legal characteristics. The improper use of tax treaties may then be avoided by denying the tax treaty benefits to these companies (the exclusion approach). The main cases are specific types of companies enjoying tax privileges in their State of residence giving them in fact a status similar to that of a non-resident. As such privileges are granted mostly to specific types of companies as defined in the commercial law or in the tax law of a country, the most radical solution would be to exclude such companies from the scope of the treaty. Another solution would be to insert a safeguarding clause such as the following:~~

> ~~"No provision of the Convention conferring an exemption from, or reduction of, tax shall apply to income received or paid by a company as defined under Section ... of the ... Act, or under any similar provision enacted by ... after the signature of the Convention."~~

~~The scope of this provision could be limited by referring only to specific types of income, such as dividends, interest, capital gains, or directors' fees. Under such provisions companies of the type concerned would remain entitled to the protection offered under Article 24 (non-discrimination) and to the benefits of Article 25 (mutual agreement procedure) and they would be subject to the provisions of Article 26 (exchange of information).~~

~~16. Exclusion provisions are clear and their application is simple, even though they may require administrative assistance in some instances. They are an important instrument by which a State that has created special privileges in its tax law may prevent those privileges from being used in connection with the improper use of tax treaties concluded by that State.~~

*15.* ~~17.~~ General subject-to-tax provisions provide that treaty benefits in the State of source are granted only if the income in question is subject to tax in the State of residence. This corresponds basically to the aim of tax treaties, namely to avoid double taxation. For a number of reasons, however, the Model Convention does not recommend such a general provision. Whilst this seems adequate with respect to a normal international relationship, a subject-to-tax approach might well be adopted in a typical conduit situation. A safeguarding provision of this kind could have the following wording:

> "Where income arising in a Contracting State is received by a company resident of the other Contracting State and one or more persons not resident in that other Contracting State
>
> *a*) have directly or indirectly or through one or more companies, wherever resident, a substantial interest in such company, in the form of a participation or otherwise, or
> *b)* exercise directly or indirectly, alone or together, the management or control of such company,
>
> any provision of this Convention conferring an exemption from, or a reduction of, tax shall apply only to income that is subject to tax in the last-mentioned State under the ordinary rules of its tax law."

The concept of "substantial interest" may be further specified when drafting a bilateral convention. Contracting States may express it, for instance, as a percentage of the capital or of the voting rights of the company.

*16.* *18.* The subject-to-tax approach seems to have certain merits. It may be used in the case of States with a well-developed economic structure and a complex tax law. It will, however, be necessary to supplement this provision by inserting bona fide provisions in the treaty to provide for the necessary flexibility (cf. paragraph 19 below); moreover, such an approach does not offer adequate protection against advanced tax avoidance schemes such as "stepping-stone strategies."

*17.* ~~19.~~ The approaches referred to above are in many ways unsatisfactory. They refer to the changing and complex tax laws of the Contracting States and not to the arrangements giving rise to the improper use of conventions. It has been suggested that the conduit problem be dealt with in a more straightforward way

by inserting a provision that would single out cases of improper use with reference to the conduit arrangements themselves (the channel approach). Such a provision might have the following wording:

> "Where income arising in a Contracting State is received by a company that is a resident of the other Contracting State and one or more persons who are not residents of that other Contracting State
>
> *a)* have directly or indirectly or through one or more companies, wherever resident, a substantial interest in such company, in the form of a participation or otherwise, or
>
> *b)* exercise directly or indirectly, alone or together, the management or control of such company
>
> any provision of this Convention conferring an exemption from, or a reduction of, tax shall not apply if more than 50 per cent of such income is used to satisfy claims by such persons (including interest, royalties, development, advertising, initial and travel expenses, and depreciation of any kind of business assets including those on immaterial goods and processes)."

**18** ~~20~~. A provision of this kind appears to be the only effective way of combating "stepping-stone" devices. It is found in bilateral treaties entered into by Switzerland and the United States and its principle also seems to underly the Swiss provisions against the improper use of tax treaties by certain types of Swiss companies. States that consider including a clause of this kind in their convention should bear in mind that it may cover normal business transactions and would therefore have to be supplemented by a bona fide clause.

**19.** ~~21~~. The solutions described above are of a general nature and they need to be accompanied by specific provisions to ensure that treaty benefits will be granted in bona fide cases. Such provisions could have the following wording:

> *a) General bona fide provision*
>
> "The foregoing provisions shall not apply where the company establishes that the principal purpose of the company, the conduct of its business and the acquisition or maintenance by it of the shareholding or other property from which the income in question is derived, are motivated by sound business reasons and do not have as primary purpose the obtaining of any benefits under this Convention."
>
> *b) Activity provision*
>
> "The foregoing provisions shall not apply where the company is engaged in substantive business operations in the Contracting State of which it is a resident and the relief from taxation claimed from the

other Contracting State is with respect to income that is connected with such operations."

c) *Amount of tax provision*

"The foregoing provisions shall not apply where the reduction of tax claimed is not greater than the tax actually imposed by the Contracting State of which the company is a resident."

d) *Stock exchange provision*

"The foregoing provisions shall not apply to a company that is a resident of a Contracting State if the principal class of its shares is registered on an approved stock exchange in a Contracting State or if such company is wholly owned—directly or through one or more companies each of which is a resident of the first-mentioned State— by a company which is a resident of the first-mentioned State and the principal class of whose shares is so registered."

e) *Alternative relief provision*

In cases where an anti-abuse clause refers to non-residents of a Contracting State, it could be provided that the term "shall not be deemed to include residents of third States that have income tax conventions in force with the Contracting State from which relief from taxation is claimed and such conventions provide relief from taxation not less than the relief from taxation claimed under this Convention."

These provisions illustrate possible approaches. The specific wording of the provisions to be included in a particular treaty depends on the general approach taken in that treaty and should be determined on a bilateral basis. Also, where the competent authorities of the Contracting States have the power to apply discretionary provisions, it may be considered appropriate to include an additional rule that would give the competent authority of the source country the discretion to allow the benefits of the Convention to a resident of the other State even if the resident fails to pass any of the tests described above.

**20.      Whilst the preceding paragraphs identify different approaches to deal with conduit situations, each of them deals with a particular aspect of the problem commonly referred to as "treaty shopping". States wishing to address the issue in a comprehensive way may want to consider the following example of detailed limitation-of-benefits provisions aimed at preventing persons who are not resident of either Contracting States from accessing the benefits of a Convention through the use of an entity that would otherwise qualify as a resident of one of these States, keeping in mind that adaptations may be**

necessary and that many States prefer other approaches to deal with treaty shopping:

> "1. Except as otherwise provided in this Article, a resident of a Contracting State who derives income from the other Contracting State shall be entitled to all the benefits of this Convention otherwise accorded to residents of a Contracting State only if such resident is a "qualified person" as defined in paragraph 2 and meets the other conditions of this Convention for the obtaining of such benefits.
>
> 2. A resident of a Contracting State is a qualified person for a fiscal year only if such resident is either:
>
> > a) an individual;
> >
> > b) a qualified governmental entity;
> >
> > c) a company, if
> >
> > > i) the principal class of its shares is listed on a recognised stock exchange specified in subparagraph a) or b) of paragraph 6 and is regularly traded on one or more recognized stock exchanges, or
> > >
> > > ii) at least 50 percent of the aggregate vote and value of the shares in the company is owned directly or indirectly by five or fewer companies entitled to benefits under subdivision i) of this subparagraph, provided that, in the case of indirect ownership, each intermediate owner is a resident of either Contracting State;
> >
> > d) a charity or other tax-exempt entity, provided that, in the case of a pension trust or any other organization that is established exclusively to provide pension or other similar benefits, more than 50 percent of the person's beneficiaries, members or participants are individuals resident in either Contracting State; or
> >
> > e) a person other than an individual, if:
> >
> > > i) on at least half the days of the fiscal year persons that are qualified persons by reason of subparagraph a), b) or d) or subdivision c) i) of this paragraph own, directly or indirectly, at least 50 percent of the aggregate vote and value of the shares or other beneficial interests in the person, and
> > >
> > > ii) less than 50 percent of the person's gross income for the taxable year is paid or accrued, directly or indirectly, to persons who are not residents of either Contracting State

*in the form of payments that are deductible for purposes of the taxes covered by this Convention in the person's State of residence (but not including arm's length payments in the ordinary course of business for services or tangible property and payments in respect of financial obligations to a bank, provided that where such a bank is not a resident of a Contracting State such payment is attributable to a permanent establishment of that bank located in one of the Contracting States).*

3. *a)* *A resident of a Contracting State will be entitled to benefits of the Convention with respect to an item of income, derived from the other State, regardless of whether the resident is a qualified person, if the resident is actively carrying on business in the first-mentioned State (other than the business of making or managing investments for the resident's own account, unless these activities are banking, insurance or securities activities carried on by a bank, insurance company or registered securities dealer), the income derived from the other Contracting State is derived in connection with, or is incidental to, that business and that resident satisfies the other conditions of this Convention for the obtaining of such benefits.*

   *b)* *If the resident or any of its associated enterprises carries on a business activity in the other Contracting State which gives rise to an item of income, subparagraph a) shall apply to such item only if the business activity in the first-mentioned State is substantial in relation to business carried on in the other State. Whether a business activity is substantial for purposes of this paragraph will be determined based on all the facts and circumstances.*

   *c)* *In determining whether a person is actively carrying on business in a Contracting State under subparagraph a), activities conducted by a partnership in which that person is a partner and activities conducted by persons connected to such person shall be deemed to be conducted by such person. A person shall be connected to another if one possesses at least 50 percent of the beneficial interest in the other (or, in the case of a company, at least 50 percent of the aggregate vote and value of the company's shares) or another person possesses, directly or indirectly, at least 50 percent of the beneficial interest (or, in the case of a company, at least 50 percent of the aggregate vote and value of the company's shares) in each person. In any case, a person shall be*

*considered to be connected to another if, based on all the facts and circumstances, one has control of the other or both are under the control of the same person or persons.*

*4. Notwithstanding the preceding provisions of this Article, if a company that is a resident of a Contracting State, or a company that controls such a company, has outstanding a class of shares*

*a) which is subject to terms or other arrangements which entitle its holders to a portion of the income of the company derived from the other Contracting State that is larger than the portion such holders would receive absent such terms or arrangements ("the disproportionate part of the income"); and*

*b) 50 percent or more of the voting power and value of which is owned by persons who are not qualified persons*

*the benefits of this Convention shall not apply to the disproportionate part of the income.*

*5. A resident of a Contracting State that is neither a qualified person pursuant to the provisions of paragraph 2 or entitled to benefits under paragraph 3 or 4 shall, nevertheless, be granted benefits of the Convention if the competent authority of that other Contracting State determines that the establishment, acquisition or maintenance of such person and the conduct of its operations did not have as one of its principal purposes the obtaining of benefits under the Convention.*

*6. For the purposes of this Article the term "recognized stock exchange" means:*

*a) in State A ……..;*

*b) in State B ……..; and*

*c) any other stock exchange which the competent authorities agree to recognize for the purposes of this Article."*

*Provisions which are aimed at entities benefiting from preferential tax regimes*

*21*. [OLD 15] *Specific types of companies enjoying tax privileges in their State of residence facilitate conduit arrangements and raise the issue of harmful tax practices.* ~~Conduit situations can be created by the use of~~ *Where* tax-exempt (or nearly tax-exempt) companies ~~that~~ may be distinguished by special legal characteristics*, the* ~~.The~~ improper use of tax treaties may ~~then~~ be avoided by denying the tax treaty benefits to these companies (the exclusion approach). ~~The main cases are specific types of companies enjoying tax privileges in their State of residence giving them in fact a status similar to that of a non resident.~~ As such privileges are granted

mostly to specific types of companies as defined in the commercial law or in the tax law of a country, the most radical solution would be to exclude such companies from the scope of the treaty. Another solution would be to insert a safeguarding clause ~~such as the following~~ *which would apply to the income received or paid by such companies and which could be drafted along the following lines:*

> "No provision of the Convention conferring an exemption from, or reduction of, tax shall apply to income received or paid by a company as defined under Section ... of the ... Act, or under any similar provision enacted by ... after the signature of the Convention."

The scope of this provision could be limited by referring only to specific types of income, such as dividends, interest, capital gains, or directors' fees. Under such provisions companies of the type concerned would remain entitled to the protection offered under Article 24 (non-discrimination) and to the benefits of Article 25 (mutual agreement procedure) and they would be subject to the provisions of Article 26 (exchange of information).

*21.1* [OLD 16]     Exclusion provisions are clear and their application is simple, even though they may require administrative assistance in some instances. They are an important instrument by which a State that has created special privileges in its tax law may prevent those privileges from being used in connection with the improper use of tax treaties concluded by that State.

*21.2     Where it is not possible or appropriate to identify the companies enjoying tax privileges by reference to their special legal characteristics, a more general formulation will be necessary. The following provision aims at denying the benefits of the Convention to entities which would otherwise qualify as residents of a Contracting State but which enjoy, in that State, a preferential tax regime restricted to foreign-held entities (i.e. not available to entities that belong to residents of that State):*

> *"Any company, trust or partnership that is a resident of a Contracting State and is beneficially owned or controlled directly or indirectly by one or more persons who are not residents of that State shall not be entitled to the benefits of this Convention if the amount of the tax imposed on the income or capital of the company, trust or partnership by that State (after taking into account any reduction or offset of the amount of tax in any manner, including a refund, reimbursement, contribution, credit or allowance to the company, trust or partnership, or to any other person) is substantially lower than the amount that would be imposed by that State  if all of the shares of the capital stock of the company or all of the interests in the trust or partnership, as the case may be, were beneficially owned by one or more residents of that State."*

*Provisions which are aimed at particular types of income*

*21.3    The following provision aims at denying the benefits of the Convention with respect to income that is subject to low or no tax under a preferential tax regime:*

> *"1.    The benefits of this Convention shall not apply to income which may, in accordance with the other provisions of the Convention, be taxed in  a Contracting State and which is derived  from activities the performance of which do not require substantial presence in that State, including :*
>
> > *a)    such activities involving banking, shipping, financing, or insurance or electronic commerce activities; or*
> > *b)    activities involving headquarter or coordination centre or similar arrangements providing company or group administration, financing or other support; or*
> > *c)    activities which give rise to passive income, such as dividends, interest and royalties*
>
> *where, under the laws or administrative practices of that State, such income is preferentially taxed and, in relation thereto, information is accorded confidential treatment that prevents the effective exchange of information.*
>
> *2.    For the purposes of paragraph 1, income is preferentially taxed in a Contracting State if, other than by reason of the preceding Articles of this Agreement, an item  of income:*
>
> > *a)    is exempt from tax; or*
> > *b)    is taxable in the hands of a taxpayer but that is subject to a rate of tax that is lower than the rate applicable to an equivalent item that is taxable in the hands of similar taxpayers who are residents of that State; or*
> > *c)    benefits from a credit, rebate or other concession or benefit that is provided directly or indirectly in relation to that item of income, other than a credit for foreign tax paid. "*

*Anti-abuse rules dealing with source taxation of specific types of income*

*21.4    The following provision has the effect of denying the benefits of specific Articles of the convention that restrict source taxation where transactions have been entered into for the main purpose of obtaining these benefits. The Articles concerned are 10, 11, 12 and 21; the provision should be slightly modified as indicated below to deal with the specific type of income covered by each of these Articles:*

> *"The provisions of this Article shall not apply if it was the main purpose or one of the main purposes of any person concerned with the creation or assignment of the [Article 10: "shares or other rights"; Article 11: "debt-claim"; Articles 12 and 21: "rights"] in respect of which the [Article 10: "dividend"; Article 11: "interest"; Articles 12 "royalties" and Article 21: "income"] is paid to take advantage of this Article by means of that creation or assignment."*

*Provisions which are aimed at preferential regimes introduced after the signature of the convention*

*21.5    States may wish to prevent abuses of their conventions involving provisions introduced by a Contracting State after the signature of the Convention. The following provision aims to protect a Contracting State from having to give treaty benefits with respect to income benefiting from a special regime for certain offshore income introduced after the signature of the treaty:*

> *"The benefits of Articles 6 to 22 of this Convention shall not accrue to persons entitled to any special tax benefit under:*
>
> > *a)    a law of either one of the States which has been identified in an exchange of notes between the States; or*
> > *b)    any substantially similar law subsequently enacted."*

## b)    Background

15.    The Committee has examined what new types of provisions for the Model Tax Convention could be appropriate to ensure that income sheltered from taxation through harmful tax regimes would not inappropriately get the benefits of tax conventions.

16.    As part of that work, several possible provisions were put forward. Several delegates advocated the inclusion of a comprehensive limitation of benefits provision. Other delegates opposed the inclusion of such a provision favouring an Article by Article approach to those provisions most likely to be abused. It was decided that these two approaches need not be alternatives and that both could be included, complementing each other in a Convention. It was also agreed that the relevant part of the Commentary on Article 1 should be redrafted to include some of the provisions put forward during the work on this issue.

**5.    Restriction of the benefits of tax conventions after the introduction of a new regime**

17.    Another issue examined by the Committee was how to ensure that, where a country that is a party to a tax convention introduces measures resulting in harmful tax competition after the conclusion of the tax convention, benefits of the convention are not inappropriately granted with respect to income covered by such measures. Consideration of the provisions put forward by delegates in relation to the previous issue revealed that most would be effective in dealing both with regimes existing at the time of entry into effect of a convention and new regimes introduced later. However such provisions might not be included in a convention where no harmful preferential regime existed at the time of conclusion of the convention.

*a)    Changes adopted by the Committee*

18.    The Committee discussed the possibility of including in the Convention a so-called "switch-over clause" in order to deal with harmful preferential regimes introduced after the signature of a convention.

19.    During that discussion, the Committee debated the merits of such a clause and examined a proposal for including such a provision in Article 23A. After discussion, it was agreed that the proposed provision should not be included in Article 23A but that the Commentary could include the suggestion to adopt such a clause and could provide an example.

20.    The Committee therefore adopted the following change to be made to the Commentary on Articles 23A and 23B:

*Add the following paragraph 31.1 to the Commentaries on Articles 23A and 23B:*

"31.1    One example where paragraph 2 could be so amended is where a State that generally adopts the exemption method considers that that method should not apply to items of income that benefit from a preferential tax treatment in the other State by reason of a tax measure that has been introduced in that State after the date of signature of the Convention. In order to include these items of income, paragraph 2 could be amended as follows:

"2.    Where a resident of a Contracting State derives an item of income which

*a*)    in accordance with the provisions of Articles 10 and 11, may be taxed in the other Contracting State, or

*b*)    in accordance with the provisions of this Convention, may be taxed in the other Contracting State but which benefits from a

preferential tax treatment in that other State by reason of a tax measure

    *i)*    that has been introduced in the other Contracting State after the date of signature of the Convention, and

    *ii)*    in respect of which that State has notified the competent authorities of the other Contracting State, before the item of income is so derived and after consultation with that other State, that this paragraph shall apply,

the first-mentioned State shall allow as a deduction from the tax on the income of that resident an amount equal to the tax paid in that other State. Such deduction shall not, however, exceed that part of the tax, as computed before the deduction is given, which is attributable to such item of income derived from that other State."

## 6.    Clarification of the concept of "beneficial ownership"

### *a)*    *Changes adopted by the Committee*

21.    The Committee adopted the following changes aimed at clarifying the meaning of "beneficial ownership" in the Commentary on Articles 10, 11 and 12:

*Replace paragraph 12 of the Commentary on Article 10 with the following new paragraphs (changes to the existing text of the Commentary appear in* **bold italics** *for additions and* ~~strikethrough~~ *for deletions):*

"***12.    The requirement of beneficial ownership was introduced in paragraph 2 of Article 10 to clarify the meaning of the words "paid...to a resident" as they are used in paragraph 1 of the Article. It makes plain that the State of source is not obliged to give up taxing rights over dividend income merely because that income was immediately received by a resident of a State with which the State of source had concluded a convention. The term "beneficial owner" is not used in a narrow technical sense, rather, it should be understood in its context and in light of the object and purposes of the Convention, including avoiding double taxation and the prevention of fiscal evasion and avoidance.***

***12.1    Where an item of income is received by a resident of a Contracting State acting in the capacity of agent or nominee it would be inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption merely on account of the status of the immediate recipient of the income as a resident of the other Contracting State. The immediate recipient of the income in this situation qualifies as a resident but no potential double taxation arises as a consequence of that status since the recipient is not treated as the owner of the income for tax purposes in the State of residence. It would***

*be equally inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption where a resident of a Contracting State, otherwise than through an agency or nominee relationship, simply acts as a conduit for another person who in fact receives the benefit of the income concerned. For these reasons, the report from the Committee on Fiscal Affairs entitled "Double Taxation Conventions and the Use of Conduit Companies"*1 *concludes that a conduit company cannot normally be regarded as the beneficial owner if, though the formal owner, it has, as a practical matter, very narrow powers which render it, in relation to the income concerned, a mere fiduciary or administrator acting on account of the interested parties.*

12.2    ~~Under paragraph 2,~~ *Subject to other conditions imposed by the Article,* the limitation of tax in the State of source *remains* ~~is not~~ available when an intermediary, such as an agent or nominee *located in a Contracting State or in a third State,* is interposed between the beneficiary and the payer *but the beneficial owner is a resident of the other Contracting State.* (The text of the Model was amended in 1995 to clarify this point, which has been the consistent position of all Member countries). States which wish to make this more explicit are free to do so during bilateral negotiations."

*Replace  paragraph 8 of the Commentary on Article 11 with the following new paragraphs:*

"*8.        The requirement of beneficial ownership was introduced in paragraph 2 of Article 11 to clarify the meaning of the words "paid to a resident" as they are used in paragraph 1 of the Article. It makes plain that the State of source is not obliged to give up taxing rights over interest income merely because that income was immediately received by a resident of a State with which the State of source had concluded a convention. The term "beneficial owner" is not used in a narrow technical sense, rather, it should be understood in its context and in light of the object and purposes of the Convention, including avoiding double taxation and the prevention of fiscal evasion and avoidance.*

*8.1        Relief or exemption in respect of an item of income is granted by the State of source to a resident of the other Contracting State to avoid in whole or in part the double taxation that would otherwise arise from the concurrent taxation of that income by the State of residence. Where an item of income is received by a resident of a Contracting State acting in the capacity of agent or*

---

1.    Reproduced at page R(6)-1 of Volume II of the loose-leaf version of the OECD Model Tax Convention.

*nominee it would be inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption merely on account of the status of the immediate recipient of the income as a resident of the other Contracting State. The immediate recipient of the income in this situation qualifies as a resident but no potential double taxation arises as a consequence of that status since the recipient is not treated as the owner of the income for tax purposes in the State of residence. It would be equally inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption where a resident of a Contracting State, otherwise than through an agency or nominee relationship, simply acts as a conduit for another person who in fact receives the benefit of the income concerned. For these reasons, the report from the Committee on Fiscal Affairs entitled "Double Taxation Conventions and the Use of Conduit Companies"[1] concludes that a conduit company cannot normally be regarded as the beneficial owner if, though the formal owner, it has, as a practical matter, very narrow powers which render it, in relation to the income concerned, a mere fiduciary or administrator acting on account of the interested parties.*

8.2     ~~Under paragraph 2,~~ *Subject to other conditions imposed by the Article,* the limitation of tax in the State of source *remains* ~~is not~~ available when an intermediary, such as an agent or nominee *located in a Contracting State or in a third State,* is interposed between the beneficiary and the payer *but the beneficial owner is a resident of the other Contracting State.* (The text of the Model was amended in 1995 to clarify this point, which has been the consistent position of all Member countries). States which wish to make this more explicit are free to do so during bilateral negotiations."

*Replace  paragraph 4 of the Commentary on Article 12 with the following new paragraphs:*

"*4.     The requirement of beneficial ownership was introduced in paragraph 1 of Article 12 to clarify how the Article applies in relation to payments made to intermediaries. It makes plain that the State of source is not obliged to give up taxing rights over royalty income merely because that income was immediately received by a resident of a State with which the State of source had concluded a convention. The term "beneficial owner" is not used in a narrow technical sense, rather, it should be understood in its context and in light of the object and purposes of the Convention, including avoiding double taxation and the prevention of fiscal evasion and avoidance.*

---

1.   Reproduced at page R(6)-1 of Volume II of the loose-leaf version of the OECD Model Tax Convention.

*4.1 Relief or exemption in respect of an item of income is granted by the State of source to a resident of the other Contracting State to avoid in whole or in part the double taxation that would otherwise arise from the concurrent taxation of that income by the State of residence. Where an item of income is received by a resident of a Contracting State acting in the capacity of agent or nominee it would be inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption merely on account of the status of the immediate recipient of the income as a resident of the other Contracting State. The immediate recipient of the income in this situation qualifies as a resident but no potential double taxation arises as a consequence of that status since the recipient is not treated as the owner of the income for tax purposes in the State of residence. It would be equally inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption where a resident of a Contracting State, otherwise than through an agency or nominee relationship, simply acts as a conduit for another person who in fact receives the benefit of the income concerned. For these reasons, the report from the Committee on Fiscal Affairs entitled "Double Taxation Conventions and the Use of Conduit Companies"[1] concludes that a conduit company cannot normally be regarded as the beneficial owner if, though the formal owner, it has, as a practical matter, very narrow powers which render it, in relation to the income concerned, a mere fiduciary or administrator acting on account of the interested parties.*

*4.2* ~~Under paragraph 1~~, *Subject to other conditions imposed by the Article*, the *limitation of* ~~exemption from~~ tax in the State of source *remains* ~~is not~~ available when an intermediary, such as an agent or nominee, is interposed between the beneficiary and the payer, ~~unless~~ *in those cases where* the beneficial owner is a resident of the other Contracting State. (The text of the Model was amended in 1995 to clarify this point, which has been the consistent position of all Member countries). States which wish to make this more explicit are free to do so during bilateral negotiations."

## b) Background

22.     The Committee discussed various options concerning the clarification of the concept of "beneficial ownership". Some delegates noted that the beneficial ownership test very much depended on the facts and circumstances of the individual case and that it was therefore difficult to develop a generally applicable definition of the concept. Most delegates still took the view that it would be useful to further clarify the concept. It was

---

1.   Reproduced at page R(6)-1 of Volume II of the loose-leaf version of the OECD Model Tax Convention.

noted that any addition to the Commentary had to be drafted in a neutral way so as to avoid inadvertent limitation of the concept.

*Meaning of beneficial owner*

23.    The Model Convention does not provide a definition of "beneficial owner". The Commentary indicates that an intermediary, such as an agent or nominee, is not the beneficial owner, but otherwise does not elaborate on the meaning of the term. In the absence of more extensive clarification the concept of beneficial ownership presents several difficulties of interpretation and application. While it is obvious that the use of the concept excludes bare legal ownership as the criterion for determining availability of treaty benefits it is less apparent what is intended to be the salient connection with a stream of income in a case where different interests in the income are held by diverse hands who might each be considered, as a matter of general law, to possess some attributes of ownership.

*Report on the use of conduit companies*

24.    Paragraph 14 *b)* of the 1987 report from the Committee on Fiscal Affairs entitled "Double Taxation Conventions and the Use of Conduit Companies"[1] discussed the application of the requirement of beneficial ownership in abuse cases:

> "The OECD has incorporated in its revised 1977 Model provisions precluding in certain cases persons not entitled to a treaty from obtaining its benefits through a "conduit company".
>
> [...]
>
> *b)*    Articles 10 to 12 of the OECD Model deny the limitation of tax in the State of source on dividends, interest and royalties if the conduit company is not its "beneficial owner". Thus the limitation is not available when, economically, it would benefit a person not entitled to it who interposed the conduit company as an intermediary between himself and the payer of the income (paragraphs 12, 8 and 4 of the Commentary to Articles 10, 11 and 12 respectively). The Commentaries mention the case of a nominee or agent. The provisions would, however, apply also to other cases where a person enters into contracts or takes over obligations under which he has a similar function to those of a nominee or an agent. Thus a conduit company can normally not be regarded as the beneficial owner if, though the formal owner of certain assets, it has very narrow powers which render it a mere fiduciary

---

1.    Reproduced at page R(6)-1 of Volume II of the loose-leaf version of the OECD Model Tax Convention.

or an administrator acting on account of the interested parties (most likely the shareholders of the conduit company). In practice, however, it will usually be difficult for the country of source to show that the conduit company is not the beneficial owner. The fact that its main function is to hold assets or rights is not itself sufficient to categorise it as a mere intermediary, although this may indicate that further examination is necessary. This examination will in any case be highly burdensome for the country of source and not even the country of residence of the conduit company may have the necessary information regarding the shareholders of the conduit company, the company's relationships to the shareholders or other interested parties or the decision-making process of the conduit company. So even an exchange of information between the country of source and the country of the conduit company may not solve the problem. It is apparently in view of these difficulties that the Commentaries on the 1977 OECD Model mentioned the possibility of defining more specifically during bilateral negotiations the treatment that should be applicable to such companies (cf. paragraph 22 of the Commentary on Article 10)."

# Exhibit 47

# 2014 UPDATE TO THE OECD MODEL TAX CONVENTION





*used for such other purposes under the laws of both States and the competent authority of the supplying State authorises such use.*

**C.    COMMENTARY**

*Commentary on Article 3*

9.    Replace paragraph 3 of the Commentary on Article 3 by the following:

3.    The term "company" means in the first place any body corporate. In addition, the term covers any other taxable unit that is treated as a body corporate ***for the purposes of the tax law of the Contracting State of which it is a resident*** ~~according to the tax laws of the Contracting State in which it is organised~~. The definition is drafted with special regard to the Article on dividends. The term "company" has a bearing only on that Article, paragraph 7 of Article 5, and Article 16.

10.    Add the following new paragraph 16 to the Commentary on Article 3:

***16.    Israel reserves the right to include a trust within the definition of a "person".***

*Commentary on Article 4*

11.    Delete the following paragraph 27 of the Commentary on Article 4:

~~27.    Canada reserves the right to use as the test for paragraph 3 the place of incorporation or organisation with respect to a company and, failing that, to deny dual resident companies the benefits under the Convention.~~

12.    Delete the following paragraph 32 of the Commentary on Article 4:

~~32.    Germany reserves the right to include a provision under which a partnership that is not a resident of a Contracting State according to the provisions of paragraph 1 is deemed to be a resident of the Contracting State where the place of its effective management is situated, but only to the extent that the income derived from the other Contracting State or the capital situated in that other State is liable to tax in the first-mentioned State.~~

13.    Add the following new paragraph 33 to the Commentary on Article 4:

***33.    Israel reserves the right to include a separate provision regarding a trust that is a resident of both Contracting States.***

14.    Add the following new paragraph 34 to the Commentary on Article 4:

***34.    Estonia reserves the right to include the place of incorporation or similar criterion in paragraph 1.***

*Commentary on Article 5*

15.    Add the following new paragraph 45.1 to the Commentary on Article 5:

***45.1    Germany, as regards sentence 3 of paragraph 17, takes the view that business activities limited to on-site planning and supervision over a construction project can only constitute a permanent establishment if they meet the requirements specified in paragraph 1 of Article 5.***

17.    ~~Germany reserves the right not to insert paragraph 2 in its conventions but is prepared in the course of negotiations to accept this paragraph based on Germany's long standing and unaltered understanding that the other Contracting State is only obliged to make an adjustment to the amount of tax to the extent that it agrees, unilaterally or in a mutual agreement procedure, with the adjustment of profits by the first-mentioned State.~~

33.    Replace paragraph 19 of the Commentary on Article 9 by the following:

19.    ***Hungary and*** Slovenia reserve~~s~~ the right to specify in paragraph 2 that a correlative adjustment will be made only if ~~it~~ ***they*** consider~~s~~ that the primary adjustment is justified.

***Commentary on Article 10***

34.    Replace paragraphs 12 to 12.2 of the Commentary on Article 10 by the following:

12.    The requirement of beneficial owner was introduced in paragraph 2 of Article 10 to clarify the meaning of the words "paid ... to a resident" as they are used in paragraph 1 of the Article. It makes plain that the State of source is not obliged to give up taxing rights over dividend income merely because that income was ~~immediately received by~~ ***paid direct to*** a resident of a State with which the State of source had concluded a convention. [*the rest of the paragraph has been moved to new paragraph 12.1*]

***12.1   Since the term "beneficial owner" was added to address potential difficulties arising from the use of the words "paid to … a resident" in paragraph 1, it was intended to be interpreted in this context and not to refer to any technical meaning that it could have had under the domestic law of a specific country (in fact, when it was added to the paragraph, the term did not have a precise meaning in the law of many countries).*** The term "beneficial owner" is ***therefore*** not used in a narrow technical sense ***(such as the meaning that it has under the trust law of many common law countries[1])***, rather, it should be understood in its context***, in particular in relation to the words "paid … to a resident",*** and in light of the object and purposes of the Convention, including avoiding double taxation and the prevention of fiscal evasion and avoidance.

_____

*[Footnote to paragraph 12.1]*

***1.    For example, where the trustees of a discretionary trust do not distribute dividends earned during a given period, these trustees, acting in their capacity as such (or the trust, if recognised as a separate taxpayer), could constitute the beneficial owners of such income for the purposes of Article 10 even if they are not the beneficial owners under the relevant trust law.***

12.~~12~~ Where an item of income is ~~received by~~ ***paid to*** a resident of a Contracting State acting in the capacity of agent or nominee it would be inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption merely on account of the status of the ~~immediate~~ ***direct*** recipient of the income as a resident of the other Contracting State. The ~~immediate~~ ***direct*** recipient of the income in this situation qualifies as a resident but no potential double taxation arises as a consequence of that status since the recipient is not treated as the owner of the income for tax purposes in the State of residence. [*the rest of the paragraph has been moved to new paragraph 12.3*]

***12.3***   It would be equally inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption where a resident of a Contracting State, otherwise than through

an agency or nominee relationship, simply acts as a conduit for another person who in fact receives the benefit of the income concerned. For these reasons, the report from the Committee on Fiscal Affairs entitled "Double Taxation Conventions and the Use of Conduit Companies"[1] concludes that a conduit company cannot normally be regarded as the beneficial owner if, though the formal owner, it has, as a practical matter, very narrow powers which render it, in relation to the income concerned, a mere fiduciary or administrator acting on account of the interested parties.

_____

*[Footnote to paragraph 12.3]*

1.    Reproduced at page R(6)-1 of Volume II of the ***full-length*** ~~loose-leaf~~ version of the OECD Model Tax Convention.

***12.4  In these various examples (agent, nominee, conduit company acting as a fiduciary or administrator), the direct recipient of the dividend is not the "beneficial owner" because that recipient's right to use and enjoy the dividend is constrained by a contractual or legal obligation to pass on the payment received to another person. Such an obligation will normally derive from relevant legal documents but may also be found to exist on the basis of facts and circumstances showing that, in substance, the recipient clearly does not have the right to use and enjoy the dividend unconstrained by a contractual or legal obligation to pass on the payment received to another person. This type of obligation would not include contractual or legal obligations that are not dependent on the receipt of the payment by the direct recipient such as an obligation that is not dependent on the receipt of the payment and which the direct recipient has as a debtor or as a party to financial transactions, or typical distribution obligations of pension schemes and of collective investment vehicles entitled to treaty benefits under the principles of paragraphs 6.8 to 6.34 of the Commentary on Article 1. Where the recipient of a dividend does have the right to use and enjoy the dividend unconstrained by a contractual or legal obligation to pass on the payment received to another person, the recipient is the "beneficial owner" of that dividend. It should also be noted that Article 10 refers to the beneficial owner of a dividend as opposed to the owner of the shares, which may be different in some cases.***

***12.5  The fact that the recipient of a dividend is considered to be the beneficial owner of that dividend does not mean, however, that the limitation of tax provided for by paragraph 2 must automatically be granted. This limitation of tax should not be granted in cases of abuse of this provision (see also paragraphs 17 and 22 below). As explained in the section on "Improper use of the Convention" in the Commentary on Article 1, there are many ways of addressing conduit company and, more generally, treaty shopping situations. These include specific anti-abuse provisions in treaties, general anti-abuse rules and substance-over-form or economic substance approaches. Whilst the concept of "beneficial owner" deals with some forms of tax avoidance (i.e. those involving the interposition of a recipient who is obliged to pass on the dividend to someone else), it does not deal with other cases of treaty shopping and must not, therefore, be considered as restricting in any way the application of other approaches to addressing such cases.***

***12.6  The above explanations concerning the meaning of "beneficial owner" make it clear that the meaning given to this term in the context of the Article must be distinguished from the different meaning that has been given to that term in the context of other instruments[1] that concern the determination of the persons (typically the individuals) that exercise ultimate control over entities or assets. That different meaning of "beneficial owner" cannot be applied in the context of the Article. Indeed, that meaning, which refers to natural persons (i.e. individuals), cannot be reconciled with the express wording of subparagraph 2 a), which refers to the situation where a company is the beneficial owner of a dividend. In the context of Article 10, the term "beneficial owner" is intended to address difficulties arising from the use of the words "paid to"***

*in relation to dividends rather than difficulties related to the ownership of the shares of the company paying these dividends. For that reason, it would be inappropriate, in the context of that Article, to consider a meaning developed in order to refer to the individuals who exercise "ultimate effective control over a legal person or arrangement."[2]*

---

*[Footnotes to paragraph 12.6]*

1. ***See, for example, Financial Action Task Force,* International Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation – The FATF Recommendations** *(OECD-FATF, Paris, 2012), which sets forth in detail the international anti-money laundering standard and which includes the following definition of beneficial owner (at page 110): "the natural person(s) who ultimately owns or controls a customer and/or the person on whose behalf a transaction is being conducted. It also incorporates those persons who exercise ultimate effective control over a legal person or arrangement." Similarly, the 2001 report of the OECD Steering Group on Corporate Governance, "Behind the Corporate Veil: Using Corporate Entities for Illicit Purposes" (OECD, Paris, 2001), defines beneficial ownership as follows (at page 14):*

   > *In this Report, "beneficial ownership" refers to ultimate beneficial ownership or interest by a natural person. In some situations, uncovering the beneficial owner may involve piercing through various intermediary entities and/or individuals until the true owner who is a natural person is found. With respect to corporations, ownership is held by shareholders or members. In partnerships, interests are held by general and limited partners. In trusts and foundations, beneficial ownership refers to beneficiaries, which may also include the settlor or founder.*

2. ***See the Financial Action Task Force's definition quoted in the previous note.***

12.7~~2~~  Subject to other conditions imposed by the Article, the limitation of tax in the State of source remains available when an intermediary, such as an agent or nominee located in a Contracting State or in a third State, is interposed between the beneficiary and the payer but the beneficial owner is a resident of the other Contracting State (the text of the Model was amended in 1995 *and in 2014* to clarify this point, which has been the consistent position of all M*m*ember countries). ~~States which wish to make this more explicit are free to do so during bilateral negotiations.~~

35.    Replace paragraph 28 of the Commentary on Article 10 by the following:

28.    Payments regarded as dividends may include not only distributions of profits decided by annual general meetings of shareholders, but also other benefits in money or money's worth, such as bonus shares, bonuses, profits on a liquidation *or redemption of shares (see paragraph 31 of the Commentary on Article 13)* and disguised distributions of profits. The reliefs provided in the Article apply so long as the State of which the paying company is a resident taxes such benefits as dividends. It is immaterial whether any such benefits are paid out of current profits made by the company or are derived, for example, from reserves, *i.e.* profits of previous financial years. Normally, distributions by a company which have the effect of reducing the membership rights, for instance, payments constituting a reimbursement of capital in any form whatever, are not regarded as dividends.

14

36.     Replace paragraph 75 of the Commentary on Article 10 by the following:

75.     *Israel, Mexico, Portugal* and *Turkey* reserve their positions on the rates of tax in paragraph 2.

37.     Add the following new paragraph 76 to the Commentary on Article 10:

*76.     Estonia reserves the right not to include the requirement for the competent authorities to settle by mutual agreement the mode of application of paragraph 2.*

38.     Add the following new paragraph 82 to the Commentary on Article 10:

*82.     Israel reserves the right to exclude payments made by a Real Estate Investment Trust which is a resident of Israel from the definition of dividends in paragraph 3 and to tax those payments according to its domestic law.*

39.     Add the following new paragraph 82.1 to the Commentary on Article 10:

*82.1    Estonia reserves the right to replace, in paragraph 3, the words "income from other corporate rights" by "income from other rights".*

***Commentary on Article 11***

40.     Replace paragraph 7.7 of the Commentary on Article 11 by the following:

7.7     The problem described in paragraph 7.1, which essentially arises because taxation by the State of source is typically levied on the gross amount of the interest and therefore ignores the real amount of income derived from the transaction for which the interest is paid, is particularly important in the case of financial institutions. For instance, a bank generally finances the loan which it grants with funds lent to it and, in particular, funds accepted on deposit. Since the State of source, in determining the amount of tax payable on the interest, will usually ignore the cost of funds for the bank, the amount of tax may prevent the transaction from occurring unless the amount of that tax is borne by the debtor. For that reason, many States provide that interest paid to a financial institution such as a bank will be exempt from any tax at source. States wishing to do so may agree to include the following ~~interest~~ in a paragraph providing *for* ~~from~~ exemption of certain interest from taxation in the State of source:

*d*)   is a financial institution;

41.     Replace paragraphs 9 to 11 of the Commentary on Article 11 by the following:

9.     The requirement of beneficial owner~~ship~~ was introduced in paragraph 2 of Article 11 to clarify the meaning of the words "paid to a resident" as they are used in paragraph 1 of the Article. It makes plain that the State of source is not obliged to give up taxing rights over interest income merely because that income was ~~immediately received~~ *paid direct to* a resident of a State with which the State of source had concluded a convention. [*the rest of the paragraph has been moved to new paragraph 9.1*]

*9.1    Since the term "beneficial owner" was added to address potential difficulties arising from the use of the words "paid to a resident" in paragraph 1, it was intended to be interpreted in this context and not to refer to any technical meaning that it could have had under the domestic law of a specific country (in fact, when it was added to the paragraph, the term did not have a precise meaning in the law of many countries).* The term "beneficial owner" is *therefore* not used in a

15

# Exhibit 48



# Model Tax Convention on Income and on Capital

**FULL VERSION**

**(as it read on 21 November 2017)**



# MODEL CONVENTION
# WITH RESPECT TO TAXES
# ON INCOME AND ON CAPITAL

# SUMMARY OF THE CONVENTION

## Title and Preamble

*Chapter I*

**SCOPE OF THE CONVENTION**

Article 1      Persons covered
Article 2      Taxes covered

*Chapter II*

**DEFINITIONS**

Article 3      General definitions
Article 4      Resident
Article 5      Permanent establishment

*Chapter III*

**TAXATION OF INCOME**

Article 6      Income from immovable property
Article 7      Business profits
Article 8      International shipping and air transport
Article 9      Associated enterprises
Article 10     Dividends
Article 11     Interest
Article 12     Royalties
Article 13     Capital gains
Article 14     [Deleted]
Article 15     Income from employment
Article 16     Directors' fees
Article 17     Entertainers and sportspersons
Article 18     Pensions
Article 19     Government service
Article 20     Students
Article 21     Other income

*Chapter IV*

**TAXATION OF CAPITAL**

Article 22     Capital

*Chapter V*

**METHODS FOR ELIMINATION OF DOUBLE TAXATION**

Article 23 A   Exemption method
Article 23 B   Credit method

*Chapter VI*

**SPECIAL PROVISIONS**

Article 24      Non-discrimination
Article 25      Mutual agreement procedure
Article 26      Exchange of information
Article 27      Assistance in the collection of taxes
Article 28      Members of diplomatic missions and consular posts
Article 29      Entitlement to benefits
Article 30      Territorial extension

*Chapter VII*

**FINAL PROVISIONS**

Article 31      Entry into force
Article 32      Termination

MODEL TAX CONVENTION (FULL VERSION) – © OECD 2019

# TITLE OF THE CONVENTION

**Convention between (State A) and (State B)**

**for the elimination of double taxation with respect to taxes on income and on capital and the prevention of tax evasion and avoidance**

# PREAMBLE TO THE CONVENTION

(State A) and (State B),

Desiring to further develop their economic relationship and to enhance their co-operation in tax matters,

Intending to conclude a Convention for the elimination of double taxation with respect to taxes on income and on capital without creating opportunities for non-taxation or reduced taxation through tax evasion or avoidance (including through treaty-shopping arrangements aimed at obtaining reliefs provided in this Convention for the indirect benefit of residents of third States),

Have agreed as follows:

## HISTORY

**The title of the Convention:** Changed on 21 November 2017, by amending the title of the Convention and removing the footnote, by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017 on the basis of another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015. In the 1963 Draft Convention (adopted

by the OECD Council on 30 July 1963) and until 21 November 2017, the title of the Convention read as follows:

> "Convention between (State A) and (State B)
> with respect to taxes on income and on capital"

After 23 July 1992 and until 21 November 2017, the footnote to the title of the Convention read as follows:

> "1  States wishing to do so may follow the widespread practice of including in the title a reference to either the avoidance of double taxation or to both the avoidance of double taxation and the prevention of fiscal evasion."

The footnote to the title of the Convention was added by the report entitled "The Revision of the Model Convention", adopted by the OECD Council on 23 July 1992.

**Preamble to the Convention:** Changed on 21 November 2017, by amending the preamble to the Convention and removing the footnote, by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015. After 23 July 1992 and until 21 November 2017, the preamble to the Convention and the footnote read as follows:

> "Preamble to the Convention[2]

> 2  The Preamble of the Convention shall be drafted in accordance with the constitutional procedure of both Contracting States."

The footnote to the preamble to the Convention was redesignated as footnote 2 (from a "Note") when footnote 1 was added to the title of the Convention by the report entitled "The Revision of the Model Convention", adopted by the OECD Council on 23 July 1992.

# Chapter I
# SCOPE OF THE CONVENTION

## ARTICLE 1
## PERSONS COVERED

1.     This Convention shall apply to persons who are residents of one or both of the Contracting States.

2.     For the purposes of this Convention, income derived by or through an entity or arrangement that is treated as wholly or partly fiscally transparent under the tax law of either Contracting State shall be considered to be income of a resident of a Contracting State but only to the extent that the income is treated, for purposes of taxation by that State, as the income of a resident of that State.

3.     This Convention shall not affect the taxation, by a Contracting State, of its residents except with respect to the benefits granted under paragraph 3 of Article 7, paragraph 2 of Article 9 and Articles 19, 20, 23 [A] [B], 24, 25 and 28.

## HISTORY

**The title of Article 1:** Changed on 21 September 1995, by replacing the title "Personal Scope" with "Persons Covered", by the report entitled "The 1995 Update to the Model Tax Convention", adopted by the OECD Council on 21 September 1995. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until 21 September 1995, the title of Article 1 read as follows:

"PERSONAL SCOPE"

**Paragraph 1:** Unchanged since the adoption of the 1963 Draft Convention by the OECD Council on 30 July 1963.

**Paragraph 2:** Added on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Neutralising the Effects of Hybrid Mismatch Arrangements, Action 2 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015.

**Paragraph 3:** Added on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, as a result of follow-up work on another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015.

# ARTICLE 2

# TAXES COVERED

1.    This Convention shall apply to taxes on income and on capital imposed on behalf of a Contracting State or of its political subdivisions or local authorities, irrespective of the manner in which they are levied.

2.    There shall be regarded as taxes on income and on capital all taxes imposed on total income, on total capital, or on elements of income or of capital, including taxes on gains from the alienation of movable or immovable property, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation.

3.    The existing taxes to which the Convention shall apply are in particular:

*a)* (in State A): ..........................................

*b)* (in State B): ..........................................

4.    The Convention shall apply also to any identical or substantially similar taxes that are imposed after the date of signature of the Convention in addition to, or in place of, the existing taxes. The competent authorities of the Contracting States shall notify each other of any significant changes that have been made in their taxation laws.

## HISTORY

**Paragraph 1:** Amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977 by substituting the words "a Contracting State" for "each Contracting State". In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 1 read as follows:

"1.    This Convention shall apply to taxes on income and on capital imposed on behalf of each Contracting State or of its political subdivisions or local authorities, irrespective of the manner in which they are levied."

**Paragraph 2:** Unchanged since the adoption of the 1963 Draft Convention by the OECD Council on 30 July 1963.

**Paragraph 3:** Amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977 by deleting the comma before "in particular" and replacing the words "In the case of (" with "(in" at the beginning of subparagraphs *a)* and *b)*. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 3 read as follows:

"3.    The existing taxes to which the Convention shall apply are, in particular:

*a)* In the case of (State A): ..........................................

*b)* In the case of (State B): .........................................."

**Paragraph 4:** Amended on 29 April 2000 by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000. In the 1977 Convention and until 29 April 2000, paragraph 4 read as follows:

"4.    The Convention shall apply also to any identical or substantially similar taxes which are imposed after the date of signature of the Convention in addition to, or in place of, the existing taxes. At the end of each year, the competent authorities of the Contracting States shall notify each other of changes which have been made in their respective taxation laws."

Paragraph 4 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 4 read as follows:

"4.    The Convention shall also apply to any identical or substantially similar taxes which are subsequently imposed in addition to, or in place of, the existing taxes. At the end of each year, the competent authorities of the Contracting States shall notify to each other any changes which have been made in their respective taxation laws."

# *Chapter II*
# **DEFINITIONS**

## **ARTICLE 3**
## **GENERAL DEFINITIONS**

1.    For the purposes of this Convention, unless the context otherwise requires:

a)  the term "person" includes an individual, a company and any other body of persons;

b)  the term "company" means any body corporate or any entity that is treated as a body corporate for tax purposes;

c)  the term "enterprise" applies to the carrying on of any business;

d)  the terms "enterprise of a Contracting State" and "enterprise of the other Contracting State" mean respectively an enterprise carried on by a resident of a Contracting State and an enterprise carried on by a resident of the other Contracting State;

e)  the term "international traffic" means any transport by a ship or aircraft except when the ship or aircraft is operated solely between places in a Contracting State and the enterprise that operates the ship or aircraft is not an enterprise of that State;

f)  the term "competent authority" means:

(i)  (in State A): ...............................

(ii)  (in State B): ...............................

g)  the term "national", in relation to a Contracting State, means:

(i)  any individual possessing the nationality or citizenship of that Contracting State; and

(ii)  any legal person, partnership or association deriving its status as such from the laws in force in that Contracting State;

h)  the term "business" includes the performance of professional services and of other activities of an independent character.

i)  the term "recognised pension fund" of a State means an entity or arrangement established in that State that is treated as a separate person under the taxation laws of that State and:

(i)  that is established and operated exclusively or almost exclusively to administer or provide retirement benefits and ancillary or incidental

benefits to individuals and that is regulated as such by that State or one of its political subdivisions or local authorities; or

*(ii)* that is established and operated exclusively or almost exclusively to invest funds for the benefit of entities or arrangements referred to in subdivision (i).

2.    As regards the application of the Convention at any time by a Contracting State, any term not defined therein shall, unless the context otherwise requires or the competent authorities agree to a different meaning pursuant to the provisions of Article 25, have the meaning that it has at that time under the law of that State for the purposes of the taxes to which the Convention applies, any meaning under the applicable tax laws of that State prevailing over a meaning given to the term under other laws of that State.

## HISTORY

**Paragraph 1:** The preamble of paragraph 1 was amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977 by replacing the words "In this Convention" with "For the purposes of this Convention". In the 1963 Draft Convention (adopted by the OECD Coun**c**il on 30 July 1963) and until the adoption of the 1977 Model Convention, the preamble of paragraph 1 read as follows:

"1.    In this Convention, unless the context otherwise requires:"

**Subparagraph a):**  Corresponds to subparagraph *b)* of the 1963 Draft Convention. On 11 April 1977 subparagraph *a)* of the 1963 Draft Convention was deleted and subparagraph *b)* was redesignated as subparagraph *a)* and amended, by replacing the word "comprises" with "includes", when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, Subparagraphs *a)* and *b)* of paragraph 1 read as follows:

*"a)*    the terms "a Contracting State" and "the other Contracting State" mean (State A) or (State B), as the context requires;.

*b)*    the term "person" comprises an individual, a company and any other body of persons;"

**Subparagraph b):** Amended on 21 September 1995, by replacing the words "entity which" with "entity that", by the report entitled "The 1995 Update to the Model Tax Convention", adopted by the OECD Council on 21 September 1995. In the 1977 Model Convention and until 21 September 1995, subparagraph *b)* of paragraph 1 read as follows:

*"b)*    the term "company" means any body corporate or any entity which is treated as a body corporate for tax purposes;"

Subparagraph *b)* of the 1977 Model Convention corresponded to subparagraph *c)* of the 1963 Draft Convention. Subparagraph *b)* of the 1963 Draft Convention was amended and redesignated as subparagraph *a)* (see history of subparagraph *a)* above) and subparagraph *c)* of the 1963 Draft Convention was redesignated as subparagraph *b)* when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977.

**Subparagraph c):** Replaced on 29 April 2000, when it was redesignated as subparagraph *d)* (see history of subparagraph *d)* below) and a new subparagraph *c)* was

added by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of the Annex of another report entitled "Issues related to Article 14 of the OECD Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 27 January 2000).

**Subparagraph d):** Corresponds to subparagraph *c)* as it read before 29 April 2000. On that date subparagraph *d)* of the 1977 Model Convention was redesignated as subparagraph *e)* (see history of subparagraph *e)* below) and subparagraph *c)* of the 1977 Model Convention was redesignated as subparagraph *d)* by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000.

Subparagraph *c)* of the 1977 Model Convention corresponded to subparagraph *d)* of the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963), which was redesignated as subparagraph *c)* when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977.

**Subparagraph e):** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017. After 29 April 2000 and until 21 November 2017, subparagraph *e)* read as follows:

> "*e)*  the term "international traffic" means any transport by a ship or aircraft operated by an enterprise that has its place of effective management in a Contracting State, except when the ship or aircraft is operated solely between places in the other Contracting State;"

Corresponds to subparagraph *d)* as it read before 29 April 2000. On that date, subparagraph *e)* was redesignated as subparagraph *f)* (see history of subparagraph *f)* below) and subparagraph *d)* was redesignated as subparagraph *e)*, by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000.

Subparagraph *d)* of the 1977 Model Convention was amended on 21 September 1995, by replacing the words "enterprise which" with the words "enterprise that", by the report entitled "The 1995 Update to the Model Tax Convention", adopted by the OECD Council on 21 September 1995. In the 1977 Model Convention and until 21 September 1995, subparagraph *d)* read as follows:

> "*d)*  the term "international traffic" means any transport by a ship or aircraft operated by an enterprise which has its place of effective management in a Contracting State, except when the ship or aircraft is operated solely between places in the other Contracting State;"

Subparagraph *d)* of the 1963 Draft Convention was replaced when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. At that time, subparagraph *d)* of the 1963 Draft Convention was redesignated subparagraph *c)* and a new subparagraph *d)* was added.

**Subparagraph f):** Corresponds to subparagraph *e)* as it read before 29 April 2000. On that date, subparagraph *f)* was redesignated as subparagraph *g)* (see history of subparagraph *g)* below) and subparagraph *e)* was redesignated as subparagraph *f)* by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000.

Subparagraph *e)* of the 1963 Draft Convention was amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, subparagraph *e)* read as follows:

"*e)*  the term "competent authority" means:

 *(i)* (in State A):

 *(ii)* (in State B):"

**Subparagraph g):** Amended on 28 January 2003 by adding the words ", in relation to a Contracting State" immediately before the word "means", by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003. After 29 April 2000 and until 28 January 2003 subparagraph *g)* read as follows:

"*g)* the term "national" means:

 *(i)* any individual possessing the nationality of a Contracting State;

 *(ii)* any legal person, partnership or association deriving its status as such from the laws in force in a Contracting State;"

Subparagraph *g)* as it read after 29 April 2000 corresponded to subparagraph *f)* as it read in the 1977 Model Convention. Subparagraph *f)* was redesignated as subparagraph *g)* by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000.

Subparagraph *f)* as it read after 23 July 1992 corresponded to paragraph 2 of Article 24 of the 1977 Model Convention. On 23 July 1992, paragraph 2 of Article 24 was amended and redesignated as subparagraph *f)* of paragraph 1 of Article 3 by the report entitled "The Revision of the Model Convention", adopted by the OECD Council on 23 July 1992. In the 1977 Model Convention and until 23 July 1992, paragraph 2 of Article 24 read as follows:

"2. The term "nationals" means:

 *a)* all individuals possessing the nationality of a Contracting State;

 *b)* all legal persons, partnerships and associations deriving their status as such from the laws in force in a Contracting State."

Paragraph 2 of Article 24 of the 1977 Model Convention was amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977, by substituting the word "laws" for "law" in subparagraph *b)*. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 2 of Article 24 read as follows:

"2. The term "nationals" means:

 *a)* all individuals possessing the nationality of a Contracting State;

 *b)* all legal persons, partnerships and associations deriving their status as such from the law in force in a Contracting State."

**Subparagraph h):** Added on 29 April 2000 by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of the Annex of another report entitled "Issues related to Article 14 of the OECD Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 27 January 2000).

**Subparagraph i):** Added on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, as a result of follow-up work on another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015.

**Paragraph 2:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017. After 21 September 1995 and until 21 November 2017, paragraph 2 read as follows:

"2.    As regards the application of the Convention at any time by a Contracting State, any term not defined therein shall, unless the context otherwise requires, have the meaning that it has at that time under the law of that State for the purposes of the taxes to which the Convention applies, any meaning under the applicable tax laws of that State prevailing over a meaning given to the term under other laws of that State."

Paragraph 2 was previously amended on 21 September 1995 by the report entitled "The 1995 Update to the Model Tax Convention", adopted by the OECD Council on 21 September 1995. In the 1977 Model Convention and until 21 September 1995, paragraph 2 read as follows:

"2.    As regards the application of the Convention by a Contracting State any term not defined therein shall, unless the context otherwise requires, have the meaning which it has under the law of that State concerning the taxes to which the Convention applies."

Paragraph 2 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 2 read as follows:

"2.    As regards the application of the Convention by a Contracting State any term not otherwise defined shall, unless the context otherwise requires, have the meaning which it has under the laws of that Contracting State relating to the taxes which are the subject of the Convention."

# ARTICLE 4

# RESIDENT

1.    For the purposes of this Convention, the term "resident of a Contracting State" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, place of management or any other criterion of a similar nature, and also includes that State and any political subdivision or local authority thereof as well as a recognised pension fund of that State. This term, however, does not include any person who is liable to tax in that State in respect only of income from sources in that State or capital situated therein.

2.    Where by reason of the provisions of paragraph 1 an individual is a resident of both Contracting States, then his status shall be determined as follows:

  *a)* he shall be deemed to be a resident only of the State in which he has a permanent home available to him; if he has a permanent home available to him in both States, he shall be deemed to be a resident only of the State with which his personal and economic relations are closer (centre of vital interests);

  *b)* if the State in which he has his centre of vital interests cannot be determined, or if he has not a permanent home available to him in either State, he shall be deemed to be a resident only of the State in which he has an habitual abode;

  *c)* if he has an habitual abode in both States or in neither of them, he shall be deemed to be a resident only of the State of which he is a national;

  *d)* if he is a national of both States or of neither of them, the competent authorities of the Contracting States shall settle the question by mutual agreement.

3.    Where by reason of the provisions of paragraph 1 a person other than an individual is a resident of both Contracting States, the competent authorities of the Contracting States shall endeavour to determine by mutual agreement the Contracting State of which such person shall be deemed to be a resident for the purposes of the Convention, having regard to its place of effective management, the place where it is incorporated or otherwise constituted and any other relevant factors. In the absence of such agreement, such person shall not be entitled to any relief or exemption from tax provided by this Convention except to the extent and in such manner as may be agreed upon by the competent authorities of the Contracting States.

## HISTORY

**The title of Article 4:** Changed when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, the title of Article 4 read as follows:

"FISCAL DOMICILE"

**Paragraph 1:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, as a result of follow-up work on another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015. After 21 September 1995 and until 21 November 2017, paragraph 1 read as follows:

"1.    For the purposes of this Convention, the term "resident of a Contracting State" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, place of management or any other criterion of a similar nature, and also includes that State and any political subdivision or local authority thereof. This term, however, does not include any person who is liable to tax in that State in respect only of income from sources in that State or capital situated therein."

Paragraph 1 was previously amended on 21 September 1995, by adding to the first sentence the words "and also includes that State and any political subdivision or local authority thereof" and by replacing in the second sentence the words "But this term" with "This term, however,", by the report entitled "The 1995 Update to the Model Tax Convention", adopted by the OECD Council on 21 September 1995. In the 1977 Model Convention and until 21 September 1995, paragraph 1 read as follows:

"1.    For the purposes of this Convention, the term "resident of a Contracting State" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, place of management or any other criterion of a similar nature. But this term does not include any person who is liable to tax in that State in respect only of income from sources in that State or capital situated therein."

Paragraph 1 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977, by the addition of the second sentence. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 1 read as follows:

"1.    For the purposes of this Convention, the term "resident of a Contracting State" means any person who, under the law of that State, is liable to taxation therein by reason of his domicile, residence, place of management or any other criterion of a similar nature."

**Paragraph 2:** Amended on 23 October 1997, by adding the word "only" after the word "resident" in the third line of subparagraph *a)* to correct an omission that was made when similar changes were made to subparagraphs *a)*, *b)* and *c)* as part of the 1995 update (see below), by the report entitled "The 1997 Update to the Model Tax Convention", adopted by the OECD Council on 23 October 1997. After 21 September 1995 and until 23 October 1997 subparagraph *a)* of paragraph 2 read as follows:

"*a)*  he shall be deemed to be a resident only of the State in which he has a permanent home available to him; if he has a permanent home available to him in both States, he shall be deemed to be a resident of the State with which his personal and economic relations are closer (centre of vital interests);"

Subparagraphs *a)*, *b)*, and *c)* were previously amended on 21 September 1995, by adding the word "only" after the word "resident" (except in the third line of subparagraph *a)*), by the report entitled "The 1995 Update to the Model Tax Convention", adopted by the OECD Council on 21 September 1995. In the 1977 Model Convention and until 21 September 1995, paragraph 2 read as follows:

"2.    Where by reason of the provisions of paragraph 1 an individual is a resident of both Contracting States, then his status shall be determined as follows:

*a)* he shall be deemed to be a resident of the State in which he has a permanent home available to him; if he has a permanent home available to him in both States, he shall be deemed to be a resident of the State with which his personal and economic relations are closer (centre of vital interests);

*b)* if the State in which he has his centre of vital interests cannot be determined, or if he has not a permanent home available to him in either State, he shall be deemed to be a resident of the State in which he has an habitual abode;

*c)* if he has an habitual abode in both States or in neither of them, he shall be deemed to be a resident of the State of which he is a national;

*d)* if he is a national of both States or of neither of them, the competent authorities of the Contracting States shall settle the question by mutual agreement."

Paragraph 2 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 2 read as follows:

"2.    Where by reason of the provisions of paragraph 1 an individual is a resident of both Contracting States, then this case shall be determined in accordance with the following rules:

*a)* He shall be deemed to be a resident of the Contracting State in which he has a permanent home available to him. If he has a permanent home available to him in both Contracting States, he shall be deemed to be a resident of the Contracting State with which his personal and economic relations are closest (centre of vital interests);

*b)* If the Contracting State in which he has his centre of vital interests cannot be determined, or if he has not a permanent home available to him in either Contracting State, he shall be deemed to be a resident of the Contracting State in which he has an habitual abode;

*c)* If he has an habitual abode in both Contracting States or in neither of them, he shall be deemed to be a resident of the Contracting State of which he is a national;

*d)* If he is a national of both Contracting States or of neither of them, the competent authorities of the Contracting States shall settle the question by mutual agreement."

**Paragraph 3:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015. After 21 September 1995 and until 21 November 2017, paragraph 3 read as follows:

"3.    Where by reason of the provisions of paragraphs 1 a person other than an individual is a resident of both Contracting States, then it shall be deemed to be a resident only of the State in which its place of effective management is situated."

Paragraph 3 was previously amended on 21 September 1995, by adding the word "only" after the words "shall be deemed to be a resident", by the report entitled "The 1995 Update to the Model Tax Convention", adopted by the OECD Council on 21 September 1995. In the 1977 Model Convention and until 21 September 1995, paragraph 3 read as follows:

"3.    Where by reason of the provisions of paragraph 1 a person other than an individual is a resident of both Contracting States, then it shall be deemed to be a resident of the State in which its place of effective management is situated."

Paragraph 3 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977, by replacing the words "the Contracting State in which" with "the State in which". In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 3 read as follows:

"3.    Where by reason of the provisions of paragraph 1 a person other than an individual is a resident of both Contracting States, then it shall be deemed to be a resident of the Contraction State in which its place of effective management is situated."

# ARTICLE 5

# PERMANENT ESTABLISHMENT

1.    For the purposes of this Convention, the term "permanent establishment" means a fixed place of business through which the business of an enterprise is wholly or partly carried on.

2.    The term "permanent establishment" includes especially:

   *a)* a place of management;

   *b)* a branch;

   *c)* an office;

   *d)* a factory;

   *e)* a workshop, and

   *f)* a mine, an oil or gas well, a quarry or any other place of extraction of natural resources.

3.    A building site or construction or installation project constitutes a permanent establishment only if it lasts more than twelve months.

4.    Notwithstanding the preceding provisions of this Article, the term "permanent establishment" shall be deemed not to include:

   *a)* the use of facilities solely for the purpose of storage, display or delivery of goods or merchandise belonging to the enterprise;

   *b)* the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of storage, display or delivery;

   *c)* the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of processing by another enterprise;

   *d)* the maintenance of a fixed place of business solely for the purpose of purchasing goods or merchandise or of collecting information, for the enterprise;

   *e)* the maintenance of a fixed place of business solely for the purpose of carrying on, for the enterprise, any other activity;

   *f)* the maintenance of a fixed place of business solely for any combination of activities mentioned in subparagraphs *a)* to *e)*,

provided that such activity or, in the case of subparagraph *f)*, the overall activity of the fixed place of business, is of a preparatory or auxiliary character.

4.1    Paragraph 4 shall not apply to a fixed place of business that is used or maintained by an enterprise if the same enterprise or a closely related enterprise carries on business activities at the same place or at another place in the same Contracting State and

**MTC**

a) that place or other place constitutes a permanent establishment for the enterprise or the closely related enterprise under the provisions of this Article, or

b) the overall activity resulting from the combination of the activities carried on by the two enterprises at the same place, or by the same enterprise or closely related enterprises at the two places, is not of a preparatory or auxiliary character,

provided that the business activities carried on by the two enterprises at the same place, or by the same enterprise or closely related enterprises at the two places, constitute complementary functions that are part of a cohesive business operation.

5.     Notwithstanding the provisions of paragraphs 1 and 2 but subject to the provisions of paragraph 6, where a person is acting in a Contracting State on behalf of an enterprise and, in doing so, habitually concludes contracts, or habitually plays the principal role leading to the conclusion of contracts that are routinely concluded without material modification by the enterprise, and these contracts are

a) in the name of the enterprise, or

b) for the transfer of the ownership of, or for the granting of the right to use, property owned by that enterprise or that the enterprise has the right to use, or

c) for the provision of services by that enterprise,

that enterprise shall be deemed to have a permanent establishment in that State in respect of any activities which that person undertakes for the enterprise, unless the activities of such person are limited to those mentioned in paragraph 4 which, if exercised through a fixed place of business (other than a fixed place of business to which paragraph 4.1 would apply), would not make this fixed place of business a permanent establishment under the provisions of that paragraph.

6.     Paragraph 5 shall not apply where the person acting in a Contracting State on behalf of an enterprise of the other Contracting State carries on business in the first-mentioned State as an independent agent and acts for the enterprise in the ordinary course of that business. Where, however, a person acts exclusively or almost exclusively on behalf of one or more enterprises to which it is closely related, that person shall not be considered to be an independent agent within the meaning of this paragraph with respect to any such enterprise.

7.     The fact that a company which is a resident of a Contracting State controls or is controlled by a company which is a resident of the other Contracting State, or which carries on business in that other State (whether

through a permanent establishment or otherwise), shall not of itself constitute either company a permanent establishment of the other.

8.    For the purposes of this Article, a person or enterprise is closely related to an enterprise if, based on all the relevant facts and circumstances, one has control of the other or both are under the control of the same persons or enterprises. In any case, a person or enterprise shall be considered to be closely related to an enterprise if one possesses directly or indirectly more than 50 per cent of the beneficial interest in the other (or, in the case of a company, more than 50 per cent of the aggregate vote and value of the company's shares or of the beneficial equity interest in the company) or if another person or enterprise possesses directly or indirectly more than 50 per cent of the beneficial interest (or, in the case of a company, more than 50 per cent of the aggregate vote and value of the company's shares or of the beneficial equity interest in the company) in the person and the enterprise or in the two enterprises.

## HISTORY

**Paragraph 1:** Amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977, by replacing the words "in which the business of the enterprise" with "through which the business of an enterprise". In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 1 read as follows:

"1.    For the purposes of this Convention, the term "permanent establishment" means a fixed place of business in which the business of the enterprise is wholly or partly carried on."

**Paragraph 2:** Amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977, by substituting the words "includes" in the first line for "shall include". At the same time, the word "and" was added at the end of subparagraph *e)*, subparagraph *f)* was modified and subparagraph *g)* was deleted. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 2 read as follows:

"2.    The term "permanent establishment" shall include especially:

*a)*  a place of management;

*b)*  a branch;

*c)*  an office;

*d)*  a factory;

*e)*  a workshop, and

*f)*  a mine, quarry or other place of extraction of natural resources;

*g)*  a building site or construction or assembly project which exists for more than twelve months."

**Paragraph 3:** Replaced when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. At that time, paragraph 3 of the 1963 Draft Convention was amended and renumbered as paragraph 4 (see history of paragraph 4) and a new paragraph 3 was added.

**Paragraph 4:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Artificial Avoidance of Permanent Establishment Status, Action 7 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015. In the 1977 Model Convention and until 21 November 2017, paragraph 4 read as follows:

"4.    Notwithstanding the preceding provisions of this Article, the term "permanent establishment" shall be deemed not to include:

a) the use of facilities solely for the purpose of storage, display or delivery of goods or merchandise belonging to the enterprise;

b) the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of storage, display or delivery;

c) the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of processing by another enterprise;

d) the maintenance of a fixed place of business solely for the purpose of purchasing goods or merchandise or of collecting information, for the enterprise;

e) the maintenance of a fixed place of business solely for the purpose of carrying on, for the enterprise, any other activity of a preparatory or auxiliary character;

f) the maintenance of a fixed place of business solely for any combination of activities mentioned in subparagraphs a) to e), provided that the overall activity of the fixed place of business resulting from this combination is of a preparatory or auxiliary character."

Paragraph 4 of the 1977 Model Convention corresponded to paragraph 3 of the 1963 Draft Convention. Paragraph 4 of the 1963 Draft Convention was amended and renumbered as paragraph 5 (see history of paragraph 5) when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. At the same time, paragraph 3 was renumbered as paragraph 4 and amended, by modifying its preamble and subparagraph e) and adding subparagraph f). In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 3 read as follows:

"3.    The term "permanent establishment" shall not be deemed to include:

a) the use of facilities solely for the purpose of storage, display or delivery of goods or merchandise belonging to the enterprise;

b) the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of storage, display or delivery;

c) the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of processing by another enterprise;

d) the maintenance of a fixed place of business solely for the purpose of purchasing goods or merchandise, or for collecting information, for the enterprise;

e) the maintenance of a fixed place of business solely for the purpose of advertising, for the supply of information, for scientific research or for similar activities which have a preparatory or auxiliary character, for the enterprise."

**Paragraph 4.1:** Added on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Artificial Avoidance of Permanent

Establishment Status, Action 7 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015.

**Paragraph 5:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Artificial Avoidance of Permanent Establishment Status, Action 7 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015. In the 1977 Model Convention and until 21 November 2017, paragraph 5 read as follows:

> "5.    Notwithstanding the provisions of paragraphs 1 and 2, where a person — other than an agent of an independent status to whom paragraph 6 applies — is acting on behalf of an enterprise and has, and habitually exercises, in a Contracting State an authority to conclude contracts in the name of the enterprise, that enterprise shall be deemed to have a permanent establishment in that State in respect of any activities which that person undertakes for the enterprise, unless the activities of such person are limited to those mentioned in paragraph 4 which, if exercised through a fixed place of business, would not make this fixed place of business a permanent establishment under the provisions of that paragraph."

Paragraph 5 of the 1977 Model Convention corresponded to paragraph 4 of the 1963 Draft Convention. Paragraph 5 of the 1963 Draft Convention was amended and renumbered as paragraph 6 (see history of paragraph 6) when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. At the same time, paragraph 4 of the 1963 Draft Convention was renumbered as paragraph 5 and amended. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 4 read as follows:

> "4.    A person acting in a Contracting State on behalf of an enterprise of the other Contracting State — other than an agent of an independent status to whom paragraph 5 applies — shall be deemed to be a permanent establishment in the first-mentioned State if he has, and habitually exercises in that State, an authority to conclude contracts in the name of the enterprise, unless his activities are limited to the purchase of goods or merchandise for the enterprise."

**Paragraph 6:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Artificial Avoidance of Permanent Establishment Status, Action 7 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015. In the 1977 Model Convention and until 21 November 2017, paragraph 6 read as follows:

> "6.    An enterprise shall not be deemed to have a permanent establishment in a Contracting State merely because it carries on business in that State through a broker, general commission agent or any other agent of an independent status, provided that such persons are acting in the ordinary course of their business."

Paragraph 6 of the 1977 Model Convention corresponded to paragraph 5 of the 1963 Draft Convention. Paragraph 6 of the 1963 Draft Convention was renumbered as paragraph 7 (see history of paragraph 7) and paragraph 5 of the 1963 Draft Convention was amended and renumbered as paragraph 6 when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 5 read as follows:

> "5.    An enterprise of a Contracting State shall not be deemed to have a permanent establishment in the other Contracting State merely because it carries on business in that other State through a broker, general commission agent or any other agent of an independent status, where such persons are acting in the ordinary course of their business."

**Paragraph 7:** Corresponds to paragraph 6 of the 1963 Draft Convention as it read before 11 April 1977. On that date, paragraph 6 of the 1963 Draft Convention was renumbered as paragraph 7 when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977.

**Paragraph 8:** Added on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Artificial Avoidance of Permanent Establishment Status, Action 7 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015.

# Chapter III
# TAXATION OF INCOME

## ARTICLE 6
## INCOME FROM IMMOVABLE PROPERTY

1.    Income derived by a resident of a Contracting State from immovable property (including income from agriculture or forestry) situated in the other Contracting State may be taxed in that other State.

2.    The term "immovable property" shall have the meaning which it has under the law of the Contracting State in which the property in question is situated. The term shall in any case include property accessory to immovable property, livestock and equipment used in agriculture and forestry, rights to which the provisions of general law respecting landed property apply, usufruct of immovable property and rights to variable or fixed payments as consideration for the working of, or the right to work, mineral deposits, sources and other natural resources; ships and aircraft shall not be regarded as immovable property.

3.    The provisions of paragraph 1 shall apply to income derived from the direct use, letting, or use in any other form of immovable property.

4.    The provisions of paragraphs 1 and 3 shall also apply to the income from immovable property of an enterprise.

## HISTORY

**Paragraph 1:** Amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 1 read as follows:

"1.    Income from immovable property may be taxed in the Contracting State in which such property is situated."

**Paragraph 2:** Amended on 21 November 2017, by removing the reference to "boats", by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017. In the 1977 Model Convention and until 21 November 2017, paragraph 2 read as follows:

"2.    The term "immovable property" shall have the meaning which it has under the law of the Contracting State in which the property in question is situated. The term shall in any case include property accessory to immovable property, livestock and equipment used in agriculture and forestry, rights to which the provisions of general law respecting landed property apply, usufruct of immovable property and rights to variable or fixed payments as consideration for the working of, or the right to work, mineral deposits, sources and other natural resources; ships, boats and aircraft shall not be regarded as immovable property."

Paragraph 2 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977, by changing the first sentence. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 2 read as follows:

"2.    The term "immovable property" shall be defined in accordance with the law of the Contracting State in which the property in question is situated. The term shall in any case include property accessory to immovable property, livestock and equipment used in agriculture and forestry, rights to which the provisions of general law respecting landed property apply, usufruct of immovable property and rights to variable or fixed payments as consideration for the working of, or the right to work, mineral deposits, sources and other natural resources; ships, boats and aircraft shall not be regarded as immovable property."

**Paragraph 3:** Unchanged since the adoption of the 1963 Draft Convention by the OECD Council on 30 July 1963.

**Paragraph 4:** Amended on 29 April 2000 by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of the Annex of another report entitled "Issues related to Article 14 of the OECD Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 27 January 2000). In the 1977 Convention and until 29 April 2000, paragraph 4 read as follows:

"4.    The provisions of paragraphs 1 and 3 shall also apply to the income from immovable property of an enterprise and to income from immovable property used for the performance of independent personal services."

Paragraph 4 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977, by substituting the words "independent personal services" for "professional services". In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 4 read as follows:

"4.    The provisions of paragraphs 1 and 3 shall also apply to the income from immovable property of an enterprise and to income from immovable property used for the performance of professional services."

## ARTICLE 7

## BUSINESS PROFITS

1.      Profits of an enterprise of a Contracting State shall be taxable only in that State unless the enterprise carries on business in the other Contracting State through a permanent establishment situated therein. If the enterprise carries on business as aforesaid, the profits that are attributable to the permanent establishment in accordance with the provisions of paragraph 2 may be taxed in that other State.

2.      For the purposes of this Article and Article [23 A] [23 B], the profits that are attributable in each Contracting State to the permanent establishment referred to in paragraph 1 are the profits it might be expected to make, in particular in its dealings with other parts of the enterprise, if it were a separate and independent enterprise engaged in the same or similar activities under the same or similar conditions, taking into account the functions performed, assets used and risks assumed by the enterprise through the permanent establishment and through the other parts of the enterprise.

3.      Where, in accordance with paragraph 2, a Contracting State adjusts the profits that are attributable to a permanent establishment of an enterprise of one of the Contracting States and taxes accordingly profits of the enterprise that have been charged to tax in the other State, the other State shall, to the extent necessary to eliminate double taxation on these profits, make an appropriate adjustment to the amount of the tax charged on those profits. In determining such adjustment, the competent authorities of the Contracting States shall if necessary consult each other.

4.      Where profits include items of income which are dealt with separately in other Articles of this Convention, then the provisions of those Articles shall not be affected by the provisions of this Article.

## HISTORY

**Paragraph 1:** Amended on 22 July 2010 by the report entitled "The 2010 Update to the Model Tax Convention", adopted by the OECD Council on 22 July 2010. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until 22 July 2010, paragraph 1 read as follows:

"1.      The profits of an enterprise of a Contracting State shall be taxable only in that State unless the enterprise carries on business in the other Contracting State through a permanent establishment situated therein. If the enterprise carries on business as aforesaid, the profits of the enterprise may be taxed in the other State but only so much of them as is attributable to that permanent establishment."

**Paragraph 2:** Replaced on 22 July 2010 when paragraph 2 was deleted and a new paragraph 2 was added by the report entitled "The 2010 Update to the Model Tax

MODEL CONVENTION

Convention", adopted by the OECD Council on 22 July 2010. In the 1977 Model Convention and until it was deleted on 22 July 2010 paragraph 2 read as follows:

"2.     Subject to the provisions of paragraph 3, where an enterprise of a Contracting State carries on business in the other Contracting State through a permanent establishment situated therein, there shall in each Contracting State be attributed to that permanent establishment the profits which it might be expected to make if it were a distinct and separate enterprise engaged in the same or similar activities under the same or similar conditions and dealing wholly independently with the enterprise of which it is a permanent establishment."

Paragraph 2 was amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977, by adding the words "Subject to the provisions of paragraph 3" at the beginning of the paragraph. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 2 read as follows:

"2.     Where an enterprise of a Contracting State carries on business in the other Contracting State through a permanent establishment situated therein, there shall in each Contracting State be attributed to that permanent establishment the profits which it might be expected to make if it were a distinct and separate enterprise engaged in the same or similar activities under the same or similar conditions and dealing wholly independently with the enterprise of which it is a permanent establishment."

**Paragraph 3:** Replaced on 22 July 2010 when paragraph 2 was deleted and a new paragraph 2 was added by the report entitled "The 2010 Update to the Model Tax Convention", adopted by the OECD Council on 22 July 2010. In the 1977 Model Convention and until 22 July 2010 paragraph 3 read as follows:

"3.     In determining the profits of a permanent establishment, there shall be allowed as deductions expenses which are incurred for the purposes of the permanent establishment, including executive and general administrative expenses so incurred, whether in the State in which the permanent establishment is situated or elsewhere."

Paragraph 3 was amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977, by substituting the words "In determining" for "In the determination of" at the beginning of the paragraph. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 3 read as follows:

"3.     In the determination of the profits of a permanent establishment, there shall be allowed as deductions expenses which are incurred for the purposes of the permanent establishment, including executive and general administrative expenses so incurred, whether in the State in which the permanent establishment is situated or elsewhere."

**Paragraph 4:** Corresponds to paragraph 7 as it read before 22 July 2010. On that date, paragraph 4, was deleted and paragraph 7 was renumbered as paragraph 4 by the report entitled "The 2010 Update to the Model Tax Convention", adopted by the OECD Council on 22 July 2010.

Paragraph 7, as it read before 22 July 2010, was included in the 1963 Draft Convention, adopted by the OECD Council on 30 July 1963.

Paragraph 4 of the 1977 Model Convention was deleted on 22 July 2010 by the report entitled "The 2010 Update to the Model Tax Convention", adopted by the OECD Council on 22 July 2010. In the 1977 Model Tax Convention and until 22 July 2010, paragraph 4 read as follows:

"4.    Insofar as it has been customary in a Contracting State to determine the profits to be attributed to a permanent establishment on the basis of an apportionment of the total profits of the enterprise to its various parts, nothing in paragraph 2 shall preclude that Contracting State from determining the profits to be taxed by such an apportionment as may be customary; the method of apportionment adopted shall, however, be such that the result shall be in accordance with the principles contained in this Article."

Paragraph 4 was amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977, by substituting the word "contained" in the last line for "laid down". In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 4 read as follows:

"4.    Insofar as it has been customary in a Contracting State to determine the profits to be attributed to a permanent establishment on the basis of an apportionment of the total profits of the enterprise to its various parts, nothing in paragraph 2 shall preclude that Contracting State from determining the profits to be taxed by such an apportionment as may be customary; the method of apportionment adopted shall, however, be such that the result shall be in accordance with the principles laid down in this Article."

**Paragraph 5:** Deleted on 22 July 2010 by the report entitled "The 2010 Update to the Model Tax Convention", adopted by the OECD Council on 22 July 2010. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until 22 July 2010, paragraph 5 read as follows:

"5.    No profits shall be attributed to a permanent establishment by reason of the mere purchase by that permanent establishment of goods or merchandise for the enterprise."

**Paragraph 6:** Deleted on 22 July 2010 by the report entitled "The 2010 Update to the Model Tax Convention", adopted by the OECD Council on 22 July 2010. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until 22 July 2010, paragraph 6 read as follows:

"6.    For the purposes of the preceding paragraphs, the profits to be attributed to the permanent establishment shall be determined by the same method year by year unless there is good and sufficient reason to the contrary."

**Paragraph 7:** Renumbered on 22 July 2010 as paragraph 4 (see history of paragraph 4) by the report entitled "The 2010 Update to the Model Tax Convention", adopted by the OECD Council on 22 July 2010.

# ARTICLE 8

# INTERNATIONAL SHIPPING AND AIR TRANSPORT

1.    Profits of an enterprise of a Contracting State from the operation of ships or aircraft in international traffic shall be taxable only in that State.

2.    The provisions of paragraph 1 shall also apply to profits from the participation in a pool, a joint business or an international operating agency.

## HISTORY

**The title of Article 8:** Changed on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until 21 November 2017, the title of Article 8 read as follows:

"SHIPPING, INLAND WATERWAYS TRANSPORT AND AIR TRANSPORT"

**Paragraph 1:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017. In the 1963 Draft Convention and until 21 November 2017, paragraph 1 read as follows:

"1.    Profits from the operation of ships or aircraft in international traffic shall be taxable only in the Contracting State in which the place of effective management of the enterprise is situated."

Paragraph 1 was included in the 1963 Draft Convention, adopted by the OECD Council on 30 July 1963.

**Paragraph 2:** Corresponds to paragraph 4 as it read before 21 November 2017. On that date, paragraph 2 was deleted and paragraph 4 was renumbered as paragraph 2, by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017.

Paragraph 4 was included in the 1963 Draft Convention, adopted by the OECD Council on 30 July 1963.

Paragraph 2, as it read before 21 November 2017, was deleted by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017. In the 1963 Draft Convention and until 21 November 2017, paragraph 2 read as follows:

"2.    Profits from the operation of boats engaged in inland waterways transport shall be taxable only in the Contracting State in which the place of effective management of the enterprise is situated."

Paragraph 2 was included in the 1963 Draft Convention, adopted by the OECD Council on 30 July 1963.

**Paragraph 3:** Deleted on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017. In the 1963 Draft Convention and until 21 November 2017, paragraph 3 read as follows:

"3.    If the place of effective management of a shipping enterprise or of an inland waterways transport enterprise is aboard a ship or boat, then it shall be deemed to be situated in the Contracting State in which the home harbour of the ship or boat is situated, or, if there is no such home harbour, in the Contracting State of which the operator of the ship or boat is a resident."

Paragraph 3 was included in the 1963 Draft Convention, adopted by the OECD Council on 30 July 1963.

**Paragraph 4:** Renumbered as paragraph 2 (see history of paragraph 2) on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017.

# ARTICLE 9

## ASSOCIATED ENTERPRISES

1.    Where

   *a)* an enterprise of a Contracting State participates directly or indirectly in the management, control or capital of an enterprise of the other Contracting State, or

   *b)* the same persons participate directly or indirectly in the management, control or capital of an enterprise of a Contracting State and an enterprise of the other Contracting State,

and in either case conditions are made or imposed between the two enterprises in their commercial or financial relations which differ from those which would be made between independent enterprises, then any profits which would, but for those conditions, have accrued to one of the enterprises, but, by reason of those conditions, have not so accrued, may be included in the profits of that enterprise and taxed accordingly.

2.    Where a Contracting State includes in the profits of an enterprise of that State — and taxes accordingly — profits on which an enterprise of the other Contracting State has been charged to tax in that other State and the profits so included are profits which would have accrued to the enterprise of the first-mentioned State if the conditions made between the two enterprises had been those which would have been made between independent enterprises, then that other State shall make an appropriate adjustment to the amount of the tax charged therein on those profits. In determining such adjustment, due regard shall be had to the other provisions of this Convention and the competent authorities of the Contracting States shall if necessary consult each other.

## HISTORY

**Paragraph 1:** Corresponds to Article 9 of the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963). Article 9 was designated as paragraph 1 in the 1977 Model Convention, adopted by the OECD Council on 11 April 1977.

**Paragraph 2:** Added when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977.

# ARTICLE 10

# DIVIDENDS

1.    Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2.    However, dividends paid by a company which is a resident of a Contracting State may also be taxed in that State according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other Contracting State, the tax so charged shall not exceed:

   *a)* 5 per cent of the gross amount of the dividends if the beneficial owner is a company which holds directly at least 25 per cent of the capital of the company paying the dividends throughout a 365 day period that includes the day of the payment of the dividend (for the purpose of computing that period, no account shall be taken of changes of ownership that would directly result from a corporate reorganisation, such as a merger or divisive reorganisation, of the company that holds the shares or that pays the dividend);

   *b)* 15 per cent of the gross amount of the dividends in all other cases.

The competent authorities of the Contracting States shall by mutual agreement settle the mode of application of these limitations. This paragraph shall not affect the taxation of the company in respect of the profits out of which the dividends are paid.

3.    The term "dividends" as used in this Article means income from shares, "jouissance" shares or "jouissance" rights, mining shares, founders' shares or other rights, not being debt-claims, participating in profits, as well as income from other corporate rights which is subjected to the same taxation treatment as income from shares by the laws of the State of which the company making the distribution is a resident.

4.    The provisions of  paragraphs 1 and 2 shall not apply if the beneficial owner of the dividends, being a resident of a Contracting State, carries on business in the other Contracting State of which the company paying the dividends is a resident through a permanent establishment situated therein and the holding in respect of which the dividends are paid is effectively connected with such permanent establishment. In such case the provisions of Article 7 shall apply.

5.    Where a company which is a resident of a Contracting State derives profits or income from the other Contracting State, that other State may not impose any tax on the dividends paid by the company, except insofar as such dividends are paid to a resident of that other State or insofar as the holding in respect of which the dividends are paid is effectively connected with a

permanent establishment situated in that other State, nor subject the company's undistributed profits to a tax on the company's undistributed profits, even if the dividends paid or the undistributed profits consist wholly or partly of profits or income arising in such other State.

## HISTORY

**Paragraph 1:** Unchanged since the adoption of the 1963 Draft Convention by the OECD Council on 30 July 1963.

**Paragraph 2:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015. After 15 July 2014 and until 21 November 2017, paragraph 2 read as follows:

"2.    However, dividends paid by a company which is a resident of a Contracting State may also be taxed in that State according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other Contracting State, the tax so charged shall not exceed:

   *a)* 5 per cent of the gross amount of the dividends if the beneficial owner is a company (other than a partnership) which holds directly at least 25 per cent of the capital of the company paying the dividends;

   *b)* 15 per cent of the gross amount of the dividends in all other cases.

The competent authorities of the Contracting States shall by mutual agreement settle the mode of application of these limitations. This paragraph shall not affect the taxation of the company in respect of the profits out of which the dividends are paid."

Paragraph 2 was previously amended on 15 July 2014 by the report entitled "The 2014 Update to the Model Tax Convention", adopted by the OECD Council on 15 July 2014. After 21 September 1995 and until 15 July 2014, paragraph 2 read as follows:

"2.    However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other Contracting State, the tax so charged shall not exceed:

   *a)* 5 per cent of the gross amount of the dividends if the beneficial owner is a company (other than a partnership) which holds directly at least 25 per cent of the capital of the company paying the dividends;

   *b)* 15 per cent of the gross amount of the dividends in all other cases.

The competent authorities of the Contracting States shall by mutual agreement settle the mode of application of these limitations. This paragraph shall not affect the taxation of the company in respect of the profits out of which the dividends are paid."

Paragraph 2 was previously amended on 21 September 1995, by replacing the words "if the recipient is the beneficial owner of the dividends" with "if the beneficial owner of the dividends is a resident of the other Contracting State,", by the report entitled "The 1995 Update to the Model Tax Convention", adopted by the OECD Council on 21 September 1995. In the 1977 Model Convention and until 21 September 1995, paragraph 2 read as follows:

"2.    However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State, but if the recipient is the beneficial owner of the dividends the tax so charged shall not exceed:

   a)  5 per cent of the gross amount of the dividends if the beneficial owner is a company (other than a partnership) which holds directly at least 25 per cent of the capital of the company paying the dividends;

   b)  15 per cent of the gross amount of the dividends in all other cases.

The competent authorities of the Contracting States shall by mutual agreement settle the mode of application of these limitations.This paragraph shall not affect the taxation of the company in respect of the profits out of which the dividends are paid."

Paragraph 2 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 2 read as follows:

"2.    However, such dividends may be taxed in the Contracting State of which the company paying the dividends is a resident, and according to the law of that State, but the tax so charged shall not exceed:

   a)  5 per cent of the gross amount of the dividends if the recipient is a company (excluding partnership) which holds directly at least 25 per cent of the capital of the company paying the dividends;

   b)  in all other cases, 15 per cent of the gross amount of the dividends.

The competent authorities of the Contracting States shall by mutual agreement settle the mode of application of this limitation.This paragraph shall not affect the taxation of the company in respect of the profits out of which the dividends are paid."

**Paragraph 3:** Amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977, by substituting the words "which is subjected to the same taxation treatment as income from shares by the laws of the State" for "assimilated to income from shares by the taxation law of the State". In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 3 read as follows:

"3.    The term "dividends" as used in this Article means income from shares, "jouissance" shares or "jouissance" rights, mining shares, founders' shares or other rights, not being debt-claims, participating in profits, as well as income from other corporate rights assimilated to income from shares by the taxation law of the State of which the company making the distribution is a resident."

**Paragraph 4:** Amended on 29 April 2000 by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of the Annex of another report entitled "Issues related to Article 14 of the OECD Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 27 January 2000). In the 1977 Convention and until 29 April 2000, paragraph 4 read as follows:

"4.    The provisions of paragraphs 1 and 2 shall not apply if the beneficial owner of the dividends, being a resident of a Contracting State, carries on business in the other Contracting State of which the company paying the dividends is a resident, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the holding in respect of which the dividends are paid is effectively connected with

such permanent establishment or fixed base. In such case the provisions of Article 7 or Article 14, as the case may be, shall apply."

Paragraph 4 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 4 read as follows:

"4.    The provisions of paragraphs 1 and 2 shall not apply if the recipient of the dividends, being a resident of a Contracting State, has in the other Contracting State, of which the company paying the dividends is a resident, a permanent establishment with which the holding by virtue of which the dividends are paid is effectively connected. In such a case, the provisions of Article 7 shall apply."

**Paragraph 5:** Amended on 29 April 2000 by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of the Annex of another report entitled "Issues related to Article 14 of the OECD Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 27 January 2000). In the 1977 Convention and until 29 April 2000, paragraph 5 read as follows:

"5.    Where a company which is a resident of a Contracting State derives profits or income from the other Contracting State, that other State may not impose any tax on the dividends paid by the company, except insofar as such dividends are paid to a resident of that other State or insofar as the holding in respect of which the dividends are paid is effectively connected with a permanent establishment or a fixed base situated in that other State, nor subject the company's undistributed profits to a tax on the company's undistributed profits, even if the dividends paid or the undistributed profits consist wholly or partly of profits or income arising in such other State."

Paragraph 5 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 5 read as follows:

"5.    Where a company which is a resident of a Contracting State derives profits or income from the other Contracting State, that other State may not impose any tax on the dividends paid by the company to persons who are not residents of that other State, or subject the company's undistributed profits to a tax on undistributed profits, even if the dividends paid or the undistributed profits consist wholly or partly of profits or income arising in such other State."

# ARTICLE 11

# INTEREST

1.    Interest arising in a Contracting State and paid to a resident of the other Contracting State may be taxed in that other State.

2.    However, interest arising in a Contracting State may also be taxed in that State according to the laws of that State, but if the beneficial owner of the interest is a resident of the other Contracting State, the tax so charged shall not exceed 10 per cent of the gross amount of the interest. The competent authorities of the Contracting States shall by mutual agreement settle the mode of application of this limitation.

3.    The term "interest" as used in this Article means income from debt-claims of every kind, whether or not secured by mortgage and whether or not carrying a right to participate in the debtor's profits, and in particular, income from government securities and income from bonds or debentures, including premiums and prizes attaching to such securities, bonds or debentures. Penalty charges for late payment shall not be regarded as interest for the purpose of this Article.

4.    The provisions of paragraphs 1 and 2 shall not apply if the beneficial owner of the interest, being a resident of a Contracting State, carries on business in the other Contracting State in which the interest arises through a permanent establishment situated therein and the debt-claim in respect of which the interest is paid is effectively connected with such permanent establishment. In such case the provisions of Article 7 shall apply.

5.    Interest shall be deemed to arise in a Contracting State when the payer is a resident of that State. Where, however, the person paying the interest, whether he is a resident of a Contracting State or not, has in a Contracting State a permanent establishment in connection with which the indebtedness on which the interest is paid was incurred, and such interest is borne by such permanent establishment, then such interest shall be deemed to arise in the State in which the permanent establishment is situated.

6.    Where, by reason of a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the interest, having regard to the debt-claim for which it is paid, exceeds the amount which would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case, the excess part of the payments shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of this Convention.

## HISTORY

**Paragraph 1:** Unchanged since the adoption of the 1963 Draft Convention by the OECD Council on 30 July 1963.

**Paragraph 2:** Amended on 15 July 2014 by the report entitled "The 2014 Update to the Model Tax Convention", adopted by the OECD Council on 15 July 2014. After 21 September 1995 and until 15 July 2014, paragraph 2 read as follows:

> "2.    However, such interest may also be taxed in the Contracting State in which it arises and according to the laws of that State, but if the beneficial owner of the interest is a resident of the other Contracting State, the tax so charged shall not exceed 10 per cent of the gross amount of the interest. The competent authorities of the Contracting States shall by mutual agreement settle the mode of application of this limitation."

Paragraph 2 was previously amended on 21 September 1995, by replacing the words "if the recipient is the beneficial owner of the interest" with "if the beneficial owner of the interest is a resident of the other Contracting State,", by the report entitled "The 1995 Update to the Model Tax Convention", adopted by the OECD Council on 21 September 1995. In the 1977 Model Convention and until 21 September 1995, paragraph 2 read as follows:

> "2.    However, such interest may also be taxed in the Contracting State in which it arises and according to the laws of that State, but if the recipient is the beneficial owner of the interest the tax so charged shall not exceed 10 per cent of the gross amount of the interest. The competent authorities of the Contracting States shall by mutual agreement settle the mode of application of this limitation."

Paragraph 2 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 2 read as follows:

> "2.    However, such interest may be taxed in the Contracting State in which it arises, and according to the law of that State, but the tax so charged shall not exceed 10 per cent of the amount of the interest. The competent authorities of the Contracting States shall by mutual agreement settle the mode of application of this limitation."

**Paragraph 3:** Amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 3 read as follows:

> "3.    The term "interest" as used in this Article means income from Government securities, bonds or debentures, whether or not secured by mortgage and whether or not carrying a right to participate in profits, and debt-claims of every kind as well as all other income assimilated to income from money lent by the taxation law of the State in which the income arises."

**Paragraph 4:** Amended on 29 April 2000 by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of the Annex of another report entitled "Issues related to Article 14 of the OECD Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 27 January 2000). In the 1977 Convention and until 29 April 2000, paragraph 4 read as follows:

> "4.    The provisions of paragraphs 1 and 2 shall not apply if the beneficial owner of the interest, being a resident of a Contracting State, carries on business in the other Contracting State in which the interest arises, through a permanent

establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the debt-claim in respect of which the interest is paid is effectively connected with such permanent establishment or fixed base. In such case the provisions of Article 7 or Article 14, as the case may be, shall apply."

Paragraph 4 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 4 read as follows:

"4.    The provisions of paragraphs 1 and 2 shall not apply if the recipient of the interest, being a resident of a Contracting State, has in the other Contracting State in which the interest arises a permanent establishment with which the debt-claim from which the interest arises is effectively connected. In such a case, the provisions of Article 7 shall apply."

**Paragraph 5:** Amended on 29 April 2000 by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of the Annex of another report entitled "Issues related to Article 14 of the OECD Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 27 January 2000). After 21 September 1995 and until 29 April 2000, paragraph 5 read as follows:

"5.    Interest shall be deemed to arise in a Contracting State when the payer is a resident of that State. Where, however, the person paying the interest, whether he is a resident of a Contracting State or not, has in a Contracting State a permanent establishment or a fixed base in connection with which the indebtedness on which the interest is paid was incurred, and such interest is borne by such permanent establishment or fixed base, then such interest shall be deemed to arise in the State in which the permanent establishment or fixed base is situated."

Paragraph 5 was previously amended on 21 September 1995, by deleting the words "that State itself, a political subdivision, a local authority or", by the report entitled "The 1995 Update to the Model Tax Convention", adopted by the OECD Council on 21 September 1995. In the 1977 Model Convention and until 21 September 1995, paragraph 5 read as follows:

"5.    Interest shall be deemed to arise in a Contracting State when the payer is that State itself, a political subdivision, a local authority or a resident of that State. Where, however, the person paying the interest, whether he is a resident of a Contracting State or not, has in a Contracting State a permanent establishment or a fixed base in connection with which the indebtedness on which the interest is paid was incurred, and such interest is borne by such permanent establishment or fixed base, then such interest shall be deemed to arise in the State in which the permanent establishment or fixed base is situated."

Paragraph 5 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977, by substituting "permanent establishment or fixed base" for "permanent establishment" in the three different places where these words appeared. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 5 read as follows:

"5.    Interest shall be deemed to arise in a Contracting State when the payer is that State itself, a political subdivision, a local authority or a resident of that State. Where, however, the person paying the interest, whether he is a resident of a Contracting State or not, has in a Contracting State a permanent establishment in connection with which the indebtedness on which the interest is paid was incurred, and such interest is borne by such permanent establishment, then such

interest shall be deemed to arise in the State in which the permanent establishment is situated."

**Paragraph 6:** Amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 6 read as follows:

"6.    Where, owing to a special relationship between the payer and the recipient or between both of them and some other person, the amount of the interest paid, having regard to the debt claim for which it is paid, exceeds the amount which would have been agreed upon by the payer and the recipient in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In that case, the excess part of the payments shall remain taxable according to the law of each Contracting State, due regard being had to the other provisions of this Convention."

# ARTICLE 12

# ROYALTIES

1.    Royalties arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in that other State.

2.    The term "royalties" as used in this Article means payments of any kind received as a consideration for the use of, or the right to use, any copyright of literary, artistic or scientific work including cinematograph films, any patent, trade mark, design or model, plan, secret formula or process, or for information concerning industrial, commercial or scientific experience.

3.    The provisions of paragraph 1 shall not apply if the beneficial owner of the royalties, being a resident of a Contracting State, carries on business in the other Contracting State in which the royalties arise through a permanent establishment situated therein and the right or property in respect of which the royalties are paid is effectively connected with such permanent establishment. In such case the provisions of Article 7 shall apply.

4.    Where, by reason of a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the royalties, having regard to the use, right or information for which they are paid, exceeds the amount which would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case, the excess part of the payments shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of this Convention.

## HISTORY

**Paragraph 1:** Amended on 23 October 1997 by the report entitled "The 1997 Update to the Model Tax Convention", adopted by the OECD Council on 23 October 1997. In the 1977 Model Convention and until 23 October 1997, paragraph 1 read as follows:

"1.    Royalties arising in a Contracting State and paid to a resident of the other Contracting State shall be taxable only in that other State if such resident is the beneficial owner of the royalties."

Paragraph 1 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 1 read as follows:

"1.    Royalties arising in a Contracting State and paid to a resident of the other Contracting State shall be taxable only in that other State."

**Paragraph 2:** Amended on 23 July 1992, by deleting the words "or for the use of, or the right to use, industrial, commercial or scientific equipment", by the report entitled "The Revision of the Model Convention", adopted by the OECD Council on 23 July 1992, on the basis of paragraph 23 of the report entitled "The Taxation of Income Derived

MTC

MODEL CONVENTION

from the Leasing of Industrial, Commercial or Scientific Equipment" (adopted by the OECD Council on 13 September 1983). In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until 23 July 1992, paragraph 2 read as follows:

"2. The term "royalties" as used in this Article means payments of any kind received as a consideration for the use of, or the right to use, any copyright of literary, artistic or scientific work including cinematograph films, any patent, trade mark, design or model, plan, secret formula or process, or for the use of, or the right to use, industrial, commercial, or scientific equipment, or for information concerning industrial, commercial or scientific experience."

**Paragraph 3:** Amended on 29 April 2000 by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of the Annex of another report entitled "Issues related to Article 14 of the OECD Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 27 January 2000). In the 1977 Convention and until 29 April 2000, paragraph 3 read as follows:

"3. The provisions of paragraph 1 shall not apply if the beneficial owner of the royalties, being a resident of a Contracting State, carries on business in the other Contracting State in which the royalties arise, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the right or property in respect of which the royalties are paid is effectively connected with such permanent establishment or fixed base. In such case the provisions of Article 7 or Article 14, as the case may be, shall apply."

Paragraph 3 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 3 read as follows:

"3. The provisions of paragraph 1 shall not apply if the recipient of the royalties, being a resident of a Contracting State, has in the other Contracting State in which the royalties arise a permanent establishment with which the right or property giving rise to the royalties is effectively connected. In such a case, the provisions of Article 7 shall apply."

**Paragraph 4:** Amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 4 read as follows:

"4. Where, owing to a special relationship between the payer and the recipient or between both of them and some other person, the amount of the royalties paid, having regard to the use, right or information for which they are paid, exceeds the amount which would have been agreed upon by the payer and the recipient in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In that case, the excess part of the payments shall remain taxable according to the law of each Contracting State, due regard being had to the other provisions of this Convention."

# ARTICLE 13

# CAPITAL GAINS

1.    Gains derived by a resident of a Contracting State from the alienation of immovable property referred to in Article 6 and situated in the other Contracting State may be taxed in that other State.

2.    Gains from the alienation of movable property forming part of the business property of a permanent establishment which an enterprise of a Contracting State has in the other Contracting State, including such gains from the alienation of such a permanent establishment (alone or with the whole enterprise), may be taxed in that other State.

3.    Gains that an enterprise of a Contracting State that operates ships or aircraft in international traffic derives from the alienation of such ships or aircraft, or of movable property pertaining to the operation of such ships or aircraft, shall be taxable only in that State.

4.    Gains derived by a resident of a Contracting State from the alienation of shares or comparable interests, such as interests in a partnership or trust, may be taxed in the other Contracting State if, at any time during the 365 days preceding the alienation, these shares or comparable interests derived more than 50 per cent of their value directly or indirectly from immovable property, as defined in Article 6, situated in that other State.

5.    Gains from the alienation of any property, other than that referred to in paragraphs 1, 2, 3 and 4, shall be taxable only in the Contracting State of which the alienator is a resident.

## HISTORY

**Paragraph 1:** Amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 1 read as follows:

"1.    Gains from the alienation of immovable property, as defined in paragraph 2 of Article 6, may be taxed in the Contracting State in which such property is situated."

**Paragraph 2:** Amended on 29 April 2000 by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of the Annex of another report entitled "Issues related to Article 14 of the OECD Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 27 January 2000). In the 1977 Convention and until 29 April 2000, paragraph 2 read as follows:

"2.    Gains from the alienation of movable property forming part of the business property of a permanent establishment which an enterprise of a Contracting State has in the other Contracting State or of movable property pertaining to a fixed base available to a resident of a Contracting State in the other Contracting State for the

MTC

purpose of performing independent personal services, including such gains from the alienation of such a permanent establishment (alone or with the whole enterprise) or of such fixed base, may be taxed in that other State."

Paragraph 2 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977 by replacing the word "professional" with "independent personal" and by deleting the last sentence (the principle of which was been taken up in paragraph 3). In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 2 read as follows:

"2.    Gains from the alienation of movable property forming part of the business property of a permanent establishment which an enterprise of a Contracting State has in the other Contracting State or of movable property pertaining to a fixed base available to a resident of a Contracting State in the other Contracting State for the purpose of performing professional services, including such gains from the alienation of such a permanent establishment (alone or together with the whole enterprise) or of such a fixed base, may be taxed in the other State. However, gains from the alienation of movable property of the kind referred to in paragraph 3 of Article 22 shall be taxable only in the Contracting State in which such movable property is taxable according to the said Article."

**Paragraph 3:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017. In the 1977 Model Convention and until 21 November 2017, paragraph 3 read as follows:

"3.    Gains from the alienation of ships or aircraft operated in international traffic, boats engaged in inland waterways transport or movable property pertaining to the operation of such ships, aircraft or boats, shall be taxable only in the Contracting State in which the place of effective management of the enterprise is situated."

Paragraph 3 was added when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977; it corresponds generally to the last sentence of paragraph 2 of the 1963 Draft Convention.

**Paragraph 4:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015. After 28 January 2003 and until 21 November 2017, paragraph 4 read as follows:

"4.    Gains derived by a resident of a Contracting State from the alienation of shares deriving more than 50 per cent of their value directly or indirectly from immovable property situated in the other Contracting State may be taxed in that other State."

Paragraph 4 was replaced on 28 January 2003 when paragraph 4 was amended and renumbered as paragraph 5 (see history of paragraph 5) and a new paragraph 4 was added by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 5:** Corresponds to paragraph 4 of the 1977 Model Convention as it read before 28 January 2003. On that date, paragraph 4 was amended and renumbered as paragraph 5 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003. In the 1977 Model Convention and until 28 January 2003, paragraph 4 read as follows:

"4.    Gains from the alienation of any property other than that referred to in paragraphs 1, 2 and 3, shall be taxable only in the Contracting State of which the alienator is a resident."

Paragraph 4 corresponded to paragraph 3 of the 1963 Draft Convention. Paragraph 3 was amended and renumbered as paragraph 4 when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 3 read as follows:

"3.     Gains from the alienation of any property other than those mentioned in paragraphs 1 and 2, shall be taxable only in the Contracting State of which the alienator is a resident."

MTC

MODEL CONVENTION

# [ ARTICLE 14 - INDEPENDENT PERSONAL SERVICES ]

## [DELETED]

## HISTORY

Article 14 was deleted by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of another report entitled "Issues related to Article 14 of the OECD Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 27 January 2000). In the 1977 Model Convention and until 29 April 2000, Article 14 read as follows:

"INDEPENDENT PERSONAL SERVICES

1.      Income derived by a resident of a Contracting State in respect of professional services or other activities of an independent character shall be taxable only in that State unless he has a fixed base regularly available to him in the other Contracting State for the purpose of performing his activities. If he has such a fixed base, the income may be taxed in the other State but only so much of it as is attributable to that fixed base.

2.      The term "professional services" includes especially independent scientific, literary, artistic, educational or teaching activities as well as the independent activities of physicians, lawyers, engineers, architects, dentists and accountants.

**Paragraph 1**

Before it was deleted on 29 April 2000, paragraph 1 was amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 1 read as follows:

"1.      Income derived by a resident of a Contracting State in respect of professional services or other independent activities of a similar character shall be taxable only in that State unless he has a fixed base regularly available to him in the other Contracting State for the purpose of performing his activities. If he has such a fixed base, the income may be taxed in the other Contracting State but only so much of it as is attributable to that fixed base."

**Paragraph 2**

Before it was deleted on 29 April 2000, paragraph 2 was unchanged since the adoption of the 1963 Draft Convention by the OECD Council on 30 July 1963."

# ARTICLE 15

## INCOME FROM EMPLOYMENT

1.    Subject to the provisions of Articles 16, 18 and 19, salaries, wages and other similar remuneration derived by a resident of a Contracting State in respect of an employment shall be taxable only in that State unless the employment is exercised in the other Contracting State. If the employment is so exercised, such remuneration as is derived therefrom may be taxed in that other State.

2.    Notwithstanding the provisions of paragraph 1, remuneration derived by a resident of a Contracting State in respect of an employment exercised in the other Contracting State shall be taxable only in the first-mentioned State if:

   a) the recipient is present in the other State for a period or periods not exceeding in the aggregate 183 days in any twelve month period commencing or ending in the fiscal year concerned, and

   b) the remuneration is paid by, or on behalf of, an employer who is not a resident of the other State, and

   c) the remuneration is not borne by a permanent establishment which the employer has in the other State.

3.    Notwithstanding the preceding provisions of this Article, remuneration derived by a resident of a Contracting State in respect of an employment, as a member of the regular complement of a ship or aircraft, that is exercised aboard a ship or aircraft operated in international traffic, other than aboard a ship or aircraft operated solely within the other Contracting State, shall be taxable only in the first-mentioned State.

## HISTORY

**The title of Article 15:** Amended by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of the Annex of another report entitled "Issues related to Article 14 of the OECD Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 27 January 2000). In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until 29 April 2000, the title of Article 15 read as follows:

"DEPENDENT PERSONAL SERVICES"

**Paragraph 1:** Unchanged since the adoption of the 1963 Draft Convention by the OECD Council on 30 July 1963.

**Paragraph 2:** Amended on 29 April 2000, by deleting the words "or a fixed base" in subparagraph c), by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of the Annex of another report entitled "Issues related to Article 14 of the OECD Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on

27 January 2000). After 23 July 1992 and until 29 April 2000, paragraph 2 read as follows:

"2.      Notwithstanding the provisions of paragraph 1, remuneration derived by a resident of a Contracting State in respect of an employment exercised in the other Contracting State shall be taxable only in the first-mentioned State if:

   *a)* the recipient is present in the other State for a period or periods not exceeding in the aggregate 183 days in any twelve month period commencing or ending in the fiscal year concerned, and

   *b)* the remuneration is paid by, or on behalf of, an employer who is not a resident of the other State, and

   *c)* the remuneration is not borne by a permanent establishment or a fixed base which the employer has in the other State."

Paragraph 2 was previously amended on 23 July 1992, by adding the words "in any twelve month period commencing or ending" to subparagraph *a)*, by the report entitled "The Revision of the Model Convention", adopted by the OECD Council on 23 July 1992, on the basis of paragraph 80 of the report entitled "Taxation Issues Relating to the International Hiring-out of Labour" (adopted by the OECD Council on 24 August 1984). In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until 23 July 1992, paragraph 2 read as follows:

"2.      Notwithstanding the provisions of paragraph 1, remuneration derived by a resident of a Contracting State in respect of an employment exercised in the other Contracting State shall be taxable only in the first-mentioned State if:

   *a)* the recipient is present in the other State for a period or periods not exceeding in the aggregate 183 days in the fiscal year concerned, and.

   *b)* the remuneration is paid by, or on behalf of, an employer who is not a resident of the other State, and

   *c)* the remuneration is not borne by a permanent establishment or a fixed base which the employer has in the other State."

**Paragraph 3:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017. In the 1977 Model Convention and until 21 November 2017, paragraph 3 read as follows:

"3.      Notwithstanding the preceding provisions of this Article, remuneration derived in respect of an employment exercised aboard a ship or aircraft operated in international traffic, or aboard a boat engaged in inland waterways transport, may be taxed in the Contracting State in which the place of effective management of the enterprise is situated."

Paragraph 3 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 3 read as follows:

"3.      Notwithstanding the preceding provisions of this Article, remuneration in respect of an employment exercised aboard a ship or aircraft in international traffic, or aboard a boat engaged in inland waterways transport, may be taxed in the Contracting State in which the place of effective management of the enterprise is situated."

# ARTICLE 16

## DIRECTORS' FEES

Directors' fees and other similar payments derived by a resident of a Contracting State in his capacity as a member of the board of directors of a company which is a resident of the other Contracting State may be taxed in that other State.

## HISTORY

Article 16 was amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977 by adding the word "other" immediately before "similar payments". In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, Article 16 read as follows:

"Directors' fees and similar payments derived by a resident of a Contracting State in his capacity as a member of the board of directors of a company which is a resident of the other Contracting State may be taxed in that other State."

# ARTICLE 17

## ENTERTAINERS AND SPORTSPERSONS

1.    Notwithstanding the provisions of Article 15, income derived by a resident of a Contracting State as an entertainer, such as a theatre, motion picture, radio or television artiste, or a musician, or as a sportsperson, from that resident's personal activities as such exercised in the other Contracting State, may be taxed in that other State.

2.    Where income in respect of personal activities exercised by an entertainer or a sportsperson acting as such accrues not to the entertainer or sportsperson but to another person, that income may, notwithstanding the provisions of Article 15, be taxed in the Contracting State in which the activities of the entertainer or sportsperson are exercised.

## HISTORY

**The title of Article 17:** Amended on 15 July 2014 by the report entitled "The 2014 Update to the Model Tax Convention", adopted by the OECD Council on 15 July 2014. After 23 July 1992 and until 15 July 2014, the title of Article 17 read as follows:

<div align="center">"ARTISTES AND SPORTSMEN"</div>

The title of Article 17 was previously amended on 23 July 1992 by the report entitled "The Revision of the Model Convention", adopted by the OECD Council on 23 July 1992, on the basis of paragraph 5 of the report entitled "The Taxation of Income Derived from Entertainment, Artistic and Sporting Activities" (adopted by the OECD Council on 27 March 1987). In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until 23 July 1992, the title of Article 17 read as follows:

<div align="center">"ARTISTES AND ATHLETES"</div>

**Paragraph 1:** Amended on 15 July 2014 by the report entitled "The 2014 Update to the Model Tax Convention", adopted by the OECD Council on 15 July 2014. After 29 April 2000 and until 15 July 2014, paragraph 1 read as follows:

"1.    Notwithstanding the provisions of Articles 7 and 15, income derived by a resident of a Contracting State as an entertainer, such as a theatre, motion picture, radio or television artiste, or a musician, or as a sportsman, from his personal activities as such exercised in the other Contracting State, may be taxed in that other State."

Paragraph 1 was previously amended on 29 April 2000, by replacing the cross-reference to "Article 14" with a cross-reference to "Article 7", by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of the Annex of another report entitled "Issues related to Article 14 of the OECD Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 27 January 2000). After 23 July 1992 and until 29 April 2000, paragraph 1 read as follows:

"1.    Notwithstanding the provisions of Articles 14 and 15, income derived by a resident of a Contracting State as an entertainer, such as a theatre, motion picture, radio or television artiste, or a musician, or as a sportsman, from his personal activities as such exercised in the other Contracting State, may be taxed in that other State."

Paragraph 1 was previously amended on 23 July 1992, by replacing the words "an athlete" with "a sportsman", by the report entitled "The Revision of the Model Convention", adopted by the OECD Council on 23 July 1992, on the basis of paragraph 5 of the report entitled "The Taxation of Income Derived from Entertainment, Artistic and Sporting Activities" (adopted by the OECD Council on 27 March 1987). In the 1977 Model Convention and until 23 July 1992, paragraph 1 read as follows:

"1.    Notwithstanding the provisions of Articles 14 and 15, income derived by a resident of a Contracting State as an entertainer, such as a theatre, motion picture, radio or television artiste, or a musician, or as an athlete, from his personal activities as such exercised in the other Contracting State, may be taxed in that other State."

Paragraph 1 was included in the 1963 Draft Convention as Article 17. In the 1977 Model Convention, adopted by the OECD Council on 11 April 1977, Article 17 was designated as paragraph 1 and amended. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, Article 17 read as follows:

"Notwithstanding the provisions of Articles 14 and 15, income derived by public entertainers, such as theatre, motion picture, radio or television artistes, and musicians, and by athletes, from their personal activities as such may be taxed in the Contracting State in which these activities are exercised."

**Paragraph 2:** Amended on 15 July 2014 by the report entitled "The 2014 Update to the Model Tax Convention", adopted by the OECD Council on 15 July 2014. After 29 April 2000 and until 15 July 2014, paragraph 2 read as follows:

"2.    Where income in respect of personal activities exercised by an entertainer or a sportsman in his capacity as such accrues not to the entertainer or sportsman himself but to another person, that income may, notwithstanding the provisions of Articles 7 and 15, be taxed in the Contracting State in which the activities of the entertainer or sportsman are exercised."

Paragraph 2 was previously amended on 29 April 2000, by deleting the reference to Article 14, by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of the Annex of another report entitled "Issues related to Article 14 of the OECD Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 27 January 2000). After 23 July 1992 and until 29 April 2000, paragraph 2 read as follows:

"2.    Where income in respect of personal activities exercised by an entertainer or a sportsman in his capacity as such accrues not to the entertainer or sportsman himself but to another person, that income may, notwithstanding the provisions of Articles 7, 14 and 15, be taxed in the Contracting State in which the activities of the entertainer or sportsman are exercised."

Paragraph 2 was previously amended on 23 July 1992, by replacing the two references to "athlete" with "sportsman", by the report entitled "The Revision of the Model Convention", adopted by the OECD Council on 23 July 1992, on the basis of paragraph 5 of the report entitled "The Taxation of Income Derived from Entertainment, Artistic and Sporting Activities" (adopted by the OECD Council on 27 March 1987). In the 1977 Model Convention and until 23 July 1992, paragraph 2 read as follows:

"2.    Where income in respect of personal activities exercised by an entertainer or a athlete in his capacity as such accrues not to the entertainer or athlete himself but to another person, that income may, notwithstanding the provisions of Articles 7, 14 and 15, be taxed in the Contracting State in which the activities of the entertainer or sportsman are exercised."

Paragraph 2 was added when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977.

# ARTICLE 18

# PENSIONS

Subject to the provisions of paragraph 2 of Article 19, pensions and other similar remuneration paid to a resident of a Contracting State in consideration of past employment shall be taxable only in that State.

## HISTORY

Article 18 was amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977 by replacing the words "paragraph 1 of Article 19" with "paragraph 2 of Article 19". In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, Article 18 read as follows:

> "Subject to the provisions of paragraph 1 of Article 19, pensions and other similar remuneration paid to a resident of a Contracting State in consideration of past employment shall be taxable only in that State."

# ARTICLE 19

## GOVERNMENT SERVICE

1. *a)* Salaries, wages and other similar remuneration paid by a Contracting State or a political subdivision or a local authority thereof to an individual in respect of services rendered to that State or subdivision or authority shall be taxable only in that State.

    *b)* However, such salaries, wages and other similar remuneration shall be taxable only in the other Contracting State if the services are rendered in that State and the individual is a resident of that State who:

    *(i)* is a national of that State; or

    *(ii)* did not become a resident of that State solely for the purpose of rendering the services.

2. *a)* Notwithstanding the provisions of paragraph 1, pensions and other similar remuneration paid by, or out of funds created by, a Contracting State or a political subdivision or a local authority thereof to an individual in respect of services rendered to that State or subdivision or authority shall be taxable only in that State.

    *b)* However, such pensions and other similar remuneration shall be taxable only in the other Contracting State if the individual is a resident of, and a national of, that State.

3. The provisions of Articles 15, 16, 17, and 18 shall apply to salaries, wages, pensions, and other similar remuneration in respect of services rendered in connection with a business carried on by a Contracting State or a political subdivision or a local authority thereof.

## HISTORY

**The title of Article 19:** Amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, the title of Article 19 read as follows:

"GOVERNMENTAL FUNCTIONS"

**Paragraph 1:** Amended on 15 July 2005, by deleting the words "other than a pension" in subparagraph *a)*, by the report entitled "The 2005 Update to the Model Tax Convention", adopted by the OECD Council on 15 July 2005. After 31 March 1994 and until 15 July 2005, paragraph 1 read as follows:

"1. *a)* Salaries, wages and other similar remuneration, other than a pension, paid by a Contracting State or a political subdivision or a local authority thereof to an individual in respect of services rendered to that State or subdivision or authority shall be taxable only in that State.

    *b)*  However, such salaries, wages and other similar remuneration shall be taxable only in the other Contracting State if the services are rendered in that State and the individual is a resident of that State who:

    *(i)*  is a national of that State; or

    *(ii)* did not become a resident of that State solely for the purpose of rendering the services."

Paragraph 1 was previously amended on 31 March 1994 by the report entitled "1994 Update to the Model Tax Convention", adopted by the OECD Council on 31 March 1994. In the 1977 Model Convention and until 31 March 1994, paragraph 1 read as follows:

"1. *a)*  Remuneration, other than a pension, paid by a Contracting State or a political subdivision or a local authority thereof to an individual in respect of services rendered to that State or subdivision or authority shall be taxable only in that State.

    *b)*  However, such remuneration shall be taxable only in the other Contracting State if the services are rendered in that State and the individual is a resident of that State who:

    *(i)*  is a national of that State; or

    *(ii)* did not become a resident of that State solely for the purpose of rendering the services."

Paragraph 1 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 1 read as follows:

"1.    Remuneration, including pensions, paid by, or out of funds created by, a Contracting State or a political subdivision or a local authority thereof to any individual in respect of services rendered to that State or subdivision or local authority thereof in the discharge of functions of a governmental nature may be taxed in that State."

**Paragraph 2:** Amended on 15 July 2005 by the report entitled "The 2005 Update to the Model Tax Convention", adopted by the OECD Council on 15 July 2005. In the 1977 Model Convention and until 15 July 2005, paragraph 2 read as follows:

"2. *a)*  Any pension paid by, or out of funds created by, a Contracting State or a political subdivision or a local authority thereof to an individual in respect of services rendered to that State or subdivision or authority shall be taxable only in that State.

    *b)*  However, such pension shall be taxable only in the other Contracting State if the individual is a resident of, and a national of, that State."

Paragraph 2 of the 1963 Draft Convention was replaced when the 1977 Model Convention, was adopted by the OECD Council on 11 April 1977. At that time, paragraph 2 of the 1963 Draft Convention was amended and renumbered as paragraph 3 (see history of paragraph 3) and new paragraph 2 was added when the 1977 Model Convention was adopted.

**Paragraph 3:** Amended on 15 July 2005 by the report entitled "The 2005 Update to the Model Tax Convention", adopted by the OECD Council on 15 July 2005. After 21 September 1995 and until 15 July 2005, paragraph 3 read as follows:

"3.    The provisions of Articles 15, 16, 17, and 18 shall apply to salaries, wages and other similar remuneration, and to pensions, in respect of services rendered in connection with a business carried on by a Contracting State or a political subdivision or a local authority thereof."

Paragraph 3 was previously amended on 21 September 1995, by adding a reference to Article 17, by the report entitled "The 1995 Update to the Model Tax Convention", adopted by the OECD Council on 21 September 1995. After 31 March 1994 and until 21 September 1995, paragraph 3 read as follows:

"3.    The provisions of Articles 15, 16, and 18 shall apply to salaries, wages and other similar remuneration, and to pensions, in respect of services rendered in connection with a business carried on by a Contracting State or a political subdivision or a local authority thereof."

Paragraph 3 was previously amended on 31 March 1994 by the report entitled "1994 Update to the Model Tax Convention", adopted by the OECD Council on 31 March 1994. In the 1977 Model Convention and until 31 March 1994, paragraph 3 read as follows:

"3.    The provisions of Articles 15, 16 and 18 shall apply to remuneration and pensions in respect of services rendered in connection with a business carried on by a Contracting State or a political subdivision or a local authority thereof."

Paragraph 3 of the 1977 Model Convention corresponded to paragraph 2 of the 1963 Draft Convention. Paragraph 2 of the 1963 Draft Convention was renumbered as paragraph 3 and amended, by substituting "remuneration and pensions" for "remuneration or pensions" and by substituting "a business" for "any trade or business", when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 2 read as follows:

"2.    The provisions of Articles 15, 16 and 18 shall apply to remuneration or pensions in respect of services rendered in connection with a trade or business carried on by one of the Contracting States or a political subdivision or a local authority thereof."

# ARTICLE 20

# STUDENTS

Payments which a student or business apprentice who is or was immediately before visiting a Contracting State a resident of the other Contracting State and who is present in the first-mentioned State solely for the purpose of his education or training receives for the purpose of his maintenance, education or training shall not be taxed in that State, provided that such payments arise from sources outside that State.

## HISTORY

Article 20 was amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, Article 20 read as follows:

> "Payments which a student or business apprentice who is or was formerly a resident of a Contracting State and who is present in the other Contracting State solely for the purpose of his education or training receives for the purpose of his maintenance, education or training shall not be taxed in that other State, provided that such payments are made to him from sources outside that other State."

# ARTICLE 21

# OTHER INCOME

1.    Items of income of a resident of a Contracting State, wherever arising, not dealt with in the foregoing Articles of this Convention shall be taxable only in that State.

2.    The provisions of paragraph 1 shall not apply to income, other than income from immovable property as defined in paragraph 2 of Article 6, if the recipient of such income, being a resident of a Contracting State, carries on business in the other Contracting State through a permanent establishment situated therein and the right or property in respect of which the income is paid is effectively connected with such permanent establishment. In such case the provisions of Article 7 shall apply.

## HISTORY

**The title of Article 21:** Amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, the title of Article 21 read as follows:

<div align="center">"INCOME NOT EXPRESSLY MENTIONED"</div>

**Paragraph 1:** Corresponds to Article 21 of the 1963 Draft Convention. Article 21 of the 1963 Draft Convention was designated as paragraph 1 and amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, Article 21 read as follows:

"Items of income of a resident of a Contracting State which are not expressly mentioned in the foregoing Articles of this Convention shall be taxable only in that State."

**Paragraph 2:** Amended on 29 April 2000 by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of the Annex of another report entitled "Issues related to Article 14 of the OECD Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 27 January 2000). In the 1977 Convention and until 29 April 2000, paragraph 2 read as follows:

"2.    The provisions of paragraph 1 shall not apply to income, other than income from immovable property as defined in paragraph 2 of Article 6, if the recipient of such income, being a resident of a Contracting State, carries on business in the other Contracting State through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the right or property in respect of which the income is paid is effectively connected with such permanent establishment or fixed base. In such case the provisions of Article 7 or Article 14, as the case may be, shall apply."

Paragraph 2 was added when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977.

# *Chapter IV*
# TAXATION OF CAPITAL

## ARTICLE 22

## CAPITAL

1.    Capital represented by immovable property referred to in Article 6, owned by a resident of a Contracting State and situated in the other Contracting State, may be taxed in that other State.

2.    Capital represented by movable property forming part of the business property of a permanent establishment which an enterprise of a Contracting State has in the other Contracting State may be taxed in that other State.

3.    Capital of an enterprise of a Contracting State that operates ships or aircraft in international traffic represented by such ships or aircraft, and by movable property pertaining to the operation of such ships or aircraft, shall be taxable only in that State.

4.    All other elements of capital of a resident of a Contracting State shall be taxable only in that State.

## HISTORY

**Paragraph 1:** Amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 1 read as follows:

"1.    Capital represented by immovable property, as defined in paragraph 2 of Article 6, may be taxed in the Contracting State in which such property is situated."

**Paragraph 2:** Amended on 29 April 2000 by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of the Annex of another report entitled "Issues related to Article 14 of the OECD Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 27 January 2000). In the 1977 Convention and until 29 April 2000, paragraph 2 read as follows:

"2.    Capital represented by movable property forming part of the business property of a permanent establishment which an enterprise of a Contracting State has in the other Contracting State or by movable property pertaining to a fixed base available to a resident of a Contracting State in the other Contracting State for the purpose of performing independent personal services, may be taxed in that other State."

Paragraph 2 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 2 read as follows:

"2.    Capital represented by movable property forming part of the business property of a permanent establishment of an enterprise, or by movable property pertaining to a fixed base used for the performance of professional services, may be taxed in the Contracting State in which the permanent establishment or fixed base is situated."

**Paragraph 3:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017. In the 1977 Model Convention and until 21 November 2017, paragraph 3 read as follows:

"3.    Capital represented by ships and aircraft operated in international traffic and by boats engaged in inland waterways transport, and by movable property pertaining to the operation of such ships, aircraft and boats, shall be taxable only in the Contracting State in which the place of effective management of the enterprise is situated."

Paragraph 3 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 3 read as follows:

"3.    Ships and aircraft operated in international traffic and boats engaged in inland waterways transport, and movable property pertaining to the operation of such ships, aircraft and boats, shall be taxable only in the Contracting State in which the place of effective management of the enterprise is situated."

**Paragraph 4:** Unchanged since the adoption of the 1963 Draft Convention by the OECD Council on 30 July 1963.

# *Chapter V*
# METHODS FOR ELIMINATION OF DOUBLE TAXATION

## ARTICLE 23 A
## EXEMPTION METHOD

1.    Where a resident of a Contracting State derives income or owns capital which may be taxed in the other Contracting State in accordance with the provisions of this Convention (except to the extent that these provisions allow taxation by that other State solely because the income is also income derived by a resident of that State or because the capital is also capital owned by a resident of that State), the first-mentioned State shall, subject to the provisions of paragraphs 2 and 3, exempt such income or capital from tax.

2.    Where a resident of a Contracting State derives items of income which may be taxed in the other Contracting State in accordance with the provisions of Articles 10 and 11 (except to the extent that these provisions allow taxation by that other State solely because the income is also income derived by a resident of that State), the first-mentioned State shall allow as a deduction from the tax on the income of that resident an amount equal to the tax paid in that other State. Such deduction shall not, however, exceed that part of the tax, as computed before the deduction is given, which is attributable to such items of income derived from that other State.

3.    Where in accordance with any provision of the Convention income derived or capital owned by a resident of a Contracting State is exempt from tax in that State, such State may nevertheless, in calculating the amount of tax on the remaining income or capital of such resident, take into account the exempted income or capital.

4.    The provisions of paragraph 1 shall not apply to income derived or capital owned by a resident of a Contracting State where the other Contracting State applies the provisions of this Convention to exempt such income or capital from tax or applies the provisions of paragraph 2 of Article 10 or 11 to such income.

## HISTORY

**Paragraph 1:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, as a result of follow-up work on another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by

the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015. In the 1977 Model Convention and until 21 November 2017, paragraph 1 read as follows:

"1.    Where a resident of a Contracting State derives income or owns capital which, in accordance with the provisions of this Convention, may be taxed in the other Contracting State, the first-mentioned State shall, subject to the provisions of paragraphs 2 and 3, exempt such income or capital from tax."

Paragraph 1 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 1 read as follows:

"1.    Where a resident of a Contracting State derives income or owns capital which, in accordance with the provisions of this Convention, may be taxed in the other Contracting State, the first-mentioned State shall, subject to the provisions of paragraph 2, exempt such income or capital from tax but may, in calculating tax on the remaining income or capital of that person, apply the rate of tax which would have been applicable if the exempted income or capital had not been so exempted."

**Paragraph 2:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, as a result of follow-up work on another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015. In the 1977 Model Convention and until 21 November 2017, paragraph 2 read as follows:

"2.    Where a resident of a Contracting State derives items of income which, in accordance with the provisions of Articles 10 and 11, may be taxed in the other Contracting State, the first-mentioned State shall allow as a deduction from the tax on the income of that resident an amount equal to the tax paid in that other State. Such deduction shall not, however, exceed that part of the tax, as computed before the deduction is given, which is attributable to such items of income derived from that other State."

Paragraph 2 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 2 read as follows:

"2.    Where a resident of a Contracting State derives income which, in accordance with the provisions of Articles 10 and 11, may be taxed in the other Contracting State, the first-mentioned State shall allow as a deduction from the tax on the income of that person an amount equal to the tax paid in that other Contracting State. Such deduction shall not, however, exceed that part of the tax, as computed before the deduction is given, which is appropriate to the income derived from that other Contracting State."

**Paragraph 3:** Added when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977.

**Paragraph 4:** Added on 29 April 2000 by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000, on the basis of paragraph 113 of another report entitled "The Application of the OECD Model Tax Convention to Partnerships" (adopted by the OECD Committee on Fiscal Affairs on 20 January 1999).

## ARTICLE 23 B

## CREDIT METHOD

1.    Where a resident of a Contracting State derives income or owns capital which may be taxed in the other Contracting State in accordance with the provisions of this Convention (except to the extent that these provisions allow taxation by that other State solely because the income is also income derived by a resident of that State or because the capital is also capital owned by a resident of that State), the first-mentioned State shall allow:

   *a)* as a deduction from the tax on the income of that resident, an amount equal to the income tax paid in that other State;

   *b)* as a deduction from the tax on the capital of that resident, an amount equal to the capital tax paid in that other State.

Such deduction in either case shall not, however, exceed that part of the income tax or capital tax, as computed before the deduction is given, which is attributable, as the case may be, to the income or the capital which may be taxed in that other State.

2.    Where in accordance with any provision of the Convention income derived or capital owned by a resident of a Contracting State is exempt from tax in that State, such State may nevertheless, in calculating the amount of tax on the remaining income or capital of such resident, take into account the exempted income or capital.

## HISTORY

**Paragraph 1:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, as a result of follow-up work on another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015. In the 1977 Model Convention and until 21 November 2017, paragraph 1 read as follows:

   "1.    Where a resident of a Contracting State derives income or owns capital which, in accordance with the provisions of this Convention, may be taxed in the other Contracting State, the first-mentioned State shall allow:

      *a)* as a deduction from the tax on the income of that resident, an amount equal to the income tax paid in that other State;

      *b)* as a deduction from the tax on the capital of that resident, an amount equal to the capital tax paid in that other State.

   Such deduction in either case shall not, however, exceed that part of the income tax or capital tax, as computed before the deduction is given, which is attributable, as the case may be, to the income or the capital which may be taxed in that other State."

Paragraph 1 as it read after 11 April 1977 corresponded to paragraphs 1 and 2 of the 1963 Draft Convention. These paragraphs were merged and amended when the 1977

Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraphs 1 and 2 read as follows:

"1.    Where a resident of a Contracting State derives income or owns capital which, in accordance with the provisions of this Convention, may be taxed in the other Contracting State, the first-mentioned State shall allow:

   *a)* as a deduction from the tax on the income of that person, an amount equal to the income tax paid in that other Contracting State;

   *b)* as a deduction from the tax on the capital of that person, an amount equal to the capital tax paid in that other Contracting State.

2.    The deduction in either case shall not, however, exceed that part of the income tax or capital tax, respectively, as computed before the deduction is given, which is appropriate, as the case may be, to the income or the capital which may be taxed in the other Contracting State."

**Paragraph 2:** Replaced paragraph 2 of the 1963 Draft Convention when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. At that time, paragraph 2 of the 1963 Draft Convention was merged with paragraph 1 (see history of paragraph 1) and a new paragraph 2 was added.

# Chapter VI
# SPECIAL PROVISIONS

## ARTICLE 24

## NON-DISCRIMINATION

1.    Nationals of a Contracting State shall not be subjected in the other Contracting State to any taxation or any requirement connected therewith, which is other or more burdensome than the taxation and connected requirements to which nationals of that other State in the same circumstances, in particular with respect to residence, are or may be subjected. This provision shall, notwithstanding the provisions of Article 1, also apply to persons who are not residents of one or both of the Contracting States.

2.    Stateless persons who are residents of a Contracting State shall not be subjected in either Contracting State to any taxation or any requirement connected therewith, which is other or more burdensome than the taxation and connected requirements to which nationals of the State concerned in the same circumstances, in particular with respect to residence, are or may be subjected.

3.    The taxation on a permanent establishment which an enterprise of a Contracting State has in the other Contracting State shall not be less favourably levied in that other State than the taxation levied on enterprises of that other State carrying on the same activities. This provision shall not be construed as obliging a Contracting State to grant to residents of the other Contracting State any personal allowances, reliefs and reductions for taxation purposes on account of civil status or family responsibilities which it grants to its own residents.

4.    Except where the provisions of paragraph 1 of Article 9, paragraph 6 of Article 11, or paragraph 4 of Article 12, apply, interest, royalties and other disbursements paid by an enterprise of a Contracting State to a resident of the other Contracting State shall, for the purpose of determining the taxable profits of such enterprise, be deductible under the same conditions as if they had been paid to a resident of the first-mentioned State. Similarly, any debts of an enterprise of a Contracting State to a resident of the other Contracting State shall, for the purpose of determining the taxable capital of such enterprise, be deductible under the same conditions as if they had been contracted to a resident of the first-mentioned State.

5.    Enterprises of a Contracting State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State, shall not be subjected in the first-mentioned State to any taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which other similar enterprises of the first-mentioned State are or may be subjected.

6.    The provisions of this Article shall, notwithstanding the provisions of Article 2, apply to taxes of every kind and description.

## HISTORY

**Paragraph 1:** Amended on 23 July 1992, by adding the words "in particular with respect to residence" in the first sentence, by the report entitled "The Revision of the Model Convention", adopted by the OECD Council on 23 July 1992. In the 1977 Model Convention and until 23 July 1992, paragraph 1 read as follows:

"1.    Nationals of a Contracting State shall not be subjected in the other Contracting State to any taxation or any requirement connected therewith, which is other or more burdensome than the taxation and connected requirements to which nationals of that other State in the same circumstances are or may be subjected. This provision shall, notwithstanding the provisions of Article 1, also apply to persons who are not residents of one or both of the Contracting States."

Paragraph 1 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977, notably by adding the second sentence. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 1 read as follows:

"1.    The nationals of a Contracting State shall not be subjected in the other Contracting State to any taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which nationals of that other State in the same circumstances are or may be subjected."

**Paragraph 2:** Amended on 23 October 1997, by adding the words "in particular with respect to residence" after the words "in the same circumstances", by the report entitled "The 1997 Update to the Model Tax Convention", adopted by the OECD Council on 23 October 1997. After 23 July 1992 and until 23 October 1997, paragraph 2 read as follows:

"2.    Stateless persons who are residents of a Contracting State shall not be subjected in either Contracting State to any taxation or any requirement connected therewith, which is other or more burdensome than the taxation and connected requirements to which nationals of the State concerned in the same circumstances, in particular with respect to residence, are or may be subjected."

Paragraph 2 as it read after 23 July 1992 corresponded to paragraph 3 of the 1977 Model Convention. On 23 July 1992, paragraph 2 of the 1977 Model Convention was amended and redesignated as subparagraph 1 f) of Article 3 (see history of paragraph 1 of Article 3) and paragraph 3 was renumbered as paragraph 2, by the report entitled "The Revision of the Model Convention", adopted by the OECD Council

on 23 July 1992. In the 1977 Model Convention and until 23 July 1992, paragraph 3 read as follows:

"3.    The term "nationals" means:

*a)* all individuals possessing the nationality of a Contracting State;

*b)* all legal persons, partnerships and associations deriving their status as such from the laws in force in a Contracting State."

Paragraph 3 of the 1963 Draft Convention was amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 3 read as follows:

"3.    Stateless persons shall not be subjected in a Contracting State to any taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which nationals of that State in the same circumstances are or may be subjected."

**Paragraph 3:** Corresponds to paragraph 4 of the 1977 Model Convention as it read before 23 July 1992. On that date, paragraph 3 was renumbered as paragraph 2 (see history of paragraph 2) and paragraph 4 of the 1977 Model Convention was renumbered as paragraph 3, by the report entitled "The Revision of the Model Convention", adopted by the OECD Council on 23 July 1992.

Paragraph 4 was amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention, the second sentence was presented as a second paragraph within paragraph 4 of the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963). This was corrected when the 1977 Model Convention was adopted.

**Paragraph 4:** Corresponds to paragraph 5 of the 1977 Model Convention as it read before 23 July 1992. On that date, paragraph 4 was renumbered as paragraph 3 (see history of paragraph 3) and paragraph 5 of the 1977 Model Convention was renumbered as paragraph 4, by the report entitled "The Revision of the Model Convention", adopted by the OECD Council on 23 July 1992.

Paragraph 5 of the 1977 Model Convention was added when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977.

**Paragraph 5:** Corresponds to paragraph 6 of the 1977 Model Convention as it read before 23 July 1992. On that date, paragraph 5 was renumbered as paragraph 4 (see history of paragraph 4) and paragraph 6 of the 1977 Model Convention was renumbered as paragraph 5 by the report entitled "The Revision of the Model Convention", adopted by the OECD Council on 23 July 1992.

Paragraph 6 of the 1977 Model Convention corresponded to paragraph 5 of the 1963 Draft Convention. Paragraph 5 of the 1963 Draft Convention was renumbered as paragraph 6 and amended when the 1977 Model Convention, was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 5 read as follows:

"5.    Enterprises of a Contracting State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State, shall not be subjected in the first-mentioned Contracting State to any taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which other similar enterprises of that first-mentioned State are or may be subjected."

**Paragraph 6:** Corresponds to paragraph 7 of the 1977 Model Convention as it read before 23 July 1992. On that date, paragraph 6 was renumbered as paragraph 5 (see

history of paragraph 5) and paragraph 7 of the 1977 Model Convention was renumbered as paragraph 6 by the report entitled "The Revision of the Model Convention", adopted by the OECD Council on 23 July 1992.

Paragraph 7 of the 1977 Model Convention corresponded to paragraph 6 of the 1963 Draft Convention. Paragraph 6 of the 1963 Draft Convention was amended and renumbered as paragraph 7 when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 6 read as follows:

"6.    In this Article the term "taxation" means taxes of every kind and description."

## ARTICLE 25

## MUTUAL AGREEMENT PROCEDURE

1.     Where a person considers that the actions of one or both of the Contracting States result or will result for him in taxation not in accordance with the provisions of this Convention, he may, irrespective of the remedies provided by the domestic law of those States, present his case to the competent authority of either Contracting State. The case must be presented within three years from the first notification of the action resulting in taxation not in accordance with the provisions of the Convention.

2.     The competent authority shall endeavour, if the objection appears to it to be justified and if it is not itself able to arrive at a satisfactory solution, to resolve the case by mutual agreement with the competent authority of the other Contracting State, with a view to the avoidance of taxation which is not in accordance with the Convention. Any agreement reached shall be implemented notwithstanding any time limits in the domestic law of the Contracting States.

3.     The competent authorities of the Contracting States shall endeavour to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention. They may also consult together for the elimination of double taxation in cases not provided for in the Convention.

4.     The competent authorities of the Contracting States may communicate with each other directly, including through a joint commission consisting of themselves or their representatives, for the purpose of reaching an agreement in the sense of the preceding paragraphs.

5.     Where,

   *a)* under paragraph 1, a person has presented a case to the competent authority of a Contracting State on the basis that the actions of one or both of the Contracting States have resulted for that person in taxation not in accordance with the provisions of this Convention, and

   *b)* the competent authorities are unable to reach an agreement to resolve that case pursuant to paragraph 2 within two years from the date when all the information required by the competent authorities in order to address the case has been provided to both competent authorities,

any unresolved issues arising from the case shall be submitted to arbitration if the person so requests in writing. These unresolved issues shall not, however, be submitted to arbitration if a decision on these issues has already been rendered by a court or administrative tribunal of either State. Unless a person directly affected by the case does not accept the mutual agreement

that implements the arbitration decision, that decision shall be binding on both Contracting States and shall be implemented notwithstanding any time limits in the domestic laws of these States. The competent authorities of the Contracting States shall by mutual agreement settle the mode of application of this paragraph.

## HISTORY

**Paragraph 1:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Making Dispute Resolution Mechanisms More Effective, Action 14 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015. In the 1977 Model Convention and until 21 November 2017, paragraph 1 read as follows:

"1.    Where a person considers that the actions of one or both of the Contracting States result or will result for him in taxation not in accordance with the provisions of this Convention, he may, irrespective of the remedies provided by the domestic law of those States, present his case to the competent authority of the Contracting State of which he is a resident or, if his case comes under paragraph 1 of Article 24, to that of the Contracting State of which he is a national. The case must be presented within three years from the first notification of the action resulting in taxation not in accordance with the provisions of the Convention."

Paragraph 1 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977, notably by adding the second sentence. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 1 read as follows:

"1.    Where a resident of a Contracting State considers that the actions of one or both of the Contracting States result or will result for him in taxation not in accordance with this Convention, he may, notwithstanding the remedies provided by the national laws of those States, present his case to the competent authority of the Contracting State of which he is a resident."

**Paragraph 2:** Amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977, notably by adding the second sentence. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 2 read as follows:

"2.    The competent authority shall endeavour, if the objection appears to it to be justified and if it is not itself able to arrive at an appropriate solution, to resolve the case by mutual agreement with the competent authority of the other Contracting State, with a view to the avoidance of taxation not in accordance with the Convention."

**Paragraph 3:** Unchanged since the adoption of the 1963 Draft Convention by the OECD Council on 30 July 1963.

**Paragraph 4:** Amended on 21 September 1995 by the report entitled "The 1995 Update to the Model Tax Convention", adopted by the OECD Council on 21 September 1995. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until 21 September 1995, paragraph 4 read as follows:

"4.    The competent authorities of the Contracting States may communicate with each other directly for the purpose of reaching an agreement in the sense of the preceding paragraphs. When it seems advisable in order to reach agreement to have an oral exchange of opinions, such exchange may take place through a Commission consisting of representatives of the competent authorities of the Contracting States."

**Paragraph 5:** Amended on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017. After 17 July 2008 and until 21 November 2017, paragraph 5 read as follows:

"5.    Where,

  a)  under paragraph 1, a person has presented a case to the competent authority of a Contracting State on the basis that the actions of one or both of the Contracting States have resulted for that person in taxation not in accordance with the provisions of this Convention, and

  b)  the competent authorities are unable to reach an agreement to resolve that case pursuant to paragraph 2 within two years from the presentation of the case to the competent authority of the other Contracting State,

any unresolved issues arising from the case shall be submitted to arbitration if the person so requests. These unresolved issues shall not, however, be submitted to arbitration if a decision on these issues has already been rendered by a court or administrative tribunal of either State. Unless a person directly affected by the case does not accept the mutual agreement that implements the arbitration decision, that decision shall be binding on both Contracting States and shall be implemented notwithstanding any time limits in the domestic laws of these States. The competent authorities of the Contracting States shall by mutual agreement settle the mode of application of this paragraph.[1]

1   In some States, national law, policy or administrative considerations may not allow or justify the type of dispute resolution envisaged under this paragraph. In addition, some States may only wish to include this paragraph in treaties with certain States. For these reasons, the paragraph should only be included in the Convention where each State concludes that it would be appropriate to do so based on the factors described in paragraph 65 of the Commentary on the paragraph. As mentioned in paragraph 74 of that Commentary, however, other States may be able to agree to remove from the paragraph the condition that issues may not be submitted to arbitration if a decision on these issues has already been rendered by one of their courts or administrative tribunals."

Paragraph 5 was added on 17 July 2008 by the report entitled "The 2008 Update to the Model Tax Convention", adopted by the OECD Council on 17 July 2008.

# ARTICLE 26

# EXCHANGE OF INFORMATION

1.    The competent authorities of the Contracting States shall exchange such information as is foreseeably relevant for carrying out the provisions of this Convention or to the administration or enforcement of the domestic laws concerning taxes of every kind and description imposed on behalf of the Contracting States, or of their political subdivisions or local authorities, insofar as the taxation thereunder is not contrary to the Convention. The exchange of information is not restricted by Articles 1 and 2.

2.    Any information received under paragraph 1 by a Contracting State shall be treated as secret in the same manner as information obtained under the domestic laws of that State and shall be disclosed only to persons or authorities (including courts and administrative bodies) concerned with the assessment or collection of, the enforcement or prosecution in respect of, the determination of appeals in relation to the taxes referred to in paragraph 1, or the oversight of the above. Such persons or authorities shall use the information only for such purposes. They may disclose the information in public court proceedings or in judicial decisions. Notwithstanding the foregoing, information received by a Contracting State may be used for other purposes when such information may be used for such other purposes under the laws of both States and the competent authority of the supplying State authorises such use.

3.    In no case shall the provisions of paragraphs 1 and 2 be construed so as to impose on a Contracting State the obligation:

   a) to carry out administrative measures at variance with the laws and administrative practice of that or of the other Contracting State;

   b) to supply information which is not obtainable under the laws or in the normal course of the administration of that or of the other Contracting State;

   c) to supply information which would disclose any trade, business, industrial, commercial or professional secret or trade process, or information the disclosure of which would be contrary to public policy (ordre public).

4.    If information is requested by a Contracting State in accordance with this Article, the other Contracting State shall use its information gathering measures to obtain the requested information, even though that other State may not need such information for its own tax purposes. The obligation contained in the preceding sentence is subject to the limitations of paragraph 3 but in no case shall such limitations be construed to permit a

Contracting State to decline to supply information solely because it has no domestic interest in such information.

5.      In no case shall the provisions of paragraph 3 be construed to permit a Contracting State to decline to supply information solely because the information is held by a bank, other financial institution, nominee or person acting in an agency or a fiduciary capacity or because it relates to ownership interests in a person.

## HISTORY

**Paragraph 1:** Corresponds to the first two sentences of paragraph 1 as they read before 15 July 2005. The first two sentences of Paragraph 1 were amended and the third and subsequent sentences were incorporated into paragraph 2 (see history of paragraph 2) by the report entitled "The 2005 Update to the Model Tax Convention", adopted by the OECD Council on 15 July 2005, on the basis of another report entitled "Changes to Articles 25 and 26 of the Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 1 June 2004). After 29 April 2000 and until 15 July 2005, paragraph 1 read as follows:

"1.      The competent authorities of the Contracting States shall exchange such information as is necessary for carrying out the provisions of this Convention or of the domestic laws concerning taxes of every kind and description imposed on behalf of the Contracting States, or of their political subdivisions or local authorities, insofar as the taxation thereunder is not contrary to the Convention. The exchange of information is not restricted by Articles 1 and 2. Any information received by a Contracting State shall be treated as secret in the same manner as information obtained under the domestic laws of that State and shall be disclosed only to persons or authorities (including courts and administrative bodies) concerned with the assessment or collection of, the enforcement or prosecution in respect of, or the determination of appeals in relation to the taxes referred to in the first sentence. Such persons or authorities shall use the information only for such purposes. They may disclose the information in public court proceedings or in judicial decisions."

Paragraph 1 was previously amended on 29 April 2000 by the report entitled "The 2000 Update to the Model Tax Convention", adopted by the OECD Committee on Fiscal Affairs on 29 April 2000. After 21 September 1995 and until 29 April 2000, paragraph 1 read as follows:

"1.      The competent authorities of the Contracting States shall exchange such information as is necessary for carrying out the provisions of this Convention or of the domestic laws of the Contracting States concerning taxes covered by the Convention insofar as the taxation thereunder is not contrary to the Convention. The exchange of information is not restricted by Article 1. Any information received by a Contracting State shall be treated as secret in the same manner as information obtained under the domestic laws of that State and shall be disclosed only to persons or authorities (including courts and administrative bodies) concerned with the assessment or collection of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes covered by the Convention. Such persons or authorities shall use the information only for such purposes. They may disclose the information in public court proceedings or in judicial decisions."

Paragraph 1 was previously amended on 21 September 1995, by replacing the words "involved in" with "concerned with", by the report entitled "The 1995 Update to the Model Tax Convention", adopted by the OECD Council on 21 September 1995. In the 1977 Model Convention and until 21 September 1995, paragraph 1 read as follows:

"1.    The competent authorities of the Contracting States shall exchange such information as is necessary for carrying out the provisions of this Convention or of the domestic laws of the Contracting States concerning taxes covered by the Convention insofar as the taxation thereunder is not contrary to the Convention. The exchange of information is not restricted by Article 1. Any information received by a Contracting State shall be treated as secret in the same manner as information obtained under the domestic laws of that State and shall be disclosed only to persons or authorities (including courts and administrative bodies) involved in the assessment or collection of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes covered by the Convention. Such persons or authorities shall use the information only for such purposes. They may disclose the information in public court proceedings or in judicial decisions."

Paragraph 1 was previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 1 read as follows:

"1.    The competent authorities of the Contracting States shall exchange such information as is necessary for the carrying out of this Convention and of the domestic laws of the Contracting States concerning taxes covered by this Convention insofar as the taxation thereunder is in accordance with this Convention. Any information so exchanged shall be treated as secret and shall not be disclosed to any persons or authorities other than those concerned with the assessment or collection of the taxes which are the subject of the Convention."

**Paragraph 2:** Amended on 15 July 2014, by adding the last sentence, by the report entitled "The 2014 Update to the Model Tax Convention", adopted by the OECD Council on 15 July 2014, on the basis of the report "Draft Amendments to Article 26 of the OECD Model Tax Convention and its Commentary", adopted by the OECD Council on 17 July 2012 and applicable from that date. After 15 July 2005 and until 15 July 2014, paragraph 2 read as follows:

"2.    Any information received under paragraph 1 by a Contracting State shall be treated as secret in the same manner as information obtained under the domestic laws of that State and shall be disclosed only to persons or authorities (including courts and administrative bodies) concerned with the assessment or collection of, the enforcement or prosecution in respect of, the determination of appeals in relation to the taxes referred to in paragraph 1, or the oversight of the above. Such persons or authorities shall use the information only for such purposes. They may disclose the information in public court proceedings or in judicial decisions."

Paragraph 2 as it read after 15 July 2005 corresponded to the third and subsequent sentences of paragraph 1 as they read before 15 July 2005. Those sentences were amended and incorporated into a new paragraph 2 by the report entitled "The 2005 Update to the Model Tax Convention", adopted by the OECD Council on 15 July 2005, on the basis of another report entitled "Changes to Articles 25 and 26 of the Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 1 June 2004) (see history of paragraph 1). At the same time, paragraph 2 was renumbered as paragraph 3 (see history of paragraph 3) and amended to include a cross-reference to paragraph 2.

MODEL CONVENTION

**Paragraph 3:** Corresponds to paragraph 2 as it read before 15 July 2005. On that date, paragraph 2 was renumbered as paragraph 3 and amended, by adding a cross-reference to paragraph 2, by the report entitled "The 2005 Update to the Model Tax Convention", adopted by the OECD Council on 15 July 2005, on the basis of another report entitled "Changes to Articles 25 and 26 of the Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 1 June 2004). In the 1977 Model Convention and until 15 July 2005, paragraph 2 read as follows:

"2.    In no case shall the provisions of paragraphs 1 and be construed so as to impose on a Contracting State the obligation:

    *a)* to carry out administrative measures at variance with the laws and administrative practice of that or of the other Contracting State;

    *b)* to supply information which is not obtainable under the laws or in the normal course of the administration of that or of the other Contracting State;

    *c)* to supply information which would disclose any trade, business, industrial, commercial or professional secret or trade process, or information, the disclosure of which would be contrary to public policy (*ordre public*)."

Paragraph 2 was amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 2 read as follows:

"2.    In no case shall the provisions of paragraph 1 be construed so as to impose on one of the Contracting States the obligation:

    *a)* to carry out administrative measures at variance with the laws or the administrative practice of that or of the other Contracting State;

    *b)* to supply particulars which are not obtainable under the laws or in the normal course of the administration of that or of the other Contracting State;

    *c)* to supply information which would disclose any trade, business, industrial, commercial or professional secret or trade process, or information, the disclosure of which would be contrary to public policy (ordre public)."

**Paragraph 4:** Added on 15 July 2005 by the report entitled "The 2005 Update to the Model Tax Convention", adopted by the OECD Council on 15 July 2005, on the basis of another report entitled "Changes to Articles 25 and 26 of the Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 1 June 2004).

**Paragraph 5:** Added on 15 July 2005 by the report entitled "The 2005 Update to the Model Tax Convention", adopted by the OECD Council on 15 July 2005, on the basis of another report entitled "Changes to Articles 25 and 26 of the Model Tax Convention" (adopted by the OECD Committee on Fiscal Affairs on 1 June 2004).

# ARTICLE 27

## ASSISTANCE IN THE COLLECTION OF TAXES[1]

1.    The Contracting States shall lend assistance to each other in the collection of revenue claims. This assistance is not restricted by Articles 1 and 2. The competent authorities of the Contracting States may by mutual agreement settle the mode of application of this Article.

2.    The term "revenue claim" as used in this Article means an amount owed in respect of taxes of every kind and description imposed on behalf of the Contracting States, or of their political subdivisions or local authorities, insofar as the taxation thereunder is not contrary to this Convention or any other instrument to which the Contracting States are parties, as well as interest, administrative penalties and costs of collection or conservancy related to such amount.

3.    When a revenue claim of a Contracting State is enforceable under the laws of that State and is owed by a person who, at that time, cannot, under the laws of that State, prevent its collection, that revenue claim shall, at the request of the competent authority of that State, be accepted for purposes of collection by the competent authority of the other Contracting State. That revenue claim shall be collected by that other State in accordance with the provisions of its laws applicable to the enforcement and collection of its own taxes as if the revenue claim were a revenue claim of that other State.

4.    When a revenue claim of a Contracting State is a claim in respect of which that State may, under its law, take measures of conservancy with a view to ensure its collection, that revenue claim shall, at the request of the competent authority of that State, be accepted for purposes of taking measures of conservancy by the competent authority of the other Contracting State. That other State shall take measures of conservancy in respect of that revenue claim in accordance with the provisions of its laws as if the revenue claim were a revenue claim of that other State even if, at the time when such measures are applied, the revenue claim is not enforceable in the first-mentioned State or is owed by a person who has a right to prevent its collection.

---

1  In some countries, national law, policy or administrative considerations may not allow or justify the type of assistance envisaged under this Article or may require that this type of assistance be restricted, e.g. to countries that have similar tax systems or tax administrations or as to the taxes covered. For that reason, the Article should only be included in the Convention where each State concludes that, based on the factors described in paragraph 1 of the Commentary on the Article, they can agree to provide assistance in the collection of taxes levied by the other State.

5.     Notwithstanding the provisions of paragraphs 3 and 4, a revenue claim accepted by a Contracting State for purposes of paragraph 3 or 4 shall not, in that State, be subject to the time limits or accorded any priority applicable to a revenue claim under the laws of that State by reason of its nature as such. In addition, a revenue claim accepted by a Contracting State for the purposes of paragraph 3 or 4 shall not, in that State, have any priority applicable to that revenue claim under the laws of the other Contracting State.

6.     Proceedings with respect to the existence, validity or the amount of a revenue claim of a Contracting State shall not be brought before the courts or administrative bodies of the other Contracting State.

7.     Where, at any time after a request has been made by a Contracting State under paragraph 3 or 4 and before the other Contracting State has collected and remitted the relevant revenue claim to the first-mentioned State, the relevant revenue claim ceases to be

   a) in the case of a request under paragraph 3, a revenue claim of the first-mentioned State that is enforceable under the laws of that State and is owed by a person who, at that time, cannot, under the laws of that State, prevent its collection, or

   b) in the case of a request under paragraph 4, a revenue claim of the first-mentioned State in respect of which that State may, under its laws, take measures of conservancy with a view to ensure its collection

the competent authority of the first-mentioned State shall promptly notify the competent authority of the other State of that fact and, at the option of the other State, the first-mentioned State shall either suspend or withdraw its request.

8.     In no case shall the provisions of this Article be construed so as to impose on a Contracting State the obligation:

   a) to carry out administrative measures at variance with the laws and administrative practice of that or of the other Contracting State;

   b) to carry out measures which would be contrary to public policy (*ordre public*);

   c) to provide assistance if the other Contracting State has not pursued all reasonable measures of collection or conservancy, as the case may be, available under its laws or administrative practice;

   d) to provide assistance in those cases where the administrative burden for that State is clearly disproportionate to the benefit to be derived by the other Contracting State.

## HISTORY

**The title of Article 27:** Replaced on 28 January 2003 when the previous Article 27 (Members of Diplomatic Missions and Consular Posts) was renumbered as Article 28 (see history of Article 28) and a new Article 27 (Assistance in the Collection of Taxes) was added by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 1:** Replaced on 28 January 2003 when paragraph 1 was renumbered as paragraph 1 of Article 28 (see history of paragraph 1 of Article 28) and a new paragraph 1 was added by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003 (see history of Article 28).

**Paragraph 2:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2002.

**Paragraph 3:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2002.

**Paragraph 4:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2002.

**Paragraph 5:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2002.

**Paragraph 6:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2002.

**Paragraph 7:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2002.

**Paragraph 8:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2002.

# ARTICLE 28

## MEMBERS OF DIPLOMATIC MISSIONS AND CONSULAR POSTS

Nothing in this Convention shall affect the fiscal privileges of members of diplomatic missions or consular posts under the general rules of international law or under the provisions of special agreements.

## HISTORY

Article 28 corresponds to Article 27 as it read before 28 January 2003. The previous Article 28 (Territorial Extension) was renumbered as Article 29 (see history of Article 30) and Article 27 was renumbered as Article 28 as a consequence of the addition of a new Article 27 (Assistance in the Collection of Taxes) by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

Article 27 and its title were amended on 31 March 1994 by the report entitled "1994 Update to the Model Tax Convention", adopted by the OECD Council on 31 March 1994. In the 1977 Model Convention and until 31 March 1994, Article 27 and its title read as follows:

> "DIPLOMATIC AGENTS AND CONSULAR OFFICERS
>
> Nothing in this Convention shall affect the fiscal privileges of diplomatic agents or consular officers under the general rules of international law or under the provisions of special agreements."

Article 27 and its title were previously amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, Article 27 and its title read as follows:

> "DIPLOMATIC AND CONSULAR OFFICIALS
>
> Nothing in this Convention shall affect the fiscal privileges of diplomatic or consular officials under the general rules of international law or under the provisions of special agreements."

# ARTICLE 29

## ENTITLEMENT TO BENEFITS[1]

1.      [Provision that, subject to paragraphs 3 to 5, restricts treaty benefits to a resident of a Contracting State who is a "qualified person" as defined in paragraph 2].

2.      [Definition of situations where a resident is a qualified person, which covers

— an individual;

— a Contracting State, its political subdivisions and their agencies and instrumentalities;

— certain publicly-traded companies and entities;

— certain affiliates of publicly-listed companies and entities;

— certain non-profit organisations and recognised pension funds;

— other entities that meet certain ownership and base erosion requirements;

— certain collective investment vehicles].

3.      [Provision that provides treaty benefits to certain income derived by a person that is not a qualified person if the person is engaged in the active conduct of a business in its State of residence and the income emanates from, or is incidental to, that business].

4.      [Provision that provides treaty benefits to a person that is not a qualified person if at least more than an agreed proportion of that entity is owned by certain persons entitled to equivalent benefits].

5.      [Provision that provides treaty benefits to a person that qualifies as a "headquarters company"].

6.      [Provision that allows the competent authority of a Contracting State to grant certain treaty benefits to a person where benefits would otherwise be denied under paragraph 1].

7.      [Definitions applicable for the purposes of paragraphs 1 to 7].

_____

1  The drafting of this Article will depend on how the Contracting States decide to implement their common intention, reflected in the preamble of the Convention and incorporated in the minimum standard agreed to as part of the OECD/G20 Base Erosion and Profit Shifting Project, to eliminate double taxation without creating opportunities for non-taxation or reduced taxation through tax evasion or avoidance, including through treaty-shopping arrangements. This may be done either through the adoption of paragraph 9 only, through the adoption of the detailed version of paragraphs 1 to 7 that is described in the Commentary on Article 29 together with the implementation of an anti-conduit mechanism as described in paragraph 187 of that Commentary, or through the adoption of paragraph 9 together with any variation of paragraphs 1 to 7 described in the Commentary on Article 29.

8. *a)* Where

   *(i)* an enterprise of a Contracting State derives income from the other Contracting State and the first-mentioned State treats such income as attributable to a permanent establishment of the enterprise situated in a third jurisdiction, and

   *(ii)* the profits attributable to that permanent establishment are exempt from tax in the first-mentioned State,

   the benefits of this Convention shall not apply to any item of income on which the tax in the third jurisdiction is less than the lower of [rate to be determined bilaterally] of the amount of that item of income and 60 per cent of the tax that would be imposed in the first-mentioned State on that item of income if that permanent establishment were situated in the first-mentioned State. In such a case any income to which the provisions of this paragraph apply shall remain taxable according to the domestic law of the other State, notwithstanding any other provisions of the Convention.

   *b)* The preceding provisions of this paragraph shall not apply if the income derived from the other State emanates from, or is incidental to, the active conduct of a business carried on through the permanent establishment (other than the business of making, managing or simply holding investments for the enterprise's own account, unless these activities are banking, insurance or securities activities carried on by a bank, insurance enterprise or registered securities dealer, respectively).

   *c)* If benefits under this Convention are denied pursuant to the preceding provisions of this paragraph with respect to an item of income derived by a resident of a Contracting State, the competent authority of the other Contracting State may, nevertheless, grant these benefits with respect to that item of income if, in response to a request by such resident, such competent authority determines that granting such benefits is justified in light of the reasons such resident did not satisfy the requirements of this paragraph (such as the existence of losses). The competent authority of the Contracting State to which a request has been made under the preceding sentence shall consult with the competent authority of the other Contracting State before either granting or denying the request.

9. Notwithstanding the other provisions of this Convention, a benefit under this Convention shall not be granted in respect of an item of income or capital if it is reasonable to conclude, having regard to all relevant facts and circumstances, that obtaining that benefit was one of the principal purposes of any arrangement or transaction that resulted directly or indirectly in that benefit, unless it is established that granting that benefit in these

circumstances would be in accordance with the object and purpose of the relevant provisions of this Convention.

## HISTORY

**The title of Article 29:** Replaced on 21 November 2017 when the previous Article 29 (Territorial Extension) was renumbered as Article 30 (see history of Article 30) and a new Article 29 (Entitlement to Benefits) was added, by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015.

**Paragraph 1:** Replaced on 21 November 2017 when paragraph 1 was renumbered as paragraph 1 of Article 30 (see history of paragraph 1 of Article 30) and a new paragraph 1 was added, by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015.

**Paragraph 2:** Replaced on 21 November 2017 when paragraph 2 was renumbered as paragraph 2 of Article 30 (see history of paragraph 2 of Article 30) and a new paragraph 2 was added, by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015.

**Paragraph 3:** Added on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015.

**Paragraph 4:** Added on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015.

**Paragraph 5:** Added on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November , as a result of follow-up work on another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015.

**Paragraph 6:** Added on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015.

**Paragraph 7:** Added on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015.

MODEL CONVENTION

**Paragraph 8:** Added on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, as a result of follow-up work on another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015.

**Paragraph 9:** Added on 21 November 2017 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017, on the basis of another report entitled "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances, Action 6 - Final Report", endorsed by the G20 at the 2015 G20 Antalya Summit on 15-16 November 2015.

# ARTICLE 30

# TERRITORIAL EXTENSION[1]

1.    This Convention may be extended, either in its entirety or with any necessary modifications [to any part of the territory of (State A) or of (State B) which is specifically excluded from the application of the Convention or], to any State or territory for whose international relations (State A) or (State B) is responsible, which imposes taxes substantially similar in character to those to which the Convention applies. Any such extension shall take effect from such date and subject to such modifications and conditions, including conditions as to termination, as may be specified and agreed between the Contracting States in notes to be exchanged through diplomatic channels or in any other manner in accordance with their constitutional procedures.

2.    Unless otherwise agreed by both Contracting States, the termination of the Convention by one of them under Article 32 shall also terminate, in the manner provided for in that Article, the application of the Convention [to any part of the territory of (State A) or of (State B) or] to any State or territory to which it has been extended under this Article.

_____

1  The words between brackets are of relevance when, by special provision, a part of the territory of a Contracting State is excluded from the application of the Convention.

## HISTORY

Article 30 corresponds to Article 29 as it read before 21 November 2017. On that date, Article 29 was renumbered as Article 30 as a consequence of the addition of a new Article 29 (Entitlement to Benefits) and the renumbering of the following Articles by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017.

Article 29 as it read after 28 January 2003 corresponded to Article 28 as it read before that date. On 28 January 2003, the Article 29 (Entry into Force) was renumbered as Article 30 (see history of Article 31) and Article 28 was renumbered as Article 29 as a consequence of the addition of a new Article 27 (Assistance in the Collection of Taxes) and the renumbering of the following Articles, by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 1:** Corresponds  to  paragraph 1  of  Article 29  as  it  read  before 21 November 2017. On that date, Article 30 was renumbered as Article 31 (see history of paragraph 1 of Article 31) and paragraph 1 of Article 29 was renumbered as paragraph 1 of Article 30, by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017.

Paragraph 1 of Article 29 as it read after 28 January 2003 corresponded to paragraph 1 of Article 28 of the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963). On 28 January 2003, paragraph 1 of Article 29 was renumbered as paragraph 1 of Article 30 (see history of paragraph 2 of Article 31) and paragraph 1 of Article 28 was renumbered as paragraph 1 of Article 29, by the report entitled "The

2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 2:** Corresponds to paragraph 2 of Article 29 as it read before 21 November 2017. On that date, paragraph 2 of Article 29 was renumbered as paragraph 2 of Article 30 by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017. After 28 January 2003 and until 21 November 2017, paragraph 2 read as follows:

"2.    Unless otherwise agreed by both Contracting States, the termination of the Convention by one of them under Article 31 shall also terminate, in the manner provided for in that Article, the application of the Convention [to any part of the territory of (State A) or of (State B) or] to any State or territory to which it has been extended under this Article."

Paragraph 2 as it read after 28 January 2003 corresponded to paragraph 2 of Article 28 as it read before that date. On 28 January 2003, paragraph 2 of Article 29 was renumbered as paragraph 2 of Article 30 (see history of paragraph 2 of Article 31) and paragraph 2 of Article 28 was renumbered as paragraph 2 of Article 29, by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

Paragraph 2 of Article 28 was amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, paragraph 2 of Article 28 read as follows:

"2.    Unless otherwise agreed by both Contracting States, the denunciation of the Convention by one of them under Article 30 shall terminate, in the manner provided for in that Article, the application of the Convention [to any part of the territory of (State A) or of (State B) or] to any State or territory to which it has been extended under this Article."

# *Chapter VII*
# FINAL PROVISIONS

## ARTICLE 31

## ENTRY INTO FORCE

1.    This Convention shall be ratified and the instruments of ratification shall be exchanged at .......... as soon as possible.

2.    The Convention shall enter into force upon the exchange of instruments of ratification and its provisions shall have effect:

> *a)* (in State A): .......................................
>
> *b)* (in State B): .......................................

## HISTORY

Article 31 corresponds to Article 30 as it read before 21 November 2017. On that date, Article 30 was renumbered as Article 31 as a consequence of the addition of a new Article 29 (Entitlement to Benefits) and the renumbering of the following Articles by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017.

Article 30 as it read after 28 January 2003 corresponded to Article 29 as it read before that date. On 28 January 2003, Article 29 was renumbered as Article 30 and Article 30 (Termination) was renumbered as Article 31 (see history of Article 32) as a consequence of the addition of a new Article 27 (Assistance in the Collection of Taxes) and the renumbering of the following Articles, by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 1:** Corresponds to paragraph 1 of Article 30 as it read before 21 November 2017. On that date, paragraph 1 of Article 31 was renumbered as paragraph 1 of Article 32 (see history of paragraph 1 of Article 32) and paragraph 1 of Article 30 was renumbered as paragraph 1 of Article 31, by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017.

Paragraph 1 of Article 30 as it read after 28 January 2003 corresponded to paragraph 1 of Article 29 of the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963). On 28 January 2003, paragraph 1 of Article 30 was renumbered as paragraph 1 of Article 31 (see history of paragraph 1 of Article 32) and paragraph 1 of Article 29 was renumbered as paragraph 1 of Article 30, by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 2:** Corresponds to paragraph 2 of Article 30 as it read before 21 November 2017. On that date, paragraph 2 of Article 31 was renumbered as paragraph 2 of Article 32 (see history of paragraph 2 of Article 32) and paragraph 2 of Article 30 was renumbered as paragraph 2 of Article 31, by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017.

Paragraph 2 of Article 30 as it read after 28 January 2003 corresponded to paragraph 2 of Article 29 of the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963). On 28 January 2003, paragraph 2 of Article 30 was renumbered as paragraph 2 of Article 31 (see history of paragraph 2 of Article 32) and paragraph 2 of Article 29 was renumbered as paragraph 2 of Article 30, by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

# ARTICLE 32

## TERMINATION

This Convention shall remain in force until terminated by a Contracting State. Either Contracting State may terminate the Convention, through diplomatic channels, by giving notice of termination at least six months before the end of any calendar year after the year ...... In such event, the Convention shall cease to have effect:

*a)* (in State A): .........................................

*b)* (in State B): .........................................

## TERMINAL CLAUSE[1]

_____

1   The terminal clause concerning the signing shall be drafted in accordance with the constitutional procedure of both Contracting States.

## HISTORY

Article 32 corresponds to Article 31 as it read before 21 November 2017. On that date, Article 31 was renumbered as Article 32 as a consequence of the addition of a new Article 29 (Entitlement to Benefits) and the renumbering of the following Articles, by the report entitled "The 2017 Update to the Model Tax Convention", adopted by the OECD Council on 21 November 2017.

Article 31 as it read after 28 January 2003 corresponded to Article 30 as it read before that date. On 28 January 2003, Article 30 was renumbered as Article 31 as a consequence of the addition of a new Article 27 (Assistance in the Collection of Taxes) and the renumbering of the following Articles, by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

Article 30 was amended when the 1977 Model Convention was adopted by the OECD Council on 11 April 1977. In the 1963 Draft Convention (adopted by the OECD Council on 30 July 1963) and until the adoption of the 1977 Model Convention, Article 30 read as follows:

"This Convention shall remain in force until denounced by one of the Contracting States. Either Contracting State may denounce the Convention, through diplomatic channels, by giving notice of termination at least six months before the end of any calendar year after the year ..... In such event, the Convention shall cease to have effect:

*a)* in (State A) : ......................

*b)* in (State B) : ......................"

**COMMENTARY ON ARTICLE 27**
**CONCERNING THE ASSISTANCE IN THE COLLECTION**
**OF TAXES**

1.    This Article provides the rules under which Contracting States[1] may agree to provide each other assistance in the collection of taxes. In some States, national law or policy may prevent this form of assistance or set limitations to it. Also, in some cases, administrative considerations may not justify providing assistance in the collection of taxes to another State or may similarly limit it. During the negotiations, each Contracting State will therefore need to decide whether and to what extent assistance should be given to the other State based on various factors, including

— the stance taken in national law to providing assistance in the collection of other States' taxes;

— whether and to what extent the tax systems, tax administrations and legal standards of the two States are similar, particularly as concerns the protection of fundamental taxpayers' rights (e.g. timely and adequate notice of claims against the taxpayer, the right to confidentiality of taxpayer information, the right to appeal, the right to be heard and present argument and evidence, the right to be assisted by a counsel of the taxpayer's choice, the right to a fair trial, etc.);

— whether assistance in the collection of taxes will provide balanced and reciprocal benefits to both States;

— whether each State's tax administration will be able to effectively provide such assistance;

— whether trade and investment flows between the two States are sufficient to justify this form of assistance;

— whether for constitutional or other reasons the taxes to which the Article applies should be limited.

The Article should only be included in the Convention where each State concludes that, based on these factors, they can agree to provide assistance in the collection of taxes levied by the other State.

*(Replaced on 28 January 2003; see HISTORY)*

2.    The Article provides for comprehensive collection assistance. Some States may prefer to provide a more limited type of collection assistance. This may be the only form of collection assistance that they are generally able to

C (27)

---

1   Throughout this Commentary on Article 27, the State making a request for assistance is referred to as the "requesting State" whilst the State from which assistance is requested is referred to as the "requested State".

provide or that they may agree to in a particular convention. For instance, a State may want to limit assistance to cases where the benefits of the Convention (e.g. a reduction of taxes in the State where income such as interest arises) have been claimed by persons not entitled to them. States wishing to provide such limited collection assistance are free to adopt bilaterally an alternative Article drafted along the following lines:

**Article 27**
**Assistance in the collection of taxes**

1.    The Contracting States shall lend assistance to each other in the collection of tax to the extent needed to ensure that any exemption or reduced rate of tax granted under this Convention shall not be enjoyed by persons not entitled to such benefits. The competent authorities of the Contracting States may by mutual agreement settle the mode of application of this Article.

2.    In no case shall the provisions of this Article be construed so as to impose on a Contracting State the obligation:

    *a)* to carry out administrative measures at variance with the laws and administrative practice of that or of the other Contracting State;

    *b)* to carry out measures which would be contrary to public policy (*ordre public*).

*(Replaced on 28 January 2003; see HISTORY)*

## Paragraph 1

3.    This paragraph contains the principle that a Contracting State is obliged to assist the other State in the collection of taxes owed to it, provided that the conditions of the Article are met. Paragraphs 3 and 4 provide the two forms that this assistance will take.

*(Replaced on 28 January 2003; see HISTORY)*

4.    The paragraph also provides that assistance under the Article is not restricted by Articles 1 and 2. Assistance must therefore be provided as regards a revenue claim owed to a Contracting State by any person, whether or not a resident of a Contracting State. Some Contracting States may, however, wish to limit assistance to taxes owed by residents of either Contracting State. Such States are free to restrict the scope of the Article by omitting the reference to Article 1 from the paragraph.

*(Replaced on 28 January 2003; see HISTORY)*

C (27)

MODEL TAX CONVENTION (FULL VERSION) – © OECD 2019

COMMENTARY ON ARTICLE 27

5.    Article 26 applies to the exchange of information for purposes of the provisions of this Article. The confidentiality of information exchanged for purposes of assistance in collection is thus ensured.

*(Replaced on 28 January 2003; see HISTORY)*

6.    The paragraph finally provides that the competent authorities of the Contracting States may, by mutual agreement, decide the details of the practical application of the provisions of the Article.

*(Replaced on 28 January 2003; see HISTORY)*

7.    Such agreement should, in particular, deal with the documentation that should accompany a request made pursuant to paragraph 3 or 4. It is common practice to agree that a request for assistance will be accompanied by such documentation as is required by the law of the requested State, or has been agreed to by the competent authorities of the Contracting States, and that is necessary to undertake, as the case may be, collection of the revenue claim or measures of conservancy. Such documentation may include, for example, a declaration that the revenue claim is enforceable and is owed by a person who cannot, under the law of the requesting State, prevent its collection or an official copy of the instrument permitting enforcement in the requesting State. An official translation of the documentation in the language of the requested State should also be provided. It could also be agreed, where appropriate, that the instrument permitting enforcement in the requesting State shall, where appropriate and in accordance with the provisions in force in the requested State, be accepted, recognised, supplemented or replaced, as soon as possible after the date of the receipt of the request for assistance, by an instrument permitting enforcement in the latter State.

*(Added on 28 January 2003; see HISTORY)*

8.    The agreement should also deal with the issue of the costs that will be incurred by the requested State in satisfying a request made under paragraph 3 or 4. In general, the costs of collecting a revenue claim are charged to the debtor but it is necessary to determine which State will bear costs that cannot be recovered from that person. The usual practice, in this respect, is to provide that in the absence of an agreement specific to a particular case, ordinary costs incurred by a State in providing assistance to the other State will not be reimbursed by that other State. Ordinary costs are those directly and normally related to the collection, i.e. those expected in normal domestic collection proceedings. In the case of extraordinary costs, however, the practice is to provide that these will be borne by the requesting State, unless otherwise agreed bilaterally. Such costs would cover, for instance, costs incurred when a particular type of procedure has been used at the request of the other State, or supplementary costs of experts, interpreters, or translators.

C (27)

Most States also consider as extraordinary costs the costs of judicial and bankruptcy proceedings. The agreement should provide a definition of extraordinary costs and consultation between the Contracting States should take place in any particular case where extraordinary costs are likely to be involved. It should also be agreed that, as soon as a Contracting State anticipates that extraordinary costs may be incurred, it will inform the other Contracting State and indicate the estimated amount of such costs so that the other State may decide whether such costs should be incurred. It is, of course, also possible for the Contracting States to provide that costs will be allocated on a basis different from what is described above; this may be necessary, for instance, where a request for assistance in collection is suspended or withdrawn under paragraph 7 or where the issue of costs incurred in providing assistance in collection is already dealt with in another legal instrument applicable to these States.

*(Added on 28 January 2003; see HISTORY)*

9.     In the agreement, the competent authorities may also deal with other practical issues such as:

— whether there should be a limit of time after which a request for assistance could no longer be made as regards a particular revenue claim;

— what should be the applicable exchange rate when a revenue claim is collected in a currency that differs from the one which is used in the requesting State;

— how should any amount collected pursuant to a request under paragraph 3 be remitted to the requesting State.

*(Added on 28 January 2003; see HISTORY)*

### Paragraph 2

10.     Paragraph 2 defines the term "revenue claim" for purposes of the Article. The definition applies to any amount owed in respect of all taxes that are imposed on behalf of the Contracting States, or of their political subdivisions or local authorities, but only insofar as the imposition of such taxes is not contrary to the Convention or other instrument in force between the Contracting States. It also applies to the interest, administrative penalties and costs of collection or conservancy that are related to such an amount. Assistance is therefore not restricted to taxes to which the Convention generally applies pursuant to Article 2, as is confirmed in paragraph 1.

*(Added on 28 January 2003; see HISTORY)*

11.     Some Contracting States may prefer to limit the application of the Article to taxes that are covered by the Convention under the general rules of

C (27)

Article 2. States wishing to do so should replace paragraphs 1 and 2 by the following:

> 1.    The Contracting States shall lend assistance to each other in the collection of revenue claims. This assistance is not restricted by Article 1. The competent authorities of the Contracting States may by mutual agreement settle the mode of application of this Article.
>
> 2.    The term "revenue claim" as used in this Article means any amount owed in respect of taxes covered by the Convention together with interest, administrative penalties and costs of collection or conservancy related to such amount.

*(Added on 28 January 2003; see HISTORY)*

12.    Similarly, some Contracting States may wish to limit the types of taxes to which the provisions of the Article will apply or to clarify the scope of application of these provisions by including in the definition a detailed list of the taxes. States wishing to do so are free to adopt bilaterally the following definition:

> The term "revenue claim" as used in this Article means an amount owed in respect of the following taxes imposed by the Contracting States, insofar as the taxation thereunder is not contrary to this Convention or any other instrument to which the Contracting States are parties, as well as interest, administrative penalties and costs of collection or conservancy related to such amount:
>
> *a)* (in State A): …
>
> *b)* (in State B): …

*(Amended on 15 July 2014; see HISTORY)*

13.    In order to make sure that the competent authorities can freely communicate information for purposes of the Article, Contracting States should ensure that Article 26 is drafted in a way that allows exchanges of information with respect to any tax to which this Article applies.

*(Added on 28 January 2003; see HISTORY)*

14.    Nothing in the Convention prevents the application of the provisions of the Article to revenue claims that arise before the Convention enters into force, as long as assistance with respect to these claims is provided after the treaty has entered into force and the provisions of the Article have become effective. Contracting States may find it useful, however, to clarify the extent to which the provisions of the Article are applicable to such revenue claims, in particular when the provisions concerning the entry into force of their convention provide that the provisions of that convention will have effect with respect to taxes arising or levied from a certain time. States wishing to restrict

C (27)

the application of the Article to claims arising after the Convention enters into force are also free to do so in the course of bilateral negotiations.

*(Added on 28 January 2003; see HISTORY)*

### Paragraph 3

15.    This paragraph stipulates the conditions under which a request for assistance in collection can be made. The revenue claim has to be enforceable under the law of the requesting State and be owed by a person who, at that time, cannot, under the law of that State, prevent its collection. This will be the case where the requesting State has the right, under its internal law, to collect the revenue claim and the person owing the amount has no administrative or judicial rights to prevent such collection.

*(Added on 28 January 2003; see HISTORY)*

16.    In many States, a revenue claim can be collected even though there is still a right to appeal to an administrative body or a court as regards the validity or the amount of the claim. If, however, the internal law of the requested State does not allow it to collect its own revenue claims when appeals are still pending, the paragraph does not authorise it to do so in the case of revenue claims of the other State in respect of which such appeal rights still exist even if this does not prevent collection in that other State. Indeed, the phrase "collected by that other State in accordance with the provisions of its laws applicable to the enforcement and collection of its own taxes as if the revenue claim were a revenue claim of that other State" has the effect of making that requested State's internal law restriction applicable to the collection of the revenue claim of the other State. Many States, however, may wish to allow collection assistance where a revenue claim may be collected in the requesting State notwithstanding the existence of appeal rights even though the requested State's own law prevents collection in that case. States wishing to do so are free to modify paragraph 3 to read as follows:

> When a revenue claim of a Contracting State is enforceable under the laws of that State and is owed by a person who, at that time, cannot, under the laws of that State, prevent its collection, that revenue claim shall, at the request of the competent authority of that State, be accepted for purposes of collection by the competent authority of the other Contracting State. That revenue claim shall be collected by that other State in accordance with the provisions of its laws applicable to the enforcement and collection of its own taxes as if the revenue claim were a revenue claim of that other State that met the conditions allowing that other State to make a request under this paragraph.

*(Added on 28 January 2003; see HISTORY)*

C (27)

17.    Paragraph 3 also regulates the way in which the revenue claim of the requesting State is to be collected by the requested State. Except with respect to time limits and priority (see the Commentary on paragraph 5), the requested State is obliged to collect the revenue claim of the requesting State as though it were the requested State's own revenue claim even if, at the time, it has no need to undertake collection actions related to that taxpayer for its own purposes. As already mentioned, the phrase "in accordance with the provisions of its law applicable to the enforcement and collection of its own taxes" has the effect of limiting collection assistance to claims with respect to which no further appeal rights exist if, under the requested State's internal law, collection of that State's own revenue claims are not permitted as long as such rights still exist.

*(Added on 28 January 2003; see HISTORY)*

18.    It is possible that the request may concern a tax that does not exist in the requested State. The requesting State shall indicate where appropriate the nature of the revenue claim, the components of the revenue claim, the date of expiry of the claim and the assets from which the revenue claim may be recovered. The requested State will then follow the procedure applicable to a claim for a tax of its own which is similar to that of the requesting State or any other appropriate procedure if no similar tax exists.

*(Added on 28 January 2003; see HISTORY)*

### Paragraph 4

19.    In order to safeguard the collection rights of a Contracting State, this paragraph enables it to request the other State to take measures of conservancy even where it cannot yet ask for assistance in collection, e.g. when the revenue claim is not yet enforceable or when the debtor still has the right to prevent its collection. This paragraph should only be included in conventions between States that are able to take measures of conservancy under their own laws. Also, States that consider that it is not appropriate to take measures of conservancy in respect of taxes owed to another State may decide not to include the paragraph in their conventions or to restrict its scope. In some States, measures of conservancy are referred to as "interim measures" and such States are free to add these words to the paragraph to clarify its scope in relation to their own terminology.

*(Added on 28 January 2003; see HISTORY)*

20.    One example of measures to which the paragraph applies is the seizure or the freezing of assets before final judgement to guarantee that these assets will still be available when collection can subsequently take place. The conditions required for the taking of measures of conservancy may vary from

C (27)

one State to another but in all cases the amount of the revenue claim should be determined beforehand, if only provisionally or partially. A request for measures of conservancy as regards a particular revenue claim cannot be made unless the requesting State can itself take such measures with respect to that claim (see the Commentary on paragraph 8).

*(Added on 28 January 2003; see HISTORY)*

21.    In making a request for measures of conservancy the requesting State should indicate in each case what stage in the process of assessment or collection has been reached. The requested State will then have to consider whether in such a case its own laws and administrative practice permit it to take measures of conservancy.

*(Added on 28 January 2003; see HISTORY)*

### Paragraph 5

22.    Paragraph 5 first provides that the time limits of the requested State, i.e. time limitations beyond which a revenue claim cannot be enforced or collected, shall not apply to a revenue claim in respect of which the other State has made a request under paragraph 3 or 4. Since paragraph 3 refers to revenue claims that are enforceable in the requesting State and paragraph 4 to revenue claims in respect of which the requesting State can take measures of conservancy, it follows that it is the time limits of the requesting State that are solely applicable.

*(Added on 28 January 2003; see HISTORY)*

23.    Thus, as long as a revenue claim can still be enforced or collected (paragraph 3) or give rise to measures of conservancy (paragraph 4) in the requesting State, no objection based on the time limits provided under the laws of the requested State may be made to the application of paragraph 3 or 4 to that revenue claim. States which cannot agree to disregard their own domestic time limits should amend paragraph 5 accordingly.

*(Added on 28 January 2003; see HISTORY)*

24.    The Contracting States may agree that after a certain period of time the obligation to assist in the collection of the revenue claim no longer exists. The period should run from the date of the original instrument permitting enforcement. Legislation in some States requires renewal of the enforcement instrument, in which case the first instrument is the one that counts for purposes of calculating the time period after which the obligation to provide assistance ends.

*(Added on 28 January 2003; see HISTORY)*

C (27)

25.    Paragraph 5 also provides that the rules of both the requested (first sentence) and requesting (second sentence) States giving their own revenue claims priority over the claims of other creditors shall not apply to a revenue claim in respect of which a request has been made under paragraph 3 or 4. Such rules are often included in domestic laws to ensure that tax authorities can collect taxes to the fullest possible extent.

*(Added on 28 January 2003; see HISTORY)*

26.    The rule according to which the priority rules of the requested State do not apply to a revenue claim of the other State in respect of which a request for assistance has been made applies even if the requested State must generally treat that claim as its own revenue claim pursuant to paragraphs 3 and 4. States wishing to provide that revenue claims of the other State should have the same priority as is applicable to their own revenue claims are free to amend the paragraph by deleting the words "or accorded any priority" in the first sentence.

*(Added on 28 January 2003; see HISTORY)*

27.    The words "by reason of their nature as such", which are found at the end of the first sentence, indicate that the time limits and priority rules of the requested State to which the paragraph applies are only those that are specific to unpaid taxes. Thus, the paragraph does not prevent the application of general rules concerning time limits or priority which would apply to all debts (e.g. rules giving priority to a claim by reason of that claim having arisen or having been registered before another one).

*(Added on 28 January 2003; see HISTORY)*

### Paragraph 6

28.    This paragraph ensures that any legal or administrative objection concerning the existence, validity or the amount of a revenue claim of the requesting State shall not be dealt with by the requested State's courts and administrative bodies. Thus, no legal or administrative proceedings, such as a request for judicial review, shall be undertaken in the requested State with respect to these matters. The main purpose of this rule is to prevent administrative or judicial bodies of the requested State from being asked to decide matters which concern whether an amount, or part thereof, is owed under the internal law of the other State. States in which the paragraph may raise constitutional or legal difficulties may amend or omit it in the course of bilateral negotiations.

*(Added on 28 January 2003; see HISTORY)*

C (27)

*Paragraph 7*

29.    This paragraph provides that if, after a request has been made under paragraph 3 or 4, the conditions that applied when such request was made cease to apply (e.g. a revenue claim ceases to be enforceable in the requesting State), the State that made the request must promptly notify the other State of this change of situation. Following the receipt of such a notice, the requested State has the option to ask the requesting State to either suspend or withdraw the request. If the request is suspended, the suspension should apply until such time as the State that made the request informs the other State that the conditions necessary for making a request as regards the relevant revenue claim are again satisfied or that it withdraws its request.

*(Added on 28 January 2003; see HISTORY)*

*Paragraph 8*

30.    This paragraph contains certain limitations to the obligations imposed on the State which receives a request for assistance.

*(Added on 28 January 2003; see HISTORY)*

31.    The requested State is at liberty to refuse to provide assistance in the cases referred to in the paragraph. However if it does provide assistance in these cases, it remains within the framework of the Article and it cannot be objected that this State has failed to observe the provisions of the Article.

*(Added on 28 January 2003; see HISTORY)*

32.    In the first place, the paragraph contains the clarification that a Contracting State is not bound to go beyond its own internal laws and administrative practice or those of the other State in fulfilling its obligations under the Article. Thus, if the requesting State has no domestic power to take measures of conservancy, the requested State could decline to take such measures on behalf of the requesting State. Similarly, if the seizure of assets to satisfy a revenue claim is not permitted in the requested State, that State is not obliged to seize assets when providing assistance in collection under the provisions of the Article. However, types of administrative measures authorised for the purpose of the requested State's tax must be utilised, even though invoked solely to provide assistance in the collection of taxes owed to the requesting State.

*(Added on 28 January 2003; see HISTORY)*

33.    Paragraph 5 of the Article provides that a Contracting State's time limits will not apply to a revenue claim in respect of which the other State has requested assistance. Subparagraph *a*) is not intended to defeat that principle. Providing assistance with respect to a revenue claim after the requested

C (27)

State's time limits have expired will not, therefore, be considered to be at variance with the laws and administrative practice of that or of the other Contracting State in cases where the time limits applicable to that claim have not expired in the requesting State.

*(Added on 28 January 2003; see HISTORY)*

34.    Subparagraph *b)* includes a limitation to carrying out measures contrary to public policy (*ordre public*). As is the case under Article 26 (see paragraph 19 of the Commentary on Article 26), it has been felt necessary to prescribe a limitation with regard to assistance which may affect the vital interests of the State itself.

*(Added on 28 January 2003; see HISTORY)*

35.    Under subparagraph *c)*, a Contracting State is not obliged to satisfy the request if the other State has not pursued all reasonable measures of collection or conservancy, as the case may be, available under its laws or administrative practice.

*(Added on 28 January 2003; see HISTORY)*

36.    Finally, under subparagraph *d)*, the requested State may also reject the request for practical considerations, for instance if the costs that it would incur in collecting a revenue claim of the requesting State would exceed the amount of the revenue claim.

*(Added on 28 January 2003; see HISTORY)*

37.    Some States may wish to add to the paragraph a further limitation, already found in the joint Council of Europe-OECD multilateral Convention on Mutual Administrative Assistance in Tax Matters, which would allow a State not to provide assistance if it considers that the taxes with respect to which assistance is requested are imposed contrary to generally accepted taxation principles.

*(Added on 28 January 2003; see HISTORY)*

## HISTORY

Article 27 replaced a previous Article 27 on 28 January 2003. The previous Article 27 (Members of Diplomatic Missions and Consular Posts) was renumbered as Article 28 (see history of the Commentary on Article 28) and the new Article 27 (Assistance in the Collection of Taxes) was added by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003. The addition of the new Article 27 also required the renumbering of Articles 28, 29 and 30 as Articles 29, 30 and 31 (see history of the Commentaries on these Articles).

**Paragraph 1:** Replaced on 28 January 2003 when paragraph 1 was renumbered as paragraph 1 of the Commentary on Article 28 (see history of paragraph 1 of the Commentary on Article 28) and a new paragraph 1 was added by the report entitled

C (27)

"The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 2:** Replaced on 28 January 2003 when paragraph 2 was renumbered as paragraph 2 of the Commentary on Article 28 (see history of paragraph 2 of the Commentary on Article 28) and a new paragraph 2 was added by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 3:** Replaced on 28 January 2003 when paragraph 3 was renumbered as paragraph 3 of the Commentary on Article 28 (see history of paragraph 3 of the Commentary on Article 28) and a new paragraph 3 and the heading preceding it were added by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 4:** Replaced on 28 January 2003 when paragraph 4 was renumbered as paragraph 4 of the Commentary on Article 28 (see history of paragraph 4 of the Commentary on Article 28) and a new paragraph 4 was added by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 5:** Replaced on 28 January 2003 when paragraph 5 was renumbered as paragraph 5 of the Commentary on Article 28 (see history of paragraph 5 of the Commentary on Article 28) and a new paragraph 5 was added by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 6:** Replaced on 28 January 2003 when paragraph 6 was renumbered as paragraph 6 of the Commentary on Article 28 (see history of paragraph 6 of the Commentary on Article 28) and a new paragraph 6 was added by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 7:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 8:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 9:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 10:** Added together with the heading preceding it on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 11:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 12:** Amended on 15 July 2014 by the report entitled "The 2014 Update to the Model Tax Convention", adopted by the OECD Council on 15 July 2014. After 28 January 2003 and until 15 July 2014, paragraph 12 read as follows:

"12.   Similarly, some Contracting States may wish to limit the types of tax to which the provisions of the Article will apply or to clarify the scope of application of these provisions by including in the definition a detailed list of the taxes. States wishing to do so are free to adopt bilaterally the following definition:

The term "revenue claim" as used in this Article means any amount owed in respect of the following taxes imposed by the Contracting States, together with interest, administrative penalties and costs of collection or conservancy related to such amount:

*a)* (in State A): …

C (27)

> b) (in State B): ..."

Paragraph 12 was added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 13:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 14:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 15:** Added together with the heading preceding it on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 16:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 17:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 18:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 19:** Added together with the heading preceding it on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 20:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 21:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 22:** Added together with the heading preceding it on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 23:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 24:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 25:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 26:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 27:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 28:** Added together with the heading preceding it on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 29:** Added together with the heading preceding it on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 30:** Added together with the heading preceding it on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 31:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 32:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 33:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 34:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 35:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 36:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

**Paragraph 37:** Added on 28 January 2003 by the report entitled "The 2002 Update to the Model Tax Convention", adopted by the OECD Council on 28 January 2003.

# Exhibit 49

# United States: 1981 U.S. Model Income and Capital Tax Convention

| | |
|---|---|
| TREATY PARTNERS | United States |
| SIGNED | June 16, 1981 |
| STATUS | Not Applicable |
| TAX ANALYSTS CITATIONS | Doc 93-30986 |

U.S. Legislative History

## CONVENTION BETWEEN THE UNITED STATES OF AMERICA AND _____ FOR THE AVOIDANCE OF DOUBLE TAXATION AND THE PREVENTION OF FISCAL EVASION WITH RESPECT TO TAXES ON INCOME AND CAPITAL

The United States of America and _____, desiring to conclude a convention for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income and capital, have agreed as follows:

## Article 1

### General Scope

1. This Convention shall apply to persons who are residents of one or both of the Contractin States, except as otherwise provided in the Convention.

2. The Convention shall not restrict in any manner any exclusion, exemption, deduction, credit, or other allowance now or hereafter accorded

a) by the laws of either Contracting State; or

b) by any other agreement between the Contracting States.

3. Notwithstanding any provision of the Convention except paragraph 4, a Contracting State may tax its residents (as determined under Article V (Residence), end by reason of citizenship may tax its citizens, as if the Convention had not come into effect. For this purpose , the term

"citizen" shall include a former citizen whose loss of citizenship had as one of its principal purposes the avoidance of income tax, but only for a period of 10 years following such loss.

4. The provisions of paragraph 3 shall not affect

a) the benefits conferred by a Contracting State under paragraph 2 of Article 9 (Associated Enterprises), under paragraphs 1 b) and 4 of Article 18 (Pensions, Annuities, Alimony, and Child Support), and under Articles 23 (Relief From Double Taxation), 24 (Non-Discrimination) and 25 (Mutual Agreement Procedure); and

b) the benefits conferred by a Contracting State under Articles 19 (Government Service), 20 (Students and Trainees), and 27 (Diplomatic Agents and Consular Officers), upon individuals who are neither citizens of, nor have immigrant status in, that State.

## Article 2
## Taxes Covered

1. The existing taxes to which this Convention shall apply are

a) in the United States: the Federal income taxes imposed by the Internal Revenue Code (but excluding the accumulated earnings tax, the personal holding company tax, and social security taxes), and the excise taxes imposed on insurance premiums paid to foreign insurer and with respect to private foundations. The Convention shall, however, apply to the excise taxes imposed on insurance premiums paid to foreign insurers only to the extent that the risks covered by. such premiums are not reinsured with a person not entitled to the benefits of this or any other convention which applies to these taxes;

b) in _____: _____ .

2. The Convention shall apply also to any identical or substantially similar taxes which are imposed after the date of signature of the Convention in addition to, or in place of, the existing taxes. The competent authorities of the Contracting State shall notify each other of any significant changes which have been made in their respective taxation laws and of any official published material concerning the application of the Convention, including explanations, regulations, rulings, or judicial decisions.

## Article 3
## General Definitions

1. For the purposes of this Convention, unless the context otherwise requires

a) the term"person" includes an individual, an estate, a trust, a partnership, a company, and any other body of persons;

b) the term"company" means any body corporate or any entity which is treated as a body corporate for tax purposes;

c) the terms"enterprise of a Contracting State" and "enterprise of the other Contracting State mean respectively an enterprise carried on by a resident of a Contracting State and an enterprise carried on by a resident of the other Contracting State;

d) the term"international traffic" means any transport by a ship or aircraft, except when such transport is solely between places in the other Contracting State;

e) the term"competent authority" means

    (i) in the United States: the Secretary of the Treasury or his delegate; and

    (ii) in _____: _____;

f) the term"United States" means the United States of America, but does not include Puerto Rico, the Virgin Islands, Guam, or any other United States possession or territory;

g) the term _____ means _____ .

2. As regards the application of the Convention by a Contracting State any term not defined therein shall, unless the context otherwise requires or the competent authorities agree to a common meaning pursuant to the provisions of Article 25 (Mutual Agreement Procedure), have the meaning which it has under the laws of that State concerning the taxes to which the Convention applies.

## Article 4

## Residence

1. For the purposes of this Convention, the term"resident of a Contracting State" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, citizenship, place of management, place of incorporation, or any other criterion of a similar nature, provided, however, that

a) this term does not include any person who is liable to tax in that State in respect only of income from sources in that State or capital situated therein; and

b) in the case of income derived or paid by a partnership, estate, or trust, this term applies only to the extent that the income derived by such partnership, estate, or trust is subject to tax in that State as the income of a resident, either in its hands or in the hands of its partner or beneficiaries.

2. Where by reason of the provisions of paragraph 1, an individual is a resident of both Contracting States, then his status shall be determined as follows:

a) he shall be deemed to be a resident of the State in which he has a permanent home available to him; if he has a permanent home available to him in both States, he shall be deemed to be a resident of the State with which his personal and economic relations are closer (center of vital interests);

b) if the State in which he has his center of vital interests cannot be determined, or if he does not have a permanent home available to him in either State, he shall be deemed to be a resident of the State in which he has an habitual abode;,

c) if he has an habitual abode in both States or in neither of them, he shall be deemed to be resident of the State of which he is a national;

d) if he is a national of both States or of neither of them, the competent authorities of the Contracting States shall settle the question by mutual agreement.

3. Where by reason of the provisions of paragraph 1 a company is a resident of both Contracting States, then if it is created under the laws of a Contracting State or a political subdivision thereof, it shall be deemed to be a resident of that State.

4. Where by reason of the provisions of paragraph 1 a person other than an individual or a company is a resident of both Contracting States, the competent authorities of the Contracting States shall settle the question by mutual agreement and determine the mode of application o the Convention to such person.

## Article 5
## Permanent Establishment

1. For the purposes of this Convention, the term "permanent establishment" means a fixed place of business through which the business of an enterprise is wholly or partly carried on.

2. The term "permanent establishment" includes especially

a) a place of management;

b) a branch;

c) an office;

d) a factory;

e) a workshop; and

f) a mine, an oil or gas well, a quarry, or any other place of extraction of natural resources.

3. A building site or construction or installation project, or an installation or drilling rig or shi used for the exploration or exploitation of natural resources, constitutes a permanent establishment only if it lasts more than twelve months.

4. Notwithstanding the preceding provisions of this Article, the term "permanent establishment" shall be deemed not to include

a) the use of facilities solely for the purpose of storage, display, or delivery of goods or merchandise belonging to the enterprise;

b) the maintenance of a stock of goods or merchandise belonging to the enterprise solely fo the purpose of storage, display, or delivery;

c) the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of processing by another enterprise;

d) the maintenance of a fixed place of business solely for the purpose of purchasing goods o merchandise, or of collecting information, for the enterprise;,

e) the maintenance of a fixed place of business solely for the purpose of carrying on, for the enterprise, any other activity of a preparatory or auxiliary character;

f) the maintenance of a fixed place of business solely for any combination of the activities mentioned in subparagraphs a) to e).

5. Notwithstanding the provisions of paragraphs 1 and 2, where a person - other than an agent of an independent status to whom paragraph 6 applies - is acting on behalf of an enterprise and has and habitually exercises in a Contracting State an authority to conclude contracts in the name of the enterprise, that enterprise shall be deemed to have a permanent establishment in that State in respect of any activities which that person undertakes for the enterprise, unless the activities of such person are limited to those mentioned in paragraph 4 which, if exercised through a fixed place of business, would not make this fixed place of busine a permanent establishment under the provisions of that paragraph.

6. An enterprise shall not be deemed to have a permanent establishment in a Contracting State merely because it carries on business in that State through a broker, general commission agent, or any other agent of an independent status, provided that such persons are acting in th ordinary course of their business.

7. The fact that a company which is a resident of a Contracting State controls or is controlled by a company which is a resident of the other Contracting State, or which carries on business in that other State (whether through a permanent establishment or otherwise), shall not of itself constitute either company a permanent establishment of the other.

## Article 6

### Income From Real Property (Immovable Property)

1. Income derived by a resident of a Contracting State from real property (including income from agriculture or forestry) situated in the other Contracting State may be taxed in that other State.

2. The term "real property" shall have the meaning which it has under the law of the Contracting State in which the property in question is situated.

3. The provisions of paragraph 1 shall apply to income derived from the direct use, letting, o use in any other form of real property.

4. The provisions of paragraphs 1 and 3 shall also apply to the income from real property of an enterprise and to income from real property used for the performance of independent

personal services.

5. A resident of a Contracting State who is liable to tax in the other Contracting State on income from real property situated in the other Contracting State may elect for any taxable yea to compute the tax on such income on a net basis as if such income were attributable to a permanent establishment in such other State. Any such election shall be binding for the taxable year of the election and all subsequent taxable years unless the competent authorities of the Contracting States, pursuant to a request by the taxpayer made to the competent authority of the Contracting State in which the taxpayer is a resident, agree to terminate the election.

## Article 7
### Business Profits

1. The business profits of an enterprise of a Contracting State shall be taxable only in that State unless the enterprise carries on business in the other Contracting State through a permanent establishment situated therein. If the enterprise carries on business as aforesaid, th business profits of the enterprise may be taxed in the other State but only so much of them as attributable to that permanent establishment.

2. Subject to the provisions of paragraph 3, where an enterprise of a Contracting State carrie on business in the other Contracting State through a permanent establishment situated therein there shall in each Contracting State be attributed to that permanent establishment the business profits which it might be expected to make if it were a distinct and independent enterprise engaged in the same or similar activities under the same or similar conditions.

3. In determining the business profits of a permanent establishment, there shall be allowed as deductions expenses which are incurred for the purposes of the permanent establishment, including a reasonable allocation of executive and general administrative expenses, research and development expenses, interest, and other expenses incurred for the purposes of the enterprise as a whole (or the part thereof which includes the permanent establishment), whether incurred in the State in which the permanent establishment is situated or elsewhere.

4. No business profits shall be attributed to a permanent establishment by reason of the mere purchase by that permanent establishment of goods or merchandise for the enterprise.

5. For the purposes of this Convention, the business profits to be attributed to the permane establishment shall include only the profits derived from the assets or activities of the permanent establishment and shall be determined by the same method year by year unless there is good and sufficient reason to the contrary.

6. Where business profits include items of income which are dealt with separately in other Articles of the Convention, then the provisions of those Articles shall not be affected by the provisions of this Article.

7. For the purposes of the Convention, the term "business profits" means income derived from any trade or business, including the rental of tangible personal property and the rental or licensing of cinematographic films or films or tapes used for radio or television broadcasting.

## Article 8

### Shipping and Air Transport

1. Profits of an enterprise of a Contracting State from the operation of ships or aircraft in international traffic shall be taxable only in that State.

2. For the purposes of this Article, profits from the operation of ships or aircraft in international traffic include profits derived from the rental of ships or aircraft if such ships or aircraft are operated in international traffic by the lessee or if such rental profits are incidental to other profits described in paragraph 1.

3. Profits of an enterprise of a Contracting State from the use, maintenance, or rental of containers (including trailers, barges, and related equipment for the transport of containers) used in international traffic shall be taxable only in that State.

4. The provisions of paragraphs 1 and 3 shall also apply to profits from participation in a poo a joint business, or an international operating agency.

## Article 9

### Associated Enterprises

1. Where

a) an enterprise of a Contracting State participates directly or indirectly in the management, control or capital of an enterprise of the other Contracting State; or

b) the same persons participate directly or indirectly in the management, control, or capital o an enterprise of a Contracting State and an enterprise of the other Contracting State,

and in either case conditions are made or imposed between the two enterprises in their commercial or financial relations which differ from those which would be made between independent enterprises, then any profits which, but for those conditions would have accrued one of the enterprises, but by reason of those conditions have not so accrued, may be included in the profits of that enterprise and taxed accordingly.

2. Where a Contracting State includes in the profits of an enterprise of that State, and taxes accordingly, profits on which an enterprise of the other Contracting State has been charged to tax in that other State, and the profits so included are profits which would have accrued to the enterprise of the first-mentioned State if the conditions made between the two enterprises had been those which would have been made between independent enterprises, then that other State shall make an appropriate adjustment to the amount of the tax charged therein on those profits. In determining such adjustment, due regard shall be paid to the other provisions of this Convention and the competent authorities of the Contracting States shall if necessary consult each other.

3. The provisions of paragraph 1 shall not limit any provisions of the law of either Contractin State which permit the distribution, apportionment, or allocation of income, deductions, credits or allowances between persons, whether or not residents of a Contracting State, owned or controlled directly or indirectly by the same interests when necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such persons.

## Article 10
### Dividends

1. Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2. However, such dividends may also be taxed in the Contracting State of which the compan paying the dividends is a resident, and according to the laws of that State, but if the beneficial

owner of the dividends is a resident of the other Contracting State, the tax so charged shall not exceed

a) 5 percent of the gross amount of the dividends if the beneficial owner is a company which owns at least 10 percent of the voting stock of the company paying the dividends;

b) 15 percent of the gross amount of the dividends in all other cases.

This paragraph shall not affect the taxation of the company in respect of the profits out of which the dividends are paid.

3. The term "dividends" as used in this Article means income from shares or other rights, no being debt-claims, participating in profits, as well as income from other corporate rights which subjected to the same taxation treatment as income from shares by the laws of the State of which the company making the distribution is a resident.

4. The provisions of paragraph 2 shall not apply if the beneficial owner of the dividends, bein a resident of a Contracting State, carries on business in the other Contracting State, of which th company paying the dividends is a resident, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the dividends are attributable to such permanent establishment or fixed base. In such case the provisions of Article 7 (Business Profits) or Article l4 (Independent Personal Services), as the case may be, shall apply.

5. A Contracting State may not impose any tax on dividends paid by a company which is not resident of that State, except insofar as

a) the dividends are paid to a resident of that State,

b) the dividends are attributable to a permanent establishment or a fixed base situated in that State, or

c) the dividends are paid out of profits attributable to one or more permanent establishmen of such company in that State, provided that the gross income of the company attributable t such permanent establishment constituted at least 50 percent of the company's gross incom from all sources.

Where subparagraph c) applies and subparagraphs a) and b) do not apply, the tax shall be subject to the limitations of paragraph 2.

# Article 11

## Interest

1. Interest derived and beneficially owned by a resident of a Contracting State shall be taxab only in that State.

2. The term "interest" as used in this Convention means income from debt-claims of every kind, whether or not secured by mortgage, and whether or not carrying a right to participate in the debtor's profits, and in particular, Income from government securities, and income from bonds or debentures, including premiums or prizes attaching to such securities, bonds, or debentures. Penalty charges for late payment shall not be regarded as interest for the purpose of the Convention.

3. The provisions of paragraph 1 shall not apply if the beneficial owner of the interest, being resident of a Contracting State, carries on business in the other Contracting State, in which the interest arises, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the interest is attributable to such permanent establishment or fixed base. In such case the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services), as the case may be, shall apply.

4. Interest shall be deemed to arise in a Contracting State when the payer is that State itself a political subdivision, local authority, or resident of that State. Where, however, the person paying the interest, whether he is a resident of a Contracting State or not, has in a Contracting State a permanent establishment or a fixed base in connection with which the indebtedness on which the interest is paid was incurred, and such interest is borne by such permanent establishment or fixed base, then such interest shall be deemed to arise in the State in which th permanent establishment or fixed base is situated.

5. Where, by reason of a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the interest, having regard to the debt-claim for which it is paid, exceeds the amount which would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case the excess part of the payments

shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of the Convention.

6. A Contracting State may not impose any tax on interest paid by a resident of the other Contracting State, except insofar as

a) the interest is paid to a resident of the first-mentioned State;

b) the interest is attributable to a permanent establishment or a fixed base situated in the first-mentioned State; or

c) the interest arises in the first-mentioned State and is not paid to a resident of the other State.

## Article 12

### Royalties

1. Royalties derived and beneficially owned by a resident of a Contracting State shall be taxable only in that State.

2. The term "royalties" as used in this Convention means payments of any kind received as a consideration for the use of, or the right to use, any copyright of literary, artistic, or scientific work (but not including cinematographic films or films or tapes used for radio or television broadcasting), any patent, trademark, design or model, plan, secret formula or process, or othe like right or property, or for information concerning industrial, commercial, or scientific experience. The term "royalties" also includes gains derived from the alienation of any such rig or property which are contingent on the productivity, use, or dispositor thereof.

3. The provisions of paragraph 1 shall not apply if the beneficial owner of the royalties, being a resident of a Contracting State, carries on business in the other Contracting State, in which th royalties arise, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the royalties are attributable to such permanent establishment or fixed base. In such case the provisions of Article 7 (Business Profits) or Article l4 (Independent Personal Services), as the case may be, sha apply.

4. Where, by reason of a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the royalties, having regard to th use, right, or information for which they are paid, exceeds the amount which would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case the excess part of the payments shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of the Convention.

## Article 13

## Gains

1. Gains derived by a resident of a Contracting State from the alienation of real property referred to in Article 6 (Income from Real Property (Immovable Property)) and situated in the other Contracting State may be taxed in that other State.

2. Gains from the alienation of

a) shares of the stock of a company (whether or not a resident of a Contracting State) the property of which consists principally of real property situated in a Contracting State; or

b) an interest in a partnership, trust, or estate (whether or not a resident of a Contracting State) to the extent attributable to real property situated in a Contracting State

may be taxed in that State. For the purposes of this paragraph, the term"real property" include the shares of a company referred to in subparagraph a) or an interest in a partnership, trust, o estate referred to in subparagraph b).

3. Gains from the alienation of personal property which are attributable to a permanent establishment which an enterprise of a Contracting State has in the other Contracting State, or which are attributable to a fixed base available to a resident of a Contracting State in the other Contracting State for the purpose of performing independent personal services, and gains from the alienation of such a permanent establishment (alone or with the whole enterprise) or such fixed base, may be taxed in that other State.

4. Gains derived by an enterprise of a Contracting State from the alienation of ships, aircraft or containers operated in international traffic shall be taxable only in that State.

5. Gains described in Article 12 (Royalties) shall be taxable only in accordance with the provisions of Article 12.

6. Gains from the alienation of any property other than property referred to in paragraphs 1 through 5 shall be taxable only in the Contracting State of which the alienator is a resident.

## Article 14

### Independent Personal Services

Income derived by an individual who is a resident of a Contracting State from the performance of personal services in an independent capacity shall be taxable only in that State unless such services are performed in the other Contracting State and the income is attributab to a fixed base regularly available to the individual in that other State for the purpose of performing his activities.

## Article 15

### Dependent Personal Services

1. Subject to the provisions of Articles 18 (Pensions, Annuities, Alimony, and Child Support) and 19 (Government Service), salaries, wages, and other similar remuneration derived by a resident of a Contracting State in respect of an employment shall be taxable only in that State unless the employment is exercised in the other Contracting State. If the employment is so exercised, such remuneration as is derived therefrom may be taxed in that other State.

2. Notwithstanding the provisions of paragraph 1, remuneration derived by a resident of a Contracting State in respect of an employment exercised in the other Contracting State shall be taxable only in the first-mentioned State if

a) the recipient is present in the other State for a period or periods not exceeding in the aggregate 183 days in the taxable year concerned;

b) the remuneration is paid by, or on behalf of, an employer who is not a resident of the othe State; and

c) the remuneration is not borne by a permanent establishment or a fixed base which the employer has in the other State.

3. Notwithstanding the preceding provisions of this Article, remuneration derived by a resident of a Contracting State in respect of an employment as a member of the regular complement of a ship or aircraft operated in international traffic may be taxed only in that Stat

## Article 16

## Limitation on Benefits

1. A person (other than an individual) which is a resident of a Contracting State shall not be entitled under this Convention to relief from taxation in the other Contracting State unless

a) more than 75 percent of the beneficial interest in such person is owned, directly or indirectly, by one or more individual residents of the first-mentioned Contracting State; and

b) the income of such person is not used in substantial part, directly or indirectly, to meet liabilities (including liabilities for interest or royalties) to persons who are residents of a State other than a Contracting State and who are not citizens of the United States.

For the purposes of subparagraph a), a company that has substantial trading in its stock on recognized exchange in a Contracting State is presumed to be owned by individual residents of that Contracting State.

2. Paragraph 1 shall not apply if it is determined that the acquisition or maintenance of such person and the conduct of its operations did not have as a principal purpose obtaining benefits under the Convention.

3. Any relief from tax provided by a Contracting State to a resident of the other Contracting State under the Convention shall be inapplicable to the extent that, under the law in force in th other State, the income to which the relief relates bears significantly lower tax than similar income arising within that other State derived by residents of that other State.

## Article 17

## Artistes and Athletes

1. Notwithstanding the provisions of Articles l4 (Independent Personal Services) and 15 (Dependent Personal Services), income derived by a resident of a Contracting State as an entertainer, such as a theatre, motion picture, radio, or television artiste, or a musician, or as a athlete, from his personal activities as such exercised in the other Contracting State, may be taxed in that other State, except where the amount of the gross receipts derived by such

entertainer or athlete, including expenses reimbursed to him or borne on his behalf, from such activities does not exceed twenty thousand United States dollars ($20,000) or its equivalent in * * * for the taxable year concerned.

2. Where income in respect of activities exercised by an entertainer or an athlete in his capacity as such accrues not to the entertainer or athlete but to another person, that income o that other person may, notwithstanding the provisions of Articles 7 (Business Profits) and 141 (Independent Personal Services), be taxed in the Contracting State in which the activities of the entertainer or athlete are exercised, unless it is established that neither the entertainer or athlete nor persons related thereto participate directly or indirectly in the profits of that other person in any manner, including the receipt of deferred remuneration, bonuses, fees, dividend partnership distributions, or other distributions.

## Article 18

### Pensions, Annuities, Alimony, and Child Support

1. Subject to the provisions of Article 19 (Government Service)

a) pensions and other similar remuneration derived and beneficially owed by a resident of a Contracting State in consideration of past employment shall be taxable only in that State; an

b) social security benefits and other public pensions paid by a Contracting State to a residen of the other Contracting State or a citizen of the United States shall be taxable only in the firs mentioned State.

2. Annuities derived and beneficially owned by a resident of a Contracting State shall be taxable only in that State. The term"annuities" as used in this paragraph means a stated sum paid periodically at stated times during a specified number of years, under an obligation to ma the payments in return for adequate and full consideration (other than services rendered).

3. Alimony paid to a resident of a Contracting State shall be taxable only in that State. The term "alimony" as used in this paragraph means periodic payments made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support, which payments are taxable to the recipient under the laws of the State of which he is a resident.

4. Periodic payments for the support of a minor child made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support, paid by a resident of a Contracting State to a resident of the other Contracting State, shall be taxable only in the first-mentioned State.

## Article 19

## Government Service

Remuneration, including a pension, paid from the public funds of a Contracting State or a political subdivision or local authority thereof to a citizen of that State in respect of services rendered in the discharge of functions of a governmental nature shall be taxable only in that State. However, the provisions of Article 14 (Independent Personal Services), Article 15 (Dependent Personal Services) or Article 17 (Artistes and Athletes), as the case may be, shall apply, and the preceding sentence shall not apply, to remuneration paid in respect of services rendered in connection with a business carried on by a Contracting State or a political subdivision or local authority thereof.

## Article 20

## Students and Trainees

Payments received for the purpose of maintenance, education, or training by a student, apprentice, or business trainee who is or was immediately before visiting a Contracting State a resident of the other Contracting State and who is present in the first-mentioned State for the purpose of his full-time education or training shall not be taxed in that State, provided that suc payments arise outside that State.

## Article 21

## Other Income

1. Items of income of a resident of a Contracting State, wherever arising, not dealt with in the foregoing Articles of this Convention shall be taxable only in that State.

2. The provisions of paragraph 1 shall not apply to income, other than income from real property as defined in paragraph 2 of Article 6 (Income from Real Property (Immovable Property)), if the beneficial owner of the income, being a resident of a Contracting State, carries on business in the other Contracting State through a permanent establishment situated therein

or performs in that other State independent personal services from a fixed base situated therein, and the income is attributable to such permanent establishment or fixed base. In such case the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services), as the case may be, shall apply.

## Article 22

## Capital

1. Capital represented by real property referred to in Article 6 (Income from Real Property (Immovable Property)), owned by a resident of a Contracting State and situated in the other Contracting State, may be taxed in that other State.

2. Capital represented by personal property forming part of the business property of a permanent establishment which an enterprise of a Contracting State has in the other Contracting State, or by personal property pertaining to a fixed base available to a resident of a Contracting State in the other Contracting State for the purpose of performing independent personal services, may be taxed in that other State.

3. Capital represented by ships, aircraft, and containers owned by a resident of a Contracting State and operated in international traffic, and by personal property pertaining to the operatio of such ships, aircraft, and containers shall be taxable only in that State.

4. All other elements of capital of a resident of a Contracting State shall be taxable only in th State.

## Article 23

## Relief From Double Taxation

1. In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof) the United States shall allow to a resident or citizen of the United States as a credit against the United States tax on income

a) the income tax paid to _____ by or on behalf of such citizen or resident; and

b) in the case of a United States company owning at least 10 percent of the voting stock of a company which is a resident of _____ and from which the United States company receives

dividends, the income tax paid to _____ by or on behalf of the distributing company with respect to the profits out of which the dividends are paid.

For the purposes of this paragraph, the taxes referred to in paragraphs lb) and 2 of Article 2 (Taxes Covered) shall be considered income taxes. Credits allowed solely by reason of the preceding sentence, when added to otherwise allowable credits for taxes referred to in paragraphs lb) and 2 of Article 2, shall not in any taxable year exceed that proportion of the United States tax on income which taxable income arising in _____ bears to total taxable income

2. In accordance with the provisions and subject to the limitations of the law of _____ (as it m be amended from time to time without amending the general principle hereof) _____ shall allow to a resident or citizen of _____ as a credit against the _____ tax on income _____ .

3. For the purposes of allowing relief from double taxation pursuant to this Article, income shall be deemed to arise exclusively as follows

a) income derived by a resident of a Contracting State which may be taxed in the other Contracting State in accordance with this Convention (other than solely by reason of citizenship in accordance with paragraph 2 of Article 1 (General Scope)) shall be deemed to arise in that other State;

b) income derived by a resident of a Contracting State which may not be taxed in the other Contracting State in accordance with the Convention shall be deemed to arise in the first-mentioned State.

The rules of this paragraph shall not apply in determining credits against United States tax fo foreign taxes other than the taxes referred to in paragraphs lb) and 2 of Article 2 (Taxes Covered).

## Article 24

## Nondiscrimination

1. Nationals of a Contracting State shall not be subjected in the other Contracting State to an taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which nationals of that other State in the same circumstances are or may be subjected. This provision shall apply to persons who are not residents of one or both of the Contracting States. However, for the purposes of United States

tax, a United States national who is not a resident of the United States and a national who is no a resident of the United States are not in the same circumstances.

2. For the purposes of this Convention, the term"nationals" means

a) in relation to _____, _____; and

b) in relation to the United States, United States citizens.

3. The taxation on a permanent establishment which an enterprise of a Contracting State ha in the other Contracting State shall not be less favorably levied in that other State than the taxation levied on enterprises of that other State carrying on the same activities. This provision shall not be construed as obliging a Contracting State to grant to residents of the other Contracting State any personal allowances, reliefs, and reductions for taxation purposes on account of civil status or family responsibilities which it grants to its own residents.

4. Except where the provisions of paragraph 1 of Article 9 (Associated-Enterprises), paragrap 5 of Article 11 (Interest), or paragraph 4 of Article 12 (Royalties) apply, interest, royalties, and other disbursements paid by a resident of a Contracting State to a resident of the other Contracting State shall, for the purposes of determining the taxable profits of the first-mentioned resident, be deductible under the same conditions as if they had been paid to a resident of the first-mentioned State. Similarly, any debts of a resident of a Contracting State to resident of the other Contracting State shall, for the purposes of determining the taxable capita of the first-mentioned resident, be deductible under the same conditions as if they had been contracted to a resident of the first-mentioned State.

5. Enterprises of a Contracting State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State, shall not be subjected in the first-mentioned State to any taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements which other similar enterprises of the first-mentioned State are or may be subjected.

6. The provisions of this Article shall, notwithstanding the provisions of Article 2 (Taxes Covered), apply to taxes of every kind and description imposed by a Contracting State or a political subdivision or local authority thereof.

## Article 25

## Mutal Agreement Procedure

1. Where a person considers that the actions of one or both of the Contracting States result will result for him in taxation not in accordance with the provisions of this Convention, he may, irrespective of the remedies provided by the domestic law of those States, present his case to the competent authority of the Contracting State of which he is a resident or national.

2. The competent authority shall endeavor, if the objection appears to it to be justified and i it is not itself able to arrive at a satisfactory solution, to resolve the case by mutual agreement with the competent authority of the other Contracting State, with a view to the avoidance of taxation which is not in accordance with the Convention. Any agreement reached shall be implemented notwithstanding any time limits or other procedural limitations in the domestic law of the Contracting States.

3. The competent authorities of the Contracting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention. In particular the competent authorities of the Contracting States may agree

a) to the same attribution of income, deductions, credits, or allowances of an enterprise of a Contracting State to its permanent establishment situated in the other Contracting State;

b) to the same allocation of income, deductions, credits or allowances between persons;

c) to the same characterization of particular items of income;

d) to the same application of source rules with respect to particular items of income;

e) to a common meaning of a term;

f) to increases in any specific amounts referred to in the Convention to reflect economic or monetary developments; and

g) to the application of the provisions of domestic law regarding penalties, fines, and interes in a manner consistent with the purposes of the Convention.

They may also consult together for the elimination of double taxation in cases not provided for in the "Convention.

4. The competent authorities of the contracting States may communicate with each other directly for the purpose of reaching an agreement in the sense of the preceding paragraphs.

## Article 26
### Exchange of Information and Administrative Assistance

1. The competent authorities of the Contracting States shall exchange such information as is necessary for carrying out the provisions of this Convention or of the domestic laws of the Contracting States concerning taxes covered by the Convention insofar as the taxation thereunder is not contrary to the Convention. The exchange of information is not restricted by Article 1 (General Scope). Any information received by a Contracting State shall be treated as secret in the same manner as information obtained under the domestic laws of that State and shall be disclosed only to persons or authorities (including courts and administrative bodies) involved in the assessment, collection, or administration of, the enforcement or prosecution in respect of, or the, determination of appeals in relation to, the taxes covered by the Convention Such persons or authorities shall use the information only for such purposes. They may disclos the information in public court proceedings or in judicial decisions.

2. In no case shall the provisions of paragraph 1 be construed so as to impose on a Contracting State the obligation

a) to carry out administrative measures at variance with the laws and administrative practice of that or of the other Contracting State;

b) to supply information which is not obtainable under the laws or in the normal course of th administration of that or of the other Contracting State;

c) to supply information which would disclose any trade business, industrial, commercial, or professional secret or trade process, or information the disclosure of which would be contrary to public policy (ordre public).

3. If information is requested by a Contracting State in accordance with this Article, the othe Contracting State shall obtain the information to which the request relates in the same manner and to the same extent as if the tax of the first-mentioned State were the tax of that other State and were being imposed by that other State. If specifically requested by the competent authori of a Contracting State, the competent authority of the other Contracting State shall provide information under this Article. in the form of depositions of witnesses and authenticated copies

of unedited original documents (including books, papers, statements, records, accounts, and writings), to the same extent such depositions and documents can be obtained under the laws and administrative practices of that other State with respect to its own taxes.

4. Each of the Contracting States shall endeavor to collect on behalf of the other Contracting State such amounts as may be necessary to ensure that relief granted by the Convention from taxation imposed by that other State does not enure to the benefit of persons not entitled thereto.

5. Paragraph 4 of this Article shall not impose upon either of the Contracting States the obligation to carry out administrative measures which are of a different nature from those used in the collection of its own taxes, or which would be contrary to its sovereignty, security, or public policy.

6. For the purposes of this Article, the Convention shall apply, notwithstanding the provision of Article 2 (Taxes Covered), to taxes of every kind imposed by a Contracting State.

## Article 27

### Diplomatic Agents and Consular Officers

Nothing in this Convention shall affect the fiscal privileges of diplomatic agents or consular officers under the general rules of international law or under the provisions of special agreements.

## Article 28

### Entry Into Force

1. This Convention shall be subject to ratification in accordance with the applicable procedures of each Contracting State and instruments of ratification shall be exchanged at ____ as soon as possible.

2. The Convention shall enter into force upon the exchange of instruments of ratification and its provisions shall have effect

a) in respect of taxes withheld at source, for amounts paid or credited on or after the first da of the second month next following the date on which the Convention enters into force;

b) in respect of other taxes, for taxable periods beginning on or after the first day of January next following the date on which the Convention enters into force.

# Article 29

## Termination

1. This Convention shall remain in force until terminated by a Contracting State. Either Contracting State may terminate the Convention at any time after 5 years from the date on which the Convention enters into force, provided that at least 6 months prior notice of termination has been given through diplomatic channels. In such event, the Convention shall cease to have effect

a) in respect of taxes withheld at source, for amounts paid or credited on or after the first da of January next following the expiration of the 6 months period;

b) in respect of other taxes, for taxable periods beginning on or after the first day of January next following the expiration of the 6 months period.

Done at _____ in duplicate, in the English and _____ languages, the two texts having equal authenticity, this _____ day of _____ 19 _____ .

**FOR THE UNITED STATES OF AMERICA:**

**FOR _____:**

# Exhibit 50

DEPARTMENT OF THE TREASURY
TECHNICAL EXPLANATION OF THE PROTOCOL
SIGNED AT COPENHAGEN ON MAY 2, 2006
AMENDING THE CONVENTION BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND
THE GOVERNMENT OF THE KINGDOM OF DENMARK
FOR THE AVOIDANCE OF DOUBLE TAXATION AND
THE PREVENTION OF FISCAL EVASION
WITH RESPECT TO TAXES ON INCOME
SIGNED AT WASHINGTON ON AUGUST 19, 1999

This is a technical explanation of the Protocol signed at Copenhagen on May 2, 2006 (the "Protocol"), amending the Convention between the United States of America and the Government of Denmark for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income, signed at Washington on August 19, 1999 (the "Convention").

Negotiations took into account the U.S. Department of the Treasury's current tax treaty policy and Treasury's Model Income Tax Convention, published on September 20, 1996 (the "U.S. Model"). Negotiations also took into account the Model Tax Convention on Income and on Capital, published by the Organization for Economic Cooperation and Development (the "OECD Model"), and recent tax treaties concluded by both countries.

This Technical Explanation is an official guide to the Protocol. It explains policies behind particular provisions, as well as understandings reached during the negotiations with respect to the interpretation and application of the Protocol. This technical explanation is not intended to provide a complete guide to the Convention as amended by the Protocol. To the extent that the Convention has not been amended by the Protocol, the Technical Explanation of the Convention remains the official explanation. References in this technical explanation to "he" or "his" should be read to mean "he or she" or "his or her."

**Article I**

Article I of the Protocol replaces paragraph 4 of Article 1 (General Scope) of the Convention, which contains the traditional saving clause found in U.S. tax treaties. The Contracting States reserve their rights, except as provided in paragraph 5, to tax their residents and citizens as provided in their internal laws, notwithstanding any provisions of the Convention to the contrary.  For example, if a resident of Denmark performs professional services in the United States and the income from the services is not attributable to a permanent establishment in the United States, Article 7 (Business Profits) would by its terms prevent the United States from taxing the income. If, however, the resident of Denmark is also a citizen of the United States, the saving clause permits the United States to include the remuneration in the worldwide income of the citizen and subject it to tax under the normal Code rules (*i.e.*, without regard to Code section 894(a)).

However, subparagraph 5(a) of Article 1 preserves the benefits of special foreign tax credit rules applicable to the U.S. taxation of certain U.S. income of its citizens resident in Denmark.

For purposes of the saving clause, "residence" is determined under Article 4 (Residence). Thus, an individual who is a resident of the United States under the Code (but not a U.S. citizen) but who is determined to be a resident of Denmark under the tie-breaker rules of Article 4 would be subject to U.S. tax only to the extent permitted by the Convention. The United States would not be permitted to apply its statutory rules to that person to the extent the rules are inconsistent with the treaty.

However, the person would be treated as a U.S. resident for U.S. tax purposes other than determining the individual's U.S. tax liability. For example, in determining under Code section 957 whether a foreign corporation is a controlled foreign corporation, shares in that corporation held by the individual would be considered to be held by a U.S. resident. As a result, other U.S. citizens or residents might be deemed to be United States shareholders of a controlled foreign corporation subject to current inclusion of Subpart F income recognized by the corporation. See, Treas. Reg. section 301.7701(b)-7(a)(3).

Under paragraph 4, each Contracting State also reserves its right to tax former citizens and former long-term residents for a period of ten years following the loss of such status. Thus, paragraph 4 allows the United States to tax former U.S. citizens and former U.S. long-term residents in accordance with Section 877 of the Code. Section 877 generally applies to a former citizen or long-term resident of the United States who relinquishes citizenship or terminates long-term residency if either of the following criteria exceed established thresholds: (a) the average annual net income tax of such individual for the period of 5 taxable years ending before the date of the loss of status, or (b) the net worth of such individual as of the date of the loss of status. The average annual net income tax threshold is adjusted annually for inflation. The United States defines "long-term resident" as an individual (other than a U.S. citizen) who is a lawful permanent resident of the United States in at least 8 of the prior 15 taxable years. An individual is not treated as a lawful permanent resident for any taxable year if such individual is treated as a resident of a foreign country under the provisions of a tax treaty between the United States and the foreign country and the individual does not waive the benefits of such treaty applicable to residents of the foreign country.

**Article  II**

Article II of the Protocol replaces Article 10 (Dividends) of the Convention. Article 10 provides rules for the taxation of dividends paid by a company that is a resident of one Contracting State to a beneficial owner that is a resident of the other Contracting State. The Article provides for full residence country taxation of such dividends and a limited source-State right to tax. Article 10 also provides rules for the imposition of a tax on branch profits by the State of source.

2

*Paragraph 1*

The right of a shareholder's country of residence to tax dividends arising in the source country is preserved by paragraph 1, which permits a Contracting State to tax its residents on dividends paid to them by a company that is a resident of the other Contracting State.  For dividends from any other source paid to a resident, Article 21 (Other Income) grants the residence country exclusive taxing jurisdiction (other than for dividends attributable to a permanent establishment in the other State).

*Paragraph 2*

The State of source also may tax dividends beneficially owned by a resident of the other State, subject to the limitations of paragraphs 2 and 3. Paragraph 2 generally limits the rate of withholding tax in the State of source on dividends paid by a company resident in that State to 15 percent of the gross amount of the dividend.  If, however, the beneficial owner of the dividend is a company resident in the other State and owns directly shares representing at least 10 percent of the voting shares of the company paying the dividend, then the rate of withholding tax in the State of source is limited to 5 percent of the gross amount of the dividend.  Shares are considered voting shares if they provide the power to elect, appoint, or replace any person vested with the powers ordinarily exercised by the board of directors of a U.S. corporation.

The benefits of paragraph 2 may be granted at the time of payment by means of a reduced rate of withholding at source. It also is consistent with the paragraph for tax to be withheld at the time of payment at full statutory rates, and the treaty benefit to be granted by means of a subsequent refund so long as such procedures are applied in a reasonable manner.

The determination of whether the ownership threshold for subparagraph a) of paragraph 2 is met for purposes of the 5 percent maximum rate of withholding tax is made on the date on which entitlement to the dividend is determined.  Thus, in the case of a dividend from a U.S. company, the determination of whether the ownership threshold is met generally would be made on the dividend record date.

Paragraph 2 does not affect the taxation of the profits out of which the dividends are paid.  The taxation by a Contracting State of the income of its resident companies is governed by the internal law of the Contracting State, subject to the provisions of paragraph 4 of Article 24 (Non-Discrimination).

The term "beneficial owner" is not defined in the Convention, and is, therefore, defined as under the internal law of the country imposing tax (*i.e.*, the source country). The beneficial owner of the dividend for purposes of Article 10 is the person to which the dividend income is attributable for tax purposes under the laws of the source State. Thus, if a dividend paid by a corporation that is a resident of one of the States (as determined under Article 4 (Residence)) is received by a nominee or agent that is a resident of the other State on behalf of a person that is not a resident of that other State, the dividend is not entitled to the benefits of this Article. However, a dividend received by a nominee on

3

behalf of a resident of that other State would be entitled to benefits. These interpretations are confirmed by paragraph 12 of the Commentary to Article 10 of the OECD Model.

Companies holding shares through fiscally transparent entities such as partnerships are considered for purposes of this paragraph to hold their proportionate interest in the shares held by the intermediate entity. As a result, companies holding shares through such entities may be able to claim the benefits of subparagraph (a) under certain circumstances. The lower rate applies when the company's proportionate share of the shares held by the intermediate entity meets the 10 percent threshold, and the company meets the requirements of Article 4(1)(d) (i.e., the company's country of residence treats the intermediate entity as fiscally transparent) with respect to the dividend. Whether this ownership threshold is satisfied may be difficult to determine and often will require an analysis of the partnership or trust agreement.

*Paragraph 3*

Paragraph 3 provides exclusive residence-country taxation (*i.e.,* an elimination of withholding tax) with respect to certain dividends distributed by a company that is a resident of one Contracting State to a resident of the other Contracting State. As described further below, this elimination of withholding tax is available with respect to certain inter-company dividends, with respect to qualified governmental entities, and with respect to pension funds.

Subparagraph (a) of paragraph 3 provides for the elimination of withholding tax on dividends beneficially owned by a company that has owned 80 percent or more of the voting power of the company paying the dividend for the 12-month period ending on the date entitlement to the dividend is determined. The determination of whether the beneficial owner of the dividends owns at least 80 percent of the voting power of the paying company is made by taking into account stock owned both directly and stock owned indirectly through one or more residents of either Contracting State.

Eligibility for the elimination of withholding tax provided by subparagraph (a) is subject to additional restrictions based on, but supplementing, the rules of Article 22 (Limitation of Benefits). Accordingly, a company that meets the holding requirements described above will qualify for the benefits of paragraph 3 only if it also: (1) meets the "publicly traded" test of subparagraph 2(c) of Article 22 (Limitation of Benefits), (2) meets the "ownership-base erosion" and "active trade or business" tests described in subparagraph 2(f) and paragraph 4 of Article 22 (Limitation of Benefits), (3) meets the "derivative benefits" test of paragraph 3 of Article 22 (Limitation of Benefits), or (4) is granted the benefits of subparagraph 3(a) of Article 10 by the competent authority of the source State pursuant to paragraph 7 of Article 22 (Limitation of Benefits).

These restrictions are necessary because of the increased pressure on the Limitation of Benefits tests resulting from the fact that the United States has relatively few treaties that provide for such elimination of withholding tax on inter-company dividends. The additional restrictions are intended to prevent companies from re-organizing in order to become eligible for the elimination of withholding tax in

4

circumstances where the Limitation of Benefits provision does not provide sufficient protection against treaty-shopping.

For example, assume that ThirdCo is a company resident in a third country that does not have a tax treaty with the United States providing for the elimination of withholding tax on inter-company dividends. ThirdCo owns directly 100 percent of the issued and outstanding voting stock of USCo, a U.S. company, and of DCo, a Danish company. DCo is a substantial company that manufactures widgets; USCo distributes those widgets in the United States. If ThirdCo contributes to DCo all the stock of USCo, dividends paid by USCo to DCo would qualify for treaty benefits under the active trade or business test of paragraph 4 of Article 22. However, allowing ThirdCo to qualify for the elimination of withholding tax, which is not available to it under the third state's treaty with the United States (if any), would encourage treaty-shopping.

In order to prevent this type of treaty-shopping, paragraph 3 requires DCo to meet the ownership-base erosion requirements of subparagraph 2(f) of Article 22 in addition to the active trade or business test of paragraph 4 of Article 22. Thus, DCo would not qualify for the exemption from withholding tax unless (i) on at least half the days of the taxable year, at least 50 percent of each class of its shares was owned by persons that are residents of Denmark and eligible for treaty benefits under certain specified tests and (ii) less than 50 percent of DCo's gross income is paid in deductible payments to persons that are not residents of either Contracting State eligible for benefits under those specified tests. Because DCo is wholly owned by a third country resident, DCo could not qualify for the elimination of withholding tax on dividends from USCo under the ownership-base erosion test and the active trade or business test. Consequently, DCo would need to qualify under another test or obtain discretionary relief from the competent authority under Article 22(7). For purposes of Article 10(3)(a)(ii), it is not sufficient for a company to qualify for treaty benefits generally under the active trade or business test or the ownership-base erosion test unless it qualifies for treaty benefits under both.

Alternatively, companies that are publicly traded or subsidiaries of publicly-traded companies will generally qualify for the elimination of withholding tax.   In the case of companies resident in Denmark, this includes companies that are more than 50 percent owned by one or more taxable nonstock corporations entitled to benefits under Article 22(2)(g).  Thus, a company that is a resident of Denmark and that meets the requirements of Article 22(2)(i), (ii) or (iii) will be entitled to the elimination of withholding tax, subject to the 12-month holding period requirement of Article 10(3)(a).

In addition, under Article 10(3)(a)(iii), a company that is a resident of a Contracting State may also qualify for the elimination of withholding tax on dividends if it satisfies the derivative benefits test of paragraph 3 of Article 22. Thus, a Danish company that owns all of the stock of a U.S. corporation may qualify for the elimination of withholding tax if it is wholly-owned, for example, by a U.K., Dutch, Swedish, or Mexican publicly-traded company and the other requirements of the derivative benefits test are met. At this time, ownership by companies that are residents of other European Union, European Economic Area or North American Free Trade Agreement countries would not qualify the Danish company for benefits under this provision, as the United

5

States does not have treaties that eliminate the withholding tax on inter-company dividends with any other of those countries. If the United States were to enter into such treaties with more of those countries, residents of those countries could then qualify as equivalent beneficiaries for purposes of this provision.

The derivative benefits test may also provide benefits to U.S. companies receiving dividends from Danish subsidiaries, because of the effect of the Parent-Subsidiary Directive in the European Union. Under that directive, inter-company dividends paid within the European Union are free of withholding tax. Under subparagraph (i) of paragraph 8 of Article 22, that directive will also be taken into account in determining whether the owner of a U.S. company receiving dividends from a Danish company is an "equivalent beneficiary." Thus, a company that is a resident of a member state of the European Union will, by definition, meet the requirements regarding equivalent benefits with respect to any dividends received by its U.S. subsidiary from a Danish company. For example, assume USCo is a wholly-owned subsidiary of ICo, an Italian publicly-traded company. USCo owns all of the shares of DCo, a Danish company. If DCo were to pay dividends directly to ICo, those dividends would be exempt from withholding tax in Denmark by reason of the Parent-Subsidiary Directive.  If ICo meets the other conditions of subparagraph 8(h) of Article 22, it will be treated as an equivalent beneficiary by reason of subparagraph 8(i) of that article.

A company also may qualify for the elimination of withholding tax pursuant to Article 10(3)(a)(iii) if it is owned by seven or fewer U.S. or Danish residents who qualify as an "equivalent beneficiary" and meet the other requirements of the derivative benefits provision. This rule may apply, for example, to certain Danish corporate joint venture vehicles that are closely-held by a few Danish resident individuals.

Subparagraph h) of paragraph 8 of Article 22 contains a specific rule of application intended to ensure that for purposes of applying Article 10(3) certain joint ventures, not just wholly-owned subsidiaries, can qualify for benefits. For example, assume that the United States were to enter into a treaty with Country X, a member of the European Union, that includes a provision identical to Article 10(3). USCo is 100 percent owned by DCo, a Danish company, which in turn is owned 49 percent by PCo, a Danish publicly-traded company, and 51 percent by XCo, a publicly-traded company that is resident in Country X. In the absence of a special rule for interpreting the derivative benefits provision, each of the shareholders would be treated as owning only its proportionate share of the shares held by DCo. If that rule were applied in this situation, neither shareholder would be an equivalent beneficiary, because neither would meet the 80 percent ownership test with respect to USCo. However, since both PCo and XCo are residents of countries that have treaties with the United States that provide for elimination of withholding tax on inter-company dividends, it is appropriate to provide benefits to DCo in this case.

Consequently, when determining whether a person is an equivalent beneficiary under paragraph 8 of Article 22, each of the shareholders is treated as owning shares with the same percentage of voting power as the shares held by DCo for purposes of determining whether it would be entitled to an equivalent rate of withholding tax. This

rule is necessary because of the high ownership threshold for qualification for the elimination of withholding tax on inter-company dividends.

If a company does not qualify for the elimination of withholding tax under any of the foregoing objective tests, it may request a determination from the relevant competent authority pursuant to paragraph 7 of Article 22. Benefits will be granted with respect to an item of income if the competent authority of the Contracting State in which the income arises determines that the establishment, acquisition or maintenance of such resident and the conduct of its operations did not have as one of its principal purposes the obtaining of benefits under the Convention. The Notes provide that the U.S. competent authority generally will exercise its discretion to grant benefits under this paragraph to a company that is a resident of Denmark if (1) the company meets the requirements of paragraph 4 of Article 22 (Limitation of Benefits) regarding the active conduct of a trade or business in Denmark, (2) the company meets the base erosion test of clause f)(ii) of paragraph 2 of Article 22, and (3) more than 80 percent of the voting power and the value of the shares in the company is owned by one or more taxable nonstock corporations that meet the requirements of subparagraph g) of paragraph 2 of Article 22. However, the competent authority may choose not to grant benefits under this paragraph if it determines that a significant percentage or amount of the income qualifying for benefits under this paragraph will inure to the benefit of a private person who is not a resident of Denmark.

Subparagraph (b) of paragraph 3 of Article 10 of the Convention provides for exemption from tax in the state of source for dividends paid to qualified governmental entities. This exemption is analogous to that provided to foreign governments under section 892 of the Code. Subparagraph (b) of paragraph 3 makes that exemption reciprocal. A qualified governmental entity is defined in paragraph 1(i) of Article 3 (General Definitions) of the Convention. The definition does not include a governmental entity that carries on commercial activity. Further, a dividend paid by a company engaged in commercial activity that is controlled (within the meaning of Treas. Reg. section 1.892-5T) by a qualified governmental entity that is the beneficial owner of the dividend is not exempt at source under paragraph 4 because ownership of a controlled company is viewed as a substitute for carrying on a business activity.

Subparagraph (c) of paragraph 3 of Article 10 of the Convention provides that dividends beneficially owned by a pension fund described in subparagraph e) of paragraph 2 of Article 22 (Limitation of Benefits) may not be taxed in the Contracting State of which the company paying the dividends is a resident, unless such dividends are derived from the carrying on of a business, directly by the pension fund or indirectly, through an associated enterprise.

This rule is necessary because pension funds normally do not pay tax (either through a general exemption or because reserves for future pension liabilities effectively offset all of the fund's income), and therefore cannot benefit from a foreign tax credit. Moreover, distributions from a pension fund generally do not maintain the character of the underlying income, so the beneficiaries of the pension are not in a position to claim a foreign tax credit when they finally receive the pension, in many cases years after the

withholding tax has been paid.  Accordingly, in the absence of this rule, the dividends would almost certainly be subject to unrelieved double taxation.

*Paragraph 4*

Article 10 generally applies to distributions made by a RIC or a REIT.  However, distributions made by a REIT or certain RICs that are attributable to gains derived from the alienation of U.S. real property interests and treated as gain recognized under section 897(h)(1) are taxable under paragraph 1 of Article 13 instead of Article 10.  In the case of RIC or REIT distributions to which Article 10 applies, paragraph 4 imposes limitations on the rate reductions provided by paragraphs 2 and 3 in the case of dividends paid by a RIC or a REIT.

The first sentence of subparagraph 4(a) provides that dividends paid by a RIC or REIT are not eligible for the 5 percent rate of withholding tax of subparagraph 2(a) or the elimination of source-country withholding tax of subparagraph 3(a).

The second sentence of subparagraph 4(a) provides that the 15 percent maximum rate of withholding tax of subparagraph 2(b) applies to dividends paid by RICs and that the elimination of source-country withholding tax of subparagraphs 3(b) and (c) applies to dividends paid by RICs and beneficially owned by a qualified governmental entity or a pension fund.

The third sentence of subparagraph 4(a) provides that the 15 percent rate of withholding tax also applies to dividends paid by a REIT and that the elimination of source-country withholding tax of subparagraphs 3(b) and (c) applies to dividends paid by REITs and beneficially owned by a qualified governmental entity or a pension fund, provided that one of the three following conditions is met. First, the beneficial owner of the dividend is an individual or a pension fund, in either case holding an interest of not more than 10 percent in the REIT. Second, the dividend is paid with respect to a class of stock that is publicly traded and the beneficial owner of the dividend is a person holding an interest of not more than 5 percent of any class of the REIT's shares. Third, the beneficial owner of the dividend holds an interest in the REIT of not more than 10 percent and the REIT is "diversified."

Subparagraph (b) provides a definition of the term "diversified," which is necessary because the term is not defined in the Code.  A REIT is diversified if the gross value of no single interest in real property held by the REIT exceeds 10 percent of the gross value of the REIT's total interest in real property.

Foreclosure property is not considered an interest in real property, and a REIT holding a partnership interest is treated as owning its proportionate share of any interest in real property held by the partnership.

The restrictions set out above are intended to prevent the use of these entities to gain inappropriate U.S. tax benefits. For example, a company resident in Denmark that wishes to hold a diversified portfolio of U.S. corporate shares could hold the portfolio

directly and would bear a U.S. withholding tax of 15 percent on all of the dividends that it receives. Alternatively, it could hold the same diversified portfolio by purchasing 10 percent or more of the interests in a RIC. If the RIC is a pure conduit, there may be no U.S. tax cost to interposing the RIC in the chain of ownership. Absent the special rule in paragraph 4, such use of the RIC could transform portfolio dividends, taxable in the United States under the Convention at a 15 percent maximum rate of withholding tax, into direct investment dividends taxable at a 5 percent maximum rate of withholding tax or eligible for the elimination of source-country withholding tax.

Similarly, a resident of Denmark directly holding U.S. real property would pay U.S. tax on rental income either at a 30 percent rate of withholding tax on the gross income or at graduated rates on the net income. As in the preceding example, by placing the real property in a REIT, the investor could, absent a special rule, transform rental income into dividend income from the REIT, taxable at the rates provided in Article 10, significantly reducing the U.S. tax that otherwise would be imposed. Paragraph 4 prevents this result and thereby avoids a disparity between the taxation of direct real estate investments and real estate investments made through REIT conduits. In the cases in which paragraph 4 allows a dividend from a REIT to be eligible for the 15 percent rate of withholding tax, the holding in the REIT is not considered the equivalent of a direct holding in the underlying real property.

The final sentence of paragraph 4(a) provides that the rules of paragraph 4 apply also to dividends paid by companies resident in Denmark that are similar to U.S. RICs and REITs. Whether a Danish company is similar to a U.S. RIC or REIT will be determined by mutual agreement of the competent authorities. The Notes provide that for purposes of paragraph 4, a Danish undertaking for collective investment in transferable securities that is required to currently distribute its income will be treated as a company similar to a U.S. RIC, while such an undertaking that is permitted to accumulate its income will not be so treated.

*Paragraph 5*

Paragraph 5 defines the term "dividends" broadly and flexibly. The definition is intended to cover all arrangements that yield a return on an equity investment in a corporation as determined under the tax law of the state of source, including types of arrangements that might be developed in the future.

The term includes income from shares, or other corporate rights that are not treated as debt under the law of the source State, that participate in the profits of the company. The term also includes income that is subjected to the same tax treatment as income from shares by the law of the State of source. Thus, a constructive dividend that results from a non-arm's length transaction between a corporation and a related party is a dividend. In the case of the United States, the term dividends includes amounts treated as a dividend under U.S. law upon the sale or redemption of shares or upon a transfer of shares in a reorganization. *See*, *e.g.*, Rev. Rul. 92-85, 1992-2 C.B. 69 (sale of foreign subsidiary's stock to U.S. sister company is a deemed dividend to extent of subsidiary's and sister's earnings and profits). Further, a distribution from a U.S. publicly traded

limited partnership, which is taxed as a corporation under U.S. law, is a dividend for purposes of Article 10. However, a distribution by a limited liability company is not taxable by the United States under, provided the limited liability company is not characterized as an association taxable as a corporation under U.S. law.

Finally, a payment denominated as interest that is made by a thinly capitalized corporation may be treated as a dividend to the extent that the debt is recharacterized as equity under the laws of the source State.

*Paragraph 6*

Paragraph 6 provides that the general source country limitations under paragraph 2 and 3 on dividends do not apply if the beneficial owner of the dividends carries on business through a permanent establishment situated in the source country, or performs in the source country independent personal services from a fixed base situated therein, and the dividends are attributable to such permanent establishment or fixed base. In such case, the rules of Article 7 (Business Profits) or Article 14 (Independent Personal Services) shall apply, as the case may be. Accordingly, such dividends will be taxed on a net basis using the rates and rules of taxation generally applicable to residents of the Contracting State in which the permanent establishment or fixed base is located, as such rules may be modified by the Convention. An example of dividends attributable to a permanent establishment would be dividends derived by a dealer in stock or securities from stock or securities that the dealer held for sale to customers.

*Paragraph 7*

The right of a Contracting State to tax dividends paid by a company that is a resident of the other Contracting State is restricted by paragraph 7 to cases in which the dividends are paid to a resident of that Contracting State or are attributable to a permanent establishment or fixed base in that Contracting State. Thus, a Contracting State may not impose a "secondary" withholding tax on dividends paid by a nonresident company out of earnings and profits from that Contracting State. In the case of the United States, the secondary withholding tax was eliminated for payments made after December 31, 2004 in the American Jobs Creation Act of 2004.

The paragraph also restricts the right of a Contracting State to impose corporate level taxes on undistributed profits, other than a branch profits tax. The paragraph does not restrict a State's right to tax its resident shareholders on undistributed earnings of a corporation resident in the other State. Thus, the authority of the United States to impose taxes on subpart F income and on earnings deemed invested in U.S. property, and its tax on income of a passive foreign investment company that is a qualified electing fund is in no way restricted by this provision.

*Paragraphs 8 and 9*

Paragraph 8 permits a Contracting State to impose a branch profits tax on a company resident in the other Contracting State. The tax is in addition to other taxes

permitted by the Convention. The term "company" is defined in subparagraph 1(b) of Article 3 (General Definitions).

A Contracting State may impose a branch profits tax on a company if the company has income attributable to a permanent establishment in that Contracting State, derives income from real property in that Contracting State that is taxed on a net basis under Article 6 (Income from Real Property), or realizes gains taxable in that State under paragraph 1 of Article 13 (Capital Gains). In the case of the United States, the imposition of such tax is limited, however, to the portion of the aforementioned items of income that represents the amount of such income that is the "dividend equivalent amount." This is consistent with the relevant rules under the U.S. branch profits tax, and the term dividend equivalent amount is defined under U.S. law. Section 884 defines the dividend equivalent amount as an amount for a particular year that is equivalent to the income described above that is included in the corporation's effectively connected earnings and profits for that year, after payment of the corporate tax under Articles 6 (Income from Real Property), 7 (Business Profits) or 13 (Capital Gains), reduced for any increase in the branch's U.S. net equity during the year or increased for any reduction in its U.S. net equity during the year. U.S. net equity is U.S. assets less U.S. liabilities. See Treas. Reg. section 1.884-1.

The dividend equivalent amount for any year approximates the dividend that a U.S. branch office would have paid during the year if the branch had been operated as a separate U.S. subsidiary company.  Denmark currently does not impose a branch profits tax.  If in the future Denmark were to impose a branch profits tax, paragraph 8 provides that the base of its tax must be limited to an amount that is analogous to the dividend equivalent amount.

Paragraph 9 limits the rate of the branch profits tax allowed under paragraph 8 to 5 percent.  Paragraph 9 also provides, however, that the branch profits tax will not be imposed if certain requirements are met. In general, these requirements provide rules for a branch that parallel the rules for when a dividend paid by a subsidiary will be subject to exclusive residence-country taxation (i.e., the elimination of source-country withholding tax). Accordingly, the branch profits tax may not be imposed in the case of a company that: (1) meets the "publicly traded" test of subparagraph 2(c) of Article 22 (Limitation of Benefits), (2) meets the "ownership-base erosion" and "active trade or business" tests described subparagraph 2(f) and subparagraph 4 of Article 22, (3) meets the "derivative benefits" test of paragraph 3 of Article 22, or (4) is granted benefits with respect to the elimination of the branch profits tax by the competent authority pursuant to paragraph 7 of Article 22.

Thus, for example, if a Danish company would be subject to the branch profits tax with respect to profits attributable to a U.S. branch and not reinvested in that branch, paragraph 9 may apply to eliminate the branch profits tax if the company either met the "publicly traded" test, met the combined "ownership-base erosion" *and* "active trade or business" test, or met the derivative benefits test. If, by contrast, a Danish company did not meet those tests, but met the ownership-base erosion test (and thus qualified for treaty benefits under subparagraph 2(a)), then the branch profits tax would apply at a rate of 5

percent, unless the Danish company is granted benefits with respect to the elimination of the branch profits tax by the competent authority pursuant to paragraph 7 of Article 22.

*Relation to Other Articles*

Notwithstanding the foregoing limitations on source country taxation of dividends, the saving clause of paragraph 4 of Article 1 (General Scope) permits the United States to tax dividends received by its residents and citizens, subject to the special foreign tax credit rules of paragraph 2 of Article 23 (Relief From Double Taxation), as if the Convention had not come into effect.

The benefits of this Article are also subject to the provisions of Article 22 (Limitation of Benefits). Thus, if a resident of Denmark is the beneficial owner of dividends paid by a U.S. corporation, the shareholder must qualify for treaty benefits under at least one of the tests of Article 22 in order to receive the benefits of this Article.

**Article III**

Article III of the Protocol amends subparagraph b) of paragraph 2 of Article 19 (Government Service) of the Convention to correct a drafting error. Paragraph 2 (a) provides a general rule that a pension paid from public funds of a Contracting State or a political subdivision or local authority thereof to an individual in respect of services rendered to that State or subdivision or authority in the discharge of governmental functions is taxable only in that State. Paragraph 2(b) provides an exception under which the pension is taxable only in the other State if the individual is a resident of and a national of that other State. Before this amendment, paragraph 2(b) incorrectly referred to pensions paid to "a resident or a national" rather than pensions paid to "a resident and a national."

**Article IV**

Article IV of the Protocol replaces Article 22 (Limitation of Benefits) of the Convention. Article 22 contains anti-treaty-shopping provisions that are intended to prevent residents of third countries from benefiting from what is intended to be a reciprocal agreement between two countries. In general, the provision does not rely on a determination of purpose or intention, but instead sets forth a series of objective tests. A resident of a Contracting State that satisfies one of the tests will receive benefits regardless of its motivations in choosing its particular business structure.

The structure of the Article is as follows: Paragraph 1 states the general rule that residents are entitled to benefits otherwise accorded to residents only to the extent provided in the Article. Paragraph 2 lists a series of attributes of a resident of a Contracting State, the presence of any one of which will entitle that person to all the benefits of the Convention. Paragraph 3 provides a so-called "derivative benefits" test under which certain categories of income may qualify for benefits. Paragraph 4 provides that regardless of whether a person qualifies for benefits under paragraph 2 or 3, benefits may be granted to that person with regard to certain income earned in the conduct of an

active trade or business. Paragraph 5 provides for limited derivative benefits for shipping and air transport income. Paragraph 6 provides special rules for so-called "triangular cases" notwithstanding paragraphs 1 through 5 of Article 22. Paragraph 7 provides that benefits may also be granted if the competent authority of the State from which the benefits are claimed determines that it is appropriate to grant benefits in that case. Paragraph 8 defines certain terms used in the Article.

*Paragraph 1*

Paragraph 1 provides that a resident of a Contracting State will be entitled to benefits of the Convention otherwise accorded to residents of a Contracting State only to the extent provided in this Article. The benefits otherwise accorded to residents under the Convention include all limitations on source-based taxation under Articles 6 through 21, the treaty-based relief from double taxation provided by Article 23 (Relief From Double Taxation), and the protection afforded to residents of a Contracting State under Article 24 (Non-Discrimination). Some provisions do not require that a person be a resident in order to enjoy the benefits of those provisions. For example, Article 25 (Mutual Agreement Procedure) is not limited to residents of the Contracting States, and Article 27 (Diplomatic Agents and Consular Officers) applies to diplomatic agents or consular officials regardless of residence. Article 22 accordingly does not limit the availability of treaty benefits under such provisions.

Article 22 and the anti-abuse provisions of domestic law complement each other, as Article 22 effectively determines whether an entity has a sufficient nexus to a Contracting State to be treated as a resident for treaty purposes, while domestic anti-abuse provisions (*e.g.*, business purpose, substance-over-form, step transaction or conduit principles) determine whether a particular transaction should be recast in accordance with its substance. Thus, internal law principles of the source Contracting State may be applied to identify the beneficial owner of an item of income, and Article 22 then will be applied to the beneficial owner to determine if that person is entitled to the benefits of the Convention with respect to such income.

*Paragraph 2*

Paragraph 2 has seven subparagraphs, each of which describes a category of residents that are entitled to all benefits of the Convention.

It is intended that the provisions of paragraph 2 will be self-executing. Unlike the provisions of paragraph 7, discussed below, claiming benefits under paragraph 2 does not require an advance competent authority ruling or approval. The tax authorities may, of course, on review, determine that the taxpayer has improperly interpreted the paragraph and is not entitled to the benefits claimed.

Individuals -- Subparagraph 2(a)

Subparagraph (a) provides that individual residents of a Contracting State will be entitled to all treaty benefits. If such an individual receives income as a nominee on behalf of a third country resident, benefits may be denied under the applicable articles of

the Convention by the requirement that the beneficial owner of the income be a resident of a Contracting State.

### Governments -- Subparagraph 2(b)

Subparagraph (b) provides that the Contracting States and any political subdivision or local authority thereof, or an agency or instrumentality of that State, subdivision, or authority will be entitled to all the benefits of the Convention.

### Publicly-Traded Corporations -- Subparagraph 2(c)(i)

Subparagraph (c) applies to two categories of companies: publicly traded companies and subsidiaries of publicly traded companies. A company resident in a Contracting State is entitled to all the benefits of the Convention under clause (i) of subparagraph (c) if the principal class of its shares, and any disproportionate class of shares, is regularly traded on one or more recognized stock exchanges and the company satisfies at least one of the following additional requirements: first, the company's principal class of shares is primarily traded on a recognized stock exchange located in the Contracting State of which the company is a resident, or, in the case of a company resident in Denmark, on a recognized stock exchange located within the European Union, any other European Economic Area country, or, in the case of a company resident in the United States, on a recognized stock exchange located in another state that is a party to the North American Free Trade Agreement; or, second, the company's primary place of management and control is in its State of residence.

The term "recognized stock exchange" is defined in subparagraph (d) of paragraph 8. It includes the NASDAQ System, any stock exchange registered with the Securities and Exchange Commission as a national securities exchange for purposes of the Securities Exchange Act of 1934, and the Copenhagen Stock Exchange. The term also includes the stock exchanges of Amsterdam, Brussels, Frankfurt, Hamburg, Helsinki, London, Oslo, Paris, Stockholm, Sydney, Tokyo, and Toronto, and any other stock exchange agreed upon by the competent authorities of the Contracting States.

If a company has only one class of shares, it is only necessary to consider whether the shares of that class meet the relevant trading requirements. If the company has more than one class of shares, it is necessary as an initial matter to determine which class or classes constitute the "principal class of shares." The term "principal class of shares" is defined in subparagraph (a) of paragraph 8 to mean the ordinary or common shares of the company representing the majority of the aggregate voting power and value of the company. If the company does not have a class of ordinary or common shares representing the majority of the aggregate voting power and value of the company, then the "principal class of shares" is that class or any combination of classes of shares that represents, in the aggregate, a majority of the voting power and value of the company. Subparagraph (c) of paragraph 8 defines the term "shares" to include depository receipts for shares. Although in a particular case involving a company with several classes of shares it is conceivable that more than one group of classes could be identified that account for more than 50 percent of the shares, it is only necessary for one such group to

satisfy the requirements of this subparagraph in order for the company to be entitled to benefits. Benefits would not be denied to the company even if a second, non-qualifying group of shares with more than half of the company's voting power and value could be identified.

A company whose principal class of shares is regularly traded on a recognized stock exchange will nevertheless not qualify for benefits under subparagraph (c) of paragraph 2 if it has a disproportionate class of shares that is not regularly traded on a recognized stock exchange. The term "disproportionate class of shares" is defined in subparagraph (b) of paragraph 8. A company has a disproportionate class of shares if it has outstanding a class of shares that is subject to terms or other arrangements that entitle the holder to a larger portion of the company's income, profit, or gain in the other Contracting State than that to which the holder would be entitled in the absence of such terms or arrangements. Thus, for example, a company resident in Denmark meets the test of subparagraph (b) of paragraph 8 if it has outstanding a class of "tracking stock" that pays dividends based upon a formula that approximates the company's return on its assets employed in the United States.

The following example illustrates this result.

Example. DCo is a corporation resident in Denmark. DCo has two classes of shares: Common and Preferred. The Common shares are listed and regularly traded on the Stockholm Stock Exchange. The Preferred shares have no voting rights and are entitled to receive dividends equal in amount to interest payments that DCo receives from unrelated borrowers in the United States. The Preferred shares are owned entirely by a single investor that is a resident of a country with which the United States does not have a tax treaty. The Common shares account for more than 50 percent of the value of DCo and for 100 percent of the voting power. Because the owner of the Preferred shares is entitled to receive payments corresponding to the U.S. source interest income earned by DCo, the Preferred shares are a disproportionate class of shares. Because the Preferred shares are not regularly traded on a recognized stock exchange, DCo will not qualify for benefits under subparagraph (c) of paragraph 2.

A class of shares will be "regularly traded" on one or more recognized stock exchanges in a taxable year, under subparagraph (f)(i) of paragraph 8, if two requirements are met: (1) trades in the class of shares are effected on one or more such exchanges in other than de minimis quantities during every quarter, and (2) the aggregate number of shares of that class traded on one or more such exchanges during the twelve months ending on the day before the beginning of that taxable year is at least six percent of the average number of shares outstanding in that class (including shares held by taxable nonstock corporations) during that twelve-month period. For this purpose, if a class of shares was not listed on a recognized stock exchange during this twelve-month period, the class of shares will be treated as regularly traded only if the class meets the aggregate trading requirements for the taxable period in which the income arises. Trading on one or more recognized stock exchanges may be aggregated for purposes of meeting the "regularly traded" standard of subparagraph (f). For example, a U.S. company could satisfy the definition of "regularly traded" through trading, in whole or in part, on a

recognized stock exchange located in Denmark or certain third countries. Authorized but unissued shares are not considered for purposes of subparagraph (f).

The term "primarily traded" is not defined in the Convention. In accordance with paragraph 2 of Article 3 (General Definitions), this term will have the meaning it has under the laws of the State concerning the taxes to which the Convention applies, generally the source State. In the case of the United States, this term is understood to have the meaning it has under Treas. Reg. section 1.884-5(d)(3), relating to the branch tax provisions of the Code. Accordingly, stock of a corporation is "primarily traded" if the number of shares in the company's principal class of shares that are traded during the taxable year on all recognized stock exchanges in the Contracting State of which the company is a resident exceeds the number of shares in the company's principal class of shares that are traded during that year on established securities markets in any other single foreign country.

A company whose principal class of shares is regularly traded on a recognized exchange but cannot meet the primarily traded test may claim treaty benefits if its primary place of management and control is in its country of residence. This test should be distinguished from the "place of effective management" test which is used in the OECD Model and by many other countries to establish residence. In some cases, the place of effective management test has been interpreted to mean the place where the board of directors meets. By contrast, the primary place of management and control test looks to where day-to-day responsibility for the management of the company (and its subsidiaries) is exercised. The company's primary place of management and control will be located in the State in which the company is a resident only if the executive officers and senior management employees exercise day-to-day responsibility for more of the strategic, financial and operational policy decision making for the company (including direct and indirect subsidiaries) in that State than in the other State or any third state, and the staffs that support the management in making those decisions are also based in that State. Thus, the test looks to the overall activities of the relevant persons to see where those activities are conducted. In most cases, it will be a necessary, but not a sufficient, condition that the headquarters of the company (that is, the place at which the CEO and other top executives normally are based) be located in the Contracting State of which the company is a resident.

To apply the test, it will be necessary to determine which persons are to be considered "executive officers and senior management employees." In most cases, it will not be necessary to look beyond the executives who are members of the Board of Directors (the "inside directors") in the case of a U.S. company. That will not always be the case, however; in fact, the relevant persons may be employees of subsidiaries if those persons make the strategic, financial, and operational policy decisions. Moreover, it would be necessary to take into account any special voting arrangements that result in certain board members making certain decisions without the participation of other board members.

<u>Subsidiaries of Danish Taxable Nonstock Corporations – Subparagraph 2(c)(ii)</u>

Clause (ii) of subparagraph 2(c) provides a test under which certain companies that are controlled by one or more taxable nonstock corporations ("TNCs") entitled to benefits under subparagraph g) may meet the publicly-traded test.  This test is necessary because it is common for a TNC to hold 100% of the "Class A" shares of another company.  The Class A shares have a disproportionate amount of the voting power but have little or no rights to dividends.  The subsidiary company also issues "Class B" shares, which have preferential treatment as to dividends.  Class A shares held by TNCs are listed but not traded on the Copenhagen stock exchange.  Any class A shares that are not held by TNCs and all Class B shares are both listed and traded on the Copenhagen stock exchange.  This rule is included to ensure that a corporation whose voting shares are substantially owned by a Danish TNC is not precluded from qualifying as a publicly-traded company, so long as the rest of its shares satisfy a public trading test.

A company will qualify under this test if one or more such TNCs own shares representing more than 50 percent of the voting power of the company and all other shares are listed on a recognized stock exchange and are primarily traded on a recognized stock exchange located within the European Union or in any other European Economic Area state.  Thus, all shares not owned by TNCs, taken as a single class, must be traded more on a recognized stock exchange located in a state within the European Union or in any other European Economic Area state than on established securities markets in any other single foreign state.

<u>Subsidiaries of Publicly-Traded Corporations – Subparagraph 2(c)(iii)</u>

A company resident in a Contracting State is entitled to all the benefits of the Convention under clause (iii) of subparagraph (c) of paragraph 2 if five or fewer companies entitled to benefits under clause (i) or (ii) (or any combination thereof) are the direct or indirect owners of at least 50 percent of the aggregate vote and value of the company's shares (and at least 50 percent of any disproportionate class of shares). If the companies are indirect owners, however, each of the intermediate companies must be a resident of one of the Contracting States.

Thus, for example, a Danish company, all the shares of which are owned by another Danish company, would qualify for benefits under the Convention if the principal class of shares (and any disproportionate classes of shares) of the Danish parent company are regularly and primarily traded on the London stock exchange. However, a Danish subsidiary would not qualify for benefits under clause (iii) if the publicly traded parent company were a resident of Ireland, for example, and not a resident of the United States or Denmark. Furthermore, if a Danish parent company indirectly owned a Danish company through a chain of subsidiaries, each such subsidiary in the chain, as an intermediate owner, must be a resident of the United States or Denmark for the Danish subsidiary to meet the test in clause (iii).

<u>Tax-Exempt Organizations -- Subparagraph 2(d)</u>

Subparagraphs 2(d) and 2(e) provide rules by which tax-exempt organizations described in Article 4(1)(b)(i) and pension funds will be entitled to all of the benefits of the Convention. A tax-exempt organization other than a pension fund automatically qualifies for benefits, without regard to the residence of its beneficiaries or members. Entities qualifying under this subparagraph are those that are generally exempt from tax in their Contracting State of residence and that are established and maintained exclusively to fulfill religious, charitable, educational, scientific, or other similar purposes.

<u>Pensions – Subparagraph 2(e)</u>

A legal person, whether tax-exempt or not, that is organized under the laws of either Contracting State to provide pension or similar benefits to employees (including self-employed individuals) pursuant to a plan will qualify for benefits if, as of the close of the end of the prior taxable year, more than 50 percent of the pension's beneficiaries, members or participants are individuals resident in either Contracting State. For purposes of this provision, the term "beneficiaries" should be understood to refer to the persons receiving benefits from the pension fund.

<u>Ownership/Base Erosion -- Subparagraph 2(f)</u>

Subparagraph 2(f) provides an additional method to qualify for treaty benefits that applies to any form of legal entity that is a resident of a Contracting State. The test provided in subparagraph (f), the so-called ownership and base erosion test, is a two-part test. Both prongs of the test must be satisfied for the resident to be entitled to treaty benefits under subparagraph 2(f).

The ownership prong of the test, under clause (i), requires that 50 percent or more of each class of shares or other beneficial interests in the person is owned, directly or indirectly, on at least half the days of the person's taxable year by persons who are residents of the Contracting State of which that person is a resident and that are themselves entitled to treaty benefits under subparagraphs (a), (b), (d), (e), or clause (i) of subparagraph (c) of paragraph 2. In the case of indirect owners, however, each of the intermediate owners must be a resident of that Contracting State.

Trusts may be entitled to benefits under this provision if they are treated as residents under Article 4 (Residence) and they otherwise satisfy the requirements of this subparagraph. For purposes of this subparagraph, the beneficial interests in a trust will be considered to be owned by its beneficiaries in proportion to each beneficiary's actuarial interest in the trust. The interest of a remainder beneficiary will be equal to 100 percent less the aggregate percentages held by income beneficiaries. A beneficiary's interest in a trust will not be considered to be owned by a person entitled to benefits under the other provisions of paragraph 2 if it is not possible to determine the beneficiary's actuarial interest. Consequently, if it is not possible to determine the actuarial interest of the beneficiaries in a trust, the ownership test under clause i) cannot be satisfied, unless all

18

possible beneficiaries are persons entitled to benefits under the other subparagraphs of paragraph 2.

The base erosion prong of clause (ii) of subparagraph (f) is satisfied with respect to a person if less than 50 percent of the person's gross income for the taxable year, as determined under the tax law in the person's State of residence, is paid or accrued, directly or indirectly, to persons who are not residents of either Contracting State entitled to benefits under subparagraphs (a), (b), (d), (e), or clause (i) of subparagraph (c) of paragraph 2, in the form of payments deductible for tax purposes in the payer's State of residence. These amounts do not include arm's-length payments in the ordinary course of business for services or tangible property or payments in respect of financial obligations to a bank that is not related to the payor. To the extent they are deductible from the taxable base, trust distributions are deductible payments. However, depreciation and amortization deductions, which do not represent payments or accruals to other persons, are disregarded for this purpose.

<u>Danish Taxable Nonstock Corporations – Subparagraph 2(g)</u>

Paragraph 2(g) provides a special rule for a Danish Taxable Nonstock Corporation ("TNC"), which is a vehicle to preserve control of operating companies by the TNC through its control of voting shares, with public shareholders receiving most rights to dividends of the operating company. A TNC may qualify for the benefits of the Convention if it meets specific requirements under a two-part test.

Under subparagraph 8(e), the term "taxable nonstock corporation" as used in paragraph 2 means a foundation that is taxable in accordance with paragraph 1 of Article 1 of the Danish Act on Taxable Nonstock Corporations (*fonde der beskattes efter fondsbeskatningsloven*). A TNC is a legal person that is controlled by a professional board of directors, the majority of which must be unrelated to the persons that founded the TNC. As a foundation, a TNC must have a charter governing the corporation's operations and identifying any TNC beneficiaries and their entitlement to distributions from the TNC. One TNC cannot own another. A TNC's capital is irrevocably separated from the control of any person ("founder") contributing assets to the TNC at the time the TNC is established. A TNC's assets can never be inherited nor can such assets be paid out in liquidation except to creditors. TNCs are subject to income tax at the same rate (32%) and in exactly the same way as Danish corporations, except that a TNC can deduct charitable contributions, whereas a regular Danish corporation cannot deduct them, and a TNC, like any other foundation, can deduct distributions to members of the founder's family provided that these family members are resident in Denmark and are taxable in Denmark at the full rate, which is from 45% to 59%. Distributions to other persons, *e.g.*, Danish nonresidents, are not deductible.

The two-part test in subparagraph (g) is a modification of the ownership-base erosion test that is necessary because TNCs do not have owners and thus cannot be subject to any ownership test. This test was included for TNCs in order to treat them as similarly as possible to other Danish corporations.

19

The first part of the test under subparagraph (g)(i) is satisfied if no more than 50 percent of the amount of the TNC's gross income (excluding its tax-exempt income) is paid or accrued in the form of deductible payments (but not including arms-length payments in the ordinary course of its activities of a charitable nature and authorized by the Danish laws on taxable non-stock companies for services or tangible property) in the taxable year and in each of the preceding three taxable years, directly or indirectly, to persons who are not entitled to benefits under subparagraphs a), b), d), e), or clause (i) of subparagraph c.  This means that no more than 50 percent of the amount of the TNC's gross income (excluding its tax-exempt income) can be paid to persons other than residents of either Contracting State that qualify for treaty benefits as an individual (subparagraph (a)), a Contracting State, etc. (subparagraph (b)), a company that is publicly traded (subparagraph (c)(i)), a charitable organization, etc. (subparagraph (d)), or a pension plan (subparagraph e).

The second part of the test under subparagraph g)(ii) is satisfied if no more than 50% of the amount of the total income of the TNC (including its tax-exempt income) is paid or accrued, in the form of deductible payments (but not including arm's length payments in the ordinary course of its activities of a charitable nature and authorized by the Danish laws on taxable non-stock companies for services or tangible properties) and non-deductible distributions, in the taxable year and in each of the preceding three taxable years, directly or indirectly, to persons who are not entitled to benefits under subparagraphs a), b), d), e), or clause (i) of subparagraph (c).

*Paragraph 3*

Paragraph 3 sets forth a derivative benefits test that is potentially applicable to all treaty benefits, although the test is applied to individual items of income. In general, a derivative benefits test entitles the resident of a Contracting State to treaty benefits if the owner of the resident would have been entitled to the same benefit had the income in question flowed directly to that owner. To qualify under this paragraph, the company must meet an ownership test and a base erosion test.

Subparagraph (a) sets forth the ownership test. Under this test, seven or fewer equivalent beneficiaries must own shares representing at least 95 percent of the aggregate voting power and value of the company and at least 50 percent of any disproportionate class of shares. Ownership may be direct or indirect. The term "equivalent beneficiary" is defined in subparagraph (h) of paragraph 8. This definition may be met in two alternative ways, the first of which has two requirements.

Under the first alternative, a person may be an equivalent beneficiary because it is entitled to equivalent benefits under a treaty between the country of source and the country in which the person is a resident. This alternative has two requirements.

The first requirement is that the person must be a resident of a member state of the European Union, a European Economic Area state, a party to the North American Free Trade Agreement, or Switzerland (collectively, "qualifying States").

The second requirement of the definition of "equivalent beneficiary" is that the person must be entitled to equivalent benefits under an applicable treaty. To satisfy the second requirement, the person must be entitled to all the benefits of a comprehensive treaty between the Contracting State from which benefits of the Convention are claimed and a qualifying State under provisions that are analogous to the rules in paragraph 2 of this Article regarding individuals, governmental entities, publicly-traded companies, tax-exempt organizations, and pensions. If the treaty in question does not have a comprehensive limitation on benefits article, this requirement is met only if the person would be entitled to treaty benefits under the tests in paragraph 2 of this Article applicable to individuals, governmental entities, publicly-traded companies, tax-exempt organizations, and pensions if the person were a resident of one of the Contracting States.

In order to satisfy the second requirement to qualify as an "equivalent beneficiary" under paragraph 8(h)(i)(B) with respect to dividends, interest, royalties, or branch tax, the person must also be entitled to a rate of withholding or branch tax that is at least as low as the withholding or branch tax rate that would apply under the Convention to such income. Thus, the rates to be compared are: (1) the rate of tax that the source State would have imposed if a qualified resident of the other Contracting State was the beneficial owner of the income; and (2) the rate of tax that the source State would have imposed if the third State resident received the income directly from the source State. For example, USCo is a wholly owned subsidiary of DCo, a company resident in Denmark. DCo is wholly owned by ICo, a corporation resident in Italy. Assuming DCo satisfies the requirements of paragraph 3 of Article 10 (Dividends), DCo would be eligible for the elimination of dividend withholding tax. The dividend withholding tax rate in the treaty between the United States and Italy is 5 percent. Thus, if ICo received the dividend directly from USCo, ICo would have been subject to a 5 percent rate of withholding tax on the dividend. Because ICo would not be entitled to a rate of withholding tax that is at least as low as the rate that would apply under the Convention to such income (*i.e.*, zero), ICo is not an equivalent beneficiary within the meaning of paragraph 8(h)(i) of Article 22 with respect to the elimination of withholding tax on dividends.

Subparagraph 8(i) provides a special rule to take account of the fact that withholding taxes on many inter-company dividends, interest and royalties are exempt within the European Union by reason of various EU directives, rather than by tax treaty. If a U.S. company receives such payments from a Danish company, and that U.S. company is owned by a company resident in a member state of the European Union that would have qualified for an exemption from withholding tax if it had received the income directly, the parent company will be treated as an equivalent beneficiary. This rule is necessary because many European Union member countries have not re-negotiated their tax treaties to reflect the exemptions available under the directives.

The requirement that a person be entitled to "all the benefits" of a comprehensive tax treaty eliminates those persons that qualify for benefits with respect to only certain types of income. Accordingly, the fact that a French parent of a Danish company is engaged in the active conduct of a trade or business in France and therefore would be entitled to the benefits of the U.S.-France treaty if it received dividends directly from a

U.S. subsidiary of the Danish company is not sufficient for purposes of this paragraph. Further, the French company cannot be an equivalent beneficiary if it qualifies for benefits only with respect to certain income as a result of a "derivative benefits" provision in the U.S.-France treaty. However, it would be possible to look through the French company to its parent company to determine whether the parent company is an equivalent beneficiary.

The second alternative for satisfying the "equivalent beneficiary" test is available only to residents of one of the two Contracting States. U.S. or Danish residents who are eligible for treaty benefits by reason of subparagraphs (a), (b), (c)(i), (d), or (e) of paragraph 2 are equivalent beneficiaries under the second alternative. Thus, a Danish individual will be an equivalent beneficiary without regard to whether the individual would have been entitled to receive the same benefits if it received the income directly. A resident of a third country cannot qualify for treaty benefits under any of those subparagraphs or any other rule of the treaty, and therefore does not qualify as an equivalent beneficiary under this alternative. Thus, a resident of a third country can be an equivalent beneficiary only if it would have been entitled to equivalent benefits had it received the income directly.

The second alternative was included in order to clarify that ownership by certain residents of a Contracting State would not disqualify a U.S. or Danish company under this paragraph. Thus, for example, if 90 percent of a Danish company is owned by five companies that are resident in member states of the European Union who satisfy the requirements of clause (i), and 10 percent of the Danish company is owned by a U.S. or Danish individual, then the Danish company still can satisfy the requirements of subparagraph (a) of paragraph 3.

Subparagraph (b) of paragraph 3 sets forth the base erosion test. A company meets this base erosion test if less than 50 percent of its gross income (as determined in the company's State of residence) for the taxable period is paid or accrued, directly or indirectly, to a person or persons who are not equivalent beneficiaries in the form of payments deductible for tax purposes in company's State of residence. These amounts do not include arm's-length payments in the ordinary course of business for services or tangible property and payments in respect of financial obligations to a bank that is not related to the payor. This test is the same as the base erosion test in clause (ii) of subparagraph (f) of paragraph 2, except that the test in subparagraph 3(b) focuses on base-eroding payments to persons who are not equivalent beneficiaries.

*Paragraph 4*

Paragraph 4 sets forth an alternative test under which a resident of a Contracting State may receive treaty benefits with respect to certain items of income that are connected to an active trade or business conducted in its State of residence. A resident of a Contracting State may qualify for benefits under paragraph 4 whether or not it also qualifies under paragraphs 2 or 3.

Subparagraph (a) sets forth the general rule that a resident of a Contracting State engaged in the active conduct of a trade or business in that State may obtain the benefits of the Convention with respect to an item of income derived from the other Contracting State. The item of income, however, must be derived in connection with or incidental to that trade or business.

The term "trade or business" is not defined in the Convention. Pursuant to paragraph 2 of Article 3 (General Definitions), when determining whether a resident of Denmark is entitled to the benefits of the Convention under paragraph 4 of this Article with respect to an item of income derived from sources within the United States, the United States will ascribe to this term the meaning that it has under the law of the United States. Accordingly, the U.S. competent authority will refer to the regulations issued under section 367(a) for the definition of the term "trade or business." In general, therefore, a trade or business will be considered to be a specific unified group of activities that constitute or could constitute an independent economic enterprise carried on for profit. Furthermore, a corporation generally will be considered to carry on a trade or business only if the officers and employees of the corporation conduct substantial managerial and operational activities.

The business of making or managing investments for the resident's own account will be considered to be a trade or business only when part of banking, insurance or securities activities conducted by a bank, an insurance company, or a registered securities dealer. Such activities conducted by a person other than a bank, insurance company or registered securities dealer will not be considered to be the conduct of an active trade or business, nor would they be considered to be the conduct of an active trade or business if conducted by a bank, insurance company or registered securities dealer but not as part of the company's banking, insurance or dealer business.  Because a headquarters operation is in the business of managing investments, a company that functions solely as a headquarters company will not be considered to be engaged in an active trade or business for purposes of paragraph 4.

An item of income is derived in connection with a trade or business if the income-producing activity in the State of source is a line of business that "forms a part of" or is "complementary" to the trade or business conducted in the State of residence by the income recipient.

A business activity generally will be considered to form part of a business activity conducted in the State of source if the two activities involve the design, manufacture or sale of the same products or type of products, or the provision of similar services. The line of business in the State of residence may be upstream, downstream, or parallel to the activity conducted in the State of source. Thus, the line of business may provide inputs for a manufacturing process that occurs in the State of source, may sell the output of that manufacturing process, or simply may sell the same sorts of products that are being sold by the trade or business carried on in the State of source.

Example 1. USCo is a corporation resident in the United States. USCo is engaged in an active manufacturing business in the United States. USCo owns 100 percent of the

shares of DCo, a company resident in Denmark. DCo distributes USCo products in Denmark. Because the business activities conducted by the two corporations involve the same products, DCo's distribution business is considered to form a part of USCo's manufacturing business.

Example 2. The facts are the same as in Example 1, except that USCo does not manufacture. Rather, USCo operates a large research and development facility in the United States that licenses intellectual property to affiliates worldwide, including DCo. DCo and other USCo affiliates then manufacture and market the USCo-designed products in their respective markets. Because the activities conducted by DCo and USCo involve the same product lines, these activities are considered to form a part of the same trade or business.

For two activities to be considered to be "complementary," the activities need not relate to the same types of products or services, but they should be part of the same overall industry and be related in the sense that the success or failure of one activity will tend to result in success or failure for the other. Where more than one trade or business is conducted in the State of source and only one of the trades or businesses forms a part of or is complementary to a trade or business conducted in the State of residence, it is necessary to identify the trade or business to which an item of income is attributable. Royalties generally will be considered to be derived in connection with the trade or business to which the underlying intangible property is attributable. Dividends will be deemed to be derived first out of earnings and profits of the treaty-benefited trade or business, and then out of other earnings and profits. Interest income may be allocated under any reasonable method consistently applied. A method that conforms to U.S. principles for expense allocation will be considered a reasonable method.

Example 3. Americair is a corporation resident in the United States that operates an international airline. DSub is a wholly-owned subsidiary of Americair resident in Denmark. DSub operates a chain of hotels in Denmark that are located near airports served by Americair flights. Americair frequently sells tour packages that include air travel to Denmark and lodging at DSub hotels. Although both companies are engaged in the active conduct of a trade or business, the businesses of operating a chain of hotels and operating an airline are distinct trades or businesses. Therefore DSub's business does not form a part of Americair's business. However, DSub's business is considered to be complementary to Americair's business because they are part of the same overall industry (travel), and the links between their operations tend to make them interdependent.

Example 4. The facts are the same as in Example 3, except that DSub owns an office building in Denmark instead of a hotel chain. No part of Americair's business is conducted through the office building. DSub's business is not considered to form a part of or to be complementary to Americair's business. They are engaged in distinct trades or businesses in separate industries, and there is no economic dependence between the two operations.

Example 5. USFlower is a company resident in the United States. USFlower produces and sells flowers in the United States and other countries. USFlower owns all

the shares of DHolding, a corporation resident in Denmark. DHolding is a holding company that is not engaged in a trade or business. DHolding owns all the shares of three corporations that are resident in Denmark: DFlower, DLawn, and DFish. DFlower distributes USFlower flowers under the USFlower trademark in Denmark. DLawn markets a line of lawn care products in Denmark under the USFlower trademark. In addition to being sold under the same trademark, DLawn and DFlower products are sold in the same stores and sales of each company's products tend to generate increased sales of the other's products. DFish imports fish from the United States and distributes it to fish wholesalers in Denmark. For purposes of paragraph 4, the business of DFlower forms a part of the business of USFlower, the business of DLawn is complementary to the business of USFlower, and the business of DFish is neither part of nor complementary to that of USFlower.

An item of income derived from the State of source is "incidental to" the trade or business carried on in the State of residence if production of the item facilitates the conduct of the trade or business in the State of residence. An example of incidental income is the temporary investment of working capital of a person in the State of residence in securities issued by persons in the State of source.

Subparagraph (b) of paragraph 4 states a further condition to the general rule in subparagraph (a) in cases where the trade or business generating the item of income in question is carried on either by the person deriving the income or by any associated enterprises. Subparagraph (b) states that the trade or business carried on in the State of residence, under these circumstances, must be substantial in relation to the activity in the State of source. The substantiality requirement is intended to prevent a narrow case of treaty-shopping abuses in which a company attempts to qualify for benefits by engaging in de minimis connected business activities in the treaty country in which it is resident (*i.e.*, activities that have little economic cost or effect with respect to the company business as a whole).

The determination of substantiality is made based upon all the facts and circumstances and takes into account the comparative sizes of the trades or businesses in each Contracting State, the nature of the activities performed in each Contracting State, and the relative contributions made to that trade or business in each Contracting State. In any case, in making each determination or comparison, due regard will be given to the relative sizes of the U.S. and Danish economies.

The determination in subparagraph (b) also is made separately for each item of income derived from the State of source. It therefore is possible that a person would be entitled to the benefits of the Convention with respect to one item of income but not with respect to another. If a resident of a Contracting State is entitled to treaty benefits with respect to a particular item of income under paragraph 4, the resident is entitled to all benefits of the Convention insofar as they affect the taxation of that item of income in the State of source.

The application of the substantiality requirement only to income from related parties focuses only on potential abuse cases, and does not hamper certain other kinds of

25

non-abusive activities, even though the income recipient resident in a Contracting State may be very small in relation to the entity generating income in the other Contracting State. For example, if a small U.S. research firm develops a process that it licenses to a very large, unrelated, Danish pharmaceutical manufacturer, the size of the U.S. research firm would not have to be tested against the size of the Danish manufacturer. Similarly, a small U.S. bank that makes a loan to a very large unrelated Danish business would not have to pass a substantiality test to receive treaty benefits under Paragraph 4.

Subparagraph (c) of paragraph 4 provides special attribution rules for purposes of applying the substantive rules of subparagraphs (a) and (b). Thus, these rules apply for purposes of determining whether a person meets the requirement in subparagraph (a) that it be engaged in the active conduct of a trade or business and that the item of income is derived in connection with that active trade or business, and for making the comparison required by the "substantiality" requirement in subparagraph (b). Subparagraph (c) attributes to a person activities conducted by persons "connected" to such person. A person ("X") is connected to another person ("Y") if X possesses 50 percent or more of the beneficial interest in Y (or if Y possesses 50 percent or more of the beneficial interest in X). For this purpose, X is connected to a company if X owns shares representing fifty percent or more of the aggregate voting power and value of the company or fifty percent or more of the beneficial equity interest in the company. X also is connected to Y if a third person possesses fifty percent or more of the beneficial interest in both X and Y. For this purpose, if X or Y is a company, the threshold relationship with respect to such company or companies is fifty percent or more of the aggregate voting power and value or fifty percent or more of the beneficial equity interest. Finally, X is connected to Y if, based upon all the facts and circumstances, X controls Y, Y controls X, or X and Y are controlled by the same person or persons.

*Paragraph 5*

Paragraph 5 provides that a resident of one of the States that derives income from the other State described in Article 8 (Shipping and Air Transport) and that is not entitled to the benefits of the Convention under paragraphs 1 through 4, shall nonetheless be entitled to the benefits of the Convention with respect to income described in Article 8 if it meets one of two tests. These tests in substance duplicate the rules set forth under Code section 883 and therefore afford little additional benefit beyond those provided by the Code. These tests are described below.

First, a resident of one of the States that derives income from the other State will be entitled to the benefits of the Convention with respect to income described in Article 8 if at least 50 percent of the beneficial interest in the person (in the case of a company, at least 50 percent of the aggregate vote and value of the stock of the company) is owned, directly or indirectly, by persons entitled to benefits under subparagraphs a), b), c)(i), d), or e), paragraph 2, citizens of the United States or individuals who are residents of a third state that grants by law, common agreement, or convention an exemption under similar terms for profits as mentioned in Article 8 to citizens and corporations of the other State. This provision is analogous to the relief provided under Code section 883(c)(1).

Alternatively, a resident of one of the States that derives income from the other State will be entitled to the benefits of the Convention with respect to income described in Article 8 if at least 50 percent of the beneficial interest in the person (in the case of a company, at least 50 percent of the aggregate vote and value of the stock of the company) is owned directly or indirectly by a company or combination of companies the stock of which is primarily and regularly traded on an established securities market in a third state, provided that the third state grants by law, common agreement or convention an exemption under similar terms for profits as mentioned in Article 8 to citizens and corporations of the other State.  This provision is analogous to the relief provided under Code section 883(c)(3).

The provisions of paragraph 5 are intended to be self executing.  Unlike the provisions of paragraph 7, discussed below, claiming benefits under paragraph 5 does not require an advance competent authority ruling or approval.  The tax authorities may, of course, on review, determine that the taxpayer has improperly interpreted the paragraph and is not entitled to the benefits claimed.

*Paragraph 6*

Paragraph 6 deals with the treatment of royalties and interest in the context of a so-called "triangular case."

The term "triangular case" refers to the use of the following structure by a resident of Denmark to earn, in this case, interest income from the United States. The resident of Denmark, who is assumed to qualify for benefits under one or more of the provisions of Article 22 (Limitation of Benefits), sets up a permanent establishment in a third jurisdiction that imposes only a low rate of tax on the income of the permanent establishment. The Danish resident lends funds into the United States through the permanent establishment. The permanent establishment, despite its third-jurisdiction location, is an integral part of a Danish resident. Therefore the income that it earns on those loans, absent the provisions of paragraph 6, is entitled to exemption from U.S. withholding tax under the Convention. Under a current Danish income tax treaty with the host jurisdiction of the permanent establishment, the income of the permanent establishment is exempt from Danish tax. Thus, the interest income is exempt from U.S. tax, is subject to little tax in the host jurisdiction of the permanent establishment, and is exempt from Danish tax.

Because the United States does not exempt the profits of a third-jurisdiction permanent establishment of a U.S. resident from U.S. tax, either by statute or by treaty, the paragraph only applies with respect to U.S. source interest or royalties that are attributable to a third-jurisdiction permanent establishment of a Danish resident.

Paragraph 6 replaces the otherwise applicable rules in the Convention for interest and royalties with a 15 percent withholding tax for interest and royalties if the actual tax paid on the income in the third state is less than 60 percent of the tax that would have

been payable in Denmark if the income were earned in Denmark by the enterprise and were not attributable to the permanent establishment in the third state.

In general, the principles employed under Code section 954(b)(4) will be employed to determine whether the profits are subject to an effective rate of taxation that is above the specified threshold.

Notwithstanding the level of tax on interest and royalty income of the permanent establishment, paragraph 6 will not apply under certain circumstances. In the case of interest (as defined in Article 11 (Interest)), paragraph 6 will not apply if the interest is derived in connection with, or is incidental to, the active conduct of a trade or business carried on by the permanent establishment in the third state. The business of making, managing or simply holding investments is not considered to be an active trade or business, unless these are banking or securities activities carried on by a bank or registered securities dealer. In the case of royalties, paragraph 6 will not apply if the royalties are received as compensation for the use of, or the right to use, intangible property produced or developed by the permanent establishment itself.

*Paragraph 7*

Paragraph 7 provides that a resident of one of the States that is not entitled to the benefits of the Convention as a result of paragraphs 1 through 6 still may be granted benefits under the Convention at the discretion of the competent authority of the State from which benefits are claimed. In making determinations under paragraph 7, that competent authority will take into account as its guideline whether the establishment, acquisition, or maintenance of the person seeking benefits under the Convention, or the conduct of such person's operations, has or had as one of its principal purposes the obtaining of benefits under the Convention. Benefits will not be granted, however, solely because a company was established prior to the effective date of the Convention or the Protocol.  In that case, a company would still be required to establish to the satisfaction of the Competent Authority clear non-tax business reasons for its formation in a Contracting State, or that the allowance of benefits would not otherwise be contrary to the purposes of the Convention.  Thus, persons that establish operations in one of the States with a principal purpose of obtaining the benefits of the Convention ordinarily will not be granted relief under paragraph 7.

The competent authority's discretion is quite broad.  It may grant all of the benefits of the Convention to the taxpayer making the request, or it may grant only certain benefits.  For instance, it may grant benefits only with respect to a particular item of income in a manner similar to paragraph 4. Further, the competent authority may establish conditions, such as setting time limits on the duration of any relief granted.

For purposes of implementing paragraph 7, a taxpayer will be permitted to present his case to the relevant competent authority for an advance determination based on the facts. In these circumstances, it is also expected that if the competent authority determines that benefits are to be allowed, they will be allowed retroactively to the time

28

of entry into force of the relevant treaty provision or the establishment of the structure in question, whichever is later.

A competent authority is required by paragraph 7 to consult the other competent authority before denying benefits under this paragraph.

*Paragraph 8*

Paragraph 8 defines several key terms for purposes of Article 22. Each of the defined terms is discussed in the context in which it is used.

**Article V**

Article V of the Protocol contains the rules for bringing the Protocol into force and giving effect to its provisions.

Paragraph 1 provides that each State must notify the other as soon as its requirements for ratification have been complied with. The Protocol will enter into force upon the date of receipt of the later of such notifications.

In the United States, the process leading to ratification and entry into force is as follows: Once a protocol or treaty has been signed by authorized representatives of the two Contracting States, the Department of State sends the protocol or treaty to the President who formally transmits it to the Senate for its advice and consent to ratification, which requires approval by two-thirds of the Senators present and voting. Prior to this vote, however, it generally has been the practice of the Senate Committee on Foreign Relations to hold hearings on the protocol or treaty and make a recommendation regarding its approval to the full Senate. Both Government and private sector witnesses may testify at these hearings. After the Senate gives its advice and consent to ratification of the protocol or treaty, an instrument of ratification is drafted for the President's signature. The President's signature completes the process in the United States.

The date on which a treaty enters into force is not necessarily the date on which its provisions take effect. Paragraph 2 contains rules that determine when the provisions of the treaty will have effect.

Under subparagraphs (a), the provisions of the Protocol relating to taxes withheld at source will have effect with respect to income derived on or after the first day of the second month next following the date on which the Protocol enters into force. For example, if instruments of ratification are exchanged on April 25 of a given year, the withholding rates specified in paragraphs 2 and 3 of Article 10 (Dividends) would be applicable to any dividends paid or credited on or after June 1 of that year. Similarly, the revised Limitation of Benefits provisions of Article 5 of the Protocol would apply with respect to any payments of interest, royalties or other amounts on which withholding would apply under the Code if those amounts are paid or credited on or after June 1.

This rule allows the benefits of the withholding reductions to be put into effect as soon as possible, without waiting until the following year. The delay of one to two

29

months is required to allow sufficient time for withholding agents to be informed about the change in withholding rates. If for some reason a withholding agent withholds at a higher rate than that provided by the Convention (perhaps because it was not able to re-program its computers before the payment is made), a beneficial owner of the income that is a resident of Denmark may make a claim for refund pursuant to section 1464 of the Code.

For all other taxes, subparagraph (b) specifies that the Protocol will have effect for any taxable period beginning on or after January 1 of the year next following entry into force.

# Exhibit 51

## International - The Evolution of the Term "Beneficial Ownership" in Relation to International Taxation over the Past 45 Years

**Citation:** C.P. du Toit, *The Evolution of the Term "Beneficial Ownership" in Relation to International Taxation over the Past 45 Years*, 64 Bull. Intl. Taxn. 10 (2010), Journals IBFD

**Charl du Toit** [*]

**Vol. 64**
**Issue:** Bulletin for International Taxation, 2010 (Volume 64), No. 10
**Published online:** 19 July 2010

**Citation:** C.P. du Toit, *The Evolution of the Term "Beneficial Ownership" in Relation to International Taxation over the Past 45 Years*, 64 Bull. Intl. Taxn. 10 (2010), Journals IBFD

**This article reviews the evolution of the term "beneficial ownership" in tax treaties since its first inception 45 years ago, with special focus on whether or not the meaning has evolved away from that in the domestic law of the common law states and the implications of the recent decisions in *Indofood* and *Prévost*.**

### 1. Introduction and Focus

Beneficial ownership is probably the most well-known undefined treaty term and its international tax meaning is a matter that lends itself to much debate. The focus of this article is on considering whether or not the meaning of the term has evolved during the period of approximately 45 years since its introduction as a treaty concept in relation to income.

The meaning of beneficial ownership was one of the topics at both the IFA Congresses in 1998 in London and 1999 in Eilat. At the Eilat Congress, a representative from the Netherlands commented as follows: [1]

> Conceding that the origin [of the term beneficial owner] is in common law, we must then in my opinion proceed to a more common view and common explication of the term which is able to be applied in different legal systems.

and:

> Thus, it may not be a reasoning on the basis of the text and literal meaning of the words, but rather the object and purpose of the treaty which dictates this international meaning, largely based on common law, but not identical to it.

There appears to be good merit for this view. In this regard, the purpose of this article is, therefore, to review significant events from 1966 to 2009 (the year of the *Prévost* [2] decision) to investigate to what extent there has been an evolution to a more international meaning "largely based on the common law, but not identical to it".

The concept of beneficial ownership has developed and existed for many years in the domestic (non-tax) law of the common law states. It was incorporated for the first time in a tax treaty in relation to income in the 1966 protocol to the 1945 United Kingdom–United States tax treaty. The concept was introduced into the OECD Model Tax Convention ("the OECD Model") in 1977.

There is probably little room for argument that, when introduced into the United Kingdom–United States tax treaty in 1966 (both common law states), the meaning to be ascribed to the term was the meaning in the United Kingdom and the United States. The question is whether or not that meaning when applied in the tax treaty between the same two states (or any other two states) changed when the term was introduced into the OECD Model in 1977 and/or over the period since then until today.

### 2. The Context

As a starting point, it is important to review the reasons for, and background to, the controversy. The term and concept of beneficial ownership are used both in the OECD Model and in the UN Model Tax Convention ("the UN Model"), and have similarly been incorporated into many tax treaties between different states. The concept is decisive in determining whether or not a person qualifies for treaty benefits and for the allocation of the right to tax between the two contracting states in respect of dividends, interest and royalties. In this respect, tax treaties typically use wording to the effect that the person claiming the treaty benefits (normally a reduced withholding tax) must be the beneficial owner of the dividends, interest or royalties. Given the high value of the international flow of dividends, interest and royalties, it is a surprise that – more than 30 years after its incorporation into the

OECD Model in 1977 – there is still so much confusion and dispute as to the exact international tax meaning of beneficial ownership.

The concept of beneficial ownership is neither defined in the OECD Model, nor the UN Model, nor in most tax treaties. The main reason for the difference in opinion as to its meaning is the fact that the concept is used in tax treaties between states with different legal systems and traditions, including different understandings and meanings of ownership. In an international treaty context, the conflict is most often between the civil law and the common law states. Whereas beneficial ownership is a well-known term in common law states, it is not known in the domestic law of civil law states. Maisto [3] explained that, in Italy, the position that was traditionally taken was that the real rights (which included ownership and usufruct) of enjoyment of an asset were expressly defined and limited by the Italian Civil Code. These were the sole rights of enjoyment, which could be enforced against anyone, as opposed to contractual arrangements such as lease agreements, which could be enforced only between the contracting parties. Any right of enjoyment other than those defined and governed by the Italian Civil Code could not exist and, consequently, could be deemed to be contrary to public policy.

In practice, the question of beneficial ownership is especially problematic in group situations – for example, where there are intermediate companies holding sub-licences or back-to-back loans, or simply acting as the holding company of subsidiaries (where a flow-through of dividends occurs). The cession (or similar arrangement) of income is another area where the question of beneficial ownership arises. A further question is the effect of contractual arrangements, i.e. where a person has on the face of it received a payment as their own, but has already contractually agreed to pay the same, or a similar amount, on to someone else. Added to this is the effect of bona fide security arrangements in respect of payments on the beneficial ownership question, which is an issue that has so far probably not received sufficient scholarly attention. Against the background of its anti-avoidance purpose, the question as to whether or not the reason why a certain structure of transaction was entered into is a factor in determining beneficial ownership inevitably arises. Finally, there is the role of domestic anti-avoidance or substance-over-form rules in the interpretation of the treaty meaning of a term.

Baker properly sums up the main issue surrounding the meaning of beneficial ownership: [4]

> The practical question remains whether, for example, a company under the control of another – and therefore likely (though not legally obliged) to pay to its ultimate owner any sums received – could be regarded as beneficial owner of the dividends it receives. Or, to take another example, suppose that a member of a multinational group borrows money and then lends the money on to another group company: the two loans are not tied together, and the lending company is not obliged to use the interest it receives to pay interest on the loan it received – in practice, however, it is likely to do so.

Put differently, arguably the main issue today is whether beneficial ownership is a legal as opposed to a factual or economic substance test. This question was particularly prominent in the recent *Indofood* [5] and *Prévost* decisions. In *Indofood*, back-to-back loan and interest arrangements were between third parties, which necessitated contractual arrangements to ensure the on-payment of interest. The question is whether or not the outcome of the beneficial ownership investigation would be different in a similar structure in a group situation, where there would be less need for contractual arrangements to ensure the on-payment of interest.

The author [6] previously expressed his hypothesis as to the meaning of beneficial ownership as follows:

> The term was taken from the common law states and incorporated into the OECD Model. The term is not known in the domestic law of states other than the common law states. It can properly be classified as international tax language. It is not defined in the OECD Model. No OECD member state has expressed either a reservation or an observation as to its meaning in the OECD Model. The meaning of beneficial owner at the source that it was taken from, that is, the common law states, should therefore be taken as the starting point for the investigation of its international tax meaning in those bilateral tax treaties which have adopted the wording of the OECD Model. This meaning should then be modified, if necessary, in the context of the treaty and in the light of its object and purpose. This whole process of interpretation should be in accordance with the steps as prescribed by the Vienna Convention.

By applying the reasoning and steps as described above, the following answer is reached: [7]

> *The beneficial owner is the person whose ownership attributes outweigh those of any other person.* (emphasis added)

## 3. Important Developments over the Past 45 Years

### 3.1. Introductory remarks

For purposes of the following discussion, eight events (see 3.2. to 3.9.) have been identified that are considered to be important developments the past 45 years with regard to the meaning of beneficial ownership. The reason for the inclusion of some of these events is self-evident and is not open to debate. The selection of relevant court cases could, however, be debated. Why, for example, are the Netherlands Supreme Court (*Hoge Raad*) [8] and *Prévost* decisions regarded as more relevant than decisions in, say, France, Spain or Switzerland? Because of

the language barriers, students of international tax often have to rely on summaries by others of cases that are not in the language with which they are familiar [9] It ha to be acknowledged that, for thi rea on, ome key factor or principle from the e ca e may not be fully under tood and appreciated

It appear , though, that the deci ion in ome of the e ca e were influenced by dome tic anti abu e or substance-over-form rules, or by factors such as that the taxpayers could not provide sufficient evidence that they are the beneficial owners. Most importantly, there appears to be a lack of discussion as to how the courts have arrived at the meaning of the term "beneficial ownership". [10] In the search for a uniform international tax meaning preference should be given to cases where there was a proper analysis of the meaning of the term, where all the fact were clear and where the deci ion of the court wa not tainted by dome tic tax law considerations.

## 3.2. 1966: first use of beneficial ownership in relation to income in a tax treaty

### 3.2.1. Initial comments

Beneficial ownership was incorporated by way of a protocol of 1966 into the United Kingdom–United States tax treaty. In an explanatory note, which is attached to one copy of the protocol, the following is stated:

> Relief from tax on dividends, interest and royalties... in the country of origin will no longer depend on whether the recipient i ubject to tax in the other country, but will depend on the income being beneficially owned by a resident of the other country.

It must be assumed that the meaning of the term at that time in the tax treaty between the United Kingdom and United States, which are both common law states, was the meaning in the common law states. [11]

This raises the question of the meaning of beneficial ownership in common law states. In the *Prévost* [12] decision, reference was made to studies by Brown [13] and Brender, [14] concluding respectively that beneficial ownership has different meanings under the Canadian Income Tax Act depending on the provision and that there is no settled definition of beneficial ownership even under common law.

Hattingh, [15] writing on the subject in a South African context, concludes that:

> There is probably no perfect well-described all-encompassing definition of beneficial ownership that lies hidden in a case or an old authority waiting to be discovered.

and:

> The term beneficial owner is rather like a chameleon, taking its colour from the content of the personal rights to which it is attached as a label. It is not in the nature of a chameleon to nail its colours to the ma t

The fact that a legal term doe not have a ingle meaning and that the meaning i determined by reference to the context in which the term is used is, of course, not new. This applies to most other terms and words and not only to beneficial ownership. If the meaning of beneficial ownership as expressed in the common law states is referred to, there are a few clear principles that are also relevant in a treaty context. Some of these meanings are con idered in 3 2 2 to 3 2 4 [16]

### 3.2.2. England

Lord Diplock in *Ayerst (Inspector of Taxes) v. C&K (Construction) Ltd* [17] stated that:

> My lords, the concept of legal ownership of property, which did not carry with it the right of the owner to enjoy the fruits of it or dispose of it for his own benefit, owed its origin to the Court of Chancery. The archetype is the trust. The "legal ownership" of the trust property is in the trustee, but he holds it not for hi own benefit but for the benefit of the ce tui que tru tent or beneficiarie

### 3.2.3. United States

In the Supreme Court, *Montana Catholic Missions v. Missoula County*, [18] Mr Justice Peckham held as follows:

> The expression "beneficial use" or "beneficial ownership or interest" in property is quite frequent in the law, and means, in this connection, such a right to its enjoyment as exists where the legal title is in one per on and the right to uch beneficial u e or intere t i in another, and where uch right i recognized by law, and can be enforced by the courts, at the suit of such owner or of some one in his behalf.

### 3.2.4. Dictionary definition

The following definition of beneficial owner from a legal dictionary, [19] which is in line with those in 3.2.2. and 3.2.3., can be added:

9/24/2018    International Tax Law - Lexis® - Function of the term "beneficial ownership" in international tax law after 75 or so Years

Case 1:18-md-02865-LAK    Document 808-18    Filed 05/12/22    Page 753 of 1574

One who does not have title to property but has rights in the property which are the normal incidents of owning the property. The persons for whom a trustee holds title to the property are the beneficial owners of the property, and the trustee has a fiduciary responsibility to them.

### 3.2.5. Interim conclusions

The first principle from the meanings set out in 3.2.2. to 3.2.4. is that an investigation into beneficial ownership is one into the incidents or attributes of ownership. A second principle, which is very important in the debate as to whether beneficial ownership is a question of law or a question of fact, is that, with regard to the meaning in the common law states, the answer is that it is a question of law. In this regard, the author previously concluded as follows: [20]

> The case law discussed has shown that in order to qualify as a right of beneficial ownership, a right must be recognised by law, and be able to be enforced by the courts. This study has found no evidence, neither in the OECD Model nor the MC Commentary, to support a different meaning for international purposes, namely that beneficial ownership is excluded not only where a person is under a legal obligation to pay out a royalty but also where it is paid on in fact and in the absence of a legal obligation.

### 3.3. 1977: beneficial ownership introduced into the OECD Model

The concept of beneficial ownership was incorporated into the OECD Model in 1977, but without defining it. In addition, no reservations or observations were expressed by any OECD Member country.

To date, there have not been readily available minutes or other documentation of the OECD during the period before 1977 that provide insight as to the true intentions of the drafters of the OECD Model in adopting this notion. [21] This situation has, however, changed in the last year or so since the materials in the OECD archives have become available. Specifically, in a document of 9 May 1967, [22] the following statement from the United Kingdom appears under the heading "Article 10: Dividends":

> In our view the relief provided for under these Articles ought to apply only if the beneficial owner of the income in question is resident in the other contracting State, for otherwise the Articles are open to abuse by taxpayers who are resident in third countries and who could, for instance, put their income into the hands of bare nominees who are resident in the other contracting State. You will no doubt have noticed that our recent protocols with the United States and with Switzerland we have introduced this test of beneficial ownership which clearly reflects what was intended by the Committee when the Model Convention was prepared.

This statement is insightful. The idea of using the concept of beneficial ownership to deny treaty benefits to a "bare nominee" who is not the beneficial owner makes a lot of sense. The search (by the author) of OECD materials on this matter still needs to be completed. It might even be worthwhile to do a search in the relevant UK archives for materials that contributed to the OECD process. At the very least, though, there is strong evidence that the OECD borrowed the notion of beneficial ownership from the common law states to be used as a treaty concept and there does not appear to be any evidence negating such a view. As stated before by the author, the question may, indeed, be asked where else the term could have been taken from, if not from the common law states. [23]

### 3.4. 1977: OECD Commentary on Arts. 10, 11 and 12 [24]

As with the OECD Model, which did not provide a definition, the Commentaries to the 1977 OECD Model provided very little guidance on the meaning of beneficial ownership, other than excluding an intermediary, such as an agent or nominee, as a beneficial owner.

### 3.5. 1986: OECD Conduit Companies Report [25]

The Conduit Companies Report was adopted by the OECD in 1986 – in other words, almost 10 years after the introduction of the beneficial ownership concept in the OECD Model in 1977. From this perspective, the Report's role and place in the interpretation of the meaning of beneficial owner can be questioned.

Be that as it may, its primary relevance appears to be to expand the persons to be excluded as beneficial owners, in addition to nominees and agents, to the formal owner of assets who has very narrow powers, which make such an owner a mere fiduciary or an administrator acting on account of the interested parties. As long as the meaning to be ascribed to "narrow powers" meant that from a legal point of view that person does not hold the biggest weight of ownership attributes it could be concluded that, to the extent that the Conduit Companies Report provided a meaning of beneficial ownership, such a meaning does not conflict with the meaning in the common law states.

### 3.6. 1994: Netherlands Supreme Court decision in *Royal Dutch Petroleum* [26]

For many years, the leading international case on beneficial ownership has been that by the Netherlands Supreme Court regarding dividends. It remains one of the most authoritative cases on the subject.

The well-known facts were that a stockbroker resident in the United Kingdom bought dividend coupons of Royal Dutch Petroleum shares. The stockbroker did not possess or acquire the underlying shares. At the time of the purchase, the dividends had been declared but not yet made payable. On payment of the dividends, the stockbroker claimed the reduced withholding tax rate under the Netherlands–United Kingdom tax treaty. The relevant question to be decided by the Supreme Court was whether the stockbroker was the beneficial owner of the dividend.

In finding that the stockbroker was the beneficial owner, the Supreme Court established some important principles. First, the Supreme Court confirmed that there is no need to be the owner of the underlying property. Second, the Supreme Court focused on the rights in respect of the coupons and payment to conclude that the taxpayer was the beneficial owner of the dividends, as he could freely deal with both the coupons and payment. Third, the Supreme Court held that beneficial ownership must be determined at the time when payment takes place. A final point why the decision is important with reference to the search of a uniform international tax meaning for beneficial ownership is that the Supreme Court focused only on the issue to be decided, i.e. beneficial ownership, and did not apply any other tests, such as, for example, whether or not the sole reason for the scheme was to obtain a tax benefit.

It is submitted that applying the meaning of beneficial ownership in the common law states would have resulted in the same finding.

### 3.7. 2003: substantial amendment of the OECD Commentary on Arts. 10, 11 and 12

The original OECD Commentaries from 1977 were substantially expanded in 2003. It is stated that the term beneficial owner should not be used in a narrow technical sense, but, rather, should be understood in its context and in the light of the object and purposes of the tax treaty, including avoiding double taxation and the prevention of fiscal evasion and avoidance.

Stating, as was the case in 1977, that agents and nominees are excluded as beneficial owners, the 2003 Commentaries further incorporate elements from the 1986 Conduit Companies Report by excluding persons who simply act as a conduit for another person who, in fact, receives the benefit of the income concerned. In this regard, there is again reference to (and the exclusion of) formal owners with very narrow powers. However, significantly, for the first time, the words "as a practical matter" were added in front of "narrow powers".

Of all the developments regarding the international tax meaning of beneficial ownership over the past 45 years these amendments to the OECD Commentaries were arguably the most dramatic. The reference to formal owners who "as a practical matter" have very narrow powers is particularly relevant. The wording "as a practical matter" is new and did not appear before in either the Commentary on Arts. 10, 11 or 12 of the OECD Model or the OECD Conduit Companies Report. This wording is important and goes to the heart of the matter, i.e. whether beneficial ownership is a legal as opposed to a practical or economic substance test (see also the comment by Baker in 2. on the main issue surrounding the meaning of beneficial ownership). [27] This is also a diversion from the view that beneficial ownership is a question of law. [28] The statement that the meaning of beneficial ownership should be interpreted in the context of the object of the tax treaty to prevent fiscal evasion and avoidance is also new in the Commentary to Arts. 10, 11 and 12.

Although the focus of this article is not on the correct process of treaty interpretation, it is appropriate to reflect on how the tax courts have dealt with the amended Commentaries. In this respect, it appears that, whilst the academic debate on the role and status of the Commentaries – i.e. whether or not they form part of the context, can be regarded as an instrument, reflect a special meaning, etc. – continues as vehemently as before, [29] the courts (or at least some of them) appear not to be too concerned about this debate and to have no problem with not only accepting the Commentaries as a valid source for the meaning of beneficial ownership, but also accepting an addition to the Commentaries after the date of conclusion of the relevant tax treaty under consideration.

As can be seen from the further discussion in this article, the amended Commentary on Arts. 10, 11 and 12 of the OECD Model was quite prominent in two of the recent important court cases, i.e. *Indofood* and *Prévost*. In both cases, the courts had no problem in referring to the Commentaries that were issued after the conclusion of tax treaties under consideration. Whereas in *Indofood* the English Court of Appeal did not appear to have provided justification for its entitlement to refer to the Commentaries, [30] the Canadian Court of Appeal in *Prévost*, however, did so by referring to the Commentaries as a "widely-accepted guide" to treaty interpretation and also accepted the amendments "insofar as they are eliciting [sic 'elucidating'], rather than contradicting, views previously expressed". [31]

The outcomes of the two courts' reliance on the Commentaries were different though. In *Indofood*, the court appears to have relied strongly on the "practical matter" test to find that the relevant company was not the

beneficial owner. In *Prévost*, though, the court was not willing to go that far, i.e. to stretch the meaning of beneficial owner hip into "a practical matter" te t

In neither *Indofood* nor the Spani h deci ion that Martín Jiménez [32] refer to did the court inve tigate the plain meaning of the word "beneficial owner hip" It i ubmitted that, although the exact role of the Commentaries in the process of interpretation can be debated, what cannot be debated is that a court cannot refer to the Commentaries as the first or only source of the meaning of beneficial ownership. The starting point in the process of interpretation is the elucidation of the meaning of the text, i.e. the wording. [33] Only after such an investigation of the meaning of the words or at most as part of the investigation, can reference be made to the Commentarie , if there i a legal ba i to ay that the contracting tate intended the Commentarie to be *a*, not *the*, source to establish the meaning of the treaty text. The further step, if there is a legal basis to consult the Commentaries, is to justify why an addition to the Commentaries after the date of conclusion of a tax treaty may be considered, especially if that addition to the Commentaries changed the interpretation therein, which is arguably the ca e with the 2003 amendment s to Commentary on Art 10, 11 and 12 of the OECD Model regarding the meaning of the term "beneficial owner".

The view that the plain meaning of the words must be considered as a first step is even more valid in the case of beneficial ownership: it is a term with unique and subtle characteristics, which must have played a role in the decision of the OECD to employ it as a treaty concept. [34] On this point (of not first considering the plain meaning of the words), the approach by the relevant courts can, therefore, justifiably be criticized.

As conclusion under the heading of the amended Commentary on Arts. 10, 11 and 12 of the OECD Model, the que tion ari e why hould the OECD or treaty partner want to go that far they do not imply in ert a rule to the effect that treaty benefits are not available in cases where entities are specifically interposed to benefit from specific tax treaties between states. Why persevere with a term such as beneficial ownership that has its origin in the common law states and the meaning of which must be stretched considerably to exclude beneficial owner hip in ituation of paying on money "a a practical matter", even where no legal obligation exi t and/or where the question of whether or not a tax avoidance motive was present must be taken into account in determining beneficial ownership?

## 3.8. 2006: the *Indofood* case

Even though there could be questions on some aspects of the *Indofood* decision, this much-discussed case is important for various reasons. In the first place, the case highlights what has become the key focus of the beneficial ownership debate, i.e. whether or not beneficial ownership is excluded not only where a person is under a legal obligation to pay on dividend , intere t or royaltie , but al o where the e amount are paid on in fact and in the absence of a legal obligation.

Another reason for the importance of the *Indofood* case is the specific structure under investigation, i.e. a typical back-to-back loan structure. There is arguably nothing that puts the beneficial ownership question to a greater test than back-to-back loans.

The *Indofood* case is also the first time that an English court had to provide a definition of the term "beneficial owner hip" in a treaty context A the birth place of the term "beneficial owner hip" and a country in which the term has a domestic law meaning, the case therefore immediately catches the attention. On closer examination, though, this was not a case on English law. From this point of view, it is therefore not the "English case" on the international tax meaning of beneficial ownership that everyone has been waiting for.

The case is somewhat peculiar in various respects, including that it was a case on Indonesian law and practice heard by an Engli h court, it wa trictly peaking a civil ca e and not a tax ca e, none of the judge and none of the counsel involved in the case was an expert in taxation, [35] and it appears that the court's decision was influenced by some domestic elements of Indonesian law. [36] The case also dealt with a hypothetical situation, i.e. the effect if a Netherlands company were introduced. For these reasons, it is doubtful whether the finding has wide international implications and application. It, however, remains an important case.

For purposes of this discussion, the information on the facts and the issue at stake can be reduced simply to the question of whether or not a Netherlands company ("Netherlands Newco") introduced between an Indonesian borrower and a Mauritian company, holding back to back loan for the ame amount and receiving and paying the same amount of interest, could be regarded as the beneficial owner of the interest received. It must be assumed that the company would have no other assets and business and little substance. It was further clear that the main reason for the formation of the company would be to take advantage of the favourable withholding tax rate on intere t in term of the Indone ia Netherland tax treaty

There appear to be ome uncertainty a to whether Netherland Newco would have to pay over the pecific amount of interest received or whether it would have been allowed to find the money from another source – a fact that is quite important in the beneficial ownership analysis. [37] It appears that the court was of the opinion that Netherlands Newco would be precluded from finding the money from any other source [38] and this premise should, therefore, be assumed.

The court found that Netherlands Newco would not be the beneficial owner in holding that:

> ... the Issuer is bound to pay to the Principal Paying Agent that which it received from the Parent Guarantor because it is precluded from finding the money from any other source by the Note Conditions... (at 43)

and:

> But the meaning to be given to the phrase "beneficial owner" is plainly not to be limited by so technical and legal an approach. Regard is to be had to the substance of the matter. In both commercial and practical terms the Issuer is, and Newco would be, bound to pay on to the Principal Paying Agent that which it receives from the Parent Guarantor.... In practical terms it is impossible to conceive of any circumstances in which either the Issuer or Newco could derive any "direct benefit" from the interest payable by the Parent Guarantor except by funding its liability to the Principal Paying Agent or Issuer respectively. Such an exception can hardly be described as the "full privilege" needed to qualify as the beneficial owner, rather the position of the Issuer and Newco equates to that of an "administrator of the income". (at 44)

What does one make of this case? Is it a watershed case [39] or is the finding the result of the specific facts and circumstances? The most problematic part of the decision is the economic substance test, as opposed to a legal test, that is given to beneficial ownership. Had the court stopped at 43 it may well have been possible to be more comfortable with the decision. If it was true that Netherlands Newco was bound to pay over the exact same payment that it received, in other words that it was under a contractual or legal obligation to do so, it could well be concluded that it is not the beneficial owner of the interest received.

But (at 44) the court concluded that there was no need for such a narrow (legal) test. On the contrary, if as a practical matter of fact a person is bound to pay over an amount then that person is not the beneficial owner. And, the fact that a payment received is used to fund a liability means that the recipient has not benefited from the receipt. In almost every other commercial situation in life a person is bound to use money received from their debtors to pay their creditors. Does this mean that these persons are not the beneficial owners of the proceeds from their sales? Or is the difference that such businesses would not be classified as conduit entities in the first place? If so, where is the cut-off? Would it have made a difference if Netherlands Newco had earned a small profit on the interest, had some other business or did not have to pay on the specific interest received and was allowed to fund it from other sources?

There is little doubt that the Indofood structure had a blatant tax avoidance motive. Is this the key to the decision in *Indofood*, i.e. that the hypothetical facts so clearly reveal a case of treaty shopping by using an entity that is clearly a conduit entity that the court, which was well aware of the concern of the Indonesian authorities regarding what they conceive to be the misuse of tax treaties, had no choice other than to stretch the meaning of beneficial owner in finding the way it did? Stated differently, was this simply a case where the use of a conduit entity with a lack of substance and function was taken too far? [40]

Or is the last word on this case that it was indeed correctly decided on the basis that Netherlands Newco was under a contractual (and, therefore, legal) obligation to pay on the interest that it received? In contrast to the situation in the Netherlands Supreme Court and *Prévost* decisions discussed elsewhere in this article, Netherlands Newco could not freely deal with the interest received, as it was accountable to someone else in respect of the specific income. In fact, on the assumption that the practice would be similar as it was under the previous structure, where a Mauritian intermediary company had been used, the interest would not have even physically moved through Netherlands Newco, as it would have been paid directly from the borrower to the lender. If this analysis is correct, then (surprising as it may sound) it could be possible to conclude that such a result would have been similar if the domestic law meaning in the common law states were applied to the situation. [41] It could then be further concluded that there was no need for the court to revert to an economic substance or practical matter test – a proper analysis of the legal obligations would have resulted in the same finding. [42]

## 3.9. 2009: the *Prévost* case

For various reasons, this most recent case on beneficial ownership is also the most significant. Not only does it represent the most detailed analysis of the subject by a high court, but the fact that Canada is a country where both the common and civil law, and both the English and French languages (the official languages of the OECD Model) are prevalent, makes it an ideal jurisdiction to pronounce on the international tax meaning of beneficial ownership.

The facts were quite simple, representing a fairly common structure. Prévost Canada was incorporated as a company under the laws of Quebec and was a tax resident of Canada. Its shares were held indirectly by two companies in Sweden and the United Kingdom. A Netherlands company (Prévost Netherlands) was incorporated between the two shareholders and Prévost Canada. In court, it was admitted that tax was a consideration for the structure, but not an overriding consideration. In terms of the Canada–Netherlands tax treaty, a withholding tax of

9/24/2018          International Taxation Law of Double Taxation "Beneficial Ownership" Related Issues and International Tax over the Last 75 Years

Case 1:18-md-02865-LAK Document 808-18 Filed 05/12/22 Page 757 of 1574

only 5% applies to dividends. In comparison, withholding taxes of 15% and 10%, respectively, would have been applied if the dividends had been paid directly to Canada or the United Kingdom.

The shareholders' agreement provided that not less than 80% of the profits of Prévost Netherlands were to be distributed to its shareholders. On the face of it, Prévost Netherlands had little substance. It also emerged that several of the formalities relating to the declaration of dividends were implemented rather sloppy. It could be said that, if ever there was a good chance of a successful attack by a revenue authority on the beneficial ownership of dividends, this was the case.

The issue to be decided by the court was whether or not Prévost Netherlands was the beneficial owner of the dividends from Prévost Canada.

The first reason for placing this case on the top of the beneficial ownership court decisions so far is the thorough analysis of the meaning of beneficial ownership, including the meaning of the plain wording, by the court. Although not expressed by the Federal Court of Appeal as such, Rip J's approach of carefully analysing the meaning of the term from the different sources (referring to the origins of the term, as well as to the OECD Model and Commentaries) makes this case a good example of following the principles of the Vienna Convention on the Law of Treaties of 1969 ("the Vienna Convention") to arrive at an international tax meaning of the term. [43] Rip J's definition can, therefore, be regarded as an international tax meaning of beneficial ownership.

The following extracts from the Federal Court of Appeal's finding support the above conclusion: [44]

> In his search for the meaning of these terms, the Judge closely examined their ordinary meaning, their technical meaning and the meaning they might have in common law, in Quebec's civil law, in Dutch law and in international law. He relied, inter alia, on the OECD [materials]. (at 8)

and:

> The Judge's formulation captures the essence of the concepts of "beneficial owner", "*beneficiare effectif*" as it emerges from the review of the general, technical and legal meanings of the terms. Most importantly, perhaps, the formulation accords with what is stated in the OECD Commentaries and in the Conduit Companies Report. (at 14)

Significantly, before pronouncing its finding Rip J [45] analysed and reconciled the civil law concepts of bare owner and usufructuary with the common law principle of holding property as a trustee, as well as a further common law principle that one person may have a life interest in property and another may have a remainder interest. This was clearly an attempt to find common ground between the two legal families, arguably with the purpose of arriving at a definition that would be acceptable to both.

Also important [46] is the fact that the focus of the beneficial ownership test is narrowed down to the payment and/or the dividend, as distinct from the share. By narrowing the focus of the beneficial ownership test, one further restricts the conflicts on the meaning of ownership between different legal systems.

Rip J then found as follows:

> In my view the "beneficial owner" of dividends is the person who receives the dividends for his or her own use and enjoyment and assumes the risk and control of the dividend he or she received. The person who is the beneficial owner of the dividend is the person who enjoys and assumes all the attributes of ownership. In short the dividend is for the owner's own benefit and this person is not accountable to anyone for how he or she deals with the dividend income. (at 100)

Of particular interest is the statement that the beneficial owner is the person who enjoys and assumes *all* the attributes of ownership. Compare this to a different view that the beneficial owner is the person whose ownership attributes outweigh those of any other person. [47] Leading up to his definition, Rip J listed possession, use, risk and control as attributes of ownership. [48] In this case, all these attributes were arguably with Prévost Netherlands, but how will Rip J's definition be applied if there is a split in these attributes between different parties or is he suggesting that such a split is not possible? If such a split is not possible why does the OECD Model not simply use "ownership" instead of "beneficial ownership"? Was the use of the word "all" a further attempt to satisfy members from both the civil and common law families and to address sensitivities that any of these legal families may have on the splitting of ownership?

The question of whether beneficial ownership is a legal as opposed to a factual or economic substance test also featured strongly in this case. On behalf of the Crown, the argument that Prévost Netherlands was not the beneficial owner was mainly that the term "beneficial owner" should not be given a narrow legalistic meaning. Rather, it was necessary to search behind the legal relationships to identify the person who, as a matter of fact, could ultimately benefit from the dividends. In this respect, the *Indofood* decision was specifically quoted as support.

The Canadian Court, however, applied a legalistic as opposed to a "practical matter" test, as was the case in *Indofood*. There could be various reasons for this. For example, Ward points out that, whereas Indonesian courts

apply a substance-over-form approach, Canada does not apply an economic analysis in determining the facts in tax cases, nor does it apply the doctrine of "substance over form" in tax cases. [49] In *Indofood*, the court appears to have attached great importance to statements by the Director-General of Taxes in Indonesia to the effect that Netherlands Newco would not be regarded as the beneficial owner. In *Prévost*, evidence was lead that, under Netherlands law, Prévost Netherlands would be the beneficial owner of the dividends. It was also found that Prévost Netherlands was not a conduit and that there were commercial reasons for forming a holding company somewhere in Europe. Compared to this, Netherlands Newco in *Indofood* was found to be a mere conduit. Importantly, it was also found that Prévost Netherlands was under no contractual obligation to pay on the dividends received, whereas the finding in *Indofood* was that Netherlands Newco was bound to pay on that which it received.

It is also submitted that, because of the company law formalities involved in the declaration of dividends, it will probably always be more difficult to prove non-beneficial-owner status in the case of the flow-through of dividends than it would be in back-to-back arrangements involving interest or royalties. [50]

Despite these differences, it can be additionally sensed that there is a general uneasiness in *Prévost* in applying a "practical matter" test to beneficial ownership, which was again the contention of the Crown on appeal. In this respect, the Federal Court of Appeal found as follows:

> Counsel for the Crown has invited the Court to determine that "beneficial owner", "*beneficiaire effectif*", "mean the person who can, in fact, ultimately benefit from the dividend". That proposed definition does not appear anywhere in the OECD documents and the very use of the word "can" opens up a myriad of possibilities which would jeopardize the relative degree of certainty and stability that a tax treaty seeks to achieve. The Crown, it seems to me, is asking the Court to adopt a pejorative view of holding companies which neither Canadian domestic law, the international community nor the Canadian government through the process of objection, have adopted. (at 15)

Ward, therefore, states that the word "can" appears to have substantially overstated the OECD position and that this was correctly rejected. He then speculated whether the Canadian Revenue Authority would have been more successful had counsel changed the word "can" to "does" and changed the phrase "benefit from the income" or the word "benefit" to "receive an amount". [51]

In summary, little fault can be found with the *Prévost* decision and it is likely that the decision will have wide international application in future. There is also little doubt that applying the meaning of beneficial ownership in the common law states would have resulted in the same finding.

## 4. Conclusions

What then is the answer to the question of whether or not there has been an evolution of the international tax meaning of beneficial ownership over the last 45 years? Has the meaning evolved away from that in the domestic law of the common law states? If the *Prévost* decision is to be regarded as the most recent authoritative case and representing an international tax meaning, the question must be answered "not really".

If the principles from the meaning of beneficial ownership in the common law states as summarized in 3.2. are compared with the principles from the *Prévost* decision, there is not much of a difference. In both instances, the focus of the beneficial ownership question is an investigation into the incidents or attributes of ownership. Again in both instances, the beneficial ownership question is a question of law.

Does it come as a surprise that there has been little evolution? Once again the answer must be "not really". A concept that has been developed over, and has been around for, centuries does not easily allow itself to be modified, even if used in an international context. In addition, the likely reason why the concept was chosen as a treaty concept, i.e. to avoid the interposition of "bare nominees" [52] to make use of treaty benefits, has also not changed.

It is submitted that, where the parties involved are unrelated, the ownership attributes test would always be able to identify the beneficial owner, provided that all the information on the relationship between them is available. Unrelated parties should always make sure that respective rights and obligations are precisely spelled out in order to cater, amongst other things, for situations where things go wrong. By studying these legal relationships and specifically the ownership attributes of the intermediary, it should not be difficult to determine the beneficial owner. [53]

Using the beneficial ownership concept to police treaty shopping in a group context is, however, problematic. The reason for this is what Baker [54] has identified as the main issue surrounding the meaning of beneficial ownership, i.e. whether or not, for example, a company under the control of another and, therefore, likely (though not legally obliged) to pay to its ultimate owner any sums received, could be regarded as beneficial owner. In contrast to a case where unrelated parties are involved, there is less need in a group situation to regulate and fix the flow of funds by way of contractual arrangements. It is, therefore, more difficult to argue successfully that the intermediate entity (with, for example, its own board of directors) is not the beneficial owner of income received.

This fact obviously places a serious restriction on the efficiency of the beneficial ownership concept as an anti-treaty shopping measure and provides ammunition for those who argue that the beneficial ownership test should not be a narrow legalistic test but rather a "as a practical matter" test. Whether or not the solution to this problem lies in changing the meaning of beneficial ownership via the OECD Commentaries can, however, be questioned. It remains a mystery why not more states have introduced specific measures in addition to beneficial ownership to counter treaty shopping. The limitation-on-benefits rule contained in many US tax treaties is a good example of this. The OECD Commentaries specifically note that Member countries can formulate their own rules. [55]

The two most important issues as far as the future is concerned will arguably be (or continue to be) whether beneficial ownership is a legal as opposed to a factual or economic substance test, and whether tax avoidance motives should be taken into account when deciding on beneficial ownership.

On the first issue, the court in *Prévost* has warned of the myriad of possibilities that can be opened by a factual test, which would jeopardize the relative degree of certainty and stability that a tax treaty seeks to achieve.

As far as the issue of anti-avoidance is concerned, some may argue that many states are already taking tax avoidance motives into account when considering beneficial ownership [56] and that the two cases which in this article are placed at the top of the list of decisions on beneficial ownership that represent an international tax meaning, i.e. that of the Netherlands Supreme Court and the *Prévost* case, are really the minority. There might be truth in such a statement. It must be investigated, though, to what extent these anti-avoidance rules are of a domestic nature. As stated in 3.1., the use of domestic anti-avoidance rules (of the source state) is not helpful in developing a uniform international tax meaning. Uniformity of meaning is desirable in model-based tax treaties. It is, therefore, an unwelcome development that the meaning of the term "beneficial ownership" in model-based tax treaties should change according to the particularities of the anti-avoidance rules of the specific state that is party to a tax treaty. Why not rather insert an anti-avoidance rule into the tax treaty that specifically disallows treaty benefit where the main reason for introducing an intermediary party was to make use of treaty benefits?

In conclusion, apart from the focus on beneficial ownership, this article also illustrates the wider problem that arises when there is an unwillingness to change the OECD Model and to address issues on meaning by rather (constantly) changing the Commentaries. Coupled with this, the inconsistent and selective use of the Commentaries by courts internationally, and issues such as different legal traditions and the languages of the treaty partners, mean that the objective of uniform international tax meanings, however noble it may be, may never be achieved. It is, of course, possible to consider the issue from a different (and more positive and philosophical) angle and conclude by admiring the level of cooperation and uniformity that has already been achieved, despite the complex stage on which the international tax game plays out.

---

\*     **PhD, International Tax Partner, PricewaterhouseCoopers, Cape Town. This article is based on a presentation given by the author on 10 May 2010 in Vienna. The seminar was organized (in cooperation with PricewaterhouseCoopers) by the Institute for Austrian and International Tax Law of the Vienna University of Economics and Business as part of a series of seminars on European and International Tax Law. The author can be contacted at charl.du.toit@za.pwc.com.**

1.    Huub Bierlaagh, Senior Principle, IBFD, Amsterdam, reported in J.D.B. Oliver, J. Libin, S. van Weeghel and C. du Toit, "Beneficial Ownership and the OECD Model", *The British Tax Review* 1 (2001), p. 65.

2.    *Prévost Car Inc. v. Her Majesty the Queen* 2008 TCC 231 (10 ITLR 736) and *Her Majesty the Queen v. Prévost Car Inc.* 2009 FCA 59 (Federal Court of Appeal).

3.    G. Maisto, "The Taxation Of Trusts In Civil Law Countries – Italy: Aspects of Trust Taxation", *European Taxation* 8 (1998), p. 242. For a discussion of the situation in other civil law states, see C. Asser, *Handleiding tot de Beoefening van het Nederlands Burgerlijk Recht: Bijzondere Overeenkomsten: Deel III*, revised by S.C.J.J. Kortmann et al. (7th ed.) (Zwolle: W.E.J. Tjeenk Willink, 1994), pp. 387-390. For further discussion on the differences between the common law and civil law states, see D.W.M. Waters, "The Concept Called 'The Trust'", *Bulletin for International Fiscal Documentation* 3 (1999), pp. 118-119.

4.    P. Baker, *Double Taxation Conventions* (London: Sweet & Maxwell), loose-leaf edition, October 2009, at 10B-15.

5.    *Indofood International Finance Ltd v. JP Morgan Chase Bank NA*, Court of Appeal, (2006) 8 ITLR 653, STC 1 195.

6.    C.P. du Toit, *Beneficial Ownership of Royalties in Bilateral Tax Treaties* (Amsterdam: IBFD, 1999), p. 20. For different views, see the discussion in Oliver, Libin, Van Weeghel and Du Toit, supra note 1.

7.    Du Toit, supra note 6, p. 21.

8.    *Hoge Raad*, 6 April 1994, No. 28 638, BNB 1994/217.

9.    For a discussion of other cases on beneficial ownership, see P. Baker, "Possible extension of the beneficial ownership concept", Annex: The United Nations Model Double Taxation Convention between

International concept of the "beneficial ownership" in relation to international tax law. Last 4 Years developed and developing countries: Economic and Social Council, Committee of Experts on International Cooperation in Tax Matter, Fourth Se ion, Geneva, 20 24 October 2008; S Bolderman, "Tour d'Horizen of the term 'beneficial owner'", 54 *Tax Notes International* 11 (2009), p. 881; and A. Martín Jiménez, "Beneficial Ownership: Current Trends", *World Tax Journal* 1 (2010), p. 35.

10.    For example, Martín Jiménez, supra note 9, 2.1. with reference to Spanish decisions comments that "there is no reference as to where the courts found the meaning of the term 'beneficial owner'".

11.    See, however, the discussion by J.F. Avery Jones et al., "The Origins of Concepts and Expressions Used in the OECD Model and their Adoption by State ", *Bulletin for International Taxation* 6 (2006), p 249, who cast some doubt on the meaning that was intended.

12    *Prévost Car Inc. v. Her Majesty the Queen* 2008 TCC 231 (10 ITLR 736), at 65-66.

13    C. Brown, "Symposium: Beneficial ownership and the Income Tax Act", 51 *Canadian Tax Journal* 1 (2003), pp. 424-427.

14.    M.D. Brender, "Symposium: Beneficial ownership and the Income Tax Act", 51 *Canadian Tax Journal* 1 (2003), pp. 315-318.

15.    P.J. Hattingh, "Beneficial Ownership and Double Tax Conventions, Part II", in A. De-Koker and E. Brincker (ed ), *International Tax* (Durban Lexi Nexi , forthcoming)

16.    For more dome tic law meaning , ee Du Toit, upra note 6, Chap 5

17.    *Ayerst (Inspector of Taxes) v C&K (Construction) Ltd* [1975] STC 345, HL, at 349

18.    *Montana Catholic Missions v Missoula County* 200 U S 118 (1906), at 127 128 See al o Brown, upra note 13, p. 412, who, with reference to this decision comments, "If one were to search for a general meaning of 'beneficial ownership', that provided by the US Supreme Court almost a century ago is probably the most useful".

19.    *Black's Law Dictionary* (1990).

20.    Du Toit, supra note 6, p. 227. This conclusion was made when the Commentaries to the OECD Model did not include the reference to "a a practical matter"

21.    See, however, Du Toit, upra note 6, note 384, for reference to unpubli hed minute

22.    OECD Fi cal Committee, "Ob ervation of Member Countrie on difficultie rai ed by the OECD Draft Convention on Income and Capital", TFD/FC/216, p. 14.

23    Du Toit, supra note 6, p. 181.

24    For the history on the changes to the OECD Commentary, see Baker, supra note 4, at 10B-09.

25    OECD, "Double Taxation Conventions and the Use of Conduit Companies", Issues in International Taxation No.1: International Tax Avoidance and Evasion (Paris: 1987).

26.    *Hoge Raad*, 6 April 1994, No. 28 638, BNB 1994/217.

27.    Baker, supra note 4.

28.    Du Toit, supra note 6, p. 227.

29.    See, for example, F.A. Engelen, *Interpretation of Tax Treaties under International Law* (Amsterdam: IBFD, 2005), p. 439, and B.J. Arnold, "The Interpretation of Tax Treaties: Myth and Reality", *Bulletin for International Taxation* 1 (2010), p 2

30.    See al o Martín Jiménez, upra note 9, 2 1 , who, with reference to Spani h deci ion , comment that, although the 2003 OECD Commentary as well as the 1986 OECD Conduit Report was applied, the court "did not even dedicate a word of its judgements to explain why later Commentaries or OECD materials could be used to interpret previous DTCs".

31.    *Her Majesty the Queen v. Prévost Car Inc.* 2009 FCA 59 (Federal Court of Appeal), at 9-12. It may be que tioned though whether, on the i ue of introducing a "a a practical matter" te t and al o directly referring to an anti-avoidance purpose, the amendments were not more than simply "elucidating". It can further be questioned whether or not the court, in fact, applied these two principles in its decision.

32.    Martín Jiménez, supra note 9.

33.    Supporting this view, see H. Pijl, "The Theory of the Interpretation of Tax Treaties, With Reference to Dutch Practice", *Bulletin for International Fiscal Documentation* 12 (1997), p. 539; K. Vogel and R.G. Proki ch, "General Report Interpretation of double taxation convention ", *Cashiers de droit fiscal*

*international*, Vol. LXXVIIIa (Deventer: Kluwer Law and Taxation Publishers, 1993), pp. 68 and 73-74; S.I. Katz, "National Reporter United States: Interpretation of double taxation conventions", *Cahiers de droit fiscal international*, Vol. LXXVIIIa (Deventer: Kluwer Law and Taxation Publishers, 1993), p. 616; and M. Edwardes-Ker, *Tax Treaty Interpretation: The International Tax Treatise Service* (London: In-Depth Publishing, 1994-1996), loose-leaf, 4.01.

34.   See Du Toit, supra note 6, p. 195 on the alternative terms that were, and could have been, considered by the OECD.

35.   P. Baker, "Beneficial Owner: After *Indofood*", *Grays Inn Tax Chamber Review*, Vol. VI, No. 1 (February 2007), p. 22, available at www.taxbar.com/gitc.html.

36.   See *Indofood International Finance Ltd v. JP Morgan Chase Bank NA*, Court of Appeal, (2006) 8 ITLR 653, STC 1 195] at 24, where it is stated, for example, that the Netherlands tax treaty must be interpreted, in addition to the requirements of Art. 31 of the Vienna Convention and also by having regard to substance over form, as required by the law of Indonesia.

37.   See Baker, supra note 35.

38.   *Indofood International Finance Ltd v. JP Morgan Chase Bank NA*, Court of Appeal, (2006) 8 ITLR 653, at 43.

39.   M. McGowan, "*Indofood* Court Expands Interpretation on Beneficial Ownership", *Tax Notes International* (26 June 2006), p. 1091 comments that "[t]he expanded 'international fiscal' meaning of beneficial ownership, in the context of tax treaties, is undoubtedly a new departure".

40.   In his comments on the case, Baker, supra note 35, p. 25, appears to agree.

41.   See, for example, the English decision in *Wood Preservation Ltd v. Prior (Inspector of Taxes)* (1968) 45 TC 112, CA, at 133, where the court, in finding that a person holding something under an obligation to transfer it to someone else is not the beneficial owner, states "[t]here was no benefit at all in their ownership: it was a mere legal shell ... They were tied and foot".

42.   See also Martín Jiménez, supra note 9, 3.2., who comments that "one of the major problems of most of the decisions studied (with the exception of *Prévost*) is their tendency to resort to 'economic interpretation', when all that was needed in the cases they considered was probably no more than 'legal interpretation'".

43.   Some may argue though that Rip J did not sufficiently deal with the statement in the OECD Commentaries that the meaning of beneficial ownership should be understood in its context, including the prevention of fiscal evasion and avoidance.

44.   *Her Majesty the Queen v. Prévost Car Inc.*, 2009 FCA 59 (Federal Court of Appeal).

45.   Id., at 97-99. For more on the reconciliation of the civil and common law views, see Du Toit, supra note 6, p. 203.

46.   Id., at 99. See also Du Toit, supra note 6, p. 89, for agreement that the object of the beneficial ownership test is the actual payment.

47.   Du Toit, supra note 6, p. 21.

48.   *Prévost Car Inc. v. Her Majesty the Queen*, 2008 TCC 231 (10 ITLR 736), at 98. See also Du Toit, supra note 6, p. 66 on the attributes and/or incidents of ownership.

49.   D. Ward, "*Prévost Car Inc v R*", 11 *International Tax Law Reports*, p. 757".

50.   The question remains open then as to how a Canadian court would find on facts such as those in *Indofood*.

51.   Ward, supra note 49.

52.   OECD Fiscal Committee, "Observations of Member Countries on difficulties raised by the OECD Draft Convention on Income and Capital".

53.   See also Du Toit, supra note 6, p. 225.

54.   Baker, supra note 4.

55.   See Para. 9.6 of the Commentary on Art. 1 of the OECD Model. For more on the limitations on the beneficial ownership concept and the fact that not all states have the same view on treaty abuse, and that the OECD therefore correctly should leave it to the individual states to decide how they want to deal with the matter in their tax treaties, see Baker, supra note 4, at 10B-15 and Du Toit, supra note 6, pp. 247-249.

56.   See, for example, Martín Jiménez, supra note 9, 2.4., who comments that "[t]he trend to identify beneficial ownership with a broad anti-avoidance clause seems to be gaining ground in all the countries studied so far".

---

C.P. du Toit, *The Evolution of the Term "Beneficial Ownership" in Relation to International Taxation over the Past 45 Years*, 64 Bull. Intl. Taxn. 10 (2010), Journals IBFD (accessed 25 Sep. 2018)

© Copyright 2018 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

# Exhibit 52

Case 1:18-md-02865-LAK    Document 808-18    Filed 05/12/22    Page 764 of 1574

Thinker, Teacher, Traveler - Chapter 2: Reciprocity as a Fundamental Principle of Tax Treaties: Meaningless Platitude, Interpretive Guideline or Misguided Policy? - Books (Last Reviewed:15 January 2021)

## Chapter 2: Reciprocity as a Fundamental Principle of Tax Treaties: Meaningless Platitude, Interpretive Guideline or Misguided Policy?

Brian J. Arnold[1]

## 2.1. Introduction

As I pondered a suitable topic for this well-deserved tribute to David Rosenbloom, I thought back to when we first met in 1979. At that time, David was International Tax Counsel at the US Treasury Department, busy putting the finishing touches on the new Canada-United States tax treaty. The renegotiation of the 1942 Canada-United States treaty was a monumental achievement, taking 10 years to complete. Forty years later, the 1980 Canada-United States tax treaty still stands as the most complex, comprehensive and innovative tax treaty between two countries, thanks to the efforts of David and Al Short, his Canadian counterpart.

The draft treaty had already been finalized when a client of the Canadian law firm I was associated with at the time asked us whether it would be possible to make a change to the transitional rule for capital gains in article XIII(9). We contacted Al Short, who told us that he had no problem with what we were suggesting but that the draft treaty was final; however, he generously agreed that if we could convince David to accept our proposed change, he would go along with it. I went to Washington to meet with David at the Treasury to make our case.

To my delight (but not to the surprise of anyone who has dealt with him), David listened carefully and grasped the essence of our case before I had finished presenting it. He treated it as an intellectual puzzle to be solved, and, after drawing several examples on his whiteboard and some further discussions, said that he didn't see any serious problems with our suggested change and that he would think about it. The end result is what is now article XIII(9).

Given the circumstances of our first meeting and David's reputation as a world-renowned treaty expert, I concluded that my topic should deal with tax treaties and present both academic and practical issues, reflecting David's multi-faceted career as both tax scholar and practitioner. As a result, this chapter explores the significance of the concept of reciprocity with respect to tax treaties.

Reciprocity is often said to be a fundamental principle of all treaties and of customary international law in general. The principle of reciprocal rights and obligations for all the signatories to a treaty has intuitive appeal as a manifestation of the golden rule. Why would a country enter into a treaty and agree to limit its own conduct if it believes that its treaty partners will not limit their conduct?

Although reciprocity provides the underlying motivation for people and countries to enter into and adhere to their agreements, what does the principle of reciprocity mean with respect to tax treaties? This chapter addresses three basic questions with respect to reciprocity and tax treaties. What is the origin of the principle of reciprocity? What does it mean (and by implication, what does it not mean)? What effects, if any, does it have on tax treaties?

The chapter begins with a brief discussion of the principle as a part of customary international law and as expressed in the Vienna Convention on the Law of Treaties. It then examines the provisions of bilateral tax treaties, as exemplified by the OECD and UN Model Conventions, to determine to what extent the principle of reciprocity is evident in these provisions. The chapter also reviews the references to reciprocity in the Commentaries on the OECD and UN Models. The chapter then attempts to clarify the meaning of the principle of reciprocity in the context of tax treaties and to determine its effects on the interpretation and application of tax treaties. The chapter ends with a brief conclusion.

## 2.2. The principle of reciprocity in international law

Although space does not allow even a brief discussion of the principle of reciprocity in public international law, in my view, reciprocity is derived from the principle of sovereign equality; all nations are equal under the law, all nations are subject to the same legal obligations and entitled to the same legal rights irrespective of their economic or military power. Thus, the principle of reciprocity is inherent in the principle of sovereign equality: if all nations are equal under international law, it follows that all nations are subject to reciprocal legal rights and obligations. Moreover, the principle of sovereign equality and the supplementary principle of reciprocity are limited to formal legal equality and formal legal reciprocity. In reality, however, nations are not equal, and therefore formal equal and reciprocal treatment may sometimes be inappropriate even with respect to tax treaties, as discussed below.

---

1.    The author thanks Hugh Ault and Adolfo Martín Jiménez for their valuable comments. Due to space limitations, footnotes for this chapter have been eliminated. They are available from the author.

B. Arnold, Chapter 2  Reciprocity as a Fundamental Principle of Tax Treaties  Meaningless Platitude, Interpretive Guideline or Misguided Policy? in Thinker, Teacher, Traveler  Reimagining International    1
TaxEssays in honor of H. David Rosenbloom (G. Kofler, R. Mason & A. Rust eds., IBFD 2021), Books IBFD (accessed 2 September 2021).
© Copyright 2021  BFD: No part of this information may be reproduced or distributed without permission of  BFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Case 1:18-md-02865-LAK    Document 808-18    Filed 05/12/22    Page 765 of 1574

Thinker, Teacher, Traveler - Chapter 2: Reciprocity as a Fundamental Principle of Tax Treaties: Meaningless Platitude, Interpretive Guideline or Misguided Policy? - Books (Last Reviewed:15 January 2021)

The concepts of sovereign equality and reciprocity are reflected in the Vienna Convention on the Law of Treaties. The Vienna Convention contains two provisions that are relevant to an examination of the principle of reciprocity in public international law. The most well-known provision is article 26, *Pacta Sunt Servanda,* which provides:

> Every treaty in force is binding upon the parties to it and must be performed by them in good faith.

In accordance with article 26, all parties to a treaty have reciprocal obligations to perform the terms of the treaty in good faith. In addition, article 21(1) of the Vienna Convention provides:

> A reservation established with regard to another party in accordance with articles 19, 20 and 23:

> (a) modifies for the reserving State in its relations with the other party the provisions of the treaty to which the reservation relates to the extent of the reservation; and

> (b) modifies those provisions to the same extent for that other party in its relations with the reserving State.

This provision is an explicit expression of the application of the principle of reciprocity to treaties.

In summary, the principle of reciprocity is derived from the principle of the sovereign equality of nations, and reciprocity means formal legal reciprocity – all nations are subject to the same legal rights and obligations.

## 2.3. The role of the principle of reciprocity in tax treaties

This section focuses on the role of reciprocity in bilateral tax treaties, starting with an analysis of the provisions of the OECD and UN Models, the Commentaries on those Models and countries' reservations on the OECD Model. It then briefly examines non-reciprocal provisions in actual bilateral tax treaties. Finally, this section examines the role of reciprocity, if any, for purposes of the interpretation of the provisions of tax treaties, which is an especially important issue for tax advisers, tax officials and courts.

### 2.3.1. The OECD and UN Models

Some commentators, including me, have noted that reciprocity is a fundamental principle of the OECD and UN Models and all bilateral tax treaties. If anything, this is an understatement: the provisions of the OECD and UN Models are perfectly reciprocal, with a few exceptions discussed below. Although the Introduction to both Models makes no reference to the principle of reciprocity, such a reference is unnecessary because the provisions of the Models themselves are expressly reciprocal.

It is unnecessary to analyse in detail every article of the OECD and UN Models to illustrate the reciprocal application of those articles. What follows is a general survey of the articles based on their function in the various sections of the Models.

With respect to the scope of the treaty, articles 1 and 2 identify the persons and taxes covered by the treaty and apply reciprocally for both contracting states. Each state is obliged to apply the treaty to its residents and residents of the other state and to income and capital taxes imposed by those states. Further, the ability of a state to upset this reciprocity by defining its residents or its income or capital taxes in a peculiar way is constrained by the definitions of "a resident of Contracting State" in article 4 and the elaboration of the meaning of taxes on income and capital in article 2(2) to (4).

Leaving aside for the moment article 3(2), with respect to undefined terms in the treaty, it is not surprising that the definitions in articles 3 to 5 also apply reciprocally to the application of the treaty in both contracting states.

Similarly, all the distributive rules in articles 6 to 21 apply in an identical fashion, irrespective of which contracting state is applying those rules. Thus, all the items of income covered by either Model are taxable (or not taxable) under the same conditions for both contracting states, irrespective of their level of economic development or the level of financial flows between the states. The treatment of royalties under article 12 of the OECD Model provides a dramatic example of the reciprocal application of treaty provisions. Under article 12, a state is entitled to tax royalties arising in the other state that are paid to its residents, but the other state (the source state) is not allowed to tax those royalties at all (assuming the royalties are paid to the beneficial owner resident in the first state); in other words, the residence state has the exclusive right to tax cross-border royalties. Although article 12 applies reciprocally, where developed and developing countries enter into a tax treaty with such an article, royalties will likely be paid disproportionately from the developing country to the developed country, and the developed country will be entitled to collect all the tax on those cross-border royalties. Thus, article 12 of the treaty does not result in the equal (reciprocal) allocation of tax revenues on payments of cross-border between the two states; this effect is so obvious that it cannot reasonably be said that article 12 is intended to achieve such a result. It follows that the only type of reciprocity that article 12 (and the other distributive provisions of the treaty) is intended to achieve is formal legal reciprocity: the contracting states are allowed to tax precisely the same amounts and are precluded from taxing precisely the same amounts in their capacity as both the country of residence and the country of source, irrespective of the amount of tax collected by each country.

B. Arnold, Chapter 2  Reciprocity as a Fundamental Principle of Tax Treaties  Meaningless Platitude, Interpretive Guideline or Misguided Policy? in Thinker, Teacher, Traveler  Reimagining International TaxEssays in Honor of H. David Rosenbloom (G. Kofler, R. Mason & A. Rust eds., IBFD 2021), Books IBFD (accessed 2 September 2021).

© Copyright 2021  BFD: No part of this information may be reproduced or distributed without permission of  BFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

2

Case 1:18-md-02865-LAK    Document 808-18    Filed 05/12/22    Page 766 of 1574

Thinker, Teacher, Traveler - Chapter 2: Reciprocity as a Fundamental Principle of Tax Treaties: Meaningless Platitude, Interpretive Guideline or Misguided Policy? - Books (Last Reviewed:15 January 2021)

Article 23 (Methods for the Elimination of Double Taxation) of both Models does not explicitly apply on a reciprocal basis because it provides states with a choice of methods for eliminating double taxation, and the states are not required to adopt the same method. Where one state adopts the exemption method and the other state adopts the credit method, the treaty does not require the reciprocal application of the treaty by both states. A state that adopts the exemption method effectively gives up the right to tax items of income (other than dividends, interest, and royalties (as well as fees for technical services under the UN Model only)) that are taxable by the other state in accordance with the treaty. In contrast, a state that adopts the credit method insists on retaining the right to tax items of income that are also taxable by the other state in accordance with the treaty but agrees to provide a credit for the source country tax on that income so the amount of tax it collects depends on the relative tax rates of the two states.

The lack of reciprocity with respect to the elimination of double taxation is not particularly significant because it results from a country's unilateral choice. The reciprocal objective of article 23 is to eliminate double taxation, not to mandate reciprocity with respect to the method used to achieve that result.

The administrative provisions of the OECD and UN Models – articles 25 (Mutual Agreement Procedure), 26 (Exchange of Information) and 27 (Assistance in the Collection of Taxes) – also operate on a reciprocal basis. Although article 25 of the UN Model provides a choice between two versions of the article (one providing for mandatory arbitration and the other without arbitration), unlike the choice provided by article 23, both contracting states must adopt the same version of article 25. Therefore, in effect, article 25 operates on a reciprocal basis in the same way as most of the other provisions of both Models.

Both contracting states are under the same obligations to exchange information and provide assistance in the collection of taxes. However, with respect to article 27, both Models acknowledge that some countries may not be able to provide the type of assistance required by article 27 because of "national law, policy or administrative considerations". Such countries should not include article 27 in their tax treaties. In this context, reciprocity is a factor in deciding whether to include article 27 in a treaty; however, once the contracting states agree to include that provision in their treaty, it operates on a reciprocal basis.

## 2.3.2. Reservations

Countries are entitled to enter reservations on the articles of the OECD Model where they disagree with all or part of those articles, and to make observations on the OECD Commentary where they disagree with the interpretation of an article presented in the Commentary. These reservations and observations can be made by both OECD member and non-member countries. Since the UN Model is a creation of an expert committee (unlike the OECD Model, which is a creation of OECD member countries), it does not allow country reservations or observations.

A detailed analysis of the country reservations and observations on the OECD Model is well beyond the scope of this chapter. However, a few brief comments are appropriate with respect to the effects of reservations on reciprocity. First, in effect, a reservation is simply advance notice by a country as to its negotiating position, especially with respect to the issues that it considers non-negotiable, or at least very important. Where a country agrees to a position in a treaty that clearly contradicts its reservation on the comparable provision in the OECD Model, the terms of the treaty prevail and the country's reservation has no effect.

Second, where a country is successful in negotiating the terms of a treaty in accordance with its reservation, the issue for the other contracting state is whether it wants to apply that provision of the treaty reciprocally. For example, the United States has reserved its position on article 1 because of its long-standing practice to tax its citizens, wherever resident, on their worldwide income. Although the United States could not reasonably object if the other contracting state insisted on the reciprocal application of the provision in the treaty allowing the United States to tax its citizens without regard to the limitations in the treaty, most countries do not tax non-resident citizens under their domestic law and therefore they do not want or need the US provision to apply on a reciprocal basis. However, with respect to provisions such as the non-discrimination article, it would be strange for a country to accept another country's position to provide less protection against discrimination but still provide the full protection under article 24 of the OECD Model for the benefit of the other country.

## 2.3.3. Non-reciprocal provisions in tax treaties

A comprehensive survey and analysis of non-reciprocal provisions in bilateral tax treaties would be an excellent subject for a doctoral dissertation but is beyond the scope of this chapter. As noted above, all the provisions of the OECD and UN Models are reciprocal in the sense of formal legal reciprocity. Similarly, most of the provisions of actual bilateral tax treaties are reciprocal; non-reciprocal provisions are the exception rather than the rule.

The term "non-reciprocal provision" used here means a treaty provision that is operative or has effect for only one contracting state where there is no other non-reciprocal provision in the treaty with respect to the other state that can reasonably be considered to be the counterpart of the first state's non-reciprocal provision. For example, the US saving clause in US tax treaties, which

B. Arnold, Chapter 2  Reciprocity as a Fundamental Principle of Tax Treaties  Meaningless Platitude, Interpretive Guideline or Misguided Policy? in Thinker, Teacher, Traveler  Reimagining International Tax  Essays in Honor of H. David Rosenbloom (G. Kofler, R. Mason & A. Rust eds., IBFD 2021), Books IBFD (accessed 2 September 2021).

© Copyright 2021  BFD: No part of this information may be reproduced or distributed without permission of BFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

3

Case 1:18-md-02865-LAK    Document 808-18    Filed 05/12/22    Page 767 of 1574

Thinker, Teacher, Traveler - Chapter 2: Reciprocity as a Fundamental Principle of Tax Treaties: Meaningless Platitude, Interpretive Guideline or Misguided Policy? - Books (Last Reviewed:15 January 2021)

preserves the US right to tax its citizens without regard to the treaty, is a non-reciprocal provision where the other state declines to have that provision apply to its citizens as well.

Non-reciprocal provisions do not include definitions in a treaty that refer to domestic law meanings, such as the definition of "immovable property" in article 6 of the OECD and UN Models, article 3(2) with respect to the meaning of undefined terms, or provisions which facilitate the application of the treaty in light of differences in domestic law. Treaty provisions that refer to domestic law as well as article 3(2) operate on a reciprocal basis: each state applies the meaning of the relevant terms under its domestic law. In these situations, the treaty applies on a reciprocal basis even though it will likely have different effects in the two states. Similarly, treaty provisions that make their operation dependent on the provisions of domestic law are reciprocal even where they produce different effects in the two states.

One issue that may result in non-reciprocal provisions in a treaty is the issue of treaty abuse. For example, most US treaties contain a limitation on benefits provision that restricts the benefits of the treaty to real residents of the other country. From 1995 to 2007, article XXIX-A, the limitation on benefits provision of the Canada-United States tax treaty, applied unilaterally only with respect to the United States; Canada preferred instead to apply its general anti-avoidance rule to deal with treaty abuse. However, from a broader perspective, even in this situation, the formal reciprocity of the treaty was respected: the contracting states simply agreed to use different methods to deal with treaty abuse.

In certain circumstances where treaty overrides are contrary to the provisions of a country's tax treaties and accepted international practice, they are properly considered to be non-reciprocal treaty provisions. However, where a treaty override is intended to reverse or pre-empt a decision of a domestic court that is inconsistent with international practice, that override is, in substance, an attempt to ensure that the treaty applies on a reciprocal basis. Each treaty override must be assessed on its own merits to determine whether it results in a non-reciprocal aspect of the treaty.

### 2.3.4. References to the principle of reciprocity in the Commentaries on the OECD and UN Models

Although the Commentaries on the OECD and UN Nations Models make several references to the principle of reciprocity – with respect to articles 3(2), 24, 26 and 27 – a detailed discussion of all these references is beyond the scope of this chapter and, in any event, the references are not particularly illuminating with respect to the meaning of reciprocity. In general, the references to reciprocity are either redundant, because the provisions of the Models are explicitly reciprocal, or are simply vague descriptions of a factor that countries should consider in deciding whether to enter into a tax treaty with another country. However, some of the references in the OECD Commentary can be read, incorrectly in my view as explained below, as suggesting that one state's obligations are conditional on the other state satisfying its obligations or that each state must receive reciprocal benefits from the application of the treaty. The only controversial aspects of the references to reciprocity in the OECD and UN Commentary are the statements in the Commentary on Articles 3(2) and 26(3), which are discussed below with respect to the interpretation of tax treaties.

## 2.4. What does the principle of reciprocity mean for purposes of tax treaties?

On the basis of the preceding analysis, the following conclusions can be drawn about the meaning of reciprocity.

First, "reciprocity" as used with respect to tax treaties is an accurate term to describe the formal legal reciprocity of the provisions of tax treaties – in the sense that the states are subject to precisely the same legal rights and obligations. In the context of tax treaties, this formal legal reciprocity operates on an article-by-article basis as well as with respect to the treaty as a whole. However, the principle of reciprocity does not mean that a tax treaty has equal or even similar effects in both contracting states. The effects of the provisions of a tax treaty depend on both the provisions of the treaty and the provisions of a country's domestic law. For example, article 13 dealing with capital gains will have no effect for a country that does not tax capital gains but will prevent a country that does tax capital gains from taxing gains that are taxable exclusively by the other country under the treaty. Therefore, the results of the application of the treaty may be substantially different in the two countries despite the operation of the provisions of the treaty on a reciprocal basis.

Second, the term "reciprocity" is often used to mean an objective or goal to be achieved through the negotiation of a tax treaty or a motivating factor in deciding whether to negotiate a bilateral tax treaty with another country or include a particular article in a treaty. In this sense, reciprocity is used loosely to mean that tax treaties are generally intended to confer mutual benefits on the parties. For example, it would not make sense for a high-tax country to negotiate a comprehensive income tax treaty with a tax haven since the tax haven does not have any income taxes to give up or limit to match the sacrifices made by the high-tax country. This use

B. Arnold, Chapter 2  Reciprocity as a Fundamental Principle of Tax Treaties  Meaningless Platitude, Interpretive Guideline or Misguided Policy? in Thinker, Teacher, Traveler  Reimagining International TaxEssays in Honor of H. David Rosenbloom (G. Kofler, R. Mason & A. Rust eds., IBFD 2021), Books IBFD (accessed 2 September 2021).    4
© Copyright 2021  BFD: No part of this information may be reproduced or distributed without permission of  BFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Case 1:18-md-02865-LAK    Document 808-18    Filed 05/12/22    Page 768 of 1574

Thinker, Teacher, Traveler - Chapter 2: Reciprocity as a Fundamental Principle of Tax Treaties: Meaningless Platitude, Interpretive Guideline or Misguided Policy? - Books (Last Reviewed:15 January 2021)

of the term "reciprocity" does not lead to the conclusion that reciprocity is a purpose of a tax treaty to be taken into account in interpreting the provisions of the treaty in accordance with article 31(1) of the Vienna Convention.

Third, the principle of reciprocity is sometimes invoked as a constraint on a country's ability to perform its obligations under a treaty. This is the sense in which reciprocity is used in the OECD and UN Commentary on Article 26 (Exchange of Information), as discussed above. This use of "reciprocity" is similar to its use to mean a goal or motivation for entering into treaty negotiations with another country.

## 2.5. The role of reciprocity in the interpretation of tax treaties

For taxpayers and their advisers, the most important issue with respect to the principle of reciprocity is whether it has any effect on the interpretation of tax treaties. In my view, the principle of reciprocity has little or no effect on the interpretation of tax treaties.

As noted above, the provisions of the OECD and UN Models are perfectly reciprocal in the sense of formal legal reciprocity and should be interpreted in accordance with the ordinary meaning of the words in their context and in the light of the purposes of the treaty, as mandated by article 31(1) of the Vienna Convention. This does not mean that taxpayers, their advisers, tax officials and courts of the contracting states may not arrive at conflicting interpretations of a treaty. Some scholars have argued that the principle of reciprocity supports an interpretive approach that results in a common meaning of the terms of the treaty for both countries. This approach has been adopted by the OECD and United Nations with respect to conflicts of characterization and qualification that might result in double taxation. Since both contracting states are required to use the same interpretive approach where they are the residence country, this approach is reciprocal.

Article 3(2) allows each country to use the domestic law meaning of undefined terms in a treaty unless the context requires otherwise, despite the consequence that the treaty will apply differently in the contracting states. Nevertheless, the operation of article 3(2) is consistent with the principle of formal legal reciprocity, since each country must use the same interpretive approach for undefined treaty terms. The Commentary on Article 3(2) of both Models provides that, for purposes of the exception – "unless the context otherwise requires" – to the use of domestic law meanings for undefined terms in the treaty, "the context is determined in particular by the intention of the Contracting States when signing the Convention as well as the meaning of the terms in question in the legislation of the other Contracting State (an implicit reference to the principle of reciprocity on which the Convention is based)." Nevertheless, article 3(2) would be reciprocal without the reference to reciprocity in the Commentary because by its terms article 3(2) applies to both countries in precisely the same way. The Commentary is trying to ensure that article 3(2) is interpreted and applied in the same way by both contracting states. Although this may be an aspirational goal of article 3(2), it is not a requirement. Neither the wording of the exception in article 3(2) nor the principle of reciprocity requires a contracting state to consider, let alone adopt, the meaning of an undefined term under the domestic law of the other state. Article 3(2) would be reciprocal in a formal legal sense even where one or both states choose not to consider the meaning of an undefined term under the domestic law of the other state.

The references to reciprocity in the OECD Commentary on Article 26 dealing with exchange of information are problematic. The Commentary on Article 26(3) suggests that a state may refuse to provide information "where the requesting State's administrative practices (e.g., failure to provide sufficient administrative resources) result in a lack of reciprocity." This statement suggests that the principle of reciprocity extends beyond formal legal reciprocity to the substantive administrative capacity of a state to carry out its obligations under the treaty. This interpretation is contrary to the nature of reciprocity as a formal legal principle, which underlies tax treaties generally and article 26, in particular. Article 26 does not mean that one country's obligations are conditional on the other state performing its obligations or limited to the extent that the other state performs its obligations.

In contrast, the UN Commentary on Article 26 provides the following comment in response to the comments on reciprocity in the OECD Commentary:

> Although Article 26 imposes reciprocal obligations on the Contracting States, it does not allow a developed country to refuse to provide information to a developing country on the ground that the developing country does not have an administrative capacity comparable to the developed country. Reciprocity has to be measured by reference to the overall effects of a treaty, not with respect to the effects of a single article.

The UN Commentary goes on to clarify that a difference between the administrative capacity of a developed country and a developing country does not justify a refusal by the developed country to exchange information under article 26(3)(b) because:

> paragraph 3 does not require that each of the Contracting States receives reciprocal benefits under Article 26. In freely adopting a convention, the Contracting States presumably have concluded that the convention, viewed as a whole, provides each of them with reciprocal benefits. There is no necessary presumption that each of the articles, or each paragraph of each article, provides a reciprocal benefit. On the contrary, it is commonplace for a Contracting State to give up some benefit in one article in order to obtain a benefit in another article.

© Copyright 2021  BFD: No part of this information may be reproduced or distributed without permission of  BFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 3 Dec. 2021 by Stephen.shay@ropesgray.com.

**Thinker, Teacher, Traveler - Chapter 2: Reciprocity as a Fundamental Principle of Tax Treaties: Meaningless Platitude, Interpretive Guideline or Misguided Policy? - Books (Last Reviewed:15 January 2021)**

According to the UN Commentary, all that is necessary is that "the tax administration [of the other state] has the authority to obtain the information, whether or not it has the capacity to exercise that authority."

In my view, the UN Commentary on Article 26 takes the correct view of reciprocity applied to exchanges of information: both states are under reciprocal obligations to exchange information that they have the authority to obtain under their domestic tax systems. Their administrative capacity to collect and exchange information or the extent to which they actually exchange information are irrelevant with respect to reciprocity as a formal legal principle.

## 2.6. Conclusion

This chapter has attempted to answer three basic questions about reciprocity: Where does the principle of reciprocity come from? What does it mean? What effect does it have on tax treaties? The answers to these questions are straightforward. The principle of reciprocity is derived from the more fundamental principle of sovereign equality. In the context of tax treaties, the principle of reciprocity is sometimes used to mean the achievement of mutual benefits as a motivating factor for the negotiation of a tax treaty with another country; however, with respect to the provisions of tax treaties, it means formal legal reciprocity in the sense that both states are subject to precisely the same legal rights and obligations. Reciprocity does not mean that tax treaties are intended to have the same effects in both countries. Finally, because reciprocity means formal legal reciprocity, it should have no effect on the interpretation and application of the provisions of a tax treaty, either individually or as a whole.

The question that this chapter leaves unanswered is whether formal legal reciprocity is always appropriate for tax treaties. Especially where two countries are at significantly different stages of economic development, it seems strange that the provisions of their tax treaty must invariably adhere to formal legal reciprocity. Why should countries that are obviously economically unequal be presumed to be equal for purposes of allocating tax revenues from cross-border activities between them?

© Copyright 2021  BFD: No part of this information may be reproduced or distributed without permission of  BFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

# Exhibit 53

February 17, 2016

## PREAMBLE TO 2016 U.S. MODEL INCOME TAX CONVENTION

On February 17, 2016, the Treasury Department released a revised 2016 U.S. Model Income Tax Convention (the 2016 Model), which is the baseline text the Treasury Department uses when it negotiates tax treaties.  The U.S. Model Income Tax Convention was last updated in 2006 (the 2006 Model).  This preamble highlights the significant features of the 2016 Model.

Many of the 2016 Model updates reflect technical improvements developed in the context of bilateral tax treaty negotiations and do not represent substantive changes to the 2006 Model.  The 2016 Model also includes a number of new provisions intended to more clearly implement the Treasury Department's longstanding policy that tax treaties should eliminate double taxation without creating opportunities for non-taxation or reduced taxation through tax evasion or avoidance.  For example, to protect against treaty abuse, the 2016 Model contains rules that would deny treaty benefits on deductible payments of highly mobile income that are made to related persons that enjoy low or no taxation with respect to that income under a preferential tax regime.  In addition, new Article 28 (Subsequent Changes in Law) obligates the treaty partners to consult with a view to amending the treaty as necessary when changes in the domestic law of a treaty partner draw into question the treaty's original balance of negotiated benefits and the need for the treaty to reduce double taxation.  The 2016 Model also includes provisions to reduce the tax benefits of corporate inversions by denying reduced withholding taxes on U.S. source payments made by expatriated entities to related foreign persons.

In addition to these new provisions, the 2016 Model includes a number of technical improvements and certain policy changes to longstanding Article 22 (Limitation on Benefits), which is intended to prevent so-called "treaty shopping" by third-country residents that are not intended beneficiaries of the treaty.  The 2016 Model also includes a rule (located in new paragraph 8 of Article 1 (General Scope)) that is a revised version of the so-called "triangular permanent establishment" rule that has been included in some of the United States' income treaties since the 1990s.  The new version of the rule addresses income treated by a residence country as attributable to a permanent establishment and subject to little or no tax, as well as income that is excluded from the tax base of the residence country and attributable to a permanent establishment located in a third country that does not have a tax treaty with the source country.

Draft versions of these new model treaty provisions, as well as proposed changes to Article 22 (Limitation on Benefits), were released on May 20, 2015 (the May 2015 draft) for public comment.  The Treasury Department carefully considered all the comments it received and made a number of significant modifications to the proposed model treaty provisions in response to those comments.  This preamble discusses the most significant changes made in response to comments.

The 2016 Model also contains rules to make more efficient and effective dispute resolution mechanisms between tax authorities through the use of mandatory binding arbitration.

February 17, 2016

**Special Tax Regimes**

The Treasury Department received several comments on the proposed rules contained in the May 2015 draft that would deny reductions to withholding taxes under the treaty for deductible related-party payments when the beneficial owner of the payment pays little or no tax on the related income as a result of a "special tax regime" (STR).

### *Purpose of the STR provisions*

Some countries have implemented preferential regimes to attract highly mobile income—income that taxpayers can easily shift around the globe through deductible payments such as royalties and interest expense—by allowing resident companies to pay no or very little tax on that income. Consistent with the G20-OECD Base Erosion and Profit Shifting (BEPS) initiative, the STR provisions are intended to mitigate instances of double non-taxation whereby a taxpayer uses provisions in the tax treaty, combined with special tax regimes, to pay no or very low tax in either treaty country.  However, the new provisions also reflect the United States' preference for addressing BEPS concerns through changes to objective rules that apply on a prospective basis, rather than introducing subjective standards that could call into question agreed treaty benefits or applying wholly new concepts to prior years.

It is inappropriate for tax treaties to reduce U.S. statutory withholding rates on deductible U.S. source payments when the related income is subject to no or very little tax.  The current ability of foreign-parented companies to engage in these types of transactions creates strong incentives to erode the U.S. tax base and gives foreign-parented companies an advantage over U.S.-parented companies, which cannot use these regimes to avoid paying tax on their U.S. income.  To address this unintended result, the 2016 Model would deny treaty benefits for payments of interest, royalties, and certain guarantee fees between related parties if the beneficial owner of the payment benefits from a special tax regime with respect to the payment.

### *Changes to the STR provisions in response to comments*

Comments on the May 2015 draft expressed concern that the proposed definition of STR was too broad and would result in uncertainty as to when treaty benefits would be denied.  Comments also requested that tax administrators be required to provide a public notification before the provisions would apply to a particular STR in order to assist taxpayers in applying the treaty.

In response to these comments, the STR provisions have been significantly revised to both limit and clarify their application:

- The scope of when the STR provisions can apply has been narrowed to cases when the resident benefits from an STR with respect to a particular related-party interest payment, royalty payment, or guarantee fee that is within the scope of Article 21 (Other Income).

- In contrast to the May 2015 draft, the definition of STR has been tightened to provide an exclusive list of the circumstances in which a statute, regulation, or administrative practice will be treated as an STR.  To qualify as an STR, the regime must provide

preferential treatment to interest, royalties, or guarantee fees as compared to income from sales of goods or services. Such preferential treatment be in the form of either a preferential rate for such income, a *permanent* reduction in the tax base with respect to such income (as compared to preferences that merely defer the taxation of income for a reasonable period of time), or a preferential regime for companies that do not engage in an active business in the residence state.

- Regimes that provide "notional interest deductions" (NIDs) with respect to equity are no longer treated as STRs. Instead, Article 11 (Interest) includes a new rule that would allow a treaty partner to tax interest arising in that country in accordance with domestic law if the interest is beneficially owned by a related person that benefits from a NID. This change represents a more focused approach to addressing the policy concern that interest income that benefits from a NID is often subject to no or very little tax because (i) a NID, in effect, allows for a deduction on equity with respect to the time value of money, which is a very significant component of interest income, and (ii) in the related-party context, the holder of the equity often benefits from a participation exemption with respect to any returns on that equity.

- The 2016 Model requires a country invoking the STR provisions to, after consultation with the other country, notify the other country of its intention through a diplomatic note and issue a written public notification.

- In response to comments on how to determine when a payee that benefits from an STR is "related to the payor" of an item of income, the 2016 Model provides that the STR provisions will only apply when the payee is a "connected person" with respect to the payor of the income and provides a definition of that term.

- The exceptions from the STR provisions for collective investment vehicles such as U.S. regulated investment companies and U.S. real estate investment trusts that are designed to achieve a single level of current tax (at either the entity level or the shareholder level) have been clarified.

- The 2016 Model provides an exception for preferential regimes that are generally expected to result in a rate of taxation that is at least 15 percent, or 60 percent of the general statutory rate of company tax in the source country, whichever is lower. In order to provide additional clarity, the 2016 Model provides language that would be included in an instrument reflecting an agreed interpretation between the two treaty countries. Such instrument would provide that the rate of taxation generally would be calculated based on the income tax principles of the country that has implemented the regime in question.

## **Payments by Expatriated Entities**

The 2016 Model contains provisions that would reduce the benefits of corporate inversions by denying treaty benefits for U.S. withholding taxes on U.S. source dividends, interest, royalties, and certain guarantee fees paid by U.S. companies that are "expatriated entities," as defined under the Internal Revenue Code.

February 17, 2016

In response to comments, the Treasury Department has made several revisions to the version of these provisions included in the May 2015 draft. First, the 2016 Model provisions will apply only when the beneficial owner of a dividend, interest payment, royalty, or guarantee fee characterized as other income is a connected person with respect to the expatriated entity. Second, to provide certainty about the scope of the rule notwithstanding any future changes to U.S. law, the 2016 Model fixes the definition of "expatriated entity" to the meaning it has under Internal Revenue Code section 7874(a)(2)(A) as of the date the bilateral tax treaty is signed. Third, the 2016 Model provides that, under certain circumstances, preexisting U.S. subsidiaries of the foreign acquirer would not be considered expatriated entities for purposes of the treaty.

## Revised Limitation on Benefits (LOB) Article

The May 2015 draft included a number of proposed changes to Article 22 (Limitation on Benefits). The 2016 Model contains significant revisions in response to comments received on those proposals.

A fundamental pillar of U.S. tax treaty policy for over two decades has been to include objective LOB rules to prevent a practice known as "treaty shopping," in which an investor from a third country routes investment into the United States through a company resident in a treaty partner that does not have sufficient nexus to that country with respect to the treaty-benefitted income. While protecting the U.S. tax treaty network from abuse is the overarching objective of Article 22, the Treasury Department also recognizes that multinationals often have operations dispersed through many subsidiaries around the globe. Accordingly, the May 2015 draft proposed to include for the first time in a U.S. model a "derivative benefits" test as an additional method for satisfying LOB. As described below, the 2016 Model retains a modified version of this test that was developed in response to comments and adds a second new test, a "headquarters company" test. In addition, a number of the preexisting LOB tests have been tightened to prevent abuse by third-country residents.

### *Active-trade-or-business test*

The May 2015 draft proposed a new limitation on the ability of connected companies to aggregate their activities for purposes of satisfying the LOB test that grants benefits with respect to income that is derived by a company in connection with the active conduct of a trade or business in its country of residence (the active-trade-or-business test). The change would, for example, have prevented a holding company from relying on the activities of connected active companies in the same country to satisfy the active-trade-or-business test.

The change to the active-trade-or-business test in the May 2015 draft was motivated by a concern that the existing active-trade-or-business test can, in certain circumstances, allow third-country residents to treaty shop through an entity that has an active trade or business in a treaty partner with respect to income, in particular intra-group dividends and interest, that does not in fact have a nexus to the activities in the treaty partner. After further consideration, the Treasury Department has determined that the treaty-shopping concern is not driven by the division of activities among connected persons. Rather, the concern arises from the standard applied to

4

February 17, 2016

determine whether income is "derived in connection with" an active trade or business in the residence country, which was not addressed in the May 2015 draft. To more directly address this concern, the active-trade-or-business test of the 2016 Model has been changed to require a factual connection between an active trade or business in the residence country and the item of income for which benefits are sought. Specifically, the 2016 Model requires that the treaty-benefitted income "*emanates* from, or is incidental to," a trade or business that is actively conducted by the resident in the residence state. With this change, the 2016 Model also restores the provision that allows activities to be attributed from connected persons.

The technical explanation of the 2016 Model, which the Treasury Department plans to release this spring, will provide guidance on when an item of income, in particular an intra-group dividend or interest payment, is considered to emanate from the active conduct of a trade or business of a resident. This guidance is expected to differ from the 2006 Model technical explanation of the meaning of the term "derived in connection with." An example that the Treasury Department is considering including in the technical explanation is dividends and interest paid by a commodity-supplying subsidiary that was acquired by a company whose business in the residence state depends on a reliable source for the commodity supplied by the subsidiary. Under this example, such dividends and interest would be considered to emanate from the active trade or business of the parent. Another possible example could involve dividends and interest paid by a subsidiary that distributes products that were manufactured by the parent company in its state of residence. In contrast, the mere fact that two companies are in similar lines of businesses would not be sufficient to establish that dividends or interest paid between them are related to the active conduct of a trade or business.

The Treasury Department invites comments with additional examples for potential inclusion in the technical explanation that would illustrate dividend or interest income that should be considered to emanate from an active trade or business in the residence state. Comments should take into account the extent to which suggested interpretations could facilitate treaty shopping by third-country residents with large global operations, and the extent to which the new derivative benefits and headquarters company tests—including the treatment of a headquarters company as a potential equivalent beneficiary with respect to intra-group dividends and interest income for purposes of the derivative benefits test—provide the more appropriate LOB tests for dividends and interest income and supplant any role for the active-trade-or-business test with respect to such income. The deadline for public comments is April 18, 2016.

### *Derivative benefits*

The 2016 Model allows companies to qualify for treaty benefits under a "derivative benefits" test, which is based on a broader concept of the longstanding "ownership-and-base erosion" test (contained in paragraph 2(f) of Article 22 of the 2016 Model). While a form of derivative benefits is included in most existing U.S. tax treaties with countries in the European Union, those treaties limit third-country ownership to seven or fewer "equivalent beneficiaries," which generally must be resident in a member country of the European Union or North American Free Trade Area trading blocs. In contrast, the derivative benefits rule in the 2016 Model contains no such geographic restriction, instead requiring only that 95 percent of the tested company's shares be owned, directly or indirectly, by seven or fewer persons that are equivalent beneficiaries.

5

February 17, 2016

Additionally, in response to comments received on the May 2015 draft, the 2016 Model allows certain categories of qualified persons in the state of source to be treated as equivalent beneficiaries, provided that such persons in the aggregate do not own more than 25percent of the tested company.  However, in contrast to the derivative benefits provisions in existing U.S. tax treaties, the 2016 Model would restrict intermediate ownership to companies resident in the same state as the company seeking benefits or in a country that has a comprehensive income tax treaty in force with the country of source that contains rules addressing STRs and NIDs that are analogous to the rules in the 2016 Model.-

Under all derivative benefits provisions in existing U.S. tax treaties, in order to qualify as an equivalent beneficiary with respect to income referred to in Article 10 (Dividends), 11 (Interest), or 12 (Royalties), a third-country resident must be entitled, either under a comprehensive convention for the avoidance of double taxation between its country of residence and the source country or otherwise, to a rate of tax with respect to the particular category of income that is less than or equal to the rate applicable under the tax treaty pursuant to which benefits are being claimed.  Companies that fail to satisfy this rate comparison test are not entitled to treaty benefits, and therefore are generally subject to 30-percent gross basis withholding tax on U.S. source payments of dividends, interest (other than interest of a portfolio nature), and royalties. The Treasury Department received comments requesting the elimination of this so-called "cliff effect."  In response to these comments, the 2016 Model would remove the cliff effect in these cases, and instead entitle a resident of the treaty partner to the highest rate of withholding to which its third-country resident owners would be entitled.

In crafting the LOB article in the 2016 Model, the Treasury Department revised the various tests to provide an appropriate scope of benefits.  In particular, the May 2015 draft stated in a footnote that the Treasury Department believed that the new derivative benefits test was a more appropriate test than the active-trade-or-business test for holding companies.  However, under existing treaties that include a derivative benefits test, subsidiaries of private companies are unable to qualify for benefits with respect to dividends under the derivative benefits test because individual shareholders are only entitled to a 15-percent rate on dividends, and therefore the cliff effect described above would preclude any reduction in dividend withholding.  The 2016 Model goes beyond solving this cliff effect by allowing certain companies relying on derivative benefits to qualify for the five-percent rate of withholding on dividends even if the company's shareholders are individuals who would not be entitled to the five-percent rate.  To achieve this, the definition of equivalent beneficiary in the 2016 Model has been modified to allow individual shareholders to be treated as companies for purposes of the rate comparison test with respect to dividends, provided that the company seeking to qualify under derivative benefits has sufficient substance in its residence country to indicate that the individual shareholders are not simply routing income through a corporate entity in order to benefit from the lower company rate.

### Headquarters companies

Comments to the May 2015 draft requested that the LOB article include a rule that would entitle companies that serve as the active headquarters company of a multinational corporate group ("headquarters companies") to treaty benefits.  In response, the 2016 Model LOB includes a headquarters-company rule that is based on analogous tests found in some existing U.S. tax

6

treaties, but with important modifications.  Most significantly, the 2016 Model requires a headquarters company to exercise *primary* management and control functions (and not just supervision and administration) in its residence country with respect to itself and its geographically diverse subsidiaries.  The headquarters company rule in the 2016 Model also differs from existing headquarters company rules by including a base erosion test.  Furthermore, a headquarters company is only entitled to benefits with respect to dividends and interest paid by members of its multinational corporate group; in the case of interest, this benefit is limited to a 10-percent cap on withholding in the source state, which is consistent with the general rate of withholding on interest that is permitted under the OECD's Model Income Tax Convention.

The new headquarters company test is analogous to the active-trade-or-business test in paragraph 3 of Article 22, which (as described above) generally entitles a company to treaty benefits without regard to the residence of its owners when the company derives income from the source state that emanates from, or is incidental to, such company's trade or business in the residence country.  The Treasury Department concluded that locating the strategic, financial, and operational policy decision-making for a multinational corporate group in a country establishes sufficient nexus to that country with respect to interest and dividends paid by members of the multinational corporate group for the company to be entitled to treaty benefits, as well as equivalent-beneficiary status for purposes of the derivative benefits test with respect to such dividend and interest income.  The Treasury Department continues to believe that the active-trade-or-business test in paragraph 3 of Article 22 is the more appropriate test for other types of benefits provided under a treaty.

### *Rules for intermediate ownership*

Comments requested that the rules for intermediate ownership contained in the various ownership-based LOB tests in the May 2015 draft be relaxed.  In response to these comments, the intermediate ownership rules in the LOB test for subsidiaries of publicly-traded companies (paragraph 2(d) of Article 22) and the general ownership-base erosion test (paragraph 2(f) of Article 22) in the 2016 Model LOB have been revised to permit as an intermediate owner any company that is a resident of a country that has in effect a comprehensive tax treaty that contains rules addressing special tax regimes and notional interest deductions.

## **Mandatory Binding Arbitration to Facilitate the Resolution of Disputes Between the Tax Authorities**

The Treasury Department is a strong proponent of developing ways to facilitate the resolution of disputes with treaty partners regarding the application of tax treaties.  In this regard, Article 25 (Mutual Agreement Procedure) of the 2016 Model contains rules requiring that certain disputes between tax authorities be resolved through mandatory binding arbitration.  The "last-best offer" arbitration approach in the 2016 Model is substantively the same as the arbitration provision that is found in four U.S. tax treaties in force and three additional U.S. tax treaties that are awaiting the advice and consent of the Senate.

February 17, 2016

**New Article 28 (Subsequent Changes in Law)**

Article 28 (Subsequent Changes in Law) has been added to the 2016 Model to address situations in which, after a treaty is signed, one of the treaty partners changes its overall corporate tax system to no longer impose significant tax on cross-border income of resident companies. Such a fundamental change could call into question the original balance of negotiated benefits and the extent to which the tax treaty is needed to eliminate double taxation. The Treasury Department has made a number of changes to the version of Article 28 contained in the May 2015 draft in response to comments.

Comments raised questions regarding the application of Article 28 with respect to changes in the laws of a country governing the taxation of individuals. In response to these comments, the scope of Article 28 in the 2016 Model has been narrowed to address only changes in the laws governing the taxation of companies. To address concerns regarding individuals, the 2016 Model contains discrete rules in other articles that address the availability of tax treaty benefits for individuals who are taxed on a remittance, fixed fee, "forfeit," or similar basis.

When implicated, Article 28 requires the treaty partners to consult to determine if amendments to the treaty are necessary to restore an appropriate allocation of taxing rights between the two countries, consistent with the purpose of the treaty to eliminate double taxation without creating opportunities for non-taxation. In contrast to the May 2015 draft, the 2016 Model explicitly provides that it is only after such consultations fail to progress that a treaty partner may issue a diplomatic note stating that it will cease to grant certain benefits under the treaty for payments to companies. The May 2015 draft provided that Article 28 would be triggered if the general rate of company tax fell below 15 percent. The Treasury Department did not intend for the use of a fixed rate to imply support for a floor on appropriate corporate tax rates, but rather only intended for the rate test to serve as a signal for when the original balance of negotiated benefits between the two countries had been significantly altered. However, if both the United States and its treaty partner substantially reduce their general rates of company tax, the fact that one country's general rate falls below 15 percent may not be indicative of a shifting of the balance of benefits under the treaty. In order to better effectuate the policy underlying Article 28, the 2016 Model provides that Article 28 is triggered if a treaty partner's general rate of company tax falls below the *lesser* of either 15 percent, or 60 percent of the other country's general statutory rate of company tax.

**Incorporation of Select Other Measures Developed by the OECD-G20 BEPS Initiative**

A number of the key recommendations regarding bilateral income tax treaties from the OECD-G20 BEPS initiative have been fundamental parts of U.S. tax treaty policy for many years. For example, U.S. tax treaties have since the 1990s contained robust LOB provisions and rules that determine when treaty benefits should be available for payments through fiscally transparent entities. The 2016 Model incorporates certain other BEPS recommendations for the first time:

- A revised preamble for tax treaties that makes clear the intentions of the treaty partners that the purpose of a tax treaty is the elimination of double taxation with respect to taxes

February 17, 2016

on income without creating opportunities for non-taxation or reduced taxation through tax evasion or avoidance.

- A rule intended to protect against contract-splitting abuses of the twelve-month permanent establishment threshold for building sites or construction or installation projects.

- A twelve-month ownership requirement for the five-percent withholding rate for direct dividends, with refinements in the 2016 Model to impose a twelve-month residence requirement to prevent companies from circumventing the ownership period as well as to allow the payee company to take into account certain prior ownership.

The 2016 Model has not adopted the other BEPS recommendations regarding the permanent establishment threshold, notably the revised rules related to dependent and independent agents and the exemption for preparatory and auxiliary activities. It is important to ensure that the implications from any modifications to these treaty provisions are commonly understood and consistently administered by treaty partners. Accordingly, the Treasury Department is working with OECD and G20 member countries to create a common global understanding regarding profit attribution that will address the concerns raised by these BEPS permanent establishment recommendations. Furthermore, the Treasury Department is interested in developing ways to mitigate the compliance burdens on businesses and tax administrations that the new permanent establishment rules could create.

# Exhibit 54

# EXPLANATION OF PROPOSED INCOME TAX TREATY
# BETWEEN THE UNITED STATES AND POLAND

Scheduled for a Hearing
Before the
COMMITTEE ON FOREIGN RELATIONS
UNITED STATES SENATE

On June 19, 2014

———————

Prepared by the Staff
of the
JOINT COMMITTEE ON TAXATION



June 17, 2014
JCX-68-14

# CONTENTS

Page

INTRODUCTION ................................................................................................ 1

  I.  SUMMARY .......................................................................................... 2

 II.  OVERVIEW OF U.S. TAXATION OF INTERNATIONAL TRADE AND
     INVESTMENT AND U.S. TAX TREATIES .................................... 4

    A.  U.S. Tax Rules ........................................................................... 4
    B.  U.S. Tax Treaties ........................................................................ 6

III. OVERVIEW OF TAXATION IN POLAND .................................... 8

    A.  National Income Taxes .............................................................. 8
    B.  International Aspects of Taxation in Poland............................. 11
    C.  Other Taxes .............................................................................. 13

IV. THE UNITED STATES AND POLAND: CROSS-BORDER INVESTMENT AND
     TRADE ............................................................................................ 15

    A.  Introduction............................................................................... 15
    B.  Overview of Economic Activity Between the United States and Poland.................. 16

  V.  EXPLANATION OF THE PROPOSED TREATY ........................ 17

    Article 1.  General Scope ........................................................... 17
    Article 2.  Taxes Covered .......................................................... 22
    Article 3.  General Definitions.................................................... 22
    Article 4.  Resident .................................................................... 24
    Article 5.  Permanent Establishment........................................... 25
    Article 6.  Income from Real Property........................................ 27
    Article 7.  Business Profits......................................................... 28
    Article 8.  Shipping and Air Transport ...................................... 34
    Article 9.  Associated Enterprises .............................................. 35
    Article 10.  Dividends ................................................................ 36
    Article 11.  Interest .................................................................... 41
    Article 12.  Branch Profits ......................................................... 44
    Article 13.  Royalties ................................................................. 44
    Article 14.  Capital Gains........................................................... 45
    Article 15.  Income from Employment ....................................... 47
    Article 16.  Directors' Fees ........................................................ 48
    Article 17.  Entertainers and Sportsmen .................................... 48
    Article 18.  Pensions, Social Security, Annuities, Alimony, and Child Support.............. 50
    Article 19.  Government Service ................................................ 52
    Article 20.  Students and Trainees ............................................. 53

Article 21.  Other Income ........................................................................................ 54
Article 22.  Limitation on Benefits ........................................................................... 55
Article 23.  Elimination of Double Taxation ........................................................... 67
Article 24.  Non-Discrimination .............................................................................. 72
Article 25.  Mutual Agreement Procedure ............................................................... 74
Article 26.  Exchange of Information and Administrative Assistance ..................... 76
Article 27.  Members of Diplomatic Missions and Consular Posts........................... 79
Article 28.  Entry into Force .................................................................................... 79
Article 29.  Termination........................................................................................... 80

VI. ISSUES ........................................................................................................... 81

A.  Attribution of Business Profits........................................................................ 81
B.  Limitation on Benefits ..................................................................................... 86

## INTRODUCTION

This pamphlet,[1] prepared by the staff of the Joint Committee on Taxation, describes the proposed income tax treaty between the United States and Poland (the "proposed treaty"). The proposed treaty was signed on February 13, 2013, and, when ratified, will replace the income tax treaty between the United States and Poland (the "existing treaty") signed on October 8, 1974. The Senate Committee on Foreign Relations has scheduled a public hearing on the proposed treaty for June 19, 2014.[2]

Part I of the pamphlet provides a summary of the proposed treaty. Part II provides a brief overview of U.S. tax laws relating to international trade and investment and of U.S. income tax treaties in general. Part III provides a brief overview of Poland's tax laws. Part IV provides a discussion of investment and trade flows between the United States and Poland. Part V explains, in order, each article of the proposed treaty. Part VI describes issues that members of the Committee on Foreign Relations may wish to consider in its deliberations over the proposed treaty.

---

[1] This document may be cited as follows: Joint Committee on Taxation, *Explanation of Proposed Income Tax Treaty Between the United States and Poland* (JCX-68-14), June 17, 2014. References to "the Code" are to the U.S. Internal Revenue Code of 1986, as amended. This document is available on the internet at http://www.jct.gov.

[2] For a copy of the proposed treaty, see Senate Treaty Doc. 113-5.

# I.  SUMMARY

The principal purposes of the proposed treaty are to reduce or eliminate double taxation of income earned by residents of each country from sources within the other country, and to prevent avoidance or evasion of the taxes of the two countries.  The proposed treaty also is intended to promote closer economic cooperation between the two countries and to eliminate possible barriers to trade and investment caused by overlapping taxing jurisdictions of the two countries.  As in other U.S. tax treaties, these objectives principally are achieved through each country's agreement to limit, in certain specified situations, its right to tax income derived from its territory by residents of the other country.

For example, the proposed treaty includes provisions under which each country generally agrees not to tax business income derived from sources within that country by residents of the other country unless the business activities in the taxing country are substantial enough to constitute a permanent establishment (Article 7).  Similarly, the proposed treaty includes certain exemptions under which residents of one country performing personal services in the other country will not be required to pay tax in the other country unless their contact with the other country exceeds specified minimums (Articles 15, 17, 19, and 20).

The proposed treaty provides that dividends, interest, royalties, and certain gains derived by a resident of one country from sources within the other country generally may be taxed by both countries (Articles 10, 11, 12, 13, and 14).  The proposed treaty, however, provides limits on the rates of tax that the source country may impose on a resident of the other country on dividends, interest, and royalties.

In situations in which the country of source retains the right under the proposed treaty to tax income derived by residents of the other country, the proposed treaty generally provides for relief from the potential double taxation through the allowance by the country of residence of a tax credit for certain foreign taxes paid to the other country (Article 23).  The proposed treaty includes the standard U.S. treaty provision, referred to as the "saving clause," under which each country retains the right to tax its residents and citizens as if the treaty had not come into effect (Article 1, paragraph 4).  The proposed treaty also includes (in Article 1, paragraph 2) the standard provision that the treaty may not be applied to deny any taxpayer any benefits to which the taxpayer would be entitled under the domestic law of a country or under any other agreement between the two countries.

The proposed treaty (Article 20) generally provides that students and business trainees visiting the other treaty country are exempt from host country taxation on certain types of payments received.

The proposed treaty also includes (in Article 22) a detailed limitation-on-benefits provision that reflects the anti-treaty-shopping provisions included in the United States Model Income Tax Convention of November 15, 2006 (the "U.S. Model treaty") and more recent U.S. income tax treaties.  The rules are intended to prevent the inappropriate use of the treaty by third-country residents.

2

The proposed treaty provides authority for the two countries to resolve disputes (Article 25) and exchange information (Article 26) to carry out the provisions of the proposed treaty.

The provisions of the proposed treaty will have effect generally for taxable periods beginning on or after January 1 of the calendar year immediately following the date on which the proposed treaty enters into force. With respect to withholding taxes (on, for example, dividends, interest or royalties), the proposed treaty has effect for amounts paid or credited on or after the first day of the second month following the date on which the proposed treaty enters into force. Certain exceptions to the entry into force provision permit the continuation of benefits to teachers, students, trainees or government employees currently receiving such benefits under the existing convention, until such benefits would have ended under the terms of the existing convention.

The rules of the proposed treaty generally are similar to rules of recent U.S. income tax treaties, the U.S Model treaty,[3] and the 2010 Model Tax Convention on Income and on Capital of the Organisation for Economic Co-operation and Development (the "OECD Model treaty"). The proposed treaty does, though, include certain substantive deviations from these treaties and models. These deviations are noted throughout the explanation of the proposed treaty in Part V and Part VI of this document.

---

[3] For a comparison of the U.S. Model treaty with its 1996 predecessor, *see* Joint Committee on Taxation, *Comparison of the United States Model Income Tax Convention of September 20, 1996 with the United States Model Income Tax Convention of November 15, 2006* (JCX-27-07), May 8, 2007.

## II.  OVERVIEW OF U.S. TAXATION OF INTERNATIONAL TRADE AND INVESTMENT AND U.S. TAX TREATIES

This overview briefly describes certain U.S. tax rules relating to foreign income and foreign persons that apply in the absence of a U.S. tax treaty.  This overview also discusses the general objectives of U.S. tax treaties and describes some of the modifications to U.S. tax rules made by treaties.

### A.  U.S. Tax Rules[4]

The United States taxes its citizens, residents, and corporations on their worldwide income, whether derived in the United States or abroad.  The United States generally taxes nonresident alien individuals and foreign corporations on all of their income that is effectively connected with the conduct of a trade or business in the United States (sometimes referred to as "effectively connected income").  The United States also taxes nonresident alien individuals and foreign corporations on certain U.S.-source income that is not effectively connected with a U.S. trade or business.

Income of a nonresident alien individual or foreign corporation that is effectively connected with the conduct of a trade or business in the United States generally is subject to U.S. tax in the same manner and at the same rates as income of a U.S. person.  Deductions are allowed to the extent that they are related to effectively connected income.  A foreign corporation also is subject to a flat 30-percent branch profits tax on its "dividend equivalent amount," which is a measure of the effectively connected earnings and profits of the corporation that are removed in any year from the conduct of its U.S. trade or business.  In addition, a foreign corporation is subject to a flat 30-percent branch-level excess interest tax on the excess of the amount of interest that is deducted by the foreign corporation in computing its effectively connected income over the amount of interest that is paid by its U.S. trade or business.

U.S.-source fixed or determinable annual or periodical income of a nonresident alien individual or foreign corporation (including, for example, interest, dividends, rents, royalties, salaries, and annuities) that is not effectively connected with the conduct of a U.S. trade or business is subject to U.S. tax at a rate of 30 percent of the gross amount paid.  Certain insurance premiums earned by a nonresident alien individual or foreign corporation are subject to U.S. tax at a rate of one or four percent of the premiums.  These taxes generally are collected through withholding.  Certain payments of U.S.-source income paid to foreign financial institutions and other foreign entities also are subject to withholding tax at a rate of 30 percent unless the foreign financial institution or foreign entity is compliant with specific reporting requirements.

Specific statutory exemptions from the 30-percent withholding tax are provided.  For example, certain original issue discount and certain interest on deposits with banks or savings institutions are exempt from the 30-percent withholding tax.  An exemption also is provided for

---

[4]  The U.S. tax rules are codified in Title 26, of the United States Code, referred to as the Internal Revenue Code of 1986, as amended ("IRC").  Unless otherwise stated, all section references in this document are to the IRC.

certain interest paid on portfolio debt obligations.  In addition, income of a foreign government or international organization from investments in U.S. securities is exempt from U.S. tax.

U.S.-source capital gains of a nonresident alien individual or a foreign corporation that are not effectively connected with a U.S. trade or business generally are exempt from U.S. tax, with two exceptions:  (1) gains realized by a nonresident alien individual who is present in the United States for at least 183 days during the taxable year, and (2) certain gains from the disposition of interests in U.S. real property.

Rules are provided for the determination of the source of income.  For example, interest and dividends paid by a U.S. resident or by a U.S. corporation generally are considered U.S.-source income.  Conversely, dividends and interest paid by a foreign corporation generally are treated as foreign-source income.  Notwithstanding this general rule that dividends and interest are sourced based upon the residence of the taxpayer making such a payment, special rules may apply in limited circumstances to treat as foreign source certain amounts paid by a U.S. resident taxpayer and treat as U.S. source certain amounts paid by a foreign resident taxpayer.[5]  Rents and royalties paid for the use of property in the United States are considered U.S.-source income.

Because the United States taxes U.S. citizens, residents, and corporations on their worldwide income, double taxation of income can arise when income earned abroad by a U.S. person is taxed by the country in which the income is earned and also by the United States.  The United States seeks to mitigate this double taxation generally by allowing U.S. persons to credit foreign income taxes paid against the U.S. tax imposed on their foreign-source income.  A fundamental premise of the foreign tax credit is that it may not offset the U.S. tax liability on U.S.-source income.  Therefore, the foreign tax credit provisions contain a limitation that ensures that the foreign tax credit offsets only the U.S. tax on foreign-source income.  The foreign tax credit limitation generally is computed on a worldwide basis (as opposed to a "per-country" basis).  The limitation is applied separately for certain classifications of income.  In addition, a special limitation applies to credits for foreign oil and gas taxes.

For foreign tax credit purposes, a U.S. corporation that owns 10 percent or more of the voting stock of a foreign corporation and receives a dividend from the foreign corporation (or is otherwise required to include in its income earnings of the foreign corporation) is deemed to have paid a portion of the foreign income taxes paid by the foreign corporation on its accumulated earnings.  The taxes deemed paid by the U.S. corporation are included in its total foreign taxes paid and its foreign tax credit limitation calculations for the year in which the dividend is received.

---

[5]  For tax years beginning before January 1, 2011, all (or a portion) of a payment of interest by a resident alien individual or domestic corporation was treated as foreign source if such individual or corporation met an 80-percent foreign business requirement.  Although this provision generally was repealed for tax years beginning after December 31, 2010, other rules still apply to treat certain payments of interest by a foreign bank branch or foreign thrift branch of a domestic corporation or partnership as foreign source.  Similarly, several rules apply to treat as U.S. source certain payments made by a foreign resident.  For example, certain interest paid by a foreign corporation that is engaged in a U.S. trade or business at any time during its taxable year or has income deemed effectively connected with a U.S. trade or business during such year is treated as U.S. source.

## B.   U.S. Tax Treaties

The traditional objectives of U.S. tax treaties have been the avoidance of international double taxation and the prevention of tax avoidance and evasion.  Another related objective of U.S. tax treaties is the removal of the barriers to trade, capital flows, and commercial travel that may be caused by overlapping tax jurisdictions and by the burdens of complying with the tax laws of a jurisdiction when a person's contacts with, and income derived from, that jurisdiction are minimal.  To a large extent, the treaty provisions designed to carry out these objectives supplement U.S. tax law provisions having the same objectives; treaty provisions modify the generally applicable statutory rules with provisions that take into account the particular tax system of the treaty partner.

The objective of limiting double taxation generally is accomplished in treaties through the agreement of each country to limit, in specified situations, its right to tax income earned within its territory by residents of the other country.  For the most part, the various rate reductions and exemptions agreed to by the country in which income is derived (the "source country") in treaties are premised on the assumption that the country of residence of the taxpayer deriving the income (the "residence country") may tax the income at levels comparable to those imposed by the source country on its residents.  Treaties also provide for the elimination of double taxation by requiring the residence country to allow a credit for taxes that the source country retains the right to impose under the treaty.  In addition, in the case of certain types of income, treaties may provide for exemption by the residence country of income taxed by the source country.

Treaties define the term "resident" so that an individual or corporation generally will not be subject to tax as a resident by both of the countries.  Treaties generally provide that neither country may tax business income derived by residents of the other country unless the business activities in the taxing jurisdiction are substantial enough to constitute a permanent establishment or fixed base in that jurisdiction.  Treaties also contain commercial visitation exemptions under which individual residents of one country performing personal services in the other are not required to pay tax in that other country unless their contacts exceed certain specified minimums (for example, presence for a set number of days or earnings in excess of a specified amount).  Treaties address the taxation of passive income such as dividends, interest, and royalties from sources within one country derived by residents of the other country either by providing that the income is taxed only in the recipient's country of residence or by reducing the rate of the source country's withholding tax imposed on the income.  In this regard, the United States agrees in its tax treaties to reduce its 30-percent withholding tax (or, in the case of some income, to eliminate it entirely) in return for reciprocal treatment by its treaty partner.  In particular, under the U.S. Model treaty and many U.S. tax treaties, source-country taxation of most payments of interest and royalties is eliminated, and, although not provided for in the U.S. Model treaty, many recent U.S. treaties forbid the source country from imposing withholding tax on dividends paid by an 80-percent owned subsidiary to a parent corporation organized in the other treaty country.

In its treaties, the United States, as a matter of policy, generally retains the right to tax its citizens and residents on their worldwide income as if the treaty had not come into effect.  The United States also provides in its treaties that it allows a credit against U.S. tax for income taxes paid to the treaty partners, subject to the various limitations of U.S. law.

The objective of preventing tax avoidance and evasion generally is accomplished in treaties by the agreement of each country to exchange tax-related information.  Treaties generally provide for the exchange of information between the tax authorities of the two countries when the information is necessary for carrying out provisions of the treaty or of their domestic tax laws.  The obligation to exchange information under the treaties typically does not require either country to carry out measures contrary to its laws or administrative practices or to supply information that is not obtainable under its laws or in the normal course of its administration or that would reveal trade secrets or other information the disclosure of which would be contrary to public policy.  Several recent treaties and protocols provide that, notwithstanding the general treaty principle that treaty countries are not required to take any actions at variance with their domestic laws, a treaty country may not refuse to provide information requested by the other treaty country simply because the requested information is maintained by a financial institution, nominee, or person acting in an agency or fiduciary capacity.  This provision thus explicitly overrides bank secrecy rules of the requested treaty country.  The Internal Revenue Service ("IRS") and the treaty partner's tax authorities also can request specific tax information from a treaty partner.  These requests can include information to be used in criminal tax investigations or prosecutions.

Administrative cooperation between countries is enhanced further under treaties by the inclusion of a "competent authority" mechanism to resolve double taxation problems arising in individual cases and, more generally, to facilitate consultation between tax officials of the two governments.  Several recent treaties also provide for mandatory arbitration of disputes that the competent authorities are unable to resolve by mutual agreement.

Treaties generally provide that neither country may subject nationals of the other country (or permanent establishments of enterprises of the other country) to taxation more burdensome than the tax it imposes on its own nationals (or on its own enterprises).  Similarly, in general, neither treaty country may discriminate against enterprises owned by residents of the other country.

At times, residents of countries that do not have income tax treaties with the United States attempt to use a treaty between the United States and another country to avoid U.S. tax. To prevent third-country residents from obtaining treaty benefits intended for treaty country residents only, treaties generally contain "anti-treaty shopping" provisions designed to limit treaty benefits to bona fide residents of the two countries.

## III.  OVERVIEW OF TAXATION IN POLAND[6]

### A.  National Income Taxes

#### Overview

The republic of Poland is a parliamentary republic, divided into 16 regions (*voivodships*), each of which also has an elected parliamentary form of government.  Poland acceded to the European Union ("EU") and is a member of the European Economic Area ("EEA").[7]  Its national currency is the Polish *zloty* ("PLN").[8]  The main taxes imposed by the Polish national government are the corporate income tax, a personal income tax, and the value-added tax ("VAT").  In addition, there are also national taxes on inheritance and gifts, civil law transactions, transportation, agriculture, forestry, as well as various excise taxes and custom duties.  The central government imposes income tax on net income of both individuals and corporate entities, while regional or municipal authorities may adjust deductions and applicable rates and also impose license fees and indirect taxes on business activities.  Residents are subject to tax on worldwide income while nonresidents are generally subject to tax only their income from Polish sources.  Foreign tax credits are generally available to individual and corporate residents.  Income is broadly defined and includes capital gains.  Tax reform aimed at tightening the tax system, combating tax evasion, improving compliance, and increasing the efficiency of tax administration was announced by the Minister of Finance in April 2014.  For these purposes, during the next three years, the government intends to introduce the general anti-avoidance rule, amend existing double taxation treaties with foreign countries, and sign 23 new agreements on the exchange of information with jurisdictions applying harmful tax practices.[9]

---

[6]  This description of Polish law in this section relies largely on the Joint Committee staff's review of the following publicly available secondary sources:  MDDP, "Invest in Poland," (Polish Information and Foreign Investment Agency), available at  http://www.paiz.gov.pl/polish_law/taxation; Deloitte, "Taxation and Investment in Poland 2014: Reach, relevance and reliability,"  available at http://www.deloitte.com/assets/Dcom-Poland/Local%20Assets/Documents/Broszury%20nt.%20us%C5%82ug/pl_taxation&investments2014_1_EN.pdf, Baker & McKenzie, "Doing Business in Poland" available at http://www.bakermckenzie.com/BKDPolandBI12; and Romanczuk and Swirski, "Business Operations in Poland," *BNA Tax Management Portfolio*, 979-2d.  The description is intended to serve as a general overview; many details have been omitted and simplifying generalizations made.

[7]  The EEA comprises the European Union and three member states of the European Free Trade Association ("EFTA"), Iceland, Norway and Liechtenstein to form a single European market.  The fourth member of EFTA is Switzerland.

[8]  All amounts herein that are converted from Polish zloty to the U.S. dollar used the rate of $3.05 to 1PLN, as reported at www.xe.com as of June 16, 2014.

[9]  Magdalena van Doorn-Olejnicka, *Poland: Tax Reforms 2014-2017 Announced by Minister of Finance*, INTERNATIONAL BUREAU OF FISCAL DOCUMENTATION (IBFD): TAX NEWS SERVICE, http://online.ibfd.org/kbase/ (by subscription) (last updated Apr. 17, 2014).

## Individual

Individuals residing in Poland are subject to tax on worldwide income, referred to in Poland as an "unlimited tax obligation." Residence is determined either on the basis of a physical presence test, requiring presence during more than 183 days during a tax year, or a vital interests test, based on the presence of an individual's personal and economic interests in Poland.

The types of income subject to the personal income tax include most wages and earned income for services and property transfers. These items include pensions, rents, and other sources, but do not include gifts or inheritances. This taxable base is taxed at progressive rates based on both amount and type of income received. The minimum rate is 18 percent on earned income; the highest marginal rate is 32 percent. For passive income such as dividends, interests, gain from sales of securities or private property, a flat rate of 19 percent is imposed. In addition, individuals conducting certain businesses may elect to be taxed at the flat-rate of 19 percent.

Residents are entitled to reduce their tax with a variety of deductions and credits. Deduction of social security contributions are permitted, as are deductions for mandatory health insurance contributions.[10] Credits for charitable donations, contributions to individual retirement security accounts, as well as a child tax credit and internet tax credit are permitted. Qualifying married individuals may file jointly, provided that each spouse is a resident of either Poland, or Switzerland or a member state of either the European Union or the EEA.

## Corporate

The corporate income tax in Poland is generally 19 percent of all net income. It applies to most entities that are resident in Poland other than partnerships. Taxpayers subject to this tax include not only corporations, but also joint-stock corporations. Limited partnerships were excluded from the category of corporate taxpayers by an amendment to the Corporate Income Tax Act of November 8, 2013.[11] Although partnerships are not generally subject to the corporate income tax, foreign entities or partnerships that are treated as legal entities in the jurisdiction in which they are formed are also subject to the corporate income tax. An entity is a resident of Poland if its offices or management board is located in Poland.

Resident companies are subject to tax on all income without regard to source, under the concept of "unlimited tax liability" similar to that applicable to individuals, but, as discussed in part B., below, are generally relieved of double taxation by either foreign credits or an exemption

---

[10] Both employer and employee are required to contribute to fund the social security system that encompasses retirement, disability, and health and accident insurance. The required contribution equals approximately 35 percent of annual wages up to a maximum of 112,380PLN ($36,819). The employee is responsible for less than half of the total contribution, the balance of which is paid by the employer. Self-employed individuals are responsible for the full contribution.

[11] Law of Nov. 8, 2013, DZIENNIK USTAW [JOURNAL OF LAWS] (official gazette) 2013, Pos. 1387, http://isap.sejm.gov.pl/ DetailsServlet?id=WDU20130001387; *see also* Magdalena van Doorn-Olejnicka, *Poland: Partnerships Become Corporate Entities – Parliament Passes Amendments to Corporate Income Tax Law*, INTERNATIONAL BUREAU OF FISCAL DOCUMENTATION [IBFD]: TAX NEWS SERVICE, http://online.ibfd.org/kbase/ (by subscription) (last updated Nov. 19, 2013).

from income under a participation exemption.  Companies are entitled to consolidate for tax purposes, forming a tax capital group of related commercial companies all with residence in Poland.   The tax capital group must meet other restrictions based on size and required consistency of reporting.

Expenses

In determining the taxable base, income is determined by computing total revenues and reducing it by expenses related to producing the revenues.  Cost-recovery through depreciation of assets and amortization of acquisition costs is permitted.  In addition to a straight-line ("linear rule") method, other methods are specified in the statute as permissible methods.

Interest on business debt is generally one such deductible expense, but is limited in certain instances in which related party indebtedness results in thin capitalization or over-leveraging.  An entity is over-leveraged if the debt owed to a related party exceeds an amount three times the debtor's total equity.  Any interest paid attributable to the excess debt is disallowed.  For purposes of these rules, a debt is considered to be between related parties if either the lender holds a 25-percent share of the voting interest in the debtor, or a holding corporation or shareholder holds a 25-percent voting share in both the lender and debtor.

## B.  International Aspects of Taxation in Poland

__Individual__

The foreign part of the income and capital gains of Polish residents must be added to their domestic taxable amount; however, an ordinary credit is used to avoid double taxation.  The credit is calculated for each country individually if no tax treaty applies.  If a tax treaty between Poland and the country in question has been concluded, a relief provided by the treaty is mandatory.[12]

Individuals who are not resident in Poland under either the physical presence or vital interests tests are subject to tax in Poland only with respect to certain income from sources within Poland.  Such income includes income for fees for serving on management boards, athletic or entertainment services, advertising, legal or accounting services, license fees and royalties, and amounts paid pursuant to civil law agreements or leases.  The tax is assessed on a gross basis at a flat rate of 20 percent and withheld at the source, absent an agreement in a treaty that provides a reduced rate of withholding for the category of income in question.

__Corporate__

The resident companies are subject to tax on global income, but are eligible for relief from double taxation either through a credit system or a participation exemption system, depending on the identity of the other foreign taxing jurisdiction.  For jurisdictions other than Switzerland or member states in either the EU or EEA, a credit is available to offset Polish tax in the amount of the underlying corporate income tax paid in the foreign jurisdiction.  The credit is available only with respect to tax paid on the income of a foreign entity in which the Polish entity holds at least 75 percent of the capital outstanding.  In addition, any foreign tax directly paid by the Polish entity to the foreign jurisdiction is available as a credit.  Income from foreign branches is not taxable upon distribution.

 Non-resident companies are subject to the same taxation regime as resident companies and "are subject to tax on their Polish source income, capital gains.  Dividends, interests and royalties paid to non-resident companies are subject to a withholding tax."[13]  The withholding tax rate for non-resident companies is the same as for residents, which is 19 percent for dividends and 20 percent for interest and royalties unless a reduced tax rate applies under a tax treaty.[14]

---

[12]  Magdalena van Doorn-Olejnicka, *Poland: Individual Taxation – Country Surveys* ¶ 6.1 INTERNATIONAL BUREAU OF FISCAL DOCUMENTATION [IBFD], http://online.ibfd.org/kbase/ (by subscription) (last updated May 1, 2014).

[13]  Magdalena van Doorn-Olejnicka, *Poland – Corporate Taxation* ¶ 6.2 INTERNATIONAL BUREAU OF FISCAL DOCUMENTATION [IBFD]: COUNTRY ANALYSES (POLAND), http://online.ibfd.org/kbase/ (by subscription) (last visited June 13, 2014).

[14]  *Ibid.* ¶ 6.3.

11

Poland does not have an anti-deferral regime for controlled foreign corporations held by Polish residents.  A proposal that would tax controlled foreign corporations was proposed by the cabinet of Ministers to the legislature in March 2014.  Under the proposal, income earned by foreign units of Polish corporations located in countries designated as tax havens or having a corporate income tax rate of 25 percent below that of Poland is required to be included in the taxable income base of the controlled foreign corporation.  The new rules are not intended to apply to units located in the EU or EEA countries.[15]

Participation exemption

For income derived from subsidiaries in Switzerland, any member state of the EU or the EEA, a participation exemption system exempts dividend income from tax.  Dividends and capital gains from eligible foreign subsidiaries qualify for an exemption from the Polish corporate tax if the resident corporation owns at least 10 percent of the capital in the foreign company and has held the participation for at least a two year period, which may elapse after the date on which the dividend is payable.  If the subsidiary company is located in Switzerland, the minimum required capital participation held by the Polish parent is 25 percent rather than 10 percent.  A reciprocal exemption applies to withholding tax that would otherwise apply to dividend disbursements from a Polish resident company to the qualified subsidiaries.

---

[15] *Poland Adopts Bill on Taxation of Controlled Foreign Corporations*, WARSAW VOICE (Mar. 19, 2014), http://www.warsawvoice.pl/WVpage/pages/article.php/27688/news.

12

## C.  Other Taxes

**Value-added taxes**

Poland enacted a VAT in 2004 that applies to taxable sales of goods and services, and conforms to EU requirements.[16]  The VAT is an indirect consumption tax that is imposed at time of transfer and collected by a taxable person responsible for remitting the VAT to the tax authorities, and generally falls on the ultimate consumer of the goods or services.  The amount of VAT paid by the taxable person in purchasing goods or services for his or her business offsets the amount of tax remitted to authorities.  The general rate of tax is 23 percent of the amount of the transaction, but a reduced rate of eight percent applies to food items, medical products, and certain housing expenses, with a further reduced rate of five percent for food staples, and certain publications.  In May 2014, the Polish Tax Administration issued a statement to the effect that the general rate VAT will be imposed on profits received from sales of Bitcoin.[17]  Finally, cross-border sales within the EU are eligible for a zero-rate VAT, because the offsetting VAT in business-to-business transactions are expected to be VAT neutral.

In the case of cross-border services, the authority to collect the VAT depends upon whether the transaction is business-to-business, or between a business and non-business service recipient.  In the former instances, Poland is authorized to collect the VAT if the service recipient is a Polish resident.   In the latter case, the converse is true.  The VAT is collected in Poland only if the service provider is a Polish resident.  Moreover, on January 1, 2014, the liability to pay VAT was changed from the date that the invoice was issued to the date that the goods were supplied or service provided, regardless of when the invoice is issued.[18]  A variety of services are exempt from VAT, including financial, medical, educational, welfare or insurance services, as well as some arts or sports events.

**Inheritance and gift tax**

A tax on inheritance and charitable donations is imposed on all receipts of assets or rights within Poland.  In the case of beneficiaries who are residents or citizens of Poland at the time of the inheritance or donation, the tax is also applicable to the receipt of assets or rights that are located or used abroad.  The degree of relationship of a beneficiary to the transferor and the value of the transfer determines the rate of tax applicable.  The three categories of beneficiaries are (1) direct ascendants or descendents, whether by marriage or consanguinity, including parents, step-parents, children and spouses, siblings; (2) the parents' siblings, siblings' spouses and descendents; and (3) all other beneficiaries.   The progressive rates that apply to the first category of beneficiaries ranges from three to seven percent; the rates for the second category

---

[16]  Directive 2006/112/EC on the common system of value added tax, known as the VAT Directive.

[17]  Eric Calouro, Polish Tax Man Says Bitcoin Mining Profits Subject to VAT, NEWSBTC (May 27, 2014), http://newsbtc.com/2014/05/27/polish-tax-man-says-bitcoin-mining-profits-subject-vat/.

[18]  Ministry of Finance Regulation of Dec. 23, 2013, DZIENNIK USTAW  2013, Pos. 1713, http://isap.sejm.gov.pl/DetailsServlet?id=WDU20130001589 (in Polish); Tomasz Rysiak Magnusson, *Modifications to Tax Law*, WARSAW BUSINESS JOURNAL (Dec. 23, 2013), http://www.wbj.pl/article-64683-modifications-to-tax-law.html?type=wbj.

range from seven to 12 percent; and for the third, from 12 to 20 percent.    All gifts or bequests of more than 4,902PLN ($1,606) are subject to tax, with the highest rates in each category applicable to taxable transfers over 20,566PLN, or $6,738.

## IV.  THE UNITED STATES AND POLAND:
## CROSS-BORDER INVESTMENT AND TRADE

### A.  Introduction

Tax treaties can be viewed as part of a set of economic arrangements, such as trade agreements and bilateral investment treaties, reached between two countries to promote cross-border economic activity.  Tax treaties are often concluded between countries that already have significant economic ties and have historically preceded, rather than followed, trade agreements, which suggests that the conclusion of a tax treaty between two countries may provide some foundation for future economic agreements.[19]

By clarifying the assignment of taxing authority between residence and source countries and eliminating the double taxation of income, tax treaties reduce the uncertainty individuals and businesses may face when deciding to work or invest in another country and can increase after-tax returns to economic activity in cases where income may have been subject to double taxation or withholding tax.  Tax treaties can lead to a more efficient allocation of labor and capital between countries to the extent that they eliminate tax-related barriers to economic activity.  The existence of a tax treaty between two countries can also have an indirect effect on investment because the extensiveness of a country's tax treaty network can influence decisions to invest in that country.  However, their economic impact partly depends on the character and volume of capital and labor flows between treaty countries and the scope for double taxation of income in the absence of a tax treaty.

Although research on the economic impact of tax treaties has not yielded conclusive results, studies suggest that they have positive impacts on cross-border investment and trade by mitigating double taxation.[20]  For example, one study found that, by facilitating the resolution of transfer pricing disputes, the mutual agreement procedures in tax treaties can be particularly beneficial for multinational firms that use inputs whose arm's-length prices are difficult to determine.[21]

---

[19]  Peter Egger and George Wamser, "Multiple Faces of Preferential Market Access: Their Causes and Consequences," *Economic Policy*, vo. 28, no. 73, January 2013, pp. 143-187.

[20]  *Ibid.*

[21]  Bruce A. Blonigen, Lindsay Oldenski, and Nicholas Sly, "The Differential Effects of Bilateral Tax Treaties," *American Economic Journal: Economic Policy*, vol. 6, no. 2, May 2014, pp. 1-18.

### B.  Overview of Economic Activity Between the United States and Poland

#### Cross-border trade

With a gross domestic product of $171 billion in 2013, Poland has the eighth largest economy of the 28 EU member countries and is one of the more significant U.S. trading partners in the European Union.[22]  In 2013, the United States exported $3.9 billion in goods and services to Poland, making Poland the 10th largest destination for U.S. exports to the European Union and 49th largest destination for U.S. exports in the world.[23]  U.S. imports of goods and services from Poland totaled $4.9 billion in 2013, which made Poland the 12th largest source of U.S. imports from the European Union and 47th largest source of U.S. imports in the world.[24]

#### Cross-border direct investment

In 2012, Poland was the 13th largest target for U.S. direct investment ($14.2 billion) in the European Union, and $732 million in direct investment income was generated.[25]

#### Income taxes on cross-border income flows

Tax return data provide a complementary snapshot of the economic activity between the United States and Poland.  For tax year 2010, Polish-source gross income (less losses) from U.S. corporate returns with a foreign tax credit totaled $1.7 billion, with the three largest items of income being dividends ($333 million), foreign branch income ($260 million), and rents, royalties, and license fees ($230 million).[26]  Polish taxes that were reported on these returns as paid, accrued, or deemed paid totaled $235 million in 2010.[27]

---

[22] International Monetary Fund, World Economic Outlook Database (April 2014), available at http://www.imf.org/external/pubs/ft/weo/2014/01/weodata/index.aspx.

[23] U.S. Bureau of Economic Analysis and U.S. Census Bureau, U.S. Department of Commerce, "International Trade in Goods and Services: December 2013," February 6, 2014, available at http://www.bea.gov/newsreleases/international/trade/2014/pdf/trad1213.pdf.

[24] *Ibid*.

[25] Bureau of Economic Analysis, U.S. Department of Commerce, "International Economic Accounts," http://www.bea.gov/international.  The U.S. Department of Commerce defines an investment as direct when a single person owns or controls, directly or indirectly, at least 10 percent of the voting securities of a corporate enterprise or the equivalent interest in an unincorporated business.  Direct investment positions are valued on an historical-cost basis.  Data on Polish direct investment in the United States is not publicly available in order to avoid disclosing data on individual companies.

[26] The figure for gross income reported here includes income from the extraction of oil and gas as well as foreign branch income.  The data is obtained from Form 1118 filings.  See http://www.irs.gov/uac/SOI-Tax-Stats-Corporate-Foreign-Tax-Credit-Table-3.

[27] See http://www.irs.gov/uac/SOI-Tax-Stats-Corporate-Foreign-Tax-Credit-Table-3.

## V.  EXPLANATION OF THE PROPOSED TREATY

### Article 1.  General Scope

#### In general

The general scope article describes the persons who may claim the benefits of the proposed treaty.  It also includes a "saving clause" provision similar to provisions found in most U.S. income tax treaties, and a special rule for fiscally transparent entities similar to that found in the U.S. Model treaty.

#### Who may claim treaty benefits

Paragraph 1 provides that the proposed treaty generally applies only to residents of the United States and to residents of Poland.  The determination of whether a person is a resident of the United States or Poland is made under Article 4 (Resident) of the treaty.  Certain provisions are applicable to persons who may not be residents of either treaty country.  For example, paragraph 1 of Article 24 (Non-Discrimination) applies to nationals of the treaty countries. Under Article 26 (Exchange of Information), information may be exchanged with respect to residents of third states.

#### Relationship to U.S. law and other agreements

Paragraph 2 states the generally accepted relationships both between the proposed treaty and domestic law and between the proposed treaty and other agreements to which the United States and Poland are parties.  It provides that the proposed treaty generally does not restrict any benefit accorded by internal law or by any other agreement between the United States and Poland.  Consequently, the proposed treaty may not increase the tax burden of a resident of either the United States or Poland beyond that determined under internal law.

Under the principles of paragraph 2, a taxpayer's U.S. tax liability need not be determined under the proposed treaty if the Code would produce a more favorable result.  The Technical Explanation[28] states, however, that a taxpayer may not choose among the provisions of the Code and the proposed treaty in an inconsistent manner to minimize U.S. tax.  The Technical Explanation includes an example illustrating this rule.  In the example, a resident of Poland has three separate businesses in the United States.  One of the separate businesses is a profitable permanent establishment and the other two are trades or businesses that would earn taxable income (or loss) under the Code but that do not meet the permanent establishment threshold tests of the proposed treaty.  One is profitable and the other incurs a loss.  Under the proposed treaty, the income of the permanent establishment is taxable in the United States, and both the income and loss of the other two businesses are ignored.  Under the Code, all three would be subject to tax, but the loss would offset the income of the two profitable ventures.  The Technical

---

[28]  Department of the Treasury Technical Explanation of the Convention Between the United States of America and the Republic of Poland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income (hereinafter referred to as the "Technical Explanation").

Explanation states that the taxpayer may not invoke the proposed treaty to exclude the income of the profitable trade or business and invoke the Code to claim the loss of the loss trade or business against the income of the permanent establishment.  However, if the taxpayer invokes the Code for the taxation of all three ventures, that taxpayer would not be precluded from invoking the proposed treaty in respect of, for example, any dividend income from the United States that is not effectively connected with any of the taxpayer's business activities in the United States.

Paragraph 3 of the proposed treaty relates to non-discrimination obligations of the treaty countries under the General Agreement on Trade in Services (the "GATS").  The provisions of paragraph 3 are an exception to the rule provided in paragraph 2 under which the proposed treaty may not restrict any benefit accorded by any other agreement to which the United States and Poland are parties.

Paragraph 3 provides that, unless the competent authorities determine that a taxation measure is not within the scope of Article 24 (Non-Discrimination) of the proposed treaty, the national treatment obligations of the GATS do not apply to that measure.  Further, for purposes of paragraph 3 of Article 22 (Consultation) of the GATS, any question arising as to the interpretation or application of the proposed treaty, including whether a taxation measure is within the scope of the proposed treaty, is determined exclusively in accordance with the provisions of Article 25 (Mutual Agreement Procedure) of the proposed treaty.  According to the Technical Explanation, the result under paragraph 3 of the proposed treaty is that paragraph 3 of Article 22 of the GATS may not be used to bring a dispute before the World Trade Organization unless the competent authorities of both treaty countries have determined that the relevant taxation measure is not within the scope of Article 24 of the proposed treaty.

Paragraph 3 provides that the term "measure" means a law, regulation, rule, procedure, decision, administrative action, or any similar provision or action.

Saving clause

Like all U.S. income tax treaties and the U.S. Model treaty, the proposed treaty includes a "saving clause" in paragraph 4.  Under this clause, with specific exceptions described below, the proposed treaty does not affect the taxation by either treaty country of its residents and citizens. By reason of this saving clause, subject to the exceptions described below, either treaty country may continue to tax its residents and its citizens who are residents of the other treaty country as if the treaty were not in force.

Paragraph 4 generally also allows the United States and Poland to tax, in accordance with their internal taxation laws, a former citizen or former long-term resident for a period of ten years following the loss of citizenship or long-term resident status, but only on income from sources within the respective treaty country (including income deemed to arise from sources within that country under the domestic laws of that country).  This provision is consistent with U.S. internal law rules that impose tax on certain former U.S. citizens and long-term residents who, before June 17, 2008, relinquished their citizenship or ceased to be long-term residents.[29]

---

[29]  Sec. 877.

The tax under these rules is imposed for a ten-year period following the relinquishment of citizenship or long-term residence.[30]

The United States defines "long-term resident" as an individual (other than a U.S. citizen) who was a lawful permanent resident of the United States in at least eight of the 15 taxable years ending with the taxable year in which the individual ceased to be a long-term resident. An individual is not treated as a lawful permanent resident for any taxable year in which (1) the individual is treated as a resident of Poland under the proposed treaty, or as a resident of any country other than the United States under the provisions of any other tax treaty of the United States, and (2) in either case, the individual does not waive the benefits of the relevant treaty.

U.S. internal law now provides a mark-to-market exit tax instead of the ten-year taxing rules for certain individuals ("covered expatriates") who expatriate on or after June 17, 2008.[31] In general, covered expatriates are treated as having sold all of their property on the day before the expatriation date for its fair market value.[32] Covered expatriates subject to the mark-to-market exit tax may be eligible for the basis-step up rule provided by paragraph 5 of Article 23 (Elimination of Double Taxation), described below.

At a covered expatriate's election, the time for payment of additional tax attributable to any gain so recognized (but not realized) under the mark-to-market exit tax may be deferred until the expatriate actually disposes of property deemed sold.[33] This election may be made only if the taxpayer irrevocably waives any right under any U.S. treaty that would preclude assessment or collection of the tax deferred by reason of the election.[34] If a covered expatriate eligible for the benefits of the proposed treaty makes this election and sells property more than ten years after expatriating, the treaty's ten-year rule would prevent the United States from collecting tax otherwise due from the individual, but in this circumstance the individual will have been required, as a condition of making the election to defer payment of the mark-to-market exit tax, to waive the benefits of the proposed treaty's ten-year rule.

Paragraph 5 provides exceptions to the saving clause. The referenced provisions are intended to provide benefits to citizens and residents even if those benefits do not exist under internal law. Paragraph 5 thus preserves these benefits for citizens and residents of the treaty

---

[30] *Ibid*. Under section 877 taxpayers are subject to U.S. tax on both their U.S.-source income (including deemed U.S.-source income), and their foreign-source income that is effectively connected with the conduct of a trade or business within the United States.

[31] Sec. 877A. An individual generally is a covered expatriate if the individual's annual net income tax for the five taxable years ending before the expatriation date is greater than $157,000 (adjusted for inflation annually); the individual's net worth on the expatriation date is $2 million or more; or the individual fails to certify under penalties of perjury that the individual has satisfied all applicable Code requirements for the five preceding taxable years or fails to submit evidence of compliance that the Treasury Secretary may require.

[32] Sec. 877A(a)(1).

[33] Sec. 877A(b)(1).

[34] Sec. 877A(b)(5).

countries. Exceptions to the saving clause are provided for the following benefits conferred by the proposed treaty: the allowance of correlative adjustments when the profits of an associated enterprise are adjusted by the other country (Article 9, paragraph 2); exemption from source or resident country taxation for certain pension distributions, social security payments, and alimony and child support payments (Article 18, paragraphs 2, 3, and 5); relief from double taxation through the provision of a foreign tax credit or an exemption for income earned in the other state (Article 23); protection of residents and nationals of one country from discriminatory tax treatment in the other country (Article 24); and benefits under the mutual agreement procedures of the proposed treaty (Article 25).

The saving clause also does not apply to certain benefits conferred by the United States or Poland upon individuals who are not citizens of, and have not been admitted for permanent residence in, respectively, the United States or Poland. Under this set of exceptions to the saving clause, the specified treaty benefits are available to, for example, a citizen of Poland who spends enough time in the United States to be taxed as a U.S. resident but who has not acquired U.S. permanent residence status (that is, does not hold a "green card"). The benefits that are covered under this set of exceptions are exemptions from host country taxation for certain income for government service (Article 19), certain income received by visiting students and trainees (Article 20), and certain income received by members of diplomatic missions and consular posts (Article 27).

Fiscally transparent entities

The proposed treaty provides special rules for fiscally transparent entities that are similar to those of the U.S. Model treaty, with one exception. Under these rules, as explained in the Technical Explanation, income derived through an entity that is fiscally transparent under the laws of either treaty country is, with the exception described below, considered to be the income of a resident of one of the treaty countries to the extent that the income is subject to tax in that country as the income of a resident. For example, if a Polish company pays interest to an entity that is treated as fiscally transparent for U.S. tax purposes, the interest will be considered to be derived by a resident of the United States only to the extent that U.S. tax laws treat one or more U.S. residents (whose status as U.S. residents is determined under U.S. tax laws) as deriving the interest income for U.S. tax purposes.

As the Technical Explanation notes, treaty rules for fiscally transparent entities have two purposes. One goal is to ensure that residents of treaty countries who invest through fiscally transparent entities are entitled to treaty benefits in respect of income derived through the entities if they are subject to tax on the income and are otherwise eligible for treaty benefits in respect of the income. The rules also prevent a resident of one of the treaty countries from claiming treaty benefits in respect of an item of income derived through an entity if the resident does not take into account the income because the entity is not fiscally transparent in the residence country.

According to the Technical Explanation, the principles of the proposed treaty's rules for income derived through fiscally transparent entities reflect Treas. Reg. section 1.894-1(d). Consequently, with respect to an item of income paid to an entity, the entity is considered fiscally transparent under the laws of the country of residence of a person who holds an interest in the entity to the extent that the laws of that country require the interest holder to separately

take into account on a current basis the holder's share of the item of income paid to the entity, whether or not the income is distributed to the interest holder.   The Technical Explanation states that entities considered fiscally transparent in the United States include partnerships, subchapter S corporations, common investment trusts under section 584, simple trusts, and grantor trusts. The rules for fiscally transparent entities also apply to payments made to other entities such as U.S. limited liability companies ("LLCs") that may elect to be treated as partnerships or disregarded entities for U.S. tax purposes.

The Technical Explanation states that the rules for fiscally transparent entities apply even if an entity organized in one treaty country is viewed differently under the tax laws of the other treaty country.  As an example, the Technical Explanation states that income from U.S. sources received by an entity organized under the laws of the United States, which is treated for Polish tax purposes as a corporation and is owned by a Polish shareholder who is a Polish resident for Polish tax purposes, is not considered derived by the shareholder of that corporation even if, under the tax laws of the United States, the entity is treated as fiscally transparent.  Rather, for purposes of the proposed treaty, the income is treated as derived by the U.S. entity.

Like the U.S. Model treaty's rules for fiscally transparent entities, the proposed treaty's rules apply to fiscally transparent entities that are organized in non-treaty countries.  By contrast with the U.S. Model treaty rules, the proposed treaty provides a special requirement when payments are made through an entity organized in a third country.  Under this requirement, the general rule for fiscally transparent entities described previously does not apply to an item of income derived through an entity organized in a third country if (1) the entity is not fiscally transparent in the country in which the income arises and is eligible for benefits in respect of that income under an income tax treaty between the third country and the country in which the income arises, and (2) those benefits are more favorable than the benefits provided by the proposed treaty in respect of the income.

For example, suppose that USCo, a U.S. resident corporation, is the only shareholder of FCo, an entity organized in a third country that is treated as fiscally transparent in the United States but as a corporation under Polish law.  Assume FCo receives interest arising in Poland that would be eligible for the five-percent withholding tax rate of Article 11 (Interest) of the proposed treaty.  Under the general rule for fiscally transparent entities, USCo would be considered to derive the Polish-source interest and would be eligible for the five-percent treaty withholding rate if all other conditions for receiving treaty benefits were satisfied.  Because, however, FCo is not fiscally transparent in Poland (the country in which the interest arises), under the special requirement for fiscally transparent entities organized in third countries, if FCo's residence country and Poland have in force an income tax treaty that provides a maximum withholding tax rate on the interest of less than five percent and if FCo is eligible for the benefits of that reduced withholding tax rate on the interest, the proposed treaty's rule treating USCo as deriving the interest does not apply.  FCo, though, would be permitted to claim the lower withholding tax rate under the treaty between its country of residence and Poland.

As the Technical Explanation states, the treatment of fiscally transparent entities is not an exception to the saving clause.  As a result, a treaty country is not precluded from taxing an entity that is treated as a resident of that country under its tax laws.  For example, if a U.S. LLC with Polish members elects to be taxed as a corporation for U.S. tax purposes, the United States

will tax that LLC on its worldwide income on a net basis, without regard to whether Poland views the LLC as fiscally transparent.

## Article 2.  Taxes Covered

The proposed treaty applies to all taxes on income regardless of the manner in which they are levied, including taxes on gains from the disposition of property and on the total amounts of wages or salaries paid by enterprises but excluding social security and unemployment taxes.  In the case of Poland, the proposed treaty applies to the personal income tax and the corporate income tax.  In the case of the United States, the proposed treaty applies to the Federal income taxes imposed by the Code (but excluding social security and unemployment taxes) and to the Federal excise taxes imposed with respect to private foundations.

The proposed treaty also applies to any taxes that are identical or substantially similar to the taxes described in the preceding paragraph and that are imposed after the signing of the proposed treaty in addition to or in place of existing taxes.  This provision is generally found in U.S. income tax treaties.  The proposed treaty obligates the competent authority of each treaty country to notify the competent authority of the other treaty country of any significant changes in its internal taxation laws.

## Article 3.  General Definitions

This article provides definitions of a number of terms for purposes of the proposed treaty. Certain of the standard definitions found in most U.S. income tax treaties are included in the article.

The term "person" includes an individual, an estate, a trust, a partnership, a company, and any other body of persons.

The term "company" means a body corporate or any entity treated as a body corporate for tax purposes according to the laws of the country in which it is organized.

The terms "enterprise of a Contracting State" and "enterprise of the other Contracting State" mean respectively an enterprise carried on by a resident of one of the treaty countries and an enterprise carried on by a resident of the other treaty country.  An enterprise of a Contracting State also includes an enterprise carried on by a resident of a treaty country through an entity that is treated as fiscally transparent in that treaty country.

The term "enterprise" applies to the carrying on of any business.  The Technical Explanation clarifies that an enterprise of a treaty country need not be carried on in that country. It may be carried on in the other treaty country or in a third state.  For example, a U.S. corporation doing all of its business in Poland would still be a U.S. enterprise.

The term "business" is not defined, but the proposed treaty provides that the term includes the performance of professional services and other activities of an independent character.  According to the Technical Explanation, this provision is intended to clarify that income from the performance of professional services or other activities of an independent character is dealt with under Article 7 (Business Profits) and not Article 21 (Other Income).

The term "international traffic" means any transport by a ship or aircraft except when such transport is solely between places within a treaty country.  This definition is applicable principally in the context of Article 8 (Shipping and Air Transport).

The article designates the "competent authorities" for Poland and the United States.  In the case of Poland, the competent authority is the Minister of Finance or his authorized representative.  The U.S. competent authority is the Secretary of the Treasury or his delegate.  According to the Technical Explanation, the Secretary of the Treasury has delegated the competent authority function to the Commissioner of Internal Revenue, who in turn has delegated the authority to the Deputy Commissioner (International) LB&I.

The article sets forth the geographical scope of the proposed treaty with respect to Poland and the United States.  In the case of Poland, it encompasses the territory of the Republic of Poland, including the territorial sea thereof.  It also includes any area outside the territorial sea of the Republic of Poland designated under its laws and in accordance with international law as an area within which the sovereign rights of the Republic of Poland with respect to the sea bed and sub-soil and their natural resources may be exercised.  In the case of the United States, it encompasses the United States of America, including the States and the District of Columbia, and the territorial sea thereof.  It also includes the sea bed and the subsoil of the submarine areas adjacent to the territorial sea, over which the United States exercises sovereign rights in accordance with international law.  The term does not include Puerto Rico, the Virgin Islands, Guam, or any other U.S. possession or territory.[35]

The term "national" as applied to one of the two treaty countries means (1) an individual who possesses nationality or citizenship of that treaty country, and (2) any legal person, partnership, or association deriving its status as such from the laws of that treaty country.  This term is relevant for purposes of Articles 19 (Government Service) and 24 (Non-Discrimination).

The term "pension fund" means any person established in a treaty country that (1) is generally exempt from income taxation in that country and (2) operates principally to administer or provide pension or retirement benefits or to earn income for the benefit of one or more such persons.

The terms "a Contracting State" and "the other Contracting State" mean the United States or the Republic of Poland, as the context requires.

Any term not defined in the proposed treaty will have the meaning that it has at that time under the law of the country whose tax is being applied, unless the context requires otherwise.  If the term is defined under both the tax and non-tax laws of a treaty country, the definition in the tax law prevails.

---

[35]  This is consistent with section 7701(a)(9) defining the term "United States," when used in a geographical sense, to include only the States and the District of Columbia.

## Article 4.  Resident

The assignment of a country of residence is important because the benefits of the proposed treaty are generally available only to a resident of one of the treaty countries as that term is defined in the proposed treaty.  Issues arising because of dual residency, including situations of double taxation, may be avoided by the assignment of one treaty country as the country of residence when, under the internal laws of the treaty countries, a person is a resident of both countries.

Article 4 of the proposed treaty provides rules to determine whether a person is a resident of the United States or Poland under the proposed treaty.  The rules are generally consistent with the rules of the U.S. Model treaty.

The proposed treaty generally defines "resident of a Contracting State" to mean any person who, under the laws of that treaty country, is liable to tax therein by reason of the person's domicile, residence, citizenship, place of management, place of incorporation, or any other criterion of a similar nature.  The term does not include any person who is liable for tax in that treaty country only on income from sources in that country or on profits attributable to a permanent establishment in that country.  Accordingly, although not explicitly stated in the proposed treaty, an enterprise of Poland with a permanent establishment in the United States does not become a resident of the United States as a result of its U.S. permanent establishment.  Such an enterprise is generally liable to tax by the United States only on income attributable to its U.S. permanent establishment and not on its worldwide income.

The proposed treaty makes explicit the generally understood practice of including in the definition of "resident of a Contracting State" the two treaty countries and any political subdivisions or local authorities of those countries.

The proposed treaty provides a special rule to treat as residents of a treaty country certain legal entities that are generally exempt from tax in that country.  For example, the provision applies to a pension fund established in that state.  In addition, the provision applies to an organization that is a resident of a treaty country under its laws and is established exclusively for religious, charitable, scientific, artistic, cultural, or educational purposes.

The proposed treaty provides a series of tie-breaker rules to determine residence in the case of an individual who, under the basic residence definition, would be considered to be a resident of both countries.  These tie-breaker rules are to be applied in the order in which they are described below.  Under these rules, an individual is deemed to be a resident of the country in which he or she has a permanent home available.  If the individual has a permanent home in both countries, the individual's residence is deemed to be the country with which his or her personal and economic relations are closer (that is, the individual's "center of vital interests").  If it cannot be determined in which country the individual has his or her center of vital interests, or if the individual does not have a permanent home available in either country, the individual is deemed to be a resident of the country in which he or she has a habitual abode.  If the individual has a habitual abode in both countries or in neither country, the individual is deemed to be a resident of the country of which he or she is a national.  If the individual is a national of both countries or of

neither country, the competent authorities of the countries will endeavor to settle the question of residence by mutual agreement.

The proposed treaty also establishes a tie-breaker rule for a company that, under the general residence rules described previously, is a resident of both countries (a "dual resident company"). In this case, the proposed treaty provides that if the company is created or organized under the laws of one treaty country, or political subdivision thereof, but not under the laws of the other treaty country, or political subdivision thereof, the company shall be deemed to be a resident of the country in which it is created or organized.

If, under the general residence rules described previously, and despite application of the tie-breaker rule for dual resident companies, a person other than an individual is a resident of both countries, the proposed treaty provides that the competent authorities of the treaty countries may endeavor to settle the issue of residence by mutual agreement. Unlike the U.S. Model treaty, the text of the proposed treaty does not make explicit the consequence of the competent authorities' inability to settle the issue of a person's residence. However, the Technical Explanation states that in this event, the person may claim only those benefits that are not limited to residents of the treaty countries--such as those provided by paragraph 1 of Article 24 (Non-Discrimination)--which is similar to the result obtained under the U.S. Model treaty.

A dual resident company may also be treated as a resident of a treaty country for purposes other than obtaining benefits under the proposed treaty. For example, according to the Technical Explanation, if a dual resident company pays a U.S.-source dividend to a resident of Poland, the tax on the dividend is limited to the treaty rate because the treaty reduction is a benefit of the Polish resident, not a benefit of the dual resident company. Moreover, information related to the dual resident company may be exchanged because Article 26 (Exchange of Information) is not limited to residents of the treaty countries.

### Article 5. Permanent Establishment

The proposed treaty contains a definition of the term "permanent establishment" that generally follows the language of other recent U.S. income tax treaties, the U.S. Model treaty, and the OECD Model treaty.

The permanent establishment concept is one of the basic devices used in income tax treaties to limit the taxing jurisdiction of the host country and thus to mitigate double taxation. Generally, an enterprise that is a resident of one country is not taxable by the other country on its business profits unless those profits are attributable to a permanent establishment of the resident in the other country. In addition, the permanent establishment concept is used to determine whether the reduced rates of, or exemptions from, tax provided for dividends, interest, and royalties apply, or whether those items of income will be taxed as business profits.

In general, under the proposed treaty, a permanent establishment is a fixed place of business in which the business of an enterprise is wholly or partly carried on. A permanent establishment includes a place of management, a branch, an office, a factory, a workshop, a mine, an oil or gas well, a quarry, or other place of extraction of natural resources.

Under the proposed treaty, a permanent establishment also includes a building site or a construction, assembly, or installation project if the site or project lasts for more than 12 months, and includes an installation or drilling rig or ship used for the exploration of natural resources if the activity continues in the treaty country for more than 12 months. The Technical Explanation states that the 12-month test applies separately to each individual site or project, with a series of contracts or projects that are interdependent both commercially and geographically treated as a single project. The Technical Explanation further states that if the 12-month threshold is exceeded, the site or project constitutes a permanent establishment as of the first day that work in the country began.

By contrast, the existing treaty provides an 18-month test that applies in the case of a building site or construction or assembly project. The change in the proposed treaty to a 12-month test conforms to the U.S. Model treaty.

The proposed treaty provides that the following activities of a preparatory or auxiliary character are deemed not to constitute a permanent establishment:  (1) the use of facilities solely for storing, displaying, or delivering goods or merchandise belonging to the enterprise; (2) the maintenance of a stock of goods or merchandise belonging to the enterprise solely for storage, display, or delivery or solely for processing by another enterprise; and (3) the maintenance of a fixed place of business solely for the purchase of goods or merchandise or for the collection of information for the enterprise. The proposed treaty also provides that the maintenance of a fixed place of business solely for the purpose of carrying on, for the enterprise, any other activity of a preparatory or auxiliary character does not constitute a permanent establishment. The proposed treaty further provides that a combination of these activities will not give rise to a permanent establishment if the combination results in an overall activity that is of a preparatory or auxiliary character.

Under the proposed treaty, if a person, other than an independent agent, is acting in a treaty country on behalf of an enterprise of the other country and has, and habitually exercises in such first country, the authority to conclude contracts in the name of such enterprise, the enterprise is deemed to have a permanent establishment in the first country in respect of any activities undertaken for that enterprise. This rule does not apply in cases in which the activities are limited to the activities described in the preceding paragraph that would not give rise to a permanent establishment if carried on by the enterprise through a fixed place of business. The Technical Explanation states that the language "in the name of that enterprise," which also appears in the OECD Model treaty, is intended to have the same meaning as "binding on the enterprise" found in the U.S. Model treaty. Both phrases are intended to encompass persons who have sufficient authority to bind the enterprise's participation in the business activity in the treaty country.

No permanent establishment is deemed to arise under the proposed treaty if the agent is a broker, general commission agent, or any other agent of independent status, provided that the agent is acting in the ordinary course of its business. The Technical Explanation states that whether an enterprise and an agent are independent is a factual determination, and that the relevant factors in making this determination include:  (1) the extent to which the agent operates on the basis of instructions from the principal; (2) the extent to which the agent bears business

26

risk; and (3) whether the agent has an exclusive or nearly exclusive relationship with the principal.

The proposed treaty provides that the fact that a company that is a resident of one country controls or is controlled by a company that is a resident of the other country or that carries on business in the other country does not cause either company to be a permanent establishment of the other country.  The Technical Explanation clarifies that, consistent with the U.S. Model treaty, such control is not taken into account in determining whether either company has a permanent establishment in the other treaty country.

## Article 6.  Income from Real Property

This article covers income from real property.  Under the proposed treaty, income derived by a resident of one country from real property situated in the other country may be taxed in that other country.  This rule and, in general, the other rules of this article are consistent with the rules in the U.S. and OECD Model treaties.  The rules governing gains from the sale of real property are included in Article 13 (Capital Gains).

The term "real property" generally has the meaning that it has under the law of the country in which the property in question is situated.  According to the Technical Explanation, in the case of the United States, the term "real property" has the meaning given to it by Treas. Reg. section 1.897-1(b).  The proposed treaty provides, however, that regardless of internal law definitions, real property also includes property accessory to real property, including livestock and equipment used in agriculture and forestry; rights to which the provisions of general law respecting landed property apply; usufruct of real property; and rights to variable or fixed payments as consideration for the working of, or the right to work, mineral deposits, sources, and other natural resources.  Ships, boats, and aircraft are not regarded as real property.

The proposed treaty specifies that the country in which the property is situated may also tax income derived from the direct use, letting, or use in any other form of real property.  The rules permitting source-country taxation of income from real property also apply to the income from real property of an enterprise.  This rule, according to the Technical Explanation, clarifies that the source country may tax the real property income of a resident of the other treaty country even if the income is not attributable to that resident's permanent establishment in the source country.  This rule is an exception to the general rule in Article 7 (Business Profits) that income is taxable in the source country only if it is attributable to a permanent establishment in that country.

Unlike the U.S. Model treaty, the proposed treaty does not include a rule allowing taxpayers to elect to be taxed on a net basis in the country in which the real property is situated.

**Article 7.  Business Profits**

<u>Internal taxation rules</u>

<u>United States</u>

U.S. law distinguishes between the U.S. business income and the other U.S. income of a nonresident alien or foreign corporation.  A nonresident alien or foreign corporation is subject to a flat 30-percent rate (or lower treaty rate) of tax on certain U.S.-source income if that income is not effectively connected with the conduct of a trade or business within the United States.  The regular individual or corporate rates apply to income (from any source) that is effectively connected with the conduct of a trade or business within the United States.  The performance of personal services within the United States may constitute a trade or business within the United States.

The treatment of income as effectively connected with a U.S. trade or business depends upon whether the source of the income is U.S. or foreign.  In general, U.S.-source periodic income (such as interest, dividends, rents, and wages) and U.S.-source capital gains are effectively connected with the conduct of a trade or business within the United States if the asset generating the income is used in (or held for use in) the conduct of the trade or business or if the activities of the trade or business are a material factor in the realization of the income.  All other U.S.-source income of a person engaged in a trade or business in the United States is treated as effectively connected with the conduct of a trade or business in the United States (under what is referred to as a "force-of-attraction" rule).

The income of a nonresident alien individual from the performance of personal services within the United States is excluded from U.S.-source income, and therefore is not taxed by the United States in the absence of a U.S. trade or business, if the following criteria are met:  (1) the individual is not in the United States for over 90 days during the taxable year; (2) the compensation does not exceed $3,000; and (3) the services are performed as an employee of, or under a contract with, a foreign person not engaged in a trade or business in the United States, or are performed for a foreign office or place of business of a U.S. person.

Foreign-source income generally is effectively connected income only if the foreign person has an office or other fixed place of business in the United States and the income is attributable to that place of business.  In those circumstances, only three types of foreign-source income are considered to be effectively connected income:  rents and royalties for the use of certain intangible property derived from the active conduct of a U.S. business; certain dividends and interest either derived in the active conduct of a banking, financing or similar business in the United States or received by a corporation the principal business of which is trading in stocks or securities for its own account; and certain sales income attributable to a U.S. sales office.  Special rules apply for purposes of determining the foreign-source income that is effectively connected with a U.S. business of an insurance company.

Any income or gain of a foreign person for any taxable year that is attributable to a transaction in another year is treated as effectively connected with the conduct of a U.S. trade or business if it would have been so treated had it been taken into account in that other year (section

864(c)(6)).  In addition, if any property ceases to be used or held for use in connection with the conduct of a trade or business within the United States, the determination of whether any income or gain attributable to a sale or exchange of that property occurring within ten years after the cessation of business is effectively connected with the conduct of a trade or business within the United States is made as if the sale or exchange occurred immediately before the cessation of business (section 864(c)(7)).

<u>Poland</u>

A company is considered to be a resident in Poland if its registered office or management is located in Poland.  A non-resident is subject to tax in Poland only on its Polish-source income and the same rate (19 percent) that applies to resident corporations.  The tax base for corporate income tax purposes is generally computed in accordance with general income determination rules relevant to Polish companies.  Certain adjustments are made to the profit reported for accounting purposes to arrive at corporate taxable income.  A branch of a non-resident company is required to compute its taxable income using the same rules applicable to Polish companies.  A tax-deductible cost is defined as a cost incurred for the purposes of deriving revenues, as well as for the purpose of securing or preserving a source of revenue.

Dividends received from Polish residents are subject to a 19-percent withholding tax unless paid to a Polish beneficiary holding at least a 10-percent share in the paying company for at least two years.  Dividends include income from the liquidation of a company and income from the redemption of shares (with certain exceptions).

The general withholding tax rate on interest and royalties paid to non-residents is 20 percent.  There is also a 20-percent withholding tax on payments made to non-residents for intangible services (such as consulting services).

<u>Proposed treaty limitations on internal law</u>

Under paragraph 1 of the proposed treaty, business profits of an enterprise of a treaty country may be taxed in the other treaty country only to the extent that they are attributable to a permanent establishment (as defined in Article 5) in that other country through which the enterprise carries on business.  If the enterprise carries on a business meeting the definition of a permanent establishment, the profits that are attributable to the permanent establishment are determined under the provisions of paragraph 2 of this article.  This rule is one of the basic treaty limitations on a country's right to tax income of a resident of the other country.  This article generally follows the OECD Model treaty which in operation is not substantively different from the U.S. Model treaty.[36]

Although the proposed treaty does not provide a definition of the term "business profits," the Technical Explanation states that the term is intended to cover income derived from any trade or business.  The term "business profits" includes income attributable to notional principal

---

[36]  For further discussion of the U.S. and OECD Model treaty provisions, see section VI.A. of this document.

contracts and other financial instruments to the extent that the income is attributable to a trade or business of dealing in such instruments or is otherwise related to a trade or business (as in the case of a notional principal contract entered into for the purpose of hedging currency risk arising from an active trade or business). Any other income derived from financial instruments is, according to the Technical Explanation, addressed in Article 21 (Other Income) unless it is specifically governed by another article.

As a result of the definitions of "enterprise" and "business" in Article 3 (General Definitions), the definition of business profits includes income from the furnishing of personal services. Accordingly, the Technical Explanation states, a consulting firm resident in one treaty country whose employees or partners perform services in the other treaty country through a permanent establishment may be taxed in that other country under this article, and not under Article 15 (Income from Employment), because Article 15 applies only to income of employees. With regard to the enterprise's employees themselves, however, their salaries remain subject to Article 15.

Paragraph 2 of the proposed treaty provides rules for the attribution of business profits to a permanent establishment. Under these rules, the treaty countries attribute to a permanent establishment the business profits that the permanent establishment might be expected to make, particularly in its dealings with other parts of the enterprise, if it were a separate and independent enterprise engaged in the same or similar activities under the same or similar conditions, taking into account the functions performed, assets used and risks assumed by the enterprise through the permanent establishment and through the other parts of the enterprise. Although paragraph 2 generally follows the OECD Model treaty, the proposed treaty differs in that Article 7 applies only for purposes of attributing business profits, and does not have relevance for purposes of Article 23 (Elimination of Double Taxation), other than related to an adjustment of profits as described below. The OECD Model treaty provides that the attribution of business profits to a permanent establishment under this article apply for purposes of this article as well as for purposes of Article 23.

The Technical Explanation explains that the concept of "attributable to" employs the arm's length principle reflected in the report of the OECD "2010 Report on the Attribution of Profits to Permanent Establishments" (the "2010 OECD Report") for determining the amount of business profit that is taxable to a permanent establishment, in place of the analogous but somewhat different effectively connected income concept of section 864(c). According to the Technical Explanation, the amount of income attributable to a permanent establishment may, depending on the circumstances, be greater or less than the amount of income that would be treated as effectively connected with the conduct of a U.S. trade or business under section 864. The profits attributable to a permanent establishment may be from sources within or without the treaty country. However, the business profits attributable to a permanent establishment include only those profits derived from the functions performed, assets used and risks assumed by the permanent establishment.

To illustrate, the Technical Explanation provides an example of a foreign corporation that has a significant amount of third party foreign-source royalty income attributable to a U.S. permanent establishment. The foreign corporation may find that it will pay less tax in the United States by applying the effectively connected rules under section 864(c), rather than the rules of

this article if the royalty income is not derived in the active conduct of a trade or business in the United States as under section 864(c)(4)(B)(i).  But, as described in the Technical Explanation to paragraph 2 of Article 1 (General Scope), if the foreign corporation chooses to apply section 864(c) to determine its effectively connected income, it may not also use the principles of this article to reduce its third-party royalty income by interbranch royalty expense, since doing so would be inconsistent with either the principles of the Code or the proposed treaty.[37]  Conversely, if the taxpayer opts to use this article to calculate the amount of business profits attributable to its U.S. permanent establishment, it must include all foreign-source income from third parties and interbranch income in its business profits whether or not such income would be effectively connected income under the Code, if attributable to functions performed, assets used or risks assumed by the U.S. permanent establishment.  This article can only be used to reduce the amount of tax that would have otherwise been calculated using section 864(c) principles.

The Technical Explanation includes details about the attribution of profits to the permanent establishment.  The Technical Explanation explains that the article refers specifically to the dealings between the permanent establishment and other parts of the enterprise to emphasize that the concept of a separate and independent enterprise within this paragraph requires that these dealings be treated in the same way as similar transactions taking place between independent enterprises.  The specific reference to dealings between the permanent establishment and other parts of the enterprise does not restrict the scope of the paragraph.  Where a transaction that takes place between the enterprise and an associated enterprise effects directly the determination of profits attributable to the permanent establishment (*e.g.* the acquisition by the permanent establishment from an associated enterprise of goods that will be sold through the permanent establishment), this article also requires that, for the purpose of computing the profits attributable to the permanent establishment, the conditions of the transaction be adjusted, if necessary, to reflect the conditions of a similar transaction between independent enterprises.  The Technical Explanation provides an example.

Example.  A permanent establishment situated in State S of an enterprise of State R that acquires property from an associated enterprise of State T.  If the price provided for in the contract between the two associated enterprises exceeds what would have been agreed between independent enterprises, this article of the proposed treaty between State R and State S will authorize State S to adjust the profits attributable to the permanent establishment to reflect what a separate and independent enterprise would have paid for the property.  In such case, State R will also be able to adjust the profits of the enterprise of State R under Article 9 (Associated Enterprises) of the treaty between State R and State T, which will trigger the application of the corresponding adjustment mechanism of Article 9 of that treaty.

The Technical Explanation explains the two steps involved in the computation of profits attributable to a permanent establishment under the proposed treaty, taking into account the profits from all its activities, transactions with both associated and independent enterprises, and dealings with other parts of the enterprise.  The first step requires a functional and factual analysis to determine:  the attribution to the permanent establishment of the rights and

---

[37] See Rev. Rul. 84-17, 1984-1 C.B. 308.

obligations arising out of transactions between the enterprise of which the permanent establishment is a part and separate enterprises; the identification of significant people functions relevant to the attribution of economic ownership of assets, and the attribution of economic ownership of assets to the permanent establishment; the identification of significant people functions relevant to the assumption of risks, and the attribution of risks to the permanent establishment; the identification of other functions of the permanent establishment; the recognition of dealings between the permanent establishment and other parts of the enterprise; and the attribution of capital based on the assets and risks attributed to the permanent establishment.  The second step is to determine a price for any such dealings that are attributed to the permanent establishment in accordance with the 2010 OECD Report.  Thus, any of the methods permitted in the 2010 OECD Report, including profits methods, may be used as appropriate and in accordance with the principles of the OECD Transfer Pricing Guidelines. According to the Technical Explanation, the attribution methods apply only for purposes of attributing profits within the legal entity.  It does not create legal obligations or other tax consequences that would result from transactions having independent legal significance.

The Technical Explanation explains that U.S. domestic regulations generally do not recognize internal "transactions" as they do not have legal significance.  In contrast, the proposed treaty provides that such internal dealings may be used to allocate income in cases where the dealings accurately reflect the allocation of risk within the enterprise.

According to the Technical Explanation, a financial institution's use of internal dealings to allocate income within an enterprise may produce results under Article 7 that are significantly different from the results under the Code's effectively connected income rules.  As an example, the Technical Explanation states that income from interbranch notional principal contracts may be taken into account under Article 7 even though those transactions may be ignored under U.S. domestic law.

The Technical Explanation states that, in computing taxable business profits of a permanent establishment, deductions are allowed for expenses incurred for the purposes of the permanent establishment.  These deductions may include compensation to other parts of the enterprise for functions performed for the benefit of the permanent establishment, if they are functions that would be compensated at arm's length.

According to the Technical Explanation, for these purposes, a permanent establishment cannot be funded entirely with debt, and must have sufficient capital to carry on its activities as if it were a distinct and separate enterprise.  To the extent that the permanent establishment has not booked adequate capital, a treaty country may attribute such capital to the permanent establishment and deny an interest deduction to the extent necessary to reflect that attribution. The method prescribed by U.S. domestic law for making this attribution is found in Treas. Reg. section 1.882-5.  Both Treas. Reg. section 1.882-5 and the method prescribed in this paragraph start from the premise that all of the capital of the enterprise supports all of the assets and risks of the enterprise, and therefore the entire capital of the enterprise must be allocated to its various businesses and offices.

However, the Technical Explanation points out that Treas. Reg. section 1.882-5 does not take into account the fact that there is more risk associated with some assets than others.

Accordingly, in some cases, Treas. Reg. section 1.882-5 would require a taxpayer to allocate more capital to the United States, and therefore would reduce the taxpayer's interest deduction more than is appropriate.  To address these cases, the proposed treaty allows a taxpayer to apply a more flexible approach that takes into account the relative risk of its assets in the various jurisdictions in which it does business.

Paragraph 3 of the proposed treaty provides that where, in accordance with paragraph 2 of the proposed treaty, a treaty country adjusts the profits that are attributable to a permanent establishment of an enterprise of one of the treaty countries and taxes profits of the enterprise that have been charged to tax in the other treaty country, the other treaty country will, to the extent necessary to eliminate double taxation, make and appropriate adjustment if it agrees to the adjustment made by the first treaty country.  If the other treaty country does not agree, the treaty countries shall eliminate any double taxation by mutual agreement.  Paragraph 3 is an alternative paragraph available under the OECD Model treaty as explained further in the section VI.A. of this document.[38]

Paragraph 4 of the proposed treaty coordinates the provisions of this article and other provisions of the convention.  Where business profits include items of income that are dealt with separately in other articles of the proposed treaty, those other articles, and not the business profits article, generally govern the treatment of those items of income.  Thus, for example, the taxation of dividends is determined under the rules of Article 10 (Dividends), and not by the rules of this article, except as specifically provided in Article 10 (that is, when dividends are attributable to a permanent establishment).

The proposed treaty, in paragraph 5, provides an anti-abuse provision.  For purposes of the taxation of business profits, income may be attributable to a permanent establishment (and therefore may be taxable in the source country) even if the payment of the income is deferred until after the permanent establishment has ceased to exist.  The Technical Explanation explains that his rule incorporates into the proposed treaty the rule of section 864(c)(6), but not section 864(c)(7).  This rule applies for purposes of the rules for business profits under this article, dividends (Article 10, paragraph 6), interest (Article 11, paragraph 4), royalties (Article 13, paragraph 3), gains (Article 14, paragraph 5) and other income (Article 21, paragraph 2).

The Technical Explanation notes that Article 7 is subject to the saving clause of paragraph 4 of Article 1 (General Scope).  Thus, if a U.S. citizen who is a resident of Poland derives business profits from the United States that are not attributable to a permanent establishment in the United States, the United States may, subject to the special foreign tax credit rules of paragraph 4 of Article 23 (Relief from Double Taxation), tax those profits, notwithstanding that paragraph 1 of this article would exempt the income from U.S. tax.

The Technical Explanation further notes that this article is subject to Article 22 (Limitation on Benefits).  Consequently, a Polish enterprise with income that is effectively

---

[38] See also the Commentaries to the OECD Model treaty, paragraphs 68-70.

connected to a U.S. trade or business is not entitled to the benefits of this article unless the resident carrying on the enterprise qualifies for those benefits under Article 22.

### Article 8.  Shipping and Air Transport

This article provides for exclusive residence-country taxation of profits of an enterprise from the operation of ships or aircraft in international traffic.  Income from the disposition of ships, aircraft, and containers is covered in paragraphs 5 and 6 of Article 14 (Capital Gains).

The United States generally taxes the U.S.-source income of a foreign person from the operation of ships or aircraft to or from the United States.  An exemption from U.S. tax is provided if the income is earned by a corporation or nonresident alien individual organized or resident in a foreign country that grants an equivalent exemption to U.S. corporations and residents.  Under the present treaty, Poland is considered to grant an equivalent exemption.[39]

Paragraph 4 of Article 7 (Business Profits) provides that if profits include items of income that are described in both Article 7 and other articles of the proposed treaty, including this article, the provisions of those other articles are not affected by the provisions of Article 7.  Therefore, the rules of this article are not affected by the general rule of Article 7 that profits attributable to a permanent establishment that an enterprise of a treaty country has in the other treaty country may be taxed in the other treaty country.  Consequently, the profits of an enterprise of a treaty country from the operation of ships or aircraft in international traffic may not be taxed in the other treaty country even if the enterprise has a permanent establishment in that other treaty country.

"International traffic" is defined in subparagraph 1(f) of Article 3 (General Definitions) as any transport by a ship or aircraft, except when the transport is solely between places in a treaty country.

The proposed treaty includes a nonexclusive list of items that constitute profits from the operation of ships or aircraft in international traffic.  That list includes profits derived from the rental of ships or aircraft on a full basis (*i.e.*, with crew).  The list also includes profits from the rental of ships or aircraft on a bareboat basis (*i.e.*, without crew), whether the ships or aircraft are operated in international traffic by the lessee or the rental income is incidental to the lessor's other profits from the operation of ships or aircraft in international traffic.

The proposed treaty provides that profits of an enterprise from the inland transport of property or passengers within either treaty country are treated as profits from the operation of ships or aircraft in international traffic (and are therefore governed by this article) if the transport is undertaken as part of international traffic.  Thus, according to the Technical Explanation, if a U.S. enterprise contracts to carry property from Poland to a U.S. city and, as part of that contract, transports the property by truck from its point of origin at an airport in Poland (or contracts with a trucking company to carry the property to the airport), the income earned by the U.S. enterprise from the overland leg of the transport is taxable only in the United States.  Similarly, the

---

[39]  *See* Rev. Rul. 2008-17, 2008-1 C.B. 626.

Technical Explanation states that this article also applies to all income derived from a contract for the international transport of goods even if the goods are transported to the port by a lighter (a barge used in loading and unloading ships) and not by the vessel that carries the goods in international waters.

The proposed treaty provides that profits of an enterprise of a treaty country from the use, maintenance, or rental of containers (including trailers, barges, and related equipment for the transport of containers) used in international traffic are taxable only in that treaty country if such use, maintenance or rental, as the case may be, is incidental to the operation of ships or aircraft in international traffic. According to the Technical Explanation, this exclusive residence-country taxation applies even if the enterprise is not engaged in the operation of ships or aircraft in international traffic and even if the enterprise has a permanent establishment in the other treaty country.

The rules applicable to profits of an enterprise of a treaty country from the operation of ships or aircraft in international traffic also apply to the proportionate share of profits from the operation of ships or aircraft in international traffic from participation in a pool, a joint business, or an international operating agency. These arrangements are common methods of cooperation among international shipping and air transport companies. For example, airlines from two countries may share the transport of passengers between the treaty countries.

The Technical Explanation notes that this article is subject to the saving clause of paragraph 4 of Article 1 (General Scope). Consequently, if a U.S. citizen who is a resident of Poland derives profits from the operation of ships or aircraft in international traffic, the United States may tax those profits as part of the citizen's worldwide income (subject to the proposed treaty's foreign tax credit rules). The benefit of exclusive residence-country taxation is available to an enterprise of a treaty country only if that enterprise satisfies the limitation on benefits requirements of Article 22 (Limitation on Benefits).

## Article 9.  Associated Enterprises

The proposed treaty, like most other U.S. tax treaties, contains an arm's-length pricing provision. The proposed treaty recognizes the right of each country to make an allocation of profits to an enterprise of that country in the case of transactions between related enterprises, if conditions are made or imposed between the two enterprises in their commercial or financial relations that differ from those that would be made between independent enterprises. In such a case, a country may allocate to such an enterprise the profits (or losses) that it would have accrued but for the conditions so imposed. The proposed treaty is consistent with the U.S. Model and OECD Model treaties.

For purposes of the proposed treaty, an enterprise of one country is related to an enterprise of the other country if one of the enterprises participates directly or indirectly in the management, control, or capital of the other enterprise. An enterprise is also related if the same persons participate directly or indirectly in the enterprise's management, control, or capital.

The Technical Explanation clarifies that this article permits tax authorities to address thin capitalization issues. Tax authorities may scrutinize more than the rate of interest charged on a

loan between related persons. They may examine the capital structure of an enterprise, whether a payment in respect of that loan should be treated as interest, and, if it is treated as interest, under what circumstances interest deductions should be allowed to the payor.

Under the proposed treaty, when a redetermination of tax liability has been made by one country under the provisions of this article, and the other country agrees with that redetermination, then that other country will make an appropriate adjustment to the amount of tax paid in that country on the redetermined income. In making such adjustment, due regard is to be given to other provisions of the proposed treaty. As explained in the Technical Explanation, if the effect of an adjustment is to treat a U.S. corporation as having made a distribution of profits to its parent corporation in Poland, the provisions of Article 10 (Dividends) will apply, and the United States may impose a five percent withholding tax on the dividend. Also, if under Article 23 (Elimination of Double Taxation), Poland generally gives a credit for taxes paid with respect to such dividends, it would also be required to do so in this case.

The proposed treaty's saving clause retaining full taxing jurisdiction in the country of residence or citizenship does not apply in the case of such adjustments. Accordingly, internal statute of limitations provisions do not prevent the allowance of appropriate correlative adjustments. However, the Technical Explanation states that statutory or procedural limitations cannot be overridden to impose additional tax because paragraph 2 of Article 1 (General Scope) provides that the proposed treaty cannot restrict any statutory benefit.

## Article 10.  Dividends

### Overview

The dividends article of the proposed treaty generally allows full residence-country taxation and limited source-country taxation of dividends. The proposed treaty includes a generally applicable maximum rate of withholding at source of 15 percent and a reduced five-percent maximum rate for dividends received by a company owning at least 10 percent of the dividend-paying company. A zero rate of withholding tax generally applies to dividends received by pension funds if the dividends are not derived from the trade or business by the pension fund or through an associated enterprise. Special rules apply to dividends received from regulated investment companies ("RICs") and real estate investment trusts ("REITs"). The provisions in this article are generally consistent with the U.S. and OECD Model treaties, although the proposed treaty does not provide the complete exemption from withholding tax for certain direct dividends that is found in a number of recent U.S. tax treaties and protocols.

### Internal taxation rules

### United States

The United States generally imposes a 30-percent tax on the gross amount of U.S.-source dividends paid to nonresident alien individuals and foreign corporations. The 30-percent tax does not apply if the foreign recipient is engaged in a trade or business in the United States and the dividends are effectively connected with that trade or business. In that case, the foreign recipient is subject to U.S. tax on the dividends on a net basis at graduated rates in the same manner in which a U.S. person would be taxed.

36

Under U.S. law, the term "dividend" generally means any distribution of property made by a corporation to its shareholders from current or accumulated earnings and profits.

In general, corporations are not entitled under U.S. law to a deduction for dividends paid. Thus, the withholding tax on dividends theoretically represents imposition of a second level of tax on corporate taxable income. Treaty reductions of this tax reflect the view that where the United States already imposes corporate-level tax on the earnings of a U.S. corporation, a 30-percent withholding rate may represent an excessive level of source-country taxation. Moreover, the reduced rate of tax, or the elimination of source country withholding tax, often applied by treaty to dividends paid to direct investors reflects the view that the source-country tax on payments of profits to a substantial foreign corporate shareholder may properly be reduced further or eliminated to avoid double corporate-level taxation and to facilitate international investment.

A REIT is a U.S. domestic corporation, trust, or association that is subject to the regular corporate income tax, but that receives a deduction for dividends paid to its shareholders if certain conditions are met. To qualify for the deduction for dividends paid, a REIT must distribute most of its income. As a result of the deduction for dividends paid, a REIT generally does not pay Federal income tax. Except for capital gain dividends, a distribution of REIT earnings is generally treated by the recipient as a dividend rather than as income of the same type as the underlying earnings.[40] This distribution is subject to the U.S. 30-percent withholding tax when paid to foreign owners. However, the receipt of a distribution from a REIT is generally treated as a disposition of a U.S. real property interest by the recipient to the extent that it is attributable to a sale or exchange of a U.S. real property interest by the REIT.[41]

A REIT generally is organized to allow investment in primarily passive real estate investments. As such, income of a REIT often includes rentals from real estate holdings or interest from loans secured by real estate mortgages. Like dividends, U.S.-source rental income of foreign persons generally is subject to the 30-percent withholding tax (unless the recipient makes an election to have the rental income taxed in the United States on a net basis at the regular graduated rates). Unlike the withholding tax on dividends, however, the withholding tax on rental income generally is not reduced in U.S. income tax treaties. When rental income (or interest income) of a REIT is distributed to a foreign shareholder as a REIT dividend, it is treated as a dividend under U.S. internal law. U.S.-source interest income of foreign persons is not subject to U.S. withholding tax in certain circumstances. A REIT dividend does not, however, pass through interest characterization of the REIT's underlying earnings.

---

[40] Because a REIT generally does not pay corporate level tax, certain U.S. benefits of dividend treatment are not available. A U.S. corporate shareholder is not generally entitled to a dividends-received deduction for REIT dividends. REIT dividends generally are not qualified dividends eligible for the 20-percent rate available for individual shareholders.

[41] There is an exception for distributions to a shareholder that owns five percent or less of the REIT, if the REIT stock is regularly traded on an established securities market located in the United States. Sec. 897(h)(1). These distributions are treated as dividends under U.S. internal law.

U.S. internal law also generally treats a RIC as both a corporation and as an entity not subject to corporate tax to the extent it distributes substantially all of its income.  The purpose of a RIC is to allow investors to hold diversified portfolios of securities.  Dividends paid by a RIC generally are treated as dividends received by the payee, and the RIC generally pays no tax because it is permitted to deduct dividends paid to its shareholders in computing its taxable income.  However, a RIC generally may pass through to its shareholders the character of its net long-term and, before January 1, 2014[42], net short-term capital gains by designating a dividend it pays as a long-term or short-term capital gain dividend, to the extent that the RIC has net capital gains.  Nonresident aliens and foreign corporations generally are not subject to tax on capital gains.  A distribution before January 1, 2014[43] to a nonresident alien or foreign corporation made by a RIC that is (or, if certain exceptions were disregarded, would be) a U.S. real property holding corporation, however, is treated as gain recognized by that nonresident alien or foreign corporation from the sale or exchange of a U.S. real property interest to the extent the gain is attributable to gain from sales or exchanges of U.S. real property interests.[44]

Similarly, a RIC that earns interest income that would not be subject to U.S. tax if earned by a foreign person directly ("qualified interest income")[45] generally may designate a dividend it pays before January 1, 2014 as derived from that interest income, to the extent of that income. Nonresident aliens and foreign corporations are not subject to tax on interest-related dividends. The aggregate amount that may be designated by a RIC as interest-related dividends generally is limited to the sum of qualified interest income less the amount of expenses of the RIC properly allocable to the interest income.

<u>Poland</u>

Poland generally imposes a 19 percent gross-basis withholding tax on Polish-source dividend payments to nonresident companies.

---

[42] This short-term capital gain designation rule of Code sec. 871(k) was a temporary provision.

[43] This look-through rule for certain distributions by certain RICs was a temporary provision.  Sec. 897(h)(1), (4)(a)(i)(II), (4)(a)(ii).

[44] The exception for five-percent-or-less REIT shareholders described above also applies for distributions by RICs.

[45] Qualified interest income of the RIC is equal to the sum of its U.S.-source income with respect to:  (1) bank deposit interest; (2) short term original issue discount that is currently exempt from the gross-basis tax under section 871; (3) any interest (including amounts recognized as ordinary income in respect of original issue discount, market discount, or acquisition discount under the provisions of sections 1271-1288, and such other amounts as regulations may provide) on an obligation that is in registered form, unless it is earned on an obligation issued by a corporation or partnership in which the RIC is a 10-percent shareholder or is contingent interest not treated as portfolio interest under section 871(h)(4); and (4) any interest-related dividend from another RIC.

Proposed treaty limitations on internal law

In general

Under the proposed treaty, dividends paid by a company that is a resident of a treaty country to a resident of the other country may be taxed in that other country.  The dividends also may be taxed by the country in which the dividend-paying company is resident (the source country), but the rate of tax is limited.  Under the proposed treaty, source-country taxation of dividends generally is limited to 15 percent of the gross amount of the dividends paid to residents of the other treaty country.  A lower rate of five percent applies if the beneficial owner of the dividends is a company that owns directly at least 10 percent of the voting stock of the dividend-paying company.  According to the Technical Explanation, shares are considered to be voting shares if they provide the power to elect, appoint, or replace any person vested with the powers ordinarily exercised by the board of directors of a U.S. corporation.

The term "beneficial owner" is not defined in the proposed treaty and therefore is defined under the internal law of the country imposing tax (i.e., the source country).  The Technical Explanation states that the beneficial owner of a dividend for purposes of this article is the person to which the dividend income is attributable for tax purposes under the laws of the source country.

According to the Technical Explanation, however, special rules apply to companies holding shares through fiscally transparent entities, such as partnerships.  In such cases, the rules of paragraph 6 of Article 1 (General Scope) of the proposed treaty apply to determine whether the dividends should be treated as derived by a resident of a treaty country.  The laws of the residence country determine who derives the dividend, and the laws of the source country determine whether the person who derives the dividends is the beneficial owner of the dividends. The principles of paragraph 6 of Article 1 of the treaty also apply to determine whether other requirements have been satisfied, such as the ownership threshold that must be met to qualify for the 10-percent rate under this article.

The proposed treaty provides a zero rate of withholding tax for dividends received by a pension fund, provided that the dividends are not derived from the carrying on of a business by the pension fund or through an associated enterprise.  For these purposes, the term pension fund is defined in subparagraph 1(k) of Article 3 (General Definitions).

Dividends paid by U.S. RICs and REITs

The proposed treaty generally denies the five-percent rate of withholding tax to dividends paid by U.S. RICs and REITs.

The 15-percent rate of withholding (or zero rate for dividends received by a pension fund) generally is allowed for dividends paid by a RIC.  The 15-percent rate of withholding (or zero rate for dividends received by a pension fund) is allowed for dividends paid by a REIT, provided one of three additional conditions is met:  (1) the beneficial owner of the dividends is an individual or pension fund holding an interest of not more than 10 percent in the REIT; (2) the dividends are paid with respect to a class of stock that is publicly traded, and the beneficial owner of the dividends is a person holding an interest of not more than five percent of any class

of the REIT's stock; or (3) the beneficial owner of the dividends holds an interest in the REIT of not more than 10 percent, and the REIT is diversified (i.e., the value of no single interest in real property held by the REIT exceeds 10 percent of the gross value of the REIT's total interest in real property).

The proposed treaty also provides that the rules described above apply to dividends paid by companies resident in Poland that the competent authorities have determined by mutual agreement are similar to U.S. RICs and REITs.

<u>Definitions and special rules and limitations</u>

The proposed treaty generally defines dividends as income from shares or other participation rights that are not treated as debt, as well as income from other corporate rights that is subject to the same tax treatment by the source country as income from shares (for example, constructive dividends).  The Technical Explanation notes that the term is defined broadly and flexibly, and is intended to cover all arrangements that yield a return on an equity investment in a corporation as determined under the tax law of the source country.

The proposed treaty's reduced rates of tax on dividends do not apply if the dividend recipient carries on business through a permanent establishment in the source country and the holding in respect of which the dividends are paid is effectively connected with that permanent establishment.  In this case, the dividends are taxed as business profits (Article 7).

The proposed treaty prevents each treaty country from imposing a tax on dividends paid by a resident of the other treaty country unless the dividends are paid to a resident of the first country or are attributable to a permanent establishment in that country.  The proposed treaty also restricts the rights of a treaty country to impose corporate level taxes, other than a branch profits tax (the rules for which are in Article 12, described below) on undistributed profits.  The Technical Explanation notes that this rule does not restrict a treaty country's right to tax its resident shareholders on undistributed earnings of a corporation resident in the other country.  Thus, the authority of the United States to impose taxes on subpart F income, earnings deemed invested in U.S. property, and income of a passive foreign investment company (a PFIC) that is a qualified electing fund is not restricted under the proposed treaty.

<u>Relation to other articles</u>

The Technical Explanation notes that the saving clause of paragraph 4 of Article 1 of the proposed treaty (General Scope) permits the United States to tax dividends received by its residents and citizens, subject to the special foreign tax credit rules of paragraph 4 of Article 23 (Elimination of Double Taxation), as if the proposed treaty had not come into effect.

The benefits of the dividends article are also subject to the provisions of Article 22 of the proposed treaty (Limitation on Benefits).

## Article 11.  Interest

### Internal taxation rules

### United States

Subject to several exceptions (such as those for portfolio interest, bank deposit interest, and short-term original issue discount), the United States imposes a 30-percent withholding tax on U.S.-source interest paid to foreign persons under the same rules that apply to dividends. U.S.-source interest, for purposes of the 30-percent tax, generally is interest on the debt obligations of a U.S. person, other than a U.S. person that satisfies specified foreign business requirements.  Also subject to the 30-percent tax is interest paid by the U.S. trade or business of a foreign corporation.  A foreign corporation is subject to a branch-level tax on certain "excess interest" of a U.S. trade or business of that corporation.  Under this rule, an amount equal to the excess of the interest deduction allowed to the U.S. business over the interest paid by the business is treated as if paid by a U.S. corporation to a foreign parent and, therefore, is subject to the 30-percent withholding tax.

Portfolio interest generally is defined as any U.S.-source interest that is not effectively connected with the conduct of a trade or business if the interest (1) is paid on an obligation that satisfies certain registration requirements and (2) is not received by a 10-percent owner of the issuer of the obligation, taking into account shares owned by attribution.  The portfolio interest exemption does not apply to certain contingent interest income.

If an investor holds an interest in a fixed pool of real estate mortgages that is a real estate mortgage interest conduit ("REMIC"), the REMIC generally is treated for U.S. tax purposes as a pass-through entity, and the investor is subject to U.S. tax on a portion of the REMIC's income (generally, interest income).  If the investor holds a so-called "residual interest" in the REMIC, the Code provides that a portion of the net income of the REMIC that is taxed in the hands of the investor – referred to as the investor's "excess inclusion" – may not be offset by any net operating losses of the investor, must be treated as unrelated business income if the investor is an organization subject to the unrelated business income tax, and is not eligible for any reduction in the 30-percent rate of withholding tax (by treaty or otherwise) that would apply if the investor otherwise were eligible for such a rate reduction.

### Poland

Poland generally imposes a 20-percent gross-basis withholding tax on Polish-source interest payments to nonresident companies.

### Proposed treaty limitations on internal law

The proposed treaty restricts the ability of each treaty country to tax interest income arising in that country (the source country) when that interest income is beneficially owned by a resident of the other treaty country (the residence country).  The proposed treaty generally permits full residence-country taxation of interest income and allows the source country to tax the interest income at a rate not exceeding five percent of the gross amount of the interest.  The

allowance of source-country taxation of interest income contrasts with the U.S. Model's general rule of exclusive residence-country taxation.

Although the source country is generally permitted to tax interest income at a five-percent rate on the gross amount of the interest, in certain circumstances, the proposed treaty forbids source-country taxation.  Source-country taxation of interest income is not permitted if (1) the interest income is beneficially owned by the government of the other treaty country, by a political subdivision or a local authority (for example, a State or local government) or statutory body in that other country, or by the central bank of the other treaty country; (2) the interest income is beneficially owned by a resident of the other treaty country and is paid by the government of the source country, by a political subdivision or a local authority (for example, a State or local government) or statutory body in that source country, or by the central bank of source country; (3) the interest income is beneficially owned by a resident of the other treaty country and is paid in respect of a loan, debt-claim, or credit that is owed to, or is made, provided, guaranteed, or insured by, the government of that other treaty country, by a political subdivision or a local authority (for example, a State or local government) or a statutory body or export financing agency in that other country; (4) the interest is beneficially owned by a pension fund that is a resident of the other treaty country unless the interest is derived from the pension's fund direct or indirect carrying on of a business; or (5) the interest is beneficially owned by a bank, an insurance company, or an enterprise that is unrelated to the payor of the interest and that substantially derives its gross income from the active and regular conduct of a lending or finance business (other than a bank).  For the purpose of this rule, a lending or finance business includes the business of making loans; purchasing or discounting accounts receivable, notes, or installment obligations; engaging in finance leasing (including purchasing, servicing, and disposing of finance leases and related assets); issuing letters of credit or providing guarantees; or providing charges and credit card services.

The proposed treaty provides two anti-abuse exceptions to the general source-country exemption from tax on interest.  The first exception relates to contingent interest payments.  If interest arising in a treaty country is determined with reference to (1) receipts, sales, income, profits, or other cash flow of the debtor or a related person, (2) any change in the value of any property of the debtor or a related person, or (3) any dividend, partnership distribution, or similar payment made by the debtor or a related person, that country may tax the interest in accordance with its law.  If, however, the beneficial owner of contingent interest arising in either the United States or Poland is a resident of the other treaty country, the interest may not be taxed at a rate exceeding 15 percent of the gross amount of the interest (that is, the rate prescribed in Article 10 for dividends derived by less-than-10-percent shareholders).  The Technical Explanation states that contingent interest is of a type described by section 871(h)(4)(C).

The second anti-abuse exception provides that the exemption from source-country taxation does not apply to interest that accrues with respect to the ownership interests in an arrangement used for the securitization of real estate mortgages or other assets to the extent that the amount of the interest accrued exceeds the return on comparable debt instruments as specified by the internal law of that country.  That interest may be taxed by each treaty country in accordance with its domestic law.  According to the Technical Explanation, this exception is consistent with the policy of section 860G(b) that excess inclusions with respect to a REMIC should bear full U.S. tax in all cases.

The proposed treaty defines interest as income from debt-claims of every kind, whether or not secured by mortgage and whether or not carrying a right to participate in the debtor's profits. In particular, interest includes income from government securities and from bonds or debentures, including premiums and prizes attaching to those securities, bonds, or debentures. The term "interest" also includes all other income that is treated as income from money lent under the tax laws of the treaty country in which the income arises. Interest does not include income covered in Article 10 (Dividends). Penalty charges for late payment also are not treated as interest.

The rules of this article permitting residence-country taxation of interest income and limiting source-country taxation of interest income do not apply if the beneficial owner of the interest carries on business through a permanent establishment in that source country and the debt-claim in respect of which the interest is paid is effectively connected with that permanent establishment. In that circumstance, the interest is taxed as business profits (Article 7). According to the Technical Explanation, interest effectively connected with a permanent establishment but received after the permanent establishment is no longer in existence is similarly taxable under Article 7.

The proposed treaty includes a rule for determining the source of interest. Interest generally is deemed to arise in the payor's country of residence. If, however, the person paying the interest (whether or not a resident of either of the treaty countries) has a permanent establishment in a treaty country, the indebtedness on which the interest is paid was incurred in connection with that permanent establishment, and the interest is borne (that is, is deductible) by that permanent establishment, the interest is deemed to arise in the treaty country in which the permanent establishment is situated. This source rule is equivalent to the rule in the OECD Model treaty. The U.S. Model treaty does not include a rule for the source of interest payments because the U.S. Model treaty generally forbids source-country taxation of interest.

The proposed treaty addresses non-arm's-length interest charges between a payor and a beneficial owner that have a special relationship. Paragraph 8 of this article provides that the article applies only to the amount of interest that would have been agreed in the absence of a special relationship. Any excess amount is taxable according to the laws of each treaty country, with due regard being given to other provisions of the proposed treaty. For example, excess interest paid to a parent corporation may be treated as a dividend under a country's internal laws and, accordingly, would be entitled to the benefits of Article 10 (Dividends). The Technical Explanation notes that the term "special relationship" is not defined in the proposed treaty and states that the United States considers the term to include the relationships described in Article 9 (Associated Enterprises). Those relationships, according to the Technical Explanation, involve control as defined under the transfer pricing rules of section 482.

The proposed treaty includes a rule that permits each treaty country to impose a branch-level interest tax on a corporation resident in the other treaty country. This branch-level interest tax rule is in paragraph 2 of Article 12 (Branch Profits) and is described below in the description of Article 12.

The Technical Explanation notes that the benefits of this article, like benefits provided by other articles, are subject to the saving clause of paragraph 4 of Article 1 (General Scope) and are available only if a resident satisfies the limitation-on-benefits requirements of Article 22.

**Article 12. Branch Profits**

This article of the proposed treaty provides rules related to the imposition of a branch profits tax and a branch-level interest tax.

Branch profits tax

The proposed treaty allows one treaty country (the source country) to impose a branch profits tax on a company resident in the other treaty country if the company earns income through a permanent establishment in the source country or if the company is subject to net-basis taxation on income earned in the source country that is taxed under Article 6 (Income from Real Property) or under paragraph 1 of Article 14 (Capital Gains). This tax is in addition to other taxes allowable under the proposed treaty.

The branch profits tax may be imposed only on the portion of the income described above that represents the dividend equivalent amount in the case of the United States, and an amount analogous to the dividend equivalent amount in the case of Poland. The rate of tax may not exceed the rate specified in subparagraph 2(a) of Article 10 (Dividends), which is five percent.

Branch-level interest tax.

The proposed treaty allows one treaty country (the source country) to tax the excess, if any, of the interest allocable to the profits of a company resident in the other treaty country that are either attributable to a permanent establishment in the source country (including gains under paragraph 4 of Article 14), or subject to tax in the source country under Article 6 or paragraph 1 of Article 14, over the interest paid on indebtedness related to that permanent establishment, or in the case of profits subject to tax under Article 6 or paragraph 1 of Article 14, over the interest paid by that trade or business in the source country. This excess interest may be taxed as if it were interest arising in the source country but beneficially owned by a resident of the other treaty country. The rate of tax may not exceed the applicable rate provided in paragraph 2 of Article 11 (Interest), which allows for a maximum rate of five percent.

**Article 13. Royalties**

The proposed treaty permits limited source-country taxation of royalties. The proposed treaty provides that royalties arising in the source country and beneficially owned by a resident of the other treaty country may be subject to a withholding tax imposed at a rate no greater than five percent.

The term "royalties" as used in this article means payments of any kind received as consideration for the use of, or the right to use, any copyright of literary, artistic, or scientific work (including cinematographic films), any patent, trademark, design or model, plan, secret formula or process, or for information concerning industrial, commercial, or scientific

experience. The term royalties also includes gain from the disposition of any such property, to the extent the gain is contingent on the productivity, use, or disposition of the property. The Technical Explanation states that any gain from the disposition of royalty-producing property that is not contingent on the productivity, use, or disposition of the property is gain addressed in Article 14 (Capital Gains). Unlike the U.S. Model treaty, the proposed treaty also includes as royalties any payments of any kind received as consideration for the use of, or the right to use, any industrial, commercial, or scientific equipment.

The term royalties does not expressly include consideration for the use of computer software. The Technical Explanation states that consideration received for the use, or the right to use, computer software is treated either as royalties or as business profits, depending on the facts and circumstances of the transaction giving rise to the payment. The primary factor in determining whether consideration is treated as royalties or as business profits is the nature of the rights transferred.

The reduced source-country withholding tax does not apply if the beneficial owner of the royalties carries on a business through a permanent establishment in the source country, and the right or property in respect of which the royalties are paid is effectively connected with such permanent establishment. In that event, the royalties are taxed as business profits (Article 7). According to the Technical Explanation, royalties attributable to a permanent establishment, but received after the permanent establishment is no longer in existence, remain taxable under the provisions of Article 7 (Business Profits), and not under this article.

The proposed treaty addresses the issue of non-arm's-length royalties between related parties (or parties otherwise having a special relationship) by providing that this article applies only to the amount of arm's-length royalties. Any amount of royalties paid in excess of the arm's-length amount is taxable according to other provisions of the proposed treaty. For example, excess royalties paid by a subsidiary corporation to its parent corporation may be treated as a dividend under local law and therefore entitled to the benefits of Article 10 (Dividends).

The Technical Explanation states that the saving clause of paragraph 4 of Article 1 (General Scope) permits the United States to tax its citizens and residents as if the proposed treaty had not come into effect. In addition, the benefits of this article are available only to a treaty country resident that satisfies one of the conditions in Article 22 (Limitation on Benefits).

## Article 14. Capital Gains

The proposed treaty provides rules governing when a treaty country may tax gains from the disposition of property by a resident of the other treaty country. The rules are generally consistent with those included in the U.S. Model treaty.

Under the proposed treaty, gains derived by a resident of one treaty country that are attributable to the disposition of real property situated in the other country may be taxed in that other country. For the purposes of this article, real property situated in the other treaty country includes: (1) real property referred to in Article 6 (Income from Real Property)—that is, an interest in the real property itself; and (2) in the case of the United States, a U.S. real property

interest. Under U.S. internal law, a U.S. real property interest includes, among other property, shares in a U.S. corporation that owns sufficient U.S. real property interests to satisfy an asset-based test. The Technical Explanation clarifies that the taxation of distributions made by a REIT or by certain RICs is governed by this Article, rather than Article 10 (Dividends), when they are attributable to gains derived from the alienation of real property.

In addition, the proposed treaty permits Poland to tax gains derived by a resident of the United States from (1) the disposition of shares or comparable interests that derive more than 50 percent of their value, directly or indirectly, from real property situated in Poland, or (2) an interest in a partnership or trust to the extent that the assets of the partnership or trust consist in aggregate more than 50 percent of real property situated in Poland or of shares and comparable interests described in (1).

The proposed treaty includes a standard provision (included in the U.S. and OECD Model treaties) that permits a treaty country to tax gains from the disposition of movable property (that is, property other than real property) that forms a part of the business property of a permanent establishment that an enterprise of the other treaty country has in the first treaty country. This rule permits source-country taxation of gains from disposition of the permanent establishment (alone or with the enterprise as a whole). According to the Technical Explanation, this taxation is permitted regardless of whether the permanent establishment exists at the time of alienation. Consequently, income that is attributable to a permanent establishment, but that is deferred and is received after the permanent establishment no longer exists, may nevertheless be taxed in the treaty country in which the permanent establishment was located. This rule is similar to a rule in U.S. internal law.

The Technical Explanation notes that a resident of Poland that is a partner in a partnership doing business in the United States will generally have a permanent establishment in the United States as a result of the activities of the partnership that rise to the level of a permanent establishment. The Technical Explanation states that under the proposed treaty, the United States may tax the partner's distributive share of income realized by the partnership on the disposition of movable property forming part of the partnership's business property in the United States.

The proposed treaty provides that gains derived by an enterprise of one treaty country from the alienation of ships or aircraft operated or used in international traffic, or of personal property related to the operation of the ships or aircraft, are taxable only in that country. The Technical Explanation notes that this rule applies even if the gains are attributable to a permanent establishment maintained by the enterprise in the other treaty country. Similarly, gains derived by an enterprise of one treaty country from the disposition of containers (including trailers, barges, and related equipment for the transport of containers) that are used for transport of goods or merchandise, are taxable only in that country, unless the containers are used for transport solely between places within the other treaty country.

Gain from the alienation of any property other than the property described above is taxable under the proposed treaty only in the country in which the person alienating the property is a resident.

The Technical Explanation states that the saving clause of paragraph 4 of Article 1 (General Scope) permits the United States to tax its citizens and residents as if the proposed treaty had not come into effect.  In addition, the benefits of this article are available only to a treaty country resident that satisfies one of the conditions in Article 22 (Limitation on Benefits).  Paragraph 5 of Article 23 (Relief from Double Taxation) coordinates the tax systems of the treaty countries to avoid double taxation that could result from the imposition of exit tax regimes on individuals who relinquish their citizenship or long-term residence status.

## Article 15.  Income from Employment

The proposed treaty provides that income from employment such as salaries, wages, and other similar remuneration derived by a resident of one treaty country may be taxed only by the country of residence unless the employment is exercised in the other treaty country (the "host country").  However, the host country may not tax remuneration from employment in the host country if three conditions are met:  (1) the individual is present in the host country for not more than 183 days in any 12-month period commencing or ending in the taxable year concerned; (2) the individual is paid by, or on behalf of, an employer who is not a resident of the host country; and (3) the remuneration is not borne by a permanent establishment of the employer in the host country (whether or not such expenses are actually deductible when determining the taxable income of the permanent establishment).

According to the Technical Explanation, this article applies to any form of compensation for employment, including payments in kind.  Further, it applies without regard to the timing of the payment.  Thus, a bonus paid to a resident of a treaty country with respect to services provided in the other treaty country would be subject to the terms of this article even if the bonus is paid in a subsequent year.

This article is subject to the provisions of Articles 16 (Directors' Fees), 18 (Pensions, Social Security, Annuities, Alimony, and Child Support) and 19 (Government Service).  Thus, even though a treaty country may have the right to tax income from employment under this article, the right may be preempted if the income is also described, for example, in Article 19 (Government Service).

The proposed treaty contains a special rule that permits income from employment derived by a resident of one treaty country for employment as a member of the regular complement of a ship or aircraft operated in international traffic by an enterprise of the other treaty country to be taxed only in the country of residence.  U.S. internal law does not impose tax on such income of a person who is neither a citizen nor a resident of the United States, even if the person is employed by a U.S. entity.

This article is subject to the saving clause of paragraph 4 of Article 1 (General Scope).  Consequently, if a U.S. citizen who is a resident of Poland performs services as an employee in the United States and meets the requirements for source country exemption, the United States may nevertheless tax the income earned from that employment, subject to the foreign tax credit provisions of Article 23 (Elimination of Double Taxation).

47

## Article 16.  Directors' Fees

Under the proposed treaty, directors' fees and other similar payments derived by a resident of one treaty country in his or her capacity as a member of the board of directors of a company that is a resident of the other treaty country may be taxed by that other treaty country. This rule is an exception to the more general rules of Articles 7 (Business Profits) and 15 (Income from Employment).  Thus, as noted in the Technical Explanation, in determining whether a director's fee paid to a nonemployee director of a corporation is subject to tax in the country of residence of the corporation, it is not relevant to establish whether the fee is attributable to a permanent establishment in that country.

This rule for director's fees is substantively identical to the rule for directors' fees in the OECD Model treaty.  The proposed treaty's rule differs from the rule of the U.S. Model treaty: The U.S. Model treaty's rule applies only to fees derived for services rendered in the treaty country of which the company is a resident.

## Article 17.  Entertainers and Sportsmen

The proposed treaty addresses the taxation by a treaty country of entertainers and sportsmen resident in the other treaty country from the performance of services as entertainers and sportsmen.  The Technical Explanation states that the proposed treaty applies to the income both of an entertainer or sportsman who performs services on his own behalf and of an entertainer or sportsman who performs services on behalf of another person, either as an employee of that person, or pursuant to any other arrangement.  The rules of this article take precedence, in some circumstances, over those of Articles 7 (Business Profits) and 15 (Income from Employment).

Under the paragraph, income derived by an individual resident of a treaty country from personal activities as an entertainer, such as theater, motion picture, radio, or television artiste, or a musician, or as a sportsman exercised in the other treaty country may be taxed in that other country if the amount of the gross receipts derived by the performer exceeds $20,000 (or its equivalent in Polish legal tender) for the taxable year of payment  According to the Technical Explanation, the monetary threshold is intended to reach entertainers and athletes who are paid relatively large sums of money for short periods of service, and who would, therefore, normally be exempt from host-country tax under the standard personal services income rules.

Tax may be imposed under the proposed treaty even if the performer would have been exempt from tax under Article 7 or 15.  On the other hand, if the performer would be exempt from host-country tax this article, but would be taxable under either Article 7 or 15, tax may be imposed under either of those articles.  For example, a performer who receives less than the $20,000 threshold amount and therefore is not taxable under this article nevertheless may be subject to tax in the host country under Article 7 or 15 if the tests for host-country taxability under the relevant article are met.

The Technical Explanation states that nothing in this article precludes a treaty country from withholding tax from payments during the year and refunding the tax after the close of the year if the monetary threshold has not been met.

The Technical Explanation states that this article applies to all income connected with a performance by the entertainer, such as appearance fees, award or prize money, and a share of the gate receipts.  Income derived from a treaty country by a performer who is a resident of the other treaty country from other than actual performance, such as royalties from record sales and payments for product endorsements, is covered not by this article but by other articles of the treaty, such as Article 13 (Royalties) or Article 7.  The Technical Explanation states that in determining whether income falls under this or another article, the controlling factor is whether the income in question is predominantly attributable to the performance itself or to other activities or property rights.

According to the Technical Explanation, where an individual fulfills a dual role as performer and non-performer (such as a player-coach or an actor-director), but his role in one of the two capacities is negligible, the predominant character of the individual's activities should control the characterization of those activities.  In other cases, there should be an apportionment between the performance-related compensation and other compensation.

The proposed treaty includes a provision meant to address the potential for circumvention of the general rule when a performer's income does not accrue directly to the performer, but to another person.  Under the proposed treaty, when income in respect of personal activities exercised by and entertainer or a sportsman in his capacity as such accrues to a person other than the performer, the income may be taxed in the treaty country where the performer's services are exercised, without regard to the provisions of the proposed treaty under Article 7 or 15 unless the contract pursuant to which the personal activities are preformed allows the person other than the performer to designate the individual who is to perform the personal activities.

For example, the "employer" may be a company established and owned by the performer, which is merely acting as the nominal income recipient in respect of the remuneration for the performance (a "star company").  The performer may act as an "employee," receive a modest salary, and arrange to receive the remainder of the income from his performance from the company in another form or at a later time.  In that case, absent the provisions of paragraph 2, the income arguably could escape host-country tax because the star company earns business profits but has no permanent establishment in that country.  The performer may largely or entirely escape host-country tax by receiving only a small salary, perhaps small enough to place him below the monetary threshold in the proposed treaty.

According to the Technical Explanation, the premise of this rule is that, in a case in which a performer is using another person in an attempt to circumvent the provisions of the proposed treaty, the recipient of the services of the performer would contract with a person other than that performer (i.e., a star company employing the performer) only if the recipient of the services were certain that the performer himself would perform the services (that is, the contract mentioned the performer by name or description or else allowed the recipient of the services to designate who is to perform the services).  If instead the person to whom the income accrues is allowed to designate the individual who is to perform the services, then it is likely that the person is a service company not formed to circumvent the provisions of the proposed treaty.

Taxation under this anti-abuse provision is on the person providing the services of the performer (*i.e.*, the star company).  According to the Technical Explanation, the income taxable

49

by virtue of these rules is reduced to the extent of salary payments to the performer, which fall under the general rule.

This article is subject to the provisions of the saving clause of paragraph 4 of Article 1 (General Scope). Thus, if an entertainer or a sportsman who is resident in Poland is a citizen of the United States, the United States may tax all of his income from performances without regard to the provisions of this article, subject to the foreign tax credit provisions of Article 23 (Elimination of Double Taxation). In addition, the benefits of this article are subject to the provisions of Article 22 (Limitation on Benefits).

## Article 18.  Pensions, Social Security, Annuities, Alimony, and Child Support

This article deals with the taxation of private pensions, social security benefits, annuities, alimony, child support and, to a limited extent, pension funds, as defined in paragraph 1(k) of Article 3 (General Definitions). This article generally does not cover payments of government pensions covered under Article 19 (Government Service).

Pension and annuities

Under the proposed treaty, pensions, annuities and other similar payments made to and beneficially owned by a resident of a treaty country is taxable only in the treaty country of residence. According to the Technical Explanation, the term "pensions and other similar payments" include both periodic and lump sum payments and are intended to encompass payments made by qualified private retirement plans. In the United States, the plans encompassed include:  qualified plans under Code section 401(a); individual retirement plans (including individual retirement plans that are part of a simplified employee pension plan that satisfies Code section 408(k), individual retirement accounts, and Code section 408(p) accounts); Code section 403(a) qualified annuity plans; and Code section 403(b) plans. Distributions from Code section 457 plans may also meet this definition if they are not paid with respect to government services covered by Article 19 (Government Service).

Pensions in respect of government services covered by Article 19 (Government Service) are not covered by the term "pensions and other similar payments." Such pensions are covered either by paragraph 2 of this article, if they are in the form of social security benefits, or by paragraph 2 of Article 19. According to the Technical Explanation, Article 19 generally covers plans established for government employees under Code sections 457(g), 401(a), 403(a), 403(b) and including the Thrift Savings Plan under Code section 7701(j).

The proposed treaty precludes the individual's country of residence from taxing the portion of pension income arising in the other country to the extent such income would have been exempt if the beneficiary were a resident of the other country. The Technical Explanation provides an example, a distribution from a U.S. "Roth IRA" to a resident of Poland would be exempt from tax in Poland to the same extent the distribution would be exempt from tax in the United States if it were distributed to a U.S. resident. The same is true with respect to distributions from a traditional IRA to the extent that the distribution represents a return of non-deductible contributions. Similarly, if the distribution were not subject to tax when it was "rolled

over" into another U.S. IRA (but not, for example, to a pension fund in the other treaty country), then the distribution would be exempt from tax in Poland.

The proposed treaty provides that neither country may tax a resident on pension income earned through a pension fund that is a resident of the other country until a distribution is made from the pension fund. A transfer from a pension fund located in a treaty country to another pension fund located in the same treaty country is not subject to tax by either treaty country.

When a resident receives a distribution from a pension fund, such distribution is subject to taxation in accordance with the provisions of this article (or, if relevant, Article 19 (Government Service)). For example, if a U.S. citizen contributes to a U.S. qualified plan while working in the United States and then establishes residence in Poland, Poland is prevented from taxing currently that fund's earnings and accretions with respect to that individual. When the resident receives a distribution from the pension fund, that distribution may be subject to tax in Poland. For purposes of this provision, rollovers to another pension fund in the same country are not treated as distributions.

### Social security benefits

The proposed treaty provides that payments made by a treaty country under the provisions of the social security or "similar legislation" of that treaty country to a resident of the other treaty country or to a citizen of the United States are taxable only in the first treaty country. The Technical Explanation clarifies that the reference to U.S. citizens is necessary to ensure that a social security payment made by Poland to a U.S. citizen who is not resident in the United States will not be taxable by the United States. The Technical Explanation states that the term "similar legislation" is intended to refer to United States tier 1 Railroad Retirement benefits.

This provision is an exception to the saving clause of paragraph 4 of Article 1 (General Scope) by virtue of subparagraph 5(a) of Article 1. Thus, only Poland, and not the United States, may tax Polish social security benefits paid to a U.S. citizen or resident. The provision under the proposed treaty applies to both private sector and government employees.

### Alimony and child support

Paragraph 5 of the proposed treaty provides that neither country may tax alimony paid by a resident of one treaty country and periodic payments for the support of a child made pursuant to a written separation agreement of a decree of divorce, separate maintenance, or compulsory support, paid by a resident of one treaty country to a resident of the other treaty country.

The term "alimony" means periodic payments made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support, which payments are taxable to the recipient under the laws of the country of which he is a resident.

### Saving clause

Paragraphs 1 and 4 of this article are subject to the saving clause of paragraph 4 of Article 1 (General Scope). Thus, for example, a U.S. citizen who is a resident of Poland and receives a pension or annuity payment from the United States may be subject to U.S. tax on the

payment, notwithstanding the rules in the paragraphs that give the recipient's country of residence the exclusive taxing right.  Paragraphs 2, 3, and 5 of this article are excepted from the saving clause by virtue of paragraph 5(a) of Article 1.  Thus, the United States will not tax U.S. citizens and residents on the income described in those paragraphs even if such amounts otherwise would be subject to tax under U.S. law.

## Article 19.  Government Service

Under this article, salaries, wages and other remuneration paid by a treaty country or a political subdivision or a local authority of that treaty country to an individual for services rendered to that treaty country or subdivision or local authority may be taxed only by that treaty country.  The remuneration is exclusively taxable by the other treaty country if the services are rendered in that other country and the individual providing the services is a resident of that other country who is a national of that other country or who did not become a resident of that other country solely for the purpose of rendering the services.

Notwithstanding paragraph 1 of Article 18 (Pensions, Social Security, Annuities, Alimony, and Child Support), any pension or other similar remuneration paid by, or out of funds created by, a treaty country or a political subdivision or a local authority of that treaty country, other than a payment to which paragraph 2 of Article 18 applies, to an individual in respect of services rendered to that treaty country or subdivision or local authority, is taxable only in that treaty country.  However, such pensions, annuities and other similar payments are taxable only in the other treaty country if the individual is both a resident and a national of the other country.  The Technical Explanation states that pensions paid to retired civilian and military employees of the government of either treaty country are intended to be covered by this provision.

When benefits paid by a treaty country in respect of services rendered to that country (or political subdivision or local authority) are in the form of social security benefits, those payments are covered by paragraph 3 of Article 18 (Pensions, Social Security, Annuities, Alimony, and Child Support).  As a general matter, the result is the same whether Article 18 or 19 applies, since social security benefits and government pensions are taxable exclusively by the source country (that is, the paying country).  The Technical Explanation states that the result differs only when the payment is made to a person who is both a citizen and a resident of the other country who is not also a citizen of the source country.  In this situation, social security benefits remain taxable at source while government pensions are taxable only in the residence country.

The provisions of Articles 15 (Income from Employment), 16 (Directors' Fees), 17 (Entertainers and Sportsmen), and 18 (Pensions and Income from Social Security) of the proposed treaty apply to salaries, wages, pensions and other similar remuneration paid for services performed in connection with a business carried on by a treaty country (or a political subdivision or a local authority of the treaty country).

The saving clause of paragraph 4 of Article 1 (General Scope) of the proposed treaty does not apply under this article in the case of an individual who is neither a citizen of the host country nor admitted to permanent residence in the host country (that is, in the United States, the individual does not acquire a green card).  Such an individual is thus entitled to the exemptions under this article.  The saving clause does apply, however, to citizens and permanent residents of

the host country.  The Technical Explanation states that a resident of one treaty country who, in the course of performing functions of a governmental nature, becomes a resident (but not a permanent resident) of the other treaty country is entitled to the benefits of this article.  However, an individual who receives a pension paid by the government of Poland in respect of services rendered to the government of Poland may be taxed on this pension only by Poland unless the individual is a U.S. citizen or green card holder.

### Article 20.  Students and Trainees

The treatment provided to students and business trainees under the proposed treaty is similar to the provision in the U.S. Model treaty and the OECD Model treaty.

Under the proposed treaty, a student or business trainee who visits a treaty country and who is, or was immediately prior to visiting the host country, a resident of the other treaty country is exempt from income tax in the host country on certain payments, other than remuneration for personal services, received if the primary purpose of the visit is education or training.  The exempt payments are limited to those payments the individual may receive for his or her maintenance, education, or training as long as such payments are from sources outside the host country.  In the case of business trainees, the exemption from income tax in the host country applies only for a period not exceeding one year from the time the visitor first arrives in the host country for the purpose of training. The Technical Explanation states that, if a business trainee remains in the host country for more than a year, he will not retroactively lose the treaty benefits for the first year.

The proposed treaty also provides students and business trainees with an exemption for income from personal services performed in the host country up to a total of $9,000 or its equivalent in Polish legal tender annually.

A business trainee is an individual who is in the host country temporarily either (1) for the purpose of securing training required to qualify the individual to practice a profession or professional specialty or (2) as an employee of, or under contract with, a resident of the other treaty country for the primary purpose of acquiring technical, professional, or business experience from a person other than that resident of the other treaty country.

The saving clause of paragraph 4 of Article 1 (General Scope) of the proposed treaty does not apply under this article in the case of an individual who is neither a citizen of the host country nor admitted to permanent residence in the host country (that is, in the United States, the individual does not acquire a green card).  Such an individual is thus entitled to the exemptions under this article.  The saving clause does apply, however, to citizens and permanent residents of the host country.  As an example, the Technical Explanation refers to a person who is not a U.S. citizen, and who visits the United States as a student and remains long enough to become a resident under U.S. law, but does not become a permanent resident.  This individual is eligible for the exemption under this article from U.S. tax on remittances from abroad that would otherwise constitute U.S. taxable income.

## Article 21.  Other Income

The proposed treaty includes a catch-all provision that assigns taxing jurisdiction over items of income beneficially owned by a resident of a treaty country and not addressed in the other articles of the proposed treaty.  The general rule is that such items are taxable only in the country of residence of the person receiving the income.  This right of taxation applies regardless of whether the residence country exercises its right to tax the income covered by the article.  This rule is similar to the rules in the U.S. and OECD Model treaties.

An item of income is addressed in another article if it is the type of income described in the article and, in most cases, has its source in one of the treaty countries.  For example, royalty income that is beneficially owned by a resident of a treaty county is addressed in Article 13 (Royalties) if the royalty income arises in the other treaty country, but not if the royalty income arises in a third country.  However, profits derived in the conduct of a business are addressed in Article 7 (Business Profits) whether or not they have their source in one of the treaty countries.

According to the Technical Explanation, examples of types of items of income covered by this article include income from gambling, punitive (but not compensatory) damages, and covenants not to compete.  Income from a variety of financial transactions is also covered when such income does not arise in the course of the conduct of a trade or business.  For example, income from notional principal contracts and other derivatives are covered if derived by persons not engaged in the business of dealing in such instruments, unless such instruments were used to hedge risks arising in a trade or business.  This article also applies to securities lending fees derived by an institutional investor and guarantee fees paid within an intercompany group, unless the guarantor is engaged in the business of providing such guarantees to unrelated parties.

This article also applies to items of income that are not addressed in the other articles because of their source, character, or some other attribute.  For example, Article 11 (Interest) addresses only the taxation of interest arising in one of the treaty countries.  Therefore, interest arising in a third country that is not attributable to a permanent establishment is subject to this article.

Distributions from partnerships are not generally covered under this article because partnership distributions generally do not constitute income.  Under the Code, partners include in income annually their distributive share of partnership income, and partnership distributions themselves generally do not give rise to income.  A similar result is achieved under U.S. law with respect to distributions from trusts.  Trust income and distributions that, under the Code, have the character of the associated distributable net income (for example, interest or royalties) are generally covered by another article of the proposed treaty.

The general rule of residence taxation does not apply to income, other than income from real property as defined in paragraph 2 of Article 6 (Income from Real Property), if the recipient of the income is a resident of one country and carries on business in the other country through a permanent establishment situated therein and the right or property in respect of which the income is paid is effectively connected with such permanent establishment.  In such a case, the provisions of Article 7 (Business Profits) will apply.

The Technical Explanation states that this article is subject to the saving clause in paragraph 4 of Article 1 (General Scope). Accordingly, U.S. citizens who are residents of Poland will continue to be taxable by the United States on income to which this article applies, including relevant third-country income. In addition, the benefits of this article are available only to a treaty country resident that satisfies one of the conditions in Article 22 (Limitation on Benefits).

## Article 22.  Limitation on Benefits

Article 22 (Limitation on Benefits) provides that benefits that are dependent upon residency of the claimant are limited to residents who are qualified persons within the meaning of this article. Generally, the limitation operates to ensure that beneficiaries of the treaty have a sufficient nexus with a treaty country. Neither the mutual agreement procedures nor benefits to members of embassy staff, under Article 25 (Mutual Agreement Procedures) and Article 27 (Members of Diplomatic Missions and Consular Posts), respectively, are restricted by this article. The limitation-on-benefits provision includes restrictions similar to the limitations article included in the U.S. Model treaty, as well as rules developed and included in recent U.S. income tax treaties to address triangular arrangements, headquarters companies, and derivative benefits.

A resident of either treaty country, as determined under Article 4 (Residence), may satisfy the restrictions of this article in one of several ways, subject to antiabuse provisions. First, a resident who is within one of the categories enumerated is entitled to all benefits that are accorded by the proposed treaty on the basis of residency. In addition, residents that do not meet one of the enumerated categories may be entitled to treaty benefits with respect to certain items of income either under a derivative benefits rule or the active trade or business rule. Finally, a discretionary rule permits the competent authority of one treaty country to grant treaty benefits to a resident of the other treaty country with respect to an item of income if the competent authority determines that treaty shopping was not a principal purpose of the transaction or structure giving rise to the income.

Anti-abuse rules govern items of income derived from one of the treaty countries by an enterprise resident in the other treaty country in so-called "triangular cases." Together, these provisions deny treaty benefits in certain cases of treaty shopping or income stripping engaged in by third-country residents. Treaty shopping may occur when residents of third countries attempt to benefit from a treaty by organizing, in a treaty country, a corporation that is entitled to the benefits of the treaty. Income stripping may result if a third-country resident eligible for favorable treatment under the tax rules of its country of residency is able to reduce the income base of a treaty country resident by having that treaty country resident pay to it, directly or indirectly, interest, royalties, or other amounts that are deductible in the treaty country from which the payments are made.

## Categories of residents that qualify for all treaty benefits

The proposed treaty extends full benefits to the same categories of persons identified in the U.S. Model treaty as qualified persons:  (a) an individual other than one receiving income as a nominee for, or on behalf of, a beneficial owner resident in a third-country; (b) one of the two treaty countries, or any political subdivision or instrumentality thereof; (c) a public company, or

its subsidiary; (d) certain pension funds and charitable or philanthropic organizations that is established in its country of residence exclusively for religious, charitable, scientific, artistic, cultural, or educational purposes, regardless of its tax exempt status under the residence country's domestic law; or (e) an entity that satisfies both an ownership test and a base erosion test.  In addition to these five categories, the proposed treaty also extends full benefits to headquarters companies, that is, entities that perform headquarter functions for a multinational group of companies and are subject to the same income tax rules in its country of residence as would apply to a company engaged in the active conduct of a trade or business in that country with independent authority to carry out its supervisory and administrative functions.  The rules to establish qualified resident status as a public company, a headquarters company or a resident who satisfies an ownership-base erosion test are defined in greater detail in the proposed treaty, as explained below.

<u>Public companies and subsidiaries</u>

A company that is a resident of the United States or Poland is a qualified person entitled to all treaty benefits if it satisfies either the "regular trading test" or the "vote or value test."

1. Regular trading test

Under the regular trading test, the proposed treaty permits a company to qualify based on regular trading of the principal class of its shares, and any disproportionate class of shares, on one or more recognized stock exchanges, provided that it satisfies one of two tests, either the "primary trading test" or the "management and control test."  The former requires that the company's principal class of shares is primarily traded on a recognized stock exchange in its country of residence (or in the case of a company resident in Poland, on a recognized stock exchanged located within a state that is a member of the European Union or the EFTA or, in the case of a company resident in the United States, on a recognized stock exchange located in another country that is a party to the North American Free Trade Agreement ("NAFTA")). The latter test requires that the company's primary place of management and control is in its country of residence.  Certain key elements of the regular trading test and its components, the primary trading test and management and control test, are described below.

The term "regularly traded" is not defined.  Under the provisions for definition of otherwise undefined terms in Article 3 (General Definitions), the domestic law of the country from which benefits are sought is determinative.  According to the Technical Explanation, the applicable domestic law in the case of the United States is found in Treas. Reg. section 1.884-5(d)(4)(i)(B), relating to the branch tax provisions of the Code.

a) Primarily traded

"Primarily traded" is defined in the proposed treaty consistently with U.S. regulations promulgated to administer the branch profits tax.[46]  Under the definitions, a class of shares is

---

[46]  Under section 884(e), a foreign corporation is exempt from the branch profits tax otherwise imposed by section 884 if it is a qualified resident of a country with which the United States has an income tax treaty.  In

regularly traded if (1) trades in the class of shares are made in more than de minimis quantities on at least 60 days during the taxable year, and (2) the aggregate number of shares in the class traded during the year is at least 10 percent of the average number of shares outstanding during the year.  Trading on one or more recognized stock exchanges in either treaty country may be aggregated for purposes of meeting the "regularly traded" requirement.  In order to be considered to be primarily traded in the company's country of residence under the relevant regulatory definition of "primarily trading," the number of shares in the company's principal class of shares that are traded during the taxable year on all recognized stock exchanges in the treaty country of which the company is a resident must exceed the number of shares in the company's principal class of shares that are traded during that year on established securities markets in any other single foreign country.[47]

The term "recognized stock exchange" means the NASDAQ System owned by the National Association of Securities Dealers, Inc.; any stock exchange registered with the U.S. Securities and Exchange Commission as a national securities exchange under the U.S. Securities Exchange Act of 1934; the Warsaw stock exchange; the stock exchanges of Amsterdam, Brussels, Budapest, Frankfurt, London, Mexico City, Montreal, Paris, Toronto, Vienna and Zurich; and any other stock exchange agreed upon by the competent authorities of the treaty countries.

The regular trading test requires that both the principal class of shares and any disproportionate class of shares be regularly traded on one of the recognized stock exchanges. These classes of shares are defined in Article 22, as follows.  The "principal class of shares" is the class of ordinary or common shares of a company representing the majority of the aggregate voting power and value of that company.  If the company does not have a single class of ordinary or common shares representing the majority of the aggregate voting power and value, then the term is used to refer collectively to those classes of shares that together represent a majority of the aggregate voting power and value of the company.  A "disproportionate class of shares" is defined as any outstanding class of shares that is subject to terms or other arrangements that entitle a shareholder to a larger portion of the company's income, profit, or gain in the other treaty country than that to which the shareholder would be entitled in the absence of those terms or arrangements.  For example, if a company resident in Poland has outstanding a class of tracking stock that pays dividends based upon a formula that approximates the company's return on its assets employed in the United States, that class of stock shall be considered a disproportionate class of shares.

b) Management and control test

If the principal class of shares of a company is regularly traded on a recognized stock exchange but does not satisfy the primarily traded test, the company may qualify for treaty benefits under the management and control test if its primary place of management and control is

_____

defining "qualified resident," the Code provides a special rule for certain publicly traded corporations and their subsidiaries, permitting them to be treated as qualified residents.

[47]  Treas. Reg. section 1.884-5(d)(3).

in the treaty country of which it is a resident. A company's primary place of management and control is located in the treaty country in which the company is a resident only if the executive officers and senior management employees exercise day-to-day responsibility for more of the strategic, financial, and operational policy decision making for the company (including direct and indirect subsidiaries) in that country than in the other treaty country or any third country, and if the staff that support the management in making those decisions are also based in that residence country.

The Technical Explanation notes that the management and control test should be distinguished from the "place of effective management" test used by many countries and in the OECD Model treaty to establish residence. The place of effective management test has been interpreted to mean the place where the board of directors meets. Under the proposed treaty, the place where the board of directors meets will be a necessary factor but not sufficient to establish management and control. Instead, the management and control test looks to where day-to-day responsibility for the management of the company (and its subsidiaries) is exercised.

    2. Vote or value test

In an alternative to the regular trading test, companies may qualify for treaty benefits if at least 50 percent of the vote or value of its shares are owned directly or indirectly by five or fewer companies entitled to benefits under the regular trading test. A company that does not satisfy the regular trading test and either the primary trading test or the management and control test (because, for example, its shares are not publicly traded) may be entitled to treaty benefits if shares representing at least 50 percent of its aggregate voting power and value are owned, directly or indirectly, by five or fewer companies that satisfy the regular trading test and either the primary trading test or the management and control test. In order for a company to meet the vote or value on the basis of indirect ownership, each intermediate owner must be a resident of the United States or Poland. This rule allows certain subsidiaries of publicly traded companies to be eligible for all benefits under the proposed treaty.

    <u>Ownership and base-erosion test</u>

The ownership and base erosion test provides a residual category under which residents not described in the other categories of residents listed in paragraph 2 may qualify for full treaty benefits. To satisfy both prongs of the test, the resident of the treaty country must establish a requisite level of ownership by residents who do qualify for treaty benefits and that at least 50 percent of its income earned remains subject to taxation in the treaty jurisdiction.

The ownership test is met if at least 50 percent of each class of the entity's shares or other beneficial interests is owned, directly or indirectly, by residents of that treaty country who are otherwise entitled to full treaty benefits under the limitation-on-benefits article without regard to the ownership and base erosion test. The qualifying owners must be individuals, governments, public companies, pension funds, or tax-exempt organizations. In the case of indirect ownership, each intermediate owner must be a resident of the same treaty country as the entity seeking to satisfy the ownership test. In addition, the test includes a temporal requirement, in that the requisite ownership must be met on at least half the days of the taxable year of the person claiming treaty benefits under this test.

The Technical Explanation states that trusts may be entitled to the benefits of this provision if they are treated as residents under Article 4 (Residence). According to the Technical Explanation, the beneficial interests in a trust are considered to be owned by its beneficiaries in proportion to the actuarial interest of each beneficiary. For purposes of applying the ownership test to trusts, the remainder beneficiary is considered to have an interest equal to 100 percent minus the aggregate interests determined for the income beneficiaries. An interest in a trust will not be considered to be owned by a person entitled to full treaty benefits unless the actuarial interest of the beneficiary can be determined. As a result, when an actuarial interest of any beneficiary cannot be determined, the ownership test can be satisfied only if all possible beneficiaries are persons otherwise entitled to benefits as individuals, governments, public companies, pension funds, or tax-exempt organizations.

The base erosion test requires that less than 50 percent of the person's gross income for the taxable year, as determined in that person's country of residence, is paid or accrued, directly or indirectly, in the form of payments deductible in the person's country of residence, to persons who are not residents of either treaty country entitled to treaty benefits under this article as individuals, governments, public companies, pension funds, or tax-exempt organizations. Arm's-length payments made in the ordinary course of business for tangible property or services do not count against the entity in determining whether the base erosion threshold is reached, nor do deductions for amortization or depreciation. According to the Technical Explanation, trust distributions that are deductible from the taxable base are deductible payments for purposes of determining whether the 50 percent threshold is reached.

### Headquarters companies

Under the proposed treaty, a resident of the United States or Poland is entitled to treaty benefits if that person functions as a headquarters company for a multinational corporate group described below, whether or not it owns shares in the entities that it supervises. A potential headquarters company must perform substantial supervisory and administrative functions for a group of companies in its country of residence. The group of companies for which it performs services must operate and derive income from a genuinely multinational active business, as determined from its operations in at least five different countries, deriving gross income from each country above specified thresholds without earning excessive amounts from any one non-treaty country or from the other treaty country (that is, the treaty country in which it is not a resident). The headquarters company must be subject to the same income tax rules in its country of residence as would apply to a company engaged in the active conduct of a trade or business in that country, and must have independent authority in carrying out its supervisory and administrative functions. U.S. income tax treaties in force with Austria, Australia, Belgium, the Netherlands, and Switzerland include similar rules for headquarters companies, although the U.S. Model treaty does not. A person is considered a headquarters company for this purpose only if each of several criteria is satisfied.

1. Overall supervision and administration

To be considered a headquarters company, a person must provide a substantial portion of the overall supervision and administration of the multinational corporate group. This supervision and administration may include group financing, provided that group financing is not the

principal activity of the company. The Technical Explanation states that a person will be considered to engage in supervision and administration only if it engages in a number of the following activities: group financing (but, as mentioned above, not as its principal activity), pricing, marketing, internal auditing, internal communications, and management. In determining whether a substantial portion of the overall supervision and administration of the group is provided by the headquarters company, that company's headquarters-related activities must be substantial in relation to the same activities for the same group performed by other entities.

2. Genuinely multinational active trade or business

The multinational corporate group supervised by a headquarters company must consist of companies that are engaged in an active business in, and reside in, at least five countries (or five groupings of countries). The business activities carried on in each of those five countries or groupings must constitute at least 10 percent of the gross income of the group. This active trade or business rule, as well as the limitations on gross income earned in a single country limitation or in the other treaty country, are intended to ensure that the relevant group is truly multinational. According to the Technical Explanation, the income from multiple countries may be aggregated into groupings that do not overlap in determining whether the 10-percent gross income requirement is satisfied. So long as there are five or more individual countries or groupings that each satisfy the 10-percent requirement, the requirement is met. In addition, if the gross income requirement is not satisfied for a taxable year, it may be deemed to be met if the average gross income from the four preceding years exceeds the 10-percent gross income threshold.

The Technical Explanation gives the following example of the operation of the active trade or business requirement. PHQ is a Polish resident that functions as a headquarters company for a group of companies resident in the United States, Canada, New Zealand, the United Kingdom, Malaysia, the Philippines, Singapore, and Indonesia. In 2012, the total gross income of the multinational corporate group is $137, of which $40 is generated in the United States, $25 in Canada, $10 in New Zealand, $30 in the United Kingdom, $10 in Malaysia, $7 in the Philippines, $10 in Singapore, and $5 in Indonesia. Ten percent of the group's gross income in 2012 is $13.70; only the United States, Canada, and the United Kingdom satisfy the 10-percent requirement by themselves. Together, the New Zealand and Malaysia members generate $20 of gross income, and the Philippines, Singapore, and Indonesia members together generate $22 of gross income. These two groupings therefore may be treated as the fourth and fifth members of the group (in addition to the United States, Canada, and the United Kingdom) under the active trade or business requirement, and the requirement is satisfied in 2012. The composition of the groupings may change from year to year. Thus, if in 2013, the income of the Canadian resident company did not exceed the 10-percent requirement but that of the New Zealand company did, Canada could be included in the fourth grouping in lieu of New Zealand to determine whether the threshold is met.

3. Single-country income limitation

The business activities carried on in any one country other than the residence country of the headquarters company may not equal or exceed 50 percent of the gross income of the group. If this less-than-50-percent requirement cannot be met for a taxable year, the taxpayer may apply

the 50 percent test to the averages for the four immediately preceding years. The Technical Explanation provides an example of the application of this rule:

Example: PHQ is a corporation resident in Poland. PHQ functions as a headquarters company for a group of companies. PHQ derives dividend income from a U.S. subsidiary in the 2008 taxable year. The countries of residence of the companies in the group, the sites of their activities, and the amounts of gross income attributable to the companies for the years 2008 through 2012 are set forth below:

| Country | Situs | 2012 | 2011 | 2010 | 2009 | 2008 |
|---------|-------|------|------|------|------|------|
| United States | U.S. | $100 | $100 | $95 | $90 | $85 |
| Mexico | U.S. | 10 | 8 | 5 | 0 | 0 |
| Canada | U.S. | 20 | 18 | 16 | 15 | 12 |
| United Kingdom | U.K. | 30 | 32 | 30 | 28 | 27 |
| New Zealand | N.Z. | 35 | 42 | 38 | 36 | 35 |
| Japan | Japan | 35 | 32 | 30 | 30 | 28 |
| Singapore | Singapore | 30 | 25 | 24 | 22 | 20 |
| TOTAL | | $260 | $257 | $238 | $221 | $207 |

Because the U.S. situs companies' total gross income of $130 in 2012 is not less than 50 percent of the gross income of the group, the provision is not satisfied with respect to dividends derived in 2012. However, the U.S. situs companies' average gross income for the preceding four years may be used in lieu of the preceding year's average. The United States's average gross income for the years 2008 through 2011 is $111 ($444/4). The group's total average gross income for these years is $230.75 ($923/4). Because $111 represents 48.1 percent of the group's average gross income for the years 2008 through 2011, the United States satisfies the single-country limitation.

4. Other treaty country gross income limitation

No more than 25 percent of gross income of a headquarters company that is a resident of one treaty country may be derived from the other treaty country. Thus, according to the Technical Explanation, if the headquarters company's gross income for the taxable year is $200, no more than $50 of gross income may be derived from the other treaty country. If this gross income requirement is not met for the taxable year, it may also be satisfied based on the average percentage for the four preceding years.

5. Independent discretionary authority

The headquarters company must have and exercise independent discretionary authority to carry out the overall supervision and administration functions described above for the overall supervision and administration requirement. The Technical Explanation states that this determination is made separately for each function. Thus, if a headquarters company is nominally responsible for group financing, pricing, marketing, and internal auditing functions, and another entity is actually directing the headquarters company as to the group financing function, the headquarters company would not be deemed to have independent discretionary authority for group financing, but it may have such authority for the other functions.

6. Income taxation rules

The headquarters company must be subject to the same income taxation rules in its country of residence as apply to persons who are entitled to treaty benefits with respect to certain items of income that satisfies the active business test. The Technical Explanation states that the requirement should be understood to mean that the company must be subject to the income taxation rules to which a company engaged in the active trade or business would be subject. Thus, a headquarters company is not entitled to treaty benefits under the headquarters company rules if it is subject to special taxation legislation that imposes a lower rate of income tax on headquarters companies in a treaty country than is imposed on companies engaged in the active conduct of a trade or business, or otherwise artificially lowers the taxable base for headquarters companies in the treaty country.

7. In connection with or incidental to a trade or business

The income that a headquarters company resident in one treaty country derives in the other treaty country must be derived in connection with or be incidental to the active business activities described in the special active trade or business requirement under the headquarter company rules, above. For example, according to the Technical Explanation, if a Polish company that satisfied the other requirements of the headquarters company rules acted as a headquarters company for a group that included a U.S. company, and the group was engaged in the design and manufacture of computer software, but the U.S. company was also engaged in the design and manufacture of photocopying machines, the income that the Polish company derived from the United States would have to be derived in connection with or be incidental to the income generated by the computer business to be entitled to treaty benefits under the headquarters company rules. The Technical Explanation similarly states that interest income received from the U.S. company also would be entitled to treaty benefits as long as the interest was attributable to the computer business supervised by the headquarters company. Interest income derived from an unrelated party, however, normally would not be considered to be in connection with or incidental to the active trade or business supervised by the headquarters company.

**Certain income entitled to treaty benefits**

Under the proposed treaty, residents of a treaty country that do not qualify for full treaty benefits under any of the tests described above may qualify for limited treaty benefits with respect to specific items of income under two scenarios. Active business income is entitled to treaty benefits under conditions similar to those identified in the U.S. Model treaty. In addition, income may be subject to treaty benefits under the derivative benefits rules, in which income is entitled to treaty benefits if the beneficial owners of income would have been entitled to treaty benefits they directly derived the income.

Active conduct of trade or business

Similar to the terms of the U.S. Model treaty, the proposed treaty permits treaty benefits for items of income connected to the active trade or business. If the income derived from the other treaty country is from a related person, the proposed treaty also imposes a substantiality

requirement for the business activities in the country of residence in relation to the activities in the source country.  For purposes of determining whether income qualifies for the benefits, activities by persons related to the resident of a treaty country may be attributed to that resident.  Under a Memorandum of Understanding between the Competent Authorities, executed contemporaneously with the proposed treaty, a person is deemed to be related to another person if either person or the same persons participate directly or indirectly in the management, control or capital of the other.

The term "trade or business" is not defined in the proposed treaty.  According to the Technical Explanation, under paragraph 2 of Article 3 (General Definitions) of the proposed treaty, when determining whether a resident of Poland is entitled to the benefits of the proposed treaty under the active business test with respect to an item of income derived from sources within the United States, the United States will ascribe to this term the meaning that it has under the laws of the United States.  Accordingly, the Technical Explanation states that the U.S. competent authority will refer to the regulations issued under section 367(a) for the definition of the term "trade or business."

In general, a trade or business will be considered to be a specific unified group of activities that constitute or could constitute an independent economic enterprise carried on for profit.  The business of making or managing investments for its own account does not constitute an active trade or business unless the business of the resident is banking, insurance or securities dealing.  Furthermore, a corporation generally will be considered to carry on a trade or business only if the officers and employees of the corporation conduct substantial managerial and operational activities.

The Technical Explanation elaborates on the requirement that an item of income from the source country be derived "in connection with" or be "incidental to" the resident's trade or business in its residence country.  The Technical Explanation provides that an item of income is derived in connection with a trade or business if the income-producing activity in the source country is a line of business that "forms a part of" or is "complementary to" the trade or business conducted in the residence country by the income recipient.

According to the Technical Explanation, a business activity generally will be considered to form part of a business activity conducted in the source country if the two activities involve the design, manufacture, or sale of the same products or type of products, or the provision of similar services.  The line of business in the country of residence may be upstream, downstream, or parallel to the activity conducted in the country of source.  Thus, the line of business may provide inputs for a manufacturing process that occurs in the source country, may sell the output of that manufacturing process, or simply may sell the same sorts of products that are being sold by the trade or business carried on in the country of source.

The Technical Explanation states that for two activities to be considered to be "complementary," the activities need not relate to the same types of products or services but should be part of the same overall industry and should be related in the sense that the success or failure of one activity will tend to result in success or failure for the other.  Where more than one trade or business is conducted in the country of source and only one of the trades or businesses forms a part of or is complementary to a trade or business conducted in the country of residence,

it is necessary, according to the Technical Explanation, to identify the trade or business to which an item of income is attributable.  Royalties generally are considered to be derived in connection with the trade or business to which the underlying intangible property is attributable.  Dividends are deemed to be derived first from earnings and profits of the treaty-benefited trade or business and then from other earnings and profits.  Interest income may be allocated under any reasonable method consistently applied.  A method that conforms to U.S. principles for expense allocation will be considered a reasonable method.

The Technical Explanation further states that an item of income derived from the country of source is "incidental to" the trade or business carried on in the country of residence if production of the item facilitates the conduct of the trade or business in the country of residence. An example of incidental income is the temporary investment of working capital of a person in the country of residence in securities issued by persons in the country of source.

1.  Substantiality of business activity in residence country

The proposed treaty restricts the availability of the active business test by imposing a substantiality requirement if the income with respect to which treaty benefits are claimed is derived from a source related to the claimant.  In such instances, the income qualifies for treaty benefits only if the trade or business activity in the residence country is substantial in relation to the trade or business activity conducted by the related entity in the source country.  By limiting the substantiality requirement to transactions between related parties, the provision thwarts treaty-shopping abuses in which a company attempts to qualify for benefits by engaging in minor business activities in its jurisdiction of residence that are of little economic cost or effect for the company as a whole, without hindering activity that is not potentially abusive, according to the Technical Explanation.

Whether the substantiality requirement is met is determined separately for each item of income derived from the source country on the basis of all the facts and circumstances.  Facts and circumstances relevant to the determination of substantiality include the comparative sizes of the trades or businesses in each treaty country, the nature of the activities performed in each country, and the relative contributions made to that trade or business in each country.  Thus, it is possible that income from one line of business may qualify for favorable treatment under the proposed treaty, but income from another activity in the source country is ineligible.

2.  Attribution rules

The proposed treaty provides attribution rules to be used in determining whether a person is engaged in the active conduct of a trade or business in a treaty country and whether it is subject to the substantiality requirement.  Activities conducted by persons connected to the person claiming treaty benefits will be deemed to be conducted by that person.  A person is "connected" to another person if one person possesses at least 50 percent of the beneficial interest in the other (or, in the case of a company, at least 50 percent of the aggregate voting power and at least 50 percent of the aggregate value of the shares in the company or of the beneficial equity interest in the company).  Alternatively, a connection between entities exists if the entities are under common ownership, that is, one owner holds the requisite 50 percent interest in each of the entities.  Regardless of the formalities of ownership, person may be

64

considered to be connected to one another if, based on all the relevant facts and circumstances, one has control of the other or both are under the control of the same person or persons.

Derivative benefits rule

Like other recent treaties, the proposed treaty includes derivative benefits rules that are generally intended to allow a treaty-country company treaty benefits for an item of income if the company's owners would have been entitled to the same benefits for the income had those owners derived the income directly. By contrast, there is no such provision in the U.S. Model treaty. Under these derivative benefits rules, a treaty-country company is eligible for treaty benefits for an item of income only if the company satisfies both an ownership requirement and a base erosion requirement.

1. Ownership test

A company satisfies the ownership requirement if shares representing at least 95 percent of the company's aggregate voting power and value, and at least 50 percent of any of the company's disproportionate class of shares, are owned directly or indirectly by seven or fewer persons who are equivalent beneficiaries. The term "disproportionate class of shares" has the same definition as the definition previously described.

An equivalent beneficiary must be a resident of an EU member country, an EFTA country, or a NAFTA party (together, "qualifying countries") and must satisfy either of two criteria. The first criterion includes two requirements. First, the person must be entitled to all treaty benefits under a comprehensive income tax treaty between a qualifying country and the country from which the benefits of the U.S.-Poland treaty are being claimed (an "applicable treaty"), and this entitlement to treaty benefits must result from satisfaction of limitation-on-benefits provisions analogous to the proposed treaty's rules, described above, for individuals, governments, publicly-traded companies, pension funds, and tax-exempt organizations. If the applicable treaty does not include a comprehensive limitation-on-benefits article, this first requirement is satisfied only if the person would meet the proposed treaty's requirements for entitlement to treaty benefits as an individual, a government, a publicly-traded company, a tax-exempt organization, or a pension fund. Second, for income from dividends, interest, or royalties, the person must be entitled under an applicable treaty to a rate of tax on that income that is at least as low as the rate applicable under the proposed treaty.

For dividend, interest, or royalty payments arising in Poland and beneficially owned by a resident of the United States, the proposed treaty includes a special rule for determining whether a company that is a resident of an EU member country satisfies the tax rate test for purposes of determining whether the U.S. resident is entitled to treaty benefits for the payments. The special rule provides that the EU member country resident satisfies the tax rate test if a dividend, interest, or royalty payment arising in Poland and paid directly to that EU member country resident would be exempt from withholding tax under an EU directive even though the income tax treaty between Poland and that EU member country would permit imposition of a higher withholding tax rate on that payment than is permitted by the proposed treaty. The Technical Explanation states that this special rule takes into account that withholding taxes on many intercompany dividend, interest, and royalty payments are exempt within the EU under various

EU directives.  The special rule is necessary, according to the Technical Explanation, because many EU member countries have not renegotiated their tax treaties to reflect the EU directives' elimination of withholding tax.

Under the second criterion for determining whether a resident of a qualifying country is an equivalent beneficiary, the resident must be a U.S. or Polish resident that is entitled to treaty benefits under one of the rules described previously for individuals, governments, publicly traded companies, pension funds, and tax-exempt organizations.  Under this rule, according to the Technical Explanation, a Polish individual is an equivalent beneficiary for an item of income received by another treaty country resident regardless of whether the individual would have been entitled to receive the same benefits if it had received the income directly.  The Technical Explanation states that this criterion is included to clarify that ownership by certain residents of a treaty country does not disqualify a U.S. or Polish company from treaty benefits under the derivative benefits rules.  If, for example, 90 percent of a Polish company is owned by five companies that are residents of EU member countries and that satisfy the first criterion described above, and 10 percent of the Polish company is owned by a U.S. or a Polish individual, the Polish company still can satisfy the requirements of the ownership test of the derivative benefits rules.

2.  Base erosion test

A company satisfies the base erosion requirement for an item of income only if, in the taxable year in which the income item arises, the amount of the deductible payments or accruals the company makes, directly or indirectly, to persons who are not equivalent beneficiaries is less than 50 percent of the company's gross income for the year, as determined in the company's country of residence.  Deductible payments do not include arm's-length payments in the ordinary course of a business for services or tangible property.  The Technical Explanation notes that the base erosion requirement under the derivative benefits rule is the same as the base erosion test described previously (that is, the test that is included in the rules for determining whether a treaty country resident has one of the six attributes for qualification for all treaty benefits), except that, for the derivative benefits rule, the test focuses on deductible payments made to persons who are not equivalent beneficiaries.

**Anti-abuse rules: The triangular case**

The proposed treaty provides a special anti-abuse rule that, according to the Technical Explanation, addresses a Polish resident's use of the following structure to earn interest income from the United States.  The Polish resident (who is otherwise qualified for benefits under this article) organizes a permanent establishment in a third country that imposes a low rate of tax on the income of the permanent establishment.  The Polish resident then lends funds into the United States through the permanent establishment.  The permanent establishment is an integral part of the Polish resident.  Consequently, the interest income that the permanent establishment earns on the loan is entitled to exemption from U.S. withholding tax under the treaty.  Under the tax treaty between Poland and the third country, Poland does not tax the income earned by the permanent establishment.  Alternatively, Poland may choose to exempt the income of the permanent establishment from Polish income tax.  Consequently, the income is not taxed in Poland or the United States, and is only lightly taxed in the third country.

Under the proposed treaty, the United States may impose withholding tax on the interest payments if the combined tax actually paid on the income in Poland and the third country is less than 60 percent of the general rate of company tax applicable in Poland.

Although the example in the Technical Explanation involves interest income, the triangular provision applies to all types of income. Any dividends, interest, or royalties to which the provision applies may be subject to a maximum withholding tax rate of 15 percent. Any other income to which the provision applies is subject to tax under the domestic law of the source country, notwithstanding any other provision of the proposed treaty.

According to the Technical Explanation, the principles of the U.S. subpart F rules are employed to determine whether the profits of the permanent establishment are subject to an effective rate of tax that is above the specified threshold.

The triangular provision does not apply to royalties that are received as compensation for the use of, or the right to use, intangible property produced or developed by the permanent establishment itself. In the case of any other income, the triangular provision does not apply if that income is derived in connection with, or is incidental to, the active conduct of a trade or business carried on by the permanent establishment in the third country, other than the business of making, managing, or holding investments for the person's own account, unless the business is a securities activities carried on by a registered securities dealer.

The triangular provision applies reciprocally. However, according to the Technical Explanation, the United States does not exempt the income of a third-country permanent establishment of a U.S. resident from U.S. tax, either by statute or by treaty.

**Grant of treaty benefits by the competent authority**

Under the proposed treaty, a resident of a treaty country that is not otherwise entitled to treaty benefits in the other treaty country under this article may nonetheless be granted treaty benefits by the competent authority of the other treaty country. The competent authority may grant full or partial treaty benefits based on an evaluation of the extent to which the resident of the other country met any of the criteria under other provisions in the article. The competent authority of the source country is expected to consider the views of the competent authority of the residence country in determining whether to extend treaty benefits under this provision.

## <u>Article 23. Elimination of Double Taxation</u>

### <u>Internal taxation rules</u>

#### <u>United States</u>

The United States taxes the worldwide income of its citizens and residents. It attempts unilaterally to mitigate double taxation generally by allowing taxpayers to credit the foreign income taxes that they pay against U.S. tax imposed on their foreign-source income. An indirect or "deemed-paid" credit is also provided. Under this rule, a U.S. corporation that owns 10 percent or more of the voting stock of a foreign corporation and that receives a dividend from the foreign corporation (or an inclusion of the foreign corporation's income) is deemed to have paid

a portion of the foreign income taxes paid by the foreign corporation on its earnings. The taxes deemed paid by the U.S. corporation are included in its total foreign taxes paid for the year the dividend is received.

A fundamental premise of the foreign tax credit is that it may not offset U.S. tax on U.S.-source income. Therefore, the foreign tax credit provisions limit the foreign taxes that a taxpayer may claim as credits for the year to the amount of the taxpayer's U.S. tax liability attributable to its foreign-source income. The limitation is computed separately for passive category income and other income to prevent the crediting of foreign taxes on certain high-taxed foreign-source income against the U.S. tax on certain types of traditionally low-taxed foreign-source income. Other limitations may apply in determining the amount of foreign taxes that may be credited against the U.S. tax liability of a U.S. taxpayer.

<u>Poland</u>

Individuals residing in Poland are subject to tax on worldwide income, referred to in Poland as an "unlimited tax obligation." Polish resident individuals are eligible for relief from double taxation by means of a credit against Polish tax for foreign income tax paid. The credit is computed on a country-by-country basis.

Polish resident companies are subject to tax on global income but are eligible for relief from double taxation either through a credit system or a participation exemption system, depending on the identity of the other foreign taxing jurisdiction. For jurisdictions other than Switzerland or member states in either the EU or EEA, a credit is available to offset Polish tax in the amount of the underlying corporate income tax paid in the foreign jurisdiction. The credit is available only with respect to tax paid on the income of a foreign entity in which the Polish entity holds at least 75 percent of the capital outstanding. In addition, any foreign tax directly paid by the Polish entity to the foreign jurisdiction is available as a credit.

For income derived from subsidiaries in Switzerland, any member state of the EU or the EEA, a participation exemption system exempts dividend income for tax. Dividends and capital gains from eligible foreign subsidiaries qualify for an exemption from the Polish corporate tax if the resident corporation owns at least 10 percent of the capital in the foreign company and has held the participation for at least a two year period, which may elapse after the date on which the dividend is payable. If the subsidiary company is located in Switzerland, the minimum required capital participation held by the Polish parent is 25 percent rather than 10 percent.

<u>Proposed treaty</u>

<u>Overview</u>

One of the principal purposes for entering into an income tax treaty is to limit double taxation of income earned by a resident of one of the countries that may be taxed by the other country. Unilateral efforts to limit double taxation are imperfect. Because of differences in rules for when a person may be taxed on business income, a business may be taxed by two countries as if it were engaged in business in both countries. Also, a corporation or individual may be treated as a resident of more than one country and may therefore be taxed on a worldwide basis by both.

Double taxation is partly addressed in other articles of the proposed treaty that limit the right of a source country to tax income.  This article provides further relief in circumstances in which both Poland and the United States still tax the same item of income.  This article is not subject to the saving clause; the country of citizenship or residence will waive its overriding taxing jurisdiction to the extent that this article applies.

<u>Poland tax relief for taxes paid to the United States</u>

Specific rules are provided in paragraph 1 under which Poland, in imposing tax on its residents, provides relief for U.S. taxes paid by those residents.  Poland is required to provide relief from double taxation under the proposed treaty either by exempting the income otherwise subject to double taxation or by allowing a credit against Polish income tax in an amount equal to the U.S. tax imposed on the income.

As a general rule, Poland must exempt from tax income that a Polish resident derives that may be taxed by the United States under the proposed treaty.  Poland is, however, permitted to take into account the exempted income in calculating the amount of tax to be imposed on the remaining income of the Polish resident.  According to the Technical Explanation, this rule provides "exemption with progression."

For limited classes of income, this article requires Poland to allow a foreign tax credit.  If a Polish resident derives dividends, interest, royalties, capital gains, or other income that the United States is permitted to tax under Article 10, 11, 13, 14, or 21,  Poland must relieve double taxation by permitting the resident to deduct from its tax an amount equal to the tax paid to the United States.  The deduction is not to exceed the amount of Polish tax attributable to the income or capital gains.

<u>U.S. tax relief for taxes paid to Poland</u>

Paragraph 2 of this article generally provides that the United States must allow a U.S. citizen or resident a foreign tax credit for the income taxes paid or accrued to Poland, and must allow a U.S. corporation a deemed-paid credit when the U.S. corporation receives dividends from a Polish corporation in which the U.S. corporation owns 10 percent or more of the voting stock.  The credit generally is to be computed in accordance with the provisions and subject to the limitations of U.S. law (as that law may be amended from time to time without changing the general principles of the proposed treaty provisions).  This provision is similar to those found in the U.S. Model treaty and many U.S. tax treaties, and is consistent with U.S. law.

The proposed treaty provides that the taxes referred to in paragraphs 3(a) and 4 of Article 2 (Taxes Covered), which are Poland's personal income tax and any identical or substantially similar tax imposed after the proposed treaty was signed, are considered income taxes for purposes of paragraph 2.

Paragraph 3 includes a re-sourcing rule that applies for purposes of paragraph 2.  Under paragraph 3, an item of gross income (as determined under U.S. law) that is derived by a U.S. resident and that may be taxed by Poland under the proposed treaty is deemed to be income from sources in Poland for U.S. foreign tax credit purposes.  The Technical Explanation states that this re-sourcing rule is intended to ensure that a U.S. resident can obtain an appropriate amount of

U.S. foreign tax credit for taxes paid to Poland when the proposed treaty assigns to Poland primary taxing jurisdiction over an item of gross income.  As the Technical Explanation notes, the Code's foreign tax credit limitation generally applies separately to income re-sourced under treaties.

<u>U.S. citizens who are resident in Poland</u>

Paragraph 4 provides special rules for the tax treatment of certain types of income derived by U.S. citizens who are residents of Poland.  U.S. citizens, regardless of residence, are subject to U.S. tax on their worldwide income.  The U.S. tax on the income of a U.S. citizen who is a resident of Poland may exceed the U.S. tax that may be imposed under the proposed treaty on the income if it were derived by a resident of Poland who is not a U.S. citizen.  The Technical Explanation states that the provisions of paragraph 4 ensure that Poland does not bear the cost of U.S. taxation of its citizens who are residents of Poland.

Subparagraph 4(a) provides a special credit rule for Poland that limits the amount of credit Poland must allow a resident of Poland.  The rule applies to items of income that would be either exempt from U.S. tax or subject to reduced rates of U.S. tax under the provisions of the proposed treaty if they had been received by a resident of Poland who is not a U.S. citizen.  The tax credit allowed by Poland under paragraph 4 with respect to such items is limited to the U.S. tax that may be imposed under the proposed treaty, other than U.S. tax imposed solely by reason of the U.S. citizenship of the taxpayer under the provisions of the saving clause of paragraph 4 of Article 1 (General Scope).

For example, according to the Technical Explanation, if a U.S. citizen resident in Poland receives portfolio dividends from sources within the United States, the foreign tax credit granted by Poland would be limited to 15 percent of the dividend – the U.S. tax that may be imposed under subparagraph 2(b) of Article 10 (Dividends) – even if the shareholder is subject to U.S. net income tax because of his U.S. citizenship.

Subparagraph 4(b) eliminates the potential for double taxation that can arise because subparagraph 4(a) provides that Poland need not provide full relief for the U.S. tax imposed on its citizens resident in Poland.  The subparagraph provides that the United States will credit the income tax paid or accrued to Poland, after the application of subparagraph 4(a).  It further provides that in allowing the credit of the taxes paid to Poland, the United States will not reduce its tax below the amount that is creditable against Polish tax under subparagraph 4(a).

Since the income described in subparagraph 4(a) generally will be U.S. source income, special rules are required to re-source some of the income to Poland in order for a taxpayer to be able to credit the tax paid to Poland. This re-sourcing is provided for in subparagraph 4(c), which deems the items of income referred to in subparagraph 4(a) to be from foreign sources to the extent necessary to avoid double taxation under subparagraph 4(b).

The Technical Explanation includes two examples illustrating the application of paragraph 4 to a U.S. citizen resident in Poland ("the U.S. citizen") that receives a $100 U.S.-source portfolio dividend.  In both examples, the rate of withholding on a U.S.-source dividend is 15 percent and the U.S. income tax rate on U.S. citizens is 35 percent ("the U.S. citizenship

tax"). In the first example, the Poland tax rate that applies to the U.S. citizen that is resident in Poland is 25 percent. In this example, Poland allows the U.S. citizen to take a credit of $15 ($100 multiplied by 15 percent) against the Poland resident tax of $25 under subparagraph 4(a). As a result, the net tax the U.S. citizen pays to Poland post-credit is $10. In applying subparagraphs 4(b) and (c), the U.S. citizen first calculates the pre-credit citizenship tax of $35 ($100 multiplied by 35 percent). Since the tax the U.S. citizen owes to the U.S. government may not be less than the $15 of credit that the U.S. citizen takes against the Poland income tax under subparagraph 4(b), the maximum U.S. citizenship tax eligible to be offset by a credit is $20 ($35 pre-credit citizenship tax less $15 of Poland credit attributable to the dividend). As the $10 of net tax the U.S. citizen pays to Poland is less than the $20 of U.S. citizenship tax that may be offset by a credit, the U.S. citizen may take a credit of $10 under subparagraph 4(b). Subparagraph 4(c) then applies to resource $28.57 ($10 divided by 35 percent) of the U.S.-source dividend as foreign-source income in the current year so that the U.S. citizen may take the credit under the U.S. foreign tax credit limitation.

In the second example, the Poland tax rate that applies to the U.S. citizen that is resident in Poland is 40 percent. In this example, Poland allows the U.S. citizen to take a credit of $15 ($100 multiplied by 15 percent) against the Poland resident tax of $40 under subparagraph 4(a). As a result, the net tax the U.S. citizen pays to Poland post-credit will be $25. In applying subparagraphs 4(b) and (c), the U.S. citizen first calculates the pre-credit citizenship tax of $35 ($100 multiplied by 35 percent). Since the tax the U.S. citizen owes to the U.S. government may not be less than the $15 of credit that the U.S. citizen takes against the Poland income tax under subparagraph 4(b), the maximum U.S. citizenship tax eligible to be offset by a credit is $20 ($35 pre-credit citizenship tax less $15 of Poland credit attributable to the dividend). As the $25 of net tax the U.S. citizen pays to Poland is greater than the $20 of U.S. citizenship tax that may be offset by a credit, the U.S. citizen may take a credit in the current year of $20 under subparagraph 4(b) with $5 of excess foreign tax credit available for carryover. Subparagraph 4(c) then applies to re-source $57.14 ($20 divided by 35 percent) of the U.S.-source dividend as foreign-source income in the current year so that the U.S. citizen may take the credit under the U.S. foreign tax credit limitation.

Basis step-up

Paragraph 5 provides a rule to avoid the double taxation that could occur if a citizen or a resident of one treaty country relinquishes citizenship or long-term residence and is subject to an exit tax in that country. In particular, the rule of paragraph 5 addresses the mark-to-market tax imposed on covered expatriates under Code section 877A. The rule also would apply in circumstances in which Poland imposed any similar tax.

The paragraph 5 rule provides that when an individual gives up residence in one of the treaty countries and is treated under that country's tax laws as having sold any property for its fair market value and, consequently, is taxed by that country by reason of the deemed sale, the individual may elect to be treated for purposes of taxation in the other treaty country as if the individual had, immediately before relinquishing residence in the first treaty country, sold and reacquired the property for its fair market value. This election is available to a U.S. citizen or long-term resident who expatriates from the United States to Poland and is subject to U.S. mark-to-market tax under section 877A. The effect of the election is that for Polish tax purposes the

individual's basis in the property with respect to which the election is made is the fair market value of that property on the date of the deemed sale. As a result, only the amount of the appreciation in the property's value attributable to the period during which the individual is a resident of Poland will be taxed if the individual sells the property while a resident of Poland.

The Technical Explanation states that individuals may make the election allowed by paragraph 5 only in respect of property that is subject to a treaty country's deemed disposition rules and only in respect of which gain on a deemed sale is recognized for that country's tax purposes in the taxable year of the deemed sale. If an individual is deemed to have sold multiple properties, the individual may make an election only if the deemed sale results in an overall net taxable gain; if the individual has a net loss, the election may not be made for any properties deemed sold.

The Technical Explanation also notes that a treaty country is required to provide a basis adjustment only to the extent that tax is actually paid to the other treaty country on a deemed sale. A taxpayer who has a deemed sale that produces gain no greater than the exclusion amount of section 877A or with respect to which payment of tax is deferred under section 877A(b) therefore is not eligible for the basis step-up.

### Relationship to other Articles

By virtue of subparagraph 5(a) of Article 1 (General Scope), this article is not subject to the saving clause of paragraph 4 of Article 1. Thus, the United States will allow a credit to its citizens and residents in accordance with this article, even if the credit were to provide a benefit not available under the Code (such as the re-sourcing provided by paragraph 3 and subparagraph 4(c)).

The Technical Explanation also notes that paragraph 5 explicitly grants new U.S. citizens and residents a benefit (by allowing a basis step-up when they become U.S. citizens or residents). The exception from the saving clause clarifies that the United States will not tax new U.S. citizens and residents on pre-emigration gain on property in respect of which an election is made under paragraph 5.

## Article 24.  Non-Discrimination

The proposed treaty includes a comprehensive nondiscrimination article. The article is substantially similar to the nondiscrimination article in the U.S. Model treaty and to provisions that have been included in other recent U.S. income tax treaties. The description below explains the scope and operation of the individual paragraphs and identifies instances in which the article varies from the U.S. Model treaty.

In general, neither treaty country is permitted to discriminate against persons from the other country. Not all instances of differential treatment are discriminatory. Rather, the Technical Explanation provides, "[o]nly differences in tax treatment that materially disadvantage the foreign person relative to the domestic person are properly the subject of the Article." According to the Technical Explanation, the underlying premise of the operative paragraphs is that if the differential treatment is directly related to tax-relevant differences, the treatment is not discriminatory within the meaning of the article, regardless of slight variations in the language

used in the operative paragraphs. Examples of tax-relevant disparities in circumstances include that one person is subject to worldwide taxation in a treaty country and another person is not, or that an item of income may be taxed at a later date in one person's hands but not in another person's hands.

In paragraph 1, the proposed treaty provides that a national of one treaty country may not be subject to taxation by the other treaty country if that taxation is "other or more burdensome than" that imposed on the treaty country's own comparably situated nationals in the same circumstances. In so providing, the language is consistent with the OECD Model treaty. In contrast, the language in the U.S. Model treaty omits reference to "other" taxation. Although the paragraph also departs from the U.S. Model treaty in that it does not include a statement to the effect that U.S. nationals subject to tax on a worldwide basis are not in the same circumstances as Polish nationals who are not U.S. residents, it achieves the same result by including a reference to taxation of worldwide income as a factor to be considered in determining whether circumstances are comparable.

Because this paragraph, unlike the succeeding paragraphs in this article, refers to nationals rather than residents, this paragraph may apply to a national without regard to the limitations of Article 23 (Limitation on Benefits). The term "national" includes both individuals and juridical entities, as defined in Article 3 (General Definitions). Thus, a national of one treaty country need not be a resident of either treaty country to claim the protection of this provision if circumstances are comparable. For example, a U.S. citizen who is resident in a third country is entitled to the same treatment in Poland as a comparably situated Polish national.

Under paragraph 2 of the proposed treaty, neither treaty country may tax a permanent establishment of an enterprise of the other treaty country less favorably than it taxes income from the same activities carried on by its own enterprises. In this instance, the fact that the U.S. enterprise is subject to U.S. tax on its worldwide income does not provide a basis on which differential treatment of the Polish owned permanent establishment is permitted. However, the Technical Explanation notes that foreign ownership or control may justify differences in information reporting requirements, collection methods and related penalties.

As under both the U.S. and OECD Model treaties, paragraph 3 makes clear that a treaty country is not obligated to grant residents of the other treaty country any personal allowances, reliefs, or reductions for tax purposes on account of civil status or family responsibilities that it grants to its own residents.

Paragraph 4 is similar but not identical to that of the U.S. Model treaty, and generally prohibits discrimination in the treatment of amounts paid by an enterprise of one treaty country to a resident of the other treaty country, for purposes of computing the enterprise's taxable profits, except to the extent that the anti-avoidance rules in other articles of the proposed treaty require otherwise. Those rules are prescribed in paragraph 1 of Article 9 (Associated Enterprises), paragraph 8 of Article 11 (Interest), and paragraph 6 of Article 12 (Royalties) and concern transactions between related persons. The Technical Explanation states that the exception relating to paragraph 8 of Article 11 (Interest) would include the denial or deferral of certain interest deductions under section 163(j) of the Code, thus allowing the United States to

73

apply its earnings stripping rules. The language of the paragraph in the U.S. Model treaty refers to taxable profits and deductions of a resident rather than of an enterprise.

Debts of an enterprise of one treaty country to a resident of the other treaty country are also deductible for purposes of determining the taxable capital of the enterprise under the same conditions as if they had been owed to a resident of the first treaty country. Because the nondiscrimination provisions are not limited in application to those taxes identified in Article 2 (Taxes Covered), this provision may be relevant to both treaty countries (for example, because in the United States capital taxes often are imposed by local governments).

Paragraph 5 provides that the nondiscrimination rules also apply to enterprises of one treaty country the capital of which is owned in whole or in part by one or more residents of the other treaty country. An enterprise of one treaty country the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other treaty country may not be subjected in the first country to any taxation (or any connected requirement) that is more burdensome than the taxation (or connected requirements) that the first country imposes or may impose on other similar enterprises. As noted above, some differences in treatment may be justified on the basis of tax-relevant differences in circumstances between two enterprises. In this regard, the Technical Explanation provides examples of Code provisions that are understood by the two treaty countries not to violate the nondiscrimination provision of the proposed treaty, including the rules that tax U.S. corporations making certain distributions to foreign shareholders in what would otherwise be nonrecognition transactions, the rules that impose a withholding tax on non-U.S. partners of a partnership, the rules that prevent foreign persons from owning stock in subchapter S corporations, and the rules that prevent foreign corporations from joining in filing consolidated returns with domestic corporations.

The proposed treaty at paragraph 6 provides that nothing in this article may be construed as preventing either of the countries from imposing a branch profits tax as described in paragraph 1 of Article 12 (Branch Profits).

Paragraph 7 provides that the protection from discrimination applies to taxes of every kind and description imposed by either treaty country, or any political subdivision or local authority of that treaty country, whether or not within the definition of taxes covered in Article 2 (Taxes Covered). According to the Technical Explanation, however, customs duties are not regarded as taxes for purposes of this article.

## Article 25.  Mutual Agreement Procedure

The mutual agreement provision permits the competent authorities of the treaty countries to communicate to resolve disputes and clarify issues with respect to interpretation and application of the treaty. Under this article, a person who believes that one or both of the treaty countries have taken actions causing that person to be subject to tax in a manner not in accordance with the provisions of the proposed treaty may, irrespective of internal law remedies, present a case to the competent authority of the treaty country of which the person is a resident. If the case comes under paragraph 1 of Article 24 (Non-Discrimination), the person may present the case to the treaty country of which the person is a national.

Typical cases brought under the mutual agreement procedure involve double taxation arising from transfer pricing adjustments, but other types of cases may also be brought. For example, a taxpayer who has received income that the source country has determined is deferred compensation and therefore is taxable in that country may believe that the income is pension income and taxable only in the taxpayer's country of residence. The benefits of this article are not limited by the saving clause understood to apply to this treaty under paragraph 4 of the Article 1 (General Scope). Consequently, the United States may apply rules and definitions agreed to by the competent authorities under the mutual agreement procedure to a U.S. citizen or resident even if those rules and definitions differ from comparable provisions of the Code. In addition, a person may seek relief under this provision even if not entitled to benefits under Article 22 (Limitation on Benefits).

The proposed treaty requires the competent authorities to attempt to reach mutual agreement when resolution of a case presented to one competent authority appears justified but cannot be resolved by unilateral action of that competent authority. The competent authority to whom a case was first presented must endeavor to resolve the case by mutual agreement with the competent authority of the other treaty country, with a view to the avoidance of taxation that is not in accordance with the proposed treaty.

Although the U.S. Model treaty does not set a limitations period in which such cases must be presented, the proposed treaty follows the OECD Model treaty imposes a time limit for doing so. The case must be presented by the taxpayer within three years from the first notification of action that results in taxation not in accordance with the treaty. Taxpayers need not exhaust the remedies under the laws of the relevant treaty country before presenting a case to the competent authorities. The competent authorities may accept a timely submitted case even if the treaty was terminated after the tax year that is the subject of the request, even though the ability to achieve a solution is limited by the constraints on the competent authorities by reason of the termination of the treaty.

The proposed treaty provides that any agreement reached will be implemented notwithstanding any time limits or other procedural limitations in the domestic law of either treaty country (for example, a country's applicable statute of limitations). However, consistent with the general scope of the treaty, a mutual agreement may not override benefits or allowances authorized under domestic law or by the terms of an agreement to which the treaty country is a party. As a result, according to the Technical Explanation, if a case is presented to the U.S. competent authority after the taxpayer has entered into a written settlement or closing agreement with the United States, efforts of the U.S. competent authority will be limited to seeking a correlative adjustment from Polish authorities.

The competent authorities of the treaty countries agree to endeavor to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the proposed treaty. The article does not specify the types of issues that may be addressed or the specific remedies that may be agreed upon, as the U.S. Model treaty does. However, it is likely that the competent authorities may, for example, negotiate with respect to allocation of income, deductions, credits, or allowances between an enterprise in one treaty country and its permanent establishment in the other treaty country, or between related persons, consistent with the arm's-length principle underlying Article 7 (Business Profits) and Article 9 (Associated Enterprises) of

the proposed treaty.  Authority to resolve transfer pricing issues (including advanced pricing agreements) and to settle conflicts regarding the characterization of particular items of income, the characterization of persons, the application of source rules with respect to particular items of income, the meaning of a term, or the timing of an item of income are consistent with the objective of the mutual agreement procedure.   It is also possible that the competent authorities would be expected to identify the procedures within their respective administrative agencies that may constitute "first notification of action" for purposes of triggering the time period within which a case may be presented to a competent authority.

The competent authorities are permitted to communicate with each other directly for purposes of reaching an agreement in the sense of this article, thus avoiding the need for the competent authorities to communicate through diplomatic channels.  According to the Technical Explanation, the competent authorities may avail themselves of the benefit of a network of bilateral treaties to resolve multijurisdictional issues, provided that no member of the multilateral solution exceeds the scope of its authority under the respective bilateral agreements.

The proposed treaty specifically authorizes use of a joint commission for the purpose of reaching mutual agreements, in the nature of voluntary arbitration.

### Article 26.  Exchange of Information and Administrative Assistance

The proposed treaty includes rules governing exchange of information and administrative assistance that are substantially similar to those in the U.S. Model treaty.  The description below explains the scope and operation of the individual paragraphs.  It also identifies instances in which the article varies from the U.S. Model treaty.

The United States and Poland agree to exchange such information as is foreseeably relevant in carrying out the provisions of the proposed treaty or in carrying out the provisions of the domestic laws of the two treaty countries concerning all taxes of any kind imposed by a treaty country.  The use of the word "relevant" indicates the breadth of the scope of the exchanges, in establishing the standard for determining whether or not information may be exchanged under the proposed treaty.  It conforms to the standard used in Code section 7602, which is the principal source of authority for U.S. information gathering and examination of records.  Under section 7602, the IRS may request to examine any books, records or other material that "may be relevant," as confirmed by the U.S. Supreme Court in a line of cases beginning with *United States v. Powell.*[48]

In the United States, the administrative authority of the IRS to obtain information by service of an administrative summons extends to the territories and possessions under Code section 7651 in the same manner as if the possession or territory were a state.  Thus, even though paragraph 1(i) of Article 3 (General Definitions) of the proposed treaty provides a definition of "United States" that limits its meaning to its geographic sense for most purposes under the proposed treaty and specifically carves out its possessions and territories, information in the U.S.

---

[48]  379 U.S. 48 (1964).

possessions or territories is subject to exchange of information pursuant to a proper request under the proposed treaty.

Information may be exchanged to enable each treaty country to administer its own domestic law, to the extent that taxation under that law is not contrary to the proposed treaty. The competent authority of one treaty country may request information about a transaction from the competent authority of the other treaty country even if the transaction to which the information relates is a purely domestic transaction in the requested country and information exchange about the transaction would not be undertaken to carry out the proposed treaty.  As an example, similar to the rules applicable under the OECD Model treaty, if a U.S. company and a Polish company transact with one another through a company resident in a third country that has no treaty with the United States or Poland, the U.S. and Polish competent authorities may, to enforce their internal rules, exchange information about prices their respective resident companies paid in their transactions with the third-country company.

The proposed treaty provides that exchange of information may include information relating to the assessment or enforcement of taxes of any kind.  Enforcement includes the collection of, or prosecution in respect of, or the determination of appeals in relation to, taxes. Consequently, the competent authorities may exchange information about collection cases, cases under civil examination or criminal investigation, and cases being prosecuted.

Exchange of information is not restricted by paragraph 1 of Article 1 (General Scope) or Article 2 (Taxes Covered).   Accordingly, information about persons who are residents of neither Poland nor the United States may be requested and provided under this article.  For example, if a third-country resident has a Polish bank account and the IRS believes that funds in the account should have been, but have not been, reported, the U.S. competent authority may request information from Poland about the bank account.  Similarly, the competent authorities may exchange information relating to a broader category of taxes beyond those otherwise covered by the proposed treaty, including, for example, U.S. estate and gift taxes, U.S. excise taxes, and Polish value-added taxes.

Under paragraph 2 of this article in the proposed treaty, any information exchanged under the proposed treaty is to be treated as secret in the same manner as information obtained under the domestic laws of the treaty country receiving the information.  The exchanged information may be disclosed only to persons or authorities (including courts, administrative bodies, and legislative bodies) involved in the administration, enforcement or oversight of the tax laws.  Such functions include assessment, collection, civil and criminal prosecution, and the determination of appeals in relation to the taxes to which the proposed treaty applies.  The paragraph also authorizes disclosure of the exchanged information to persons involved in oversight of taxes, which in the United States includes the tax-writing committees of the U.S. Congress and the Government Accountability Office.  All such persons or authorities receiving the information may use the information only in the performance of their role in overseeing the administration of U.S. tax laws.  Exchanged information may be disclosed in public court proceedings or in judicial decisions.

The proposed treaty includes protections against requiring a treaty country to take action contrary to its own laws while ensuring that such protection is not used to refuse a proper request

simply because the requested country does not have an domestic tax need for the information. Paragraph 3 specifies that a treaty country is not required to carry out administrative measures at variance with the laws and administrative practice of either treaty country, to supply information that is not obtainable under the laws or in the normal administrative practice of either treaty country, or to supply information that would disclose any trade, business, industrial, commercial, or professional secret or trade process, or information the disclosure of which would be contrary to public policy.   Paragraph 4 provides that the requested treaty country is required to exercise its administrative powers to obtain information even if it is not needed or usable in a domestic tax matter and specifies that the restrictions in paragraph 3 do not justify a refusal to exchange of information based on lack of a domestic interest.

This provision makes clear that the restrictions discussed above do not permit rejection of a request based solely on its lack of relevance under domestic law of the requested country.   If information requested by a treaty country is within the scope of this article, the proposed treaty provides that the requested treaty country must obtain the information in the same manner and to the same extent as if the tax of the requesting treaty country were the tax of the requested treaty country and were being imposed by that treaty country.  The request for exchange of information is to be honored notwithstanding that the requested treaty country may not need the information at that time for purposes of administering its own tax rules.  Thus, for example, if a treaty country is asked to provide information, it should provide the information even if its own statute of limitations period has expired for the issue to which the information relates.   The statute of limitations of the treaty country making the request should govern.

According to the Technical Explanation, even in cases in which the restrictions on information exchange are appropriately construed to relieve a treaty country of an obligation to supply information in response to a request from the other treaty country, the requested country may choose to supply the information if doing so does not violate its internal law.  The limitations on the scope of the obligation to exchange information do not preclude exchange.

The proposed treaty at paragraph 5 explicitly limits the scope of the general principle described above that the treaty is not intended to require any actions by a treaty country at variance with its domestic law, by providing that a treaty country cannot refuse to respond to a request for information based on the fact that the information is in the possession of financial institutions, nominees, or persons acting in an agency or fiduciary capacity.  With regard to persons acting in an agency or fiduciary capacity, the scope of any override of domestic law is not clear.  Thus, a competent authority receiving a request for information from a financial institution may not decline the request based on an argument that domestic bank secrecy or similar rules override the proposed treaty obligations and preclude honoring the request.

The proposed treaty at paragraph 5 also provides that the competent authorities shall not refuse to exchange information because it relates to information concerning ownership interests in a "person."  According to the Technical Explanation, this requirement is expected to have the effect of requiring disclosure of the beneficial owner of bearer shares, notwithstanding the lack of reference to ownership interests in instruments as well as persons.

The proposed treaty makes it possible for a treaty country to request that responsive information be provided in an authenticated form that will facilitate use of that information in the

administrative or judicial proceedings in the requesting treaty country. Upon specific request by the competent authority of a treaty country, the other treaty country competent authority must provide information in the form of depositions of witnesses and authenticated copies of unedited original documents (including books, papers, statements, records, accounts, and writings), to the same extent such depositions and documents can be obtained under the laws and administrative practices of the requested treaty country with respect to its own taxes.

Unlike the U.S. Model treaty, the proposed treaty does not require collection assistance in order to facilitate the administration of the benefits provided under the proposed treaty. It does, however, authorize exchange of information with respect to collection and enforcement.

According to the Technical Explanation, the exchange of information provision is applicable to any taxable period, including taxable periods prior to the entry into force, upon entry into force of the proposed treaty. If the provisions of the new Article 26 are subsequently terminated in accordance with Article 29 (Termination) of the proposed treaty, authority to exchange information with respect to any taxable period would cease under the treaty, even if the treaty was in force during the year to which the requested information relates, but the competent authorities could exchange information to the extent that domestic law or another international agreement permitted such exchange.

## Article 27.  Members of Diplomatic Missions and Consular Posts

The proposed treaty contains the rule (similar to that found in the U.S. Model treaty and other U.S. tax treaties) that its provisions do not affect the fiscal privileges of members of diplomatic missions, permanent representations, or consular posts under the general rules of international law or under the provisions of special agreements. Accordingly, the proposed treaty will not preempt the exemption from tax that a host country may grant to the salary of diplomatic officials of the other country. The saving clause is not taken into account in the application of this article to host country residents (*i.e.*, person who are resident for purposes of the proposed treaty) who are neither citizens nor lawful permanent residents (*i.e.*, permanent residents for immigration law purposes) of the host country. Thus, for example, Polish diplomats who are considered residents of the United States for purposes of the proposed treaty (but not for purposes of U.S. immigration law) are not made subject to U.S. tax by the proposed treaty.

## Article 28.  Entry into Force

The proposed treaty is subject to ratification in accordance with the applicable procedures in the United States and Poland. The treaty countries shall notify each other in writing, through diplomatic channels, when their respective applicable procedures have been satisfied. The proposed treaty will enter into force on the date of the later of the notifications.

With respect to withholding taxes (principally on dividends, interest, and royalties), the proposed treaty has effect for amounts paid or credited on or after the first day of the second month following the date on which the proposed treaty enters into force. The Technical Explanation provides an example, in which, as a result of the instruments of ratification being

exchanged on April 25 of a given year, the treaty rate of withholding under paragraph 2 of Article 10 (Dividends) is applicable to dividends paid after June 1 of that year.

For other taxes, the proposed treaty has effect for taxable periods beginning on or after January 1 of the calendar year immediately following the date on which the proposed treaty enters into force.

The proposed treaty terminates the existing treaty between Poland and the United States in relation to any tax from the date the proposed treaty has effect in respect to such tax. The existing treaty terminates on the last date on which it has effect in relation to any tax.

An individual entitled to benefits of Article 17 (Teachers), Article 18 (Students and Trainees) or Article 19 (Government Functions) of the existing treaty at the time of the entry into force of the proposed treaty shall continue to be entitled to such benefits until such time as the individual would cease to be entitled to such benefits if the existing treaty remained in force.

## Article 29. Termination

This article provides that the proposed treaty is to remain in effect indefinitely, unless terminated by one of the treaty countries. The treaty may be terminated through the appropriate diplomatic channels on or before June 30th in any calendar year beginning after the year in which the proposed treaty enters into force.

If notice of termination is given, the provisions of the treaty with respect to withholding at source will cease to have effect on January 1 of the next calendar year. Similarly, for other taxes, the treaty will cease to have effect for taxes chargeable with respect to the tax periods beginning on or after January 1 of the next calendar year. For example, if notice of termination is given on May 1, 2015, then provisions of the treaty with respect to withholding at source will cease to have effect on January 1, 2016. For calendar year companies, the treaty will cease to have effect for taxes chargeable to the tax period commencing January 1, 2016. However, for a company with a November 30 fiscal year end, the treaty will cease to have effect for taxes chargeable to the tax period commencing December 1, 2016.

# VI.  ISSUES

The current U.S. Model treaty was published in 2006.  A number of U.S. income tax treaties and protocols to earlier treaties have entered into force since then.  Significant deviations from the U.S. Model treaty have, understandably, proliferated.  This proliferation can be expected to continue as the U.S. State Department and Treasury Department negotiate new income tax treaties and protocols.

The proposed treaty includes at least two provisions, the limitation on benefits rules and the rules for attributing profits to a permanent establishment, that include important deviations from the U.S. Model treaty.  The Committee may wish to consider, among other questions described below, the extent to which these deviations represent actual U.S. income tax treaty policy notwithstanding that they differ from the policy as provided in the U.S. Model treaty.  The Committee also may wish to inquire into whether the Treasury Department expects to publish a new model treaty in the near future and, if it does so expect, whether that new model would include provisions similar to the two deviations described below.

## A.  Attribution of Business Profits

### In general

Article 7 (Business Profits) provides rules for the taxation by a treaty country of the business profits of an enterprise located in the other treaty country.  The proposed treaty is the first to generally adopt the language of Article 7 (Business Profits) of the OECD Model treaty.  Although the language used in the OECD Model treaty differs from the U.S. Model treaty, the policy toward, and implementation of, the business profits article under the two models are substantively similar.  The Committee may wish to ask the Treasury Department whether the use of the OECD Model treaty Article 7 in the Polish treaty represents a change in U.S. income tax treaty policy.  As the proposed treaty generally adopts the language of Article 7 of the OECD Model treaty, the discussion that follows compares Article 7 of the OECD and U.S. Model treaties.

### Permanent establishment

In paragraph 1 of both the OECD and U.S. Model treaties, Article 7 sets forth the basic rule that the business profits cannot be taxed unless the enterprise carries on a business through a permanent establishment in the other treaty country.  Although there are slight differences in the language, the provisions in the two models are identical in operation.  This principle is based on the general international consensus that a country should not have taxing rights over the profits of an enterprise if the enterprise is not participating in the economic life of the country.  Additionally, if an enterprise carries on business in the other treaty country through a permanent establishment, only the profits attributable to the permanent establishment determined under Article 7 are taxable in the country where the permanent establishment is located.

This determination may differ from the amount determined to be effectively connected income under U.S. tax law.  U.S. source income, gain, or loss (other than periodical income and capital gains and losses subject to specific factors) is treated as effectively connected with the conduct of a U.S. trade or business, whether or not the income, gain or loss is derived from the

trade or business being carried on in the U.S. during the tax year (the "force-of-attraction rule").[49]  Neither the U.S. Model treaty nor the OECD Model treaty includes a force-of-attraction rule; only profits attributable to the permanent establishment under the principles of Article 7 are taxable by the treaty country where the permanent establishment is located.

## Attribution of profits

### Basic principles

Paragraph 2 of the OECD Model treaty and paragraphs 2, 3, 4 and 5 of the U.S. Model treaty provide rules for determining the profits that are attributable to the permanent establishment.  The separate entity and arm's-length pricing principles are the basic principles upon which paragraph 2 in both model treaties is based.  This paragraph does not allocate profits of the entire enterprise between the permanent establishment and the other parts of the enterprise; rather, it requires that the profits attributable to a permanent establishment be determined as if the permanent establishment were a separate enterprise operating at arm's length.  These principles are incorporated into both the OECD and U.S. Model treaties.

### Determination of profits

The OECD and U.S. model treaties include similar language that the profits attributable to the permanent establishment are the profits it might be expected to make if it were an independent enterprise engaged in the same or similar activities under the same or similar conditions.  Whereas the U.S. Model treaty uses the words "distinct and independent enterprise"; the OECD Model treaty refers to "a separate and independent enterprise."  The OECD Model treaty provides that to attribute profits, one must take into account "the functions performed, assets used and risks assumed by the enterprise through the permanent establishment and through the other parts of the enterprise."  The U.S. Model treaty provides that only the profits derived from the assets used, risks assumed and activities performed by the permanent establishment be included in profits attributed to the permanent establishment.  The Committee may wish to ask whether these distinctions between the two model treaties are viewed as significant differences giving rise to different outcomes when applied by treaty countries.

Both model treaties adopt the Authorized OECD Approach (the "AOA"), as set out under the 2010 OECD Report.  This AOA attributes profits to the permanent establishment from all its activities, including transactions with independent enterprises, transactions with associated enterprises, and dealings with other parts of the enterprise.  Article 7 of the U.S. and OECD Model treaties specifically refers to the dealings between the permanent establishment and other parts of the enterprise in order to emphasize that the treatment of the permanent establishment requires that these dealings be treated the same way as similar transaction taking place between independent enterprises.  The AOA involves two steps, described in more detail in the description of Article 7 of this document.

---

[49]  Sec. 864(c).

Allowable expenses

The U.S. Model treaty includes paragraph 3, explicitly providing for net basis taxation by allowing expenses incurred for the purposes of the permanent establishment, including executive and general administrative expenses so incurred, whether in the treaty country where the permanent establishment is situated or elsewhere, in determining the profits attributed to that permanent establishment.

The Commentaries to the OECD Model treaty, paragraph 30, state that profits are determined under paragraph 2 of this article, but that the issue of whether expenses are deductible when computing the taxable income of the enterprise in either state is a matter to be determined under domestic law, subject to the provisions of the treaty. The Commentaries to the OECD Model treaty, paragraph 31, explain that domestic rules that would ignore the recognition of dealings that should be recognized for the purposes of determining the profits attributable to a permanent establishment or that would deny the deduction of expenses not incurred exclusively for the benefit of the permanent establishment would clearly be in violation of Article 7. However, rules that prevent the deduction of certain categories of expenses (*e.g.* entertainment expenses) or provide for the timing of particular expenses are not affected by Article 7.

The Commentaries to the OECD Model, paragraphs 38-40, explain the history of a provision in the OECD Model treaty similar to paragraph 3 of the U.S. Model treaty. This paragraph explicitly allowed deductions for expenses incurred for the purposes of the permanent establishment, including executive and general administrative expenses, whether in the treaty country where the permanent establishment is located or elsewhere. The paragraph was intended to clarify that the determination of profit attributable to a permanent establishment required that expenses incurred directly or indirectly for the benefit of that permanent establishment be deducted. However, the paragraph was sometimes read as limiting the deduction of expenses to the actual amount of the expense. Paragraph 40 of the Commentaries to the OECD Model explains that the current wording in Article 7, paragraph 2 requires the recognition and arm's length pricing of the dealings through which one part of the enterprise performs function for the benefit of the permanent establishment (*e.g.*, through the provision of assistance in day-to-day management). This requires that a deduction be allowed based on an arm's length charge for these dealings, as opposed to a deduction limited to the actual amount of the expense. The Committee may wish to inquire about the experience of the United States with its treaty partners related to the allowance and determination of the price for functions provided by one part of the enterprise for the benefit of the permanent establishment.

**Consistent treatment and mere purchase of goods**

Paragraph 4 of the U.S. Model treaty provides that no profits may be attributed to a permanent establishment by reason of the mere purchase of goods or merchandise for the enterprise. Paragraph 5 of the U.S. Model provides for consistency in the methods used to determine profits year by year. These paragraphs were also included in an earlier version of the OECD Model treaty. The Commentaries to the OECD Model treaty, paragraph 42, explain that the consistent treatment of methods is not necessary as the AOA does not allow for the application of fundamentally different methods and therefore there is not a need for such a provision. Paragraph 43 of the Commentaries to the OECD Model treaty explains that the

paragraph related to the mere purchase of goods is not consistent with the arm's-length principle as an independent enterprise performing purchasing activities would be remunerated for performing such activities.  The Committee may wish to ask the Treasury Department whether the exclusion of these paragraphs signals a change in treaty policy.  Additionally, the Committee may inquire why the Treasury Department included paragraphs 4 (viewed as inconsistent with the AOA) and 5 (viewed as unnecessary under the AOA) in the U.S. Model treaty if the U.S. Model treaty incorporates the AOA.

## Application to foreign tax credit

The proposed treaty Article 7 principles apply only for purposes of attributing profits to a permanent establishment and do not affect the application of other articles.  However, the OECD Model treaty applies the Article 7 principles to attributing profits to a permanent establishment and for purposes of Article 23 (Elimination of Double Taxation).  The OECD Model treaty requires that where an enterprise of one treaty country carries on business through a permanent establishment located in the other treaty country, the first country must either exempt the profits that are attributable to the permanent establishment (exemption system) or give a credit for the tax levied by the other country on the profits (foreign tax credit system).

The significance of this difference relates to the computation of the foreign tax credit limitation.  The United States does not apply the principles of Article 7 to the computation of the foreign tax credit limitation; rather, it applies the principles set forth by the Code.  A taxpayer seeking to obtain additional foreign tax credit limitation to prevent double taxation must do so through the mutual agreement procedures.  The taxpayer would have to prove that double taxation of the permanent establishment profits which resulted from the conflicting domestic law has been left unrelieved after applying mechanisms under domestic law.  The Committee may ask the Treasury Department about this difference as well as about the standard to be applied in determining whether a taxpayer meets the level of proof to show that double taxation was not relieved under the mechanisms of local law.

## Appropriate adjustment

The OECD Model treaty, paragraph 3, provides that where, in accordance with paragraph 2, one treaty country adjusts the profits attributable to a permanent establishment and taxes accordingly profits of the enterprises which have been charged to tax in the other treaty country, the other country will, to the extent necessary to eliminate double taxation on these profits, make an appropriate adjustment to the tax charged on those profits.  In determining such adjustment, the competent authorities of the treaty countries will, if necessary, consult other.  Paragraph 68 of the Commentaries to the OECD Model treaty acknowledges that some countries may prefer to resolve issues related to appropriate adjustments through the mutual agreement procedure if one treaty country does not unilaterally agree to make a corresponding adjustment, without any deference given to the adjusting treaty country's preferred position, and provides an alternative paragraph 3.  The proposed treaty follows this alternative paragraph providing that that the appropriate adjustment be made by the other treaty country only if it agrees with the adjustment made by the first treaty country.  The alternative paragraph 3 provides that where the other treaty country does not agree with the adjustment, the treaty countries will eliminate any double taxation through mutual agreement.  The Committee may wish to inquire about this

alternative paragraph provided in the Commentaries to the OECD Model treaty, including the concerns raised by the Treasury Department related to the requirement to make appropriate adjustments as a result of an adjustment made by another treaty country.

## Anti-abuse provision

The U.S. Model treaty, paragraph 7, and the proposed treaty, paragraph 5, include an anti-abuse provision treating income or gain attributable to a permanent establishment as taxable in the treaty country where the permanent establishment is located, even if the payment is deferred until after such permanent establishment has ceased to exist. The OECD Model treaty does not include a similar provision and the United States reserved the right to amend Article 7 to provide for taxation of income or gain even if payments are deferred until after the permanent establishment has ceased to exist.[50]

---

[50] See Commentaries to the OECD Model treaty, paragraph 79.

## B.  Limitation on Benefits

### In general

The proposed treaty, like nearly all U.S. income tax treaties, generally limits treaty benefits for treaty country residents so that only those residents with a sufficient nexus to a treaty country will receive treaty benefits.  Although the proposed treaty generally is intended to benefit residents of Poland and the United States only, residents of third countries sometimes attempt to use a treaty to obtain treaty benefits.  This practice is known as treaty shopping.  Investors from countries that do not have tax treaties with the United States, or from countries that have not agreed in their tax treaties with the United States to limit source-country taxation to the same extent that it is limited in another treaty may, for example, attempt to reduce the tax on interest on a loan to a U.S. person by lending money to the U.S. person indirectly through a country whose treaty with the United States provides a lower rate of withholding tax on interest.  The third-country investor may attempt to accomplish this result by establishing in that treaty country a subsidiary, trust, or other entity that then makes the loan to the U.S. person and claims the treaty reduction for the interest it receives – a reduction in withholding tax that would not have been possible had the investor made the loan directly from his or her country of residence.

Although the limitation on benefits rules in the proposed treaty are similar to the rules in other recent and proposed U.S. income tax treaties and protocols and in the U.S. Model treaty, they are not identical. The Committee may wish to inquire about certain differences such as the inclusion of full treaty benefits for headquarters companies, the derivative benefits rule and the anti-abuse rules on certain triangular arrangements, as well as selected aspects of applying the rules with respect to publicly traded companies. In addition, the Committee may wish to inquire about the standard that is to be applied by Competent Authorities in exercising discretion to grant benefits to a party that does not otherwise meet the limitation on benefits rules.

### Publicly-traded companies

The Committee may wish to explore the rationale underlying the identification of recognized stock exchanges for purposes of limitations of benefits, and the criteria the Treasury Department considers when negotiating over the definition of a recognized stock exchange.  A publicly traded company that is a resident of a treaty country is eligible for all the benefits of the proposed treaty if it satisfies the regular trading test, which requires that the company's principal class of shares (and any disproportionate class of shares) is primarily traded on one or more recognized stock exchanges, and also satisfies either the primary trading test, which requires that the company's principal class of shares be primarily traded on one or more recognized stock exchanges in its country of residence), or the management and control test, which requires that the company's primary place of management and control be in the treaty country of which the company is a resident.  In addition, a subsidiary of a company may qualify for benefits as a publicly traded company by satisfying a "vote or value" test under which it establishes that at least 50 percent of vote or value is owned directly or indirectly by five or fewer companies entitled to benefits under the requirements described immediately above (that is, the regular trading test and either the primary trading test or the management and control test).  A recognized stock exchange includes certain exchanges specified in the treaty, as well as any other stock exchange agreed upon by the competent authorities of the treaty countries.  Trading

on exchanges in either treaty country may be considered in determining whether the stock is regularly traded. In determining whether it is primarily traded in its country of residence, the proportion of trades that occur on exchanges within its country of residence must exceed trades in any other single country.

A possible rationale for the U.S. Model treaty's primary trading test is that a publicly-traded company should be eligible for treaty benefits only if it has a nexus with its country of residence, and may underlie the decision in both the proposed treaty and the U.S. Model treaty to permit substitution of the management and control test in lieu of a primary trading test. Accordingly, the Committee may wish to ask the Treasury Department to explain the latitude that is available to the Competent Authorities in identifying other exchanges that may be considered in satisfying the primary trading tests. For example, the Committee may ask about circumstances under which it is appropriate to consider trading that occurs within the economic areas of the treaty countries (for example, in the case of the United States, in a country that is party to NAFTA).

## Derivative benefits

The Committee may wish to inquire about the criteria used in determining whether inclusion of derivative benefits is appropriate in a particular treaty. Unlike the U.S. Model treaty, the proposed protocol grants benefits to an entity located in a treaty country if the owners of that entity would have been entitled to treaty benefits had they derived the income directly. To qualify, the company must satisfy both an ownership requirement and a base erosion requirement. The ownership requirement is met if shares representing at least 95 percent of the company's aggregate voting power and value, and at least 50 percent of any of the company's disproportionate class of shares, are owned directly or indirectly by seven or fewer persons who are equivalent beneficiaries. To date, derivative benefits rules have been included in the U.S.-Iceland treaty, entered into force in 2009, in the protocol to the U.S.-Canada treaty entered into force in late 2008, as well as in a number of treaties with countries that are member states of the European Union. In the case of member states of the European Union, special rules addressing withholding rates on intra-E.U. cross-border payments are generally included.

## Headquarters companies

The Committee may wish to ask the Treasury Department about the policies that justify deviating from the U.S. Model treaty and including rules in a treaty that grant headquarters companies treaty benefits when those headquarters companies would not be eligible for treaty benefits under any other limitation-on-benefits provision. In the proposed treaty, special rules allow treaty country benefits for a resident of a treaty country that functions as a headquarters company. The benefits are extended if the resident satisfies certain requirements intended to ensure that the headquarters company performs substantial supervisory and administrative functions for a group of companies: (1) that the group of companies is genuinely multinational; (2) that the headquarters company is subject to the same income tax rules in its country of residence as would apply to a company engaged in the active conduct of a trade or business in that country; and (3) that the headquarters company has independent authority in carrying out its supervisory and administrative functions. U.S. income tax treaties in force with Austria,

Australia, Belgium, the Netherlands, and Switzerland include similar rules for headquarters companies.

## Triangular arrangements

The proposed treaty includes special anti-abuse rules intended to deny treaty benefits in certain circumstances in which a Polish resident company earns U.S.-source income attributable to a third-country permanent establishment and is subject to little or no tax in the third jurisdiction and Poland. Although the U.S. Model treaty does not include rules addressing triangular arrangements, similar anti-abuse rules are included in other recent treaties and protocols. The Committee may wish to confirm that inclusion of such rules is indicative of a shift in Treasury Department policy rather than a concern specific to the jurisdiction with which the treaty is negotiated. The Committee may also wish to inquire whether the Treasury Department will insist on inclusion of anti-abuse rules whenever a treaty partner's internal tax rules provide an exemption for the income of a third-country permanent establishment of a treaty partner resident.

## Scope of discretion for grant of benefits by the competent authority

The Committee may wish to inquire whether it is appropriate to grant discretion to competent authorities to extend treaty benefits to persons not otherwise entitled to such benefits, and the standard for exercise of any such authorized. As in the U.S. Model and other recently negotiated treaties with modern limitations on benefits articles, the proposed treaty includes a grant of discretion to the competent authority to extend otherwise unavailable treaty benefits to a party that is not otherwise entitled to treaty benefits. The conditions placed on the exercise of that discretion in the proposed treaty are consistent with that of the U.S. Model and other recent treaties. In the U.S. Model and the proposed treaty, the competent authority is required to determine whether there was a principal purpose of obtaining treaty benefits before exercising his discretion to grant benefits. Although a test that requires examination of motive and principal purpose can be considered a subjective test, the application of such a test to an entity requires the review of the series of objective factors: the establishment, acquisition or maintenance and conduct of operations of the entity. The facts and circumstances surrounding each of these aspects of the entity's presence in a treaty jurisdiction are considered to evidence the underlying purpose of the entity.

An alternative would look to a purely objective standard, and require that the competent authority evaluate the extent to which the resident of the other country met any of the criteria under other provisions in the article, without regard to motivation. To the extent that such an objective test is applied to overlook inadvertent or minor failures to satisfy one of the limitations, the test cures mere foot faults. On the other hand, if loosely applied, such a standard could signal that relief is broadly available notwithstanding failure to comply with the requirements of one of the explicit limitations. In that case, it may inadvertently encourage the treaty shopping that the limitation on benefits rules are intended to discourage.

The OECD Model does not include an article similar to the limitations on benefits article in the proposed treaty or U.S. Model, but inclusion of such an article is under consideration in response to one of the action items in the Action Plan on Base Erosion and Profit Shifting,

undertaken by the OECD at the request of the G-20.[51]  Action Six in that plan is how to prevent inappropriate extension of treaty benefits.  A discussion draft report on the issue includes two draft articles designed to stem treaty abuse.  The first is a detailed limitations-on-benefits article similar to the U.S. Model.  The second is an article that generally disallows treaty benefits, notwithstanding any other provision in the treaty, if one can reasonably conclude after a review of facts and circumstances that obtaining treaty benefits was one of the main purposes of an arrangement or transaction.[52]  The model limitations on benefits article includes the discretionary authority to extend benefits based on the principal purpose test as well as the detailed rules.

---

[51]  The full Action Plan, published July 19, 2013 is available at www.oecd.org/ctp/BEPSActionPlan.pdf.

[52]  OECD, *Public Discussion Draft BEPS Action Item 6: Preventing the Granting of Treaty Benefits in Inappropriate Circumstances*, available at http://www.oecd.org/tax/beps-reports.htm.

89

# Exhibit 55

| 114TH CONGRESS 2d Session | SENATE | EXEC. REPT. 114–1 |
|---|---|---|

## PROTOCOL AMENDING TAX CONVENTION WITH SWITZERLAND

FEBRUARY 9, 2016.—Ordered to be printed

Mr. CORKER, from the Committee on Foreign Relations, submitted the following

# REPORT

[To accompany Treaty Doc. 112–1]

The Committee on Foreign Relations, to which was referred the Protocol Amending the Convention between the United States of America and the Swiss Confederation for the Avoidance of Double Taxation With Respect to Taxes on Income, signed at Washington on October 2, 1996, signed on September 23, 2009, at Washington, as corrected by an exchange of notes effected November 16, 2010, and a related agreement effected by an exchange of notes on September 23, 2009 (Treaty Doc. 112–1) (collectively, the "Protocol"), having considered the same, reports favorably thereon with one declaration and conditions related to reporting on mandatory arbitration, as indicated in the resolution of advice and consent, and recommends that the Senate give its advice and consent to ratification thereof, as set forth in this report and the accompanying resolution of advice and consent.

### CONTENTS

| | | Page |
|---|---|---|
| I. | Purpose | 1 |
| II. | Background | 2 |
| III. | Major Provisions | 2 |
| IV. | Entry Into Force | 3 |
| V. | Implementing Legislation | 3 |
| VI. | Committee Action | 3 |
| VII. | Committee Comments | 3 |
| VIII. | Text of Resolution of Advice and Consent to Ratification | 7 |
| IX. | Annex 1.—Technical Explanation | 11 |
| X. | Annex 2.—Transcript of Hearing of October 29, 2015 | 23 |

## I. PURPOSE

The purpose of the Protocol, along with the underlying treaty, is to promote and facilitate trade and investment between the United States and Switzerland, and to bring the existing treaty with Swit-

2

zerland (the "Treaty") into conformity with current U.S. tax treaty policy. Principally, the Protocol will modernize the existing Treaty's rules governing exchange of information; provide for the establishment of a mandatory arbitration rule to facilitate resolution of disputes between the U.S. and Swiss revenue authorities about the Treaty's application to particular taxpayers; and provide an exemption from source country withholding tax on dividends paid to individual retirement accounts.

## II. BACKGROUND

The United States has a tax treaty with Switzerland that is currently in force, which was concluded in 1996 along with a separate protocol to the treaty concluded on the same day ("1996 Protocol"). The proposed Protocol was negotiated to modernize our relationship with Switzerland in this area and to update the current treaty to better reflect current U.S. and Swiss domestic tax policy.

## III. MAJOR PROVISIONS

A detailed article-by-article analysis of the Protocol may be found in the Technical Explanation Published by the Department of the Treasury on June 7, 2011, which is included in Annex 1. In addition, the staff of the Joint Committee on Taxation prepared an analysis of the Protocol, JCX-31-11 (May 20, 2011), which was of great assistance to the committee in reviewing the Protocol. A summary of the key provisions of the Protocol is set forth below.

The Protocol is primarily intended to update the existing Swiss Convention to conform to current U.S. and Swiss tax treaty policy. It provides an exemption from source country withholding tax on dividends paid to individual retirement accounts; provides for the establishment of a mandatory arbitration rule to facilitate resolution of disputes between the U.S. and Swiss revenue authorities about the Treaty's application to particular taxpayers; and modernizes the existing Convention's rules governing exchange of information.

### INDIVIDUAL RETIREMENT ACCOUNTS

The Protocol updates the provisions of the existing Convention, as requested by Switzerland, to provide an exemption from source country withholding tax on dividends paid to individual retirement accounts.

### MANDATORY ARBITRATION

The Protocol incorporates mandatory, binding arbitration in certain cases that the competent authorities of the United States and Switzerland have been unable to resolve after a reasonable period of time under the mutual agreement procedure. The procedures include: (1) the opportunity for taxpayer participation by providing information directly to the arbitral panel through position papers; and (2) a prohibition against either state appointing an employee of its tax administration as a member of the arbitration panel.

### EXCHANGE OF INFORMATION

The Protocol would replace the existing Treaty's tax information exchange provisions (contained in Article 26) with updated rules

3

that are consistent with current U.S. tax treaty practice. The Protocol provides that the tax authorities of the two countries shall exchange information relevant to carrying out the provisions of the Convention or the domestic tax laws of either country. This broadens the Treaty's existing information sharing provisions, which provides for information sharing only where necessary for the prevention of income tax fraud or similar activities but in a manner consistent with long-standing U.S. tax laws. The Protocol also enables the United States to obtain information (including from financial institutions) from Switzerland whether or not Switzerland needs the information for its own tax purposes.

## IV. Entry Into Force

The proposed Protocol will enter into force between the United States and Switzerland on the date of the later note in an exchange of diplomatic notes in which the Parties notify each other that their respective applicable procedures for ratification have been satisfied. The various provisions of this Protocol shall have effect as described in paragraph 2 of Article V of the Protocol.

## V. Implementing Legislation

As is the case generally with income tax treaties, the Protocol is self-executing and does not require implementing legislation for the United States.

## VI. Committee Action

The committee held a public hearing on the Convention on October 29, 2015. Testimony was received from Robert Stack, Deputy Assistant Secretary (International Tax Affairs) at the U.S. Department of the Treasury and Thomas Barthold, Chief of Staff of the Joint Committee on Taxation. A transcript of the hearing is included in Annex 2 of this report. On November 10, 2015, the committee considered the Protocol and ordered it favorably reported by voice vote, with a quorum present and without objection.

In the 112th Congress, on July 26, 2011, the committee considered the Protocol and ordered it favorably reported by voice vote, with a quorum present and without objection.

In the 113th Congress, on April 1, 2014, the committee again considered the Protocol and ordered it favorably reported by voice vote, with a quorum present and without objection.

## VII. Committee Comments

The committee on Foreign Relations believes that the Protocol will stimulate increased trade and investment, strengthen provisions regarding the exchange of tax information, and promote closer co-operation between the United States and Switzerland. The committee therefore urges the Senate to act promptly to give advice and consent to ratification of the Protocol, as set forth in this report and the accompanying resolution of advice and consent.

4

A. MANDATORY ARBITRATION

The arbitration provision in the Protocol is largely consistent with the arbitration provisions included in recent treaties negotiated with Canada, Germany, Belgium, and France. It includes the modifications that were made first to the French treaty provisions to reflect concerns expressed by the Senate during its approval of the other treaties. Significantly, the provision in the Protocol includes: (1) the opportunity for taxpayer participation by providing information directly to the arbitral panel through position papers; and (2) a prohibition against either state appointing an employee of its tax administration as a member of the panel.

B. EXCHANGE OF INFORMATION

All tax treaties provide a process for the exchange of information between the two Competent Authorities who have the responsibility of enforcing national tax laws. If issues arise regarding a taxpayer failing to pay owed taxes that may be subject to taxation, the Competent Authority may formally request information and assistance from the other Competent Authority.

The Internal Revenue Services, designated the U.S. Competent Authority, must under the IRS Manual, exhaust all reasonable attempts to secure the information regarding the taxpayer's accounts before making an exchange of information request of the foreign competent authority. The Joint Committee on Taxation publishes an annual report with the total number of tax treaty disclosures. The latest report, dated June 5, 2015, indicated 2557 disclosures of taxpayer specific returns or return information made to a foreign competent authority under either a tax treaty or a tax information exchange agreement in the previous calendar year.

The committee notes that an exchange of information undertaken pursuant to a tax treaty is a tightly controlled process. U.S.government officials engaging in an exchange of information with a foreign Competent Authority are required to safeguard U.S. taxpayer information under the taxpayer confidentiality provisions of 26 U.S.C. 6103. The U.S. "Competent Authority" is authorized to decline an information request from a foreign government if the U.S. official has reason to believe the information will be disclosed in an unauthorized manner, misused for purposes other than legitimate tax collection, or otherwise used or disclosed for a purpose other than the legitimate enforcement of tax laws. The U.S. Competent Authority has declined requests the engage in information exchange when the Competent Authority had reason to believe the information would be used inappropriately or disclosed in an unauthorized manner.

Furthermore, the committee notes that U.S. taxpayers are further protected under the IRS Manual and long-standing tax treaty practice by the fact that a foreign Competent Authority is obligated to exhaust all reasonable efforts to secure the information and must present a credible case for the need for the information before a treaty request will be honored by the U.S. Government.

The Protocol would replace the existing Treaty's tax information exchange provisions with updated rules that are consistent with current U.S. tax treaty practice. The Protocol would allow the tax authorities of each country to exchange information relevant to car-

5

rying out the provisions of the Treaty or the domestic tax laws of either country, including information that would otherwise be protected by the bank secrecy laws of either country. It would also enable the United States to obtain information (including from financial institutions) from Switzerland whether or not Switzerland needs the information for its own tax purposes.

With respect to the issue of exchange of information under the treaty, the committee notes that the new standard under the Protocol for when Treasury can seek information in a tax inquiry under the exchange of information provisions in the treaty is in fact the existing standard under the U.S. tax law that has been in effect since 1954. The relevant federal statute (26 U.S.C. § 7602(a)(1)) authorizes the IRS, for the purpose of examining a tax return or determining a person's tax liability, "to examine any books, papers, records, or other data which may be relevant or material to such inquiry."

This "may be relevant" standard has been repeatedly upheld by the U.S. Supreme Court. See e.g., *United States* v. *Arthur Young & Co.*, 465 U.S. 805 (1984). A version of this standard has been part of the model U.S. Tax Treaty since 1996, and prior versions of the U.S. Model Tax Treaty were consistently interpreted as establishing the same standard. Since 1999, the Senate has approved at least fourteen other tax treaties specifically providing for the exchange of information that is or may be relevant for carrying out the treaty or the domestic tax laws of the parties.

The existing U.S.-Swiss tax treaty (which is proposed to be amended) is the only treaty that requires an establishment of tax fraud before Switzerland would hand over any information on U.S. accountholders with Swiss bank accounts. No other U.S. tax treaty uses this standard.

The committee further notes that the exchange of information provisions under tax treaties only permit the exchange of information that is foreseeably relevant to the collection of taxes. The treaties do not permit what has been mistakenly characterized as "bulk collection of the private financial information of all U.S. citizens living abroad." The type of information that would be covered under the information exchange standard has been described by the Supreme Court in the domestic context as "critical to the investigative and enforcement functions of the IRS." See *United States* v. *Powell,* 379 U.S. 48 (1964).

The proposed threshold under the U.S.-Switzerland Protocol would apply the same statutory standard to U.S. citizens with bank accounts abroad as already applies to U.S. citizens with bank accounts in the United States.

The committee takes note of the difficulties faced in 2008–2009 by the Internal Revenue Service and the Department of Justice in obtaining information needed to enforce U.S. tax laws against U.S. persons who utilized the services of UBS AG, a multinational bank based in Switzerland. The committee expects that the proposed Protocol—including in particular the express provisions making clear that a country's bank secrecy laws cannot prevent the exchange of tax information which may be relevant to the enforcement of the tax laws and requested pursuant to the treaty—should put the government of Switzerland in a position to prevent recurrence of such an incident in the future.

6

The committee takes note of Article 4 of the Protocol which sets forth information that should be provided to the requested State by the requesting State when making a request for information under the Treaty. It is the committee's understanding based upon the testimony and Technical Explanation provided by the Department of the Treasury that, while this paragraph contains important procedural requirements that are intended to ensure that "fishing expeditions" do not occur, the provisions of this paragraph will be interpreted by the United States and Switzerland to permit the widest possible exchange of information and not to frustrate effective exchange of information. In particular, the committee understands that with respect to the requirement that a request must include "information sufficient to identify the person under examination or investigation," it is mutually understood by the United States and Switzerland that there can be circumstances in which there is information sufficient to identify the person under examination or investigation even though the requesting State cannot provide the person's name.

## C. DECLARATION ON THE SELF-EXECUTING NATURE OF THE PROTOCOL

The committee has included one declaration in the recommended resolution of advice and consent. The declaration states that the Protocol is self-executing, as is the case generally with income tax treaties. Prior to the 110th Congress, the committee generally included such statements in the committee's report, but in light of the Supreme Court decision in *Medellin* v. *Texas,* 128 S. Ct. 1346 (2008), the committee determined that a clear statement in the Resolution is warranted. A further discussion of the committee's views on this matter can be found in Section VIII of Executive Report 110–12.

## D. CONDITIONS RELATED TO REPORTING ON MANDATORY ARBITRATION

The committee has included conditions in the recommended resolution of advice and consent. These types of conditions have been included in prior resolutions of advice and consent for tax treaties that provide for mandatory arbitration.

Specifically, not later than 2 years after the Protocol enters into force and prior to the first arbitration conducted pursuant to the binding arbitration mechanism provided for in the Protocol, the Secretary of the Treasury is required to transmit to the Committees on Finance and Foreign Relations of the Senate and the Joint Committee on Taxation the text of the rules of procedure applicable to arbitration panels, including conflict of interest rules to be applied to members of the arbitration panel.

In addition, not later than 60 days after a determination has been reached by an arbitration panel in the tenth arbitration proceeding conducted pursuant to the Protocol or any similar treaties specifically identified, the Secretary of the Treasury must submit to the Joint Committee on Taxation and the Committee on Finance of the Senate a detailed report regarding the operation and application of the arbitration mechanism contained in the Protocol and such treaties. The Secretary of the Treasury is further required to submit this type of report on March 1 of the year following the year in which the first report is submitted, and on an annual basis thereafter for a period of five years. Finally, the section clarifies

7

that these reporting requirements supersede the reporting requirements contained in paragraphs (2) and (3) of section 3 of the resolution of advice and consent to ratification of the 2009 France Protocol, approved by the Senate on December 3, 2009.

### E. AGREEMENTS RELATING TO REQUESTS FOR INFORMATION

In connection with efforts to obtain from Switzerland information relevant to U.S. investigations of alleged tax fraud committed by account holders of UBS AG, in 2009 and 2010 the United States and Switzerland entered into two agreements pursuant to the U.S. Switzerland Tax Treaty.

In particular, on August 19, 2009, the two governments signed an Agreement Between the United States of America and the Swiss Confederation on the request for information from the Internal Revenue Service of the United States of America regarding UBS AG, a corporation established under the laws of the Swiss Confederation. On March 31, 2010, the two governments signed a separate protocol amending the August 19, 2009 agreement.

The committee supports the objective of these agreements to facilitate the exchange of information between Switzerland and the United States in support of U.S. efforts to investigate and prosecute alleged tax fraud by account holder of UBS AG.

The committee notes its concern, however, about one provision of the March 31, 2010 protocol. Paragraph 4 of that protocol provides that "For the purposes of processing the Treaty Request, this Agreement and its Annex shall prevail over the existing Tax Treaty, its Protocol, and the Mutual Agreement in case of conflicting provisions."

Some could interpret the March 31, 2010, protocol's language indicating that the August 19, 2009, agreement "shall prevail" over the existing U.S.-Switzerland tax treaty to mean that the agreement has the effect of amending the tax treaty. The U.S.-Switzerland tax treaty is a treaty concluded with the advice and consent of the Senate. Amendments to treaties are themselves ordinarily subject to the advice and consent of the Senate. The executive branch has not sought the Senate's advice and consent to either the August 19, 2009 agreement or the March 31, 2010 protocol. The executive branch has assured the committee that the two governments did not intend this language to have any effect on the obligations of the United States under the U.S.-Switzerland tax treaty.

In order to avoid any similar confusion in the future, the committee expects that the executive branch will refrain from the use of similar language in any future agreements relating to requests for information under tax treaties unless it intends to seek the Senate's advice and consent for such agreements.

### VIII. TEXT OF RESOLUTION OF ADVICE AND CONSENT TO RATIFICATION

*Resolved (two-thirds of the Senators present concurring therein),*

**SECTION 1. SENATE ADVICE AND CONSENT SUBJECT TO A DECLARATION**

The Senate advises and consents to the ratification of the Protocol Amending the Convention between the United States of America and the Swiss Confederation for the Avoidance of Double

8

Taxation With Respect to Taxes on Income, signed at Washington October 2, 1996, signed September 23, 2009, at Washington, with a related agreement effected by an exchange of notes September 23, 2009, as corrected by an exchange of notes effected November 16, 2010 (the "Protocol") (Treaty Doc. 112–1), subject to the declaration of section 2.

**SECTION 2. DECLARATION**

The advice and consent of the Senate under section 1 is subject to the following declaration:

The Protocol is self-executing.

**SECTION 3. CONDITIONS**

The advice and consent of the Senate under section 1 is subject to the following conditions:

(1) Not later than 2 years after the Protocol enters into force and prior to the first arbitration conducted pursuant to the binding arbitration mechanism provided for in the Protocol, the Secretary of the Treasury shall transmit to the Committees on Finance and Foreign Relations of the Senate and the Joint Committee on Taxation the text of the rules of procedure applicable to arbitration panels, including conflict of interest rules to be applied to members of the arbitration panel.

(2)(A) Not later than 60 days after a determination has been reached by an arbitration panel in the tenth arbitration proceeding conducted pursuant to the Protocol or any of the treaties described in subparagraph (B), the Secretary of the Treasury shall prepare and submit to the Joint Committee on Taxation and the Committee on Finance of the Senate, subject to laws relating to taxpayer confidentiality, a detailed report regarding the operation and application of the arbitration mechanism contained in the Protocol and such treaties. The report shall include the following information:

(i) For the Protocol and each such treaty, the aggregate number of cases pending on the respective dates of entry into force of the Protocol and each treaty, including the following information:

(I) The number of such cases by treaty article or articles at issue.

(II) The number of such cases that have been resolved by the competent authorities through a mutual agreement as of the date of the report.

(III) The number of such cases for which arbitration proceedings have commenced as of the date of the report.

(ii) A list of every case presented to the competent authorities after the entry into force of the Protocol and each such treaty, including the following information regarding each case:

(I) The commencement date of the case for purposes of determining when arbitration is available.

(II) Whether the adjustment triggering the case, if any, was made by the United States or the relevant treaty partner.

(III) Which treaty the case relates to.

9

(IV) The treaty article or articles at issue in the case.

(V) The date the case was resolved by the competent authorities through a mutual agreement, if so resolved.

(VI) The date on which an arbitration proceeding commenced, if an arbitration proceeding commenced.

(VII) The date on which a determination was reached by the arbitration panel, if a determination was reached, and an indication as to whether the panel found in favor of the United States or the relevant treaty partner.

(iii) With respect to each dispute submitted to arbitration and for which a determination was reached by the arbitration panel pursuant to the Protocol or any such treaty, the following information:

(I) In the case of a dispute submitted under the Protocol, an indication as to whether the presenter of the case to the competent authority of a Contracting State submitted a Position Paper for consideration by the arbitration panel.

(II) An indication as to whether the determination of the arbitration panel was accepted by each concerned person.

(III) The amount of income, expense, or taxation at issue in the case as determined by reference to the filings that were sufficient to set the commencement date of the case for purposes of determining when arbitration is available.

(IV) The proposed resolutions (income, expense, or taxation) submitted by each competent authority to the arbitration panel.

(B) The treaties referred to in subparagraph (A) are—

(i) the 2006 Protocol Amending the Convention between the United States of America and the Federal Republic of Germany for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital and to Certain Other Taxes, done at Berlin June 1, 2006 (Treaty Doc. 109–20) (the "2006 German Protocol");

(ii) the Convention between the Government of the United States of America and the Government of the Kingdom of Belgium for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, and accompanying protocol, done at Brussels July 9, 1970 (the "Belgium Convention") (Treaty Doc. 110–3);

(iii) the Protocol Amending the Convention between the United States of America and Canada with Respect to Taxes on Income and on Capital, signed at Washington September 26, 1980 (the "2007 Canada Protocol") (Treaty Doc. 110–15); or

(iv) the Protocol Amending the Convention between the Government of the United States of America and the Government of the French Republic for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Re-

10

spect to Taxes on Income and Capital, signed at Paris August 31, 1994 (the "2009 France Protocol") (Treaty Doc. 111–4).

(3) The Secretary of the Treasury shall prepare and submit the detailed report required under paragraph (2) on March 1 of the year following the year in which the first report is submitted to the Joint Committee on Taxation and the Committee on Finance of the Senate, and on an annual basis thereafter for a period of five years. In each such report, disputes that were resolved, either by a mutual agreement between the relevant competent authorities or by a determination of an arbitration panel, and noted as such in prior reports may be omitted.

(4) The reporting requirements referred to in paragraphs (2) and (3) supersede the reporting requirements contained in paragraphs (2) and (3) of section 3 of the resolution of advice and consent to ratification of the 2009 France Protocol, approved by the Senate on December 3, 2009.

IX. ANNEX 1.—TECHNICAL EXPLANATION

DEPARTMENT OF THE TREASURY TECHNICAL EXPLA-
NATION OF THE PROTOCOL SIGNED AT WASHINGTON ON
SEPTEMBER 23, 2009 AMENDING THE CONVENTION BE-
TWEEN THE UNITED STATES OF AMERICA AND THE
SWISS CONFEDERATION FOR THE AVOIDANCE OF DOU-
BLE TAXATION AND THE PREVENTION OF FISCAL EVA-
SION WITH RESPECT TO TAXES ON INCOME, SIGNED AT
WASHINGTON ON OCTOBER 2, 1996, AS AMENDED BY THE
PROTOCOL SIGNED ON OCTOBER 2, 1996

This is a Technical Explanation of the Protocol signed at Wash-
ington on September 23, 2009 and the related Exchange of Notes
(hereinafter the "Protocol" and "Exchange of Notes" respectively),
amending the Convention between the United States of America
and the Swiss Confederation for the avoidance of double taxation
and the prevention of fiscal evasion with respect to taxes on in-
come, signed at Washington on October 2, 1996 as amended by the
Protocol also signed on October 2, 1996 (together, the "existing
Convention").

Negotiations took into account the U.S. Department of the Treas-
ury's current tax treaty policy and the Treasury Department's
Model Income Tax Convention, published on November 15, 2006
(the "U.S. Model"). Negotiations also took into account the Model
Tax Convention on Income and on Capital, published by the
Organisation for Economic Cooperation and Development (the
"OECD Model"), and recent tax treaties concluded by both coun-
tries.

This Technical Explanation is an official guide to the Protocol
and Exchange of Notes. It explains policies behind particular provi-
sions, as well as understandings reached during the negotiations
with respect to the interpretation and application of the Protocol
and the Exchange of Notes.

References to the existing Convention are intended to put various
provisions of the Protocol into context. The Technical Explanation
does not, however, provide a complete comparison between the pro-
visions of the existing Convention and the amendments made by
the Protocol and Exchange of Notes. The Technical Explanation is
not intended to provide a complete guide to the existing Convention
as amended by the Protocol and Exchange of Notes. To the extent
that the existing Convention has not been amended by the Protocol
and Exchange of Notes, the technical explanation of the Convention
signed at Washington on October 2, 1996 and the Protocol signed
on also signed on October 2, 1996 remains the official explanation.
References in this Technical Explanation to "he" or "his" should be
read to mean "he or she" or "his or her." References to the "Code"
are to the Internal Revenue Code of 1986, as amended.

(11)

The Exchange of Notes relates to the implementation of new paragraphs 6 and 7 of Article 25 (Mutual Agreement Procedure), which provide for binding arbitration of certain disputes between the competent authorities.

ARTICLE 1

Article 1 of the Protocol revises Article 10 (Dividends) of the existing Convention by restating paragraph 3. New paragraph 3 provides that dividends paid by a company resident in a Contracting State shall be exempt from tax in that State if the dividends are paid to and beneficially owned by a pension or other retirement arrangement which is a resident of the other Contracting State, or an individual retirement savings plan set up in and owned by a resident of the other Contracting State, and the competent authorities of the Contracting States agree that the pension or retirement arrangement, or the individual retirement savings plan, in a Contracting State generally corresponds to a pension or other retirement arrangement, or to an individual retirement savings plan, recognized for tax purposes in the other Contracting State.

The exemption from tax provided in new paragraph 3 shall not apply if the pension or retirement arrangement or the individual retirement savings plan receiving the dividend controls the company paying the dividend. Additionally, in order to qualify for the benefits of new paragraph 3, a pension or retirement arrangement or individual retirement savings plan must satisfy the requirements of paragraph 2 of Article 22 (Limitation on Benefits).

ARTICLE 2

Article 2 of the Protocol replaces paragraph 6 of Article 25 (Mutual Agreement Procedure) of the existing Convention with new paragraphs 6 and 7. New paragraphs 6 and 7 provide a mandatory binding arbitration proceeding. Paragraph 1 of the Exchange of Notes provides that binding arbitration will be used to determine the application of the Convention in respect of any case where the competent authorities have endeavored but are unable to reach an agreement under Article 25 regarding such application (the competent authorities may, however, agree that the particular case is not suitable for determination by arbitration. Paragraph 1 of the Exchange of Notes provides additional rules and procedures that apply to a case considered under the arbitration provisions.

New paragraph 6 provides that a case shall be resolved through arbitration when the competent authorities have endeavored but are unable to reach a complete agreement regarding a case and the following three conditions are satisfied. First, tax returns have been filed with at least one of the Contracting States with respect to the taxable years at issue in the case. Second, the case is not a case that the competent authorities agree before the date on which arbitration proceedings would otherwise have begun, is not suitable for determination by arbitration. Third, all concerned persons and their authorized representatives agree, according to the provisions of new subparagraph (7)(d), not to disclose to any other person any information received during the course of the arbitration proceeding from either Contracting State or the arbitration board, other than the determination of the board (confidentiality

13

agreement). The confidentiality agreement may also be executed by any concerned person that has the legal authority to bind any other concerned person on the matter. For example, a parent corporation with the legal authority to bind its subsidiary with respect to confidentiality may execute a comprehensive confidentiality agreement on its own behalf and that of its subsidiary.

New paragraph 6 provides that an unresolved case shall not be submitted to arbitration if a decision on such case has already been rendered by a court or administrative tribunal of either Contracting State.

New paragraph 7 provides additional rules and definitions to be used in applying the arbitration provisions. Subparagraph (7)(a) provides that the term "concerned person" means the person that brought the case to competent authority for consideration under Article 25 and includes all other persons, if any, whose tax liability to either Contracting State may be directly affected by a mutual agreement arising from that consideration. For example, a concerned person does not only include a U.S. corporation that brings a transfer pricing case with respect to a transaction entered into with its Swiss subsidiary for resolution to the U.S. competent authority, but also the Swiss subsidiary, which may have a correlative adjustment as a result of the resolution of the case.

Subparagraph (7)(c) provides that an arbitration proceeding begins on the later of two dates: two years from the commencement date of that case (unless both competent authorities have previously agreed to a different date), or the earliest date upon which all concerned persons have entered into a confidentiality agreement and the agreements have been received by both competent authorities. The commencement date of the case is defined by subparagraph (7)(b) as the earliest date on which the information necessary to undertake substantive consideration for a mutual agreement has been received by both competent authorities.

Subparagraph (1)(c) of the Exchange of Notes provides that notwithstanding the initiation of an arbitration proceeding, the competent authorities may reach a mutual agreement to resolve the case and terminate the arbitration proceeding. Correspondingly, a concerned person may withdraw its request for the competent authorities to engage in the Mutual Agreement Procedure and thereby terminate the arbitration proceeding at any time.Subparagraph (1)(p) of the Exchange of Notes provides that each competent authority will confirm in writing to the other competent authority and to the concerned persons the date of its receipt of the information necessary to undertake substantive consideration for a mutual agreement. Such information will be submitted to the competent authorities under relevant internal rules and procedures of each of the Contracting States. The information will not be considered received until both competent authorities have received copies of all materials submitted to either Contracting State by concerned persons in connection with the mutual agreement procedure.

The Exchange of Notes provides several procedural rules once an arbitration proceeding under paragraph 6 of Article 25 has commenced, but the competent authorities may complete these rules as necessary. In addition, as provided in subparagraph (1)(f) of the Exchange of Notes, the arbitration panel may adopt any procedures

14

necessary for the conduct of its business, provided the procedures are not inconsistent with any provision of Article 25 or of the Exchange of Notes.

Subparagraph (1)(e) of the Exchange of Notes provides that each Contracting State has 90 days from the date on which the arbitration proceeding begins to send a written communication to the other Contracting State appointing one member of the arbitration panel. The members of the arbitration panel shall not be employees of the tax administration which appoints them. Within 60 days of the date the second of such communications is sent, these two board members will appoint a third member to serve as the chair of the panel. The competent authorities will develop a non-exclusive list of individuals familiar in international tax matters who may potentially serve as the chair of the panel, but in any case, the chair can not be a citizen or resident of either Contracting State. In the event that the two members appointed by the Contracting States fail to agree on the third member by the requisite date, these members will be dismissed and each Contracting State will appoint a new member of the panel within 30 days of the dismissal of the original members.

Subparagraph (1)(g) of the Exchange of Notes establishes deadlines for submission of materials by the Contracting States to the arbitration panel. Each competent authority has 60 days from the date of appointment of the chair to submit a Proposed Resolution describing the proposed disposition of the specific monetary amounts of income, expense or taxation at issue in the case, and a supporting Position Paper. Copies of each State's submissions are to be provided by the panel to the other Contracting State on the date on which the later of the submissions is submitted to the panel. Each of the Contracting States may submit a Reply Submission to the panel within 120 days of the appointment of the chair to address points raised in the other State's Proposed Resolution or Position Paper. If one Contracting State fails to submit a Proposed Resolution within the requisite time, the Proposed Resolution of the other Contracting State is deemed to be the determination of the arbitration panel in the case and the arbitration proceeding will be terminated. Additional information may be supplied to the arbitration panel by a Contracting State only at the panel's request. The panel will provide copies of any such requested information, along with the panel's request, to the other Contracting State on the date on which the request or response is submitted. All communication from the Contracting States to the panel, and vice versa, is to be in writing between the chair of the panel and the designated competent authorities with the exception of communication regarding logistical matters.

Subparagraph (1)(h) of the Exchange of Notes provides that the presenter of the case to the competent authority of a Contracting State may submit a Position Paper to the panel for consideration by the panel. The Position Paper must be submitted within 90 days of the appointment of the chair, and the panel will provide copies of the Position Paper to the Contracting States on the date on which the later of the submissions of the Contracting States is submitted to the panel.

15

Subparagraph (1)(i) of the Exchange of Notes provides that the arbitration panel must deliver a determination in writing to the Contracting States within six months of the appointment of the chair. The determination must be one of the two Proposed Resolutions submitted by the Contracting States. Subparagraph (1)(b) of the Exchange of Notes provides that the determination may only provide a determination regarding the amount of income, expense or tax reportable to the Contracting States. The determination has no precedential value, and consequently the rationale behind a panel's determination would not be beneficial and may not be provided by the panel.

Subparagraphs (1)(j) and (1)(k) of the Exchange of Notes provide that unless any concerned person does not accept the decision of the arbitration panel, the determination of the panel constitutes a resolution by mutual agreement under Article 25 and, consequently, is binding on both Contracting States. Within 30 days of receiving the determination from the competent authority to which the case was first presented, each concerned person must advise that competent authority whether the person accepts the determination. In addition, if the case is in litigation, each concerned person who is a party to the litigation must also advise, within the same time frame, the court of its acceptance of the arbitration determination, and withdraw from the litigation the issues resolved by the arbitration proceeding. If any concerned person fails to advise the competent authority and relevant court within the requisite time, such failure is considered a rejection of the determination. If a determination is rejected, the case cannot be the subject of a subsequent arbitration proceeding.

For purposes of the arbitration proceeding, the members of the arbitration panel and their staffs shall be considered "persons or authorities" to whom information may be disclosed under Article 26 (Exchange of Information). Subparagraph (1)(n) of the Exchange of Notes provides that all materials prepared in the course of, or relating to the arbitration proceeding are considered information exchanged between the Contracting States. No information relating to the arbitration proceeding or the panel's determination may be disclosed by members of the arbitration panel or their staffs or by either competent authority, except as permitted by the Convention and the domestic laws of the Contracting States. Members of the arbitration panel and their staffs must agree in statements sent to each of the Contracting States in confirmation of their appointment to the arbitration board to abide by and be subject to the confidentiality and nondisclosure provisions of Article 26 of the Convention and the applicable domestic laws of the Contracting States, with the most restrictive of the provisions applying. Subparagraph (1)(m) of the Exchange of Notes provides that the applicable domestic law of the Contracting States determines the treatment of any interest or penalties associated with a competent authority agreement achieved through arbitration.

Subparagraph (1)(l) of the Exchange of Notes provides that any meetings of the arbitration panel shall be in facilities provided by the Contracting State whose competent authority initiated the mutual agreement proceedings in the case. Subparagraph (1)(o) of the Exchange of Notes provides that fees and expenses are borne

16

equally by the Contracting States, including the cost of translation services. In general, the fees of members of the arbitration panel will be set at the fixed amount of $2,000 per day or the equivalent amount in Swiss francs. The expenses of members of the panel will be set in accordance with the International Centre for Settlement of Investment Disputes (ICSID) Schedule of Fees for arbitrators (in effect on the date on which the arbitration board proceedings begin). The competent authorities may amend the set fees and expenses of members of the board. Meeting facilities, related resources, financial management, other logistical support, and general and administrative coordination of the arbitration proceeding will be provided, at its own cost, by the Contracting State whose competent authority initiated the mutual agreement proceedings. All other costs are to be borne by the Contracting State that incurs them.

ARTICLE 3

Article 3 of the Protocol replaces Article 26 (Exchange of Information) of the existing Convention. This Article provides for the exchange of information and administrative assistance between the competent authorities of the Contracting States.

*Paragraph 1 of Article 26*

The obligation to obtain and provide information to the other Contracting State is set out in new Paragraph 1. The information to be exchanged is that which may be relevant for carrying out the provisions of the Convention or the domestic laws of the United States or of Switzerland concerning taxes covered by the Convention, insofar as the taxation thereunder is not contrary to the Convention. This language incorporates the standard in 26 U.S.C. Section 7602 which authorizes the IRS to examine "any books, papers, records, or other data which may be relevant or material." (emphasis added) In *United States* v. *Arthur Young & Co.*, 465 U.S. 805, 814 (1984), the Supreme Court stated that the language "may be" reflects Congress's express intention to allow the IRS to obtain "items of even potential relevance to an ongoing investigation, without reference to its admissibility." (emphasis in original) However, the language "may be" would not support a request in which a Contracting State simply asked for information regarding all bank accounts maintained by residents of that Contracting State in the other Contracting State.

Exchange of information with respect to each State's domestic law is authorized to the extent that taxation under domestic law is not contrary to the Convention. Thus, for example, information may be exchanged with respect to a covered tax, even if the transaction to which the information relates is a purely domestic transaction in the requesting State and, therefore, the exchange is not made to carry out the Convention. An example of such a case is provided in the OECD Commentary: a company resident in one Contracting State and a company resident in the other Contracting State transact business between themselves through a third-country resident company. Neither Contracting State has a treaty with the third State. To enforce their internal laws with respect to transactions of their residents with the third-country company

(since there is no relevant treaty in force), the Contracting States may exchange information regarding the prices that their residents paid in their transactions with the third-country resident.

New paragraph 1 clarifies that information may be exchanged that relates to the administration or enforcement of the taxes covered by the Convention. Thus, the competent authorities may request and provide information for cases under examination or criminal investigation, in collection, on appeals, or under prosecution.

Information exchange is not restricted by paragraph 1 of Article 1 (General Scope). Accordingly, information may be requested and provided under this Article with respect to persons who are not residents of either Contracting State. For example, if a third-country resident has a permanent establishment in Switzerland, and that permanent establishment engages in transactions with a U.S. enterprise, the United States could request information with respect to that permanent establishment, even though the thirdcountry resident is not a resident of either Contracting State. Similarly, if a third-country resident maintains a bank account in Switzerland, and the Internal Revenue Service has reason to believe that funds in that account should have been reported for U.S. tax purposes but have not been so reported, information can be requested from Switzerland with respect to that person's account, even though that person is not the taxpayer under examination.

The obligation to exchange information under paragraph 1 does not limit a Contracting State's ability to employ unilateral procedures otherwise available under its domestic law to obtain, or to require the disclosure of, information from a taxpayer or third party. Thus, the Protocol does not prevent or restrict the United States' information gathering authority or enforcement measures provided under its domestic law.

Although the term "United States" does not encompass U.S. possessions for most purposes of the Convention, Section 7651 of the Code authorizes the Internal Revenue Service to utilize the provisions of the Internal Revenue Code to obtain information from the U.S. possessions pursuant to a proper request made under Article 26. If necessary to obtain requested information, the Internal Revenue Service could issue and enforce an administrative summons to the taxpayer, a tax authority (or a government agency in a U.S. possession), or a third party located in a U.S. possession.

*Paragraph 2 of Article 26*

New paragraph 2 provides assurances that any information exchanged will be treated as secret, subject to the same disclosure constraints as information obtained under the laws of the requesting State. Information received may be disclosed only to persons, including courts and administrative bodies, involved in the assessment, collection, or administration of, the enforcement or prosecution in respect of, or the determination of the of appeals in relation to, the taxes covered by the Convention. The information must be used by these persons in connection with the specified functions. Information may also be disclosed to legislative bodies, such as the tax-writing committees of Congress and the Government Accountability Office, engaged in the oversight of the preceding activities.

18

Information received by these bodies must be for use in the performance of their role in overseeing the administration of U.S. tax laws. Information received may be disclosed in public court proceedings or in judicial decisions.

New paragraph 2 also provides that information received by a Contracting State may be used for other purposes when such information may be used for such other purpose under the laws of both States, and the competent authority of the requested State has authorized such use. This provision is derived from the OECD Model Commentary, which explains that Contracting States may add this provision to broaden the purposes for which they may use information exchanged to allow other non-tax law enforcement agencies and judicial authorities on certain high priority matters (e.g., to combat money laundering, corruption, or terrorism financing). To ensure that the laws of both States would allow the information to be used for such other purpose, the Contracting States will only seek consent under this provision to the extent that the non-tax use is allowed under the provisions of the Mutual Legal Assistance Treaty between the United States and Switzerland which entered into force on January 23, 1977 (or as it may be amended or replaced in the future).

*Paragraph 3 of Article 26*

New paragraph 3 provides that the obligations undertaken in paragraphs 1 and 2 to exchange information do not require a Contracting State to carry out administrative measures that are at variance with the laws or administrative practice of either State. Nor is a Contracting State required to supply information not obtainable under the laws or administrative practice of either State, or to disclose trade secrets or other information, the disclosure of which would be contrary to public policy.

Thus, a requesting State may be denied information from the other State if the information would be obtained pursuant to procedures or measures that are broader than those available in the requesting State. However, the statute of limitations of the Contracting State making the request for information should govern a request for information. Thus, the Contracting State of which the request is made should attempt to obtain the information even if its own statute of limitations has passed. In many cases, relevant information will still exist in the business records of the taxpayer or a third party, even though it is no longer required to be kept for domestic tax purposes.

While paragraph 3 states conditions under which a Contracting State is not obligated to comply with a request from the other Contracting State for information, the requested State is not precluded from providing such information, and may, at its discretion, do so subject to the limitations of its internal law.

*Paragraph 4 of Article 26*

New paragraph 4 provides that when information is requested by a Contracting State in accordance with this Article, the other Contracting State is obligated to obtain the requested information as if the tax in question were the tax of the requested State, even if that State has no direct tax interest in the case to which the re-

quest relates. In the absence of such a paragraph, some taxpayers have argued that paragraph 3(a) prevents a Contracting State from requesting information from a bank or fiduciary that the Contracting State does not need for its own tax purposes. This paragraph clarifies that paragraph 3 does not impose such a restriction and that a Contracting State is not limited to providing only the information that it already has in its own files.

*Paragraph 5 of Article 26*

New paragraph 5 provides that a Contracting State may not decline to provide information because that information is held by financial institutions, nominees or persons acting in an agency or fiduciary capacity. Thus, paragraph 5 would effectively prevent a Contracting State from relying on paragraph 3 to argue that its domestic bank secrecy laws (or similar legislation relating to disclosure of financial information by financial institutions or intermediaries) override its obligation to provide information under paragraph 1. This paragraph also requires the disclosure of information regarding the beneficial owner of an interest in a person, such as the identity of a beneficial owner of bearer shares. Paragraph 5 further provides that the requested State has the power to meet its obligations under Article 26, and paragraph 5 in particular, even though it may not have such powers for purposes of enforcing its own tax laws.

Paragraph 2 of the Exchange of Notes provides that the Contracting States understand that there may be instances when paragraph 3 of Article 26 may be invoked to decline a request to supply information that is held by a person described in paragraph 5 of the Article. Such refusal must be based, however, on reasons unrelated to that person's status as a bank, financial institution, agent, fiduciary or nominee, or the fact that the information relates to ownership interests. For example, a Contracting State may decline to provide information relating to confidential communications between attorneys and their clients that are protected from disclosure under that State's domestic law.

*Treaty effective dates and termination in relation to exchange of information*

Article 5 of the Protocol sets forth rules governing the effective dates of the provisions of Articles 3 and 4 of the Protocol. The competent authorities are obligated to exchange information described in new paragraph 5 of Article 26 if that information relates to any date beginning on or after September 23, 2009, the date on which the Protocol was signed notwithstanding the provisions of the existing Convention. In all other cases of application of new Article 26, the competent authorities are obligated to exchange information that relates to taxable periods beginning on or after January 1 of the year following the date of signature of the Protocol.

A tax administration may also seek information with respect to a year for which a treaty was in force after the treaty has been terminated. In such a case the ability of the other tax administration to act is limited. The treaty no longer provides authority for the tax administrations to exchange confidential information. They may

20

only exchange information pursuant to domestic law or other international agreement or arrangement.

ARTICLE 4

Article 4 of the Protocol replaces paragraph 10 of the Protocol to the existing Convention. New Protocol paragraph 10 provides greater detail regarding how the provisions of revised Article 26 (Exchange of Information) will be applied.

New Protocol paragraph (10)(a) lists the information that should be provided to the requested State by the requesting State when making a request for information under paragraph 26 of the Convention. Clause (i) of paragraph (10)(a) provides that a request must contain information sufficient to identify the person under examination or investigation. In a typical case, information sufficient to identify the person under examination or investigation would include a name, and to the extent known, an address, account number or similar identifying information. It is mutually understood that there can be circumstances in which there is information sufficient to identify the person under examination or investigation even though the requesting State cannot provide a name.

Clause (ii) of paragraph (10)(a) provides that a request for information must contain the period of time for which the information is requested. Clause (iii) of paragraph (10)(a) provides that a request for information must contain a statement of the information sought, including its nature and the form in which the requesting State wishes to receive the information from the requested State. Clause (iv) of paragraph (10)(a) provides that a request for information must contain a statement of the tax purpose for which the information is sought. Clause (v) of paragraph (10)(a) provides that the request must include the name and, to the extent known, the address of any person believed to be in possession of the requested information.

New Protocol paragraph (10)(b) provides confirmation of the extent to which information is to be exchanged pursuant to new paragraph 1 of Article 26. The purposes of referring to information that may be relevant is to provide for exchange of information to the widest extent possible. This standard nevertheless does not allow the Contracting States to engage in so-called "fishing expeditions" or to request information that is unlikely to be relevant to the tax affairs of a given taxpayer. For example, the language "may be" would not support a request in which a Contracting State simply asked for information regarding all bank accounts maintained by residents of that Contracting State in the other Contracting State. New Protocol paragraph (10)(b) further confirms that the provisions of new Protocol paragraph (10)(a) are to be interpreted in order not to frustrate effective exchange of information.

New Protocol paragraph (10)(c) provides that the requesting State may specify the form in which information is to be provided (e.g., authenticated copies of original documents (including books, papers, statements, records, accounts and writings)). The intention is to ensure that the information may be introduced as evidence in the judicial proceedings of the requesting State. The requested State should, if possible, provide the information in the form requested to the same extent that it can obtain information in that

21

form under its own laws and administrative practices with respect to its own taxes.

New Protocol paragraph (10)(d) confirms that Article 26 of the Convention does not restrict the possible methods for exchanging information, but also does not commit either Contracting State to exchange information on an automatic or spontaneous basis. The Contracting States expect to provide information to one another necessary for carrying out the provisions of the Convention.

New Protocol paragraph (10)(e) provides clarification regarding the application of paragraph (3)(a) of revised Article 26, which provides that in no case shall the provisions of paragraphs 1 and 2 be construed so as to impose on a Contracting State the obligation to carry out administrative measures at variance with the laws and administrative practice of that or the other Contracting State. The Contracting States understand that the administrative procedural rules regarding a taxpayer's rights (such as the right to be notified or the right to an appeal) provided for in the requested State remain applicable before information is exchanged with the requesting State. Notification procedures should not, however, be applied in a manner that, in the particular circumstances of the request, would frustrate the efforts of the requesting State. The Contracting States further understand that such rules are intended to provide the taxpayer a fair procedure and are not to prevent or unduly delay the exchange of information process.

ARTICLE 5

Article 5 of the Protocol contains the rules for bringing the Protocol into force and giving effect to its provisions.

*Paragraph 1*

Paragraph 1 provides for the ratification of the Protocol by both Contracting States according to their constitutional and statutory requirements. Instruments of ratification shall be exchanged as soon as possible.

In the United States, the process leading to ratification and entry into force is as follows: Once a treaty has been signed by authorized representatives of the two Contracting States, the Department of State sends the treaty to the President who formally transmits it to the Senate for its advice and consent to ratification, which requires approval by two-thirds of the Senators present and voting. Prior to this vote, however, it generally has been the practice for the Senate Committee on Foreign Relations to hold hearings on the treaty and make a recommendation regarding its approval to the full Senate. Both Government and private sector witnesses may testify at these hearings. After the Senate gives its advice and consent to ratification of the protocol or treaty, an instrument of ratification is drafted for the President's signature. The President's signature completes the process in the United States.

*Paragraph 2*

Paragraph 2 provides that the Convention will enter into force upon the exchange of instruments of ratification. The date on which a treaty enters into force is not necessarily the date on which its provisions take effect. Paragraph 2, therefore, also con-

22

tains rules that determine when the provisions of the treaty will have effect.

Under paragraph 2(a), the Convention will have effect with respect to taxes withheld at source (principally dividends, interest and royalties) for amounts paid or credited on or after the first day of January of the year following the entry into force of the Protocol. For example, if instruments of ratification are exchanged on October 25 of a given year, the withholding rates specified in paragraph 3 of Article 10 (Dividends) would be applicable to any dividends paid or credited on or after January 1 of the following year. If for some reason a withholding agent withholds at a higher rate than that provided by the Convention (perhaps because it was not able to re-program its computers before the payment is made), a beneficial owner of the income that is a resident of the other Contracting State may make a claim for refund pursuant to section 1464 of the Code.

Paragraph (2)(b) provides rules for the effective dates of Articles 3 and 4 of the Protocol. Those Articles shall have application for requests made on or after the date of entry into force of the Protocol. Clause (i) provides that information described in paragraph 5 of revised Article 26 (Exchange of Information) shall be exchanged upon request if such information relates to any date beginning on or after September 23, 2009, the date of signature of the Protocol. Clause (ii) provides that in all other cases, information shall be exchanged pursuant to Articles 3 and 4 if the information relates to taxable periods beginning on or after January 1, 2010.

Paragraph (2)(c) sets forth a specific effective date for purposes of the binding arbitration provisions of new paragraphs 6 and 7 of revised Article 25 (Mutual Agreement Procedure) (Article 2 of the Protocol). Paragraph (2)(c) provides new paragraphs 6 and 7 of revised Article 25 is effective for cases (i) that are under consideration by the competent authorities as of the date on which the Protocol enters into force, and (ii) cases that come under such consideration after the Protocol enters into force. In addition, paragraph (2)(c) provides that the commencement date for cases that are under consideration by the competent authorities as of the date on which the Protocol enters into force is the date the Protocol enters into force. As a result, cases that are open and unresolved as of the entry into force of the Protocol will go into binding arbitration on the later of two years after the entry into force of the Protocol (unless both competent authorities have previously agreed to a different date) and the earliest date upon which the agreement required by new paragraph (6)(d) of revised Article 25 has been received by both competent authorities.

X. Annex 2.—Transcript of Hearing of October 29, 2015

# TREATIES

———

**THURSDAY, OCTOBER 29, 2015**

U.S. Senate,
Committee on Foreign Relations,
*Washington, DC.*

The committee met, pursuant to notice, at 2:17 p.m., in room
SD–419, Dirksen Senate Office Building, Hon. Johnny Isakson pre-
siding.

Present: Senators Isakson, Gardner, Menendez, and Murphy.

**OPENING STATEMENT OF HON. JOHNNY ISAKSON,
U.S. SENATOR FROM GEORGIA**

Senator Isakson. The Senate Foreign Relations Committee is
called to order.

To begin with, I would like to ask unanimous consent that we
introduce three letters into the record at this hearing. One is from
a number of companies in the United States of America in favor
of the tax treaties. One is from the Business Roundtable and other
executive organizations. And one is from the Ambassadors and Em-
bassy organizations of the countries affected by the treaties.

So without objection, that will be entered into the record.

[Editor's note.—The three letters submitted for the record can be
found in the "Additional Material Submitted for the Record" section
at the end of this hearing.]

Senator Isakson. I want to thank our witnesses for being here
today and Senator Menendez for being here today. This is an im-
portant hearing for a lot of American businesses. It means more
business for the United States, and it means predictable regulation
in terms of many foreign businesses and opportunities overseas.

We are going to consider eight tax treaties, several of which this
committee has considered in the past. The importance of tax trea-
ties to American businesses and individuals is underappreciated
and not widely understood, including, I will admit, by myself until
I was asked to chair this hearing and got into the details of it.

For any business, one of the greatest disincentives to expand and
take advantage of new opportunities is uncertainty. For govern-
ments, ensuring a favorable business climate environment by mini-
mizing uncertainty is one of the most important things we can do
to help U.S. businesses grow.

The United States uses a worldwide tax system that taxes the
income of a U.S. citizen, resident, or corporation, whether the in-

(23)

24

come is earned in the United States or in a foreign country. A worldwide system of taxation would often result in double taxation if not for tax treaties.

Tax treaties ensure certainty by establishing rules on what foreign income may be taxed by the country in which it is earned, and how much tax may be withheld in foreign income. Tax treaties benefit the United States businesses and citizens in a number of ways by facilitating trade, foreign investment, and by preventing double taxation. They provide U.S. investors with greater certainty about the tax burden by ensuring the treaties are equally and fairly overseen, and by allowing them to invest and compete abroad with a thorough knowledge of how the regulations in that country will work.

Tax treaties strengthen the ability of United States business to explore many new opportunities abroad by establishing a predictable framework for new taxation to be structured.

Further, tax treaties provide tools to help resolve tax disputes between the United States and other countries. Without those tools, United States investors would have limited ability to resolve these problems on their own.

It is not just businesses that benefit from tax treaties, as they also impose reasonable limits on the amount of tax other countries may levy or can impose or withhold on a U.S. person who might live or work overseas.

Tax treaties also help ensure the United States maintains an appropriate tax base by preventing tax fraud.

In previous Congresses, this committee has responded with similar treaties and conventions and protocols with Chile, Hungary, Luxembourg, Poland, Spain, Switzerland, and the OECD Mutual Assistance Protocol. Today, we will, for the first time, hear about an update to the new treaty with Japan.

It is time to move these treaties forward to the full Senate and for a full vote in the Senate as reasonably and early as possible.

With that statement read, I will turn it over to the ranking member for any comment he may have.

## OPENING STATEMENT OF HON. BOB MENENDEZ, U.S. SENATOR FROM NEW JERSEY

Senator MENENDEZ. Thank you, Mr. Chairman. As someone who has sat and chaired some of these in the past, I can tell you that we are in for a scintillating hearing. [Laughter.]

Gentlemen, I know you are going to make it so.

Let me say, however, we are discussing eight important treaties pending before the committee, a new protocol to the existing tax treaty between the United States and Japan, which brings the treaty into line with our modern tax relationships, as well as seven other treaties and protocols the committee has considered over the past few years.

As I think most members are aware, this committee has expended significant effort in recent years to obtain Senate confirmation of pending income tax treaties and protocols. In February of last year, Senator Cardin chaired a hearing, together with Senator Barrasso, on five income tax treaties and protocols with Switzerland, Hungary, Luxembourg, Chile, and the OECD multilateral.

25

And I chaired hearing a few months later on the Spain and Poland treaties. The committee approved all seven previous treaties last Congress.

Today, we continue our consideration of tax treaties with the Japan protocol, which was transmitted to the Senate in April.

We have important and accelerating trade relationships with Japan. Being the largest and third-largest economies in the world, together our countries account for nearly one-third of global GDP. The United States has consistently been the largest source of foreign direct investment in Japan, and Japan is similarly one of the top investors in the U.S. economy.

American and Japanese businesses employ hundreds of thousands of people in both countries. As our trade and investment links continue to deepen, it behooves us to simplify the tax administration between our countries and ensure that an outdated tax treaty does not stand in the way of continued cross-border investment.

Traditionally, tax treaties have enjoyed strong bipartisan support, and I continue to urge my colleagues in the Senate to ratify these crucial components of U.S. trade and tax policy.

And I look forward to the hearing, Mr. Chairman.

Senator ISAKSON. Thank you, Senator Menendez.

We are very fortunate to have two very distinguished witnesses to testify today. First, Mr. Robert Stack, the Deputy Assistant Secretary for the International Tax Affairs, Department of the United States Treasury; second, Mr. Thomas A. Barthold, Chief of Staff, Joint Committee on Taxation and, I might add, a significant adviser to the Finance Committee, where I benefited from his advice on many occasions.

So we welcome your testimony today, and we will start with Mr. Stack first.

## STATEMENT OF ROBERT B. STACK, DEPUTY ASSISTANT SECRETARY FOR INTERNATIONAL TAX AFFAIRS, DEPARTMENT OF THE TREASURY, WASHINGTON, DC

Mr. STACK. Thank you, Senator.

Chairman Isakson, Ranking Member Menendez, and distinguished members of the committee, I appreciate the opportunity to appear today to recommend on behalf of the administration favorable action on eight tax treaties pending before this committee. The proposed agreements before the committee today with Chile, Hungary, Japan, Luxembourg, Poland, Spain, and Switzerland, as well as the proposed Protocol to the Convention on Mutual Administrative Assistance in Tax Matters, which I will refer to today as the multilateral convention, serve to further the goals of our tax treaty network, in particular, the goals of increased transparency, relief from double taxation, and protecting U.S. tax treaties from abuse.

It has now been over 5 years since the Senate provided its advice and consent to a tax treaty. This prolonged and unprecedented delay in approving tax treaties is inconsistent with the Senate's long history of bipartisan support for these agreements.

It denies U.S. businesses important protections against double taxation. It denies our law enforcement community the tools they need to fight tax evasion. It jeopardizes U.S. leadership on issues

26

of transparency in tax matters and causes other countries to question the United States' commitment to tax treaties.

I would like to take the opportunity at the outset to briefly address a concern that has been expressed by some in the Senate about these proposed tax treaties. As I understand it, the claim is that these agreements adopt a new and unacceptably low standard for exchanging information that departs from the prior U.S. policy of exchanging information only in cases of suspicion of tax fraud.

To the contrary, the standard in the pending treaties that permits exchange of information that may be relevant or is foreseeably relevant is not new. In fact, it has been the U.S. model standard since 1996 and has subsequently been endorsed as the international standard for information exchange under our tax treaties.

Of the 57 United States income tax treaties in force, all of which were approved by the Senate, only one, our existing treaty with Switzerland, refers to exchanging information only in cases of tax fraud or the like. This standard allowed Switzerland to become a haven for tax cheats. That is why that treaty must be updated.

Moreover, the foreseeably relevant standard has safeguards that prevent so-called fishing expeditions and ensures that information is kept confidential.

Because my written statement and the Treasury technical explanations describe in detail the provisions of the eight agreements pending before this committee, I would like to highlight only the most noteworthy aspects of each agreement. I would like to start with the proposed protocol to the multilateral convention.

If approved by the Senate, this agreement would establish several new information exchange relationships for the United States, which would enhance the IRS's ability to fight tax evasion. The proposed protocol amends the multilateral convention, which in its existing form is open to signature only by countries which are members of either the OECD or the Council of Europe, to allow any country to become a signatory, provided that all other signatories are satisfied that such a country has a sufficient legal framework to ensure that information exchanged pursuant to the agreement will be kept confidential.

The proposed protocols amending the United States tax treaties with Luxembourg and Switzerland replace the limited information exchange provisions of the existing tax treaties with updated rules that are consistent with the international standard.

The Treasury Department is hopeful that the proposed protocols with Luxembourg and Switzerland, if approved by the Senate, will greatly improve the collaboration between the IRS and the revenue authorities of Luxembourg and Switzerland in tax law enforcement matters.

The proposed income tax treaty with Chile, if approved by the Senate, would be only the second United States income tax treaty enforced in South America, a region into which the Treasury Department has long sought to expand the U.S. tax treaty network.

The most important feature of the proposed tax treaties with Hungary and Poland, which would both replace existing tax treaties with those countries, is that each agreement contains a comprehensive limitation on benefits article, which is designed to prevent third country investors from inappropriately taking advantage

27

of the treaty, a practice known as treaty shopping. Data from United States corporate tax returns show that the existing tax treaties with Hungary and Poland, which do not have limitations on benefit provisions, are facilitating treaty shopping. And for this reason, replacing them with new agreements has been a top treaty priority for the Treasury Department.

The proposed protocols amending the U.S. tax treaties with Japan and Spain significantly reduce source taxation of cross-border payments of income and gains. In addition, the proposed protocols adopt mandatory binding arbitration as a means of resolving certain disputes between the tax authorities.

The proposed protocol with Switzerland also contains a mandatory binding arbitration provision.

Another noteworthy feature of the proposed protocol with Japan is its adoption of rules that obligate the tax authorities to provide limited assistance to each other in the collection of taxes. While as a general matter, it is not the policy of the Treasury Department to include such assistance in collection provisions in U.S. treaties, we concluded after consultation with the IRS that entering into such an agreement with Japan would produce a net revenue benefit to the United States.

Let me repeat our appreciation for the committee's interest in these agreements. We are also grateful for the assistance and cooperation of the staffs of this committee and of the Joint Committee on Taxation, as well as the tireless work of the Treasury staff.

We urge the committee and Senate to take prompt and favorable action on all eight agreements, and I would be happy to answer any questions you may have. Thank you.

[The prepared statement of Mr. Stack follows:]

PREPARED STATEMENT OF ROBERT B. STACK

Chairman Isakson, Ranking Member Menendez, and distinguished members of the committee, I appreciate the opportunity to appear today to recommend, on behalf of the administration, favorable action on eight tax treaties pending before this committee.

This administration is committed to eliminating barriers to cross-border trade and investment, and tax treaties are one of the primary means for eliminating such tax barriers. Tax treaties provide greater certainty to taxpayers regarding their potential liability for tax in foreign jurisdictions, and they allocate taxing rights between jurisdictions to reduce the risk of double taxation. Tax treaties also ensure that taxpayers are not subject to discriminatory taxation in foreign jurisdictions.

Additionally, this administration is committed to preventing tax evasion, and our tax treaties play an important role in this area. A key element of U.S. tax treaties is exchange of information between tax authorities. Under tax treaties, one country may request from the other such information that is foreseeably relevant for the proper administration of the first country's tax laws. Because access to information from other countries is critically important to the full and fair enforcement of U.S. tax laws, information exchange is a top priority for the United States in its tax treaty program. I would like to emphasize to the committee that as we establish exchange of information relationships, the administration places a high priority on ensuring that our treaty partners not misuse the information exchanged. The United States will only exchange tax information with a country if we are satisfied that the county has adequate confidentiality laws that will protect the information we have provided.

A tax treaty reflects a balance of benefits that is agreed to when the treaty is negotiated. In some cases, changes in law or policy in one or both of the treaty partners make the partners more willing to increase the benefits beyond those provided in an existing treaty; in these cases, revisions to a treaty may be very beneficial. In other cases, developments in one or both countries, or international developments

28

more generally, may make it desirable to revisit an existing treaty to prevent improper exploitation of treaty provisions and eliminate unintended and inappropriate consequences in the application of the treaty. In yet other cases, the United States seeks to establish new income tax treaties with countries in which there is significant U.S. direct investment, and with respect to which U.S. companies are experiencing double taxation that is not otherwise relieved by domestic law remedies, such as the U.S. foreign tax credit. Both in setting our overall negotiation priorities and in negotiating individual treaties, our focus is on ensuring that our tax treaty network fulfills its goals of facilitating cross-border trade and investment and preventing tax evasion.

It has now been over 5 years since the full Senate last gave its advice and consent to a tax treaty. This prolonged delay is inconsistent with the Senate's long history of bipartisan support for timely consideration and approval of tax treaties, and it is damaging to important U.S. interests. It denies U.S. businesses important protections against double taxation. It denies our law enforcement community the tools they need to fight tax evasion. It jeopardizes U.S. leadership on issues of transparency. It causes other countries to question our reliability as a treaty partner and makes it harder to gain cooperation in other matters important to the United States.

The administration urges the Senate to act swiftly to approve the pending tax treaties and protocols with Switzerland, Luxembourg, Hungary, Chile, Spain, Poland, and Japan, as well as the protocol amending the Multilateral Convention on Mutual Administrative Assistance in Tax Matters. Each proposed treaty serves to further the goals of our tax treaty network, and in particular, the goals of providing meaningful tax benefits to cross-border investors as well as protecting U.S. tax treaties from abuse.

The proposed tax treaty with Chile would be the first tax treaty between the United States and Chile. The proposed tax treaties with Hungary and Poland would replace existing treaties the revisions of which have been a top tax treaty priority for the Treasury Department. The proposed protocols with Japan, Luxembourg, Spain, and Switzerland modify existing tax treaty relationships. The proposed protocol to the Multilateral Convention brings the Multilateral Convention, which the United States signed in 1989, into conformity with current international standards for full exchange of information between tax authorities to combat tax evasion.

Before talking about the proposed treaties in more detail, I would like to discuss some general tax treaty matters.

PURPOSES AND BENEFITS OF TAX TREATIES

Tax treaties set out clear ground rules that govern tax matters relating to trade and investment between two countries. One of the primary functions of tax treaties is to provide certainty to taxpayers regarding a threshold question with respect to international taxation: whether a taxpayer's cross-border activities will subject it to taxation by two or more countries. Tax treaties answer this question by establishing the minimum level of economic activity that must be conducted within a country by a resident of the other country before the first country may tax any resulting business profits. In general terms, tax treaties provide that if branch operations in a foreign country have sufficient substance and continuity, the country where those activities occur will have primary (but not exclusive) jurisdiction to tax. In other cases, where the operations in the foreign country are relatively minor, the home country retains the sole jurisdiction to tax.

Another primary function of tax treaties is relief from double taxation. Tax treaties protect taxpayers from potential double taxation primarily through the allocation of taxing rights between the two countries. This allocation takes several forms. First, because residence is relevant to jurisdiction to tax, a tax treaty includes a mechanism for resolving the issue of residence in the case of a taxpayer that otherwise would be considered to be a resident of both countries. Second, with respect to each category of income, a tax treaty assigns primary taxing rights to one country, usually (but not always) the country in which the income arises (the "source" country), and the residual right to tax to the other country, usually (but not always) the country of residence of the taxpayer (the "residence" country). Third, a tax treaty provides rules for determining the country of source for each category of income. Fourth, a tax treaty establishes the obligation of the residence country to eliminate double taxation that otherwise would arise from the exercise of concurrent taxing jurisdiction by the two countries. Finally, a tax treaty provides for resolution of disputes between jurisdictions in a manner that avoids double taxation.

As a complement to these substantive rules regarding the allocation of taxing rights, tax treaties provide a mechanism for dealing with disputes between countries

29

regarding the proper application of a treaty. To resolve such disputes, designated tax authorities of the two governments—known as the "competent authorities" in tax treaty parlance—are required to consult and endeavor to reach agreement. Under many such agreements, the competent authorities agree to allocate a taxpayer's income between the two taxing jurisdictions on a consistent basis, thereby preventing the double taxation that might otherwise result. The U.S. competent authority is the Secretary of the Treasury, who has delegated this function to the Deputy Commissioner (International) of the Large Business and International Division of the Internal Revenue Service (IRS).

Another key element of U.S. tax treaties is the exchange of information between tax authorities. Under tax treaties, one country may request from the other such information that is foreseeably relevant for the proper administration of the first country's tax laws. Some have suggested that this standard is ambiguous and that it represents a lower threshold than the standard in earlier U.S. tax treaties. This is not the case. For at least 50 years, bilateral income tax treaties have permitted revenue authorities to exchange information for tax administration purposes. Moreover, this standard has been extensively defined in internationally agreed guidance to which no country has expressed a dissenting opinion to date.

Because access to information from other countries is critically important to the full and fair enforcement of U.S. tax laws, information exchange is a top priority for the United States in its tax treaty program. As we establish exchange of information relationships, the administration places a high priority on ensuring that the exchanged information will not be misused by our treaty partners. The United States will not exchange tax information with a country unless it has adequate confidentiality laws that will protect the information we have provided, and it has demonstrated the foreseeable relevance of the requested information to a tax matter.

Tax treaties also include provisions intended to ensure that cross-border investors do not suffer discrimination in the application of the tax laws of the other country. This is similar to a basic investor protection provided in other types of agreements, but the nondiscrimination provisions of tax treaties are specifically tailored to tax matters and, therefore, are the most effective means of addressing potential discrimination in the tax context. The relevant tax treaty provisions explicitly prohibit the types of discriminatory measures that once were common in some tax systems and clarify the manner in which possible discrimination is to be evaluated in the tax context.

In addition to these core provisions, tax treaties include provisions dealing with more specialized situations, such as rules addressing and coordinating the taxation of pensions, Social Security benefits, alimony, and child-support payments in the cross-border context. (The Social Security Administration separately negotiates and administers bilateral totalization agreements.) These provisions are becoming increasingly important as more individuals move between countries or otherwise engage in cross-border activities. While these matters may not involve substantial tax revenue from the perspective of the two governments, rules providing clear and appropriate treatment are very important to the affected taxpayers.

TAX TREATY NEGOTIATING PRIORITIES AND PROCESS

The United States has a network of 57 comprehensive income tax treaties covering 66 countries. This network covers the vast majority of foreign trade and investment of U.S. businesses and investors. In establishing our negotiating priorities, our primary objective is the conclusion of tax treaties that will provide the greatest benefit to the United States and to U.S. taxpayers. We regularly seek input from the U.S. business community and the IRS regarding the areas on which we should develop our treaty network, and any practical problems encountered under particular treaties or particular tax regimes.

Numerous features of a country's tax legislation and its interaction with U.S. domestic tax rules are considered in negotiating a tax treaty. Examples include whether the country eliminates double taxation through an exemption system or credit system, the country's treatment of partnerships and other transparent entities, and how the country taxes contributions to, earnings of, and distributions from pension funds.

Moreover, a country's fundamental tax policy choices are reflected not only in its tax laws, but also in its tax treaty policy positions. These choices differ significantly from country to country with substantial variation even across countries that seem to have quite similar economic profiles. A tax treaty negotiation must take into account all of these aspects of the treaty partner's tax system and treaty policies to arrive at an agreement that accomplishes the United States tax treaty objectives.

30

Obtaining the agreement of our tax treaty partners on provisions of importance to the United States sometimes requires concessions on our part. Similarly, the other countries sometimes must make concessions to obtain our agreement on matters that are critical to it. Each tax treaty that is presented to the Senate represents not only the best deal that we believe can be achieved with the particular country, but also constitutes an agreement that we believe is in the best interests of the United States.

It is not uncommon for the Treasury Department to conclude that the right result may be no tax treaty at all. With certain countries there simply may not be the type of cross-border tax issues that are best resolved by a treaty. For example, if a country does not impose significant income taxes, or imposes tax on a strictly territorial basis (that is, it exempts not only dividend income but all foreign source income from taxation by reason of its foreign source), there is little possibility of unresolved double taxation of cross-border income, given the fact that the United States provides foreign tax credits to its citizens and residents regardless of the existence of an income tax treaty. Under such a circumstance, it would not be appropriate to enter into a comprehensive tax treaty with that particular country because doing so would result in a unilateral concession of taxing rights by the United States. Absent instances of unrelieved double taxation, a bilateral agreement that focuses exclusively on the exchange of tax information (often referred to as a "tax information exchange agreement" or "TIEA") may be appropriate.

In other cases, a tax treaty may be inappropriate because the potential treaty partner is not willing to agree to rules that address tax issues U.S. businesses operating there have identified. If the potential treaty partner is unwilling to provide meaningful benefits in a tax treaty, such a treaty would provide little or no relief from double taxation to U.S. investors, and accordingly there would be no merit to entering into such an agreement. The Treasury Department will not conclude a tax treaty that does not provide meaningful benefits to U.S. investors or which may be construed by potential treaty partners as an indication that we would settle for a tax treaty with inferior terms.

COMBATING TAX EVASION AND IMPROVING TRANSPARENCY
THROUGH FULL EXCHANGE OF INFORMATION

As noted above, effective information exchange to combat tax evasion and ensure full and fair enforcement of the tax laws is a top priority for the United States. A key provision found in all modern U.S. tax treaties is a rule that obligates the competent authorities of the two countries to obtain and exchange information that is foreseeably relevant to tax administration in the requesting country. In recent years there has been a global recognition of the need to strive for greater transparency and for full exchange of information between revenue authorities to combat tax evasion. The United States has taken a leading role in this movement.

The proposed protocols amending the bilateral tax treaties with Switzerland and Luxembourg and the Multilateral Convention that are before the committee today are intended to ensure full exchange of information to prevent tax evasion and enhance transparency. These proposed protocols incorporate the modern international standards for exchange of information, which require countries to obtain and exchange information for both civil and criminal matters, and which require the tax authorities to obtain and exchange information held by banks or other financial institutions.

The international standards on transparency and exchange of information for tax purposes are now virtually universally accepted in the global community. Indeed, all jurisdictions surveyed by the Global Forum on Transparency and Exchange of Information for Tax Purposes (the Global Forum) are now committed to implementing these standards. The Global Forum, now the largest international tax group in the world with 126 member jurisdictions (and 15 observing members), endorses exchange of information. The Global Forum uses a robust and comprehensive monitoring and peer review process by evaluating the compliance of jurisdictions with the international standards of transparency.

Initiated by the Organization for Economic Cooperation and Development (OECD), the Global Forum has been a driving force behind the acceptance and implementation of international standards. The United States actively participates in the Global Forum. Treasury's Offices of Tax Policy and General Counsel, and IRS's Office of Chief Counsel and its Large Business and International Division have devoted substantial resources over the past 2 years both to the peer review of U.S. rules and procedures and to our role as members of the Steering Group and Peer Review Group of the Forum.

31

In addition, the G20 has, for the past several years, stressed the importance of quickly implementing the international standards for transparency and exchange of information. It has also requested proposals to make it easier for developing countries to secure the benefits of the new cooperative tax environment, including a multilateral approach for the exchange of information.

Against the backdrop of the Global Forum and the G20 process, the proposed Protocol to the Multilateral Convention was opened for signature on May 27, 2010. The Multilateral Convention is an instrument that permits its signatories to exchange information for tax purposes. However, because it was signed in 1989, its provisions are out of date in many respects and do not conform to current international standards for transparency and exchange of information. In addition, prior to its amendment by the proposed protocol, the Multilateral Convention was open for accession only to member countries of either the Council of Europe or the OECD. The proposed protocol to the Multilateral Convention conforms the existing agreement to the current international standards for exchange of information, and opens the agreement for signature by any country, provided that the Parties have provided unanimous consent. This important agreement is therefore a centerpiece to the global effort to improve transparency and foster full exchange of information between tax authorities.

### ENSURING THE PROTECTION AND CONFIDENTIALITY OF INFORMATION EXCHANGED WITH OUR TREATY PARTNERS

As we modernize existing exchange of information relationships and establish new relationships, the administration is also strongly committed to ensuring that information that we provide our treaty partners will not be misused and will be strictly protected and treated as confidential. One of the critical principles under today's existing international standards for information exchange upon request is that the country receiving information must ensure that exchanged information is kept confidential and only used for legitimate tax administration purposes. Consistent with this standard, the United States will not enter into an information exchange agreement unless the Treasury Department and the IRS are satisfied that the foreign government has strict confidentiality protections. Specifically, prior to entering into an information exchange agreement with another jurisdiction, the Treasury Department and the IRS closely review the foreign jurisdiction's legal framework for maintaining the confidentiality of taxpayer information. Before entering into an agreement, the Treasury Department and the IRS must be satisfied that the foreign jurisdiction has the necessary legal safeguards in place to protect exchanged information.

Even if an information exchange agreement is in effect, the IRS will not exchange information with a country if the IRS determines that the country is not complying with its obligations under the agreement to protect the confidentiality of information and to use the information solely for collecting and enforcing taxes covered by the agreement.

With respect to the Multilateral Convention, a Coordinating Body, on which the United States sits, was established under the terms of the Multilateral Convention for the express purpose of evaluating the domestic laws of countries that request to sign the agreement to ensure that new signatories will provide confidential treatment to information received under the agreement. In many cases, potential signatory countries have statutory confidentiality laws that cover information exchanged pursuant to an international agreement. In other cases, the potential signatory country has agreed to adopt as law the confidentiality provisions that are found in the Multilateral Convention itself. Countries that do not have sufficient domestic laws or the legal framework to guarantee the confidentiality of taxpayer information are not permitted to sign the proposed protocol to the Multilateral Convention.

### ENSURING SAFEGUARDS AGAINST ABUSE OF TAX TREATIES

A high priority for improving our overall treaty network is a continued focus on prevention of "treaty shopping." The U.S. commitment to including comprehensive Limitation on Benefits articles is a key element to limiting treaty benefits to residents of the United States and residents of the particular treaty partner on a reciprocal basis. Tax treaty benefits are not intended for residents of a third country. If third country residents are able to exploit one of our tax treaties to secure reductions in U.S. tax, such as through the use of an entity resident in a treaty country that merely holds passive U.S. assets, the benefits would flow only in one direction. That is, third country residents would enjoy U.S. tax reductions for their U.S. investments, but U.S. residents would not enjoy reciprocal tax reductions for their investments in that third country. Moreover, such third country residents may be

32

securing benefits that are not appropriate in the context of the interaction between their home countries' tax systems and policies and those of the United States. This use of tax treaties is not consistent with the balance of the agreement negotiated in the underlying tax treaty. Preventing this exploitation of our tax treaties is critical to ensuring that the third country will sit down at the table with us to negotiate on a reciprocal basis so we can secure for U.S. persons the benefits of reductions in source-country tax on their investments in that country. Effective antitreaty shopping rules also ensure that the benefits of a U.S. tax treaty do not accrue to residents of countries with which the United States does not have a bilateral tax treaty because that country imposes little or no tax, and thus the potential of unrelieved double taxation is low.

In this regard, the proposed tax treaties with Poland and Hungary before the committee today include comprehensive limitation on benefits provisions and represent a major step forward in protecting the U.S. tax treaty network from abuse. These achievements demonstrate the Treasury Department has been effective in addressing concerns about treaty shopping through bilateral negotiations and amendments of our existing tax treaties. We hope the Senate will provide its advice and consent to the new tax treaties with Poland and Hungary, as well as the other tax treaties currently pending before the Senate, as soon as possible.

CONSIDERATION OF ARBITRATION

A tax treaty cannot provide a stable investment environment unless the tax administrations of the two countries implement the treaty effectively. Under the mutual agreement procedure article, a U.S. taxpayer concerned with a treaty partner's application of a treaty can bring the matter to the U.S. competent authority to resolve the matter with the competent authority of the treaty partner. The competent authorities are expected to work cooperatively to resolve the dispute.

The U.S. competent authority has a good track record in resolving disputes. Even in the most cooperative bilateral relationships, however, there may be instances in which the competent authorities will not be able to reach timely and satisfactory resolutions. Moreover, as the number and complexity of cross-border transactions increase, so do the number and complexity of cross-border tax disputes. Accordingly, we have considered ways to equip the U.S. competent authority with additional tools to assist in resolving disputes promptly, including through arbitration.

As it developed the arbitration provisions for the tax treaties with Canada, Germany and Belgium, the Treasury Department carefully considered and studied various types of arbitration procedures that could be included in our treaties and used as part of the competent authority mutual agreement process. Based on our review of the merits of arbitration in other areas of the law, the success of other countries with arbitration in the tax area, and the overwhelming support of the business community, we concluded that mandatory binding arbitration as the final step in the competent authority process can be an effective and appropriate tool to facilitate mutual agreement under U.S. tax treaties.

Three of the treaties before the committee (the proposed protocols with Switzerland, Spain, and Japan) include mandatory arbitration provisions. In general, these provisions are substantially similar to arbitration provisions in several of our recent treaties (Canada, Germany, Belgium, and France) that the Senate has approved over the last several years.

In the typical competent authority mutual agreement process, a U.S. taxpayer presents its case to the U.S. competent authority and participates in formulating the position the U.S. competent authority will take in discussions with the treaty partner. Under the arbitration provision in the proposed protocols with Switzerland, Spain, and Japan, as in the similar provisions that are now part of our treaties with Canada, Germany, Belgium, and France, if the competent authorities cannot resolve the issue within 2 years, the competent authorities must present the issue to an arbitration board for resolution, unless both competent authorities agree the case is not suitable for arbitration. The arbitration board must resolve the issue by choosing the position of one of the competent authorities. That position is adopted as the agreement of the competent authorities and is treated like any other mutual agreement under the treaty (i.e., one that has been negotiated by the competent authorities).

The arbitration process in each of these proposed protocols is mandatory and binding with respect to the competent authorities. However, consistent with the negotiation process under the mutual agreement procedure generally, the taxpayer can terminate the arbitration at any time by withdrawing its request for competent authority assistance. Moreover, the taxpayer retains the right to litigate the matter (in the United States or the treaty partner) in lieu of accepting the result of the

33

arbitration, just as it would be entitled to litigate in lieu of accepting the result of a negotiation under the mutual agreement procedure.

In negotiating the arbitration provisions in the proposed protocols with Switzerland, Spain, and Japan, we took into account, as we did when we negotiated the arbitration provision in the 2009 protocol to the France tax treaty, concerns this committee expressed in its report on the 2007 protocol to the U.S.-Canada treaty over certain aspects of the arbitration rules in our treaties with Canada, Germany, and Belgium. Accordingly, the proposed arbitration rule in each of these treaties differs from the provision in the treaties with Canada, Germany, and Belgium in three key respects. First, the proposed rule allows the taxpayer who presented the original case that is subjected to arbitration to submit its views on the case for consideration by the arbitration panel. Second, the proposed rule prohibits a competent authority from appointing an employee from its own tax administration to the arbitration board. Finally, the proposed rule does not prescribe a hierarchy of legal authorities that the arbitration panel must use in making its decision, thus ensuring that customary international law rules on treaty interpretation will apply.

Because the arbitration board can only choose between the positions of each competent authority, the expectation is that the differences between the positions of the competent authorities will tend to narrow as the case moves closer to arbitration. In fact, if the arbitration provision is successful, difficult issues will be resolved without resorting to arbitration. Thus, it is our objective that these arbitration provisions will rarely be utilized, but their presence will motivate the competent authorities to approach negotiations in ways that result in mutually agreeable conclusions without invoking the arbitration process.

We are hopeful that our desired objectives for arbitration are being realized, even though we are still in the early stages in our experience with arbitration and at this time cannot report definitively on the effects of arbitration on our tax treaty relationships. Our observation is that, where mandatory arbitration has been included in a treaty, the competent authorities are negotiating with greater intent to reach principled and timely resolution of disputes. Therefore, under the mandatory arbitration provision, double taxation is being effectively eliminated in a timely and more expeditious manner.

ASSISTANCE IN COLLECTION OF TAXES

Among the important modifications to the existing tax treaty with Japan that are made in the proposed protocol amending the tax treaty with that country is the introduction of provisions obligating the tax authorities of the United States and Japan to provide to each other limited assistance in the collection of taxes. While the inclusion of assistance in collection provisions has been part of the international norm of tax treaty policy (both the OECD and United Nations Model Tax Conventions contain such provisions), this has not been a policy that the Treasury Department has followed as a general matter, largely because of our concerns that such treaty obligations could lead to a disproportionate amount of additional burden on the IRS without the commensurate benefit to the U.S. fisc. For this reason, only five U.S. tax treaties in force contain assistance in collection provisions, including our treaties with Canada, Denmark, France, Netherlands, and Sweden.

The Treasury Department's general policy with respect to collection assistance remains unchanged, and we will continue to decline the many requests from other countries to include these provisions in tax treaties when we do not have reason to believe that doing so would yield net benefits to the fisc. We will continue to examine requests for collection assistance on a case-by-case basis, and will commit to such treaty provisions if, based on a thorough consultation with the IRS, we conclude that establishing collection assistance obligations with a particular country would on balance enhance the collection of U.S. taxes. The proposed protocol with Japan is an example of one such case.

It is noteworthy that, in line with our continued concern that any obligations to assist a treaty partner in the collection of taxes must not lead to a disproportionate burden on the IRS, the proposed protocol with Japan contains a number of protections to ensure that the U.S. and Japanese tax authorities will provide such assistance in a limited and balanced manner. First, the protocol mandates the U.S. and Japanese tax authorities to arrive at a mutual understanding on a limit to the number of applications for assistance that either country may make in any given year. In addition, the two revenue authorities must mutually establish a minimum monetary threshold for applications, in order to prevent either country from seeking assistance in the collection of revenue claims that represent negligible amounts of taxes owed.

34

As is explained in the following paragraphs, the scope of the collection assistance provisions in the proposed protocol with Japan differs in significant ways from the five collection assistance provisions we have in force with our other treaty partners. The Treasury Department firmly believes that these adjustments to the scope permitted in the prior treaties are both justified and appropriate.

First, the proposed protocol permits a country to request assistance in the collection of a revenue claim that that country has against an individual citizen of the other country. Thus, Japan would be able to request, in certain cases, assistance from the IRS in the collection of a Japanese revenue claim against a U.S. citizen. However, the scope of such requests is limited only to situations in which the citizen has either, filed a fraudulent tax return (or a fraudulent claim for refund), willfully failed to file a tax return in an attempt to evade taxes, or has transferred assets to the other country to avoid collection of the revenue claim.

Second, the proposed protocol permits a country to request assistance in the collection of a revenue claim that it has against a company resident in the other country. Just as is the case for collection against citizens, we have agreed to limitations with Japan on the scope of permissible collection assistance of companies resident in the other country. As a general matter, we do not want to allow the collection assistance provisions to be used as an end run against the dispute resolution provisions in the tax treaty. Therefore, under the proposed protocol, the tax authority of Japan may only request assistance from the IRS on the collection of a Japanese revenue claim against a company incorporated in the United States if the authority has exhausted all applicable dispute resolution mechanisms with respect to the particular revenue claim.

EXPANDING THE U.S. TAX TREATY NETWORK

While much of the Treasury Department's tax treaty negotiations involve modernizing existing agreements with key trading partners to close loopholes or improve the level of benefits to U.S. investors, we also engage countries such as Chile to negotiate new tax treaties. The Treasury Department actively pursues opportunities to establish new tax treaty relationships with countries in which U.S. businesses encounter unrelieved double taxation with respect to their investments. The Treasury Department is aware of the keen interest of both the business community and the Senate to conclude income tax treaties that provide meaningful benefits to cross-border investors with South American countries. If approved by the Senate and the Chilean Congress, the tax treaty with Chile would be the second U.S. tax treaty in force in South America. Thus, the proposed tax treaty with Chile represents a significant inroad into the South American region.

The Treasury Department is also developing new tax treaty relationships in other regions of the world. For example, on July 7 of this year, the administration signed a new tax treaty with Vietnam, a country that U.S. businesses have listed as a priority because they have experienced significant unrelieved double taxation. We hope to transmit the new tax treaty with Vietnam soon for its advice and consent. This treaty, if approved by the Senate, would be the first agreement of its kind between the United States and Vietnam.

DISCUSSION OF PROPOSED TREATIES

I would now like to discuss the eight tax treaties that have been transmitted for the Senate's consideration. The treaties are generally consistent with modern U.S. tax treaty policy as reflected in the Treasury Department's 2006 U.S. Model Income Tax Convention. As with all bilateral tax treaties, the treaties contain minor variations that reflect particular aspects of the treaty policies and domestic tax laws of the foreign countries, and their economic relations with the United States. We have submitted a Technical Explanation for each treaty that contains detailed discussions of the provisions of each treaty. These Technical Explanations serve as the Treasury Department's official explanation of each tax treaty.

*Chile*

The proposed Chile tax treaty is generally consistent with U.S. tax treaty policy as reflected in the 2006 U.S. Model. There are, as with all bilateral tax treaties, some variations from these norms. In the proposed treaty, these variations from the U.S. Model reflect particular aspects of the Chilean tax system and treaty policy, the interaction of U.S. and Chilean law, and U.S.-Chile economic relations.

The proposed treaty provides for reduced source-country taxation of dividends distributed by a company resident of one country to a resident of the other country. The proposed treaty generally allows for taxation by the source country of 5 percent on direct dividends (i.e., where a 10-percent ownership threshold is met) and 15 per-

35

cent on all other dividends. Additionally, the proposed treaty provides for an exemption from withholding tax on certain cross-border dividend payments to pension funds. In recognition of unique aspects of Chile's domestic tax system, the withholding rate reductions on dividend payments from Chile will generally not apply to Chile unless Chile makes certain modifications to its corporate tax system in the future.

Consistent with the U.S. Model, the proposed treaty contains special rules for dividends paid by U.S. regulated investment companies and real estate investment trusts to prevent their usage to inappropriately avoid U.S. tax.

The proposed treaty provides a limit of 4 percent on source-country withholding taxes on cross-border interest payments to banks, insurance companies, and certain other financial enterprises. For the first 5 years following entry into force, the proposed treaty provides a limit of 15 percent on all other cross-border interest payments. After the initial 5-year period, the 15-percent limit is reduced to 10 percent for all other cross-border interest payments. In addition, consistent with the U.S. Model, source-country tax may be imposed on certain contingent interest and payments from a U.S. real estate mortgage investment conduit. The proposed treaty also permits the United States to impose its branch-level interest tax according to the applicable withholding rate reductions for cross-border interest payments.

The proposed treaty provides a limit of 2 percent on source-country withholding taxes on cross-border royalty payments that constitute a rental payment for the use of industrial, commercial or scientific equipment, and a limit of 10 percent on all other cross-border royalty payments.

The taxation of capital gains under the proposed treaty generally follows the format of the U.S. Model, with some departures in recognition of unique aspects of Chile's domestic tax system. Similar to the U.S. Model, gains derived from the sale of real property and real property interests may be taxed by the country in which the property is located. Likewise, gains from the sale of personal property forming part of a permanent establishment situated in a country may be taxed in that country. Gains from the alienation of shares or other rights or interests in a company may either be taxed at a maximum rate of 16 percent by the country in which the company is a resident, or in certain circumstances in accordance with that country's domestic law. However, the proposed treaty recognizes a unique aspect of Chile's domestic law and provides that these gains shall be taxable only in the country of residence of the seller if Chile makes certain modifications to its corporate tax system in the future. Certain other gains from the alienation of shares of a company are taxable only in the country of residence of the seller, such as gains derived by a pension fund. Furthermore, gains from the alienation of ships, boats, aircraft, and containers used in international traffic, as well as gains from the alienation of any property not specifically addressed by the proposed treaty's article on capital gains, are taxable only in the country of residence of the seller.

The proposed treaty permits source-country taxation of business profits only if the business profits are attributable to a permanent establishment located in that country. The proposed treaty generally defines a "permanent establishment" in a way consistent with the U.S. Model. One departure from the U.S. Model, but found in a number of other U.S. tax treaties with developing countries, is a provision that deems an enterprise to have a permanent establishment in a country if the enterprise has performed services in that country exceeding 183 days in a 12-month period.

The proposed treaty preserves the U.S. right to impose its branch profits tax on U.S. branches of Chilean corporations. The proposed treaty also accommodates a provision of U.S. domestic law providing that income earned during the life of the permanent establishment, but deferred and not received until after the permanent establishment no longer exists, is still attributed to the permanent establishment.

The proposed treaty provides that an individual resident in one country and performing services in the other country will become taxable in the other country only if the individual has a fixed place of business (a so-called "fixed base"). The proposed treaty generally defines "fixed base" in a way consistent with the U.S. Model, with a departure found in a number of U.S. tax treaties with developing countries which deems an individual to have a fixed base if he or she has performed services in that country for at least 183 days in the taxable year concerned.

The rules for the taxation of income from employment under the proposed treaty are similar to those under the U.S. Model. The general rule is that employment income may be taxed in the country where the employment is exercised unless three conditions constituting a safe harbor are satisfied.

The proposed treaty permits both the residence country and source country to tax pension payments, although the source country's taxation right is limited to 15 percent of the gross amount of the pension. Consistent with current U.S. tax treaty

36

policy, the proposed treaty permits the deductibility of certain cross-border contributions to pension plans. Also consistent with current U.S. tax treaty policy, the proposed treaty provides for exclusive source-country taxation of Social Security payments.

The proposed treaty contains a comprehensive "limitation-on-benefits" article designed to address "treaty shopping," which is the inappropriate use of a tax treaty by residents of a third country. The limitation-on-benefits article is consistent with current U.S. tax treaty policy, although it contains a special rule for so-called "headquarters companies" that is also found in a number of other U.S. tax treaties.

The proposed treaty incorporates rules providing that a former citizen or long-term resident of the United States may, for the period of 10 years following the loss of such status, be taxed in accordance with the laws of the United States. The proposed treaty also coordinates the U.S. and Chilean tax rules to address the "mark-to-market" provisions enacted by the United States in 2007, which apply to individuals who relinquish U.S. citizenship or terminate long-term residency.

Consistent with the OECD and U.S. Models, the proposed treaty provides for the exchange between the competent authorities of each country of information that is foreseeably relevant to carrying out the provisions of the proposed treaty or enforcing the domestic tax laws of either country. The proposed treaty allows the United States to obtain information from Chile, including from Chilean financial institutions, regardless of whether Chile needs the information for its own tax purposes.

The proposed treaty will enter into force when the United States and Chile have notified each other that they have completed all of the necessary procedures required for entry into force. With respect to taxes withheld at source, the treaty will have effect for amounts paid or credited on or after the first day of the second month following the date of entry into force. With respect to other taxes, the treaty will have effect for taxable years beginning on or after the first day of January next following the date of entry into force.

*Hungary*

The proposed tax treaty and related agreement, which will be effected by exchange of notes with Hungary, were negotiated to bring the existing tax treaty into closer conformity with modern U.S. tax treaty policy. Entering into a new agreement has been a top tax treaty priority for the Treasury Department because the existing tax treaty with Hungary, signed in 1979, does not contain the necessary treaty shopping protections and, as a result, is currently being used inappropriately by third country investors to gain access to U.S. treaty benefits.

The proposed treaty contains a comprehensive Limitation on Benefits article designed to address this problem. Similar to the provision included in all recent U.S. tax treaties with member countries of the European Union, the new Limitation on Benefits article includes a provision granting so-called "derivative benefits." The article also contains a special rule for so-called "headquarters companies" found in a number of other U.S. tax treaties.

The proposed treaty incorporates updated rules providing that a former citizen or long-term resident of the United States may, for the period of 10 years following the loss of such status, be taxed in accordance with the laws of the United States. The proposed treaty also coordinates the U.S. and Hungarian tax rules with the "mark-to-market" U.S. domestic tax laws enacted in 2007, which apply to individuals who relinquish U.S. citizenship or terminate long-term residency.

The withholding rates on investment income in the proposed treaty are the same as, or lower than, those in the current treaty. The proposed treaty provides for reduced source-country taxation of dividends distributed by a company resident of one country to a resident of the other country. The proposed treaty generally allows for taxation by the source country of 5 percent on direct dividends (i.e., where a 10-percent ownership threshold is met) and 15 percent on all other dividends. Additionally, the proposed treaty provides for an exemption from withholding tax on certain cross-border dividend payments to pension funds.

The proposed treaty updates the treatment of dividends paid by U.S. regulated investment companies and real estate investment trusts to prevent their usage to inappropriately avoid U.S. tax.

Consistent with the existing treaty, the proposed treaty generally eliminates source-country withholding taxes on cross-border interest and royalty payments. However, consistent with current U.S. tax treaty policy, source-country tax may be imposed on certain contingent interest and payments from a U.S. real estate mortgage investment conduit.

The taxation of capital gains under the proposed treaty generally follows the format of the U.S. Model. Gains derived from the sale of real property and real property interests may be taxed by the State in which the property is located. Likewise,

37

gains from the sale of personal property forming part of a permanent establishment situated in a country may be taxed in that country. All other gains, including gains from the alienation of ships, boats, aircraft, and containers used in international traffic, as well as gains from the sale of stock in a corporation, are taxable only in the country of residence of the seller.

The proposed treaty, like several recent U.S. tax treaties, provides that the OECD Transfer Pricing Guidelines apply by analogy in determining the amount of business profits of a resident of the other country. The source country's right to tax such profits is generally limited to cases in which the profits are attributable to a permanent establishment located in that country. The proposed treaty preserves the U.S. right to impose its branch profits tax on U.S. branches of Hungarian corporations. The proposed treaty will also accommodate a provision of U.S. domestic law providing that income earned during the life of the permanent establishment, but deferred and not received until after the permanent establishment no longer exists, is still attributed to the permanent establishment.

The proposed treaty would change the rules currently applied under the existing treaty regarding the taxation of independent personal services. Furthermore, an enterprise performing services in the other country will be taxable in the other country only if the enterprise has a fixed place of business in that country.

The rules for the taxation of income from employment under the proposed treaty are similar to those under the U.S. Model. The general rule is that employment income may be taxed in the country where the employment is exercised unless three conditions constituting a safe harbor are satisfied.

The proposed treaty preserves the current treaty's rules that allow for exclusive residence-country taxation of pensions, and, consistent with current U.S. tax treaty policy, provides for exclusive source-country taxation of Social Security payments.

Consistent with the OECD and U.S. Models, the proposed treaty with Hungary provides for the exchange between the tax authorities of each country of information relevant to carrying out the provisions of the proposed treaty or the domestic tax laws of either country. The proposed treaty allows the United States to obtain information (including from financial institutions) from Hungary whether or not Hungary needs the information for its own tax purposes.

The proposed treaty would enter into force on the date of the exchange of instruments of ratification. With respect to taxes withheld at source, the treaty will have effect for amounts paid or credited on, or after, the first day of the second month following the date of entry into force. With respect to other taxes, the treaty will have effect for taxable years beginning on or after the first day of January next following the date of entry into force. The existing treaty will, with respect to any tax, cease to have effect as of the date on which the proposed treaty has effect with respect to such tax.

*Japan*

The proposed protocol to amend the existing tax treaty with Japan and an agreement effected by exchange of notes were negotiated to make a number of key amendments to the existing tax treaty with Japan concluded in 2003. Many of the provisions in the proposed protocol are intended to bring the existing tax treaty into closer conformity with current U.S. tax treaty policy as reflected in the U.S. Model. The provisions also reflect particular aspects of Japanese law and tax treaty policy, the interaction of U.S. law with Japanese law, and U.S.-Japan economic relations.

The proposed protocol brings the existing treaty's taxation of cross-border interest payments largely into conformity with the U.S. Model by broadening the existing treaty's limited exemptions from source-country withholding to cover all payments of interest. However, contingent interest may be subject to source-country withholding tax at a rate of 10 percent, and full source-country tax may be imposed on payments from a U.S. real estate mortgage investment conduit.

The proposed protocol with Japan expands the category of cross-border dividends that are eligible for an exemption from source-country withholding. Under the existing treaty, such dividends are exempt from source-country withholding if the company that beneficially owns the dividends has owned, for a period of at least 12 months ending on the date on which the entitlement to the dividends is determined, greater than 50 percent of the voting stock of the company paying the dividends (and only if additional requirements are satisfied). The proposed protocol slightly lowers the ownership requirement for the exemption from source-country withholding to 50 percent or more of the voting stock of the company paying the dividends, and reduces the holding period requirement to 6 months.

The proposed protocol amends the provisions of the existing Convention governing the taxation of capital gains to allow for taxation of gains from the sale of real property and from real property interests by the State in which the property is located.

38

Accordingly, under the proposed protocol, the United States may fully apply the Foreign Investment in Real Property Tax Act.

The proposed protocol updates the provisions of the existing Convention with respect to the mutual agreement procedure by incorporating mandatory arbitration of certain cases that the competent authorities of the United States and Japan are unable to resolve after a reasonable period of time. These provisions are similar to the mandatory arbitration provisions recently introduced into a number of other U.S. bilateral tax treaties.

As previously discussed, above, the proposed protocol incorporates into the existing Convention provisions that enable the revenue authority of a country to request assistance from the revenue authority of the other country in the collection of taxes and related costs, interest and penalties.

Consistent with the U.S. Model and the international standard for tax information exchange, the proposed protocol provides for the exchange between the revenue authorities of both countries of information foreseeably relevant to carrying out the provisions of the existing Convention (as modified by the proposed protocol) or the domestic tax laws of either country. The proposed protocol allows the United States to obtain information (including from financial institutions) from Japan whether or not Japan needs the information for its own tax purposes.

The proposed protocol will enter into force upon exchange of instruments of ratification. The proposed protocol will have effect, with respect to taxes withheld at source, for amounts paid or credited on or after the first day of the third month next following the date of entry into force, and with respect to other taxes, for taxable years beginning on or after the first day of January next following the date of entry into force. Special rules apply for the entry into force of the mandatory binding arbitration provisions.

*Luxembourg*

The proposed protocol to amend the existing tax treaty with Luxembourg and the related agreement effected by exchange of notes were negotiated to bring the existing treaty, signed in 1996, into closer conformity with current U.S. tax treaty policy regarding exchange of information.

The proposed protocol replaces the existing treaty's information exchange provisions with updated rules that are consistent with current U.S. tax treaty practice and the current international standards for exchange of information. The proposed protocol allows the tax authorities of each country to exchange information foreseeably relevant to carrying out the provisions of the agreement or the domestic tax laws of either country. Among other things, the proposed protocol would allow the United States to obtain information from Luxembourg authorities whether or not Luxembourg needs the information for its own tax purposes. In addition, the proposed protocol provides that requests for information cannot be declined solely because the information is held by a bank or other financial institution.

The proposed related agreement effected by exchange of notes sets forth agreed understandings between the countries regarding the updated provisions on tax information exchange. The agreed understandings include obligations on the United States and Luxembourg to ensure that their respective competent authorities have the authority to obtain and provide, upon request, information held by banks and other financial institutions and information regarding ownership of certain entities. The understandings also provide that information shall be exchanged without regard to whether the conduct being investigated would be a crime under the laws of the country from which the information has been requested.

The proposed protocol would enter into force once both the United States and Luxembourg have notified each other that their respective applicable procedures for ratification have been satisfied. It would have effect with respect to requests made on or after the date of entry into force with regard to tax years beginning on or after January 1, 2009. The related agreement effected by exchange of notes would enter into force on the date of entry into force of the proposed protocol and would become an integral part of the proposed protocol on that date.

*Poland*

The proposed tax treaty with Poland was negotiated to bring the current treaty, concluded in 1974, into closer conformity with current U.S. tax treaty policy as reflected in the U.S. Model. There are, as with all bilateral tax treaties, some variations from these norms. In the proposed treaty, these differences reflect particular aspects of Polish law and treaty policy, the interaction of U.S. and Polish law, and U.S.-Poland economic relations.

The proposed treaty contains a comprehensive Limitation on Benefits article designed to address "treaty shopping." The existing tax treaty with Poland does not

39

contain treaty shopping protections and, for this reason, revising the existing treaty has been a top priority for the Treasury Department's tax treaty program. Beyond the standard provisions, the new article includes a provision granting "derivative benefits" similar to the provision included in all recent U.S. tax treaties with member countries of the European Union. The article also contains a special rule for "headquarters companies" identical to with the rule in a number of other U.S. tax treaties.

The proposed treaty incorporates updated rules that provide that a former citizen or former long-term resident of the United States may, for the period of 10 years following the loss of such status, be taxed in accordance with the laws of the United States. The proposed treaty also coordinates the U.S. and Polish tax rules to address the "mark-to-market" provisions enacted by the United States in 2007 that apply to individuals who relinquish U.S. citizenship or terminate long-term residency.

The withholding rates on investment income in the proposed treaty are in most cases the same as or lower than those in the current treaty. The proposed treaty provides for reduced source-country taxation of dividends distributed by a company resident in one country to a resident of the other country. The treaty will generally allow for taxation by the source country of 5 percent on direct dividends (i.e., where a 10-percent ownership threshold is met) and 15 percent on all other dividends. Additionally, the treaty will provide for an exemption from withholding tax on certain cross-border dividend payments to pension funds.

The proposed treaty updates the treatment of dividends paid by U.S. regulated investment companies and U.S. real estate investment trusts to prevent their usage to inappropriately avoid U.S. tax.

The proposed treaty provides for an exemption from source-country taxation for the following classes of interest: interest that is either paid by or paid to governments (including central banks); interest paid in respect of a loan made to or provided, guaranteed or insured by a government, statutory body or export financing agency; certain interest paid to a pension fund, interest paid to a bank or an insurance company; and interest paid to certain other financial enterprises that are unrelated to the payer of the interest. The proposed treaty provides for a limit of 5 percent on source-country withholding taxes on all other cross-border interest payments. In addition, consistent with the U.S. Model, source-country tax may be imposed on certain contingent interest and payments from a U.S. real estate mortgage investment conduit.

The proposed treaty provides a limit of 5 percent on source-country withholding taxes on cross-border payments of royalties. The definition of the term "royalty" in the proposed treaty includes payments of any kind received as a consideration for the use of, or the right to use any industrial, commercial or scientific equipment.

The taxation of capital gains under the proposed treaty generally follows the U.S. Model. Gains derived from the sale of real property and from real property interests may be taxed by the country in which the property is located. Likewise, gains from the sale of personal property forming part of a permanent establishment situated in either the United States or Poland may be taxed in that country. All other gains, including gains from the alienation of ships, aircraft, and containers used in international traffic and gains from the sale of stock in a corporation, are taxable only in the country of residence of the seller.

Consistent with U.S. tax treaty policy, the proposed treaty employs the so-called "Approved OECD Approach" for attributing profits to a permanent establishment. The source country's right to tax such profits is generally limited to cases in which the profits are attributable to a permanent establishment located in that country. The proposed treaty defines a "permanent establishment" in a way that grants rights to tax business profits that are consistent with those found in the U.S. Model.

The proposed treaty preserves the U.S. right to impose its branch profits tax on U.S. branches of Polish corporations. The proposed treaty also accommodates a provision of U.S. domestic law that attributes to a permanent establishment income that is earned during the life of the permanent establishment, but is deferred and not received until after the permanent establishment no longer exists.

Under the proposed treaty an enterprise performing services in the other country will become taxable in the other country only if the enterprise has a fixed place of business.

The rules for the taxation of income from employment under the proposed treaty are consistent with the U.S. Model. The general rule is that employment income may be taxed in the country where the employment is exercised unless the conditions constituting a safe harbor are satisfied.

The proposed treaty contains rules regarding the taxation of pensions, Social Security payments, annuities, alimony, and child support that are generally consistent with the U.S. Model. Further, pensions and annuities are taxable only in the

40

country of residence of the beneficiary. In addition, the treaty provides for exclusive source-country taxation of Social Security payments. Payments of alimony and child support are exempt from tax in both countries. Consistent with the U.S. Model and the international standard for tax information exchange, the proposed treaty provides for the exchange between the tax authorities of each country of information that is foreseeably relevant to carrying out the provisions of the proposed treaty or the domestic tax laws of either country. The proposed treaty allows the United States to obtain such foreseeably relevant information (including from financial institutions) from Poland whether or not Poland needs the information for its own tax purposes.

The proposed treaty will enter into force when both the United States and Poland have notified each other that they have completed all of the necessary procedures required for entry into force. The proposed treaty will have effect, with respect to taxes withheld at source, for amounts paid or credited on or after the first day of the second month next following the date of entry into force, and with respect to other taxes, for taxable years beginning on or after the first day of January next following the date of entry into force. The current treaty will, with respect to any tax, cease to have effect as of the date on which this proposed treaty has effect with respect to such tax.

The proposed treaty provides that an individual who was entitled to the benefits under the provisions for teachers, students and trainees, or government functions of the existing treaty at the time of entry into force of the proposed treaty shall continue to be entitled to such benefits until such time as the individual would cease to be entitled to such benefits if the existing treaty remained in force.

*Spain*

The proposed protocol with Spain and an accompanying memorandum of understanding and exchange of notes make a number of key amendments to the existing tax treaty with Spain, concluded in 1990. Many of the provisions in the proposed protocol are intended to bring the existing treaty into closer conformity with the U.S. Model. The provisions in the proposed protocol also reflect particular aspects of Spanish law and tax treaty policy and U.S.-Spain economic relations. Modernizing the existing treaty has been a high tax treaty priority for the business communities in both the United States and Spain.

The proposed protocol brings the existing tax treaty's rules for taxing payments of cross-border dividends into conformity with a number of recent U.S. tax treaties with major trading partners. The proposed protocol provides for an exemption from source-country withholding on certain direct dividends (i.e., dividends beneficially owned by a company that has owned, for a period of at least 12 months prior to the date on which the entitlement to the dividends is determined, at least 80 percent of the voting stock of the company paying the dividends), as well as dividends beneficially owned by certain pension funds. With respect to other dividends, consistent with the U.S. Model, the proposed protocol limits to 5 percent the rate of source-country withholding permitted on cross-border dividends beneficially owned by a company that owns at least 10 percent of the voting stock of the company paying the dividends, and limits to 15 percent the rate of source-country withholding permitted on all other dividends. The proposed protocol permits the imposition of source-country withholding on branch profits in a manner consistent with the U.S. Model.

The proposed protocol brings the existing tax treaty's rules for taxation of cross-border interest payments largely into conformity with the U.S. Model by exempting such interest from source-country taxation. However, interest that is contingent interest may be subject to source-country withholding tax at a rate of 10 percent (in contrast to 15 percent under the U.S. Model). Consistent with the U.S. Model, full source-country tax may be imposed on payments from a U.S. real estate mortgage investment conduit.

The proposed protocol exempts from source-country withholding cross-border payments of royalties and capital gains in a manner consistent with the U.S. Model.

The proposed protocol updates the provisions of the existing treaty with respect to the mutual agreement procedure by requiring mandatory binding arbitration of certain cases that the competent authorities of the United States and Spain are unable to resolve after a reasonable period of time. The arbitration provisions in the proposed protocol are similar to other mandatory arbitration provisions that were recently incorporated into a number of other U.S. bilateral tax treaties.

The proposed protocol replaces the limitation-on-benefits provisions in the existing tax treaty with updated rules similar to those found in recent U.S. tax treaties with countries in the European Union.

41

Consistent with the U.S. Model and the international standard for tax information exchange, the proposed protocol provides for the exchange between the tax authorities of each country of information that is foreseeably relevant to carrying out the provisions of the tax treaty or the domestic tax laws of either country. The proposed protocol allows the United States to obtain such foreseeably relevant information (including from financial institutions) from Spain regardless of whether Spain needs the information for its own tax purposes.

The proposed protocol will enter into force 3 months after both countries have notified each other that they have completed all required internal procedures for entry into force. The proposed protocol will have effect, with respect to taxes withheld at source, for amounts paid or credited on or after the date on which the proposed protocol enters into force, and with respect to other taxes, for taxable years beginning on or after the date on which the proposed protocol enters into force. Special rules apply for the entry into force of the mandatory binding arbitration provisions.

*Switzerland*

The proposed protocol to amend the existing tax treaty with Switzerland and related agreement effected by exchange of notes were negotiated to bring the existing treaty, signed in 1996, into closer conformity with current U.S. tax treaty policy regarding exchange of information. There are, as with all bilateral tax conventions, some variations from these norms. In the proposed protocol, these minor differences reflect particular aspects of Swiss law and treaty policy, and they generally follow the OECD standard for exchange of information.

The proposed protocol replaces the existing treaty's information exchange provisions with updated rules that are consistent with current U.S. tax treaty practice and the current international standards for exchange of information. The proposed protocol will also allow the tax authorities of each country to exchange information that may be relevant to carrying out the provisions of the agreement or the domestic tax laws of either country, including information that would otherwise be protected by the bank secrecy laws of either country. In addition, it will allow the United States to obtain information from Switzerland whether or not Switzerland needs the information for its own tax purposes, and provides that requests for information cannot be declined solely because the information is held by a bank or other financial institution.

The proposed protocol amends a paragraph of the existing protocol to the existing treaty by incorporating procedural rules to govern requests for information and an agreement between the United States and Switzerland that such procedural rules are to be interpreted in order not to frustrate effective exchange of information.

The proposed protocol and related agreement effected by exchange of notes update the provisions of the existing treaty with respect to the mutual agreement procedure by incorporating mandatory arbitration of certain cases that the competent authorities of the United States and Switzerland are unable to resolve after a reasonable period of time.

Finally, the proposed protocol updates the provisions of the existing treaty to provide that individual retirement accounts are eligible for the benefits afforded to pensions under the existing treaty.

The proposed protocol would enter into force when the United States and Switzerland exchange instruments of ratification. The proposed protocol would have effect, with respect to taxes withheld at source, for amounts paid or credited on or after the first day of January of the year following entry into force. With respect to information exchange, the proposed protocol would have effect with respect to requests for bank information that relate to any date beginning on or after the date the proposed protocol is signed. With respect to all other cases, the proposed protocol would have effect with respect to requests for information that relates to taxable periods beginning on or after the first day of January next following the date of signature. The mandatory arbitration provision would have effect with respect both to cases that are under consideration by the competent authorities as of the date on which the proposed protocol enters into force and to cases that come under consideration after that date.

*Protocol to the Multilateral Convention*

On January 25, 1988, the OECD and the Council of Europe jointly opened for signature the Multilateral Convention, which the United States signed in 1989. The proposed protocol to the Multilateral Convention was negotiated to bring the Multilateral Convention into conformity with current international standards regarding exchange of information for tax purposes.

Although the Multilateral Convention contains broad provisions for the exchange of information, it predates the current internationally agreed standards on exchange

42

of information. Thus, the obligations contained in the Multilateral Convention are subject to certain domestic law limitations that could impede full exchange of information. In particular, the Multilateral Convention does not require the exchange of bank information on request, nor does it override domestic tax interest requirements. In contrast, the current internationally agreed standards on transparency and exchange of information provide for full exchange of information upon request in all tax matters without regard to a domestic tax interest requirement or bank secrecy laws. The protocol amends the Multilateral Convention in order to bring it into conformity with these international standards, which are also reflected in the U.S. Model and OECD Model tax treaties.

The Multilateral Convention specifies information the applicant country is to provide the requested country when making a request. In some situations, the name of the person under examination is not known to the applicant country, but there is other information sufficient to identify the person. The proposed protocol amends the Multilateral Convention by providing that a request for assistance is adequate even if the name of the person(s) under examination is not known, provided that the request contains sufficient information to identify the person or ascertainable group or category of persons.

Prior to amendment, the Multilateral Convention was open for signature only by countries that were members of the Council of Europe, the OECD, or both. The proposed protocol amends the Multilateral Convention by allowing any country to become a party thereto. However, countries that are not members of the OECD or of the Council of Europe are only invited to become a party to the amended Convention subject to unanimous consent of the parties to the amended Convention.

The Multilateral Convention as amended by the proposed protocol entered into force on June 1, 2011, for countries that signed and ratified it prior to that date. For countries that sign subsequent to that date, the Multilateral Convention as amended by the proposed protocol will enter into force on the first day of the month following the expiration of a period of 3 months after the date of deposit of the instrument of ratification with one of the Depositaries.

Any Member State of the Council of Europe or of the OECD that is not yet a party to the Multilateral Convention will become a party to the Multilateral Convention as amended by the proposed protocol upon ratification of the Convention as amended by the proposed protocol by that Member State, unless it explicitly expresses the will to adhere exclusively to the unamended Convention. Any country that is not a member of the OECD or the Council of Europe that subsequently becomes a signatory to the Convention as amended by the proposed protocol shall be a party to the Convention as amended by the proposed protocol.

The amendments shall have effect for administrative assistance related to taxable periods beginning on or after January 1 of the year following the year in which the Convention as amended by the proposed protocol, entered into force in respect of a party. Where there is no taxable period, the amendments shall have effect for administrative assistance related to charges to tax arising on or after January 1 of the year following the year in which the Convention as amended by the proposed protocol entered into force in respect of a party. Any two or more parties may mutually agree that the Convention as amended by the proposed protocol may have effect for administrative assistance related to earlier taxable periods or charges to tax. However, for criminal tax matters, the proposed protocol provides that the Convention as amended by the proposed protocol shall have effect for any earlier taxable period or charge to tax from the date of entry into force in respect of a party. A signatory country may nevertheless lodge a reservation according to which the provisions of the Convention as amended by the proposed protocol would have effect for administrative assistance related to criminal tax matters, only as related to taxable periods beginning from the third year prior to the year in which the Convention as amended by the proposed protocol entered into force in respect of that party.

CONCLUSION

Chairman Isakson and Ranking Member Menendez, let me conclude by thanking you for the opportunity to appear before the committee to discuss the administration's efforts with respect to the eight treaties under consideration. We appreciate the committee's continuing interest in the tax treaty program, and we thank the members and staff for devoting time and attention to the review of these new treaties. We are also grateful for the assistance and cooperation of the staff of the Joint Committee on Taxation.

On behalf of the administration, we urge the committee to take prompt and favorable action on the agreements before you today. That concludes my testimony, and I would be happy to answer any questions.

43

Senator ISAKSON. Thank you, Mr. Stack.
Mr. Barthold.

**STATEMENT OF THOMAS A. BARTHOLD, CHIEF OF STAFF,
JOINT COMMITTEE ON TAXATION, WASHINGTON, DC**

Mr. BARTHOLD. Thank you, Mr. Chairman.

The Joint Committee staff, led by my colleague, Kristine Roth, has prepared pamphlets covering each of the proposed treaties and protocols. These pamphlets provide detailed descriptions of the treaties and protocols, and include comparisons with U.S. model and other recent U.S. treaties, as well as providing discussion of issues raised by the proposed agreements.

There are many proposed agreements before your committee today. I will highlight only a few issues presented by these agreements, with some emphasis on the most recent protocol with Japan.

Let me note first, though, that treaties and protocols are negotiated in the context of the tax laws of the two countries involved in the negotiation. We understand that there have been potentially noteworthy changes in the income tax laws of Chile, Poland, and Spain since the Foreign Relations Committee last considered the proposed agreements with those countries in 2014.

In particular, in Chile, the corporate shareholder income tax, which is fully integrated, has been the subject of reform legislation scheduled to take effect in 2017. And under this reform, a shareholder of a Chilean corporation who is a resident of a country with which Chile does not have an income tax treaty, would be credited with 65 percent rather than 100 percent of the corporate tax paid.

We also understand that the Government of Spain has enacted legislation that, among other things, reduces its corporate tax rate and modifies its depreciation rules, and that the Government of Poland has enacted changes to the individual income tax and corporate income tax.

The committee may wish to inquire of my colleagues from the Treasury Department if they believe that these current proposed agreements appropriately accommodate these internal law developments in these other countries.

The principal purposes of income tax treaties are to reduce or eliminate double taxation of income, and to prevent avoidance or evasion of taxes between the two countries. These objectives are primarily achieved through countries agreeing to limit, in certain situations, its right to tax income derived from its territory by residents of the other country and providing procedures to resolve disputes.

The proposed protocol with Japan broadens the scope of companies eligible for a zero withholding tax rate on parent subsidiary dividends provided under the existing treaty. The proposed protocol with Spain would bring to 13 the number of U.S. income tax treaties that provide such a zero rate on direct dividends. The U.S. model treaty does not provide a zero rate on direct dividends. In previous testimony before the committee, the Treasury Department has stated that the dividend withholding tax should only be eliminated on the basis of an overall balance of benefits, and only in sit-

44

uations where treaties have restrictive limitations on benefit rules and provide comprehensive information exchange.

I observe that every recent U.S. income tax treaty or protocol has included restrictive limitation-on-benefits provisions and comprehensive income information exchange provisions. Therefore, the committee may wish to inquire whether there are particular considerations the Treasury Department will now take into account in deciding whether to negotiate for zero-rate direct-dividend provisions in future income tax treaties or protocols, and whether the new U.S. model treaty that is being developed by the Treasury Department will eliminate withholding tax on direct dividends.

The proposed protocol with Japan also provides for, as noted by Mr. Stack, mandatory and binding arbitration in mutual agreement procedure cases pending before the competent authorities that have been without resolution for 2 years or more. The protocols amending the Swiss and Spanish treaties also include similar provisions.

While similar to arbitration procedures adopted in some recent income tax treaties, the Japanese protocol presents some significant differences. First, it does not require the presenter of the case to have filed a return with each of the two jurisdictions. It also may expedite the schedule on which the taxpayer who seeks a bilateral advanced pricing agreement may have it resolved by binding arbitration related to that advanced pricing agreement. And the proposed protocol also departs from the U.S. model treaty general rules limiting participation of a taxpayer in any mutual agreement proceedings by allowing that taxpayer who presents a case to submit a position paper directly to the arbitration panel.

The committee may wish to consider the extent to which the inclusion of mandatory arbitration rules and the particular features of the Japanese protocol now represent United States policy regarding mandatory binding arbitration. In particular, you may wish to inquire about the criteria on which the Treasury Department determines whether to include such provisions, the appropriate scope of issues eligible for determination by binding arbitration, the absence of precedential value, and the role of the taxpayer in an arbitration proceeding.

Lastly, the pending protocol with Japan also expands the mutual collection assistance available under the Japan treaty to include taxes not otherwise covered by the treaty and to permit collection assistance against one's own nationals on behalf of the other jurisdiction in cases of fraudulent conduct by the citizen.

This provision aggregates what is known as the revenue rule, a common law doctrine against providing collection assistance to which the United States has generally adhered. The changes to the scope of collection assistance are similar to those of only five other countries, but there is no comparable provision in the U.S. model treaty, and the United States has expressly reserved with respect to a similar provision that is included in the OECD multilateral treaty, which is also pending before this committee.

The protocol's article requires the competent authorities to negotiate limitations to the extent of which assistance will be sought or provided in order to ensure that the administrative burden is not unfairly imposed on the jurisdiction.

45

The committee may want to, again, explore the basis for agreeing to this departure from general policy and the criteria applied in so doing. And in addition to any concerns that there might be about preserving the sovereignty of the United States and the rights of its taxpayers, the risk of increased administrative burden should also be considered.

This concludes my testimony. I would be pleased to answer any questions that the members might have.

[The prepared statement of Mr. Barthold follows:]

PREPARED STATEMENT OF THOMAS A. BARTHOLD [1]

My name is Thomas A. Barthold. I am Chief of Staff of the Joint Committee on Taxation. It is my pleasure to present the testimony of the staff of the Joint Committee on Taxation today concerning the proposed income tax treaties with Chile, Hungary, and Poland, the proposed tax protocols with Japan, Luxembourg, Spain and Switzerland, and the proposed protocol amending the multilateral mutual administrative assistance treaty.

OVERVIEW

The Joint Committee staff has prepared pamphlets covering each of the proposed treaties and protocols.[2] The pamphlets provide detailed descriptions of the proposed treaties and protocols, including, in the case of the income tax treaties and protocols, comparisons with the United States Model Income Tax Convention of November 15, 2006 ("U.S. Model treaty"), which reflects preferred U.S. tax treaty policy, and with other recent U.S. tax treaties. The pamphlets also provide detailed discussions of issues raised by the proposed treaties and protocols. We consulted with the Treasury Department and with the staff of your committee in analyzing the proposed treaties and protocols and in preparing the pamphlets.

The principal purposes of the proposed income tax treaties and protocols are to reduce or eliminate double taxation of income earned by residents of either country from sources within the other country and to prevent avoidance or evasion of the taxes of the two countries. The proposed income tax treaties and protocols also are intended to promote close economic cooperation between the treaty countries and to eliminate possible barriers to trade and investment caused by overlapping taxing jurisdictions of the treaty countries. As in other U.S. income tax treaties, these objectives principally are achieved through each country's agreement to limit, in certain specified situations, its right to tax income derived from its territory by residents of the other country.

The principal purpose of the multilateral mutual assistance treaty is to promote increased cooperation in tax administration and enforcement among the parties to the treaty.

The proposed protocol with Japan amends an existing treaty, last amended by a protocol signed November 6, 2003. The proposed protocol with Spain would amend an existing tax treaty signed on February 22, 1990, and its protocol. The proposed treaty with Poland would replace an existing income tax treaty signed on October 8, 1974. The proposed treaty with Hungary would replace an existing income tax treaty signed in 1979. The proposed protocol with Luxembourg would amend an existing tax treaty that was signed in 1996. The proposed protocol with Switzerland would amend an existing tax treaty and previous protocol that were both signed in 1996. The proposed treaty with Chile is the first income tax treaty with that nation. The last proposed protocol under consideration by your committee amends the multilateral mutual administrative assistance in tax matters agreement that the United States ratified in 1991.

My testimony today will first provide an article-by-article summary of the principal features of the proposed protocol with Japan. My testimony will also address the extent to which the U.S. Model treaty continues to represent U.S. tax policy, as reflected in the issues related to benefits conferred under the various agreements pending with your committee and issues related to mutual administrative assistance. With respect to the former, these issues include the limitation-on-benefits provisions in the treaties with Spain, Chile, and Hungary; zero-withholding for parent-subsidiary dividends in Spain, Japan; and the commitment included in the proposed protocol with Spain to negotiate toward an agreement between Puerto Rico and Spain. With respect to the latter, the issues are the exchange of information modernization included in all of the agreements, including the expansion of the multilateral mutual administrative assistance agreement; the mandatory arbitration

46

provisions of the protocols with Switzerland, Spain, and Japan; and the expanded collection assistance agreed upon with Japan.

ARTICLE-BY-ARTICLE SUMMARY OF PROPOSED PROTOCOL WITH JAPAN

The proposed protocol with Japan includes the following significant changes to the existing treaty.

Article II provides that companies that are resident in both Japan and the United States (dual resident companies) will not be considered resident of either jurisdiction for purposes of the treaty. As a result, the treaty benefits available to such companies are limited to those that are available to nonresidents.

Article III reduces the thresholds for exemption from source-country taxation of dividends from subsidiaries resident in one country to a parent corporation resident in the other treaty country. Under the proposed protocol, ownership of 50 percent or more, rather than ownership of more than 50 percent, qualifies. Article III also reduces the required holding period for elimination of source-country taxation on such dividends to the 6-month period ending on the date on which entitlement to the dividends is determined. Both the ownership standard and the holding period thresholds depart from recent U.S. tax treaties that provided zero-rate withholding contingent upon a 12-month holding period and 80-percent ownership.

Article IV replaces Article 11 of the existing treaty, regarding taxation of cross-border interest payments (interest payments arising in one treaty country to residents of the other treaty country). First, the proposed protocol brings the tax treatment of cross-border interest payments into closer alignment with the rules described in the U.S. Model treaty and exempts such interest from source-country taxation. The interest remains subject to tax in the residence country. Antiabuse provisions are also provided that permit source-country taxation, notwithstanding the above rule, for contingent interest payments and payments with respect to ownership in entities used for securitization of real estate mortgages.

Article V revises the definition of real property in Article 13 of the existing treaty to conform more closely to the U.S. Model treaty.

Article VII repeals Article 20 of the existing treaty, which provides certain benefits to researchers and teachers from one jurisdiction when they are temporarily present in the other jurisdiction, consistent with modern treaty policy of both the United States and Japan. A conforming change is made by Article I to paragraph 5 of Article 1 of the existing treaty.

Article IX revises the rules regarding foreign tax credits to conform to changes in Japanese statutory rules for relief from double taxation. The changes reflect the recent adoption of a participation exemption system in Japan.

Article X revises the nondiscrimination rules of Article 24 of the existing treaty to reflect the changes to Article 11, as summarized above.

Article XI provides mandatory and binding arbitration in mutual agreement procedure cases pending before the competent authorities without resolution for 2 years or more. The provision is similar in scope and process to that found in recent treaties and in the proposed protocol with Spain that is also pending before the committee. The new article includes procedures to ensure confidentiality of taxpayer information and the mutual agreement process are included, as well as rules for the selection of members of the arbitration panel to avoid conflicts of interest. The taxpayer is permitted an opportunity to participate in the proceeding in the form of a presentation of views and reasoning. Each competent authority is permitted to provide views, reasoning and its proposed solution to each issue. The panel must reach a determination that selects the proposed solution of one of the competent authorities. That determination is not accorded precedential value and does not include a rationale or other reasoning.

The article prescribes standards similar but not identical to those found in recent treaties with Belgium, France, Germany, and Canada, and is a departure from the U.S. Model treaty. First, it does not require the presenter of the case to have filed a return with each of the two jurisdictions. It also may expedite the schedule on which a taxpayer who seeks a bilateral advanced pricing agreement may contest a proposed adjustment that is related to the subject of the pending request for a pricing agreement, thus compelling arbitration if the competent authorities do not reach agreement on the bilateral advanced pricing agreement. The proposed article also departs from the U.S. Model treaty general rules limiting participation of the taxpayer in any mutual agreement proceedings by allowing the taxpayer who presents a case to submit a position paper directly to the arbitration panel.

Article XII of the proposed protocol modernizes the exchange of information provisions of Article 26. The revised exchange of information provisions conform to modern standards similar to those in the U.S. Model treaty and the OECD Model treaty.

47

Unlike the U.S. Model treaty, the proposed protocol includes a specific provision that the obligation to exchange information does not override domestic law privilege that attaches to confidential communications.

Article XIII expands the mutual collection assistance available under Article 27 to include taxes not otherwise covered by the treaty, and to permit collection assistance against one's own nationals on behalf of the other jurisdiction in cases of fraudulent conduct by the citizen. The provision abrogates the Revenue Rule, a common law doctrine against providing collection assistance to which the United States has generally adhered. The changes to the scope of collection assistance are similar to those in treaties with only five other countries: France, Netherlands, Sweden, Canada, and Denmark. There is no comparable provision in the U.S. Model treaty, and the United States expressly reserved with respect to a similar provision that is included in the OECD Multilateral treaty that is also pending before this committee. The article requires the competent authorities to negotiate limitations on the extent to which such assistance will be sought or provided, in order to assure that administrative burden is not unfairly imposed on either jurisdiction.

Article XIV amends the 2003 Protocol to provide rules for the implementation of both arbitration and collection provisions, as well as conforming changes.

### THE EXTENT TO WHICH THE U.S. MODEL TREATY CONTINUES TO REFLECT U.S. TAX POLICY

The most recent U.S. Model treaty was published in 2006. A number of U.S. income tax treaties and protocols to earlier treaties have entered into force since then. Significant deviations from the U.S. Model treaty have, understandably, proliferated. This proliferation can be expected to continue as the U.S. State Department and Treasury Department negotiate new income tax treaties and protocols. Earlier this year, the Treasury Department proposed several revisions and additions to the U.S. Model and announced its goal of completing its revision of the U.S. Model treaty this year.[3] The following discussion identifies areas in which the pending protocols differ from the current U.S. Model treaty. First, I address those issues related to benefits conferred under the various agreements pending with your committee, and second, the issues related to mutual administrative assistance, specifically exchange of information and mutual collection assistance.

*A. Issues Related to the Benefits Provided to Relieve Double Taxation*

*Attribution of profits in treaty with Poland*

In the proposed treaty with Poland, Article 7 (Business Profits) is the first United States treaty to adopt rules for the taxation by a treaty country of the business profits of an enterprise located in the other treaty country that is based on the language of Article 7 (Business Profits) of the OECD Model treaty. Although the language used in the OECD Model treaty differs from the U.S. Model treaty, the policy toward, and implementation of, the business profits article under the two models are substantively similar. The committee may wish to ask the Treasury Department whether the use of the OECD Model treaty Article 7 in the Polish treaty represents a change in U.S. income tax treaty policy. One area in which the U.S. Model treaty and that of the OECD differ is the inclusion of an antiabuse measure. The U.S. Model treaty, paragraph 7, and the proposed treaty, paragraph 5, include an antiabuse provision treating income or gain attributable to a permanent establishment as taxable in the treaty country where the permanent establishment is located, even if the payment is deferred until after such permanent establishment has ceased to exist. The OECD Model treaty does not include a similar provision and the United States reserved the right to amend Article 7 to provide for taxation of income or gain even if payments are deferred until after the permanent establishment has ceased to exist.[4] The committee may wish to ask the Treasury Department if they believe this provision is adequate to prevent the avoidance of tax on income attributable to a permanent establishment when that permanent establishment is no longer in existence.

*Limitation-on-benefits provisions in treaties with Hungary, Chile, Poland, and Spain*

Like the U.S. Model treaty, the proposed revisions to the treaties with Chile, Hungary, Poland, and Spain include extensive limitation-on-benefits rules (Chile, Article 24; Hungary, Article 22; Poland, Article 22; Spain, Article IX of the proposed protocol, amending Article 17 of the existing treaty) that are intended to prevent third-country residents from benefiting inappropriately from a treaty that generally grants benefits only to residents of the two treaty countries. This practice is commonly referred to as "treaty shopping." With the inclusion of modern limitation-on-

48

benefits rules, the proposed treaties with Hungary and Poland represent a significant opportunity to mitigate treaty shopping. The present treaties with Hungary and Poland are two of only seven U.S. income tax treaties that do not include any limitation-on-benefits rules.[5] The lack of any limitation-on-benefits rules in combination with provisions for complete exemption from withholding on interest payments from one treaty country to the other treaty country present attractive opportunities for treaty shopping.[6] For example, a November 2007 report prepared by the Treasury Department at the request of Congress suggests that the income tax treaty with Hungary has increasingly been used for treaty-shopping purposes as the United States adopted modern limitation-on-benefits provisions in its other treaties. In 2004, U.S. corporations that were at least 25-percent foreign owned made $1.2 billion in interest payments to related parties in Hungary, the seventh-largest amount of interest paid to related parties in any single country.[7]

Earlier this year, a possible revision of Article 22 (Limitation on Benefits) of the U.S. Model treaty was published for public comment. Although the limitation-on-benefits rules in the proposed treaties with Chile, Hungary, Poland, and Spain are similar to the rules in other recent and proposed U.S. income tax treaties and protocols and in the U.S. Model treaty, they are not uniform. Your committee may wish to inquire about certain differences among these agreements, the underlying rationale for the differences and the extent to which they align with the policies in the U.S. Model treaty or its proposed revision. The principal differences from the U.S. Model treaty are the inclusion of the headquarters company category of qualified person, the derivative benefits rule, and the antiabuse rule for triangular arrangements, and with respect to Spain, the standard for exercise of competent authority discretion to grant treaty benefits to persons or with respect to income not otherwise eligible.

As in the U.S. Model treaty, in the pending protocols, a recognized stock exchange includes certain exchanges specified in the treaty as well as any other stock exchange agreed upon by the competent authorities of the treaty countries. Your committee may wish to explore the rationale underlying the identification of recognized stock exchanges for purposes of limitations of benefits, and the criteria the Treasury Department considers when negotiating over the definition of a recognized stock exchange.

The derivative benefits rules may grant treaty benefits to a treaty-country resident company in circumstances in which the company itself would not qualify for treaty benefits under any of the other limitation-on-benefits provisions. Like other recent treaties, including those with Canada and Iceland as well as several European treaty countries, the proposed treaties with Poland, Spain, and Hungary include a derivative benefits rule. Under the derivative benefits rule, a treaty-country company receives treaty benefits for an item of income if the company's owners (referred to in the proposed treaty as equivalent beneficiaries) reside in a country that is in the same trading bloc as the treaty country and would have been entitled to the same benefits for the income had those owners derived the income directly. The definition of equivalent beneficiary differs in the proposed agreements. With respect to Spain, a party whose ownership interest is held indirectly is not an equivalent beneficiary unless the intermediate owner also qualifies as an equivalent beneficiary, similar to the rule in the proposed revision to the U.S. Model treaty. The Chile treaty, like the existing U.S. Model treaty, does not include derivative benefits rules.

The proposed treaties with Chile and Hungary include special antiabuse rules intended to deny treaty benefits in certain circumstances in which a Chilean or Hungarian resident company earns U.S.-source income attributable to a third-country permanent establishment and is subject to little or no tax in the third jurisdiction and (as applicable) Chile or Hungary. A rule on triangular arrangements is not included in the U.S. Model treaty, but similar antiabuse rules are included in other recent treaties and protocols.

With respect to the headquarters company rule, the committee may wish to explore the rationale for granting benefits to an entity that is not otherwise eligible for benefits. The proposed treaties with Chile and Hungary and the proposed protocols with Spain and Poland allow full treaty benefits for an entity that functions as a headquarters company, but does not satisfy the other categories of persons entitled to full treaty benefits. In doing so, they conform to U.S. income tax treaties in force with Austria, Australia, Belgium, the Netherlands, and Switzerland but not the U.S. Model treaty. The conditions for qualifying as a headquarters company include requirements intended to ensure that the headquarters company performs substantial supervisory and administrative functions for a group of companies, including its multinational nature, that the headquarters company is subject to the same income tax rules in its country of residence as would apply to a company en-

49

gaged in the active conduct of a trade or business in that country; and that the headquarters company has independent authority in carrying out its supervisory and administrative functions.

Finally, the committee may wish to inquire whether it is appropriate to grant discretion to competent authorities to extend treaty benefits to persons not otherwise entitled to such benefits, and, if so, the standard for exercise of any such authority. As in the U.S. Model and other recently negotiated treaties with modern limitations on benefits articles, the proposed treaty with Poland includes a grant of discretion to the competent authority to extend otherwise unavailable treaty benefits to a party that is not otherwise entitled to treaty benefits if the competent authority determines that the organization or operation of the person claiming benefits did not have as a principal purpose the obtaining of treaty benefits. By contrast, the proposed protocol with Spain requires that the competent authority evaluate the extent to which the resident of the other country met any of the criteria under other provisions in the article, without regard to motivation.

The committee may wish to inquire of the Treasury Department about the alternative formulations of the standard for discretion to extend tax treaty benefits that have been proposed as part of Action Plan on Base Erosion and Profit Shifting, undertaken by the Organisation for Economic Co-operation and Development ("OECD") at the request of the G20.[8]

*Mandatory arbitration in treaties with Japan, Spain, and Switzerland*

In addition to the proposed protocol with Japan, the protocols amending the Swiss and Spanish treaties also include revisions to the mutual agreement procedures to require competent authorities to resort to binding arbitration if unable to reach a resolution within a specified period of time. Although tax treaties traditionally have not included a mechanism to ensure resolution of disputes, the addition of mandatory procedures for binding arbitration as part of the mutual agreement procedures has become increasingly frequent in recent years. The U.S. tax treaties currently in effect with Belgium, Germany, France, and Canada include such provisions. Mandatory binding arbitration is provided upon request of the taxpayer in paragraph 5 of Article 25 (Mutual Agreement Procedure) of the OECD Model treaty. Following its 2-year study on base erosion and profit shifting, the OECD concluded that the inclusion of mandatory binding arbitration is necessary to achieve the goal of the mutual agreement procedures, which generally encourage, but do not require, dispute resolution by the competent authorities.[9]

In considering the proposed protocols, the committee may wish to consider the extent to which the inclusion of mandatory arbitration rules and the particular features of the arbitration provisions in the proposed protocols now represent the United States policy regarding mandatory binding arbitration. In particular, the committee may wish to inquire about the criteria on which the Treasury Department determines whether to include such provisions in a particular treaty, the appropriate scope of issues eligible for determination by binding arbitration, the absence of precedential value of arbitration determinations, the role of the taxpayer in an arbitration proceeding and how to ensure adequate oversight of the use of mandatory arbitration.

Regardless of whether the Treasury Department expects mandatory arbitration to become a standard feature in all future U.S. tax treaties, the committee may wish to inquire about the experience to date in the four treaties with such provisions currently in effect, and whether the Treasury Department intends to develop and publish a standardized set of arbitration principles and procedures for inclusion in a revision to the U.S. Model treaty.

*Zero-withholding on parent-subsidiary dividends in treaties with Spain and Japan*

When certain conditions are satisfied, the proposed protocol with Spain eliminates withholding tax on dividends paid by a company that is resident in one treaty country to a company that is a resident of the other treaty country and that owns at least 80 percent of the stock of the dividend-paying company (often referred to as "direct dividends"). The elimination of withholding tax on direct dividends is intended to reduce the tax barriers to direct investment between the two treaty countries. The proposed protocol with Japan broadens the scope of companies eligible for zero-withholding under the existing treaty by reducing the ownership and holding period thresholds for eliminating of withholding on dividends.

Until 2003, no U.S. income tax treaty provided for a complete exemption from dividend withholding tax, and the U.S. Model treaty does not provide an exemption. By contrast, many bilateral income tax treaties of other countries eliminate withholding taxes on direct dividends between treaty countries, and the European Union

50

("EU") Parent-Subsidiary Directive repeals withholding taxes on intra-EU direct dividends. Recent U.S. income tax treaties and protocols with Australia, Japan, Mexico, the Netherlands, Sweden, the United Kingdom, Belgium, Denmark, Finland, Germany, France, and New Zealand include zero-rate provisions. The Senate ratified those treaties and protocols in 2003 (Australia, Mexico, United Kingdom), 2004 (Japan, Netherlands), 2006 (Sweden), 2007 (Belgium, Denmark, Finland, and Germany), 2009 (France), and 2010 (New Zealand). The proposed protocol with Spain therefore would bring to 13 the number of U.S. income tax treaties that provide a zero rate for direct dividends.

Because zero-rate provisions are a relatively recent but now prominent development in U.S. income tax treaty practice, the committee may wish to consider possible costs and benefits of zero-rate provisions such as revenue considerations and diminishing of barriers to cross-border investment; the Treasury Department's criteria for determining when a zero-rate provision is appropriate; and certain specific features of zero-rate provisions such as ownership thresholds, holding-period requirements, the treatment of indirect ownership, and heightened limitation-on-benefits requirements. These issues have been described in detail in connection with the committee's previous consideration of proposed income tax treaties and protocols that have included zero-rate provisions.[10]

Although zero-rate provisions for direct dividends have become a common feature of U.S. income tax treaties signed in the last decade, the U.S. Model treaty does not provide a zero rate for direct dividends. In previous testimony before the committee, the Treasury Department has indicated that zero-rate provisions should be allowed only under treaties that have restrictive limitation-on-benefits rules and that provide comprehensive information exchange. Even in those treaties, according to previous Treasury Department statements, dividend withholding tax should be eliminated only on the basis of an evaluation of the overall balance of benefits under the treaty. Every recent U.S. income tax treaty or protocol has included restrictive limitation-on-benefits provisions and comprehensive information exchange provisions. The committee therefore may wish to inquire into whether there are other particular considerations that the Treasury Department will now take into account in deciding whether to negotiate for zero-rate direct dividend provisions in future income tax treaties and protocols. The committee also may wish to ask whether any new U.S model income tax treaty might eliminate withholding tax on direct dividends and, if it would not so provide, why it would not.

### Developments in substantive foreign tax laws of Chile, Poland, and Spain

Based on our own research and on assistance from foreign law specialists of the Global Legal Research Center of the Library of Congress' Law Library, we understand that there have been potentially noteworthy changes in the income tax laws of Chile, Poland, and Spain since the Foreign Relations Committee last considered the proposed agreements with those countries in 2014.

In Chile, the corporate-shareholder income tax, which is fully integrated by means of a shareholder-level credit for corporate tax paid on distributed profits, has been the subject of reform legislation scheduled to take effect in 2017. Under this reform, a shareholder of a Chilean corporation who is a resident of a country with which Chile does not have an income tax treaty will be credited with 65 percent, rather than 100 percent, of corporate tax paid on distributed profits. We understand that the Government of Spain has also enacted legislation that, among other things, reduces the corporate tax rate and modifies depreciation rules. Finally, we understand that the Government of Poland has enacted changes to the individual income tax and corporate income tax.

The committee may wish to inquire whether the Treasury Department believes that the proposed agreements appropriately accommodate these internal law developments.

### B. Administrative Assistance Issues

#### Mutual collection assistance with Japan

The proposed protocol with Japan departs from the U.S. Model Article 26 (Exchange of Information and Administrative Assistance) in providing for assistance in the collection of revenue claims of the other contracting state beyond those amounts required to ensure that treaty benefits are respected and limited to those entitled to them under the terms of the treaty. The committee may wish to explore the basis for agreeing to this departure from general U.S. policy and the criteria applied in determining to do so. For example, the committee may seek assurances as to the nature of safeguards protecting the rights of persons whose U.S. tax debts may be subject to collection in Japan and the extent to which persons with Japanese

51

tax debts can be assumed to have had adequate opportunities for review of the merits of the underlying claim may also warrant inquiry.

The infrequency of such provisions is consistent with the revenue rule doctrine, which can be traced to the centuries-long tradition based on Lord Mansfield's statement, "For no country ever takes notice of the revenue laws of another." [11] Although its vitality and scope have been questioned, most recently in *Pasquantino* v. *United States*,[12] the doctrine remains a cornerstone of all common law jurisdictions, as well as many others. In determining whether to honor a judgment of a foreign court, U.S. courts generally do not accord comity to tax or penal judgments of a foreign court.[13]

In addition to the concerns about preserving the sovereignty of the United States and the rights of its taxpayers, the risk of increased administrative burden may also be considered. The agreement includes requirements that the authorities reach agreement to limit the volume of such requests and share costs of the program.

#### Exchange of information issues in all pending protocols

Tax treaties establish the scope of information that can be exchanged between treaty countries. Exchange of information provisions first appeared in the late 1930s,[14] and are now included in all double tax conventions to which the United States is a party. A broad international consensus has coalesced around the issue of bank transparency for tax purposes and strengthened in recent years, in part due to events involving one of Switzerland's largest banks, UBS AG, the global financial crisis, and the general increase in globalization. Greater attention to all means of restoring integrity and stability to financial institutions has led to greater efforts to reconcile the conflicts between jurisdictions, particularly between jurisdictions with strict bank secrecy and those seeking information to enforce their own tax laws.[15] As a result, the committee may wish to inquire as to whether the U.S. Model treaty published in 2006 remains the appropriate standard by which to measure an effective exchange of information program.

Although the United States has long had bilateral income tax treaties in force with Hungary, Luxembourg, and Switzerland, the United States has engaged in relatively limited exchange of information under these tax treaties. With Luxembourg and Switzerland, the limitations stem from strict bank secrecy rules in those jurisdictions. The proposed protocols with Luxembourg and Switzerland are a response to that history as well as part of the international trend in exchange of information.

The pamphlets prepared by the Joint Committee staff provide detailed overviews of the information exchange articles in each of the pending protocols. They also describe the extent to which those articles differ from the U.S. Model treaty's rules on information exchange. The pamphlets published on May 20, 2011, describing the agreements with Hungary, Luxembourg, and Switzerland included detail about several practical issues relating to information exchange under income tax treaties. We addressed those issues in testimony with respect to those agreements and others in 2014. Since then, additional developments relevant to exchange of information with Luxembourg and Switzerland have occurred.

Here I wish to highlight first those issues related to the effectiveness of information exchange under income tax treaties that are common to all of the pending protocols under consideration today, and second, issues specific to the proposed protocols with Luxembourg and Switzerland and recent developments.

#### Effectiveness of U.S. information exchange agreements in general

Today, I will briefly note three issues: automatic exchange of information, the ability of the United States to provide information about beneficial ownership of foreign-owned entities, and the limitations on specific requests for information.

The committee may wish to explore issues related to "routine exchange of information." In this type of exchange, also referred to as "automatic exchange of information," the treaty countries identify categories of information that are consistently relevant to the tax administration of the receiving treaty country and agree to share such information on an ongoing basis, without the need for a specific request. The type of information, when it will be provided, and how frequently it will be provided are determined by the respective Competent Authorities after consultation. In particular, the committee may wish to inquire about (1) the extent to which the United States presently engages in automatic exchange of taxpayer-specific information, (2) practical hurdles to greater use of automatic exchange, and (3) whether it anticipates significant changes in that practice with the ratification of the documents presently before the committee.

The inability of the United States to provide information about beneficial ownership of entities formed in the United States has been criticized in the past and led to pressure to eliminate policies that provide foreign persons with the ability to shel-

52

ter income.[16] Because the information obtained through information exchange relationships with other jurisdictions has been central to recent successful IRS enforcement efforts against offshore tax evasion, the Treasury Department has included in its budgets for fiscal years 2015 and 2016 a proposal to address the perceived shortcoming by requiring certain financial institutions to report the account balance (including, in the case of a cash value insurance contract or annuity contract, the cash value or surrender value) for all financial accounts maintained at a U.S. office and held by foreign persons.[17] The committee may wish to explore the extent to which either the existing U.S. know-your-customer rules or the corporate formation and ownership standards prevent the United States from providing information about beneficial ownership on a reciprocal basis with its treaty countries. The committee may also consider whether there are steps to take that would help refute the perception that the United States permits States to operate as tax havens and that would help the United States better respond to information requests from treaty countries who suspect that their own citizens and residents may be engaging in illegal activities through U.S. corporations and limited liability companies.[18]

The committee may wish to inquire as to the extent to which a request that a treaty country provide information in response to a John Doe summons[19] is a specific request within the meaning of the Article 26, and whether protracted litigation similar to that which occurred in the UBS litigation[20] can be avoided or shortened. A "specific" request refers to an exchange which occurs when one treaty country provides information to the other treaty country in response to a specific request by the latter country for information that is relevant to an ongoing investigation of a particular tax matter. One problem with specific exchange has been that some treaty countries have declined to exchange information in response to specific requests intended to identify limited classes of persons.[21] Your committee may wish to seek assurances that, under the proposed treaties and protocols, treaty countries are required to exchange information in response to specific requests that are comparable to John Doe summonses under domestic law.[22]

*Information exchange with Luxembourg and Switzerland*

The existing treaties with Luxembourg and Switzerland include exchange of information articles that do not comply with the U.S. Model treaty, the terms of U.S. tax treaties currently in force, or the international norms on transparency. To date, neither jurisdiction has achieved a satisfactory rating under the peer review process of the Global Forum on Transparency and Exchange of Information, the international body organized within the OECD to conduct its work on exchange of information standards ("Global Forum"). The peer review is conducted in two phases: Phase I evaluates the legal and regulatory aspects of exchange, that is, whether or not the domestic law and administrative structures exist in a jurisdiction to enable it to exchange information. In Phase II, the peer review evaluates the actual practice of exchange of information.[23] Both jurisdictions have made progress in addressing the deficiencies, according to the Global Forum, but neither has yet been rated to be compliant or largely compliant.

*Switzerland*

The exchange of information article in the 1951 U.S.-Swiss treaty was limited to "prevention of fraud or the like." Under the treaty, Switzerland applied a principle of dual criminality, requiring that the purpose for which the information was sought also be a valid purpose under local law. Because "fraud or the like" was limited to nontax crimes in Switzerland, information on civil or criminal tax cases was not available. The provision was substantially revised for the present treaty, signed in 1996, and accompanied by a contemporaneous protocol that elaborated on the terms used in the exchange of information article. That 1996 Protocol was intended to broaden the circumstances under which tax authorities could exchange information to include tax fraud or fraudulent conduct, both civil and criminal. It provided a definition at paragraph 10 of "tax fraud" to mean "fraudulent conduct that causes or is intended to cause an illegal and substantial reduction in the amount of tax paid to a contracting state." In practice, exchange apparently remained limited, leading the competent authorities to negotiate a subsequent memorandum of understanding that included numerous examples of the facts upon which a treaty country may base its suspicions of fraud to support a request to exchange information.[24]

The proposed protocol, by replacing Article 26 (Exchange of Information and Administrative Assistance) of the present treaty and amending paragraph 10 of the 1996 Protocol, closely adheres to the principles announced by Switzerland. It also conforms to the standards, if not the language, of the exchange of information provisions in the U.S. Model treaty in many respects. As a result, the proposed protocol may facilitate greater exchange of information than has occurred in the past, chiefly

53

by eliminating the present treaty requirement that the requesting treaty country establish tax fraud or fraudulent conduct or the like as a basis for exchange of information and providing that domestic bank secrecy laws and lack of a domestic interest in the requested information are not possible grounds for refusing to provide requested information. Lack of proof of fraud, lack of a domestic interest in the information requested, and Swiss bank secrecy laws were cited by Swiss authorities in declining to exchange information. The proposed protocol attempts to ensure that subsequent changes in domestic law cannot be relied upon to prevent access to the information by including in the proposed protocol a self-executing statement that the competent authorities are empowered to obtain access to the information notwithstanding any domestic legislation to the contrary.

Nevertheless, there are several areas in which questions about the extent to which the exchange of information article in the proposed protocol may prove effective are warranted. The proposed revisions to paragraph 10 of the 1996 Protocol reflect complete adoption of the first element listed above in the Swiss negotiating position, "limitation of administrative assistance to individual cases and thus no fishing expeditions." The limitation poses issues regarding (1) the extent to which the Swiss will continue to reject requests that do not name the taxpayer as a result of the requirement that a taxpayer be "typically" identified by name, and (2) the standard of relevance to be applied to requests for information, in light of the caveat against "fishing expeditions." In addition, the appropriate interpretation of the scope of purposes for which exchanged information may be used may be unnecessarily limited by comments in the Technical Explanation. In particular, although paragraph 2 of Article 26 (Exchange of Information), as modified by the proposed protocol, generally prohibits persons who receive information exchanged under the article from using the information for purposes other than those related to the administration, assessment, or collection of taxes covered by the treaty, the paragraph also allows the information to be used for other purposes so long as the laws of both the United States and Switzerland permit that use and the competent authority of the requested country consents to that use. The Technical Explanation, however, states that one treaty country (for example, the United States) will seek the other treaty country's (for example, Switzerland's) consent under this expanded use provision only to the extent that use is allowed under the provisions of the U.S.-Switzerland Mutual Legal Assistance Treaty that entered into force in 1977.

The extent to which Swiss commitment to transparency in practice is consistent with international norms remains the subject of inquiry by the Global Forum, despite the apparent adoption of the OECD standards on administrative assistance in tax matters in 2009,[25] when it simultaneously announced key elements that it would require as conditions to be met in any new agreements. The Swiss conditions established by the Federal Council limited administrative assistance to individual cases and only in response to a specific and justified request. Although Switzerland is considered by the OECD to be a jurisdiction that has fully committed to the transparency standards of the OECD, the OECD report on Phase I of its peer review of Switzerland states that the Swiss authorities' initial insistence on imposing identification requirements as a predicate for exchange of information was inconsistent with the international standards and that additional actions would be needed to permit the review process to proceed to Phase II. Those actions include bringing a significant number of its agreements into line with the standards and taking action to confirm that all new agreements are interpreted in line with the standard. On October 1, 2015, the Global Forum launched the Phase II peer review of Switzerland, signaling that the actions taken by Switzerland to improve its transparency with respect to tax matters since the Phase I report have satisfied the Global Forum.

According to advice we received from foreign law specialists at the Global Legal Research Center of the Library of Congress' Law Library, the actions taken by the Swiss since the initial unfavorable Phase I peer review include its agreement to the international standards on automatic exchange, expansion of its information exchange network, amendment of existing agreements to conform to the international transparency norms, and revision of domestic law to ensure the ability of tax authorities to comply with the exchange of information obligations and safeguards required in its bilateral and multilateral agreements. A report of the recently launched Phase II peer review is expected in 2016.

*Luxembourg*

The proposed protocol with Luxembourg, by replacing Article 28 (Exchange of Information and Administrative Assistance) of the 1996 treaty, is consistent with both the OECD and U.S. Model treaties. There are several areas in which questions are warranted about the extent to which the new article as revised in the proposed

protocol may prove effective. These questions arise not from the language in the proposed protocol itself but from the mutual understandings reflected in diplomatic notes exchanged at the time the protocol was signed. Potential areas of concern are found in statements in the diplomatic notes concerning (1) the obligation to ensure tax authority access to information about beneficial ownership of juridical entities and financial institutions, other than publicly traded entities, to the extent that such information is of a type that is within the possession or control of someone within the territorial jurisdiction, (2) the requirement that all requests must provide the identity of the person under investigation, (3) the standard of relevance to be applied in stating a purpose for which the information is sought, and (4) the requirement that requests include a representation that all other means of obtaining the information have been attempted, except to the extent that to do so would cause disproportionate difficulties.

The Global Forum's Phase II peer review of Luxembourg's implementation of transparency and information exchange standards reported in 2013 that Luxembourg was noncompliant with OECD standards. Based on the research assistance from foreign law specialists of the Global Legal Research Center of the Library of Congress' Law Library, we understand that Luxembourg has undertaken significant action to address the deficiencies identified in the earlier peer review report. These measures include ratification of the OECD Multilateral agreement that is pending before this committee, implementation of various directives of the European Union, and enactment of legislation in 2014 explicitly intended to remedy a number of criticisms of the Global Forum report.[26] It has also ratified a number of bilateral agreements that include exchange of information provisions that comply with the international norms. Based on these measures, the Global Forum agreed to conduct a supplementary peer review, which was launched on January 16, 2015. The results of that review are not yet known.

*Expansion of the OECD Multilateral mutual administrative assistance agreement*

One of the most significant changes to the multilateral convention made by the proposed protocol is the opening of membership in the convention to states that are neither OECD nor Council of Europe members. The signatories include a number of countries who are not members of G20,[27] the OECD or the Council of Europe: Colombia, Costa Rica, Ghana, Guatemala, and Tunisia. All members of G20 are among the signatories. Those members of G20 who are not also members of either the OECD or Council of Europe include Argentina, Brazil, India, Indonesia, Saudi Arabia, and South Africa. Thus, on the one hand, the inclusive standard for permitting nations to participate has opened the multilateral convention to a number of significant trade partners of the United States. On the other hand, it requires the United States to initiate an exchange of information program with jurisdictions with which it has not previously entered into a bilateral relationship. Among the signatories that have neither a tax treaty nor a TIEA with the United States are Albania, Andorra, Croatia, Ghana, Nigeria, Saudi Arabia, and Singapore.

The extent to which any of those states are jurisdictions with which the United States has previously participated in an exchange of information program and whether the program has operated satisfactorily are areas in which the committee may wish to inquire. To the extent that they are jurisdictions with whom the United States has no exchange of information program under a bilateral agreement, the committee may wish to inquire about the extent to which the United States has been able to satisfy itself that each jurisdiction is an appropriate partner for exchange of information. The committee may also wish to inquire whether the expanded exchange of information requirements will be manageable.

The committee may also wish to inquire about the circumstances under which the United States would object to accession by a nonmember state, as contemplated under the procedures for securing the unanimous consent of the governing body of the treaty before the agreement may enter into effect with respect to that nonmember state. For example, in explaining its general standards for considering entry into a bilateral agreement with a jurisdiction, Treasury has stated, " . . . prior to entering into an information exchange agreement with another jurisdiction, the Treasury Department and the IRS closely review the foreign jurisdiction's legal framework for maintaining the confidentiality of taxpayer information. In order to conclude an information exchange agreement with another country, the Treasury Department and the IRS must be satisfied that the foreign jurisdiction has the necessary legal safeguards in place to protect exchanged information and that adequate penalties apply to any breach of that confidentiality."[28]

CONCLUSION

The matters that I have described in this testimony are addressed in more detail in the Joint Committee staff pamphlets on the proposed treaties and protocols. I am happy to answer any questions that your committee may have at this time or in the future.

Notes

[1] This document may be cited as follows: Joint Committee on Taxation, "Testimony of the Staff of the Joint Committee on Taxation Before the Senate Committee on Foreign Relations Hearing on the Proposed Tax Treaties with Chile, Hungary, and Poland the Proposed Tax Protocols with Luxembourg, Switzerland, Spain, and Japan, and the Proposed Protocol Amending the Multilateral Convention on Mutual Administrative Assistance in Tax Matters" (JCX–137–15), October 29, 2015. This document is available on the Internet at http://www.jct.gov.

[2] Joint Committee on Taxation, "Explanation of Proposed Protocol Amending the Income Tax Treaty Between the United States and Japan" (JCX–XX–15), October XX, 2015; Joint Committee on Taxation, "Explanation of Proposed Income Tax Treaty Between the United States and Hungary" (JCX–32–11), May 20, 2011; Joint Committee on Taxation, "Explanation of Proposed Protocol to the Income Tax Treaty Between the United States and Luxembourg" (JCX–30–11), May 20, 2011; Joint Committee on Taxation, "Explanation of Proposed Protocol to the Income Tax Treaty Between the United States and Switzerland" (JCX–31–11), May 20, 2011; Joint Committee on Taxation, "Explanation of Proposed Protocol Amending the Multilateral Convention on Mutual Administrative Assistance in Tax Matters" (JCX–9–14), February 21, 2014; Joint Committee on Taxation, "Explanation of Proposed Income Tax Treaty Between the United States and Chile" (JCX–10–14), February 24, 2014. Joint Committee on Taxation, "Explanation of Proposed Income Tax Treaty Between the United States and Poland" (JCX–68–14), June 17, 2014; and Joint Committee on Taxation, "Explanation of Proposed Protocol to the Income Tax Treaty Between the United States and Spain" (JCX–67–14), June 17, 2014. The pamphlets describing the proposed treaty with Hungary and the proposed protocols with Luxembourg and Switzerland were prepared in connection with a Committee on Foreign Relations hearing held on June 7, 2011. The pamphlet describing the proposed treaty with Chile was prepared in connection with the hearing of the Committee on February 26, 2014. The pamphlets describing the proposed treaty with Poland and the proposed protocol with Spain were prepared in connection with the hearing on June 19, 2014.

[3] Full text of the proposed rules published on May 20, 2015, at the Resource Center, Department of Treasury, available at http://www.treasury.gov/resource-center/tax-policy/treaties/Pages/international.aspx.

[4] See Commentaries to the OECD Model treaty, paragraph 79.

[5] The other income tax treaties without limitation-on-benefits rules are the ones with Greece (1953), Pakistan (1959), the Philippines (1982), Romania (1976), and the U.S.S.R (1976). Following the dissolution of the U.S.S.R., the income tax treaty with the U.S.S.R. applies to the countries of Armenia, Azerbaijan, Belarus, Georgia, Kyrgyzstan, Moldova, Tajikstan, Turkmenistan, and Uzbekistan.

[6] The income tax treaty with Greece also provides for complete exemption from withholding on interest, although it contains restrictions that limit the availability of the exemption, such that a Greek company receiving interest from a U.S. company does not qualify for the exemption if it controls, directly or indirectly, more than 50 percent of the U.S. company.

[7] Department of the Treasury, "Report to the Congress on Earnings Stripping, Transfer Pricing and U.S. Income Tax Treaties" (Nov. 28, 2007). The report states that, as of 2004, it does not appear that the U.S.-Poland income tax treaty has been extensively exploited by third-country residents. Although the report also focused on Iceland to the same extent as Hungary, a 2007 Income Tax Convention with Iceland that includes a modern limitation-on-benefits provision has since taken effect.

[8] OECD, "Preventing the Granting of Treaty Benefits in Inappropriate Circumstances Action 6–2015 Final Report," (October 5, 2015), available at http://www.oecd-ilibrary.org/taxation/preventing-the-granting-of-treaty-benefits-in-inappropriate-circumstances-action-6-2015-final-report_9789264241695-en.

[9] OECD, "Making Dispute Resolution Mechanisms More Effective, Action 14–2015 Final Report, OECD/G20 Base Erosion and Profit-Shifting Project," OECD Publishing, Paris.

[10] See, for example, Joint Committee on Taxation, "Explanation of Proposed Protocol to the Income Tax Treaty Between the United States and Germany" (JCX–47–07), July 13, 2007, pp. 82–84.

[11] *Holman* v. *Johnson*, 98 The English Reporter 1120 (King's Bench 1775), cited in *AG of Canada* v. *R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, cert. denied, 537 U.S. 1000 (2002).

[12] 544 U.S. 349; 125 S. Ct. 1766; 161 L. Ed. 2d 619 (2005).

[13] "Restatement (Third) of the Foreign Relations Law of the United States," secs. 483 (1987), stating "Courts in the United States are not required to recognize or to enforce judgments for the collection of taxes, fines, or penalties rendered by the courts of other states." The principle is permissive, not a requirement.

[14] Article XV of the U.S.-Sweden Double Tax Convention, signed on March 23, 1939.

[15] See, Joint Committee on Taxation, "Description of Revenue Provisions Contained in the President's Fiscal Year 2010 Budget Proposal; Part Three: Provisions Related to the Taxation of Cross-Border Income and Investment" (JCS–4–09), September 2009. Section VI of that pamphlet provides an overview of the international efforts to address these issues.

[16] Financial Action Task Force, IMF, "Summary of the Third Mutual Evaluation Report on Anti-Money Laundering and Combating the Financing of Terrorism United States of America,"

56

pp. 10–11 (June 23, 2006); Government Accountability Office, "Company Formations: Minimal Ownership Information Is Collected and Available," a report to the Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, U.S. Senate GAO–06–376 (April 2006); Government Accountability Office, "Suspicious Banking Activities: Possible Money Laundering by U.S. Corporations Formed for Russian Entities," GAO–01–120 (October 31, 2006).

[17] A description and analysis of the complete proposal can be found in Joint Committee on Taxation, "Description of Certain Revenue Provisions Contained in the President's Fiscal Year 2015 Budget Proposal" (JCS–2–14), December 2014, at pages 184–190. See also Joint Committee on Taxation, "Description of Certain Revenue Provisions Contained in the President's Fiscal Year 2016 Budget Proposal" (JCS–2–15), September 2015, at page 248.

[18] E.g., the "Incorporation Transparency and Law Enforcement Assistance Act," S. 569, 111th Congress (2009), would require States to obtain and periodically update beneficial ownership information from persons who seek to form a corporation or limited liability company.

[19] When the existence of a possibly noncompliant taxpayer is known but not his identity, as in the case of holders of offshore bank accounts or investors in particular abusive transactions, the IRS is able to issue a summons to learn the identity of the taxpayer, but must first meet greater statutory requirements, to guard against fishing expeditions. Prior to issuance of the summons intended to learn the identity of unnamed "John Does," the United States must seek judicial review in an ex parte proceeding. In its application and supporting documents, the United States must establish that the information sought pertains to an ascertainable group of persons, that there is a reasonable basis to believe that taxes have been avoided, and that the information is not otherwise available.

[20] See, United States v. *UBS AG*, Civil No. 09–20423 (S.D. Fla.), enforcing a "John Doe summons" which requested the identities of U.S. persons believed to have accounts at UBS in Switzerland. On August 19, 2009, the United States and UBS announced an agreement (approved by the Swiss Parliament on June 17, 2010) under which UBS provided the requested information.

[21] For example, a petition to enforce a John Doe summons served by the United States on UBS, AG was filed on February 21, 2009, accompanied by an affidavit of Barry B. Shott, the U.S. competent authority for the United States-Switzerland income tax treaty. Paragraph 16 of that affidavit notes that Switzerland had traditionally taken the position that a specific request must identify the taxpayer. See *United States* v. *UBS AG*, Civil No. 09-20423 (S.D. Fla.). On August 19, 2009, after extensive negotiations between the Swiss and U.S. Governments, the United States and UBS announced that UBS had agreed to provide information on over 4,000 U.S. persons with accounts at UBS.

[22] Under a John Doe summons, the U.S. Internal Revenue Service ("IRS") asks for information to identify unnamed "John Doe" taxpayers. The IRS may issue a John Doe summons only with judicial approval, and judicial approval is given only if there is a reasonable basis to believe that taxes have been avoided and that the information sought pertains to an ascertainable group of taxpayers and is not otherwise available.

[23] Certain OECD conclusions about information exchange with Luxembourg and Switzerland are noted below. The OECD peer reviews of Chile and Hungary found that although those jurisdictions generally are compliant with OECD standards, each country had certain deficiencies preventing fully effective information exchange.

[24] "Mutual Agreement of January 23, 2003, Regarding the Administration of Article 26 (Exchange of Information) of the Swiss-U.S. Tax Convention of October 2, 1996," reprinted at paragraph 9106, "Tax Treaties," (CCH 2005).

[25] See "Switzerland to adopt OECD standard on administrative assistance in fiscal matters," Federal Department of Finance, FDF (March 13, 2009), available at http://www.efd.admin.ch/dokumentation/medieninformationen/00467/index.html?lang=en&msg-id=25863 (last accessed March 1, 2011).

[26] Law of November 25, 2014: New applicable procedure with respect to exchange of information on request, amending the Law of March 31, 2010.

[27] G20, or the Group of Twenty, is a forum for international economic cooperation among the member countries and the European Union. The leaders of the members meet annually, while finance and banking regulators meet more frequently throughout the year. They work closely with a number of international organizations, including the OECD.

[28] Preamble to Treas. Reg. 1.6049–4(b)(5). T.D. 9584, April 12, 2012.

Senator ISAKSON. Thank you, and thanks to both of you for your testimony today.

Mr. Stack, are there any provisions in the treaties being considered today that would override current U.S. domestic tax laws requiring protection of taxpayer information? Or are these treaties consistent with U.S. domestic law?

Mr. STACK. Senator, these treaties are consistent with U.S. domestic law and do not override U.S. domestic law in connection with the treatment of confidential information.

Senator ISAKSON. I think I heard you in your testimony refer to the perception of Swiss bank accounts being a safe haven in the past. Was that a perception or was that true? And does, in fact, the

57

treaty limit that being a safe haven so there is more transparency on deposits in Switzerland?

Mr. STACK. Well, let me answer this way, Senator. In a report from this committee, when the Swiss treaty was reported out, the committee took note of the difficulties faced in 2008 and 2009 by the IRS and the Department of Justice in obtaining information needed to enforce U.S. tax laws against U.S. persons who utilized the services of UBS AG back then, a multinational bank based in Switzerland.

What we expect, and this, again, was reported by the Senate committee, expect that the proposed protocol, including in particular the express provision making clear that a country's bank secrecy laws cannot prevent the exchange of tax information requested pursuant to a treaty, should put the Government of Switzerland in a position to prevent recurrence of such an incident in the future.

So without directly saying whether it was a haven or not, we had a difficulty. The difficulty was the old treaty required a showing of fraud, or the like, before the Swiss would give us information. The new treaty to which they have agreed says the United States just needs to demonstrate that the information sought is foreseeably relevant to a tax investigation. The Swiss treaty says "may be relevant." And that is going to make it easier for us to hunt down tax cheats that might be hiding assets in Switzerland.

Senator ISAKSON. That would be a consistent standard with domestic U.S. law, if it was a domestic case. Is that not right?

Mr. STACK. Yes, Senator. The treaty standard is actually taken from our statutory standard in section 7602, which authorizes the IRS to inspect books and records that "may be relevant to a tax inquiry." So the standard that is in the treaty and the standard that is in our statutes are coterminous.

Senator ISAKSON. I would assume, when you refer to limited cooperation in the Japan treaty and others in terms of the collection of taxes, that that is a step forward in collecting taxes that might be owed to the United States.

Mr. STACK. It is, Senator. It is. I would add that we are very careful before we agree to enter into mutual assistance and collection in our treaties, simply because we do not want to put a disproportionate burden on the IRS to be spending more effort collecting taxes for the other jurisdiction than the other jurisdiction might be helping us collect. So we do a very careful balancing.

So while we are happy to have this in our Japan treaty, I would not say that this will necessarily become the standard, since we weigh it on a case-by-case basis.

But, yes, you are correct. It will assist us in this case in collecting taxes from people in Japan who owe the U.S. taxes.

Senator ISAKSON. As I understand it, the tax rate on tax treaty participants in Chile is 27 percent, and the tax rate in Chile on nonparticipants in a tax treaty is 35 percent. Is that correct? I have been told that is correct.

Mr. STACK. I would just say, I mean, there are different flows that might have different rates. I would just say that, under the treaty, we are reducing all of the withholding rates on payments out of Chile that otherwise might have applied in the absence of

58

the treaty, although because they have a unique corporate tax system, we have given them some more time to be able to collect a withholding tax on shareholders on dividends out of Chile.

But generally speaking, the treaty participants get a reduced rate, a better rate than nontreaty participants investing in a country.

Senator Isakson. Assuming my numbers are correct at 35 percent and 27 percent, an American company competing in Chile and earning money from a country that does not have a treaty with Chile would be at an 8 percent disadvantage competing in the country. Would that not be correct?

Mr. Stack. Yes. If the point is that if we do not have our Chilean treaty, our companies can be at a disadvantage with companies that do have a treaty with Chile, that would be correct, yes.

Senator Isakson. That is what I am trying to get into the record.

Mr. Stack. Thank you.

Senator Isakson. Mr. Barthold, one of the stated goals of entering into a tax treaty is to prevent tax avoidance and tax evasion. A primary tool used to prevent tax avoidance is the exchange of information between countries and revenue authorities.

The United States has used exchange of information for decades in its tax treaties. Is that correct?

Mr. Barthold. Yes, it is, Mr. Chairman.

Senator Isakson. That has resulted in better collection. Is that correct?

Mr. Barthold. The Internal Revenue Service believes that it has aided in their collection of liabilities that are owed, sir, yes.

Senator Isakson. Can you tell us, for the record, the assurances that the information of domestic U.S. taxpayers, how they are protected in these treaties, in terms of the privacy information they would otherwise have protected in the United States?

Mr. Barthold. The treaties do not grant access to taxpayer records that are beyond what is provided in U.S. law. Under code section 6103, there is strict protection on the ability of anyone to access taxpayer information, except for tax administration purposes. That is mainly within the Internal Revenue Service.

As part of their treaty process, and Mr. Stack can address this further, before there is any exchange of information, the Treasury and the Internal Revenue Service assure themselves that there are comparable rights or that disclosures are not permitted that are beyond what is permitted under U.S. domestic law.

Senator Isakson. Are there any penalties for unauthorized release of private information by any of these treaties? I mean, a country that accidentally or intentionally released private information, is there a penalty within the treaty provided for that? Or is there an enforcement mechanism to give them a motivation to be sure they do not do that?

Mr. Barthold. I am not sure. There are not penalties on countries, per se. There is potentially penalty on our side, on the United States person, if we are party to an unauthorized disclosure. So Mr. Stack might be at risk.

Senator Isakson. Okay. So I understand breaking the treaty is probably the penalty you have. If you break the treaty, you can always dissolve the treaty. Is that correct?

59

Mr. BARTHOLD. You could abrogate the treaty. That would be the basis for the administration to abrogate.

Senator ISAKSON. That is the ultimate enforcement mechanism, because these treaties are mutually beneficial to the countries.

Mr. BARTHOLD. That is the idea behind the treaty.

Senator ISAKSON. Thank you both for your testimony.

Senator Menendez.

Senator MENENDEZ. Thank you, Mr. Chairman.

When you said Mr. Stack is at risk, you meant that the Treasury Department would be at risk?

Mr. BARTHOLD. It can actually be specific individuals, Senator Menendez.

Senator MENENDEZ. Okay.

Mr. Stack, you have to watch out here.

First of all, I want to thank you, Mr. Stack, and your colleagues at Treasury for the immense work that has gone into negotiating these treaties and preparing them for consideration. For most of this, this is the second round that we have been at this. I know that when I was chairman, I wanted to push these through. Chairman Corker has also expressed a great deal of interest in trying to break the logjam here. I hope we can work with him to achieve that.

Mr. Barthold, to you and your colleagues, thanks for your analysis and the questions that you posed in the pamphlets that you provided to the staff, which were incredibly helpful. I saw them, and I think they are incredibly helpful in addressing the treaties.

So just a few questions. I really want to develop a record here for when we have a debate on the floor to be able to refer to it, because, from my knowledge, this is largely being impeded by one or two colleagues who have somewhat of a different view.

To both of you, since Japan is really the only new treaty that we will be considering before the committee, could you highlight any notable departures, if there are any, from the United States model or any unique aspects of the Japan treaty that we should be aware of?

Mr. BARTHOLD. I noted a couple directly in my oral testimony, Senator Menendez, and Mr. Stack partially addressed both of those.

One was the mutual assistance. I mean, it is not provided for. It is somewhat unusual. And as I noted, its position in the Japan treaty is somewhat at odds with the reservation that the United States has taken with respect to the OECD multilateral mutual assistance treaty.

The other, I think, most notable departure from what we have been doing recently, and, of course, from the model, is the mandatory and binding arbitration. So it is not part of our model. It might be part of a new model treaty that the Treasury is developing.

But I also noted that within this protocol there are slightly different provisions of how it will operate than in the four operative mandatory and binding arbitration provisions that we have.

One item of note is the ability of the taxpayer involved to participate in the arbitration by submitting a position paper directly to the panel.

Senator MENENDEZ. Mr. Stack, your observations? And could you address yourself to the utility of the mandatory arbitration procedures that we have in this?

Mr. STACK. Yes, Senator.

Mandatory arbitration has garnered the support, mandatory binding arbitration, of many countries around the world as part of the work we just finished at the OECD in connection with base erosion and profit-shifting. Many, many countries are hoping to move forward in including provisions on mandatory binding arbitration in treaties going forward.

Why? Well, I think the reigning view is that it is a tremendous help to resolving cases if both of the competent authorities know that, at the end of the day, their distinct positions will be presented to a neutral arbitrator.

You may, or may not, be aware that we use a particular type of arbitration in our tax treaties, which is sometimes called baseball arbitration or last best offer. What that means is that the arbitrator must choose only between the positions given by the two countries with respect to the tax issue before it. The feeling is that this helps the tax administration move toward a more reasonable position because they know that, at the end of the day, the arbitrator is bound to choose only one of the two government positions.

It is also the hope with arbitration that when the entire tax administration of a country is aware that, at the end of the day, some neutral party is going to decide which country has the better claim to the income, that this could improve administration throughout the governments that we deal with.

So the goal of an arbitration provision is often said not to have an arbitration but to simply help the system more easily resolve cases as we go through the process.

Senator MENENDEZ. I can see that. When I was mayor and negotiating with police and fire unions, we had a very similar process. It brought people to a much more reasonable offer, because they wanted to be closer to the offer that the arbitrator would choose at the end of the day.

Mr. Barthold, let me ask you, with reference to my understanding that these treaties, in essence, the reason that we pursue them is in large part to lower the tax burden of U.S. companies or firms operating abroad. Could you give us a sense of how this does that?

Mr. BARTHOLD. There are a number of different ways. Countries impose withholding taxes on cross-border distributions, such as the point I noted on the zero rate on a distribution of a dividend from a subsidiary to a parent, which is provided anew at a zero rate under the Spanish treaty, and the eligible companies have been expanded for the zero rate under the Japanese treaty.

The default in American law is a 30 percent withholding rate on a payment out of the United States. Other countries have comparable rates on payments out of their countries into the United States. So in the treaties, we mutually agreed to lower those rates.

While such taxes might be creditable under the different tax systems of those countries, sometimes tax credits are not always currently available because of foreign tax credit limitations. So you have a direct effect of lowering the tax rate on earnings by U.S. en-

terprises that are earned abroad when they are paid back in that situation.

Some other situations that arise are that it is possible that the income tax base of a foreign country is somewhat different than the income tax base in the United States. And so it might be the perception of both countries' tax administrators that there is some part of income that is earned that they get to tax. That is the clear case of double taxation, and a primary purpose of the treaties is to try to lay out a number of specific instances where, no, this is yours, and this is mine, so that you eliminate clear cases of double taxation.

Senator MENENDEZ. Mr. Chairman, I have a question or two left, but I am happy to wait for the next round.

Senator ISAKSON. Go ahead.

Senator MENENDEZ. Okay.

Mr. Stack, my understanding is that Treasury typically prioritizes the negotiation of new tax treaties partially based on where U.S. individuals and businesses stand to see the most benefit from reducing, for example, double taxation. What kind of support is there in the business community for ratification of these treaties?

Mr. STACK. There is extraordinary support. I think in the opening you mentioned some letters coming in from business groups. And in our prior hearings, Senator, as you may recall, the National Foreign Trade Council and the Organization for International Investment came here and testified.

So we have felt nothing but very strong support from the business community, because they would very much like the benefits that Mr. Barthold mentioned in terms of cross-border investment.

Senator MENENDEZ. And then two final sets of questions. One is, I understand the Spain protocol includes a provision that requires the United States and Spain to begin negotiations within 6 months from the protocol entering into force to conclude an agreement to avoid double taxation on investments between Puerto Rico and Spain. Given that Puerto Rico administers its own tax system but cannot enter into treaties, how is Treasury planning to work with its Spanish counterparts to extend the benefits of the protocol to Puerto Rico?

Mr. STACK. Thank you, Senator. Just for the record, paragraph 3 of the protocol commits the contracting states to initiate discussions as soon as possible but no later than 6 months after the entry into force of the 2013 protocol regarding the conclusion of an appropriate agreement to avoid double taxation on investments between Puerto Rico and Spain. I believe, as we discussed in prior hearings, the United States actually has reached out and worked with both Puerto Rico and Spain in advance of that deadline, since obviously the treaty has not yet entered into force.

The concept of how to handle the double tax issues between Puerto Rico and Spain raises complex legal and political questions. In our involvement to date, we are seeking to see if the agreement referenced in the protocol could be somehow handled by both Spain and Puerto Rico via a statutory approach where, for example, Puerto Rico could lessen withholding taxes on investments in Spain,

62

and vice versa. This is an analogy to the process undertaken by Guam.

We will return to this issue in full once the agreement is in force and with respect to the discussions we started and continue them as well.

Senator MENENDEZ. Finally, one of, if not the biggest hurdle that I understand some of my colleagues have in supporting this, is something that the chairman started off with you, and that is the question of information exchange and privacy, and other issues which in part you touched upon.

I just want you, for the record, to talk about how standards on information exchange in these treaties have changed from previous treaties. Does the "may be relevant" standard in the treaties before us today represent a new standard not used in previous tax treaties? And in your view, is there any reason why people who have a foreign bank account should be treated any differently from a U.S. citizen who has a bank account in the United States?

Mr. STACK. Thank you, Senator.

As I mentioned in my opening statement, this is not a new standard. What has happened over time is sometimes it has been labeled "such information as is relevant," "as may be relevant." Over time, the OECD has adopted a phrase "foreseeably relevant," which is what we tend to see in our current treaties.

Each of these standards really are about a simple idea, which is that when another country is asking us for tax information, they must demonstrate that there is a link between the information sought and some actual tax investigation of a taxpayer, so that we can avoid what is called a fishing expedition where people can just come in and say give me all the information possible about this or that.

The confusion in this space I think has been caused by the fact that Switzerland alone, out of 57 treaties, has a standard that said one country can only get information from the other if there is a demonstration of fraud or the like, a much higher standard before a tax authority could investigate assets of others abroad.

But as I mentioned in the opening, the "may be relevant," "foreseeably relevant" has been in our model since 1996. The Senate has already ratified 14 treaties, I am told, since 1999 with a version of this standard in the treaty.

In terms of the bank accounts, I would just say that there is no reason to treat someone with a foreign bank account, different from someone with a U.S. bank account when it comes to the ability of a tax authority to find out whether the person has been evading taxes. These information exchange provisions put people with foreign bank accounts on an equal footing with U.S. citizens who have bank accounts here in the United States.

As I just mentioned earlier, under the code, the IRS has authority to seek information that "may be relevant or material." The treaties before the committee today permit the IRS to request information that is foreseeably relevant, even if there is a variation in the phrasing.

So in the tax treaty context, this standard and these provisions are critical to ensure that taxpayers cannot avoid their obligations

63

by the simple device of shifting accounts overseas and getting better treatment than their U.S. resident counterparts.

Senator MENENDEZ. Thank you very much.

Senator ISAKSON. In light of the question originally asked by Senator Menendez, I will add to my unanimous consent record that the unanimous consent for the three letters that I introduced, one of those letters was from 77 United States companies, from Coca-Cola and Pepsi-Cola to Baxter and Caterpillar and everybody else in between, in favor of these treaties.

Senator MENENDEZ. Is Coca-Cola from Georgia?

Senator ISAKSON. Yes, they are a small bottling company in Georgia. Pepsi-Cola, their competitor, is on here, too, so we have competitors on there just alike.

Secondly, I want to echo the compliments Senator Menendez made to you all on the information you supplied to the committee and the staff, and tell you that when we go into binding arbitration as a country, I am glad we have two people like you all on our side of the table and not on the other side. So thank you for your service to the country, and we will do everything we can to expedite the consideration of the treaties.

If there are no further comments or questions, the hearing stands adjourned.

[Whereupon, at 2:55 p.m., the hearing was adjourned.]

––––––––––

ADDITIONAL MATERIAL SUBMITTED FOR THE RECORD

RESPONSE OF ROBERT STACK AND THOMAS A. BARTHOLD TO A QUESTION
SUBMITTED BY SENATOR CORY GARDNER

In 2014 testimony before this committee describing the purposes and benefits of tax treaties, Deputy Assistant Secretary of the Treasury for International Tax Affairs Robert Stack said that one purpose of tax treaties is to "reduce potential 'excessive' taxation by reducing withholding taxes that are imposed at the source," which ensures that a taxpayer is not "subject to an effective rate of tax that is significantly higher than the tax rate that would apply to net income in either the source or residence country." In fact, the 2006 U.S. Model Income Tax Convention specifies a zero rate of withholding tax on interest payments as the standard goal.

The current U.S.-Poland tax treaty, signed in 1974, has a zero rate of withholding tax on interest payments. In his 2014 testimony, Deputy Assistant Secretary Stack stated this treaty was one of three U.S. tax treaties, along with the Hungary treaty, that "provided an exemption from source-country withholding on interest payments but contained no protections against treaty shopping." Treasury testified this year that the updated Poland and Hungary income tax treaties would now include comprehensive limitation-on-benefits provisions to avoid treaty shopping, "represent[ing] a major step forward in protecting the U.S. tax treaty network from abuse."

Our existing tax treaties with Poland and Hungary both have zero-rate withholding on interest payments, and the proposed new tax treaty with Hungary maintains that zero rate. The updated U.S.-Poland tax treaty, however, would actually increase the rate of withholding tax on interest to 5 percent.

♦ Why, given that both treaties now have comprehensive limitation-of-benefits provisions that "represent a major step forward" in abuse protection, did the United States maintain a zero rate in the treaty with Hungary but not in the treaty with Poland?

Answer. The tax treaty policy of the United States is generally to assign the exclusive taxation right on cross-border payments of interest to the country of residence of the payee of the interest. Poland has expressed that its current policy is to maintain a level of taxation at source on cross-border payments of interest. The proposed income tax treaty, as is the case with every bilateral tax treaty, therefore represents a negotiated overall package that both countries concluded was mutually acceptable.

64

It should be noted that in the process of the negotiations the Treasury Department was able to secure a fairly low rate of withholding on interest (5 percent). In addition, the proposed treaty provides that interest paid: (1) by or to a governmental body; (2) in respect of a loan that is guaranteed or insured by a governmental body; (3) to a pension fund; or (4) to a bank, insurance company or other financial institution that is unrelated to the payor of the interest; shall nevertheless be exempt from withholding at source. The proposed income tax treaty with Hungary does not contain a positive rate of withholding on cross-border payments of interest because doing so is not the current tax treaty policy of either the United States or Hungary.

———

JULY 1, 2015.

Chairman Bob Corker,
*Senate Foreign Relations Committee,*
*Dirksen Senate Office Building,*
*Washington, DC.*

DEAR SENATOR CORKER The bilateral income tax treaties and protocols pending before the Senate Foreign Relations Committee are important to U.S. economic growth and U.S. trade and tax policy. For over eighty years, income tax treaties have played a critical role in fostering U.S. bilateral trade and investment and protecting U.S. businesses, large and small, from double taxation of the income they earn from selling goods and services in foreign markets.

We ask for your support for these treaties and protocols and also ask for expeditious action on them by both the Senate Foreign Relations Committee and the Senate.

Sincerely.

ABB Incorporated
AbbVie Pharmaceuticals
Adobe
Akzo Nobel Incorporated
Amazon.com
Applied Materials
Baxter International Inc.
Bayer Corporation
BASF Corporation
Bechtel Corporation
BHP Billiton
Braskem America, Inc.
British American Tobacco
BP plc
Caterpillar Incorporated
Chevron Corporation
Chrysler Corporation
CIGNA International
Cisco Systems
Coca-Cola Company
ConocoPhillips, Inc.
Daiichi Sankyo Inc.
Dassault Systemes
DHL North America
DSM North America
eBay, Inc.
E.I.du Pont de Nemours & Co.
ExxonMobil Corporation
Fluor Corporation
Ford Motor Company
General Electric Company
Google, Inc.
Halliburton Company
Hanesbrands Inc.
Hercules Group
Hewlett-Packard Company
Honda
Iberdrola USA
International Business Machines Corporation
Johnson & Johnson
Magna International, Inc.
Mars Incorporated
McCormick & Company, Inc.
Microsoft Corporation
Michelin North America
Nestle
North American Stainless
Novartis Corporation
Occidental Petroleum
Oracle Corporation
Panasonic Corporation North America
Pepsi-Cola Corporation
Pernod Ricard USA
Pfizer International Inc.
Procter & Gamble
Prudential Financial Inc. RELXGroup
Ridgewood Group International, Ltd.
Siemens Corporation
SSAB Americas
Sony Corporation of America
Solvay America, Inc.
Swiss Re Americas
Syngenta
Thomson Reuters
Toyota
Tupperware
Tyco International
UCB Inc.
Umicore USA Inc.
United Parcel Service, Inc.
United Technologies
Visa, Inc.
Vodafone Group plc
Walmart Stores, Inc.
Zurich North America

65

Embassy of Chile
Embassy of Hungary
Embassy of Japan
Embassy of Luxembourg
Embassy of Poland
Embassy of Spain
Embassy of Switzerland

October 29, 2015

The Honorable Mitch McConnell          The Honorable Harry Reid
Majority Leader                        Minority Leader
United States Senate                   United States Senate
S-230 Capitol Building                 S-221 Capitol Building
Washington, DC 20510                   Washington, DC 20510

Dear Majority Leader McConnell and Minority Leader Reid,

We, the Ambassadors of Chile, Hungary, Japan, Luxembourg, Poland, Spain, and
Switzerland, are writing to ask your further support for the tax treaties pending before the
United States Senate.

We welcome the hearing being held today by the Senate Committee on Foreign Relations
and request that once these treaties have been favorably reported to the full Senate, they
be given prompt consideration on the Senate floor.

The pending bilateral treaties were signed between the United States and each government
several years ago, and our home countries have taken all necessary steps to ratify the
treaties.

Ratification will benefit all of our countries including the United States. Once all of the
pending treaties go into effect, they would further invigorate foreign direct investments in
both directions by mitigating double taxation and withholding tax on companies from each
country in the United States and vice versa. They would also foster greater legal certainty
for investors. Our countries are already deeply integrated with foreign direct investment
of $900 billion in the United States and 1.3 million American jobs created by that FDI.
Ratification will help deepen the ties between our countries, as well as strengthen
cooperation between our tax authorities.

66

We respectfully request expeditious consideration and consent for the tax treaties by the United States Senate. For your information, the attached document describes each bilateral treaty, and we would be happy to provide any additional information that you require.

Sincerely,

Juan Gabriel Valdés
Ambassador of Chile

Réka Szemerkényi
Ambassador of Hungary

Kenichiro Sasae
Ambassador of Japan

Jean-Louis Wolzfeld
Ambassador of Luxembourg

Ryszard Schnepf
Ambassador of Poland

Ramon Gil-Casares
Ambassador of Spain

Martin Dahinden
Ambassador of Switzerland

cc      Members of the Senate Committee on Foreign Relations
        Members of the Senate Committee on Finance

67

**Business Roundtable**
**Financial Executives International**
**National Association of Manufacturers**
**National Foreign Trade Council**
**Organization for International Investment**
**Semiconductor Industry Association**
**Software Finance & Tax Executives Council**
**Trans-Atlantic Business Council**
**U.S. Chamber of Commerce**
**United States Council for International Business**

February 20, 2015

The Honorable Tim Scott
United States Senate
520 Hart Senate Office Building
Washington, DC 20510-0609

Dear Senator Scott,

The bilateral income tax treaties and protocols pending before the Senate are important to U.S. economic growth and U.S. trade and tax policy. We ask for your support for these treaties and protocols and also ask for expeditious action on them by the United States Senate.

Many of these agreements were signed by the U.S. Department of Treasury several years ago. The protracted period of ratification could send a signal, inadvertently, to all U.S. tax treaty partners that the U.S. does not value the benefits of tax treaties and that the expansion, improvement and modernization of the U.S. bilateral tax treaty network is not a priority. Given the unilateral actions that many foreign governments are considering as a consequence of issues raised in the OECD Base Erosion and Profit Shifting process, this sends the wrong signal at the wrong time.

For over 80 years, income tax treaties have played a critical role in fostering U.S. bilateral trade and investment and protecting U.S. businesses, large and small, from double taxation of the income they earn from selling goods and services in foreign markets. Tax treaties do so primarily by reducing foreign withholding taxes and otherwise restricting the ability of the foreign treaty partner to tax the income of U.S. taxpayers. On a reciprocal basis, tax treaties reduce U.S. withholding taxes to encourage foreign companies to invest in the United States. Where both

68

countries have the right to tax an item of income under the treaty, the treaty seeks to avoid double taxation by requiring one of the countries to allow a credit for the other country's tax (or to exempt the income from its own tax). Tax treaties help the U.S. economy by allowing U.S. companies to more efficiently conduct their businesses abroad and by making the U.S. more hospitable to foreign investment, which creates and sustains millions of American jobs.

In addition, tax treaties contain administrative procedures for U.S. taxpayers, treaty-partner taxpayers, and the U.S. and foreign taxing authorities themselves to resolve disagreements and to assist in the enforcement of the two countries' tax laws. In these and other ways, the U.S. network of over 60 bilateral income tax treaties plays a significant role in advancing the economic interests of the United States in the global economy.

- The pending bilateral treaties and protocols contain pro-investment, pro-trade, and pro-job creation measures and help to coordinate tax administration with our treaty partners: The proposed tax treaty with Chile, signed in 2010, would be our first with that country, and its ratification would represent an important milestone in lowering tax barriers to U.S. companies operating in Latin America, where we have few such agreements. The proposed treaty would lower withholding taxes on a bilateral basis and protect the interests of U.S. taxpayers in that country. Chile has adopted a tax reform package that contains two different levels of corporate taxes—one for companies incorporated in countries with which they have bilateral tax treaties, and a separate higher rate for companies in countries without a tax treaty. Unfortunately, until the Senate acts on the tax treaty with Chile, U.S. companies are in the latter category and pay a higher corporate tax than their competitors in Chile.

- The proposed tax treaty with Hungary, also signed in 2010, would modernize the existing treaty, which was signed when Hungary was part of the Soviet bloc. The new treaty also would close a "treaty shopping" loophole in the existing treaty that currently allows non-Hungarian companies to obtain U.S. tax benefits even if their home country does not grant benefits to U.S. companies.

- The Swiss and Luxembourg treaty protocols, both signed in 2009, would among other measures update our information exchange provisions with those countries to override their bank secrecy laws. The Swiss Protocol in particular would enable the U.S. Government to collect U.S. tax revenues from hidden offshore accounts of U.S. tax evaders, while specifically protecting against "fishing expeditions" by either country. The Swiss Protocol has been ratified by Switzerland, and its approval is essential to resolving hundreds of long-running U.S. tax investigations.

- The proposed treaty with Spain updates the tax treaty signed in 1990. The Spanish Protocol lowers the withholding rates for dividends, interest, and royalties. The Spanish

69

Protocol provides for mandatory arbitration of certain cases that cannot be resolved by the competent authorities within a specified period of time.

- The Polish Tax Treaty replaces the treaty signed by the U.S. and Poland in 1974. The Protocol and Tax Treaty improve conventions that have stimulated increased investment, greater transparency, and a stronger economic relationship between our countries. The Polish Tax Treaty also includes a limitation on benefits (LOB) provision that will help stop treaty shopping through Poland. The proposed treaty would lower withholding taxes on a bilateral basis and protect the interests of U.S. taxpayers in that country.

Treaties and protocols such as these have routinely been approved by unanimous consent. These treaties promote good business and financial decisions based on free-market principles rather than government influence. They incorporate reforms that foster robust economic growth and build on long-term investment partnerships between the U.S. and our tax treaty partners. Their contents are the product of years of dialogue among Senate Foreign Relations Committee Members, the Joint Committee on Taxation, the Executive Branch, and interested stakeholders in the U.S. and abroad.

The bilateral tax treaties and protocols before the Senate include provisions repeatedly approved by the Senate. The tax treaties and protocols have been reported out of the Senate Foreign Relations Committee without amendment in 2014, and are likely to be reported out in 2015.

We encourage prompt consideration and approval of these pending tax treaties in protocols by the United States Senate.

Sincerely,


Business Roundtable
Financial Executives International
National Association of Manufacturers
National Foreign Trade Council
Organization for International Investment
Semiconductor Industry Association
Software Finance & Tax Executives Council
Trans-Atlantic Business Council
U.S. Chamber of Commerce
United States Council for International Business

# Exhibit 56

# UNITED STATES MODEL
# INCOME TAX CONVENTION

**CONVENTION BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND THE GOVERNMENT OF _____
FOR THE AVOIDANCE OF DOUBLE TAXATION AND THE
PREVENTION OF TAX EVASION
WITH RESPECT TO TAXES ON INCOME**

The Government of the United States of America and the Government of _____, intending to conclude a Convention for the elimination of double taxation with respect to taxes on income without creating opportunities for non-taxation or reduced taxation through tax evasion or avoidance (including through treaty-shopping arrangements aimed at obtaining reliefs provided in this Convention for the indirect benefit of residents of third states), have agreed as follows:

## Article 1

## GENERAL SCOPE

1.    This Convention shall apply only to persons who are residents of one or both of the Contracting States, except as otherwise provided in this Convention.

2.    This Convention shall not restrict in any manner any benefit now or hereafter accorded:

    a)    by the laws of either Contracting State; or

    b)    by any other agreement to which both Contracting States are parties.

3.    a)    Notwithstanding the provisions of subparagraph (b) of paragraph 2 of this Article:

        i)    for purposes of paragraph 3 of Article XXII (Consultation) of the General Agreement on Trade in Services, the Contracting States agree that any question arising as to the interpretation or application of this Convention and, in particular, whether a taxation measure is within the scope of this Convention, shall be determined exclusively in accordance with the provisions of Article 25 (Mutual Agreement Procedure) of this Convention; and

        ii)    the provisions of Article XVII (National Treatment) of the General Agreement on Trade in Services shall not apply to a taxation measure unless the competent authorities agree that the measure is not within the scope of Article 24 (Non-Discrimination) of this Convention.

    b)    For the purposes of this paragraph, a "measure" is a law, regulation, rule, procedure, decision, administrative action or any similar provision or action.

4.    Except to the extent provided in paragraph 5 of this Article, this Convention shall not affect the taxation by a Contracting State of its residents (as determined under Article 4 (Resident)) and its citizens.  Notwithstanding the other provisions of this Convention, a former citizen or former long-term resident of a Contracting State may be taxed in accordance with the laws of that Contracting State.

5.    The provisions of paragraph 4 of this Article shall not affect:

    a)    the benefits conferred by a Contracting State under paragraph 3 of Article 7 (Business Profits), paragraph 2 of Article 9 (Associated Enterprises), paragraph 7 of Article 13 (Gains), subparagraph (b) of paragraph 1, paragraphs 2, 3 and 6 of Article 17 (Pensions, Social Security, Annuities, Alimony and Child Support), paragraph 3 of

2

Article 18 (Pension Funds), and Articles 23 (Relief From Double Taxation), 24 (Non-Discrimination) and 25 (Mutual Agreement Procedure); and

b)    the benefits conferred by a Contracting State under paragraph 1 of Article 18 (Pension Funds), and Articles 19 (Government Service), 20 (Students and Trainees) and 27 (Members of Diplomatic Missions and Consular Posts), upon individuals who are neither citizens of, nor have been admitted for permanent residence in, that Contracting State.

6.    For the purposes of this Convention, an item of income, profit or gain derived by or through an entity that is treated as wholly or partly fiscally transparent under the taxation laws of either Contracting State shall be considered to be derived by a resident of a Contracting State, but only to the extent that the item is treated for purposes of the taxation laws of such Contracting State as the income, profit or gain of a resident.

7.    Where an item of income, profit or gain arising in one of the Contracting States otherwise would be entitled to the benefits of this Convention in that Contracting State and, under the law of the other Contracting State, a person's tax in respect of such item is determined by reference to the amount thereof that is remitted to or received in that other Contracting State and not by reference to the full amount thereof, then the relief to be allowed under this Convention in the first-mentioned Contracting State shall apply only to so much of the amount as is taxed in the other Contracting State.

8.    Where an enterprise of a Contracting State derives income from the other Contracting State, and the first-mentioned Contracting State treats that income as attributable to a permanent establishment situated outside of that Contracting State, the benefits of this Convention shall not apply to that income if:

a)    the profits that are treated as attributable to the permanent establishment are subject to a combined aggregate effective rate of tax in the first-mentioned Contracting State and the state in which the permanent establishment is situated that is less than the lesser of (i) 15 percent or (ii) 60 percent of the general statutory rate of company tax applicable in the first-mentioned Contracting State; or

b)    the permanent establishment is situated in a third state that does not have a comprehensive convention for the avoidance of double taxation in force with the Contracting State from which the benefits of this Convention are being claimed, unless the first-mentioned Contracting State includes the income treated as attributable to the permanent establishment in its tax base.

However, if a resident of a Contracting State is denied the benefits of this Convention pursuant to this paragraph, the competent authority of the other Contracting State may, nevertheless, grant the benefits of this Convention with respect to a specific item of income if such competent

3

authority determines that such grant of benefits is justified in light of the reasons such resident did not satisfy the requirements of this paragraph (such as the existence of losses).  The competent authority of the Contracting State to which the request has been made shall consult with the competent authority of the other Contracting State before either granting or denying a request made under this paragraph by a resident of that other Contracting State.

**Article 2**

**TAXES COVERED**

1.      This Convention shall apply to taxes on income imposed on behalf of a Contracting State irrespective of the manner in which they are levied.

2.      There shall be regarded as taxes on income all taxes imposed on total income, or on elements of income, including taxes on gains from the alienation of property.

3.      The existing taxes to which this Convention shall apply are:

   a)      in the case of _____:

   b)      in the case of the United States:  the Federal income taxes imposed by the Internal Revenue Code (which do not include social security and unemployment taxes) and the Federal taxes imposed on the investment income of foreign private foundations.

4.      This Convention also shall apply to any identical or substantially similar taxes that are imposed after the date of signature of this Convention in addition to, or in place of, the existing taxes.  The competent authorities of the Contracting States shall notify each other of any significant changes that have been made in their taxation laws or other laws that relate to the application of this Convention.

**Article 3**

**GENERAL DEFINITIONS**

1.      For the purposes of this Convention, unless the context otherwise requires:

a)      the term "person" includes an individual, an estate, a trust, a partnership, a company, and any other body of persons;

b)      the term "company" means any body corporate or any entity that is treated as a body corporate for tax purposes according to the laws of the Contracting State in which it is resident;

c)      the terms "enterprise of a Contracting State" and "enterprise of the other Contracting State" mean, respectively, an enterprise carried on by a resident of a Contracting State, and an enterprise carried on by a resident of the other Contracting State; the terms also include an enterprise carried on by a resident of a Contracting State through an entity that is treated as fiscally transparent in that Contracting State;

d)      the term "enterprise" applies to the carrying on of any business;

e)      the term "business" includes the performance of professional services and of other activities of an independent character;

f)      the term "international traffic" means any transport by a ship or aircraft, except when such transport is solely between places in a Contracting State;

g)      the term "competent authority" means:

i)      in _____:  ----------; and

ii)      in the United States:  the Secretary of the Treasury or his delegate;

h)      the term "_____:"  means ----------;

i)      the term "United States" means the United States of America, and includes the states thereof and the District of Columbia; such term also includes the territorial sea thereof and the sea bed and subsoil of the submarine areas adjacent to that territorial sea, over which the United States exercises sovereign rights in accordance with international law; the term, however, does not include Puerto Rico, the Virgin Islands, Guam or any other United States possession or territory;

j)      the term "national" of a Contracting State means:

6

       i)     any individual possessing the nationality or citizenship of that Contracting State; and

       ii)    any legal person, partnership or association deriving its status as such from the laws in force in that Contracting State;

k)     the term "pension fund" means any person established in a Contracting State that is:

       i)     generally exempt from income taxation in that Contracting State; and

       ii)    operated exclusively or almost exclusively:

           A)    to administer or provide pension or retirement benefits; or

           B)    to earn income for the benefit of one or more persons established in the same Contracting State that are generally exempt from income taxation in that Contracting State and that are operated exclusively or almost exclusively to administer or provide pension or retirement benefits;

l)     the term "special tax regime" means any statute, regulation or administrative practice in a Contracting State with respect to a tax described in Article 2 (Taxes Covered) that meets all of the following conditions:

       i)     results in one or more of the following:

           A)    a preferential rate of taxation for interest, royalties, guarantee fees or any combination thereof, as compared to income from sales of goods or services;

           B)    a permanent reduction in the tax base with respect to interest, royalties, guarantee fees or any combination thereof, without a comparable reduction for income from sales of goods or services, by allowing:

               1)    an exclusion from gross receipts;

               2)    a deduction without regard to any corresponding payment or obligation to make a payment;

               3)    a deduction for dividends paid or accrued; or

4)      taxation that is inconsistent with the principles of Article 7 (Business Profits) or Article 9 (Associated Enterprises); or

C)      a preferential rate of taxation or a permanent reduction in the tax base of the type described in part (1), (2), (3) or (4) of subclause (B) of this clause with respect to substantially all of a company's income or substantially all of a company's foreign source income, for companies that do not engage in the active conduct of a trade or business in that Contracting State;

ii)      in the case of any preferential rate of taxation or permanent reduction in the tax base for royalties, does not condition such benefits on the extent of research and development activities that take place in the Contracting State;

iii)      is generally expected to result in a rate of taxation[1] that is less than the lesser of either:

A)      15 percent; or

B)      60 percent of the general statutory rate of company tax applicable in the other Contracting State;

iv)      does not apply principally to:

A)      pension funds;

B)      organizations that are established and maintained exclusively for religious, charitable, scientific, artistic, cultural or educational purposes;

---

1 For inclusion in an instrument reflecting an agreed interpretation: Except as provided below, the rate of taxation shall be determined based on the income tax principles of the Contracting State that has implemented the regime in question. Therefore, in the case of a regime that provides only for a preferential rate of taxation, the generally expected rate of taxation under the regime will equal such preferential rate. In the case of a regime that provides only for a permanent reduction in the tax base, the rate of taxation will equal the statutory rate of company tax generally applicable in the Contracting State to companies subject to the regime in question less the product of such rate and the percentage reduction in the tax base (with the baseline tax base determined under the principles of the Contracting State, but without regard to any permanent reductions in the tax base described in subparagraph (l)(i)(B)) that the regime is generally expected to provide. Therefore, a regime that generally provides for a 20 percent permanent reduction in a company's tax base would have a rate of taxation equal to the applicable statutory rate of company tax reduced by 20 percent of such statutory rate. In the case of a regime that provides for both a preferential rate of taxation and a permanent reduction in the tax base, the rate of taxation would be based on the preferential rate of taxation reduced by the product of such rate and the percentage reduction in the tax base.

8

C)      persons the taxation of which achieves a single level of taxation either in the hands of the person or the person's shareholders (with at most one year of deferral), that hold a diversified portfolio of securities, that are subject to investor-protection regulation in the Contracting State and the interests in which are marketed primarily to retail investors; or

D)      persons the taxation of which achieves a single level of taxation either in the hands of the person or the person's shareholders (with at most one year of deferral) and that hold predominantly real estate assets; and

v)      after consultation with the first-mentioned Contracting State, has been identified by the other Contracting State through diplomatic channels to the first-mentioned Contracting State as satisfying clauses (i) through (iv) of this subparagraph.

No statute, regulation or administrative practice shall be treated as a special tax regime until 30 days after the date when the other Contracting State issues a written public notification identifying the regime as satisfying clauses (i) through (v) of this subparagraph; and

m)      two persons shall be "connected persons" if one owns, directly or indirectly, at least 50 percent of the beneficial interest in the other (or, in the case of a company, at least 50 percent of the aggregate vote and value of the company's shares) or another person owns, directly or indirectly, at least 50 percent of the beneficial interest (or, in the case of a company, at least 50 percent of the aggregate vote and value of the company's shares) in each person.  In any case, a person shall be connected to another if, based on all the relevant facts and circumstances, one has control of the other or both are under the control of the same person or persons.

2.      As regards the application of this Convention at any time by a Contracting State, any term not defined herein shall, unless the context otherwise requires, or the competent authorities agree to a common meaning pursuant to the provisions of Article 25 (Mutual Agreement Procedure), have the meaning that it has at that time under the law of that Contracting State for the purposes of the taxes to which this Convention applies, any meaning under the applicable tax laws of that Contracting State prevailing over a meaning given to the term under other laws of that Contracting State.

**Article 4**

**RESIDENT**

1.      For the purposes of this Convention, the term "resident of a Contracting State" means any person who, under the laws of that Contracting State, is liable to tax therein by reason of his domicile, residence, citizenship, place of management, place of incorporation, or any other criterion of a similar nature, and also includes that Contracting State and any political subdivision or local authority thereof.  This term does not include any person whose tax is determined in that Contracting State on a fixed-fee, "forfait" or similar basis, or who is liable to tax in respect only of income from sources in that Contracting State or of profits attributable to a permanent establishment in that Contracting State.

2.      The term "resident of a Contracting State" includes:

　　　　a)      a pension fund established in that Contracting State; and

　　　　b)      an organization that is established and maintained in that Contracting State exclusively for religious, charitable, scientific, artistic, cultural, or educational purposes;

notwithstanding that all or part of its income or gains may be exempt from tax under the domestic law of that Contracting State.

3.      Where, by reason of the provisions of paragraph 1 of this Article, an individual is a resident of both Contracting States, then his status shall be determined as follows:

　　　　a)      he shall be deemed to be a resident only of the Contracting State in which he has a permanent home available to him; if he has a permanent home available to him in both Contracting States, he shall be deemed to be a resident only of the Contracting State with which his personal and economic relations are closer (center of vital interests);

　　　　b)      if the Contracting State in which he has his center of vital interests cannot be determined, or if he does not have a permanent home available to him in either Contracting State, he shall be deemed to be a resident only of the Contracting State in which he has a habitual abode;

　　　　c)      if he has a habitual abode in both Contracting States or in neither of them, he shall be deemed to be a resident only of the Contracting State of which he is a national;

　　　　d)      if he is a national of both Contracting States or of neither of them, the competent authorities of the Contracting States shall endeavor to settle the question by mutual agreement.

10

4.      Where by reason of the provisions of paragraph 1 of this Article a company is a resident of both Contracting States, such company shall not be treated as a resident of either Contracting State for purposes of its claiming the benefits provided by this Convention.

5.      Where by reason of the provisions of paragraph 1 of this Article a person other than an individual or a company is a resident of both Contracting States, the competent authorities of the Contracting States shall by mutual agreement endeavor to determine the mode of application of this Convention to that person.

**Article 5**

**PERMANENT ESTABLISHMENT**

1.    For the purposes of this Convention, the term "permanent establishment" means a fixed place of business through which the business of an enterprise is wholly or partly carried on.

2.    The term "permanent establishment" includes especially:

      a)    a place of management;

      b)    a branch;

      c)    an office;

      d)    a factory;

      e)    a workshop; and

      f)    a mine, an oil or gas well, a quarry, or any other place of extraction of natural resources.

3.    A building site or construction or installation project, or an installation or drilling rig or ship used for the exploration or exploitation of the sea bed and its subsoil and their natural resources, situated in one of the Contracting States constitutes a permanent establishment only if it lasts, or the activities of the rig or ship lasts, for more than twelve months.  For the sole purpose of determining whether the twelve-month period referred to in this paragraph has been exceeded:

      a)    where an enterprise of a Contracting State carries on activities in the other Contracting State at a place that constitutes a building site or construction or installation project and these activities are carried on during periods of time that in the aggregate do not last more than twelve months; and

      b)    connected activities are carried on at the same building site or construction or installation project during different periods of time, each exceeding thirty days, by one or more enterprises that are connected persons with respect to the first-mentioned enterprise,

these different periods of time shall be added to the periods of time during which the first-mentioned enterprise has carried on activities at that building site or construction or installation project.

4.    Notwithstanding the preceding provisions of this Article, the term "permanent establishment" shall be deemed not to include:

    a)    the use of facilities solely for the purpose of storage, display or delivery of goods or merchandise belonging to the enterprise;

    b)    the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of storage, display or delivery;

    c)    the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of processing by another enterprise;

    d)    the maintenance of a fixed place of business solely for the purpose of purchasing goods or merchandise, or of collecting information, for the enterprise;

    e)    the maintenance of a fixed place of business solely for the purpose of carrying on, for the enterprise, any other activity of a preparatory or auxiliary character;

    f)    the maintenance of a fixed place of business solely for any combination of the activities mentioned in subparagraphs (a) through (e) of this paragraph, provided that the overall activity of the fixed place of business resulting from this combination is of a preparatory or auxiliary character.

5.    Notwithstanding the provisions of paragraphs 1 and 2 of this Article, where a person -- other than an agent of an independent status to whom paragraph 6 of this Article applies -- is acting on behalf of an enterprise and has and habitually exercises in a Contracting State an authority to conclude contracts that are binding on the enterprise, that enterprise shall be deemed to have a permanent establishment in that Contracting State in respect of any activities that the person undertakes for the enterprise, unless the activities of such person are limited to those mentioned in paragraph 4 that, if exercised through a fixed place of business, would not make this fixed place of business a permanent establishment under the provisions of that paragraph.

6.    An enterprise shall not be deemed to have a permanent establishment in a Contracting State merely because it carries on business in that Contracting State through a broker, general commission agent, or any other agent of an independent status, provided that such persons are acting in the ordinary course of their business as independent agents.

7.    The fact that a company that is a resident of a Contracting State controls or is controlled by a company that is a resident of the other Contracting State, or that carries on business in that other Contracting State (whether through a permanent establishment or otherwise), shall not be taken into account in determining whether either company has a permanent establishment in that other Contracting State.

13

**Article 6**

**INCOME FROM REAL PROPERTY (IMMOVABLE PROPERTY)**

1.      Income derived by a resident of a Contracting State from real property (immovable property), including income from agriculture or forestry, situated in the other Contracting State may be taxed in that other Contracting State.

2.      The term "real property" or "immovable property" shall have the meaning which it has under the law of the Contracting State in which the property in question is situated.  The term shall in any case include property accessory to real property (immovable property), livestock and equipment used in agriculture and forestry, rights to which the provisions of general law respecting landed property apply, usufruct of real property (immovable property) and rights to variable or fixed payments as consideration for the working of, or the right to work, mineral deposits, sources and other natural resources.  Ships and aircraft shall not be regarded as real property (immovable property).

3.      The provisions of paragraph 1 of this Article shall apply to income derived from the direct use, letting, or use in any other form of real property (immovable property).

4.      The provisions of paragraphs 1 and 3 of this Article shall also apply to the income from real property (immovable property) of an enterprise.

5.      A resident of a Contracting State that is liable to tax in the other Contracting State on income from real property (immovable property) situated in the other Contracting State may elect for any taxable year to compute the tax on such income on a net basis as if such income were business profits attributable to a permanent establishment in such other Contracting State. Any such election shall be binding for the taxable year of the election and all subsequent taxable years unless the competent authority of the Contracting State in which the property is situated agrees to terminate the election.

**Article 7**

**BUSINESS PROFITS**

1.      Profits of an enterprise of a Contracting State shall be taxable only in that Contracting State unless the enterprise carries on business in the other Contracting State through a permanent establishment situated therein.  If the enterprise carries on business as aforesaid, the profits that are attributable to the permanent establishment in accordance with the provisions of paragraph 2 of this Article may be taxed in that other Contracting State.

2.      For the purposes of this Article, the profits that are attributable in each Contracting State to the permanent establishment referred to in paragraph 1 of this Article are the profits it might be expected to make, in particular in its dealings with other parts of the enterprise, if it were a separate and independent enterprise engaged in the same or similar activities under the same or similar conditions, taking into account the functions performed, assets used and risks assumed by the enterprise through the permanent establishment and through the other parts of the enterprise.

3.      Where, in accordance with paragraph 2 of this Article, a Contracting State adjusts the profits that are attributable to a permanent establishment of an enterprise of one of the Contracting States and taxes accordingly profits of the enterprise that have been charged to tax in the other Contracting State, the other Contracting State shall, to the extent necessary to eliminate double taxation, make an appropriate adjustment if it agrees with the adjustment made by the first-mentioned Contracting State; if the other Contracting State does not so agree, the Contracting States shall eliminate any double taxation resulting therefrom by mutual agreement.

4.      Where profits include items of income that are dealt with separately in other Articles of this Convention, then the provisions of those Articles shall not be affected by the provisions of this Article.

5.      In applying this Article, paragraph 8 of Article 10 (Dividends), paragraph 5 of Article 11 (Interest), paragraph 5 of Article 12 (Royalties), paragraph 3 of Article 13 (Gains) and paragraph 3 of Article 21 (Other Income), any income, profit or gain attributable to a permanent establishment during its existence is taxable in the Contracting State where such permanent establishment is situated even if the payments are deferred until such permanent establishment has ceased to exist.

**Article 8**

**SHIPPING AND AIR TRANSPORT**

1.      Profits of an enterprise of a Contracting State from the operation of ships or aircraft in international traffic shall be taxable only in that Contracting State.

2.      For purposes of this Article, profits from the operation of ships or aircraft include, but are not limited to:

> a)      profits from the rental of ships or aircraft on a full (time or voyage) basis;

> b)      profits from the rental on a bareboat basis of ships or aircraft if the rental income is incidental to profits from the operation of ships or aircraft in international traffic; and

> c)      profits from the rental on a bareboat basis of ships or aircraft if such ships or aircraft are operated in international traffic by the lessee.

Profits derived by an enterprise from the inland transport of property or passengers within either Contracting State shall be treated as profits from the operation of ships or aircraft in international traffic if such transport is undertaken as part of international traffic.

3.      Profits of an enterprise of a Contracting State from the use, maintenance, or rental of containers (including trailers, barges, and related equipment for the transport of containers) shall be taxable only in that Contracting State, except to the extent that those containers are used for transport solely between places within the other Contracting State.

4.      The provisions of paragraphs 1 and 3 of this Article shall also apply to profits from participation in a pool, a joint business, or an international operating agency.

16

**Article 9**

**ASSOCIATED ENTERPRISES**

1.    Where:

    a)    an enterprise of a Contracting State participates directly or indirectly in the management, control or capital of an enterprise of the other Contracting State; or

    b)    the same persons participate directly or indirectly in the management, control, or capital of an enterprise of a Contracting State and an enterprise of the other Contracting State;

and in either case conditions are made or imposed between the two enterprises in their commercial or financial relations that differ from those that would be made between independent enterprises, then any profits that, but for those conditions, would have accrued to one of the enterprises, but by reason of those conditions have not so accrued, may be included in the profits of that enterprise and taxed accordingly.

2.    Where a Contracting State includes in the profits of an enterprise of that Contracting State, and taxes accordingly, profits on which an enterprise of the other Contracting State has been charged to tax in that other Contracting State, and the other Contracting State agrees that the profits so included are profits that would have accrued to the enterprise of the first-mentioned Contracting State if the conditions made between the two enterprises had been those that would have been made between independent enterprises, then that other Contracting State shall make an appropriate adjustment to the amount of the tax charged therein on those profits.  In determining such adjustment, due regard shall be had to the other provisions of this Convention and the competent authorities of the Contracting States shall if necessary consult each other.

17

**Article 10**

**DIVIDENDS**

1.    Dividends paid by a company that is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other Contracting State.

2.    However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that Contracting State, but if the beneficial owner of the dividends is a resident of the other Contracting State, except as otherwise provided, the tax so charged shall not exceed:

    a)    5 percent of the gross amount of the dividends if, for the twelve-month period ending on the date on which the entitlement to the dividends is determined:

        i)    the beneficial owner has been a company that was a resident of the other Contracting State or of a qualifying third state.  The term "qualifying third state" means a state that has in effect a comprehensive convention for the avoidance of double taxation with the Contracting State of the company paying the dividends that would have allowed the beneficial owner to benefit from a rate of tax on dividends that is less than or equal to 5 percent; and

        ii)    at least 10 percent of the aggregate vote and value of the shares of the payor of the dividends was owned directly by the beneficial owner or a qualifying predecessor owner.  The term "qualifying predecessor owner" means a company from which the beneficial owner acquired the shares of the payor of the dividends, but only if such company was, at the time the shares were acquired, a connected person with respect to the beneficial owner of the dividend, and a resident of a state that has in effect a comprehensive convention for the avoidance of double taxation with the Contracting State of the company paying the dividends that would have allowed such company to benefit from a rate of tax on dividends that is less than or equal to 5 percent.  For this purpose, a company that is a resident of a Contracting State shall be considered to own directly the shares owned by an entity that:

            A)    is considered fiscally transparent under the laws of that Contracting State; and

            B)    is not a resident of the other Contracting State of which the company paying the dividends is a resident;

        in proportion to the company's ownership interest in that entity; and

18

b)    15 percent of the gross amount of the dividends in all other cases.

This paragraph shall not affect the taxation of the company in respect of the profits out of which the dividends are paid.

3.    Notwithstanding the provisions of paragraph 2 of this Article, dividends shall not be taxed in the Contracting State of which the company paying the dividends is a resident if:

a)    the beneficial owner of the dividends is a pension fund that is a resident of the other Contracting State; and

b)    such dividends are not derived from the carrying on of a trade or business by the pension fund or through a person that is a connected person with respect to the pension fund.

4.    a)    Subparagraph (a) of paragraph 2 of this Article shall not apply in the case of dividends paid by a U.S. Regulated Investment Company (RIC) or a U.S. Real Estate Investment Trust (REIT).  In the case of dividends paid by a RIC, subparagraph (b) of paragraph 2 and paragraph 3 of this Article shall apply.  In the case of dividends paid by a REIT, subparagraph (b) of paragraph 2 and paragraph 3 of this Article shall apply only if:

i)    the beneficial owner of the dividends is an individual or pension fund, in either case holding an interest of not more than 10 percent in the REIT;

ii)    the dividends are paid with respect to a class of shares that is publicly traded and the beneficial owner of the dividends is a person holding an interest of not more than 5 percent of any class of the REIT's shares; or

iii)    the beneficial owner of the dividends is a person holding an interest of not more than 10 percent in the REIT and the REIT is diversified.

b)    For purposes of this paragraph, a REIT shall be "diversified" if the value of no single interest in real property (immovable property) exceeds 10 percent of its total interests in real property (immovable property).  For the purposes of this rule, foreclosure property shall not be considered an interest in real property (immovable property). Where a REIT holds an interest in a partnership, it shall be treated as owning directly a proportion of the partnership's interests in real property (immovable property) corresponding to its interest in the partnership.

5.    In the case of the United States, notwithstanding the provisions of paragraph 2 of this Article, dividends paid by an expatriated entity and beneficially owned by a company resident in _____ that is a connected person with respect to such expatriated entity may be taxed in

19

accordance with the law of the United States for a period of ten years beginning on the date on which the acquisition of the domestic entity is completed.  For purposes of applying this paragraph:

a)    no effect shall be given to any amendment to section 7874 of the Internal Revenue Code after the date of signature of this Convention; and

b)    no entity shall be treated as an expatriated entity that:

i)    is a connected person with respect to the domestic entity immediately after the date on which the acquisition of the domestic entity is completed; and

ii)    prior to that date, was never a connected person with respect to the domestic entity.

However, an entity described in the preceding sentence shall become an expatriated entity if, subsequent to the date on which the acquisition of the domestic entity is completed, the entity joins in filing a U.S. consolidated return with either the domestic entity or another entity that was a connected person with respect to the domestic entity immediately prior to the date on which the acquisition of the domestic entity was completed.

6.    Notwithstanding the provisions of paragraphs 1 and 2 of this Article, in the case of a company seeking to satisfy the requirements of paragraph 4 of Article 22 (Limitation on Benefits) regarding a dividend, if such company fails to satisfy the criteria of that paragraph solely by reason of:

a)    the requirement in subclause (B) of clause (i) of subparagraph (e) of paragraph 7 of Article 22 (Limitation on Benefits) of this Convention; or

b)    the requirement in clause (ii) of subparagraph (e) of paragraph 7 of Article 22 (Limitation on Benefits) that a person entitled to benefits under paragraph 5 of Article 22 (Limitation on Benefits) would be entitled to a rate of tax with respect to the dividend that is less than or equal to the rate applicable under paragraph 2 of this Article;

such company may be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that Contracting State.  In these cases, however, the tax so charged shall not exceed the highest rate among the rates of tax to which persons described in subparagraph (e) of paragraph 7 of Article 22 (Limitation on Benefits) of this Convention (notwithstanding the requirements referred to in subparagraphs (a) and (b) of this paragraph) would have been entitled if such persons had received the dividend directly.  For purposes of this paragraph, (i) such persons' indirect ownership of the shares of the company paying the dividends shall be treated as direct ownership, and (ii) a person described in clause (iii) of

20

subparagraph (e) of paragraph 7 of Article 22 (Limitation on Benefits) shall be treated as entitled to the limitation of tax to which such person would be entitled if such person were a resident of the same Contracting State as the company receiving the dividends.

7.    For purposes of this Article, the term "dividends" means income from shares or other rights, not being debt-claims, participating in profits, as well as income that is subject to the same taxation treatment as income from shares under the laws of the Contracting State of which the company making the distribution is a resident.  The term does not include distributions that are treated as gain under the laws of the Contracting State of which the company making the distribution is a resident.  In such case, the provisions of Article 13 (Gains) shall apply.

8.    The provisions of paragraphs 1 through 6 of this Article shall not apply if the beneficial owner of the dividends, being a resident of a Contracting State, carries on business in the other Contracting State, of which the company paying the dividends is a resident, through a permanent establishment situated therein, and the holding in respect of which the dividends are paid is effectively connected with such permanent establishment.  In such case the provisions of Article 7 (Business Profits) shall apply.

9.    A Contracting State may not impose any tax on dividends paid by a resident of the other Contracting State, except insofar as the dividends are paid to a resident of the first-mentioned Contracting State or the dividends are attributable to a permanent establishment situated therein, nor may it impose tax on a corporation's undistributed profits, except as provided in paragraph 10 of this Article, even if the dividends paid or the undistributed profits consist wholly or partly of profits or income arising in that Contracting State.

10.    a)    A company that is a resident of one of the Contracting States and that has a permanent establishment in the other Contracting State or that is subject to tax in the other Contracting State on a net basis on its income that may be taxed in the other Contracting State under Article 6 (Income from Real Property (Immovable Property)) or under paragraph 1 of Article 13 (Gains) may be subject in that other Contracting State to a tax in addition to the tax allowable under the other provisions of this Convention.

    b)    Such tax, however, may be imposed:

        i)    on only the portion of the business profits of the company attributable to the permanent establishment and the portion of the income referred to in subparagraph (a) of this paragraph that is subject to tax under Article 6 (Income from Real Property (Immovable Property)) or under paragraph 1 of Article 13 (Gains) that, in the case of the United States, represents the dividend equivalent amount of such profits or income and, in the case of _____, is an amount that is analogous to the dividend equivalent amount; and

21

ii)      at a rate not in excess of the rate specified in subparagraph (a) of paragraph 2 or paragraph 6 of this Article, but only if for the twelve-month period ending on the date on which the entitlement to the dividend equivalent amount is determined, the company has been a resident of the other Contracting State or of a qualifying third state.  The term "qualifying third state" has the same meaning as in clause (i) of subparagraph (a) of paragraph 2 of this Article.

**Article 11**

**INTEREST**

1.      Interest arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in that other Contracting State.

2.      Notwithstanding the provisions of paragraph 1 of this Article:

a)      interest arising in _____ that is determined with reference to receipts, sales, income, profits or other cash flow of the debtor or a connected person with respect to the debtor, to any change in the value of any property of the debtor or a connected person with respect to the debtor or to any dividend, partnership distribution or similar payment made by the debtor or a connected person with respect to the debtor may be taxed in _____, and according to the laws of _____, but if the beneficial owner is a resident of the United States, the interest may be taxed at a rate not exceeding 15 percent of the gross amount of the interest;

b)      interest arising in the United States that is contingent interest of a type that does not qualify as portfolio interest under the law of the United States may be taxed by the United States, but if the beneficial owner is a resident of _____, the interest may be taxed at a rate not exceeding 15 percent of the gross amount of the interest;

c)      interest arising in a Contracting State and beneficially owned by a resident of the other Contracting State that is a connected person with respect to the payor of the interest may be taxed in the first-mentioned Contracting State in accordance with domestic law if such resident benefits from a special tax regime with respect to such interest in its Contracting State of residence;

d)      in the case of the United States, interest paid by an expatriated entity and beneficially owned by a company resident in _____ that is a connected person with respect to such expatriated entity may be taxed in accordance with the law of the United States for a period of ten years beginning on the date on which the acquisition of the domestic entity is completed.  For purposes of applying this paragraph:

i)      no effect shall be given to any amendment to section 7874 of the Internal Revenue Code after the date of signature of this Convention; and

ii)     no entity shall be treated as an expatriated entity that:

A)      is a connected person with respect to the domestic entity immediately after the date on which the acquisition of the domestic entity is completed; and

23

B)    prior to that date, was never a connected person with respect to the domestic entity.

However, an entity described in the preceding sentence shall become an expatriated entity if, subsequent to the date on which the acquisition of the domestic entity is completed, the entity joins in filing a U.S. consolidated return with either the domestic entity or another entity that was a connected person with respect to the domestic entity immediately prior to the date on which the acquisition of the domestic entity was completed;

e)    interest arising in a Contracting State and beneficially owned by a resident of the other Contracting State that is a connected person with respect to the payor of the interest may be taxed in the first-mentioned Contracting State in accordance with domestic law if such resident benefits, at any time during the taxable year in which the interest is paid, from notional deductions with respect to amounts that the Contracting State of which the beneficial owner is resident treats as equity;

f)    interest arising in a Contracting State and beneficially owned by a resident of the other Contracting State that is entitled to the benefits of this Article only by reason of paragraph 5 of Article 22 (Limitation on Benefits) may be taxed in the first-mentioned Contracting State, but the tax so charged shall not exceed 10 percent of the gross amount of the interest; and

g)    interest that is an excess inclusion with respect to a residual interest in a real estate mortgage investment conduit may be taxed by each Contracting State in accordance with its domestic law.

3.    Notwithstanding the provisions of paragraph 1 of this Article, in the case of a company seeking to satisfy the requirements of paragraph 4 of Article 22 (Limitation on Benefits) of this Convention regarding a payment of interest, if such company fails to satisfy the criteria of that paragraph solely by reason of:

a)    the requirement in subclause (B) of clause (i) of subparagraph (e) of paragraph 7 of Article 22 (Limitation on Benefits) of this Convention; or

b)    the requirement in clause (ii) of subparagraph (e) of paragraph 7 of Article 22 (Limitation on Benefits) that a person entitled to benefits under paragraph 5 of Article 22 (Limitation on Benefits) would be entitled to a rate of tax with respect to the interest that is less than or equal to the rate applicable under paragraph 2 of this Article;

such company may be taxed by the Contracting State in which the interest arises according to the laws of that Contracting State.  In these cases, however, the tax so charged shall not exceed the

24

highest rate among the rates of tax to which persons described in subparagraph (e) of paragraph 7 of Article 22 (Limitation on Benefits) of this Convention (notwithstanding the requirements referred to in subparagraphs (a) and (b) of this paragraph) would have been entitled if such persons had received the interest directly.  For purposes of this paragraph, a person described in clause (iii) of subparagraph (e) of paragraph 7 of Article 22 (Limitation on Benefits) shall be treated as entitled to the limitation of tax to which such person would be entitled if such person were a resident of the same Contracting State as the company receiving the interest.

4.      The term "interest" as used in this Article means income from debt-claims of every kind, whether or not secured by mortgage, and whether or not carrying a right to participate in the debtor's profits, and in particular, income from government securities and income from bonds or debentures, including premiums or prizes attaching to such securities, bonds or debentures, and all other income that is subjected to the same taxation treatment as income from money lent under the law of the Contracting State in which the income arises.  Income dealt with in Article 10 (Dividends) and penalty charges for late payment shall not be regarded as interest for the purposes of this Convention.

5.      The provisions of paragraphs 1 through 3 of this Article shall not apply if the beneficial owner of the interest, being a resident of a Contracting State, carries on business in the other Contracting State in which the interest arises through a permanent establishment situated therein, and the debt-claim in respect of which the interest is paid is effectively connected with such permanent establishment.  In such case the provisions of Article 7 (Business Profits) shall apply.

6.      For purposes of this Article, interest shall be deemed to arise in a Contracting State when the payor is a resident of that Contracting State.  Where, however, the person paying the interest, whether a resident of a Contracting State or not, has in a Contracting State a permanent establishment or derives profits that are taxable on a net basis in a Contracting State under paragraph 5 of Article 6 (Income from Real Property (Immovable Property)) or paragraph 1 of Article 13 (Gains), and such interest is borne by such permanent establishment or allocable to such profits, then such interest shall be deemed to arise in the Contracting State in which the permanent establishment is situated or from which such profits are derived.

7.      The excess, if any, of the amount of interest allocable to the profits of a company resident in a Contracting State that are:

        a)      attributable to a permanent establishment in the other Contracting State (including gains under paragraph 3 of Article 13 (Gains)); or

        b)      subject to tax in the other Contracting State under Article 6 (Income from Real Property (Immovable Property)) or paragraph 1 of Article 13 (Gains);

over the interest paid by that permanent establishment, or in the case of profits subject to tax under Article 6 (Income from Real Property (Immovable Property)) or paragraph 1 of Article 13

(Gains), over the interest paid by that company, shall be deemed to arise in that other Contracting State and to be beneficially owned by a resident of the first-mentioned Contracting State.  The tax imposed under this Article on such interest shall not exceed the rates provided in paragraphs 1 through 3 of this Article.

8.      Where, by reason of a special relationship between the payor and the beneficial owner or between both of them and some other person, the amount of the interest, having regard to the debt-claim for which it is paid, exceeds the amount that would have been agreed upon by the payor and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount.  In such case the excess part of the payments shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of this Convention.

26

**Article 12**

**ROYALTIES**

1.      Royalties arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in that other Contracting State.

2.      Notwithstanding the provisions of paragraph 1 of this Article:

a)      a royalty arising in a Contracting State and beneficially owned by a resident of the other Contracting State that is a connected person with respect to the payor of the royalty may be taxed in the first-mentioned Contracting State in accordance with domestic law if such resident benefits from a special tax regime with respect to the royalty in its Contracting State of residence; and

b)      in the case of the United States, royalties paid by an expatriated entity and beneficially owned by a company resident in _____ that is a connected person with respect to such expatriated entity may be taxed in accordance with the law of the United States for a period of ten years beginning on the date on which the acquisition of the domestic entity is completed.  For purposes of applying this paragraph:

i)      no effect shall be given to any amendment to section 7874 of the Internal Revenue Code after the date of signature of this Convention; and

ii)     no entity shall be treated as an expatriated entity that:

A)      is a connected person with respect to the domestic entity immediately after the date on which the acquisition of the domestic entity is completed; and

B)      prior to that date, was never a connected person with respect to the domestic entity.

However, an entity described in the preceding sentence shall become an expatriated entity if, subsequent to the date on which the acquisition of the domestic entity is completed, the entity joins in filing a U.S. consolidated return with either the domestic entity or another entity that was a connected person with respect to the domestic entity immediately prior to the date on which the acquisition of the domestic entity was completed.

3.      Notwithstanding the provisions of paragraph 1 of this Article, in the case of a company seeking to satisfy the requirements of paragraph 4 of Article 22 (Limitation on Benefits) of this Convention regarding a royalty, if such company fails to satisfy the criteria of that paragraph

27

solely by reason of the requirement in subclause (B) of clause (i) of subparagraph (e) of paragraph 7 of Article 22 (Limitation on Benefits) of this Convention, such company may be taxed in the Contracting State of which the royalty arises and according to the laws of that Contracting State, except that the tax so charged shall not exceed the highest rate among the rates of tax to which persons described in subparagraph (e) of paragraph 7 of Article 22 (Limitation on Benefits) of this Convention (notwithstanding the requirement of subclause (B) of clause (i) of subparagraph (e) of paragraph 7 of Article 22 (Limitation on Benefits)) would have been entitled if such persons had received the royalty directly. For purposes of this paragraph, a person described in clause (iii) of subparagraph (e) of paragraph 7 of Article 22 (Limitation on Benefits) shall be treated as entitled to the limitation of tax to which such person would be entitled if such person were a resident of the same Contracting State as the company receiving the royalties.

4.      The term "royalty" as used in this Article means payments of any kind received as consideration for the use of, or the right to use, any copyright of literary, artistic, scientific or other work (including cinematographic films); any patent, trademark, design or model, plan, secret formula or process; or for information concerning industrial, commercial or scientific experience.

5.      The provisions of paragraphs 1 through 3 of this Article shall not apply if the beneficial owner of the royalties, being a resident of a Contracting State, carries on business in the other Contracting State in which the royalties arise through a permanent establishment situated therein and the right or property in respect of which the royalties are paid is effectively connected with such permanent establishment. In such case the provisions of Article 7 (Business Profits) shall apply.

6.      Royalties shall be deemed to arise in a Contracting State when they are in consideration for the use of, or the right to use, property, information or experience in that Contracting State.

7.      Where, by reason of a special relationship between the payor and the beneficial owner or between both of them and some other person, the amount of the royalties, having regard to the use, right, or information for which they are paid, exceeds the amount that would have been agreed upon by the payor and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case the excess part of the payments shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of this Convention.

**Article 13**

**GAINS**

1.    Gains derived by a resident of a Contracting State from the alienation of real property (immovable property) situated in the other Contracting State may be taxed in that other Contracting State.

2.    For the purposes of this Article the term "real property (immovable property) situated in the other Contracting State" shall include:

    a)    real property (immovable property) referred to in Article 6 (Income from Real Property (Immovable Property));

    b)    where that other Contracting State is the United States, a United States real property interest; and

    c)    where that other Contracting State is _____,

        i)    shares, including rights to acquire shares, other than shares in which there is regular trading on a stock exchange, deriving 50 percent or more of their value directly or indirectly from real property referred to in subparagraph (a) of this paragraph situated in _____; and

        ii)    an interest in a partnership or trust to the extent that the assets of the partnership or trust consist of real property situated in _____, or of shares referred to in clause (i) of this subparagraph.

3.    Gains from the alienation of movable property forming part of the business property of a permanent establishment that an enterprise of a Contracting State has in the other Contracting State, including such gains from the alienation of such a permanent establishment (alone or with the whole enterprise), may be taxed in that other Contracting State.

4.    Gains derived by an enterprise of a Contracting State from the alienation of ships or aircraft operated or used in international traffic or personal property pertaining to the operation or use of such ships or aircraft shall be taxable only in that Contracting State.

5.    Gains derived by an enterprise of a Contracting State from the alienation of containers (including trailers, barges and related equipment for the transport of containers) used for the transport of goods or merchandise shall be taxable only in that Contracting State, unless those containers are used for transport solely between places within the other Contracting State.

29

6.      Gains from the alienation of any property other than property referred to in paragraphs 1 through 5 of this Article shall be taxable only in the Contracting State of which the alienator is a resident.

7.      Where an individual who, upon ceasing to be a resident (as determined under paragraph 1 of Article 4 (Resident)) of one of the Contracting States, is treated under the taxation law of that Contracting State as having alienated property for its fair market value and is taxed in that Contracting State by reason thereof, the individual may elect to be treated for purposes of taxation in the other Contracting State as if the individual had, immediately before ceasing to be a resident of the first-mentioned Contracting State, alienated and reacquired such property for an amount equal to its fair market value at such time.

**Article 14**

**INCOME FROM EMPLOYMENT**

1.      Subject to the provisions of Articles 15 (Directors' Fees), 17 (Pensions, Social Security, Annuities, Alimony, and Child Support) and 19 (Government Service), salaries, wages and other similar remuneration derived by a resident of a Contracting State in respect of an employment shall be taxable only in that Contracting State unless the employment is exercised in the other Contracting State.  If the employment is so exercised, such remuneration as is derived therefrom may be taxed in that other Contracting State.

2.      Notwithstanding the provisions of paragraph 1 of this Article, remuneration derived by a resident of a Contracting State in respect of an employment exercised in the other Contracting State shall be taxable only in the first-mentioned Contracting State if:

   a)      the recipient is present in the other Contracting State for a period or periods not exceeding in the aggregate 183 days for all twelve-month periods commencing or ending in the taxable year concerned;

   b)      the remuneration is paid by, or on behalf of, an employer who is not a resident of the other Contracting State; and

   c)      the remuneration is not borne by a permanent establishment that the employer has in the other Contracting State.

3.      Notwithstanding the preceding provisions of this Article, remuneration described in paragraph 1 of this Article that is derived by a resident of a Contracting State in respect of an employment as a member of the regular complement of a ship or aircraft operated in international traffic shall be taxable only in that Contracting State.

**Article 15**

**DIRECTORS' FEES**

Directors' fees and other similar payments derived by a resident of a Contracting State for services rendered in the other Contracting State in his capacity as a member of the board of directors of a company that is a resident of the other Contracting State may be taxed in that other Contracting State.

## Article 16

## ENTERTAINERS AND SPORTSMEN

1.      Notwithstanding the provisions of Article 14 (Income from Employment), income derived by a resident of a Contracting State as an entertainer, such as a theater, motion picture, radio, or television artiste, or a musician, or as a sportsman, from his personal activities as such exercised in the other Contracting State, may be taxed in that other Contracting State, except where the amount of the gross receipts derived by such entertainer or sportsman, including expenses reimbursed to him or borne on his behalf, from such activities does not exceed thirty thousand United States dollars (30,000) or its equivalent in ---------- for the taxable year of the payment.

2.      Where income in respect of activities exercised by an entertainer or a sportsman in his capacity as such accrues not to the entertainer or sportsman himself but to another person, that income, notwithstanding the provisions of Article 14 (Income from Employment), may be taxed in the Contracting State in which the activities of the entertainer or sportsman are exercised unless the contract pursuant to which the personal activities are performed allows that other person to designate the individual who is to perform the personal activities.

**Article 17**

**PENSIONS, SOCIAL SECURITY, ANNUITIES,
ALIMONY, AND CHILD SUPPORT**

1.    a)    Pensions and other similar remuneration beneficially owned by a resident of a Contracting State shall be taxable only in that Contracting State.

    b)    Notwithstanding subparagraph (a) of this paragraph, the amount of any such pension or remuneration arising in a Contracting State that, when received, would be exempt from taxation in that Contracting State if the beneficial owner were a resident thereof shall be exempt from taxation in the Contracting State of which the beneficial owner is a resident.

2.    a)    Where an individual who is a resident of a Contracting State is a member or beneficiary of, or participant in, a pension fund established in the other Contracting State, income earned by the pension fund may not be taxed as income of that individual, unless, and then only to the extent that, it is paid to, or for the benefit of, that individual from the pension fund (and not transferred to another pension fund established in that other Contracting State in a transfer that qualifies as a tax-deferred transfer under the laws of that other Contracting State).  In such case, the provisions of paragraph 1 of this Article shall apply.

    b)    Where a citizen of the United States who is a resident of _____ is a member or beneficiary of, or participant in, a pension fund established in _____, the United States may not tax the income earned by the pension fund as income of the individual unless, and then only to the extent that, it is paid to, or for the benefit of, that individual from the pension fund (and not transferred to another pension fund established in _____ in a transfer that qualifies as a tax-deferred transfer under the laws of _____).  In such case, the provisions of paragraph 1 of this Article, which generally is subject to paragraph 4 of Article 1 (General Scope), shall apply.

3.    Notwithstanding the provisions of paragraph 1 of this Article, payments made by a Contracting State under provisions of the social security or similar legislation of that Contracting State to a resident of the other Contracting State or to a citizen of the United States shall be taxable only in the first-mentioned Contracting State.

4.    Annuities derived and beneficially owned by an individual resident of a Contracting State shall be taxable only in that Contracting State.  The term "annuities" as used in this paragraph means a stated sum paid periodically at stated times during a specified number of years, or for life, under an obligation to make the payments in return for adequate and full consideration (other than services rendered).

34

5.    Alimony paid by a resident of a Contracting State to a resident of the other Contracting State shall be taxable only in that other Contracting State.  The term "alimony" as used in this paragraph means periodic payments made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support, which payments are taxable to the recipient under the laws of the Contracting State of which he is a resident.

6.    Periodic payments, not dealt with in paragraph 5 of this Article, for the support of a child made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support, paid by a resident of a Contracting State to a resident of the other Contracting State, shall be exempt from tax in both Contracting States.

**Article 18**

**PENSION FUNDS**

1.      Where an individual who is a member or beneficiary of, or participant in, a pension fund established in one of the Contracting States exercises an employment or self-employment in the other Contracting State:

a)      contributions paid by or on behalf of that individual to the pension fund during the period that he exercises an employment or self-employment in the other Contracting State shall be deductible (or excludible) in computing the individual's taxable income in that other Contracting State; and

b)      any benefits accrued under the pension fund, or contributions made to the pension fund by or on behalf of the individual's employer, during that period shall not be treated as part of the employee's taxable income and any such contributions shall be allowed as a deduction in computing the taxable income of the individual's employer in that other Contracting State.

The relief available under this paragraph shall not exceed the relief that would be allowed by the other Contracting State to residents of that Contracting State for contributions to, or benefits accrued under, a pension fund established in that Contracting State.

2.      The provisions of paragraph 1 of this Article shall not apply unless:

a)      contributions by or on behalf of the individual, or by or on behalf of the individual's employer, to the pension fund (or to another similar pension fund established in the same Contracting State for which the first-mentioned pension fund was substituted) were made before the individual began to exercise an employment or self-employment in the other Contracting State; and

b)      the competent authority of the other Contracting State has agreed that the pension fund generally corresponds to a pension fund established in that other Contracting State.

3.      a)      Where a citizen of the United States who is a resident of _____ exercises an employment in _____ the income from which is taxable in _____, the contribution is borne by an employer who is a resident of _____ or by a permanent establishment situated in _____, and the individual is a member or beneficiary of, or participant in, a pension fund established in _____,

i)      contributions paid by or on behalf of that individual to the pension fund during the period that the individual exercises the employment in _____, and

36

that are attributable to the employment, shall be deductible (or excludible) in computing the individual's taxable income in the United States; and

ii)     any benefits accrued under the pension fund, or contributions made to the pension fund by or on behalf of the individual's employer, during that period, and that are attributable to the employment, shall not be included in computing the employee's taxable income in the United States.

b)     The relief available under this paragraph shall not exceed the lesser of:

i)     the relief that would be allowed by the United States to its residents for contributions to, or benefits accrued under, a generally corresponding pension fund established in the United States; and

ii)     the amount of contributions or benefits that qualify for tax relief in _____.

c)     For purposes of determining an individual's eligibility to participate in and receive tax benefits with respect to a pension fund established in the United States, contributions made to, or benefits accrued under, a pension fund established in _____ shall be treated as contributions or benefits under a generally corresponding pension fund established in the United States to the extent relief is available to the individual under this paragraph.

d)     This paragraph shall not apply unless the competent authority of the United States has agreed that the pension fund generally corresponds to a pension fund established in the United States.

37

**Article 19**

**GOVERNMENT SERVICE**

1.      Notwithstanding the provisions of Articles 14 (Income from Employment), 15 (Directors' Fees), 16 (Entertainers and Sportsmen) and 20 (Students and Trainees):

    a)      salaries, wages and other remuneration, other than a pension, paid to an individual in respect of services rendered to a Contracting State or a political subdivision or local authority thereof shall, subject to the provisions of subparagraph (b) of this paragraph, be taxable only in that Contracting State;

    b)      such remuneration, however, shall be taxable only in the other Contracting State if the services are rendered in that Contracting State and the individual is a resident of that Contracting State who:

        i)      is a national of that Contracting State; or

        ii)      did not become a resident of that Contracting State solely for the purpose of rendering the services.

2.      Notwithstanding the provisions of paragraph 1 of Article 17 (Pensions, Social Security, Annuities, Alimony, and Child Support):

    a)      any pension and other similar remuneration paid by, or out of funds created by, a Contracting State or a political subdivision or a local authority thereof to an individual in respect of services rendered to that Contracting State or subdivision or authority (other than a payment to which paragraph 3 of Article 17 (Pensions, Social Security, Annuities, Alimony, and Child Support) applies) shall, subject to the provisions of subparagraph (b) of this paragraph, be taxable only in that Contracting State;

    b)      such pension and other similar remuneration, however, shall be taxable only in the other Contracting State if the individual is a resident of, and a national of, that Contracting State.

3.      The provisions of Articles 14 (Income from Employment), 15 (Directors' Fees), 16 (Entertainers and Sportsmen) and 17 (Pensions, Social Security, Annuities, Alimony, and Child Support) shall apply to salaries, wages and other similar remuneration, and to pensions and other similar remuneration, in respect of services rendered in connection with a business carried on by a Contracting State or a political subdivision or a local authority thereof.

38

**Article 20**

**STUDENTS AND TRAINEES**

1.      Payments, other than remuneration for personal services, received by a student or business trainee who is, or was immediately before visiting a Contracting State, a resident of the other Contracting State, and who is present in the first-mentioned Contracting State for the purpose of his full-time education or for his full-time training, shall not be taxed in that Contracting State, provided that such payments arise outside that Contracting State, and are for the purpose of his maintenance, education or training.  The exemption from tax provided by this paragraph shall apply to a business trainee only for a period of time not exceeding twelve months from the date the business trainee first arrives in the first-mentioned Contracting State for the purpose of training.

2.      A student or business trainee described in paragraph 1 of this Article shall be exempt from tax by the Contracting State in which the individual is temporarily present with respect to income from personal services in an aggregate amount equal to ten thousand United States dollars (10,000) or its equivalent in ------ for the taxable year of the payment.  The competent authorities of the Contracting States may adjust the amount provided in this paragraph to the extent necessary to take into account changes in the personal exemption, standard deduction or filing thresholds in the domestic laws of either Contracting State.

3.      For purposes of this Article, a business trainee is an individual:

        a)      who is temporarily in a Contracting State for the purpose of securing training required to qualify the individual to practice a profession or professional specialty; or

        b)      who is temporarily in a Contracting State as an employee of, or under contract with, a resident of the other Contracting State, for the primary purpose of acquiring technical, professional or business experience from a person other than that resident of the other Contracting State (or a connected person with respect to such resident of the other Contracting State).

**Article 21**

**OTHER INCOME**

1.      Items of income beneficially owned by a resident of a Contracting State, wherever arising, not dealt with in the foregoing Articles of this Convention shall be taxable only in that Contracting State.

2.      Notwithstanding paragraph 1 of this Article:

a)      a guarantee fee arising in a Contracting State and characterized as other income by that Contracting State and beneficially owned by a resident of the other Contracting State that is a connected person with respect to the payor of the guarantee fee may be taxed in the first-mentioned Contracting State in accordance with domestic law if such resident benefits from a special tax regime with respect to the guarantee fee in its Contracting State of residence; and

b)      in the case of the United States, a guarantee fee characterized as other income paid by an expatriated entity and beneficially owned by a company resident in _____ that is a connected person with respect to such expatriated entity may be taxed in accordance with the law of the United States for a period of ten years beginning on the date on which the acquisition of the domestic entity is completed.  For purposes of applying this paragraph:

i)      no effect shall be given to any amendment to section 7874 of the Internal Revenue Code after the date of signature of this Convention; and

ii)      no entity shall be treated as an expatriated entity that:

A)      is a connected person with respect to the domestic entity immediately after the date on which the acquisition of the domestic entity is completed; and

B)      prior to that date, was never a connected person with respect to the domestic entity.

However, an entity described in the preceding sentence shall become an expatriated entity if, subsequent to the date on which the acquisition of the domestic entity is completed, the entity joins in filing a U.S. consolidated return with either the domestic entity or another entity that was a connected person with respect to the domestic entity immediately prior to the date on which the acquisition of the domestic entity was completed.

40

3.      The provisions of paragraphs 1 and 2 of this Article shall not apply to income, other than income from real property (immovable property) as defined in paragraph 2 of Article 6 (Income from Real Property (Immovable Property)), if the beneficial owner of the income, being a resident of a Contracting State, carries on business in the other Contracting State through a permanent establishment situated therein and the right or property in respect of which the income is paid is effectively connected with such permanent establishment.  In such case the provisions of Article 7 (Business Profits) shall apply.

**Article 22**

**LIMITATION ON BENEFITS**

1.       Except as otherwise provided in this Article and in paragraph 6 of Article 10 (Dividends), paragraph 3 of Article 11 (Interest) and paragraph 3 of Article 12 (Royalties), a resident of a Contracting State shall not be entitled to the benefits of this Convention otherwise accorded to residents of a Contracting State unless such resident is a "qualified person" as defined in paragraph 2 of this Article at the time when the benefit would be accorded.

2.       A resident of a Contracting State shall be a qualified person at the time when a benefit otherwise would be accorded by this Convention if, at that time and, with respect to clause (i) of subparagraph (f) of this paragraph, on at least half of the days of any twelve-month period that includes the date when the benefit otherwise would be accorded, the resident is:

     a)       an individual;

     b)       a Contracting State, political subdivision or local authority thereof, or any agency or instrumentality of any such Contracting State, political subdivision or local authority;

     c)       a company, if the principal class of its shares (and any disproportionate class of shares) is regularly traded on one or more recognized stock exchanges, and either:

          i)       its principal class of shares is primarily traded on one or more recognized stock exchanges located in the Contracting State of which the company is a resident; or

          ii)       the company's primary place of management and control is in the Contracting State of which it is a resident;

     d)       a company, if:

          i)       at least 50 percent of the aggregate vote and value of the shares (and at least 50 percent of the aggregate vote and value of any disproportionate class of shares) in the company is owned directly or indirectly by five or fewer companies entitled to benefits under subparagraph (c) of this paragraph, provided that, in the case of indirect ownership, each intermediate owner is a resident of the Contracting State from which a benefit under this Convention is being sought or is a qualifying intermediate owner; and

          ii)       with respect to benefits under this Convention other than under Article 10 (Dividends), less than 50 percent of the company's gross income, and less than 50 percent of the tested group's gross income, is paid or accrued, directly or

42

indirectly, in the form of payments that are deductible for purposes of the taxes covered by this Convention in the company's Contracting State of residence (but not including arm's length payments in the ordinary course of business for services or tangible property, and in the case of a tested group, not including intra-group transactions): (A) to persons that are not residents of either Contracting State entitled to the benefits of this Convention under subparagraph (a), (b), (c) or (e) of this paragraph; (B) to persons that are connected persons with respect to the company described in this subparagraph and that benefit from a special tax regime with respect to the deductible payment; or (C) with respect to a payment of interest, to persons that are connected persons with respect to the company described in this subparagraph and that benefit from notional deductions described in subparagraph (e) of paragraph 2 of Article 11 (Interest);

e)    a person described in paragraph 2 of Article 4 (Resident) of this Convention, provided that:

i)    in the case of a person described in subclause (A) of clause (ii) of subparagraph (k) of paragraph 1 of Article 3 (General Definitions), more than 50 percent of the person's beneficiaries, members or participants are individuals resident in either Contracting State; and

ii)    in the case of a person described in subclause (B) of clause (ii) of subparagraph (k) of paragraph 1 of Article 3 (General Definitions), the earnings of such person benefit exclusively, or almost exclusively, pension funds that satisfy the requirements of clause (i) of this subparagraph; or

f)    a person other than an individual, if:

i)    persons that are residents of that Contracting State entitled to the benefits of this Convention under subparagraph (a), (b), (c) or (e) of this paragraph own, directly or indirectly, shares or other beneficial interests representing at least 50 percent of the aggregate vote and value (and at least 50 percent of the aggregate vote and value of any disproportionate class of shares) of the shares or other beneficial interests of such person, provided that, in the case of indirect ownership, each intermediate owner is a qualifying intermediate owner; and

ii)    less than 50 percent of the person's gross income, and less than 50 percent of the tested group's gross income, is paid or accrued, directly or indirectly, in the form of payments that are deductible for purposes of the taxes covered by this Convention in the person's Contracting State of residence (but not including arm's length payments in the ordinary course of business for services or tangible property, and in the case of a tested group, not including intra-group transactions): (A) to persons that are not residents of either Contracting State entitled to the

43

benefits of this Convention under subparagraph (a), (b), (c) or (e) of this paragraph; (B) to persons that are connected persons with respect to the person described in this subparagraph and that benefit from a special tax regime with respect to the deductible payment; or (C) with respect to a payment of interest, to persons that are connected persons with respect to the person described in this subparagraph and that benefit from notional deductions described in subparagraph (e) of paragraph 2 of Article 11 (Interest).

3.    a)    A resident of a Contracting State shall be entitled to benefits under this Convention with respect to an item of income derived from the other Contracting State, regardless of whether the resident is a qualified person, if the resident is engaged in the active conduct of a trade or business in the first-mentioned Contracting State, and the income derived from the other Contracting State emanates from, or is incidental to, that trade or business.  For purposes of this Article, the term "active conduct of a trade or business" shall not include the following activities or any combination thereof:

  i)    operating as a holding company;

  ii)    providing overall supervision or administration of a group of companies;

  iii)    providing group financing (including cash pooling); or

  iv)    making or managing investments, unless these activities are carried on by a bank, insurance company or registered securities dealer in the ordinary course of its business as such.

    b)    If a resident of a Contracting State derives an item of income from a trade or business activity conducted by that resident in the other Contracting State, or derives an item of income arising in the other Contracting State from a connected person, the conditions described in subparagraph (a) of this paragraph shall be considered to be satisfied with respect to such item only if the trade or business activity conducted by the resident in the first-mentioned Contracting State to which the item is related is substantial in relation to the same or complementary trade or business activity carried on by the resident or such connected person in the other Contracting State.  Whether a trade or business activity is substantial for the purposes of this paragraph shall be determined based on all the facts and circumstances.

    c)    For purposes of applying this paragraph, activities conducted by persons connected to a resident of a Contracting State shall be deemed to be conducted by such resident.

4.    A company that is a resident of a Contracting State shall be entitled to a benefit under this Convention, regardless of whether the resident is a qualified person if, at the time when the

44

benefit would be accorded, and on at least half of the days of a twelve-month period commencing or ending on the date when the benefit otherwise would be accorded:

a)      at least 95 percent of the aggregate vote and value of its shares (and at least 50 percent of any disproportionate class of shares) is owned, directly or indirectly, by seven or fewer persons that are equivalent beneficiaries, provided that, in the case of indirect ownership, each intermediate owner is a qualifying intermediate owner; and

b)      less than 50 percent of the company's gross income, and less than 50 percent of the tested group's gross income, is paid or accrued, directly or indirectly, in the form of payments that are deductible for purposes of the taxes covered by this Convention in the company's Contracting State of residence (but not including arm's length payments in the ordinary course of business for services or tangible property, and in the case of a tested group, not including intra-group transactions): (i) to persons that are not equivalent beneficiaries; (ii) to persons that are equivalent beneficiaries only by reason of paragraph 5 of this Article or of a substantially similar provision in the relevant comprehensive convention for the avoidance of double taxation; (iii) to persons that are equivalent beneficiaries that are connected persons with respect to the company described in this paragraph and that benefit from a special tax regime with respect to the deductible payment, provided that if the relevant comprehensive convention for the avoidance of double taxation does not contain a definition of a special tax regime analogous to the definition in subparagraph (l) of paragraph 1 of Article 3 (General Definitions), the principles of the definition provided in this Convention shall apply, but without regard to the requirement in clause (v) of that definition; or (iv) with respect to a payment of interest, to persons that are equivalent beneficiaries that are connected persons with respect to the company described in this paragraph and that benefit from notional deductions of the type described in subparagraph (e) of paragraph 2 of Article 11 (Interest).

5.      A company that is a resident of a Contracting State that functions as a headquarters company for a multinational corporate group consisting of such company and its direct and indirect subsidiaries shall be entitled to benefits under this Convention with respect to dividends and interest paid by members of its multinational corporate group.  A company shall be considered a headquarters company for this purpose only if:

a)      such company's primary place of management and control is in the Contracting State of which it is a resident;

b)      the multinational corporate group consists of companies resident in, and engaged in the active conduct of a trade or business in, at least four countries, and the trades or businesses carried on in each of the four countries (or four groupings of countries) generate at least 10 percent of the gross income of the group;

45

c)    the trades or businesses of the multinational corporate group that are carried on in any one state other than the Contracting State of residence of such company generate less than 50 percent of the gross income of the group;

d)    no more than 25 percent of such company's gross income is derived from the other Contracting State;

e)    such company is subject to the same income taxation rules in its Contracting State of residence as persons described in paragraph 3 of this Article; and

f)    less than 50 percent of such company's gross income, and less than 50 percent of the tested group's gross income, is paid or accrued, directly or indirectly, in the form of payments that are deductible for purposes of the taxes covered by this Convention in the company's Contracting State of residence (but not including arm's length payments in the ordinary course of business for services or tangible property or payments in respect of financial obligations to a bank that is not a connected person with respect to such company, and in the case of a tested group, not including intra-group transactions): (i) to persons that are not residents of either Contracting State entitled to the benefits of this Convention under subparagraph (a), (b), (c) or (e) of paragraph 2 of this Article; (ii) to persons that are connected persons with respect to such company and that benefit from a special tax regime with respect to the deductible payment; or (iii) with respect to a payment of interest, to persons that are connected persons with respect to such company and that benefit from notional deductions described in subparagraph (e) of paragraph 2 of Article 11 (Interest).

If the requirements of subparagraph (b), (c) or (d) of this paragraph are not fulfilled for the relevant taxable year, they shall be deemed to be fulfilled if the required ratios are met when averaging the gross income of the preceding four taxable years.

6.    If a resident of a Contracting State is neither a qualified person pursuant to the provisions of paragraph 2 of this Article, nor entitled to benefits under paragraph 3, 4 or 5 of this Article, the competent authority of the other Contracting State may, nevertheless, grant the benefits of this Convention, or benefits with respect to a specific item of income, taking into account the object and purpose of this Convention, but only if such resident demonstrates to the satisfaction of such competent authority a substantial nontax nexus to its Contracting State of residence and that neither its establishment, acquisition or maintenance, nor the conduct of its operations had as one of its principal purposes the obtaining of benefits under this Convention. The competent authority of the Contracting State to which the request has been made shall consult with the competent authority of the other Contracting State before either granting or denying a request made under this paragraph by a resident of that other Contracting State.

7.    For the purposes of this Article:

46

a)      the term "recognized stock exchange" means:

    i)      any stock exchange registered with the U.S. Securities and Exchange Commission as a national securities exchange under the U.S. Securities Exchange Act of 1934;

    ii)     the _____ Stock Exchange; and

    iii)    any other stock exchange agreed upon by the competent authorities of the Contracting States;

b)      the term "principal class of shares" means the ordinary or common shares of the company, provided that such class of shares represents the majority of the aggregate vote and value of the company.  If no single class of ordinary or common shares represents the majority of the aggregate vote and value of the company, the "principal class of shares" are those classes that in the aggregate represent a majority of the aggregate vote and value of the company;

c)      the term "disproportionate class of shares" means any class of shares of a company, or in the case of a trust, any class of beneficial interests in such trust, resident in one of the Contracting States that entitles the shareholder or interest holder to disproportionately higher participation, through dividends, redemption payments or otherwise, in the earnings generated in the other Contracting State;

d)      a company's "primary place of management and control" is in the Contracting State of which it is a resident only if:

    i)      the executive officers and senior management employees of the company exercise day-to-day responsibility for more of the strategic, financial and operational policy decision-making for the company and its direct and indirect subsidiaries in that Contracting State, and the staff of such persons conduct more of the day-to-day activities necessary for preparing and making those decisions in that Contracting State, than in any other state; and

    ii)     such executive officers and senior management employees exercise responsibility for more of the strategic, financial and operational policy decision-making for the company and its direct and indirect subsidiaries, and the staff of such persons conduct more of the day-to-day activities necessary for preparing and making those decisions, than the officers or employees of any other company;

e)      the term "equivalent beneficiary" means:

    i)      a resident of any state, provided that:

47

A)      the resident is entitled to all the benefits of a comprehensive convention for the avoidance of double taxation between that state and the Contracting State from which the benefits of this Convention are sought, under provisions substantially similar to subparagraph (a), (b), (c) or (e) of paragraph 2 of this Article or, when the benefit being sought is with respect to interest or dividends paid by a member of the resident's multinational corporate group, the resident is entitled to benefits under provisions substantially similar to paragraph 5 of this Article, provided that, if such convention does not contain a comprehensive limitation on benefits article, the resident would be entitled to the benefits of this Convention by reason of subparagraph (a), (b), (c) or (e) of paragraph 2 of this Article if such resident were a resident of one of the Contracting States under Article 4 (Resident) of this Convention.  Notwithstanding the preceding sentence, an individual who is (1) liable to tax in his or her state of residence with respect to foreign source income or gains only on a remittance or similar basis, or (2) whose tax is determined in that Contracting State on a fixed-fee, "forfait" or similar basis, shall not be considered an equivalent beneficiary; and

B)      1)      with respect to income referred to in Article 10 (Dividends), 11 (Interest) or 12 (Royalties) of this Convention, if the resident had received such income directly, the resident would be entitled under such convention, a provision of domestic law or any other international agreement, to a rate of tax with respect to such income for which benefits are being sought under this Convention that is less than or equal to the rate applicable under this Convention.  Regarding a company seeking benefits under paragraph 4 of this Article with respect to dividends, for purposes of this subclause:

I)      if the resident is an individual, and the company is engaged in the active conduct of a trade or business in its Contracting State of residence that is substantial in relation, and similar or complementary, to the trade or business that generated the earnings from which the dividend is paid, such individual shall be treated as if he or she were a company.  Activities conducted by a person that is a connected person with respect to the company seeking benefits shall be deemed to be conducted by such company.  Whether a trade or business activity is substantial shall be determined based on all the facts and circumstances; and

48

II)    if the resident is a company (including an individual treated as a company), to determine whether the resident is entitled to a rate of tax that is less than or equal to the rate applicable under this Convention, the resident's indirect ownership of the shares of the company paying the dividends shall be treated as direct ownership; or

2)    with respect to an item of income, profit or gain referred to in Article 7 (Business Profits), 13 (Gains) or 21 (Other Income) of this Convention, the resident is entitled to benefits under such convention that are at least as favorable as the benefits that are being sought under this Convention; and

C)    notwithstanding that a resident may satisfy the requirements of subclauses (A) and (B) of this clause, where the item of income, profit or gain has been derived through an entity that is treated as fiscally transparent under the laws of the Contracting State of the company seeking benefits, if the item of income, profit or gain would not be treated as the income, profit or gain of the resident under a provision analogous to paragraph 6 of Article 1 (General Scope) of this Convention had the resident, and not the company seeking benefits under paragraph 4 of this Article, itself owned the entity through which the income, profit or gain was derived by the company, such resident shall not be considered an equivalent beneficiary with respect to the item of income; and

ii)    a resident of the same Contracting State as the company seeking benefits under paragraph 4 of this Article that is entitled to all the benefits of this Convention by reason of subparagraph (a), (b), (c) or (e) of paragraph 2 of this Article or, when the benefit being sought is with respect to interest or dividends paid by a member of the resident's multinational corporate group, the resident is entitled to benefits under paragraph 5 of this Article, provided that, in the case of a resident described in paragraph 5 of this Article, if the resident had received such interest or dividends directly, the resident would be entitled to a rate of tax with respect to such income that is less than or equal to the rate applicable under this Convention to the company seeking benefits under paragraph 4 of this Article; or

iii)    a resident of the Contracting State from which the benefits of this Convention are sought that is entitled to all the benefits of this Convention by reason of subparagraph (a), (b), (c) or (e) of paragraph 2 of this Article, provided that all such residents' ownership of the aggregate vote and value of the shares (and any disproportionate class of shares) of the company seeking benefits under paragraph 4 of this Article does not exceed 25 percent of the total vote and value

49

of the shares (and any disproportionate class of shares) of the company.

f)      the term "qualifying intermediate owner" means an intermediate owner that is either:

     i)      a resident of a state that has in effect with the Contracting State from which a benefit under this Convention is being sought a comprehensive convention for the avoidance of double taxation that includes provisions addressing special tax regimes and notional deductions analogous to subparagraph (l) of paragraph 1 of Article 3 (General Definitions) and subparagraph (e) of paragraph 2 of Article 11 (Interest), respectively; or

     ii)     a resident of the same Contracting State as the company applying the test under subparagraph (d) or (f) of paragraph 2 or paragraph 4 of this Article to determine whether it is eligible for benefits under the Convention;

g)      the term "tested group" means the resident of a Contracting State that is applying the test under subparagraph (d) or (f) of paragraph 2 of this Article or paragraph 4 or 5 of this Article to determine whether it is eligible for benefits under the Convention (the "tested resident"), and any company that:

     i)      participates as a member with the tested resident in a tax consolidation, fiscal unity or similar regime that requires members of the group to share profits or losses; or

     ii)     shares losses with the tested resident pursuant to a group relief or other loss sharing regime in the taxable year; and

h)      the term "gross income" means gross receipts as determined in the person's Contracting State of residence for the taxable year that includes the time when the benefit would be accorded, except that where a person is engaged in a business that includes the manufacture, production or sale of goods, "gross income" means such gross receipts reduced by the cost of goods sold, and where a person is engaged in a business of providing non-financial services, "gross income" means such gross receipts reduced by the direct costs of generating such receipts, provided that:

     i)      except when relevant for determining benefits under Article 10 (Dividends) of this Convention, gross income shall not include the portion of any dividends that are effectively exempt from tax in the person's Contracting State of residence, whether through deductions or otherwise; and

ii)     except with respect to the portion of any dividend that is taxable, a tested group's gross income shall not take into account transactions between companies within the tested group.

**Article 23**

**RELIEF FROM DOUBLE TAXATION**

1.    In the case of _____, double taxation will be relieved as follows:

2.    In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a resident or citizen of the United States as a credit against the United States tax on income applicable to residents and citizens:

     a)    the income tax paid or accrued to _____ by or on behalf of such resident or citizen; and

     b)    in the case of a United States company owning at least 10 percent of the voting stock of a company that is a resident of _____ and from which the United States company receives dividends, the income tax paid or accrued to _____ by or on behalf of the payor with respect to the profits out of which the dividends are paid.

For the purposes of this paragraph, the taxes referred to in subparagraph (a) of paragraph 3 and paragraph 4 of Article 2 (Taxes Covered) shall be considered income taxes.

3.    For the purposes of applying paragraph 2 of this Article, an item of gross income, as determined under the law of the United States, derived by a resident of the United States that, under this Convention, may be taxed in _____ shall be deemed to be income from sources in _____.

4.    Where a United States citizen is a resident of _____:

     a)    with respect to items of income, profit or gain that under the provisions of this Convention are exempt from United States tax or that are subject to a reduced rate of United States tax when derived by a resident of _____ who is not a United States citizen, _____ shall allow as a credit against _____ tax only the tax paid, if any, that the United States may impose under the provisions of this Convention other than taxes that may be imposed solely by reason of citizenship under paragraph 4 of Article 1 (General Scope);

     b)    for purposes of applying paragraph 2 to compute United States tax on those items of income, profit or gain referred to in subparagraph (a) of this paragraph, the United States shall allow as a credit against United States tax the income tax paid to _____ after the credit referred to in subparagraph (a) of this paragraph; the credit so allowed shall not reduce the portion of the United States tax that is creditable against the _____ tax in accordance with subparagraph (a) of this paragraph; and

52

c)      for the exclusive purpose of relieving double taxation in the United States under subparagraph (b) of this paragraph, items of income, profit or gain referred to in subparagraph (a) of this paragraph shall be deemed to arise in _____ to the extent necessary to avoid double taxation of such income under subparagraph (b) of this paragraph.

## Article 24

## NON-DISCRIMINATION

1.      Nationals of a Contracting State shall not be subjected in the other Contracting State to any taxation or any requirement connected therewith that is more burdensome than the taxation and connected requirements to which nationals of that other Contracting State in the same circumstances, in particular with respect to residence, are or may be subjected.  This provision shall also apply to persons who are not residents of one or both of the Contracting States. However, for the purposes of United States taxation, United States nationals who are subject to tax on a worldwide basis are not in the same circumstances as nationals of _____ who are not residents of the United States.

2.      The taxation on a permanent establishment that an enterprise of a Contracting State has in the other Contracting State shall not be less favorably levied in that other Contracting State than the taxation levied on enterprises of that other Contracting State carrying on the same activities.

3.      The provisions of paragraphs 1 and 2 of this Article shall not be construed as obliging a Contracting State to grant to residents of the other Contracting State any personal allowances, reliefs, and reductions for taxation purposes on account of civil status or family responsibilities that it grants to its own residents.

4.      Except where the provisions of paragraph 1 of Article 9 (Associated Enterprises), paragraph 8 of Article 11 (Interest), or paragraph 7 of Article 12 (Royalties) apply, interest, royalties, and other disbursements paid by an enterprise of a Contracting State to a resident of the other Contracting State shall, for the purpose of determining the taxable profits of such enterprise, be deductible under the same conditions as if they had been paid to a resident of the first-mentioned Contracting State.  Similarly, any debts of an enterprise of a Contracting State to a resident of the other Contracting State shall, for the purpose of determining the taxable capital of the first-mentioned resident, be deductible under the same conditions as if they had been contracted to a resident of the first-mentioned Contracting State.

5.      Enterprises of a Contracting State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State, shall not be subjected in the first-mentioned Contracting State to any taxation or any requirement connected therewith that is more burdensome than the taxation and connected requirements to which other similar enterprises of the first-mentioned Contracting State are or may be subjected.

6.      Nothing in this Article shall be construed as preventing either Contracting State from imposing a tax as described in paragraph 10 of Article 10 (Dividends) or paragraph 7 of Article 11 (Interest).

7.      The provisions of this Article shall, notwithstanding the provisions of Article 2 (Taxes Covered), apply to taxes of every kind and description.

**Article 25**

**MUTUAL AGREEMENT PROCEDURE**

1.    Where a person considers that the actions of one or both of the Contracting States result or will result for such person in taxation not in accordance with the provisions of this Convention, it may, irrespective of the remedies provided by the domestic law of those Contracting States, and the time limits prescribed in such laws for presenting claims for refund, present its case to the competent authority of one or both of the Contracting States.

2.    The competent authority shall endeavor, if the objection appears to it to be justified and if it is not itself able to arrive at a satisfactory solution, to resolve the case by mutual agreement with the competent authority of the other Contracting State, with a view to the avoidance of taxation that is not in accordance with this Convention.  Any agreement reached shall be implemented notwithstanding any time limits or other procedural limitations in the domestic law of the Contracting States.  Assessment and collection procedures shall be suspended during the period that any mutual agreement proceeding is pending.

3.    The competent authorities of the Contracting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of this Convention.  They also may consult together for the elimination of double taxation in cases not provided for in this Convention.  In particular the competent authorities of the Contracting States may agree:

   a)    to the same attribution of income, deductions, credits, or allowances of an enterprise of a Contracting State to its permanent establishment situated in the other Contracting State;

   b)    to the same allocation of income, deductions, credits, or allowances between persons;

   c)    to the settlement of conflicting applications of this Convention, including conflicts regarding:

      i)    the characterization of particular items of income;

      ii)    the characterization of persons;

      iii)    the application of source rules with respect to particular items of income;

      iv)    the meaning of any term used in this Convention;

      v)    the timing of particular items of income;

56

    d)      to advance pricing arrangements; and

    e)      to the application of the provisions of domestic law regarding penalties, fines, and interest in a manner consistent with the purposes of this Convention.

4.     The competent authorities of the Contracting States may agree to increase any specific monetary amounts referred to in this Convention to reflect economic or monetary developments.

5.     The competent authorities of the Contracting States may communicate with each other directly, including through a joint commission, for the purpose of reaching an agreement in the sense of the preceding paragraphs.

6.     Where a person has presented a case to the competent authority of one or both of the Contracting States either:

    a)      pursuant to paragraph 1 of this Article on the basis that the actions of one or both of the Contracting States resulted or will result for that person in taxation not in accordance with the provisions of this Convention; or

    b)      on a taxpayer-specific case regarding a matter described in paragraph 3 of this Article;

and the competent authorities are unable to reach agreement to resolve that case, and the conditions described in paragraph 7 of this Article are met, the case shall be resolved through arbitration conducted in the manner prescribed by paragraphs 7 through 9 of this Article and according to any rules or procedures agreed upon by the competent authorities of the Contracting States pursuant to paragraph 10 of this Article.

7.     A case shall be submitted to arbitration on the earliest date on which all of the following conditions have been satisfied:

    a)      tax returns have been filed with at least one of the Contracting States with respect to the taxable years at issue in the case;

    b)      at least two years have passed since the commencement date of such case, unless the competent authorities of the Contracting States have agreed to a different date and notified the presenter of the case of such agreement;

    c)      the presenter of the case has submitted a written request to the competent authority to which the case was presented for a resolution of the case through arbitration; and

    d)      all concerned persons and their authorized representatives or agents have

57

submitted to the competent authorities of both Contracting States written agreements not to disclose to any other person any information received during the course of the arbitration proceeding from either Contracting State or the arbitration panel, other than the determination of the panel.

A case shall not, however, be submitted to arbitration if a decision with respect to such case has already been rendered by a court or administrative tribunal of either Contracting State, or if the competent authorities of the Contracting States have agreed prior to the date on which the arbitration otherwise would be submitted that the particular case is not suitable for resolution through arbitration.

8.      For the purposes of this Article, the following definitions shall apply:

     a)      the term "presenter" means the person that has presented a case to the competent authority of one or both of the Contracting States either:

          i)      pursuant to paragraph 1 of this Article on the basis that the actions of one or both of the Contracting States result or will result for that person in taxation not in accordance with the provisions of this Convention; or

          ii)      on a taxpayer-specific case regarding a matter described in paragraph 3 of this Article;

     b)      the term "concerned person" means the presenter and all other persons, if any, whose tax liability to either Contracting State may be directly affected by a mutual agreement to resolve a case submitted to arbitration pursuant to paragraph 7 of this Article; and

     c)      the "commencement date" for a case means the earliest date on which the information necessary to undertake substantive consideration for a mutual agreement has been received by both competent authorities.

9.      For the purposes of arbitrations under this Article, the following rules shall apply:

     a)      The arbitration panel shall consist of three individual members.  The competent authority of each Contracting State shall select one member of the arbitration panel.  In the event that the competent authority of a Contracting State fails to select a member for the arbitration panel in the manner and within the time periods agreed by the competent authorities of the Contracting States pursuant to paragraph 10 of this Article, the competent authority of the other Contracting State shall select a second member.  The two members of the arbitration panel who have been selected shall select the third member, who shall serve as Chair of the arbitration panel.  If the two initial members of the arbitration panel fail to select the Chair in the manner and within the time periods

agreed by the competent authorities of the Contracting States pursuant to paragraph 10 of this Article, these members shall be dismissed, and each competent authority of the Contracting States shall select a new member of the arbitration panel.  The Chair shall not be a national or lawful permanent resident of either Contracting State.  The members appointed shall not be employees, nor have been employees within the twelve-month period prior to the date on which a case is submitted to arbitration, of the tax administration or the treasury department of the Contracting State that identified them.  Furthermore, the members appointed shall not have any prior involvement with the specific matters at issue in the arbitration proceeding for which they are being considered as arbitrators.

b)      The members of the arbitration panel and their staff shall be considered to be "persons or authorities" to whom information may be disclosed under Article 26 (Exchange of Information and Administrative Assistance) of this Convention.

c)      All material received by a competent authority of a Contracting State in the course of, or relating to, an arbitration proceeding (including the arbitration panel's determination) shall be considered to be information exchanged between the Contracting States.  Accordingly, no such information relating to an arbitration proceeding may be disclosed by the competent authorities of the Contracting States, except as permitted under Article 26 (Exchange of Information and Administrative Assistance).  The competent authorities of the Contracting States shall ensure that members of the arbitration panel and their staff agree in writing to treat any information relating to the arbitration proceeding consistent with the confidentiality and nondisclosure provisions of Article 26 (Exchange of Information and Administrative Assistance) of this Convention and the applicable domestic laws of the Contracting States.

d)      If at any time before the arbitration panel delivers a determination to the competent authorities of the Contracting States:

   i)      the competent authorities of the Contracting States reach a mutual agreement to resolve the case pursuant to this Article;

   ii)     the presenter of the case withdraws the request for arbitration;

   iii)    a decision concerning the case is rendered by a court or administrative tribunal of one of the Contracting States during the arbitration proceeding; or

   iv)     if any concerned person or their authorized representatives or agents violates the written nondisclosure statement required by subparagraph (d) of paragraph 7 of this Article, and the competent authorities of both Contracting States agree that such violation should result in the termination of the arbitration proceeding;

59

the mutual agreement procedure, including the arbitration proceeding, with respect to the case shall terminate.

e)      After a case is submitted to arbitration, the presenter shall be permitted to submit to the competent authorities of both Contracting States for submission to the arbitration panel a paper setting forth the presenter's analysis and views of the case for consideration by the arbitration panel.  Such submission must be submitted before the date on which the competent authorities of the Contracting States are required to submit their position papers to the arbitration panel, and shall not include any information not previously provided to the competent authorities before the case was submitted to arbitration.

f)      After a case is submitted to arbitration, the competent authority of each of the Contracting States shall be permitted to submit to the arbitration panel a position paper with a proposed resolution addressing each adjustment or similar issue raised in the case, and shall simultaneously provide a copy of such position paper to the other competent authority.  Such proposed resolution shall be a resolution of the entire case and shall reflect all agreements previously reached between the competent authorities of the Contracting States with respect to any adjustment or similar issue raised in the case.  Such proposed resolution shall be limited to a disposition of specific monetary amounts (for example, of income, profit, gain or expense) or, where specified, the maximum rate of tax charged pursuant to the Convention for each adjustment or similar issue in the case.  The competent authority of each of the Contracting States shall also be permitted to submit additional supporting papers for consideration by the arbitration panel, and shall simultaneously provide a copy of such supporting papers to the other competent authority.

g)      Notwithstanding the provisions of subparagraph (e) of this paragraph, it is understood that, in the case of an arbitration proceeding concerning:

        i)      the tax liability of an individual for which the competent authorities have been unable to reach agreement with respect to the individual's Contracting State of residence;

        ii)      the taxation of the business profits of an enterprise with respect to which the competent authorities have been unable to reach an agreement on whether a permanent establishment exists; or

        iii)      such other issues the determination of which are contingent on resolution of similar threshold questions;

the position paper may include positions regarding clause (i), (ii) or (iii) of this subparagraph, in addition to proposed resolutions limited to specific monetary amounts

60

(for example, of income, profit, gain or expense) or, where specified, the maximum rate of tax charged pursuant to this Convention due as a consequence of the arbitration panel's determination regarding residency, the existence of a permanent establishment or other threshold questions.

h)      Where an arbitration proceeding concerns a case comprising multiple adjustments or issues each requiring a disposition of specific monetary amounts of income, profit, gain or expense or, where specified, the maximum rate of tax charged pursuant to this Convention, the position paper may propose a separate disposition for each adjustment or similar issue.

i)      Each competent authority shall be permitted to submit a reply to any position paper submitted to the arbitration panel, and shall simultaneously provide the other competent authority with a copy of any such reply submitted to the arbitration panel.

j)      The arbitration panel shall deliver a determination in writing to the competent authorities of the Contracting States.  The determination reached by the arbitration panel in the arbitration proceeding shall be limited to one of the proposed resolutions for the case submitted by one of the competent authorities of the Contracting States for each adjustment or similar issue and any threshold questions, and shall not include a rationale or any other explanation of the determination.  The determination of the arbitration panel shall have no precedential value with respect to the application of this Convention in any other case.

k)      The determination of the arbitration panel with respect to a case submitted to arbitration shall constitute a resolution by mutual agreement under this Article and shall be binding on the Contracting States if it is accepted by all of the concerned persons. Unless the competent authorities of both Contracting States agree to a longer time period, the concerned persons shall have 45 days from the date they receive the determination of the arbitration panel to notify, in writing, the competent authority of the Contracting State to whom the case was presented of their acceptance of determination.  In the event the case is pending in litigation, each concerned person that is a party to such litigation must also advise, within the same time frame, the relevant court of its acceptance of the determination of the arbitration panel and its intention to withdraw from the consideration of the court the issues resolved through the proceeding.  If any concerned person fails to so advise the relevant competent authority and relevant court within this time frame, the determination of the arbitration panel shall be considered not to have been accepted by the concerned persons.  Where the determination of the arbitration panel is not accepted, the case shall not be eligible for any subsequent further consideration by the competent authorities.

l)      The fees and expenses of the members of the arbitration panel, as well as any costs incurred in connection with the proceeding by the Contracting States, shall be borne

61

equitably by the competent authorities of the Contracting States.

10.    The competent authorities of the Contracting States shall agree in writing, before the first case is submitted to arbitration, on time periods and procedures that are consistent with paragraphs 6 through 9 of this Article for:

a)    establishing when information necessary to undertake substantive consideration for a mutual agreement has been received by both competent authorities for purposes of determining the commencement date, and for notifying each other when such requirement has been satisfied;

b)    notifying the presenter of any agreements that a case is not suitable for resolution through arbitration, or to change the date on which a case shall be submitted to arbitration;

c)    the appropriate application of arbitration in the context of a request for an advanced pricing agreement, including rules concerning the date on which a case may be submitted to arbitration;

d)    obtaining the agreements of all concerned persons and their authorized representatives or agents not to disclose any information received during the course of the arbitration proceeding from the competent authority of either Contracting State or the arbitration panel, other than the determination of such panel pursuant to subparagraph (d) of paragraph 7 of this Article, and the agreements of the members of the arbitration panel and their staff to treat any information relating to the arbitration proceeding consistent with the confidentiality and nondisclosure provisions of Article 26 (Exchange of Information and Administrative Assistance), as required by subparagraph (c) of paragraph 9 of this Article;

e)    the appointment of the members of the arbitration panel;

f)    the submission of position papers, supporting papers and reply submissions by the competent authorities of the Contracting States to the arbitration panel;

g)    the submission to the competent authorities of both Contracting States by the presenter of a paper setting forth the presenter's views and analysis of the case for consideration by the arbitration panel;

h)    the delivery by the arbitration panel of its determination to the competent authorities of the Contracting States;

i)    the acceptance or rejection by the concerned persons of the determination of the arbitration panel; and

62

j)      the adoption by the arbitration panel of any additional procedures necessary for the conduct of its business.

The competent authorities of the Contracting States may mutually agree in writing to modify their agreement concerning these time periods and procedures, as needed, and may further agree in writing on such other rules, time periods and procedures as may be necessary for the effective and timely implementation of an arbitration proceeding.

**Article 26**

**EXCHANGE OF INFORMATION AND ADMINISTRATIVE ASSISTANCE**

1.      The competent authorities of the Contracting States shall exchange such information as is foreseeably relevant for carrying out the provisions of this Convention or the domestic laws of the Contracting States concerning taxes of every kind imposed by a Contracting State to the extent that the taxation thereunder is not contrary to the Convention, including information relating to the assessment or collection, or administration of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, such taxes.  The exchange of information is not restricted by paragraph 1 of Article 1 (General Scope) or Article 2 (Taxes Covered).

2.      Any information received under this Article by a Contracting State shall be treated as secret in the same manner as information obtained under the domestic law of that Contracting State and shall be disclosed only to persons or authorities (including courts and administrative bodies) involved in the assessment, collection, or administration of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes referred to in paragraph 1 of this Article, or the oversight of such functions.  Such persons or authorities shall use the information only for such purposes.  They may disclose the information in public court proceedings or in judicial decisions.  Notwithstanding the preceding sentences of this paragraph, the competent authority of the Contracting State that receives information under the provisions of this Article may, with the written consent of the Contracting State that provided the information, also make available that information for other purposes allowed under the provisions of a mutual legal assistance treaty in force between the Contracting States that allows for the exchange of tax information.

3.      In no case shall the provisions of paragraphs 1 and 2 of this Article be construed so as to impose on a Contracting State the obligation:

> a)      to carry out administrative measures at variance with the laws and administrative practice of that or of the other Contracting State;
>
> b)      to supply information that is not obtainable under the laws or in the normal course of the administration of that or of the other Contracting State; or
>
> c)      to supply information that would disclose any trade, business, industrial, commercial, or professional secret or trade process, or information the disclosure of which would be contrary to public policy.

4.      If information is requested by a Contracting State in accordance with this Article, the other Contracting State shall use its information gathering measures to obtain the requested information, even though that other Contracting State may not need such information for its own

tax purposes. The obligation contained in the preceding sentence is subject to the limitations of paragraph 3 of this Article but in no case shall such limitations be construed to permit a Contracting State to decline to supply information solely because it has no domestic interest in such information.

5.      In no case shall the provisions of paragraph 3 of this Article be construed to permit a Contracting State to decline to supply information solely because the information is held by a bank, other financial institution, nominee or person acting in an agency or a fiduciary capacity or because it relates to ownership interests in a person.

6.      If specifically requested by the competent authority of a Contracting State, the competent authority of the other Contracting State shall provide information under this Article in the form of depositions of witnesses and authenticated copies of unedited original documents (including books, papers, statements, records, accounts, and writings).

7.      Each of the Contracting States shall endeavor to collect on behalf of the other Contracting State such amounts as may be necessary to ensure that relief granted by the Convention from taxation imposed by that other Contracting State does not inure to the benefit of persons not entitled thereto. This paragraph shall not impose upon either of the Contracting States the obligation to carry out administrative measures that would be contrary to its sovereignty, security, or public policy.

8.      The requested Contracting State shall allow representatives of the requesting Contracting State to interview individuals and examine books and records in the requested Contracting State with the consent of the persons subject to examination.

9.      The competent authorities of the Contracting States may develop an agreement upon the mode of application of this Article, including agreement to ensure comparable levels of assistance to each of the Contracting States, but in no case will the lack of such agreement relieve a Contracting State of its obligations under this Article.

**Article 27**

**MEMBERS OF DIPLOMATIC MISSIONS AND CONSULAR POSTS**

Nothing in this Convention shall affect the fiscal privileges of members of diplomatic missions or consular posts under the general rules of international law or under the provisions of special agreements.

**Article 28**

**SUBSEQUENT CHANGES IN LAW**

1.      If at any time after the signing of this Convention, a Contracting State reduces the general statutory rate of company tax that applies with respect to substantially all of the income of resident companies with the result that such rate falls below the lesser of either (a) 15 percent or (b) 60 percent of the general statutory rate of company tax applicable in the other Contracting State, or the first-mentioned Contracting State provides an exemption from taxation to resident companies for substantially all foreign source income (including interest and royalties), the Contracting States shall consult with a view to amending this Convention to restore an appropriate allocation of taxing rights between the Contracting States.  If such consultations do not progress, the other Contracting State may notify the first-mentioned Contracting State through diplomatic channels that it shall cease to apply the provisions of Articles 10 (Dividends), 11 (Interest), 12 (Royalties) and 21 (Other Income).  In such case, the provisions of such Articles shall cease to have effect in both Contracting States with respect to payments to resident companies six months after the date that the other Contracting State issues a written public notification stating that it shall cease to apply the provisions of Articles 10 (Dividends), 11 (Interest), 12 (Royalties) and 21 (Other Income).

2.      For the purposes of determining the general statutory rate of company tax:

        a)      the allowance of generally available deductions based on a percentage of what otherwise would be taxable income, and other similar mechanisms to achieve a reduction in the overall rate of tax, shall be taken into account; and

        b)      a tax that applies to a company only upon a distribution by such company, or that applies to shareholders, shall not be taken into account.

## Article 29

## ENTRY INTO FORCE

1.      This Convention shall be subject to ratification in accordance with the applicable procedures of each Contracting State.  The Contracting States shall notify each other in writing, through diplomatic channels when their respective applicable procedures have been satisfied.

2.      This Convention shall enter into force on the date of the later of the notifications referred to in paragraph 1 of this Article.  The provisions of this Convention shall have effect:

      a)      in respect of taxes withheld at source, for amounts paid or credited on or after the first day of the second month next following the date on which this Convention enters into force;

      b)      in respect of other taxes, for taxable years beginning on or after the first day of January next following the date on which this Convention enters into force.

3.      Notwithstanding paragraph 2 of this Article:

      a)      the provisions of paragraphs 6 through 10 of Article 25 (Mutual Agreement Procedure) of this Convention shall have effect with respect to:

            i)      cases that are under consideration by the competent authorities as of the date on which this Convention enters into force.  For such cases, the commencement date shall be the date on which this Convention enters into force; and

            ii)      cases that come under consideration after the date on which this Convention enters into force; and

      b)      the provisions of Article 26 (Exchange of Information and Administrative Assistance) shall have effect from the date of entry into force of this Convention, without regard to the taxable year to which the matter relates.

**Article 30**

**TERMINATION**

This Convention shall remain in force until terminated by a Contracting State.  Either Contracting State may terminate the Convention by giving notice of termination to the other Contracting State through diplomatic channels.  In such event, the Convention shall terminate on the date of such notification.  Notwithstanding such termination, this Convention shall cease to have effect:

a)      in respect of taxes withheld at source, for amounts paid or credited after the expiration of the six-month period beginning on the date on which notice of termination was given; and

b)      in respect of other taxes, for taxable years beginning on or after the expiration of the six-month period beginning on the date on which notice of termination was given.

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto by their respective Governments, have signed this Convention.

DONE at _____ in duplicate, in the English and _____ languages, both texts being equally authentic, this __ day of _____, 20__.

FOR THE GOVERNMENT OF                    FOR THE GOVERNMENT OF
THE UNITED STATES OF AMERICA:            _____

69

**PROTOCOL TO THE CONVENTION BETWEEN**
**THE GOVERNMENT OF THE UNITED STATES OF AMERICA**
**AND**
**THE GOVERNMENT OF ----------**
**FOR THE AVOIDANCE OF DOUBLE TAXATION AND THE PREVENTION OF TAX**
**EVASION**
**WITH RESPECT TO TAXES ON INCOME**

On signing the Convention between the Government of the United States of America and the Government of _____ for the Avoidance of Double Taxation and the Prevention of Tax Evasion with respect to Taxes on Income (the "Convention"), the two Governments have agreed to the following provisions.

1.      With reference to subparagraph (k) of paragraph 1 of Article 3 (General Definitions) of the Convention:

a)      In the case of the United States, the term "pension fund" includes the following: a trust providing pension or retirement benefits under an Internal Revenue Code section 401(a) qualified pension plan (which includes a Code section 401(k) plan) and a profit sharing or stock bonus plan, a Code section 403(a) qualified annuity plan, a Code section 403(b) plan, a trust that is an individual retirement account under Code section 408, a Roth individual retirement account under Code section 408A, a simple retirement account under Code section 408(p), a trust providing pension or retirement benefits under a simplified employee pension plan under Code section 408(k), a trust described in section 457(g) providing pension or retirement benefits under a Code section 457(b) plan, and the Thrift Savings Fund (section 7701(j)).  A group trust described in Revenue Ruling 81-100, as amended by Revenue Ruling 2014-24 and Revenue Ruling 2011-1, qualifies as a pension fund only if it is operated exclusively or almost exclusively to earn income for the benefit of pension funds that are themselves entitled to benefits under the Convention as a resident of the United States.

b)      In the case of _____, the term "pension fund" includes the following:

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto by their respective Governments, have signed this Convention.

DONE at _____ in duplicate, in the English and _____ languages, both texts being equally authentic, this ___ day of _____, 20___.

FOR THE GOVERNMENT OF                    FOR THE GOVERNMENT OF
THE UNITED STATES OF AMERICA:            _____

70

# Exhibit 57

> **Uniform Laws Annotated**
>   Uniform Foreign Money-Judgments Recognition Act (1962) (Refs & Annos)

<div align="center">

Unif.Foreign Money-Judgments Recognition Act § 1

## § 1. [Definitions].

Currentness

</div>

As used in this Act:

(1) "foreign state" means any governmental unit other than the United States, or any state, district, commonwealth, territory, insular possession thereof, or the Panama Canal Zone, the Trust Territory of the Pacific Islands, or the Ryukyu Islands;

(2) "foreign judgment" means any judgment of a foreign state granting or denying recovery of a sum of money, other than a judgment for taxes, a fine or other penalty, or a judgment for support in matrimonial or family matters.

Notes of Decisions (17)

Copr. (C) Thomson Reuters 2021. All rights reserved. Official Text and Comments Reproduced with Permission of the National Conference of Commissioners on Uniform State Laws. Current through 2020 Annual Meeting of the National Conference of Commissioners on Uniform State Laws

Unif. Foreign Money-Judgments Recognition Act § 1, ULA F MONEY JMT § 1

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

# Exhibit 58

# UNIFORM FOREIGN-COUNTRY MONEY JUDGMENTS RECOGNITION ACT (2005) *

NATIONAL CONFERENCE OF COMMISSIONERS
ON UNIFORM STATE LAWS

MEETING IN ITS ONE-HUNDRED-AND-FOURTEENTH YEAR
PITTSBURGH, PENNSYLVANIA

JULY 22 - 29, 2005

# UNIFORM FOREIGN-COUNTRY MONEY JUDGMENTS RECOGNITION ACT (2005)

*WITHOUT PREFATORY NOTE OR COMMENTS*

Copyright © 2005
By
National Conference of Commissioners
on Uniform State Laws

---

\* The following text is subject to revision by the Committee on Style of the National Conference of Commissioners on Uniform State Laws.

# ABOUT NCCUSL

The **National Conference of Commissioners on Uniform State Laws** (NCCUSL), now in its 114th year, provides states with non-partisan, well-conceived and well-drafted legislation that brings clarity and stability to critical areas of state statutory law.

Conference members must be lawyers, qualified to practice law. They are practicing lawyers, judges, legislators and legislative staff and law professors, who have been appointed by state governments as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands to research, draft and promote enactment of uniform state laws in areas of state law where uniformity is desirable and practical.

- NCCUSL strengthens the federal system by providing rules and procedures that are consistent from state to state but that also reflect the diverse experience of the states.

- NCCUSL statutes are representative of state experience, because the organization is made up of representatives from each state, appointed by state government.

- NCCUSL keeps state law up-to-date by addressing important and timely legal issues.

- NCCUSL's efforts reduce the need for individuals and businesses to deal with different laws as they move and do business in different states.

- NCCUSL's work facilitates economic development and provides a legal platform for foreign entities to deal with U.S. citizens and businesses.

- NCCUSL Commissioners donate thousands of hours of their time and legal and drafting expertise every year as a public service, and receive no salary or compensation for their work.

- NCCUSL's deliberative and uniquely open drafting process draws on the expertise of commissioners, but also utilizes input from legal experts, and advisors and observers representing the views of other legal organizations or interests that will be subject to the proposed laws.

- NCCUSL is a state-supported organization that represents true value for the states, providing services that most states could not otherwise afford or duplicate.

# UNIFORM FOREIGN-COUNTRY MONEY JUDGMENTS RECOGNITION ACT (2005)

The Committee acting for the National Conference of Commissioners on Uniform State Laws in preparing the Uniform Foreign-Country Money Judgments Recognition Act (2005) is as follows:

ROBERT H. CORNELL, 573 Arkansas, San Francisco, CA 94107, *Chair*
K. KING BURNETT, P.O. Box 910, Salisbury, MD 21803-0910
JOHN P. BURTON, P.O. Box 1357, 315 Paseo de Peralta, Santa Fe, NM 87501
JOHN A. CHANIN, 5901 Mount Eagle Dr., Apt. 1115, Alexandria, VA 22303, *Enactment Plan Coordinator*
FRANK W. DAYKIN, 2180 Thomas Jefferson Dr., Reno, NV 89509
W. MICHAEL DUNN, P.O. Box 3701, 1000 Elm St., Manchester, NH 03105
HENRY DEEB GABRIEL, JR., Loyola University School of Law, 526 Pine St., New Orleans, LA 70118
CURTIS R. REITZ, University of Pennsylvania School of Law, 3400 Chestnut St., Philadelphia, PA 19104
H. KATHLEEN PATCHEL, Indiana University, School of Law, 530 W. New York St., Indianapolis, IN 46202-3225, *National Conference Reporter*

## EX OFFICIO

FRED H. MILLER, University of Oklahoma, College of Law, 300 Timberdell Rd., Room 3056, Norman, OK 73019, *President*
REX BLACKBURN, 1673 W. Shoreline Dr., Suite 200, P.O. Box 7808, Boise, ID 83707, *Division Chair*

## AMERICAN BAR ASSOCIATION ADVISOR

ELIZABETH M. BOHN, 777 Brickell Ave., Ste. 500, Miami, FL 33131-2803, *American Bar Association Advisor*

## EXECUTIVE DIRECTOR

WILLIAM H. HENNING, University of Alabama School of Law, Box 870382, Tuscaloosa, AL 35487-0382, *Executive Director*

Copies of this Act may be obtained from:

NATIONAL CONFERENCE OF COMMISSIONERS
ON UNIFORM STATE LAWS
211 E. Ontario Street, Suite 1300
Chicago, Illinois 60611
312/915-0195
www.nccusl.org

# UNIFORM FOREIGN-COUNTRY MONEY JUDGMENTS RECOGNITION ACT (2005)

## TABLE OF CONTENTS

SECTION 1.  SHORT TITLE ...................................................... 5

SECTION 2.  DEFINITIONS ..................................................... 5

SECTION 3.  APPLICATION ..................................................... 5

SECTION 4.  STANDARDS FOR RECOGNITION OF FOREIGN-COUNTRY
        JUDGMENT ........................................................ 6

SECTION 5.  PERSONAL JURISDICTION ........................................ 7

SECTION 6.  PROCEDURE FOR RECOGNITION OF FOREIGN-COUNTRY
        JUDGMENT ........................................................ 8

SECTION 7.  EFFECT OF RECOGNITION OF FOREIGN-COUNTRY JUDGMENT
        UNDER THIS [ACT] ................................................ 9

SECTION 8.  STAY OF PROCEEDINGS PENDING APPEAL OF FOREIGN-COUNTRY
        JUDGMENT ........................................................ 9

SECTION 9.  STATUTE OF LIMITATIONS ....................................... 9

SECTION 10.  SAVING CLAUSE ................................................ 10

SECTION 11.  UNIFORMITY OF INTERPRETATION ............................... 10

SECTION 12.  REPEAL ....................................................... 10

SECTION 13.  EFFECTIVE DATE .............................................. 10

**UNIFORM FOREIGN-COUNTRY MONEY JUDGMENTS RECOGNITION ACT (2005)**

    **SECTION 1.  SHORT TITLE.**  This [act] may be cited as the [Uniform Foreign-Country Money Judgments Recognition Act of 2005].

    **SECTION 2.  DEFINITIONS.**  In this [act]:

    (a)  "Foreign country" means a government other than

        (i)  the United States;

        (ii)  a state, district, commonwealth, territory or insular possession of the United States; or

        (iii)  any other government with regard to which the decision in this state as to whether to recognize the judgments of that government's courts is initially subject to determination under the Full Faith and Credit Clause of the United States Constitution.

    (b)  "Foreign-country judgment" means a judgment of a court of a foreign country.

    **SECTION 3.  APPLICATION.**

    (a)  Except as otherwise provided in subsection (b), this [act] applies to a foreign-country judgment to the extent that the foreign-country judgment

        (1)  grants or denies recovery of a sum of money; and

        (2)  under the law of the foreign country where rendered, is final, conclusive, and enforceable.

    (b)  This [act] does not apply to a foreign-country judgment, even if the foreign-country judgment grants or denies recovery of a sum of money, to the extent that the foreign-country judgment is

(1)  a judgment for taxes;

(2)  a fine or other penalty; or

(3)  a judgment for divorce, support, or maintenance, or other judgment rendered in connection with domestic relations.

(c)  The party seeking recognition of a foreign-country judgment has the burden of establishing that this [act] applies to the foreign-country judgment.

**SECTION 4.  STANDARDS FOR RECOGNITION OF FOREIGN-COUNTRY JUDGMENT.**

(a)  Except as otherwise provided in subsections (b) and (c), a court of this state shall recognize a foreign-country judgment to which this [act] applies.

(b)  A court of this state may not recognize a foreign-country judgment if:

(1)  the foreign-country judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with the requirements of due process of law;

(2)  the foreign court did not have personal jurisdiction over the defendant; or

(3)  the foreign court did not have jurisdiction over the subject matter.

(c)  A court of this state need not recognize a foreign-country judgment  if:

(1)  the defendant in the proceeding in the foreign court did not receive notice of the proceeding in sufficient time to enable the defendant to defend;

(2)  the foreign-country judgment was obtained by fraud that deprived the losing party of an adequate opportunity to present its case;

6

(3)  the foreign-country judgment or the [cause of action] [claim for relief] on which the foreign-country judgment is based is repugnant to the public policy of this state or of the United States;

(4)  the foreign-country judgment conflicts with another final and conclusive judgment;

(5)  the proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be determined otherwise than by proceedings in that foreign court;

(6)  in the case of jurisdiction based only on personal service, the foreign court was a seriously inconvenient forum for the trial of the action;

(7)  the foreign-country judgment was rendered in circumstances that raise substantial doubt about the integrity of the rendering court with respect to the foreign-country judgment; or

(8)  the specific proceeding in the foreign court leading to the foreign-country judgment was not compatible with the requirements of due process of law.

(d)  The party resisting recognition of the foreign-country judgment has the burden of establishing that one of the grounds for non-recognition stated in subsection (b) or (c) exists.

**SECTION 5.  PERSONAL JURISDICTION.**

(a)  A foreign-country judgment may not be refused recognition for lack of personal jurisdiction if:

(1)  the defendant was served with process personally in the foreign

7

country;

(2)  the defendant voluntarily appeared in the proceeding, other than for the purpose of protecting property seized or threatened with seizure in the proceeding or of contesting the jurisdiction of the court over the defendant;

(3)  the defendant, before the commencement of the proceeding, had agreed to submit to the jurisdiction of the foreign court with respect to the subject matter involved;

(4)  the defendant was domiciled in the foreign country when the proceeding was instituted or was a corporation or other form of business organization that had its principal place of business in, or was organized under the laws of, the foreign country;

(5)  the defendant had a business office in the foreign country and the proceeding in the foreign court involved a [cause of action] [claim for relief] arising out of business done by the defendant through that office in the foreign country; or

(6)  the defendant operated a motor vehicle or airplane in the foreign country and the proceeding involved a [cause of action] [claim for relief] arising out of that operation.

(b)  The list of bases for personal jurisdiction in subsection (a) is not exclusive, and the courts of this state may recognize other bases of personal jurisdiction as sufficient to support a foreign-country judgment.

**SECTION 6.  PROCEDURE FOR RECOGNITION OF FOREIGN-COUNTRY JUDGMENT.**

(a)  If recognition of a foreign-country judgment is sought as an original matter,

8

the issue of recognition shall be raised by filing an action seeking recognition of the foreign-country judgment.

(b)  If recognition of a foreign-country judgment is sought in a pending action, the issue of recognition may be raised by counterclaim, cross-claim or affirmative defense.

**SECTION 7.  EFFECT OF RECOGNITION OF FOREIGN-COUNTRY JUDGMENT UNDER THIS [ACT].**  If the court in a proceeding under Section 6 finds that the foreign-country judgment is entitled to recognition under this [act] then, to the extent that the foreign-country judgment grants or denies recovery of a sum of money, the foreign-country judgment is:

(a)  conclusive between the parties to the same extent as the judgment of a sister state entitled to full faith and credit in this state would be conclusive; and

(b)  enforceable in the same manner and to the same extent as a judgment rendered in this state.

**SECTION 8.  STAY OF PROCEEDINGS PENDING APPEAL OF FOREIGN-COUNTRY JUDGMENT.**  If a party establishes that an appeal from a foreign-country judgment is pending or will be taken, the court may stay any proceedings with regard to the foreign-country judgment until the appeal is concluded, the time for appeal expires, or the party appealing has had sufficient time to prosecute the appeal and has failed to do so.

**SECTION 9.  STATUTE OF LIMITATIONS.**  An action to recognize a foreign-country judgment must be commenced within the earlier of the time during which the foreign-country judgment is effective in the foreign country or 15 years from the date that the foreign-country judgment became effective in the foreign country.

9

**SECTION 10.  SAVING CLAUSE.**  This [act] does not prevent the recognition under principles of comity or otherwise of a foreign-country judgment not within the scope of this [act].

**SECTION 11.  UNIFORMITY OF INTERPRETATION.**  In applying and construing this uniform act, consideration must be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it.

**SECTION 12.  REPEAL.**  The following [acts] are repealed:

(a)  Uniform Foreign Money-Judgments Recognition Act of 1962;

(b)                                              .

**SECTION 13.  EFFECTIVE DATE.**

(a)  This [act] takes effect … .

(b)  This [act] applies to all actions commenced on or after the effective date of this [act] in which the issue of recognition of a foreign-country judgment is raised.

10

# Exhibit 59

# DOUBLE TAXATION

**Convention Between the**

**UNITED STATES OF AMERICA**

**and BELGIUM**

Signed at Brussels November 27, 2006

with

Protocol



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
 evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

# BELGIUM

## Double Taxation

*Convention signed at Brussels November 27, 2006;*
*Transmitted by the President of the United States of America*
    *to the Senate June 21, 2007 (Treaty Doc. 110-3,*
    *110th Congress, 1st Session);*
*Reported favorably by the Senate Committee on Foreign Relations*
    *October 31, 2007 (Senate Executive Report No. 110-2,*
    *110th Congress, 1st Session);*
*Advice and consent to ratification by the Senate*
    *December 14, 2007;*
*Ratified by the President December 21, 2007;*
*Entered into force December 28, 2007.*
*With protocol.*

**CONVENTION BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND THE GOVERNMENT OF THE KINGDOM OF BELGIUM
FOR THE AVOIDANCE OF DOUBLE TAXATION AND THE
PREVENTION OF FISCAL EVASION
WITH RESPECT TO TAXES ON INCOME**

The Government of the United States of America and the Government of the Kingdom

of Belgium, desiring to conclude a Convention for the avoidance of double taxation and the

prevention of fiscal evasion with respect to taxes on income, have agreed as follows:

2

## Article 1

## GENERAL SCOPE

1.    This Convention shall apply only to persons who are residents of one or both of the Contracting States, except as otherwise provided in the Convention.

2.    Except as provided in subparagraph a) of paragraph 4 of Article 22 (Relief from Double Taxation), the Convention shall not restrict in any manner any benefit now or hereafter accorded:

      a)    by the laws of either Contracting State; or

      b)    by any other agreement to which the Contracting States are party.

3.    a)    Notwithstanding the provisions of sub-paragraph b) of paragraph 2 of this Article:

      i)  for purposes of paragraph 3 of Article XXII (Consultation) of the General Agreement on Trade in Services, the Contracting States agree that any question arising as to the interpretation or application of this Convention and, in particular, whether a taxation measure is within the scope of this Convention, shall be determined exclusively in accordance with the provisions of Article 24 (Mutual Agreement Procedure) of this Convention; and

      ii)  the provisions of Article XVII of the General Agreement on Trade in Services shall not apply to a taxation measure unless the competent authorities agree that the measure is not within the scope of Article 23 (Non-Discrimination) of this Convention.

      b)    For the purposes of this paragraph, a "measure" is a law, regulation, rule, procedure, decision, administrative action, or any similar provision or action.

4.    Except to the extent provided in paragraph 5, this Convention shall not affect the taxation by a Contracting State of its residents (as determined under Article 4 (Resident)) and its citizens.  Notwithstanding the other provisions of this Convention, a former citizen or former long-term resident of a Contracting State may, for the period of ten years following the loss of such status, be taxed in accordance with the laws of that Contracting State.

5.    The provisions of paragraph 4 shall not affect:

3

a)     the benefits conferred by a Contracting State under paragraph 2 of Article 9 (Associated Enterprises), paragraphs 1 b), 2, 5, 6 and 9 of Article 17 (Pensions, Social Security, Annuities, Alimony, and Child Support), and Articles 22 (Relief from Double Taxation), 23 (Non-Discrimination), and 24 (Mutual Agreement Procedure); and

b)     the benefits conferred by a Contracting State under paragraph 7 of Article 17 (Pensions, Social Security, Annuities, Alimony, and Child Support), Articles 18 (Government Service), 19 (Students, Trainees, Teachers and Researchers), and 27 (Members of Diplomatic Missions and Consular Posts), upon individuals who are neither citizens of, nor have been admitted for permanent residence in, that State.

6.     An item of income, profit or gain derived through an entity that is fiscally transparent under the laws of either Contracting State shall be considered to be derived by a resident of a State to the extent that the item is treated for purposes of the taxation law of such Contracting State as the income, profit or gain of a resident.

## Article 2

## TAXES COVERED

1.     This Convention shall apply to taxes on income imposed on behalf of a Contracting State irrespective of the manner in which they are levied.

2.     There shall be regarded as taxes on income all taxes imposed on total income, or on elements of income, including taxes on gains from the alienation of property.

3.     The existing taxes to which this Convention shall apply are:

a)     in the case of Belgium:

i)     the individual income tax;

ii)     the corporate income tax;

iii)     the income tax on legal entities; and

iv)     the income tax on non-residents;

including the prepayments and the surcharges on these taxes and prepayments;

b)     in the case of the United States:

4

      i)     the Federal income taxes imposed by the Internal Revenue Code (but excluding social security taxes); and

      ii)    the Federal excise taxes imposed with respect to private foundations.

4.     The Convention shall apply also to any identical or substantially similar taxes that are imposed after the date of signature of the Convention in addition to, or in place of, the existing taxes. The competent authorities of the Contracting States shall notify each other of any changes that have been made in their respective taxation or other laws that significantly affect their obligations under this Convention.

## Article 3

## GENERAL DEFINITIONS

1. For the purposes of this Convention, unless the context otherwise requires:

    a)    the term "person" includes an individual, an estate, a trust, a partnership, a company, and any other body of persons;

    b)    the term "company" means any body corporate or any entity that is treated as a body corporate for tax purposes according to the laws of the state in which it is organized;

    c)    the terms "enterprise of a Contracting State" and "enterprise of the other Contracting State" mean respectively an enterprise carried on by a resident of a Contracting State, and an enterprise carried on by a resident of the other Contracting State; the terms also include an enterprise carried on by a resident of a Contracting State through an entity that is treated as fiscally transparent in that Contracting State;

    d)    the term "enterprise" applies to the carrying on of any business;

    e)    the term "business" includes the performance of professional services and of other activities of an independent character;

    f)    the term "international traffic" means any transport by a ship or aircraft, except when such transport is solely between places in a Contracting State;

    g)    the term "competent authority" means:

      i)     in Belgium: the Minister of Finance or his authorized representative; and

5

  ii)  in the United States:  the Secretary of the Treasury or his delegate;

h)  the term "Belgium" means the Kingdom of Belgium; when used in a
geographical sense, such term means the territory of Belgium and includes the territorial
sea and the seabed and subsoil and the superjacent waters of the adjacent submarine
areas beyond the territorial sea over which Belgium exercises sovereign rights in
accordance with international law;

i)  the term "United States" means the United States of America, and includes the
states thereof and the District of Columbia; such term also includes the territorial sea
thereof and the sea bed and subsoil of the submarine areas adjacent to that territorial sea,
over which the United States exercises sovereign rights in accordance with international
law; the term, however, does not include Puerto Rico, the Virgin Islands, Guam or any
other United States possession or territory;

j)  the term "national" of a Contracting State means:

  i)  any individual possessing the nationality or citizenship of that State; and

  ii)  any legal person, partnership or association deriving its status as such
  from the laws in force in that State;

k)  the term "pension fund" means any person established in a Contracting State that
is:

  i)  operated principally:

    A)  to administer or provide pension or retirement
    benefits; or

    B)  to earn income for the benefit of one or more arrangements
    described in A); and

  ii)  is either:

    A)  in the case of Belgium, an entity organized under Belgian law and
    regulated by the Bank Finance and Insurance Commission; or

    B)  in the case of the United States, exempt from tax in the United
    States with respect to the activities described in clause i) of this
    subparagraph.

6

2.      As regards the application of the Convention at any time by a Contracting State, any term not defined therein shall, unless the context otherwise requires, or the competent authorities agree to a common meaning pursuant to the provisions of Article 24 (Mutual Agreement Procedure), have the meaning which it has at that time under the law of that State for the purposes of the taxes to which the Convention applies, any meaning under the applicable tax laws of that State prevailing over a meaning given to the term under other laws of that State.

**Article 4**

**RESIDENT**

1.      For the purposes of this Convention, the term "resident of a Contracting State" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, citizenship, place of management, place of incorporation, or any other criterion of a similar nature, and also includes that State and any political subdivision or local authority thereof.  This term, however, does not include any person who is liable to tax in that State in respect only of income from sources in that State or of profits attributable to a permanent establishment in that State.

2.      An individual who is a United States citizen or an alien admitted to the United States for permanent residence (a "green card" holder) is a resident of the United States only if the individual has a substantial presence, permanent home or habitual abode in the United States and if that individual is not a resident of a State other than Belgium for the purposes of a double taxation convention between that State and Belgium.

3.      The term "resident of a Contracting State" includes:

        a)      a pension fund established in that State; and

        b)      an organization that is established and maintained in that State exclusively for

        religious, charitable, scientific, artistic, cultural, or educational purposes,

notwithstanding that all or part of its income or gains may be exempt from tax under the

domestic law of that State.

4.      Where, by reason of the provisions of paragraph 1, an individual is a resident of both

Contracting States, then his status shall be determined as follows:

7

a)    he shall be deemed to be a resident only of the State in which he has a permanent

home available to him; if he has a permanent home available to him in both States, he

shall be deemed to be a resident only of the State with which his personal and economic

relations are closer (center of vital interests);

b)    if the State in which he has his center of vital interests cannot be determined, or

if he does not have a permanent home available to him in either State, he shall be

deemed to be a resident only of the State in which he has an habitual abode;

c)    if he has an habitual abode in both States or in neither of them, he shall be

deemed to be a resident only of the State of which he is a national;

d)    if he is a national of both States or of neither of them, the competent authorities

of the Contracting States shall endeavor to settle the question by mutual agreement.

5.    Where by reason of the provisions of paragraph 1 a person other than an individual is a

resident of both Contracting States, the competent authorities of the Contracting States shall by

mutual agreement procedure endeavor to settle the question. If the competent authorities do not

reach such an agreement, that person shall not be entitled to claim any benefit provided by the

Convention, except those provided by paragraph 1 of Article 22 (Relief from Double Taxation),

by paragraph 1 of Article 23 (Non-Discrimination) and by Article 24 (Mutual Agreement

Procedure).

**Article 5**

**PERMANENT ESTABLISHMENT**

1.    For the purposes of this Convention, the term "permanent establishment" means a fixed

place of business through which the business of an enterprise is wholly or partly carried on.

2.    The term "permanent establishment" includes especially:

a)    a place of management;

b)    a branch;

c)    an office;

d)    a factory;

e)    a workshop; and

8

f)    a mine, an oil or gas well, a quarry, or any other place of extraction of natural resources.

3.    a)    A building site or construction or installation project constitutes a permanent establishment only if it lasts for more than twelve months.

b)    An installation used for the exploration for natural resources constitutes a permanent establishment in a Contracting State only if it lasts or the activity continues in that State for more than twelve months.

4.    Notwithstanding the preceding provisions of this Article, the term "permanent establishment" shall be deemed not to include:

a)    the use of facilities solely for the purpose of storage, display or delivery of goods or merchandise belonging to the enterprise;

b)    the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of storage, display or delivery;

c)    the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of processing by another enterprise;

d)    the maintenance of a fixed place of business solely for the purpose of purchasing goods or merchandise, or of collecting information, for the enterprise;

e)    the maintenance of a fixed place of business solely for the purpose of carrying on, for the enterprise, any other activity of a preparatory or auxiliary character;

f)    the maintenance of a fixed place of business solely for any combination of the activities mentioned in subparagraphs a) through e), provided that the overall activity of the fixed place of business resulting from this combination is of a preparatory or auxiliary character.

5.    Notwithstanding the provisions of paragraphs 1 and 2, where a person -- other than an agent of an independent status to whom paragraph 6 applies -- is acting on behalf of an enterprise and has and habitually exercises in a Contracting State an authority to conclude contracts that are binding on the enterprise, that enterprise shall be deemed to have a permanent establishment in that State in respect of any activities that the person undertakes for the enterprise, unless the activities of such person are limited to those mentioned in paragraph 4

9

that, if exercised through a fixed place of business, would not make this fixed place of business a permanent establishment under the provisions of that paragraph.

6.      An enterprise shall not be deemed to have a permanent establishment in a Contracting State merely because it carries on business in that State through a broker, general commission agent, or any other agent of an independent status, provided that such persons are acting in the ordinary course of their business as independent agents.

7.      The fact that a company that is a resident of a Contracting State controls or is controlled by a company that is a resident of the other Contracting State, or that carries on business in that other State (whether through a permanent establishment or otherwise), shall not be taken into account in determining whether either company has a permanent establishment in that other State.

**Article 6**

**INCOME FROM REAL PROPERTY**

1.      Income derived by a resident of a Contracting State from real property, including income from agriculture or forestry, situated in the other Contracting State may be taxed in that other State.

2.      The term "real property" shall have the meaning which it has under the law of the Contracting State in which the property in question is situated.  The term shall in any case include property accessory to real property (including livestock and equipment used in agriculture and forestry), rights to which the provisions of general law respecting landed property apply, usufruct of real property and rights to variable or fixed payments as consideration for the working of, or the right to work, mineral deposits, sources and other natural resources.  Ships and aircraft shall not be regarded as real property.

3.      The provisions of paragraph 1 shall apply to income derived from the direct use, letting, or use in any other form of real property.

4.      The provisions of paragraphs 1 and 3 shall also apply to the income from real property of an enterprise.

10

5.    A resident of a Contracting State who is liable to tax in the other Contracting State on income from real property situated in the other Contracting State may elect for any taxable year to compute the tax on such income on a net basis as if such income were business profits attributable to a permanent establishment in such other State.  Any such election shall be binding for the taxable year of the election and all subsequent taxable years unless the competent authority of the Contracting State in which the property is situated agrees to terminate the election.

**Article 7**

**BUSINESS PROFITS**

1.    The profits of an enterprise of a Contracting State shall be taxable only in that State unless the enterprise carries on business in the other Contracting State through a permanent establishment situated therein.  If the enterprise carries on business as aforesaid, the profits of the enterprise may be taxed in the other State but only so much of them as are attributable to that permanent establishment.

2.    Subject to the provisions of paragraph 3, where an enterprise of a Contracting State carries on business in the other Contracting State through a permanent establishment situated therein, there shall in each Contracting State be attributed to that permanent establishment the profits that it might be expected to make if it were a distinct and independent enterprise engaged in the same or similar activities under the same or similar conditions.

3.    In determining the profits of a permanent establishment, there shall be allowed as deductions expenses that are incurred for the purposes of the permanent establishment, including executive and general administrative expenses so incurred, whether in the State in which the permanent establishment is situated or elsewhere.

4.    No profits shall be attributed to a permanent establishment by reason of the mere purchase by that permanent establishment of goods or merchandise for the enterprise.

5.    For the purposes of the preceding paragraphs, the profits to be attributed to the permanent establishment shall be determined by the same method year by year unless there is good and sufficient reason to the contrary.

11

6.    Where profits include items of income that are dealt with separately in other Articles of the Convention, then the provisions of those Articles shall not be affected by the provisions of this Article.

7.    In applying this Article, paragraph 8 of Article 10 (Dividends), paragraph 4 of Article 11 (Interest), paragraph 3 of Article 12 (Royalties), paragraph 3 of Article 13 (Gains) and paragraph 2 of Article 20 (Other Income), any income or gain attributable to a permanent establishment during its existence is taxable in the Contracting State where such permanent establishment is situated even if the payments are deferred until such permanent establishment has ceased to exist.

**Article 8**

**SHIPPING AND AIR TRANSPORT**

1.    Profits of an enterprise of a Contracting State from the operation of ships or aircraft in international traffic shall be taxable only in that State.

2.    For purposes of this Article, profits from the operation of ships or aircraft include, but are not limited to:

    a)    profits from the rental of ships or aircraft on a full (time or voyage) basis;

    b)    profits from the rental on a bareboat basis of ships or aircraft if the rental income is incidental to profits from the operation of ships or aircraft in international traffic; and

    c)    profits from the rental on a bareboat basis of ships or aircraft if such ships or aircraft are operated in international traffic by the lessee.

Profits derived by an enterprise from the inland transport of property or passengers within either Contracting State shall be treated as profits from the operation of ships or aircraft in international traffic if such transport is undertaken as part of international traffic.

3.    Profits of an enterprise of a Contracting State from the use, maintenance, or rental of containers (including trailers, barges, and related equipment for the transport of containers) shall be taxable only in that Contracting State, except to the extent that those containers or trailers and related equipment are used for transport solely between places within the other Contracting State.

12

4.      The provisions of paragraphs 1 and 3 shall also apply to profits from participation in a
pool, a joint business, or an international operating agency.


**Article 9**

**ASSOCIATED ENTERPRISES**

1.      Where:

        a)      an enterprise of a Contracting State participates directly or indirectly in the

        management, control or capital of an enterprise of the other Contracting State; or

        b)      the same persons participate directly or indirectly in the management, control, or

        capital of an enterprise of a Contracting State and an enterprise of the other Contracting

        State,

and in either case conditions are made or imposed between the two enterprises in their

commercial or financial relations that differ from those that would be made between

independent enterprises, then, any profits that, but for those conditions, would have accrued to

one of the enterprises, but by reason of those conditions have not so accrued, may be included

in the profits of that enterprise and taxed accordingly.

2.      Where a Contracting State includes in the profits of an enterprise of that State, and taxes

accordingly, profits on which an enterprise of the other Contracting State has been charged to

tax in that other State, and the other Contracting State agrees that the profits so included are

profits that would have accrued to the enterprise of the first-mentioned State if the conditions

made between the two enterprises had been those that would have been made between

independent enterprises, then that other State shall make an appropriate adjustment to the

amount of the tax charged therein on those profits.  In determining such adjustment, due regard

shall be had to the other provisions of this Convention and the competent authorities of the

Contracting States shall if necessary consult each other.

13

**Article 10**

**DIVIDENDS**

1.    Dividends paid by a company that is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2.    However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State, but if the dividends are beneficially owned by a resident of the other Contracting State, except as otherwise provided, the tax so charged shall not exceed:

    a)    5 percent of the gross amount of the dividends if the beneficial owner is a company that owns directly at least 10 percent of the voting stock of the company paying the dividends;

    b)    15 percent of the gross amount of the dividends in all other cases.

3.    Notwithstanding the provisions of paragraph 2, where the company paying the dividends is a resident of the United States, such dividends shall not be taxed in the United States if the beneficial owner is:

    a)    a company that is a resident of Belgium that has owned directly or indirectly shares representing 80 percent or more of the voting power in the company paying the dividends for a 12-month period ending on the date on which entitlement to the dividend is determined and:

        i)    satisfies the conditions of clause i) or ii) of subparagraph c) of paragraph 2 of Article 21 (Limitation on Benefits);

        ii)    satisfies the conditions of clauses i) and ii) of subparagraph e) of paragraph 2 of Article 21, provided that the company satisfies the conditions described in paragraph 4 of that Article with respect to the dividends;

        iii)    is entitled to benefits with respect to the dividends under paragraph 3 of Article 21; or

        iv)    has received a determination pursuant to paragraph 7 of Article 21 with respect to this paragraph; or

14

b) a pension fund that is a resident of Belgium, provided that such dividends are not derived from the carrying on of a business by the pension fund or through an associated enterprise.

4. Notwithstanding the provisions of paragraph 2, where the company paying the dividends is a resident of Belgium, such dividends shall not be taxed in Belgium if the beneficial owner of the dividends is:

a) a company that is a resident of the United States that has owned directly shares representing at least 10 percent of the capital of the company paying the dividends for a 12-month period ending on the date the dividend is declared; or

b) a pension fund that is a resident of the United States, provided that such dividends are not derived from the carrying on of a business by the pension fund or through an associated enterprise.

5. Paragraphs 2, 3 and 4 shall not affect the taxation of the company in respect of the profits out of which the dividends are paid.

6. a) Subparagraph a) of paragraph 2 and subparagraph a) of paragraph 3 shall not apply in the case of dividends paid by a U.S. Regulated Investment Company (RIC) or a U.S. Real Estate Investment Trust (REIT). In the case of dividends paid by a RIC, subparagraph b) of paragraph 2 and subparagraph b) of paragraph 3 shall apply. In the case of dividends paid by a REIT, subparagraph b) of paragraph 2 and subparagraph b) of paragraph 3 shall apply only if:

i) the beneficial owner of the dividends is an individual or a pension fund, in either case holding an interest of not more than 10 percent in the REIT;

ii) the dividends are paid with respect to a class of stock that is publicly traded and the beneficial owner of the dividends is a person holding an interest of not more than 5 percent of any class of the REIT's stock; or

iii) the beneficial owner of the dividends is a person holding an interest of not more than 10 percent in the REIT and the REIT is diversified.

15

b)     For purposes of this paragraph, a REIT shall be "diversified" if the value of no single interest in real property exceeds 10 percent of its total interests in real property. For the purposes of this rule, foreclosure property shall not be considered an interest in real property.  Where a REIT holds an interest in a partnership, it shall be treated as owning directly a proportion of the partnership's interests in real property corresponding to its interest in the partnership.

7.     For purposes of this Article, the term "dividends" means income from shares or other rights, not being debt-claims, participating in profits, as well as income that is subjected to the same taxation treatment as income from shares under the laws of the State of which the payer is a resident.

8.     The provisions of paragraphs 1 through 6 shall not apply if the beneficial owner of the dividends, being a resident of a Contracting State, carries on business in the other Contracting State, of which the payer is a resident, through a permanent establishment situated therein, and the holding in respect of which the dividends are paid is effectively connected with such permanent establishment.  In such case the provisions of Article 7 (Business Profits) shall apply.

9.     A Contracting State may not impose any tax on dividends paid by a resident of the other State, except insofar as the dividends are paid to a resident of the first-mentioned State or the dividends are attributable to a permanent establishment situated in the first-mentioned State, nor may it impose tax on a corporation's undistributed profits, except as provided in paragraph 10, even if the dividends paid or the undistributed profits consist wholly or partly of profits or income arising in that State.

10.    a)     A company that is a resident of one of the States and that has a permanent establishment in the other State or that is subject to tax in the other State on a net basis on its income that may be taxed in the other State under Article 6 (Income from Real Property) or under paragraph 1 of Article 13 (Gains) may be subject in that other State to a tax in addition to the tax allowable under the other provisions of this Convention.

b)     Such tax, however, may be imposed on only the portion of the business profits of the company attributable to the permanent establishment and the portion of the

16

income referred to in the preceding sentence that is subject to tax under Article 6 or under paragraph 1 of Article 13 that, in the case of the United States, represent the dividend equivalent amount of such profits or income and, in the case of Belgium, is an amount that is analogous to the dividend equivalent amount.

11.    The tax referred to in subparagraphs a) and b) of paragraph 10 shall not be imposed at a rate exceeding the rate specified in subparagraph a) of paragraph 2.  In any case, it shall not be imposed on a company that:

a)      satisfies the conditions of clause i) or ii) of subparagraph c) of paragraph 2 of Article 21 (Limitation on Benefits);

b)      satisfies the conditions of clauses i) and ii) of subparagraph e) of paragraph 2 of Article 21, provided that the company satisfies the conditions described in paragraph 4 of that Article with respect to an item of income, profit, or gain described in paragraph 10;

c)      is entitled under paragraph 3 of Article 21 to benefits with respect to an item of income, profit, or gain described in paragraph 10; or

d)      has received a determination pursuant to paragraph 7 of Article 21 with respect to this paragraph.

12.    a)      Notwithstanding Article 29 (Termination):

i)      paragraph 3 of this Article shall terminate on, and shall cease to be effective for amounts paid or credited on or after, January 1 of the 6th year following the year in which the Convention enters into force, unless, by June 30 of the 5th year following entry into force, the United States Secretary of the Treasury, on the basis of a report of the Commissioner of Internal Revenue, certifies to the Senate of the United States that Belgium has satisfactorily complied with its obligations under Article 25 (Exchange of Information and Administrative Assistance); and

ii)      the United States may terminate paragraph 3 of this Article by giving written notice of termination to Belgium, through the diplomatic channel, on or before June 30 in any year.  In such case, paragraph 3 hereof shall cease to be

17

effective for amounts paid or credited on or after January 1 of the year next following that in which such notice is given. The United States will not give such notice of termination unless it has determined that Belgium's actions with respect to Articles 24 (Mutual Agreement Procedure) and 25 have materially altered the balance of benefits of the Convention.

b)    The competent authorities shall consult at least annually regarding any issues that arise with respect to the functioning of Articles 24 and 25 that otherwise might trigger a termination under subparagraph a).

## Article 11

### INTEREST

1.    Interest arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in that other State.

2.    Notwithstanding the provisions of paragraph 1:

a)    interest arising in the United States that is contingent interest of a type that does not qualify as portfolio interest under United States law may be taxed by the United States but, if the beneficial owner of the interest is a resident of Belgium, the interest may be taxed at a rate not exceeding 15 percent of the gross amount of the interest;

b)    interest arising in Belgium that is determined with reference to receipts, sales, income, profits or other cash flow of the debtor or a related person, to any change in the value of any property of the debtor or a related person or to any dividend, partnership distribution or similar payment made by the debtor to a related person may be taxed in Belgium, and according to the laws of Belgium, but if the beneficial owner is a resident of the United States, the interest may be taxed at a rate not exceeding 15 percent of the gross amount of the interest; and

c)    interest that is an excess inclusion with respect to a residual interest in a real estate mortgage investment conduit may be taxed by each State in accordance with its domestic law.

18

3.      The term "interest" as used in this Article means income from debt-claims of every kind, whether or not secured by mortgage, and whether or not carrying a right to participate in the debtor's profits, and in particular, income from government securities and income from bonds or debentures, including premiums or prizes attaching to such securities, bonds or debentures, and all other income that is subjected to the same taxation treatment as income from money lent by the taxation law of the Contracting State in which the income arises. Income dealt with in Article 10 (Dividends) and penalty charges for late payment shall not be regarded as interest for the purposes of this Convention.

4.      The provisions of paragraph 1 shall not apply if the beneficial owner of the interest, being a resident of a Contracting State, carries on business in the other Contracting State, in which the interest arises, through a permanent establishment situated therein, and the debt-claim in respect of which the interest is paid is effectively connected with such permanent establishment.  In such case the provisions of Article 7 (Business Profits) shall apply.

5.      Interest shall be deemed to arise in a Contracting State when the payer is a resident of that State.  Where, however, the person paying the interest, whether he is a resident of a Contracting State or not, has in a Contracting State a permanent establishment in connection with which the indebtedness on which the interest is paid was incurred, and such interest is borne by such permanent establishment, then such interest shall be deemed to arise in the State in which the permanent establishment is situated.

6.      Where, by reason of a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the interest, having regard to the debt-claim for which it is paid, exceeds the amount which would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount.  In such case the excess part of the payments shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of this Convention.

19

**Article 12**

**ROYALTIES**

1.      Royalties arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in that other State.

2.      The term "royalties" as used in this Article means payments of any kind received as a consideration for the use of, or the right to use, any copyright of literary, artistic, or scientific work (including cinematographic films and software), any patent, trade mark, design or model, plan, secret formula or process, or for information concerning industrial, commercial or scientific experience.

3.      The provisions of paragraph 1 shall not apply if the beneficial owner of the royalties, being a resident of a Contracting State, carries on business in the other Contracting State through a permanent establishment situated therein and the right or property in respect of which the royalties are paid is effectively connected with such permanent establishment.  In such case the provisions of Article 7 (Business Profits) shall apply.

4.      Where, by reason of a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the royalties, having regard to the use, right, or information for which they are paid, exceeds the amount which would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount.  In such case the excess part of the payments shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of this Convention.

**Article 13**

**GAINS**

1.      Gains derived by a resident of a Contracting State that are attributable to the alienation of real property situated in the other Contracting State may be taxed in that other State.

2.      For the purposes of this Article the term "real property situated in the other Contracting State" shall include:

    a)      real property referred to in Article 6 (Income from Real Property); and

20

b)    where that other State is the United States, a United States real property interest.

3.    Gains from the alienation of movable property forming part of the business property of a permanent establishment that an enterprise of a Contracting State has in the other Contracting State, including such gains from the alienation of such a permanent establishment (alone or with the whole enterprise), may be taxed in that other State.

4.    Gains derived by an enterprise of a Contracting State from the alienation of ships or aircraft operated in international traffic or personal property pertaining to the operation of such ships or aircraft shall be taxable only in that State.

5.    Gains derived by an enterprise of a Contracting State from the alienation of containers (including trailers and related equipment for the transport of containers) used for the transport of goods or merchandise shall be taxable only in that State, unless those containers or trailers and related equipment are used for transport solely between places within the other Contracting State.

6.    Gains from the alienation of any property other than property referred to in paragraphs 1 through 5 shall be taxable only in the Contracting State of which the alienator is a resident.

**Article 14**

**INCOME FROM EMPLOYMENT**

1.    Subject to the provisions of Articles 15 (Directors' Fees), 17 (Pensions, Social Security, Annuities, Alimony, and Child Support), 18 (Government Service) and 19 (Students, Trainees, Teachers and Researchers), salaries, wages, and other similar remuneration derived by a resident of a Contracting State in respect of an employment shall be taxable only in that State unless the employment is exercised in the other Contracting State. If the employment is so exercised, such remuneration as is derived therefrom may be taxed in that other State.

2.    Notwithstanding the provisions of paragraph 1, remuneration derived by a resident of a Contracting State in respect of an employment exercised in the other Contracting State shall be taxable only in the first-mentioned State if:

21

a)     the recipient is present in the other State for a period or periods not exceeding in the aggregate 183 days in any twelve month period commencing or ending in the taxable year concerned; and

b)     the remuneration is paid by, or on behalf of, an employer who is not a resident of the other State; and

c)     the remuneration is not borne by a permanent establishment which the employer has in the other State.

3.     Notwithstanding the preceding provisions of this Article, remuneration described in paragraph 1 that is derived by a resident of a Contracting State in respect of an employment as a member of the regular complement of a ship or aircraft operated in international traffic shall be taxable only in that State.

**Article 15**

**DIRECTORS' FEES**

Directors' fees and other compensation derived by a resident of a Contracting State for services rendered in the other Contracting State in his capacity as a member of the board of directors of a company that is a resident of the other Contracting State may be taxed in that other Contracting State.

**Article 16**

**ENTERTAINERS AND SPORTSMEN**

1.     Income derived by a resident of a Contracting State as an entertainer, such as a theater, motion picture, radio, or television artiste, or a musician, or as a sportsman, from his personal activities as such exercised in the other Contracting State, which income would be exempt from tax in that other Contracting State under the provisions of Articles 7 (Business Profits) and 14 (Income from Employment) may be taxed in that other State, except where the amount of the gross receipts derived by such entertainer or sportsman, including expenses reimbursed to him or borne on his behalf, from such activities does not exceed twenty thousand United States dollars ($20,000) or its equivalent in euro for the taxable year of the payment.

22

2.      Where income in respect of personal activities exercised by an entertainer or a sportsman in his capacity as such accrues not to the entertainer or sportsman himself but to another person, that income may, notwithstanding the provisions of Articles 7 and 14, be taxed in the Contracting State in which the activities of the entertainer or sportsman are exercised, but only in cases in which the contract pursuant to which the personal activities are performed

      a)      designates (by name or description) the entertainer or sportsman; or

      b)      allows the other party to the contract (or some third person other than the entertainer, sportsman or the first-mentioned other person) to designate the individual who is to perform the personal activities.

### Article 17

### PENSIONS, SOCIAL SECURITY, ANNUITIES,

### ALIMONY, AND CHILD SUPPORT

1.      Subject to paragraph 2 of Article 18 (Government Service),

      a)      pensions and other similar remuneration beneficially owned by a resident of a Contracting State shall be taxable only in that State;

      b)      notwithstanding subparagraph a), the amount of any such pension or remuneration arising in a Contracting State that, when received, would be exempt from taxation in that State if the beneficial owner were a resident thereof shall be exempt from taxation in the Contracting State of which the beneficial owner is a resident.

2.      Notwithstanding the provisions of paragraph 1, payments made by a Contracting State under provisions of the social security or similar legislation of that State to a resident of the other Contracting State or to a citizen of the United States shall be taxable only in the first-mentioned State.

3.      Annuities derived and beneficially owned by an individual resident of a Contracting State shall be taxable only in that State. The term "annuities" as used in this paragraph means a stated sum paid periodically at stated times during a specified number of years, or for life, under an obligation to make the payments in return for adequate and full consideration (other than services rendered).

23

4.      Alimony paid by a resident of a Contracting State to a resident of the other Contracting State shall be taxable only in that other State.  The term "alimony" as used in this paragraph means periodic payments made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support, which payments are taxable to the recipient under the laws of the State of which he is a resident.

5.      Periodic payments, not dealt with in paragraph 4, for the support of a child made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support, paid by a resident of a Contracting State to a resident of the other Contracting State, shall be taxable only in the first-mentioned State.

6.      Income earned by a pension fund that is a resident of a Contracting State may be taxed as income of an individual who is a resident of the other Contracting State only when, and, subject to the provisions of paragraph 1 of this Article, to the extent that, it is paid to, or for the benefit of, that individual from the pension fund (and not transferred to another pension fund that is a resident of the first-mentioned Contracting State).

7.      Where an individual who is a member or beneficiary of, or participant in, a pension fund that is a resident of one of the Contracting States (or in a similar fund that is a resident of a comparable third State) exercises an employment or self-employment in the other Contracting State:

        a)      contributions paid by or on behalf of that individual under a pension plan during the period that he exercises an employment or self-employment in the other Contracting State shall be deductible (or excludible) in computing his taxable income in that other Contracting State; and

        b)      any benefits accrued under the pension plan, or contributions made under the pension plan by or on behalf of the individual's employer, during that period shall not be treated as part of the employee's taxable income and any such contributions shall be allowed as a deduction in computing the taxable income of his employer in that other Contracting State.

The relief available under this paragraph shall not exceed the relief that would be allowed by the other Contracting State to residents of that Contracting State for contributions to, or benefits

24

accrued under, a pension plan established in that Contracting State, in the case of the United

States, or recognized for tax purposes in that Contracting State, in the case of Belgium.

8.    The provisions of paragraph 7 of this Article shall not apply unless:

    a)    contributions by or on behalf of the individual, or by or on behalf of the

individual's employer, under the pension plan (or under another similar pension plan for

which the first-mentioned pension plan was substituted) were made before the

individual began to exercise an employment or self-employment in the other

Contracting State;

    b)    the individual has performed personal services in the other Contracting State for

a cumulative period not exceeding ten calendar years; and

    c)    the competent authority of the other Contracting State has agreed that the

pension plan generally corresponds to a pension plan recognized for tax purposes in that

other Contracting State.

9.    a)    Where a citizen of the United States who is a resident of Belgium exercises an

employment in Belgium the income from which is taxable in Belgium, the contribution

is borne by an employer who is a resident of Belgium or by a permanent establishment

situated in Belgium, and the individual is a member or beneficiary of, or participant in, a

pension fund that is a resident of Belgium (or in a similar fund that is a resident of a

comparable third State),

        i)    contributions paid by or on behalf of that individual under a pension plan

during the period that he exercises the employment in Belgium, and that are

attributable to the employment, shall be deductible (or excludible) in computing

his taxable income in the United States; and

        ii)    any benefits accrued under the pension plan, or contributions made under

the pension plan by or on behalf of the individual's employer, during that period,

and that are attributable to the employment, shall not be treated as part of the

employee's taxable income in computing his taxable income in the United

States.

    b)    The relief available under this paragraph shall not exceed the lesser of:

25

        i)      the relief that would be allowed by the United States to its residents for contributions to, or benefits accrued under, a generally corresponding pension plan recognized for tax purposes in the United States; and

        ii)     the amount of the contributions or benefits that qualify for tax relief in Belgium.

    c)     For purposes of determining an individual's eligibility to participate in and receive tax benefits with respect to a pension plan established in the United States, contributions made to, or benefits accrued under, a pension plan recognized for tax purposes in Belgium shall be treated as contributions or benefits under a generally corresponding pension plan established in the United States to the extent relief is available to the individual under this paragraph.

    d)     This paragraph shall not apply unless the competent authority of the United States has agreed that the pension plan generally corresponds to a pension plan recognized for tax purposes in the United States.

10.    a)     For purposes of paragraphs 7 and 9, a similar fund that is a resident of a State other than a Contracting State will be considered to be a resident of a comparable third State only if that third State:

        i)      is a member state of the European Union or any other European Economic Area state or any party to the North American Free Trade Agreement or Switzerland;

        ii)     provides, under a tax treaty or otherwise, comparable favorable treatment for contributions to a pension fund that is a resident of the Contracting State that is providing benefits under paragraph 7 or 9; and

        iii)    has an information exchange provision in a tax treaty or other arrangement with the Contracting State that is providing benefits under paragraph 7 or 9 that is satisfactory to that Contracting State;

    b)     a pension plan is recognized for tax purposes in a Contracting State if contributions to the plan would qualify for tax relief in that Contracting State.

26

## Article 18

### GOVERNMENT SERVICE

1.    Notwithstanding the provisions of Articles 14 (Income from Employment), 15 (Directors' Fees), 16 (Entertainers and Sportsmen) and 19 (Students, Trainees, Teachers and Researchers):

    a)    salaries, wages and other similar remuneration, other than a pension, paid to an individual in respect of services rendered to a Contracting State or a political subdivision or local authority thereof shall be taxable only in that State;

    b)    such remuneration, however, shall be taxable only in the other Contracting State if the services are rendered in that State and the individual is a resident of that State who:

        i)    is a national of that State; or

        ii)    did not become a resident of that State solely for the purpose of rendering the services.

2.    a)    Notwithstanding the provisions of paragraph 1, any pension and other similar remuneration paid by, or out of funds created by, a Contracting State or a political subdivision or a local authority thereof to an individual in respect of services rendered to that State or subdivision or authority (other than a payment to which paragraph 2 of Article 17 (Pensions, Social Security, Annuities, Alimony, and Child Support) applies) shall be taxable only in that State;

    b)    such pensions and other similar remuneration, however, shall be taxable only in the other Contracting State if the individual is a resident of, and a national of, that State.

3.    The provisions of Articles 14, 15, 16 and 17 shall apply to salaries, wages, pensions, and other similar remuneration, in respect of services rendered in connection with a business carried on by a Contracting State or a political subdivision or a local authority thereof.

## Article 19

### STUDENTS, TRAINEES, TEACHERS AND RESEARCHERS

1.    a)    Payments, other than compensation for personal services, received by a student

27

or business trainee who is, or was immediately before visiting a Contracting State, a resident of the other Contracting State, and who is present in the first-mentioned State for the purpose of his full-time education or for his full-time training, shall not be taxed in that State, provided that such payments arise outside that State, and are for the purpose of his maintenance, education or training. The exemption from tax provided by this paragraph shall apply to a business trainee only for a period of time not exceeding two years from the date the business trainee first arrives in the first-mentioned Contracting State for the purpose of training.

b)    A student or business trainee within the meaning of subparagraph a) shall be exempt from tax in the Contracting State in which the individual is temporarily present with respect to income from personal services in an aggregate amount equal to $9,000 or its equivalent in euro annually. The competent authorities shall, every five years, adjust the amount provided in this subparagraph to the extent necessary to take into account changes in the U.S. personal exemption and standard deduction and the Belgian basic allowance (quotité exemptée/belastingvrije som).

c)    For purposes of this paragraph, a business trainee is an individual:

i)    who is temporarily present in a Contracting State for the purpose of securing training required to qualify the individual to practice a profession or professional specialty; or

ii)    who is temporarily present in a Contracting State as an employee of, or under contract with, a resident of the other Contracting State, for the primary purpose of acquiring technical, professional, or business experience from a person other than that resident of the other Contracting State (or a person related to such resident of the other Contracting State).

2.    An individual who is a resident of a Contracting State at the beginning of his visit to the other Contracting State and who is temporarily present in the other Contracting State for the purpose of teaching or carrying on research at a school, college, university or other educational or research institution shall be exempt from tax in the other Contracting State for a period not exceeding two years from the date of the individual's arrival in that other State on the

28

remuneration received in consideration of teaching or carrying on research. This paragraph shall not apply to income from research if such research is undertaken not in the public interest but primarily for the private benefit of a specific person or persons.

## Article 20

### OTHER INCOME

1.      Items of income beneficially owned by a resident of a Contracting State, wherever arising, not dealt with in the foregoing Articles of this Convention shall be taxable only in that State.

2.      The provisions of paragraph 1 shall not apply to income, other than income from real property as defined in paragraph 2 of Article 6 (Income from Real Property), if the beneficial owner of the income, being a resident of a Contracting State, carries on business in the other Contracting State through a permanent establishment situated therein and the income is attributable to such permanent establishment. In such case the provisions of Article 7 (Business Profits) shall apply.

## Article 21

### LIMITATION ON BENEFITS

1.      A resident of a Contracting State shall be entitled to benefits otherwise accorded to residents of a Contracting State by this Convention only to the extent provided in this Article.

2.      A resident of a Contracting State shall be entitled to all the benefits of this Convention if the resident is:

      a)      an individual;

      b)      a Contracting State or any political subdivision or local authority thereof;

      c)      a company, if:

            i)      its principal class of shares (and any disproportionate class of shares) is regularly traded on one or more recognized stock exchanges, and either:

                  A)      its principal class of shares is primarily traded on a recognized stock exchange located in the Contracting State of which the company is

29

a resident (or, in the case of a company resident in Belgium, on a recognized stock exchange located within the European Union or in any other European Economic Area state, or, in the case of a company resident in the United States, on a recognized stock exchange located in another state that is a party to the North American Free Trade Agreement); or

B)    the company's primary place of management and control is in the Contracting State of which it is a resident; or

ii)    at least 50 percent of the aggregate voting power and value of the shares (and at least 50 percent of any disproportionate class of shares) in the company are owned directly or indirectly by five or fewer companies entitled to benefits under clause i) of this subparagraph, provided that, in the case of indirect ownership, each intermediate owner is a resident of either Contracting State;

d)    a person described in paragraph 3 of Article 4 (Resident), provided that, in the case of a person described in subparagraph a) of that paragraph, either:

i)    more than 50 percent of the person's beneficiaries, members or participants are individuals resident in either Contracting State; or

ii)    the organization sponsoring such person is entitled to the benefits of this Convention pursuant to this Article; or

e)    a person other than an individual, if:

i)    on at least half the days of the taxable year at least 50 percent of each class of shares or other beneficial interests in the person is owned, directly or indirectly, by residents of the Contracting State of which that person is a resident that are entitled to the benefits of this Convention under subparagraph a), subparagraph b), clause i) of subparagraph c), or subparagraph d) of this paragraph; and

ii)    less than 50 percent of the person's gross income for the taxable year, as determined in the person's State of residence, is paid or accrued, directly or indirectly, to persons who are not residents of either Contracting State entitled to

30

the benefits of this Convention under subparagraph a), subparagraph b), clause i)
of subparagraph c), or subparagraph d) of this paragraph in the form of payments
that are deductible for purposes of the taxes covered by this Convention in the
person's State of residence (but not including arm's length payments in the
ordinary course of business for services or tangible property and payments in
respect of financial obligations to a bank that is not related to the payor).

3.      A company that is a resident of a Contracting State shall also be entitled to the benefits
of the Convention if:

a)      at least 95 percent of the aggregate voting power and value of its shares (and at
least 50 percent of any disproportionate class of shares) is owned, directly or indirectly,
by seven or fewer persons that are equivalent beneficiaries; and

b)      less than 50 percent of the company's gross income, as determined in the
company's State of residence, for the taxable year is paid or accrued, directly or
indirectly, to persons who are not equivalent beneficiaries, in the form of payments (but
not including arm's length payments in the ordinary course of business for services or
tangible property and payments in respect of financial obligations to a bank that is not
related to the payor), that are deductible for the purposes of the taxes covered by this
Convention in the company's State of residence.

4.      a)      A resident of a Contracting State will be entitled to benefits of the Convention
with respect to an item of income derived from the other Contracting State, regardless of
whether the resident is entitled to benefits under paragraph 2 or 3, if the resident is
engaged in the active conduct of a trade or business in the first-mentioned State (other
than the business of making or managing investments for the resident's own account,
unless these activities are banking, insurance, or securities activities carried on by a
bank, insurance company or registered securities dealer), and the income derived from
the other Contracting State is derived in connection with, or is incidental to, that trade or
business.

b)      If a resident of a Contracting State or any of its associated enterprises carries on
a trade or business activity in the other Contracting State which gives rise to an item of

31

income, subparagraph a) of this paragraph shall apply to such item only if the trade or business activity in the first-mentioned State is substantial in relation to the trade or business activity in the other State. Whether a trade or business activity is substantial for purposes of this paragraph will be determined based on all the facts and circumstances.

c)    In determining whether a person is "engaged in the active conduct of a trade or business" in a Contracting State under subparagraph a) of this paragraph, activities conducted by persons connected to such person shall be deemed to be conducted by such person. A person shall be connected to another if one possesses at least 50 percent of the beneficial interest in the other (or, in the case of a company, at least 50 percent of the aggregate voting power and at least 50 percent of the aggregate value of the shares in the company or of the beneficial equity interest in the company) or another person possesses, directly or indirectly, at least 50 percent of the beneficial interest (or, in the case of a company, at least 50 percent of the aggregate voting power and at least 50 percent of the aggregate value of the shares in the company or of the beneficial equity interest in the company) in each person. In any case, a person shall be considered to be connected to another if, based on all the relevant facts and circumstances, one has control of the other or both are under the control of the same person or persons.

5.    A person that is a resident of a Contracting State and functions as a headquarters company for a multinational corporate group shall also be entitled to all the benefits of this Convention otherwise accorded to residents of that Contracting State if that person satisfies any other specified conditions for the obtaining of such benefits.  A person shall be considered a headquarters company for this purpose only if:

a)    it provides a substantial portion of the overall supervision and administration of the group, which may include, but cannot be principally, group financing;

b)    the corporate group consists of companies which are resident in, and engaged in an active business in, at least five countries, and the business activities carried on in each of the five countries (or five groupings of countries) generate at least 10 percent of the gross income of the group;

32

c) the business activities carried on in any one country other than the State of residence of the headquarters company generate less than 50 percent of the gross income of the group;

d) no more than 25 percent of its gross income is derived from the other State;

e) it has, and exercises, independent discretionary authority to carry out the functions referred to in subparagraph a);

f) it is subject to the same income taxation rules in its country of residence as persons described in paragraph 4; and

g) the income derived in the other State either is derived in connection with, or is incidental to, the active business referred to in subparagraph b).

If the gross income requirements of subparagraphs b), c), or d) of this paragraph are not fulfilled, they will be deemed to be fulfilled if the required ratios are met when averaging the gross income of the preceding four years.

6. Notwithstanding the preceding provisions of this Article, where an enterprise of Belgium derives interest, or royalties from the United States, and the income consisting of such interest, or royalties is exempt from taxation in Belgium because it is attributable to a permanent establishment which that enterprise has in a third state, the tax benefits that would otherwise apply under the other provisions of the Convention will not apply to such income if the tax that is actually paid with respect to such income in the third state is less than 60 percent of the tax that would have been payable in Belgium if the income were earned in Belgium by the enterprise and were not attributable to the permanent establishment in the third state. Any interest or royalties to which the provisions of this paragraph apply may be taxed in the United States at a rate that shall not exceed 15 percent of the gross amount thereof. The provisions of this paragraph shall not apply if:

a) in the case of interest, as defined in Article 11 (Interest), the income from the United States is derived in connection with, or is incidental to, the active conduct of a trade or business carried on by the permanent establishment in the third state (other than the business of making, managing, or simply holding investments for the enterprise's own account, unless these activities are banking, or securities activities carried on by a

33

bank, or registered securities dealer); or

b)      in the case of royalties, as defined in Article 12 (Royalties), the royalties are received as compensation for the use of, or the right to use, intangible property produced or developed by the permanent establishment itself.

7.      A resident of a Contracting State that is not entitled to benefits pursuant to the preceding paragraphs of this Article shall, nevertheless, be granted benefits of the Convention if the competent authority of the other Contracting State determines that the establishment, acquisition, or maintenance of such person and the conduct of its operations did not have as one of its principal purposes the obtaining of benefits under the Convention. The competent authority of the other Contracting State shall consult with the competent authority of the first-mentioned State before denying the benefits of the Convention under this paragraph.

8.      For the purposes of this Article:

a)      the term "principal class of shares" means the ordinary or common shares of the company, provided that such class of shares represents the majority of the voting power and value of the company. If no single class of ordinary or common shares represents the majority of the aggregate voting power and value of the company, the "principal class of shares" are those classes that in the aggregate represent a majority of the aggregate voting power and value of the company;

b)      the term "disproportionate class of shares" means any class of shares of a company resident in a Contracting State that entitles the shareholder to disproportionately higher participation, through dividends, redemption payments, or otherwise, in the earnings generated in the other Contracting State by particular assets or activities of the company when compared to its participation in overall assets or activities of such company;

c)      the term "shares" shall include depository receipts thereof;

d)      the term "recognized stock exchange" means:

i)      the NASDAQ System owned by the National Association of Securities Dealers, Inc. and any stock exchange registered with the U.S. Securities and Exchange Commission as a national securities exchange under the U.S.

34

Securities Exchange Act of 1934;

ii)    the Brussels Stock Exchange;

iii)    the Irish Stock Exchange and the stock exchanges of Amsterdam, Frankfurt, Hamburg, Lisbon, London, Madrid, Milan, Paris, Toronto and Zurich; and

iv)    any other stock exchanges agreed upon by the competent authorities of the Contracting States;

e)    a class of shares is considered to be regularly traded on one or more recognized stock exchanges in a taxable year if the aggregate number of shares of that class traded on such stock exchange or exchanges during the preceding taxable year is at least 6 percent of the average number of shares outstanding in that class during that preceding taxable year;

f)    a company's primary place of management and control will be in the Contracting State of which it is a resident only if executive officers and senior management employees exercise day-to-day responsibility for more of the strategic, financial, and operational policy decision making for the company (including its direct and indirect subsidiaries) in that State than in any other state, and the staffs conduct more of the day-to-day activities necessary for preparing and making those decisions in that State than in any other state;

g)    the term "equivalent beneficiary" means a resident of a member state of the European Union or of any other European Economic Area state or of a party to the North American Free Trade Agreement, or of Switzerland, but only if that resident:

i)    A)    would be entitled to all the benefits of a comprehensive tax convention between any member state of the European Union or any other European Economic Area state or any party to the North American Free Trade Agreement, or Switzerland, and the State from which the benefits of this Convention are claimed under provisions analogous to subparagraph a), subparagraph b), clause i) of subparagraph c) or subparagraph d) of paragraph 2, provided that if such convention does

35

not contain a comprehensive limitation on benefits provision, the resident would be entitled to the benefits of this Convention by reason of subparagraph a), subparagraph b), clause i) of subparagraph c), or subparagraph d) of paragraph 2 if such person were a resident of one of the Contracting States under Article 4 (Resident); and

B)      with respect to insurance premiums and to income referred to in Article 10 (Dividends), 11 (Interest), or 12 (Royalties), would be entitled under such convention to a rate of tax with respect to the item of income for which benefits are being claimed under this Convention that is at least as low as the rate applicable under this Convention; or

ii)      is a resident of a Contracting State that is entitled to the benefits of this Convention by reason of subparagraph a), subparagraph b), clause i) of subparagraph c), or subparagraph d) of paragraph 2;

h)      with respect to dividends, interest, or royalties arising in Belgium and beneficially owned by a company that is a resident of the United States, a company that is a resident of a member state of the European Union will be treated as satisfying the requirements of subparagraph g) i) B) for purposes of determining whether such United States resident is entitled to the benefits of the Convention under this paragraph if a payment of dividends, interest, or royalties arising in Belgium and paid directly to such resident of a member state of the European Union would have been exempt from tax pursuant to any directive of the European Union, notwithstanding that the tax convention between Belgium and that other member state of the European Union would provide for a higher rate of tax with respect to such payment than the rate of tax applicable to such United States company under Article 10, 11, or 12.

**Article 22**

**RELIEF FROM DOUBLE TAXATION**

1.      In the case of Belgium, double taxation will be relieved as follows:

a)      Where a resident of Belgium derives income, other than dividends, interest and

36

royalties, which is taxed in the United States in accordance with the provisions of this Convention, Belgium shall exempt such income from tax but may, in calculating the amount of tax on the remainder of the income of that resident, apply the rate of tax which would have been applicable if such income had not been exempted.

b)    The exemption provided by subparagraph a) shall also be granted with respect to income treated as dividends under Belgian law, which is derived by a resident of Belgium from a participation in an entity that derives its status as such from the laws of the United States or any state thereof, where that entity has not been taxed as a corporation by the United States, provided that the resident of Belgium has been taxed by the United States, proportionally to his participation in such entity, on the income out of which the income treated as dividends under Belgian law is paid. The exempted income is the income received after deduction of the costs incurred in Belgium or elsewhere in relation to the management of the participation in the entity.

c)    Dividends derived by a company which is a resident of Belgium from a company which is a resident of the United States, shall be exempt from the corporate income tax in Belgium to the extent that exemption would have been accorded if the two companies had been residents of Belgium.

d)    Where dividends described in subparagraph c) are not exempted from the corporate income tax in Belgium, Belgium shall deduct from the corporate income tax relating to these dividends, the United States tax levied on these dividends in accordance with Article 10 (Dividends). This deduction shall not exceed that part of the corporate income tax which is proportionally relating to these dividends.

e)    Subject to the provisions of Belgian law regarding the deduction from Belgian tax of taxes paid abroad, where a resident of Belgium derives items of his aggregate income for Belgian tax purposes which are interest or royalties, the United States tax levied on that income shall be allowed as a credit against Belgian tax relating to such income.

f)    Where, in accordance with Belgian law, losses incurred by an enterprise carried on by a resident of Belgium in a permanent establishment situated in the United States,

37

have been effectively deducted from the profits of that enterprise for its taxation in Belgium, the exemption provided for in subparagraph a) shall not apply in Belgium to the profits of other taxable periods attributable to that establishment to the extent that those profits have also been exempted from tax in the United States by reason of compensation for the said losses.

2.    In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a resident or citizen of the United States as a credit against the United States tax on income applicable to residents and citizens:

    a)    the income tax paid or accrued to Belgium by or on behalf of such resident or citizen; and

    b)    in the case of a United States company owning at least 10 percent of the voting stock of a company that is a resident of Belgium and from which the United States company receives dividends, the income tax paid or accrued to Belgium by or on behalf of the payer with respect to the profits out of which the dividends are paid.

For the purposes of this paragraph, the taxes referred to in paragraphs 3 a) and 4 of Article 2 (Taxes Covered) shall be considered income taxes.

3.    For the purposes of applying paragraph 2 of this Article, an item of gross income, as determined under the laws of the United States, derived by a resident of the United States that, under this Convention, may be taxed in Belgium shall be deemed to be income from sources in Belgium.

4.    Where a resident of Belgium is also a citizen or a former citizen or former long-term resident of the United States and is subject to United States tax in accordance with paragraph 4 of Article 1 (General Scope), the following rules shall apply:

    a)    taxation by the United States of the income of such persons shall not affect the taxation in Belgium of income from sources arising in third countries, as determined under the laws of Belgium, and received by a resident of Belgium;

    b)    in the case of income from sources within the United States, Belgium shall apply paragraph 1 as if the tax paid to the United States in respect of such income were the tax

38

that would have been paid to the United States if the resident were not a citizen or a former citizen or a former long-term resident of the United States;

c)      for purposes of applying paragraph 2 to compute United States tax on those items of income referred to in subparagraph b), the United States shall allow as a credit against United States tax the income tax paid to Belgium in accordance with subparagraph b); the credit so allowed shall not reduce the amount of the United States tax below the amount that is taken into account in applying subparagraph b); and

d)      for the exclusive purpose of relieving double taxation in the United States under subparagraph c), items of income referred to in subparagraph b) shall be deemed to arise in Belgium to the extent necessary to avoid double taxation of such income under subparagraph c).

**Article 23**

**NON-DISCRIMINATION**

1.      Nationals of a Contracting State shall not be subjected in the other Contracting State to any taxation or any requirement connected therewith that is more burdensome than the taxation and connected requirements to which nationals of that other State in the same circumstances, in particular with respect to residence, are or may be subjected.  This provision shall also apply to persons who are not residents of one or both of the Contracting States.  However, for the purposes of United States taxation, United States nationals who are subject to tax on a worldwide basis are not in the same circumstances as nationals of Belgium who are not residents of the United States.

2.      The taxation on a permanent establishment that an enterprise of a Contracting State has in the other Contracting State shall be not less favorably levied in that other State than the taxation levied on enterprises of that other State carrying on the same activities.

3.      The provisions of paragraphs 1 and 2 shall not be construed as obliging a Contracting State to grant to residents of the other Contracting State any personal allowances, reliefs, and reductions for taxation purposes on account of civil status or family responsibilities that it grants to its own residents.

39

4.      Except where the provisions of paragraph 1 of Article 9 (Associated Enterprises), paragraph 6 of Article 11 (Interest), or paragraph 4 of Article 12 (Royalties) apply, interest, royalties, and other disbursements paid by a resident of a Contracting State to a resident of the other Contracting State shall, for the purpose of determining the taxable profits of the first-mentioned resident, be deductible under the same conditions as if they had been paid to a resident of the first-mentioned State.  Similarly, any debts of a resident of a Contracting State to a resident of the other Contracting State shall, for the purpose of determining the taxable capital of the first-mentioned resident, be deductible under the same conditions as if they had been contracted to a resident of the first-mentioned State.

5.      Enterprises of a Contracting State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State, shall not be subjected in the first-mentioned State to any taxation or any requirement connected therewith that is more burdensome than the taxation and connected requirements to which other similar enterprises of the first-mentioned State are or may be subjected.

6.      Nothing in this Article shall be construed as preventing either Contracting State from imposing a tax as described in paragraph 10 of Article 10 (Dividends).

7.      The provisions of this Article shall, notwithstanding the provisions of Article 2 (Taxes Covered), apply to taxes of every kind and description imposed by a Contracting State or a political subdivision or local authority thereof.


**Article 24**

**MUTUAL AGREEMENT PROCEDURE**

1.      Where a person considers that the actions of one or both of the Contracting States result or will result for such person in taxation not in accordance with the provisions of this Convention, it may, irrespective of the remedies provided by the domestic law of those States, and the time limits prescribed in such laws for presenting claims for refund, present its case to the competent authority of either Contracting State.  The case must be presented within three years from the first notification of the action resulting in taxation not in accordance with the provisions of the Convention.

40

2.      The competent authority shall endeavor, if the objection appears to it to be justified and if it is not itself able to arrive at a satisfactory solution, to resolve the case by mutual agreement with the competent authority of the other Contracting State, with a view to the avoidance of taxation which is not in accordance with the Convention.  Collection procedures shall be suspended during the period that any mutual agreement proceeding is pending.

3.      The competent authorities of the Contracting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention.  In particular the competent authorities of the Contracting States may agree:

    a)      to the same attribution of income, deductions, credits, or allowances of an enterprise of a Contracting State to its permanent establishment situated in the other Contracting State;

    b)      to the same attribution of income, deductions, credits, or allowances between permanent establishments of an enterprise where the permanent establishments are located in the Contracting States, whether or not the enterprise is an enterprise of a Contracting State;

    c)      to the same allocation of income, deductions, credits, or allowances between persons;

    d)      to the settlement of conflicting application of the Convention, including conflicts regarding:

        i)      the characterization of particular items of income;

        ii)     the characterization of persons;

        iii)    the application of source rules with respect to particular items of income;

        iv)     the same meaning of any term used in the Convention;

    e)      to advance pricing arrangements; and

    f)      to the application of the provisions of domestic law regarding penalties, fines, and interest in a manner consistent with the purposes of the Convention.

4.      To the extent necessary to facilitate the resolution of a case that is the subject of a mutual agreement proceeding under the preceding paragraphs, the tax authorities of each Contracting State shall have the power to ask any person who may have relevant information

41

for the disclosure of such information and to conduct investigations and hearings notwithstanding any time limits in their domestic tax laws that would otherwise bar such requests for information.  Any agreement reached under this Article shall be implemented notwithstanding any time limits or other procedural limitations in the domestic law of the Contracting States.

5.      The competent authorities of the Contracting States may agree on administrative measures necessary to carry out the provisions of the Convention and particularly on the documentation to be furnished by a resident of a Contracting State in order to support its claim for the exemptions or reductions of tax provided for in the Convention.

6.      The competent authorities of the Contracting States may communicate with each other directly, including through a joint commission, for the purpose of reaching an agreement in the sense of the preceding paragraphs.

7.      Where, pursuant to a mutual agreement procedure under this Article, the competent authorities have endeavored but are unable to reach a complete agreement in a case, the case shall be resolved through arbitration conducted in the manner prescribed by, and subject to, the requirements of paragraph 8 and any rules or procedures agreed upon by the Contracting States, if:

        a)      tax returns have been filed with at least one of the Contracting States with respect to the taxable years at issue in the case;

        b)      the case is not a particular case that the competent authorities agree, before the date on which arbitration proceedings would otherwise have begun, is not suitable for determination by arbitration; and

        c)      all concerned persons agree according to the provisions of subparagraph d) of paragraph 8.

8.      For the purposes of paragraph 7 and this paragraph, the following rules and definitions shall apply:

        a)      the term "concerned person" means the presenter of a case to a competent authority for consideration under this Article and all other persons, if any, whose tax liability to either Contracting State may be directly affected by a mutual agreement

42

arising from that consideration;

b)    the "commencement date" for a case is the earliest date on which the information necessary to undertake substantive consideration for a mutual agreement has been received by both competent authorities;

c)    arbitration proceedings in a case shall begin on the later of:

    i)    two years after the commencement date of that case, unless both competent authorities have previously agreed to a different date, and

    ii)   the earliest date upon which the agreement required by subparagraph d) has been received by both competent authorities;

d)    the concerned person(s), and their authorized representatives or agents, must agree prior to the beginning of arbitration proceedings not to disclose to any other person any information received during the course of the arbitration proceeding from either Contracting State or the arbitration board, other than the determination of such board;

e)    unless any concerned person does not accept the determination of an arbitration board, the determination shall constitute a resolution by mutual agreement under this Article and shall be binding on both Contracting States with respect to that case; and

f)    for purposes of an arbitration proceeding under paragraph 7 and this paragraph, the members of the arbitration board and their staffs shall be considered "persons or authorities" to whom information may be disclosed under Article 25 (Exchange of Information and Administrative Assistance) of the Convention.


## Article 25

## EXCHANGE OF INFORMATION AND ADMINISTRATIVE ASSISTANCE

1.    The competent authorities of the Contracting States shall exchange such information as may be relevant for carrying out the provisions of this Convention or of the domestic laws of the Contracting States concerning the taxes covered by the Convention insofar as the taxation thereunder is not contrary to the Convention, including information relating to the assessment or collection of, the enforcement or prosecution in respect of, or the determination of appeals in

43

relation to, the taxes covered by the Convention. The exchange of information is not restricted by paragraph 1 of Article 1 (General Scope).

2.    Any information received under this Article by a Contracting State shall be treated as secret in the same manner as information obtained under the domestic laws of that State and shall be disclosed only to persons or authorities (including courts and administrative bodies) involved in the assessment, collection, or administration of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes referred to above, or the oversight of the above. Such persons or authorities shall use the information only for such purposes. They may disclose the information in public court proceedings or in judicial decisions.

3.    In no case shall the provisions of the preceding paragraphs be construed so as to impose on a Contracting State the obligation:

    a)    to carry out administrative measures at variance with the laws and administrative practice of that or of the other Contracting State;

    b)    to supply information that is not obtainable under the laws or in the normal course of the administration of that or of the other Contracting State;

    c)    to supply information that would disclose any trade, business, industrial, commercial, or professional secret or trade process, or information the disclosure of which would be contrary to public policy (ordre public).

4.    If information is requested by a Contracting State in accordance with this Article, the other Contracting State shall use its information gathering measures to obtain the requested information, even though that other State may not need such information for its own purposes. The obligation contained in the preceding sentence is subject to the limitations of paragraph 3 but in no case shall such limitations be construed to permit a Contracting State to decline to supply information because it has no domestic interest in such information.

5.    In no case shall the provisions of paragraph 3 be construed to permit a Contracting State to decline to supply information requested by the other Contracting State because the information is held by a bank, other financial institution, nominee or person acting in an agency or a fiduciary capacity or because it relates to ownership interests in a person. In order to obtain

44

such information the tax administration of the requested Contracting State shall have the power to ask for the disclosure of information and to conduct investigations and hearings notwithstanding any contrary provisions in its domestic tax laws.

6.      Notwithstanding paragraph 3, in order to obtain information requested within the framework of this Article, the tax administration of the requested Contracting State shall have the power to ask for the disclosure of information and to conduct investigations and hearings outside any time limits required in its domestic tax laws.

7.      Penalties provided by the domestic laws of the requested State for a person failing to give information relevant for carrying out its domestic tax laws shall apply as if the obligation to give information provided in paragraphs 5 or 6 was an obligation provided in the domestic tax laws of the requested State.

8.      Where a person refuses to give information requested within the framework of this Article or fails to give such information within the time required by the tax administration of the requested State, the requested State may bring appropriate enforcement proceedings against such person. Such enforcement proceedings include, but are not limited to, summary summons enforcement proceedings in the case of the United States and summary proceedings (procédure en référé/procedure in kortgeding) in the case of Belgium. Such person may be compelled to give such information under pain of such civil or criminal penalties as may be available under the laws of the requested State.

9.      If specifically requested by the competent authority of a Contracting State, the competent authority of the other Contracting State shall provide information under this Article in the form of depositions of witnesses and authenticated copies of unedited original documents (including books, papers, statements, records, accounts, and writings).

10.     The requested State shall allow representatives of the requesting State to enter the requested State to interview individuals and examine books and records. Such interview or examination shall take place under the conditions and within the limits agreed upon by the competent authorities of both Contracting States.

45

11.     The competent authorities of the Contracting States shall agree upon the mode of application of this Article, including agreement to ensure comparable levels of assistance to each of the Contracting States.

12.     If the United States terminates paragraph 3 of Article 10 (Dividends) in accordance with paragraph 12 of Article 10, Belgium's obligations pursuant to paragraph 5 shall cease as of the date that paragraph 3 of Article 10 is no longer effective.

**Article 26**

**ASSISTANCE IN COLLECTION**

1.     Each of the Contracting States shall endeavor to collect on behalf of the other Contracting State such taxes imposed by that other Contracting State as will ensure that any exemption or reduced rate of tax granted under this Convention by that other Contracting State shall not be enjoyed by persons not entitled to such benefits.

2.     In no case shall this Article be construed so as to impose upon a Contracting State the obligation to carry out administrative measures at variance with the regulations and practices of either Contracting State or which would be contrary to the first-mentioned Contracting State's sovereignty, security, or public policy.

**Article 27**

**MEMBERS OF DIPLOMATIC MISSIONS AND CONSULAR POSTS**

Nothing in this Convention shall affect the fiscal privileges of members of diplomatic missions or consular posts under the general rules of international law or under the provisions of special agreements.

**Article 28**

**ENTRY INTO FORCE**

1.     This Convention shall be subject to ratification in accordance with the applicable procedures of each Contracting State.  Each Contracting State shall notify the other through the

46

diplomatic channel, accompanied by an instrument of ratification, when it has completed the required procedures.

2.      The Convention shall enter into force on the date on which the later of the notifications is received, and its provisions shall have effect:

      a)      in respect of taxes withheld at source, for amounts paid or credited on or after the first day of the second month next following the date on which the Convention enters into force;

      b)      in respect of other taxes, for taxable periods beginning on or after the first day of January next following the date on which the Convention enters into force.

3.      Subparagraph f) of paragraph 5 of Article 21 (Limitation on Benefits) shall not have effect until January 1, 2011.

4.      The Convention between the United States of America and the Kingdom of Belgium for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, signed at Brussels on July 9, 1970, as modified by a Supplementary Protocol (the "prior Convention"), shall, in relation to any tax, cease to have effect as of the date on which this Convention has effect with respect to such tax in accordance with paragraphs 2 and 6 of this Article.

5.      Notwithstanding the preceding paragraph, where any person entitled to benefits under the prior Convention would have been entitled to greater benefits thereunder than under this Convention, the prior Convention shall, at the election of such person, continue to have effect in its entirety with respect to such person for a twelve-month period from the date on which the provisions of this Convention would have effect under paragraph 2 of this Article.

6.      Notwithstanding paragraphs 2 and 5, the provisions of Article 25 (Exchange of Information and Administrative Assistance) shall have effect from the date of entry into force of the Convention, without regard to the taxable period to which the matter relates.

7.      Notwithstanding paragraph 2, paragraphs 7 and 8 of Article 24 (Mutual Agreement Procedure) shall have effect, with respect to, and without regard to the taxable period to which the particular case relates:

47

a)      cases that are under consideration by the competent authorities as of the date on which this Convention enters into force; and

b)      cases that come under such consideration after such time,

and the commencement date for a case described in subparagraph a) of this paragraph shall be the date on which this Convention enters into force.

**Article 29**

**TERMINATION**

This Convention shall remain in force until terminated by a Contracting State. Either Contracting State may terminate the Convention at any time after 5 years from the date on which this Convention enters into force by giving notice of termination to the other Contracting State through diplomatic channels. In such event, the Convention shall cease to have effect:

a)      in respect of taxes withheld at source, for amounts paid or credited after the expiration of the 6-month period beginning on the date on which notice of termination was given; and

b)      in respect of other taxes, for taxable periods beginning on or after the expiration of the 6-month period beginning on the date on which notice of termination was given.

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto by their respective Governments, have signed this Convention.

DONE at Brussels, in duplicate, in the English language, this twenty-seventh day of November, 2006.

FOR THE GOVERNMENT OF                FOR THE GOVERNMENT OF
THE UNITED STATES OF AMERICA:        THE KINGDOM OF BELGIUM:

# PROTOCOL

At the signing of the Convention between the Government of the United States of America and the Government of the Kingdom of Belgium for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income (hereinafter referred to as "the Convention"), the Government of the United States of America and the Government of the Kingdom of Belgium have agreed on the following provisions. This Protocol shall form an integral part of the Convention.

*1.    In reference to Article 7 (Business Profits)*

It is understood that the business profits to be attributed to a permanent establishment shall include only the profits derived from the assets used, risks assumed and activities performed by the permanent establishment. The principles of the OECD Transfer Pricing Guidelines will apply for purposes of determining the profits attributable to a permanent establishment, taking into account the different economic and legal circumstances of a single entity. Accordingly, any of the methods described therein as acceptable methods for determining an arm's length result may be used to determine the income of a permanent establishment so long as those methods are applied in accordance with the Guidelines. In particular, in determining the amount of attributable profits, the permanent establishment shall be treated as having the same amount of capital that it would need to support its activities if it were a distinct and separate enterprise engaged in the same or similar activities. With respect to financial institutions other than insurance companies, a Contracting State may determine the amount of capital to be attributed to a permanent establishment by allocating the institution's total equity between its various offices on the basis of the proportion of the financial institution's risk-weighted assets attributable to each of them. In the case of an insurance company, there shall be attributed to a permanent establishment not only premiums earned through the permanent establishment, but that portion of the insurance company's overall investment income from reserves and surplus that supports the risks assumed by the permanent establishment.

*2.    In reference to Article 14 (Income from Employment)*

With respect to paragraphs 1 and 2 of Article 14 (Income from Employment), where remuneration is derived by a resident of one of the States in respect of an employment, employment is exercised in the place where the employee is physically present when performing the activities for which the remuneration is paid, irrespective of the residence of the payer, the place in which the contract of employment was made, the residence of the employer, the place or time of payment, or the place where the results of the work were exploited.

2

3.    *In reference to Article 15 (Directors' Fees)*

a)    Article 15 (Directors' Fees) also shall apply to fees received by a "gerant"/"zaakvoerder" of a company, other than a company with share capital, in his capacity as such.

b)    i)    Remuneration derived by a person referred to in Article 15 from a company which is a resident of a Contracting State in respect of the discharge of day-to-day functions of a managerial or technical, commercial or financial nature shall be taxable in accordance with the provisions of Article 14 (Income from Employment), and not Article 15; to the extent that the company is a Belgian company, Article 14 shall be applied as if such remuneration were remuneration derived by an employee in respect of an employment and as if references to the "employer" were references to the company.

ii)    Remuneration received by a resident of a Contracting State in respect of his day-to-day activity as a partner of a company that is a resident of Belgium, other than a company with share capital, shall be taxable in accordance with the provisions of Article 14, as if such remuneration were remuneration derived by an employee in respect of an employment and as if references to the "employer" were references to the company.

iii)    Article 7 (Business Profits), and not Article 14 or 15, shall apply to a partner's distributive share of the income of an entity that is treated as fiscally transparent, such as a U.S. partnership.

4.    *In reference to Article 17 (Pensions, Social Security, Annuities, Alimony, and Child Support)*

The term "similar legislation" is intended to refer to United States tier 1 Railroad Retirement benefits.

5.    *In reference to paragraph 1 of Article 24 (Mutual Agreement Procedure)*

The term "first notification of the action resulting in taxation not in accordance with the provisions of the Convention" shall mean:

a)    in the case of Belgium, the date on which the notice of assessment containing an assessment or supplementary assessment is sent to the person who considers that the taxation provided for in such assessment or supplementary assessment is contrary to the provisions of the Convention; and

3

b)      in the case of the United States, the date on which the taxpayer receives a notice of proposed adjustment or of assessment, whichever is earlier.

6.    *In reference to paragraphs 7 and 8 of Article 24 (Mutual Agreement Procedure)*

In respect of any case where the competent authorities have endeavored but are unable to reach an agreement under Article 24 regarding the application of the Convention, binding arbitration shall be used to determine such application, unless the competent authorities agree that the particular case is not suitable for determination by arbitration. If an arbitration proceeding (the Proceeding) under paragraph 7 of Article 24 commences, the following rules and procedures will apply.

a)      The Proceeding will be conducted in the manner prescribed by, and subject to the requirements of, paragraphs 7 and 8 of Article 24 and these rules and procedures, as modified or supplemented by any other rules and procedures agreed upon by the competent authorities pursuant to subparagraph q) below.

b)      The determination reached by an arbitration board in the Proceeding shall be limited to a determination regarding the amount of income, expense or tax reportable to the Contracting States.

c)      Notwithstanding the initiation of the Proceeding, the competent authorities may reach a mutual agreement to resolve a case and terminate the Proceeding. Correspondingly, a concerned person may withdraw a request for the competent authorities to engage in the Mutual Agreement Procedure (and thereby terminate the Proceeding) at any time.

d)      The requirements of subparagraph d) of paragraph 8 of Article 24 will be met when the competent authorities have each received from each concerned person a statement agreeing that the concerned person and each person acting on the concerned person's behalf will not disclose to any other person any information received during the course of the Proceeding from either Contracting State or the arbitration board, other than the determination of the Proceeding. A concerned person that has the legal authority to bind any other concerned person(s) on this matter may do so in a comprehensive statement.

e)      Each Contracting State will have 60 days from the date on which the Proceeding begins to send a written communication to the other Contracting State appointing one member of the arbitration board. Within 60 days of the date on which the second such communication is sent, the two members appointed by the Contracting States will appoint a third member, who will serve as Chair of the board. If either Contracting State fails to appoint a member, or if the members appointed by the Contracting States fail to agree upon the third member in the manner prescribed by this paragraph, the remaining member(s) will be appointed

4

by the highest-ranking member of the Secretariat at the Centre for Tax Policy and
Administration of the Organisation for Economic Co-operation and Development
(OECD) who is not a citizen of either Contracting State, by written notice to both
Contracting States within 60 days of the date of such failure.  The competent
authorities will develop a non-exclusive list of individuals with familiarity in
international tax matters who may potentially serve as the Chair of the board. In
any case, the Chair shall not be a citizen of either Contracting State.

f)      The arbitration board may adopt any procedures necessary for the conduct
of its business, provided that the procedures are not inconsistent with any
provision of Article 24 or the Protocol to the Convention.

g)      Each of the Contracting States will be permitted to submit, within 60 days
of the appointment of the Chair of the arbitration board, a Proposed Resolution
describing the proposed disposition of the specific monetary amounts of income,
expense or taxation at issue in the case, and a supporting Position Paper, for
consideration by the arbitration board.  Copies of the Proposed Resolution and
supporting Position Paper shall be provided by the board to the other Contracting
State on the date on which the later of the submissions is submitted to the board.
In the event that only one Contracting State submits a Proposed Resolution within
the allotted time, then that Proposed Resolution shall be deemed to be the
determination of the board in that case and the Proceeding shall be terminated.
Each of the Contracting States may, if it so desires, submit a Reply Submission to
the board within 120 days of the appointment of its Chair, to address any points
raised by the Proposed Resolution or Position Paper submitted by the other
Contracting State.  Additional information may be submitted to the arbitration
board only at its request, and copies of the board's request and the Contracting
State's response shall be provided to the other Contracting State on the date on
which the request or the response is submitted.  Except for logistical matters such
as those identified in subparagraphs l), n) and o) below, all communications from
the Contracting States to the arbitration board, and vice versa, shall take place
only through written communications between the designated competent
authorities and the Chair of the board.

h)      The arbitration board will deliver a determination in writing to the
Contracting States within six months of the appointment of its Chair.  The board
will adopt as its determination one of the Proposed Resolutions submitted by the
Contracting States.

i)      In making its determination, the arbitration board will apply, as necessary
and in descending order of priority:

         i)      the provisions of the Convention;

5

        ii)     any agreed commentaries or explanations of the Contracting States concerning the Convention;

        iii)    the laws of the Contracting States to the extent they are not inconsistent with each other; and

        iv)    any OECD Commentary, Guidelines or Reports regarding relevant analogous portions of the OECD Model Tax Convention.

j)      The determination of the arbitration board in a particular case shall be binding on the Contracting States. The determination of the board will not state a rationale. It will have no precedential value.

k)     As provided in subparagraph e) of paragraph 8 of Article 24, the determination of an arbitration board shall constitute a resolution by mutual agreement under Article 24. Each concerned person must, within 30 days of receiving the determination of the board from the competent authority to which the case was first presented, advise that competent authority whether that concerned person accepts the determination of the board. In the event the case is in litigation, each concerned person who is a party to the litigation must also advise, within the same time frame, the relevant court of its acceptance of the determination of the board as the resolution by mutual agreement and withdraw from the consideration of the court the issues resolved through the Proceeding. If any concerned person fails to so advise the relevant competent authority and relevant court within this time frame, the determination of the board will be considered not to have been accepted in that case. Where the determination of the board is not accepted, the case may not subsequently be the subject of a Proceeding.

l)      Any meeting(s) of the arbitration board shall be in facilities provided by the Contracting State whose competent authority initiated the mutual agreement proceedings in the case.

m)    The treatment of any associated interest or penalties will be determined by applicable domestic law of the Contracting State(s) concerned.

n)     No information relating to the Proceeding (including the board's determination) may be disclosed by the members of the arbitration board or their staffs or by either competent authority, except as permitted by the Convention and the domestic laws of the Contracting States. In addition, all material prepared in the course of, or relating to, the Proceeding shall be considered to be information exchanged between the Contracting States. All members of the arbitration board and their staffs must agree in statements sent to each of the Contracting States in confirmation of their appointment to the arbitration board to abide by and be subject to the confidentiality and nondisclosure provisions of Article 25 (Exchange of Information and Administrative Assistance) of the Convention and the applicable domestic laws of the Contracting States. In the event those

6

provisions conflict, the most restrictive condition shall apply.

o)      The fees and expenses will be borne equally by the Contracting States. In general, the fees of members of the arbitration board will be set at the fixed amount of $2,000 (two thousand United States dollars) per day or the equivalent amount in euro, subject to modification by the competent authorities. In general, the expenses of members of the arbitration board will be set in accordance with the International Centre for Settlement of Investment Disputes (ICSID) Schedule of Fees for arbitrators (as in effect on the date on which the arbitration proceedings begin), subject to modification by the competent authorities. Any fees for language translation will also be borne equally by the Contracting States. Meeting facilities, related resources, financial management, other logistical support, and general administrative coordination of the Proceeding will be provided, at its own cost, by the Contracting State whose competent authority initiated the mutual agreement proceedings in the case. Any other costs shall be borne by the Contracting State that incurs them.

p)      For purposes of paragraphs 7 and 8 of Article 24 and this paragraph, each competent authority will confirm in writing to the other competent authority and to the concerned person(s) the date of its receipt of the information necessary to undertake substantive consideration for a mutual agreement. Such information will be:

>       i)      in the United States, the information required to be submitted to the United States competent authority under Revenue Procedure 2002-52, section 4.05 (or any applicable successor provisions) and, for cases initially submitted as a request for an Advance Pricing Agreement, the information required to be submitted to the Internal Revenue Service under Revenue Procedure 2006-9, section 4 (or any applicable successor provisions), and

>       ii)     in Belgium, any information that would be required under instructions or commentaries published by the Federal Public Service Finance.

However, this information shall not be considered received until both competent authorities have received copies of all materials submitted to either Contracting State by the concerned person(s) in connection with the mutual agreement procedure.

q)      The competent authorities of the Contracting States may modify or supplement the above rules and procedures as necessary to more effectively implement the intent of paragraph 7 of Article 24 to eliminate double taxation.

7

7.    *In reference to Article 25 (Exchange of Information and Administrative Assistance)*

Banking records will be exchanged only upon request.  If the request does not identify both a specific taxpayer and a specific bank or financial institution, the competent authority of the requested State may decline to obtain any information that it does not already possess.

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto by their respective Governments, have signed this Protocol.

DONE at Brussels in duplicate, in the English language, this twenty-seventh day of November, 2006.

FOR THE GOVERNMENT OF                FOR THE GOVERNMENT OF
THE UNITED STATES OF AMERICA:        THE KINGDOM OF BELGIUM:

# Exhibit 60

UNITED STATES MODEL
INCOME TAX CONVENTION OF
SEPTEMBER 20, 1996

TECHNICAL EXPLANATION

TITLE AND PREAMBLE

PURPOSE OF MODEL CONVENTION AND TECHNICAL EXPLANATION

Set forth below is an explanation of the purposes for publishing a Model Convention and Technical Explanation.

The Model is drawn from a number of sources. Instrumental in its development was the U.S. Treasury Department's draft Model Income Tax Convention, published on June 16, 1981 ("the 1981 Model") and withdrawn as an official U.S. Model on July 17, 1992, the Model Double Taxation Convention on Income and Capital, and its Commentaries, published by the OECD, as updated in 1995 ("the OECD Model"), existing U.S. income tax treaties, recent U.S. negotiating experience, current U.S. tax laws and policies and comments received from tax practitioners and other interested parties.

For over thirty years the United States has actively participated in the development of the OECD Model, and the United States continues its support of that process. Accordingly, the publication of a U.S. Model does not represent a lack of support for the work of the OECD in developing and refining its Model treaty. To the contrary, the strong identity between the provisions of the OECD and U.S. Models reflects the fact that the United States drew heavily on the work of the OECD in the development of the U.S. Model. References are made in the Technical Explanation to the OECD commentaries, where appropriate, to note similarities and differences.

Like the OECD Model, the Model is intended to be an ambulatory document that may be updated from time to time to reflect further consideration of various provisions in light of experience, subsequent treaty negotiations, economic, judicial, legislative or regulatory developments in the United States, and changes in the nature or significance of transactions between U.S. and foreign persons. The Technical Explanation is also intended to be ambulatory, and may be expanded to deal with new issues that may arise in the future. The Model will be more useful if it is understood which developments have given rise to alterations in the Model, rather than leaving such judgements to be inferred from actual treaties concluded after the release of the Model. The manner and timing of such updates will be subsequently determined.

The Model does not present alternative provisions that might be included in a particular treaty under a particular set of circumstances. For example, a treaty with a country that has a remittance basis or an integrated system of corporate taxation might have to depart significantly in several respects from the Model.

For this reason and others, the Model is not intended to represent an ideal United States income tax treaty. Rather, a principal function of the Model is to facilitate negotiations by helping the negotiators identify differences between income tax policies in the two countries. In this regard, the Model can be especially valuable with respect to the many countries that are conversant with the OECD Model. Such countries can compare the Model with the OECD Model and very quickly identify issues for discussion during tax treaty negotiations. By helping to identify legal and policy differences between the two treaty partners, the Model will facilitate the negotiations by enabling the negotiators to move more quickly to the most important issues that must be resolved. Reconciling these differences will lead to an agreed text that will differ from the Model in numerous respects. Another purpose of the Model and the Technical Explanation is to provide a basic explanation of U.S. treaty policy for all interested parties, regardless of whether they are prospective treaty partners.

Since the Model is intended to facilitate negotiations and not to provide a text that the United States would propose that the treaty partner accept without variation, it should not be assumed that a departure from the Model text in an actual treaty represents an undesirable departure from U.S. treaty policy. The United States would not negotiate a treaty with a country without thoroughly analyzing the tax laws and administrative practices of the other country. For these reasons, it is unlikely that the United States ever will sign an income tax convention that is identical to the Model.

Therefore, variations from the Model text in a particular case may represent a modification that the United States views as necessary to address a particular aspect of the treaty partner's tax law, or even represent a substantive concession by the treaty partner in favor of the United States. Time is another relevant consideration, as treaty policies evolve in other countries just as they do in the United States. Furthermore, language differences (even with English-speaking countries) sometimes necessitate changes in Model language. Consequently, it would not be appropriate to base an evaluation of an actual treaty simply on the number of differences between the treaty and the Model. Rather, such an evaluation must be based on a firm understanding of the treaty partner's tax laws and policies, how that law interacts with the treaty and the provisions of U.S. tax law, precedents in the partner's other treaties, the relative economic positions of the two treaty partners, the considerations that gave rise to the negotiations, and the numerous other considerations that give rise to any agreement between two sovereign nations.

## TABLE OF ARTICLES

Article 1--------------------------------General Scope
Article 2--------------------------------Taxes Covered
Article 3--------------------------------General Definitions
Article 4--------------------------------Residence
Article 5--------------------------------Permanent Establishment
Article 6--------------------------------Income from Real Property (Immovable Property)
Article 7--------------------------------Business Profits

Article 8--------------------------------Shipping and Air Transport
Article 9--------------------------------Associated Enterprises
Article 10--------------------------------Dividends
Article 11--------------------------------Interest
Article 12--------------------------------Royalties
Article 13--------------------------------Gains
Article 14--------------------------------Independent Personal Services
Article 15--------------------------------Dependent Personal Services
Article 16--------------------------------Directors' Fees
Article 17--------------------------------Artistes and Sportsmen
Article 18--------------------------------Pensions, Social Security, Annuities,
                                          Alimony, and Child Support
Article 19--------------------------------Government Service
Article 20--------------------------------Students and Trainees
Article 21--------------------------------Other Income
Article 22--------------------------------Limitation on Benefits
Article 23--------------------------------Relief from Double Taxation
Article 24--------------------------------Nondiscrimination
Article 25--------------------------------Mutual Agreement Procedure
Article 26--------------------------------Exchange of Information and Administrative Assistance
Article 27--------------------------------Diplomatic Agents and Consular Officers
Article 28--------------------------------Entry into Force
Article 29--------------------------------Termination

## ARTICLE 1
### General Scope

Paragraph 1 of Article 1 provides that the Convention applies to residents of the United States or the other Contracting State except where the terms of the Convention provide otherwise. Under Article 4 (Residence) a person is generally treated as a resident of a Contracting State if that person is, under the laws of that State, liable to tax therein by reason of his domicile or other similar criteria. If, however, a person is considered a resident of both Contracting States, a single state of residence (or no state of residence) is assigned under Article 4. This definition governs for all purposes of the Convention.

Certain provisions are applicable to persons who may not be residents of either Contracting State. For example, Article 19 (Government Service) may apply to an employee of a Contracting State who is resident in neither State. Paragraph 1 of Article 24 (Nondiscrimination) applies to nationals of the Contracting States. Under Article 26 (Exchange of Information and Administrative Assistance), information may be exchanged with respect to residents of third states.

Paragraph 2 states the generally accepted relationship both between the Convention and domestic law and between the Convention and other agreements between the Contracting States

(i.e., that no provision in the Convention may restrict any exclusion, exemption, deduction, credit or other benefit accorded by the tax laws of the Contracting States, or by any other agreement between the Contracting States). For example, if a deduction would be allowed under the U.S. Internal Revenue Code (the "Code") in computing the U.S. taxable income of a resident of the other Contracting State, the deduction also is allowed to that person in computing taxable income under the Convention. Paragraph 2 also means that the Convention may not increase the tax burden on a resident of a Contracting States beyond the burden determined under domestic law. Thus, a right to tax given by the Convention cannot be exercised unless that right also exists under internal law. The relationship between the nondiscrimination provisions of the Convention and other agreements is not addressed in paragraph 2 but in paragraph 3.

It follows that under the principle of paragraph 2 a taxpayer's liability to U.S. tax need not be determined under the Convention if the Code would produce a more favorable result. A taxpayer may not, however, choose among the provisions of the Code and the Convention in an inconsistent manner in order to minimize tax. For example, assume that a resident of the other Contracting State has three separate businesses in the United States. One is a profitable permanent establishment and the other two are trades or businesses that would earn taxable income under the Code but that do not meet the permanent establishment threshold tests of the Convention. One is profitable and the other incurs a loss. Under the Convention, the income of the permanent establishment is taxable, and both the profit and loss of the other two businesses are ignored. Under the Code, all three would be subject to tax, but the loss would be offset against the profits of the two profitable ventures. The taxpayer may not invoke the Convention to exclude the profits of the profitable trade or business and invoke the Code to claim the loss of the loss trade or business against the profit of the permanent establishment. (See Rev. Rul. 84-17, 1984-1 C.B. 308.) If, however, the taxpayer invokes the Code for the taxation of all three ventures, he would not be precluded from invoking the Convention with respect, for example, to any dividend income he may receive from the United States that is not effectively connected with any of his business activities in the United States.

Similarly, nothing in the Convention can be used to deny any benefit granted by any other agreement between the United States and the other Contracting State. For example, if certain benefits are provided for military personnel or military contractors under a Status of Forces Agreement between the United States and the other Contracting State, those benefits or protections will be available to residents of the Contracting States regardless of any provisions to the contrary (or silence) in the Convention.

Paragraph 3 specifically relates to nondiscrimination obligations of the Contracting States under other agreements. The provisions of paragraph 3 are an exception to the rule provided in paragraph 2 of this Article under which the Convention shall not restrict in any manner any benefit now or hereafter accorded by any other agreement between the Contracting States.

Subparagraph (a) of paragraph 3 provides that, notwithstanding any other agreement to which the Contracting States may be parties, a dispute concerning whether a measure is within the scope of this Convention shall be considered only by the competent authorities of the Contracting States, and the procedures under this Convention exclusively shall apply to the

dispute. Thus, procedures for dealing with disputes that may be incorporated into trade, investment, or other agreements between the Contracting States shall not apply for the purpose of determining the scope of the Convention.

Subparagraph (b) of paragraph 3 provides that, unless the competent authorities determine that a taxation measure is not within the scope of this Convention, the nondiscrimination obligations of this Convention exclusively shall apply with respect to that measure, except for such national treatment or most-favored-nation ("MFN") obligations as may apply to trade in goods under the General Agreement on Tariffs and Trade ("GATT"). No national treatment or MFN obligation under any other agreement shall apply with respect to that measure. Thus, unless the competent authorities agree otherwise, any national treatment and MFN obligations undertaken by the Contracting States under agreements other than the Convention shall not apply to a taxation measure, with the exception of GATT as applicable to trade in goods.

Subparagraph (c) of paragraph 3 defines a "measure" broadly. It would include, for example, a law, regulation, rule, procedure, decision, administrative action or guidance, or any other form of measure.

Paragraph 4 contains the traditional saving clause found in all U.S. treaties. The Contracting States reserve their rights, except as provided in paragraph 5, to tax their residents and citizens as provided in their internal laws, notwithstanding any provisions of the Convention to the contrary. For example, if a resident of the other Contracting State performs independent personal services in the United States and the income from the services is not attributable to a fixed base in the United States, Article 14 (Independent Personal Services) would normally prevent the United States from taxing the income. If, however, the resident of the other Contracting State is also a citizen of the United States, the saving clause permits the United States to include the remuneration in the worldwide income of the citizen and subject it to tax under the normal Code rules (i.e., without regard to Code section 894(a)). For special foreign tax credit rules applicable to the U.S. taxation of certain U.S. income of its citizens resident in the other Contracting State, see paragraph 3 of Article 23 (Relief from Double Taxation).

For purposes of the saving clause, "residence" is determined under Article 4 (Residence). Thus, if an individual who is not a U.S. citizen is a resident of the United States under the Code, and is also a resident of the other Contracting State under its law, and that individual has a permanent home available to him in the other Contracting State and not in the United States, he would be treated as a resident of the other Contracting State under Article 4 and for purposes of the saving clause. The United States would not be permitted to apply its statutory rules to that person if they are inconsistent with the treaty. Thus, an individual who is a U.S. resident under the Internal Revenue Code but who is deemed to be a resident of the other Contracting State under the tie-breaker rules of Article 4 (Residence) would be subject to U.S. tax only to the extent permitted by the Convention. However, the person would be treated as a U.S. resident for U.S. tax purposes other than determining the individual's U.S. tax liability. For example, in determining under Code section 957 whether a foreign corporation is a controlled foreign corporation, shares in that corporation held by the individual would be considered to be held by a

U.S. resident. As a result, other U.S. citizens or residents might be deemed to be United States shareholders of a controlled foreign corporation subject to current inclusion of Subpart F income recognized by the corporation. See Treas. Reg. section 301.7701(b)-7(a)(3).

Under paragraph 4 each Contracting State also reserves its right to tax former citizens and long-term residents whose loss of citizenship or long-term residence had as one of its principal purposes the avoidance of tax. The United States treats an individual as having a principal purpose to avoid tax if

      (a) the average annual net income tax of such individual for the period of 5 taxable years ending before the date of the loss of status is greater than $100,000, or

      (b) the net worth of such individual as of such date is $500,000 or more.

The United States defines "long-term resident" as an individual (other than a U.S. citizen) who is a lawful permanent resident of the United States in at least 8 of the prior 15 taxable years. An individual shall not be treated as a lawful permanent resident for any taxable year if such individual is treated as a resident of a foreign country under the provisions of a tax treaty between the United States and the foreign country and the individual does not waive the benefits of such treaty applicable to residents of the foreign country. In the United States, such a former citizen or long-term resident is taxable in accordance with the provisions of section 877 of the Code.

Some provisions are intended to provide benefits to citizens and residents that do not exist under internal law. Paragraph 5 sets forth certain exceptions to the saving clause that preserve these benefits for citizens and residents of the Contracting States. Subparagraph (a) lists certain provisions of the Convention that are applicable to all citizens and residents of a Contracting State, despite the general saving clause rule of paragraph 3:

(1) Paragraph 2 of Article 9 (Associated Enterprises) grants the right to a correlative adjustment with respect to income tax due on profits reallocated under Article 9.

(2) Paragraphs 2 and 5 of Article 18 (Pensions, Social Security, Annuities, Alimony and Child Support) deal with social security benefits and child support payments, respectively. The inclusion of paragraph 2 in the exceptions to the saving clause means that the grant of exclusive taxing right of social security benefits to the paying country applies to deny, for example, to the United States the right to tax its citizens and residents on social security benefits paid by the other Contracting State. The inclusion of paragraph 5, which exempts child support payments from taxation by the State of residence of the recipient, means that if a resident of the other Contracting State pays child support to a citizen or resident of the United States, the United States may not tax the recipient.

(3) Article 23 (Relief from Double Taxation) confirms the benefit of a credit to citizens and residents of one Contracting State for income taxes paid to the other.

(4) Article 24 (Nondiscrimination) requires one Contracting State to grant national treatment to residents and citizens of the other Contracting State in certain circumstances. Excepting this Article from the saving clause requires, for example, that the United States give such benefits to a resident or citizen of the other Contracting State even if that person is a citizen of the United States.

(5) Article 25 (Mutual Agreement Procedure) may confer benefits on citizens and residents of the Contracting States. For example, the statute of limitations may be waived for

refunds and the competent authorities are permitted to use a definition of a term that differs from the internal law definition. As with the foreign tax credit, these benefits are intended to be granted by a Contracting State to its citizens and residents.

Subparagraph (b) of paragraph 5 provides a different set of exceptions to the saving clause. The benefits referred to are all intended to be granted to temporary residents of a Contracting State (for example, in the case of the United States, holders of non-immigrant visas), but not to citizens or to persons who have acquired permanent residence in that State. If beneficiaries of these provisions travel from one of the Contracting States to the other, and remain in the other long enough to become residents under its internal law, but do not acquire permanent residence status (i.e., in the U.S. context, they do not become "green card" holders) and are not citizens of that State, the host State will continue to grant these benefits even if they conflict with the statutory rules. The benefits preserved by this paragraph are the host country exemptions for the following items of income: tax treatment of pension fund contributions under paragraph 6 of Article 18 (Pensions, Social Security , Annuities, Alimony, and Child Support), government service salaries and pensions under Article 19 (Government Service); certain income of visiting students and trainees under Article 20 (Students and Trainees); and the income of diplomatic agents and consular officers under Article 27 (Diplomatic Agents and Consular Officers).

ARTICLE 2
Taxes Covered

This Article specifies the U.S. taxes and the taxes of the other Contracting State to which the Convention applies. Unlike Article 2 in the OECD Model, this Article does not contain a general description of the types of taxes that are covered (i.e., income taxes), but only a listing of the specific taxes covered for both of the Contracting States. With two exceptions, the taxes specified in Article 2 are the covered taxes for all purposes of the Convention. A broader coverage applies, however, for purposes of Articles 24 (Nondiscrimination) and 26 (Exchange of Information and Administrative Assistance). Article 24 (Nondiscrimination applies with respect to all taxes, including those imposed by state and local governments. Article 26 (Exchange of Information and Administrative Assistance) applies with respect to all taxes imposed at the national level.

Subparagraph 1(a) provides that the United States covered taxes are the Federal income taxes imposed by the Code, together with the excise taxes imposed with respect to private foundations (Code sections 4940 through 4948). Although they may be regarded as income taxes, social security taxes (Code sections 1401, 3101, 3111 and 3301) are specifically excluded from coverage. It is expected that social security taxes will be dealt with in bilateral Social Security Totalization Agreements, which are negotiated and administered by the Social Security Administration. Except with respect to Article 24 (Nondiscrimination), state and local taxes in the United States are not covered by the Convention.

In this Model, unlike some U.S. treaties, the Accumulated Earnings Tax and the Personal

Holding Companies Tax are covered taxes because they are income taxes and they are not otherwise excluded from coverage. Under the Code, these taxes will not apply to most foreign corporations because of a statutory exclusion or the corporation's failure to meet a statutory requirement. In the few cases where the taxes may apply to a foreign corporation, the tax due is likely to be insignificant. Treaty coverage therefore confers little if any benefit on such corporations.

Subparagraph 1(b) specifies the existing taxes of the other Contracting State that are covered by the Convention.

Under paragraph 2, the Convention will apply to any taxes that are identical, or substantially similar, to those enumerated in paragraph 1, and which are imposed in addition to, or in place of, the existing taxes after the date of signature of the Convention. The paragraph also provides that the competent authorities of the Contracting States will notify each other of significant changes in their taxation laws or of other laws that affect their obligations under the Convention. The use of the term "significant" means that changes must be reported that are of significance to the operation of the Convention. Other laws that may affect a Contracting State's obligations under the Convention may include, for example, laws affecting bank secrecy.

The competent authorities are also obligated to notify each other of official published materials concerning the application of the Convention. This requirement encompasses materials such as technical explanations, regulations, rulings and judicial decisions relating to the Convention.

ARTICLE 3
General Definitions

Paragraph 1 defines a number of basic terms used in the Convention. Certain others are defined in other articles of the Convention. For example, the term "resident of a Contracting State" is defined in Article 4 (Residence). The term "permanent establishment" is defined in Article 5 (Permanent Establishment). The terms "dividends," "interest" and "royalties" are defined in Articles 10, 11 and 12, respectively. The introduction to paragraph 1 makes clear that these definitions apply for all purposes of the Convention, unless the context requires otherwise. This latter condition allows flexibility in the interpretation of the treaty in order to avoid results not intended by the treaty's negotiators. Terms that are not defined in the Convention are dealt with in paragraph 2.

Subparagraph 1(a) defines the term "person" to include an individual, a trust, a partnership, a company and any other body of persons. The definition is significant for a variety of reasons. For example, under Article 4, only a "person" can be a "resident" and therefore eligible for most benefits under the treaty. Also, all "persons" are eligible to claim relief under Article 25 (Mutual Agreement Procedure).

This definition is more specific but not substantively different from the corresponding

provision in the OECD Model. Unlike the OECD Model, it specifically includes a trust, an estate, and a partnership. Since, however, the OECD Model's definition also uses the phrase "and any other body of persons," partnerships would be included, consistent with paragraph 2 of the Article, to the extent that they are treated as "bodies of persons." Furthermore, because the OECD Model uses the term "includes," trusts and estates would be persons. Under Article 3(2) the meaning of the terms "partnership," "trust" and "estate" would be determined by reference to the law of the Contracting State whose tax is being applied.

The term "company" is defined in subparagraph 1(b) as a body corporate or an entity treated as a body corporate for tax purposes in the state where it is organized.

The terms "enterprise of a Contracting State" and "enterprise of the other Contracting State" are defined in subparagraph 1(c) as an enterprise carried on by a resident of a Contracting State and an enterprise carried on by a resident of the other Contracting State. The term "enterprise" is not defined in the Convention, nor is it defined in the OECD Model or its Commentaries. Despite the absence of a clear, generally accepted meaning for the term "enterprise," the term is understood to refer to any activity or set of activities that constitute a trade or business.

Unlike the OECD Model, subparagraph 1(c) also provides that these terms also encompass an enterprise conducted through an entity (such as a partnership) that is treated as fiscally transparent in the Contracting State where the entity's owner is resident. This phrase has been included in the Model in order to address more explicitly some of the problems presented by fiscally transparent entities. In accordance with Article 4 (Residence), entities that are fiscally transparent in the country in which their owners are resident are not considered to be residents of a Contracting State (although income derived by such entities may be taxed as the income of a resident, if taxed in the hands of resident partners or other owners). Given the approach taken in Article 4, an enterprise conducted by such an entity arguably could not qualify as an enterprise of a Contracting State under the OECD Model because the OECD definition of enterprise requires that the enterprise be conducted by a resident, although most countries would attribute the enterprise to the owners of the entity in such circumstances. The definition in the Model is intended to make clear that an enterprise conducted by such an entity will be treated as carried on by a resident of a Contracting State to the extent its partners or other owners are residents. This approach is consistent with the Code, which under section 875 attributes a trade or business conducted by a partnership to its partners and a trade or business conducted by an estate or trust to its beneficiaries.

An enterprise of a Contracting State need not be carried on in that State. It may be carried on in the other Contracting State or a third state (e.g., a U.S. corporation doing all of its business in the other Contracting State would still be a U.S. enterprise).

Subparagraph 1(d) defines the term "international traffic." The term means any transport by a ship or aircraft except when the vessel is operated solely between places within a Contracting State. This definition is applicable principally in the context of Article 8 (Shipping and Air Transport). The definition in the OECD Model refers to the operator of the ship or

aircraft having its place of effective management in a Contracting State (i.e., being a resident of that State). The U.S. Model does not include this limitation. The broader definition combines with paragraphs 2 and 3 of Article 8 to exempt from tax by the source State income from the rental of ships, aircraft or containers that is earned both by lessors that are operators of ships and aircraft and by those lessors that are not (e.g., a bank or a container leasing company).

The exclusion from international traffic of transport solely between places within a Contracting State means, for example, that carriage of goods or passengers solely between New York and Chicago would not be treated as international traffic, whether carried by a U.S. or a foreign carrier. The substantive taxing rules of the Convention relating to the taxation of income from transport, principally Article 8 (Shipping and Air Transport), therefore, would not apply to income from such carriage. Thus, if the carrier engaged in internal U.S. traffic were a resident of the other Contracting State (assuming that were possible under U.S. law), the United States would not be required to exempt the income from that transport under Article 8. The income would, however, be treated as business profits under Article 7 (Business Profits), and therefore would be taxable in the United States only if attributable to a U.S. permanent establishment of the foreign carrier, and then only on a net basis. The gross basis U.S. tax imposed by section 887 would never apply under the circumstances described. If, however, goods or passengers are carried by a carrier resident in the other Contracting State from a non-U.S. port to, for example, New York, and some of the goods or passengers continue on to Chicago, the entire transport would be international traffic. This would be true if the international carrier transferred the goods at the U.S. port of entry from a ship to a land vehicle, from a ship to a lighter, or even if the overland portion of the trip in the United States was handled by an independent carrier under contract with the original international carrier, so long as both parts of the trip were reflected in original bills of lading. For this reason, the U.S. Model refers, in the definition of "international traffic," to "such transport" being solely between places in the other Contracting State, while the OECD Model refers to the ship or aircraft being operated solely between such places. The U.S. Model language is intended to make clear that, as in the above example, even if the goods are carried on a different aircraft for the internal portion of the international voyage than is used for the overseas portion of the trip, the definition applies to that internal portion as well as the external portion.

Finally, a "cruise to nowhere," i.e., a cruise beginning and ending in a port in the same Contracting State with no stops in a foreign port, would not constitute international traffic.

Subparagraphs 1(e)(i) and (ii) define the term "competent authority" for the United States and the other Contracting State, respectively. The U.S. competent authority is the Secretary of the Treasury or his delegate. The Secretary of the Treasury has delegated the competent authority function to the Commissioner of Internal Revenue, who in turn has delegated the authority to the Assistant Commissioner (International). With respect to interpretative issues, the Assistant Commissioner acts with the concurrence of the Associate Chief Counsel (International) of the Internal Revenue Service.

The term "United States" is defined in subparagraph 1(f) to mean the United States of America, including the states, the District of Columbia and the territorial sea of the United States.

The term does not include Puerto Rico, the Virgin Islands, Guam or any other U.S. possession or territory. Unlike the 1981 Model, this Model explicitly includes certain areas under the sea within the definition of the United States. For certain purposes, the definition is extended to include the seabed and subsoil of undersea areas adjacent to the territorial sea of the United States. This extension applies to the extent that the United States exercises sovereignty in accordance with international law for the purpose of natural resource exploration and exploitation of such areas. This extension of the definition applies, however, only if the person, property or activity to which the Convention is being applied is connected with such natural resource exploration or exploitation. Thus, it would not include any activity involving the sea floor of an area over which the United States exercised sovereignty for natural resource purposes if that activity was unrelated to the exploration and exploitation of natural resources. The other Contracting State is defined in subparagraph 1(g).

This result is consistent with the result that would be obtained under the sometimes less precise definitions in some U.S. treaties. In the absence of a precise definition incorporating the continental shelf, the term "United States of America" would be interpreted by reference to the U.S. internal law definition. Section 638 treats the continental shelf as part of the United States.

The term "national," as it relates to the United States and to the other Contracting State, is defined in subparagraphs 1(h)(i) and (ii). This term is relevant for purposes of Articles 19 (Government Service) and 24 (Nondiscrimination). A national of one of the Contracting States is (1) an individual who is a citizen or national of that State, and (2) any legal person, partnership or association deriving its status, as such, from the law in force in the State where it is established. This definition is closely analogous to that found in the OECD Model.

The definition differs in two substantive respects from that in the 1981 Model. First, in the 1981 Model a U.S. national was defined as a citizen of the United States, and did not include juridical persons. The addition of juridical persons to the definition may have significance in relation to paragraph 1 of Article 24 (Nondiscrimination), which provides that nationals of one Contracting State may not be subject in the other to any taxes or connected requirements that are other or more burdensome than those applicable to nationals of that other State who are in the same circumstances. Second, the 1981 Model (and the 1977 OECD Model) included the definition of the term "national" in Article 24 (Nondiscrimination) rather than in Article 3. Since the term has application in other articles as well (e.g., Article 19 (Government Service)), the definition has been moved to Article 3 (as it has been in the current OECD Model).

This Model adds a definition that was not included in previous U.S. Models, or in the OECD Model. This is the definition of "qualified governmental entity" in subparagraph 1(i). This definition is relevant for purposes of Articles 4 (Residence) and 22 (Limitation on Benefits). A portion of this definition (i.e., sub-subparagraph (iii) dealing with governmental pension funds) also is relevant for purposes of Article 10 (Dividends). The term means:

        (i) the Government of a Contracting State or of a political subdivision or local authority of the Contracting State;

        (ii) A person wholly owned by a governmental entity described in subparagraph (i), that satisfies certain organizational and funding standards; and

(iii) a pension fund that meets the standards of subparagraphs (i) and (ii) and that provides government service pension benefits, described in Article 19 (Government Service).

A qualified governmental entity described in subparagraphs (ii) and (iii) may not engage in any commercial activity.

Paragraph 2 provides that in the application of the Convention, any term used but not defined in the Convention will have the meaning that it has under the law of the Contracting State whose tax is being applied, unless the context requires otherwise. The text of the paragraph has been amended from previous Models to clarify that if the term is defined under both the tax and non-tax laws of a Contracting State, the definition in the tax law will take precedence over the definition in the non-tax laws. Finally, there also may be cases where the tax laws of a State contain multiple definitions of the same term. In such a case, the definition used for purposes of the particular provision at issue, if any, should be used.

If the meaning of a term cannot be readily determined under the law of a Contracting State, or if there is a conflict in meaning under the laws of the two States that creates difficulties in the application of the Convention, the competent authorities, as indicated in paragraph 3(f) of Article 25 (Mutual Agreement Procedure), may establish a common meaning in order to prevent double taxation or to further any other purpose of the Convention. This common meaning need not conform to the meaning of the term under the laws of either Contracting State.

It has been understood implicitly in previous U.S. Models and in the OECD Model that the reference in paragraph 2 to the internal law of a Contracting State means the law in effect at the time the treaty is being applied, not the law as in effect at the time the treaty was signed. This use of "ambulatory definitions" has been clarified in the text of this Model.

The use of an ambulatory definition, however, may lead to results that are at variance with the intentions of the negotiators and of the Contracting States when the treaty was negotiated and ratified. The reference in both paragraphs 1 and 2 to the "context otherwise requiring" a definition different from the treaty definition, in paragraph 1, or from the internal law definition of the Contracting State whose tax is being imposed, under paragraph 2, refers to a circumstance where the result intended by the Contracting States is different from the result that would obtain under either the paragraph 1 definition or the statutory definition. For example, the Technical Explanation to paragraph 2(b) of Article 15 (Dependent Personal Services) suggests a definition of the term "employer," which is not defined in the Article. This definition may or may not conform to the statutory definitions in the Contracting States, but is consistent with the text and the intent of the Article, and is intended to prevent a practice known as the "hiring out of labor." (See the discussion of this issue on page __ of the Technical Explanation to Article 15 (Dependent Personal Services).) This case therefore may be one in which the context requires a definition different from that of the internal law of one of the States. Thus, some flexibility is permitted in defining terms.

ARTICLE 4
Residence

This Article sets forth rules for determining whether a person is a resident of a Contracting State for purposes of the Convention. As a general matter only residents of the Contracting States may claim the benefits of the Convention. The treaty definition of residence is to be used only for purposes of the Convention. The fact that a person is determined to be a resident of a Contracting State under Article 4 does not necessarily entitle that person to the benefits of the Convention. In addition to being a resident, a person also must qualify for benefits under Article 22 (Limitation on Benefits) in order to receive benefits conferred on residents of a Contracting State.

The determination of residence for treaty purposes looks first to a person's liability to tax as a resident under the respective taxation laws of the Contracting States. As a general matter, a person who, under those laws, is a resident of one Contracting State and not of the other need look no further. That person is a resident for purposes of the Convention of the State in which he is resident under internal law. If, however, a person is resident in both Contracting States under their respective taxation laws, the Article proceeds, where possible, to assign a single State of residence to such a person for purposes of the Convention through the use of tie-breaker rules.

*Paragraph 1*

The term "resident of a Contracting State" is defined in paragraph 1. In general, this definition incorporates the definitions of residence in U.S. law and that of the other Contracting State by referring to a resident as a person who, under the laws of a Contracting State, is subject to tax there by reason of his domicile, residence, citizenship, place of management, place of incorporation or any other similar criterion. Thus, residents of the United States include aliens who are considered U.S. residents under Code section 7701(b). Subparagraphs (a) through (d) each address special cases that may arise in the context of Article 4.

Certain entities that are nominally subject to tax but that in practice rarely pay tax also would generally be treated as residents and therefore accorded treaty benefits. For example, RICs, REITs and REMICs are all residents of the United States for purposes of the treaty. Although the income earned by these entities normally is not subject to U.S. tax in the hands of the entity, they are taxable to the extent that they do not currently distribute their profits, and therefore may be regarded as "liable to tax." They also must satisfy a number of requirements under the Code in order to be entitled to special tax treatment.

Subparagraph (a) provides that a person who is liable to tax in a Contracting State only in respect of income from sources within that State will not be treated as a resident of that Contracting State for purposes of the Convention. Thus, a consular official of the other Contracting State who is posted in the United States, who may be subject to U.S. tax on U.S. source investment income, but is not taxable in the United States on non-U.S. source income, would not be considered a resident of the United States for purposes of the Convention. (See Code section 7701(b)(5)(B)). Similarly, an enterprise of the other Contracting State with a

permanent establishment in the United States is not, by virtue of that permanent establishment, a resident of the United States. The enterprise generally is subject to U.S. tax only with respect to its income that is attributable to the U.S. permanent establishment, not with respect to its worldwide income, as is a U.S. resident.

Subparagraph (b) provides that certain tax-exempt entities such as pension funds and charitable organizations will be regarded as residents regardless of whether they are generally liable for income tax in the State where they are established. An entity will be described in this subparagraph if it is generally exempt from tax by reason of the fact that it is organized and operated exclusively to perform a charitable or similar purpose or to provide pension or similar benefits to employees. The reference to "similar benefits" is intended to encompass employee benefits such as health and disability benefits.

The inclusion of this provision is intended to clarify the generally accepted practice of treating an entity that would be liable for tax as a resident under the internal law of a state but for a specific exemption from tax (either complete or partial) as a resident of that state for purposes of paragraph 1. The reference to a general exemption is intended to reflect the fact that under U.S. law, certain organizations that generally are considered to be tax-exempt entities may be subject to certain excise taxes or to income tax on their unrelated business income. Thus, a U.S. pension trust, or an exempt section 501(c) organization (such as a U.S. charity) that is generally exempt from tax under U.S. law is considered a resident of the United States for all purposes of the treaty.

Subparagraph (c) specifies that a qualified governmental entity (as defined in Article 3) is to be treated as a resident of that State. Although this provision is not contained in previous U.S. Models, it is generally understood that such entities are to be treated as residents under all of those Model treaties. The purpose of including the rule in the Model is to make this understanding explicit. Article 4 of the OECD Model was amended in 1995 to adopt a similar approach.

Subparagraph (d) addresses special problems presented by fiscally transparent entities such as partnerships and certain estates and trusts that are not subject to tax at the entity level. This subparagraph applies to any resident of a Contracting State who is entitled to income derived through an entity that is treated as fiscally transparent under the laws of either Contracting State. Entities falling under this description in the United States would include partnerships, common investment trusts under section 584 and grantor trusts. This paragraph also applies to U.S. limited liability companies ("LLC's") that are treated as partnerships for U.S. tax purposes.

Subparagraph (d) provides that an item of income derived through such fiscally transparent entities will be considered to be derived by a resident of a Contracting State if the resident is treated under the taxation laws of the State where he is resident as deriving the item of income. For example, if a U.S. corporation distributes a dividend to an entity that is treated as fiscally transparent in the other State, the dividend will be considered to be derived by a resident of that State to the extent that the taxation law of that State treats residents of that State as

deriving the income for tax purposes. In the case of a partnership, this normally would include the partners of the entity that are residents of that other Contracting State.

The taxation laws of a Contracting State may treat an item of income, profit or gain as income, profit or gain of a resident of that State even if the resident is not subject to tax on that particular item of income, profit or gain. For example, if a Contracting State has a participation exemption for certain foreign-source dividends and capital gains, such income or gains would be regarded as income or gain of a resident of that State who otherwise derived the income or gain, despite the fact that the resident could be exempt from tax in that State on the income or gain.

Income is "derived through" a fiscally transparent entity if the entity's participation in the transaction giving rise to the income, profit or gain in question is respected after application of any source State anti-abuse principles based on substance over form and similar analyses. For example, if a partnership with U.S. partners receives income arising in the other Contracting State, that income will be considered to be derived through the partnership by its partners as long as the partnership's participation in the transaction is not disregarded for lack of economic substance. In such a case, the partners would be considered to be the beneficial owners of the income.

Where income is derived through an entity organized in a third state that has owners resident in one of the Contracting States, the characterization of the entity in that third state is irrelevant for purposes of determining whether the resident is entitled to treaty benefits with respect to income derived by the entity.

This rule also applies to trusts to the extent that they are fiscally transparent in their beneficial owner's State of residence. For example, if X, a resident of the other Contracting State, creates a revocable trust and names persons resident in a third country as the beneficiaries of the trust, X would be treated as the beneficial owner of income derived from the United States under the Code's rules. If the other State had no rules comparable to those in sections 671 through 679 then it is possible that under the laws of the other State neither X nor the trust would be taxed on the income derived from the United States. In these cases subparagraph (d) provides that the trust's income would be regarded as being derived by a resident of the other State only to the extent that the laws of that State treat residents of that State as deriving the income for tax purposes.

*Paragraph 2*

If, under the laws of the two Contracting States, and, thus, under paragraph 1, an individual is deemed to be a resident of both Contracting States, a series of tie-breaker rules are provided in paragraph 3 to determine a single State of residence for that individual. These tests are to be applied in the order in which they are stated. The first test is based on where the individual has a permanent home. If that test is inconclusive because the individual has a permanent home available to him in both States, he will be considered to be a resident of the Contracting State where his personal and economic relations are closest (i.e., the location of his "center of vital interests"). If that test is also inconclusive, or if he does not have a permanent

home available to him in either State, he will be treated as a resident of the Contracting State where he maintains an habitual abode. If he has an habitual abode in both States or in neither of them, he will be treated as a resident of his Contracting State of citizenship. If he is a citizen of both States or of neither, the matter will be considered by the competent authorities, who will attempt to agree to assign a single State of residence.

*Paragraph 3*

Paragraph 3 seeks to settle dual-residence issues for companies. A company is treated as resident in the United States if it is created or organized under the laws of the United States or a political subdivision. If the same test is used to determine corporate residence under the laws of the other Contracting State, dual corporate residence will not occur. If, however, as is frequently the case, a company is treated as a resident of the other Contracting State if it is either incorporated or managed and controlled there, dual residence can arise in the case of a U.S. company that is managed and controlled in the other Contracting State. Under paragraph 3, the residence of such a company will be in the Contracting State under the laws of which it is created or organized (i.e., the United States, in the example).

*Paragraph 4*

Dual residents other than individuals or companies (such as trusts or estates) are addressed by paragraph 4. If such a person is, under the rules of paragraph 1, resident in both Contracting States, the competent authorities shall seek to determine a single State of residence for that person for purposes of the Convention.

ARTICLE 5
Permanent Establishment

This Article defines the term "permanent establishment," a term that is significant for several articles of the Convention. The existence of a permanent establishment in a Contracting State is necessary under Article 7 (Business Profits) for the taxation by that State of the business profits of a resident of the other Contracting State. Since the term "fixed base" in Article 14 (Independent Personal Services) is understood by reference to the definition of "permanent establishment," this Article is also relevant for purposes of Article 14. Articles 10, 11 and 12 (dealing with dividends, interest, and royalties, respectively) provide for reduced rates of tax at source on payments of these items of income to a resident of the other State only when the income is not attributable to a permanent establishment or fixed base that the recipient has in the source State. The concept is also relevant in determining which Contracting State may tax certain gains under Article 13 (Gains) and certain "other income" under Article 21 (Other Income).

The Article follows closely both the OECD Model and the 1981 U.S. Model provisions.

*Paragraph 1*

The basic definition of the term "permanent establishment" is contained in paragraph 1. As used in the Convention, the term means a fixed place of business through which the business of an enterprise is wholly or partly carried on.

*Paragraph 2*

Paragraph 2 lists a number of types of fixed places of business that constitute a permanent establishment. This list is illustrative and non-exclusive. According to paragraph 2, the term permanent establishment includes a place of management, a branch, an office, a factory, a workshop, and a mine, oil or gas well, quarry or other place of extraction of natural resources. As indicated in the OECD Commentaries (see paragraphs 4 through 8), a general principle to be observed in determining whether a permanent establishment exists is that the place of business must be "fixed" in the sense that a particular building or physical location is used by the enterprise for the conduct of its business, and that it must be foreseeable that the enterprise's use of this building or other physical location will be more than temporary.

*Paragraph 3*

This paragraph provides rules to determine whether a building site or a construction, assembly or installation project, or a drilling rig or ship used for the exploration of natural resources constitutes a permanent establishment for the contractor, driller, etc. An activity is merely preparatory and does not create a permanent establishment under paragraph 4(e) unless the site, project, etc. lasts or continues for more than twelve months. It is only necessary to refer to "exploration" and not "exploitation" in this context because exploitation activities are defined to constitute a permanent establishment under subparagraph (f) of paragraph 2. Thus, a drilling rig does not constitute a permanent establishment if a well is drilled in only six months, but if production begins in the following month the well becomes a permanent establishment as of that date.

The twelve-month test applies separately to each site or project. The twelve-month period begins when work (including preparatory work carried on by the enterprise) physically begins in a Contracting State. A series of contracts or projects by a contractor that are interdependent both commercially and geographically are to be treated as a single project for purposes of applying the twelve-month threshold test. For example, the construction of a housing development would be considered as a single project even if each house were constructed for a different purchaser. Several drilling rigs operated by a drilling contractor in the same sector of the continental shelf also normally would be treated as a single project.

If the twelve-month threshold is exceeded, the site or project constitutes a permanent establishment from the first day of activity. In applying this paragraph, time spent by a sub-contractor on a building site is counted as time spent by the general contractor at the site for purposes of determining whether the general contractor has a permanent establishment. However, for the sub-contractor itself to be treated as having a permanent establishment, the sub-contractor's activities at the site must last for more than 12 months. If a sub-contractor is on a site intermittently time is measured from the first day the sub-contractor is on the site until the last

day (i.e., intervening days that the sub-contractor is not on the site are counted) for purposes of applying the 12-month rule.

These interpretations of the Article are based on the Commentary to paragraph 3 of Article 5 of the OECD Model, which contains language almost identical to that in the Convention (except for the absence in the OECD Model of a rule for drilling rigs). These interpretations are consistent with the generally accepted international interpretation of the language in paragraph 3 of Article 5 of the Convention.

*Paragraph 4*

This paragraph contains exceptions to the general rule of paragraph 1, listing a number of activities that may be carried on through a fixed place of business, but which nevertheless do not create a permanent establishment. The use of facilities solely to store, display or deliver merchandise belonging to an enterprise does not constitute a permanent establishment of that enterprise. The maintenance of a stock of goods belonging to an enterprise solely for the purpose of storage, display or delivery, or solely for the purpose of processing by another enterprise does not give rise to a permanent establishment of the first-mentioned enterprise. The maintenance of a fixed place of business solely for the purpose of purchasing goods or merchandise, or for collecting information, for the enterprise, or for other activities that have a preparatory or auxiliary character for the enterprise, such as advertising, or the supply of information do not constitute a permanent establishment of the enterprise. Thus, as explained in paragraph 22 of the OECD Commentaries, an employee of a news organization engaged merely in gathering information would not constitute a permanent establishment of the news organization.

Further, a combination of these activities will not give rise to a permanent establishment: unlike the OECD Model, the Model provides that the maintenance of a fixed place of business for a combination of the activities listed in subparagraphs (a) through (e) of the paragraph does not give rise to a permanent establishment, without the OECD Model's qualification that the overall combination of activities must be of a preparatory or auxiliary character. The United States position is that a combination of activities that are each preparatory or auxiliary always will result in an overall activity that is also preparatory or auxiliary.

*Paragraph 5*

Paragraphs 5 and 6 specify when activities carried on by an agent on behalf of an enterprise create a permanent establishment of that enterprise. Under paragraph 5, a dependent agent of an enterprise is deemed to be a permanent establishment of the enterprise if the agent has and habitually exercises an authority to conclude contracts that are binding on the enterprise. If, however, for example, his activities are limited to those activities specified in paragraph 4 which would not constitute a permanent establishment if carried on by the enterprise through a fixed place of business, the agent is not a permanent establishment of the enterprise.

The OECD Model uses the term "in the name of that enterprise" rather than "binding on the enterprise." This difference is intended to be a clarification rather than a substantive

difference. As indicated in paragraph 32 to the OECD Commentaries on Article 5, paragraph 5 of the Article is intended to encompass persons who have "sufficient authority to bind the enterprise's participation in the business activity in the State concerned."

The contracts referred to in paragraph 5 are those relating to the essential business operations of the enterprise, rather than ancillary activities. For example, if the agent has no authority to conclude contracts in the name of the enterprise with its customers for, say, the sale of the goods produced by the enterprise, but it can enter into service contracts in the name of the enterprise for the enterprise's business equipment used in the agent's office, this contracting authority would not fall within the scope of the paragraph, even if exercised regularly.

*Paragraph 6*

Under paragraph 6, an enterprise is not deemed to have a permanent establishment in a Contracting State merely because it carries on business in that State through an independent agent, including a broker or general commission agent, if the agent is acting in the ordinary course of his business as an independent agent. Thus, there are two conditions that must be satisfied: the agent must be both legally and economically independent of the enterprise, and the agent must be acting in the ordinary course of its business in carrying out activities on behalf of the enterprise

Whether the agent and the enterprise are independent is a factual determination. Among the questions to be considered are the extent to which the agent operates on the basis of instructions from the enterprise. An agent that is subject to detailed instructions regarding the conduct of its operations or comprehensive control by the enterprise is not legally independent.

In determining whether the agent is economically independent, a relevant factor is the extent to which the agent bears business risk. Business risk refers primarily to risk of loss. An independent agent typically bears risk of loss from its own activities. In the absence of other factors that would establish dependence, an agent that shares business risk with the enterprise, or has its own business risk, is economically independent because its business activities are not integrated with those of the principal. Conversely, an agent that bears little or no risk from that activities it performs is not economically independent and therefore is not described in paragraph 6.

Another relevant factor in determining whether an agent is economically independent is whether the agent has an exclusive or nearly exclusive relationship with the principal. Such a relationship may indicate that the principal has economic control over the agent. A number of principals acting in concert also may have economic control over an agent. The limited scope of the agent's activities and the agent's dependence on a single source of income may indicate that the agent lacks economic independence. It should be borne in mind, however, that exclusivity is not in itself a conclusive test: an agent may be economically independent notwithstanding an exclusive relationship with the principal if it has the capacity to diversify and acquire other clients without substantial modifications to its current business and without substantial harm to its business profits. Thus, exclusivity should be viewed merely as a pointer to further

investigation of the relationship between the principal and the agent. Each case must be addressed on the basis of its own facts and circumstances.

*Paragraph 7*

This paragraph clarifies that a company that is a resident of a Contracting State is not deemed to have a permanent establishment in the other Contracting State merely because it controls, or is controlled by, a company that is a resident of that other Contracting State, or that carries on business in that other Contracting State. The determination whether a permanent establishment exists is made solely on the basis of the factors described in paragraphs 1 through 6 of the Article. Whether a company is a permanent establishment of a related company, therefore, is based solely on those factors and not on the ownership or control relationship between the companies.


ARTICLE 6
Income from Real Property (Immovable Property)

*Paragraph 1*

The first paragraph of Article 6 states the general rule that income of a resident of a Contracting State derived from real property situated in the other Contracting State may be taxed in the Contracting State in which the property is situated. The paragraph specifies that income from real property includes income from agriculture and forestry. Income from agriculture and forestry are dealt with in Article 6 rather than in Article 7 (Business Profits) in order to conform the U.S. Model to the OECD Model. Given the availability of the net election in paragraph 5, taxpayers generally should be able to obtain the same tax treatment in the situs country regardless of whether the income is treated as business profits or real property income. Paragraph 3 clarifies that the income referred to in paragraph 1 also means income from any use of real property, including, but not limited to, income from direct use by the owner (in which case income may be imputed to the owner for tax purposes) and rental income from the letting of real property.

This Article does not grant an exclusive taxing right to the situs State; the situs State is merely given the primary right to tax. The Article does not impose any limitation in terms of rate or form of tax on the situs State, except that, as provided in paragraph 5, the situs State must allow the taxpayer an election to be taxed on a net basis.

*Paragraph 2*

The term "real property" is defined in paragraph 2 by reference to the internal law definition in the situs State. In the case of the United States, the term has the meaning given to it by Reg. § 1.897-1(b). The OECD Model, and many other countries, use the term "immovable property" instead. It is to be understood from the parenthetical use of the term "immovable property" in the title to the Article and in paragraphs 1 and 2, that the two terms are synonymous. Thus the statutory definition is to be used whether the statutory term is "real property" or

"immovable property".

*Paragraph 3*

Paragraph 3 makes clear that all forms of income derived from the exploitation of real property are taxable in the Contracting State in which the property is situated. In the case of a net lease of real property, if a net election has not been made, the gross rental payment (before deductible expenses incurred by the lessee) is treated as income from the property. Income from the disposition of an interest in real property, however, is not considered "derived" from real property and is not dealt with in this article. The taxation of that income is addressed in Article 13 (Gains). Also, the interest paid on a mortgage on real property and distributions by a U.S. Real Estate Investment Trust are not dealt with in Article 6. Such payments would fall under Articles 10 (Dividends), 11 (Interest) or 13 (Gains). Finally, dividends paid by a United States Real Property Holding Corporation are not considered to be income from the exploitation of real property: such payments would fall under Article 10 (Dividends) or 13(Gains).

*Paragraph 4*

This paragraph specifies that the basic rule of paragraph 1 (as elaborated in paragraph 3) applies to income from real property of an enterprise and to income from real property used for the performance of independent personal services. This clarifies that the situs country may tax the real property income (including rental income) of a resident of the other Contracting State in the absence of attribution to a permanent establishment or fixed base in the situs State. This provision represents an exception to the general rule under Articles 7 (Business Profits) and 14 (Independent Personal Services) that income must be attributable to a permanent establishment or fixed base, respectively, in order to be taxable in the situs state.

*Paragraph 5*

The paragraph provides that a resident of one Contracting State that derives real property income from the other may elect, for any taxable year, to be subject to tax in that other State on a net basis, as though the income were attributable to a permanent establishment in that other State. The election may be terminated with the consent of the competent authority of the situs State. In the United States, revocation will be granted in accordance with the provisions of Treas. Reg. section 1.871-10(d)(2).

ARTICLE 7
Business Profits

This Article provides rules for the taxation by a Contracting State of the business profits of an enterprise of the other Contracting State.

*Paragraph 1*

Paragraph 1 states the general rule that business profits (as defined in paragraph 7) of an enterprise of one Contracting State may not be taxed by the other Contracting State unless the enterprise carries on business in that other Contracting State through a permanent establishment (as defined in Article 5 (Permanent Establishment)) situated there. When that condition is met, the State in which the permanent establishment is situated may tax the enterprise, but only on a net basis and only on the income that is attributable to the permanent establishment. This paragraph is identical to paragraph 1 of Article 7 of the OECD Model.

*Paragraph 2*

Paragraph 2 provides rules for the attribution of business profits to a permanent establishment. The Contracting States will attribute to a permanent establishment the profits that it would have earned had it been an independent enterprise engaged in the same or similar activities under the same or similar circumstances. This language incorporates the arm's length standard for purposes of determining the profits attributable to a permanent establishment. The computation of business profits attributable to a permanent establishment under this paragraph is subject to the rules of paragraph 3 for the allowance of expenses incurred for the purposes of earning the profits.

The "attributable to" concept of paragraph 2 is analogous but not entirely equivalent to the "effectively connected" concept in Code section 864(c). The profits attributable to a permanent establishment may be from sources within or without a Contracting State.

Paragraph 2 also provides that the business profits attributed to a permanent establishment include only those derived from that permanent establishment's assets or activities. This rule is consistent with the "asset-use" and "business activities" test of Code section 864(c)(2). The OECD Model does not expressly provide such a limitation, although it generally is understood to be implicit in paragraph 1 of Article 7 of the OECD Model. This provision was included in the U.S. Model to make it clear that the limited force of attraction rule of Code section 864(c)(3) is not incorporated into paragraph 2.

This Article does not contain a provision corresponding to paragraph 4 of Article 7 of the OECD Model. That paragraph provides that a Contracting State in certain circumstances may determine the profits attributable to a permanent establishment on the basis of an apportionment of the total profits of the enterprise. This paragraph has not been included in the Model because it is unnecessary. The OECD Commentaries to paragraphs 2 and 3 of Article 7 authorize the use of such approaches independently of paragraph 4 of Article 7 of the OECD Model. Any such approach, however, must be designed to approximate an arm's length result.

*Paragraph 3*

This paragraph is in substance the same as paragraph 3 of Article 7 of the OECD Model, although it is in some respects more detailed. Paragraph 3 provides that in determining the business profits of a permanent establishment, deductions shall be allowed for the expenses incurred for the purposes of the permanent establishment, ensuring that business profits will be

taxed on a net basis. This rule is not limited to expenses incurred exclusively for the purposes of the permanent establishment, but includes a reasonable allocation of expenses incurred for the purposes of the enterprise as a whole, or that part of the enterprise that includes the permanent establishment. Deductions are to be allowed regardless of which accounting unit of the enterprise books the expenses, so long as they are incurred for the purposes of the permanent establishment. For example, a portion of the interest expense recorded on the books of the home office in one State may be deducted by a permanent establishment in the other if properly allocable thereto.

The paragraph specifies that the expenses that may be considered to be incurred for the purposes of the permanent establishment are expenses for research and development, interest and other similar expenses, as well as a reasonable amount of executive and general administrative expenses. This rule permits (but does not require) each Contracting State to apply the type of expense allocation rules provided by U.S. law (such as in Treas. Reg. sections 1.861-8 and 1.882-5).

Paragraph 3 does not permit a deduction for expenses charged to a permanent establishment by another unit of the enterprise. Thus, a permanent establishment may not deduct a royalty deemed paid to the head office. Similarly, a permanent establishment may not increase its business profits by the amount of any notional fees for ancillary services performed for another unit of the enterprise, but also should not receive a deduction for the expense of providing such services, since those expenses would be incurred for purposes of a business unit other than the permanent establishment.

*Paragraph 4*

Paragraph 4 provides that no business profits can be attributed to a permanent establishment merely because it purchases goods or merchandise for the enterprise of which it is a part. This paragraph is essentially identical to paragraph 5 of Article 7 of the OECD Model. This rule applies only to an office that performs functions for the enterprise in addition to purchasing. The income attribution issue does not arise if the sole activity of the permanent establishment is the purchase of goods or merchandise because such activity dos not give rise to a permanent establishment under Article 5 (Permanent Establishment). A common situation in which paragraph 4 is relevant is one in which a permanent establishment purchases raw materials for the enterprise's manufacturing operation conducted outside the United States and sells the manufactured product. While business profits may be attributable to the permanent establishment with respect to its sales activities, no profits are attributable to it with respect to its purchasing activities.

*Paragraph 5*

This paragraph tracks paragraph 6 of Article 7 of the OECD Model, providing that profits shall be determined by the same method of accounting each year, unless there is good reason to change the method used. This rule assures consistent tax treatment over time for permanent establishments. It limits the ability of both the Contracting State and the enterprise to change accounting methods to be applied to the permanent establishment. It does not, however, restrict a

Contracting State from imposing additional requirements, such as the rules under Code section 481, to prevent amounts from being duplicated or omitted following a change in accounting method.

*Paragraph 6*

Paragraph 6 coordinates the provisions of Article 7 and other provisions of the Convention. Under this paragraph, when business profits include items of income that are dealt with separately under other articles of the Convention, the provisions of those articles will, except when they specifically provide to the contrary, take precedence over the provisions of Article 7. For example, the taxation of dividends will be determined by the rules of Article 10 (Dividends), and not by Article 7, except where, as provided in paragraph 6 of Article 10, the dividend is attributable to a permanent establishment or fixed base. In the latter case the provisions of Articles 7 or 14 (Independent Personal Services) apply. Thus, an enterprise of one State deriving dividends from the other State may not rely on Article 7 to exempt those dividends from tax at source if they are not attributable to a permanent establishment of the enterprise in the other State. By the same token, if the dividends are attributable to a permanent establishment in the other State, the dividends may be taxed on a net income basis at the source State's full corporate tax rate, rather than on a gross basis under Article 10 (Dividends).

As provided in Article 8 (Shipping and Air Transport), income derived from shipping and air transport activities in international traffic described in that Article is taxable only in the country of residence of the enterprise regardless of whether it is attributable to a permanent establishment situated in the source State.

*Paragraph 7*

The term "business profits" is defined generally in paragraph 7 to mean income derived from any trade or business. In the absence of evidence to the contrary the lack of this definition in a bilateral Convention should not be construed to indicate that any different meaning should be attributed to the term.

In accordance with this broad definition, the term "business profits" includes income attributable to notional principal contracts and other financial instruments to the extent that the income is attributable to a trade or business of dealing in such instruments, or is otherwise related to a trade or business (as in the case of a notional principal contract entered into for the purpose of hedging currency risk arising from an active trade or business). Any other income derived from such instruments is, unless specifically covered in another article, dealt with under Article 21 (Other Income).

The first sentence of the paragraph states the longstanding U.S. view that income earned by an enterprise from the furnishing of personal services is business profits. Thus, a consulting firm resident in one State whose employees perform services in the other State through a permanent establishment may be taxed in that other State on a net basis under Article 7, and not under Article 14 (Independent Personal Services), which applies only to individuals. The salaries

of the employees would be subject to the rules of Article 15 (Dependent Personal Services).

The paragraph also specifies that the term "business profits" includes income derived by an enterprise from the rental of tangible personal property. In the 1977 OECD Model Convention this class of income was treated as a royalty, subject to the rules of Article 12. This rule was changed in the 1992 OECD Model, and the U.S. Model reflects this change in policy. The inclusion of income derived by an enterprise from the rental of tangible personal property in business profits means that such income earned by a resident of a Contracting State can be taxed by the other Contracting State only if the income is attributable to a permanent establishment maintained by the resident in that other State, and, if the income is taxable, it can be taxed only on a net basis. Income from the rental of tangible personal property that is not derived in connection with a trade or business is dealt with in Article 21 (Other Income).

*Paragraph 8*

Paragraph 8 incorporates into the Convention the rule of Code section 864(c)(6). Like the Code section on which it is based, paragraph 8 provides that any income or gain attributable to a permanent establishment or a fixed base during its existence is taxable in the Contracting State where the permanent establishment or fixed base is situated, even if the payment of that income or gain is deferred until after the permanent establishment or fixed base ceases to exist. This rule applies with respect to paragraphs 1 and 2 of Article 7 (Business Profits), paragraph 6 of Article 10 (Dividends), paragraph 3 of Articles 11 (Interest), 12 (Royalties) and 13 (Gains), Article 14 (Independent Personal Services) and paragraph 2 of Article 21 (Other Income).

The effect of this rule can be illustrated by the following example. Assume a company that is a resident of the other Contracting State and that maintains a permanent establishment in the United States winds up the permanent establishment's business and sells the permanent establishment's inventory and assets to a U.S. buyer at the end of year 1 in exchange for an interest-bearing installment obligation payable in full at the end of year 3. Despite the fact that Article 13's threshold requirement for U.S. taxation is not met in year 3 because the company has no permanent establishment in the United States, the United States may tax the deferred income payment recognized by the company in year 3.

*Relation to Other Articles*

This Article is subject to the saving clause of paragraph 4 of Article 1 (General Scope) of the Model. Thus, if a citizen of the United States who is a resident of the other Contracting State under the treaty derives business profits from the United States that are not attributable to a permanent establishment in the United States, the United States may, subject to the special foreign tax credit rules of paragraph 3 of Article 23 (Relief from Double Taxation), tax those profits, notwithstanding the provision of paragraph 1 of this Article which would exempt the income from U.S. tax.

The benefits of this Article are also subject to Article 22 (Limitation on Benefits). Thus, an enterprise of the other Contracting State and that derives income effectively connected with a

U.S. trade or business may not claim the benefits of Article 7 unless the resident carrying on the enterprise qualifies for such benefits under Article 22.

ARTICLE 8
Shipping and Air Transport

This Article governs the taxation of profits from the operation of ships and aircraft in international traffic. The term "international traffic" is defined in subparagraph 1(d) of Article 3 (General Definitions).

*Paragraph 1*

Paragraph 1 provides that profits derived by an enterprise of a Contracting State from the operation in international traffic of ships or aircraft are taxable only in that Contracting State. Because paragraph 6 of Article 7 (Business Profits) defers to Article 8 with respect to shipping income, such income derived by a resident of one of the Contracting States may not be taxed in the other State even if the enterprise has a permanent establishment in that other State. Thus, if a U.S. airline has a ticket office in the other State, that State may not tax the airline's profits attributable to that office under Article 7. Since entities engaged in international transportation activities normally will have many permanent establishments in a number of countries, the rule avoids difficulties that would be encountered in attributing income to multiple permanent establishments if the income were covered by Article 7 (Business Profits).

*Paragraph 2*

The income from the operation of ships or aircraft in international traffic that is exempt from tax under paragraph 1 is defined in paragraph 2. This paragraph is not found in the OECD Model, but the effect of the paragraph is generally consistent with the description of the scope of Article 8 in the Commentary to Article 8 of the OECD Model. Most of the income items that are described in paragraph 2 of the U.S. Model are described in the OECD Commentary as being included within the scope of the exemption in paragraph 1. Unlike the OECD Model, however, paragraph 2 also covers non-incidental bareboat leasing. See paragraph 5 of the OECD Commentaries.

In addition to income derived directly from the operation of ships and aircraft in international traffic, this definition also includes certain items of rental income that are closely related to those activities. First, income of an enterprise of a Contracting State from the rental of ships or aircraft on a full basis (i.e., with crew) when such ships or aircraft are used in international traffic is income of the lessor from the operation of ships and aircraft in international traffic and, therefore, is exempt from tax in the other Contracting State under paragraph 1. Also, paragraph 2 encompasses income from the lease of ships or aircraft on a bareboat basis (i.e., without crew), either when the ships or aircraft are operated in international traffic by the lessee, or when the income is incidental to other income of the lessor from the operation of ships or aircraft in international traffic. As discussed above, of these classes of rental

income, only non-incidental, bareboat lease income is not covered by Article 8 of the OECD Model.

Paragraph 2 also clarifies, consistent with the Commentary to Article 8 of the OECD Model, that income earned by an enterprise from the inland transport of property or passengers within either Contracting State falls within Article 8 if the transport is undertaken as part of the international transport of property or passengers by the enterprise. Thus, if a U.S. shipping company contracts to carry property from the other State to a U.S. city and, as part of that contract, it transports the property by truck from its point of origin to an airport in the other State (or it contracts with a trucking company to carry the property to the airport) the income earned by the U.S. shipping company from the overland leg of the journey would be taxable only in the United States. Similarly, Article 8 also would apply to income from lighterage undertaken as part of the international transport of goods.

Finally, certain non-transport activities that are an integral part of the services performed by a transport company are understood to be covered in paragraph 1, though they are not specified in paragraph 2. These include, for example, the performance of some maintenance or catering services by one airline for another airline, if these services are incidental to the provision of those services by the airline for itself. Income earned by concessionaires, however, is not covered by Article 8. These interpretations of paragraph 1 also are consistent with the Commentary to Article 8 of the OECD Model.

*Paragraph 3*

Under this paragraph, profits of an enterprise of a Contracting State from the use, maintenance or rental of containers (including equipment for their transport) that are used for the transport of goods in international traffic are exempt from tax in the other Contracting State. This result obtains under paragraph 3 regardless of whether the recipient of the income is engaged in the operation of ships or aircraft in international traffic, and regardless of whether the enterprise has a permanent establishment in the other Contracting State. Only income from the use, maintenance or rental of containers that is incidental to other income from international traffic is covered by Article 8 of the OECD Model.

*Paragraph 4*

This paragraph clarifies that the provisions of paragraphs 1 and 3 also apply to profits derived by an enterprise of a Contracting State from participation in a pool, joint business or international operating agency. This refers to various arrangements for international cooperation by carriers in shipping and air transport. For example, airlines from two countries may agree to share the transport of passengers between the two countries. They each will fly the same number of flights per week and share the revenues from that route equally, regardless of the number of passengers that each airline actually transports. Paragraph 4 makes clear that with respect to each carrier the income dealt with in the Article is that carrier's share of the total transport, not the income derived from the passengers actually carried by the airline. This paragraph corresponds to paragraph 4 of Article 8 of the OECD Model.

*Relation to Other Articles*

The taxation of gains from the alienation of ships, aircraft or containers is not dealt with in this Article but in paragraph 4 of Article 13 (Gains).

As with other benefits of the Convention, the benefit of exclusive residence country taxation under Article 8 is available to an enterprise only if it is entitled to benefits under Article 22 (Limitation on Benefits).

This Article also is subject to the saving clause of paragraph 4 of Article 1 (General Scope) of the Model. Thus, if a citizen of the United States who is a resident of the other Contracting State derives profits from the operation of ships or aircraft in international traffic, notwithstanding the exclusive residence country taxation in paragraph 1 of Article 8, the United States may, subject to the special foreign tax credit rules of paragraph 3 of Article 23 (Relief from Double Taxation), tax those profits as part of the worldwide income of the citizen. (This is an unlikely situation, however, because non-tax considerations (e.g., insurance) generally result in shipping activities being carried on in corporate form.)


ARTICLE 9
Associated Enterprises

This Article incorporates in the Convention the arm's length principle reflected in the U.S. domestic transfer pricing provisions, particularly Code section 482. It provides that when related enterprises engage in a transaction on terms that are not arm's length, the Contracting States may make appropriate adjustments to the taxable income and tax liability of such related enterprises to reflect what the income and tax of these enterprises with respect to the transaction would have been had there been an arm's length relationship between them.

*Paragraph 1*

This paragraph is essentially the same as its counterpart in the OECD Model. It addresses the situation where an enterprise of a Contracting State is related to an enterprise of the other Contracting State, and there are arrangements or conditions imposed between the enterprises in their commercial or financial relations that are different from those that would have existed in the absence of the relationship. Under these circumstances, the Contracting States may adjust the income (or loss) of the enterprise to reflect what it would have been in the absence of such a relationship.

The paragraph identifies the relationships between enterprises that serve as a prerequisite to application of the Article. As the Commentary to the OECD Model makes clear, the necessary element in these relationships is effective control, which is also the standard for purposes of section 482. Thus, the Article applies if an enterprise of one State participates directly or indirectly in the management, control, or capital of the enterprise of the other State. Also, the

Article applies if any third person or persons participate directly or indirectly in the management, control, or capital of enterprises of different States. For this purpose, all types of control are included, i.e., whether or not legally enforceable and however exercised or exercisable.

The fact that a transaction is entered into between such related enterprises does not, in and of itself, mean that a Contracting State may adjust the income (or loss) of one or both of the enterprises under the provisions of this Article. If the conditions of the transaction are consistent with those that would be made between independent persons, the income arising from that transaction should not be subject to adjustment under this Article.

Similarly, the fact that associated enterprises may have concluded arrangements, such as cost sharing arrangements or general services agreements, is not in itself an indication that the two enterprises have entered into a non-arm's length transaction that should give rise to an adjustment under paragraph 1. Both related and unrelated parties enter into such arrangements (e.g., joint venturers may share some development costs). As with any other kind of transaction, when related parties enter into an arrangement, the specific arrangement must be examined to see whether or not it meets the arm's length standard. In the event that it does not, an appropriate adjustment may be made, which may include modifying the terms of the agreement or recharacterizing the transaction to reflect its substance.

It is understood that the "commensurate with income" standard for determining appropriate transfer prices for intangibles, added to Code section 482 by the Tax Reform Act of 1986, was designed to operate consistently with the arm's-length standard. The implementation of this standard in the section 482 regulations is in accordance with the general principles of paragraph 1 of Article 9 of the Convention, as interpreted by the OECD Transfer Pricing Guidelines.

Article 9 does not contain a version of paragraph 3 of Article 9 of the 1981 Model providing that the adjustments to income provided for in paragraph 1 do not replace, but complement, the adjustments provided for under the internal laws of the Contracting States. This language was not included in Article 9 because it had proven to be confusing. The 1981 Model language does not grant authority not otherwise present. Regardless of whether a particular convention includes a version of paragraph 3, the Contracting States preserve their rights to apply internal law provisions relating to adjustments between related parties. They also reserve the right to make adjustments in cases involving tax evasion or fraud. Such adjustments -- the distribution, apportionment, or allocation of income, deductions, credits or allowances -- are permitted even if they are different from, or go beyond, those authorized by paragraph 1 of the Article, as long as they accord with the general principles of paragraph 1, i.e., that the adjustment reflects what would have transpired had the related parties been acting at arm's length. For example, while paragraph 1 explicitly allows adjustments of deductions in computing taxable income, it does not deal with adjustments to tax credits. It does not, however, preclude such adjustments if they can be made under internal law. The OECD Model reaches the same result. See paragraph 4 of the Commentaries to Article 9.

This Article also permits tax authorities to deal with thin capitalization issues. They may,

in the context of Article 9, scrutinize more than the rate of interest charged on a loan between related persons. They also may examine the capital structure of an enterprise, whether a payment in respect of that loan should be treated as interest, and, if it is treated as interest, under what circumstances interest deductions should be allowed to the payor. Paragraph 2 of the Commentaries to Article 9 of the OECD Model, together with the U.S. observation set forth in paragraph 15, sets forth a similar understanding of the scope of Article 9 in the context of thin capitalization.

*Paragraph 2*

When a Contracting State has made an adjustment that is consistent with the provisions of paragraph 1, and the other Contracting State agrees that the adjustment was appropriate to reflect arm's-length conditions, that other Contracting State is obligated to make a correlative adjustment (sometimes referred to as a "corresponding adjustment") to the tax liability of the related person in that other Contracting State. Although the OECD Model does not specify that the other Contracting State must agree with the initial adjustment before it is obligated to make the correlative adjustment, the Commentary makes clear that the paragraph is to be read that way.

As explained in the OECD Commentaries, Article 9 leaves the treatment of "secondary adjustments" to the laws of the Contracting States. When an adjustment under Article 9 has been made, one of the parties will have in its possession funds that it would not have had at arm's length. The question arises as to how to treat these funds. In the United States the general practice is to treat such funds as a dividend or contribution to capital, depending on the relationship between the parties. Under certain circumstances, the parties may be permitted to restore the funds to the party that would have the funds at arm's length, and to establish an account payable pending restoration of the funds. See Rev. Proc. 65-17, 1965-1 C.B. 833.

The Contracting State making a secondary adjustment will take the other provisions of the Convention, where relevant, into account. For example, if the effect of a secondary adjustment is to treat a U.S. corporation as having made a distribution of profits to its parent corporation in the other Contracting State, the provisions of Article 10 (Dividends) will apply, and the United States may impose a 5 percent withholding tax on the dividend. Also, if under Article 23 the other State generally gives a credit for taxes paid with respect to such dividends, it would also be required to do so in this case.

The competent authorities are authorized by paragraph 2 to consult, if necessary, to resolve any differences in the application of these provisions. For example, there may be a disagreement over whether an adjustment made by a Contracting State under paragraph 1 was appropriate.

If a correlative adjustment is made under paragraph 2, it is to be implemented, pursuant to paragraph 2 of Article 25 (Mutual Agreement Procedure), notwithstanding any time limits or other procedural limitations in the law of the Contracting State making the adjustment. If a taxpayer has entered a closing agreement (or other written settlement) with the United States prior to bringing a case to the competent authorities, the U.S. competent authority will endeavor

only to obtain a correlative adjustment from the other Contracting State. See Rev. Proc. 96-13, 1996-13 I.R.B. 31, Section 7.05.

*Relationship to Other Articles*

The saving clause of paragraph 4 of Article 1 (General Scope) does not apply to paragraph 2 of Article 9 by virtue of the exceptions to the saving clause in paragraph 5(a) of Article 1. Thus, even if the statute of limitations has run, a refund of tax can be made in order to implement a correlative adjustment. Statutory or procedural limitations, however, cannot be overridden to impose additional tax, because paragraph 2 of Article 1 provides that the Convention cannot restrict any statutory benefit.


ARTICLE 10
Dividends

Article 10 provides rules for the taxation of dividends paid by a resident of one Contracting State to a beneficial owner that is a resident of the other Contracting State. The article provides for full residence country taxation of such dividends and a limited source-State right to tax. Article 10 also provides rules for the imposition of a tax on branch profits by the State of source. Finally, the article prohibits a State from imposing a tax on dividends paid by companies resident in the other Contracting State and from imposing taxes, other than a branch profits tax, on undistributed earnings.

*Paragraph 1*

The right of a shareholder's country of residence to tax dividends arising in the source country is preserved by paragraph 1, which permits a Contracting State to tax its residents on dividends paid to them by a resident of the other Contracting State. For dividends from any other source paid to a resident, Article 21 (Other Income) grants the residence country exclusive taxing jurisdiction (other than for dividends attributable to a permanent establishment or fixed base in the other State).

*Paragraph 2*

The State of source may also tax dividends beneficially owned by a resident of the other State, subject to the limitations in paragraph 2. Generally, the source State's tax is limited to 15 percent of the gross amount of the dividend paid. If, however, the beneficial owner of the dividends is a company resident in the other State that holds at least 10 percent of the voting shares of the company paying the dividend, then the source State's tax is limited to 5 percent of the gross amount of the dividend. Indirect ownership of voting shares (through tiers of corporations) and direct ownership of non-voting shares are not taken into account for purposes of determining eligibility for the 5 percent direct dividend rate. Shares are considered voting shares if they provide the power to elect, appoint or replace any person vested with the powers ordinarily exercised by the board of directors of a U.S. corporation. The Convention does not

require that the 10-percent voting interest be held for a minimum period prior to the dividend payment date.

The benefits of paragraph 2 may be granted at the time of payment by means of reduced withholding at source. It also is consistent with the paragraph for tax to be withheld at the time of payment at full statutory rates, and the treaty benefit to be granted by means of a subsequent refund.

Paragraph 2 does not affect the taxation of the profits out of which the dividends are paid. The taxation by a Contracting State of the income of its resident companies is governed by the internal law of the Contracting State, subject to the provisions of paragraph 4 of Article 24 (Nondiscrimination).

The "beneficial owner" of a dividend is understood generally to refer to any person resident in Contracting State to whom that State attributes the dividend for purposes of its tax. Paragraph 1(d) of Article 4 (Residence) makes this point explicitly with regard to income derived by fiscally transparent persons. Further, in accordance with paragraph 12 of the OECD Commentaries to Article 10, the source State may disregard as beneficial owner certain persons that nominally may receive a dividend but in substance do not control it. See also, paragraph 24 of the OECD Commentaries to Article 1 (General Scope).

Companies holding shares through fiscally transparent entities such as partnerships are considered for purposes of this paragraph to hold their proportionate interest in the shares held by the intermediate entity. As a result, companies holding shares through such entities may be able to claim the benefits of subparagraph (a) under certain circumstances. The lower rate applies when the company's proportionate share of the shares held by the intermediate entity meets the 10 percent voting stock threshold. Whether this ownership threshold is satisfied may be difficult to determine and often will require an analysis of the partnership or trust agreement.

*Paragraph 3*

Paragraph 3 provides rules that modify the maximum rates of tax at source provided in paragraph 2 in particular cases. The first sentence of paragraph 3 denies the lower direct investment withholding rate of paragraph 2(a) for dividends paid by a U.S. Regulated Investment Company (RIC) or a U.S. Real Estate Investment Trust (REIT). The second sentence denies the benefits of both subparagraphs (a) and (b) of paragraph 2 to dividends paid by REITs in certain circumstances, allowing them to be taxed at the U.S. statutory rate (30 percent). The United States limits the source tax on dividends paid by a REIT to the 15 percent rate when the beneficial owner of the dividend is an individual resident of the other State that owns a less than 10 percent interest in the REIT. These exceptions to the general rules of paragraph 2 became part of U.S. tax treaty policy subsequent to the publication of the 1981 Model.

The denial of the 5 percent withholding rate at source to all RIC and REIT shareholders, and the denial of the 15 percent rate to all but small individual shareholders of REITs is intended to prevent the use of these entities to gain unjustifiable source taxation benefits for certain

shareholders resident in the other Contracting State. For example, a corporation resident in the partner that wishes to hold a diversified portfolio of U.S. corporate shares may hold the portfolio directly and pay a U.S. withholding tax of 15 percent on all of the dividends that it receives. Alternatively, it may acquire a diversified portfolio by purchasing shares in a RIC. Since the RIC may be a pure conduit, there may be no U.S. tax costs to interposing the RIC in the chain of ownership. Absent the special rule in paragraph 2, use of the RIC could transform portfolio dividends, taxable in the United States under the Convention at 15 percent, into direct investment dividends taxable only at 5 percent.

Similarly, a resident of the partner directly holding U.S. real property would pay U.S. tax either at a 30 percent rate on the gross income or at graduated rates on the net income. As in the preceding example, by placing the real property in a REIT, the investor could transform real estate income into dividend income, taxable at the rates provided in Article 10, significantly reducing the U.S. tax burden that otherwise would be imposed. To prevent this circumvention of U.S. rules applicable to real property, most REIT shareholders are subject to 30 percent tax at source. However, since a relatively small individual investor who might be subject to a U.S. tax of 15 percent of the net income even if he earned the real estate income directly, individuals who hold less than a 10 percent interest in the REIT remain taxable at source at a 15 percent rate.

*Paragraph 4*

Exemption from tax in the state of source is provided for dividends paid to qualified governmental entities in paragraph 3. Although there is no analogous provision in the OECD Model, the exemption of paragraph 4 is analogous to that provided to foreign governments under section 892 of the Code. Paragraph 4 makes that exemption reciprocal. A qualified governmental entity is defined in paragraph 1(j) of Article 3 (General Definitions), and it includes a government pension plan. The definition does not include a governmental entity that carries on commercial activity. Further, a dividend paid by a company engaged in commercial activity that is controlled (within the meaning of Treas. Reg. section 1.892-5T) by a qualified governmental entity that is the beneficial owner of the dividend is not exempt at source under paragraph 4 because ownership of a controlled company is viewed as a substitute for carrying on a business directly.

*Paragraph 5*

Paragraph 5 defines the term dividends broadly and flexibly. The definition is intended to cover all arrangements that yield a return on an equity investment in a corporation as determined under the tax law of the state of source, as well as arrangements that might be developed in the future.

The term dividends includes income from shares, or other corporate rights that are not treated as debt under the law of the source State, that participate in the profits of the company. The term also includes income that is subjected to the same tax treatment as income from shares by the law of the State of source. Thus, a constructive dividend that results from a non-arm's length transaction between a corporation and a related party is a dividend. In the case of the

United States the term dividend includes amounts treated as a dividend under U.S. law upon the sale or redemption of shares or upon a transfer of shares in a reorganization. See, e.g., Rev. Rul. 92-85, 1992-2 C.B. 69 (sale of foreign subsidiary's stock to U.S. sister company is a deemed dividend to extent of subsidiary's and sister's earnings and profits). Further, a distribution from a U.S. publicly traded limited partnership, which is taxed as a corporation under U.S. law, is a dividend for purposes of Article 10. However, a distribution by a limited liability company is not taxable by the United States under Article 10, provided the limited liability company is not characterized as an association taxable as a corporation under U.S. law. Finally, a payment denominated as interest that is made by a thinly capitalized corporation may be treated as a dividend to the extent that the debt is recharacterized as equity under the laws of the source State.

*Paragraph 6*

Paragraph 6 excludes from the general source country limitations under paragraph 2 dividends paid with respect to holdings that form part of the business property of a permanent establishment or a fixed base. Such dividends will be taxed on a net basis using the rates and rules of taxation generally applicable to residents of the State in which the permanent establishment or fixed base is located, as modified by the Convention. An example of dividends paid with respect to the business property of a permanent establishment would be dividends derived by a dealer in stock or securities from stock or securities that the dealer held for sale to customers.

*Paragraph 7*

A State's right to tax dividends paid by a company that is a resident of the other State is restricted by paragraph 7 to cases in which the dividends are paid to a resident of that State or are attributable to a permanent establishment or fixed base in that State. Thus, a State may not impose a "secondary" withholding tax on dividends paid by a nonresident company out of earnings and profits from that State. In the case of the United States, paragraph 7, therefore, overrides the taxes imposed by sections 871 and 882(a) on dividends paid by foreign corporations that have a U.S. source under section 861(a)(2)(B).

The paragraph also restricts a State's right to impose corporate level taxes on undistributed profits, other than a branch profits tax. The accumulated earnings tax and the personal holding company taxes are taxes covered in Article 2. Accordingly, under the provisions of Article 7 (Business Profits), the United States may not impose those taxes on the income of a resident of the other State except to the extent that income is attributable to a permanent establishment in the United States. Paragraph 7 also confirms the denial of the U.S. authority to impose those taxes. The paragraph does not restrict a State's right to tax its resident shareholders on undistributed earnings of a corporation resident in the other State. Thus, the U.S. authority to impose the foreign personal holding company tax, its taxes on subpart F income and on an increase in earnings invested in U.S. property, and its tax on income of a Passive Foreign Investment Company that is a Qualified Electing Fund is in no way restricted by this provision.

*Paragraph 8*

Paragraph 8 permits a State to impose a branch profits tax on a corporation resident in the other State. The tax is in addition to other taxes permitted by the Convention. Since the term "corporation" is not defined in the Convention, it will be defined for this purpose under the law of the first-mentioned (i.e., source) State.

A State may impose a branch profits tax on a corporation if the corporation has income attributable to a permanent establishment in that State, derives income from real property in that State that is taxed on a net basis under Article 6, or realizes gains taxable in that State under paragraph 1 of Article 13. The tax is limited, however, to the aforementioned items of income that are included in the "dividend equivalent amount."

Paragraph 8 permits the United States generally to impose its branch profits tax on a corporation resident in the other State to the extent of the corporation's

(i) business profits that are attributable to a permanent establishment in the United States

(ii) income that is subject to taxation on a net basis because the corporation has elected under section 882(d) of the Code to treat income from real property not otherwise taxed on a net basis as effectively connected income and

(iii) gain from the disposition of a United States Real Property Interest, other than an interest in a United States Real Property Holding Corporation.

The United States may not impose its branch profits tax on the business profits of a corporation resident in the other State that are effectively connected with a U.S. trade or business but that are not attributable to a permanent establishment and are not otherwise subject to U.S. taxation under Article 6 or paragraph 1 of Article 13.

The term "dividend equivalent amount" used in paragraph 8 has the same meaning that it has under section 884 of the Code, as amended from time to time, provided the amendments are consistent with the purpose of the branch profits tax. Generally, the dividend equivalent amount for a particular year is the income described above that is included in the corporation's effectively connected earnings and profits for that year, after payment of the corporate tax under Articles 6, 7 or 13, reduced for any increase in the branch's U.S. net equity during the year and increased for any reduction in its U.S. net equity during the year. U.S. net equity is U.S. assets less U.S. liabilities. See Treas. Reg. section 1.884-1. The dividend equivalent amount for any year approximates the dividend that a U.S. branch office would have paid during the year if the branch had been operated as a separate U.S. subsidiary company. In the case that the other Contracting State also imposes a branch profits tax, the base of its tax must be limited to an amount that is analogous to the dividend equivalent amount.

*Paragraph 9*

Paragraph 9 provides that the branch profits tax permitted by paragraph 8 shall not be imposed at a rate exceeding the direct investment dividend withholding rate of five percent.

*Relation to Other Articles*

Notwithstanding the foregoing limitations on source country taxation of dividends, the saving clause of paragraph 3 of Article 1 permits the United States to tax dividends received by its residents and citizens, subject to the special foreign tax credit rules of paragraph 3 of Article 23 (Relief from Double Taxation), as if the Convention had not come into effect.

The benefits of this Article are also subject to the provisions of Article 22 (Limitation on Benefits). Thus, if a resident of the other Contracting State is the beneficial owner of dividends paid by a U.S. corporation, the shareholder must qualify for treaty benefits under at least one of the tests of Article 22 in order to receive the benefits of this Article.

<div align="center">

ARTICLE 11
Interest

</div>

Article 11 specifies the taxing jurisdictions over interest income of the States of source and residence and defines the terms necessary to apply the article.

*Paragraph 1*

This paragraph grants to the State of residence the exclusive right, subject to exceptions provided in paragraphs 3 and 5, to tax interest beneficially owned by its residents and arising in the other Contracting State. The "beneficial owner" of a payment of interest is understood generally to refer to any person resident in a Contracting State to whom that State attributes the payment for purposes of its tax. Paragraph 1(d) of Article 4 (Residence) makes this point explicitly with regard to income derived by fiscally transparent persons. Further, in accordance with paragraph 8 of the OECD Commentaries to Article 11, the source State may disregard as beneficial owner certain persons that nominally may receive an interest payment but in substance do not control it. See also, paragraph 24 of the OECD Commentaries to Article 1 (General Scope).

*Paragraph 2*

The term "interest" as used in Article 11 is defined in paragraph 2 to include, inter alia, income from debt claims of every kind, whether or not secured by a mortgage. Penalty charges for late payment of taxes are excluded from the definition of interest. Interest that is paid or accrued subject to a contingency is within the ambit of Article 11. This includes income from a debt obligation carrying the right to participate in profits. The term does not, however, include amounts, that are treated as dividends under Article 10 (Dividends).

The term interest also includes amounts subject to the same tax treatment as income from money lent under the law of the State in which the income arises. Thus, for purposes of the Convention amounts that the United States will treat as interest include

(i) the difference between the issue price and the stated redemption price at

maturity of a debt instrument, i.e., original issue discount (OID), which may be wholly or partially realized on the disposition of a debt instrument (section 1273),

(ii) amounts that are imputed interest on a deferred sales contract (section 483),

(iii) amounts treated as OID under the stripped bond rules (section 1286),

(iv) amounts treated as original issue discount under the below-market interest rate rules (section 7872),

(v) a partner's distributive share of a partnership's interest income (section 702),

(vi) the interest portion of periodic payments made under a "finance lease" or similar contractual arrangement that in substance is a borrowing by the nominal lessee to finance the acquisition of property,

(vii) amounts included in the income of a holder of a residual interest in a REMIC (section 860E), because these amounts generally are subject to the same taxation treatment as interest under U.S. tax law, and

(viii) imbedded interest with respect to notional principal contracts.

*Paragraph 3*

Paragraph 3 provides an exception to the exclusive residence taxation rule of paragraph 1 in cases where the beneficial owner of the interest carries on business through a permanent establishment in the State of source or performs independent personal services from a fixed base situated in that State and the interest is attributable to that permanent establishment or fixed base. In such cases the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services) will apply and the State of source will retain the right to impose tax on such interest income.

In the case of a permanent establishment or fixed base that once existed in the State but that no longer exists, the provisions of paragraph 3 also apply, by virtue of paragraph 8 of Article 7 (Business Profits), to interest that would be attributable to such a permanent establishment or fixed base if it did exist in the year of payment or accrual. see the Technical Explanation of paragraph 8 of Article 7.

*Paragraph 4*

Paragraph 4 provides that in cases involving special relationships between persons, Article 11 applies only to that portion of the total interest payments that would have been made absent such special relationships (i.e., an arm's length interest payment). Any excess amount of interest paid remains taxable according to the laws of the United States and the other Contracting State, respectively, with due regard to the other provisions of the Convention. Thus, if the excess amount would be treated under the source country's law as a distribution of profits by a corporation, such amount could be taxed as a dividend rather than as interest, but the tax would be subject, if appropriate, to the rate limitations of paragraph 2 of Article 10 (Dividends).

The term "special relationship" is not defined in the Convention. In applying this

paragraph the United States considers the term to include the relationships described in Article 9, which in turn corresponds to the definition of "control" for purposes of section 482 of the Code.

This paragraph does not address cases where, owing to a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the interest is less than an arm's length amount. In those cases a transaction may be characterized to reflect its substance and interest may be imputed consistent with the definition of interest in paragraph 2. The United States would apply section 482 or 7872 of the Code to determine the amount of imputed interest in those cases.

*Paragraph 5*

Paragraph 5 provides anti-abuse exceptions to the source-country exemption in paragraph 1 for two classes of interest payments.

The first exception, in subparagraph (a) of paragraph 5, deals with so-called "contingent interest." Under this provision interest arising in one of the Contracting States that is determined by reference to the receipts, sales, income, profits or other cash flow of the debtor or a related person, to any change in the value of any property of the debtor or a related person or to any dividend, partnership distribution or similar payment made by the debtor to a related person, and paid to a resident of the other State also may be taxed in the Contracting State in which it arises, and according to the laws of that State, but if the beneficial owner is a resident of the other Contracting State, the gross amount of the interest may be taxed at a rate not exceeding the rate prescribed in subparagraph (b) of paragraph 2 of Article 10 (Dividends).

The second exception, in subparagraph (b) of paragraph 5, is consistent with the policy of Code sections 860E(e) and 860G(b) that excess inclusions with respect to a real estate mortgage investment conduit (REMIC) should bear full U.S. tax in all cases. Without a full tax at source foreign purchasers of residual interests would have a competitive advantage over U.S. purchasers at the time these interests are initially offered. Also, absent this rule the U.S. FISC would suffer a revenue loss with respect to mortgages held in a REMIC because of opportunities for tax avoidance created by differences in the timing of taxable and economic income produced by these interests.

*Relation to Other Articles*

Notwithstanding the foregoing limitations on source country taxation of interest, the saving clause of paragraph 4 of Article 1 permits the United States to tax its residents and citizens, subject to the special foreign tax credit rules of paragraph 3 of Article 23 (Relief from Double Taxation), as if the Convention had not come into force.

As with other benefits of the Convention, the benefits of exclusive residence State taxation of interest under paragraph 1 of Article 11, or limited source taxation under paragraph 5(b), are available to a resident of the other State only if that resident is entitled to those benefits

under the provisions of Article 22 (Limitation on Benefits).

<div align="center">

ARTICLE 12
Royalties

</div>

Article 12 specifies the taxing jurisdiction over royalties of the States of residence and source and defines the terms necessary to apply the article.

*Paragraph 1*

Paragraph 1 grants to the state of residence of the beneficial owner of royalties the exclusive right to tax royalties arising in the other Contracting State, subject to exceptions provided in paragraph 3 (for royalties taxable as business profits and independent personal services).

The "beneficial owner" of a royalty payment is understood generally to refer to any person resident in a Contracting State to whom that State attributes the payment for purposes of its tax. Paragraph 1(d) of Article 4 (Residence) makes this point explicitly with regard to income derived by fiscally transparent persons. Further, in accordance with paragraph 4 of the OECD Commentaries to Article 12, the source State may disregard as beneficial owner certain persons that nominally may receive a royalty payment but in substance do not control it. See also, paragraph 24 of the OECD Commentaries to Article 1 (General Scope).

*Paragraph 2*

The term "royalties" as used in Article 12 is defined in paragraph 2 to include payments of any kind received as a consideration for the use of, or the right to use, any copyright of a literary, artistic, scientific or other work; for the use of, or the right to use, any patent, trademark, design or model, plan, secret formula or process, or other like right or property; or for information concerning industrial, commercial, or scientific experience. It does not include income from leasing personal property. Unlike the OECD Model, paragraph 1 does not refer to an amount "paid" to a resident of the other Contracting State. The deletion of this term is intended to eliminate any inference that an amount must actually be paid to the resident before it is subject to the provisions of Article 12. Under paragraph 1, an amount that is accrued but not paid also would fall within Article 12.

The term royalties is defined in the Convention and therefore is generally independent of domestic law. Certain terms used in the definition are not defined in the Convention, but these may be defined under domestic tax law. For example, the term "secret process or formulas" is found in the Code, and its meaning has been elaborated in the context of sections 351 and 367. See Rev. Rul. 55-17, 1955-1 C.B. 388; Rev. Rul. 64-56, 1964-1 C.B. 133; Rev. Proc. 69-19, 1969-2 C.B. 301.

Consideration for the use or right to use cinematographic films, or works on film, tape, or

other means of reproduction in radio or television broadcasting is specifically included in the definition of royalties. It is intended that subsequent technological advances in the field of radio and television broadcasting will not affect the inclusion of payments relating to the use of such means of reproduction in the definition of royalties.

If an artist who is resident in one Contracting State records a performance in the other Contracting State, retains a copyrighted interest in a recording, and receives payments for the right to use the recording based on the sale or public playing of the recording, then the right of such other Contracting State to tax those payments is governed by Article 12. See Boulez v. Commissioner, 83 T.C. 584 (1984), aff'd, 810 F.2d 209 (D.C. Cir. 1986).

Computer software generally is protected by copyright laws around the world. Under the Convention consideration received for the use or the right to use computer software is treated either as royalties or as income from the alienation of tangible personal property, depending on the facts and circumstances of the transaction giving rise to the payment. It is also understood that payments received in connection with the transfer of so-called "shrink-wrap" computer software are treated as business profits.

The term "royalties" also includes gain derived from the alienation of any right or property that would give rise to royalties, to the extent the gain is contingent on the productivity, use, or further alienation thereof. Gains that are not so contingent are dealt with under Article 13 (Gains).

The term "industrial, commercial, or scientific experience" (sometimes referred to as "know-how") has the meaning ascribed to it in paragraph 11 of the Commentary to Article 12 of the OECD Model Convention. Consistent with that meaning, the term may include information that is ancillary to a right otherwise giving rise to royalties, such as a patent or secret process.

Know-how also may include, in limited cases, technical information that is conveyed through technical or consultancy services. It does not include general educational training of the user's employees, nor does it include information developed especially for the user, for example, a technical plan or design developed according to the user's specifications. Thus, as provided in paragraph 11 of the Commentaries to Article 12 of the OECD Model, the term "royalties" does not include payments received as consideration for after-sales service, for services rendered by a seller to a purchaser under a guarantee, or for pure technical assistance.

The term "royalties" also does not include payments for professional services (such as architectural, engineering, legal, managerial, medical, software development services). For example, income from the design of a refinery by an engineer (even if the engineer employed know-how in the process of rendering the design) or the production of a legal brief by a lawyer is not income from the transfer of know-how taxable under Article 12, but is income from services taxable under either Article 14 (Independent Personal Services) or Article 15 (Dependent Personal Services). Professional services may be embodied in property that gives rise to royalties, however. Thus, if a professional contracts to develop patentable property and retains rights in the resulting property under the development contract, subsequent license payments made for those

rights would be royalties.

*Paragraph 3*

This paragraph provides an exception to the rule of paragraph 1 that gives the state of residence exclusive taxing jurisdiction in cases where the beneficial owner of the royalties carries business through a permanent establishment in the state of source or performs independent personal services from a fixed base situated in that state and the royalties are attributable to that permanent establishment or fixed base. In such cases the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services) will apply.

The provisions of paragraph 8 of Article 7 (Business Profits) apply to this paragraph. For example, royalty income that is attributable to a permanent establishment or a fixed base and that accrues during the existence of the permanent establishment or fixed base, but is received after the permanent establishment or fixed base no longer exists, remains taxable under the provisions of Articles 7 (Business Profits) or 14 (Independent Personal Services), respectively, and not under this Article.

*Paragraph 4*

Paragraph 4 provides that in cases involving special relationships between the payor and beneficial owner of royalties, Article 12 applies only to the extent the royalties would have been paid absent such special relationships (i.e., an arm's length royalty). Any excess amount of royalties paid remains taxable according to the laws of the two Contracting States with due regard to the other provisions of the Convention. If, for example, the excess amount is treated as a distribution of corporate profits under domestic law, such excess amount will be taxed as a dividend rather than as royalties, but the tax imposed on the dividend payment will be subject to the rate limitations of paragraph 2 of Article 10 (Dividends).

*Relation to Other Articles*

Notwithstanding the foregoing limitations on source country taxation of royalties, the saving clause of paragraph 4 of Article 1 (General Scope) permits the United States to tax its residents and citizens, subject to the special foreign tax credit rules of paragraph 3 of Article 23 (Relief from Double Taxation), as if the Convention had not come into force.

As with other benefits of the Convention, the benefits of exclusive residence State taxation of royalties under paragraph 1 of Article 12 are available to a resident of the other State only if that resident is entitled to those benefits under Article 22 (Limitation on Benefits).

ARTICLE 13
Gains

Article 13 assigns either primary or exclusive taxing jurisdiction over gains from the

alienation of property to the State of residence or the State of source and defines the terms necessary to apply the Article.

*Paragraph 1*

Paragraph 1 of Article 13 preserves the non-exclusive right of the State of source to tax gains attributable to the alienation of real property situated in that State. The paragraph therefore permits the United States to apply section 897 of the Code to tax gains derived by a resident of the other Contracting State that are attributable to the alienation of real property situated in the United States (as defined in paragraph 2). Gains attributable to the alienation of real property include gain from any other property that is treated as a real property interest within the meaning of paragraph 2.

*Paragraph 2*

This paragraph defines the term "real property situated in the other Contracting State." The term includes real property referred to in Article 6 (i.e., an interest in the real property itself), a "United States real property interest" (when the United States is the other Contracting State under paragraph 1), and an equivalent interest in real property situated in the other Contracting State. The OECD Model does not refer to real property interests other than the real property itself, and the United States has entered a reservation on this point with respect to the OECD Model, reserving the right to apply its tax under FIRPTA to all real estate gains encompassed by that provision.

Under section 897(c) of the Code the term "United States real property interest" includes shares in a U.S. corporation that owns sufficient U.S. real property interests to satisfy an asset-ratio test on certain testing dates. The term also includes certain foreign corporations that have elected to be treated as US corporations for this purpose. Section 897(i). In applying paragraph 1 the United States will look through distributions made by a REIT. Accordingly, distributions made by a REIT are taxable under paragraph 1 of Article 13 (not under Article 10 (Dividends)) when they are attributable to gains derived from the alienation of real property.

*Paragraph 3*

Paragraph 3 of Article 13 deals with the taxation of certain gains from the alienation of movable property forming part of the business property of a permanent establishment that an enterprise of a Contracting State has in the other Contracting State or of movable property pertaining to a fixed base available to a resident of a Contracting State in the other Contracting State for the purpose of performing independent personal services. This also includes gains from the alienation of such a permanent establishment (alone or with the whole enterprise) or of such fixed base. Such gains may be taxed in the State in which the permanent establishment or fixed base is located.

A resident of the other Contracting State that is a partner in a partnership doing business in the United States generally will have a permanent establishment in the United States as a result

of the activities of the partnership, assuming that the activities of the partnership rise to the level of a permanent establishment. Rev. Rul. 91-32, 1991-1 C.B. 107.    Further, under paragraph 3, the United States generally may tax a partner's distributive share of income realized by a partnership on the disposition of movable property forming part of the business property of the partnership in the United States.

*Paragraph 4*

This paragraph limits the taxing jurisdiction of the state of source with respect to gains from the alienation of ships, aircraft, or containers operated in international traffic or movable property pertaining to the operation of such ships, aircraft, or containers. Under paragraph 4 when such income is derived by an enterprise of a Contracting State it is taxable only in that Contracting State. Notwithstanding paragraph 3, the rules of this paragraph apply even if the income is attributable to a permanent establishment maintained by the enterprise in the other Contracting State. This result is consistent with the general rule under Article 8 (Shipping and Air Transport) that confers exclusive taxing rights over international shipping and air transport income on the state of residence of the enterprise deriving such income.

*Paragraph 5*

Paragraph 5 grants to the State of residence of the alienator the exclusive right to tax gains from the alienation of property other than property referred to in paragraphs 1 through 4. For example, gain derived from shares, other than shares described in paragraphs 2 or 3, debt instruments and various financial instruments, may be taxed only in the State of residence, to the extent such income is not otherwise characterized as income taxable under another article (e.g., Article 10 (Dividends) or Article 11 (Interest)). Similarly gain derived from the alienation of tangible personal property, other than tangible personal property described in paragraph 3, may be taxed only in the State of residence of the alienator. Gain derived from the alienation of any property, such as a patent or copyright, that produces income taxable under Article 12 (Royalties) is taxable under Article 12 and not under this article, provided that such gain is of the type described in paragraph 2(b) of Article 12 (i.e., it is contingent on the productivity, use, or disposition of the property). Thus, under either article such gain is taxable only in the State of residence of the alienator. Sales by a resident of a Contracting State of real property located in a third state are not taxable in the other Contracting State, even if the sale is attributable to a permanent establishment located in the other Contracting State.

*Relation to Other Articles*

Notwithstanding the foregoing limitations on taxation of certain gains by the State of source, the saving clause of paragraph 4 of Article 1 (General Scope) permits the United States to tax its citizens and residents as if the Convention had not come into effect. Thus, any limitation in this Article on the right of the United States to tax gains does not apply to gains of a U.S. citizens or resident. The benefits of this Article are also subject to the provisions of Article 22 (Limitation on Benefits). Thus, only a resident of a Contracting State that satisfies one of the conditions in Article 22 is entitled to the benefits of this Article.

ARTICLE 14
Independent Personal Services

The Convention deals in separate articles with different classes of income from personal services. Article 14 deals with the general class of income from independent personal services and Article 15 deals with the general class of income from dependent personal services. Articles 16 through 20 provide exceptions and additions to these general rules for directors' fees (Article 16); performance income of artistes and sportsmen (Article 17); pensions in respect of personal service income, social security benefits, annuities, alimony, and child support payments (Article 18); government service salaries and pensions (Article 19); and certain income of students and trainees (Article 20).

*Paragraph 1*

Paragraph 1 of Article 14 provides the general rule that an individual who is a resident of a Contracting State and who derives income from performing personal services in an independent capacity will be exempt from tax in respect of that income by the other Contracting State. The income may be taxed in the other Contracting State only if the services are performed there and the income is attributable to a fixed base that is regularly available to the individual in that other State for the purpose of performing his services.

Income derived by persons other than individuals or groups of individuals from the performance of independent personal services is not covered by Article 14. Such income generally would be business profits taxable in accordance with Article 7 (Business Profits). Income derived by employees of such persons generally would be taxable in accordance with Article 15 (Dependent Personal Services).

The term "fixed base" is not defined in the Convention, but its meaning is understood to be similar, but not identical, to that of the term "permanent establishment," as defined in Article 5 (Permanent Establishment). The term "regularly available" also is not defined in the Convention. Whether a fixed base is regularly available to a person will be determined based on all the facts and circumstances. In general, the term encompasses situations where a fixed base is at the disposal of the individual whenever he performs services in that State. It is not necessary that the individual regularly use the fixed base, only that the fixed base be regularly available to him. For example, a U.S. resident partner in a law firm that has offices in the other Contracting State would be considered to have a fixed base regularly available to him in the other State if the law firm had an office in the other State that was available to him whenever he wished to conduct business in the other State, regardless of how frequently he conducted business in the other State. On the other hand, an individual who had no office in the other State and occasionally rented a hotel room to serve as a temporary office would not be considered to have a fixed base regularly available to him.

It is not necessary that the individual actually use the fixed base. It is only necessary that

the fixed base be regularly available to him. For example, if an individual has an office in the other State that he can use if he chooses when he is present in the other State, that fixed base will be considered to be regularly available to him regardless of whether he conducts his activities there.

The taxing right conferred by this Article with respect to income from independent personal services can be more limited than that provided in Article 7 for the taxation of business profits. In both articles the income of a resident of one Contracting State must be attributable to a permanent establishment or fixed base in the other State in order for that other State to have a taxing right. In Article 14 the income also must be attributable to services performed in that other State, while Article 7 does not require that all of the income generating activities be performed in the State where the permanent establishment is located.

The term "personal services of an independent character" is not defined. It clearly includes those activities listed in paragraph 2 of Article 14 of the OECD Model, such as independent scientific, literary, artistic, educational or teaching activities, as well as the independent activities of physicians, lawyers, engineers, architects, dentists, and accountants. That list, however, is not exhaustive. The term includes all personal services performed by an individual for his own account, whether as a sole proprietor or a partner, where he receives the income and bears the risk of loss arising from the services. The taxation of income of an individual from those types of independent services which are covered by Articles 16 through 20 is governed by the provisions of those articles. For example, taxation of the income of a professional musician would be governed by Article 17 (Artistes and Athletes) rather than Article 14.

This Article applies to income derived by a partner in a partnership that provides independent personal services to the extent that the income received by such partner is attributable to personal services performed by the partner. For example, if a partnership agreement provides that each partner will receive a share of the partnership's income in exchange for performing independent personal services, taxation of the partner's share of that income will be governed by Article 14. In such a case, the partner would be taxable solely in his state of residence if he performed all his activities there. On the other hand, if he traveled to the other State and the partnership made an office available to him for the purpose of conducting his activities, that portion of his income attributable to the services performed in the other State would be taxable in that other State. If the partner received income in addition to that paid as remuneration for his services, the taxation of that income would not be governed by Article 14. For example, if the partner has the right to an annual payment from the partnership with respect to profits generated by employees of the firm, or with respect to his capital account in the partnership, the taxation of such payments would not be governed by Article 14.

Paragraph 8 of Article 7 (Business Profits) refers to Article 14. That rule clarifies that income that is attributable to a permanent establishment or a fixed base, but that is deferred and received after the permanent establishment or fixed base no longer exists, may nevertheless be taxed by the State in which the permanent establishment or fixed base was located. Thus, under Article 14, income derived by an individual resident of a Contracting State from services

performed in the other Contracting State and attributable to a fixed base there may be taxed by that other State even if the income is deferred and received after there is no longer a fixed base available to the resident in that other State.

If an individual resident of the other Contracting State who is also a U.S. citizen performs independent personal services in the United States, the United States may, by virtue of the saving clause of paragraph 4 of Article 1 (General Scope) tax his income without regard to the restrictions of this Article, subject to the special foreign tax credit rules of paragraph 3 of Article 23 (Relief from Double Taxation).

*Paragraph 2*

This paragraph incorporates the principles of paragraph 3 of Article 7 into Article 14. Thus, all relevant expenses, including expenses not incurred in the Contracting State where the fixed base is located, must be allowed as deductions in computing the net income from services subject to tax in the Contracting State where the fixed base is located.

ARTICLE 15
Dependent Personal Services

Article 15 apportions taxing jurisdiction over remuneration derived by a resident of a Contracting State as an employee between the States of source and residence.

*Paragraph 1*

The general rule of Article 15 is contained in paragraph 1. Remuneration derived by a resident of a Contracting State as an employee may be taxed by the State of residence, and the remuneration also may be taxed by that other Contracting State to the extent derived from employment exercised (i.e., services performed) in the other Contracting State. Paragraph 1 also provides that the more specific rules of Articles 16 (Directors' Fees), 18 (Pensions, Social Security, Annuities, Alimony and Child Support), and 19 (Government Service) apply in the case of employment income described in one of these articles. Thus, even though the State of source has a right to tax employment income under Article 15, it may not have the right to tax that income under the Convention if the income is described, e.g., in Article 18 (Pensions, Social Security, Annuities, Alimony and Child Support) and is not taxable in the State of source under the provisions of that article.

Article 15 of the OECD Model applies to "salaries, wages and other similar remuneration." The U.S. Model applies to "salaries, wages and other remuneration." The deletion of "similar" is intended to make it clear that Article 15 applies to any form of compensation for employment, including payments in kind, regardless of whether the remuneration is "similar" to salaries and wages.

Consistently with section 864(c)(6), Article 15 also applies regardless of the timing of

actual payment for services. Thus, a bonus paid to a resident of a Contracting State with respect to services performed in the other Contracting State with respect to a particular taxable year would be subject to Article 15 for that year even if it was paid after the close of the year. Similarly, an annuity received for services performed in a taxable year would be subject to Article 15 despite the fact that it was paid in subsequent years. In either case, whether such payments were taxable in the State where the employment was exercised would depend on whether the tests of paragraph 2 were satisfied. Consequently, a person who receives the right to a future payment in consideration for services rendered in a Contracting State would be taxable in that State even if the payment is received at a time when the recipient is a resident of the other Contracting State.

*Paragraph 2*

Paragraph 2 sets forth an exception to the general rule that employment income may be taxed in the State where it is exercised. Under paragraph 2, the State where the employment is exercised may not tax the income from the employment if three conditions are satisfied:

(a) the individual is present in the other Contracting State for a period or periods not exceeding 183 days in any 12-month period that begins or ends during the relevant (i.e., the year in which the services are performed) calendar year;

(b) the remuneration is paid by, or on behalf of, an employer who is not a resident of that other Contracting State; and

(c) the remuneration is not borne as a deductible expense by a permanent establishment or fixed base that the employer has in that other State.

In order for the remuneration to be exempt from tax in the source State, all three conditions must be satisfied. This exception is identical to that set forth in the OECD Model.

The 183-day period in condition (a) is to be measured using the "days of physical presence" method. Under this method, the days that are counted include any day in which a part of the day is spent in the host country. (Rev. Rul. 56-24, 1956-1 C.B. 851.) Thus, days that are counted include the days of arrival and departure; weekends and holidays on which the employee does not work but is present within the country; vacation days spent in the country before, during or after the employment period, unless the individual's presence before or after the employment can be shown to be independent of his presence there for employment purposes; and time during periods of sickness, training periods, strikes, etc., when the individual is present but not working. If illness prevented the individual from leaving the country in sufficient time to qualify for the benefit, those days will not count. Also, any part of a day spent in the host country while in transit between two points outside the host country is not counted. These rules are consistent with the description of the 183-day period in paragraph 5 of the Commentary to Article 15 in the OECD Model.

Conditions (b) and (c) are intended to ensure that a Contracting State will not be required to allow a deduction to the payor for compensation paid and at the same time to exempt the employee on the amount received. Accordingly, if a foreign person pays the salary of an employee who is employed in the host State, but a host State corporation or permanent

establishment reimburses the payor with a payment that can be identified as a reimbursement, neither condition (b) nor (c), as the case may be, will be considered to have been fulfilled.

The reference to remuneration "borne by" a permanent establishment or fixed base is understood to encompass all expenses that economically are incurred and not merely expenses that are currently deductible for tax purposes. Accordingly, the expenses referred to include expenses that are capitalizable as well as those that are currently deductible. Further, salaries paid by residents that are exempt from income taxation may be considered to be borne by a permanent establishment or fixed base notwithstanding the fact that the expenses will be neither deductible nor capitalizable since the payor is exempt from tax.

*Paragraph 3*

Paragraph 3 contains a special rule applicable to remuneration for services performed by a resident of a Contracting State as an employee aboard a ship or aircraft operated in international traffic. Such remuneration may be taxed only in the State of residence of the employee if the services are performed as a member of the regular complement of the ship or aircraft. The "regular complement" includes the crew. In the case of a cruise ship, for example, it may also include others, such as entertainers, lecturers, etc., employed by the shipping company to serve on the ship throughout its voyage. The use of the term "regular complement" is intended to clarify that a person who exercises his employment as, for example, an insurance salesman while aboard a ship or aircraft is not covered by this paragraph. This paragraph is inapplicable to persons dealt with in Article 14 (Independent Personal Services).

The comparable paragraph in the OECD Model provides that such income may be taxed (on a non-exclusive basis) in the Contracting State in which the place of effective management of the employing enterprise is situated. This rule has not been adopted by the United States because the United States exercises its taxing jurisdiction over an employee only if the employee is a U.S. citizen or resident, or the services are performed by the employee in the United States. Tax cannot be imposed simply because an employee works for an enterprise that is a resident of the United States. The U.S. Model ensures that, given U.S. law, each employee will be subject to one level of tax.

If a U.S. citizen who is resident in the other Contracting State performs services as an employee in the United States and meets the conditions of paragraph 2 for source country exemption, he nevertheless is taxable in the United States by virtue of the saving clause of paragraph 4 of Article 1 (General Scope), subject to the special foreign tax credit rule of paragraph 3 of Article 23 (Relief from Double Taxation).

ARTICLE 16
Directors' Fees

This Article provides that a Contracting State may tax the fees and other compensation paid by a company that is a resident of that State for services performed in that State by a resident

of the other Contracting State in his capacity as a director of the company. This rule is an exception to the more general rules of Article 14 (Independent Personal Services) and Article 15 (Dependent Personal Services). Thus, for example, in determining whether a director's fee paid to a non-employee director is subject to tax in the country of residence of the corporation, it is not relevant to establish whether the fee is attributable to a fixed base in that State.

The analogous OECD and U.S. provisions reach different results in certain cases. Under the OECD Model provision, a resident of one Contracting State who is a director of a corporation that is resident in the other Contracting State is subject to tax in that other State in respect of his directors' fees regardless of where the services are performed. The United States has entered a reservation with respect to the OECD provision. The provision in Article 16 of the U.S. Model represents a compromise between the U.S. position reflected in the 1981 Model and the OECD Model. Under this Model provision, the State of residence of the corporation may tax nonresident directors with no time or dollar threshold, but only with respect to remuneration for services performed in that State.

This Article is subject to the saving clause of paragraph 4 of Article 1 (General Scope). Thus, if a U.S. citizen who is a resident of the other Contracting State is a director of a U.S. corporation, the United States may tax his full remuneration regardless of where he performs his services.

<div align="center">

ARTICLE 17
Artistes and Sportsmen

</div>

This Article deals with the taxation in a Contracting State of artistes (i.e., performing artists and entertainers) and sportsmen resident in the other Contracting State from the performance of their services as such. The Article applies both to the income of an entertainer or sportsman who performs services on his own behalf and one who performs services on behalf of another person, either as an employee of that person, or pursuant to any other arrangement. The rules of this Article take precedence, in some circumstances, over those of Articles 14 (Independent Personal Services) and 15 (Dependent Personal Services).

This Article applies only with respect to the income of performing artists and sportsmen. Others involved in a performance or athletic event, such as producers, directors, technicians, managers, coaches, etc., remain subject to the provisions of Articles 14 and 15. In addition, except as provided in paragraph 2, income earned by legal persons is not covered by Article 17.

*Paragraph 1*

Paragraph 1 describes the circumstances in which a Contracting State may tax the performance income of an entertainer or sportsman who is a resident of the other Contracting State. Under the paragraph, income derived by an individual resident of a Contracting State from activities as an entertainer or sportsman exercised in the other Contracting State may be taxed in that other State if the amount of the gross receipts derived by the performer exceeds $20,000 (or

its equivalent in the currency of the other Contracting State) for the taxable year. The $20,000 includes expenses reimbursed to the individual or borne on his behalf. If the gross receipts exceed $20,000, the full amount, not just the excess, may be taxed in the State of performance.

The OECD Model provides for taxation by the country of performance of the remuneration of entertainers or sportsmen with no dollar or time threshold. The United States introduces the dollar threshold test in its treaties to distinguish between two groups of entertainers and athletes -- those who are paid very large sums of money for very short periods of service, and who would, therefore, normally be exempt from host country tax under the standard personal services income rules, and those who earn relatively modest amounts and are, therefore, not easily distinguishable from those who earn other types of personal service income. The United States has entered a reservation to the OECD Model on this point.

Tax may be imposed under paragraph 1 even if the performer would have been exempt from tax under Articles 14 (Independent Personal Services) or 15 (Dependent Personal Services). On the other hand, if the performer would be exempt from host-country tax under Article 17, but would be taxable under either Article 14 or 15, tax may be imposed under either of those Articles. Thus, for example, if a performer derives remuneration from his activities in an independent capacity, and the remuneration is not attributable to a fixed base, he may be taxed by the host State in accordance with Article 17 if his remuneration exceeds $20,000 annually, despite the fact that he generally would be exempt from host State taxation under Article 14. However, a performer who receives less than the $20,000 threshold amount and therefore is not taxable under Article 17, nevertheless may be subject to tax in the host country under Articles 14 or 15 if the tests for host-country taxability under those Articles are met. For example, if an entertainer who is an independent contractor earns $19,000 of income in a State for the calendar year, but the income is attributable to a fixed base regularly available to him in the State of performance, that State may tax his income under Article 14. This interpretation is consistent with the prevailing understanding under Article 17 of the 1981 Model, but has been clarified by amendments to the text of paragraph 1 in this Model.

Since it frequently is not possible to know until year-end whether the income an entertainer or sportsman derived from a performance in a Contracting State will exceed $20,000, nothing in the Convention precludes that Contracting State from withholding tax during the year and refunding after the close of the year if the taxability threshold has not been met.

As explained in paragraph 9 of the OECD Commentaries to Article 17, Article 17 applies to all income connected with a performance by the entertainer, such as appearance fees, award or prize money, and a share of the gate receipts. Income derived from a Contracting State by a performer who is a resident of the other Contracting State from other than actual performance, such as royalties from record sales and payments for product endorsements, is not covered by this Article, but by other articles of the Convention, such as Article 12 (Royalties) or Article 14 (Independent Personal Services). For example, if an entertainer receives royalty income from the sale of live recordings, the royalty income would be exempt from source country tax under Article 12, even if the performance was conducted in the source country, although he could be taxed in the source country with respect to income from the performance itself under this Article

if the dollar threshold is exceeded.

In determining whether income falls under Article 17 or another article, the controlling factor will be whether the income in question is predominantly attributable to the performance itself or other activities or property rights. For instance, a fee paid to a performer for endorsement of a performance in which the performer will participate would be considered to be so closely associated with the performance itself that it normally would fall within Article 17. Similarly, a sponsorship fee paid by a business in return for the right to attach its name to the performance would be so closely associated with the performance that it would fall under Article 17 as well. As indicated in paragraph 9 of the Commentaries to Article 17 of the OECD Model, a cancellation fee would not be considered to fall within Article 17 but would be dealt with under Article 7, 14 or 15.

As indicated in paragraph 4 of the Commentaries to Article 17 of the OECD Model, where an individual fulfills a dual role as performer and non-performer (such as a player-coach or an actor-director), but his role in one of the two capacities is negligible, the predominant character of the individual's activities should control the characterization of those activities. In other cases there should be an apportionment between the performance-related compensation and other compensation.

Consistently with Article 15 (Dependent Personal Services), Article 17 also applies regardless of the timing of actual payment for services. Thus, a bonus paid to a resident of a Contracting State with respect to a performance in the other Contracting State with respect to a particular taxable year would be subject to Article 17 for that year even if it was paid after the close of the year.

*Paragraph 2*

Paragraph 2 is intended to deal with the potential for abuse when a performer's income does not accrue directly to the performer himself, but to another person. Foreign performers commonly perform in the United States as employees of, or under contract with, a company or other person.

The relationship may truly be one of employee and employer, with no abuse of the tax system either intended or realized. On the other hand, the "employer" may, for example, be a company established and owned by the performer, which is merely acting as the nominal income recipient in respect of the remuneration for the performance (a "star company"). The performer may act as an "employee," receive a modest salary, and arrange to receive the remainder of the income from his performance in another form or at a later time. In such case, absent the provisions of paragraph 2, the income arguably could escape host-country tax because it earns business profits but has no permanent establishment in that country. The performer may largely or entirely escape host-country tax by receiving only a small salary in the year the services are performed, perhaps small enough to place him below the dollar threshold in paragraph 1. The performer might arrange to receive further payments in a later year, when he is not subject to host-country tax, perhaps as deferred salary payments, dividends or liquidating distributions.

Paragraph 2 seeks to prevent this type of abuse while at the same time protecting the taxpayers' rights to the benefits of the Convention when there is a legitimate employee-employer relationship between the performer and the person providing his services. Under paragraph 2, when the income accrues to a person other than the performer, and the performer or related persons participate, directly or indirectly, in the receipts or profits of that other person, the income may be taxed in the Contracting State where the performer's services are exercised, without regard to the provisions of the Convention concerning business profits (Article 7) or independent personal services (Article 14). Thus, even if the "employer" has no permanent establishment or fixed base in the host country, its income may be subject to tax there under the provisions of paragraph 2. Taxation under paragraph 2 is on the person providing the services of the performer. This paragraph does not affect the rules of paragraph 1, which apply to the performer himself. The income taxable by virtue of paragraph 2 is reduced to the extent of salary payments to the performer, which fall under paragraph 1.

For purposes of paragraph 2, income is deemed to accrue to another person (i.e., the person providing the services of the performer) if that other person has control over, or the right to receive, gross income in respect of the services of the performer. Direct or indirect participation in the profits of a person may include, but is not limited to, the accrual or receipt of deferred remuneration, bonuses, fees, dividends, partnership income or other income or distributions.

Paragraph 2 does not apply if it is established that neither the performer nor any persons related to the performer participate directly or indirectly in the receipts or profits of the person providing the services of the performer. Assume, for example, that a circus owned by a U.S. corporation performs in the other Contracting State, and promoters of the performance in the other State pay the circus, which, in turn, pays salaries to the circus performers. The circus is determined to have no permanent establishment in that State. Since the circus performers do not participate in the profits of the circus, but merely receive their salaries out of the circus' gross receipts, the circus is protected by Article 7 and its income is not subject to host-country tax. Whether the salaries of the circus performers are subject to host-country tax under this Article depends on whether they exceed the $20,000 threshold in paragraph 1.

Since pursuant to Article 1 (General Scope) the Convention only applies to persons who are residents of one of the Contracting States, if the star company is not a resident of one of the Contracting States then taxation of the income is not affected by Article 17 or any other provision of the Convention.

This exception from paragraph 2 for non-abusive cases is not found in the OECD Model. The United States has entered a reservation to the OECD Model on this point.

*Relationship to Other Articles*

This Article is subject to the provisions of the saving clause of paragraph 4 of Article 1 (General Scope). Thus, if an entertainer or a sportsman who is resident in the other Contracting

State is a citizen of the United States, the United States may tax all of his income from performances in the United States without regard to the provisions of this Article, subject, however, to the special foreign tax credit provisions of paragraph 3 of Article 23 (Relief from Double Taxation). In addition, benefits of this Article are subject to the provisions of Article 22 (Limitation on Benefits).


ARTICLE 18
Pensions, Social Security, Annuities, Alimony, and Child Support

This Article deals with the taxation of private (i.e., non-government service) pensions and annuities, social security benefits, alimony and child support payments and with the tax treatment of contributions to pension plans.

*Paragraph 1*

Paragraph 1 provides that distributions from pensions and other similar remuneration beneficially owned by a resident of a Contracting State in consideration of past employment are taxable only in the State of residence of the beneficiary. This Model, unlike the OECD Model and the 1981 Model, makes explicit the fact that the term "pension distributions and other similar remuneration" includes both periodic and single sum payments. The same result is understood to apply in U.S. treaties that do not make this point explicitly.

The phrase "pension distributions and other similar remuneration" is intended to encompass payments made by private retirement plans and arrangements in consideration of past employment. In the United States, the plans encompassed by Paragraph 1 include: qualified plans under section 401(a), individual retirement plans (including individual retirement plans that are part of a simplified employee pension plan that satisfies section 408(k), individual retirement accounts and section 408(p) accounts), nondiscriminatory section 457 plans, section 403(a) qualified annuity plans, and section 403(b) plans. The Competent Authorities may agree that distributions from other plans that generally meet similar criteria to those applicable to other plans established under their respective laws also qualify for the benefits of Paragraph 1. In the United States, these criteria are as follows:

(a) The plan must be written;

(b) In the case of an employer-maintained plan, the plan must be nondiscriminatory insofar as it (alone or in combination with other comparable plans) must cover a wide range of employees. including rank and file employees, and actually provide significant benefits for the entire range of covered employees;

(c) In the case of an employer-maintained plan the plan must contain provisions that severely limit the employees' ability to use plan assets for purposes other than retirement, and in all cases be subject to tax provisions that discourage participants from using the assets for purposes other than retirement; and

(d) The plan must provide for payment of a reasonable level of benefits at death, a stated age, or an event related to work status, and otherwise require minimum distributions under rules designed to ensure that any death benefits provided to the

participants' survivors are merely incidental to the retirement benefits provided to the participants.

In addition, certain distribution requirements must be met before distributions from these plans would fall under paragraph 1. To qualify as a pension distribution or similar remuneration from a U.S. plan the employee must have been either employed by the same employer for five years or be at least 62 years old at the time of the distribution. In addition, the distribution must be made either

> (A) on account of death or disability,
> (B) as part of a series of substantially equal payments over the employee's life expectancy (or over the joint life expectancy of the employee and a beneficiary), or
> (C) after the employee attained the age of 55.

Finally, the distribution must be made either after separation from service or on or after attainment of age 65. A distribution from a pension plan solely due to termination of the pension plan is not a distribution falling under paragraph 1.

Pensions in respect of government service are not covered by this paragraph. They are covered either by paragraph 2 of this Article, if they are in the form of social security benefits, or by paragraph 2 of Article 19 (Government Service). Thus, Article 19 covers section 457, 401(a) and 403(b) plans established for government employees. If a pension in respect of government service is not covered by Article 19 solely because the service is not "in the discharge of functions of a governmental nature," the pension is covered by this article.

The exclusive residence-based taxation provided under this paragraph is limited to taxation of amounts that were not previously included in taxable income in the other Contracting State. For example, if a Contracting State had imposed tax on the resident with respect to some portion of a pension plan's earnings, subsequent distributions to a resident of the other State would not be taxable in that State to the extent the distributions were attributable to such amounts. In determining the amount of a distribution that is attributable to previously taxed amounts, the ordering rules of the residence State will be applied. The United States will treat any amount that has increased the recipient's "investment in the contract" (as defined in section 72) as having been previously included in taxable income.

*Paragraph 2*

The treatment of social security benefits is dealt with in paragraph 2. This paragraph provides that, notwithstanding the provision of paragraph 1 under which private pensions are taxable exclusively in the State of residence of the beneficial owner, payments made by one of the Contracting States under the provisions of its social security or similar legislation to a resident of the other Contracting State or to a citizen of the United States will be taxable only in the Contracting State making the payment. This paragraph applies to social security beneficiaries whether they have contributed to the system as private sector or Government employees.

The phrase "similar legislation" is intended to refer to United States tier 1 Railroad Retirement benefits. The reference to U.S. citizens is necessary to insure that a social security payment by the other Contracting State to a U.S. citizen who is not resident in the United States will not be taxable by the United States.

*Paragraph 3*

Under paragraph 3, annuities that are derived and beneficially owned by a resident of a Contracting State are taxable only in that State. An annuity, as the term is used in this paragraph, means a stated sum paid periodically at stated times during a specified number of years, under an obligation to make the payment in return for adequate and full consideration (other than for services rendered). An annuity received in consideration for services rendered would be treated as deferred compensation and generally taxable in accordance with Article 15 (Dependent Personal Services).

*Paragraphs 4 and 5*

Paragraphs 4 and 5 deal with alimony and child support payments. Both alimony, under paragraph 4, and child support payments, under paragraph 5, are defined as periodic payments made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support. Paragraph 4, however, deals only with payments of that type that are deductible to the payor and taxable to the payee. Under that paragraph, alimony (i.e., a deductible payment that is taxable in the hands of the recipient) paid by a resident of a Contracting State to a resident of the other Contracting State is taxable under the Convention only in the State of residence of the recipient. Paragraph 5 deals with those periodic payments that are for the support of a child and that are not covered by paragraph 4 (i.e., those payments that either are not deductible to the payor or not taxable to the payee). These types of payments by a resident of a Contracting State to a resident of the other Contracting State are taxable in neither Contracting State.

*Paragraph 6*

Paragraph 6 deals with various aspects of cross-border pension contributions. There is no such rule in the OECD or U.N. Models, nor was there one in any of the previous U.S. Models. The 1992 OECD Model, however, deals extensively in the Commentary with this matter, providing both a model text and a discussion of the issues. Paragraph 6 has been included in this Model to ensure that certain differences between the two Contracting States' laws regarding pension contributions and pension plans will not inhibit the flow of personal services between the Contracting States.

Paragraph 6 essentially provides three types of benefits: deductions (or exclusions) at the employee and employer level for contributions to a pension plan (subparagraph (a)), exemption from tax on undistributed earnings realized by the plan (subparagraph (b)), and exemption from tax on rollovers from one plan to another (subparagraph (c)).

Subparagraph 6(a) allows for the deductibility (or excludability) in one State of contributions to a plan in the other State if certain conditions are satisfied. Subparagraph 6(a) also provides that contributions to the plan will be deductible for purposes of computing the employer's taxable income in the State where the individual renders services to the extent allowable in that State for contributions to plans established and recognized under that State's laws.

Where the United States is the host country, the exclusion of employee contributions from the employee's income under this paragraph is limited to elective contributions not in excess of the amount specified in section 402(g). Deduction of employer contributions is subject to the limitations of sections 415 and 404. The section 404 limitation on deductions would be calculated as if the individual were the only employee covered by the plan.

Subparagraph 6(b) provides that income earned by the plan will not be taxable in the other State until the earnings are distributed.

Subparagraph 6(c) permits the individual to withdraw funds from the plan in the first-mentioned (home) State for the purpose of rolling over the amounts to a plan established in the other (host) Contracting State without being subjected to tax in the other State with respect to such amounts. This benefit is subject to any restrictions on rollovers under the laws of the other State. For instance, in the United States a rollover ordinarily must be made within 60 days of the withdrawal from the first plan under section 408(d)(3)(A)(i) and section 402(c). Rollovers from plans covered by Article 19 (Government Service) would not be covered by this provision. It is understood that, for the purposes of maintaining the tax-exempt status of a pension arrangement receiving rolled-over amounts, the assets received will be treated as assets rolled over from a qualified plan.

The benefits of this paragraph are allowed to an individual who is present in one of the Contracting States to perform either dependent or independent personal services. The individual, however, must be a visitor to the host country. Subparagraph 6(d) provides that the individual can receive the benefits of this paragraph only if he was contributing to the plan in his home country, or to a plan that was replaced by the plan to which he is contributing, before coming to the host country. The allowance of a successor plan would apply if, for example, the employer has been taken over by another corporation that replaces the existing plan with its own plan, rolling membership in the old plan over into the new plan.

In addition, the host-country competent authority must determine that the recognized plan to which a contribution is made in the home country of the individual generally corresponds to the plan in the host country. It is understood that United States plans eligible for the benefits of paragraph 6 include qualified plans under section 403(a), individual retirement plans (including individual retirement plans that are part of a simplified employee pension plan that satisfies section 408(k), IRAs and section 408(p) accounts), section 403(a) qualified annuity plans, individual retirement accounts, and section 403(b) plans. Finally, the benefits under this paragraph are limited to the benefits that the host country accords under its law, to the host country plan most similar to the home country plan, even if the home country would have

afforded greater benefits under its law. Thus, for example, if the host country has a cap on contributions equal to, say, five percent of the remuneration, and the home country has a seven percent cap, the deduction is limited to five percent, even though if the individual had remained in his home country he would have been allowed to take the larger deduction.

*Relationship to Other Articles*

Paragraphs 1, 3 and 4 of Article 18 are subject to the saving clause of paragraph 4 of Article 1 (General Scope). Thus, a U.S. citizen who is resident in the other Contracting State, and receives either a pension, annuity or alimony payment from the United States, may be subject to U.S. tax on the payment, notwithstanding the rules in those three paragraphs that give the State of residence of the recipient the exclusive taxing right. Paragraphs 2 and 5 are excepted from the saving clause by virtue of paragraph 5(a) of Article 1. Thus, the United States will allow U.S. citizens and residents the benefits of paragraph 5. Paragraph 6 is excepted from the saving clause with respect to permanent residents and citizens by virtue of paragraph 5(b) of Article 1.

ARTICLE 19
Government Service

*Paragraph 1*

Subparagraphs (a) and (b) of paragraph 1 deal with the taxation of government compensation (other than a pension addressed in paragraph 2). Subparagraph (a) provides that remuneration paid from the public funds of one of the States or its political subdivisions or local authorities to any individual who is rendering services to that State, political subdivision or local authority, which are in the discharge of governmental functions, is exempt from tax by the other State. Under subparagraph (b), such payments are, however, taxable exclusively in the other State (i.e., the host State) if the services are rendered in that other State and the individual is a resident of that State who is either a national of that State or a person who did not become resident of that State solely for purposes of rendering the services. The paragraph applies both to government employees and to independent contractors engaged by governments to perform services for them.

The remuneration described in paragraph 1 is subject to the provisions of this paragraph and not to those of Articles 14 (Independent Personal Services), 15 (Dependent Personal Services), 16 (Director's Fees) or 17 (Artistes and Sportsmen). If, however, the conditions of paragraph 1 are not satisfied, those other Articles will apply. Thus, if a local government sponsors a basketball team in an international tournament, and pays the athletes from public funds, the compensation of the players is covered by Article 17 and not Article 19, because the athletes are not engaging in a governmental function when they play basketball.

*Paragraph 2*

Paragraph 2 deals with the taxation of a pension paid from the public funds of one of the States or a political subdivision or a local authority thereof to an individual in respect of services

rendered to that State or subdivision or authority in the discharge of governmental functions. Subparagraph (a) provides that such a pension is taxable only in that State. Subparagraph (b) provides an exception under which such a pension is taxable only in the other State if the individual is a resident of, and a national of, that other State. Pensions paid to retired civilian and military employees of a Government of either State are intended to be covered under paragraph 2. When benefits paid by a State in respect of services rendered to that State or a subdivision or authority are in the form of social security benefits, however, those payments are covered by paragraph 2 of Article 18 (Pensions, Social Security, Annuities, Alimony, and Child Support). As a general matter, the result will be the same whether Article 18 or 19 applies, since social security benefits are taxable exclusively by the source country and so are government pensions. The result will differ only when the payment is made to a citizen and resident of the other Contracting State, who is not also a citizen of the paying State. In such a case, social security benefits continue to be taxable at source while government pensions become taxable only in the residence country.

The phrase "functions of a governmental nature" is not defined. In general it is understood to encompass functions traditionally carried on by a government. It would not include functions that commonly are found in the private sector (e.g., education, health care, utilities). Rather, it is limited to functions that generally are carried on solely by the government (e.g., military, diplomatic service, tax administrators) and activities that directly support the carrying out of those functions.

The use of the phrase "paid from the public funds of a Contracting State" is intended to clarify that remuneration and pensions paid by such entities as government-owned corporations are covered by the Article, as long as the other conditions of the Article are satisfied.

*Relation to Other Articles*

Under paragraph 5(b) of Article 1 (General Scope), the saving clause (paragraph 4 of Article 1) does not apply to the benefits conferred by one of the States under Article 19 if the recipient of the benefits is neither a citizen of that State, nor a person who has been admitted for permanent residence there (i.e., in the United States, a "green card" holder). Thus, a resident of a Contracting State who in the course of performing functions of a governmental nature becomes a resident of the other State (but not a permanent resident), would be entitled to the benefits of this Article. However, an individual who receives a pension paid by the Government of the other Contracting State in respect of services rendered to that Government shall be taxable on this pension only in the other Contracting State unless the individual is a U.S. citizen or acquires a U.S. green card.

ARTICLE 20
Student and Trainees

This Article provides rules for host-country taxation of visiting students, apprentices or business trainees. Persons who meet the tests of the Article will be exempt from tax in the State

that they are visiting with respect to designated classes of income. Several conditions must be satisfied in order for an individual to be entitled to the benefits of this Article.

First, the visitor must have been, either at the time of his arrival in the host State or immediately before, a resident of the other Contracting State.

Second, the purpose of the visit must be the full-time education or training of the visitor. Thus, if the visitor comes principally to work in the host State but also is a part-time student, he would not be entitled to the benefits of this Article, even with respect to any payments he may receive from abroad for his maintenance or education, and regardless of whether or not he is in a degree program. Whether a student is to be considered full-time will be determined by the rules of the educational institution at which he is studying. Similarly, a person who visits the host State for the purpose of obtaining business training and who also receives a salary from his employer for providing services would not be considered a trainee and would not be entitled to the benefits of this Article.

Third, a student must be studying at an accredited educational institution. (This requirement does not apply to business trainees or apprentices.) An educational institution is understood to be an institution that normally maintains a regular faculty and normally has a regular body of students in attendance at the place where the educational activities are carried on. An educational institution will be considered to be accredited if it is accredited by an authority that generally is responsible for accreditation of institutions in the particular field of study.

The host-country exemption in the Article applies only to payments received by the student, apprentice or business trainee for the purpose of his maintenance, education or training that arise outside the host State. A payment will be considered to arise outside the host State if the payor is located outside the host State. Thus, if an employer from one of the Contracting States sends an employee to the other Contracting State for training, the payments the trainee receives from abroad from his employer for his maintenance or training while he is present in the host State will be exempt from host-country tax. In all cases substance over form should prevail in determining the identity of the payor. Consequently, payments made directly or indirectly by the U.S. person with whom the visitor is training, but which have been routed through a non-host-country source, such as, for example, a foreign bank account, should not be treated as arising outside the United States for this purpose.

In the case of an apprentice or business trainee, the benefits of the Article will extend only for a period of one year from the time that the visitor first arrives in the host country. If, however, an apprentice or trainee remains in the host country for a second year, thus losing the benefits of the Article, he would not retroactively lose the benefits of the Article for the first year.

The saving clause of paragraph 4 of Article 1 (General Scope) does not apply to this Article with respect to an individual who is neither a citizen of the host State nor has been admitted for permanent residence there. The saving clause, however, does apply with respect to citizens and permanent residents of the host State. Thus, a U.S. citizen who is a resident of the other Contracting State and who visits the United States as a full-time student at an accredited

university will not be exempt from U.S. tax on remittances from abroad that otherwise constitute U.S. taxable income. A person, however, who is not a U.S. citizen, and who visits the United States as a student and remains long enough to become a resident under U.S. law, but does not become a permanent resident (i.e., does not acquire a green card), will be entitled to the full benefits of the Article.

ARTICLE 21
Other Income

Article 21 generally assigns taxing jurisdiction over income not dealt with in the other articles (Articles 6 through 20) of the Convention to the State of residence of the beneficial owner of the income and defines the terms necessary to apply the article. An item of income is "dealt with" in another article if it is the type of income described in the article and it has its source in a Contracting State. For example, all royalty income that arises in a Contracting State and that is beneficially owned by a resident of the other Contracting State is "dealt with" in Article 12 (Royalties).

Examples of items of income covered by Article 21 include income from gambling, punitive (but not compensatory) damages, covenants not to compete, and income from certain financial instruments to the extent derived by persons not engaged in the trade or business of dealing in such instruments (unless the transaction giving rise to the income is related to a trade or business, in which case it is dealt with under Article 7 (Business Profits)). The article also applies to items of income that are not dealt with in the other articles because of their source or some other characteristic. For example, Article 11 (Interest) addresses only the taxation of interest arising in a Contracting State. Interest arising in a third State that is not attributable to a permanent establishment, therefore, is subject to Article 21.

Distributions from partnerships and distributions from trusts are not generally dealt with under Article 21 because partnership and trust distributions generally do not constitute income. Under the Code, partners include in income their distributive share of partnership income annually, and partnership distributions themselves generally do not give rise to income. Also, under the Code, trust income and distributions have the character of the associated distributable net income and therefore would generally be covered by another article of the Convention. See Code section 641 et seq.

*Paragraph 1*

The general rule of Article 21 is contained in paragraph 1. Items of income not dealt with in other articles and beneficially owned by a resident of a Contracting State will be taxable only in the State of residence. This exclusive right of taxation applies whether or not the residence State exercises its right to tax the income covered by the Article.

This paragraph differs in one respect from paragraph 1 in the 1981 Model and the OECD Model, by referring to "items of income beneficially owned by a resident of a Contracting State"

rather than simply "items of income of a resident of a Contracting State." This is not a substantive change. It is intended merely to make explicit the implicit understanding in other treaties that the exclusive residence taxation provided by paragraph 1 applies only when a resident of a Contracting State is the beneficial owner of the income. This should also be understood from the phrase "income of a resident of a Contracting State." The addition of a reference to beneficial ownership merely removes any possible ambiguity. Thus, source taxation of income not dealt with in other articles of the Convention is not limited by paragraph 1 if it is nominally paid to a resident of the other Contracting State, but is beneficially owned by a resident of a third State.

*Paragraph 2*

This paragraph provides an exception to the general rule of paragraph 1 for income, other than income from real property, that is attributable to a permanent establishment or fixed base maintained in a Contracting State by a resident of the other Contracting State. The taxation of such income is governed by the provisions of Articles 7 (Business Profits) and 14 (Independent Personal Services). Therefore, income arising outside the United States that is attributable to a permanent establishment maintained in the United States by a resident of the other Contracting State generally would be taxable by the United States under the provisions of Article 7. This would be true even if the income is sourced in a third State.

There is an exception to this general rule with respect to income a resident of a Contracting State derives from real property located outside the other Contracting State (whether in the first-mentioned Contracting State or in a third State) that is attributable to the resident's permanent establishment or fixed base in the other Contracting State. In such a case, only the first-mentioned Contracting State (i.e., the State of residence of the person deriving the income) and not the host State of the permanent establishment or fixed base may tax that income. This special rule for foreign-situs property is consistent with the general rule, also reflected in Article 6 (Income from Real Property (Immovable Property)), that only the situs and residence States may tax real property and real property income. Even if such property is part of the property of a permanent establishment or fixed base in a Contracting State, that State may not tax if neither the situs of the property nor the residence of the owner is in that State.

*Relation to Other Articles*

This Article is subject to the saving clause of paragraph 4 of Article 1 (General Scope). Thus, the United States may tax the income of a resident of the other Contracting State that is not dealt with elsewhere in the Convention, if that resident is a citizen of the United States. The Article is also subject to the provisions of Article 22 (Limitation on Benefits). Thus, if a resident of the other Contracting State earns income that falls within the scope of paragraph 1 of Article 21, but that is taxable by the United States under U.S. law, the income would be exempt from U.S. tax under the provisions of Article 21 only if the resident satisfies one of the tests of Article 22 for entitlement to benefits.

ARTICLE 22
Limitation on Benefits

*Purpose of Limitation on Benefits Provisions*

The United States views an income tax treaty as a vehicle for providing treaty benefits to residents of the two Contracting States. This statement begs the question of who is to be treated as a resident of a Contracting State for the purpose of being granted treaty benefits. The Commentaries to the OECD Model authorize a tax authority to deny benefits, under substance-over-form principles, to a nominee in one State deriving income from the other on behalf of a third-country resident. In addition, although the text of the OECD Model does not contain express anti-abuse provisions, the Commentaries to Article 1 contain an extensive discussion approving the use of such provisions in tax treaties in order to limit the ability of third state residents to obtain treaty benefits. The United States holds strongly to the view that tax treaties should include provisions that specifically prevent misuse of treaties by residents of third countries. Consequently, all recent U.S. income tax treaties contain comprehensive Limitation on Benefits provisions.

A treaty that provides treaty benefits to any resident of a Contracting State permits "treaty shopping": the use, by residents of third states, of legal entities established in a Contracting State with a principal purpose to obtain the benefits of a tax treaty between the United States and the other Contracting State. It is important to note that this definition of treaty shopping does not encompass every case in which a third state resident establishes an entity in a U.S. treaty partner, and that entity enjoys treaty benefits to which the third state resident would not itself be entitled. If the third country resident had substantial reasons for establishing the structure that were unrelated to obtaining treaty benefits, the structure would not fall within the definition of treaty shopping set forth above.

Of course, the fundamental problem presented by this approach is that it is based on the taxpayer's intent, which a tax administration is normally ill-equipped to identify. In order to avoid the necessity of making this subjective determination, Article 22 sets forth a series of objective tests. The assumption underlying each of these tests is that a taxpayer that satisfies the requirements of any of the tests probably has a real business purpose for the structure it has adopted, or has a sufficiently strong nexus to the other Contracting State (e.g., a resident individual) to warrant benefits even in the absence of a business connection, and that this business purpose or connection outweighs any purpose to obtain the benefits of the Treaty.

For instance, the assumption underlying the active trade or business test under paragraph 3 is that a third country resident that establishes a "substantial" operation in the other State and that derives income from a similar activity in the United States would not do so primarily to avail itself of the benefits of the Treaty; it is presumed in such a case that the investor had a valid business purpose for investing in the other State, and that the link between that trade or business and the U.S. activity that generates the treaty-benefited income manifests a business purpose for placing the U.S. investments in the entity in the other State. It is considered unlikely that the investor would incur the expense of establishing a substantial trade or business in the other State

simply to obtain the benefits of the Convention. A similar rationale underlies the other tests in Article 22.

While these tests provide useful surrogates for identifying actual intent, these mechanical tests cannot account for every case in which the taxpayer was not treaty shopping. Accordingly, Article 22 also includes a provision (paragraph 4) authorizing the competent authority of a Contracting State to grant benefits. While an analysis under paragraph 4 may well differ from that under one of the other tests of Article 22, its objective is the same: to identify investors whose residence in the other State can be justified by factors other than a purpose to derive treaty benefits.

Article 22 and the anti-abuse provisions of domestic law complement each other, as Article 22 effectively determines whether an entity has a sufficient nexus to the Contracting State to be treated as a resident for treaty purposes, while domestic anti-abuse provisions (e.g., business purpose, substance-over-form, step transaction or conduit principles) determine whether a particular transaction should be recast in accordance with its substance. Thus, internal law principles of the source State may be applied to identify the beneficial owner of an item of income, and Article 22 then will be applied to the beneficial owner to determine if that person is entitled to the benefits of the Convention with respect to such income.

*Structure of the Article*

Article 22 follows the form used in other recent U.S. income tax treaties. (See, e.g., the Convention between the United State of America and the Federal Republic of Germany for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital and to Certain Other Taxes.) The structure of the Article is as follows: Paragraph 1 states the general rule that residents are entitled to benefits otherwise accorded to residents only to the extent provided in the Article. Paragraph 2 lists a series of attributes of a resident of a Contracting State, the presence of any one of which will entitle that person to all the benefits of the Convention. Paragraph 3 provides that, with respect to a person not entitled to benefits under paragraph 2, benefits nonetheless may be granted to that person with regard to certain types of income. Paragraph 4 provides that benefits also may be granted if the competent authority of the State from which benefits are claimed determines that it is appropriate to provide benefits in that case. Paragraph 5 defines the term "recognized stock exchange" as used in paragraph 2(c).

*Paragraph 1*

Paragraph 1 provides that a resident of a Contracting State will be entitled to the benefits otherwise accorded to residents of a Contracting State under the Convention only to the extent provided in the Article. The benefits otherwise accorded to residents under the Convention include all limitations on source-based taxation under Articles 6 through 21, the treaty-based relief from double taxation provided by Article 23 (Relief from Double Taxation), and the protection afforded to residents of a Contracting State under Article 24 (Nondiscrimination). Some provisions do not require that a person be a resident in order to enjoy the benefits of those

provisions. These include paragraph 1 of Article 24 (Nondiscrimination), Article 25 (Mutual Agreement Procedure), and Article 27 (Diplomatic Agents and Consular Officers). Article 22 accordingly does not limit the availability of the benefits of these provisions.

*Paragraph 2*

Paragraph 2 has six subparagraphs, each of which describes a category of residents that are entitled to all benefits of the Convention.

### *Individuals -- Subparagraph 2(a)*

Subparagraph (a) provides that individual residents of a Contracting State will be entitled to all treaty benefits. If such an individual receives income as a nominee on behalf of a third country resident, benefits may be denied under the respective articles of the Convention by the requirement that the beneficial owner of the income be a resident of a Contracting State.

### *Qualified Governmental Entities -- Subparagraph 2(b)*

Subparagraph b) provides that qualified governmental entities, as defined in subparagraph 3(i) of Article 3 (Definitions), also will be entitled to all benefits of the Convention. As described in Article 3, in addition to federal, state and local governments, the term "qualified governmental entity" encompasses certain government-owned corporations and other entities, and certain pension trusts or funds that administer pension benefits described in Article 19 (Government Service).

### *Publicly-Traded Corporations -- Subparagraph 2(c)(i)*

Subparagraph (c) applies to two categories of corporations: publicly-traded corporations and subsidiaries of publicly-traded corporations. Clause (i) of subparagraph 2(c) provides that a company will be entitled to all the benefits of the Convention if all the shares in the class or classes of shares that represent more than 50 percent of the voting power and value of the company are regularly traded on a "recognized stock exchange" located in either State. The term "recognized stock exchange" is defined in paragraph 5. This provision differs from corresponding provisions in earlier treaties in that it states that "all of the shares" in the principal class of shares must be regularly traded on a recognized stock exchange. This language was added to make it clear that all shares in the principal class or classes of shares (as opposed to only a portion of such shares) must satisfy the requirements of this subparagraph.

If a company has only one class of shares, it is only necessary to consider whether the shares of that class are regularly traded on a recognized stock exchange. If the company has more than one class of shares, it is necessary as an initial matter to determine whether one of the classes accounts for more than half of the voting power and value of the company. If so, then only those shares are considered for purposes of the regular trading requirement. If no single class of shares accounts for more than half of the company's voting power and value, it is necessary to identify a group of two or more classes of the company's shares that account for

more than half of the company's voting power and value, and then to determine whether each class of shares in this group satisfies the regular trading requirement. Although in a particular case involving a company with several classes of shares it is conceivable that more than one group of classes could be identified that account for more than 50% of the shares, it is only necessary for one such group to satisfy the requirements of this subparagraph in order for the company to be entitled to benefits. Benefits would not be denied to the company even if a second, non-qualifying, group of shares with more than half of the company's voting power and value could be identified.

The term "regularly traded" is not defined in the Convention. In accordance with paragraph 2 of Article 3 (General Definitions), this term will be defined by reference to the domestic tax laws of the State from which treaty benefits are sought (i.e., the source State). In the case of the United States, this term is understood to have the meaning it has under Treas. Reg. section 1.884-5(d)(4)(i)(B), relating to the branch tax provisions of the Code. Under these regulations, a class of shares is considered to be "regularly traded" if two requirements are met: trades in the class of shares are made in more than de minimis quantities on at least 60 days during the taxable year, and the aggregate number of shares in the class traded during the year is at least 10 percent of the average number of shares outstanding during the year. Sections 1.884-5(d)(4)(i)(A), (ii) and (iii) will not be taken into account for purposes of defining the term "regularly traded" under the Convention.

The regular trading requirement can be met by trading on any recognized exchange or exchanges located in either State. Trading on one or more recognized stock exchanges may be aggregated for purposes of this requirement. Thus, a U.S. company could satisfy the regularly traded requirement through trading, in whole or in part, on a recognized stock exchange located in the other Contracting State. Authorized but unissued shares are not considered for purposes of this test.

*Subsidiaries of Publicly-Traded Corporations -- Subparagraph 2(c)(ii)*

Clause (ii) of subparagraph 2(c) provides a test under which certain companies that are directly or indirectly controlled by companies satisfying the publicly-traded test of subparagraph 2(c)(i) may be entitled to the benefits of the Convention. Under this test, a company will be entitled to the benefits of the Convention if 50 percent or more of each class of shares in the company is directly or indirectly owned by companies that are described in subparagraph 2(c)(i).

This test differs from that under subparagraph 2(c)(i) in that 50 percent of each class of the company's shares, not merely the class or classes accounting for more than 50 percent of the company's votes and value, must be held by publicly-traded companies described in subparagraph 2(c)(i). Thus, the test under subparagraph 2(c)(i) considers the ownership of every class of shares outstanding, while the test under subparagraph 2(c)(ii) only considers those classes that account for a majority of the company's voting power and value.

Clause (ii) permits indirect ownership. Consequently, the ownership by publicly-traded companies described in clause (i) need not be direct. However, any intermediate owners in the

chain of ownership must themselves be entitled to benefits under paragraph 2.

*Tax Exempt Organizations -- Subparagraph 2(d)*

Subparagraph 2(d) provides that the tax exempt organizations described in subparagraph 1(b)(i) of Article 4 (Residence) will be entitled to all the benefits of the Convention. These entities are entities that generally are exempt from tax in their State of residence and that are organized and operated exclusively to fulfill religious, educational, scientific and other charitable purposes. Unlike some recent U.S. treaties, there is no requirement that specified percentages of the beneficiaries of these organizations be residents of one of the Contracting States.

*Pension Funds -- Subparagraph 2(e)*

Subparagraph 2(e) provides that organizations described in subparagraph 1(b)(ii) of Article 4 (Residence) will be entitled to all the benefits of the Convention, as long as more than half of the beneficiaries, members or participants of the organization are individual residents of either Contracting State. The organizations referred to in this provision are tax-exempt entities that provide pension and other benefits to employees pursuant to a plan. For purposes of this provision, the term "beneficiaries" should be understood to refer to the persons receiving benefits from the organization.

*Ownership/Base Erosion -- Subparagraph 2(f)*

Subparagraph 2(f) provides a two part test, the so-called ownership and base erosion test. This test applies to any form of legal entity that is a resident of a Contracting State. Both prongs of the test must be satisfied for the resident to be entitled to benefits under subparagraph 2(f).

The ownership prong of the test, under clause (i), requires that 50 percent or more of each class of beneficial interests in the person (in the case of a corporation, 50 percent or more of each class of its shares) be owned on at least half the days of the person's taxable year by persons who are themselves entitled to benefits under the other tests of paragraph 2 (i.e., subparagraphs (a), (b), (c), (d), or (e)). The ownership may be indirect through other persons themselves entitled to benefits under paragraph 2.

Trusts may be entitled to benefits under this provision if they are treated as residents under Article 4 (Residence) and they otherwise satisfy the requirements of this subparagraph. For purposes of this subparagraph, the beneficial interests in a trust will be considered to be owned by its beneficiaries in proportion to each beneficiary's actuarial interest in the trust. The interest of a remainder beneficiary will be equal to 100 percent less the aggregate percentages held by income beneficiaries. A beneficiary's interest in a trust will not be considered to be owned by a person entitled to benefits under the other provisions of paragraph 2 if it is not possible to determine the beneficiary's actuarial interest. Consequently, if it is not possible to determine the actuarial interest of any beneficiaries in a trust, the ownership test under clause (i) cannot be satisfied, unless all beneficiaries are persons entitled to benefits under the other subparagraphs of paragraph 2.

The base erosion prong of the test under subparagraph 2(f) requires that less than 50 percent of the person's gross income for the taxable year be paid or accrued, directly or indirectly, to non-residents of either State (unless income is attributable to a permanent establishment located in either Contracting State), in the form of payments that are deductible for tax purposes in the entity's State of residence. To the extent they are deductible from the taxable base, trust distributions would be considered deductible payments. Depreciation and amortization deductions, which are not "payments," are disregarded for this purpose. This provision differs in some respects from analogous provisions in other treaties. Its purpose is to determine whether the income derived from the source State is in fact subject to the tax regime of that other State. Consequently, payments to any resident of either State, as well as payments that are attributable to permanent establishments in either State, are not considered base eroding payments for this purpose (to the extent that these recipients do not themselves base erode to non-residents).

The term "gross income" is not defined in the Convention. Thus, in accordance with paragraph 2 of Article 3 (General Definitions), in determining whether a person deriving income from United States sources is entitled to the benefits of the Convention, the United States will ascribe the meaning to the term that it has in the United States. In such cases, "gross income" will be defined as gross receipts less cost of goods sold.

It is intended that the provisions of paragraph 2 will be self executing. Unlike the provisions of paragraph 4, discussed below, claiming benefits under paragraph 2 does not require advance competent authority ruling or approval. The tax authorities may, of course, on review, determine that the taxpayer has improperly interpreted the paragraph and is not entitled to the benefits claimed.

*Paragraph 3*

Paragraph 3 sets forth a test under which a resident of a Contracting State that is not generally entitled to benefits of the Convention under paragraph 2 may receive treaty benefits with respect to certain items of income that are connected to an active trade or business conducted in its State of residence.

Subparagraph 3(a) sets forth a three-pronged test that must be satisfied in order for a resident of a Contracting State to be entitled to the benefits of the Convention with respect to a particular item of income. First, the resident must be engaged in the active conduct of a trade of business in its State of residence. Second, the income derived from the other State must be derived in connection with, or be incidental to, that trade or business. Third, the trade or business must be substantial in relation to the activity in the other State that generated the item of income. These determinations are made separately for each item of income derived from the other State. It therefore is possible that a person would be entitled to the benefits of the Convention with respect to one item of income but not with respect to another. If a resident of a Contracting State is entitled to treaty benefits with respect to a particular item of income under paragraph 3, the resident is entitled to all benefits of the Convention insofar as they affect the taxation of that item of income in the other State. Set forth below is a discussion of each of the three prongs of the test

under paragraph 3.

*Trade or Business -- Subparagraphs 3(a)(i) and (b)*

The term "trade or business" is not defined in the Convention. Pursuant to paragraph 2 of Article 3 (General Definitions), when determining whether a resident of the other State is entitled to the benefits of the Convention under paragraph 3 with respect to income derived from U.S. sources, the United States will ascribe to this term the meaning that it has under the law of the United States. Accordingly, the United States competent authority will refer to the regulations issued under section 367(a) for the definition of the term "trade or business." In general, therefore, a trade or business will be considered to be a specific unified group of activities that constitute or could constitute an independent economic enterprise carried on for profit. Furthermore, a corporation generally will be considered to carry on a trade or business only if the officers and employees of the corporation conduct substantial managerial and operational activities. See Code section 367(a)(3) and the regulations thereunder.

Notwithstanding this general definition of trade or business, subparagraph 3(b) provides that the business of making or managing investments, when part of banking, insurance or securities activities conducted by a bank, insurance company, or registered securities dealer, will be considered to be a trade or business. Conversely, such activities conducted by a person other than a bank, insurance company or registered securities dealer will not be considered to be the conduct of an active trade or business, nor would they be considered to be the conduct of an active trade or business if conducted by a banking or insurance company but not as part of the company's banking or insurance business.

Because a headquarters operation is in the business of managing investments, a company that functions solely as a headquarter company will not be considered to be engaged in an active trade or business for purposes of paragraph 3.

*Derived in Connection With Requirement - Subparagraphs 3(a)(ii) and (d)*

Subparagraph 3(d) provides that income is derived in connection with a trade or business if the income-producing activity in the other State is a line of business that forms a part of or is complementary to the trade or business conducted in the State of residence by the income recipient. Although no definition of the terms "forms a part of" or "complementary" is set forth in the Convention, it is intended that a business activity generally will be considered to "form a part of" a business activity conducted in the other State if the two activities involve the design, manufacture or sale of the same products or type of products, or the provision of similar services. In order for two activities to be considered to be "complementary," the activities need not relate to the same types of products or services, but they should be part of the same overall industry and be related in the sense that the success or failure of one activity will tend to result in success or failure for the other. In cases in which more than one trade or business is conducted in the other State and only one of the trades or businesses forms a part of or is complementary to a trade or business conducted in the State of residence, it is necessary to identify the trade or business to which an item of income is attributable. Royalties generally will be considered to be derived in

connection with the trade or business to which the underlying intangible property is attributable. Dividends will be deemed to be derived first out of earnings and profits of the treaty-benefited trade or business, and then out of other earnings and profits. Interest income may be allocated under any reasonable method consistently applied. A method that conforms to U.S. principles for expense allocation will be considered a reasonable method. The following examples illustrate the application of subparagraph 3(d).

Example 1.    USCo is a corporation resident in the United States. USCo is engaged in an active manufacturing business in the United States. USCo owns 100 percent of the shares of FCo, a corporation resident in the other Contracting State. FCo distributes USCo products in the other Contracting State. Since the business activities conducted by the two corporations involve the same products, FCo's distribution business is considered to form a part of USCo's manufacturing business within the meaning of subparagraph 3(d).

Example 2.    The facts are the same as in Example 1, except that USCo does not manufacture. Rather, USCo operates a large research and development facility in the United States that licenses intellectual property to affiliates worldwide, including FCo. FCo and other USCo affiliates then manufacture and market the USCo-designed products in their respective markets. Since the activities conducted by FCo and USCo involve the same product lines, these activities are considered to form a part of the same trade or business.

Example 3.    Americair is a corporation resident in the United States that operates an international airline. FSub is a wholly-owned subsidiary of Americair resident in the other Contracting State. FSub operates a chain of hotels in the other Contracting State that are located near airports served by Americair flights. Americair frequently sells tour packages that include air travel to the other Contracting State and lodging at FSub hotels. Although both companies are engaged in the active conduct of a trade or business, the businesses of operating a chain of hotels and operating an airline are distinct trades or businesses. Therefore FSub's business does not form a part of Americair's business. However, FSub's business is considered to be complementary to Americair's business because they are part of the same overall industry (travel) and the links between their operations tend to make them interdependent.

Example 4.    The facts are the same as in Example 3, except that FSub owns an office building in the other Contracting State instead of a hotel chain. No part of Americair's business is conducted through the office building. FSub's business is not considered to form a part of or to be complementary to Americair's business. They are engaged in distinct trades or businesses in separate industries, and there is no economic dependence between the two operations.

Example 5.    USFlower is a corporation resident in the United States. USFlower produces and sells flowers in the United States and other countries. USFlower owns all the

shares of ForHolding, a corporation resident in the other Contracting State. ForHolding is a holding company that is not engaged in a trade or business. ForHolding owns all the shares of three corporations that are resident in the other Contracting State: ForFlower, ForLawn, and ForFish. ForFlower distributes USFlower flowers under the USFlower trademark in the other State. ForLawn markets a line of lawn care products in the other State under the USFlower trademark. In addition to being sold under the same trademark, ForLawn and ForFlower products are sold in the same stores and sales of each company's products tend to generate increased sales of the other's products. ForFish imports fish from the United States and distributes it to fish wholesalers in the other State. For purposes of paragraph 3, the business of ForFlower forms a part of the business of USFlower, the business of ForLawn is complementary to the business of USFlower, and the business of ForFish is neither part of nor complementary to that of USFlower.

Finally, a resident in one of the States also will be entitled to the benefits of the Convention with respect to income derived from the other State if the income is "incidental" to the trade or business conducted in the recipient's State of residence. Subparagraph 3(d) provides that income derived from a State will be incidental to a trade or business conducted in the other State if the production of such income facilitates the conduct of the trade or business in the other State. An example of incidental income is the temporary investment of working capital derived from a trade or business.

*Substantiality -- Subparagraphs 3(a)(iii) and (c)*

As indicated above, subparagraph 3(a)(iii) provides that income that a resident of a State derives from the other State will be entitled to the benefits of the Convention under paragraph 3 only if the income is derived in connection with a trade or business conducted in the recipient's State of residence and that trade or business is "substantial" in relation to the income-producing activity in the other State. Subparagraph 3(c) provides that whether the trade or business of the income recipient is substantial will be determined based on all the facts and circumstances. These circumstances generally would include the relative scale of the activities conducted in the two States and the relative contributions made to the conduct of the trade or businesses in the two States.

In addition to this subjective rule, subparagraph 3(c) provides a safe harbor under which the trade or business of the income recipient may be deemed to be substantial based on three ratios that compare the size of the recipient's activities to those conducted in the other State. The three ratios compare: (i) the value of the assets in the recipient's State to the assets used in the other State; (ii) the gross income derived in the recipient's State to the gross income derived in the other State; and (iii) the payroll expense in the recipient's State to the payroll expense in the other State. The average of the three ratios with respect to the preceding taxable year must exceed 10 percent, and each individual ratio must exceed 7.5 percent. If any individual ratio does not exceed 7.5 percent for the preceding taxable year, the average for the three preceding taxable years may be used instead. Thus, if the taxable year is 1998, the preceding year is 1997. If one of

the ratios for 1997 is not greater than 7.5 percent, the average ratio for 1995, 1996, and 1997 with respect to that item may be used.

The term "value" also is not defined in the Convention. Therefore, this term also will be defined under U.S. law for purposes of determining whether a person deriving income from United States sources is entitled to the benefits of the Convention. In such cases, "value" generally will be defined using the method used by the taxpayer in keeping its books for purposes of financial reporting in its country of residence. See Treas. Reg. §1.884-5(e)(3)(ii)(A).

Only items actually located or incurred in the two Contracting States are included in the computation of the ratios. If the person from whom the income in the other State is derived is not wholly-owned by the recipient (and parties related thereto) then the items included in the computation with respect to such person must be reduced by a percentage equal to the percentage control held by persons not related to the recipient. For instance, if a United States corporation derives income from a corporation in the other State in which it holds 80 percent of the shares, and unrelated parties hold the remaining shares, for purposes of subparagraph 3(c) only 80 percent of the assets, payroll and gross income of the company in the other State would be taken into account.

Consequently, if neither the recipient nor a person related to the recipient has an ownership interest in the person from whom the income is derived, the substantiality test always will be satisfied (the denominator in the computation of each ratio will be zero and the numerator will be a positive number). Of course, the other two prongs of the test under paragraph 3 would have to be satisfied in order for the recipient of the item of income to receive treaty benefits with respect to that income. For example, assume that a resident of a Contracting State is in the business of banking in that State. The bank loans money to unrelated residents of the United States. The bank would satisfy the substantiality requirement of this subparagraph with respect to interest paid on the loans because it has no ownership interest in the payors.

*Paragraph 4*

Paragraph 4 provides that a resident of one of the States that is not otherwise entitled to the benefits of the Convention may be granted benefits under the Convention if the competent authority of the State from which benefits are claimed so determines. This discretionary provision is included in recognition of the fact that, with the increasing scope and diversity of international economic relations, there may be cases where significant participation by third country residents in an enterprise of a Contracting State is warranted by sound business practice or long-standing business structures and does not necessarily indicate a motive of attempting to derive unintended Convention benefits.

The competent authority of a State will base a determination under this paragraph on whether the establishment, acquisition, or maintenance of the person seeking benefits under the Convention, or the conduct of such person's operations, has or had as one of its principal purposes the obtaining of benefits under the Convention. Thus, persons that establish operations in one of the States with the principal purpose of obtaining the benefits of the Convention

ordinarily will not be granted relief under paragraph 4.

The competent authority may determine to grant all benefits of the Convention, or it may determine to grant only certain benefits. For instance, it may determine to grant benefits only with respect to a particular item of income in a manner similar to paragraph 3. Further, the competent authority may set time limits on the duration of any relief granted.

It is assumed that, for purposes of implementing paragraph 4, a taxpayer will not be required to wait until the tax authorities of one of the States have determined that benefits are denied before he will be permitted to seek a determination under this paragraph. In these circumstances, it is also expected that if the competent authority determines that benefits are to be allowed, they will be allowed retroactively to the time of entry into force of the relevant treaty provision or the establishment of the structure in question, whichever is later.

Finally, there may be cases in which a resident of a Contracting State may apply for discretionary relief to the competent authority of his State of residence. For instance, a resident of a State could apply to the competent authority of his State of residence in a case in which he had been denied a treaty-based credit under Article 23 on the grounds that he was not entitled to benefits of the article under Article 22.

*Paragraph 5*

Paragraph 5 provides that the term "recognized stock exchange" means
　　　　(i) the NASDAQ System owned by the National Association of Securities Dealers, and any stock exchange registered with the Securities and Exchange Commission as a national securities exchange for purposes of the Securities Exchange Act of 1934; and
　　　　(ii) [certain exchanges located in the other Contracting State].


ARTICLE 23
Relief from Double Taxation

This Article describes the manner in which each Contracting State undertakes to relieve double taxation. The United States uses the foreign tax credit method under its internal law, and by treaty. The other Contracting State may also use a foreign tax credit, or a combination of foreign tax credit and exemption methods, depending on the nature of the income involved. In rare cases of treaties with countries employing pure territorial systems, the other Contracting State will use only an exemption system for relieving double taxation.

*Paragraph 1*

The United States agrees, in paragraph 1, to allow to its citizens and residents a credit against U.S. tax for income taxes paid or accrued to the other Contracting State. Paragraph 1 also provides that the other Contracting State's covered taxes are income taxes for U.S. purposes.

This provision is based on the Treasury Department's review of the other Contracting State's laws.

The credit under the Convention is allowed in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, so long as the general principle of this Article, i.e., the allowance of a credit, is retained. Thus, although the Convention provides for a foreign tax credit, the terms of the credit are determined by the provisions, at the time a credit is given, of the U.S. statutory credit.

Subparagraph (b) provides for a deemed-paid credit, consistent with section 902 of the Code, to a U.S. corporation in respect of dividends received from a corporation resident in the other Contracting State of which the U.S. corporation owns at least 10 percent of the voting stock. This credit is for the tax paid by the corporation of the other Contracting State on the profits out of which the dividends are considered paid.

As indicated, the U.S. credit under the Convention is subject to the various limitations of U.S. law (see Code sections 901 - 908). For example, the credit against U.S. tax generally is limited to the amount of U.S. tax due with respect to net foreign source income within the relevant foreign tax credit limitation category (see Code section 904(a) and (d)), and the dollar amount of the credit is determined in accordance with U.S. currency translation rules (see, e.g., Code section 986). Similarly, U.S. law applies to determine carryover periods for excess credits and other inter-year adjustments. When the alternative minimum tax is due, the alternative minimum tax foreign tax credit generally is limited in accordance with U.S. law to 90 percent of alternative minimum tax liability. Furthermore, nothing in the Convention prevents the limitation of the U.S. credit from being applied on a per-country basis (should internal law be changed), an overall basis, or to particular categories of income (see, e.g., Code section 865(h)).

*Paragraph 2*

Specific rules will be provided in paragraph 2 of each treaty under which the other Contracting State, in imposing tax on its residents, provides relief for U.S. taxes paid by those residents. Although the Model Article is drafted as though the other Contracting State uses a credit system, in bilateral Conventions the relief may be in the form of a credit, exemption, or a combination of the two.

*Paragraph 3*

The rules of paragraph 3 were not in the 1981 Model, but they are found in a number of U.S. treaties entered into after publication of that Model. Paragraph 3 provides special rules for the tax treatment in both States of certain types of income derived from U.S. sources by U.S. citizens who are resident in the other Contracting State. Since U.S. citizens, regardless of residence, are subject to United States tax at ordinary progressive rates on their worldwide income, the U.S. tax on the U.S. source income of a U.S. citizen resident in the other Contracting State may exceed the U.S. tax that may be imposed under the Convention on an item of U.S. source income derived by a resident of the other Contracting State who is not a U.S. citizen.

Subparagraph (a) of paragraph 3 provides special credit rules for the other Contracting State with respect to items of income that are either exempt from U.S. tax or subject to reduced rates of U.S. tax under the provisions of the Convention when received by residents of the other Contracting State who are not U.S. citizens. The tax credit of the other Contracting State allowed by paragraph 3(a) under these circumstances, to the extent consistent with the law of that State, need not exceed the U.S. tax that may be imposed under the provisions of the Convention, other than tax imposed solely by reason of the U.S. citizenship of the taxpayer under the provisions of the saving clause of paragraph 4 of Article 1 (General Scope). Thus, if a U.S. citizen resident in the other Contracting State receives U.S. source portfolio dividends, the foreign tax credit granted by that other State would be limited to 15 percent of the dividend -- the U.S. tax that may be imposed under subparagraph 2(b) of Article 10 (Dividends) -- even if the shareholder is subject to U.S. net income tax because of his U.S. citizenship. With respect to royalty or interest income, the other Contracting State would allow no foreign tax credit, because its residents are exempt from U.S. tax on these classes of income under the provisions of Articles 11 (Interest) and 12 (Royalties).

Paragraph 3(b) eliminates the potential for double taxation that can arise because subparagraph 3(a) provides that the other Contracting State need not provide full relief for the U.S. tax imposed on its citizens resident in the other Contracting State. The subparagraph provides that the United States will credit the income tax paid or accrued to the other Contracting State, after the application of subparagraph 3(a). It further provides that in allowing the credit, the United States will not reduce its tax below the amount that is taken into account in the other Contracting State in applying subparagraph 3(a). Since the income described in paragraph 3 is U.S. source income, special rules are required to resource some of the income to the other Contracting State in order for the United States to be able to credit the other State's tax. This resourcing is provided for in subparagraph 3(c), which deems the items of income referred to in subparagraph 3(a) to be from foreign sources to the extent necessary to avoid double taxation under paragraph 3(b). The rules of paragraph 3(c) apply only for purposes of determining U.S. foreign tax credits with respect to taxes referred to in paragraphs 2(b) and 3 of Article 2 (Taxes Covered).

The following two examples illustrate the application of paragraph 3 in the case of a U.S. source portfolio dividend received by a U.S. citizen resident in the other Contracting State. In both examples, the U.S. rate of tax on residents of the other State under paragraph 2(b) of Article 10 (Dividends) of the Convention is 15 percent. In both examples the U.S. income tax rate on the U.S. citizen is 36 percent. In example I, the income tax rate on its resident (the U.S. citizen) is 25 percent (below the U.S. rate), and in example II, the rate on its resident is 40 percent (above the U.S. rate).

|  | Example I | Example II |
|---|---|---|
| Paragraph 3(a) |  |  |
| U.S. dividend declared | $100.00 | $100.00 |

| | | | |
|---|---|---|---|
| Notional U.S. withholding tax | | | |
| per Article 10(2)(b) | 15.00 | | 15.00 |
| Other State taxable income | 100.00 | | 100.00 |
| Other State tax before credit | 25.00 | | 40.00 |
| Other State foreign tax credit | 15.00 | | 15.00 |
| Net post-credit other State tax | | 10.00 | 25.00 |

Paragraphs 3(b) and (c)

| | | | |
|---|---|---|---|
| U.S. pre-tax income | $100.00 | | $100.00 |
| U.S. pre-credit citizenship tax | 36.00 | | 36.00 |
| Notional U.S. withholding tax | | 15.00 | 15.00 |
| U.S. tax available for credit | 21.00 | | 21.00 |
| Income resourced from U.S. to | | | |
| the other State | 27.77 | | 58.33 |
| U.S. tax on resourced income | 10.00 | | 21.00 |
| U.S. credit for other State tax | 10.00 | | 21.00 |
| Net post-credit U.S. tax | 11.00 | | 0.00 |
| Total U.S. tax | 26.00 | | 15.00 |

In both examples, in the application of paragraph 3(a), the other Contracting State credits a 15 percent U.S. tax against its residence tax on the U.S. citizen. In example I the net other State tax after foreign tax credit is $10.00; in the second example it is $25.00. In the application of paragraphs 3(b) and (c), from the U.S. tax due before credit of $36.00, the United States subtracts the amount of the U.S. source tax of $15.00, against which no U.S. foreign tax credit is to be allowed. This provision assures that the United States will collect the tax that it is due under the Convention as the source country. In both examples, the maximum amount of U.S. tax against which credit for other State tax may be claimed is $21.00. Initially, all of the income in these examples was U.S. source. In order for a U.S. credit to be allowed for the full amount of the other State tax, an appropriate amount of the income must be resourced. The amount that must be resourced depends on the amount of other State tax for which the U.S. citizen is claiming a U.S. foreign tax credit. In example I, the other State tax was $10.00. In order for this amount to be creditable against U.S. tax, $27.77 ($10 divided by .36) must be resourced as foreign source. When the other State tax is credited against U.S. tax on the resourced income, there is a net U.S. tax of $11.00 due after credit. In example II, other State tax was $25 but, because the amount available for credit is reduced under subparagraph 3(c) by the amount of the U.S. source tax, only $21.00 is eligible for credit. Accordingly, the amount that must be resourced is limited to the amount necessary to ensure a foreign tax credit for $21 of other State tax, or $58.33 ($21 divided by .36). Thus, even though other State tax was $25.00 and the U.S. tax available for credit was $21.00, there is no excess credit available for carryover.

*Relation to Other Articles*

By virtue of the exceptions in subparagraph 5(a) of Article 1 this Article is not subject to the saving clause of paragraph 4 of Article 1 (General Scope). Thus, the United States will allow

a credit to its citizens and residents in accordance with the Article, even if such credit were to provide a benefit not available under the Code.

ARTICLE 24
Nondiscrimination

This Article assures that nationals of a Contracting State, in the case of paragraph 1, and residents of a Contracting State, in the case of paragraphs 2 through 4, will not be subject, directly or indirectly, to discriminatory taxation in the other Contracting State. For this purpose, nondiscrimination means providing national treatment. Not all differences in tax treatment, either as between nationals of the two States, or between residents of the two States, are violations of this national treatment standard. Rather, the national treatment obligation of this Article applies only if the nationals or residents of the two States are comparably situated.

Each of the relevant paragraphs of the Article provides that two persons that are comparably situated must be treated similarly. Although the actual words differ from paragraph to paragraph (e.g., paragraph 1 refers to two nationals "in the same circumstances," paragraph 2 refers to two enterprises "carrying on the same activities" and paragraph 4 refers to two enterprises that are "similar"), the common underlying premise is that if the difference in treatment is directly related to a tax-relevant difference in the situations of the domestic and foreign persons being compared, that difference is not to be treated as discriminatory (e.g., if one person is taxable in a Contracting State on worldwide income and the other is not, or tax may be collectible from one person at a later stage, but not from the other, distinctions in treatment would be justified under paragraph 1). Other examples of such factors that can lead to nondiscriminatory differences in treatment will be noted in the discussions of each paragraph.

The operative paragraphs of the Article also use different language to identify the kinds of differences in taxation treatment that will be considered discriminatory. For example, paragraphs 1 and 4 speak of "any taxation or any requirement connected therewith that is other or more burdensome," while paragraph 2 specifies that a tax "shall not be less favorably levied." Regardless of these differences in language, only differences in tax treatment that materially disadvantage the foreign person relative to the domestic person are properly the subject of the Article.

*Paragraph 1*

Paragraph 1 provides that a national of one Contracting State may not be subject to taxation or connected requirements in the other Contracting State that are more burdensome than the taxes and connected requirements imposed upon a national of that other State in the same circumstances. The OECD Model prohibits taxation that is "other than or more burdensome" than that imposed on U.S. persons. The U.S. Model omits the reference to taxation that is "other than" U.S. persons because the only relevant question under this provision should be whether the requirement imposed on a national of the other State is more burdensome. A requirement may be different from the requirements imposed on U.S. nationals without being more burdensome.

As noted above, whether or not the two persons are both taxable on worldwide income is a significant circumstance for this purpose. The 1992 revision of the OECD Model added after the words "in the same circumstances, the phrase "in particular with respect to residence," reflecting the fact that under most countries' laws residents are taxable on worldwide income and nonresidents are not. Since in the United States nonresident citizens are also taxable on worldwide income, this Model expands the phrase to refer, not to residence, but to taxation on worldwide income. The underlying concept, however, is essentially the same in the two Models.

A national of a Contracting State is afforded protection under this paragraph even if the national is not a resident of either Contracting State. Thus, a U.S. citizen who is resident in a third country is entitled, under this paragraph, to the same treatment in the other Contracting State as a national of the other Contracting State who is in similar circumstances (i.e., presumably one who is resident in a third State). The term "national" in relation to a Contracting State is defined in subparagraph 1(h) of Article 3 (General Definitions).

Because the relevant circumstances referred to in the paragraph relate, among other things, to taxation on worldwide income, paragraph 1 does not obligate the United States to apply the same taxing regime to a national of the other Contracting State who is not resident in the United States and a U.S. national who is not resident in the United States. United States citizens who are not residents of the United States but who are, nevertheless, subject to United States tax on their worldwide income are not in the same circumstances with respect to United States taxation as citizens of the other Contracting State who are not United States residents. Thus, for example, Article 24 would not entitle a national of the other Contracting State resident in a third country to taxation at graduated rates of U.S. source dividends or other investment income that applies to a U.S. citizen resident in the same third country.

The scope of paragraph 1 is broader than that in the 1981 Model, because of the expanded definition of the term "national" in Article 3 (General Definitions). In order to conform the U.S. Model definition to that in the OECD Model, the definition of "national" extends beyond citizens to cover juridical persons that are nationals of a Contracting State as well. This expanded definition, however, generally may add little as a practical matter to the scope of the Article. A corporation that is a national of the other Contracting State and is doing business in the United States is already protected, vis-a-vis a U.S. corporation, by paragraph 2. If a foreign corporation is not doing business in the United States it is, in relevant respect, in different circumstances from a U.S. corporation, and is, therefore, not entitled to national treatment in the United States. With respect to U.S. nationals claiming nondiscrimination protection from the treaty partner, U.S. juridical persons that are "nationals" of the United States are also U.S. residents (e.g., U.S. corporations but not partnerships), and are, therefore, protected by paragraphs 2 and 4 in any event.

*Paragraph 2*

Paragraph 2 of the Article, like the comparable paragraphs in the OECD and 1981 Models, provides that a Contracting State may not tax a permanent establishment or fixed base of

an enterprise of the other Contracting State less favorably than an enterprise of that first-mentioned State that is carrying on the same activities. This provision, however, does not obligate a Contracting State to grant to a resident of the other Contracting State any tax allowances, reliefs, etc., that it grants to its own residents on account of their civil status or family responsibilities. Thus, if a sole proprietor who is a resident of the other Contracting State has a permanent establishment in the United States, in assessing income tax on the profits attributable to the permanent establishment, the United States is not obligated to allow to the resident of the other Contracting State the personal allowances for himself and his family that he would be permitted to take if the permanent establishment were a sole proprietorship owned and operated by a U.S. resident, despite the fact that the individual income tax rates would apply.

The fact that a U.S. permanent establishment of an enterprise of the other Contracting State is subject to U.S. tax only on income that is attributable to the permanent establishment, while a U.S. corporation engaged in the same activities is taxable on its worldwide income is not, in itself, a sufficient difference to deny national treatment to the permanent establishment. There are cases, however, where the two enterprises would not be similarly situated and differences in treatment may be warranted. For instance, it would not be a violation of the nondiscrimination protection of paragraph 2 to require the foreign enterprise to provide information in a reasonable manner that may be different from the information requirements imposed on a resident enterprise, because information may not be as readily available to the Internal Revenue Service from a foreign as from a domestic enterprise. Similarly, it would not be a violation of paragraph 2 to impose penalties on persons who fail to comply with such a requirement (see, e.g., sections 874(a) and 882(c)(2)). Further, a determination that income and expenses have been attributed or allocated to a permanent establishment in conformity with the principles of Article 7 (Business Profits) implies that the attribution or allocation was not discriminatory.

Section 1446 of the Code imposes on any partnership with income that is effectively connected with a U.S. trade or business the obligation to withhold tax on amounts allocable to a foreign partner. In the context of the Model Convention, this obligation applies with respect to a share of the partnership income of a partner resident in the other Contracting State, and attributable to a U.S. permanent establishment. There is no similar obligation with respect to the distributive shares of U.S. resident partners. It is understood, however, that this distinction is not a form of discrimination within the meaning of paragraph 2 of the Article. No distinction is made between U.S. and non-U.S. partnerships, since the law requires that partnerships of both U.S. and non-U.S. domicile withhold tax in respect of the partnership shares of non-U.S. partners. Furthermore, in distinguishing between U.S. and non-U.S. partners, the requirement to withhold on the non-U.S. but not the U.S. partner's share is not discriminatory taxation, but, like other withholding on nonresident aliens, is merely a reasonable method for the collection of tax from persons who are not continually present in the United States, and as to whom it otherwise may be difficult for the United States to enforce its tax jurisdiction. If tax has been over-withheld, the partner can, as in other cases of over- withholding, file for a refund. (The relationship between paragraph 2 and the imposition of the branch tax is dealt with below in the discussion of paragraph 5.)

Paragraph 2 in this Model goes beyond the comparable paragraphs in other Models. It

obligates the host State to provide national treatment not only to permanent establishments of an enterprise of the partner, but also to other residents of the partner that are taxable in the host State on a net basis because they derive income from independent personal services performed in the host State that is attributable to a fixed base in that State. Thus, an individual resident of the other Contracting State who performs independent personal services in the U.S., and who is subject to U.S. income tax on the income from those services that is attributable to a fixed base in the United States, is entitled to no less favorable tax treatment in the United States than a U.S. resident engaged in the same kinds of activities. With such a rule in a treaty, the host State cannot tax its own residents on a net basis, but disallow deductions (other than personal allowances, etc.) with respect to the income attributable to the fixed base. Similarly, in accordance with paragraph 5 of Article 6 (Income from Real Property (Immovable Property)), the situs State would be required to allow deductions to a resident of the other State with respect to income derived from real property located in the situs State to the same extent that deductions are allowed to residents of the situs State with respect to income derived from real property located in the situs State.

*Paragraph 3*

Paragraph 3 prohibits discrimination in the allowance of deductions. When an enterprise of a Contracting State pays interest, royalties or other disbursements to a resident of the other Contracting State, the first-mentioned Contracting State must allow a deduction for those payments in computing the taxable profits of the enterprise as if the payment had been made under the same conditions to a resident of the first-mentioned Contracting State. An exception to this rule is provided for cases where the provisions of paragraph 1 of Article 9 (Associated Enterprises), paragraph 4 of Article 11 (Interest) or paragraph 4 of Article 12 (Royalties) apply, because all of these provisions permit the denial of deductions in certain circumstances in respect of transactions between related persons. This exception would include the denial or deferral of certain interest deductions under Code section 163(j).

The term "other disbursements" is understood to include a reasonable allocation of executive and general administrative expenses, research and development expenses and other expenses incurred for the benefit of a group of related persons that includes the person incurring the expense.

Paragraph 3 also provides that any debts of an enterprise of a Contracting State to a resident of the other Contracting State are deductible in the first-mentioned Contracting State for computing the capital tax of the enterprise under the same conditions as if the debt had been contracted to a resident of the first-mentioned Contracting State. Even though, for general purposes, the Convention covers only income taxes, under paragraph 6 of this Article, the nondiscrimination provisions apply to all taxes levied in both Contracting States, at all levels of government. Thus, this provision may be relevant for both States. The other Contracting State may have capital taxes and in the United States such taxes are imposed by local governments.

*Paragraph 4*

Paragraph 4 requires that a Contracting State not impose more burdensome taxation or connected requirements on an enterprise of that State that is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State, than the taxation or connected requirements that it imposes on other similar enterprises of that first-mentioned Contracting State. For this purpose it is understood that "similar" refers to similar activities or ownership of the enterprise. As in paragraph 1, the OECD Model's reference to requirements "other" than those imposed with respect to enterprises owned by domestic persons has not been included.

The Tax Reform Act of 1986 changed the rules for taxing corporations on certain distributions they make in liquidation. Prior to 1986, corporations were not taxed on distributions of appreciated property in complete liquidation, although nonliquidating distributions of the same property, with several exceptions, resulted in corporate-level tax. In part to eliminate this disparity, the law now generally taxes corporations on the liquidating distribution of appreciated property. The Code provides an exception in the case of distributions by 80 percent or more controlled subsidiaries to their parent corporations, on the theory that the built-in gain in the asset will be recognized when the parent sells or distributes the asset. This exception does not apply to distributions to parent corporations that are tax-exempt organizations or, except to the extent provided in regulations, foreign corporations. The policy of the legislation is to collect one corporate-level tax on the liquidating distribution of appreciated property. If, and only if, that tax can be collected on a subsequent sale or distribution does the legislation defer the tax. It is understood that the inapplicability of the exception to the tax on distributions to foreign parent corporations under section 367(e)(2) does not conflict with paragraph 4 of the Article. While a liquidating distribution to a U.S. parent will not be taxed, and, except to the extent provided in regulations, a liquidating distribution to a foreign parent will, paragraph 4 merely prohibits discrimination among corporate taxpayers on the basis of U.S. or foreign stock ownership. Eligibility for the exception to the tax on liquidating distributions for distributions to non-exempt, U.S. corporate parents is not based upon the nationality of the owners of the distributing corporation, but rather is based upon whether such owners would be subject to corporate tax if they subsequently sold or distributed the same property. Thus, the exception does not apply to distributions to persons that would not be so subject -- not only foreign corporations, but also tax-exempt organizations. A similar analysis applies to the treatment of section 355 distributions subject to section 367(e)(1).

For the reasons given above in connection with the discussion of paragraph 2 of the Article, it is also understood that the provision in section 1446 of the Code for withholding of tax on non-U.S. partners does not violate paragraph 4 of the Article.

It is further understood that the ineligibility of a U.S. corporation with nonresident alien shareholders to make an election to be an "S" corporation does not violate paragraph 4 of the Article. If a corporation elects to be an S corporation (requiring 35 or fewer shareholders), it is generally not subject to income tax and the shareholders take into account their pro rata shares of the corporation's items of income, loss, deduction or credit. (The purpose of the provision is to allow an individual or small group of individuals to conduct business in corporate form while paying taxes at individual rates as if the business were conducted directly.) A nonresident alien

does not pay U.S. tax on a net basis, and, thus, does not generally take into account items of loss, deduction or credit. Thus, the S corporation provisions do not exclude corporations with nonresident alien shareholders because such shareholders are foreign, but only because they are not net-basis taxpayers. Similarly, the provisions exclude corporations with other types of shareholders where the purpose of the provisions cannot be fulfilled or their mechanics implemented. For example, corporations with corporate shareholders are excluded because the purpose of the provisions to permit individuals to conduct a business in corporate form at individual tax rates would not be furthered by their inclusion.

*Paragraph 5*

Paragraph 5 of the Article confirms that no provision of the Article will prevent either Contracting State from imposing the branch tax described in paragraph 8 of Article 10 (Dividends). Since imposition of the branch tax under the Model Convention is specifically sanctioned by paragraph 8 of Article 10 (Dividends), its imposition could not be precluded by Article 24, even without paragraph 5. Under the generally accepted rule of construction that the specific takes precedence over the more general, the specific branch tax provision of Article 10 would take precedence over the more general national treatment provision of Article 24.

*Paragraph 6*

As noted above, notwithstanding the specification of taxes covered by the Convention in Article 2 (Taxes Covered) for general purposes, for purposes of providing nondiscrimination protection this Article applies to taxes of every kind and description imposed by a Contracting State or a political subdivision or local authority thereof. Customs duties are not considered to be taxes for this purpose.

*Relation to Other Articles*

The saving clause of paragraph 4 of Article 1 (General Scope) does not apply to this Article, by virtue of the exceptions in paragraph 5(a) of Article 1. Thus, for example, a U.S. citizen who is a resident of the other Contracting State may claim benefits in the United States under this Article.

Nationals of a Contracting State may claim the benefits of paragraph 1 regardless of whether they are entitled to benefits under Article 22 (Limitation on Benefits), because that paragraph applies to nationals and not residents. They may not claim the benefits of the other paragraphs of this Article with respect to an item of income unless they are generally entitled to treaty benefits with respect to that income under a provision of Article 22.

ARTICLE 25
Mutual Agreement Procedure

This Article provides the mechanism for taxpayers to bring to the attention of competent

authorities issues and problems that may arise under the Convention. It also provides a mechanism for cooperation between the competent authorities of the Contracting States to resolve disputes and clarify issues that may arise under the Convention and to resolve cases of double taxation not provided for in the Convention. In addition, the Article authorizes the competent authorities to consult to deny the benefit of the Convention where affording such a benefit would lead to avoidance of tax in a manner inconsistent with the Convention. The competent authorities of the two Contracting States are identified in paragraph 1(e) of Article 3 (General Definitions).

*Paragraph 1*

This paragraph provides that where a resident of a Contracting State considers that the actions of one or both Contracting States will result in taxation that is not in accordance with the Convention he may present his case to the competent authority of either Contracting State. All standard Models and nearly all current U.S. treaties allow taxpayers to bring competent authority cases only to the competent authority of their country of residence, or citizenship/nationality.

Paragraph 16 of the OECD Commentary to Article 25 suggests, however, that countries may agree to allow a case to be brought to either competent authority. Because there seems to be no apparent reason why a resident of a Contracting State must take its case to the competent authority of its State of residence and not to that of the partner, the Model adopts the approach suggested in the OECD Commentary. Under this approach, a U.S. permanent establishment of a corporation resident in the treaty partner that faces inconsistent treatment in the two countries would be able to bring its complaint to the competent authority in either Contracting State.

Although the typical cases brought under this paragraph will involve economic double taxation arising from transfer pricing adjustments, the scope of this paragraph is not limited to such cases. For example, if a Contracting State treats income derived by a company resident in the other Contracting State as attributable to a permanent establishment in the first-mentioned Contracting State, and the resident believes that the income is not attributable to a permanent establishment, or that no permanent establishment exists, the resident may bring a complaint under paragraph 1 to the competent authority of either Contracting State.

It is not necessary for a person bringing a complaint first to have exhausted the remedies provided under the national laws of the Contracting States before presenting a case to the competent authorities, nor does the fact that the statute of limitations may have passed for seeking a refund preclude bringing a case to the competent authority. Like previous U.S. Models, but unlike the OECD Model, no time limit is provided within which a case must be brought.

*Paragraph 2*

This paragraph instructs the competent authorities in dealing with cases brought by taxpayers under paragraph 1. It provides that if the competent authority of the Contracting State to which the case is presented judges the case to have merit, and cannot reach a unilateral solution, it shall seek an agreement with the competent authority of the other Contracting State

pursuant to which taxation not in accordance with the Convention will be avoided. During the period that a proceeding under this Article is pending, any assessment and collection procedures shall be suspended. Any agreement is to be implemented even if such implementation otherwise would be barred by the statute of limitations or by some other procedural limitation, such as a closing agreement. In a case where the taxpayer has entered a closing agreement (or other written settlement) with the United States prior to bringing a case to the competent authorities, the U.S. competent authority will endeavor only to obtain a correlative adjustment from the other Contracting State. See Rev. Proc. 96-13, 1996-3 I.R.B. 31, section 7.05. Because, as specified in paragraph 2 of Article 1 (General Scope), the Convention cannot operate to increase a taxpayer's liability, time or other procedural limitations can be overridden only for the purpose of making refunds and not to impose additional tax.

*Paragraph 3*

Paragraph 3 authorizes the competent authorities to resolve difficulties or doubts that may arise as to the application or interpretation of the Convention. The paragraph includes a non-exhaustive list of examples of the kinds of matters about which the competent authorities may reach agreement. This list is purely illustrative; it does not grant any authority that is not implicitly present as a result of the introductory sentence of paragraph 3. The competent authorities may, for example, agree to the same attribution of income, deductions, credits or allowances between an enterprise in one Contracting State and its permanent establishment in the other (subparagraph (a)) or between related persons (subparagraph (b)). These allocations are to be made in accordance with the arm's length principle underlying Article 7 (Business Profits) and Article 9 (Associated Enterprises). Agreements reached under these subparagraphs may include agreement on a methodology for determining an appropriate transfer price, common treatment of a taxpayer's cost sharing arrangement, or upon an acceptable range of results under that methodology. Subparagraph (g) makes clear that they may also agree to apply this methodology and range of results prospectively to future transactions and time periods pursuant to advance pricing agreements.

As indicated in subparagraphs (c), (d), (e) and (f), the competent authorities also may agree to settle a variety of conflicting applications of the Convention. They may agree to characterize particular items of income in the same way (subparagraph (c)), to characterize entities in a particular way (subparagraph (d)), to apply the same source rules to particular items of income (subparagraph (e)), and to adopt a common meaning of a term (subparagraph f)).

Subparagraph (h) makes clear that the competent authorities can agree to the common application, consistent with the objective of avoiding double taxation, of procedural provisions of the internal laws of the Contracting States, including those regarding penalties, fines and interest.

Since the list under paragraph 3 is not exhaustive, the competent authorities may reach agreement on issues not enumerated in paragraph 3 if necessary to avoid double taxation. For example, the competent authorities may seek agreement on a uniform set of standards for the use of exchange rates, or agree on consistent timing of gain recognition with respect to a transaction to the extent necessary to avoid double taxation.

Finally, paragraph 3 authorizes the competent authorities to consult for the purpose of eliminating double taxation in cases not provided for in the Convention and to resolve any difficulties or doubts arising as to the interpretation or application of the Convention. This provision is intended to permit the competent authorities to implement the treaty in particular cases in a manner that is consistent with its expressed general purposes. It permits the competent authorities to deal with cases that are within the spirit of the provisions but that are not specifically covered. An example of such a case might be double taxation arising from a transfer pricing adjustment between two permanent establishments of a third-country resident, one in the United States and one in the other Contracting State. Since no resident of a Contracting State is involved in the case, the Convention does not apply, but the competent authorities nevertheless may use the authority of the Convention to prevent the double taxation.

Agreements reached by the competent authorities under paragraph 3 need not conform to the internal law provisions of either Contracting State. Paragraph 3 is not, however, intended to authorize the competent authorities to resolve problems of major policy significance that normally would be the subject of negotiations between the Contracting States themselves. For example, this provision would not authorize the competent authorities to agree to allow a U.S. foreign tax credit under the treaty for a tax imposed by the other country where that tax is not otherwise a covered tax and is not an identical or substantially similar tax imposed after the date of signature of the treaty. Whether or not the tax is creditable under the Code is a separate matter.

*Paragraph 4*

Paragraph 4 authorizes the competent authorities to increase any dollar amounts referred to in the Convention to reflect economic and monetary developments. Under the Model, this refers only to Article 17 (Artistes and Sportsmen). The rule under paragraph 4 is intended to operate as follows: if, for example, after the Convention has been in force for some time, inflation rates have been such as to make the $20,000 exemption threshold for entertainers unrealistically low in terms of the original objectives intended in setting the threshold, the competent authorities may agree to a higher threshold without the need for formal amendment to the treaty and ratification by the Contracting States. This authority can be exercised, however, only to the extent necessary to restore those original objectives. Because of paragraph 2 of Article 1 (General Scope), it is clear that this provision can be applied only to the benefit of taxpayers, i.e., only to increase thresholds, not to reduce them.

*Paragraph 5*

Paragraph 5 provides that the competent authorities may communicate with each other for the purpose of reaching an agreement. This makes clear that the competent authorities of the two Contracting States may communicate without going through diplomatic channels. Such communication may be in various forms, including, where appropriate, through face-to-face meetings of representatives of the competent authorities.

*Other Issues*

*Treaty effective dates and termination in relation to competent authority dispute resolution*

A case may be raised by a taxpayer under a treaty with respect to a year for which a treaty was in force after the treaty has been terminated. In such a case the ability of the competent authorities to act is limited. They may not exchange confidential information, nor may they reach a solution that varies from that specified in its law.

A case also may be brought to a competent authority under a treaty that is in force, but with respect to a year prior to the entry into force of the treaty. The scope of the competent authorities to address such a case is not constrained by the fact that the treaty was not in force when the transactions at issue occurred, and the competent authorities have available to them the full range of remedies afforded under this Article.

*Triangular competent authority solutions*

International tax cases may involve more than two taxing jurisdictions (e.g., transactions among a parent corporation resident in country A and its subsidiaries resident in countries B and C). As long as there is a complete network of treaties among the three countries, it should be possible, under the full combination of bilateral authorities, for the competent authorities of the three States to work together on a three-sided solution. Although country A may not be able to give information received under Article 26 (Exchange of Information) from country B to the authorities of country C, if the competent authorities of the three countries are working together, it should not be a problem for them to arrange for the authorities of country B to give the necessary information directly to the tax authorities of country C, as well as to those of country A. Each bilateral part of the trilateral solution must, of course, not exceed the scope of the authority of the competent authorities under the relevant bilateral treaty.

*Relation to Other Articles*

This Article is not subject to the saving clause of paragraph 4 of Article 1 (General Scope) by virtue of the exceptions in paragraph 5(a) of that Article. Thus, rules, definitions, procedures, etc. that are agreed upon by the competent authorities under this Article may be applied by the United States with respect to its citizens and residents even if they differ from the comparable Code provisions. Similarly, as indicated above, U.S. law may be overridden to provide refunds of tax to a U.S. citizen or resident under this Article. A person may seek relief under Article 25 regardless of whether he is generally entitled to benefits under Article 22 (Limitation on Benefits). As in all other cases, the competent authority is vested with the discretion to decide whether the claim for relief is justified.

ARTICLE 26
Exchange of Information and Administrative Assistance

*Paragraph 1*

This Article provides for the exchange of information between the competent authorities of the Contracting States. The information to be exchanged is that which is relevant for carrying out the provisions of the Convention or the domestic laws of the United States or of the other Contracting State concerning the taxes covered by the Convention. Previous U.S. Models, and the OECD Model, refer to information that is "necessary" for carrying out the provisions of the Convention, etc. This term consistently has been interpreted as being equivalent to "relevant," and as not requiring a requesting State to demonstrate that it would be disabled from enforcing its tax laws unless it obtained a particular item of information. To remove any potential misimpression that the term "necessary" created a higher threshold than relevance, the Model adopts the term "relevant."

The taxes covered by the Convention for purposes of this Article constitute a broader category of taxes than those referred to in Article 2 (Taxes Covered). As provided in paragraph 5, for purposes of exchange of information, covered taxes include all taxes imposed by the Contracting States. Exchange of information with respect to domestic law is authorized insofar as the taxation under those domestic laws is not contrary to the Convention. Thus, for example, information may be exchanged with respect to a covered tax, even if the transaction to which the information relates is a purely domestic transaction in the requesting State and, therefore, the exchange is not made for the purpose of carrying out the Convention.

An example of such a case is provided in the OECD Commentary: A company resident in the United States and a company resident in the partner transact business between themselves through a third-country resident company. Neither Contracting State has a treaty with the third State. In order to enforce their internal laws with respect to transactions of their residents with the third-country company (since there is no relevant treaty in force), the Contracting State may exchange information regarding the prices that their residents paid in their transactions with the third-country resident.

Paragraph 1 states that information exchange is not restricted by Article 1 (General Scope). Accordingly, information may be requested and provided under this Article with respect to persons who are not residents of either Contracting State. For example, if a third-country resident has a permanent establishment in the other Contracting State which engages in transactions with a U.S. enterprise, the United States could request information with respect to that permanent establishment, even though it is not a resident of either Contracting State. Similarly, if a third-country resident maintains a bank account in the other Contracting State, and the Internal Revenue Service has reason to believe that funds in that account should have been reported for U.S. tax purposes but have not been so reported, information can be requested from the other Contracting State with respect to that person's account.

Paragraph 1 also provides assurances that any information exchanged will be treated as secret, subject to the same disclosure constraints as information obtained under the laws of the requesting State. Information received may be disclosed only to persons, including courts and administrative bodies, concerned with the assessment, collection, enforcement or prosecution in

respect of the taxes to which the information relates, or to persons concerned with the administration of these taxes. The information must be used by these persons in connection with these designated functions. Persons in the United States concerned with the administration of taxes include legislative bodies, such as the tax-writing committees of Congress and the General Accounting Office. Information received by these bodies must be for use in the performance of their role in overseeing the administration of U.S. tax laws. Information received may be disclosed in public court proceedings or in judicial decisions.

The Article authorizes the competent authorities to exchange information on a routine basis, on request in relation to a specific case, or spontaneously. It is contemplated that the Contracting States will utilize this authority to engage in all of these forms of information exchange, as appropriate.

*Paragraph 2*

Paragraph 2 is identical to paragraph 2 of Article 26 of the OECD Model. It provides that the obligations undertaken in paragraph 1 to exchange information do not require a Contracting State to carry out administrative measures that are at variance with the laws or administrative practice of either State. Nor is a Contracting State required to supply information not obtainable under the laws or administrative practice of either State, or to disclose trade secrets or other information, the disclosure of which would be contrary to public policy. Thus, a requesting State cannot obtain information from the other State if the information would be obtained pursuant to procedures or measures that are broader than those available in the requesting State.

While paragraph 2 states conditions under which a Contracting State is not obligated to comply with a request from the other Contracting State for information, the requested State is not precluded from providing such information, and may, at its discretion, do so subject to the limitations of its internal law.

*Paragraph 3*

Paragraph 3 does not have an analog in the OECD Model. It sets forth two exceptions from the dispensations described in paragraph 2. First, the first sentence of the paragraph provides that information must be provided to the requesting State notwithstanding the fact that disclosure of the information is precluded by bank secrecy or similar legislation relating to disclosure of financial information by financial institutions or intermediaries. This includes the disclosure of information regarding the beneficial owner of an interest in a person, such as the identity of a beneficial owner of bearer shares.

Second, paragraph 3 provides that when information is requested by a Contracting State in accordance with this Article, the other Contracting State is obligated to obtain the requested information as if the tax in question were the tax of the requested State, even if that State has no direct tax interest in the case to which the request relates. The OECD Model does not state explicitly in the Article that the requested State is obligated to respond to a request even if it does not have a direct tax interest in the information. The OECD Commentary, however, makes clear

that this is to be understood as implicit in the OECD Model. (See paragraph 16 of the OECD Commentary to Article 26.)

Paragraph 3 further provides that the requesting State may specify the form in which information is to be provided (e.g., depositions of witnesses and authenticated copies of original documents) so that the information can be usable in the judicial proceedings of the requesting State. The requested State should, if possible, provide the information in the form requested to the same extent that it can obtain information in that form under its own laws and administrative practices with respect to its own taxes.

*Paragraph 4*

Paragraph 4 provides for assistance in collection of taxes to the extent necessary to ensure that treaty benefits are enjoyed only by persons entitled to those benefits under the terms of the Convention. Under paragraph 4, a Contracting State will endeavor to collect on behalf of the other State only those amounts necessary to ensure that any exemption or reduced rate of tax at source granted under the Convention by that other State is not enjoyed by persons not entitled to those benefits. For example, if a U.S. source dividend is paid to an addressee in a treaty partner, the withholding agent probably will withhold at the treaty's portfolio dividend rate of 15 percent. If, however, the addressee is merely acting as a nominee on behalf of a third-country resident, paragraph 4 would obligate the other Contracting State to withhold and remit to the United States the additional tax that should have been collected by the U.S. withholding agent.

This paragraph also makes clear that the Contracting State asked to collect the tax is not obligated, in the process of providing collection assistance, to carry out administrative measures that are different from those used in the collection of its own taxes, or that would be contrary to its sovereignty, security or public policy.

*Paragraph 5*

As noted above in the discussion of paragraph 1, the exchange of information provisions of the Convention apply to all taxes imposed by a Contracting State, not just to those taxes designated as covered taxes under Article 2 (Taxes Covered). The U.S. competent authority may, therefore, request information for purposes of, for example, estate and gift taxes or federal excise taxes.

*Paragraph 6*

Finally, paragraph 6 provides that the competent authority of the requested State shall allow representatives of the applicant State to enter the requested State to interview individuals and examine books and records with the consent of the persons subject to examination.

*Treaty effective dates and termination in relation to competent authority dispute resolution*

A tax administration may seek information with respect to a year for which a treaty was

in force after the treaty has been terminated. In such a case the ability of the other tax administration to act is limited. The treaty no longer provides authority for the tax administrations to exchange confidential information. They may only exchange information pursuant to domestic law.

The competent authority also may seek information under a treaty that is in force, but with respect to a year prior to the entry into force of the treaty. The scope of the competent authorities to address such a case is not constrained by the fact that a treaty was not in force when the transactions at issue occurred, and the competent authorities have available to them the full range of information exchange provisions afforded under this Article. Where a prior treaty was in effect during the years in which the transaction at issue occurred, the exchange of information provisions of the current treaty apply.

ARTICLE 27
Diplomatic Agents and Consular Officers

This Article confirms that any fiscal privileges to which diplomatic or consular officials are entitled under general provisions of international law or under special agreements will apply notwithstanding any provisions to the contrary in the Convention. The text of this Article is identical to the corresponding provision of the OECD Model. The agreements referred to include any bilateral agreements, such as consular conventions, that affect the taxation of diplomats and consular officials and any multilateral agreements dealing with these issues, such as the Vienna Convention on Diplomatic Relations and the Vienna Convention on Consular Relations. The U.S. generally adheres to the latter because its terms are consistent with customary international law.

The Article does not independently provide any benefits to diplomatic agents and consular officers. Article 19 (Government Service) does so, as do Code section 893 and a number of bilateral and multilateral agreements. Rather, the Article specifically reconfirms in this context the statement in paragraph 2 of Article 1 (General Scope) that nothing in the tax treaty will operate to restrict any benefit accorded by the general rules of international law or with any of the other agreements referred to above. In the event that there is a conflict between the tax treaty and international law or such other treaties, under which the diplomatic agent or consular official is entitled to greater benefits under the latter, the latter laws or agreements shall have precedence. Conversely, if the tax treaty confers a greater benefit than another agreement, the affected person could claim the benefit of the tax treaty.

Pursuant to subparagraph 5(b) of Article 1, the saving clause of paragraph 4 of Article 1 (General Scope) does not apply to override any benefits of this Article available to an individual who is neither a citizen of the United States nor has immigrant status there.

ARTICLE 28
Entry into Force

This Article contains the rules for bringing the Convention into force and giving effect to its provisions.

*Paragraph 1*

Paragraph 1 provides for the ratification of the Convention by both Contracting States according to their constitutional and statutory requirements. Each State must notify the other as soon as its requirements for ratification have been complied with.

In the United States, the process leading to ratification and entry into force is as follows: Once a treaty has been signed by authorized representatives of the two Contracting States, the Department of State sends the treaty to the President who formally transmits it to the Senate for its advice and consent to ratification, which requires approval by two-thirds of the Senators present and voting. Prior to this vote, however, it generally has been the practice for the Senate Committee on Foreign Relations to hold hearings on the treaty and make a recommendation regarding its approval to the full Senate. Both Government and private sector witnesses may testify at these hearings. After receiving the advice and consent of the Senate to ratification, the treaty is returned to the President for his signature on the ratification document. The President's signature on the document completes the process in the United States.

*Paragraph 2*

Paragraph 2 provides that the Convention will enter into force on the date on which the second of the two notifications of the completion of ratification requirements has been received. The date on which a treaty enters into force is not necessarily the date on which its provisions take effect. Paragraph 2, therefore, also contains rules that determine when the provisions of the treaty will have effect. Under paragraph 2(a), the Convention will have effect with respect to taxes withheld at source (principally dividends, interest and royalties) for amounts paid or credited on or after the first day of the second month following the date on which the Convention enters into force. For example, if instruments of ratification are exchanged on April 25 of a given year, the withholding rates specified in paragraph 2 of Article 10 (Dividends) would be applicable to any dividends paid or credited on or after June 1 of that year. This rule allows the benefits of the withholding reductions to be put into effect as soon as possible, without waiting until the following year. The delay of one to two months is required to allow sufficient time for withholding agents to be informed about the change in withholding rates.

For all other taxes, paragraph 2(b) specifies that the Convention will have effect for any taxable year or assessment period beginning on or after January 1 of the year following entry into force.

As discussed under Articles 25 (Mutual Agreement Procedure) and 26 (Exchange of Information), the powers afforded the competent authority under these articles apply retroactively to taxable periods preceding entry into force.

ARTICLE 29
Termination

This provision generally corresponds to its counterpart in the OECD Model. The Convention is to remain in effect indefinitely, unless terminated by one of the Contracting States in accordance with the provisions of Article 29. The Convention may be terminated at any time after the year in which the Convention enters into force. If notice of termination is given, the provisions of the Convention with respect to withholding at source will cease to have effect after the expiration of a period of 6 months beginning with the delivery of notice of termination. For other taxes, the Convention will cease to have effect as of taxable periods beginning after the expiration of this 6 month period.

A treaty performs certain specific and necessary functions regarding information exchange and mutual agreement. In the case of information exchange the treaty's function is to override confidentiality rules relating to taxpayer information. In the case of mutual agreement its function is to allow competent authorities to modify internal law in order to prevent double taxation and tax avoidance. With respect to the effective termination dates for these aspects of the treaty, therefore, if a treaty is terminated as of January 1 of a given year, no otherwise confidential information can be exchanged after that date, regardless of whether the treaty was in force for the taxable year to which the request relates. Similarly, no mutual agreement departing from internal law can be implemented after that date, regardless of the taxable year to which the agreement relates. Therefore, for the competent authorities to be allowed to exchange otherwise confidential information or to reach a mutual agreement that departs from internal law, a treaty must be in force at the time those actions are taken and any existing competent authority agreement ceases to apply.

Article 29 relates only to unilateral termination of the Convention by a Contracting State. Nothing in that Article should be construed as preventing the Contracting States from concluding a new bilateral agreement, subject to ratification, that supersedes, amends or terminates provisions of the Convention without the six-month notification period.

Customary international law observed by the United States and other countries, as reflected in the Vienna Convention on Treaties, allows termination by one Contracting State at any time in the event of a "material breach" of the agreement by the other Contracting State.

# Exhibit 61

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 19-830*

# TAXATION

## Double Income

Protocol Between the
**UNITED STATES OF AMERICA**
and **JAPAN**

**Amending the Convention of November 6, 2003**

Signed at Washington January 24, 2013
Entered into force August 30, 2019

with Exchanges of Notes

\* Publication reflects addition of related exchanges of notes.



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
 evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

# JAPAN

## Taxation:  Double Income

Protocol amending the Convention of November 6, 2003.
Protocol signed at Washington January 24, 2013;
    with related exchanges of notes;
Transmitted by the President of the United States of America
    to the Senate April 13, 2015 (Treaty Doc. 114-1,
    114th Congress, 1st Session);
Reported favorably by the Senate Committee on Foreign Relations
    June 25, 2019 (Senate Executive Report No. 116-3,
    116th Congress, 1st Session);
Advice and consent to ratification by the Senate July 17, 2019;
Ratified by the President August 5, 2019;
Ratified by Japan August 27, 2019;
Exchange of instruments of ratification at Tokyo
    August 30, 2019;
Entered into force August 30, 2019.

PROTOCOL
AMENDING THE CONVENTION BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND THE GOVERNMENT OF JAPAN
FOR THE AVOIDANCE OF DOUBLE TAXATION
AND THE PREVENTION OF FISCAL EVASION
WITH RESPECT TO TAXES ON INCOME


The Government of the United States of America and the Government of Japan,

Desiring to amend the Convention between the Government of the United States of America and the Government of Japan for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income signed at Washington on 6 November 2003 (hereinafter referred to as "the Convention") and the Protocol, which forms an integral part of the Convention, signed at Washington on 6 November 2003 (hereinafter referred to as "the Protocol of 2003"),

Have agreed as follows:

## ARTICLE I

Paragraph 5 of Article 1 of the Convention shall be deleted and replaced by the following:

"5.    The provisions of paragraph 4 shall not affect the benefits conferred by a Contracting State under paragraphs 2 and 3 of Article 9, paragraph 3 of Article 17, and Articles 18, 19, 23, 24, 25 and 28, but in the case of benefits conferred by the United States under Articles 18 and 19 only if the individuals claiming the benefits are neither citizens of, nor have been lawfully admitted for permanent residence in, the United States."

## ARTICLE II

Paragraph 4 of Article 4 of the Convention shall be deleted and replaced by the following:

"4.    Where by reason of the provisions of paragraph 1 a person other than an individual is a resident of both Contracting States, such person shall not be considered a resident of either Contracting State for the purposes of its claiming any benefits provided by this Convention."

## ARTICLE III

1.    Subparagraph (a) of paragraph 3 of Article 10 of the Convention shall be amended by deleting the terms "more than 50 percent" and replacing them with the terms "at least 50 percent", and deleting the words "twelve months" and replacing them with the words "six months".

2.    Paragraph 9 of Article 10 of the Convention shall be amended by deleting the terms "or 2" everywhere they appear within the paragraph.

## ARTICLE IV

Article 11 of the Convention shall be deleted and replaced by the following:

"ARTICLE 11

1.    Interest arising in a Contracting State and beneficially owned by a resident of the other Contracting State may be taxed only in that other Contracting State.

2.    Notwithstanding the provisions of paragraph 1:

(a)    interest arising in a Contracting State that is determined by reference to receipts, sales, income, profits or other cash flow of the debtor or a related person, to any change in the value of any property of the debtor or a related person or to any dividend, partnership distribution or similar payment made by the debtor or a related person, or any other interest similar to such interest arising in a Contracting State, may be taxed in the Contracting State in which it arises, and according to the laws of that Contracting State, but if the beneficial owner of the

interest is a resident of the other Contracting State, the tax so charged shall not exceed 10 percent of the gross amount of the interest; and

(b) a Contracting State may tax, in accordance with its domestic law, interest paid with respect to the ownership interests in an entity used for the securitization of real estate mortgages or other assets, to the extent that the amount of interest paid exceeds the return on comparable debt instruments as specified by the law of that Contracting State.

3. Interest shall be deemed to arise in a Contracting State when the payor is a resident of that Contracting State. Where, however, the person paying the interest, whether such person is a resident of a Contracting State or not, has in a state other than that of which such person is a resident a permanent establishment in connection with which the indebtedness on which the interest is paid was incurred, and such interest is borne by such permanent establishment, then:

(a) if the permanent establishment is situated in a Contracting State, such interest shall be deemed to arise in that Contracting State, and

(b) if the permanent establishment is situated in a state other than the Contracting States, such interest shall not be deemed to arise in either Contracting State.

4. The term "interest" as used in this Article means income from debt-claims of every kind, whether or not secured by mortgage and whether or not carrying a right to participate in the debtor's profits, and in particular, income from government securities and income from bonds or debentures, including premiums and prizes attaching to such securities, bonds or debentures, and all other income that is subjected to the same taxation treatment as income from money lent by the tax laws of the Contracting State in which the income arises. Income dealt with in Article 10 shall not be regarded as interest for the purposes of this Convention.

5. The provisions of paragraphs 1 and 2 shall not apply if the beneficial owner of the interest, being a resident of a Contracting State, carries on business in the other Contracting State in which the interest arises, through a permanent establishment situated therein and the debt-claim in respect of which the interest is paid is effectively connected with such permanent establishment. In such case the provisions of Article 7 shall apply.

6. Where, by reason of a special relationship between the payor and the beneficial owner or between both of them and some other person, the amount of the interest, having regard to the debt-claim for which it is paid, exceeds the amount which would have been agreed upon by the payor and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case, the excess part of the payment may be taxed in the Contracting State in which it arises at a rate not to exceed 5 percent of the gross amount of the excess.

7.    A resident of a Contracting State shall not be considered the beneficial owner of interest in respect of a debt-claim if such debt-claim would not have been established unless a person:

    (a)    that is not entitled to benefits with respect to interest arising in the other Contracting State which are equivalent to, or more favorable than, those available under this Convention to a resident of the first-mentioned Contracting State; and

    (b)    that is not a resident of either Contracting State;

held an equivalent debt-claim against the first-mentioned resident."

## ARTICLE V

1.    Paragraph 2 of Article 13 of the Convention shall be deleted and replaced by the following:

"2.    For the purposes of this Article the term "real property situated in the other Contracting State" shall include:

    (a)    real property referred to in Article 6;

    (b)    where that other Contracting State is Japan, shares or interests in a company, partnership or trust deriving the value of its property directly or indirectly principally from real property referred to in Article 6 and situated in Japan; and

    (c)    where that other Contracting State is the United States, a United States real property interest."

2.    Paragraph 4 of Article 13 of the Convention shall be deleted and replaced by the following:

"4.    Notwithstanding the provisions of paragraph 3, gains from the alienation of any property, other than real property, forming part of the business property of a permanent establishment which an enterprise of a Contracting State has in the other Contracting State, including such gains from the alienation of such a permanent establishment (alone or with the whole enterprise), may be taxed in that other Contracting State."

## ARTICLE VI

Article 15 of the Convention shall be deleted and replaced by the following:

## "ARTICLE 15

Directors' fees and other similar payments derived by a resident of a Contracting State in his capacity as a member of the board of directors of a company which is a resident of the other Contracting State may be taxed in that other Contracting State."

ARTICLE VII

Article 20 of the Convention shall be deleted and replaced by the following:

"ARTICLE 20 (Deleted)"

ARTICLE VIII

Clause (i) of subparagraph (b) of paragraph 5 of Article 22 of the Convention shall be amended by deleting the words "the Securities and Exchange Law" and replacing them with the words "the Financial Instruments and Exchange Law".

ARTICLE IX

Paragraph 1 of Article 23 of the Convention shall be deleted and replaced by the following:

"1.    (a)    Subject to the provisions of the laws of Japan regarding the allowance as a credit against the Japanese tax of tax payable in any country other than Japan, where a resident of Japan derives income from the United States which may be taxed in the United States in accordance with the provisions of this Convention, the amount of the United States tax payable in respect of that income shall be allowed as a credit against the Japanese tax imposed on that resident. The amount of credit, however, shall not exceed the amount of the Japanese tax which is appropriate to that income. For the purposes of the preceding provisions of this subparagraph, income beneficially owned by a resident of Japan which may be taxed in the United States in accordance with the Convention shall be deemed to arise from sources in the United States.

        (b)    Subject to the provisions, other than the provisions with regard to ownership requirements of shares, of the laws of Japan regarding the exclusion of dividends from the basis upon which the Japanese tax is imposed, where the income derived from the United States is dividends paid by a company which is a resident of the United States to a company which is a resident of Japan and has owned at least 10 percent of the total shares issued by that company, during the period of six months immediately before the day when the obligation to pay dividends is confirmed, such dividends shall be excluded from the basis upon which the Japanese tax is imposed."

ARTICLE X

1.    Paragraph 3 of Article 24 of the Convention shall be amended by deleting the words "paragraph 8 of Article 11" and replacing them with the words "paragraph 6 of Article 11".

2.    Paragraph 5 of Article 24 of the Convention shall be

amended by deleting the words "or paragraph 10 of Article 11".

## ARTICLE XI

Article 25 of the Convention shall be amended by adding the following after paragraph 4:

"5.     Where, pursuant to this Article, a person has presented a case to the competent authority of the Contracting State of which he is a resident or, if his case comes under paragraph 1 of Article 24, to that of the Contracting State of which he is a national, on the basis that the actions of one or both of the Contracting States have resulted for that person in taxation not in accordance with the provisions of this Convention, and the competent authorities of the Contracting States are unable to reach an agreement to resolve that case, the case shall be resolved through arbitration conducted in the manner prescribed by, and subject to the requirements of, this paragraph, paragraphs 6 and 7, and any rules or procedures agreed upon by the competent authorities of both Contracting States pursuant to subparagraph (i) of paragraph 7, if:

    (a)  the presenter of the case has submitted a written request to the relevant competent authority for resolution of the case through arbitration; and

    (b)  all concerned persons and their authorized representatives or agents have provided written statements not to disclose to any person (except other concerned persons) any information received during the course of the arbitration proceeding from the competent authorities of either Contracting State or the arbitration panel, other than the determination of such panel.

6.     Notwithstanding the provisions of paragraph 5, a case shall not be submitted to arbitration if:

    (a)  a decision with respect to such case has already been rendered by a court or administrative tribunal of either Contracting State;

    (b)  the competent authorities of both Contracting States have agreed that the case is not suitable for resolution through arbitration and have notified the presenter of the case of such agreement no later than two years after the commencement date; or

    (c)  the case is the subject only of the provisions set forth in the final sentence of paragraph 3.

7.     For the purposes of paragraphs 5, 6 and this paragraph, the following rules and definitions shall apply:

    (a)  The term "concerned person" means the presenter of a case to a competent authority for consideration under this Article and all other persons, if any, whose tax liability to either

Contracting State may be directly affected by a mutual agreement arising from that consideration.

(b) The "commencement date" for a case is the earliest date on which the information necessary to undertake substantive consideration for a mutual agreement has been received by the competent authorities of both Contracting States.

(c) An arbitration proceeding pursuant to this Article with respect to a case (other than a case described in subparagraph (d)) shall begin on the later of:

    (i) two years after the commencement date of that case, unless the competent authorities of both Contracting States have agreed to a different date and notified the presenter of the case of such agreement; and

    (ii) the earliest date upon which the requirements of subparagraphs (a) and (b) of paragraph 5 have been satisfied.

(d) An arbitration proceeding pursuant to this Article with respect to a case that is the subject of a request for an advance pricing arrangement, shall begin on the later of:

    (i) six months after an official notification has been issued by the tax authority of either Contracting State of a correction of, or an intent to adjust, the pricing of a transaction or transfer covered by a request for an advance pricing arrangement regarding a concerned person, unless the competent authorities of both Contracting States have agreed to a different date and notified the presenter of the case of such agreement; and

    (ii) the earliest date upon which the requirements of subparagraphs (a) and (b) of paragraph 5 have been satisfied.

However, in no event shall the arbitration proceeding begin any earlier than two years after the date on which the information necessary to undertake substantive consideration for a mutual agreement on the advance pricing arrangement has been received by the competent authorities of both Contracting States.

(e) Unless the presenter of the case does not accept the determination of the arbitration panel, such determination shall constitute a resolution by mutual agreement of the entire case under this Article at the time it is timely accepted by the presenter and shall be binding on both Contracting States. The resolution resulting from the determination of the arbitration panel shall be implemented notwithstanding any time limits or procedural

limitations in the law of the Contracting
States, except such limitations as apply for
the purposes of giving effect to such a
resolution.

(f)  For the purposes of an arbitration proceeding
under paragraph 5 and this paragraph, the
members of the arbitration panel and their
staff shall be considered to be "persons or
authorities" to whom information may be
disclosed under Article 26.

(g)  No information relating to an arbitration
proceeding (including the determination of the
arbitration panel) may be disclosed by the
competent authorities of the Contracting
States, except as permitted by this Convention
and the laws of the Contracting States.  In
addition, all material prepared in the course
of, or relating to, an arbitration proceeding
shall be considered to be information exchanged
between the competent authorities of the
Contracting States pursuant to Article 26.

(h)  The competent authorities of both Contracting
States shall ensure that all members of the
arbitration panel and their staff agree in
written statements sent to each of the
competent authorities of the Contracting States
not to disclose any information relating to an
arbitration proceeding (including the
determination of the arbitration panel), and to
abide by and be subject to the confidentiality
and nondisclosure provisions of Article 26 and
similar provisions of relevant laws of the
Contracting States.  Such statements shall also
include their acceptance to serve on the
arbitration panel.  Notwithstanding the
provisions of this subparagraph, the members of
the arbitration panel or their staff shall
disclose the determination of the arbitration
panel to the competent authorities of both
Contracting States.

(i)  The competent authorities of both Contracting
States shall agree in writing, before the date
that the first arbitration proceeding
commences, on time periods and procedures that
are consistent with paragraphs 5, 6 and this
paragraph for:

   (i)   notifying the presenter of the case of a
         modified date for the beginning of an
         arbitration proceeding under clause (i) of
         subparagraph (c) and clause (i) of
         subparagraph (d);

   (ii)  the appropriate application of arbitration
         in the context of advance pricing
         arrangements, including rules concerning
         the date on which an arbitration
         proceeding shall begin with respect to
         such arrangements;

   (iii) obtaining the nondisclosure statements
         required by subparagraph (b) of paragraph
         5 and subparagraph (h) of this paragraph

from each concerned person, authorized representative or agent, and member of the arbitration panel (including their staff);

(iv)   the appointment of the members of the arbitration panel;

(v)    the submission of proposed resolutions, position papers, and reply submissions by the competent authorities of the Contracting States to the arbitration panel;

(vi)   the submission by the presenter of the case of a paper setting forth the presenter's views and analysis of the case for consideration by the arbitration panel;

(vii)  the delivery by the arbitration panel of its determination to the competent authorities of both Contracting States;

(viii) the acceptance or rejection by the presenter of the case of the determination of the arbitration panel; and

(ix)   the adoption by the arbitration panel of any additional procedures necessary for the conduct of its business.

The competent authorities of both Contracting States may agree in writing on such other rules and procedures as may be necessary for the effective and timely implementation of the provisions of paragraphs 5, 6 and this paragraph."

## ARTICLE XII

Article 26 of the Convention shall be deleted and replaced by the following:

### "ARTICLE 26

1.    The competent authorities of the Contracting States shall exchange such information as is foreseeably relevant for carrying out the provisions of this Convention or to the administration or enforcement of the domestic laws concerning taxes of every kind and description imposed on behalf of the Contracting States, insofar as the taxation thereunder is not contrary to the Convention. The exchange of information is not restricted by paragraph 1 of Article 1 and Article 2. If specifically requested by the competent authority of a Contracting State, the competent authority of the other Contracting State shall provide information under this Article in the form of authenticated copies of original documents (including books, papers, statements, records, accounts, and writings).

2.    Any information received under paragraph 1 by a Contracting State shall be treated as secret in the same manner as information obtained under the laws of that Contracting State and shall be disclosed only to persons or authorities (including courts and administrative bodies) involved in the assessment, collection or

administration of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes referred to in paragraph 1, or the oversight of such functions. Such persons or authorities shall use the information only for such purposes. They may disclose the information in public court proceedings or in judicial decisions.

3.    In no case shall the provisions of paragraphs 1 and 2 be construed so as to impose on a Contracting State the obligation:

  (a)   to carry out administrative measures at variance with the laws and administrative practice of that or of the other Contracting State;

  (b)   to supply information which is not obtainable under the laws or in the normal course of the administration of that or of the other Contracting State;

  (c)   to supply information which would disclose any trade, business, industrial, commercial or professional secret or trade process, or information the disclosure of which would be contrary to public policy; or

  (d)   to obtain or provide information that would reveal confidential communications between a client and an attorney, solicitor or other admitted legal representative where such communications are:

      (i)   produced for the purposes of seeking or providing legal advice; or

      (ii)  produced for the purposes of use in existing or contemplated legal proceedings.

4.    If information is requested by a Contracting State in accordance with this Article, the other Contracting State shall use its information gathering measures to obtain the requested information, even though that other Contracting State may not need such information for its own tax purposes. The obligation contained in the preceding sentence is subject to the limitations of paragraph 3 but in no case shall such limitations be construed to permit a Contracting State to decline to supply information solely because it has no domestic interest in such information.

5.    In no case shall the provisions of paragraph 3 be construed to permit a Contracting State to decline to supply information solely because the information is held by a bank, other financial institution, nominee or person acting in an agency or a fiduciary capacity or because it relates to ownership interests in a person."

ARTICLE XIII

Article 27 of the Convention shall be deleted and replaced by the following:

"ARTICLE 27

1.    Subject to the provisions of this Article, the Contracting States shall lend assistance to each other in the collection of taxes, insofar as the taxation is not contrary to this Convention or any other agreement to which the Contracting States are parties, together with interest, costs of collection, additions to such taxes, and civil or administrative penalties related to such taxes (hereinafter referred to in this Article as a "revenue claim"). This assistance is not restricted by paragraph 1 of Article 1 and Article 2. Any assistance provided by a Contracting State shall be only to the extent allowable under the law of that Contracting State.

2.    The assistance under paragraph 1 shall be lent only in the collection of the following revenue claims:

    (a)  a revenue claim in respect of a company:

        (i)   the determination of which is not eligible to be resolved by mutual agreement procedure pursuant to Article 25;

        (ii)  the determination of which has been mutually agreed upon pursuant to Article 25; or

        (iii) with respect to the determination of which the company has terminated the mutual agreement procedure;

    (b)  a revenue claim in respect of an individual. However, if the individual is a national of the Contracting State from which assistance is requested (hereinafter referred to as the "requested State") at the time the application for assistance is received, assistance shall be lent only for revenue claims with respect to which the individual or a person acting on behalf of the individual:

        (i)   has filed a fraudulent tax return or a fraudulent claim for refund;

        (ii)  has willfully failed to file a tax return to evade taxes; or

        (iii) has transferred assets into the requested State to avoid collection of the revenue claim.

3.    Notwithstanding the provisions of paragraph 2, the assistance under paragraph 1 shall be lent in the collection of revenue claims that is necessary to ensure that any exemption or reduced rate of tax granted under this Convention shall not be enjoyed by persons not entitled thereto, provided that the requested State agrees with such determination of improper granting of benefits.

4.    The provisions of this Article shall only apply to

revenue claims in respect of the taxes covered by Article 2 and in addition, the following taxes:

    (a)   in the case of Japan:

         (i)   the consumption tax;

         (ii)  the inheritance tax; and

        (iii)  the gift tax;

    (b)   in the case of the United States:

         (i)   the Federal estate and gift taxes;

         (ii)  the Federal excise tax on insurance policies issued by foreign insurers;

        (iii)  the Federal excise taxes imposed with respect to private foundations; and

        (iv)  the Federal taxes related to employment and self-employment.

5.    An application for assistance in the collection of a revenue claim, other than the collection of a revenue claim described in paragraph 3, shall include a certification by the competent authority of the Contracting State applying for such assistance (hereinafter referred to as the "applicant State") that, under the laws of the applicant State, the revenue claim has been finally determined. For the purposes of this Article, a revenue claim is finally determined when the applicant State has the right under its domestic law to collect the revenue claim and all applicable administrative and judicial rights of the taxpayer to dispute or appeal the revenue claim have lapsed or been exhausted.

6.    When an application for assistance by the applicant State has been accepted for collection by the requested State pursuant to the provisions of this Article, the revenue claim of the applicant State shall be treated, to the extent necessary for collection under the laws of the requested State, as assessed under the laws of the requested State (as of the time the application is received), and shall be collected by the requested State as though such revenue claim were the requested State's own revenue claim in accordance with the laws applicable to the collection of the requested State's own revenue claims.

7.    Notwithstanding the provisions of paragraph 6, acts of collection carried out by the requested State in pursuance of an application for assistance, which, according to the laws of the applicant State, would have the effect of suspending or interrupting the period of limitation on the collection of a revenue claim in the applicant State if carried out by the applicant State, shall also have this effect with respect to the revenue claim under the laws of the applicant State. The requested State shall inform the applicant State about such acts.

8.    A revenue claim with respect to which assistance is being lent by the requested State shall not, in that Contracting State, be subject to the time limits, or

accorded any priority, applicable to a revenue claim under the laws of that Contracting State by reason of its nature as such.

9.    Nothing in this Article shall be construed as creating or providing any rights of administrative or judicial review by the requested State of the applicant State's finally determined revenue claim, irrespective of any such rights that may be available under the laws of either Contracting State.

10.    If, at any time pending execution of an application for assistance under this Article, the applicant State loses the right under its domestic law to collect the revenue claim or otherwise terminates collection, the competent authority of the applicant State shall promptly withdraw the application for assistance in collection and the requested State shall cease all measures of collection of the revenue claim.

11.    If, at any time pending execution of an application for assistance under this Article, the applicant State suspends collection of the revenue claim according to the laws of the applicant State, the competent authority of the applicant State shall promptly notify the competent authority of the requested State of that fact, and the competent authority of the applicant State shall either suspend or withdraw its request at the option of the competent authority of the requested State and the requested State shall suspend or cease all measures of collection of the revenue claim accordingly.

12.    Amounts collected by the requested State pursuant to this Article shall be remitted to the competent authority of the applicant State.

13.    Unless the competent authorities of both Contracting States otherwise agree, the ordinary costs incurred in providing assistance in collection shall be borne by the requested State and any extraordinary costs so incurred shall be borne by the applicant State.

14.    In no case shall the provisions of this Article be construed so as to impose on the requested State the obligation to carry out:

   (a)    administrative measures at variance with the laws and administrative practices of the requested State or of the applicant State; or

   (b)    measures which would be contrary to public policy.

15.    In no case shall the provisions of this Article be construed so as to impose on the requested State an obligation to accept an application of the applicant State:

   (a)    if the applicant State has not pursued all appropriate measures to collect the revenue claim that is the subject of the application for assistance available under its laws or administrative practices; or

   (b)    if the administrative burden for the requested State is substantially disproportionate to the benefit to be derived by the applicant State.

16.   Before assistance is lent under the provisions of this Article, other than under paragraph 3, the competent authorities of both Contracting States shall agree upon the mode of application of this Article, including an agreement to ensure comparable levels of assistance to each of the Contracting States. In particular, the competent authorities of both Contracting States shall agree on a limit to the number of applications for assistance that a Contracting State may make in a particular year, as well as a minimum monetary threshold for a revenue claim for which assistance is sought, and procedural rules related to the remittance of amounts collected pursuant to the provisions of this Article."

## ARTICLE XIV

1.   Subparagraph (a) of paragraph 1 of the Protocol of 2003 shall be amended by deleting the words "United States excise tax" and replacing them with the words "Federal excise tax," and subparagraph (b) of that paragraph shall be amended by deleting the words "United States excise tax" and replacing them with the words "Federal excise taxes".

2.   Paragraph 9 of the Protocol of 2003 shall be deleted and replaced by the following:

"9.   (Deleted)"

3.   The Protocol of 2003 shall be amended by adding the following after paragraph 13:

"14.   With reference to paragraphs 5, 6 and 7 of Article 25 of the Convention:

(a)   It is understood that taxation shall be considered to have resulted for the purpose of paragraph 5 of Article 25 of the Convention from the actions of one or both of the Contracting States as soon as tax has been paid, assessed or otherwise determined (for example, a notification of correction, determination or deficiency of a tax liability has been issued), or in cases where the taxpayer is officially notified by the tax authorities that they intend to tax him on a certain element of income (for example, a notice of proposed adjustment has been issued).

(b)   The arbitration panel shall consist of three individual members. The members appointed shall not be employees nor have been employees within the twelve-month period prior to the date on which the arbitration proceeding begins, of the tax administration, the Treasury Department, or the Ministry of Finance of the Contracting State which identifies them. Each competent authority of the Contracting States shall select one member of the arbitration panel. In the event that the competent authority of a Contracting State fails to make such selection in the manner and within the time periods agreed by the competent authorities of both Contracting States pursuant to subparagraph (i) of paragraph 7 of Article 25 of the Convention, the competent authority of the other

Contracting State shall select a second member of the arbitration panel. The two members so selected shall select a third member, who shall serve as Chair of the arbitration panel. If the two initial members of the arbitration panel fail to select the third member in the manner and within the time periods agreed by the competent authorities of both Contracting States pursuant to subparagraph (i) of paragraph 7 of Article 25 of the Convention, these members shall be dismissed, and each competent authority of the Contracting States shall select a new member of the arbitration panel. The Chair shall not be a national or lawful permanent resident of either Contracting State. Furthermore, the members appointed shall not have any prior involvement with the specific matters at issue in the arbitration proceeding for which they are being considered as members of the arbitration panel.

(c)  If at any time before the arbitration panel delivers a determination to the competent authorities of the Contracting States:

    (i)  the competent authorities of the Contracting States reach a mutual agreement to resolve the case pursuant to Article 25 of the Convention;

    (ii)  the presenter of the case withdraws the request for arbitration;

    (iii)  a decision concerning the case is rendered by a court or administrative tribunal of one of the Contracting States during the arbitration proceeding; or

    (iv)  if any concerned person or their authorized representatives or agents willfully violates the written nondisclosure statement required by subparagraph (b) of paragraph 5 of Article 25 of the Convention, and the competent authorities of both Contracting States agree that such violation should result in the termination of the arbitration proceeding;

the mutual agreement procedure, including the arbitration proceeding, with respect to the case shall terminate.

(d)  The competent authority of each of the Contracting States shall be permitted to submit a proposed resolution addressing each adjustment or similar issue raised in the case. Such proposed resolution shall be a resolution of the entire case, and shall reflect, without modification, all matters in the case previously agreed between the competent authorities of both Contracting States. Such proposed resolution shall be limited to a disposition of specific monetary amounts (for example, of income, profit, gain or expense) or, where specified, the maximum rate of tax charged pursuant to the Convention, for each

adjustment or similar issue in the case, based on the application of the Convention to the case.  The competent authority of each of the Contracting States shall also be permitted to submit a position paper for consideration by the arbitration panel.

(e)  Notwithstanding the provisions of subparagraph (d), in the case of an arbitration proceeding concerning:

    (i)  the taxation of an individual with respect to whom the competent authorities of the Contracting States have been unable to reach an agreement regarding the Contracting State of which the individual is a resident;

    (ii)  the taxation of the business profits of an enterprise with respect to which the competent authorities of the Contracting States have been unable to reach an agreement on whether a permanent establishment exists; or

    (iii)  such other issues the determination of which are contingent on resolution of similar threshold questions;

the competent authorities of the Contracting States may submit proposed resolutions separately addressing the relevant threshold questions as described in clause (i), (ii) or (iii) above (for example, the question of whether a permanent establishment exists), and the contingent determinations (for example, the determination of the amount of profit attributable to such permanent establishment).

(f)  Where an arbitration proceeding concerns a case comprising multiple adjustments or similar issues each requiring a disposition of specific monetary amounts (for example, of income, profit, gains or expense) or where specified, the maximum rate of tax charged pursuant to the Convention, the proposed resolution may propose a separate disposition for each adjustment or similar issue.

(g)  Each of the competent authorities of the Contracting States shall receive the proposed resolution and position paper submitted by the other competent authority, and shall be permitted to submit a reply submission to the arbitration panel. Each of the competent authorities of the Contracting States shall also receive the reply submission of the other competent authority.

(h)  The presenter of the case shall be permitted to submit for consideration by the arbitration panel a paper setting forth its analysis and views of the case.  Such submission shall not include any information not previously provided to the competent authorities during the mutual agreement procedure and shall be made available to the competent authorities of both

Contracting States.

(i)     The arbitration panel shall deliver a
        determination in writing to the competent
        authorities of the Contracting States.  The
        determination of the arbitration panel shall be
        limited to one of the proposed resolutions
        submitted by the competent authorities of the
        Contracting States for each adjustment or
        similar issue and any threshold questions, and
        shall not include a rationale or any other
        explanation of the determination.  The
        determination of the arbitration panel shall
        have no precedential value with respect to the
        application of the Convention in any other
        case.

(j)     Unless the competent authorities of both
        Contracting States agree to a longer time
        period, the presenter of the case shall have 45
        days after receiving the determination of the
        arbitration panel to notify, in writing, the
        competent authority of the Contracting State to
        whom the case was presented, of his acceptance
        of the determination.  If the presenter of the
        case fails to so advise the relevant competent
        authority, the determination shall be
        considered not to be accepted.  In addition, in
        the event the case is pending in litigation or
        appeal, the determination of the arbitration
        panel shall be considered not to be accepted by
        the presenter of the case if any concerned
        person who is a party to the litigation or
        appeal does not advise, within the same time
        frame described above, the relevant court or
        administrative tribunal of its intention to
        withdraw from consideration all issues resolved
        in the arbitration proceeding.  Where the
        determination of the arbitration panel is not
        accepted, the case will not be eligible for any
        further consideration by the competent
        authorities.

(k)     The fees and expenses of the members of the
        arbitration panel, as well as any costs
        incurred in connection with the proceeding by
        the Contracting States, shall be borne
        equitably by the Contracting States.

15.   With reference to paragraph 5 of Article 27 of the
Convention:

(a)     For the purposes of evaluating the final
        determination of a revenue claim:

        (i)    in the case of the United States, any
               administrative or judicial rights
               available to the taxpayer in connection
               with the revenue claim that arise after
               the collection of the revenue claim;

        (ii)   in the case of Japan, the right to take
               action pursuant to Article 36 of the
               Administrative Case Litigation Act (Law
               No. 139 of 1962) of Japan;

        shall not be taken into account.

(b)    A Contracting State may suspend assistance if
       it determines that the actions of the other
       Contracting State have resulted in an imbalance
       in the levels of assistance between the
       Contracting States contemplated in Article 27
       of the Convention.  In such case, the
       Contracting States shall enter into
       consultations with a view to restoring
       comparable levels of assistance consistent with
       paragraph 16 of Article 27 of the Convention."

## ARTICLE XV

1.    This Protocol shall be subject to ratification, and the
instruments of ratification shall be exchanged as soon as
possible.  It shall enter into force on the date of the
exchange of instruments of ratification.

2.    This Protocol shall have effect:

    (a)    in respect of taxes withheld at source, for amounts
           paid or credited on or after the first day of the
           third month next following the date on which the
           Protocol enters into force;

    (b)    in respect of other taxes, for taxable years
           beginning on or after the first day of January next
           following the date on which the Protocol enters into
           force;

3.    Notwithstanding the provisions of paragraph 2, the
provisions of paragraphs 5, 6 and 7 of Article 25 of the
Convention, as amended by Article XI of this Protocol, shall
have effect with respect to:

    (a)    Cases that are under consideration by the competent
           authorities as of the date on which this Protocol
           enters into force.  For such cases, the commencement
           date shall be the date on which this Protocol enters
           into force.

    (b)    Cases that come under consideration after the date
           on which this Protocol enters into force.

4.    Notwithstanding the provisions of paragraph 2, the
provisions of Article 26 of the Convention, as amended by
Article XII of this Protocol, and Article 27 of the
Convention, as amended by Article XIII of this Protocol, shall
have effect from the date of entry into force of this
Protocol.

5.    Notwithstanding the entry into force of this Protocol, an
individual who is entitled to the benefits of Article 20 of
the Convention at the time of the entry into force of this
Protocol shall continue to be entitled to such benefits until
such time as the individual would have ceased to be entitled
to such benefits if this Protocol had not entered into force.

6.    This Protocol shall remain in effect as long as the
Convention remains in force.

IN WITNESS WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed this Protocol.

DONE in duplicate at Washington this 24th day of January, 2013, in the English and Japanese languages, each text being equally authentic.

FOR THE GOVERNMENT OF
THE UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF
JAPAN:

19

所得に対する租税に関する二重課税の回避及び脱税の防止のためのアメリカ合衆国政府と日本国政府との間の条約を改正する議定書

アメリカ合衆国政府及び日本国政府は、二千三年十一月六日にワシントンで署名された所得に対する租税に関する二重課税の回避及び脱税の防止のためのアメリカ合衆国政府と日本国政府との間の条約（以下「条約」という。）及び条約の不可分の一部を成す二千三年十一月六日にワシントンで署名された議定書（以下「二千三年議定書」という。）を改正することを希望して、次のとおり協定した。

　第一条

条約第一条5を次のように改める。

　5　4の規定は、第九条2及び3、第十七条3、第十八条、第十九条、第二十三条から第二十五条まで並びに第二十八条の規定に基づき一方の締約国により認められる特典に影響を及ぼすものではない。もつ

1

とも、第十八条及び第十九条の規定に基づき合衆国により認められる特典については、これを要求する者が合衆国の市民でなく、かつ、合衆国における永住を適法に認められた者でない場合に限り、認められる。

第二条

条約第四条4を次のように改める。

4  1の規定により双方の締約国の居住者に該当する者で個人以外のものは、この条約により認められる特典を要求する上で、いずれの締約国の居住者ともされない。

第三条

1  条約第十条3(a)中「十二箇月」を「六箇月」に、「五十パーセントを超える株式」を「五十パーセント以上」に改める。

2  条約第十条9中「若しくは2」を削る。

第四条

条約第十一条を次のように改める。

2

第十一条

1　一方の締約国内において生じ、他方の締約国の居住者が受益者である利子に対しては、当該他方の締約国においてのみ租税を課することができる。

2　1の規定にかかわらず、

(a)　債務者若しくはその関係者の収入、売上げ、所得、利得その他の資金の流出入、債務者若しくはその関係者の有する資産の価値の変動若しくは債務者若しくはその他これらに類する支払金を基礎として算定される利子又はこれに類する利子であって、一方の締約国内において生ずるものに対しては、当該利子が生じた一方の締約国において、当該一方の締約国の法令に従って租税を課することができる。その租税の額は、当該利子の受益者が他方の締約国の居住者である場合には、当該利子の額の十パーセントを超えないものとする。

(b)　一方の締約国は、不動産により担保された債権又はその他の資産の流動化を行うための団体の持分に関して支払われる利子の額のうち、当該一方の締約国の法令で規定されている比較可能な債券の利子の額を超える部分については、当該一方の締約国の法令に従って租税を課することができる。

3

3　利子は、その支払者が一方の締約国の居住者である場合には、当該一方の締約国において生じたものとされる。ただし、利子の支払者（いずれかの締約国の居住者であるか否かを問わない。）が、その者が居住者とされる国以外の国に恒久的施設を有する場合において、当該利子の支払の基因となった債務が当該恒久的施設について生じ、かつ、当該利子が当該恒久的施設によって負担されるものであるときは、次に定めるところによる。

(a)　当該恒久的施設が一方の締約国内にある場合には、当該利子は、当該一方の締約国内において生じたものとされる。

(b)　当該恒久的施設が両締約国以外の国にある場合には、当該利子は、いずれの締約国内においても生じなかったものとされる。

4　この条において、「利子」とは、全ての種類の信用に係る債権（担保の有無及び債務者の利得の分配を受ける権利の有無を問わない。）から生じた所得、特に、公債、債券又は社債から生じた所得（公債、債券又は社債の割増金及び賞金を含む。）及びその他の所得で当該所得が生じた締約国の租税に関する法令上貸付金から生じた所得と同様に取り扱われるものをいう。前条で取り扱われる所得は、この

4

条約の適用上利子には該当しない。

5　1及び2の規定は、一方の締約国の居住者である利子の受益者が、当該利子の生じた他方の締約国内において当該他方の締約国内にある恒久的施設を通じて事業を行う場合において、当該利子の支払の基因となった債権が当該恒久的施設と実質的な関連を有するものであるときは、適用しない。この場合には、第七条の規定を適用する。

6　利子の支払の基因となった債権について考慮した場合において、利子の支払者と受益者との間又はその双方と第三者との間の特別の関係により、当該利子の額が、その関係がないとしたならば支払者及び受益者が合意したとみられる額を超えるときは、この条の規定は、その合意したとみられる額についてのみ適用する。この場合には、支払われた額のうち当該超過分に対しては、当該利子の生じた締約国において当該超過分の額の五パーセントを超えない額の租税を課することができる。

7　一方の締約国の居住者がある債権に関して他方の締約国の居住者から利子の支払を受ける場合において、次の(a)及び(b)に該当する者が当該債権と同等の債権を当該一方の締約国の居住者に対して有していないとしたならば、当該一方の締約国の居住者が当該利子の支払の基因となる債権を取得することはな

5

かったであろうと認められるときは、当該一方の締約国の居住者は、当該利子の受益者とはされない。

(a) 当該他方の締約国内において生ずる利子に関し、当該一方の締約国の居住者に対してこの条約により認められる特典と同等の又はそのような特典よりも有利な特典を受ける権利を有しないこと。

(b) いずれの締約国の居住者でもないこと。

第五条

1 条約第十三条2を次のように改める。

2 この条の規定の適用上、「他方の締約国内に存在する不動産」には、次のものを含む。

(a) 第六条に規定する不動産

(b) 当該他方の締約国が日本国である場合には、法人、組合又は信託（その資産の価値が主として第六条に規定する不動産であって日本国内に存在するものにより直接又は間接に構成されるものに限る。）の株式又は持分

(c) 当該他方の締約国が合衆国である場合には、合衆国不動産持分

2 条約第十三条4を次のように改める。

6

4 3の規定にかかわらず、一方の締約国の企業が他方の締約国内に有する恒久的施設の事業用資産を構成する財産（不動産を除く。）の譲渡から生ずる収益（当該恒久的施設の譲渡又は企業全体の譲渡の一部としての当該恒久的施設の譲渡から生ずる収益を含む。）に対しては、当該他方の締約国において租税を課することができる。

第六条

条約第十五条を次のように改める。

第十五条

一方の締約国の居住者が他方の締約国の居住者である法人の取締役会の構成員の資格で取得する報酬その他これに類する支払金に対しては、当該他方の締約国において租税を課することができる。

第七条

条約第二十条を次のように改める。

第二十条　削除

第八条

7

条約第二十二条5(b)(i)中「証券取引法」を「金融商品取引法」に改める。

　　第九条

条約第二十三条1を次のように改める。

1(a)　日本国の居住者がこの条約の規定に従って租税を課される所得を合衆国内において取得する場合には、当該所得について納付される合衆国の租税の額は、日本国以外の国において納付される租税を日本国の租税の額から控除することに関する日本国の法令の規定に従い、当該居住者に対して課される日本国の租税の額から控除する。ただし、控除の額は、当該所得に対応する日本国の租税の額を超えないものとする。この(a)の規定の適用上、日本国の居住者が受益者である所得でこの条約の規定に従って合衆国において租税を課されるものは、合衆国内の源泉から生じたものとみなす。

(b)　合衆国内において取得される所得が、配当であって、合衆国の居住者である法人により当該法人の発行済株式の十パーセント以上を当該配当の支払義務が確定する日に先立つ六箇月の期間を通じて所有する日本国の居住者である法人に対して支払われるものである場合には、当該配当は、日本国の租税の課税標準から配当を除外することに関する日本国の法令の規定（株式の所有に関する要件に係る

8

規定を除く。）に従い、日本国の租税の課税標準から除外される。

第十条

1 条約第二十四条3中「第十一条8」を「第十一条6」に改める。

2 条約第二十四条5中「又は第十一条10」を削る。

第十一条

条約第二十五条4の次に次の5から7までを加える。

5 この条の規定に従い、一方又は双方の締約国の措置によりある者がこの条約の規定に適合しない課税を受けた事案について、当該者が自己が居住者である締約国（当該事案が前条1の規定の適用に関するものである場合には、自己が国民である締約国）の権限のある当局に対して申立てをし、かつ、両締約国の権限のある当局が当該事案を解決するための合意に達することができない場合において、次の(a)及び(b)に定める要件が満たされるときは、当該事案は、この5、6及び7並びに両締約国の権限のある当局が7(i)の規定に従って合意する規則又は手続に定める方法及び要件に従って行われる仲裁を通じて解決される。

9

(a) 当該事案について申立てをした者が、その申立てをした権限のある当局に対し、当該事案の仲裁による解決を要請する書面を提出したこと。

(b) 全ての関係者及び権限を与えられたその代理人が、仲裁手続の過程においていずれかの締約国の権限のある当局又は仲裁のための委員会から受領した情報（仲裁のための委員会の決定を除く。）を他の関係者以外のいかなる者に対しても開示しない旨を表明した書面を提出したこと。

6  5の規定にかかわらず、次のいずれかに該当する場合には、事案は仲裁に付託されない。

(a) 当該事案についていずれかの締約国の裁判所又は行政審判所が既に決定を行った場合

(b) 両締約国の権限のある当局が、当該事案が仲裁による解決に適しない旨を合意し、かつ、その旨を当該事案について申立てをした者に対して開始日の後二年以内に通知した場合

(c) 当該事案が3の最終文の規定のみの対象である場合

7  5、6及びこの7の規定の適用上、次の規則及び定義を適用する。

(a) 「関係者」とは、権限のある当局に対しこの条の規定に基づく検討のために事案について申立てをした者及び当該検討に基づく両締約国の権限のある当局の合意によっていずれかの締約国に対する納

10

税義務が直接に影響を受ける可能性のある他の全ての者をいう。

(b) ある事案に係る「開始日」とは、両締約国の権限のある当局の合意のための実質的な検討を開始するために必要な情報を両締約国の権限のある当局が受領した最初の日をいう。

(c) ある事案（(d)に規定する事案を除く。）に関するこの条の規定に基づく仲裁手続は、次のいずれか遅い日に開始される。

(i) 当該事案に係る開始日の後二年を経過した日（両締約国の権限のある当局が異なる日とすることについて合意し、かつ、その旨を当該事案について申立てをした者に対して通知した場合は、当該異なる日）

(ii) 5(a)及び5(b)に定める要件が満たされた最初の日

(d) 事前価格取決めの要請の対象である事案に関するこの条の規定に基づく仲裁手続は、次のいずれか遅い日に開始される。

(i) いずれかの締約国の税務当局がある関係者に関する事前価格取決めの要請の対象となる取引又は移転の価格の更正について又は当該価格の調整の意図について正式な通知を発出した日の後六箇月

11

を経過した日（両締約国の権限のある当局が異なる日とすることについて合意し、かつ、その旨を当該事案について申立てをした者に対して通知した最初の日

(ii) 5(a)及び5(b)に定める要件が満たされた最初の日

ただし、いかなる場合においても、仲裁手続は、事前価格取決めに関する両締約国の権限のある当局の合意のための実質的な検討を開始するために必要な情報を両締約国の権限のある当局が受領した日の後二年を経過するまでは、開始しない。

(e) 仲裁のための委員会の決定は、事案について申立てをした者が当該決定を受け入れない場合を除くほか、当該申立てをした者が所定の期間内に当該決定を受け入れた時において、この条の規定に基づく両締約国の権限のある当局の合意による当該事案全体の解決とみなされ、かつ、両締約国を拘束する。仲裁のための委員会の決定による解決は、両締約国の法令上のいかなる期間制限又は手続上の制限（当該解決を実施するための手続上の制限を除く。）にもかかわらず、実施されなければならない。

(f) 5及びこの7の規定に基づく仲裁手続の適用上、仲裁のための委員会の構成員及びそれらの職員

12

は、次条の規定に基づき情報の開示を受けることができる者又は当局とみなされる。

(g) 仲裁手続に関連する情報（仲裁のための委員会の決定を含む。）は、この条約及び両締約国の法令によって開示することが認められる場合を除くほか、両締約国の権限のある当局によって開示されない。さらに、仲裁手続の過程において作成され、又は仲裁手続に関連する全ての資料は、次条の規定に従って両締約国の権限のある当局の間で交換された情報とみなされる。

(h) 両締約国の権限のある当局は、仲裁のための委員会の全ての構成員及びそれらの職員が、各締約国の権限のある当局に対して送付する書面により、仲裁手続に関連する情報（仲裁のための委員会の決定を含む。）を開示しないこと並びに次条に規定する秘密及び不開示に関する規定並びにこれに類似する両締約国の関係法令の規定に従うことに合意することを確保する。当該書面は、これらの者が仲裁のための委員会の職務を遂行することを受け入れる旨の記述も含むものでなければならない。この(h)の規定にかかわらず、仲裁のための委員会の構成員又はそれらの職員は、両締約国の権限のある当局に対して仲裁のための委員会の決定を開示する。

(i) 両締約国の権限のある当局は、最初の仲裁手続が開始される日の前に、次に掲げる事項に関する

13

5、6及びこの7の規定と整合的な期間及び手続について、書面によって合意する。

(i) (c)(i)及び(d)(i)の規定に基づき仲裁手続が開始される日が変更された場合において、その変更された日を事案について申立てをした者に対して通知すること。

(ii) 事前価格取決めに関連する仲裁の適切な適用(事前価格取決めに関して仲裁手続が開始される日に関する規則を含む。)

(iii) 関係者、権限を与えられたその代理人及び仲裁のための委員会の構成員(それらの職員を含む。)のそれぞれから、5(b)及び7(h)の規定によって求められる不開示に関する表明を取得すること。

(iv) 仲裁のための委員会の構成員の任命

(v) 両締約国の権限のある当局による仲裁のための委員会への解決案、意見書及び応答書の提出

(vi) 事案について申立てをした者が、仲裁のための委員会による検討のために、当該事案についての自己の意見及び分析を記載した書面を提出すること。

(vii) 仲裁のための委員会による両締約国の権限のある当局への決定の送付

(viii) 事案について申立てをした者による仲裁のための委員会の決定の受入れ又は拒否

14

(ix) 仲裁のための委員会によるその任務の遂行のために必要な追加的な手続の採用

両締約国の権限のある当局は、5、6及びこの7の規定を効果的かつ適時に実施するために必要な他の規則及び手続について、書面によって合意することができる。

第十二条

条約第二十六条を次のように改める。

第二十六条

1　両締約国の権限のある当局は、この条約の規定の実施又は両締約国が課する全ての種類の租税に関する両締約国の法令（当該法令に基づく課税がこの条約の規定に反しない場合に限る。）の運用若しくは執行に関連する情報を交換する。情報の交換は、第一条1及び第二条の規定による制限を受けない。一方の締約国の権限のある当局から特に要請があった場合には、他方の締約国の権限のある当局は、文書（帳簿、書類、財務諸表、記録、計算書及び書面を含む。）の原本の写しに認証を付した形式で、この条の規定に基づく情報の提供を行う。

2　1の規定に基づき一方の締約国が受領した情報は、当該一方の締約国がその法令に基づいて入手した

15

情報と同様に秘密として取り扱うものとし、1に規定する租税の賦課、徴収若しくは管理、これらの租税に関する執行若しくは訴追、これらの租税に関する不服申立てについての決定又はこれらの監督に関与する者又は当局（裁判所及び行政機関を含む。）に対してのみ、開示される。これらの者又は当局は、当該情報をそのような目的のためにのみ使用する。これらの者又は当局は、当該情報を公開の法廷における審理又は司法上の決定において開示することができる。

3　1及び2の規定は、いかなる場合にも、一方の締約国に対し、次のことを行う義務を課するものと解してはならない。

　(a)　当該一方の締約国又は他方の締約国の法令及び行政上の慣行に抵触する行政上の措置をとること。

　(b)　当該一方の締約国又は他方の締約国の法令の下において又は行政の通常の運営において入手することができない情報を提供すること。

　(c)　営業上、事業上、産業上、商業上若しくは職業上の秘密若しくは取引の過程を明らかにするような情報又は公開することが公の秩序に反することとなる情報を提供すること。

　(d)　弁護士その他の法律事務代理人がその依頼者との間で行う次のいずれかの通信の内容を明らかにす

16

る情報を入手し、又は提供すること。

(i) 法的な助言を求め、又は提供するために行われる通信

(ii) その内容を進行中の又は予定される法的な手続において使用するために行われる通信

4 一方の締約国は、他方の締約国がこの条の規定に従って当該一方の締約国に対し情報の提供を要請する場合には、自己の課税目的のために必要でないときであっても、当該情報を入手するために必要な手段を講ずる。一方の締約国がそのような手段を講ずるに当たっては、3に定める制限に従うが、その制限は、いかなる場合にも、当該情報が自己の課税目的のために必要でないことのみを理由としてその提供を拒否することを認めるものと解してはならない。

5 3の規定は、提供を要請された情報が銀行その他の金融機関、名義人、代理人若しくは受託者が有する情報又はある者の所有に関する情報であることのみを理由として、一方の締約国が情報の提供を拒否することを認めるものと解してはならない。

第十三条

条約第二十七条を次のように改める。

17

第二十七条

1 両締約国は、この条の規定に従い、租税（その課税がこの条約又は両締約国が当事国となっている他の協定の規定に反しない場合に限る。）並びに利子、徴収の費用、当該租税に対する附加税及び当該租税に関連する民事上又は行政上の金銭罰（以下この条において「租税債権」という。）の徴収につき相互に支援を行う。この支援は、第一条1及び第二条の規定による制限を受けない。一方の締約国は、当該一方の締約国の法令によって認められる範囲においてのみ、支援を行う。

2 1に規定する支援は、次に掲げる租税債権の徴収についてのみ行われる。

(a) 法人に係る租税債権の決定が次のいずれかの場合に該当するもの

(i) 当該租税債権の決定が第二十五条の規定に従い両締約国の権限のある当局の合意のための手続によって解決される対象とならない場合

(ii) 当該租税債権の決定について第二十五条の規定に従い両締約国の権限のある当局が合意した場合

(iii) 当該法人が当該租税債権の決定に関する両締約国の権限のある当局の合意のための手続を終了させた場合

18

(b) 個人に係る租税債権。ただし、支援の要請が受領された時において当該個人が支援を要請された締約国（以下「被要請国」という。）の国民である場合には、当該個人又はこれに代わる者が当該租税債権に関し次のいずれかの行為を行ったときに限る。

(i) 詐欺的な租税の申告又は詐欺的な還付請求

(ii) 租税を免れるために故意に租税の申告を怠ること。

(iii) 当該租税債権の徴収の回避を目的とする被要請国への資産の移転

3  2の規定にかかわらず、1に規定する支援は、この条約に基づいて認められる租税の免除又は税率の軽減が、このような特典を受ける権利を有しない者によって享受されることがないようにするために必要な租税債権の徴収について行われる。ただし、被要請国が、特典が不当に付与されたと認定することに同意する場合に限る。

4  この条の規定は、第二条に規定する租税及び次の租税に係る租税債権についてのみ適用する。

(a) 日本国については、

(i) 消費税

(b) 合衆国については、

(ii) 相続税

(iii) 贈与税

(i) 連邦遺産税及び連邦贈与税

(ii) 外国保険業者の発行した保険証券に対する連邦消費税

(iii) 民間財団に関する連邦消費税

(iv) 被用者及び自営業者に関する連邦税

5 租税債権の徴収(3に規定する租税債権の徴収を除く。)における支援の要請には、支援を要請する締約国(以下「要請国」という。)の法令の下において当該租税債権が最終的に決定されたものであることについての要請国の権限のある当局の証明を付する。この条の規定の適用上、租税債権は、要請国が自国の法令に基づき当該租税債権を徴収する権利を有し、かつ、当該租税債権に関する争訟のために納税者が行使することができる行政上及び司法上の全ての権利が消滅し、又は尽くされた場合に、最終的に決定されたものとする。

20

6　要請国からの支援の要請がこの条の規定に基づき被要請国によって徴収のために受理された場合には、要請国の租税債権は、被要請国の法令に基づく徴収のために必要な限りにおいて、要請が受領された時において被要請国の法令に基づき確定した租税債権として取り扱われるものとし、被要請国の租税債権の徴収に適用される法令に従い、被要請国の租税債権を徴収する場合と同様に徴収されるものとする。

7　6の規定にかかわらず、支援の要請に従い被要請国がとった徴収のための措置であって、要請国の法令によれば、要請国が当該措置をとった場合に要請国において租税債権の徴収の時効を停止し、又は中断する効果を有することとなるものは、当該租税債権に関して、要請国の法令の下においても同様の効果を有する。被要請国は、当該措置について要請国に通報する。

8　6の規定にかかわらず、被要請国による支援が行われている租税債権は、被要請国において、被要請国の法令の下で租税債権であるとの理由により適用される時効の対象とされず、かつ、その理由により適用される優先権を与えられない。

9　この条のいかなる規定も、要請国の最終的に決定された租税債権に関し、いずれかの締約国の法令の

21

下において行政上又は司法上の審査を受ける権利が認められているか否かにかかわらず、被要請国においてそのような権利を生じさせ、又は付与するものと解してはならない。

10　この条の規定に基づく支援の要請が実施されている間に、要請国が、自国の法令に基づき、要請の対象である租税債権を徴収する権利を喪失し、又はその徴収を終了する場合には、要請国の権限のある当局は、徴収における支援の要請を速やかに撤回し、被要請国は、当該租税債権の徴収に係る全ての措置を終了する。

11　この条の規定に基づく支援の要請が実施されている間に、要請国が自国の法令に従い要請の対象である租税債権の徴収を停止する場合には、要請国の権限のある当局は、被要請国の権限のある当局に対してその旨を速やかに通報し、被要請国の権限のある当局の選択により当該要請を停止し、又は撤回するものとし、被要請国は、これに従って当該租税債権の徴収に係る全ての措置を停止し、又は終了する。

12　この条の規定に基づき被要請国が徴収した額は、要請国の権限のある当局に送金される。

13　両締約国の権限のある当局が別段の合意をする場合を除くほか、徴収における支援を行うに当たり生じた通常の費用は被要請国が負担し、特別の費用は要請国が負担する。

22

14 この条の規定は、いかなる場合にも、被要請国に対し、次のことを行う義務を課するものと解しては
ならない。

(a) 被要請国又は要請国の法令及び行政上の慣行に抵触する行政上の措置をとること。

(b) 公の秩序に反することとなる措置をとること。

15 この条の規定は、いかなる場合にも、被要請国に対し、次のいずれかに該当するときに要請国からの
要請を受理する義務を課するものと解してはならない。

(a) 要請国が支援の要請の対象となる租税債権を徴収するために自国の法令又は行政上の慣行の下にお
いてとることができる全ての適当な措置をとっていないとき。

(b) 要請国が得る利益に比して被要請国の行政上の負担が著しく不均衡であるとき。

16 この条の規定（3の規定を除く。）に基づいて支援が行われる前に、両締約国の権限のある当局は、
この条の規定の実施方法（各締約国に対する支援の程度の均衡を確保するための合意を含む。）につい
て合意する。特に、両締約国の権限のある当局は、一方の締約国が特定の年において行うことができる
支援の要請の数の上限、支援を要請することができる租税債権の最低金額及びこの条の規定に基づいて

23

徴収された額の送金に関する手続規則について合意する。

第十四条

1 二千三年議定書1(a)中「合衆国の消費税」を「連邦消費税」に、「当該消費税」を「当該連邦消費税」に改め、二千三年議定書1(b)中「合衆国の消費税」を「連邦消費税」に改める。

2 二千三年議定書9を次のように改める。

9 削除

3 二千三年議定書13の次に次の14及び15を加える。

14 条約第二十五条5から7までの規定に関し、

(a) 条約第二十五条5の規定の適用上、租税が支払われ、若しくは租税について賦課その他の決定(例えば、納税義務の更正、決定又は不履行の通知の発出)がなされた場合又は税務当局により納税者に対してその所得のある要素について課税する意図がある旨の正式な通知(例えば、調整案の通知)が発出された場合には、一方又は双方の締約国の措置により課税を受けたものとされることが了解される。

24

(b)　仲裁のための委員会は、三人の個人により構成される。任命される構成員は、当該構成員を選定す
る締約国の税務当局若しくは財務省の職員である者又は仲裁手続が開始する日に先立つ十二箇月の期
間内にそれらの職員であった者であってはならない。各締約国の権限のある当局は、仲裁のための委
員会の構成員の一人を選定する。一方の締約国の権限のある当局が、条約第二十五条７(ⅰ)の規定に基
づく両締約国の権限のある当局の合意に定める方法により、かつ、当該合意に定める期間内に仲裁の
ための委員会の構成員の一人を選定しない場合には、他方の締約国の権限のある当局が仲裁のための
委員会の第二の構成員を選定する。そのように選定された二人の構成員は、仲裁のための委員会の長
となる第三の構成員を選定する。当該二人の構成員が、同条７(ⅰ)の規定に基づく両締約国の権限のあ
る当局の合意に定める方法により、かつ、当該合意に定める期間内に第三の構成員を選定しない場合
には、当該二人の構成員は解任され、各締約国の権限のある当局は、仲裁のための委員会の新たな構
成員の一人を選定する。仲裁のための委員会の長は、いずれかの締約国の国民又は適法な永住者で
あってはならない。さらに、任命される構成員は、自らが仲裁のための委員会の構成員となる仲裁手
続において問題となる特定の事項に関与したことがあってはならない。

25

(c) 仲裁のための委員会がその決定を両締約国の権限のある当局に対して送付するまでにその仲裁に係る事案が次のいずれかに該当することとなる場合には、その事案に関する両締約国の権限のある当局の合意のための手続（仲裁手続を含む。）は終了する。

(i) 両締約国の権限のある当局が、条約第二十五条の規定に従い、当該事案を解決するための合意に達する場合

(ii) 当該事案について申立てをした者が仲裁の要請を撤回する場合

(iii) 仲裁手続中に、当該事案についていずれか一方の締約国の裁判所又は行政審判所が決定を行う場合

(iv) 当該事案の関係者又は権限を与えられたその代理人のいずれかが、条約第二十五条5(b)の規定により求められる開示しない旨の書面に故意に違反し、かつ、両締約国の権限のある当局が、その違反があったことによって仲裁手続を終了させるべきであることを合意する場合

(d) 各締約国の権限のある当局は、事案において提起された調整又は類似の事項のそれぞれに対処する解決案を提出することができる。当該解決案は、当該事案全体を解決するものでなければならず、か

26

つ、両締約国の権限のある当局の間で既に合意した当該事案における全ての事項を修正することなく反映するものでなければならない。当該解決案は、当該事案における調整又は類似の事項のそれぞれについて、当該事案に対するこの条約の適用に基づく特定の金額（例えば、所得、利得、収益又は費用の金額）の決定又は条約の規定に従って課される税率の上限の決定に限られる。各締約国の権限のある当局は、また、仲裁のための委員会による検討のために意見書を提出することができる。

(e)  (d)の規定にかかわらず、次のいずれかの事案に関する仲裁手続においては、両締約国の権限のある当局は、(i)から(iii)までに規定する課税の前提となる問題（例えば、恒久的施設が存在するか否かの問題）及び当該問題の解決に応じた決定（例えば、恒久的施設が存在すると決定された場合における当該恒久的施設に帰せられる利得の額の決定）のそれぞれに対処する解決案を提出することができる。

(i)  個人に対する課税に関し、両締約国の権限のある当局が、当該個人が居住者とされる締約国について合意に達することができなかった事案

(ii)  企業の事業利得に対する課税に関し、両締約国の権限のある当局が、恒久的施設が存在するか否かについて合意に達することができなかった事案

27

(iii) これらに類似する課税の前提となる問題の解決に応じて決定される他の事項に係る事案

(f) 仲裁手続が、二以上の調整又は類似の事項であって、それぞれについて特定の金額（例えば、所得、利得、収益又は費用の金額）の決定が必要なものから成る事案に関するものである場合には、解決案は、当該調整又は類似の事項のそれぞれについての決定を提案するものとすることができる。

(g) 各締約国の権限のある当局は、他方の締約国の権限のある当局が提出した解決案及び意見書を受領するものとし、仲裁のための委員会に応答書を提出することが認められる。各締約国の権限のある当局は、他方の締約国の権限のある当局の応答書を受領する。

(h) 事案について申立てをした者は、仲裁のための委員会による検討のために、当該事案についての自己の分析及び意見を記載した書面を提出することが認められる。当該書面は、両締約国の権限のある当局の合意のための手続において事前に両締約国の権限のある当局に提供されなかった情報を含まないものとし、両締約国の権限のある当局が入手することができるものとする。

(i) 仲裁のための委員会は、その決定を両締約国の権限のある当局に対して書面により送付する。仲裁

28

のための委員会の決定は、調整又は類似の事項及び課税の前提となる問題のそれぞれに関して両締約国の権限のある当局が提出した解決案のうちのいずれかに限られ、当該決定の理由その他の説明を含まない。仲裁のための委員会の決定は、他の事案における条約の適用に関して先例としての価値を有しない。

(j) 事案について申立てをした者は、両締約国の権限のある当局が期間を延長することについて合意する場合を除くほか、仲裁のための委員会の決定を受領した日の後四十五日以内に、当該事案が申し立てられた締約国の権限のある当局に対し、当該決定を受け入れる旨を書面により通知する。当該申立てをした者が当該権限のある当局に対しその旨を通知しない場合には、当該決定は受け入れられなかったものとする。さらに、当該事案について訴訟又は審査請求が行われている場合において、当該訴訟又は審査請求の当事者であるいずれかの関係者が、第一文に定める期間内に、関連する裁判所又は行政審判所に対し、仲裁手続において解決された全ての事項に関する訴訟又は審査請求を取り下げる旨を通知しないときは、当該決定は当該事案について申立てをした者により受け入れられなかったものとする。当該決定が受け入れられない場合には、当該事案について、両締約国の権限のある当局

29

による更なる検討は行われない。

(k) 仲裁のための委員会の構成員の報酬及び費用並びに両締約国が実施する手続に関連して生ずる費用については、両締約国が衡平に負担する。

15 条約第二十七条5の規定に関し、

(a) 租税債権が最終的に決定されたものであるか否かを判断するに当たり、

(i) 合衆国については、当該租税債権に関連して納税者が行使することができる行政上又は司法上の権利であって当該租税債権の徴収の後に発生するものは、考慮されない。

(ii) 日本国については、日本国の行政事件訴訟法（昭和三十七年法律第百三十九号）第三十六条の規定に従って訴訟を提起する権利は、考慮されない。

(b) 一方の締約国は、他方の締約国の措置により条約第二十七条に規定する両締約国の間の支援の程度において不均衡が生じたと認める場合には、支援を停止することができる。この場合には、両締約国は、同条16の規定に整合的となる支援の程度の均衡を回復するため、協議を行う。

第十五条

30

1 この議定書は、批准されなければならない。批准書は、できる限り速やかに交換されるものとする。この議定書は、批准書の交換の日に効力を生ずる。

2 この議定書は、次のものについて適用する。

 (a) 源泉徴収される租税に関しては、この議定書が効力を生ずる日の三箇月後の日の属する月の初日以後に支払われ、又は貸記される額

 (b) その他の租税に関しては、この議定書が効力を生ずる年の翌年の一月一日以後に開始する各課税年度

3 2の規定にかかわらず、第十一条の規定によって改正される条約第二十五条5から7までの規定は、次のものについて適用する。

 (a) この議定書が効力を生ずる日において両締約国の権限のある当局が検討を行っている事案。当該事案に係る開始日は、この議定書が効力を生ずる日の後に検討が行われる事案

 (b) この議定書が効力を生ずる日の後に検討が行われる事案

4 2の規定にかかわらず、第十二条の規定によって改正される条約第二十六条及び第十三条の規定によって改正される条約第二十七条の規定は、この議定書が効力を生ずる日から適用する。

31

5 この議定書の効力発生の時において条約第二十条の規定によって認められる特典を受ける権利を有する個人は、この議定書が効力を生じた後においても、この議定書が効力を生じなかった場合に当該特典を受ける権利を失う時まで当該特典を受ける権利を引き続き有する。

6 この議定書は、条約が有効である限り効力を有する。

以上の証拠として、下名は、各自の政府から正当に委任を受けてこの議定書に署名した。

二千十三年一月二十四日にワシントンで、ひとしく正文である英語及び日本語により本書二通を作成した。

32



アメリカ合衆国政府のために

日本国政府のために

33

**DEPARTMENT OF STATE**

**WASHINGTON**

January 24, 2013

Excellency:

I have the honor to acknowledge receipt of Your Excellency's Note of today's date which reads as follows:

"I have the honor to refer to the Protocol signed today (hereinafter referred to as "the Protocol of 2013"), to the Convention between the Government of Japan and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income, signed at Washington on 6 November 2003, as amended by the Protocol of 2013 (hereinafter referred to as "the Convention"), to the Protocol signed at Washington on 6 November 2003 as amended by the Protocol of 2013 (hereinafter referred to as "the Protocol of 2003") and to the agreement effected by exchange of notes between the Government of Japan and the Government of the United States of America on 6 November 2003 concerning taxation (hereinafter referred to as "the Notes of 2003"), and to make, on behalf of the Government of Japan, the following proposals:

1.    Paragraphs 5, 7 and 8 of the Notes of 2003 shall be deleted and paragraph 6 of the Notes of 2003 shall be renumbered as paragraph 5.

2.    It is understood that the "special income tax for reconstruction" and the "special corporation tax for reconstruction" enacted under the Act on Special Measures Concerning Securing Financial Resources Necessary for Implementing Measures for Reconstruction in Response to the Great East Japan Earthquake (Law No. 117 of 2011) of Japan are identical or substantially similar taxes within the meaning of paragraph 2 of Article 2 of the Convention.

His Excellency
Mr. Kenichiro Sasae
Ambassador Extraordinary
and Plenipotentiary of Japan
to the United States of America

**DIPLOMATIC NOTE**

3.      With reference to Article 15 of the Convention, it is understood that if a resident of a Contracting State does not serve as a member of a board of directors of a company, Article 15 of the Convention does not apply to his remuneration regardless of his title or position.    In addition, it is understood that where a member of the board of directors of a company also has other functions (for example, as ordinary employee, advisory, or consultant) with the company, Article 15 of the Convention does not apply to remuneration paid to such a person on account of such other functions.

4.      With reference to paragraph 5 of Article 25 of the Convention, it is understood that the fact that tax collection procedures may have been suspended shall not affect a determination that taxation not in accordance with the provisions of the Convention has resulted from the actions of one or both Contracting States.

5.      With reference to paragraph 1 of Article 27 of the Convention, it is understood that the obligation to lend assistance shall be satisfied in cases where the requested State had made reasonable efforts to lend assistance but was unsuccessful in collecting the revenue claim on behalf of the applicant State.

6.      With reference to clause (i) of subparagraph (a) of paragraph 4 of Article 27 of the Convention, it is understood that the term "the consumption tax" means only the consumption tax imposed by Japan, and does not include any consumption tax imposed by a local authority of Japan.

7.      With respect to clause (ii) of subparagraph (b) of paragraph 4 of Article 27 of the Convention and subparagraph (a) of paragraph 1 of the Protocol of 2003, it is understood that the term "Federal excise tax on insurance policies issued by foreign insurers" means taxes imposed pursuant to Section 4371 through 4374 of the Internal Revenue Code of the United States.

8.      With respect to clause (iii) of subparagraph (b) of paragraph 4 of Article 27 of the Convention and subparagraph (b) of paragraph 1 of the Protocol of 2003, it is understood that the term "Federal excise tax imposed with respect to private foundations" means taxes imposed pursuant to Section 4940 through 4948 of the Internal Revenue Code of the United States.

9.    With reference to clause (iv) of subparagraph (b) of paragraph 4 of Article 27 of the Convention, it is understood that the term "the Federal taxes related to employment and self-employment" means taxes imposed pursuant to Chapter 2 and Chapters 21 through 23A of the Internal Revenue Code of the United States.

10.    With reference to paragraph 4 of Article XV of the Protocol of 2013, it is understood that Article 26 and Article 27 of the Convention shall have effect from the date of the entry into force of the Protocol of 2013, without regard to the taxable year to which the matter or revenue claim relates, provided all of the conditions and requirements of the respective Articles are satisfied.

    If the foregoing proposals are acceptable to the Government of the United States of America, I have further the honor to suggest that the present Note and Your Excellency's Note in reply shall constitute an agreement between the two Governments on this matter, which shall enter into force on the same date as the Protocol of 2013 amending the Convention between the Government of Japan and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income, signed at Washington on 6 November 2003."

    The foregoing proposals being acceptable to the Government of the United States of America, I have further the honor to confirm that Your Excellency's Note and this Note in reply shall constitute an agreement between our two Governments on this matter, which shall enter into force on the same date as the Protocol signed today.

    I avail myself of this opportunity to extend to Your Excellency the assurance of my highest consideration.


                                        For the Secretary of State,



3

<u>Translation</u>

Washington, January 24, 2013

Excellency:

I have the honor to refer to the Protocol signed today (hereinafter referred to as "the Protocol of 2013"), to the Convention between the Government of Japan and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income, signed at Washington on 6 November 2003, as amended by the Protocol of 2013 (hereinafter referred to as "the Convention"), to the Protocol signed at Washington on 6 November 2003 as amended by the Protocol of 2013 (hereinafter referred to as "the Protocol of 2003") and to the agreement effected by exchange of notes between the Government of Japan and the Government of the United States of America on 6 November 2003 concerning taxation (hereinafter referred to as "the Notes of 2003"), and to make, on behalf of the Government of Japan, the following proposals:

1.    Paragraphs 5, 7 and 8 of the Notes of 2003 shall be deleted and paragraph 6 of the Notes of 2003 shall be renumbered as paragraph 5.

2.    It is understood that the "special income tax for reconstruction" and the "special corporation tax for reconstruction" enacted under the Act on Special Measures Concerning Securing Financial Resources Necessary for Implementing Measures for Reconstruction in Response to the Great East Japan Earthquake (Law No. 117 of 2011) of Japan are identical or substantially similar taxes within the meaning of paragraph 2 of Article 2 of the Convention.

Her Excellency
Ms. Hillary Rodham Clinton
The Secretary of State
of the United States of America

3.    With reference to Article 15 of the Convention, it is understood that if a resident of a Contracting State does not serve as a member of a board of directors of a company, Article 15 of the Convention does not apply to his remuneration regardless of his title or position.    In addition, it is understood that where a member of the board of directors of a company also has other functions (for example, as ordinary employee, advisory, or consultant) with the company, Article 15 of the Convention does not apply to remuneration paid to such a person on account of such other functions.

4.    With reference to paragraph 5 of Article 25 of the Convention, it is understood that the fact that tax collection procedures may have been suspended shall not affect a determination that taxation not in accordance with the provisions of the Convention has resulted from the actions of one or both Contracting States.

5.    With reference to paragraph 1 of Article 27 of the Convention, it is understood that the obligation to lend assistance shall be satisfied in cases where the requested State had made reasonable efforts to lend assistance but was unsuccessful in collecting the revenue claim on behalf of the applicant State.

6.    With reference to clause (i) of subparagraph (a) of paragraph 4 of Article 27 of the Convention, it is understood that the term "the consumption tax" means only the consumption tax imposed by Japan, and does not include any consumption tax imposed by a local authority of Japan.

7.    With respect to clause (ii) of subparagraph (b) of paragraph 4 of Article 27 of the Convention and subparagraph (a) of paragraph 1 of the Protocol of 2003, it is understood that the term "Federal excise tax on insurance policies issued by foreign insurers" means taxes imposed pursuant to Section 4371 through 4374 of the Internal Revenue Code of the United States.

8.    With respect to clause (iii) of subparagraph (b) of paragraph 4 of Article 27 of the Convention and subparagraph (b) of paragraph 1 of the Protocol of 2003, it is understood that the term "Federal excise tax imposed with respect to private foundations" means taxes imposed pursuant to Section 4940 through 4948 of the Internal Revenue Code of the United States.

9.   With reference to clause (iv) of subparagraph (b) of paragraph 4 of Article 27 of the Convention, it is understood that the term "the Federal taxes related to employment and self-employment" means taxes imposed pursuant to Chapter 2 and Chapters 21 through 23A of the Internal Revenue Code of the United States.

10.  With reference to paragraph 4 of Article XV of the Protocol of 2013, it is understood that Article 26 and Article 27 of the Convention shall have effect from the date of the entry into force of the Protocol of 2013, without regard to the taxable year to which the matter or revenue claim relates, provided all of the conditions and requirements of the respective Articles are satisfied.

If the foregoing proposals are acceptable to the Government of the United States of America, I have further the honor to suggest that the present Note and Your Excellency's Note in reply shall constitute an agreement between the two Governments on this matter, which shall enter into force on the same date as the Protocol of 2013 amending the Convention between the Government of Japan and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income, signed at Washington on 6 November 2003.

I avail myself of this opportunity to extend to Your Excellency the assurance of my highest consideration.

Kenichiro Sasae
Ambassador Extraordinary
and Plenipotentiary of Japan
to the United States of America



Change indent

○↑　○↑ (ix)

仲裁のための委員会によるその任務の遂行のために必要な追加的な手続の採用

他の規則及び手続について、書面によって合意することができる。

両締約国の権限のある当局は、5、6及びこの7の規定を効果的かつ適時に実施するために必要な

第十二条

条約第二十六条を次のように改める。

1

第二十六条

両締約国の権限のある当局は、この条約の規定の実施又は両締約国が課する全ての種類の租税に関す

る両締約国の法令（当該法令に基づく課税がこの条約の規定に反しない場合に限る。）の運用若しくは

執行に関連する情報を交換する。情報の交換は、第一条1及び第二条の規定による制限を受けない。一

方の締約国の権限のある当局から特に要請があった場合には、他方の締約国の権限のある当局は、文書

（帳簿、書類、財務諸表、記録、計算書及び書面を含む。）の原本の写しに認証を付した形式で、この

条の規定に基づく情報の提供を行う。

2

1の規定に基づき一方の締約国が受領した情報は、当該一方の締約国がその法令に基づいて入手した

15

(x)  仲裁のための委員会によるその任務の遂行のために必要な追加的な手続の採用

両締約国の権限のある当局は、5、6及びこの7の規定を効果的かつ適時に実施するために必要な他の規則及び手続について、書面によって合意することができる。

第十二条

条約第二十六条を次のように改める。

第二十六条

1

両締約国の権限のある当局は、この条約の規定の実施又は両締約国が課する全ての種類の租税に関する両締約国の法令(当該法令に基づく課税がこの条約の規定に反しない場合に限る。)の運用若しくは執行に関連する情報を交換する。情報の交換は、第一条1及び第二条の規定による制限を受けない。一方の締約国の権限のある当局から特に要請があった場合には、他方の締約国の権限のある当局は、文書(帳簿、書類、財務諸表、記録、計算書及び書面を含む。)の原本の写しに認証を付した形式で、この条の規定に基づく情報の提供を行う。

2

1の規定に基づき一方の締約国が受領した情報は、当該一方の締約国がその法令に基づいて入手した

15

# Exhibit 62

**Japan**

Branch Reporter
Naoki Matsuda[1]

## Summary and conclusions

Japan utilises withholding tax extensively. Part I of this report deals with the function of withholding tax in domestic settings. It explains that the withholding tax system has its merits and demerits and some of them are magnified by Japan's year-end adjustment system that exempts the majority of salary income earners from the obligation to file income tax returns. As for the demerits of withholding tax, a spotlight is placed on the risk of incurring a penalty when failing to fulfil the withholding obligation properly by highlighting a few examples of cases in which such risk actually materialised. Those examples include cases in which it was the payees who were responsible for shortfalls in withholding tax collected, while payers/withholding agents might not be even aware that their withholding obligation had arisen, to say nothing of not knowing how much tax was to be withheld at source. References are also made to the withholding tax rule governing the relationship between withholding tax and income tax; a rule that gave rise to cases where it worked unfavourably against withholding agents, as well as other cases where it prevented the tax authority from collecting the right amount of tax.

Part II of the report covers the international aspects of withholding tax. There is much similarity in nature between the challenges facing the withholding tax system in the domestic context and those confronted in the international context, but some challenges are unique to the international context. For example, there has lately been a growing trend of tax treaties concluded to downscale source country taxation. There are also differences between domestic laws and tax treaties with respect to the source rules on some categories of income. The penalty risk borne by payers/withholding agents also takes on a different shade of colour in cases where payees are not residents in Japan. And in Japan this risk is likely to be higher in the international context, partly because the withholding obligation also falls on individuals and corporations that are not accustomed to withholding tax at source. Despite such challenges, the scope of application for the withholding tax is expanding vis-a-vis the increase in international tax avoidance, while additional measures have also been taken lately to reduce the risk for withholding agents of incurring a penalty.

Part III looks into the interaction of withholding tax with various types of investment vehicles or CIVs. There has lately been an increase in the number of tax avoidance and treaty shopping cases involving CIVs and, in some cases, the lack of appropriate legal actions has prevented the Japanese tax authority from counteracting them properly. Certainly, various countermeasures have recently been adopted. They include one that places a limit on setting off losses distributed by CIVs to their investors against other income. There is also one that extends the application of withholding tax to the profit distributions made by some CIVs to their investors. Nevertheless, it seems that there are still tax schemes involving CIVs for which the function of the withholding tax system would do well to be comple-

---

[1]     Dr. Matsuda currently holds the post of director at the Second Department of the Tokyo Tax Tribunal.

mented by measures that adopt new comprehensive anti-avoidance rules in domestic acts or in tax treaties that would enable the tax authority to cope better with those tax schemes whose aim is to avoid Japan's withholding tax or to unjustifiably receive the treaty benefits that Japan's tax treaties provide for.

Part IV explores the issue concerning the taxation of electronic commerce or digital transactions, which is posing quite a challenge to the conventional tax system. In the field of indirect taxes, Japan's Consumption Tax Act (VAT Act) has lately been amended to realise a fairer tax treatment for digital services provided to residents by domestic business providers and by foreign business providers. But no significant amendments targeted directly at overcoming difficulties in taxing digitized transactions have been made yet in the field of direct taxes. The taxation of digital transactions is challenging, partly because it is difficult in some cases to gain a good grip on them. Also, there continues to be much room for increasing the transparency of the tax treatment given to income derived from digital transactions, especially in cases where the applicable tax treatment varies depending, fundamentally, on whether commodities are transacted physically or electronically. Digital transactions also challenge the effectiveness of the conventional PE-based taxation method because digital services could be provided via the Internet without the service provider's PE being located in a country where their users reside.

In particular, uncertainty remains about what type of cross-border payments made for the transfer of intellectual property rights constitute payments of royalty, which is subject to withholding tax, and about what type of facility and function constitute a PE that gives rise to taxation in the source country. Recent actions of Japan's tax authority in relevant cases have revealed its determination to not interpret its taxation rights as the source country narrowly, but they have encountered some difficulties and problems in this respect. Analysis of these cases, as well as the potential of withholding tax in Japan, leads the author to conclude that, in the era of BEPS, CIVs and the digital economy, Japan needs additional measures to realise the following: (i) fairer income tax treatment between digital transactions and non-digital transactions, (ii) further clarity for withholding agents and taxpayers with respect to the tax treatment of various digital transactions, (iii) prevention of tax base erosion by digital transactions and aggressive tax strategies utilising CIVs. It is quite likely that these measures would include ones that upgrade the function of the withholding tax system.

# Part I: Overview of withholding tax

## 1.1 General overview of income tax system

The Japanese Income Tax Act (ITA) classifies income into 10 categories; interest income, dividend income, real-estate income, business income, salary income, retirement income, timber income, capital gains, occasional income and miscellaneous income. They are subject to either the aggregate (income) taxation method or the separate (income) taxation method. Income combined under the aggregate taxation method is subject to the progressive tax rate ( 5, 10, 20, 23, 33 or 40 per cent ), while the fixed tax rate applicable to the majority of income is subject to the separate taxation method at a rate of 10, 15 or 20 per cent, depending

on the income category.[2] Loss set-off against profit between the different categories of income is limited and only net loss in real-estate income, business income, timber income and a few categories of capital loss can, in principle, be set off against the other categories of income.[3]

Generally speaking, the income category determines the applicable taxation method and the applicability of withholding tax. For example, both real-estate income and salary income are invariably subject to the aggregate taxation method, but withholding tax is applicable only to the latter. Some categories of income, such as interest income (excluding interest on specific public bonds, etc.), are subject to the separate taxation method and the withholding tax applicable to them at source is final. But the other categories of income subject to the separate taxation method need to be filed irrespective of whether or not withholding tax is applicable to them.[4] While the applicable taxation method for some categories of income and the applicability of withholding tax vary, depending on which subcategories they fall under or on which method, when options are available, the choice is up to the income earner.[5]

In the case of an individual resident,[6] the following categories of income are, in principle, subject to withholding tax at source at the bracketed rate, respectively: (i) interest income (15 per cent), (ii) dividend income (15 per cent for listed stocks and 20 per cent for unlisted stocks), (iii) employment income (5, 10, 20, 23, 33, 40 or 45 per cent), (iv) retirement income (same rates as (iii)), (v) national pension (5 or 10 per cent), (vi) fees and remunerations (10 per cent), (vii) private pension (15 per cent), (viii) compensation money for benefits of a periodical deposit (15 per cent ), (ix) distribution of profit based on silent partnership contracts and other analogous arrangements (20 per cent), (x) capital gains from the transfer of listed stocks within a specified account in a financial instruments business (15 per cent), (xi) prize money from fixed-term deposit with prize (15 per cent), (xii) profit from the redemption of discount bonds (16 or 18 per cent).

In the case of a domestic corporation,[7] withholding tax is applicable to the abovementioned income (i), (ii), (viii), (ix), (xi), (xii) and to a prize from horse racing paid to a corporate horse owner,[8] while the withholding tax rate applicable to each of these categories of income

---

[2]  From 2013 to 2037, Special Income Tax for Reconstruction (introduced for procuring financial resources for reconstructing disaster-stricken Fukushima areas) is to be imposed or withheld at source together with income tax, so that the combined rate is the income tax rate x 102.1 per cent. In addition, the local tax on various categories of income is withheld at source.

[3]  For example, the set-off of capital loss from the transfer of listed stocks against the other categories of income is possible only when it meets certain conditions. Business income loss from the transfer of stocks, etc., is to be excluded when calculating the net business income loss to be set off against other categories of income.

[4]  For instance, gains from both the redemption of general public corporation bonds and timber income need to be filed and are subject to the separate taxation method, while withholding tax is applicable to the former but not to the latter.

[5]  For example, as for capital gains from the transfer of listed stocks, etc., a taxpayer could opt for the application of the separate taxation method and final withholding tax to it, provided the transfer is made within his pre-registered, specified account of a financial instruments business in Japan.

[6]  ITA s. 2(1)1 defines a resident as an individual who has a domicile in Japan or continues to have a residence in Japan for a year or longer.

[7]  A domestic corporation is defined under ITA s. 2(1)6 as a corporation that is headquartered or has its main office in Japan.

[8]  A prize from horse racing paid to an individual owner comes under the income category of fees and remunerations.

JAPAN

is, in principle, the same irrespective of whether or not it is earned by an individual or a corporation. With respect to the withholding procedure, ITA provides in section 181, section 199, section 212(3), etc., that those who pay to a resident or a domestic corporation in Japan the abovementioned categories of income that are subject to withholding tax should, in principle, withhold it at the time of its payment and deliver it to the authorities by the legal deadline (in principle, 10th day of the month following the month of the payment day). Failure on the part of a withholding agent to properly fulfil its withholding obligation incurs a penalty and, when applicable, an interest charge as well.

The administrative penalty imposed on a withholding agent is 10 per cent (35 per cent in a case involving concealment or the fabrication of facts in the process of fulfilling the withholding obligation) of the withholding tax for which it failed to fulfil its withholding obligation. The Act on General Rules for National Tax (AGRNT), section 60 stipulates that the annual interest rate on a delayed tax payment is 14.6 per cent (for the first two months, it is 7.3 per cent instead), but the Special Taxation Measures Act (STMA), section 94, introduced by the 1999 tax reform overrides AGRNT, section 60 and now stipulates it is the lower of 7.3 per cent and one per cent + "special standard rate" (designated annually in the notice issued by the Minister of the Treasury in light of the financial institutions' average short-term lending rate in the preceding year, and it is 1.7 per cent for 2019 ) for the first two months and thereafter the lower of 14.6 per cent and 7.3 per cent + "special standard rate".[9]

## 1.2 Role of withholding tax in domestic settings

The merits of the withholding tax system include 1) its efficiency in tax administration, 2) its counteraction against tax avoidance and non-reporting of income. Its demerits include (i) withholding agents' compliance cost and risk of penalty, (ii) digression from the ability-to-pay principle. Japan's year-end adjustment system on income tax works towards magnifying the aforementioned merit 1) and demerit (i). Under the system, the payees of salaries should submit to their payers a report so that the payers can determine the payee's eligibility for dependent deductions, etc. Then, around the end of the year, the payers calculate, adjust, withhold and pay the remaining withholding tax due on their annual salaries in order to relieve most of them of the burden of filing income tax returns because, in most cases, the amount of standard deduction applicable to them is larger than the amount of itemised deduction and their only other income is the interest from bank savings that is subject to the final withholding at source.[10]

The degree of the above-mentioned demerit (i) (withholding agents' compliance cost and risk of penalty) is also affected by the height of the hurdles that have to be cleared for penalty exemption, while it is sometimes difficult to know that a withholding obligation has arisen, to say nothing of knowing how much withholding tax is to be collected and paid by the legal deadline. Chapter 6 of AGRNT lists two kinds of cases in which the administrative penalty on a taxpayer's non/under-reporting of income tax and on a withholding agent's

---

[9]   In the case of a refund of over-withheld tax, interest, when applicable, not at the rate of 7.3 per cent stipulated under AGRNT s. 58, but the lower of 7.3 per cent and 1 per cent + "special standard rate" is also to be paid to the withholding agent.

[10]   Categories of expenses deductible in accordance with the itemised deduction method are quite limited, so every year there is only a small number of salary income earners who employ this method in filing their tax returns.

8

failure in fulfilling its withholding obligation properly is exempted: one is when there is a reasonable cause for such an unlawful act, and the other is when a taxpayer's delayed filing of his tax return or a withholding agent's delayed payment is not in anticipation of the tax authority's post-audit correction of it. It is generally considered that the hurdles that have to be cleared for such exemption are quite high.

It is not that no due regard has been given to the burden and risk inherent to the legal obligation of withholding agents. Such attention has been given to ensure that this obligation does not become unnecessarily onerous. For instance, the administrative penalty rate on a taxpayer's delayed filing of his return goes up by five per cent to 20/15 per cent of tax due on non/under-reported income for the part exceeding the higher of 500,000 yen and the pre-reported income tax, while it is a flat rate of 10 per cent in the case of non/under-payment of withholding tax. Also noteworthy in this connection is the Osaka High Court's 26 September 1991 judgment dictating that a payer should check the formalities of a report submitted by a payee, but he does not shoulder the responsibility of checking its substance. So, it must simply withhold the amount of tax calculated in accordance with the payee's report. This judgment suggests that, in principle, even if the amount of withholding tax collected in accordance with the payee's report does not turn out to be in line with the ITA, the withholding agent may have a reasonable cause to be exempt from a penalty.

In spite of the above, the burden and risk borne by withholding agents is by no means negligible, especially because the word "pays" in ITA section 181, ITA section 212, and so forth, is defined broadly as the administrative ruling on income tax sections 181~223 (Common -1), where it mentions that it covers not only acts of giving real money, but also all kinds of acts of paying off debt. Various court rulings have also confirmed that the withholding obligation could arise rather unexpectedly and a penalty applies even in such cases as follows: (i) a top executive with a large shareholding ratio of a closely-held company/withholding agent usurps its money,[11] (ii) quasi-GAAR such as the Corporate Income Tax ACT (CITA) section 132 (denial of a family company's act or calculation) is applied to recharacterise a transaction between a family company/withholding agent and its main shareholder,[12] (iii) a real property of a company/withholding agent is sold to its executive at a significantly lower price than its market price.[13]

## 1.3 Legal status of withholding agent

There are also cases in which the withholding tax system poses problems for the tax authority and taxpayers. One example of such cases is the tax authority's inability to collect income tax either from the payer or from the payee due to the departure of the latter from the former before it is discovered that a larger amount of withholding tax should be collected from the latter, while it is the payee rather than the payer that is to be blamed for this shortfall in withholding tax collection.[14] Another example is a taxpayer's risk of his income tax being over-withheld at source and his employer is declared bankrupt before the

[11]  See Osaka High Court's 27 August 2003 judgment.
[12]  See the Supreme Court 14 December 1973 judgment.
[13]  See Tax Tribunal 27 November 1980 decision.
[14]  See Tax Tribunal 29 November 2006 decision mentioned later in this part.

9

employer applies to the tax office for a refund.[15] These problematic cases increase when the withholding tax rule laid down under ITA, section 221, which stipulates that uncollected withholding tax should be collected from the withholding agents, is interpreted and administered strictly.

In fact, court rulings have confirmed that the withholding tax rule laid down under ITA, section 221 should be strictly observed. Particularly, the Supreme Court ruled on 18 February 1990 as follows: (i) when the amount of withholding tax collected and paid is incorrect, the withholding agent can ask the authorities for a refund and the taxpayer can ask the withholding agent for the return of tax incorrectly withheld at source, which means there is no homogeneity between withholding tax and income tax, and only the withholding agent has a legal relationship with the authorities regarding the payment of withholding tax; (ii) even when the amount of tax withheld at source is incorrect, the taxpayer, in filing his income tax return, cannot deduct the incorrectly-withheld tax from the amount of income tax he owes nor can he receive the refund, and such treatment should not be a hindrance that stands in the way of protecting the taxpayer's right.

The decision of the Tax Tribunal on 27 November 2006 also followed the above-mentioned Supreme Court judgment of 18 February 1990 by rejecting the applicant's claim that the applicant could deduct, at the time of filing the income tax return, the over-withheld tax at source, and it upheld the imposition of administrative penalty on him for his under-reporting of income tax by concluding that there was no reasonable non-subjective cause on his part for a penalty exemption because, under the income tax system, it is a rule that a taxpayer should determine his income tax due and file his income tax return accordingly, while in this case the applicant asked a tax accountant to prepare his income tax return and did not pay enough attention to notice the mistake in the amount of withholding tax collected and mentioned on the withholding tax slip. As a result, he should face the penalty for his under-reporting of income tax.[16]

On the other hand, some flexibility regarding the withholding tax rule is observable in the administrative ruling on income tax sections 194-198 (Common-2). It states that, in a case in which a withholding agent cannot collect withholding tax from a taxpayer, the tax authority would not collect it from the withholding agent, provided that there is no fault on the part of the withholding agent and there is a reasonable cause for its inability to collect it. In fact, this administrative ruling may not serve as a digression from the withholding tax rule, because the Tax Tribunal decided on 29 November 2006 that the tax office's determination to collect income tax from the applicant/taxpayer that had not been collected due to the incorrect report he submitted to the withholding agent and his subsequent leave from the withholding agent should be cancelled because those cases to which this administrative ruling applies do not give rise to a taxpayer's obligation to file his income tax return.

The decision of the Tax Tribunal of 1 July 2010 may help to clarify further the degree of strictness of the withholding tax rule, as well as the relationship between a taxpayer, a withholding agent and the tax authority under the rule. In this decision, the Tax Tribunal upheld the imposition of an administrative penalty on the applicant/taxpayer at the rate of

---

[15]   Some maintain that, in such a case, a taxpayer should, as an exception, be allowed to adjust and deduct the over-withheld tax when filing his tax return or receive the refund. See Hiroshi Kaneko, *Sozeihou* (19th ed), *Koubundou* (2014) p.840.

[16]   AGRNT s. 115 ordains that a taxpayer should dispute the tax authority's administrative disposition on him before a tax tribunal before he brings the dispute to courts. AGRNT s. 102 dictates that tax tribunal's decision binds the tax authority.

35 per cent for his fabrication of facts in order to claim the application of a special housing loan deduction. It seems that the incorrect withholding tax collected and paid for the relevant years on his income was due to his official registration of his practically unoccupied residence and the submission to the withholding agent of an incorrect report on his true residence. So the shortfall in the tax collected by the withholding agent on his income would not affect the legality of applying this penalty to this case, in which he filed his income tax returns for those years claiming a set-off of capital loss against his other income, and so forth.

## Part II: Withholding tax for international transactions

### 2.1 Tax treatment of domestic source income

ITA section 212 prescribes in subsection (1) that a person in Japan who pays domestic source income (excluding some categories of such income) to a non-resident or a foreign corporation under ITA section 161 should withhold tax on such income at the time of its payment and deliver it to the authorities by the 10th day of the month following the month of the payment day, and states in subsection (2) that even in a case in which a person's payment of domestic source income to a non-resident or a foreign corporation is made abroad, it is obliged to collect withholding tax on such income, provided it has a domicile, residence, business office or a comparable establishment in Japan, and that its legal deadline for making said payment is the last day (not the 10th day) of the month following the month of the payment day. In this connection, it is to be noted that Japan's taxation method for a non-resident and a foreign corporation went through changes when the 2014 tax reform replaced the entire income approach with the attributable income approach.

ITA section 161 lists the following as a non-resident's domestic source income and tax is withheld, wherever applicable, at the bracketed rate: (i) income from business conducted in Japan, (ii) income from the utilisation or holding of assets located in Japan (excluding the following (viii)~(xvi)), (iii) income from the transfer of assets located in Japan, (iv) business profit distributed in accordance with partnership contracts (20 per cent), (v) capital gains from real-estate transfer (10 per cent), (vi) compensation for personal service provided in Japan (20 per cent), (vii) rent or other compensation for the use or lease of real estate located in Japan (20 per cent), (xii) salary and other remunerations for personal services performed in Japan (20 per cent), (xiii) monetary award for business advertisement (20 per cent), (xiv) pension from life insurance contracts (20 per cent), (xv) compensation money for the benefits of periodical deposits (20 per cent), (xvi) profit distributed in accordance with silent partnership contracts (20 per cent), (xvii) other domestic source income.

Reflecting the move to the attributable income approach, ITA section 164 classifies a non-resident either as one with a PE in Japan or one with no PE in Japan. It follows then, in principle, that in the case of a non-resident with a PE in Japan, the above-mentioned domestic source income (i)~(iii), as well as (xvii), that is attributable to the PE is subject to the aggregate taxation method, while the above-mentioned domestic source income (iv)~(xvi) that is attributable to the PE abides by the aggregate taxation method after being subjected to withholding tax. As for a non-resident with no PE in Japan, the above-mentioned domestic source income (i) and (iv) are non-taxable, and the above-mentioned domestic source income (v), (vi) and (vii), which are subject to withholding tax, as well as (ii),

(iii) and (xvii) abide by the aggregate taxation method, and the rest((viii)~(xvi)) are subject to the final withholding at source under the separate taxation method. These taxation methods for each of these types of domestic source income of a non-resident with no PE in Japan apply equally to a non-resident with a PE in Japan with respect to such income that is not attributable to the PE.

As for a foreign corporation, CITA section 138 and ITA section 161 list the following as its domestic source income and tax is withheld, wherever applicable, at the bracketed rate: **1** income from business conducted in Japan, **2** income from the utilisation or holding of assets located in Japan (excluding the following **7~10** ), **3** income from the transfer of assets ( limited to the transfer of real estate, rights on real estate, timber, shares in domestic corporations, quasi-business shares, real-estate business shares, shares in corporations running a golf course business), **4** compensation for personal service provided in Japan (20 per cent), **5** rent or other compensation for the use or lease of real estate located in Japan (20 per cent), **6** domestic source interest (15 per cent), **7** domestic source dividend (20 per cent), **8** interest on loans (20 per cent), **9** royalty (20 per cent), **10** monetary award for business advertisement (20 per cent), **11** pension from life insurance contracts (20 per cent), **12** compensation money for the benefits of periodical deposits (15 per cent), **13** profit distributed in accordance with silent partnership contracts (20 per cent), **14** other domestic source income.

CITA section 141 classifies a foreign corporation as either one with a PE in Japan or one with no PE in Japan. It follows then, in principle, that a foreign corporation with a PE in Japan needs to file a corporate income tax return for all of the above domestic source income, provided that it is attributable to the PE in Japan and the above domestic source income **4~13** are subject to withholding tax at source. In the case of a foreign corporation with no PE in Japan, the above domestic source income **2~5** (as for **4** and **5**, they are subject to withholding tax) and **14** need to be filed for corporate income tax purposes, the above domestic source income **1** (excluding profit distributed in accordance with partnership contracts) is not taxable in Japan, and the rest (**6~13**) is subject to the final withholding at source. The tax treatments given to the various domestic source income of a foreign corporation with no PE in Japan are also applicable to domestic source income that is not attributable to a PE in Japan of a foreign corporation.

## 2.2 Burden and risk of withholding on domestic source income

The above-mentioned tax treatments on the domestic source income of a non-resident and a foreign corporation reveal that withholding tax is extensively applicable and the risk of penalty may be high, particularly in cases where withholding agents are not accustomed to withholding tax at source. But, to their relief, there are some exceptions made to the aforementioned principles of tax treatments. For example, STMA states in section 37-10 and section 37-11 that, in principle, no withholding tax is applicable to capital gains from the transfer of listed and unlisted stocks by a non-resident with a PE in Japan and the capital gains are subject to the separate taxation method when he files an income tax return on them. Also, the administrative order in ITA section 281-3 decrees that capital gains from a non-resident/foreign corporation's transfer of real estate in Japan are exempt from withholding tax if the resident transferee is an individual who acquires it at 100 million yen or less in order to utilise it as his or his relative's residence.

ITA section 180 and ITA section 214 are also noteworthy measures that help reduce the penalty risk on withholding agents. They were introduced from the viewpoint that a

non-resident and a foreign corporation, if they have a PE in Japan, are not different from a resident and a domestic corporation in terms of tax status and it is legitimate to exempt certain categories of their domestic source income from withholding tax. ITA section 214 prescribes that no withholding tax is imposed on certain categories of a non-resident's domestic source income (i.e. (iv), (vi), (vii), (x), (xi), (xii), (xiv) mentioned in 2.1) that is attributable to his PE in Japan, provided that he has acquired from a tax office a certificate of exemption from withholding tax and shows it to the withholding agent. A treatment similar to this is also laid down under ITA section 180 for a foreign corporation with its PE in Japan that meets similar requirements.

Despite such measures as mentioned above that help reduce the burden and risk of a withholding agent, there are cases in which such risks do materialise. For instance, on 19 May 2016, the Tokyo District Court upheld the tax authority's imposition of an administrative penalty due to the plaintiff/corporation's failure to withhold tax on its payment to a non-resident for the purchase of his real estate in Japan by ruling that the applicant should have, by paying attention to the possibility of the payee being a non-resident, inquired into his living conditions (frequency of entry into and exit from Japan, length of stay in the US, location of his assets, his family and so forth) in order to confirm his tax status. So its judgment of his tax status based simply on some documents such as his residence certificate does not constitute a proper exercise of caution on its part. This ruling was supported by the Tokyo High Court judgment of 1 December 2016.

The Tax Tribunal's 21 May 2013 decision implies that the level of caution to be exercised by a resident payer for determining whether or not withholding tax needs to be collected may not be so high. The tax authority imposed an administrative penalty in this case, in which the applicant paid rent several times to its non-resident owner without collecting withholding tax and claimed the inapplicability to this case of the withholding tax rule confirmed by the aforementioned Osaka High Court judgment of 26 September 1991. But the Tax Tribunal cancelled the penalty by stating that the applicant's rent payment required little contact with the owner and there were no facts implying receipts or other documents being handed over to the applicant at the time of its rent payment, so it would not be reasonable for the applicant to go through cumbersome procedures to discover the change of the owner's residence and his failure to withhold tax in time was, after all, due to the owner's delayed notification to the applicant concerning the change of his residence.

## 2.3 Interaction with tax treaties

The application scope of withholding tax is affected by tax treaties. In this connection, it is to be noted that treaties override domestic laws in accordance with article 98 of the Constitution. ITA section 162 and CITA section 139 also provide that, where there are differences in tax treatments for domestic source income between the provisions of domestic laws and those of tax treaties, the latter overrides the former and the latter are applicable to residents of the treaty partner. Consequently, there are many categories of domestic source income taxable under domestic laws but not taxable in Japan under some of its tax treaties. Categories of income on which a source country's taxation is restricted by Japan's tax treaties include (i) interest, (ii) dividends, (iii) royalties for industrial property, (iv) remunerations for services provided by professional artists, (v) payment for renting ships and aircraft, (vi) payment for patent transfer, (vii) payment to temporary visitors, and so forth.

Domestic laws and treaties also differ in their categorisation of and source rules on

income. Such differences are conspicuous, particularly with respect to income derived from transfers of intellectual property rights. For instance, some treaties categorise payments received for the transfer of industrial property rights as royalty, while some others categorise it as capital gains or other income.[17] There are also tax treaties that categorise it as royalty or capital gains depending on whether the transfer is genuine or not. One such example is article 8 of the Exchange Notes to the Japan-Germany tax treaty, which regards as capital gains such payment received for the genuine transfer of a patent and the like that does not leave behind any concerned rights whatever on the part of the transferor, and the payment received for such genuine transfer is exempt from the source country taxation.

As for the source rules on royalty payments for the transfer of intellectual property rights, article 12(1) of the OECD MTC grants the right to tax royalty paid to a country where a beneficiary of the royalty payment is a resident. But many tax treaties grant a source country the right to tax royalty payments. In fact, most of Japan's tax treaties grant the right to tax royalty payments made for licensed intellectual property rights to a country where its user is a resident.[18] On the other hand, under some other tax treaties of Japan and ITA section 161(1)11, withholding tax may be applicable to such payment of royalty because they base themselves on the principle that the source of royalty paid for licensed intellectual property rights is in a country where it is used. Therefore, the way by which such royalty payment is to be taxed varies depending on which tax treaties are relevant.

In addition, even if the source rule on royalty paid for licensed intellectual property rights under a relevant tax treaty happens to be identical to that under ITA section 161(1)11, there might be a difference between them in the standard by which a place of its usage is determined as some court cases imply. For example, in a case where a domestic corporation paid royalty to a US corporation for the licensed know-how that enables the domestic corporation to produce commodities in Japan based on such know-how and sell them in the US, the Tokyo District Court ruled on 13 May 1985 that the royalty should be deemed to be paid not for the sale of such commodities but for their production, so that all of the royalty paid is domestic source income that is subject to withholding tax in Japan in accordance with ITA section 161(7) and article 14(1) of Japan-US tax treaty effective at that time.

While, in a different case, the Tokyo high court ruled on 15 December 1998 that it is not necessarily correct to adopt the theory that the essence of a patent lies not in the sale of commodities, but rather in their production and the court regarded the place of production as the source country for royalties because the patent right is, in principle, exercised in every step of production, usage and sales, and, in this case, most important were the sales in the US, so that the appellee/Japanese corporation's royalty payment to the US licensor must be mainly for the licence to sell commodities in the US and therefore it was not domestic source income taxable in Japan. This ruling was upheld by the Supreme Court judgment of 24 June 2004, but two judges of the court dissented in the ruling by stating that the obligation to pay royalty arose when the appellee produced and sold the commodities to its US subsidiary before they were sold in the US, so it should be taxable in Japan.

---

[17]    For instance, payment for the transfer of industrial property rights is classified as other income under art. 21(3) of Japan-Sweden tax treaty and taxed in accordance with the acts of the treaty partner where it has arisen.

[18]    See for instance art. 12(4) of Japan-Italy tax treaty.

## 2.4 Procedures for claiming treaty benefits

How differences in tax treatments for domestic source income between domestic laws and tax treaties affect withholding agents' burden and risk also depends on the mechanism of procedures for claiming treaty benefits. In Japan, a non-resident and a foreign corporation that claim the application of treaty benefits to their domestic source income should, in accordance with relevant provisions (section 2, section 9, etc.) of the ministerial order on Special Tax Treaty Implementation Act (STTIA), turn in a relevant application form (Form 1~Form 14) to a tax office via the payer of such income by one day before the day of its payment. If they fail to turn it in on time, the payers should withhold tax in accordance with the domestic laws, but the payees can submit Form 11 later and ask for a refund of the difference between the tax withheld at source and the tax payable in accordance with the tax treaty,[19] and the difference would be returned directly to the payees.[20]

The procedure to receive treaty benefits is more stringent in cases where the relevant tax treaties have LOB clauses. In principle, a resident of the other party of a tax treaty with LOB clauses should, in applying for relevant tax benefits, submit to a tax office a certificate of residence issued by the tax authority of the treaty partner and Form 17, which should carry detailed information on the qualifications for the tax benefits. Thus, the procedures to claim treaty benefits for domestic source income require less involvement of the withholding agents in comparison with the procedures they are required to follow in requesting a refund of over-withheld tax of resident payees. Such difference in the procedures not only reduces withholding agents' burden and risk, but it is also consistent with the spirit of treaty benefits. Moreover, it serves as a deterrent for receiving treaty benefits unfairly.

There is another withholding procedure that is only applicable to income that is exempt from source country taxation under such treaty clauses as article 17(2) of the Japan-Italy tax treaty and so forth. They exempt Japan's taxation of outbound payments made to an entertainment business in the treaty partner country that sends non-resident entertainers to Japan to perform, provided that it has no PE in Japan or such payments are not attributable to its PE in Japan. This special withholding procedure was introduced in 1992 by STTIA section 3 and STMA section 42 (currently STMA section 41-22) because such treaty clauses used to give rise to cases in which an entertainment business in a country that had concluded these treaty clauses with Japan was thrown into the arrangement for the purpose of avoiding withholding tax in Japan and to function as a middle man between a resident promotor/payer and foreign entertainers that perform in Japan.

The abovementioned special withholding procedure requires that a resident payer of domestic source income to a foreign entertainment business with no PE in Japan should, even if it is exempt from tax in Japan in accordance with the relevant tax treaty, withhold tax on it at 15 per cent (20 per cent instead, when it has not received from it an Application Form for the Non-resident Promotor) and pay it to a tax office. Thereafter, the foreign entertainment business can submit to this office Form 12 to request a refund of tax withheld at source. In this connection, the ministerial order in STTIA section 1-3 decrees that the foreign entertainment business, in receiving a refund of the withholding tax paid to the tax office, could request that a part of the refund be allotted to the withholding tax that it should

---

[19]    If there was penalty and interest on the payer's failure to withhold and pay tax in accordance with the domestic laws on time, they are not to be waived even if Form 11 is turned in.

[20]    With the payee's letter of attorney, signature certificate, etc., the payer could, on behalf of the payee, request a refund of the difference, as well as its deposit in the payer's account.

collect and pay to the tax office with respect to the remunerations it pays to the foreign entertainers that performed in Japan.

Withholding tax is effective in counteracting tax avoidance and securing tax revenue, and there have lately been steps and measures taken in Japan that should help to enhance its effectiveness further. For example, the Japanese government has recently modified its conventional stance of not concluding tax treaties with low-tax countries and has started to conclude tax information exchange agreements with them. Also noteworthy is the 2015 tax reform that, in line with the common reporting standard advocated by the OECD as a way to exchange tax information between tax authorities in different countries concerning non-residents' accounts in domestic financial institutions, Japanese financial institutions started in 2017 supplying the tax authority in Japan with its non-resident account holders' names, addresses, identification numbers, amounts of deposits and interest paid, etc. Information collected through these measures and exchanged with treaty partners in accordance with relevant information exchange clauses should be useful for withholding tax purposes as well.

## Part III: Interaction with CIVs

### 3.1 Withholding tax and partnerships

Recently various types of investment vehicles or CIVs have appeared on the scene. They are useful for giving investors diversity in their investments. A partnership based on a contract concluded under Civil Law section 667,[21] a partnership such as a limited liability business partnership, its foreign equivalent and so forth, are pass-through entities, because the administrative ruling on corporate income tax section 14-1-1 mentions that profit and loss from business engaged in by a partnership is directly attributable to its partners, so income tax or corporate income tax is imposed not on a partnership but on its partners, and no withholding tax is applicable to the distribution of a partnership's profit to its domestic partners. Investment in a partnership is no new phenomenon, but recently it has become clearer that it poses a difficult problem to the tax authority.

Such a problem was manifested most conspicuously in the case settled by the Nagoya High Court judgment of 27 October 2005. In this case, the appellees/individual taxpayers invested in a partnership that was engaged in the business of acquiring and leasing aircraft and that distributed the loss from the business to them. They in turn, based on their judgment that the distributed loss was real-estate income, set it off against their other income.[22] The tax authority determined that the distributed loss was miscellaneous income that cannot be set off against their other income, but the court ruled in particular that, even if the concerned partnership contract was entered into mainly for tax-saving purposes, it would not change the fact that it is a genuine partnership contract concluded under Civil Law section 667 and the distributed loss is real-estate income.

There were other court rulings on similar cases, but the tax authority failed to win them

---

[21]   This section stipulates that a partnership contract becomes effective by its investors' agreement to run a joint business.

[22]   This loss is mainly due to the large amount of accelerated depreciation of aircrafts made possible by the application of the declining balance method.

and its request for an appeal on one of these cases that involved the distribution of loss from a partnership's ship leasing business was turned down by the Supreme Court's judgment of 27 March 2008. Alarmed at the fact that a partnership contract was being used as a tax-saving tool, various countermeasures have lately been adopted. They include those stipulated under STMA section 41-4-2 and STMA section 67-12 that limit a partner's set-off of distributed partnership losses against his other income and its inclusion in creditable corporate loss up to the amount proportionate to its investment if the partner is "a specific partner" that is not involved in the decision-making, etc., on important affairs of the partnership business.[23]

As is evident from 2.1, the scope of a non-resident/foreign corporation's domestic source income that is taxable in Japan or is subject to its withholding tax varies, depending on whether or not it is attributable to its PE in Japan, whereas the distribution of profit to a non-resident partner derived from a partnership business in Japan is, in principle, subject to withholding tax, because the administrative rulings on income tax expound in section 164-7 that a partnership business is a joint business of the partners and therefore non-resident partners are deemed, for the purpose of determining whether they have a PE in Japan or not, to be directly engaged in the partnership business in Japan. These administrative rulings also state in section 161-6(3) that profit derived from a partnership business conducted in Japan includes all sorts of domestic source income under ITA section 161 that is accrued in connection with its business in Japan.

The above-mentioned administrative rulings show the wide application of withholding tax to income distributed from a partnership in Japan to a non-resident and a foreign corporation, and it is prescribed that it could only be avoided if the recipient is "a specific foreign partner" by meeting all of the following conditions set forth under STMA section 41-21 – (i) being a limited liability partner, (ii) not engaging actively in the partnership business, (iii) ratio of equity in partnership property being not more than 25 per cent, (iv) not being in a special relationship with an unlimited liability partner – and by submitting, via an unlimited liability partner, an application for exemption from withholding tax and the relevant documents necessary to be deemed not to have a PE in Japan for income tax/corporate income tax purposes.

## 3.2 Withholding tax and silent partnership

Another CIV in Japan that has posed quite a challenge to the tax authority is a silent partnership. Commercial Law section 535 provides that a silent partnership contract becomes effective when one party to the contract promises to make a contribution towards the other party's business, and the other party promises to distribute to the other party the profit arising from the business. So, generally under a silent partnership contract, the assets and profit of a silent partnership belong to its manager, and the aforementioned STMA section 67-12, which limits the inclusion of a distributed partnership loss with creditable corporate loss for corporate income tax purposes up to the amount that is proportionate to its investment by "a specific partner", is also applicable in the case of a silent partner, while the aforementioned STMA section 41-4-2, which limits the set-off of distributed loss against

---

[23]    A partner of a limited liability business partnership contract is not deemed "a specific partner" and is not subject to these sections because it is predicated that all of the partners are materially involved in the partnership business.

other income by "a specific partner", is generally not applicable to an individual silent partner because the profit distributed to him is, in most cases, categorised as miscellaneous income.[24]

As for withholding tax, as mentioned in 2.1, it is applicable to profits distributed from a silent partnership to a non-resident partner and a foreign corporate partner. But, prior to the 2002 amendment of relevant provisions, it was not applicable to a silent partnership in cases in which the number of its partners was less than ten, while it was required, irrespective of whether or not it had a PE in Japan, to file tax returns on distributed profits, which comes under income derived from utilisation or holding assets located in Japan. Likewise, withholding tax used to be applicable to profit distribution from a silent partnership to a resident partner or a domestic corporate partner only in cases in which the silent partnership had 10 or more partners, but, after the 2007 amendment of ITA section 174 and ITA section 210, withholding tax has become applicable to a silent partnership irrespective of the number of its partners. These amendments were made in light of the fact that there were also tax minimisation schemes that involved a silent partnership with less than 10 partners.

Nevertheless, it soon became apparent that those countermeasures mentioned above were not enough to counteract international tax avoidance involving a silent partnership, mainly because some of Japan's tax treaties have loopholes that could be taken advantage of by a silent partnership. In the case disputed and settled at the Tokyo High Court on 28 June 2007, the tax authority asserted the application of withholding tax to the profit distribution performed by the silent partnership set up in Japan to the Dutch corporate partner because the silent partnership contract in question was atypical enough so as not to categorise the distributed profit as other income specified under article 23 of Japan-Netherlands tax treaty, which was not, prior to its 2010 amendment, taxable in the source country. But the court dismissed this assertion by ruling that it was nevertheless a silent partnership contract and Japan's withholding tax was not applicable to it.

Subsequently in 2010, a protocol to the Japan-Netherlands tax treaty was signed and it contains article 9, which enables Japan to withhold tax on profit distribution from a silent partnership in accordance with its domestic laws, whereas the Japan-Ireland tax treaty, with no corresponding change, gave rise to the Tokyo High Court judgment on 5 February 2014. In this case, profit was distributed from the appellee/silent partnership set up in the Cayman Islands, which had a PE in Japan, to a new partner in Ireland that used a lopsided contract that allowed it to transfer its partner status soon after to a related corporation in Bermuda and thus a right to the distributed profit. The Japanese tax authority asserted that this scheme of distributing profit to the corporation in Bermuda, practically with no tax payment anywhere, constituted an abuse of the Japan-Ireland tax treaty and so the treaty benefit should not apply to it. But the court ruled that the scheme, even if it might have a problem in terms of equity in taxation, would not prevent article 23 (other income) of the treaty from being applied to this distributed profit.[25]

---

[24]  While in a case where an individual silent partner is running the silent partnership business with the manager, its profit to the partner is either business income or another category of income.

[25]  Japan's tax laws have some fairly comprehensive anti-avoidance rules (e.g. CITA section 132 referred to in 1.2) and there is also a small number of court rulings that imply the application in very limited cases of judicial anti-avoidance doctrines, but it does not have codified GAAR. For details, see Naoki Matsuda, Tax Strategy VS Countermeasures, XLibris (2015) pp.3~9, pp.431~435.

## Part IV: Taxation of digital transactions

**4.1 VAT on electronic transactions**

The illustrations shown and the explanations made on relevant tax provisions, court rulings and so forth in part I~part III connote the resourcefulness of withholding tax in Japan. But this might not hold true vis-à-vis electronic commercial transactions. In the indirect tax context, consumption tax or Japan's VAT applies, in principle, to these transactions as long as they are domestic non-gratis business transfers of assets or the provision of a service. Moreover, in 2015 the Consumption Tax Act (CTA) was amended to bring about a more equitable VAT treatment of services provided through electronic transmission channels by a domestic business person or by a foreign business person. Under the amended CTA, the determination of whether or not a service provided via electronic transmission channels to a user of the service in Japan constitutes a domestic service is no longer to be made by identifying the location of the service provider's office, but rather by identifying the location of the service user's residence, so that, in principle, the service provided by a non-resident business person through electronic transmission channels to its user in Japan has now also become liable to Japan's VAT.

When it comes to the collection and payment of Japan's VAT levied on the provision of a service through electronic transmission channels, a resident business person that has received from a non-resident business person a "service directed towards business persons via electronic transmission channels" is responsible for it in accordance with the reverse charge method, provided that it is subject to the regular VAT taxation method.[26] On the other hand, in the case of a "service directed towards consumers via electronic transmission channels", it is the non-resident service provider that should collect and pay Japan's VAT, while Japan's VAT on this service is not, for the time being, creditable against the taxable purchase of the service user for the reason that the non-resident service provider's collection and payment of Japan's VAT is not warranted, unless the non-resident service provider is registered with the Japanese tax authority.

A "service directed towards business persons via electronic transmission channels" is a type of service that is usually supplied to a business person and it includes the transmission of advertisements via the Internet and the provision of a site on the web where application software, such as game software, is sold. On the other hand, a "service directed towards consumers via electronic transmission channels" is a type of service that is available to consumers, so it includes the electronic transmission of books, music and so forth. This latter type of service is less restricted, so such a service provided via cloud computing is also this type of service because it is generally directed at consumers, while it should be a "service directed towards business persons via electronic transmission channels" if it is obviously contracted to be utilised by the service recipient for its business.

---

[26]   Under this provisional treatment, such cross-border service is not deemed to have been purchased for VAT purposes in the case of a VAT-exempt business person, a business person that is subject to the simplified VAT taxation method, and a business person that can credit all input tax for VAT purposes because its taxable sales is 500 million yen or less and its ratio is 95 per cent or more.

## 4.2 Withholding tax on electronic transactions

Certainly there remain administrative problems with imposing VAT on cross-border electronic transactions, while more difficult problems might exist in the context of ITA and CITA, which have not been amended much to address the issue of inequality in the taxation of electronic and non-electronic transactions, which is caused mainly by the following facts: (i) electronic transactions often include the trading of digital content, and it is more difficult to get hold of them and determine where their source of income is, (ii) they do not necessarily need a PE in a country where they have produced income. Furthermore, the difficulty in taxing electronic transactions is bound to compound the problem of the uncertainty surrounding the taxation of royalty payments for licensed intellectual property rights, which was referred to in part II, especially because commodities that incorporate intellectual property rights could be digitized and traded electronically and different tax treatments may apply, depending fundamentally on whether or not they are digital.

In fact, the application of different tax treatments is implied, for instance, in the Supreme Court judgment of 25 April 2002. At issue in this trial was whether or not a distribution right to a movie film whose image is incorporated in a video game can also be exhausted even if a movie film constitutes an exception to the extinguishment of a distribution right after it is legally transferred, because the Copyright Act provides in section 26(1) and section 26-2(1) for the exclusive right of the producer to distribute movie film work by means of its copies even after its distribution right has been lawfully transferred. The court ruled that the game software incorporating the movie film image is a copy of movie film work that is subject to Copyright Act section 26(1) but, once it is transferred lawfully to public users, its distribution right is extinguished, so that its copyright cannot be extended to the appellee's act of transferring to the public those copies that it purchased from the users.

The term copyright in Japan's tax law is borrowed from the Copyright Act, so tax treatments of copyright transfers should reflect the relevant provisions of the Copyright Act.[27] In particular, the Copyright Act stipulates in section 47-3(1) that a holder of a copy of copyrighted work of a program can reproduce it to the extent necessary for him to utilise the work on his computer and in section 26-3 it stipulates that a producer monopolises the right to lend the copy of his copyright property (excluding the copyright on movie film) in order to provide it to the public. So it seems that such acts as (i) a user installing software on his computer, without acquiring the right to possess the copyrighted software, so as to use it for his profession, and (ii) a user's supply of software products to the public and so forth, require the permission of the software copyright holder and the payment to it for such permission constitutes copyright royalty.

Even though details on the tax treatments of electronic transactions involving software are not so clear, the Tax Tribunal decision of 31 March 2004 may provide some insight into them. This decision was not made public, but the explanations of those who had access to this decision reveal that what was at issue was whether or not the applicant's payment to a foreign corporation for the applicant's right to reproduce the software product copyrighted by the foreign corporation was copyright royalty. The Tax Tribunal did not support the

---

[27] The administrative ruling on income tax s. 161-23 prescribes that royalty for a copyright under ITA s. 161 includes all kinds of payment received in connection with the reproduction, etc. of a copyrighted product that is stipulated under the Copyright Law section 2(1)1. While some maintain that the definition of royalty in tax laws does not have to be identical to that in the Copyright Act. See 2002 report by the Japanese Institute of Certified Public Accountants at http://www.hp.jicpa.or.jp/sepcialized_field/post_391.html.

applicant's claim that this payment should not be subject to withholding tax in light of the commentary para. 14.1 on article 12 of the OECD MTC, which regards such payment as business income, and it determined that this payment was made to compensate for the permission granted to copy the software product and sell the copied products to the applicant's trading partners and end-users, and so it constituted a copyright royalty.[28]

Also, it seems to have been confirmed in the above Tax Tribunal decision that the purchase of and payment for a software-incorporated CD-ROM and the instalment of the software in the purchaser's product does not require the permission of the copyright holder and such a payment for the purchase is therefore not a royalty. While it seems to be pointed out in the decision that such an act by a lessee of a copyrighted software product involving the downloading and installing of the software product on its computer constitutes – in light of the Copyright Act section 47-3(1), which provides for the reproduction of the copyright work only by its holder – the legal act of using the copyright that requires the permission of the copyright holder. So the concerned license contract should contain the lessor's permission for such an act and the lessee's payment to the lessor constitutes royalty, irrespective of whether or not there is any explicit agreement in the contract about the permission for such an act.

On the other hand, there are some who maintain that the commentary para. 14.1 on article 12 of the OECD MTC should prevail in Japan as well, because section 47-3 of the Copyright Act might not be intended to prevent a lessee of a copyrighted software product from engaging freely in such acts that are necessary for or incidental to the use of the software product, and therefore the lessee's installing the software product on its computer for its use should not be taken to give rise to copyright royalty, even if a relevant agreement contains explicit or implicit permission of the legal use of the copyright and it does not come under the copyright restriction clauses in Chapter five of the Copyright Act, provided that such permission is intended to be given without compensation. Such treatment is also claimed to be generally in line with actual commercial transactions and those judgments in which courts denied the need for royalty payment by the users of copyrighted products in cases in which it was recognised that there were tacit agreements on their free use of them.[29]

One example of such a court judgment is the Tokyo District Court judgment of 7 May 1960. In this judgment, the court ruled that screen film presentation rights were transferred together with its advertisement materials (film pictures and posters) and both of them carried their own copyrights, but the latter were transferred in the hope that they would boost the profit of the screen film presentation to benefit the transferor as well. So the plaintiff's payment for them should only cover actual bare costs and it did not in any way whatever constitute royalty. Likewise, it was decreed in the Tokyo High Court judgment of 17 October 1995 that it is highly apparent that there existed a tacit agreement on the appellee's free use of the copyrighted construction materials management system in the process of its sale of the system, and so the appellant's claim for the appellee's unlawful act and compensation to the appellant should be denied.

The uncertainty and difficulty associated with the taxation of digital transactions may also have an aspect of incentivising tax strategy. Recently, the media reported a scenario as follows: a domestic company A with a foreign parent company gained a software copyright licence from an Irish subsidiary of the parent company to use the software and to electroni-

---

[28]   For details and comments on this decision, see Takashi Yamashita, *Zeikeitsushin*, Vol.59, No.10(2004) pp.119~144.
[29]   See Takashi Yamashita, *International Taxation*, Vol.35, No.11(2005) pp.141-142.

cally transmit music and movie films to Japanese residents, and company A made payments without collecting withholding tax to the parent company's subsidiary (company B) in Japan. As for company B, for its purchase of the parent company's products from its related Singaporean company, it included in its payment the amount received from company A. Then, the Singaporean company paid to the Irish subsidiary such an amount that corresponds to the amount of royalty for the software copyright licence. The Japanese tax authority seems to have determined that this series of payments practically contains company A's royalty payment to the Irish subsidiary and therefore a penalty is applicable to company A for its failure to withhold tax on it.[30]

### 4.3 Other approaches to taxing electronic transactions

The withholding tax system as it now stands does not seem to be sufficient to prevent the tax base erosion caused by digital transactions and various attempts and measures may be needed to support its operation. A clue to one of these measures might be found in some recent media reports. According to them, a foreign parent company making commodity sales to customers in Japan had not filed its corporate income tax returns in Japan based on its judgment that Japanese customers' purchase of its commodities listed on the web site via the Internet was a direct purchase from it and the function of its subsidiaries in Japan was limited to the system management, customer service and so forth – so they were a warehouse that did not constitute a PE in Japan. But the Japanese tax authority seems to have determined that the parent company should have paid corporate income tax for its business income in Japan for the relevant years because this warehouse's function was not limited to the storage and delivery of its commodities – so it was the company's PE in Japan.[31]

A similar approach used by the tax authority can also be found in the Tax Tribunal decision of 25 November 2011. In this case, the applicant/non-resident individual was engaged, via a website and auction site on the Internet, in selling imported foreign-made automobile parts to Japanese residents after he had stored them in his apartment and the warehouse he rented in Japan, and the tax authority imposed income tax on him by determining that this apartment and warehouse constituted a PE. The Tax Tribunal referred to article 5(4) of Japan-US tax treaty dictating that a fixed place is not a PE if it is held for the purpose of performing no more than a preparatory or complementary function for the business, and it determined that the applicant's apartment and warehouse were places where such economic value as the translation of the product descriptions was added to the commodities sold by him, so that they performed more than a preparatory or comple-mentary function for his business and therefore they constituted the individual's PE.

The above-mentioned Tax Tribunal's decision seems to be in line with the tax authority's guidance shown in Tax Answer no. 2881, stating that the judgment of whether or not a non-resident has a PE in Japan is to be made not in accordance with its formalities, but rather in accordance with its functional aspects. So a warehouse functioning simply as a storage facility is not a PE, while a hotel room functioning as a business unit is a PE. Likewise, the OECD's final report on the BEPS project published in 2015 includes a proposal to expand

---

30  For such media report, see http://www.mainichi.jp/articles/20160916/k00/00e/040/183000c

31  The reliability of those reports is unknown, but some of them reveal that the tax in question was refunded to the parent company after this case ended up in consultation between the concerned tax authorities. See, for instance, http://www.kaikeinet.com/topics/20141219-14659.html

the PE concept to cover a warehouse, provided that it performs more than a preparatory or complementary function for the business concerned. But some have expressed their concern that the adoption of such a proposal might go overboard in its application and end up regarding as a PE such a facility held for vendor management inventory.[32]

The examples and recent steps illustrated above on the taxation of income derived from digital transactions suggest that, even in the age of the digital economy, withholding tax could be a resourceful tool to secure revenue and counteract tax avoidance, but some of its demerits and limits might become conspicuous. So, measures should be taken to upgrade and supplement its operation. Options might include the following: (i) they would help the tax authority get a better grip on cross-border digital transactions; (ii) they would give more clarity to the tax treatments of income derived from various types of digital transactions in order to discern which ones give rise to a withholding obligation; (iii) they would expand the PE concept; (iv) they would require large-scale providers of cross-border digital transactions to register with the tax authorities in the relevant countries; (v) they would allocate a taxpayer's worldwide income from digital transactions to the relevant countries in accordance with a certain criterion that might substitute or supplement the PE concept.

---

[32]    For such a concern, see http://www.keidanren.or.jp/policy/2015/002.html

# Exhibit 63

| 80th Congress | SENATE | Executive |
|---|---|---|
| 2d Session | | G |

SUPPLEMENTARY PROTOCOL WITH FRANCE RELATING
TO TAXES ON ESTATES AND INHERITANCES

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

A SUPPLEMENTARY PROTOCOL, SIGNED AT WASHINGTON ON
MAY 17, 1948, MODIFYING IN CERTAIN RESPECTS THE CON-
VENTION BETWEEN THE UNITED STATES OF AMERICA AND
FRANCE, SIGNED AT PARIS ON OCTOBER 18, 1946, FOR THE AVOID-
ANCE OF DOUBLE TAXATION AND THE PREVENTION OF EVASION
IN THE CASE OF TAXES ON ESTATES AND INHERITANCES, AND
FOR THE PURPOSE OF MODIFYING AND SUPPLEMENTING CER-
TAIN PROVISIONS OF THE CONVENTION BETWEEN THE TWO
GOVERNMENTS RELATING TO INCOME TAXATION SIGNED AT
PARIS ON JULY 25, 1939

MAY 19, 1948.—Protocol was read the first time and the injunction of secrecy
was removed therefrom. The treaty, the President's message of transmittal
and all accompanying papers were referred to the Committee on Foreign
Relations and ordered to· be printed for the use of the Senate

THE WHITE HOUSE,
*May 19, 1948.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to
ratification, I transmit herewith a supplementary protocol, signed at
Washington on May 17, 1948, modifying in certain respects the con-
vention between the United States of America and France, signed at
Paris on October 18, 1946, for the avoidance of double taxation and
the prevention of evasion in the case of taxes on estates and inherit-
ances, and for the purpose of modifying and supplementing certain
provisions of the convention between the two Governments relating
to income taxation signed at Paris on July 25, 1939.

I transmit also, for the information of the Senate, the report which
the Secretary of State has addressed to me in regard to the protocol.

HARRY S. TRUMAN.

(1133)

(Enclosures: (1) Report of the Secretary of State, (2) protocol between the United States and France, signed May 17, 1948, supplementing the tax convention of October 18, 1946.)

———————

DEPARTMENT OF STATE,
*Washington, D. C., May 18, 1948.*

The PRESIDENT,
*The White House:*

The undersigned, the Secretary of State, has the honor to lay before the President, with a view to its transmission to the Senate to receive the advice and consent of that body to ratification, if his judgment approve thereof, a supplementary protocol, signed at Washington on May 17, 1948, modifying in certain respects the convention between the United States of America and France, signed at Paris on October 18, 1946, for the avoidance of double taxation and the prevention of evasion in the case of taxes on estates and inheritances, and for the purpose of modifying and supplementing certain provisions of the convention between the two Governments relating to income taxation signed at Paris on July 25, 1939.

The convention of October 18, 1946, was submitted to the Senate on January 10, 1947 (Senate Executive A, 80th Cong., 1st sess.). A subcommittee of the Committee on Foreign Relations held public hearings with respect to that convention on January 30, February 6, and April 17, 1947. Private interests, as well as the Department of State and the Treasury Department, were represented at those hearings. (See Hearings Before a Subcommittee of the Committee on Foreign Relations United States Senate, Eightieth Congress, First Session, on Executive A, Convention with France on Double Taxation, January 30, February 6, and April 17, 1947.)

In the course of those hearings numerous questions were raised concerning the scope, intent, and application of certain of the provisions of the convention, and private interests, expressing opposition to the convention, proposed certain modifications thereof. Representatives of the Government who had participated in the negotiations with the French authorities leading to the signature of the convention undertook to satisfy the private interests and the subcommittee with respect to these matters. The chairman of the subcommittee, at the meeting on April 17, 1947, proposed that before the subcommittee proceeded further the representatives of the Government and the representatives of private interests confer with a view to resolving or compromising certain remaining points of difference. Tentative understandings were reached concerning the procedure by which it would be possible to bring the convention into force, an objective desired by all concerned. It was found to be satisfactory to have certain matters covered by a protocol to supplement the convention, the protocol to be signed for the two Governments and submitted to the Senate in the same way as the convention. Certain other matters, involving principles affecting treaty construction or tax alleviation, were found not to be appropriate subjects for a supplementary protocol between the two governments, although general understanding was reached with respect to such principles.

Meanwhile, through informal consultation with the competent French authorities, it was found that they would be willing, with a

(1134)

PROTOCOL WITH FRANCE RELATING TO TAXES    3

view to bringing the convention into force as soon as practicable, to propose that the French Government enter into a protocol of the kind proposed. They presented ample evidence also of their concurrence with the statement of principles affecting treaty construction or tax alleviation.

On March 23, 1948, an informal hearing was held before the subcommittee of the Committee on Foreign Relations. The subcommittee was informed of the understandings which had been reached. It was proposed at that hearing that this Government should endeavor, without delay, to enter into a supplementary protocol with the French Government along the lines proposed. Moreover, the statement of principles dealing with certain other matters was laid before and considered by the subcommittee.

Upon the receipt by the French Ambassador in Washington of the requisite full power, such power having also been given by the President to the Acting Secretary of State, the supplementary protocol, as enclosed herewith, was signed.

The protocol contains a preamble and two articles. Article I effects substantive modifications in the convention to which it relates. Article II provides for ratification of the protocol and for entry into force of the protocol in accordance with pertinent provisions of the convention, namely, upon the exchange of instruments of ratification. It is provided that the protocol shall become effective and continue effective as though it were an integral part of the convention.

The objectives of the substantive provisions in article I may be summarized as follows:

The provision in paragraph (1), relating to assistance in the collection of taxes, has the effect of reinstating the nationality limitation now existing in article 22 of the convention of 1939 (59 Stat., pt. 2, 893), so that such assistance shall not apply, as to income taxes, in the case of citizens, corporations, or other entities of the contracting state to which application for the assistance is made, and shall not apply, as to estate or inheritance taxes, in the case of estates of such citizens.

Paragraph (2) has the effect of stabilizing the concept of domicile for the purposes of applying the provisions of title I, relating to estate and inheritance taxes, of the convention of October 18, 1946. Article 2 of the convention contains the provision, which will be found in other tax conventions of the United States, that in the application of the provisions of title I by one of the contracting states any term not otherwise defined shall have, unless the context requires a different interpretation, the meaning which it has under the laws of that contracting state relating to the taxes which are the subject of title I. As a matter of practical application, therefore, the determination of domicile for French tax would be in accordance with article 103 of the French Civil Code, while the determination of domicile for United States tax would be in accordance with section 81.5 of the United States Estate Tax Regulations. It was suggested by the representatives of private interests in the hearings above-mentioned that the word "domicile" be defined specifically, so as to eliminate the possibility, for example, that the concept of domicile or residence for income-tax purposes would be applied as to estate or inheritance taxes. Aside from the fact that such a definition has been considered unnecessary for the purposes of eliminating international double taxation through tax conventions, it has been found impracticable in negotiations with

other countries to arrive at an acceptable definition. The word "domicile" is not defined in existing estate-tax conventions of the United States and the word "residence" is not defined in existing income-tax conventions of the United States. Nevertheless, in order to meet as far as possible the expressed desires of the private interests concerned, article I (2) of the protocol has been agreed upon with the object of making it clear that the applicable French law and the applicable United States law as in effect on the date of signature of the protocol shall apply in determining domicile for purposes of estate or inheritance tax.

Paragraph (3) of article I of the protocol amends article 9 of the convention of 1939. Under French law no tax is imposed on the earned income of a resident of the United States, employed by a United States employer, who enters France for a year. In order that the convention of 1939 may operate, in this respect, upon a reciprocal and more reasonable basis, the amendment in article I (3) of the protocol would permit a resident of France (other than a United States citizen), employed by a French employer, to enter and be present in the United States for a year without liability to United States income tax on his earned income.

Paragraph (4) is designed, in view of the fact that in France the expression "liberal profession" is construed liberally in extending benefits to United States citizens, to clarify the intent of article 10 of the convention of 1939 that its provisions should be applied reciprocally. This is consistent with the corresponding provisions in the income-tax convention and protocol with the United Kingdom.

Paragraph (5), representing a unilateral concession on the part of France, contains provisions which will have the effect of incorporating in the convention of July 25, 1939, a new article 19A whereby, in practice, the future application of French capital tax for which liability may arise on or after the entering into force of the protocol will be confined, as to residents of the United States and United States corporations, to their real property in France and their commercial or industrial enterprises in France.

It is believed that the protocol represents a reasonable compromise and it is hoped that the convention of October 18, 1946, together with this protocol, may be brought into force by exchange of instruments of ratification soon. It may be useful to bear in mind that the object of existing tax conventions of the United States, and of those which may be negotiated in the future, is the elimination of double taxation in the interest primarily of taxpayers, and that taxpayers are not, by such tax conventions, deprived of any deduction, credit, or other allowance authorized by law.

Respectfully submitted.

G. C. MARSHALL.

(Enclosure: Protocol between the United States and France, signed May 17, 1948, supplementing the tax convention of October 18, 1946.)

[Text of protocol]

# Exhibit 64

*Senate Committee Report*

July 27, 1955

Executive Report No. 12

84th Congress, 1st Session

Senate Foreign Relations Committee

| 84TH CONGRESS | SENATE | EXECUTIVE REPT. |
|---|---|---|
| *1st Session* | | No. 12 |

## DOUBLE TAXATION CONVENTIONS WITH ITALY AND THE NETHERLANDS

WEDNESDAY, JULY 27, 1955.—Ordered to be printed

Mr. GEORGE, from the Committee on Foreign Relations, submitted the following

## REPORT

[To accompany Executive I, 83d Congress, 2d session, Executives I, C, and D, 84th Congress, 1st session]

The Committee on Foreign Relations has had under consideration the conventions listed below and recommends that the Senate give its advice and consent to their ratification:

1. Notification embodied in a note from the Netherlands Ambassador in Washington to the Secretary of State, dated June 24, 1952, with a view to extending the operation of the convention of April 29, 1948, between the United States and the Netherlands, to the Netherlands Antilles (Ex. I, 83d Cong., 2d sess.).

2. Protocol signed June 15, 1955, supplementing the convention between the United States of America and the Kingdom of the Netherlands with respect to taxes on income and certain other taxes for the purpose of facilitating extension of the convention to the Netherlands Antilles (Ex. I, 84th Cong., 1st sess.).

3. Convention between the United States of America and the Italian Republic for the avoidance of double taxation with respect to taxes on income, signed at Washington on March 30, 1955 (Ex. C, 84th Cong., 1st sess.).

4. Convention between the United States of America and the Italian Republic for the avoidance of double taxation with respect to taxes on estates and inheritances, signed at Washington on March 30, 1955 (Ex. D, 84th Cong., 1st sess.).

### GENERAL PURPOSE OF CONVENTIONS

Over a period of years the Department of the Treasury, in cooperation with the Department of State, has negotiated a series of conventions with foreign governments designed to relieve American nationals, on a reciprocal basis, from paying taxes in the United States on

(1665)

incomes, inheritances, and gifts upon which they have been taxed in a foreign country.

The two pending conventions with the Italian Republic and the notification and protocol with respect to the convention of April 29, 1948, with the Netherlands, are a continuation of this program to relieve nationals of the burdens of double taxation.

### COMMITTEE ACTION

As has been customary in the past, the Committee on Foriegn Relations sou~ht the advice of the Joint Committee on Internal Revenue Taxation with respect to the terms of these conventions and their consistency with the Federal tax laws of the United States.   On July 27, 1955, the Committee on Foreign Relations, after receiving the testimony of Mr. Colin F. Stam, chief of staff of the Joint Committee on Internal Revenue Taxation, voted to recommend that the Senate give its and advice and consent to the ratification of the above-mentioned agreements.

### ANALYSIS OF PENDING CONVENTIONS

The communication of the chief of staff of the joint committee analyzing the pending conventions is as follows:

CONGRESS OF THE UNITED STATES,
JOINT COMMITTEE ON INTERNAL REVENUE TAXATION,
*Washington, July 27, 1955.*

Hon. WALTER F. GEORGE,
*Chairman, Senate Foreign Relations Committee,*
*United States Senate, Washington, D. C.*

DEAR SENATOR GEORGE: At your request the staff of the Joint Committee on Internal Revenue Taxation has reviewed the provisions of the following tax treaties now pending before the Senate Foreign Relations Committee:

Extension of income-tax convention with the Netherlands to the Netherlands Antilles (Ex. I, 83d Cong., 2d sess.).

Protocol supplementing Netherlands income-tax convention with respect to the Netherlands Antilles (Ex. I, 84th Cong., 1st sess.).

Income-tax convention with Italy (Ex. C, 84th Cong., 1st sess.).

Death-duty convention with Italy (Ex. D, 84th Cong., 1st sess.).

In general, these tax treaties follow the provisions of existing tax conventions which the Senate has previously approved.   In an earlier consideration of the extension of the income-tax convention with the Netherlands to the Netherlands Antilles, certain questions were raised in the executive report and in a letter to the chairman from the National Foreign Trade Council.   The supplementary protocol which was subsequently negotiated resolves one of the questions previously raised.   The other question may be appropriately resolved by language expressing the Senate's understanding that the collection article in the Netherlands convention when applied to the Netherlands Antilles will be construed in the restricted manner which the Senate has previously approved in other tax conventions.

Memorandum from this office summarizing the principal provisions of the four treaty matters referred to above are enclosed.

Sincerely yours,

COLIN F. STAM,
*Chief of Staff.*

### EXTENSION OF THE INCOME TAX CONVENTION WITH THE NETHERLANDS TO THE NETHERLANDS ANTILLES

(Ex. I, 83 Cong., 2d sess.)

Pursuant to the procedure prescribed in the convention between the United States and the Netherlands (convention of October 28, 1948, S. Ex. I, 81st Cong., 1st sess.), regarding taxes on income and certain other taxes, the Netherlands

**3**

Government has declared its desire that the convention be extended to the Netherlands Antilles.

Article XXVII of the Netherlands convention authorizes its provisions to be extended, either in whole or in part, to an overseas area or territory of the country seeking extension by written notification of extension. The convention becomes effective, however, only after the acceptance of the notification by the other contracting country. In accordance with the procedure followed with regard to requests for extension to territories or possessions of other tax conventions, the executive branch has indicated that it will not recommend any formal declaration of acceptance of the notification for an extension of the Netherlands convention until the Senate has indicated its advice and consent to the acceptance.

The Netherlands Antilles consist of a group of islands off the coast of Venezuela that include Aruba, Bonaire, Curacao, Saba, St. Eustatius, and St. Martin (Netherlands portion). It does not include Dutch Guiana (Surinam). All of the Netherlands Antilles appear to come within the scope of one income-tax law referred to as the ordinance of Curacao. The convention between the United States and the Netherlands extended to certain property taxes imposed by the Netherlands. Since these taxes are not imposed in the Netherlands Antilles, the convention, as extended to that territory, is applicable only to income taxes and profits taxes. Thus, article XX and article VI (2) and (3) are excluded from the operation of the convention with respect to the Netherlands Antilles under the proposed extension.

In approving the convention with the Netherlands in 1948, the Senate did so with certain reservations which had the effect of deleting articles XI and XIII and of eliminating from article XIV all references to article XIII, as well as any language which might prevent taxation by the United States of capital gains where taxable under the revenue laws of the United States when realized. These articles will thus not be applicable in the extension of the convention to the Netherlands Antilles. Also, in the request for extension the Netherlands Government has indicated that the term "competent authority" contained in the definitions in article II of the convention shall be construed to mean the "Administrateur van Financien" of the Netherlands Antilles in the application of the convention to that territory.

In the consideration of the extension, account should be taken of several important modifications contained in a protocol to the Netherlands convention (Ex. I, 84th Cong., 1st sess.) which would be effective with respect to the Netherlands Antilles. This protocol is presently pending before the Senate and is described below.

---

PROTOCOL WITH THE NETHERLANDS SUPPLEMENTING INCOME TAX CONVENTION
WITH RESPECT TO THE NETHERLANDS ANTILLES

(Ex. I, 84th Cong., 1st sess.)

When the proposed extension of the Netherlands income-tax convention to the Netherlands Antilles (Ex. I, 83d Cong., 2d sess.) was first considered by the Senate Foreign Relations Committee, certain problems in connection with the extension were called to the committee's attention. For example, the executive report on the notification by the Netherlands for extension pointed out that a United States citizen resident in the Antilles would receive no credit against his Antilles income tax with respect to United States income tax on United States source income, such as dividends from the United States. Double taxation with respect to that income would occur because the Antilles law does not provide a credit in such a case.

The executive report on the proposed extension likewise specifically called to the committee's attention the fact that the Netherlands convention contains a broad provision for mutual assistance in the collection of taxes. In certain conventions subsequent to the Netherlands convention, the Senate expressed an interpretative understanding that each of the Governments would assist in collecting the other's taxes only to the extent necessary to insure that the provisions of the convention would not be enjoyed by persons not entitled to its benefits. This limited form of the collection provision was adopted in a number of subsequent conventions. In the absence of any reservation or modification, the collection provision of the Netherlands income-tax convention would thus be extended to the Antilles in the broad form which the Senate has previously questioned.

**4**                    DOUBLE TAXATION CONVENTIONS

The National Foreign Trade Council in a letter to the chairman of the Senate Foreign Relations Committee called attention to the above problems and recommended approval of the extension only if steps were taken to meet them.

To facilitate the extension, a supplementary protocol was negotiated and signed by the respective Governments subsequent to the initial consideration by the Foreign Relations Committee of the notification for extension. The supplementary protocol contains three articles. Article I modifies the credit provision of the Netherlands convention with respect to its application to the Netherlands Antilles. The modification provides that the Netherlands Antilles will allow a deduction (or its equivalent) from its income tax for Federal income taxes paid by United States citizens resident in Antilles on income derived from United States sources. The deduction may not exceed that proportion of the Antilles tax which that income bears to the entire income subject to Antilles tax. The effect of article I of the protocol is thus to allow a limited tax credit against Antilles tax similar in principle to the foreign tax credit allowed by the United States under the internal revenue laws and under the convention.

Article II of the protocol modifies the effective date provisions of the article of the convention governing territorial extensions (art. XXVII of the convention). Under the convention, extensions take effect on the 1st day of January *following* the date of notification of acceptance of the request for extension. Under the protocol the convention will become effective, with respect to the Netherlands Antilles, on January 1 *immediately preceding* the date of notification of acceptance. Thus, if the Senate gives its advice and consent to the protocol and approves the extension during the 1st session of the 84th Congress, the notification of acceptance could be accomplished so as to make the extension effective as of January 1, 1955.

Article III of the protocol provides that the above-described provisions are to be deemed an integral part of the Netherlands convention and that the protocol is to become effective on the date of exchange of instruments of notification which is to take place in Washington, D. C.

The protocol does not make any provision for limitation of the collection provision of the convention to the restricted form that the Senate has approved in other treaties. It is understood that this restriction can be accomplished by an appropriate expression by the Senate of its understanding that the collection article will be construed as granting authority to collect the other government's taxes only to the extent necessary to insure that benefits under the convention will not be enjoyed by persons not entitled thereto.

In view of the interrelationship of the protocol (Ex. I, 84th Cong., 1st sess.) and the proposal for extension (Ex. I, 83d Cong., 2d sess.), it would appear appropriate for the Senate to consider both at the same time.

---

### INCOME TAX CONVENTION WITH ITALY

#### (Memorandum from the Joint Committee on Internal Revenue Taxation)

The pending income-tax convention with Italy follows the pattern of prior income-tax conventions which the Senate has previously approved. There are no unusual provisions in the proposed treaty. The provisions follow in substance, and generally also in form, the provisions of the existing income-tax treaties between the United States and the following countries: Australia, Belgium, Canada, Denmark, Finland, France, Germany, Greece, Ireland, Japan, the Netherlands, New Zealand, Norway, Sweden, Switzerland, Union of South Africa, and the United Kingdom.

In the case of the United States, the pending convention relates only to the Federal income tax. In the case of Italy, the convention relates to the following taxes: (1) Tax on land, (2) tax on buildings, (3) tax on movable wealth, (4) tax on agricultural income, and (5) complementary tax. The treaty does not include the Italian turnover tax. The enumeration of the Italian taxes included within the treaty is necessary because Italy employs a schedular system of taxation, i. e., in addition to a progressive surtax applicable to aggregate income, a nongraduated tax is imposed on certain classes of income at varying rates depending upon the nature of the income. Although the above categories of Italian taxes are included within the terms of the convention, only those taxes which come within section 901 of the 1954 code are eligible for the credit against the United States income tax provided in sections 901 through 905 of the code. (See art. XV.)

(1668)

Under article III of the convention, an enterprise of one of the contracting states is not subject to tax by the other state on its industrial and commercial profits unless it engages in trade or business in the other state through a permanent establishment there.   This provision adopts the uniform principle of "permanent establishment" found in all existing income-tax conventions.   The definition of "permanent establishment" is contained in article II.   This definition corresponds to a similar definition contained in the present tax conventions with Canada, Denmark, France, and the Netherlands.   Under the definition, a fixed place of business which is maintained exclusively for the purchase of goods or merchandise will not, of itself, constitute a permanent establishment.   The effect of the definition and the exemption contained in articles II and III is to exempt certain activities which would otherwise be subject to tax on the ground that the income was derived from sources within the tax-imposing country.

Under article V, one contracting state will reciprocally exempt from its tax the income of an enterprise of the other contracting state which is derived from the operation of ships or aircraft registered in such other state.   With regard to income derived from shipping operations, the exemption conforms to a reciprocal agreement already in effect between the United States and Italy.   The principle of reciprocal exemption of shipping and aircraft operating profits is contained in a number of existing income-tax treaties.

Article VI, while nominally reciprocal, would operate to grant an exemption to certain United States enterprises from Italian tax since the article applies only to a tax which is "based on property and income."   The tax to which article VI applies is the Italian tax on corporations similar to the former United States capital stock and declared value excess-profits tax.   Under the Italian tax, a corporation is required to pay three-fourths of 1 percent of the value of its capital plus 15 percent of its income in excess of 6 percent of the value of the declared capital. Under Italian law, the tax applies to United States corporations with respect to any property employed in Italy and the income derived from Italian sources. Under the convention, exemption is provided with respect to that portion of the Italian tax based upon income if the United States enterprise is exempt by reason of having no permanent establishment in Italy (art. III) or is exempt on its shipping and aircraft profits, whether or not it has a permanent establishment in Italy (art. V).   The convention also expressly limits, on a reciprocal basis, that portion of the tax which is based upon property to property of a United States enterprise used or employed in Italy.

A reciprocal reduction of the rate of tax on outgoing dividends to a maximum of 15 percent is provided under article VII.   The withholding tax on dividends is further reduced to 5 percent where the dividends go to a parent corporation controlling at least 95 percent of the stock of the payor if not more than 25 percent of the gross income of the payor is derived from interest or dividends (other than interest or dividends from its own subsidiary corporations).   The treaty provides, however, that the above rates of tax may be increased, and, if such increase occurs, the other state may terminate this provision of this convention.   This provision is very similar to provisions of existing income-tax treaties, such as the tax treaties with Denmark, New Zealand, the Netherlands, and other countries.

*Rentals and royalties*

A reciprocal exemption is provided under article VIII for royalties and similar payments for the use of copyrights, patents, secret processes, and similar property. The exemption under this provision specifically includes film rentals.   A similar exemption is provided in a number of existing income-tax treaties.

Income from real property (other than interest from real estate, mortgages, and bonds) and natural resource royalties are made taxable only in the country in which the property is situated under article IX.   Also, under this article a resident or corporation of one of the countries deriving income from real property or natural resource royalties from the other country may elect to be taxed on a net basis by the other country as though he were engaged in trade or business through a permanent establishment within the other country.   Similar provisions are contained in the income-tax treaties with Denmark, the United Kingdom, and other countries.

*Earned-income provisions*

Article X provides for a reciprocal exemption of Government compensation and pensions unless the individual is a citizen or has permanent resident status in the country which otherwise would impose tax.   Thus, under this provision the United States will exempt, on a reciprocal basis, compensation and pensions

**6**            DOUBLE TAXATION CONVENTIONS

paid by the Italian Government or its political subdivisions to individuals who would otherwise be subject to United States tax on such income, unless the individual is a citizen of the United States or has permanent resident status in the United States. In addition, this provision also exempts private pensions and life annuities at the source on a reciprocal basis. Similar provisions are contained in a number of existing income-tax conventions.

Under article XI, an exemption is provided, on a reciprocal basis, for compensation for labor or personal services by a resident of one of the contracting countries who is temporarily present in the other country for a period or periods not exceeding 90 days during the taxable year. If the compensation is received from other than a resident or corporation of the country of which he is resident, the exemption applies only if the compensation does not exceed $2,000 in the aggregate. Related exemption provisions are contained in existing income-tax treaties. The article also provides that compensation for labor or personal services is to be taxable only in the contracting state where rendered.

*Students and business apprentices*

Under article XII, a student or business apprentice of one of the contracting countries who is temporarily present in the other country exclusively for the purposes of study or training is granted an exemption by the country of temporary sojourn for payments for his maintenance, education, and training received from persons resident in the country of which he is a resident. This provision does not apply, however, if the student or business apprentice is a citizen of the country in which he is temporarily present for study or training. Comparable provisions are contained in other income-tax conventions; as, for example, the conventions with Sweden, Canada, and the Netherlands.

Remuneration from teaching received by a resident of one of the countries who temporarily visits the other country for purposes of teaching for a period not exceeding 2 years at an educational institution therein is exempt from tax by the country in which the educational institution is situated. The exemption applies for the 2-year period if on date of arrival in the other country it appears that the individual will be present therein for a period not in excess of 2 years. Similar provisions are contained in a number of existing income-tax conventions; for example, in the conventions with Norway and Canada.

*Tax credit provisions*

Under article XV, the United States agrees to continue its foreign tax credit for Italian income tax subject to the provisions of sections 901 through 905 of the 1954 code. The article also provides that regardless of any other provision of the convention (other than art. XII, relating to students and business apprentices, and art. XIII, relating to teachers) the United States may continue to apply its income taxes to citizens, residents, or corporations of the United States as though the convention had not come into effect. The United States, nevertheless, reserves the right to tax its citizens despite the exemptions provided in articles XII and XIII. Similarly, Italy reserves the right to tax its citizens, residents, or corporations as though the convention had not come into effect (except insofar as arts. XII and XIII provide exemption for residents). Under this article, Italy also agrees to allow against its income taxes a proportionate credit for United States income taxes on the same income (other than dividends). With respect to dividends, the article provides that the Italian tax credit for United States income taxes withheld on such dividends may not exceed 8 percent of the amount of the dividend. Thus, with respect to dividends from United States corporations, a United States citizen subject to Italian tax on the dividends would be doubly taxed on that income to the extent that the United States tax on the dividends exceeded an effective rate of 8 percent; however, under existing Italian law he receives no credit against the Italian tax for the United States tax which he pays.

*Other provisions*

In addition to the above principal provisions, the convention also contains the usual articles providing for appeal from double taxation, for exchange of information, for safeguarding of the diplomatic exemption, and for regulations to carry out the provisions of the convention. The provision for collection by one of the countries of the taxes of the other is restricted to the collection necessary to insure that exemptions or reduced rates of tax granted under the convention may not be enjoyed by persons not entitled thereto. The collection provision is thus in the restricted form previously approved by the Senate. The convention

(1670)

also provides that none of its provisions are to be construed to restrict in any manner any exemption, deduction, credit, or other allowance provided under the laws of the respective countries.

The convention becomes effective on January 1 of the calendar year in which the exchange of instruments of ratification take place. The convention may not be terminated for the first 5 years and thereafter may be terminated by either of the countries provided that at least 6 months' prior notice of termination is given.

### DEATH-DUTY CONVENTION WITH ITALY

The pending death-duty convention between the United States and Italy is substantially similar to death-duty conventions previously approved by the Senate which are now in effect between the United States and Australia, Canada, Finland, France, Greece, Ireland, Norway, Switzerland, the Union of South Africa, and the United Kingdom.

In the case of the United States, the pending convention relates only to the Federal estate tax. In the case of Italy, the convention is applicable to two death duties, i. e., an inheritance tax imposed upon each beneficiary's share of property received from the deceased person, and an estate tax similar to the Federal estate tax imposed by the United States upon the entire net estate of the deceased. The convention is made applicable to substantially similar taxes which may be subsequently imposed by the United States or Italy. It does not apply to, and has no effect upon, death taxes imposed by any State, Territory, or possession of the United States or by the District of Columbia. The stated purpose of the convention is to avoid double taxation and to prevent fiscal evasion.

Under the Internal Revenue Code, the Federal estate tax applies to the entire estate of a citizen of the United States or a noncitizen domiciled in the United States at the time of his death, regardless of where the property is situated, with the one exception that it does not apply to real estate located outside the United States. In the case of a noncitizen not domiciled in the United States at the time of his death the Federal estate tax applies to all property of the decedent situated within the United States. Under Italian law, however, the death duties imposed by Italy apply only to property situated in Italy at the time of the decedent's death. As a result, the circumstances under which estates suffer double taxation because of the simultaneous imposition of death taxes by the two countries are more limited than the situations involving double taxation which arise between the United States and most other countries.

Double taxation by the United States and Italy is already eliminated to a considerable degree in the case of decedents who were citizens of or domiciled in the United States in view of section 2014 of the Internal Revenue Code of 1954, which provides a credit for the amount of any estate or inheritance tax paid to a foreign country on property situated in the foreign country but included in the gross estate. In addition, Italy provides by statute for an exemption in the case of stocks and bonds issued by foreign corporations and bonds issued by foreign governments in case such securities are subject to a death tax by the foreign government.

There are a number of circumstances, however, where double taxation is not eliminated either by the credit authorized by the United States or by the exemption authorized by Italy. Double taxation will result, for example, where the situs rules of Italy differ from the situs rules of the United States, such as in the case of debts constituting assets of an estate.

Under Italian law debts are considered as situated in Italy if (1) collectible in Italy, (2) secured by property located in Italy, (3) collectible on contracts on realty located in Italy, or (4) collectible on contracts entered into between Italian citizens in Italy. In addition, bonds issued by foreign governments or foreign corporations are regarded as situated in Italy if the certificates are physically located in Italy. For Federal estate tax purposes, bonds, negotiable promissory notes, and bills of exchange are regarded as situated within the United States if the written evidence of indebtedness is physically located in the United States. Double taxation would result, for example, in the case of a decedent, who at the time of his death was a national of and domiciled in Italy, and who owned a bond of an Italian corporation, the certificate of which was located in the United States. Without the treaty the United States would tax the bond on the basis of situs of property within the United States because the certificate was located in this country. Italy would tax the bond under the theory that the bond was situated in Italy because the proceeds are collectible in Italy or because the bond is secured

by property located in Italy. Under these circumstances relief would not be afforded either by the credit provided by section 2014 of the 1954 code or by the Italian statutory exemption previously mentioned.

The pending convention eliminates double taxation in these instances by providing in article III that debts constituting assets of the estate (including bonds, promissory notes, and bills of exchange) are deemed to be situated where the debtor resides or, if the debtor is a corporation, at the place where the corporation was created or organized. A similar rule is contained in conventions now in effect with countries other than the United Kingdom, France, Greece, and South Africa. Conventions with these latter countries have adopted a situs rule placing debts in the country in which the decedent was domiciled at the date of death.

Under Italian law the situs rules with respect to shares of corporate stock are the same as the rules under the 1939 code, that is, the stock is considered to be situated in the taxing country (1) if the corporation was created or organized under the laws of such country, or (2) if the certificate was physically located therein. The second rule has been eliminated by section 2014 (a) of the 1954 code. Under the convention the second rule has also been eliminated and the first rule has been adopted exclusively.

Other situs rules for specifically described property are contained in article III, which are substantially the same as in the previously mentioned death tax conventions. As to any other property not specifically covered, it is provided that such property shall be deemed to be situated in the country in which the deceased person was domiciled at the time of death.

In the case of decedents who were citizens of the United States or noncitizens domiciled in the United States at the date of death, there are also instances in which double taxation will result despite the credit authorized by section 2014 of the 1954 code. For example, in the case of a United States citizen decedent who owned a bond issued by an Italian corporation or by the Italian Government, the certificate of which at the time of his death located in the United States, credit would not be allowed under section 2014 of the 1954 code since under the situs rule applicable thereto the bond would not be regarded as situated in Italy because the certificate was located in the United States. There would be no exemption under the Italian statute since the bond was not issued by a foreign government or a foreign corporation.

Article V eliminates double taxation in such a situation by providing that the contracting state imposing a tax in the case of a deceased person, who at the time of death was domiciled in or a national of such state, shall allow against its tax a credit for the amount of tax imposed by the other contracting state. Although this article is nominally reciprocal, under the present circumstances it applies only to the United States, because, under Italian law, death taxes are not imposed on the basis of nationality or domicile. As in other conventions entered into by the United States, the credit cannot exceed the tax of the crediting state which is attributable to the property taxed by the other state. It is specifically provided that any refund of tax resulting from the allowance of the credit will be made without the payment of interest on the amount refunded.

Under the Internal Revenue Code a specific exemption of $60,000 is allowed in cases of decedents who were citizens of or domiciled in the United States at the time of death, whereas an exemption of only $2,000 is allowed the estates of nonresident alien decedents. Article IV of the pending convention liberalizes the exemption allowable in the case of nonresident alien decedents by providing, in effect, that the estates of decedents not nationals of nor domiciled in the taxing state shall be allowed an exemption not less than the proportion of the exemption allowed in the case of decedents domiciled in that state which the value of the property situated in the taxing state bears to the value of the property in the entire gross estate.

This article is similar to articles contained in conventions now in effect with Australia, Canada, Finland, France, Switzerland, Norway, and Greece. The effect of this article is to exempt from the Federal estate tax those cases in which the gross estate of a nonresident alien does not exceed $60,000 and to provide a proportionately increased exemption in the case of a larger estate. Although reciprocal in form, this article will have no effect on the application of the Italian death tax because, under Italian law, no distinction is made with respect to exemptions on the basis of nationality or domicile.

In addition to the above principal provisions, the convention also contains articles providing that the representative of an estate or the beneficiary of an estate may appeal to his own government when it appears that action by the rev-

enue authorities of the other state has resulted or will result in double taxation.
These articles also provide for exchange of fiscal information, for safeguarding of
the diplomatic exemption, and for the issuance of regulations necessary to carry
out the provisions of the convention.    The provision for collection by one of the
countries of the taxes of the other is restricted to the collection necessary to insure
that the credit or other benefit granted under the convention will not be enjoyed
by persons not entitled to these benefits.

The convention becomes effective on the day of exchange of instruments of
ratification and it will apply only to estates and inheritances in the case of deced-
ents who die on or after that day.    The convention will remain in force for 5
years but it may be terminated after that time by either country, provided such
country gives at least 6 months' notice to the other.

## COMMITTEE RECOMMENDATION

In light of the testimony received from Mr. Stam and his analysis
of the pending conventions, the Committee on Foreign Relations felt
that article XXII of the Netherlands convention relating to collections
which will be extended to the Netherlands Antilles should be clarified.
In recommending approval of the pending conventions, therefore, the
committee does so with the understanding that—

in extending the Netherlands convention to the Netherlands Antilles the collection
provision in article XXII will be restricted in its application so that each of the
Governments may assist in collecting the other's taxes only to the extent necessary
to insure that the provisions of the convention shall not be enjoyed by persons
not entitled to its benefits.

Inasmuch as these conventions become effective in the year during
which they are approved, and in light of the fact that no objections to
the conventions have been filed with the committee, it is recommended
that the Senate give its early approval to the pending conventions.

# Exhibit 65

| 104TH CONGRESS<br>*1st Session* | SENATE | TREATY DOC.<br>104–4 |
|---|---|---|

# A REVISED PROTOCOL AMENDING THE 1980 TAX CONVENTION WITH CANADA

---

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

A REVISED PROTOCOL AMENDING THE CONVENTION BETWEEN THE UNITED STATES AND CANADA WITH RESPECT TO TAXES ON INCOME AND ON CAPITAL SIGNED AT WASHINGTON ON SEPTEMBER 26, 1980, AS AMENDED BY THE PROTOCOLS SIGNED ON JUNE 14, 1983 AND MARCH 28, 1984



APRIL 24, 1995.—Protocol was read the first time and, together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

---

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1995

99–119

## LETTER OF TRANSMITTAL

———————

THE WHITE HOUSE, *April 24, 1995.*

*To the Senate of the United States:*

I transmit herewith for Senate advice and consent to ratification, a revised Protocol Amending the Convention Between the United States of America and Canada with Respect to Taxes on Income and on Capital Signed at Washington on September 26, 1980, as Amended by the Protocols Signed on June 14, 1983, and March 28, 1984. This revised Protocol was signed at Washington on March 17, 1995. Also transmitted for the information of the Senate is the report of the Department of State with respect to the revised Protocol. The principal provisions of the Protocol, as well as the reasons for the technical amendments made in the revised Protocol, are explained in that document.

It is my desire that revised Protocol transmitted herewith be considered in place of the Protocol to the Income Tax Convention with Canada signed at Washington on August 31, 1994, which was transmitted to the Senate with my message dated September 14, 1994, and which is now pending in the Committee on Foreign Relations. I desire, therefore, to withdraw from the Senate the Protocol signed in August 1994.

I recommend that the Senate give early and favorable consideration to the revised Protocol and give its advice and consent to ratification.

WILLIAM J. CLINTON.

## LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, April 12, 1995.*

THE PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you, with a view to its transmission to the Senate for advice and consent to ratification, a revised Protocol Amending the Convention between the United States and Canada with Respect to Taxes on Income and on Capital signed at Washington on September 26, 1980, as amended by the Protocols signed on June 14, 1983 and March 28, 1984. The revised Protocol would replace the Protocol to the Convention between the United States and Canada signed at Washington on August 31, 1994, which was transmitted to the Senate with a message from the President dated September 14, 1994, and which is now pending in the Committee on Foreign Relations. The Protocol makes a number of amendments to the Convention. The most significant amendments are described below, in the order in which they appear in the Protocol. The revised Protocol makes technical changes intended to clarify the operation of some of the death tax provisions and to ensure that certain rules for entry into force operate properly.

The Convention currently provides for adjustments to related party transactions to reflect the amounts of income and expense that would have been reported in unrelated party transactions. It also provides for the other Contracting State to make correlative adjustments. However, unlike most of the United States tax treaties, the present Convention requires the State making the first adjustment to withdraw it if the initial adjustment has not been reported to the other Contracting State within six years of the year to which the first adjustment relates. This has created a potential for abuse. The Protocol will remove the obligation of the first-mentioned State to withdraw its adjustment in those circumstances.

The Protocol also reduces the withholding rates charged by one country on payments of certain classes of dividends, interest and royalties to residents of the other country. The withholding rate on dividends is reduced from 10 to 5 percent, phased in over two years, for a corporate shareholder that owns at least 10 percent of the voting stock of the paying company and is the beneficial owner of the dividends. The Protocol adds, in what has become established U.S. tax treaty policy, a rule to ensure that dividends paid by non-taxable "conduit" entities, such as U.S.-regulated investment companies (RICs) and real estate investment trusts (REITs),

will not receive unjustified treaty benefits. In addition, the small individual shareholder benefits for REITs will be allowed to the estate of such an individual for up to five years.

The general withholding rate on interest will be reduced from 15 to 10 percent. The exemption in the present treaty for interest on trade credits will be broadened to include not only interest received by the seller but also interest received by other holders of trade credits. Real estate mortgage investment conduit (REMIC) excess inclusions will be taxable by the United States at full statutory rates. Most classes of royalties, including software royalties, will be exempt from withholding by the country in which the royalty arises.

Social security benefits, under the Protocol, are subject to tax only in the country making the payment. This change reflects U.S. tax treaty policy.

The scope of the non-discrimination article is broadened to include all national-level taxes in both Contracting States. Under the present Convention, the non-discrimination provisions are limited, with respect to taxes imposed by Canada, to taxes imposed under the Canadian Income Tax Act.

The Protocol strengthens levels of cooperation between the tax authorities of the Contracting States. It provides that the Contracting States may, by mutual agreement, implement an arbitration procedure for the resolution of disputes under the Convention. The Protocol also adds a detailed set of rules under which each State will assist the other in the collection of its taxes.

The information exchange provision is also broadened to include all national taxes. With respect to Canadian taxes, the present Convention covers only taxes imposed under the Income Tax Act and any national taxes on estates and gifts. The Protocol also provides for consultation and, if appropriate, renegotiation (subject to the usual ratification procedures) where future domestic legislation materially conflicts with treaty provisions.

The present Convention has no general anti-treaty-shopping rules. The comprehensive "limitations on benefits" provisions add to the treaty by the Protocol are, at Canada's request, primarily unilateral. These provisions protect the United States against use of the treaty by "treaty shoppers" seeking to gain unintended U.S. treaty benefits through Canada.

The Protocol adds rules to the Convention concerning taxation at death. The United States and Canada have different methods for imposing taxation at death. The United States imposes an estate tax, while Canada imposes an income tax on certain gains deemed realized at death. The Protocol contains many provisions which reduce the impact of taxes imposed at death by one Contracting State on residents of the other. First, the Protocol provides a limited U.S. estate tax waiver for small estates of Canadian resident decedents. Second, it provides a *pro rata* unified credit by the United States for estates of Canadian resident decedents. Third, it allows a limited U.S. "marital credit" for estates of Canadian resident decedents and of Canadian-citizen decedents resident in the United States. Fourth, the Protocol allows a credit against U.S. estate tax for Canadian income tax on certain income, profits, and gains realized in the year of death and on certain gains deemed realized at

VII

death by Canadian residents, and vice versa. Fifth, certain U.S. "qualified domestic trusts" would be allowed to qualify as Canadian spousal trusts for purposes of Canadian law. Finally, relief would be provided for certain cross-border charitable bequests. The revised Protocol clarifies certain aspects of the computation and coordination of these provisions concerning taxation at death.

The Protocol requires the appropriate authorities of the Contracting States to consult within three years of its entry into force regarding further reductions in withholding rates and the application of the anti-treaty-shopping rules. The appropriate authorities are instructed to consult after three years regarding implementation of the arbitration procedure. The Protocol enters into force upon the exchange of instruments of ratification.

A technical memorandum explaining in detail the provisions of the revised Protocol will be prepared by the Department of the Treasury and will be submitted separately to the Senate Committee on Foreign Relations.

The Department of the Treasury and the Department of State cooperated in the negotiation of the revised Protocol. It has the full approval of both Departments.

Respectfully submitted,

PETER TARNOFF.

PROTOCOL AMENDING THE CONVENTION BETWEEN THE UNITED
STATES OF AMERICA AND CANADA WITH RESPECT TO TAXES
ON INCOME AND ON CAPITAL SIGNED AT WASHINGTON ON
SEPTEMBER 26, 1980, AS AMENDED BY THE PROTOCOLS
SIGNED ON JUNE 14, 1983 AND MARCH 28, 1984


The United States of America and Canada, desiring to
conclude a Protocol to amend the Convention with Respect to
Taxes on Income and on Capital signed at Washington on
September 26, 1980, as amended by the Protocols signed on
June 14, 1983 and March 28, 1984 (hereinafter referred to as
"the Convention"), have agreed as follows:

(1)

2

ARTICLE 1

Paragraphs 2 to 4 of Article II (Taxes Covered) of the Convention shall be deleted and replaced by the following:

"2.  Notwithstanding paragraph 1, the taxes existing on __Mɑʀcʜ 17, 1995_____ to which the Convention shall apply are:

(a)  In the case of Canada, the taxes imposed by the Government of Canada under the Income Tax Act; and

(b)  In the case of the United States, the Federal income taxes imposed by the Internal Revenue Code of 1986.  However, the Convention shall apply to:

(i)  The United States accumulated earnings tax and personal holding company tax, to the extent, and only to the extent, necessary to implement the provisions of paragraphs 5 and 8 of Article X (Dividends);

(ii) The United States excise taxes imposed with respect to private foundations, to the extent, and only to the extent, necessary to implement the provisions of paragraph 4 of Article XXI (Exempt Organizations);

(iii)  The United States social security taxes, to the extent, and only to the extent, necessary to implement the provisions of paragraph 2 of Article XXIV (Elimination of Double Taxation) and paragraph 4 of Article XXIX (Miscellaneous Rules); and

(iv) The United States estate taxes imposed by the Internal Revenue Code of 1986, to the extent, and only to the extent, necessary to implement the provisions of paragraph 3(g) of Article XXVI (Mutual Agreement Procedure) and Article XXIX B (Taxes Imposed by Reason of Death).

3.    The Convention shall apply also to:

(a)  Any taxes identical or substantially similar to those taxes to which the Convention applies under paragraph 2; and

(b)  Taxes on capital;

3

which are imposed after ___March 17, 1995___
in addition to, or in place of, the taxes to which the
Convention applies under paragraph 2."


ARTICLE 2

Subparagraphs (c) and (d) of paragraph 1 of Article III
(General Definitions) of the Convention shall be deleted and
replaced by the following:

"(c) The term "Canadian tax" means the taxes
referred to in Article II (Taxes Covered) that are
imposed on income by Canada;

(d) The term "United States tax" means the taxes
referred to in Article II (Taxes Covered), other
than in subparagraph (b)(i) to (iv) of paragraph 2
thereof, that are imposed on income by the United
States;"


ARTICLE 3

1.   Paragraph 1 of Article IV (Residence) of the Convention
shall be deleted and replaced by the following:

"1.  For the purposes of this Convention, the term
"resident" of a Contracting State means any person
that, under the laws of that State, is liable to tax
therein by reason of that person's domicile, residence,
citizenship, place of management, place of
incorporation or any other criterion of a similar
nature, but in the case of an estate or trust, only to
the extent that income derived by the estate or trust
is liable to tax in that State, either in its hands or
in the hands of its beneficiaries.  For the purposes of
this paragraph, an individual who is not a resident of
Canada under this paragraph and who is a United States
citizen or an alien admitted to the United States for
permanent residence (a "green card" holder) is a
resident of the United States only if the individual
has a substantial presence, permanent home or habitual
abode in the United States, and that individual's
personal and economic relations are closer to the
United States than to any third State.  The term
"resident" of a Contracting State is understood to
include:

4

(a)  The Government of that State or a political
subdivision or local authority thereof or any
agency or instrumentality of any such government,
subdivision or authority, and

(b)  (i)  A trust, organization or other
arrangement that is operated exclusively to
administer or provide pension, retirement or
employee benefits; and

(ii) A not-for-profit organization

that was constituted in that State and that is, by
reason of its nature as such, generally exempt
from income taxation in that State."

2.    A new sentence shall be added at the end of paragraph 3
of Article IV (Residence) of the Convention as follows:

"Notwithstanding the preceding sentence, a company that
was created in a Contracting State, that is a resident
of both Contracting States and that is continued at any
time in the other Contracting State in accordance with
the corporate law in that other State shall be deemed
while it is so continued to be a resident of that other
State."


ARTICLE 4

Paragraphs 3 and 4 of Article IX (Related Persons) of
the Convention shall be deleted and replaced by the
following:

"3.  Where an adjustment is made or to be made by a
Contracting State in accordance with paragraph 1, the
other Contracting State shall (notwithstanding any time
or procedural limitations in the domestic law of that
other State) make a corresponding adjustment to the
income, loss or tax of the related person in that other
State if:

(a) It agrees with the first-mentioned adjustment;
and

(b)  Within six years from the end of the taxable
year to which the first-mentioned adjustment
relates, the competent authority of the other
State has been notified of the first-mentioned
adjustment.  The competent authorities, however,
may agree to consider cases where the

5

corresponding adjustment would not otherwise be
barred by any time or procedural limitations in
the other State, even if the notification is not
made within the six-year period.

4.   In the event that the notification referred to in
paragraph 3 is not given within the time period
referred to therein, and the competent authorities have
not agreed to otherwise consider the case in accordance
with paragraph 3(b), the competent authority of the
Contracting State which has made or is to make the
first-mentioned adjustment may provide relief from
double taxation where appropriate."

ARTICLE 5

1.   The references in paragraphs 2(a) and 6 of Article X
(Dividends) of the Convention to a rate of tax of "10 per
cent" shall be deleted and replaced by references to a rate
of tax of "5 per cent".

2.   Paragraph 7 of Article X (Dividends) of the Convention
shall be deleted and replaced by the following:

"7.   Notwithstanding the provisions of paragraph 2,

(a)   Dividends paid by a company that is a
resident of Canada and a non-resident-owned
investment corporation to a company that is a
resident of the United States, that owns at
least 10 per cent of the voting stock of the
company paying the dividends and that is the
beneficial owner of such dividends, may be
taxed in Canada at a rate not exceeding 10
per cent of the gross amount of the
dividends;

(b)   Paragraph 2(b) and not paragraph 2(a)
shall apply in the case of dividends paid by
a resident of the United States that is a
Regulated Investment Company; and

(c)   Paragraph 2(a) shall not apply to dividends
paid by a resident of the United States that is a
Real Estate Investment Trust, and paragraph 2(b)
shall apply only where such dividends are
beneficially owned by an individual holding an
interest of less than 10 per cent in the trust;
otherwise the rate of tax applicable under the
domestic law of the United States shall apply.

6

Where an estate or a testamentary trust acquired
its interest in a Real Estate Investment Trust as
a consequence of an individual's death, for the
purposes of the preceding sentence the estate or
trust shall for the five-year period following the
death be deemed with respect to that interest to
be an individual."

ARTICLE 6

1.    The reference in paragraph 2 of Article XI (Interest)
of the Convention to "15 per cent" shall be deleted and
replaced by a reference to "10 per cent".

2.    Paragraph 3(d) of Article XI (Interest) of the
Convention shall be deleted and replaced by the following:

"(d) The interest is beneficially owned by a
resident of the other Contracting State and is
paid with respect to indebtedness arising as a
consequence of the sale on credit by a resident of
that other State of any equipment, merchandise or
services except where the sale or indebtedness was
between related persons; or"

3.    A new paragraph 9 shall be added to Article XI
(Interest) of the Convention as follows:

"9.    The provisions of paragraphs 2 and 3 shall not
apply to an excess inclusion with respect to a residual
interest in a Real Estate Mortgage Investment Conduit
to which Section 860G of the United States Internal
Revenue Code, as it may be amended from time to time
without changing the general principle thereof,
applies."

ARTICLE 7

1.    Paragraph 3 of Article XII (Royalties) of the
Convention shall be deleted and replaced by the following:

"3.    Notwithstanding the provisions of paragraph 2,

(a)    Copyright royalties and other like
payments in respect of the production or
reproduction of any literary, dramatic,
musical or artistic work (other than payments
in respect of motion pictures and works on

7

film, videotape or other means of
reproduction for use in connection with
television);

(b)  Payments for the use of, or the right to
use, computer software;

(c)  Payments for the use of, or the right to
use, any patent or any information concerning
industrial, commercial or scientific
experience (but not including any such
information provided in connection with a
rental or franchise agreement); and

(d)  Payments with respect to broadcasting as may
be agreed for the purposes of this paragraph in an
exchange of notes between the Contracting States;

arising in a Contracting State and beneficially owned
by a resident of the other Contracting State shall be
taxable only in that other State."

2.    Paragraph 6 of Article XII (Royalties) of the
Convention shall be deleted and replaced by the following:

"6. For the purposes of this Article,

(a)  Royalties shall be deemed to arise in a
Contracting State when the payer is a resident of
that State.  Where, however, the person paying the
royalties, whether he is a resident of a
Contracting State or not, has in a State a
permanent establishment or a fixed base in
connection with which the obligation to pay the
royalties was incurred, and such royalties are
borne by such permanent establishment or fixed
base, then such royalties shall be deemed to arise
in the State in which the permanent establishment
or fixed base is situated and not in any other
State of which the payer is a resident; and

(b)  Where subparagraph (a) does not operate to
treat royalties as arising in either Contracting
State and the royalties are for the use of, or the
right to use, intangible property or tangible
personal property in a Contracting State, then
such royalties shall be deemed to arise in that
State."

8

### ARTICLE 8

Paragraph 8 of Article XIII (Gains) of the Convention shall be deleted and replaced by the following:

"8. Where a resident of a Contracting State alienates property in the course of a corporate or other organization, reorganization, amalgamation, division or similar transaction and profit, gain or income with respect to such alienation is not recognized for the purpose of taxation in that State, if requested to do so by the person who acquires the property, the competent authority of the other Contracting State may agree, in order to avoid double taxation and subject to terms and conditions satisfactory to such competent authority, to defer the recognition of the profit, gain or income with respect to such property for the purpose of taxation in that other State until such time and in such manner as may be stipulated in the agreement."

### ARTICLE 9

1. Paragraph 3 of Article XVIII (Pensions and Annuities) of the Convention shall be deleted and replaced by the following:

"3. For the purposes of this Convention, the term "pensions" includes any payment under a superannuation, pension or other retirement arrangement, Armed Forces retirement pay, war veterans pensions and allowances and amounts paid under a sickness, accident or disability plan, but does not include payments under an income-averaging annuity contract or any benefit referred to in paragraph 5."

2. Paragraph 5 of Article XVIII (Pensions and Annuities) of the Convention shall be deleted and replaced by the following:

"5. Benefits under the social security legislation in a Contracting State (including tier 1 railroad benefits but not including unemployment benefits) paid to a resident of the other Contracting State (and in the case of Canadian benefits, to a citizen of the United States) shall be taxable only in the first-mentioned State."

3. A new paragraph 7 shall be added to Article XVIII (Pensions and Annuities) of the Convention as follows:

·  **9**

"7.   A natural person who is a citizen or resident of a
Contracting State and a beneficiary of a trust,
company, organization or other arrangement that is a
resident of the other Contracting State, generally
exempt from income taxation in that other State and
operated exclusively to provide pension, retirement or
employee benefits may elect to defer taxation in the
first-mentioned State, under rules established by the
competent authority of that State, with respect to any
income accrued in the plan but not distributed by the
plan, until such time as and to the extent that a
distribution is made from the plan or any plan
substituted therefor."

### ARTICLE 10

1.    Paragraphs 2 and 3 of Article XXI (Exempt
Organizations) of the Convention shall be deleted and
replaced by the following:

"2.   Subject to the provisions of paragraph 3, income
referred to in Articles X (Dividends) and XI (Interest)
derived by:

(a)   A trust, company, organization or other
arrangement that is a resident of a Contracting
State, generally exempt from income taxation in a
taxable year in that State and operated
exclusively to administer or provide pension,
retirement or employee benefits; or

(b) A trust, company, organization or other
arrangement that is a resident of a Contracting
State, generally exempt from income taxation in a
taxable year in that State and operated
exclusively to earn income for the benefit of an
organization referred to in subparagraph (a);

shall be exempt from income taxation in that taxable
year in the other Contracting State.

3.    The provisions of paragraphs 1 and 2 shall not
apply with respect to the income of a trust, company,
organization or other arrangement from carrying on a
trade or business or from a related person other than a
person referred to in paragraph 1 or 2."

2.    A new sentence shall be added at the end of paragraph 5
of Article XXI (Exempt Organizations) of the Convention as
follows:

"For the purposes of this paragraph, a company that is a resident of Canada and that is taxable in the United States as if it were a resident of the United States shall be deemed to be a resident of the United States."

3.    Paragraph 6 of Article XXI (Exempt Organizations) of the Convention shall be deleted and replaced by the following:

"6. For the purposes of Canadian taxation, gifts by a resident of Canada to an organization that is a resident of the United States, that is generally exempt from United States tax and that could qualify in Canada as a registered charity if it were a resident of Canada and created or established in Canada, shall be treated as gifts to a registered charity; however, no relief from taxation shall be available in any taxation year with respect to such gifts (other than such gifts to a college or university at which the resident or a member of the resident's family is or was enrolled) to the extent that such relief would exceed the amount of relief that would be available under the Income Tax Act if the only income of the resident for that year were the resident's income arising in the United States. The preceding sentence shall not be interpreted to allow in any taxation year relief from taxation for gifts to registered charities in excess of the amount of relief allowed under the percentage limitations of the laws of Canada in respect of relief for gifts to registered charities."

ARTICLE 11

A new paragraph 3 shall be added to Article XXII (Other Income) of the Convention as follows:

"3. Losses incurred by a resident of a Contracting State with respect to wagering transactions the gains on which may be taxed in the other Contracting State shall, for the purpose of taxation in that other State, be deductible to the same extent that such losses would be deductible if they were incurred by a resident of that other State."

11

ARTICLE 12

1. Paragraphs 2(a) and 2(b) of Article XXIV (Elimination of Double Taxation) of the Convention shall be deleted and replaced by the following:

> "(a) Subject to the provisions of the law of Canada regarding the deduction from tax payable in Canada of tax paid in a territory outside Canada and to any subsequent modification of those provisions (which shall not affect the general principle hereof)
>
>> (i) Income tax paid or accrued to the United States on profits, income or gains arising in the United States, and
>>
>> (ii) In the case of an individual, any social security taxes paid to the United States (other than taxes relating to unemployment insurance benefits) by the individual on such profits, income or gains
>
> shall be deducted from any Canadian tax payable in respect of such profits, income or gains;
>
> (b) Subject to the existing provisions of the law of Canada regarding the taxation of income from a foreign affiliate and to any subsequent modification of those provisions -- which shall not affect the general principle hereof -- for the purpose of computing Canadian tax, a company which is a resident of Canada shall be allowed to deduct in computing its taxable income any dividend received by it out of the exempt surplus of a foreign affiliate which is a resident of the United States; and"

2. Paragraph 5 of Article XXIV (Elimination of Double Taxation) of the Convention shall be deleted and replaced by the following:

> "5. Notwithstanding the provisions of paragraph 4, where a United States citizen is a resident of Canada, the following rules shall apply in respect of the items of income referred to in Article X (Dividends), XI (Interest) or XII (Royalties) that arise (within the meaning of paragraph 3) in the United States and that would be subject to United States tax if the resident of Canada were not a citizen of the United States, as long as the law in force in Canada allows a deduction in computing income for the portion of any foreign tax

12

paid in respect of such items which exceeds 15 per cent of the amount thereof:

(a) The deduction so allowed in Canada shall not be reduced by any credit or deduction for income tax paid or accrued to Canada allowed in computing the United States tax on such items;

(b) Canada shall allow a deduction from Canadian tax on such items in respect of income tax paid or accrued to the United States on such items, except that such deduction need not exceed the amount of the tax that would be paid on such items to the United States if the resident of Canada were not a United States citizen; and

(c) For the purposes of computing the United States tax on such items, the United States shall allow as a credit against United States tax the income tax paid or accrued to Canada after the deduction referred to in subparagraph (b). The credit so allowed shall reduce only that portion of the United States tax on such items which exceeds the amount of tax that would be paid to the United States on such items if the resident of Canada were not a United States citizen."

3. Paragraph 7 of Article XXIV (Elimination of Double Taxation) of the Convention shall be deleted and replaced by the following:

"7. For the purposes of this Article, any reference to "income tax paid or accrued" to a Contracting State shall include Canadian tax and United States tax, as the case may be, and taxes of general application which are paid or accrued to a political subdivision or local authority of that State, which are not imposed by that political subdivision or local authority in a manner inconsistent with the provisions of the Convention and which are substantially similar to the Canadian tax or United States tax, as the case may be."

4. A new paragraph 10 shall be added to Article XXIV (Elimination of Double Taxation) of the Convention as follows:

"10. Where in accordance with any provision of the Convention income derived or capital owned by a resident of a Contracting State is exempt from tax in that State, such State may nevertheless, in calculating the amount of tax on other income or capital, take into account the exempted income or capital."

### ARTICLE 13

1.   Paragraph 3 of Article XXV (Non-Discrimination) of the Convention shall be deleted and replaced by the following:

> "3.  In determining the taxable income or tax payable of an individual who is a resident of a Contracting State, there shall be allowed as a deduction in respect of any other person who is a resident of the other Contracting State and who is dependent on the individual for support the amount that would be so allowed if that other person were a resident of the first-mentioned State."

2.    Paragraph 10 of Article XXV (Non-Discrimination) of the Convention shall be deleted and replaced by the following:

> "10. Notwithstanding the provisions of Article II (Taxes Covered), this Article shall apply to all taxes imposed by a Contracting State."

### ARTICLE 14

1.   Paragraphs 3(f) and (g) of Article XXVI (Mutual Agreement Procedure) of the Convention shall be deleted and replaced by the following:

> "(f) To the elimination of double taxation with respect to a partnership;
>
> (g) To provide relief from double taxation resulting from the application of the estate tax imposed by the United States or the Canadian tax as a result of a distribution or disposition of property by a trust that is a qualified domestic trust within the meaning of section 2056A of the Internal Revenue Code, or is described in subsection 70(6) of the Income Tax Act or is treated as such under paragraph 5 of Article XXIX B (Taxes Imposed by Reason of Death), in cases where no relief is otherwise available; or
>
> (h) To increases in any dollar amounts referred to in the Convention to reflect monetary or economic developments."

2.   A new paragraph 6 shall be added to Article XXVI (Mutual Agreement Procedure) of the Convention as follows:

"6.  If any difficulty or doubt arising as to the
interpretation or application of the Convention cannot
be resolved by the competent authorities pursuant to
the preceding paragraphs of this Article, the case may,
if both competent authorities and the taxpayer agree,
be submitted for arbitration, provided that the
taxpayer agrees in writing to be bound by the decision
of the arbitration board.  The decision of the
arbitration board in a particular case shall be binding
on both States with respect to that case.  The
procedures shall be established in an exchange of notes
between the Contracting States.  The provisions of this
paragraph shall have effect after the Contracting
States have so agreed through the exchange of notes."

ARTICLE 15

A new Article XXVI A (Assistance in Collection) shall
be added to the Convention as follows:

"Article XXVI A
Assistance in Collection

1.    The Contracting States undertake to lend
assistance to each other in the collection of taxes
referred to in paragraph 9, together with interest,
costs, additions to such taxes and civil penalties,
referred to in this Article as a "revenue claim".

2.    An application for assistance in the collection of
a revenue claim shall include a certification by the
competent authority of the applicant State that, under
the laws of that State, the revenue claim has been
finally determined.  For the purposes of this Article,
a revenue claim is finally determined when the
applicant State has the right under its internal law to
collect the revenue claim and all administrative and
judicial rights of the taxpayer to restrain collection
in the applicant State have lapsed or been exhausted.

3.    A revenue claim of the applicant State that has
been finally determined may be accepted for collection
by the competent authority of the requested State and,
subject to the provisions of paragraph 7, if accepted
shall be collected by the requested State as though
such revenue claim were the requested State's own
revenue claim finally determined in accordance with the
laws applicable to the collection of the requested
State's own taxes.

4.   Where an application for collection of a revenue claim in respect of a taxpayer is accepted

> (a)  By the United States, the revenue claim shall be treated by the United States as an assessment under United States laws against the taxpayer as of the time the application is received; and

> (b)  By Canada, the revenue claim shall be treated by Canada as an amount payable under the Income Tax Act, the collection of which is not subject to any restriction.

5.   Nothing in this Article shall be construed as creating or providing any rights of administrative or judicial review of the applicant State's finally determined revenue claim by the requested State, based on any such rights that may be available under the laws of either Contracting State.  If, at any time pending execution of a request for assistance under this Article, the applicant State loses the right under its internal law to collect the revenue claim, the competent authority of the applicant State shall promptly withdraw the request for assistance in collection.

6.   Subject to this paragraph, amounts collected by the requested State pursuant to this Article shall be forwarded to the competent authority of the applicant State.  Unless the competent authorities of the Contracting States otherwise agree, the ordinary costs incurred in providing collection assistance shall be borne by the requested State and any extraordinary costs so incurred shall be borne by the applicant State.

7.   A revenue claim of an applicant State accepted for collection shall not have in the requested State any priority accorded to the revenue claims of the requested State.

8.   No assistance shall be provided under this Article for a revenue claim in respect of a taxpayer to the extent that the taxpayer can demonstrate that

> (a)  Where the taxpayer is an individual, the revenue claim relates to a taxable period in which the taxpayer was a citizen of the requested State, and

> (b)  Where the taxpayer is an entity that is a company, estate or trust, the revenue claim

16

relates to a taxable period in which the taxpayer
derived its status as such an entity from the laws
in force in the requested State.

9.    Notwithstanding the provisions of Article II
(Taxes Covered), the provisions of this Article shall
apply to all categories of taxes collected by or on
behalf of the Government of a Contracting State.

10.   Nothing in this Article shall be construed as:

(a)   Limiting the assistance provided for in
paragraph 4 of Article XXVI (Mutual Agreement
Procedure); or

(b)   Imposing on either Contracting State the
obligation to carry out administrative measures of
a different nature from those used in the
collection of its own taxes or that would be
contrary to its public policy (ordre public).

11.   The competent authorities of the Contracting
States shall agree upon the mode of application of this
Article, including agreement to ensure comparable
levels of assistance to each of the Contracting
States."


ARTICLE 16

1.    Paragraph 1 of Article XXVII (Exchange of Information)
of the Convention shall be deleted and replaced by the
following:

"1.   The competent authorities of the Contracting
States shall exchange such information as is relevant
for carrying out the provisions of this Convention or
of the domestic laws of the Contracting States
concerning taxes to which the Convention applies
insofar as the taxation thereunder is not contrary to
the Convention.   The exchange of information is not
restricted by Article I (Personal Scope).   Any
information received by a Contracting State shall be
treated as secret in the same manner as information
obtained under the taxation laws of that State and
shall be disclosed only to persons or authorities
(including courts and administrative bodies) involved
in the assessment or collection of, the administration
and enforcement in respect of, or the determination of
appeals in relation to the taxes to which the
Convention applies or, notwithstanding paragraph 4, in

17

relation to taxes imposed by a political subdivision or
local authority of a Contracting State that are
substantially similar to the taxes covered by the
Convention under Article II (Taxes Covered).  Such
persons or authorities shall use the information only
for such purposes.  They may disclose the information
in public court proceedings or in judicial decisions.
The competent authorities may release to an arbitration
board established pursuant to paragraph 6 of Article
XXVI (Mutual Agreement Procedure) such information as
is necessary for carrying out the arbitration
procedure; the members of the arbitration board shall
be subject to the limitations on disclosure described
in this Article."

2.    Paragraph 4 of Article XXVII (Exchange of Information)
of the Convention shall be deleted and replaced by the
following:

"4. For the purposes of this Article, the Convention
shall apply, notwithstanding the provisions of Article
II (Taxes Covered):

(a)   To all taxes imposed by a Contracting State;
and

(b)   To other taxes to which any other provision
of the Convention applies, but only to the extent
that the information is relevant for the purposes
of the application of that provision."


ARTICLE 17

1.    Paragraph 3(a) of Article XXIX (Miscellaneous Rules) of
the Convention shall be deleted and replaced by the
following:

"(a) Under paragraphs 3 and 4 of Article IX
(Related Persons), paragraphs 6 and 7 of Article
XIII (Gains), paragraphs 1, 3, 4, 5, 6(b) and 7 of
Article XVIII (Pensions and Annuities), paragraph
5 of Article XXIX (Miscellaneous Rules),
paragraphs 1, 5 and 6 of Article XXIX B (Taxes
Imposed by Reason of Death), paragraphs 2, 3, 4
and 7 of Article XXIX B (Taxes Imposed by Reason
of Death) as applied to the estates of persons
other than former citizens referred to in
paragraph 2 of this Article, paragraphs 3 and 5 of
Article XXX (Entry into Force), and Articles XIX
(Government Service), XXI (Exempt Organizations),

18

XXIV (Elimination of Double Taxation), XXV (Non-Discrimination) and XXVI (Mutual Agreement Procedure);"

2.    Paragraphs 5 to 7 of Article XXIX (Miscellaneous Rules) of the Convention shall be deleted and replaced by the following:

"5.    Where a person who is a resident of Canada and a shareholder of a United States S corporation requests the competent authority of Canada to do so, the competent authority may agree, subject to terms and conditions satisfactory to such competent authority, to apply the following rules for the purposes of taxation in Canada with respect to the period during which the agreement is effective:

(a)    The corporation shall be deemed to be a controlled foreign affiliate of the person;

(b)    All the income of the corporation shall be deemed to be foreign accrual property income;

(c)    For the purposes of subsection 20(11) of the Income Tax Act, the amount of the corporation's income that is included in the person's income shall be deemed not to be income from a property; and

(d)    Each dividend paid to the person on a share of the capital stock of the corporation shall be excluded from the person's income and shall be deducted in computing the adjusted cost base to the person of the share.

6.    For purposes of paragraph 3 of Article XXII (Consultation) of the General Agreement on Trade in Services, the Contracting States agree that:

(a)    A measure falls within the scope of the Convention only if:

(i)    The measure relates to a tax to which Article XXV (Non-Discrimination) of the Convention applies; or

(ii)    The measure relates to a tax to which Article XXV (Non-Discrimination) of the Convention does not apply and to which any other provision of the Convention applies, but only to the extent that the measure

relates to a matter dealt with in that other
provision of the Convention; and

(b)  Notwithstanding paragraph 3 of Article XXII
(Consultation) of the General Agreement on Trade
in Services, any doubt as to the interpretation of
subparagraph (a) will be resolved under paragraph
3 of Article XXVI (Mutual Agreement Procedure) of
the Convention or any other procedure agreed to by
both Contracting States.

7.    The appropriate authority of a Contracting State
may request consultations with the appropriate
authority of the other Contracting State to determine
whether change to the Convention is appropriate to
respond to changes in the law or policy of that other
State.  Where domestic legislation enacted by a
Contracting State unilaterally removes or significantly
limits any material benefit otherwise provided by the
Convention, the appropriate authorities shall promptly
consult for the purpose of considering an appropriate
change to the Convention."


ARTICLE 18

A new Article XXIX A (Limitation on Benefits) shall be
added to the Convention as follows:


"Article XXIX A
Limitation on Benefits

1.    For the purposes of the application of this
Convention by the United States,

(a)  A qualifying person shall be entitled to all
of the benefits of this Convention, and

(b)  Except as provided in paragraphs 3, 4 and 6,
a person that is not a qualifying person shall not
be entitled to any benefits of the Convention.

2.    For the purposes of this Article, a qualifying
person is a resident of Canada that is:

(a) A natural person;

(b) The Government of Canada or a political
subdivision or local authority thereof, or any

20

agency or instrumentality of any such government, subdivision or authority;

(c)   A company or trust in whose principal class of shares or units there is substantial and regular trading on a recognized stock exchange;

(d)   A company more than 50 per cent of the vote and value of the shares (other than debt substitute shares) of which is owned, directly or indirectly, by five or fewer persons each of which is a company or trust referred to in subparagraph (c), provided that each company or trust in the chain of ownership is a qualifying person or a resident or citizen of the United States;

(e)   (i)   A company 50 per cent or more of the vote and value of the shares (other than debt substitute shares) of which is not owned, directly or indirectly, by persons other than qualifying persons or residents or citizens of the United States, or

(ii) A trust 50 per cent or more of the beneficial interest in which is not owned, directly or indirectly, by persons other than qualifying persons or residents or citizens of the United States,

where the amount of the expenses deductible from gross income that are paid or payable by the company or trust, as the case may be, for its preceding fiscal period (or, in the case of its first fiscal period, that period) to persons that are not qualifying persons or residents or citizens of the United States is less than 50 per cent of its gross income for that period;

(f)   An estate;

(g)   A not-for-profit organization, provided that more than half of the beneficiaries, members or participants of the organization are qualifying persons or residents or citizens of the United States; or

(h)   An organization described in paragraph 2 of Article XXI (Exempt Organizations) and established for the purpose of providing benefits primarily to individuals who are qualifying persons, persons who were qualifying persons within the five

preceding years, or residents or citizens of the United States.

3. Where a person that is a resident of Canada and is not a qualifying person of Canada, or a person related thereto, is engaged in the active conduct of a trade or business in Canada (other than the business of making or managing investments, unless those activities are carried on with customers in the ordinary course of business by a bank, an insurance company, a registered securities dealer or a deposit-taking financial institution), the benefits of the Convention shall apply to that resident person with respect to income derived from the United States in connection with or incidental to that trade or business, including any such income derived directly or indirectly by that resident person through one or more other persons that are residents of the United States. Income shall be deemed to be derived from the United States in connection with the active conduct of a trade or business in Canada only if that trade or business is substantial in relation to the activity carried on in the United States giving rise to the income in respect of which benefits provided under the Convention by the United States are claimed.

4. A company that is a resident of Canada shall also be entitled to the benefits of Articles X (Dividends), XI (Interest) and XII (Royalties) if

(a) Its shares that represent more than 90 per cent of the aggregate vote and value represented by all of its shares (other than debt substitute shares) are owned, directly or indirectly, by persons each of whom is a qualifying person, a resident or citizen of the United States or a person who

(i) Is a resident of a country with which the United States has a comprehensive income tax convention and is entitled to all of the benefits provided by the United States under that convention;

(ii) Would qualify for benefits under paragraphs 2 or 3 if that person were a resident of Canada (and, for the purposes of paragraph 3, if the business it carried on in the country of which it is a resident were carried on by it in Canada); and

22

(iii)  Would be entitled to a rate of United States tax under the convention between that person's country of residence and the United States, in respect of the particular class of income for which benefits are being claimed under this Convention, that is at least as low as the rate applicable under this Convention; and

(b)  The amount of the expenses deductible from gross income that are paid or payable by the company for its preceding fiscal period (or, in the case of its first fiscal period, that period) to persons that are not qualifying persons or residents or citizens of the United States is less than 50 per cent of the gross income of the company for that period.

5.  For the purposes of this Article,

(a)  The term "recognized stock exchange" means:

(i)  The NASDAQ System owned by the National Association of Securities Dealers, Inc. and any stock exchange registered with the Securities and Exchange Commission as a national securities exchange for purposes of the Securities Exchange Act of 1934;

(ii) Canadian stock exchanges that are "prescribed stock exchanges" under the Income Tax Act; and

(iii)  Any other stock exchange agreed upon by the Contracting States in an exchange of notes or by the competent authorities of the Contracting States;

(b)  The term "not-for-profit organization" of a Contracting State means an entity created or established in that State and that is, by reason of its not-for-profit status, generally exempt from income taxation in that State, and includes a private foundation, charity, trade union, trade association or similar organization; and

(c)  The term "debt substitute share" means:

(i)  A share described in paragraph (e) of the definition "term preferred share" in the Income Tax Act, as it may be amended from

23

time to time without changing the general
principle thereof; and

(ii) Such other type of share as may be
agreed upon by the competent authorities of
the Contracting States.

6.    Where a person that is a resident of Canada is not
entitled under the preceding provisions of this Article
to the benefits provided under the Convention by the
United States, the competent authority of the United
States shall, upon that person's request, determine on
the basis of all factors including the history,
structure, ownership and operations of that person
whether

(a)    Its creation and existence did not have as a
principal purpose the obtaining of benefits under
the Convention that would not otherwise be
available; or

(b). It would not be appropriate, having regard to
the purpose of this Article, to deny the benefits
of the Convention to that person.

The person shall be granted the benefits of the
Convention by the United States where the competent
authority determines that subparagraph (a) or (b)
applies.

7.    It is understood that the fact that the preceding
provisions of this Article apply only for the purposes
of the application of the Convention by the United
States shall not be construed as restricting in any
manner the right of a Contracting State to deny
benefits under the Convention where it can reasonably
be concluded that to do otherwise would result in an
abuse of the provisions of the Convention."


ARTICLE 19

A new Article XXIX B (Taxes Imposed by Reason of Death)
shall be added to the Convention as follows:


"Article XXIX B
Taxes Imposed by Reason of Death

24

1.    Where the property of an individual who is a
resident of a Contracting State passes by reason of the
individual's death to an organization referred to in
paragraph 1 of Article XXI (Exempt Organizations), the
tax consequences in a Contracting State arising out of
the passing of the property shall apply as if the
organization were a resident of that State.

2.    In determining the estate tax imposed by the
United States, the estate of an individual (other than
a citizen of the United States) who was a resident of
Canada at the time of the individual's death shall be
allowed a unified credit equal to the greater of

> (a)  The amount that bears the same ratio to the
> credit allowed under the law of the United States
> to the estate of a citizen of the United States as
> the value of the part of the individual's gross
> estate that at the time of the individual's death
> is situated in the United States bears to the
> value of the individual's entire gross estate
> wherever situated; and

> (b)  The unified credit allowed to the estate of a
> nonresident not a citizen of the United States
> under the law of the United States.

The amount of any unified credit otherwise allowable
under this paragraph shall be reduced by the amount of
any credit previously allowed with respect to any gift
made by the individual.  A credit otherwise allowable
under subparagraph (a) shall be allowed only if all
information necessary for the verification and
computation of the credit is provided.

3.    In determining the estate tax imposed by the
United States on an individual's estate with respect to
property that passes to the surviving spouse of the
individual (within the meaning of the law of the United
States) and that would qualify for the estate tax
marital deduction under the law of the United States if
the surviving spouse were a citizen of the United
States and all applicable elections were properly made
(in this paragraph and paragraph 4 referred to as
"qualifying property"), a non-refundable credit
computed in accordance with the provisions of paragraph
4 shall be allowed in addition to the unified credit
allowed to the estate under paragraph 2 or under the
law of the United States, provided that

(a) The individual was at the time of death a citizen of the United States or a resident of either Contracting State;

(b) The surviving spouse was at the time of the individual's death a resident of either Contracting State;

(c) If both the individual and the surviving spouse were residents of the United States at the time of the individual's death, one or both was a citizen of Canada; and

(d) The executor of the decedent's estate elects the benefits of this paragraph and waives irrevocably the benefits of any estate tax marital deduction that would be allowed under the law of the United States on a United States Federal estate tax return filed for the individual's estate by the date on which a qualified domestic trust election could be made under the law of the United States.

4. The amount of the credit allowed under paragraph 3 shall equal the lesser of

(a) The unified credit allowed under paragraph 2 or under the law of the United States (determined without regard to any credit allowed previously with respect to any gift made by the individual), and

(b) The amount of estate tax that would otherwise be imposed by the United States on the transfer of qualifying property.

The amount of estate tax that would otherwise be imposed by the United States on the transfer of qualifying property shall equal the amount by which the estate tax (before allowable credits) that would be imposed by the United States if the qualifying property were included in computing the taxable estate exceeds the estate tax (before allowable credits) that would be so imposed if the qualifying property were not so included. Solely for purposes of determining other credits allowed under the law of the United States, the credit provided under paragraph 3 shall be allowed after such other credits.

5. Where an individual was a resident of the United States immediately before the individual's death, for the purposes of subsection 70(6) of the Income Tax Act,

both the individual and the individual's spouse shall
be deemed to have been resident in Canada immediately
before the individual's death.  Where a trust that
would be a trust described in subsection 70(6) of that
Act, if its trustees that were residents or citizens of
the United States or domestic corporations under the
law of the United States were residents of Canada,
requests the competent authority of Canada to do so,
the competent authority may agree, subject to terms and
conditions satisfactory to such competent authority, to
treat the trust for the purposes of that Act as being
resident in Canada for such time as may be stipulated
in the agreement.

6.    In determining the amount of Canadian tax payable
by an individual who immediately before death was a
resident of Canada, or by a trust described in
subsection 70(6) of the Income Tax Act (or a trust
which is treated as being resident in Canada under the
provisions of paragraph 5), the amount of any Federal
or state estate or inheritance taxes payable in the
United States (not exceeding, where the individual was
a citizen of the United States or a former citizen
referred to in paragraph 2 of Article XXIX
(Miscellaneous Rules), the amount of estate and
inheritance taxes that would have been payable if the
individual were not a citizen or former citizen of the
United States) in respect of property situated within
the United States shall,

        (a)   To the extent that such estate or inheritance
        taxes are imposed upon the individual's death, be
        allowed as a deduction from the amount of any
        Canadian tax otherwise payable by the individual
        for the taxation year in which the individual died
        on the total of

                (i)  Any income, profits or gains of the
                individual arising (within the meaning of
                paragraph 3 of Article XXIV (Elimination of
                Double Taxation)) in the United States in
                that year, and

                (ii) Where the value at the time of the
                individual's death of the individual's entire
                gross estate wherever situated (determined
                under the law of the United States) exceeded
                1.2 million U.S. dollars or its equivalent in
                Canadian dollars, any income, profits or
                gains of the individual for that year from
                property situated in the United States at
                that time, and

(b)  To the extent that such estate or inheritance taxes are imposed upon the death of the individual's surviving spouse, be allowed as a deduction from the amount of any Canadian tax otherwise payable by the trust for its taxation year in which that spouse dies on any income, profits or gains of the trust for that year arising (within the meaning of paragraph 3 of Article XXIV (Elimination of Double Taxation)) in the United States or from property situated in the United States at the time of death of the spouse.

For purposes of this paragraph, property shall be treated as situated within the United States if it is so treated for estate tax purposes under the law of the United States as in effect on  March 17, 1995 , subject to any subsequent changes thereof that the competent authorities of the Contracting States have agreed to apply for the purposes of this paragraph. The deduction allowed under this paragraph shall take into account the deduction for any income tax paid or accrued to the United States that is provided under paragraph 2(a), 4(a) or 5(b) of Article XXIV (Elimination of Double Taxation).

7.   In determining the amount of estate tax imposed by the United States on the estate of an individual who was a resident or citizen of the United States at the time of death, or upon the death of a surviving spouse with respect to a qualified domestic trust created by such an individual or the individual's executor or surviving spouse, a credit shall be allowed against such tax imposed in respect of property situated outside the United States, for the federal and provincial income taxes payable in Canada in respect of such property by reason of the death of the individual or, in the case of a qualified domestic trust, the individual's surviving spouse.  Such credit shall be computed in accordance with the following rules:

(a)  A credit otherwise allowable under this paragraph shall be allowed regardless of whether the identity of the taxpayer under the law of Canada corresponds to that under the law of the United States.

(b)  The amount of a credit allowed under this paragraph shall be computed in accordance with the provisions and subject to the limitations of the law of the United States regarding credit for foreign death taxes (as it may be amended from time to time without changing the general

28

principle hereof), as though the income tax
imposed by Canada were a creditable tax under that
law.

(c)  A credit may be claimed under this paragraph
for an amount of federal or provincial income tax
payable in Canada only to the extent that no
credit or deduction is claimed for such amount in
determining any other tax imposed by the United
States, other than the estate tax imposed on
property in a qualified domestic trust upon the
death of the surviving spouse.

8.    Provided that the value, at the time of death, of
the entire gross estate wherever situated of an
individual who was a resident of Canada (other than a
citizen of the United States) at the time of death does
not exceed 1.2 million U.S. dollars or its equivalent
in Canadian dollars, the United States may impose its
estate tax upon property forming part of the estate of
the individual only if any gain derived by the
individual from the alienation of such property would
have been subject to income taxation by the United
States in accordance with Article XIII (Gains)."


ARTICLE 20

1.    The appropriate authorities of the Contracting States
shall consult within a three-year period from the date on
which this Protocol enters into force with respect to
further reductions in withholding taxes provided in the
Convention, and with respect to the rules in Article XXIX A
(Limitation on Benefits) of the Convention.

2.    The appropriate authorities of the Contracting States
shall consult after a three-year period from the date on
which the Protocol enters into force in order to determine
whether it is appropriate to make the exchange of notes
referred to in Article XXVI (Mutual Agreement Procedure) of
the Convention.


ARTICLE 21

1.    This Protocol shall be subject to ratification in
accordance with the applicable procedures in Canada and the
United States and instruments of ratification shall be
exchanged as soon as possible.

2.   The Protocol shall enter into force upon the exchange of instruments of ratification, and shall have effect:

    (a)  For tax withheld at the source on income referred to in Articles X (Dividends), XI (Interest), XII (Royalties) and XVIII (Pensions and Annuities) of the Convention, except on income referred to in paragraph 5 of Article XVIII of the Convention (as it read before the entry into force of this Protocol), with respect to amounts paid or credited on or after the first day of the second month next following the date on which the Protocol enters into force, except that the reference in paragraph 2(a) of Article X (Dividends) of the Convention, as amended by the Protocol, to "5 per cent" shall be read, in its application to amounts paid or credited on or after that first day:

        (i)  Before 1996, as "7 per cent"; and

        (ii) After 1995 and before 1997, as "6 per cent"; and

    (b)  For other taxes, with respect to taxable years beginning on or after the first day of January next following the date on which the Protocol enters into force, except that the reference in paragraph 6 of Article X (Dividends) of the Convention, as amended by the Protocol, to "5 per cent" shall be read, in its application to taxable years beginning on or after that first day and ending before 1997, as "6 per cent".

3.   Notwithstanding the provisions of paragraph 2, Article XXVI A (Assistance in Collection) of the Convention shall have effect for revenue claims finally determined by a requesting State after the date that is 10 years before the date on which the Protocol enters into force.

4.   Notwithstanding the provisions of paragraph 2, paragraphs 2 through 8 of Article XXIX B (Taxes Imposed by Reason of Death) of the Convention (and paragraph 2 of Article II (Taxes Covered) and paragraph 3(a) of Article XXIX (Miscellaneous Rules) of the Convention, as amended by the Protocol, to the extent necessary to implement paragraphs 2 through 8 of Article XXIX B (Taxes Imposed by Reason of Death) of the Convention) shall, notwithstanding any limitation imposed under the law of a Contracting State on the assessment, reassessment or refund with respect to a person's return, have effect with respect to deaths occurring after the date on which the Protocol enters into force and, provided that any claim for refund by reason of this sentence is filed within one year of the date on which the Protocol enters into force or within the otherwise

applicable period for filing such claims under domestic law,
with respect to benefits provided under any of those
paragraphs with respect to deaths occurring after November
10, 1988.

5.   Notwithstanding the provisions of paragraph 2,
paragraph 2 of Article 3 of the Protocol shall have effect
with respect to taxable years beginning on or after the
first day of January next following the date on which the
Protocol enters into force.

        IN WITNESS WHEREOF, the undersigned, duly
authorized thereto by their respective Governments, have
signed this Protocol.

        Done in two copies at Washington this Seventeenth
day of   March      1995, in the English and French
languages, each text being equally authentic.


FOR THE GOVERNMENT OF          FOR THE GOVERNMENT OF
THE UNITED STATES OF AMERICA:  CANADA:

# Exhibit 66

TREASURY DEPARTMENT TECHNICAL EXPLANATION OF THE CONVENTION
BETWEEN THE UNITED STATES OF AMERICA AND CANADA WITH RESPECT TO
TAXES ON INCOME AND ON CAPITAL SIGNED AT WASHINGTON, D.C. ON
SEPTEMBER 26, 1980, AS AMENDED BY THE PROTOCOL SIGNED AT OTTAWA ON
JUNE 14, 1983 AND THE PROTOCOL SIGNED AT WASHINGTON ON MARCH 28, 1984.

GENERAL EFFECTIVE DATE UNDER ARTICLE XXX: 1 JANUARY 1985

INTRODUCTION

This is a technical explanation of the Convention between the United States and Canada signed on September 26, 1980, as amended by the Protocols signed on June 14, 1983 and March 28, 1984. ("the Convention"). References are made to the Convention and Protocol between Canada and the United States with respect to Income Taxes signed on March 4, 1942, as amended by the Convention signed on June 12, 1950, the Convention signed on August 8, 1956 and the Supplementary Convention signed on October 25, 1966 (the "1942 Convention"). These references are intended to put various provisions of the Convention into context. The technical explanation does not, however, provide a complete comparison between the Convention and the 1942 Convention. Moreover, neither the Convention nor the technical explanation is intended to have implications for the interpretation of the 1942 Convention.

The technical explanation is an official guide to the Convention. It reflects policies behind particular Convention provisions, as well as understandings reached with respect to the interpretation and application of the Convention.

TABLE OF ARTICLES

Article I---------------------------------Personal Scope
Article II--------------------------------Taxes Covered
Article III-------------------------------General Definitions
Article IV-------------------------------Residence
Article V--------------------------------Permanent Establishment
Article VI-------------------------------Income from Real Property
Article VII------------------------------Business Profits
Article VIII-----------------------------Transportation
Article IX-------------------------------Related Persons
Article X--------------------------------Dividends
Article XI-------------------------------Interest
Article XII------------------------------Royalties
Article XIII-----------------------------Gains
Article XIV-----------------------------Independent Personal Services
Article XV------------------------------Dependent Personal Services
Article XVI-----------------------------Artistes and Athletes
Article XVII----------------------------Withholding of Taxes in Respect of Independent

Personal Services
Article XVIII---------------------------Pensions and Annuities
Article XIX------------------------------Government Service
Article XX ------------------------------Students
Article XXI------------------------------Exempt Organizations
Article XXII-----------------------------Other Income
Article XXIII----------------------------Capital
Article XXIV---------------------------Elimination of Double Taxation
Article XXV-----------------------------Non-Discrimination
Article XXVI----------------------------Mutual Agreement Procedure
Article XXVII---------------------------Exchange of Information
Article XXVIII--------------------------Diplomatic Agents and Consular Officers
Article XXIX----------------------------Miscellaneous Rules
Article XXX-----------------------------Entry into Force
Article XXXI----------------------------Termination
Protocol 3-------------------------------of 17 March, 1995
Protocol 4-------------------------------of 29 July, 1997

ARTICLE I
Personal Scope

Article I provides that the Convention is generally applicable to persons who are residents of either Canada or the United States or both Canada and the United States. The word "generally" is used because certain provisions of the Convention apply to persons who are residents of neither Canada nor the United States.

ARTICLE II
Taxes Covered

Paragraph I states that the Convention applies to taxes "on income and on capital" imposed on behalf of Canada and the United States, irrespective of the manner in which such taxes are levied. Neither Canada nor the United States presently impose taxes on capital. Paragraph 1 is not intended either to broaden or to limit paragraph 2, which provides that the Convention shall apply, in the case of Canada, to the taxes imposed by the Government of Canada under Parts I, XIII, and XIV of the Income Tax Act and, in the case of the United States, to the Federal income taxes imposed by the Internal Revenue Code ("the Code").

National taxes not generally covered by the Convention include, in the case of the United States, the estate, gift, and generation-skipping transfer taxes, the Windfall Profits Tax, Federal unemployment taxes, social security taxes imposed under sections 1401, 3101, and 3111 of the Code, and the excise tax on insurance premiums imposed under Code section 4371. The Convention also does not generally cover the Canadian excise tax on net insurance premiums paid by residents of Canada for coverage of a risk situated in Canada, the Petroleum and Gas Revenue Tax (PGRT) and the Incremental Oil Revenue Tax (IORT). However, the Convention

has the effect of covering the Canadian social security tax in certain respects because under Canadian domestic tax law no such tax is due if there is no income subject to tax under the Income Tax Act of Canada. Taxes imposed by the states of the United States, and by the provinces of Canada, are not generally covered by the Convention. However, if such taxes are imposed in accordance with the provisions of the Convention, a foreign tax credit is ensured by paragraph 7 of Article XXIV (Elimination of Double Taxation).

Paragraph 2 contrasts with paragraph 1 of the Protocol to the 1942 Convention, which refers to "Dominion income taxes." In addition, unlike the 1942 Convention, the Convention does not contain a reference to "surtaxes and excess-profits taxes."

Paragraph 3 provides that the Convention also applies to any taxes identical or substantially similar to the taxes on income in existence on September 26, 1980 which are imposed in addition to or in place of the taxes existing on that date. Similarly, taxes on capital imposed after that date are to be covered.

It was agreed that Part I of the Income Tax Act of Canada is a covered tax even though Canada has made certain modifications in the Income Tax Act after the signature of the Convention and before the signature of the 1983 Protocol. In particular, Canada has enacted a low flat rate tax on petroleum production (the PGRT) which, at the time of the signature of the 1983 Protocol, is imposed generally at the statutory rate of 14.67 percent for the period June 1, 1982 to May 31, 1983, and at 16 percent thereafter, generally reduced to an effective rate of 11 percent or 12 percent after deducting a 25 percent resource allowance. The PGRT is not deductible in computing income for Canadian income tax purposes. This agreement is not intended to have implications for any other convention or for the interpretation of Code sections 901 and 903. Further, the PGRT and IORT are not taxes described in paragraphs 2 or 3.

Paragraph 4 provides that, notwithstanding paragraphs 2 and 3 the Convention applies to certain United States taxes for certain specified purposes: the accumulated earnings tax and personal holding company tax are covered only to the extent necessary to implement the provisions of paragraphs 5 and 8 of Article X (Dividends); the excise taxes imposed with respect to private foundations are covered only to the extent necessary to implement the provisions of paragraph 4 of Article XXI (Exempt Organizations); and the social security taxes imposed under sections 1401, 3101, and 3111 of the Code are covered only to the extent necessary to implement the provisions of paragraph 4 of Article XXIX (Miscellaneous Rules). The pertinent provisions of Articles X, XXI, and XXIX are described below. Canada has no national taxes similar to the United States accumulated earnings tax, personal holding company tax, or excise taxes imposed with respect to private foundations.

Article II does not specifically refer to interest, fines and penalties. Thus, each Contracting State may, in general, impose interest, fines, and penalties or pay interest pursuant to its domestic laws. Any question whether such items are being imposed or paid in connection with covered taxes in a manner consistent with provisions of the Convention, such as Article XXV (Non-Discrimination), may, however, be resolved by the competent authorities pursuant to Article XXVI (Mutual Agreement Procedure). See, however, the discussion below of the treatment of certain interest under Articles XXIX (Miscellaneous Rules) and XXX (Entry Into

Force).

ARTICLE III
General Definitions

Article III provides definitions and general rules of interpretation for the Convention. Paragraph 1(a) states that the term "Canada," when used in a geographical sense, means the territory of Canada, including any area beyond the territorial seas of Canada which, under international law and the laws of Canada, is an area within which Canada may exercise rights with respect to the seabed and subsoil and their natural resources. This definition differs only in form from the definition of Canada in the 1942 Convention; paragraph 1(a) omits the reference in the 1942 Convention to "the Provinces, the Territories and Sable Island" as unnecessary.

Paragraph 1(b)(i) defines the term "United States" to mean the United States of America. The term does not include Puerto Rico, the Virgin Islands, Guam, or any other United States possession or territory.

Paragraph 1(b)(ii) states that when the term "United States" is used in a geographical sense the term also includes any area beyond the territorial seas of the United States which, under international law and the laws of the United States, is an area within which the United States may exercise rights with respect to the seabed and subsoil and their natural resources.

Paragraph 1(c) defines the term "Canadian tax" to mean the taxes imposed by the Government of Canada under Parts I, XIII, and XIV of the Income Tax Act as in existence on September 26, 1980 and any identical or substantially similar taxes on income imposed by the Government of Canada after that date and which are in addition to or in place of the then existing taxes. The term does not extend to capital taxes, if and when such taxes are ever imposed by Canada.

Paragraph 1(d) defines the term "United States tax" to mean the Federal income taxes imposed by the Internal Revenue Code as in existence on September 26, 1980 and any identical or substantially similar taxes on income imposed by the United States after that date in addition to or in place of the then existing taxes. The term does not extend to capital taxes, nor to the United States taxes identified in paragraph 4 of Article II (Taxes Covered).

Paragraph 1(e) provides that the term "person" includes an individual, an estate, a trust, a company, and any other body of persons. Although both the United States and Canada do not regard partnerships as taxable entities, the definition in the paragraph is broad enough to include partnerships where necessary.

Paragraph 1(f) defines the term "company" to mean any body corporate or any entity which is treated as a body corporate for tax purposes.

The term "competent authority" is defined in paragraph 1(g) to mean, in the case of Canada, the Minister of National Revenue or his authorized representative and, in the case of the

United States, the Secretary of the Treasury or his delegate. The Secretary of the Treasury has delegated the general authority to act as competent authority to the Commissioner of the Internal Revenue Service, who has redelegated such authority to the Associate Commissioner (Operations). The Assistant Commissioner (Examination) has been delegated the authority to administer programs for simultaneous, spontaneous and industry wide exchanges of information. The Director, Foreign Operations District, has been delegated the authority to administer programs for routine and specific exchanges of information and mutual assistance in collection. The Assistant Commissioner (Criminal Investigations) has been delegated the authority to administer the simultaneous criminal investigation program with Canada.

Paragraph 1(h) defines the term "international traffic" to mean, with reference to a resident of a Contracting State, any voyage of a ship or aircraft to transport passengers or property (whether or not operated or used by that resident), except where the principal purpose of the voyage is transport between points within the other Contracting State. For example, in determining for Canadian tax purposes whether a United States resident has derived profits from the operation of ships or aircraft in international traffic, a voyage of a ship or aircraft (whether or not operated or used by that resident) that includes stops in both Contracting States will not be international traffic if the principal purpose of the voyage is to transport passengers or property from one point in Canada to another point in Canada.

Paragraph 1(i) defines the term "State" to mean any national State, whether or not a Contracting State.

Paragraph 1(j) establishes "the 1942 Convention" as the term to be used throughout the Convention for referring to the pre-existing income tax treaty relationship between the United States and Canada.

Paragraph 2 provides that, in the case of a term not defined in the Convention, the domestic tax law of the Contracting State applying to the Convention shall control, unless the context in which the term is used requires a definition independent of domestic tax law or the competent authorities reach agreement on a meaning pursuant to Article XXVI (Mutual Agreement Procedure). The term "context" refers to the purpose and background of the provision in which the term appears.

Pursuant to the provisions of Article XXVI, the competent authorities of the Contracting States may resolve any difficulties or doubts as to the interpretation or application of the Convention. An agreement by the competent authorities with respect to the meaning of a term used in the Convention would supersede conflicting meanings in the domestic laws of the Contracting States.

ARTICLE IV
Residence

Article IV provides a detailed definition of the term "resident of a Contracting State." The definition begins with a person's liability to tax as a resident under the respective taxation laws of

the Contracting States. A person who, under those laws, is a resident of one Contracting State and not the other need look no further. However, the Convention definition is also designed to assign residence to one State or the other for purposes of the Convention in circumstances where each of the Contracting States believes a person to be its resident. The Convention definition is, of course, exclusively for purposes of the Convention.

Paragraph 1 provides that the term "resident of a Contracting State" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, place of management, place of incorporation, or any other criterion of a similar nature. The phrase "any other criterion of a similar nature" includes, for U.S. purposes, an election under the Code to be treated as a U.S. resident. An estate or trust is, however, considered to be a resident of a Contracting State only to the extent that income derived by such estate or trust is liable to tax in that State either in its hands or in the hands of its beneficiaries. To the extent that an estate or trust is considered a resident of a Contracting State under this provision, it can be a "beneficial owner" of items of income specified in other articles of the Convention - e.g., paragraph 2 of Article X (Dividends).

Paragraphs 2, 3, and 4 provide rules to determine a single residence for purposes of the Convention for persons resident in both Contracting States under the rules set forth in paragraph 1. Paragraph 2 deals with individuals. A "dual resident" individual is initially deemed to be a resident of the Contracting State in which he has a permanent home available to him in both States or in neither, he is deemed to be a resident of the Contracting State with which his personal and economic relations are closer. If the personal and economic relations of an individual are not closer to one Contracting State than to the other, the individual is deemed to be a resident of the Contracting State in which he has an habitual abode. If he has such an abode in both States or in neither State, he is deemed to be a resident of the Contracting State of which he is a citizen. If the individual is a citizen of both States or of neither, the competent authorities are to settle the status of the individual by mutual agreement.

Paragraph 3 provides that if, under the provisions of paragraph 1, a company is a resident of both Canada and the United States, then it shall be deemed to be a resident of the State under whose laws (including laws of political subdivisions) it was created. Paragraph 3 does not refer to the State in which a company is organized, thus making clear that the tie-breaker rule for a company is controlled by the State of the company's original creation. Various jurisdictions may allow local incorporation of an entity that is already organized and incorporated under the laws of another country. Paragraph 3 provides certainty in both the United States and Canada with respect to the treatment of such an entity for purposes of the Convention.

Paragraph 4 provides that where, by reason of the provisions of paragraph 1, an estate, trust, or other person, other than an individual or a company, is a resident of both Contracting States, the competent authorities of the States shall by mutual agreement endeavor to settle the question and determine the mode of application of the Convention to such person. This delegation of authority to the competent authorities complements the provisions of Article XXVI (Mutual Agreement Procedure), which implicitly grant such authority.

Paragraph 5 provides a special rule for certain government employees, their spouses, and

dependent children. An individual is deemed to be a resident of a Contracting State if he is an employee of that State or of a political subdivision, local authority, or instrumentality of that State, is rendering services in the discharge of functions of a governmental nature in any State, and is subjected in the first-mentioned State to "similar obligations" in respect of taxes on income as are residents of the first-mentioned State. Paragraph 5 provides further that a spouse and dependent children residing with a government employee and also subject to "similar obligations" in respect of income taxes as residents if the first-mentioned State are also deemed to be residents of that State. Paragraph 5 overrides the normal tie-breaker rule of paragraph 2. A U.S. citizen or resident who is an employee of the U.S. government in a foreign country or who is a spouse or dependent of such employee is considered to be subject in the United States to "similar obligations" in respect of taxes on income as those imposed on residents of the United States, notwithstanding that such person may be entitled to the benefits allowed by sections 911 or 912 of the Code.

## ARTICLE V
### Permanent Establishment

Paragraph 1 provides that for the purposes of the Convention the term "permanent establishment" means a fixed place of business through which the business of a resident of a Contracting State is wholly or partly carried on. Article V does not use. the term "enterprise of a Contracting State," which appears in the 1942 Convention. Thus, paragraph 1 avoids introducing an additional term into the Convention. The omission of the term is not intended to have any implications for the interpretation of the 1942 Convention.

Paragraph 2 provides that the term "permanent establishment" includes especially a place of management, a branch, an office, a factory, a workshop, and a mine, oil or gas well, quarry, or any other place of extraction of natural resources. Paragraph 3 adds that a building site or construction or installation project constitutes a permanent establishment if and only if it lasts for more than 12 months. Paragraph 4 provides that a permanent establishment exists in a Contracting State if the use of an installation or drilling rig or drilling ship in that State to explore for or exploit natural resources lasts for more than 3 months in any 12 month period, but not if such activity exists for a lesser period of time. The competent authorities have entered into an agreement under the 1942 Convention setting forth guidelines as to certain aspects of Canadian taxation of drilling rigs owned by U.S. persons that constitute Canadian permanent establishments. The agreement will be renewed when this Convention enters into force.

Paragraph 5 provides that a person acting in a Contracting State on behalf of a resident of the other Contracting State is deemed to be a permanent establishment of the resident if such person has and habitually exercises in the first-mentioned State the authority to conclude contracts in the name of the resident. This rule does not apply to an agent of independent status, covered by paragraph 7. Under the provisions of paragraph 5, a permanent establishment may exist even in the absence of a fixed place of business. If, however, the activities of a person described in paragraph 5 are limited to the ancillary activities described in paragraph 6, then a permanent establishment does not exist solely on account of the person's activities.

There are a number of minor differences between the provisions of paragraphs 1 through 5 and the analogous provisions of the 1942 Convention. One important deviation is elimination of the rule of the 1942 Convention which deems a permanent establishment to exist in any circumstance where a resident of one State uses substantial equipment in the other State for any period of time. The Convention thus generally raises the thresh-hold for source basis taxation of activities that involve substantial equipment (and that do not otherwise constitute a permanent establishment). Another deviation of some significance is elimination of the rule of the 1942 Convention that considers a permanent establishment to exist where a resident of one State carries on business in the other State through an agent or employee who has a stock of merchandise from which he regularly fills orders that he receives. The Convention provides that a person other than an agent of independent status who is engaged solely in the maintenance of a stock of goods or merchandise belonging to a resident of the other State for the purpose of storage, display or delivery does not constitute a permanent establishment.

Paragraph 6 provides that a fixed place of business used solely for, or an employee described in paragraph 5 engaged solely in, certain specified activities is not a permanent establishment, notwithstanding the provisions of paragraphs 1, 2, and 5. The specified activities are:

      (a) the use of facilities for the purpose of storage, display, or delivery of goods or merchandise belonging to the resident whose business is being carried on;

      (b) the maintenance of a stock of goods or merchandise belonging to the resident for the purpose of storage, display, or delivery;

      (c) the maintenance of a stock of goods or merchandise belonging to the resident for the purpose of processing by another person;

      (d) the purchase of goods or merchandise, or the collection of information, for the resident; and

      (e) advertising, the supply of information, scientific research, or similar activities which have a preparatory or auxiliary character, for the resident.

Combinations of the specified activities have the same status as any one of the activities. Thus, unlike the OECD Model Convention, a combination of the activities described in subparagraphs 6(a) through 6(e) need not be of a preparatory or auxiliary character (except as required by subparagraph 6(e)) in order to avoid the creation of a permanent establishment. The reference in paragraph 6(e) to specific activities does not imply that any other particular activities - for example, the servicing of a patent or a know-how contract or the inspection of the implementation of engineering plans - do not fall within the scope of paragraph 6(e) provided that, based on the facts and circumstances, such activities have a preparatory or auxiliary character.

Paragraph 7 provides that a resident of a Contracting State is not deemed .to have a permanent establishment in the other Contracting State merely because such resident carries on business in the other State through a broker, general commission agent, or any other agent of independent status, provided that such persons are acting in the ordinary course of their business.

Paragraph 8 states that the fact that a company which is a resident of one Contracting State controls or is controlled by a company which is either a resident of the other Contracting State or which is carrying on a business in the other State, whether through a permanent establishment or

otherwise, does not automatically render either company a permanent establishment of the other.

Paragraph 9 provides that, for purposes of the Convention, the provisions of Article V apply in determining whether any person has a permanent establishment in any State. Thus, these provisions would determine whether a person other than a resident of Canada or the United States has a permanent establishment in Canada or the United States, and whether a person resident in Canada or the United States, has a permanent establishment in a third State.

ARTICLE VI
Income from Real Property

Paragraph 1 provides that income derived by a resident of a Contracting State from real property situated in the other Contracting State may be taxed by that other State. Income from real property includes, for purposes of Article VI, income from agriculture, forestry or other natural resources. Also, while "income derived .... from real property" includes income from rights such as an overriding royalty or a net profits interest in a natural resource, it does not include income in the form of rights to explore for or exploit natural resources which a party receives as compensation for services (e.g., exploration services); the latter income is subject to the provisions of Article VII (Business Profits), XIV (Independent Personal Services), or XV (Dependent Personal Services), as the case may be. As provided by paragraph 3, paragraph 1 applies to income derived from the direct use, letting or use in any other form of real property and to income from the alienation of such property.

Generally speaking, the term "real property" has the meaning which it has under the taxation laws of the Contracting State in which the property in question is situated, in accordance with paragraph 2. In any case, the term includes any option or similar right in respect of real property, the usufruct of real property, and rights to explore for or to exploit mineral deposits, sources, and other natural resources. The reference to "rights to explore for or to exploit mineral deposits, sources and other natural resources" includes rights generating either variable (e.g., computed by reference to the amount of value or production) or fixed payments. The term "real property" does not include ships and aircraft.

Unlike Article XIII A of the 1942 Convention, Article VI does not contain an election to allow a resident of a Contracting State to compute tax on income from real property situated in the other State on a net basis. Both the Internal Revenue Code and the Income Tax Act of Canada generally allow for net basis taxation with respect to real estate rental income, although Canada does not permit such an election for natural resource royalties. Also, unlike the 1942 Convention which in Article XI imposes a 15 percent limitation on the source basis taxation of rental or royalty income from real property, Article VI of the Convention allows a Contracting State to impose tax on such income under its internal law. In Canada the rate of tax on resource royalties is 25 percent of the gross amount of the royalty, if the income is not attributable to a business carried on in Canada. In an exchange of notes to the Protocol, the United States and Canada agreed to resume negotiations, upon request by either country, to provide an appropriate limit on taxation in the State of source if either country subsequently increases its statutory tax rate now applicable to such royalties (25 percent in the case of Canada and 30 percent in the case of the

United States).

<div align="center">

ARTICLE VII
<u>Business Profits</u>

</div>

Paragraph 1 provides that business profits of a resident of a Contracting State are taxable only in that State unless the resident carries on business in the other Contracting State through a permanent establishment situated in that other State. If the resident carries on, or has carried on, business through such a permanent establishment, the other State may tax such business profits but only so much of them as are attributable to the permanent establishment. The reference to a prior permanent establishment ("or has carried on") makes clear that a Contracting State in which a permanent establishment existed has the right to tax the business profits attributable to that permanent establishment, even if there is a delay in the receipt or accrual of such profits until after the permanent establishment has been terminated.

Any business profits received or accrued in taxable years in which the Convention has effect, in accordance with Article XXX (Entry Into Force), which are attributable to a permanent establishment that was previously terminated are subject to tax in the Contracting State in which such permanent establishment existed under the provisions of Article VII.

Paragraph 2 provides that where a resident of either Canada or the United States carries on business in the other Contracting State through a permanent establishment in that other State, both Canada and the United States shall attribute to that permanent establishment business profits which the permanent establishment might be expected to make if it were a distinct and separate person engaged in the same or similar activities under the same or similar conditions and dealing wholly independently with the resident and with any other person related to the resident. The term "related to the resident" is to be interpreted in accordance with paragraph 2 of Article IX (Related Persons). The reference to other related persons is intended to make clear that the test of paragraph 2 is not restricted to independence between a permanent establishment and a home office.

Paragraph 3 provides that, in determining business profits of a permanent establishment, there are to be allowed as deductions those expenses which are incurred for the purposes of the permanent establishment, including executive and administrative expenses, whether incurred in the State in which the permanent establishment is situated or in any other State. However, nothing in the paragraph requires Canada or the United States to allow a deduction for any expenditure which would not generally be allowed as a deduction under its taxation laws. The language of this provision differs from that of paragraph 1 of Article III of the 1942 Convention, which states that in the determination of net industrial and commercial profits of a permanent establishment there shall be allowed as deductions "all expenses, wherever incurred" as long as such expenses are reasonably allocable to the permanent establishment. Paragraph 3 of Article VII of the Convention is not intended to have any implications for interpretation of the 1942 Convention, but is intended to assure that under the Convention deductions are allowed by a Contracting State which are generally allowable by that State.

Paragraph 4 provides that no business profits are to be attributed to a permanent establishment of a resident of a Contracting State by reason of the use of the permanent establishment for merely purchasing goods or merchandise or merely providing executive, managerial, or administrative facilities or services for the resident. Thus, if a company resident in a Contracting State has a permanent establishment in the other State, and uses the permanent establishment for the mere performance of stewardship or other managerial services carried on for the benefit of the resident, this activity will not result in profits being attributed to the permanent establishment.

Paragraph 5 provides that business profits are to be attributed to a permanent establishment by the same method in every taxable period unless there is good and sufficient reason to change such method. In the United States, such a change may be a change in accounting method requiring the approval of the Internal Revenue Service.

Paragraph 6 explains the relationship between the provisions of Article VII and other provisions of the Convention. Where business profits include items of income which are dealt with separately in other Articles of the Convention, those other Articles are controlling.

Paragraph 7 provides a definition for the term "attributable to". Profits "attributable to" a permanent establishment are those derived from the assets or activities of the permanent establishment. Paragraph 7 does not preclude Canada or the United States from using appropriate domestic tax law rules of attribution. The "attributable to" definition does not, for example, preclude a taxpayer from using the rules of section 1, 864-4(c)(5) of the Treasury Regulations to assure for U.S. tax purposes that interest arising in the United States is attributable to a permanent establishment in the United States. (Interest arising outside the United States is attributable to a permanent establishment in the United States based on the principles of Regulations sections 1.864-5 and 1.864-6 and Revenue Ruling 75-253, 1975-2 C.B. 203.) Income that would be taxable under the Code and that is "attributable to" a permanent establishment under paragraph 7 is taxable pursuant to Article VII, however, even if such income might under the Code be treated as fixed or determinable annual or periodical gains or income not effectively connected with the conduct of a trade or business within the United States. The "attributable to" definition means that the limited "force-of-attraction" rule of Code section 864(c)(3) does not apply for U.S. tax purposes under the Convention.

ARTICLE VIII
<u>Transportation</u>

Paragraph 1 provides that profits derived by a resident of a Contracting State from the operation of ships or aircraft in international traffic are exempt from tax in the other Contracting State, even if, under Article VII (Business Profits), such profits are attributable to a permanent establishment. Paragraph 1 also provides that gains derived by a resident of a Contracting State from the alienation of ships, aircraft or containers (including trailers and related equipment for the transport of containers) used principally in international traffic are exempt from tax in the other Contracting State even if, under Article XIII (Gains), those gains would be taxable in that other State. These rules differ from Article V of the 1942 Convention, which conditions the exemption

in the State of source on registration of the ship or aircraft in the other State. Paragraph 1 also applies notwithstanding the provisions of Article XII (Royalties). Thus, to the extent that profits described in paragraph 2 would also fall within Article XII (Royalties) (e.g., rent from the lease of a container), the provisions of Article VIII are controlling.

Paragraph 2(a) provides that profits covered by paragraph 1 include profits from the rental of ships or aircraft operated in international traffic. Such rental profits are included whether the rental is on a time, voyage, or bareboat basis, and irrespective of the State of residence of the operator.

Paragraph 2(b) provides that profits covered by paragraph 1 include profits derived from the use, maintenance or rental of containers, including trailers and related equipment for the transport of containers, if such containers are used in international traffic.

Paragraph 2(c) provides that profits covered by paragraph 1 include profits derived by a resident of a Contracting State from the rental of ships, aircraft, or containers (including trailers and related equipment for the transport of containers), even if not operated in international traffic, as long as such profits are incidental to profits of such person referred to in paragraphs 1, 2(a), or 2(b).

Paragraph 3 states that profits derived by a resident of a Contracting State from a voyage of a ship where the principal purpose of the voyage is to transport passengers or property between points in the other Contracting State is taxable in that other State, whether or not the resident maintains a permanent establishment there. Paragraph 3 overrides the provisions of Article VII. Profits from such a voyage do not qualify for exemption under Article VIII by virtue of the definition of "international traffic" in paragraph 1(h) of Article III (General Definitions). However, profits from a similar voyage by aircraft are taxable in the Contracting State of source only if the profits are attributable to a permanent establishment maintained in that State.

Paragraph 4 provides that profits derived by a resident of a Contracting State engaged in the operation of motor vehicles or a railway as a common carrier or contract carrier, and attributable to the transportation of passengers or property between a point outside the other Contracting State and any other point are exempt from tax in that other State. In addition, profits of such a person from the rental of motor vehicles (including trailers) or railway rolling stock, or from the use, maintenance, or rental of containers (including trailers and related equipment for the transport of containers) used to transport passengers or property between a point outside the other Contracting State and any other point are exempt from tax in that other State.

Paragraph 5 provides that a resident of a Contracting State that participates in a pool, a joint business, or an international operating agency is subject to the provisions of paragraphs 1, 3, and 4 with respect to the profits or gains referred to in paragraphs 1, 3, and 4.

Paragraph 6 states that profits derived by a resident of a Contracting State from the use, maintenance, or rental of railway rolling stock, motor vehicles, trailers, or containers (including trailers and related equipment for the transport of containers) used in the other Contracting State for a period not expected to exceed 183 days in the aggregate in any 12-month period are exempt

from tax in that other State except to the extent that the profits are attributable to a permanent establishment, in which case the State of source has the right to tax under Article VII. The provisions of paragraph 6, unlike the provisions of paragraph 4, apply whether or not the resident is engaged in the operation of motor vehicles or a railway as a common carrier or contract carrier. Paragraph 6 overrides the provisions of Article XII (Royalties), which would otherwise permit taxation in the State of source in the circumstances described.

Gains from the alienation of motor vehicles and railway rolling stock derived by a resident of a Contracting State are not affected by paragraph 4 or 6. Such gains would be taxable in the other Contracting State, however, only if the motor vehicles or rolling stock formed part of a permanent establishment maintained there. See paragraphs 2 and 4 of Article XIII.

ARTICLE IX
Related Persons

Paragraph 1 authorizes Canada and the United States, as the case may be, to adjust the amount of income, loss, or tax payable by a person with respect to arrangements between that person and a related person in the other Contracting State. Such adjustment may be made when arrangements between related persons differ from those that would obtain between unrelated persons. The term "person" encompasses a company resident in a third State with, for example, a permanent establishment in a Contracting State.

Paragraph 2 provides that, for the purposes of Article IX, a person is deemed to be related to another person if either participates directly or indirectly in the management or control of the other or if any third person or persons participate directly or indirectly in the management or control of both. Thus, if a resident of any State controls directly or indirectly a company resident in Canada and a company resident in the United States, such companies are considered to be related persons for purposes of Article IX. Article IX and the definition of "related person" in paragraph 2 may encompass situations that would not be covered by provisions in the domestic laws of the Contracting States. Nor is the paragraph 2 definition controlling for the definition of "related person" or similar terms appearing in other Articles of the Convention. Those terms are defined as provided in paragraph 2 of Article III (General Definitions).

Paragraph 3 provides that where, pursuant to paragraph 1, an adjustment is made or to be made by a Contracting State, the other Contracting State shall make a corresponding adjustment to the income, loss, or tax of the related person in that other State, provided that the other State agrees with the adjustment and, within six years from the end of the taxable year of the person in the first State to which the adjustment relates, the competent authority of the other State has been notified in writing of the adjustment. The reference to an adjustment which "is made or to be made" does not require a Contracting State to formally propose an adjustment before paragraph 3 becomes pertinent. The notification required by paragraph 3 may be made by any of the related persons involved or by the competent authority of the State which makes or is to make the initial adjustment. The notification must give details regarding the adjustment sufficient to apprize the competent authority receiving the notification of the nature of the adjustment. If the requirements of paragraph 3 are complied with, the corresponding adjustment will be made by the other

Contracting State notwithstanding any time or procedural limitations in the domestic law of that State.

Paragraph 4 provides that in a case where the other Contracting State has not been notified as provided in paragraph 3 and if the person whose income, loss, or tax is being adjusted has not received notification of the adjustment within five and one-half years from the end of its taxable year to which the adjustment relates, such adjustment shall not be made to the extent that the adjustment would give rise to double taxation between the United States and Canada. Again, the notification referred to in this paragraph need not be a formal adjustment, but it must be in writing and must contain sufficient details to permit the taxpayer to give the notification referred to in paragraph 3.

If, for example, the Internal Revenue Service proposes to make an adjustment to the income of a U.S. company pursuant to Code section 482, and the adjustment involves an allocation of income from a related Canadian company, the competent authority of Canada must receive written notification of the proposed IRS adjustment within six years from the end of the taxable year of the U.S. company to which the adjustment relates. If such notification is not received in a timely fashion and if the U.S. company does not receive written notification of the adjustment from the IRS within 5-1/2 years from the end of its relevant taxable year, the IRS will unilaterally recede on the proposed section 482 adjustment to the extent that this adjustment would otherwise give rise to double taxation between the United States and Canada. The Internal Revenue Service will determine whether and to what extent the adjustment would give rise to double taxation with respect to income arising in Canada by examining the relevant facts and circumstances such as the amount of foreign tax credits attributable to Canadian taxes paid by the U.S. company, including any carry-overs and credits for deemed paid taxes.

Paragraph 5 provides that neither a corresponding adjustment described in paragraph 3 nor the canceling of an adjustment described in paragraph 4 will be made in any case of fraud, willful default, neglect, or gross negligence on the part of the taxpayer or any related person.

Paragraphs 3 and 4 of Article IX are exceptions to the "saving clause" contained in paragraph 2 of Article XXIX (Miscellaneous Rules), as provided in paragraph 3(a) of Article XXIX. Paragraphs 3 and 4 of Article IX apply to adjustments made or to be made with respect to taxable years for which the Convention has effect as provided in paragraphs 2 and 5 of Article XXX (Entry Into Force).

<div align="center">

ARTICLE X
Dividends

</div>

Paragraph 1 allows a Contracting State to impose tax on its residents with respect to dividends paid by a company which is a resident of the other Contracting State.

Paragraph 2 limits the amount of tax that may be imposed on such dividends by the Contracting State in which the company paying the dividends is resident if the beneficial owner of the dividends is a resident of the other Contracting State. The limitation is 10 percent of the gross

amount of the dividends if the beneficial owner is a company that owns 10 percent or more of the voting stock of the company paying the dividends; and 15 percent of the gross amount of the dividends in all other cases. Paragraph 2 does not impose any restrictions with respect to taxation of the profits out of which the dividends are paid.

Paragraph 3 defines the term "dividends," as the term is used in this Article. Each Contracting State is permitted to apply its domestic law rules for differentiating dividends from interest and other disbursements.

Paragraph 4 provides that the limitations of paragraph 2 do not apply if the beneficial owner of the dividends carries on business in the State in which the company paying the dividends is a resident through a permanent establishment or fixed base situated there, and the stock holding in respect of which the dividends are paid is effectively connected with such permanent establishment or fixed base. In such a case, the dividends are taxable pursuant to the provisions of Article VII (Business Profits) or Article XIV (Independent Personal Services), as the case may be. Thus, dividends paid in respect of holdings forming part of the assets of a permanent establishment or fixed base or which are otherwise effectively connected with such permanent establishment or fixed base (i.e., dividends attributable to the permanent establishment or fixed base) will be taxed on a net basis using the rates and rules of taxation generally applicable to residents of the State in which the permanent establishment or fixed base is situated.

Paragraph 5 imposes limitations on the right of Canada or the United States, as the case may be, to impose tax on dividends paid by a company which is a resident of the other Contracting State. The State in which the company is not resident may not tax such dividends except insofar as they are paid to a resident of that State or the holding in respect of which the dividends are paid is effectively connected with a permanent establishment or fixed base in that State. In the case of the United States such dividends may also be in the hands of a U.S. citizen and certain former citizens, pursuant the "saving clause" of paragraph 2 of Article XXIX (Miscellaneous Rules). In addition, the Contracting State in which the company is not resident may not subject such company's undistributed profits to any tax. See, however, paragraphs 6, 7, and 8 which, in certain circumstances, qualify the rules of paragraph 5. Neither paragraph 5 nor any other provision of the Convention restricts the ability of the United States to apply the provisions of the Code concerning foreign personal holding companies and controlled foreign corporations.

Paragraph 6 provides that, notwithstanding paragraph 5, a Contracting State in which is maintained permanent establishment or permanent establishments of a company resident in the other Contracting State may impose tax on such company's earnings, in addition to the tax that would be charged on the earnings of a company resident in that State. The additional tax may not, however, exceed 10 percent of amount of the earnings which have not been subjected to such additional tax in previous taxation years. Thus, Canada, which has a branch profits tax in force, may impose that tax up to the 10 percent limitation in the case of a United States company with one or more permanent establishments in Canada. This branch profits tax may be imposed notwithstanding other rules of the Convention, including paragraph 6 of Article XXV (Non-Discrimination).

For purposes of paragraph 6, the term "earnings" means the excess of business profits attributable to all permanent establishments for a year and previous years over the sum of:

(a) business losses attributable to such permanent establishments for such years;

(b) all taxes on profits, whether or not covered by the Convention (e.g., provincial taxes on profits and provincial resource royalties (which Canada considers "taxes") in excess of the mineral resource allowance provided for under the law of Canada), other than the additional tax referred to in paragraph 6;

(c) profits reinvested in such State; and

(d) $500,000 (Canadian, or its equivalent in U.S. dollars) less any amounts deducted under paragraph 6(d) with respect to the same or a similar business by the company or an associated company.

The deduction under paragraph 6(d) is available as of the first year for which the Convention has effect, regardless of the prior earnings and tax expenses, if any, of the permanent establishment. The $500,000 deduction is taken into account after other deductions, and is permanent. For the purpose of paragraph 6, references to business profits and business losses include gains and losses from the alienation of property forming part of the business property of a permanent establishment. The term "associated company" includes a company which directly or indirectly controls another company or two companies directly or indirectly controlled by the same person or persons, as well as any two companies that deal with each other not at arm's length. This definition differs from the definition of "related persons" in paragraph 2 of Article IX (Related Persons).

Paragraph 7 provides that, notwithstanding paragraph 5, a Contracting State that does not impose a branch profits tax as described in paragraph 6 (i.e., under current law, the United States) may tax a dividend paid by a company which is a resident of the other Contracting State if at least 50 percent of the company's gross income from all sources was included in the computation of business profits attributable to one or more permanent establishments which such company had in the first-mentioned State. The dividend subject to such a tax must, however, be attributable to profits earned by the company in taxable years beginning after September 26, 1980 and the 50 percent test must be met for the three-year period preceding the taxable year of the company in which the dividend is declared (including years ending on or before September 26, 1980) or such shorter period as the company had been in existence prior to that taxable year. Dividends will be deemed to be distributed, for purposes of paragraph 7, first out of profits of the taxation year of the company in which the distribution is made and then out of the profits of the preceding year or years of the company. Paragraph 7 provides further that if a resident of the other Contracting State is the beneficial owner of such dividends, any tax imposed under paragraph 7 is subject to the 10 or 15 percent limitation of paragraph 2 or the rules of paragraph 4 (providing for dividends to be taxed as business profits or income from independent personal services), as the case may be.

Paragraph 8 provides that, notwithstanding paragraph 5, a company which is a resident of Canada and which, absent the provisions of the Convention, has income subject to tax by the United States may be liable for the United States accumulated earnings tax and personal holding company tax. These taxes can be applied, however, only if 50 percent or more in value of the outstanding voting shares of the company is owned, directly or indirectly, throughout the last half of its taxable year by residents of a third State or by citizens or residents of the United States,

other than citizens of Canada who are resident in the United States but who either do not have immigrant status in the United States or who have not been resident in the United States for more than three taxable years. The accumulated earnings tax is applied to accumulated taxable income calculated without the benefits of the Convention. Similarly, the personal holding company tax is applied to undistributed personal holding company income computed as if the Convention had not come into force.

Article X does not apply to dividends paid by a company which is not a resident of either Contracting State. Such dividends, if they are income of a resident of one of the Contracting States, are subject to tax as provided in Article XXII (Other Income).

ARTICLE XI
Interest

Paragraph 1 allows interest arising in Canada or the United States and paid to a resident of the other State to be taxed in the latter State. Paragraph 2 provides that such interest may also be taxed in the Contracting State where it arises, but if a resident of the other Contracting State is the beneficial owner, the tax imposed by the State of source is limited to 15 percent of the gross amount of the interest.

Paragraph 3 provides a number of exceptions to the right of the source State to impose a 15 percent tax under paragraph 2. The following types of interest beneficially owned by a resident of a Contracting State are exempt from tax in the State of source:

(a) interest beneficially owned by a Contracting State, a political subdivision, or a local authority thereof, or an instrumentality of such State, subdivision, or authority, which interest is not subject to tax by such State;

(b) interest beneficially owned by a resident of a Contracting State and paid with respect to debt obligations issued at arm's length which are guaranteed or insured by such State or a political subdivision thereof, or by an instrumentality of such State or subdivision (not by a local authority or an instrumentality thereof), but only if the guarantor or insurer is not subject to tax by that State;

(c) interest paid by a Contracting State, a political subdivision, or a local authority thereof, or by an instrumentality of such State, subdivision, or authority, but only if the payor is not subject to tax by such State; and

(d) interest beneficially owned by a seller of equipment, merchandise, or services, but only if the interest is paid in connection with a sale on credit of equipment, merchandise, or services and the sale was made at arm's length.

Whether such a transaction is made at arm's length will be determined in the United States under the facts and circumstances. The relationship between the parties is a factor, but not the only factor, taken into account in making this determination. Furthermore, interest paid by a company resident in the other Contracting State with respect to an obligation entered into before September 26, 1980 is exempt from tax in the State of source (irrespective of the State of residence of the beneficial owner), provided that such interest would have been exempt from tax in the Contracting State of source under Article XII of the 1942 Convention. Thus, interest paid by a

United States corporation whose business is not managed and controlled in Canada to a recipient not resident in Canada or to a corporation not managed and controlled in Canada would be exempt from Canadian tax as long as the debt obligation was entered into before September 26, 1980. The phrase "not subject to tax by that State" in paragraph 3(a), (b), and (c) refers to taxation at the Federal levels of Canada and the United States.

The phrase "obligation entered into before the date of signature of this Convention" means:

(1) any obligation under which funds were dispersed prior to September 26, 1980;

(2) any obligation under which funds are dispersed on or after September 26, 1980, pursuant to a written contract binding prior to and on such date, and at all times thereafter until the obligation is satisfied; or

(3) any obligation with respect to which, prior to September 26, 1980, a lender had taken every action to signify approval under procedures ordinarily employed by such lender in similar transactions and had sent or deposited for delivery to the person to whom the loan is to be made written evidence of such approval in the form of a document setting forth, or referring to a document sent by the person to whom the loan is to be made that sets forth, the principal terms of such loan.

Paragraph 4 defines the term "interest," as used in Article XI, to include, among other things, debt claims of every kind as well as income assimilated to income from money lent by the taxation laws of the Contracting State in which the income arises. In no event, however, is income dealt with in Article X (Dividends) to be considered interest.

Paragraph 5 provides that neither the 15 percent limitation on tax in the Contracting State of source provided in paragraph 2 nor the various exemptions from tax in such State provided in paragraph 3 apply if the beneficial owner of the interest is a resident of the other Contracting State carrying on business in the State of source through a permanent establishment or fixed base, and the debt claim in respect of which the interest is paid is effectively connected with such permanent establishment or fixed base (i.e., the interest is attributable to the permanent establishment or fixed base). In this case, interest income is to be taxed in the Contracting State of source as business profits - that is, on a net basis.

Paragraph 6 establishes the source of interest for purposes of Article XI. Interest is considered to arise in a Contracting State if the payer is that State, or a political subdivision, local authority, or resident of that State. However, in cases where the person paying the interest, whether a resident of a Contracting State or of a third State, has in a State other than that of which he is a resident a permanent establishment or fixed base in connection with which the indebtedness on which the interest was paid was incurred, and such interest is borne by the permanent establishment or fixed base, then such interest is deemed to arise in the State in which the permanent establishment or fixed base is situated and not in the State of the payer's residence. Thus, pursuant to paragraphs 6 and 2, and Article XXII (Other Income), Canadian tax will not be imposed on interest paid to a U.S. resident by a company resident in Canada if the indebtedness is incurred in connection with, and the interest is borne by, a permanent establishment of the company situated in a third State. "Borne by" means allowable as a deduction in computing taxable income.

Paragraph 7 provides that in cases involving special relationships between persons Article XI does not apply to amounts in excess of the amount which would have been agreed upon between persons having no special relationship; any such excess amount remains taxable according to the laws of Canada and the United States, consistent with any relevant provisions of the Convention.

Paragraph 8 restricts the right of a Contracting State to impose tax on interest paid by a resident of the other Contracting State. The first State may not impose any tax on such interest except insofar as the interest is paid to a resident of that State or arises in that State or the debt claim in respect of which the interest is paid is effectively connected with a permanent establishment or fixed base situated in that State. Thus, pursuant to paragraph 8 the United States has agreed not to impose tax on certain interest paid by Canadian companies to persons not resident in the United States, to the extent that such companies would pay U.S.- source interest under Code section 861(a)(1)(C) but not under the source rule of paragraph 6. It is to be noted that paragraph 8 is subject to the "saving clause" of paragraph 2 of Article XXIX (Miscellaneous Rules), so the United States may in all events impose its tax on interest received by U.S. citizens.

ARTICLE XII
Royalties

Generally speaking, under the 1942 Convention royalties, including royalties with respect to motion picture films, which are derived by a resident of one Contracting State from sources within the other Contracting State are taxed at a maximum rate of 15 percent in the latter State; copyright royalties are exempt from tax in the State of source, if the resident does not have a permanent establishment in that State. See Articles II, III, XIII C, and paragraph 1 of Article XI of the 1942 Convention, and paragraph 6(a) of the Protocol the 1942 Convention.

Paragraph 1 of Article XII of the Convention provides that a Contracting State may tax its residents with respect to royalties arising in the other Contracting State. Paragraph 2 provides that such royalties may also be taxed in the Contracting State in which they arise, but that if a resident of the other Contracting State is the beneficial owner of the royalties the tax in the Contracting State of source is limited to 10 percent of the gross amount of the royalties.

Paragraph 3 provides that, notwithstanding paragraph 2, copyright royalties and other like payments in respect of the production or reproduction of any literary, dramatic, musical, or artistic work, including royalties from such works on videotape or other means of reproduction for private (home) use, if beneficially owned by a resident of the other Contracting State, may not be taxed by the Contracting State of source. This exemption at source does not apply to royalties in respect of motion pictures, and of works on film, videotape or other means of reproduction for use in connection with television broadcasting. Such royalties are subject to tax at a maximum rate of 10 percent in the Contracting State in which they arise, as provided in paragraph 2 (unless the provisions of paragraph 5, described below, apply).

Paragraph 4 defines the term "royalties" for purposes of Article XII. "Royalties" means

payments of any kind received as consideration for the use of or the right to use any copyright of literary, artistic, or scientific work, including motion pictures, and works on film, videotape or other means of reproduction for use in connection with television broadcasting, any patent, trademark, design or model, plan, secret formula or process, or any payment for the use of or the right to use tangible personal property or for information concerning industrial, commercial, or scientific experience. The term "royalties" also includes gains from the alienation of any intangible property or rights described in paragraph 4 to the extent that such gains are contingent on the productivity, use, or subsequent disposition of such intangible property or rights. Thus, a guaranteed minimum payment derived from the alienation of (but not the use of) any right or property described in paragraph 4 is not a "royalty." Any amounts deemed contingent on use by reason of Code section 871(e) are, however, royalties under paragraph 2 of Article III (General Definitions), subject to Article XXVI (Mutual Agreement Procedure). The term "royalties" does not encompass management fees, which are covered by the provisions of Article VII (Business Profits) or XIV (Independent Personal Services), or payments under a bona fide cost - sharing arrangement. Technical service fees may be royalties in cases where the fees are periodic and dependent upon productivity or a similar measure.

Paragraph 5 provides that the 10 percent limitation on tax in the Contracting State of source provided by paragraph 2, and the exemption in the Contracting State of source for certain copyright royalties provided by paragraph 3, do not apply if the beneficial owner of the royalties carries on business in the State of source through a permanent establishment or fixed base and the right or property in respect of which the royalties are paid is effectively connected with such permanent establishment or fixed base (i.e., the royalties are attributable to the permanent establishment or fixed base). In that event, the royalty income would be taxable under the provisions of Article VII (Business Profits) or XIV (Independent Personal Services), as the case may be.

Paragraph 6 establishes rules to determine the source of royalties for purposes of Article XII. The first rule is that royalties arise in a Contracting State when the payer is that State, or a political subdivision, local authority, or resident of that State. Notwithstanding that rule, royalties arise not in the State of the payer's residence but in any State, whether or not a Contracting State, in which is situated a permanent establishment or fixed base in connection with which the obligation to pay royalties was incurred, if such royalties are borne by such permanent establishment or fixed base. Thus, royalties paid to a resident of the United States by a company resident in Canada for the use of property in a third State will not be subject to tax in Canada if the obligation to pay the royalties is incurred in connection with, and the royalties are borne by, a permanent establishment of the company in a third State. "Borne by" means allowable as a deduction in computing taxable income.

A third rule, which overrides both the residence rule and the permanent establishment rule just described, provides that royalties for the use of, or the right to use, intangible property or tangible personal property in a Contracting State arise in that State. Thus, consistent with the provisions of Code section 861(a)(4), if a resident of a third State pays royalties to a resident of Canada for the use of or the right to use intangible property or tangible personal property in the United States, such royalties are considered to arise in the United States and are subject to taxation by the United States consistent with the Convention. Similarly, if a resident of Canada

pays royalties to a resident of a third State, such royalties are considered to arise in the United States and are subject to U.S. taxation if they are for the use of or the right to use intangible property or tangible personal property in the United States. The term "intangible property" encompasses all the items described in paragraph 4, other than tangible personal property.

Paragraph 7 provides that in cases involving special relationships between persons the benefits of Article XII do not apply to amounts in excess of the amount which would have been agreed upon between persons with no special relationship; any such excess amount remains taxable according to the laws of Canada and the United States, consistent with any relevant provisions of the Convention.

Paragraph 8 restricts the right of a Contracting State to impose tax on royalties paid by a resident of the other Contracting State. The first State may not impose any tax on such royalties except insofar as they arise in that State or they are paid to a resident of that State or the right or property in respect of which the royalties are paid is effectively connected with a permanent establishment or fixed base situated in that State. This rule parallels the rule in paragraph 8 of Article XI (Interest) and paragraph 5 of Article X (Dividends). Again, U.S. citizens remain subject to U.S. taxation on royalties received despite this rule, by virtue of paragraph 2 of Article XXIX (Miscellaneous Rules).


ARTICLE XIII
Gains

Paragraph 1 provides that Canada and the United States may each tax gains from the alienation of real property situated within that State which are derived by a resident of the other Contracting State. The term "real property situated in the other Contracting State" is defined for this purpose in paragraph 3 of this Article. The term "alienation" used in paragraph 1 and other paragraphs of Article XIII means sales, exchanges and other dispositions or deemed dispositions (e.g., change of use, gifts, distributions, death) that are taxable events under the taxation laws of the Contracting State applying the provisions of the Article.

Paragraph 2 of Article XIII provides that the Contracting State in which a resident of the other Contracting State "has or had" a permanent establishment or fixed base may tax gains from the alienation of personal property constituting business property if such gains are attributable to such permanent establishment or fixed base. Unlike paragraph 1 of Article VII (Business Profits), paragraph 2 limits the right of the source State to tax such gains to a twelve-month period following the termination of the permanent establishment or fixed base.

Paragraph 3 provides a definition of the term "real property situated in the other Contracting State." Where the United States is the other Contracting State, the term includes real property (as defined in Article VI (Income from Real Property)) situated in the United States and a United States real property interest. Thus, the United States retains the ability to exercise its full taxing right under the Foreign Investment in Real Property Tax Act (Code section 897). (For a transition rule from the 1942 Convention, see paragraph 9 of this Article.)

Where Canada is the other Contracting State, the term means real property (as defined in Article VI) situated in Canada; shares of stock of a company, the value of whose shares consists principally of Canadian real property; and an interest in a partnership, trust or estate, the value of which consists principally of Canadian real property. The term "principally" means more than 50 percent. Taxation in Canada is preserved through several tiers of entities if the value of the company's shares or the partnership, trust or estate is ultimately dependent principally upon real property situated in Canada.

Paragraph 4 reserves to the Contracting State of residence the sole right to tax gains from the alienation of any property other than property referred to in paragraphs 1, 2, and 3.

Paragraph 5 states that, despite paragraph 4, a Contracting State may impose tax on gains derived by an individual who is a resident of the other Contracting State if such individual was a resident of the first-mentioned State for 120 months (whether or not consecutive) during any period of 20 consecutive years preceding the alienation of the property, and was a resident of that State at any time during the 10-year period immediately preceding the alienation of the property. The property (or property received in substitution in a tax-free transaction in the first-mentioned State) must have been owned by the individual at the time he ceased to be a resident of the first-mentioned State.

Paragraph 6 provides a rule to coordinate Canadian and United States taxation of gains from the alienation of a principal residence situated in Canada. An individual (not a citizen of the United States) who was a resident of Canada and becomes a resident of the United States may determine his liability for U.S. income tax purposes in respect of gain from the alienation of a principal residence in Canada owned by him at the time he ceased to be a resident of Canada by claiming an adjusted basis for such residence in an amount no less than the fair market value of the residence at that time. Under paragraph 2(b) of Article XXX, the rule of paragraph 6 applies to gains realized for U.S. income tax purposes in taxable years beginning on or after the first day of January next following the date when instruments of ratification are exchanged, even if a particular individual described in paragraph 6 ceased to be a resident of Canada prior to such date. Paragraph 6 supplements any benefits available to a taxpayer pursuant to the provisions of the Code, e.g., section 1034.

Paragraph 7 provides a rule to coordinate U.S. and Canadian taxation of gains in circumstances where an individual is subject to tax in both Contracting States and one Contracting State deems a taxable alienation of property by such person to have occurred, while the other Contracting State at that time does not find a realization or recognition of income and thus defers, but does not forgive taxation. In such a case the individual may elect in his annual return of income for the year of such alienation to be liable to tax in the latter Contracting State as if he had sold and repurchased the property for an amount equal to its fair market value at a time immediately prior to the deemed alienation. The provision would, for example, apply in the case of a gift by a U.S. citizen or a U.S. resident individual which Canada deems to be an income producing event for its tax purposes but with respect to which the United States defers taxation while assigning the donor's basis to the donee. The provision would also apply in the case of a U.S. citizen who, for Canadian tax purposes, is deemed to recognize income upon his departure from Canada, but not to a Canadian resident (not a U.S. citizen) who is deemed to recognize such

income. The rule does not apply in the case death, although Canada also deems that to be a taxable event, because the United States in effect forgives income taxation of economic gains at death. If in one Contracting State there are losses and gains from deemed alienations of different properties, then paragraph 7 must be applied consistently in the other Contracting State within the taxable period with respect to all such properties. Paragraph 7 only applies, however, if the deemed alienations of the properties result in a net gain.

Paragraph 8 concerns the coordination of Canadian and U.S. rules with respect to the recognition of gain on corporate organizations, reorganizations, amalgamations, divisions, and similar transactions. Where a resident of a Contracting State alienates property in such a transaction, and profit, gain, or income with respect to such alienation is not recognized for income tax purposes in the Contracting State of residence, the competent authority of the other Contracting State may agree, pursuant to paragraph 8, if requested by the person who acquires the property, to defer recognition of the profit, gain, or income with respect to such property for income tax purposes. This deferral shall be for such time and under such other conditions as are stipulated between the person who acquires the property and the competent authority. The agreement of the competent authority of the State of source is entirely discretionary and will be granted only to the extent necessary to avoid double taxation of income. This provision means, for example, that the United States competent authority may agree to defer recognition of gain with respect to a transaction if the alienator would otherwise recognize gain for U.S. tax purposes and would not recognize gain under Canada's law. The provision only applies, however, if alienations described in paragraph 8 result in a net gain. In the absence of extraordinary circumstances the provisions of the paragraph must be applied consistently within a taxable period with respect to alienations described in the paragraph that take place within that period.

Paragraph 9 provides a transitional rule reflecting the fact that under Article VIII of the 1942 Convention gains from the sale or exchange of capital assets are exempt from taxation in the State of source provided the taxpayer had no permanent establishment in that State. Paragraph 9 applies to deemed, as well as actual, alienations or dispositions. In addition, paragraph 9 applies to a gain described in paragraph 1, even though such gain is also income within the meaning of paragraph 3 of Article VI. Paragraph 9 will apply to transactions notwithstanding section 1125(c) of the Foreign Investment in Real Property Tax Act, Public Law 96-499 ("FIRPTA").

Paragraph 9 applies to capital assets alienated by a resident of a Contracting State if
(a) that person owned the asset on September 26, 1980 and was a resident of that Contracting State on September 26, 1980 (and at all times after that date until the alienation), or
(b) the asset was acquired by that person in an alienation of property which qualified as a non-recognition transaction for tax purposes in the other Contracting State.

For purposes of subparagraph 9(b), a non-recognition transaction is a transaction in which gain resulting therefrom is, in effect, deferred for tax purposes, but is not permanently forgiven. Thus, in the United States, certain tax-free organizations, reorganizations, liquidations and like kind exchanges will qualify as non-recognition transactions. However, a transfer of property at death will not constitute a non-recognition transaction, since any gain due to appreciation in the property is permanently forgiven in the United States due to the fair market value basis taken by

the recipient of the property. If a transaction is a non-recognition transaction for tax purposes, the transfer of non-qualified property, or "boot," which may cause some portion of the gain on the transaction to be recognized, will not cause the transaction to lose its character as a non-recognition transaction for purposes of subparagraph 9(b). In addition, a transaction that would have been a non-recognition transaction in the United States but for the application of sections 897(d) and 897(e) of the Code will also constitute a non-recognition transaction for purposes of subparagraph 9(b). Further, a transaction which is not a non-recognition transaction under U.S. law, but to which non-recognition treatment is granted pursuant to the agreement of the competent authority under paragraph 8 of this Article, is a non-recognition transaction for purposes of subparagraph 9(b). However, a transaction which is not a non-recognition transaction under U.S. law does not become a non-recognition transaction for purposes of subparagraph 9(b) merely because the basis of the property in the hands of the transferee is reduced under section 1125(d) of FIRPTA.

The benefits of paragraph 9 are not available to the alienation or disposition by a resident of a Contracting State of an asset that

(a) on September 26, 1980 formed part of the business property of a permanent establishment or pertained to a fixed base which a resident of that Contracting State had in the other Contracting State,

(b) was alienated after September 26, 1980 and before the alienation in question in any transaction that was not a non-recognition transaction, as described above, or

(c) was owned at any time prior to the alienation in question and after September 26, 1980 by a person who was not a resident of that same Contracting State after September 26, 1980 while such person held the asset.

Thus, for example, in order for paragraph 9 to be availed of by a Canadian resident who did not own the alienated asset on September 26, 1980, the asset must have been owned by other Canadian residents continuously after September 26, 1980 and must have been transferred only in transactions which were non-recognition transactions for U.S. tax purposes.

The availability of the benefits of paragraph 9 is illustrated by the following examples. It should be noted that the examples do not purport to fully describe the U.S. and Canadian tax consequences resulting from the transactions described therein. Any condition for the application of paragraph 9 which is not discussed in an example should be assumed to be satisfied.

*Example 1.*    A, an individual resident of Canada, owned an appreciated U.S. real property interest on September 26, 1980. On January 1, 1982, A transferred the U.S. real property interest to X, a Canadian corporation, in exchange for 100 percent of X's voting stock. A's gain on the transfer to X is exempt from U.S. tax under Article VIII of the 1942 Convention. Since the transaction qualifies as a non-recognition transaction for U.S. tax purposes, as described above, X is entitled to the benefits of paragraph 9, pursuant to subparagraph 9(b), upon a subsequent disposition of the U.S. real property interest occurring after the entry into force of this Convention. If A's transfer to X had instead occurred after the entry into force of this Convention, A would be entitled to the benefits of paragraph 9, pursuant to subparagraph 9(a), with respect to U.S. taxation of that portion of the gain resulting from the transfer to

X that is attributable on a monthly basis to the period ending on December 31 of the year in which the Convention enters into force (or a greater portion of the gain as is shown to the satisfaction of the U.S. competent authority). X would be entitled to the benefits of paragraph 9 pursuant to subparagraph 9(b), upon a subsequent disposition of the U.S. real property interest.

*Example 2.*    The facts are the same as in *Example 1,* except that A is a corporation which is resident in Canada. Assuming that the transfer of the U.S. real property interest to X is a section 351 transaction or a tax-free reorganization for U.S. tax purposes, the results are the same as in *Example 1.*

*Example 3.*    The facts are the same as in *Example 1,* except that X is a U.S. corporation. If the transfer to X by A took place on January 1, 1982, A's gain on the transfer to X would be exempt from tax under Article VIII of the 1942 Convention and A would be entitled to the benefits of paragraph 9, pursuant to subparagraph 9(b), upon a subsequent disposition of the stock of X occurring after the entry into force of this Convention. If the transfer to X by A took place after the entry into force of this Convention, A would be entitled to the benefits of paragraph 9, pursuant to subparagraph 9(a), with respect to U.S. taxation (if any) of the gain resulting from the transfer to X, and would also be entitled to the benefits of paragraph 9, pursuant to subparagraph 9(b), upon a subsequent disposition of the stock of X. For several reasons, including the fact that X is a U.S. corporation, paragraph 9 has no impact on the U.S. tax consequences of a subsequent disposition by X of the U.S. real property interest in either case.

*Example 4.*    B, a corporation resident in Canada, owns all of the stock of C, which is also a corporation resident in Canada. C owns a U.S. real property interest. After the Convention enters into force, B liquidates C in a section 332 liquidation. The transaction is treated as a non-recognition transaction for U.S. tax purposes under the definition of a non-recognition transaction described above. C is entitled to the benefits of paragraph 9, pursuant to subparagraph 9(a), with respect to gain taxed (if any) under section 897(d), and B is entitled to the benefits of paragraph 9, pursuant to subparagraph 9(b), upon a subsequent disposition of the U.S. real property interest. Generally, the United States would not subject B to tax upon the liquidation of C.

*Example 5.*    The facts are the same as in *Example 4,* except that C is a U.S. corporation. B is entitled to the benefits of paragraph 9, pursuant to subparagraph 9(a), with respect to U.S. taxation (if any) of the gain resulting from the liquidation of C. B is not entitled to the benefits of paragraph 9 upon a subsequent disposition of the U.S. real property interest since that asset was held after September 26, 1980 by a person who was not a resident of Canada. The U.S. tax consequences to C are governed by the internal law of the United States.

*Example 6.*    D, an individual resident of the United States, owns Canadian real estate. On January 1, 1982, D transfers the Canadian real estate to E, a corporation resident in

Canada, in exchange for all of E's stock. This transfer is treated as a taxable transaction under the Income Tax Act of Canada. However, D's gain on the transfer is exempt from Canadian tax under Article VIII of the 1942 Convention. D is not entitled to the benefits of subparagraph 9(b) upon a subsequent disposition of the stock of E since the stock was not transferred in a transaction which was a non-recognition transaction for Canadian tax purposes. E is not entitled to Canadian benefits under this paragraph since, *inter alia,* it is a Canadian resident. (However, under Canadian law, both D and E would have a basis for tax purposes equal to the fair market value of the property at the time of D's transfer). If the transfer to E had taken place after entry into force of this Convention, D would be entitled to the benefits of paragraph 9, pursuant to subparagraph 9(a), with respect to Canadian tax resulting from the transfer to E, but would not be entitled to the benefits of subparagraph 9(b) upon a subsequent disposition of the E stock. (Note that E could seek to have the transaction treated as a non-recognition transaction under paragraph 8 of this Article, with the result that, if the competent authority agrees, D will take a carryover basis in the stock of E and be entitled to the benefits of subparagraph 9(b) upon a subsequent disposition thereof).

*Example 7.*    The facts are the same as in *Example 6,* except that E is a U.S. corporation. This transaction is also a recognition event under Canadian law at the shareholder level. The results are generally the same as in *Example* 6. However, if the transfer to E had been granted non-recognition treatment in Canada pursuant to paragraph 8, both D and E would be entitled to the benefits of paragraph 9 for Canadian tax purposes, pursuant to subparagraph 9(b), upon subsequent dispositions of the stock of E or the Canadian real estate, respectively.

*Example 8.*    F, an individual resident of the United States, owns all of the stock of G, a Canadian corporation, which in turn owns Canadian real estate. F causes G to be amalgamated in a merger with another Canadian corporation. This is a non-recognition transaction under Canadian law and F is entitled, for Canadian tax purposes, to the benefits of paragraph 9, pursuant to subparagraph 9(b) upon a subsequent disposition of the stock of the other Canadian corporation.

*Example 9.*    H, a U.S. corporation, owns all of the stock of J, another U.S. corporation. J owns Canadian real estate. H liquidates J. For Canadian tax purposes, no tax is imposed on H as a result of the liquidation and H received a fair market value basis in the Canadian real estate. Accordingly, since gain has been forgiven due to the fair market value basis (rather than postponed in a non-recognition transaction), H would not be entitled to the benefits of subparagraph 9(b) upon the subsequent disposition of the Canadian real estate. Canada would impose a tax on J, but J would be entitled to the benefits of paragraph 9, pursuant to subparagraph 9(a), with respect to Canadian tax imposed on the liquidation.

*Example 10.*    The facts are the same as in *Example 9,* except that J is a Canadian corporation. Paragraph 9 does not affect the Canadian taxation of J. While H is subject to Canadian tax on the liquidation of J, H is entitled to the benefits of paragraph 9,

pursuant to subparagraph 9(a), with respect to such Canadian taxation. H will take a fair market value basis (rather than have gain postponed in a non-recognition transaction) in the Canadian real estate for Canadian tax purposes and is thus not entitled to the benefits of paragraph 9 upon a subsequent disposition of the Canadian real estate (since, *inter alia,* the gain has been forgiven due to the fair market value basis).

*Example 11.* K, a U.S. corporation, owns the stock of L, another U.S. corporation, which in turn owns Canadian real estate. K causes L to be merged into another U.S. corporation. For Canadian tax purposes, such a transaction treated as a recognition event, but Canada will not impose a tax on K under its internal law. Canada would impose tax on L, but L is entitled to the benefits of paragraph 9, pursuant to subparagraph 9(a), with respect to Canadian taxation of gain resulting from the merger. The acquiring U.S. corporation would take a fair market value basis in the Canadian real estate, and would thus not be entitled to the benefits of subparagraph 9(b) upon subsequent disposition of the real estate. (Note that the acquiring U.S. corporation could seek to obtain non-recognition treatment under paragraph 8 of this Article, with the results that, if approved by the competent authority it would obtain a carryover basis in the property and be entitled to the benefits of subparagraph 9(b) upon a subsequent disposition of the Canadian real estate.)

Paragraph 9 provides that where a resident of Canada or the United States is subject to tax pursuant to Article XIII in the other Contracting State on gains from the alienation of a capital asset, and if the other conditions of paragraph 9 are satisfied, the amount of the gain shall be reduced for tax purposes in that other State by the amount of the gain attributable to the period during which the property was held up to and including December 31 of the year in which the documents of ratification are exchanged. The gain attributable to such person is normally determined by dividing the total gain by the number of full calendar months the property was held by such person, including, in the case of an alienation described in paragraph 9(b), the number of months in which a predecessor in interest held the property, and multiplying such monthly amount by the number of full calendar months ending on or before December 31 of the year in which the instruments of ratification are exchanged.

Upon a clear showing, however, a taxpayer may prove that a greater portion of the gain was attributable to the specified period. Thus, in the United States the fair market value of the alienated property at the treaty valuation date may be established under paragraph 9 in the manner and with the evidence that is generally required by U.S. Federal Income, estate, and gift tax regulations. For this purpose a taxpayer may use valid appraisal techniques for valuing real estate such as the comparable sales approach (see Rev. Proc. 79-24, 1979-1 C.B. 565) and the reproduction cost approach. If more than one property is alienated in a single transaction each property will be considered individually.

A taxpayer who desires to make this alternate showing for U.S. tax purposes must so indicate on his U.S. income tax return for the year of the sale or exchange and must attach to the return a statement describing the relevant evidence. The U.S. competent authority or his authorized delegate will determine whether the taxpayer has satisfied the requirements of

paragraph 9.

The amount of gain which is reduced by reason of the application of paragraph 9 is not to be treated for U.S. tax purposes as an amount of "non-taxed gain" under section 1125(d)(2)(B) of FIRPTA, where that section would otherwise apply. (Note that gain not taxed by virtue of the 1942 Convention is "non-taxed gain".)

U.S. residents, citizens and former citizens remain subject to U.S. taxation on gains as provided by the Code notwithstanding the provisions of Article XIII, other than paragraphs 6 and 7. See paragraphs 2 and 3(a) of Article XXIX (Miscellaneous Rules).

ARTICLE XIV
Independent Personal Services

Article XIV concerns the taxation of income derived by an individual in respect of the performance of independent personal services. Such income may be taxed in the Contracting State of which such individual is a resident. It may also be taxed in the other Contracting State if the individual has or had a fixed base regularly available to him in the other State for the purpose of performing his activities, but only to the extent that the income is attributable to that fixed base. The use of the term "has or had" ensures that a Contracting State in which a fixed base existed has the right to tax income attributable to that fixed base even if there is a delay between the termination of the fixed base and the receipt or accrual of such income.

Unlike Article VII of the 1942 Convention, which provides a limited exemption from tax at source on income from independent personal services, Article XIV does not restrict the exemption to persons present in the State of source for fewer than 184 days. Furthermore, Article XIV does not allow the $5,000 exemption at source of the 1942 Convention, which was available even if services were performed through a fixed base. However, Article XIV provides complete exemption at source if a fixed base does not exist.

ARTICLE XV
Dependent Personal Services

Paragraph 1 provides that, in general, salaries, wages, and other similar remuneration derived by a resident of a Contracting State in respect of an employment are taxable only in that State unless the employment is exercised in the other Contracting State. If the employment is exercised in the other Contracting State, the entire remuneration derived therefrom may be taxed in that other State but only if, as provided by paragraph 2, the recipient is present in the other State for a period or periods exceeding 183 days in the calendar year, or the remuneration is borne by an employer who is a resident of that other State or by a permanent establishment or fixed base which the employer has in that other State. However, in all cases where the employee earns $10,000 or less in the currency of the State of source, such earnings are exempt from tax in that State. "Borne by" means allowable as a deduction in computing taxable income. Thus, if a Canadian resident individual employed at the Canadian permanent establishment of a U.S.

company performs services in the United States, the income earned by the employee from such services is not exempt from U.S. tax under paragraph 1 if such income exceeds $10,000 (U.S.) because the U.S. company is entitled to a deduction for such wages in computing its taxable income.

Paragraph 3 provides that a resident of a Contracting State is exempt from tax in the other Contracting State with respect to remuneration derived in respect of an employment regularly exercised in more than one State on a ship, aircraft, motor vehicle, or train operated by a resident of the taxpayer's State of residence. The word "regularly" is intended to distinguish crew members from persons occasionally employed on a ship, aircraft, motor vehicle, or train. Only the Contracting State of which the employee and operator are resident has the right to tax such remuneration. However, this provision is subject to the "saving clause" of paragraph 2 of Article XXIX (Miscellaneous Rules), which permits the United States to tax its citizens despite paragraph 3.

Article XV states that its provisions are overridden by the more specific rules of Article XVIII (Pensions and Annuities) and Article XIX (Government Services).


## ARTICLE XVI
### Artistes and Athletes

Article XVI concerns income derived by a resident of a Contracting State as an entertainer, such as a theatre, motion picture, radio, or television artiste, or a musician, or as an athlete, from his personal activities as such exercised in the other Contracting State. Article XVI overrides Articles XIV (Independent Personal Services) and XV (Dependent Personal Services) to allow source basis taxation of an entertainer or athlete in cases where the latter Articles would not permit such taxation. Thus, paragraph 1 provides that certain income of an entertainer or athlete may be taxed in the State of source in all cases where the amount of gross receipts derived by the entertainer or athlete, including expenses reimbursed to him or borne on his behalf, exceeds $15,000 in the currency of that other State for the calendar year concerned. For example, where a resident of Canada who is an entertainer derives income from his personal activities as an entertainer in the United States, he is taxable in the United States on all such income in any case where his gross receipts are greater than $15,000 for the calendar year. Article XVI does not restrict the right of the State of source to apply the provisions of Articles XIV and XV. Thus, an entertainer or athlete resident in a Contracting State and earning $14,000 in wages borne by a permanent establishment in the other State may be taxed in the other State as provided in Article XV

Paragraph 2 provides that where income in respect of personal activities exercised by an entertainer or an athlete accrues not to the entertainer or athlete himself but to another person, that income may, notwithstanding the provisions of Article VII (Business Profits), Article XIV, and Article XV, be taxed in the Contracting State in which the activities are exercised. The anti-avoidance rule of paragraph 2 does not apply if it is established by the entertainer or athlete that neither he nor persons related to him participate directly or indirectly in the profits of the other person in any manner, including the receipt of deferred remuneration, bonuses, fees, dividends,

partnership distributions, or other distributions.

Thus, if an entertainer who is a resident of Canada is under contract with a company and the arrangement between the entertainer and the company provides for payments to the entertainer based on the profits of the company, all of the income of the company attributable to the performer's U.S. activities may be taxed in the United States irrespective of whether the company maintains a permanent establishment in the United States. Paragraph 2 does not affect the rule of paragraph 1 that applies to the entertainer or athlete himself.

Paragraph 3 provides that paragraphs 1 and 2 of Article XVI do not apply to the income of an athlete in respect of an employment with a team which participates in a league with regularly scheduled games in both Canada and the United States, nor do those paragraphs apply to the income of such a team. Such an athlete is subject to the rules of Article XV. Thus, the athlete's remuneration would be exempt from tax in the Contracting State of source if he is a resident of the other Contracting State and earns $10,000 or less in the currency of the State of source, or if he is present in that State for a period or periods not exceeding in the aggregate 183 days in the calendar year, and his remuneration is not borne by a resident of that State or a permanent establishment or fixed base in that State. In addition, a team described in paragraph 3 may not be taxed in a Contracting State under paragraph 2 of this Article solely by reason of the fact that a member of the team may participate in the profits of the team through the receipt of a bonus based, for example, on ticket sales. The employer may be taxable pursuant to other articles of the Convention, such as Article VII.

Paragraph 4 provides that, notwithstanding Articles XIV and XV, an amount paid by a resident of a Contracting State to a resident of the other State as an inducement to sign an agreement relating to the performance of the services of an athlete may be taxed in the first-mentioned State. However, the tax imposed may not exceed 15 percent of the gross amount of the payment. The provision clarifies the taxation of signing bonuses in a manner consistent with their treatment under U.S. interpretations of the 1942 Convention. Amounts paid as salary or other remuneration for the performance of the athletic services themselves are not taxable under this provision but are subject to the provisions of paragraphs 1 and 3 of this Article, or Articles XIV or XV, as the case may be. The paragraph covers all amounts paid (to the athlete or another person) as an inducement to sign an agreement for the services of an athlete, such as a bonus to sign a contract not to perform for other teams. An amount described in this paragraph is not to be included in determining the amount of gross receipts derived by an athlete in a calendar year for purposes of paragraph 1. Thus, if an athlete receives a $50,000 signing bonus and a $12,000 salary for a taxable year, the State of source would not be entitled to tax the salary portion of the receipt of the athlete for that year under paragraph 1 of this Article.

ARTICLE XVII
Withholding of Taxes in Respect of Personal Services

Article XVII confirms that a Contracting State may require withholding of tax on account of tax liability with respect to remuneration paid to an individual who is a resident of the other Contracting State, including an entertainer or athlete, in respect of the performance of

independent personal services in the first-mentioned State. However, withholding with respect to the first $5,000 (in the currency of the State of source) of such remuneration paid in that taxable year by each payor shall not exceed 10 percent of such payment. In the United States, the withholding described in paragraph 1 relates to withholding with respect to income tax liability and does not relate to withholding with respect to other taxes, such as social security taxes. Nor is the paragraph intended to suggest that withholding in circumstances not specifically mentioned, such as withholding with respect to dependent personal services, is precluded by the Convention.

Paragraph 2 provides that in any case where the competent authority of Canada or the United States believes that withholding with respect to remuneration for the performance of personal services is excessive in relation to the estimated tax liability of an individual to that State for a taxable year, it may determine that a lesser amount will be deducted or withheld. In the case of independent personal services, paragraph 2 may thus result in a lesser withholding than the maximum authorized by paragraph 1.

Paragraph 3 states that the provisions of Article XVII do not affect the liability of a resident of a Contracting State for taxes imposed by the other Contracting State. The Article deals only with the method of collecting taxes and not with substantive tax liability.

Article XVIII A of the 1942 Convention authorizes the issuance of regulations to specify circumstances under which residents of the United States temporarily performing personal services in Canada may be exempted from deduction and withholding of United States tax. This provision is omitted from the Convention as unnecessary. The Code and regulations provide sufficient authority to avoid excessive withholding of U.S. income tax. Further, paragraph 2 provides for adjustments in the amount of withholding where appropriate.

ARTICLE XVIII
Pensions and Annuities

Paragraph 1 provides that a resident of a Contracting State is taxable in that State with respect to pensions and annuities arising in the other Contracting State. However, the State of residence shall exempt from taxation the amount of any such pension that would be excluded from taxable income in the State of source if the recipient were a resident thereof. Thus, if a $10,000 pension payment arising in a Contracting State is paid to a resident of the Contracting State and $5,000 of such payment would be excluded from taxable income as a return of capital in the first-mentioned State if the recipient were a resident of the first-mentioned State, the State of residence shall exempt from tax $5,000 of the payment. Only $5,000 would be so exempt even if the first-mentioned State would also grant a personal allowance as a deduction from gross income if the recipient were a resident thereof. Paragraph 1 imposes no such restriction with respect to the amount that may be taxed in the State of residence in the case of annuities.

Paragraph 2 provides rules with respect to the taxation of pensions and annuities in the Contracting State in which they arise. If the beneficial owner of a periodic pension payment is a resident of the other Contracting State, the tax imposed in the State of source is limited to 15 percent of the gross amount of such payment. Thus, the State of source is not required to allow a

deduction or exclusion for a return of capital to the pensioner, but its tax is limited in amount in the case of a periodic payment. Other pension payments may be taxed in the State of source without limit.

In the case of annuities beneficially owned by a resident of a Contracting State, the Contracting State of source is limited to a 15 percent tax on the portion of the payment that would not be excluded from taxable income (i.e., as a return of capital) in that State if the beneficial owner were a resident thereof.

Paragraph 3 defines the term "pensions" for purposes of the Convention to include any payment under a superannuation, pension, or retirement plan, Armed-Forces retirement pay, war veterans pensions and allowances, and amounts paid under a sickness, accident, or disability plan. Thus, the term "pension" includes pensions paid by private employers as well as any pension paid by a Contracting State in respect of services rendered to that State. A pension for government service is covered. The term "pensions" does not include payments under an income averaging annuity contact or benefits paid under social security legislation. The latter benefits are taxed, pursuant to paragraph 5, only in the Contracting State paying the benefit. Income derived from an income averaging annuity contract is taxable pursuant to the provisions of Article XXII (Other Income).

Paragraph 4 provides that, for purposes of the Convention, the term "annuities" means a stated sum paid periodically at stated times during life or during a specified number of years, under an obligation to make payments in return for adequate and full consideration other than services rendered. The term does not include a payment that is not periodic or any annuity the cost of which was deductible for tax purposes in the Contracting State where the annuity was acquired. Items excluded from the definition of "annuities" are subject to the rules of Article XXII.

Paragraph 5, as amended by the 1984 Protocol, provides that benefits under social security legislation in Canada or the United States paid to a resident of the other Contracting State are taxable only in the State in which the recipient is resident. However, the State of residence must exempt from taxation one-half of the total amount of such benefits paid in a taxable year. Thus, if U.S. social security benefits are paid to a resident of Canada, the United States will exempt such benefits from tax and Canada will exempt one-half of the benefits from taxation. The exemption of one-half of the benefits in the State of residence is an exception to the saving clause under subparagraph 3(a) of Article XXIX (Miscellaneous Rules). The United States will not exempt U.S. social security benefits from tax if the Canadian resident receiving such benefits is a U.S. citizen. If a U.S. citizen and resident receives Canadian social security benefits, Canada will not tax such benefits and the United States will exempt from tax one-half of the total amount of such benefits. The United States will also exempt one-half of Canadian social security benefits from tax if the recipient is a U.S. citizen who is a resident of Canada, under paragraph 7 of Article XXIX. Paragraph 5 encompasses benefits paid under social security legislation of a political subdivision, such as a province of Canada.

Paragraph 6(a) provides that only the State of which a person is resident has the right to tax alimony and other similar amounts (including child support payments) arising in the other

Contracting State and paid to such person. However, under paragraph 6(b), the State of residence shall exempt from taxation the amount that would be excluded from taxable income in the State of source if the recipient were a resident thereof. Thus, if child support payments are made by a U.S. resident to a resident of Canada, Canada shall exempt from tax the amount of such payments which would be excluded from taxable income under section 71(b) of the Internal Revenue Code. Paragraph 6 does not define the term "alimony"; the term is defined pursuant to the provisions of paragraph 2 of Article III (General Definitions).

Article XVIII does not provide rules to determine the State in which pensions, annuities, alimony, and other similar amounts arise. The provisions of paragraph 2 of Article III are used to determine where such amounts arise for purposes of determining whether a Contracting State has the right to tax such amounts.

Paragraphs 1, 3, 4, 5(b) and 6(b) of Article XVIII are, by reason of paragraph 3(a) of Article XXIX (Miscellaneous Rules), exceptions to the "saving clause." Thus, the rules in those paragraphs change U.S. taxation of U.S. citizens and residents.

ARTICLE XIX
Government Service

Article XIX provides that remuneration, other than a pension, paid by a Contracting State or political subdivision or local authority thereof to a citizen of that State in respect of services rendered in the discharge of governmental functions shall be taxable only in that State. (Pursuant to paragraph 5 of Article IV (Residence), other income of such a citizen may also be exempt from tax, or subject to reduced rates of tax, in the State in which he is performing services, in accordance with other provisions of the Convention.) However, if the services are rendered in connection with a trade or business, then the provisions of Article XIV (Independent Personal Services), Article XV (Dependent Personal Services), or Article XVI (Artistes and Athletes), as the case may be, are controlling. Whether functions are of a governmental nature may be determined by a comparison with the concept of a governmental function in the State in which the income arises.

Pursuant to paragraph 3(a) of Article XXIX (Miscellaneous Rules), Article XIX is an exception to the "saving clause." As a result, a U.S. citizen resident in Canada and performing services in Canada in the discharge of functions of a governmental nature for the United States is taxable only in the United States on remuneration for such services.

This provision differs from the rules of Article VI of the 1942 Convention. For example, Article XIX allows the United States to impose tax on a person other than a citizen of Canada who earns remuneration paid by Canada in respect of services rendered in the discharge of governmental functions in the United States. (Such a person may, however, be entitled to an exemption from U.S. tax as provided in Code section 893.) Also, under the provisions of Article XIX Canada will not impose tax on amounts paid by the United States in respect of services rendered in the discharge of governmental functions to a U.S. citizen who is ordinarily resident in Canada for purposes other than rendering governmental services. Under paragraph 1 of Article VI

of the 1942 Convention, such amounts would be taxable by Canada.

ARTICLE XX
Students

Article XX provides that a student, apprentice, or business trainee temporarily present in a Contracting State for the purpose of his full-time education or training is exempt from tax in that State with respect to amounts received from outside that State for the purpose of his maintenance, education, or training, if the individual is or was a resident of the other Contracting State immediately before visiting the first-mentioned State. There is no limitation on the number of years or the amount of income to which the exemption applies.

The Convention does not contain provisions relating specifically to professors and teachers. Teachers are treated under the Convention pursuant to the rules established in Articles XIV (Independent Personal Services) and XV (Dependent Personal Services), in the same manner as other persons performing services. In Article VIII A of the 1942 Convention there is a 2-year exemption in the Contracting State of source in the case of a professor or teacher who is a resident of the other Contracting State.

ARTICLE XXI
Exempt Organizations

Paragraph 1 provides that a religious, scientific, literary, educational, or charitable organization resident in a Contracting State shall be exempt from tax on income arising in the other Contracting State but only to the extent that such income is exempt from taxation in the Contracting State in which the organization is resident. Since this paragraph, and the remainder of Article XXI, deal with entities that are not normally taxable, the test of "resident in" is intended to be similar - but cannot be identical - to the one outlined in paragraph 1 of Article IV (Residence). Paragraph 3 provides that paragraph 1 does not exempt from tax, income of a trust, company, or other organization from carrying on a trade or business, or income from a "related person" other than a person referred to in paragraph 1 or 2.

Paragraph 2 provides that a trust, company, or other organization that is resident in a Contracting State constituted and operated exclusively to administer or provide employee benefits or benefits for the self-employed under one or more funds or plans established to provide pension or retirement benefits or other employee benefits is exempt from taxation on dividend and interest income arising in the other Contracting State in a taxable year, if the income of such, organization is generally exempt from taxation for that year in the Contracting State in which it is resident. In addition, a trust, company, or other organization resident in a Contracting State and not taxed in a taxable year in that State shall be exempt from taxation in the other State in that year on dividend and interest income arising in that other State if it is constituted and operated exclusively to earn, income for the benefit of an organization described in the preceding sentence. Pursuant to paragraph 3 the exemption at source provided by paragraph 2 does not apply to dividends or interest from carrying on trade or business or from a "related person," other than a person referred

to in paragraph 1 or 2. The term "related person" is not necessarily defined by paragraph 2 of Article IX (Related Persons).

Paragraph 4 provides an exemption from U.S. excise taxes on private foundations in the case of a religious, scientific, literary, educational, or charitable organization which is resident in Canada but only if such organization has received substantially all of its support from persons other than citizens or residents of the United States.

Paragraph 5 provides that contributions by a citizen or resident of the United States to an organization which is resident in Canada and is generally exempt from Canadian tax are treated as charitable contributions, but only if the organization could qualify in the United States to receive deductible contributions if it were resident in (i.e., organized in) the United States. Paragraph 5 generally limits the amount of contributions made deductible by the Convention to the income of the U.S. citizen or resident arising in Canada, as determined under the Convention. In the case of contributions to a college or university at which the U.S. citizen or resident or a member of his family is or was enrolled, the special limitation to income arising in Canada is not required. The percentage limitations of Code section 170 in respect of the deductibility of charitable contributions apply after the limitations established by the Convention. Any amounts treated as charitable contributions by paragraph 5 which are in excess of amounts deductible in a taxable year pursuant to paragraph 5 may be carried over and deducted in subsequent taxable years, subject to the limitations of paragraph 5.

Paragraph 6 provides rules for purposes of Canadian taxation with respect to the deductibility of gifts to a U.S. resident organization by a resident of Canada. The rules of paragraph 6 parallel the rules of paragraph 5. The current limitations in Canadian law provide that deductions for gifts to charitable organizations may not exceed 20 percent of income. Excess deductions may be carried forward for one year.

The term "family" used in paragraphs 5 and 6 is defined in paragraph 2 of the Exchange of Notes accompanying the Convention to mean an individual's brothers and sisters (whether by whole or half-blood, or by adoption), spouse, ancestors, lineal descendants, and adopted descendants. Paragraph 2 of the Exchange of Notes also provides that the competent authorities of Canada and the United States will review procedures and requirements for organizations to establish their exempt status under paragraph 1 of Article XXI or as an eligible recipient of charitable contributions or gifts under paragraphs 5 and 6 of Article XXI. It is contemplated that such review will lead to the avoidance of duplicative administrative efforts in determining such status and eligibility.

The provisions of paragraph 5 and 6 generally parallel the rules of Article XIII D of the 1942 Convention. However, paragraphs 5 and 6 permit greater deductions for certain contributions to colleges and universities than do the provisions of the 1942 Convention.

<div align="center">

ARTICLE XXII
Other Income

</div>

Paragraph 1 provides that a Contracting State of which a person is a resident has the sole right to tax items of income, wherever arising, if such income is not dealt with in the prior Articles of the Convention. If such income arises in the other Contracting State, however, it may also be taxed in that State. The determination of where income arises for this purpose is made under the domestic laws of the respective Contracting States unless the Convention specifies where the income arises (e.g., paragraph 6 of Article XI (Interest)) for purposes of determining the right to tax, in which case the provisions of the Convention control.

Paragraph 2 provides that to the extent that income distributed by an estate or trust resident in one Contracting State is deemed under the domestic law of that State to be a separate type of income "arising" within that State, such income distributed to a beneficiary resident in the other Contracting State may be taxed in the State of source at a maximum rate of 15 percent of the gross amount of such distribution. Such a distribution will, however, be exempt from tax in the State of source to the extent that the income distributed by the estate or trust was derived by the estate or trust from sources outside that State. Thus, in a case where the law of Canada treats a distribution made by a trust resident in Canada as a separate type of income arising in Canada, Canadian tax is limited by paragraph 2 to 15 percent of the gross amount distributed to a U.S. resident beneficiary. Although the Code imposes tax on certain domestic trusts (e.g., accumulation trusts) and such trusts are residents of the United States for purposes of Article IV (Residence) and paragraph 2 of Article XXII, paragraph 2 does not apply to distributions by such trusts because, pursuant to Code sections 667(e) and 662(b), these distributions have the same character in the hands of a nonresident beneficiary as they do in the hands of the trust. Thus, a distribution by a domestic accumulation trust is not a separate type of income for U.S. purposes. The taxation of such a distribution in the United States is governed by the distribution's character, the provisions of the Code and the provisions of the Convention other than the provision in paragraph 2 limiting the tax at source to 15 percent.

ARTICLE XXIII
Capital

Although neither Canada nor the United States currently has national taxes on capital, Article XXIII provides rules for the eventuality that such taxes might be enacted in the future. Paragraph 1 provides that capital represented by real property (as defined in paragraph 2 of Article VI (Income From Real Property)) owned by a resident of a Contracting State and situated in the other Contracting State may be taxed in that other State.

Paragraph 2 provides that capital represented by either personal property forming part of the business property of a permanent establishment or personal property pertaining to a fixed base in a Contracting State may be taxed in that State.

Paragraph 3 provides that capital represented by ships and aircraft operated by a resident of a Contracting State in international traffic and by personal property pertaining to the operation of such ships and aircraft are taxable only in the Contracting State of residence.

Paragraph 4 provides that all elements of capital other than those covered by paragraphs 1,

2, and 3 are taxable only in the Contracting State of residence. Thus, capital represented by motor vehicles or railway cars, not pertaining to a permanent establishment or fixed base in a Contracting State, would be taxable only in the Contracting State of which the taxpayer is a resident.

ARTICLE XXIV
Elimination of Double Taxation

Paragraph 1 provides the general rules that will apply under the Convention with respect to foreign tax credits for Canadian taxes paid or accrued. The United States undertakes to allow to a citizen or resident of the United States, or to a company electing under Code section 1504(d) to be treated as a domestic corporation, a credit against the Federal income taxes imposed by the Code for the appropriate amount of income tax paid or accrued to Canada. In the case of a company which is a resident of the United States owning 10 percent or more of the voting stock of a company which is a resident of Canada (which for this purpose does not include a company electing under Code section 1504(d) to be treated as a domestic corporation), and from which it receives dividends in a taxable year, the United States shall allow as a credit against income taxes imposed by the Code the appropriate amount of income tax paid or accrued to Canada by the Canadian company with respect to the profits out of which such company paid the dividends.

The direct and deemed-paid credits allowed by paragraph 1 are subject to the limitations of the Code as they may be amended from time to time without changing the general principle of paragraph 1. Thus, as is generally the case under U.S. income tax conventions, provisions such as Code sections 901(c), 904, 905, 907, 908, and 911 apply for purposes of computing the allowable credit under paragraph 1. In addition, the United States is not required to maintain the overall limitation currently provided by U.S. law.

The term "income tax paid or accrued" is defined in paragraph 7 of Article XXIV to include certain specified taxes which are paid or accrued. The Convention only provides a credit for amounts paid or accrued. The determination of whether an amount is paid or accrued is made under the Code. Paragraph 1 provides a credit for these specified taxes whether or not they qualify as creditable under Code section 901 or 903. A taxpayer who claims credit under the Convention for Canadian taxes made creditable solely by paragraph 1 is not, as a result of the Protocol, subject to a per-country limitation with respect to Canadian taxes. Thus, credit for such Canadian taxes would be computed under the overall limitation currently provided by U.S. law. (However, see the discussion below of the source rules of paragraphs 3 and 9 for a restriction on the use of third country taxes to offset the U.S. tax imposed on resourced income.)

A taxpayer claiming credits for Canadian taxes under the Convention must apply the source rules of the Convention, and must apply those source rules in their entirety. Similarly, a taxpayer claiming credit for Canadian taxes which are creditable under the Code and who wishes to use the source rules of the Convention in computing that credit must apply the source rules of the Convention in their entirety.

Paragraph 3 provides source rules for purposes of applying Article XXIV. Profits, income

or gains of a resident of a Contracting State which may be taxed in the other Contracting State in accordance with the Convention, for reasons other than the saving clause of paragraph 2 of Article XXIX (Miscellaneous Rules) (e.g., pensions and annuities taxable where arising pursuant to Article XVIII (Pensions and Annuities)), are deemed to arise in the latter State. This rule does not, however, apply to gains taxable under paragraph 5 of Article XIII (Gains) (i.e., gains taxed by a Contracting State derived from the alienation of property by a former resident of that State). Gains from such an alienation arise, pursuant to paragraph 3(b), in the State of which the alienator is a resident. Thus, if in accordance with paragraph 5 of Article XIII, Canada imposes tax on certain gains of a U.S. resident such gains are deemed, pursuant to paragraphs 2 and 3(b) of Article XXIV, to arise in the United States for purposes of computing the deduction against Canadian tax for the U.S. tax on such gain. Under the Convention such gains arise in the United States for purposes of the United States foreign tax credit. Paragraph 3(b) also provides that profits, income, or gains arise in the Contracting State of which a person is a resident if they may not be taxed in the other Contracting State under the provisions of the Convention (e.g., alimony), other than the "saving clause" of paragraph 2 of Article XXIX.

Paragraph 9 provides clarification that the source rules of this Article shall not be used to determine the credit available against U.S. tax for foreign taxes other than income taxes paid or accrued to Canada (i.e., taxes of third countries). Thus, creditable third country taxes may not offset the U.S. tax on income treated as arising in Canada under the source rules of the Convention. A person claiming credit for income taxes of a third country may not rely upon the rules of paragraphs 3 and 6 for purposes of treating income that would otherwise have a U.S. source as having a foreign source. Thus, if the taxpayer elects to compute the foreign tax credit for any year using the special source rules set forth in paragraphs 3 and 6, paragraph 9 requires that a separate limitation be computed for taxes not covered by paragraph 1 without regard to the source rules of paragraphs 3 and 6, and the credit for such taxes may not exceed such limitation. The credit allowed under this separate limitation may not exceed the proportion of the Federal income taxes imposed by the Code that the taxpayer's taxable income from foreign sources (under the Code) not included in taxable income arising in Canada (and not in excess of total foreign source taxable income under the Code) bears to the taxpayer's worldwide taxable income. In any case the credit for taxes covered by paragraph 1 and the credit for other foreign taxes is limited to the amount allowed under overall limitation computed by aggregating taxable income arising in Canada and other foreign source taxable income.

If creditable Canadian taxes exceed the proportion of U.S. tax that taxable income arising in Canada bears to the entire taxable income, such taxes may qualify to be absorbed by any excess in the separate limitation computed with respect to other taxes.

In a case where a taxpayer has different types of income subject to separate limitations under the Code (e.g., section 904(d)(l)(B) DISC dividends) the Convention rules just described apply in the context of each of the separate Code limitations.

A taxpayer may, for any year, claim a credit pursuant to the rules of the Code. In such case, the taxpayer would be subject to the limitations established in the Code, and would forego the rules of the Convention that determine where taxable income arises. In addition, any Canadian taxes covered by paragraph 1 which are not creditable under the Code would not be credited.

Thus, where a taxpayer elects to use the special source rules of this Article to compute the foreign tax credit for any year, the following computations must be made:

*Step 1(a):*    Compute a hypothetical foreign tax credit limitation for Canadian income and taxes using the source rules of the Convention.

*Step 1(b):*    Compute a hypothetical foreign tax credit limitation for third country income and taxes using the source rules of the Code.

*Step 1*(c):    Compute an overall foreign tax credit limitation using the source rules of the Convention to the extent they resource Canadian source income as U.S. source income or U.S. source income as Canadian source income, and using the source rules of the Code with respect to any other income.

*Step 2:*    Allocate the amount of creditable Canadian taxes to the amount of the limitation computed under step 1(a), and allocate the amount of creditable third country taxes to the amount of the limitation computed under step 1(b). The amount of credit to be so allocated may not exceed the amount of the respective limitation.

*Step 3*:

(1) If the total credits allocated under step 2 exceed the amount of the limitation computed under step 1(c), the amount of allowable credits must be reduced to that limitation (see Rev. Rule. 82-215, 1982-2 C.B. 153 for the method of such reduction).

(2) If the total credits allocated under step 2 are less than the amount of the limitation computed under step 1(c), then

(a) any amount of creditable Canadian taxes in excess of the amount of the step 1(a) limitation may be credited to the extent of the excess of the step 1(c) limitation over the total step 2 allocation, and

(b) any amount of third country taxes in excess of the amount of the step 1(b) limitation may not be credited.

The following examples (in which the taxpayer's U.S. tax rate is presumed to be 46%) illustrate the application of the source rules of Article XXIV:

*Example 1.*

(a) A U.S. corporate taxpayer has for the taxable year $100 of taxable income having a U.S. source under both the Convention and the Code; $100 of taxable income having a Canadian source under both the Convention and the Code; $50 of taxable income having a Canadian source under the Convention but a U.S. source under the Code (see, for example, paragraph 1 of Article VII (Business Profits) and paragraph 3(a) of Article XXIV); and $80 of taxable income having a foreign (non-Canadian) source under the Code. The taxpayer pays $75 of Canadian income taxes and $45 of third country income taxes. All the foreign source income of the taxpayer constitutes "other" income described in Code section 904(d)(l)(C).

The source rule of the Convention are applied as follows to compute the taxpayer's foreign tax credit:

Step 1(a): $150 (Canadian source taxable income under convention)
    $330 (total taxable income)
x $151.80 = $69 limit for Canadian taxes.

Step 1(b): $ 80 (third country source taxable income under Code)
    $330 (total taxable income)
x $151.80 = $36.80 limit for third country taxes.

Step 1(c): $230 (overall foreign taxable income under source rules described above)
    $330 (total taxable income)
x $151.80 = $105.80 total limit.

Step 2: The taxpayer may tentatively credit $69 of the $75 Canadian income taxes under the step 1(a) limitation, and $36.80 of the third country income taxes under the step 1(b) limitation.

Step 3: Since the total amount of taxes credited under step 2 equals the taxpayer's total limitation of $105.80 under step 1(c), no additional taxes may be credited. The taxpayer has a $6 Canadian income tax carryover and a $8.20 third country income tax carryover for U.S. foreign tax credit purposes.

(b) If the taxpayer had paid only $30 of third country taxes, he would credit that $30 in step 2. Since the total amount of credits allowed under step 2 ($99) is less than the taxpayer's total limit of $105.80, and since the taxpayer has $6 of excess Canadian taxes not credited under step 2, he may also claim a credit for that $6 of Canadian income taxes, for a total credit of $105.

(c) If the taxpayer had paid $45 of third country income taxes and $65 of Canadian income taxes, the computation would be as follows:

Step 2: The taxpayer would credit the $65 of Canadian income taxes, and would also credit $36.80 of the $45 of third country income taxes.

Step 3: Although the total amount of credits computed under step 2 ($101.80) is less than the taxpayer's total limitation of $105.80, no additional credits can be claimed since the taxpayer has only excess third country income taxes. The excess third country income taxes are thus not permitted to offset U.S. tax on income that is Canadian source income under the Convention. The taxpayer would have $8.20 of third country income taxes as a carryover for U.S. foreign tax credit purposes.

*Example 2.* A United States corporate taxpayer has for the taxable year $100 of taxable income having a Canadian source under the Convention but a U.S. source under the Code; $100 of taxable income having a U.S. source under both the Convention and the

Code; $80 of taxable income having a foreign (non-Canadian) source under the Code; and ($50) of loss allocated or apportioned to Canadian source income. The taxpayer pays $50 of foreign (non-Canadian) income taxes, and $20 of Canadian income taxes.

The source rules of the Convention are applied as follows to compute the taxpayer's foreign tax credit:

Step 1(a):  $\underline{\$\ 50}$ (Canadian source taxable income under Contention)
   $230 (total taxable income)
x $105.80 = $23 limit for Canadian taxes.

Step 1(b):  $\underline{\$\ 80}$ (third country source taxable income under Code)
   $230 (total taxable income)
x $105.80 = $36.80 limit for third country taxes.

Step 1(c):  $\underline{\$130}$ (overall foreign taxable income under source rules described above)
   $230 (total taxable income)
x $105.80 = $59.80 total limit.

Step 2: Since the taxpayer paid $20 of Canadian income taxes, he may credit that amount in full since the step 1(a) limit is $23. Since the step 1(b) limit is $36.80, the taxpayer may credit $36.80 of the $50 foreign income taxes paid.

Step 3: Although the total taxes credited under step 2 ($56.80) is less than the taxpayer's total limit of $59.80, no additional credits may be claimed since the only excess taxes are third country income taxes, and those may not be used to offset any excess limitation in step 3. The $13.20 of foreign taxes not allowed as a credit is available as a foreign tax credit carryover.

*Example 3:* The facts are the same as in *Example 2,* except that foreign (non-Canadian) operations result in a loss of ($30) rather than taxable income of $80, and no foreign (non-Canadian) income taxes are paid. The taxpayer's credit is computed as follows:

Step 1(a):  $\underline{\$\ 50}$ x  $55.20 = $23 limit for Canadian taxes.
   $120

Step 1(b): Since there is no third country source taxable income under the Code, the limit for third country income taxes is zero.

Step 1(c):  $\underline{\$\ 20}$ x $55.20 = $9.20 total limit.
   $120

Step 2: Since the taxpayer paid $20 of Canadian income tax, he may tentatively credit that amount in full since the step 1(a) limit is $23.

Step 3: Since the total taxes credited under step 2 ($20) exceeds the taxpayer's total limit

of \$9.20, the taxpayer must reduce the total amount claimed as a credit of \$9.20. The remaining \$10.80 of Canadian income taxes are available as a foreign tax credit carryover.

*Example 4.*    The facts are the same as in *Example 2,* except that the first \$100 of taxable income mentioned in *Example 2* has a Canadian source under both the Convention and the Code.

Step 1(a): $\underline{\$\,50}$ x \$105.80 = \$23 limit for Canadian taxes.
$\phantom{Step 1(a): }\$120$

Step 1(b): $\underline{\$\,80}$ x \$105.80 = \$36.80 limit for third country income taxes.
$\phantom{Step 1(b): }\$120$

Step 1(c): $\underline{\$130}$ x \$105.80 = \$59.80 total limit.
$\phantom{Step 1(c): }\$230$

Step 2: The taxpayer credits the \$20 of Canadian income tax and \$36.80 of third country income tax.

Step 3: As explained in *Example 2,* the taxpayer's total credit is limited to \$56.80. In this case, however, if the Canadian taxes covered by the Convention are creditable under the Code, the taxpayer could elect the Code limitation of \$59.80 ($\underline{\$130}$ x \$105.80),
$\phantom{taxpayer could elect the Code limitation of \$59.80 (}\$230$
which is more advantageous than the Convention limitation because that limitation does not permit third country income taxes to be credited against the U.S. tax on income arising in Canada under the Convention.

*Example* 5.    The facts are the same as in *Example 2,* except that the corporation pays \$25 of Canadian income taxes and \$12 of foreign (non-Canadian) income taxes. Under step 2, the taxpayer would credit \$23 of the \$25 of Canadian income taxes and the full \$12 of third country income taxes. Since the total amount of income taxes credited under step 2 is \$35, which is less than the taxpayer's total limit of \$59.80, the taxpayer may credit an amount of Canadian income taxes up to the \$24.80 excess. Here, the taxpayer may claim a credit for the additional \$2 of Canadian income taxes not credited under step 2, and has a total credit of \$37.

*Example* 6.

(a) A U.S. corporate taxpayer has for the taxable year \$100 of taxable income having a Canadian source under the Convention and the Code; \$50 of taxable income having a Canadian source under the Convention but a U.S. source under the Code; \$80 of taxable income having a foreign (non-Canadian) source under the Code; and (\$50) of loss allocated or apportioned to U.S. source income. The taxpayer pays \$65 of Canadian income taxes, and \$45 of third country income taxes.

Step 1(a): $\underline{\$150}$  x  \$82.80 = \$69 limit for Canadian income taxes.
$\phantom{Step 1(a): }\$180$

Step 1(b): $\underline{\$ 80}$ x $\$82.80 = \$36.80$ limit for third country income taxes.
$\$180$

Step 1(c): $\underline{\$180}$ x $\$82.80 = \$82.80$ total limit.
$\$180$

Step 2: The taxpayer tentatively credits the $65 of Canadian income taxes against the $69 limit of step 1(a), and $36.80 of the $45 of third country income taxes against the $36.80 limit of step 1(b).

Step 3: Since the total amount of credits tentatively allowed under step 2 ($101.80) exceeds the taxpayer's total limit of $82.80 under step 1(c), the taxpayer's allowable credit is reduced to $82.80 under the method provided by Rev. Rul. 82-215.

(b) If the taxpayer had paid only $40 of Canadian income taxes, the total credits tentatively allowed under step 2 is $76.80. Although that amount is less than the $82.80 total limit under step 1(c), no additional taxes may be credited since the taxpayer only has excess third country income taxes. The $8.20 of excess third country income taxes would be allowed as a foreign tax credit carryover.

The general rule for avoiding double taxation in Canada is provided in paragraph 2. Pursuant to paragraph 2(a) Canada undertakes to allow to a resident of Canada a credit against income taxes imposed under the Income Tax Act for the appropriate amount of income taxes paid or accrued to the United States. Paragraph 2(b) provides for the deduction by a Canadian company, in computing taxable income, of any dividend received out of the exempt surplus of a U.S. company which is an affiliate. The provisions of paragraphs 2(a) and (b) are subject to the provisions of the Income Tax Act as they may be amended from time to time without changing the general principle of paragraph 2. Paragraph 2(c) provides that where Canada imposes a tax on the alienation of property pursuant to the provisions of paragraph 5 of Article XIII (Gains), Canada will allow a credit for the income tax paid or accrued to the United States on such gain.

The rules of paragraph 1 are modified in certain respects by rules in paragraphs 4 and 5 for income derived by United States citizens who are residents of Canada. Paragraph 4 provides two steps for the elimination of double taxation in such a case. First, paragraph 4(a) provides that Canada shall allow a deduction from (credit against) Canadian tax in respect of income tax paid or accrued to the United States in respect of profits, income, or gains which arise in the United States (within the meaning of paragraph 3(a)); the deduction against Canadian tax need not, however, exceed the amount of income tax that would be paid or accrued to the United States if the individual were not a U.S. citizen, after taking into account any relief available under the Convention.

The second step, as provided in paragraph 4(b), is that the United States allows as a credit against United States tax, subject to the rules of paragraph 1, the income tax paid or accrued to Canada after the Canadian credit for U.S. tax provided by paragraph 4(a). The credit so allowed by the United States is not to reduce the portion of the United States tax that is creditable against

Canadian tax in accordance with paragraph 4(a).

The following example illustrates the application of paragraph 4.

*Example A*

- A U.S. citizen who is a resident of Canada earns $175 of income from the performance of independent personal services, of which $100 is derived from services performed in Canada and $75 from services performed in the United States. That is his total world-wide income.

If he were not a U.S. citizen, the United States could tax $75 of that amount under Article XIV (Independent Personal Services). By reason of paragraph 3(a), the $75 that may be taxed by the United States under Article XIV is deemed to arise in the United States. Assume that the U.S. tax on the $75 would be $25 if the taxpayer were not a U.S. citizen.

- However, since the individual is a U. S. citizen, he is subject to U.S. tax on his worldwide income of $175. After excluding $75 under section 911, his taxable income is $100 and his U.S. tax is $40.
- Because he is a resident of Canada, he is also subject to Canadian tax on his world-wide income. Assume that Canada taxes the $175 at $75.
- Canada will credit against its tax of $75 the U.S. tax at source of $25, leaving a net Canadian tax of $50.
- The United States will credit against its tax of $40 the Canadian tax net of credit, but without reducing its source basis tax of $25; thus, the allowable credit is $40 - $25 = $15.
- To use a credit of $15 requires Canadian source taxable income of $37.50 ($37.50/$100 x $40 = $15). Without any special treaty rule, Canadian source taxable income would be only $25 ($100 less the section 911 exclusion of $75). Paragraph 6 provides for resourcing an additional $12.50 of income to Canada, so that the credit of $15 can be fully used.

Paragraph 5 provides special rules for the elimination of double taxation in the case of dividends, interest, and royalties earned by a U.S. citizen resident in Canada. These rules apply notwithstanding the provisions of paragraph 4, but only as long as the law in Canada allows a deduction in computing income for the portion of any foreign tax paid in respect of dividends, interest, or royalties which exceeds 15 percent of the amount of such items of income, and only with respect to those items of income. The rules of paragraph 4 apply with respect to other items of income; moreover, if the law in force in Canada regarding the deduction for foreign taxes changes, the provisions of paragraph 5 shall not apply and the U.S. foreign tax credit for Canadian taxes and the Canadian credit for U.S. taxes will be determined solely pursuant to the provisions of paragraph 4.

The calculations under paragraph 5 are as follows. First, the deduction allowed in Canada in computing income shall be made with respect to U.S. tax on the dividends, interest and royalties before any foreign tax credit by the United States with respect to income taxes paid or accrued to Canada. Second, Canada shall allow a deduction from (credit against) Canadian tax for U.S. tax paid or accrued with respect to the dividends, interest, royalties, but such credit need not exceed 15 percent of the gross amount of such items income that have been included in computed

income for Canadian tax purposes. (The credit may, however, exceed the amount of tax that the United States would be entitled to levy under the Convention upon a Canadian resident who is not a U.S. citizen.) Third, for purposes of computing the U.S. tax on such dividends, interest, and royalties, the United States shall allow as a credit against the U.S. tax the income tax paid or accrued to Canada after the 15 percent credit against Canadian tax for income tax paid or accrued to the United States. The United States is in no event obliged to give a credit for Canadian income tax which will reduce the U.S. tax below 15 percent of the amount of the dividends, interest, and royalties.

The rules of paragraph 5 are illustrated by the following examples.

*Example B*

    - A U.S. citizen who is a resident of Canada has $100 of royalty income arising in the United States. The tentative U.S. tax before foreign tax credit is $40.
    - Canada, under its law, allows a deduction for the U.S. tax in excess of 15 percent or, in this case, a deduction of $25 ($40 - $15). The Canadian taxable income is $75 and the Canadian tax on that amount is $35.
    - Canada gives a credit of $15 (the maximum credit allowed is 15 percent of the gross royalty taken into Canadian income) and collects a net tax of $20.
    - The United States allows a credit for the net Canadian tax against its tax in excess of 15 percent. Thus, the maximum credit is $25 ($40 - $15). But since the net Canadian tax paid was $20, the usable credit is $20.
    - To be able to use a credit of $20 requires Canadian source taxable income of $50 (50% of the U.S. tentative tax of $40). Under paragraph 6, $50 of the U.S. royalty is resourced to be of Canadian source. The credit of $20 may then be offset against the U.S. tax of $40, leaving a net U.S. tax of $20.
    - The combined tax paid to both countries is $40, $20 to Canada and $20 to the United States.

*Example C*

    A U.S. citizen who is a resident of Canada receives $200 of income with respect to personal services performed within Canada and $100 of royalty income arising within the United States. Taxable income for U.S. purposes, taking into account the rules of Code section 911, is $220. U.S. tax (before foreign tax credits) is $92. The $100 of royalty income is deemed to bear U.S. tax (before foreign tax credits) of $41.82

$$\frac{(\$100 \times \$92)}{\$220}.$$

Under Canadian law, a deduction of $26.82 (the excess of $41.82 over 15 percent of the $100 royalty income) is allowed in computing income. The Canadian tax on $273.18 of income ($300 less the $26.82 deduction) is $130. Canada then gives a credit against the $130 for $15 (the U.S. tax paid or accrued with respect to the royalty, $41.82, but limited to 15 percent of the gross amount of such income, or $15), leaving a final Canadian tax of $115. Of the $115, $30.80 is

attributable to the royalty

$$\frac{(\$ 73.18 \ (\$100 \ royalty \ less \ \$26.82 \ deduction \ x \ \$115.}{(\$273.18 \ (\$300 \ income \ less \ \$26.82 \ deduction)}$$

Of this amount, $26.82 is creditable against U.S. tax pursuant to paragraph 5. (Although the U.S. allows a credit for the Canadian tax imposed on the royalty, $30.80, the credit may not reduce the U.S. tax below 15 percent of the amount of the royalty. Thus, the maximum allowable credit is the excess of $41.82, the U.S. tax imposed on the royalty income, over $15, which is 15 percent of the $100 royalty). The remaining $3.98 (the Canadian tax of $30.80 less the credit allowed of $26.82) is a foreign tax credit carryover for U.S. purposes, subject to the limitations of paragraph 5. (An additional $50.18 of Canadian tax with respect to Canadian source services income is creditable against U.S. tax pursuant to paragraphs 3 and 4(b). The $50.18 is computed as follows: tentative U.S. tax (before foreign tax credits) is $92; the U.S. tax on Canadian source services income is $50.18 ($92 less the U.S. tax on the royalty income of $41.82); the limitation on the services income is:

$$\frac{\$120 \ (taxable \ income \ from \ services) \ x \ \$92.}{\$220 \ (total \ taxable \ income)}$$

or $50.18. The credit for Canadian tax paid on the services income is therefore $50.18; the remainder of the Canadian tax on the services income, or $34.02, is a foreign tax credit carryover for U.S. purposes, subject to the limitations of paragraph 5).

Paragraph 6 is necessary to implement the objectives of paragraphs 4(b) and 5(c). Paragraph 6 provides that where a U.S. citizen is a resident of Canada, items of income referred to in paragraph 4 or 5 are deemed for the purposes of Article XXIV to arise in Canada to the extent necessary to avoid double taxation of income by Canada and the United States consistent with the objectives of paragraphs 4(b) and 5(c). Paragraph 6 can override the source rules of paragraph 3 to permit a limited resourcing of income. The principles of paragraph 6 have effect, pursuant to paragraph 3(b) of Article XXX (Entry Into Force), for taxable years beginning on or after January 1, 1976. See the discussion of Article XXX below.

The application of paragraph 6 is illustrated by the following example.

*Example D*

The facts are the same as in *Example C.* The United States has undertaken, pursuant to paragraph 5(c) and paragraph 6, to credit $26.82 of Canadian taxes on royalty income that has a U.S. source under both paragraph 3 and the Internal Revenue Code. (As illustrated in *Example C,* the credit, however, only reduces the U.S. tax on the royalty income which exceeds 15 percent of the amount of such income included in computing U.S. taxable income.) Pursuant to paragraph 6, for purposes of determining the U.S. foreign tax credit limitation under the Convention with respect to Canadian taxes,

$$\$ 64.13 \ (\frac{A}{\$220} \ x \ \$92 = \$26.82; \ A = \$64.13)$$

of taxable income with respect to the royalties is deemed to arise in Canada.

Paragraph 7 provides that any reference to "income tax paid or accrued" to Canada or the United States includes Canadian tax or United States tax, as the case may be. The terms "Canadian tax" and "United States tax" are defined in paragraphs 1(c) and 1(d) of Article III (General Definitions). References to income taxes paid or accrued also include taxes of general application paid or accrued to a political subdivision or local authority of Canada or the United States which are not imposed by such political subdivision or local authority in a manner inconsistent with the provisions of the Convention and which are substantially similar to taxes of Canada or the United States referred to in paragraphs 2 and 3(a) of Article II (Taxes Covered).

In order for a tax imposed by a political subdivision or local authority to fall within the scope of paragraph 7, such tax must apply to individuals, companies, or other persons generally, and not only to a particular class of individuals or companies or a particular type of business. The tax must also be substantially similar to the national taxes referred to in paragraphs 2 and 3(a) of Article II. Finally, the political subdivision or local authority must apply its tax in a manner not inconsistent with the provisions of the Convention. For example, the political subdivision or local authority must not impose its tax on a resident of the other Contracting State earning business profits within the political subdivision or local authority but not having a permanent establishment there. It is understood that a Canadian provincial income tax that satisfied the conditions of paragraph 7 on September 26, 1980 also satisfied the conditions of that paragraph on June 14, 1983 - i.e., no significant changes have occurred in the taxes imposed by Canadian provinces.

Paragraph 8 relates to the provisions of Article XXIII (Capital). It provides that where a resident of a Contracting State owns capital which, in accordance with the provisions of Article XXIII, may be taxed in the other Contracting State, the State of residence shall allow as a deduction from (credit against) its tax on capital an amount equal to the capital tax paid in the other Contracting State. The deduction is not, however, to exceed that part of the capital tax, computed before the deduction, which is attributable to capital which may be taxed in the other State.

ARTICLE XXV
Non-discrimination

Paragraphs 1 and 2 of Article XXV protect individual citizens of a Contracting State from discrimination by the other Contracting State in taxation matters. Paragraph 1 provides that a citizen of a Contracting State who is a resident of the other Contacting State may not be subjected in that other State to any taxation or requirement connected with taxation which is other or more burdensome than the taxation and connected requirements imposed on similarly situated citizens of the other State.

Paragraph 2 assures protection in a case where a citizen of a Contracting State is not a resident of the other Contracting State. Such a citizen may not be subjected in the other State to any taxation or requirement connected to taxation which is other or more burdensome than the taxation and connected requirements to which similarly situated citizens of any third State are subjected. The reference to citizens of a third State "in the same circumstances" includes

consideration of the State of residence. Thus, pursuant to paragraph 2, the Canadian taxation with respect to a citizen of the United States resident in, for example, the United Kingdom may not be more burdensome than the taxation of a U.K. citizen resident in the United Kingdom. Any benefits available to the U.K. citizen by virtue of an income tax convention between the United Kingdom and Canada would be available to the U.S. citizen resident in the United Kingdom if he is otherwise in the same circumstances as the U.K. citizen.

Paragraph 3 assures that, in computing taxable income, an individual resident of a Contracting State will be entitled to the same deduction for dependents resident in the other Contracting State that would be allowed if the dependents were residents of the individual's State of residence. The term "dependent" is defined in accordance with the rules set forth in paragraph 2 of Article III (General Definitions). For U.S. tax purposes, paragraph 3 does not expand the benefits currently available to a resident of the United States with a dependent resident in Canada. See Code section 152(b)(3).

Paragraph 4 allows a resident of Canada (not a citizen of the United States) to file a joint return in cases where such person earns salary, wages, or other similar remuneration as an employee and such income is taxable in the United States under the Convention. Paragraph 4 does not apply where the resident of Canada earns wages which are exempt in the United States under Article XV (Dependent Personal Services) or earns only income taxable by the United States under provisions of the Convention other than Article XV.

The benefit provided by paragraph 4 is available regardless of the residence of the taxpayer's spouse. It is limited, however, by a formula designed to ensure that the benefit is available solely with respect to persons whose U.S. source income is entirely, or almost entirely, wage income. The formula limits the United States tax with respect to wage income to that portion of the total U.S. tax that would be payable for the taxable year if both the individual and his spouse were United States citizens as the individual's taxable income (determined without any of the benefits made available by paragraph 4, such as the standard deduction) bears to the total taxable income of the individual and his spouse. The term "total United States tax" used in the formula is total United States tax without regard to any foreign tax credits, as provided in subparagraph 4(a). (Foreign income taxes may, however, be claimed as deductions in computing taxable income, to the extent allowed by the Code.) In determining total taxable income of the individual and his spouse, the benefits made available by paragraph 4 are taken into account, but a deficit of the spouse is not.

The following example illustrates the application of paragraph 4.

A, a Canadian citizen and resident, is married to B who is also a Canadian citizen and resident. A earns $12,000 of wages taxable in the U.S. under Article XV (Dependent Personal Services) and $2,000 of wages taxable only in Canada. B earns $1,000 of U.S. source dividend income, taxed by the United States at 15 percent pursuant to Article X (Dividends). B also earns $2,000 of wages taxable only in Canada. A's taxable income for U.S. Pu poses, determined without regard to paragraph 4, is $11,700 ($12,000 - $2,000 (Code sections 151(b) and 873(b)(3)) + $1,700 (Code sections 63)). The U.S. tax (Code section 1(d)) with respect to such income is $2,084.50. The total U.S. tax payable by A and B if both were U.S. citizens and all their income

arose in the United States would be $2,013 under Code section 1(a) on taxable income of $14,800 ($17,000 - $200 (Code section 116) - $2,000 (Code section 151)). Pursuant to paragraph 4, the U.S. tax imposed on A's wages from U.S. sources is limited to B's U.S. tax liability with respect to the U.S. source dividends remains $150.

$$\$1,591.36 \ (\underline{\$11,700} \ x \ \$2,013).$$
$$\$14,800$$

The provisions of paragraph 4 may be elected on a year-by-year basis They are purely computational and do not make either or both spouses residents of the United States for the purpose of other U.S. income tax conventions. The rules relating to the election provided by U.S. law under Code section 6013(g)(see section 1.6013-6 of the Treasury Regulations) do not apply to the election described in this paragraph.

Paragraph 5 protects against discrimination in a case where the capital of a company which is a resident of one Contracting State is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State. Such a company shall not be subjected in the State of which it is a resident to any taxation or requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which are subjected to other similar companies which are residents of that State but whose capital is wholly or partly owned or controlled, directly or indirectly, by one or more residents of a third State.

Paragraph 6 protects against discrimination in the case of a permanent establishment which a resident of one Contracting State has in the other Contracting State. The taxation of such a permanent establishment by the other Contracting State shall not be less favorable than the taxation of residents of that other State carrying on the same activities. The paragraph specifically overrides the provisions of Article XXIV (Elimination of Double Taxation), thus ensuring that permanent establishments will be entitled to relief from double taxation on a basis comparable to the relief, afforded to similarly situated residents. Paragraph 6 does not oblige a Contracting State to grant to a residents of the other Contracting State any personal allowances, reliefs, and reductions for taxation purposes on account of civil status or family responsibilities which it grants to its own residents. In addition, paragraph 6 does not require a Contracting State to grant to a company which is a resident of the other Contracting State the same tax relief that it grants to companies which are resident in the first-mentioned State with respect to intercorporate dividends. This provision is merely clarifying in nature, since neither the United States nor Canada would interpret paragraph 6 to provide for granting the same relief in the absence of a specific denial thereof. The principles of paragraph 6 would apply with respect to a fixed base as well as a permanent establishment. Paragraph 6 does not, however, override the provisions of Code section 906.

Paragraph 7 concerns the right of a resident of a Contracting State to claim deductions for purposes of computing taxable profits in the case of disbursements made to a resident of the other Contracting State. Such disbursements shall be deductible under the same conditions as if they had been made to a resident of the first-mentioned State. Thus, this paragraph does not require Canada to permit a deduction to a Canadian trust for disbursements made to a nonresident beneficiary out of income derived from a business in Canada or Canadian real property; granting

such a deduction would result in complete exemption by Canada of such income and would put Canadian trusts with nonresident beneficiaries in a better position than if they had resident beneficiaries. These provisions do not apply to amounts to which paragraph 1 of Article IX (Related Persons), paragraph 7 of Article XI (Interest), or paragraph 7 of Article XII (Royalties) apply. Paragraph 7 of Article XXV also provides that, for purposes of determining the taxable capital of a resident of a Contracting State, any debts of such person to a resident of the other Contracting State shall be deductible under the same conditions as if they had been contracted to a resident of the first-mentioned State. This portion of paragraph 7 relates to Article XXIII (Capital).

Paragraph 8 provides that, notwithstanding the provisions of paragraph 7, a Contracting State may enforce the provisions of its taxation laws relating to the deductibility of interest, in force on September 26, 1980, or as modified subsequent to that date in a manner that does not change the general nature of the provisions in force on September 26, 1980; or which are adopted after September 26, 1980, and are designed to ensure that nonresidents do not enjoy a more favorable tax treatment under the taxation laws of that State than that enjoyed by residents. Thus Canada may continue to limit the deductions for interest paid to certain nonresidents as provided in section 18(4) of Part 1 of the Income Tax Act.

Paragraph 9 provides that expenses incurred by citizens or residents of a Contracting State with respect to any Convention, including any seminar, meeting, congress, or other function of similar nature, held in the other Contracting State, are deductible for purposes of taxation in the first-mentioned State to the same extent that such expenses would be deductible if the convention were held in that first-mentioned State. Thus, for U.S. income tax purposes an individual who is a citizen or resident of the United States and who attends a convention held in Canada may claim deductions for expenses incurred in connection with such convention without regard to the provisions of Code section 274(h). Section 274(h) imposes special restrictions on the deductibility of expenses incurred in connection with foreign conventions. A claim for a deduction for such an expense remains subject, in all events, to the provisions of U.S. law with respect to the deductibility of convention expenses generally (e.g., Code sections 162 and 212). Similarly, in the case of a citizen or resident of Canada attending a convention in the United States, paragraph 9 requires Canada to allow a deduction for expenses relating to such convention as if the convention had taken place in Canada.

Paragraph 10 provides that, notwithstanding the provisions of Article II (Taxes Covered), the provisions of Article XXV apply in the case of Canada to all taxes imposed under the Income Tax Act; and, in the case of the United States, to all taxes imposed under the Code. Article XXV does not apply to taxes imposed by political subdivisions or local authorities of Canada or the United States.

Article XXV substantially broadens the protection against discrimination provided by the 1942 Convention, which contains only one provision dealing specifically with this subject. That provision, paragraph 11 of the Protocol to the 1942 Convention, states that citizens of one of the Contracting States residing within the other Contracting State are not to be subjected to the payment of more burdensome taxes than the citizens of the other State.

The benefits of Article XXV may affect the tax liability of a U.S. citizen or resident with respect to the United States. See paragraphs 2 and 3 of Article XXIX (Miscellaneous Rules).

ARTICLE XXVI
Mutual Agreement Procedure

Paragraph 1 provides that where a person considers that the actions of one or both of the Contracting States will result in taxation not in accordance with the Convention, he may present his case in writing to the competent authority of the Contracting State of which he is a resident or, if he is a resident of neither Contracting State, of which he is a national. Thus, a resident of Canada must present to the Minister of National Revenue (or his authorized representative) any claim that such resident is being subjected to taxation contrary to the Convention. A person who requests assistance from the competent authority may also avail himself of any remedies available under domestic laws.

Paragraph 2 provides that the competent authority of the Contracting State to which the case is presented shall endeavor to resolve the case by mutual agreement with the competent authority of the other Contracting State, unless he believes that the objection is not justified or he is able to arrive at a satisfactory unilateral solution. Any agreement reached between the competent authorities of Canada and the United States shall be implemented notwithstanding any time or other procedural limitations in the domestic laws of the Contracting States, except where the special mutual agreement provisions of Article IX (Related Persons) apply, provided that the competent authority of the Contracting State asked to waive its domestic time or procedural limitations has received written notification that such a case exists within six years from the end of the taxable year in the first-mentioned State to which the case relates. The notification may be given by the competent authority of the first-mentioned State, the taxpayer who has requested the competent authority to take action, or a person related to the taxpayer. Unlike Article IX, Article XXVI does not require the competent authority of a Contracting State to grant unilateral relief to avoid double taxation in a case where timely notification is not given to the competent authority of the other Contracting State. Such unilateral relief may, however, be granted by the competent authority in its discretion pursuant to the provisions of Article XXVI and in order to achieve the purposes of the Convention. In a case where the provisions of Article IX apply, the provisions of paragraphs 3, 4, and 5 of that Article are controlling with respect to adjustments and corresponding adjustments of income, loss, or tax and the effect of the Convention upon time or procedural limitations of domestic law. Thus, if the provisions of paragraph 2 of Article XXVI do not independently authorize such relief.

Paragraph 3 provides that the competent authorities of the Contacting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention. In particular, the competent authorities may agree to the same attribution of profits to a resident of a Contracting State and its permanent establishment in the other Contracting State; the same allocation of income, deductions, credits, or allowances between persons; the same determination of the source of income; the same characterization of particular items of income; a common meaning of any term used in the Convention; rules, guidelines, or procedures for the elimination of double taxation with respect to income distributed

by an estate or trust, or with respect to a partnership; or to increase any dollar amounts referred to in the Convention to reflect monetary or economic developments. The competent authorities may also consult and reach agreements on rules, guidelines, or procedures for the elimination of double taxation in cases not provided for in the Convention.

The list of subjects of potential mutual agreement in paragraph 3 is not exhaustive; it merely illustrates the principles set forth in the paragraph. As in the case of other U.S. tax conventions, agreement can be arrived at in the context of determining the tax liability of a specific person or in establishing rules, guidelines, and procedures that will apply generally under the Convention to resolve issues for classes of taxpayers. It is contemplated that paragraph 3 could be utilized by the competent authorities, for example, to resolve conflicts between the domestic laws of Canada and the United States with respect to the allocation and apportionment of deductions.

Paragraph 4 provides that each Contracting State will endeavor to collect on behalf of the other State such amounts as may be necessary to ensure that relief granted by the Convention from taxation imposed by the other State does not enure to the benefit of persons not entitled to such relief. Paragraph 4 does not oblige either Contracting State to carry out administrative measures of a different nature from those that would be used by Canada or the United States in the collection of its own tax or which would be contrary to its public policy.

Paragraph 5 confirms that the competent authorities of Canada and the United States may communicate with each other directly for the purpose of reaching agreement in the sense of paragraphs 1 through 4.


ARTICLE XXVII
Exchange of Information

Paragraph 1 authorizes the competent authorities to exchange the information necessary for carrying out the provisions of the Convention or the domestic laws of Canada and the United States concerning taxes covered by the Convention, insofar as the taxation under those domestic laws is not contrary to the Convention. The authority to exchange information granted by paragraph 1 is not restricted by Article I (Personal Scope), and thus need not relate solely to persons otherwise covered by the Convention. It is contemplated that Article XXVII will be utilized by the competent authorities to exchange information upon request, routinely, and spontaneously.

Any information received by a Contracting State pursuant to the Convention is to be treated as secret in the same manner as information is obtained under the taxation laws of that State. Such information shall be disclosed only to persons or authorities, including courts and administrative bodies, involved in the assessment or collection of, the administration and enforcement in respect of, or the determination of appeals in relation to, the taxes covered by the Convention and the information may be used by such persons only for such purposes. (In accordance with paragraph 4, for the purposes of this Article the Convention applies to a broader range of taxes than those covered specifically by Article II (Taxes Covered).

In specific cases a competent authority providing information may, pursuant to paragraph 3, impose such other conditions on the use of information as are necessary. Although the information received by persons described in paragraph 1 is to be treated as secret, it may be disclosed by such persons in public court proceedings or in judicial decisions.

The provisions of paragraph 1 authorize the U.S. competent authority to continue to allow the General Accounting Office to examine tax return information received from Canada when GAO is engaged in a study of the administration of U.S. tax laws pursuant to a directive of Congress. However, the secrecy requirements of paragraph 1 must be met.

If a Contracting State requests information in accordance with Article XXVII, the other Contracting State, shall endeavor, pursuant to paragraph 2, to obtain the information to which the request relates in the same manner as if its own taxation were involved, notwithstanding the fact that such States does not need the information. In addition, the competent authority requested to obtain information shall endeavor to provide the information in the particular form requested, such as depositions of witnesses and copies of unedited original documents, to the same extent such depositions and documents can be obtained under the laws or administrative practices of that State with respect to its own taxes.

Paragraph 3 provides that the provisions of paragraphs 1 and 2 do not impose on Canada or the United States the obligation to carry out administrative measures at variance with the laws and administrative practice of either State; to supply information which is not obtainable under the laws or in the normal course of the administration of either State; or to supply information which would disclose any trade, business, industrial, commercial, or professional secret or trade process, or information the disclosure of which would be contrary to public policy. Thus, Article XXVII allows, but does not obligate, the United States and Canada to obtain and provide information that would not be available to the requesting State under its laws or administrative practice or that in different circumstances would not be available to the State requested to provide the information. Further, Article XXVII allows a Contracting State to obtain information for the other Contracting State even if there is no tax liability in the State requested to obtain the information. Thus, the United States will continue to be able to give Canada tax information even if there is no U.S. tax liability at issue.

Paragraph 4 provides that, for the purposes of Article XXVII, the Convention applies, in the case of Canada, to all taxes imposed by the Government of Canada on estates and gifts and under the Income Tax Act and, in the case of the United States, to all taxes imposed under the Internal Revenue Code. Article XXVII does not apply to taxes imposed by political subdivisions or local authorities of the Contracting States. Paragraph 4 is designed to ensure that information exchange will extend to most national level taxes on both sides, and specifically to information gathered for purposes of Canada's taxes on estates and gifts (not effective for deaths or gifts after 1971). This provision is intended to mesh with paragraph 8 of Article XXX (Entry Into Force), which terminates the existing estate tax convention between the United States and Canada.

ARTICLE XXVIII

<u>Diplomatic Agents and Consular Officers</u>

Article XXVIII states that nothing in the Convention affects the fiscal privileges of diplomatic agents or consular officers under the general rules of international law or under the provisions of special agreements. However, various provisions of the Convention could apply to such persons, such as those concerning exchange of information, mutual agreement, and non-discrimination.


ARTICLE XXIX
<u>Miscellaneous Rules</u>

Paragraph 1 states that the provisions of the Convention do not restrict in any manner any exclusion, exemption, deduction, credit, or other allowance accorded by the laws of a Contracting State in the determination of the tax imposed by that State. Thus, if a deduction would be allowed for an item in computing the taxable income of a Canadian resident under the Code, such deduction is available to such person in computing taxable income under the Convention. Paragraph 1 does not, however, authorize a taxpayer to make inconsistent choices between rules of the Code and rules of the Convention. For example, if a resident of Canada desires to claim the benefits of the "attributable to" rule of paragraphs 1 and 7 of Article VII (Business Profits) with respect to the taxation of business profits of a permanent establishment, such person must use the "attributable to" concept consistently for all items of income and deductions and may not rely upon the "effectively connected" rules of the Code to avoid U.S. tax on other items of attributable income. In no event are the rules of the Convention to increase overall U.S. tax liability from what liability would be if there were no convention.

Paragraph 2 provides a "saving clause" pursuant to which Canada and the United States may each tax its residents, as determined under Article IV (Residence), and the United States may tax its citizens (including any former citizen whose loss of citizenship had as one of its principal purposes the avoidance of tax, but only for a period of 10 years following such loss) and companies electing under Code section 1504(d) to be treated as domestic corporations, as if there were no convention between the United States and Canada with respect to taxes on income and capital.

Paragraph 3 provides that, notwithstanding paragraph 2, the United States and Canada must respect certain specified provisions of the Convention in regard to residents, citizens, and section 1504(d) companies. Paragraph 3(a) lists certain paragraphs and Articles of the Convention that represent exceptions to the "saving clause" in all situations; paragraph 3(b) provides a limited further exception for students who have not acquired immigrant status in the State where they are temporarily present.

Paragraph 4 provides relief with respect to social security taxes imposed on employers, employees, and self-employed persons under Code sections 1401, 3101, and 3111. Income from personal services not subject to tax by the United States under the provisions of this Convention or the 1942 Convention is not to be considered wages or net earnings from self-employment for purposes of the U.S. social security taxes with respect to taxable years of the taxpayer not barred

by the statute of limitations relating to refunds (under the Code) ending on or before December 31 of the year before the year in which the Social Security Agreement between Canada and the United States (signed in Ottawa on March 11, 1981) enters into force. Thus, if that agreement enters into force in 1986, a resident of Canada earning income from personal services and such person's employer may apply for refunds of the employee's and employer's shares of U.S. social security tax paid attributable to the employee's income from personal services that is exempt from U.S. tax by virtue of this Convention or the 1942 Convention. In this example, the refunds would be available for social security taxes paid with respect to taxable years not barred by the statute of limitations of the Code ending on or before December 31, 1985. For purposes of Code section 6611, the date of overpayment with respect to refunds of U.S. tax pursuant to paragraph 4 is the later of the date on which the Social Security Agreement between Canada and the United States enters into force and the date on which instruments of ratification of the Convention are exchanged.

Under certain limited circumstances, an employee may, pursuant to paragraph 5 of Article XXX (Entry Into Force), claim an exemption from U.S. tax on wages under the 1942 Convention for one year after the Convention comes into force. The provisions of paragraph 4 would not, however, provide an exemption from U.S. social security taxes for such year.

Paragraph 4 does not modify existing U.S. statutes concerning social security benefits or funding. The Social Security Act requires the general funds of the Treasury to reimburse the social security trust funds on the basis of the records of wages and self-employment income maintained by the Social Security Administration. The Convention does not alter those records. Thus, any refunds of tax made pursuant to paragraph 4 would not affect claims for U.S. quarters of coverage with respect to social security benefits. And such refunds would be charged to general revenue funds, not social security trust funds.

Paragraph 5 provides a method to resolve conflicts between the Canadian and U.S. treatment of individual retirement accounts. Certain Canadian retirement plans which are qualified plans for Canadian tax purposes do not meet Code requirements for qualification. As a result, the earnings of such a plan are currently included in income, for U.S. tax purposes, rather than being deferred until actual distributions are made by the plan. Canada defers current taxes on the earnings of such a plan but imposes tax on actual distributions from the plan. Paragraph 5 is designed to avoid a mismatch of U.S. taxable income and foreign tax credits attributable to the Canadian tax on such distributions. Under the paragraph a beneficiary of a Canadian registered retirement savings plan may elect to defer U.S. taxation with respect to any income accrued in the plan but not distributed by the plan, until such time as a distribution is made from the plan or any substitute plan. The election is to be made under rules established by the competent authority of the United States. The election is not available with respect to income accrued in the plan which is reasonably attributable to contributions made to the plan by the beneficiary while he was not a Canadian resident.

Paragraph 6 provides rules denying the benefits of the Convention in certain situations where both countries believed that granting benefits would be inappropriate. Paragraph 6(a) provides that Articles VI (Income from Real Property) through XXIV (Elimination of Double Taxation) shall not apply to profits, income or gains derived by a trust which is treated as the

income of a resident of a Contracting State (see paragraph 1 of Article IV (Residence)), if a principal purpose of the establishment, acquisition or maintenance of the trust was to obtain a benefit under the Convention or the 1942 Convention for persons who are not residents of that State. For example, the provision could be applied to a case where a nonresident of the United States created a United States trust to derive dividend income from Canada and a principal purpose of the establishment or maintenance of the trust was to obtain the reduced rate of Canadian tax under Article X (Dividends) for the nonresident. Paragraph 6(b) provides that Articles VI through XXIV shall not apply to Canadian nonresident owned investment companies, as defined in section 133 of the Income Tax Act, or under a similar provision that is subsequently enacted. This provision operates to deny the benefits of the Convention to a Canadian nonresident owned investment company, and does not effect the grant of benefits to other persons. Thus, for example, a dividend paid by such a company to a shareholder who is a U.S. resident is subject to the reduced rates of tax provided by Article X. The denial of the benefits of Articles VI through XXIV in such cases applies notwithstanding any other provision of the Convention. A Canadian nonresident owned investment company may, however, be entitled to claim the benefits of the 1942 Convention for an additional one-year period, pursuant to paragraph 5 of Article XXX (Entry Into Force). Where the provisions of this paragraph apply, the Contracting State in which the income arises may tax such income under its domestic law.

Paragraph 7 provides rules for the U.S. taxation of Canadian social security benefits paid to a resident of Canada who is a U.S. citizen. These rules are described in the discussion of paragraph 5 of Article XVIII (Pensions and Annuities).

ARTICLE XXX
Entry into Force

Paragraph 1 provides that the Convention is subject to ratification in accordance with the procedures of Canada and the United States. The exchange of instruments of ratification is to take place at Ottawa as soon as possible.

Paragraph 2 provides, subject to paragraph 3, that the Convention shall enter into force upon the exchange of instruments of ratification. It has effect, with respect to source State taxation of dividends, interest, royalties, pensions, annuities, alimony, and child support, for amounts paid or credited on or after the first day of the second calendar month after the date on which the instruments of ratification are exchanged. For other taxes, the Convention takes effect for taxable years beginning on or after January 1 next following the date when instrument of ratification are exchanged. In the case of relief from United States social security taxes provided by paragraph 4 of Article XXIX (Miscellaneous Rules), the Convention also has effect for taxable year before the date on which instrument of ratification are exchanged.

Paragraph 3 provides special effective date rules for foreign tax credit computations with respect to tax paid or accrued to Canada. Paragraph 3(a) provides that the tax on 1971 undistributed income on hand imposed by Part IX of the Income Tax Act of Canada is considered to be an "income tax" for distribution made on or after January 1, 1972 and before January 1, 1979. Any such tax which is paid or accrued under U.S. standards is considered be imposed at the

time of distribution and on the recipient of the distribution, in the proportion that the distribution out of undistributed income with respect to which the tax has been paid bears to 85 percent of undistributed income. A person claiming a credit for tax pursuant to paragraph 3(a) is obligated to compute the amount of the credit in accordance with that paragraph.

Paragraph 3(b) provides that the principles of paragraph 6 of Article XXIV (Elimination of Double Taxation), which provides for resourcing of certain dividend, interest, and royalty income to eliminate double taxation of U.S. citizens residing in Canada, have effect for taxable years beginning on or after January 1, 1976. The paragraph is intended to grant the competent authorities sufficient flexibility to address certain practical problems that have arisen under the 1942 Convention. It is anticipated that the competent authorities will be guided by paragraphs 4 and 5 of Article XXIV in applying paragraph 3(b) of Article XXX. Paragraph 3(c) provides that the provisions of paragraph 1 of Article XXIV (and the source rules of that Article) shall have effect for taxable years beginning on or after January 1,1981.

Any claim for refund based on the provisions of paragraph 3 may be filed on or before June 30 of the calendar year following the year in which instruments of ratification are exchanged, notwithstanding statutes of limitations or other rules of domestic law to the contrary. For purposes of Code section 6611, the date of overpayment is the date on which instruments of ratification are exchanged, with respect to any refunds of U.S. tax pursuant to paragraph 3.

Paragraph 4 provides that, subject to paragraph 5, the 1942 Convention ceases to have effect for taxes for which the Convention has effect under the provisions of paragraph 2. For example, if under paragraph 2 the Convention were to have effect with respect to taxes withheld at source on dividends paid as of October 1, 1984, the 1942 Convention will not have effect with respect to such taxes.

Paragraph 5 modifies the rule of paragraph 4 to allow all of the provisions of the 1942 Convention to continue to have effect for the period through the first taxable year with respect to which the provisions of the Convention would otherwise have effect under paragraph 2(b), if greater relief from tax is available under the 1942 Convention than under the Convention. Paragraph 5 applies to all provisions of the 1942 Convention, not just those provisions of the convention for which the Convention takes effect under paragraph 2(b) of this Article. Thus, for example, assume that the Convention has effect, pursuant to paragraph 2(b), for taxable years of a taxpayer beginning on or after January 1, 1985. Further assume that a U.S. resident with a taxable year beginning on April 1 and ending on March 31 receives natural resource royalties from Canada which are subject to a 25% tax under Article VI (Income from Real Property) of the Convention, as amended by the Protocol, and Canada's internal law, but which would be subject to a 15% tax under Article XI of the 1942 Convention. Pursuant to paragraph 5, the greater benefits of the 1942 Convention would continue to apply to royalties paid or credited to the U.S. resident through March 31, 1986.

Paragraph 6 provides that the 1942 Convention terminates on the last of the dates on which it has effect in accordance with the provisions of paragraphs 4 and 5.

Paragraph 7 terminates the Exchange of Notes between the United States and Canada of

August 2 and September 17, 1928 providing for relief from double taxation of shipping profits. The provisions of the Exchange of Notes no longer have effect for taxable years beginning on or after January 1 following the exchange of instruments of ratification of the Convention. The 1942 Convention, in Article V, had suspended the effectiveness of the Exchange of Notes.

Paragraph 8 terminates the Convention between Canada and the United States for the Avoidance of Double Taxation with Respect to Taxes on the Estates of Deceased Persons signed on February 17, 1961. The provisions of that Convention cease to have effect with respect to estates of persons deceased on or after January 1 of the year following the exchange of instruments of ratification of the Convention.

ARTICLE XXXI
Termination

Paragraph 1 provides that the Convention shall remain in force until terminated by Canada or the United States.

Paragraph 2 provides that either Canada or the United States may terminate the Convention at any time after 5 years from the date on which instruments of ratification are exchanged, provided that notice of termination is given through diplomatic channels at least 6 months prior to the date on which the Convention is to terminate.

Paragraph 3 provides a special termination rule in situations where Canada or the United States changes its taxation laws and the other Contracting State believes that such change is significant enough to warrant modification of the Convention. In such a circumstance, the Canadian Ministry of Finance and the United States Department of the Treasury would consult with a view to resolving the matter. If the matter cannot be satisfactorily resolved, the Contracting State requesting an accommodation because of the change in the other Contracting State's taxation laws may terminate the Convention by giving the 6 months' prior notice required by paragraph 2, without regard to whether the Convention has been in force for 5 years.

Paragraph 4 provides that, in the event of termination, the Convention ceases to have effect for tax withheld at source under Articles X (Dividends), XI (Interest), XII (Royalties), and XVIII (Pensions and Annuities), and under paragraph 2 of Article XXII (Other Income), with respect to amounts paid or credited on or after the first day of January following the expiration of the 6 month period referred to in paragraph 2. In the case of other taxes, the Convention shall cease to have effect in the event of termination with respect to taxable years beginning on or after January 1 following the expiration of the 6 month period referred to in paragraph 2.

PROTOCOL 3

Treasury Department Technical Explanation of the Protocol Amending the Convention Between the United States of America and Canada with Respect to Taxes on Income and on Capital Signed at Washington on September 26, 1980, as Amended by the Protocols

Signed on June 14, 1983 and March 28, 1984

The Protocol, signed at Washington on March 17, 1995 (the "Protocol"), amends the Convention Between the United States of America and Canada with Respect to Taxes on Income and on Capital, signed at Washington on September 26, 1980, as amended by the Protocols signed on June 14, 1983 and March 28, 1984 (collectively referred to as the "Convention"). This technical explanation is an official guide to the Protocol. It explains policies behind particular provisions, as well as understandings reached during the negotiations with respect to the interpretation and application of the Protocol. The technical explanation is not intended to provide a complete comparison between the Protocol and the Articles of the Convention that it amends. To the extent that the Convention has not been amended by the Protocol, the Technical Explanation of the Convention remains the official explanation. References to "he" or "his" should be read to mean "he" or "she" or "his" or "her."

## ARTICLE 1

Article 1 of the Protocol amends Article II (Taxes Covered) of the Convention. Article II identifies the taxes to which the Convention applies. Paragraph 1 of Article 1 replaces paragraphs 2 through 4 of Article II of the Convention with new paragraphs 2 and 3. For each Contracting State, new paragraph 2 of Article II specifies the taxes existing on the date of signature of the Protocol to which the Convention applies. New paragraph 3 provides that the Convention will also apply to taxes identical or substantially similar to those specified in paragraph 2, and to any new capital taxes, that are imposed after the date of signature of the Protocol.

New paragraph 2(a) of Article II describes the Canadian taxes covered by the Convention. As amended by the Protocol, the Convention will apply to all taxes imposed by the Government of Canada under the Income Tax Act.

New paragraph 2(b) of Article II amends the provisions identifying the U.S. taxes covered by the Convention in several respects. The Protocol incorporates into paragraph 2(b) the special rules found in paragraph 4 of Article II of the present Convention. New paragraph 2(b)(iii) conforms the rule previously found in paragraph 4(c) of Article II to the amended provisions of Article XXIV (Elimination of Double Taxation), under which Canada has agreed to grant a foreign tax credit for U.S. social security taxes. In addition, the Protocol adds a fourth special rule to reflect the addition to the Convention of new Article XXIX B (Taxes Imposed by Reason of Death) and related provisions in new paragraph 3(g) of Article XXVI (Mutual Agreement Procedure).

Article 1 of the Protocol also makes minor clarifying, nonsubstantive amendments to paragraphs 2 and 3 of the Article.

## ARTICLE 2

This Article of the Protocol amends paragraphs 1(c) and 1(d) of Article III (General

Definitions) of the Convention. These paragraphs define the terms "Canadian tax" and "United States tax," respectively. The present Convention defines "Canadian tax" to mean the Canadian taxes specified in paragraph 2(a) or 3(a) of Article II (Taxes Covered), i.e., Canadian income taxes. It similarly defines the term "United States tax" to mean the U.S. taxes specified in paragraph 2(b) or 3(a) of Article II, i.e., U.S. income taxes.

As amended by the Protocol, paragraph 2(a) of Article II of the Convention covers all taxes imposed by Canada under its Income Tax Act, including certain taxes that are not *income* taxes. As explained below, paragraph 2(b) is similarly amended by the Protocol to include certain U.S. taxes that are not *income* taxes. It was, therefore, necessary to amend the terms "Canadian tax" and "United States tax" so that they would continue to refer exclusively to the *income* taxes imposed by each Contracting State. The amendment to the definition of the term "Canadian tax" ensures, for example, that the Protocol will not obligate the United States to give a foreign tax credit under Article XXIV (Elimination of Double Taxation) for covered taxes other than income taxes.

The definition of "United States tax," as amended, excludes certain United States taxes that are covered in Article II only for certain limited purposes under the Convention. These include the accumulated earnings tax, the personal holding company tax, foundation excise taxes, social security taxes, and estate taxes. To the extent that these are to be creditable taxes in Canada, that fact is specified elsewhere in the Convention. A Canadian income tax credit for U.S. social security taxes is provided in new paragraph 2(a)(ii) of Article XXIV (Elimination of Double Taxation). A Canadian income tax credit for the U.S. estate taxes is provided in paragraph 6 of new Article XXIX B (Taxes Imposed by Reason of Death).


ARTICLE 3

Article 3 of the Protocol amends Article IV (Residence) of the Convention. It clarifies the meaning of the term "resident" in certain cases and adds a special rule, found in a number of recent U.S. treaties, for determining the residence of U.S. citizens and "green card" holders.

The first sentence of paragraph 1 of Article IV sets forth the general criteria for determining residence under the Convention. It is amended by the Protocol to state explicitly that a person will be considered a resident of a Contracting State for purposes of the Convention if he is liable to tax in that Contracting State by reason of citizenship. Although the sentence applies to both Contracting States, only the United States taxes its nonresident citizens in the same manner as its residents. Aliens admitted to the United States for permanent residence ("green card" holders) continue to qualify as U.S. residents under the first sentence of paragraph 1, because they are taxed by the United States as residents, regardless of where they physically reside.

U.S. citizens and green card holders who reside outside the United States, however, may have relatively little personal or economic nexus with the United States. The Protocol adds a second sentence to paragraph 1 that acknowledges this fact by limiting the circumstances under which such persons are to be treated, for purposes of the Convention, as U.S. residents.

Under that sentence, a U.S. citizen or green card holder will be treated as a resident of the United States for purposes of the Convention, and, thereby, be entitled to treaty benefits, only if

(1) the individual has a substantial presence, permanent home, or habitual abode in the United States, and

(2) the individual's personal and economic relations with the United States are closer than those with any third country.

If, however, such an individual is a resident of both the United States and Canada under the first sentence of the paragraph, his residence for purposes of the Convention is determined instead under the "tie-breaker" rules of paragraph 2 of the Article.

The fact that a U.S. citizen who does not have close ties to the United States may not be treated as a U.S. resident under Article IV of the Convention does not alter the application of the saving clause of paragraph 2 of Article XXIX (Miscellaneous Rules) to that citizen. However, like any other individual that is a resident alien under U.S. law, a green card holder is treated as a resident of the United States for purposes of the saving clause only if he qualifies as such under Article IV.

New paragraph 1(a) confirms that the term "resident" of a Contracting State includes the Government of that State or a political subdivision or local authority of that State, as well as any agency or instrumentality of one of these governmental entities. This is implicit in the current Convention and in other U.S. and Canadian treaties, even where not specified.

New paragraph 1 also clarifies, in subparagraph (b), that trusts, organizations, or other arrangements operated exclusively to provide retirement or employee benefits, and other not-for-profit organizations, such as organizations described in section 501(c) of the Internal Revenue Code, are residents of a Contracting State if they are constituted in that State and are generally exempt from income taxation in that State by reason of their nature as described above. This change clarifies that the specified entities are to be treated as residents of one of the Contracting States. This corresponds to the interpretation that had previously been adopted by the Contracting States. Such entities, therefore, will be entitled to the benefits of the Convention with respect to the other Contracting State, provided that they satisfy the requirements of new Article XXIX A (Limitation on Benefits) (discussed below).

Article 3 of the Protocol adds a sentence to paragraph 3 of Article IV of the current Convention to address the residence of certain dual resident corporations. Certain jurisdictions allow local incorporation of an entity that is already organized and incorporated under the laws of another country. Under Canadian law, such an entity is referred to as having been "continued" into the other country. Although the Protocol uses the Canadian term, the provision operates reciprocally. The new sentence states that such a corporation will be considered a resident of the State into which it is continued. Paragraph 5 of Article 21 of the Protocol governs the effective date of this provision.

ARTICLE 4

Article 4 of the Protocol amends paragraphs 3 and 4 of Article IX (Related Persons) of the Convention. Paragraph 1 of Article IX authorizes a Contracting State to adjust the amount of income, loss, or tax payable by a person with respect to arrangements between that person and a related person in the other Contracting State, when such arrangements differ from those that would obtain between unrelated persons. Under the present Convention, if an adjustment is made or to be made by a Contracting State under paragraph 1, paragraph 3 obligates the other Contracting State to make a corresponding adjustment if two conditions are satisfied:

(1) the other Contracting State agrees with the adjustment made or to be made by the first Contracting State, and

(2) the competent authority of the other Contracting State has received notice of the first adjustment within six years of the end of the taxable year to which that adjustment relates.

If notice is not given within the six-year period, and if the person to whom the first adjustment relates is not notified of the adjustment at least six months prior to the end of the six-year period, paragraph 4 of Article IX of the present Convention requires that the first Contracting State withdraw its adjustment, to the extent necessary to avoid double taxation.

Article 4 of the Protocol amends paragraphs 3 and 4 of Article IX to prevent taxpayers from using the notification requirements of the present Convention to avoid adjustments. Paragraph 4, as amended, eliminates the requirement that a Contracting State withdraw an adjustment if the notification requirement of paragraph 3 has not been met. Paragraph 4 is also amended to delete the requirement that the taxpayer be notified at least six months before expiration of the six-year period specified in paragraph 3.

As amended by the Protocol, Article IX also explicitly authorizes the competent authorities to relieve double taxation in appropriate cases, even if the notification requirement is not satisfied. Paragraph 3 confirms that the competent authorities may agree to a corresponding adjustment if such an adjustment is not otherwise barred by time or procedural limitations such as the statute of limitations. Paragraph 4 provides that the competent authority of the State making the initial adjustment may grant unilateral relief from double taxation in other cases, although such relief is not obligatory.

ARTICLE 5

Article 5 of the Protocol amends Article X (Dividends) of the Convention, paragraph 1 of Article 5 amends paragraph 2(a) of Article X to reduce from 10 percent 5 percent the maximum rate of tax that may be imposed by a Contracting State on the gross amount of dividends beneficially owned by a company resident in the other Contracting State that owns at least 10 percent of the voting stock of the company paying the dividends. The rate at which the branch profits tax may be imposed under paragraph 6 is also reduced by paragraph 1 of Article 5 from 10 percent to 5 percent. Under the entry-into-force provisions of Article 21 of the Protocol, these reductions will be phased in over a three-year period.

Paragraph 2 of Article 5 of the Protocol replaces paragraph 7 of Article X of the Convention with a new paragraph 7. Paragraph 7 of the existing Convention is no longer relevant

because it applies only in the case where a Contracting State does not impose a branch profits tax. Both Contracting States now do impose such a tax.

New paragraph 7 makes the 5 percent withholding rate of new paragraph 2(a) inapplicable in certain situations. Under new paragraph 7(b), dividends paid by U.S. regulated investment companies (RICs) are denied the 5 percent withholding rate even if the Canadian shareholder is a corporation that would otherwise qualify as a direct investor by satisfying the 10-percent ownership requirement. Consequently, all RIC dividends to Canadian beneficial owners are subjected to the 15 percent rate that applies to dividends paid to portfolio investors.

Dividends paid by U.S. real estate investment trusts (REITs) to Canadian beneficial owners are also denied the 5 percent rate under the rules of paragraph 7(c). REIT dividends paid to individuals who own less than a 10 percent interest in the REIT are subject to withholding at a maximum rate of 15 percent. Paragraph 7(c) also provides that dividend distributions by a REIT to an estate or a testamentary trust acquiring the interest in the REIT as a consequence of the death of an individual will be treated as distributions to an individual, for the five-year period following the death. Thus, dividends paid to an estate or testamentary trust in respect of a holding of less than a 10 percent interest in the REIT also will be entitled to the 15 percent rate of withholding, but only for up to five years after the death. REIT dividends paid to other Canadian beneficial owners are subject to the rate of withholding tax that applies under the domestic law of the United States (i.e., 30 percent).

The denial of the 5 percent withholding rate at source to all RIC and REIT shareholders, and the denial of the 15 percent rate to most shareholders of REITs, is intended to prevent the use of these nontaxable conduit entities to gain unjustifiable benefits for certain shareholders. For example, a Canadian corporation that wishes to hold a portfolio of U.S. corporate shares may hold the portfolio directly and pay a U.S. withholding tax of 15 percent on all of the dividends that it receives. Alternatively, it may place the portfolio of U.S. stocks in a RIC, in which the Canadian corporation owns more than 10 percent of the shares, but in which there are enough small shareholders to satisfy the RIC diversified ownership requirements. Since the RIC is a pure conduit, there are no U.S. tax costs to the Canadian corporation of interposing the RIC as an intermediary in the chain of ownership. It is unlikely that a 10 percent shareholding in a RIC will constitute a 10 percent share holding in any company from which the dividends originate. In the absence of the special rules in paragraph 7(b), however, interposition of a RIC would transform what should be portfolio dividends into direct investment dividends taxable at source by the United States only at 5 percent. The special rules of paragraph 7 prevent this.

Similarly, a resident of Canada may hold U.S. real property directly and pay U.S. tax either at a 30 percent rate on the gross income or at the income tax rates specified in the Internal Revenue Code on the net income. By placing the real estate holding in a REIT, the Canadian investor could transform real estate income into dividend income and thus transform high-taxed income into much lower-taxed income. In the absence of the special rule, if the REIT shareholder were a Canadian corporation that owned at least a 10 percent interest in the REIT, the withholding rate would be 5 percent; in all other cases, it would be 15 percent. In either event, with one exception, a tax rate of 30 percent or more would be significantly reduced. The exception is the relatively small individual Canadian investor who might be subject to U.S. tax at a rate of only 15

percent on the net income even if he earned the real estate income directly. Under the rule in paragraph 7(c), such individuals, defined as those holding less than a 10 percent interest in the REIT, remain taxable at source at a 15 percent rate.

Subparagraph (a) of paragraph 7 provides a special rule for certain dividends paid by Canadian non-resident-owned investment corporations ("NROs"). The subparagraph provides for a maximum rate of 10 percent (instead of the standard rate of 5 percent) for dividends paid by NROs that are Canadian residents to a U.S. company that owns 10 percent or more of the voting stock of the NRO and that is the beneficial owner of the dividend. This rule maintains the rate available under the current Convention for dividends from NROs. Canada wanted the withholding rate for direct investment NRO dividends to be no lower than the maximum withholding rates under the Convention on interest and royalties, to make sure that a foreign investor cannot transform interest or royalty income subject to a 10 percent withholding tax into direct dividends qualifying for a 5 percent withholding tax by passing it through to an NRO.

ARTICLE 6

Article 6 of the Protocol amends Article XI (Interest) of the Convention. Paragraph 1 of the Article reduces the general maximum withholding rate on interest under paragraph 2 of Article XI from 15 percent to 10 percent.

Paragraph 3 of Article XI of the Convention provides that, notwithstanding the general withholding rate applicable to interest payments under paragraph 2, certain specified categories of interest are exempt from withholding at source. Paragraph 2 of Article 6 of the Protocol amends paragraph 3(d) of the Convention, which deals with interest paid on indebtedness arising in connection with a sale on credit of equipment, merchandise, or services. The exemption provided by that paragraph in the Convention is broadened under the Protocol to apply to interest that is beneficially owned either by the seller in the underlying transaction, as under the present Convention, or by any beneficial owner of interest paid with respect to an indebtedness arising as a result of the sale on credit of equipment, merchandise, or services. This exemption, however, does not apply in cases where the purchaser is related to the seller or the debtor is related to the beneficial owner of the interest. The negotiators agreed that this exemption is subject, as are the other provisions of the Convention, to any anti-avoidance rules applicable under the respective domestic law of the Contracting States.

The reference to "related persons" in paragraph 3(d) of Article XI of the Convention, as amended, is a change from the present Convention, which refers to "persons dealing at arm's length." The term "related person" as used in this Article is not defined for purposes of the Convention. Accordingly, the meaning of the term, and, therefore, the application of this Article, will be governed by the domestic law of each Contracting State (as is true with the use of the term "arm's length" under the current Convention) under the interpretative rule of paragraph 2 of Article III (General Definitions). The United States will define the term "related person" as under section 482 of the Internal Revenue Code, to include organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests. The Canadian definition of

"related persons" is found in section 251 of the Income Tax Act.

Paragraph 3 of Article 6 of the Protocol adds a new paragraph 9 to Article XI of the Convention. Although the definition of "interest" in paragraph 4 includes an excess inclusion with respect to a residual interest in a real estate mortgage investment conduit (REMIC) described in section 86OG of the Internal Revenue Code, new paragraph 9 provides that the reduced rates of tax at source for interest provided for in paragraphs 2 and 3 do not apply to such income. This class of interest, therefore, remains subject to the statutory 30 percent U.S. rate of tax at source. The legislation that created REMICs in 1986 provided that such excess inclusions were to be taxed at the full 30 percent statutory rate, regardless of any then-existing treaty provisions to the contrary. The 30 percent rate of tax on excess inclusions received by residents of Canada is consistent with this expression of Congressional intent.


ARTICLE 7

Article 7 of the Protocol modifies Article XII (Royalties) of the Convention by expanding the classes of royalties exempt from withholding of tax at source. Paragraph 3, as amended by the Protocol, identifies four classes of royalty payments arising in one Contracting State and beneficially owned by a resident of the other that are exempt at source:

(1) subparagraph (a) preserves the exemption in paragraph 3 of the present Convention for copyright royalties in respect of literary and other works, other than certain such payments in respect of motion pictures, videotapes, and similar payments;

(2) subparagraph (b) specifies that computer software royalties are also exempt;

(3) subparagraph (c) adds royalties paid for the use of, or the right to use, patents and information concerning industrial, commercial, and scientific experience, other than payments in connection with rental or franchise agreements; and

(4) subparagraph (d) allows the Contracting States to reach an agreement, through an exchange of diplomatic notes, with respect to the application of paragraph 3 of Article XII to payments in respect of certain live broadcasting transmissions.

The specific reference to software in subparagraph (b) is not intended to suggest that the United States views the term "copyright" as excluding software in other U.S. treaties (including the current treaty with Canada).

The negotiators agreed that royalties paid for the use of, or the right to use, designs or models, plans, secret formulas, or processes are included under subparagraph 3(c) to the extent that they represent payments for the use of, or the right to use, information concerning industrial, commercial, or scientific experience. In addition, they agreed that royalties paid for the use of, or the right to use, "know-how," as defined in paragraph 11 of the Commentary on Article 12 of the OECD Model Income Tax Treaty, constitute payments for the use of, or the right to use, information concerning industrial, commercial, or scientific experience. The negotiators further agreed that a royalty paid under a "mixed contract," "package fee," or similar arrangement will be treated as exempt at source by virtue of paragraph 3 to the extent of any portion that is paid for the use of, or the right to use, property or information with respect to which paragraph 3 grants an exemption.

The exemption granted under subparagraph 3(c) does not, however, extend to payments made for information concerning industrial, commercial, or scientific experience that is provided in connection with a rental or franchise agreement. For this purpose, the negotiators agreed that a franchise is to be distinguished from other arrangements resulting in the transfer of intangible property. They agreed that a license to use intangibles (whether or not including a trademark) in a territory, in and of itself, would not constitute a franchise agreement for purposes of subparagraph 3(c) in the absence of other rights and obligations in the license agreement or in any other agreement that would indicate that the arrangement in its totality constituted a franchise agreement. For example, a resident of one Contracting State may acquire a right to use a secret formula to manufacture a particular product (e.g., a perfume), together with the right to use a trademark for that product and to market it at a non-retail level, in the other Contracting State. Such an arrangement would not constitute a franchise in the absence of any other rights or obligations under that arrangement or any other agreement that would indicate that the arrangement in its totality constituted a franchise agreement. Therefore, the royalty payment under that arrangement would be exempt from withholding tax in the other Contracting State to the extent made for the use of, or the right to use, the secret formula or other information concerning industrial, commercial, or scientific experience; however, it would be subject to withholding tax at a rate of 10 percent, to the extent made for the use of, or the right to use, the trademark.

The provisions of paragraph 3 do not fully reflect the U.S. treaty policy of exempting all types of royalty payments from taxation at source, but Canada was not prepared to grant a complete exemption for all types of royalties in the Protocol. Although the Protocol makes several important changes to the royalty provisions of the present Convention in the direction of bringing Article XII into conformity with U.S. policy, the United States remains concerned about the imposition of withholding tax on some classes of royalties and about the associated administrative burdens. In this connection, the Contracting States have affirmed their intention to collaborate to resolve in good faith any administrative issues that may arise in applying the provisions of subparagraph 3(c). The United States intends to continue to pursue a zero rate of withholding for all royalties in future negotiations with Canada, including discussions under Article 20 of the Protocol, as well as in negotiations with other countries.

As noted above, new subparagraph 3(d) enables the Contracting States to provide an exemption for royalties paid with respect to broadcasting through an exchange of notes. This provision was included because Canada was not prepared at the time of the negotiations to commit to an exemption for broadcasting royalties. Subparagraph 3(d) was included to enable the Senate to give its advice and consent in advance to such an exemption, in the hope that such an exemption could be obtained without awaiting the negotiation of another full protocol. Any agreement reached under the exchange of notes authorized by subparagraph 3(d) would lower the withholding rate from 10 percent to zero and, thus, bring the Convention into greater conformity with established U.S. treaty policy.

Paragraph 2 of Article 7 of the Protocol amends the rules in paragraph 6 of Article XII of the Convention for determining the source of royalty payments. Under the present Convention, royalties generally are deemed to arise in a Contracting State if paid by a resident of that State.

However, if the obligation to pay the royalties was incurred in connection with a permanent establishment or a fixed base in one of the Contracting States that bears the expense, the royalties are deemed to arise in that State.

The Protocol continues to apply these basic rules but changes the scope of an exception provided under the present Convention. Under the present Convention, a royalty paid for the use of, or the right to use, property in a Contracting State is deemed to arise in that State. Under the Protocol, this "place of use" exception applies only if the Convention does not otherwise deem the royalties to arise in one of the Contracting States. Thus, the "place of use" exception will apply only if royalties are neither paid by a resident of one of the Contracting States nor borne by a permanent establishment or fixed base in either State. For example, if a Canadian resident were to grant franchise rights to a resident of Chile for use in the United States, the royalty paid by the Chilean resident to the Canadian resident for those rights would be U.S. source income under this Article, subject to U.S. withholding at the 10 percent rate provided in paragraph 2.

The rules of this Article differ from those provided under U.S. domestic law. Under U.S. domestic law, a royalty is considered to be from U.S. sources if it is paid for the use of, or the privilege of using, an intangible within the United States; the residence of the payor is irrelevant. If paid to a nonresident alien individual or other foreign person, a U.S. source royalty is generally subject to withholding tax at a rate of 30 percent under U.S. domestic law. By reason of paragraph 1 of Article XXIX (Miscellaneous Rules), a Canadian resident would be permitted to apply the rules of U.S. domestic law to its royalty income if those rules produced a more favorable result in its case than those of this Article. However, under a basic principle of tax treaty interpretation recognized by both Contracting States, the prohibition against so-called "cherry-picking," the Canadian resident would be precluded from claiming selected benefits under the Convention (e.g., the tax rates only) and other benefits under U.S. domestic law (e.g., the source rules only) with respect to its royalties. See, e.g., Rev. Rul. 84-17, 1984-1 C.B. 308. For example, if a Canadian company granted franchise rights to a resident of the United States for use 50 percent in the United States and 50 percent in Chile, the Convention would permit the Canadian company to treat all of its royalty income from that single transaction as U.S. source income entitled to the withholding tax reduction under paragraph 2. U.S. domestic law would permit the Canadian company to treat 50 percent of its royalty income as U.S. source income subject to a 30 percent withholding tax and the other 50 percent as foreign source income exempt from U.S. tax. The Canadian company could choose to apply either the provisions of U.S. domestic law or the provisions of the Convention to the transaction, but would not be permitted to claim both the U.S. domestic law exemption for 50 percent of the income and the Convention's reduced withholding rate for the remainder of the income.

Royalties generally are considered borne by a permanent establishment or fixed base if they are deductible in computing the taxable income of that permanent establishment or fixed base.

Since the definition of "resident" of a Contracting State in Article IV (Residence), as amended by Article 3 of the Protocol, specifies that this term includes the Contracting States and their political subdivisions and local authorities, the source rule does not include a specific reference to these governmental entities.

ARTICLE 8

Article 8 of the Protocol broadens the scope of paragraph 8 of Article XIII (Gains) of the Convention to cover organizations, reorganizations, amalgamations, and similar transactions involving either corporations or other entities. The present Convention covers only transactions involving corporations. The amendment is intended to make the paragraph applicable to transactions involving other types of entities, such as trusts and partnerships.

As in the case of transactions covered by the present Convention, the deferral allowed under this provision shall be for such time and under such other conditions as are stipulated between the person acquiring the property and the competent authority. The agreement of the competent authority of the State of source is entirely discretionary and, when granted, will be granted only to the extent necessary to avoid double taxation.

ARTICLE 9

Article 9 of the Protocol amends Article XVIII (Pensions and Annuities) of the Convention. Paragraph 3 of Article XVIII defines the term "pensions" for purposes of the Convention, including the rules for the taxation of cross-border pensions in paragraphs 1 and 2 of the Article, the rules in paragraphs 2 and 3 of Article XXI (Exempt Organizations) for certain income derived by pension funds, and the rules in paragraph 1(b)(i) of Article IV (Residence) regarding the residence of pension funds and certain other entities. The Protocol amends the present definition by substituting the phrase "other retirement arrangement" for the phrase "retirement plan." The purpose of this change is to clarify that the definition of "pensions" includes, for example, payments from Individual Retirement Accounts (IRAs) in the United States and to provide that "pensions" includes, for example, Registered Retirement Savings Plans (RRSPS) and Registered Retirement Income Funds (RRIFs) in Canada. The term "pensions" also would include amounts paid by other retirement plans or arrangements, whether or not they are qualified plans under U.S. domestic law; this would include, for example, plans and arrangements described in section 457 or 414(d) of the Internal Revenue Code.

Paragraph 2 of Article 9 of the Protocol amends paragraph 5 of Article XVIII to modify the treatment of social security benefits under the Convention. Under the amended paragraph, benefits paid under the U.S. or Canadian social security legislation to a resident of the other Contracting State, or, in the case of Canadian benefits, to a U.S. citizen, are taxable exclusively in the paying State. This amendment brings the Convention into line with current U.S. treaty policy. Social security benefits are defined, for this purpose, to include tier 1 railroad retirement benefits but not unemployment benefits (which therefore fall under Article XXII (Other Income) of the Convention). Pensions in respect of government service are covered not by this rule but by the rules of paragraphs 1 and 2 of Article XVIII.

The special rule regarding U.S. citizens is intended to clarify that only Canada, and not the United States, may tax a social security payment by Canada to a U.S. citizen not resident in the

United States. This is consistent with the intention of the general rule, which is to give each Contracting State exclusive taxing jurisdiction over its social security payments. Since paragraph 5 is an exception to the saving clause, Canada will retain exclusive taxing jurisdiction over Canadian social security benefits paid to U.S. residents and citizens, and vice versa. It was not necessary to provide a special rule to clarify the taxation of U.S. social security payments to Canadian citizens, because Canada does not tax on the basis of citizenship and, therefore, does not include citizens within the scope of its saving clause.

A new paragraph 7 is added to Article XVIII by Article 9 of the Protocol. This paragraph replaces paragraph 5 of Article XXIX (Miscellaneous Rules) of the present Convention. The new paragraph makes reciprocal the rule that it replaced and expands its scope, so that it no longer applies only to residents and citizens of the United States who are beneficiaries of Canadian RRSPs. As amended, paragraph 7 applies to an individual who is a citizen or resident of a Contracting State and a beneficiary of a trust, company, organization, or other arrangement that is a resident of the other Contracting State and that is both generally exempt from income taxation in its State of residence and operated exclusively to provide pension, retirement, or employee benefits. Under this rule, the beneficiary may elect to defer taxation in his State of residence on income accrued in the plan until it is distributed or rolled over into another plan. The new rule also broadens the types of arrangements covered by this paragraph in a manner consistent with other pension-related provisions of the Protocol.


ARTICLE 10

Article 10 of the Protocol amends Article XXI (Exempt Organizations) of the Convention. Paragraph 1 of Article 10 amends paragraphs 2 and 3 of Article XXI. The most significant changes are those that conform the language of the two paragraphs to the revised definition of the term "pension" in paragraph 3 of Article XVIII (Pensions and Annuities). The revision adds the term "arrangement" to "trust, company or organization" in describing the residents of a Contracting State that may receive dividend and interest income exempt from current income taxation by the other Contracting State. This clarifies that IRAs, for example, are eligible for the benefits of paragraph 2, subject to the exception in paragraph 3, and makes Canadian RRSPs and RRIFs, for example, similarly eligible (provided that they are operated exclusively to administer or provide pension, retirement, or employee benefits).

The other changes, all in paragraph 2, are intended to improve and clarify the language. For example, the reference to "tax" in the present Convention is changed to a reference to "income taxation." This is intended to clarify that if an otherwise exempt organization is subject to an excise tax, for example, it will not lose the benefits of this paragraph. In subparagraph 2 (b), the phrase "not taxed in a taxable year" was changed to "generally exempt from income taxation in a taxable year" to ensure uniformity throughout the Convention; this change was not intended to disqualify a trust or other arrangement that qualifies for the exemption under the wording of the present Convention.

Paragraph 2 of Article 10 adds a sentence to paragraph 5 of Article XXI of the Convention. The paragraph in the present Convention provides that a U.S. citizen or resident may

deduct, for U.S. income tax purposes, contributions made to Canadian charities under certain circumstances. The added sentence makes clear that the benefits of the paragraph are available to a company that is a resident of Canada but is treated by the United States as a domestic corporation under the consolidated return rules of section 1504(d) of the Internal Revenue Code. Thus, such a company will be able to deduct, for U.S. income tax purposes, contributions to Canadian charities that are deductible to a U.S. resident under the provisions of the paragraph.

Paragraph 3 of Article 10 amends paragraph 6 of Article XXI of the Convention to replace references to "deductions" for Canadian tax purposes with references to "relief" from tax. These changes clarify that the provisions of paragraph 6 apply to the credit for charitable contributions allowed under current Canadian law. The Protocol also makes other non-substantive drafting changes to paragraph 6.

## ARTICLE 11

Article 11 of the Protocol adds a new paragraph 3 to Article XXII (Other Income) of the Convention. This Article entitles residents of one Contracting State who are taxable by the other State on gains from wagering transactions to deduct losses from wagering transactions for the purposes of taxation in that other State. However, losses are to be deductible only to the extent that they are incurred with respect to wagering transactions, the gains on which could be taxable in the other State, and only to the extent that such losses would be deductible if incurred by a resident of that other State.

This Article does not affect the collection of tax by a Contracting State. Thus, in the case of a resident of Canada, this Article does not affect, for example, the imposition of U.S. withholding taxes under section 1441 or section 1442 of the Internal Revenue Code on the gross amount of gains from wagering transactions. However, in computing its U.S. income tax liability on net income for the taxable year concerned, the Canadian resident may reduce its gains from wagering transactions subject to taxation in the United States by any wagering losses incurred on such transactions, to the extent that those losses are deductible under the provisions of new paragraph 3. Under U.S. domestic law, the deduction of wagering losses is governed by section 165 of the Internal Revenue Code. It is intended that the resident of Canada file a nonresident income tax return in order to substantiate the deduction for losses and to claim a refund of any overpayment of U.S. taxes collected by withholding.

## ARTICLE 12

Article 12 of the Protocol amends Article XXIV (Elimination of Double Taxation) of the Convention. Paragraph 1 of Article 12 amends the rules for Canadian double taxation relief in subparagraphs (a) and (b) of paragraph 2 of Article XXIV. The amendment to subparagraph (a) obligates Canada to give a foreign tax credit for U.S. social security taxes paid by individuals. The amendment to subparagraph (b) of paragraph 2 does not alter the substantive effect of the rule, but conforms the language to current Canadian law. Under the provision as amended, Canada generally continues to allow an exemption to a Canadian corporation for direct dividends

paid from the exempt surplus of a U.S. affiliate.

Paragraphs 4 and 5 of Article XXIV of the Convention provide double taxation relief rules, for both the United States and Canada, with respect to U.S. source income derived by a U.S. citizen who is resident in Canada. These rules address the fact that a U.S. citizen resident in Canada remains subject to U.S. tax on his worldwide income at ordinary progressive rates, and may, therefore, be subject to U.S. tax at a higher rate than a resident of Canada who is not a U.S. citizen. In essence, these paragraphs limit the foreign tax credit that Canada is obliged to allow such a U.S. citizen to the amount of tax on his U.S. source income that the United States would be allowed to collect from a Canadian resident who is not a U.S. citizen. They also oblige the United States to allow the U.S. citizen a credit for any income tax paid to Canada on the remainder of his income. Paragraph 4 deals with items of income other than dividends, interest, and royalties and is not changed by the Protocol. Paragraph 5, which deals with dividends, interest, and royalties, is amended by paragraph 2 of Article 12 of the Protocol.

The amendments to paragraph 5 of the Article make that paragraph applicable only to dividend, interest, and royalty income that would be subject to a positive rate of U.S. tax if paid to a Canadian resident who is not a U.S. citizen. This means that the rules of paragraph 4, not paragraph 5, will apply to items of interest and royalties, such as portfolio interest, that would be exempt from U.S. tax if paid to a non-U.S. citizen resident in Canada. Under paragraph 4, Canada will not allow a credit for the U.S. tax on such income, and the United States will credit the Canadian tax to the extent necessary to avoid double taxation.

Paragraph 2 of Article 12 of the Protocol makes further technical amendments to paragraph 5 of Article XXIV of the Convention. The existing Technical Explanation of paragraphs 5 and 6 of Article XXIV of the Convention should be read as follows to reflect the amendments made by the Protocol.

Paragraph 5 provides special rules for the elimination of double taxation in the case of dividends, interest, and royalties earned by a U.S. citizen resident in Canada. These rules apply notwithstanding the provisions of paragraph 4, but only as long as the law in Canada allows a deduction in computing income for the portion of any foreign tax paid in respect of dividends, interest, or royalties which exceeds 15 percent of the amount of such items of income, and only with respect to those items of income. The rules of paragraph 4 apply with respect to other items of income; moreover, if the law in force in Canada regarding the deduction for foreign taxes is changed so as to no longer allow such a deduction, the provisions of paragraph 5 shall not apply and the U.S. foreign tax credit for Canadian taxes and the Canadian credit for U.S. taxes will be determined solely pursuant to the provisions of paragraph 4.

The calculations under paragraph 5 are as follows. First, the deduction allowed in Canada in computing income shall be made with respect to U.S. tax on the dividends, interest, and royalties before any foreign tax credit by the United States with respect to income tax paid or accrued to Canada. Second, Canada shall allow a deduction from (credit against) Canadian tax for U.S. tax paid or accrued with respect to the dividends, interest, and royalties, but such credit need not exceed the amount of income tax that would be paid or accrued to the United States on such items of income if the individual were not a U.S. citizen after taking into account any relief

available under the Convention. Third, for purposes of computing the U.S. tax on such dividends, interest, and royalties, the United States shall allow as a credit against the U.S. tax the income tax paid or accrued to Canada after the credit against Canadian tax for income tax paid or accrued to the United States. The United States is in no event obliged to give a credit for Canadian income tax which will reduce the U.S. tax below the amount of income tax that would be paid or accrued to the United States on the amount of the dividends, interest, and royalties if the individual were not a U.S. citizen after taking into account any relief available under the Convention.

The rules of paragraph 5 are illustrated by the following examples.

*Example B*

- A U.S. citizen who is a resident of Canada has $100 of dividend income arising in the United States. The tentative U.S. tax before foreign tax credit is $40.

- Canada, under its law, allows a deduction for the U.S. tax in excess of 15 percent or, in this case, a deduction of $25 ($40 - $15). The Canadian taxable income is $75 and the Canadian tax on that amount is $35.

- Canada gives a credit of $15 (the maximum credit allowed is 15 percent of the gross dividend taken into Canadian income) and collects a net tax of $20.

- The United States allows a credit for the net Canadian tax against its tax in excess of 15 percent. Thus, the maximum credit is $25 ($40 - $15). But since the net Canadian tax paid was $20, the usable credit is $20.

- To be able to use a credit of $20 requires Canadian source taxable income of $50 (50% of the U.S. tentative tax of $40). Under paragraph 6, $50 of the U.S. dividend is resourced to be of Canadian source. The credit of $20 may then be offset against the U.S. tax of $40, leaving a net U.S. tax of $20.

- The combined tax paid to both countries is $40, $20 to Canada and $20 to the United States.

*Example C*

- A U.S. citizen who is a resident of Canada receives $200 of income with respect to personal services performed within Canada and $100 of dividend income arising within the United States. Taxable income for U.S. purposes, taking into account the rules of Code section 911, is $220. U.S. tax (before foreign tax credits) is $92. The $100 of dividend income is deemed to bear U.S. tax (before foreign tax credits) of $41.82 ($100/$200 x $92). Under Canadian law, a deduction of $26.82 (the excess of $41.82 over 15 percent of the $100 dividend income) is allowed in computing income. The Canadian tax on $273.18 of income ($300 less the $26.82 deduction) is $130. Canada then gives a credit against the $130 for $15 (the U.S. tax paid or accrued with respect to the dividend, $41.82 but limited to 15 percent of the gross amount of such income, or $15), leaving a final Canadian tax of $115. Of the $115, $30.80 is attributable to the

dividend:

$73.18 ($100 dividend less $26.82 deduction) x $115
$273.18 ($300 income less $26.82 deduction)

Of this amount, $26.82 is creditable against U.S. tax pursuant to paragraph 5. (Although the U.S. allows a credit for the Canadian tax imposed on the dividend, $30.80, the credit may not reduce the U.S. tax below 15 percent of the amount of the dividend. Thus, the maximum allowable credit is the excess of $41.82, the U.S. tax imposed on the dividend income, over $15, which is 15 percent of the $100 dividend.) The remaining $3.98 (the Canadian tax of $30.80 less the credit allowed of $26.82) is a foreign tax credit carryover for U.S. purposes, subject to the limitations of paragraph 5. (An additional $50.18 of Canadian tax with respect to Canadian source services income is creditable against U.S. tax pursuant to paragraphs 3 and 4(b). The $50.18 is computed as follows: tentative U.S. tax (before foreign tax credits) is $92; the U.S. tax on Canadian source services income is $50.18 ($92 less the U.S. tax on the dividend income of $41.82); the limitation on the services income is:

$120 (taxable income from services) x $92
$220 (total taxable income),

or $50.18. The credit for Canadian tax paid on the services income is therefore $50.18; the remainder of the Canadian tax on the services income, or $34.02, is a foreign tax credit carryover for U.S. purposes, subject to the limitations of paragraph 5.)

Paragraph 6 is necessary to implement the objectives of paragraphs 4(b) and 5(c). Paragraph 6 provides that where a U.S. citizen is a resident of Canada, items of income referred to in paragraph 4 or 5 are deemed for the purposes of Article XXIV to arise in Canada to the extent necessary to avoid double taxation of income by Canada and the United States consistent with the objectives of paragraphs 4(b) and 5(c). Paragraph 6 can override the source rules of paragraph 3 to permit a limited resourcing of income. The principles of paragraph 3 have effect, pursuant to paragraph 3(b) of Article XXX (Entry Into Force) of the Convention, for taxable years beginning on or after January 1, 1976. See the discussion of Article XXX below.

The application of paragraph 6 is illustrated by the following example.

*Example D*

The facts are the same as in Example C. The United States has undertaken, pursuant to paragraph 5(c) and paragraph 6, to credit $26.82 of Canadian taxes on dividend income that has a U.S. source under both paragraph 3 and the Internal Revenue Code. (As illustrated in Example C, the credit, however, only reduces the U.S. tax on the dividend income which exceeds the amount of income tax that would be paid or accrued to the United States on such income if the individual were not a U.S. citizen after taking into account any relief available under the Convention. Pursuant to paragraph 6, for purposes of determining the U.S. foreign tax credit limitation under the Convention with respect to Canadian taxes,

$64.13 ( __A__   X  $92  $26.82; A = $64.13

$220

of taxable income with respect to the dividends is deemed to arise in Canada.

Paragraph 3 of Article 12 of the Protocol makes a technical amendment to paragraph 7 of Article XXIV. It conforms the reference to U.S. and Canadian taxes to the amended definitions of "United States tax" and "Canadian tax" in subparagraphs (c) and (d) of paragraph 1 of Article III (General Definitions). No substantive change in the effect of the paragraph is intended.

Paragraph 4 of Article 12 of the Protocol adds a new paragraph 10 to Article XXIV of the Convention. This paragraph provides for the application of the rule of "exemption with progression" by a Contracting State in cases where an item of income of a resident of that State is exempt from tax in that State by virtue of a provision of the Convention. For example, where under Canadian law a tax benefit, such as the goods and services tax credit, to a Canadian resident individual is reduced as the income of that individual, or the individual's spouse or other dependent, increases, and any of these persons receives U.S. social security benefits that are exempt from tax in Canada under the Convention, Canada may, nevertheless, take the U.S. social security benefits into account in determining whether, and to what extent, the benefit should be reduced.

New Article XXIX B (Taxes Imposed by Reason of Death), added by Article 19 of the Protocol, also provides relief from double taxation in certain circumstances in connection with Canadian income tax imposed by reason of death and U.S. estate taxes. However, subparagraph 7(c) of Article XXIX B generally denies relief from U.S. estate tax under that Article to the extent that a credit or deduction has been claimed for the same amount in determining any other tax imposed by the United States. This restriction would operate to deny relief, for example, to the extent that relief from U.S. income tax is claimed under Article XXIV in respect of the same amount of Canadian tax. There is, however, no requirement that relief from U.S. tax be claimed first (or exclusively) under Article XXIV. Paragraph 6 of Article XXIX B also prevents the claiming of double relief from Canadian income taxation under both that Article and Article XXIV, by providing that the credit provided by Article XXIX B applies only after the application of the credit provided by Article XXIV.

ARTICLE 13

Article 13 of the Protocol amends Article XXV (Non-Discrimination) of the Convention. Paragraph 1 of Article 13 amends paragraph 3 of Article XXV to conform the treaty language to a change in Canadian law. The paragraph is intended to allow the treatment of dependents under the income tax law of a Contracting State to apply with respect to dependents who are residents of the other Contracting State. As drafted in the present Convention, the rule deals specifically only with deductions; the amendments made by the Protocol clarify that it also applies to the credits now provided by Canadian law.

Paragraph 2 of Article 13 of the Protocol amends paragraph 10 of Article XXV of the Convention to broaden the scope of the non-discrimination protection provided by the Convention. As amended, Article XXV will apply to all taxes imposed by a Contracting State.

Under the present Convention, non-discrimination protection is limited in the case of Canadian taxes to taxes imposed under the Income Tax Act. As amended by the Protocol, non-discrimination protection will extend, for example, to the Canadian goods and services tax and other Canadian excise taxes.

ARTICLE 14

Article 14 of the Protocol makes two changes to Article XXVI (Mutual Agreement Procedure) of the Convention. First, it adds a new subparagraph 3(g) specifically authorizing the competent authorities to provide relief from double taxation in certain cases involving the distribution or disposition of property by a U.S. qualified domestic trust or a Canadian spousal trust, where relief is not otherwise available.

Article 14 also adds a new paragraph 6 to Article XXVI (Mutual Agreement Procedure). Paragraph 6 provides for a voluntary arbitration procedure, to be implemented only upon the exchange of diplomatic notes between the United States and Canada. Similar provisions are found in the recent U.S. treaties with the Federal Republic of Germany, the Netherlands, and Mexico. Paragraph 6 provides that where the competent authorities have been unable, pursuant to the other provisions of Article XXVI, to resolve a disagreement regarding the interpretation or application of the Convention, the disagreement may, with the consent of the taxpayer and both competent authorities, be submitted for arbitration, provided the taxpayer agrees in writing to be bound by the decision of the arbitration board. Nothing in the provision requires that any case be submitted for arbitration. However, if a case is submitted to an arbitration board, the board's decision in that case will be binding on both Contracting States and on the taxpayer with respect to that case.

The United States was reluctant to implement an arbitration procedure until there has been an opportunity to evaluate the process in practice under other agreements that allow for arbitration, particularly the U.S.-Germany Convention. It was agreed, therefore, as specified in paragraph 6, that the provisions of the Convention calling for an arbitration procedure will not take effect until the two Contracting States have agreed through an exchange of diplomatic notes to do so. This is similar to the approach taken with the Netherlands and Mexico. Paragraph 6 also provides that the procedures to be followed in applying arbitration will be agreed through an exchange of notes by the Contracting States. It is expected that such procedures will ensure that arbitration will not generally be available where matters of either State's tax policy or domestic law are involved.

Paragraph 2 of Article 20 of the Protocol provides that the appropriate authorities of the Contracting State will consult after three years following entry into force of the Protocol to determine whether the diplomatic notes implementing the arbitration procedure should be exchanged.

ARTICLE 15

Article 15 of the Protocol adds to the Convention a new Article XXVI A (Assistance in

Collection). Collection assistance provisions are included in several other U.S. income tax treaties, including the recent treaty with the Netherlands, and in many U.S. estate tax treaties. U.S. negotiators initially raised with Canada the possibility of including collection assistance provisions in the Protocol, because the Internal Revenue Service has claims pending against persons in Canada that would be subject to collection under these provisions. However, the ultimate decision of the U.S. and Canadian negotiators to add the collection assistance article was attributable to the confluence of several unusual factors.

Of critical importance was the similarity between the laws of the United States and Canada. The Internal Revenue Service, the Justice Department, and other U.S. negotiators were reassured by the close similarity of the legal and procedural protections afforded by the Contracting States to their citizens and residents and by the fact that these protections apply to the tax collection procedures used by each State. In addition, the U.S. negotiators were confident, given their extensive experience in working with their Canadian counterparts, that the agreed procedures could be administered appropriately, effectively, and efficiently. Finally, given the close cooperation already developed between the United States and Canada in the exchange of tax information, the U.S. and Canadian negotiators concluded that the potential benefits to both countries of obtaining such assistance would be immediate and substantial and would far outweigh any cost involved.

Under paragraph 1 of Article XXVI A, each Contracting State agrees, subject to the exercise of its discretion and to the conditions explicitly provided later in the Article, to lend assistance and support to the other in the collection of revenue claims. The term "revenue claim" is defined in paragraph 1 to include all taxes referred to in paragraph 9 of the Article, as well as interest, costs, additions to such taxes, and civil penalties. Paragraph 9 provides that, notwithstanding the provisions of Article II (Taxes Covered) of the Convention, Article XXVI A shall apply to all categories of taxes collected by or on behalf of the Government of a Contracting State.

Paragraph 2 of the Article requires the Contracting State applying for collection assistance (the "applicant State") to certify that the revenue claim for which collection assistance is sought has been "finally determined." A revenue claim has been finally determined when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted.

Paragraph 3 of the Article clarifies that the Contracting State from which assistance was requested (the "requested State") has discretion as to whether to accept a particular application for collection assistance. However, if the application for assistance is accepted, paragraph 3 requires that the requested State grant assistance under its existing procedures as though the claim were the requested State's own revenue claim finally determined under the laws of that State. This obligation under paragraph 3 is limited by paragraph 7 of the Article, which provides that, although generally treated as a revenue claim of the requested State, a claim for which collection assistance is granted shall not have any priority accorded to the revenue claims of the requested State.

Paragraph 4 of Article XXVI A provides that, when the United States accepts a request for assistance in collection, the claim will be treated by the United States as an assessment as of the time the application was received. Similarly, when Canada accepts a request, a revenue claim shall be treated as an amount payable under the Income Tax Act, the collection of which is not subject to any restriction.

Paragraph 5 of the Article provides that nothing in Article XXVI A shall be construed as creating in the requested State any rights of administrative or judicial review of the applicant State's finally determined revenue claim. Thus, when an application for collection assistance has been accepted, the substantive validity of the applicant State's revenue claim cannot be challenged in an action in the requested State. Paragraph 5 further provides, however, that if the applicant State's revenue claim ceases to be finally determined, the applicant State is obligated to withdraw promptly any request that had been based on that claim.

Paragraph 6 provides that, as a general rule, the requested State is to forward the entire amount collected to the competent authority of the applicant State. The ordinary costs incurred in providing collection assistance will normally be borne by the requested State and only extraordinary costs will be borne by the applicant State. The application of this paragraph, including rules specifying which collection costs are to be borne by each State and the time and manner of payment of the amounts collected, will be agreed upon by the competent authorities, as provided for in paragraph 11.

Paragraph 8 provides that no assistance is to be given under this Article for a claim in respect of an individual taxpayer, to the extent that the taxpayer can demonstrate that he was a citizen of the requested State during the taxable period to which the revenue claim relates. Similarly, in the case of a company, estate, or trust, no assistance is to be given to the extent that the entity can demonstrate that it derived its status as such under the laws in force in the requested State during the taxable period to which the claim relates.

Subparagraph (a) of paragraph 10 clarifies that Article XXVI A supplements the provisions of paragraph 4 of Article XXVI (Mutual Agreement Procedure). The Mutual Agreement Procedure paragraph, which is more common in U.S. tax treaties, provides for collection assistance in cases in which a Contracting State seeks assistance in reclaiming treaty benefits that have been granted to a person that is not entitled to those benefits. Subparagraph (b) of paragraph 10 makes clear that nothing in Article XXVI A can require a Contracting State to carry out administrative measures of a different nature from those used in the collection of its own taxes, or that would be contrary to its public policy (ordre public).

Paragraph 11 requires the competent authorities to agree upon the mode of application of Article XXVI A, including agreement to ensure comparable levels of assistance to each of the Contracting States.

Paragraph 3 of Article 21 of the Protocol allows collection assistance under Article XXVI A to be sought for revenue claims that have been finally determined at any time within the 10 years preceding the date on which the Protocol enters into force.

ARTICLE 16

Article 16 of the Protocol amends Article XXVII (Exchange of Information) of the Convention. Paragraph 1 of Article 16 amends paragraph 1 of Article XXVII. The first change is a wording change to make it clear that information must be exchanged if it is "relevant" for carrying out the provisions of the Convention or of the domestic laws of the Contracting States, even if it is not "necessary." Neither the United States nor Canada views this as a substantive change. The second amendment merely conforms the language of the paragraph to the language of Article II (Taxes Covered), as amended, by referring to the taxes "to which the Convention applies" rather than to the taxes "covered by the Convention."

The Protocol further amends paragraph 1 to allow a Contracting State to provide information received from the other Contracting State to its states, provinces, or local authorities, if it relates to a tax imposed by that state, province, or local authority that is substantially similar to a national-level tax covered under Article II (Taxes Covered). However, this provision does not authorize a Contracting State to request information on behalf of a state, province, or local authority. The Protocol also amends paragraph 1 to authorize the competent authorities to release information to any arbitration panel that may be established under the provisions of new paragraph 6 of Article XXVI (Mutual Agreement Procedure). Any information provided to a state, province, or local authority or to an arbitration panel is subject to the same use and disclosure provisions as is information received by the national Governments and used for their purposes.

Paragraph 2 of Article 16 amends paragraph 4 of Article XXVII, which describes the applicable taxes for the purposes of this Article. Under the present Convention, the Article applies in Canada to taxes imposed by the Government of Canada under the Income Tax Act and on estates and gifts and in the United States to all taxes imposed under the Internal Revenue Code. The Protocol broadens the scope of the Article to apply to "all taxes imposed by a Contracting State." This change allows information to be exchanged, for example, with respect to Canadian excise taxes, as is the case with respect to U.S. excise taxes under the present Convention. Paragraph 4 is also amended to authorize the exchange of information with respect to other taxes, to the extent relevant to any other provision of the Convention.

ARTICLE 17

Article 17 of the Protocol amends Article XXIX (Miscellaneous Rules) of the Convention. Paragraph 1 of Article 17 modifies paragraph 3(a), the exceptions to the saving clause, to conform the cross-references in the paragraph to changes in other parts of the Convention. The paragraph also adds to the exceptions to the saving clause certain provisions of Article XXIX B (Taxes Imposed by Reason of Death). Thus, certain benefits under that Article will be granted by a Contracting State to its residents and, in the case of the United States, to its citizens, notwithstanding the saving clause of paragraph 2 of Article XXIX.

Paragraph 2 of Article 17 replaces paragraphs 5 through 7 of Article XXIX of the present

Convention with three new paragraphs. (Paragraph 5 in the present Convention was moved to paragraph 7 of Article XVIII (Pensions and Annuities), and paragraphs 6 and 7 were deleted as unnecessary.) New paragraph 5 provides a rule for the taxation by Canada of a Canadian resident that is a shareholder in a U.S. S corporation. The application of this rule is relatively limited, because U.S. domestic law requires that S corporation shareholders be either U.S. citizens or U.S. residents. Therefore, the rule provided by paragraph 5 would apply only to an S corporation shareholder who is a resident of both the United States and Canada (i.e., a "dual resident" who meets certain requirements), determined before application of the "tie-breaker" rules of Article IV (Residence), or a U.S. citizen resident in Canada. Since the shareholder would be subject to U.S. tax on its share of the income of the S corporation as it is earned by the S corporation and, under Canadian statutory law, would be subject to tax only when the income is distributed, there could be a timing mismatch resulting in unrelieved double taxation. Under paragraph 5, the shareholder can make a request to the Canadian competent authority for relief under the special rules of the paragraph. Under these rules, the Canadian shareholder will be subject to Canadian tax on essentially the same basis as he is subject to U.S. tax, thus eliminating the timing mismatch.

The Protocol adds to Article XXIX a new paragraph 6, which provides a coordination rule for the Convention and the General Agreement on Trade in Services ("GATS"). Paragraph 6(a) provides that, for purposes of paragraph 3 of Article XXII (Consultation) of the GATS, a measure falls within the scope of the Convention only if the measure relates to a tax
(1) to which Article XXV (Non-Discrimination) of the Convention applies, or
(2) to which Article XXV does not apply and to which any other provision of the Convention applies, but only to the extent that the measure relates to a matter dealt with in that other provision.

Under paragraph 6(b), notwithstanding paragraph 3 of Article XXII of the GATS, any doubt as to the interpretation of subparagraph (a) will be resolved under paragraph 3 of Article XXVI (Mutual Agreement Procedure) of the Convention or any other procedure agreed to by both Contracting States.

GATS generally obliges its Members to provide national treatment and most-favored-nation treatment to services and service suppliers of other Members. A very broad exception from the national treatment obligation applies to direct taxes. An exception from the most-favored-nation obligation applies to a difference in treatment resulting from an international agreement on the avoidance of double taxation (a "tax agreement") or from provisions on the avoidance of double taxation in any other international agreement or arrangement by which the Member is bound.

Article XXII(3) of GATS specifically provides that there will be no access to GATS procedures to settle a national treatment dispute concerning a measure that falls within the scope of a tax agreement. This provision preserves the exclusive application of nondiscrimination obligations in the tax agreement and clarifies that the competent authority mechanism provided by the tax agreement will apply, instead of GATS procedures, to resolve nondiscrimination disputes involving the taxation of services and service suppliers.

In the event of a disagreement between Members as to whether a measure falls within the

scope of a tax agreement that existed at the time of the entry into force of the Agreement establishing the World Trade Organization, Article XXII(2), footnote 11, of GATS reserves the resolution of the dispute to the Contracting States under the tax agreement. In such a case, the issue of the scope of- a tax agreement may be resolved under GATS procedures (rather than tax treaty procedures) only if both parties to the existing tax agreement consent. With respect to subsequent tax agreements, GATS provides that either Member may bring the jurisdictional matter before the Council for Trade In Services, which will refer the matter to arbitration for a decision that will be final and binding on the Members.

Both Canada and the United States agree that a protocol to a convention that is grandfathered under Article XXII(2), footnote 11, of GATS is also grandfathered. Nevertheless, since the Protocol extends the application of the Convention, and particularly the nondiscrimination article, to additional taxes (e.g., some non-income taxes imposed by Canada), the negotiators sought to remove any ambiguity and agreed to a provision that clarified the scope of the Convention and the relationship between the Convention and GATS.

The purpose of new paragraph 6(a) of the Convention is to provide the agreement of the Contracting States as to the measures considered to fall within the scope of the Convention in applying Article XXII(3) of GATS between the Contracting States. The purpose of new paragraph 6(b) is to reserve the resolution of the issue of the scope of the Convention for purposes of Article XXII(3) of GATS to the competent authorities under the Convention rather than to settlement under GATS procedures.

The Protocol also adds to Article XXIX a new paragraph 7, relating to certain changes in the law or treaty policy of either of the Contracting States. Paragraph 7 provides, first, that in response to a change in the law or policy of either State, the appropriate authority of either State may request consultations with its counterpart in the other State to determine whether a change in the Convention is appropriate. If a change in domestic legislation has unilaterally removed or significantly limited a material benefit provided by the Convention, the appropriate authorities are instructed by the paragraph to consult promptly to consider an appropriate amendment to the Convention. The "appropriate authorities" may be the Contracting States themselves or the competent authorities under the Convention. The consultations may be initiated by the authority of the Contracting State making the change in law or policy or by the authority of the other State. Any change in the Convention recommended as a result of this process can be implemented only through the negotiation, signature, ratification, and entry into force of a new protocol to the Convention.

ARTICLE 18

*In general.*

Article 18 of the Protocol adds a new Article XXIX A (Limitation on Benefits) to the Convention. Article XXIX A addresses the problem of "treaty shopping" by requiring, in most cases, that the person seeking U.S. treaty benefits not only be a Canadian resident but also satisfy other tests. In a typical case of treaty shopping, a resident of a third State might establish an entity

resident in Canada for the purpose of deriving income from the United States and claiming U.S. treaty benefits with respect to that income. Article XXIX A limits the benefits granted by the United States under the Convention to those persons whose residence in Canada is not considered to have been motivated by the existence of the Convention. Absent Article XXIX A, the entity would be entitled to U.S. benefits under the Convention as a resident of Canada, unless it were denied benefits as a result of limitations (e.g., business purpose, substance-over-form, step transaction, or conduit principles or other anti-avoidance rules) applicable to a particular transaction or arrangement. General anti-abuse provisions of this sort apply in conjunction with the Convention in both the United States and Canada. In the case of the United States, such anti-abuse provisions complement the explicit anti-treaty-shopping rules of Article XXIX A. While the anti-treaty-shopping rules determine whether a person has a sufficient nexus to Canada to be entitled to treaty benefits, general anti-abuse provisions determine whether a particular transaction should be recast in accordance with the substance of the transaction.

The present Convention deals with treaty-shopping in a very limited manner, in paragraph 6 of Article XXIX, by denying benefits to Canadian residents that benefit from specified provisions of Canadian law. The Protocol removes that paragraph 6 from Article XXIX, because it is superseded by the more general provisions of Article XXIX A.

The Article is not reciprocal, except for paragraph 7. Canada prefers to rely on general anti-avoidance rules to counter arrangements involving treaty-shopping through the United States.

The structure of the Article is as follows: paragraph 1 states that, in determining whether a resident of Canada is entitled to U.S. benefits under the Convention, a "qualifying person is entitled to all of the benefits of the Convention, and other persons are not entitled to benefits, except where paragraphs 3, 4, or 6 provide otherwise. Paragraph 2 lists a number of characteristics, any one of which will make a Canadian resident a qualifying person. These are essentially mechanical tests. Paragraph 3 provides an alternative rule, under which a Canadian resident that is not a qualifying person under paragraph 2 may claim U.S. benefits with respect to those items of U.S. source income that are connected with the active conduct of a trade or business in Canada. Paragraph 4 provides a limited "derivative benefits" test for entitlement to benefits with respect to U.S. source dividends, interest, and royalties beneficially owned by a resident of Canada that is not a qualifying person. Paragraph 5 defines certain terms used in the Article. Paragraph 6 requires the U.S. competent authority to grant benefits to a resident of Canada that does not qualify for benefits under any other provision of the Article, where the competent authority determines, on the basis of all factors, that benefits should be granted. Paragraph 7 clarifies the application of general anti-abuse provisions.

### *Individuals and governmental entities*

Under paragraph 2, the first two categories of qualifying persons are
(1) individual residents of Canada, and
(2) the Government of Canada, a political subdivision or local authority thereof, or an agency or instrumentality of that Government, political subdivision, or local authority.

It is considered unlikely that persons falling into these two categories can be used, as the

beneficial owner of income, to derive treaty benefits on behalf of a third-country person. If a person is receiving income as a nominee on behalf of a third-country resident, benefits will be denied with respect to those items of income under the articles of the Convention that grant the benefit, because of the requirements in those articles that the beneficial owner of the income be a resident of a Contracting State.

### Publicly traded entities.

Under subparagraph (c) of paragraph 2, a Canadian resident company or trust is a qualifying person if there is substantial and regular trading in the company's principal class of shares, or in the trust's units, on a recognized stock exchange. The term "recognized stock exchange" is defined in paragraph 5(a) of the Article to mean, in the United States, the NASDAQ System and any stock exchange registered as a national securities exchange with the Securities and Exchange Commission, and, in Canada, any Canadian stock exchanges that are "prescribed stock exchanges" under the Income Tax Act. These are, at the time of signature of the Protocol, the Alberta, Montreal, Toronto, Vancouver, and Winnipeg Stock Exchanges. Additional exchanges may be added to the list of recognized exchanges by exchange of notes between the Contracting States or by agreement between the competent authorities.

Certain companies owned by publicly traded corporations also may be qualifying persons. Under subparagraph (d) of paragraph 2, a Canadian resident company will be a qualifying person, even if not publicly traded, if more than 50 percent of the vote and value of its shares is owned (directly or indirectly) by five or fewer persons that would be qualifying persons under subparagraph (c). In addition, each company in the chain of ownership must be a qualifying person or a U.S. citizen or resident. Thus, for example, a Canadian company that is not publicly traded but that is owned, one4hird each, by three companies, two of which are Canadian resident corporations whose principal classes of shares are substantially and regularly traded on a recognized stock exchange, will qualify under subparagraph (d).

The 50-percent test under subparagraph (d) applies only to shares other than "debt substitute shares." The term "debt substitute shares" is defined in paragraph 5 to mean shares defined in paragraph (e) of the definition in the Canadian Income Tax Act of "term preferred shares" (see section 248(1) of the Income Tax Act), which relates to certain shares received in debt-restructuring arrangements undertaken by reason of financial difficulty or insolvency. Paragraph 5 also provides that the competent authorities may agree to treat other types of shares as debt substitute shares.

### Ownership/base erosion test.

Subparagraph (e) of paragraph 2 provides a two-part test under which certain other entities may be qualifying persons, based on ownership and "base erosion." Under the first of these tests, benefits will be granted to a Canadian resident company if 50 percent or more of the vote and value of its shares (other than debt substitute shares), or to a Canadian resident trust if 50 percent or more of its beneficial interest, is *not* owned, directly or indirectly, by persons other than qualifying persons or U.S. residents or citizens. The wording of these tests is intended to make clear that, for example, if a Canadian company is more than 50 percent owned by a U.S. resident

corporation that is, itself, wholly owned by a third-country resident other than a U.S. citizen, the Canadian company would not pass the ownership test. This is because more than 50 percent of its shares is owned indirectly by a person (the third-country resident) that is not a qualifying person or a citizen or resident of the United States.

For purposes of this subparagraph (e) and other provisions of this Article, the term "shares" includes, in the case of a mutual insurance company, any certificate or contract entitling the holder to voting power in the corporation. This is consistent with the interpretation of similar limitation on benefits provisions in other U.S. treaties.

The second test of subparagraph (e) is the so-called "base erosion" test. A Canadian company or trust that passes the ownership test must also pass this test to be a qualifying person. This test requires that the amount of expenses that are paid or payable by the Canadian entity in question to persons that are not qualifying persons or U.S. citizens or residents, and that are deductible from gross income, be less than 50 percent of the gross income of the company or trust. This test is applied for the fiscal period immediately preceding the period for which the qualifying person test is being applied. If it is the first fiscal period of the person, the test is applied for the current period.

The ownership/base erosion test recognizes that the benefits of the Convention can be enjoyed indirectly not only by equity holders of an entity, but also by that entity's obligees, such as lenders, licensers, service providers, insurers and reinsurers, and others. For example, a third-country resident could license technology to Canadian-owned Canadian corporation to be sub licensed to a U.S. resident. The U.S. source royalty income of the Canadian corporation would be exempt from U.S. withholding tax under Article XII (Royalties) of the Convention (as amended by the Protocol). While the Canadian corporation would be subject to Canadian corporation income tax, its taxable income could be reduced to near zero as a result of the deductible royalties paid to the third-country resident. If, under a Convention between Canada and the third country, those royalties were either exempt from Canadian tax or subject to tax at a low rate, the U.S. treaty benefit with respect to the U.S. source royalty income would have flowed to the third-country resident at little or no tax cost, with no reciprocal benefit to the United States from the third country. The ownership/base erosion test therefore requires both that qualifying persons or U.S. residents or citizens substantially own the entity and that the entity's deductible payments be made in substantial part to such persons.

### Other qualifying persons.

Under subparagraph (f) of paragraph 2, a Canadian resident estate is a qualifying person, entitled to the benefits of the Convention with respect to its U.S. source income.

Subparagraphs (g) and (h) specify the circumstances under which certain types of not-for-profit organizations will be qualifying persons. Subparagraph (g) of paragraph 2 provides that a not-for-profit organization that is a resident of Canada is a qualifying person, and thus entitled to U.S. benefits, if more than half of the beneficiaries, members, or participants in the organization are qualifying persons or citizens or residents of the United States. The term "not-for-profit organization" of a Contracting State is defined in subparagraph (b) of paragraph 5 of the Article to

mean an entity created or established in that State that is generally exempt from income taxation in that State by reason of its not-for-profit status. The term includes charities, private foundations, trade unions, trade associations, and similar organizations.

Subparagraph (h) of paragraph 2 specifies that certain organizations described in paragraph 2 of Article XXI (Exempt Organizations), as amended by Article 10 of the Protocol, are qualifying persons. To be a qualifying person, such an organization must be established primarily for the purpose of providing pension, retirement, or employee benefits to individual residents of Canada who are (or were, within any of the five preceding years) qualifying persons, or to citizens or residents of the United States. An organization will be considered to be established "primarily" for this purpose if more than 50 percent of its beneficiaries, members, or participants are such persons. Thus, for example, a Canadian Registered Retirement Savings Plan ("RRSP") of a former resident of Canada who is working temporarily outside of Canada would continue to be a qualifying person during the period of the individual's absence from Canada or for five years, whichever is shorter. A Canadian pension fund established to provide benefits to persons employed by a company would be a qualifying person only if most of the beneficiaries of the fund are (or were within the five preceding years) individual residents of Canada or residents or citizens of the United States.

The provisions of paragraph 2 are self-executing, unlike the provisions of paragraph 6, discussed below. The tax authorities may, of course, on review, determine that the taxpayer has improperly interpreted the paragraph and is not entitled to the benefits claimed.

***Active trade or business test.***

Paragraph 3 provides an eligibility test for benefits for residents of Canada that are not qualifying persons under paragraph 2. This is the so-called "active trade or business" test. Unlike the tests of paragraph 2, the active trade or business test looks not solely at the characteristics of the person deriving the income, but also at the nature of the activity engaged in by that person and the connection between the income and that activity. Under the active trade or business test, a resident of Canada deriving an item of income from the United States is entitled to benefits with respect to that income if that person (or a person related to that person under the principles of Internal Revenue Code section 482) is engaged in an active trade or business in Canada and the income in question is derived in connection with, or is incidental to, that trade or business. Income that is derived in connection with, or is incidental to, the business of making or managing investments will not qualify for benefits under this provision, unless those investment activities are carried on with customers in the ordinary course of the business of a bank, insurance company, registered securities dealer, or deposit-taking financial institution.

Income is considered derived "in connection" with an active trade or business in the United States if, for example, the income-generating activity in the United States is "upstream," "downstream," or parallel to that conducted in Canada. Thus, if the U.S. activity consisted of selling the output of a Canadian manufacturer or providing inputs to the manufacturing process, or of manufacturing or selling in the United States the same sorts of products that were being sold by the Canadian trade or business in Canada, the income generated by that activity would be treated as earned in connection with the Canadian trade or business. Income is considered

"incidental" to the Canadian trade or business if, for example, it arises from the short-term investment of working capital of the Canadian resident in U.S. securities.

An item of income will be considered to be earned in connection with or to be incidental to an active trade or business in Canada if the income is derived by the resident of Canada claiming the benefits directly or indirectly through one or more other persons that are residents of the United States. Thus, for example, a Canadian resident could claim benefits with respect to an item of income earned by a U.S. operating subsidiary but derived by the Canadian resident indirectly through a wholly-owned U.S. holding company interposed between it and the operating subsidiary. This language would also permit a Canadian resident to derive income from the United States through one or more U.S. residents that it does not wholly own. For example, a Canadian partnership in which three unrelated Canadian companies each hold a one-third interest could form a wholly-owned U.S. holding company with a U.S. operating subsidiary. The "directly or indirectly" language would allow otherwise available treaty benefits to be claimed with respect to income derived by the three Canadian partners through the U.S. holding company, even if the partners were not considered to be related to the U.S. holding company under the principles of Internal Revenue Code section 482.

Income that is derived in connection with, or is incidental to, an active trade or business in Canada, must pass an additional test to qualify for U.S. treaty benefits. The trade or business in Canada must be substantial in relation to the activity in the United States that gave rise to the income in respect of which treaty benefits are being claimed. To be considered substantial, it is not necessary that the Canadian trade or business be as large as the U.S. income-generating activity. The Canadian trade or business cannot, however, in terms of income, assets, or other similar measures, represent only a very small percentage of the size of the U.S. activity.

The substantiality requirement is intended to prevent treaty-shopping. For example, a third-country resident may want to acquire a U.S. company that manufactures television sets for worldwide markets; however, since its country of residence has no tax treaty with the United States, any dividends generated by the investment would be subject to a U.S. withholding tax of 30 percent. Absent a substantiality test, the investor could establish a Canadian corporation that would operate a small outlet in Canada to sell a few of the television sets manufactured by the U.S. company and earn a very small amount of income. That Canadian corporation could then acquire the U.S. manufacturer with capital provided by the third-country resident and produce a very large number of sets for sale in several countries, generating a much larger amount of income. It might attempt to argue that the U.S. source income is generated from business activities in the United States related to the television sales activity of the Canadian parent and that the dividend income should be subject to U.S. tax at the 5 percent rate provided by Article X of the Convention, as amended by the Protocol. However, the substantiality test would not be met in this example, so the dividends would remain subject to withholding in the United States at a rate of 30 percent.

In general, it is expected that if a person qualifies for benefits under one of the tests of paragraph 2, no inquiry will be made into qualification for benefits under paragraph 3. Upon satisfaction of any of the tests of paragraph 2, any income derived by the beneficial owner from the other Contracting State is entitled to treaty benefits. Under paragraph 3, however, the test is

applied separately to each item of income.

***Derivative benefits test.***

Paragraph 4 of Article XXIX A contains a so-called "derivative benefits" rule not generally found in U.S. treaties. This rule was included in the Protocol because of the special economic relationship between the United States and Canada and the close coordination between the tax administrations of the two countries.

Under the derivative benefits rule, a Canadian resident company may receive the benefits of Articles X (Dividends), XI (Interest), and XII (Royalties), even if the company is not a qualifying person and does not satisfy the active trade or business test of paragraph 3. To qualify under this paragraph, the Canadian company must satisfy both
> (i) the base erosion test under subparagraph (e) of paragraph 2, and
> (ii) an ownership test.

The derivative benefits ownership test requires that shares (other than debt substitute shares) representing more than 90 percent of the vote and value of the Canadian company be owned directly or indirectly by either
> (i) qualifying persons or U.S. citizens or residents, or
> (ii) other persons that satisfy each of three tests. The three tests that must be satisfied by these other persons are as follows:

First, the person must be a resident of a third State with which the United States has a comprehensive income tax convention and be entitled to all of the benefits under that convention. Thus, if the person fails to satisfy the limitation on benefits tests, if any, of that convention, no benefits would be granted under this paragraph. Qualification for benefits under an active trade or business test does not suffice for these purposes, because that test grants benefits only for certain items of income, not for all purposes of the convention.

Second, the person must be a person that would qualify for benefits with respect to the item of income for which benefits are sought under one or more of the tests of paragraph 2 or 3 of this Convention, if the person were a resident of Canada and, for purposes of paragraph 3, the business were carried on in Canada. For example, a person resident in a third country would be deemed to be a person that would qualify under the publicly-traded test of paragraph 2 of this Convention if the principal class of its shares were substantially and regularly traded on a stock exchange recognized either under the treaty between the United States and Canada or under the treaty between the United States and the third country. Similarly, a company resident in a third country would be deemed to satisfy the ownership/base erosion test of paragraph 2 under this hypothetical analysis if, for example, it were wholly owned by an individual resident in that third country and most of its deductible payments were made to individual residents of that country (i.e., it satisfied base erosion).

The third requirement is that the rate of U.S. withholding tax on the item of income in respect of which benefits are sought must be at least as low under the convention between the person's country of residence and the United States as under this Convention.

***Competent authority discretion.***

Paragraph 6 provides that when a resident of Canada derives income from the United States and is not entitled to the benefits of the Convention under other provisions of the Article, benefits may, nevertheless be granted at the discretion of the U.S. competent authority. In making a determination under this paragraph, the competent authority will take into account all relevant facts and circumstances relating to the person requesting the benefits. In particular, the competent authority will consider the history, structure, ownership (including ultimate beneficial ownership), and operations of the person. In addition, the competent authority is to consider

(1) whether the creation and existence of the person did not have as a principal purpose obtaining treaty benefits that would not otherwise be available to the person, and

(2) whether it would not be appropriate, in view of the purpose of the Article, to deny benefits.

The paragraph specifies that if the U.S. competent authority determines that either of these two standards is satisfied, benefits shall be granted.

For purposes of implementing paragraph 6, a taxpayer will be expected to present his case to the competent authority for an advance determination based on the facts. The taxpayer will not be required to wait until it has been determined that benefits are denied under one of the other provisions of the Article. It also is expected that, if and when the competent authority determines that benefits are to be allowed, they will be allowed retroactively to the time of entry into force of the relevant treaty provision or the establishment of the structure in question, whichever is later (assuming that the taxpayer also qualifies under the relevant facts for the earlier period).

***General anti-abuse provisions.***

Paragraph 7 was added at Canada's request to confirm that the specific provisions of Article XXIX A and the fact that these provisions apply only for the purposes of the application of the Convention by the United States should not be construed so as to limit the right of each Contracting State to invoke applicable anti-abuse rules. Thus, for example, Canada remains free to apply such rules to counter abusive arrangements involving "treaty-shopping" through the United States, and the United States remains free to apply its substance-over-form and anti conduit rules, for example, in relation to Canadian residents. This principle is recognized by the Organization for Economic Cooperation and Development in the Commentaries to its Model Tax Convention on Income and on Capital, and the United States and Canada agree that it is inherent in the Convention. The agreement to state this principle explicitly in the Protocol is not intended to suggest that the principle is not also inherent in other tax conventions, including the current Convention with Canada.

ARTICLE 19

***In general.***

Article 19 of the Protocol adds to the Convention a new Article XXIX B (Taxes Imposed by Reason of Death). The purpose of Article XXIX B is to better coordinate the operation of the death tax regimes of the two Contracting States. Such coordination is necessary because the United States imposes an estate tax, while Canada now applies an income tax on gains deemed realized at death rather than an estate tax. Article XXIX B also contains other provisions designed to alleviate death taxes in certain situations.

For purposes of new Article XXIX B, the term "resident" has the meaning provided by Article IV (Residence) of the Convention, as amended by Article 3 of the Protocol. The meaning of the term "resident" for purposes of Article XXIX B, therefore, differs in some respects from its meaning under the estate, gift, and generation-skipping transfer tax provisions of the Internal Revenue Code.

**Charitable bequests.**

Paragraph 1 of new Article XXIX B facilitates certain charitable bequests. It provides that a Contracting State shall accord the same death tax treatment to a bequest by an individual resident in one of the Contracting States to a qualifying exempt organization resident in the other Contracting State as it would have accorded if the organization had been a resident of the first Contracting State. The organizations covered by this provision are those referred to in paragraph 1 of Article XXI (Exempt Organizations) of the Convention. A bequest by a U.S. citizen or U.S. resident (as defined for estate tax purposes under the Internal Revenue Code) to such an exempt organization generally is deductible for U.S. estate tax purposes under section 2055 of the Internal Revenue Code, without regard to whether the organization is a U.S. corporation. However, if the decedent is not a U.S. citizen or U.S. resident (as defined for estate tax purposes under the Internal Revenue Code), such a bequest is deductible for U.S. estate tax purposes, under section 2106(a)(2) of the Internal Revenue Code, only if the recipient organization is a U.S. corporation. Under paragraph 1 of Article XXIX B, a U.S. estate tax deduction also will be allowed for a bequest by a Canadian resident (as defined under Article IV (Residence)) to a qualifying exempt organization that is a Canadian corporation. However, paragraph 1 does not allow a deduction for U.S. estate tax purposes with respect to any transfer of property that is not subject to U.S. estate tax.

**Unified credit.**

Paragraph 2 of Article XXIX B grants a "pro rata" unified credit to the estate of a Canadian resident decedent, for purposes of computing U.S. estate tax. Although the Congress anticipated the negotiation of such *pro rata* unified credits in Internal Revenue Code section 2102(c)(3)(A), this is the first convention in which the United States has agreed to give such a credit. However, certain exemption provisions of existing estate and gift tax conventions have been interpreted as providing a pro rata unified credit.

Under the Internal Revenue Code, the estate of a nonresident not a citizen of the United States is subject to U.S. estate tax only on its U.S. situs assets and is entitled to a unified credit of $13,000, while the estate of a U.S. citizen or U.S. resident is subject to U.S. estate tax on its entire worldwide assets and is entitled to a unified credit of $192,800. (For purposes of these Internal

Revenue Code provisions, the term "resident" has the meaning provided for estate tax purposes under the Internal Revenue Code.) A lower unified credit is provided for the former category of estates because it is assumed that the estate of a nonresident not a citizen generally will hold fewer U.S. situs assets, as a percentage of the estate's total assets, and thus will have a lower U.S. estate tax liability. The pro rata unified credit provisions of paragraph 2 increase the credit allowed to the estate of a Canadian resident decedent to an amount between $13,000 and $192,800 in appropriate cases, to take into account the extent to which the assets of the estate are situated in the United States. Paragraph 2 provides that the amount of the unified credit allowed to the estate of a Canadian resident decedent will in no event be less than the $13,000 allowed under the Internal Revenue Code to the estate of a nonresident not a citizen of the United States (subject to the adjustment for prior gift tax unified credits, discussed below). Paragraph 2 does not apply to the estates of U.S. citizen decedents, whether resident in Canada or elsewhere, because such estates receive a unified credit of $192,800 under the Internal Revenue Code.

Subject to the adjustment for gift tax unified credits, the pro rata credit allowed under paragraph 2 is determined by multiplying $192,800 by a fraction, the numerator of which is the value of the part of the gross estate situated in the United States and he denominator of which is the value of the entire gross estate wherever situated. Thus, if half of the entire gross estate (by value) of a decedent who was a resident and citizen of Canada were situated in the United States, the estate would be entitled to a pro rata unified credit of $96,400 (provided that the U.S. estate tax due is not less than that amount). For purposes of the denominator, the entire gross estate wherever situated (i.e., the worldwide estate, determined under U.S. domestic law) is to be taken into account for purposes of the computation. For purposes of the numerator, an estate's assets will be treated as situated in the United States if they are so treated under U.S. domestic law. However, if enacted, a technical correction now pending before the Congress will amend U.S. domestic law to clarify that assets will not be treated as U.S. situs assets for purposes of the pro rata unified credit computation if the United States is precluded from taxing them by reason of a treaty obligation. This technical correction will affect the interpretation of both this paragraph 2 and the analogous provisions in existing conventions. As currently proposed, it will take effect on the date of enactment.

Paragraph 2 restricts the availability of the pro rata unified credit in two respects. First, the amount of the unified credit otherwise allowable under paragraph 2 is reduced by the amount of any unified credit previously allowed against U.S. gift tax imposed on any gift by the decedent. This rule reflects the fact that, under U.S. domestic law, a U.S. citizen or U.S. resident individual is allowed a unified credit against the U.S. gift tax on lifetime transfers. However, as a result of the estate tax computation, the individual is entitled only to a total unified credit of $192,800, and the amount of the unified credit available for use against U.S. estate tax on the individual's estate is effectively reduced by the amount of any unified credit that has been allowed in respect of gifts by the individual. This rule is reflected by reducing the amount of the pro rata unified credit otherwise allowed to the estate of a decedent individual under paragraph 2 by the amount of any unified credit previously allowed with respect to lifetime gifts by that individual. This reduction will be relevant only in rare cases, where the decedent made gifts subject to the U.S. gift tax while a U.S. citizen or U.S. resident (as defined under the Internal Revenue Code for U.S. gift tax purposes).

Paragraph 2 also conditions allowance of the pro rata unified credit upon the provision of all information necessary to verify and compute the credit. Thus, for example, the estate's representatives will be required to demonstrate satisfactorily both the value of the worldwide estate and the value of the U.S. portion of the estate. Substantiation requirements also apply, of course, with respect to other provisions of the Protocol and the Convention. However, the negotiators believed it advisable to emphasize the substantiation requirements in connection with this provision, because the computation of the pro rata unified credit involves certain information not otherwise relevant for U.S. estate tax purposes.

In addition, the amount of the pro rata unified credit is limited to the amount of U.S. estate tax imposed on the estate. See section 2102(c)(4) of the Internal Revenue Code.

*Marital credit.*

Paragraph 3 of Article XXIX B allows a special "marital credit" against U.S. estate tax in respect of certain transfers to a surviving spouse. The purpose of this marital credit is to alleviate, in appropriate cases, the impact of the estate tax marital deduction restrictions enacted by the Congress in the Technical and Miscellaneous Revenue Act of 1988 ("TAMRA"). It is the firm position of the U.S. Treasury Department that the TAMRA provisions do not violate the non-discrimination provisions of this Convention or any other convention to which the United States is a party. This is because the estate--not the surviving spouse--is the taxpayer, and the TAMRA provisions treat the estates of nonresidents not citizens of the United States in the same manner as the estates of U.S. citizen and U.S. resident decedents. However, the U.S. negotiators believed that it was not inappropriate, in the context of the Protocol, to ease the impact of those TAMRA provisions upon certain estates of limited value.

Paragraph 3 allows a non-refundable marital credit in addition to the pro rata unified credit allowed under paragraph 2 (or, in the case of a U.S. citizen or U.S. resident decedent, the unified credit allowed under U.S. domestic law). However, the marital credit is allowed only in connection with transfers satisfying each of the five conditions set forth in paragraph 3. First, the property must be "qualifying property," i.e., it must pass to the surviving spouse (within the meaning of U.S. domestic law) and be property that would have qualified for the estate tax marital deduction under U.S. domestic law if the surviving spouse had been a U.S. citizen and all applicable elections specified by U.S. domestic law had been properly made. Second, the decedent must have been, at the time of death, either a resident of Canada or the United States or a citizen of the United States. Third, the surviving spouse must have been, at the time of the decedent's death, a resident of either Canada or the United States. Fourth, if both the decedent and the surviving spouse were residents of the United States at the time of the decedent's death, at least one of them must have been a citizen of Canada. Finally, to limit the benefits of paragraph 3 to relatively small estates, the executor of the decedent's estate is required to elect the benefits of paragraph 3, and to waive irrevocably the benefits of any estate tax marital deduction that would be allowed under U.S. domestic law, on a U.S. Federal estate tax return filed by the deadline for making a qualified domestic trust election under Internal Revenue Code section 2056A(d). In the case of the estate of a decedent for which the U.S. Federal estate tax return is filed on or before the date on which this Protocol enters into force, this election and waiver must be made on any return filed to claim a refund pursuant to the special effective date applicable to such estates

(discussed below).

      Paragraph 4 governs the computation of the marital credit allowed under paragraph 3. It provides that the amount of the marital credit shall equal the lesser of

           (i) the amount of the unified credit allowed to the estate under paragraph 2 or, where applicable, under U.S. domestic law (before reduction for any gift tax unified credit), or

           (ii) the amount of U.S. estate tax that would otherwise be imposed on the transfer of qualifying property to the surviving spouse.

For this purpose, the amount of U.S. estate tax that would otherwise be imposed on the transfer of qualifying property equals the amount by which

           (i) the estate tax (before allowable credits) that would be imposed if that property were included in computing the taxable estate exceeds

           (ii) the estate tax (before allowable credits) that would be imposed if the property were not so included.

Property that, by reason of the provisions of paragraph 8 of this Article, is not subject to U.S. estate tax is not taken into account for purposes of this hypothetical computation.

      Finally, paragraph 4 provides taxpayers with an ordering rule. The rule states that, solely for purposes of determining any other credits (e.g., the credits for foreign and state death taxes) that may be allowed under U.S. domestic law to the estate, the marital credit shall be allowed after such other credits.

      In certain cases, the provisions of paragraphs 3 and 4 may affect the U.S. estate taxation of a trust that would meet the requirements for a qualified terminable interest property ("QTIP") election, for example, a trust with a life income interest for the surviving spouse and a remainder interest for other family members. If, in lieu of making the QTIP election and the qualified domestic trust election, the decedent's executor makes the election described in paragraph 3(d) of this Article, the provisions of Internal Revenue Code sections 2044 (regarding inclusion in the estate of the second spouse of certain property for which the marital deduction was previously allowed), 2056A (regarding qualified domestic trusts), and 2519 (regarding dispositions of certain life estates) will not apply. To obtain this treatment, however, tile executor is required, under paragraph 3, to irrevocably waive the benefit of any marital deduction allowable under the Internal Revenue Code with respect to the trust.

      The following examples illustrate the operation of the marital credit and its interaction with other credits. Unless otherwise stated, assume for purposes of illustration that H, the decedent, and W, his surviving spouse, are Canadian citizens resident in Canada at the time of the decedent's death. Assume further that all conditions set forth in paragraphs 2 and 3 of this Article XXIX B are satisfied (including the condition that the executor waive the estate tax marital deduction), that no deductions are available under the Internal Revenue Code in computing the U.S. estate tax liability, and that there are no adjusted taxable gifts within the meaning of Internal Revenue Code section 2001(b) or 2101(c). Also assume that the applicable U.S. domestic estate and gift tax laws are those that were in effect on the date the Protocol was signed.

*Example 1.*    H has a worldwide gross estate of $1,200,000. He bequeaths U.S. real property worth $600,000 to W. The remainder of H's estate consists of Canadian situs property. H's estate would be entitled to a pro rata unified credit of $96,400 (= $192,800 x ($600,000/$1,200,000)) and to a marital credit in the same amount (the lesser of the unified credit allowed ($96,400) and the U.S. estate tax that would otherwise be imposed on the property transferred to W ($192,800 [tax on U.S. taxable estate of $600,000])). The pro rata unified credit and the marital credit combined would eliminate all U.S. estate tax with respect to the property transferred to W.

*Example 2.*    H has a worldwide gross estate of $1,200,000, all of which is situated in the United States. He bequeaths U.S. real property worth $600,000 to W and U.S. real property worth $600,000 to a child, C. H's estate would be entitled to a pro rata unified credit of $192,800 (= $192,800 x $1,200,000/$1,200,000) and to a marital credit of $192,800 (the lesser of the unified credit ($192,800) and the U.S. estate tax that would otherwise be imposed on the property transferred to W ($235,000, i.e., $427,800 [tax on U.S. taxable estate of $1,200,000] less $192,800 [tax on U.S. taxable estate of $600,000])). This would reduce the estate's total U.S. estate tax liability of $427,800 by $385,600.

*Example 3.*    H has a worldwide gross estate of $700,000, of which $500,000 is real property situated in the United States. H bequeaths U.S. real property valued at $100,000 to W. The remainder of H's gross estate, consisting of U.S. and Canadian situs real property, is bequeathed to H's child, C. H's estate would be entitled to a pro rata unified credit of $137,714 ($192,800 x $500,000/$700,000). In addition, H's estate would be entitled to a marital credit of $34,000, which equals the lesser of the unified credit ($137,714) and $34,000 (the U.S. estate tax that would otherwise be imposed on the property transferred to W before allowance of any credits, i.e., $155,800 [tax on U.S. taxable estate of $500,000] less $121,800 [tax on U.S. taxable estate of $400,000]).

*Example 4.*    H has a worldwide gross estate of $5,000,000, $2,000,000 of which consists of U.S. real property situated in State X. State X imposes a state death tax equal to the federal credit allowed under Internal Revenue Code section 2011. H bequeaths U.S. situs real property worth $1,000,000 to W and U.S. situs real property worth $1,000,000 to his child, C. The remainder of H's estate ($3,000,000) consists of Canadian situs property passing to C. H's estate would be entitled to a pro rata unified credit of $77,120 ($192,800 x $2,000,000/$5,000,000). H's estate would be entitled to a state death tax credit under Internal Revenue Code section 2102 of $99,600 (determined under Internal Revenue Code section 2011(b) with respect to an adjusted taxable estate of $1,940,000). H's estate also would be entitled to a marital credit of $77,120, which equals the lesser of the unified credit ($77,120) and

$435,000 (the U.S. estate tax that would otherwise be imposed on the property transferred to W before allowance of any credits, i.e., $780,000 [tax on U.S. taxable estate of $2,000,000] less $345,800 [tax on U.S. taxable estate of $1,000,000]).

*Example 5.*        The facts are the same as in Example 4, except that H and W are Canadian citizens who are resident in the United States at the time of H's death. Canadian Federal and provincial income taxes totaling $500,000 are imposed by reason of H's death. H's estate would be entitled to a unified credit of $192,800 and to a state death tax credit of $300,880 under Internal Revenue Code sections 2010 and 2011(b), respectively. Under paragraph 6 of Article XXIX B, H's estate would be entitled to a credit for the Canadian income tax imposed by reason of death, equal to the lesser of $500,000 (the Canadian taxes paid) or $1,138,272 ($2,390,800 (tax on $5,000,000 taxable estate) less total of unified and state death tax credits ($493,680) x $3,000,000/$5,000,000). H's estate also would be entitled to a marital credit of $192,800, which equals the lesser of the unified credit ($192,800) and $550,000 (the U.S. estate tax that would otherwise be imposed on the property transferred to W before allowance of any credits, i.e., $2,390,800 (tax on U.S. taxable estate of $5,000,000) less $1,840,800 [tax on U.S. taxable estate of $4,000,000]).

### Canadian treatment of certain transfers.

The provisions of paragraph 5 relate to the operation of Canadian law. They are intended to provide deferral ("rollover") of the Canadian tax at death for certain transfers to a surviving spouse and to permit the Canadian competent authority to allow such deferral for certain transfers to a trust. For example, they would enable the competent authority to treat a trust that is a qualified domestic trust for U.S. estate tax purposes as a Canadian spousal trust as well for purposes of certain provisions of Canadian tax law and of the Convention. These provisions do not affect U.S. domestic law regarding qualified domestic trusts. Nor do they affect the status of U.S. resident individuals for any other purpose.

### Credit for U.S. taxes.

Under paragraph 6, Canada agrees to give Canadian residents and Canadian resident spousal trusts (or trusts treated as such by virtue of paragraph 5) a deduction from tax (i.e., a credit) for U.S. Federal or state estate or inheritance taxes imposed on U.S. situs property of the decedent or the trust. This credit is allowed against the income tax imposed by Canada, in an amount computed in accordance with subparagraph 6(a) or 6(b).

Subparagraph 6(a) covers the first set of cases---where the U.S. tax is imposed upon a decedent's death. Subparagraph 6(a)(i) allows a credit for U.S. tax against the total amount of Canadian income tax payable by the decedent in the taxable year of death on any income, profits, or gains arising in the United States (within the meaning of paragraph 3 of Article XXIV

(Elimination of Double Taxation)). For purposes of subparagraph 6(a)(i), income, profits, or gains arising in the United States within the meaning of paragraph 3 of Article XXIV include gains deemed realized at death on U.S. situs real property and on personal property forming part of the business property of a U.S. permanent establishment or fixed base. (As explained below, these are the only types of property on which the United States may impose its estate tax if the estate is worth $1.2 million or less.) Income, profits, or gains arising in the United States also include income and profits earned by the decedent during the taxable year of death, to the extent that the United States may tax such amounts under the Convention (e.g., dividends received from a U.S. corporation and wages from the performance of personal services in the United States).

Where the value of the decedent's entire gross estate exceeds $1.2 million, subparagraph 6(a)(ii) allows a credit against the Canadian income tax on any income, profits, or gains from any U.S. situs property, in addition to any credit allowed by subparagraph 6(a)(i). This provision is broader in scope than is the general rule under subparagraph 6(a)(i), because the United States has retained the right to impose its estate tax on all types of property in the case of larger estates.

Subparagraph 6(b) provides rules for a second category of cases----where the U.S. tax is imposed upon the death of the surviving spouse. In these cases, Canada agrees to allow a credit against the Canadian tax payable by a trust for its taxable year during which the surviving spouse dies on any income, profits, or gains

        (i) arising in the United States on U.S. situs real property or business property, or

        (ii) from property situated in the United States.

These rules are intended to provide a credit for taxes imposed as a result of the death of the surviving spouse in situations involving trusts. To the extent that taxes are imposed on the estate of the surviving spouse, subparagraph 6(a) would apply as well. In addition, the competent authorities are authorized to provide relief from double taxation in certain additional circumstances involving trusts, as described above in connection with Article 14 of the Protocol.

The credit allowed under paragraph 6 is subject to certain conditions. First, where the decedent was a U.S. citizen or former citizen (described in paragraph 2 of Article XXIX (Miscellaneous Rules)), paragraph 6 does not obligate Canada to provide a credit for U.S. taxes in excess of the amount of U.S. taxes that would have been payable if the decedent had not been a U.S. citizen or former citizen. Second, the credit allowed under paragraph 6 will be computed after taking into account any deduction for U.S. income tax provided under paragraph 2(a), 4(a), or 5(b) of Article XXIV (Elimination of Double Taxation). This clarifies that no double credit will be allowed for any amount and provides an ordering rule. Finally, because Canadian domestic law does not contain a definition of U.S. situs property for death tax purposes, such a definition is provided for purposes of paragraph 6. To maximize coordination of the credit provisions, the Contracting States agreed to follow the U.S. estate tax law definition as in effect on the date of signature of the Protocol and, subject to competent authority agreement, as it may be amended in the future.

*Credit for Canadian taxes.*

Under paragraph 7, the United States agrees to allow a credit against U.S. Federal estate tax imposed on the estate of a U.S. resident or U.S. citizen decedent, or upon the death of a surviving spouse with respect to a qualified; domestic trust created by such a decedent (or the decedent's executor or surviving spouse). The credit is allowed for <u>Canadian Federal and provincial income taxes</u> imposed at death with respect to property of the estate or trust that is situated outside of the United States. As in the case under paragraph 6, the competent authorities also are authorized to provide relief from double taxation in certain cases involving trusts (see discussion of Article 14, above).

The amount of the credit generally will be determined as though the income tax imposed by Canada were a creditable tax under the U.S. estate tax provisions regarding credit for foreign death taxes, in accordance with the provisions and subject to the limitations of Internal Revenue Code section 2014. However, subparagraph 7(a) clarifies that a credit otherwise allowable under paragraph 7 will not be denied merely because of inconsistencies between U.S. and Canadian law regarding the identity of the taxpayer in the case of a particular taxable event. For example, the fact that the taxpayer is the decedent's estate for purposes of U.S. estate taxation and the decedent for purposes of Canadian income taxation will not prevent the allowance of a credit under paragraph 7 for Canadian income taxes imposed by reason of the death of the decedent.

In addition, subparagraph 7(c) clarifies that the credit against the U.S. estate tax generally may be claimed only to the extent that no credit or deduction is claimed for the same amount of Canadian tax in determining any other U.S. tax. This makes clear, for example, that a credit may not be claimed for the same amount under both this provision and Article XXIV (Elimination of Double Taxation). To prevent double taxation, an exception to this restriction is provided for certain taxes imposed with respect to qualified domestic trusts. Subject to the limitations of subparagraph 7(c), the taxpayer may choose between relief under Article XXIV, relief under this paragraph 7, or some combination of the two.

***Relief for small estates.***

Under paragraph 8, the United States agrees to limit the application of its estate tax in the case of certain small estates of Canadian resident decedents. This provision is intended to eliminate the "trap for the unwary" that exists for such decedents, in the absence of an estate tax convention between the United States and Canada. In the absence of sophisticated estate tax planning, such decedents may inadvertently subject their estates to U.S. estate tax liability by holding shares of U.S. corporate stock or other U.S. situs property. U.S. resident decedents are already protected in this regard by the provisions of Article XIII (Gains) of the present Convention, which prohibit Canada from imposing its income tax on gains deemed realized at death by U.S. residents on such property.

Paragraph 8 provides relief only in the case of Canadian resident decedents whose entire gross estates wherever situated (i.e., worldwide gross estates determined under U.S. law) have a value, at the time of death, not exceeding $1.2 million. Paragraph 8 provides that the United States may impose its estate tax upon property forming part of such estates only if any gain on alienation of the property would have been subject to U.S. income taxation under Article XIII (Gains). For estates with a total value not exceeding $1.2 million, this provision has the effect of

permitting the United States to impose its estate tax only on real property situated in the United States within the meaning of Article XIII, and personal property forming part of the business property of a U.S. permanent establishment or fixed base.

### Saving clause exceptions.

Certain provisions of Article XXIX B are included in the list of exceptions to the general "saving clause" of Article XXIX (Miscellaneous Rules), as amended by Article 17 of the Protocol. To the extent that an exception from the saving clause is provided for a provision, each Contracting State is required to allow the benefits of that provision to its residents (and, in the case of the United States, its citizens), notwithstanding the saving clause. General saving clause exceptions are provided for paragraphs 1, 5, and 6 of Article XXIX B. Saving clause exceptions are provided for paragraphs 2, 3, 4, and 7, except for the estates of former U.S. citizens referred to in paragraph 2 of Article XXIX.

### Effective dates.

Article 21 of the Protocol contains special retrospective effective date provisions for paragraphs 2 through 8 of Article XXIX B and certain related provisions of the Protocol. Paragraphs 2 through 8 of Article XXIX B and the specified related provisions generally will take effect with respect to deaths occurring after the date on which the Protocol enters into force (i.e., the date on which the instruments of ratification are exchanged). However, the benefits of those provisions will also be available with respect to deaths occurring after November 10, 1988, provided that a claim for refund due as a result of these provisions is filed by the later of one year from the date on which the Protocol enters into force or the date on which the applicable period for filing such a claim expires under the domestic law of the Contracting State concerned. The general effective dates set forth in Article 21 of the Protocol otherwise apply.

It is unusual for the United States to agree to retrospective effective dates. In this case, however, the negotiators believed that retrospective application was not inappropriate, given the fact that the TAMRA provisions were the impetus for negotiation of the Protocol and that the negotiations commenced soon after the enactment of TAMRA. The United States has agreed to retrospective effective dates in certain other instances (e.g., in the case of the U.S.-Germany estate tax treaty). The retrospective effective dates apply reciprocally, so that they will benefit the estates of U.S. decedents as well as Canadian decedents.

ARTICLE 20

Article 20 of the Protocol does not amend the text of the Convention. It states two understandings between the Contracting States regarding future action relating to matters dealt with in the Protocol. Paragraph 1 requires the appropriate authorities of the Contracting States to consult on two matters within three years from the date on which the Protocol enters into force. First, they will consult with a view to agreeing to further reductions in withholding rates on dividends, interest and royalties under Articles X, XI, and XII, respectively. This provision reflects the fact that, although the Protocol does significantly reduce withholding rates, the United

States remains interested in even greater reductions, to further open the capital markets and fulfill the objectives of the North American Free Trade Agreement. Second, the appropriate authorities of the Contracting States will consult about the rules in Article XXIX A (Limitation on Benefits). By that time, both Contracting States will have had an opportunity to observe the operation of the Article, and the United States will have had greater experience with the corresponding provisions in other recent U.S. tax conventions.

Paragraph 2 of Article 20 also requires consultations between the appropriate authorities, after the three-year period from the date on which the Protocol enters into force, to determine whether to implement the arbitration procedure provided for in paragraph 6 of Article XXVI (Mutual Agreement Procedure), added by Article 14 of the Protocol. The three-year period is intended to give the authorities an opportunity to consider how arbitration has functioned in other tax conventions, such as the U.S.-Germany Convention, before implementing it under this Convention.

ARTICLE 21

Article 21 of the Protocol provides the rules for the entry into force of the Protocol provisions. The Protocol will be subject to ratification according to the normal procedures in both Contracting States and instruments of ratification will be exchanged as soon as possible. Upon the exchange of instruments, the Protocol will enter into force.

Paragraph 2(a) of Article 21 generally governs the entry into force of the provisions of the Protocol for taxes withheld at source, while paragraph 2(b) generally governs for other taxes. Paragraphs 3, 4, and 5 provide special rules for certain provisions.

Paragraph 2(a) provides that the Protocol generally will have effect for taxes withheld at source on dividends, interest, royalties, and pensions and annuities (other than social security benefits), under Articles X, XI, XII, and XVIII, respectively, with respect to amounts paid or credited on or after the first day of the second month following the date on which the Protocol enters into force (i.e., the date on which instruments of ratification are exchanged). However, with respect to direct investment dividends, the 5 percent rate specified in paragraph 2(a) of Article X will be phased in as follows:

(1) for dividends paid or credited after the first day of the second month referred to above, and during 1995, the rate of withholding will be 7 percent;

(2) for dividends paid or credited after the first day of the second month, and during 1996, the rate will be 6 percent; and

(3) for dividends paid or credited after the first day of the second month and after 1996, the rate will be 5 percent.

For taxes other than those withheld at source and for the provisions of the Protocol relating to taxes withheld on social security benefits, the Protocol will have effect with respect to taxable years beginning on or after the first day of January following the date on which the Protocol enters into force. However, the rate of tax applicable to the branch tax under paragraph 6 of Article X (Dividends) will be phased in a manner similar to the direct investment dividend

withholding tax rate; that is, a rate of 6 percent will apply for taxable years beginning in 1996 and a rate of 5 percent will apply for taxable years beginning in 1997 and subsequent years.

Paragraph 3 of Article 21 provides a special effective date for the provisions of the new Article XXVI A (Assistance in Collection) of the Convention, introduced by Article 15 of the Protocol. Collection assistance may be granted by a Contracting State with respect to a request by the other Contracting State for a claim finally determined by the requesting State after the date that is ten years before the date of the entry into force of the Protocol. Thus, for example, if instruments of ratification are exchanged on July 1,1995, assistance may be given by Canada under Article XXVI A for a claim that was finally determined in the United States at any time after July 1, 1985.

Paragraph 4 of Article 21 provides special effective date provisions for paragraphs 2 through 7 of the new Article XXIX B (Taxes Imposed by Reason of Death) of the Convention, introduced by Article 18 of the Protocol, and certain related provisions elsewhere in the Convention. These special effective date provisions are discussed above in connection with Article 18.

Finally, paragraph 5 of Article 21 provides a special effective date for paragraph 2 of Article 3 of the Protocol, which provides a new residence rule for certain "continued" corporations. Under paragraph 5, the new residence rule for such corporations will have effect for taxable years beginning on or after the first day of January following the date on which the Protocol enters into force.


PROTOCOL 4

DEPARTMENT OF THE TREASURY TECHNICAL EXPLANATION OF THE
PROTOCOL BETWEEN THE UNITED STATES OF AMERICA AND CANADA
SIGNED AT OTTAWA ON JULY 29, 1997 AMENDING THE CONVENTION
BETWEEN THE UNITED STATES OF AMERICA AND CANADA
WITH RESPECT TO TAXES ON INCOME AND ON CAPITAL
SIGNED AT WASHINGTON ON SEPTEMBER 26, 1980 AS AMENDED BY THE
PROTOCOLS SIGNED ON JUNE 14, 1983, MARCH 28, 1984 AND MARCH 17, 1995

GENERAL EFFECTIVE DATE UNDER ARTICLE XXX: 1 JANUARY 1985

INTRODUCTION

This document is a technical explanation of the Protocol Between the United States of America and Canada signed on July 29, 1997 (the "Protocol") amending the Convention Between the United States of America and Canada With Respect to Taxes on Income and on Capital Signed at Washington on September 26, 1980 as Amended by the Protocols Signed on June 14, 1983, March 28, 1984 and March 17, 1995 (the "Convention").

This technical explanation is an official guide to the Protocol. It reflects the policies

behind particular Protocol provisions, as well as understandings reached with respect to the application and interpretation of the Protocol. References in this technical explanation to "he" or "his" should be read to mean "he or she" or "his or her."


## ARTICLE 1

Article 1 of the Protocol amends paragraph 3 of Article XIII (Gains) of the Convention. Paragraph 1 of Article XIII of the Convention provides that gains derived by a resident of a Contracting State from the alienation of real property situated within the other Contracting State may be taxed in that other State. The term "real property situated in the other Contracting State" is defined for this purpose in paragraph 3 of Article XIII of the Convention.

Under paragraph 3(a) of Article XIII of the Convention, real property situated in the United States includes real property (as defined in Article VI (Income from Real Property) of the Convention) situated in the United States and a United States real property interest. Under section 897(c) of the Internal Revenue Code (the "Code") the term "United States real property interest" includes shares in a U.S. corporation that owns sufficient U.S. real property interests to satisfy an asset-ratio test on certain testing dates.

Under Paragraph 3(b) of Article XIII of the Convention, real property situated in Canada means real property (as defined in Article VI of the Convention) situated in Canada; shares of stock of a company, the value of whose shares consists principally of Canadian real property; and an interest in a partnership, trust or estate, the value of which consists principally of Canadian real property. The term "principally" means more than 50 percent.

Under the Code, stock of a foreign corporation is not considered a "United States real property interest." Therefore, the United States does not tax a resident of Canada on the sale of stock of a foreign corporation, regardless of the composition of the corporation's assets. Although the Convention permits Canada to tax a U.S. resident on the sale of stock of a company that is not a resident of Canada if the value of the company's shares consists principally of Canadian real property, Canada does not currently impose such a tax. However, on April 26, 1995, amendments were proposed to the Canadian Income Tax Act that would impose Canadian income tax on gains realized on stock of certain companies that are not residents of Canada if

> (i) more than 50 percent of the fair market value of all of the company's properties consists of any combination of taxable Canadian property, Canadian resource property, timber resource property in Canada and income interests in Canadian trusts, and

> (ii) more than 50 percent of the fair market value of the shares in question is derived directly or indirectly from any combination of real property located in Canada, Canadian resource property, and timber resource property in Canada.

This amendment is proposed to be effective as of April 26, 1995 with proration for gains that accrued before that date. Although the Canadian Parliament was dissolved before these amendments were passed, they are expected to be re-introduced in the current session with the same effective date.

The Protocol amends paragraphs 3(a) and 3(b)(ii) of Article XIII of the Convention to limit each State's right to tax the gains of a resident of the other State from the sale of stock of a real property holding company to cases where the company is resident in that State. Although the United States does not impose and is not currently considering imposing a tax under the Code on gains from the sale of stock of nonresident real property holding companies, the Protocol nevertheless amends the Convention to prohibit the imposition of such a tax on Canadian residents. Although Canada is considering imposing such a tax on gains from the sale of shares of companies that are not residents of Canada, this Protocol provision will cause the proposed amendments to the Canadian Income Tax Act to be inapplicable to U.S. residents who derive gains from the sale of stock of real property holding companies that are not residents of Canada. This provision will be retroactively effective to April 26, 1995, the date the previous Canadian legislation was proposed to be effective.

ARTICLE 2

*Paragraph 1*

Paragraph 1 of Article 2 of the Protocol amends paragraph 3 of Article XVIII (Pensions and Annuities) of the Convention to clarify that social security benefits paid by one Contracting State in respect of services rendered to that State or a subdivision or authority of that State are subject to the rules set forth in paragraph 5 of Article XVIII, and are not subject to Article XIX (Government Service). Thus, all social security benefits paid by a Contracting State will be subject to the same rules, regardless of whether the services were rendered to a private sector employer, the government, or both.

*Paragraph 2*

Paragraph 2 of Article 2 of the Protocol amends paragraph 5 of Article XVIII of the Convention, which provides rules for the taxation of social security benefits (including tier 1 railroad retirement benefits but not including unemployment benefits), and reverses changes made by the third protocol to the Convention, which was signed on March 17, 1995 and generally took effect as of January 1, 1996 (the "1995 Protocol"). Under the Convention prior to amendment by the 1995 Protocol, the State of residence of the recipient of social security benefits had the exclusive right to tax social security benefits paid by the other State on a net basis but exempted 50 percent of the benefit. This was changed by the 1995 Protocol. Under the 1995 Protocol, effective January 1, 1996 benefits paid under the U.S. or Canadian social security legislation to a resident of the other Contracting State (or, in the case of Canadian benefits, paid to a U.S. citizen) are taxable exclusively in the paying State.

Canada and the United States impose different source-basis taxing regimes on social security benefits. Under Code section 871(a)(3), 85 percent of social security benefits paid to a nonresident alien are includible in gross income. The taxable portion of social security benefits is subject to the regular 30 percent withholding tax, with the result that the gross social security benefit is subject to an effective tax rate of 25.5 percent. This is a final payment of tax and

Canadian recipients of U.S. social security benefits, regardless of their level of income, may not elect to be taxed in the United States on a net basis at graduated rates.

In Canada, social security benefits paid to nonresidents are subject to a general withholding tax of 25 percent. However, Canada permits U.S. recipients of Canadian benefits to file a Canadian tax return and pay tax at regular graduated rates on their net income. As a result, low-income U.S. recipients of Canadian social security typically pay little or no tax on their benefits.

The Protocol returns to a system of residence-based taxation in which social security benefits are exclusively taxable in the State where the recipient lives. Social security benefits will generally be taxed as if they were benefits paid under the social security legislation in the residence State. Therefore, social security benefits will be taxed on a net basis at graduated rates and low-income recipients will not pay any tax on these benefits. However, the Protocol modifies the residence State's taxation of cross-border benefits in order to take into account how the benefits would have been taxed in the source State if paid to a resident of that State.

In the case of Canadian recipients of U.S. social security benefits, the Protocol provides that only 85 percent of these benefits will be subject to tax in Canada. This reflects the fact that, although in Canada social security benefits are fully includible, a maximum of 85 percent of United States social security benefits are includible in income for U.S. tax purposes. See Code section 86. This is also consistent with the taxation of social security benefits under the Convention prior to the effective date of the 1995 Protocol, since at the time the pre-1996 rule was adopted the United States included a maximum of 50 percent of the social security benefits in income.

In the case of U.S. recipients of Canadian social security benefits, the Protocol provides that the benefits will be taxed as if they were payments under the Social Security Act. Therefore, a maximum of 85 percent of the Canadian benefits will be included in the gross income of a U.S. recipient, even though the entire benefit would have been taxed by Canada if received by a Canadian resident. However, if the Canadian benefit is of a type that is not subject to Canadian tax when paid to a resident of Canada, it will not be subject to U.S. tax when received by a resident of the United States. This provision is necessary to take into account certain proposed changes to Canada's Old Age Security benefits. At present, Old Age Security benefits paid to U.S. residents are subject to both ordinary Canadian income tax and an additional "recovery tax" that has the effect of means-testing the benefit. Canada has proposed to change the Old Age Security benefit system so that the benefit would be means-tested at source and not subject to the recovery tax. Because the amount of such future benefits will have already been reduced to take into account the recipient's income, it would not be appropriate to subject such benefits to additional U.S. tax.

ARTICLE 3

Article 3 of the Protocol contains the rules for bringing the Protocol into force and giving effect to its provisions.

*Paragraph 1*

Paragraph 1 provides for the ratification of the Protocol by both Contracting States according to their constitutional and statutory requirements and instruments of ratification will be exchanged as soon as possible.

In the United States, the process leading to ratification and entry into force is as follows: Once a protocol has been signed by authorized representatives of the two Contracting States, the Department of State sends the protocol to the President who formally transmits it to the Senate for its advice and consent to ratification, which requires approval by two-thirds of the Senators present and voting. Prior to this vote, however, it generally has been the practice for the Senate Committee on Foreign Relations to hold hearings on the protocol and make a recommendation regarding its approval to the full Senate. Both Government and private sector witnesses may testify at these hearings. After receiving the advice and consent of the Senate to ratification, the protocol is returned to the President for his signature on the ratification document. The President's signature on the document completes the process in the United States.

*Paragraph 2*

Paragraph 2 of Article 3 provides that the Protocol will enter into force on the date on which the instruments of ratification are exchanged. However, the date on which the Protocol enters into force will not be the date on which its provisions will take effect. Paragraph 2, therefore, also contains rules that determine when the provisions of the Protocol will have effect.

Under paragraph 2(a), Article 1 of the Protocol will have effect as of April 26, 1995. As discussed above, this is the date on which certain proposed amendments to Canadian law would be effective.

Under paragraph 2(b), Article 2 of the Protocol will have effect as of January 1, 1996, which is the date as of which the changes to the taxation of social security benefits that were implemented by the 1995 Protocol became effective. Consequently, the source-basis taxation of social security benefits that was implemented by the 1995 Protocol will be retroactively eliminated and recipients of cross-border social security benefits will be entitled to a refund of any source-State tax withheld on their benefits for 1996 and later years. This return to residence-basis taxation of social security benefits means that some high-income recipients of cross-border benefits may be required to pay additional taxes to their State of residence if their average tax rate on these benefits in their State of residence is higher than the current rate of source-State withholding tax. It is only for future years, however, that such high-income recipients of benefits will be subject to a higher rate of tax. No one will be subject to a higher rate of tax for the retroactive period. If, as a result of the change, the residence-State tax would exceed the amount of the refund otherwise due, there will be neither a refund of source-State tax nor the imposition of additional residence-State tax.

Subparagraphs (b)(i) and (ii) provide rules that determine how the retroactive effect of the Protocol will generally be implemented for the year in which the Protocol enters into effect. As

discussed below, these rules are required as a result of administrative limitations on the ability of the relevant Government organizations to effect the payment of refunds. Withholding taxes imposed by the United States on cross-border social security benefits are collected and administered by the Social Security Administration (SSA), not the Internal Revenue Service (IRS). However, any refunds of withholding tax improperly collected on social security benefits are ordinarily paid by the IRS. If the Protocol enters into force prior to September 1 of a calendar year, it is possible for the SSA to pay refunds of the tax withheld for the entire year directly to the individual Canadian recipient. If the Protocol enters into force after August 31 of a calendar year, it will not be possible for SSA to pay refunds of tax withheld for that year and refunds must be paid through the IRS.

Paragraphs 3, 4 and 5 of Article 3 establish administrative procedures to govern the payment of refunds through the IRS, including rules to ensure that benefits will not be subject to a higher rate of tax in the residence State for the retroactive period. The taxes withheld on social security benefits paid for years after 1995 and prior to the calendar year in which the Protocol enters into force (referred to in the Protocol as "source-taxed benefits") will be subject to the refund procedures set forth in paragraphs 3, 4, and 5, regardless of when the Protocol enters into force. Social security benefits paid for calendar years beginning after the Protocol enters into force will not be subject to the refund procedures set forth in paragraphs 3, 4, and 5 because source State tax will not be withheld.

If the Protocol enters into force after August 31 of a calendar year, subparagraph (b)(i) provides that social security benefits paid during such calendar year will be treated as benefits paid for calendar years ending before the year in which the Protocol enters into force (and thus will be treated as "source-taxed benefits"). In this case, the taxes withheld on these benefits will be subject to the refund procedures set forth in paragraphs 3, 4, and 5 of Article 3 and these benefits will not be subject to a higher rate of residence-State tax. If the Protocol enters into force before September 1 of a calendar year, subparagraph (b)(ii) provides that social security benefits paid during such calendar year will be treated as benefits paid for calendar years beginning after the year in which the Protocol enters into force. In this case, the taxes withheld on these benefits will be directly and automatically refunded by the source State and the potentially higher rate of residence-State tax will apply.

*Paragraph 3*

Paragraph 3 of Article 3 of the Protocol provides rules governing the payment of refunds of source-State tax with respect to "source-taxed benefits." In general, all applications for refund must be made to the competent authority of the source State within three years of entry into force of the Protocol.

Except as set forth in subparagraph (b) of paragraph 2, the retroactive effect of the Protocol is elective and applies only if a recipient of benefits applies for a refund of the tax paid or withheld. Consequently, if a recipient of benefits does not apply for a refund of the tax paid or withheld, the Protocol will not be given retroactive effect, except as set forth in subparagraph (b) of paragraph 2. If the residence-State tax that would be imposed on such source-taxed benefits is greater than the source-State tax imposed on such benefits, it is assumed that the recipient will not

apply for a refund of the source-State tax and such benefits will not be subject to the retroactive effect of the Protocol. Because the application for refund may be made on a year-by-year basis, the recipient may elect the most beneficial treatment for each year. Therefore, social security benefits will not be subject to a higher rate of tax for the retroactive period, except as set forth in subparagraph (b) of paragraph 2.

The refund procedure depends on the recipient's State of residence. In the case of U.S. residents who received Canadian social security benefits that were subject to Canadian tax, a U.S. resident who elects to have the Protocol apply retroactively will apply directly to the Canadian competent authority for the refund of any Canadian tax not previously refunded. On the receipt of such refund, the Canadian social security benefits will be includible in the U.S. resident's gross income for the years with respect to which the refund was paid. Consequently, the U.S. recipient may be required to file an amended U.S. income tax return for such years and pay U.S. tax on such benefits. Pursuant to Article XXVII (Exchange of Information) of the Convention, the Canadian competent authority will provide the U.S. competent authority with information regarding the payment of refunds.

In the case of Canadian residents who received U.S. social security benefits, the Canadian competent authority shall be the only person entitled to apply for a refund of the U.S. taxes withheld on such benefits. Individual residents of Canada will not apply directly to the IRS for refunds. However, the Canadian competent authority may base its applications on information received from individual Canadians, as well as on information to be provided by the United State competent authority. The Protocol provides that the Canadian competent authority shall apply for and receive all such refunds on behalf of individual residents of Canada and shall remit such refunds to individual residents of Canada after deducting any additional Canadian tax that may be imposed as a result of such social security benefits being subject to tax in Canada. The Canadian competent authority shall make such application for refund on behalf of an individual resident of Canada only if the additional Canadian tax that would be imposed is less than the amount of the U.S. tax to be refunded. If, with respect to an individual resident of Canada, the additional Canadian tax that would be imposed on the individual's social security benefits is equal to or greater than the U.S. tax withheld, the Canadian competent authority shall not apply for a refund of the U.S. tax withheld on the individual's benefits. This provision ensures that refunds of U.S. tax will be paid only when the refund will benefit an individual resident of Canada. A refund of U.S. tax will not be paid if it would simply result in a payment from the U.S. Treasury to the Government of Canada without any portion of the refund being paid to an individual resident of Canada.

*Paragraph 4*

Paragraph 4 provides that all taxes refunded as a result of the Protocol will be refunded without interest. Consequently, any additional taxes assessed as a result of the Protocol will be assessed without interest provided that the additional taxes are paid in a timely manner. However, interest and penalties on underpayments may be assessed for periods beginning after December 31 of the year following the year in which the Protocol enters into force.

*Paragraph 5*

Paragraph 5 provides that the competent authorities shall establish procedures for making or revoking the application for refund provided for in paragraph 3 and such other procedures as are necessary to ensure the appropriate implementation of the Protocol. It will be necessary to establish procedures for a taxpayer to revoke his application for refund because a taxpayer may apply for a refund and then determine that the residence-State tax imposed on his social security benefits pursuant to Article 2 of the Protocol exceeds the amount of source-State tax refunded. Such a taxpayer (or, in the case of a Canadian resident, the Canadian competent authority acting on behalf of such taxpayer) will be permitted to revoke his application for refund provided that the taxpayer returns the source-State refund and the three-year period established in paragraph 3 has not expired as of the date on which the revocation is filed. The competent authorities will also establish procedures to ensure that duplicate refunds are not paid.

# Exhibit 67

CHAPTER 3

# The Penal and Revenue Rules, State Law, and Federal Preemption

*William S. Dodge**

Under two longstanding rules, U.S. courts will not enforce the penal and revenue laws of foreign nations, nor the judgments of foreign courts based upon such laws.[1] In *Pasquantino v. United States*, the U.S. Supreme Court referred to both the revenue rule and the prohibition against enforcing foreign penal laws as rules of common law.[2] The Court did not say, however, whether this meant state or federal common law. The question in *Pasquantino* was whether a U.S. prosecution under the federal wire-fraud statute for defrauding Canada of taxes should be barred by the revenue rule, given "the canon of construction that '[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.'"[3] This presumption applies equally to state and federal common law,[4] which is why the Court did not have to categorize the revenue rule. And in any event, the Court held in

---

* The Honorable Roger J. Traynor Professor of Law and Associate Dean for Research, University of California, Hastings College of the Law. My thanks to Paul Stephan for encouraging me to think hard about my preconceptions, to Scott Dodson and Mike Ramsey for helpful comments, and to Emily Goldberg and Christopher McKinnon for outstanding research assistance.

1   *See* RESTATEMENT (SECOND) OF CONFLICTS § 89 (1971) ("No action will be entertained on a foreign penal cause of action."); *id.*, Reporter's Note (discussing tax claims); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 483 (1987) ("Courts in the United States are not required to recognize or to enforcement judgments for the collection of taxes, fines, or penalties rendered by the courts of other states."). *See generally* William S. Dodge, *Breaking the Public Law Taboo*, 43 HARV. INT'L L.J. 161 (2002).

2   *See* 544 U.S. 349, 353 (2005) (referring to "the common-law revenue rule"); *id.* at 361 (noting that "[t]he rule against the enforcement of foreign penal statutes . . . tracked the common-law principle that crimes could only be prosecuted in the country in which they were committed").

3   *Id.* at 359 (quoting United States v. Texas, 507 U.S. 529, 534 (1993)).

4   *See* United States v. Texas, 507 U.S. 529, 534 (1993) (rejecting argument that the "presumption favoring retention of existing law is appropriate only with respect to state common law").

© KONINKLIJKE BRILL NV, LEIDEN, 2014 | DOI 10.1163/9789004278929_005

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

*Pasquantino* that the common-law revenue rule did not clearly prohibit pros-
ecutions for evading foreign taxes when the wire-fraud statute was enacted.[5]

Lower federal courts, however, have considered the revenue rule to be *fed-
eral* common law.[6] The cases making this assertion have involved claims by
foreign governments to recover damages under the federal RICO statute for tax
revenues lost to smuggling. Federal courts have uniformly held such claims to
be barred by the revenue rule as an indirect enforcement of foreign tax laws.[7]
In one case, the foreign government brought suit not just under the federal
RICO statute but under its state counterpart, a claim the district court held to
be preempted because of the revenue rule's supposed status as federal com-
mon law.[8] According to a recent count, 35 States have their own RICO statutes,[9]
and the preemption of such state statutes in cases brought by foreign govern-
ments to recover lost tax revenues makes a certain amount of sense. As the
Second Circuit noted in what is still the leading case, the continuing vitality
of the revenue rule rests on its "congruence with the international tax policies
pursued by the political branches of our government."[10] As discussed below,
the United States has entered into tax treaties with many nations, only a few
of which provide for collection assistance.[11] The Second Circuit concluded that
"[d]eclining to apply the revenue rule in this case would arguably undermine

---

5    *See Pasquantino*, 544 U.S. at 560 ("We are aware of no common-law revenue rule case
     decided as of 1952 that held or clearly implied that the revenue rule barred the United
     States from prosecuting a fraudulent scheme to evade foreign taxes.").

6    *See* Republic of Honduras v. Philip Morris Companies, 341 F.3d 1253, 1256 (11th Cir. 2003)
     (adopting the revenue rule "as the rule of this circuit"); Republic of Ecuador v. Philip
     Morris Companies, Inc., 188 F. Supp. 2d 1359, 1366 (S.D. Fla. 2002) (referring to the
     revenue rule as "a federal common law rule"); European Community v. Japan Tobacco,
     Inc., 186 F. Supp. 2d 231, 235 n. 1 (E.D.N.Y. 2002) ("[T]his court understands the revenue
     rule to be a federal rule of common law.").

7    *See, e.g.*, Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d
     103, 106 (2d Cir. 2001); Republic of Honduras v. Philip Morris Companies, 341 F.3d 1253,
     1255 (11th Cir. 2003). *Pasquantino* left the question open, *see* 544 U.S. at 355 n. 1, and the
     Second Circuit has since distinguished *Pasquantino* and reaffirmed its position. *See*
     European Community v. RJR Nabisco, Inc., 424 F.3d 175 (2d Cir. 2005).

8    *See Republic of Ecuador*, 188 F. Supp. 2d at 1366 (noting that "the Florida legislature has no
     authority under the supremacy clause to eradicate a federal common law rule"); *see also*
     *European Community*, 186 F. Supp. 2d at 235 n. 1 (noting that, as a rule of federal common
     law, "[t]he revenue rule thus preempts any conflicting state law").

9    *See* G. Robert Blakey, *Time-Bars: RICO—Criminal and Civil—Federal and State*, 88 NOTRE
     DAME L. REV. 1581, 1592 n. 13 (2013) (giving citations).

10   *Attorney General of Canada*, 268 F.3d at 109.

11   *See infra* notes 121–30 and accompanying text.

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

the considered policy judgment of our political branches" and "would poten-
tially allow Canada to obtain assistance it has not negotiated for."[12] Letting for-
eign governments substitute state RICO claims for their federal ones would
have the same effect, undercutting the federal policy not to provide collection
assistance in the absence of a specific treaty provision.

But treating the revenue rule and its penal-law cousin as federal common
law raises other problems. First, it would be a significant departure from the
general rule that the conflict of laws and the recognition of foreign judg-
ments are governed by state law in the United States.[13] Second, it would call
into question a number of state laws that do *not* appear to contravene any
federal policy and seem otherwise unproblematic. For example, a number
of States have enacted double-jeopardy statutes that bar prosecution for an
offense of which the defendant has previously been convicted or acquitted
by a foreign country.[14] Such statutes clearly call for recognition of a foreign
penal judgment, and if the penal rule were a rule of federal common law,
they would seem to be preempted. But surely this would be federal overkill.
Under the dual sovereignty doctrine, States are not constitutionally required
to extend double-jeopardy protection based on foreign convictions and
acquittals,[15] but neither is such protection problematic. It contravenes no
federal policy established by treaty or statute, and is a choice that ought to
be open to the States.

This chapter argues for a middle course that would preempt state laws that
interfere with clear federal policies—like the U.S. policy against providing tax
collection assistance without a treaty provision—but would leave States free
to recognize foreign tax and penal laws and judgments when no clear federal
policy prohibits it. Doctrinally, this means treating the penal and revenue rules
as rules of *state* common law, but recognizing that (as in other areas) state
law may be preempted by clear federal policies, in this context, particularly
policies found in U.S. treaties. It is important to make clear at the outset that
whether the penal and revenue rules are federal or state common law does *not*
implicate the debate about whether customary international law should be

---

12  *Attorney General of Canada*, 268 F.3d at 122.

13  *See infra* Section 2.

14  *See infra* notes 39–40 and accompanying text.

15  *See* United States v. Studabaker, 578 F.3d 423, 430 (6th Cir. 2009); United States v.
Villanueva, 408 F.3d 193, 201 (5th Cir. 2005); United States v. Rezaq, 134 F.3d 1121, 1128
(D.C. Cir. 1998).

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

treated as federal or state law in the United States.[16] The rules against enforcing foreign penal and tax laws are rules of domestic law and not rules of customary international law.[17] Thus, the penal and revenue rules may be rules of state common law even if customary international law is considered to be federal common law, or *vice versa*.

Section 1 of this chapter frames the issue by describing the contours of the penal and revenue rules. Section 2 notes that the conflict of laws and the recognition of judgments have generally been seen as questions of state law in the United States, and describes how the penal and revenue rules have been treated historically against that state-law background. Section 3 considers the case for treating the penal and revenue rules as federal common law, noting that the case is weaker than might be supposed and broader than necessary. Finally, Section 4 sets forth an alternative theory of preemption—based on conflict with clearly established federal policy—that is narrower and more defensible than treating the penal and revenue rules as federal common law.

## 1      The Scope of the Rules

To appreciate the implications of allowing States to depart from the penal and revenue rules, or of federal law preempting such departures, it is useful to understand the contours of these two rules. Both rules developed at common law,[18] and U.S. courts have frequently looked to the decisions of other common-law countries to define their scope.[19] Nevertheless, whether a particular law or judgment falls within one of the rules is a question of U.S. law.[20]

---

16   *Compare* Curtis A. Bradley & Jack L. Goldsmith, *Customary International Law as Federal Common Law: A Critique of the Modern Position*, 110 Harv. L. Rev. 815 (1997), *with* Harold Hongju Koh, *Is International Law Really State Law?*, 111 Harv. L. Rev. 1824 (1998).

17   *See* Restatement (Third) of Foreign Relations Law § 483 (noting that "[n]o rule of international law would be violated if a court in the United States enforced a judgment of a foreign court for payment of taxes"); International Law Association, *Report of International Committee on Transnational Recognition and Enforcement of Foreign Public Laws*, in Report of the Sixty-Third Conference 719, 751 (1988) (observing that "there is no general rule of public international law prohibiting the transnational recognition or enforcement of foreign public laws as such").

18   *See generally* Dodge, *supra* note 1.

19   *See, e.g.*, Pasquantino v. United States, 544 U.S. 349, 362–368 (2005); Huntington v. Attrill, 146 U.S. 657, 680–83 (1892).

20   *See Huntington*, 146 U.S. at 483 ("The test is not by what name the statute is called by the legislature or the courts of the state in which it was passed, but whether it appears, to

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

On the scope of the penal rule, the Supreme Court's decision in *Huntington v. Attrill* is still the leading case. *Huntington* held that a law is "penal" for the purposes of this rule if "its purpose is to punish an offence against the public justice of the State" rather than "to afford a private remedy to a person injured by the wrongful act."[21] Under this definition, not all suits brought by foreign governments are penal.[22] Thus, a U.S. court has allowed the United Kingdom to recover funds embezzled by the defendants,[23] while a Canadian court has allowed the United States to enforce a judgment for clean-up costs under CERCLA.[24] Courts have also held that the penal rule does not bar a foreign government from seeking restitution for the benefit of private persons.[25]

Suits by private parties may be barred under the penal rule if brought in the name of the state, as with a *qui tam* action.[26] But the rule does not bar claims under foreign competition law, for example, because the plaintiff seeks to recover based on its own injury, even though the plaintiff is sometimes

---

the tribunal which is called upon to enforce it, to be, in its essential character and effect, a punishment of an offense against the public, or a grant of a civil right to a private person.").

21    *Id.* at 673–74.

22    *See* Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 290 (1888) (noting that U.S. courts "have entertained suits by a foreign state . . . to enforce demands of a strictly civil nature").

23    *See* Bullen v. United Kingdom, 553 So. 2d 1344, 1345 (Fla. App. 1989) (analogizing the foreign government to an ordinary judgment creditor). It made no difference to the court that the funds unlawfully retained by the defendants had been collected as Value Added Tax. *See id.*

24    *See* United States v. Ivey, 139 D.L.R.4th 570, 574 (Ont. C.A. 1996) (noting that the CERCLA claim "is so close to a common law claim for nuisance that it is, in substance, of a commercial or private law character").

25    *See* United States Securities and Exchange Commission v. Manterfield, [2009] EWCA Civ. 27, ¶ 24 (Eng. & Wales) (noting that "[t]he substance of what the SEC will seek to enforce . . . is the disgorgement of what they allege to be the proceeds of fraud"); Evans v. European Bank Ltd., [2004] NSWCA 82, ¶ 83 (Austl.) (enforcing U.S. judgment under Federal Trade Commission Act for disgorgement proceeds of credit card fraud even though surplus might go to U.S. Treasury because "as a matter of substance, this is a proceeding designed to compensate persons who have been defrauded"). So long as the judgment is not penal, U.S. courts have considered it irrelevant that the judgment was rendered in a criminal proceeding or pursuant to a criminal statute. *See* Mexican Nat'l R.R. Co. v. Slater, 115 F. 593, 602–03 (5th Cir. 1902), *aff'd*, 194 U.S. 120 (1904); Chase Manhattan Bank, N.A. v. Hoffman, 665 F. Supp. 73, 76 (D. Mass. 1987).

26    *See Huntington*, 146 U.S. at 673 (noting that *qui tam* actions "may stand on the same ground as suits brought for such a penalty in the name of the state or of its officers, because they are equally brought to enforce the criminal law of the state").

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

characterized as a "private attorney general."[27] Neither are claims by private parties for multiple or punitive damages considered "penal."[28]

A tax claim, for purposes of the revenue rule, is "a claim for an assessment of a tax, whether imposed in respect of income, property, transfer of wealth, or transactions in the taxing state."[29] The revenue rule has been held to bar both direct and indirect enforcement of tax claims.[30] Thus, courts have denied liquidators' requests to recover assets to satisfy foreign tax claims.[31] As noted above, U.S. courts have also rejected under the revenue rule efforts by foreign governments to use the federal RICO statute to recover tax revenues lost to smuggling.[32] Although the question of indirect enforcement has arisen less frequently in a penal context, at least one court has held that the penal rule barred enforcement of a civil judgment on an appearance bond against a criminal defendant who fled the jurisdiction.[33]

The fact that the penal and revenue rules bar both direct and indirect enforcement does not, however, prevent courts from taking account of foreign tax and penal laws and judgments in other ways. Some of these ways are quite well established. In determining whether performance of a contract should

---

27    *See* Dodge, *supra* note 1, at 189–93; F.A. Mann, *The International Enforcement of Public Rights*, 19 N.Y.U. J. Int'l L. & Pol. 603, 614–15 (1987); *see, e.g.*, Old N. State Brewing Co. v. Newlands Services Inc., 58 B.C.L.R. 3d 144 (B.C.C.A. 1998) (Can.) (noting that "until the Attorney General of Canada invokes the provisions of the Foreign Extraterritorial Measures Act, treble damage awards based even on anti-trust laws are enforceable").

28    *See Huntington*, 146 U.S. at 667–68; S.A. Consortium Gen. Textiles v. Sun & Sand Agencies, [1978] 1 Q.B. 279, 299–300 (C.A.) ("The word 'penalty' . . . means, I think, a sum payable to the state by way of punishment and not a sum payable to a private individual, even though it is payable by way of exemplary damages.").

29    Restatement (Third) of Foreign Relations § 483 cmt. c.

30    *See* Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103, 130 (2001) ("a court must examine whether the substance of the claim is, either directly or indirectly, one for tax revenues"); QRS 1 APS v. Frandsen, [1999] 3 All E.R. 289, 291 (C.A.) ("our courts will not directly or indirectly enforce the penal, revenue or other public laws of another country").

31    *See QRS*, [1999] 3 All E.R. 289; Peter Buchanan Ltd. v. McVey, [1955] A.C. 516 (Ir. H. Ct. 1950), *aff'd*, [1954] A.C. 530 (Ir. S. Ct. 1951).

32    *See, e.g., Attorney General of Canada*, 268 F.3d at 131 ("[A]t bottom, Canada would have a United States court require defendants to reimburse Canada for its unpaid taxes, plus a significant penalty due to RICO's treble damages provision. Thus, Canada's object is clearly to recover allegedly unpaid taxes.").

33    *See* United States v. Inkley, [1989] 1 Q.B. 255, 265 (C.A. 1988) (noting that "whole purpose of the bond was to ensure, so far as it was possible, the presence of the executor of the bond to meet justice at the hands of the state in a criminal prosecution").

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

be excused on grounds of impracticability, for example, U.S. courts will consider whether the performance was prohibited by foreign law, which obviously would include foreign criminal law.[34] Similarly, in *Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, the U.S. Supreme Court took account of foreign criminal laws prohibiting the production of bank records in holding that dismissal of the complaint was too harsh a sanction for non-compliance with a discovery order.[35] In circumstances such as these, U.S. courts do not enforce foreign penal laws either directly or indirectly but rather treat them as facts about the world upon which the application of certain domestic laws must depend.

A number of States have also passed repeat-offender statutes that expressly require consideration of criminal convictions in other countries.[36] "Habitual criminal statutes do not punish defendants for their previous offenses, but for their persistence in crime."[37] Because these laws consider foreign criminal convictions only for the purpose of determining how harshly to punish a *new* offense under U.S. domestic law, they do not violate the rule against enforcing foreign penal judgments.[38]

---

34  *See* Uniform Commercial Code § 2–615(a) (excusing performance that "has been made impracticable . . . by compliance in good faith with any applicable foreign or domestic governmental regulation"); Restatement (Second) of Contracts § 264 (1981) (excusing performance that "is made impracticable by having to comply with a domestic or foreign governmental regulation or order").

35  357 U.S. 197, 211 (1958) ("It is hardly debatable that fear of criminal prosecution constitutes a weighty excuse for nonproduction, and this excuse is not weakened because the laws preventing compliance are those of a foreign sovereign.").

36  *See, e.g.*, Cal. Penal Code § 668 ("Every person who has been convicted in any other state, government, *country*, or jurisdiction of an offense for which, if committed within this state, that person could have been punished under the laws of this state by imprisonment in the state prison, is punishable for any subsequent crime committed within this state in the manner prescribed by law and to the same extent as if that prior conviction had taken place in a court of this state." (emphasis added)); *see also* Fla. Stat. Ann. § 775.084(1)(e); La. Rev. Stat. Ann. § 15 529.1A; 21 Okla. Stat. Ann. § 54; Tenn. Code Ann. § 40–35–106 (b)(5); 13 Vt. Stat. Ann. § 11 & § 11a.

37  Martha Kimes, *The Effect of Foreign Criminal Convictions under American Repeat Offender Statutes: A Case Against the Use of Foreign Crimes in Determining Habitual Criminal Status*, 35 Colum. J. Transnat'l L. 503, 507 (1997).

38  In *Small v. United States*, 544 U.S. 385 (2005), the Supreme Court held that the federal felon-in-possession-of-a-firearm statute, 18 U.S.C. § 944(g)(1), did not apply to persons convicted in foreign courts. Unlike the state statutes mentioned in the text, this federal statute made no express mention of foreign convictions. It is worth noting, however, that no member of the Court thought the rule against enforcing foreign penal judgments to be

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

As noted above, however, four States have laws requiring consideration of foreign penal judgments—convictions and acquittals—in a different way, as a bar to prosecution for the same offense under the law of that State.[39] California used to have a similar double-jeopardy statute, but amended it in 2004 to remove the bar to prosecution and instead to give credit for time served abroad for the crime.[40] These state statutes do not simply use the fact of a foreign conviction to determine how harshly to punish a new offense under domestic law. They instead recognize the foreign criminal judgment as a bar to a domestic prosecution (or in California's case as an offset against the sentence) in much the same way that giving *res judicata* effect to a foreign civil judgment precludes a new lawsuit. It seems difficult to avoid the conclusion that such laws call for the direct enforcement of foreign penal judgments. That is not problematic if the penal rule is a rule of *state* common law, for state statutes can override state common law. But if the penal rule is instead a rule of *federal* common law, then state double-jeopardy statutes would be preempted to the extent they require recognition of foreign convictions or acquittals. Such preemption would be a departure from the general rule that the recognition and enforcement of foreign judgments in the United States is governed by state law, to which this chapter now turns.

## 2    The State Law Background

In the United States today, both the conflict of laws (on which the enforcement of foreign law turns) and the recognition and enforcement of foreign judgments

---

implicated by the interpretation of the federal statute. This is particularly striking because *Small* was decided on the very same day the Court handed down *Pasquantino*, which considered how to construe the federal wire-fraud statute in light of the revenue rule. *See supra* notes 2–5 and accompanying text.

39    *See, e.g.*, Idaho Code Ann. § 19-315 ("When an act charged as a public offense, is within the venue of another state, territory, or *country*, as well as of this state, a conviction or acquittal thereof in the former is a bar to the prosecution or indictment therefor in this state." (emphasis added)); *see also* Miss. Code Ann. § 99-11-27; N.D. Cent. Code Ann. § 29-03-13; Wash. Rev. Stat. § 10.43.040. Under the dual sovereignty doctrine, such prosecutions are not barred by the Double Jeopardy Clause of the U.S. Constitution. *See supra* note 15.

40    *See* A.B. 1432, Stats. 2004, ch. 511, § 1, p. 4109 (codified at Cal. Penal Code §§ 656, 656.5, 656.6, 793, 793.5).

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

are generally governed by state law.[41] It was not always thus. Before *Erie*,[42] the conflict of laws was considered part of the general common law, which state and federal courts administered independently and without any obligation to follow the decisions of the other. The first *Restatement of Conflicts*—published in 1934, just four years before *Erie*—described its purpose "to present an orderly statement of the general common law of the United States,"[43] and its reporter Joseph Beale noted that "the federal and the state courts may differ in their interpretation."[44] The same was true in the area of judgments, where state courts felt no obligation to follow the Supreme Court's decision in *Hilton v. Guyot* requiring reciprocity as a condition for recognizing foreign judgments,[45] and the Supreme Court itself held that the recognition of foreign judgments by state courts did not present a federal question.[46]

In 1938 *Erie* famously declared: "There is no federal general common law."[47] Three years later, in *Klaxon*, the Supreme Court said this meant that "[t]he conflict of laws rules to be applied by the federal court in Delaware must conform

---

41    *See* Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941) (conflict of laws); Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1971), *cert. denied*, 405 U.S. 1017 (1972) (enforcement of judgments).

42    *See* Erie Railroad v. Tompkins, 304 U.S. 64 (1938).

43    RESTATEMENT OF CONFLICTS viii (1934); *see also* 1 JOSEPH H. BEALE, A TREATISE ON THE CONFLICT OF LAWS § 1.12, at 10 (1935) (noting that the conflict of laws "is a branch of the ordinary private law of each country, and is based upon the same sources as general law").

44    BEALE, *supra* note 43, § 3.3, at 22. During the late-nineteenth and early-twentieth centuries, the Supreme Court constitutionalized certain aspects of the conflict of laws. *See, e.g.*, Allgeyer v. Louisiana, 165 U.S. 578, 592–93 (1897); N.Y. Life Ins. Co. v. Dodge, 246 U.S. 357 (1918); Home Ins. Co. v. Dick, 281 U.S. 397 (1930). To this extent, conflicts rules became preemptive federal law, reviewable on appeal by the Supreme Court. *See Home Ins.*, 281 U.S. at 407 ("the objection that, as applied to contracts made and to be performed outside of Texas, the statute violates the Federal Constitution, raises federal questions of substance"). The Court began to withdraw from its experiment with constitutionalization in the 1930s, *see, e.g.*, Alaska Packers Assn. v. Industrial Accident Comm'n, 294 U.S. 532 (1935); Pacific Employers Ins. Co. v. Industrial Accident Comm'n, 306 U.S. 493 (1939), and today the constitutional limits on choice-of-law are quite weak. *See* Allstate Ins. Co. v. Hague, 449 U.S. 302, 313 (1981) (requiring "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair").

45    *See, e.g.*, Johnston v. Compagnie Générale Transatlantique, 152 N.E. 121, 123 (N.Y. 1926).

46    *See* Aetna Life Insurance Co. v. Tremblay, 223 U.S. 185, 190 (1912).

47    304 U.S. at 78.

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

to those prevailing in Delaware's state courts."[48] And, while the Supreme Court has never squarely addressed the question, lower courts and commentators have generally concluded that the recognition of foreign judgments is also governed by state law.[49] Over the years, there have been proposals to federalize the conflict of laws[50] or the recognition and enforcement of foreign judgments,[51] but these have so far gained little traction.[52]

Until recently, the penal and revenue rules were treated in much the same way as the rest of the law of conflicts and judgments. Before *Erie*, they were considered rules of general common law. The Supreme Court made this explicit in *Huntington v. Attrill*, where it characterized the penal rule as one of "general jurisprudence," which a federal court "must decide for itself, uncontrolled by local decisions."[53] After *Erie*, the penal and revenue rules were treated like other rules of conflicts and judgments law as questions of state law. In 1971, the *Restatement* (*Second*) *of Conflicts* stated that "no action will be entertained on a foreign penal cause of action" without any suggestion that this rule was one of federal common law from which the States could not depart by judicial decision or by statute.[54] With respect to the recognition and enforcement of foreign judgments, many States adopted Uniform Acts that reflect the penal and

---

48 313 U.S. at 496. In *Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3 (1975) (per curiam), the Court made clear that *Klaxon* applies to cases involving the laws of other countries.

49 *See, e.g.*, Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1971), *cert. denied*, 405 U.S. 1017 (1972) (applying Pennsylvania law); Restatement (Third) of Foreign Relations § 481 cmt. a ("Since Erie v. Tompkins, . . . it has been accepted that in the absence of a federal statute or treaty or some other basis for federal jurisdiction, such as admiralty, recognition and enforcement of foreign country judgments is a matter of State law, and an action to enforce a foreign country judgment is not an action arising under the laws of the United States. Thus, State courts, and federal courts applying State law, recognize and enforce foreign country judgments without reference to federal rules.")

50 *See, e.g.*, Michael H. Gottesman, *Draining the Dismal Swamp: The Case for Federal Choice of Law Statutes*, 80 Geo. L.J. 1 (1991); William Baxter, *Choice of Law and the Federal System*, 16 Stan L. Rev. 1 (1963).

51 American Law Institute, Recognition and Enforcement of Foreign Judgments: Analysis and Proposed Federal Statute (2006) [hereinafter ALI Proposed Federal Statute].

52 In 2010, Congress did codify rules for the non-recognition of foreign defamation judgments in the so-called SPEECH Act. *See* 28 U.S.C. §§ 4101–05.

53 *See* 146 U.S. 657, 683 (1892).

54 *See* Restatement (Second) of Conflicts § 89.

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

revenue rules by excluding tax and penal judgments from their coverage.[55] To my knowledge, there was no suggestion at the time that either act was drafted that the exclusion of tax and penal judgments was required by federal law.[56] Indeed, the savings clause in each of the acts expressly allows States to recognize at common law judgments that are not covered by the acts.[57]

The Ninth Circuit briefly suggested in *British Columbia v. Gilbertson* that the revenue rule might be treated as federal law because of its "foreign relations overtones," but found it unnecessary to decide whether state or federal law governed, since each would have denied enforcement of the Canadian tax judgment in question.[58] It was not until 2002, that federal courts began to hold that the revenue rule was a rule of federal common law. In *European Community v. Japan Tobacco, Inc.*, the district court held that the European Community's smuggling and money-laundering claims under the federal RICO statute and state common law were barred by the revenue rule.[59] In a footnote, the district court stated that it "understands the revenue rule to be a federal rule of common

---

55  *See* Uniform Foreign Money-Judgments Recognition Act § 1(2) (defining "foreign judgment" as a money judgment "other than a judgment for taxes, a fine or other penalty, or a judgment for support in matrimonial or family matters") [hereinafter 1962 Uniform Act]; Uniform Foreign-Country Money Judgments Recognition Act § 3(b) (providing that the act does not apply "to the extent that the judgment is: (1) a judgment for taxes; (2) a fine or other penalty; (3) a judgment for divorce, support, or maintenance, or other judgment rendered in connection with domestic relations") [hereinafter 2005 Uniform Act]. As of this writing, the 2005 Uniform Act has been adopted by 18 States and the District of Columbia. The 1962 Uniform Act is in force in an additional 15 States and the U.S. Virgin Islands.

56  The 1962 Uniform Act sought to obtain widespread state adoption by confining itself to "rules that have long been applied by the majority of courts in this country." Prefatory Note, Uniform Foreign Money-Judgments Recognition Act, reprinted in HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS AND PROCEEDINGS OF THE ANNUAL CONFERENCE MEETING IN ITS SEVENTY-FIRST YEAR 242, 242 (1962). The 2005 Uniform Act simply repeated the exclusions found in the 1962 Act. *See* 2005 Uniform Act § 3, cmt. 1.

57  *See* 1962 Uniform Act § 7 ("This Act does not prevent the recognition of a foreign judgment in situations not covered by this Act."); 2005 Uniform Act § 11 ("This [act] does not prevent the recognition under principles of comity or otherwise of a foreign-country judgment not within the scope of this [act].")

58  597 F.2d 1161, 1163 (9th Cir. 1979). The Ninth Circuit also noted that under *Erie* and *Klaxon*, a federal court sitting in diversity would ordinarily apply state law to the enforcement of foreign judgments. *See id.*

59  186 F. Supp. 2d 231 (E.D.N.Y. 2002).

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

law."[60] The district court cited the revenue rule's "close association with federal and constitutional policy concerns, such as foreign relations and separation of powers" as well as the Supreme Court's decision in *Banco Nacional de Cuba v. Sabbatino*[61] holding that the act of state doctrine was a rule of federal common law, a decision on which the Second Circuit had relied heavily in an earlier revenue rule case.[62] As a rule of federal common law, the district court noted, "[t]he revenue rule thus preempts any conflicting state law."[63] With respect to the federal RICO claims, the district court's assertions about federal common law were dictum, because (as explained above) the presumption against reading federal statutes to displace the common law applies equally to state and federal common law.[64] With respect to the European Community's claims under state common law, a federal-common-law revenue rule should have had preemptive effect. The district court did not rest on that ground, however, saying simply instead that "[a]s a rule of common law, the revenue rule applies to common law rights of action,"[65] a line of reasoning that would have applied just as readily if the revenue rule were a rule of state common law.

One week later, in *Republic of Ecuador v. Philip Morris Companies, Inc.*, another district court similarly concluded that the revenue rule was a rule of federal common law in another case brought by a foreign government seeking tax revenues lost to smuggling.[66] The district court did not specifically state the basis for this conclusion, though it did note that the revenue rule was a judicial doctrine, like the act of state doctrine, based on separation of powers.[67] The court did, however, rely expressly on the revenue rule's supposed status as federal common law to preempt Ecuador's state RICO claims, noting that "the Florida legislature has no authority under the supremacy clause to eradicate a federal common law rule."[68] On appeal, having consolidated cases brought by Honduras and Belize, the Eleventh Circuit affirmed.[69] The Court of Appeals

---

60    *Id.* at 235 n. 1.

61    376 U.S. 398, 425 (1964). For discussion of *Sabbatino* and other arguments for treating the revenue rule as a rule of federal common law, see *infra* Section 3.

62    *See* 186 F. Supp. 2d at 235 n. 1 (citing Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103 (2d Cir. 2001)).

63    *Id.*

64    *See supra* note 4 and accompanying text.

65    186 F. Supp. 2d at 242.

66    *See* 188 F. Supp. 2d 1359, 1366 (S.D. Fla. 2002) (referring to the revenue rule as "a federal common law rule").

67    *See id.* at 1362.

68    *Id.* at 1366.

69    Republic of Honduras v. Philip Morris Companies, 341 F.3d 1253, 1256 (11th Cir. 2003).

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

neither distinguished among the claims brought under the federal RICO statute, the state RICO statute, and state common law, nor relied expressly on the preemptive force of a federal common law rule. But it did refer to the revenue rule "as the rule of this circuit,"[70] a phrase that would make no sense if the rule were one of state common law.

Thus, since the start of the twenty-first century, federal courts have departed from the general rule that the conflict of laws and recognition of foreign judgments are governed by state law and have begun to treat the revenue rule as a rule of federal common law that preempts state common-law and statutory claims. The courts' analysis of this question, however, has been sketchy at best, resting on brief invocations of "foreign relations," "separation of powers," and the Supreme Court's decision in *Sabbatino*. It is worth considering just how strong the case for federal common law might be.

### 3      The Case for Federal Common Law

Despite *Erie*'s holding that there is "no federal general common law,"[71] the federal courts may create federal common law in limited instances.[72] As the Supreme Court recognized in *Texas Industries*, such instances "fall into essentially two categories: those in which a federal rule of decision is 'necessary to protect uniquely federal interests,' and those in which Congress has given the courts the power to develop substantive law.[73] The first category includes "international disputes implicating . . . our relations with foreign nations."[74]

The archetypal example of federal common law for disputes implicating our relations with foreign nations is the act of state doctrine.[75] In its "classic formulation," the act of state doctrine provides that "'the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory.'"[76] In *Sabbatino*, the Supreme Court noted that the act of state

---

70   *Id.* at 1256; *see also id.* at 1261 ("we adopt the revenue rule as the law of this circuit").

71   Erie Railroad v. Tompkins, 304 U.S. 64, 78 (1938).

72   *See* Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 640 (1981).

73   *Id.* (quoting Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 426 (1964)).

74   *Id.* at 641.

75   *Texas Industries* cited *Sabbatino* as its example of a case implicating relations with foreign nations. *See id.*, at 641 n. 13.

76   Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 416 (1964) (quoting Underhill v. Hernandez, 168 U.S. 250, 252 (1897)); *see also* W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., 493 U.S. 400, 405 (1990) (holding that the act of state doctrine applies only when a "suit requires the Court to declare invalid, and thus ineffective as a rule of

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

doctrine was not required by international law,[77] and went on to hold that it was required by federal common law:

> [W]e are constrained to make it clear that an issue concerned with a basic choice regarding the competence and function of the Judiciary and the National Executive in ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law. It seems fair to assume that the Court did not have rules like the act of state doctrine in mind when it decided *Erie R. Co. v. Tompkins*.[78]

The Court described the "problems surrounding the act of state doctrine" as "intrinsically federal,"[79] and stated that they "should not be left to divergent and perhaps parochial state interpretations."[80]

Certainly, the strongest case for treating the penal and revenue rules as federal common law rests on *Sabbatino*. The district court in the *European Community* case relied explicitly on that decision,[81] while the district court in the *Ecuador* case did so implicitly by citing the act of state doctrine as a precedent.[82] But *Sabbatino*'s support for treating the penal and revenue rules as federal common law is not as powerful as it first appears. First, the *Sabbatino* Court itself suggested that States might depart in certain respects from its interpretation of the act of state doctrine. Second, the analogy to *Sabbatino* rests on the supposed similarity of the rationales for the act of state doctrine on the one hand and the penal and revenue rules on the other, a similarity that does not survive close scrutiny.

While *Sabbatino* held that the States were bound as a matter of federal common law to give foreign acts of state at least the same deference as the Supreme Court did in that case, the Court expressly left open the possibility

---

decision for the courts of this country the official act of a foreign sovereign" (internal quotation marks and citation omitted)).

77   *See Sabbatino*, 376 U.S. at 421–22.
78   *Id.* at 425.
79   *Id.* at 427.
80   *Id.* at 425.
81   *See* European Community v. Japan Tobacco, Inc., 186 F. Supp. 2d 231, 235 n. 1 (E.D.N.Y. 2002).
82   *See* Republic of Ecuador v. Philip Morris Companies, 188 F. Supp. 2d 1359, 1362 (S.D. Fla. 2002).

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

that state courts might give foreign acts of state *greater deference*.[83] Because the act of state doctrine requires the enforcement of certain foreign acts of state, greater deference by the States would not conflict with the federal-common-law act of state doctrine. But because the penal and revenue rules require the *non*-enforcement of foreign penal and tax laws and judgments, greater deference by the States to such foreign legislative or judicial acts would conflict with a federal-common-law penal or revenue rule. One could argue that the penal and revenue rules are nevertheless federal common law from which the States are not free to depart, but this would be to go beyond *Sabbatino* and give the penal and revenue rules even greater preemptive force than the act of state doctrine. Or one could argue that, in the context of the penal and revenue rules, state freedom to afford greater deference to foreign legislative and judicial acts means that these rules cannot be treated as federal common law. In any event, it is clear that because of the different ways in which these rules operate—the act of state doctrine requiring enforcement of foreign acts and the penal and revenue rules requiring non-enforcement—one cannot mechanically apply what *Sabbatino* has to say about the relationship of federal and state law under the act of state doctrine to the penal and revenue rules.

The case for treating the penal and revenue rules as federal common law on the basis of *Sabbatino* also depends critically on the supposed similarity of the justifications for the act of state doctrine on the one hand and the penal and revenue rules on the other. In *Sabbatino*, the Supreme Court itself asserted the similarity. While acknowledging that the penal and revenue rules "presume[] invalidity in the forum whereas the act of state principle presumes the contrary," the Supreme Court asserted that "the doctrines have a common rationale"—specifically, "to avoid embarrassing another state by scrutinizing its . . . laws."[84] But upon examination, this rationale for the penal and revenue rules proves less than convincing.

The rationale was first articulated by Judge Learned Hand in *Moore v. Mitchell*.[85] Hand noted that courts would not enforce foreign laws or judgments

---

83   *Sabbatino*, 376 U.S. at 425 n. 23 ("We need not now consider whether a state court might, in certain circumstances, adhere to a more restrictive view concerning the scope of examination of foreign acts than that required by this Court.").

84   *Id.* at 437.

85   30 F.2d 600, 603–04 (2d Cir. 1929) (L. Hand, J., concurring). *Sabbatino* cited an Irish decision for the rationale, 376 U.S. at 437, but the Irish court had cited *Moore v. Mitchell*, quoting Hand at length. *See* Peter Buchanan Ltd. v. McVey, [1955] A.C. 516, 528 (Ir. H. Ct. 1950), *aff'd*, [1955] A.C. 530 (Ir. S. Ct. 1951).

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

that were contrary to its own public policy.[86] "This is not a troublesome or deli-
cate inquiry when the question arises between private persons," Hand reasoned,
but the inquiry becomes more sensitive in the areas of penal and tax law.[87] "To
pass upon the provisions for the public order of another state is, or at any rate
should be, beyond the powers of a court; it involves the relations between the
states themselves, with which courts are incompetent to deal, and which are
intrusted to other authorities. It may commit the domestic state to a position
which would seriously embarrass its neighbor."[88] Although the Supreme Court
in *Pasquantino* described public-policy review as "the principal evil against
which the revenue rule was traditionally thought to guard,"[89] Hand's reasoning
suffers from serious flaws. First, it assumes that foreign penal and revenue laws
are more likely to be found in violation of U.S. public policy than other for-
eign laws. This seems highly questionable. "After all, every State collects taxes,
every State has a criminal law," and such laws are broadly similar.[90] Second, it
seems questionable that selective non-enforcement of foreign tax and penal
laws is more offensive than blanket non-enforcement. As Robert Leflar noted
long ago, the possibility of holding a foreign tax or penal law contrary to public
policy "would seldom be more offensive than a flat refusal to permit any action
at all."[91] Third, those foreign states most likely to pass penal or tax laws mani-
festly contrary to U.S. public policy are those the United States should be least
concerned to offend. A policy that refuses enforcement to Canadian tax judg-
ments in order to avoid offending Hitler's Germany seems difficult to defend.[92]
If the possibility of offending foreign governments by finding their penal and
tax laws inconsistent with U.S. public policy seems low (or the possibility of
offending them by a blanket refusal to enforce such laws seems high), then
the case for preempting state laws that would permit such enforcement seems
much weaker than with the act of state doctrine.

Other rationales for the penal and revenue rules exist, but they do not sup-
port an analogy to the act of state doctrine or the case for preemption. Some
courts and commentators have pointed to the supposed difficulty of applying

---

86    *Moore*, 30 F.2d at 604 (L. Hand, J., concurring).

87    *Id.*

88    *Id.*

89    Pasquantino v. United States, 544 U.S. 349, 368 (2005).

90    Andreas F. Lowenfeld, *Public Law in the International Arena: Conflict of Laws, International Law, and Some Suggestions for Their Interaction*, 163 RECUEIL DES COURS 311, 421 (1976-II).

91    Robert A. Leflar, *Extrastate Enforcement of Foreign Penal and Governmental Claims*, 46 HARV. L. REV. 193, 217 (1932).

92    *See* Dodge, *supra* note 1, at 214–15.

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

foreign penal and tax laws,[93] but this seems doubtful. As one court has noted, "[t]here may be difficulty in interpreting foreign revenue laws but such difficulties are met with in relation to other foreign laws with which the Courts have on occasion to grapple."[94] And even if one accepts this rationale, it provides no support for an analogy to *Sabbatino* or the creation of a preemptive rule of federal common law. If States should wish to shoulder the burden of deciding particularly difficult issues of foreign law, there would seem to be no federal policy against their doing so.

A final justification for the penal and revenue rules is the argument that courts should avoid furthering the governmental interests of a foreign sovereign.[95] This rationale does not support an analogy to the act of state doctrine but rather *distinguishes* the penal and revenue rules from that doctrine, which advances the interests of foreign sovereigns. Indeed, Justice White made precisely that point in his *Sabbatino* dissent.[96] This rationale may, however, support the case for federal preemption of state law in some instances. In rejecting foreign government claims under the federal RICO statute for tax revenues lost to smuggling, a number of U.S. courts have noted that allowing such claims would tend to undercut the federal government's ability to ensure the reciprocal treatment of U.S. claims by negotiating treaties. As the district court asked in the *Ecuador* case, "Why would Ecuador negotiate a tax treaty with the Executive to recover lost taxes if it could pursue RICO's treble damages in court?"[97] The same danger of undercutting the U.S. negotiating position exists

---

93    *See id.* at 209–12.

94    Commissioner of Taxes v. McFarland, [1965] 1 SA 470, 473 (Witwatersrand Local Div.). The Supreme Court also cast doubt on this rationale in *Pasquantino* when it noted that the federal rules give "federal courts sufficient means to resolve the incidental foreign law issues." Pasquantino v. United States, 544 U.S. 349, 370 (2005).

95    *See* Dodge, *supra* note 1, at 215–19; *Pasquantino*, 544 U.S. at 369–70 (discussing the "risk of advancing the policies of Canada illegitimately").

96    *See* Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 448–49 (1964) (White, J., dissenting) (noting that "our courts customarily refuse to enforce the revenue and penal laws of a foreign state, since no country has an obligation to further the governmental interests of a foreign sovereign" and that "[t]hese rules demonstrate that our courts have never been bound to pay unlimited deference to foreign acts of state, defined as an act or law in which the sovereign's governmental interest is involved").

97    Republic of Ecuador v. Philip Morris Companies, 188 F. Supp. 2d 1359, 1364 (S.D. Fla. 2002); *see also* Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103, 122 (2d Cir. 2001) ("Declining to apply the revenue rule in this case . . . would potentially allow Canada to obtain assistance it has not negotiated for and that would be greater than the assistance our government would likely receive as a litigant in Canada's courts.").

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

with respect to state law claims—common-law or statutory—that would allow foreign governments to recover lost taxes.[98]

The case for federal preemption of state laws that would recognize foreign tax claims is strong because, as explained in Section 4, there is a clear federal policy manifested in numerous tax treaties not to recognize such claims in the absence of a specific treaty provision providing for collection assistance. But such a clear federal policy does not always exist. For example, as noted above, some States have double-jeopardy statutes that bar prosecution under state law of a defendant who has been convicted or acquitted of the same offense by a foreign court.[99] To my knowledge, the United States has no federal policy on this subject, expressed in treaties or otherwise. Treating the penal and revenue rules as federal common law would sweep too broadly, preempting state law irrespective of federal policy. The better approach is to treat the penal and revenue rules as rules of state common-law, capable of alteration by state statute or judicial decision, but subject to preemption where a clear federal policy against recognition of foreign laws or judgments exists. Building on Justice Harlan's concurring opinion in *Zschernig v. Miller*,[100] Section 4 sketches such an approach.

## 4    Preemption by Federal Policy

*Zschernig v. Miller* is not everyone's favorite case.[101] Writing for the majority, Justice Douglas adopted a potentially broad theory of foreign affairs preemption and struck down a state escheat statute that conditioned the right of a non-resident alien to inherit property in Oregon on what the law of the alien's country said about the inheritance rights of U.S. citizens.[102] Despite a concession by the Solicitor General that the state statute did not unduly interfere

---

98    *Cf.* Crosby v. National Foreign Trade Council, 530 U.S. 363, 377 (2000) (noting that a state act imposing sanctions on a foreign country "reduces the value of the [bargaining] chips created by the federal statute").

99    *See supra* notes 39–40 and accompanying text.

100    *See* Zschernig v. Miller, 389 U.S. 429, 429–62 (Harlan, J., concurring).

101    For a sampling of scholarly opinions, see, *e.g.*, Jack L. Goldsmith, *Federal Courts, Foreign Affairs, and Federalism*, 83 Va. L. Rev. 1617 (1997); Michael D. Ramsey, *The Power of the States in Foreign Affairs: The Original Understanding of Foreign Affairs Federalism*, 75 Notre Dame L. Rev. 341 (1999); Carlos Manuel Vazquez, *W(h)ither Zschernig?*, 46 Villanova L. Rev. 1259 (2001).

102    *See Zschernig*, 389 U.S. at 430–31 & n. 1.

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

with the United States' conduct of foreign relations,[103] the Court held that the Oregon law was unconstitutional as "an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress."[104] Concurring in the result, Justice Harlan took a narrower view. He rejected the majority's theory of dormant foreign affairs preemption and would have held that "in the absence of a conflicting federal policy or violation of the express mandates of the Constitution the States may legislate in areas of their traditional competence even though their statutes may have an incidental effect on foreign relations."[105] Harlan concurred in the result because he found such a conflicting federal policy in the 1923 treaty with Germany guaranteeing the right to inherit property.[106]

The scope of foreign affairs preemption today remains controversial. Dissenting on behalf of herself and three other members of the Court in *American Insurance Association v. Garamendi*, Justice Ginsburg wrote: "We have not relied on *Zschernig* since it was decided, and I would not resurrect that decision here."[107] But the majority did rely on Justice Douglas's majority opinion in *Zschernig*, as well as on Justice Harlan's concurrence.[108] In a significant footnote, the Court suggested that the two approaches to preemption might be reconciled—that field preemption might be appropriate "[i]f a State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility," but that Harlan's conflict preemption approach might make sense where a State had acted within "its 'traditional competence' but in a way that affects foreign relations."[109]

The conflict of laws and the recognition of foreign judgments lie within the traditional competence of the States.[110] Under Harlan's approach, the question would then be whether state laws departing from the penal and revenue rules would run afoul of "a conflicting federal policy."[111] Although

---

103   *See id.* at 434 (quoting brief of the United States as *amicus curiae*).

104   *Id.* at 432.

105   Zschernig v. Miller, 389 U.S. 429, 458–59 (Harlan, J., concurring).

106   *See id.* at 457. The Supreme Court had held in *Clark v. Allen*, 331 U.S. 503 (1947), that the treaty in question did not guarantee the right of German nationals to inherit personal property located in the United States. The *Zschernig* majority found it unnecessary to re-examine *Clark, see* 389 U.S. at 432, while Justice Harlan did and found *Clark* to be wrongly decided. *See id.* at 444–57 (Harlan, J., concurring).

107   American Ins. Ass'n v. Garamendi, 539 U.S. 396, 439 (2003) (Ginsburg, J., dissenting).

108   *See id.* at 417–20 (2003).

109   *Id.* at 419 n. 11 (quoting Zschernig v. Miller, 389 U.S. 429, 459 (Harlan, J., concurring)).

110   *See supra* Section 2.

111   *Zschernig*, 389 U.S. at 459 (Harlan, J., concurring).

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

Justice Ginsburg's dissenting opinion in *Garamendi* did not expressly endorse Harlan's approach to foreign affairs preemption, the central question that divided the dissent from the majority was precisely how to determine the existence of a preemptive federal policy. For the *Garamendi* majority, a "consistent Presidential foreign policy" reflected in the statements of high-level executive officials was sufficient.[112] For the dissent, "[t]he displacement of state law by preemption properly requires a considerably more formal and binding federal instrument," and the fact that the U.S. executive agreement with Germany dealing with Holocaust-era claims did not even address disclosure laws like California's indicated the absence of a preemptive federal policy.[113]

Clearly, a conflicting federal policy may be established by an act of Congress. In *Crosby v. National Foreign Trade Council*, for example, the Supreme Court held that a state law barring state entities from companies doing business with Burma was preempted by a federal statute delegating discretion to the President to establish a flexible sanctions policy with respect to that country.[114] Just as clearly, a conflicting federal policy may be established by the express terms of a treaty or executive agreement.[115]

The Supreme Court has also held that in some instances a preemptive federal policy may be expressed by the *absence* of a treaty or other international agreement. In *Holmes v. Jennison*,[116] the question was whether Vermont could extradite a fugitive to Canada. Chief Justice Taney noted that "[s]ince the expiration of the treaty with Great Britain, negotiated in 1793, the general government appears to have adopted the policy of refusing to surrender persons, who, having committed offences in a foreign nation, have taken shelter in this."[117] Taney found this federal policy to be expressed by the *absence* of extradition treaties.[118] Moreover, Taney found the federal policy on extradition to preempt state authority with respect to extradition.

---

112    *See id.* at 421–23.

113    *Id.* at 440–42 (Ginsburg, J., dissenting).

114    530 U.S. 363 (2000).

115    *See, e.g.*, Ware v. Hylton, 3 U.S. (3 Dall.) 199 (1796) (holding Virginia debt confiscation statute preempted by Article 4 of the 1783 treaty of peace with Great Britain); United States v. Belmont, 301 U.S. 324 (1937) (holding New York law preempted by executive agreement recognizing the Soviet Union and assigning claims against it to the United States).

116    29 U.S. (14 Pet.) 540 (1840).

117    *Id.* at 574.

118    *See id.* ("It is believed that the general government has entered into no treaty stipulations upon this subject since the one above mentioned; and in every instance where there was no engagement by treaty to deliver, and a demand has been made, they have uniformly

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

> What avails it that the general government, in the exercise of that portion
> of its power over our foreign relations, which embraces this subject,
> deems it wisest and safest for the Union to enter into no arrangements
> upon the subject, and to refuse all such demands; if the state in which the
> fugitive is found, may immediately reverse this decision, and deliver over
> the offender to the government that demands him?[119]

Although the Court in *Holmes* was equally divided, a majority of the Supreme
Court subsequently endorsed Taney's opinion, which is now considered to
be the position of the Court.[120] *Holmes* does not mean that state law is pre-
empted anytime it touches an area that could be the subject of a treaty. Such
a rule would preempt the state law of judgments, as well as many other areas
of regulation that the federal government has chosen to leave to the States.
Rather *Holmes* teaches that sometimes the lack of treaties, as well as limits in
treaties that do exist, reflect a clear federal policy to limit cooperation with
other nations.

---------

refused, and have denied the right of the executive to surrender, because there was no
treaty, and no law of Congress to authorize it.").

119    *Id.*

120    *See* United States v. Rauscher, 119 U.S. 407, 414 (1886) (noting that "there can be little
doubt of the soundness of the opinion of Chief Justice TANEY, that the power exercised
by the governor of Vermont is a part of the foreign intercourse of this country, which has
undoubtedly been conferred upon the federal government"); Goldsmith, *supra* note 101,
at 1651 (describing Taney's opinion as "orthodoxy"). For more on *Holmes* and its reception,
see Edward T. Swaine, *Negotiating Federalism: State Bargaining and the Dormant Treaty
Power*, 49 DUKE L.J. 1127, 1224–31 (2000).

Professor Swaine argues for recognition of a "dormant treaty power," under which
States would be precluded from activities "involving direct or indirect negotiating—put
less formally, bargaining—with foreign powers on matters of national concern." *Id.* at
1138. This would include "state measures contingent on the policies of foreign powers," *id.*
at 1141, for example, the Oregon statute at issue in *Zschernig*. *See id.* at 1234. While
Professor Swaine's argument has the virtue of rooting preemption in a specific provision
of the Constitution (the Treaty Power), it seems both too broad and too narrow. It seems
too broad because it would invalidate state reciprocity requirements aimed at securing
greater recognition for U.S. judgments abroad. *See id.* at 1271, n. 508. *But cf.* Clark v. Allen,
331 U.S. 503, 516–17 (1947) (rejecting the argument that reciprocity requirements in state
inheritance statutes "entered the forbidden domain of negotiating with a foreign
country"). It seems too narrow because States can intrude upon treaty negotiations not
just by seeking changes in foreign law but also by giving away the United States' bargaining
chips. State laws allowing foreign tax claims would be one example.

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

The United States has income tax treaties with 66 countries,[121] but only five treaties in force—those with Canada, Denmark, France, the Netherlands, and Sweden—have provisions for general collection assistance.[122] Even these treaties limit collection assistance in various ways. The relevant provision with Canada, for example, applies only to revenue claims that have been "finally determined,"[123] gives the government of the requested state discretion over whether to accept the claim,[124] and does not extend to taxpayers who are nationals of the requested state.[125] The issue of collection assistance was intensely debated in the Senate from 1946 to 1951, and while collection assistance provisions were approved in the treaties with France, Denmark, and the Netherlands (adding to the existing treaty with Sweden), they were rejected in treaties with Greece, Norway, and South Africa.[126] Subsequent treaties limited collection assistance to that necessary to

---

121    *See*   http://www.irs.gov/Businesses/International-Businesses/United-States-Income-Tax-Treaties---A-to-Z (last visited Feb. 6, 2014).

122    *See* Protocol Amending the Convention with Respect to Taxes on Income and on Capital art. 15, U.S.-Can., Mar. 17, 1995, S. Treaty Doc. 104–4 (1995) [hereinafter 1995 U.S.-Canada Protocol]; Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income art. 27, U.S.-Den., Aug. 19, 1999, S. Treaty Doc. 106–12 (1999); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital art. 28, U.S.-Fr., Aug. 31, 1994, S. Treaty Doc. No. 103–32 (1994) [hereinafter 1994 U.S.-France Treaty]; Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income art. 31, U.S.-Neth., Dec. 18, 1992, S. Treaty Doc. No. 103–6 (1993); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income art. 27, U.S.-Swed., Sept. 1, 1994, S. Treaty Doc. 103–29 (1994).

123    1995 U.S.-Canada Protocol, *supra* note 122, art. 15 (adding Article XXVI A(2)).

124    *See id.* (adding Article XXVI A(3)) ("A revenue claim of the applicant State that has been finally determined may be accepted for collection by the competent authority of the requested State and . . . if accepted shall be collected by the requested State as though such revenue claim were the requested State's own revenue claim finally determined . . . ."). The treaties with Denmark, the Netherlands, and Sweden similarly grant discretion. The treaty with France, by contrast, provides that "[r]evenue claims of each of the Contracting States which have been finally determined *will* be accepted for enforcement by the State to which application is made and collected in that State in accordance with the laws applicable to the enforcement and collection of its own taxes." 1994 U.S.-France Treaty, *supra* note 122, art. 28(2). In practice, foreign tax claims are collected by the IRS through its tax collecting procedures, not by foreign governments using U.S. courts. *See* Internal Revenue Manual § 5.1.8.7.7.

125    1995 U.S.-Canada Protocol, *supra* note 122, art. 15 (adding Article XXVI A(8)).

126    *See* Dodge, *supra* note 1, at 204–05.

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

ensure that the benefits of the treaties would be limited to those entitled to them.[127] When the Senate ratified the 1988 OECD Convention on Mutual Administrative Assistance in Tax Matters, it entered a reservation to Article 11 so that it would not be obligated "to recover tax claims of [other signatories] as if they were its own tax claims."[128] In 1995, the United States and Canada concluded a protocol adding a provision on collection assistance to their existing treaty,[129] but this exception simply confirms the federal policy not to enforce foreign tax claims in the absence of a specific treaty provision.[130]

---

127  *See, e.g.*, United States Model Income Tax Convention of November 15, 2006, art. 26(7) ("Each of the Contracting States shall endeavor to collect on behalf of the other Contracting State such amounts as may be necessary to ensure that relief granted by the Convention from taxation imposed by that other State does not inure to the benefit of persons not entitled thereto."), *available at* http://www.irs.gov/pub/irs-trty/model006 .pdf [hereinafter 2006 U.S. Model Tax Treaty].

128  Convention on Mutual Administrative Assistance in Tax Matters, art. 11, 27 I.L.M. 1160, 1168 (1988). A Protocol amending the Convention to open it to non-OECD countries was opened for signature in 2010. Thirty-three countries are currently parties to either the original or the amended Convention. *See* http://www.oecd.org/tax/exchange-of-tax-information/Status_of_convention%2023_December_Jurisdictions.pdf (last visited Feb. 6, 2014). The United States has signed but not ratified the amended Convention.

129  1995 U.S.-Canada Protocol, *supra* note 122, art. 15.

130  This is not to say that the U.S. policy is a wise one. As far back as 1834, Justice Story criticized the non-enforcement of foreign tax laws, noting that "[s]ound morals would seem to point to a very different conclusion." Joseph Story, Commentaries on the Conflict of Laws § 254 (1834). The current U.S. policy resulted from intense lobbying from the business community during the late 1940s and early 1950s, and reciprocal enforcement of tax laws and judgments would be mutually beneficial. *See* Dodge, *supra* note 1, at 203–05, 220–21. As mentioned, the OECD Convention, which 33 countries have joined, specifically provides for collection assistance, and the ALI has recommended that "[t]he United States should include in income tax treaties with selected treaty partners provisions authorizing reciprocal judicial recognition and enforcement of tax judgments rendered by courts of the treaty partner." American Law Institute, International Aspects of United States Income Taxation II, at 124 (1992). But whether the current U.S. policy is wise or not, it is clearly the policy of the federal government with respect to the enforcement of foreign tax claims.

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

U.S. tax treaties generally exclude state and local taxes from their scope.[131] In *Barclays Bank PLC v. Franchise Tax Board of California*,[132] the Supreme Court found such an exclusion relevant in considering whether California's world-wide combined reporting method of assessing state tax violated the "one voice" requirement of the Foreign Commerce Clause.[133] The Court looked the history of the U.S.-U.K. tax treaty, which would originally have prohibited the States from using combined reporting but was ratified by the Senate subject to the reservation that the relevant provision would not apply to state and local taxes.[134] This history reinforced the conclusion that "Congress implicitly has *permitted* the States to use the worldwide combined reporting method."[135] But to say that U.S. tax treaties do not limit the imposition of *state* taxes is not to say that States are free to assist in collecting *foreign* taxes. Foreign taxes *are* typically covered by the treaty and thus subject to the limitations contained in its collection assistance provision. Put more generally, the existence of a policy to permit States to tax freely expresses no exception to the separate policy reflected in U.S. tax treaties not to enforce foreign tax claims in the absence of a specific treaty provision.

It seems clear, then, that a state law permitting the collection of foreign tax claims other than pursuant to such a provision would violate federal policy and should therefore be preempted. This is obviously true when the claim is made by a foreign country with which the United States has an existing tax treaty. But it is also true where the claim is made by a country with which the United States has declined to enter such a treaty. As the district court noted in the *Ecuador* case, "the lack of a treaty is all the more reason why this Court must enforce the revenue rule. . . . An adjudication of Ecuador's claims would

---

131  *See, e.g.*, 2006 U.S. Model Tax Treaty, *supra* note 127, art. 2(3)(b) (defining the U.S. taxes to which the Convention applies as the federal income taxes imposed by the Internal Revenue Code and the federal excise taxes imposed with respect to private foundations). Article 24's provision on non-discrimination, however, applies "to taxes of every kind and description imposed by a Contracting State or a political subdivision or local authority thereof." *Id*. art. 24(7).

132  512 U.S. 298 (1994).

133  *See* Japan Line, Ltd. v. Los Angeles County, 441 U.S. 434, 453 (1979).

134  *See Barclays*, 512 U.S. at 326–327.

135  *Id*. at 326. The Court also found such implied permission in the failure of bills that would have prohibited state use of combined reporting to be enacted by Congress. *See id*. at 324–26.

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

eliminate Ecuador's incentive to negotiate a tax treaty with the Executive."[136] And *Holmes v. Jennison* teaches that the absence of treaties may reflect a federal policy just as clearly as their presence.[137]

The United States has also chosen to depart from the penal rule by treaty in some instances. For example, the United States is party to two multilateral prisoner transfer treaties and several bilateral treaties that allow U.S. nationals convicted abroad to serve their sentences in the United States.[138] Congress has provided for the implementation of these treaties through legislation.[139] That legislation authorizes the Attorney General to act on behalf of the United States under existing treaties and to make arrangements with the States "for the confinement, where appropriate, in State institutions of offenders transferred to the United States."[140] Were a State to enforce a foreign prison sentence in the absence of such an arrangement by the Attorney General, it would conflict with the scheme established by this network of treaties and federal legislation.[141]

The United States has also agreed in some Mutual Legal Assistance Treaties (MLATs) to provide assistance in collecting criminal fines and forfeitures. The United States entered its first such MLAT with Canada in 1985, one article of which provided that "[t]he Parties shall assist each other to the extent permitted by their respective laws in proceedings related to the forfeiture of the proceeds of crime, restitution to the victims of crime, and the collection of fines imposed as a sentence in criminal prosecution."[142] Restitution is not within

---

136  Republic of Ecuador v. Philip Morris Companies, 188 F. Supp. 2d 1359, 1364–65 (S.D. Fla. 2002).

137  *See supra* notes 116–20 and accompanying text.

138  *See* Council of Europe Convention on the Transfer of Sentenced Persons, Mar. 21, 1983, 35 U.S.T. 2867, 22 I.L.M. 530; Inter-American Convention on Serving Criminal Sentences Abroad, June 9, 1993, S. Treaty Doc. 104–35 [hereinafter Inter-American Convention]. The United States has bilateral treaties with Bolivia, Canada, France, Hong Kong, Mexico, Panama, Peru, Thailand, and Turkey. *See* http://www.justice.gov/criminal/oeo/iptu/lists .html (last visited Feb. 6, 2014).

139  *See* 18 U.S.C. §§ 4100–4115.

140  *Id.* §§ 4102(1) & (6).

141  Such enforcement might also violate Article 1, Section 10 of the Constitution, which prohibits the States from "enter[ing] into any Treaty" and "without the Consent of Congress" from "enter[ing] into any Agreement or Compact . . . with a foreign Power." U.S. Const. art. I, § 10.

142  Treaty on Mutual Legal Assistance in Criminal Matters art. XVII(2), Mar. 18, 1985, Can-U.S., S. Treaty Doc. No. 100–14 (1988), 24 I.L.M. 1092, 1098 (1985).

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

the penal rule,[143] but criminal fines and forfeitures are, which raises the question whether States may enforce criminal fines and forfeitures without treaty authorization.

As of 2012, the United States has MLATs with 63 countries.[144] Thirty-eight of these treaties provide for assistance in the collection of criminal fines and forfeitures, like the U.S. MLAT with Canada quoted above,[145] while an additional

---

143   *See supra* note 25 and accompanying text.

144   *See* 2 U.S. Department of State, International Narcotics Control Strategy Report: Money Laundering and Financial Crimes 20 (2012), *available at* http://www.state.gov/ documents/organization/185866.pdf. This counts the 56 countries identified by the Department of State, plus seven mutual legal assistance relationships concluded pursuant to an MLAT with the European Union. *See* Agreement on Mutual Legal Assistance, U.S.- E.U., June 25, 2003, S. Treaty Doc. 109–13 (2006). The United States has various other mutual legal assistance agreements, including one with China. *See* International Narcotics Control Strategy Report, *supra*, at 20–21.

145   The 38 treaties are those with Antigua & Barbuda, Argentina, Austria, the Bahamas, Barbados, Belize, Brazil, Canada, Cyprus, Dominica, Egypt, Estonia, Germany, Greece, Grenada, Hungary, India, Jamaica, Latvia, Liechtenstein, Lithuania, Malaysia, Mexico, Nigeria, Panama, Philippines, Poland, Romania, Russia, St. Kitts & Nevis, St. Lucia, St. Vincent & the Grenadines, South Africa, Trinidad & Tobago, Ukraine, the United Kingdom, Uruguay, and Venezuela; the treaties with Malaysia and the United Kingdom exclude restitution. *See* Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.-Ant. & Barb., Oct. 31, 1996, S. Treaty Doc. 105–24; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.-Arg., Dec. 4, 1990, S. Treaty Doc. 102–18; Treaty on Mutual Legal Assistance in Criminal Matters art. 17(2), U.S.-Austria, Feb. 23, 1995, S. Treaty Doc. 104–21; Treaty on Mutual Legal Assistance in Criminal Matters art. 14(2), U.S.-Bah., June 12, 1987, S. Treaty Doc. 100–17; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.-Barb., Feb. 28, 1996, S. Treaty Doc. 105–23; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.- Belize, Sept. 19, 2000, S. Treaty Doc. 107–13; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.-Braz., Oct. 19, 1997, S. Treaty Doc. 105–42; Treaty on Mutual Legal Assistance in Criminal Matters art. XVII(2), U.S.-Can., Mar. 18, 1985, S. Treaty Doc. 100–14; Treaty on Mutual Legal Assistance in Criminal Matters art. 17(2), U.S.-Cyprus, Dec. 20, 1999, S. Treaty Doc. 106–35; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.- Dominica, Oct. 10, 1996, S. Treaty Doc. 105–24; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.-Egypt, May 3, 1998, S. Treaty Doc. 106–19; Treaty on Mutual Legal Assistance in Criminal Matters art. 17(2), U.S.-Est., Apr. 2, 1998, S. Treaty Doc. 105–52; Treaty on Mutual Legal Assistance in Criminal Matters art. 13(2), U.S.-Ger., Oct. 14, 2003, S. Treaty Doc. 108–27; Treaty on Mutual Legal Assistance in Criminal Matters art. 17(2), U.S.- Greece, May 25, 1999, S. Treaty Doc. 106–18; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.- Gren., May 30, 1996, S. Treaty Doc. 105–24; Treaty on Mutual Legal Assistance in Criminal Matters art. 17(2), U.S.-Hung., Dec. 1, 1994, S. Treaty Doc. 104–20; Treaty on Mutual Legal Assistance in Criminal Matters art. 17(2), U.S.-India, Oct. 17, 2001, S. Treaty Doc. 107–3; Treaty on Mutual Legal Assistance in Criminal Matters art. 20(2),

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

13 provide for assistance with criminal forfeitures but not fines.[146] Significantly, 12 of these MLATs do *not* contain a provision on assistance with either fines

---

U.S.-Jam., July 7, 1989, S. Treaty Doc. 102–16; Treaty on Mutual Legal Assistance in Criminal Matters art. 17(2), U.S.-Lat., June 13, 1997, S. Treaty Doc. 105–34; Treaty on Mutual Legal Assistance in Criminal Matters art. 17(2), U.S.-Liech., July 8, 2002, S. Treaty Doc. 107–16; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.-Lith., Jan 16, 1998, S. Treaty Doc. 105–41; Treaty on Mutual Legal Assistance in Criminal Matters art. 17(1), U.S.-Malay., July 28, 2006, S. Treaty Doc. 109–22; Treaty on Mutual Legal Assistance art. 11(2), U.S.-Mex., Dec. 9, 1987, S. Treaty Doc. 100–13; Treaty on Mutual Legal Assistance in Criminal Matters art. XVII(1), U.S.-Nigeria, Sept. 13, 1989, S. Treaty Doc. 102–26; Treaty on Mutual Legal Assistance in Criminal Matters art. 14(2) [hereinafter U.S.-Nigeria MLAT], U.S.-Pan., Apr. 11, 1991, S. Treaty Doc. 102–15; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.-Phil., Nov. 13, 1994, S. Treaty Doc. 104–18; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.-Pol., July 10, 1996, S. Treaty Doc. 105–12; Treaty on Mutual Legal Assistance in Criminal Matters art. 17(2), U.S.-Rom., May 26, 1999, S. Treaty Doc. 106–20; Treaty on Mutual Legal Assistance in Criminal Matters art. 18(1), U.S.-Russ., June 17, 1999, S. Treaty Doc. 106–22; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.-St. Kitts & Nevis, Sept. 18, 1997, S. Treaty Doc. 105–37; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.- St. Lucia, Apr. 18, 1996, S. Treaty Doc. 105–24; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.-St.Vincent, Jan. 8, 1998, S. Treaty Doc. 105–44; Treaty on Mutual Legal Assistance in Criminal Matters art. 18(2), U.S.-S. Afr., Sept. 16, 1999, S. Treaty Doc. 106–36; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.-Trin. & Tobago, Mar. 4, 1996, S. Treaty Doc. 105–22; Treaty on Mutual Legal Assistance in Criminal Matters art. 17(2), U.S.-Ukr., July 22, 1998, S. Treaty Doc. 106–16; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(1), U.S.-U.K., Jan. 6, 1994, S. Treaty Doc. 104–2; Treaty on Mutual Legal Assistance in Criminal Matters art. 22(2), U.S.-Uru., May 6, 1991, S. Treaty Doc. 102–19; Treaty on Mutual Legal Assistance in Criminal Matters art. XVI(2), U.S.-Venez., Oct. 12, 1997, S. Treaty Doc. 105–38.

146   The 13 treaties are with Australia, Belgium, Czech Republic, France, Hong Kong, Ireland, Israel, Japan, Luxembourg, South Korea, Spain, Sweden, and Thailand. *See* Treaty on Mutual Legal Assistance in Criminal Matters art. 17(1), U.S.-Austl., Apr. 30, 1997, S. Treaty Doc. 105–27; Treaty on Mutual Legal Assistance in Criminal Matters art. 12(1), U.S.-Belg., Jan. 28, 1988, S. Treaty Doc. 100–16; Treaty on Mutual Legal Assistance in Criminal Matters arts. 18–20, U.S.-Czech, Feb. 4, 1998, S. Treaty Doc. 105–47 [hereinafter U.S.-Czech MLAT]; Treaty on Mutual Legal Assistance in Criminal Matters art. 11(4), U.S.-Fr., Dec. 10, 1998, S. Treaty Doc. 106–17 [hereinafter U.S.-France MLAT]; Treaty on Mutual Legal Assistance in Criminal Matters art. 18(3), U.S.-H.K., Apr. 15, 1997, S. Treaty Doc. 105–06 [hereinafter U.S.-Hong Kong MLAT]; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.-Ir., Jan. 18, 2001, S. Treaty Doc. 107–9; Treaty on Mutual Legal Assistance in Criminal Matters art. 17(1), U.S.-Isr., Jan. 26, 1998, S. Treaty Doc. 105–40 [hereinafter U.S.-Israel MLAT]; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(1), U.S.-Japan, Aug. 5, 2003, S. Treaty Doc. 108–12; Treaty on Mutual Legal Assistance in Criminal Matters art. 17, U.S.-Lux., Mar. 13, 1997, S. Treaty Doc. 105–11[hereinafter U.S.-Luxembourg MLAT];

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

or forfeitures,[147] and of course the United States does not have MLATs with a large number of countries. In a few instances, U.S. MLATs express a policy of not enforcing a particular kind of penal judgments not just by omission but by express provision. The U.S. MLAT with Israel, for example, states that "the parties shall not be obligated to enforce orders of restitution or to collect fines or to enforce judgments imposing fines."[148] In short, the United States has not authorized the enforcement of foreign criminal fines and forfeitures across the board but rather through a series of specific treaty provisions, extending that

---------------

Treaty on Mutual Assistance in Criminal Matters art. 17(2), U.S.-S. Kor., Nov. 23, 1993, S. Treaty Doc. 104–1; Treaty on Mutual Legal Assistance in Criminal Matters art. 16(2), U.S.-Spain, Nov. 20, 1990, S. Treaty Doc. 102–21; Treaty on Mutual Legal Assistance in Criminal Matters art. 18(2), U.S.-Swed., Dec. 17, 2001, S. Treaty Doc. 107–12; Treaty on Mutual Legal Assistance in Criminal Matters art. 15(2), U.S.-Thai., Mar. 19, 1986, S. Treaty Doc. 100–18.

A number of U.S. MLATs expressly provide that assistance will extend to the enforcement of particular penal judgments. *See* U.S.-Czech MLAT, *supra*, art. 18(3) ("The Requested State may, to the extent permitted by its laws, give effect to any final legal determination given in the Requesting State forfeiting such proceeds or instrumentalities, or initiate its own legal action for the forfeiture of such assets."); U.S.-France MLAT, *supra*, art. 11(4); U.S.-Hong Kong MLAT, *supra*, art. 18(3) ("Where a request is made for assistance in securing the confiscation or forfeiture of proceeds or instrumentalities of crime, such assistance shall be given by whatever means are appropriate. This may include enforcing an order made by a court in the Requesting Party or initiating or assisting in proceedings in relation to the request."); U.S.-Luxembourg MLAT, *supra*, art. 17(3); U.S.-Nigeria MLAT, *supra* note 145, art. XVII(2) ("Such assistance shall include . . . invoking the procedures of the Requested State for the recognition, confirmation, and enforcement of an order for the forfeiture of the proceeds or instrumentalities of criminal activities made by a court or other competent authority in the Requesting State.").

147  These treaties include U.S. MLATs with Italy, Morocco, the Netherlands, Switzerland, and Turkey, *see* Treaty on Mutual Legal Assistance in Criminal Matters art. 18(2), U.S.-It., Nov. 9, 1982, S. Treaty Doc. 98–25; Treaty on Mutual Legal Assistance in Criminal Matters art. 12(2), U.S-Morocco, Oct. 17, 1983, S. Treaty Doc. 98–24; Treaty on Mutual Legal Assistance art. 1, U.S.-Neth., June 12, 1981, S. Treaty Doc. 97–16; Treaty on Mutual Legal Assistance art. 1, U.S.-Switz., May 25, 1973, T.I.A.S. No. 8302, 27 U.S.T. 2019; Treaty on Extradition and Mutual Legal Assistance in Criminal Matters art. 21, U.S.-Turk., June 7, 1979, T.I.A.S. No. 9891, 32 U.S.T. 3111, as well as arrangements with Bulgaria, Denmark, Finland, Malta, Portugal, and Slovakia pursuant to an MLAT with the European Union. *See* Agreement on Mutual Legal Assistance, June 25, 2003, U.S.-E.U., S. Treaty Doc. 109–13.

148  U.S.-Israel MLAT, *supra* note 146, art. 17(4); *see also* U.S.-Czech MLAT, *supra* note 146, art. 20 ("Assistance shall not include collection of criminal fines."); U.S.-France MLAT, *supra* note 146, art. 1(2)(b) ("This Treaty does not apply to . . . the enforcement of criminal judgments except for forfeiture decisions referred to in Article 11.").

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

right to some countries but not to others, and sometimes to some kinds of judgments but not to others. State laws that would enforce foreign criminal fines and forfeitures where the federal government has not chosen to do so would conflict with the federal policy of allowing such enforcement only pursuant to specific treaty provisions and, as in the tax area, would undercut the United States ability to negotiate future treaties providing for reciprocal treatment of U.S. fines and forfeitures.

On the other hand, some state laws recognizing foreign criminal judgments do not appear to violate any federal policy even though they would depart from the penal rule. The clearest examples are state double-jeopardy statutes that bar prosecution under state law when the defendant has been convicted or acquitted by a foreign country for the same offense.[149] In the context of prisoner transfer, federal law prohibits a subsequent prosecution for the same offense by the federal government or by the States,[150] as does the Inter-American Convention.[151] But outside that context, there appears to be no federal policy either for or against extending double-jeopardy protection based on foreign criminal judgments. As Justice Harlan put it in *Zschernig*, "in the absence of a conflicting federal policy or violation of the express mandates of the Constitution the States may legislate in areas of their traditional competence even though their statutes may have an incidental effect on foreign relations."[152]

There are many kinds of state laws that might implicate foreign relations, and might even weaken the U.S. bargaining position in negotiations with other countries. The fact that most States recognize and enforce foreign judgments without requiring reciprocity undoubtedly weakens the position of U.S. negotiators seeking a judgments convention.[153] The American Law Institute's proposed federal judgments statute included a reciprocity requirement precisely "to create an incentive to foreign countries to commit to recognition and enforcement of judgments rendered in the United States."[154] It is not enough to preempt state law that topic could be the subject of treaty negotiations, for

---

149   *See supra* notes 39–40 and accompanying text.

150   18 U.S.C. § 4111.

151   Inter-American Convention, *supra* note 138, art. VII(1).

152   Zschernig v. Miller, 389 U.S. 429, 458–59 (Harlan, J., concurring).

153   Efforts to negotiate a comprehensive Hague Judgments Convention that would include the United States failed, but gave rise to a narrower Convention on Choice of Court Agreements, which the United States has signed but not ratified. For an overview of these developments, including documents, see http://www.hcch.net/index_en.php?act=text .display&tid=153 (last visited Feb. 6, 2014).

154   ALI PROPOSED FEDERAL STATUTE, *supra* note 51, § 7, cmt. b.

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

that is true of many areas of law that the federal government has chosen to leave to the States. When, however, U.S. treaty practice has established a federal policy not to permit the enforcement of foreign tax or penal laws or judgments in the absence of a specific treaty provision, then preemption of state law is clearly called for.

## 5        Conclusion

This chapter has argued that federal preemption of state law departing from the penal and revenue rules is sometimes appropriate, but not across the board on the basis of federal common law. For better or worse, the conflict of laws and the recognition of foreign judgments in the United States have generally been left to the States. The Supreme Court's decision in *Sabbatino* offers only limited support for treating the penal and revenue rules as federal common law, both because *Sabbatino* itself recognized the possibility of state deviations from the act of state doctrine and because the rationales underlying the penal and revenue rules are different from those underlying the act of state doctrine. The better approach is to treat the penal and revenue rules as state common law, capable of alteration by state statute or judicial decision, and to limit federal preemption to situations where "a conflicting federal policy"[155] exists. Under this approach, state laws enforcing foreign tax claims, foreign criminal sentences, and foreign criminal fines and forfeitures would be preempted, while state double-jeopardy statutes would not. Such an approach would protect federal prerogatives in foreign relations, but would also recognize that sometimes it is federal policy to leave even matters affecting foreign relations to the States.

---

155    *Zschernig*, 389 U.S. at 458–59 (Harlan, J., concurring).

William S. Dodge - 9789004278929
Downloaded from Brill.com10/27/2021 03:45:24PM
via Boston College

# Exhibit 68

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 11543

# TAXATION

# Exchange of Information

Agreement Between the
UNITED STATES OF AMERICA
and DOMINICA

Signed at Washington October 1, 1987



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89–497, approved July 8, 1966 (80 Stat. 271; 1 U.S.C. 113)—

". . . the Treaties and Other International Acts Series issued under the authority of the Secretary of State shall be competent evidence . . . of the treaties, international agreements other than treaties, and proclamations by the President of such treaties and international agreements other than treaties, as the case may be, therein contained, in all the courts of law and equity and of maritime jurisdiction, and in all the tribunals and public offices of the United States, and of the several States, without any further proof or authentication thereof."

*For sale by the Superintendent of Documents, U.S. Government Printing Office, Washington, D.C. 20402*

# DOMINICA

## Taxation:    Exchange of Information

*Agreement signed at Washington October 1, 1987;*
*Entered into force May 9, 1988.*

AGREEMENT BETWEEN THE GOVERNMENT OF
THE UNITED STATES OF AMERICA
AND THE GOVERNMENT OF THE COMMONWEALTH
OF DOMINICA FOR THE EXCHANGE
OF INFORMATION WITH RESPECT TO TAXES

The Government of the United States of America and the Government of the Commonwealth of Dominica, desiring to conclude an Agreement for the exchange of information with respect to taxes (hereinafter referred to as the ''Agreement''), have agreed as follows:

## Article 1

### OBJECT AND SCOPE OF THE AGREEMENT

1.  The Contracting States shall assist each other to assure the accurate assessment and collection of taxes, to prevent fiscal fraud and evasion, and to develop improved information sources for tax matters. The Contracting States shall provide assistance through exchange of information authorized pursuant to Article 4 and such related measures as may be agreed upon by the competent authorities pursuant to Article 5.

2.  Information shall be exchanged to fulfill the purpose of this Agreement without regard to whether the person to whom the information relates is, or whether the information is held by, a resident or national of a Contracting State.

## Article 2

### TAXES COVERED

1.  This Agreement shall apply to the following taxes imposed by or on behalf of a Contracting State:

    a)  in the case of the United States of America,

        (i)    Federal income taxes,

        (ii)   Federal taxes on self - employment income,

        (iii)  Federal taxes on transfers to avoid income tax,

        (iv)   Federal estate and gift taxes,

        (v)    Federal excise taxes; and

    b)  in the case of the Commonwealth of Dominica,

> (i)   Income Tax (including withholding taxes),
>
> (ii)  Corporation Tax (including the tax on branch profits), and
>
> (iii) Social Security.

2. This Agreement shall apply also to any identical or substantially similar taxes imposed after the date of signature of the Agreement in addition to or in place of the existing taxes. The competent authority of each Contracting State shall notify the other of significant changes in laws which may affect the obligations of that State pursuant to this Agreement.

3. This Agreement shall not apply to the extent that an action or proceeding concerning taxes covered by this Agreement is barred by the applicant State's statute of limitations.

4. This Agreement shall not apply to taxes imposed by states, municipalities or other political subdivisions, or possessions of a Contracting State.

## *Article 3*

### DEFINITIONS

1. In this Agreement, unless otherwise defined:

   a)  The term ''competent authority'' means:

   > (i)   in the case of the United States of America, the Secretary of the Treasury or his delegate, and
   >
   > (ii)  in the case of the Commonwealth of Dominica, the Minister of Finance or his authorized representative.

   b)  The term ''national'' means:

   > (i)   in the case of the United States, any United States citizen and any legal person, partnership, corporation, trust, estate, association, or other entity deriving its status as such from the laws in force in the United States; and
   >
   > (ii)  in the case of the Commonwealth of Dominica, any citizen and any legal person, partnership, corporation, trust, estate, association, or other entity deriving its status as such from the laws in force in the Commonwealth of Dominica.

   c)  The term ''person'' includes an individual and a partnership, corporation, trust, estate, association or other legal entity.

   d)  The term ''tax'' means any tax to which the Agreement applies.

4

e)   The term "information" means any fact or statement, in any form whatever, that may be relevant or material to tax administration and enforcement, including (but not limited to):

   (i)   testimony of an individual, and

   (ii)   documents, records or tangible personal property of a person or Contracting State.

f)   For purposes of determining the geographical area within which jurisdiction to require production of information may be exercised, the term "United States" means the United States of America, including Puerto Rico, the Virgin Islands, Guam, and any other United States possession or territory, and the territorial waters thereof.

g)   For purposes of determining the geographical area within which jurisdiction to require production of information may be exercised, the term "the Commonwealth of Dominica" means the island of Dominica and the territorial waters thereof.

h)   The terms "applicant State" and "requested State" mean, respectively, the Contracting State applying for or receiving information and the Contracting State providing or requested to provide such information.

2.   Any term not defined in this Agreement, unless the context otherwise requires or the competent authorities agree to a common meaning pursuant to the provisions of Article 5, shall have the meaning which it has under the laws of the Contracting State relating to the taxes which are the subject of this Agreement.

## Article 4

### EXCHANGE OF INFORMATION

1.   The competent authorities of the Contracting States shall exchange information to administer and enforce the domestic laws of the Contracting States concerning taxes covered by this Agreement, including information to effect the determination, assessment, and collection of tax, the recovery and enforcement of tax claims, or the investigation or prosecution of tax crimes or crimes involving the contravention of tax administration.

2.   The competent authority of the requested State shall endeavour to provide information upon request by the competent authority of the applicant State for the purpose referred to in paragraph 1 of this Article. If the information

5

available in the tax files of the requested State is not sufficient to enable compliance with the request, that State shall endeavour to take all available measures to provide the applicant State with the information requested. Privileges under the laws or practices of the applicant State shall not apply in the execution of a request but shall be preserved for resolution by the applicant State. The laws of the respective Contracting States authorize each State to obtain and provide information from financial institutions. The laws of the respective Contracting States do not permit bearer shares of companies organized pursuant to those laws.

3.  If information is requested by a Contracting State pursuant to paragraph 2 of this Article, the requested State shall endeavour to obtain the information requested in the same manner and form provided for in its relevant legislation as though the information was required for enforcement of its own tax laws. However, if specifically requested by the competent authority of the applicant State, the requested State shall:

   a)  specify the time and place for the taking of testimony or the production of books, papers, records, and other tangible property;

   b)  place the individual giving testimony or producing books, papers, records and other tangible property under oath;

   c)  permit the presence of individuals designated by the competent authority of the applicant State as being involved in or affected by execution of the request, including an accused, counsel for the accused, individuals charged with the administration and enforcement of the domestic laws of the applicant State covered by this Agreement, and a commissioner or magistrate present for the purpose of determining issues of privilege under the laws of the applicant State;

   d)  provide individuals permitted to be present with an opportunity to question, directly or through the executing authority, the individual giving testimony or producing books, papers, records and other tangible property;

   e)  determine the authenticity of books, papers, records and other tangible property produced;

   f)  examine the individual producing books, papers, records and other tangible property regarding the purpose for which and the manner in which the item produced is or was maintained;

   h)  permit the competent authority of the applicant State to provide written questions to which the individual producing books, papers,

records and other tangible property is to respond regarding the item produced;

i)    perform any other act not in violation of the laws or at variance with the administrative practice of the requested State;

j)    certify either that procedures requested by the competent authority of the applicant State were followed or that the procedures requested could not be followed, with an explanation of the deviation and the reason therefor.

4.    The provisions of the preceding paragraphs shall not be construed so as to impose on a Contracting State the obligation:

a)    to carry out administrative measures at variance with the laws and administrative practice of that State or of the other Contracting State;

b)    to supply particular items of information which are not obtainable under the laws or in the normal course of the administration of that State or of the other Contracting State;

c)    to supply information which would disclose any trade, business, industrial, commercial or professional secret or trade process;

d)    to supply information, the disclosure of which would be contrary to public policy (ordre public);

e)    to supply information requested by the applicant State to administer or enforce a provision of the tax law of the applicant State, or any requirement connected therewith, which discriminates against a national of the requested State. A provision of tax law, or connected requirement, will be considered to be discriminatory against a national of the requested State if it is more burdensome with respect to a national of the applicant State in the same circumstances. For purposes of the preceding sentence, a national of the applicant State who is subject to tax on worldwide income is not in the same circumstances as a national of the requested State who is not subject to tax on worldwide income. The provisions of this subparagraph shall not be construed to prevent the exchange of information with respect to the taxes imposed by the United States or by the Commonwealth of Dominica on branch profits or on the premium income of nonresident insurers or foreign insurance companies.

5.    Except as provided in paragraph 4, the provisions of the preceding paragraphs shall be construed so as to impose on a Contracting State the obligation to use all legal means and its best efforts to execute a request.

7

A Contracting State may, in its discretion, take measures to obtain and transmit to the other State information which, pursuant to paragraph 4, it has no obligation to transmit.

6.   Any information received by a Contracting State shall be treated as secret in the same manner as information obtained under the domestic laws of that State and shall be disclosed only to individuals or authorities (including judicial and administrative bodies) involved in the determination, assessment, collection, and administration of, the recovery and collection of claims derived from, the enforcement or prosecution in respect of or the determination of appeals in respect of, the taxes which are the subject of this Agreement, or the oversight of the above. Such individuals or authorities shall use the information only for such purposes. These individuals or authorities may disclose the information in public court proceedings or in judicial decisions.

7.   The competent authority of the requested State shall allow representatives of the applicant State to enter the requested State to interview individuals and examine books and records with the consent of the individuals contacted.

## Article 5

### MUTUAL AGREEMENT PROCEDURE AND COSTS

1.   The competent authorities of the Contracting States shall agree to implement a program to carry out the purposes of this Agreement. This program may include, in addition to exchanges specified in Article 4, other measures to improve tax compliance, such as exchanges of technical know-how, development of new audit techniques, identification of new areas of non-compliance, and joint studies of non–compliance areas.

2.   The competent authorities of the Contracting States shall endeavour to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of this Agreement. In particular, the competent authorities may agree to a common meaning of a term and may determine when costs are extraordinary for purposes of this Article.

3.   The competent authorities of the Contracting States may communicate with each other directly for the purposes of reaching an agreement under this Article.

4.   Unless the competent authorities of the Contracting States otherwise agree, ordinary costs incurred in providing assistance shall be borne by the

requested State and extraordinary costs incurred in providing assistance shall be borne by the applicant State.

## Article 6

### IMPLEMENTATION

A Contracting State shall enact such legislation as may be necessary to effectuate this Agreement.

## Article 7

### OTHER APPLICATIONS OF THE AGREEMENT

This Agreement is consistent with the standards for an exchange of information agreement described in Section 274(h)(6)(C) of the United States Internal Revenue Code of 1986 (the Code) (relating to deductions for attendance at foreign conventions), and referred to by cross-reference in Section 927(e)(3)(A) of the Code (relating to foreign sales corporations), and Section 936(d)(4) (relating to Puerto Rico and the possession tax credit).

## Article 8

### ENTRY INTO FORCE

This Agreement shall enter into force upon an exchange of notes by the duly authorized representatives of the Contracting States confirming their mutual agreement that both sides have met all constitutional and statutory requirements necessary to effectuate this Agreement.[1]

## Article 9

### AMENDMENT AND TERMINATION

1.  This Agreement may be modified or amended by mutual consent of the Contracting States.

---

[1] May 9, 1988.

2.   This Agreement shall remain in force until terminated by one of the Contracting States. Either Contracting State may terminate the Agreement at any time after the Agreement enters into force provided that at least 6 months' prior notice of termination has been given through diplomatic channels.

DONE at Washington, D.C., in duplicate, this 1st day of October, 1987.

| FOR THE GOVERNMENT OF | FOR THE GOVERNMENT OF |
|---|---|
| THE UNITED STATES OF | THE COMMONWEALTH OF |
| AMERICA: | DOMINICA: |
| | |
| O. Donaldson Chapoton | The Honorable |
| Assistant Secretary/Designate | Eugenia Charles |
| (Tax Policy) | Prime Minister |

# Exhibit 69

(C) Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

# Why FATCA Intergovernmental Agreements Bind the U.S. Government

Posted on Apr. 15, 2013
Susan Morse is an associate professor at UC Hastings College of the Law in San Francisco.
The author would like to thank Allison Christians, Itai Grinberg, and Stephen Shay for their helpful comments on this essay.

\* \* \* \* \*

In an essay published recently in this magazine, professor Allison Christians questioned the binding legal force of bilateral intergovernmental agreements (IGAs) relating to the Foreign Account Tax Compliance Act and entered into by the U.S. government. (Prior coverage: "The Dubious Legal .) Yet IGAs have a strong case for binding status as valid congressional-executive agreements or treaty-based agreements. And regardless of their status as international agreements, IGAs should bind the U.S. government as administrative guidance.

FATCA aims to ensure that U.S. holders of accounts at foreign financial institutions (FFIs) do not escape the notice of the U.S. government. The statute anticipates that FFIs will automatically provide information about U.S. account holders under direct agreements with the U.S. government. Otherwise, FATCA imposes an onerous 30 percent withholding tax under section 1471(a). Under the statute, the withholding tax would apply to certain U.S.-source income, such as interest and dividends, and also to gross proceeds from the sale of securities that would produce certain U.S.-source investment income. Moreover, it could apply to all accounts at an FFI, whether or not held by a U.S. person.[1]

The IGAs address the potential problem of lack of enforceability presented by FATCA.[2] They have at least three important components that contribute to relief from FATCA's withholding tax. First, they allow the rerouting of information about non-U.S. accounts. Rather than requiring direct reporting from FFIs to the U.S. government, the IGA framework permits a non-U.S. government with jurisdiction over an FFI to collect and forward information about U.S. accounts at the FFI to the U.S. government. For example, in the U.K.-U.S. IGA, the U.K. agrees to collect and automatically forward to the U.S. certain information about "each U.S. Reportable Account of each Reporting United Kingdom Financial Institution." Each reporting U.K. financial institution is "not subject to withholding under Section 1471(a)," even with respect to recalcitrant account holders.

The U.S. is also obliged to provide information, including, for example, about U.K. taxpayers with accounts at U.S. institutions. However, its ability to do so is constrained by its lack of access to such

Pedigree of IGAs (and Why It Matters)," *Tax Notes Int'l*, Feb. 11, 2013, p. 565

(C) Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

information, partly because of the qualified intermediary rules. It goes too far to label any of the IGAs "reciprocal" as yet, even though IGA recitals state that the U.S. "is committed to "pursuing equivalent levels of exchange."

Second, the IGAs clarify and in some ways soften the due diligence requirements that apply to determine whether an account is a reportable U.S. account. For example, the U.K.-U.S. IGA permits an electronic records screen for most preexisting accounts whose value does not exceed $1 million. It also exempts certain preexisting insurance and annuity contracts from review and provides methods to evaluate accounts held by entities.

Third, the IGAs create explicit exceptions for some types of exempt entities, financial institutions, or accounts. These include not only U.K. government units and nongovernmental organizations but also some U.K. retirement funds and local banks. The IGA also exempts some retirement accounts and other savings vehicles aimed at or limited to U.K. taxpayers.

Christians points out that the IGAs are not treaties endorsed by Senate advice and consent. She also argues that they are not congressional-executive agreements pre-authorized by statute and are not treaty-based agreements that interpret existing treaty positions. She expresses concern that if IGAs are merely "sole executive agreements," they may lack the force of law, and suggests that this may cause problems for taxpayers with non-U.S. accounts who rely on the IGAs to reduce or eliminate otherwise applicable FATCA withholding liability. Might such taxpayers, including non-U.S. persons, discover that the IGAs are invalid and that they face the 30 percent withholding tax after all?

## Congressional-Executive Agreements

 The grant of congressional-executive authority to Treasury in section 274(h)(6)(C)(i) to negotiate tax information exchange agreements does not explicitly cover the FATCA IGAs. As Christians writes, the section refers to only a narrow category of TIEAs -- those with a list of Caribbean Basin countries. Yet this section has previously received a broad judicial interpretation. Even if the statute is not clear, case law suggests that courts would enforce FATCA IGAs as valid information exchange agreements.
In *Barquero v. United States*, 18 F.3d 1311 (5th Cir. 1994), the court refused to quash a summons issued by the U.S. in response to a request by Mexico seeking information about a Mexican citizen pursuant to the Mexico-U.S. TIEA. The court held that section 274(h)(6)(C)(i) supported the government's negotiation of a TIEA with Mexico and found the agreement "constitutional and valid," even though Mexico is not among the Caribbean Basin countries specifically listed in section 274.

The court relied on "congressional acquiescence in the President's concluding [tax information exchange agreements] with [other] countries," as evidenced by the Senate's ratification of an updated Mexico-U.S. treaty after the negotiation of the TIEA. In addition, the court found "implicit approval" for entry into the TIEA in the enactment of section 927(e)(3), which limited the application of now-defunct foreign sales corporation preferential status to corporations organized in countries that had negotiated TIEAs with the U.S. Section 927(e)(3) explicitly gave effect to TIEAs with countries not listed in section 274 for purposes of eligibility for FSC status.

(C) Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

A WTO challenge to the FSC regime as an illegal export subsidy led to the regime's repeal in 2000. Partly because of the clear WTO reason for the repeal of section 927 together with other FSC provisions, it need not be interpreted as a congressional retreat from the endorsement of Treasury's negotiations of TIEAs. Indeed, the U.S. has over the last several years entered into a significant number of TIEAs that follow the OECD's information-on-request model. These are generally treated as valid agreements despite the lack of Senate advice and consent.[3]

### Treaty-Based Agreements

Christians also challenges the position of the U.S. that exchange of information articles in existing treaties support the negotiation of the FATCA IGAs. IGAs refer to this basis for negotiation in their recitals. But Christians argues that treaty information provisions do not support the exchange of information contemplated by FATCA, because FATCA imposes a withholding tax (absent compliance with additional information requirements) in violation of the treaties' restrictions on U.S. taxation of interest, dividends, and capital gains paid to treaty residents.

According to the information exchange provision in article 26 of the U.S. model treaty:

The competent authorities of the Contracting States shall exchange such information as may be relevant for carrying out the provisions of this Convention or of the domestic laws of the Contracting States concerning taxes of every kind imposed by a Contracting State to the extent that the taxation thereunder is not contrary to the Convention.

FATCA aims to carry out the U.S. domestic law provisions that tax U.S. citizens and residents -- for example, sections 1, 11, and 61. These core provisions are not contrary to any tax treaty. Indeed, tax treaty savings clauses ensure that the U.S. retains the right to tax its citizens. And it is clear that article 26 supports information exchange for taxes regardless of whether they are addressed by the convention.

But FATCA also provides that a non-U.S. account may be subject to withholding if an FFI fails to provide sufficient information. For example, if a treaty interest article provides that there will be no U.S. tax on U.S.-source interest paid to a treaty resident, and FATCA provides that there will be a 30 percent tax on U.S.-source interest paid to a treaty resident, is FATCA contrary to the treaty? As Christians writes, the last-in-time rule articulated in section 7852 preserves the validity of the U.S. statute, but it does not resolve this question of consistency.

Yet FATCA is consistent with U.S. treaty obligations. FATCA only imposes an information requirement relating to certification of treaty eligibility in order to avoid a withholding tax. FATCA is like the regulations under section 1441, which require the provision of a Form W-8BEN to evidence non-U.S. status or treaty status before the application of reduced rates of withholding. Under section 1474(b) and implementing regulations, FATCA permits non-U.S. beneficial owners or FFIs to claim a refund if a withheld FATCA tax exceeds the U.S. tax liability otherwise due and other requirements

(C) Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

are satisfied.

Neither the requirement of a Form W-8BEN nor the requirement of information exchange under an IGA violates tax treaties' commitments to reduced rates of tax. Instead, both are administrative mechanisms for verifying eligibility for such reduced rates of tax. The OECD commentary to article 26 contemplates information exchange as "foreseeably relevant to secure the correct application of the provisions of the Convention." Even if IGA counterparties run the agreements through their treaty ratification processes, as Christians points out, treaty provisions and commentary support IGA validity without this step.

## Binding Administrative Guidance

IGAs should also bind the U.S. government as administrative guidance. FATCA's statutory withholding requirement is subject to several exceptions, including one that excepts "any other class of persons identified by the Secretary for purposes of this subsection as posing a low risk of tax evasion." (Section 1471(f)(4).) To provide taxpayers, including non-U.S. persons, with assurance that the IGAs will indeed limit the circumstances in which the U.S. government may impose FATCA's withholding tax, U.S. tax administrators need only create guidance that will constrain their own power to impose that tax. The IGAs do not need to qualify as enforceable intergovernmental agreements -- although they may fit that description as well. They need only constitute domestic law with enough force to bind the U.S. government.

The hierarchy of tax administrative guidance includes regulations; published Internal Revenue Bulletin guidance such as revenue rulings, revenue procedures, and notices; and private guidance, including technical advice memoranda requested by auditors and private letter rulings requested by taxpayers. Because the framework and substance of IGAs is incorporated into the regulations under FATCA, it presumably merits the generous deference of *Chevron* review, which is accorded to regulations under *Mayo* when notice and comment requirements are met.[4]

*Chevron* deference requires that "Congress has not directly addressed the precise question at issue" and that "the agency's answer is based on a permissible construction of the statute."[5] Because the statute specifically invites administratively created exceptions, it fulfills the first step. Regarding the second step, there is a high degree of congruence between the availability of automatic reporting from a non-U.S. treaty partner and the goal of identifying low tax-evasion risks. For example, extremely low underreporting rates for income that is reported evidences the reasonableness of the link between the substance of the IGAs and the purpose of the statute.

Even if it is reviewed under the less generous deference standard applied to published Internal Revenue Bulletin guidance, a court should conclude that the IGAs bind the U.S. government and require the government to offer the withholding tax relief set forth in the agreements. Internal agency practice and guidance confirms that U.S. tax administrators consider themselves bound by the terms of their own published guidance.[6] Courts have agreed. For example, the Sixth Circuit has said that published guidance such as a revenue ruling "binds the government."[7]

The U.S. might bring FATCA IGAs into future tax treaty ratification rounds to cement the position that

---



the IGAs are valid and enforceable congressional-executive agreements or treaty interpretations. And U.S. regulation writers may further incorporate the IGA framework into the FATCA regs to ensure that IGAs reside under the *Chevron* deference umbrella. But even if they do neither, there are excellent reasons to conclude that U.S. courts would require U.S. tax administrators to fulfill the withholding tax relief commitments made in FATCA IGAs.

(C) Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

## FOOTNOTES

[1] *See* Itai Grinberg, "The Battle Over Taxing Offshore Accounts," 60 *UCLA L. Rev.* 304 (2012); J. Richard Harvey, Jr. "Offshore Accounts: Insider's Summary of FATCA and Its Potential Future," 57 *Vill. L. Rev.* 471 (2012).
[2] *See* Susan C. Morse, "Ask for Help, Uncle Sam: The Future of Global Tax Reporting," 57 *Vill. L. Rev.* 529 (2012).

[3] *See, e.g.*, Charles M. Bruce, "Making Sense of the Liechtenstein-U.S. TIEA," *Tax Notes Int'l*, Jan. 5,
.

[4] *See, e.g.,* Kristin E. Hickman, "Unpacking the Force of Law," 66 *Vand. L. Rev.* 465 (2013).

[5] *Chevron Inc. v. Natural Resources Defense Council*, 468 U.S. 1227 (1984).

[6] *See* Leandra Lederman, "The Fight Over 'Fighting Regs' and Judicial Deference in Tax Litigation," 92 *B.U. L. Rev.* 643, 664-666 (2012) (citing a Treasury regulation providing for taxpayer reliance on revenue rulings for "substantially the same" facts and a chief counsel notice stating that "Chief Counsel attorneys may not argue contrary to final guidance" in litigation).

[7] *The Limited v. Commissioner*, 286 F.3d 324, 337 (2011). Even "customary deviations" from law may acquire the force of law over time and come to bind the government. *See* Lawrence Zelenak, "Custom and the Rule of Law in the Administration of the Income Tax," 62 *Duke L. J.* 829, 839-840 (2013) (citing *Vesco v. Comm'r*, 39 T.C.M. (CCH) 101, 130 (1979) (holding that an exclusion extended as a matter of administrative grace must be extended to all taxpayers equally)).

## END OF FOOTNOTES

2009, p. 12

# Exhibit 70

# International Journal™

December 03, 2021
•

## Current Status of U.S. Tax Treaties and International Tax Agreements

  

By Jason R. Connery, Seth Green, and
Kimberly Tan Majure
KPMG LLP
Washington, D.C.

*Editor's Note:* New material is indicated in bold italics and is current as of ***November 26, 2021***.

|  | TABLE OF CONTENTS |
|---|---|

| I. Income Tax Treaties |
|---|

| | A. | Income Tax Treaties in Force |
|---|---|---|

| | B. | Income Tax Treaties Approved by U.S. Senate, Awaiting Exchange of Instruments of Ratification |
|---|---|---|

| | C. | Income Tax Treaties Signed, Awaiting U.S. Senate Approval |
|---|---|---|

| | D. | Income Tax Treaties Under Negotiation |
|---|---|---|

| | E. | Income Tax Treaties Terminated |
|---|---|---|

| II. Estate/Gift Tax Treaties |
|---|

| | A. | Estate/Gift Tax Treaties in Force |
|---|---|---|

| | B. | Estate/Gift Tax Treaties Signed, Awaiting Final Action |
|---|---|---|

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

C. | Estate/Gift Tax Treaties Under Negotiation

III. Tax Information Exchange Agreements (TIEAs)

A. | TIEAs in Force

B. | TIEAs Signed, Awaiting Final Action

C. | TIEAs Under Negotiation

IV. FATCA Intergovernmental Agreements (FATCA IGAs)

A. | FATCA IGAs in Force

B. | FATCA IGAs Signed and in Effect, Awaiting Final Action

C. | FATCA IGAs Not Yet Signed But Treated as in Effect

D. | FATCA IGAs Signed But Not Yet Treated as in Effect

E. | FATCA IGAs Under Negotiation

V. Reciprocal Shipping/Aviation Agreements

A. | Reciprocal Shipping/Aviation Agreements in Force

B. | Reciprocal Shipping/Aviation Agreements Under Negotiation

VI. Social Security Totalization Agreements

A. | Social Security Totalization Agreements in Force

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

| B. | Social Security Totalization Agreements Signed, Awaiting Final Action |
|----|---|

| C. | Social Security Totalization Agreements Under Negotiation |
|----|---|

**I. Income Tax Treaties**

**A. Income Tax Treaties in Force**

| Country | General Effective Date [1] |
|---|---|
| Armenia[6] | 01-01-1976 |
| *Australia[9] | 12-01-1983 |
| *Austria[9] | 01-01-1999 |
| Azerbaijan[6] | 01-01-1976 |
| Bangladesh[1, 9] | 01-01-2007 |
| *Barbados[5, 9] | 01-01-1984 |
| Belarus[6] | 01-01-1976 |
| *Belgium[9, 10] | 01-01-2008 |
| Bermuda[2] | 01-01-1986 |
| Bulgaria[9, 14] | 01-01-2009 |
| *Canada[9, 15] | 01-01-1985 |
| China, People's Republic of[7, 9] | 01-01-1987 |
| Cyprus[9] | 01-01-1986 |
| Czech Republic[9] | 01-01-1993 |
| *Denmark[9, 11] | 01-01-2001 |
| Egypt[9] | 01-01-1982 |
| Estonia[9] | 01-01-2000 |
| *Finland[9, 12] | 01-01-1991 |
| *France[9, 17] | 01-01-1996 |
| Georgia[6] | 01-01-1976 |
| *Germany[4, 9, 13] | 01-01-1991 |
| Greece[9] | 01-01-1953 |
| Hungary[9] | 01-01-1980 |
| *Iceland[9, 16] | 01-01-2009 |

Current Status of U.S. Tax Treaties and International Tax Agreements, International Journal (BNA)

| | |
|---|---|
| India[9] | 01-01-1991 |
| Indonesia[9] | 01-01-1990 |
| *Ireland[9] | 01-01-1998 |
| Israel[9] | 01-01-1995 |
| *Italy[9, 18] | 01-01-2010 |
| *Jamaica[5, 9] | 01-01-1982 |
| *Japan[9],[21] | 01-01-2005 |
| *Kazakhstan[9] | 01-01-1996 |
| Korea[9] | 01-01-1980 |
| Kyrgyzstan[6] | 01-01-1976 |
| Latvia[9] | 01-01-2000 |
| Lithuania[9] | 01-01-2000 |
| *Luxembourg[9, 23] | 01-01-2001 |
| Malta[9, 20] | 01-01-2011 |
| Mexico[9] | 01-01-1994 |
| Moldova[6] | 01-01-1976 |
| Morocco[9] | 01-01-1981 |
| *Netherlands[9] | 01-01-1994 |
| Netherlands Antilles[3] | 01-01-1955 |
| *New Zealand[9, 19] | 01-01-1984 |
| *Norway[9] | 01-01-1971 |
| Pakistan[9] | 01-01-1959 |
| Philippines[9] | 01-01-1983 |
| Poland[9] | 01-01-1974 |
| Portugal[9] | 01-01-1996 |
| Romania[9] | 01-01-1974 |
| *Russia[9] | 01-01-1994 |
| Slovak Republic[9] | 01-01-1993 |
| Slovenia[9] | 01-01-2002 |
| South Africa[9] | 01-01-1998 |
| Spain[9, 22] | 01-01-1991 |
| Sri Lanka[9] | 01-01-2004 |
| *Sweden[9] | 01-01-1996 |
| *Switzerland[9, 24] | 01-01-1998 |

**Bloomberg Law®**

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

| ⬜Tajikistan[6] | 01-01-1976 |
| ⬜Thailand[8, 9] | 01-01-1998 |
| *Trinidad & Tobago[5, 9] | 01-01-1970 |
| ⬜Tunisia[9] | 01-01-1990 |
| ⬜Turkey[9] | 01-01-1998 |
| ⬜Turkmenistan[6] | 01-01-1976 |
| *Ukraine[9] | 01-01-2001 |
| *United Kingdom[9] | 01-01-2004 |
| ⬜Uzbekistan[6] | 01-01-1976 |
| ⬜Venezuela[9] | 01-01-2000 |
| | |
| ___ | |

\* A prior income tax treaty was in force before the general effective date noted above.

[1] The general effective date indicates when the latest income tax treaty with the United States became effective. This general effective date does not necessarily apply to any protocol to the treaty. Some income tax treaties provide for different effective dates for different provisions of the treaty (e.g., taxation at source). The specific treaty and all related protocols should be examined carefully to determine the applicable effective date.

[2] The tax treaty between the United States and Bermuda (dealing with income of insurance companies) entered into force with certain reservations on December 2, 1988, and is effective as follows: (1) for excise taxes on insurance premiums paid to foreign insurers, for premiums paid or credited on or after January 1, 1986; (2) for income taxes on business profits derived by an insurance enterprise, for assistance. A reservation to the treaty provides that the treaty exemption from U.S. insurance excise taxes will *not* apply to premiums allocable to insurance coverage for periods after December 31, 1989.

[3] In a note dated June 29, 1987, the Netherlands Antilles and Aruba governments were notified that the U.S. government was terminating the U.S.-Netherlands Antilles and the U.S.-Aruba income tax treaties. The termination of both treaties was effective as of January 1, 1988. On July 10, 1987, the U.S. government modified the June 29 notice of termination to provide that Article VIII of both treaties (which exempts interest paid by U.S. persons to corporations and residents of the Netherlands Antilles and Aruba from U.S. tax) will continue in force after December 31, 1987. A protocol to the U.S.-Netherlands Antilles Income Tax Treaty entered into force and became effective on December 30, 1996. The protocol to the limited income tax treaty terminates the current U.S. tax exemption on interest paid to: (1) Antilles companies that are not U.S.-owned (i.e., not controlled foreign corporations); (2) U.S.-owned Antilles companies on non-Eurobond debt; and (3) U.S.-owned Antilles companies on Eurobond debt issued after October 15, 1984.

[4] The U.S.-Germany Income Tax Treaty is effective for the eastern states of Germany (the former East Germany) from January 1, 1991.

[5] The U.S.-U.K. Income Tax Treaty previously applied.

[6] The U.S.-U.S.S.R. Income Tax Treaty, signed June 20, 1973, applies to the countries of

**Bloomberg Law**®
© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Current Status of U.S. Tax Treaties and International Tax Agreements, International Journal (BNA)

Armenia, Azerbaijan, Belarus, Georgia, Kyrgyzstan, Moldova, Tajikistan, Turkmenistan, and Uzbekistan.

[7] The IRS announced in Notice 97-40 that the United States will continue to treat Hong Kong and China as separate countries for tax treaty purposes and that this U.S.-China Income Tax Treaty will not apply to Hong Kong.

[8] The U.S. Treasury announced on December 18, 2001, that the U.S.-Thailand Income Tax Treaty will not terminate because Thailand and the United States have exchanged diplomatic notes providing for the implementation of the treaty's exchange of information provisions. The treaty would have automatically terminated from January 1, 2004, if the exchange of information issue had not been resolved. Thailand and the United States had until June 30, 2003, to exchange the diplomatic notes.

[9] Designated as a "comprehensive income tax treaty … which includes an exchange of information program" for purposes of Code §1(h)(11)(C)(i)(II), thereby allowing certain dividends paid by qualified corporations of that country to U.S. citizens and U.S. resident individuals to be taxed for U.S. tax purposes at rates limited to 5%, 15%, and 20%, as the case may be. (*See* IRS Notice 2011-64.)

[10] A new income tax treaty with Belgium was signed on November 27, 2006, and entered into force on December 28, 2007. The provisions of the tax treaty relating to taxes withheld at source are generally effective for amounts paid or credited on or after February 1, 2008. All other provisions of the tax treaty are generally effective for taxable periods beginning on or after January 1, 2008. However, subparagraph (f) of paragraph 5 of Article 21 (Limitation on Benefits), dealing with the requirement that a "headquarters company" must be subject to the same income tax rules in its country of

residence as a company actively engaged in a trade or business in that country, will not have effect until January 1, 2011. A person that would have been entitled to greater benefits under the old U.S.-Belgium Income Tax Treaty may elect to apply the old treaty in its entirety for an additional 12-month period from the date the new treaty would otherwise have been effective under the withholding and general effective dates.

[11] A new protocol to the U.S.-Denmark Income Tax Treaty was signed on May 2, 2006, and entered into force on December 28, 2007. The provisions of the protocol relating to taxes withheld at source are effective for amounts derived on or after February 1, 2008. All other provisions of the protocol are effective for taxable periods beginning on or after January 1, 2008.

[12] A new protocol to the U.S.-Finland Income Tax Treaty as signed on May 31, 2006, and entered into force on December

28, 2007. The provisions of the protocol relating to taxes withheld at source are generally effective for amounts paid or credited on or after February 1, 2008. However, the provision providing for a tax exemption for certain corporate dividends is effective retroactively for income derived on or after January 1, 2007. All other provisions of the protocol are effective for taxable periods beginning on or after January 1, 2008.

[13] A new protocol to the U.S.-Germany Income Tax Treaty was signed on June 1, 2006, and entered into force on December 28, 2007. The provisions of the protocol relating to

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Current Status of U.S. Tax Treaties and International Tax Agreements, International Journal (BNA)

taxes withheld at source are effective retroactively for amounts paid or credited on or after January 1, 2007. All other provisions of the protocol are generally effective for taxable years beginning on or after January 1, 2008.

[14] An income tax treaty with Bulgaria signed on February 23, 2007, and a related protocol signed on February 26, 2008, entered into force on December 15, 2008. The provisions of the tax treaty and protocol relating to taxes withheld at source are effective for income paid or credited on or after January 1, 2009. All other provisions of the tax treaty and protocol are effective for taxable periods beginning on or after January 1, 2009.

[15] A 5th protocol to the U.S.-Canada Income Tax Treaty was signed on September 21, 2007, and entered into force on December 15, 2008. The provisions of the protocol become effective on various dates in accordance with Article 27 of the protocol. The provisions of the protocol relating to taxes withheld at source are generally effective for amounts paid or credited on or after February 1, 2009. However, the provision providing for the reduction of the tax rate on related party interest from 10% to 7% is effective retroactively for interest derived on or after January 1, 2008. Article 27 should be reviewed to determine other applicable effective dates.

[16] A new income tax treaty and protocol with Iceland were signed on October 23, 2007, and entered into force on December 15, 2008. The provisions of the tax treaty and protocol relating to taxes withheld at source are generally effective for amounts derived on or after January 1, 2009. All other provisions of the tax treaty and protocol are generally effective for any taxable year beginning on or after January 1, 2009.

A person that would have been entitled to greater benefits under the old U.S.-Iceland Income Tax Treaty may elect to apply the old treaty in its entirety for an additional 12-month period from the date the new treaty would otherwise have been effective under the withholding and general effective dates. In addition, an individual who was entitled to benefits under Article 21 (Teachers) of the old treaty at the time of the entry into force of the new treaty shall continue to be entitled to benefits under Article 21 of the old treaty until such time as the individual would cease to be entitled to benefits had the old treaty remained in force.

[17] A new protocol to the U.S.-France Income Tax Treaty was signed on January 13, 2009, and entered into force on December 24, 2009. The provisions of the protocol relating to taxes withheld at source are effective retroactively for amounts paid or credited on or after January 1, 2009. All other provisions of the protocol are generally effective for taxable years beginning on or after January 1, 2010.

[18] A new income tax treaty with Italy was signed on August 25, 1999, and entered into force on December 16, 2009. The provisions of the new tax treaty relating to taxes withheld at source are effective for amounts paid or credited on or after February 1, 2010. All other provisions of the new tax treaty are effective for taxable years beginning on or after January 1, 2010. A person that would have been entitled to greater benefits under the old U.S.-Italy Income Tax Treaty may elect to apply the old treaty in its entirety for an additional 12-month period from the date the new treaty would otherwise have been effective under the withholding and general effective dates.

[19] A new protocol to the U.S.-New Zealand Income Tax Treaty was signed on December

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Current Status of U.S. Tax Treaties and International Tax Agreements, International Journal (BNA)

1, 2008, and entered into force on November 12, 2010. The provisions of the protocol relating to taxes withheld at source are effective for amounts paid or credited on or after January 1, 2011. All other provisions of the protocol are generally effective in the United States for taxable years beginning on or after January 1, 2011, and in New Zealand for taxable years beginning on or after April 1, 2011.

[20] A new income tax treaty with Malta was signed on August 8, 2008, and entered into force on November 23, 2010. The provisions of the new tax treaty relating to taxes withheld at source are effective for amounts paid or credited on or after January 1, 2011. All other provisions of the new tax treaty are effective for taxable years beginning on or after January 1, 2011.

[21] A new protocol to the U.S.-Japan Income Tax Treaty was signed on January 24, 2013, and entered into force on August 30, 2019. The provisions of the protocol relating to taxes withheld at source are effective for amounts paid or credited on or after November 1, 2019. All other provisions of the protocol generally are effective for taxable periods beginning on or after January 1, 2020.

[22] A new protocol to the U.S.-Spain Income Tax Treaty was signed on January 14, 2013, and will enter into force on November 27, 2019. The provisions of the protocol relating to taxes withheld at source are effective for amounts paid or credited on or after November 27, 2019. Other provisions of the protocol are effective for taxable periods beginning on or after November 27, 2019.

[23] A new protocol to the U.S.-Luxembourg Income Tax Treaty was signed on May 20, 2009, and entered into force on September 20, 2019. The protocol is effective for information requests made on or after September 20, 2019, with regard to tax years beginning on or after January 1, 2009.

[24] A new protocol to the U.S.-Switzerland Income Tax Treaty was signed on September 23, 2009, and entered into force on September 20, 2019. The provisions of the protocol relating to taxes withheld at source are effective for amounts paid or credited on or after January 1, 2020. The provisions of the protocol relating to information requests are effective with respect to requests for bank information made on or after September 20, 2019, to information that relates to any date beginning on or after September 23, 2009, and with respect to all other cases, with respect to requests for information that relate to taxable periods beginning on or after January 1, 2010. The provisions of the protocol relating to mandatory arbitration are effective with respect to both cases that are under consideration by the competent authorities as of September 20, 2019, and to cases that come under consideration after September 20, 2019.

**B. Income Tax Treaties Approved by U.S. Senate, Awaiting Exchange of Instruments of Ratification or Formal Notice To Be Given**

| Country | Date Signed | Status |
|---------|-------------|--------|
| None | | |

**C. Income Tax Treaties Signed, Awaiting U.S. Senate Approval**

Bloomberg Law®    © 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

| Country | Date Signed | Status |
|---|---|---|
| Chile (Treaty) | 02-04-2010 | Treaty signed at Washington, D.C., on February 4, 2010. Sent to the U.S. Senate on May 17, 2012, for advice and consent to ratification. Approved by the Senate Foreign Relations Committee and reported to the full U.S. Senate on April 1, 2014, and again on November 10, 2015, and February 8, 2016. |
| Hungary (Treaty) | 02-04-2010 | Treaty signed at Budapest, Hungary, on February 4, 2010. Sent to the U.S. Senate on November 15, 2010, for advice and consent to ratification. Considered by the Senate Foreign Relations Committee at a hearing held |
| | | on June 7, 2011. Approved by the Senate Foreign Relations Committee and reported to the full U.S. Senate on July 26, 2011, and again on April 1, 2014, November 10, 2015, and February 8, 2016. |
| Poland (Treaty) | 02-13-2013 | Treaty signed in Poland on February 13, 2013. Sent to the U.S. Senate on May 20, 2014, for advice and consent to ratification. Approved by the Senate Foreign Relations Committee and reported to the full U.S. Senate on July 16, 2014, and again on November 10, 2015, and February 8, 2016. |
| Vietnam (Treaty and Protocol) | 07-07-2015 | Treaty and accompanying protocol signed in Washington, D.C., on July 7, 2015. |

**D. Income Tax Treaties Under Negotiation**

| Algeria | First round of negotiations was held the week of September 21, 1992. No recent activities. |
|---|---|
| Argentina | Argentina has expressed interest in beginning income tax treaty negotiations. Preliminary talks held on August 10, 1992. The preliminary round of talks planned for the week of August 15, 1994, was postponed. Correspondence sent to Argentina in January 1996. On September 26, 2016, Treasury announced it invited Argentina's representatives to consult with |
| | it on the negotiation of an income tax treaty. On December 15, 2016, a U.S. Treasury official indicated that the first round of negotiations on an income tax treaty had taken place. |
| Armenia | Armenia expressed an interest in beginning income tax treaty negotiations. Correspondence was exchanged. On December 3, 2015, Treasury issued a letter indicating it has no plans to initiate negotiations with Armenia at this time. On February 6, 2018, Treasury announced it will commit resources to negotiating an income tax treaty with Armenia. |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Current Status of U.S. Tax Treaties and International Tax Agreements, International Journal (BNA)

| Azerbaijan | Azerbaijan has expressed an interest in beginning income tax treaty negotiations. Correspondence has been exchanged. No recent activities. |
|---|---|
| Belarus | Belarus has expressed an interest in beginning income tax treaty negotiations. Correspondence has been exchanged. No recent activities. |
| Brazil | Discussions held the weeks of November 13, 1990, and May 18, 1992. Brazil has expressed the need for a tax sparing provision. It is the U.S. Treasury's position that the United States will not enter into a tax treaty with a tax sparing provision, nor will the United States continue negotiations with a country that insists on including such a provision in a tax treaty. On March 17, 2011, Senator Richard Lugar (R-Ind.) introduced a resolution (S. Res. 108) that encourages President Obama to negotiate an income tax treaty with Brazil. |
| Colombia | Initial meetings were held the week of December 8, 2008. The round of negotiations that had been scheduled for the week of December 14, 2009, did not occur. On May 9, 2014, a U.S. Treasury official confirmed a second round of negotiations is underway. On December 15, 2016, a U.S. Treasury official indicated that the U.S. and Colombia were close to initialing a treaty. |
| Croatia | Correspondence exchanged. No recent activities. |
| Ireland | The Irish Department of Finance announced in a press release dated August 25, 2016, that negotiations to amend the existing treaty are underway. On December 15, 2016, a U.S. Treasury official stated that two rounds of negotiations had been completed. |
| Israel | Discussions held the week of November 16, 2009. In July 2017, officials from the United States and Israel expressed an interest in exploring treaty update negotiations. |
| Korea | Negotiations to discuss a new income tax treaty were held the weeks of March 15, 1999 and March 20, 2000. Rounds were also held the weeks of March 19, 2001 and on June 28 and 29, 2001. Negotiations were held in Washington, D.C., the week of June 1, 2009. The round of negotiations that had been planned for October 2009 did not occur. Negotiations seemed to have "stalled." |
| Kuwait | First round of negotiations held the week of November 27, 1989. No recent activities. |
| Kyrgyzstan | Former Soviet Republic has expressed interest in beginning income tax treaty negotiations. Correspondence has been exchanged. No recent activities. |
| Luxembourg | Two rounds of negotiations were held in 2015, with a third round held in early 2016. On June 22, 2016, the U.S. Treasury Department released a statement confirming the two States are in the process of negotiating a protocol that would amend a number of the current treaty's provisions and add the expanded triangular/exempt permanent establishment provision introduced in the 2016 U.S. Model Income Tax Treaty. |

Bloomberg Law®

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Current Status of U.S. Tax Treaties and International Tax Agreements, International Journal (BNA)

| | |
|---|---|
| Malaysia | Negotiations were held the week of March 30, 1992. Another round was held during the week of February 28, 1994. Open issues remain on bank secrecy and the offshore sector. No recent activities. |
| Moldova | Moldova has expressed an interest in beginning income tax treaty negotiations. No recent activities. |
| Netherlands | On December 15, 2016, a U.S. Treasury official stated that negotiations on a new treaty were scheduled to begin in 2017. |
| Norway | U.S. government officials stated on April 5, 2006, that negotiations "have been completed." On May 11, 2012, a U.S. Treasury official stated that a new income tax treaty with Norway had been initialed and is awaiting signature. On January 24, 2014, a U.S. Treasury official stated that a new income tax treaty with Norway is being prepared for signature. |
| Pakistan | The United States has sent correspondence to Pakistan to resume negotiations. Negotiations were held the week of March 11, 1991. Correspondence has been exchanged. However, no recent movement on these discussions. |
| Romania | U.S. government officials stated on November 29, 2005, that preliminary treaty discussions have begun with Romania. On November 6, 2012, a U.S. Treasury official stated that a first round of negotiations was held in March 2012 and a second round of negotiations was held in October 2012. On January 24, 2014, a U.S. Treasury official stated that a new income tax treaty with Romania is being prepared for signature. |
| Singapore | A first round of negotiations was held the week of December 14, 1987. No recent activities. |
| Switzerland | On April 23, 2021, a U.S. Treasury official stated the U.S. is interested in amending the existing treaty with Switzerland |
| Taiwan | Preliminary negotiations were held the week of July 9, 1990. A second round was held the week of March 23, 1992. |
| Trinidad and Tobago | There has been correspondence on open issues. No recent activities. |
| United Kingdom | A second round of negotiations was held at the end of May 2011. On January 15, 2013, a U.S. Treasury official stated that an agreement had been reached on the text of a protocol. |
| Uzbekistan | Has expressed an interest in beginning income tax treaty negotiations. No recent activities. |

**E. Income Tax Treaties Terminated**

| Country | Date Terminated | Effective Date |
|---|---|---|
| Anguilla | 06-30-1983 | 01-01-1984 |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Current Status of U.S. Tax Treaties and International Tax Agreements, International Journal (BNA)

| | | |
|---|---|---|
| Antigua and Barbuda | 02-26-1983 | 08-26-1983 |
| Aruba[1] | 06-29-1987 | 01-01-1988 |
| Barbados[2] | 06-30-1983 | 01-01-1984 |
| Belize | 06-30-1983 | 01-01-1984 |
| British Virgin Islands | 06-30-1982 | 01-01-1983 |
| Burundi | 06-30-1983 | 01-01-1984 |
| Dominica | 06-30-1983 | 01-01-1984 |
| Falkland Islands | 06-30-1983 | 01-01-1984 |
| The Gambia | 06-30-1983 | 01-01-1984 |
| Grenada | 06-30-1983 | 01-01-1984 |
| Malawi | 06-30-1983 | 01-01-1984 |
| Malta | 11-16-1995 | 01-01-1997 |
| Montserrat | 06-30-1983 | 01-01-1984 |
| Netherlands Antilles[1] | 06-29-1987 | 01-01-1988 |
| Rwanda | 06-30-1983 | 01-01-1984 |
| St. Christopher-Nevis | 06-30-1983 | 01-01-1984 |
| St. Lucia | 06-30-1983 | 01-01-1984 |
| St. Vincent and the Grenadines | 06-30-1983 | 01-01-1984 |
| Seychelles | 06-30-1983 | 01-01-1984 |
| Sierra Leone | 06-30-1983 | 01-01-1984 |
| South Africa[3] | 10-15-1986 | 07-01-1987 |
| Zaire | 06-30-1983 | 01-01-1984 |
| Zambia | 06-30-1983 | 01-01-1984 |

[1] Under a modification of the termination notice, Article VIII will remain in force after December 31, 1987. Treasury announced on September 15, 1995, that Article VIII of the treaty with the Antilles would be limited, applying only to interest paid to U.S.-owned Antilles companies on Eurobond debt issued on or before October 15, 1984. The limitation is contained in a protocol that became effective on December 30, 1996. Treasury also announced the complete termination, as of January 1, 1997, of the remaining provision of the income tax treaty with Aruba.

[2] A new Barbados Income Tax Treaty entered into force on March 28, 1986.

[3] A new income tax treaty between the United States and South Africa was entered into and became generally effective as of January 1, 1998.

**II. Estate/Gift Tax Treaties**

**A. Estate/Gift Tax Treaties in Force**

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

The United States has estate, gift, or combined estate and gift, tax treaties in force with the following countries:

| Country | General Effective Date |
|---|---|
| Australia (estate) | 01-07-1954 |
| Australia (gift) | 12-14-1953 |
| Austria (combined estate and gift) | 07-01-1983 |
| Canada (estate) — Terminated | This treaty ceased to have effect with respect to estates of persons dying on or after January 1, 1985; however, see the U.S.-Canada Income Tax Treaty regarding the application of estate and gift taxes. |
| Denmark (combined estate and gift) | 11-07-1984 |
| Finland (estate) | 12-18-1952 |
| France (combined estate and gift)[1] | 10-01-1980 |
| Germany (combined estate and gift) | 01-01-1979 |
| Greece (estate) | 12-30-1953 |
| Ireland (estate) | 12-20-1951 (or, upon election, estates of persons dying in 1951 prior to December 20) |
| Italy (estate) | 10-26-1956 |
| Japan (combined estate and gift) | 04-01-1955 |
| Netherlands (estate) | 02-03-1971 |
| Norway (estate)[3] | 12-11-1951 |
| South Africa (estate) | 07-15-1952 (or upon election, 06-30-1944) |
| Sweden (combined estate and gift) — Notice of Termination given[2] | 09-05-1984; ceased to have effect as of January 1, 2008[2] |
| Switzerland (estate) | 09-17-1952 |
| United Kingdom (combined estate and gift) | 11-11-1979 |
| [1] A protocol to the U.S.-France Estate and Gift Tax Treaty was signed on December 8, 2004, and entered into force on December 21, 2006. It is generally effective with respect to gifts made and deaths occurring after entry into force; however, relief provided with respect to surviving non-citizen spouses and the pro rata unified credit is effective with respect to gifts made and deaths occurring after November 10, 1988. | |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

[2] The U.S. Treasury announced that on June 7, 2007, the United States delivered to the Government of Sweden a Notice of Termination of the Estates, Inheritances, and Gifts Tax Treaty between the two countries. In accordance with Article 15 (Termination) of the treaty, the treaty ceased to have effect as of January 1, 2008. The U.S. Treasury announcement states that since Sweden has abolished its tax on inheritances and gifts, the treaty is no longer needed to prevent double taxation with respect to taxes on estates, inheritances, and gifts.

[3] The Norwegian government terminated this agreement on June 6, 2014. This agreement will not be in effect after December 31, 2014.

### B. Estate/Gift Tax Treaties Signed, Awaiting Final Action

| Country | Date Signed | Status |
|---------|-------------|--------|
| None | — | — |

### C. Estate/Gift Tax Treaties Under Negotiation

| United Kingdom | Meetings were held in April 2000 to negotiate revisions to the current estate and gift tax treaty. |
|---------|--------|

### III. Tax Information Exchange Agreements (TIEAs)

### A. TIEAs in Force

| Multilateral | Effective Date |
|--------------|----------------|
| OECD / Council of Europe Convention on Mutual Administrative Assistance on Tax Matters | 01-04-1995 |
| Country | Effective Date |
| Antigua & Barbuda | 02-10-2003 |
| Argentina | 01-01-2018 |
| Aruba | 09-13-2004 |
| Bahamas | 01-01-2004 - Criminal Tax<br>01-01-2006 - Civil Tax |
| Barbados | 11-03-1984 |
| Bermuda | 12-02-1988 |
| Brazil | 03-19-2013 |

**Bloomberg Law®**

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

| | |
|---|---|
| British Virgin Islands[1] | 03-10-2006 |
| Cayman Islands[1, 4] | 03-10-2006 |
| Colombia | 04-30-2014 |
| Costa Rica[10] | 01-01-2021 |
| Dominica | 05-08-1988 |
| Dominican Republic | 10-12-1989 |
| Gibraltar[7] | 12-22-2009 - Criminal Tax<br>01-01-2010 - Civil Tax |
| Grenada | 07-13-1987 |
| *Guernsey[6] | 03-30-2006 |
| Guyana | 08-27-1992 |
| Honduras | 10-11-1991 |
| Hong Kong | 06-20-2014 |
| *Isle of Man[3] | 06-26-2006 |
| Jamaica | 12-18-1986 |
| *Jersey[8] | 06-26-2006 |
| Liechtenstein[5] | 01-01-2010 |
| Marshall Islands | 03-14-1991 |
| Mauritius | 08-29-2014 |
| Mexico | 01-18-1990 |
| Monaco | 03-11-2010 |
| Netherlands Antilles | 03-22-2007 |
| Panama | 04-18-2011 |
| *Peru | 03-31-1993 |
| Singapore | 01-01-2021 |
| *St. Lucia[2] | 04-22-1991 |
| Trinidad & Tobago | 02-09-1990 |

* Countries that are not included in the "North American area" for purposes of §274(h) relating to the deductibility of certain convention expenses. (See Rev. Rul. 2007-28, issued April 4, 2007.)

[1] Rev. Rul. 2007-28 states that the British Virgin Islands and the Cayman Islands have entered into tax information exchange agreements with the United States that are not of the type described in Code §274(h)(6)(C)(i) because of certain limitations on the scope of those agreements.

[2] Rev. Rul. 2007-28 states that it has come to the attention of the IRS that the tax information exchange agreement signed by the United States and Saint Lucia on January

Current Status of U.S. Tax Treaties and International Tax Agreements, International Journal (BNA)

30, 1987, is not in effect within the meaning of §274(h)(6)(A)(i) because the government of Saint Lucia has not enacted legislation to implement the agreement. The IRS will treat Saint Lucia as not included in the North American area under Code §274(h)(6) with respect to conventions that begin after April 4, 2007, except with respect to expenses for which the taxpayer demonstrates a nonrefundable contractual obligation existing as of April 4, 2007. Representatives of the State Department confirm that the TIEA with Saint Lucia is otherwise in force.

[3] On February 21, 2014, the Isle of Man ratified a protocol, signed on December 13, 2013, that amends this TIEA. This protocol entered into force on August 26, 2015.

[4] A new TIEA with the Cayman Islands entered into force on April 14, 2014.

[5] On May 16, 2014, the United States and Liechtenstein signed a protocol amending the current TIEA. The protocol entered into force on January 22, 2015.

[6] On June 25, 2014, Guernsey ratified a protocol (signed on December 13, 2013) amending the current TIEA. The protocol entered into force on August 26, 2015.

[7] A protocol (signed on May 8, 2014) that amends the current TIEA governing criminal tax matters entered into force on June 29, 2014.

[8] A protocol (signed on December 13, 2013) that amends the current TIEA entered into force on October 28, 2015.

[9] A new TIEA (signed on November 13, 2018) with Singapore entered into force on March 5, 2020.

[10] A new TIEA (signed on April 17, 2018) with Costa Rica entered into force on September 18, 2020.

## B. TIEAs Signed, Awaiting Final Action

| Country | Date Signed | Action Required |
|---|---|---|
| Ecuador | 04-07-2021 | To be determined upon release of the agreement. |
| Gibraltar | 05-08-2014 | To be determined upon release of the agreement. |
| Protocol to the OECD / Council of Europe Convention on Mutual Administrative Assistance on Tax Matters | 05-27-2010 | Will enter into force three months after five parties ratify the Protocol. If a party ratifies the Protocol after it has entered into force, then the Protocol binds that party beginning three months from the date of that party's ratification. Sent to the U.S. Senate on May 17, 2012, for advice and consent to ratification. Approved by the Senate Foreign Relations Committee and reported to the full U.S. Senate on April 1, 2014, and again on February 8, 2016. |

**Bloomberg Law** ®

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**C. TIEAs Under Negotiation**

| | |
|---|---|
| Belize | Preliminary discussions held the week of April 13, 1992. No recent activities. |
| El Salvador | An agreement initialed July 29, 1993. No recent activities. |
| Nicaragua | An agreement initialed June 14, 1991. No recent activities. |

**IV. FATCA Intergovernmental Agreements (FATCA IGAs)**

**A. FATCA IGAs in Force**

| Country | Effective Date |
|---|---|
| Algeria | 01-18-2017 |
| Angola | 10-02-2017 |
| Antigua and Barbuda | 06-07-2017 |
| Armenia | 07-07-2019 |
| Australia | 06-30-2014 |
| Austria | 12-09-2014 |
| Azerbaijan | 11-05-2015 |
| Bahamas | 09-17-2015 |
| Bahrain | 03-05-2018 |
| Barbados | 09-25-2015 |
| Belarus | 07-29-2015 |
| Belgium | 12-23-2016 |
| Bermuda | 08-19-2014 |
| Brazil | 06-26-2015 |
| British Virgin Islands | 07-13-2015 |
| Bulgaria | 06-30-2015 |
| Cambodia | 12-23-2016 |
| Canada | 06-27-2014 |
| Cayman Islands | 07-01-2014 |
| Colombia | 08-27-2015 |
| Costa Rica | 07-08-2019 |
| Croatia | 12-27-2016 |
| Curaçao | 08-03-2016 |
| Cyprus | 09-21-2015 |
| Czech Republic | 12-18-2014 |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Current Status of U.S. Tax Treaties and International Tax Agreements, International Journal (BNA)

| Denmark | 09-30-2015 |
|---|---|
| Dominica | 08-12-2019 |
| Dominican Republic | 07-17-2019 |
| Estonia | 07-09-2014 |
| Finland | 02-20-2015 |
| France | 10-14-2014 |
| Germany | 12-11-2013 |
| Gibraltar | 09-17-2015 |
| Guernsey | 08-26-2015 |
| Greece | 12-13-2017 |
| Greenland | 11-30-2018 |
| Grenada | 04-06-2018 |
| Guyana | 09-29-2017 |
| The Holy See | 06-10-2015 |
| Honduras | 02-19-2015 |
| Hong Kong | 07-06-2016 |
| Hungary | 07-16-2014 |
| Iceland | 09-22-2015 |
| India | 08-31-2015 |
| Ireland | 04-02-2014 |
| Isle of Man | 08-26-2015 |
| Israel | 08-29-2016 |
| Italy | 08-17-2015 |
| Jamaica | 09-24-2015 |
| Jersey | 10-28-2015 |
| Korea | 09-08-2016 |
| Kosovo | 11-04-2015 |
| Kuwait | 01-28-2016 |
| Latvia | 12-15-2014 |
| Liechtenstein | 01-22-2015 |
| Lithuania | 10-07-2014 |
| Luxembourg | 07-29-2015 |
| ***Macau*** | ***07-30-2021*** |
| Malta | 06-26-2014 |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Current Status of U.S. Tax Treaties and International Tax Agreements, International Journal (BNA)

| | |
|---|---|
| Mauritius | 08-29-2014 |
| Mexico | 04-10-2014[1] |
| Moldova | 01-21-2016 |
| Montenegro | 03-28-2018 |
| Netherlands | 04-09-2015 |
| New Zealand | 07-03-2014 |
| Norway | 01-27-2014 |
| Panama | 10-25-2016 |
| Poland | 07-01-2015 |
| Portugal | 08-10-2016 |
| Qatar | 06-23-2015 |
| Romania | 11-03-2015 |
| San Marino | 08-30-2016 |
| Saudi Arabia | 02-28-2017 |
| Serbia | 01-08-2020 |
| Singapore | 01-01-2021[2] |
| Slovak Republic | 11-09-2015 |
| Slovenia | 07-01-2014 |
| South Africa | 10-28-2014 |
| Spain | 12-09-2013 |
| St. Kitts and Nevis | 04-28-2016 |
| St. Lucia | 09-01-2016 |
| St. Vincent and the Grenadines | 05-13-2016 |
| Sweden | 03-01-2015 |
| Switzerland | 06-02-2014 |
| Trinidad and Tobago | 09-22-2017 |
| Tunisia | 09-09-2019 |
| Turkmenistan | 11-06-2017 |
| Turks and Caicos Islands | 07-25-2016 |
| Ukraine | 11-18-2019 |
| United Kingdom | 08-11-2014 |
| Uzbekistan | 07-07-2017 |
| Vietnam | 07-07-2016 |
| [1] The FATCA IGA signed with Mexico on April 9, 2014, replaces the FATCA IGA signed on November 19, 2012. | |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

[2] On January 1, 2021, a FATCA IGA signed with Singapore on November 13, 2018, entered into force. This FATCA IGA supersedes the FATCA IGA signed on December 9, 2014, that had entered into force on March 28, 2015.

## B. FATCA IGAs Signed and in Effect, Awaiting Final Action

| Country | Date Signed | Action Required |
|---|---|---|
| Anguilla | 01-15-2017 | Agreement subject to domestic ratification procedures of Anguilla. |
| Cabo Verde | 03-20-2021 | Agreement subject to domestic ratification procedures of Cabo Verde. |
| Chile | 03-05-2014 | Agreement subject to domestic ratification procedures of Chile. |
| Georgia | 07-10-2015 | Georgia ratified the agreement on September 18, 2015. |
| Greece | 01-19-2017 | Agreement subject to domestic ratification procedures of Greece. |
| Guyana | 10-17-2016 | Agreement subject to domestic ratification procedures of Guyana. |
| Japan | 06-11-2013 | Agreement subject to domestic ratification procedures of Japan. |
| Kazakhstan | 09-11-2017 | Agreement subject to domestic ratification procedures of Kazakhstan. |
| ***Malaysia*** | ***07-21-2021*** | ***Agreement subject to domestic ratification procedures of Malaysia.*** |
| Montserrat | 09-08-2015 | Agreement subject to domestic ratification procedures of Montserrat. |
| Philippines | 07-13-2015 | Agreement subject to domestic ratification procedures of the Philippines. |
| Seychelles | 07-01-2019 | Agreement subject to domestic ratification procedures of Seychelles. |
| Taiwan | 12-22-2016 | Agreement subject to domestic ratification procedures of Taiwan. |
| Thailand | 03-04-2016 | Agreement subject to domestic ratification procedures of Thailand. |
| Turkey | 07-29-2015 | The Turkish Council of Ministers ratified the agreement on October 5, 2016. |
| United Arab | 06-17- | Agreement subject to domestic ratification procedures of |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

| | | |
|---|---|---|
| Emirates | 2015 | the United Arab Emirates. |

## C. FATCA IGAs Not Yet Signed But Treated as in Effect[*]

| Country | Date Identified as Being Treated as in Effect |
|---|---|
| Cabo Verde | 06-30-2014 |
| China | 06-26-2014 |
| Haiti | 06-30-2014 |
| Indonesia | 05-04-2014 |
| Iraq | 06-30-2014 |
| Nicaragua | 06-30-2014 |
| Paraguay | 06-06-2014 |
| Peru | 05-01-2014 |
| ___ | |
| [*] On April 2, 2014, the Internal Revenue Service released Announcement 2014-17 indicating that a jurisdiction that has reached a FATCA IGA in substance can be treated as having a FATCA IGA in effect until December 31, 2014, if: (1) such FATCA IGA is reached in substance prior to July 1, 2014; and (2) such jurisdiction consents to having the status of such FATCA IGA disclosed. On December 1, 2014, the Internal Revenue Service released Announcement 2014-38 indicating that a jurisdiction that has reached a FATCA IGA in substance will be treated beyond December 31, 2014, as having a FATCA IGA in effect, provided the jurisdiction demonstrates firm resolve to sign the FATCA IGA as soon as possible. On August 1, 2016, the IRS released an advance version of Announcement 2016-27. This announcement provides that each jurisdiction that is treated as if it had an IGA in effect and that wishes to continue this treatment must provide the Treasury Department, by December 31, 2016, with a detailed explanation of why the jurisdiction has not yet brought the IGA into force and provide a step-by-step plan that the jurisdiction intends to follow in order to sign the IGA (if it has not been signed) and bring the IGA into force. | |
| | |

## D. FATCA IGAs Signed But Not Yet Treated as in Effect

| Country | Date Signed | Action Required |
|---|---|---|
| None | | |

## E. FATCA IGAs Under Negotiation

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

| Argentina | FATCA IGA negotiations are underway. |
| Lebanon | The U.S. Treasury Department is working to explore options for a FATCA IGA. |
| Pakistan | In a press release dated June 24, 2014, the Pakistani government noted FATCA IGA negotiations are underway. |
| Russia | According to a Russian press release published in April 2014, FATCA IGA negotiations with Russia have been suspended. |
| Saint Maarten | The U.S. Treasury Department is working to explore options for a FATCA IGA. |
| Singapore | On August 2, 2016, the United States and Singapore jointly announced that negotiations are ongoing for an IGA that provides for reciprocal automatic exchange of information with respect to financial accounts under FATCA. On October 24, 2017, the United States and Singapore jointly announced that these negotiations have concluded. |
| Sri Lanka | Sri Lankan banks have been directed to comply with the FATCA regime by entering into foreign financial institution agreements with the IRS. |
| Swaziland | FATCA IGA negotiations are underway. |

**V. Reciprocal Shipping/Aviation Agreements**

**A. Reciprocal Shipping/Aviation Agreements in Force**

| Country | Effective Date |
| --- | --- |
| Angola | 01-01-2006 |
| Argentina | 01-01-1987 |
| Bahamas | 01-01-1987 |
| Bahrain | 01-01-1999 |
| Belgium | 01-01-1987 |
| Bolivia | 03-31-1999 |
| Cape Verde | 01-01-2005 |
| Chile (aviation only) | 01-01-1987 |
| China[3, 6] | 01-01-1981 |
| Colombia | 01-01-1987 |
| Cyprus | 01-01-1987 |
| Denmark | 01-01-1987 |
| El Salvador (aviation only) | 01-01-1987 |
| Ethiopia | 01-01-1998 |
| Fiji | 01-01-1996 |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Current Status of U.S. Tax Treaties and International Tax Agreements, International Journal (BNA)

| | |
|---|---|
| Finland | 01-01-1987 |
| Ghana | 01-01-2001 |
| Greece | 01-01-1987 |
| Greenland | 01-01-2011 |
| Hong Kong (shipping only) Terminated[3] | 01-01-2021 |
| India | 01-01-1987 |
| Isle of Man (shipping only) | 01-01-1987 |
| Japan | 01-01-1987 |
| Jersey | 01-01-1997 |
| Jordan | 01-01-1987 |
| Liberia | 01-01-1987 |
| Luxembourg | 01-01-1987 |
| Malaysia | 01-01-1987 |
| Malta | 01-01-1997 |
| Marshall Islands (shipping only) | 01-01-1987 |
| Mexico[4] | 01-01-1987 |
| Norway | 01-01-1987 |
| Pakistan (shipping only) | 01-01-1987 |
| Panama | 01-01-1987 |
| Peru (shipping only) | 01-01-1987 |
| Russia[2] | 01-01-1991 |
| St. Vincent & the Grenadines | 01-01-1987 |
| Saudi Arabia | 01-01-1999 |
| Singapore | 01-01-1987 |
| Sweden | 01-01-1987 |
| Taiwan | 01-01-1987 |
| United Arab Emirates | 01-01-1994 |
| Venezuela | 01-01-1987 |

Rev. Rul. 2008-17, issued March 7, 2008, modifying and superseding Rev. Rul. 2001-48, which had modified and superseded Rev. Rul. 89-42, as supplemented by Rev. Rul. 97-31 and corrected by Announcement 97-75, provides that the following countries qualify for the reciprocal exemption by virtue of their domestic law: Antigua and Barbuda (shipping only), Aruba, Barbados, Bermuda, Brazil,[1] British Virgin Islands, Bulgaria, Cayman Islands, Chile (shipping only), Croatia, Ecuador (shipping only),[5] Gibraltar, Israel, Kuwait (shipping only), Monaco, The Netherlands, The Netherlands Antilles, Peru (aviation only), Portugal,[1] Qatar

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Current Status of U.S. Tax Treaties and International Tax Agreements, International Journal (BNA)

(aviation only), Spain,[1] Surinam, Turkey, Turks & Caicos, Uruguay, Vanuatu and the U.S. Virgin Islands.

[1] Local law exempts corporations only.

[2] The Russian Federation entered into a diplomatic note effective retroactively to January 1, 1991. This note was terminated on January 1, 1994, the general effective date of the new U.S.-Russia Income Tax Treaty.

[3] On October 20, 2020, the IRS and U.S. Treasury released Announcement 2020-40 confirming that the termination takes effect on January 1, 2021, and shall have effect for taxable years beginning on or after January 1, 2021. On August 19, 2020, the U.S. Department of State announced that it notified the Hong Kong authorities of the suspension or termination of the agreement. The IRS announced in Notice 97-40 that the United States will continue to treat Hong Kong and China as separate countries for purposes of the Reciprocal Shipping Exemption and that the Shipping Agreement with Hong Kong will continue to apply.

[4] Mexico entered into a diplomatic note with the United States. This note was terminated on January 1, 1994, the general effective date of the new U.S.-Mexico Income Tax Treaty.

[5] The exemption is generally effective for all open years beginning on or after January 1, 1987.

[6] A shipping and aircraft agreement between the United States and China was signed on March 5, 1982, and became effective retroactively to January 1, 1981. Note that, unlike other shipping and aircraft agreements, this agreement was ratified by the President on September 6, 1983, after receiving the advice and consent of the U.S. Senate (as required for treaties). This agreement is considered a "limited treaty" and in Rev. Rul. 2008-17 the IRS includes China in its list of countries (Table II) currently granting equivalent exemptions by income tax treaty. The U.S.-China Income Tax Treaty (with Protocols) does not include a provision relating to the international operation of ships and aircraft.

**B. Reciprocal Shipping/Aviation Agreements Under Negotiation**

| Costa Rica | Negotiations suspended. |
|---|---|
| Honduras | Expressed interest in exchange of notes relating to airlines only. |
| Hong Kong | Discussions on airlines only. |
| Kenya | Expressed interest in exchange of notes relating to airlines only. |
| Kuwait | On May 28, 2014, the United States and Kuwait signed a Memorandum of Understanding (MOU) evidencing a reciprocal tax exemption for income derived from the international operation of aircraft. The MOU enters into force on the date of the later of the notifications by each party and is to have effect with respect to taxable years beginning on or after January 1 following such later notification. |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Current Status of U.S. Tax Treaties and International Tax Agreements, International Journal (BNA)

| Latvia | Draft texts of agreement relating to both shipping and airlines have been exchanged and are being reviewed. |
|---|---|
| Mauritius | Negotiations suspended. |
| Tonga | Negotiations suspended. |

## VI. Social Security Totalization Agreements

### A. Social Security Totalization Agreements in Force

| Country | Effective Date |
|---|---|
| Australia | 10-01-2002 |
| Austria | 11-01-1991 |
| (Austria—Supplementary Agreement) | 01-01-1997 |
| Belgium | 07-01-1984 |
| Brazil | 10-01-2018 |
| Canada with Supplementary Agreement | 08-01-1984 |
| (Canada—2nd Supplementary Agreement) | 10-01-1997 |
| Chile | 12-01-2001 |
| Czech Republic[3] | 01-01-2009 |
| Denmark | 10-01-2008 |
| Finland | 11-01-1992 |
| France | 07-01-1988 |
| Germany[1] | 12-01-1979 |
| (Germany—Supplementary Agreement) | 03-01-1988 |
| (Germany—2nd Supplementary Agreement) | 05-01-1996 |
| Greece | 09-01-1994 |
| Hungary | 09-01-2016 |
| Iceland | 03-01-2019 |
| Ireland | 09-01-1993 |
| Italy | 11-01-1978 |
| (Italy—Supplementary Agreement) | 01-01-1986 |
| Japan | 10-01-2005 |
| Luxembourg | 11-01-1993 |
| Netherlands (with protocol) | 11-01-1990 |
| (Netherlands—Supplementary Protocol) | 05-01-2003 |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Current Status of U.S. Tax Treaties and International Tax Agreements, International Journal (BNA)

| | |
|---|---|
| Norway | 07-01-1984 |
| (Norway—Supplementary Agreement) | 09-01-2003 |
| Poland | 03-01-2009 |
| Portugal | 08-01-1989 |
| Slovak Republic | 05-01-2014 |
| Slovenia | 02-01-2019 |
| South Korea | 04-01-2001 |
| Spain | 04-01-1988 |
| (Spain—Supplementary Agreement) | 08-26-2014 |
| Sweden | 01-01-1987 |
| (Sweden—Supplementary Agreement) | 11-01-2007 |
| Switzerland[2] | 08-01-2014 |
| United Kingdom | 01-01-1985 |
| (United Kingdom—Benefits based on combined periods of coverage) | 01-01-1988 |
| (United Kingdom—Supplementary Agreement) | 09-01-1997 |
| Uruguay | 11-01-2018 |
| [1] Reunification has extended application of the agreement to former East German territory effective October 3, 1990. | |
| [2] This social security agreement with Switzerland (signed on December 3, 2012) replaces the social security agreement signed in 1979, as amended by a 1988 protocol. | |
| [3] A protocol signed on September 23, 2013, to the social security totalization agreement with the Czech Republic entered into force on May 1, 2016. The protocol's provisions are generally effective May 1, 2016. | |

**B. Social Security Totalization Agreements Signed, Awaiting Final Action**

| Country | Date Signed | Status |
|---|---|---|
| Mexico | 06-29-2004 | The Agreement must be submitted to the U.S. Congress and the Mexican Senate for review. |

**C. Social Security Totalization Agreements Under Negotiation**

| | |
|---|---|
| Albania | No formal discussions are underway. |
| Argentina | Meetings for preliminary discussions held during the week of June 9, 1997. No recent activity reported. |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Current Status of U.S. Tax Treaties and International Tax Agreements, International Journal (BNA)

| | |
|---|---|
| Bulgaria | Meeting held on January 6, 2015. No formal discussions are underway. |
| India | Meeting held on January 25, 2015. No formal discussions are underway. ***According to a statement published by the Office of the United States Trade Representative on November 23, 2021, there are ongoing discussions on an agreement.*** |
| Israel | Initial inquires made. No recent interest expressed by Israel. |
| Italy | U.S. negotiators have proposed a supplementary agreement. No recent activity reported. |
| Latvia | No formal discussions have been held. |
| New Zealand | Initial inquiries made. Meetings held June 6 and 7, 1991. Discussions held the week of April 27, 1998. No recent activity reported. |
| Paraguay | Paraguay has expressed an interest in beginning negotiations. No formal discussions have been held. |
| Romania | Romania has expressed an interest in beginning negotiations. Formal negotiations are nearly finished. |
| San Marino | No formal discussions have been held. |

*The information contained herein is general in nature and based on authorities that are subject to change. Applicability to specific situations is to be determined through consultation with your tax adviser. The views and opinions are those of the authors and do not necessarily represent the views and opinions of KPMG LLP.*

Bloomberg Law®

# Exhibit 71

# OECD / International

# Beneficial Owner: The Enigma Storms Ahead

**Charl P. du Toit**[*]

**Issue:** Bulletin for International Taxation, 2021 (Volume 75), No. 11/12
**Published online:** 15 October 2021

In this article for the 75th Jubilee issue of the *Bulletin for International Taxation*, Charl du Toit questions and explores why, despite all the criticism that beneficial ownership has received, its use as a "policing term" appears to be ever increasing. It is now also widely used outside international tax in various areas under the exchange of information banner.

## 1. Introduction

"A rose by any other name would smell as sweet", Juliet famously pronounced in William Shakespeare's play, Romeo and Juliet, written in the late 1500s. "What someone or something is called does not change their innate characteristic or attributes" is how this phrase has been interpreted. As will be shown in the discussion in this article, this phrase may well have resemblance to the way in which the term "beneficial owner" has been used in an international tax and other contexts, albeit not in the romantic sense underlying Romeo and Juliet. In the case of beneficial owner, the question, though, is not so much calling a rose by a different name – it is rather a case of why calling it a rose if a different name or term might have been clearer or more appropriate?

What is it that is so appealing about the term "beneficial owner" that its use as a "policing" term is ever increasing, despite all the criticism that it has received in a treaty context, including that it has no clear meaning, it does not achieve its purpose, it is not really needed and so on? In the late 1990s, I did research for my study on beneficial ownership at IBFD. I recall that, when I entered it as a search term on a large international electronic database of articles, court cases and other publications, I received about 19 hits. If the same exercise is done today, one would probably not be able to count the hits. As is discussed further, its use as a term has expanded widely from the OECD Model[1] to various other spheres.

Years ago, in the firm where I worked, one of the secretaries had a notice above her desk. It stated (tongue in cheek, hopefully) something along the following lines:

> I have been abused, misunderstood, ridiculed, trampled upon, underpaid and insulted... the only reason why I return to the office every day is my curiosity as to what will happen next!

Such a situation could well apply to beneficial owner – not only the first part on being abused, misunderstood, etc. but also the strong way in which it keeps coming back.

In this article, various uses of beneficial owner(ship) in an international context will be examined in order to see if an answer can be found to the question in the second paragraph of this section. Its most well-known international use is as a treaty concept in articles 10, 11 and 12 (dividends, interest and royalties) of the OECD Model. These days, the use has expanded especially in the exchange of information space dealing with things such as combatting money-laundering, terrorist financing, tax avoidance and bank secrecy, and one must make sense of the meaning and role of organizations and terms, such as the Financial Action Task Force (FATF), the Global Forum, the US Foreign Account Tax Compliance Act (FATCA),[2] the Common Reporting Standard (CRS) and country beneficial owner registers, to name but a few. Unlike the case of the OECD Model, a definition of beneficial owner is provided in most of the other situations in which it is used these days. Although that may take away some of the debate on the meaning of the term in those cases, the question remains "why use beneficial owner as a term when a different term might have been more appropriate"?

*    PhD and Tax Partner Stonehage Fleming, Cape Town. The author can be contacted at charl.dutoit@stonehagefleming.com.
     The author would like to thank the following persons who were willing to share ideas and documentation: Pablo A. Hernandez Gonzalez-Barreda, Adolfo J. Martín Jiménez, René Offermanns and Richard Vann. All of the views expressed in this article are those of the author.

1.   Most recently, *OECD Model Tax Convention on Income and Capital* (21 Nov. 2017), Treaties & Models IBFD.
2.   US: Foreign Account Tax Compliance Act (FATCA).

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

1

Exported / Printed on 28 Oct. 2021 by isabelle.farrar@ropesgray.com.

In line with the objectives of the 75th Jubilee issue of the *Bulletin for International Taxation*, for which this article is written, it is not a fully researched technical thesis covering all aspects and sources – it is merely an article expressing some views. Even though it is in the style of a critical analysis, it is not raw criticism. The challenge of finding solutions for complex international issues is well appreciated, and there is no quarrel with the important work done by the organizations mentioned in the article.

## 2. The Use of Tax Treaties

As a basis for further discussion, I draw on my previous work[3] on the background, context and meaning, knowing well that just about every statement can be (and has been) the subject of a dissenting view. Such is the nature of beneficial ownership.

Beneficial owner is probably the most well-known undefined term in tax treaties, and its international tax meaning is a matter that lends itself to much debate. Beneficial ownership as a term and concept is used both in the OECD Model and the UN Model,[4] and has similarly been incorporated into many tax treaties between different states. The concept is decisive[5] in determining whether a person qualifies for treaty benefits and for the allocation of the right to tax between the two contracting states in respect of dividends, interest and royalties.

Beneficial owner is not defined in either the OECD Model or the UN Model, or in most tax treaties. The main reason for the difference in opinion as to its meaning is the fact that the concept is used in tax treaties between states with different legal systems and traditions, including different understandings and meanings of ownership. In an international treaty context, the conflict is most often between the civil law and the common law states. Whereas beneficial ownership is a well-known term in common law states, it is generally not known in the domestic law of civil law states.

In practice, the question of beneficial ownership is especially problematic in group situations, for example, where there are intermediate companies holding sub-licences, back-to-back loans or simply acting as the holding company of subsidiaries (where a flow-through of dividends occurs). Against the background of its anti-avoidance purpose, the question of whether the reason a certain structure of transaction was entered into is a factor in determining beneficial ownership inevitably arises. There is also the role of domestic anti-avoidance or substance-over-form rules in the interpretation of the treaty meaning of a term. Arguably, the main issue today is whether beneficial ownership is a legal as opposed to a factual or economic substance test.

I previously expressed my hypothesis as to the meaning of beneficial ownership as follows:

> The term was taken from the common law states and incorporated into the OECD Model. The term is not known in the domestic law of states other than the common law states. It can properly be classified as international tax language. It is not defined in the OECD Model. No OECD member state has expressed either a reservation or an observation as to its meaning in the OECD Model. The meaning of beneficial owner at the source that it was taken from, that is, the common law states, should therefore be taken as the starting point for the investigation of its international tax meaning in those bilateral tax treaties which have adopted the wording of the OECD Model. This meaning should then be modified, if necessary, in the context of the treaty and in the light of its object and purpose. This whole process of interpretation should be in accordance with the steps as prescribed by the Vienna Convention.[6]

By applying the reasoning and steps as described above, the following answer is reached:

> The beneficial owner is the person whose ownership attributes outweigh those of any other person.[7]

There has been a big increase in articles, commentaries and court cases on beneficial ownership the last number of years, with the only points of agreement probably being that the term is controversial and its meaning uncertain. One of the latest angles added to this debate is the future relevance of the term following the introduction of the principal purpose test (PPT). In fact, the introduction of the PPT is probably the most significant event as far as the role and place of beneficial owner is concerned, since the introduction of the term beneficial owner into the OECD Model (1977).[8] The PPT has relieved beneficial ownership from solely carrying the burden of being the main (and not always very successful) anti-treaty shopping mechanism.

---

3.   *See* C.P. du Toit, *Beneficial Ownership of Royalties in Bilateral Tax Treaties* (IBFD 1999) and *The Evolution of the Term "Beneficial Ownership" in Relation to International Taxation over the Past 45 Years*, 64 Bull. Intl. Taxn. 10 (2010), Journal Articles & Opinion Pieces IBFD.

4.   At the time of writing this article, most recently, *UN Model Double Taxation Convention between Developed and Developing Countries* (1 Jan. 2017), Treaties & Models IBFD.

5.   Consider the introduction of OECD, *Multilateral Convention to Implement Tax Treaty Related Measures to Prevent Base Erosion and Profit Shifting* (7 June 2017), Treaties & Models IBFD and the principal purpose test (PPT), the use of the term "decisive" is probably no longer fully accurate.

6.   Du Toit, *Beneficial Ownership of Royalties, supra* n. 3, at pp. 178 and 237.

7.   Some years later, in the decision of the Tax Court of Canada (TCC) in CA: TCC, 22 Apr. 2008, *Prévost Car Inc. v. Her Majesty the Queen*, 2008 TCC 231 (10 ITLR 736), 100, Case Law IBFD, a very similar meaning was formulated. However, instead of "outweighs", the court referred to "all the attributes".

8.   *OECD Model Tax Convention on Income and Capital* (11 Apr. 1977), Treaties & Models IBFD.

---

*C. du Toit, Beneficial Owner: The Enigma Storms Ahead, 75 Bull. Intl. Taxn. 11/12 (2021), Journal Articles & Opinion Pieces IBFD  (accessed 22 October 2021).*

2

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.

Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 28 Oct. 2021 by isabelle.farrar@ropesgray.com.

An important reason for the uncertainty is the fact that beneficial owner is not defined in the OECD Model. In addition, the Commentaries on the OECD Model[9] have not been very helpful and clear, despite various amendments over the years. Of particular relevance (as far as the focus of this article is concerned) is the following from the Commentary on Article 12 of the OECD Model, namely that:

> (t)he term "beneficial owner" is therefore not used in a narrow technical sense (such as the meaning that it has under the trust law of many common law countries), rather, it should be understood in its context...[10]

The obvious point is that, if you do not want a term to have its narrow technical meaning, why then choose it – why not use another, more neutral term? It should be borne in mind that the drafters of the OECD Model had several options available to them when they had to decide on a method to restrict treaty benefits. It is known, for example, that they considered making treaty benefits dependent on the payments being liable to tax in the state of residence, or to use the wording "final recipient". There were several other options available to them. For instance, they could simply have said that the treaty benefits are not available to (formal) agents and nominees, or to conduit entities, or to an entity that has been incorporated for the sole purpose of making use of the treaty benefits, or that an entity should be ignored in terms of the substance-over-form principle. They could have used known treaty concepts, such as "special relationship" or "associated enterprises". They could have used "owner" or "economic owner". They could have opted for wording, such as "beneficially entitled", which is more neutral as far as the different member countries of the OECD are concerned.[11]

As mentioned earlier in this section, much has been written on the subject over the last number of years. I refer to but a few. Avery Jones[12] is of the view that the concept of beneficial ownership should never have been incorporated into tax treaties, and that it was never necessary anyway. He further states that it is a perfect example of Humpty Dumpty's famous saying "When I use a word it means just what I choose it to mean – neither more nor less", and finds it amazing that the same expression can have such different meanings. He also questions the view that the treaty meaning originates from the meaning in the common law states.[13]

Vann (2012)[14] refers to the discretionary use of beneficial ownership by tax administrations to deny treaty benefits when it suits them. Following a thorough analysis of the history of the term, he concludes that the sole purpose of the concept should be the exclusion of custodians and persons in a similar situation from treaty protection in their own right.

Danon (2020)[15] concludes his analysis with a proposal to get rid of beneficial ownership. In the author's words, "since, in any event, the PPT is now intended and capable of addressing the conduit company problem in a holistic fashion".

Martín Jiménez(2020)[16] comments that the history of beneficial ownership is unfortunate and is riddled with mistakes, misunderstandings, and biased or interested use. His detailed analysis of court cases in various countries (including Denmark, France, Spain and Switzerland) reveals a tendency to treat beneficial ownership as a de facto as opposed to a legal test. It further shows examples of courts reaching decisions without properly following the steps for interpretation as per the Vienna Convention on the Law of Treaties (the "Vienna Convention") (1969)[17] or referring to other international cases on the subject. He concludes that most countries (with the notable exceptions of Canada and the Netherlands) have preferred to construe beneficial ownership broadly as an alternative to, or replacement for, domestic general anti-avoidance rules (GAARs). Contrary to others, who are of the opinion that recent changes following the OECD/G20 Base Erosion and Profit Shifting (BEPS) Project, including the introduction of the PPT, may signal the end of (the need for) beneficial ownership, he speculates that beneficial ownership may become more relevant in the era following the OECD/G20 BEPS initiative. The reason for this is that tax administrations may find it easier to apply than GAARs (no procedural limitations or GAAR tests). He adds that the judgments of the Court of Justice of the European Union (ECJ) relating to Denmark have made some tax administrations think that beneficial ownership and GAAR are more or less the same, and that they can find support for that in those judgments.

Hattingh (2019),[18] writing on the subject in a South African context, concludes that there is probably no perfect well-described all-encompassing definition of beneficial ownership that lies hidden in a case or an old authority waiting to be discovered. He

---

9.    Most recently, *OECD Model Tax Convention on Income and Capital: Commentaries* (21 Nov. 2017), Treaties & Models IBFD.
10.   Para. 4 *OECD Model: Commentary on Article 12* (2017).
11.   For further discussion on this point, *see* Du Toit, *Beneficial Ownership of Royalties, supra* n. 3, at p. 194.
12.   *See* P.A. Hernandez Gonzalez-Barreda, *Beneficial Ownership in Tax Law and Tax Treaties* Foreword (Hart Publishing 2020).
13.   J.F. Avery Jones, et al., *The Origins of Concepts and Expressions Used in the OECD Model and their Adoption by States*, 60 Bull. Intl. Fiscal Docn. 6, sec. 3.8. (2006), Journal Articles & Opinion Pieces IBFD.
14.   R. Vann, *Beneficial Ownership: What Does History (and Maybe Policy) Tell Us*, Sydney L. Sch. Research Paper No. 12/66, pp. 267 and 306 (9 Sept. 2012), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2144038 (accessed 8 Sept. 2021).
15.   R.J. Danon, *The Beneficial Ownership Limitation in Articles 10, 11 and 12 OECD Model and Conduit Companies in Pre- and Post-BEPS Tax Treaty Policy: Do We (Still) Need It?*, in *Current Tax Treaty Issues: 50th Anniversary of the International Tax Group* sec. 15.4. (G. Maisto ed., IBFD 2020), Books IBFD.
16.   A.J. Martín Jiménez, *Beneficial Ownership – Global Tax Treaty Commentaries* pp. 3 and 44, Global Topics IBFD.
17.   *UN Vienna Convention on the Law of Treaties* (23 May 1969), Treaties & Models IBFD [the "*Vienna Convention* (1969)"].
18.   J. Hattingh, *Beneficial Ownership*, in *Silke on International Tax* 2nd edn., ch. 9: 2.10. (LexisNexis On-line 2019).

*C. du Toit, Beneficial Owner: The Enigma Storms Ahead, 75 Bull. Intl. Taxn. 11/12 (2021), Journal Articles & Opinion Pieces IBFD  (accessed 22 October 2021).*

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 28 Oct. 2021 by isabelle.farrar@ropesgray.com.

3

describes the term "beneficial owner" as being rather like a chameleon, taking its colour from the content of the personal rights to which it is attached as a label, adding that it is not in the nature of a chameleon to nail its colours to the mast.

Gonzalez-Barreda (2020),[19] in a major recent work on the topic, questions whether all the different interpretations of the term mean that beneficial owner is a myth. He illustrates that by his choice of a seahorse as the cover of his book, explaining that some claim it is a fish with the head of a horse - others claim it is a horse with the tail of a fish - and probably both are true to some extent. But in the end, he concludes that it is just a limited rule for agent, nominees and similar arrangements, comparing it to just a horse from which commentators derived a non-existent seahorse. He also refers to a statement by the governor of the Bank of England in 1987 that beneficial owners are like elephants - you know them when you see them. In the Preface of his book, mention is made to Alice's response to the aforementioned Humpty Dumpty statement, namely whether you can make words mean so many different things?[20]

As far as the differences between common and civil law are concerned, I had a memorable experience from a participation in a seminar on trusts in Amsterdam in the late 1990s. I used the opportunity to convey enthusiastically my newly found wisdom on the meaning of beneficial ownership, including my view that it is a concept taken from the common law countries to be applied in international tax treaties. A grey-haired gentleman from Switzerland took great exception to the suggestion that Switzerland should apply the common law (which is of course not what I implied). His temperature then steeply increased on my response (probably a bit insensitive) that, if the Swiss do not recognize or know the term, why then incorporate it in their tax treaties? I recall that, while feebly trying to stand my ground on my view, I glanced over my shoulder at the distance to the hall entrance, calculating whether I would beat this gentleman in a race there should he decide to physically attack me, something that looked like a real possibility at that stage. I realized then that people and countries feel strongly about the sovereignty of their legal systems, and that one should tread carefully on that front.

In concluding this section, the short summary once again illustrates the controversy and uncertainty. In my opinion, though some of it is overstated. The starting point should be an appreciation that there are no simple solutions to deal with complex international issues. Also, if courts and tax administrations carefully and correctly follow and apply the rules of international treaty interpretation, as was the case in *Prévost*,[21] there will be less controversy and uncertainty. With reference to suggestions that beneficial ownership should be deleted from the OECD Model now or be renamed, I am not so sure – the horse has bolted. As far as the focus of this article is concerned and, moving on to section 3., the most important question is to ask why, against this background of controversy and uncertainty, would any body or administration choose beneficial ownership as its policing concept?

# 3. Exchange of Information

## 3.1. Introductory remarks

It has been a real challenge (in which I have not succeeded) for the purposes of this article to understand and analyse properly and categorize the international bodies, instruments and goals that should go under this heading. Which one came first, what is their ranking, hierarchy, status and interrelationship? Are there clearly defined lines or is there overlapping as far as their focus and/or target and constituents are concerned? In addition, given the sheer volume of documentation and publications, you are never certain whether what you are looking at is the latest version, and/or whether it is a stand-alone instrument or should be considered in conjunction with other supplementary documentation.

My experience in this regard is not unique. Offermanns and Botelho Moniz (2019)[22] comment that the number of mechanisms being implemented is unending, and question whether they are all needed and whether the burden faced by taxpayers in obtaining the required information is always proportionate to the goal. Diepvens and Debelva (2015)[23] observe that the Member States of the European Union could be confronted with a plethora of rules regarding the international exchange of information, and that it could be unclear for a Member State which instrument has to be applied in a specific case.

Fortunately, the aforementioned issues are not matters that I have to resolve for the purposes of this article. I have the luxury of randomly picking instruments using the beneficial ownership concept.

---

19.  Gonzalez-Barreda, *supra* n. 12, at Preface, Introduction and p. 304.
20.  Some may observe that the fact that beneficial owner has been linked to as wide a group as an elephant, a chameleon, a seahorse, Humpty Dumpty, Alice in Wonderland and now also William Shakespeare, is a further illustration of its diversity!
21.  *Prévost Car* (2008), *supra* n. 7.
22.  R.H.M.J. Offermanns & R. Botelho Moniz, *Current Trends Regarding Disclosure Mechanisms: Reporting Ultimate Beneficial Ownership – Part 1*, 59 Eur. Taxn. 4, sec. 1. (2019), Journal Articles & Opinion Pieces IBFD.
23.  N. Diepvens & F. Debelva, *The Evolution of the Exchange of Information in Direct Tax Matters: The Taxpayer's Rights under Pressure*, 24 EC Tax Rev. 4, p. 218 (2015).

---

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 28 Oct. 2021 by isabelle.farrar@ropesgray.com.

As far as bodies and instruments are concerned, it is probably safe to say that article 26 of the OECD Model is where exchange of information started as it was already included there in the OECD Draft (1963),[24] and expanded in later versions. Following this, various other bodies and instruments were established, some of which are discussed in sections 3.2. to 3.4. One further important instrument, not discussed in this article, is the OECD Automatic Exchange of Financial Account Information Agreement,[25] which was signed in Berlin on 29 October 2014.

## 3.2. The FATF and the Global Forum

The FATF[26] is an inter-governmental body established in 1989 by the ministers of its member jurisdictions. The FATF recommendations set out a comprehensive and consistent framework of measures which countries should implement in order to counter money laundering and terrorist financing, as well as the financing of proliferation of weapons of mass destruction.

An important element of the FATF procedures is to identify the beneficial owner. For this purpose, the FATF has established the following definition:

> Beneficial owner refers to the natural person(s) who ultimately owns or controls a customer and/or the natural person on whose behalf a transaction is being conducted. It also includes those persons who exercise ultimate effective control over a legal person or arrangement.[27]

Under the heading "Putting an end to offshore tax evasion", the website of the Global Forum describes itself as:

> With 162 members, the Global Forum on Transparency and Exchange of Information for Tax Purposes is the leading international body working on the implementation of global transparency and exchange of information standards around the world.[28]

The Global Forum has adopted standards for tax transparency for both exchange of information on request (EOIR) and automatic exchange of information (AEOI). Member countries also undergo peer reviews to assess their compliance.

An important development in recent years has been the G20's call for more integrated cooperation between organizations on beneficial ownership, given the crucial role beneficial ownership information plays in tax transparency. The FATF and the Global Forum in particular have been given a mandate to align their technical work on beneficial ownership more closely, with a view to better serving the international community.[29]

The Global Forum has adopted the FATF's definition of beneficial ownership, and the rest of the discussion in this section is with specific reference to the Global Forum Toolkit, but which then also has relevance to the FATF meaning and use of the term. The Toolkit provides detailed commentary on how to apply beneficial ownership, for example, in respect of companies and trusts. A full analysis of this is beyond the scope of this article. One point to highlight, though, is applying a percentage threshold for determining controlling participation. In this regard, 25% appears to be a general guideline.

As stated in section 1., once a definition of beneficial ownership is provided it takes away most of the uncertainty that exists in the treaty context. It is worthwhile, though, reflecting on some of the differences between the foregoing definition and the meaning of the term in the common law countries (the last-mentioned reference used in a wide sense). The first difference is that, in terms of the definition of the FATF and/or the Global Forum, only natural persons can be beneficial owners. The second point is the importance of control in the definition of the FATF and/or the Global Forum. In England and Wales, the courts have stated that beneficial ownership has nothing to do with control.[30] Put in simple words, the question is not who can cause a benefit to accrue. Rather, the question is who will enjoy the benefit once it accrues. The definition of the FATF and/or the Global Forum also allows and/or requires one to go right to the top of a pyramid structure to determine the beneficial owner of the assets held at the bottom of the structure. In terms of the meaning in common law countries, arguably, in most cases, the bottom entity will be the beneficial owner of its assets.

Returning to the focus of this article, the question then, given the importance of control in its approach, is why did the FATF adopted beneficial ownership as its "policing" concept? Why not a term focusing on control, which is, indeed, what the CRS did (for which, *see* the discussion in section 3.3.) by using "controlling person"? There are various other terms based on control that

---

24.   *OECD Draft Tax Convention on Income and Capital* (30 July 1963), Treaties & Models IBFD.

25.   *OECD Automatic Exchange of Financial Account Information Agreement* (29 Oct. 2014), Treaties & Models IBFD.

26.   FATF, *International Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation*, FATF, Paris, France (2012-2020).

27.   Global Forum on Transparency and Exchange of Information for Tax Purposes and Inter-American Development Bank, *infra* n. 29, at p. 7.

28.   OECD, Global Forum on Transparency and Exchange of Information for Tax Purposes, *Putting an end to offshore tax evasion*, available at www.oecd.org/tax/transparency/ (accessed 29 Sept. 2021).

29.   *See* Global Forum on Transparency and Exchange of Information for Tax Purposes and Inter-American Development Bank, *A Beneficial Ownership Implementation Toolkit* p. 6 (Mar. 2010).

30.   *See* Du Toit, *Beneficial Ownership of Royalties*, *supra* n. 3, at p. 106.

*C. du Toit, Beneficial Owner: The Enigma Storms Ahead, 75 Bull. Intl. Taxn. 11/12 (2021), Journal Articles & Opinion Pieces IBFD  (accessed 22 October 2021).*

5

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.

Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

could have been considered, such as "ultimate controller". Other terms that come to mind include "main or significant influencer or decision maker".

## 3.3. The FATCA and the CRS

The United States introduced the FATCA in 2010 to exchange financial account information of US taxpayers. The main aim of the FATCA is to counter offshore tax avoidance and non-compliance of US individuals and companies with foreign bank accounts. It obliges foreign financial institutions from all countries to report foreign bank accounts of US taxpayers to the Internal Revenue Service (IRS).[31] The term "beneficial ownership" is used widely in the FATCA documentation. The following definition is provided. The definition is arguably closer to the meaning in the common law countries than some of the others discussed in this article. The focus of the definition also appears to be on the income as opposed to the underlying assets:

> The term beneficial owner means the person who is the owner of the income for tax purposes and who beneficially owns that income. Thus, a person receiving income in a capacity as a nominee, agent or custodian for another person is not the beneficial owner of the income.[32]

In 2014, the OECD published its Standard for Automatic Exchange of Information in Tax Matters.[33] This consists of three parts including the CRS. In terms of the CRS, the information to be provided are all types of investment income as well as sales proceeds from financial assets. According to Diepvens and Debelva,[34] the OECD explained that the CRS, with a view to maximizing efficiency and reducing cost for financial institutions, draws extensively on the intergovernmental approach to implementing the FATCA. These authors conclude that the CRS can be seen as the international version of the FATCA.

The CRS does not in the first place use beneficial ownership as its key policing term. Rather, it uses the term "controlling person", which is defined as the natural persons who exercise control over an entity.[35] However, wide reference to beneficial ownership is made in the Implementation Handbook.[36] In this regard, it is stated that the meaning of controlling person corresponds with the FATF meaning of beneficial ownership.

## 3.4. The European Union

There is widespread use of the term "beneficial owner" within the European Union, which is somewhat surprising. This is so, as the Members States mostly fall within the civil law family, where this term is generally not known.

Even though it does not fit in under this heading on exchange of information, reference should be made to the Interest and Royalties Directive (2003/49)[37] enacted by the European Union. Gonzalez-Barreda[38] explains that the Interest and Royalties Directive (2003/49) borrowed part of its definitions from the OECD Model, including the beneficial owner requirement, so the doubts on the meaning of the concept also entered EU law. The Interest and Royalties Directive (2003/49) provides two different definitions of beneficial ownership, one for companies and one for permanent establishments (PEs). He further points out that the definition provided for companies, although inspired by the OECD Model, does not fully match the OECD meaning. Largely based on the example in the Commentary on Article 12 of the OECD Model (2000),[39] it states that a company should be treated as beneficial owner if receiving the income for its own benefit and not as an intermediary, such as an agent, a trustee or an authorized signatory, for another person.

It is in the exchange of information space, though, that the European Union has really embraced beneficial ownership. It actually takes the concept one step further by changing it to the term "ultimate beneficial owner" (UBO). Once again, even though not relevant in a case where a definition is provided, it is worth pointing out that the position in the common law countries is that there can only be one beneficial owner at a specific time.[40] The concept of an UBO suggests that there can in fact be more than one. The thinking behind it looks clear, however, namely, to identify the person(s) right at the top.

31. R.H.M.J. Offermanns & R. Botelho Moniz, *Current Trends Regarding Disclosure Mechanisms: Reporting Ultimate Beneficial Ownership – Part 2*, 59 Eur. Taxn. 5, sec. 5.5.1. (2019), Journal Articles & Opinion Pieces IBFD.
32. Deloitte, Global Financial Services Industry, *FATCA glossary of acronyms: Closing the distance*, (Deloitte 2016), available at www2.deloitte.com/content/dam/Deloitte/us/Documents/Tax/us-tax-fatca-glossary-of-acronyms-081916.pdf (accessed 29 Sept. 2021).
33. *OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters (AEOI)* (21 July 2014), Treaties & Models IBFD.
34. Diepvens & Debelva, *supra* n. 23, at p. 214.
35. Gonzalez-Barreda, *supra* n. 12, at pp. 282 and 285.
36. OECD, *Standard for Automatic Exchange of Financial Information in Tax Matters – Implementation Handbook* 2nd edn. (OECD 2018).
37. Council Directive 2003/49/EC of 3 June 2003 on a Common System of Taxation Applicable to Interest and Royalty Payments Made between Associated Companies of Different Member States, OJ L 49 (2007), Primary Sources IBFD [hereinafter the Interest and Royalties Directive (2003/49)].
38. Gonzalez-Barreda, *supra* n. 12, at p. 267.
39. *OECD Model Tax Convention on Income and on Capital: Commentary on Article 12*, para. 4.2 (29 Apr. 2000), Treaties & Models IBFD.
40. Du Toit, *Beneficial Ownership of Royalties, supra* n. 3, at p. 100.

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.
Exported / Printed on 28 Oct. 2021 by isabelle.farrar@ropesgray.com.

The main instrument as far as the European Union is concerned appears to be the 4th Anti-Money Laundering Directive (2015/849) (the AML Directive (2015/849))[41] with the aim of countering crime and terrorism and encouraging a strong internal market, economic prosperity and financial stability and integrity. In terms of the AML Directive (2015/849), all of the Member States are obliged to set up a register identifying the UBO of all companies and other legal entities incorporated in the various Member States.

The AML Directive (2015/849) is based on the FATF recommendations and its "general" definition of UBO largely resembles that of the FATF.[42] More precise definitions are, however, provided in respect of different legal entities. In the case of companies, the definition in the AML Directive (2015/849) includes:

> the natural person(s) who ultimately owns or controls a legal entity through direct or indirect ownership of a sufficient percentage of the shares or voting rights or ownership interest in that entity, including through bearer shareholdings, or through control via other means.[43]

It is stated that Member States can decide to use a lower percentage. It is further stated that, if the UBO cannot be identified based on control or if doubt exists, the senior managing directors of the company are regarded as such. However, the senior manager need not, in all cases, be a member of the board of directors. As far as trusts are concerned, any of the following could be the UBO: the settlor, the trustee, the protector, the beneficiaries or any other natural person exercising ultimate control over the trust.

# 4. Other Uses and Definitions of Beneficial Ownership

There are numerous other uses (and definitions) of beneficial owner, especially if one also considers its use in the domestic law (tax and otherwise) of various countries. During my research for this article, I have stumbled on several other references which I did not further investigate.[44] The discussion in sections 1., 2. and 3. barely scrapes the surface and is by no means complete. The only conclusion from it, which was also the purpose of the exercise, was to show the wide and diverse use of the term, including the confusion that it can (and most likely does) create. Even though definitions are provided in the exchange of information space, the documentation that persons are confronted with on a day-to-day basis (for example, certain forms required by banks) often does not refer to a specific definition. As mentioned in section 3.1., there is often uncertainty as to the source and hierarchy for certain instruments. The country beneficial owner registers are a good example of this. Many of them probably emanate from the AML Directive (2015/849), but other could be from the Global Forum or from specific domestic law in certain countries.[45]

In *Prévost Car* (2008),[46] for example, it was indicated that beneficial ownership has more than one meaning. Well, those were the good old days when it was simply a case of "more than one meaning". I have made no attempt to list and count the number of different meanings and definitions (this could be a good topic for a thesis by an honours student) that currently exist. Especially if one considers the country beneficial owner registers, where different thresholds apply, there is little doubt that the number of definitions will be high.[47]

# 5. Conclusions

It is time to conclude and to suggest an answer to the question at the beginning of this article, namely why is the use of the term "beneficial owner" so popular and widespread? In my view, the answer is that intuitively, despite all the dispute and uncertainty, many people know what it means, or what it is supposed to mean – it is about identifying the real owner. Finding the answer is not always easy and it is complicated by various factors mentioned in this article, including the fact that it is applied in an international context involving countries with different legal systems and traditions. Despite all of this, there probably is wide consensus on the focus of the term, which would account for its wide use and popularity.

---

41. Directive (EU) 2015/849 of  he European Parliament and of the Council of 20 May 2015 on the Prevention of the Use of the Financial System for the Purposes of Money Laundering or Terrorist Financing, Amending Regula ion (EU) No. 648/2012 of the European Parliament and of the Council, and Repealing Directive 2005/60/EC of the European Parliament and of the Council and Commission Directive 2006/70/EC (as amended through 2010), OJ L 141 (2015), Primary Sources IBFD [hereinafter the 4th Anti-Money Laundering Directive (2015/849) and/or the AML Directive (2015/849)].
42. Gonzalez-Barreda, *supra* n. 12, at p. 292.
43. Art. 3(6)(a)(i) AML Directive (2015/849).
44. For instance, para. 4.5 *OECD Model: Commentary on Article 12* (2017) refers to a specific definition in OECD, *Behind the Corporate Veil: Using Corporate Entities for Illicit Purposes* (OECD 2001). Another example is *The Extractive Industries Transparency Initiative*, in respect of which it is stated that it has a definition that is similar, but not identical, to that of FATF.
45. The countries that have enacted specific UBO legislation include the Netherlands, Portugal and the United Kingdom.
46. *Prévost Car* (2008), *supra* n. 7, at 65.
47. Whe her the number of different meanings matches the number of definitions is an open question.

---

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 28 Oct. 2021 by isabelle.farrar@ropesgray.com.

There can be no doubt that beneficial owner is now entrenched as international tax language. In fact, based on the use of the term these days internationally, outside a treaty context, one can remove "tax" – it is now truly international language.

# 6. Final Comments

In a treaty context "beneficial owner" remains one of the most (if not the most) discussed, disputed and maybe controversial terms. But herein also lies a large contribution that it has made to the world of international tax – in discussing and analysing it, arguably no other term has been of greater assistance to tax students in understanding and appreciating the intricacies and interpretation of international tax law, including the effect of reconciling common and civil law. So, here is a suggestion. It happens from time to time that international tax bodies (for example, the International Fiscal Association (IFA)) give recognition and awards to persons who have made a special contribution to the world of international tax. I am not sure whether there is a special "hall of fame" for all these recipients, but I am quite sure that if there is, it will be impressive and well deserving. My suggestion is: next time do not give the award to a person - rather give it to a term, namely "beneficial owner". It is a special term full of subtle nuances and has contributed as much to the understanding and enhancing of international tax as any natural person. Long may it (and by the look of things, will it) live!

*C. du Toit, Beneficial Owner: The Enigma Storms Ahead, 75 Bull. Intl. Taxn. 11/12 (2021), Journal Articles & Opinion Pieces IBFD  (accessed 22 October 2021).*

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.

Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

8

# Exhibit 72

# COMMENTARIES ON THE ARTICLES
# OF THE MODEL TAX CONVENTION

Exported / Printed on 28 Dec. 2021 by isabelle.farrar@ropesgray.com.

COMMENTARY ON ARTICLE 10
CONCERNING THE TAXATION OF DIVIDENDS

## I. Preliminary remarks

1.     By "dividends" is generally meant the distribution of profits to the shareholders by companies limited by shares,[1] limited partnerships with share capital[2] limited liability companies[3] or other joint stock companies.[4]   Under the laws of the OECD Member countries, such joint stock companies are legal entities with a separate juridical personality distinct from all their shareholders.  On this point, they differ from partnerships insofar as the latter do not have juridical personality in most countries.

2.     The profits of a business carried on by a partnership are the partners' profits derived from their own exertions;  for them they are industrial or commercial profits. So the partner is ordinarily taxed personally on his share of the partnership capital and partnership profits.

3.     The position is different for the shareholder;  he is not a trader and the company's profits are not his;  so they cannot be attributed to him.  He is personally taxable only on those profits which are distributed by the company (apart from the provisions in certain countries' laws relating to the taxation of undistributed profits in special cases).  From the shareholders' standpoint, dividends are income from the capital which they have made available to the company as its shareholders.

## II. Commentary on the provisions of the Article

*Paragraph 1*

4.     Paragraph 1 does not prescribe the principle of taxation of dividends either exclusively in the State of the beneficiary's residence or exclusively in the State of which the company paying the dividends is a resident.

5.     Taxation of dividends exclusively in the State of source is not acceptable as a general rule.  Furthermore, there are some States which do not have taxation of

---

1.     "Sociétés anonymes".

2.     "Sociétés en commandite par actions".

3.     "Sociétés à responsabilité limitée".

4.     "Sociétés de capitaux".

Exported / Printed on 28 Dec. 2021 by isabelle.farrar@ropesgray.com.

OECD MODEL TAX CONVENTION

dividends at the source, while as a general rule, all the States tax residents in respect of dividends they receive from non-resident companies.

6.      On the other hand, taxation of dividends exclusively in the State of the beneficiary's residence is not feasible as a general rule. It would be more in keeping with the nature of dividends, which are investment income, but it would be unrealistic to suppose that there is any prospect of it being agreed that all taxation of dividends at the source should be relinquished.

7.      For this reason, paragraph 1 states simply that dividends may be taxed in the State of the beneficiary's residence. The term "paid" has a very wide meaning, since the concept of payment means the fulfilment of the obligation to put funds at the disposal of the shareholder in the manner required by contract or by custom.

8.      The Article deals only with dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State. It does not, therefore, apply to dividends paid by a company which is a resident of a third State or to dividends paid by a company which is a resident of a Contracting State which are attributable to a permanent establishment which an enterprise of that State has in the other Contracting State (for these cases, cf. paragraphs 4 to 6 of the Commentary on Article 21).

*Paragraph 2*

9.      Paragraph 2 reserves a right to tax to the State of source of the dividends, i.e. to the State of which the company paying the dividends is a resident; this right to tax, however, is limited considerably. The rate of tax is limited to 15 per cent, which appears to be a reasonable maximum figure. A higher rate could hardly be justified since the State of source can already tax the company's profits.

10.      On the other hand, a lower rate (5 per cent) is expressly provided in respect of dividends paid by a subsidiary company to its parent company. If a company of one of the States owns directly a holding of at least 25 per cent in a company of the other State, it is reasonable that payments of profits by the subsidiary to the foreign parent company should be taxed less heavily to avoid recurrent taxation and to facilitate international investment. The realisation of this intention depends on the fiscal treatment of the dividends in the State of which the parent company is a resident (cf. paragraphs 49 to 54 of the Commentary on Articles 23 A and 23 B).

11.      If a partnership is treated as a body corporate under the domestic laws applying to it, the two Contracting States may agree to modify sub-paragraph *a)* of paragraph 2

Exported / Printed on 28 Dec. 2021 by isabelle.farrar@ropesgray.com.

COMMENTARY ON ARTICLE 10

in a way to give the benefits of the reduced rate provided for parent companies also to such partnership.

12.      Under paragraph 2, the limitation of tax in the State of source is not available when an intermediary, such as an agent or nominee, is interposed between the beneficiary and the payer, unless the beneficial owner is a resident of the other Contracting State. (The text of the Model was amended in 1995 to clarify this point, which has been the consistent position of all Member countries.) States which wish to make this more explicit are free to do so during bilateral negotiations.

13.      The tax rates fixed by the Article for the tax in the State of source are maximum rates. The States may agree, in bilateral negotiations, on lower rates or even on taxation exclusively in the State of the beneficiary's residence. The reduction of rates provided for in paragraph 2 refers solely to the taxation of dividends and not to the taxation of the profits of the company paying the dividends.

14.      The two Contracting States may also, during bilateral negotiations, agree to a holding percentage lower than that fixed in the Article. A lower percentage is, for instance, justified in cases where the State of residence of the parent company, in accordance with its domestic law, grants exemption to such a company for dividends derived from a holding of less than 25 per cent in a non-resident subsidiary.

15.      In sub-paragraph *a*) of paragraph 2, the term "capital" is used in relation to the taxation treatment of dividends, i.e. distributions of profits to shareholders. The use of this term in this context implies that, for the purposes of sub-paragraph *a*), it should be used in the sense in which it is used for the purposes of distribution to the shareholder (in the particular case, the parent company).

   *a*)   As a general rule, therefore, the term "capital" in sub-paragraph *a*) should be understood as it is understood in company law. Other elements, in particular the reserves, are not to be taken into account.

   *b*)   Capital, as understood in company law, should be indicated in terms of par value of all shares which in the majority of cases will be shown as capital in the company's balance sheet.

   *c*)   No account need be taken of differences due to the different classes of shares issued (ordinary shares, preference shares, plural voting shares, non-voting shares, bearer shares, registered shares, etc.), as such differences relate more to the nature of the shareholder's right than to the extent of his ownership of the capital.

   *d*)   When a loan or other contribution to the company does not, strictly speaking, come as capital under company law but when on the basis of internal law or practice ("thin capitalisation", or assimilation of a loan to share capital), the income derived in respect thereof is treated as dividend under Article 10, the

© OECD                                                      121

Exported / Printed on 28 Dec. 2021 by isabelle.farrar@ropesgray.com.

OECD MODEL TAX CONVENTION

> value of such loan or contribution is also to be taken as "capital" within the meaning of sub-paragraph *a*).
>
> *e*)   In the case of bodies which do not have a capital within the meaning of company law, capital for the purpose of sub-paragraph *a*) is to be taken as meaning the total of all contributions to the body which are taken into account for the purpose of distributing profits.

In bilateral negotiations, Contracting States may depart from the criterion of "capital" used in sub-paragraph *a*) of paragraph 2 and use instead the criterion of "voting power".

16.      Sub-paragraph *a*) of paragraph 2 does not require that the company receiving the dividends must have owned at least 25 per cent of the capital for a relatively long time before the date of the distribution.  This means that all that counts regarding the holding is the situation prevailing at the time material for the coming into existence of the liability to the tax to which paragraph 2 applies, i.e. in most cases the situation existing at the time when the dividends become legally available to the shareholders. The primary reason for this resides in the desire to have a provision which is applicable as broadly as possible.  To require the parent company to have possessed the minimum holding for a certain time before the distribution of the profits could involve extensive inquiries.  Internal laws of certain OECD Member countries provide for a minimum period during which the recipient company must have held the shares to qualify for exemption or relief in respect of dividends received.  In view of this, Contracting States may include a similar condition in their conventions.

17.      The reduction envisaged in sub-paragraph *a*) of paragraph 2 should not be granted in cases of abuse of this provision, for example, where a company with a holding of less than 25 per cent has, shortly before the dividends become payable, increased its holding primarily for the purpose of securing the benefits of the above-mentioned provision, or otherwise, where the qualifying holding was arranged primarily in order to obtain the reduction.  To counteract such manoeuvres Contracting States may find it appropriate to add to sub-paragraph *a*) a provision along the following lines:

> "provided that this holding was not acquired primarily for the purpose of taking advantage of this provision".

18.      Paragraph 2 lays down nothing about the mode of taxation in the State of source.  It therefore leaves that State free to apply its own laws and, in particular, to levy the tax either by deduction at source or by individual assessment.

19.      The paragraph does not settle procedural questions.  Each State should be able to use the procedure provided in its own laws. It can either forthwith limit its tax to the

122                                                        © OECD

COMMENTARY ON ARTICLE 10

rates given in the Article or tax in full and make a refund. Specific questions arise
with triangular cases (see paragraph 53 of the Commentary on Article 24).

20.      It does not specify whether or not the relief in the State of source should
be conditional upon the dividends being subject to tax in the State of residence.
This question can be settled by bilateral negotiations.

21.      The Article contains no provisions as to how the State of the beneficiary's
residence should make allowance for the taxation in the State of source of the
dividends. This question is dealt with in Articles 23 A and 23 B.

22.      Attention is drawn generally to the following case: the beneficial owner of the
dividends arising in a Contracting State is a company resident of the other Contracting
State; all or part of its capital is held by shareholders resident outside that other State;
its practice is not to distribute its profits in the form of dividends; and it enjoys
preferential taxation treatment (private investment company, base company). The
question may arise whether in the case of such a company it is justifiable to allow in
the State of source of the dividends the limitation of tax which is provided in
paragraph 2. It may be appropriate, when bilateral negotiations are being conducted,
to agree upon special exceptions to the taxing rule laid down in this Article, in order to
define the treatment applicable to such companies.

*Paragraph 3*

23.      In view of the great differences between the laws of OECD Member countries,
it is impossible to define "dividends" fully and exhaustively. Consequently, the
definition merely mentions examples which are to be found in the majority of the
Member countries' laws and which, in any case, are not treated differently in them.
The enumeration is followed up by a general formula. In the course of the revision of
the 1963 Draft Convention, a thorough study has been undertaken to find a solution
that does not refer to domestic laws. This study has led to the conclusion that, in view
of the still remaining dissimilarities between Member countries in the field of
company law and taxation law, it did not appear to be possible to work out a definition
of the concept of dividends that would be independent of domestic laws. It is open to
the Contracting States, through bilateral negotiations, to make allowance for
peculiarities of their laws and to agree to bring under the definition of "dividends"
other payments by companies falling under the Article.

24.      The notion of dividends basically concerns distributions by companies within
the meaning of sub-paragraph *b*) of paragraph 1 of Article 3. Therefore the definition
relates, in the first instance, to distributions of profits the title to which is constituted
by shares, that is holdings in a company limited by shares (joint stock company). The

Exported / Printed on 28 Dec. 2021 by isabelle.farrar@ropesgray.com.

OECD MODEL TAX CONVENTION

definition assimilates to shares all securities issued by companies which carry a right to participate in the companies' profits without being debt-claims; such are, for example, "jouissance" shares or "jouissance" rights, founders' shares or other rights participating in profits. In bilateral conventions, of course, this enumeration may be adapted to the legal situation in the Contracting States concerned. This may be necessary in particular, as regards income from "jouissance" shares and founders' shares. On the other hand, debt-claims participating in profits do not come into this category; (cf. paragraph 19 of the Commentary on Article 11); likewise interest on convertible debentures is not a dividend.

25.     Article 10 deals not only with dividends as such but also with interest on loans insofar as the lender effectively shares the risks run by the company, i.e. when repayment depends largely on the success or otherwise of the enterprise's business. Articles 10 and 11 do not therefore prevent the treatment of this type of interest as dividends under the national rules on thin capitalisation applied in the borrower's country. The question whether the contributor of the loan shares the risks run by the enterprise must be determined in each individual case in the light of all the circumstances, as for example the following:

— the loan very heavily outweighs any other contribution to the enterprise's capital (or was taken out to replace a substantial proportion of capital which has been lost) and is substantially unmatched by redeemable assets;
— the creditor will share in any profits of the company;
— repayment of the loan is subordinated to claims of other creditors or to the payment of dividends;
— the level or payment of interest would depend on the profits of the company;
— the loan contract contains no fixed provisions for repayment by a definite date.

26.     The laws of many of the States put participations in a *société à responsabilité limitée* (limited liability company) on the same footing as shares. Likewise, distributions of profits by co-operative societies are generally regarded as dividends.

27.     Distributions of profits by partnerships are not dividends within the meaning of the definition, unless the partnerships are subject, in the State where their place of effective management is situated, to a fiscal treatment substantially similar to that applied to companies limited by shares (for instance, in Belgium, Portugal and Spain, also in France as regards distributions to *commanditaires* in the *sociétés en commandite simple*). On the other hand, clarification in bilateral conventions may be necessary in cases where the taxation law of a Contracting State gives the owner of holdings in a company a right to opt, under certain conditions, for being taxed as a partner of a partnership, or, vice versa, gives the partner of a partnership the right to opt for taxation as the owner of holdings in a company.

© OECD

Exported / Printed on 28 Dec. 2021 by isabelle.farrar@ropesgray.com.

COMMENTARY ON ARTICLE 10

28.    Payments regarded as dividends may include not only distributions of profits decided by annual general meetings of shareholders, but also other benefits in money or money's worth, such as bonus shares, bonuses, profits on a liquidation and disguised distributions of profits. The reliefs provided in the Article apply so long as the State of which the paying company is a resident taxes such benefits as dividends. It is immaterial whether any such benefits are paid out of current profits made by the company or are derived, for example, from reserves, i.e. profits of previous financial years. Normally, distributions by a company which have the effect of reducing the membership rights, for instance, payments constituting a reimbursement of capital in any form whatever, are not regarded as dividends.

29.    The benefits to which a holding in a company confer entitlement are, as a general rule, available solely to the shareholders themselves. Should, however, certain of such benefits be made available to persons who are not shareholders within the meaning of company law, they may constitute dividends if:

—  the legal relations between such persons and the company are assimilated to a holding in a company ("concealed holdings") and
—  the persons receiving such benefits are closely connected with a shareholder; this is the case, for example, where the recipient is a relative of the shareholder or is a company belonging to the same group as the company owning the shares.

30.    When the shareholder and the person receiving such benefits are residents of two different States with which the State of source has concluded conventions, differences of views may arise as to which of these conventions is applicable. A similar problem may arise when the State of source has concluded a convention with one of the States but not with the other. This, however, is a conflict which may affect other types of income, and the solution to it can be found only through an arrangement under the mutual agreement procedure.

*Paragraph 4*

31.    Certain States consider that dividends, interest and royalties arising from sources in their territory and payable to individuals or legal persons who are residents of other States fall outside the scope of the arrangement made to prevent them from being taxed both in the State of source and in the State of the beneficiary's residence when the beneficiary has a permanent establishment in the former State. Paragraph 4 is not based on such a conception which is sometimes referred to as "the force of attraction of the permanent establishment". It does not stipulate  that  dividends flowing  to a resident  of a Contracting  State  from a source situated in the other State must, by a kind of legal presumption, or fiction even, be related to a permanent

© OECD                                    125

OECD MODEL TAX CONVENTION

establishment which that resident may have in the latter State, so that the said State would not be obliged to limit its taxation in such a case. The paragraph merely provides that in the State of source the dividends are taxable as part of the profits of the permanent establishment there owned by the beneficiary which is a resident of the other State, if they are paid in respect of holdings forming part of the assets of the permanent establishment or otherwise effectively connected with that establishment. In that case, paragraph 4 relieves the State of source of the dividends from any limitations under the Article. The foregoing explanations accord with those in the Commentary on Article 7.

32.      The rules set out above also apply where the beneficiary of the dividends has in the other Contracting State, for the purpose of performing any of the kinds of independent personal services mentioned in Article 14, a fixed base with which the holding in respect of which the dividends are paid is effectively connected.

*Paragraph 5*

33.      The Article deals only with dividends paid by a company which is a resident of a Contracting State to a resident of the other State. Certain States, however, tax not only dividends paid by companies resident therein but even distributions by non-resident companies of profits arising within their territory. Each State, of course, is entitled to tax profits arising in its territory which are made by non-resident companies, to the extent provided in the Convention (in particular in Article 7). The shareholders of such companies should not be taxed as well at any rate, unless they are residents of the State and so naturally subject to its fiscal sovereignty.

34.      Paragraph 5 rules out the extra-territorial taxation of dividends, i.e. the practice by which States tax dividends distributed by a non-resident company solely because the corporate profits from which the distributions are made originated in their territory (for example, realised through a permanent establishment situated therein). There is, of course, no question of extra-territorial taxation when the country of source of the corporate profits taxes the dividends because they are paid to a shareholder who is a resident of that State or to a permanent establishment or fixed base situated in that State.

35.      Moreover, it can be argued that such a provision does not aim at, or cannot result in, preventing a State from subjecting the dividends to a withholding tax when distributed by foreign companies if they are cashed in its territory. Indeed, in such a case, the criterion for tax liability is the fact of the payment of the dividends, and not the origin of the corporate profits allotted for distribution. But if the person cashing the dividends in a Contracting State is a resident of the other Contracting State (of which the distributing company is a resident), he may under Article 21 obtain

126                                                © OECD

Exported / Printed on 28 Dec. 2021 by isabelle.farrar@ropesgray.com.

COMMENTARY ON ARTICLE 10

exemption from, or refund of, the withholding tax of the first-mentioned State. Similarly, if the beneficiary of the dividends is a resident of a third State which had concluded a double taxation convention with the State where the dividends are cashed, he may, under Article 21 of that convention, obtain exemption from, or refund of, the withholding tax of the last-mentioned State.

36.    Paragraph 5 further provides that non-resident companies are not to be subjected to special taxes on undistributed profits.

37.    It might be argued that where the taxpayer's country of residence, pursuant to its counteracting measures (such as subpart F legislation in the United States), seeks to tax profits which have not been distributed it is acting contrary to the provisions of paragraph 5. However, it should be noted that the paragraph is confined to taxation at source and, thus, has no bearing on the taxation at residence under a counteracting legislation. In addition, the paragraph concerns only the taxation of the company and not that of the shareholder.

38.    The application of counteracting legislation may, however, pose some difficulties. If the income is attributed to the taxpayer then each item of the income would have to be treated under the relevant provisions of the Convention (business profits, interest, royalties). If the amount is treated as a deemed dividend then it is clearly derived from the base company thus constituting income from that company's country. Even then, it is by no means clear whether the taxable amount is to be regarded as a dividend within the meaning of Article 10 or as "other income" within the meaning of Article 21. Under some counteracting measures the taxable amount is treated as a dividend with the result that an exemption provided for by a tax convention, e.g. an affiliation exemption, is also extended to it (for instance, in Germany). It is doubtful whether the Convention requires this to be done. If the country of residence considers that this is not the case it may face the allegation that it is obstructing the normal operation of the affiliation exemption by taxing the dividend (in the form of "deemed dividend") in advance.

39.    Where dividends are actually distributed by the base company, the provisions of a bilateral convention regarding dividends have to be applied in the normal way because there is dividend income within the meaning of the convention. Thus, the country of the base company may subject the dividend to a withholding tax. The country of residence of the shareholder will apply the normal methods for the elimination of double taxation (i.e. tax credit or tax exemption is granted). This implies that the withholding tax on the dividend should be credited in the shareholder's country of residence, even if the distributed profit (the dividend) has been taxed years before under counteracting legislation. However, the obligation to give credit in that case remains doubtful. Generally the dividend as such is exempted from tax (as it was

Exported / Printed on 28 Dec. 2021 by isabelle.farrar@ropesgray.com.

OECD MODEL TAX CONVENTION

already taxed under the counteracting legislation) and one might argue that there is no basis for a tax credit. On the other hand, the purpose of the treaty would be frustrated if the crediting of taxes could be avoided by simply anticipating the dividend taxation under counteracting legislation. The general principle set out above would suggest that the credit should be granted, though the details may depend on the technicalities of the counteracting measures and the system for crediting foreign taxes against domestic tax, as well as on the particularities of the case (e.g. time lapsed since the taxation of the "deemed dividend"). However, taxpayers who have recourse to artificial arrangements are taking risks against which they cannot fully be safeguarded by tax authorities.

## III. Effects of special features of the domestic tax laws of certain countries

40.    Certain countries' laws seek to avoid or mitigate economic double taxation i.e. the simultaneous taxation of the company's profits at the level of the company and of the dividends at the level of the shareholder. There are various ways of achieving this:

— company tax in respect of distributed profits may be charged at a lower rate than that on retained profits;
— relief may be granted in computing the shareholder's personal tax;
— dividends may bear only one tax, the distributed profits not being taxed at the level of the company.

The Committee on Fiscal Affairs has examined the question whether the special features of the tax laws of the Member countries would justify solutions other than those contained in the Model Convention.

### A. Dividends distributed to individuals

41.    In contrast to the notion of juridical double taxation, which has, generally, a quite precise meaning, the concept of economic double taxation is less certain. Some States do not accept the validity of this concept and others, more numerously, do not consider it necessary to relieve economic double taxation at the national level (dividends distributed by resident companies to resident shareholders). Consequently, as the concept of economic double taxation was not sufficiently well defined to serve as a basis for the analysis, it seemed appropriate to study the problem from a more general economic standpoint, i.e. from the point of view of the effects which the various systems for alleviating such double taxation can have on the international flow of capital. For this purpose, it was necessary to see, among other things, what distortions and discriminations the various national systems could create; but it was necessary to have regard also to the implications for States' budgets and for effective

128                                            © OECD

COMMENTARY ON ARTICLE 10

fiscal verification, without losing sight of the principle of reciprocity that underlies every convention. In considering all these aspects, it became apparent that the burden represented by company tax could not be wholly left out of account.

### 1. States with the classical system

42.    The Committee has recognised that economic double taxation need not be relieved at the international level when such double taxation remains unrelieved at the national level. It therefore considers that in relations between two States with the classical system, i.e. States which do not relieve economic double taxation, the respective levels of company tax in the Contracting States should have no influence on the rate of withholding tax on the dividend in the State of source (rate limited to 15 per cent by sub-paragraph *b)* of paragraph 2 of Article 10). Consequently, the solution recommended in the Model Convention remains fully applicable in the present case.

### 2. States applying a split rate company tax

43.    These States levy company tax at different rates according to what the company does with its profits: the high rate is charged on any profits retained and the lower rate on those distributed.

44.    None of these States, in negotiating double taxation conventions, has obtained, on the grounds of its split rate of company tax, the right to levy withholding tax of more than 15 per cent (cf. sub-paragraph *b)* of paragraph 2 of Article 10) on dividends paid by its companies to a shareholder who is an individual resident in the other State.

45.    The Committee considered whether such a State (State B) should not be recognised as being entitled to levy withholding tax exceeding 15 per cent on dividends distributed by its companies to residents of a State with a classical system (State A), with the proviso that the excess over 15 per cent, which would be designed to offset, in relation to the shareholder concerned, the effects of the lower rate of company tax on distributed profits of companies of State B, would not be creditable against the tax payable by the shareholder in State A of which he is a resident.

46.    Most Member countries considered that in State B regard should be had to the average level of company tax, and that such average level should be considered as the counterpart to the charge levied in the form of a single-rate tax on companies resident of State A. The levy by State B of an additional withholding tax not credited in State A would, moreover, create twofold discrimination: on the one hand, dividends, distributed by a company resident of State B would be more heavily taxed when distributed to residents of State A than when distributed to residents of State B, and, on

© OECD                                    129

OECD MODEL TAX CONVENTION

the other hand, the resident of State A would pay higher personal tax on his dividends from State B than on his dividends from State A. The idea of a "balancing tax" was not, therefore, adopted by the Committee.

### 3. *States which provide relief at the shareholder's level*

47.    In these States, the company is taxed on its total profits, whether distributed or not, and the dividends are taxed in the hands of the resident shareholder (an individual); the latter, however, is entitled to relief, usually as a tax credit against his personal tax, on the grounds that — in the normal course at least — the dividend has borne company tax as part of the company's profits.

48.    Internal law of these States does not provide for the extension of the tax relief to the international field. Relief is allowed only to residents and only in respect of dividends of domestic sources. However, as indicated below, some States have, in some conventions, extended the right to the tax credit provided for in their legislation to residents of the other Contracting State.

49.    In many States that provide relief at the shareholder's level, the resident shareholder receives a credit in recognition of the fact that the profits out of which the dividends are paid have already been taxed in the hands of the company. The resident shareholder is taxed on his dividend grossed up by the tax credit; this credit is set off against the tax payable and can possibly give rise to a refund. In some double taxation conventions, some countries that apply this system have agreed to extend the credit to shareholders who are residents of the other Contracting State. Whilst most States that have agreed to such extensions have done so on a reciprocal basis, a few countries have concluded conventions where they unilaterally extend the benefits of the credit to residents of the other Contracting State.

50.    Some States that also provide relief at the shareholder's level claim that under their systems the company tax remains in its entirety a true company tax, in that it is charged by reference solely to the company's own situation, without any regard to the person and the residence of the shareholder, and in that, having been so charged, it remains appropriated to the Treasury. The tax credit given to the shareholder is designed to relieve his personal tax liability and in no way constitutes an adjustment of the company's tax. No refund, therefore, is given if the tax credit exceeds that personal tax.

51.    The Committee could not reach a general agreement on whether the systems of the States referred to in paragraph 50 above display a fundamental difference that could justify different solutions at the international level.

© OECD

Exported / Printed on 28 Dec. 2021 by isabelle.farrar@ropesgray.com.

COMMENTARY ON ARTICLE 10

52.    Some Member countries were of the opinion that such a fundamental difference does not exist. This opinion leaves room for the conclusion that the States referred to in paragraph 50 above should agree to extend the tax credit to non-resident shareholders, at least on a reciprocal basis, in the same way as some of the countries referred to in paragraph 49 above do. Such a solution tends to ensure neutrality as regards dividends distributed by companies of these countries, the same treatment being given to resident and non-resident shareholders. On the other hand, it would in relation to shareholders who are residents of a Contracting State (a State with a classical system in particular) encourage investment in a State that provides relief at the shareholder's level since residents of the first State would receive a tax credit (in fact a refund of company tax) for dividends from the other State while they do not receive one for dividends from their own country. However, these effects are similar to those which present themselves between a State applying a split rate company tax and a State with a classical system or between two States with a classical system one of which has a lower company tax rate than the other (paragraphs 42 and 43 to 46 above).

53.    On the other hand, many Member countries stressed the fact that a determination of the true nature of the tax relief given under the systems of the States referred to in paragraph 50 above reveals a mere alleviation of the shareholder's personal income tax in recognition of the fact that his dividend will normally have borne company tax. The tax credit is given once and for all (*forfaitaire*) and is therefore not in exact relation to the actual company tax appropriate to the profits out of which the dividend is paid. There is no refund if the tax credit exceeds the personal income tax.

54.    As the relief in essence is not a refund of company tax but an alleviation of the personal income tax, the extension of the relief to non-resident shareholders who are not subject to personal income tax in the countries concerned does not come into consideration. On the other hand, however, on this line of reasoning, the question whether States which provide relief at the shareholder's level should give relief against personal income tax levied from resident shareholders on foreign dividends deserves attention. In this respect it should be observed that the answer is in the affirmative if the question is looked at from the standpoint of neutrality as regards the source of the dividends; otherwise, residents of these States will be encouraged to acquire shares in their own country rather than abroad. But such an extension of the tax credit would be contrary to the principle of reciprocity: not only would the State concerned thereby be making a unilateral budgetary sacrifice (allowing the tax credit over and above the withholding tax levied in the other State), but it would do so without receiving any economic compensation, since it would not be encouraging residents of the other State to acquire shares in its own territory.

© OECD                                131

OECD MODEL TAX CONVENTION

55.      To overcome these objections, it might be a conceivable proposition, amongst other possibilities, that the State of source — which will have collected company tax on dividends distributed by resident companies — should bear the cost of the tax credit that a State which provides relief at the shareholder's level would allow, by transferring funds to that State.  As, however, such transfers are hardly favoured by the States this might be more simply achieved by means of a "compositional" arrangement under which the State of source would relinquish all withholding tax on dividends paid to residents of the other State, and the latter would then allow against its own tax, not the 15 per cent withholding tax (abolished in the State of source) but a tax credit similar to that which it gives on dividends of domestic source.

56.      When everything is fully considered, it seems that the problem can be solved only in bilateral negotiations, where one is better placed to evaluate the sacrifices and advantages which the Convention must bring for each Contracting State.

57-58.  [Deleted]

### B. Dividends distributed to companies

59.      Comments above relating to dividends paid to individuals are generally applicable to dividends paid to companies which hold less than 25 per cent of the capital of the company paying the dividends.  Moreover, the Committee on Fiscal Affairs has not covered in the Commentary the special problem of dividends paid to collective investment institutions (investment companies or investment funds).

60.      In respect of dividends paid to companies which hold at least 25 per cent of the capital of the company paying the dividends, the Committee has examined the incidence which the particular company taxation systems quoted in paragraphs 42 and following have on the tax treatment of dividends paid by the subsidiary.

61.      Various opinions were expressed in the course of the discussion. Opinions diverge even when the discussion is limited to the taxation of subsidiaries and parent companies.  They diverge still more if the discussion takes into account more general economic considerations and extends to the taxation of shareholders of the parent company.

62.      In their bilateral conventions States have adopted different solutions, which were motivated by the economic objectives and the peculiarities of the legal situation of those States, by budgetary considerations, and by a whole series of other factors. Accordingly, no generally accepted principles have emerged.  The Committee did nevertheless consider the situation for the more common systems of company taxation.

Exported / Printed on 28 Dec. 2021 by isabelle.farrar@ropesgray.com.

COMMENTARY ON ARTICLE 10

*1. Classical system in the State of the subsidiary*
   (paragraph 42 above)

63.    The provisions of the Convention have been drafted to apply when the State of
which the distributing company is a resident has a so-called "classical" system of
company taxation, namely one under which distributed profits are not entitled to any
benefit at the level either of the company or of the shareholder (except for the purpose
of avoiding recurrent taxation of inter-company dividends).

*2. Split-rate company tax system in the State of the subsidiary*
   (paragraphs 43 to 46 above)

64.    States of this kind collect company tax on distributed profits at a lower rate
than on retained profits which results in a lower company tax burden on
profits distributed by a subsidiary to its parent company. In view of this situation,
most of these States have obtained, in their conventions, rates of tax at
source of 10 or 15 per cent, and in some cases even above 15 per cent. It has not been
possible in the Committee to get views to converge on this question, the solution of
which is left to bilateral negotiations.

*3. Imputation system in the State of the subsidiary*
   (paragraphs 47 and following)

65.    In such States, a company is liable to tax on the whole of its profits, whether
distributed or not; the shareholders resident of the State of which the distributing
company is itself a resident are subject to tax on dividends distributed to them, but
receive a tax credit in consideration of the fact that the profits distributed have been
taxed at company level.

66.    The question has been considered whether States of this kind should extend the
benefit of the tax credit to the shareholders of parent companies resident of another
State, or even to grant the tax credit directly to such parent companies. It has not been
possible in the Committee to get views to converge on this question, the solution of
which is left to bilateral negotiations.

67.    If, in such a system, profits, whether distributed or not, are taxed at the same
rate, the system is not different from a "classical" one at the level of the distributing
company. Consequently, the State of which the subsidiary is a resident can only levy a
tax at source at the rate provided in sub-paragraph *a*) of paragraph 2.

© OECD                                    133

OECD MODEL TAX CONVENTION

### Observation on the Commentary

68.    *Canada* and the *United Kingdom* do not adhere to paragraph 24 above. Under their law, certain interest payments are treated as distributions, and are therefore included in the definition of dividends.

### Reservations on the Article

*Paragraph 2*

69.    *Australia* reserves the right to tax, at a rate of not less than 15 per cent, dividends paid by a company that is a resident of Australia for purposes of its tax.

70.    *New Zealand* reserves its positions on sub-paragraph *a*) because it wishes to retain its freedom of action with regard to the treatment of holdings (parent companies and subsidiaries).

71.    *Canada* reserves the right to apply a 10 per cent rate of tax at source in the case of holdings (parent companies and subsidiaries).

72.    The *United States* reserves the right to provide that shareholders of pass-through entities will not be granted the direct dividend investment rate, even if they would qualify (based on their percentage of ownership).

73.    *Italy* reserves its position concerning the percentage envisaged for the holding (25 per cent) and can only agree to a rate of tax of 5 per cent for a direct holding of more than 50 per cent.

74.    The *Netherlands* reserves its position on the rate of 5 per cent, since it considers that transfers of profits within a group of enterprises should be entirely exempted from tax at the source.

75.    *Portugal*, *Mexico* and *Turkey* reserve their positions on the rates of tax in paragraph 2. *Mexico* will seek a zero tax rate for all dividends, because it does not levy tax on profits in the hands of the shareholders but taxes profits only at the corporate level.

76.    *Spain* reserves its position on the rate of tax of 5 per cent and the determination of the minimum percentage for the holding.

© OECD

Exported / Printed on 28 Dec. 2021 by isabelle.farrar@ropesgray.com.

COMMENTARY ON ARTICLE 10

77.     *Poland* reserves its position on the minimum percentage for the holding (25 per cent) and the rates of tax (5 per cent and 15 per cent).

*Paragraph 3*

78.     *Belgium* reserves the right to broaden the definition of dividends in paragraph 3 so as to cover expressly income—even when paid in the form of interest—which is subjected to the same taxation treatment as income from shares by its internal law.

79.     *Denmark* reserves the right, in certain cases, to consider as dividends the selling price derived from the sale of shares.

80.     *France* reserves the right to amplify the definition of dividends in paragraph 3 so as to cover all income subjected to the taxation treatment of distributions.

81.     *Canada, Germany, Ireland* and *Spain* reserve the right to amplify the definition of dividends in paragraph 3 so as to cover certain interest payments which are treated as distributions under their domestic law.

81.1    *Portugal* reserves the right to amplify the definition of dividends in paragraph 3 so as to cover certain payments, made under profit participation arrangements, which are treated as distributions under its domestic law.

*Paragraph 4*

82.     *Italy* reserves the right to subject dividends to the taxes imposed by its law whenever the recipient thereof has a permanent establishment in Italy, even if the holding on which the dividends are paid is not effectively connected with such permanent establishment.

*Paragraph 5*

83.     *Canada* and the *United States* reserve the right to impose their branch tax on the earnings of a company attributable to a permanent establishment situated in these countries.

84.     [Deleted]

85.     *Turkey* reserves the right to tax, in a manner corresponding to that provided by paragraph 2 of the Article, the part of the profits of a company of the other Contracting

© OECD                                      135

OECD MODEL TAX CONVENTION

State that carries on business through a permanent establishment situated in Turkey that remains after taxation pursuant to Article 7.

86.     *The United States* reserves the right to  impose its accumulated earnings tax and personal holding company tax, to prevent tax avoidance.

© OECD

Exported / Printed on 28 Dec. 2021 by isabelle.farrar@ropesgray.com.

# Exhibit 73

# OECD
## Income and Capital Model Convention and Commentary

**Status:** Not Applicable

**Date:** 15 July 2005.

**NOTE 2:**

The Condensed version of the 2005 OECD Model Convention, containing the text of the Convention as it read on 15 July 2005 following the adoption of the sixth update by the Council of the OECD, is reproduced below in its entirety. Available in pdf format are both the Condensed version of the 2005 OECD Model Convention and the Complete version of the 2005 OECD Model Convention. The Complete version contains, in addition to the 2005 edition of the text of the Model Convention, an explanatory introduction to the text, full historical documentation of amendments made to the text of the Convention since 1963, a detailed list of tax conventions concluded between OECD Member countries, and background reports, as published by the Council of the OECD.

**CONDENSED Version**

A pdf version of the Condensed 2005 OECD Model Convention is available here.

**COMPLETE Version**

The Complete 2005 OECD Model Convention is available below. For a pdf version of each of its constituent parts click on the appropriate pdf link.

**Title and Table of Contents**

A pdf version is available here.

**Introduction**

A pdf version is available here.

**Model Convention**

A pdf version is available here.

**Commentary**

A pdf version is available here.

**Non-Member Countries Positions**

A pdf version is available here.

**Previous Reports**

R1-4  A pdf version is available here.

R5-8  A pdf version is available here.

R9-12  A pdf version is available here.

R13-14  A pdf version is available here.

R15-16  A pdf version is available here.

R17-20  A pdf version is available here.

**Appendices**

A pdf version is available here.

**NOTE 3:**

Data © OECD, 1992, 1994, 1995, 1997, 2000, 2003, 2005.

OECD grants you the right to use and quote these OECD materials for private or other personal and professional use only, provided that any quotation is limited to insignificant portions, which in themselves have no commercial value in the context in which they are used. Unauthorised reproduction, lending, hiring, transmission or distribution of all or part of OECD materials is prohibited. You must treat these OECD materials and any elements thereof like any other copyrighted material. OECD does not warrant, and shall not be liable for, the accuracy and completeness of OECD materials.

Applications for permission to reproduce all or part of these OECD materials should be made to:

OECD Publications

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

1

**OECD**

**Commentaries on the Articles of the Model Tax Convention**

> **Status:** Not In Force
> **Date of Conclusion:** Not applicable.
> **Entry into Force:** Not applicable.
> **Effective Date:** Not applicable.

**COMMENTARY ON ARTICLE 1**

**CONCERNING THE PERSONS COVERED BY THE CONVENTION**

1. Whereas the earliest conventions in general were applicable to "citizens" of the Contracting States, more recent conventions usually apply to "residents" of one or both of the Contracting States irrespective of nationality. Some conventions are of even wider scope because they apply more generally to "taxpayers" of the Contracting States; they are, therefore, also applicable to persons, who, although not residing in either State, are nevertheless liable to tax on part of their income or capital in each of them. It has been deemed preferable for practical reasons to provide that the Convention is to apply to persons who are residents of one or both of the Contracting States. The term "resident" is defined in Article 4.

**Application of the Convention to partnerships**

2. Domestic laws differ in the treatment of partnerships. These differences create various difficulties when applying tax Conventions in relation to partnerships. These difficulties are analysed in the report by the Committee on Fiscal Affairs entitled "The Application of the OECD Model Tax Convention to Partnerships",[1] the conclusions of which have been incorporated below and in the Commentary on various other provisions of the Model Tax Convention.

3. As discussed in that report, a main source of difficulties is the fact that some countries treat partnerships as taxable units (sometimes even as companies) whereas other countries adopt what may be referred to as the fiscally transparent approach, under which the partnership is ignored for tax purposes and the individual partners are taxed on their respective share of the partnership's income.

4. A first difficulty is the extent to which a partnership is entitled as such to the benefits of the provisions of the Convention. Under Article 1, only persons who are residents of the Contracting States are entitled to the benefits of the tax Convention entered into by these States. While paragraph 2 of the Commentary on Article 3 explains why a partnership constitutes a person, a partnership does not necessarily qualify as a resident of a Contracting State under Article 4.

5. Where a partnership is treated as a company or taxed in the same way, it is a resident of the Contracting State that taxes the partnership on the grounds mentioned in paragraph 1 of Article 4 and, therefore, it is entitled to the benefits of the Convention. Where, however, a partnership is treated as fiscally transparent in a State, the partnership is not "liable to tax" in that State within the meaning of paragraph 1 of Article 4, and so cannot be a resident thereof for purposes of the Convention. In such a case, the application of the Convention to the partnership as such would be refused, unless a special rule covering partnerships were provided for in the Convention. Where the application of the Convention is so refused, the partners should be entitled, with respect to their share of the income of the partnership, to the benefits provided by the Conventions entered into by the States of which they are residents to the extent that the partnership's income is allocated to them for the purposes of taxation in their State of residence (cf. paragraph 8.4 of the Commentary on Article 4).

6. The relationship between the partnership's entitlement to the benefits of a tax Convention and that of the partners raises other questions.

6.1  One issue is the effect that the application of the provisions of the Convention to a partnership can have on the taxation of the partners. Where a partnership is treated as a resident of a Contracting State, the provisions of the Convention that restrict the other Contracting State's right to tax the partnership on its income do not apply to restrict that other State's right to tax the partners who are its own residents on their share of the income of the partnership. Some states may wish to include in their conventions a provision that expressly confirms a Contracting State's right to tax resident partners on their share of the income of a partnership that is treated as a resident of the other State.

6.2  Another issue is that of the effect of the provisions of the Convention on a Contracting State's right to tax income arising on its territory where the entitlement to the benefits of one, or more than one, Conventions is different for the partners and the partnership. Where, for instance, the State of source treats a domestic partnership as fiscally transparent and therefore taxes the partners on their share of the income of the partnership, a partner that is resident of a State that taxes partnerships as companies would not be able to claim the benefits of the Convention between the two States with respect to the share of the partnership's income that the State of source taxes in his hands since that income, though allocated to the person claiming the benefits of the Convention under the laws of the State of source, is not similarly allocated for purposes of determining the liability to tax on that item of income in the State of residence of that person.

---

1    This report is reproduced in Volume II of the loose-leaf version of the OECD Model Tax Convention, at page R(15)-1.

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

apply to that enterprise for that purpose the provisions of the taxation law of that State, subject to the qualification that such law will be applied, as far as the information available to the competent authority permits, in accordance with the principles of this Article.

19. *Canada* reserves the right not to insert paragraph 2 in its conventions unless the commitment to make an adjustment is subject to certain time limitations and does not apply in the case of fraud, wilful default or neglect.


**COMMENTARY ON ARTICLE 10**

**CONCERNING THE TAXATION OF DIVIDENDS**

I. **Preliminary remarks**

1. By "dividends" is generally meant the distribution of profits to the shareholders by companies limited by shares,[1] limited partnerships with share capital,[2] limited liability companies[3] or other joint stock companies.[4] Under the laws of the OECD Member countries, such joint stock companies are legal entities with a separate juridical personality distinct from all their shareholders. On this point, they differ from partnerships insofar as the latter do not have juridical personality in most countries.

2. The profits of a business carried on by a partnership are the partners' profits derived from their own exertions; for them they are business profits. So the partner is ordinarily taxed personally on his share of the partnership capital and partnership profits.

3. The position is different for the shareholder; he is not a trader and the company's profits are not his; so they cannot be attributed to him. He is personally taxable only on those profits which are distributed by the company (apart from the provisions in certain countries' laws relating to the taxation of undistributed profits in special cases). From the shareholders' standpoint, dividends are income from the capital which they have made available to the company as its shareholders.

II. **Commentary on the provisions of the Article**

*Paragraph 1*

4. Paragraph 1 does not prescribe the principle of taxation of dividends either exclusively in the State of the beneficiary's residence or exclusively in the State of which the company paying the dividends is a resident.

5. Taxation of dividends exclusively in the State of source is not acceptable as a general rule. Furthermore, there are some States which do not have taxation of dividends at the source, while as a general rule, all the States tax residents in respect of dividends they receive from non-resident companies.

6. On the other hand, taxation of dividends exclusively in the State of the beneficiary's residence is not feasible as a general rule. It would be more in keeping with the nature of dividends, which are investment income, but it would be unrealistic to suppose that there is any prospect of it being agreed that all taxation of dividends at the source should be relinquished.

7. For this reason, paragraph 1 states simply that dividends may be taxed in the State of the beneficiary's residence. The term "paid" has a very wide meaning, since the concept of payment means the fulfilment of the obligation to put funds at the disposal of the shareholder in the manner required by contract or by custom.

8. The Article deals only with dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State. It does not, therefore, apply to dividends paid by a company which is a resident of a third State or to dividends paid by a company which is a resident of a Contracting State which are attributable to a permanent establishment which an enterprise of that State has in the other Contracting State (for these cases, cf. paragraphs 4 to 6 of the Commentary on Article 21).

*Paragraph 2*

9. Paragraph 2 reserves a right to tax to the State of source of the dividends, i.e. to the State of which the company paying the dividends is a resident; this right to tax, however, is limited considerably. The rate of tax is limited to 15 per cent, which appears to be a reasonable maximum figure. A higher rate could hardly be justified since the State of source can already tax the company's profits.

10. On the other hand, a lower rate (5 per cent) is expressly provided in respect of dividends paid by a subsidiary company to its parent company. If a company of one of the States owns directly a holding of at least 25 per cent in a company of the other State, it is reasonable that payments of profits by the subsidiary to the foreign parent company should be taxed less heavily to avoid recurrent taxation and to facilitate international investment. The realisation of this intention depends on the fiscal treatment of the dividends in the State of which the parent company is a resident (cf. paragraphs 49 to 54 of the Commentary on Articles 23 A and 23 B).

11. If a partnership is treated as a body corporate under the domestic laws applying to it, the two Contracting States may agree to modify subparagraph *a)* of paragraph 2 in a way to give the benefits of the reduced rate provided for parent companies also to such partnership.

---

1    "Sociétés anonymes".
2    "Sociétés en commandite par actions".
3    "Sociétés à responsabilité limitée".
4    "Sociétés de capitaux".

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 2 Nov. 2021 by isabelle.farrar@ropesgray.com.

12. The requirement of beneficial ownership was introduced in paragraph 2 of Article 10 to clarify the meaning of the words "paid ... to a resident" as they are used in paragraph 1 of the Article. It makes plain that the State of source is not obliged to give up taxing rights over dividend income merely because that income was immediately received by a resident of a State with which the State of source had concluded a convention. The term "beneficial owner" is not used in a narrow technical sense, rather, it should be understood in its context and in light of the object and purposes of the Convention, including avoiding double taxation and the prevention of fiscal evasion and avoidance.

12.1  Where an item of income is received by a resident of a Contracting State acting in the capacity of agent or nominee it would be inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption merely on account of the status of the immediate recipient of the income as a resident of the other Contracting State. The immediate recipient of the income in this situation qualifies as a resident but no potential double taxation arises as a consequence of that status since the recipient is not treated as the owner of the income for tax purposes in the State of residence. It would be equally inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption where a resident of a Contracting State, otherwise than through an agency or nominee relationship, simply acts as a conduit for another person who in fact receives the benefit of the income concerned. For these reasons, the report from the Committee on Fiscal Affairs entitled "Double Taxation Conventions and the Use of Conduit Companies"[5] concludes that a conduit company cannot normally be regarded as the beneficial owner if, though the formal owner, it has, as a practical matter, very narrow powers which render it, in relation to the income concerned, a mere fiduciary or administrator acting on account of the interested parties.

12.2  Subject to other conditions imposed by the Article, the limitation of tax in the State of source remains available when an intermediary, such as an agent or nominee located in a Contracting State or in a third State, is interposed between the beneficiary and the payer but the beneficial owner is a resident of the other Contracting State (the text of the Model was amended in 1995 to clarify this point, which has been the consistent position of all Member countries). States which wish to make this more explicit are free to do so during bilateral negotiations.

13. The tax rates fixed by the Article for the tax in the State of source are maximum rates. The States may agree, in bilateral negotiations, on lower rates or even on taxation exclusively in the State of the beneficiary's residence. The reduction of rates provided for in paragraph 2 refers solely to the taxation of dividends and not to the taxation of the profits of the company paying the dividends.

13.1  Under the domestic laws of many States, pension funds and similar entities are generally exempt from tax on their investment income. In order to achieve neutrality of treatment as regards domestic and foreign investments by these entities, some States provide bilaterally that income, including dividends, derived by such an entity resident of the other State shall be exempt from source taxation. States wishing to do so may agree bilaterally on a provision drafted along the lines of the provision found in paragraph 69 of the Commentary on Article 18.

14. The two Contracting States may also, during bilateral negotiations, agree to a holding percentage lower than that fixed in the Article. A lower percentage is, for instance, justified in cases where the State of residence of the parent company, in accordance with its domestic law, grants exemption to such a company for dividends derived from a holding of less than 25 per cent in a non-resident subsidiary.

15. In subparagraph *a*) of paragraph 2, the term "capital" is used in relation to the taxation treatment of dividends, i.e. distributions of profits to shareholders. The use of this term in this context implies that, for the purposes of subparagraph *a*), it should be used in the sense in which it is used for the purposes of distribution to the shareholder (in the particular case, the parent company).

a)  As a general rule, therefore, the term "capital" in subparagraph *a*) should be understood as it is understood in company law. Other elements, in particular the reserves, are not to be taken into account.

b)  Capital, as understood in company law, should be indicated in terms of par value of all shares which in the majority of cases will be shown as capital in the company's balance sheet.

c)  No account need be taken of differences due to the different classes of shares issued (ordinary shares, preference shares, plural voting shares, non-voting shares, bearer shares, registered shares, etc.), as such differences relate more to the nature of the shareholder's right than to the extent of his ownership of the capital.

d)  When a loan or other contribution to the company does not, strictly speaking, come as capital under company law but when on the basis of internal law or practice ("thin capitalisation", or assimilation of a loan to share capital), the income derived in respect thereof is treated as dividend under Article 10, the value of such loan or contribution is also to be taken as "capital" within the meaning of subparagraph *a*).

e)  In the case of bodies which do not have a capital within the meaning of company law, capital for the purpose of subparagraph *a*) is to be taken as meaning the total of all contributions to the body which are taken into account for the purpose of distributing profits.

In bilateral negotiations, Contracting States may depart from the criterion of "capital" used in subparagraph *a*) of paragraph 2 and use instead the criterion of "voting power".

---

5    Reproduced at page R(6)-1 of Volume II of the loose-leaf version of the OECD Model Tax Convention.

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.                66

16. Subparagraph *a)* of paragraph 2 does not require that the company receiving the dividends must have owned at least 25 per cent of the capital for a relatively long time before the date of the distribution. This means that all that counts regarding the holding is the situation prevailing at the time material for the coming into existence of the liability to the tax to which paragraph 2 applies, i.e. in most cases the situation existing at the time when the dividends become legally available to the shareholders. The primary reason for this resides in the desire to have a provision which is applicable as broadly as possible. To require the parent company to have possessed the minimum holding for a certain time before the distribution of the profits could involve extensive inquiries. Internal laws of certain OECD Member countries provide for a minimum period during which the recipient company must have held the shares to qualify for exemption or relief in respect of dividends received. In view of this, Contracting States may include a similar condition in their conventions.

17. The reduction envisaged in subparagraph *a)* of paragraph 2 should not be granted in cases of abuse of this provision, for example, where a company with a holding of less than 25 per cent has, shortly before the dividends become payable, increased its holding primarily for the purpose of securing the benefits of the above-mentioned provision, or otherwise, where the qualifying holding was arranged primarily in order to obtain the reduction. To counteract such manoeuvres Contracting States may find it appropriate to add to subparagraph *a)* a provision along the following lines:

"provided that this holding was not acquired primarily for the purpose of taking advantage of this provision".

18. Paragraph 2 lays down nothing about the mode of taxation in the State of source. It therefore leaves that State free to apply its own laws and, in particular, to levy the tax either by deduction at source or by individual assessment.

19. The paragraph does not settle procedural questions. Each State should be able to use the procedure provided in its own laws. It can either forthwith limit its tax to the rates given in the Article or tax in full and make a refund (see, however, paragraph 26.2 of the Commentary on Article 1). Specific questions arise with triangular cases (see paragraph 53 of the Commentary on Article 24).

20. It does not specify whether or not the relief in the State of source should be conditional upon the dividends being subject to tax in the State of residence. This question can be settled by bilateral negotiations.

21. The Article contains no provisions as to how the State of the beneficiary's residence should make allowance for the taxation in the State of source of the dividends. This question is dealt with in Articles 23 A and 23 B.

22. Attention is drawn generally to the following case: the beneficial owner of the dividends arising in a Contracting State is a company resident of the other Contracting State; all or part of its capital is held by shareholders resident outside that other State; its practice is not to distribute its profits in the form of dividends; and it enjoys preferential taxation treatment (private investment company, base company). The question may arise whether in the case of such a company it is justifiable to allow in the State of source of the dividends the limitation of tax which is provided in paragraph 2. It may be appropriate, when bilateral negotiations are being conducted, to agree upon special exceptions to the taxing rule laid down in this Article, in order to define the treatment applicable to such companies.

*Paragraph 3*

23. In view of the great differences between the laws of OECD Member countries, it is impossible to define "dividends" fully and exhaustively. Consequently, the definition merely mentions examples which are to be found in the majority of the Member countries' laws and which, in any case, are not treated differently in them. The enumeration is followed up by a general formula. In the course of the revision of the 1963 Draft Convention, a thorough study has been undertaken to find a solution that does not refer to domestic laws. This study has led to the conclusion that, in view of the still remaining dissimilarities between Member countries in the field of company law and taxation law, it did not appear to be possible to work out a definition of the concept of dividends that would be independent of domestic laws. It is open to the Contracting States, through bilateral negotiations, to make allowance for peculiarities of their laws and to agree to bring under the definition of "dividends" other payments by companies falling under the Article.

24. The notion of dividends basically concerns distributions by companies within the meaning of subparagraph *b)* of paragraph 1 of Article 3. Therefore the definition relates, in the first instance, to distributions of profits the title to which is constituted by shares, that is holdings in a company limited by shares (joint stock company). The definition assimilates to shares all securities issued by companies which carry a right to participate in the companies' profits without being debt-claims; such are, for example, "jouissance" shares or "jouissance" rights, founders' shares or other rights participating in profits. In bilateral conventions, of course, this enumeration may be adapted to the legal situation in the Contracting States concerned. This may be necessary in particular, as regards income from "jouissance" shares and founders' shares. On the other hand, debt-claims participating in profits do not come into this category; (cf. paragraph 19 of the Commentary on Article 11); likewise interest on convertible debentures is not a dividend.

25. Article 10 deals not only with dividends as such but also with interest on loans insofar as the lender effectively shares the risks run by the company, i.e. when repayment depends largely on the success or otherwise of the enterprise's business. Articles 10 and 11 do not therefore prevent the treatment of this type of interest as dividends under the national rules on thin capitalisation applied in the borrower's country. The question whether the contributor of the loan shares the risks run by the enterprise must be determined in each individual case in the light of all the circumstances, as for example the following:

- the loan very heavily outweighs any other contribution to the enterprise's capital (or was taken out to replace a substantial proportion of capital which has been lost) and is substantially unmatched by redeemable assets;

© Copyright 2021 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 2 Nov. 2021 by isabelle.farrar@ropesgray.com.

- the creditor will share in any profits of the company;

- repayment of the loan is subordinated to claims of other creditors or to the payment of dividends;

- the level or payment of interest would depend on the profits of the company;

- the loan contract contains no fixed provisions for repayment by a definite date.

26. The laws of many of the States put participations in a *société à responsabilité limitée* (limited liability company) on the same footing as shares. Likewise, distributions of profits by co-operative societies are generally regarded as dividends.

27. Distributions of profits by partnerships are not dividends within the meaning of the definition, unless the partnerships are subject, in the State where their place of effective management is situated, to a fiscal treatment substantially similar to that applied to companies limited by shares (for instance, in Belgium, Portugal and Spain, also in France as regards distributions to *commanditaires* in the *sociétés en commandite simple*). On the other hand, clarification in bilateral conventions may be necessary in cases where the taxation law of a Contracting State gives the owner of holdings in a company a right to opt, under certain conditions, for being taxed as a partner of a partnership, or, vice versa, gives the partner of a partnership the right to opt for taxation as the owner of holdings in a company.

28. Payments regarded as dividends may include not only distributions of profits decided by annual general meetings of shareholders, but also other benefits in money or money's worth, such as bonus shares, bonuses, profits on a liquidation and disguised distributions of profits. The reliefs provided in the Article apply so long as the State of which the paying company is a resident taxes such benefits as dividends. It is immaterial whether any such benefits are paid out of current profits made by the company or are derived, for example, from reserves, i.e. profits of previous financial years. Normally, distributions by a company which have the effect of reducing the membership rights, for instance, payments constituting a reimbursement of capital in any form whatever, are not regarded as dividends.

29. The benefits to which a holding in a company confer entitlement are, as a general rule, available solely to the shareholders themselves. Should, however, certain of such benefits be made available to persons who are not shareholders within the meaning of company law, they may constitute dividends if:

- the legal relations between such persons and the company are assimilated to a holding in a company ("concealed holdings") and

- the persons receiving such benefits are closely connected with a shareholder; this is the case, for example, where the recipient is a relative of the shareholder or is a company belonging to the same group as the company owning the shares.

30. When the shareholder and the person receiving such benefits are residents of two different States with which the State of source has concluded conventions, differences of views may arise as to which of these conventions is applicable. A similar problem may arise when the State of source has concluded a convention with one of the States but not with the other. This, however, is a conflict which may affect other types of income, and the solution to it can be found only through an arrangement under the mutual agreement procedure.

*Paragraph 4*

31. Certain States consider that dividends, interest and royalties arising from sources in their territory and payable to individuals or legal persons who are residents of other States fall outside the scope of the arrangement made to prevent them from being taxed both in the State of source and in the State of the beneficiary's residence when the beneficiary has a permanent establishment in the former State. Paragraph 4 is not based on such a conception which is sometimes referred to as "the force of attraction of the permanent establishment". It does not stipulate that dividends flowing to a resident of a Contracting State from a source situated in the other State must, by a kind of legal presumption, or fiction even, be related to a permanent establishment which that resident may have in the latter State, so that the said State would not be obliged to limit its taxation in such a case. The paragraph merely provides that in the State of source the dividends are taxable as part of the profits of the permanent establishment there owned by the beneficiary which is a resident of the other State, if they are paid in respect of holdings forming part of the assets of the permanent establishment or otherwise effectively connected with that establishment. In that case, paragraph 4 relieves the State of source of the dividends from any limitations under the Article. The foregoing explanations accord with those in the Commentary on Article 7.

32. It has been suggested that the paragraph could give rise to abuses through the transfer of shares to permanent establishments set up solely for that purpose in countries that offer preferential treatment to dividend income. Apart from the fact that such abusive transactions might trigger the application of domestic anti-abuse rules, it must be recognised that a particular location can only constitute a permanent establishment if a business is carried on therein and, also, that the requirement that a shareholding be "effectively connected" to such a location requires that the shareholding be genuinely connected to that business.

*Paragraph 5*

33. The Article deals only with dividends paid by a company which is a resident of a Contracting State to a resident of the other State. Certain States, however, tax not only dividends paid by companies resident therein but even distributions by non-resident companies of profits arising within their territory. Each State, of course, is entitled to tax profits arising in its territory which are made by non-resident companies, to the extent provided in the Convention (in particular in Article 7). The

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.                                                                      68

shareholders of such companies should not be taxed as well at any rate, unless they are residents of the State and so naturally subject to its fiscal sovereignty.

34. Paragraph 5 rules out the extra-territorial taxation of dividends, i.e. the practice by which States tax dividends distributed by a non-resident company solely because the corporate profits from which the distributions are made originated in their territory (for example, realised through a permanent establishment situated therein). There is, of course, no question of extra-territorial taxation when the country of source of the corporate profits taxes the dividends because they are paid to a shareholder who is a resident of that State or to a permanent establishment situated in that State.

35. Moreover, it can be argued that such a provision does not aim at, or cannot result in, preventing a State from subjecting the dividends to a withholding tax when distributed by foreign companies if they are cashed in its territory. Indeed, in such a case, the criterion for tax liability is the fact of the payment of the dividends, and not the origin of the corporate profits allotted for distribution. But if the person cashing the dividends in a Contracting State is a resident of the other Contracting State (of which the distributing company is a resident), he may under Article 21 obtain exemption from, or refund of, the withholding tax of the first-mentioned State. Similarly, if the beneficiary of the dividends is a resident of a third State which had concluded a double taxation convention with the State where the dividends are cashed, he may, under Article 21 of that convention, obtain exemption from, or refund of, the withholding tax of the last-mentioned State.

36. Paragraph 5 further provides that non-resident companies are not to be subjected to special taxes on undistributed profits.

37. It might be argued that where the taxpayer's country of residence, pursuant to its controlled foreign companies legislation or other rules with similar effect seeks to tax profits which have not been distributed, it is acting contrary to the provisions of paragraph 5. However, it should be noted that the paragraph is confined to taxation at source and, thus, has no bearing on the taxation at residence under such legislation or rules. In addition, the paragraph concerns only the taxation of the company and not that of the shareholder.

38. The application of such legislation or rules may, however, complicate the application of Article 23. If the income were attributed to the taxpayer then each item of the income would have to be treated under the relevant provisions of the Convention (business profits, interest, royalties). If the amount is treated as a deemed dividend then it is clearly derived from the base company thus constituting income from that company's country. Even then, it is by no means clear whether the taxable amount is to be regarded as a dividend within the meaning of Article 10 or as "other income" within the meaning of Article 21. Under some of these legislation or rules the taxable amount is treated as a dividend with the result that an exemption provided for by a tax convention, e.g. an affiliation exemption, is also extended to it. It is doubtful whether the Convention requires this to be done. If the country of residence considers that this is not the case it may face the allegation that it is obstructing the normal operation of the affiliation exemption by taxing the dividend (in the form of "deemed dividend") in advance.

39. Where dividends are actually distributed by the base company, the provisions of a bilateral convention regarding dividends have to be applied in the normal way because there is dividend income within the meaning of the convention. Thus, the country of the base company may subject the dividend to a withholding tax. The country of residence of the shareholder will apply the normal methods for the elimination of double taxation (i.e. tax credit or tax exemption is granted). This implies that the withholding tax on the dividend should be credited in the shareholder's country of residence, even if the distributed profit (the dividend) has been taxed years before under controlled foreign companies legislation or other rules with similar effect. However, the obligation to give credit in that case remains doubtful. Generally the dividend as such is exempted from tax (as it was already taxed under the relevant legislation or rules) and one might argue that there is no basis for a tax credit. On the other hand, the purpose of the treaty would be frustrated if the crediting of taxes could be avoided by simply anticipating the dividend taxation under counteracting legislation. The general principle set out above would suggest that the credit should be granted, though the details may depend on the technicalities of the relevant legislation or rules) and the system for crediting foreign taxes against domestic tax, as well as on the particularities of the case (e.g. time lapsed since the taxation of the "deemed dividend"). However, taxpayers who have recourse to artificial arrangements are taking risks against which they cannot fully be safeguarded by tax authorities.

### III. **Effects of special features of the domestic tax laws of certain countries**

40. Certain countries' laws seek to avoid or mitigate economic double taxation i.e. the simultaneous taxation of the company's profits at the level of the company and of the dividends at the level of the shareholder. There are various ways of achieving this:

- company tax in respect of distributed profits may be charged at a lower rate than that on retained profits;

- relief may be granted in computing the shareholder's personal tax;

- dividends may bear only one tax, the distributed profits not being taxed at the level of the company.

The Committee on Fiscal Affairs has examined the question whether the special features of the tax laws of the Member countries would justify solutions other than those contained in the Model Convention.

### A. *Dividends distributed to individuals*

41. In contrast to the notion of juridical double taxation, which has, generally, a quite precise meaning, the concept of economic double taxation is less certain. Some States do not accept the validity of this concept and others, more numerously, do not consider it necessary to relieve economic double taxation at the national level (dividends distributed by resident companies

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 2 Nov. 2021 by isabelle.farrar@ropesgray.com.

to resident shareholders). Consequently, as the concept of economic double taxation was not sufficiently well defined to serve as a basis for the analysis, it seemed appropriate to study the problem from a more general economic standpoint, i.e. from the point of view of the effects which the various systems for alleviating such double taxation can have on the international flow of capital. For this purpose, it was necessary to see, among other things, what distortions and discriminations the various national systems could create; but it was necessary to have regard also to the implications for States' budgets and for effective fiscal verification, without losing sight of the principle of reciprocity that underlies every convention. In considering all these aspects, it became apparent that the burden represented by company tax could not be wholly left out of account.

1. *States with the classical system*

42. The Committee has recognised that economic double taxation need not be relieved at the international level when such double taxation remains unrelieved at the national level. It therefore considers that in relations between two States with the classical system, i.e. States which do not relieve economic double taxation, the respective levels of company tax in the Contracting States should have no influence on the rate of withholding tax on the dividend in the State of source (rate limited to 15 per cent by subparagraph *b)* of paragraph 2 of Article 10). Consequently, the solution recommended in the Model Convention remains fully applicable in the present case.

2. *States applying a split rate company tax*

43. These States levy company tax at different rates according to what the company does with its profits: the high rate is charged on any profits retained and the lower rate on those distributed.

44. None of these States, in negotiating double taxation conventions, has obtained, on the grounds of its split rate of company tax, the right to levy withholding tax of more than 15 per cent (cf. subparagraph *b)* of paragraph 2 of Article 10) on dividends paid by its companies to a shareholder who is an individual resident in the other State.

45. The Committee considered whether such a State (State B) should not be recognised as being entitled to levy withholding tax exceeding 15 per cent on dividends distributed by its companies to residents of a State with a classical system (State A), with the proviso that the excess over 15 per cent, which would be designed to offset, in relation to the shareholder concerned, the effects of the lower rate of company tax on distributed profits of companies of State B, would not be creditable against the tax payable by the shareholder in State A of which he is a resident.

46. Most Member countries considered that in State B regard should be had to the average level of company tax, and that such average level should be considered as the counterpart to the charge levied in the form of a single-rate tax on companies resident in State A. The levy by State B of an additional withholding tax not credited in State A would, moreover, create twofold discrimination: on the one hand, dividends, distributed by a company resident of State B would be more heavily taxed when distributed to residents of State A than when distributed to residents of State B, and, on the other hand, the resident of State A would pay higher personal tax on his dividends from State B than on his dividends from State A. The idea of a "balancing tax" was not, therefore, adopted by the Committee.

3. *States which provide relief at the shareholder's level*

47. In these States, the company is taxed on its total profits, whether distributed or not, and the dividends are taxed in the hands of the resident shareholder (an individual); the latter, however, is entitled to relief, usually as a tax credit against his personal tax, on the grounds that - in the normal course at least - the dividend has borne company tax as part of the company's profits.

48. Internal law of these States does not provide for the extension of the tax relief to the international field. Relief is allowed only to residents and only in respect of dividends of domestic sources. However, as indicated below, some States have, in some conventions, extended the right to the tax credit provided for in their legislation to residents of the other Contracting State.

49. In many States that provide relief at the shareholder's level, the resident shareholder receives a credit in recognition of the fact that the profits out of which the dividends are paid have already been taxed in the hands of the company. The resident shareholder is taxed on his dividend grossed up by the tax credit; this credit is set off against the tax payable and can possibly give rise to a refund. In some double taxation conventions, some countries that apply this system have agreed to extend the credit to shareholders who are residents of the other Contracting State. Whilst most States that have agreed to such extensions have done so on a reciprocal basis, a few countries have concluded conventions where they unilaterally extend the benefits of the credit to residents of the other Contracting State.

50. Some States that also provide relief at the shareholder's level claim that under their systems the company tax remains in its entirety a true company tax, in that it is charged by reference solely to the company's own situation, without any regard to the person and the residence of the shareholder, and in that, having been so charged, it remains appropriated to the Treasury. The tax credit given to the shareholder is designed to relieve his personal tax liability and in no way constitutes an adjustment of the company's tax. No refund, therefore, is given if the tax credit exceeds that personal tax.

51. The Committee could not reach a general agreement on whether the systems of the States referred to in paragraph 50 above display a fundamental difference that could justify different solutions at the international level.

52. Some Member countries were of the opinion that such a fundamental difference does not exist. This opinion leaves room for the conclusion that the States referred to in paragraph 50 above should agree to extend the tax credit to non-resident shareholders, at least on a reciprocal basis, in the same way as some of the countries referred to in paragraph 49 above

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

do. Such a solution tends to ensure neutrality as regards dividends distributed by companies of these countries, the same treatment being given to resident and non-resident shareholders. On the other hand, it would in relation to shareholders who are residents of a Contracting State (a State with a classical system in particular) encourage investment in a State that provides relief at the shareholder's level since residents of the first State would receive a tax credit (in fact a refund of company tax) for dividends from the other State while they do not receive one for dividends from their own country. However, these effects are similar to those which present themselves between a State applying a split rate company tax and a State with a classical system or between two States with a classical system one of which has a lower company tax rate than the other (paragraphs 42 and 43 to 46 above).

53. On the other hand, many Member countries stressed the fact that a determination of the true nature of the tax relief given under the systems of the States referred to in paragraph 50 above reveals a mere alleviation of the shareholder's personal income tax in recognition of the fact that his dividend will normally have borne company tax. The tax credit is given once and for all (*forfaitaire*) and is therefore not in exact relation to the actual company tax appropriate to the profits out of which the dividend is paid. There is no refund if the tax credit exceeds the personal income tax.

54. As the relief in essence is not a refund of company tax but an alleviation of the personal income tax, the extension of the relief to non-resident shareholders who are not subject to personal income tax in the countries concerned does not come into consideration. On the other hand, however, on this line of reasoning, the question whether States which provide relief at the shareholder's level should give relief against personal income tax levied from resident shareholders on foreign dividends deserves attention. In this respect it should be observed that the answer is in the affirmative if the question is looked at from the standpoint of neutrality as regards the source of the dividends; otherwise, residents of these States will be encouraged to acquire shares in their own country rather than abroad. But such an extension of the tax credit would be contrary to the principle of reciprocity: not only would the State concerned thereby be making a unilateral budgetary sacrifice (allowing the tax credit over and above the withholding tax levied in the other State), but it would do so without receiving any economic compensation, since it would not be encouraging residents of the other State to acquire shares in its own territory.

55. To overcome these objections, it might be a conceivable proposition, amongst other possibilities, that the State of source - which will have collected company tax on dividends distributed by resident companies - should bear the cost of the tax credit that a State which provides relief at the shareholder's level would allow, by transferring funds to that State. As, however, such transfers are hardly favoured by the States this might be more simply achieved by means of a "compositional" arrangement under which the State of source would relinquish all withholding tax on dividends paid to residents of the other State, and the latter would then allow against its own tax, not the 15 per cent withholding tax (abolished in the State of source) but a tax credit similar to that which it gives on dividends of domestic source.

56. When everything is fully considered, it seems that the problem can be solved only in bilateral negotiations, where one is better placed to evaluate the sacrifices and advantages which the Convention must bring for each Contracting State.

57-58. [Deleted]

B. *Dividends distributed to companies*

59. Comments above relating to dividends paid to individuals are generally applicable to dividends paid to companies which hold less than 25 per cent of the capital of the company paying the dividends. Moreover, the Committee on Fiscal Affairs has not covered in the Commentary the special problem of dividends paid to collective investment institutions (investment companies or investment funds).

60. In respect of dividends paid to companies which hold at least 25 per cent of the capital of the company paying the dividends, the Committee has examined the incidence which the particular company taxation systems quoted in paragraphs 42 and following have on the tax treatment of dividends paid by the subsidiary.

61. Various opinions were expressed in the course of the discussion. Opinions diverge even when the discussion is limited to the taxation of subsidiaries and parent companies. They diverge still more if the discussion takes into account more general economic considerations and extends to the taxation of shareholders of the parent company.

62. In their bilateral conventions States have adopted different solutions, which were motivated by the economic objectives and the peculiarities of the legal situation of those States, by budgetary considerations, and by a whole series of other factors. Accordingly, no generally accepted principles have emerged. The Committee did nevertheless consider the situation for the more common systems of company taxation.

1. *Classical system in the State of the subsidiary*

(paragraph 42 above)

63. The provisions of the Convention have been drafted to apply when the State of which the distributing company is a resident has a so-called "classical" system of company taxation, namely one under which distributed profits are not entitled to any benefit at the level either of the company or of the shareholder (except for the purpose of avoiding recurrent taxation of inter-company dividends).

2. *Split-rate company tax system in the State of the subsidiary*

(paragraphs 43 to 46 above)

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Exported / Printed on 2 Nov. 2021 by isabelle.farrar@ropesgray.com.

64. States of this kind collect company tax on distributed profits at a lower rate than on retained profits which results in a lower company tax burden on profits distributed by a subsidiary to its parent company. In view of this situation, most of these States have obtained, in their conventions, rates of tax at source of 10 or 15 per cent, and in some cases even above 15 per cent. It has not been possible in the Committee to get views to converge on this question, the solution of which is left to bilateral negotiations.

3. *Imputation system in the State of the subsidiary*

(paragraphs 47 and following)

65. In such States, a company is liable to tax on the whole of its profits, whether distributed or not; the shareholders resident of the State of which the distributing company is itself a resident are subject to tax on dividends distributed to them, but receive a tax credit in consideration of the fact that the profits distributed have been taxed at company level.

66. The question has been considered whether States of this kind should extend the benefit of the tax credit to the shareholders of parent companies resident of another State, or even to grant the tax credit directly to such parent companies. It has not been possible in the Committee to get views to converge on this question, the solution of which is left to bilateral negotiations.

67. If, in such a system, profits, whether distributed or not, are taxed at the same rate, the system is not different from a "classical" one at the level of the distributing company. Consequently, the State of which the subsidiary is a resident can only levy a tax at source at the rate provided in subparagraph *a)* of paragraph 2.

**Observation on the Commentary**

68. *Canada* and the *United Kingdom* do not adhere to paragraph 24 above. Under their law, certain interest payments are treated as distributions, and are therefore included in the definition of dividends.

68.1 *Belgium* cannot share the views expressed in paragraph 37 of the Commentary. Belgium considers that paragraph 5 of Article 10 is a particular application of a general principle underlying various provisions of the Convention (paragraph 7 of Article 5, paragraph 1 of Article 7, and paragraphs 1 and 5 of Article 10), which is the prohibition for a contracting State, except in exceptional cases expressly provided for in the Convention, to levy a tax on the profits of a company which is a resident of the other contracting State. Paragraph 5, which deals with taxation where the income has its source, confirms this general prohibition and provides that the prohibition applies even where the undistributed profits derived by the entity that is a resident of the other contracting State arise from business carried out in the State of source. Paragraph 5 prohibits the taxation of the undistributed profits of the foreign entity even where the State where those profits arise taxes them in the hands of a resident shareholder.

68.2  With reference to paragraph 37, *Ireland* notes its general observation in paragraph 27.5 of the Commentary on Article 1.

**Reservations on the Article**

*Paragraph 2*

69. *New Zealand* reserves the right to tax, at a rate of 15 per cent, dividends paid by a company that is a resident of New Zealand.

70-71.  [Deleted]

72. The *United States* reserves the right to provide that shareholders of certain passthrough entities, such as Regulated Investment Companies and Real Estate Investment Trusts, will not be granted the direct dividend investment rate, even if they would qualify based on their percentage ownership.

73. *Italy* reserves its position concerning the percentage envisaged for the holding (25 per cent) and can only agree to a rate of tax of 5 per cent for a direct holding of more than 50 per cent.

74. [Deleted]

75. *Portugal*, *Mexico* and *Turkey* reserve their positions on the rates of tax in paragraph 2.

76. *Spain* reserves its position on the rate of tax of 5 per cent and the determination of the minimum percentage for the holding.

77. *Poland* reserves its position on the minimum percentage for the holding (25 per cent) and the rates of tax (5 per cent and 15 per cent).

*Paragraph 3*

78. *Belgium* reserves the right to broaden the definition of dividends in paragraph 3 so as to cover expressly income-even when paid in the form of interest-which is subjected to the same taxation treatment as income from shares by its internal law.

79. *Denmark* reserves the right, in certain cases, to consider as dividends the selling price derived from the sale of shares.

80. *France* and *Mexico* reserve the right to amplify the definition of dividends in paragraph 3 so as to cover all income subjected to the taxation treatment of distributions.

81. *Canada*, *Germany*, *Ireland* and *Spain* reserve the right to amplify the definition of dividends in paragraph 3 so as to cover certain interest payments which are treated as distributions under their domestic law.

Exported / Printed on 2 Nov. 2021 by isabelle.farrar@ropesgray.com.

81.1 *Portugal* reserves the right to amplify the definition of dividends in paragraph 3 so as to cover certain payments, made under profit participation arrangements, which are treated as distributions under its domestic law.

81.2 *Luxembourg* reserves the right to expand the definition of dividends in paragraph 3 in order to cover certain payments which are treated as distributions of dividends under its domestic law.

*Paragraph 4*

82. *Italy* reserves the right to subject dividends to the taxes imposed by its law whenever the recipient thereof has a permanent establishment in Italy, even if the holding on which the dividends are paid is not effectively connected with such permanent establishment.

*Paragraph 5*

83. *Canada* and the *United States* reserve the right to impose their branch tax on the earnings of a company attributable to a permanent establishment situated in these countries. Canada also reserves the right to impose this tax on profits attributable to the alienation of immovable property situated in Canada by a company carrying on a trade in immovable property.

84. [Deleted]

85. *Turkey* reserves the right to tax, in a manner corresponding to that provided by paragraph 2 of the Article, the part of the profits of a company of the other Contracting State that carries on business through a permanent establishment situated in Turkey that remains after taxation pursuant to Article 7.

## COMMENTARY ON ARTICLE 11

## CONCERNING THE TAXATION OF INTEREST

### I. Preliminary remarks

1. "Interest" is generally taken to mean remuneration on money lent, being remuneration coming within the category of "income from movable capital" (*revenus de capitaux mobiliers*). Unlike dividends, interest does not suffer economic double taxation, that is, it is not taxed both in the hands of the debtor and in the hands of the creditor. Unless it is provided to the contrary by the contract, payment of the tax charged on interest falls on the recipient. If it happens that the debtor undertakes to bear any tax chargeable at the source, this is as though he had agreed to pay his creditor additional interest corresponding to such tax.

2. But, like dividends, interest on bonds or debentures or loans usually attracts tax charged by deduction at the source when the interest is paid. This method is, in fact, commonly used for practical reasons, as the tax charged at the source can constitute an advance of the tax payable by the recipient in respect of his total income or profits. If in such a case the recipient is a resident of the country which practises deduction at the source, any double taxation he suffers is remedied by internal measures. But the position is different if he is a resident of another country: he is then liable to be taxed twice on the interest, first by the State of source and then by the State of which he is a resident. It is clear that his double charge of tax can reduce considerably the interest on the money lent and so hamper the movement of capital and the development of international investment.

3. A formula reserving the exclusive taxation of interest to one State, whether the State of the beneficiary's residence or the State of source, could not be sure of receiving general approval. Therefore a compromise solution was adopted. It provides that interest may be taxed in the State of residence, but leaves to the State of source the right to impose a tax if its laws so provide, it being implicit in this right that the State of source is free to give up all taxation on interest paid to non-residents. Its exercise of this right will however be limited by a ceiling which its tax cannot exceed but, it goes without saying, the Contracting States can agree to adopt an even lower rate of taxation in the State of source. The sacrifice that the latter would accept in such conditions will be matched by a relief to be given by the State of residence, in order to take into account the tax levied in the State of source (cf. Article 23 A or 23 B).

4. Certain countries do not allow interest paid to be deducted for the purposes of the payer's tax unless the recipient also resides in the same State or is taxable in that State. Otherwise they forbid the deduction. The question whether the deduction should also be allowed in cases where the interest is paid by a resident of a Contracting State to a resident of the other State, is dealt with in paragraph 4 of Article 24.

### II. Commentary on the provisions of the Article

*Paragraph 1*

5. Paragraph 1 lays down the principle that interest arising in a Contracting State and paid to a resident of the other Contracting State may be taxed in the latter. In doing so, it does not stipulate an exclusive right to tax in favour of the State of residence. The term "paid" has a very wide meaning, since the concept of payment means the fulfilment of the obligation to put funds at the disposal of the creditor in the manner required by contract or by custom.

6. The Article deals only with interest arising in a Contracting State and paid to a resident of the other Contracting State. It does not, therefore, apply to interest arising in a third State or to interest arising in a Contracting State which is attributable to a permanent establishment which an enterprise of that State has in the other Contracting State (for these cases, cf. paragraphs 4 to 6 of the Commentary on Article 21).

© Copyright 2021  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

# Exhibit 74



# Model Tax Convention on Income and on Capital

## CONDENSED VERSION



**JULY 2010**

le.farrar@ropesgray.com

# COMMENTARIES ON THE ARTICLES
# OF THE MODEL TAX CONVENTION

## COMMENTARY ON ARTICLE 10
## CONCERNING THE TAXATION OF DIVIDENDS

## I.    Preliminary remarks

1.    By "dividends" is generally meant the distribution of profits to the shareholders by companies limited by shares,[1] limited partnerships with share capital,[2] limited liability companies[3] or other joint stock companies.[4] Under the laws of the OECD member countries, such joint stock companies are legal entities with a separate juridical personality distinct from all their shareholders. On this point, they differ from partnerships insofar as the latter do not have juridical personality in most countries.

2.    The profits of a business carried on by a partnership are the partners' profits derived from their own exertions; for them they are business profits. So the partner is ordinarily taxed personally on his share of the partnership capital and partnership profits.

3.    The position is different for the shareholder; he is not a trader and the company's profits are not his; so they cannot be attributed to him. He is personally taxable only on those profits which are distributed by the company (apart from the provisions in certain countries' laws relating to the taxation of undistributed profits in special cases). From the shareholders' standpoint, dividends are income from the capital which they have made available to the company as its shareholders.

## II.    Commentary on the provisions of the Article

### *Paragraph 1*

4.    Paragraph 1 does not prescribe the principle of taxation of dividends either exclusively in the State of the beneficiary's residence or exclusively in the State of which the company paying the dividends is a resident.

5.    Taxation of dividends exclusively in the State of source is not acceptable as a general rule. Furthermore, there are some States which do not have taxation of dividends at the source, while as a general rule, all the States tax residents in respect of dividends they receive from non-resident companies.

6.    On the other hand, taxation of dividends exclusively in the State of the beneficiary's residence is not feasible as a general rule. It would be more in keeping with the nature of dividends, which are investment income, but it would be unrealistic to suppose that there is any prospect of it being agreed that all taxation of dividends at the source should be relinquished.

---

1    *Sociétés anonymes.*

2    *Sociétés en commandite par actions.*

3    *Sociétés à responsabilité limitée.*

4    *Sociétés de capitaux.*

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

7.     For this reason, paragraph 1 states simply that dividends may be taxed in the State of the beneficiary's residence. The term "paid" has a very wide meaning, since the concept of payment means the fulfilment of the obligation to put funds at the disposal of the shareholder in the manner required by contract or by custom.

8.     The Article deals only with dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State. It does not, therefore, apply to dividends paid by a company which is a resident of a third State or to dividends paid by a company which is a resident of a Contracting State which are attributable to a permanent establishment which an enterprise of that State has in the other Contracting State (for these cases, see paragraphs 4 to 6 of the Commentary on Article 21).

## *Paragraph 2*

9.     Paragraph 2 reserves a right to tax to the State of source of the dividends, *i.e.* to the State of which the company paying the dividends is a resident; this right to tax, however, is limited considerably. The rate of tax is limited to 15 per cent, which appears to be a reasonable maximum figure. A higher rate could hardly be justified since the State of source can already tax the company's profits.

10.    On the other hand, a lower rate (5 per cent) is expressly provided in respect of dividends paid by a subsidiary company to its parent company. If a company of one of the States owns directly a holding of at least 25 per cent in a company of the other State, it is reasonable that payments of profits by the subsidiary to the foreign parent company should be taxed less heavily to avoid recurrent taxation and to facilitate international investment. The realisation of this intention depends on the fiscal treatment of the dividends in the State of which the parent company is a resident (see paragraphs 49 to 54 of the Commentary on Articles 23 A and 23 B).

11.    If a partnership is treated as a body corporate under the domestic laws applying to it, the two Contracting States may agree to modify subparagraph *a)* of paragraph 2 in a way to give the benefits of the reduced rate provided for parent companies also to such partnership.

12.    The requirement of beneficial ownership was introduced in paragraph 2 of Article 10 to clarify the meaning of the words "paid ... to a resident" as they are used in paragraph 1 of the Article. It makes plain that the State of source is not obliged to give up taxing rights over dividend income merely because that income was immediately received by a resident of a State with which the State of source had concluded a convention. The term "beneficial owner" is not used in a narrow technical sense, rather, it should be understood in its context and in light of the object and purposes of the Convention, including avoiding double taxation and the prevention of fiscal evasion and avoidance.

12.1   Where an item of income is received by a resident of a Contracting State acting in the capacity of agent or nominee it would be inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption merely

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

on account of the status of the immediate recipient of the income as a resident of the other Contracting State. The immediate recipient of the income in this situation qualifies as a resident but no potential double taxation arises as a consequence of that status since the recipient is not treated as the owner of the income for tax purposes in the State of residence. It would be equally inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption where a resident of a Contracting State, otherwise than through an agency or nominee relationship, simply acts as a conduit for another person who in fact receives the benefit of the income concerned. For these reasons, the report from the Committee on Fiscal Affairs entitled "Double Taxation Conventions and the Use of Conduit Companies"[1] concludes that a conduit company cannot normally be regarded as the beneficial owner if, though the formal owner, it has, as a practical matter, very narrow powers which render it, in relation to the income concerned, a mere fiduciary or administrator acting on account of the interested parties.

12.2   Subject to other conditions imposed by the Article, the limitation of tax in the State of source remains available when an intermediary, such as an agent or nominee located in a Contracting State or in a third State, is interposed between the beneficiary and the payer but the beneficial owner is a resident of the other Contracting State (the text of the Model was amended in 1995 to clarify this point, which has been the consistent position of all member countries). States which wish to make this more explicit are free to do so during bilateral negotiations.

13.    The tax rates fixed by the Article for the tax in the State of source are maximum rates. The States may agree, in bilateral negotiations, on lower rates or even on taxation exclusively in the State of the beneficiary's residence. The reduction of rates provided for in paragraph 2 refers solely to the taxation of dividends and not to the taxation of the profits of the company paying the dividends.

13.1   Under the domestic laws of many States, pension funds and similar entities are generally exempt from tax on their investment income. In order to achieve neutrality of treatment as regards domestic and foreign investments by these entities, some States provide bilaterally that income, including dividends, derived by such an entity resident of the other State shall be exempt from source taxation. States wishing to do so may agree bilaterally on a provision drafted along the lines of the provision found in paragraph 69 of the Commentary on Article 18.

13.2   Similarly, some States refrain from levying tax on dividends paid to other States and some of their wholly-owned entities, at least to the extent that such dividends are derived from activities of a governmental nature. Some States are able to grant such an exemption under their interpretation of the sovereign immunity principle (see paragraphs 6.38 and 6.39 of the Commentary on Article 1); others may do it pursuant to provisions of their domestic law. States wishing to do so may confirm or clarify, in their bilateral conventions, the scope of these exemptions or grant such an exemption in

---

1   Reproduced in Volume II of the full-length version of the OECD Model Tax Convention at page R(6)-1.

MODEL TAX CONVENTION (CONDENSED VERSION) – ISBN 978-92-64-08948-8 – © OECD 2010

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

cases where it would not otherwise be available. This may be done by adding to the Article an additional paragraph drafted along the following lines:

Notwithstanding the provisions of paragraph 2, dividends referred to in paragraph 1 shall be taxable only in the Contracting State of which the recipient is a resident if the beneficial owner of the dividends is that State or a political subdivision or local authority thereof.

14.     The two Contracting States may also, during bilateral negotiations, agree to a holding percentage lower than that fixed in the Article. A lower percentage is, for instance, justified in cases where the State of residence of the parent company, in accordance with its domestic law, grants exemption to such a company for dividends derived from a holding of less than 25 per cent in a non-resident subsidiary.

15.     In subparagraph *a)* of paragraph 2, the term "capital" is used in relation to the taxation treatment of dividends, *i.e.* distributions of profits to shareholders. The use of this term in this context implies that, for the purposes of subparagraph *a)*, it should be used in the sense in which it is used for the purposes of distribution to the shareholder (in the particular case, the parent company).

   *a)* As a general rule, therefore, the term "capital" in subparagraph *a)* should be understood as it is understood in company law. Other elements, in particular the reserves, are not to be taken into account.

   *b)* Capital, as understood in company law, should be indicated in terms of par value of all shares which in the majority of cases will be shown as capital in the company's balance sheet.

   *c)* No account need be taken of differences due to the different classes of shares issued (ordinary shares, preference shares, plural voting shares, non-voting shares, bearer shares, registered shares, etc.), as such differences relate more to the nature of the shareholder's right than to the extent of his ownership of the capital.

   *d)* When a loan or other contribution to the company does not, strictly speaking, come as capital under company law but when on the basis of internal law or practice ("thin capitalisation", or assimilation of a loan to share capital), the income derived in respect thereof is treated as dividend under Article 10, the value of such loan or contribution is also to be taken as "capital" within the meaning of subparagraph *a)*.

   *e)* In the case of bodies which do not have a capital within the meaning of company law, capital for the purpose of subparagraph *a)* is to be taken as meaning the total of all contributions to the body which are taken into account for the purpose of distributing profits.

In bilateral negotiations, Contracting States may depart from the criterion of "capital" used in subparagraph *a)* of paragraph 2 and use instead the criterion of "voting power".

16.     Subparagraph *a)* of paragraph 2 does not require that the company receiving the dividends must have owned at least 25 per cent of the capital for a relatively long time before the date of the distribution. This means that all that counts regarding the

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

holding is the situation prevailing at the time material for the coming into existence of the liability to the tax to which paragraph 2 applies, *i.e.* in most cases the situation existing at the time when the dividends become legally available to the shareholders. The primary reason for this resides in the desire to have a provision which is applicable as broadly as possible. To require the parent company to have possessed the minimum holding for a certain time before the distribution of the profits could involve extensive inquiries. Internal laws of certain OECD member countries provide for a minimum period during which the recipient company must have held the shares to qualify for exemption or relief in respect of dividends received. In view of this, Contracting States may include a similar condition in their conventions.

17.    The reduction envisaged in subparagraph *a)* of paragraph 2 should not be granted in cases of abuse of this provision, for example, where a company with a holding of less than 25 per cent has, shortly before the dividends become payable, increased its holding primarily for the purpose of securing the benefits of the above-mentioned provision, or otherwise, where the qualifying holding was arranged primarily in order to obtain the reduction. To counteract such manoeuvres Contracting States may find it appropriate to add to subparagraph *a)* a provision along the following lines:

> provided that this holding was not acquired primarily for the purpose of taking advantage of this provision.

18.    Paragraph 2 lays down nothing about the mode of taxation in the State of source. It therefore leaves that State free to apply its own laws and, in particular, to levy the tax either by deduction at source or by individual assessment.

19.    The paragraph does not settle procedural questions. Each State should be able to use the procedure provided in its own laws. It can either forthwith limit its tax to the rates given in the Article or tax in full and make a refund (see, however, paragraph 26.2 of the Commentary on Article 1). Specific questions arise with triangular cases (see paragraph 71 of the Commentary on Article 24).

20.    It does not specify whether or not the relief in the State of source should be conditional upon the dividends being subject to tax in the State of residence. This question can be settled by bilateral negotiations.

21.    The Article contains no provisions as to how the State of the beneficiary's residence should make allowance for the taxation in the State of source of the dividends. This question is dealt with in Articles 23 A and 23 B.

22.    Attention is drawn generally to the following case: the beneficial owner of the dividends arising in a Contracting State is a company resident of the other Contracting State; all or part of its capital is held by shareholders resident outside that other State; its practice is not to distribute its profits in the form of dividends; and it enjoys preferential taxation treatment (private investment company, base company). The question may arise whether in the case of such a company it is justifiable to allow in the State of source of the dividends the limitation of tax which is provided in paragraph 2. It may be appropriate, when bilateral negotiations are being conducted, to

MODEL TAX CONVENTION (CONDENSED VERSION) – ISBN 978-92-64-08948-8 – © OECD 2010

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

agree upon special exceptions to the taxing rule laid down in this Article, in order to define the treatment applicable to such companies.

### *Paragraph 3*

23.    In view of the great differences between the laws of OECD member countries, it is impossible to define "dividends" fully and exhaustively. Consequently, the definition merely mentions examples which are to be found in the majority of the member countries' laws and which, in any case, are not treated differently in them. The enumeration is followed up by a general formula. In the course of the revision of the 1963 Draft Convention, a thorough study has been undertaken to find a solution that does not refer to domestic laws. This study has led to the conclusion that, in view of the still remaining dissimilarities between member countries in the field of company law and taxation law, it did not appear to be possible to work out a definition of the concept of dividends that would be independent of domestic laws. It is open to the Contracting States, through bilateral negotiations, to make allowance for peculiarities of their laws and to agree to bring under the definition of "dividends" other payments by companies falling under the Article.

24.    The notion of dividends basically concerns distributions by companies within the meaning of subparagraph *b)* of paragraph 1 of Article 3. Therefore the definition relates, in the first instance, to distributions of profits the title to which is constituted by shares, that is holdings in a company limited by shares (joint stock company). The definition assimilates to shares all securities issued by companies which carry a right to participate in the companies' profits without being debt-claims; such are, for example, "jouissance" shares or "jouissance" rights, founders' shares or other rights participating in profits. In bilateral conventions, of course, this enumeration may be adapted to the legal situation in the Contracting States concerned. This may be necessary in particular, as regards income from "jouissance" shares and founders' shares. On the other hand, debt-claims participating in profits do not come into this category (see paragraph 19 of the Commentary on Article 11); likewise interest on convertible debentures is not a dividend.

25.    Article 10 deals not only with dividends as such but also with interest on loans insofar as the lender effectively shares the risks run by the company, *i.e.* when repayment depends largely on the success or otherwise of the enterprise's business. Articles 10 and 11 do not therefore prevent the treatment of this type of interest as dividends under the national rules on thin capitalisation applied in the borrower's country. The question whether the contributor of the loan shares the risks run by the enterprise must be determined in each individual case in the light of all the circumstances, as for example the following:

— the loan very heavily outweighs any other contribution to the enterprise's capital (or was taken out to replace a substantial proportion of capital which has been lost) and is substantially unmatched by redeemable assets;

— the creditor will share in any profits of the company;

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

— repayment of the loan is subordinated to claims of other creditors or to the payment of dividends;

— the level or payment of interest would depend on the profits of the company;

— the loan contract contains no fixed provisions for repayment by a definite date.

26.     The laws of many of the States put participations in a *société à responsabilité limitée* (limited liability company) on the same footing as shares. Likewise, distributions of profits by co-operative societies are generally regarded as dividends.

27.     Distributions of profits by partnerships are not dividends within the meaning of the definition, unless the partnerships are subject, in the State where their place of effective management is situated, to a fiscal treatment substantially similar to that applied to companies limited by shares (for instance, in Belgium, Portugal and Spain, also in France as regards distributions to *commanditaires* in the *sociétés en commandite simple*). On the other hand, clarification in bilateral conventions may be necessary in cases where the taxation law of a Contracting State gives the owner of holdings in a company a right to opt, under certain conditions, for being taxed as a partner of a partnership, or, vice versa, gives the partner of a partnership the right to opt for taxation as the owner of holdings in a company.

28.     Payments regarded as dividends may include not only distributions of profits decided by annual general meetings of shareholders, but also other benefits in money or money's worth, such as bonus shares, bonuses, profits on a liquidation and disguised distributions of profits. The reliefs provided in the Article apply so long as the State of which the paying company is a resident taxes such benefits as dividends. It is immaterial whether any such benefits are paid out of current profits made by the company or are derived, for example, from reserves, *i.e.* profits of previous financial years. Normally, distributions by a company which have the effect of reducing the membership rights, for instance, payments constituting a reimbursement of capital in any form whatever, are not regarded as dividends.

29.     The benefits to which a holding in a company confer entitlement are, as a general rule, available solely to the shareholders themselves. Should, however, certain of such benefits be made available to persons who are not shareholders within the meaning of company law, they may constitute dividends if:

— the legal relations between such persons and the company are assimilated to a holding in a company ("concealed holdings"); and

— the persons receiving such benefits are closely connected with a shareholder; this is the case, for example, where the recipient is a relative of the shareholder or is a company belonging to the same group as the company owning the shares.

30.     When the shareholder and the person receiving such benefits are residents of two different States with which the State of source has concluded conventions, differences of views may arise as to which of these conventions is applicable. A similar problem may arise when the State of source has concluded a convention with one of the States but not with the other. This, however, is a conflict which may affect other

MODEL TAX CONVENTION (CONDENSED VERSION) – ISBN 978-92-64-08948-8 – © OECD 2010

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

types of income, and the solution to it can be found only through an arrangement under the mutual agreement procedure.

### *Paragraph 4*

31.    Certain States consider that dividends, interest and royalties arising from sources in their territory and payable to individuals or legal persons who are residents of other States fall outside the scope of the arrangement made to prevent them from being taxed both in the State of source and in the State of the beneficiary's residence when the beneficiary has a permanent establishment in the former State. Paragraph 4 is not based on such a conception which is sometimes referred to as "the force of attraction of the permanent establishment". It does not stipulate that dividends flowing to a resident of a Contracting State from a source situated in the other State must, by a kind of legal presumption, or fiction even, be related to a permanent establishment which that resident may have in the latter State, so that the said State would not be obliged to limit its taxation in such a case. The paragraph merely provides that in the State of source the dividends are taxable as part of the profits of the permanent establishment there owned by the beneficiary which is a resident of the other State, if they are paid in respect of holdings forming part of the assets of the permanent establishment or otherwise effectively connected with that establishment. In that case, paragraph 4 relieves the State of source of the dividends from any limitations under the Article. The foregoing explanations accord with those in the Commentary on Article 7.

32.    It has been suggested that the paragraph could give rise to abuses through the transfer of shares to permanent establishments set up solely for that purpose in countries that offer preferential treatment to dividend income. Apart from the fact that such abusive transactions might trigger the application of domestic anti-abuse rules, it must be recognised that a particular location can only constitute a permanent establishment if a business is carried on therein and, as explained below, that the requirement that a shareholding be "effectively connected" to such a location requires more than merely recording the shareholding in the books of the permanent establishment for accounting purposes.

32.1   A holding in respect of which dividends are paid will be effectively connected with a permanent establishment, and will therefore form part of its business assets, if the "economic" ownership of the holding is allocated to that permanent establishment under the principles developed in the Committee's report entitled *Attribution of Profits to Permanent Establishments*[1] (see in particular paragraphs 72-97 of Part I of the report) for the purposes of the application of paragraph 2 of Article 7. In the context of that paragraph, the "economic" ownership of a holding means the equivalent of ownership for income tax purposes by a separate enterprise, with the attendant benefits and burdens (*e.g.* the right to the dividends attributable to the ownership of the holding and

---

1   *Attribution of Profits to Permanent Establishments*, OECD, Paris, 2010.

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

the potential exposure to gains or losses from the appreciation or depreciation of the holding).

32.2 In the case of the permanent establishment of an enterprise carrying on insurance activities, the determination of whether a holding is effectively connected with the permanent establishment shall be made by giving due regard to the guidance set forth in Part IV of the Committee's report with respect to whether the income on or gain from that holding is taken into account in determining the permanent establishment's yield on the amount of investment assets attributed to it (see in particular paragraphs 165-170 of Part IV). That guidance being general in nature, tax authorities should consider applying a flexible and pragmatic approach which would take into account an enterprise's reasonable and consistent application of that guidance for purposes of identifying the specific assets that are effectively connected with the permanent establishment.

### *Paragraph 5*

33.    The Article deals only with dividends paid by a company which is a resident of a Contracting State to a resident of the other State. Certain States, however, tax not only dividends paid by companies resident therein but even distributions by non-resident companies of profits arising within their territory. Each State, of course, is entitled to tax profits arising in its territory which are made by non-resident companies, to the extent provided in the Convention (in particular in Article 7). The shareholders of such companies should not be taxed as well at any rate, unless they are residents of the State and so naturally subject to its fiscal sovereignty.

34.    Paragraph 5 rules out the extra-territorial taxation of dividends, *i.e.* the practice by which States tax dividends distributed by a non-resident company solely because the corporate profits from which the distributions are made originated in their territory (for example, realised through a permanent establishment situated therein). There is, of course, no question of extra-territorial taxation when the country of source of the corporate profits taxes the dividends because they are paid to a shareholder who is a resident of that State or to a permanent establishment situated in that State.

35.    Moreover, it can be argued that such a provision does not aim at, or cannot result in, preventing a State from subjecting the dividends to a withholding tax when distributed by foreign companies if they are cashed in its territory. Indeed, in such a case, the criterion for tax liability is the fact of the payment of the dividends, and not the origin of the corporate profits allotted for distribution. But if the person cashing the dividends in a Contracting State is a resident of the other Contracting State (of which the distributing company is a resident), he may under Article 21 obtain exemption from, or refund of, the withholding tax of the first-mentioned State. Similarly, if the beneficiary of the dividends is a resident of a third State which had concluded a double taxation convention with the State where the dividends are cashed, he may, under Article 21 of that convention, obtain exemption from, or refund of, the withholding tax of the last-mentioned State.

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

36.    Paragraph 5 further provides that non-resident companies are not to be subjected to special taxes on undistributed profits.

37.    It might be argued that where the taxpayer's country of residence, pursuant to its controlled foreign companies legislation or other rules with similar effect seeks to tax profits which have not been distributed, it is acting contrary to the provisions of paragraph 5. However, it should be noted that the paragraph is confined to taxation at source and, thus, has no bearing on the taxation at residence under such legislation or rules. In addition, the paragraph concerns only the taxation of the company and not that of the shareholder.

38.    The application of such legislation or rules may, however, complicate the application of Article 23. If the income were attributed to the taxpayer then each item of the income would have to be treated under the relevant provisions of the Convention (business profits, interest, royalties). If the amount is treated as a deemed dividend then it is clearly derived from the base company thus constituting income from that company's country. Even then, it is by no means clear whether the taxable amount is to be regarded as a dividend within the meaning of Article 10 or as "other income" within the meaning of Article 21. Under some of these legislation or rules the taxable amount is treated as a dividend with the result that an exemption provided for by a tax convention, *e.g.* an affiliation exemption, is also extended to it. It is doubtful whether the Convention requires this to be done. If the country of residence considers that this is not the case it may face the allegation that it is obstructing the normal operation of the affiliation exemption by taxing the dividend (in the form of "deemed dividend") in advance.

39.    Where dividends are actually distributed by the base company, the provisions of a bilateral convention regarding dividends have to be applied in the normal way because there is dividend income within the meaning of the convention. Thus, the country of the base company may subject the dividend to a withholding tax. The country of residence of the shareholder will apply the normal methods for the elimination of double taxation (*i.e.* tax credit or tax exemption is granted). This implies that the withholding tax on the dividend should be credited in the shareholder's country of residence, even if the distributed profit (the dividend) has been taxed years before under controlled foreign companies legislation or other rules with similar effect. However, the obligation to give credit in that case remains doubtful. Generally the dividend as such is exempted from tax (as it was already taxed under the relevant legislation or rules) and one might argue that there is no basis for a tax credit. On the other hand, the purpose of the treaty would be frustrated if the crediting of taxes could be avoided by simply anticipating the dividend taxation under counteracting legislation. The general principle set out above would suggest that the credit should be granted, though the details may depend on the technicalities of the relevant legislation or rules) and the system for crediting foreign taxes against domestic tax, as well as on the particularities of the case (*e.g.* time lapsed since the taxation of the "deemed dividend"). However, taxpayers who have recourse to artificial arrangements are taking risks against which they cannot fully be safeguarded by tax authorities.

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

## III.  Effects of special features of the domestic tax laws of certain countries

40.     Certain countries' laws seek to avoid or mitigate economic double taxation *i.e.* the simultaneous taxation of the company's profits at the level of the company and of the dividends at the level of the shareholder. There are various ways of achieving this:

— company tax in respect of distributed profits may be charged at a lower rate than that on retained profits;

— relief may be granted in computing the shareholder's personal tax;

— dividends may bear only one tax, the distributed profits not being taxed at the level of the company.

The Committee on Fiscal Affairs has examined the question whether the special features of the tax laws of the member countries would justify solutions other than those contained in the Model Convention.

### A.   *Dividends distributed to individuals*

41.     In contrast to the notion of juridical double taxation, which has, generally, a quite precise meaning, the concept of economic double taxation is less certain. Some States do not accept the validity of this concept and others, more numerously, do not consider it necessary to relieve economic double taxation at the national level (dividends distributed by resident companies to resident shareholders). Consequently, as the concept of economic double taxation was not sufficiently well defined to serve as a basis for the analysis, it seemed appropriate to study the problem from a more general economic standpoint, *i.e.* from the point of view of the effects which the various systems for alleviating such double taxation can have on the international flow of capital. For this purpose, it was necessary to see, among other things, what distortions and discriminations the various national systems could create; but it was necessary to have regard also to the implications for States' budgets and for effective fiscal verification, without losing sight of the principle of reciprocity that underlies every convention. In considering all these aspects, it became apparent that the burden represented by company tax could not be wholly left out of account.

#### 1.   *States with the classical system*

42.     The Committee has recognised that economic double taxation need not be relieved at the international level when such double taxation remains unrelieved at the national level. It therefore considers that in relations between two States with the classical system, *i.e.* States which do not relieve economic double taxation, the respective levels of company tax in the Contracting States should have no influence on the rate of withholding tax on the dividend in the State of source (rate limited to 15 per cent by subparagraph *b)* of paragraph 2 of Article 10). Consequently, the solution recommended in the Model Convention remains fully applicable in the present case.

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

### 2.  *States applying a split rate company tax*

43.    These States levy company tax at different rates according to what the company does with its profits: the high rate is charged on any profits retained and the lower rate on those distributed.

44.    None of these States, in negotiating double taxation conventions, has obtained, on the grounds of its split rate of company tax, the right to levy with- holding tax of more than 15 per cent (see subparagraph *b)* of paragraph 2 of Article 10) on dividends paid by its companies to a shareholder who is an individual resident in the other State.

45.    The Committee considered whether such a State (State B) should not be recognised as being entitled to levy withholding tax exceeding 15 per cent on dividends distributed by its companies to residents of a State with a classical system (State A), with the proviso that the excess over 15 per cent, which would be designed to offset, in relation to the shareholder concerned, the effects of the lower rate of company tax on distributed profits of companies of State B, would not be creditable against the tax payable by the shareholder in State A of which he is a resident.

46.    Most member countries considered that in State B regard should be had to the average level of company tax, and that such average level should be considered as the counterpart to the charge levied in the form of a single-rate tax on companies resident of State A. The levy by State B of an additional withholding tax not credited in State A would, moreover, create twofold discrimination: on the one hand, dividends, distributed by a company resident of State B would be more heavily taxed when distributed to residents of State A than when distributed to residents of State B, and, on the other hand, the resident of State A would pay higher personal tax on his dividends from State B than on his dividends from State A. The idea of a "balancing tax" was not, therefore, adopted by the Committee.

### 3.  *States which provide relief at the shareholder's level*

47.    In these States, the company is taxed on its total profits, whether distributed or not, and the dividends are taxed in the hands of the resident shareholder (an individual); the latter, however, is entitled to relief, usually as a tax credit against his personal tax, on the grounds that — in the normal course at least — the dividend has borne company tax as part of the company's profits.

48.    Internal law of these States does not provide for the extension of the tax relief to the international field. Relief is allowed only to residents and only in respect of dividends of domestic sources. However, as indicated below, some States have, in some conventions, extended the right to the tax credit provided for in their legislation to residents of the other Contracting State.

49.    In many States that provide relief at the shareholder's level, the resident shareholder receives a credit in recognition of the fact that the profits out of which the dividends are paid have already been taxed in the hands of the company. The resident shareholder is taxed on his dividend grossed up by the tax credit; this credit is set off against the tax payable and can possibly give rise to a refund. In some double taxation

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

conventions, some countries that apply this system have agreed to extend the credit to shareholders who are residents of the other Contracting State. Whilst most States that have agreed to such extensions have done so on a reciprocal basis, a few countries have concluded conventions where they unilaterally extend the benefits of the credit to residents of the other Contracting State.

50.     Some States that also provide relief at the shareholder's level claim that under their systems the company tax remains in its entirety a true company tax, in that it is charged by reference solely to the company's own situation, without any regard to the person and the residence of the shareholder, and in that, having been so charged, it remains appropriated to the Treasury. The tax credit given to the shareholder is designed to relieve his personal tax liability and in no way constitutes an adjustment of the company's tax. No refund, therefore, is given if the tax credit exceeds that personal tax.

51.     The Committee could not reach a general agreement on whether the systems of the States referred to in paragraph 50 above display a fundamental difference that could justify different solutions at the international level.

52.     Some member countries were of the opinion that such a fundamental difference does not exist. This opinion leaves room for the conclusion that the States referred to in paragraph 50 above should agree to extend the tax credit to non-resident shareholders, at least on a reciprocal basis, in the same way as some of the countries referred to in paragraph 49 above do. Such a solution tends to ensure neutrality as regards dividends distributed by companies of these countries, the same treatment being given to resident and non-resident shareholders. On the other hand, it would in relation to shareholders who are residents of a Contracting State (a State with a classical system in particular) encourage investment in a State that provides relief at the shareholder's level since residents of the first State would receive a tax credit (in fact a refund of company tax) for dividends from the other State while they do not receive one for dividends from their own country. However, these effects are similar to those which present themselves between a State applying a split rate company tax and a State with a classical system or between two States with a classical system one of which has a lower company tax rate than the other (paragraphs 42 and 43 to 46 above).

53.     On the other hand, many member countries stressed the fact that a determination of the true nature of the tax relief given under the systems of the States referred to in paragraph 50 above reveals a mere alleviation of the shareholder's personal income tax in recognition of the fact that his dividend will normally have borne company tax. The tax credit is given once and for all (*forfaitaire*) and is therefore not in exact relation to the actual company tax appropriate to the profits out of which the dividend is paid. There is no refund if the tax credit exceeds the personal income tax.

54.     As the relief in essence is not a refund of company tax but an alleviation of the personal income tax, the extension of the relief to non-resident shareholders who are not subject to personal income tax in the countries concerned does not come into

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

consideration. On the other hand, however, on this line of reasoning, the question whether States which provide relief at the shareholder's level should give relief against personal income tax levied from resident shareholders on foreign dividends deserves attention. In this respect it should be observed that the answer is in the affirmative if the question is looked at from the standpoint of neutrality as regards the source of the dividends; otherwise, residents of these States will be encouraged to acquire shares in their own country rather than abroad. But such an extension of the tax credit would be contrary to the principle of reciprocity: not only would the State concerned thereby be making a unilateral budgetary sacrifice (allowing the tax credit over and above the withholding tax levied in the other State), but it would do so without receiving any economic compensation, since it would not be encouraging residents of the other State to acquire shares in its own territory.

55.    To overcome these objections, it might be a conceivable proposition, amongst other possibilities, that the State of source — which will have collected company tax on dividends distributed by resident companies — should bear the cost of the tax credit that a State which provides relief at the shareholder's level would allow, by transferring funds to that State. As, however, such transfers are hardly favoured by the States this might be more simply achieved by means of a "compositional" arrangement under which the State of source would relinquish all withholding tax on dividends paid to residents of the other State, and the latter would then allow against its own tax, not the 15 per cent withholding tax (abolished in the State of source) but a tax credit similar to that which it gives on dividends of domestic source.

56.    When everything is fully considered, it seems that the problem can be solved only in bilateral negotiations, where one is better placed to evaluate the sacrifices and advantages which the Convention must bring for each Contracting State.

57.    [Deleted]

58.    [Deleted]

## B.    *Dividends distributed to companies*

59.    Comments above relating to dividends paid to individuals are generally applicable to dividends paid to companies which hold less than 25 per cent of the capital of the company paying the dividends. The treatment of dividends paid to collective investment vehicles raises particular issues which are addressed in paragraphs 6.8 to 6.34 of the Commentary on Article 1.

60.    In respect of dividends paid to companies which hold at least 25 per cent of the capital of the company paying the dividends, the Committee has examined the incidence which the particular company taxation systems quoted in paragraphs 42 and following have on the tax treatment of dividends paid by the subsidiary.

61.    Various opinions were expressed in the course of the discussion. Opinions diverge even when the discussion is limited to the taxation of subsidiaries and parent companies. They diverge still more if the discussion takes into account

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

more general economic considerations and extends to the taxation of shareholders of the parent company.

62.    In their bilateral conventions States have adopted different solutions, which were motivated by the economic objectives and the peculiarities of the legal situation of those States, by budgetary considerations, and by a whole series of other factors. Accordingly, no generally accepted principles have emerged. The Committee did nevertheless consider the situation for the more common systems of company taxation.

### 1.    *Classical system in the State of the subsidiary*
(paragraph 42 above)

63.    The provisions of the Convention have been drafted to apply when the State of which the distributing company is a resident has a so-called "classical" system of company taxation, namely one under which distributed profits are not entitled to any benefit at the level either of the company or of the shareholder (except for the purpose of avoiding recurrent taxation of inter-company dividends).

### 2.    *Split-rate company tax system in the State of the subsidiary*
(paragraph 43 to 46 above)

64.    States of this kind collect company tax on distributed profits at a lower rate than on retained profits which results in a lower company tax burden on profits distributed by a subsidiary to its parent company. In view of this situation, most of these States have obtained, in their conventions, rates of tax at source of 10 or 15 per cent, and in some cases even above 15 per cent. It has not been possible in the Committee to get views to converge on this question, the solution of which is left to bilateral negotiations.

### 3.    *Imputation system in the State of the subsidiary*
(paragraph 47 and following)

65.    In such States, a company is liable to tax on the whole of its profits, whether distributed or not; the shareholders resident of the State of which the distributing company is itself a resident are subject to tax on dividends distributed to them, but receive a tax credit in consideration of the fact that the profits distributed have been taxed at company level.

66.    The question has been considered whether States of this kind should extend the benefit of the tax credit to the shareholders of parent companies resident of another State, or even to grant the tax credit directly to such parent companies. It has not been possible in the Committee to get views to converge on this question, the solution of which is left to bilateral negotiations.

67.    If, in such a system, profits, whether distributed or not, are taxed at the same rate, the system is not different from a "classical" one at the level of the distributing

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

company. Consequently, the State of which the subsidiary is a resident can only levy a tax at source at the rate provided in subparagraph *a)* of paragraph 2.

## IV.  Distributions by Real Estate Investment Trusts

67.1  In many States, a large part of portfolio investment in immovable property is done through Real Estate Investment Trusts (REITs). A REIT may be loosely described as a widely held company, trust or contractual or fiduciary arrangement that derives its income primarily from long-term investment in immovable property, distributes most of that income annually and does not pay income tax on the income related to immovable property that is so distributed. The fact that the REIT vehicle does not pay tax on that income is the result of tax rules that provide for a single-level of taxation in the hands of the investors in the REIT.

67.2  The importance and the globalisation of investments in and through REITs have led the Committee on Fiscal Affairs to examine the tax treaty issues that arise from such investments. The results of that work appear in a report entitled "Tax Treaty Issues Related to REITS."[1]

67.3  One issue discussed in the report is the tax treaty treatment of cross-border distributions by a REIT. In the case of a small investor in a REIT, the investor has no control over the immovable property acquired by the REIT and no connection to that property. Notwithstanding the fact that the REIT itself will not pay tax on its distributed income, it may therefore be appropriate to consider that such an investor has not invested in immovable property but, rather, has simply invested in a company and should be treated as receiving a portfolio dividend. Such a treatment would also reflect the blended attributes of a REIT investment, which combines the attributes of both shares and bonds. In contrast, a larger investor in a REIT would have a more particular interest in the immovable property acquired by the REIT; for that investor, the investment in the REIT may be seen as a substitute for an investment in the underlying property of the REIT. In this situation, it would not seem appropriate to restrict the source taxation of the distribution from the REIT since the REIT itself will not pay tax on its income.

67.4  States that wish to achieve that result may agree bilaterally to replace paragraph 2 of the Article by the following:

2.      However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other Contracting State (other than a beneficial owner of dividends paid by a company which is a REIT in which such person holds, directly or indirectly, capital that represents at least 10 per cent of the value of all the capital in that company), the tax so charged shall not exceed:

---

1  Reproduced in Volume II of the full-length version of the OECD Model Tax Convention at R(23)-1.

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

COMMENTARY ON ARTICLE 10

> *a)* 5 per cent of the gross amount of the dividends if the beneficial owner is a company (other than a partnership) which holds directly at least 25 per cent of the capital of the company paying the dividends (other than a paying company that is a REIT);
>
> *b)* 15 per cent of the gross amount of the dividends in all other cases.

According to this provision, a large investor in a REIT is an investor holding, directly or indirectly, capital that represents at least 10 per cent of the value of all the REIT's capital. States may, however, agree bilaterally to use a different threshold. Also, the provision applies to all distributions by a REIT; in the case of distributions of capital gains, however, the domestic law of some countries provides for a different threshold to differentiate between a large investor and a small investor entitled to taxation at the rate applicable to portfolio dividends and these countries may wish to amend the provision to preserve that distinction in their treaties. Finally, because it would be inappropriate to restrict the source taxation of a REIT distribution to a large investor, the drafting of subparagraph *a)* excludes dividends paid by a REIT from its application; thus, the subparagraph can never apply to such dividends, even if a company that did not hold capital representing 10 per cent or more of the value of the capital of a REIT held at least 25 per cent of its capital as computed in accordance with paragraph 15 above. The State of source will therefore be able to tax such distributions to large investors regardless of the restrictions in subparagraphs *a)* and *b)*.

67.5   Where, however, the REITs established in one of the Contracting States do not qualify as companies that are residents of that Contracting State, the provision will need to be amended to ensure that it applies to distributions by such REITs.

67.6   For example, if the REIT is a company that does not qualify as a resident of the State, paragraphs 1 and 2 of the Article will need to be amended as follows to achieve that result:

1.       Dividends paid by a company which is a resident, or a REIT organised under the laws, of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2.       However, such dividends may also be taxed in, and according to the laws of, the Contracting State of which the company paying the dividends is a resident or, in the case of a REIT, under the laws of which it has been organised, but if the beneficial owner of the dividends is a resident of the other Contracting State (other than a beneficial owner of dividends paid by a company which is a REIT in which such person holds, directly or indirectly, capital that represents at least 10 per cent of the value of all the capital in that company), the tax so charged shall not exceed:

> *a)* 5 per cent of the gross amount of the dividends if the beneficial owner is a company (other than a partnership) which holds directly at least 25 per cent of the capital of the company paying the dividends (other than a paying company that is a REIT);
>
> *b)* 15 per cent of the gross amount of the dividends in all other cases.

MODEL TAX CONVENTION (CONDENSED VERSION) – ISBN 978-92-64-08948-8 – © OECD 2010

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

67.7  Similarly, in order to achieve that result where the REIT is structured as a trust or as a contractual or fiduciary arrangement and does not qualify as a company, States may agree bilaterally to add to the alternative version of paragraph 2 set forth in paragraph 67.4 above an additional provision drafted along the following lines:

> For the purposes of this Convention, where a REIT organised under the laws of a Contracting State makes a distribution of income to a resident of the other Contracting State who is the beneficial owner of that distribution, the distribution of that income shall be treated as a dividend paid by a company resident of the first-mentioned State.

Under this additional provision, the relevant distribution would be treated as a dividend and not, therefore, as another type of income (*e.g.* income from immovable property or capital gain) for the purposes of applying Article 10 and the other Articles of the Convention. Clearly, however, that would not change the characterisation of that distribution for purposes of domestic law so that domestic law treatment would not be affected except for the purposes of applying the limitations imposed by the relevant provisions of the Convention.

## Observations on the Commentary

68.    *Canada* and the *United Kingdom* do not adhere to paragraph 24 above. Under their law, certain interest payments are treated as distributions, and are therefore included in the definition of dividends.

68.1 *Belgium* cannot share the views expressed in paragraph 37 of the Commentary. Belgium considers that paragraph 5 of Article 10 is a particular application of a general principle underlying various provisions of the Convention (paragraph 7 of Article 5, paragraph 1 of Article 7, and paragraphs 1 and 5 of Article 10), which is the prohibition for a Contracting State, except in exceptional cases expressly provided for in the Convention, to levy a tax on the profits of a company which is a resident of the other Contracting State. Paragraph 5, which deals with taxation where the income has its source, confirms this general prohibition and provides that the prohibition applies even where the undistributed profits derived by the entity that is a resident of the other Contracting State arise from business carried out in the State of source. Paragraph 5 prohibits the taxation of the undistributed profits of the foreign entity even where the State where those profits arise taxes them in the hands of a resident shareholder. The fact that a Contracting State taxes one of its residents on profits that are beneficially owned by a resident of the other State cannot change the nature of the profits, their beneficiary and, therefore, the allocation of the taxing rights on these profits.

68.2 With reference to paragraph 37, *Ireland* notes its general observation in paragraph 27.5 of the Commentary on Article 1.

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

## Reservations on the Article

### *Paragraph 2*

69.    [Deleted]

70.    [Deleted]

71.    [Deleted]

72.    The *United States* reserves the right to provide that shareholders of certain pass-through entities, such as Regulated Investment Companies and Real Estate Investment Trusts, will not be granted the direct dividend investment rate, even if they would qualify based on their percentage ownership.

73.    [Deleted]

74.    In view of its particular taxation system, *Chile* retains its freedom of action with regard to the provisions in the Convention relating to the rate and form of distribution of profits by companies.

75.    *Mexico*, *Portugal* and *Turkey* reserve their positions on the rates of tax in paragraph 2.

76.    [Deleted]

77.    *Poland* reserves its position on the minimum percentage for the holding (25 per cent) and the rates of tax (5 per cent and 15 per cent).

### *Paragraph 3*

78.    *Belgium* reserves the right to broaden the definition of dividends in paragraph 3 so as to cover expressly income — even when paid in the form of interest — which is subjected to the same taxation treatment as income from shares by its internal law.

79.    *Denmark* reserves the right, in certain cases, to consider as dividends the selling price derived from the sale of shares.

80.    *France* and *Mexico* reserve the right to amplify the definition of dividends in paragraph 3 so as to cover all income subjected to the taxation treatment of distributions.

81.    *Canada* and *Germany* reserve the right to amplify the definition of dividends in paragraph 3 so as to cover certain interest payments which are treated as distributions under their domestic law.

81.1   *Portugal* reserves the right to amplify the definition of dividends in paragraph 3 so as to cover certain payments, made under profit participation arrangements, which are treated as distributions under its domestic law.

81.2   *Chile* and *Luxembourg* reserve the right to expand the definition of dividends in paragraph 3 in order to cover certain payments which are treated as distributions of dividends under their domestic law.

82.    [Deleted]

    MODEL TAX CONVENTION (CONDENSED VERSION) – ISBN 978-92-64-08948-8 – © OECD 2010

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.

### *Paragraph 5*

83.    *Canada* and the *United States* reserve the right to impose their branch tax on the earnings of a company attributable to a permanent establishment situated in these countries. Canada also reserves the right to impose this tax on profits attributable to the alienation of immovable property situated in Canada by a company carrying on a trade in immovable property.

84.    [Deleted]

85.    *Turkey* reserves the right to tax, in a manner corresponding to that provided by paragraph 2 of the Article, the part of the profits of a company of the other Contracting State that carries on business through a permanent establishment situated in Turkey that remains after taxation pursuant to Article 7.

Exported / Printed on 10 Dec. 2021 by isabelle.farrar@ropesgray.com.