# Exhibit 16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION | MASTER DOCKET<br>18-md-2865 (LAK) |

<u>REPLY EXPERT REPORT OF ADAM L. WARREN</u>

Adam L. Warren

February 28, 2022

Confidential

# Table of Contents

1. Introduction ........................................................................................................................1

2. Scope of Original Report ...................................................................................................1

3. Summary of Reply to Wade Rebuttal Report .................................................................2

4. Discussion ............................................................................................................................3

5. Conclusion, Right to Amend, and Compensation .........................................................10

Appendix .................................................................................................................................11

Additional Documents Considered ......................................................................................11

Confidential

# 1. Introduction

1. I, along with my team from NERA Economic Consulting, was asked by legal counsel for ED&F Man Capital Markets Ltd. ("ED&F Man") and Acer Investment Group, LLC ("Acer") to reply to the claims in the Rebuttal Expert Report of Mr. Graham Wade dated February 1, 2022 (the "Wade Rebuttal Report").

2. In numerous instances, Mr. Wade misrepresents my conclusions and extrapolates inferences far beyond my own conclusions. My analysis will only cover the criticism of my report and will not include any conclusions regarding any other expert report or any other part of Mr. Wade's rebuttal. I reserve the right to alter my opinions based upon new information or analysis.

# 2. Scope of Original Report

3. In my expert report dated December 31, 2021 (the "Report"), I analyzed documentation maintained by ED&F Man and its sub-custodian banks in connection with the transactions executed on behalf of pension plans for whom Acer acted as authorized agent.

4. Acer and ED&F Man asked me, as part of that analysis, to reconcile pertinent information included on the trading documentation provided to me and, in turn, to opine on whether or not the documentation supported the conclusion that actual securities transactions occurred and were settled.

5. Acer and ED&F Man also asked me to determine, with respect to the transactions other than those that ED&F Man has asserted on Annex E did not give rise to dividends net of withholding tax, whether the cash dividend account entries in ED&F Man's Shadow

system could be reconciled with the receipt of dividends memorialized by either MT566 SWIFT message or a market claim payment from a contractual counterparty.

6. Acer and ED&F Man did not ask me to opine on the import of the payments received by the pension plans as relates to the pension plans' ultimate entitlement to a tax reclaim from SKAT. I understand that such conclusion would involve the technical application of Danish tax law that is outside of my expertise, and I believe also outside of Mr. Wade's.

## 3.   Summary of Reply to Wade Rebuttal Report

7. Mr. Wade does not appear to take issue with my analysis of the trade documentation in my original report. He does not suggest that the data contained in the documentation does not reconcile in the manner I describe, nor does he suggest that the documentation does not suggest that the underlying transactions occurred.

8. Instead, the Wade Rebuttal Report seeks to ascertain what he believes is the underlying meaning or intent of the documents I analyzed, all of which is beyond the scope of my original Report. Mr. Wade's analysis mischaracterizes both the scope and content of my report in a number of respects, and he asserts legal conclusions and statements of intent that my Report does not reach.

   a. Mr. Wade's conclusions regarding what he characterizes as a "real" dividend are beyond the scope of my original Report, and his statements on that score do not relate to the issues addressed by my Report.

   b. Mr. Wade's attempts to discern intent from the factual documents he analyzes are beyond the scope of my Report, which sought to determine whether the existence of specific securities transactions could be inferred from documents maintained

2

Confidential

by ED&F Man. Nevertheless, the inferences drawn by Mr. Wade do not appear to fairly characterize the documents he purports to examine.

