# Exhibit 17

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

In re:

CUSTOMS AND TAX ADMINISTRATION
OF THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX
REFUND LITIGATION

MASTER DOCKET

18-md-2865 (LAK)

EXPERT REPORT OF MAX F. HAYDEN

February 1, 2022

**TABLE OF CONTENTS**

I.      Scope of Report ...................................................................................................................... 1

II.     Qualifications ......................................................................................................................... 2

III.    Summary of Responses to Wade Report ................................................................................ 3

IV.     Definitions ............................................................................................................................. 4

V.      The History and Development of Market Practice in the European Securities Markets .................... 4

VI.     Market Practice Regarding Dividend Entitlement ................................................................ 7

VII.    Market Practice Regarding Market Claim Process ............................................................. 11

VIII.   Market Understanding of "Cum-Ex" Transactions ............................................................. 14

IX.     Response to Wade Report Opinion 1 ................................................................................... 16

X.      Response to Wade Report Opinion 2 ................................................................................... 16

XI.     Response to Wade Report Opinion 3 ................................................................................... 28

XII.    Response to Wade Report Opinion 4 ................................................................................... 29

XIII.   Right to Amend and Compensation ..................................................................................... 30

## I.  Scope of Report

1.      I have been retained by Acer Investment Group, LLC ("Acer") and ED&F Man Capital Markets, Limited ("ED&F") to opine on the Expert Report of Graham Wade dated December 31, 2021 (the "Wade Report"), except insofar as the Wade Report purports to opine on trades executed by Solo Capital Partners LLP.

2.      I understand that the Wade Report was produced in connection with the above-captioned litigation.

3.      The Wade Report purports to analyse 191 tax vouchers executed by ED&F on behalf of its clients, though its Appendices C and F refer to trades underlying only 114 tax vouchers.  I understand that each such tax voucher would be sent by ED&F to an investment manager or agent appointed by its pension plan client or, on the instructions of such an investment manager or agent, to a tax reclaim agent.[1]  Such tax vouchers were included as a component of applications for refunds of withholding tax submitted by or on behalf of certain of ED&F's pension plan clients to the Customs and Tax Administration of the Kingdom of Denmark ("SKAT").

    a.      Mr. Wade discusses 66 trades (the "Annex E trades") for which ED&F has admitted that it improperly produced a tax voucher.[2]  For the purposes of this Report, I accept ED&F's concession that those trades did not give rise to either some (in the case of Schedule 2) or all (in the case of Schedule 1) of the dividend amount claimed in the tax voucher produced by ED&F.

    b.      Mr. Wade also discusses 56 trades set forth in Appendix F, as to which Mr. Wade acknowledges that "ED&F or one of its clients did in fact obtain a real dividend."[3]  Though I accept Mr. Wade's conclusion that these trades were proper and resulted in the receipt of dividends net of withholding tax ("WHT"), as discussed below, his definition of "real dividend" in connection with those trades is improperly narrow.

    c.      The crux of the Wade Report focuses on the 22 non-Annex E trades set forth in Appendix C, which correspond to 17[4] tax vouchers prepared by ED&F.  Mr. Wade opines that these trades are similar to the Annex E trades and did not involve the payment of a "real dividend" to ED&F's client.  My Report focuses on that analysis, which for the reasons set forth below, is flawed.

    d.      Similar flaws undercut Mr. Wade's opinion with respect to a security purchaser's entitlement to a dividend.  Implicit in Mr. Wade's conclusions are two

---

[1] *See* Re-Amended Defence para 10.1, 10.6.
[2] *See* Re-Amended Defence, Annex E.  Annex E of the Re-Amended Defence consists of two schedules, comprising 80 tax vouchers altogether.  Appendix C of Mr. Wade's report includes 64 trades that he claims correspond to the portion of these 80 tax vouchers that ED&F admits did not arise out of a dividend actually received; Mr. Wade recognises that the remainder of the trades listed in Appendix C do not correspond to these Annex E omissions, but nevertheless claims that these trades also did not confer on the pension plans the right to a "real dividend."
[3] *See* Wade Report ¶ 162.
[4] Certain sets of trades, and thus certain tax vouchers, involve a combination of these three categories of trade, and thus the number of elements in each category does not sum to 114.

underlying assumptions that are incorrect and at odds with the rules and practices governing the sale of securities with an entitlement to a dividend. Specifically, Mr. Wade incorrectly assumes that:

> i.  In order to be entitled to a dividend, a party must be registered on the issuer's share record on the "record date."[5]

> ii. By virtue of being on the share record, the party must then receive a "real dividend" payment directly from the issuer[6].

4.      In forming my opinion, I have relied upon the Wade Report and the documents cited therein, as well as additional materials provided by counsel for Acer and ED&F. Where I requested additional materials from Acer or ED&F to provide context to my analysis, those materials were provided.

## II.      Qualifications

5.      I have over 30 years of professional experience in the securities and investment industry. I am currently the Global Head of Prime Brokerage sales at IG Group, a position that I have held since 2019.

6.      I began my career at the London Traded Options Market with Smith New Court, a predominantly London-based UK broker and market maker. Beginning in 1990, I was responsible for the OTC and Listed Derivatives clearing department.

7.      I subsequently joined Merrill Lynch as Head of UK Equity Operations, which managed all non-trading activities for the market, including all stock loan trading and collateral management. I then was tasked with setting up a third-party clearing business for international access for US Professional Trading firms, and subsequently unified it with the equivalent prime brokerage business unit, which I led. I headed the International Prime Brokerage business until 2012, and between 2004 and 2006 I was also Chief Operating Officer of Merrill's Global Equity Finance business, overseeing all controls, product development, and risk management.

8.      Following Merrill Lynch's acquisition by Bank of America, I was involved in a number of industry responses to the Lehman Brothers collapse. I represented Bank of America Merrill Lynch on Her Majesty's Treasury Investment Banking Insolvency Panel, which proposed The Living Will and set up a regulated vehicle to provide protection to client assets if a similar default were to occur again.

9.      In 2012, I left Bank of America and was engaged to be a consultant of the European Commission for a research paper analysing the impact of the European Market Infrastructure Regulation on the Pension Fund Management sector of Europe. I was also engaged on other consultancy mandates, including notably the Moscow Stock Exchange's effort to price their new corporate action services.

---

[5] Wade Report ¶ 29.
[6] Id. ¶¶ 70, 80.

10.     In 2015, I set up and ran an International Prime Broker business of a newly FCA-registered overseas broker in London.  I later was hired by a private equity fund to head two FCA-regulated brokers, with the task of integrating and growing them.

11.     I am a Member of the Chartered Institute for Securities & Investment and previously was registered as an options trader and general representative of the regulating entity now known as the Financial Conduct Authority, which allowed me to provide execution and advisory services to clients.

12.     For the past 20 years, I have been Chairman of the Euroclear Settlement Discipline Committee.  In that role, I have become intimately familiar with market practices and regulations surrounding the settlement of securities transactions.

13.     A copy of my professional resume is attached as Appendix A.

### III.     Summary of Responses to Wade Report

14.     Mr. Wade's understanding of the meanings attributed to certain aspects of securities transactions are not supported by market practice.  Specifically:

    a.     Parties to a securities transaction that occurs prior to the ex-dividend date generally understand, unless otherwise specified, that the buyer obtains the right to a dividend, regardless of whether the transaction settles on or before the record date.

    b.     A dividend "market claim," which is made by a party entitled to a dividend against its contractual counterparty who conferred it that right, is a market practice that is normal, accepted and, in many cases, subject to specific exchange rules.

    c.     Markets have a well-developed understanding of how to handle "Cum-Ex" trades, meaning that the trades are made prior to the ex-dividend date but settled after the record date, and the ED&F non-Annex E "Cum-Ex" trades appear to be consistent with that understanding.

15.     Because I disagree with Mr. Wade on the principles set forth above, I disagree with Mr. Wade's Opinion 1, that the transactions listed on Appendix C did not confer dividends because they were "Cum-Ex" transactions.  The fact that a transaction is a "Cum-Ex" transaction does not mean that the Cum-Ex buyer did not receive a real dividend.

16.     I further disagree with Mr. Wade's Opinion 2, that the non-Annex E Appendix C trades were purposefully orchestrated to create a "fabricated tax reclaim."  Mr. Wade appears to mis-understand the transactions he analyses, which leads him to the false conclusion that the tax reclaim applications filed by ED&F clients were "fabricated" for the non-Annex E "Cum-Ex" Trades, which are listed on Appendix C of the Wade Report.  Similarly, the economic analysis performed by Mr. Wade does not provide sufficient support for his conclusion.

17.     Mr. Wade's Opinion 3, that ED&F did not have custody of sufficient shares to give rise to a valid tax reclaim for the non-Annex E Appendix C trades, is also unsubstantiated by the examples he cites.  Client positions can only be substantiated by SWIFT messages and

book entries, which occurred.  Moreover, the example Mr. Wade provides regarding ED&F's liquidation of client positions actually relates to an Annex E trade, and not to a non-Annex E trade, as the document argues.

18.     Finally, Mr. Wade's Opinion 4, that ED&F's tax voucher process was "highly unusual and inappropriate," is unsupported by his own analysis.  The ED&F tax voucher process appears to have been conducted by back-office personnel, as would be expected in the industry.  Moreover, ED&F's process appears to have been entirely consistent with the SEB custody agreement, which Mr. Wade distorts.

## IV.     Definitions

19.     I have reviewed Section VI of the expert report of Emre Carr dated December 31, 2021 (the "Carr Report") titled "Corporate Dividends."  I adopt Mr. Carr's definitions of "record date," "ex-dividend date," and "cum-dividend" advanced in paragraphs 119 through 121, which are consistent with the manner in which those terms are understood in the market.  For ease of reference, I relay those definitions below:

> a.     Ex-Dividend Date:  The first date on which a purchased share does not carry the right to a declared dividend.
>
> b.     Record Date: The date on which the issuer checks its share register to determine to whom it will pay a dividend.
>
> c.     Cum-Dividend: The characteristic of a security indicating that it carries the right to a declared dividend.  It is the opposite of Ex-Dividend.

20.     In this Report, I also refer to the "Payment Date," which is the date on which an issuer pays a dividend to the shareholders listed on its share record as of the Record Date.

## V.     The History and Development of Market Practice in the European Securities Markets

21.     The opinions expressed in the Wade Report appear to rest upon false premises that are inconsistent with general market practice in both the European and, more generally, the global securities markets.

22.     To establish the basis for that assertion, it is helpful to examine how European securities markets came to take their current form.

23.     Historically, the largest international capital markets participants built their operations in London.  Accordingly, as banking globalised in the late twentieth century, these London-based investment banks became desirable targets for acquisition by large international financial institutions.

24.     To provide just a few significant examples, HSBC acquired the James Capel Group in 1986,[7] Merrill Lynch acquired Smith New Court in 1995,[8] and the Swiss Bank Corporation acquired S.G. Warburg & Co. in 1995[9].

25.     In my experience, including in my personal employment at Smith New Court and then at Merrill Lynch, the London-based capital markets investment banks had developed controls, practices, and procedures consistent with the regulatory requirements of their home market.  In other words, the general market practices of the London Stock Exchange, as the home exchange for these London-based investment banks, became the general practices for those investment banks' capital markets operations, including with respect to the settlement of transactions and other relevant back-office functions.

26.     From my experience, these controls, practices, and procedures largely persisted post-acquisition by international financial institutions, and became the controls, practices, and procedures of those international institutions' international capital markets businesses.

27.     Likewise, the exchange mechanisms and regulatory framework for executing and processing international securities transactions also grew to accommodate the general practices and procedures of these primary, London-based capital markets participants.

   a.     Following the formation of the European Union in 1993 and the growth of international investment activity among European member states, the so-called "European Passport" for securities firms was created through the Investment Services Directive ("ISD"), which enshrined the principle that securities firms could operate at a European level through their domestic regulation.  The European Passport was replaced by the Markets in Financial Instruments Directive ("MiFID") in 2007, strengthening the single market concept, and then updated again to MiFID 2 in 2018.[10]

   b.     To the extent the European Passport required firms to make enhancements to their existing systems of controls, practices, and procedures, such enhancements were typically overlaid upon the existing systems within the company and were not completely re-designed from the ground up.

28.     Although wider access to international markets presents opportunities for investors, it is in many ways inefficient.

   a.     For market participants looking to take advantage of the new transactional freedom conferred by the European Passport, the ability to access, connect to, and operate local trading and operational infrastructure was essential.

---

[7] *See* Erik Portanger, *As Banks Regroup, HSBC Shows Why Boring Isn't Bad*, Wall Street Journal (Oct. 28, 2002), *available at* https://www.wsj.com/articles/SB1035764815138595151.

[8] *See* Erik Ipsen, *Smith New Court Accepts Bid by Merrill Lynch*, N.Y. Times (July 22, 1995), *available at* https://www.nytimes.com/1995/07/22/business/worldbusiness/IHT-smith-new-court-accepts-bid-by-merrill-lynch-90081831357.html.

[9] *See* Richard W. Stevenson, *Swiss Bank in Deal to Buy S.G. Warburg*, N.Y. Times (May 11, 1995), *available at* https://www.nytimes.com/1995/05/11/business/international-business-swiss-bank-in-deal-to-buy-sg-warburg.html.

