# Exhibit 46

Page 306

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO.  18-MD-2865 (LAK)

_____
                                        )
IN RE:                                  )
                                        )
CUSTOMS AND TAX ADMINISTRATION OF       )
THE KINGDOM OF DENMARK                  )
(SKATTEFORVALTNINGEN) TAX REFUND        )
SCHEME LITIGATION                       )
                                        )
This document relates to case nos.      )
19-cv-01783; 19-cv-01788; 19-cv-01794;  )
19-cv-01798; 19-cv-01918                )
_____)


C O N F I D E N T I A L
SUBJECT TO THE PROTECTIVE ORDER


CONTINUED REMOTE VTC VIDEOTAPED DEPOSITION UNDER
ORAL EXAMINATION OF
RICHARD MARKOWITZ
VOLUME II
DATE: April 9, 2021




REPORTED BY:  MICHAEL FRIEDMAN, CCR

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

9 (Pages 335 to 338)

Page 335

1  River Capital?
2      A    Yes.
3      Q    And that's Mr. LaRosa's LLC?
4      A    Yes.
5      Q    So was that a payment in connection
6  with the services that he was providing to
7  the RJM Capital Pension Plan Trust?
8      A    Yes.
9      Q    Is that amount consistent with what
10 you understood his fee was going to be for
11 performing that role?
12     A    I recall that there were service
13 agreements prepared by our attorneys at
14 Kaye Scholer that documented the services
15 that Mr. LaRosa would provide. And in that,
16 the fee would be contained or referenced in
17 that document.
18     Q    Okay. Was that a document between
19 Mr. LaRosa and each particular pension plan,
20 or was it a document that covered all the
21 pension plans?
22          MR. BONGIORNO:  Objection.
23     A    My pension plan, Raj Capital, and
24 others would have signed it, each an
25 individual agreement with Mr. LaRosa,

Page 336

1  one-off.
2      Q    Okay. And do you recall what his
3  fee was for the RJM Capital Pension Plan
4  pursuant to that agreement?
5      A    At least $5,000.
6      Q    Okay. Can you turn to the October
7  statement, Page 3 of 3?
8           Do you see, there's a withdrawal on
9  October 23rd for $700,000 to Mr. LaRosa?
10     A    Yes.
11     Q    What was that payment for?
12     A    The RJM Capital Pension Plan
13 purchased interest in a business that
14 Mr. LaRosa was also a partner in. So this
15 was a private equity investment that the
16 pension plan made.
17     Q    What was the name of the business
18 that the plan invested in?
19     A    I don't recall the name
20 specifically, but it was a business that was
21 producing, manufacturing, and distributing
22 alcohol -- spirits and distilled beverages.
23     Q    Who owned that business?
24     A    I don't recall.
25     Q    Did you become a partial owner

Page 337

1  based on this investment of $700,000?
2      A    The pension plan became a partial
3  owner.
4      Q    Do you know what percentage the
5  pension plan owned in that business?
6      A    A minority interest.
7      Q    Do you have -- minority
8  could -- that's a big range.
9           Do you have a ballpark figure of
10 the percentage interest owned by
11 Mr. LaRosa -- by the plan?
12     A    I don't recall.
13     Q    Can you turn to the December
14 statement? Do you see a wire transfer of
15 $5.3 million out to Altura Productions LLC
16 Roth 401(k)?
17     A    Yes.
18     Q    What is that 401(k)?
19     A    I'm sorry. Repeat that last part
20 of the question.
21     Q    Sure. Who -- I'll withdraw it and
22 ask you a new question.
23          Who were the plan participants in
24 the Altura Productions 401(k)?
25     A    Myself, and perhaps at the time, my

