**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

CUSTOMS AND TAX ADMINISTRATION
OF THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX
REFUND LITIGATION

This document relates to:

18-cv-09840 and 18-cv-09841

MASTER DOCKET

Case No. 1:18-md-02865-LAK

**MEMORANDUM OF LAW IN SUPPORT OF MOTION *IN LIMINE* TO
EXCLUDE THE PROPOSED EXPERT REPORTS, OPINIONS AND
TESTIMONY OF GRAHAM WADE**

# TABLE OF CONTENTS

*Page*

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT ................................................................................... 1

LEGAL STANDARD ................................................................................................... 2

ARGUMENT ................................................................................................................ 5

    I.     I.     MR. WADE IS NOT QUALIFIED TO PROVIDE THE
                  PROPOSED EXPERT TESTIMONY ................................................. 6

    II.    II.    MR. WADE'S REPORTS ARE REPLETE WITH
                  IMPERMISSIBLE OPINIONS .......................................................... 8

    III.   III.   MR. WADE'S OPINIONS SHOULD BE EXCLUDED FOR
                  LACK OF RELIABILITY ................................................................. 9

          A.     Opinion 1:  ED&F's Pension Plan Clients Did Not Receive "Real"
                  Dividends ........................................................................................ 9

                1.     What is a "real" dividend according to Mr. Wade? ...................... 11

                2.     What is a "dividend compensation payment" according to
                       Mr. Wade? ..................................................................................... 14

                3.     What is a "Cum-Ex" transaction according to Mr. Wade? .......... 17

          B.     Opinion 2:  The Only Reason to Participate in the Appendix C
                  Cum-Ex Trades Was To Generate A Fabricated Tax Reclaim ................. 19

                 1.     Mr. Wade's speculation about a network of "deliberate
                       coordination" is without basis......................................................... 19

                 2.     Mr. Wade's opinion regarding the "common characteristics
                       of the non-Annex E transactions" is of no relevance.................... 21

                 3.     Mr. Wade's pricing analysis is flawed and unreliable ................. 22

          C.     Opinion 3:  ED&F Did Not Have Custody of Sufficient Shares ............. 26

          D.     Opinion 4:  ED&F's Tax Voucher Process Was Highly Unusual
                  And Inappropriate .......................................................................... 29

i

CONCLUSION ............................................................................................................................ 31

# TABLE OF AUTHORITIES

Cases

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)......................................................................................... 2, 4, 23

*Apple v. Atlantic Yards Dev. Co., LLC*,
   11-CV-5550 (CBA)(SMG), 2015 WL 11182422 (E.D.N.Y. Mar. 31, 2015) ......................... 24

*Arista Records LLC v. Usenet.com, Inc.*,
   608 F. Supp. 2d 409 (S.D.N.Y. 2009).................................................................................. 2, 3

*Colon ex rel. Molina v. BIC USA, Inc.*,
   199 F. Supp. 2d 53 (S.D.N.Y. 2001)............................................................................. 3, 9, 27

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)............................................................................................................ 2, 4

*First Nat'l Bank of Chicago v. Comptroller of Currency of U.S.*,
   956 F.2d 1360 (7th Cir. 1992) ................................................................................................ 25

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)................................................................................................................... 4

*Highland Capital Mgmt., L.P. v. Schneider*,
   379 F. Supp. 2d 461 (S.D.N.Y. 2005).................................................................................... 4

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*,
   341 F. Supp. 3d 213 (S.D.N.Y. 2018).................................................................................... 4

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*,
   982 F.3d 113 (2d Cir. 2020)...................................................................................................... 4

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004).......................................................................... passim

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)................................................................................................................... 2

*Lippe v Bairnco Corp.*,
   288 B.R. 678 (S.D.N.Y. 2003)....................................................................................... passim

*Lippe v Bairnco Corp.*,
   99 F. App'x 274 (2d Cir. 2004) ............................................................................................... 2

*Nimely v. City of New York,*
    414 F.3d 381 (2d Cir. 2005) .............................................................................. 3, 31

*R.F.M.A.S., Inc., v. So,*
    748 F. Supp. 2d 244 (S.D.N.Y. 2010) ........................................................... 4, 6, 19

*Raskin v. Wyatt Co.,*
    125 F.3d 55 (2d Cir. 1997) ............................................................................... 3, 24

*S.E.C. v. Tourre,*
    950 F. Supp. 2d 666 (S.D.N.Y. 2013) .............................................................. 5, 7

*U.S. Commodity Futures Trading Comm'n v. Moncada,*
    No. 12 Civ. 8791, 2014 WL 2945793 (S.D.N.Y. June 30, 2014) ................ 4, 5, 9, 23

*United States v. Bilzerian,*
    926 F.2d 1285 (2d Cir. 1991) ................................................................................ 5

*United States v. Roldan-Zapata,*
    916 F.2d 795 (2d Cir. 1990) ................................................................................. 7

*Weingarten v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*
    680 F. Supp. 2d 595 ............................................................................................. 3

*West v. Comm'r of Internal Revenue,*
    No. 2674-06L, 2010 WL 4780323 (U.S. Tax. Ct. Nov. 16, 2010) ....................... 14

*Yang v. City of New York,*
    No. 07 Civ. 3636(LAK), 2008 WL 3928238 (S.D.N.Y. Aug. 20, 2008) ............... 5

**Rules**

Fed. R. Evid. 403 ............................................................................................................. 31

Fed. R. Evid. 702 ........................................................................................................... 1, 3

The ED&F Bellwether Defendants[1] and Third-Party Defendant ED&F Man Capital Markets, Ltd. ("ED&F") respectfully submit this memorandum of law in support of their motion *in limine* to exclude the proposed expert reports, opinions and testimony of Graham Wade from evidence.

## PRELIMINARY STATEMENT

SKAT's argument for partial summary judgment against the ED&F Bellwether Defendants relies extensively on the opinions and analysis of Graham Wade, a one-time employee of Barclays Investment Bank turned startup entrepreneur who has been proffered as an expert on the financial transactions undertaken by the pension plan defendants.  As set forth below, the proposed expert reports, opinions and testimony of Mr. Wade fall well short of the standards for admissibility established under Fed. R. Evid. 702.

Mr. Wade's reports present a patchwork of faulty analysis, improper speculation and ill-concealed advocacy.  Mr. Wade recognizes that it is not his place to draw legal conclusions or to opine on states of mind—he says as much in his reports—and yet he oversteps these bounds with a kind of relentless regularity.  Mr. Wade expounds repeatedly on what parties are thinking, and what non-parties are thinking, and what *hypothetical* non-parties are thinking, and what "market participants" in general are thinking.  He opines on foreign regulatory obligations and interprets the pronouncements of foreign regulators.  He passes judgment on the credibility of parties and non-parties alike, second-guessing sworn deposition testimony and purporting to tell the fact-finder what communications in the record *really* mean.

---

[1] The ED&F Bellwether Defendants are Acer Investment Group, LLC, American Investment Group of New York, L.P. Pension Plan (the "AIG Plan"), David Schulman, Riverside Associates Defined Benefit Plan (the "Riverside Plan"), Robert Crema and Stacey Kaminer.

Mr. Wade also applies no tested or testable methodology to achieve his ends.  His
analysis rests instead on partial data, and arbitrary benchmarks, and documents that—by his own
admission—he does not fully understand.  In Mr. Wade's hands, even the fundamentals are
elusive, for Mr. Wade engages in a definitional shell-game, shifting the meanings of key terms to
better suit his argument.  And it *is* argument, not expertise, that Mr. Wade is ultimately offering.
Mr. Wade's reports, opinions and proposed testimony are pervasively improper and should be
excluded in their entirety.

## LEGAL STANDARD

The district courts are charged with responsibility for "ensuring that an expert's
testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v.
Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *see also Amorgianos v. Nat'l R.R.
Passenger Corp.*, 303 F.3d 256, 259 (2d Cir. 2002).  In performing this gatekeeping function, the
district court must "make certain that an expert, whether basing testimony upon professional
studies or personal experience, employs in the courtroom the same level of intellectual rigor that
characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526
U.S. 137, 152 (1999).  The district court must "undertake a rigorous examination of the facts on
which the expert relies, the method by which the expert draws an opinion from those facts, and
how the expert applies the facts and methods to the case at hand."  *See Amorgianos*, 303 F.3d at
267.  A party offering expert testimony "must establish its admissibility by a preponderance of
the evidence."  *Lippe v. Bairnco Corp.* , 288 B.R. 678, 685 (S.D.N.Y. 2003), *aff'd* 99 F. App'x
274 (2d Cir. 2004); *see also Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 422
(S.D.N.Y. 2009).

2

With respect to expert testimony, the district court performs the same "gatekeeper" role at the "summary judgment phase as at trial." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). It is therefore "appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment." *See id.* ("The resolution of evidentiary questions on summary judgment conserves the resources of the parties, the court, and the jury."); *see also Weingarten v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 680 F. Supp. 2d 595, 601 (S.D.N.Y. 2010) ("[C]ourts consider only admissible evidence in resolving motions for summary judgment."). The "principles governing admissibility of evidence do not change on a motion for summary judgment." *Raskin*, 125 F.3d at 66. "If a proffer of expert testimony is excluded as inadmissible pursuant to Rule 702, the court must make the summary judgment determination on a record that does not include that evidence." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001).