## 4. Discussion

9. The purpose of my original Report was:

   *To examine certain trading documentation related to transactions executed on behalf of certain pension plans to determine whether the pension plan for whom Acer acted as authorized agent, using ED&F Man as broker-custodian, acquired certain Danish securities and whether dividends on those shares were received and credited to those pension plans.[1]*

10. As part of the review of the documentation underlying 72 of the tax vouchers[2] and relating to transactions in Danish securities executed by ED&F Man on behalf of the pension plans for whom Acer acted as authorized agent, I was aware that 42 of the vouchers were listed on "Annex E" as part of two schedules.

    a. Schedule 1 to Annex E contained vouchers for which ED&F Man admitted in England that none of the shares received a dividend payment, net of withholding tax.

    b. Schedule 2 to Annex E contained Tax Vouchers for which ED&F Man admitted in England that only a portion of the purchased shares received a dividend payment net of withholding tax.

11. My original Report states at paragraph 11(i) that "ED&F Man executed a trade to acquire the shares described on the Tax Voucher before the ex-dividend date." Paragraph 11(j) states "the shares remained in the relevant Plan's account at least until the ex-dividend

---

[1] Report ¶ 5.

[2] Mr. Wade criticizes (at paragraphs 164-65) my original Report for grouping my analysis of trades according to the tax voucher created by ED&F Man, which I understand the Pension Plans included in their tax reclaim applications to SKAT. This grouping was used because it is the tax reclaim applications that are ultimately the subject of dispute in this case. For the avoidance of doubt, my original analysis included the component parts of each trade underlying each of the 72 tax vouchers I analyzed, and Mr. Wade does not suggest otherwise.

Confidential

3

date." Footnote 4 acknowledges that one transaction's written trade instruction occurred on the ex-dividend date[3]. It further states that for each of the other 71 Tax Vouchers, the written client trade instruction was provided prior to the ex-dividend date.[4] My Report draws no conclusions about whether the settlement of a trade in relation to the record date confers a dividend that may serve as the basis of a tax reclaim.

12. Rather, my Report observes a pattern in the manner in which ED&F Man received a dividend payment based on whether the trades executed by ED&F Man settled on or before the record date or after the record date. As discussed in paragraph 11 of my original Report, for each instance in which the equity transaction settled after the record date for the dividend, ED&F Man received, on behalf of the relevant Plan, a payment for the dividend from the unrelated party from whom ED&F Man (or its internal inter-dealer broker or Volcafe) acquired the shares for the relevant Plan. In each instance, this is reflected by an email confirmation of the ceded dividend from the party from whom the shares were acquired. Ultimately, in these instances, the party from whom ED&F Man acquired the shares on behalf of the Plan remitted the dividend to ED&F Man, who then credited that dividend to the Plan's account.

13. Much of Mr. Wade's report concerns whether or not the dividend payment received by the Pension Plans would give rise to what he refers to as a "real" or "legitimate" dividend that could support the submission of tax reclaim applications in Denmark. My Report took no position on this issue, which I believe would ultimately involve a legal analysis under Danish law. I understand that the European market understanding of whether

---

[3] In analyzing the 72 trades that were the subject of my original Report, I only reviewed written instructions and did not address whether instructions may have been received by other form, such as orally.

[4] Report p. 7, footnote 4.

market claim payments are dividends or something else is a subject of both Mr. Wade's original report dated December 31, 2021, and Max Hayden's rebuttal expert report dated February 1, 2022. I take no position on how the European securities markets or Danish law may view the dividend payments received by the Pension Plans.

a. In situations where the share acquisition transaction settled on or before the record date for the security, the analysis of the MT566 SWIFT messages sought to determine whether the cash transfer ED&F Man received on behalf of the Plans corresponded to the expected dividend amount for the shares that settled on or prior to the record date. I found that the cash transfer matched the expected dividend amount.

b. In situations where the share acquisition transaction settled after the record date for the security, the analysis of documents sought to determine whether the cash transfer ED&F Man received on behalf of the Plans, as evidenced by correspondence surrounding the agreed market claim, was in the correct amount of the net dividend expected on the acquired shares and came from the correct ultimate counterparty (or its share custodian). I found that the market claim was made in the correct amount and was agreed to by the expected counterparty.