[10] *See* https://www.oxfordreference.com/view/10.1093/oi/authority.20110803100009856.

Undertaking this investment across a number of local markets was an enormous commitment of financial and operational resources. To be able to trade in other European markets, market participants needed to engage local financial operators (such as brokers, settlement agents, and custodians) to execute, settle, and hold positions for both their financial institution clients and their clients' clients. This also created opportunity for those local suppliers to focus on serving new entrants from overseas markets.[11]

b.  In an attempt to mitigate this inefficiency, many of the largest market participants set up or acquired dedicated local entities in European markets to operate as direct exchange members, registered entities with central securities depositories, or both. For example, during my time at Merrill Lynch there were several initiatives to open local exchange and settlement services in continental European markets, including the formation of Merrill Lynch Capital Markets España SA SV in Spain, and Merrill International Bank in Ireland. The formation of these entities reduced the reliance and stress placed on domestic suppliers by the growth of international investment activity.

c.  In this way, as well, the general practices and operations within local European securities markets grew to be influenced by those of the largest global market participants. To perform more efficiently at this new scale, many local markets adopted mechanisms learned from the much larger securities markets in the United States and the United Kingdom, including the "netting" of offsetting transactions, the dematerialisation of securities and the allowance of internalised settlement via book entry, and more explicit recognition of stock lending markets. The challenges faced by new market participants at the time were the subject of the two Giovannini Reports in 2001 and 2003, which recommended the development of clearing and settlement arrangements within the EU. The report identified 15 barriers to efficiency, including uncertainty as to whether transactions settlements could be netted, ownership rights for intermediaries holding positions in their accounts, and disparate rules relating to corporate actions, ownership and custody that could not easily be harmonised.[12]

29.  As a result of the late-twentieth century growth in international investment activity I have described above, market practice in local European markets is inextricably linked to the historical practices of the largest United Kingdom-based capital markets brokers, as influenced by their participation in the world's largest exchanges, such as the London Stock Exchange and the New York Stock Exchange.

---

[11] *See* European Central Bank, *Occasional Paper Series No. 68*, at 12-13 (Aug. 2007), *available at* https://www.ecb.europa.eu/pub/pdf/scpops/ecbocp68.pdf.

[12] *See The Giovannini Group*, *Second Report on EU Clearing and Settlement Arrangements* (April 2003), *available at* https://www.ebf.eu/wp-content/uploads/2017/07/Second-Giovannini-Report-on-Clearing-Settlement-in-the-EU-2003-1.pdf.

30.     Accordingly, absent laws and regulations to the contrary in the specific jurisdiction to be examined (here, Denmark),[13] it is appropriate to look to market practice in the United Kingdom and the United States for guidance on how trading in European capital markets is perceived by international market participants, including ED&F and its transactional counterparties.

## VI.     Market Practice Regarding Dividend Entitlement

31.     Mr. Wade's opinions are premised on a purported requirement that, in order to receive a dividend, a party must *both* purchase a share prior to the ex-dividend date *and* settle its purchase prior to the record date.[14]  Further, in Mr. Wade's view, any party who does not receive a dividend payment directly from the issuer has not actually received a "real dividend," only an equivalent payment.[15]

32.     As an initial matter, it is important to understand market practice regarding the acquisition of an equity share, which is influenced by the manner in which securities are bought and sold on an exchange.

a.     When a buyer or seller agrees to the security, price, and quantity terms offered by the exchange for the relevant transaction, the trade is booked and the price agreed for the securities is fixed.  The buyer is then immediately exposed to the price movement of the security as of the booking of the trade, because it has already fixed a set price.

b.     For on-exchange trades, the timing of trade settlement is dictated by the rules of the exchange.  As Mr. Wade notes (at paragraph 28 and footnotes 33 and 34), exchange settlement periods for the NASDAQ, and thus the Copenhagen Stock Exchange, were three days post-trade until October 2014, and two days post-trade after that date.

c.     Because an issuer uses an available asset—its cash reserves—to make dividend payments to its shareholders, the overall equity in the issuer, and thus the value of each share, declines following the payment of that dividend.  The issuer makes the dividend payment to those individuals present on its share record on the record date it chooses.  When a share is purchased on exchange, the ex-dividend date is generally (though, as discussed below, not always) set such that a purchaser before that date will appear on the issuer's share record on the record date, and therefore will receive a dividend payment directly from the issuer.

---

[13] Mr. Wade's conclusions do not appear to be based upon any interpretation of Danish law, as Danish law is not cited to support Mr. Wade's views on the market practices discussed below.

[14] Wade Report ¶ 29

[15] *Id.* ¶ 70 and 80

d. Nevertheless, in the words of the SEC, cited by Mr. Wade (at paragraph 29 n.35), the general rule is that "[i]f you purchase before the ex-dividend date, you get the dividend."[16]

e. Conversely, buyers of the security on or after the ex-dividend date receive no dividend payment, and thus will necessarily demand to pay less for the shares they purchase.

f. The exchange's practice of setting the ex-dividend date promotes one of the core objectives of stock exchanges: to operate an orderly and efficient market for the benefit of their members and clients.

33. The rules governing the sale and purchase of shares on exchange are designed to ensure that the holder of the shares immediately prior to the ex-dividend date will receive the dividends:

a. In the United States, the SEC is clear: "If you purchase before the ex-dividend date, you get the dividend."[17]

   i. In most circumstances, the ex-dividend date is set under stock exchange rules so that under the exchanges' clearing rules, trades placed before that date will generally settle on or before the record date.[18] Thus, the purchaser will appear on the issuer's share record on the record date, and will receive the dividend directly from the issuer.

   ii. In those circumstances where a trade settles after the record date, the SEC's rules require that the seller deliver the dividend to the buyer. For instance, where a company pays a stock dividend rather than cash, "[t]he ex-dividend date is set the first business day after the stock dividend is paid," which the SEC acknowledges would also be "after the record date."[19] When this occurs, though the seller will receive the dividend shares, the seller has an "obligation to deliver any shares acquired as a result of the dividend to the buyer of [the] shares."[20]

---

[16] U.S. SEC, *Ex-Dividend Dates: When You Are Entitled to Stock and Cash Dividends*, *available at* https://www.investor.gov/introduction-investing/investing-basics/glossary/ex-dividend-dates-when-are-you-entitled-stock-and. Mr. Wade mischaracterises this source to suggest a relationship between the record date and dividend entitlement that the text does not support. The source merely states that the company (not the exchange) "sets the record date when you must be on the company's books as a shareholder to receive the dividend." The source does not say that the record date has an effect on who is *entitled* to the dividend, as Mr. Wade suggests. Rather, as discussed above, it states that a purchase before the ex-dividend date carries a dividend.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

iii.    Likewise, where the "dividend is 25% or more of the stock value, . . . the ex-dividend date will be deferred until one business day after the dividend is paid."[21] In this circumstance, because the ex-dividend date occurs after the pay date, it necessarily occurs after the record date, because the record date determines to whom the issuer pays the dividend directly.  In that circumstance, the shareholder who sells his shares on the day he is paid a dividend by the issuer is required to forward that payment to the buyer, because the buyer nevertheless purchased the shares prior to the ex-date, even though the transaction occurred and settled after the record date.

iv.    Because there are scenarios in which the ex-dividend date is after the record date, there will necessarily be trades in which the trade occurs prior to the ex-dividend date, but settlement occurs after the record date.[22]  In other words, there are scenarios in which the issuer, the government, the seller, and the buyer are aware that a dividend is conferred even where the buyer's name does not appear on the share record.

b.    The London Stock Exchange also allows parties to contract for dividend entitlements on exchange, if specified.  Trades intended to confer a dividend right executed on or after the ex-dividend date are known as "Special Cum" trades.  The only restriction on Special Cum trades is that they not be placed "on or after the payment date in the case of a cash benefit or on or after the distribution date in the case of a stock benefit."[23]

c.    The exception recognised by the London Stock Exchange reinforces the general rule that the purchase of a share prior to the ex-dividend date entitles the purchaser to a dividend, and the purchase of a share on or after the ex-dividend date does not.

34.    Many rules of stock exchanges and central securities depositories ("CSDs") specifically contemplate that parties may execute transactions on bespoke terms, including both public and private securities transactions (known as "over-the-counter," or "OTC" transactions).

a.    OTC markets are generally quote-driven, meaning that the market participants show the bids and offers at which they are willing to trade.  This provides for more natural liquidity in the market, allowing the matching of parties willing to trade on the same terms.  The OTC market also generally allows for lower transaction costs, as OTC transactions generally do not provide buyers or sellers with the services that exchanges

---

[21] *Id.*

[22] This exception also illustrates why the term "cum-ex trade," discussed in more detail below, does not have the implications that Mr. Wade claims it does.

[23] London Stock Exchange Rule 5240, *available at* https://docs.londonstockexchange.com/sites/default/files/documents/rules-lse.pdf.

customarily provide to their customers.  And although OTC transactions are not transparent to outside market participants, that lack of transparency carries some benefits:  financial institutions can conduct large trades to support market liquidity without distortion of market prices.

b.      In order to price exchange-traded securities, parties to OTC transactions nevertheless generally look to exchanges prices, and then price their transaction in the same way.  A necessary result of this reliance on market pricing is that parties to OTC transactions also consider, as a default rule, that shares purchased prior to the ex-dividend date carry the right to a dividend, while shares purchased after the ex-dividend date do not.

c.      Exchange rules generally recognise the rights of parties to trade securities on terms that differ from the on-exchange defaults.  That includes an agreement to settle trades on terms other than those used by the exchange.

d.      For example, the London Stock Exchange allows parties to settle even "on exchange" transactions on settlement terms "otherwise agreed at the time of trade," without permission from the Exchange, as long as the parties do not agree to settle such transactions "more than 20 days after the time of the trade."[24]

e.      In his report, Mr. Wade does not rely on any specific legal prohibition under the rules of the Copenhagen Stock Exchange or under Danish securities laws against OTC trading between financial institutions or the selection of extended settlement dates.

f.      Indeed, at least as of 2012, parties could agree to settle transactions in any securities housed at VP Securities, the Danish CSD, on "any settlement date from the trading day, T+0, to T+365," though most transactions settled T+3.[25]

35.      Given that extended settlements have been present and accepted in the market for years, it is predictable that an exchange's setting of the ex-dividend date based upon the exchange-standard settlement timeframe would not necessarily guarantee settlement prior to the

---

[24] London Stock Exchange Rules 5010 & 5011.

[25] *See* Danmarks Nationalbank, *Assessment of the VP settlement system against the ECSB/CESR Recommendations for Securities Settlement Systems*, at 12, *available at* https://www.nationalbanken.dk/en/publications/Documents/2012/04/Assesment%20of%20the%20VP%20settlement%20system_2012.pdf.  Although the Danish National Bank recommends in that document that settlement "should occur no later than T+3," *see id.* at 28, I am not aware that such recommendation was accepted, and indeed the same recommendation was made eight years earlier in 2004, when settlements up to T+365 were also allowed, and presumably not accepted.  *See* Danmarks Nationalbank, *Review of VP Securities Services in relation to Recommendations for Securities Settlement Systems*, at 11, 21, *available at* https://www.finanstilsynet.dk/upload/finanstilsynet/mediafiles/newdoc/rapporter/4/assessment_rapport_eng.pdf.  That same report also notes that the described settlement practices do not apply "to private investors," and recognised that "international share dealers in the Danish market have settled on the same terms as private investors."  *Id.* at 22.

record date for shares purchased prior to the ex-dividend date.  It is these extended settlement terms that lead to a share owner not appearing on the share record, which necessitates that the seller of the shares deliver the dividend to the share purchaser.

## VII.    Market Practice Regarding Market Claim Process

36.    Mr. Wade also premises his opinions on an artificial distinction between what he calls a "real dividend" and a "dividend compensation payment" (which by his definition includes both manufactured dividends and market claims), which is not consistent with market practice.[26]

37.    As Mr. Wade notes, it is generally accepted practice for a party entitled to a dividend to make a "market claim" for the dividend, even if the party did not receive that dividend directly from the issuer.[27]

a.    As recognised by the European Market Standards that Mr. Wade cites, "a market claim is a process to reallocate the proceeds of a distribution to the contractually entitled party."[28]  The European Central Bank ("ECB") and Target2 Securities ("T2S") also recognise that the need for a market claim arises where "the contractually entitled party has not received the underlying securities (there is a pending underlying transaction) at close of business on Record Date."[29]

i.    The recognition of the market claim process by the ECB is significant.  T2S was implemented in 2015 to provide a common platform to support cross-border settlement in Europe.  The purpose was to reduce the friction of cross-border settlement between countries that operate their own CSDs, such that it would not be significantly more expensive for an EU investor to buy a security issued in another member state than it would be for the investor to buy a security in their own country.

ii.    T2S connects local CSDs to investors to facilitate cross-border investment and while it ensures that local market rules and law still apply, it attempts to harmonise them with general EU market practice where possible.  Because T2S settles transactions across markets, its own guidance is indicative of general securities market practice for equity transactions.

b.    The same European Market Standards recognise, at point 14 on page 13, that a process (such as the one in Denmark) that "separat[es] the core market claim processing from the withholding tax implications may generate some level of risk for the withholding agent" due to the possibility of different tax statuses between the "receiving and/or delivering account."  In other words, the Market Standards accept that the tax

---

[26] *See* Wade Report ¶ 69.