Page 338

1  wife, although she may not have been a
2  participant at this particular time.
3      Q    Who were the trustees?
4      A    I was.
5      Q    What was the purpose of taking
6  $5.3 million out of the RJM Capital Pension
7  Plan and putting it into this other pension
8  plan?
9      A    As we worked with our lawyers, it
10 was a -- either call it a trustee-to-trustee
11 plan transfer or just a plan-to-plan transfer
12 or rollover of assets. And this plan was
13 going to be setting up investments with some
14 financial institutions that First Republic
15 didn't offer, and it was to try to manage the
16 investments of my plans that are associated
17 with it.
18     Q    During the period of time that the
19 Argre plans were trading, did the trading
20 involve the purchase of shares from short
21 sellers?
22     A    I don't know.
23     Q    On each occasion that the plans
24 purchased Danish stock, did you know one way
25 or the other if the seller was long or short

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

10 (Pages 339 to 342)

Page 339

1  when the sale was made?
2      A    No.
3      Q    Did you have any discussions with
4  anyone at Solo Capital about whether the
5  sellers would be selling short when selling
6  to the pension plans?
7      A    Our discussions would have dated
8  back to 2010 and even earlier when we did our
9  initial due diligence on the dividend
10 arbitrage strategy, that it's possible that
11 sellers are borrowing shares in order to
12 engage in the transactions.
13          And when we did our supplementary
14 due diligence on Solo Capital in 2012, their
15 offices had grown dramatically from when we
16 first met them in 2010 as they transitioned
17 to become a custodian.
18          And we were pointed out by
19 employees of Solo that they had a securities
20 finance team behind essentially a Chinese
21 wall that could source securities through the
22 stock lending market, but never told directly
23 or indirectly whether that would be the
24 source of shares in any of the strategies we
25 would do.

Page 340

1      Q    When you say that there was
2  "discussion about sourcing the shares through
3  the stock lending market," what do you mean
4  by that?
5      A    When an entity sells short shares,
6  they go directly to one or more financial
7  institutions in order to borrow those shares
8  to settle the short, whether they settle it
9  immediately or sometime in the future.  And
10 we were -- I was explaining that -- or it was
11 explained to us that Solo security finance
12 desk would be functioning no differently than
13 Merrill Lynch's stock lending desk and others
14 looking to participate in the securities,
15 finance, and stock lending market.
16     Q    Okay.  So did you -- based on that
17 discussion, was it your understanding that
18 when the pension plans bought shares from the
19 sellers, that the sellers were selling short,
20 but then borrowing from the stock lending
21 market?
22          MR. BONGIORNO:  Objection.
23     A    No.  As I said, I was not aware
24 whether the sellers were selling short or
25 not.  If they were selling short and they

Page 341

1  needed to settle their short position, they
2  would most likely borrow from the trillion
3  dollar stock lending market, yes.
4      Q    Okay.  When you say the
5  billion -- or did you say trillion?  I'm
6  sorry.
7      A    Trillion, yes.
8      Q    Okay.  So when you refer to the
9  trillion dollar stock lending market, with
10 respect to the dividend arbitrage trading,
11 that the market was the Solo platform
12 customers.
13          Right?
14     A    No.
15     Q    Okay.  Was it Solo for the stock
16 lending?  Was it your understanding that Solo
17 was going outside its platform of customers?
18     A    We were told that the securities
19 finance team at Solo would be participating
20 with the entire marketplace, borrowing,
21 lending shares.  That's what a securities
22 finance team would do.
23     Q    Okay.  So was it your understanding
24 that when the plans would purchase the
25 shares, it was possible that the sellers were

Page 342

1  selling short, and then looking to Solo to
2  borrow shares in the market, but you didn't
3  know one way or the other if that was
4  actually happening for a given trade?
5      A    It is possible that they were
6  selling short, and it is possible that the
7  sellers would borrow shares from Solo or any
8  other market participant in the securities
9  finance marketplace.
10     Q    And what was your understanding as
11 to the timing of when the seller would borrow
12 those shares to cover a short?
13     A    I have no knowledge of that
14 information.
15     Q    In the dividend arbitrage trading
16 that was going on with Denmark, did the
17 pension plans, in your view, have risk?
18     A    Yes.
19     Q    What were the risks to the pension
20 plan in that strategy?
21     A    Financial risks, execution risks,
22 counterparty risks, and tax risks.
23     Q    What were the financial risks to
24 the pension plans in participating in that
25 strategy?