In assessing the admissibility of expert testimony, the Court must in the first instance determine whether the proffered witness is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *see also Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) ("Rule 702 requires . . . a finding that the proposed witness be qualified by virtue of specialized knowledge, skill, experience, training, or education."). While a witness may qualify as an expert "with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimely*, 414 F.3d at 399 n.13. The district court must therefore ensure that the proposed expert is "qualified to testify" and "will be proffering opinions on issues or subject matter that are within his area of expertise." *Arista Records*, 608 F. Supp. 2d at 422. If a witness "does not possess superior

3

knowledge, education, experience or skill in the relevant area, the Court must exclude his or her testimony." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 341 F. Supp. 3d 213, 240-41 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020).

In order to be admissible, the expert's analysis must "actually be relevant to an issue in the case," *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468 (S.D.N.Y. 2005), and it must also be "reliable at every step." *Amorgianos*, 303 F.3d at 267; *see also Lippe*, 288 B.R. at 685 ("To be admissible, expert testimony must be both relevant and reliable."). The reliability of expert opinion cannot be established on the basis of credentials alone. *U.S. Commodity Futures Trading Comm'n v. Moncada*, No. 12 Civ. 8791(CM), 2014 WL 2945793, at *2 (S.D.N.Y. June 30, 2014) ("[I]mpressive and extensive experience does not equate to analysis."). Rather, in order to be admissible, expert opinion must rest on "reliable principles and methods properly applied" to "sufficient facts or data." *Lippe*, 288 B.R. at 685. To establish such reliability, experts must explain their reasoning with sufficient specificity to "allow defendants' counsel and the jury to test their conclusions." *R.F.M.A.S., Inc., v. So*, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010). Mere "subjective belief or unsupported speculation" is never admissible, regardless of an expert's qualifications, *Daubert*, 509 U.S. at 590, and opinions that are "not backed up with analysis, studies, or facts" also do not satisfy the "threshold test of reliability." *Moncada*, 2014 WL 2945793, at *2; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Finally, expert testimony must be "circumscribed carefully to ensure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law" or the

4

"role of the jury in applying that law to the facts before it." *Rezulin*, 309 F. Supp. 2d at 557

(quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).  An expert must not

draw legal conclusions, *Moncada*, 2014 WL 2945793, at *2, or opine on a party's motivation,

intent, or state of mind, *Rezulin*, 309 F. Supp. 2d at 545-47, nor may expert opinion be used as a

"vehicle for factual narrative," *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013), or

for "argu[ing] the client's cause from the witness stand." *Rezulin*, 309 F. Supp. 2d at 538; *Lippe*,

288 B.R. at 687 ("[T]he expert's role is not to be an advocate.").

## ARGUMENT

Over a decade ago, this Court cautioned against the tendency of "some well-financed

litigants" to deploy expert witnesses intended "more to argue the client's cause from the witness

stand than to bring to the fact-finder specialized knowledge or expertise . . . ." *Rezulin*, 309 F.

Supp. 2d at 538.  In this litigation, SKAT proffers Graham Wade, purportedly an expert by virtue

of education and experience in the "design, implementation, and management of complex

structured transactions."  Declaration of Brandon Dillman ("Dillman Decl."), Ex. 1 (Expert

Report of Graham Wade ("Wade Report") ¶ 9).  However, as discussed below, Mr. Wade

ventures into areas well outside his area of professional expertise, and to the extent his

conclusions purport to rest on his own experience, Mr. Wade persistently fails to explain "how

his conclusions were reached, why the conclusions have a factual basis, or how his experience is

reliably applied." *Lippe*, 288 B.R. at 689.  When Mr. Wade tries his hand at quantitative

analysis, he offers no reason to suppose that his methods "can and have been tested," much less

that they "have been subjected to peer review and publication." *Yang v. City of New York*, No.

07 Civ. 3636(LAK), 2008 WL 3928238, at *2 (S.D.N.Y. Aug. 20, 2008).  Indeed, rather than

applying "reliable principles and methods" to "sufficient facts or data," *see Lippe*, 288 B.R. at

5

701, Mr. Wade repeatedly rests his opinions on conjecture, unsupported assumptions, and his own conclusory say-so.  Mr. Wade's proposed testimony should be excluded not only because it is unreliable, but also because it crosses the line between expert opinion and advocacy.

## I.    Mr. Wade Is Not Qualified To Provide The Proposed Expert Testimony

As an initial matter, SKAT has not met its "burden of proving by a preponderance of the evidence" that Mr. Wade is "qualified to offer [his] proposed testimony." *R.F.M.A.S.*, 748 F. Supp. 2d. at 269.  Mr. Wade's qualifications rest principally on his professional experience. Most pertinently, Mr. Wade spent "more than thirteen years" with Barclays Investment Bank ("Barclays"), serving in various capacities in the Structured Capital Markets group from 2001 until approximately 2012, when his responsibilities shifted to the "restructuring and management of a range of legacy activities."  Wade Report ¶¶ 3-5.  Mr. Wade's tenure at Barclays ended in late 2014.  *See id.* ¶ 6.

Such experience may well qualify Mr. Wade to opine on Barclays' internal practices, or on standard market practice with respect to structured financial transactions generally.  However, Mr. Wade's opinions are focused on a very particular set of dividend arbitrage transactions—of a sort that Mr. Wade calls "Cum-Ex" transactions—involving a very particular set of Danish securities.  *See id.* ¶¶ 1, 79.  In his reports, Mr. Wade purports to expound on the specific market practices and expectations peculiar to such "Cum Ex" trading.  However, as Mr. Wade disclosed at deposition, he has never actually executed a "Cum Ex" transaction of any kind, nor has he ever been involved in the oversight, execution, or approval of any "Cum Ex" transaction. Dillman Decl., Ex. 4 (Transcript of Deposition of Graham Wade ("Wade Dep.") 163:15-17,

168:13-19).[2]  A "witness may be qualified as an expert on certain matters and not others," *United States v. Roldan-Zapata*, 916 F.2d 795, 805 (2d Cir. 1990), and Mr. Wade's proposed testimony here—as to the purportedly distinctive character of a specialized form of trading in which he has *never even participated*—is a bridge too far.  *See Tourre*, 950 F. Supp. 2d at 677-78 (finding "expertise in the general area of structured finance" insufficient to qualify expert to "opine about what information would and would not matter" to investors in a "very specific type of security.").

Mr. Wade's lack of direct experience with "Cum Ex" transactions of any kind—much less "Cum-Ex" transactions involving Danish securities—is particularly striking given that Mr. Wade ventures to opine specifically on the beliefs, motivations, and objectives of "market participants" engaged in so-called "Cum-Ex" trading.  *See, e.g.*, Wade Report ¶¶ 15(b), 37, 73, 76, 170; Dillman Decl., Ex. 2 (Rebuttal Expert Report of Graham Wade ("Wade Rebuttal") ¶¶ 9, 120); Dillman Decl., Ex. 3 (Reply Expert Report of Graham Wade ("Wade Reply") ¶¶ 8, 10, 50, 95).  Mr. Wade's professional experience does not qualify him to offer such opinions, and it certainly does not qualify him to convey the views of foreign regulatory entities, *see* Wade Report ¶¶ 222-23, or to evaluate the credibility of tax opinions, *see id*. ¶¶ 15(d), 224, or to identify supposed breaches of fiduciary or regulatory duties, *see id*. ¶¶ 15(d), 221, or to construe actual or potential Danish regulatory reporting requirements.  *See id*. ¶ 209, Wade Rebuttal ¶ 132.  Mr. Wade's opinions in fact stray so far afield from his area of professional expertise that they are excludable on this basis alone.

---

[2] Indeed, it is Mr. Wade's testimony that "Cum Ex" trading at Barclays was confined entirely to transactions in *German* shares conducted no later than the beginning of 2012, and that Barclays engaged in no "Cum Ex" transactions of any kind during the time period in which the transactions at issue in this matter occurred.  *See* Wade Dep. 163:18-167:2, 244:25-245:12.