c. Mr. Wade's Opinion 7 appears to equate the ownership of a security with the settlement of the trade to acquire that security, and his Opinion 8 appears to rely on a similar assumption that share acquisition equates to settlement. Although I believe the transfer of the legal ownership right in a security would be a matter of Danish law, Mr. Wade's understanding that ownership is equivalent to settlement is not consistent with the manner in which economic rights and risks are

5

Confidential

transferred. For example, a party is exposed to price movements in the security as soon as it agrees to the price at which it will purchase the security, which occurs on the trade date. I understand that market understanding of the transfer of share ownership rights is discussed in more detail in the expert reports of Max Hayden and Dr. Emre Carr.

14. Insofar as Mr. Wade seeks to make the point that SWIFT messages do not necessarily reflect what he considers "real" dividends, he provides no supporting evidence. Rather, he states only that because he has "not seen any evidence" that contradicts his view, it must be correct.[5]

   a. All of the SWIFT messages analyzed in my Report contain the corporate action code "DVCA," which under ISO protocols indicates that the payment is a "Distribution of cash to shareholders, in proportion to their equity holding."[6] To the extent Mr. Wade seeks to assert that MT566 SWIFT messages received by ED&F Man do not actually reflect cash dividend distributions, that assertion is unsupported.

   b. Mr. Wade misrepresents my Report to assert that the SWIFT messages underlying that portion of the Annex E Schedule 2 tax vouchers that ED&F Man maintains carried a dividend right net of withholding tax actually supports the entire shareholding stated by ED&F Man in the tax voucher. That is not accurate. My Report clearly states that MT566 SWIFT messages support only "trades that settled on or before the relevant record date for the security."[7] All of the Annex E

---

[5] Wade Rebuttal Report ¶ 153.

[6] https://www.iso20022.org/15022/uhb/mt566-4-field-22f htm.

[7] Report ¶ 27(a).

6

Confidential

        trades that ED&F Man has asserted did not give rise to a dividend net of withholding tax settled after the record date, and therefore would not have given rise to an MT566 SWIFT.

   c.   Mr. Wade states (at paragraph 160) that "the only shares held by ED&F Man in its BNP Paribas custody account over the Record Date related to Cum-Cum transactions." But such reasoning is tautological, for Mr. Wade defines the "Cum-Cum" transactions to be those that settled on or before the record date, whereas he defines the "Cum-Ex" transactions to be those executed before the ex-dividend date but settled after the record date. Obviously, the trades that Mr. Wade categorizes as settling after the record date would not have settled into ED&F Man's BNP Paribas custody account on the record date. And, as expected, the trades that were settled on or before the record date produced MT566 SWIFT messages, whereas the trades that settled after the record date did not (with one exception discussed in my Report).

15.   Finally, Mr. Wade criticizes my original Report for its analysis of records from BNP Paribas related to market claims made by ED&F Man for what he describes as the "Cum-Ex transactions." Although, as stated above, neither my original Report nor this one reaches the issue of whether a market claim is, as a matter of Danish tax law,[8] what Mr. Wade describes as a "real" dividend, (to the extent that is even a meaningful distinction), the BNP Paribas documentation cited by Mr. Wade appears to be consistent with the market's understanding that the market claim process is valid, as discussed in further detail by Mr. Hayden.

---

[8] As stated above, I offer no legal opinions.

a. Mr. Wade's statement that there are no MT566 SWIFT messages from BNP demonstrating a payment from the issuer for shares for the "Cum-Ex transactions"—i.e. transactions settling after the record date—proves nothing. As discussed in my original Report, one would not generally expect to see such MT566 SWIFT messages for transactions settling after the record date, as the buyer of the shares would not appear on the issuer's share record as of the record date. The presence or absence of an MT566 SWIFT flows directly from Mr. Wade's definition of "Cum-Cum" and "Cum-Ex" transactions.