[27] *See* Wade Report ¶ 31.

[28] *See* European Central Bank and Target2 Securities, *T2S Corporate Actions Standards:  Market Claims*, at 3 (May 16, 2013), *available at* https://www.ecb.europa.eu/paym/target/t2s/governance/pdf/casg/ecb.targetseccasg130316_T2SMarketClaimStandards.en.pdf.  Mr. Wade misquotes this authority as stating that the proceeds would be reallocated "**by** the contractually entitled party."  Wade Report ¶ 31 n.39.

[29] *T2S Corporate Action Standards:  Market Claims* at 3.

11

status of the receiving party *matters* for the withholding tax implications of a market claim. The Market Standards also recognise that "such risk is inherent in the function of [the] withholding agent."

  c. Other jurisdictions provide similar guidance, consistent with the market practice in the ECB and T2S report.

   i. In Germany, for example, Clearstream, the German CSD, describes in its Compensation Handbook the workings of the claims process in that market:

> Market claims are processed for income and non-income distribution events, if a security is traded "cum" (with coupon), but settled after the entitlement date. This initiates a market claim cycle of 20 business days. This process is applied for OTC, C7 SCS and stock exchange trades (LION).[30]

   ii. The London Stock Exchange likewise sets deadlines for the resolution of situations where the recipient of a dividend is not the party ultimately entitled to the dividend. Rules 5300 and 5310 provide that in such instances, the "seller is responsible for any dividend due to the buyer unless there has been a delay of more than six months from the record date or three months from the pay date (whichever is the later) in claiming the dividend." Likewise, settlement of such a "dividend claim" shall occur "not later than 28 calendar days after receipt of the claim or 14 calendar days after the payment date, whichever is the later."[31]

   iii. The International Securities Services Association recognises that efficient handling of "pending transactions" at the time of a corporate action is critical to the operation of an efficient marketplace. "'Market Claim' instruction type should be used to ensure that proceeds of a distribution (cash and/or securities) reach the contractually entitled parties in case they have not already received full entitlement on record date."[32]

  d. Contingencies for post-record date settlement are important not only for transactions where the settlement date was chosen purposefully, but also for those transactions in which the settlement date was scheduled to occur on or before the record date but was delayed due to a failed settlement attempt.

---

[30] https://www.clearstream.com/resource/blob/1316782/43a60afa470c37ba74f7cb2d6949e71c/compensation-handbook-cata-en-data.pdf.
[31] London Stock Exchange Rules 5300 & 5310, *available at* https://docs.londonstockexchange.com/sites/default/files/documents/rules-lse.pdf.
[32] Int'l Sec. Servs. Ass'n, *Annexes to the Report Global Corporate Actions Principles*,

  i.  The Association for Financial Markets in Europe published a guide on the "market practice to handle cash compensations (formally known within the industry as 'market claims')."[33]

  ii.  The guide sets out the expected market practice where a failure to settle a trade causes incorrect tax to be withheld at point of payment due to a failure to deliver securities to the buyer in time to be listed on the issuer's share record.  Based on whether the fault of the revenue shortfall is attributable to the buyer or the seller, the guide sets forth who should bear the temporary cash shortfall pending "any reclaim of withholding tax" by the party entitled.[34]

38.  Given the lengths to which the market has gone to address the situation in which the party entitled to a dividend does not receive it, Mr. Wade's assertion that a "dividend" is such only where it is received directly from the issuer is simply incorrect as a matter of securities market practice.

39.  The Wade Report's assertion that *any* payment passed on to an entitled party is a "manufactured dividend" and not a "real dividend" is similarly inconsistent with market practice and guidance available in the marketplace.[35]  Mr. Wade is confusing a "market claim" with a "manufactured dividend."  The former refers to the transfer of a dividend traceable to the dividend paying company and which is received by a party who sold shares prior to the ex-date and then passed on to the purchaser of those shares.  The latter refers to the contractual payment of an amount equal to a dividend, usually in respect of stock loan agreements as I explain further below.

  a.  The United Kingdom guidance on manufactured dividend payments, cited by Mr. Wade himself (at paragraph 73), makes clear that the exact scenario examined by Mr. Wade does not involve a "manufactured dividend."

> *Where the recipient of a dividend simply passes on the dividend to which it is not entitled, this is not a manufactured payment.*  For example, a person may make a 'cum div' sale out of his existing shareholding (a 'long' position), and receive the dividend merely because the company register has not been updated to reflect the change of ownership.  The passing on of this dividend to the purchaser is not dividend manufacture.[36]

  b.  In my experience, the market understanding throughout Europe is consistent with the UK definition:  A manufactured dividend is not one in which a dividend recipient "passes on the dividend to which it is not entitled," but has received "merely because the company register has not been updated."  On the other hand, where

---

[33] *See* Association for Financial Markets in Europe, *Spanish Equity Cash Dividends: Market Practice for Failed Settlements*, at 1 (2017), *available at* https://www.afme.eu/portals/0/globalassets/downloads/divisions/post-trade/afme-ptd-spanish-equity-cash-dividends.pdf.

[34] *Id.* at 2.

[35] *See* Wade Report ¶¶ 70, 71.

[36] *See* Her Majesty's Revenue & Customs, *Corporate Finance Manual* § 74430 (emphasis added).

the seller "sells securities 'cum div' (with dividend) but delivers securities that are 'ex div' (without dividend)," any resulting payment made by the seller to the buyer would be considered dividend manufacture, because the seller delivered shares that did not have the right to a dividend from the issuer.

      i.      The UK guidance recognises that such entitlement arises where "the dealer does not own the securities at the time of selling them" and "may only be able to acquire 'ex div' stock" to settle the trade.[37]

      ii.      Thus, the salient question is whether there is any basis to conclude that ED&F's market counterparty did not have the right to cum-dividend shares when it executed the transaction, and if so, whether ED&F had any basis to conclude that they did not.  I have seen none, and none appears to be cited by Mr. Wade in his report.

      c.      "Manufactured dividends" are more generally linked to the stock lending industry, which necessarily relies upon them.  Stocks are lent as a temporary transfer of shares and, generally, the lenders reserve a contractual right to receive any kind of dividend and participate in the corporate actions of the shares of that company.  As the beneficial owner of the shares by contract, the lender expects the borrower to provide their due income.  To the extent the shares were borrowed and lent down a chain of parties, then the same terms would trigger the passage of any received dividend income at one link of the chain back up to the original holder.  Notably, none of the transactions related to the tax vouchers produced by ED&F were the product of pure stock loans by the pension plans, but rather were purchased.

      d.      Despite Mr. Wade's unsupported insistence (at paragraph 76) that market participants are "wary of receiving dividend compensation payments instead of real dividends," ISLA EMEA Securities Lending Market Report states that there are €24 trillion of securities available for securities lending, of which €2.4 trillion are on loan balances.[38]  This market would not be so robust but for the comfort of market participants with the compensation payment process.

## VIII.  Market Understanding of "Cum-Ex" Transactions

40.      Mr. Wade's definition of a "Cum-Ex" trade (at paragraphs 79-81) ignores the critical distinction between cum-dividend and ex-dividend shares, and instead assumes that all settlements after the record date were settled using ex-dividend shares that the seller did not own at the time of sale.  That assumption is unsupported by affirmative facts, and indeed is controverted by several key points.

---

[37] *Id.*  Based on my review of the testimony of Shahab Hashemi, I believe ED&F's "manufactured dividend" descriptor accurately describes the payments made by ED&F Man Professional Trading (Dubai) Limited for dividend rights it purported to confer for the "Annex E" trades.  However, as discussed further below, I have asked counsel for Acer and ED&F for any evidence to support the assertion that other market counterparties did not deliver "cum dividend" shares, and I was told that they are aware of none.

[38] *See* Int'l Sec. Lending Ass'n, *Sec. Lending Mkt. Report*, at 12-13 (Mar. 2020), *available at* https://www.islaemea.org/assets/smart-pdfs/isla-securities-lending-market-report-march-2021/#p=12.

a.      First, many of the interdealer brokers ("IDBs") and ultimate counterparties with which ED&F traded to execute client orders were regulated institutions, and as such, would have been required to be aware of any short-sale transactions.

i.      Following the 2008 financial crisis, there has been significant legislation across global markets to prevent abuse of short selling uncovered positions.  EU Regulation 236/2012, Article 12, for example, explicitly states that a person can short sell only as long as they can demonstrate they have a right to or can borrow the shares to enable the settlement of the sale when it is contractually agreed to settle.[39]  It is market practice for IDBs, when discussing orders with their clients, to enquire as to whether a short sale is covered by a borrow or a locate, and they can and should reject the transaction if it is not sufficiently evidenced.

ii.      Many of the ultimate counterparties to the trades executed by ED&F (to the extent those counterparties are knowable) are FCA regulated entities, for example Mitsubishi UFG Securities EMEA PLC ("Mitsubishi"). These regulated entities were similarly subject to EU Regulation 236/2012, Article 12, discussed above.

b.      There are several legitimate reasons to agree to an extended settlement period.

i.      The most important of these reasons is the need to secure funding and financing for trading, which is common in the market.

ii.      Because equity transactions are most commonly settled delivery-versus-payment (or "DVP"), meaning that cash moves only upon the delivery of shares, a party seeking to buy and sell within a short period of time can reduce its financing requirements by agreeing to bespoke settlement terms that cause the purchase and sale transactions to settle closer in time.

iii.      Likewise, a party may obtain funding for a transaction by executing a Buy/Sell-back transaction, a type of undocumented Repurchase transaction or "Repo," to create a temporary funding position for the holder.[40]

c.      Mr. Wade makes the puzzling assertion (at paragraph 85) that "Cum-Ex" transactions involve the "consensual choice made by the parties to the cum-ex transaction to 'mis-price' the purchase transaction in the first place."

i.      As discussed above, pricing is fixed at the time the transaction is executed, not at the time it is settled, and parties generally look to exchange-

---

[39] See https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32012R0236.
[40] See Int'l Capital Market Ass'n, 11. What is the difference between a repurchase transaction and a buy/sell-back?, *available at* https://www.icmagroup.org/Regulatory-Policy-and-Market-Practice/repo-and-collateral-markets/icma-ercc-publications/frequently-asked-questions-on-repo/11-what-is-the-difference-between-a-repurchase-transaction-and-a-buy-sell-back/.

traded prices for guidance in pricing their OTC transactions.  Therefore, parties purchasing a share cum-dividend generally expect the pricing to include the payment of a dividend, absent specification otherwise.

      ii.     Based on the ED&F transaction documentation I reviewed for the so-called "cum-ex" trades, I have not seen any specification in the trade confirms that would suggest to me that ED&F intended to deviate from the default rule, *i.e.* that purchases prior to the ex-dividend date confer a dividend right.  Given that ED&F is a London-based broker, I would expect a trade executed prior to the ex-dividend date that did not intend to confer a dividend right to specify that arrangement in express terms.

      iii.     To the extent that Mr. Wade is suggesting that ED&F or its pension plan clients were aware that they would be receiving shares without the right to a dividend, that assertion is unsupported.

## IX.    Response to Wade Report Opinion 1

41.    Given the false premises on which it relies, Mr. Wade's Opinion 1, that "All the ED&F Man-Related Appendix C Transactions Were Cum-Ex Transactions, Which Means The ED&F Man Pension Plans Did Not Receive Any Real Dividends," is without merit.

42.    Mr. Wade appears to be correct in his assertion that the transactions listed on Appendix C were "agreed . . . before the Ex-Dividend Date and settled . . . after the Record Date."[41]  However, Mr. Wade defined "Cum-Ex" trades to involve a "manufactured dividend" payment, which as discussed above is not the case.  The evidence in the trading documentation suggests that the market counterparties were passing along a dividend they received but to which they were not entitled, which, as discussed above, the market understands to be a "real dividend" payment.  I am unaware of any documentation that would have made ED&F aware that they had purchased from a counterparty who could not deliver cum-dividend shares, even if they in fact delivered them after the record date.  Nor am I aware of any method by which ED&F or its pension plan clients could ascertain with any certainty whether an ultimate counterparty was in a position to deliver cum-dividend shares.

## X.    Response to Wade Report Opinion 2

43.    Mr. Wade's Opinion 2, that "The Only Reason to Participate in The Appendix C Cum-Ex Trades Was to Generate a Fabricated Tax Reclaim That Was Shared by the Parties to the Transactions," rests on a flawed comparison between an Annex E and a non-Annex E trade.