Page 439

1  of it before in the financial markets?
2  　　A　　I was not familiar with this
3  company.
4  　　Q　　Okay.  And the next one is Rock
5  Capital.
6  　　　　　Had you heard of that entity
7  before?
8  　　A　　No.
9  　　Q　　The next one is Colbrook.
10 　　　　　Had you heard of that entity
11 before?
12 　　A　　I don't recall.
13 　　Q　　The next one is Neoteric.
14 　　　　　Had you heard of that one before?
15 　　A　　No.
16 　　Q　　And the last -- no, two more.  The
17 next one is RVT.
18 　　　　　Had you heard of that entity
19 before?
20 　　A　　No.
21 　　Q　　And then, finally, the last one is
22 Gnosis that we had just looked at in the
23 prior exhibit.  And here you're seeking their
24 services to be onboarded.
25 　　　　　Correct?

Page 440

1  　　A　　You'll have to repeat that.
2  　　Q　　It looks like, from this e-mail,
3  you were reaching out to Gnosis to see if you
4  could get onboarded with them.
5  　　　　　Correct?
6  　　A　　Yes.
7  　　Q　　Okay.  And so, for each of these,
8  was it Solo Capital that introduced them as
9  an entity for stock lending services?
10 　　A　　Yes.
11 　　Q　　Okay.
12 　　　　　MR. WEINSTEIN:  Why don't we break
13 　　for lunch?
14 　　　　　THE VIDEOGRAPHER:  Stand by.  The
15 　　time is 12:59 p.m. and we're going off
16 　　the record.
17 　　　　　(Lunch recess taken.)
18 　　　　　THE VIDEOGRAPHER:  Stand by.  The
19 　　time is 1:33 p.m. and we're back on
20 　　record.
21 　　Q　　Mr. Markowitz, do you have
22 Exhibit 1785 still in front of you?
23 　　A　　Yes.
24 　　Q　　After receiving the trade
25 allocations from Solo Capital, did the plans

Page 441

1  agree to go forward with those trades?
2  　　A　　Yes.
3  　　Q　　Okay.  And would that happen on
4  each occasion?  Where Solo would suggest an
5  allocation and tradings, would the plans
6  agree to go forward with it?
7  　　A　　No.
8  　　Q　　Were there occasions where the
9  plans did not agree to go forward?
10 　　A　　Yes.
11 　　Q　　Do you have any in mind?
12 　　A　　I don't recall the specific names.
13 　　Q　　Okay.  How would you communicate
14 that to Solo?
15 　　A　　Through an e-mail.
16 　　Q　　So if the plans decided not to go
17 forward with trading that was proposed by
18 Solo, we should see that in an e-mail?
19 　　A　　E-mail or telephone call.  I don't
20 recall.
21 　　Q　　If it was a telephone call, who
22 would make that call?
23 　　A　　Either myself, Mr. Klugman, Mr. Van
24 Merkensteijn, or the authorized traders for
25 the plans.

Page 442

1  　　Q　　Do you recall ever making that kind
2  of call yourself?
3  　　A　　I don't recall.
4  　　Q　　Are you still in touch with either
5  Mr. Cooper or Mr. Reibeisen?
6  　　A　　No.
7  　　Q　　Do you know where they work today?
8  　　　　　MR. BONGIORNO:  Objection.
9  　　A　　No.
10 　　Q　　Do you have contact information for
11 them?
12 　　　　　MR. BONGIORNO:  Objection.
13 　　A　　Contact information for -- as of
14 today?
15 　　Q　　Yes.
16 　　A　　No.
17 　　Q　　In your e-mail, the second
18 paragraph says, "The trading volume per plan
19 represents about 40 basis points of TDC's
20 outstanding shares."
21 　　　　　What does that mean?
22 　　A　　The simple mathematical calculation
23 of taking the shares allocated, divided by
24 the total shares outstanding, and the result
25 of that would be approximately .4 percent of