## II.    Mr. Wade's Reports Are Replete With Impermissible Opinions

The improprieties in Mr. Wade's proposed opinions are pervasive.  As this Court has observed, "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony."  *Rezulin*, 309 F. Supp. 2d at 547.  While Mr. Wade nominally acknowledges this prohibition, *see* Wade Reply ¶ 219 ("[I]t is my understand [sic] that opining on that state of knowledge is not an area for expert opinion."), he nevertheless makes repeated pronouncements about what parties and non-parties alike knew or must have known.  Mr. Wade purports to divine what was in the minds of some or all of the participants in the transactions at issue—*see, e.g.,* Wade Report ¶¶ 15(b), 15(d), 117, 129, 144, 155, 157, 169(a), 177, 181, 206; Wade Reply ¶¶ 20, 189, 192, 218—and in the minds of foreign regulators and banking institutions—*see* Wade Report ¶¶ 222-223; Wade Reply ¶¶ 110, 112-13—and in the minds of unspecified agents and sellers and inter-dealer brokers—*see* Wade Report ¶¶ 155-56, 170; Wade Reply ¶¶ 74, 85—and in the minds of market participants generally, *see* Wade Report ¶¶ 15(b), 69, 76, 106 n.77; Wade Reply ¶¶ 10, 11, 50.[3]  Mr. Wade claims to have deduced the "sole purpose" of the "transactions in question"—Wade Report ¶ 221—he indulges in credibility determinations—*see id* ¶¶ 142-43, 208 ("It is simply not credible for the participants in these transactions to claim that these were real investment positions."), 248 ("I do not give any credibility to this supposed initiation . . . .")—and he even purports to have discerned the truth behind sworn deposition testimony.  *See id*. ¶ 134; Wade Reply ¶ 50 n.52.  All of these opinions are improper.

---

[3] *See also* Wade Dep. 91:4-92:7 ("I've given a number of reasons in my report as to why I concluded that the nature of the transactions between the parties were not intended to deliver a dividend to the pension plan . . . ."), 93:6-94:8 ("[I]t is clear to me that the transactions were not intended to deliver a real dividend to the pension plan . . . ."), 152:17-153:12 ("[I]t is clear that there was no intention to sell a dividend from the cum ex seller to the cum ex buyer . . . ."), 159:3-21 ("[I]t is clear to me that what the parties intended to do was have a contract where the cum ex seller had agreed a trade under which they were going to deliver ex-dividend shares.").

Legal conclusions are likewise not permitted to experts.  *Rezulin*, 309 F. Supp. at 541; *Molina*, 199 F. Supp. 2d at 96 ("[I]t is well-settled that experts are prohibited from testifying as to the content or application of the law.").  This is another prohibition to which Mr. Wade gives lip service, *see* Wade Report ¶ 9; Wade Rebuttal ¶ 3; Wade Reply ¶ 3, and proceeds to ignore.  Mr. Wade purports to be able to identify breaches of regulatory obligations—*see* Wade Report ¶¶ 15(d), 221-24—to construe the statements of foreign regulatory entities—*see id*. ¶¶ 222-23— and to suggest potential Danish regulatory disclosure requirements.  *See id*. ¶ 209.  Mr. Wade goes so far as to instruct the fact-finder on the "starting point of most laws," *see* Wade Report ¶ 72, albeit without offering so much as a single citation or example.  *See Molina*, 199 F. Supp. 2d at 97 n.39 (experts "may not testify on the development and content" of law).  These opinions, too, are improper.

Mr. Wade also does not hesitate to engage in naked speculation—*see* Wade Report ¶ 196 ("[T]his is speculation on my part . . . .")—or to embrace ultimate questions of law, *see* Wade Rebuttal ¶ 219 ("[A]bsent a real dividend, it is not possible that the Pension Plans were entitled to make a tax reclaim . . . .").  Indeed, when you "take out all the objectionable portions" of Mr. Wade's testimony, "there is simply not much left to it."  *Moncada*, 2014 WL 2945793, at *6.

## III.   Mr. Wade's Opinions Should Be Excluded For Lack of Reliability

### A.   Opinion 1:  ED&F's Pension Plan Clients Did Not Receive "Real" Dividends

Mr. Wade's first opinion is the foundation for all the rest:  With respect to a subset of trades identified in Appendix C of his report, Mr. Wade opines that the dividend payments received by ED&F's pension plan clients were not—and could not have been—what Mr. Wade regards as "real" dividends.  Wade Report ¶¶ 15(a), 92-93.  Mr. Wade maintains that the

9

payments were instead what he calls "manufactured" dividends or, alternately, "dividend compensation payments." *See id.* ¶¶ 71, 166,[4]

      This purported distinction between "real" dividends, on the one hand, and "dividend compensation payments" or "manufactured dividends," on the other, is at the heart of Mr. Wade's opinion.  However, after three reports spanning several hundred pages, it remains unclear whether Mr. Wade thinks his notion of a "real" dividend has any relevance to this litigation at all.  At times, Mr. Wade appears to take the position that the "real" dividend question is dispositive of the ultimate question in this litigation.  *See* Wade Rebuttal ¶ 219 "[A]bsent a real dividend, it is not possible that the Pension Plans were entitled to make a tax reclaim . . . .").  At his deposition, however, Mr. Wade gave countervailing testimony, admitting that he did not actually know whether a "dividend compensation payment," as opposed to a "real" dividend, could have "entitled [a claimant] to a tax reclaim in Denmark," adding "that's not something I've offered an opinion on."  Wade Dep. 173:13-174:19; *see also id.* 42:3-12 (stating that "it's the law, and ultimately the courts that decide what tax is due").  If Mr. Wade's purported distinction between a "real" dividend and a "dividend compensation payment" makes no difference with respect to an entitlement to withholding tax refunds under Danish tax law—a possibility that Mr. Wade himself does not rule out—then it is difficult to see how it could make any difference in this litigation.

      In any event, Mr. Wade never defines his terms in a uniform or coherent way.  Mr. Wade claims—without citation—that the difference between a "real" dividend and a "dividend

---

[4] Mr. Wade uses the terms "manufactured dividend" and "dividend compensation payment" synonymously. *See* Wade Dep. 127:11-128:20, 129:19-130:5 (defining "dividend compensation payment" and "manufactured dividend" equivalently).

compensation payment" is "well understood" in "equity finance markets."  Wade Report ¶ 69,

but Mr. Wade never provides a consistent explanation for this purportedly "well understood"

distinction.  To the contrary, as discussed below, the only constant in Mr. Wade's shifting

conception of a "real" dividend is his determination to exclude from the definition any payment

received by ED&F's pension plan clients.  But it is not the proper task of an expert simply to

"come up with conclusions that would support [their client's] positions in the case."  *Lippe*, 288

B.R. at 701.  At bottom, Mr. Wade's professed opinion that ED&F's pension plan clients

received no "real" dividends boils down to inadmissible *ipse dixit* and should be excluded in full.

### 1.  *What is a "real" dividend according to Mr. Wade?*

The confusion begins with Mr. Wade's conception of a "real" dividend.  On Mr. Wade's

view, a "real" dividend must start with a "direct payment" from a share issuer, presumably to the

shareholder of record on the record date.  *See* Wade Report ¶ 70.  But Mr. Wade's opinion

appears to rely on the further premise that *only* the registered shareholder may receive a "real"

dividend.  *See id*. ¶¶ 92-93 ("[T]he parties who purchased the securities would not be the holders

of record on the Record Date."); *see also id*. ¶ 70 ("A real dividend . . . results from being a

shareholder of record on the dividend Record Date.").  Mr. Wade seems to be saying that if the

"buyer of the securities" is not the "registered holder" as of the record date, then the buyer

cannot "receive a real dividend from the company which issued the shares."  *See id*. ¶ 80; *see*

*also* Wade Dep. 184:15-185:4 ("I think the only entity that can make a payment as a dividend is

the issuer.").[5]

---

[5] Similarly, Mr. Wade opines that the "starting point of most laws is to assume that real dividends *can only be received directly from a company*."  Wade Report ¶ 72 (emphasis added).  Mr. Wade cites no authority for this sweeping proposition, and if Mr. Wade has conducted a survey of federal, state and/or international law to arrive at this conclusion, he has kept it to himself.

Proceeding from this understanding of a "real" dividend, Mr. Wade's first opinion purports to rest on a kind of syllogism:

1.  Because the transactions at issue were so-called "Cum-Ex" transactions, the purchases all settled after the record date;

2.  Because the purchases settled after the record date, the "parties who purchased the securities" were not the "holders of record" as of the record date; and

3.  Because the "parties who purchased the securities" were not the "holders of record" as of the record date, those purchasers could not have received any "real" dividends.

*See id.* ¶¶ 92-93.

This formulation, however, is undermined by Mr. Wade himself.  Mr. Wade allows that the shareholder of record (and, according to Mr. Wade, the recipient of a "real" dividend) will often be a custodian or sub-custodian, rather than the dividend's ultimate recipient; Mr. Wade testified that this was in fact "typically" the case with respect to Danish securities.  Wade Dep. 102:5-103:13, 103:20-104:16.[6]  Mr. Wade further acknowledges that a "real" dividend may pass through "one or more" such custodians or sub-custodians on its way to its ultimate recipient, remaining a "real" dividend all the while.  Wade Report ¶ 70.  Thus, on Mr. Wade's view, it is *not* necessary to be the registered shareholder as of the record date in order to receive a "real" dividend.  *Compare id.* ¶¶ 80, 92-93 *with* Wade Dep. 103:14-19 (agreeing that the registered shareholder is not necessarily the party ultimately entitled to receive the dividend).  Mr. Wade's syllogism thus falls apart as written.

---

[6] *See also* Wade Report ¶ 211 (noting that it is "entirely customary" for securities to be held "in co-mingled or omnibus accounts and through a series of sub-custodians.").