b. The payments and reversals of the dividend amounts (discussed at paragraph 211-214 of the Wade Rebuttal Report) were outside the scope of my original Report, as they do not pertain to trades executed on behalf of the Pension Plans for whom Acer acted as authorized agent. Nevertheless, Mr. Wade's characterization of the documents does not fairly reflect their content.[9]

c. Mr. Wade states (at paragraph 213) that BNP Paribas's email to ED&F Man that ED&F's counterparty "did not agree (contractual date > record date) with the claims on trades attached" demonstrates that "BNP Paribas[] realized it had made a mistake and then articulated its view that a Cum-Ex trade does not entitle ED&F Man's clients to a dividend." The email shows no such thing. The email and the SWIFT messages Mr. Wade analyzes demonstrate BNP Paribas attempting to make a market claim on the contractual counterparty on the pay date for the

---

[9] Although I did not analyze the TRYG A/S trade in the same manner as the other 72 trades in my original report because it does not relate to an Acer Pension Plan, for the purposes of this report I was provided by counsel the documentation cited below, which confirms the discussion that follows.

dividend.[10] However, in this case, over two months later, ED&F Man's counterparty failed to pay the market claim, and so on June 27, 2013 BNP Paribas clawed back from ED&F Man the payments it had made.[11] ED&F Man then had to enforce the market claim directly with the counterparty, as it did in the Acer trades addressed in my original Report where settlement occurred after the record date. No documents cited by Mr. Wade demonstrate a rejection of the market claim process by BNP Paribas; rather, the documents show that specific instances of the market claim were disputed by ED&F Man's counterparty to the transaction, which BNP Paribas asked ED&F Man to work out directly.

    d.    As Mr. Wade then points out, ED&F Man was surprised by the much later reversal of its market claim and followed up directly with the counterparty, Mitsubishi UFJ, to resolve the issue.[12] The email correspondence in the trade pack cited by Mr. Wade shows that Mitsubishi UFJ ultimately agreed to pay the market claim, consistent with the other trades analyzed in my original Report where the trade date occurred before the ex-dividend date and settlement occurred after the record date.[13] Mr. Wade's statement (at paragraph 215) that the statement made about market claim success rate indicates that a "dividend-paying stock needs to settle before or on the Record Date in order to entitle the buyer to the dividend" is belied by the fact that Mitsubishi UFJ ultimately agreed to pay the market claim amounts to ED&F Man.

---

[10] The pay date for the TRYG shares was April 24, 2013; all payments were credited to ED&F Man's accounts on either April 24 or April 25, 2013. *See* ED&F-00044265 at -65, -83-94.

[11] Ibid. at -89-94.

[12] *See* Wade Report ¶ 214; ED&F-00137236.

[13] *See* ED&F-00044265 at -98.

e. Indeed, emails not cited by Mr. Wade suggest that BNP Paribas recognized the validity and appropriateness of the market claim process and pursued a market claim application to Mitsubishi UFJ on the shares purchased by ED&F Man's clients, but Mitsubishi UFJ did not agree to the claim made by BNP Paribas until ED&F Man intervened.[14]

## 5. Conclusion, Right to Amend, and Compensation

16. Mr. Wade fails to engage with the substance of my original Report, and his critique of my findings is not supported by the sources he cites and relies upon.

17. I reserve the right to amend or add to my analysis as the result of developments prior to or at trial, including but not limited to the discovery of new evidence, expert testimony, and/or the testimony of any other person at trial. I am currently being compensated in this matter at the hourly rate of $925, plus normal reimbursable expenses. My compensation is not dependent upon my conclusions or the outcome of this litigation.

Respectfully Submitted:

_/s/ Adam Warren_

Adam Warren

---

[14] *See* ED&F-00137328.

Confidential

# Appendix

## Additional Documents Considered

Rebuttal Expert Report of Graham Wade, Dated February 1, 2022

Bates Numbered Documents

ED&F-00044265 through ED&F-00044301

ED&F-00137236

ED&F-00137328

11

Confidential