44.    Mr. Wade begins (at paragraph 98) with the mistaken assertion that ED&F's receipt of a market payment from a counterparty is a "distinction without a difference," because the dividend was not received directly from the issuer.  As discussed above, the premise that a

---

[41] Wade Report ¶¶ 92-93.  At least as relates to Mr. Wade's inclusion of Acer-related pension plans in Appendix C, the transactions are those that Adam Warren, in his expert report dated December 31, 2021 (which I reviewed), identified as settling after the record date.

dividend must be received directly from the issuer is a false one, and it is not consistent with the market understanding that a market claim confers a real dividend.

      a.     In fact, the conduct of one of ED&F's sub-custodians, Skandinaviska Enskilda Banken ("SEB"), is consistent with the general market understanding of a market claim that I have advanced above.

      b.     In August 2014, ED&F purchased shares of TDC A/S stock on behalf of certain of its clients.[42]  Although the trades were intended to settle on the record date for the stock, 12 August 2014,[43] one of the trades was in fact settled on 13 August 2014[44].

      c.     The trade thus settled after the record date and would be considered a "Cum-Ex" trade under Mr. Wade's definition of the term, even though he instead includes it on Appendix F as a "Cum-Cum" trade that he does not dispute.[45]

      d.     Because the trade settled after record date, ED&F proceeded to make the customary market claim for the dividend due to its clients by virtue of their purchase of cum-dividend shares prior to the ex-dividend date.[46]  This market claim was settled by SEB "directly with BNYM," as custodian and agent for the market counterparty.[47]

      e.     SEB explained to ED&F that "identification and processing of market claims is a part of our service to our clients.  We contacted your counterparty (BNY Mellon) and they have transferred DKK 2.190.000 to SEB and we have credited your cash account accordingly.  We will confirm all processed and finalized market claims via MT566."[48]

      f.     SEB's actions are significant.  First, they demonstrate that sub-custodians for both parties to the transaction (neither of whom directly arranged the terms of the transaction) recognised the validity and appropriateness of the market claim process.

      g.     Second, they demonstrate that SEB regarded the market claim amount as a "real" dividend.  This is because SEB produced an MT566 SWIFT message for the market claim amount received, and MT566 SWIFT messages are generated following receipt of funds from corporate actions such as dividends.  MT566 SWIFT messages were produced for all of the "Cum-Cum" trades that Mr. Wade recognises were proper in Appendix F.

      h.     This transaction shows that "Cum-Ex" trades may arise for entirely legitimate reasons, and do not necessarily imply that there is a concerted effort to arrange for a cum-dividend transaction to be settled through delivery of ex-dividend shares.

---

[42] *See, e.g.*, ED&F-00042677.

[43] *See id.* at ED&F-00042677, 80-83.

[44] *See id.* at ED&F-00042688.

[45] *See* Wade Report ¶¶ 79-81.  Notably, Appendix C of the Wade Report ignores this trade, despite purporting to include trades settling after record date.

[46] *See* ED&F-00312726, at -28-29.

[47] *See id.* at ED&F-00312726.

[48] ED&F-00273945.

Rather, I would expect to see some documentary indicia of coordination between ED&F, the IDB, and the ultimate market counterparty had there been some concerted effort to arrange for the type of "Cum-Ex" transaction the Mr. Wade contends occurred, an issue I discuss further below.

45.     Mr. Wade also lists (at paragraph 103) several factors that he claims are common among "all the ED&F Man Appendix C Cum-Ex Trades." But Mr. Wade's conclusions are undercut by the very exemplar trade he chose for his analysis, the AIG-Lutetia TDC 2014 trade.

a.     First, contrary to Mr. Wade's conclusion in paragraph 103 that the execution of the Appendix C trades did not "require any participant to have any shares in its possession," ED&F was required to have shares in its possession to execute the AIG-Lutetia TDC 2014 Trade, and in fact did have shares in its possession when the trade was executed.

i.     As Mr. Wade points out, ED&F purchased 6,000,000 TDC shares on behalf of its clients, 2,000,000 of which were for AIG.[49] These shares were purchased cum-dividend on 6 March 2014 (before the ex-dividend date of 7 March 2014), to settle on 12 March 2014, the day after the record date, from ED&F's internal IDB, who had in turn purchased the shares from Lutetia Capital.[50]

ii.     The shares were delivered to ED&F and settled on the intended day, 12 March 2014. This delivery of shares was memorialized in an MT545 SWIFT sent to ED&F by its sub-custodian, BNP Paribas.[51]

iii.     As Mr. Wade acknowledges, 2,000,000 shares were then re-hypothecated[52] and sold by ED&F on 12 March 2014 to Link Asset and Securities, an external IDB, which sale settled on 13 March 2014.[53]

iv.     In other words, because the buy transaction settled on 12 March 2014 and the sell transaction settled on 13 March 2014, ED&F held shares for the transaction during the period between the settlement of the two trades. Conversely, because ED&F received and held actual shares, Lutetia Capital and,

---

[49] See Wade Report ¶ 122, ED&F-00040919, at -56, 59, 62, 65, 72-75.

[50] See id., id. at -19.

[51] See id. at -79; see also ED&F-00604196, Tab DK0060228559, Rows 146-48 and 191-93.

[52] Rehypothecation is a common, generally accepted, and legal market practice among broker-custodians that provide financing for trades executed by their clients. The right of rehypothecation allows a broker to use the shares acquired by the client to recoup the cash financing they extended to the client to buy the shares in the first place. Like a stock borrow, the client still receives the benefits of holding the long position and still sees it in their client reports as a long position. See https://www.icmagroup.org/Regulatory-Policy-and-Market-Practice/repo-and-collateral-markets/icma-ercc-publications/frequently-asked-questions-on-repo/10-what-is-rehypothecation-of-collateral/.

[53] See ED&F-00252021. I take no position on whether these 2,000,000 shares were the same shares purchased from Lutetia Capital, as Mr. Wade contends, for it is not possible to "match" fungible shares of stock in this way. That said, even assuming Mr. Wade's contention were correct, it would not support his argument that none of the Appendix C trades required ED&F (or its counterparties) to own and hold actual shares.

in turn, ED&F's internal IDB were required to have possession of those shares to deliver to ED&F and AIG.

  v.  For the same reason, the AIG-Lutetia TDC 2014 trade, a non-Annex E, Appendix C trade, was not "circular and self-cancelling," the phrase Mr. Wade uses to describe the Annex E trades (at paragraph 114).  First, the buy and sell transactions settled on two different dates, so the orders could not be said to self-cancel.  Second, as Mr. Wade acknowledges, the buy transaction was sourced through ED&F's internal IDB and then sold on to Link, so neither IDB would have had an equal but opposite buy or sell transaction to offset its sell or buy transaction, respectively.

46.  In addition, and contrary to Mr. Wade's assertion (at paragraphs 124-29), it is entirely expected that neither ED&F nor AIG would have held an unhedged, directional position in TDC during the ownership period.

  a.  From AIG's perspective, it was engaging in a dividend arbitrage transaction.  Dividend arbitrage is, by definition, arbitrage; it seeks to achieve a return with minimal exposure to market risk.  Mr. Wade points out that AIG's long equity position was completely hedged by, at relevant times, a single stock future or a total return swap.  But that was an intended feature of the dividend arbitrage strategy, a strategy which was employed in all of the "Cum-Cum" trades listed in Appendix F to the Wade Report, where Mr. Wade does not dispute that dividends net of tax were received.

  b.  From ED&F's perspective, it was acting as a broker on behalf of its client, and thus would have hedged the transaction to avoid taking a net directional position itself.

  c.  In other words, there was no reason for ED&F and AIG to have net directional (i.e., unhedged) positions to execute this strategy, and a trader experienced in the trading or operations supporting dividend arbitrage strategies would readily understand this.

  d.  Similarly, because ED&F and AIG were fully hedged as a feature of the dividend arbitrage trading, and thus had no exposure to market movement, there would have been no reason for Acer to "attempt to confirm the prices at which these unwinds w[ould] take place."[54]  Again, as anyone experienced in equity finance practice would understand, a holder of a fully hedged position would be insulated from market movement of their shares.

47.  Mr. Wade next compares (at paragraphs 128-35) the manner in which ED&F unwound its clients' TDC March 2014 position with the manner in which it unwound its clients' Coloplast December 2013 position.  But this is nothing more than the comparison of the unwinding of an Annex E trade with the unwinding of another Annex E trade, and thus has no bearing on the liquidation of non-Annex E positions.

---

[54] Wade Report ¶ 129.

a.      Although AIG's March 2014 position in TDC included non-Annex E components, it is nevertheless an Annex E trade, listed on Schedule 2 of Annex E.[55]  My review of the AIG TDC March 2014 Trade Pack[56] indicates that ED&F sourced other shares held by AIG and other Acer pension plans from ED&F Man Professional Trading (Dubai) Limited, who I understand to be associated with the Annex E trades.

b.      It is hardly surprising that ED&F would unwind those positions the exact same way it had unwound the other Annex E positions, as the trades were executed similarly.  I understand that ED&F admits the similarities between the Annex E trades.[57]

c.      Moreover, as discussed above and as Mr. Wade acknowledges, ED&F had already sold the 2,000,000 non-Annex E shares originally acquired from Lutetia Capital through re-hypothecation.  ED&F could therefore have executed an internalised settlement to liquidate its client's position in those shares against its own position.

d.      Accordingly, Mr. Wade's comparison of the unwinding of the TDC March 2014 and Coloplast December 2013 positions has no bearing on the distinction between the Annex E and non-Annex E transactions.  Rather, Mr. Wade is simply comparing one Annex E transaction to another Annex E transaction.

e.      In any event, internalised settlement itself is an accepted and, indeed, important part of the market framework that does not, standing alone, suggest any wrongdoing.  Although the European Commission introduced the Central Securities Depositories Regulation to obtain transparency on internalised settlements in agents and custodians, the regulation makes clear that the practice is accepted.[58]  The defect in the Annex E transactions is not purely that the trades were settled in this manner, but that ED&F Man Professional Trading (Dubai) Limited did not have possession of or entitlement to a sufficient number of cum-dividend shares on the trade to support the forwarding of dividends to its clients. [59]

48.     Mr. Wade next compares (at paragraphs 136-38) the profit and loss of the pension plan versus the IDB's profit and loss.  However, this comparison only demonstrates that AIG successfully executed a fully hedged arbitrage trade.  Moreover, the comparison is fundamentally flawed, as it collapses two different IDBs, two different futures counterparties, and an ultimate market counterparty into a single column.[60]

---

[55] *See* ED&F Re-Amended Defence, Annex E, Schedule 2.

[56] *See* ED&F-00040919.

[57] *See* Hashemi Tr. at 253:17-22, 254:11-17.

[58] *See* European Securities Markets Authority, *Guidelines on Internalised Settlement Reporting Under Article 9 of CSDR*, *available at* https://www.esma.europa.eu/sites/default/files/library/esma70-151-367_csdr_guidelines_on_internalised_settlement_reporting.pdf.

[59] *See* Hashemi Tr. at 253:17-22, 254:11-17.

[60] Mr. Wade's Appendix E contains similar flaws, collapsing the role of numerous different counterparties down into a single category for the purpose of his analysis.  In addition to these similar flaws, however, Appendix E also discusses a "Non-Annex E AIG – MPT DUBAI TDC 2014 Transaction," *see* Wade Report at 134, that I understand to be an Annex E transaction and therefore is not representative of the transaction structures for any non-Annex E trades.

a.      From AIG's perspective, the core purpose of an arbitrage trade is to capture the benefit of disparate treatment between markets or entities (here, the difference in tax treatment) with minimal exposure to market risk.  As the table at paragraph 136 of the Wade Report demonstrates, AIG was successful in capturing this benefit less the brokerage fees it incurred in doing so.  Moreover, the fact that the only outside "net" benefit to any party to the transaction was the tax reclaim was expected, as that is the point of arbitrage.

b.      It is therefore meaningless to collapse the other market counterparties into a single, consolidated column.  The IDBs and futures brokers were merely acting as intermediaries by virtue of their positions, and the brokerage fee they received was the customary compensation for such service.  For its part, Lutetia Capital sold[61] and was paid for cum-dividend shares, and thus was required to forward to AIG the dividend that it received.  The same calculation that Mr. Wade shows in Paragraph 136 can be re-created for Appendix F transactions, such as the Moira Novozymes March 2014 trade,[62] which Mr. Wade does not dispute:

|  | Moira P&L | Counterparties P&L | Combined P&L |
|---|---|---|---|
| *Buy* |  |  |  |
| Cost of purchase of shares | (251.7) | 251.7 |  |
| Contract price under future | 249.4792 | (249.479) |  |
| Net Buy Date Loss | (2.2208) | 2.2208 |  |
| *Sell* |  |  |  |
| Sale proceeds from shares | 248 | (248) |  |
| Contract price under future | (248.05) | 248.05 |  |
| Sell Date loss | (0.05) | 0.05 |  |
|  |  |  |  |
| Dividend compensation | 1.77 | (1.77) |  |
| **Net pre-tax profit/(loss)** | **(0.5008)** | **0.5008** |  |
| Tax reclaim | 0.675 |  |  |
|  |  |  |  |
| **Net Profit** | **0.1742** | **0.5008** | **0.675** |

c.      Mr. Wade's suggestion that the parties could have priced their shares ex-dividend and achieved the same economic result (at paragraph 137) entirely ignores the fact that AIG, as Mr. Wade's own analysis makes clear, entered into this trade such that it would have a real right to a dividend, thus allowing it to reclaim the withheld tax. Having purchased cum-dividend shares prior to the ex-dividend date, it would make no sense for AIG to agree not to receive the right customarily transferred by virtue of

---

[61] Again, the Wade Report simply assumes without support that Lutetia Capital did not have cum-dividend shares to sell.  Nor would there be any way in the ordinary course, from ED&F's perspective, to verify whether Lutetia Capital had possession of cum-dividend shares.  In general, however, there is a presumption in the market that regulated counterparties and IDBs do not engage in or enable prohibited naked short sales.