But perhaps this can be set down to clumsy drafting.  Taking a different tack, Mr. Wade writes that a "real" dividend is a payment "derived from rights granted by owning shares in a company. . . ."  Wade Report ¶ 72.[7]  On this definition, ownership of the underlying share appears to be the necessary precondition for receipt of a "real" dividend.[8]  But Mr. Wade does not provide a definition of share ownership, and when pressed for clarification at his deposition, Mr. Wade equivocated, testifying that there was a "range of different ways in which one can think about who the owner of a share is."  Wade Dep. 106:18-107:13.[9]  Indeed, on Mr. Wade's view, different parties may own the same share at the same time for different purposes.  *Id*. 108:12-109:11.[10]  Even when the focus of deposition questioning turned to just those transactions analyzed in his reports, Mr. Wade could not provide a definitive answer to the ownership question, responding with bafflement, for example, when asked to explain when the purchaser of a share becomes its owner:  "[W]hat do you mean by 'owner'?"  Wade Dep. 123:14-24 ("There are lots of different definitions.").[11]  To say that a "real" dividend derives from share ownership

---

[7] *See also* Wade Report ¶ 70 ("A real dividend . . . derives directly from the rights which the recipient owns in the underlying shares. . . .").

[8] According to Mr. Wade, timing of ownership also appears to be a factor.  Mr. Wade writes that, in order to receive a "real" dividend, a shareholder must have "held the relevant shares over the Record Date."  Wade Report ¶ 98; *see also* Wade Rebuttal ¶ 153 n.274 (A "real" dividend is a "payment in respect of an actual right to a dividend as a result of being shareholder on the Record Date . . . .).

[9] *See also* Wade Dep. 123:25-124:22 ("[W]hat it means to be the owner of a security can take a number of different meanings . . . ."), 131:24-132:13 (The word "'owner' is a very broad term that can mean all kinds of things."), 137:23-138:11 ("[I]t would be very imprudent of me to use the general English meaning of 'owner' when we're talking about securities transactions where 'owner' may well be defined in a number of different ways depending on what the situation and the context and the facts are.").

[10] For example, according to Mr. Wade, a custodian that is the registered holder of record is the "nominee owner" for "accounting purposes," while the party entitled to the dividend on that share may be a different "owner" entirely. Wade Dep. 103:14-19, 108:17-109:11.

[11] At one point in his deposition, Mr. Wade seemed on the verge of clarifying his understanding of ownership, explaining that, for the narrow purposes of determining who is to receive a dividend from the issuing company, the "owner of shares in a company" is the "record holder on the company's share register" as of the record date.  Wade

simply begs the question of what it means to be the owner of a share, and that is a question that Mr. Wade refuses or is unable to answer.[12] No fact-finder can begin to evaluate Mr. Wade's opinions—much less find them helpful—because Mr. Wade fails to provide clear, consistent definitions for the core concepts that are the basis of his opinions.

> 2. *What is a "dividend compensation payment" according to Mr. Wade?*

Perhaps the better approach is to focus not on what a "real" dividend *is* for Mr. Wade, but on what it is *not*. After all, Mr. Wade is emphatic that a "real" dividend is *not* a "dividend compensation payment," and, conversely, that a "dividend compensation payment" is *not* a "real" dividend. Wade Report ¶¶ 69-71.[13]

According to Mr. Wade, a "dividend compensation payment" is a "contractual payment" in the amount of a dividend, one that "arises under a contract for the sale or transfer of securities." *Id*. ¶ 71.[14] Such a payment, says Mr. Wade, is "definitionally not a dividend." Wade Dep. 128:21-129:11; *see also id.* 172:19-173:12. Mr. Wade's theory appears to be that a

---

Dep. 130:23-134:6, 135:10-137:13. But Mr. Wade was quick to add that this definition of ownership was not "actually relevant" to any of his opinions. *See id.* 136:6-137:13.

[12] SKAT itself has been far more clear on the question of share ownership: According to SKAT, as a matter of Danish tax law, a share is "acquired or disposed of at the time when a final and binding agreement exists on the acquisition or disposal." *See* Dillman Decl., Ex. 6 (Claimant's Further Particulars Regarding the Validity of WHT Refund Applications ¶ 15.3). At his deposition, however, Mr. Wade took issue with this view of ownership, adding that he was not offering any opinion on the question of share ownership for Danish tax purposes. Wade Dep. 96:16-99:2, 126:6-127:10, 193:18-195:3. Were Mr. Wade to adopt SKAT's position, he would have to acknowledge the possibility that in Denmark, as in the United States, the obligation to pay tax is determined as of the trade date, not the settlement date. *See West v. Comm'r of Internal Revenue*, No. 2674-06L, 2010 WL 4780323, at *9 (U.S. Tax. Ct. Nov. 16, 2010) (referring to the "Internal Revenue Service's use of the trade date, rather than the settlement date, as the date of a stock sale for Federal income tax purposes").

[13] *See also* Wade Report ¶¶ 69 ("It is well understood in equity finance markets that a real dividend is different from a dividend compensation payment."), 98 ("[T]he payment . . . would still have simply been a dividend compensation payment and not the real dividend."), 116 ("[T]he payment . . . would have been a dividend compensation payment and not the real dividend."), 144 ("[T]he Tax Voucher was issued for a dividend compensation payment and not a real dividend."), 166(b) (The "net dividend compensation payment" is not a "real dividend.").

[14] *See also* Wade Dep. 127:11-128:2 (A "dividend compensation payment" is a "contractual payment that arises under . . . a contract for the transfer of securities.").

"real" dividend payment cannot arise under a contract, and therefore that a "dividend compensation payment," defined as a "contractual payment," can never be a "real" dividend.[15] None of this is obvious, however, or even coherent, and it breaks down entirely when applied to real-world situations.[16]

Mr. Wade acknowledges, for example, that there are instances where the buyer of a share will not be listed as the registered shareholder as of the record date. Wade Report ¶ 80; Wade Reply ¶ 93(2). In some such instances, the seller of the share may receive a dividend from the share issuer (either directly or through a chain of custodians or subcustodians), even though the underlying share has in fact already been sold to another. Wade Reply ¶ 93(2). In that situation, the buyer is said to have a "market claim," and the "seller must pass on the dividend." Wade Report ¶¶ 31, 83; Wade Reply ¶ 93(2).[17]

Is the holder of such a "market claim" entitled to a "real" dividend, in Mr. Wade's view, or a "dividend compensation payment," or something else entirely? It is a critical question, for Mr. Wade opines that a "market claim" arose in connection with each of the transactions

---

[15] *See also* Wade Rebuttal ¶¶ 153 n.274, 153 n.277 (a "contractual payment of an amount representative of the dividend" is "very different from the real dividend"), 210 ("[T]he payments received were not real dividends, but instead were contractual payments.").

[16] A dividend recipient's entitlement to receive a dividend through a chain of custodians and subcustodians is presumably a *contractual* entitlement, and yet Mr. Wade never explains why a dividend payment made to such a recipient, pursuant to a contractual custodial arrangement, is in his view a "real" dividend rather than a "dividend compensation payment."

[17] *See* European Central Bank T2S Corporate Actions Standards, Frequently Asked Questions ("European Central Bank T2S FAQ"), Questions 1.1, 1.3, 1.5, 1.22 (March 8, 2018), *available at* https://www.ecb.europa.eu/paym/target/t2s/governance/pdf/casg/ecb.targetseccasg180308_T2SCAStandardsFAQsUpdatedMarch2018.en.pdf; Corporate Action Joint Working Group, Market Standards for Corporate Actions Processing at 41 (2012), *available at* https://www.ebf.eu/wp-content/uploads/2017/07/CAJWG-Standards-revised-version-2012-final-clean-_-priorities-marked.pdf ("Market Claims should be created . . . [f]rom the seller to the buyer, when trade date is before Ex Date and there is a Pending Transaction at close of business of Record Date . . . .").

considered in his report. Wade Report ¶ 31.[18] But it is a question to which Mr. Wade offers no

clear answer. In his opening report, Mr. Wade stated that the "European markets did not operate

in a way that market claims and real dividends were interchangeable," suggesting that, for Mr.

Wade, a "market claim" is not a "real" dividend. *See* Wade Report ¶¶ 158-59. But in his reply

report, Mr. Wade appears to take a different view, acknowledging that where a buyer is

"contractually entitled to receive" a dividend pursuant to a "purchase contract," and where that

dividend is nevertheless paid to the seller (because the seller is "still shown as the owner on the

shareholder register"), then the seller must "pass on the dividend," presumably by paying the

dividend amount to the buyer. Wade Reply ¶ 93(2).[19] At deposition, Mr. Wade equivocated

further, testifying that a "market claim" may be a "dividend compensation payment" or it may

not, depending on the "facts and circumstances of the position." Wade Dep. 190:1-21.[20] Such

resolutely noncommittal testimony leaves the factfinder with no principled basis upon which

even to begin to evaluate Mr. Wade's opinion.