[62] *See* ED&F-00076369 (listed as Trade Number 5 on Wade Report Appendix F (page 140)); ED&F-00212577; ED&F-00212578.

executing a trade prior to the ex-dividend date. And Mr. Wade presents no evidence that the shares delivered by Lutetia Capital were ex-dividend shares.

49.     Mr. Wade's argument (at paragraphs 139-45) regarding the role of the IDBs in the transactions similarly fails to suggest any wrongdoing.

      a.     First, as discussed above and as Mr. Wade acknowledges (at paragraphs 139-41), regulated IDBs were required to trade only on a matched principal basis or as agents for other market parties. The only compensation that Mr. Wade notes for these parties is the brokerage fee that they charged. And ED&F's internal IDB was clearly able to match Lutetia Capital and the ED&F pension plans in the AIG-Lutetia TDC 2014 trade, where the IDB counterparty was knowable because the IDB desk operated internally at ED&F, as well as all of the Appendix F trades with which Mr. Wade does not take issue.

      b.     Second, Mr. Wade appears to draw conclusions regarding the size of the futures positions based on liquidity drawn from Bloomberg average daily trading volume ("ADTV") data.

        i.     Mr. Wade's ADTV calculations appear to be based on standard output for the Bloomberg query relating to the Copenhagen Exchange, which does not by default contain OTC trade volume among non-members of the Exchange.

        ii.     I tested this theory by attempting to re-create the data reflected in Figure 9 of the Wade Report. According to ED&F's dividend reconciliation sheets, ED&F clients held a total long position in Danske DC of 24,805,000 for the March 2015 dividend event.[63] Mr. Wade's query yielded that that position was 474% of ADTV. Taking the average of Bloomberg's reported daily volume for Danske DC the 15 days before and 15 days after the 20 March 2015 record date, as Mr. Wade suggests, yields an average of about 5.2 million shares per day, which is approximately equal to 24,805,000 divided by 4.74, as expected.[64]

        iii.     However, the market data reported by Bloomberg does not account for OTC trade volume, and thus underestimates true ADTV. Appendix C contains a print-out of the Bloomberg codes that compose the PX_VOLUME data field on which Mr. Wade relies to compute ADTV, which clearly states that OTC Non-Standard (code OTN) and OTC Standard (code OTS) trades are not part of the queried Bloomberg data.[65]

---

[63] See ED&F-00047364, at -93.

[64] See Appendix C, which contains the Bloomberg output for Danske DC equity shares from 15 days before to 15 days after the relevant record date. The average share volume is 5,233,074 shares, and 474% of that number comes to 24,804,767 shares, which rounds to the 24,805,000 total share position listed on the ED&F dividend reconciliation sheet.

[65] The reported data does contain manual, off-exchange trades (codes ON and OS), but my understanding from Bloomberg is that such codes relate only to off-exchange trades that are entered into the exchange interface manually for trades between exchange members. ED&F was not a member of the Copenhagen Stock Exchange, and

iv.        By using a 30-day ADTV window for corporate actions, Mr. Wade also fails to account for the fact that trading volume spikes in the days immediately around corporate action dates, even with respect to on-exchange transactions.  This is true even for large companies who frequently pay dividends. For example, looking at TotalEnergies SE (formerly known as Total SA) trading data from Bloomberg surrounding its 6 January 2020 ex-dividend date, trading volume spikes from about 1.3 million shares three trading days before the dividend to about 7.6 million shares on the ex-dividend date, as shown below. The trend in TotalEnergies stock is indicative of the manner in which trading volumes increase (even without accounting for OTC volume) immediately surrounding corporation action dates.

| 31-Dec-19 | 02-Jan-20 | 03-Jan-20 | 06-Jan-20 | 07-Jan-20 | 08-Jan-20 | 09-Jan-20 |
|-----------|-----------|-----------|-----------|-----------|-----------|-----------|
| 1,359,317 | 4,326,276 | 4,960,724 | 7,596,924 | 5,380,020 | 4,922,510 | 4,672,439 |

v.        Moreover, a comparison of holdings to ADTV may be relevant to risk management to the extent the asset being valued is held as collateral.  That is because the value of such collateral may not be realisable if there is not sufficient liquidity at the time of sale (which may not be proximate to corporate action dates), which is more likely in the case of a highly concentrated position. However, the ratio of holdings to ADTV is not generally used in the market to evaluate whether a party could reasonably have the right to a dividend in the shares it acquires.

c.        Third, Mr. Wade insinuates that Lutetia Capital was the ultimate buyer of the single stock futures sold by AIG through Mariana Capital.

i.        As an initial matter, the trading documentation contains no evidence that ED&F colluded with Mariana Capital and Lutetia Capital to arrange for ED&F sell Lutetia Capital an offsetting single-stock future.  Indeed, looking at the trading confirms for the equity trade and the derivative trade by the IDB, there appears to be over an hour between the two trades.[66]  I would expect to see trades executed to support a pre-arranged transaction executed closer in time.

ii.        Moreover, when executing orders in a market between brokers there is a recorded audit trail, which is particularly important if there are any errors or losses so that trading mistakes may be attributed to the proper party.  The transactions examined in the Wade Report contain this evidence of written order requests and subsequent execution confirmations of these trades, as expected. The Wade Report asserts that these transactions were circular and numerous participants—including ED&F's equity finance desk, two different IDBs (Link

---

in general neither were the IDBs with which ED&F transacted, *see* http://www.nasdaqomxnordic.com/membership-list, and thus the parties could not have entered these trades to qualify under the ON and OS Bloomberg codes to be included in Mr. Wade's data.

[66] *See id.* at -66, 72.

and ED&F's internal IDB), two futures brokers (Mariana Capital and Arian Financial), and the ultimate counterparty (Lutetia Capital)—jointly orchestrated circular transactions to create camouflage.  To orchestrate such a number of individual market participants to transact business at this scale, with non-standard trading conditions, across multiple securities products, would have required some sharing of information for all parties to conduct their piece of the transaction at the right time and in the right way.  If so, I would have expected to see some evidence of this information sharing in writing, which I am not aware exists.

  iii.  More critically, though, Mr. Wade's argument that Lutetia Capital must have hedged its sale of TDC stock with a single-stock future assumes that Lutetia Capital did not have a cum-dividend position in TDC stock to sell.  But Mr. Wade provides no support for such an assumption.  Indeed, assuming Lutetia Capital held or had a right to cum-dividend TDC shares, there would be no reason for it to hedge its sale of the shares with a future.  It could simply have liquidated its position to ED&F.

 d. The Wade Report's assertion (at paragraphs 146-159) that a hedge does not require a receipt of a dividend is irrelevant.  An offsetting hedge neutralizes exposure to price movement, which already accounts for the payment of dividends.

  i.  Wade then goes on to make a different argument, equally meritless, that the fact that two different IDBs executed the buy and sell transactions does not preclude collusive conduct.

  ii.  Wade provides no support for the suggestion that any collusion between different IDBs occurred.  Indeed, as the Wade Report recognises immediately prior (at paragraphs 139-41), IDBs are precluded by their regulator from executing trades other than on a matched principal basis or as an agent for another market party.

  iii.  IDB-to-IDB sale of a hedge would be a proprietary position for each IDB, precluded by the regulatory framework under which they operate.  As a rule, IDBs do not take proprietary positions but rather trade as a "riskless principal," matching market counterparties.  ED&F's risk mandate for its Equity IDB states that the IDB's trading would be conducted "against market counterparties on a back to back basis."[67]

  iv.  Wade then, extraordinarily, states (at paragraph 154) that "All the Appendix C Cum-Ex Trades involved a variation of the steps I have described above."  I am not aware of any documentary support for this assertion.  In fact, from the documents I have reviewed and that are cited in Mr. Wade's report, the available information indicates that the non-Annex E Appendix C trades were executed in the same manner as the Appendix F trades.

---

[67] ED&F-00395919 at -28.

50.     Mr. Wade's discussion of the comparative all-in price of the Appendix C and Appendix F trades is readily explained by normal market practice and is not indicative of misconduct.

a.     First, in all cases, the all-in cost of the 18 non-Annex E, Appendix C trades exceeded 73% of the gross dividend amount.[68]  That is significant, because a Danish shareholder, or a foreign shareholder of Danish securities without tax-advantaged status would suffer withholding tax of at least 27% of the gross dividend for their shareholding and would not be entitled to reclaim that tax through the reclaim process.[69]  Indeed, through the market claim process, these shareholders paid the 73% dividend payment to ED&F.  Even if such costs arose out of a securities lending transaction and not the purchase of shares, they would be economically rational for a market counterparty without tax-advantaged treatment.  One significant reason that stock becomes available around corporate action dates is because offshore investors with favorable tax treatment for the sale of securities at home and unfavorable tax treatment for the receipt of dividends abroad make their shares available to investors with superior dividend tax treatment.

b.     Second, the very fact that the 18 non-Annex E, Appendix C transactions selected by Wade for his report featured bespoke settlement timings—longer for the pension plans' purchase transactions and shorter for the pension plans' sale transactions—meant that those transactions would settle closer in time, and all parties to such transactions would have been able to secure superior financing terms to the extent necessary.  The lower costs of the transaction would have allowed more competitive pricing.

c.     Third, Mr. Wade's blended all-in cost calculation for the Appendix C trades[70] includes both Annex E and non-Annex E trades alike, despite the fact that he is using the calculation to support his assertion that the Annex E and non-Annex E trades were similar, while the Appendix F trades were different.  Breaking out the Annex E and non-Annex E trades in Appendix C, there is still some observable price difference, on average, but it is smaller and can be explained by the points set forth above.  Moreover, on average these percentages are significantly higher than the 73% gross-dividend amount typically enjoyed by non-tax-advantaged shareholders of Danish securities:

| Appendix C Annex E Trades | Appendix C Non-Annex E Trades | Appendix F Trades |
|---|---|---|
| 79.6% | 81.7% | 89.6% |

---

[68] My analysis excludes the December 2013 Chr. Hansen trades, as does the Wade Report's.  Although the Acorn Capital Coloplast December 2013 trade appears to be an exception, that results from a data entry error on the price of the purchased shares; the true price is DKK 353.20, not DKK 352.20.  *See* ED&F-00044966.

[69] *See, e.g.*, https://skat.dk/data.aspx?oid=2303242 (showing 27% and 42% marginal dividend tax rates for 2021-22); https://stats.oecd.org/Index.aspx?QueryId=59615 (showing 42% marginal tax rate for 2012-15).

[70] Wade Report ¶ 163.

     d.     Finally, some of the 18 non-Annex E, Appendix C trades selected by Wade have all-in costs close to or above the calculated cost for the Appendix F trades. The KK Law Firm Novo Nordisk March 2013 trade, for example, had an all-in cost of 91.6%, and the AIG Coloplast December 2013 trade had an all-in cost of 89.7%.  On the other hand, the Kamco LP Novo Nordisk March 2014 trade had an all-in cost of 79.3%, despite being an Appendix F trade.

     e.     In summary, Mr. Wade's use of the all-in cost of his selected trades to determine whether or not a trade conferred an actual right to a dividend is not a reliable indicator of whether the transaction was legitimate or not.  The pricing of every transaction executed by ED&F was rational for a significant number of market participants, the "cum-ex" structure conferred transaction cost advantages vis-a-vis the "cum-cum" structure, and there are crossover examples between the Appendix C and Appendix F trades.

51.     Mr. Wade's analysis of risk management failures is flawed.

     a.     First, Mr. Wade premises his analysis on the assertion that ED&F acted as a "prime broker."[71]

     i.     However, a prime broker is subject to specific regulatory requirements under UK law.

     ii.     My understanding is that ED&F was not licensed to be a prime broker, did not operate as a prime broker, and thus was not required to meet the regulatory requirements that Mr. Wade alludes to in this section.[72]

     b.     Second, Mr. Wade criticizes (at paragraphs 172-81) the amount of risk capital that ED&F required its clients to contribute as part of the transactions they executed on behalf of those clients.

     i.     As Mr. Wade recognises, however, the long equity positions acquired by ED&F's clients were fully, or "delta," hedged with an equal but opposite derivative product.[73]  These products would have eliminated economic risk substantially and decreased other risks posed to the client and to ED&F.

     ii.     Mr. Wade's analysis of customary margin contributions for unhedged positions (at paragraph 176) is irrelevant.  Directional positions inherently carry much greater risk than fully hedged positions because they are susceptible to market price fluctuations, whereas fully hedged positions are not.

---

[71] Wade Report ¶ 194.

[72] ED&F is only registered with a specific activity license under reference number 194926, under which it is not authorized to do business as a prime broker.  *See* https://register.fca.org.uk/s/firm?id=001b000000MfISLAA3.