---

[18] *See also* Wade Report ¶ 213 (suggesting that ED&F prepared tax vouchers "solely on the basis of a Market Claim"). At deposition, Mr. Wade said something else entirely, appearing to suggest that *none* of the transactions considered in his report involved a "market claim": Asked whether a market claim would arise with respect to a transaction with a trade date prior to the ex date and an intended settlement date after the record date—which was, on Mr. Wade's own account, the case for every "Cum-Ex" transaction he analyzed, Wade Report ¶ 79—he responded that it would not. *See* Wade Dep. 191:12-25. Not only is this testimony inconsistent with Mr. Wade's reports, it is inconsistent with market practice. *See* European Central Bank T2S FAQ, Questions 1.3, 1.5, 1.22 ("Since settlement cannot take place on or before record date, a market claim will be raised, transferring the proceeds from the seller to the buyer.").

[19] Mr. Wade's acknowledgement that the seller "must pass on the dividend," Wade Reply ¶ 93(2), is not easily reconciled with Mr. Wade's testimony at deposition, where he appeared to maintain that a purchaser who does not "own the shares on the record date" can never receive a "real" dividend. Wade Dep. 171:12-22.

[20] Mr. Wade cannot seem to decide whether the dividend payments at issue in this litigation are "market claims" or not. In his opening report, Mr. Wade wrote that market claims "arose in all the ED&F Man . . . Appendix C Cum-Ex Trades," and he added that such market claims "involved purported dividend compensation payments." Wade Report ¶ 71. But in his reply report, Mr. Wade wrote that the payment received by the pension plans was "not a real dividend or *even a market claim*," and that it was instead a "dividend compensation payment," Wade Reply ¶ 94 (emphasis added), suggesting that (contrary to his opening report) no "market claims" arose with respect to the trades at issue and, moreover, that a "market claim" is incompatible with a "dividend compensation payment."

Taking another example, Mr. Wade writes that where the purchase of a share occurs *before* the ex-dividend date, but where the settlement of that purchase occurs *after* the record date, then any dividend payment received by the purchaser cannot be a "real" dividend.  Wade Report ¶¶ 79-81, 93.  Indeed, this is the bedrock of his opinion.  But Mr. Wade does not explain why this should be so, and at deposition he was unable to provide any definite answers.  Asked directly whether settlement must occur by the record date in order for the buyer of a share to be entitled to a dividend, Mr. Wade responded: "It depends."  Wade Dep. 149:25-150:6.  Depends on what?  "All the facts and circumstances."  Wade Dep. 150:7-12.  Here again, Mr. Wade's equivocal testimony on a concept central to his analysis leaves the fact-finder with nothing to go on but Mr. Wade's own conclusory say-so.

*3.  What is a "Cum-Ex" transaction according to Mr. Wade?*

Mr. Wade's definition of a "Cum-Ex" transaction is also a moving target.  In his opening report, Mr. Wade defines a "Cum-Ex transaction" as one where the terms are agreed upon prior to the ex-dividend date, and where settlement is not scheduled to occur until after the record date.  Wade Report ¶ 79.  Nothing in this definition rules out the possibility that dividend-bearing shares will be delivered upon settlement; to the contrary, as Mr. Wade himself notes, the timing and pricing of a "Cum-Ex transaction" will "typically indicate that the buyer of the securities *will receive the dividend*."  *See id*. ¶ 25 (emphasis added).[21]

In his rebuttal report, however, Mr. Wade shifts the meaning of this key term, maintaining that a "Cum-Ex" transaction is one which, "*by definition*," involves the purchase of

---

[21] Mr. Wade resisted this language at deposition, maintaining that it was inconsistent with his view that a "cum ex transaction" is an "arrangement to deliver ex-dividend shares . . . ."  Wade Dep. 151:10-154:22.  Upon being reminded that the language came from his own report, Mr. Wade insisted that there was no inconsistency, *id*. 154:23-156:3 ("I think that's entirely consistent with what I said a few minutes ago."), but subsequently conceded that it was possible for a "cum ex" transaction to be undertaken "out of a long position."  *See id*. 162:7-163:9.

"Ex-Dividend shares" (by which Mr. Wade presumably means shares which do *not* carry a dividend entitlement).  *See* Wade Rebuttal ¶ 153 n.276 (emphasis added); *see also id.* ¶ 141; Wade Dep. 154:9-22 ("[T]he very nature of a cum ex transaction is that what the seller is agreeing to do is to deliver ex-dividend shares, using the definition of cum ex in my report.").[22] By this maneuver, Mr. Wade seeks to smuggle his desired conclusion into the very definition of a "Cum-Ex" transaction:  Having identified the relevant trades as "Cum-Ex" transactions for purposes of his first report, Mr. Wade now shifts the definition in a way that categorically excludes "real" dividends.  This is not expert analysis; it is sleight-of-hand.

In his reply report, Mr. Wade recasts his opinion yet again, claiming that it is his position—and has been all along—that a purchaser of "Cum-Ex *shares*" is "not entitled to receive the real dividend."  Wade Reply ¶ 95 (emphasis added).  The phrase "Cum-Ex shares" does not occur at all in Mr. Wade's opening report, and it is undefined in Mr. Wade's rebuttal and reply reports.  If what Mr. Wade means by a "Cum-Ex share" is a share that carries no dividend entitlement, then Mr. Wade's opinion—that a "purchaser of Cum-Ex shares is not entitled to receive the real dividend"—collapses into empty tautology, of no use to the fact-finder.[23]

---

[22] *See also* Wade Dep. 64:24-65:11 ("[T]he nature of the way the cum ex transactions were structured is that even if there had been shares, it would still not have been the receipt of the dividend."), 94:9-95:6 ("It is clear to me that the nature of those transactions were that they were – they did not deliver dividends to the pension plans."), 151:23-152:16 ("[T]he whole point of a cum ex transaction is that a – the seller is not selling the real dividend because they don't have it."), 154:9-22 ("[T]he very nature of a cum ex transaction is that what the seller is agreeing to do is to deliver ex-dividend shares, using the definition of cum ex in my report."), 156:25-157:25 ("[T]he very nature and essence of the design of a cum ex transaction is that it is designed to deliver ex-dividend shares . . . . [T]hat's the fundamental nature of a cum ex transaction.").

[23] At deposition, Mr. Wade appeared to embrace the tautological nature of his opinion, explaining that, "using the definition of cum ex in [his] report," a cum ex transaction is an "arrangement to deliver ex-dividend shares, which, by that point, will not have a right to a dividend attached to them anymore." Wade Dep. 154:9-22, 158:1-14 (agreeing that, based on his definition of "cum ex," all "cum ex" transactions necessarily involve shares to which there is no dividend entitlement), 158:15-159:2 ("[I]f you refer to a cum ex transaction, what people understand that

**B.  Opinion 2:  The Only Reason to Participate in the Appendix C Cum-Ex Trades Was To Generate A Fabricated Tax Reclaim**

Mr. Wade's second opinion is improper on its face, because it purports to explain the *motivation* behind the so-called "Appendix C Cum-Ex Trades."  Specifically, Mr. Wade opines that these transactions could have been undertaken with only one object in mind:  to "generate a fabricated tax reclaim."  Wade Report ¶ 15(b).  Because such "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony," Mr. Wade's second opinion should be excluded in full.  *See Rezulin*, 309 F. Supp. 2d at 547; *see also R.F.M.A.S.*, 748 F. Supp. 2d at 268 ("Determining what motivated a particular person or entity is generally not an appropriate subject matter for expert testimony."); *Lippe*, 288 B.R. at 687 ("Expert testimony is not relevant if the expert is offering a personal evaluation of . . . the motivations of the parties.").

1.  *Mr. Wade's speculation about a network of "deliberate coordination" is without basis.*

Mr. Wade's second opinion begins with a chronological recital of communications and documents produced in this litigation, interlarded with editorial commentary regarding what the communicating parties meant, or what they intended, or what they understood to be true.  *See* Wade Report ¶¶ 101-38.[24]  Throughout this section, Mr. Wade opines on the mental states of parties and non-parties alike, imputing knowledge to various "participants in the transaction,"

---

to mean is a transaction where you're going to execute a trade before the trade date, *but only deliver ex-dividend shares*." (emphasis added)).

[24] *See* Wade Report ¶¶ 129 ("[A]ll parties shared an understanding of the combined client and proprietary positions . . . ."); 130 (opining on what the "point of discussion" in an email chain "appears to be"), 131 (providing Mr. Wade's "understand[ing]" of the meaning of an email chain), 133 (opining that a trading position was "created to present" an "illusion").

including various unspecified "agents," "Investment Managers," and inter-dealer brokers.[25]  At

one point, Mr. Wade goes so far as to challenge sworn testimony.[26]  None of this is permissible

expert opinion.