[73] *See, e.g.*, Wade Report ¶ 125.

      iii.      For the same reasons, Mr. Wade's discussion of AIG's ability to absorb a price fluctuation in its TDC position (at paragraph 179) does not account for the fact that AIG had a directionally opposite hedge position that would offset that price fluctuation.

     c.     In my opinion, the Wade Report also does not fairly characterize the risk management environment within ED&F.

      i.      ED&F's equity finance desk was subject to daily net liquidating value, or "NLV," monitoring of client positions by ED&F's risk department. The NLV summaries I reviewed also indicated that the client would be called for the margin shortfall where there was an NLV shortfall in the client accounts that would not be covered by pending receivables.[74]

      ii.      The equity finance desk also operated under a risk mandate and desk procedures that set forth the conditions of its operation. That risk mandate set limits on client positions, including in relation to gross cash value, percentage of daily trading volume, and percentage of free float of the security.[75]

      iii.      Finally, in reviewing the deposition testimony of Adam Piper, ED&F's Chief Risk Officer during the relevant period, I learned that there were more than ten operational risk reports produced by the risk department during the relevant period, which suggests that some risk-related escalation did occur.[76]

      iv.      Although I cannot say that ED&F's risk monitoring during the relevant period was "best practice" for the industry, neither can I say that it is out of the ordinary, much less indicative of purposeful fraud. Suboptimal risk management is, regrettably, quite common in the equity finance industry. A recent example is the losses sustained by Credit Suisse resulting from their financing of Archegos Capital, a client with unusually concentrated positions. Moreover, those positions, unlike the ones taken by the ED&F clients here, were directional and therefore susceptible to market movement.[77] The failure of Archegos Capital caused the Bank of England and the FCA to send a "Dear CEO" letter to their members to ensure they undertook a systematic review of risk management in equity finance business units.[78]

52.     Finally, Mr. Wade draws three conclusions (at paragraphs 171, 182, and 183) that are not backed by citation, analysis, or explanation. To the extent that Mr. Wade implies that these conclusions flow directly from the other analysis he has provided, I disagree for the reasons given above in response to such analysis.

---

[74] *See, e.g.*, ED&F-00392651, ED&F-00395638.

[75] *See* ED&F-00395919 at -26-27; ED&F-00495341.

[76] *See* Piper Tr. at 274:25-275:13.

[77] *See* https://www.credit-suisse.com/media/assets/corporate/docs/about-us/investor-relations/financial-disclosures/results/csg-special-committee-bod-report-archegos.pdf.

[78] *See* https://www.fca.org.uk/publication/correspondence/dear-ceo-supervisory-review-global-equity-finance-businesses.pdf.

a. I add one additional point here for clarity regarding ED&F's calculation of fees by reference to profit and loss for the transaction. If, as suggested by Mr. Wade, the non-Annex E, Appendix C transactions were entirely premeditated and choreographed to achieve a collusive result, I would expect to have seen that ED&F's profit and loss calculations for the transactions were done in advance, so as to ensure that the chosen terms of the transactions would indeed produce the desired effect.[79]

b. However, metadata for the Acer pension plans' TDC March 2014 transactions shows that the profit and loss calculation was created on 25 March 2014, almost two weeks after the dividend pay date.[80]

## XI.     Response to Wade Report Opinion 3

53.     Mr. Wade's Opinion 3, that "ED&F Man, Custodian for the ED&F Man Pension Plans, Did Not Actually Have Custody of a Sufficient Number of Shares to Support the Tax Vouchers That Were Issued for the ED&F Man Pension Plans," is controverted by the very materials discussed by Mr. Wade in that section.

54.     First, Mr. Wade acknowledges (at paragraph 186) that appropriate cash and equity transactions were made in the books and records of BNP Paribas, as sub-custodian for ED&F, to support the fact that shares entered into and exited from the ED&F sub-custodial accounts. Mr. Wade's dismissal of these entries as mere "book entries" is unfounded, for Danish shares are dematerialised and their movement can only be tracked by books and records of relevant custodians.[81]

55.     Second, and as discussed above, Mr. Wade's criticism of the methods by which ED&F settled the transactions to unwind its clients' equity positions applies only to the Annex E trades, because the purportedly non-Annex E unwinding example he relies upon is, in reality, just another Annex E example.

a. The back-office operations departments of all securities market participants are measured by the efficiency with which they settle transactions and reduce any exposure the firm or its clients face on open trades. In my role chairing the Settlement Discipline Committee of Euroclear UK, I see first-hand the importance the authorities put on participant firms achieving an acceptable level of settlement performance. It is clear that the EU Commission appreciates the need to achieve greater settlement efficiency with the implementation of the Central Securities Depository Regulation and the introduction of cash penalties for settlement fails as a deterrent.[82]

---

[79] The Appendix F trades contain a similar P&L calculation by ED&F, and thus those arrangements are not unique to the Appendix C trades. *See* ED&F-00355699 (Fee spreadsheet for August 2014 Acer pension plan transactions in TDC shares).

[80] *See* ED&F-00265891.

[81] I understand that the reconciliation of these books and records was the subject of the Warren Report.

[82] *See* European Commission, *Central securities depositories (CSDs)*, *available at* https://ec.europa.eu/info/business-economy-euro/banking-and-finance/financial-markets/post-trade-services/central-securities-depositories-csds_en.

b.      A method to increase settlement efficiency is to split and shape open transactions to allow what can be settled to settle.  This approach helps to ensure that, as the cycles in the custodian and/or the CSD continue through the settlement day, log jams will not be created which could cause unnecessary settlement fails.  Many CSDs provide specific functionality to do this, but the Securities Market Practice Group supplies guidance on how firms should perform settlement functions, including partial settlement of open transactions.[83]

56.      Third, as discussed above, Mr. Wade's conclusions regarding average daily trading volumes are again not consistent with market practices.

## XII.    Response to Wade Report Opinion 4

57.      Mr. Wade's Opinion 4, that "ED&F Man's Tax Voucher Process Was Highly Unusual, Inappropriate, and Resulted in Fabricated Tax Vouchers with False Statements," does not comport with general market practice for the creation of tax vouchers.

58.      The generation of tax vouchers for a client is a standard market practice for brokers in the equity finance industry where the client has declared its tax status and domicile in a way that warrants the generation.[84]

a.      Based on my review of the dividend reconciliation sheets produced by ED&F, it appears that the process by which they created tax vouchers depended on whether or not their books and records indicated that their client held a cum-dividend position in the security on a trade date basis.

b.      Michael Meade, who worked in securities operations at ED&F, produced the tax vouchers.[85]  Operations personnel such as Mr. Meade are generally back-office personnel and do not conduct trades, so they are typically not directly involved in the rationale or discussions that gave rise to the trades.

c.      As stated above, the production of tax vouchers is common practice where a broker is acting as a custodian for client assets and the account has declared particular tax status to the custodian.

59.      Mr. Wade's assertion that the documentation from SEB is illustrative of flaws with the ED&F tax voucher process[86] is not persuasive.

---

[83] *See* Sec. Mkt. Practice Grp., *Split Settlement Market Practice* (Feb. 2016), *available at* https://www.smpg.info/fileadmin/documents/3_Settlement%20and%20Reconciliation%20WG/A_Final%20Global%20Market%20Practices/SMPG_MP_SR_Split_Settlement.pdf.
[84] *See, e.g.*, Societe Generale Global Custody, Key Features & Benefits, *available at* https://www.securities-services.societegenerale.com/en/solution-finder/global-custody/; BNY Mellon Global Custody, Capabilities, *available at* https://www.bnymellon.com/us/en/solutions/securities-services/custody-services.html.
[85] *See* Hashemi Tr. at 323:5-20.
[86] *See* Wade Report ¶ 212.

a.    While the SEB Country Annex for Denmark states that tax reclaims shall be filed "for settled positions only,"[87] that is completely consistent with the instances in which ED&F produced a tax voucher for the pension plans.  I have reviewed the Schedule C transactions that form the basis for the Wade Report, and each of them settled, as evidenced by ED&F's receipt of an MT544 or MT545 SWIFT message confirming such settlement.  Mr. Wade's suggestion that the language of the document implies that such settlement must occur prior to the record date is his own invention, unsupported by the terms of the document and by the general market understanding of what it means to receive a dividend.

b.    Likewise, the assertion that "no tax reclaims will be filed for stock lending, where the given entity is not entitled to the refund" is irrelevant.  I have asked counsel for ED&F and SKAT for documentation supporting the production of a tax voucher based purely upon shares borrowed by a pension plan, and they have informed me they are aware of none.  And none is cited in the Wade Report.

c.    Indeed, as detailed above, documentation I have seen from SEB suggests that SEB recognised dividends received from a market counterparty, pursuant to a market claim, to be "real" dividends.  Indeed, where SEB was able to obtain such market claim for ED&F from the delivering bank, BNY Mellon, it created an MT 566 SWIFT message (which is normally generated upon direct receipt of a dividend from an issuer) to memorialise the receipt of that dividend.[88]

60.    Wade also again re-asserts (at paragraph 213) that "no member of ED&F Man's group ever held any shares or received any real dividend for the event involving Appendix C Cum-Ex trades."  But as discussed above, even in the AIG-Lutetia TDC 2014 trade that is featured prominently in the Wade Report, ED&F held the shares in its omnibus account for a day prior to settling its sell transaction, and therefore were not "self-canceling."  In other words, even in Wade's chosen example, ED&F plainly held shares, and the assertion that ED&F did not receive a "real dividend" on behalf of its client is premised on Wade's false understanding of what a "real dividend" is.

## XIII.   Right to Amend and Compensation

61.    Amendments or additions to this Report may be required as a result of developments prior to or at trial, including but not limited to, the discovery of new evidence, expert testimony, and the testimony of any other person at trial.  I reserve the right to amend and supplement this Report.  I am currently being compensated in this matter at my hourly rate of £510, plus normal reimbursable expenses.  My compensation is not dependent on my conclusions or on the outcome of this litigation.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

[87] See SEB_00000016.
[88] See ED&F-00273945; ED&F-00312726.

62.　　This report includes the opinions I have formed as of this date and the bases for those opinions.

Dated this 1st day of February, 2022.

_____
M.F. Hayden

**Appendix A**

**Curriculum Vitae of Max F. Hayden**

# Max Hayden

## PROFILE:

Senior financial services and equity finance professional with over 30 years' experience within a leading investment bank and a series of startup enterprises. Proven track record of building and managing highly profitable franchises, as well as leading first class infrastructure platforms and programmes of change. A highly motivated and proactive member of the Securities and Investment industry with an extensive range of experience and expertise, which includes:

- Running a regulated business/company
- Business development
- Financial management
- Risk management & control
- Project management
- Leadership
- Client relationship management
- Industry development

## PROFESSIONAL EXPERIENCE:

**IG Group, Global Head of Institutional Sales**                                          **2019-Date**
- Development of Prime Brokerage business and organisational focus on Hedge Funds, Family Offices and Prop Shops
- Manage global sales force situated in all major financial centres

**ITI Capital, CEO**                                                                       **2017-2019**
- Integrated two London based FCA regulated brokers, acting as CF1 and CF3 and sold FCA licensed company
- Develop and manage relationship with FCA and GFSC regulators to further permissions and license
- Oversaw Moscow, Guernsey and London offices totaling 200 staff
- Developed business lines for Retail, Professional Traders, Hedge Fund and Institutional client bases
- Developed a number of business strategies to meet the expectations of Private Equity owners and investors
- Implement back and front office technologies and platforms to cater for range different business line requirements
- Migrate Retail business to white label provider

**BCS Financial Group, Head of Prime Brokerage (MD)**                                      **2014-2017**
- Introduce controls and structure for newly granted FCA license.
- Develop a Russian Prime Brokerage and execution product to be in line with internationally accepted conventions and develop product for targeted US and EMEA Professional Trading and HFT clients
- Introduce international products into the platform for CIS client base and international clients to emerging markets
- Introduce new structured finance opportunities outside of mainstream prime finance activities
- Design and implement a strategic plan to build the London business for emerging and mature market products by identifying acquisitions and trading opportunities and launch a Mini-Prime platform to target International start up hedge funds

**Elkhorn Consulting Limited, Co-Owner**                                                   **2014-Date**
- Specialist consultancy and provider of advisory services to a range of financial sector participants
- Products include the provision of project management services to sell side firms to assist in regulatory efficiency to respond to the range of directives, controls and new regulations
- Formulation and provision of research for industry suppliers on a range of topics and requirements
- Recent engagements include – CSDR fine simulations, corporate action pricing for MOEX, ICAAP for Prop Shop

**Bourse Consult & the European Commission**                                              **2013-2014**
- Requested to participate by the European Commission to contribute to a research paper to provide a comprehensive analysis to cost the impact of EMIR on the Pension Fund Management community of Europe
- Data gathering, modeling, interviewing and publication took 10 months.