From this selection of communications, Mr. Wade proceeds to extrapolate a coordinated

network of collaborating entities, extending beyond the pension plans and their "Investment

Managers" to an unspecified number of hypothetical, "ostensibly independent" inter-dealer

brokers.[27]  According to Mr. Wade, coordination between all of these various entities—some

named, some unnamed—was "crucial" and "required careful preparation."  Wade Report

¶ 155.[28]  Having made this sweeping pronouncement, Mr. Wade promises to "detail [his] basis"

for having postulated a network of coordinating parties, *see id.* ¶ 171, but all he delivers is a

---

[25] *See* Wade Report ¶¶ 21 (introducing the term "Investment Managers"), 155 (speculating as to what hypothetical inter-dealer brokers "would either have known, been informed, or have easily discovered"), 156 (opining that unidentified inter-dealer brokers were "confident that they did not need to find any shares to deliver"), 157 ("This fact would have been understood by ED&F Man's Equity Finance team and all other participants in the transaction."), 158 (inferring that "ED&F Man was aware of this fact."), 161 (opining on what "[p]articipants of the Cum-Ex transactions expect one to believe"), 166 (opining on the motivation behind the structuring of "Cum-Ex transactions"), 167 (opining on the incentives of the "largest investment banks"), 169(a) (finding it "evident" that "all parties understood the difference between Cum-Cum and Cum-Ex transactions."), 170 (opining that "ED&F Man's personnel and the E&F Man [sic] Pension Plans' agents, including but not limited to Investment Managers such as Acer, would have been well aware of this market view."), 176 (inferring agreement between "Acer and ED&F Man"), 177 (positing how the "participants viewed the transactions"), 183 (inferring that "MPT Dubai and ED&F Man" had "complete confidence that the transactions would reverse and offset" and opining on what was or was not "being contemplated by MPT Dubai").

[26] *See* Wade Report ¶ 134 (insisting that, notwithstanding Stacey Kaminer's deposition testimony, it was "obvious" what Acer really "believed"); *see also* Wade Reply ¶ 50 n.52 (dismissing Stacey Kaminer's deposition testimony as "nonsensical").

[27] *See* Wade Report ¶¶ 15(b) ("Transactions conducted by ED&F Man through the ostensibly independent external third-party inter-dealer brokers . . . were simply camouflage."), 133 (The "absence of any evidence of a security margin . . . clearly indicates that ED&F Man and Acer coordinated and collaborated in these transactions"), 155 (inferring "coordinat[ion]" between "the Investment Managers and ED&F Man" and referring to the "coordination required between the IDBs"), 171 ("The Appendix C Cum-Ex Trades were entered into deliberately, in coordination . . . ."), 172 (opining that the "Investment Managers, ED&F Man Pension Plans and ED&F Man" had "effectively" entered into a "joint venture").

[28] Although Mr. Wade does not mention them by name, the inter-dealer brokers he is accusing of having played a role in the coordination of "fabricated" transactions appear to include such non-parties as ICAP and GFI Securities. *See* Decl. of Marc Weinstein, Ex. 130 at ED&F-00252019-20.

discussion of what he regards as the unduly low margin requirements imposed on the pension

plan defendants.  *See id*. ¶¶ 172-81.[29]  Mr. Wade's unsupported insinuations about the supposed

coordination between the pension plans, their "Investment Managers," ED&F, and various

unidentified inter-dealer brokers should be excluded as not only baseless but impermissibly

prejudicial innuendo.

> 2. *Mr. Wade's opinion regarding the "common characteristics of the non-Annex E*
> *transactions" is of no relevance.*

Mr. Wade devotes a sizeable portion of his report to a comparison of the Annex E and

non-Annex E transactions, which leads Mr. Wade to conclude that the structures of these trades

were in key respects "fundamentally the same."  *See* Wade Report ¶¶ 118-45.  This section of

Mr. Wade's report has no bearing on any issue of relevance to this litigation, for there is no

dispute that the Annex E and non-Annex E transactions were broadly similar in structure.  Nor,

for that matter, is there any dispute that the Annex E and non-Annex E transactions were

themselves similar in structure to the so-called "Cum-Cum" transactions that Mr. Wade himself

concedes yielded "real" dividends.  *Id*. ¶ 162.  Such similarities are hardly surprising, given that

all of the transactions involved trades in Danish securities executed by the same brokerage on

behalf of the same pension plan clients pursuant to the same dividend arbitrage strategy.  The

only relevant difference between the Annex E and non-Annex E transactions—as explained at

deposition by ED&F's corporate representative—is the fact that ED&F's counterparty with

respect to the Annex E transactions was discovered to have engaged in short-selling such that—

contrary to expectations—it failed to deliver dividend-bearing shares to ED&F's pension plan

---

[29] Mr. Wade suggests that at least some of the documentation he was asked to rely upon was not adequate to the task.  *See* Wade Report ¶ 177 ("I have only been provided with snapshots of the position of the account on a particular trading date for each dividend event and so it is not straightforward to determine exactly how these arrangements worked.").

clients.  Dillman Decl., Ex. 5 (Transcript of Deposition of Andrew Wall 55:10-57:12).  There is
no evidence that the shares delivered in connection with the non-Annex E transactions did not
carry a right to a dividend, and Mr. Wade provides no grounds for supposing that the shares were
anything other than dividend-bearing.  *This* is the critical distinction between the Annex E and
non-Annex E trades, and it is one that Mr. Wade's comparative analysis does not even address.

###### 3.  Mr. Wade's pricing analysis is flawed and unreliable

As discussed above, it is Mr. Wade's core opinion that "Cum-Ex transactions," by their
very nature, could never have resulted in the receipt of "real" dividends by ED&F's pension plan
clients.  In an apparent retreat from that position, however, Mr. Wade turns to an analysis of the
"implied pricing" of the transactions, which he contends may shed light on whether the
dividends received were in fact "real."  Wade Report ¶¶ 15(b), 160-66.[30]  Mr. Wade does not
appear to appreciate the incongruity:  If "Cum-Ex transactions" are *inherently* incapable of
conveying "real" dividends, as Mr. Wade has argued, then any pricing analysis would be
superfluous, for there could be no "real" dividends at any price.  Mr. Wade's foray into pricing
analysis is effectively a concession that the "Cum-Ex transactions" could convey "real"
dividends, after all.

In any event, Mr. Wade's pricing analysis is thoroughly flawed.  Mr. Wade premises his
analysis on the proposition that the "market level" for dividend-bearing transactions in Denmark
(the so-called "Cum-Cum" transactions) was set by the "overall supply and demand in the
market" at "around 90% of the real dividend."  Wade Report ¶¶ 163-65, 168; Wade Reply ¶ 49.

---

[30] In his report, Mr. Wade was tentative about his findings:  By his own account, the pricing analysis only "strongly
suggest[ed]" that no "real" dividends were received.  Wade Report ¶¶ 15(b), 160-66.  At deposition, however, Mr.
Wade appeared more certain. *See* Wade Dep. 91:4-92:7 ("[T]he pricing clearly indicated that the seller did not
receive a dividend."), 145:22-146:24 ("[T]he pricing clearly indicates that the cum ex sellers were not transferring a
real dividend.").

However, Mr. Wade did not in fact undertake anything like an analysis of the "overall supply and demand in the market."  Instead, he derived his "market level" from a sample of just fifty-three "Cum-Cum" trades, all of them executed by ED&F through a limited number of market counterparties on behalf of various pension plans that have been named as defendants in this multidistrict litigation.  Wade Report ¶¶ 163-64.  Mr. Wade provides no basis whatsoever for supposing that this subset of trades constitutes a representative sample of trading during the relevant time period, or that the size of his sample is large enough to yield statistically significant findings.  *See Amorgianos*, 303 F.3d at 267 (expert opinion must be excluded if based on data "inadequate to support the conclusions reached"); *Moncada*, 2014 WL 2945793, at *3-4 (expert conclusions "highly suspect" because based on "incomplete data set").[31]  To the contrary, given Mr. Wade's own stated position that "market price" is "determined by the aggregate supply and demand for the asset across *all market participants*," Wade Reply ¶ 50 n.52 (emphasis added), it would appear that such a small subset of trades, executed by a single brokerage on behalf of a handful of pension plan clients with a limited number of counterparties, manifestly could *not* reflect the "market level."  Indeed, Mr. Wade conceded at deposition that the 90% figure was in fact "not a hard and fast number" at all and could "vary across market" and even "across a particular dividend event."  *See* Wade Dep. 204:10-205:2.[32]

---

[31] At deposition, Mr. Wade suggested for the first time that the "approximately 90%" pricing he had computed (on the basis of 53 trades in Danish shares executed by ED&F) was also consistent with his recollection, from his time at Barclays, that the "market level" in a "number of markets," including Denmark, was "somewhere around 90 percent" during that time period.  Wade Dep. 203:11-205:2.  Mr. Wade added (without explanation) that in "many cases" European and U.S. financial institutions "may well have been able," through unspecified "other mechanisms involving foreign tax credit relief," to obtain 100% of dividend value.  *Id.* 205:10-206:13.

[32] *See also* Wade Reply ¶ 50 n.51 ("Supply and demand can vary for a range of reasons.").  In his reply report, Mr. Wade further suggested that "high dividend yield shares" might be in higher demand "because there was more opportunity for profit."  *See id.*  But Mr. Wade makes no effort to take this consideration into account in his pricing analysis.  *See Lippe*, 288 B.R. at 686 ("Expert testimony is inadmissible if it makes no effort to account for major variables . . . .").