**Bank of America Merrill Lynch, Head of Prime Brokerage Product (MD)**                    **2006-2012**
- Supervised a department of 100 which included Relationship Management, Client Service, Product Development, Integration and Pricing
- Ran the PB element of the Equity Financing P&L, with associated budgeting.
- Conceived an insolvency remote entity for the protection of client assets, post the collapse of Lehman. Set up PACT Ltd as a separately regulated FCA member, with independent Board and was registered CF1 Director.
- Managed the PB business Balance Sheet and imposed behavioral changes on the client base through pricing.
- Positioned the business funding requirements through the credit squeeze and optimizing the inventory.
- Implemented a range of clearing services and market access to meet the international demands of professional trading firms e.g. provision of AP services for ETF Market Makers and the volume capacity required.

- Proposed, designed and implemented smart segregation and rehypothecation engines to hone P&L
- Consolidated the disparate Prime Brokerage organizations in EMEA (FI, FX, Equity).
- Developed and delivered a multiproduct/cross asset account for clients to trade in 60+ markets.
- Provided business solutions and serviced the business support requirements of 450 HFs and 70 PT clients.
- Negotiated all commercial and risk terms in the plethora of client agreements required for PB and Clearing

**Merrill Lynch Int'l, COO Global Equity Finance (Dir)**                                    **2004-2006**

- Supervised a department of 30 which included Risk, Margin, Product Development and Balance Sheet Management
- Managed the GEF EMEA revenue budget and associated expenses.
- Negotiated internal support and funding costs and effected changes on the organization at large if appropriate.
- Managed a number of client and counterparty defaults with the focus being to ensure the Firm and where possible all other affected parties were protected, e.g. Refco, Lehman, MF Global, etc.
- Instituted a range of policies and procedures to ensure regulatory control and measurement of the business.
- Introduced a trading platform to support the growth in Equity Finance trading e.g. Structured Finance, Repo/Swaps
- Collaborated in the design of Portfolio Margin policies for Hedge Fund and Proprietary Trading client accounts.
- Introduced client profitability tools and subsequently re-priced the whole client base.

**Merrill Lynch Int'l, Co-Head of International Prime Brokerage Platform (Dir)**                **2002-2004**

- Supervised a department of 50 which included Client Service, Product Development and Integration
- Designed, planned, developed and implemented a complete International Prime Brokerage infrastructure. Including client tools, reporting, margining, transaction processing, books and records, clearing, settlement and asset servicing.
- Managed technology budget and resource prioritization to optimize the return on product investment.
- Developed a follow the sun model and transferred Asian business out of London.

**Merrill Lynch Int'l, Head of Business/Prod Development Security Services Division (Dir)**    **2000-2002**

- Supervised a department of 30 which included Product Development, Strategy, PMO and Unit Pricing
- Implemented Third Party Clearing business to support the international demands of Market Makers and Brokers and subsequently drove capacity to effortlessly deal with 2.6mm transactions per day.
- Seconded to a variety of external organizations to assist in the design and implementation of a new operating model e.g. ML/HSBC JV, Knight Europe and Kuwait Stock Exchange.

**Merrill Lynch Int'l, Head of Operational Risk (Dir)**                                    **1999-2000**

- Supervised a department of 40 which included Collateral Management, Operational Risk and Client Money
- Planned for the migration of operational activities from London to Dublin with the transference of 500 roles.

**Merrill Lynch Int'l, Head of UK Equity Operations (VP)**                                **1993-1999**

- Supervised a department of 150 which included Stock Loan, Settlements, Asset Servicing and Middle Office
- Ran a 3-year initiative that designed, built and implemented a complete suite of operational systems for of Crest

**Smith New Court, Head of Listed and OTC Derivative Operations**                        **1990-1993**

- Supervised a department of 30 which included all on and off exchange derivatives clearing and margining
- Collaborated on the invention and development of the Contract for Differences product.

**Scott Goff Layton/SNC, Traded Options Floor Brokerage**                                **1987-1990**

- Performed various roles on the exchange floor, sales desk and clearing departments as a registered options trader.

## NOTABLE INDUSTRY PARTICIPATIONS AND PROFESSIONAL MEMBERSHIPS:

- Chairman of the Euroclear Settlement Discipline Committee - current
- Represented BoAML on the HM Treasury Investment Banking Insolvency Panel, which proposed The Living Will.
- Represented BoAML on the AFME Prime Brokerage Committee
- Participated in the industry lobbying of Brussels on the terms within the AIFMD.
- Full Member of the Securities Institute - current
- Registered with FCA as CF1 (Director), CF3 (CEO) and CF30

## EDUCATION:

- Haileybury and The Imperial Service College

## Appendix B

## Documents Considered

### Expert Reports

Expert Report of Graham Wade dated December 31, 2021 and cited documents

Expert Report of Adam Warren dated December 31, 2021 and cited documents

Expert Report of Emre Carr dated December 31, 2021 and cited documents

### Deposition Transcripts and Documents

Deposition of Stacey Kaminer (Vols. 1 and 2)

Deposition of Shahab Hashemi (Vols. 1 and 2)

Deposition of Adam Piper

Deposition Exhibit 4152

Deposition Exhibit 4430

### Pleadings

ED&F Re-Amended Defence

### Produced Documents

ED&F-00001461

ED&F-00003191

ED&F-00004919

ED&F-00008044

ED&F-00016620

ED&F-00016853

ED&F-00017642

ED&F-00021858

ED&F-00026581

ED&F-00026596

ED&F-00026628

ED&F-00026653

ED&F-00026769

ED&F-00026785

ED&F-00038254

ED&F-00038269

ED&F-00038285

ED&F-00039011

ED&F-00039716

ED&F-00040919

ED&F-00040991

ED&F-00041009

ED&F-00041034

ED&F-00041059

ED&F-00041083

ED&F-00041108

ED&F-00041180

ED&F-00041211

ED&F-00041236

ED&F-00041285

ED&F-00041310

ED&F-00042261

ED&F-00042604

ED&F-00042677

ED&F-00042832

ED&F-00042905

ED&F-00042978

ED&F-00043326

ED&F-00043382

ED&F-00043981

ED&F-00043997

ED&F-00044265

ED&F-00044535

ED&F-00044663

ED&F-00044749

ED&F-00044771

ED&F-00044825

ED&F-00044847

ED&F-00044869

ED&F-00044891

ED&F-00044966

ED&F-00044985

ED&F-00045042

ED&F-00045169

ED&F-00045188

ED&F-00045280

ED&F-00045298

ED&F-00045320

ED&F-00045363

ED&F-00045381

ED&F-00045423

ED&F-00045466

ED&F-00045535

ED&F-00045678

ED&F-00045740

ED&F-00045782

ED&F-00045804

ED&F-00046098

ED&F-00046267

ED&F-00046320

ED&F-00046423

ED&F-00046476

ED&F-00046531

ED&F-00046550

ED&F-00046603

ED&F-00046656

ED&F-00046709

ED&F-00046992

ED&F-00047332

ED&F-00047364

ED&F-00047396

ED&F-00047428

ED&F-00047516

ED&F-00048728

ED&F-00048961

ED&F-00049091

ED&F-00049119

ED&F-00049171

ED&F-00049257

ED&F-00049309

ED&F-00049371

ED&F-00049386

ED&F-00049438

ED&F-00049490

ED&F-00049714

ED&F-00049766

ED&F-00049905

ED&F-00049940

ED&F-00076303

ED&F-00076338

ED&F-00076369

ED&F-00076389

ED&F-00076404

ED&F-00076422

ED&F-00076579

ED&F-00076734

ED&F-00076758

ED&F-00076827

ED&F-00076877

ED&F-00076918

ED&F-00077325

ED&F-00077515

ED&F-00077536

ED&F-00077697

ED&F-00077846

ED&F-00077869

ED&F-00077895

ED&F-00077994

ED&F-00078020

ED&F-00078083

ED&F-00078478

ED&F-00212577

ED&F-00212578

ED&F-00252021

ED&F-00265891

ED&F-00273945

ED&F-00277197

ED&F-00312726

ED&F-00355699

ED&F-00392651

ED&F-00395638

ED&F-00395919

ED&F-00441294

ED&F-00495341

ED&F-00604196

SEB_00000016

SEB_00000006

SEB_00000092


**Public Sources**

https://www.wsj.com/articles/SB1035764815138595151

https://www.nytimes.com/1995/07/22/business/worldbusiness/IHT-smith-new-court-accepts-bid-by-merrill-lynch-90081831357.html

https://www.nytimes.com/1995/05/11/business/international-business-swiss-bank-in-deal-to-buy-sg-warburg.html

https://www.oxfordreference.com/view/10.1093/oi/authority.20110803100009856

https://www.ecb.europa.eu/pub/pdf/scpops/ecbocp68.pdf

https://www.ebf.eu/wp-content/uploads/2017/07/Second-Giovannini-Report-on-Clearing-Settlement-in-the-EU-2003-1.pdf

https://www.investor.gov/introduction-investing/investing-basics/glossary/ex-dividend-dates-when-are-you-entitled-stock-and

https://docs.londonstockexchange.com/sites/default/files/documents/rules-lse.pdf

https://www.nationalbanken.dk/en/publications/Documents/2012/04/Assesment%20of%20the%20VP%20settlement%20system_2012.pdf

https://www.finanstilsynet.dk/upload/finanstilsynet/mediafiles/newdoc/rapporter/4/assessment_rapport_eng.pdf

https://www.ecb.europa.eu/paym/target/t2s/governance/pdf/casg/ecb.targetseccasg130316_T2SMarketClaimStandards.en.pdf

https://www.clearstream.com/resource/blob/1316782/43a60afa470c37ba74f7cb2d6949e71c/compensation-handbook-cata-en-data.pdf

https://www.afme.eu/portals/0/globalassets/downloads/divisions/post-trade/afme-ptd-spanish-equity-cash-dividends.pdf

https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32012R0236

https://www.icmagroup.org/Regulatory-Policy-and-Market-Practice/repo-and-collateral-markets/icma-ercc-publications/frequently-asked-questions-on-repo/11-what-is-the-difference-between-a-repurchase-transaction-and-a-buy-sell-back/

https://www.icmagroup.org/Regulatory-Policy-and-Market-Practice/repo-and-collateral-markets/icma-ercc-publications/frequently-asked-questions-on-repo/10-what-is-rehypothecation-of-collateral/

https://www.esma.europa.eu/sites/default/files/library/esma70-151-367_csdr_guidelines_on_internalised_settlement_reporting.pdf

http://www.nasdaqomxnordic.com/membership-list

https://skat.dk/data.aspx?oid=2303242

https://stats.oecd.org/Index.aspx?QueryId=59615

https://register.fca.org.uk/s/firm?id=001b000000MfISLAA3

https://www.credit-suisse.com/media/assets/corporate/docs/about-us/investor-relations/financial-disclosures/results/csg-special-committee-bod-report-archegos.pdf

https://www.fca.org.uk/publication/correspondence/dear-ceo-supervisory-review-global-equity-finance-businesses.pdf

https://www.securities-services.societegenerale.com/en/solution-finder/global-custody/

https://www.bnymellon.com/us/en/solutions/securities-services/custody-services.html

**Appendix C**

**Bloomberg Data**

| | Security | DANSKE DC Equity |
| --- | --- | --- |
| | Start Date | 2/20/2015 0:00 |
| | End Date | 4/29/2015 0:00 |
| | Period | D |
| | Currency | DKK |