Mr. Wade nevertheless rests his pricing analysis on this figure of "approximately 90%," opining that he "can see no reason why a person who was due to receive the real dividend on shares they owned or controlled would be prepared to offer them for use in a transaction without being compensated" at the 90% "market level."  Wade Report ¶ 168.  For Mr. Wade, in other words, pricing below the 90% "market level" threshold presumptively suggests that no "real" dividends were involved in the transaction.  *See* Wade Dep. 202:13-203:10 ("It would be irrational for them to sell at any level below 90 if, on my assumption, the prevailing market level is 90.").  And according to Mr. Wade's further computations (based on a separate sample of eighty-six trades), the "average market level" for ED&F's so-called "Cum-Ex transactions" was indeed below 90%, at "approximately 80%."  Wade Report ¶ 163.  According to Mr. Wade, this "approximately 80%" figure is "significantly lower" than the "market level" of "approximately 90%" and thus "strongly suggests" the possibility that no real dividends were received.  *See id.* ¶¶ 15(b), 160-66; *see also* Wade Reply ¶¶ 8, 20, 34, 39.

The analysis is unreliable at every step.  First, as noted above, the key benchmark in Mr. Wade's analysis—the 90% "market level" for trading in Denmark during the relevant period—is derived from a limited subset of trades that Mr. Wade does not even attempt to demonstrate is sufficiently representative or sufficiently large to support statistically significant conclusions. *See Raskin*, 125 F.3d at 67 (expert report lacked probative value where, among other things, its analysis rested on "unrepresentative sample") *Apple v. Atlantic Yards Dev. Co., LLC*, 11-CV-5550 (CBA)(SMG), 2015 WL 11182422, at *8-10 (E.D.N.Y. Mar. 31, 2015) ("[A]dmissibility turns on whether the expert shows the results derived from that small sample are statistically

significant.").[33]  Second, Mr. Wade provides no reason to suppose that a difference of roughly

10% of the gross value of a dividend—the purported difference between the "market levels" for

the "Cum-Cum" and "Cum-Ex" trades, respectively—represents a statistically significant

difference, even assuming that the underlying computations are not themselves methodologically

suspect.[34]  Third, Mr. Wade provides no justification for his apparent assumption that pricing

data with respect to different Danish securities—bought and sold at different times, by different

parties—can be meaningfully blended together to arrive at a single "market level" applicable

across all Danish securities alike.  Fourth, Mr. Wade's ability to divine an "average market level"

on the basis of his limited sample is cast into further doubt by Mr. Wade's own position that

Denmark was an "illiquid market" during the relevant time period.  Wade Report ¶ 68(i); s*ee*

*also id.* ¶¶ 103(iii) (referring to "relatively illiquid Danish shares"), 143, 143 n.108 (emphasizing

the purported illiquidity of Danish shares and the relatively small size of the "Danish Stock

Market").[35]  Fifth, the primary conclusion that Mr. Wade seeks to draw—that dividend-bearing

Danish shares would not have been offered at any price under the "approximately 90%" market

level, Wade Report ¶ 168—is belied by the very data on which he relies:  Over half of the so-

called "Cum-Cum" trades—which, by Mr. Wade's own account, conveyed a "real" dividend—

---

[33] Mr. Wade further notes that he excluded certain dividend events concerning Chr. Hansen November 2013 from his sample as "not reliable."  *See* Wade Report ¶ 163 n.117, App'x C n.1.  Although Mr. Wade identifies "trades 7-14" from Appendix C as the excluded trades, *see* Wade Report, App'x C n.1, it appears that trades 13 and 14 were in fact not excluded from his analysis.  *See id.*

[34] The actual averages computed by Mr. Wade are 79.8% and 89.5%, respectively.  *See* Wade Report ¶ 163, Wade Reply ¶ 49.  Mr. Wade characterizes this as a "very large margin," *see* Wade Reply ¶ 49, but he does not attempt to quantify its statistical significance, if any.

[35] Mr. Wade does not even address the implications of this supposed illiquidity on his purported analysis of "market" pricing.  *See, e.g., First Nat'l Bank of Chicago v. Comptroller of Currency of U.S.*, 956 F.2d 1360, 1368 (7th Cir. 1992) (In "illiquid markets . . . transaction prices will not always reflect market values . . . .").

were priced *below* the 90% mark.[36]  In fact, a full half of the so-called "Cum-Ex" trades—which Mr. Wade supposes did not convey a "real" dividend—were priced at rates *higher* than the lowest-priced "Cum-Cum" trade in Mr. Wade's sample.[37]

### C.  Opinion 3:  ED&F Did Not Have Custody of Sufficient Shares

In his third opinion, Mr. Wade argues that ED&F did not have custody of sufficient shares to support the tax vouchers issued.  Mr. Wade starts with a review of selected "BNP Paribas records" regarding two "client omnibus accounts" purportedly maintained by ED&F.  Wade Report ¶¶ 185, 186 n.132, 187.  According to Mr. Wade, his review of these records establishes that the "number of actual shares settled" was "not connected to the transaction amounts." *Id*. ¶ 15(c).

The deficiencies in Mr. Wade's analysis are obvious.  Indeed, Mr. Wade *concedes* that he does not know the purpose of at least one of the two accounts he set out to analyze.  *See id*. ¶¶ 186 n.132 ("It is not clear what this account was used for."), 195 ("It is not clear to me what the purpose of the two different accounts is . . . .").  Mr. Wade further concedes that he does not understand the meaning of all the entries in the accounts, *see id*. ¶ 195 ("It is not clear to

---

[36] According to Mr. Wade's computations, 28 of the 53 "Cum-Cum" trades had an "'All-In' Dividend Sourcing Cost" at or under 89.1%.  *See* Wade Report, App'x F.  This is not unexpected, given that Mr. Wade's "approximately 90%" figure is merely an average, but it makes clear that the "approximately 90%" figure cannot be the bright-line benchmark that Mr. Wade suggests it is.  Mr. Wade also appears to suggest an alternative pricing benchmark of 85%, on the theory that the "largest investment banks" can "generally earn 85% of the gross real dividend on any shares they own."  Wade Report ¶ 167; Wade Reply ¶ 34 (suggesting that inter-dealer brokers, too, "could have obtained 85% of the gross dividend simply by holding the shares"). In any event, at least one of the "Cum-Cum" trades—which, again, Mr. Wade himself acknowledges conveyed a "real" dividend—was priced *below* the 85% mark.

[37] According to Mr. Wade's computations, the lowest "'All-In' Dividend Sourcing Cost" for the 53 "Cum-Cum" trades was 79.3%, and 43 of the 86 "Cum-Ex" trades had an "'All-In' Dividend Sourcing Cost" higher than 79.3%, while an additional 18 of the of the 86 "Cum-Ex" trades had an "'All-In' Dividend Sourcing Cost" equal to 79.3%.  All told, over two-thirds of the "Cum-Ex" trades were priced at rates greater than or equal to the lowest-priced "Cum-Cum" trade in Mr. Wade's sample.  If in Mr. Wade's view there is nothing presumptively suspect about 79.3% pricing in association with a "Cum-Cum" trade, then it is unclear why pricing greater than or equal to 79.3% should be presumptively suspect in association with a "Cum-Ex" trade.

me . . .why there are so many entries . . . ."), and that it was "not possible" for him to "directly link any given settlement movement to a specific transaction due to the lack of details about the exact coding used by BNP Paribas." *Id.* ¶¶ 186, 196.  Reliable expert opinion cannot stand on such shaky foundations, *see Molina*, 199 F. Supp. 2d at 73 n.9 ("Experts "must base their opinions on a reliable foundation."), and Mr. Wade himself appears to recognize as much.  At one point in his discussion, he posits a "possible" settlement scenario about which he acknowledges he "cannot be definitive."  Wade Report ¶ 201.  At another, Mr. Wade acknowledges that he is resorting to "speculation."  *Id.* ¶ 196.  Mr. Wade's opinion should be excluded as patently unreliable.[38]

Mr. Wade next opines that the shareholdings of ED&F's pension plan clients were "wholly inconsistent" with an "average daily trading volume" that he has calculated over what appears to be a period of six weeks.  Wade Report ¶¶ 15(c), 184; *see also* Wade Reply ¶ 213 ("My opinion is that an implausible ratio of holdings to ADTV is evidence that the purported holdings were not real.").  Mr. Wade arrives at this conclusion by comparing the number of shares "claimed to be owned by ED&F Clients" with the average daily trading volume ("ADTV") for the shares.  *See* Wade Report ¶¶ 206-07, App'x D.  Mr. Wade chose to calculate average daily trading volume "over the 15 trading days preceding each Record Date and 15 trading days following it," Wade Report, Figure 9, but he offers no reasoned basis for selecting

---

[38] Mr. Wade explains at one point that he was obliged to make assumptions about the meaning of certain data, because the "quality of the pdfs is very poor."  Wade Report ¶ 186 n.131.  Mr. Wade does not indicate whether he requested a better copy of the document, nor does he explain why, if the data was indeed illegible, he nevertheless felt justified in relying on the document for his analysis.