| Day Count | Date | PX_LAST | Change | % Change | PX_VOLUME | Change | % Change |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 29/04/2015 | 157.55 | -3.102 | -1.93 | 2,965,467 | 1,358,321 | 84.52 |
| | 28/04/2015 | 160.652 | -1.469 | -0.91 | 1,607,146 | -297,660 | -15.63 |
| | 27/04/2015 | 162.121 | 1.959 | 1.22 | 1,904,806 | 512,459 | 36.81 |
| | 24/04/2015 | 160.162 | 0.163 | 0.10 | 1,392,347 | -687,855 | -33.07 |
| | 23/04/2015 | 159.999 | -0.734 | -0.46 | 2,080,202 | -931,881 | -30.94 |
| | 22/04/2015 | 160.733 | 0 | 0.00 | 3,012,083 | -358,563 | -10.64 |
| | 21/04/2015 | 160.733 | 2.53 | 1.60 | 3,370,646 | 17,658 | 0.53 |
| | 20/04/2015 | 158.203 | 5.388 | 3.53 | 3,352,988 | 818,624 | 32.30 |
| | 17/04/2015 | 152.815 | -2.286 | -1.47 | 2,534,364 | 485,477 | 23.69 |
| | 16/04/2015 | 155.101 | -0.979 | -0.63 | 2,048,887 | -46,555 | -2.22 |
| 15 | 15/04/2015 | 156.08 | 0.898 | 0.58 | 2,095,442 | 35,586 | 1.73 |
| 14 | 14/04/2015 | 155.182 | -0.735 | -0.47 | 2,059,856 | 261,266 | 14.53 |
| 13 | 13/04/2015 | 155.917 | 0.326 | 0.21 | 1,798,590 | -473,504 | -20.84 |
| 12 | 10/04/2015 | 155.591 | 0.327 | 0.21 | 2,272,094 | -162,190 | -6.66 |
| 11 | 09/04/2015 | 155.264 | 1.714 | 1.12 | 2,434,284 | 595,879 | 32.41 |
| 10 | 08/04/2015 | 153.55 | 0 | 0.00 | 1,838,405 | -519,584 | -22.04 |
| 9 | 07/04/2015 | 153.55 | 1.306 | 0.86 | 2,357,989 | -91,260,563 | -97.48 |
| 8 | 01/04/2015 | 152.244 | 2.449 | 1.63 | 93,618,552 | 91,543,134 | 4410.83 |
| 7 | 31/03/2015 | 149.795 | -1.061 | -0.70 | 2,075,418 | -44,498 | -2.10 |
| 6 | 30/03/2015 | 150.856 | 1.714 | 1.15 | 2,119,916 | -2,484,267 | -53.96 |
| 5 | 27/03/2015 | 149.142 | 4.735 | 3.28 | 4,604,183 | 2,351,440 | 104.38 |
| 4 | 26/03/2015 | 144.407 | -1.796 | -1.23 | 2,252,743 | 587,770 | 35.30 |
| 3 | 25/03/2015 | 146.203 | -0.408 | -0.28 | 1,664,973 | -1,705,583 | -50.60 |
| 2 | 24/03/2015 | 146.611 | 0.98 | 0.67 | 3,370,556 | 61,804 | 1.87 |
| 1 | 23/03/2015 | 145.631 | 2.612 | 1.83 | 3,308,752 | -1,767,376 | -34.82 |
| Rec Date | 20/03/2015 | 143.019 | 2.367 | 1.68 | 5,076,128 | 2,145,955 | 73.24 |
| 1 | 19/03/2015 | 140.652 | 2.041 | 1.47 | 2,930,173 | -347,672 | -10.61 |
| 2 | 18/03/2015 | 138.611 | 0.87 | 0.63 | 3,277,845 | 1,279,055 | 63.99 |
| 3 | 17/03/2015 | 137.741 | -1.424 | -1.02 | 1,998,790 | -230,453 | -10.34 |
| 4 | 16/03/2015 | 139.165 | 0.396 | 0.29 | 2,229,243 | 835,712 | 59.97 |
| 5 | 13/03/2015 | 138.769 | -0.396 | -0.28 | 1,393,531 | -72,847 | -4.97 |
| 6 | 12/03/2015 | 139.165 | 0.08 | 0.06 | 1,466,378 | 420,088 | 40.15 |
| 7 | 11/03/2015 | 139.085 | 0.79 | 0.57 | 1,046,290 | -1,087,199 | -50.96 |
| 8 | 10/03/2015 | 138.295 | -0.949 | -0.68 | 2,133,489 | 362,702 | 20.48 |
| 9 | 09/03/2015 | 139.244 | 0.079 | 0.06 | 1,770,787 | 148,808 | 9.17 |
| 10 | 06/03/2015 | 139.165 | 0.08 | 0.06 | 1,621,979 | -675,242 | -29.39 |
| 11 | 05/03/2015 | 139.085 | 0.79 | 0.57 | 2,297,221 | 219,437 | 10.56 |
| 12 | 04/03/2015 | 138.295 | -0.553 | -0.40 | 2,077,784 | 558,350 | 36.75 |
| 13 | 03/03/2015 | 138.848 | -1.503 | -1.07 | 1,519,434 | -289,585 | -16.01 |
| 14 | 02/03/2015 | 140.351 | 0.712 | 0.51 | 1,809,019 | 103,593 | 6.07 |
| 15 | 27/02/2015 | 139.639 | 0.158 | 0.11 | 1,705,426 | -91,627 | -5.10 |
| | 26/02/2015 | 139.481 | 1.423 | 1.03 | 1,797,053 | -1,041,390 | -36.69 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 25/02/2015 | 138.058 | -1.739 | -1.24 | 2,838,443 | 426,472 | 17.68 |
| 24/02/2015 | 139.797 | 0.237 | 0.17 | 2,411,971 | -710,805 | -22.76 |
| 23/02/2015 | 139.56 | 2.214 | 1.61 | 3,122,776 | 1,152,522 | 58.50 |
| 20/02/2015 | 137.346 | | | 1,970,254 | | |

| | |
|---|---|
| Calculated Average Share Volume in Period | 5,233,073 |
| Wade Holding % of ADV | 474% |
| Calculated Share Position | 24,804,767 |

**<Back> to Return**

| 1) New Search | 2) Export | | Exchange Profile : Details |
|---|---|---|---|

Exchange Name ↑ ▲ Nasdaq Nordic - Copenhagen

◄ | 11) Trading | 12) Information | 13) Events | 14) News | 15) Condition Codes | 16) Tick Size | ▼ ►

21) Equity | 22) Fixed Income | 23) Derivatives

○ Trade  ● Bid/Ask

| CC | Description | Open | High | Low | Last | Volume | ▲ |
|---|---|---|---|---|---|---|---|
| 501) LCTR | Linked Component Transaction | No | No | No | No | Yes | |
| 502) BOTT | Beneficial Ownership Transfer Transaction | No | No | No | No | Yes | |
| 503) CCPR | CCP Related Transaction | No | No | No | No | Yes | |
| 504) GUGI | Give-up or Give-in Transaction | No | No | No | No | Yes | |
| 505) ON | OFF EXCHANGE NON-STANDARD TRADE | Yes | Yes | Yes | Yes | Yes | |
| 506) OS | Standard Manual Trade | Yes | Yes | Yes | Yes | Yes | |
| 507) SN | SI Non-Standard | No | No | No | No | Yes | |
| 508) STRD | Standard Routed Dark Trade | No | No | No | No | Yes | |
| 509) SI | SI Standard | No | No | No | No | Yes | |
| 510) V | No Update Total Volume/Turnover | Yes | Yes | Yes | Yes | No | |
| 511) DR | Delayed Trade Report | First | Yes | Yes | First | Yes | |
| 512) SOR | Smart Order Router | Yes | Yes | Yes | Yes | Yes | |
| 513) PD | Prior Day Trade | No | No | No | No | No | |
| 514) AOD | Auction On Demand Trade | No | No | No | No | Yes | |
| 515) AU | Scheduled Intraday Auction | Yes | Yes | Yes | Yes | Yes | |
| 516) OA | Opening Auction | Yes | Yes | Yes | Yes | Yes | |
| 517) CA | Closing Auction | Yes | Yes | Yes | Yes | Yes | |
| 518) A | No Update Average Price | Yes | Yes | Yes | Yes | Yes | |
| 519) OTS | OTC Standard | No | No | No | No | No | |
| 520) OTN | OTC Non Standard | No | No | No | No | No | |
| 521) N | Non-Standard Trade | Yes | Yes | Yes | Yes | Yes | |
| 522) UA | Volatility Auction | Yes | Yes | Yes | Yes | Yes | |
| 523) AP | All Trades Average Price | No | No | No | No | No | |
| 524) PROP | Pre-Opening Trade | No | No | No | No | No | |
| 525) T | Theoretical | No | No | No | No | No | |
| 526) TA | Theoretical - AOD | No | No | No | No | No | |
| 527) AM | Auto Mid Price | Yes | Yes | Yes | Yes | Yes | |
| 528) BTCR | Block Trade - Cash Related | No | No | No | No | No | |
| 529) SV | Service Price | No | No | No | No | No | |
| 530) OV | Official Price | No | No | No | No | No | |
| 531) DT | OX Derivatives Related Trade | No | No | No | No | No | |
| 532) IC | Indicative Closing Price | No | No | No | No | No | |

| 51) Asia Pacific Excha... |
| 52) Bursa Malaysia |
| 53) China Financial Fu... |
| 54) Dalian Commodity... |
| 55) Hanoi Stock Excha... |
| 56) Hanoi UPCoM |
| 57) Ho Chi Minh Stock ... |
| 58) Hong Kong Future... |
| 59) Hong Kong Stock E... |
| 60) Indonesia Stock E... |
| 61) K-OTC |
| 62) KONEX |
| 63) KOSDAQ |
| 64) KOSPI Stock Market |
| 65) KRX Derivatives M... |
| 66) Korea Exchange |
| 67) Korea Exchange E... |
| 68) Mauritius Stock Ex... |
| 69) Philippine Stock E... |
| 70) Rwanda Stock Exc... |
| 71) SH-HK Connect No... |
| 72) SH-HK Connect So... |
| 73) SZ-HK Connect No... |
| 74) SZ-HK Connect So... |
| 75) Shanghai Futures ... |
| 76) Shanghai Gold Exc... |
| 77) Shanghai Internati... |
| 78) Shanghai Stock Ex... |
| 79) Shenzhen Stock Ex... |
| 80) Singapore Exchan... |
| 81) Taipei Exchange |
| 82) Taiwan Futures Ex... |
| 83) Taiwan Stock Exch... |
| 84) Zhengzhou Commo... |
| 85) A2X Markets |
| 86) AIAF Mercado De ... |

| CC | Description | Open | High | Low | Last | Volume |
|---|---|---|---|---|---|---|
| @Mid | Nordic@Mid Trade | No | No | No | No | Yes |
| A | No Update Average Price | Yes | Yes | Yes | Yes | Yes |
| AM | Auto Mid Price | Yes | Yes | Yes | Yes | Yes |
| AOD | Auction On Demand Trade | No | No | No | No | Yes |
| AP | All Trades Average Price | No | No | No | No | No |
| AU | Scheduled Intraday Auction | Yes | Yes | Yes | Yes | Yes |
| BOTT | Beneficial Ownership Transfer Transaction | No | No | No | No | Yes |
| BT | Block Trade | No | No | Yes | No | Yes |
| BTCR | Block Trade - Cash Related | No | No | No | No | Yes |
| BTOH | Block Trade - Off Hours Trade | No | No | No | No | Yes |
| BTOS | Block Trade - Outside Spread Trade | No | No | No | No | Yes |
| BTX | Exchange Granted 2 | No | Yes | Yes | No | Yes |
| BTXO | Exchange Granted 3 | No | No | No | No | Yes |
| CA | Closing Auction | Yes | Yes | Yes | Yes | Yes |
| CCPR | CCP Related Transaction | No | No | No | No | Yes |
| DR | Delayed Trade Report | First | Yes | Yes | First | Yes |
| DT | OX Derivatives Related Trade | No | No | No | No | Yes |
| E1 | Exchange Granted 1 | First | Yes | Yes | First | Yes |
| EG | Off-Exchange Exchange Granted Trade | No | No | No | No | Yes |
| EGT | Exchange Granted 1 | No | Yes | Yes | No | Yes |
| GUGI | Give-up or Give-in Transaction | No | No | No | No | Yes |
| IC | Indicative Closing Price | No | No | No | No | No |
| IM | ISSUED CALL MATCH | Yes | Yes | Yes | Yes | Yes |
| L | NO LAST UPDATE | No | No | No | No | Yes |
| LCTR | Linked Component Transaction | No | No | No | No | Yes |
| MPR | Margin Price | No | No | No | No | No |
| MT | Standard Trade | Yes | Yes | Yes | Yes | Yes |
| N | Non-Standard Trade | Yes | Yes | Yes | Yes | Yes |
| OA | Opening Auction | Yes | Yes | Yes | Yes | Yes |
| OC | Official Close | Yes | Yes | Yes | Yes | Yes |
| OHT | Off Hours Trade | No | No | No | No | Yes |
| ON | OFF EXCHANGE NON-STANDARD TRADE | Yes | Yes | Yes | Yes | Yes |
| OS | Standard Manual Trade | Yes | Yes | Yes | Yes | Yes |
| OTN | OTC Non Standard | No | No | No | No | No |
| OTS | OTC Standard | No | No | No | No | No |
| OV | Official Price | No | No | No | No | No |
| PCP | Primary Listing Closing Price | No | No | No | No | No |
| PD | Prior Day Trade | No | No | No | No | No |
| PROP | Pre-Opening Trade | No | No | No | No | No |
| PT | Portfolio Trade | No | No | No | No | No |
| SI | SI Standard | No | No | No | No | Yes |
| SN | SI Non-Standard | No | No | No | No | Yes |
| SOR | Smart Order Router | Yes | Yes | Yes | Yes | Yes |
| SP | Outside Spread | First | Yes | Yes | First | Yes |
| ST | Standard Trade | Yes | Yes | Yes | Yes | Yes |
| STOS | Standard Trade Outside Spread | Yes | No | No | No | Yes |
| STRD | Standard Routed Dark Trade | No | No | No | No | Yes |
| SV | Service Price | No | No | No | No | No |
| T | Theoretical | No | No | No | No | No |
| TA | Theoretical - AOD | No | No | No | No | No |
| TCP | Trading at Closing Price | No | No | No | No | Yes |
| TY | True Yield Price | Yes | Yes | Yes | Yes | Yes |
| UA | Volatility Auction | Yes | Yes | Yes | Yes | Yes |

| ur | Unrecognised Trade Type | No | No | No | No | Yes |
|---|---|---|---|---|---|---|
| V | No Update Total Volume/Turnover | Yes | Yes | Yes | Yes | No |
| VA | Volatility Auction | Yes | Yes | Yes | Yes | Yes |
| VW | Off-Exchange Volume Weighted Average Price T | No | No | No | No | Yes |
| XT | CROSS TRADE | Yes | Yes | Yes | Yes | Yes |