this interval, particularly given that the "Cum-Ex" trades he analyzed were generally executed in the one or two days immediately prior to the ex-dividend date.[39]

According to Mr. Wade's computations, ED&F's pension plan clients "claimed" to be holding shares in amounts that varied dramatically, ranging from 24% to 6828% of ADTV.  *See* Wade Report, Figure 9.  Mr. Wade appears to believe that any figure above 200% of ADTV is presumptively suspect:  According to Mr. Wade, a trading limit of "around 200% of ADTV" would have been "typical for an equity finance trading desk," *see* Wade Report ¶ 205, and "200% was a limit used by many risk management teams as threshold over which extra risk mitigations or trading stops would be applied."  *See* Wade Report, App'x D.  But Mr. Wade provides no support for the 200% figure beyond his own professed experience—not even a single citation to a single risk management policy of a single market participant—and he does not even suggest how much variation from the 200% benchmark may have been "typical" among the unidentified "risk management teams" he has in mind.[40]  Indeed, far from defending the reliability of the 200% figure, Mr. Wade concedes that the number is "inevitably arbitrary." Wade Reply ¶ 209 (explaining that he has "define[d] a risk limit based on an arbitrary percentage of the exchange volume calculated ADTV").  Nor does Mr. Wade address whether ED&F employed any of the "extra risk mitigations" that he suggests would have rendered trading above

---

[39] Assuming five trading days per week, Mr. Wade's average was computed over a period of approximately six weeks.  In addition, while it appears that Mr. Wade included the record date itself in his computations, his description of his methodology suggests otherwise.  *See* Wade Report, Figure 9.

[40] According to Mr. Wade, "ED&F Man's Equity Finance Team" was subject to a limit of "20% of ADTV," based on the average daily trading value "calculated over a 20 Day period."  Wade Report ¶ 204.  This limit is markedly different from the 200% ADTV limit that Mr. Wade claims is "typical," *id.* ¶ 205, but Mr. Wade does not comment on the discrepancy except to say that it was "not clear" to him "whether or how this limit was applied in practice . . . ."  *Id.* ¶ 204.

200% ADTV acceptable in the eyes of "many risk management teams."  *See* Wade Report,

App'x D.  Mr. Wade's ADTV analysis should be excluded as both unsupported and unreliable.

Finally, Mr. Wade opines that had the "reported amounts actually been transacted," they

would have "materially moved the market."  Wade Report ¶¶ 208-09.  Mr. Wade makes no effort

to quantify or even describe the nature of the "market impact" to which he alludes, nor does he

suggest that he looked for any signs of such impact— "serious" or otherwise—on the Danish

securities market.  *See id*. ¶ 209.  Mr. Wade in fact does no analysis whatsoever.  Instead, he

merely states that, having "seen no evidence" that a potential market impact was ever

"considered or discussed by the participants," he feels confirmed in his view that "these were not

real trading positions."  *Id*. ¶ 208.

### D.  Opinion 4:  ED&F's Tax Voucher Process Was Highly Unusual And Inappropriate

In his fourth opinion, Mr. Wade purports to take issue with the "highly unusual and

inappropriate process" by which ED&F created tax vouchers.  Wade Report ¶¶ 15(d), 210.  But

Mr. Wade has no apparent knowledge of—and certainly provides no details about—ED&F's

internal processes for preparing tax vouchers.  Rather, Mr. Wade's sole objection appears to rest

on his belief that the tax vouchers were prepared on the basis of trades that "remained unsettled

by the Ex-Record Date."  *Id*. ¶ 212.  What is the "Ex-Record Date"?  We are left to guess, as the

term is undefined and occurs nowhere else in Mr. Wade's report.  Mr. Wade may have meant to

refer to the *record* date, rather than the "Ex-Record Date," but if so, his objection to the tax

vouchers is just another way of restating his opinion that so-called "Cum-Ex" trades do not

deliver a "real" dividend, and thus cannot support a tax voucher.

Mr. Wade also purports to show that ED&F, through its tax vouchers, "claimed"

ownership of more shares than were actually held by ED&F at a specific BNP Paribas account,

account number 778523F.  *See* Wade Report ¶¶ 186 n.132, 214-15.  Mr. Wade does not explain

why he focuses exclusively on this single account, particularly in light of his own contention,

stated elsewhere in his reports, that ED&F maintained at least one other "client omnibus

account" at BNP Paribas.  *See id*. ¶ 186 n.132 (conceding that he did not know what this other

BNP Paribas account "was used for"); Wade Rebuttal ¶ 180 n.301 (characterizing BNP Paribas

account number 778523F as the "main account" but noting that another BNP Paribas account—

"BNP Paribas Custody Account 778045F"—was also used to settle trades).[41]  Even assuming

that account number 778523F is the only relevant account, Mr. Wade's methodology is

fundamentally unsound:  Mr. Wade appears to have looked at share quantities in the account *as

of the record date*, *see* Wade Report, Figure 10, when on Mr. Wade's own view, the trades at

issue would not have settled until *after* the record date and, thus, the relevant shares would not

have been received into the account until *after* the record date.  In effect, Mr. Wade purports to

draw conclusions about an empty mailbox, even though he knows the mail carrier has not yet

arrived.

     The remainder of Mr. Wade's fourth opinion is a litany of impermissible expert

testimony.  Mr. Wade draws improper legal conclusions about foreign regulatory obligations, *see

id*. ¶¶ 15(d), 221-22 (opining that ED&F breached its "U.K. regulatory obligations") and follows

this up with musings about "fiduciary and regulatory" duties of care.  *See id*. ¶ 221 ("My

expectation is that all of the ED&F Man Pension Plan advisers would have been under at least

---

[41] Mr. Wade's only cited basis for focusing on BNP Paribas account number 778523F is a *draft* document prepared by ED&F in connection with the English proceeding.  *See* Wade Report ¶ 215 n.157.

some basic form of fiduciary and regulatory duty of care. . . .").[42]  Mr. Wade opines repeatedly about state of mind, offering his thoughts on the views of a foreign regulator, Wade Report ¶¶ 222-23, and on what "all participants" would have known about the role of tax vouchers in the tax reclaim process.  *Id*. ¶ 15(d), 220.  Mr. Wade ventures to pass judgment on tax opinions prepared by reputable accounting firms, dismissing them as "marketing" exercises of the sort used by "promoters of schemes."  *See id*. ¶ 224.[43]  And Mr. Wade weighs in on one of the ultimate questions in this litigation, pronouncing the tax vouchers to be "fabricated" and "false," and misquoting their text for good measure.  *See id*. ¶ 220.  Mr. Wade's fourth opinion should be excluded in full.[44]

## CONCLUSION

For the foregoing reasons, the ED&F Bellwether Defendants and ED&F respectfully request that the Court grant this motion *in limine* to exclude the proposed expert reports, opinions and testimony of Graham Wade in their entirety.

Dated: June 6, 2022                  Respectfully submitted,

                                     */s/ John C. Blessington*
                                     John C. Blessington (*pro hac vice*)
                                     Brandon R. Dillman (*pro hac vice*)

---

[42] *See also* Wade Report ¶ 221 ("As such, the transaction participants would have been under regulatory and legal duty to appropriately due diligence any transactions."), 222 ("I have seen no evidence that these FCA requirements were properly adhered to by the parties.").

[43] Mr. Wade's sole qualification for opining on these tax opinions apparently rests on his "experience in reading similar opinions."  Wade Report ¶ 224.  Mr. Wade confides that "many of the conclusions" in these tax opinions were "very surprising" to him but he does not specify which ones.  *See id*.  Mr. Wade adds that he would have "significantly challenged" the "conclusions in those opinions," but he does not say on what grounds or in what way. *See id*.

[44] Mr. Wade's opinion as to the falsity of the tax vouchers impermissibly intrudes on an "ultimate determination" that is exclusively within the province of the fact-finder, *see Nimely*, 414 F.3d 397-98, and would in any event be subject to exclusion under FRE 403.  *See Rezulin*, 309 F. Supp. 2d at 545.

Michael R. Creta (*pro hac vice*)
John L. Gavin (*pro hac vice*)
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Tel. (617) 261 3100
Fax: (617) 261 3175
john.blessington@klgates.com
brandon.dillman@klgates.com
michael.creta@klgates.com
john.gavin@klgates.com

*Attorneys for Bellwether Defendants American
Investment Group of New York, L.P. Pension
Plan, Riverside Associates Defined Benefit
Plan, Robert Crema, David Schulman, Stacey
Kaminer, and Acer Investment Group, LLC*


/s/ Neil S. Binder
Neil S. Binder
M. Tomas Murphy
Gregory C. Pruden
BINDER & SCHWARTZ, LLP
366 Madison Avenue, Sixth Floor
New York, NY 10017
Tel. (212) 510-7008
Fax: (212) 510-7299
nbinder@binderschwartz.com
tmurphy@binderschwartz.com
gpruden@binderschwartz.com

*Attorneys for Third-Party Defendant
ED&F Man Capital Markets, Ltd.*